# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:16-cv-03088- |
| | ) | ELR |
| STATE OF GEORGIA | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>UNITED STATES' OPPOSITION TO GEORGIA'S</u>
## <u>MOTION TO DISMISS OR FOR A STAY OF PROCEEDINGS</u>

## INTRODUCTION

The United States opposes the State of Georgia's ("Georgia") motion to dismiss or, in the alternative, for a stay of the United States' claim that the Georgia Network for Educational and Therapeutic Support ("GNETS") Program violates Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134 (1990) ("Title II"). First, Georgia challenges the United States' long-standing authority to bring an action under Title II. Second, Georgia denies, as a matter of law, that it "administers" GNETS within the meaning of the Title II regulation, 28 C.F.R. § 35.130, and argues that the United States' Complaint fails to adequately allege elements necessary to establish a violation of Title II's integration mandate. Third, Georgia asserts that its obligation to comply with the Individuals with Disabilities Education Act ("IDEA") supplants the ADA's prohibition against disability-based discrimination.

For the reasons explained below, each of Georgia's arguments lacks merit. This Court should deny Georgia's motion and allow this action to proceed to vindicate the rights of children and their families who are subject to discrimination.

## THE UNITED STATES' ALLEGATIONS

The United States alleges that Georgia violates Title II of the ADA by discriminating against public school students with behavior-related disabilities through its administration of a statewide system known as GNETS. Compl. ¶¶ 1, 23-33. Title II

1

prohibits discrimination in the provision of services by a public entity, such as Georgia, against individuals with disabilities. The Title II regulation requires a public entity to administer services in the most integrated setting appropriate to the needs of each individual. 28 C.F.R. § 35.130(d).

Georgia segregates thousands of students with behavior-related disabilities in GNETS, which is where Georgia provides those students with mental health and therapeutic educational services. *Id*. ¶¶ 5, 14, 29. Instead of delivering these services in a general education setting within a student's zoned school, Georgia spends over $72 million annually to provide such services primarily in segregated settings, *id*. ¶¶ 33-35, depriving students in GNETS of educational opportunities provided to their peers, *id*. ¶¶ 47-51. The United States seeks to remedy this ongoing discrimination and prevent future discrimination against students at risk of GNETS placement. *See id*. ¶¶ 52-61.

## ARGUMENT

## I.  THE ATTORNEY GENERAL MAY BRING SUIT UNDER TITLE II.

For nearly three decades, the Attorney General has investigated violations of Title II's prohibition against discrimination, achieving compliance through negotiations where possible and bringing enforcement actions when necessary. In doing so, the United States has obtained relief benefiting tens of thousands of individuals with disabilities to ensure access to and equality of opportunity in the core

public services provided by state and local government entities nationwide. Courts have long recognized the Attorney General's authority to obtain this relief.[1] Seeking to dismiss on the ground that the Attorney General "lacks standing to bring claims under Title II," Georgia relies on a single decision, *C.V. v. Dudek*, No. 12-60460, 2016 WL 5220059 (S.D. Fla. Sept. 20, 2016) ("*Dudek II*"). *See* Memorandum of Law in Support of Motion to Dismiss, or, in the Alternative, for Stay of Proceedings, ECF No. 9 ("Def. Mem.") at 1, 9-12. Since the ADA's enactment, no other court has ruled that the federal government lacks enforcement authority under Title II. Moreover, a prior judge in *Dudek* ruled the other way,[2] rejecting the challenge to the Attorney General's authority to enforce Title II. *A.R. ex rel. Root v. Dudek*, No. 12-60460, 31 F. Supp. 3d 1363, 1367 (S.D. Fla. 2014) ("*Dudek I*").

---

[1] *See, e.g.*, *United States v. City & Cty. of Denver*, 927 F. Supp. 1396, 1399-1400 (D. Colo. 1996) (finding the United States has authority to bring a Title II claim); *Smith v. City of Phila.*, 345 F. Supp. 2d 482, 489-90 (E.D. Pa. 2004) (dismissing private individual's Title II claim but retaining jurisdiction over United States' claim because United States "has 'a separate and independent basis for jurisdiction' under Title II of the ADA and Section 504 of the Rehabilitation Act"); *United States v. N. Ill. Special Recreation Ass'n*, No. 12 C 7613, 2013 WL 1499034, at *5 (N.D. Ill. Apr. 11, 2013) (denying motion to dismiss United States' Title II complaint alleging discrimination); *United States v. Virginia*, No. 3:12cv59-JAG, at 3-6 (E.D. Va. June 5, 2012), ECF No. 90 (holding that "the United States has the authority to initiate legal action to enforce Title II of the ADA"); *United States v. City of Balt.*, Civil Nos. JFM-09-1049 & JFM-09-1766, 2012 WL 662172, at *1 (D. Md. Feb. 29, 2012) (granting United States' summary judgment motion on Title II claim).

[2] After the 2014 elevation of Judge Robin S. Rosenbaum to the Eleventh Circuit, the case was transferred to Judge William J. Zloch who, *sua sponte*, reversed. *See C.V. v. Dudek*, No. 12-60460, 2016 WL 5220059, at *1 & n.3 (S.D. Fla. Sept. 20, 2016).

*Dudek II* is not controlling authority in this Court, and it is not persuasive. The text and history of Title II, including its relationship to key predecessor civil rights statutes (the Rehabilitation Act of 1973 and the Civil Rights Act of 1964), make clear that Congress gave the Attorney General enforcement authority over Title II.

A. Title II's Enforcement Provision Expressly Incorporates the Remedies Provided by the Rehabilitation Act of 1973 and Title VI of the Civil Rights Act of 1964.

Congress expressly adopted Title II's enforcement scheme from a long-standing, well-understood civil rights framework. Specifically, Title II incorporates the enforcement mechanism of the Rehabilitation Act of 1973, which prohibits discrimination by federally funded entities on the basis of disability. 29 U.S.C. §§ 794, 794a. The Rehabilitation Act, in turn, incorporates the enforcement framework of Title VI of the Civil Rights Act of 1964, which prohibits discrimination by federally funded entities on the bases of race, color, or national origin. 42 U.S.C. §§ 2000d, 2000d-1.

Analysis of Title II's enforcement structure begins with Title VI and its enforcement provision, 42 U.S.C. § 2000d-1, which provides that the federal government can achieve compliance either: (1) through administrative termination of federal funds, *or* (2) "by any other means authorized by law." The termination of federal funding is "[t]he ultimate sanction[] under title VI," as it could adversely impact the program's beneficiaries. *See* 28 C.F.R. § 50.3(c)(I)(A) (Title VI Enforcement Guidelines). Conversely, obtaining compliance through "any other

means" – such as by a court order – is a preferred method of achieving compliance. *See* 28 C.F.R. § 50.3(c)(I)(B)(1) (Title VI compliance "may often be obtained more promptly by appropriate court action" than funding termination). Thus, courts have consistently interpreted Title VI's "any other means" language as empowering the Attorney General to bring suit under that statute.[3]

Other courts have similarly construed statutes modeled on Title VI's enforcement provision.[4] The United States' Title VI enforcement authority has been taken as a given for decades, with courts instead preoccupied with whether private parties, *in addition to the United States*, had a cause of action and what remedies were available to them.[5] Regulations implementing Title VI likewise recognize that the Attorney

[3] *See, e.g.*, *Nat'l Black Police Ass'n, Inc. v. Velde*, 712 F.2d 569, 575 (D.C. Cir. 1983) ("Title VI clearly tolerates other enforcement schemes" besides termination of federal funding, including "referral of cases to the Attorney General, who may bring an action"); *United States v. Maricopa Cty.*, 151 F. Supp. 3d 998, 1018-19 (D. Ariz. 2015) (Title VI's "any other means authorized by law" provision empowers the United States to bring suit); *United States v. Tatum Indep. Sch. Dist.*, 306 F. Supp. 285, 288 (E.D. Tex. 1969) ("The United States is authorized to [file suit] under Title VI of the Civil Rights Act of 1964, and its implementing regulations, 45 C.F.R. 80.8(a).")

[4] *See United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1050 (5th Cir. 1984) (Rehabilitation Act); *see also United States v. Miami Univ.*, 294 F.3d 797, 808 (6th Cir. 2002) (Family Educational Rights and Privacy Act).

[5] *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) (Title VI's enforcement provision focuses on federal enforcement, not private parties); *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 467 n.5 (1999) (it would be "anomalous to assume that Congress intended" private litigants to obtain relief while the government could not); *Guardians Ass'n v. Civil Serv. Comm'n of N.Y.C.*, 463 U.S. 582, 631 n.26 (1983)

General can sue to enforce Title VI,[6] including Title VI Guidelines for Enforcement issued fifty years ago pursuant to an Executive Order.[7] Thus, for half a century, courts and federal agencies have construed Title VI to permit the Attorney General to bring litigation to secure compliance.

It was this Title VI enforcement framework that Congress incorporated into the Rehabilitation Act of 1973, which extended to persons with disabilities the ban on discrimination by federally funded entities. 29 U.S.C. § 794. Although the Rehabilitation Act contained no specific enforcement provision upon its passage, in 1977 the Department of Health, Education and Welfare ("HEW") issued regulations mirroring HEW's Title VI regulations, which called for enforcement by the Department of Justice.[8] The following year, Congress amended the Rehabilitation Act

---

(Marshall, J., dissenting) (disagreeing with majority regarding whether compensatory relief was available to private plaintiffs in the absence of discriminatory intent, while emphasizing the availability of government suits to enforce Title VI); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 722 & n.9 (1979) (White, J., dissenting) (disagreeing with majority regarding whether Title IX, which was modeled on Title VI, allowed *private* lawsuits, while emphasizing that Title VI's "other means" provision includes suits by federal agencies).

[6] *See*, *e.g.*, 29 Fed. Reg. 16,301 (Dec. 4, 1964) (codified at 45 C.F.R. § 80.8) (issued by the Department of Health, Education and Welfare).

[7] 31 Fed. Reg. 5292 (Apr. 2, 1966) (codified at 28 C.F.R. § 50.3); Exec. Order No. 11,247, 30 Fed. Reg. 12,327 (Sept. 24, 1965), superseded by Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980).

[8] *See* 42 Fed. Reg. 22,685, 22,694-22,695 (May 4, 1977) (84 C.F.R. § 84.61, incorporating HEW's Title VI regulations at 45 C.F.R. § 80.6-80.10).

to add Section 505 to *specifically incorporate* the enforcement remedies of Title VI.[9]

As the Supreme Court recognized, in enacting Section 505, Congress "intended to

codify the regulations of [HEW] governing enforcement of" the Rehabilitation Act.

*Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 635 & n.16 (1984) (citing S. Rep. No.

95-890, at 19 (1978)); *accord Alexander v. Choate,* 469 U.S. 287, 304 n.24, 306 n.27

(1985). Section 505 codified HEW's enforcement regulations, which mandated the

Attorney General's enforcement authority through litigation, "as a specific statutory

requirement." S. Rep. No. 95-890, at 19 (1978). As Congress intended, the Attorney

General has continued to enforce the Rehabilitation Act via litigation.[10]

When Congress enacted the ADA in 1990 and incorporated the Rehabilitation

Act's remedial mechanisms, it had been understood for two and a half decades that

Title VI, and then the Rehabilitation Act, gave the Attorney General a right of action to

sue to ensure compliance. As explained by the Supreme Court, when "Congress adopts

a new law incorporating sections of a prior law, Congress normally can be presumed to

have had knowledge of the interpretation given to the incorporated law . . . insofar as it

---

[9] Pub. L. No. 95-602, § 120(a), 92 Stat. 2955 (1978) (codified at 29 U.S.C. § 794a) (providing that the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act" in violation of the Rehabilitation Act).

[10] *See, e.g.*, *United States v. Baylor*, 736 F.2d at 1049; *United States v. Univ. Hosp. of State Univ. of N.Y. at Stony Brook*, 575 F. Supp. 607, 616 (E.D.N.Y. 1983), *aff'd*, 729 F.2d 144 (2d Cir. 1984); *see also United States v. Bd. of Trustees for Univ. of Ala.*, 908 F.2d 740 (11th Cir. 1990).

affects the new statute." *Lorillard v. Pons*, 434 U.S. 575, 581 (1978).

Indeed, Congress enacted Title II to extend the Rehabilitation Act's reach beyond federally funded entities to all public entities. *See* 42 U.S.C. § 12101(a)(3) (finding that disability-based discrimination "persists" in "access to public services"). To this end, Title II's enforcement provision incorporates the "remedies, procedures, and rights" of Section 505 of the Rehabilitation Act. 42 U.S.C. § 12133. As Congress knew, the "remedies, procedures, and rights" of Section 505 (and before that, Title VI) center on enforcement *by the federal government*, including litigation by the Attorney General. *See, e.g.*, 28 C.F.R. § 50.3; 28 C.F.R. § 41.5. Contrary to Georgia's insistence that Congress precluded federal enforcement of Title II by not specifically using the words "Attorney General," Def. Mem. at 9-10, the Attorney General has a right of action under this section. This is so – not because the Attorney General is a "person" within the meaning of the statute, *see id.* – but because the Attorney General may file suit to remedy discrimination against such persons pursuant to the "remedies, procedures, and rights" of Section 505, and Congress explicitly incorporated that enforcement system into Title II.

When discussing the Attorney General's authority under the Rehabilitation Act and its relevance to Title II, the ADA's legislative history makes clear that Congress intended exactly this result:

> Because the fund termination procedures of section 505 [of the
> Rehabilitation Act] are inapplicable to State and local government entities
> that do not receive Federal funds, the major enforcement sanction for the
> Federal government will be referral of cases by . . . Federal agencies to the
> Department of Justice. . . . The Department of Justice may then proceed to
> file suits in Federal district court.

H.R. Rep. No. 101-485(II), at 98 (1990); S. Rep. No. 101-116, at 57-58 (1989).

In other words, by incorporating the remedies, procedures, and rights of Section 505 into Title II, Congress extended that procedural structure into Title II and thereby provided the Attorney General with a right of action to enforce Title II. *See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2520 (2015) ("If a word or phrase has been . . . given a uniform interpretation by inferior courts . . ., a later version of that act perpetuating the wording is presumed to carry forward that interpretation.") (ellipsis in original; internal quotation marks omitted).[11]

---

[11] Georgia's reliance, Def. Mem. at 10, (and the *Dudek II* Court's reliance) on *Director v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 129 (1995), is also misplaced. There, the Court held that the statute at issue did not provide appellate authority for the agency director in light of the text and statutory scheme as a whole. *Id.* at 126-36. Unlike Title II, the statute at issue in *Newport News* used a term of art in identifying who could "obtain a review" and, unlike Title II, it did not incorporate any other statutory enforcement scheme, much less a well-established enforcement structure that for fifty years has relied on federal government enforcement action. Nothing in *Newport News* prohibits Congress from incorporating the Attorney General's enforcement authority by reference rather than by explicitly naming the Attorney General.

B. <u>Georgia Misconstrues the Significance of Textual Differences Among Titles I, II, and III of the ADA.</u>

Georgia argues that textual differences in the remedial provisions among Titles I, II, and III of the ADA suggest that the Attorney General lacks enforcement authority under Title II. *See* Def. Mem. at 9-10. In fact, close reading of the statute demonstrates that the distinctions have nothing to do with the Attorney General's ability to sue to enforce Title II. Rather, the reference to the Attorney General in Title I distinguishes the Attorney General's authority from other federal agencies with shared ADA enforcement authority. And in Title III, it distinguishes her authority from that of private litigants.

In particular, Title I of the ADA (which prohibits disability-based discrimination in employment) contains an enforcement provision (42 U.S.C. § 12117) that incorporates enforcement powers, remedies, and procedures from several sections of the employment discrimination provisions of the Civil Rights Act (Title VII, 42 U.S.C. §§ 2000e *et seq.*). Title VII established a complex administrative protocol governing the rights of complainants and the powers of the Equal Employment Opportunity Commission ("EEOC") and the Attorney General.[12] Accordingly, "the Commission" and "the Attorney General" are identified by necessity in Title I's enforcement

---

[12] For example, 42 U.S.C. § 2000e-5 describes the role of the EEOC, while § 2000e-6 describes the role of the Attorney General.

provision to clarify that their rights and responsibilities under Title VII (which differ from those of private plaintiffs) carry over to Title I of the ADA.

Likewise, Title III of the ADA (which prohibits disability-based discrimination by places of public accommodation) contains an enforcement provision (42 U.S.C. § 12188) that incorporates public accommodations discrimination and enforcement provisions of the Civil Rights Act (Title II, 42 U.S.C. § 2000a-3), but makes clear that the Attorney General possesses powers in addition to those provided in Title II of the Civil Rights Act. For instance, the ADA, unlike the Civil Rights Act, allows the Attorney General to obtain damages remedies against public accommodations. *See* 42 U.S.C. § 12188(b); 42 U.S.C. § 2000a-5(a). Title III also authorizes the Attorney General to request damages remedies and civil penalties, whereas private litigants may not. *See* 42 U.S.C. §§ 12188(b)(2)(B)-(C).

Title II of the ADA, by contrast, incorporates without modification the decades-old existing enforcement structure established under Title VI and the Rehabilitation Act, under which the Attorney General's authority to proceed in court is already clear and parallel to that of private plaintiffs. Thus, unlike Titles I and III, it was unnecessary that Title II specifically name the Attorney General.

    C.  <u>In Title II, the Goal of Congress was to Expand the Federal Prohibition on Disability-Based Discrimination.</u>

Georgia argues that in Title II, Congress precluded the Attorney General's

enforcement to avoid federal intrusion on the States. Def. Mem. at 10. But Georgia offers no support from either the ADA's text or legislative history suggesting that Congress had such a concern. To the contrary, the text and legislative history reveal Congress' overriding purpose was the opposite – to *expand* the reach of the Rehabilitation Act to all programs, activities, or services provided by state and local governments rather than withdraw federal enforcement authority. *See, e.g.*, 42 U.S.C. §§ 12101(a)(3), (b)(1) and (3), 12132; H.R. Rep. No. 101-485(II), at 84, 98 (1990); S. Rep. No. 101-116, at 44, 57-58 (1989); *see also Shotz v. City of Plantation*, 344 F.3d 1161, 1175-77 (11th Cir. 2003) (concluding Congress' chief goal in Title II was to expand the reach of the Rehabilitation Act and refuting an "overly literal" reading that would frustrate that goal). Georgia's reading rings especially hollow given that one of the ADA's key purposes is "to ensure that the Federal Government plays a central role in enforcing" the ADA's prohibition of discrimination "on behalf of individuals with disabilities," 42 U.S.C. § 12101(b)(3).

D. This Court Must Defer to the Department of Justice's Regulations Interpreting Title II.

While the text of Title II and the statutes it incorporates shows that the Attorney General has authority to enforce the ADA, to the extent the Court finds it ambiguous, it must defer to the Department of Justice regulations interpreting Title II. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842-43 (1984). Congress

directed the Attorney General to promulgate regulations implementing Title II that are "consistent with" Rehabilitation Act regulations. 42 U.S.C. § 12134 (citing 28 C.F.R. pt. 41). The Attorney General did so, providing in 28 C.F.R. § 35.174 that if voluntary compliance cannot be achieved, a designated agency, having confirmed that it was unable to resolve a discrimination complaint, "shall refer the matter to the Attorney General with a recommendation for appropriate action." The Court must accept the Attorney General's reasonable construction of its authority under the statute. *See Chevron*, 467 U.S. at 842–43; *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868-69 (2013); *see also Shotz*, 344 F.3d at 1179 (holding Department of Justice Title II regulations are "entitled to controlling weight unless they are procedurally flawed, substantively arbitrary and capricious, or plainly contradict the statute"). Here, as the Florida district court initially and correctly concluded, "DOJ's interpretation of Title II [is] a reasonable construction of the statute." *Dudek I*, 31 F. Supp. 3d at 1367 (citing *City of Arlington*, 133 S. Ct. at 1868; *Chevron*, 467 U.S. at 842).

## II.   THE COMPLAINT PROPERLY ALLEGES DISCRIMINATION UNDER TITLE II.

To sustain a complaint, a plaintiff "must allege sufficient facts such that it is reasonable to expect that discovery will lead to evidence supporting the claim." *Alexander Contracting v. Nat'l Trust Ins. Co.*, No. 1:14-CV-002423-ELR, 2015 WL

11347588, at *2 (N.D. Ga. July 8, 2015) (Ross, J.) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The United States has met this burden.[13]

    A.  <u>The Complaint Alleges that Georgia Administers GNETS Within the Meaning of the Title II Regulation.</u>

According to Georgia, the Complaint does not adequately plead that Georgia "administers" the mental health and therapeutic educational services delivered through the statewide GNETS Program within the meaning of 28 C.F.R. § 35.130(d). *See* Def. Mem. at 13-16. In fact, the Complaint spells out the myriad ways that Georgia administers GNETS. Georgia "determines which mental health and therapeutic educational services and supports to provide" through GNETS,[14] and "who will provide such services, in what settings services will be provided, and how to allocate and manage the State and federal funds earmarked for such services." Compl. ¶ 24.

---

[13] The United States is also seeking relief the Court may grant, contrary to Georgia's assertions. Def. Mem. at 24. The declaratory and injunctive relief sought here is designed to ensure that children with disabilities are served in the most integrated setting appropriate. Such relief is not an "obey the law" injunction. *See*, *e.g.*, *Florida PIRG v. E.P.A.*, 386 F.3d 1070 (11th Cir. 2004). The State's argument is not supported by *Elend v. Basham*, 471 F.3d 1199, 1208-09 (11th Cir. 2006), which affirmed dismissal of vague claims of impermissible First Amendment restrictions while distinguishing cases involving "a concrete, ongoing injury" and "a credible threat that the injury would be repeated."

[14] Georgia also controls the State Medicaid Program and its Early Periodic Screening, Diagnosis, and Testing ("EPSDT") program matched with federal dollars to provide community-based health care to eligible children, including an array of mental health services appropriate for children receiving services and supports through GNETS.

Georgia agencies and programs provide significant funding for GNETS: in its 2016-2017 budget, Georgia allocated over $72 million in State and federal dollars to GNETS. *Id.* ¶ 33. Furthermore, after the United States publicly issued its Findings Letter, Georgia exercised substantial control over GNETS facilities, closing nine GNETS facilities "due to the deteriorating physical conditions and need for structural improvements" a week before the start of the 2016-2017 school year. *See id.* ¶¶ 50, 62.

Additionally, Georgia, through GaDOE, employs centralized GNETS staff to oversee both GNETS and other statewide service measures for students with behavior-related disabilities, including Positive Behavioral Interventions and Supports. *See* Compl. ¶¶ 1, 25. Georgia sets the criteria for entry into and transition out of GNETS. *Id.* ¶ 25. And while Georgia claims to have no role in GNETS student placement, Def. Mem. at 15, the GNETS Operations Manual explicitly states that an IEP team for any student considered for placement in GNETS "includes GNETS personnel." *See* Def. Mem., Ex.1 at 14. These allegations demonstrate that Georgia "administers" GNETS by either dictionary definition proffered by Georgia: it both "manage[s]" and is "responsible for the running of" GNETS and it provides "practical management and direction" to the Program. *See* Def. Mem. at 13-14.

Indeed, the authorities that Georgia cites hurt, rather than help, its argument that Georgia law "does not empower the State to control or manage GNETS." Def. Mem. at

14. Georgia Constitution, Art. 8, § 5, ¶ II does not "mandate[] that" the "education services" at issue here "be 'maintained and controlled' by the local education agencies." Def. Mem. at 14. The Constitution affirms that "[t]he provision of an adequate public education for the citizens shall be a primary obligation of the State of Georgia." Art. 8, § 1, ¶ I. Regarding special education, the Constitution confirms the authority that is, in fact, exercised by the State. *See* Art. 8, § 5, ¶ VII(a) ("Any special schools shall be operated in conformity with regulations of the State Board of Education pursuant to provisions of law."). *Gwinnett Cty. Sch. Dist. v. Cox*, 710 S.E.2d 773, 775 (Ga. 2011), which concerns the State's authority to establish "general K-12 public education" charter schools, does not support Georgia's claim that local educational authorities have exclusive control over GNETS. Def. Mem. at 14. Indeed, *Gwinnett* distinguishes *general* education – which it held to be under local control for the purposes of establishing general education charter schools – from the State's authority over "special schools" for children with special needs. 710 S.E.2d at 777-79.

Georgia's reliance on *Bacon v. City of Richmond*, 475 F.3d 633, 638 (4th Cir. 2007), is equally unavailing. Def. Mem. at 15. In *Bacon,* the Fourth Circuit ruled that the City of Richmond was not obligated to fund the remedies under a consent decree in a Title II action absent proof "the City had in any way discriminated against plaintiffs." 475 F.3d at 639. The Court found Title II "cannot be read to impose strict liability on

public entities that neither caused plaintiffs to be excluded nor discriminated against them." *Id*. at 639-40.

 Here, Georgia is the party that has violated Title II. The United States has adequately alleged facts in support of its claim that Georgia administers GNETS; whether Georgia's involvement is, as it claims, limited to providing funding is a question of fact that is not properly resolved on this motion to dismiss.

B.  The Complaint States a Claim for Violation of Title II's Integration Mandate.

Georgia argues that the Complaint is deficient because it does not allege that "the State's treatment professionals have determined that the general education setting is appropriate." Def. Mem. at 18. In fact, the Complaint alleges that public school children with disabilities in GNETS could appropriately be served in general education classrooms and other more integrated settings. *See* Compl. ¶¶ 37-43; *see also Day v. Dist. of Columbia*, 894 F. Supp. 2d 1, 23 (D.D.C. 2012) (plaintiffs need not allege the public entity's treatment professionals have determined eligibility for community services, noting that "lower courts have universally rejected the absolutist interpretation proposed by the defendants").

Georgia also asserts that the United States has failed to adequately allege that students or their guardians do not oppose services in more integrated settings. Def. Mem. at 19-20. The Complaint, in fact, states that "[t]he majority of students in the

GNETS Program would not oppose receiving mental health and therapeutic educational services and supports in a more integrated setting." Compl. ¶ 46; *see also* Compl. ¶ 62.

The United States' allegations, which must be taken as true for the purposes of the instant motion, clearly support a claim for violation of the ADA's integration mandate. *See Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 292 (E.D.N.Y. 2008) ("[A]llegations that individuals with mental illness are unnecessarily segregated in highly restrictive [settings], even though their needs could be met in a more integrated setting, and that these individuals desire to reside in a more integrated setting, are adequate to state violations of the ADA and Section 504 under *Olmstead* and meet *Twombly's* plausibility standard.").

Georgia alleges that because IEP teams have purportedly assessed these students and determined them to require the services provided in GNETS, these students categorically cannot be determined appropriate for more integrated services. *See* Def. Mem. at 18. But this misses the point. As explained above, Georgia chooses to deliver mental health and therapeutic educational services through GNETS, and it chooses to offer these services primarily in segregated settings. *See* Compl. ¶¶ 37-39. In doing so, Georgia incentivizes IEP Teams to rely unnecessarily on the segregated GNETS Program to provide special education and related services because often this is the only

manner by which Georgia makes these services available. This dynamic, created by

Georgia, does not absolve Georgia of its ADA obligations to avoid operating a service

delivery system that segregates, and thus discriminates against, thousands of students

with behavior-related disabilities.

## III.    THE IDEA DOES NOT SHIELD GEORGIA FROM LIABILITY UNDER THE ADA.

Georgia misconstrues the United States' ADA claim by reducing it to a series of

individualized disputes over whether students with disabilities are educated in settings

that meet the IDEA's "least restrictive environment" ("LRE") requirement. Def. Mem.

20-23. Additionally, Georgia incorrectly suggests that its purported compliance with

the IDEA's LRE requirement satisfies Georgia's independent ADA integration

obligation; it also wrongly asserts that the United States must exhaust the IDEA's

administrative due process procedures before pursuing its ADA claims.[15] *Id.* These

assertions are incorrect. The United States alleges that Georgia violates the ADA by

---

[15] Puzzlingly, Georgia contends that *United States v. Arkansas*, 794 F. Supp. 2d 935 (E.D. Ark. 2011), is "particularly instructive," Def. Mem. at 23, but that case provides no guidance whatsoever in determining the relationship between the ADA and the IDEA. There, the Court adjudicated two distinct claims brought by the United States under 42 U.S.C. § 1997 on behalf of institutionalized persons for violations of their statutory rights – a claim under the ADA that Arkansas failed to deliver services to such individuals in the most integrated setting appropriate, and a claim under the IDEA that Arkansas failed to provide these individuals a Free Appropriate Public Education ("FAPE"). Similarly, Georgia's reliance on *MTV v. DeKalb Cty. Sch. Dist.*, 446 F.3d 1153 (11th Cir. 2006) is unavailing because that case states that *students and parents* must exhaust claims seeking relief that is available under the IDEA.

systematically denying students with behavior-related disabilities in GNETS, or at risk of placement in GNETS, access to mental health and therapeutic educational services which would allow them the opportunity to attend schools in the most integrated setting appropriate to their needs. This ADA claim is distinct and independent of a claim challenging a school district's compliance with IDEA's LRE requirement for individual students. Moreover, the IDEA's exhaustion requirement does not apply to the United States.

First, Georgia fails to recognize the distinct, but complementary, purposes, standards, and obligations that the IDEA and ADA impose on a state educational agency ("SEA") or local educational agency ("LEA"). *See K.M. v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1097 (9th Cir. 2013) (recognizing that the IDEA and Title II of the ADA differ "in both ends and means"), *cert. denied*, 134 S. Ct. 1493 (2014).[16] The ADA establishes a "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *See* 42 U.S.C. § 12101(b)(1); *see also* 42 U.S.C. § 12132, 28 C.F.R. § 35.130(b)(1)(i)-(iii), (vii), .130(d). This mandate extends to protect students with disabilities in public schools, including the

---

[16] *See also Ellenberg v. New Mexico Mil. Inst.*, 478 F.3d 1262, 1281-82 (10th Cir. 2007) (reversing summary judgment on ADA claim and recognizing that even when IDEA is satisfied by student's receipt of a FAPE in LRE, discriminatory denial of admission to specialized school may violate ADA); *S.S. v. City of Springfield*, 146 F. Supp. 3d 414, 423, 425 (D. Mass. 2015) (ADA and IDEA have "distinct rights and remedies"; denying motion to dismiss ADA integration claims).

unnecessary segregation and unequal educational opportunities imposed upon students who are in, or at risk of placement in, GNETS.[17] The IDEA, in contrast, prescribes the protections and procedural safeguards for children with disabilities and their parents, as well as requirements for SEAs and LEAs to offer a Free Appropriate Public Education ("FAPE") to eligible children with particular disabilities enumerated in the IDEA. 20 U.S.C. §§ 1412-1415. Specifically, SEAs and LEAs must ensure compliance with the IDEA's LRE requirement, which requires that "[t]o the maximum extent appropriate, children with disabilities . . . [be] educated with children who are not disabled" and that they only be removed to more restrictive settings "when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.114. A student's LRE placement requires an

---

[17] *See*, *e.g.*, *K.M. v. Tustin Unified Sch. Dist.*, 725 F.3d 1088 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1493 (2014) (ADA claims not foreclosed by finding that schools had not violated the IDEA); *Y.G. v. Riverside U.S.D.*, 774 F. Supp. 2d 1055 (C.D. Cal. 2011) (denying motion to dismiss student's claims of violations of the IDEA and of ADA); *K.M. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 360 (S.D.N.Y. 2005) (citing *Olmstead* with respect to needlessly segregating students during lunch period). *See also Olmstead v. L.C.*, 527 U.S. 581, 601 (1999) (segregation "severely diminishes the everyday life activities of individuals, including . . . educational advancement"); *Steimel v. Wernert*, 823 F.3d 902 (7th Cir. 2016) ("The [Olmstead] Court had no occasion to consider whether the same evils it had identified for institutional placements might exist in some settings outside of an institution. . . . We see no reason why the same analysis should not apply.").

individualized assessment that adheres to the IDEA's regulatory framework. *See* 20

U.S.C. § 1412(a)(5)(a); 34 C.F.R. §§ 300.114-.120.[18]

Georgia suggests that the United States seeks to usurp or supplant the IEP

process and has filed suit under the ADA to bypass the administrative requirements of

the IDEA. Not so. The United States' claims do not interfere with IDEA enforcement;

in fact, the two statutes co-exist and their requirements are complementary. The

Complaint alleges that Georgia delivers mental health and therapeutic educational

services to students with behavior-related disabilities in an overall manner that causes

unnecessary segregation and places other students at risk of such segregation. Compl.

¶¶ 37-43. For example, Georgia has chosen not to provide and fund sufficient mental

health and therapeutic educational services for students with behavior-related

---

[18] Additionally, courts analyze the respective claims under the two statutes differently. In IDEA cases, the Eleventh Circuit recognizes three major factors that courts may consider when deciding if the LRE obligation was satisfied: (1) the educational benefits a child will receive in general education, with appropriate supports and services, compared with the benefits she will receive in a self-contained special education environment; (2) the effect of the student with a disability on the class; and (3) the cost of supplemental aids and services necessary to achieve a satisfactory education in a general classroom. *Greer v. Rome City Sch. Dist.*, 950 F.2d 688, 697 (11th Cir. 1991). By contrast, the Supreme Court held that a State discriminates against individuals with disabilities, system-wide, under Title II of the ADA when it fails to offer community-based services to persons with disabilities when (1) such services are appropriate, (2) the affected persons do not oppose community-based treatment, and (3) community-based services can be reasonably accommodated, taking into account the resources available to the entity and the needs of other persons with disabilities. *Olmstead v. L.C.*, 527 U.S. 581, 587 (1999).

disabilities in integrated educational settings; instead, Georgia primarily relies on segregated GNETS settings for students to access most services. Compl. ¶ 39. Georgia also fails to provide adequate training to general education teachers on how to support students with behavior-related disabilities in integrated settings and has, instead, focused its training and resources on personnel in segregated GNETS programs. Compl. ¶ 40. By remedying the alleged Title II violations, Georgia would, *inter alia,* be able to provide IEP Teams with a wider array of appropriate mental health and therapeutic educational services in integrated general education settings to avoid the unnecessary segregation of students with behavior-related disabilities.

Georgia's assertion that the United States must follow the IDEA's administrative exhaustion procedures before pursuing its ADA claim contradicts the plain terms of the IDEA and therefore should be rejected. The IDEA requires administrative exhaustion by private litigants before filing suit under the IDEA, the ADA, Section 504, certain other statutes, or the Constitution when the civil suit is "seeking relief that is also available under [the IDEA]." 20 U.S.C. §§ 1415(*l*); 1415(f)-(h). Significantly, the exhaustion requirement applies only to parents and children, and LEAs, SEAs, or state agencies that are directly responsible for providing a child a FAPE; it does not apply to the United States. *See* 20 U.S.C. §§ 1415(b)(6)-(7), (c), (e)-(g), and (*l*). The United States is not required to exhaust IDEA's administrative

23

remedies before exercising its independent statutory authority and discretion to enforce other statutes.[19] Georgia fails to proffer any authority to the contrary and, in fact, correctly asserted that a "*parent*" must exhaust before pursuing relief that is available under the IDEA. Def. Mem. at 20.

## IV.    THE COURT SHOULD DENY GEORGIA'S REQUEST FOR A STAY.

As an alternative to dismissal, Georgia seeks an indefinite stay of this action – until such time as the district court proceedings in *Dudek* come to an end and the Eleventh Circuit decides any appeal from the order dismissing the United States. Well-settled case law makes clear that Georgia bears the heavy burden to justify a stay pending future proceedings, of indefinite duration, in another case. *See Landis v. N. Amer. Co.*, 299 U.S. 248, 255-56 (1936) (burden lies "heavily" on party requesting a stay who must demonstrate a "clear case of hardship or inequity . . . if there is even a fair possibility that the stay . . . will work damage to some one else"). Appellate courts – including the Supreme Court in *Landis*, on which Georgia relies – have rejected, as an abuse of discretion, an indefinite stay pending an appeal to be heard at an unspecified future time. *See Landis*, 299 U.S. at 257 (vacating stay pending potential

---

[19] The U.S. Department of Education is responsible for monitoring and administrative enforcement of a State's compliance with the IDEA. *See* 20 U.S.C. § 1416. The Department of Education also may refer IDEA noncompliance matters to the U.S. Department of Justice for judicial enforcement. *See* 20 U.S.C. §§ 1416(e)(2)(B)(vi), (3)(D).

appeals was "immoderate and hence unlawful"); *Ortega Trujillo v. Conover & Co. Comm.*, *Inc.*, 221 F.3d 1262, 1264 (11th Cir. 2000) (vacating stay pending trial proceedings and subsequent appeal as indefinite in scope).

Georgia has not carried its burden here. It can offer no assurance as to when an appeal in *Dudek* will be heard, much less decided. In *Dudek*, the remaining plaintiffs are scheduled to proceed to trial in the district court, which has issued no appealable order against the United States.[20] Any appeal that may eventually be taken may not be decided for years.

More critically, Georgia fails to mention, much less address, the "damage" an indefinite stay "will work on someone else" – specifically, students with disabilities across Georgia. *See Landis*, 299 U.S. at 256. Thousands of students with behavior-related disabilities in the GNETS Program will bear the brunt of any delay in the relief sought here. With each passing school year, these students continue to endure unnecessary segregation and unequal educational opportunities, and many other students face serious risk of the same fate. In these circumstances, as the Eleventh Circuit concluded, vacating a stay in *Ortega Trujillo*, Georgia offers "no reason to justify the indefinite stay" it seeks. *See* 221 F.3d at 1265.

---

[20] The district court denied the United States' motion to vacate consolidation with the private plaintiffs' case. *Dudek*, No. 12-60460 (S.D. Fla. Nov. 14, 2016), ECF No. 560.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Georgia's motion to dismiss and deny its alternative request for a stay.

Dated: December 9, 2016

Respectfully submitted:

JOHN A. HORN
United States Attorney
Northern District of Georgia


/s/ *Aileen Bell Hughes*
AILEEN BELL HUGHES
GA Bar Number: 375505
Assistant United States Attorney
United States Department of Justice
Richard B. Russell Federal Building
75 Ted Turner Dr. SW
Suite 600
Atlanta, GA 30303-3309
(404) 581.6000
aileen.bell.hughes@usdoj.gov

VANITA GUPTA
Principal Deputy Assistant Attorney
General

EVE HILL
Deputy Assistant Attorney General

REGINA KLINE
Senior Counsel

SHAHEENA SIMONS
Chief
Educational Opportunities Section

RENEE WOHLENHAUS
Deputy Chief
Educational Opportunities Section

FRANCES S. COHEN
TRAVIS W. ENGLAND
ANDREA E. HAMILTON
VICTORIA M. LILL
Trial Attorneys
United States Department of Justice
Civil Rights Division

_/s/ Andrea E. Hamilton_
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-4092
andrea.hamilton@usdoj.gov

# **L.R. 7.1(D) CERTIFICATION**

I certify that this brief has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C). Specifically, this brief has been prepared using 14-pt Times New Roman Font.

<u>/s Aileen Bell Hughes</u>
AILEEN BELL HUGHES
ASSISTANT U.S.ATTORNEY

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day filed the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sent counsel of record e-mail notification of such filing.

This 9 day of December, 2016.

/s Aileen Bell Hughes
AILEEN BELL HUGHES
ASSISTANT U.S.ATTORNEY