**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

| |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>STATE OF GEORGIA*,*<br><br>    Defendants. | Civil Action No. 1:16-cv-03088-ELR |

**BRIEF FOR *AMICI CURIAE* THE LEADERSHIP CONFERENCE ON CIVIL RIGHTS, THE NATIONAL FEDERATION OF THE BLIND, THE NATIONAL ALLIANCE ON MENTAL ILLNESS, THE AUTISTIC SELF-ADVOCACY NETWORK, THE AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES, THE ATLANTA LEGAL AID SOCIETY, INC., THE CARTER CENTER MENTAL HEALTH PROGRAM, MENTAL HEALTH AMERICA OF GEORGIA, <u>AND PARENT TO PARENT OF GEORGIA</u>**

**INTRODUCTION**

The United States filed this action to challenge the State of Georgia's practice of unnecessarily segregating students with behavior-related disabilities in separate schools or classrooms in violation of Title II of the Americans with Disabilities Act ("ADA"). According to the complaint filed by the United States, the students assigned to this separate educational program, known as the Georgia Network for Educational and Therapeutic Support Program, receive services and supports in isolation from their peers instead of in the "most integrated setting appropriate" to their needs as required by Title II.

Georgia moved to dismiss the action on several grounds, among them a challenge to the Attorney General's authority to enforce Title II of the ADA. For decades, courts have repeatedly recognized this authority. The sole basis for Georgia's argument against the Attorney General's enforcement authority is a single case decided by a Florida district court earlier this year. When

weighed against the text and purpose of the ADA, the longstanding Department of Justice ("DOJ") regulations establishing the enforcement procedures for Title II, and the unanimity of all other cases decided to the contrary, this aberrant decision should have little persuasive effect. Further, granting Georgia's motion would undermine the significant role the Attorney General has traditionally played in the enforcement of the ADA, and would impede the progress the country has made toward the ADA's goal of "assur[ing] equality of opportunity, full participation, independent living, and economic self-sufficiency" for individuals with disabilities. 42 U.S.C. § 12101(a)(7).

## STATEMENTS OF INTEREST OF *AMICI CURIAE*

**The Leadership Conference on Civil Rights**

The Leadership Conference on Civil and Human Rights ("The Leadership Conference") is a coalition of more than 200 organizations committed to the protection of civil and human rights in the United States. Founded in 1950 by three legendary leaders of the civil rights movement, The Leadership Conference is the nation's oldest, largest, and most diverse civil and human rights coalition. Its member organizations represent people of all races, ethnicities, and sexual orientations. The Leadership Conference works to build an America that is inclusive and as good as its ideals. For more than half a century, The Leadership Conference, based in Washington, D.C., has led the fight for civil and human rights by advocating for federal legislation and policy, securing passage of every major civil rights statute since the Civil Rights Act of 1957. The Leadership Conference was a leader in the efforts to pass both the Americans with Disabilities Act ("ADA") of 1990 and the Americans with Disabilities Act Amendments Act ("ADAAA") of 2008.

**The National Federation of the Blind**

The National Federation of the Blind ("NFB") is the largest and most influential membership organization of blind people in the United States. With more than 50,000 members, and affiliates in all fifty states, the District of Columbia, and Puerto Rico, and over 700 local chapters in most major cities, the ultimate purpose of the NFB is the complete integration of the blind into society on an equal basis. Since its founding in 1940, the NFB has devoted significant resources toward advocacy, education, research, and development of programs to ensure that children and students who are blind or have low-vision receive an equal and appropriate public education. The NFB was actively involved in the passage of the Individuals with Disabilities in Education Act (IDEA) and continues to be involved in legislative and programmatic efforts to improve the education of blind children. The NFB actively engages in litigation on behalf of blind children throughout the country to ensure that they receive the educational services to which they are entitled and to address systemic barriers.

**The National Alliance on Mental Illness**

The National Alliance on Mental Illness ("NAMI") is the nation's largest grassroots mental health organization dedicated to building better lives for the millions of Americans affected by mental illness. NAMI advocates for access to services, treatment, support, and research and is steadfast in its commitment to raising awareness and building a community of hope for individuals living with mental illnesses across the lifespan, including students. NAMI strongly supports equal access to services in integrated settings for students with disabilities, including those who live with mental health conditions.

**The Autistic Self-Advocacy Network**

The Autistic Self Advocacy Network ("ASAN") is a national, private, non-profit organization run by and for individuals on the autism spectrum. ASAN engages in educational public outreach and promotes public policies that benefit autistic individuals and others with developmental or other disabilities. ASAN promotes policies that ensure that all people with developmental disabilities are presumed competent and offered meaningful opportunities to participate in public programs, including public education.

**The American Association of People with Disabilities**

The American Association of People with Disabilities ("AAPD") is a convener, connector, and catalyst for change, increasing the political and economic power of people with disabilities. As a national cross-disability rights organization, AAPD advocates for full civil rights for the 50+ million Americans with disabilities. AAPD's members include people with disabilities and family, friends, and supporters.

**The Atlanta Legal Aid Society, Inc.**

The Atlanta Legal Aid Society, Inc. ("ALAS") helps low-income people meet basic needs through free civil legal services. During its 90-plus year history, the ALAS has helped to establish the Atlanta Volunteer Lawyers Foundation, coined the term "predatory lending," pioneered legal services for people with AIDS and cancer, established the first medical-legal collaborative serving children in the Southeast, and won *Olmstead v. L.C.*, the most important U.S. Supreme Court civil rights decision for people with disabilities. The ALAS also advocates on behalf of students in each of the metro Atlanta GNETS schools and on behalf of students at risk of entering the GNETS.

**The Carter Center Mental Health Program**

Founded in 1982 by former U.S. President Jimmy Carter and former First Lady Rosalynn Carter, the Atlanta-based Carter Center is committed to advancing human rights and alleviating unnecessary human suffering. The Carter Center's Mental Health Program works to promote awareness about mental health issues, inform public policy, achieve equity for mental health care comparable to other health care, and reduce stigma and discrimination against those with mental illnesses. In the state of Georgia, the Mental Health Program works in three areas: integrating behavioral health care into primary care, monitoring a settlement agreement between the state and the U.S. Department of Justice, and implementing a child and adolescent mental health initiative.

**Mental Health America of Georgia**

Since 1946, Mental Health America of Georgia (formerly the National Mental Health Association of Georgia, Inc.) has been the primary public policy voice for mental health across all 159 counties of Georgia and at the state Capitol. Over the years, it has have worked tirelessly to promote the mental health of all Georgians and to guarantee that mental health issues are heard.

**Parent to Parent of Georgia**

The mission of Parent to Parent of Georgia ("P2PGA"), a private nonprofit organization, is simple: to support Georgia families and individuals affected by disability. Authorized in the Individuals with Disabilities in Education Act as Georgia's Parent Training and Information Center, we assist families of individuals with disabilities from birth to adulthood in building their capacity to be better decision-makers. For over 30 years, our programs have been based on two assumptions: (1) families can be empowered to build capacity, and (2) collaborative and

integrated support services are most effective. We look optimistically to the day that Georgia fully embraces the legal protections afforded to those impacted by disability to create effective, research-based, inclusive practices.

## ARGUMENT

**I.     Congress Expressly Granted the Attorney General Enforcement Authority for Title II.**

Since the passage of the ADA in 1990, the three branches of the federal government have maintained a rare consensus that Title II provides the Attorney General with the authority to bring an enforcement action. Georgia's motion to dismiss, which rests on a single district court opinion to the contrary, lacks a persuasive reason to depart from the long-standing precedent that acknowledges the Attorney General's critical role in enforcing Title II.

Congress intended the federal government to play a primary role in implementing the ADA, stating among the purposes of the Act the provision of "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "ensur[ing] that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities." 42 U.S.C. §§ 12101(b)(1), (3). Congress also provided that the Attorney General in particular would play a key role in the enforcement of the ADA, including Title II's prohibition of discrimination on the basis of disability by a public entity, by expressly instructing the Attorney General to promulgate regulations to implement the requirements of Title II. 42 U.S.C. § 12134(a). Those regulations provide that an individual may file a Title II complaint with the appropriate agency, 28 C.F.R. § 35.170(a), (c); that if the designated agency issues a noncompliance Letter of Findings, the agency shall "notify the Assistant Attorney General," 28 C.F.R. § 35.173(a)(1); that if the state or local government agrees to enter a voluntary compliance agreement, the agreement shall

6

"provide for enforcement by the Attorney General," 28 C.F.R. § 35.173(b)(5); and that if the designated agency is unable to secure a voluntary compliance agreement with the state or local government, "the designated agency shall refer the matter to the Attorney General for appropriate action." 28 C.F.R. § 35.174.  These regulations have been in place, without Congressional modification, since 1991.  In addition, as Congress expressly delegated rulemaking authority for Title II to the Attorney General, and the DOJ's issuance of the rules was procedurally and substantively sound, courts have deferred to the regulations under *Chevron* as "providing controlling weight." *Shotz v. City of Plantation*, Fla., 344 F.3d 1161, 1179 (11th Cir. 2003) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)); *see also*, *e.g.*, *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1096 (9th Cir. 2013); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 506 (4th Cir. 2016); *Johnson v. City of Saline*, 151 F.3d 564, 570 (6th Cir. 1998).

Congress further delegated federal enforcement authority for Title II to the Attorney General by providing that the "remedies, procedures, and rights" of the Rehabilitation Act of 1973 would govern the enforcement of Title II.  42 U.S.C. § 12133.  The Rehabilitation Act, in turn, incorporated the "remedies, procedures, and rights" set forth in Title VI of the Civil Rights Act of 1964.  29 U.S.C. § 794a; *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 590 (1999) (tracing remedies available under ADA to Title VI); *Shotz*, 344 F.3d at 1169 (same). Finally, Title VI directs federal agencies to pursue compliance by either terminating the federal funding of any program in violation of the Act or "by any other means authorized by law." 42 U.S.C. § 2000d-1.  The Title VI regulations promulgated by the DOJ include among these "other means" "appropriate proceedings brought by the Department to enforce any rights of the United States under any law of the United States."  28 C.F.R. § 42.108(a)(1).

As the Supreme Court has made clear, it is immaterial that an agency regulation concerns the breadth of the agency's regulatory authority; as long as the agency's interpretation is a permissible construction of the statute, a regulation governing the scope of the agency's enforcement power should be given *Chevron* deference. *City of Arlington, Tex. v. F.C.C.*, __ U.S. __, 133 S. Ct. 1863, 1874 (2013).[1] Accordingly, courts have consistently recognized that, among the "other means authorized by law" to enforce Title VI, the Rehabilitation Act, and Title II of the ADA is an enforcement action by the Attorney General. *See*, *e.g.*, *Shotz*, 344 F.3d at 1175 ("[T]he major enforcement sanction for the Federal government [for ADA violations] will be referral of cases by these Federal agencies to the Department of Justice." (quoting S.Rep. No. 101–116, at 57 (1989)); *Nat'l Black Police Ass'n, Inc. v. Velde*, 712 F.2d 569, 575 (D.C. Cir. 1983) ("Prominent among these other means of enforcement [of Title VI] is referral of cases to the Attorney General, who may bring an action against the recipient."); *United States v. Marion Cty. Sch. Dist.*, 625 F.2d 607, 612 (5th Cir. 1980) ("'any other means authorized by law' language in Title VI…include[s] government suits"); *United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1050 (5th Cir. 1984) ("any other means authorized by law" in the Rehabilitation Act includes "the federal courts"); *Smith v. City of Philadelphia*, 345 F. Supp. 2d 482, 490 (E.D. Pa. 2004) ("Section 602 of Title VI, 42 U.S.C. § 2000d–1, authorizes the Attorney General to enforce compliance with Title VI by filing an action in federal court. By extension, the Attorney

---

[1] The regulations of other agencies that share the responsibility for enforcing Title VI also interpret "other means" to include DOJ enforcement, as does the executive order delegating and coordinating the enforcement of antidiscrimination statutes among the federal agencies. *See, e.g.*, regulations of the Departments of Health and Human Services (45 C.F.R. § 80.8(a)), Education (34 C.F.R. § 100.8(a)), and Labor (29 C.F.R. § 31.8(a)) (stating that "[s]uch other means may include, but are not limited to, (1) a reference to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States"); *see also* Leadership and Coordination of Nondiscrimination Laws, Exec. Order No. 12250, 45 Fed. Reg. 72995 (1980) ("The Attorney General shall coordinate the implementation and enforcement by Executive agencies of … Title VI of the Civil Rights Act of 1964" including "referral to the Department of Justice for enforcement where there is noncompliance.").

General may also bring suit to enforce other statutes which adhere to the enforcement scheme set forth in Title VI." (citations omitted)); *United States v. City & Cty. of Denver*, 927 F. Supp. 1396, 1400 (D. Colo. 1996) ("Courts have interpreted the words 'by any other means authorized by law' to mean that a funding agency … could refer a matter to the Department of Justice to enforce the statute's nondiscrimination requirements in court.").[2]

Georgia puts forth a reading of Title II that also ignores the history and context of the statute.  As the above discussion demonstrates, Title II cannot be read without reference to and incorporation of provisions of the Rehabilitation Act and Title VI.  *See King v. Burwell*, 135 S. Ct. 2480, 2496 (2015) ("A fair reading of legislation demands a fair understanding of the legislative plan."); *Shotz*, 344 F.3d at 1168 ("[T]he meaning of one statute may be affected by other Acts…" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). The "remedies, procedures, and rights" of Title VI have always been interpreted to include enforcement by the Attorney General.  Congress was aware of this interpretation when it incorporated those same "remedies, procedures, and rights" into Title II, and would not have disclaimed the longstanding understanding of the DOJ's enforcement authority without an explicit statement to that effect.  *See King*, 135 S. Ct. at 2495 ("We have held that Congress 'does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions.'… Had Congress meant to limit tax credits to State Exchanges, it likely would have

---

[2] Like the courts, the executive branch has always understood that the Attorney General has the authority to bring enforcement actions under Title II.  In 2001, President George W. Bush recognized this role in his Executive Order describing the federal government's plan for implementing the holding of *Olmstead v. L.C.*, 527 U.S. 581 (1999), which established that individuals with disabilities must have the opportunity to live in community-based settings whenever appropriate under Title II.  The President directed the Attorney General and other executive agencies to achieve "swift implementation" of the *Olmstead* decision and to "fully enforce Title II of the ADA, including investigating and resolving complaints filed on behalf of individuals who allege that they have been the victims of unjustified institutionalization."  Community-Based Alternatives for Individuals with Disabilities, Exec. Order No. 13217, 66 Fed. Reg. 33,155 (June 18, 2001).

done so in …[a] prominent manner." (quoting *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001)).  Moreover, as noted earlier, the stated purpose of Title II of the ADA is to provide for "the elimination of discrimination against individuals with disabilities" and "to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter *on behalf of individuals with disabilities*."  42 U.S.C. § 12101(b) (emphasis added).  If the Attorney General were not authorized to bring suit to enforce individual rights, it would violate not only the plain meaning of the statutory language, but also the intended means for implementation of the entire statutory scheme.  But courts "cannot interpret federal statutes to negate their own stated purposes."  *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419–20 (1973).  A reading of Title II that includes DOJ enforcement authority is consistent with the statutory language and Congress's plan, and is thus the reading the Court should adopt.[3]  *See King*, 135 S. Ct. at 2496 ("Section 36B can fairly be read consistent with what we see as Congress's plan, and that is the reading we adopt.").

## II. The Department of Justice Must Continue to Play Its Distinctive and Significant Role in the Enforcement of the ADA.

Since its creation in 1957, the Civil Rights Division of the DOJ has led the enforcement of the nation's civil rights statutes, enabling countless Americans to more fully enjoy their voting, housing, employment, and educational rights.[4]  Courts have noted that the delegation of

---

[3] Georgia also fails to explain why the Attorney General would have the authority to enforce Titles I and III of the ADA, but not Title II.  While the language of Title II may be less explicit regarding this authority than the other Titles are, the entire statute must be read together, in a manner that comports with common sense and the statutory purpose.  "A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme ... because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law."  *King*, 135 S. Ct. at 2492 (quoting *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371 (1988)).

[4] *See* U.S. Dep't of Justice, The Civil Rights Division (2010), https://www.justice.gov/sites/default/ files/ crt/ legacy/ 2010/12/14/division_booklet.pdf.

authority to the DOJ to enforce a civil rights statute is "especially meaningful, given the Department's historic role in civil rights enforcement, its experience in helping to develop desegregation plans, and its authority to intervene in private suits as well as initiate enforcement actions." *Brown v. Califano*, 627 F.2d 1221, 1231 (D.C. Cir. 1980).  Compared to private litigators, the DOJ is able to bring greater resources, stronger credibility, and the voice of the United States to its enforcement actions.[5]  Georgia's attempt to diminish the DOJ's role in the enforcement of a civil rights statute should be carefully scrutinized.

### A. The Civil Rights Division of the DOJ Has Enforced Title II of the ADA Since Its Passage.

Since the passage of the ADA in 1990, the Civil Rights Division has enforced the statute, including Title II.  Congress has implicitly authorized the Civil Rights Division's activities, including its ADA enforcement work, by funding the Division every year since its founding.  There is such a reliance now on the authority of the DOJ to bring suit to enforce Title II that it would be remarkable to suddenly require the type of 180-degree change that Georgia advocates for in this case.

While this case may give the impression otherwise, the vast majority of the DOJ's ADA activities do not take the form of highly contested court battles.  Rather, the Civil Rights Division uses a variety of methods to enforce Title II, including technical assistance, mediation, investigations, and compliance reviews.[6]  Most of the Section's investigations and compliance reviews end in settlement agreements with the covered entities.  If the DOJ's enforcement

---

[5] *See* Owen M. Fiss, *The Fate of an Idea Whose Time Has Come: Antidiscrimination Law in the Second Decade after Brown v. Board of Education*, 41 U. CHI. L. REV. 742, 754 (1974).

[6] Indeed, this case is the result of a compliance review of GNETS that the DOJ completed in 2015, the findings of which are detailed in a letter from the Principal Deputy Assistant Attorney General of the Civil Rights Division to the Georgia Governor and Attorney General.  *See* July 15, 2015 letter from Vanita Gupta to Gov. Nathan Deal and Attorney General Sam Olens, *available at* http://p2pga.org/images/US_DOJ_Letter_to_Georgia_07.15.2015.pdf.

11

authority for Title II were taken away, the only way the Department could act on any deficiencies identified in such investigations and reviews would be by withholding federal funds (if, of course, the public entity investigated receives federal funds). Yet "[t]he ADA makes *any* public entity liable for prohibited acts of discrimination, regardless of funding source." *Shotz*, 344 F.3d at 1174. Accordingly, if the Court countenances Georgia's position, the DOJ's ability to enforce Title II would be circumscribed in a manner antithetical to the express purpose of the ADA.

### B. The DOJ Is Able to Achieve Systemic Relief that Private Litigants Do Not Often Have Standing to Pursue.

It is hornbook constitutional law that, to invoke federal jurisdiction, a litigant must establish the three elements of standing: (1) injury in fact; (2) causation; and (3) redressability. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Generally, then, an individual with a disability can bring suit only to address a specific violation of Title II that has caused her injury, but will be unable to secure prospective relief unless she can show that it is reasonably likely that she will suffer the same discrimination in the future. The Supreme Court's decision in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), is instructive on this point. Adolph Lyons filed a complaint for damages, an injunction, and declaratory relief after he alleged that Los Angeles police put him in a chokehold during a routine traffic stop, though he offered no resistance and posed no threat. *See id*. at 97. Lyons sought injunctive relief against the use of the chokeholds except in situations where the police were threatened by the use of deadly force, and a declaration "that use of the chokeholds absent the threat of immediate use of deadly force is a *per se* violation of various constitutional rights." *Id*. at 98. The Supreme Court held that Lyons did not have standing to see an injunction because there was not a case or controversy between the parties, i.e., Lyons could not "establish a real and immediate threat that he would again be

12

stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id*. at 105.  Because it was "no more than conjecture" that Lyons would again be stopped by the police and subjected to a chokehold, he "ha[d] made no showing that he [was] realistically threatened by a repetition of his experience of October, 1976," and consequently, "he ha[d] not met the requirements for seeking an injunction in a federal court, whether the injunction contemplates intrusive structural relief or the cessation of a discrete practice." *Id*. at 109.

The Court's holding in *Lyons* demonstrates that it is extremely difficult for an individual plaintiff with a disability to achieve prospective, systemic relief through a single lawsuit under Title II.  For instance, a deaf individual who was unable to communicate via 911 during an emergency could sue the municipality under Title II due to the inaccessibility of emergency services.  However, based on *Lyons*, she would likely have standing to seek only retrospective relief in the form of damages.  It would be quite challenging to establish that it is "more than speculation" that she would need to use 911 again, such that she could seek an injunction requiring that emergency services comply with Title II.  *Id*. at 108.

Because the federal government has standing to enforce federal laws, the DOJ does not face the same limitations to seeking injunctive relief that an individual does.  Taking the example used above, while a single deaf plaintiff may not be able to show that she would need to use 911 again, the DOJ can establish the likelihood that deaf individuals generally will need to use 911 and that its inaccessibility violates Title II.  Thus, the DOJ has standing to seek the sort of injunctive relief, often unavailable to private litigants, that brings substantive, structural change that benefits entire classes of persons with disabilities.  Not only does this kind of litigation better fulfill the purpose of the ADA, but it brings greater efficiency to the judicial process by

solving in one suit a problem that affects many people, and could therefore generate multiple individual lawsuits.[7]

In recent years, among other significant achievements, the DOJ has used its Title II standing to make classroom technologies accessible to university students with vision, hearing, and learning disabilities;[8] make polling places accessible to individuals with mobility and vision disabilities;[9] transform Rhode Island's day services system for individuals with intellectual and developmental disabilities from one based on segregated sheltered workshops and day programs to one that provides integrated supported employment opportunities;[10] and provide thousands of residents of segregated, institutional adult homes in New York the opportunity to live in the community.[11] Eliminating the ability of the Attorney General to file suit under Title II would make it harder for individuals with disabilities to realize and benefit from these kinds of victories in the future.

In addition, through its Project Civic Access, the DOJ is able to achieve global Title II compliance in a way that a private litigant never could. Built on a settlement between the Civil Rights Division and the City of Toledo, Ohio reached in 1999, Project Civic Access seeks to help state and local governments come into full compliance with Title II of the ADA. The DOJ

---

[7] While private litigants may be able to achieve this sort of injunctive relief through a class action, that mechanism has its own procedural and economic barriers that make it very difficult for plaintiffs to certify a class, much less prevail on the merits. *See*, *e.g.*, Christine P. Bartholomew, *Redefining Prey and Predator in Class Actions*, 80 Brook. L. Rev. 743, 745-56 (2015) ("It is now more difficult to state a class claim, certify a class, and survive summary judgment than it has been since the birth of the modern class action in 1966. Whether a serious injury afflicts a substantial class is now secondary to procedural battles. Class claims rarely reach merit-based determinations, as procedural hurdles that create barriers to resolving liability continue to rise.").

[8] Consent Decree, Dudley v. Miami University, No. 14-038 (S.D. Ohio Dec. 14, 2016).

[9] Consent Decree, U.S. v. Augusta County, Virginia, No. 15-00077 (W.D. Va. Jan. 20, 2016).

[10] Consent Decree, U.S. v. Rhode Island, No. 14-175 (D. R.I. Apr. 9, 2014).

[11] Amended Stipulation and Order of Settlement, U.S. v. New York, No. 13-4165 (E.D.N.Y. Jan. 30, 2014).

generally undertakes compliance reviews on its own initiative under the authority of Title II, though it sometimes does so in response to complaints filed by private citizens.  Most compliance reviews occur in small cities or towns, and the majority of communities have made progress on meeting their ADA obligations.  Settlement agreements between the Civil Rights Division and the localities resolve the balance of issues, and the project now includes 219 settlement agreements with 204 localities in all 50 states, Puerto Rico, and Washington, D.C.  These settlements cover the full range of Title II accessibility issues, such as: physical modifications of government facilities, physical modifications of polling places, establishment and delivery of auxiliary aids, installation of assistive listening systems in assembly areas, accessibility of 911 emergency services, and better telephone communication between the government and citizens with hearing or speech impairments.[12]

At least four Project Civic Access settlements have been reached in Georgia.  In 2009, the City of Atlanta entered into a settlement with the Civil Rights Division covering, among other things, law enforcement and effective communication, 911, emergency management procedures and policies, accessibility of sidewalks, accessibility of web-based services and programs, and physical changes to facilities.[13]  In 2012, an agreement between the Civil Rights Division and Randolph County covered many of the same issues, as well as physical changes to emergency shelters, accessibility of polling places, and creation of an ADA Coordinator.[14]  The

---

[12] *See generally* Project Civic Access Fact Sheet, *available at* https://www.ada.gov/civicfac.htm (last visited December 30, 2016).

[13] *See* Settlement Agreement between the United States of America and Atlanta Georgia under the Americans with Disabilities Act, DJ 204-19-216, *available at* https://www.ada.gov/atlanta_pca/atlanta_sa.htm (last visited December 30, 2016).

[14] *See* Settlement Agreement between the United States of America and Randolph County, Georgia under the Americans with Disabilities Act, DJ 204-19M-111, *available at* https://www.ada.gov/randolph-co-pca/randolph-co-sa.htm (last visited December 30, 2016).

2013 settlement with Stewart County[15] and 2015 settlement with Lumpkin County[16] contain similar provisions, with the latter also requiring that the County retain an Independent Licensed Architect to certify whether any physical alterations, additions, or modifications made by the County during the term of the agreement comply with ADA standards.  Each of these settlement agreements also recognizes the DOJ's Title II enforcement authority by authorizing the Department to institute a civil action in federal district court to enforce the terms of the agreement should the locality fail to comply.

As these settlement agreements demonstrate, the DOJ's Title II authority allows it to improve the overall accessibility of communities in one fell swoop, thereby achieving systemic change that will benefit all individuals with disabilities within the community.  By contrast, private litigants would have to address the same issues one-by-one through separate lawsuits.  Not only would such a procedure bog down the courts, it would likely leave many ADA violations unaddressed because of the effort and expense inherent in litigation.  Even for organizations such as the *amici* here that might have standing to enforce the ADA, the costs of impact litigation prevent most non-profits from instituting more than one or two such suits at a time.

But the public entities benefit as well.  Without such comprehensive agreements as those achieved by Project Civic Access, public entities would be subject to a multiplicity of individual lawsuits, the response to which would be hodge-podge, unsystematic, and more expensive in terms of fees (to the plaintiffs as well as the public entities).  A Project Civic Access settlement

---

[15] *See* Settlement Agreement between the United States of America and Stewart County, Georgia under the Americans with Disabilities Act, DJ 204-19M-110, *available at* https://www.ada.gov/stewart-co-pca/stewart-co-pca-sa.htm (last visited December 30, 2016).

[16] *See* Settlement Agreement between the United States of America and Lumpkin County, Georgia under the Americans with Disabilities Act, DJ 204-19-227, *available at* https://www.ada.gov/lumpkin_co_pca/lumpkin_ sa.html (last visited December 30, 2016).

allows for a financially feasible, transparent, systematic plan to address discrimination that also protects the public entity from further suits. In short, the DOJ's Title II enforcement authority achieves great equality for persons with disabilities in a more efficient, less costly manner than private-party litigation ever could.

### C. Due to the Correlation Between Disability and Poverty, Many Violations of Title II Will Remain Unaddressed if the DOJ Does Not Have Enforcement Authority.

In the United States, a person with a disability is twice as likely to be poor as someone without a disability.[17] The numbers are stark: in 2015, 20.5% of the disabled population over 16 years of age lived below the poverty line, while only 11.8% of the non-disabled population did. Similarly, 13.1% of the disabled population over 16 lived between 100 and 149% of the poverty level, but only 7.7% of the non-disabled population did.[18] Not only does poverty negatively impact the basics of survival for persons with disabilities – including access to safe housing, reliable transportation, and adequate healthcare – but it also makes it even more difficult for persons with disabilities to enforce their rights under the ADA. Litigation is expensive, time-consuming, and emotionally draining. The filing fee alone in federal court, currently $400, is more than people living in poverty can scrape together. Further, when many aspects of daily life are already difficult and stressful because of disability and poverty, the added weight of a lawsuit is simply more than the most stalwart individual would wish to take on. Yet if the DOJ did not have Title II enforcement authority, the full burden of achieving ADA compliance would fall on the very people the statute was intended to protect, who are often the least positioned in

---

[17] Pam Fessler, *Why Disability And Poverty Still Go Hand In Hand 25 Years After Landmark Law*, *available at* http://www.npr.org/sections/health-shots/2015/07/23/424990474/ why-disability-and-poverty-still-go-hand-in-hand-25-years-after-landmark-law (last visited December 30, 2016).

[18] *See* Selected Economic Characteristics for the Civilian Noninstitutionalized Population by Disability Status, 2015 American Community Survey 1-Year Estimates, *available at* https://factfinder.census.gov/faces/tableservices/ jsf/ pages/productview.xhtml?src=bkmk.

American society to carry it. This cannot be the result Congress intended when it created "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

## CONCLUSION

Title II of the ADA and valid DOJ regulations expressly provide the Attorney General with the authority to bring an enforcement action, as Congress has countenanced and federal courts have recognized since the ADA's enactment. The Attorney General has used this authority to achieve important victories for the rights of individuals with disabilities and seeks to do so again in this case by compelling Georgia to integrate its classrooms. *Amici* urge the Court to follow the long-standing, nearly universal precedent supporting this authority and allow the DOJ to present its case to the Court.

Respectfully submitted,

/s/
Daniel F. Goldstein
Jean M. Zachariasiewicz
BROWN GOLDSTEIN & LEVY, LLP
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
(410) 962-1030
dfg@browngold.com
jmz@browngold.com

*Counsel for Amici Curiae*

Dated: January 4, 2017