1

```
 1                UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION


 3


 4   UNITED STATES OF AMERICA,


 5
             PLAINTIFF,
 6                                   DOCKET NO. 1:16-CV-03088-ELR
             -VS-
 7

 8   STATE OF GEORGIA,

 9
             DEFENDANT.
10


11

12             TRANSCRIPT OF MOTIONS PROCEEDINGS
             BEFORE THE HONORABLE ELEANOR L. ROSS
13                UNITED STATES DISTRICT JUDGE
                      MAY 10, 2017
14

15
     APPEARANCES:
16
     ON BEHALF OF THE PLAINTIFF:
17
             AILEEN BELL HUGHES, ATTORNEY AT LAW
18           BONNIE I. ROBIN-VERGEER, ATTORNEY AT LAW
             TRAVIS WILLIAM ENGLAND, ESQ.
19
     ON BEHALF OF THE DEFENDANT:
20
             ALEXA R. ROSS, ATTORNEY AT LAW
21           JOSHUA B. BELINFANTE, ESQ.
             KIMBERLY K. ANDERSON, ATTORNEY AT LAW
22

23

24   ELIZABETH G. COHN, RMR, CRR
     OFFICIAL COURT REPORTER
25   UNITED STATES DISTRICT COURT
     ATLANTA, GEORGIA
```

1          (ATLANTA, FULTON COUNTY, GEORGIA; MAY 10, 2017, AT

2     10:02 A.M. IN OPEN COURT.)

3          THE COURT:  THANK YOU, SIR.

4          THANK YOU ALL.  PLEASE BE SEATED.  AND GOOD MORNING

5     TO YOU.

6          OKAY.  I NOW CALL THE CASE OF THE UNITED STATES OF

7     AMERICA AS PLAINTIFF VERSUS THE STATE OF GEORGIA AS DEFENDANT.

8     THIS IS CIVIL ACTION 13-CV-3088.  AND WE ARE HERE ON

9     DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY

10    PROCEEDINGS.

11         I SUSPECT THAT, BASED ON SOME DEVELOPMENTS THAT HAVE

12    OCCURRED SINCE THIS MOTION WAS FILED, THE MOTION TO STAY WILL

13    NO LONGER BE APPLICABLE.  BUT WE'LL GET TO ALL OF THAT IN JUST

14    A MOMENT.

15         IN THE MEANTIME, I'D ASK FOR PLAINTIFF'S COUNSEL TO

16    GO AHEAD AND ANNOUNCE YOUR APPEARANCE FOR THE RECORD.  PLEASE

17    GO AHEAD AND IDENTIFY WHOMEVER WILL BE ACTING AS LEAD COUNSEL

18    FOR PURPOSES OF TODAY'S HEARING, BUT THEN EVERY ATTORNEY ON

19    BEHALF OF PLAINTIFF WHO WILL SPEAK ON THE RECORD TODAY SHOULD

20    INTRODUCE HIM- OR HERSELF.

21         MS. HUGHES:  GOOD MORNING, YOUR HONOR.  AILEEN BELL

22    HUGHES REPRESENTING THE UNITED STATES OF AMERICA.

23         AND HERE AT COUNSEL TABLE I HAVE MR. TRAVIS ENGLAND.

24         MR. ENGLAND:  GOOD MORNING, YOUR HONOR.

25         THE COURT:  GOOD MORNING, SIR.

3

1          MS. HUGHES:  AND ROBIN --

2          MS. ROBIN-VERGEER:  I'M ROBIN-VERGEER.

3          THE COURT:  ALL RIGHT.  AND, COUNSELOR, WOULD YOU

4    SPELL YOUR LAST NAME FOR ME?

5          MS. ROBIN-VERGEER:  R-O-B-I-N HYPHEN V-E-R-G-E-E-R.

6          THE COURT:  ALL RIGHT.  GOOD MORNING TO ALL OF YOU.

7    THANK YOU SO MUCH.

8          AND ON BEHALF OF THE DEFENDANT, IF YOU WOULD DO THE

9    SAME, STARTING WITH WHOMEVER WILL ASSUME THE ROLE OF LEAD

10   COUNSEL FOR TODAY'S HEARING.

11         MS. ROSS:  GOOD MORNING, YOUR HONOR.  I'M ALEXA ROSS.

12   AND WITH ME TODAY ARE OTHER ATTORNEYS WHO ARE GOING TO BE

13   ARGUING AS WELL.

14         THE COURT:  ALL RIGHT.

15         MR. BELINFANTE:  GOOD MORNING, YOUR HONOR.  JOSH

16   BELINFANTE ON BEHALF OF THE STATE OF GEORGIA AS WELL.

17         THE COURT:  GOOD MORNING.

18         MS. ANDERSON:  AND I'M KIMBERLY ANDERSON ON BEHALF OF

19   THE STATE OF GEORGIA.

20         THE COURT:  GOOD MORNING TO ALL OF YOU.  THANK YOU SO

21   MUCH.

22         ALL RIGHT.  AND WE HAVE ALREADY INDICATED BY ORDER

23   THAT EACH SIDE WILL HAVE ABOUT AN HOUR AND 20 MINUTES FOR ORAL

24   ARGUMENT.

25         DEFENSE, BECAUSE IT IS YOUR MOTION, YOU WILL, OF

4

1    COURSE, BEGIN AND END.  SO YOU WILL NEED TO MONITOR YOUR OWN

2    TIME TO ENSURE THAT YOU ALLOT ADEQUATE TIME FOR REBUTTAL.

3            IF YOU LOOK TO THE CLOCKS THAT ARE OVER HERE TO MY

4    RIGHT, THE DEFENSE CLOCK WILL BE OVER TO THE LEFT AND THE

5    PLAINTIFF'S CLOCK WILL BE TO THE RIGHT.  SO WE WILL BEGIN THE

6    CLOCKS RUNNING, HAVE THE CLOCKS RUNNING ONCE YOU BEGIN YOUR

7    ORAL ARGUMENTS.

8            ARE THERE ANY ISSUES, WHETHER HOUSEKEEPING OR OTHER,

9    TO TAKE UP BEFORE WE BEGIN?  ON BEHALF OF THE PLAINTIFF?

10           MS. HUGHES:  NO, YOUR HONOR.  THANK YOU.

11           THE COURT:  THANK YOU.

12           ON BEHALF OF DEFENDANT.

13           MS. ROSS:  NO, YOUR HONOR.  THANK YOU.

14           THE COURT:  ALL RIGHT.  WELL, DEFENSE, YOU MAY

15    PROCEED.  THANK YOU SO MUCH.

16           MS. ROSS:  AGAIN, GOOD MORNING, YOUR HONOR.  THANK

17    YOU FOR HEARING ORAL ARGUMENT IN THIS IMPORTANT CASE.

18           I AM ALEXA ROSS, THE SPECIAL ASSISTANT ATTORNEY

19    GENERAL NAMED TO REPRESENT THE STATE OF GEORGIA.  AND MY

20    PORTION OF THIS ARGUMENT IS GOING TO BE REGARDING PAGES TWO

21    THROUGH EIGHT OF OUR BRIEF AND ARGUMENT C.  BUT IN TERMS OF

22    SUBJECT MATTER, I'M GOING TO BE TALKING ABOUT THE OVERARCHING

23    ISSUES THAT ARE BEFORE THE COURT:  FOR EXAMPLE, WHO AT THE

24    STATE LEVEL IS IN CHARGE OF SPECIAL EDUCATION FOR STUDENTS,

25    WHAT IS THE GNETS PROGRAM, HOW DO THE ADA AND THE I.D.E.A. COME

1    INTO PLAY HERE, IN WHAT SETTINGS ARE GNETS SERVICES PROVIDED.

2              I WILL ALSO TALK ABOUT THE SPECIFIC ALLEGATIONS IN

3    THE COMPLAINT THAT COMPRISE THE TITLE II CLAIM AND WHY THOSE

4    ALLEGATIONS ARE INSUFFICIENT TO STATE A CLAIM.

5              NOW, YOUR HONOR, WE ARE HERE ON A MOTION TO DISMISS.

6    SO, OF COURSE, WE HAVE TO TAKE AS TRUE ALL OF THE WELL PLEADED

7    FACTS IN THE COMPLAINT.  AND THE STATE WILL DO EXACTLY THAT.

8              HOWEVER, THE SUBJECT MATTER OF THIS CASE IS SO

9    IMPORTANT THAT TO NOT ACKNOWLEDGE IT SEEMS DISINGENUOUS.  WHAT

10   WE ARE TALKING ABOUT HERE IS EDUCATION AND THERAPEUTIC SERVICES

11   FOR THE MOST SEVERELY EMOTIONALLY DISABLED STUDENTS IN GEORGIA

12   FROM AGE THREE THROUGH AGE 21.

13             NOW, TO GIVE A PERSPECTIVE, IN GEORGIA, APPROXIMATELY

14   12 PERCENT OF THE PUBLIC SCHOOL POPULATION HAS SOME KIND OF

15   DIAGNOSED DISABILITY.  OF THAT 12 PERCENT, APPROXIMATELY TEN

16   PERCENT REQUIRE SPECIAL EDUCATION AND RELATED SERVICES.  SO

17   THERE ARE SOME STUDENTS WITH DISABILITIES WHO DON'T NEED

18   SPECIAL EDUCATION AND SOME WHO DO.

19             NOW, OF THOSE STUDENTS WHO REQUIRE SPECIAL ED AND

20   RELATED SERVICES, THERE ARE MANY DISABILITY CATEGORIES.

21   THERE'S DEAF-BLIND, THERE'S ATTENTION DEFICIT HYPERACTIVITY

22   DISORDER, AND AUTISM, AND DOWN THE LINE.  SOME STUDENTS HAVE A

23   DIAGNOSIS OF WHAT IS CALLED EMOTIONAL BEHAVIORAL DISORDER.  AND

24   THAT IS A DISABILITY UNDER BOTH TITLE II OF ADA AND UNDER THE

25   INDIVIDUALS WITH DISABILITIES EDUCATION ACT.  STUDENTS WHO HAVE

1    A DIAGNOSIS OF EMOTIONAL AND BEHAVIOR DISORDER ARE A SPECTRUM

2    OF SEVERITY, AS YOU CAN IMAGINE, FROM MILD TO VERY SEVERE.

3          OF THAT GROUP OF STUDENTS, A SMALL PORTION ARE

4    SEVERELY EMOTIONALLY BEHAVIORALLY DISORDER.  NOW, THE STUDENTS

5    WHO RECEIVE GNETS PROGRAM SERVICES -- GNETS IS THE GEORGIA

6    NETWORK OF EDUCATIONAL AND THERAPEUTIC SUPPORT.  THE STUDENTS

7    WHO RECEIVE GNETS PROGRAM SERVICES ARE THOSE WHO EXHIBIT

8    MANIFESTATIONS OF THE MOST SEVERE EMOTIONAL AND BEHAVIORAL

9    DISORDER.  SOME ARE TRAUMATIZED.  SOME HAVE POST-TRAUMATIC

10   STRESS DISORDER.  SOME ARE NONVERBAL.  SOME HAVE BEEN RAPED.

11   SOME STUDENTS HAVE PARENTS WHO ARE SIBLINGS.  WE HAVE A

12   SPECTRUM OF STUDENTS HERE THAT ARE THE MOST SEVERELY DISABLED

13   IN TERMS OF THEIR EMOTIONAL ABILITY.

14          NOW, AGAIN, THIS IS A MOTION TO DISMISS.  AFTER I GO

15   THROUGH SOME OF THE PARTICULARS REGARDING THESE STUDENTS AND

16   HOW THEY ARE SERVED AND HOW THE STATE -- WHAT STATE ENTITY

17   SERVES THEM AND THE LOCAL SCHOOL DISTRICTS, JOSH BELINFANTE

18   WILL TAKE OVER AND DISCUSS THE MORE INTRICATE AND MECHANICAL

19   ASPECTS OF THE MOTION TO DISMISS, WHY THE UNITED STATES DOES

20   NOT HAVE STANDING, WHY THE UNITED STATES HAS FAILED TO STATE A

21   VALID CLAIM, WHY THE STATE CANNOT PROVIDE THE RELIEF SOUGHT,

22   WHY THE UNITED STATES IS SEEKING AN INVALID OBEY-THE-LAW

23   INJUNCTION.

24          AND THEN, FINALLY, IF WE GET TO THE ISSUE OF STAY,

25   KIMBERLY ANDERSON WILL ADDRESS THAT.

1       YOUR HONOR, SPECIAL EDUCATION LAW IS MORE THAN A

2  LEGAL PRACTICE TO ME.  IT IS MY LIFE'S WORK.  I'VE SPENT 20

3  YEARS DOING IT.  IT'S THE PRACTICE THAT I CHARGE HALF OF MY

4  NORMAL HOURLY RATES FOR.  AND I'M LUCKY ENOUGH TO BE WITH A LAW

5  FIRM THAT ALLOWS THAT.

6       AND I ASK THE COURT TO NOTE THAT, IN THE COMPLAINT,

7  THERE IS NO ALLEGATION THAT THE STUDENTS DO NOT RECEIVE SPECIAL

8  EDUCATION AND RELATED SERVICES.  THAT'S NOT THE ALLEGATION.

9  THE THRUST OF THE UNITED STATES' ALLEGATION IS IN PARAGRAPH

10  FOUR OF THE COMPLAINT, WHERE THE UNITED STATES SAYS THAT THE

11  VAST MAJORITY OF STUDENTS SERVED IN THE GNETS PROGRAM COULD BE

12  SERVED IN A GENERAL EDUCATION SETTING.  THAT IS THE CRUX OF THE

13  UNITED STATES' ARGUMENT.

14       NOW, WHAT THERE IS NO ALLEGATION OF IN THE COMPLAINT

15  IS THAT ANY TREATMENT PROFESSIONAL IN CHARGE OF DETERMINING

16  WHAT SERVICES A STUDENT RECEIVES AND THE SETTING IN WHICH HE OR

17  SHE RECEIVES THEM HAS BEEN DETERMINED BY A PROFESSIONAL.

18  THERE'S NO ALLEGATION OF THAT.

19       WHAT WE HAVE IS THE UNITED STATES' OPINION, BASED ON

20  NOTHING ALLEGED, THAT THE VAST MAJORITY OF THESE STUDENTS COULD

21  BE IN GENERAL ED.  NO RECOMMENDATION OF ANY TREATMENT

22  PROFESSIONAL IS ALLEGED.  THAT IS KEY TO THE PROBLEM WITH THE

23  COMPLAINT.

24       ALSO, THE DEPARTMENT OF JUSTICE DOES NOT ENFORCE THE

25  INDIVIDUALS WITH DISABILITIES EDUCATION ACT.  AND THAT IS THE

8

1   STATUTE THAT MUST BE HONORED, IN ADDITION TO THE AMERICANS WITH

2   DISABILITIES ACT, IN ORDER TO DETERMINE WHERE THESE STUDENTS

3   ARE PLACED AND WHAT THEY RECEIVE.

4          SO, WE'VE PROVIDED THE COURT WITH NOTEBOOKS.  INSTEAD

5   OF GOING THROUGH OUR BRIEF ROTELY OR GOING THROUGH THE

6   NOTEBOOKS ROTELY, I AM GOING TO TELL YOU WHAT'S IN THEM SO THAT

7   WE CAN REFER TO THEM LATER.  THESE NOTEBOOKS, THE NOTEBOOKS

8   THAT WERE JUST HANDED OUT, GIVE THE COURT ALL OF THE LAW THAT I

9   AM GOING TO BE REFERRING TO AND THAT MY COLLEAGUES WILL BE

10  REFERRING TO.

11         TAB B HAS THE OLMSTEAD CASE, WHICH IS GOING TO FIGURE

12  PROMINENTLY IN THE ARGUMENT FOR BOTH SIDES HERE.

13         TAB C ARE ALL OF THE FEDERAL REGULATIONS THAT GOVERN,

14  ALL OF THE PERTINENT FEDERAL REGULATIONS THAT GOVERN THE

15  PROVISION OF SPECIAL EDUCATION AND RELATED SERVICES.

16         TAB D ARE THE GEORGIA REGULATIONS THAT ARE

17  PROMULGATED AND ENFORCED TO COMPLY WITH THE FEDERAL LAW.

18         AND TAKE A LOOK, PLEASE, YOUR HONOR, AT THE FEDERAL

19  REGULATIONS, WHICH ARE UNDER TAB C.  I'D LIKE TO CALL THE

20  COURT'S ATTENTION TO C-5.  FEDERAL LAW REQUIRES THE STATE

21  EDUCATIONAL AGENCY -- NOT THE AMORPHOUS STATE -- BUT THE STATE

22  EDUCATIONAL AGENCY, WHICH IS THE STATE DEPARTMENT OF ED, TO

23  PROMULGATE RULES THAT REQUIRE THE LOCAL EDUCATION AGENCY, THE

24  SCHOOL DISTRICTS, TO FOLLOW I.D.E.A.

25         AND UNDER TAB FIVE, WE SEE THE CODE OF FEDERAL

1    REGULATIONS, THE FEDERAL LAW, SAYING, AN LEA, WHICH IS THE

2    SCHOOL DISTRICT, IS ELIGIBLE FOR ASSISTANCE UNDER PART B,

3    MEANING FEDERAL FUNDING FOR SPECIAL ED, IF IT SUBMITS A PLAN

4    THAT PROVIDES ASSURANCES TO THE STATE EDUCATIONAL AGENCY, THE

5    STATE DEPARTMENT, THAT THE, THAT THE LOCAL DISTRICT MEETS ALL

6    OF THE CONDITIONS OF I.D.E.A.

7           SO, IN TERMS OF WHERE THE RUBBER MEETS THE ROAD, HOW

8    ALL THIS WORKS, WE HAVE THE FEDERAL LAW, THE INDIVIDUALS WITH

9    DISABILITIES EDUCATION ACT.  AND IT SAYS, STATE EDUCATIONAL

10   AGENCIES, STATE DEPARTMENT OF ED, YOU GET FEDERAL FUNDS TO

11   SUPPORT THE EDUCATION OF SPECIAL EDUCATION STUDENTS, BUT YOU

12   ONLY GET THESE FEDERAL FUNDS IF YOU ASSURE US THAT YOU ARE

13   GOING TO UPHOLD THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT

14   AND ITS PROVISIONS.

15          AND THE FEDERAL LAW RECOGNIZES THAT THAT'S ACTUALLY

16   CARRIED OUT AT THE SCHOOL DISTRICT LEVEL.  SO THE STATE HAS TO

17   HAVE POLICIES IN PLACE UNDER WHICH THE SCHOOL DISTRICTS MUST,

18   IN TURN, CARRY OUT THE INDIVIDUALS WITH DISABILITIES EDUCATION

19   ACT.  THAT'S HOW IT WORKS.

20          SO WHAT ARE THE SPECIFICS.  HERE ARE THE SPECIFICS.

21   UNDER FEDERAL AND STATE LAW, FIRST, THERE IS SOMETHING CALLED

22   CHILD FIND.  SCHOOL DISTRICTS MUST IDENTIFY STUDENTS WHO SEEM

23   TO HAVE SPECIAL NEEDS.  HOW ARE THEY IDENTIFIED?  SOMETIMES BY

24   CLASSROOM TEACHERS, SOMETIMES PARENTS REFER, BUT BEGINNING AT

25   AGE THREE, FOR PART B.  THEN THOSE STUDENTS UNDERGO ASSESSMENT.

1          THEY UNDERGO PSYCHOEDUCATIONAL ASSESSMENT, HEARING

2    TESTS, PHYSICAL TESTS, WHATEVER IT SEEMS TO BE NECESSARY GIVEN

3    WHAT THE STUDENT IS MANIFESTING.  IF THE RESULTS OF THE

4    ASSESSMENT ARE SUCH THAT THE STUDENT APPEARS TO HAVE A

5    DISABILITY, A TEAM IS ASSEMBLED.  THAT TEAM IS CALLED AN IEP

6    TEAM, INDIVIDUALIZED EDUCATION PLACEMENT TEAM.

7          THE MEMBERS OF THE IEP TEAM MUST INCLUDE PEOPLE

8    KNOWLEDGEABLE REGARDING THE STUDENT AND REGARDING THE

9    DISABILITY.  YOU HAVE TO HAVE A REGULAR EDUCATION TEACHER.  YOU

10   HAVE TO HAVE A SCHOOL DISTRICT-LEVEL PERSON, WHO IS ABLE TO

11   OKAY THE PROVISION OF CERTAIN SERVICES.  MOST OF THE TIME, YOU

12   HAVE A SCHOOL PSYCHOLOGIST.

13         THE REGULATIONS I'VE PROVIDED IN THIS NOTEBOOK LISTS

14   EVERYBODY WHO HAS TO BE A PART OF THE IEP TEAM.  PARENTS ARE

15   PART OF THE IEP TEAM.  AND, WHEN APPROPRIATE, THE STUDENTS ARE

16   PART OF THE IEP TEAM.

17         IEP TEAM GETS TOGETHER ONCE A YEAR AND SAYS, OKAY,

18   LET'S LOOK AT WHERE THIS STUDENT IS, WHAT IS THE STUDENT'S

19   STATUS, HIS OR HER WEAKNESSES, HIS OR HER STRENGTHS, WHAT DOES

20   THIS STUDENT NEED IN ORDER TO LEARN, IN ORDER TO BE ABLE TO

21   BENEFIT FROM EDUCATION.  AND THAT'S THE BIG DIFFERENCE BETWEEN

22   AN ANTIDISCRIMINATION ACT LIKE ADA, WHICH SAYS YOU CANNOT

23   DISCRIMINATE AGAINST ANYONE ON THE BASIS OF DISABILITY, AND

24   I.D.E.A., INDIVIDUALS WITH DISABILITIES EDUCATION ACT.

25         IT'S AN AFFIRMATIVE ACTION STATUTE THAT SAYS, IF THAT

1  DISABILITY IS SUCH THAT THE STUDENT REQUIRES SPECIAL ED, YOU

2  MUST PROVIDE -- NOT YOU CAN'T DISCRIMINATE -- BUT YOU MUST

3  PROVIDE EVERYTHING THAT STUDENT NEEDS TO BE ABLE TO BENEFIT

4  FROM HIS OR HER EDUCATION.

5          NOW, THE KINDS OF SERVICES THAT ARE PROVIDED

6  TYPICALLY INCLUDE ASSISTIVE TECHNOLOGY PERHAPS, PHYSICAL

7  THERAPY, OCCUPATIONAL THERAPY, EMOTIONAL COUNSELING, COGNITIVE

8  BEHAVIORAL THERAPY, THERAPIES THAT MOST PARENTS COULD NOT

9  POSSIBLY AFFORD FOR THEIR CHILDREN IF THEY WERE IN PRIVATE

10  SCHOOL.  SO WHAT THE PUBLIC SCHOOLS DO FOR STUDENTS WITH

11  SPECIAL NEEDS IS REALLY REMARKABLE.

12          NOW, ONCE THE IEP TEAM DETERMINES WHAT SERVICES THE

13  STUDENTS NEED, THE IEP TEAM THEN HAS TO GO TO PART TWO, WHICH

14  IS REALLY THE CRUX OF THIS CASE.  AND THAT IS, WHAT IS THE

15  LEAST RESTRICTIVE ENVIRONMENT IN WHICH WE CAN DELIVER THOSE

16  SERVICES.

17          BOTH FEDERAL AND STATE LAW REQUIRE -- AND IT'S IN THE

18  NOTEBOOKS -- THAT THE IEP TEAM BEGIN WITH THE PRESUMPTION THAT

19  THE STUDENT CAN BE SERVED IN THE GENERAL EDUCATION CLASSROOM.

20  NOW, PERHAPS THE STUDENT WILL NEED SUPPORTS IN THAT CLASSROOM,

21  AN AIDE, A SPECIAL TEACHER WHO COMES IN AND OUT.  PERHAPS YOU

22  WILL NEED TO BE PAIRED -- HE OR SHE NEEDS TO BE PAIRED WITH A

23  SPECIALIST.

24          IF THAT CAN'T BE DONE, THE NEXT STEP, GENERALLY

25  SPEAKING, IS WHAT'S CALLED A PULLOUT.  A STUDENT CAN BE PULLED

1  OUT OF THE GENERAL ED CLASSROOM FOR PARTS OF THE DAY TO GET

2  CERTAIN SERVICES THAT CAN'T BE DELIVERED IN THE REGULAR

3  CLASSROOM.

4       IF THAT WON'T WORK, WELL, THEN, THE IEP TEAM

5  DETERMINES WHETHER -- AND I'M SKIPPING SOME STEPS IN THE

6  MIDDLE, BUT THIS IS THE GENERAL IDEA -- THE IEP TEAM THEN

7  DETERMINES WHETHER A DAY SCHOOL IS APPROPRIATE, WHETHER THE

8  STUDENT HAS TO BE REMOVED FROM A GENERAL ZONED SCHOOL AND GO TO

9  A SETTING DURING THE REGULAR SCHOOL DAY AND THEN PERHAPS GO

10  BACK TO SCHOOL FOR EXTRACURRICULAR ACTIVITIES, PERHAPS GO HOME.

11      THE MOST RESTRICTIVE PLACEMENT IS THE RESIDENTIAL

12  PLACEMENT.  THERE ARE SOME STUDENTS WHO ARE IN, NOT ONLY

13  BEHAVIORALLY-DISORDERED STUDENTS, BUT FOR ANY DISABILITY --

14  WELL, MOST DISABILITIES SO SEVERE THAT THEY HAVE TO BE TAKEN

15  OUT OF THEIR COMMUNITIES, AWAY FROM THEIR FAMILIES, AND LIVE IN

16  RESIDENTIAL TREATMENT CENTERS WHERE THEY GET SOME EDUCATION,

17  AND IT IS AN EDUCATION/HOSPITAL SETTING.

18      NOW, STATE OF GEORGIA WANTS TO PREVENT STUDENTS AS

19  MUCH AS POSSIBLE FROM HAVING TO LEAVE THEIR COMMUNITIES AND

20  THEIR FAMILIES.  AND THIS IS WHERE GNETS COMES IN.  THE GEORGIA

21  NETWORK FOR EDUCATIONAL AND THERAPEUTIC SERVICES IS NOT

22  REQUIRED BY FEDERAL LAW.  GNETS IS THE CREATION OF THE GEORGIA

23  LEGISLATURE AND THE STATE BOARD OF EDUCATION TO PROVIDE

24  SERVICES TO STUDENTS TO PREVENT THEM FROM HAVING TO LEAVE THEIR

25  FAMILIES AND THEIR COMMUNITIES AND GO INTO RESIDENTIAL

1  PLACEMENT.

2          WHAT IS GNETS.  GNETS IS NOT A PLACE.  GNETS IS A

3  PROGRAM.  AND IT'S NOT JUST ONE PROGRAM.  WHAT GNETS IS IS A

4  NETWORK OF PROVIDERS WHO SPECIALIZE IN STUDENTS WITH SEVERE

5  EMOTIONAL AND BEHAVIORAL DISORDER SYMPTOMS.  EACH STUDENT WHO

6  RECEIVES GNETS PROGRAM SERVICES RECEIVES THOSE SERVICES BECAUSE

7  HIS OR HER IEP TEAM HAVE DETERMINED THEY ARE NECESSARY IN ORDER

8  FOR THAT STUDENT TO BENEFIT FROM HIS OR HER EDUCATION.

9          GNETS PROGRAM SERVICES CAN BE PROVIDED IN THE GENERAL

10  EDUCATION SETTING, AND THEY OFTEN ARE.  THAT WHOLE SPECTRUM OF

11  SERVICES THAT I JUST MENTIONED APPLIES.  SOME STUDENTS HAVE TO

12  BE PULLED OUT OF THEIR CLASS FOR PART OF THE DAY TO HAVE GNETS

13  PROGRAM SERVICES, PERHAPS COGNITIVE THERAPY, PERHAPS BEHAVIORAL

14  THERAPY PROVIDED TO THEM.

15          A SMALL SUBSET OF GNETS PROGRAM STUDENTS ARE SERVED

16  IN WHAT IS CALLED A SELF-CONTAINED ENVIRONMENT.  AND IT'S THAT

17  ENVIRONMENT THAT IS THE SUBJECT OF THE LAWSUIT HERE.

18          A SELF-CONTAINED ENVIRONMENT IS AN ENVIRONMENT WITH

19  ONLY STUDENTS LIKE YOU WHO HAVE THESE SPECIAL NEEDS.  THERE ARE

20  TWO DIFFERENT PLACES WHERE GNETS PROGRAM SERVICES HAVE BEEN

21  PROVIDED IN SELF-CONTAINED SETTINGS.  ONE, THERE ARE

22  FREE-STANDING GNETS FACILITIES.  AND, TWO, SOME REGULAR ZONED

23  SCHOOLS HAVE AREAS THAT ARE RESERVED FOR SELF-CONTAINED GNETS

24  PROGRAMS.

25          NOW, IF I MAY, YOUR HONOR, I AM GOING TO SPEAK VERY

1    LOUDLY WHILE I GO OVER TO THIS POSTER.

2              THE COURT:  CERTAINLY.

3              MS. ROSS:  THIS IS THE STATE BOARD OF EDUCATION OF

4    GEORGIA'S RULE AND REGULATION REGARDING GNETS.  THE PURPOSE OF

5    GNETS IS TO PREVENT CHILDREN FROM REQUIRING RESIDENTIAL OR

6    OTHER MORE RESTRICTIVE PLACEMENTS BY OFFERING COST-EFFECTIVE

7    COMPREHENSIVE SERVICES IN LOCAL AREAS.  CHILD SPECIALISTS,

8    INCLUDING EDUCATORS, PSYCHOLOGISTS, SOCIAL WORKERS,

9    PSYCHIATRISTS, BEHAVIOR SUPPORT SPECIALISTS, ET CETERA, FROM A

10   VARIETY OF PROFESSIONALS COLLABORATE ON BEHALF OF THE CHILDREN

11   SERVED.

12             NOW, IN ADDITION, AN IEP TEAM -- REMEMBER, THEY HAVE

13   TO START WITH THE GENERAL EDUCATION SETTING AS THEIR

14   PRESUMPTION.  AN IEP TEAM MAY CONSIDER GNETS PROGRAM SERVICES

15   FOR A CHILD WITH AN EMOTIONAL AND BEHAVIORAL DISORDER BASED

16   UPON DOCUMENTATION OF THE SEVERITY, THE DURATION, THE

17   FREQUENCY, AND THE INTENSITY OF ONE OR MORE OF THE

18   CHARACTERISTICS OF THE DISABILITY CATEGORY OF EMOTIONAL AND

19   BEHAVIORAL DISORDERS.

20             AND THIS NEXT SENTENCE IS PERHAPS THE MOST IMPORTANT.

21   THIS DOCUMENTATION MUST INCLUDE PRIOR EXTENSION OF LESS

22   RESTRICTIVE SERVICES AND DATA WHICH INDICATE THAT SUCH SERVICES

23   HAVE NOT ENABLED THE CHILD TO BENEFIT EDUCATIONALLY.  EVERY

24   STUDENT UNDER GEORGIA LAW AND REGULATION WHO IS SERVED IN A

25   GNETS SELF-CONTAINED SETTING HAS ALREADY BEEN DETERMINED WITH

15

1    -- BY DATA, HARD DATA, TO BE UNABLE TO BENEFIT EDUCATIONALLY IN

2    A LESS RESTRICTIVE ENVIRONMENT.

3              THE GNETS ENVIRONMENT IS INTENDED TO BE TEMPORARY.

4    IT IS NOT INTENDED TO BE A PERMANENT SETTING FOR A STUDENT.

5              THE COURT:  AND, EXCUSE ME, COUNSELOR, BUT BY DATA,

6    DO YOU MEAN DATA THAT HAS GENERALLY BEEN COLLECTED, OR DO YOU

7    MEAN SPECIFICALLY AS IT RELATES TO THAT PARTICULAR CHILD?  FOR

8    INSTANCE, THESE MEASURES HAVE BEEN ATTEMPTED WITH THAT CHILD

9    AND FAILED, OR DATA THAT HAS BEEN COLLECTED WITH RESPECT TO

10   OTHER CHILDREN SIMILARLY SITUATED?

11             MS. ROSS:  THE LATTER, THE INDIVIDUAL CHILD, YOUR

12   HONOR, YES.

13             WHEN THE IEP TEAM MEETS AT THE END OF ANY GIVEN

14   SCHOOL YEAR, THE IEP TEAM HAS TO REVIEW THE DATA THAT'S BEEN

15   COLLECTED THAT YEAR AND DETERMINE, HAS THE IEP WORKED.  IF NOT,

16   WE HAVE TO FIX IT.  SO IT IS SPECIFIC TO THAT DATA.

17             THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT

18   REQUIRES INDIVIDUALIZATION OF EACH AND EVERY IEP.  NO SCHOOL

19   SYSTEM CAN SAY, WE'RE GOING TO TAKE ALL OF OUR STUDENTS WITH

20   EBD AND PUT THEM HERE, OR ALL OF OUR STUDENTS WITH PHYSICAL

21   DISABILITIES AND PUT THEM HERE.  ABSOLUTELY NOT.

22             AND I'M GLAD YOU ASKED THAT, YOUR HONOR, BECAUSE THE

23   ALLEGATION IN THE COMPLAINT THAT THIS VAST MAJORITY OF STUDENTS

24   WHO ARE NOW BEING SERVED IN THE GNETS PROGRAM IN SELF-CONTAINED

25   SETTINGS CAN BE SERVED IN GENERAL EDUCATION, TO ADOPT THAT

16

1   WOULD REQUIRE THE STATE TO VIOLATE I.D.E.A., BECAUSE YOU MUST

2   HAVE INDIVIDUAL DETERMINATIONS.

3          NOW, YOUR HONOR, THE UNITED STATES DOES NOT ALLEGE

4   THAT THIS RULE OR THE GEORGIA STATUTE THAT PROVIDES THE

5   AUTHORITY FOR THE RULE VIOLATES THE I.D.E.A. OR THE

6   CONSTITUTION OR ADA.  THEY DON'T POINT TO THE RULE OR TO THE

7   STATUTE.  THE COMPLAINT DOES NOT ALLEGE THAT THE STATE OF

8   GEORGIA, THE AMORPHOUS STATE OF GEORGIA, FAILS TO FOLLOW THE

9   RULE.  IT DOESN'T ALLEGE THAT.  THE COMPLAINT DOESN'T ALLEGE

10  THAT THE SCHOOL DISTRICTS FAIL TO FOLLOW THE GNETS RULE.

11         NOW, HERE'S WHAT THE COMPLAINT ALLEGES.  THE

12  COMPLAINT ALLEGES THAT ADA TITLE II AS INTERPRETED BY THE

13  UNITED STATES SUPREME COURT IN OLMSTEAD REQUIRES THAT THE VAST

14  MAJORITY OF STUDENTS SERVED IN GNETS SELF-CONTAINED SETTINGS

15  NEED TO BE MOVED TO GENERAL EDUCATION.

16         AND UNDER TAB B IN THE NOTEBOOK I'VE PROVIDED IS THE

17  OLMSTEAD CASE.  AND IT'S HIGHLIGHTED.  AND ON PAGE 11 OF THE

18  OLMSTEAD CASE -- UNFORTUNATELY, THIS IS HIGHLIGHTED IN GREEN

19  AND IT'S A LITTLE DARK, BUT I CAN MAKE IT OUT FOR YOU.  THIS IS

20  THE COURT'S CONCLUSION:  WE CONCLUDE THAT, UNDER TITLE II OF

21  THE ADA, STATES ARE REQUIRED TO PROVIDE COMMUNITY-BASED

22  TREATMENT FOR PERSONS WITH MENTAL DISABILITIES WHEN THE STATE'S

23  TREATMENT PROFESSIONALS DETERMINE THAT EACH PLACEMENT, EACH

24  PLACEMENT IS APPROPRIATE, THE AFFECTED PERSONS DO NOT OPPOSE

25  SUCH TREATMENT, AND THE PLACEMENT CAN BE REASONABLY

1    ACCOMMODATED TAKING INTO ACCOUNT THE RESOURCES AVAILABLE TO THE

2    STATE AND THE -- AND THE NEEDS OF OTHERS WITH MENTAL

3    DISABILITIES.

4            NOW, OLMSTEAD DID NOT INVOLVE STUDENTS OR THE

5    I.D.E.A.  OLMSTEAD WAS ABOUT ADULTS WITH MENTAL DISABILITIES

6    AND SPECIAL NEEDS.  BUT EVEN IF WE FORGET ABOUT I.D.E.A., EVEN

7    IF WE MAKE BELIEVE THAT I.D.E.A. DOESN'T GOVERN HERE -- AND IT

8    DOES, CLEARLY -- IF WE LOOK ONLY AT TITLE II ADA, WHAT THE

9    UNITED STATES SUPREME COURT SAYS MUST BE ALLEGED IS NOT ALLEGED

10   IN THIS COMPLAINT.

11           THE COMPLAINT BEFORE THE COURT DOES NOT ALLEGE THAT

12   THE STATE'S TREATMENT PROFESSIONALS HAVE DETERMINED THAT EACH

13   INDIVIDUAL STUDENT CAN BE SERVED IN A LESS RESTRICTIVE SETTING.

14           NOW, YOUR HONOR, NO CASE SUPPORTS THE CLAIM THAT THE

15   UNITED STATES HAS MADE TO THIS COURT.  THERE IS NO CASE ON

16   POINT.  THIS LAWSUIT IS ONE OF A KIND.  WHAT THE UNITED STATES

17   IS ASKING THE COURT TO DO, FIRST, IS TO REQUIRE THE STATE --

18   WELL, THE STATE OF GEORGIA IS NOT A SUABLE ENTITY.  AND IT'S AN

19   AMORPHOUS BEING.  THE STATE EDUCATIONAL AGENCY, THE STATE

20   DEPARTMENT OF EDUCATION AGENCY AND THE LOCAL EDUCATION AGENCY,

21   SCHOOL DISTRICTS, ARE IN CHARGE OF SPECIAL EDUCATION.  AND THE

22   LOCAL EDUCATION AGENCIES COMBINE TO RUN THE GNETS PROGRAMS.

23           SO THE WORD STATE JOSH BELINFANTE WILL ADDRESS MORE

24   SPECIFICALLY.  I WILL LEAVE ASIDE THOSE ISSUES, SAY THAT WHAT

25   THE UNITED STATES IS ASKING HERE IS THAT THE UNITED STATES BE

1    ABLE TO COME IN AND DETERMINE GROUP-WISE WHO SHOULD BE SERVED

2    IN GNETS SELF-CONTAINED SETTINGS AND WHO SHOULDN'T.

3             YOUR HONOR, I WANT TO BE COMPLETELY HONEST HERE.  IS

4    EVERY SINGLE STUDENT WHO'S SERVED IN THE GNETS SELF-CONTAINED

5    SETTING CORRECTLY THERE?  OF COURSE NOT.  OF COURSE THERE ARE

6    STUDENTS WHO NEED TO BE MOVED OUT, AND THEY ARE BEING MOVED

7    OUT.  BUT THAT'S AN INDIVIDUAL IEP TEAM DETERMINATION, AS IT

8    MUST BE UNDER FEDERAL LAW.  A THIRD PARTY CAN'T JUST COME IN

9    AND SAY, THIS GROUP GOES OUT.  THAT'S JUST -- THAT WOULD

10   REQUIRE A VIOLATION OF I.D.E.A.

11            NOW, THE UNITED STATES ALSO ALLEGES THAT FACILITIES

12   THAT HOUSE SOME OF THESE SELF-CONTAINED GNETS PROGRAMS ARE

13   INADEQUATE.  WELL, WHEN THE STATE LEARNS ABOUT THAT, THE STATE

14   MAKES SURE THAT THOSE STUDENTS ARE MOVED ELSEWHERE TO BE

15   SERVED.  THEY ARE NOT TAKEN OUT OF GNETS.  THEY ARE NOT DENIED

16   GNETS PROGRAM SERVICES, BUT BE PUT IN BETTER FACILITIES.

17            REMEMBER, IT IS THE LOCAL EDUCATION AGENCIES THAT

18   DETERMINE WHERE THE SERVICES ARE GIVEN.  IF THE STATE FINDS OUT

19   THAT A FACILITY IS INADEQUATE, THE STUDENTS AREN'T SERVED THERE

20   ANYMORE.

21            SO I'M GOING TO TURN OVER TO JOSH NOW.  BUT, IN

22   PARTING, I DO WANT TO THANK YOU AGAIN FOR YOUR TIME.  AND I'D

23   ASK THE COURT TO CONSIDER HOW SPECIFIC I.D.E.A. IS REGARDING

24   WHAT THE STATE AND THE LOCAL EDUCATIONAL AGENCIES MUST DO AND

25   THE FACT THAT MAKING A WHOLESALE RECOMMENDATION, AS THE UNITED

19

1    STATES IS ASKING, WOULD REQUIRE A VIOLATION OF THAT LAW.

2            THANK YOU.

3            THE COURT:  THANK YOU.  LET ME ASK YOU ONE MORE

4    QUESTION --

5            MS. ROSS:  SURE.

6            THE COURT:  -- BEFORE YOU STEP AWAY.  WHEN YOU SAY,

7    AS YOU JUST SAID AT THE END OF YOUR PRESENTATION, THAT WHEN THE

8    STATE LEARNS ABOUT CERTAIN ISSUES, THE STATE DOES THIS OR STATE

9    DOES THAT, SPECIFICALLY WHO ARE YOU REFERENCING?

10           MS. ROSS:  THE STATE BOARD OF EDUCATION, YOUR HONOR.

11           THE COURT:  THANK YOU.  ALL RIGHT.

12           ALL RIGHT.  THANK YOU.

13           MR. BELINFANTE:  GOOD MORNING, YOUR HONOR.

14           THE COURT:  GOOD MORNING AGAIN.

15           MR. BELINFANTE:  TODAY, AS MS. ROSS INDICATED, I'M

16   GOING TO ARGUE THE FIRST TWO SECTIONS OF OUR BRIEF AND, IN

17   DOING SO, WILL ADDRESS THE COURT'S MORE RECENT ORDER ON THE

18   QUESTIONS OF PROPER PARTY AND REDRESSABILITY OR WHETHER RELIEF

19   IS AVAILABLE.

20           THE COURT:  YES, SIR.

21           MR. BELINFANTE:  THE FIRST ARGUMENT I'LL RAISE IS THE

22   FIRST ONE IN OUR BRIEF, WHICH IS THAT THE UNITED STATES SIMPLY

23   LACKS STANDING UNDER TITLE II TO BRING AN ACTION AGAINST THE

24   STATE OF GEORGIA.  THE DUDEK COURT, AS THIS COURT KNOWS WE RELY

25   ON EXTENSIVELY, CONDUCTED A THOROUGH ANALYSIS OF THIS AND AN

20

1    ANALYSIS, FRANKLY, THAT WAS NOT DISCUSSED IN THE SUPPLEMENTAL

2    AUTHORITY, THE HARRIS COUNTY DECISION BROUGHT TO THE COURT'S

3    ATTENTION BY THE UNITED STATES.

4              IT IS APPARENT AND IT IS OBVIOUS THAT STANDING MUST

5    BE DEMONSTRATED.  IT IS NOT PRESUMED.  AND WHEN DEALING WITH

6    FEDERAL AGENCIES, AS THE SUPREME COURT SAID IN LOUISIANA PUBLIC

7    SERVICE COMMISSION AGAINST THE FEDERAL COMMUNICATION COMMISSION

8    IN 1986, AN AGENCY LITERALLY HAS NO POWER TO ACT UNLESS AND

9    UNTIL CONGRESS CONFERS POWER ON IT.

10             AND THAT'S THE QUESTION BEFORE YOU TODAY.  HAS

11   CONGRESS AUTHORIZED THE UNITED STATES ACTING THROUGH THE

12   ATTORNEY GENERAL TO BRING A TITLE II CLAIM.  AND THE ANSWER TO

13   THE QUESTION IS NO.  AND AS COURTS HAVE ROUTINELY HELD, IN

14   DETERMINING QUESTIONS OF STATUTORY INTERPRETATION, YOU BEGIN

15   WITH THE TEXT OF THE STATUTE AT ISSUE.

16             IN YOUR NOTEBOOK AT TAB FIVE IS 42 -- OR, EXCUSE ME,

17   TAB F.

18             THE COURT:  TAB WHAT?

19             MR. BELINFANTE:  F.

20             THE COURT:  F?

21             MR. BELINFANTE:  F AS IN FRANK.  AND I'M GOING TO GO

22   PUT IT UP HERE IN A SECOND.  IT IS 42 U.S.C. 12133.  THAT'S THE

23   ENFORCEMENT SECTION OF TITLE II.

24             THIS IS THE STATUTORY TEXT WHICH THE UNITED STATES

25   HAS BROUGHT THIS CLAIM.  THE PROBLEM THE UNITED STATES RUNS

21

1    INTO AND THE FACT THAT THEY EFFECTIVELY CONCEDE ON PAGE EIGHT

2    OF THEIR BRIEF, THEY SAY, WE ARE NOT ARGUING THAT THE UNITED

3    STATES IS A PERSON.  THEIR ARGUMENT, WHICH I'LL GET TO, IS,

4    THEY'RE COVERED IN THE REMEDIES SECTION.

5         BUT LIKE ANY STATUTE PROVIDING FOR REMEDIES OR

6    ENFORCEMENT, THERE'S A QUESTION OF WHAT, WHAT ARE THE REMEDIES.

7    AND THAT'S THIS SECTION THAT THE UNITED STATES RELIES ON.

8         AND THERE'S A QUESTION OF WHO.  WHO CAN BRING THE

9    REMEDIES.  AND THAT FOCUSES ON THE QUESTION OF WHO IS A PERSON.

10   AND THE INQUIRY INTO THIS LAWSUIT CAN EFFECTIVELY END THERE AND

11   EFFECTIVELY END BECAUSE, AS THE UNITED STATES INDICATES, IT

12   DOES NOT ARGUE IT'S A PERSON.  AND, FOR THAT MATTER, NEITHER

13   DOES THE UNITED STATES CODE.  AT 1 U.S.C. 1, THERE IS A

14   DEFINITION OF THE WORD PERSON.  AND IT SAYS, IT INCLUDES

15   CORPORATIONS, COMPANIES, ASSOCIATIONS, FIRMS, PARTNERSHIPS,

16   SOCIETIES, JOINT STOCK COMPANIES, AND INDIVIDUALS.  NOTICEABLY

17   ABSENT FROM 1 U.S.C. 1 IS ANY REFERENCE TO THE GOVERNMENT.

18        NOW, THE DUDEK COURT RELIES HEAVILY ON THE DECISION

19   FROM THE UNITED STATES SUPREME COURT OF VERMONT AGENCY NATURAL

20   RESOURCES AGAINST UNITED STATES FROM 2000.  AND THE ISSUE IN

21   THAT CASE IS WHETHER A STATE WAS A PERSON UNDER THE FALSE

22   CLAIMS ACT AND COULD BE LIABLE TO THE FEDERAL GOVERNMENT FOR

23   SUBMITTING FALSE CLAIMS.  THE COURT DECIDED NO.  AND THE

24   MAJORITY OF THE COURT CONCLUDED THAT IT IS A LONGSTANDING

25   INTERPRETIVE PRESUMPTION THAT PERSON DOES NOT INCLUDE THE

1   SOVEREIGN -- IN THAT CASE, THE STATE OF VERMONT -- BUT,

2   INTERESTINGLY ITSELF, IT CITED AND RELIED ON THE DECISION THE

3   UNITED STATES AGAINST COOPER FROM THE SUPREME COURT IN 1941.

4   AND COOPER IS THE ONE THAT ADDRESSES THE UNITED STATES

5   SPECIFICALLY.

6         AND THE COOPER COURT SAYS THAT IF THE PURPOSE WAS TO

7   INCLUDE THE UNITED STATES, THE ORDINARY DIGNITIES OF SPEECH

8   WOULD HAVE LED IT TO MENTION IT BY NAME.  AND CONGRESS DID

9   THAT, AS WE WILL DISCUSS IN A MINUTE, IN TITLE I AND TITLE III

10  OF THE ADA, BUT NOT IN TITLE II.

11        EVEN THE DISSENT, JUSTICE STEVENS JOINED BY JUSTICE

12  SOUTER IN VERMONT AGENCY IN DISCUSSING THE SHERMAN ACT AS

13  ANOTHER EXAMPLE UNDER -- ADDRESSED THE ISSUE OF WHETHER THE

14  SOVEREIGN, WHICH IS PROMULGATING THE LAW, ENACTING THE LAW,

15  INCLUDES ITSELF.  AND HE WROTE, FOR EXAMPLE, THE WORD PERSON IN

16  THE SHERMAN ACT DOES NOT INCLUDE THE SOVEREIGN THAT ENACTED THE

17  STATUTE, BUT IT DOES INCLUDE THE STATE.

18        I HAVE NOT SEEN ANY AUTHORITY THAT WOULD SUPPORT THE

19  IDEA THAT THE UNITED STATES QUALIFIES AS A PERSON UNDER THIS

20  STATUTE.  THE CASES THAT HAVE BEEN CITED IN THE HARRIS COUNTY

21  COURT TEND TO JUST MOVE PAST THE ISSUE, OR THEY RELY ON THE

22  REHABILITATION ACT, WHICH JUDGE ZLOCH IN THE SOUTHERN DISTRICT

23  OF FLORIDA ADDRESSED SQUARELY IN DUDEK.

24        LASTLY, YOUR HONOR, ON THIS POINT, THE QUESTION

25  REALLY -- IF THE COURT IS SATISFIED THAT A PERSON DOES NOT

1  INCLUDE THE UNITED STATES, THE CLAIM CAN SIMPLY NOT BE BROUGHT.

2  AND WHAT COOPER CORPORATION HELD IN TERMS OF IF CONGRESS WANTED

3  TO INCLUDE THE UNITED STATES, IT WOULD HAVE SAID SO, AS I

4  INDICATED, THAT'S MADE PLAIN BY TITLES 1 AND TITLE III.

5           THIS ONE'S A LITTLE SMALLER.  BUT IT SHOWS YOU ON A

6  COMPARATIVE BASIS -- AND WE'VE GOT HANDOUTS OF SLIDES, JUDGE,

7  IF YOU WOULD PREFER THAT.

8           THE COURT:  MS. ANDERSON HAS TAKEN CARE OF IT.

9           MR. BELINFANTE:  OH, GREAT.  PERFECT.

10           AND JUDGE ZLOCH POINTS THIS OUT, IN TITLE I AND TITLE

11  III, YOU HAVE BOTH THE WORD PERSON AND THE WORD ATTORNEY

12  GENERAL.  TITLE II IS THE ONLY ONE THAT DOESN'T.

13           AND IN TITLE III, THIS IS -- WHAT YOU HAVE BEFORE YOU

14  HERE IS BOTH A AND B.  THEY ARE SEPARATE CODE SECTIONS

15  ALTOGETHER.  THEY ARE NOT JOINED.  AND AS THE DUDEK COURT

16  POINTS OUT, THERE ARE THREE CANONS OF STATUTORY CONSTRUCTION

17  THAT WOULD SHOW THAT THIS WAS THE INTENT OF CONGRESS TO LIMIT

18  TITLE II REMEDIES TO A PERSON AS DEFINED BY THE THE U.S. CODE

19  AND AS INTERPRETED BY THE UNITED STATES SUPREME COURT.

20           THE FIRST IS THE SURPLUSAGE CANON, THAT IF THE UNITED

21  STATES IS CORRECT THAT IT HAS JURISDICTION UNDER TITLE II

22  BECAUSE IT IS INCLUDED WITHIN A PERSON, THEN THERE WAS NO POINT

23  FOR CONGRESS TO INCLUDE THE ATTORNEY GENERAL AND PERSON IN

24  TITLES I AND III.  THE WORD ATTORNEY -- THE PHRASE ATTORNEY

25  GENERAL WOULD BE DUPLICATIVE BECAUSE IT WOULD ALREADY BE

1    INCORPORATED IN WHO IS A PERSON.

2              REMEMBER, IT COMES BACK TO THE QUESTION REMEDIES

3    ALWAYS BRING UP OF WHAT IS THE REMEDY AND WHO CAN BRING IT.

4              THE SECOND IS THAT STATUTES ARE PRESUMED TO HAVE --

5    OR WORDS AND STATUTES ARE PRESUMED TO HAVE THE SAME MEANING

6    THROUGHOUT THE ACT.  JUDGE DUDEK CITES THE GUSTAFSON AGAINST

7    ALLOYD COMPANY, INCORPORATED DECISION FROM THE SUPREME COURT IN

8    1995 ON THIS POINT.  THAT CASE ADDRESSED THE QUESTION OF

9    WHETHER THE WORD PROSPECTUS IN THE 1933 SECURITIES ACT MEANT

10   THE SAME IN SECTION TEN OF THE ACT AS IT DID IN SECTION 12.

11   AND THE COURT RULED IN THE AFFIRMATIVE THAT IT DOES, BECAUSE AS

12   THE COURT SAID, THE NORMAL RULE OF STATUTORY CONSTRUCTION IS

13   THAT IDENTICAL WORDS USED IN DIFFERENT PARTS OF THE SAME ACT

14   ARE INTENDED TO HAVE THE SAME MEANING.

15             AND SO IF YOU LOOK HERE AT THE WAY THAT CONGRESS SET

16   UP TITLE I AND TITLE III, PERSON AND ATTORNEY GENERAL ARE

17   PLAINLY TWO DIFFERENT ENTITIES.  AND SO IF PERSON IS A

18   DIFFERENT ENTITY THAN THE ATTORNEY GENERAL, THEN IN TITLE II,

19   THE ATTORNEY GENERAL'S ABSENCE IS DISPOSITIVE.

20             LASTLY, THE DUDEK COURT ON PAGE FOUR CITED THE

21   NEGATIVE IMPLICATION CANON OR EXPRESS VIEW OF MEANINGS.  AND

22   THERE BECAUSE CONGRESS NAMED ONLY PERSON IN TITLE II, THAT IS

23   MEANT TO BE EXCLUSIVE.  AND THAT WAS HELD SPECIFICALLY BY THE

24   SUPREME COURT IN ANDERSON AGAINST SANDOVAL IN 2001 ADDRESSING

25   THIS EXACT QUESTION OF ENFORCEMENT WHERE IT SAID, THE EXPRESS

25

1    PROVISION OF ONE METHOD OF ENFORCING A SUBSTANTIVE RULE

2    SUGGESTS THAT CONGRESS INTENDED IT TO PRECLUDE OTHERS.

3         NOW, IN THE LIGHT OF THIS AUTHORITY, THE UNITED

4    STATES AGAIN FOCUSES ON THE REMEDIES THAT ARE AVAILABLE, BUT IT

5    FAILS TO ADDRESS WHO CAN BRING THOSE REMEDIES, AS THE HARRIS

6    COUNTY COURT DID AS WELL.  AND IT SIMPLY FAILS SIMPLE GRAMMAR,

7    BECAUSE THE RIGHTS AND REMEDIES THAT ARE AVAILABLE, THEY ARE

8    PROVIDED TO ANY PERSON.  AND IF THE UNITED STATES IS NOT THAT

9    PERSON, IT IS NOT PROVIDED THE SAME RIGHTS AND REMEDIES THAT

10   ARE CITED IN THE PRECURSOR OF THE STATUTE.

11        AND THE SUPREME COURT IN A CASE CITED FOR A DIFFERENT

12   REASON BY JUDGE ZLOCH, INTERNATIONAL PRIMATE PROTECTION LEAGUE

13   VERSUS ADMINISTRATORS OF TULANE EDUCATION FUND IN 1991, HELD

14   THE UNREMARKABLE AND WELL-SETTLED PRINCIPLE THAT YOU HAVE TO

15   READ STATUTES GRAMMATICALLY.  AND WHEN DONE SO HERE, THE UNITED

16   STATES IS SIMPLY EXCLUDED FROM A PARTY THAT CAN BRING A TITLE

17   II CLAIM.

18        BUT IT ALSO MAKES SENSE BEYOND GRAMMAR, BECAUSE THE

19   REMEDIES, PROCEDURES, AND RIGHTS SET FORTH IN THE

20   REHABILITATION ACT AND, THEREFORE, INCORPORATING THE CIVIL

21   RIGHTS ACT, INCLUDE PRIVATE RIGHTS OF ACTION.  SO WHAT CONGRESS

22   WAS SIMPLY SAYING IS THAT A PERSON CAN BRING THE SAME TYPE OF

23   PRIVATE RIGHT OF ACTION THEY COULD UNDER THE REHABILITATION ACT

24   AND, THEREFORE, THE CIVIL RIGHTS ACT.  THEY ARE NOT SAYING THE

25   UNITED STATES COULD.  THEY KNEW HOW TO DO THAT.  THIS IS

1   SOMETHING SEPARATE.

2          SO THEN THE UNITED STATES RELIES ON OTHER COURTS,

3   HARRIS COUNTY BEING THE MOST RECENT.  AND AS WE POINTED OUT IN

4   OUR SUPPLEMENTAL AUTHORITY FILED ON MONDAY, HARRIS CITES

5   BASICALLY EIGHT CASES.  ONLY TWO ADDRESS THE ISSUE OF STANDING.

6   THE REST IT WAS NOT AN ISSUE.

7          AND THE ANALYSIS IN THOSE CASES, THE LATEST BEING

8   HARRIS, WAS COVERED BY WHAT WE JUST DISCUSSED AND COVERED BY

9   JUDGE ZLOCH IN THE DUDEK CASE.

10         SO THE UNITED STATES THEN CITES TO WHAT IT REFERS TO

11  AS THE LEGISLATIVE HISTORY IN THE BRIEF AT PAGE NINE.  THE

12  PROBLEM THE UNITED STATES RUNS INTO IN LEGISLATIVE HISTORY IS

13  THAT, AT BEST IN THIS CASE, YOUR HONOR, IT'S A MIXED BAG.  AND

14  THE PROBLEMS OF THAT WERE POINTED OUT BY JUSTICE KENNEDY IN THE

15  DECISION OF EXXON MOBIL CORPORATION AGAINST ALLAPATTAH

16  SERVICES, INCORPORATED, AT 545 UNITED STATES 546 IN 2005.

17         AND THERE JUSTICE KENNEDY ADDRESSED THIS ISSUE OF

18  COMMITTEE REPORTS.  THE UNITED STATES RELIES ON A COMMITTEE

19  REPORT FROM THE LABOR COMMITTEE IN THE UNITED STATES HOUSE.

20  JUSTICE KENNEDY SAID, RELIANCE ON LEGISLATIVE MATERIALS LIKE

21  COMMITTEE REPORTS WHICH ARE THEMSELVES NOT SUBJECT TO THE

22  REQUIREMENTS OF ARTICLE ONE MAY GIVE UNREPRESENTATIVE COMMITTEE

23  MEMBERS OR, WORSE YET, UNELECTED STAFFERS AND LOBBYISTS BOTH

24  THE POWER AND THE INCENTIVE TO ATTEMPT STRATEGIC MANIPULATIONS

25  OF LEGISLATIVE HISTORY TO SECURE RESULTS THEY WERE UNABLE TO

1  ACHIEVE THROUGH STATUTORY TEXT.  AS DESCRIBED PERHAPS MORE

2  COLORFULLY BY OTHER COURTS, RELYING ON LEGISLATIVE HISTORY IS

3  LIKE GOING TO A COCKTAIL PARTY AND SEARCHING OUT YOUR FRIENDS.

4          AND THAT'S ABSOLUTELY THE CASE HERE.  IF THE COURT

5  LOOKS AT HOUSE REPORT 101-485, ROMAN NUMERAL III, THAT'S THE

6  JUDICIARY COMMITTEE'S REPORT.  AND THE SECTION ON ENFORCEMENT

7  OF TITLE II, THE UNITED STATES AND THE ATTORNEY GENERAL ARE NOT

8  NAMED.  THE ENERGY AND COMMERCE AND THE PUBLIC WORKS AND

9  TRANSPORTATION COMMITTEES TAKE IT A STEP FURTHER AT BOTH HOUSE

10 REPORT 101-485(4) -- THAT'S ENERGY AND COMMERCE -- AND (1).

11 THAT'S PUBLIC WORKS AND TRANSPORTATION.

12         ON PAGE 39 OF THE ENERGY AND COMMERCE REPORT, THE

13 COMMITTEE SAYS, IN DISCUSSING THIS SECTION OF THE ENFORCEMENT

14 OF TITLE II, THE COMMITTEE SAYS, THIS SECTION PROVIDES THE

15 REMEDIES, PROCEDURES, AND RIGHTS SET FORTH IN SECTION 505 OF

16 THE REHABILITATION ACT IN 1973 AND SHALL BE AVAILABLE TO

17 INDIVIDUALS ALLEGING DISCRIMINATION ON THE BASIS OF DISABILITY

18 AND VIOLATION OF THE STATUTE.  ALL THREE, JUDICIARY, ENERGY AND

19 COMMERCE, AND PUBLIC WORKS AND TRANSPORTATION, WHEN REFERRING

20 TO TITLE III, AT A MINIMUM, ACKNOWLEDGE THAT THE UNITED STATES

21 HAS AUTHORITY TO BRING THOSE CLAIMS.

22         SO, AT BEST, LEGISLATIVE HISTORY, ONCE AGAIN, IS

23 INCONCLUSIVE.

24         THE UNITED STATES THEN TURNS AND SAYS, WELL, IF YOU

25 LOOK PAST THE STATUTORY TEXT AND YOU GO THROUGH THE LEGISLATIVE

1    HISTORY, YOU SHOULD RELY ON OUR RULES BECAUSE OUR RULES SAY

2    THAT WE HAVE AUTHORITY TO DO IT.  YOUR HONOR, THE PROBLEM WITH

3    THAT, AS THE SOUTHERN DISTRICT OF FLORIDA RECOGNIZED, IS THAT

4    AN AGENCY CANNOT CREATE A PRIVATE RIGHT OF ACTION OR ANY RIGHT

5    OF ACTION WHERE CONGRESS HAS NOT.  THAT IS ABSOLUTE LAW COMING

6    FROM THE ANDERSON AGAINST SANDOVAL DECISION WHICH WE'VE ALREADY

7    DISCUSSED FROM THE SUPREME COURT IN 2001.

8              PUT DIFFERENTLY, THE SUPREME COURT IN 1986'S DECISION

9    OF LYNG AGAINST PAYNE SAID, AN AGENCY'S POWER IS NO GREATER TO

10   IT THAN THAT DELEGATED TO IT BY CONGRESS.

11             SO IF THIS COURT, WHICH CHEVRON ITSELF POINTS OUT IN

12   FOOTNOTE EIGHT, INTERPRETS THESE STATUTES AS NOT INCLUDING THE

13   UNITED STATES AS A PARTY, THAT ENDS THE INQUIRY, AND YOU DON'T

14   GET TO THE REGULATIONS.

15             THEY SIMPLY DON'T HAVE THE AUTHORITY TO BRING A CLAIM

16   UNDER TITLE II.  AND I THINK MS. ROSS PUT IT IN THE PROPER

17   CONTEXT.  IF YOU'RE LOOKING AT QUESTIONS OF DISABILITIES WITHIN

18   EDUCATION, THE I.D.E.A. IS THE STATUTE THAT ADDRESSES EXACTLY

19   WHAT THE UNITED STATES COMPLAINS OF IN THIS LAWSUIT.  AND IT'S

20   THEIR QUESTIONING OF THE I.D.E.A.'S IEP TEAMS THAT IS THE

21   ESSENCE OF THIS LAWSUIT.  IT'S THOSE TEAMS THAT PLACE STUDENTS

22   AFTER THOROUGH REVIEWS IN A GNETS PROGRAM BECAUSE THEY FIND

23   THAT'S WHERE THEY WILL GET THEIR BEST EDUCATION SERVICES.

24             THE PROBLEM THE JUSTICE DEPARTMENT RUNS INTO, THOUGH,

25   IS, THEY CAN'T ENFORCE THE I.D.E.A.  THAT IS LIMITED TO THE

1    UNITED STATES DEPARTMENT OF EDUCATION AT 20 U.S.C. 1416.  AND

2    SO THIS CASE, WHICH SEEKS TO TRANSFORM THE AMERICANS WITH

3    DISABILITIES ACT INTO A PARALLEL OF THE I.D.E.A., FAILS FOR THE

4    REASONS INITIALLY OF STANDING THAT CONGRESS HAS PROVIDED.

5         BUT IF THIS COURT WANTED TO MOVE BEYOND THE QUESTION

6    OF STATUTORY STANDING AND LOOK TO THE HEART OF THE COMPLAINT,

7    IT SHOULD STILL DISMISS THE COMPLAINT BECAUSE IT FAILS TO STATE

8    A CLAIM FOR TWO REASONS.  ONE, THE STATE OF GEORGIA DOES NOT

9    ADMINISTER THE GNETS PROGRAM.  AND WITHIN THAT IT RAISES THE

10   QUESTION OF WHETHER THE STATE OF GEORGIA IS A PROPER PARTY.

11        AND, TWO, AS MS. ROSS ALLUDED TO, THEY FAILED TO

12   ALLEGE THAT ANY TREATMENT PROFESSIONAL HAS DETERMINED THAT ANY

13   STUDENT WITHIN THE GNETS PROGRAM IS BEST SUITED FOR COMMUNITY

14   PLACEMENT OR COMMUNITY EDUCATION SERVICES.

15        WHILE THE CASE IS STATUTORILY BASED ON 42 U.S.C.

16   12133, IT IS BASED, AS THE COMPLAINT MAKES CLEAR, ON PARAGRAPHS

17   19, 69, AND 72, AT LEAST, BASED ON WHAT'S KNOWN AS THE

18   INTEGRATION MANDATE, WHICH IS FOUND IN 28 C.F.R. 35.130, SO

19   PARAGRAPH (D).  THAT'S IN TAB A OF YOUR NOTEBOOK, AND I'LL SET

20   IT UP OVER HERE AS WELL.

21        THE COURT:  WHILE YOU'RE DOING THAT, WHAT SAY YOU

22   WITH RESPECT TO WHETHER THE ISSUE OF CONTROLLING OR

23   ADMINISTERING IS IN SOME WAYS A FACT QUESTION?

24        MR. BELINFANTE:  AT BEST, YOUR HONOR, IN SOME WAYS IT

25   IS.  BUT THE ALLEGATIONS HERE ARE PLED IN A LEGAL CONTEXT.  AND

1    IF YOU LOOK AT THE STATE CONSTITUTION AND YOU LOOK AT THE STATE

2    STATUTE AND THE STATE RULE, THAT LIMITS THE STATE BOARD OF

3    EDUCATION TO EFFECTIVELY FUNDING.

4        THE STATE DOES HAVE AUTHORITY TO OPERATE SPECIAL

5    EDUCATION SCHOOLS.  AND THE UNITED STATES INTERPRETS THE COX

6    DECISION AS GOING THAT WAY.  BUT THERE ARE SPECIFIC SCHOOLS.

7    THERE ARE THREE SCHOOLS IN GEORGIA FOR THE BLIND AND DEAF THAT

8    THE STATE OPERATES.  SO AS A MATTER OF LAW, THE STATE CANNOT

9    ADMINISTER THE GNETS PROGRAM.  AND THEY HAVE NOT ALLEGED AS A

10   QUESTION OF FACT WHETHER THE STATE THAT THE STATE IS VIOLATING

11   ITS OWN LAW.  THAT'S A PROBLEM THAT THE COMPLAINT SIMPLY

12   DOESN'T ADDRESS.

13       AND STRAIGHT TO THAT POINT, THE WORD ADMINISTER COMES

14   FROM THE RULE.  AND THAT'S THE FIRST REASON THAT THEY FAIL TO

15   STATE THE CLAIM.  THE PARTIES AGREE THAT NEITHER THE REGULATION

16   NOR THE ADA ITSELF DEFINES THE WORD ADMINISTER.  SO WE OFFERED

17   TWO DICTIONARY DEFINITIONS WHICH THE UNITED STATES HAS NOT

18   CHALLENGED, ONE FROM THE OXFORD ENGLISH DICTIONARY, ONE FROM

19   BLACK'S LAW DICTIONARY.  BOTH USE THE WORD MANAGE IN TERMS OF

20   WHAT IT MEANS TO ADMINISTRATE.  SO IT MEANS TO EXERCISE SOME

21   TYPE OF OPERATIONAL CONTROL.

22       AND TO THE COURT'S QUESTION, PARAGRAPH 24 OF THE

23   COMPLAINT IS REPRESENTATIVE OF HOW THE UNITED STATES HAS

24   ALLEGED THE TYPE OF ADMINISTRATION IN THE INTEGRATION MANDATE.

25   AND PARAGRAPH 24 SAYS IN PART, THE STATE PLANS, FUNDS,

1    ADMINISTERS, LICENSES, MANAGES, AND OVERSEES THE GNETS PROGRAM.

2            THOSE ARE AT LEAST PARTIALLY A LEGAL QUESTION.  AND

3    THE IQBAL DECISION SAYS, THIS COURT DOES NOT NEED TO DEFER TO

4    CERTAINLY CONCLUSORY PLEADINGS OF LAW.  BUT, AS INDICATED, THE

5    STATE CONSTITUTION ITSELF SAYS IN ARTICLE EIGHT, SECTION ONE,

6    PARAGRAPH ONE, THAT -- EXCUSE ME, ARTICLE EIGHT, SECTION FIVE,

7    PARAGRAPH TWO, THAT EACH SCHOOL SYSTEM SHALL BE UNDER THE

8    CONTROL AND MANAGEMENT AND CONTROL OF THE BOARD OF EDUCATION,

9    WHICH SHALL BE ELECTED AS PROVIDED BY LAW.  THAT'S DISCUSSED IN

10   THE LOCAL SCHOOL BOARDS, WHETHER THEY ARE CITIES OR

11   MUNICIPALITIES -- OR EXCUSE ME, OR COUNTIES.

12           THE SUPREME COURT OF GEORGIA IN THAT CASE, GWINNETT

13   SCHOOL DISTRICT AGAINST COX IN 2011 WHERE THE MAJORITY OF THE

14   COURT STRUCK THE CHARTER SCHOOL LAW, THERE JUSTICE HUNSTEIN,

15   WRITING FOR THE MAJORITY, SAID THAT LOCAL BOARDS OF EDUCATION

16   HAD THE EXCLUSIVE RIGHT TO ESTABLISH, MAINTAIN, AND CONTROL

17   K-12 PUBLIC EDUCATION.  THAT'S SUPPORTED BY GNETS' OWN STATUTE,

18   WHICH IS CODIFIED AT O.C.G.A. 20-2-152(C)(1).  THERE IT

19   DESCRIBES WHAT THE STATE BOARD OF EDUCATION -- GETTING TO THE

20   QUESTION OF PARTIES -- WHAT THE STATE BOARD OF EDUCATION DOES

21   REGARDING GNETS.  AND WHAT THE GENERAL ASSEMBLY AUTHORIZED IS

22   VERY LIMITED.  THE STATE BOARD OF EDUCATION SHALL PROVIDE FOR

23   THE FUNDING WHICH HAS BEEN APPROVED BY THE GENERAL ASSEMBLY FOR

24   THIS PURPOSE FOR SPECIAL EDUCATION PROGRAMS AND DOES NOT LIST

25   ANY TYPE OF OPERATIONAL CONTROL.

1          NOW, INTERESTINGLY ENOUGH, BY CONTRAST, IT DOES LATER

2     IN THE STATUTE IN SUBPARAGRAPH (C)(1)(E) WHERE IT TALKS ABOUT

3     THE SCHOOLS FOR THE BLIND AND DEAF, OVER WHICH THE STATE BOARD

4     OF EDUCATION DOES EXERCISE ADMINISTRATION, MANAGEMENT, CONTROL.

5     THAT'S SIMPLY NOT THERE AS A MATTER OF LAW FOR PURPOSES OF

6     GNETS.

7          SO THE ONLY THING THE COURT IS LEFT WITH IS FUNDING

8     BY GRANTS.  AND WE CITED THE BACON CASE OUT OF THE FOURTH

9     CIRCUIT.  IT SAYS, IF YOU ARE FUNDING A THIRD PARTY TO ACT, THE

10    FUNDER, IN EFFECT, IS NOT LIABLE UNDER THE ADA.

11         NOW, THIS RAISES THAT THE STATE CANNOT ADMINISTER THE

12    GNETS PROGRAM.  WHAT ABOUT THE AGENCIES NAMED IN THE COMPLAINT

13    IN THE OPERATIVE PARAGRAPHS BUT NOT IN THE TITLE.  THE FIRST IS

14    THE STATE BOARD OF EDUCATION.  WE'VE DISCUSSED THE STATUTORY

15    BASIS OF THE STATE BOARD.  IT IS, AT BEST, A FUNDER.  THEN IT

16    TALKS ABOUT THE DEPARTMENT OF COMMUNITY HEALTH.

17         THE DEPARTMENT OF COMMUNITY HEALTH, OR DCH, IS THE

18    STATE MEDICAID AGENCY.  IT RECEIVES MEDICAID FUNDS FROM THE

19    FEDERAL GOVERNMENT AND CONTRACTS WITH PROVIDERS TO DISTRIBUTE

20    THOSE.  SOME PEOPLE, AS ALLEGED IN THE COMPLAINT, SOME STUDENTS

21    IN THE GNETS PROGRAM ARE SERVED THROUGH MEDICAID DOLLARS.  BUT

22    THERE'S NO ALLEGATION THAT MEDICAID IS OPERATING IN A

23    DISCRIMINATORY MANNER.

24         AT BEST, THERE'S AN ALLEGATION THAT THERE SHOULD BE

25    MORE DOLLARS SPENT ON MEDICAID.  WELL, THAT DEBATE HAPPENS

1   EVERY LEGISLATIVE SESSION AT THE GEORGIA GENERAL ASSEMBLY.

2   IT'S NOT AN ADA COMPLAINT.

3          THEY THEN NAME THE DEPARTMENT -- OR CITE TO THE

4   DEPARTMENT OF BEHAVIORAL HEALTH AND DEVELOPMENT ON

5   DISABILITIES.  DDHDD, AS IT'S KNOWN, RECEIVED MEDICAID DOLLARS

6   FROM THE DEPARTMENT OF COMMUNITY HEALTH.  IT THEN CONTRACTS

7   WITH PROVIDERS TO PROVIDE CERTAIN MENTAL HEALTH SERVICES,

8   INCLUDING TO SOME KIDS IN THE GNETS PROGRAM.  BUT AS WITH DTH,

9   THERE'S NO ALLEGATION THAT THOSE FUNDS ARE BEING SPENT IN A

10  DISCRIMINATORY MANNER.

11         AND MOST IMPORTANTLY, THE PERSONS WHO DECIDE HOW

12  THOSE FUNDS ARE GOING TO BE SPENT AT THE INDIVIDUAL CHILD

13  LEVEL, AS MS. ROSS POINTED OUT, BASED ON THE I.D.E.A, ARE LOCAL

14  EDUCATION AGENCIES.  IT'S NOT THE STATE.  AND SO THAT, AGAIN,

15  THIS KEEPS COMING BACK TO, THIS IS REALLY AN I.D.E.A. CLAIM

16  THAT THE UNITED STATES IS SEEKING TO SHOO ON IN THROUGH THE

17  AMERICANS WITH DISABILITIES ACT.  IF THEY WANT TO CHALLENGE THE

18  DECISIONS OF THE IEP TEAM, THEY NEED TO TALK TO THE U.S.

19  DEPARTMENT OF EDUCATION AND HAVE THEM LOOK AT IT FROM AN

20  I.D.E.A. PERSPECTIVE, NOT AN ADA PERSPECTIVE.

21         AND ON THAT POINT, THE LAW IN THE 11TH CIRCUIT IS,

22  WHEN YOU'RE LOOKING AT WHICH PARTY TO SUE -- AND THIS TYPICALLY

23  COMES UP IN THE CONTEXT OF THE 11TH AMENDMENT WHERE AN

24  INDIVIDUAL SUES THE STATE AS THE STATE.  AND THE 11TH AMENDMENT

25  PROHIBITS THAT, SO THROUGH THE EX PARTE YOUNG ANALYSIS, YOU

34

1    WOULD SUE, IN THE WORDS OF THE 11TH CIRCUIT IN LUCKEY AGAINST

2    HARRIS, WHICH WILL BE IN OUR FORTHCOMING BRIEF, YOU LOOK AT THE

3    OFFICER WHOSE OFFICE HAD SOME CONNECTION TO THE PROGRAM.  AND

4    WE WOULD SUGGEST THAT, HERE, THAT OFFICE IS THE IEP TEAMS AND

5    THOSE THAT ARE ACTUALLY MAKING DECISIONS ABOUT WHERE STUDENTS

6    SHOULD RECEIVE EDUCATION SERVICES.

7             AND THERE'S A LIST OF DISTRICT COURT DECISIONS THAT

8    WALK THROUGH THAT ANALYSIS THAT WILL BE IN OUR BRIEF AS WELL.

9             ONE CASE, THOUGH, SPEAKS, I THINK, MORE APPROPRIATELY

10   TO THIS ONE, WHICH IS FROM THE 11TH CIRCUIT IN 2003.  IT'S THE

11   CASE OF DOE VERSUS PRYOR AT 344 FEDERAL THIRD 1282.  THAT WAS A

12   SUIT BROUGHT AGAINST NOW JUDGE PRYOR, THEN ATTORNEY GENERAL

13   PRYOR, OVER WHAT WAS ALABAMA'S SODOMY LAW IN THE WAKE OF THE

14   LAWRENCE DECISION.  AND JUDGE PRYOR HAD INDICATED HE WAS NOT

15   GOING TO ENFORCE THE SODOMY LAW IN THE WAKE OF THE DECISION.

16   AND SO THERE WAS REALLY NOTHING HE WAS GOING TO BE DOING TO

17   ENFORCE THE LAW THAT WAS BEING CHALLENGED.

18            AND THE 11TH CIRCUIT SAID, WELL, IN THAT CASE, JUDGE

19   CARNES SAID THAT THE ATTORNEY GENERAL HAD NO ROLE WITH RESPECT

20   TO THE PARTIES BECAUSE HE'S INDICATED HE'S NOT ENFORCING IT.

21   AND AFTER LAWRENCE, HE CAN'T ENFORCE IT.  THE LINK THAT WAS

22   TYPICALLY YOU WOULD BRING IN THE ATTORNEY GENERAL BECAUSE THEY

23   ARE THE PERSON ENFORCING THE LAW IN THAT CASE COULD NOT, JUST

24   AS HERE, THE STATE CANNOT INTERFERE WITH THE IEP TEAM PURSUANT

25   TO THE I.D.E.A.

1          BUT YOUR HONOR'S QUESTION ABOUT THE PROPER PARTY

2    RAISED, I THINK, ANOTHER QUESTION THAT SPEAKS TO THE

3    JURISDICTION OF THIS COURT TO DECIDE THE CASE, AND THAT IS

4    CONSTITUTIONAL STANDING.  AND ONE OF THE THREE FACTORS OF

5    CONSTITUTIONAL STANDING IS WHETHER THE INJURY ALLEGED IS

6    ACTUALLY TRACEABLE TO THE CONDUCT OF THE DEFENDANT, THE SECOND

7    ELEMENT.  HERE, WHAT IS COMPLAINED OF, THAT STUDENTS ARE

8    SEGREGATED IN THE GNETS PROGRAM, THEY ARE NOT STAYING WITH

9    THEIR PEERS IN THE GENERAL EDUCATION CLASSES, AGAIN, THAT

10   DECISION IS NOT COMING FROM THE STATE.  IT'S NOT COMING FROM

11   THE STATE BOARD OF EDUCATION.  AND IT'S CERTAINLY NOT COMING

12   FROM DCH OR DBHDD.

13          THE SUPREME COURT ADDRESSED A SIMILAR SITUATION IN

14   THE LUJAN AGAINST WILDLIFE -- EXCUSE ME, THE DEFENDERS OF

15   WILDLIFE DECISION FROM 1992.  AND THIS WILL BE IN OUR

16   FORTHCOMING BRIEF AS WELL.  THERE THE COURT SAID THAT THE

17   EXISTENCE OF ONE OR MORE ESSENTIAL ELEMENTS OF STANDING IN THAT

18   CASE DEPENDED UPON THE UNFETTERED CHOICES MADE BY INDEPENDENT

19   ACTORS NOT BEFORE THE COURTS AND WHOSE EXERCISE OF BROAD AND

20   LEGITIMATE DISCRETION THE COURTS CANNOT PRESUME EITHER TO

21   CONTROL OR TO PREDICT.

22          IN THAT CASE, THE PLAINTIFF SUED THE SECRETARY OF AN

23   INTERIOR BECAUSE THEY ALLEGED THAT A RULE HE HAD ABOUT

24   EFFECTIVELY ENVIRONMENTALLY SENSITIVE TRAVEL WAS SUPPOSED TO

25   APPLY ACROSS THE FEDERAL GOVERNMENT AT VARIOUS AGENCIES AND IT

1    DID NOT.  AND SO THEY SUED AND SAID, THESE OTHER AGENCIES WON'T

2    HAVE ENVIRONMENTALLY SENSITIVE TRAVEL IF THE SECRETARY DOES NOT

3    CHANGE THE RULE AND HAVE IT APPLY MORE BROADLY.

4         AND THAT'S WHEN THE SUPREME COURT SAID, THE REAL

5    PARTY THERE ARE THESE OTHER AGENCIES.  IT'S THEIR TRAVEL THAT'S

6    AT ISSUE, NOT THE SECRETARY OF INTERIOR, WHO CAN PROMULGATE A

7    RULE WHICH, GIVEN THE PARALLELS HERE AND THE PARTY OF THE

8    ACTION IS BASED, AT LEAST IMPLIEDLY, ON THE GNETS RULE, IT PUTS

9    IT SQUARELY IN THE CAMP OF LUJAN.

10        SO WHETHER THE COURT LOOKS AT THIS QUESTION IS ONE OF

11   WHETHER THE STATE ADMINISTERS THE GNETS PROGRAM, WHETHER THE

12   STATE IS A PROPER PARTY, OR WHETHER STANDING HAS BEEN ALLEGED,

13   ANY OF THOSE, IF THE COURT FINDS ARE LACKING, THE MOTION TO

14   DISMISS SHOULD BE GRANTED.

15        THE NEXT REASON ON THE PRIMA FACIE CASE WAS ALLUDED

16   TO BY MS. ROSS.  AND THAT IS THAT, UNDER OLMSTEAD, WHICH IS

17   CITED AND INCORPORATED THROUGHOUT THE COMPLAINT, ISOLATION

18   ITSELF IS NOT ACTIONABLE DISCRIMINATION.  JUSTICE GINSBURG

19   WRITING FOR THE MAJORITY SAID ON PAGE 597, IT IS UNJUSTIFIED

20   ISOLATION THAT IS PROPERLY REGARDED AS DISCRIMINATION BASED ON

21   DISABILITY.

22        AND BECAUSE THE FACTS IN THAT CASE, THE TWO

23   PLAINTIFFS WERE DETERMINED BY THE STATE OF GEORGIA TO BE

24   APPROPRIATE TO RECEIVE SERVICES WITHIN THE COMMUNITY, NOT IN

25   THE STATE HOSPITAL WHERE THEY WERE, AT THE TIME, RECEIVING CARE

```
 1   AND TREATMENT.  BUT -- AND THAT WAS A KEY FACT FOR THE OLMSTEAD
 2   COURT, BECAUSE IT RECOGNIZED ON PAGE 601 THAT NOTHING IN THE
 3   AMERICANS WITH DISABILITIES ACT OR ITS IMPLEMENTING REGULATIONS
 4   CONDONES TERMINATION OF INSTITUTIONAL SETTINGS FOR PERSONS
 5   UNABLE TO HANDLE OR BENEFIT FROM COMMUNITY SETTINGS.
 6          IN FACT, IT CONTINUES TO SAY, ABSENT SUCH
 7   QUALIFICATION, IT WOULD BE INAPPROPRIATE TO REMOVE A PATIENT
 8   FROM THE MORE RESTRICTIVE SETTING, WHICH GOES TO THE WORD
 9   APPROPRIATE WITHIN THE COMPLAINT ITSELF.  EVERY CASE FROM
10   OLMSTEAD, INCLUDING THE CASES CITED BY DAY, WHICH IS THE CASE
11   RELIED ON BY THE UNITED STATES IN ITS BRIEF ON THIS POINT,
12   THERE HAS BEEN SOME DETERMINATION BY A TREATMENT PROFESSIONAL
13   THAT THE PERSON OF WHOM THE HARM WAS ALLEGED WAS APPROPRIATE --
14   COULD APPROPRIATELY RECEIVE COMMUNITY SERVICES.
15          THE DAY CASE IS THE ONE THAT THE UNITED STATES RELIES
16   ON.  BUT DAY IS LARGELY IRRELEVANT TO THIS LAWSUIT, BECAUSE, IN
17   DAY, THE QUESTION WAS, IN DETERMINING WHETHER COMMUNITY
18   SERVICES ARE APPROPRIATE, DO YOU HAVE TO USE THE STATE'S
19   TREATMENT PROFESSIONALS, WHICH IS CANDIDLY WHAT THE WORDS OF
20   OLMSTEAD SAYS, OR CAN YOU USE ANY TREATMENT PROFESSIONALS.  AND
21   THE ANSWER WAS HELD IN DAY AND THE CASES IT CITES, ANY
22   TREATMENT PROFESSIONALS.  AND IN DAY, JUST AS IN THE FIVE CASES
23   IT CITES, THERE WERE ALLEGATIONS THAT A TREATMENT PROFESSIONAL
24   HAD DETERMINED THAT COMMUNITY SERVICES WERE APPROPRIATE FOR THE
25   INDIVIDUALS NAMED.
```

38

1        WE HAVE ZERO REFERENCE TO ANY INDIVIDUAL IN THIS

2   CASE.  WE HAVE ZERO REFERENCE TO ANY TREATMENT PROFESSIONAL IN

3   THIS CASE.  THE UNITED STATES CITES TO PARAGRAPHS 37 THROUGH 43

4   IN ITS BRIEF TO ANSWER THIS POINT.  BUT THE WORDS TREATMENT

5   PROFESSIONALS ARE NOT THERE.  THEY SIMPLY SAY PEOPLE CAN

6   EXPERIENCE EDUCATIONAL BENEFITS IN A GENERAL EDUCATION SETTING.

7   WE DON'T DISAGREE WITH THAT.

8        BUT THE QUESTION AND WHAT OLMSTEAD MAKES CLEAR IS, TO

9   STATE A CLAIM OF DISCRIMINATION UNDER THE ADA, THE FIRST

10  ELEMENT THAT A PLAINTIFF HAS TO SHOW IS -- AND THIS IS PAGE 607

11  OF THE COMPLAINT -- OR THE CASE, THAT THE STATE'S TREATMENT

12  PROFESSIONALS DETERMINE THAT SUCH TREATMENT IS APPROPRIATE.

13  AND THAT'S WHAT THE RULE SAYS.  THERE IS SIMPLY NO ALLEGATION

14  OF THAT IN THIS CASE AT ALL.  AND FOR THAT REASON, THE CASE

15  SHOULD BE DISMISSED.

16        LAST, YOUR HONOR, THE QUESTION OF REDRESSABILITY AND

17  WHETHER RELIEF CAN BE GRANTED AND WHETHER WHAT THE UNITED

18  STATES IS SEEKING IS REALLY AN IMPERMISSIBLE OBEY-THE-LAW

19  INJUNCTION.  WE TOOK THE COURT'S QUESTION TO GO TO THE

20  QUESTION, AGAIN, OF CONSTITUTIONAL STANDING.  AND HERE

21  REDRESSABILITY AND WHETHER IT IS LIKELY, AS OPPOSED TO MERELY

22  SPECULATIVE, THAT THE INJURY WILL BE REDRESSED BY A FAVORABLE

23  DECISION.

24        AND AS IN MANY CASES, THIS QUESTION IS SOMEWHAT

25  INTERTWINED WITH THAT TRACEABILITY AND PROPER PARTY ANALYSIS AS

39

1    WELL.  THE SUPREME COURT ADDRESSED A SIMILAR CASE IN ALLEN

2    AGAINST WRIGHT IN 1984.  IT'S AT 469 UNITED STATES 737.  IN

3    ALLEN, A GROUP OF PLAINTIFFS SUED THE INTERNAL REVENUE SERVICE

4    BECAUSE THEY CLAIM THAT PRIVATE SCHOOLS, CERTAIN PRIVATE

5    SCHOOLS THROUGHOUT THE COUNTRY WERE PRACTICING DISCRIMINATORY

6    ADMISSIONS POLICIES AND, AS SUCH, THEY SHOULD LOSE THEIR TAX

7    EXEMPT STATUS.  THE SUPREME COURT SAID, YOU DON'T HAVE STANDING

8    TO BRING THAT CLAIM AND YOU DON'T BECAUSE YOU'RE TALKING ABOUT

9    ACTIONS OF A THIRD PARTY, YET, SUING THE UNITED STATES INTERNAL

10   REVENUE SERVICE.  AND THERE'S NO INDICATION THAT IF THE UNITED

11   STATES INTERNAL REVENUE SERVICE WERE TO REVOKE THE TAX EXEMPT

12   STATUS OF THESE SCHOOLS, THAT THEY WOULD STOP PRACTICING THESE

13   DISCRIMINATORY PRACTICES.

14        AND WHAT THE COURT SAID AND USED SOME FAIRLY BROAD

15   LANGUAGE WHICH APPLIES SQUARELY TO THIS CASE BECAUSE HERE THE

16   UNITED STATES IS NOT CHALLENGING ANYTHING THE STATE DOES.  WHAT

17   IT'S REALLY CHALLENGING AT ITS HEART IS WHAT THE IEP TEAMS DO,

18   HOWEVER IT'S DRESSED UP.  IT'S THE DECISION OF WHERE TO --

19   THESE CHILDREN SHOULD RECEIVE EDUCATION SERVICES.

20        AND WHAT THE SUPREME COURT SAID ABOUT THAT IN ALLEN

21   IS THAT SUITS CHALLENGING NOT SPECIFICALLY IDENTIFIABLE

22   GOVERNMENT VIOLATIONS OF LAW BUT THAT PARTICULAR PROGRAMS,

23   AGENCIES ESTABLISHED TO CARRY OUT THEIR LEGAL OBLIGATIONS ARE,

24   EVEN WHEN PREMISED ON ALLEGATIONS OF SEVERAL INSTANCES OF

25   VIOLATIONS OF LAW, RARELY, IF EVER, APPROPRIATE FOR FEDERAL

1   COURT ADJUDICATION.

2           LUJAN SAYS THE SAME THING IN SECTION 3(B) OF THE

3   OPINION, WHICH WAS AT THE TIME OF PLURALITY BUT HAS SINCE BEEN

4   ADOPTED BY THE 11TH CIRCUIT IN THE ALABAMA TOMBIGBEE RIVERS

5   COALITION CASE AGAINST NORTON, WHICH WILL BE CITED IN OUR

6   FORTHCOMING BRIEF AS WELL.

7           A MORE RECENT CASE WHICH ADDRESSES SOMETHING SIMILAR

8   HERE IS ONE THAT WAS UNPUBLISHED BY THE 11TH CIRCUIT BUT CAME

9   OUT ON MARCH 29TH OF THIS YEAR.  THAT CASE WAS DAOGARU VERSUS

10  THE UNITED STATES ATTORNEY GENERAL.  IT'S AT 2017 WESTLAW

11  1160882.  MR. DAOGARU WAS A GEORGIA RESIDENT WHO RECENTLY CAME

12  FROM MICHIGAN.  IN MICHIGAN, HE HAD SOME TYPE OF CONVICTION

13  WHICH PROHIBITED HIM UNDER FEDERAL LAW FROM OBTAINING A

14  FIREARMS LICENSE.  SO HE SUED THE ATTORNEY GENERAL SEEKING TO

15  GET HIS FIREARM LICENSE.  AND THE 11TH CIRCUIT AFFIRMED THIS

16  COURT, THE DISTRICT COURT, AND SAID THAT, EVEN IF MR. DAOGARU

17  COULD HAVE THE FEDERAL HURDLE CLEARED, SO TO SPEAK, GEORGIA LAW

18  PREVENTED HIM FROM GETTING HIS FIREARMS LICENSE.  SO THE COURT

19  COULD NOT ISSUE A REMEDY FOR HIS UNDERLYING HARM OF NOT GETTING

20  A LICENSE.

21          THAT'S THE CASE HERE.  WHATEVER THIS COURT ORDERS

22  AGAINST THE STATE OF GEORGIA OR, LET'S EVEN SAY THE STATE BOARD

23  OF EDUCATION, SHORT OF EFFECTIVELY CLOSING DOWN THE GNETS

24  PROGRAM, WHICH THE UNITED STATES IS NOT AT LEAST EXPLICITLY

25  ASKING THE COURT TO DO, THOSE DECISIONS ARE STILL GOING TO BE

1   MADE AT THE LOCAL LEVEL.  THERE'S NOT A -- AND SO THAT IS

2   ANOTHER REASON WHY THE RELIEF THEY SEEK IS NOT PERMISSIBLE AS A

3   STANDING MATTER.

4        LAST, YOUR HONOR, AS WE ALLEGE, OR AS WE ARGUE IN OUR

5   BRIEF, THE COMPLAINT SEEKS A CLASSIC OBEY-THE-LAW INJUNCTION.

6   AND THE STANDARD THERE, IT'S IN THE ELEND VERSUS BASHAM

7   DECISION WE CITE IN OUR BRIEF IN THE 11TH CIRCUIT IN 2006, BUT

8   PERHAPS A BETTER ARTICULATION IS IN MEYER VERSUS BROWN ROOT

9   CONSTRUCTION COMPANY FROM THE FIFTH CIRCUIT IN 1981.  AND IT

10  SAYS THERE THAT THE CONDUCT THAT HAS BEEN ENJOINED HAS TO BE

11  SUCH THAT IT WILL LET THE PARTIES SUBJECT TO IT KNOW WHAT

12  CONDUCT THE COURT HAS PROHIBITED.

13       AND IF THE COURT LOOKS AT THE AD DAMNUM CLAUSES AND

14  SPECIFICALLY TO THE INJUNCTIVE RELIEF IN THE AD DAMNUM CLAUSES

15  IN THIS COMPLAINT, THE SECOND ONE IS A CLASSIC OBEY-THE-LAW

16  INJUNCTION.  IT ORDERS THE STATE, OR SEEKS AN ORDER FOR THE

17  STATE TO CEASE DISCRIMINATING AGAINST THOSE IN OR AT SERIOUS

18  RISK OF ENTERING THE GNETS PROGRAM BY FAILING TO PROVIDE MENTAL

19  HEALTH AND THERAPEUTIC SERVICES AND SUPPORT IN THE MOST

20  INTEGRATIVE SETTING APPROPRIATE TO THEIR NEEDS.

21       THEY HAVE TAKEN THE RULE AND THEY HAVE MADE IT AN

22  INJUNCTION.  THAT HAS VERY LITTLE DIFFERENCE FROM WHAT THE

23  FIFTH CIRCUIT ADDRESSED IN THE CASE OF PAYNE VERSUS TRAVENOL

24  LABS IN 1978 WHERE THE COURT THERE PROHIBITED THE DEFENDANT

25  FROM DISCRIMINATING ON THE BASIS OF COLOR, RACE, OR SEX IN

42

1   EMPLOYMENT PRACTICES OR CONDITIONS IN EMPLOYMENT IN DEFENDANT'S

2   CLEVELAND, MISSISSIPPI, FACILITY.

3           THE FIRST PART OF THE AD DAMNUM CLAUSE GIVES NO

4   CLARITY AS TO WHAT IT WOULD INCLUDE.  AND I CAN TELL YOU THAT

5   TWO LAWYERS WOULD HAVE TO HIRE PROBABLY FOUR EXPERTS, AND THEY

6   WOULD COME UP WITH ABOUT 20 DIFFERENT THINGS FOR WHAT THIS ONE

7   ASKS.  AND IT'S THAT THEY ASK FOR AN INJUNCTION TO PROVIDE

8   APPROPRIATE, INTEGRATIVE MENTAL HEALTH THERAPEUTIC EDUCATION

9   SERVICES AND SUPPORTS THAT ARE DESIGNED TO ALLOW STUDENTS WITH

10  BEHAVIORAL-RELATED DISABILITIES TO BE PLACED IN INTEGRATED

11  GENERAL EDUCATION CLASSROOMS, SETTINGS, AND ACCESS TO EQUAL

12  EDUCATIONAL OPPORTUNITIES TO THOSE THAT ARE AT OR IN SERIOUS

13  RISK OF ENTERING THE GNETS PROGRAM.  THOSE QUESTIONS OF

14  APPROPRIATE SERVICES AND ACCESS TO EQUAL EDUCATIONAL

15  OPPORTUNITIES ARE DEBATED THROUGHOUT THIS COUNTRY EVERY DAY AT

16  LEGISLATURES, AT SCHOOL BOARDS, AND IN THE UNITED STATES

17  CONGRESS.  THAT ORDER PROVIDES THE STATE -- OR WOULD PROVIDE

18  THE STATE WITH NO GUIDANCE AS TO WHAT IT ACTUALLY MEANS.

19          UNLESS THE COURT HAS ANY OTHER QUESTIONS, I WOULD

20  REST AND HAVE MS. ANDERSON DISCUSS THE STAY ISSUE.

21          THE COURT:  I DO NOT HAVE ANY OTHER QUESTIONS.  THANK

22  YOU, SIR.

23          MR. BELINFANTE:  THANK YOU, JUDGE.

24          MS. ANDERSON:  YOUR HONOR, I'LL BE RATHER BRIEF.  AS

25  YOU ARE WELL AWARE, THIS COURT HAS THE BROAD DISCRETION TO

1   MANAGE AND CONTROL ITS DOCKET.  AND, GIVEN THE RECENT DECISION

2   IN THE DUDEK CASE, WE BELIEVE THAT A STAY WOULD BE WARRANTED

3   HERE TO -- JUST SO THE 11TH CIRCUIT CAN ADDRESS THE ISSUE THAT

4   IS DIRECTLY BEFORE THIS COURT AS TO WHETHER THE UNITED STATES

5   HAS STANDING TO ENFORCE TITLE II OF THE ADA.

6           COURTS IN THE 11TH CIRCUIT HAVE ESTABLISHED A

7   THREE-FACTOR TEST TO DETERMINE WHETHER A STAY IS WARRANTED IN

8   THIS CERTAIN INSTANCE.  ITS FIRST -- THE FIRST FACTOR IS IF

9   THERE'S UNDUE PREJUDICE OR A TACTICAL DISADVANTAGE TO THE

10  NONMOVANT, IN THIS CASE WOULD BE THE DEPARTMENT OF JUSTICE.

11          THE SECOND FACTOR IS WHETHER A STAY WILL SIMPLIFY THE

12  ISSUES BEFORE THIS COURT.

13          AND THE THIRD IS ESSENTIALLY STATUS OF THE LITIGATION

14  OR WHETHER DISCOVERY IS COMPLETE AND A TRIAL DATE HAS BEEN SET.

15          YOUR HONOR, THIS IS A BALANCING TEST.  YOU WEIGH THE

16  FACTORS.  AND WE BELIEVE APPLYING THIS TEST WOULD INDICATE THAT

17  A STAY IS NECESSARY.

18          FIRST, YOUR HONOR, THERE WOULD BE NO PREJUDICE OR

19  TACTICAL DISADVANTAGE TO THE DEPARTMENT OF JUSTICE.  THAT -- IN

20  THEIR BRIEF, THE DEPARTMENT OF JUSTICE HAS ALLEGED THAT A STAY

21  WOULD DAMAGE STUDENTS WITH DISABILITIES.  QUITE FRANKLY, YOUR

22  HONOR, THE STUDENTS ARE NOT PARTIES TO THIS ACTION.  AND THE

23  FACTOR CLEARLY SAYS TO NONMOVANT.  AND NOR DOES THE DOJ

24  REPRESENT THE STUDENTS HERE.

25          ADDITIONALLY, YOUR HONOR, THIS LAWSUIT HAS BEEN IN

44

1    THE WORKS FOR QUITE SOME TIME PRIOR TO THE FILING OF THE ACTUAL

2    ACTION, AND IT WILL NOT BE RESOLVED IMMEDIATELY.  THE DOJ

3    INITIATED ITS INVESTIGATION IN 2012 AND MADE, MADE -- ISSUED A

4    LETTER OF FINDINGS.  THE PARTIES NEGOTIATED OVER A YEAR PRIOR

5    TO THE FILING OF THIS LAWSUIT.  AND THE DOJ ADMITS IN THE

6    COMPLAINT THAT THE STATE OF GEORGIA ACTED -- PUT FORTH

7    GOOD-FAITH EFFORTS IN ADDRESSING THOSE ISSUES.

8            MOST IMPORTANTLY, YOUR HONOR, IN ITS COMPLAINT, THE

9    DOJ DID NOT MOVE FOR A PRELIMINARY INJUNCTION OR A TEMPORARY

10   RESTRAINING ORDER TO HALT THE IMPLEMENTATION OF THE GNETS

11   PROGRAM.  THEREFORE, THROUGHOUT THIS LITIGATION, THE GNETS

12   PROGRAM WILL CONTINUE TO SERVE THOSE STUDENTS WHO HAVE

13   EMOTIONAL, BEHAVIORAL, OR SEVERE EMOTIONAL AND BEHAVIOR

14   DISORDERS.

15           YOUR HONOR, BOTH PARTIES IN THE JOINT PRELIMINARY

16   REPORT RECOGNIZE THAT THIS CASE IS COMPLEX.  IT WILL REQUIRE A

17   GREATER THAN NORMAL VOLUME OF EVIDENCE.  WE WILL HAVE NUMEROUS

18   EXPERTS TESTIFY AND WILL REQUIRE AT LEAST AN ADDITIONAL FOUR

19   MONTHS OF DISCOVERY.

20           THE DOJ HAS NOT ASKED FOR ANY EXPEDITED PROCEEDINGS.

21   AND STUDENTS WILL CONTINUE TO RECEIVE SERVICES ON OTHER GNETS

22   PROGRAMS.

23           FOR THE SECOND FACTOR, A STAY WILL UNDOUBTEDLY

24   SIMPLIFY THE ISSUES.  AS I MENTIONED EARLIER AND ACTUALLY HAVE

25   MENTIONED, THIS CASE AND THE DUDEK ACTION ADDRESSES THE EXACT

1    SAME ISSUE AS IT PERTAINS TO THE UNITED STATES, WHETHER THE

2    UNITED STATES HAS STANDING TO BRING A CLAIM UNDER TITLE II OF

3    THE ADA.

4          YOUR HONOR, THE 11TH CIRCUIT IN MICCOSUKEE TRIBE OF

5    INDIANS OF FLORIDA VERSUS THE SOUTH FLORIDA WATER MANAGEMENT

6    SYSTEM HAS NOTED THAT, WHEN THERE IS -- WHEN TWO FEDERAL

7    LITIGATIONS WILL ADDRESS THE SAME ISSUE, THIS IS AN EXCELLENT

8    REASON TO STAY.  A STAY WOULD AVOID DUPLICATIVE LITIGATION AND

9    AVOID POTENTIALLY CONFLICTING DECISIONS IN THE CIRCUIT.

10         JUST BY WAY OF A BRIEF UPDATE, FOR THE DUDEK CASE,

11   THE UNITED STATES HAS MADE CLEAR IT WILL APPEAL THE COURT'S

12   RULING ONCE THERE IS A FINAL DISPOSITION.  BECAUSE THE CASES

13   WERE CONSOLIDATED, THE UNITED STATES HAS TO WAIT UNTIL ALL OF

14   THE PARTIES HAVE BEEN RESOLVED.  IT IS OUR UNDERSTANDING THAT

15   THE STATE OF FLORIDA MOVED FOR SUMMARY JUDGMENT AS TO THE

16   REMAINING PARTIES.  THE MAGISTRATE JUDGE RECOMMENDED SUMMARY

17   JUDGMENT BE GRANTED.  AND AT THIS POINT, IT'S JUST WAITING FOR

18   THE DISTRICT COURT TO ENTER OR MODIFY THE MAGISTRATE JUDGE

19   ORDER AND, AT THAT POINT, AN APPEAL COULD BE HAD TO THE 11TH

20   CIRCUIT.

21         FINALLY, FOR THE THIRD FACTOR, NO DISCOVERY HAS TAKEN

22   PLACE.  AND COSTS CURRENTLY REMAIN MINIMAL HERE.  AND IT WOULD

23   BE UNNECESSARY EXPENSES FOR THE GEORGIA TAXPAYERS AS WELL AS

24   FEDERAL TAXPAYERS TO CONDUCT DISCOVERY IF THE 11TH CIRCUIT

25   EVENTUALLY AGREES WITH THE DECISION IN DUDEK.

1          YOUR HONOR, IN THEIR RESPONSE, THE DEPARTMENT OF

2     JUSTICE BRINGS UP OR ALLEGES THAT THIS WOULD BE AN IMMODERATE

3     OR AN INDEFINITE STAY.  AS ENTERED EARLIER, THIS COURT HAS

4     GREAT DISCRETION IN CRAFTING A STAY HOWEVER IT SO DESIRES.

5     THAT MEANS IT CAN -- THIS COURT COULD PUT A TEMPORAL LIMITATION

6     ON IT, SAY, YOU KNOW, STAY THE CASE FOR A YEAR OR UNTIL THE

7     11TH CIRCUIT DECIDES THE DUDEK CASE, WHICHEVER IS SOONER, WITH

8     OPTION TO RENEW THE STAY.

9          THIS IS ACTUALLY WHAT HAPPENED IN THE MICCOSUKEE

10    CASE, WHICH THE COURT DETERMINED WAS A REASONABLE STAY IN THAT

11    INSTANCE, AND COULD ALSO REQUIRE THE PARTIES TO, TO PROVIDE

12    PERIODIC REPORTING.

13         YOUR HONOR, IT IS PRUDENT TO WAIT -- OR WE BELIEVE IT

14    IS PRUDENT TO WAIT UNTIL THE 11TH CIRCUIT HAS RENDERED ITS

15    OPINION IN DUDEK, AS OPPOSED TO INITIATING POTENTIALLY

16    UNNECESSARY DISCOVERY.  THIS WOULD PRESERVE JUDICIAL AND STATE

17    AND FEDERAL RESOURCES -- AS I MENTIONED, THE TAXPAYERS ARE

18    BEARING THE BRUNT OF THIS LAWSUIT -- AND WOULD AVOID

19    POTENTIALLY DUPLICATIVE LITIGATION IN THE SAME CIRCUIT.

20         THANK YOU.

21         THE COURT:  THANK YOU.

22         ALL RIGHT.  LET'S GO AHEAD AND TAKE A BRIEF BREAK,

23    MAYBE TEN MINUTES, BEFORE WE HEAR FROM THE UNITED STATES.

24    THANK YOU SO MUCH.  WE'RE IN RECESS.

25         THE COURTROOM SECURITY OFFICER:  ALL RISE.  COURT

47

1    STANDS IN RECESS FOR TEN MINUTES.

2              (WHEREUPON, A BRIEF RECESS WAS HAD FROM 11:12 A.M. TO

3    11:24 A.M.)

4              THE COURT:  THANK YOU.  YOU MAY BE SEATED.  THANK YOU

5    SO MUCH.

6              ALL RIGHT.  ON BEHALF OF THE UNITED STATES, ARE YOU

7    READY TO PROCEED?

8              MS. ROBIN-VERGEER:  YES, YOUR HONOR.

9              THE COURT:  ALL RIGHT.  THANK YOU.

10             MS. ROBIN-VERGEER:  GOOD MORNING, YOUR HONOR.

11             THE COURT:  GOOD MORNING.

12             MS. ROBIN-VERGEER:  MY NAME IS BONNIE ROBIN-VERGEER,

13   AND I'M HERE ON BEHALF OF THE UNITED STATES.  I WILL ADDRESS

14   GEORGIA'S ARGUMENT THAT THE ATTORNEY GENERAL HAS NO CAUSE OF

15   ACTION TO ENFORCE TITLE II AND ALSO, IN THE ALTERNATIVE, THEY

16   ARE MOVING FOR A STAY.  MY COLLEAGUE, TRAVIS ENGLAND, WILL

17   ADDRESS THE REMAINING ISSUES.

18             I'D LIKE TO START BY GIVING THE COURT AN OVERVIEW OF

19   OUR ARGUMENT.  AND THEN I'LL WALK YOUR HONOR THROUGH THE STEPS

20   OF THE ARGUMENT AND ALSO ADDRESS GEORGIA'S COUNTER-ARGUMENTS.

21             THE ADA'S TEXT, PURPOSES, AND OVERALL STATUTORY

22   SCHEME ESTABLISH THAT CONGRESS INTENDED THE FEDERAL GOVERNMENT

23   TO PLAY A CENTRAL ROLE IN ENFORCING THE ADA, INCLUDING TITLE

24   II, WHICH COVERS PUBLIC ENTITIES.  THE STATUTE STATES IN THE

25   TEXT THAT ONE OF ITS PURPOSES IS TO ENSURE THAT THE FEDERAL

48

1    GOVERNMENT PLAYS A CENTRAL ROLE IN ENFORCING THE STANDARDS

2    ESTABLISHED IN THIS CHAPTER ON BEHALF OF INDIVIDUALS WITH

3    DISABILITIES.

4         AND I'M REFERRING TO SECTION 12101(B)(3).  TITLE II

5    IS PART OF THIS CHAPTER.  AND CONSISTENT WITH THAT PURPOSE,

6    TITLE II'S ENFORCEMENT SECTION GIVES THE ATTORNEY GENERAL A

7    CAUSE OF ACTION.  AND LET ME JUST SAY, THAT IS THE QUESTION

8    HERE.  DOES THE ATTORNEY GENERAL HAVE A CAUSE OF ACTION TO

9    ENFORCE TITLE II.

10        THE WORD STANDING HAS BEEN KIND OF THROWN AROUND A

11   BIT LOOSELY HERE.  AND SUBJECT MATTER JURISDICTION IS NOT

12   IMPLICATED BY THE QUESTION.  IT'S JUST A STRAIGHT QUESTION OF

13   STATUTORY CONSTRUCTION.

14        ALTHOUGH THE STATUTORY BACKDROP IS COMPLICATED, THE

15   ARGUMENT THAT THE ATTORNEY GENERAL HAS A RIGHT OF ACTION IS

16   ACTUALLY PRETTY SIMPLE.  CONGRESS INCORPORATED INTO TITLE II'S

17   ENFORCEMENT SECTION THE REMEDIES, PROCEDURES, AND RIGHTS OF

18   SECTION 505 OF THE REHABILITATION ACT.  AND SECTION 505, IN

19   TURN, INCORPORATED THE REMEDIES, PROCEDURES, AND RIGHTS OF

20   TITLE VI OF THE CIVIL RIGHTS ACT.  AND THESE REMEDIES,

21   PROCEDURES, AND RIGHTS INCLUDE THE POSSIBILITY OF A LAWSUIT BY

22   THE ATTORNEY GENERAL TO ENFORCE THE STATUTE'S NONDISCRIMINATION

23   REQUIREMENTS.

24        SO AMONG THE REMEDIES, PROCEDURES, AND RIGHTS THAT

25   TITLE II PROVIDES, PROVIDES TO A PERSON IS AN ADMINISTRATIVE

49

1    ENFORCEMENT PROCESS THAT MAY CULMINATE IN A SUIT BY THE

2    ATTORNEY GENERAL.  AND THE JUSTICE DEPARTMENT HAS BEEN

3    ENFORCING TITLE II FOR MORE THAN 25 YEARS THROUGH THE

4    ADMINISTRATIVE PROCESS, THROUGH SETTLEMENT AGREEMENTS, AND

5    THROUGH LAWSUITS WHEN EFFORTS TO ACHIEVE VOLUNTARY COMPLIANCE

6    ARE NOT SUCCESSFUL.  AN AMICI BRIEF THAT'S BEEN FILED IN THIS

7    CASE GIVES AN OVERVIEW OF THE DEPARTMENT'S ENFORCEMENT EFFORTS

8    REGARDING TITLE II.

9           BUT IF THE COURT CONCLUDES THAT THE ENFORCEMENT

10   SECTION IS AMBIGUOUS, THEN THE ADA'S LEGISLATIVE HISTORY AND

11   DEFERENCE TO THE DEPARTMENT OF JUSTICE'S REGULATIONS SHOULD

12   RESOLVE THE QUESTION.

13          THE LEGISLATIVE HISTORY IS CRYSTAL CLEAR AS REFLECTED

14   IN BOTH HOUSE AND SENATE COMMITTEE REPORTS.  THE CONGRESS

15   EXPECTED THAT THE MAJOR ENFORCEMENT SANCTION FOR THE FEDERAL

16   GOVERNMENT FOR TITLE II WOULD BE REFERRAL OF CASES TO THE

17   DEPARTMENT OF JUSTICE SO THAT THE DEPARTMENT MAY PROCEED TO

18   FILE SUITS IN FEDERAL DISTRICT COURT.  AND AS FOR THE

19   REGULATIONS, AS CONGRESS DIRECTED, THE DEPARTMENT ISSUED TITLE

20   II REGULATIONS IN PART 35 OF 28 C.F.R.  AND THE REGS PROVIDE

21   THAT IF VOLUNTARY COMPLIANCE BY THE PUBLIC ENTITY IS NOT

22   ACHIEVED, THEN THE FEDERAL AGENCY SHALL REFER THE MATTER TO THE

23   ATTORNEY GENERAL WITH A RECOMMENDATION FOR APPROPRIATE ACTION,

24   I.E., THE POSSIBILITY OF A LAWSUIT.

25          AND AS I WILL DISCUSS, THE DEPARTMENT'S REGULATION IS

50

1    ENTITLED THE CHEVRON DEFERENCE.

2            GEORGIA'S ARGUMENT THAT THE ATTORNEY GENERAL HAS NO

3    AUTHORITY TO ENFORCE TITLE II RESTS ON A LONE DISTRICT COURT

4    DECISION IN THE SOUTHERN DISTRICT OF FLORIDA LAST FALL IN CV

5    VERSUS DUDEK.  AND THIS CASE IS AN OUTLIER.  ALL OF THE COURTS

6    THAT HAVE LOOKED AT THIS ISSUE, INCLUDING THE SAME FEDERAL

7    DISTRICT COURT IN AN EARLIER RULING BY JUDGE ROSENBAUM IN THE

8    SAME CASE, HAVE CONCLUDED THAT ATTORNEY GENERAL DOES HAVE A

9    CAUSE OF ACTION TO ENFORCE TITLE II.

10           AND JUST TWO WEEKS AGO, ANOTHER DISTRICT COURT IN

11   UNITED STATES VERSUS HARRIS COUNTY SQUARELY REJECTED THE

12   HOLDING AND THE RATIONALE OF THE COURT IN DUDEK.

13           AND NOW I'D LIKE TO WALK YOUR HONOR THROUGH THESE

14   POINTS.  BECAUSE THE ENFORCEMENT SECTION OF TITLE II

15   INCORPORATES ENFORCEMENT SCHEME OF THE REHABILITATION ACT,

16   WHICH INCORPORATES THE ENFORCEMENT SCHEME OF TITLE VI, I'D LIKE

17   TO START WITH TITLE VI.

18           TITLE VI OF THE CIVIL RIGHTS ACT PROHIBITS

19   DISCRIMINATION ON THE BASIS OF RACE, COLOR, OR NATIONAL ORIGIN

20   BY ENTITIES RECEIVING FEDERAL FINANCIAL ASSISTANCE.  AND TITLE

21   VI'S ENFORCEMENT SCHEME PROVIDES THAT FEDERAL AGENCIES CAN

22   ACHIEVE COMPLIANCE, ONE, THROUGH ADMINISTRATIVE TERMINATION OF

23   FEDERAL FUNDING; OR, TWO, BY ANY OTHER MEANS AUTHORIZED BY LAW.

24           FOR THE PAST 50 YEARS, AGENCY REGULATIONS, TITLE VI

25   ENFORCEMENT GUIDELINES, AND COURT DECISIONS HAVE ALL

51

1    INTERPRETED THIS SECOND METHOD BY ANY OTHER MEANS AUTHORIZED BY

2    LAW TO GRANT AUTHORITY TO THE UNITED STATES TO BRING SUITS TO

3    ENFORCE TITLE VI'S ANTIDISCRIMINATION REQUIREMENTS.  BASICALLY

4    THE REGULATIONS SET UP IN ADMINISTRATIVE ENFORCEMENT SCHEME

5    WITH COMPLAINTS BY INDIVIDUALS, ADMINISTRATIVE COMPLAINTS,

6    COMPLIANCE REVIEWS, INVESTIGATIONS BY THE FEDERAL AGENCIES, AND

7    ULTIMATELY A VOLUNTARY COMPLIANCE CANNOT BE ACHIEVED IN A

8    COMPLAINT THAT'S MERITORIOUS, THE AGENCY CAN REFER THE MATTER

9    TO THE ATTORNEY GENERAL BRINGING THE LAWSUIT.

10           AND THE TITLE VI GUIDELINES ARE, I KNOW ARE CITED IN

11   OUR BRIEF, BUT JUST TO GIVE YOU ANOTHER EXAMPLE, THE DEPARTMENT

12   OF JUSTICE'S COORDINATION REGULATIONS UNDER TITLE VI, 28 C.F.R.

13   42.411, ALSO SPEAK IN TERMS OF INCORPORATE THE TITLE VI

14   GUIDELINES, WHICH THEMSELVES EXPLAIN SORT OF THIS RATIONALE

15   THAT COURT ENFORCEMENT IS SORT OF A PREFERRED ALTERNATIVE

16   MECHANISM BECAUSE TERMINATION OF FEDERAL FUNDING IS PRETTY

17   DRASTIC AND IS SEEN SORT OF A LAST RESORT.  AND THE FIRST

18   RESORT IS TO TRY TO ACHIEVE COMPLIANCE THROUGH SOME OTHER

19   MEANS, INCLUDING POSSIBLY LAWSUITS.

20           TITLE VI'S ENFORCEMENT SCHEME FOCUSED ON FEDERAL

21   ENFORCEMENT.  IT WAS ALWAYS UNDERSTOOD THAT THE FEDERAL

22   GOVERNMENT COULD TAKE ACTION TO OBTAIN COMPLIANCE.  AND WHAT

23   THE FIGHT WAS ALL ABOUT IN THE EARLY YEARS WAS WHETHER THERE

24   WAS AN IMPLIED PRIVATE RIGHT OF ACTION IN ADDITION TO FEDERAL

25   ENFORCEMENT.  AND IF THERE WAS A PRIVATE RIGHT OF ACTION, WHAT

52

1    WAS ITS SCOPE.

2            AND THAT'S WHAT A LOT OF THE LITIGATION AND THE

3    SUPREME COURT AND OTHER COURTS IN TITLE VI AND OTHER STATUTES

4    MODELED ON TITLE VI LIKE TITLE IX, THAT'S WHAT THE DISPUTE IN

5    THOSE CASES WAS PRIMARILY ABOUT.

6            TITLE VI'S ENFORCEMENT SCHEME HAS BEEN USED AS THE

7    MODEL FOR A NUMBER OF CIVIL RIGHTS LAWS LIKE IN TITLE IX, THE

8    REHABILITATION ACT, TITLE II OF THE ADA, AMONG OTHERS.  SO IT

9    WAS THIS TITLE VI ENFORCEMENT FRAMEWORK THAT CONGRESS

10   INCORPORATED INTO THE REHABILITATION ACT OF 1973.  AND THAT

11   STATUTE WAS PASSED TO EXTEND A PERSONS WITH DISABILITIES, THE

12   BAN ON DISCRIMINATION BY FEDERALLY FUNDED ENTITIES.  AND AT THE

13   TIME IT WAS ENACTED IN '73, THE REHABILITATION ACT CONTAINED NO

14   SPECIFIC ENFORCEMENT PROVISION.

15           IN 1977, THE DEPARTMENT OF HEALTH, EDUCATION, AND

16   WELFARE, WHICH I'M JUST GOING TO CALL HEW, ISSUED REGULATIONS

17   THAT INCORPORATED ITS TITLE VI ENFORCEMENT PROCEDURES.  AND

18   THOSE PROCEDURES, LIKE I SAID, AUTHORIZED REFERRALS BY FEDERAL

19   AGENCIES TO THE DEPARTMENT OF JUSTICE TO BRING LAWSUITS.

20           THEN THE NEXT YEAR, IN 1978, CONGRESS AMENDED THE

21   REHABILITATION ACT TO ACTUALLY ADD SECTION 505, THE ENFORCEMENT

22   PROVISION, WHICH INCORPORATES THE REMEDIES, PROCEDURES, AND

23   RIGHTS, THIS PACKAGE THAT'S SET OUT IN TITLE VI.

24           THE SUPREME COURT HAS RECOGNIZED THAT, IN ENACTING

25   SECTION 505, CONGRESS INTENDED TO CODIFY THE 1977 HEW REGS

1    GOVERNING THE ENFORCEMENT OF THE REHABILITATION ACT.  THE LEAD

2    CASE ON THAT IS CONSOLIDATED RAIL CORPORATION VERSUS DARRONE.

3    AS CONGRESS INTENDED, THE ATTORNEY GENERAL HAS ENFORCED THE

4    REHABILITATION ACT THROUGH THE ADMINISTRATIVE PROCESS AND

5    THROUGH LITIGATION.

6          SO HERE'S WHERE WE ARE.  BY ENACTING TITLE II'S

7    ENFORCEMENT SECTION, WHICH INCORPORATES THE REMEDIES,

8    PROCEDURES, AND RIGHTS OF THE REHABILITATION ACT AND, THUS, OF

9    TITLE VI, CONGRESS INTENDED THE PERSONS WITH DISABILITIES TO

10   HAVE ACCESS TO THE SAME KIND OF ADMINISTRATIVE ENFORCEMENT

11   PROCESS THAT THEY HAVE UNDER THE REHABILITATION ACT AND UNDER

12   TITLE VI.  AND THAT PROCESS INCLUDES THE POSSIBILITY OF A

13   LAWSUIT BY THE ATTORNEY GENERAL.

14         THIS INTERPRETATION IS SUPPORTED BY THE VERY BASIC

15   PRINCIPLE RECOGNIZED MANY TIMES BY THE SUPREME COURT, THAT WHEN

16   CONGRESS ADOPTS A NEW LAW INCORPORATING PARTS OF A PRIOR LAW,

17   CONGRESS IS PRESUMED TO INCORPORATE THE JUDICIAL AND

18   ADMINISTRATIVE INTERPRETATIONS OF THE PRIOR LAW AS IT AFFECTS

19   THE NEW STATUTE.  AND JUST KEY CASES FOR THAT PROPOSITION

20   INCLUDE LORILLARD VERSUS PONS AND BRAGDON VERSUS ABBOTT.

21         BUT, ESSENTIALLY, THE POINT I'M MAKING IS THIS:

22   CONGRESS RATIFIED THE ADMINISTRATIVE AND JUDICIAL

23   INTERPRETATIONS REGARDING THE ATTORNEY GENERAL'S ENFORCEMENT

24   POWERS WHEN IT INCORPORATED THESE TWO PRIOR STATUTORY SCHEMES

25   INTO TITLE II OF THE ADA.

54

1              BUT IF THE COURT THINKS IT'S UNCLEAR WHAT THE

2     ENFORCEMENT PROVISION MEANS, THEN THE LEGISLATIVE HISTORY AND

3     THE REGULATIONS SHOULD RESOLVE THE MATTER.  FIRST, THE

4     LEGISLATIVE HISTORY, IT CONFIRMS THAT THE ATTORNEY GENERAL HAS

5     A CAUSE OF ACTION.  BOTH HOUSE AND SENATE COMMITTEE REPORTS

6     STATE THAT THE MAJOR ENFORCEMENT SANCTION FOR THE FEDERAL

7     GOVERNMENT UNDER TITLE II WOULD BE REFERRAL OF CASES TO THE

8     DEPARTMENT OF JUSTICE SO THAT THE DEPARTMENT MAY PROCEED TO

9     FILE SUITS IN FEDERAL DISTRICT COURT.

10             AND YOU HAVE TO REMEMBER A LITTLE BIT THE CONTEXT

11    HERE.  TITLE II WAS INTENDED BY CONGRESS TO COVER OR TO CLOSE A

12    GAP THAT HAD BEEN LEFT IN THE REHABILITATION ACT.  THE

13    REHABILITATION ACT ONLY COVERS PUBLIC AND PRIVATE ENTITIES THAT

14    RECEIVE FEDERAL FUNDING.  WHENEVER THERE IS FEDERAL FUNDING,

15    THERE'S ALWAYS THE POSSIBILITY OF TERMINATION OF THAT FEDERAL

16    FUNDING.  THE GOVERNMENT INHERENTLY HAS THAT LEVERAGE IN

17    ADDITION TO THE POSSIBILITY OF GOING TO COURT.

18             BUT IN COVERING ALL PUBLIC ENTITIES, UNDER TITLE II,

19    WHICH WAS A KEY PURPOSE OF THE STATUTE, AND 11TH CIRCUIT

20    RECOGNIZED THAT IN SHOTZ VERSUS THE CITY OF PLANTATION, THAT

21    LEVERAGE IS GONE.

22             SO WHAT IS THE LEVERAGE THAT THE FEDERAL GOVERNMENT

23    HAS TO BRING NONCOMPLIANT PUBLIC ENTITIES TO THE TABLE.  IT'S

24    THE POSSIBILITY OF A LAWSUIT.  AND THAT'S WHAT THE LANGUAGE IN

25    THE SENATE AND THE HOUSE COMMITTEE REPORTS RECOGNIZES.  THAT'S

55

1    WHY IT WOULD BE SORT OF THE MAJOR ENFORCEMENT MECHANISM.

2          IN ADDITION, THE DEPARTMENT'S -- AND I SHOULD SAY,

3    ALSO, IN SHOTZ, THE 11TH CIRCUIT CITED THIS LEGISLATIVE HISTORY

4    FAVORABLY BECAUSE THE QUESTION OF TITLE II REMEDIES WAS

5    ACTUALLY AN IMBEDDED QUESTION AND THE QUESTION THAT WAS BEFORE

6    THE 11TH CIRCUIT IN SHOTZ TO KIND OF WALK THROUGH SOME OF THE

7    BACKGROUND ON WHAT THE TITLE II REMEDIAL SCHEME IS OR HOW IT

8    WORKS.

9          IN ADDITION, THE DEPARTMENT'S TITLE II REGULATIONS

10   ARE ENTITLED TO CONTROLLING WEIGHT UNDER CHEVRON.  THE

11   DEPARTMENT ISSUED TITLE II REGS IN PART 35 AS PART OR PURSUANT

12   TO CONGRESS'S DIRECTION THAT THE DEPARTMENT PROMULGATE

13   REGULATIONS THAT ARE CONSISTENT WITH THE COORDINATION

14   REGULATIONS OF THE REHABILITATION ACT AND THE DEPARTMENT DID

15   SO.

16         SUBPART (F) OF PART 35 SETS OUT COMPLIANCE PROCEDURES

17   WHICH ARE PART OF THE ADMINISTRATIVE PROCESS.  AND THESE

18   PROCEDURES PROVIDE FOR THE REFERRAL OF CASES TO THE DEPARTMENT

19   TO TAKE APPROPRIATE ACTION.  IN OTHER WORDS, REFER THE MATTER

20   FOR POTENTIAL LAWSUIT.  THAT'S IN 28 C.F.R. 35.174.  UNDER CITY

21   OF ARLINGTON VERSUS FCC, THIS COURT SHOULD GIVE CHEVRON

22   DEFERENCE TO THIS PROVISION IS A REASONABLE CONSTRUCTION OF THE

23   DEPARTMENT'S AUTHORITY UNDER THE STATUTE.

24         JUDGE ROSENBAUM AND THE FIRST DUDEK CASE RECOGNIZED

25   THAT AND GAVE DEFERENCE TO THE REGULATION.  BUT JUDGE ZLOCH

56

1   DISAGREED.  AND I THINK THE REASON WHY JUDGE ZLOCH DID NOT GIVE

2   DEFERENCE I THINK IS QUITE TELLING, BECAUSE THE COURT WENT

3   ASTRAY IN DETERMINING THAT A QUESTION, WHETHER THE ATTORNEY

4   GENERAL HAS AUTHORITY TO SUE UNDER TITLE II, IMPLICATED THE

5   COURT'S OWN SUBJECT MATTER JURISDICTION.  AND SO THE COURT

6   WASN'T GOING TO DEFER TO THE DEPARTMENT'S VIEW BECAUSE, FOR

7   THAT REASON.

8          BUT THE QUESTION OF WHETHER THE ATTORNEY GENERAL HAS

9   AUTHORITY TO SUE UNDER TITLE II DOESN'T AFFECT THE COURT'S

10  SUBJECT MATTER JURISDICTION.  IT'S JUST STATUTORY CONSTRUCTION

11  QUESTION.  THE SUPREME COURT'S BEEN MUCH MORE PRECISE IN THE

12  LAST COUPLE OF DECADES IN DISTINGUISHING BETWEEN SO-CALLED

13  STANDING, ARTICLE THREE CONSTITUTIONAL STANDING, AND QUESTIONS

14  OF STATUTORY CONSTRUCTION.

15         AND JUST TO CITE YOU ONE EXAMPLE, IN LEXMARK

16  INTERNATIONAL, INC. VERSUS STATIC CONTROL COMPONENTS, THE COURT

17  CLARIFIED THAT THE ABSENCE OF A VALID CAUSE OF ACTION DOESN'T

18  IMPLICATE THE COURT'S OWN JURISDICTION.  THIS IS A QUESTION OF

19  THE AGENCY'S AUTHORITY UNDER THE AD -- UNDER TITLE II OF THE

20  ADA.  IS THE DEPARTMENT OF JUSTICE ENTITLED TO DEFERENCE IN ITS

21  INTERPRETATION OF THAT QUESTION.  AND THE 11TH CIRCUIT GAVE

22  CHEVRON DEFERENCE TO THE TITLE II REGS IN SHOTZ VERSUS CITY OF

23  PLANTATION.

24         NOW, I WANT, I WANT TO TURN TO GEORGIA'S

25  COUNTER-ARGUMENTS.  IT FOCUSES HEAVILY ON THE FACT THAT THE

57

1    STATUTORY LANGUAGE USES THE WORD PERSON.  AND WE ARE NOT

2    ARGUING THAT THE UNITED STATES OR THE ATTORNEY GENERAL IS A

3    PERSON.  BUT THAT DOESN'T MEAN THAT THE ATTORNEY GENERAL HAS NO

4    CAUSE OF ACTION.

5         WHAT THIS LANGUAGE MEANS IS THAT, AMONG THE REMEDIES

6    AND PROCEDURES PROVIDED TO PERSONS IS AN ADMINISTRATIVE

7    ENFORCEMENT PROCESS THAT MAY CULMINATE IN A LAWSUIT BY THE

8    ATTORNEY GENERAL.  NOW, THE COURT IN DUDEK PUT A LOT OF WEIGHT

9    ON PERSON.  AND I WANT TO EXPLAIN WHERE I THINK THAT COURT WENT

10   WRONG ANALYTICALLY.

11        THE COURT SAID THERE, THE CONGRESS DID NOT

12   INCORPORATE ALL REMEDIES, PROCEDURES, AND RIGHTS AVAILABLE

13   UNDER TITLE VI BUT ONLY THOSE REMEDIES, PROCEDURES, AND RIGHTS

14   THAT MAY BE EXERCISED BY A PERSON ALLEGING DISCRIMINATION.  BUT

15   THE COURT MADE AN IMPORTANT WORD CHANGE THERE IN READING TITLE

16   II TO AFFORD ONLY THE REMEDIES, PROCEDURES, AND RIGHTS THAT MAY

17   BE EXERCISED BY A PERSON, BUT THAT'S NOT WHAT THE STATUTE SAYS.

18        INSTEAD, IT SAYS, THE REMEDIES, PROCEDURES, AND

19   RIGHTS OF THE REHABILITATION ACT ARE THOSE THE TITLE II

20   PROVIDES TO ANY PERSON ALLEGING DISCRIMINATION ON THE BASIS OF

21   DISABILITY.  AND TO PROVIDE IS TO SUPPLY OR MAKE AVAILABLE,

22   COURTESY OF MERRIAM-WEBSTER.COM.  IN OTHER WORDS, CONGRESS HAS

23   MADE AVAILABLE TO A PERSON ALLEGING DISCRIMINATION UNDER TITLE

24   II THE BUNDLE OF A PACKAGE OF REMEDIES, PROCEDURES, AND RIGHTS

25   THAT WERE AVAILABLE TO PERSONS UNDER SECTION 505, WHICH

1   INCLUDES AN ADMINISTRATIVE ENFORCEMENT SCHEME THAT MAY

2   CULMINATE IN A LAWSUIT BY THE ATTORNEY GENERAL.

3        THIS INTERPRETATION OF THE STATUTE MAKES SENSE IN

4   SEVERAL WAYS.  FOR ONE THING, IT MAKES SENSE OF REENFORCEMENT

5   SECTIONS OF BOTH TITLE II AND THE REHABILITATION ACT.  AND IT'S

6   IMPORTANT TO READ THE STATUTES TOGETHER, BECAUSE ONE

7   INCORPORATES THE OTHER.  THE WORDING OF THE REHABILITATION

8   ACT'S ENFORCEMENT SECTION IS QUITE SIMILAR.  IT'S NEARLY

9   VERBATIM, THE SAME, IN THAT IT PROVIDES THAT THE REMEDIES,

10  PROCEDURES, AND RIGHTS OF TITLE VI SHALL BE AVAILABLE TO ANY

11  PERSON AGGRIEVED BY THE PROHIBITED DISCRIMINATION.

12        AND THE DEPARTMENT OF JUSTICE HAS BEEN BRINGING

13  LAWSUITS TO ENFORCE THE REHABILITATION ACT FOR YEARS.  AND

14  CONGRESS RATIFIED THAT INTERPRETATION WHEN IT ADOPTED, YOU

15  KNOW, THE EXACT SAME PHRASE, THE ONE STATUTE, AND IMPORTED IT

16  INTO THE SECOND.

17        IT'S ALSO CONSISTENT WITH THE PURPOSE I ALLUDED TO

18  BEFORE OF GIVING A FEDERAL GOVERNMENT A CENTRAL ENFORCEMENT

19  ROLE, BECAUSE IF YOU READ IT THE WAY GEORGIA'S READING IT, THE

20  FEDERAL GOVERNMENT HAS BEEN STRIPPED FROM ENFORCEMENT OF TITLE

21  II OF THE ADA, DESPITE THE LANGUAGE EXPRESSLY IN THE TEXT OF

22  THE STATUTE.  THE ONE OF THE KEY PURPOSES IS TO MAKE SURE THE

23  FEDERAL GOVERNMENT HAS ESSENTIAL ROLE IN ENFORCING THE

24  PROVISIONS OF THIS CHAPTER, WHICH INCLUDES TITLE II.  AND THE

25  ABILITY OF THE FEDERAL GOVERNMENT TO ENFORCE TITLE II, AS I

59

1  EXPLAINED BEFORE, WOULD BE SHARPLY CURTAILED IF THERE WAS NO

2  POSSIBILITY OF A LAWSUIT, BECAUSE THERE WOULD BE NO LEVERAGE

3  FOR THE FEDERAL GOVERNMENT TO BRING TO BEAR ON PUBLIC ENTITIES

4  THAT WERE NOT RECEIVING FEDERAL FUNDING.

5        THERE'S NO SUGGESTION ANYWHERE IN TITLE II OR ITS

6  LEGISLATIVE HISTORY THAT CONGRESS INTENDED TO TOPPLE

7  ENFORCEMENT OF TITLE II AGAINST PUBLIC ENTITIES THAT ARE NOT

8  RECEIVING FEDERAL FUNDS.  THE OPPOSITE IS TRUE, AS THE 11TH

9  CIRCUIT RECOGNIZED IN THE SHOTZ CASE.  THE WHOLE POINT OF TITLE

10 II IS TO CLOSE THE GAP LEFT BY THE REHABILITATION ACT, WHICH

11 COVERED ONLY THOSE PUBLIC ENTITIES AND PRIVATE ENTITIES

12 RECEIVING FEDERAL FUNDING, WHEREAS TITLE II APPLIES TO ALL

13 PUBLIC ENTITIES, FEDERAL FUNDING OR NO.

14       GEORGIA'S READING ALSO MEANS THAT PRIVATE PARTIES WHO

15 HAVE ONLY AN IMPLIED RIGHT OF ACTION TO ENFORCE TITLE VI ARE

16 NOW THE ONLY GAME IN TOWN, AND THEY COULD SUE TO ENFORCE TITLE

17 II, WHILE THE ATTORNEY GENERAL CANNOT.  BUT THAT IDEA DOESN'T

18 MAKE ANY SENSE, BECAUSE TITLE VI'S ENFORCEMENT SCHEME ON WHICH

19 ALL THESE SCHEMES ARE PREDICATED CENTERED ON FEDERAL

20 ENFORCEMENT.

21       NOW, WITH RESPECT TO WHY TITLE II IS DRAFTED THIS WAY

22 AS COMPARED TO TITLES I AND III, GEORGIA'S ARGUMENT AND THE

23 COURT IN DUDEK, I THINK, OVERLOOKED THE FACT THAT THEY ARE

24 DRAFTED DIFFERENTLY BECAUSE THERE WAS A DRAFTING NEED TO NAME

25 THE ATTORNEY GENERAL IN TITLES I AND III THAT THERE WASN'T IN

60

1    TITLE II.

2           TITLE I ADDRESSES DISABILITY DISCRIMINATION IN

3    EMPLOYMENT.  AND ITS ENFORCEMENT PROVISION INCORPORATES TITLE

4    VII'S FRAMEWORK, WHICH INCLUDES DIFFERENT PROCEDURES FOR

5    COMPLAINANTS FOR THE EEOC AND FOR THE ATTORNEY GENERAL.

6           AND THE SLIDE I'VE GOT THERE, IT'S HIGHLIGHTED

7    ATTORNEY GENERAL IN PERSON, BUT THEY HAVEN'T HIGHLIGHTED

8    COMMISSION, WHICH IS ALSO LISTED.  BUT THESE THREE ACTORS ARE

9    ALL NAMED IN TITLE I TO MAKE CLEAR THAT THERE ARE SPECIFIC

10   PROVISIONS OF TITLE VII THAT RELATE TO THESE DIFFERENT ACTORS

11   CARRY OVER TO TITLE I OF THE ADA.

12          TITLE III OF THE ADA ADDRESSES DISABILITY

13   DISCRIMINATION IN PUBLIC ACCOMMODATIONS.  AND ITS ENFORCEMENT

14   SECTION INCORPORATES THE ENFORCEMENT PROVISION OF TITLE II OF

15   THE CIVIL RIGHTS ACT WHICH ALSO ADDRESSES PUBLIC

16   ACCOMMODATIONS.  BUT THEN TITLE III GOES AHEAD AND AUTHORIZES

17   BROADER RELIEF IN ACTIONS BROUGHT BY THE ATTORNEY GENERAL UNDER

18   TITLE III.

19          AND YOU CAN'T SEE THAT IN THEIR QUOTE FROM TITLE III

20   BECAUSE IT JUST STOPPED AT (B)(1)(B).  BUT IF YOU CONTINUED

21   READING THE REST OF (B), YOU WOULD SEE THAT, IN ACTIONS BROUGHT

22   BY THE ATTORNEY GENERAL, DAMAGES ARE POTENTIALLY AVAILABLE AS

23   WELL AS CIVIL PENALTIES.  THAT IS UNTRUE IN TITLE II OF THE

24   CIVIL RIGHTS ACT THAT'S BEING INCORPORATED.  IT'S ALSO BROADER

25   THAN THE REMEDIES PROVIDED TO PRIVATE PARTIES.  SO, IF -- SO

1   CONGRESS HAD TO SPECIFY WHAT RIGHTS AND PROCEDURES GO WITH

2   ATTORNEY GENERAL ACTIONS BECAUSE OF THOSE DIFFERENCES.

3            TITLE II IS DIFFERENT.  IT INCORPORATES WITHOUT

4   CHANGE THE DECADES-OLD EXISTING ENFORCEMENT SCHEME ESTABLISHED

5   UNDER TITLE VI AND THE REHABILITATION ACT UNDER WHICH THE

6   ATTORNEY GENERAL'S AUTHORITY TO FILE AN ACTION HAS ALREADY BEEN

7   CLEAR.  IT'S BEEN CLEAR FOR DECADES.  AND CONGRESS USED

8   LANGUAGE AS NEARLY IDENTICAL TO THE LANGUAGE THEY ARE USING IN

9   THE REHABILITATION ACT WHEN IT WANTED TO ACCOMPLISH THE SAME

10  THING WITH RESPECT TO THE RIGHTS, PROCEDURES, AND REMEDIES FROM

11  TITLE VI.

12           WITH RESPECT TO THE REQUEST FOR A STAY, SO GEORGIA

13  ASKS IN THE ALTERNATIVE THAT THIS COURT STAY THE CASE UNTIL THE

14  11TH CIRCUIT HAS RULED ON AN APPEAL IN DUDEK.  SO THERE ARE A

15  NUMBER OF PROBLEMS WITH THAT REQUEST.

16           AND, FIRST, THERE'S NO FINAL JUDGMENT IN DUDEK, SO WE

17  DON'T KNOW WHEN THERE WILL BE A FINAL JUDGMENT IN THE CASE OR

18  WHETHER THE CASE WILL GO TO TRIAL.  AND SO YOU'RE FACING THE

19  PROSPECT OF POSSIBLY AN INDEFINITE STAY.  BUT EVEN IF AND WHEN

20  THE DISTRICT COURT ISSUES A FINAL JUDGMENT IN DUDEK, THE

21  PARTIES HAVE 60 DAYS TO APPEAL.

22           GEORGIA SEEMS TO ASSUME AS A FOREGONE CONCLUSION THAT

23  THE UNITED STATES WILL APPEAL.  BUT IT HAS TO GO THROUGH THE

24  DEPARTMENT'S INTERNAL REVIEW PROCESS FOR DETERMINING WHETHER OR

25  NOT TO TAKE AN APPEAL.  AND SO YOU CAN'T ASSUME FOR CERTAIN

62

1   THAT THE UNITED STATES WILL APPEAL.  AND SO THERE'S REALLY NO

2   KNOWING HOW LONG THE APPELLATE PROCESS, IF ANY APPELLATE

3   PROCESS, IS GOING TO LAST.  SO WE ARE IN A SITUATION WE HAVE AN

4   OPEN-ENDED AND INDEFINITE STAY OF PROCEEDINGS HERE.

5          I DON'T THINK IT'S AN ANSWER TO SAY, WELL, YOUR HONOR

6   COULD SAY FOR A YEAR AND SEE WHERE WE ARE.  THE WHOLE POINT OF

7   THE STAY REQUEST IS TO STAY THIS CASE UNTIL THE 11TH CIRCUIT

8   RULES IN DUDEK.  AND WE REALLY HAVE NO IDEA IF AND WHEN THAT

9   WILL EVER OCCUR.

10          AND, AT THE SAME TIME, THERE'S THIS EQUITABLE

11   COMPONENT ABOUT THE ENORMOUS DAMAGE THAT WOULD BE INFLICTED ON

12   STUDENTS IN THE MEANTIME.  GEORGIA SAYS, WELL, THE STUDENTS

13   AREN'T A PARTY TO THE CASE, THE UNITED STATES IS A PARTY TO THE

14   CASE.  BUT THE WHOLE PURPOSE OF -- I'VE SAID THIS BEFORE -- BUT

15   THE PURPOSE THAT'S ARTICULATED IN THE STATUTE IS FOR THE

16   FEDERAL GOVERNMENT TO HAVE A CENTRAL ROLE ENFORCING THE CHAPTER

17   ON BEHALF OF INDIVIDUALS WITH DISABILITIES.

18          UNITED STATES IS THE CHAMPION OF THESE STUDENTS'

19   RIGHTS HERE.  THEY DON'T ALL HAVE THE WHEREWITHAL TO SUE ON

20   THEIR OWN BEHALF.  AND THEY ARE FACING SORT OF YEAR-END,

21   YEAR-OUT, THEY WILL BEAR THE BRUNT OF THE STAY, OF ANY STAY IN

22   THIS CASE.  THESE STUDENTS ARE ENJOYING UNNECESSARY SEGREGATION

23   AND UNEQUAL EDUCATIONAL OPPORTUNITIES.  AND MY COLLEAGUE WILL

24   ADDRESS THE FACTS FURTHER.  BUT THE EQUITIES DO NOT FAVOR

25   GEORGIA IN THIS CASE APART FROM THE FACT THEY ARE FACING AN

63

1    INDEFINITE AND OPEN-ENDED STAY IF THE GOAL IS TO WAIT FOR AN

2    11TH CIRCUIT RULING IN DUDEK.

3            SO, WITH RESPECT, YOUR HONOR, WE DON'T THINK A STAY

4    WOULD BE APPROPRIATE HERE.  AND FOR THE REASONS THAT I'VE

5    GIVEN, UNITED STATES AND THE ATTORNEY GENERAL DO HAVE A CAUSE

6    OF ACTION TO ENFORCE TITLE II.

7            AND IF THE COURT HAS NO FURTHER QUESTIONS, I WILL

8    DEFER TO MY COLLEAGUE.

9            THE COURT:  ALL RIGHT.  THANK YOU, MA'AM.

10           MR. ENGLAND:  GOOD MORNING, YOUR HONOR.

11           THE COURT:  GOOD MORNING AGAIN, SIR.

12           MR. ENGLAND:  MAY IT PLEASE THE COURT, MY NAME IS

13   TRAVIS ENGLAND, AND I ALSO REPRESENT THE UNITED STATES OF

14   AMERICA IN THIS MATTER.  AS MY COLLEAGUE MENTIONED, I WILL BE

15   ADDRESSING THE STATE'S REMAINING ARGUMENTS OTHER THAN THOSE

16   ADDRESSING THE ATTORNEY GENERAL'S AUTHORITY TO BRING SUIT UNDER

17   TITLE II AND THE STATE OF GEORGIA'S REQUEST FOR A STAY.

18           EACH OF THE STATE'S REMAINING ARGUMENTS IS PREMISED

19   ON A FUNDAMENTAL MISUNDERSTANDING OF THE NATURE OF THE UNITED

20   STATES' CLAIMS HERE OR THE FACTUAL ALLEGATIONS THAT HAVE BEEN

21   RAISED IN THE COMPLAINT.  AND BECAUSE OF THIS DISAGREEMENT

22   BETWEEN THE PARTIES ABOUT THE NATURE OF THE UNITED STATES'

23   CLAIM, I THINK IT WOULD BE HELPFUL FOR ME TO TAKE A STEP BACK

24   AND GIVE A BRIEF OVERVIEW OF WHAT THE UNITED STATES IS ALLEGING

25   HERE AND THE RELIEF THAT IT IS SEEKING.

64

1      ALTERNATIVELY, I'M HAPPY TO ANSWER ANY SPECIFIC

2  QUESTIONS YOUR HONOR MIGHT HAVE ABOUT THE ARGUMENTS.  BUT I

3  THINK IT MIGHT BE HELPFUL TO HAVE AN OVERVIEW FIRST.

4      AS MY COLLEAGUE MENTIONED, TITLE II OF THE ADA

5  PROHIBITS DISCRIMINATION BY PUBLIC ENTITIES IN THE

6  ADMINISTRATION OF THEIR PROGRAMS, SERVICES, OR ACTIVITIES.  THE

7  UNITED STATES HAS BROUGHT THIS LAWSUIT ALLEGING THAT THE STATE

8  HAS CHOSEN TO ADMINISTER A PROGRAM DELIVERING MENTAL HEALTH AND

9  THERAPEUTIC EDUCATIONAL SERVICES AND SUPPORTS TO THOUSANDS OF

10  STUDENTS WITH DISABILITIES AND BEHAVIOR-RELATED DISABILITIES,

11  PRIMARILY IN THE SEGREGATED RATHER THAN INTEGRATED

12  ENVIRONMENTS.

13      NOW, THIS PROGRAM, AS COUNSEL FOR THE STATE OF

14  GEORGIA HAS EXPLAINED, IS KNOWN AS THE GEORGIA NETWORK FOR

15  THERAPEUTIC AND EDUCATIONAL SUPPORTS.  AND AS COUNSEL

16  ACKNOWLEDGES, HAS ACKNOWLEDGED TODAY, THIS IS NOT A PLACE.

17  THIS IS A PROGRAM OF THE STATE OF GEORGIA DELIVERING A SET OF

18  SERVICES TO THOUSANDS OF STUDENTS WITH DISABILITIES THROUGHOUT

19  THE STATE.  AND THAT'S THE FOCUS OF THE UNITED STATES'

20  COMPLAINT, HOW THE STATE IS ADMINISTERING THIS PROGRAM AND THE

21  SET OF SERVICES.

22      AND THE UNITED STATES ALLEGES THAT THE MANNER IN

23  WHICH THIS PROGRAM HAS BEEN ADMINISTERED IS CAUSING THOUSANDS

24  OF STUDENTS WITH DISABILITIES TO BE SUBJECTED TO UNNECESSARY

25  SEGREGATION.  AND NOT ONLY DOES IT CAUSE STUDENTS IN THE

1  PROGRAM TO BE SEGREGATED FROM THEIR PEERS, IT DEPRIVES THE

2  STUDENTS OF EQUAL EDUCATIONAL OPPORTUNITIES.  STUDENTS IN THE

3  PROGRAM ARE OFTEN DEPRIVED OF OPPORTUNITIES TO PARTICIPATE IN

4  ELECTIVES, TO -- THEY ATTEND SCHOOLS WITHOUT PROPER GYMNASIUMS

5  OR CAFETERIAS.  AND THEY ARE UNABLE TO ENJOY THE BENEFITS OF

6  AFTER-SCHOOL ACTIVITIES AND PROGRAMS, SUCH AS SPORTS AND OTHER

7  CLUBS.  NOW, THOSE ARE THE CENTRAL ALLEGATIONS OF THE UNITED

8  STATES' COMPLAINT.

9          THE RELIEF THAT THE UNITED STATES SEEKS IS A

10  REASONABLE MODIFICATION SYSTEMICALLY TO THE PROGRAM OF SERVICES

11  THAT GEORGIA ADMINISTERS, IN THE FORM OF TAKING THE SPECIALIZED

12  SERVICES THAT GEORGIA MAKES AVAILABLE IN THE GNETS PROGRAM,

13  PRIMARILY IN SEGREGATED SETTINGS, AND INSTEAD DELIVERING MANY

14  OF THOSE SAME SERVICES UP FRONT IN MORE INTEGRATED SETTINGS,

15  THUS PREVENTING THE SEGREGATION IN THE FIRST PLACE.

16          THIS LAWSUIT IS NOT -- I REPEAT -- IS NOT ABOUT ANY

17  PARTICULAR PLACEMENT OF ANY CHILD OR ANY SET OF CHILDREN.  IT

18  DOES NOT SEEK RELIEF IN THE FORM OF ANY PARTICULAR REVISIONS TO

19  THE INDIVIDUAL EDUCATION PROGRAMS OF ANY PARTICULAR CHILD OR

20  SET OF CHILDREN.  RATHER, THIS LAWSUIT IS ABOUT THE STATE'S

21  DISCRIMINATORY ADMINISTRATION OF THE PUBLIC FUNDING AND

22  SERVICES FOR CHILDREN WITH BEHAVIORAL-RELATED DISABILITIES.

23          BECAUSE OF THE CHOICES THAT THE STATE OF GEORGIA AND

24  ITS AGENCIES HAVE MADE WITH RESPECT TO ITS ALLOCATION OF

25  RESOURCES WITH RESPECT TO THESE SERVICES, THOUSANDS HAVE BEEN

1    UNNECESSARILY SEGREGATED AWAY FROM THEIR PEERS.  AND THAT IS

2    DISCRIMINATION.  AND THAT IS WHAT THIS LAWSUIT IS ABOUT.

3          THE UNITED STATES -- COUNSEL FOR THE STATE OF GEORGIA

4    CLAIMS THAT ONLY A SMALL SUBSET OF THE STUDENTS WITHIN THE

5    GNETS PROGRAM HAVE BEEN SUBJECTED TO SEGREGATION OR BEEN PLACED

6    IN SELF-CONTAINED SETTINGS.  BUT THAT SIMPLY IS JUST NOT THE

7    CASE.

8          THE UNITED STATES' INVESTIGATION, WHICH IT UNDERTOOK

9    SEVERAL YEARS AGO, FOUND THAT MORE THAN A SMALL SUBSET OF

10   CHILDREN WERE IN SELF-CONTAINED ENVIRONMENTS.  IN FACT,

11   THOUSANDS WERE IN SELF-CONTAINED ENVIRONMENTS.  AND THE UNITED

12   STATES IS NOT AWARE OF ANY OTHER STATE THAT OPERATES A PROGRAM

13   FOR STUDENTS WITH BEHAVIORAL-RELATED DISABILITIES IN THIS

14   MANNER, THAT PRIMARILY RELIES ON THESE SEGREGATED SETTINGS,

15   THESE SEPARATE SELF-CONTAINED SETTINGS TO DELIVER SERVICES TO

16   THIS POPULATION.

17         AND SO, YOUR HONOR, THAT IS WHAT THE UNITED STATES

18   SEEKS HERE, A MODIFICATION OF THAT SERVICE DELIVERY PARADIGM

19   SUCH THAT SERVICES WILL BE DELIVERED UP FRONT TO ENABLE

20   CHILDREN TO BE -- TO ENJOY EQUAL OPPORTUNITIES WITH AND TO BE

21   INTEGRATED IN GENERAL EDUCATION ENVIRONMENTS WITH THEIR PEERS.

22         NOW, GEORGIA'S FIRST SPECIFIC ARGUMENT REGARDING THE

23   SUFFICIENCY OF THE COMPLAINT'S ALLEGATIONS CENTERS ON ITS

24   CONTENTION THAT THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT

25   THE STATE OF GEORGIA ADMINISTERS THE GNETS PROGRAM AND THAT THE

1    UNITED STATES' CLAIMS WOULD THEREFORE BE DISMISSED.  THIS

2    ARGUMENT IS SIMPLY BASELESS.

3            THE GNETS PROGRAM IS A SERVICE PROGRAM OR ACTIVITY OF

4    THE STATE OF GEORGIA.  AND, THEREFORE, UNDER TITLE II, THE

5    STATE OF GEORGIA MUST ADMINISTER IT IN A WAY THAT IT DOES NOT

6    CAUSE DISCRIMINATION.

7            NOW, GEORGIA CLAIMS THAT ITS CONSTITUTION PLACES SOLE

8    RESPONSIBILITY FOR EDUCATION WITH LOCAL BOARDS OF EDUCATION.

9    BUT THIS ARGUMENT DISREGARDS THE CENTRAL ROLE THAT GEORGIA'S

10   BOARD OF EDUCATION FEATURES IN THE CONSTITUTION AS WELL

11   REGARDING THE, REGARDING THE MANNER IN WHICH EDUCATIONAL

12   SERVICES ARE DELIVERED IN THE STATE.

13           AND IN DISREGARD TO SUBSTANTIAL REGULATORY AND

14   MANAGERIAL ROLE THAT THE GEORGIA DEPARTMENT OF EDUCATION PLAYS

15   IN DETERMINING THE MANNER IN WHICH THE GNETS PROGRAM WILL

16   OPERATE STATEWIDE, THE COMPLAINT PLAINLY ALLEGES THE MYRIAD

17   WAYS THAT THE STATE OF GEORGIA PLANS, FUNDS, MANAGES, AND

18   OVERSEES THE GNETS PROGRAM STATEWIDE.  AND I'LL GO THROUGH A

19   NUMBER OF THOSE WAYS.

20           THESE TERMS ARE NOT MERE UNSUPPORTED LEGAL

21   CONCLUSIONS, AS GEORGIA HAS ARGUED IN ITS PAPERS AND TODAY.

22   THEY ARE FACTS.  NOW, THE GEORGIA'S GENERAL ASSEMBLY FOR

23   DECADES HAS DESIGNATED SPECIFIC FUNDING FOR THE GNETS PROGRAM.

24   MILLIONS OF DOLLARS IN STATE AND FEDERAL FUNDS THAT ARE TO BE

25   ADMINISTERED BY THE GEORGIA DEPARTMENT OF EDUCATION AND GRANTED

68

1    TO REGIONAL GNETS PROGRAMS THROUGHOUT THE STATE.  THE GEORGIA

2    DEPARTMENT OF EDUCATION DETERMINES HOW THESE FUNDS WILL BE

3    SPENT AND WHAT SERVICES THEY WILL FUND AND WHERE THESE SERVICES

4    WILL BE DELIVERED.  IT APPROVES THE GRANTS THAT -- THE GRANT

5    APPLICATIONS THAT ARE MADE BY THE REGIONAL PROGRAMS AND

6    THEREFORE HAS CONTROL OVER WHAT IS APPROVED OR WHAT IS

7    DISAPPROVED.

8              AND, AGAIN, THE GEORGIA DEPARTMENT OF EDUCATION HAS

9    SET FORTH A REGULATION ESTABLISHING THE USE OF FEDERAL FUNDING

10   UNDER THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT PART B,

11   SPECIFICALLY FOR FUNDING SERVICES FOR CHILDREN DIAGNOSED WITH

12   SERIOUS EMOTIONAL AND BEHAVIORAL DISORDERS AND THAT THE

13   SPECIFIC STATUTE THAT I'M REFERRING TO IS GEORGIA COMPREHENSIVE

14   RULES AND REGULATIONS 160-1-4-49.  THESE REGULATIONS REQUIRE

15   DOLLARS TO BE SPENT ON THE GNETS PROGRAM.  THESE ARE SPECIFIC

16   DOLLARS THAT HAVE BEEN GRANTED BY THE FEDERAL GOVERNMENT UNDER

17   I.D.E.A. PART B.  AND THESE REGULATIONS DIRECT THE GEORGIA

18   DEPARTMENT OF EDUCATION TO SPEND THEM ON THE GNETS PROGRAM.

19             THE STATE IS THUS A GATEKEEPER OF THESE DOLLARS THAT

20   ARE ULTIMATELY USED FOR DELIVERY OF SERVICES TO THE, TO THE

21   STUDENTS IN THE GNETS PROGRAM.

22             IT MAY CHOOSE HOW TO ALLOCATE THEM AS IT SEES FIT

23   WITHIN THE BOUNDARIES OF THE FEDERAL I.D.E.A. GRANT.  AS IT

24   STANDS, HOWEVER, IT CHOOSES TO SPEND THESE DOLLARS PRIMARILY IN

25   A PROGRAM THAT DELIVERS SERVICES IN PRIMARILY SEGREGATED

69

1    SETTINGS.

2           NOW, THE GEORGIA DEPARTMENT OF EDUCATION HAS ALSO

3    ISSUED REGULATIONS GOVERNING THE OPERATION OF THE GNETS

4    PROGRAMS STATEWIDE.  AND THESE WHICH, WHICH ARE LOCATED IN THE

5    BINDER THAT COUNSEL FOR THE STATE HAS PROVIDED UNDER TAB D-2

6    ENDING IN 7-.15, THESE REGULATIONS ESTABLISH ELIGIBILITY

7    REQUIREMENTS FOR THE PROGRAM STATEWIDE.  THEY DELINEATE

8    RESPONSIBILITIES FOR VARIOUS ACTORS THAT PARTICIPATE IN THE

9    PROGRAM, INCLUDING REGIONAL EDUCATION SERVICE AGENCIES AS WELL

10   AS LOCAL EDUCATIONAL AGENCIES.  AND THE REGULATIONS ALSO GOVERN

11   THE MANNER IN WHICH REGIONAL GNETS PROGRAMS ARE TO SET THEIR

12   BUDGETS AND OTHER OPERATIONAL REQUIREMENTS SUCH AS CLASS SIZES.

13          THE GEORGIA ITSELF HAS ACKNOWLEDGED ITS CENTRAL ROLE

14   THAT THE GEORGIA DEPARTMENT OF EDUCATION PLAYS IN THE

15   ADMINISTRATION OF THE GNETS PROGRAM.  AND I THINK THAT IF YOU

16   LOOK AT PARAGRAPH 60 OF THE COMPLAINT, THE UNITED STATES REFERS

17   TO A 2010 AUDIT BY THE GEORGIA DEPARTMENT OF AUDITS AND

18   ACCOUNTING, WHICH WAS UNDERTAKEN OVER -- AN AUDIT THAT WAS

19   UNDERTAKEN REGARDING THE GNETS PROGRAM AND ITS ADMINISTRATION.

20          NOW, THE RESULTS OF THE AUDIT, WHICH FOUND NO

21   ASSURANCE THAT THE GNETS PROGRAM PROVED COST-EFFECTIVE IN

22   DELIVERY OF SERVICES TO ITS STUDENTS, MADE SPECIFIC

23   RECOMMENDATIONS.  AND WHO ARE THOSE RECOMMENDATIONS MADE TO.

24   THEY WERE MADE TO THE GEORGIA DEPARTMENT OF EDUCATION BECAUSE

25   OF ITS CENTRAL ROLE IN THE ADMINISTRATION OF THE PROGRAM AND

1    ENSURING THAT THE PROGRAM MEETS THE GOALS AS SET FORTH BY THE

2    LEGISLATURE.

3            NOW, BECAUSE OF THE AUDIT'S FINDINGS, THE GEORGIA

4    DEPARTMENT OF EDUCATION FOR THE LAST SEVERAL YEARS HAS

5    UNDERTAKEN A STRATEGIC PLANNING PROCESS WITH VARIOUS ACTORS

6    WITHIN THE GNETS PROGRAM.  IT EMPLOYS STAFF SPECIFICALLY

7    CHARGED WITH OVERSEEING THE OPERATION OF THE PROGRAM STATEWIDE

8    AND WORKING WITH VARIOUS ACTORS THROUGHOUT THE STATE.  AND IT

9    HAS PUBLISHED NUMEROUS UPDATES TO A STRATEGIC PLAN OVER THE

10   LAST SEVERAL YEARS DICTATING THE COURSE AND THE TRAJECTORY OF

11   WHERE THE PROGRAM WAS GOING.

12           IN ADDITION, AS COUNSEL ACKNOWLEDGED EARLIER TODAY,

13   IT -- THE GEORGIA DEPARTMENT OF EDUCATION HAS UNDERTAKEN

14   CLOSURES OF FACILITIES WHERE THOSE FACILITIES HAVE BEEN

15   IDENTIFIED TO VIOLATE CERTAIN COMPLIANCE CRITERIA.  AND COUNSEL

16   ACKNOWLEDGED THAT IT WOULD NOT HESITATE TO TAKE FURTHER ACTION

17   IF SUCH, IF SUCH NONCOMPLIANCE WAS FOUND IN THE FUTURE.  AND

18   THE COMPLAINT THAT SETS FORTH A NUMBER OF SCHOOL CLOSURES THAT

19   OCCURRED PRIOR TO THE CURRENT SCHOOL YEAR.

20           SO STATE AGENCIES IN GEORGIA, INCLUDING THE GEORGIA

21   DEPARTMENT OF EDUCATION, ARE CENTRALLY INVOLVED IN PLANNING,

22   FUNDING, MANAGING, REGULATING, AND OVERSEEING THE STATEWIDE

23   GNETS PROGRAM.

24           GEORGIA'S COUNTER-ARGUMENTS ARE UNAVAILING.  GEORGIA

25   PRINCIPALLY RELIES ON THE BACON CASE FROM THE FOURTH CIRCUIT.

71

1    AND I THINK THAT CASE IS MATERIALLY DISTINGUISHABLE.  FIRST OF

2    ALL, IT DIDN'T STAND FOR THE GENERAL PROPOSITION THAT FUNDING

3    IS NOT A BASIS FOR LIABILITY.  WHAT THAT CASE STOOD FOR WAS

4    THAT THERE, THE -- A GROUP OF PLAINTIFFS SUED THE SCHOOL BOARD

5    WITHIN THE CITY OF RICHMOND, WHICH IS A SEPARATE LEGAL ENTITY

6    FROM THE CITY OF RICHMOND ITSELF.  AND THE FOURTH CIRCUIT

7    CONSIDERED WHAT -- THE LAW -- THE FOCUS OF THE LAWSUIT WAS

8    WHETHER THE SCHOOL DISTRICT AND ITS FACILITIES WERE PHYSICALLY

9    ACCESSIBLE TO STUDENTS WITH DISABILITIES.

10          PART OF THE RELIEF THAT WAS SOUGHT IN THE LAWSUIT

11    SOUGHT TO INCLUDE THE STATE OF GEORGIA -- OR SOUGHT TO INCLUDE

12    THE CITY OF RICHMOND TO PROVIDE FUNDING FOR CERTAIN PHYSICAL

13    MODIFICATIONS THAT WERE NECESSARY TO EFFECTUATE THE RELIEF THAT

14    WAS SOUGHT.  AND THE FOURTH CIRCUIT CONSIDERED WHETHER IN --

15    WHETHER THE DISTRICT COURT WAS PROPERLY ABLE TO ISSUE AN ORDER

16    REQUIRING THE CITY OF RICHMOND TO EFFECTUATE THE RELIEF.

17          AND THE FOURTH CIRCUIT HELD THAT THE DISTRICT COURT

18    WAS NOT, BUT THAT WAS BECAUSE NO FINDING OF LIABILITY WAS

19    ISSUED AS TO THE DISTRICT -- AS TO THE CITY OF RICHMOND.  SO IT

20    DID NOT STAND FOR THE PROPOSITION THAT THE SOLE -- A PUBLIC

21    ENTITY'S SOLE CONNECTION TO A VIOLATION IS FUNDING THAT IT

22    CANNOT BE FORCED TO COMPLY OR COMPELLED TO COMPLY WITH THE LAW

23    VIA COURT ORDER.

24          BUT I THINK, IRRESPECTIVE OF WHAT THE, WHAT THE BACON

25    COURT HELD, WHAT YOU HAVE HERE, AS I LAID OUT EARLIER, IS

1    SUBSTANTIALLY MORE THAN JUST FUNDING.  THE STATE OF GEORGIA

2    REGULATES, MANAGES, OVERSEES, AND FUNDS THE GNETS PROGRAM.

3            AND FOR THE SAME REASONS ADDRESSING THE ARGUMENT THAT

4    YOUR HONOR ORDERS BRIEFING ON REGARDING WHETHER THE STATE OF

5    GEORGIA IS THE PROPER DEFENDANT IN THIS ACTION, THE LOCUS OF

6    CONTROL OF THE STATEWIDE POLICIES AND PROCEDURES OF THE GNETS

7    PROGRAM AND THE MENTAL HEALTH AND THERAPEUTIC EDUCATIONAL

8    SERVICES THAT ARE AT ISSUE IN THIS CASE, THE LOCUS OF CONTROL

9    OF THESE ACTIVITIES IN THIS PROGRAM IS WITH THE STATE OF

10   GEORGIA AND ITS, AND ITS STATE AGENCIES.

11           NOW, COUNSEL'S ARGUMENTS AND AUTHORITY SUGGESTING THE

12   STATE IS NOT A PROPER DEFENDANT ARE, THEREFORE, INAPPOSITE.

13   THE STATE OF GEORGIA IS A PUBLIC ENTITY UNDER TITLE II OF THE

14   ADA.  42 U.S.C. 12131 DEFINES WHAT A PUBLIC ENTITY IS.  AND

15   GEORGIA HAS NOT CITED TO A SINGLE CASE WHERE THE STATE HAS NOT

16   BEEN HELD -- WHERE A STATE HAS NOT BEEN FOUND A PROPER PARTY IN

17   A CASE WHERE THE UNITED STATES HAS BROUGHT RELIEF -- BROUGHT A

18   CASE FOR RELIEF UNDER THE ADA.

19           SO THE UNITED STATES SETS FORTH A REASONABLE --

20   UNITED STATES' COMPLAINT SETS FORTH THE REASONABLE

21   MODIFICATIONS THAT ARE REQUIRED TO REMEDY THE SYSTEMIC

22   DISCRIMINATION THAT IS DESCRIBED IN THE COMPLAINT CAUSED BY THE

23   STATE'S ADMINISTRATION OF THE GNETS PROGRAM AND THE MENTAL

24   HEALTH AND THERAPEUTIC EDUCATIONAL SERVICES DELIVERED BY THAT

25   PROGRAM.

1          THE VIOLATIONS OF -- IDENTIFIED BY THE COMPLAINT ARE,

2     THEREFORE, FAIRLY TRACEABLE TO THE STATE'S ACTIONS AND,

3     THEREFORE, CAPABLE OF REDRESS BY THIS COURT.

4          THE STATE DOES CITE A HODGEPODGE OF CASES THAT INVOKE

5     THE 11TH AMENDMENT OR THE 11TH AMENDMENT EX PARTE YOUNG

6     EXCEPTION.  BUT THERE'S CLEAR 11TH CIRCUIT AUTHORITY THAT THE

7     11TH AMENDMENT DOES NOT APPLY TO SUITS BROUGHT BY THE UNITED

8     STATES AS TO SUIT BY -- DOES NOT APPLY TO SUITS BY THE UNITED

9     STATES AGAINST A STATE ACTOR OR AGAINST THE STATE ITSELF.

10         AND SO THE VARIOUS CASES THAT THE STATE CITES INSTEAD

11    FOCUSES ON WHERE THE RELIEF AGAINST A STATE ACTOR WILL NOT

12    PROVIDE ANY RELIEF AT ALL FOR VARIOUS REASONS.  AND I THINK

13    HERE, WHERE THE UNITED STATES HAS ALLEGED THE CLEAR WAYS THAT

14    THE STATE ADMINISTERS THIS PROGRAM AND THAT THE ADMINISTRATION

15    OF THE PROGRAM RESULTS IN THOUSANDS OF STUDENTS INAPPROPRIATELY

16    SEGREGATED, THE RELIEF THAT UNITED STATES SEEKS TO OBTAIN HERE

17    IS APPROPRIATELY SOUGHT FROM THE STATE ITSELF.

18         THE INJURY THAT WE ALLEGE IS THEREFORE FAIRLY

19    TRACEABLE TO THE CHALLENGED ACTION AND FAIRLY TO MAKE SERVICES

20    IN INTEGRATED SETTINGS THROUGH THE GNETS PROGRAM, GEORGIA

21    ITSELF CAN DO THAT.

22         GEORGIA'S NEXT ARGUMENT IS THAT THE UNITED STATES HAS

23    FAILED TO ALLEGE NECESSARY ELEMENTS OF ITS CLAIM.  IT ARGUES

24    THAT THE COMPLAINT DOES NOT ALLEGE THAT STUDENTS WITH

25    DISABILITIES HAVE BEEN ASSESSED BY STATE TREATMENT

74

1    PROFESSIONALS TO BE APPROPRIATE TO RECEIVE SERVICES IN MORE

2    INTEGRATED SETTINGS AND THAT THESE STUDENTS AND THEIR FAMILIES

3    DO NOT OPPOSE.  AND IT CHARACTERIZES THESE AS NECESSARY

4    ELEMENTS OF A CLAIM FOR VIOLATION OF THE INTEGRATION MANDATE.

5         BUT UNITED STATES' COMPLAINT PLAINLY ALLEGES THAT THE

6    STUDENTS IN THE GNETS PROGRAM COULD BE SERVED IN MORE

7    INTEGRATED SETTINGS AND THAT THE SERVICES CURRENTLY DELIVERED

8    BY THE GNETS PROGRAM COULD BE DELIVERED IN MORE INTEGRATED

9    SETTINGS.  AND THEY COULD MEET THESE NEEDS.  AND THAT REALLY

10   GOES TO WHETHER STUDENTS WITH DISABILITIES ARE QUALIFIED

11   INDIVIDUALS WITH DISABILITIES AND THEY ARE QUALIFIED FOR BOTH

12   SERVICES IN THE GNETS PROGRAM AND SERVICES IN THE COMMUNITY.

13        AND THESE ALLEGATIONS ARE NOT MADE ON MERE

14   INFORMATION OR BELIEF, AS COUNSEL STATES IN THEIR PAPERS, OR

15   BASED ON NOTHING, AS COUNSEL STATED TODAY.  THEY ARE BASED ON

16   -- THEY ARE MADE AFTER A MULTI-YEAR INVESTIGATION THAT COUNSEL

17   ACKNOWLEDGED EARLIER INVOLVING EXPERTS WITH SPECIALIZED

18   KNOWLEDGE IN THE DELIVERY OF MENTAL HEALTH AND THERAPEUTIC

19   EDUCATIONAL SERVICES.

20        AS SET FORTH IN THE UNITED STATES' COMPREHENSIVE

21   LETTER OF FINDINGS, WHICH ISSUED A YEAR PRIOR TO THIS LAWSUIT,

22   THE EXPERTS THAT THE UNITED STATES RETAINED FOUND THAT THE

23   STUDENTS IN THE GNETS PROGRAM WITH BEHAVIORAL-RELATED

24   DISABILITIES DID INDEED NEED CERTAIN SERVICES THAT WERE MADE

25   AVAILABLE THROUGH THE GNETS PROGRAM, BUT THERE WAS NOTHING

75

1    UNIQUE ABOUT THOSE NEEDED SERVICES THAT REQUIRED THEIR

2    PERMISSION IN SEGREGATED SETTINGS.

3            THUS, THE VAST MAJORITY OF THE STUDENTS IN THE

4    PROGRAM, THESE EXPERTS FOUND, COULD BE SERVED IN MORE

5    INTEGRATED SETTINGS.

6            AS TO THE STATE'S ARGUMENT RELATING TO WHETHER THE

7    STATE'S TREATMENT PROFESSIONALS HAVE MADE SPECIFIC FINDINGS, AS

8    COUNSEL ACKNOWLEDGED, THE DAY VERSUS DISTRICT OF COLUMBIA CASE

9    FROM THE DISTRICT OF D.C. FROM 2012 ACKNOWLEDGED THAT A PERSON

10   WITH A DISABILITY NEED NOT RELY SOLELY ON STATE TREATMENT

11   PROFESSIONALS' DETERMINATIONS REGARDING WHETHER SOMEONE IS

12   APPROPRIATE FOR COMMUNITY-BASED SETTINGS OR NOT.  AND SO THERE

13   IS NO REQUIREMENT IN THE LAW THAT THE STATE TREATMENT

14   PROFESSIONAL HAVE FOUND SOMEONE SPECIFICALLY APPROPRIATE.

15           AND, IN THIS CASE, WE WOULD SUBMIT THAT THIS IS A

16   MATTER THAT WOULD BE INAPPROPRIATE FOR DETERMINATION AT SUMMARY

17   JUDGMENT AS A FULL FACTUAL RECORD WOULD ALLOW THE PARTIES TO

18   ENGAGE IN APPROPRIATE DISCOVERY REGARDING THE APPROPRIATENESS

19   AND REGARDING EXPERT OPINIONS RELATING TO THE POPULATION OF

20   GNETS -- OF STUDENTS WITHIN THE GNETS PROGRAM AS TO WHETHER

21   THEY ARE APPROPRIATE FOR SERVICES IN MORE INTEGRATED SETTINGS.

22           THE COURT:  SO YOU'RE NOT MAKING A POINT THAT THE

23   FINDINGS OF SOME PROFESSIONAL MAY NOT BE NECESSARY AT SOME

24   POINT IN THIS CASE, BUT IT WOULD NOT BE APPROPRIATE AT THIS

25   STAGE, A MOTION TO DISMISS?

76

1          MR. ENGLAND:  THAT'S CORRECT, YOUR HONOR.  WE -- YOU

2   KNOW, IN A CASE OF THIS NATURE, IN OTHER CASES THAT HAVE

3   IMPLICATED THE INTEGRATION MANDATE ON BEHALF OF -- OR WITH

4   RESPECT TO A CLASS OF INDIVIDUALS, MANY CASES, MANY THOUSANDS

5   OF INDIVIDUALS, THE PARTIES TYPICALLY RELY ON EXPERT DISCOVERY

6   AND EXPERT REPORTS AND TESTIMONY TO ASSESS THAT APPROPRIATENESS

7   FACTOR, THAT THERE MAY BE -- IT MAY NOT BE THAT THE PARTIES

8   WILL ASSESS EACH AND EVERY INDIVIDUAL THROUGH THE COURSE OF THE

9   LITIGATION.  IT MAY BE THAT AN EXPERT WILL CONDUCT SAMPLES, A

10  SAMPLING OF INDIVIDUALS AND REVIEW RECORDS AND INTERVIEW

11  INDIVIDUALS FOR APPROPRIATENESS.  BUT IN NEARLY EVERY OTHER

12  CASE IMPLICATING THE INTEGRATION MANDATE, THAT IS HOW THAT HAS

13  PLAYED OUT AND THAT A DECISION TO DISMISS IN THE ABSENCE OF A

14  SPECIFIC, THE SPECIFIC PRESENCE OF THE STATE TREATMENT

15  PROFESSIONALS' ASSESSMENT WOULD REALLY RENDER INDIVIDUALS WITH

16  DISABILITIES AT -- RENDER THEM POWERLESS TO BRING THEIR OWN

17  CLAIMS, WHEREAS STATE TREATMENT PROFESSIONALS, FOR EXAMPLE,

18  HAVEN'T ENGAGED IN THAT ANALYSIS.

19          AND THAT, I THINK, IS A PART OF WHAT THE DAY V.

20  DISTRICT OF COLUMBIA OPINION ACKNOWLEDGED.

21          SIMILARLY, THE UNITED STATES' INVESTIGATION FOUND

22  THAT STUDENTS AND THEIR PARENTS WOULD NOT OPPOSE RECEIVING

23  SERVICES IN MORE INTEGRATED SETTINGS.  TAKING THE GNETS

24  SERVICES AND PROGRAMS THAT ARE CURRENTLY MADE AVAILABLE

25  PRIMARILY IN THE SEPARATE SELF-CONTAINED ENVIRONMENTS AND

77

1    PUTTING THEM IN GENERAL EDUCATION ENVIRONMENTS WHERE

2    APPROPRIATE WOULD NOT BE OPPOSED BY THE POPULATION OF

3    INDIVIDUALS THAT THE UNITED STATES INTERACTED WITH DURING ITS

4    INVESTIGATION.  AND THE COMPLAINT AT PARAGRAPH -- AT 46

5    SPECIFICALLY RESTATES THAT ALLEGATION.  AND, AGAIN, WE WOULD

6    SUBMIT THAT FURTHER DISCOVERY, EITHER EXPERT OR SIMPLE FACT

7    DISCOVERY, WOULD ELUCIDATE THAT, THAT POINT.

8         AND SO, AT THE VERY LEAST, THE UNITED STATES'

9    ALLEGATIONS SET FORTH A PLAUSIBLE CLAIM FOR RELIEF SUCH THAT

10   DISMISSAL AT THIS JUNCTURE WOULD BE INAPPROPRIATE ABSENT

11   FURTHER DEVELOPMENT OF THE FACTUAL RECORD.  AND I THINK A

12   HELPFUL CASE TO LOOK AT THE PLEADING REQUIREMENTS REGARDING AT

13   THE MOTION TO DISMISS STAGE IN OLMSTEAD INTEGRATION AND CASE

14   WOULD BE JOSEPH S. V. HOGAN, WHICH IS AN EASTERN DISTRICT OF

15   NEW YORK CASE FROM 2008, WHICH THE UNITED STATES CITES IN ITS

16   PAPERS.

17        GEORGIA'S NEXT ARGUMENT IS THAT THE I.D.E.A. GOVERNS

18   THE OUTCOME OF STUDENTS' PLACEMENTS AND THAT THE ADA DOES NOT

19   DELIVER RELIEF THAT IS INCONSISTENT WITH THE I.D.E.A.  AND

20   THIS, AGAIN, IS PREMISED ON A MISUNDERSTANDING AND MISSTATEMENT

21   OF WHAT THE UNITED STATES SEEKS HERE.  AGAIN, THE UNITED STATES

22   ISN'T SEEKING ANY PARTICULAR, OVERTURNING ANY PARTICULAR

23   RECOMMENDATION OF IEP TEAMS OR DETERMINATIONS OF IEP TEAMS

24   REGARDING ANY INDIVIDUALS, STUDENTS, INDIVIDUALLY TAILORED

25   SERVICES AS SET FORTH IN THE IEP.  IT IS SEEKING MODIFICATION

78

1    OF THE MANNER IN WHICH THE STATE ADMINISTERS ITS STATEWIDE

2    GNETS PROGRAM SUCH THAT STUDENTS AND THEIR IEP TEAMS ARE NOT

3    INAPPROPRIATELY INCENTIVIZED -- ARE NOT INCENTIVIZED TO ACCESS

4    SERVICES THROUGH THE GNETS PROGRAM IN LIEU OF MORE INTEGRATED

5    GENERAL EDUCATION ENVIRONMENTS.

6            RIGHT NOW STUDENTS WHOSE IEP TEAMS HAVE IDENTIFIED

7    THEM AS NEEDING THE SERVICES THAT ARE MADE AVAILABLE THROUGH

8    THE GNETS PROGRAM, THEY PRIMARILY CAN ONLY GET THESE SERVICES

9    IN THE SEGREGATED ENVIRONMENTS THAT THE GNETS PROGRAM

10   CONTEMPLATES.  AND SO, AS I HAVE MENTIONED, TAKING THAT PACKAGE

11   OF SPECIALIZED SERVICES THAT GEORGIA HAS DEVELOPED WITHIN THE

12   GNETS PROGRAM AND MAKING AVAILABLE MANY OF THOSE SERVICES

13   BEFORE STUDENTS GET SENT OR SHUNTED TO SEGREGATED PLACEMENTS,

14   THAT IS THE RELIEF WE'RE TALKING ABOUT.

15           LASTLY, GEORGIA MAKES THE ARGUMENT THAT THE UNITED

16   STATES SEEKS HERE IS AN OBEY-THE-LAW INJUNCTION.  AND I THINK

17   AS I'VE EXPLAINED THROUGHOUT THIS ARGUMENT, UNITED STATES HAS

18   DESCRIBED IN GREAT DETAIL IN ITS COMPLAINT AS WELL AS THE

19   PRE-SUIT LETTER OF FINDINGS, THE REASONABLE MODIFICATIONS

20   SYSTEMICALLY THAT IT BELIEVES WOULD BE NECESSARY TO ENSURE THE

21   DISCRIMINATION AT ISSUE IN THIS CASE.

22           AND THE SPECIFIC SERVICES WHICH COUNSEL, COUNSEL

23   STATES THAT THE COMPLAINT ASKS IN THE RELIEF PART THAT, THAT WE

24   WOULD ASK FOR INTEGRATED MENTAL HEALTH AND BEHAVIORAL-RELATED

25   SERVICES IN INTEGRATED SETTINGS, BUT THE COMPLAINT SPECIFICALLY

1  DESCRIBES THE TYPES OF SERVICES THAT ARE -- THAT WE ENVISION

2  WOULD BE PROVIDED IN MORE INTEGRATED SETTINGS AT PARAGRAPHS 53

3  THROUGH 55.  AND IT DETAILS THE SERVICES THAT COULD BE

4  DELIVERED AND HOW THE STATE CAN EFFECTUATE THE DELIVERY OF

5  THOSE SERVICES IN MORE INTEGRATED SETTINGS AND ALLOW EQUAL

6  EDUCATIONAL OPPORTUNITIES FOR THIS POPULATION.

7       AND, YOUR HONOR, I'M HAPPY TO ANSWER ANY FURTHER

8  QUESTIONS THAT YOU MAY HAVE.

9       BUT FOR ALL THESE REASONS, WE WOULD RESPECTFULLY

10  SUBMIT THAT GEORGIA'S MOTION TO DISMISS SHOULD BE DENIED.

11       THE COURT:  THANK YOU SO MUCH, SIR.

12       ALL RIGHT.  GEORGIA, DO YOU NEED A SHORT BREAK BEFORE

13  YOU FINISH YOUR ARGUMENT?  OR ARE YOU READY TO GO?

14       MS. ROSS:  READY TO GO, YOUR HONOR.

15       THE COURT:  ALL RIGHT.  YOU MAY PROCEED.

16       ARE YOU WAITING FOR ME?  GO AHEAD.  I WAS FLIPPING,

17  SO MY APOLOGIES.

18       MR. BELINFANTE:  NOT A PROBLEM AT ALL.  THANK YOU,

19  YOUR HONOR.

20       YOUR HONOR, THERE IS MUCH, CANDIDLY, THAT THE UNITED

21  STATES AND THE STATE OF GEORGIA AGREE ON.  THE STATE OF GEORGIA

22  DOES NOT TAKE THE POSITION THAT CONGRESS INTENDED FOR THE

23  UNITED STATES TO HAVE AN ACTIVE ROLE IN PROHIBITING

24  DISCRIMINATION BASED ON DISABILITY.  IN TITLES I AND III, THEY

25  HAVE AN EXPRESS CAUSE OF ACTION, STATUTORY STANDING TO BRING A

1    CASE.

2            IN TITLE II, THEY HAVE AUTHORITY TO ISSUE REGULATIONS

3    THAT PRIVATE PARTIES CAN TAKE ADVANTAGE OF WHEN SEEKING REDRESS

4    FOR DISCRIMINATION BASED ON DISABILITIES.  THERE'S NO ARGUMENT

5    THAT THE FEDERAL GOVERNMENT DOESN'T HAVE A ROLE TO PLAY AT ALL.

6            THE SOLE QUESTION IS WHETHER THAT ROLE INCLUDES

7    BRINGING A SUIT UNDER TITLE II WHEN ALL OF THE CASES THAT, THAT

8    WE HAVE CITED HAVE SHOWN, WHEN YOU LOOK TO WHETHER THE UNITED

9    STATES IS GOING TO BE A PARTY, CONGRESS MAKES IT CLEAR.  AND

10   IT'S TELLING THAT IN OPPOSING COUNSEL'S ARGUMENT, IT TOOK ABOUT

11   SEVEN OR EIGHT MINUTES BEFORE THEY BEGAN EVEN TALKING ABOUT

12   TITLE II OF THE ADA.  AND THEY BEGAN WITH TITLE VI OF THE CIVIL

13   RIGHTS ACT.

14           BUT THAT STILL IGNORES THE BASIC PREMISE THAT THE

15   REMEDIES THEY ARE FOCUSING ON ARE THE WHAT BUT THAT THEY IGNORE

16   THE WHO CAN BRING THOSE CASES.

17           NOW, WHAT THEY ULTIMATELY, IT SEEMED, RELIED ON IS TO

18   SAY THAT THE REMEDIES AND PROCEDURES IN THE CIVIL RIGHTS ACT

19   ALLOW FOR AN ADMINISTRATIVE PROCESS AND, THEREFORE, THE

20   DEPARTMENT OF JUSTICE CAN COME IN THROUGH THAT ADMINISTRATIVE

21   PROCESS.

22           YOUR HONOR, THIS IS NOT ONE OF THOSE CASES.  THERE IS

23   NOT A STUDENT IN THE GNETS PROGRAM OR THEIR FAMILY MEMBER OR

24   ANYONE ELSE WHO HAS, AS A PERSON, COMMENCED AN ADMINISTRATIVE

25   PROCESS UNDER TITLE II.  THIS IS SOMETHING THE DEPARTMENT OF

81

1    JUSTICE HAS DONE COMPLETELY ON ITS OWN.  AND, THUS, THERE IS

2    NOT THAT -- THE ARGUMENT THAT THEY RELY ON IS SIMPLY NOT THE

3    CASE HERE.

4            THE NEXT ONE THAT THEY FOCUS ON, THEY CONTINUE TO

5    REPEAT THAT THE LEGISLATIVE HISTORY MAKES CLEAR THAT THE UNITED

6    STATES HAS A STRONG ROLE.  AGAIN, WE DON'T DISAGREE.  IT'S JUST

7    AN EXCEPTION AS IT RELATES TO BRINGING AN ACTION IN TITLE II.

8    AND AS WE WENT THROUGH, OF THE FOUR COMMITTEES THAT ISSUED IN

9    THE HOUSE REPORTS ON THE ISSUE, ONLY ONE, EDUCATION AND LABOR,

10   TOOK THE POSITION THAT TITLE II APPLIES AND ALLOWS THE ATTORNEY

11   GENERAL TO MOVE FORWARD.

12           AND IT SHOULD NOTE THAT THE SECTION DEALING WITH

13   ENFORCEMENT DID NOT FOCUS ON SCHOOL SYSTEMS OR SCHOOL

14   SEGREGATION, EVEN THOUGH IT WAS COMING OUT OF THE EDUCATION AND

15   LABOR COMMITTEE, WHEREAS THE OTHER TWO MADE EXPRESSLY CLEAR

16   THAT THEY INTENDED IT TO BE AN INDIVIDUAL.

17           UNITED STATES CONTINUES TO RELY ON CHEVRON DEFERENCE

18   IN THE SHOTZ CASE FROM THE 11TH CIRCUIT.  SHOTZ INVOLVED AN

19   INDIVIDUAL PLAINTIFF.  THE UNITED STATES WAS NOT THE PARTY TO

20   THAT.  AND SO THE QUESTION IN INTERPRETING THE REGULATIONS WERE

21   WHETHER THEY WERE CHEVRON DEFERENCE APPLIED AS IT WAS TO THE

22   PERSON.

23           BUT, INTERESTINGLY ENOUGH, SHOTZ DISTINGUISHES IN A

24   FOOTNOTE, I BELIEVE IT'S ROUGHLY 28, IT'S IN THE SECTION

25   DEALING WITH CHEVRON DEFERENCE, IT SEEKS AND IT COMPARES

82

1    CHEVRON ANALYSIS FROM ANDERSON -- AGAIN, IT'S THE SANDOVAL

2    ANALYSIS -- AND WHETHER AN AGENCY CAN CREATE A RIGHT OF ACTION

3    WHERE CONGRESS HAS NOT.

4            THE ARGUMENT ADVANCED BY THE STATE OF GEORGIA IS IN

5    ANDERSON AGAINST SANDOVAL DECISION.  AND OUR POSITION IS THAT

6    THIS STATUTE, 42 U.S.C. 12133, DOES NOT CREATE A PRIVATE RIGHT

7    OF ACTION FOR THE ATTORNEY GENERAL.  AND THE ATTORNEY GENERAL

8    -- AND THEY DON'T EVEN ARGUE TODAY THAT THEY CAN CREATE ONE OUT

9    OF THIN AIR.  THAT'S -- THE SUPREME COURT AND THE DUDEK COURT

10   RECOGNIZE THAT IN ITS OPINION.

11           YOUR HONOR, I THINK THAT THE CASE CANDIDLY COLLAPSES

12   AND REALLY COMES DOWN ON THE QUESTION OF TITLE II STATUTORY

13   CONSTRUCTION UNDERSTANDING, HOWEVER YOU WANT TO CALL IT, IN THE

14   UNITED STATES' CONCESSION THAT THEY ARE NOT A PERSON, BECAUSE

15   THE STATUTE SAYS THAT THE REMEDIES ARE AVAILABLE TO A PERSON.

16   AND IF THE SAVING GRACE TO THAT IS THE ADMINISTRATIVE PROCESS,

17   THAT'S NOT WHAT IS AT ISSUE HERE.

18           MOVING ON TO MR. ENGLAND'S ARGUMENT.  HE BEGAN WITH A

19   STATEMENT THAT THE STATE OF GEORGIA IS, IS ADMINISTERING THE

20   PLAN IN A WAY THAT LEADS TO UNNECESSARY SEGREGATION.  AND THEN

21   SHORTLY AFTER THAT, HE SAID THAT THIS CASE IS NOT ABOUT THE

22   PLACEMENT OF ANY CHILD.

23           YOUR HONOR, YOU CANNOT RECONCILE THOSE TWO ARGUMENTS

24   WITH OLMSTEAD ANALYSIS.  BECAUSE IN ORDER FOR IT TO BE

25   UNNECESSARY SEGREGATION, AS OLMSTEAD MAKES VERY CLEAR, IN ORDER

1   FOR IT TO BE DISCRIMINATION AT ALL, THE ISOLATION HAS TO BE

2   UNJUSTIFIED.  AND THE QUESTION OF WHETHER IT IS UNJUSTIFIED

3   TURNS ON THE DECISION OF A STATE PROFESSIONAL.

4           YOU'LL NOTE THERE'S NO ARGUMENT, THERE'S NO RESPONSE

5   TO THE FACT THAT, HERE, THE IEP TEAM IS THE ONLY PROFESSIONALS

6   THAT HAVE CONDUCTED ANY ANALYSIS.  AND THEY HAVE MADE AN

7   AFFIRMATIVE CONCLUSION THAT GNETS SERVICES ARE APPROPRIATE FOR

8   THE STUDENTS TO RECEIVE.

9           ON THE ADMINISTRATION ARGUMENT AND THAT THE STATE OF

10  GEORGIA DOES NOT ADMINISTER IT, THE DEPARTMENT OF JUSTICE

11  CONTINUES TO SAY, WELL, OF COURSE IT DOES, BUT, FOR ONE EXAMPLE

12  THEY DON'T ADDRESS TO THE COURT, THE STATUTORY LIMITATIONS

13  IMPOSED ON THE STATE BOARD OF EDUCATION.  CODE SECTION

14  20-2-152, THE OFFICIAL CODE OF GEORGIA, SAYS THAT THE STATE CAN

15  FUND.  IT DOES NOT SAY OPERATE.  IT DOES NOT SAY ADMINISTER.

16  IT DOES NOT SAY ANY OF THOSE THINGS.  AND, AGAIN, THEY ARE NOT

17  PLEADING AS A MATTER OF FACT THAT THE STATE IS OPERATING

18  OUTSIDE OF ITS JURISDICTION.  THE STATE IS FUNDING, AND THAT'S

19  IT.

20          THE DEPARTMENT OF JUSTICE ALSO IN ITS COMPLAINT AT

21  PARAGRAPH 25 INCORPORATES THE GNETS MANUAL.  AND THE GNETS

22  MANUAL ON PAGE 14 SETS FORTH THE ROLE OF THE GEORGIA DEPARTMENT

23  OF EDUCATION.  AND IT'S, ONCE FUNDS ARE APPROVED BY THE GENERAL

24  ASSEMBLY FOR OPERATIONS OF GNETS, THE STATE BOARD OF EDUCATION

25  APPROVED THE ALLOCATION OF THE FUNDS BASED ON THE FORMULA FOR

84

1    EACH GNETS PROGRAM.

2           THE GEORGIA DEPARTMENT OF EDUCATION PROVIDES ANNUAL

3    PROGRAM APPLICATIONS FOR FUNDING THAT ARE SUBMITTED TO THE

4    DEPARTMENT BY THE FISCAL AGENTS, WHICH ARE NOT STATE ACTORS.

5           AND THEN IT GOES ON FURTHER TO DISCUSS FUNDING VERSUS

6    THE IMPLEMENTATION THAT OCCURS AT THE LOCAL EDUCATION LEVEL.

7    IT'S NOT ENOUGH TO SAY IN A COMPLAINT THAT THE STATE

8    ADMINISTERS SOMETHING WHEN THE LAW SIMPLY INDICATES OTHERWISE.

9    THAT WOULD BE A LEGAL CONCLUSION THAT IS NOT SUPPORTED.

10          ON THE ISSUE OF WHETHER THERE WAS A PROPER PARTY

11   INVOLVED, WE ARE NOT ARGUING AS THE STATE THAT THE 11TH

12   AMENDMENT PROHIBITS THIS CASE.  THE UNITED STATES IS THE

13   PLAINTIFF.  WE UNDERSTAND THAT.  OUR POINT IN DISCUSSING THOSE

14   OTHER CASES, THOUGH, IS THAT THE ANALYSIS TYPICALLY FOLLOWS ON

15   WHO ADMINISTERS THE PROGRAM.  AND THE STATE OF GEORGIA, WHETHER

16   YOU LOOK AT IT FROM THE PERSPECTIVE OF ADMINISTER OR WHETHER

17   YOU LOOK AT IT FROM THE STANDARD OF WHAT KIND OF RELIEF WOULD

18   BE ISSUED AGAINST THE STATE OF GEORGIA, IT IS NOT THE

19   ADMINISTRATOR OF THE GNETS PROGRAM.

20          FINALLY, FOR MY SECTION BEFORE MS. ROSS COMES, THE

21   UNITED STATES TRIES TO AVOID THE FACT THAT IT FAILED TO PLEAD

22   ANYTHING ABOUT ANY STUDENT BEING ASSESSED.  THERE'S NO

23   ALLEGATION OF THAT WHATSOEVER.  DAY HAD IT, ALL THE CASES THEY

24   HAD CITED.  OLMSTEAD HAD IT.  AND THIS IS SOMETHING THAT CAN BE

25   DECIDED ON A MOTION TO DISMISS, BECAUSE THE OLMSTEAD DECISION

1    SETS FORTH, WHAT IS THE PRIMA FACIE ELEMENT.  IT WOULD BE THE

2    SAME AS ALLEGING A NEGLIGENCE CASE AND NOT ARGUING THAT THERE'S

3    A DUTY.  IT'S JUST SIMPLY ONE OF THOSE THINGS THAT PROVIDES A

4    BASIS TO DISMISS FOR FAILURE TO STATE A CLAIM.

5             THEY THEN SAY, I THINK IN RESPONSE TO YOUR HONOR'S

6    QUESTION, THAT THEY DON'T NEED TO ALLEGE THERE'S BEEN A FINDING

7    NOW.  THAT'S SIMPLY NOT THE CASE UNDER OLMSTEAD ITSELF, WHERE

8    IT SAYS THAT -- AND THIS IS ON PAGE 607 OF THE COMPLAINT, UNDER

9    TITLE II OF THE ADA, STATES ARE REQUIRED TO PROVIDE

10   COMMUNITY-BASED TREATMENT FOR PERSONS WITH MENTAL DISABILITIES

11   WHEN, ONE, THE STATE'S TREATMENT PROFESSIONALS DETERMINE THAT

12   SUCH PLACEMENT IS APPROPRIATE.

13            THERE IS NOTHING IN THE COMPLAINT TO SHOW THAT.  AND

14   IN SOME WAYS, YOUR HONOR, IT'S NOT THAT DISSIMILAR FROM A STATE

15   MEDICAL MALPRACTICE CASE WHERE THERE HAS TO BE AN ALLEGATION

16   THAT THERE HAS BEEN A BREACH OF THE STANDARD OF CARE.  AND, AT

17   LEAST IN GEORGIA, THAT HAS TO BE DONE BY AN AFFIDAVIT OF A, OF

18   A PHYSICIAN.  WE'RE NOT SAYING THEY NEEDED AN AFFIDAVIT IN THIS

19   CASE.  THEY AT LEAST, THOUGH, NEEDED TO MAKE THE BARE

20   ALLEGATION THAT SOME TREATMENT PROFESSIONAL -- NOW, THE GEORGIA

21   TAKES THE POSITION IT HAS TO BE A STATE TREATMENT PROFESSIONAL,

22   BECAUSE THAT'S WHAT OLMSTEAD SAYS.  BUT THE COURT DOESN'T NEED

23   TO DECIDE THAT ISSUE TODAY BECAUSE THERE'S NO ALLEGATION ABOUT

24   A TREATMENT PROFESSIONAL AT ALL.

25            AND JUST TO DRIVE THAT POINT HOME, YOUR HONOR, THE

1    UNITED STATES CITES JOSEPH S. VERSUS HOGAN AS ITS AUTHORITY ON

2    HOW TO LOOK AT A CASE ON A MOTION TO DISMISS GROUND.  IT'S A

3    DECISION IN THE EASTERN DISTRICT OF NEW YORK IN 2008.  JOSEPH

4    H., AS WE POINTED OUT, INVOLVED ALLEGATIONS OF A, A TREATMENT

5    PROFESSIONAL SAYING THAT, IN THAT CASE, THE PLAINTIFF WAS, WAS

6    APPROPRIATE FOR COMMUNITY SERVICES.  AND JOSEPH H. -- OR JOSEPH

7    S. SAYS ON PAGE 290 OF THE COMPLAINT ITSELF THAT PLAINTIFFS

8    HERE MAY PREVAIL IF THE COMPLAINT ALLEGES WITH SUFFICIENT

9    FACTUAL DETAIL TO RENDER THEIR CLAIMS PLAUSIBLE THAT

10   INDIVIDUALS ARE PLACED IN NURSING HOMES, EVEN THOUGH, ONE, A

11   DETERMINATION HAS BEEN MADE THAT A PARTICULAR INDIVIDUAL'S

12   NEEDS MAY BE MET IN A MORE INTEGRATED SETTING.  THAT ALLEGATION

13   IS NOT IN THE COMPLAINT.

14            JOSEPH S. GOES ON ON PAGE 292 TO SAY THAT THE

15   ALLEGATIONS CITED ABOVE ARE SUFFICIENT TO SUGGEST THERE HAS

16   BEEN A PROFESSIONAL DETERMINATION THAT THE CLINICAL NEEDS OF

17   THESE INDIVIDUALS MAY BE MET IN AN INTEGRATED COMMUNITY-BASED

18   SETTING.  IN FACT, THE COMPLAINT SPECIFICALLY ALLEGES THAT A

19   MENTAL HEALTH PROFESSIONAL EVALUATED JOSEPH S. AND DETERMINED

20   THAT HIS NEEDS COULD BE MET IN A MORE INTEGRATED SETTING.

21            YOU WILL NOT FIND A SIMILAR ALLEGATION IN THIS

22   COMPLAINT.  THEY DON'T CITE ONE TO YOU.  AND THAT IS A BASIS TO

23   DISMISS UNDER THE OLMSTEAD CASE ITSELF.

24            UNLESS YOUR HONOR HAS ANY OTHER QUESTIONS, I WILL

25   RESERVE THE REST OF THE TIME FOR MS. ROSS.

1          THE COURT:  I DO NOT.  SHE'S GOT ABOUT TWO MINUTES

2     AND 50 SECONDS.

3          MR. BELINFANTE:  THANK YOU, JUDGE.

4          THE COURT:  THANK YOU.

5          MS. ROSS:  THIS IS WHEN I RETURN TO MY ROOTS OF

6     GROWING UP IN BROOKLYN AND I START TALKING REALLY REALLY FAST.

7          THE COURT:  ALL RIGHT.  I'M SURE MADAM COURT REPORTER

8     WILL APPRECIATE YOU FOR THAT.

9          MS. ROSS:  YOUR HONOR, I'D LIKE TO CALL YOUR

10    ATTENTION TO THE INTEGRATION MANDATE REGULATION THAT WAS PUT UP

11    ON WHICH THE UNITED STATES RELIES, BECAUSE IT'S KNOWN TO REALLY

12    FORM THE CENTER OF MY REBUTTAL.  A PUBLIC ENTITY SHALL

13    ADMINISTER SERVICES, PROGRAMS, AND ACTIVITIES IN THE MOST

14    INTEGRATED SETTING APPROPRIATE TO THE NEEDS OF QUALIFIED

15    INDIVIDUALS WITH DISABILITIES.

16         YOUR HONOR, WE ARE TALKING HERE ABOUT CHILDREN AGES

17    THREE THROUGH 21 WHO, UNDER THE INDIVIDUALS WITH DISABILITIES

18    EDUCATION ACT, ARE IN AN APPROPRIATE SETTING ONLY IF TREATMENT

19    PROFESSIONALS HAVE MADE THAT DETERMINATION AS TO THAT

20    INDIVIDUAL STUDENT.  SO THE UNITED STATES' SUGGESTION THAT, IN

21    OTHER CASES, WHICH ARE NONEDUCATION CASES THAT HAVE BEEN

22    BROUGHT UNDER TITLE II, THERE MAY BE A GENERAL STATEMENT OR

23    GENERAL ALLEGATION IN THE COMPLAINT THAT TREATMENT

24    PROFESSIONALS, AS A GENERAL RULE, BELIEVE THAT A

25    COMMUNITY-BASED SETTING WILL WORK, AND THEN WE COULD GO INTO

1   DISCOVERY AND DETERMINE WHETHER IT WOULD WORK HERE ABSOLUTELY

2   DEFIES I.D.E.A.  IT MUST BE, BEFORE A STUDENT IS PLACED, AN

3   INDIVIDUAL DETERMINATION.  AND TIME IS IMPORTANT AS WELL, YOUR

4   HONOR.

5           UNDER I.D.E.A., FROM THE -- IF THERE IS A COMPLAINT

6   ABOUT A PLACEMENT OR ABOUT THE SETTING IN WHICH THE PLACEMENT

7   IS DELIVERED, THERE'S A 45-DAY TIME FRAME FROM THE COMPLAINT,

8   THE DUE PROCESS HEARING REQUEST, AND THE RESOLUTION.  DISCOVERY

9   IN FEDERAL COURT IS MONTHS AND MONTHS AND MONTHS.  IT'S

10  ABSOLUTELY INAPPLICABLE HERE.

11          NOW, THE UNITED STATES ARGUED THAT INDIVIDUALS IN

12  GNETS SELF-CONTAINED SETTINGS MIGHT NOT HAVE THE ABILITY TO

13  BRING CLAIMS.  YES, THEY DO.  FIRST OF ALL, IF ANY INDIVIDUAL

14  STUDENT OR HIS OR HER PARENTS BELIEVES THAT THE GNETS PROGRAM

15  IS BEING DELIVERED IN TOO RESTRICTIVE A SETTING, THEY CAN BRING

16  A CLAIM WITH A 45-DAY WINDOW.  AND THE DEPARTMENT OF EDUCATION

17  CAN BRING A CLAIM AGAINST THE STATE OF GEORGIA UNDER I.D.E.A.

18  IF IT WANTED TO.  THERE IS ALSO CLASS ACTION PROVISION UNDER

19  I.D.E.A.

20          IT'S SIMPLY NOT TRUE THAT I.D.E.A. COULD NOT REMEDY

21  ANY INDIVIDUAL PROBLEM OR A PROBLEM IF A GROUP THOUGHT THAT

22  PROBLEM EXISTED.

23          ALSO, THE UNITED STATES CLAIMS THAT IT IS NOT SEEKING

24  TO OVERTURN THE DECISION OF ANY IEP TEAM.  THAT'S COMPLETELY

25  NOT TRUE, BECAUSE, REMEMBER, I SAID EARLY ON IN MY INITIAL

89

1    PRESENTATION, THE IEP TEAM MAKES TWO DETERMINATIONS:  ONE, WHAT

2    SERVICES DOES THIS INDIVIDUAL CHILD NEED.  TWO, WHERE SHOULD

3    THOSE SERVICES BE DELIVERED.  THAT'S PART OF THE IEP.

4         NOW, IF YOU TAKE A LOOK IN THE NOTEBOOK THAT I

5    PROVIDED UNDER TAB FIVE, UNDER TAB -- EXCUSE ME, C-5, EACH

6    PUBLIC AGENCY MUST ENSURE THAT, TO THE MAXIMUM EXTENT

7    APPROPRIATE, EACH CHILD WITH A DISABILITY IS EDUCATED WITH

8    CHILDREN WHO ARE NON-DISABLED AND THAT SPECIAL CLASSES, ET

9    CETERA, OR ANY REMOVAL OF CHILDREN WITH DISABILITIES FROM

10   REGULAR EDUCATIONAL ENVIRONMENT OCCURS ONLY IF THE NATURE AND

11   THE SEVERITY OF THE DISABILITY IS SUCH THAT EDUCATION IN

12   REGULAR CLASSES WITH THE USE OF SUPPLEMENTARY AIDS AND SERVICES

13   CANNOT BE ACHIEVED SATISFACTORILY.

14        NOW, WE KNOW THAT THE SCHOOL DISTRICT IS RESPONSIBLE

15   UNDER THE FEDERAL REGULATIONS FOR PUTTING TOGETHER THE IEP TEAM

16   THAT MAKES THAT DETERMINATION.  BUT LOOK, PLEASE, UNDER TAB

17   D-1.  AND THIS IS PERHAPS THE MOST ESSENTIAL POINT.  THE STATE

18   OF GEORGIA REQUIRES EACH SCHOOL DISTRICT TO USE SPECIAL

19   CLASSES, SEPARATE SCHOOLING, OR OTHER REMOVAL OF CHILDREN WITH

20   DISABILITIES FROM THE REGULAR CLASS ENVIRONMENT ONLY, AS THE

21   FEDERAL REG SAYS, WHEN THE NATURE OF THE SEVERITY OF THE

22   DISABILITY IS SUCH THAT THEY CANNOT BE EDUCATED IN REGULAR

23   CLASSES.

24        SO WHAT DOES THE GNETS PROGRAM PROVIDE?  THE UNITED

25   STATES IS SIMPLY WRONG IN SAYING THAT THE STATE PLACES THE

90

```
1   STUDENTS IN GNETS, THAT IT MAKES THESE SERVICES AVAILABLE ONLY

2   IN SELF-CONTAINED SETTINGS.  NO.  BECAUSE IF WE LOOK BACK AT

3   THE GNETS RULE, IT DOESN'T STATE THAT THE -- ANY STUDENT MUST

4   GO INTO GNETS.  IT RESTRICTS WHICH STUDENTS CAN GO INTO GNETS.

5   SO THE GNETS RULE, WHICH IS --

6           THE COURT:  YOU'RE OUT OF TIME, COUNSELOR, SO WRAP UP

7   THIS POINT.

8           MS. ROSS:  YOUR HONOR, THE PURPOSE OF GNETS IS TO

9   PREVENT STUDENTS FROM HAVING TO GO INTO MORE RESTRICTED

10  RESIDENTIAL PLACEMENT.  THE FACT THAT THE GNETS PROGRAMS EXIST,

11  EVEN THOSE THAT ARE DELIVERED IN SELF-CONTAINED SETTINGS, IS

12  SOMETHING EXTRA THAT GEORGIA DOES TO PREVENT RESIDENTIAL

13  PLACEMENT.  IT IS NOT A MANDATORY PLACEMENT, NOR IS IT A

14  MANDATORY SETTING FOR ANY SPECIAL EDUCATION STUDENT.

15          THANK YOU.

16          THE COURT:  THANK YOU, MA'AM.

17          ALL RIGHT.  THAT IS THE END OF OUR ORAL ARGUMENTS.

18          THE COURT WILL TAKE THIS UNDER ADVISEMENT.  I DO WANT

19  TO POINT OUT TO BOTH SIDES THAT THE COURT WAS EXTREMELY

20  IMPRESSED AND PLEASED WITH THE BRIEFING IN THIS CASE.  BOTH

21  SIDES WERE EXCEPTIONAL.

22          ARE THERE ANY OTHER MATTERS TO BE HANDLED RIGHT NOW

23  BEFORE WE ADJOURN FOR TODAY, ON BEHALF OF THE UNITED STATES?

24          MS. HUGHES:  NO, YOUR HONOR.

25          THE COURT:  ON BEHALF OF THE STATE OF GEORGIA.
```

91

1          MS. ROSS:  NO, YOUR HONOR.  THANK YOU.

2          THE COURT:  ALL RIGHT.  THANK YOU SO MUCH.  WE'RE

3   ADJOURNED.

4          THE COURTROOM SECURITY OFFICER:  ALL RISE.  COURT

5   STANDS IN RECESS UNTIL FURTHER ORDERED.

6                    (PROCEEDINGS CONCLUDED AT 12:31 P.M.)

7                         -   -   -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

92

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF GEORGIA

3    CERTIFICATE OF REPORTER

4

5

6            I DO HEREBY CERTIFY THAT THE FOREGOING PAGES ARE A

7    TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS TAKEN DOWN BY

8    ME IN THE CASE AFORESAID.

9            THIS, THE 15TH DAY OF MAY, 2017.

10

11

12

13                            /S/ ELIZABETH G. COHN

                              _____
14                            ELIZABETH G. COHN, RMR, CRR
                              OFFICIAL COURT REPORTER
15

16

17

18

19

20

21

22

23

24

25