# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | 1:16-CV-3088-ELR |
| | * | |
| STATE OF GEORGIA, | * | |
| | * | |
| Defendant. | * | |
| | * | |

## UNITED STATES' RESPONSE BRIEF

Pursuant to this Court's May 4, 2017 Order, the United States submits this response to Georgia's memorandum regarding the questions framed by the Court: "(1) whether the State of Georgia is a proper party defendant; and (2) whether the relief sought – injunctive relief – can be obtained against the State of Georgia in this case." (ECF No. 30 at 2.)

## Introduction

As this Court notes, in its opening brief the State argued – without elaboration – that the State "is not a proper party defendant" because "State agencies are entities capable of being sued. The State is not." Order at 1. Asked for authority by this Court, the State, in its latest filing, does not argue that it lacks the legal capacity to be sued except through its agencies. Instead, the State claims

not to be a proper party because: (1) it does not "actually administer[] or enforce[]" the Georgia Network for Educational and Therapeutic Support ("GNETS") Program; (2) Eleventh Amendment cases – which the State concedes are not binding where the United States is the plaintiff – require individual plaintiffs to name state officials in federal suits against the state; and (3) the United States lacks constitutional standing either because its alleged injury is not "fairly traceable" to the State's conduct or could not be redressed by an order of this Court.  Suppl. Br. at 2-4, 7.  Each of these claims lacks merit.

> **1.  GNETS is a "service, program or activity" of the State of Georgia, thus making the State the party required to ensure that the GNETS Program complies with Title II's non-discrimination requirements.**

The United States alleges that the State of Georgia has violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134.  Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Section 12131 defines "public entities" to include "any State."  The United States' allegations fall squarely within Title II's prohibitions of discrimination by a public entity.  The Complaint alleges that the State, operating through the Governor's office, executive agencies, and the State

legislature, has chosen to provide mental health and therapeutic educational services to students with behavior-related disabilities through the GNETS Program primarily in segregated, rather than integrated, settings. *See* Compl. ¶ 1. By so doing, the State denies these students with disabilities the full opportunity to interact with their nondisabled peers. Compl. ¶ 8.

As the State acknowledges, a "proper party" defendant "is the one that actually administers or enforces the challenged program." Suppl. Br. at 3. The Complaint is replete with factual allegations that the State "actually administers" *and* "enforces" the GNETS Program. The Georgia General Assembly has, for decades, directed tens of millions of dollars annually in state and federal funds, administered by the Georgia Department of Education ("GaDOE"), to fund GNETS statewide. *See* Compl. ¶ 33. By regulation, Georgia designates its federal IDEA, Part B funds, for services for children with serious emotional and behavioral disorders, to be spent through GNETS. *See* Ga. Comp. R. & Regs. § 160-1-4-.49.

Further, through the GaDOE, Georgia determines how the funds will be spent, what services will be funded, and where those services will be delivered; those choices are reflected in regulations and a manual governing the operation of the GNETS Program ("Operations Manual"). *See* Compl. ¶¶ 24-25 and cited

3

Operations Manual; Ga. Comp. R. & Regs. § 160-1-4-.49. Georgia regulations define the Program and establish eligibility and exit requirements for students' entry into and transition out of GNETS; the GNETS Operations Manual explicitly states that an IEP Team for any student considered for placement in GNETS must "include GNETS personnel." Compl. ¶ 25 and cited Operations Manual at 13. The State has also designated a State employee to serve as GNETS Director, overseeing the Program. Compl. ¶ 25.

Moreover, a 2010 review of the GNETS Program by Georgia's Department of Audits (the "Audit") acknowledged and affirmed the State's control over the Program.[1] *See* Compl. ¶ 60. The State Audit, which found no assurance that GNETS delivered cost-effective services to its student population, made specific recommendations as to how the GaDOE could ensure that the Program met its stated purpose to serve public school students with serious emotional and behavioral disturbances. *See* Compl. ¶ 60 and cited Audit at 13, 21-22.

---

[1] Funding for GNETS moves from the Georgia State Legislature through the GaDOE to Regional Education Service Agencies ("RESAs") using a state grant process that the State controls. Conditions and obligations associated with the grant process are another tool that the State uses to administer the Program. *See* Audit at 9.

Further, following the July 15, 2015 United States' Letter of Findings[2] – which detailed inferior and inadequate conditions at many Program facilities – the State demonstrated its substantial control over GNETS by closing several facilities prior to the start of the 2016-2017 school year. Compl. ¶ 50. In sum, the United States has pleaded ample factual allegations that, if taken as true and construed in the light most favorable to the United States,[3] demonstrate that Georgia is centrally involved in planning, funding, managing, regulating, and overseeing the GNETS Program. Discovery will further support the claim that the State "actually administers or enforces" the "services, programs, or activities," as defined by Title II of the ADA, that make up the GNETS Program. The State has chosen to administer the Program in a manner that locates services in primarily segregated,

---

[2] The United States' Letter of Findings, referenced in ¶ 2 of the Complaint, followed complaints received from families and a comprehensive, multi-year investigation.

[3] *See* United States Response (ECF No. 16) at 13-14; *Bennett v. Spear*, 520 U.S. 154, 167-68 (1997) ("[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim'") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal citation omitted)).

rather than integrated, settings, and it is that choice that makes the State the "proper party" to this action.[4]

### 2. Eleventh Amendment Cases cited by the State are Inapposite.

The State concedes that, in this action by the United States, it "cannot assert" immunity under the Eleventh Amendment to the United States Constitution. Suppl. Br. at 2. Nonetheless, it claims the Eleventh Amendment cases it cites are "instructive" in analyzing whether the State is a proper party. *Id*.

Not only are the State's authorities "not instructive," they have nothing to do with the United States' authority to sue Georgia under Title II of the ADA. The State's cases hold only that an individual – but not the United States – suing in federal court must sue a responsible official to get prospective relief under the

---

[4] In the alternative, if the Court determines that the State should be sued through its agencies, or that the agencies must be named for the United States to be able to obtain complete relief, that concern could readily be cured by amending the Complaint to add the state agencies as defendants and does not justify dismissal of the Complaint. *See* Fed. R. Civ. P. 15(a)(2). Such an amendment is unnecessary, however, because the United States may properly enforce Title II against the State of Georgia. *See United States v. New York*, 2014 WL 1028982 (E.D.N.Y. Mar. 17, 2014) (approving proposed settlement of Title II claims against state); *United States v. Virginia*, 282 F.R.D. 403 (E.D. Va. 2012) (granting motion of individuals to intervene in U.S. action against state for Title II violations); *United States v. Arkansas*, 2010 WL 1408818 (E.D. Ark. Apr. 7, 2010) (denying government's motion for preliminary injunction pending decision on the merits of Title II claims).

sovereign immunity exception first stated in *Ex parte Young*, 209 U.S. 123 (1908). For example, *Luckey v. Harris*, 860 F.2d 1012, 1015 (11th Cir. 1988), on which the State relies, holds only that an *individual's* complaint must name an "official responsible for challenged action."[5]

Indeed, the sovereign immunity rules have no application to the United States, which may sue the State – or its agencies – directly, and need not name a responsible state official.  *See United States v. Ala. Dept. of Mental Health and Mental Retardation*, 673 F.3d 1320, 1325-26 (11th Cir. 2012) ("It is well-settled that States 'surrendered their immunity from suit by the Federal Government' when they ratified the Constitution") (*citing Pennhurst St. Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99-100 (1984) (discussing core principles of Eleventh Amendment immunity)); *United States v. Miss. Dept. of Pub. Safety*, 321 F.3d 495, 498 (5th Cir. 2003).

---

[5] The other cases the State cites are to the same effect as *Luckey*.  *See* Suppl. Br. at 2, citing *Brenner v. Scott*, 999 F. Supp. 2d 1278, 1285 (N.D. Fla. 2014); *Fla. Hosp. Assoc. v. Viamonte*, No. 4:08cv312 – RH/WCS, 2008 WL 5101755 (N.D. Fla. Nov. 26, 2008); *Gay Lesbian Bisexual Alliance v. Evans*, 843 F. Supp. 1424, 1426 (M.D. Ala. 1993).

### 3. The United States has alleged an injury fairly traceable to the State of Georgia.

Relying on the standing doctrine of traceability, the State asserts that the "causal connection between the injury" and the State's conduct is "too attenuated" to hold the State directly responsible. Suppl. Br. at 4, quoting *Ga. State Conf. of NAACP Branches v. Cox*, 183 F.3d 1259, 1262 (11th Cir. 1999). To this end, the State offers alternate theories: that the "Complaint does not allege any specific action by the 'State of Georgia'"; that the injuries are caused by third parties such as Individualized Education Program ("IEP") Teams, Local Educational Agencies ("LEAs"), and RESAs; or that the State has had "no role in causing the harm." Suppl. Br. at 4, 7. Each of these theories is directly contradicted by the specific factual allegations of the Complaint.

Here, the United States alleges an injury that is not only "fairly traceable," but is directly attributable, to "specific action" by the State. The Complaint alleges that, in violation of its obligation to provide services and supports "in the most integrated setting appropriate" to students' needs, the State provides such services and supports to students with behavior-related disabilities primarily in segregated settings through the GNETS Program. Compl. ¶¶ 1, 26, 34-43. Moreover, in the State's GNETS Program, students receive unequal educational opportunities when compared to those available in general education settings, amounting to a distinct

violation of Title II that is also directly traceable to the State's actions. Compl. ¶¶ 7, 47-51. Unlike *Doe v. Pryor*, 344 F.3d 1282, 1286-87 (11th Cir. 2003), where plaintiffs failed to allege any "challenged action" by the defendant Attorney General, the United States here challenges specific action by the State: its operation of a segregated and unequal service delivery system for students with behavior-related disabilities. Nor can Georgia absolve itself of responsibility by pointing the finger at the LEAs and IEP Teams that refer students to the GNETS Program – because GNETS is the primary vehicle through which the State makes the necessary services and supports available. *See United States v. Harris Cty.*, Civ. No. 4:16-CV-2331, Slip Op. at 4-5 (S.D. Tex. Apr. 26, 2017).

     The United States does not challenge individual placement decisions by IEP Teams, or the actions of LEAs or RESAs. Instead, the focus of the Complaint is entirely on the State's conduct, specifically Georgia's choice to deliver necessary mental health and therapeutic educational services almost exclusively in segregated settings, where students receive separate and unequal educational opportunities. Because this is a case where the injury arises from actions by the State, not those of independent third parties, the authorities that Georgia cites are simply inapposite.[6]

---

[6] *See Lujan*, 504 U.S. at 562 (actions not fairly traceable to the defendant where the injury stemmed from "unfettered choices made by independent actors"); *Allen v. Wright*, 468 U.S. 737, 759-60 (1984) (the alleged injury stemmed not from action

9

### 4. The Claims Asserted by the United States are Redressable against Georgia.

Seeking to apply the standing doctrine of redressability, the State argues that relief against it will not "address the alleged injury" because third parties "are those that make the decisions causing the alleged injury or violations of the Americans with Disabilities Act," not Georgia.  Suppl. Br. at 7-8.  The United States, however, seeks a remedy for the State's creation, funding, and operation of the GNETS Program.  These are activities that only Georgia can control.

The United States asks this Court to order *Georgia*, and not *third parties*, to provide essential services in the most integrated setting appropriate to students' needs.  The State, as the party responsible for legislative funding and statewide delivery of services to students with disabilities via various state agencies, is the only entity positioned to remedy the alleged Title II violations.  *See* Georgia Const., Art. 8, §1, ¶ 1 ("The provision of an adequate public education for the citizens shall be a primary obligation of the State of Georgia").  The State has failed to satisfy the legal requirement of Title II that "[n]o qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be

---

by defendant IRS, but from independent third parties); *Ga. State Conf. of NAACP Branches*, 183 F.3d at 1264 (the alleged injury was "attributable to the conduct and resources of private individuals, not the state").

denied the benefits of the services, programs, or activities" of the State educational system or otherwise "be subjected to discrimination."  35 C.F.R. § 35.130(a).  The State can remedy that failure by making reasonable modifications to its system for delivering mental health and therapeutic educational services to students with behavior-related disabilities.  Compl. ¶¶ 23-28, 57-58.  Based on the United States' investigation, the vast majority of these students can be served in more integrated settings if the State provides appropriate services and supports in or near their zoned schools.  Compl. ¶ 44.

Georgia, as the Complaint alleges, has the ability and resources to make those changes, as well as the discretion to draw on resources already available within its own agencies, including GaDOE, the Department of Community Health, and the Department of Behavioral Health and Developmental Disabilities.  Compl. ¶¶ 25, 27, 28, 55-56.  Injunctive and declaratory relief against Georgia will fully provide the relief the United States seeks.

Georgia also speculates that, even if the United States is granted the relief it seeks, such relief would be unavailing because IEP Teams *may* continue to place students in segregated settings.  *See* Suppl. Br. at 9.  The United States does not seek relief in the form of changes to the IEP process or mandatory placements for individual students in more integrated settings.  Rather, the United States sues to

change Georgia's discriminatory conduct: Georgia provides services to students with behavioral disabilities in segregated settings in a manner that incentivizes their placement in such settings.[7] The United States seeks reasonable modifications to the State's system for delivering mental health and therapeutic educational services to ensure that students with behavior-related disabilities in need of services have the opportunity to access those needed services in more integrated settings, as appropriate. That relief is fully redressable against the State.[8]

---

[7] This is not a case in which the United States has sued "in an attempt to change the behavior of a party not before the court." *Alabama-Tombigbee Rivers Coalition v. Norton*, 338 F. 3d 1244, 1254-55 (11th Cir. 2003). *Alabama-Tombigbee*, reversing the trial court's dismissal on the ground the plaintiffs' claims were not redressable, specifically distinguished the line of cases on which the State relies, as challenging the "behavior of part[ies]" not before the Court. Both *Allen*, 468 U.S. at 757, and the opinion of only four justices on which the State relies in *Lujan*, Part III-B, 504 U.S. at 568-69, related to attempts to change the conduct of parties not before the Court and, therefore, have no bearing here. The Eleventh Circuit's decision in *Daogaru v. United States*, Civ. No. 16-15722, 2017 WL 1160882 (11th Cir. Mar. 29, 2017), on which the State also relies, is likewise inapposite. *Daogaru*, an action to challenge the constitutionality of 18 U.S.C. § 922(g)(1)'s ban on firearm possession by a convicted felon, was not redressable because Georgia law contained an identical ban.

[8] The State also claims without discussion that the United States lacks standing because it seeks an "obey the law" injunction. *See* Suppl. Br. at 7. The United States respectfully refers the Court to the original briefing on this issue. *See* United States Response (ECF No. 16) at 14, n.13.

## **Conclusion**

For the foregoing reasons, Georgia is the proper party defendant, and the relief sought by the United States can be obtained against Georgia in this case. Accordingly, the Court should deny Georgia's motion to dismiss and deny its alternative request for a stay.

Dated: May 19, 2017

Respectfully submitted:

KURT ERSKINE
Acting United States Attorney
Northern District of Georgia

/s/ *Aileen Bell Hughes*
AILEEN BELL HUGHES
GA Bar Number: 375505
Assistant United States Attorney
United States Department of Justice
Richard B. Russell Federal Building
75 Ted Turner Dr. SW
Suite 600
Atlanta, GA 30303-3309
(404) 581.6000
aileen.bell.hughes@usdoj.gov

T.E. WHEELER, II
Acting Assistant Attorney General

REBECCA BOND
Acting Deputy Assistant Attorney General

SHAHEENA SIMONS
Chief
Educational Opportunities Section

RENEE WOHLENHAUS
Deputy Chief
Educational Opportunities Section

FRANCES S. COHEN
ANDREA E. HAMILTON
VICTORIA M. LILL

Trial Attorneys
United States Department of Justice
Civil Rights Division

*/s/ Andrea E. Hamilton*
NC Bar Number: 42878
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-4092
andrea.hamilton@usdoj.gov

## **L.R. 7.1(D) CERTIFICATION**

I certify that this brief has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C). Specifically, this brief has been prepared using 14-pt Times New Roman Font.

*/s/ Aileen Bell Hughes*
Aileen Bell Hughes
Assistant U.S. Attorney
Northern District of Georgia

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day filed the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sent counsel of record e-mail notification of such filing.

This 19th day of May, 2017.

*/s/Aileen Bell Hughes*
Aileen Bell Hughes
Assistant U.S. Attorney
Northern District of Georgia