[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13595

_____

D.C. Docket No. 0:12-cv-60460-WJZ

UNITED STATES OF AMERICA,

Plaintiff-Appellants,

versus

STATE OF FLORIDA,

Defendant-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 17, 2019)

Before JILL PRYOR, BRANCH, and BOGGS,[*] Circuit Judges.

Table of Contents

ANALYSIS ..................................................................................................5

I. An Overview of Title II of the ADA ....................................................5

II. The Remedial Structure of Title VI of the Civil Rights Act ..............12

    A. Title VI Enforcement Regulations Contemplate Department of Justice
    Enforcement Suits ...............................................................................14

_____

[*] Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by designation.

B. Enforcing Title VI: Any Other Means Authorized By Law ...........................17

III. Section 505 of the Rehabilitation Act ................................................21

   A. Rehabilitation Act Enforcement Regulations Tracked Title VI Regulations .22

   B. Department of Justice Enforcement of the Rehabilitation Act .....................27

IV. Enforcement of Title II of the ADA ...................................................32

   A. Title II Enforcement Regulations Follow Regulations Promulgated Under the Rehabilitation Act and Title VI............................................................33

   B. Title II of the ADA Permits Department of Justice Enforcement .................39

   C. The Legislative History of Title II Supports the Attorney General's Authority to File Suit...................................................................................46

   D. The Department of Justice Has Filed Suit to Enforce Title II ......................51

   E. Federalism Principles Do Not Alter Our Conclusion....................................54

CONCLUSION ........................................................................................58

BOGGS, Circuit Judge:

     In September 2012, after completing a six-month investigation, the Department of Justice issued a Letter of Findings notifying Florida that it was failing to meet its obligations under Title II of the Americans With Disabilities Act of 1990 ("ADA") and its implementing regulations, by "unnecessarily institutionalizing hundreds of children with disabilities in nursing facilities." The Department of Justice also asserted that Florida's Medicaid policies and practices placed other

children who have "medically complex"[1] conditions, or who are "medically fragile,"[2] at risk of unnecessary institutionalization.

The Department of Justice negotiated with Florida to attempt to resolve the violations identified in the Letter of Findings.  After concluding that it could not obtain voluntary compliance, the Department of Justice filed suit in the Southern District of Florida in July 2013, seeking declaratory and injunctive relief under Title II of the ADA and 28 C.F.R. § 35.130(d).

In December 2013, pursuant to Fed. R. Civ. P. 42(a), the district court consolidated the Department of Justice's suit with a previously-filed class-action complaint from a group of children who similarly alleged that Florida's policies

---

[1] The Letter of Findings relied on Florida's then-operative definition of "medically complex."  The term describes "a person [who] has chronic debilitating diseases or conditions of one (1) or more physiological or organ systems that generally make the person dependent upon twenty-four (24) hour-per-day medical, nursing, or health supervision or intervention."  Fla. Admin. Code R. 59G-1.010(164) (2012).  Florida has since amended its Administrative Code, and this definition no longer appears.  *See* Fla. Admin. Code R. 59G-1.010.

[2] At the time the Letter of Findings was issued, Florida defined "medically fragile" as a person who is:

> medically complex and whose medical condition is of such a nature that he is technologically dependent, requiring medical apparatus or procedures to sustain life, *e.g.*, requires total parenteral nutrition (TPN), is ventilator dependent, or is dependent on a heightened level of medical supervision to sustain life, and without such services is likely to expire without warning.

Fla. Admin. Code R. 59G-1.010(165) (2012).  This definition no longer appears in Florida's Administrative Code.  *See* Fla. Admin. Code R. 59G-1.010.

caused, or put them at risk of, unnecessary institutionalization and unlawful segregation on the basis of disability. *See A.R. v. Sec'y Fla. Agency for Health Care Admin.*, 769 F. App'x 718 (11th Cir. 2019).

Shortly before the consolidation, Florida filed a Motion for Judgment on the Pleadings, asserting that Title II of the ADA did not authorize the Attorney General to file suit. The district court denied Florida's motion, concluding that the Department of Justice had reasonably interpreted Title II and had the authority to file suit to enforce Title II. *See A.R. v. Dudek*, 31 F. Supp. 3d 1363, 1367 (S.D. Fla. 2014).

In 2016, the district court *sua sponte* revisited the issue[3] and dismissed the Department of Justice's case because it concluded that the Attorney General lacked standing to sue under Title II of the ADA. *See C.V. v. Dudek*, 209 F. Supp. 3d 1279, 1282 (S.D. Fla. 2016). After further litigation, the district court dismissed the children's case. This appeal followed.

---

[3] There do not appear to be any significant factual or legal changes between the 2014 decision and the 2016 decision. The consolidated cases were reassigned in 2014, shortly after the district court decided Florida's Motion for Judgment on the Pleadings. In 2016, the district court justified its departure from the 2014 decision because it concluded that the 2014 decision erroneously applied *Chevron U.S.A. Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837 (1984), and improperly deferred to the Department of Justice's interpretation of the statute. *See C.V. v. Dudek*, 209 F. Supp. 3d 1279, 1291 n.11 (S.D. Fla. 2016).

## ANALYSIS

This case requires us to determine whether the Attorney General has a cause of action to enforce Title II of the ADA.  This is a purely legal question, requiring statutory interpretation.  Therefore, the proper standard of review is *de novo*. *Stansell v. Revolutionary Armed Forces of Colombia*, 704 F.3d 910, 914 (11th Cir. 2014).

## I. An Overview of Title II of the ADA

The ADA was intended to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," and establish strong, enforceable standards to achieve that goal.  42 U.S.C. § 12101(b)(1)–(2).  Congress envisioned that, through the ADA, the Federal Government would take "a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities," and invoked "the sweep of congressional authority, including the power to enforce the [F]ourteenth [A]mendment and to regulate commerce" to "address the major areas of discrimination faced day-to-day by people with disabilities."  *Id.* (b)(3)–(4).  *See also United States v. Georgia*, 546 U.S. 151, 154 (2006).

Part A of Title II, 42 U.S.C. §§ 12131–12134, addresses public services provided by public entities.  A "public entity" means "any State or local government," or "any department, agency, special purpose district, or other

5

instrumentality of a State or States or local government . . . ." 42 U.S.C.
§ 12131(1)(A)–(B). Title II prohibits discrimination based on disability, specifically,
"[s]ubject to the provisions of this subchapter, no qualified individual with a
disability shall, by reason of such disability, be excluded from participation in or be
denied the benefits of the services, programs, or activities of a public entity, or be
subjected to discrimination by any such entity." 42 U.S.C. § 12132. The term
"qualified individual with a disability" means:

> an individual with a disability who, with or without
> reasonable modifications to rules, policies, or practices,
> the removal of architectural, communication, or
> transportation barriers, or the provision of auxiliary aids
> and services, meets the essential eligibility requirements
> for the receipt of services or the participation in programs
> or activities provided by a public entity.

42 U.S.C. § 12131(2).

Title II's enforcement provision states that "[t]he remedies, procedures, and
rights set forth in section 794a of Title 29 shall be the remedies, procedures, and
rights this subchapter provides to any person alleging discrimination on the basis of
disability in violation of section 12132 of this title." 42 U.S.C. § 12133. Congress
directed the Attorney General to "promulgate regulations in an accessible format
that implement [Title II]." 42 U.S.C. § 12134(a). Such regulations, with the
exception of specifically-identified terms,

> shall be consistent with this chapter and with the
> coordination regulations under part 41 of title 28, Code of

> Federal Regulations (as promulgated by the Department of Health, Education, and Welfare on January 13, 1978), applicable to recipients of Federal financial assistance under section 794 of Title 29.

*Id.* (b).

It is undisputed that Title II permits a private cause of action for injunctive relief or money damages. *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 750 (2017). We must determine whether Title II's enforcement scheme, 42 U.S.C. § 12133, permits the Attorney General to bring an enforcement action.[4] The starting point is the language of the statute. *United States Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 604 (1986). If the words of the statute are unambiguous, then we may conclude the inquiry there. *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992).

Through a series of cross-references, the enforcement mechanism for Title II of the ADA is ultimately Title VI of the Civil Rights Act of 1964. *See* 42 U.S.C. § 12133; 29 U.S.C. § 794a; 42 U.S.C. § 2000d-1. Section 12133 of Title II states

---

[4] Florida maintains that Supreme Court decisions examining Title II's enforcement provisions that consistently mention private enforcement without considering public enforcement support a conclusion that Title II was never meant to permit public enforcement. But in each of those cases, the Supreme Court was confronted with questions stemming from private litigation (the United States intervened to defend abrogation of state sovereign immunity in two cases). *See Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 751–52 (2017); *United States v. Georgia*, 546 U.S. 151, 154–55 (2006); *Tennessee v. Lane*, 541 U.S. 509, 513 (2004); *Barnes v. Gorman*, 536 U.S. 181, 183 (2002); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 588 (1999). The Court was not required to consider whether the Attorney General could enforce Title II in those cases. We do not consider the Supreme Court's silence on an issue that was not presented dispositive.

that the "remedies, procedures, and rights" available to a person alleging discrimination are those available in § 505 of the Rehabilitation Act of 1973, 29 U.S.C. § 794a. Section 505 contains a provision for enforcing § 504 of the Rehabilitation Act, which prohibits discrimination on the basis of disability by programs and activities receiving federal financial assistance. *See* 29 U.S.C. §§ 794(a); 794a. In relevant part, § 505 states that:

> The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

29 U.S.C. § 794a(a)(2).

Like § 504 of the Rehabilitation Act, § 601 of Title VI of the Civil Act of 1964 prohibits discrimination, exclusion, or denial of benefits—in that statutory scheme, on the basis of race, color, or national origin—by "any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d.

Section 602 of Title VI requires the various federal departments and agencies that provide federal financial assistance to "effectuate" § 601 by "issuing rules, regulations, or orders of general applicability . . . ." 42 U.S.C. § 2000d-1. Agencies may "effect" "[c]ompliance with any requirement adopted pursuant to this section . . . (1) by the termination of or refusal to grant or to continue assistance

under such program or activity to any recipient . . . or (2) by any other means authorized by law . . . ." *Ibid.* Before any action may be taken, the department or agency must issue appropriate notice and determine that it cannot obtain voluntary compliance. *Ibid.*

Florida insists that we need not consider the "remedies, procedures, and rights" available in § 505 of the Rehabilitation Act, or Title VI of the Civil Rights Act. It reasons that, because the Attorney General is not a "person alleging discrimination," he is "not within the class to whom Title II provides enforcement authority," and therefore is not authorized to bring suit to enforce Title II. To support this argument, Florida compares Titles I and III of the ADA, which expressly mention the Attorney General, with Title II, which does not.[5]

The United States contends that this interpretation (followed by the district court) "misreads the plain text of Title II." It asserts that "Title II does not authorize the Attorney General to file enforcement suits by equating the Attorney General with a 'person alleging discrimination.'" Rather, it contends that the phrase "remedies, procedures, and rights" in § 12133 is the operative phrase for statutory analysis. By

---

[5] The dissenting opinion focuses on the presumption against treating the government as a "person," citing *Return Mail, Inc. v. U.S. Postal Serv.*, 587 U.S. ____ (2019), No. 17-1594, 2019 WL 2412904, at *5 (June 10, 2019). The Supreme Court's holding in *Return Mail* should not change our analysis: in *Return Mail*, the underlying patent-review statute provided specific remedies for a specified offended party, thus differing significantly from the complex "remedies, procedures, and rights" structure of the ADA explained in detail in Part IV of our opinion.

cross-referencing to other statutes, Congress made a "package" of remedies, rights, and procedures available that may include enforcement by the Attorney General.

In enacting the ADA, Congress legislated in light of existing remedial statutes. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 590 & n.4 (1999); *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1176–77 (11th Cir. 2003). This decision carries significant weight. When Congress adopts a new law that incorporates sections of a prior law, "Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Lorillard v. Pons*, 434 U.S. 575, 581 (1978). Because in Title II Congress expressly incorporated § 505 of the Rehabilitation Act, which in turn incorporated Title VI of the Civil Rights Act, as the available "remedies, procedures, and rights," it is "especially justified" to conclude that Congress was aware of prior interpretations, as well as the operation of, both Acts. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 696–98 (1979) (applying a similar presumption while using Title VI to interpret Title IX). Focusing solely on the word "person" and the difference in the language of enforcement provisions within the ADA ignores this presumption.

Title II, the Rehabilitation Act, and Title VI are structured in a similar manner. Each has a statutory provision forbidding discrimination. *Compare* 42 U.S.C. § 2000d, *with* 29 U.S.C. § 794(a), *and* 42 U.S.C. § 12132. Indeed, § 202 of Title II (42 U.S.C. § 12132) and § 504 of the Rehabilitation Act overlap substantially in their

prohibitions on discrimination on the basis of disability.  *See Barnes v. Gorman*, 536 U.S. 181, 184–85 (2002).  Title II and the Rehabilitation Act share the same enforcement provision, which incorporates the entirety of Title VI.  *See* 42 U.S.C. § 12133; 29 U.S.C. § 794a(a)(2).

It is true that, at first glance, Title II's enforcement provision is not as specific as those in Titles I and III.  But that difference should not dictate a conclusion that, absent greater specificity, we should simply assume that a single word in § 12133 ends all inquiry.  Because Congress chose to cross-reference other statutory provisions to identify how Title II may be enforced, we must consider those statutory provisions.  Courts construing Title II and the Rehabilitation Act have taken the same approach.  *See Barnes*, 536 U.S. at 185 (Title II); *Olmstead*, 527 U.S. at 590 n.4 (Title II); *Alexander v. Choate*, 469 U.S. 287, 293 n.7 (1985) (Rehabilitation Act); *Community Television of S. Cal. v. Gottfried*, 459 U.S. 498 (1983) (Rehabilitation Act); *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012) (Rehabilitation Act); *Shotz*, 344 F.3d at 1169–70 (Title II); *United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1043–45 (5th Cir. 1984), *cert. denied*, 469 U.S. 1189 (1985) (Rehabilitation Act).

We begin in Part II by discussing the remedial provisions of Title VI of the Civil Rights Act, as it is the earliest-enacted statute and ultimate fount of the cascade of cross-references.  We also examine the regulations promulgated with Title VI and

litigation that considered whether the United States could file suit to enforce Title VI.  Next, in Part III, we analyze § 505 of the Rehabilitation Act, its accompanying regulations, and cases in which the United States brought suit to enforce the Rehabilitation Act.  In Part IV, we return to Title II of the ADA and examine the regulations the Attorney General promulgated pursuant to Congress's directive in 42 U.S.C. § 12134, and the district court's conclusions about the scope of Title II enforcement.  We analyze Title II's legislative history, and other cases in which federal courts have concluded that the Attorney General may file suit to enforce Title II.

## II. The Remedial Structure of Title VI of the Civil Rights Act

Title VI contains two enforcement mechanisms.  *See Alexander v. Sandoval*, 532 U.S. 275, 280–81, 288–89 (2001); Arthur R. Block, *Enforcement of Title VI Compliance Agreements by Third Party Beneficiaries*, 18 Harv. C.R.-C.L. L. Rev. 1, 9–10 (1983).  First, § 601 contains an implied private cause of action.  *See Sandoval*, 532 U.S. at 279–80.  The second enforcement mechanism is in § 602, which, as discussed above, directs federal agencies to "effectuate" § 601's prohibition on discrimination by programs that receive federal funding through regulation, fund termination, and "any other means authorized by law."[6] *See id.* at

---

[6] The regulatory powers attached to § 602 are substantial by contrast with other grants of regulatory power elsewhere in the Civil Rights Act.  In Title VII, for example, Congress specified

289.  Regulations promulgated pursuant to § 602 do not create a private right of action.[7]  *Id.* at 289.  Agencies enforce § 601's prohibition on discrimination "either by terminating funding to the 'particular program, or part therof,' that has violated the regulation or 'by any other means authorized by law[.]"  *Ibid.* (quoting 42 U.S.C. § 2000d-1).  This system, developed in the 1960s, was well-established at the time the ADA and the Rehabilitation Act were enacted.  *See* Block, *supra*, 9–10.

_____

that the EEOC could create "procedural" regulations to carry out the Title, rather than Congress's more substantive grant of authority in Title VI to implement § 601.  *See* Olatunde C.A. Johnson, *Lawyering That Has No Name: Title VI and the Meaning of Private Enforcement*, 66 Stan. L. Rev. 1293, 1298 (2014) (citing 42 U.S.C. § 2000e-12).

[7]  In *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001), the Supreme Court considered whether a private cause of action existed to enforce Department of Justice regulations promulgated under § 602.  Sandoval had filed suit, alleging that Alabama's policy of administering driver's license examinations only in English violated a Department of Justice regulation that forbade recipients of funding from using methods of administration that had the effect of discriminating on the basis of race, color, or national origin.  *Id.* at 278–79.  Florida points to *Sandoval* for the proposition that expressly providing one method of enforcing a substantive rule suggests that Congress intended to preclude others.  The Supreme Court made this statement in *Sandoval* as it concluded that private individuals may not sue to enforce agency regulations promulgated under § 602 because *that* statute did not contemplate a private right of action—rather, it directed authority to agencies.  *Id.* at 289.  *Sandoval* instructs us that we must look to the statutory language of particular provisions to assess the method of enforcement Congress has provided.  Further, as the Supreme Court explained in *Cannon v. Univ. of Chi.*, 441 U.S. 677, 711 (1979), when it concluded that Title IX implied a private right of action, the fact that other provisions of a "complex statutory scheme create express remedies" is not a sufficient reason to conclude that separate sections do not contain other remedies.  The Court "has generally avoided this type of 'excursion into extrapolation of legislative intent,' unless there is other, more convincing evidence that Congress meant to exclude the remedy."  *Ibid.* (quoting *Cort v. Ash*, 422 U.S. 66, 83 n.14 (1975)).

## A. Title VI Enforcement Regulations Contemplate Department of Justice Enforcement Suits

It is helpful to survey the Department of Justice's regulations addressing Title VI enforcement, particularly because Congress, in § 602, specifically directed the Department of Justice (and other agencies) to make those regulations.  When the "empowering provision" of a statute directs the agency to regulate as necessary to carry out what Congress intends, "the validity of a regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.'"  *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 369 (1973) (quoting *Thorpe v. Hous. Auth. of City of Durham*, 393 U.S. 268, 280–81 (1969)); *see also Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 634 (1984) (deferring to "contemporaneous regulations issued by the agency responsible for implementing a congressional enactment").

Individuals who believe that they have been subjected to discrimination in violation of Title VI may file a written complaint.  *See* 28 C.F.R. § 42.107(b).  Upon receipt of a complaint, the Department is required to "make a prompt investigation," to determine whether a recipient of federal funding has failed to comply with the antidiscrimination requirements.  *Id.* (c).[8]  If that investigation demonstrates that the

---

[8] Agencies are also required to conduct periodic compliance reviews to ensure that federal-funding recipients are complying with their obligations.  28 C.F.R. § 42.107(a).  A compliance

recipient is not in compliance, then the Department must notify the recipient and attempt to resolve the matter by "informal means" if possible.  *Id.* (d)(1).

If the Department and recipient are unable to resolve the matter, then further action may be taken to induce compliance.  *Ibid.*  Such actions may include suspending, terminating, refusing to grant or continue federal financial assistance, or "any other means authorized by law[.]"  28 C.F.R. § 42.108(a).  The Department of Justice has characterized those other means as including, but not limited to "[a]ppropriate proceedings brought by the Department to enforce any rights of the United States under any law of the United States (including other titles of the Act), or any assurance or other contractual undertaking," or "[a]ny applicable proceeding under State or local law."  *Id.* (a)(1)–(2).  The Department may not take such actions until it has determined that it cannot secure voluntary compliance, the Attorney General has approved the action, and the non-complying party has been notified of its failure to comply and the action to be taken.  *Id.* (d).

Terminating or refusing to provide federal funding is the "ultimate sanction[.]"  28 C.F.R. § 50.3.  To avoid such a drastic step, the Department's guidelines urge agencies to take alternatives to achieve "prompt and full compliance

_____

review that indicates that there may be discrimination or noncompliance with agency regulations may also trigger an investigation.  *Id.* (c).

so that needed Federal assistance may commence or continue." *Ibid.* Such alternatives include administrative action or court enforcement.

> Compliance with the nondiscrimination mandate of title VI may often be obtained more promptly by appropriate court action than by hearings and termination of assistance. Possibilities of judicial enforcement include (1) a suit to obtain specific enforcement of assurances, covenants running with the federally provided property, statements or compliance or desegregation plans filed pursuant to agency regulations, (2) a suit to enforce compliance with the other titles of the 1964 Act, other Civil Rights Acts, or constitutional or statutory provisions requiring nondiscrimination, and (3) initiation of, or intervention or other participation in, a suit for other relief designed to secure compliance.

*Ibid.*

Florida argues that Title VI (and § 505 of the Rehabilitation Act, which we discuss *infra* in Part III, pp. 23–33) do *not* authorize federal enforcement actions, and never have. It maintains that the cases the United States relies upon are limited to "specific performance of contractual assurances of compliance obtained from recipients of federal funds."

It is hardly surprising that many Title VI cases are actions to ensure compliance by recipients of federal funding. Title VI was intended to ensure that "funds of the United States are not used to support racial discrimination." 110 Cong. Rec. 6544 (1964) (statement of Sen. Humphrey). One of the easiest methods of achieving this goal was to require all recipients or seekers of federal financial

assistance to execute assurances that they would not discriminate.  Such assurances

stated that the United States could enforce those agreements in court.  *See* 28 C.F.R.

§ 42.105(a)(1).

### B. Enforcing Title VI: Any Other Means Authorized By Law

Even though government Title VI enforcement actions may be brought to

ensure a funding recipient's assurances of nondiscrimination, Title VI does *not* limit

"other means authorized by law" solely to such enforcement.  *United States v.*

*Marion Cty. Sch. Dist.*, 625 F.2d 607 (5th Cir. 1980), *cert. denied*, 451 U.S. 910

(1981), illustrates this principle.  There, the Fifth Circuit determined that the United

States had authority to sue to enforce a school district's contractual assurance to

comply with Title VI's prohibition against discrimination.  *Id.* at 617.  The court

observed that the government's complaint described the suit as one to compel

specific performance and enforce Title VI and the Fourteenth Amendment.  *Id.* at

609 n.3.  The district court had dismissed the complaint because it concluded that,

by establishing alternative means to achieve federal antidiscrimination objectives,

Congress nullified the United States's existing right to sue to enforce contracts.  *Id.*

at 611–12.

The court rejected this reasoning, concluding that the Civil Rights Act did not

limit enforcement strategies to only those means set out explicitly in the Act.  The

government has a right to "sue to enforce its contracts . . . as a matter of federal

common law without the necessity of a statute." *Id.* at 611. Congress may, by statute, remove that right, but only if it offers "extremely, even unmistakably clear" evidence of such intent. *Ibid.* (citing *United States v. United Mine Workers*, 330 U.S. 258, 272 (1947)).

The language in § 602 supported this conclusion. It "clearly provide[d] that other means of action, even if not mentioned in the Act, are to be preserved." *Id.* at 612. The phrase "any other means authorized by law" showed that Congress intended to preserve other methods of enforcement—including filing suit. *Id.* at 612–13. The Civil Rights Act contained a provision that explicitly preserved the existing authority of the Attorney General, the United States, or any agency, to bring, or intervene in, any action or proceeding. *Id.* at 612 (citing 42 U.S.C. § 2000h-3).

The Fifth Circuit only considered whether § 602 permitted contract enforcement actions. The United States' response to the school district's motion to dismiss had asserted that the Title VI and Fourteenth Amendment claims were not brought as independent causes of action, but subsidiary to the contract claims. *Id.* at 609 n.3.[9] Because the Fifth Circuit resolved the case on the contractual question, it

---

[9] This is not necessarily the winning point Florida thinks it is. The United States's authority to bring contractual actions is, as the Fifth Circuit pointed out in *United States v. Marion Cty. Sch. Dist.*, 625 F.2d 607, 611 (5th Cir. 1980), *cert. denied*, 451 U.S. 910 (1981), clearly established. The decision to emphasize the contract action may have been a strategic litigation decision, or it may have been made for any of a number of reasons. Regardless, we decline to accord substantial weight to an assertion made in a brief in a different case over thirty years ago.

did not consider whether the United States had an "implied right of action under Title VI," or the "inherent authority to sue to enforce the Fourteenth Amendment." *Id.* at 616–17.

Akin to *Marion County*, in *United States v. Alabama*, 828 F.2d 1532, 1547 (11th Cir. 1987), *cert. denied,* 487 U.S. 1210 (1988), *superseded by statute on other grounds by J.W. v. Birmingham Bd. of Educ.*, 904 F.3d 1248 (11th Cir. 2018), we acknowledged that Title VI's status as spending-power legislation, and the presence of federal funding was sufficient to permit the United States to file suit to enforce Title VI's antidiscrimination provisions. A review of the history of Title VI demonstrates that the United States has consistently used such litigation to enforce its provisions.[10]

Other cases that have considered § 602's administrative-enforcement scheme have recognized the Attorney General's right to bring legal actions as an avenue of enforcing Title VI without specifying that *only* contract actions are permissible. In

---

[10] *See, e.g., United States v. Fordice*, 505 U.S. 717, 724 (1992); *United States v. Harris Methodist Forth Worth*, 970 F.2d 94, 96 (5th Cir. 1992); *United States v. Lovett*, 416 F.2d 386, 390 n.4, 391 n.5 (8th Cir. 1969); *United States v. Louisiana*, 692 F. Supp. 642, 649–50 (E.D. La. 1988), *vacated on other grounds by* 715 F. Supp. 606 (E.D. La. 1990); *United States v. Yonkers Bd. of Educ.*, 518 F. Supp. 191, 201 (S.D.N.Y. 1981); *United States v. El Camino Cmty. Coll. Dist.*, 454 F. Supp. 825, 826–27 (C.D. Cal. 1978), *aff'd*, 600 F.2d 1258 (9th Cir. 1979); *United States v. Texas*, 321 F. Supp. 1043, 1057–58 & n.18 (E.D. Tex. 1970), *supplemented by* 330 F. Supp. 235 (E.D. Tex. 1971), *aff'd by* 447 F.2d 441 (5th Cir. 1971); *United States v. Tatum Indep. Sch. Dist.*, 306 F. Supp. 285, 288 (E.D. Tex. 1969); *United States by Clark v. Frazer*, 297 F. Supp. 319, 323 (M.D. Ala. 1968).

*National Black Police Ass'n v. Velde*, 712 F.2d 569, 572 (D.C. Cir. 1983), *cert. denied*, 466 U.S. 963 (1984), the court considered whether agency officials' failure to terminate federal funding to discriminatory local law enforcement violated their statutorily-imposed duties.   In concluding that terminating federal funding was discretionary, the court relied on Title VI's construction to permit other enforcement schemes, including "referral of cases to the Attorney General, who may bring an action against the recipient."  *Id.* at 575.  *See also United States v. Maricopa Cty.*, 151 F. Supp. 3d 998, 1018–19 (D. Ariz. 2015), *aff'd* 889 F.3d 648 (9th Cir. 2018); *United States v. Tatum Indep. Sch. Dist.*, 306 F. Supp. 285, 288 (E.D. Tex. 1969); *United States v. Frazer*, 297 F. Supp. 319, 323 (M.D. Ala. 1968).

The phrase "any other means authorized by law" in § 602 appears to be routinely interpreted to permit suit by the Department of Justice.  *See United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1050 (5th Cir. 1984), *cert. denied*, 469 U.S. 1189 (1985) (phrase refers to federal enforcement); *Brown v. Califano*, 627 F.2d 1221, 1224 & n.10, 1227, 1233 & n.73 (D.C. Cir. 1980) (discussing referrals to the Department of Justice); *Maricopa Cty.*, 151 F. Supp. 3d at 1018–19; *Adams v. Richardson*, 351 F. Supp. 636, 641 (D.D.C. 1972).

A similar phrase in another statute has received a comparable interpretation. In *United States v. Miami Univ.*, 294 F.3d 797, 808 (6th Cir. 2002), the Sixth Circuit considered whether the phrase "any other action authorized by law with respect to

the recipient" in the Family Educational Rights and Privacy Act ("FERPA")
conferred standing upon the Department of Education to seek injunctive relief.  The
court observed that, while FERPA contained a general authorization to permit the
Secretary of Education to "take appropriate actions to enforce" FERPA, that alone
was insufficient to permit enforcement litigation.  *Ibid.* (citing 20 U.S.C. § 1232g(f)).
However, another provision in FERPA offered the Secretary a menu of options in
response to noncompliance with FERPA, including "any other action authorized by
law with respect to the recipient."  *Id.* at 807–08 (citing 20 U.S.C. § 1234c(a)(4)).
The court concluded that *this* language "expressly" permitted the Secretary to sue to
enforce FERPA "in lieu of its administrative remedies."  *Id.* at 808.  In reaching this
conclusion, the Sixth Circuit relied on *Baylor Univ. Med. Ctr.*, 736 F.2d at 1050,
which had interpreted the Rehabilitation Act (encompassing § 602), and *National
Black Police Ass'n*, 712 F.2d at 575, which discussed § 602.

A review of the statute, the regulations that Congress expressly directed the
agencies to create, and precedent demonstrates that Title VI contains an
administrative enforcement scheme and permits judicial enforcement of its
prohibition against discrimination.  We next turn to the Rehabilitation Act.

### III. Section 505 of the Rehabilitation Act

The Rehabilitation Act established a "comprehensive federal program" that
Congress intended to benefit individuals with disabilities.  *Consolidated Rail Corp.*

*v. Darrone*, 465 U.S. 624, 626 (1984). It was originally enacted without an enforcement provision. *See Community Television of S. Cal. v. Gottfried*, 459 U.S. 498, 509 (1983). Because § 504 was "patterned after Title VI of the Civil Rights Act of 1964, it was understood that responsibility for enforcing it . . . would lie with those agencies administering the federal financial assistance programs." *Ibid.* (citing S. Rep. No. 93-1297, at 39–40 (1974)).[11]

## A. Rehabilitation Act Enforcement Regulations Tracked Title VI Regulations

The Department of Health, Education, and Welfare ("HEW") developed implementing regulations for § 504, and its Secretary was assigned to coordinate enforcement across federal departments and agencies. *See* S. Rep. No. 93-1297, at 40 (1974); Exec. Order No. 11,914, 41 Fed. Reg. 17,871 (Apr. 28, 1976), *revoked by* Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980). HEW's 1977 regulations incorporated by reference its procedures under Title VI of the Civil Rights Act on an interim basis. *See* Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefitting From Federal Financial

---

[11] Congress amended the Rehabilitation Act in 1974. Legislative history from that amendment reveals that Congress intended § 504 to lead to "implementation of a compliance program" similar to Title VI, including regulations, investigation, review, attempts to ensure voluntary compliance, and sanctions such as termination of federal funds, or "other means otherwise authorized by law." S. Rep. No. 93-1297, at 39-40 (1974). This legislative history is especially relevant in light of the 1978 Amendments to the Rehabilitation Act. *See infra* pp. 25–27.

Assistance, 42 Fed. Reg. 22685 (May 4, 1977) (adopting 45 C.F.R. § 80.6–80.10 and Part 81 of Title 45 of the C.F.R. which specify "[T]itle VI complaint and enforcement procedures" to implement § 504).

HEW's Title VI procedures were identical to those adopted by the Department of Justice to implement Title VI, discussed *supra* at Part II.A, pp. 14–17.[12]   They permit individuals to file complaints, 45 C.F.R. § 80.7(b), which require an investigation.  *Id.* (c).  Agencies must attempt to resolve the matter by "informal means."  *Id.* (d).  Like the Department of Justice's regulations, they identify other actions that may be taken against noncompliant funding recipients: termination of funding and referral to the Department of Justice for enforcement proceedings. *Compare* 45 C.F.R. § 80.8(a), *with* 28 C.F.R. § 42.108(a).

In January 1978, HEW issued coordination regulations for the Rehabilitation Act.  *See* Implementation of Executive Order 11,914: Nondiscrimination on the Basis of Handicap in Federally Assisted Programs, 43 Fed. Reg. 2132 (Jan. 13, 1978).  Executive Order 11,914 had directed HEW's Secretary to coordinate implementation of § 504.  Exec. Order 11,914, 41 Fed. Reg. 17,871 (Apr. 28, 1976);

---

[12] In 1979, the Department of Education Organization Act divided HEW into the Department of Education and the Department of Health and Human Services ("HHS").  *See National Wrestling Coaches Ass'n v. U.S. Dep't of Educ.*, 263 F. Supp. 2d 82, 91 (D.D.C. 2003). HEW's regulations promulgating § 504 of the Rehabilitation Act remain in HHS's regulations. *See* 45 C.F.R. §§ 80.7–80.8.

*Consolidated Rail Corp.*, 465 U.S. at 634.  The 1978 regulations directed agencies to establish a system to enforce § 504, which was to include "[t]he enforcement and hearing procedures that the agency has adopted for the enforcement of [T]itle VI of the Civil Rights Act of 1964 . . . ."  43 Fed. Reg. 2137, § 85.5(a).

In November 1978, Congress amended the Rehabilitation Act.  There are two aspects to this amendment that are significant for the purposes of this case.  First, Congress amended § 504.  It directed that agencies "shall promulgate such regulations as may be necessary" to carry out the 1978 amendments.  *See* Pub. L. 95-602, Title I, § 119, *codified at* 29 U.S.C. § 794(a).  The agencies were required to submit copies of any proposed regulation to "appropriate authorizing committees of the Congress . . . ."  *Ibid.*

Second, Congress enacted § 505, which established the enforcement procedures for violations of the Rehabilitation Act, including § 504.  *See* Pub. L. 95-602, Title I, § 120, *codified* at 29 U.S.C. § 794a.  As we have discussed, § 505 adopted the "remedies, procedures, and rights" set out in Title VI, and specified that those remedies "shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."  29 U.S.C. § 794a(a)(2).

In *Consolidated Rail Corp.*, the Supreme Court observed that the effect of these amendments was to "incorporate the substance of the Department's regulations

into the statute." 465 U.S. at 634 n.15. Legislative history demonstrates that Congress intended § 505(a)(2) to codify HEW's regulations for § 504 enforcement. *Id.* at 635. Specifically, the "regulations promulgated by the Department of Health, Education, and Welfare with respect to procedures, remedies, and rights under section 504 conform with those promulgated under Title VI. Thus, this amendment codifies existing practice as a specific statutory requirement."[13] S. Rep. No. 95-890, at 19 (1978); *Consolidated Rail Corp.*, 465 U.S. at 635 n.16 ("[T]hese Department regulations incorporated Title VI regulations governing 'complaint and enforcement procedures . . . .'"); *see also School Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 279 (1987); *United States v. Bd. of Trustees for Univ. of Ala.*, 908 F.2d 740, 746–47 (11th Cir. 1990); *Miener v. Missouri*, 673 F.2d 969, 978 (8th Cir. 1982).

In 1980, President Carter issued an Executive Order assigning responsibility for coordinating the implementation and enforcement of Title VI, the Rehabilitation

---

[13] Florida points to language in legislative history from the 1974 Amendments that it asserts showed that Congress only intended to create a private right of action. It is true that Congress stated that it intended to "permit a judicial remedy through a private right of action." S. Rep. 93-1297, at 40 (1974). But this portion of the report also discusses Congress's vision of a "compliance program" similar to Title VI enforcement. *Ibid.*; *see also supra*, note 11 (discussing the 1974 Amendments' legislative history). Congress's decision in 1978 to codify existing regulations that specifically required agencies to use Title VI's administrative enforcement procedures undercuts Florida's contentions. Congress's decision, in 1978, to mention a private remedy is not surprising, given the litigation over whether Title VI implied a private right of action. *See Sandoval*, 532 U.S. at 280; *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978); *Guardians Ass'n v. Civil Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 587 (1983).

Act, and Title IX of the 1972 Education Amendments[14] to the Attorney General.  *See* Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980), *reprinted in* 42 U.S.C. § 2000d-1, app.  Executive Order 12,250 directs the Attorney General to review the existing rules and regulations to determine their adequacy and consistency, as well as "develop standards and procedures for taking enforcement actions and for conducting investigations and compliance reviews."  *Ibid.*  Executive Order 12,250 revoked Executive Order No. 11,914.   *Id.* at 72997.   The Executive Order also preserved the coordinating regulations HEW had promulgated, which by then fell under the auspices of the newly-formed Department of Health and Human Services "HHS").

> The present regulations of the Secretary of Health and Human Services relating to the coordination of the implementation of Section 504 of the Rehabilitation Act of 1973, as amended, shall be deemed to have been issued by the Attorney General pursuant [to] this Order and shall continue in effect until revoked or modified by the Attorney General.

*Ibid.*  The Department of Justice's regulations for enforcement of § 504 are the same as those HEW promulgated in 1978.  *Compare* 28 C.F.R. § 41.5, *with* 43 Fed. Reg. 2137, § 85.5(a).

---

[14] Title IX was also modeled after Title VI.  *See Cannon*, 441 U.S. at 694.  Section 902 of Title IX is substantially similar to § 602 of Title VI.  *Compare* 20 U.S.C. § 1682, *with* 42 U.S.C. § 2000d-1.

As tedious as this administrative and regulatory history may be, it is essential to understand what Congress did when it enacted the enforcement provision of Title II.  Sections 504 and 505 of the Rehabilitation Act, and their implementing regulations, established a system of administrative enforcement that replicated the one in § 602 of the Civil Rights Act.  This system permits both individual complaints and federal agency oversight to lead to investigations that may end with federal enforcement actions.  This is illustrated in Rehabilitation Act enforcement litigation.

### B. Department of Justice Enforcement of the Rehabilitation Act

The United States and Florida dispute whether the United States has enforced the Rehabilitation Act through litigation.  Florida argues that, because there have been no such enforcement actions, this undercuts the United States's argument that Congress knew the Rehabilitation Act could trigger federal litigation, and so incorporated the same intent in Title II.

The United States has filed suit to enforce the Rehabilitation Act.  There appear to be fewer cases than Title VI enforcement, but this is not surprising.  Federal investigations may not always culminate in litigation.  The Rehabilitation Act was intended to track Title VI, which requires that agencies attempt to achieve voluntary compliance through informal means before terminating funding or taking "any other means authorized by law."  42 U.S.C. § 2000d-1; 29 U.S.C. § 794a(a)(2).

Although much of the litigation under the Rehabilitation Act was brought by private parties, that does not automatically lead to the conclusion that a private right of action is the sole method of enforcement. Reliance on a private right of action may be more attractive to individuals who want to ensure that they receive relief that best fits their circumstances and goals. For example, they can control the progress of the litigation or settle on their own terms. *See* Block, *supra*, at 9–10. Litigation over whether there was an implied private right of action in the Rehabilitation Act recognized that the Rehabilitation Act also contained an administrative-enforcement system. *See Miener v. Missouri*, 673 F.2d 969, 978 (8th Cir. 1982); *Pushkin v. Regents of Univ. of Colo.*, 658 F.2d 1372, 1381 (10th Cir. 1981); *Camenisch v. Univ. of Tex.*, 616 F.2d 127, 133–34 (5th Cir. 1980), *vacated on other grounds*, 451 U.S. 390 (1981); *Kling v. Los Angeles Cty.*, 633 F.2d 876, 879 (9th Cir. 1980); *NAACP v. Med. Ctr., Inc.*, 559 F.2d 1247, 1254–55, 1258 (3d Cir. 1979).

The United States has brought suits to ensure compliance with the Rehabilitation Act, and each of those suits took place after the relevant agency had received a complaint and investigated. *See United States v. Bd. of Trustees for Univ. of Ala.*, 908 F.2d 740, 742 (11th Cir. 1990) (deaf student filed complaint in 1979 alleging University improperly denied sign-language interpreter services, government filed suit to enforce Rehabilitation Act); *United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1041 (5th Cir. 1984), *cert. denied*, 469 U.S. 1189 (1985)

28

(deaf patient filed complaint that hospital refused to permit her to bring an interpreter, hospital refused to allow HHS to investigate); *United States v. Univ. Hosp. of State Univ. of N.Y. at Stony Brook*, 729 F.2d 144, 147 (2d Cir. 1984) (United States filed suit after receiving a complaint relating to medical treatment of disabled baby).

Florida argues that *Baylor Univ. Med. Ctr.* was not an enforcement action because the central question was whether the receipt of Medicare and Medicaid funds made the hospital a recipient of federal financial assistance subject to § 504. Florida is correct about the nature of the central question, but it errs in characterizing *Baylor* as anything other than an enforcement action. The United States and the Medical Center had both sought summary judgment on the question of federal funding, and the district court awarded it to the United States. *Id.* at 1041–42. It concluded that the Medical Center was in violation of § 504 and suspended all future Medicare and Medicaid payments to the Medical Center until it complied with the investigation. *Id.* at 1042. The question of the receipt of federal financial assistance was essential to determining whether the Medical Center was violating § 504 and whether the United States could enforce § 504. *Ibid.*

The Fifth Circuit affirmed the conclusion that the hospital was a federal-funding recipient but determined that the district court abused its discretion in suspending the funding immediately. *Id.* at 1050. It relied on the history of the

Rehabilitation Act and its relationship to Title VI.  Administrative enforcement remedies, the court explained, were inconsistent with an immediate, automatic suspension of federal funding because § 602 sets out very specific procedures to be implemented before terminating funding.  *Ibid.*  The court also specifically stated that agencies seeking to enforce § 504 may "resort to 'any other means authorized by law'—including the federal courts."  *Ibid.* (citing *United States v. Marion Cty. Sch. Dist.*, 625 F.2d 607 (5th Cir. 1980)).

The Second Circuit has considered the nature of the United States's authority to enforce § 504.  In *Stony Brook*, 729 F.2d at 148, the United States filed suit, alleging that a hospital had violated § 504 and accompanying regulations by refusing to provide information regarding medical care provided to a baby born with severe disabilities.  The Second Circuit, applying the assumption that § 504 covered the hospital, and determining that the baby was a "handicapped individual," *id.* at 155, nonetheless concluded that § 504 did not apply to decisions about medical treatment, and that HHS could not proceed in its investigation.  *Id.* at 157–59.[15]  Importantly,

---

[15] It is important to note that in *United States v. Univ. Hosp. of State Univ. of N.Y. at Stony Brook*, 729 F.3d 144, 161 (2d Cir. 1984), the relevant Rehabilitation Act claim was whether the baby was denied certain surgical interventions on the basis of her disability.  The Second Circuit pointed out that the hospital was always willing to perform the surgeries if her parents consented, thus the baby was treated in an "evenhanded manner" by the hospital.  *Ibid.*  The United States's claims in this case are consistent with (although not limited to) the kind of claims raised in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999), and, *inter alia*, concern whether Florida is violating Title II of the ADA by failing to provide community placements for individuals for whom a less restrictive setting than an institution is appropriate.  This is a far cry from a case

the court did *not* conclude that the government lacked *any* authority to enforce § 504. Rather, with the issue of the United States's authority before it, the court concluded *that this particular investigation and enforcement action* exceeded the congressionally delegated enforcement authority under the Rehabilitation Act because Congress did not intend for agencies to insert themselves in those circumstances. *Id.* at 160.

A review of the legislative and regulatory background of the Rehabilitation Act, its existing regulations, and legal precedent demonstrate that the Act incorporated a system of administrative procedures that included a complaint, compliance reviews, investigation, and possible enforcement action by the Attorney General. As we have discussed above, Congress was fully aware of this system, it is consistent with what Congress intended, and the 1978 Amendments to § 504 and § 505 demonstrate that Congress codified the existing administrative practice of using Title VI procedures. Further, by 1980, the Attorney General had been tasked with enforcing Title VI, the Rehabilitation Act, Title IX, and other similar statutes. It is with this background that we now address the specific language in the enforcement provision of Title II of the ADA.

---

in which a federal agency sought to investigate (and possibly override) parents' reasonable, informed medical decisions for their child. *See also American Acad. of Pediatrics v. Heckler*, 561 F. Supp. 395 (D.D.C. 1983).

### IV. Enforcement of Title II of the ADA

The United States contends that by incorporating the "remedies, procedures, and rights" of the Rehabilitation Act (and accordingly Title VI), "Congress adopted a federal administrative enforcement scheme in which persons claiming unlawful discrimination may complain to and enlist the aid of federal agencies in compelling compliance, potentially leading to a DOJ lawsuit." Florida argues that, because the administrative process was not designed to vindicate individual rights, such actions "taken at the executive's discretion and without the complainant's involvement" deprive the terms "right" and "remedy" of all meaning. Florida relies on precedent that recognized a private right of action under the Rehabilitation Act and rejected administrative exhaustion, particularly *Camenisch v. Univ. of Tex.*, 616 F.2d 127 (5th Cir. 1980), *vacated on other grounds*, 451 U.S. 390 (1981).

In recognizing private rights of action, courts have emphasized the potentially unsatisfactory nature of administrative remedies for individuals under Title VI and the Rehabilitation Act. *See id.* at 135. That argument lends support to finding an implied cause of action to permit individuals to seek personal redress. *Ibid.* It does not, however, automatically lead to the conclusion that government enforcement is impermissible. Ensuring that public entities subject to federal statutes comply with those states ultimately vindicates individuals' personal rights. Although some plaintiffs may prefer private remedies, that fact does not persuade us that we should

ignore Congress's decision to enact a statutory scheme that permits the government to enforce Title II.

### A. Title II Enforcement Regulations Follow Regulations Promulgated Under the Rehabilitation Act and Title VI

Congress directed the Attorney General to "promulgate regulations . . . that implement" Title II.  42 U.S.C. § 12134(a).  Congress directed that those regulations "be consistent with this chapter and with the coordination regulations under part 41 of title 28, Code of Federal Regulations (as promulgated by the Department of Health, Education, and Welfare on January 13, 1978), applicable to recipients of Federal financial assistance under section 794 of Title 29."  *Id.* (b).

As we have discussed above in Part III.A, pp. 23–28, the 1978 regulations required agencies to establish enforcement procedures for § 504.  *See* Implementation of Executive Order 11,914: Nondiscrimination on the Basis of Handicap in Federally Assisted Programs, 43 Fed. Reg. 2132, 2137, § 85.5(a) (Jan. 13, 1978).  Part 41 of title 28 of the Code of Federal Regulations contains the regulations that the Attorney General promulgated in response to Executive Order 12,250, Nondiscrimination on the Basis of Handicap in Federally Assisted Programs, which, as we have already observed, are the same as HEW's January 13, 1978 regulations.  Those regulations required agencies to use the "enforcement and hearing procedures that the agency has adopted for the enforcement of [T]itle VI of

the Civil Rights Act of 1964[.]" *Compare* 28 C.F.R. § 41.5, *with* 43 Fed. Reg. 2137, § 85.5(a).

The Department of Justice then issued regulations that, consistent with Congress's directive in § 12134, established an administrative scheme for Title II similar to the ones available for the Rehabilitation Act and Title VI. *See* 28 C.F.R. §§ 35.170–35.174, 35.190. An individual may file a complaint with the appropriate federal agency, any agency that provides funding to the public entity allegedly discriminating, or with the Department of Justice. 28 C.F.R. § 35.170. Agencies "shall" investigate complaints, may conduct compliance reviews, and, if appropriate, attempt informal resolution.[16] *Id.* § 35.172(a)–(c). If an agency can obtain voluntary compliance, then such agreements must provide for enforcement by the Attorney General. *Id.* § 35.173(b)(5).

_____

[16] Florida points out that the Department of Justice amended its regulations to clarify that agencies are not obligated to investigate administrative complaints alleging violations of Title II. In 2010, the Department modified its regulations. *See* Nondiscrimination on the Basis of Disability in State and Local Government Services, 75 Fed. Reg. 56,164, 56,228 (Sept. 15, 2010). The Department explained that, since Title II regulations went into effect, it had "received many more complaints alleging violations of [T]itle II than its resources permit it to resolve." *Ibid.* It modified a regulation to clarify that designated agencies may exercise discretion in determining which complaints they select to resolve. Agencies may still "engage in conscientious enforcement" without fully investigating each complaint. *Ibid.* Rather, the Department explained that the modification was to permit agencies to assess whether agencies are likely to succeed in enforcement, whether the enforcement is consistent with the agencies' policies, and whether agencies' limited resources are best spent on a particular complaint. *Ibid.* A person who complains to an agency may still file suit regardless of the agency's resolution of the matter. 28 C.F.R. § 35.172(d). As we have already said, this argument certainly supports an implied private right of action. But our concern is with government, rather than private, enforcement.

Agencies are required to issue a letter of findings that provides public entities their findings of fact, conclusions of law, description of remedies for violations, and notice of available rights and procedures. *Id.* § 35.172(c). If a public entity "declines to enter into voluntary compliance negotiations or if negotiations are unsuccessful, the designated agency shall refer the matter to the Attorney General with a recommendation for appropriate action." *Id.* § 35.174. Complainants may file private suits under 42 U.S.C. § 12133, regardless of whether or not an agency finds a violation. *Id.* § 35.172(d).

The district court dismissed Congress's directive to the Attorney General in § 12134(a)–(b) to implement regulations that must be consistent with Title II and the Rehabilitation Act enforcement regulations. *C.V.*, 209 F. Supp. 3d at 1288. Relying on *Elwell v. Oklahoma ex rel. Bd. of Regents of Univ. of Okla.*, 693 F.3d 1303, 1313 (10th Cir. 2012), and *Zimmerman v. Or. Dep't of Justice*, 170 F.3d 1169, 1179 (9th Cir. 1999), the district court explained that § 12134(a) "authorizes the Attorney General to define the substantive standards for discrimination under Title II," and "the consistency mandate merely ensures that Title II's substantive standards are analogous to those under the Rehabilitation Act." *C.V.*, 209 F. Supp. 3d at 1288. It quoted *Zimmerman*, 170 F.3d at 1179, for the proposition that "42 U.S.C. § 12134(b) does not suggest that Congress intended to incorporate *any* provisions from the

Rehabilitation Act into Title II." *C.V.*, 209 F. Supp. 3d at 1288 (emphasis in original).[17]

But *Elwell* and *Zimmerman* addressed a very different issue than the one presented here.   Both of those cases considered whether Title II permitted individuals to bring *employment discrimination claims* against public entities.  *See Elwell*, 693 F.3d at 1305–06; *Zimmerman*, 170 F.3d at 1171–72.  In those cases, plaintiffs contended that, because Title II incorporated § 505 of the Rehabilitation Act's "remedies, procedures, and rights," Congress intended to adopt the Rehabilitation Act's prohibition on employment discrimination.  *Elwell*, 693 F.3d at 1312; *Zimmerman*, 170 F.3d at 1179.  Both *Elwell* and *Zimmerman* firmly rejected this argument, pointing out that Congress adopted the Rehabilitation Act's procedural rights in Title II, rather than its substantive prohibitions on employment discrimination.  After all, Congress had already extensively addressed employment discrimination in Title I of the ADA.  *Elwell*, 693 F.3d at 1312; *Zimmerman*, 170 F.3d at 1179.  Both opinions also rejected the argument that, because the Attorney

---

[17] The district court made a critical omission when it quoted *Zimmerman v. Or. Dep't of Justice*, 170 F.3d 1169, 1179 (9th Cir. 1999).  The full sentence reads: "*Unlike 42 U.S.C. § 12133*, 42 U.S.C. § 12134(b) does not suggest that Congress intended to incorporate *any* provisions from the Rehabilitation Act into Title II."  *Ibid.* (emphasis added).  The Ninth Circuit emphasized that the requirement of "consistency" in areas of regulatory overlap did not demonstrate an intent to incorporate substantive provisions concerning an entirely separate subject (employment) that Congress had already addressed exhaustively in Title I.  *Id.* at 1179–80.  Here, by contrast, the requirement of consistency makes far more sense when Title II addresses public services provided by public entities and the relevant regulations address the same subject.

General's Title II regulations were required to be consistent with certain Rehabilitation Act regulations, it adopted the Rehabilitation Act regulations that prohibited discrimination in employment. *Elwell*, 693 F.3d at 1312–13; *Zimmerman*, 179 F.3d at 1179–80.

*Elwell* and *Zimmerman* do support a conclusion that the Attorney General's regulations to implement Title II *were* intended to be consistent with the Rehabilitation Act in the areas where they might overlap. The regulations included definitions of certain terms, identified types of prohibited discrimination, and accessibility standards. *Zimmerman*, 170 F.3d at 1179–80; *Elwell*, 693 F.3d at 1313. Title II: (1) expressly addresses public services provided by public entities; 42 U.S.C. § 12132; (2) directly incorporates the rights, procedures, and remedies available in § 505(a)(2) of the Rehabilitation Act for violations of the prohibition on discrimination by programs or activities that receive federal financial assistance; *id.* at § 12133; and (3) directs that regulations to implement Title II must be "consistent" with certain Rehabilitation Act regulations that apply to recipients of Federal financial assistance. *Id.* § 12134.

The consistency requirement in § 12134(b) leads to the conclusion that Congress intended the Attorney General's Title II regulations to adopt the Rehabilitation Act's Title-VI-type enforcement procedures because Title II's enforcement procedure used the Rehabilitation Act's enforcement structure. *See* S.

37

Rep. No. 101-116, at 57 (1989) (explaining that the Attorney General should use § 504 enforcement procedures and its role under Executive Order 12,250 as "models for regulation); H.R. Rep. No. 101-485 II, at 98 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 381 (same).

We considered that the Attorney General's Title II regulations were "entitled to controlling weight" in *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1179 (11th Cir. 2003). "Congress expressly authorized the Attorney General to make rules with the force of law interpreting and implementing the ADA provisions generally applicable to public services." *Ibid.* (citing 42 U.S.C. § 12134(a)). *See also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597–98 (1999) ("Because the Department [of Justice] is the agency directed by Congress to issue regulations implementing Title II . . . its views warrant respect." (citation omitted)).

These regulations are reasonably related to the legislative purpose of the ADA, which included federal enforcement. *Id.* at 1179 & n. 25. They are consistent with the remedial structure that Congress selected for Title II, in that they adopt similar enforcement procedures to the Rehabilitation Act and Title VI, as Congress directed. Thus, "[b]ecause Congress explicitly delegated authority to construe the statute by regulation, in this case we must give the regulations legislative and hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute." *United States v. Morton*, 467 U.S. 822, 834 (1984), *accord Yeskey v. Com.*

*of Pa. Dep't of Corr.*, 118 F.3d 168, 171 (3d Cir. 1997), *aff'd sub nom. Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998); *Kornblau v. Dade Cty.*, 86 F.3d 193, 194 (11th Cir. 1996).

### B. Title II of the ADA Permits Department of Justice Enforcement

To be sure, the Attorney General may not, by regulation, employ a cause of action where none was intended. *See Sandoval*, 532 U.S. at 291 (concluding that regulations may not create a private right of action where Congress did not so intend); *Marshall v. Gibson's Prods., Inc. of Plano*, 584 F.2d 668, 677–78 & n.16 (5th Cir. 1978). But Title II incorporated the Rehabilitation Act's procedural rights. *See Elwell*, 693 F.3d at 1312; *Zimmerman*, 170 F.3d at 1179. Congress chose to use § 505(a)(2) of the Rehabilitation Act as the enforcement mechanism for Title II of the ADA, with full knowledge that those provisions established administrative enforcement and oversight in accordance with Title VI. Congress also knew that, by adopting § 502(a)(2), it incorporated Title VI's "any other means authorized by law" provision.

The district court concluded that the "simpler explanation" was that "Congress did not incorporate *all* 'remedies, procedures, and rights' available under Title VI—it incorporated only those 'remedies, procedures, and rights' that may be exercised by a 'person alleging discrimination.'" *C.V.*, 209 F. Supp. 3d at 1286–87 (quoting 42 U.S.C. § 12133) (emphasis in original). It reasoned that, as "the power

to terminate federal funding under Title VI has no foothold in Title II," the available enforcement remedy is simply a private lawsuit.[18]  *Id.* at 1287.

This conclusion is inconsistent with the statutory text, and Congress's directive that Title II's remedies are the same as the Rehabilitation Act.  *See Barnes*, 536 U.S. at 185.  At the time Congress enacted the ADA, there had been a number of decisions from the Supreme Court and the circuits regarding the availability of an implied private right of action under Title VI and the Rehabilitation Act.  If Congress *only* intended to create a private right of action under Title II, then its decision to cross-reference to § 505 of the Rehabilitation Act, which *expressly* incorporates Title VI, including its administrative enforcement scheme in § 602, would be mystifying, especially because it had directed the Attorney General to develop regulations that were to be consistent with Rehabilitation Act enforcement procedures that included Title VI enforcement.  *See* 42 U.S.C. § 12134.

It is true that Title II, unlike the Rehabilitation Act and Title VI, does not condition the right to enforce the statute on a defendant's receipt of federal funding.

---

[18]  The district court's reliance on *Alexander v. Sandoval*, 532 U.S. 275 (2001), is misplaced.  There, the Supreme Court, interpreting § 602 of the Civil Rights Act, explained that § 602 did not confer rights on individuals, rather it focused on federal agencies' responsibilities.  *Id.* at 289.  The implication from *Sandoval*, as was observed in *United States v. Maricopa Cty.*, 151 F. Supp. 3d 998, 1018 (D. Ariz. 2015), is that when enforcement provisions focus on a particular party, it is more likely that Congress gave that party the ability to enforce the provision.  *Sandoval*'s logic lends more support to concluding that there is a right of action for federal agency enforcement in § 602's reference to "any other means authorized by law."  *Ibid.*

But, as the Supreme Court observed in *Barnes v. Gorman*, 536 U.S. 181, 189 n.3 (2002), that does not mean that an analysis of the available "remedies, procedures, and rights" turns on that distinction.  Justice Scalia (who wrote the Court's opinion) and Justice Stevens (who concurred only in the judgment) disagreed over the relevance of contract-law principles to the Court's conclusion that punitive damages were not available in Title II suits.  *See id.* at 189–90 (Scalia, J.), 192–93 (Stevens, J., concurring in the judgment).  The Court had determined that because such damages were not available in suits under Title VI or the Rehabilitation Act, which were Spending Clause legislation, they were not available in Title II suits.  *Id.* at 189–90.  Justice Scalia noted that the ADA is not Spending Clause legislation, but rejected the distinction because Congress had "unequivocally" selected remedies derived from Spending Clause legislation when it enacted the ADA.

> The ADA could not be clearer that the "remedies, procedures, and rights . . . this subchapter provides" for violations of § 202 are the same as the "remedies, procedures, and rights set forth in" § 505(a)(2) of the Rehabilitation Act, which *is* Spending Clause legislation. Section 505(a)(2), in turn, explains that the "remedies, procedures, and rights set forth in title VI . . . shall be available" for violations of § 504 of the Rehabilitation Act.

*Id.* at 189 n.3 (Scalia, J.) (emphasis in original) (citations omitted).

In *Barnes*, while interpreting the remedial structure of Title II of the ADA, the Supreme Court did not consider the federal-funding distinction persuasive *because*

*Congress expressly adopted remedies from those Spending Clause statutes.* Congress intended for those to be the available remedies for Title II because it said so.[19]  *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.").  To determine the available remedies, we must take Congress at its word.  This brings us to Florida's arguments concerning who may file suit under Title II.

Florida asserts that because Congress did not name the Attorney General in Title II, the Attorney General may not sue.  It relies on *Director, Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 129 (1995), for the proposition that if an agency is meant to have standing, then Congress expressly says so.  This is one of the key concepts from *Newport News*.  The other is that, when making such determinations, courts examine the nature, structure, and purpose of the relevant statutory scheme.  We do not conclude that *Newport News* dictates the result Florida proposes.

*Newport News* examined a single, self-contained statute, rather than a complex statutory scheme with two layers of statutory cross-reference.  The

---

[19] Of course, if a public entity does not receive federal funding, then the United States may not terminate or withhold such funding.  But the ADA prohibits discrimination by all public entities, regardless of the source of funding.  *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1174 (11th Cir. 2003).

Supreme Court considered whether the Director of the Office of Workers' Compensation Programs could, under the judicial review provision of the Longshore Harbor Workers' Compensation Act ("LHWCA"), seek judicial review of a decision by the Benefits Review Board.  514 U.S. at 123.

The relevant statute provided that "'any person adversely affected or aggrieved by' the Board's order" could appeal the decision in a United States Court of Appeals.  *Id.* at 126 (quoting 33 U.S.C. § 921(c)).  The Board had affirmed an administrative law judge's determination that a worker was only partially disabled. The Director sought review in the Fourth Circuit, which independently concluded that the Director could not seek judicial review because she was not a "person adversely affected or aggrieved" by the Board's decision within the meaning of the LHWCA.[20]

The Supreme Court affirmed.  The Director was not a party to the proceedings before the administrative law judge, and, under the LHWCA, she could not appeal the judge's determinations to the Board.  Thus, allowing her to challenge the Board's determinations in a federal court of appeals would be quite odd.  The key phrase in the judicial review provision, "a person adversely affected or aggrieved," is, the

---

[20] The worker did not seek judicial review, and upon inquiry by the Fourth Circuit, "expressly declined to intervene on his own behalf," although he did not oppose the Director's appeal.  *Director, Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 124–25 (1995).

Court explained, a "term of art" that statutes use to "designate those who have standing to challenge or appeal an agency decision, within the agency or before the courts." *Id.* at 126. But nothing suggested that, "without benefit of specific authorization to appeal, an agency, in its regulatory or policy-making capacity, is 'adversely affected' or 'aggrieved.'"[21] *Id.* at 127. The Court explained that the general judicial review provision of the Administrative Procedure Act does not include an agency as a person adversely affected or aggrieved, *id.* at 129, and "when an agency in its governmental capacity *is* meant to have standing, Congress says so." *Ibid.* (emphasis in original).

The Court rejected the Director's argument that she could seek judicial review because the Board's decision impaired her ability to achieve the LHWCA's purposes and perform administrative duties. *Id.* at 126. The Court observed that the Board's decision did not interfere with the Director's duties as set forth by the LHWCA, and that the purpose of the LHWCA was not to ensure adequate compensation, but rather to resolve disputes. *Id.* at 130–31. Even assuming that the LHWCA's sole purpose was to ensure compensation for workers, agencies "do not automatically have standing to sue for actions that frustrate the purposes of their statutes[,]" and the

---

[21] Agencies *may* be "adversely affected or aggrieved" in some circumstances, such as when they are injured in their "nongovernmental capacity . . . as . . . member[s] of the market group that the statute was meant to protect." *Newport News*, 514 U.S. at 128 (citing *United States v. ICC*, 337 U.S. 426, 430 (1949)).

plain language of the statute did not show a "clear and distinctive responsibility for employee compensation as to overcome" the obvious reading of the text—that the "person adversely affected or aggrieved" by the Board's decision is one of the parties to the proceeding.  *Id.* at 132.

By contrast, here, Congress enacted a statute that drew upon two other statutes to create the remedies, rights, and procedures available for enforcement, with the full knowledge that the other statutes—the Rehabilitation Act and the Civil Rights Act—were enforceable by federal agencies through funding termination or "any other means authorized by law."  *See* 42 U.S.C. § 12133.  Then Congress told the Attorney General to make regulations (that we defer to) to implement Title II that were to be consistent with a set of regulations that traced directly back to Title VI regulations.  42 U.S.C. § 12134(a)–(b).  Congress was quite clear that Title V of the Rehabilitation Act and its accompanying regulations were to be construed as the *minimum standard* for the ADA.  42 U.S.C. § 12201 ("Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. 790 et seq.) or the regulations issued by Federal agencies pursuant to such title.").

By the time Congress enacted the ADA, it had established administrative enforcement structures in Title VI and the Rehabilitation Act that each followed the same pattern.  Various federal investigations under those statutes had culminated in

45

the Department of Justice filing suit in federal court to enforce these statutory provisions.  Congress knew that both Title VI and the Rehabilitation Act had been enforced through Department of Justice litigation, and when it enacted the ADA, cross-referencing to Spending Clause remedies—without the federal-funding hook—such remedies necessarily entailed federal enforcement actions, particularly when § 12133 ultimately cascades back to "any other means authorized by law," a phrase that courts have interpreted to permit referral to the Department of Justice for further legal action.  *See Cannon*, 441 U.S. at 710–11 (implying a private remedy in part because Congress considered it to be available at the time of enactment); *Brown v. Gen. Svcs. Admin.*, 425 U.S. 820, 828 (1976) ("For the relevant inquiry is not whether Congress correctly perceived the then state  of the law, but rather what its perception of the state of the law was.").  The legislative, regulatory, and precedential background of the statutes that Congress incorporated demonstrate that Congress intended to create a system of federal enforcement for Title II of the ADA.  Indeed, one of the purposes of the ADA was to ensure that the Federal Government "play[ed] a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities."  42 U.S.C. § 12101(b)(3).

### C. The Legislative History of Title II Supports the Attorney General's Authority to File Suit

In considering the legislative history, we are mindful that courts need not examine legislative history if the meaning of the statute is plain, but it may do so,

particularly if a party's interpretation is based on a misreading or misapplication of legislative history. *See Harris v. Garner*, 216 F.3d 970, 976–77 (11th Cir. 2000) (en banc), *cert. denied*, 532 U.S. 1065 (2001). Here, both parties dispute the effect of certain portions of the legislative history surrounding the enactment of the ADA.

The United States cites two committee reports, one from the Senate Committee on Labor and Human Resources, S. Rep. No. 101-116 (1989), and one from the House Committee on Education and Labor, H.R. Rep. No. 101-485 II (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, which, it asserts, demonstrate that Congress intended that the Department of Justice should enforce Title II.

Both reports note that Title II's enforcement provision specifies that the "remedies, procedures, and rights" are those available in § 505 of the Rehabilitation Act. S. Rep. No. 101-116, at 57; H.R. Rep. No. 101-485 II, at 98, 1990 U.S.C.C.A.N. at 381. The Committee reports state (in virtually identical language) that administrative enforcement of § 12133 should track federal enforcement practices under § 504 of the Rehabilitation Act, and the Attorney General "should use section 504 enforcement procedures and the Department's coordination role under Executive Order 12250 as models for regulation in this area." H.R. Rep. No. 101-485 II, at 98, 1990 U.S.C.C.A.N. at 381; S. Rep. No. 101-116, at 57.

> The Committee envisions that the Department of Justice will identify appropriate Federal agencies to oversee compliance activities for State and local governments. As with section 504, these Federal agencies,

> including the Department of Justice, will receive, investigate, and where possible, resolve complaints of discrimination.  If a Federal agency is unable to resolve a complaint by voluntary means, the Federal government would use the enforcement sanctions of section 505 of the Rehabilitation Act of 1973.  Because the fund termination procedures of section 505 are inapplicable to State and local government entities that do not receive Federal funds, the major enforcement sanction for the Federal government will be referral of cases by these Federal agencies to the Department of Justice.
>
> The Department of Justice may then proceed to file suits in Federal district court. As with section 504, there is also a private right of action for persons with disabilities, which includes the full panoply of remedies. Again, consistent with section 504, it is not the Committee's intent that persons with disabilities need to exhaust Federal administrative remedies before exercising their private right of action.

H.R. Rep. No. 101-485 II, at 98, 1990 U.S.C.C.A.N. at 381; S. Rep. No. 101-116, at

57–58.[22]

Florida emphasizes that these reports refer to an earlier version of the bill, and

cites another, later report, from the Committee on the Judiciary H.R. Rep. No. 101-

485 III, *reprinted in* 1990 U.S.C.C.A.N. 445, that does not discuss federal

enforcement actions under Title II.  In discussing Title II's enforcement provision,

the report from the Committee on the Judiciary stated:

---

[22] Title II of the ADA and the Rehabilitation Act do not require a private party to exhaust administrative remedies before bringing suit.  *See Zimmerman v. Or. Dep't of Justice*, 170 F.3d 1169, 1178 (9th Cir. 1999).

> Section 205 incorporates the remedies, procedures and rights set forth in Section 505 of the Rehabilitation Act of 1973. As in [T]itle I, the Committee adopted an amendment to delete the term "shall be available" in order to clarify that Rehabilitation Act remedies are the only remedies which [T]itle II provides for violations of [T]itle II. The Rehabilitation Act provides a private right of action, with a full panoply of remedies available, as well as attorney's fees.

H.R. Rep. No. 101-485 III, at 52, 1990 U.S.C.C.A.N. at 475 (footnotes omitted).

The difference between these Committee Reports is not, however, conclusive. First, the report from the Committee on the Judiciary emphasized that Title II extended the coverage of § 504 of the Rehabilitation Act, and that it intended for Title II to "work in the same manner as Section 504." *Id.* at 49–50, 1990 U.S.C.C.A.N. at 472–73. Second, the reference to a "private right of action" included a footnote to *Miener v. Missouri*, 673 F.2d 969 (8th Cir. 1982), which concluded that the Rehabilitation Act contained an implied private right of action *and* recognized the federal enforcement structure. *Id.* at 978. As we have discussed above, there had been considerable litigation over whether the Rehabilitation Act permitted a private right of action. Thus, references to that private right equally permit the inference that Congress wanted to be clear that Title II did not just track the administrative enforcement structure of the Rehabilitation Act and Title VI, but also authorized a private right of action.

This legislative history is not dispositive—indeed, we are wary of putting much, if any weight on various committee reports when the text of the bill was subsequently amended.  More significantly, other courts considering this question have concluded that the Attorney General has the power to enforce Title II in federal court.[23]

---

[23] Florida, adopting the district court's arguments, contends that the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 et seq. ("CRIPA"), is an express mechanism to protect the rights of institutionalized persons.  The district court concluded that "[r]ecognizing the authority the Department seeks in this case would, in effect, allow an end-run around CRIPA's stringent requirements." *C.V. v. Dudek*, 209 F. Supp. 3d 1279, 1290 (S.D. Fla. 2016).

CRIPA requires that the Attorney General have reasonable cause to believe that "any State or political subdivision of a State, official, employee, or agent thereof, or other person acting on behalf of a State or political subdivision of a State" is subjecting persons confined in an institution to "egregious or flagrant conditions" that deprive them of rights, privileges or immunities secured or protected by the Constitution or laws of the Untied States that causes them "grievous harm" and is "pursuant to a pattern or practice" before filing suit.  42 U.S.C. § 1997a(a).  But CRIPA is irrelevant in this case.  Institutions that are subject to CRIPA must be "owned, operated, or managed by, or provide[] services on behalf of any State or political subdivision of a State," 42 U.S.C. § 1997(1)(A), and include institutions that provide "skilled nursing, intermediate or long-term care, or custodial or residential care." *Id.* (B)(v).  Privately owned and operated facilities are *not* subject to CRIPA if either licensing or receipt of payments under Medicaid, Medicare, or Social Security, are the "sole nexus" between the facility and the State.  *Id.* (2)(C).  A review of the record seems to indicate that the nursing facilities at issue are private facilities that receive payments from Florida through Medicaid.  Further, the United States' claims address more than just practices within Florida's institutions.

There is nothing to suggest that CRIPA was intended to be the *only* means of enforcing the rights of institutionalized persons.  Congress enacted CRIPA some ten years before the ADA.  Presumably Congress was aware that CRIPA existed, and yet it chose to enact the ADA, which reaches far more broadly, and provides protection against unnecessary institutionalization.  *See* 42 U.S.C. § 12101; *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999).  Obviously Congress can create different types of enforcement schemes for different types of statutory or constitutional violations.

### D. The Department of Justice Has Filed Suit to Enforce Title II

We are not the first court to pass upon this issue, and a review of other cases that have considered whether Title II permits the Attorney General to file suit demonstrates that the district court's decision is an outlier.

This Circuit has generally acknowledged the scope of potential federal enforcement under Title II, in *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1175 (11th Cir. 2003). In that case, we concluded that individuals could be liable under the ADA's anti-retaliation provision where the retaliation took place in response to opposition against discrimination prohibited by Title II. *Id.* at 1163. To do so, we explained, would not be inconsistent with the "allowed scope of government enforcement action" because the ADA is not Spending Clause legislation and funding-termination procedures are not applicable to public entities that do not receive federal funding. *Id.* at 1175. We concluded that the ADA and its accompanying regulations did not "indicate" that enforcement by referral to the Department of Justice or the Attorney General for appropriate action could not be taken against individuals. *Ibid.*

In *United States v. City & Cty. of Denver*, 927 F. Supp. 1396, 1399 (D. Colo. 1996), the district court considered whether the Attorney General had authority to file suit under Title II of the ADA. After describing the statutory cascade from

§ 12133, to § 504 of the Rehabilitation Act, to § 602 of Title VI, the district court observed that "[c]ourts have interpreted the words 'by any other means authorized by law' to mean that a funding agency, after finding a violation and determining that voluntary compliance is not forthcoming, could refer a matter to the Department of Justice to enforce the statute's nondiscrimination requirements in court." *Id.* at 1400 (citing *National Black Police Ass'n*, 712 F.2d at 575 & n.33; *Marion Cty.*, 625 F.2d at 612 & n.12). The United States's regulations that implemented Title II were consistent with the administrative procedures under Title VI and the Rehabilitation Act. *Ibid.* The district court concluded that, by investigating, attempting to negotiate with Denver, and following Denver's refusal to enter into an agreement, the United States complied with the procedural requirements for Title II of the ADA (which were consistent with § 602's requirement that no action be taken until the department had advised the noncompliant party of its failure, and attempted to secure compliance through voluntary means). *Ibid.*

In *Smith v. City of Philadelphia*, 345 F. Supp. 2d 482, 484–85 (E.D. Pa. 2004), Smith filed suit alleging that, upon learning that he had AIDS, paramedics refused to assist him, in violation of Title II of the ADA. The United States intervened. *Id.* at 484. The district court ruled that Smith's claims were time barred but concluded that the United States could proceed with its enforcement action because it had a separate and independent base of jurisdiction under Title II and § 504 of the

Rehabilitation Act.  *Id.* at 489.  The district court's reasoning tracked the reasoning used in *City & Cty. of Denver*.  Because the Title II's enforcement provision cascades to § 602, which authorizes the Attorney General to enforce compliance with Title VI by filing suit in federal court, "the Attorney General may also bring suit to enforce other statutes which adhere to the enforcement scheme set forth in Title VI."  *Id.* at 490.

Other courts have considered this matter and reached the same conclusion following the same analysis.  *See United States v. Harris Cty.*, No. 4:16-cv-2331, 2017 WL 7692396, at *1 (S.D. Tex. Apr. 26, 2017); *United States v. Virginia*, No. 3:12-cv-59-JAG, 2012 WL 13034148, at *2–3 (E.D. Va. June 5, 2012); *United States v. Arkansas*, No. 4:10-cv-00327, 2011 WL 251107, at *3, *8 (E.D. Ark. Jan. 24, 2011) (concluding that the Department of Justice had authority to initiate a civil action to enforce Title II but dismissing the complaint without prejudice because the Department had not sufficiently alleged that it had complied with statutory prerequisites).

Other cases the United States has filed to enforce Title II have not considered the question of standing but were litigated without jurisdictional challenge in the federal courts.  *See, e.g.*, *United States v. Gates-Chili Cent. Sch. Dist.*, 198 F. Supp. 3d 228 (W.D.N.Y. 2016) (alleging ADA violations from a school's rule regarding a student's service dog); *United States v. City of Balt.*, 845 F. Supp. 2d 640, 642 n.1

(D. Md. 2012) (DOJ filed suit alleging that the City of Baltimore Zoning Code discriminates against individuals receiving treatment in residential substance abuse provisions in violation of Title II of the ADA); *United States v. N. Ill. Special Recreation Ass'n*, No. 12-c-7613, 2013 WL 1499034 (N.D. Ill. Apr. 11, 2013) (United States filed suit alleging discrimination against individuals with epilepsy in violation of Title II).

When confronted with this issue, courts have routinely concluded that Congress's decision to utilize the same enforcement mechanism for Title II as the Rehabilitation Act, and therefore Title VI, demonstrates that the Attorney General has the authority to act "by any other means authorized by law" to enforce Title II, including initiating a civil action. We agree with this reasoning.

### E. Federalism Principles Do Not Alter Our Conclusion

Florida contends that principles of federalism dictate a different result and complains that "the federal government has haled a State into court over questions that go to the heart of its sovereignty: the weighing of competing healthcare policies." Relying on *Gregory v. Ashcroft*, 501 U.S. 452 (1991), Florida asserts that Congress did not make a clear statement in Title II that it intended to "empower the federal executive to sue the States[.]" Florida argues that we should not presume that Congress intended to authorize such litigation without a clear statement because

federal enforcement actions impose "considerable federalism costs," and such litigation is "coercive."

In *Gregory*, the Supreme Court considered whether a mandatory age-based retirement provision for judges in the Missouri Constitution violated the Age Discrimination in Employment Act ("ADEA").   501 U.S. at 455.   The Court recognized that, under the Supremacy Clause, Congress may legislate in areas usually controlled by states provided that it is within its constitutional authority.  *Id.* at 460.   But, the Court pointed out, the structure of a State's government and the qualifications it establishes for exercising government authority are fundamental questions of sovereignty, particularly when it comes to identifying constitutional officers.  *Ibid.*   For Congress to interfere with those issues would seriously disrupt the "usual constitutional balance of federal and state powers."  *Ibid.*   Therefore, the Court would not read the ADEA to reach state judges *unless* Congress expressly indicated that it should.  Because the ADEA identified an exception for "appointees on the policymaking level," the Court decided that was "sufficiently broad" to permit a conclusion that the ADEA did not reach state judges.  *Id.* at 467.  *Gregory* instructs us that, to alter the usual balance between state and federal interests, Congress must speak clearly.

Congress has done so.  Twenty years ago, in *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 208 (1998), the Supreme Court considered whether Title II

applied to state prisons. "Assuming, without deciding, that the plain-statement rule" of *Gregory* controlled the application of the ADA to state prisons, the Court concluded that, unlike in *Gregory*, the language of the ADA "plainly cover[ed] state institutions *without* any exception that could cast the coverage of prisons into doubt." *Id.* at 209–10 (citing 42 U.S.C. § 12131(1)(B)).[24]

Our analysis is similarly straightforward. Even assuming the "plain statement rule" applies, Congress expressly intended for Title II to reach states. Title II of the ADA defines "public entities" as "any State or local government," or "any department, agency, special purpose district, or other instrumentality of a State or States or local government . . . ." 42 U.S.C. § 12131(1)(A)–(B). Florida has been a state since 1845. Thus, it "fall[s] squarely within the statutory definition of 'public entity[]' . . . ." *Yeskey*, 524 U.S. at 210.

Florida may have valid complaints about this lawsuit, but whether it is amenable to suit by the United States is not one of them. The Supreme Court has consistently recognized that, "[i]n ratifying the Constitution, the States consented to suits brought by other states or by the Federal Government." *Alden v. Maine*, 527

---

[24] The Supreme Court declined to consider whether the application of the ADA to state prisons was a constitutional exercise of Congress's power under either the Commerce Clause or § 5 of the Fourteenth Amendment because the courts below had not considered the issue. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212–13 (1998). We similarly do not need to reach the question of whether application of the ADA to a state is a constitutional exercise of Congressional power because it is not before us.

U.S. 706, 755 (1999).  States do not retain sovereign immunity from suits brought by the federal government.  *See West Virginia v. United States*, 479 U.S. 305, 311 n.4 (1987); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 71 n.14 (1996); *Principality of Monaco v. Mississippi*, 292 U.S. 313, 329 (1934); *United States v. Miss. Dep't of Pub. Safety*, 321 F.3d 495, 498–99 (5th Cir. 2003) (concluding that the Eleventh Amendment does not bar the United States from suing a state to enforce Title I of the ADA).

To be sure, there are "federalism costs inherent in referring state decisions regarding the administration of treatment programs and the allocation of resources to the reviewing authority of the federal courts."  *Olmstead*, 527 U.S. at 610 (Kennedy, J., concurring).  But the Supreme Court struck that balance in *Olmstead*, holding that the requirement that States provide community-based treatment must be tempered by: (1) a determination by the State's treatment professionals that such placement is appropriate; (2) the individuals to receive such treatment do not oppose it; and (3) the placement can be accommodated, considering the state's resources and the needs of other individuals who receive such treatment.  *Id.* at 607.  The same considerations in *Olmstead* apply to the merits of this case.  Florida's federalism concerns do not dictate a different result.

## CONCLUSION

When Congress chose to designate the "remedies, procedures, and rights" in § 505 of the Rehabilitation Act, which in turn adopted Title VI, as the enforcement provision for Title II of the ADA, Congress created a system of federal enforcement. The express statutory language in Title II adopts federal statutes that use a remedial structure based on investigation of complaints, compliance reviews, negotiation to achieve voluntary compliance, and ultimately enforcement through "any other means authorized by law" in the event of noncompliance.  In the other referenced statutes, the Attorney General may sue.  The same is true here.

For the foregoing reasons, we **REVERSE** the district court's judgment and **REMAND** for proceedings consistent with this opinion.

BRANCH, Circuit Judge, dissenting:

Because the United States is not a "person alleging discrimination" under Title II of the Americans with Disabilities Act ("ADA"), Title II does not provide the Attorney General of the United States with a cause of action to enforce its priorities against the State of Florida. Accordingly, I respectfully dissent.

The relevant text of Title II states:

> The remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to **any person alleging discrimination** on the basis of disability in violation of section 12132 of this title.

42 U.S.C. § 12133 (emphasis added).  The language of this provision is unambiguous.  Title II provides enforcement rights "to any person alleging discrimination."  Thus, the question is whether the Attorney General is a "person alleging discrimination" under Title II.

To answer that question, we apply "a 'longstanding interpretive presumption that 'person' does not include the sovereign,' and thus excludes a federal agency." *Return Mail, Inc. v. USPS*, 587 U.S. ____, No. 17-1594, 2019 WL 2412904, at *5 (June 10, 2019) (quoting *Vermont Agency of Natural Resources v. US ex rel. Stevens*, 529 U. S. 765, 780–781 (2000)).  In *Return Mail*, the Supreme Court considered whether the United States Postal Service ("USPS"), a federal agency, was a "person" eligible to seek patent review under the America Invents Act

("AIA").  USPS had petitioned for review of Return Mail's patent under two

sections of the AIA that allow for post-issuance patent review.  *Id.* at \*4–5.

However, the language of the AIA limited post-issuance review proceedings to "a

person who is not the owner of a patent," *id.* (citing 35 U.S.C. §§ 311(a), 321(a)),

or when "the person or the person's real party in interest or privy has been sued for

infringement." *Id.* (citing AIA § 18(a)(1)(B), 125 Stat. 330).  Thus, the direct

question presented to the Supreme Court in *Return Mail* was: "whether a federal

agency is a 'person' capable of petitioning for post-issuance review under the

AIA." *Id.*  In concluding that the Government presumptively is *not* a "person" for

purposes of federal statutes, the Supreme Court explained:

> This presumption reflects "common usage."  *United States v. Mine Workers*, 330 U.S. 258, 275 (1947).  It is also an express directive from Congress: The Dictionary Act has since 1947 provided the definition of "person" that courts use "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise." 1 U.S.C. § 1; see *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 199–200 (1993).  The Act provides that the word "person . . . include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." § 1.  Notably absent from the list of "person[s]" is the Federal Government.  *See Mine Workers*, 330 U.S. at 275 (reasoning that Congress' express inclusion of partnerships and corporations in § 1 implies that Congress did not intend to include the Government).  Thus, although the presumption is not a "hard and fast rule of exclusion," *United States v. Cooper Corp.*, 312 U.S. 600, 604–605 (1941), "it may be disregarded only upon some affirmative showing of statutory intent to the contrary." *Stevens*, 529 U.S. at 781.

*Id.* at \*6.

Given *Return Mail*'s clear explanation of the presumption in favor of excluding the Federal Government from the definition of "person," I approach the analysis of Title II the same way.  As such, I begin with the presumption that "person alleging discrimination," 42 U.S.C. § 12133, does not include the United States.  *See Return Mail*, 2019 WL 2412904, at *5.  In order to overcome "the presumption that a statutory reference to a 'person' does not include the Government," there must be "some indication in the text or context of the statute that affirmatively shows Congress intended to include the Government" in its definition of "person." *Id.* Nothing in the text of Title II overcomes this presumption. But *Return Mail* states that context matters, too. And so I next examine the enforcement language contained in the other Titles of the ADA.[1]

In Title I of the ADA, the enforcement language provides as follows:

The powers, remedies, and procedures set forth in . . . this title shall be the powers, remedies, and procedures this subchapter provides **to the Commission, to the Attorney General, or to any person alleging discrimination** on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

---

[1] The ADA contains three primary subchapters, each referred to as a separate "Title." Each Title "forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." *Tennessee v. Lane*, 541 U.S. 509, 516–17 (2004).

42 U.S.C. § 12117(a) (emphasis added).  The text of Title I thus explicitly conveys the "powers, remedies, and procedures . . . to the Attorney General."  *Id.*  Title II echoes the "any person alleging discrimination" language contained in Title I, but the reference to "the Attorney General" is conspicuously missing from Title II.  *Compare* 42 U.S.C. § 12133, *with* 42 U.S.C. § 12117(a).

Title III of the ADA also contains language bestowing enforcement authority on the Attorney General:

> If the Attorney General has reasonable cause to believe that—(i) any person or group of persons is engaged in a pattern or practice of discrimination under this subchapter; or (ii) any person or group of persons has been discriminated against under this subchapter and such discrimination raises an issue of general public importance, **the Attorney General may commence a civil action in any appropriate United States district court**.

42 U.S.C. § 12188(b)(B) (emphasis added).  The text of Title III of the ADA is even more explicit than the text of Title I and clearly provides the Attorney General with the authority to bring a civil suit in federal court.  Title II, by contrast, is entirely devoid of any reference to "the Attorney General" or the power to "commence a civil action."  *Compare* 42 U.S.C. § 12133 *with* 42 U.S.C. § 12188(b)(B).

The difference in language across the ADA's three titles is noteworthy.  It is well settled that, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that

Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).  If Congress had intended to grant a civil cause of action to the Attorney General in Title II, "it presumably would have done so expressly as it did in" Titles I and III.  *See Russello*, 464 U.S. at 23.

Yet the majority essentially reads Title III's language (that "the Attorney General may commence a civil action in any appropriate United States district court") into Title II.  Although the majority readily admits that, "at first glance, Title II's enforcement provision is not as specific as those in Titles I and III," it finds these differences inconsequential.  The majority reasons that the differences between Title II and the other subchapters of the ADA "should not dictate a conclusion that, absent greater specificity, we should simply assume that a single word in § 12133 ends all inquiry."  As discussed above, the inquiry does, in fact, turn on a single word. Accordingly, it is clear that the Attorney General is not a "person alleging discrimination" under Title II.

Notably, however, the United States does not argue that the Attorney General is a "person alleging discrimination." The United States instead argues that "Title II provides to 'persons' alleging discrimination the 'remedies, procedures, and rights'—including the prospect of Attorney General enforcement—that are provided to persons under the Rehabilitation Act and Title

63

VI." The majority agrees with the United States: "Focusing solely on the word 'person' and the difference in the language of enforcement provisions within the ADA ignores" the presumption that "Congress legislated in light of existing remedial structures." But "[f]ocusing solely on the word 'person'" is precisely where this case should begin and end. Because the Attorney General of the United States—on behalf of the United States itself and *not* on behalf of any individuals served by the State of Florida—filed suit in this case, it is the United States that must have a cause of action to enforce Title II. And that determination necessarily depends on whether the Attorney General is a "person alleging discrimination" under the text of Title II. Because he is not such a person, the Attorney General has none of the "rights, procedures, and remedies" available under the Rehabilitation Act and Title VI. Accordingly, in this case, it is legally irrelevant what those "rights, procedures, and remedies" are because he simply does not possess those rights with respect to Title II. I do not agree that the multitude of cross-references to other federal regulatory schemes somehow provides a cause of action that does not otherwise exist in the text of Title II.

The Attorney General also insists that "a holding that the Attorney General cannot continue to bring lawsuits to enforce Title II would seriously undermine federal enforcement of the ADA against public entities." But we cannot expand the definition of "person" just because such an interpretation would "further the

purpose of the" statute. *Return Mail*, 2019 WL 2412904, at *10 n.11. "Statutes rarely embrace every possible measure that would further their general aims, and, absent other contextual indicators of Congress' intent to include the Government in a statutory provision referring to a 'person,' the mere furtherance of the statute's broad purpose does not overcome the presumption in this case." *Id. See Cooper*, 312 U.S. at 605 ("[I]t is not our function to engraft on a statute additions which we think the legislature logically might or should have made"). And Title II remains enforceable—even if the Attorney General does not have enforcement authority—because, as the Attorney General acknowledges, a "person alleging discrimination" may still enforce Title II through a private right of action.

Both the United States and the majority make much of the fact that "one of the purposes of the ADA was to ensure that the Federal Government 'play[ed] a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities.'" But, even if we find—as I do—that Title II does not allow the Attorney General to bring suit, the federal government will continue to "play a central role in enforcing the standards established in [the ADA] on behalf of individuals with disabilities." 42 U.S.C. § 12101(b)(3). Title I and Title III of the ADA clearly and explicitly confer enforcement authority on the Attorney General. *See* 42 U.S.C. §§ 12117(a), 12188(b)(B). Accordingly, a holding that the Attorney General cannot sue the States to enforce Title II does not affect, in any

way, the Attorney General's ability to enforce the other Titles of the ADA.  Thus, the ADA's broad statutory purpose rationally coexists with the holding that the Attorney General cannot file federal lawsuits to enforce Title II.

Because the text of Title II is determinative, and because that text does not provide the Attorney General with a cause of action to enforce Title II against the State of Florida, I would affirm the order of the district court.  I respectfully dissent.