# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:16-cv-03088- |
| | ) | ELR |
| STATE OF GEORGIA | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR STAY OF PROCEEDINGS

**INTRODUCTION**

The United States opposes the renewed motion by the State of Georgia ("Georgia") to dismiss or, in the alternative, for a stay of the United States' suit alleging that the Georgia Network for Educational and Therapeutic Support ("GNETS") Program violates Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134 (1990) ("Title II").  This Court should deny the motion in full.

First, due to its strained interpretation of Title II's language, Georgia wrongly denies that it has legal responsibility for discrimination on the theory that the State does not "administer" GNETS within the meaning of the Title II regulation, 28 C.F.R. § 35.130.  Georgia also argues that the United States' Complaint fails to adequately allege a violation of Title II's integration mandate. Next, Georgia argues that the United States' claims fail because ADA enforcement in this context will result in violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*  Georgia insists that offering the statewide GNETS Program is the manner by which it complies with both the IDEA and the ADA.  Third, Georgia claims that the relief the United States seeks is akin to an "obey-the-law" injunction.  Finally, despite the Eleventh Circuit Court of Appeals' recent decision in *United States v. Florida*, 938 F.3d 1221 (11th Cir.

2019), that the United States Department of Justice *does* have standing to enforce Title II, Georgia renews its challenge to the United States' long-standing authority to bring an action under Title II.  Furthermore, Georgia asks this Court to extend its two-year-long discretionary stay of this lawsuit in light of a possibility of rehearing *en banc*.

For the reasons explained below, each of Georgia's arguments should be rejected.  This Court should deny Georgia's renewed motion and allow this case to proceed to vindicate the rights of children and their families who are subject to discrimination and who have already waited more than two years for a remedy.

## THE UNITED STATES' ALLEGATIONS

The United States alleges that Georgia violates Title II's integration mandate by discriminating against thousands of public school students with behavior-related disabilities through its administration of a largely segregated and unequal statewide service delivery system known as GNETS.  Compl. ¶¶ 1, 7, 24, 26, 34, 35.  Instead of choosing to provide emotional and therapeutic services and supports for students with behavior-related disabilities primarily within general education settings in a student's zoned school, Georgia spends over $72 million annually to deliver such services primarily in segregated settings where children with disabilities have few, if any, interactions with non-disabled peers.  *Id*. ¶¶ 33-35.  Title II prohibits

discrimination against persons with disabilities in the provision of services by a public entity, such as Georgia. The Title II regulation mandates that public entities "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). *See also* 42 U.S.C. § 12132; *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999).

The vast majority of students in GNETS could be served in more integrated settings with appropriate services and supports, and these students and their families would not oppose integration. Compl. ¶¶ 1, 4, 46. Through its segregated service delivery system, Georgia deprives thousands of GNETS students of meaningful interactions with non-disabled peers, as well as myriad educational opportunities available in general education settings but not in segregated GNETS settings, such as access to electives, extracurriculars, playgrounds, gymnasiums, science labs, libraries, or cafeterias. *Id*. ¶¶ 34-35, 47-51. The United States seeks to remedy this ongoing discrimination and prevent future discrimination against students at risk of GNETS placement. *See id*. ¶¶ 52-61.

## STANDARD OF REVIEW

In deciding a motion to dismiss, a court "take[s] the factual allegations in the complaint as true and construe[s] them in the light most favorable to the plaintiffs."

3

*Edwards v. Prime Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010).  In addition, all

reasonable inferences should be drawn in favor of the plaintiff.  *See Omar ex rel.*

*Cannon v. Lindsey*, 334 F.3d 1246, 1247 (11th Cir. 2003); *Cobb Theatres III, LLC*

*v. AMC Entm't Holdings, Inc.*, 101 F. Supp. 3d 1319, 1328 (N.D. Ga. 2015).

"[T]he plaintiff must allege sufficient facts such that it is reasonable to expect that

discovery will lead to evidence supporting the claim."  *Cobb Theatres*, 101 F.

Supp. 3d at 1329 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The United

States has met this burden.

## ARGUMENT

## I. THE COMPLAINT PROPERLY ALLEGES DISCRIMINATION UNDER TITLE II.

A. The United States Correctly Pled that Georgia Violated Multiple Title II Requirements.

According to Georgia, the Complaint does not adequately plead that Georgia

"administers" the mental health and therapeutic educational services delivered

through the statewide GNETS Program within the meaning of 28 C.F.R. § 35.130.

*See* Memorandum in Support of Defendant's Renewed Motion to Dismiss, ECF

No. 47 ("Mem."), at 11-16.  Georgia relies on the language from 28 C.F.R.

§ 35.130(d), which states that a "public entity shall *administer* services, programs,

and activities in the most integrated setting appropriate to the needs of qualified

individuals with disabilities." Mem. at 11 (citing 28 C.F.R. § 35.130(d) (emphasis added)).

It is true that the United States argues that Georgia "administers" the GNETS Program in violation of Title II and its implementing regulation. *See* Section B, *infra*. However, that is not the full extent of the State's Title II liability. Other provisions of the ADA Title II regulation also are relevant when considering a State's liability. *See, e.g.*, 28 C.F.R. § 35.130(a) ("No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."); 28 C.F.R. § 35.130(b)(3) ("A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration . . . that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability[.]"). *See also* Compl. ¶¶ 15, 20, 22.

Courts have held that it is sufficient for a plaintiff to allege that the defendant "provides, administers and/or funds the existing service system" and/or that the defendant "utilized criteria or methods of administration" that lead to unnecessary segregation. *See Day v. District of Columbia*, 894 F. Supp. 2d 1, 22-23 (D.D.C. 2012), *rev'd on other grounds sub nom. Brown v. District of Columbia*,

928 F.3d 1070 (D.C. Cir. 2019).  In fact, the State can be liable under Title II for "methods of administration" that discriminate even if it is not directly operating the facilities at issue.  *See Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d 289, 317-18 (E.D.N.Y. 2009) (the State, through its "statutory and regulatory framework," may be held liable for its use of private entities to deliver services).

B. The Complaint Correctly Alleges that Georgia Administers GNETS Within the Meaning of the Title II Regulation.

The Complaint spells out myriad ways that Georgia plans, funds, manages, and oversees GNETS, and assuming arguendo, the Court were to find that the Complaint must specifically allege that Georgia "administers" GNETS, the Complaint does that.  The Georgia General Assembly has, for decades, appropriated tens of millions of dollars annually in State and federal funds to support GNETS statewide; Georgia, through the Georgia Department of Education ("GaDOE"), allocates and manages these earmarked funds.  *See* Compl. ¶ 24, 33; Ga. Comp. R. & Regs. § 160-4-7-.15(5)(a).  During the 2016-2017 fiscal year, Georgia allocated over $72 million in State and federal dollars to GNETS.  Compl. ¶ 33.  By regulation, Georgia also designates its federal IDEA, Part B funds, for services for children with serious emotional and behavioral disorders, to be spent through GNETS.  *See* Ga. Comp. R. & Regs. § 160-1-4-.49.

In addition to funding, Georgia has established rules and regulations that govern the operation of GNETS. Georgia's regulations define the Program and set the criteria for entry into and transition out of GNETS. Compl. ¶ 25. Georgia "determines which mental health and therapeutic educational services and supports to provide" through GNETS, and "who will provide such services." Compl. ¶ 24. Georgia employs centralized GNETS staff, including a statewide GNETS Director, to oversee GNETS and other statewide measures for students with behavior-related disabilities, including Positive Behavioral Interventions and Supports. *See* Compl. ¶ 25. Georgia provides training and other technical assistance to faculty and staff in GNETS. Compl. ¶ 40. And while Georgia claims to have no role in GNETS student placement, Mem. at 15, the State's GNETS Rule explicitly states that an IEP team for any student considered for placement in GNETS "will include a GNETS Director or his/her designee." Ga. Comp. R. & Regs. § 160-4-7-.15(3)(b).

A 2010 review of the GNETS Program by Georgia's Department of Audits (the "Audit") acknowledged and affirmed the State's control over the Program.[1] *See* Compl. ¶ 60. The State Audit, which found no assurance that GNETS

---

[1] Funding for GNETS moves from the Georgia State Legislature through GaDOE to Regional Education Service Agencies ("RESAs") using a state grant process that the State controls. Conditions and obligations associated with the grant process are another tool that the State uses to place conditions on the receipt of funds to administer the Program. *See* Audit at 9.

7

delivered cost-effective services to its student population, made specific recommendations as to how GaDOE could ensure that the Program met its stated purpose to serve public school students with serious emotional and behavioral disturbances. *See* Compl. ¶ 60 and cited Audit at 13, 21-22. Further, following the July 15, 2015 United States' Letter of Findings ("LOF")[2]—which detailed inferior and inadequate conditions at many Program facilities—the State demonstrated its substantial control over GNETS by closing several facilities prior to the start of the 2016-2017 school year. Compl. ¶ 50. Taken together, these allegations show that Georgia "administers" GNETS by either definition proffered by Georgia: it both "manage[s]" and is "responsible for the running of" GNETS and provides "practical management and direction" to the Program. *See* Mem. at 11-12.

Indeed, the authorities that Georgia cites hurt, rather than help, its argument that Georgia law "does not empower the State to control or manage GNETS." Mem. at 14. The Georgia Constitution, Art. 8, § 5, ¶ II, does not "mandate[] that" the "education services" at issue here "be 'maintained and controlled' by the local education agencies." Mem. at 14. The Constitution affirms that "[t]he provision of an adequate public education for the citizens shall be a primary obligation of the

---

[2] The United States incorporates by reference its LOF cited in paragraph 2 of the Complaint. Accordingly, the Court may consider the LOF at this procedural posture. *See Hoefling v. City of Miami*, 811 F. 3d 1271, 1277 (11th Cir. 2016).

State of Georgia." Art. 8, § 1, ¶ I. Also, contrary to the State's assertion that it does not provide special education services, Mem. at 13-14, the Constitution confirms that the authority is, in fact, exercised by the State. *See* Art. 8, § 5, ¶ VII(a) ("Any special schools shall be operated in conformity with regulations of the State Board of Education pursuant to provisions of law.").[3]

The Georgia Code sets forth the State's additional obligations to children with disabilities, including that the State must adopt "classification criteria for each area of special education to be served on a state-wide basis" and "the criteria used to determine eligibility of students for state funded special education programs." Ga. Code Ann. § 20-2-152(a). The State, through GaDOE and the Georgia Department of Behavioral Health and Developmental Disabilities, also is responsible for coordinating services for children experiencing "severe emotional disturbance," including those in GNETS. Ga. Code Ann. § 49-5-220(a)(6).[4]

---

[3] *Gwinnett Cty. Sch. Dist. v. Cox*, 710 S.E.2d 773, 775 (Ga. 2011), which concerns the State's authority to establish "general K-12 public education" charter schools, does not support Georgia's claim that local educational authorities have exclusive control over GNETS. Mem. at 14. On the contrary, *Gwinnett* distinguishes *general* education—which it held to be under local control for the purposes of establishing general education charter schools—from the State's authority over "special schools" for children with special needs. 710 S.E.2d at 777-79.

[4] Georgia, through its Department of Community Health, also controls the State Medicaid Program and its Early Periodic Screening, Diagnosis, and Testing ("EPSDT") program matched with federal dollars to provide community-based

Further, Georgia's regulations support the United States' allegations that Georgia has authority to administer special education services, including GNETS. Georgia, through the State Board of Education, has authority to determine whether an LEA is unable to provide services to a student with a disability and, if such a determination is made, to locate or provide such services. Ga. Comp. R. & Regs. § 160-4-7-.20(1). *Cf. Todd D. v. Andrews*, 933 F.2d 1576, 1583 (11th Cir. 1991) (concluding that Georgia has the "ultimate responsibility" for providing eligible students with disabilities an appropriate education when the LEA is "unable or unwilling to do so"). Moreover, as noted earlier, the State's GNETS Rule, which sets forth the LEA and State's duties and responsibilities, requires Georgia, through GaDOE, to, *inter alia*, (1) "receive and disburse funds appropriated by the Georgia General Assembly to support GNETS services;" (2) "develop rules and procedures regulating the operation of the GNETS grant;" and (3) "[m]onitor GNETS to ensure compliance with Federal and state policies, procedures, rules, and the delivery of appropriate instructional and therapeutic services." Ga. Comp. R. & Regs. § 160-4-7-.15(5)(a).

---

health care to eligible children, including an array of mental health services appropriate for children receiving services and supports through GNETS. Compl. ¶ 27. A large percentage of GNETS students are Medicaid-eligible and participate in the EPSDT program. *See* LOF at 19 (noting that, in 2013, 83% of all students in GNETS were enrolled in Medicaid).

Georgia downplays the State's obligations by focusing on the additional roles and responsibilities of the LEA.  Mem. at 13-16.  However, state law makes clear that Georgia offers a statewide program of education, and that program is currently designed to provide the education for many students with disabilities in the highly segregated and inferior GNETS.

Georgia's reliance on *Bacon v. City of Richmond*, 475 F.3d 633, 638 (4th Cir. 2007), is misplaced.  Mem. at 15-16.  In *Bacon,* the Fourth Circuit ruled that the City of Richmond was not obligated to fund the remedies under a consent decree in a Title II action absent proof "the City had in any way discriminated against plaintiffs."  475 F.3d at 639.  Although the City provided funding to the district and had legal title to the school buildings, the Court observed that the City did not "exercise any control over challenged services and activities."  *Id.* at 643. The Court found Title II "cannot be read to impose strict liability on public entities that neither caused plaintiffs to be excluded nor discriminated against them."  *Id*. at 639-40.  Here, the United States alleges that Georgia is liable under Title II because Georgia itself has discriminated against students with disabilities by creating and administering a service delivery system that unnecessarily segregates them from their non-disabled peers.  The United States has pleaded ample factual allegations that, if taken as true and construed in the light most favorable to the

United States, demonstrate that Georgia "exercises control" over the services at issue and is centrally involved in planning, funding, managing, regulating, and overseeing the GNETS Program.

    C. <u>The Complaint States a Claim for Violation of Title II's Integration Mandate.</u>

Georgia argues that the Complaint is deficient because it fails to state a claim for violation of the integration mandate in Title II of the ADA. *See* 28 C.F.R. § 35.130(d). Specifically, Georgia argues that, per *Olmstead*, the Complaint fails to allege (1) whether state professionals have determined community placement is appropriate, and (2) whether the individual does not oppose community placement. Mem. at 17-20. Not only are Georgia's allegations wrong, Georgia also misconstrues Title II's integration mandate and *Olmstead*'s interpretation of it.

First, the Complaint does not need to allege that "the State's treatment professionals have determined that the general education setting is appropriate" to state a claim for a violation of Title II's integration mandate. The Court in *Olmstead* "did not hold that such a determination [by a State professional] was required to state a claim" and many "lower courts have universally rejected th[is] absolutist interpretation." *Day*, 894 F. Supp. 2d at 23. *See, e.g.*, *Frederick L. v. Dep't of Pub. Welfare*, 157 F. Supp. 2d 509, 540 (E.D. Pa. 2001) ("[The court]

do[es] not read *Olmstead* to require a formal 'recommendation' for community placement…."); *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 291 (E.D.N.Y. 2008); *Disability Advocates, Inc. v. Paterson*, 653 F. Supp. 2d 184, 258-59 (E.D.N.Y. 2009), *vacated on other grounds*, 675 F.3d 149 (2d Cir. 2012); *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1318 n.8 (W.D. Wash. 2015); *M.J. v. District of Columbia*, 2019 WL 3344459, at *8 (D.D.C. July 25, 2019).

Nevertheless, the Complaint *does allege* that public school children with disabilities in GNETS could appropriately be served in general education classrooms and other more integrated settings. *See* Compl. ¶¶ 37-43, 62. This allegation is further supported by the LOF, *see* Compl. ¶ 2, issued after the United States' investigation of the GNETS Program. The letter details numerous findings by experts, including that "students with behavior-related disabilities who are placed in segregated settings in the GNETS Program would benefit from the general education setting." Compl. ¶ 2 and cited LOF at 11.

Georgia further alleges that because IEP teams have purportedly assessed these students pursuant to the IDEA and determined them to require the services provided in GNETS, these students categorically cannot be determined appropriate for more integrated services. *See* Mem. at 17-18. But this misses the point. As explained above, Georgia chooses to deliver mental health and therapeutic

educational services through GNETS, and it chooses to offer these services primarily in segregated settings. *See* Compl. ¶¶ 37-39. In doing so, Georgia incentivizes IEP Teams to rely unnecessarily on the segregated GNETS Program to provide special education and related services because often this is the only manner by which Georgia makes these services available. This dynamic, created by Georgia, does not absolve Georgia of its ADA obligations to avoid operating a service delivery system that segregates, and thus discriminates against, thousands of students with behavior-related disabilities.

Second, Georgia also wrongly asserts that the United States has failed to adequately allege that students or their guardians do not oppose services in more integrated settings. Mem. at 19-20. The Complaint, in fact, states that "[t]he majority of students in the GNETS Program would not oppose receiving mental health and therapeutic educational services and supports in a more integrated setting." Compl. ¶ 46. *See also id.* ¶ 62. In its investigation, the United States met with families who "returned from or avoided placement in the GNETS Program" and other parents who felt "'pushed' or 'forced'" into the GNETS Program. *See* Compl. ¶ 2 and cited LOF at 11-13.

In addition, the United States' allegations, which must be taken as true for the purposes of the instant motion, clearly support a claim for violation of the

14

ADA's integration mandate. *See Joseph S.*, 561 F. Supp. 2d at 292. Importantly, *Olmstead* was at a different procedural posture—on appeal from a motion for summary judgment rather than, as here, at the motion to dismiss stage. While the *Olmstead* Court was introduced to specific facts regarding findings by treatment professionals or an individual's opposition to placement, such facts would not yet be at issue here as only "a complaint with enough factual matter (taken as true) to suggest [a defendant is liable]" is required at this stage of litigation. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). This standard is undoubtedly met here. *See M.J.*, 2019 WL 3344459, at *7 ("*At this stage of the litigation*, allegations that defendants failed to provide mandated services . . ., are sufficient to state a claim of discrimination under *Olmstead*.") (emphasis added).

## II.   THE IDEA DOES NOT SHIELD GEORGIA FROM LIABILITY UNDER THE ADA.

Georgia misconstrues the United States' ADA claim by attempting to reduce it to a series of individualized disputes over whether students with disabilities are educated in settings that meet the IDEA's "least restrictive environment" ("LRE") requirement and are ultimately guaranteed a Free Appropriate Public Education ("FAPE"). Mem. at 20-23. Additionally, Georgia fails to acknowledge binding, relevant Supreme Court and Eleventh Circuit precedent which demonstrates that

Georgia is incorrect in asserting that its purported compliance with the IDEA somehow satisfies Georgia's independent obligation under the ADA not to discriminate in violation of Title II's integration mandate.  It also wrongly asserts that the United States must exhaust the IDEA's administrative due process procedures before pursuing its ADA claims.[5]  *Id.*

The United States' allegations are in no way bound up in the IDEA; the United States alleges that Georgia violates the ADA in a systemic manner by choosing to fund and operate a statewide service delivery system through which it primarily offers mental health and therapeutic educational services in overwhelmingly segregated settings, denying thousands of students with behavior-related disabilities the opportunity to attend schools in the most integrated setting appropriate to their needs.  This ADA claim is distinct and independent of a claim challenging a school district's compliance with IDEA's LRE requirement for individual students.  Nothing in the United States' Complaint purports to limit or

---

[5] Georgia contends that *United States v. Arkansas*, 794 F. Supp. 2d 935 (E.D. Ark. 2011), is "particularly instructive," Mem. at 22, but that case provides no guidance in determining the relationship between the ADA and the IDEA. There, the Court adjudicated two distinct claims brought by the United States under 42 U.S.C. § 1997 on behalf of institutionalized persons: an ADA claim that Arkansas failed to deliver services in the most integrated setting appropriate, and an IDEA claim that Arkansas failed to provide these individuals FAPE.

change local LEA process or procedures pursuant to the IDEA to make evaluations in individual cases.  This case is about the State's Title II responsibility to avoid designing, funding, or operating programs like GNETS in a way that segregates students with disabilities who can be served in general education settings.

Georgia's brief failed to mention critical, binding precedent that speaks directly to the distinct, but complementary, purposes, standards, and obligations that the IDEA and ADA impose in the realm of public education.  In 2017, the Supreme Court in *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 746 (2017), specifically addressed the rights of parents of a child with disabilities to bring an ADA discrimination claim arising in the education context.

In *Fry*, the Supreme Court made clear that Title II of the ADA covers children with disabilities in public schools, stating that "[i]mportant as the IDEA is for children with disabilities, it is not the only federal statute protecting their interests." *Id.* at 749.  The Court's analysis is centered on 20 U.S.C. § 1415(*l*) of the IDEA, which states that nothing in the IDEA "restrict[s] or limit[s] the rights [or] remedies" that other federal laws, including the ADA, confer on children with disabilities.  *Id*. at 750.  The Court explained that "the IDEA guarantees individually tailored educational services, while Title II . . . promise[s] non-discriminatory access to public institutions." *Id.* at 756.  Ultimately, the Court held

that a plaintiff has a right to file an ADA lawsuit in federal court alleging disability

discrimination in a public education setting without exhausting the procedures in

the IDEA if "the remedy sought is not for the denial of a FAPE."  *Id.* at 754.

In this suit, the United States seeks a reasonable modification to the GNETS

Program through which it serves thousands of public school students with

emotional and behavioral disorders in primarily segregated settings.  The United

States is not making any individualized claim about any particular student's receipt

of FAPE; this is a claim against the State of systemic discrimination in violation of

Title II's integration mandate.

In *J.S. v. Houston Cty. Bd. of Educ.*, 877 F.3d 979, 986 (11th Cir. 2017), the

Eleventh Circuit applied *Fry* specifically to address allegations that a public school

student with a disability faced unjustified isolation in his elementary school.  The

Eleventh Circuit acknowledged the applicability of *Olmstead* to unjustified

segregation in public education, stating that a complaint that alleges that a student

was "excluded and isolated from his classroom and peers on the basis of his

disability . . . implicate[s] those further, intangible consequences of discrimination

contemplated in *Olmstead* that could result from isolation, such as stigmatization

and deprivation of opportunities for enriching interaction with fellow students."

*Id.* at 986-87.  In *J.S.*, the Eleventh Circuit ruled that such an allegation of

18

unnecessary segregation in public education adequately states a claim of disability

discrimination under Title II, regardless of whether such allegations may also

implicate the IDEA. *Id.*

Without so much as acknowledging to this Court that the Eleventh Circuit in

*J.S.* explicitly affirms Plaintiff's right to pursue unjustified segregation in public

education under the ADA, Georgia suggests that the United States seeks to usurp

or supplant the IEP process and has filed suit under the ADA to bypass the

administrative requirements of the IDEA. This is not so. The United States'

claims do not interfere in any way with IDEA enforcement. IEP Teams can and

must continue to individually assess students to determine their LRE and ensure

their receipt of FAPE. This lawsuit is not focused on individual students; instead,

the United States argues that Georgia created, funds, and operates a service

delivery system by which it provides mental health and therapeutic educational

services to thousands of students with behavior-related disabilities in an overall

manner that causes unnecessary segregation and places other students at risk of

such segregation. Compl. ¶¶ 37-43.

Georgia argues that "[t]he GNETS program is a means by which the State

complies with IDEA." Mem. at 4. Many other states across this country comply

with the IDEA without funneling tens of millions of dollars into and asserting

operative control over a program that provides services to students with disabilities primarily in segregated settings.  As Georgia points out, it chose to undertake the provision of these services, Mem. at 4, and it could have done so primarily in integrated educational settings; instead, Georgia primarily relies on segregated GNETS settings to provide those services.  Compl. ¶ 39.  Georgia also fails to provide adequate training to general education teachers on how to support students with behavior-related disabilities in integrated settings and has, instead, focused its training and resources on personnel in the largely segregated GNETS Program.  Compl. ¶ 40.  By remedying the alleged Title II violations, Georgia would, *inter alia,* be able to provide IEP Teams with a wider array of appropriate mental health and therapeutic educational services.

Georgia's assertion that the United States must somehow follow the IDEA's administrative exhaustion procedures before pursuing its ADA claim contradicts the plain terms of the IDEA.  The IDEA requires administrative exhaustion by private litigants before filing suit under the IDEA, the ADA, Section 504, certain other statutes, or the Constitution when the civil suit is "seeking relief that is also available under [the IDEA]."  20 U.S.C. §§ 1415(*l*), (f)-(h).  Notably, the exhaustion requirement applies only to parents and children and to LEAs, SEAs, or state agencies that are directly responsible for providing a child a FAPE; it does

not apply to the United States.  *See* 20 U.S.C. §§ 1415(b)(6)-(7), (c), (e)-(g), and

(*l*).  Georgia fails to proffer any authority to the contrary and, in fact, correctly

asserts that a "*parent*" must exhaust before pursuing relief available under the

IDEA.  Mem. at 20.

## III.   THE UNITED STATES SEEKS PERMISSIBLE RELIEF.

Contrary to Georgia's assertions, Mem. at 23, the United States is seeking

relief that the Court may grant.  The sole case relied upon by the State in support of

its contention that the United States may not sue for judicial enforcement of a

statute, *Elend v. Basham*, 471 F.3d 1199 (11th Cir. 2006), does not stand for such a

broad proposition.  In *Elend*, plaintiffs alleged that their First Amendment rights

had been infringed at a specific event and sought an injunction against "any further

constitutional violations."  *Elend*, 471 F.3d at 1203.  The Court denied the request

"involv[ing] the possibility of wholly prospective future injury."  *Id*. at 1205.

Significantly, the Court distinguished cases involving "a concrete, *ongoing* injury."

*Id*. at 1209 (emphasis in original) (*citing Florida PIRG v. E.P.A.*, 386 F.3d 1070,

1083 (11th Cir. 2004)).

Unlike the ambiguous complaint in *Elend* that amounted to a request for an

order that defendants obey the law, the United States sets forth specific remedies

that it seeks in order to bring the State into compliance with Title II.  *See* Compl.

¶¶ 52-61, Prayer for Relief ¶ C.  The Complaint describes the kinds of changes that would allow Georgia to ensure that children with disabilities currently served primarily in segregated GNETS settings are appropriately served in the most integrated setting appropriate.  Thus, the declaratory and injunctive relief sought here is not an "obey-the-law" injunction.  *See, e.g.*, *Florida PIRG*, 386 F.3d 1070.

## IV.    THE ATTORNEY GENERAL MAY BRING SUIT UNDER TITLE II.

For nearly three decades, the Attorney General has investigated violations of Title II's prohibition against discrimination, achieving compliance through negotiations where possible and bringing enforcement actions when necessary.  In doing so, the United States has obtained relief benefiting countless individuals with disabilities to ensure access to and equality of opportunity in the core public services provided by state and local government entities nationwide.  Courts have long recognized the Attorney General's authority to obtain this relief.

The State, relying on a single decision, *C.V. v. Dudek*, 209 F. Supp. 3d. 1279 (S.D. Fla. 2016) ("*Dudek*"),[6] sought to dismiss this case in its original motion on

---

[6] Since the ADA's enactment, no other court has ruled that the federal government lacks enforcement authority under Title II.  Even a prior judge in *Dudek* ruled the other way, rejecting the challenge to the Attorney General's authority to enforce Title II.  *A.R. ex rel. Root v. Dudek*, 31 F. Supp. 3d 1363, 1367 (S.D. Fla. 2014) (Rosenbaum, J.).

the ground that the Attorney General "lacks standing to bring claims under Title II." *See* Memorandum of Law in Support of Motion to Dismiss, ECF No. 9 at 1, 9-12. As this Court is aware, the Eleventh Circuit Court of Appeals, in a well-reasoned opinion, recently reversed the district's court ruling in *Dudek* and held that the United States has authority to enforce Title II of the ADA. *United States v. Florida*, 938 F.3d at 1250. In setting forth the basis for its decision, the Eleventh Circuit ruled:

> When Congress chose to designate the "remedies, procedures, and rights" in § 505 of the Rehabilitation Act, which in turn adopted Title VI, as the enforcement provision for Title II of the ADA, Congress created a system of federal enforcement. The express statutory language in Title II adopts federal statutes that use a remedial structure based on investigation of complaints, compliance reviews, negotiation to achieve voluntary compliance, and ultimately enforcement through "any other means authorized by law" in the event of noncompliance. In the other referenced statutes, the Attorney General may sue. The same is true here.

*Id.*[7]

Georgia now argues, as an alternative to dismissal, that the Court should stay this lawsuit a *second* time pending a final determination on the State of Florida's petition for rehearing *en banc* by the Eleventh Circuit. Well-settled case law

---

[7] In addition to relying on this Eleventh Circuit decision, the United States incorporates its original response in opposition to Defendant's Motion to Dismiss, ECF. No. 16, in this brief to preserve its argument that the Attorney General has authority to sue under Title II.

makes clear that Georgia bears a heavy burden to justify another stay pending future proceedings, of indefinite duration, in another case. *See Landis v. N. Amer. Co.*, 299 U.S. 248, 255-56 (1936). Courts have rejected as an abuse of discretion an indefinite stay pending an appeal to be heard at an unspecified future time. *See Landis*, 299 U.S. at 257 (vacating stay pending potential appeals as "immoderate and hence unlawful"); *Ortega Trujillo v. Conover & Co. Comm., Inc.*, 221 F.3d 1262, 1264 (11th Cir. 2000).

Georgia has not carried its burden to continue the stay here. *En banc* consideration of an appeal is "an extraordinary procedure." 11TH CIR. R. 35-3. Georgia has no basis for assuming that the petition for rehearing *en banc* will be granted, especially given that the Eleventh Circuit reached the same conclusion— that Title II authorizes the Attorney General to sue—as has every other court to have considered the issue. *See United States v. Florida*, 938 F.3d at 1246-1248. Even if granted, Georgia cannot proffer when the appeal would be reheard, much less decided.

Finally, Georgia fails to mention, much less address, the "damage" an indefinite stay "will work on someone else"—specifically, those thousands of students with behavior-related disabilities in GNETS who have already waited more than two years for relief due to the initial stay. *See Landis*, 299 U.S. at 256.

With each passing school year, these students continue to endure unnecessary segregation and unequal educational opportunities, and many other students face serious risk of the same fate.  For the students who are aging out of the system each year that the case is stayed, relief may already be too late.  When balancing the gravity of the harm faced by these students against any inconvenience associated with initiating the discovery process, Georgia has not established its need for another stay.  *See Ortega Trujillo*, 221 F.3d at 1265.

## CONCLUSION

For the foregoing reasons, the Court should deny Georgia's motion to dismiss and deny its alternative request for a stay.

Dated:  November 20, 2019

Respectfully submitted:

BYUNG J. PAK
United States Attorney
600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303

/s/ Aileen Bell Hughes
AILEEN BELL HUGHES
GA Bar Number: 375505
Assistant United States Attorney
United States Department of Justice
Richard B. Russell Federal Building
75 Ted Turner Dr. SW
Suite 600
Atlanta, GA 30303-3309
(404) 581.6000
aileen.bell.hughes@usdoj.gov

ERIC S. DREIBAND
Assistant Attorney General

GREGORY B. FRIEL
Deputy Assistant Attorney General

SHAHEENA A. SIMONS
Chief
Educational Opportunities Section

RENEE M.WOHLENHAUS
Deputy Chief
Educational Opportunities Section

ANDREA E. HAMILTON
VICTORIA M. LILL
LAURA C. TAYLOE
MICHELLE L. TUCKER
Trial Attorneys
United States Department of Justice
Civil Rights Division


/s/ Andrea E. Hamilton
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-4092
andrea.hamilton@usdoj.gov

## **L.R. 7.1(D) CERTIFICATION**

I certify that this brief has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C). Specifically, this brief has been prepared using 14-pt Times New Roman Font.

*/s/ Aileen Bell Hughes*
AILEEN BELL HUGHES
ASSISTANT U.S. ATTORNEY

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day filed the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sent counsel of record e-mail notification of such filing.

This 20th day of November, 2019.

*/s/ Aileen Bell Hughes*
AILEEN BELL HUGHES
ASSISTANT U.S. ATTORNEY