# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

The Georgia Advocacy Office, et al.,

                 Plaintiffs,

v.

State of Georgia, et al.,

                 Defendants.

_____/

Case No. 1:17-cv-03999

Michael L. Brown
United States District Judge

## <u>ORDER</u>

Advocacy organizations for individuals with disabilities sued the State of Georgia and public officials in Georgia for violating Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("ADA"); Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and the Equal Protection Clause of the Fourteenth Amendment. (Dkt. 1.) Defendants moved to dismiss. (Dkt. 46.) The Court denies Defendants' motion.

## I.    Background

Georgia sends some students with learning disabilities to classrooms specifically designed for their needs. This program is called

the Georgia Network for Educational and Therapeutic Services ("GNETS") Program. Plaintiffs allege GNETS unnecessarily removes students from general education classrooms, leading to stigmatization and a poor education. Plaintiffs seek relief under the ADA, Section 504 of the Rehabilitation Act of 1973, and the 14th Amendment of the U.S. Constitution.[1]

## A.    Overview and Selection into GNETS

GNETS is a state program designed for students between ages three and twenty-one with behavioral needs. (Dkt. 1 ¶ 2.) Through this program, students attend separate classrooms and schools designed to meet their needs. (*Id.* ¶ 5); Ga. Comp. R. & Regs. § 160-4-7-.15(1). The State of Georgia establishes the criteria for placing students in GNETS. (Dkt. 1 ¶ 4.) Originally designed for students with Emotional Behavioral Disorder, the program now extends to students unable to succeed in the traditional classroom because of their behavior. *See* Ga. Comp. R. & Regs. § 160-4-7-.15(2)(a) (stating GNETS includes "students with disabilities" who "exhibit intense social, emotional and/or behavioral

---

[1] The Department of Justice wrote Governor Deal, seeking a settlement that would entail ADA compliance. (Dkt. 48-2.) The DOJ then sued the state, *United States v. Georgia*, 16-cv-03088-ELR (N.D. Ga. 2016).

challenges with a severity, frequency, or duration such that the provision
of education and related services in the general education environment
has not enabled him or her to benefit educationally based on the IEP");
(Dkt. 1 ¶ 86.)

Individual Education Plan ("IEP") Teams determine a student's
eligibility for GNETS. Ga. Comp. R. & Regs. §§ 160-4-7-.15(3)(a), 4(a),
5(b). An IEP Team is a group including the child's parents, a regular
education teacher, a special education teacher, and a representative of
the Local Education Association. *Id.* §§ 160-4-7-.06(5)(a)–(g). Before the
IEP team places a student in GNETS, the IEP team must show the school
has tried intermediate steps — called Less Restrictive Placements — and
those steps did not work. *Id.* § 160-4-7.15(3); Ga. SBOE R. 160. The IEP
team then determines what the student needs to meet the federal
baseline standard for the student's education, called a Free and
Appropriate Public Education ("FAPE"). Ga. SBOE R. 160-4-7.06. The
IEP team next determines where the child can get a FAPE. For instance,
the student may succeed with more support (like particularized teaching
strategies or constant personal adult supervision) in the classroom or
with part of the day in a different classroom. The most restrictive setting

3

is residential placement, which places students in a residential program. *See* Ga. Comp R. & Regs. 160-4-7.15(2)(a). GNETS, essentially a separate school, is an intermediate option before residential placement and after traditional classroom options. *Id.*

## B. Control of GNETS

Georgia's Constitution grants authority "to county and area boards of education to establish and maintain public schools within their limits." Ga. Const. Art. VIII, Sec. V. (1983). The State, however, has some control over GNETS through its duty to create regulations and fund the program. For instance, the Georgia Department of Education ("GDOE") passes regulations on GNETS' operation. *See* Ga. Comp. R. & Regs. 160-4-7.15. The GDOE also grants GNETS funding to local fiscal agents. *See* Ga. Comp. R. & Regs. 160-1-4.286. These fiscal agents are not state agencies. *See* Ga. Code Ann. § 20-2-270. The GDOE uses its discretion in evaluating each GNETS funding application. *See* Ga. Comp. R. & Regs. 160-1-4.286.

## C. Alleged Problems with GNETS

Broadly, the complaint claims GNETS stigmatizes students and provides them an inadequate education. Plaintiffs allege GNETS

classrooms lack access to libraries, cafeterias, gyms, science labs, music rooms, or playgrounds. (Dkt. 1 ¶ 94.) The instruction is not rigorous; much of it happens on computers, not through teachers. (*Id.* ¶¶ 100–105.) And electives are sparse. (*Id.* ¶ 105.) GNETS teachers and support staff often physically restrain students to control their behavior. (*Id.* ¶ 109.)

GNETS is also stigmatizing. (*Id.* ¶ 90.) GNETS students enter the building in separate entrances when their classroom is in a zoned school. (*Id.* ¶ 97.) Otherwise GNETS classrooms are in different buildings, separating GNETS students from other children. (*Id.* ¶ 5.) Families feel they must consent to these requirements because school officials tell them GNETS is the only way their children can get an education. (*Id.* ¶ 114.)

During the 2016 school year, GNETS served about 5,256 students from school districts across Georgia. (*Id.* ¶¶ 3, 77.) Only ten percent of the students graduate, two-thirds of which receive a special education diploma. (*Id.* ¶ 107.)

## II.   Standard of Review

A court may dismiss a pleading for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999).

## III.  Discussion

### A.   GNETS' Administration

"Title II of the ADA and § 504 of the Rehabilitation Act forbid discrimination on the basis of disability in the provision of public services." *J.S., III by & through J.S. Jr. v. Houston Cty. Bd. of Educ.,* 877 F.3d 979, 985 (11th Cir. 2017).  Under Title II, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any

6

such entity." 42 U.S.C. § 12132. Under § 504, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. The same standards govern discrimination claims under the ADA and the Rehabilitation Act. *See Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000).

To prevail against the State under Title II of the ADA, Plaintiffs must show that they were qualified individuals who, as a result of their disabilities, were either excluded from participation in or denied the benefits of a program or activity offered by the State or subjected to discrimination by the State. Title II's implementing regulation, 28 C.F.R. § 35.130(d), provides that "a public entity shall *administer* services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities" (emphasis added). Defendants moved to dismiss Plaintiffs' Title II ADA claim in Count I on the grounds that the State does not "administer" the GNETS program.

(Dkt. 46-1 at 7.)[2]  Whether the State "administers" GNETS turns out to be a difficult question.

The Court starts by looking to Georgia's constitutional and statutory structure.  Georgia's Constitution grants authority "to county and area boards of education to establish and maintain public schools within their limits."  Ga. Const. Art. 8 § V ¶ 1.  This provision "embodies the fundamental principle of exclusive local control of general primary and secondary ('K–12') public education." *Gwinnett Cty. Sch. Dist. v. Cox*, 710 S.E.2d 773, 775 (Ga. 2011).  The Georgia Supreme Court has explained this as a fundamental choice by the State to empower those closest to the children with the authority to control their education:

> By providing for local boards of education to have exclusive control over general K–12 schools, our constitutions, past and present, have limited governmental authority over the public

---

[2] Plaintiffs' ADA claim focuses on other implementing regulations as well.  Plaintiffs also claim Defendants violated Title II of the ADA, *inter alia*, by denying Plaintiffs the opportunity to participate in and benefit from educational services equal to that afforded other students in violation of 28 C.F.R. § 35.130(b)(1)(ii) and by denying Plaintiffs services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other students in violation of 28 C.F.R. § 35.130(b)(1)(iii). (Dkt. 1 at ¶¶ 158(i) and (iii).  Defendants failed to address these allegations in their motion to dismiss, focusing only on the "administers" portion of the regulation.  (Dkt. 48 at 4-5.)  This provides another basis for denying Plaintiff's motion to dismiss Count I.

education of Georgia's children to that level of government closest and most responsive to the taxpayers and parents of the children being educated. The constitutional history of Georgia could not be more clear that, as to general K–12 public education, local boards of education have the exclusive authority to fulfill one of the "primary obligation[s] of the State of Georgia," namely, "[t]he provision of an adequate public education for the citizens." Art. VIII, Sec. I, Par. I.

*Id.* at 776.

Building on this, the Georgia Code requires Local Education Associations to "provide" special education services and administer K–12 education generally. Ga. Code Ann. §§ 20-2-152(b) (special education), 20-2-50 (LEAs). GNETS is part of the special education services. Ga. Comp. R. & Regs. § 160-4-7-.15. The State has a limited role in special education, consisting of (1) operating three schools not at issue; (2) establishing GNETS eligibility criteria; and (3) providing funding for GNETS services. Ga. Code Ann. §§ 20-2-152(a) and 20-2-152(c)(1). The State's GNETS grants are general, giving local fiscal agents flexibility. *Id.* § 20-2-152(C)(1)(A); *see also* Ga. Comp. R. & Regs. § 160-4-7-.15(5)(a). Local school districts, through their IEP Teams, also decide whether individual students meet GNETS admission criteria. *Id.* § 160-4-7-.15(3)(a), 4(a), 5(b).

The State does, however, have some authority over GNETS.  The SBOE can "receive and disburse [GNETS] funds." *Id.* § 160-4-7-.15(5)(a). It can also "[a]dminister the funds by . . . develop[ing] rules and procedures regulating the operation of the GNETS grant," "notify[ing] the fiscal agents regarding each fiscal year's allocation," and "[m]onitor[ing] GNETS to ensure compliance with Federal and state policies, procedures, rules and the delivery of appropriate instructional and therapeutic services." *Id.*  The State Board of Education has the authority to determine whether a local educational authority is incapable of serving a student with a disability.  *Id.* § 160-4-7-.20(1)(b).  The State Board of Education also creates "classification criteria for each area of special education to be served on a state-wide basis" and "the criteria used to determine eligibility of students for state funded special education programs."  Ga. Code Ann. § 20-2-152(a).

Distilled down, on the one hand, local governmental authorities run individual GNETS schools and place students in GNETS.  On the other hand, the State funds GNETS and develops rules and procedures and then ensures GNETS complies with those rules and procedures.  All of this — of course — must be considered in the light of the State's strongly

held commitment to ensuring that local boards of education have the "exclusive authority" to provide an adequate public education. Nothing in the statutes or regulations suggest the State of Georgia intended to create GNETS outside of this construct or to limit the local school boards' exclusive authority to educate students. The regulations seem to heed the well-established rule that the local boards of education offer educational benefits to Georgia's children. But, the regulations allow the State some oversight, including to ensure compliance with federal and state law.

The Court next determines how broadly to read the term "administer" — a word used in the implementing regulations for both the ADA and the Rehabilitation Act. Neither statute defines that term, so the Court starts with the word's plain meaning. The Oxford English Dictionary defines "administer" as to "manage and be responsible for the running of." *Administration*, Oxford Dictionary of the English Language (3d Ed. 2010). Black's Law Dictionary defines it, in the public law context, as "practical management and direction." *Administration*, Black's Law Dictionary (7th ed. 1999). This suggests the statutes only apply to the entity that manages and is responsible for the running of the

11

GNETS program.  Here that would be the local boards of education, not the State of Georgia.  Indeed, a conclusion that the State administers GNETS would seem antithetical to Georgia's decision to vest local boards of education with responsibility for and authority to educate the State's children.

The Court next looks to three cases the parties cited and that examined whether a public entity administered a public program: (1) *Bacon v. City of Richmond*, 475 F.3d 633 (4th Cir. 2007); (2) *Day v. District of Columbia*, 894 F. Supp. 2d 1 (D.D.C. 2012); and (3) *Disability Advocates, Inc. v. Paterson*, 653 F. Supp. 2d 184 (E.D.N.Y. 2009), *vacated sub nom. Disability Advocates, Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149 (2d Cir. 2012).

In *Bacon*, the plaintiffs (disabled school children and their families) sued Richmond's school board and the city under the ADA claiming the city's schools had inadequate handicapped access.  475 F.3d 633.  After the school board settled and agreed to modify the schools, the district court granted plaintiff's motion for summary judgment against the City of Richmond, ordering it to pay for necessary modifications.  *Id.* at 637.  In doing so, the district court refused to consider whether the City

excluded plaintiffs from the benefits of services or programs — the operative words of the statute. Instead, the district court held that, because the City funded the schools, it was liable under the ADA and that "evidence neither of fault nor of discrimination was necessary to obtain equitable remedies under the ADA." *Id.* (internal quotations omitted). The Fourth Circuit reversed. In doing so, it noted that the school board had "exclusive control" over the schools' day-to-day operation. *Id.* at 640–42. The Court of Appeals recognized that the statute imposes liability on an entity for depriving a plaintiff of rights guaranteed by the ADA, not merely for funding a benefits program:

> [T]o make funding entities responsible for the statutory violations of funding recipients would stretch the contours of Title II. . . . [T]he plain text of Title II limits responsibility to public entities that discriminate against or exclude persons with disabilities from the services, programs, or activities administered by the entity.

*Id.* at 642. Applying that logic here, the State would not be liable merely because it funds GNETS or even because it has responsibility for oversight. The local school boards provide GNETS services and are responsible for any deprivation of rights guaranteed by the Title II of the ADA.

13

In *Day*, disability advocacy organizations alleged the District of Columbia unnecessarily institutionalized individuals with disabilities in state nursing facilities.  894 F. Supp. 2d 1.  The nursing facilities were both public and private, though the city funded the care of individuals in the private nursing homes.  *Id*.  The *Day* court found that to bring an ADA claim the plaintiffs did not need to allege the District "caused" individuals' placement in a nursing facility.  *Id*. at 22.  That is, the plaintiffs did not have to allege the District made the decision to place them into a nursing facility.  Instead, the plaintiffs had to allege a "causal connection" between their injury and the state's conduct.[3]  *Id*.  The court found the plaintiffs met their burden of pleading an ADA or Rehabilitation Act claim by alleging the District "provides, administers, and/or funds the existing service system . . . and/or that the District, in

---

[3] The Court also notes that the *Day* court took this "causal connection" language from the requirements for Article III standing.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (finding Article III standing requires "a causal connection between the injury and the conduct complained of," meaning "the injury [is] fairly traceable to the challenged action of the defendant").  The *Bacon* court also based its analysis of "administer" upon the connection between an injury and a public entity's action.  475 F.3d 639 ("To impose responsibility in the absence of fault and causation would stretch the law of remedies beyond limit.").

so doing, has utilized criteria or methods of administration that have caused [plaintiffs] to be confined unnecessarily in nursing facilities." *Id.* The court noted the complaint alleged the District had complete control of the facilities' funding and denied the District's motion to dismiss. It is hard to understand where the *Day* court got the "and/or funds" language as the relevant implementing regulations use the terms "administer," "provide," and "utilize," which mean something different than mere funding. Neither the statute nor the implementing regulations suggest a public entity may be liable under Title II of the ADA merely because it funds a program, and the Court is not inclined to read such liability into the regulation.[4]

---

[4] The *Day* court cited several decisions in support of its use of the term "fund." In those cases, however, the courts found that the defendants administered ***and*** funded the programs at issue. *See e.g. Conn. Off. of Prot. & Advocacy v. Connecticut,* 706 F. Supp. 2d 266, 276–77, 284 (D. Conn. 2010) ("The statutory and regulatory framework governing the administration, funding, and oversight of New York's mental health services-including the allocation of State resources for the housing programs at issue here-involves 'administration' on the part of Defendants.") and *Disability Advocates, Inc. v. Paterson,* 598 F. Supp. 2d 289, 319 (E.D.N.Y. 2009) (plaintiffs stated integration claim against State officials even though "State officials do not require anyone to be in an adult home," because the "[d]efendants plan, fund and administer the State's existing service system"). In neither case did the court conclude that funding alone would be enough. The only authority the *Day* court cited to support such a conclusion was the "Statement of Department of

In *Paterson*, an advocacy organization sued New York State on behalf of adults with mental illness who lived in state-licensed adult homes. 653 F. Supp. 2d 184. The advocacy organization alleged the adult homes violated the ADA's integration mandate by unnecessarily institutionalizing adults with mental illness. *Id.* The court found that New York's statutory and regulatory framework led to individuals with mental illness living and receiving services in private segregated settings. *Id.* at 277. New York's relevant state regulations, in contrast to the case here, specifically required the State of New York to "administer the State's mental health service system, plan the settings in which mental health services are provided, and allocate resources within the mental health service system." *Id.* at 188.

From these cases, the Court draws principles to determine whether an entity "administered" a government program. First, and most directly, the Court looks to whether the public entity made decisions that led to segregation. Second, funding a program alone is not

---

Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* (2011)." The Court does not find the Department's own interpretation of a statute it seeks to enforce controlling or even very compelling, particularly when it appears to expand the plain language of the implementing regulation and statute.

administration.  Third, a state's statutory structure informs whether the state administers the program.  Fourth, the state need not have made the direct decisions that led to the discrimination, as using criteria that leads to discrimination sufficiently forms a causal connection.  Last, the level of control the public entity has informs whether a plaintiff has shown a causal connection.

Applying these principles, some of Plaintiffs' claims do not show administration. For instance, broad supervision or funding of GNETS does not constitute administration.  (*See, e.g.,* Dkt. 1 ¶ 91 ("By creating and maintaining segregated educational placements, the State has allowed and encouraged local school districts to avoid educating and supporting students with disabilities."); ¶ 79 ("The State funds, maintains, coordinates, and is generally responsible for the operations of GNETS.").)  These allegations might represent a similar level of control to New York's responsibility in *Paterson*.  Georgia's constitutional and statutory structure, however, grant the State of Georgia less power over GNETS than New York law granted the State of New York over its mental health system.  *See Paterson*, 653 F. Supp. 2d at 188.  Similarly, the allegations that claim the state encourages GNETS through its

17

funding scheme are not enough.  (*See, e.g.,* Dkt. 1 ¶ 79.)  Indeed, the funding grants preserve the flexibility of local fiscal bodies to make decisions. *See* Ga. Code Ann. § 20-2-152(C)(1)(A); *see also* Ga. Comp. R. & Regs. § 160-4-7-.15(5)(a).

Still, discovery might show the State administers GNETS.  For instance, Plaintiffs allege the State School Superintendent "is responsible for . . . developing rules and procedures regulating the operation of the GNETS grant" and "monitoring GNETS to ensure compliance with Federal and state policies, procedures, rules and the delivery of appropriate instructional and therapeutic services."  (Dkt. 1 ¶ 42); Ga. Comp. R. & Regs. § 160-4-7.15(5)(a).  Accepted as true, these allegations suggest the State made decisions that would constitute administering GNETS.  These allegations thus allege the "causal connection" required in *Day.*  894 F. Supp. 2d at 22.

Though the State's constitutional and statutory structure provides little State control over GNETS, the State may have exercised control over GNETS in a way that went beyond a strict reading of the statutory structure (or at least Defendants' preferred reading); sort of an *ultra vires* kind of claim.  That is, perhaps Plaintiffs believe the State stepped into

the gap created by ambiguity in state regulations and the need to deliver services to exerted some power or authority over GNETS.  For instance, the complaint alleges "GNETS is administered by the State through regional organizations." (Dkt. 1 ¶ 78.)  And, "State employees provide services to students in GNETS." (*Id.* ¶ 80.)  Plaintiffs are not clear where the State gets the authority to make these decisions, but if the State has made such decisions, the State could have administered GNETS.  The Court does not suggest a plaintiff can always allege *ultra vires* to avoid a statutory structure in a motion to dismiss.  Of course not.  The statutes and regulations in this case, however, provide the State the power to "[a]dminister the funds by . . . develop[ing] rules and procedures regulating the operation of the GNETS grant" and "[m]onitor[ing] GNETS to ensure compliance with Federal and state policies, procedures, rules and the delivery of appropriate instructional and therapeutic services."  This language provides enough ambiguity to find Plaintiffs' allegations plausible.

To be clear, the plain meaning of the term "administer," Georgia's clear decision to vest local school boards with control over educational decisions, and the lack of any state regulation giving the State anything

more than funding and limited involvement in GNETS weigh heavily against Plaintiffs' claim.  But, Plaintiffs have alleged the State had a role in the management and direction of GNETS such that it "administers" the program.  Plaintiffs will be required to back up their allegations at summary judgment.  The Court thus denies Defendants' motion to dismiss Plaintiffs' ADA claims.[5]

## B.  *Olmstead* Claim

One of Title II's implementing regulations, the integration regulation, requires a "public entity [to] administer . . . programs . . . in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 CFR § 35.130(d).  In *Olmstead v. L.C. ex rel. Zimring*, two women submitted themselves to a hospital, where they were confined to a psychiatric unit.  527 U.S. 581, 593–94 (1999).  State professionals determined a community-based program could treat them, but the hospital kept them institutionalized.  *Id.*  The women sued, arguing the state violated the integration mandate by failing to place

---

[5] The Court also reiterates that Defendants did not move to dismiss the other regulatory sections on which Plaintiffs based their Title II ADA claims.

them in a community-based program once the treating professionals determined that placement appropriate.  *Id.*

The Supreme Court agreed, finding public entities must provide community-based services to persons with disabilities when (1) the services are appropriate; (2) the affected persons do not oppose the services; and (3) the public entity can reasonably accommodate the community-based services.  *Id.* at 597–98, 607.  This holding, the Supreme Court explained, "reflects two evident judgments."  *Id.* at 600.  "First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life."  *Id.*  "Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment."  *Id.*

Defendants seek to dismiss Plaintiffs' ADA and Rehabilitation Act claims (Counts I and II), arguing Plaintiffs have failed to state an *Olmstead* claim.  Plaintiffs say they have done so because they allege qualified professionals determined GNETS students could be educated in

a more integrated setting, GNETS students consent to the more integrated setting, and the schools can be reasonably accommodated. (Dkt. 1 ¶¶ 151, 152.) The Court agrees with Plaintiffs.

Defendants make five arguments against Plaintiffs' *Olmstead* claim. First, Defendants argue *Olmstead* claims require a state treatment professional to determine that community placement is appropriate. Many courts, however, have found that *Olmstead* claims require no state professional's determination.[6] These courts conclude it would be illogical to make plaintiffs suing a state rely on an opinion from that state's professionals. This Court agrees.

Second, Defendants argue an *Olmstead* claim requires some determination from a professional that a less restrictive placement is appropriate. Since Plaintiffs identify no professional, Defendants say

---

[6] *See Day*, 894 F. Supp. 2d at 23 (rejecting this interpretation of *Olmstead* and explaining "lower courts have universally rejected the absolutist interpretation [of *Olmstead*] proposed by defendants"); *Frederick L. v. Dep't of Pub. Welfare*, 157 F. Supp. 2d 509, 539–40 (E.D. Pa. 2001) (rejecting argument that *Olmstead* "require[s] a formal recommendation for community placement"); *see also Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 291 (E.D.N.Y. 2008) ("[I]t is not clear whether *Olmstead* even requires a specific determination by *any* medical professional that an individual with mental illness may receive services in a less restrictive setting, or whether that just happened to be what occurred in *Olmstead*.").

their allegations are conclusory. The Complaint states "qualified experts agree the Individual Named Plaintiffs . . . can successfully attend zoned schools with their non-disabled peers if given needed supports and services." (Dkt. 1 ¶ 151.) At this stage in the litigation, Plaintiffs need not submit an expert's determination. Plaintiffs can do that during discovery. The Court rejects Defendants' argument.

Third, Defendants argue the proposed class is conclusory. The proposed class includes "[u]nidentified students who may 'in the future . . . or are at serious risk of being' placed in the GNETS program at some unknown future date." (*Id.* ¶ 23.) At this stage, Plaintiffs need only allege that the proposed class members are at risk of institutionalization. *See Hunter ex rel. Lynah v. Cook*, No. 1:08-cv-2930, 2011 WL 4500009, at *5 (N.D. Ga. Sept. 27, 2011) (explaining that a plaintiff can show an *Olmstead* violation if public entity's failure to provide community services would lead to individual's institutionalization). As numerous courts have found, potential plaintiffs

need not wait until the segregation occurs or is about to occur.[7] The Court rejects Defendants' argument.

Fourth, Defendants argue there is no *Olmstead* violation because the State can rely on its professionals to determine when a student should be served in the general education setting. (Dkt. 46 at 15–16 (citing *Olmstead,* 527 U.S. at 602).) According to Defendants, since IEP teams have found community placement inappropriate, the *Olmstead* claim fails. (*Id.*) This may be true, but Plaintiffs here attack those findings. *See Long v. Benson*, No. 4:08-cv-26, 2008 WL 4571904, at *2

---

[7] *See, e.g., Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013) ("[T]he ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings." (quoting U.S. Dep't of Justice, *Statement of the Department of Justice on the Integration Mandate of Title II of the ADA and Olmstead v. L.C.*, http://www.ada.gov/olmstead/q&a_olmstead.htm (last updated June 22, 2011))); *M.R. v. Dreyfus*, 697 F.3d 706, 720 (9th Cir. 2012) (recognizing an *Olmstead* violation where plaintiffs established that "reduced access to personal care services will place them at serious risk of institutionalization"); *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003) (explaining Title II of the ADA "would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation"); *Hunter v. Cook*, 1:08-cv-2930 2011 WL 4500009, at *5 (N.D. Ga. Sept. 27, 2011) (following *Fisher* and granting motion to amend complaint to add plaintiffs at risk of institutionalization).

(N.D. Fla. Oct. 14, 2008) (noting that the State "cannot deny the right [to an integrated setting] simply by refusing to acknowledge that the individual could receive appropriate care in the community. Otherwise the right would, or at least could, become wholly illusory.").

Last, Defendants claim that, even with these allegations, "a State is not liable for unjustified discrimination if it has a good-faith working plan to transition to the community individuals who, per State professionals, can benefit in a community setting even if the transition moves more slowly than opposing parties would like." (Dkt. 46 at 13.) The Complaint, however, claims the State does not follow its own GNETS regulations, creating a question of fact over whether the State operates under a valid *Olmstead* plan sufficient to avoid liability.[8] (Dkt. 1 ¶¶ 88, 118.)

The Court finds Plaintiffs have stated an *Olmstead* claim. The Court denies Defendants' motion to dismiss Counts I and II.

---

[8] Defendants also argue *United States v. Arkansas*, 794 F. Supp. 935 (E.D. Ark. 2011), shows how separate facilities are not a per se violation of the ADA. That may be true, but Plaintiffs allege the GNETS facilities violated the ADA.

## C.    IDEA Claim

"The Individuals with Disabilities Education Act (IDEA) offers federal funds to States in exchange for a commitment to furnish a [FAPE] to children with certain disabilities." *Fry v. Napolean Cmty. Schs.*, 137 S. Ct. 743, 746 (2017). The IDEA has exhaustion requirements, and Plaintiffs must exhaust the administrative procedures when they seek relief available under the IDEA.  20 U.S.C. § 1415(l).  Some conduct is prohibited by both the ADA and the IDEA.

The Supreme Court discussed in *Fry* when a plaintiff must meet these exhaustion requirements for conduct prohibited by both the ADA and IDEA.  137 S. Ct. at 748.  The Court found the plaintiffs need not exhaust the IDEA's administrative requirements if the gravamen of the "suit is something other than the denial of the IDEA's core guarantee— what the Act calls a 'free appropriate public education.' " *Id.*  The Supreme Court explained how to determine whether the gravamen of the complaint falls under the IDEA:

> One clue to the gravamen of a complaint can come from asking a pair of hypothetical questions.  First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school? Second, could an adult at the school have pressed essentially the same grievance?

*Id.* at 756.  If yes to both, then the IDEA's exhaustion requirements do not apply, and the plaintiffs can sue under the ADA or the Rehabilitation Act.  *Id.*  If no to either, then the IDEA's exhaustion requirements apply, and the plaintiffs cannot sue until they exhaust these requirements.[9]  *Id.*

Defendants argue the gravamen of Plaintiffs' ADA and Rehabilitation Act claims is that schools have not placed students in the Least Restrictive Environment, claims subject to the IDEA's exhaustion requirements.  (Dkt. 46 at 17.)  Plaintiffs argue the claim is GNETS stigmatizes and isolates students.  (Dkt. 48 at 18.)  In *Fry*, the Supreme Court laid out two examples to ground the test.  First, "a wheelchair-bound child [could sue] the school for discrimination under Title II (again, without mentioning the denial of a FAPE) because the building lacks access ramps."  137 S. Ct. at 757.  The child there could also sue a movie theater for not having ramps.  *Id.*  Second, "a student with a learning disability sues his school under Title II for failing to provide remedial tutoring in mathematics."  *Id.*  An adult could not sue the school and a

---

[9] "A further sign of the gravamen of a suit can emerge from the history of the proceedings . . . .  Prior pursuit of the IDEA's administrative remedies may provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE, even if the complaint never explicitly uses that term."  *Fry*, 137 S. Ct. at 757.

child could not sue a public theater for a math tutor.  *Id.*  A plaintiff with that claim would thus need to exhaust the IDEA's requirements before suing.  *Id.*

As Plaintiffs here allege both that they have been stigmatized and that they have received an inadequate education, this situation seems to be in the middle of the hypothetical proposed by the Supreme Court. Even so, the Court finds Plaintiffs have stated independent ADA claims and the IDEA's exhaustion requirements do not apply.  Applying the Supreme Court's hypothetical, a child with learning disabilities could sue the movie theater if he was made to sit in a different part of the theater. An adult with learning disabilities could sue if she were made to enter in a separate entrance of a building.

Plaintiffs claim this case is analogous to *J.S. v. Houston County Board of Education*, 877 F.3d 979.  In *J.S.*, a child had a personal teaching assistant as a part of his IEP.  *Id.* at 983–84.  This teaching assistant routinely took the child from the classroom to the weight room, where the teaching assistant could get on the computer.  *Id.*  The child sued, alleging the school board "allowed J.S. [] to be removed from his

regular classroom, based on discriminatory reasons and for no purpose related to his education." *Id.* at 986. The court found that

> Although the circumstances alleged here do involve a violation of J.S.' IEP, they also implicate those further, intangible consequences of discrimination contemplated in *Olmstead* that could result from isolation, such as stigmatization and deprivation of opportunities for enriching interaction with fellow students. These injuries reach beyond a misdiagnosis or failure to provide appropriate remedial coursework.

*Id.* at 987. Though the Complaint implicates Plaintiffs' IEPs — it explicitly states that Plaintiffs lack access to an adequate education — Plaintiffs allege their separation deprives them of the benefits of learning with other students, thus implicating the "stigmatization and deprivation of opportunities for enriching interaction with fellow students" at issue in *J.S.* In other words, the gravamen of the claim is the separation.

The Court acknowledges the facts in *J.S.* are distinguishable from the allegations here. In *J.S.*, the school removed the plaintiff from classes for no reason related to education. And here, IEP teams recommend students for GNETS. Still, *J.S.* supports Plaintiff's claim, as that case highlights the harm in the "deprivation of opportunities for enriching interaction with fellow students." *Id.* at 987. Plaintiff alleges the state

segregates students and denies them the opportunity to be educated with their peers, stigmatizing them. (Dkt. 1 ¶¶ 1, 5, 90.)

The Court also acknowledges Plaintiffs' claims are tied to their status as students. But the same was true of the plaintiff in *J.S.* That court could not "easily divorce J.S.' claim of isolation from the context of him being an elementary student at a school." *Id.* at 986. That court still allowed the plaintiff to bring a separate intentional discrimination claim. *Id.* ("Although this claim could be brought as a FAPE violation for failure to follow [plaintiff's] IEP, we conclude that it is also cognizable as a separate claim for intentional discrimination under the ADA and § 504.").

Since stigmatization is the gravamen of the complaint, Plaintiffs did not have to exhaust their remedies under the IDEA.

## D. Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment "directs that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Most legislation, however, "classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Hispanic Interest Coalition*

30

of Alabama v. Governor of Alabama, 691 F.3d 1236, 1245 (11th Cir. 2012) ("HICA") (quoting Romer v. Evans, 517 U.S. 620, 631 (1996)).  Plaintiff claims Defendants violate the Equal Protection Clause of the Fourteenth Amendment by denying them an equal opportunity to an education. "[W]here a statute significantly interferes with the exercise of a protected right, it must also be reviewed under a [ ] heightened level of scrutiny." Id.  Courts apply rational basis review when no suspect class or fundamental right is involved.  Houston v. Williams, 547 F.3d 1357, 1363 (11th Cir. 2008).  Defendants argue rational basis is appropriate because public education is not a fundamental right and the disabled are not a suspect class.  See Bd. of Trs. of the Univ. of Ala. v. Garrett, 531 U.S. 356, 366–67 (2001); Plyler v. Doe, 457 U.S. 202, 221 (1982).

The Eleventh Circuit, however, applied a heightened scrutiny when reviewing an Alabama law that implicated undocumented children and education.  See HICA, 691 F.3d 1236.  In HICA, the statute at issue required all students to submit their birth certificates to disclose their citizenship.  Id. at 1240.  Although education is not a fundamental right and illegal aliens are not a protected class, the court reviewed the law under heightened scrutiny.  Id. at 1244.  The court found that

31

certain statutory classifications require more exacting scrutiny when the court reviews their compatibility with the mandate of the Equal Protection Clause. . . . Apart from certain classifications, the Supreme Court has recognized that where a statute significantly interferes with the exercise of a protected right, it must also be reviewed under a similarly heightened level of scrutiny.

691 F.3d at 1244 (citations removed). The court went on to explain that "the specific interplay between the type of individual affected by the statute and the deprivation at issue may justify a heightened level of scrutiny to uphold the statute's categorization." *Id.* Finally, the Court of Appeals recognized that the issue presented was whether the state statute "significantly interferes with the exercise of the right to an elementary public education as guaranteed by *Plyer v. Zablocki*" and that the statute imposes "obstacles" on undocumented children. *Id.* As a result, the Court held that it could only uphold the statute if it "furthers some substantial state interest." *Id.* at 1248.

*HICA* is like this case. In *HICA*, the right was education and the classification of undocumented children. Here, the right is education and the statutory classification of disabled children. In *HICA*, the court found that the law significantly interfered with the children's education because students would stop coming to school. The law operated to "place

undocumented children, and their families, in an impossible dilemma: either admit your unlawful status outright or concede it through silence." *Id.* at 1247. According to the Complaint, the law operates here to segregate students and to deny them the education that other students in Georgia receive. The Court finds the heighted scrutiny warranted in *HICA* is also warranted here.

Under this heightened scrutiny, the Court can uphold the law if it "furthers some substantial state interest." *HICA*, 691 F.3d at 1248 (quoting *Plyler*, 457 U.S. at 230).). The State bears the burden of showing a substantial state interest. *Id.* The State only attempts to defend GNETS under a rational basis theory, and the State has thus not met its burden. (*See* Dkts. 46 at 21–25; 50 at 12–14.)[10]

### E.    Obey the Law Injunction

To have standing, a plaintiff must establish: (1) an injury, (2) a causal connection between the injury and the conduct, and that (3) the

---

[10] The Court recognizes that *HICA* involved undocumented children and a law that would have discouraged undocumented children from enrolling in and attending school (or perhaps was intended to do exactly that). *HICA*, 691 F.3d 1247. The statute at issue here provides no such discouragement. Defendants argue this distinguishes *HICA*. Based on a plain reading of the Eleventh Circuit opinion, this Court disagrees.

injury is redressable by the Court. *See Fla. Pub. Interest Research Grp. Citizen Lobby, Inc. v. E.P.A.*, 386 F.3d 1070, 1083 (11th Cir. 2004). Rule 65(d) of the Federal Rules of Civil Procedure requires a preliminary injunction to be specific in its terms and set forth in reasonable detail the acts to be restrained. Fed. R. Civ. P. 65(d). An injunction "must be framed so that those enjoined know exactly what conduct the court has prohibited and what steps they must take to conform their conduct to the law." *S.E.C. v. Smyth*, 420 F.3d 1225, n.14 (11th Cir. 2005) (citations omitted).

Plaintiffs ask the Court to "issue a preliminary and permanent injunction requiring Defendants, their successors in office, agents, employees and assigns, and all persons acting in concert with them to provide to the Individual Named Plaintiffs and the Plaintiff Class the services necessary to ensure them equal educational opportunity in classrooms with their non-disabled peers." (Dkt. 1 at 47.)

Defendants claim this is an impermissible "obey the law" injunction. An obey-the-law injunction simply demands the party obey the law, making it incapable of enforcement. *See Elend v. Basham*, 471 F.3d 1199, 1210 (11th Cir. 2006). For instance, in *Elend*, a group of

political protestors sought an injunction protecting their free speech at future rallies. *Id.* at 1210. The protesters offered as a preliminary injunction "the Secret Service shall ensure there's no violation of the First Amendment." *Id.* The Eleventh Circuit found that injunction "would merely command the Secret Service to obey the law." *Id.; see also. Smyth*, 420 F.3d at 1233 n.14 (finding an injunction that forbid conduct with language tracking a statute or regulation to be an "obey the law" injunction).

Defendants frame Plaintiffs' injunction as "stop discrimination." (Dkt. 50 at 14.) But the injunction is more detailed than that, seeking the services necessary to ensure Plaintiffs equal educational opportunity in classrooms with their non-disabled peers. These types of services have been laid out in the complaint, including granting GNETS students access to the same curriculum, access to electives, and entrance through the same doors as students not in GNETS. (Dkt. 1 ¶¶ 97, 101, 104.) The *Elend* court distinguished its case from cases involving a "concrete, ongoing injury." 471 F.3d at 1208–09. Plaintiffs allege an ongoing injury — continued stigmatization and inferior education. The Court denies Defendants' motion to dismiss.

## IV. Conclusion

The Court **DENIES** Defendants' Motion to Dismiss (Dkt. 46).

The Court **ORDERS** the parties to hold the Rule 26(f) conference no later than April 6, 2020, and to file their joint preliminary report and discovery plan no later than April 20, 2020.

**SO ORDERED** this 19th day of March, 2020.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE