# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNITED STATES OF AMERICA,    *
                           *

       Plaintiff,            *
                           *

   v.                 *      1:16-CV-03088-ELR
                           *

STATE OF GEORGIA,         *
                           *

       Defendant.        *
                           *

---

## ORDER

---

Presently before the Court is Defendant's Motion to Dismiss, or in the Alternative, Motion to Stay Proceedings. [Doc. 47]. The Court's rulings and conclusions are set forth below.

## I. Background[1]

Plaintiff the United States brings this civil rights suit against Defendant State of Georgia ("State") for claims arising from an alleged violation of Title II of the American with Disabilities Act ("ADA" or "Title II"). Compl. [Doc. 1]. Specifically, Plaintiff brings this case against Defendant alleging that the State of

---

[1] The Court derives the facts from Plaintiff's Complaint. [Doc. 1]. The Court accepts these facts as true for purposes of ruling on Defendants' Motions to Dismiss. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

Georgia discriminates against thousands of public school students with behavior-related disabilities "by unnecessarily segregating them, or by placing them at serious risk of such segregation, in a separate and unequal educational program known as the Georgia Network for Educational and Therapeutic Support Program (the "GNETS Program" or "GNETS")." Id. ¶ 1. Plaintiff alleges further that such isolation and segregation of these students violates the ADA's mandate that public entities "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." Id. As a result of these allegations, Plaintiff claims Defendant has violated, and continues to violate, Title II of the ADA.

A.    **The GNETS Program**

GNETS is a statewide program developed and administered by the Georgia Department of Education ("DOE") to provide separate educational environments for students diagnosed with certain emotional and behavioral disorders. Id. ¶¶ 24, 30. Per the DOE's criteria, to be eligible for GNETS services, a student must have an emotional and behavioral disorder "based upon documentation of the severity of the duration, frequency, and intensity of one or more of the characteristics of the disability category of emotional and behavioral disorders ("EBD")." Or, alternatively, students may receive GNETS services where the "frequency, intensity, and duration of their behaviors is such that [GNETS] placement is deemed by those

2

students' IEP teams[2] to be appropriate to meet the students' needs." Id. ¶ 30.  To put it another way, the program addresses the needs of students with intense and severe emotional and behavioral disorders who are not best served by learning in traditional classroom environments.  See id.

GNETS is divided into 24 regional programs serving all of the State's public school districts.  Id. ¶ 31.  The Program currently serves all of the State's 181 school districts, with some regional programs individually serving over a dozen school districts.  Id.  More than two-thirds of all students in the GNETS Program attend school in regional GNETS Centers, which are generally located in self-contained buildings that serve only students with disabilities from multiple school districts.  Id.

---

[2] As background:

> Individual Education Plan ("IEP") Teams determine a student's eligibility for GNETS. GA. COMP. R. & REGS. §§ 160-4-7-.15(3)(a), 4(a), 5(b).  The IEP Team includes the child's parents, a regular education teacher, a special education teacher, and a representative of the Local Education Association. Id. §§ 160-4-7-.06(5)(a)–(g).  Before the IEP team places a student in GNETS, the IEP team must show the school has tried intermediate steps — called Less Restrictive Placements — and that those steps did not work. Id. § 160-4-7.15(3); Ga. SBOE R. 160. The IEP team then determines what the student needs to meet the federal baseline standard for the student's education, called a Free and Appropriate Public Education ("FAPE"). Ga. SBOE R. 160-4-7.06.  The IEP team next determines where the child can get a FAPE. For instance, the student may succeed with more support (like particularized teaching strategies or constant personal adult supervision) in the classroom or with part of the day in a different classroom. The most restrictive setting is residential placement, which places students in a residential program. See GA. COMP R. & REGS. 160-4-7.15(2)(a). GNETS, essentially a separate school, is an intermediate option before residential placement and after traditional classroom options. Id.

The Georgia Advocacy Office, et al. v. Sate of Georgia, et al., No. 1:17-CV-03999-MLB, 2020 WL 1650434, at *1 (N.D. Ga. March 19, 2020).

¶ 34.  Other students in the GNETS Program attend school in regional GNETS Classrooms, which serve only students with disabilities and, although the Classrooms are located within general education school buildings, they are often not within the students' zoned general education schools.  Id. ¶ 35.  The GNETS Classrooms may also be located at schools that serve different grade configurations than the grades in which the students in GNETS are enrolled (e.g., a 4th grade student in GNETS may be in a GNETS Classroom in a general education high school).  Id.  GNETS Classrooms are often located in separate wings or isolated parts of school buildings, some of which are locked and/or fenced off from spaces used for general education programs.  Id. ¶ 36.

### B.    Procedural History

On November 1, 2016, Defendant State of Georgia filed its first Motion to Dismiss, or in the Alternative, to Stay Proceedings.  [Doc. 9].  In its motion, Defendant asserted, in part, that the Department of Justice ("DOJ") lacked standing to sue raising Title II claims.  [Id.]  In a case raising this identical issue in the Southern District of Florida, Judge William J. Zloch found that the DOJ lacked standing to sue raising Title II claims.  C.V. v. Dudek, 209 F.Supp. 3d 1279, 1295 (S.D. Fla. Sept. 20, 2016).  This decision was appealed to the Eleventh Circuit Court of Appeals.  Accordingly, on August 11, 2017,  the Court granted Defendant's alternative request to stay this case pending ruling by the Eleventh Circuit Court of Appeals on the threshold issue

of whether or not the United States has standing to bring a claim for an alleged violation of Title II of the ADA. [Doc. 40]. The Eleventh Circuit resolved this issue, ruling that the United States does have the requisite standing. See United States v. Florida, 938 F. 3d 1221 (11th Cir. 2019). Accordingly, the Court lifted the previously imposed stay and directed the Defendant to re-file its motion to dismiss on any remaining grounds if it intended to do so. [Doc. 45]. On November 6, 2019, Defendant renewed its motion to dismiss for failure to state a claim, and again requested the Court to stay the case as alternative relief. [Doc. 47].[3] Having been fully briefed, Defendant's motion is now ripe for the Court's review.

## II.    Legal Standard

The Court first sets out the applicable legal standards before turning to the merits of Defendant's motions.

Federal Rule of Civil Procedure 12(b)(6) requires dismissal when a complaint fails to "state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v.

---

[3] Defendant asserts the present request to stay based on the State of Florida's application for rehearing en banc on the standing issue. [Doc. 47 at 2]. After consideration, the Court finds that the Eleventh Circuit's ruling is controlling authority on the issue of standing. Further, there is no guarantee that rehearing will be granted as such relief is given only in exceptional cases. Moreover, the Complaint in this case was filed nearly four (4) years ago. The Court finds no reason to further delay the case for an indefinite period of time. As such, the Court denies Defendant's alternative Motion to Stay Proceedings. [Doc. 47].

Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S at

570). The Supreme Court has further explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content
> that allows the court to draw the reasonable inference that the defendant
> is liable for the misconduct alleged. The plausibility standard is not
> akin to a "probability requirement," but it asks for more than a sheer
> possibility that a defendant has acted unlawfully.

Id. Further, when considering a 12(b)(6) motion to dismiss, the Court must accept

as true the allegations set forth in the complaint, drawing all reasonable inferences

in the light most favorable to the plaintiff. Twombly, 550 U.S. at 555-567; U.S. v.

Stricker, 524 F. App'x 500, 505 (11th Cir. 2013) (per curiam).

## III.    Discussion

Defendant moves the Court to dismiss the sole count alleged in the

Complaint—Violation of Title II of the ADA—for several reasons:   (1) The

Complaint fails to allege actionable discrimination pursuant to the ADA because

Defendant does not administer GNETS and Plaintiff fails to allege discriminatory

practices; (2) The relief Plaintiff seeks would violate the Individuals with

Disabilities Education Act ("IDEA"); (3) "Obey-the-law injunctions are prohibited

in the Eleventh Circuit; and (4) The Eleventh Circuit has not fully resolved the issue

of whether the DOJ lacks standing to raise claims that arise from Title II of the ADA.

[Doc. 47-1]. For ease of organization, the Court addresses each claim separately.

### A.    Discrimination Pursuant to the ADA

Defendant first contends that Plaintiff fails to allege actionable discrimination pursuant to the ADA. [Id.] Title II of the ADA and § 504 of the Rehabilitation Act prohibit discrimination on the basis of disability in the provision of public services. 42 U.S.C. § 12132. Indeed, Congress' intent in enacting the ADA is expressed as follows: "[H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Congress further found that discrimination against individuals with disabilities persisted in education and access to public services, and that such individuals faced various forms of discrimination, including "segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. §§ 12101(a)(3), (a)(5).

Title II states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Accordingly, to allege a case against the State under Title II of the ADA, Plaintiff must plausibly plead that GNETS students were either excluded from participation in or denied the benefits of a program or activity offered by the State, or (2) subjected to discrimination by the State. See id.

Further, Plaintiff must prove that the State is the acting "public entity" that administers GNETS. Id.  The Court first addresses the latter.

i.  Whether the State Administers GNETS

According to Defendant, Plaintiff fails to plead a prima facie case for Title II discrimination because it is the local school districts, not the State, that manages and implements the GNETS program. [Doc. 47-1 at 11].  The federal regulation that governs and provides implementation criteria for Title II provides that "a public entity shall *administer* services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (emphasis added).  Defendant firmly asserts that because the State does not administer GNETS, and Plaintiff cannot maintain its Title II action against it. [Doc. 47-1 at 11].

The Court disagrees.  Defendant made this identical argument recently in Georgia Advocacy Office, 2020 WL 1650434, at *1—an argument which was rejected.  Like the Court in Georgia Advocacy Office, this Court declines to assign such a limited definition to the term "administers" under the liberal pleading standard at this stage of the litigation.

It is uncontroverted that the DOE oversees GNETS by establishing criteria for the implementation of the program in local school districts, by disbursing federal and state funds to support the program, by promulgating regulations to carry out the

program, and by overseeing the operations and implementation of the program throughout the state. [Doc. 47-1 at 13]. However, Defendant focuses its analysis on the daily control and day-to-day management of the GNETS program by the local IEP teams as a basis for establishing its proffered definition of "administers." [Id.] But, Defendant ignores the possibility that state and local governments may exercise joint control and management over GNETS.

To define the term "administers," the Court first looks to the definition the legislature assigned to the term "public entity" in context with "services, programs and activities" referenced in the applicable Title II regulation. See 28 C.F.R. § 35.130(d). The ADA defines "public entity" as any "State or local government" and any department, agency, or other instrumentality of a State or local government, and covers all services, programs, and activities provided or made available by public entities, including through contractual, licensing, or other arrangements. See 42 U.S.C. §§ 12131(1), 12132; 28 C.F.R. § 35.130. Accordingly, it is apparent that Title II's coverage is intended to, and can, extend to the State in the implementation of the GNETS program if the State, and not a local entity, is the actor that administers GNETS within the meaning of the Act. See 28 C.F.R. § 35.130(d).

While the Georgia Constitution and the Georgia Code provide that counties and local school boards have the sole power to "establish and maintain public schools within their limits," GA. CONST. ART. VIII § 5 para. I, the same Constitution

and Code confirm one exception to this general principle: the State's operation of "special schools." See id. para. VII(a) ("Any special schools shall be operated in conformity with regulations of the State Board of Education pursuant to provisions of law."); see also Gwinnett Cty. Sch. Dist. v. Cox, 710 S.E.2d 773, 776 (Ga. 2011) (where the Georgia Supreme Court distinguishes general education schools with "special schools" for children with special needs).

The Georgia Code sets forth the State's additional obligations to children with disabilities, including that the State must adopt "classification criteria for each area of special education to be served on a state-wide basis" and "the criteria used to determine eligibility of students for state funded special education programs." GA. CODE ANN. § 20-2-152(a). The State, through the DOE and the Georgia Department of Behavioral Health and Developmental Disabilities, is also responsible for coordinating services for children experiencing "severe emotional disturbance," like children in GNETS. GA. CODE ANN. § 49-5-220(a)(6).

As such, it appears that the State is authorized, and does in fact exercise, some level of control over state-funded programs such as the GNETS program. See GA. COMP. R. & REGS. § 160-4-7-.15(5)(a). In compliance with these local rules and regulations, the DOE receives and disburses GNETS funds; it "[a]dminister[s] the funds by . . . develop[ing] rules and procedures regulating the operation of the GNETS grant;" and "[m]onitor[s] GNETS to ensure compliance with Federal and

state policies, procedures, rules and the delivery of appropriate instructional and therapeutic services." Id.; see also Compl.    Further, the DOE is vested with the authority to determine if a local school district is incapable of serving a student with a disability.    Id. § 160-4-7-.20(1)(b). The DOE creates "classification criteria for each area of special education to be served on a state-wide basis" and "the criteria used to determine eligibility of students for state funded special education programs." GA. CODE ANN. § 20-2-152(a); see also GA. COMP. R. & REGS. § 160-4-7-.15(2).

The Complaint sets forth the following pertinent facts:

> The State, through the GaDOE, plans, funds, administers, licenses, manages, and oversees the GNETS Program. It determines which mental health and therapeutic educational services and supports to provide, who will provide such services, in what settings services will be provided, and how to allocate and manage the State and federal funds earmarked for such services. The State, through the GaDOE, sets the criteria for students' eligibility for GNETS and establishes the requirements for students' entry into and transition out of GNETS. The State also has designated an employee to oversee the GNETS Program as well as several employees to oversee implementation of Positive Behavioral Interventions and Supports ("PBIS") across the State.
>
> Even though mental health and therapeutic educational services and supports can be provided in integrated general education classrooms, the State, including GaDOE, has selected to plan, fund, administer, license, manage, and oversee those services almost exclusively in segregated GNETS centers and classrooms. As a result, local school districts often must send students with behavior-related disabilities to GNETS for such services and supports because the state will not make available the same services in integrated settings.

11

The Georgia Department of Community Health ("DCH") is the State agency responsible for Medicaid and PeachCare for Kids®, which is the State's program to implement the federal Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") program that funds Medicaid services for eligible children across the State and the United States. Many mental health and therapeutic educational services and supports, including services and supports provided through the GNETS Program, are reimbursable through the EPSDT program that is administered by DCH.

The Georgia Department of Behavioral Health and Developmental Disabilities ("DBHDD") is the State agency providing policies, programs, and services for people with mental illness, substance use disorders, and developmental disabilities. DBHDD is responsible for many of the supports and services that are needed by students with disabilities placed in GNETS and delivered through the State-managed care system that DBHDD administers in part.

Compl. ¶¶ 24-28.  Upon review of these pertinent facts, the Court finds that Plaintiff's Complaint sufficiently alleges that the true administration of the program rests with the State.  This idea is expressed astutely by the Court in <u>Georgia Advocacy Office</u> as follows:

Distilled down, on the one hand, local governmental authorities run individual GNETS schools and place students in GNETS. On the other hand, the State funds GNETS and develops rules and procedures and then ensures GNETS complies with those rules and procedures. All of this — of course — must be considered in the light of the State's strongly held commitment to ensuring that local boards of education have the "exclusive authority" to provide an adequate public education. Nothing in the statutes or regulations suggest the State of Georgia intended to create GNETS outside of this construct or to limit the local school boards' exclusive authority to educate students. The regulations seem to heed the well-established rule that the local boards of education offer educational benefits to Georgia's children. But, the regulations

12

allow the State some oversight, including to ensure compliance with federal and state law.

Georgia Advocacy Office, 2020 WL 1650434, at *4.

While the Eleventh Circuit has not yet been confronted with this issue, Defendant cites to one circuit that has. Defendant directs the Court to Bacon v. City of Richmond, Va., 475 F.3d 633, 638 (4th Cir. 2007). In Bacon, the Fourth Circuit affirmed the dismissal of a Title II lawsuit against a municipality over retrofitting the city's schools. The court held that, absent any "control over challenged services and activities," the municipality could not be liable. Id. at 643. More specifically, the court opined that standing alone, funding a program does not constitute administering it for purposes of the ADA and cannot therefore be the basis for determining that the city discriminated against plaintiff in violation of Title II. Id. at 639. According to the Fourth Circuit, Title II "cannot be read to impose strict liability on public entities that neither caused plaintiffs to be excluded nor discriminated against them." Id. at 639–40.

However, as explained above, Plaintiff has alleged far more than only that Defendant is the funding source for GNETS. Plaintiff has sufficiently alleged in its Complaint that GNETS is "operated, *and* administered by the State." Compl. at 1. (emphasis added). Plaintiff articulates specific facts which explain the particular ways in which it contends the DOE controls and administers the program within the

meaning of Title II of the ADA.  Accordingly, the Court cannot conclude, at this juncture, that Plaintiff's Title II claim is subject to dismissal on this ground.

ii.  <u>Whether Plaintiff Alleges Requisite Discriminatory Action</u>

Defendant next contends that Plaintiff fails to allege "cognizable discrimination." [Doc. 47-1 at 17].  Specifically, Defendant argues that Plaintiff has not sufficiently pled that the students in the GNETS program suffered any "unjustifiable" isolation or segregation.  [<u>Id.</u>].  As such, Defendant asserts, Plaintiff cannot show that Defendant specifically violated the ADA or applicable regulation. [<u>Id.</u>]

Title II of the ADA mandates integration. (The District is required to "administer" services, programs, and activities "in the most integrated setting appropriate to the needs of qualified individuals with disabilities.").  28 C.F.R. § 35.130(d).  In construing this mandate, Defendant asks the Court to look to the seminal case <u>Olmstead v. L.C. ex rel. Zimring</u>, 521 U.S. 581 (1999).  Defendant contends <u>Olmstead</u> mandates that Plaintiff allege in its Complaint that state treatment professionals have determined general education placement is appropriate for students receiving services in GNETS, and that students receiving GNETS services do not oppose moving into a general education setting.  [Doc. 47-1 at 17]. The Court disagrees.

As noted in <u>Day v. District of Columbia</u>, 894 F. Supp. 2d 1 (D.D.C. 2012),

"<u>Olmstead</u> established that where a State's own professionals have determined that

community-based treatment is appropriate, a State may be required to provide

community-based services." 894 F. Supp at 23.   Although the Supreme Court in

<u>Olmstead</u> noted that a State "generally may rely on the reasonable assessments of its

own professionals," it did not hold that such a determination was required to state a

claim.   <u>Olmstead</u>, 521 U.S. at 602.   Additionally, in <u>Day</u>, the court described how

courts around the country have repeatedly rejected Defendant's argument:

> Since <u>Olmstead,</u> lower courts have universally rejected the
> absolutist interpretation proposed by defendants. <u>See</u> <u>Frederick L. v.</u>
> <u>Dep't of Pub. Welfare</u>,157 F.Supp.2d 509, 539–40 (E.D.Pa.2001)
> (denying defendants' motion to dismiss <u>Olmstead</u> claims and rejecting
> the argument that <u>Olmstead</u> "require[s] a formal recommendation for
> community placement."); <u>Disability Advocates, Inc. v. Paterson</u>, 653
> F.Supp.2d 184, 258–59 (E.D.N.Y.2009) (requiring a determination by
> treating professionals, who are contracted by the State, "would
> eviscerate the integration mandate" and "condemn the placements of
> [individuals with disabilities in adult homes] to the virtually
> unreviewable discretion" of the State and its contractors); <u>Joseph S.</u>,
> 561 F.Supp.2d at 291 ("I reject defendants' argument that <u>Olmstead</u>
> requires that the State's mental health professionals be the ones to
> determine that an individual's needs may be met in a more integrated
> setting."); <u>Long v. Benson,</u> No. 08–0026, 2008 WL 4571904, at *2
> (N.D.Fla.2008) (refusing to limit class to individuals whom state
> professionals deemed could be treated in the community, because a
> State "cannot deny the [integration] right simply by refusing to
> acknowledge that the individual could receive appropriate care in the
> community. Otherwise the right would, or at least could, become
> wholly illusory."); <u>see also</u> DOJ Statement at 4 ("the ADA and its
> regulations do not require an individual to have had a state treating
> professional make such a determination . . . .This evidence may come
> from their own treatment providers, from community-based

organizations that provide services to people with disabilities outside of institutional settings, or from any other relevant source. Limiting the evidence on which <u>Olmstead</u> plaintiffs may rely would enable public entities to circumvent their <u>Olmstead</u> requirements by failing to require professionals to make recommendations regarding the ability of individuals to be served in more integrated settings.").

<u>Day</u>, 894 F. Supp. 2d at 23, 24.

Moreover, the Complaint does indeed allege that public school children with disabilities in GNETS could appropriately be served in general education classrooms and other more integrated settings. <u>See</u> Compl. ¶¶ 37-43, 62. This allegation is further supported by the Letter of Findings issued after the United States' investigation of the GNETS Program. <u>Id.</u> ¶ 2. The letter details numerous findings by experts, including a finding that "students with behavior-related disabilities who are placed in segregated settings in the GNETS Program would benefit from the general education setting." <u>Id.</u>   Accordingly, the Court finds that Plaintiff has met the pleading standard in alleging a violation of the integration mandate of Title II.

Secondly, Defendant asserts that Plaintiff fails to allege cognizable discrimination because Plaintiff has not sufficiently pled that students receiving GNETS services do not oppose moving into a general education setting.   [Doc. 47-1 at 19]. This argument is also unpersuasive. The Court finds that Defendant's reliance on <u>Olmstead</u> to support this argument is misplaced.   In <u>Olsmstead,</u> the plaintiffs submitted themselves to a hospital, where they were confined to a psychiatric unit. 527 U.S. at 593-94. State professionals made a determination that a community-based

program could treat them, but the hospital kept them institutionalized despite the determination by the state professionals. Id. The plaintiffs sued, asserting violations of Title II's integration mandate by failing to place them in a community-based program once the treating professionals determined that community placement was appropriate. Id. The Court held: Under Title II of the ADA, states are required to provide persons with mental disabilities with *community based treatment* rather than placement in *institutions*, "where (1) the state treatment professionals have determined that community placement is appropriate; (2) the transfer from institutional to a less restrictive setting is not opposed by the affected individual; and (3) the community placement can be reasonably accommodated. . . ." Id. at 587 (emphasis added).

The Supreme Court's ruling is a narrow one, as the Court specifically identifies the state's requirements with respect to individuals living in mental institutions. Nothing in the Court's analysis of the facts in that case indicate that this mandate applies to programs like GNETS, where students are not institutionalized, but rather receive learning in segregated, or separate classrooms or facilities. Defendant cites to no authority that stands for the proposition that a Plaintiff, in any case alleging a violation of Title II, must plead facts which support the proposition that the affected persons do not oppose moving into a less restrictive setting. The Court is unaware of any such precedent. As such, Defendant's argument fails.

**B.    IDEA Exhaustion**

The Court next turns to Defendant's second argument, that Plaintiff's Title II claims violates the IDEA.  More specifically, Defendant contends that the IDEA requires Plaintiff to exhaust administrative remedies before seeking to overturn the decision of an individual IEP team regarding least restrictive environments ("LRE"). [Doc. 47-1 at 20].  Because Plaintiff failed to do so and because Defendant has complied with the IDEA, Defendant claims that Plaintiff's Title II claim fails.  [Id.] The Court disagrees.

Upon review, Defendant appears to contend that its compliance with the IDEA shields it from any liability alleging a violation of the integration mandate of Title II.[4]   [Id.]   Defendant also argues that Plaintiff must first complete an administrative process challenging the placements before bringing a lawsuit alleging violation of Title II.   [Id.]   In doing so, Defendant ignores the precedent that establishes that alleged violations of Title II are separate and distinct from an alleged breach of the requirements of the IDEA. See, eg. Fry v. Napoleon Cmty. Sch., 137 S. Ct. 743, 746 (2017) (distinguishing between the types of cases parents can bring alleging violation of the IDEA and the separate right to bring a lawsuit claiming an

---

[4] The IDEA offers federal funds to States in exchange for a commitment to furnish a "free appropriate public education" (FAPE) to children with certain disabilities, and establishes formal administrative procedures for resolving disputes between parents and schools concerning the provision of a FAPE. 20 U.S.C. § 1412(a)(1)(A).

ADA discrimination). Here, like many Title II violation cases, Plaintiff alleges far more than simply the denial of a FAPE in the LRE. Plaintiff claims systematic discriminatory practices which result in unlawful stigmatization, deprivation of advantages that come from integrated learning environments, denial of access to public institutions, and unjustified segregation and discrimination of children who are in the GNETS program. See generally Compl. The Court in Fry held: "[e]xhaustion of the IDEA's administrative procedures is unnecessary where the gravamen of the plaintiff's suit is something other than the denial of the IDEA's core guarantee of a FAPE." Fry, 137 S. Ct. at 752. The Court further explained the type of inquiry the courts must make when determining which issue lies at the core of a plaintiff's complaint:

> [E]xamination of a plaintiff's complaint should consider substance, not surface: § 1415(l) requires exhaustion when the gravamen of a complaint seeks redress for a school's failure to provide a FAPE, even if not phrased or framed in precisely that way. In addressing whether a complaint fits that description, a court should attend to the diverse means and ends of the statutes covering persons with disabilities. The IDEA guarantees individually tailored educational services for children with disabilities, while Title II and § 504 promise nondiscriminatory access to public institutions for people with disabilities of all ages. That is not to deny some overlap in coverage: The same conduct might violate all three statutes. But still, these statutory differences mean that a complaint brought under Title II and § 504 might instead seek relief for simple discrimination, irrespective of the IDEA's FAPE obligation.

Id. at 755. To be sure, Plaintiff's claim involves allegations that the Defendant failed to provide a FAPE in a LRE for the wide population of students enrolled in the

19

GNETS program.  See Compl.  However, as discussed, *supra*, the breadth of

Plaintiff's claims goes much further.  Whether or not Plaintiff can present evidence

which supports these claims (as separate and apart from the IDEA claims), is a matter

to be resolved after the discovery phase of the litigation. At this juncture, however,

the Court finds that the exhaustion remedies of the IDEA do not bar Plaintiff's Title

II claims.[5]

## C.    Obey-the-Law Injunction

Next, Defendant contends that the relief sought by Plaintiff is nothing more

than a directive from the court to follow the law, which is disallowed in the Eleventh

Circuit. [Doc. 47-1 at 23].  For the following reasons, the Court disagrees.

In its Complaint, Plaintiff specifically requests that the Court mandate

modification of Defendant's mental health and therapeutic educational service

system for students with behavior-related disabilities.   [Id. at 19].    Plaintiff

---

[5] As the Court in Georgia Advocacy Office opined, the facts of J.S. v. Houston County Board of Education, 877 F.3d 979 (11th Cir. 2017) are analogous. 2020 WL 11050434, at *4. In that case, a child had a personal teaching assistant as a part of his IEP. Id.  This teaching assistant routinely took the child from the classroom to the weight room, where the teaching assistant could get on the computer. Id. The child sued, alleging the school board 'allowed J.S. to be removed from his regular classroom, based on discriminatory reasons and for no purpose related to his education.' Id. (quoting J.S. v. Houston County, 877 F.3d at 986).  The Eleventh Circuit found that although the circumstances alleged involve a violation of J.S.' IEP, they also "implicate those further, intangible consequences of discrimination contemplated in Olmstead that could result from isolation, such as stigmatization and deprivation of opportunities for enriching interaction with fellow students." J.S. v. Houston County, 877 F.3d at 986-87. These injuries reach beyond a misdiagnosis or failure to provide appropriate remedial coursework.  Georgia Advocacy Office, 2020 WL 1650434, at *10.

unambiguously lists the methods by which such modifications can be made. [Id. ¶ 58]. Finally, in its prayers for relief, Plaintiff seeks both declaratory and injunctive relief. [Id. at 26].

Defendant relies on Eland v. Basham, arguing that the relief Plaintiff seeks is similar to the relief sought in Eland, which the Eleventh Circuit dismissed as an impermissible injunction seeking nothing more from the court than an order to "obey the law." Eland, 471 F.3d 1199, 1210 (11th Cir. 2006).[6]  However, Plaintiff here seeks specific relief which calls for enjoining tangible, continuous, and ongoing injury.  Finding that Plaintiff requests tangible relief that is more than just an "obey the law" judgment, the Court denies Defendant's motion to dismiss on this ground.

**D.    DOJ's Standing to Sue**

Finally, Defendants assert that the DOJ lacks the requisite standing to pursue Title II claims. [Doc. 47-1 at 24, 25].  To invoke federal jurisdiction, a litigant must establish the three elements of standing: (1) injury in fact; (2) causation; and (3) redressability. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).  In its first Memorandum and Brief in Support of Motion to Dismiss, Defendant appears to

---

[6] In Eland, political protestors sought an injunction to protect their right to free speech at future rallies. Id. at 1210. The protesters requested the following preliminary injunction "The Secret Service shall ensure there's no violation of the First Amendment." Id. The Eleventh Circuit found that the requested relief "would merely command the Secret Service to obey the law." Further, the court expressed concern with ordering injunctive relief for some act that was too speculative and not certain to occur in the future which is distinguishable from the facts presented here. Id.

argue that a combination  of the first and the third elements are lacking.  [See generally Doc. 9-1].  The Court disagrees.

In enacting the ADA, Congress "invoke[d] the sweep of congressional authority, including the power to enforce the fourteenth amendment . . ." 42 U.S.C. § 12101(b)(4).  United States v. Georgia, 546 U.S. 151, 154 (2006).  In so enacting, Congress envisioned that, through the ADA, the Federal Government would take "a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities.  United States v. Florida, 938 F. 3d at 1226.  Some district courts across the country have interpreted this grant of power to the federal government in enforcing the ADA to extend to the power for the federal government to bring suit. See Steward v. Abbott, 189 F. Supp. 3d 620, 640 n. 1 (W.D. Tex. May 17, 2016); United States v. City and Cnty. of Denver, 927 F. Supp. 1396, 1400  (D. Colo. June 7, 1996). While not controlling, the cases are illustrative of a consistent trend in the courts finding that the federal government is armed with the authority to sue for alleged violations of Title II.

As the Court noted, *supra*, the Eleventh Circuit recently issued an opinion regarding whether or not the Attorney General, on behalf of the United States of America, has standing to sue for violations of Title II.  This decision is controlling precedent for this Court; and the Court is bound by it absent other controlling decisions.   The Eleventh Circuit specifically opined that the enforcement

mechanisms available under Title II are those that have been made available under Title VI of the Civil Rights Act of 1964.  See 42 U.S.C. § 12133; 29 U.S.C. § 794a; 42 U.S.C. § 2000d-1.  Section 12133 of Title II states that the "remedies, procedures, and rights" available to a person alleging discrimination are those available in § 505 of the Rehabilitation Act of 1973, 29 U.S.C. § 794a.  Section 505 contains a provision for enforcing § 504 of the Rehabilitation Act, which prohibits discrimination on the basis of disability by programs and activities receiving federal financial assistance. See 29 U.S.C. §§ 794(a) The Eleventh Circuit specifically held:

> When Congress chose to designate the "remedies, procedures, and rights" in § 505 of the Rehabilitation Act, which in turn adopted Title VI, as the enforcement provision for Title II of the ADA, Congress created a system of federal enforcement. The express statutory language in Title II adopts federal statutes that use a remedial structure based on investigation of complaints, compliance reviews, negotiation to achieve voluntary compliance, and ultimately enforcement through "any other means authorized by law" in the event of noncompliance. In the other referenced statutes, the Attorney General may sue. The same is true here.

United States v. Florida, 938 F. 3d at 1250.

Finding no other controlling precedent, the Court is bound to follow the precedent set by the Eleventh Circuit's careful and thoughtful analysis of the United State's standing to bring Title II claims.  As such, the Court denies Defendant's motion to dismiss on the issue of standing.

## IV.    Summary

In sum, the Court finds that Plaintiff has met the pleading threshold sufficient to meet the plausibility standard set forth by Twombly and it its progeny.  As such, for the reasons cited herein, the Court finds that the arguments presented in Defendant's Motion to Dismiss [Doc. 47] thereby fail.

## V.    Conclusion

Accordingly, the Court **DENIES** Defendant's Motion to Dismiss, or in the Alternative, Stay Proceedings.  [Doc. 47]. The Court **ORDERS** the Parties to meet and confer and file a proposed scheduling order and joint preliminary report and discovery plan, in addition to their Initial Disclosures, within fifteen (15) business days of the date of entry of this Order.

**SO ORDERED**, this 13th day of May, 2020.

Eleanor L. Ross
United States District Judge
Northern District of Georgia

24