IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | 1:16-CV-03088-ELR |
| | * | |
| STATE OF GEORGIA, | * | |
| | * | |
| Defendant. | * | |
| | * | |

_____

**O R D E R**

_____

Presently before the Court is Defendant State of Georgia's "Motion for Judgment on the Pleadings." [Doc. 78]. For the reasons below, the Court denies Defendant's motion.

**I.      Background**

Plaintiff United States of America brings this civil rights suit against Defendant State of Georgia ("State") for one claim arising from alleged violations of Title II of the American with Disabilities Act, 42 U.S.C. §§ 12131–34 ("ADA" or "Title II"). Compl. [Doc. 1]. Specifically, Plaintiff alleges that Defendant State of Georgia discriminates against thousands of public school students with behavior-related disabilities "by unnecessarily segregating them, or by placing them at serious risk of such segregation, in a separate and unequal educational program known as

the Georgia Network for Educational and Therapeutic Support Program (the 'GNETS Program' or 'GNETS')." Id. ¶ 1. Plaintiff argues further that the isolation and segregation of these students violates the ADA's mandate that public entities "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." Id. As a result, Plaintiff claims Defendant has violated, and continues to violate, Title II of the ADA.

GNETS is a statewide program developed and administered by the Georgia Department of Education ("DOE") that is designed to provide educational environments for students diagnosed with certain emotional and behavioral disorders. Id. ¶¶ 24, 30. Per the DOE's criteria, to be eligible for GNETS services, a student must have an emotional and behavioral disorder "based upon documentation of the severity of the duration, frequency, and intensity of one or more of the characteristics of the disability category of emotional and behavioral disorders ('EBD')." Id. ¶ 30. Alternatively, students may receive GNETS services where the "frequency, intensity, and duration of their behaviors is such that [GNETS] placement is deemed by those students' [Individual Education Plan ('IEP')] teams[1] to be appropriate to meet the students' needs." Id. Put differently, the GNETS Program is intended to address the needs of students with intense or

---

[1] An Individual Education Plan ("IEP") Team, which determines a student's eligibility for GNETS, consists of (at minimum) the child's parents, a general education teacher, a special education teacher, and a representative of the Local Education Association. GA. COMP. R. & REGS. §§ 160-4-7-.06(5)(a)–(g); 160-4-7-.15(3)(a), 4(a), 5(b).

2

severe emotional and behavioral disorders outside a general education setting. See id.

The GNETS Program is divided into twenty-four (24) regional programs serving all the State's 181 public-school districts. Id. ¶ 31. According to the Complaint, "[m]ore than two-thirds of all students in the GNETS Program attend school in regional GNETS Centers, which are generally located in self-contained buildings that serve only students with disabilities from multiple school districts." Id. ¶ 34. The remaining one-third of students in the GNETS Program attend school in regional GNETS Classrooms. Id. ¶ 35. Although GNETS Classrooms are located within general education school buildings, these Classrooms only serve students with disabilities and are often not within the students' zoned general education schools. Id. Additionally, "GNETS Classrooms may also be located at schools that serve different grade configurations than the grades in which the students in GNETS are enrolled (e.g., a 4th grade student in GNETS may be in a GNETS Classroom in a general education high school)." Id. According the Complaint, students placed in these GNETS Classrooms are "often unnecessarily segregated from their non-disabled peers" because these Classrooms are "often located in separate wings or isolated parts of school buildings, some of which are locked and/or fenced off from spaces used for general education programs." Id. ¶ 36.

Although mental health and therapeutic educational services can be provided in an integrated educational setting, Plaintiff contends that "for over 40 years, the State has operated, administered, and funded the GNETS Program" in a manner which segregates students with disabilities and excludes integrated alternatives. Id. ¶ 38.  Thus, Plaintiff brings this case against the State seeking both declaratory and injunctive relief.

**II.   Procedural History**

On November 1, 2016, Defendant State of Georgia filed its first "Motion to Dismiss, or in the Alternative, for Stay of Proceedings." [Doc. 9].  In its motion, Defendant asserted, in part, that the Department of Justice ("DOJ") lacked standing to raise Title II claims.  [Id.]  In a case raising this identical issue in the Southern District of Florida, Judge William J. Zloch found that the DOJ lacked standing to sue for Title II claims.  C.V. v. Dudek, 209 F. Supp. 3d 1279, 1295 (S.D. Fla. Sept. 20, 2016).  This decision was appealed to the Eleventh Circuit Court of Appeals. Accordingly, on August 11, 2017, the Court granted Defendant's alternative request to stay this case pending ruling by the Eleventh Circuit Court of Appeals on the threshold issue of whether the United States has standing to bring a claim for alleged violations of Title II of the ADA. [Doc. 40]. The Eleventh Circuit resolved this issue, ruling that the United States does have the requisite standing. See United States v. Florida, 938 F.3d 1221 (11th Cir. 2019). Accordingly, the Court lifted the previously

imposed stay and directed Defendant to re-file its motion to dismiss on any remaining grounds if it intended to do so. [Doc. 45]. On November 6, 2019, Defendant filed its "Renewed Motion to Dismiss, or in the Alternative, for Stay of Proceedings." [Doc. 47].

On May 13, 2020, the Court denied Defendant's renewed motion to dismiss and alternative request to stay proceedings. [Doc. 61]. Subsequently, the case proceeded to discovery. [Doc. 70]. Since that time, Defendant has filed its "Motion for Judgment on the Pleadings." [Doc. 78]. Having been fully briefed, this motion is now ripe for the Court's review.

### III. Legal Standard

Defendant's motion for judgment on the pleadings is governed by Federal Rule of Civil Procedure 12(c). Rule 12(c) provides that a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." FED. R. CIV. P. 12(c). District courts have applied "a fairly restrictive standard in ruling on motions for judgment on the pleadings." 5C CHARLES A. WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 1368 (3d ed.). Specifically, the Court will only grant such a motion "when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings." Horsley v. Rivera, 292 F.3d 695, 700 (11th Cir. 2002).

Notably, a Rule 12(c) motion is governed by the same standard as a motion to dismiss brought under Rule 12(b)(6).  Roma Outdoor Creations, Inc. v. City of Cumming, 558 F. Supp. 2d 1283, 1284 (N.D. Ga. 2008).  Thus, the Court must accept as true the allegations set forth in the complaint, drawing all reasonable inferences in the light most favorable to the plaintiff.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007).  Although the Court must accept a plaintiff's factual allegations as true, the complaint must provide "more than labels and conclusions" to survive a motion for judgment on the pleadings.  See id. at 555.

## IV. Discussion

Defendant moves for judgment on the pleadings, arguing that pursuant to the recent holding of Jacobson v. Fla. Sec'y of State, 957 F.3d 1193 (11th Cir. 2020),[2] Plaintiff lacks Article III standing.  [Doc. 78].  Specifically, Defendant claims that Plaintiff cannot demonstrate that any alleged acts of discrimination (which violate Title II of the ADA) are traceable to the State of Georgia nor redressable by a judgment against it. [Doc. 78-1 at 5–8].  Thus, Defendant contends judgment on the pleadings is appropriate.  The Court begins by setting forth the legal standard for Article III standing before addressing Defendant's argument.

---

[2] The Court notes that the original opinion Defendant cites to at 957 F.3d 1193 (11th Cir. 2020) was vacated and substituted by a decision on September 3, 2020.  See Jacobson v. Fla. Sec'y of State, 974 F.3d 1236 (11th Cir. 2020).  However, the superseding decision by the Eleventh Circuit made no changes to the original panel's decision on traceability and redressability.  Compare Jacobson, 974 F.3d at 1254–55, with Jacobson, 957 F.3d at 1208–09.

### A. Legal Standard for Standing

Article III of the Constitution permits federal courts to adjudicate only "actual cases and controversies." U.S. CONST. art. III, § 2. "To have a case or controversy, a litigant must establish that he has standing, which must exist throughout all stages of litigation." United States v. Amodeo, 916 F.3d 967, 971 (11th Cir. 2019) (internal quotation marks and citation omitted). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975). To establish Article III standing, the plaintiff must show "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." Jacobson, 974 F.3d at 1245 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)).

### B. Defendant's Argument

Having laid out the relevant legal standard, the Court now turns to Defendant's argument. As noted above, Defendant argues that Plaintiff lacks standing pursuant to the holding of Jacobson. [Doc. 78-1]. Specifically, Defendant claims the alleged discrimination Plaintiff complains of "occurs when students are 'segregated' into the GNETS program" [id. at 2], or "once a student is receiving GNETS services" at the local level. [Doc. 87 at 2]. According to Defendant, those injuries are neither traceable to the State, nor redressable because the decision to

7

place students into the GNETS Program rests with IEP Teams, and the decision whether to administer GNETS Program in different classrooms or buildings is made by Local Education Agencies ("LEAs") and Regional Educational Service Agencies ("RESAs"). [Id.] Put another way, Defendant contends "the when, who, where, and how of special education"—and any associated acts of alleged discrimination—occur at the local level, not the state level. [Id. at 8]. Because Plaintiff failed to sue the local officials who are causing these alleged discriminatory acts, Defendant argues that Plaintiff's claims are not redressable by the State.

However, the Court disagrees with Defendant. First, the Court finds fault with Defendant's characterization that local officials are solely responsible for any discriminatory acts within the administration of the GNETS system. As the Court explained in its May 13, 2020 Order, Plaintiff has alleged sufficient facts for the Court to conclude (at this stage) that the GNETS system is jointly operated and administered at *both* the state and local levels in a discriminatory manner. [See Doc. 61 at 8–14]. In fact, in the May 13, 2020 Order, the Court provided an extensive analysis of how acts at the state level can discriminate against students with disabilities. [See generally id.]

For instance, the Complaint sets forth the following pertinent facts:

> The State, through the [DOE], plans, funds, administers, licenses, manages, and oversees the GNETS Program. It determines which mental health and therapeutic educational services and supports to provide, who will provide such services,

> in what settings services will be provided, and how to allocate and manage the State and federal funds earmarked for such services.
>
> The State, through the [DOE], sets the criteria for students' eligibility for GNETS and establishes the requirements for students' entry into and transition out of GNETS. The State also has designated an employee to oversee the GNETS Program as well as several employees to oversee implementation of Positive Behavioral Interventions and Supports ("PBIS") across the State.
>
> Even though mental health and therapeutic educational services and supports can be provided in integrated general education classrooms, the State, including [DOE], has selected to plan, fund, administer, license, manage, and oversee those services almost exclusively in segregated GNETS centers and classrooms. As a result, local school districts often must send students with behavior-related disabilities to GNETS for such services and supports because the state will not make available the same services in integrated settings.
>
> The Georgia Department of Community Health ("DCH") is the State agency responsible for Medicaid and PeachCare for Kids®, which is the State's program to implement the federal Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") program that funds Medicaid services for eligible children across the State and the United States. Many mental health and therapeutic educational services and supports, including services and supports provided through the GNETS Program, are reimbursable through the EPSDT program that is administered by DCH.
>
> The Georgia Department of Behavioral Health and Developmental Disabilities ("DBHDD") is the State agency providing policies, programs, and services for people with mental illness, substance use disorders, and developmental disabilities. DBHDD is responsible for many of the supports and services that are needed by students with disabilities placed in GNETS and delivered through the State-managed care system that DBHDD administers in part.

Compl. ¶¶ 24–28. Based on these facts, the Court found that Plaintiff's Complaint sufficiently alleges that the administration of GNETS rests with the State (not just at

9

the local level), and that the State bears some responsibility for operating and administering GNETS in a discriminatory manner. [See Doc. 61 at 12–13]; see also The Georgia Advocacy Office, et al. v. State of Georgia, et al., 447 F. Supp. 3d 1311, 1318–19 (N.D. Ga. 2020) (noting that both the State of Georgia and local actors share responsibility in the management and direction of the GNETS program).

Further, in the Complaint, Plaintiff alleges the following:

> The State fails to provide adequate training to general education teachers regarding students with behavior-related disabilities and the supports and services that allow these students to learn in integrated settings.  Instead, the State focuses its training and technical assistance resources related to serving students with behavior-related disabilities on faculty and staff in segregated GNETS programs.  For example, the State provides professional development and training on Functional Behavior Assessments and Behavior Intervention Plans and other evidence-based practices and interventions to GNETS professionals and staff in segregated GNETS programs.
> The State uses discriminatory referral, admissions, and exit criteria for the GNETS Program that have the effect of screening out students with disabilities from integrated settings.
> Because the State does not make available adequate or effective integrated mental health and therapeutic educational services and supports for students with disabilities, thousands of students with behavior-related disabilities in Georgia are at serious risk of placement in segregated GNETS programs.  For instance, many students are placed at serious risk of placement in the GNETS Program because they are not informed of or given the opportunity to receive integrated mental health and therapeutic educational services and supports prior to receiving a referral or recommendation for placement in GNETS, while other students who are able to transition back to general education classrooms from the GNETS Program are at risk of returning to GNETS because the State fails to provide them with the mental health and therapeutic educational services and supports necessary to allow them to remain in a general education classroom.

> Moreover, the GNETS Program utilizes exit criteria that require students with disabilities to meet behavioral standards that result in students unnecessarily remaining in the GNETS Program when they could be served in general education schools.

Compl. ¶¶ 40–43. In sum, Plaintiff asserts that the State fails to provide adequate training to teachers, creates discriminatory placement criteria that unnecessarily screen out students from integrated settings, and utilizes exit criteria that result in "students unnecessarily remaining in the GNETS Program when they could be served in general education schools." Id. ¶ 43. Accepting these facts as true, which the Court must do at this juncture, it seems clear that actions within the State's control, not solely local measures, cause the alleged discrimination. Twombly, 550 U.S. at 555–56.

Moreover, the Court finds Defendant's reliance on Jacobson to be misguided, as the facts of Jacobson are distinguishable from the case at hand. See 974 F.3d at 1242–45.[3] In Jacobson, several individual voters and organizations sued the Florida Secretary of State to challenge Florida's ballot order laws. Id. at 1241. On appeal, the Eleventh Circuit held that the voters and organizations lacked standing because, pursuant to Florida state law, the Florida Secretary of State did not have the authority to redress the plaintiffs' asserted injuries. Id. at 1241–42. Instead, that power rested

---

[3] Although Defendant cites to original panel opinion, 957 F.3d 1193 (11th Cir. 2020), the Court cites to the superseding opinion, 974 F.3d 1236 (11th Cir. 2020), again noting that the discussion on traceability and redressability remained unchanged.

11

with the sixty-seven (67) county Supervisors of Elections, who are "independent officials under Florida law" and "not subject to the Secretary's control." Id. at 1253.

In so holding, the Eleventh Circuit noted:

> [a]ny persuasive effect a judicial order might have upon the [county] Supervisors, as absent nonparties who are not under the Secretary's control, cannot suffice to establish redressability.  [See Lewis v. Governor of Ala., 944 F.3d 1287, 1305 (11th Cir. 2019)] ("If courts may simply assume that everyone (including those who are not proper parties to an action) will honor the legal rationales that underlie their decrees, then redressability will always exist." (quoting Franklin v. Massachusetts, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in the judgment))).  "Redressability requires that the court be able to afford relief through the exercise of its power, not through the persuasive or even awe-inspiring effect of the opinion explaining the exercise of its power." Id. (quoting Franklin, 505 U.S. at 825 (Scalia, J., concurring in part and concurring in the judgment)).  Because the voters and organizations failed to sue the officials who will cause any future injuries, even the most persuasive of judicial opinions would have been powerless to redress those injuries.

Id. at 1254–55.  Thus, Jacobson simply reinforces the long-established principle that any injuries alleged by a plaintiff must be traceable to the defendant, and therefore, redressable by a Court decision against the defendant. Id. at 1255.

However, the situation in this case is different from that in Jacobson.  As noted above, Plaintiff sufficiently alleges the State bears some responsibility for operating and administering the GNETS Program in a discriminatory manner.  Thus, any decision by the Court addressing these acts would be redressable by a judgment against the State.  Id.

Accordingly, the Court finds that the alleged discrimination within the GNETS Program is traceable to the State and could be redressed by a decision against Defendant. Of course, whether Plaintiff can prove its case is another matter entirely. Thus, finding Plaintiff has Article III standing to pursue its claims, the Court denies Defendant's motion.

## V.   Conclusion

Accordingly, the Court denies Defendant State of Georgia's "Motion for Judgment on the Pleadings." [Doc. 78].

**SO ORDERED**, this 15th day of January, 2021.

*[signature: Eleanor L. Ross]*

Eleanor L. Ross
United States District Judge
Northern District of Georgia