# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| PLAINTIFF, | |
| *v.* | Civil Action No. |
| **STATE OF GEORGIA,** | 1:16-cv-03088-ELR |
| DEFENDANT. | |

## UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL COMPLIANCE WITH RULE 45 SUBPOENAS FOR INSPECTION OF PREMISES

Plaintiff United States of America ("United States") respectfully submits this Memorandum of Law in Support of its Motion to Compel Compliance with Rule 45 Subpoenas for Inspection of Premises.

Expert testimony in this case will be critically important to address the United States' claims that the State of Georgia ("State") unnecessarily segregates thousands of students with behavior-related disabilities into a separate and unequal educational program known as the Georgia Network for Educational and Therapeutic Support ("GNETS"), thus violating Title II of the Americans with Disabilities Act (the "ADA"). To facilitate its experts' access to the educational programs at the heart of this litigation, the United States first sought the State's cooperation. When the State declined to coordinate site inspections of GNETS facilities and classrooms, claiming

that it did not represent the regional GNETS programs or the local school districts providing those programs with classroom space, the United States attempted to negotiate voluntary site inspections with the regional GNETS programs themselves. That approach met with limited success following the first full week of cooperative site inspections in November 2021.

In an effort to advance discovery, the United States turned to Rule 45 inspection subpoenas, serving 3 on Cobb County School District (Doc. 142); 4 on Fulton County School District (Doc. 146); 7 on Pioneer RESA (2), the Habersham County School District (1), the Dawson County School District (3), and the Forsyth County School District (1) (collectively "Pioneer Respondents") (Docs. 136, 139-141, 173); 7 on Oconee RESA (5) and Putnam County School District (2) (collectively "Oconee Respondents") (Docs. 138, 170); 7 on Northwest RESA (5) and Chattooga County School District (2) (collectively "Northwest Respondents") (Docs. 169, 171); and 7 on Metro RESA ("Metro Respondents")  (Doc. 172) (together, the "Objecting Parties").

The Objecting Parties, in apparent coordination with the State and one another, responded to the duly-served subpoenas with a closely orchestrated game of whack-a-mole.  They assert virtually identical or overlapping objections that find little support in the law.  The result has been needless delay and an unnecessary consumption of public resources.  Indeed, the United States has devoted far more

attorney hours to mediating the objections than would have been required to conduct the site inspections themselves. These delays must end and the case must move forward. Accordingly, the United States respectfully requests that this Court enforce the subpoenas and permit the United States to conduct the remainder of its site inspections in accordance with the protocol set forth in Attachment A to the subpoenas and the terms of the proposed order accompanying its motion.

## **BACKGROUND**

### I.    **Fact Discovery, Including Experts' Facility Tours and Classroom Observations, Has Been Long Delayed.**

The United States filed this action against the State in 2016. Shortly thereafter, at the State's request, discovery was stayed for more than two years in light of the State's assertions that the United States lacked authority to sue to enforce Title II of the ADA and that a case before the Eleventh Circuit would soon adopt that view. (Doc. 9) Contrary to the State's claim, the Eleventh Circuit squarely held that the United States has authority to enforce the ADA. *United States v. Florida*, 938 F.3d 1221, 1250 (11th Cir. 2019), reh'g en banc denied, App. No. 17-13595-GG (Dec. 22, 2021) (upholding the United States' authority to enforce Title II in court). Undeterred, the State sought a further stay of discovery while the Eleventh Circuit considered whether to rehear the issue en banc. This Court denied that request for an additional stay (Doc. 61), and the Eleventh Circuit ultimately declined to rehear the matter. Following the denial of its request for an additional stay, the

State renewed its previously-filed motion to dismiss, which this Court denied on May 13, 2020. (Doc 61). Discovery opened in July of 2020—nearly four years after the United States filed suit.

At the time discovery opened, the COVID-19 pandemic made site inspections impracticable. Many schools and GNETS Program locations transitioned to remote instruction in the spring of 2020 and did not fully reopen for in-person attendance until the 2021-22 school year. Given this disruption, as well as ongoing health and safety concerns, the United States refrained from pursuing site inspections during the 2020-21 school year and focused on document discovery.

## II.    The State's Refusal to Facilitate Discovery from the GNETS Program Has Promoted Further Delay.

In July 2021, anticipating the return of in-person educational instruction, the United States advised the State that it intended to proceed with site inspections of GNETS Program locations during the fall semester. The United States inquired whether the State would facilitate access to the Program locations for that purpose, but the State refused to do so, taking the position that it did not represent the regional GNETS programs or local school districts providing those regional programs with classroom space and thus had no control over them. To be clear, the United States asserts just the opposite—that the State administers, operates, and controls the

GNETS Program.[1]    However, with discovery incomplete, the United States prioritized advancing the case and sought other avenues for conducting inspections.

Lacking meaningful cooperation from the State, the United States spent nearly a month working to identify counsel for the regional GNETS programs' fiscal agents.    To bridge gaps in information remaining after the State disclaimed possession of key information regarding GNETS facilities, in August and September 2021 the United States served 18 Rule 45 subpoenas for production of documents on the fiscal agents for various regional GNETS programs and worked with counsel for those fiscal agents to obtain the documents requested.  In its initial conversations with those counsel, including counsel for the Objecting Parties, the United States shared its desire to conduct site inspections that could be coordinated cooperatively. Counsel for the fiscal agents for several regional GNETS programs consented to the inspections, the first of which took place in November 2021.

The United States and its experts were scheduled to conduct a second week of site inspections in early December 2021 at Program locations affiliated with the

---

[1] The State's refusal to facilitate the United States' inspection of GNETS Program locations is baffling.  While the GNETS Program is divided into 24 regional GNETS programs, the Georgia Department of Education ("GADOE") employs both a GNETS Program Manager and GNETS Program Specialist whose full-time jobs are to oversee GNETS Program operations, including conducting annual monitoring site visits at GNETS Program locations throughout all 24 regions.  On each site visit the United States has conducted, the State's counsel has been joined by personnel in leadership at GADOE, any of whom, by virtue of their leadership role, could directly coordinate a site visit with a GNETS Program location.

Northwest, North Metro, South Metro, and HAVEN regional GNETS programs. The United States had worked cooperatively with counsel to coordinate the terms of those inspections. Indeed, the United States and counsel for Cobb County School District (HAVEN) had reached full verbal agreement on the terms of inspection.

On the eve of the site inspections, counsel for the Northwest and Metro Respondents emailed the United States, copying counsel for various school districts, and unilaterally sought to impose extreme and unwarranted restrictions not raised on prior coordinating calls.[2] A few days later, counsel for Cobb County School District sent the United States a separate email upending his prior agreement to site inspection parameters that he had initially described as "pretty routine." His newly formed objection parroted most of the extreme restrictions advanced by counsel for the Northwest and Metro Respondents.

The United States' experts, already on the ground in Georgia, ultimately completed only 1.5 days of the originally-scheduled five-day trip.[3] Having invested

---

[2] These restrictions included, among other things, limiting the number of GNETS classrooms experts would be permitted to observe within a given facility to three (regardless of the total number of GNETS classrooms operated by the facility), requiring that the three GNETS classrooms selected for observation be chosen by a site-based administrator rather than the experts, capping observations within each classroom to five minutes, and prohibiting experts from taking any photographs of the physical facilities where GNETS students are served.

[3] The United States arranged all site inspections during the 1.5 days with counsel for the South Metro regional GNETS program's fiscal agent (Clayton County School District). On the day of the inspections, an attorney representing the Henry County

public resources in travel and arrangements for site inspections that were unexpectedly cancelled or only partially completed, the United States decided to pursue all remaining site inspections by formal subpoena.

### III.    The United States Issued Detailed Rule 45 Inspection Subpoenas.

In November and December 2021, the United States issued 77 Rule 45 subpoenas to regional GNETS program fiscal agents and local school districts seeking inspection of 47 GNETS Program facilities, including those affiliated with Cobb County School District, Fulton County School District, and the Pioneer, Oconee, Northwest, and Metro Respondents.

To understand the volume of Rule 45 inspection subpoenas required to facilitate access to the GNETS Program locations the United States seeks to inspect, it is helpful to understand the size and structure of the GNETS Program statewide. The Program is organized into 24 regional GNETS programs.   Each regional GNETS program, in turn, is comprised of either standalone GNETS centers, GNETS classrooms co-located with general education schools ("GNETS school-based locations"), or both.  The number of GNETS centers and/or GNETS school-based locations varies according to each regional GNETS program and the number of

---

School District prohibited the United States' experts from observing classrooms at a South Metro GNETS center operating in a brick-and-mortar facility owned by Henry County School District.  That attorney cited the United States' failure to serve a subpoena on Henry County School District as the basis for the prohibition.

students served through that regional program. Statewide, the GNETS Program serves approximately 3,900 students across 157 program locations, 34 of which are centers and 123 of which are school-based locations. The 123 school-based locations span 56 school districts across the State.

Although GNETS centers and classrooms in regional GNETS program locations are staffed by regional GNETS program personnel, the brick-and-mortar facilities housing those centers and classrooms may be owned by other entities (generally local school districts). Conducting site inspections of GNETS Program locations has required coordination among numerous stakeholders, particularly given the State's refusal to take an active role in facilitating access. Accordingly, for each location the United States seeks to inspect, the United States has subpoenaed the relevant GNETS program's fiscal agent as well as any local school district with an ownership interest in the building housing the program.

Each of the United States' Rule 45 subpoenas contains a near uniform Attachment A specifying the protocol that the United States and its experts will follow in conducting each inspection. That protocol identifies the United States' experts—all of whom have expertise in the education of students with emotional and behavioral disabilities and extensive professional experience touring educational facilities, observing classroom instruction, and assessing student engagement in a manner that minimizes disruption to school operations. The protocol also identifies

the contours of the site inspection, balancing concerns regarding disruption, student privacy, and health and safety with the experts' need for broad access to the information that will inform their opinions in this matter. Among other things, the protocol provides that:

- The United States will limit the number of personnel in a facility at any one time by conducting inspections in two separate teams each consisting of two experts and two DOJ employees.

- All team members have been fully vaccinated against COVID-19 and will wear masks during the entirety of the inspection.

- Each team will abide by the standard security protocol for visitors at the facility (e.g. providing government ID, signing in, wearing a name badge).

- Each team's inspection of a single facility is limited to a maximum of 3.5 hours. Experts may decide how to allocate that time to facility tours and classroom observations.

- Each team will inspect the following areas, to the extent they exist at the facility: classrooms that serve any student enrolled in the regional GNETS program; any classrooms or other areas linked to "specials," "connections," "or electives"; media centers, gymnasiums, cafeterias, science labs, computer labs, playground/outdoor athletic facilities; sensory rooms and/or de-escalation rooms; any rooms used to provide therapeutic services; counseling

offices/centers; nurse's offices; storage rooms/closets; and any other area of the facility accessed or utilized by students in the regional GNETS program.

- Experts will not engage students or classroom personnel beyond exchanging common pleasantries (e.g., acknowledging a student saying hello with a smile). Team members will generally remain in the back of classrooms. However, experts retain reasonable leeway to adjust their positioning when required to meaningfully observe instruction or student engagement.

- The regional GNETS program director or another GNETS site-based administrator will accompany each team during the entirety of the inspection in order to limit disruptions associated with navigating an unfamiliar location. Experts are permitted to ask incidental questions of such administrators outside of classrooms where instruction is occurring.

- In the event of a student crisis or urgent situation, the team will promptly follow the instructions given by the escorting director or administrator.

## IV. Some Nonparty Subpoena Recipients Lodged Objections that the United States Has Been Unable To Resolve.

### A. Cobb County School District and Fulton County School District

On December 28, 2021, Cobb and Fulton County School Districts provided the United States with separate, but largely identical, written objections to the Rule 45 inspection subpoenas. *See* Ex. B (Cobb County School District); Ex. C (Fulton County School District). The objections broadly assert that the Rule 45 subpoenas

"are not proportional to the needs of the case, attempt to impose obligations greater than those under the Federal Rules of Civil Procedure, and seek to gather information or collect evidence that is not relevant to any issue in the above-styled litigation." Ex. B at 1-2; Ex. C at 1-2.  In addition, the two districts further objected to: site inspections by two teams occurring on different days; any more than one expert and one attorney participating in site inspections; experts being accompanied by a DOJ employee during classroom observations; observations of more than four GNETS classrooms at any given site; expert discretion to select which classrooms to observe; classroom observations exceeding 15 minutes or facility tours exceeding 45 minutes; observation of general education classrooms; questioning of any district official, site employee, or GNETS representative; expert discretion to return to previously visited classrooms or adjust positioning within the classroom; expert observation of student transitions between classrooms; experts taking photographs of the premises without first notifying counsel; and experts taking notes that contain the names of students. *See* Ex. B at 2-10; Ex. C at 2-10.

The United States met and conferred with counsel for Cobb and Fulton County School Districts on three occasions between January 10 and January 21, 2022. During that time, the parties narrowed but did not fully resolve the issues in dispute. The remaining issues in dispute include: site inspections conducted on two different days, the number of experts and DOJ personnel permitted to participate in classroom

observations, the length of classroom observations and facility tours, incidental questioning of administrators, expert authority to return to previously visited classrooms, and expert leeway to adjust positioning within classrooms.  On March 4, 2022, the United States and Cobb and Fulton County School Districts filed a Consolidated/Joint Discovery Statement addressing these issues.  (Doc. 160)

### B. The Pioneer, Oconee, Northwest, and Metro Respondents

On January 3, 2022, the Pioneer and Oconee Respondents filed a formal objection to the Rule 45 inspection subpoenas.  *See* Ex. D.  The objection asserts that the Rule 45 subpoenas "are overly burdensome and outside the scope of Rule 45."  *Id.* at 6.  The objection provides few specifics in support of this assertion beyond claiming that the subpoenas are "costly," include "catch all lists of portions of the facilities they seek to inspect – whether they exist in a given school or not," and "ask that each GNETS and school involved sacrifice large amounts of time."  *Id.* at 6-7.  The objection further asserts, without citing any legal authority, that conducting classroom observations and photographing premises fall outside the scope of Rule 45.  *Id.* at 7.

The United States conferred with counsel for the Pioneer and Oconee Respondents regarding their objections on January 6 and 20, 2022.  Each of those telephonic conferences lasted over two hours and included counsel for another local school district with an interest in the facilities housing the Oconee GNETS program.

By February 4, 2022, the United States had largely resolved its dispute with counsel for that local school district.  Despite meeting and conferring by telephone and submitting lengthy written correspondence to counsel in the interim, the United States was unable to resolve its dispute with the Pioneer and Oconee Respondents.

On February 21, 2022, the Metro and Northwest Respondents filed a formal objection to the Rule 45 inspection subpoenas.  *See* Ex. E.  That objection largely tracks the objection filed by the Pioneer and Oconee Respondents.  On February 24, 2022, the United States conferred with counsel for the Metro and Northwest Respondents regarding their objections but was unable to reach agreement.  On March 4, 2022, the United States and the Pioneer, Oconee, Northwest, and Metro Respondents filed a Consolidated/Joint Discovery Statement addressing the disputes between the parties in detail.  (Doc. 161)

## **ARGUMENT**

## I.    **The Information the United States Seeks Under Rule 45 Falls Squarely Within the Scope of Allowable Discovery.**

In challenging the terms of the United States' Rule 45 subpoenas, the Objecting Parties ignore the broad scope of discovery permitted by the Federal Rules.  "The scope of discovery a party can seek under Rule 45 is decided under the same standards set forth in Rule 26(b)."  *Secs. & Exch. Comm'n v. Avent*, No. 16 Civ. 2459, 2018 WL 8996272, at *1 (N.D. Ga. Apr. 26, 2018) (internal quotation marks omitted).  Rule 26(b) provides that a party generally "may obtain discovery

regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). To be discoverable, information satisfying these requirements "need not be admissible in evidence." *Id.*

As even case law cited by the Objecting Parties makes clear, "[r]elevancy is broadly construed, and [a] request for discovery should be allowed unless it is clear that the information sought can have no possible bearing on the claim or defense of a party." *Martinelli v. Petland, Inc.*, Nos. 10 Civ. 407 & 09 Civ. 529, 2010 WL 3947526, at *3 (D. Kan. Oct. 7, 2010) (internal quotation marks omitted) (alteration in original); *see also State Bank of Tex. v. Patel*, No. 09 Civ. 1494, 2015 WL 13358146, at *1 (N.D. Ga. Mar. 31, 2015) ("Put simply, the Civil Rules and this Court's local rules mandate that parties be permitted liberal discovery."). So long as "the discovery sought appears facially relevant, [a] party resisting discovery has the burden to show that the information does not come within the broad scope of relevance as defined by Fed.R.Civ.P. 26(b) or that potential harm outweighs the presumption in favor of broad disclosure." *Martinelli*, 2010 WL 3947526, at *3. *See also Scruggs v. Int'l Paper Co.*, 278 F.R.D. 698, 701 (S.D. Ga. 2012).

The Objecting Parties cannot meet that burden. The information the United States seeks through Rule 45—namely the degree to which GNETS students are segregated from non-GNETS students and the quality of the facilities and

educational opportunities to which GNETS and non-GNETS students have access—is relevant and plainly falls within the broad scope of discovery granted by the Federal Rules.  The United States contends that the State unlawfully discriminates against thousands of students with behavior-related disabilities by financing, operating, and administering "a *separate and unequal* educational program known as [GNETS]." (Compl. ¶ 1) (emphasis added).  In support of this contention, the United States' Complaint alleges, among other things, that:

- "Many of the GNETS Centers and Classrooms are inferior facilities in various states of disrepair that lack many of the features and amenities of general education schools, such as gymnasiums, cafeterias, libraries, science labs, music rooms, or playgrounds" (*Id.* ¶ 49);

- GNETS students are often "unnecessarily segregated from their non-disabled peers because the GNETS [school-based] Classrooms are often located in separate wings or isolated parts of school buildings, some of which are locked and/or fenced off from spaces used for general education programs" (*Id.* ¶ 36);

- "Students in GNETS also often lack access to electives, facilities, and extracurricular activities, such as after-school athletics or clubs, that are available to other students in general education settings" (*Id.* ¶ 48);

- GNETS students "generally do not receive grade-level instruction that meets Georgia's State Standards like other students in general education classrooms.

Rather, particularly at the high school level, students in the GNETS Centers and Classrooms often receive only computer-based instruction" (*Id.* ¶ 47); and

- "When provided with appropriate mental health and therapeutic educational services and supports, the vast majority of the students with disabilities in the GNETS Program could participate in the curriculum, instruction, elective courses, extracurricular activities, and other educational enrichment services in general education classrooms with their peers" (*Id.* ¶ 4).

In-person tours of facilities while school is in session provide firsthand information regarding the quality of the facilities to which students have access, the placement of and interaction between GNETS and non-GNETS students within general education settings, and the opportunities GNETS and non-GNETS students have to take advantage of the features within specific facilities. Classroom observations provide firsthand information regarding the nature and quality of curricula and instruction, classroom structure and management, the provision of therapeutic services and supports, student engagement and interaction, and the extent to which students can be served in general education settings. Each of these issues is relevant to establishing whether the GNETS Program is "separate and unequal" as alleged. Moreover, giving the United States' experts the opportunity to observe the conditions within GNETS Program locations and gather this relevant information

firsthand positions the experts to provide the Court with reports and testimony that are more useful than they would be if based on documentary evidence alone.

## II. The Law Is Well-Established that Rule 45 Permits the Type of School Tours and Classroom Observations the United States Seeks.

The Objecting Parties seek to dictate the manner in which the United States conducts its site inspections by, among other things, arbitrarily limiting which classrooms serving GNETS students the United States' experts may observe and the manner in which those observations are conducted, unduly restricting the length of facility tours and classroom observations, and prohibiting experts from asking incidental questions onsite.   These efforts ignore well-established precedent interpreting Rule 45 to permit reasonable facility tours and classroom observations, particularly in cases alleging deprivation of important civil rights.

Rule 45 authorizes a litigant to command third parties to permit the inspection of physical facilities within their control: "[a] command to produce documents, electronically stored information, or tangible things or to permit the inspection of premises may be included in a subpoena commanding attendance at a deposition, hearing, or trial, or may be set out in a separate subpoena."   Fed. R. Civ. P. 45(a)(1)(C).  Like Rule 34 (which authorizes inspection of a party's premises), Rule 45 has been construed to permit "the broadest sweep of access, inspection, examination, testing, sampling, copying, and photographing of documents, electronically stored information, or objects in the possession or control of another

party." 8B Wright & Miller, *Fed. Prac. & Proc.*, § 2206 (3d ed. 2021); *see also Gaskin v. Commonwealth of Pennsylvania*, No. Civ.A 94-4048, 1997 WL 734031, at *1 n.3 (E.D. Pa. Nov. 4, 1997) (quoting Wright & Miller). Indeed, in cases involving schools, adolescent centers, and mental hospitals, courts have long recognized that Rule 45 permits a party to tour facilities, conduct observations, and ask questions of facility personnel, provided these activities are "reasonable and not oppressive." *Gaskin*, 1997 WL 734031, at *1 (granting motion to compel and denying motion to quash enforcement of Rule 45 subpoenas for classroom observation). *See also*, *New York State Ass'n for Retarded Child. v. Carey,* 706 F.2d 956, 960–61 (2d Cir. 1983) (concluding that district court did not abuse its discretion by permitting plaintiffs' counsel, consultants, and experts to inspect state facility for disabled children and to "take photographs, make observations, take notes, … and interview any class member, staff member, or employee desired outside the presence of defendants, their counsel, and representatives."); *Kenny A. v. Perdue*, Civ Act. 1:02-cv-1686, 2004 U.S. Dist. LEXIS 33464, at *12-13 (N.D. Ga. Dec. 3, 2004) (permitting experts to conduct private interviews with children and informal interviews with staff); *Barnhardt v. Meridian Mun. Separate Sch. Dist.*, Civ. No. 4:65-cv-1300, 2012 U.S. Dist. LEXIS 42460, at *19-20 (S.D. Miss. Mar. 28, 2012) (permitting experts to conduct informal interviews of appropriate school discipline personnel and school tour); *Santamaria v. Dallas Indep. Sch. Dist.*, Civ. No. 3:06-

CV-692-L, 2006 WL 1343604 at *1, *3 (N.D. Tex. May 16, 2006) (permitting expert to observe classes at a single school "for up to three days, without interfering with classroom instruction"); and *Wyatt v. Hannan*, Civ. No. 3195-N, 1995 WL 699616 at *1 (M.D. Ala. Nov. 8, 1995) (permitting expert, outside the presence of defendants' counsel and without a staff escort, to tour an adolescent center, conduct classroom observations, and interview students and teachers at the end of class).

The terms on which the United States proposes its experts tour facilities, conduct classroom observations, and ask questions of facility personnel fall well within the scope of reasonableness. Attachment A to the United States' Rule 45 subpoenas outlines a protocol for school tours and classroom observations that is designed to minimize health and safety concerns, as well as any disruption. The terms of that protocol are driven by the United States' experts and their extensive professional experience conducting classroom observations with minimal disruption to students and teachers. Among other things, the protocol sets a maximum time limit for each inspection of 3.5 hours, limits inspection teams to two experts and two DOJ personnel, further limits classroom observation teams to two experts and one DOJ personnel, identifies beforehand the areas of the underlying facility that the inspection team intends to tour, focuses observations on those classrooms that serve GNETS students, restricts verbal engagement by the classroom observation team while permitting experts to ask incidental questions of site-based administrators

outside of classrooms, establishes general rules about the areas of classrooms where the observation team should situate itself to minimize disruption while allowing experts the flexibility to adjust their positioning should meaningfully observing instruction or student engagement require them to do so, and ensures that experts have the ability to document their findings in writing or through photographs while protecting student privacy. Given that each inspection lasts only a fraction of one day, provides for the United States' inspection team to be accompanied by a site-based administrator, permits experts to ask incidental questions of those administrators while foregoing sit-down interviews of students and staff, and accounts for student privacy concerns, the inspections the United States seeks are far less intrusive than those courts have permitted in other cases involving classroom observations. *See, e.g., Carey*, 706 F.2d at 960-61; *Kenny A.*, 2004 U.S. Dist. LEXIS 33464, at *12-13; *Barnhardt*, 2012 U.S. Dist. LEXIS 42460, at *19-20; *Santamaria*, 2006 WL 1343604 at *1, *3; *Wyatt,* 1995 WL 699616, at *1. Under these circumstances, the proposed inspections are reasonable and—as explained below— do not impose any undue burden. The inspections should go forward as the expert-guided protocol proposes and as well-established precedent allows.

## III. The Objecting Parties Cannot Meet Their Burden To Show the Inspections Will Be Oppressive or Unreasonably Disruptive.

Given that the facility tours and classroom observations that the United States seeks to conduct are both relevant to the claims at issue and within the scope of Rule

45, the United States is entitled to conduct the tours and observations as set forth in Attachment A absent a showing by the Objecting Parties that the inspections impose an undue burden. The Objecting Parties cannot meet this standard.

Compliance with a subpoena necessarily imposes some burden on a subpoenaed party. Accordingly, a "court will not deny a party access to relevant discovery merely because compliance inconveniences a nonparty or subjects it to some expense." *Martinelli*, 2010 WL 3947526, at *6. "Nor will the court excuse compliance with a subpoena for relevant information simply upon the cry of 'unduly burdensome.'" *Id.* (internal quotation marks omitted). *See also Gaskin*, 1997 WL 734031, at *1 n.3 (an objector cannot "rely on a mere assertion that compliance would be burdensome and onerous" (quoting 9A Wright & Miller, *Fed. Prac. & Proc.*, § 2549 at 46 (2d ed. 1994))). Instead, a party seeking to avoid compliance with an inspection subpoena must demonstrate that the subpoena presents an undue burden, including "showing the manner and extent of the burden and the injurious consequences of insisting upon compliance." *Gaskin*, 1997 WL 734031, at *1 n.3 (quoting 9A Wright & Miller, *Fed. Prac. & Proc.*, § 2549 at 46 (2d ed. 1994)). *See also Whatley v. World Fuel Servs. Corp.*, No. 20-20993-MC-SCOLA, 2020 WL 2616209, at *2-3 (S.D. Fla. May 22, 2020); *Meide v. Pulse Evolution Corp.*, No. 3:18-cv-1037, 2019 WL 1518959, at *4-5 (M.D. Fla. Apr. 8, 2019).

Here, the Objecting Parties generally assert that classroom observations will be disruptive. But conclusory assertions, without more, are insufficient to relieve the Objecting Parties of their obligations to comply with lawfully issued subpoenas. In *Gaskin*, the court considered motions by two nonparty school districts to quash Rule 45 inspection subpoenas. 1997 WL 734031, at *1. In support of their motions, the nonparties—much like the Objecting Parties here—argued that the classroom observations plaintiffs sought were beyond the scope of Rule 45 and would "disrupt the learning environment" at the schools subject to inspection. *Id.* at *1 n.3. The court rejected these arguments, concluding that the school districts failed to "show[] that the classroom observations are not within the meaning of the term 'inspection of premises' under Rule 45" and that the "mere assertion that the classroom observations will likely be disruptive, without more, is insufficient to show that the subpoenas should be quashed as unduly burdensome." *Id.* This Court should similarly reject the Objecting Parties' bald assertions that the proposed observations will be so disruptive as to be unduly burdensome.

The Objecting Parties' claims of undue disruption are particularly weak given that classroom personnel are routinely observed in the regular course of business. Principals, central office administrators, therapists, and other providers all routinely enter classrooms to observe teachers and students. In addition, the State itself conducts routine site visits of GNETS program locations as part of its GNETS

Program Strategic Plan Assessments.  The United States' proposed inspections and classroom observations are no more burdensome or disruptive than these regularly-conducted inspections and observations.

Although the Objecting Parties challenge particular aspects of the United States' inspection protocol—including those governing the specific areas of each facility that may be inspected and the classrooms that may be observed, the length of individual classroom observations, experts' positioning within classrooms, experts' rights to return to classrooms previously visited, and the circumstances in which photographs may be taken—they fail to identify with specificity how these protocol provisions result in undue burden, much less injurious consequences to students and staff.  As the United States explains in the Consolidated/Joint Discovery Statements it filed with the Objecting Parties, the provisions of the inspection protocol that the Objecting Parties challenge are reasonable and should be enforced.

Insofar as the Objecting Parties contend that the proposed inspections are unduly burdensome because they require a regional GNETS program administrator or site-based administrator to answer questions from the experts and thus subject the administrators to "roving depositions," those arguments are equally unavailing.  In *New York State Ass'n for Retarded Children v. Carey*, the court acknowledged the danger that "interrogation of … employees, conducted informally, could amount to a roving deposition, taken without notice, throughout the [facility], of persons who

were not sworn and whose testimony was not recorded, and without any right by the defendant to make any objection to the questions asked." 706 F.2d at 961. However, the Second Circuit held that the lower court did not err in concluding that the danger did not outweigh the value of the proposed inspection in the search for the truth because "plaintiff counsel's claims of noncompliance were quite specific," "[a]lmost all the out-of-court statements by … employees provisionally admitted were received for the purpose of enabling plaintiffs' experts to express an opinion as permitted by FRE 703," and the observations to which plaintiffs' experts testified were accompanied by "documentary and photographic exhibits." *Id.*

Here, as in *Carey*, the United States' claims of unlawful discrimination are specific, the statements from administrators are being elicited to enable the United States' experts to render opinions, and those opinions will be supported not only by information gleaned from administrators' statements but also by documentary and photographic evidence. Although the Objecting Parties rely on *Belcher v. Bassett Furniture Industries Inc.*, 588 F. 2d 904, 908 (4th Cir. 1978), to bolster their claim that informal questioning should be prohibited during a Rule 45 inspection, that case was decided against "the backdrop of a boilerplate complaint without any specific allegations of discrimination and a motion which failed 'to specify any reason or need for the inspection, relying simply on rule 34.'" *Clay v. Consol Pa. Coal Co., LLC*, No. 12 cv 92, 2013 WL 12373591, at * 1 (N.D. W.Va. Apr. 25, 2013)

(characterizing *Belcher*).  As in *Carey* and elsewhere, differing facts in this case warrant a different outcome.  *See Carey*, 706 F.2d at 961 (concluding that "[a] different balance [from that in *Belcher*] must be struck in the present case"); *U.S. Equal Emp. Opportunity Comm'n v. Akebono Brake Corp.*, C/A No.: 3:16-3545-CMC-SVH, 2018 WL 1365796, at *3, *6 (N.D. W.Va. Mar. 16, 2018); *Clay*, 2013 WL 12373591, at *2.

## CONCLUSION

For the reasons set forth above, the United States respectfully requests that this Court issue an order compelling the Objecting Parties to comply with the Rule 45 inspection subpoenas served on them, including the protocol outlined in Attachment A to those subpoenas.

Respectfully submitted this 25th day of March, 2022.

KURT R. ERSKINE
*United States Attorney*
Northern District of Georgia

*/s/ Aileen Bell Hughes*
AILEEN BELL HUGHES
GA Bar Number: 375505
Assistant United States Attorney
United States Department of Justice
Richard B. Russell Federal Building
75 Ted Turner Dr. SW, Suite 600
Atlanta, GA 30303-3309
(404) 581.6000
aileen.bell.hughes@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General

SHAHEENA A. SIMONS
Chief

RENEE M.WOHLENHAUS
KELLY GARDNER WOMACK
Deputy Chiefs

ANDREA E. HAMILTON
Special Litigation Counsel

VICTORIA M. LILL

CLAIRE D. CHEVRIER
FRANCES S. COHEN
PATRICK HOLKINS
LAURA C. TAYLOE
MICHELLE L. TUCKER
Trial Attorneys
Educational Opportunities Section

*/s/ Kelly Gardner Womack*
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 598-9603
kelly.gardner@usdoj.gov

## **L.R. 7.1(D) CERTIFICATION**

I certify that this statement has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C). Specifically, this memorandum has been prepared using 14-pt Times New Roman font.

/s/ *Aileen Bell Hughes*
AILEEN BELL HUGHES
ASSISTANT U.S. ATTORNEY

## **CERTIFICATE OF SERVICE**

I certify that, on this 25th day of March 2022, I electronically filed the foregoing Memorandum of Law in Support of the United States' Motion to Compel Compliance with Rule 45 Subpoenas for Inspection of Premises with the Clerk of Court using the CM/ECF system, in order to effect service upon all counsel of record.

/s/ *Aileen Bell Hughes*
AILEEN BELL HUGHES
ASSISTANT U.S. ATTORNEY