# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNITED STATES OF AMERICA,

    PLAINTIFF,

    *v.*                                          Civil Action No.

STATE OF GEORGIA,                1:16-cv-03088-ELR

    DEFENDANT.

## CONSOLIDATED/JOINT DISCOVERY STATEMENT REGARDING THE UNITED STATES' RULE 45 SUBPOENAS FOR INSPECTION OF PREMISES WITHIN FLOYD COUNTY SCHOOL DISTRICT

Plaintiff United States of America and nonparty Floyd County School District ("Respondent" or "FCS"), being unable to resolve a discovery dispute despite meeting and conferring in good faith, respectfully submit this Joint Statement pursuant to the applicable terms of the Court's standing order.

In December 2021, the United States issued 77 Rule 45 subpoenas to inspect sites and observe classrooms in 47 facilities housing Georgia Network for Educational and Therapeutic Support ("GNETS") programs.[1] Each subpoena

---

[1] The United States served stakeholders claiming an interest in the program or the properties where the program operates, including GNETS programs, Regional Education Service Agencies ("RESAs"), and local education agencies ("LEAs").

includes a uniform, carefully considered site visit protocol (attached hereto as Exhibit A) that identifies the terms of the inspections.

Respondent duly filed objections. After meeting and conferring, counsel narrowed the disputes to the following.

## 1. Tailoring Subpoenas for Each Facility

*United States' Position*

The United States' protocol purposefully facilitates its experts' use of a uniform methodology for collecting data and information from site inspections. Consistent access across facilities promotes the reliability of experts' opinions.

*Respondent's Position*

With due respect to the United States' position, it is the position of FCS that the proposed protocol lacks an understanding of the unique circumstances of each individual school district and fails to appreciate the lack of uniformity of each GNETS program and accompanying facilities. FCS is one of many local school systems within Georgia. *See generally* Ga. Const. Art. VIII, § V, ¶ I. As FCS explained in its Objection to the United States' subpoena, Coosa High School and Coosa Middle School are general education schools which also house FCS' local GNETS program. (*See* Objection of the Floyd Co. School Dist. to Pl.'s Subps. at 2-3 (Feb. 7, 2022) ("FCS' Objection").) Thus, the quality and access of the FCS's facilities is precisely the same for all students, including those participating in the

GNETS' program.  This is vastly different from some other schools that house only a stand-alone GNETS program, and different protocols should apply to the different circumstances found in each local school system, and the United States - though it has stated it recognizes that FCS's GNETS program is housed within precisely the same buildings as all other students - has steadfastly refused to more narrowly tailor its subpoenas seeking site visits, which narrowing would dramatically reduce the scope of any proposed site visit and result in far less disruption to the educational setting and environment.

Not only are the United States' subpoenas not reasonably tailored to fit the particularized circumstances present at Coosa High and Coosa Middle, but they are also unacceptable from the standpoint of permitting unknown persons into a very sensitive school or educational setting - which necessarily will be very disruptive for behaviorally-disabled students at issue.  Plaintiff seeks carte blanche access to schools in which the residents of Floyd County have entrusted the safety and welfare of their behaviorally disabled children to FCS, and Plaintiff's overly-broad subpoenas completely fail to reflect this reality - especially where here there is nothing to be gained by the United States inasmuch as there is no difference or distinction - that the United States contends it is seeking to discover - between the facilities accessed by general education students versus the GNETS program participants/students.

*United States' Reply*

The United States acknowledges that the FCS sites it intends to inspect house school-based GNETS programs, but this fact alone does not, as Respondent indicates, provide dispositive evidence of the "quality and access" of the facilities to which GNETS students are entitled. To date, the United States has observed school-based GNETS programs that are similarly co-located at general education schools that do not provide "precisely the same" access to GNETS and non-GNETS students. Observing school-based GNETS programs permits the United States' experts to assess the educational opportunities available to GNETS and non-GNETS students, including those groups' access to various facilities and educational opportunities, which are plainly relevant to establishing whether the GNETS Program is "separate and unequal" as alleged in the Complaint.

Insofar as Respondent describes the proposed inspections as "necessarily…very disruptive" without proffering any supporting evidence, courts have dismissed these kinds of unsubstantiated claims of classroom disruption. *See, e.g., Santamaria v. Dallas Indep. Sch. Dist.*, Civ. No. 3:06-CV-692-L, 2006 U.S. Dist. LEXIS 33195, at *1, *3 (N.D. Tex. May 16, 2006).

## 2.  Incidental Questions from Experts Asked On-Site

*United States' Position*

Under the United States' site visit protocol, "[t]he experts on each team shall be permitted to ask questions of the GNETS director or site-based administrator that are incidental to the inspection of the premises. This includes questions about the specific use(s) of particular rooms or areas of the building, the extent to which GNETS students are permitted to use those rooms or areas of the building, basic facts regarding the nature of any classrooms entered and/or observed (e.g., the grade level(s) of the classroom, subject matter, etc.), whether classroom attendance that day reflects actual enrollment, the job title of school staff interacting with students, and, generally, what students are working on." Ex. A at 2. These incidental questions provide important context for what experts observe during site inspections. For that reason, they must be asked and answered contemporaneously with the site inspection.

*Respondent's Position*

What Plaintiff proposes is—in essence—"'a roving deposition . . . throughout the [school], of persons who were not sworn and whose testimony was not recorded, and without any right by [FCS] to make any objection to the questions asked.'" *See, e.g., Curry v. Allan S. Goodman, Inc.*, 2003 WL 22305161 (D. Conn. 2003) (prohibiting questions during an on-site inspection); *U.S. v. Territory of the Virgin Islands*, 280 F.R.D. 232, 236-237 (D.V.I. 2012) (*quoting Belcher v. Bassett Furniture Indus., Inc.*, 588 F.2d 904, 907 (4th Cir. 1978) (Denying United States

request for carte blanche to conduct on-site inspections to include "informal questioning" or otherwise interview staff members). ).  FCS responds that the term "incidental" is vague and ambiguous.  As best as FCS can tell, the United States intends to use term in the sense that "incidental questions" are "minor" or "inferior in importance, size, or degree; comparatively unimportant." *See* Merriam-Webster Dictionary, *Definition    of    Incidental*, https://www.merriam-webster.com/dictionary/incidental (last accessed Mar. 14, 2022); Merriam-Webster Dictionary, *Definition   of   Minor   (adjective)*, https://www.merriam-webster.com/dictionary/incidental (last accessed Mar. 14, 2022) (referenced in definition of the word "incidental").  And the cases cited below by the United States do not support the United States' position and are clearly distinguishable.  The *New York State Ass'n for Retarded Children Inc. v. Carey*, 706 F.2d 956 (2nd Cir. 1983) placed at issued a prior Consent Order previously agreed to by the parties.  And, why the United States cited *Kenny A. v. Perdue*, 2004 WL 5503780 (N.D. Ga., Dec. 13, 2004) is a complete mystery, as this decision does not remotely support the idea, as the United States contends, that asking questions, or conducing roving depositions, during a Rule 45 site inspection is permissible.  Indeed, this decision neither involves nor makes any reference to Rule 45 site inspections.

Further, the questions that the United States' experts apparently intend to ask are not "incidental" in the sense that they are minor.  Moreover, the term "incidental"

is so vague and ambiguous as to provide very little indication to FCS—and this Court—of the questions these experts may ask.  These questions apparently go to the United States' theory of the case, and therefore, FCS proposes a reasonable alternative—questioning of appropriate FCS personnel in a controlled, recorded format during which FCS' counsel will be available to make reasonable objections—in other words, a deposition under Rule 30 of the Federal Rules of Civil Procedure. A recorded deposition will protect the United States, the United States' experts, and FCS from any misunderstandings or any allegations of misrepresentations or purposeful omissions.

Also, the United States suggests that *the experts* will be able to ask these incidental questions.  (Exhibit A at 3.)  And without citing to any supporting authority, the United States simply assumes that there exists some obligation or duty for anyone to respond to or answer an expert's questions during a site inspection. No such duty or obligation exists.  Further, the United States' subpoena excludes Department of Justice personnel from this limitation of asking "incidental" questions.  (*See id*.)  DOJ personnel should not be permitted to question any students, parents, staff members, faculty members, or other such persons at Coosa High or Coosa Middle.[2]  One may reasonably imagine a student, a parent, a faculty member,

---

[2] If this is the intent of the United States, then it should be written explicitly in the protocol.

or a staff member of a school being legitimately intimidated and feeling as though he or she must respond to any questions from an official from the DOJ, regardless of any intentions on the part of DOJ personnel. This approach is not acceptable in a school setting.

Here, FCS' have proposed that the United States consider convening a short deposition of FCS for purposes of answering any so-called "incidental" questions about the facilities in advance and for purposes of gaining additional information about FCS so that the United States may narrowly tailor their subpoenas.  For the reasons expressed above, FCS objects to Plaintiff's subpoenas and any roving questioning of unsworn and unknown persons at Coosa High or Coosa Middle whom Plaintiff's experts or which Department of Justice staff may encounter.

Lastly, despite serving subpoenas seeking on-site inspections, the United States seeks to also compel agents of FCS to also be present and answer their questions.  Again, FCS' objects to this overreach.  Also and as FCS understands the term, FCS does not have a "GNETS director," and FCS cannot compel any such person to be there.  To the extent that the United States compels a GNETS director to attend a site inspection, any statements by a "GNETS director" who is not employed by, or affiliated with, FCS should not be attributable to FCS.

_United States' Reply_

As discussed in detail in the United States' prior joint discovery statements (Docs. 160 and 161), courts have upheld the right of parties to ask questions during a Rule 45 inspection. *See, e.g., New York State Ass'n for Retarded Children v. Carey*, 706 F.2d 956, 960–61 (2d Cir. 1983); *Kenny A. v. Perdue*, Civ Act. 1:02-cv-1686, 2004 U.S. Dist. LEXIS 33464, at *12-15 (N.D. Ga., Dec. 3, 2004). The contextual questions the United States' experts intend to ask administrative personnel are permissible.

Further, only experts, not DOJ personnel, will ask questions incidental to the site inspection. The United States has also acknowledged repeatedly to Respondent that it recognizes FCS is not responsible for the presence of, or statements made by, the GNETS Director.

### 3. Individuals Permitted to Participate in Classroom Observation

<u>United States' Position</u>

"Each [site inspection] team will consist of a maximum of two DOJ employees and two experts." Ex. A at 1. While all will participate in the facility tour, only one DOJ employee will join experts in classrooms for observations. This protocol limits the total number of classroom visitors, ensures the United States' experts have adequate access, and guards against accusations of improper questioning of the experts and protocol violations by other parties.

Any DOJ employee who participates in a classroom observation will be bound by the same protocol restrictions outlined for experts in Exhibit A, with the exception that DOJ employees will, to the extent practicable, stand by the door of a classroom rather than move around a classroom.

*Respondent's Position*

At the outset, the United States baldly contend that the classrooms with behavior-disabled students in Floyd County Schools are routinely observed by strangers and/or lawyers and experts; no facts exist to support this representation to the Court by the United States' attorneys.

The United States proposes having two experts and one DOJ employee in the classroom. (Ex. A at 2.) This protocol considers only those persons associated with the United States, but it does not consider counsel for the State of Georgia, counsel for FCS, and any employees of FCS who might be accompanying counsel for FCS. This adds at least three "strange" adults in a classroom, plus the three other adults proposed by the United States. The thought that this will not disrupt or distract the class or cause behavioral changes on the part of students is not reasonable, nor is it realistic, based upon the experience of actual classroom educators.

FCS has offered a reasonable alternative to the United States. FCS has technological capability to install cameras in GNETS classrooms that will provide high-quality audio and video at various angles. There will be no adults in the

classroom, and the United States' experts will be able to observe the classroom remotely, while on FCS' campus, without the distraction of multiple strange adults being present.  Respectfully, this will probably give the United States a more accurate picture of what actually occurs during a typical day in a GNETS classroom at Coosa High or Coosa Middle that is not disrupted by multiple strange adults standing, sitting, or moving about the classroom (as the United States has refused to agree that their experts must remain seated or stationary while observing the classrooms).  The United States has wholly rejected FCS' proposal for a remote/video observation of the subject classrooms without considering same.

_United States' Reply_

Classroom personnel are routinely observed in the regular course of business. Principals, central office administrators, therapists, and other providers all enter classrooms to observe teachers and students. The State itself conducts periodic site inspections and observations of GNETS programs as part of its administration and oversight of the GNETS Program. Respondent has made no showing that the inspections the United States proposes are any more disruptive than the presence of multiple cameras or the regularly-conducted inspections and observations to which teachers and students are accustomed. Since November of 2021, the United States' experts have conducted site inspections of 22 GNETS facilities. During these inspections, the experts generally have been accompanied by at least one DOJ

personnel when conducting classroom observations. While students have occasionally acknowledged the presence of visitors during these observations, they have generally returned to what they were doing prior to the expert team entering the classroom within the first minute or two. This is true even when other administrators and counsel not affiliated with DOJ are present.

## 4. Expert Positioning During In-Person Classroom Observation

_United States' Position_

The United States designed its protocol to maximize the experts' ability to conduct meaningful classroom observations, while minimizing disruption. The protocol describes the manner in which the United States' experts will conduct in-person classroom observations at each facility. Further, the protocol prescribes that the United States' experienced and highly trained experts will stand or sit, usually in "the back of the classroom," but allows "reasonable leeway" when "needed to observe what students are working on and students' level of engagement." Ex. A at 2-3.

This limitation provides the right degree of flexibility. If students are working individually on laptops, experts may need to view the screens so as to gauge instructional content and students' engagement. Similarly, an expert may need to adjust her positioning to see and hear small group instruction.

_Respondent's Position_

According to the United States' protocol, "[t]he experts shall make all reasonable efforts to stand and/or sit in the area of the classroom least likely to cause disruption." (Ex. A. at 2.)  This will generally be in the rear area of the classroom. (*Id.*)  However, "[e]xperts *shall have reasonable leeway to adjust their position* within the classroom *where needed* to observe what students are working on and students' level of engagement." (*Id.* at 3 (emphasis added).)

Nowhere in Exhibit A does the United States acknowledge the conspicuous omission of restrictions upon DOJ staff. By its own terms, these restrictions on movement only apply to the United States' supposed experts. Second, "reasonable leeway" is an incredibly broad and imprecise term.  Given that the protocol apparently leaves it to the experts to determine what is "reasonable," this vague term provide essentially no guidance to the experts.   Under this present protocol, and despite any good intentions on the part of the United States, the experts could—if they deem such leeway "reasonable"—hover over or follow students, faculty, or staff.  FCS objects to the broad and imprecise term "reasonable leeway" and requests that the Court impose specific guidelines for movement of all visitors to the classrooms.

Again, FCS has technological capability to install cameras in GNETS classrooms that will provide high-quality audio and video at various angles to enable their experts to observe the classroom via live audio/video feeds such that the

educational setting is not disrupted and will provide the experts with a true depiction of what occurs in GNETS program's educational setting.  FCS asks that the United States be required to observe the subject classrooms via a live audio/video feed, or in the alternative, that all experts and other adults in the room remain seated at all times.

<u>United States' Reply</u>

The United States' experts, combined, have thousands of hours of classroom observation experience. The discretion to adjust one's position within a classroom, if necessary, supports the experts' ability to gather information needed to form reliable opinions.

The experts have already conducted site inspections of 22 GNETS facilities and generally have had no issues with the way in which they have exercised the discretion to adjust their positioning. The experts have a shared interest in minimizing disruption not only out of concern for the students and the school environment, but also to ensure their observations are of a typical classroom environment operating as it normally would.

The United States has also addressed with Respondent, both in writing and by telephone, that its experts will "not encroach on students' personal space" nor will they hover or follow any student, faculty, or staff.  Further, Attachment A only

describes the minimal, discretionary movement of United States' experts because the one DOJ employee present in the classroom generally will not need to move.

## 5. Two Inspections within Provided Time Limitations

_United States' Position_

The United States "intends to conduct inspections of the identified premises in two separate teams." Ex. A at 1. This site inspection design aims to minimize the disruption that GNETS programs and local school systems complain of by moving through buildings in two modestly sized teams rather than a single, large team. The two-team design also offers COVID-19-related benefits by limiting the number of individuals traveling in close proximity to one another through buildings. The total inspection time for any given facility is 7 hours—the equivalent of a single school day—whether the two 3.5-hour visits occur on the same day or two different days.

No team will leave and then return to the same inspection site, even if the time limit permits. The United States will also coordinate with counsel ahead of time to schedule the precise start times of the inspection.

_Respondent's Position_

Again, the United States has refused to narrowly tailor each subpoena to the particular school campus at issue. Here, FCS's GNETS programs are held within the very same educational buildings where all other general education students attend. The United States understands that the qualify and access to the amenities is

precisely the same for all FCS' students, yet the United States is insisting on disrupting the school day and educational setting by viewing all parts and aspects of the school campus.  And, since the United States will not accept the fact that GNETS students have equal access and use of precisely the same buildings and facilities as all other general education students, inasmuch as they all occupy precisely the same buildings and space, the far less disruptive alternative to a site inspection would be a simple and short sworn deposition of FCS - which would serve to dramatically limit the scope of any on-site inspection and would serve to promote a much shorter and less disruptive site visit, but the United States has rejected FCS' ideas in this regard.  All the United States has done is make *ipse dixit* assertions that taking a sworn deposition, with an eye towards substantially narrowing the scope of intrusive and disruptive site inspections of a non-party's educational premises, is inadequate.

And, while FCS appreciates the United States' commitments concerning: (1) leaving and returning to the same inspection site; and (2) coordinating with FCS' counsel ahead of time.  Respectfully, however, none of these commitments are currently within Exhibit A, despite counsel for FCS' asking the United States to revise their subpoenas in this connection.  (*See generally* Ex. A.)  FCS requests that these commitments be incorporated into the actual document or subpoena, but in conferring with counsel for the United States, they have steadfastly refused to revise

or amend their subpoenas to reflect a requirement to either begin at a certain time of the day or to actually call and coordinate well in advance of appearing.

*United States' Reply*

The United States does not accept Respondent's assumption that GNETS and general education students necessarily have equal access. The experts are entitled to explore the nature of the access in any given school-based GNETS program location and reach their own conclusions firsthand. Depositions rely solely on verbal reports from interested parties and are an inadequate substitute.

## 6.  Inspection of Areas Accessible to Students

*United States' Position*

The United States has detailed, with particularity, the areas within the school facilities that it intends to inspect. Ex. A at 2. Each location listed is a necessary part of the United States' inspection, as it provides information regarding the quality of facilities to which GNETS and general education students have access. The United States' experts do not seek to inspect areas of the school that are not accessed or utilized by GNETS students or general education students, nor do they seek to observe individual therapy or health sessions during which confidential information about students may be discussed.

*Respondent's Position*

The United States continues to fail to glean that FCS is not a party to these proceedings but is, instead, a non-party.  The United States' protocol regarding access to facilities is objectionable for several reasons.

First, one of the apparent purposes of the United States' proposed site inspections is to ascertain the quality and condition of FCS' GNETS facilities as compared to FCS' general education facilities. As explained in FCS' Objection, while Coosa High and Coosa Middle house FCS' GNETS program, these schools are also general education schools. All students at Coosa High and Coosa Middle— regardless of whether such students are GNETS students or general education students—have access to the same facilities. Thus, there is no reason why Plaintiff should have any need to conduct such expansive and invasive inspections of these schools - particularly where FCS is a non-party to this litigation.

Second, several of these areas listed in the Exhibits A are particularly concerning because these are areas in which students, staff, or faculty may receive confidential medical or counseling services and in which students, parents, faculty, and staff have a reasonable expectation of privacy or confidentiality. Obviously, purported experts and employees of the DOJ should not be permitted to invade the personal privacy and confidentiality of others (particularly children) by invading these spaces. Furthermore, the catch-all phrase of "any other area of the premises" essentially gives unlimited permission to invade any space within the school,

including principals' offices, bathrooms, and other places where there would be a reasonable expectation of privacy or confidentiality on the part of students, parents, faculty, and staff.

Again, while FCS appreciates that the United States now says it does not "seek to observe individual therapy or health sessions during which confidential information about students may be discussed[]",FCS against requests that the Court impose additional requirements and protections—beyond just a commitment from the United States that it will not "observe individual therapy and health sessions"— for students, faculty, staff, and other persons at Coosa High and Coosa Middle to ensure that the United States and DOJ do not invade places where students, parents, faculty, staff, and other persons have reasonable expectations of privacy.

Third, a review of the subpoenas served demonstrate that the United States has <u>not</u> detailed "with particularity" the areas it intends to inspect."  The protocol includes the wide-open catch-all phrase, "[a]ny other area of the premises accessed or utilized by students in the GNETS program not specifically identified above." (Ex. A. at 2.)  Thus, while some of the other areas listed may be particularly described, this catch-all phrase affords wide leeway for the United States to unnecessarily and unreasonably inspect any part of Coosa High or Coosa Middle. And, in conferring with the United States, the United States has indicated it intends

to gain access to any space or part of the buildings it experts may so choose to explore.

*United States' Reply*

The United States has provided Respondent more than sufficient notice of what it seeks to inspect. The "catch-all" phrase in Attachment A, Ex. A at 2, to which Respondent refers does not authorize the United States "to unnecessarily and unreasonably inspect any part" of the proposed sites, as Respondent asserts. The language specifically limits the request to those areas "accessed or utilized by students in the GNETS program." Ex. A at 2.

Respondent's continued claim that "there is no reason" for the United States to conduct site visits of school-based GNETS programs such as the ones in FCS is conclusory and disregards the broad scope of discovery afforded by Rule 45, which is construed consistently with Rule 26(b). *See* Fed. R. Civ. P. 26(b)(1) (providing that a party generally "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case").

Further, and consistent with its practice during the 22 site inspections conducted to date, the United States will not observe any location where an individual is receiving confidential medical or counseling services or engaged in other activities for which common decency requires privacy.

**7.  Photographs of Site Locations, Provided Photographs Do Not Contain Images of Students, Staff, or FERPA-Protected Material**

*United States' Position*

The United States' experts "shall have the right to document the nature, condition, and appearance of the premises via photographs so long as the photographs taken do not include students, parents/guardians, building personnel, or any other images that implicate the Family Educational Rights and Privacy Act." Taking photographs of the premises can be done silently through the use of a cell phone without disruption.

Consistent with our proposal during the meet and confer, the United States agrees to provide Respondent with a copy of any photographs taken during the site visit within 30 days of the visit.

*Respondent's Position*

Plaintiff states it "shall have the right to document the nature, condition, and appearance of the premises via photographs so long as the photographs taken do not include students, parents/guardians, building personnel, or any other images that implicate [FERPA]."[3]  (Ex. A at 3.)  First, this does not take into account the privacy protections and non-delegable duties under state law as described in  *Pavesich v. New England Life Insurance Company*, 122 Ga. 190 (1905), *Multimedia WMAZ, Inc. v. Kubach*, 212 Ga.App. 707 (1994),  *Bazemore v. Savannah Hospital*, 171 Ga.,

---

[3] "FERPA" refers to the Federal Educational Rights and Privacy Act, 20 U.S.C. § 1232g, and the regulations promulgated as a result of that act, 34 C.F.R. §§ 99.1 through 99.67.

257 (1930), *Bullard v. MRA Holdings, LLC*, 292 Ga. 748 (213), FERPA, and their progeny.

Second, the United States' protocol does not supply any means for FCS to ensure that the United States' experts and representatives are, in fact, complying with this portion of the protocol. The United States seems to assume that FCS is required to just "trust" their experts; such an assumption is misguided. Third, the United States' proposal concerning photographs does not account for areas where students, parents, faculty, or staff have a reasonable expectation of privacy or confidentiality, as described above. To ensure that all persons can be assured of privacy, FCS has previously offered to take photographs, as requested by the United States' representatives and experts, and provide these to the United States on the same day at no cost; however, the United States has rejected that proposal without explanation. Thus, FCS objects to the taking of photographs or other visual images at Coosa High or Coosa Middle as proposed in the United States' protocol.

FCS also objects to the proposal that the United States provide any photographs "within 30 days of the visit." Given modern technology, the United States can—and should—provide these photographs much more quickly and on the same day. Under FCS' proposal, photographs *will be shared on the same day.*

*United States' Reply*

Despite Respondent's claims to the contrary, the United States has, both in writing and via telephone, offered and agreed to solutions to many of the above-stated concerns. In January, prior to the filing of Respondent's objections, the United States agreed via email to "sit down on site at the completion of each visit to review…any photographs the experts have taken [and]…to delete any photographs that may inadvertently contain PII or images of students." This same email offered to provide copies of photographs after the visit in addition to going over the photographs on the day of the site visit. Although Respondent relies on *Pavesich v. New England Life Insurance Company*, 122 Ga. 190 (1905), a case about a man whose likeness was used without his consent in a company advertisement, it and the other cases cited do not apply here. The United States has repeatedly made clear—in Attachment A, Ex. A at 3; in emails; in its initial position in this brief; and on phone calls with Respondent—that the photographs taken by its experts will not include students or facility personnel. The offer to meet on the date of the site inspection to delete any such photographs inadvertently taken is precisely the kind of procedural safeguard Respondent claims the United States has not offered. Having Respondent take photographs instead of the United States' experts would slow down the inspections and hinder the control of the inspections to which the United States is entitled. *See Scruggs v. Int'l Paper Co.*, 278 F.R.D. 698, 702 (S.D. Ga. 2012) (concluding that a party was "patently unreasonable" in proposing that it—rather

than the party conducting the inspection—videotape the premises and noting that the party seeking the inspection was "entitled to control his own videotaping and evidentiary presentation, not to mention protect his own litigation strategy"). The United States' proposal adequately protects student privacy while ensuring access to needed discovery.

Respectfully submitted this 28th day of March, 2022.

KURT R. ERSKINE
*United States Attorney*
Northern District of Georgia

/s/ *Aileen Bell Hughes*
AILEEN BELL HUGHES
GA Bar Number: 375505
Assistant United States Attorney
United States Department of
Justice
Richard B. Russell Federal
Building
75 Ted Turner Dr. SW, Suite 600
Atlanta, GA 30303-3309
(404) 581.6000
aileen.bell.hughes@usdoj.gov


KRISTEN CLARKE
Assistant Attorney General

SHAHEENA A. SIMONS
Chief

/s/ *I. Stewart Duggan*
I. STEWART DUGGAN
GA Bar Number: 232207
Brinson Askew Berry
P.O. Box 5007
Rome, GA 30162-5007
Telephone: 706-291-8853
isduggan@brinson-askew.com

*Counsel for Floyd County Schools*

RENEE M.WOHLENHAUS
KELLY GARDNER WOMACK
Deputy Chiefs

ANDREA E. HAMILTON
VICTORIA M. LILL
CLAIRE D. CHEVRIER
FRANCES S. COHEN
PATRICK HOLKINS
LAURA C. TAYLOE
MICHELLE L. TUCKER
Trial Attorneys
Educational Opportunities Section

*/s/ Kelly Gardner Womack*
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 598-9603
kelly.gardner@usdoj.gov

*Counsel for Plaintiff*

## **L.R. 7.1(D) CERTIFICATION**

I certify that this statement has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C). Specifically, this brief has been prepared using 14-pt Times New Roman font.

/s/ *Aileen Bell Hughes*
AILEEN BELL HUGHES
ASSISTANT U.S. ATTORNEY

## **CERTIFICATE OF SERVICE**

I certify that, on this 28th day of March 2022, I electronically filed the

foregoing Consolidated Joint Discovery Statement with the Clerk of Court using

the CM/ECF system, in order to effect service upon all counsel of record.


/s/ *Aileen Bell Hughes*
AILEEN BELL HUGHES
ASSISTANT U.S. ATTORNEY

EXHIBIT A

## **Attachment A**

Pursuant to the terms of the attached subpoena to permit inspection of premises in a civil action, the United States of America, by and through the United States Department of Justice ("DOJ"), intends to inspect the premises identified by address in the attached subpoena on the dates specified. This inspection, or "site visit," will be conducted in accordance with the terms set forth below.

*General Health and Safety Precautions*

In an effort to limit the number of personnel in any given facility at one time, the United States intends to conduct inspections of the identified premises in two separate teams.  One team will inspect the premises on the first date identified in the subpoena and the second team will inspect the premises on the second date identified in the subpoena.  Each team will consist of a maximum of two DOJ employees and two experts, and DOJ will provide the names of the members of the visiting teams one week in advance of the site visit.  All DOJ team members have been fully vaccinated against COVID-19 and will wear masks during the entirety of the visit, regardless of whether the underlying facility operates under a mask mandate.  Team members will abide by any sign-in policies and procedures regularly applied to visitors to the premises.  The United States requests that either the regional GNETS program director or another GNETS site-based administrator accompany each team during the entirety of the inspection of the identified premises.  In the event a student has a crisis or any other urgent school-based situation arises, members of the team will immediately follow the regional GNETS program director or GNETS site-based administrator's instructions for responding to the crisis/situation.

*Experts*

The purpose of these site visits is to allow the United States' experts an opportunity to access the information they need to form opinions in the matter of *United States v. Georgia*, No. 16 Civ. 3088 (N.D. Ga.).  Each of the United States' experts (Jeff Anderson, Mary Jo Dare, Amy McCart, and Melinda Mitchiner) specializes in the field of special education and has extensive experience touring educational facilities, observing classroom instruction, and assessing student engagement in a manner that minimizes disruption to school operations.  As stated above, the names of the specific experts and DOJ personnel whom the United States expects to be in attendance during the site visit will be provided one week in advance of the visit.

*Timing*

While this subpoena identifies an 8-hour time range for inspection on account of yet-to-be-determined start and end times, the total length of a single team's inspection of the premises identified shall not exceed 3.5 hours.  In most cases—particularly in facilities where there are smaller numbers of students in the GNETS program—the length of the site visit will be significantly shorter.  So long as total inspection time for a single team does not exceed 3.5 hours, the experts' time spent on any particular aspect of the site visit shall not be limited.  In advance of the visit, the United States will work with counsel to identify more specific arrival and departure times that do not interrupt the start or dismissal of school.

*Physical Inspection*

Each site visit team will tour the premises and have the opportunity to inspect the following areas:

- Any classrooms that serve any student enrolled in the regional GNETS program (regardless of whether the classroom is a dedicated GNETS classroom or general education classroom where a student in the GNETS program spends a portion of the day);
- Any classrooms or other areas linked to "specials," "connections," or "electives" (e.g., art, music, theatre, band, career tech);
- Media center/Library;
- Gymnasium;
- Cafeteria;
- Science Labs;
- Computer Labs;
- Playground/Outdoor Athletic Facilities;
- Sensory Rooms and/or De-escalation Rooms;
- Any rooms that are used to provide therapeutic services, whether to students in the GNETS programs or to students with or without disabilities in the general education school;
- Counseling Office/Center;
- Nurse's Office/Station;
- Storage rooms/closets within GNETS school-based classrooms or standalone GNETS centers; and
- Any other area of the premises accessed or utilized by students in the GNETS program not specifically identified above.

The experts on each team shall be permitted to ask questions of the GNETS director or site-based administrator that are incidental to the inspection of the premises.  This includes questions about the specific use(s) of particular rooms or areas of the building, the extent to which GNETS students are permitted to use those rooms or areas of the building, basic facts regarding the nature of any classrooms entered and/or observed (e.g., the grade level(s) of the classroom, subject matter, etc.), whether classroom attendance that day reflects actual enrollment, the job title of school staff interacting with students, and, generally, what students are working on.  To minimize disruptions to classroom instruction, the experts shall refrain from asking such questions inside of individual classrooms where instruction is occurring.

*Classroom Observations*

Each team inspecting the identified premises will have the opportunity to observe classroom instruction or any other activity taking place in all GNETS classrooms and any general education classroom that serves a student in the GNETS program ("qualifying classrooms").  The two experts on each team and one DOJ employee shall have the right to enter each qualifying classroom to conduct observations.  The experts shall make all reasonable efforts to stand and/or sit in the area of the classroom least likely to cause disruption.  In most cases, this area will be the back of the classroom.

2

Experts shall have reasonable leeway to adjust their position within the classroom where needed to observe what students are working on and students' level of engagement.  The duration of the classroom visit will be determined by the experts.  If requested, the experts shall be permitted to return to a classroom already observed for additional observation.  Additionally, experts shall be permitted to observe—either from a stationary position in a classroom or in a hallway—periods of transition where students in the GNETS program move to and from classrooms or other areas of the school facility.

At no time during the observation will the experts question or otherwise engage students or classroom personnel beyond exchanging common pleasantries (e.g., responding to a "hello," saying "thank you" or smiling).  In the event classroom personnel or students speak to the experts unprompted, the experts will minimize communication by responding with a nod or by saying "thank you" or "okay."

*Expert and Team Member Documentation*

The experts participating in the inspection of the premises shall have the right to document the nature, condition, and appearance of the premises via photographs so long as the photographs taken do not include students, parents/guardians, building personnel, or any other images that implicate the Family Educational Rights and Privacy Act.  No other limitations shall be placed on the experts' right to photograph the premises.

All members of the DOJ team, including experts, participating in the inspection of the premises shall have the right to document any part of the inspection by taking notes.  No restrictions shall be placed on this right.