IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　Plaintiff,<br><br>v.<br><br>STATE OF GEORGIA,<br><br>　　Defendant. | **Civil Action File No.**<br>**1:16-cv-03088-ELR** |

**NONPARTY FULTON COUNTY SCHOOL DISTRICT AND COBB COUNTY SCHOOL DISTRICT'S RESPONSE BRIEF IN OPPOSITION TO UNITED STATES' MOTION TO COMPEL**

The Fulton County School District ("FCSD") and Cobb County School District ("CCSD") (collectively, the Districts"), both non-parties in the above-styled action, oppose the United States' (the "Government") Motion to Compel [Doc. 174], as follows:

**I.　INTRODUCTION.**

GNETS classrooms are perhaps the most sensitive, non-residential educational settings within the State of Georgia, with students exhibiting a broad range of severe social, emotional, or behavioral challenges that require intensive support, therapy, and services. Students focus on coping skills, behavior regulation, and adaptive behaviors—all in accordance with each student's individualized needs

under their IEP. They do so by developing a relationship of trust and familiarity with their classroom teachers, paraprofessionals, and other support personnel who regularly assist and provide services in a small, classroom environment.

The Government's proposed site inspections will severely disrupt the harmony and effectiveness of that classroom setting. The Government essentially asks this Court to give four different experts unfettered discretion to enter classrooms, move about freely within the classrooms, observe classes for up to an hour, and return to those same classrooms for re-observations. The Government insists that its attorneys may be present in the classroom during these observations—in many cases doubling the number of adults who would otherwise be present in the classroom. The Government intends to conduct observations across multiple school days, requiring a site-based administrator and other school personnel to be on call to assist with and facilitate site tours. And it demands that its experts have discretion to question school district employees freely about a non-exhaustive list of topics. The Government intends to repeat this process within at least 47 schools across the State. [Doc. 174-1 at 7.]

Under Federal Rule of Civil Procedure 26, these proposed site inspections are not proportional to the needs of the case. Given the sensitivity of these educational environments, there is no question that Government's proposed protocol would

disrupt classroom operations. Furthermore, facilitating site visits for two days would unduly burden school-wide operations by monopolizing the time of administrators who must escort the Government's representatives around the school.

To the extent the Government has a theoretical need to conduct site inspections, it does not outweigh the burden they would impose on the Districts. The Government has not explained why it needs four experts to observe each classroom, with no meaningful limit on their discretion regarding duration of classroom visits, re-observation of classrooms, moving freely about the classroom, or interrogating site employees. For that matter, it has not explained why cumulative, protracted site inspections would yield any more relevant information about GNETS facilities and educational opportunities [*see* Doc. 174-1 at 14-15] than a review of program documents and student educational records. Though these site inspections would contribute little to the case from an evidentiary standpoint, they would severely disrupt the learning of students and unreasonably strain school resources. The Court should therefore place limitations on them, consistent with the objections the Districts have set forth in their joint discovery statement.

## II.   STATEMENT OF FACTS.

**A. Overview of GNETS classrooms.**

Within the continuum of supports available to help special needs students, GNETS is a non-residential service that "provides comprehensive educational and therapeutic support services to students who exhibit intense social, emotional and/or behavioral challenges with a severity, frequency or duration such that the provision of education and related services in the general education environment has not enabled him or her to benefit educationally based on the IEP." Ga. Comp. R. & Regs. § 160-4-7-.15(2)(a). The behaviors of GNETS students often includes "significant, aggressive, self-destructive, atypical, and withdrawal behaviors." *Id.* § 160-4-7-.15(2)(b). "Children receiving GNETS services are taught coping skills, behavior regulation, and adaptive behaviors, with a keen focus on developing positive interpersonal relationships with others." *Id.* Those services are "implemented with greater intensity and frequency than what is typically delivered in a general educational school environment." *Id.* § 160-4-7-.15(2)(c). GNETS classrooms are "staffed to meet the needs of a unique population of students requiring intensive individualized supports." *Id.* § 160-4-7-.15(2)(d).

### B. The Government's proposed site inspections.

The Government seeks to have four experts, divided into teams of two, observe every GNETS classroom in 47 schools, across two school days, for a total of up to seven hours of observational time at each school. To date, the U.S. has not disclosed the identity of those four experts, their field(s) of expertise, or the matters on which they will opine. Though the Government's attorneys have repeatedly acknowledged that its experts usually complete each classroom observation within 15-20 minutes, they insist upon having discretion not only to observe classrooms for up to an hour but also to re-observe classrooms. The Government also insists that its experts must have discretion to move about the classroom freely and interrogate site employees and representatives.

### III. MEMORANDUM OF LAW.

A subpoena under Rule 45 is subject to the same discovery limitations set forth under Rule 26. *S.E.C. v. Avent*, No. 1:16-CV-2459-SCJ, 2018 WL 8996272, *1 (N.D. Ga. Apr. 26, 2018). Under Rule 26(b)(1), parties generally may conduct discovery into a non-privileged matter that is both relevant and proportional to the needs of the case. When assessing proportionality, courts consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the

discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "Restrictions on discovery may be broader where a non-party is the target of discovery to protect such third parties from unnecessary harassment, inconvenience, expense or disclosure of confidential information." *In re Candor Diamond Corp.*, 26 B.R. 847, 849 (S.D. N.Y. 1983) (citing *Dart Indus. Co. v. Westwood Chem. Co.*, 649 F.2d 646, 649 (9th Cir. 1980)).

Under Rule 26, this Court has "broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998). Even in a "complex" action where the Government makes "wide-ranging allegations," this Court "nevertheless must ensure discovery remains proportional to the needs of [the] case." *U.S. v. Zak*, No. 1:18-CV-5774-AT, 2019 WL 13059907, *3 (N.D. Ga. June 28, 2019). Toward that end, the Court must limit otherwise allowable discovery if it would be "unreasonably cumulative or duplicative, or can be obtained from some other sources that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C).

Under Rule 26(b), this Court should limit the scope of the Government's site inspections in accordance with the District's objections set forth in their joint discovery statement, as further set forth below.

### A. The Government has not shown a need for four experts observing each classroom.

First and foremost, the Government's desire to have four experts observe and re-observe every classroom across multiple days is not proportional to the needs of the case. The Government has not disclosed these experts' field(s) of expertise or the matters on which they will opine. Without such information, this Court cannot ascertain the need for one of these experts—much less four—to conduct classroom observations and tour school facilities. Even assuming the experts are competent to conduct these observations, there will doubtlessly be overlap amongst their opinions, making them needlessly cumulative and redundant.

To compound matters, classroom observations will become increasingly distracting as more unfamiliar adults gather during class. GNETS classrooms are small. The presence of multiple experts, a DOJ attorney, and school district and GNETS attorneys will not go unnoticed, making it difficult for students to focus. Accordingly, this Court should limit observation of a given classroom only to two experts, with other Government representatives and attorneys remaining outside the classroom.

**B. The Government should not retain unfettered discretion regarding the duration of classroom observations and repeat observations.**

The Government's request that its experts have up to an hour to observe and re-observe each classroom is not proportional to the needs of the case. When conferring with the District's counsel regarding the terms of these site inspections, the Government's attorneys have repeatedly acknowledged that classroom observations generally may be completed within 15-20 minutes. The Districts' proposed twenty-minute cap is not "arbitrary," as the Government accuses in its Motion; it is based on the time period the Government's attorneys said was typically required for a full classroom observation. [Doc. 174-1 at 17.] If any proposed time limit is arbitrary, it is the Government's proposed one-hour cap, which appears to be based on nothing more than hypothetical speculation that the need for a full hour might arise.

Similarly, the Government has demonstrated a need for its experts to leave a classroom and return for a repeat observation. The Government intends to conduct site visits within at least 47 schools around the State. Its case will not suffer if its experts are unable to observe every instructional scenario that might unfold in a single classroom on a given day. Repeat observations would needlessly distract students with strangers coming and going during class time.

Accordingly, this Court should limit each classroom observation to twenty minutes and prohibit the Government from returning to classrooms for repeat observations.

### C. The Government should not be permitted to conduct multi-day observations at a site.

Given the above limitations, the Government's request for multi-day inspections is also not proportional to the needs of the case. The Government's insistence on multi-day inspections is premised on the assumption that it has four experts conducting parallel observations in teams of two. Yet, as discussed above, there is no need for four experts to see each classroom. Moreover, it would unduly burden school operations for the Government to monopolize the time of any administrators who must accompany Government representatives during two days of site visits. Thus, the Court should require that each site visit be scheduled during a single school day.

### D. The Government's experts should remain stationary at the back of classrooms during observations.

The Government's experts should not have discretion to move freely about the classroom during observations. The Government contends that the purpose of these classroom observations is to assess "the degree to which GNETS students are segregated from non-GNETS students and the quality of the facilities and

educational opportunities to which GNETS and non-GNETS students have access." [Doc. 174-1 at 14-15.] The Government's experts can easily accomplish those stated objectives by observing classes from a stationary position at the back of the classroom. After all, the classrooms and class sizes are small.

Because the site visits are ostensibly programmatic observations—not individual educational evaluations relating to specific students—there is no need for the Government's experts to move about the classroom, distracting students from receiving services and instruction. But, as drafted, the Government's subpoenas place no practical limitation on the expert's discretion to do so. [*See* Doc. 174-3 at 5 (giving experts "reasonable leeway to adjust their position within the classroom" as they see fit). This Court should place a bright-line limitation on the experts' discretion: requiring them to conduct observations from a stationary position at the back of the classroom.

### E. The Government should not be permitted to conduct unsworn, roving depositions of non-party personnel who have not had a reasonable opportunity to prepare for such questions.

The Government should not be allowed to use Rule 45 to interrogate site employees, thereby circumventing any protections that Rule 30 would otherwise provide during the course of a deposition. Under Rule 26, "the degree to which [a] proposed [site] inspection will aid in the search for truth must be balanced against

the burdens and dangers created by the inspection." *Belcher v. Bassett Furniture Industries, Inc.*, 588 F.2d 904, 908 (4th Cir. 1978).

For instance, in *Belcher v. Bassett Furniture Industries, Inc.*—a discrimination case remarkably similar to this one—the Fourth Circuit reversed a trial court's decision to permit a plaintiff's expert to interview the defendant's employees during an inspection of the defendant's plant. *Id.* at 911. The court noted that the burdens and dangers of such interviews were significant. *Id.* at 909. Beyond disrupting the defendant's plant operations, there was a substantial risk that the plaintiff would exploit the opportunity to conduct unsworn depositions of ill-prepared plant employees, upon which the expert presumably would base her opinions. *Id.* at 907, 909.

Conversely, the plaintiff had minimal interest in interviewing the employees. *Id.* Though the questions may have been relevant to the plaintiff's discrimination claims, the plaintiff had not demonstrated a need for site inspection interviews over other forms of less invasive discovery, such as written discovery or depositions. *Id.* at 909-10. Like here, the plaintiff refused to disclose the expert's field of expertise or the areas of inquiry, revealing only that the inspection would relate to the

desirability of certain jobs. *Id.* at 909.[1] And like here, the complaint alleged discrimination, but the plaintiff had not alleged any specific instances of discrimination. *Id.* Given the limited—if any—evidentiary value of unsworn, hearsay testimony of ill-prepared employees, the burdensome site inspection interviews were not proportional to the needs of the case. *Id.*

Here, the Government aims to do essentially the same thing, relying on generalized allegations of disability discrimination to justify its intrusion. Though the Government bullet-points those allegations in its Motion, none of them involve *specific instances* of discrimination that might necessitate a site inspection. [*See* Doc. 174-1 at 15-16.] The Government does not allege that a particular teacher, school, or even school district improperly places children in GNETS. [*See generally* Doc. 1.] The Government takes issue with the state-wide GNETS program as a whole.

Even if the Government could tie these interrogations to a specific instance of alleged discrimination, the information gathered would still be of minimal evidentiary value, consisting only of unsworn, hearsay testimony by site employees. *See Belcher*, 588 F.2d at 909. And like the plaintiff in *Belcher*, the Government has

---

[1] Though the site inspection subpoenas list examples of potential topics, that the list is not exhaustive. [Doc. 174-3 at 4.]

unfairly placed those employees at a disadvantage in fielding questions, refusing to disclose its four experts' fields of expertise or the areas of inquiry.[2] If the Government is truly interested in discovering accurate and meaningful information in its case, it should not attempt to rely on informal interrogations at site visits.

Furthermore, no matter how much the Government insists otherwise, site inspection interviews would impose a significant burden on the Districts. If school district officials are answering questions from Government representatives, they are not able to do their jobs as educators. These interrogations would also cause site visits to drag on longer, further disrupting school operations and monopolizing personnel resources longer than necessary.

The Districts also have an interest in making sure their employees are reasonably prepared to answer questions by DOJ representatives. But the Government's caginess about the experts' fields of expertise and areas of inquiry will make that task more expensive and time-consuming than it otherwise would be. If the Government were interested in eliciting meaningful, accurate, and fully informed answers, it would share that information.

---

[2] Even in its Motion, the Government still has not disclosed this information, raising questions about the qualifications of its experts to be conducting programmatic observations of GNETS in the first place. [*See generally* Doc. 174-1.]

The Government cites no authority lessening the burden of its showing. In *New York State Association for Retarded Children v. Carey*, the case on which the Government principally relies, the Second Circuit allowed a plaintiff's expert to interview the defendant's employees at the facility in question, but it recognized that the facts of that case—unlike here—were markedly different from *Belcher*. 706 F.2d 956, 961 (2d Cir. 1983). In *Carey*, the plaintiff alleged that a specific youth facility was 65% over capacity, severely understaffed, and in a tragic state of "physical squalor," including human waste in common areas, rodent and cockroach infestation, and the "most glaring maintenance inadequacies," like "blocked plumbing, broken furniture, and lack of curtains for privacy. . . ." *Id.* at 958, 961-62. Some residents also were nude, partially clothed, or forced to wear "ill-fitting, badly torn and stained" clothing. *Id.* at 962.

After the defendant entered into a consent judgment to improve these awful conditions, the trial court allowed the plaintiff's expert to inspect the facility and interview willing employees and children for the narrow purpose of verifying compliance with the judgment. *Id.* at 958, 960-61. In other words, the site inspections interviews related to (i) a specific defendant, (ii) engaging in specific misconduct, at (iii) at a specific facility. *Id.* at 960-61. Most importantly, a physical inspection was

by far the most effective means of discovery to confirm whether the facility's practices and conditions complied with the judgment. *See id.*

The facts of the instant case bear no similarity to *Carey's*. There, the allegations of misconduct were far more egregious—and specific—than anything the Government has alleged regarding GNETS. [*See* Doc. 174-1 at 15-16.] Unlike here, the site inspection interviews also promoted a narrow purpose (verifying compliance with a consent judgment) that could not be achieved through less intrusive means, such as a review of documents or records.[3] Here, if the Government questions whether children are properly placed in a GNETS setting, they could ascertain that information from reviewing their IEPs and other education records. Indeed, a records review would provide far more relevant information than an informal interrogation of an ill-prepared staff member could.

The Government's reliance on *Kenny A. v. Purdue* is also misplaced. There, unlike here, the plaintiff sued on behalf of a class of foster children and requested a court order permitting his expert to interview those children (*i.e.*, class members he represented). 2004 WL 7335091, No. 1:02-cv-1686-MHS, *1 (N.D. Ga. Dec. 3,

---

[3] Similarly, in *Barnhardt v. Meridian Municipal School District*, the purpose of the United States' site inspection interviews was to verify compliance with a prior court-ordered de-segregation plan—not generalized discovery as the Government seeks here. 2012 WL 1067105, No. 4:65-cv-1300 HTW-LRA, *1-2 (S.D. Miss. Mar. 28, 2012).

2004). The plaintiff's motion was prompted not by a desire to conduct general discovery, but by two, specific, troubling events: (i) the firing of a staff member who sexually molested a foster child and who never should have been hired because of a disqualifying criminal record; and (ii) a police officer's refusal to leave a child with the facility because of "concerns about the chaos he found there and unsupervised residents threatening the child with sexual assault." *Id.* at *1. The plaintiff also submitted evidence that the facilities in question were "plagued by routine overstays . . . , overcrowding, and runaways." *Id.* In contrast, the Government has not made any allegations—much less produced any evidence—of the types of specific misconduct that warranted a site inspection interview in *Kenny A*.

The Government fares no better with *Santamaria v. Dallas Independent School District*. There, the court granted a plaintiff's expert limited access to "merely observe" classes. No. 3:06-CV-692-L, 2006 WL 1343604, *3 (N.D. Tex. May 16, 2006). While the court allowed the expert to "communicat[e] with the necessary personnel of the [school district] to facilitate her observations," it did not permit the type of open-ended interviews that the Government seeks here. *Id.*[4]

---

[4] The last case the Government cites, *Wyatt v. Hanan*, is virtually useless as a precedent, as it provides no rationale for why the court permitted site inspection interviews—only that the court made that ruling after a telephone conference. No. 3195-N, 1995 WL 699616, *1 (M.D. Ala. Nov. 8,. 1995).

In short, the facts of the instant case closely resemble those of *Belcher*. Like there, this Court should prohibit the Government's experts from attempting to exploit a Rule 45 site inspection to conduct roving, informal interrogations to elicit unsworn, hearsay statements from school district employees who have not had a reasonable opportunity to prepare for such questions. The Government has not made specific allegations warranting such intrusive, disruptive interrogations, and alternative discovery methods would yield more meaningful and accurate information. Because employee interviews are not proportional to the needs of the case, this Court should not allow them.

## IV.  CONCLUSION.

For the foregoing reasons, the Districts respectfully request that this Court DENY the United States' Motion to Compel [Doc. 111] and only permit site inspections consistent with the objections the Districts set forth in their joint discovery statement.

*/s/Jeffrey R. Daniel*
Jeffrey R. Daniel
Georgia Bar No. 949075
*Counsel for NonParties Cobb County School District and Fulton County School District*

PARKER, POE, ADAMS & BERNSTEIN, LLP
1075 Peachtree St., NE, Suite 1500
Atlanta, GA 30309; jeffdaniel@parkerpoe.com

## **CERTIFICATE OF SERVICE**

This is to certify that the within and foregoing **NONPARTY FULTON COUNTY SCHOOL DISTRICT AND COBB COUNTY SCHOOL DISTRICT'S RESPONSE BRIEF IN OPPOSITION TO UNITED STATES' MOTION TO COMPEL** has been served via CM/ECF notification upon the following:

| | |
|---|---|
| Aileen Bell Hughes, Esq. <br> abellhughes@usa.doj.gov | Claire Chevrier, Esq. <br> claire.chevrier@usdoj.gov |
| Kelly Gardner, Esq. <br> kelly.gardner@usdoj.gov | Victoria Lill, Esq. <br> victoria.lill@usdoj.gov |
| Renee Wohlenhaus, Esq. <br> renee.wohlenhaus@usdoj.gov | Andrea Hamilton, Esq. <br> andrea.hamilton@usdoj.gov |

This 8th day of April 2022.

/s/*Jeffrey R. Daniel*
Jeffrey R. Daniel
Georgia Bar No. 949075
*Counsel for NonParties Cobb County School District and Fulton County School District*

PARKER, POE, ADAMS & BERNSTEIN, LLP
1075 Peachtree St., NE, Suite 1500
Atlanta, GA 30309
Phone: 678.690.5750
jeffdaniel@parkerpoe.com