IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA
    PLAINTIFF,

    *v.*

STATE OF GEORGIA
    DEFENDANT.

Civil Action No.

1:16-CV-03088-ELR

## **CERTIFICATION OF SERVICE OF DISCOVERY**

Pursuant to Local Rule 5.4, N.D. Ga., I certify that on Thursday, December 22, 2022, the United States served its **FIRST REQUESTS FOR ADMISSION** to the State of Georgia, on the following counsel of record via email:

    Josh Belinfante
    Robbins Alloy Belinfante Littlefield LLC
    500 Fourteenth Street NW
    Atlanta, GA 30318
    Josh.Belinfante@robbinsfirm.com

A true and correct copy of the request is attached hereto.

Respectfully submitted,

RYAN K. BUCHANAN
*United States Attorney*

/s/ Aileen Bell Hughes
*Assistant United States Attorney*
Georgia Bar No. 375505
aileen.bell.hughes@usdoj.gov
*600 U.S. Courthouse*
*75 Ted Turner Drive, S.W.*
*Atlanta, GA 30303*
*(404) 581-6000  fax (404) 581-6181*

**Certificate of Compliance**

I hereby certify, pursuant to Local Rules 5.1 and 7.1D, that the foregoing certification has been prepared using Book Antiqua, 13-point font.

/s/ Aileen Bell Hughes
*Assistant United States Attorney*

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

January 26, 2023

/s/ AILEEN BELL HUGHES
AILEEN BELL HUGHES
*Assistant United States Attorney*

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:16-cv-03088-ELR |
| | ) | |
| STATE OF GEORGIA | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF UNITED STATES' FIRST REQUESTS
FOR ADMISSION**

Pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 36, Plaintiff,

the United States of America hereby serves Defendant, the State of Georgia, with

the following requests for admission.  Please copy each request, and set forth your

response beneath each.

## <u>INSTRUCTIONS</u>

1.      Pursuant to Fed. R. Civ. P. 36, responses to these requests are due in

writing within 30 days.

1

2.      These requests seek information in the possession, custody, or control of Defendant or its employees, including information contained in documents as defined herein or in any other source of data known or available to Defendant, its employees, attorneys, agents, and/or any other person acting on Defendant's behalf.  All responses will be deemed to reflect Defendant's knowledge.

3.      In answering these requests, Defendant shall admit, deny, or state in detail why it cannot truthfully admit or deny each request.

## **DEFINITIONS**

1.      For purposes of responding to these requests, "Defendant" and/or "the State" means the State of Georgia, its State agencies (including the Georgia Department of Education, the Georgia Department of Behavioral Health and Developmental Disabilities, and the Georgia Department of Community Health), legislative bodies, and any of its officers, employees, contractors, attorneys, representatives, investigators, agents, or any other person acting or purporting to act on its behalf.

2.      "Document" means writings, electronic mail, drawings, graphs, charts, photographs, sound recordings, images, and other data, data records, or data compilations stored in any medium from which information can be obtained.

2

3.    "Fiscal Agent" means the local educational agency ("LEA") or the regional education service agency ("RESA"), as set forth in Ga. Code Ann. § 20-2-270.1.

4.    "FTE" means the full-time equivalent student count used for purposes of calculating funding under the Quality Basic Education formula.

5.    "General Assembly" means the Georgia General Assembly, which consists of two chambers—the Georgia House of Representatives and the Georgia Senate.

6.     "Georgia Department of Behavioral Health and Developmental Disabilities" ("DBHDD") means the Georgia Department of Behavioral Health and Developmental Disabilities and any division thereof, including all officers, employees, contractors, attorneys, representatives, investigators, agents, or any other person acting or purporting to act on its behalf.

7.    "Georgia Department of Education" ("GaDOE" or "State Department of Education") means the Georgia Department of Education and any division thereof, including all officers, employees, contractors, attorneys, representatives, investigators, agents, or any other person acting or purporting to act on its behalf.

8.    "GNETS" means the Georgia Network for Educational and Therapeutic Support Program and any of the twenty-four regional GNETS programs—which may include GNETS Centers, GNETS Classrooms, and/or other

3

settings where GNETS services are provided —including all officers, employees, contractors, attorneys, representatives, investigators, agents, or any other person acting or purporting to act on its or their behalf.

9.    "GNETS Centers" or "GNETS standalone facilities" means self-contained buildings that serve only students with disabilities placed in GNETS from one or more school districts.

10.    "GNETS Classrooms" means classrooms that only serve children placed in GNETS but are located on a campus with general education school buildings.  "GNETS Classrooms" does not include general education classrooms in which GNETS services may also be provided to students with disabilities in the same classroom as their non-disabled peers.

11.    "GNETS student" means any student, pre-K through grade 12, receiving educational services through the GNETS Program at any time from the 2015-16 school year to the present.

12.    "Governor's Office" means the Office of the Governor of the State of Georgia.

13.    "GSFIC" means the Georgia State Financing and Investment Commission and any division thereof, including all officers, employees, contractors, attorneys, representatives, investigators, agents, or any other person acting or purporting to act on its behalf.

4

14.     "House Budget and Research Office" means the Georgia House of Representatives' House Budget and Research Office and any division thereof, including all officers, employees, contractors, attorneys, representatives, investigators, agents, or any other person acting or purporting to act on its behalf.

15.     "IDEA" means the Individuals with Disabilities Education Act.

16.     "Office of Planning and Budget" means the Georgia Governor's Office of Planning and Budget and any division thereof, including all officers, employees, contractors, attorneys, representatives, investigators, agents, or any other person acting or purporting to act on its behalf.

17.     "PBIS" means Positive Behavioral Interventions and Supports.

18.     Quality Basic Education ("QBE") formula means the formula used to calculate the amount of funds needed by each full-time equivalent student such that a program can be sufficiently funded to provide quality basic education to all enrolled students, as defined in Ga. Code Ann. § 20-2-161.

19.     "Regional GNETS program" means one of the 24 regional programs that together constitute the statewide GNETS Program.  The regional GNETS programs may offer services through GNETS Centers, GNETS Classrooms, and/or other settings.

20.     "Senate Budget and Evaluation Office" means the Georgia Senate's Budget and Evaluation Office and any division thereof, including all officers,

employees, contractors, attorneys, representatives, investigators, agents, or any other person acting or purporting to act on its behalf.

21.   "State appropriations bill" means a bill that authorizes one or more State agencies to spend specified sums of money from public funds.

22.   The present tense includes the past and future tenses.  Words in the singular and plural tenses are interchangeable.  The terms "all" and "any" mean "any and all;" "and" and "or" encompass both "and" and "or."  The word "including" means "including, but not limited to."

## <u>REQUESTS FOR ADMISSION</u>

Pursuant to Federal Rule of Civil Procedure 36, please state whether Defendant admits, denies, or is without sufficient information to admit or deny each of the following Requests for Admission:

1.   Admit that the first GNETS Program location was established in 1970.

2.   Admit that the first GNETS Program location was a single educational center in Athens, Georgia.

3.   Admit that in 1972, the State expanded the GNETS Program to become a network of psychoeducational centers (commonly referred to as "psycho-ed centers") operating throughout the State of Georgia.

4.   Admit that in 1976, the State reorganized the psycho-ed centers operating throughout the State into 24 regions.

6

5.      Admit that in 2007, the State renamed the network of psycho-ed centers the Georgia Network for Educational and Therapeutic Support Program.

6.      Admit that the GNETS Program currently includes the following 24 regional GNETS programs:

- Burwell
- Cedarwood
- Coastal Academy
- Coastal Georgia Comprehensive Academy
- DeKalb-Rockdale
- Elam Alexander Academy
- Flint Area Learning
- Futures
- Harrell Learning Center
- H.A.V.E.N. Academy
- Heartland Academy
- Horizon Academy
- Mainstay Academy
- North Metro
- NorthStar Educational and Therapeutic Services
- Northwest Georgia Educational
- Oak Tree
- GNETS of Oconee
- Pathways Educational
- River Quest
- Rutland Academy
- Sand Hills
- South Metro
- Woodall

7.      Admit that each of the 24 regional GNETS programs has a separate fiscal agent: a RESA or a LEA.

8.      Admit that in 1990, the State passed a law requiring the development of

7

"a coordinated system of care so that children and adolescents with emotional disturbance and their families will receive appropriate educational, nonresidential and residential mental health services."  Ga. Code Ann. § 49-5-220(a)(6).

9.    Admit that DBHDD is responsible for "planning, developing, and implementing the coordinated system of care for [children with severe emotional disabilities]."  Ga. Code Ann. § 49-5-220(b).

10.    Admit that the GNETS Program currently serves students in both GNETS Centers and GNETS Classrooms.

11.    Admit that students served in GNETS Centers do not have physical access to their non-disabled peers while at the GNETS Center where they are served.

12.    Admit that GNETS Classrooms include classrooms located in separate wings of general education school buildings, isolated parts of general education school buildings, and areas of general education school buildings that are physically distant from general education grade-level classrooms.

13.    Admit that the Georgia Department of Audits and Accounts, Performance Audit Operations Division conducted an audit of the GNETS Program and released the findings of that audit in an October 2010 document ("2010 GNETS Audit") produced as GA01852247- GA01852288.

14.    Admit that GaDOE employs both a GNETS Program Manager and GNETS Program Specialist who specifically work on the GNETS Program.

15.    Admit that GaDOE first hired a GNETS Program Manager exclusively dedicated to GNETS in 2016.

16.    Admit that the GNETS Program Manager hired in 2016 was Nakeba Rahming.

17.    Admit that prior to 2016, GaDOE employee Ginny O'Connell dedicated a portion of her time to GNETS-related program management and a portion of her time to PBIS program management and coordination.

18.    Admit that the GNETS Program Manager hired in 2016 reported directly to the State School Superintendent's Chief of Staff.

19.    Admit that GaDOE first hired a GNETS Program Specialist in 2018.

20.    Admit that the GNETS Program Specialist hired in 2018 is Lakesha Stevenson.

21.    Admit that the GNETS Program Specialist reports to the GNETS Program Manager.

22.    Admit that the current GNETS Program Manager is Vickie Cleveland.

23.    Admit that Vickie Cleveland has served as GNETS Program Manager since 2018.

24.    Admit that in order to receive funding, regional GNETS programs are required to submit an annual GNETS grant application to GaDOE each fiscal year.

25.    Admit that regional GNETS programs must complete the GNETS

9

Strategic Plan and self-assessment as part of the annual grant application process.

26.    Admit that the State appropriations bill is initiated by the General Assembly each year.

27.    Admit that the Governor's Office provides input, or has the opportunity to provide input, into the State appropriations bill each year.

28.    Admit that each year the State appropriations bill approved by the General Assembly becomes law either with the signature of the Governor or in the absence of a veto by the Governor.

29.    Admit that the annual State appropriations bill designates a "Total Funds" amount for the State Department of Education, which for FY2023 was in the amount of $12,825,676,638.  This amount is identified in HB 911 at Section 24, line 1813 (p.61).

30.    Admit that the "Total Funds" amount for the State Department of Education in an annual appropriations bill consists of federal funds and grants, State funds, and other funds.

31.    Admit that, as set forth in HB 911 at Section 24, lines 1813-1820 (pp.61-62), the FY2023 federal funds and grants portion of the "Total Funds" amount for the State Department of Education in the annual appropriations bill was $2,099,148,714, the State funds portion was $10,696,316,904, and the other funds portion was $30,211,020.

10

32.    Admit that the formula used to calculate QBE funding assumes a "basic unit cost," as stated in HB 911 at Section 24, below line 1820 (p.62), which is the "base amount" defined in Ga. Code Ann. § 20-2-161.

33.    Admit that allocations from the State Department of Education to LEAs are calculated using the QBE funding formula, as referenced in HB 911 at Section 24, below line 1820 (p.62).

34.    Admit that the base amount used in QBE funding calculations is determined for a high school student in a general education program, which has a weight of 1.0 and establishes the baseline, as set forth in Ga. Code Ann. § 20-2-161.

35.    Admit that the QBE funding formula includes multipliers, applied to the base amount, for certain categories of students to reflect the additional costs associated with those students' educational needs, as set forth in Ga. Code Ann. § 20-2-161.

36.    Admit that the multipliers for students with disabilities range from 2.4118 for Category I to 5.8710 for Category IV, as set forth in Ga. Code Ann. § 20-2-161.

37.    Admit that funding for staffing for students with disabilities also varies by the disability Category, with staffing ratios ranging from "1 to 8" for Category I to "1 to 3" for Category IV, as set forth in Ga. Code Ann. § 20-2-161.

11

38.    Admit that QBE funding for a student with disabilities is greater under the QBE formula than it would be if the same student did not have disabilities.

39.    Admit that GaDOE has instructed, for purposes of the FTE student count, that a student who is served in GNETS be reported by the LEA encompassing their place of residence.

40.    Admit that regional GNETS programs are defined as special entities that do not report students to GaDOE for the purpose of earning FTE-based QBE funds.

41.    Admit that QBE funding for a student with disabilities is allocated to the LEA encompassing the student's place of residence even if the student is enrolled in a regional GNETS program.

42.    Admit that the annual State appropriations bill designates a "Federal Programs" amount "to coordinate federally funded programs and allocate federal funds to school systems," which for FY2023 was in the amount of $1,195,922,003. This amount is identified in HB 911 at Section 24.7 and line 1913 (p.65).

43.    Admit that most, if not all, of the amount appropriated for the State Department of Education's Federal Programs comes from federal IDEA funding.

44.    Admit that the purpose of funds in the State Department of Education's Federal Programs line item is to serve students with special needs.

45.    Admit that the State Department of Education allocates Federal Programs funds to LEAs using the QBE funding formula.

12

46.    Admit that, since at least 2015, the annual State appropriations bill has included a specific line item identifying funding for GNETS.

47.    Admit that the majority of the funds that have been allocated to the GNETS Program annually through the line item in the State appropriations bill are State funds.

48.    Admit that the amount of funding for the GNETS line item in the annual State appropriations bill is not determined by application of the QBE funding formula.

49.    Admit that State funding allocations for specific regional GNETS programs are not determined by application of the QBE funding formula.

50.    Admit that, for FY2023, the "Total Funds" amount in the annual State appropriations bill for the GNETS line item was $65,427,745.  This amount is identified in HB 911 at Section 24.8, line 1919 (p.65).

51.    Admit that since 2015, the "Total Funds" amount for the GNETS line item in each annual State appropriations bill has exceeded $60,000,000.

52.    Admit that the "Total Funds" amount for the GNETS line item in an annual State appropriations bill consists of federal funds and grants and State funds.

53.    Admit that, in FY2023, the federal funds and grants portion of the "Total Funds" amount for the GNETS line item in the annual State appropriations bill was

13

$11,322,802 and the State funds portion was $54,104,943.  These amounts are

identified in HB 911 at Section 24.8, lines 1919-1923 (p.65).

54.     Admit that the breakdown of the "Total Funds" amount for the GNETS

line item in the annual State appropriations bill for FY2015-FY2022 was as follows:

- FY2015: state - $62,081,479; federal - $8,160,000
- FY2016: state - $62,246,538; federal - $8,160,000
- FY2017: state - $63,926,563; federal - $8,260,042
- FY2018: state - $66,142,788; federal - $8,260,042
- FY2019: state - $63,821,338; federal - $8,260,042
- FY2020: state - $63,746,765; federal - $11,322,802
- FY2021: state - $56,469,094; federal - $11,322,802
- FY2022: state - $53,365,930; federal - $11,322,802

55.     Admit that, with respect to the annual State appropriations bills since

2015, the State funds portion of the "Total Funds" amount for each GNETS line item

has been at least four times larger than the federal funds and grants portion of the

"Total Funds" amount for the same GNETS line item.

56.     Admit that the State chooses to appropriate some of its IDEA funds to

GNETS.

57.     Admit that the IDEA funds the State chooses to appropriate to GNETS

are included within the federal funds and grants portion of the "Total Funds" amount

for the GNETS line item in any given annual State appropriations bill.

58.     Admit that the United States Department of Education does not require

the State to appropriate any of its IDEA funds to GNETS.

14

59.     Admit that the State generated the formula used to allocate federal IDEA funding to regional GNETS programs.

60.     Admit that the amount of federal funding that the State allocates to regional GNETS programs is based on the numerical range into which each program's student count falls.

61.     Admit that the State uses a funding formula that it created to determine the amount of State funding allocated to regional GNETS programs in any given year ("the GNETS program funding formula").

62.     Admit that the GNETS program funding formula does not include, as a factor in determining funding, the number of students for whom a regional GNETS program provides consultative services in the general education setting – that is, services directly to a student or that student's teacher or paraprofessional in the general education setting.

63.     Admit that there is no local matching funds requirement for a regional GNETS program receiving State funding.

64.     Admit that QBE funding allocated to a LEA for a given student is not transferred to the regional GNETS program if that student is served in a regional GNETS program (i.e., QBE funding does not "follow" the student).

65.     Admit that each regional GNETS program's grant application must be approved by the State in order for the regional GNETS program to receive funding.

66.    Admit that each regional GNETS program's budget must be approved by the State in order for the regional GNETS program to receive funding.

67.    Admit that the State does not require that the budget proposals for the GNETS Program submitted to the General Assembly or the Governor's Office contain any budget items designated for the provision of therapeutic services and supports for students.

68.    Admit that the State does not require that the budget proposals or grant applications for regional GNETS programs submitted to GaDOE contain any budget items designated for the provision of therapeutic services and supports for students.

69.    Admit that the Facilities Services Unit of GaDOE conducted a Facility Conditions Assessment of GNETS program facilities during the 2015 and 2016 calendar years ("Facility Conditions Assessment").

70.    Admit that GaDOE planned to use the findings of the Facility Conditions Assessment to facilitate decision making regarding the award of State funds to regional GNETS programs or their fiscal agents for repairs or upgrades to GNETS program facilities.

71.    Admit that in January 2016, GaDOE's Facilities Services Unit identified three GNETS program facilities (Cedarwood Program in Baxley, Horizon Program in Tifton, and Oaktree Elementary Program in Albany) as raising immediate facility assessment concerns.

16

72.     Admit that the State, through GSFIC, entered into a contract with an architectural firm (2WR) to conduct the Facility Conditions Assessment.

73.     Admit that GNETS program facilities were scored as part of the Facility Conditions Assessment using a rubric with a number of categories.

74.     Admit that, under the scoring system in the rubric used in the Facilities Conditions Assessment, a GNETS program facility with the highest possible score in all categories would receive a score of 1, and that GNETS program facilities receiving any lower scores on any component would receive a score between 0 and 1.

75.     Admit that some GNETS program facilities included in the Facilities Conditions Assessment dated back to the 1920s, and a number had been constructed in the 1960s and 1970s.

76.     Admit that some GNETS program facilities included in the Facilities Conditions Assessment were phased-out facilities (school facilities not included in a district's Local Facility Plan), which are not approved for FTE purposes.

77.     Admit that GNETS program facilities often do not meet contemporary codes or standards for educational environments, such as modern construction materials and practices, temperature control, mold abatement, and technological capacity.

78.     Admit that the Facility Conditions Assessment was a non-destructive site evaluation, and did not include tests for asbestos, lead paint, or lead in the water.

17

79.     Admit that in or around July 2016 the State received a draft report from the architectural firm it engaged sharing the firm's findings.

80.     Admit that in the summer of 2016 GaDOE shared information relating to the Facility Conditions Assessment with members of the State Board of Education.

81.     Admit that in the summer of 2016 the State identified nine GNETS program facilities with Facility Conditions Assessment scores below 0.4.

82.     Admit that in late July 2016, Mike Royal, Chairman of the State Board of Education, issued written notifications that nine GNETS program facilities could no longer be used to serve GNETS students.

83.     Admit that the written notifications referenced in No. 82 above were sent to the Directors of the regional GNETS programs affiliated with the nine facilities and/or the Superintendents of the LEAs owning the physical facilities.

84.     Admit that the actions taken in July 2016 with respect to the nine GNETS program facilities that could no longer be used to serve GNETS students were sometimes referred to—in the media, by GNETS program personnel, and by some GaDOE personnel—as the facilities having been "closed."

85.     Admit that GaDOE and other State personnel created a Facility Remediation Plan in relation to GNETS program facilities that were found to have identified needs following the Facility Conditions Assessment.

18

86.    Admit that LEA superintendents and fiscal agent personnel were provided information about the Facility Remediation Plan in February and March 2017.

87.    Admit that, for GNETS program facilities where the Facility Conditions Assessment identified needs, GaDOE offered the fiscal agents of the affiliated regional GNETS programs the option of submitting a proposal and timeline setting forth a plan to relocate the students served at the GNETS program facility to a different facility or applying for a State grant to help fund the necessary repairs or upgrades to the GNETS program facility.

88.    Admit that personnel from GaDOE and DBHDD created an application for State facilities grants that could be completed by regional GNETS programs or their fiscal agents to seek State funding to make repairs or upgrades to GNETS program facilities in accordance with the findings of the Facility Conditions Assessment.

89.    Admit that, for those regional GNETS programs or fiscal agents that relocated GNETS students from an existing GNETS program facility to a new site after the Facility Conditions Assessment, the new site was required to be approved by GaDOE.

19

90.    Admit that GaDOE required that a Letter of Assurance be signed by regional GNETS programs or fiscal agents applying for State grants to make repairs to GNETS program facilities after the Facility Conditions Assessment was complete.

91.    Admit that the Letter of Assurance described in No. 90 above included a provision that the regional GNETS program would agree to occupy the facility being repaired or upgraded for no less than 10 years, absent prior approval from GaDOE's Facilities Services Unit.

92.    Admit that the quality of educational facilities impacts student learning.

93.    Admit that the quality of educational facilities impacts student and staff well-being.

94.    Admit that dilapidated educational facilities pose obstacles to student learning.

95.    Admit that dilapidated educational facilities pose obstacles to overall student and staff well-being.

96.     Admit that the field labeled "SENDING_SYSTEM_ID" in files GA00000001-GA00000005 reflects the district or county where each student's home school is located as of the year identified in the field labeled "SCHOOL_YEAR".

97.    Admit that the field labeled "SENDING_SCHOOL_ID" in files GA00000001-GA00000005 reflects each student's home school as of the year identified in the field labeled "SCHOOL_YEAR".

20

98.    Admit that each entry for a student in files GA00000001-GA00000005 reflects a student entry into a regional GNETS program.

99.    Admit that the "SCHOOL_YEAR" field entries in files GA00000001-GA00000005 correspond with the year the spring semester took place: an entry of "2016" corresponds with the 2015-2016 school year, an entry of "2017" corresponds with the 2016-2017 school year, an entry of "2018" corresponds with the 2017-2018 school year, an entry of "2019" corresponds with the 2019-2020 school year, and an entry of "2020" corresponds with the 2019-2020 school year.

100.    Admit that the field labeled "END_DATE" in files GA00000001-GA00000005 reflects the date a student was fully exited from a regional GNETS program.

101.    Admit that, for any GNETS student not fully exited from GNETS by the end of a given school year, the data contained in the field labeled "END_DATE" in files GA00000001- GA00000005 reflects the date on which the relevant school year ended.

102.    Admit that an entry of 6 segments in the field labeled "NO_OF_DAILY_GNETS_SEGMENTS" in files GA00000001- GA00000005 reflects a student receiving 100% of their daily instructional time in a GNETS setting.

21

103.    Admit that an entry of 6 segments in the field labeled "NO_OF_DAILY_GNETS_SEGMENTS" in files GA00000001- GA00000005 reflects a student spending 100% of the school day in a GNETS setting.

104.    Admit that the field labeled "PRIMARY_AREA" in files GA00000001-GA00000005 reflects a student's primary exceptionality as identified on their IEP.

105.    Admit that in the year 2016 (GA00000001), there were 5,280 entries into the GNETS Program, reflecting each time any student enters the GNETS Program including when a student exits and reenters multiple times within a year, and of those 5,280 entries, 3,697 were entries into GNETS Centers, 1,536 were entries into GNETS Classrooms, and 47 entries did not specify the type of GNETS setting.

106.    Admit that in the year 2017 (GA00000002), there were 4,911 entries into the GNETS Program, reflecting each time any student enters the GNETS Program including when a student exits and reenters multiple times within a year, and of those 4,911 entries, 3,244 were entries into GNETS Centers, 1,649 were entries into GNETS Classrooms, and 18 entries did not specify the type of GNETS setting.

107.    Admit that in the year 2018 (GA00000003), there were 4,430 entries into the GNETS Program, reflecting each time any student enters the GNETS Program including when a student exits and reenters multiple times within a year, and of those 4,430 entries, 2,799 were entries into GNETS Centers, 1,622 were entries into GNETS Classrooms, and 9 entries did not specify the type of GNETS setting.

22

108.    Admit that in the year 2019 (GA00000004), there were 4,191 entries into the GNETS Program, reflecting each time any student enters the GNETS Program including when a student exits and reenters multiple times within a year, and of those 4,191 entries, 2,768 were entries into GNETS Centers, 1,420 were entries into GNETS Classrooms, and 3 entries did not specify the type of GNETS setting.

109.    Admit that in the year 2020 (GA00000005), there were 3,891 entries into the GNETS Program, reflecting each time any student enters the GNETS Program including when a student exits and reenters multiple times within a year, and of those 3,891 entries, 2,496 were entries into GNETS Centers, 1,394 were entries into GNETS Classrooms, and 1 entry did not specify the type of GNETS setting.

110.    Admit that in the year 2016 (GA00000001), there were 4,492 unique students served in the GNETS Program (regardless of the number of times an individual student may have exited and reentered).

111.    Admit that in the year 2017 (GA00000002), there were 4,117 unique students served in the GNETS program (regardless of the number of times an individual student may have exited and reentered).

112.    Admit that in the year 2018 (GA00000003), there were 3,805 unique students served in the GNETS program (regardless of the number of times an individual student may have exited and reentered).

23

113.   Admit that in the year 2019 (GA00000004), there were 3,607 unique students served in the GNETS program (regardless of the number of times an individual student may have exited and reentered).

114.   Admit that in the year 2020 (GA00000005), there were 3,344 unique students served in the GNETS program (regardless of the number of times an individual student may have exited and reentered).

115.   Admit that the State has not produced documents sufficient to identify the numbers of students in Georgia placed in Residential Treatment Facilities ("RTFs") from the 2015-16 school year to the present.

116.   Admit that the State has not produced documents sufficient to identify the numbers of GNETS students who were placed in an RTF prior to or after receiving GNETS services from the 2015-16 school year to the present.

117.   Admit that the State has not produced any evidence-based research supporting its contention that students referred to GNETS would otherwise require residential or more restrictive placement.

118.   Admit that the State has not produced any studies, plans, models, analyses, presentations, memoranda, or reports concerning whether placement in the GNETS Program has prevented children from being placed in residential facilities or other more segregated settings.

119.   Admit that the State enacted a Georgia Department of Education Rule related to the GNETS Program, produced as GA00002067-GA00002074 and appearing as Rule 160-4-7-.15 in the Rules and Regulations of the State of Georgia ("the GNETS Rule").

120.   Admit that the State has periodically revised the GNETS Rule, most recently in 2017.

121.   Admit that the State does not track the graduation rates of GNETS students.

122.   Admit that the State does not track the types of diplomas received by those GNETS students who do graduate.

123.   Admit that the State does not track the dropout rates of GNETS students.

124.   Admit that the State does not track post-secondary outcomes for GNETS students.

125.   Admit that the State excludes students from receiving school-based behavioral health services through the Georgia Apex Program at "GNETS standalone facilities" (also known as GNETS Centers), as stated here:

https://dbhdd.georgia.gov/be-supported/mental-health-children-young-adults-and-families/apex-3-faqs ("In which types of schools can Apex services be implemented?").

25

126.   Admit that the State has not produced any documents setting forth exit criteria or timelines by which students served in GNETS programs must be considered for transition back to a general education setting.

127.   Admit that the State has not produced documents identifying, summarizing, or describing the comparative costs of services and supports provided to students with disabilities within the GNETS Program and in general education settings.

128.   Admit that the State has not produced documents identifying, summarizing, or describing GaDOE's monitoring of aggregated and disaggregated GNETS Program data to determine cost effectiveness across programs.

129.   Admit that the State created the initial GNETS Strategic Plan and all subsequent versions of the GNETS Strategic Plan.

130.   Admit that the State has not produced any studies, plans, models, analyses, presentations, memoranda, or reports concerning the efficacy of providing educational and therapeutic services and supports to students in the GNETS Program in settings apart from their nondisabled peers.

131.   Admit that the State has not produced any data, analyses, assessments, studies, reports, or other information about any barriers, obstacles, or gaps in services and supports that prevent or inhibit the provision of educational and therapeutic

services and supports to school-age children in general education schools and/or local community settings.

132.   Admit that GaDOE did not comply with the legislative directive set forth in Georgia HB 911 to "evaluate, in consultation with stakeholders, the [GNETS] program to provide strategic statutory recommendations and funding formula updates to the Office of Planning and Budget, the House Budget and Research Office, and the Senate Budget and Evaluation Office by November 1, 2022."

133.   Admit that GaDOE has not provided any recommendations regarding the manner in which the GNETS Program should be funded to the Office of Planning and Budget, the House Budget and Research Office, or the Senate Budget and Evaluation Office during the 2022 calendar year.

134.   Admit that GaDOE has not provided any funding formula updates related to the GNETS Program to the Office of Planning and Budget, the House Budget and Research Office, or the Senate Budget and Evaluation Office during the 2022 calendar year.

Dated:  December 22, 2022

RYAN K. BUCHANAN
*United States Attorney*
Northern District of Georgia

/s/ *Aileen Bell Hughes*
AILEEN BELL HUGHES
GA Bar Number: 375505
Assistant United States Attorney
United States Department of Justice
Richard B. Russell Federal Building
75 Ted Turner Dr. SW, Suite 600
Atlanta, GA 30303-3309
(404) 581.6000
aileen.bell.hughes@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General

SHAHEENA A. SIMONS
Chief

RENEE M. WOHLENHAUS
KELLY GARDNER WOMACK
Deputy Chiefs

ANDREA E. HAMILTON
Special Litigation Counsel

VICTORIA M. LILL

CLAIRE D. CHEVRIER
FRANCES S. COHEN
PATRICK HOLKINS
LAURA C. TAYLOE
MICHELLE L. TUCKER
Trial Attorneys
Educational Opportunities Section

/s/ *Kelly Gardner Womack*
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 305-3753
kelly.gardner@usdoj.gov

*Attorneys for the United States*

28

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA
PLAINTIFF,

v.

STATE OF GEORGIA
DEFENDANT.

Civil Action No.

1:16-cv-03088-ELR

## CERTIFICATION OF SERVICE OF DISCOVERY

Pursuant to Local Rule 5.4, N.D. Ga., I certify that on Thursday, December 22, 2022, I served **PLAINTIFF UNITED STATES' FIRST REQUESTS FOR ADMISSION**, on all counsel of record via email.

Respectfully submitted,

RYAN K. BUCHANAN
*United States Attorney*

/s/Aileen Bell Hughes
*Assistant United States Attorney*
Georgia Bar No. 375505
Aileen.bell.hughes@usdoj.gov
*600 U.S. Courthouse*
*75 Ted Turner Drive, S.W.*
*Atlanta, GA 30303*
*(404) 581-6000*
*fax (404) 581-6181*