# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:16-cv-03088- |
| | ) | ELR |
| STATE OF GEORGIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

Filed in 2016, this action raises important issues of ongoing harm to thousands of public-school students with disabilities who are separated from their general education peers unnecessarily and placed in the Georgia Network for Educational and Therapeutic Support Program ("GNETS" or "GNETS Program" or "Program")—a statewide system operated, controlled, administered, and funded by the State of Georgia (the "State").[1]  Not only does the GNETS Program segregate

---

[1] Before the parties commenced discovery, this litigation was stayed for more than two years pending the Eleventh Circuit's resolution of the question whether the Attorney General for the United States has standing to pursue claims under Title II of the Americans with Disabilities Act.  ECF No. 40.  Discovery opened in July 2020, after the Eleventh Circuit resolved that question in the United States' favor, *see United States v. Florida*, 938 F.3d 1221(11th Cir. 2019), cert. denied, 143 S. Ct.

certain students with disabilities, but it also deprives them of equal educational opportunities.  In light of these harms, the United States presses two principal claims under Title II ("Title II") of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and its implementing regulation, 28 C.F.R. § 35.130: (1) that the State violates Title II's integration mandate by administering its mental health and therapeutic educational service system in a manner that unnecessarily segregates students with behavior-related disabilities in the GNETS Program,[2] and (2) that the State violates Title II's prohibition of discrimination on the basis of disability by relegating the students in the GNETS Program to inferior educational opportunities compared to their general education peers.[3]

The parties have completed fact discovery and exchanged expert disclosures,[4] and the United States is prepared to proceed expeditiously to trial on both claims. To narrow the issues and simplify the presentation at trial, the United States moves for partial summary judgment and asks this Court to rule, as a matter of law, that the State administers the GNETS Program within the meaning of Title II and is thus subject to Title II's integration mandate.  *See* 28 C.F.R. § 35.130(d).

---

89 (2022), and this Court denied the State's motion to dismiss and lifted the stay. ECF No. 45.

[2] *See* Compl. ¶ 68.

[3] *See* Compl. ¶ 69.

[4] None of the expert witnesses disclosed in this litigation opine on the issue at the core of this Motion—namely, the State's administration of the GNETS Program. Accordingly, the factual record relevant to this Motion is complete.

At the pleadings stage, this Court twice concluded that the United States had adequately alleged that the State administers the GNETS Program.  *See* ECF No. 61 at 8-14; ECF No. 94 at 7-11.  The United States has since fully developed the record, which confirms that the factual allegations the Court concluded would adequately establish the State's administration of the Program are not subject to dispute.[5] Accordingly, the United States asks this Court to rule dispositively that the State administers the GNETS Program and is subject to the Title II integration mandate in its operation of the Program.

## SUMMARY OF FACTS[6]

### GNETS Program Overview

GNETS is a program developed and funded by the State of Georgia that purports to provide intensive mental health and therapeutic educational services and supports to certain students with behavior-related disabilities.  The GNETS Program

---

[5] The same record evidence also establishes that the State is responsible for providing mental health and therapeutic educational services to students with disabilities, including GNETS services, directly or through contractual or other arrangements.  Accordingly, the State is subject to Title II's prohibition of discrimination on the basis of disability in the provision of these services, which the United States alleges the State has violated by failing to ensure equal educational opportunities for students in the GNETS Program.  *See* 28 C.F.R. § 35.130(b)(1)(i)- (iii), (vii).

[6] In compliance with Local Rule 56.1(b), the United States is contemporaneously filing a separate statement of material facts as to which it contends there exist no genuine issues to be tried.

3

consists of 24 regional programs, each directly answerable to the State, that collectively serve nearly all of the State's public school districts.[7]  Students in the GNETS Program attend school either in: (1) a GNETS Center—a self-contained facility that is separate from a general education school setting and that only students in the GNETS Program attend; or (2) a GNETS school-based location—that is, one or more classrooms populated exclusively by students in the GNETS Program but co-located with a general education school.[8]

## The State's Service Delivery System

As part of a legislatively mandated system of care for students with behavior-related disabilities, Georgia plans, funds, administers, regulates, manages, and oversees the GNETS Program through the Georgia Department of Education

---

[7] *See* Defendant State of Georgia's Objections and Responses to the United States' First Requests for Admission ("Def. Resp. to RFA") Nos. 2, 4-6 (attached hereto as "Ex. 1"); FY 24 GNETS Directory (July 2023), https://www.gadoe.org/Curriculum-Instruction-and-Assessment/Special-Education-Services/Documents/GNETS/FY24%20%20GNETS%20%20Directory%20Updated%20July%202023.pdf (last visited Oct. 18, 2023) (attached hereto as "Ex. 2"); FY 23 GNETS Directory (June 2022) (attached hereto as "Ex. 3"); AskDOE - Schools and Districts, https://www.gadoe.org/External-Affairs-and-Policy/AskDOE/Pages/Schools-and-Districts.aspx#:~:text=There%20are%20currently%20181%20school,in%20the%20state%20of%20Georgia (last visited Oct. 18, 2023) (attached hereto as "Ex. 4").

[8] Ex. 1, Def. Resp. to RFA No. 10; Deposition of Vickie Cleveland ("Cleveland Dep.") 112:18-25, 115:4-7 (attached hereto as "Ex. A"); Deposition of Haley Livingston ("Livingston Dep.") 126:5-127:24 (attached hereto as "Ex. B"); Deposition of Lakesha Stevenson ("Stevenson Dep.") 93:3-5 (attached hereto as "Ex. C").

4

("GaDOE"). GaDOE oversees public education throughout the State, ensuring that laws and regulations pertaining to education, including special education, are followed and that State and federal money is properly allocated and disbursed.[9]

The Georgia Department of Behavioral Health and Developmental Disabilities ("DBHDD") and the Georgia Department of Community Health ("DCH") are also part of the State's publicly funded behavioral health service delivery system.[10] Together, these agencies administer and fund additional programs, services, and activities for students with disabilities. DBHDD oversees and administers policies, programs, and services for people with mental illness, substance use disorders, and developmental disabilities, including—through the Office for Children, Young Adults and Families—children with behavior-related disabilities.[11] One such program, Georgia's Apex Program, delivers behavioral health services to children in certain school settings.[12] DCH administers the State's

---

[9] *See* Ga. Const. art. 8, § 1; Ga. Comp. R. & Regs. § 160-4-7-.15(1)(c) (attached hereto as "Ex. 7").

[10] *See generally* Ga. Code Ann. § 49-5-220(a)(6).

[11] Ga. Code Ann. § 37-1-20; *see also* Ga. Code Ann. § 37-1-21; Deposition of Frank Berry ("Berry Dep.") 165:11-166:13, 184:21-25 (attached hereto as "Ex. E"); Deposition of Judith Fitzgerald ("J. Fitzgerald Dep.") 52:21-53:19, 62:2-16 (attached hereto as "Ex. F").

[12] Notably, the State prohibits Apex services from being delivered in GNETS Centers. *See APEX 3.0 Frequently Asked Questions*, https://dbhdd.georgia.gov/be-supported/mental-health-children-young-adults-and-families/apex-3-faqs ("In which types of schools can Apex services be implemented?") (last visited Oct. 18, 2023) (attached hereto as "Ex. 10"); Ex. F, J. Fitzgerald Dep. 62:17-63:8;

Medicaid and PeachCare for Kids insurance programs, which reimburse providers for many mental health and therapeutic educational services and supports.[13]

### The GNETS Rule

As part of its oversight responsibilities, the State regulates GNETS Program operations primarily through the State GNETS Rule. That Rule, promulgated by Georgia's State Board of Education and revised most recently in 2017, binds each of the State's 24 regional GNETS programs.[14] Through the Rule, the State has established—among other things—the purpose of the GNETS Program, the characteristics that purport to distinguish the Program from other educational environments, the eligibility criteria for student placement in the Program, and the learning environments in which GNETS Program services may be delivered.[15]

The State's GNETS Rule also identifies each of the entities the State has assigned a role in Program operations, prescribes those entities' duties and responsibilities, and dictates the relationships between the entities and the State.[16]

---

Deposition of Lisa Futch ("Futch Dep.") 303:17-305:5 (attached hereto as "Ex. G"); Deposition of Dante McKay ("McKay Dep.") 158:2-16 (attached hereto as "Ex. H").

[13] *See* Ga. Code Ann. §§ 31-2-1, 31-2-4; Ex. 8; Deposition of Wendy Tiegreen ("Tiegreen Dep.") 216:3-7 (attached hereto as "Ex. D"); Ex. E, Berry Dep. 164:18-166:13; s*ee generally* PeachCare for Kids website, https://dch.georgia.gov/peachcare-kids (last visited Oct. 18, 2023) (attached hereto as "Ex. 9").

[14] *See* Ex. 7; *see also* Ex. 1, Def. Resp. to RFA No. 120.

[15] *See* Ex. 7 at ¶¶ (2)-(4).

[16] *See* Ex. 7 at ¶ (5).

The Rule charges Georgia's State Board of Education—which the Rule refers to as the State Education Agency—with disbursing State-appropriated funds to support GNETS Program services and, in collaboration with GaDOE, "[m]onitor[ing] GNETS to ensure compliance with Federal and state policies, procedures, rules, and the delivery of appropriate instructional and therapeutic services."[17]

The State GNETS Rule further requires individual school districts (the "local education agency" or "LEA"), fiscal agents (through which the State provides GNETS funding to regional programs), and regional GNETS programs to report to, collaborate with, or submit to supervision by the State in a variety of ways.[18] For example, the Rule requires regional GNETS programs to "[c]ollaborat[e] with GaDOE to implement activities outlined in the GNETS strategic plan to improve GNETS practices and student services" and to "[s]ubmit student and program data as requested by the GaDOE."[19] The Rule also requires LEAs to submit "student schedules to the GaDOE with the GNETS code" and fiscal agents to provide financial reports and requested data to the State Education Agency or GaDOE.[20]

---

[17] Ex. 7 at ¶ (5)(a).

[18] *See* Ex. 7 at ¶ (5).

[19] Ex. 7 at ¶ (5)(c)(2), (7).

[20] Ex. 7 at ¶ (5)(b)(14) and (5)(d)(3), (5).

## Direction from State-Employed GNETS Program Personnel

The State dedicates two full-time GaDOE employees—a GNETS Program Manager and a GNETS Program Specialist—to overseeing the GNETS Program,[21] including by developing, implementing, and monitoring compliance with the Program operating standards, governing documents, and directives set forth below.

### *The Project Management Plan*

The State's Project Management Plan constitutes a comprehensive plan for the GNETS Program containing "detailed action steps to address program improvements" and metrics for tracking the State's progress in ensuring implementation.[22] Developed in late 2015 and 2016 by State personnel, including the GNETS Program Manager, the Project Management Plan sought GNETS Program improvements in a wide range of areas—including program administration, instruction, therapeutic services, facilities, and funding—and specifically identified

---

[21] *See* Ex. 1, Def. Resp. to RFA Nos. 14-15, 19-23; Ex. 7 at ¶ (5)(a); Exs. 13-15; Deposition of James Beck ("Beck Dep.") 10:3-7, 23:4-21, 154:1-156:5 (attached hereto as "Ex. P"); Ex. A, Cleveland Dep. 23:12-17, 25:17-19; 36:12-37:14, 66:10-14; Deposition of Deborah Gay ("Gay Dep.") 108:1-10 (attached hereto as "Ex. N"); Deposition of Clara Keith Brown ("Keith Dep.") 25:22-26:4, 236:6-13 (attached hereto as "Ex. K"); Deposition of Wina Low ("Low Dep.") 77:10-18 (attached hereto as "Ex. L"); Ex. C, Stevenson Dep. 24:15-22, 25:6-12, 78:6-8.

[22] *See* Ex. N, Gay Dep. 156:3-156:13; Ex. K, Keith Dep. 65:23-66:22, 68:21-25, 96:20-97:5, 98:21-101:22, 169:1-170:25.

the GNETS Strategic Plan as an action step for program improvement and accountability.[23]

### *The GNETS Strategic Plan and Self-Assessment*

The GNETS Strategic Plan, which binds each regional GNETS program, sets the standards that govern nearly every aspect of GNETS Program operations.[24]  In or around 2016,[25] the GNETS Program Manager collaborated with a committee of regional GNETS program directors and various State personnel, including from

---

[23] *See* Ex. 1, Def. Resp. to RFA No. 16; GA00061974 (attached hereto as "Ex. 16") (redactions applied by State); GA00198520 (attached hereto as "Ex. 17") (redactions applied by State); Ex. N, Gay Dep. 156:3-156:13; Ex. K, Keith Dep. 65:23-66:22, 68:21-25, 96:20-97:5, 98:21-101:22, 169:1-170:25.

[24] *See* Ex. 18 at GA00362006, GA00362008-GA00362009; Deposition of Whitney Braddock ("Braddock Dep.") 206:10-19, 208:1-11 (attached hereto as "Ex. R"); Ex. A, Cleveland Dep. at 204:21-206:11, 210:19-212:13; Deposition of Derrick Gilchrist ("Gilchrist Dep.") 243:16-25, 244:21-245:8 (attached hereto as "Ex. S"); Deposition of Cassandra Holifield ("Holifield Dep.") 196:24-197:1 (attached hereto as "Ex. T"); Ex. K, Keith Dep. 90:25-91:6, 192:6-15; Ex. B, Livingston Dep. 69:17-70:12; Deposition of Celest Ngeve ("Ngeve Dep.") 285:14-17 (attached hereto as "Ex. U"); Deposition of Sonia Shaun Owen ("Owen Dep.") 193:4-15 (attached hereto as "Ex. M"); Ex. C, Stevenson Dep. 42:10-17, 47:24-48:7; Deposition of Patricia Wolf ("Wolf Dep.") 238:7-18 (attached hereto as "Ex. Q").

[25] Prior to creating the 2016 Strategic Plan, the State had developed and implemented another strategic plan that set forth goals and expectations for the GNETS Program and was updated over a four-year period.  *See* Ex. 20; Ex. N, Gay Dep. 163:1-167:1.  The Strategic Plan developed by the GNETS Program Manager effectively replaced the prior strategic plans and various other performance monitoring tools the State required regional GNETS programs to use.  *See* Ex. 21; Ex. N, Gay Dep. 171:11-173:20.

GaDOE and DBHDD, to oversee the creation, implementation, and subsequent revisions of the GNETS Strategic Plan and its supporting documents.[26]

The Strategic Plan currently has six broad "focus areas":[27] Program Leadership & Accountability; Behavioral Support & Therapeutic Services; Instructional/Academic Support; Program Funding & Fiscal Management; Integration of Services & Capacity Building; and Facilities Management & Safety.[28]

---

[26] *See* Ex. 1, Def. Resp. to RFA No. 129; Ex. 18 at GA00362006, GA00362008; Ex. 19 at GA00221994, GA00221996; Ex. R, Braddock Dep. 206:10-207:2; Ex. A, Cleveland Dep. 204:21-205:12; Ex. N, Gay Dep. at 166:3-167:1, 168:19-169:2; Ex. S, Gilchrist Dep. 41:9-19; Ex. K, Keith Dep. 67:17-19, 94:20-95:6, 109:3-14, 177:8-178:6.

[27] Ex. 18 at GA00362009; *see* Ex. A, Cleveland Dep. 204:21-205:2.

[28] Prior to implementing the "Facilities Management & Safety" component of the Strategic Plan, the State engaged an architectural firm to conduct a broad Facility Conditions Assessment of numerous regional GNETS program facilities. *See* Ex. 1, Def. Resp. to RFA No. 69; Exs. 99-101; Ex. P, Beck Dep. 135:11-136:15, 139:12-141:22; Deposition of Michael Rowland ("Rowland Dep.") 47:16-50:19, 78:7-79:20, 160:6-161:6 (attached hereto as "Ex. Y"). Based on the architectural firm's comprehensive review and the State's own assessment, the State identified nine GNETS facilities in such poor physical condition that the State required the regional GNETS programs using those facilities to move their students to a different location prior to the 2016-17 school year. *See* Ex. 1, Def. Resp. to RFA No. 81; Exs. 100, 102-104; Deposition of William Matthew Jones ("W. Jones Dep.") 189:4-190:6, 193:1-194:25 (attached hereto as "Ex. O"); Ex. K, Keith Dep. 226:16-229:22, 230:14-232:18; Ex. Y, Rowland Dep. 80:21-82:2, 83:5-86:21, 86:22-88:1, 145:7-146:20; Ex. R, Braddock Dep. 219:21-220:23. In addition, the State used the Facility Conditions Assessment to identify other facilities with needs and offered those regional programs the options of (1) submitting a proposal to relocate to a new facility contingent on GaDOE's approval of the new site or (2) applying for State funding to cover the costs of repairs, which came with State-imposed conditions outlined in a required Letter of Assurance. *See* Ex. 1, Def. Resp. to RFA Nos. 87, 89, 90-91; Ex. 105; Ex. R, Braddock Dep. 219:21-220:1, 220:16-23, 221:17-222:2, 222:15-22, 225:10-226:6; Ex. Y, Rowland Dep. 94:4-96:13, 111:21-116:9.

Each focus area establishes an overarching goal for the regional GNETS programs.[29] The Strategic Plan then breaks that goal down into individual action items and specifies how regional GNETS programs must demonstrate to the State that they have implemented each action item.[30]  Using this structure, the Strategic Plan prescribes operating standards that range from the kinds of behavioral assessments regional GNETS programs must administer to the instructional standards they must meet and the steps they must take to solicit and spend State funds.[31]

To ensure that regional GNETS programs "implement[] the action items within the strategic plan," the State requires that regional GNETS directors "reflect on implementation and practices at each GNETS site" by using a "self-assessment rating."[32]  In addition to using a State-created rubric to complete the Strategic Plan self-assessment twice annually,[33] regional GNETS directors must gather "artifacts," or evidence, identified by the State that demonstrate they meet the criteria indicated

---

[29] *See, e.g.*, Ex. 18 at GA00362009; Ex. A, Cleveland Dep. 210:5-18, 213:6-214:10; Ex. K, Keith Dep. 178:20-180:22.

[30] *See supra* note 29.

[31] *See* Ex. 18 at GA00362011-GA00362020.

[32] Ex. 18 at GA00362009-GA00362010.

[33] *See* Exs. 22-23; Ex. 24 at GA00901799; Ex. R, Braddock Dep. 209:7-17; Ex. A, Cleveland Dep. 206:13-208:1, 210:19-212:18; Ex. S, Gilchrist Dep. 245:17-24; Ex. T, Holifield Dep. 197:24-198:18; Ex. K, Keith Dep. 174:12-176:25, 178:21-180:22, 184:2-185:12, 186:13-188:10; Ex. U, Ngeve Dep. 294:8-295:15; *see generally* Ex. 18 at GA00362009-GA00362010.

on the self-assessment.[34]  The State then follows up to assess regional GNETS programs' compliance.

GaDOE staff have historically visited regional GNETS programs after they submit their self-assessments to review supporting artifacts, ask questions, and tour facilities.[35]  These GaDOE follow-up visits—referred to as Strategic Plan reviews—are extensive, often lasting hours or a full day.[36]

Although it has recently modified aspects of its Strategic Plan reviews, the State continues to mandate participation in the Strategic Plan's self-assessment and review process; regional GNETS programs cannot opt out.[37]  Moreover, while the review process contemplates that regional GNETS programs initially self-assess

---

[34] *See supra* note 33; *see also* Deposition of Samuel Clemons ("Clemons Dep.") 250:12-20 (attached hereto as "Ex. V"); Deposition of Brooke Cole ("Cole Dep.") 390:25-391:14 (attached hereto as "Ex. I"); Ex. S, Gilchrist Dep. 246:4-14; Ex. T, Holifield Dep. 200:15-201:3, 241:11-243:10; Ex. B, Livingston Dep. 69:17-70:12; Ex. U, Ngeve Dep. 288:24-289:16.

[35] *See* Ex. 18 at GA00362009; Exs. 15, 24-25; Ex. 26 at GA00337238; Ex. R, Braddock Dep. 208:6-209:17; 210:5-14, 210:23-211:15; Ex. V, Clemons Dep. 250:8-251:9, 254:7-255:20; Ex. A, Cleveland Dep. 228:12-25, 230:3-231:6; Ex. I, Cole Dep. 387:17-388:8, 390:22-391:25; Ex. G, Futch Dep. 93:20-94:14; Ex. S, Gilchrist Dep. 246:4-247:6; Ex. T, Holifield Dep. 198:19-199:23, 200:15-201:3; Ex. K, Keith Dep. 90:22-91:6, 178:20-180:22, 181:7-183:22; Ex. B, Livingston Dep. 68:12-70:12, 80:25-81:17; Ex. U, Ngeve Dep. 288:3-289:12, 290:19-291:18, 304:8-305:22; Ex. C, Stevenson Dep. 46:10-23, 49:9-51:6.

[36] *See* Ex. I, Cole Dep. 391:19-392:3; Ex. U, Ngeve Dep. 290:19-292:12.

[37] *See* Ex. 18 at GA00362008-GA00362011; Ex. 27; Ex. 29; Ex. A, Cleveland Dep. 206:25-207:19, 222:17-25; Ex. I, Cole Dep. 389:22-390:10; 395:9-15; Ex. G, Futch Dep. 93:20-94:11; Ex. S, Gilchrist Dep. 243:16-25; Ex. B, Livingston Dep. 69:17-70:12; Ex. U, Ngeve Dep. 285:14-286:3; Ex. C, Stevenson Dep. 149:4-151:8; 164:14-165:7, 167:4-19.

their implementation of the Strategic Plan, the State, through the GNETS Program Manager, typically reviews the evidence supporting that self-assessment, determines the programs' final ratings on each State standard, and provides feedback related to performance, including steps the regional GNETS programs should take in the future.[38]

### *Other State-Created Documents Governing the GNETS Program*

Beyond the GNETS Strategic Plan, the State provides direction to regional GNETS programs through other State-created documents. For example, regional GNETS programs use the Consideration of Services Forms to assess student eligibility for GNETS services.[39] GaDOE oversaw the development of these forms

---

[38] *See* Ex. 7; Ex 15; Ex. 18 at GA00362008-GA00362010; Exs. 28-29; Ex. V, Clemons Dep. 250:24-251:9, 253:7-254:2; Ex. A, Cleveland Dep. 158:24-159:10, 166:11-167:10, 210:5-18, 217:20-219:8, 230:16– 231:14; Ex. G, Futch Dep. 94:15-95:18; Ex. T, Holifield Dep. 200:15-202:4; Ex. B, Livingston Dep. 81:6-17; Deposition of Jaqueline Neal ("Neal Dep.") 23:21-24:13 (attached hereto as "Ex. W"); Ex. U, Ngeve Dep. 295:16-297:7; Ex. C, Stevenson Dep. 46:10-23, 49:20-24, 160:22-163:2.

[39] *See* Exs. 30-39, 40-47; Ex. R, Braddock Dep. 101:21-102:24, 103:15-104:3, 107:11-110:10; Ex. V, Clemons Dep. 51:21-52:6, 61:20-62:19, 206:2-207:7, 208:3-210:7, 210:19-211:5, 211:21-212:11, 213:18-20; Ex. I, Cole Dep. 192:18-20, 193:6-11, 194:21-195:4, 200:23-202:21, 213:23-214:24; Ex. G, Futch Dep. 325:7-326:5, 328:17-23, 350:23-353:5; Ex. S, Gilchrist Dep. 228:5-233:6; Ex. W, Neal Dep. 128:10-130:11; Ex. U, Ngeve Dep. 191:18-193:24, 195:21-198:5, 201:16-204:15, 220:11-222:9, 235:13-238:1, 313:25-316:22; Ex. Q, Wolf Dep. 170:19-175:22, 185:4-22, 191:14-194:8.

through the leadership and guidance of its GNETS Program Manager.[40]    The GNETS Program Manager assembled a committee to prepare drafts that aligned with the State's GNETS Rule, reviewed and approved the forms, and dictated when and how the documents would be rolled out to the regional programs.[41]    In addition, before the State created and implemented the GNETS Strategic Plan, it had also published and maintained a GNETS Operations Manual designed to ensure efficient, effective, and consistent operations across all regional GNETS programs.[42]

*Data Directives*

The State—primarily through GaDOE—also requires regional GNETS programs to respond to a host of data requests, including requests for program level or student-specific information related to student enrollment (i.e., entry and exit from the GNETS Program), the use of physical restraint, available interventions and mental health services, and other related topics.[43]    On occasion, the State has also

---

[40] *See* Exs. 32, 40-43, 48-53; Ex. Q, Wolf Dep. 187:6-205:15; *see generally* Ex. I, Cole Dep. 97:1-98:14; Ex. S, Gilchrist Dep. 228:5-233:6; Ex. U, Ngeve Dep. 192:13-193:6, 201:16-202:17, 207:1-6, 220:6-24.

[41] Exs. 40, 41, 43, 48-49, 51-53; Ex. Q, Wolf Dep. 185:4-189:18, 190:8-205:15.

[42] Ex. 54 at GA00403826; *see* Ex. 55; Ex. T, Holifield Dep. 250:10-251:2, 252:6-14; Ex. K, Keith Dep. 55:12-56:1, 63:7-16; Ex. Q, Wolf Dep. 241:8-243:7.

[43] *See* Exs. 15, 56-63; Ex. A, Cleveland Dep. 111:22-112:17, 133:21-135:8, 174:20-175:8, 186:14-187:2, 192:17-198:15, 198:16-203:7, 204:6-14; Ex. T, Holifield Dep. 93:11-102:23; Ex. B, Livingston Dep. 148:15-151:2; 223:24-225:4; 227:8-228:19; 241:6-242:12; Ex. W, Neal Dep. 114:14-116:1, 335:17-336:12; Ex. U, Ngeve Dep. 179:17-182:10, 183:18-184:2; Ex. C, Stevenson Dep. 46:10-23, 69:8-20, 212:5-214:5; Ex. L, Low Dep. 142:11-20, 192:6-20, 193:17-196:22, 199:4-23.

14

imposed mandatory Individualized Education Program ("IEP") file reviews on the

regional GNETS programs to assess compliance with State-imposed operating

standards.[44] During this mandatory process, the State has required GNETS directors

to review student files and produce detailed and wide-ranging information for every

student receiving GNETS services.[45]

### *Direction Regarding Program Administration*

State personnel also provide general and day-to-day direction to the GNETS

Program.  The GNETS Program Manager and Program Specialist facilitate periodic

statewide GNETS director meetings and regularly communicate with regional

GNETS directors to ensure coordination and compliance across programs.[46]

Regional GNETS program directors look to the State for direction on a host of day-

to-day matters involving student eligibility and service delivery.[47] *See, e.g.*,  Ex. 67

---

[44] Exs. 57, 64-66; Ex. A, Cleveland Dep. 192:17-193:5, 194:13-196:8, 198:16-202:23; Ex. I, Cole Dep. 365:18-366:4, 368:20-370:13; Ex. U, Ngeve Dep. 259:21-261:22; Ex. C, Stevenson Dep. 212:5-214:5.

[45] *See* Exs. 57, 65; Ex. A, Cleveland Dep. 192:17-193:5, 194:13-17, 195:5-24, 198:16-202:23; Ex. I, Cole Dep. 365:18-366:4, 368:20-369:23; Ex. C, Stevenson Dep. 212:5-214:5.

[46] *See* Ex. 15; Ex. R, Braddock Dep. 32:8-34:22; Ex. A, Cleveland Dep. 73:1-14, 181:21-182:21; Ex. I, Cole Dep. 26:18:-27:2, 36:1-37:6; Ex. G, Futch Dep. 97:1-18, 98:7-11; Ex. S, Gilchrist Dep. 31:18-20, 31:24-32:20; Ex. B, Livingston Dep. 79:4-80:22; Ex. W, Neal Dep. 30:7-31:7, 350:5-351:9; Deposition of Talithia Newsome ("Newsome Dep.") 56:6-57:22 (attached hereto as "Ex. X"); Ex. C, Stevenson Dep. 46:10-23, 71:13-72:1, 72:18-73:2.

[47] *See, e.g.*, Ex. 70 (Elam Alexander Academy GNETS Director seeking guidance from GaDOE regarding the placement of students with certain disability

(Oconee GNETS Director seeking confirmation from GaDOE regarding student eligibility and the 2017 GNETS Rule); Ex. 68 (clarifying whether a student whose home school system is in the Oconee GNETS catchment area could be served by a different regional GNETS); Ex. 69 (Coastal Academy GNETS Director notifying GaDOE about changes in the LEAs served by the regional GNETS program using a previously required form created by GaDOE); Ex. 71 (Horizon Academy GNETS Director seeking clarification as to whether GNETS accepts students from charter schools).

## GNETS Program Funding

### *State/Federal Funding*

The State oversees funding for the GNETS Program.  Each spring, after consultation with the Governor, the Georgia General Assembly appropriates State funds for the GNETS Program, along with federal funds that the State decides—in

---

designations); Ex. 72 (Horizon Academy GNETS Director seeking guidance as to whether an LEA could require a student transitioning out of GNETS to return to the LEA on a trial basis); Ex. G, Futch Dep. 241:17-245:8, 245:25-248:23 (Coastal Academy GNETS Director seeking guidance from GaDOE regarding use of GNETS funding); Ex. B, Livingston Dep. 233:22-236:4, 236:5-239:22 (Harrell GNETS Director seeking clarification from GaDOE about job qualification requirements for regional GNETS program staff); *see also* Exs. 73-86; Ex. R, Braddock Dep. 116:11-12, 116:21, 117:13-118:9; Ex. V, Clemons Dep. 220:19-221:13, 221:22-225:20; Ex. I, Cole Dep. 34:5-21, 108:3-12, 108:21-111:11, 115:14-117:4, 120:11-121:19; Ex. G, Futch Dep. 118:10-120:2, 120:5-122:17; Ex. S, Gilchrist Dep. 58:16-59:4, 59:23-64:15, 209:3-17, 210:1-211:14; Ex. U, Ngeve Dep. 231:11-233:25, 247:24-248:17; Ex. C, Stevenson Dep. 175:23-176:10, 177:16-180:17; Ex. Q, Wolf Dep. 213:21-215:20, 216:2-217:15.

its discretion—to use for the GNETS Program.[48]  Since 2015, the "Total Public

Funds" amount for the GNETS line item in each annual State appropriations bill has

exceeded $60,000,000, which are largely State funds.[49]

The State provides each regional GNETS program an annual allocation of

State funds based on a funding formula that the State created specifically for the

GNETS Program and that is distinct from the State's funding formula for LEAs.[50]

The State also provides each regional GNETS program an annual allocation of

federal funds based on that program's student count.[51] In addition to the funds

allocated to the regional GNETS programs, the State's annual appropriation for the

---

[48] *See* Ga. Const. art. 3, § 9, ¶¶ II(a)-(b); The Budget Process, Governor's Office of Planning and Budget, https://opb.georgia.gov/budget-information/budget-process (last visited Oct. 18, 2023) (attached hereto as "Ex. 106"); Ex. 91 at GA00054567.004; Deposition of Geronald Bell ("Bell Dep.") 42:25-43:8 (attached hereto as "Ex. Z"); Ex. A, Cleveland Deposition 235:12-236:1; 30(b)(6) Deposition of Rusk Roam ("Roam Dep.") 27:8-28:3 (attached hereto as "Ex. AA"); *see, e.g.*, H.B. 19, 157th Gen. Assemb., Reg. Sess. (see p. 105 at 151.100) (Ga. 2023).
[49] *See* H.B. 76, 153rd Gen. Assemb., Reg. Sess. (see p. 93 at 134.100) (Ga. 2015); H.B. 751, 153rd Gen. Assemb., Reg. Sess. (see p. 54 at 24.9) (Ga. 2016); H.B. 44, 154th Gen. Assemb., Reg. Sess. (see p. 96 at 142.100) (Ga. 2017); H.B. 684, 154th Gen. Assemb., Reg. Sess. (see p. 50 at 24.10) (Ga. 2018); H.B. 31, 155th Gen. Assemb., Reg. Sess. (see p. 100 at 146.100) (Ga. 2019); H.B. 793, 155th Gen. Assemb., Reg. Sess. (see p. 63 at 24.9) (Ga. 2020); H.B. 81, 156th Gen. Assemb., Reg. Sess. (see p. 80 at 142.100) (Ga. 2021); H.B. 911, 156th Gen. Assemb., Reg. Sess. (see p. 65 at 24.8) (Ga. 2022); H.B. 19, 157th Gen. Assemb., Reg. Sess. (see p. 105 at 151.100) (Ga. 2023); *see also* Ex. 1, Def. Resp. to RFA No. 47.
[50] *See* Ex. 1, Def. Resp. to RFA No. 48; Ex. Z, Bell Dep. 117:12-16, 150:14-151:21, 168:15-170:6, 175:15-176:4.
[51] Ex. 1, Def. Resp. to RFA No. 60; Ex. 91 at GA00054567.012; Ex. Z, Bell Dep. 165:9-23; Ex. R, Braddock Dep. 200:21-201:03; Ex. A, Cleveland Dep. 235:12-236:1, 239:4-11.

GNETS Program includes funds for State contracts benefitting the GNETS Program.[52]

After the State legislature sets the total amount of GNETS funding for a given year, GaDOE calculates the individual allocations for each regional GNETS program and presents those allocations to the State Board of Education for approval.[53]  GaDOE then notifies regional GNETS programs and their fiscal agents of their grant awards for the upcoming school year.[54]

### GNETS Grant Application Process

The State requires regional GNETS programs to apply annually for GNETS Program funding.[55]  The State determines the data and assurances required to

---

[52] *See* Ex. 91 at GA00054567.013 (various GaDOE supports and services provided via contract); Ex. 92 (contract for GNETS Program access to i-Ready); Ex. 93 (contract for GNETS Program access to the BASC-3); Exs. 114-116; Ex. P, Beck Dep. 184:9-185:17, 185:24-188:21; Ex. R, Braddock Dep. 203:25-204:24; Ex. A, Cleveland Dep. 189:12-21, 190:21-192:16; Ex. O, W. Jones Dep. 169:25-170:16, 176:4-21; Deposition of Larry Winter ("Winter Dep.") 170:14-172:2, 173:8-175:22 (attached hereto as "Ex. CC").

[53] Ex. 7; Ex. Z, Bell Dep. 39:23-40:2, 132:7-133:11; Ex. A, Cleveland Dep. 158:24-166:10; Ex. T, Holifield Dep. 108:22-109:8; Ex. W, Neal Dep. 354:14-21; Ex. U, Ngeve Dep. 264:4-24; Ex. Q, Wolf Dep. 65:13-16.

[54] *See* Exs. 111-113; Ex. Z, Bell Dep. 138:9-139:16; Ex. R, Braddock Dep. 199:10-17; Deposition of Amber McCollum ("McCollum Dep.") 133:12-134:11, 166:19-168:17, 214:9-22 (attached hereto as "Ex. J"); Ex. CC, Winter Dep. 156:11-157:8.

[55] *See* Ex. 1, Def. Resp. to RFA No. 24; Exs. 7, 107; Deposition of David Ackerman ("Ackerman Dep.") 54:9-16, 118:3-4 (attached hereto as "Ex. BB"); Ex. A, Cleveland Dep. 158:24-159:10, 162:5-163:16; Ex. I, Cole Dep. 174:7-25; Ex. G, Futch Dep. 239:2-19; Ex. T, Holifield Dep. 105:5-108:6; Ex. O, W. Jones Dep. 257:5-16; Ex. B, Livingston Dep. 199:10-200:13; Ex. J, McCollum Dep. 103:6-21;

complete the application, operates the system for submitting applications and related materials, and reviews and approves the applications.    To complete the grant applications, regional GNETS programs must supply GaDOE with a wide variety of data and narrative responses covering—among other things—staffing, the programs' participating school districts, available behavioral and therapeutic supports, trainings, instruction, progress monitoring, program procedures, service delivery, and proposed budgeting.[56]    Regional programs must also provide GaDOE with assurances signed by the fiscal agent, the regional program itself, and each participating school district's superintendent and special education director.[57]  These assurances require that the assuring entity take, or refrain from taking, specific action related to GNETS Program operations.[58]

---

Ex. W, Neal Dep. 93:8-11, 352:2-10; Ex. U, Ngeve Dep. 263:16-264:24, 269:20-25; Ex. C, Stevenson Dep. 118:23-120:8; Ex. Q, Wolf Dep. 64:6-20.

[56] *See, e.g.*, Exs. 7, 107-110; Ex. R, Braddock Dep. 91:2-10; Ex. V, Clemons Dep. 145:2-146:14; Ex. A, Cleveland Dep. 158:24-159:10, 159:20-161:5, 186:14-23, 208:9-210:4; Ex. I, Cole Dep. 174:7-25, 175:25-176:16; Ex. S, Gilchrist Dep. 245:6-16; Ex. T, Holifield Dep. 104:10-106:18, 108:22-109:8; Ex. B, Livingston Dep. 200:5-13; Ex. J, McCollum Dep. 107:4-109:8; 214:9-22; Ex. W, Neal Dep. 352:11-354:5, 354:14-18; Ex. U, Ngeve Dep. 263:16-264:3; 265:13-266:16, 267:21-268:10, 270:5-13; Ex. C, Stevenson Dep. 121:18-123:1, 149:4-150:5.

[57] *See* Ex. 91 at GA00054563-GA00054566; *see* GA00321621 at GA00321621-GA00321628 (attached hereto as "Ex. 135").

[58] *See supra* note 57.

*State-Level Contracts for GNETS Program Benefits*

The State also exercises centralized control and oversight of GNETS by entering into State-level contracts with outside vendors for the benefit of the GNETS Program.[59]   These contracts cover services for the regional GNETS programs, including a significant portion of the purported therapeutic services provided by various regional GNETS programs and certain expenses that arise across the GNETS Program at large.[60]   For example, in FY19, the State provided $1.3 million to cover contracts providing behavioral and therapeutic services to certain regional GNETS programs through State-approved providers.[61]   The State also has entered into contracts for academic and behavioral supports and services for the GNETS Program, including contracts facilitating regional programs' access to State-

---

[59] *See supra* note 52.

[60] *See* Exs. 114, 116-124; Ex. Z, Bell Dep. 129:19-130:11; Ex. A, Cleveland Dep. 103:21-106:10, 107:12-21; Ex. I, Cole Dep. 278:7-280:15; Ex. G, Futch Dep. 252:15-253:21; Ex. K, Keith Dep. 132:10-134:20, 136:11-140:1, 147:10-150:12, 153:7-154:15; Ex. B, Livingston Dep. 119:6-120:9; Ex. L, Low Dep. 201:20-24; Ex. W, Neal Dep. 80:6-83:8; 83:24-86:5; Ex. U, Ngeve Dep. 276:5-278:2; Ex. M, Owen Dep. 85:22-86:6, 92:17-93:24, 186:12-187:10; Ex. CC, Winter Dep. 173:8-175:22; Ex. Q, Wolf Dep. 142:16-144:12, 147:13-148:16.

[61] *See* Exs. 114, 116-124; Ex. 125 at GA00007234; Exs. 126-128; Ex. Z, Bell Dep. 122:23-124:9, 129:19-130:11; Ex. A, Cleveland Dep. 103:21-106:10, 107:12-21; Ex. I, Cole Dep. 278:7-280:15; Ex. G, Futch Dep. 252:15-253:21; Ex. K, Keith Dep. 132:10-134:20, 136:11-140:1, 140:8-143:5, 147:10-150:12, 153:7-154:15; Ex. B, Livingston Dep. 119:6-120:9; Ex. L, Low Dep. 201:20-24; Ex. W, Neal Dep. 80:6-83:8; 83:24-86:5; Ex. U, Ngeve Dep. 276:5-278:2; Ex. M, Owen Dep. 85:22-86:6, 92:17-93:24, 186:12-187:10; Ex. CC, Winter Dep. 173:8-175:22; Ex. Q, Wolf Dep. 141:6-144:12, 144:19-145:19, 147:13-149:2.

mandated academic and behavioral assessments.[62]  In addition to funding these assessments, the State provides regional GNETS programs with direction as to when and how the programs should administer them.[63]

## ARGUMENT

### I.   PARTIAL SUMMARY JUDGMENT IS WARRANTED BECAUSE THE RELEVANT MATERIAL FACTS ARE NOT IN DISPUTE.

Summary judgment must be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Hickson Corp. v. Northern Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004) (citations omitted).

---

[62] *See* Ex. 91 at GA00054567.013 (various GaDOE supports and services provided via contract); Ex. 92 (contract for GNETS Program access to i-Ready); Ex. 93 (contract for GNETS Program access to the BASC-3); Ex. P, Beck Dep. 184:9-185:17, 185:24-188:21; Ex. A, Cleveland Dep. 189:12-21, 190:21-192:16; Ex. O, W. Jones Dep. 169:25-170:16, 176:4-21.

[63] Exs. 87-90, 94-97; Ex. V, Clemons Dep. 230:11-235:1; Ex. S, Gilchrist Dep. 165:2-23, 166:15-18, 167:8-15, 168:17-169:1, 184:8-185:9, 197:2-9; Ex. T, Holifield Dep. 132:1-4, 132:24-134:25, 148:3-149:3, 152:11-153:15, 233:3-234:3, 236:19-238:6; Ex. U, Ngeve Dep. 251:23-252:20, 253:1-15, 254:8-24, 255:15-23, 256:25-257:10, 345:14-25; Ex. Q, Wolf Dep. 207:8-19, 208:16-210:23, 219:2-222:18, 224:5-225:3; .

Because the United States presents substantial evidence supporting its motion for partial summary judgment, the State may not rely on a mere "scintilla of evidence" supporting its position to avoid summary judgment. *Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252). Rather, to avoid summary judgment, the State must present evidence sufficient to support judgment in its favor. *Ibid.*; *Delovsky v. Wal-Mart Stores East, LP*, No. 1:18-cv-00207, 2020 WL 202390, at *2 (N.D. Ga. Jan. 10, 2020) (Ross, J.) (citing *Anderson*, 477 U.S. at 248). The State cannot meet that burden.

## II.   TITLE II OF THE ADA AND ITS IMPLEMENTING REGULATION APPLY TO THE STATE OF GEORGIA.

Congress enacted the ADA to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). This "broad mandate" of "comprehensive character" has a "sweeping purpose": "[t]o eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (quotation marks and citation omitted).

Title II of the ADA and its implementing regulation prohibit public entities— that is, any State or local government and any department, agency, or other instrumentality of a State or local government, 42 U.S.C. § 12131(1)—from discriminating based on disability. *See* 42 U.S.C. § 12132 (providing that "no

qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity"); 28 C.F.R. § 35.101.

The ADA recognizes segregation of persons with disabilities as a form of discrimination. *See* 42 U.S.C. §§ 12101(a)(2), 12101(a)(5); *see generally Olmstead* v. *L.C.*, 527 U.S. 581, 600 (1999). To guard against this form of discrimination, Title II's "integration mandate" requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."[64] 28 C.F.R. § 35.130(d). Public entities must also make "reasonable modifications" to policies and practices when "necessary to avoid discrimination," unless those entities can demonstrate that the modifications would "fundamentally alter the nature of the service." 28 C.F.R. § 35.130(b)(7)(i).

Because the State of Georgia, as a state government, is a "public entity" within the meaning of Title II and the undisputed facts show that the State administers the

---

[64] A state cannot avoid liability under the integration mandate by "contracting out to private entities their obligation to provide services in compliance with the ADA[.]" *Price v. Shibinette*, No. 21-cv-25, 2021 WL 5397864, at *9-10 (D.N.H. Nov. 18, 2021); *see also Conn. Office of Prot. & Advoc. for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 276-77 (D. Conn. 2010); *Disability Advocs., Inc. v. Paterson*, 598 F. Supp. 2d 289, 316-19 (E.D.N.Y. 2009); *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 286-87, 293 (E.D.N.Y. 2008); *cf.* 28 C.F.R. § 35.130(b)(1), (3) (public entities may not discriminate "directly or through contractual . . . or other arrangements").

GNETS Program, the State is subject to Title II's integration mandate in its operation of the Program.

### III. THE GEORGIA LEGISLATURE HAS CHARGED THE STATE WITH RESPONSIBILITY TO CARE FOR CHILDREN WITH BEHAVIORAL HEALTH DISABILITIES.

The State's statutory and regulatory framework places responsibility squarely on the State of Georgia for providing mental health and therapeutic educational services and supports to students with behavior-related disabilities. In particular, the State is required to develop "a coordinated system of care so that children and adolescents with emotional disturbance and their families will receive appropriate educational, nonresidential and residential mental health services." Ga. Code Ann. § 49-5-220(a)(6). The State discharges this obligation by providing a variety of services and supports that are planned, administered, and funded by State agencies, including DBHDD, DCH, and GaDOE. *See supra* pp. 4-6 and notes 9-13. DBHDD, in particular, funds and administers many of the supports and services that children with severe emotional disabilities (including students placed in GNETS) need. *See supra* p. 5 and note 11. These supports and services—including those provided via Apex—are delivered through the State's behavioral health service system, which includes the services of contracted community-based behavioral health providers. *See supra* pp. 5 and notes 11-12. GaDOE also purports to provide intensive mental

health and therapeutic educational services and supports to certain students with behavior-related disabilities through the GNETS Program.  Ex. 7 at ¶ (2)(a), (c)-(d).

## IV. **THE STATE OF GEORGIA ADMINISTERS THE GNETS PROGRAM.**

### A. This Court's Prior Decisions Outline the Standard for Establishing State Administration.

This Court previously addressed the State's administration of the GNETS Program in denying the State's motions to dismiss and for judgment on the pleadings.  In each instance, the Court ruled that the United States had adequately alleged that the State administers the GNETS Program within the meaning of Title II and its implementing regulation.  *See* ECF Nos. 61 and 94.  In denying the State's motion to dismiss, this Court rejected the argument that "the local school districts, not the State, . . . manage[] and implement[] the GNETS program" and that the State therefore could not administer the GNETS Program.  ECF No. 61 at 8.  The Court concluded that the United States had "articulate[d] specific facts which explain the particular ways in which it contends the [Ga]DOE controls and administers the [GNETS] program within the meaning of Title II of the ADA."  *Id.* at 13-14.

In support of its conclusion, the Court specifically cited the facts alleged in paragraphs 24-28 of the United States' Complaint: that the State "plans, funds, administers, licenses, manages and oversees the GNETS Program," including by setting student eligibility criteria for GNETS services and designating State

employees to oversee the Program; that the State determines which mental health and therapeutic educational services and supports will be provided, by whom, and in what setting; and that the State determines how it will allocate and manage State and federal funds earmarked for such services. *Id.* at 11-12. The Court also cited the State's regulatory obligation, shared between GaDOE and the State Board of Education, to "monitor GNETS to ensure compliance with Federal and state policies, procedures, rules and the delivery of appropriate instructional and therapeutic services." *Id.* at 10-11. Taken together, these facts "sufficiently allege[d] that the true administration of the [GNETS] program rests with the State." *Id.* at 12; *see also* ECF No. 94 at 8-11 (echoing conclusion on State's motion to dismiss in denying State's motion for judgment on the pleadings).

The evidence the United States has obtained in discovery demonstrates that there is no material issue of fact regarding these allegations. That evidence, detailed here, specifically shows that the State administers the GNETS Program in each of the ways described by this Court in denying the State's motion to dismiss: "[GaDOE] oversees GNETS by establishing criteria for the implementation of the program in local school districts, by disbursing federal and state funds to support the program, by promulgating regulations to carry out the program, and by overseeing

26

the operations and implementation of the program throughout the state."[65]  ECF No.

61 at 8-9.

### B. Material Undisputed Facts Gathered in Discovery Confirm that the State Controls and Administers GNETS.

The undisputed facts show that the State of Georgia exercises substantial

authority over GNETS Program operations by promulgating regulations to carry out

the Program, mandating and assessing the implementation of other Program

operating standards, and funding virtually all aspects of the Program.

*1. The State of Georgia's regulatory framework establishes the State's substantial authority over GNETS Program operations.*

One important way in which the State of Georgia controls the GNETS

Program is by "promulgating regulations to carry out the [P]rogram."  *See* ECF No.

61 at 8-9.  In particular, the State has used its regulatory power to craft and

implement the GNETS Rule, which binds each of the State's 24 regional GNETS

programs and demonstrates the State's substantial authority over the GNETS

---

[65]  In prior briefing, the State asserted that "[n]either the text of ADA nor its regulations define 'administer,' so the plain meaning applies."  ECF No. 047 at 11 (citing *Molloy v. Allied Van Lines, Inc.*, 267 F. Supp. 2d 1246, 1252 (M.D. Fla. 2003)).  Assuming the plain meaning applies, the State administers the GNETS Program if the State manages and is "responsible for the running of" the Program or if the State provides the Program with "practical management and direction."  ECF No. 047 at 11-12 (citing the Oxford Dictionary of English and Black's Law Dictionary).  For the reasons set forth below, the State's conduct related to the GNETS Program plainly meets these definitions.

Program as a whole. *See supra* p. 6 and note 14. This Court has previously cited the GNETS Rule—and specifically the responsibilities it imposes on the State Board of Education and GaDOE—in observing that "it appears that the State is authorized, and does in fact exercise, some level of control over state-funded programs such as the GNETS program." ECF No. 61 at 10 (citing 160-4-7-.15(5)(a)).

The State's GNETS Rule dictates the overarching structure of the GNETS Program and touches every area of GNETS Program operations, including student eligibility criteria, service delivery, staffing, facilities, financing, and accountability. *See supra* p. 6 and note 15. In each of these areas, the State has made and codified decisions about the nature and structure of the GNETS Program, including who should be responsible for what and in what way. *See supra* pp. 6-7 and notes 16-20. The State could have adopted any number of operational structures. Indeed, it still may alter the GNETS Program structure by modifying the duties and responsibilities assigned to the various entities involved or by altering student eligibility for Program services or the types of learning environments in which GNETS services may be delivered.[66] The State—not any other entity—makes these decisions.

---

[66] The State can and has modified fundamental aspects of the GNETS Program in this way. Prior to 2017, for example, students as young as three years of age were eligible for GNETS services. *See* GA01286674 (attached hereto as "Ex. 11") at GA01286675; Ex. I, Cole Dep. 66:16-67:18; Ex. J, McCollum Dep. 87:1-19. In 2017, however, the State altered this aspect of the Program by setting five as the minimum age for GNETS eligibility. *Compare* Ex. 11 at GA01286675, *with* Ex. 7

28

The State's development and implementation of the Project Management Plan corroborates the State's broad authority to dictate and modify the structure and operation of the GNETS Program through regulatory changes and other means. Like the content of the State's GNETS Rule, the "detailed action steps to address program improvements" contained in the Project Management Plan—which the State developed and took steps to ensure were implemented——touch every area of GNETS Program operations, including program administration, instruction, therapeutic services, facilities, and funding. *See supra* pp. 8-9 and notes 22-23.

> 2. *The State of Georgia develops, directs, and assesses the implementation of the operating standards to which GNETS Programs are held accountable.*

The undisputed evidence further shows that the State has a long-established practice of developing, directing, and assessing regional programs' compliance with the GNETS Program's operating standards. As this Court has observed, the State's role in "establishing criteria for the implementation of the [GNETS] program in local school districts" and "overseeing the operations and implementation of the [GNETS] program throughout the state," is evidence that the State administers GNETS. ECF No. 61 at 8-9.

---

at ¶ (2)(a). The same year, the State made further changes to the eligibility criteria for the Program by removing a diagnosis of EBD (emotional behavior disorder) as a prerequisite for GNETS placement.

Through GaDOE and the two full-time staff GaDOE employs to manage the GNETS Program, the State has created, revised, and overseen the implementation of the GNETS Strategic Plan, the mandatory framework that governs nearly every aspect of GNETS Program operations. *See supra* pp. 8-11 and notes 21, 24, 26-27, 31. Compliance with the GNETS Strategic Plan is not optional. *See supra* p. 12 and note 37. Instead, each regional GNETS program must implement the Plan's provisions and participate in a self-assessment and review process to ensure compliance. *See supra* pp. 9-13 and notes 24, 32-38. In this manner, the State directs and exercises significant control over GNETS Program operations, including regional GNETS programs' general and day-to-day activities. *See supra* p. 10-11 and notes 27, 29-31.[67]

The State also provides direction to regional GNETS programs through other State-created documents, such as the Consideration of Services forms, which guide student eligibility for GNETS, and the GNETS Operations Manual, which historically provided standards for consistent operations across all regional GNETS programs. *See supra* pp. 13-14 and notes 39, 42. Because the State aligned the Consideration of Services Forms with the GNETS Rule, *see supra* pp. 13-14 and note 41, the Forms serve as yet another State-created vehicle for ensuring

---

[67] In addition to the GNETS Strategic Plan, the State has separately imposed other standards on regional GNETS programs, including standards related to facilities. *See supra* note 28.

compliance with the State's regulatory criteria for implementation of the GNETS Program statewide.  Although most regional GNETS programs no longer use the GNETS Operations Manual, it too was a State-created tool for ensuring compliance with State regulatory criteria prior to the advent of the GNETS Strategic Plan.

Not only does the State set the operating standards that bind regional GNETS programs, but it also assesses the programs' compliance with those standards by mandating the Strategic Plan self-assessment and review process, imposing broad data reporting obligations on regional GNETS programs (including through the GNETS grant application), and requiring regional GNETS programs to conduct IEP file reviews.  *See supra* pp. 12, 14-15, 18-19 and notes 37, 43-45, 56.  The State's collection of this information, along with other Program data, permits it to review broad aspects of regional GNETS program operations, including student placement and transition (i.e., entry and exit), staffing, available behavioral and therapeutic supports, trainings, instruction, progress monitoring, program procedures, service delivery, and use of restraints, among others.  *See supra* p. 14-15 and notes 43, 45. The State also uses this information to determine budget allotments, identify program needs, and assess program alignment with the GNETS Rule.  *See supra* pp. 12-13, 14-15, 18-19 and notes 38, 43-44, 55-56.  As GaDOE's GNETS Program Specialist testified, GaDOE's review of information that regional GNETS programs supply as part of the Strategic Plan self-assessment and grant application is one way

31

GaDOE provides "supervision" of the GNETS Program.  *See* Ex. C, Stevenson Dep. 36:21-37:15, 39:18-40:10; *see also* Ex. 14.

Consistent with the control the State wields over the structure and operation of the GNETS Program, as well as the practical management it provides, regional GNETS program directors regularly look to the State for direction on a host of day-to-day matters involving student eligibility and service delivery.[68]  *See supra* pp. 15-16 and notes 46-47.  Regional GNETS program directors testified that they communicate with GaDOE—and specifically the GNETS Program Manager and GNETS Program Specialist—for numerous reasons, including to obtain answers to operational questions.  *See id.*  These questions range from issues dealing with parental objections to placement in GNETS to regional GNETS programs' service delivery model and ability to receive students from outside of their assigned catchment areas.  *See id.*  In each instance, the State provides what regional GNETS programs are looking for—direction regarding Program operations.  *See supra* pp. 15-16 and note 47.  These situations and the patterns of communication that they reveal underscore what the undisputed evidence shows: the State is the final authority on proper GNETS Program operation.

---

[68] In sworn testimony, two regional GNETS program directors even identified the current GNETS Program Manager and GNETS Program Specialist as individuals to whom they report.  Ex. I, Cole Dep. 25:6-13, 26:8-15; Ex. X, Newsome Dep. 54:25-55:8.

In sum, it is undisputed that the State sets and directs the implementation of standards governing the GNETS Program, further confirming its decisive role in administering the Program.

### C. The State Is Responsible for Funding Virtually all Elements of the GNETS Program.

Finally, the undisputed facts show that the State exercises substantial control over the GNETS Program by administering funding for the vast majority of GNETS Program expenses.[69]   Since 2015, the State has appropriated over $60 million annually for the GNETS Program, principally derived from State funds.  *See supra* pp. 16-17 and note 49.  The State prescribes and manages the process for allotting and disbursing those appropriated funds to regional GNETS programs and the GNETS Program at large.  In particular, it designates GaDOE personnel to: review the grant applications submitted by regional GNETS programs; apply the State-created funding formulas specific to the GNETS Program in order to allocate money to particular regional GNETS programs; dictate the information and assurances regional GNETS programs, fiscal agents, and/or LEAs must provide in connection with their grant applications (as well as the obligations that any such assurances

---

[69] Indeed, the vast majority of therapeutic staff in regional GNETS programs is funded through State grant monies.  *See, e.g.*, Exs. 108-109, 132-134; Ex. R, Braddock Dep. 152:22-153:20, 161:13-25; Ex. V, Clemons Dep. 145:2-7, 147:13-150:6, 167:17-168:9, 193:15-195:1; Ex. S, Gilchrist Dep. 122:4-23, 207:5-21; Ex. U, Ngeve Dep. 265:18-266:16, 271:5-23, 273:15-274:1; Ex. Q, Wolf Dep. 100:12-104:20, 105:3-106:5.

impose); and approve program budgets submitted by each regional GNETS program that detail how the programs intend to spend any allocated funds; among other things. *See supra* pp. 17-19 and notes 50-58.

In addition to funding GNETS Program operations at the regional program level through the State grant process, the State directly funds other services for regional GNETS programs, playing a substantial role in determining the purported therapeutic services that particular programs may offer, the staff offering those services, and other available services and supports like academic and behavioral assessments. *See supra* pp. 20-21 and notes 59-63. By determining and overseeing GNETS funding, including the conditions and assurances that regional GNETS programs must provide in exchange for such funding, the State exercises significant control over the GNETS Program.[70]

## **CONCLUSION**

The undisputed facts—including but not limited to the State's significant role in regulating the GNETS Program, establishing the Program's implementation

---

[70] The State is planning to modify its funding of the GNETS Program. *See*, *e.g.*, HB 911, 156th Gen. Assemb., Reg. Sess. (see p. 65 at 24.8) (Ga. 2022) (referencing proposed transfer of funds "to reflect dissolution of state level GNETS program"); Ex. Z, Bell Dep. at 81. Restructuring the funding stream for a discriminatory program operated by a state does not undo the existence of the discriminatory system, particularly where that system has been established and supported for decades. Moreover, State administration in this instance does not turn definitively on financing alone, because the State directs—in one way or another—nearly every aspect of the GNETS Program's operations.

criteria and other standards, overseeing the Program's operations, and disbursing Program funding—confirm that administration of the GNETS Program rests with the State. Accordingly, the United States respectfully requests that this Court enter partial summary judgment in its favor on this issue.

Dated: October 21, 2023

Respectfully submitted:

RYAN K. BUCHANAN
United States Attorney
Northern District of Georgia

/s/ *Aileen Bell Hughes*
AILEEN BELL HUGHES
GA Bar Number: 375505
Assistant United States Attorney
United States Department of Justice
Richard B. Russell Federal Building
75 Ted Turner Dr. SW
Suite 600
Atlanta, GA 30303-3309
(404) 581.6000
aileen.bell.hughes@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

SHAHEENA A. SIMONS
Chief
Educational Opportunities Section

KELLY GARDNER WOMACK
Deputy Chief
Educational Opportunities Section

ANDREA HAMILTON WATSON
Special Litigation Counsel

CRYSTAL ADAMS
CLAIRE D. CHEVRIER
FRANCES S. COHEN
MATTHEW GILLESPIE
PATRICK HOLKINS
VICTORIA M. LILL
JESSICA POLANSKY
LAURA C. TAYLOE
MICHELLE L. TUCKER

Trial Attorneys
United States Department of Justice
Civil Rights Division

*/s/ Andrea Hamilton Watson*
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-4092
andrea.watson2@usdoj.gov

## **L.R. 7.1(D) CERTIFICATION**

I certify that this brief has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C). Specifically, this brief has been prepared using 14-pt Times New Roman Font.

/s/ *Andrea Hamilton Watson*
ANDREA HAMILTON WATSON

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day filed the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sent counsel of record e-mail notification of such filing.

This 21st day of October, 2023.


/s/ *Andrea Hamilton Watson*
ANDREA HAMILTON WATSON