# EXHIBIT P

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                       ATLANTA DIVISION

 3

 4   UNITED STATES OF AMERICA,
                                   )CIVIL ACTION
 5              Plaintiff,          )NO. 1:16-cv-03088-ELR
                                   )
 6   vs.                            )
                                   )
 7   STATE OF GEORGIA,              )
                                   )
 8              Defendants.         )
                                   )
 9   - - - - - - - - - - - - - - -  )

10

11                 VIDEOTAPE DEPOSITION OF

12                   JAMES THEODORE BECK

13

14       Friday, January 27, 2023, 9:01 a.m., EST

15

16

17

18

19

20        HELD AT:

21        Robbins Alloy Belinfante Littlefield LLC
          500 14th Street, N.W.
22        Atlanta, Georgia  30318

23        ----------------------------------------------

24
              WANDA L. ROBINSON, CRR, CCR, No. B-1973
25        Certified Shorthand Reporter/Notary Public
```



```
 1  going to be taking your deposition today.
 2       A    Okay.
 3       Q    Would you please state your full name for
 4  the record.
 5       A    James Theodore Beck.
 6       Q    And do you typically go by Ted Beck?
 7       A    I do.
 8       Q    Mr. Beck, have you ever been deposed
 9  before?
10       A    I have not.
11       Q    And am I correct that you are being
12  represented by Javier Pico Prats today for purposes
13  of your deposition?
14       A    That's correct.
15       Q    I'm sure that your attorney has explained
16  much of this to you but today you and I are going to
17  have a conversation.  I'm going to ask the questions
18  and your only job is to answer them honestly and
19  completely.
20            Do you understand that?
21       A    I do.
22       Q    The court reporter has sworn you in.  That
23  means that everything you say here today is under
24  oath and must be truthful.
25            Do you understand that?
```



1    Q    Okay.  Did you have anyone reporting to
2  you in your capacity as budget manager?
3    A    I did not.
4    Q    Okay.  And prior to serving as budget
5  manager for the University System of Georgia, did
6  you hold any other professional roles?
7    A    I was the chief financial officer at the
8  Georgia Department of Education.
9    Q    And how long did you serve as chief
10 financial officer of the Georgia Department of
11 Education?
12   A    About four and a half years.
13   Q    And I believe you said earlier you became
14 CFO in 2015; is that correct?
15   A    Correct.
16   Q    And so I take it then you left somewhere
17 around the 2019, 2020 time mark?
18   A    I left DOE and went to the University
19 System in 2021.
20   Q    2021?
21   A    So -- 2020.
22   Q    2020, okay.
23        Who did you report to when you were
24 serving as chief financial officer for GaDOE?
25   A    Both Superintendent Richard Woods and



1  administer capital projects on behalf of the State
2  and essentially serves as the State agency's
3  liaison.  Whereas if they don't have that expertise
4  on staff, they're managing it for them.
5           MS. GARDNER:  I'd like to ask the court
6      reporter to mark this document as Plaintiff's
7      Exhibit 898.
8           (WHEREUPON, Plaintiff's Exhibit-898 was
9       marked for identification.)
10 BY MS. GARDNER:
11     Q    You've been handed Plaintiff's Exhibit
12 898.  This is an email from you to Michael Rowland,
13 dated December 1, 2015, with the subject "RE: GNETS
14 Update."
15          The document is Bates-stamped GA00277967.
16          Do you recognize this?
17     A    Not specifically.
18     Q    Do you have any reason to doubt that you
19 sent this email?
20     A    No.
21     Q    Who is Michael Rowland?
22     A    Mike was the director of the Facilities
23 Team at the start of my tenure.
24     Q    And starting with the earliest email in
25 this thread, which Mr. Rowland sent to you on



1  December 1st, 2015, with copies to Clara Keith,
2  Deborah Gay, Emily Jones, Gregory Snapp, and John
3  Jefferson, correct that in that email Mr. Rowland
4  says:  "Ted, I wanted to give you a quick update on
5  the planning we have done for GNETS facilities.  I
6  have attached the meeting minutes from our meeting
7  with John Jefferson at GSFIC, along with the
8  facility condition assessment checklist we adopted
9  from another system."
10            Do you see that?
11       A    I do.
12       Q    And he goes on to explain more about sort
13 of the process of this facility assessment and where
14 the team is in that process, correct?
15       A    That appears to be so.
16       Q    You then respond to Mr. Rowland and say:
17 "You read my mind - was going to email you this
18 morning to see if we had an update that I can
19 include in our presentation to the Governor next
20 week."
21            Do you see that?
22       A    I do.
23       Q    You reference "our presentation to the
24 Governor next week."  Who is "our"?
25       A    Most likely would have been myself, Matt



1  Q   Do you have any reason to doubt that you
2  received this email from Michael Rowland?
3  A   I do not.
4  Q   And am I correct the first attachment to
5  this email is an Excel file with the file name "Copy
6  of 2016-05-22 GNETS Fee Proposal"?
7  A   Yes.
8  Q   And then the second attachment is a Word
9  document with the file name "Edited Planning Meeting
10 Minutes 5.31.16"?
11 A   Yes.
12 Q   In this email Mr. Rowland says:  "Ted,
13 attached will you find a copy of the fee proposal to
14 perform the facility condition assessments for the
15 48 GNETS locations identified in the RFQ.  2WR was
16 the most qualified firm, and the fee proposal they
17 have submitted is in line with what I expected.  I
18 have also attached an update to my notes on how the
19 planning and execution has evolved."
20     Do you see that?
21 A   I do.
22 Q   What was your role with respect to the fee
23 proposal submitted by the firm 2WR?
24 A   I don't recall specifically.  It looks
25 like I would have reviewed it.



1    Q    Did you sign off on the fee proposal?
2    A    I don't remember.  For us to have engaged
3  them in work, we would have had to have a contract
4  of some sort, is my assumption.  So there should
5  have been some sort of approval I provided to it at
6  some point.
7    Q    At the end of his email to you, Mr.
8  Rowland says:  "If you are ok with the fee proposal,
9  then I am ready to have GSFIC negotiate the
10  contracts necessary to meet 2WR's schedule."
11         Do you see that?
12    A    I do.
13    Q    So does that refresh your recollection as
14  to whether you would have okayed the fee proposal?
15    A    Probably would have relied almost
16  exclusively on GSFIC to provide subject matter
17  expertise there.  I would have, I think, still have
18  signed something at some point, but it would have
19  been after GSFIC and the vendor concluded their
20  negotiations.
21    Q    And GSFIC here, just to be clear for the
22  record, is the same as the Georgia State Finance and
23  Investment Commission that you referenced earlier?
24    A    That's correct.
25    Q    And I believe you said earlier that



1   sometimes GSFIC comes in and negotiates on behalf of
2   state agencies when the level of expertise is such
3   that it makes sense for GSFIC to do that?
4        A    Yes.
5        Q    Is that the reason why GSFIC would have
6   been involved here?
7        A    Yes.
8        Q    Turning to the fee proposal, which is
9   included, I'll note for the record that the file was
10  provided natively, though it is reproduced here in
11  paper, and it has a Bates stamp GA00279625.
12            Am I correct that this fee proposal
13  outlines the various fees that 2WR proposed to
14  charge for the work associated with the facility
15  assessment?
16       A    It appears so.
17       Q    And the total fee for the 48 sites was
18  just over half a million dollars; is that correct?
19       A    Yes.
20       Q    Did GaDOE ultimately work with 2WR to
21  assess the GNETS facilities?
22       A    I don't recall.
23       Q    Looking at the second attachment, which
24  has a beginning Bates number of GA00279626, are
25  these the updated notes that Mr. Rowland references



1     Q    Mr. Beck, you've been handed Plaintiff's
2    Exhibit 904.  This is an email from you to Dave
3    Lakly, dated February 22nd, 2016, with the subject
4    "RE: GNETS Program Manager."
5         The document is Bates-stamped GA00278665.
6         Do you recognize this email?
7     A    Not specifically.
8     Q    Do you have any reason to doubt that you
9    sent this email?
10    A    I do not.
11    Q    Who is Dave Lakly?
12    A    Dave would have been one of the staff
13   members at the Senate Budget and Evaluation Office.
14    Q    During your time as CFO at GaDOE, were you
15   accustomed to receiving emails directly from him?
16    A    Sure, yes.
17    Q    And what kinds of things would he email
18   you about?
19    A    Things in relation to the budget, through
20   the budget development process, just like any of the
21   other SBOE staff members.
22    Q    In this email thread Dave Lakly sent you
23   an email on February 19, 2016.  Is that correct?
24    A    Yes.
25    Q    And is it also correct that in that email



1  he says:  "When you have a minute, could you send me
2  a brief (sentence or two) summary of what that new
3  statewide program manager position does"?
4       A    Yes.
5       Q    Did you understand the new statewide
6  program manager position he referred to to be the
7  statewide program manager for the GNETS program?
8       A    I did.
9       Q    And the subject of his email is "GNETS
10 Program Manager," correct?
11      A    Correct.
12      Q    You responded to him; is that right?
13      A    I did.
14      Q    And among other things, you say "her
15 primary role is to act as the program manager."
16           Do you see that?
17      A    I do.
18      Q    And is it correct that you go on to say
19 "She'll be acting as the coordinator for the 20+
20 sites, and working to implement our policies and
21 procedures with more standardization across each
22 location"?
23      A    It does.
24      Q    And then you also go on to say:  "Her
25 foremost task at the moment is to continue working



1   to implement our improvement plan, which has been in
2   existence for some time, and covers a lot of ground,
3   all of which is much needed and should demonstrate
4   so immediate results."  Correct?
5        A    Correct.
6        Q    This reference to demonstrating immediate
7   results, is that intended to say demonstrate some
8   immediate results?
9        A    That's my assumption.
10       Q    You reference an improvement plan in
11  saying that the GNETS program manager's "foremost
12  task at the moment is to continue working to
13  implement our improvement plan."
14            What improvement plan were you referring
15  to?
16       A    I don't remember.  My guess is that it's
17  related to the facilities improvement plan.
18       Q    You note the improvement plan had been in
19  existence for some time.  When did you understand
20  that improvement plan to initially come into
21  existence?
22       A    I don't recall.
23       Q    Is it fair to say, based on your email,
24  that plan would have predated this February 2016
25  email?



1  the GNETS programs"?
2       A    It does.
3            MS. GARDNER:  I'd like to have the court
4       reporter mark this document as Plaintiff's
5       Exhibit 913.
6            (WHEREUPON, Plaintiff's Exhibit-913 was
7        marked for identification.)
8  BY MS. GARDNER:
9       Q    You've been handed Plaintiff's Exhibit
10  913.  This is an email from Linda Crawford to an
11  email addressed identified as scherryA@cainc.com,
12  dated October 17, 2016, with the subject "Executed
13  contract."
14           The email contains one attachment, which
15  is a PDF with the file name "signed contract 18379,
16  Curriculum Associates."
17           The Bates-stamp of this document is
18  GA00066194.
19           Turning to the attachment, which begins
20  with the Bates-stamp GA00066195, is this a contract
21  between the State School Superintendent, on behalf
22  the Georgia Department of Education, and Curriculum
23  Associates, LLC, that you signed on behalf of the
24  Georgia Department of Education?
25      A    Yes.



1    Q    And your signature on the contract appears
2  on Page 6; is that correct?
3    A    It does.
4    Q    And as before, you also signed a
5  confidentiality agreement, and that signature
6  appears on Page 8?
7    A    Yes.
8    Q    In the Scope of Services section on this
9  contract, what does it identify as the scope of
10 services here?
11   A    It appears to be the array of services
12 provided by the vendor beginning September 2016
13 through August 2017 related to common instructional,
14 diagnostic, and progress monitoring programs.
15   Q    And that's for all students enrolled for
16 GNETS services?
17   A    That's what it reads.
18        MS. GARDNER:  I'd like to ask the court
19   reporter to mark this document as Plaintiff's
20   Exhibit 914.
21        (WHEREUPON, Plaintiff's Exhibit-914 was
22    marked for identification.)
23 BY MS. GARDNER:
24   Q    You've been handed Plaintiff's Exhibit
25 914.  This is an email from Linda Crawford to an



1  email addressed identified as maggie, M-A-G-G-I-E,
2  .kjer, K-J-E-R, at pearson.com.
3           The email is dated October 17, 2016,
4  contains a copy to Nakeba Rahming.
5           The subject is "Executed contract," and
6  there's one attachment which is a PDF with the file
7  name "signed contract 18363 Pearson."
8           The Bates-stamp on this document is
9  GA00066184.
10          Before we turn to the attachment, who is
11 Linda Crawford?
12      A    I don't know.
13      Q    Okay.  Turning to the attachment, which
14 begins at Bates-stamp GA000661885, I'm correct that
15 this is a contract that the Georgia State Department
16 of Education entered into with NCS Pearson
17 Incorporated in September 2016?
18      A    It appears to be.
19      Q    And you signed this contract on behalf of
20 the Georgia Department of Education?
21      A    I did.
22      Q    This contract doesn't look like some of
23 the other contracts we looked at previously.  Is
24 that because Pearson requires that all of its
25 customers accept the terms of sale -- of sales and



```
 1   use that appear here.
 2        A    More than likely.
 3        Q    And so in this case your signature appears
 4   on Pearson's terms of sales and use, correct?
 5        A    Yes.
 6        Q    The terms of sales and use is formed by a
 7   quote/proforma invoice from Pearson, correct?
 8        A    Yes.
 9        Q    And that invoice identifies the Georgia
10   Department of Education as the customer?
11        A    It does.
12        Q    It also notes that Nakeba Rahming is the
13   contact at the Georgia Department of Education?
14        A    Yes.
15        Q    And the invoice itself identifies four
16   products, correct?
17        A    Yes.
18        Q    All of those products relate to the BASC,
19   B-A-S-C, 3?
20        A    It appears so.
21        Q    Do you know what the BASC-3 is?
22        A    I don't.
23        Q    There is then a purchase order that
24   follows the proforma invoice, correct?
25        A    Uh-hum.  (Affirmative.)
```



1    Q    The purchase order is signed by Charles
2    Queen?
3    A    Yes.
4    Q    Am I reading that correctly?
5    A    Yes.
6    Q    Who is Charles Queen?
7    A    Charles worked in the procurement team as
8    well and managed most of our purchase orders.
9    Q    Is the purchase order the evidence that
10   payment actually was rendered for a particular
11   contract?
12   A    No.  It would have been what we call an
13   encumbrance, so that we would rope off the funds to
14   pay for it after the goods or services were
15   received.
16   Q    So the proforma invoice is Pearson telling
17   the Department of Education how much money the
18   contract is going to cost, and the purchase order is
19   segregating those funds to make sure they're
20   available to satisfy the debt at some point?
21   A    That's correct.
22        MS. GARDNER:  I'd like to have the court
23        reporter mark this document as Plaintiff's
24        Exhibit 915.
25        (WHEREUPON, Plaintiff's Exhibit-915 was

