EXHIBIT R

1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF GEORGIA

3                      ATLANTA DIVISION

4

5    UNITED STATES OF AMERICA,

6           Plaintiff,        CASE NO. 1:16-cv-03088-ELR

7    vs.

8    STATE OF GEORGIA,

9           Defendants.

10

11

12

13            VIDEOTAPED DEPOSITION OF

14                 WHITNEY BRADDOCK

15            July 18, 2022 -- 9:16 a.m.

16                 First RESA Office

17                 201 W. Lee Street

18                 Brooklet, Georgia

19

20

21        Deborah K. Lingonis, RPR, CCR 2883

22

23

24

25



WHITNEY BRADDOCK                                    July 18, 2022
UNITED STATES vs STATE OF GEORGIA                          32

 1  Community Health.  Do you have any interactions with
 2  anybody from that department?
 3      A.   No.
 4      Q.   Okay.  So we talked a little bit about the
 5  meetings with the regional directors.  Well, I'm not
 6  sure we did actually.  I might be mixing up my
 7  meetings.
 8           Do you participate in regular meetings with
 9  regional directors of GNETS program?
10      A.   Yes.
11      Q.   How often do you have those meetings?
12      A.   We have those meetings anywhere from once a
13  month to four times a year.
14      Q.   How are they organized?  Who decides when
15  there's going to be a meeting or how often?
16      A.   They are organized through Georgia Department
17  of Education.
18      Q.   Thank you.  Does Georgia Department of
19  Education personnel attend these meetings as well?
20      A.   Yes.
21      Q.   And who -- is it the people we talked about,
22  Vicky Cleveland and her predecessors or other people?
23      A.   Vicky Cleveland, yes, and her predecessors.
24      Q.   Anybody else?
25      A.   They may bring in other Georgia DOE personnel



1   to do professional learning during these meetings.

2       Q.   And what is discussed at these kinds of

3   meetings?  What kinds of topics do you talk about when

4   you meet with the other directors?

5       A.   In the past, we have had someone like from the

6   Georgia Department of Education Math Department talk

7   about math curriculum and things that could help

8   special ed students through math curriculum.

9            We kind of just talk about deadlines, making

10  sure that we've got our budget in on time, and that

11  kind of thing.

12      Q.   So is it more of a somebody presents at each

13  meeting or is it a round-table conversation or some

14  mix?

15      A.   In the past we would get together and have

16  meetings.  There were times when different directors

17  might present or there were other guests that would

18  present.  But most recently after COVID, most of our

19  meetings are virtual and last about an hour at tops.

20      Q.   So if I understand when you say the virtual

21  ones, what are they like?  Are they more of a

22  presentation or more of a conversation?

23      A.   More of a presentation.

24      Q.   And is there an agenda?  Does somebody

25  announce who the guest is going to be and what the



1  topic will be in advance?

2      A.   Yes.

3      Q.   And is that shared with you in advance?

4      A.   No, I don't think so.  I think we get it when

5  we then sign in.

6      Q.   Okay.  And is the invitation, does that come

7  from the Department of Education?

8      A.   Yes.

9      Q.   Do you have input into what the topics would

10 be?  Like, if there was something you were concerned

11 about or struggling with, would you be able to ask if

12 that will be a topic at one of these meetings?

13     A.   Yes.

14     Q.   And how would you do that?

15     A.   A lot of times a survey is sent out to the

16 directors with, you know, did you need information on

17 this, that, or the other.  And so you can fill out that

18 survey and it's sent back and those questions then can

19 be addressed.

20     Q.   And who sends out that survey?

21     A.   Vicky or some other person at the DOE that she

22 may have send it out.

23     Q.   Have you ever been asked to prepare reports

24 for anyone in the governor staff or the state

25 legislature?



1    A.   I have no idea.

2    Q.   Has anyone from the Department of Education

3  ever reached out to you about -- with questions about

4  what's in the application?

5    A.   Yes.  They've asked for clarification as to

6  what I've put.  I couldn't -- I don't know the

7  circumstances of that.  I just remember getting a phone

8  call that said, "Hey, you said this.  Is this what it

9  is?"  I may have put the wrong year or something that I

10  needed to correct.

11    Q.   You don't recall ever getting any substantive

12  questions about what kinds of services are being

13  provided or qualifications of teachers or anything like

14  that?

15    A.   No.

16    Q.   What best practices are used by staff to

17  support the students at Cedarwood?  What evidence-based

18  practices?

19    A.   Are you talking about affective-type things or

20  academic?

21    Q.   I'm thinking mainly about behavioral and

22  social emotional.  Like, are your staff trained in

23  trauma informed care for instance?

24    A.   Yes.

25    Q.   Who provides that training?



1      A.   We go for without contact mostly.

2      Q.   And when is contact -- when does contact

3  happen?

4      A.   If a student that -- it would be a young

5  student that contact would be used.  We know that they

6  run or they're pushing against someone.  Someone may

7  hold their hand to walk somewhere with them.  We really

8  try not to use any contact.

9      Q.   Do you keep a record of times where it's

10  necessary?

11      A.   If we use a full restraint.

12      Q.   What's a full restraint?

13      A.   If a student has been aggressive or is being

14  aggressive towards someone and a staff has to use the

15  Mind Set techniques to restrain them.

16      Q.   But that's the only -- so if there was someone

17  guiding somebody by the elbow or something like that or

18  holding them by the hand, that wouldn't be recorded.

19  Only the full restraint?

20      A.   Correct.

21      Q.   Okay.  Now I want to talk a little bit about

22  the admissions process or enrollment process to

23  Cedarwood.

24           Can you describe the process.  And you've

25  referenced parts of it before, but describe the process



1  for which students come to receive services at

2  Cedarwood.

3      A.   In general, a student would be in special ed

4  and having behavioral, severe behavioral issues, in

5  that setting we like to go in and do consultation

6  first, if possible.

7          If not, if things are more than -- have really

8  escalated to a certain degree that the special ed

9  director says, you know, we really need to have a

10 meeting, so we will work with a special ed director and

11 the specialty ed staff for the LEA to have a meeting on

12 the student and then the IEP committee decides

13 placement.

14     Q.   And what is your role in that process?

15     A.   I am -- I know what's going on.  I don't

16 attend those meetings unless someone has asked me to.

17         I will look over students' paperwork.  We

18 ensure that students have a behavioral intervention

19 plan that's current and it's been followed, that -- we

20 like to try to be sure everything has been tried at the

21 school before students then are met on for GNETS.

22         But even sometimes in the meeting we may come

23 with something and the IEP team decides not to send the

24 student to Cedarwood.

25     Q.   Do you come up with something at the meeting



1  that has not been tried yet?

2      A.   Yeah.

3      Q.   You said at the beginning that you don't

4  attend the meetings unless someone asks me.  Does that

5  generally include the IEP meetings?

6      A.   Yes, the psych coordinators are the

7  administrators that go do annual review meetings and

8  other IEP meetings.

9      Q.   So site coordinators.  Are they your designees

10  in that process?

11      A.   Yes.

12      Q.   And is that true for the admissions IEP

13  meetings and other IEP meetings?

14      A.   Yes.

15      Q.   Okay.  At what point in the process you

16  described is the preferred packet prepared?

17      A.   Usually when a special ed director either gets

18  in touch with me or gets in touch with the psych

19  coordinator, then we ask them to give us some

20  information on the student by filling that out and

21  sending us the information that they have on the

22  student prior to the IEP meeting.

23      Q.   Okay.  Is there a step in where -- so you

24  described you try to make sure everything has been

25  tried at the school.  Is that step you described,



 1  making sure it's been tried, done on the basis of the

 2  referral packet?

 3      A.   Yes.

 4      Q.   Okay.  And then if it passes that sort of

 5  screening stage, then would it advance to the step of

 6  an IEP meeting?

 7      A.   Yes.

 8      Q.   So you mentioned that you want to make sure

 9  they have a current IEP and that it's been followed.

10  Do you check to see whether there is an FBA?

11      A.   We do, yes.

12      Q.   Is it required?

13      A.   It is part of that, yes.  We don't have a

14  specific FBA that has to be done.  But, yeah, some type

15  of functional behavioral assessment needed to be

16  done.

17      Q.   I'm not sure I understood that.  So are there

18  different kinds of FBAs?

19      A.   There's different processes in an FBA or to

20  carry out an FBA.

21      Q.   So you're saying some FBA has to be done but

22  it could be different for different students?

23      A.   Yes.

24      Q.   And is there a requirement there be progress

25  monitoring data on the IEP implementation?



 1  we already did.

 2      Q.   Do you understand that to mean you already did

 3  it because they were required before or you already did

 4  that even though it wasn't part of the rule?

 5      A.   Just because it was best practices.

 6      Q.   So as far as you can remember, the addition

 7  for the FBA to be done prior was the only thing that

 8  changed in your practice with the amendment of the

 9  rule?

10      A.   That was -- yes.

11      Q.   Are you familiar with the -- I've been calling

12  it a referral packet, but I think it has a different

13  name.  The student information -- student information

14  packet?

15      A.   Yes.

16      Q.   And are you familiar with the flow chart, the

17  GNETS flow chart?

18      A.   Yes.

19      Q.   And the guiding questions?

20      A.   Yes.

21      Q.   Do those documents together with the GNETS

22  rule, do they form the basis for the enrollment

23  determinations that you make for students referred for

24  services at Cedarwood?

25      A.   Those along within the IEP committee team



1    meeting.

2        Q.    Okay.  Are there other documents that are used

3    in the referral process?

4        A.    No.

5        Q.    So are the criteria set forth in the documents

6    we just discussed, the information packet, the GNETS

7    rules along with the guidance and the flow chart and

8    the guiding questions, are those sort of the criteria

9    that govern the enrollment decisions?

10       A.    They are guidelines.

11       Q.    All of them?

12       A.    Well, the GNETS rule is actually the major

13   guideline.  The others are just -- well, the GNETS rule

14   is the rule and these are just guidelines to help

15   follow in the process.

16       Q.    So the information packet, the flow chart, and

17   the guiding questions are guidelines to help in the

18   process?

19       A.    Yes.

20       Q.    Have you received any guidance on what the

21   word intense means with respect to the rule requiring

22   intense social emotional behavioral challenges?

23       A.    No.

24       Q.    Have you received any guidance about how to

25   assess the severity, frequency, or duration of the



1  challenges referred to in the rule?

2      A.   No specific guidance, no.

3      Q.   Have you received general guidance?

4      A.   No.

5      Q.   How about guidance about how to assess the

6  services and supports provided in the general education

7  settings?

8      A.   No.

9      Q.   And who reviews the sufficiency of the

10  services that have been provided at the student's home

11  school?

12      A.   The Cedarwood coordinator and the special ed

13  director would have conversations about it.

14      Q.   And does the coordinator report to you or does

15  the coordinator make a determination themselves?

16      A.    In most parts the coordinator and I have

17  conversations about it.

18      Q.   And then what happens after the

19  conversations?

20      A.   Then they -- we might -- the coordinator

21  themselves or I would talk to the special ed director

22  and then they would -- it would still have a meeting,

23  an IEP meeting, for the committee to make the

24  decision.

25      Q.   So you and the coordinator would together come



1  to a decision about whether you think that enough had

2  been done and convey that to the special director?

3      A.   Yes.   We would look at, to be sure, that

4  everything has been done according to the rule, that we

5  have everything there that we need, and the information

6  that we need.

7      Q.   And then you let the special ed director know

8  that the packet was, like, complete basically and then

9  the IEP meeting would be convened?

10      A.   Yes.

11      Q.   And you would not attend that part, correct?

12  The coordinator would attend that meeting?

13      A.   Right, usually.   I'm not where I can't, but I

14  generally do not.

15      Q.   And so has a student ever referred to

16  Cedarwood been denied enrollment because he or she had

17  not received sufficient support at the home school?

18      A.   I don't know.

19      Q.   Do you have a sense of how many referrals are

20  expected and how many are denied?

21      A.   Well, we don't -- we wouldn't -- when you say

22  denied, that makes it sound like someone is saying no,

23  we can't even have a meeting on this.

24          We may say you need to do this or that, you

25  know.   You don't have an FBA to back up your behavior



1    Q.   How often would you say these kinds of

2  nonemergent but nonstandard admissions happen?

3    A.   Very seldom.

4    Q.   Does anybody in the Georgia Department of

5  Education have a role to play in these decisions, these

6  admissions or enrollment decisions?

7    A.   No.

8    Q.   Do they have a role in transferring records

9  from school to school or program to program?

10    A.   No.

11    Q.   I'm going to mark as Exhibit 253 (sic) a

12  document from the State GA00013594.

13       MS. HERNANDEZ:  I did have one question for

14  you, Laura.  It cut out.  You said, "Does anyone from

15  the blank participate in."  It was your last question

16  and I didn't hear it, if either you or the court

17  reporter can read that back.

18       MS. TAYLOE:  Georgia Department of

19  Education.

20       MS. HERNANDEZ:  Gotcha.  Okay.  Thank you.

21       (Plaintiff Exhibit 254 marked.)

22  BY MS. TAYLOE:

23    Q.   Okay.  And I'm giving you control,

24  Ms. Braddock.

25    A.   Okay.  You would think by now I would have

 1  figured out how to do it.

 2      Q.   I'm the same pre-tech generation you are, so

 3  no judgment from me.  I think if you scroll the control

 4  bar on the right, it works better.

 5      A.   The problem is when I get all the way on the

 6  right to scroll, I can't see what's on the left and

 7  then have to get back down there.  So is this -- okay,

 8  here we go.

 9      Q.   There might be a way to fit it to screen, too,

10  if it's not all on one screen for you.

11      A.   Let me try.  There we go.  Okay.  All right.

12  What's your question?

13      Q.   Do you recognize this document?

14      A.   Yes, I do.

15      Q.   Can you -- for the record, it involves an

16  email exchange between Whitney Braddock and Vicky

17  Cleveland.

18           And your message to Vicky is, "I sent a

19  request for a student transfer in i-Ready in the portal

20  earlier this week.  I was just double-checking to be

21  sure that you knew the request was there.  I have

22  teachers asking about the student."

23           Is that accurate what it says?

24      A.   Yes, it is.

25      Q.   Can you explain what was happening here?



1    A.    Okay.  A student was a move-in from another

2  GNETS to our program.  And we used the i-Ready program

3  for reading and math remediation.

4         And if a student was at another GNETS and they

5  were using i-Ready, when they moved to us so that they

6  don't -- so the continuity of using this program, the

7  DOE actually has the ability to transfer students from

8  one GNETS to another within this program, the i-Ready

9  program.

10   Q.    Okay.  What did you mean teachers asking about

11 the student?

12   A.    Well, I had teachers wanting to know when the

13 student can start using i-Ready because he hadn't been

14 transferred into our i-Ready program yet.

15   Q.    So he was already in Cedarwood classes --

16   A.    Yes.

17   Q.    -- but not able to access --

18   A.    i-Ready.  I'm sorry, I'm talking over you.

19   Q.    And is that the only circumstances in which

20 the Department of Education would get involved in a

21 transfer to access records?

22   A.    Yeah, for the i-Ready records.  Yes.

23   Q.    How many new students would you say are

24 enrolled in Cedarwood on average each year?

25   A.    It really depends on the year.  It changed and



 1   together and talk about kids who are high fliers or

 2   involved with more than one agency.

 3          So it could be Department of Public Health,

 4   Department of Family and Children Services, the DBHDD.

 5   Students that are having issues, Department of Juvenile

 6   Justice, that if a student is involved with more than

 7   one entity, then they are brought to that board if

 8   they're having significant problems in any of those and

 9   they look at them.

10          And my understanding is that -- and it's not

11   something that I'm always involved with.  So let's say

12   a student is having severe behavior issues at home and

13   has been short-term hospital placed a couple of times

14   in just a month or so.

15          Then they may look at that for a long-term

16   hospitalization placement.  Those types of things come

17   out of that board, out of that LIPT.

18      Q.   Okay.  How many students would you say at

19   Cedarwood are involved in LIPT?

20      A.   I don't know.  Off the top of my head I just

21   don't know.

22      Q.   Okay.  I'm going to introduce another

23   document.  This will be 256 and it is GA00320375.

24          (Plaintiff Exhibit 256 marked.)

25   BY MS. TAYLOE:



WHITNEY BRADDOCK                                        July 18, 2022
UNITED STATES vs STATE OF GEORGIA                            153

1      Q.   All right.  And I'm going to -- the attachment

2   to that ends with 0376 so I'm going to introduce them

3   both together as Exhibit 256.  Okay.  I'm going to

4   share the screen.  All right.  I'm giving you control.

5           The first is the email and then I'll show you

6   the attachment after you've had a chance to review the

7   email.

8           (Witness reviewing document.)

9   BY MS. TAYLOE:

10     Q.   So can you tell me, for the record, do you

11  recognize this email?

12     A.   Is there any more than "Attached is the

13  document that you asked for.  Let me know if you need

14  any more changes"?

15     Q.   No, no.  That's the entirety of the email.

16     A.   Okay.  All right.  In looking at it, I was

17  trying to figure out if that was all.

18          I don't remember this email, but I do

19  recognize it as something that my name is on it that I

20  would have sent.

21     Q.   Okay.  And the subject line is open records

22  request Cedarwood.  Can you tell us what open records

23  request is?

24     A.   It's a request for records.  It's something

25  that I have to legally comply to.  I can't say no.



1    Q.   Can I just -- I want to better understand.

2    Does it work better for schools that needed more

3    support?  I didn't understand that one.

4    A.   Okay.  Check and Connect is set up for

5    students and middle school and high school really that

6    may have attendance problems or students who are poorly

7    motivated in big settings where there's not always

8    someone that they can connect with.

9         And in our smaller setting with our students,

10   we just found that identifying students who knew Check

11   In Check Out is just as effective as the Check and

12   Connect and what goes with that.

13   Q.   Thank you.  That was helpful.

14        Okay.  And so the last question I have about

15   this is almost all of this seems like it's funded

16   through the GNETS state grant with a few things on hand

17   and the one you mentioned coming from the GLRS.

18        The one Why Try is a federal grant.  How does

19   that come to be under the federal grant for that

20   program?

21   A.   I think I probably just pay for it with our

22   federal.  In our grant, we get state grant and then we

23   get some money that is a federal grant.  And so that

24   specific year I paid for Why Try through that federal

25   grant.



1    A.   It was maybe at 1.2 million, but I'm not

2    completely certain.

3    Q.   Okay.  But in that neighborhood.  And like you

4    said before, that goes to the RESA, and RESA pays most

5    of the -- like the salaries and things of that from

6    that?

7         THE REPORTER:  I'm sorry, there was no answer.

8         THE WITNESS:  Oh, I'm sorry.  Yes.

9    BY MS. TAYLOE:

10   Q.   We've done so well for so long.

11        Do you know what the operating budget for the

12   next school year is projected to be?

13   A.   I don't know.  It's less than it was last

14   year, but I just don't know the numbers.

15   Q.   How do you know it's less?

16   A.   I've gotten the budget numbers, but I don't

17   know what the numbers are.  But it's less money.

18   Q.   Do you know about how much less?

19   A.   I don't.  I just -- my father wanted me to be

20   an accountant, and I'm not good with numbers.  I mean,

21   I can add, subtract, multiply, and divide.  But

22   remembering them, I'm not -- I can't.  I don't know.

23   Q.   But when you get the budget, does it -- I'm

24   curious what level of detail -- so you have this much

25   for staffing and this much for this and this much for



1  that or is it just a fixed amount and you do what you

2  want with it?

3      A.   It's a fixed amount, and I do with it what I

4  want.

5      Q.   So when you saw how much less it was, did you

6  start thinking like that's going to be one less staff

7  person or, you know, did you already have any ideas of

8  what it was going to limit you from being able to do?

9      A.   I did -- I looked at it and, yes, I worry that

10 it will limit me what I will -- or have to not have

11 staff.  But I also know that if it comes down to it,

12 the school systems would help meet the gap.

13     Q.   How would they do that?

14     A.   Like, Bulloch County pays for a teacher.  Some

15 of the other school systems would put money in for that

16 to help.

17     Q.   And do you know why your budget is lower this

18 year?  Is it because of the declining enrollment or

19 some other cause?

20     A.   Yes, because of declining enrollment.

21     Q.   Is there any other recurring source of funds

22 besides the annual GNETS grant?

23     A.   No.  Well, we get the annual state grant, and

24 then we get a federal allotment also.

25     Q.   What's the federal allotment?



1      A.    So it had been in the past $315,000.  But

2    because our numbers have dropped below 100, now it is

3    $285,000.

4      Q.    And is that for something in particular or

5    also discretionary spending?

6      A.    It's for discretionary spending.  Most of that

7    goes to pay for classified salaries.

8      Q.    What's classified salaries?

9      A.    Classified staff.  Paraprofessionals, case

10   managers, staff that don't have teaching certificates

11   and contracts, noncontracted people.

12     Q.    And is that the same pool of money you said

13   the Why Try came from, that federal grant?

14     A.    Yes.

15     Q.    Is there any limitation on what you can use

16   the state grant versus the annual grant for?

17     A.    Versus the federal grant?

18     Q.    I'm sorry, yes.

19     A.    There are -- yes, there are things that you

20   can use it for.  I usually have to pull my notebook out

21   every year when I sit down to do the budget to look at

22   it.

23     Q.    So you can't just put it all in one big bucket

24   and pay the bills.  You have to keep track of this is

25   for some and this is for --



 1  conversations about the restrooms, where to put white

 2  boards and smart boards and that kind of thing.

 3      Q.   You're back now.  I heard you up through not

 4  ADA compliant.

 5      A.   I'm sorry.  So we were not ADA compliant so

 6  they had to put a ramp in because we had five stairs.

 7  And so in order to bring it up to compliance, they had

 8  to put a ramp in.

 9           And so our discussions were around where the

10  ramp would be and what it needed to have.  We also

11  talked about restrooms, where to put smart boards and

12  the electrical for that.

13      Q.   And were the requests that you made, were

14  those the things that were, in fact, repaired with the

15  facilities grant money?

16      A.   Yeah.  The entire building was pretty much

17  gutted and rebuilt.

18      Q.   When was that?

19      A.   About three years ago, I think.  I'm not good

20  then with time progression either, so three or four

21  years ago.

22      Q.   And that would be the Statesboro site, right,

23  because you were in Bulloch County?

24      A.   Yes, the Statesboro site.  I'm sorry.

25      Q.   No, that's fine.  I just wanted to clarify for



1    the record.  Okay.  Have there been any other state or
2    federal funds like COVID-related monies or special
3    education-related funds?
4        A.   Yes.  Last year we got some COVID money for
5    nursing-type supplies and things and then some money
6    for counseling services.
7        Q.   But that was only last year.  It's not renewed
8    this year?
9        A.   It has not been renewed this year, no.  Well,
10   no, I'm sorry.  Yes, there is a separate counseling
11   grant that is coming from the Georgia Department of
12   Education that was renewed this year.  Yes.
13            I also get -- I'm sorry -- I also get money
14   that I didn't think about for Dr. Mullis, our
15   counselor.  We receive a separate DOE grant for his
16   salary, but I cover his benefits.
17       Q.   And is the DOE grant for Mr. Mullis, that is
18   recurring?
19       A.   It has been, yes, for three or four years.
20       Q.   But the other one, the counseling grant from
21   Georgia Department of Education, do you understand that
22   to be a one-time only like COVID?
23       A.   I believe that it's for three years.  I'm not
24   completely certain.
25       Q.   And then any other kind of funding?  Do you



1    Q.   What is S-W-I-S?

2    A.   That's SWIS.  We don't use that.

3    Q.   Okay.  Is it the school-wide information

4  system?

5    A.   Yes.  That is a system that some GNETS and

6  some school systems use for conduct citations or to

7  track conduct and what is known as write-ups.

8    Q.   Okay.

9    A.   We do that through educator's handbook.

10    Q.   And then I want to talk a little bit about the

11  strategic plan and the self-assessment reviews.  Are

12  you familiar with the GNETS strategic plan?

13    A.   Yes, I am.

14    Q.   How would you describe what that plan is?

15    A.   It's a plan that covers -- it used to be seven

16  areas.  I think it's now six areas -- to basically keep

17  us on track where we look at it and grade ourselves and

18  collect data to make sure we're doing the things we

19  need to do.

20    Q.   And who wrote the plan?

21    A.   I believe the plan was written by some folks

22  at the Georgia Department of Education and different

23  GNETS directors.  We're on a committee.

24    Q.   When was it first written?

25    A.   I don't know for certain, but it was when



1  Nakeba was the program manager at the Georgia
2  Department of Education.
3      Q.   And were you involved in that committee
4  process?
5      A.   I was not on one of the committees for the
6  initial one.  I was on a committee when we had some
7  discussions about what to combine and what to cut out
8  to make it a little more streamlined.
9      Q.   Was that in connection with it used to be
10 seven areas now it's six?
11     A.   Part of it, yes.
12     Q.   So what was the -- what were the areas that
13 were combined and streamlined?
14     A.   I'm not certain.  Off the top of my head, I
15 don't know.  If I had it in front of me, I could tell
16 you.
17     Q.   What was the timeline, you would say, that
18 your participation on this level, you know, this part
19 of the process was?
20     A.   We probably worked on it for a few months, had
21 a couple of meetings.
22     Q.   And how long ago was that?
23     A.   Prior to COVID.  So when we look at things and
24 I can track it like that, so it may have been 2018 and
25 it could have been 2017.



1      Q.    Is that around the time the GNETS rule was

2    being revised?  Do you remember in working on the

3    strategic plan, was it in connection with the GNETS

4    rule?

5      A.    I believe the rule had already been done.

6      Q.    Okay.  And what is the -- so you said it was

7    designed to keep you on track.  How does it work?  What

8    does the plan ask for GNETS or GNETS directors to do?

9      A.    We collect data and evidence for each of the

10   areas and the subareas.  It requires GNETS directors

11   to --

12     Q.    What do you do with the data and evidence?

13     A.    I've got it on a file on my computer.

14     Q.    Oh, no.

15     A.    We present it to our staff so they understand

16   some of the task that they need to do and provide for

17   us.

18           Oh, I completely lost her.  My screen is gone.

19           THE VIDEOGRAPHER:  We're off the record at

20   4:52.

21           (Recess.)

22           THE VIDEOGRAPHER:  We are back on the record

23   at 4:53.

24   BY MS. TAYLOE:

25     Q.    Okay.  You were starting to tell us that the



1   process involves collecting data and evidence for each

2   of the areas.

3       A.    Right.  And part of that is ensuring that our

4   staff knows what our goals are and turns in the things

5   they need to turn in and they are staying on track in

6   providing that information.

7       Q.    And by what -- and what standard do you

8   measure whether you're meeting the goals and achieving

9   the objectives outlined?

10      A.    So each one has the standard listed and then

11  you write yourself as a -- well, as a 01 or 2, but I

12  think changed that now.

13          Part of the change was that it's emerging or

14  operational or nonexistent.  And so that's how those

15  are then marked based on the way that each of the

16  subareas are listed.  You know, there's a lot to it in

17  each different section.

18      Q.    And are directors given guidance as to what

19  counts as emergent or operational?

20      A.    In the beginning rollout of it, yes, we

21  were.

22      Q.    But not since then?

23      A.    When it was adjusted and changed a little bit,

24  then yes.  But not to the same extent as at the

25  beginning of the rollout.



1    Q.    Okay.  And what is your understanding about

2    how this information is used when you turn in your

3    self-assessments?

4    A.    I don't know how it's used.

5    Q.    Do you ever get feedback after you've turned

6    it in?

7    A.    In the beginning when it was first rolled out,

8    it was done where someone from the DOE came around to

9    each GNETS and looked at all of the stuff that you had

10   and rated each area.

11        But then beyond that, now they don't -- the

12   DOE is not doing that.  We rate ourselves and I've not

13   turned it in.  It's just something that we now just

14   use.

15   Q.    So, I'm sorry, you're not doing or you're

16   doing it but not reporting it?

17   A.    I'm doing it but not reporting it.

18   Q.    Okay.  And do you recall filling out or

19   writing some narrative responses in response to the

20   documents subpoena where you just described maybe why

21   some information was not available?

22   A.    Yes.

23   Q.    Do you remember saying that you had not done

24   the strategic plan for FY20 and FY21 because you were

25   not scheduled for review?



1    A.   Yes.

2    Q.   So I'm confused now.  If I -- you said you

3  were doing it but not turning it in.  But that's how

4  you were doing it unless I'm confusing two documents?

5    A.   Okay.  Well, I collected all the data.  I had

6  all the data collected that needs to be done, but we

7  did not do the form and the rating.

8       I was -- it was a mistake on my part because

9  when I found out that we weren't being rated and they

10  weren't coming around -- the DOE was going to do a

11  rotation of coming around.

12       And so when I found out that we weren't being

13  in that rotation, I had all the data but we just didn't

14  do the scoring.  It was a mistake on my part.  I didn't

15  realize I was still supposed to score myself.

16    Q.   So what did you do with the data you collected

17  then?

18    A.   It is in a file on my computer.

19    Q.   Okay.  So did you take any steps to, you know,

20  make things operational that were emerging or anything

21  like that?

22    A.   Yeah.  I mean, we still used it, you know, in

23  looking at what data we had and where we needed to work

24  on.

25    Q.   So you still used it for internal purposes.



1    Q.    Okay.  One other question I wanted to revisit

2    is, is time in GNETS, like number of years a student

3    has spent in the GNETS, is that something that was

4    considered as part of the strategic plan?

5    A.    No.

6    Q.    That was not a target they wanted to reduce as

7    part of the tracking the progress of the programs?

8    A.    No.

9    Q.    Was there any request that you track exit

10   rates?

11   A.    I don't think so.

12   Q.    But if you did still track exit rates, either

13   for that or for some other purpose, could that mask

14   that some students were coming and going while others

15   were staying for a long time?

16   A.    Could that do what?  I'm sorry.

17   Q.    Like an exit rate might not look alarming but

18   it would not reveal if some students were coming and

19   going where others were staying for a long time?

20   A.    I don't think that we keep that data.

21   Q.    Okay.  All right.  I want to talk a little bit

22   more about the facility closures that we talked about

23   earlier.  I don't know that you had dates but -- okay.

24   So the Baxley site in Appling County was closed; is

25   that correct?



1     A.   Yes.

2     Q.   Do you remember what the facility's report

3  said about that facility?

4     A.   I don't remember.

5     Q.   Did you ever see the facility's report

6  itself?

7     A.   I did, yes.

8     Q.   Do you recall it mentioning the building had

9  been built in 1954 with no apparent renovations?

10     A.   I don't remember any of the content.

11     Q.   Okay.  Do you remember that it was one of the

12  first facilities closed by the Department of Education

13  even while the assessments were going on?

14     A.   No.  I don't recall that being what

15  happened.

16     Q.   What do you recall?

17     A.   I recall that an email or a phone call was

18  sent out that we were to be on a virtual meeting, all

19  GNETS directors, and that -- or maybe it was just an

20  email and a phone conference.

21          But it was announced which GNETS facilities

22  would be closed.  And I remember my heart racing and

23  trying to figure out what we were going to do.

24     Q.   Oh, because you learned on that call that --

25     A.   On that call at that point in time everyone at



 1  the same time.

 2      Q.   And what did you do with the students from the

 3  Baxley site?

 4      A.   The students from the Baxley site were then

 5  going to be bussed to the Lyons site.  And the Lyons

 6  site was moving to the current building that we're

 7  in.

 8      Q.   And what were these assessment reports for the

 9  Statesboro and Lyons sites?

10      A.   I know the Lyons site was closed.  I don't

11  really remember the content of it.  And I know that

12  there were recommendations for the Statesboro site, but

13  it was not closed.  I received the reports.

14      Q.   And do you remember what the basis for the

15  closures were?

16      A.   I don't remember the basis.

17      Q.   Okay.  And for the ones that weren't closed,

18  what was -- what happened?

19      A.   For the ones that --

20      Q.   That were not closed.  What did the Department

21  of Education tell you about the ones that were not

22  closed?

23      A.   That would have been our Statesboro site, and

24  they gave recommendations for it to be upgraded and

25  things that needed to be done, which was then why



1   Bulloch County applied for that GNETS facilities grant
2   and redid the building.
3        Q.   Do you remember were you involved in that
4   process?
5        A.   I was involved in the renovation of the
6   building, yes.  We talked about that earlier.
7        Q.   Okay.  So after the grant had been awarded,
8   you were involved in how to spend the money but not in
9   the part before that?
10       A.   Actually, the application for the grant, the
11  special ed director of Bulloch County schools did the
12  application for the grant.  And she asked me questions
13  and I provided her with some information, but she did
14  the bulk of the work on that.
15       Q.   And during the period of the renovations, did
16  students have to move to a temporary site for some
17  period?
18       A.   Yes.
19       Q.   Where did they move?
20       A.   They moved to another school in Bulloch County
21  called Portal Middle High School, and we were given
22  rooms in that school.
23       Q.   I'm going to introduce now as Exhibit 259 a
24  document from the State, GA00337565.
25            (Plaintiff Exhibit 259 marked.)



1   what parents or teachers or other students report about

2   these students when they're at these schools.

3       Q.   Did the GNETS students, in fact, attend the

4   Portal schools for that semester?

5       A.   Yes.

6       Q.   Was there any issue with them being dangerous

7   during that time?

8       A.   There was some behavior issues, but there was

9   no issues with them being dangerous.

10      Q.   Were your staff able to provide the services

11  in the Portal schools?

12      A.   Yes.

13      Q.   And then who decided that that placement would

14  be temporary?

15      A.   The Bulloch County superintendent.

16      Q.   And why -- is that a man or woman?

17      A.   A man.  Charles Wilson is his name.

18      Q.   Why did he get to decide that?

19      A.   Well, Bulloch County Schools applied for the

20  facilities grant, and Bulloch County schools made --

21  put in other local funding to redo the building.

22           And in doing that, he needed a place -- Portal

23  Middle High had the rooms for us to move to but then

24  the money was being spent to upgrade the building.  So

25  then when the building was completed, then we moved



1   back into it.

2       Q.   Were you aware that the facility's grant

3   application had a provision that the grant recipients

4   had to promise that the GNETS program would stay in the

5   facility for ten years?

6       A.   Yes.

7       Q.   Was that ever discussed with you?

8       A.   No, not really.  I don't recall having a

9   discussion with anyone about it that I can think of.

10      Q.   And are you aware of the amounts of money that

11  were spent on the renovation?

12      A.   I do not know the exact price of it.  I'm not

13  certain of what it was.

14      Q.   I'm going to mark as Exhibit 260 document

15  GA04103131 and let you have control of it.

16  Ms. Braddock.

17      A.   Okay.

18          (Plaintiff Exhibit 260 marked.)

19          (Witness reviewing document.)

20          THE WITNESS:  Okay.

21  BY MS. TAYLOE:

22      Q.   So I'm going to state for the record this is

23  an email from Troy Brown to Pat Schofill copying Scott

24  Wilson dated April 11, 2019.

25          And do you see that the award amount -- well,

