EXHIBIT Y

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                       ATLANTA DIVISION

3

4  UNITED STATES OF AMERICA,
                              )CIVIL ACTION
5          Plaintiff,         )NO. 1:16-cv-03088-ELR
                              )
6  vs.                        )
                              )
7  STATE OF GEORGIA,          )
                              )
8          Defendants.        )
                              )
9  - - - - - - - - - - - - - -  )

10

11             VIDEOTAPE DEPOSITION OF

12                 MICHAEL D. ROWLAND

13

14        Thursday, June 9, 2022, 9:02 a.m., EST

15

16

17

18

19

20        HELD AT:

21        Robbins Alloy Belinfante Littlefield LLC
          500 14th Street, N.W.
22        Atlanta, Georgia  30318

23        -----------------------------------------------

24

25        WANDA L. ROBINSON, CRR, CCR, No. B-1973
          Certified Shorthand Reporter/Notary Public



1          All right.  Get to the substance.

2          Are you familiar with the GNETS strategic

3   plan?

4     A    I'm not familiar with it, no.  I know it

5   exists, but I haven't looked at it, never -- I

6   didn't have a role to play in creating it.

7     Q    Does the Department of Education have a

8   role to play in it?

9     A    Again, I just -- I don't have any specific

10  knowledge of -- other than the fact that I know that

11  was, as I was transitioning out of my role as a

12  director into a field position and then ultimately

13  retiring, I know that was something that was being

14  worked on, but -- and I had heard reference to it,

15  but I didn't have any direct involvement in, in it.

16    Q    Okay.  Then are you familiar with the

17  Facilities Conditions Assessment Project?

18    A    Yes.

19    Q    Could you describe to me generally what

20  that entailed?

21    A    Okay.  So I was the director when the

22  Governor's Office put the $14 million into the

23  budget for, for GNETS facilities.  And it was --

24  when the budget was passed, my boss, who was the CFO

25  at the time, came down and said, okay, I don't know



1  where this money came from or what we're supposed to

2  do with it but you got to figure it out.

3          Okay.  And, look, it's okay.  I mean

4  that's -- so one of the things -- and this was, this

5  was me.

6          We do -- before we give out money to

7  school systems, we require them to create a needs --

8  to hire an architect and do a needs assessment.

9  Well, I don't care whether they hire them or not.

10  The architect will do it for free but you got to

11  have an architect to do a needs assessment for the

12  things that are going in your plan.

13          We had -- and these numbers might not be

14  exactly right, but they are from my memory.  There

15  were 46 different locations, based on a list I was

16  given from the program staff, that said, here's

17  where all these kids are located.  These are

18  addresses.

19          And some of them are at schools that in a

20  Local Facility Plan, some of them are at -- well,

21  let me -- again, in my world it's easy to use school

22  and facilities interchangeably, but they are really

23  different.  Some of these students were at

24  facilities, in the facility plan.  Some of these

25  students might have been in facilities that were not



1  in a facility plan, and some were in phased-out

2  facilities, and some were in -- so, so, it just

3  occurred to me the first thing we needed was a needs

4  assessment.

5          So I asked for permission to use a portion

6  of that 14 million to engage an architectural firm

7  that would conduct these needs assessments.  And I

8  got that permission.  I went through the selection

9  process, and we hired a firm.

10          And in that summer -- you'd have to tell

11  me the year.  If you tell me the year, I'd say

12  you're right because I don't remember the years.

13  But in the summer of that year the firm that we

14  hired did what we would call a non-destructive site

15  evaluation of each facility, each one of those

16  facilities that was on the list, provided to us by

17  the program staff.

18          They had two or three teams; divided the

19  State up into quandrants.  You know, one team went

20  here, one team went there.  And that function went

21  on all summer.

22          As a kick-off to that, we made a -- we

23  made the decision to -- myself and -- I know I was

24  involved.  Some of the program staff at GNETS was

25  involved in this.  And then representatives from --



1  the team from the architectural firm that we hired,

2  they put together a -- they were going to do --

3  again, if I remember correctly, they were going to

4  do these site visits in about -- in clusters, based

5  on where they were located, just for efficiency.

6          And so we created kind of a test case of

7  three or four sites that we would go look at

8  together.  They would do their work.  We would be

9  there watching it, looking at it, giving feedback,

10  say look at this, don't -- make sure you look at

11  that.  They would say we can't look at this but we

12  can look at that.

13          And that became sort of a baseline from

14  what the teams would do moving forward, to visit the

15  remaining sites, and that function went on during

16  the summer.

17          And in some time in the mid to late July

18  time frame, I think we got a draft report from, from

19  the architect.

20      Q    Thank you very much for that overview.

21          I want to back up to a few things you

22  said.

23          You said you received a list of 46

24  locations from program staff.  Could you tell me who

25  program staff are?



1          MS. TAYLOE:  Well, let me rephrase that.

2      Q    So the field consultants went on the

3  intermediate round of facilities visits.  Do you

4  know if anybody from the Department of Education

5  went with the architecture's round of assessments?

6      A    I don't believe so, no.

7      Q    Do you remember what the results were of

8  the preliminary assessment you said you received in

9  the summer?  What happened when you got the

10  preliminary report?

11      A    There were, there were a number of

12  facilities that the report documented both in

13  narrative form and with supporting pictures that

14  were in very bad condition.

15          And so we shared that information with the

16  State Board of Education.

17      Q    And what did they do with that

18  information?

19      A    The, the -- ultimately, the State Board

20  chair, if I remember this correctly, wrote a letter

21  to those -- I'm going to say programs.  Now, you

22  know, if RESAs were the agencies, then you can say

23  that was RESA, but superintendents are on those

24  boards of control.  So the superintendents really

25  indirectly or directly were the target of the



1  information.

2          And it was my understanding -- or my

3  memory -- and I saw the letter.  Probably -- I just

4  don't remember the specifics of it, other than I

5  think it was aimed at trying to say those districts,

6  you've got some real issues and we're giving you an

7  opportunity to fix them.

8          To the extent that the State Board had

9  whatever authority it had -- which really is outside

10  of my purview.  I don't really know ultimately what

11  authority they had, but I do know the letter went

12  out from the State Board chair that said we've

13  gotten information that says this isn't very good,

14  we need you to do something about it.

15     Q    And was your understanding that the State

16  communicated to the superintendents that the

17  Department of Education would no longer support

18  students being housed in those facilities?

19     A    I don't really know how -- I think, I

20  think -- I think certainly the intent of the letter

21  was to force a conversation on these superintendents

22  that hopefully would help them come to their Own

23  conclusion about the inadequacy of where they housed

24  these kids and make decisions without having to be

25  force into anything.

1          And my memory is that that, that work --

2    that was typical.  That was in general what

3    happened.  Now, that didn't mean I didn't have to go

4    sit down with some of them and walk through what

5    some of their operations were, but -- and we did

6    that at their request.

7          So I think the intent of the letter was

8    certainly to, to heighten the sense of urgency with

9    these superintendents over how they were housing

10   these -- over where they were housing these

11   populations.

12   Q    So it's your recollection that none of the

13   superintendents or school districts felt they were

14   instructed to close facilities?

15         MR. PICO PRATS:  Objection in terms of

16      there's a legal conclusion or any type of

17      knowledge of legal fields, that's outside of

18      his knowledge.

19         MS. TAYLOE:  Okay.  I'll address that

20      through documents then.

21         Let me -- I'm going to start with what was

22      previously marked as Exhibit 86.

23         (WHEREUPON, Plaintiff's Exhibit-86 was

24      marked for identification.)

25



 1  BY MS. TAYLOE:

 2      Q    I'm referring to the exhibit that has been

 3  produced by the State.  It's marked GA00196569, and

 4  it is an email from Mr. Rowland to Ted Beck, dated

 5  December 1st, 2015.

 6           Are you familiar with this document?

 7      A    Yes, ma'am.

 8      Q    Do you see at the beginning of the second

 9  paragraph where you're talking about narrowing the

10  list of facilities to be visited by our consultants?

11      A    Yes.

12      Q    What was the basis for narrowing the list?

13      A    Yeah, I think in reading on down, what I

14  think I'm referring to is the fact that if we had --

15  and we've talked about this earlier.

16           If we had, if we had knowledge that GNETS

17  students were being served in a facility that was

18  already in the Local Facility Plan, then that

19  facility had a way of earning state funds for

20  capital improvements.

21           So we wouldn't look -- those, those --

22  those wouldn't be reviewed.

23           But these other facilities that were not

24  in Local Facility Plans would.

25      Q    So maybe I misunderstood.  When I asked if



1  you were looking at all of the facilities or only

2  those for -- that were eligible for state grants,

3  you said all of them.  Did I misphrase --

4       A    So -- in the sense of that statement, when

5  a school district applies for funding for a facility

6  that's in their local facility grant, plan, that is

7  a state grant for facilities, because if it's

8  funded, those funds are -- so, so in the -- in the

9  true sense of this, the definition of a state grant,

10  if, if -- let's say a GNETS program was housed in a

11  facility that was in the Local Facility Plan and

12  that summer the district applied for a new roof for

13  that school, well, that's a state grant to that, and

14  it was funded.

15       Q    Okay.

16       A    Then that's a state grant.

17       Q    I understand the distinction.  So let me

18  rephrase the question.

19            So was this facilities condition

20  assessment you looked at all GNETS facilities or

21  only those GNETS facilities that would be eligible

22  for the 14 million specific facilities grant --

23       A    Yes.

24       Q    -- that was at issue?

25       A    I think that's correct.  What we were



1   trying to do is target just the facilities that

2   would be eligible for applying for the grant money,

3   because the grant, as I understood it, it was

4   intended to be competitive.

5           We wanted it to be based on this need

6   assessment.  So you at least have to apply for

7   things that have been identified as needs, and if

8   you already have a facility in a Local Facility

9   Plan, there's a mechanism for that already

10  established through department policy.

11          But this other was any facility that fell

12  outside of that.

13      Q    Okay.  So there could be some facilities

14  that might have been disrepair but otherwise

15  needing, needing repairs that might not have been

16  assessed because they were already covered by an

17  LFP?

18      A    That's correct.

19      Q    Okay.  And then other questions on this,

20  this email was copied to Clara Keith and Deborah

21  Gay.

22          Can you tell me who they are?

23      A    Debbie Gay at the time, if I remember

24  correctly, she was -- I don't remember her title but

25  she was over special education programs at the

MICHAEL D. ROWLAND                                June 09, 2022
UNITED STATES vs STATE OF GEORGIA                         64

1          Was that in your connection with her as a

2   colleague or was that her role --

3       A    Whatever role she was playing.

4       Q    Whatever role.  Thank you.

5          The last part on this document, it talks

6   about the GSFIC is working on the RFQ.  The RFQ is

7   request for qualifications for design professional,

8   and that is the process you talked about before,

9   about getting the architectural team on board to do

10  the assessments?

11      A    Yes.

12      Q    And you already made reference to the

13  checklist.  So I just want to make sure I'm

14  understanding your reference.  Is this the checklist

15  where scores were rated, different categories were

16  rated from one to five?  You know, from poor to like

17  new, or critical to like new?

18      A    I believe so.

19      Q    And we can talk about the other later.

20  Okay.

21          Then next -- may I ask momentarily to see

22  the full version of the document you have because

23  yours has attachments?

24          Thank you.

25          Since this was previously marked as



1  Exhibit 86, I would like to note that the document

2  produced by the State at GA00196572 is attached as

3  an exhibit to this document.  I ask, did you see if

4  that's the correct list you've been talking about?

5          It's not the first attachment.  It's

6  behind the blue sheet of paper.

7      A    Yes.

8      Q    Okay.  Thank you.

9          So that's the document that field

10 consultants used when they went out to the different

11 facilities to do assessments?

12     A    Yes.

13     Q    Is that also a document that the

14 architectural team used when they went out to do

15 assessments?

16     A    I really don't remember -- I would -- my

17 memory is that their -- whatever documents they used

18 to do those assessments had different detail, but I

19 just don't remember.

20          I mean if you showed it to me and said

21 this is what they used, I certainly would agree.  I

22 wouldn't have a way not to agree with that, but I

23 don't think it was this exact document.  It could

24 have been but I don't remember it that well.

25     Q    Okay.  Thank you.



1            MS. TAYLOE:  Then I'm going to --

2    BY MS. TAYLOE:

3        Q    Were there any facilities that did not

4    want to have -- I'm sorry.

5            Were there any superintendents or school

6    districts that did not want to have their facilities

7    assessed?

8        A    I'm not aware of that, no.

9            I'm not saying that -- I really don't -- I

10   don't remember having any trouble getting the

11   assessments done.

12       Q    I know it was a long time ago.

13           MS. TAYLOE:  I'm going to provide the

14       court reporter document GA00196767, and this

15       will be Exhibit No. 115.

16           (WHEREUPON, Plaintiff's Exhibit-115 was

17            marked for identification.)

18   BY MS. TAYLOE:

19       Q    This is an email from Mr. Rowland to Doug

20   Suits, dated January 7th, 2016.

21           Are you familiar with this document?

22       A    Yes.  So I stand corrected.

23           I mean I -- again, if you showed me that

24   first and asked me the question, I'd say, yep, that

25   happened.  But, you know, being able to remember



1  that one specific just, just couldn't do it.

2      Q    I don't mean to trick you.  I was just

3  hoping to avoid having to do so many documents, and

4  what we can do by memory, we can just do it that

5  way.

6      A    You're talking about one instance out of I

7  don't know how many emails that went back and forth.

8  But obviously seeing that I'm reminded of the

9  situation.  But I think you also see that that no

10  was really not an option.

11      Q    So the reason I'm curious about this is,

12  again, trying to figure out the purpose of the

13  facility assessment, since it was really about who

14  was eligible for grants.

15          You see the email you're responding to

16  indicates that the director of the program in Cobb

17  County did not want to make an application for

18  funding and yet they were instructed they had to

19  have the facility visit anyway, and I'm just curious

20  about why that was?

21      A    Even though -- even though I knew the

22  ultimate purpose of the exercise was to create this

23  basis for which GNETS program would apply for funds,

24  whether this was something I determined on my own or

25  felt like I had gotten direction on, it never



1   occurred to me that not going through the needs

2   assessment was an option.  You could go through the

3   needs assessment, and the needs assessment could

4   determine you've got the Taj Mahal, but you're going

5   through these --

6       Q    Is it fair to say you just thought it was

7   important for the state to know the condition of the

8   assessments whether or not --

9       A    Exactly.

10           THE COURT REPORTER:  Say it again.

11      A    My apologies.

12      Q    Is it fair to say you thought it was

13  important for the State to know the condition of the

14  facilities whether or not they were planning on

15  applying for a grant?

16      A    Yes.

17      Q    Thank you.

18           MS. TAYLOE:  Now I'm going to refer to

19      what was previously identified as Plaintiff's

20      Exhibit 46.

21           (WHEREUPON, Plaintiff's Exhibit-46 was

22       marked for identification.)

23           MS. TAYLOE:  I have an extra copy but we

24      can use the same number for it.

25



1          the hard copy document that was actually marked

2          included the printed attachments.

3                 So if you all have your copies that you

4          received when we first marked it, it also has

5          the copies of as attachments.

6                 (Discussion ensued off the record.)

7                 MS. TAYLOE:  I am going to give the court

8          reporter a document produced from the State

9          labeled GA00279624 and ask that be introduced

10         as Plaintiff's Exhibit 118.

11                (WHEREUPON, Plaintiff's Exhibit-118 was

12         marked for identification.)

13    BY MS. TAYLOE:

14         Q    Are you familiar with this document?

15         A    Yes.

16         Q    This is an email from you to Ted Beck,

17    dated May 31st, 2016.

18                In the second paragraph you indicate that

19    you and Nakeba accompanied two teams from -- that

20    was 2WR, the architectural firm?

21         A    Yes.

22         Q    So were these the pilot visits you talked

23    about before?

24         A    Yes.

25         Q    Where it says:  "The purpose of the trips



MICHAEL D. ROWLAND                                    June 09, 2022
UNITED STATES vs STATE OF GEORGIA                              79

1  was to work through expectations and get a baseline

2  of GaDOE's expectations."

3           Can you tell me what those expectations

4  were?

5      A    I don't think we knew until we went on the

6  visit, honestly.  But what I remember about the

7  exercise was that 2WR would go and conduct the visit

8  per some standards that were, that were available

9  for facility condition assessments based on

10 architect's stuff, and that what we were really

11 doing was just witnessing what they were doing to,

12 to understand -- to agree they were on the right

13 track.

14          I don't have any memory of saying don't do

15 this or do that, although that very well could have

16 happened.  It was more of a -- they wanted us, you

17 come watch what we're doing.  If you see anything

18 that you think we shouldn't be doing or should be

19 doing, you know, just give us the feedback.

20          That's my memory.

21     Q    And where you said, "I think we will glean

22 the kind of information that will inform our

23 decisions moving forward," what was that in

24 reference to?

25     A    I have no idea.  I don't know.  I think



1  it's exactly what I -- I don't know what decisions

2  there were to be made moving forward, but if there

3  were decisions to be made moving forward, this

4  facilities condition assessment was necessary to

5  inform those decisions.

6          Now, obviously, we know one of those

7  decisions was to inform future applicants for the

8  grant but short of -- I mean that was the purpose of

9  the exercise, was to create a basis for these

10 centers, or programs, whichever it turned out to be,

11 to be able to make an application.

12    Q    So one of the purposes would have been to

13 be able to notify the facility superintendent or

14 owner of the kinds of deficiencies they might be

15 eligible to request grants to repair?

16    A    Yes.

17    Q    Thank you.  And they might -- they might

18 have been used for something else, but that may or

19 may not have been known at the time?

20    A    Yes.

21         MS. TAYLOE:  I'm going to give the court

22    reporter a document produced by the State

23    GA00197246 and ask it be identified as

24    Plaintiff's Exhibit 119.

25         (WHEREUPON, Plaintiff's Exhibit-119 was



 1          marked for identification.)

 2   BY MS. TAYLOE:

 3          Q     Are you familiar with this document?

 4                (Witness reviews exhibit.)

 5          A     Yes.

 6          Q     Okay.  Who is Sarah Morris?

 7          A     Sarah worked, and still does, in the

 8   Facilities Department.

 9                I don't -- at the time -- she was with us

10   and she left and she came back.  So what I'm

11   stumbling over is I'm not really sure what role she

12   was in at the time, but I do know that -- I think by

13   this point, you know, I was giving this information

14   back to Pat Schofill, who was our director, and

15   Sarah had some role to play on the funding side.

16                She was our grants administrator in the

17   early -- at some point, and she left the department

18   and we hired her back as a grants administrator.  So

19   she may have had -- her role may have been in the

20   process of getting the money out to school districts

21   when -- or the entities that manage the GNETS

22   programs that were doing the work when the time

23   came.

24          Q     Okay.  And she said she's attaching the

25   list, GNETS list, ranked by the GaDOE Facilities



MICHAEL D. ROWLAND                                    June 09, 2022
UNITED STATES vs STATE OF GEORGIA                              82

1  team.

2       A    Yes.

3       Q    Is that -- which set of consultants is

4  that?  Or who is the GaDOE Facilities team?

5       A    That's the field consultants that I

6  referenced earlier.

7       Q    Okay.  And the scale she's referencing

8  there is the same one to five scale we talked about

9  before, where one is critical and five is new or

10 like new?

11      A    Correct.

12      Q    Then she talked about a formula for

13 obtaining a ranking.  Can you tell me what that is

14 in reference to?

15      A    Not by memory, no.  I mean I -- so much

16 this -- you know, I want to be clear.  Nothing would

17 make me happier than to tell you everything you're

18 asking me with perfect fidelity.  There was so much

19 -- and so much of this now I'm begin -- I see -- we

20 were doing kind of make up -- just do it as you

21 figure out and try to do the best thing.

22           And so I am confident we used some formula

23 to get to that ranking.  Whether it was an averaging

24 or a formula on a spreadsheet or -- but if you

25 showed it to me, I'd say I remember that.  But



1  without that, I just -- I don't remember what that

2  formula looked like.

3      Q    Okay.  I think I can -- I think I can find

4  one to address that.

5           MS. TAYLOE:  I'm going to ask Ms. Lill to

6       screen share the attached facilities report,

7       which is GA00197248.

8           Do we need to mark that as an exhibit?

9  BY MS. TAYLOE:

10     Q    Mr. Rowland, you have been granted control

11  of that.  So if you want to scroll up and down on

12  that, you can.

13          Have you seen this document before?

14     A    Yes.

15     Q    Can you describe it, please?

16     A    So the heading of the document is "GNETS

17  Facilities Not Active In Local Facility Plans."

18          So I mean this appears to me to be a list

19  of the GNETS programs that we couldn't find evidence

20  were housed in facilities that were in local

21  facility plans.

22          The cells highlighted in red, based on my

23  memory, was those locations that had a facility

24  condition assessment score of .4 or lower -- well,

25  lower than .4.  Because .4 is not in red.



1      Q    And what would be the consequence of

2  having a facility score of lower than .4?

3      A    Well, so I do -- let me say this about the

4  score.  Given the decimal that I'm seeing -- I think

5  this is the score that came out of the facility

6  condition assessments done by 2WR.

7           So, again, my memory is part of what we

8  have asked them to do in this process was to see if

9  they could boil this down to a facility condition

10  assessment ratio where the closer that ratio got to

11  zero, the more deficient, let's say, the building,

12  the facility would be, and the clearer it got to

13  one, the better it was.

14           And so based on this, my memory is this

15  was a spreadsheet we created -- not the list of

16  spaces but the score coming from their condition

17  report.

18           And, again, at this point in the process,

19  I don't think I knew the answer to what does -- what

20  happens to a facility that has a condition

21  assessment lower than .4, other than to say these

22  aren't very good.  And then that, that begets the

23  question, all right, what happens next.

24           I think that's where we were in the

25  process at that point.



1    Q    And you said before you believed that some
2  facilities were encouraged to consider options based
3  on those scores, consider remedial actions based on
4  the scores?
5    A    Yes.
6    Q    Okay.  But is it not your understanding,
7  looking at this document, that these ones marked in
8  red were the ones that were closed by the State?
9    A    Well --
10         MR. PICO PRATS:  And objection for -- I
11      think it's misrepresenting what he said in
12      connection to the State closing.
13  BY MS. TAYLOE:
14    Q    Did you understand these facilities closed
15  after the results were shared with them?
16    A    I'm looking at the list to see, and it --
17  again, I wish I could tell you I remember what every
18  action was, but what I know is we shared this
19  information with the Board, State Board.
20         A letter went out to these facilities from
21  the State Board chairman, and it is my belief, my
22  memory, that in most cases, if not all, that these
23  programs made different arrangements for these kids.
24         There's a, there's a meaning to the word
25  "closed" that I'm not comfortable with, if that



1 helps you understand my -- and I don't mean to be

2 vague.  I just, you know -- the purpose of the

3 exercise to me was to say, you know, guys, look,

4 we've been through this process, nobody's out to

5 hurt anybody.  We're trying to do things, what's

6 best for kids, and this has been -- this is the

7 situation.

8         And it is true that not many

9 superintendents liked to get phone calls from the

10 Department or letters from the State Board chair,

11 but -- so I know they wanted to try to do better,

12 and I think in most, if not all, of these cases they

13 did.

14     Q    So maybe am I using the word "closed" has

15 been confusing because it has different connotations

16 and facilities than I was thinking of it.

17         Would you say after -- would you say these

18 nine facilities relocated their students after --

19 the ones that were marked in red relocated their

20 students after getting those reports?

21     A    Yes, I think that's fair to say.

22         MS. TAYLOE:  I would like to refer to what

23     was previously introduced as Plaintiff's

24     Exhibit No. 91.

25         I'm afraid I don't have a copy for you,



1        because...
2                (WHEREUPON, Plaintiff's Exhibit-91 was
3          previously marked for identification.)
4                MS. TAYLOE:  It's GA01486054.
5                (Witness reviews exhibit.)
6   BY MS. TAYLOE:
7        Q    Have you had a chance to familiarize
8   yourself with this document?
9        A    Yes.
10       Q    Okay.  This is an email from Stacey
11  Suber-Drake to Nakeba Rahming and Clara Keith, dated
12  July 25th, 2016.  And it attaches a letter from the
13  Georgia State Board of Education signed by Michael
14  Royal, chairman of the State Board of Education.
15               Is that correct?
16       A    That's correct.
17       Q    Do you see at the end of the first
18  paragraph, where it says:  "Therefore, students
19  receiving services at this facility must immediately
20  be transitioned out of the site before beginning --
21  "before the beginning of the school year."
22       A    Yes.
23       Q    Is that consistent with your understanding
24  of the steps that were taken after the facilities
25  conditions assessment was completed?



MICHAEL D. ROWLAND                                    June 09, 2022
UNITED STATES vs STATE OF GEORGIA                              88

1    A    Yes.

2    Q    It says:  "We're directing staff to assist

3  you and provide guidance throughout this process so

4  it may provide the best educational opportunities

5  for all students in a safe and positive

6  environment."

7         You see where it says that?

8    A    Yes.

9    Q    Were -- which staff was directed to assist

10 and provide guidance to the -- the people these

11 letters were directed to?

12   A    The facility services staff.  Myself and

13 potentially field consultants that served those --

14 that area.

15   Q    And would you say, was that assistance in

16 the form of the GNETS grant or in terms of

17 relocating, or both, or something else?

18   A    At this time, in relation to the letter,

19 it was with relocating.

20         What we required of the GNETS programs was

21 when you find a suitable location, when you find a

22 location that you propose as suitable, you contact

23 me and I go look at it, and I say yes or no.

24   Q    And did you also help them find facilities

25 that had available instructional units that they



```
 1  BY MS. TAYLOE:

 2      Q    Are you okay going a few more?

 3      A    Absolutely.

 4      Q    I want to talk a little bit about the

 5  facilities remediation plan next that came after the

 6  facilities condition assessment.  Is that correct?

 7      A    Yes.

 8      Q    Can you tell me -- just give me an

 9  overview what the facilities remediation plan was?

10      A    Yeah, I had really forgotten about that.

11          Again, what I remember was that -- and I

12  wish I could tell you that we started this process

13  knowing how it would -- this was, this was really

14  like building an airplane while you fly.

15          And so at some point as a team -- and

16  there was -- I don't want to mislead you I was

17  making these decisions in a vacuum.  I was obviously

18  working with either Pat Schofill, maybe our

19  facilities consultants, Clara, Nakeba, and Stacey

20  and all these people to think about.

21          So we have this report now that says -- it

22  kind of had layers.  Layer one -- the first, most

23  immediate thing was we found these facilities that

24  were -- that needed immediate -- that needed

25  immediate attention, needed to be attended to
```



1  immediately.  And that took place.

2          Then we had a report that said here's a

3  condition of the facilities that remain, and when we

4  release the application for funding, you should be

5  applying for needs that have been identified in the,

6  in the plan -- or in the facility condition

7  assessments.

8          Understand that in the facilities world,

9  $14 million is not a lot of money.  So intuitively

10  we knew it wasn't enough money to meet all the needs

11  that had been identified in the condition

12  assessments, but we took the position as a

13  department that that didn't absolve the programs

14  from developing plans to remediate those needs.

15          Again, very much in keeping with the K-12

16  focus on you have a Local Facility Plan.  You can't

17  get to everything in it in one year, we know that,

18  but that doesn't mean you shouldn't be -- you

19  shouldn't be planning to meet those needs.

20          So, so -- so part of the requirement was

21  now that we've done this work, you can't just say,

22  well, we want to apply for the money, so we're off

23  the hook.  No.  You have a report and it shows

24  deficiencies -- needs, not deficiencies.  It shows

25  needs.  We want to know how you're going to address



1  those needs.

2       Q    So would it be fair to say that the

3  options available to facilities after receiving the

4  facilities condition assessment report included

5  relocating the students or submitting a plan to make

6  corrections, addressing needs with or without state

7  grant funds?

8       A    Yes.

9       Q    And if the facility operators chose not to

10  continue to serve the students in that facility,

11  were they required to provide you with an exit

12  strategy?

13       A    Yes.

14       Q    And what would that exit strategy entail?

15       A    It would be different for every situation.

16  Again, I think what our -- it's really hard to

17  remember the thinking at the moment, but based on

18  the way I know myself, what I would -- what I think

19  we were looking for is, look, you give us -- one of

20  the things I want to make sure you understand.  This

21  is an awful lot of work, and at some point I thought

22  it was all my work to do.  By me, I mean the

23  Department.

24            So what I wanted to do is give this work

25  back to the people at the ground floor who ought to



1  know how to look after their kids better than

2  anybody else, and the way to do that is to say you

3  give me the strategy -- again, me meaning the

4  Department -- give us the strategy and then we'll

5  react to it.

6          So it wasn't -- and my, my belief is that

7  ranged anywhere from that's an excellent strategy to

8  that's okay but here are some -- here's some

9  feedback like to see you address, and all the way

10 down to that's not going to work, got to have

11 another one.

12         And I just -- I don't remember

13 specifically -- I mean if you showed me a document

14 and said here's one that was submitted, I could look

15 at it and say, yeah, that makes sense.

16         But, but I think we as a Department felt

17 like while we may have started out trying to get a

18 condition assessment so that we could figure out how

19 to competitively award a pot of money, it really

20 evolved into, okay, now you can't not know what you

21 know, how we're going to address it.

22    Q    Okay.  Before -- and I will go through

23 some documents with you to address specific

24 examples, but as part of that overview, after

25 facilities either applied for a grant or proposed



MICHAEL D. ROWLAND                                    June 09, 2022
UNITED STATES vs STATE OF GEORGIA                            111

1  would be not?

2      A    Yeah.  I mean -- they would -- you might

3  remove an air filter cover, for example, and inspect

4  the air filter to see if it had been changed.

5          There was some ductwork probably that you

6  could get to and see without necessarily having to

7  go behind a wall or into a ceiling, depending on

8  some of them may have been exposed.

9          But other than knowing the --

10 theoretically, they could determine what year the

11 HVAC system had been installed.

12     Q    How about lead in the water?

13     A    No, no -- no.

14     Q    Or radon or any other kind of exposure

15 like that?

16     A    No.

17     Q    Okay.  Are those known to be -- with the

18 exception of ventilation, are the things I listed

19 known to be more common in older buildings?

20     A    Yes.

21         MS. TAYLOE:  I'm going to introduce a

22     document from the State GA00198597, and ask it

23     be marked as Plaintiff's Exhibit No. 123.

24         I'm sorry, that one has been already been

25     marked as Plaintiff's Exhibit 88.  I'm sorry.



1              (WHEREUPON, Plaintiff's Exhibit-88 was

2         previously marked for identification.

3              MS. TAYLOE:  I apologize.

4              (Witness reviews exhibit.)

5     A     Okay.

6     Q     This is an email from you dated March

7   30th, 2017 to a number of email recipients.

8              Can you identify the recipients by

9   category?

10    A     Obviously, it went to -- I think what I'm

11  looking at is GNETS directors and superintendents.

12    Q     And can you -- it says you're asking for a

13  letter of assurance for the facilities grant

14  application process.

15             Can you describe the role of the letter of

16  assurance?

17    A     Again, if you, if you put one in front of

18  me, I can certainly remember what it looked like,

19  but I think the intent was instead of creating this

20  methodology where the State would say here's what

21  you have to do, and we're going to come by and

22  visually inspect it, there was a methodology of

23  creating a list of things that these people, as the

24  fiscal agent and head of the school system, people

25  with authority, would have to attest to that you had



 1  done these things.

 2          And I do not remember what was on the

 3  list.  And if I saw it, I might have a different

 4  opinion about what its intent was but that's

 5  typically what you use a letter of assurance for.

 6  Instead of me saying you did it, I want you to say

 7  you did it.

 8      Q    Okay.  I think this is a different one,

 9  because this is in advance of the --

10      A    Was this the one saying they intended to

11  apply or not apply?

12      Q    Yes.

13      A    Okay.  Well, again, if you show it to me,

14  I might have a different answer.  But I think --

15  there were two things -- so that sets up two

16  thoughts in my mind:  One was we were trying to find

17  out who's going to apply and who's not.  And perhaps

18  that's what this -- that's this letter was about.

19          But I think later on, and as part of the

20  application, there was a letter of assurance, too.

21  Although I might be misremembering that.

22      Q    All right.  I'm going to -- I don't have

23  copies but we can -- it will help you to see the

24  document?

25      A    Yeah.



1    Q    So you have it attached to your.

2    A    Okay.  I got it.

3    Q    00198599.

4         MS. TAYLOE:  If you can pull it up so

5    counsel can see it.

6    A    Yeah.  So I think this is -- this is

7    pretty much what I remembered.

8         I mean the letter of assurance had, had --

9    the first thing it wanted to know was, you know, if

10   you return this, you're telling us you intend to

11   make an application for these funds, and if you

12   intend to make an application to these funds, you

13   attest to these eight things.

14        That you need to either understand, will

15   do, comply.  This is where, you know, you understand

16   that it's a competitive award, so you could, you

17   could not get anything.  You understand you have to

18   comply with all the State and federal laws and State

19   Board rules and guidelines that go along with it.

20        The grant is a reimbursement grant.  So

21   everybody knew that up front.  If you don't think

22   you have the money up front to pull off the project,

23   don't apply.

24        You agree -- one of the issues we ran into

25   is, okay, if we give you this money and you

1  refurbish this facility, what's the requirement for

2  how long you're going to stay in it.  So that period

3  was established, that 10 years.

4          And these other things that are listed

5  there.

6      Q    The 10-year one was the one I wanted to

7  ask you about.

8      A    Okay.

9      Q    Because I understand like fiscally it

10 makes sense you wouldn't want to invest a lot of

11 money and then have the building abandoned the next

12 year.  I understand that's the intent behind it.

13         Were you aware of any concerns by

14 superintendents or programs that they couldn't be

15 sure they would be in there for 10 more years, or

16 that it restricted their flexibility in any way?

17     A    Well, what we tried to do was, was cover

18 that in that sixth point by saying in the event it

19 becomes necessary to move a GNETS program from the

20 facility from which the grant was expended, you just

21 have to get prior approval from the Department.

22         I don't think -- I mean certainly

23 everybody understood that, that -- you know, there's

24 a lot of uncertainty in education when it comes to

25 facilities, particularly as programs evolve.



1            So I think we tried to leave -- I wouldn't

2    really call it an out, but at least leave the

3    applicant with the understanding that, look, if you

4    in good faith take the money, if you in good faith

5    do the work, if you in good faith plan to stay there

6    for 10 years, and three years in something happens

7    that requires -- you think necessitates a move, just

8    get with us and let's work through it.  We'll work

9    through it somehow.

10        Q    Did you have any ideas or discussions

11   about what would account for viability?  Or

12   viability is a different letter.  I'm sorry.

13            Becomes necessary, what would qualify as

14   necessary to move a GNETS program?

15        A    I'm sure we did.  I don't remember what

16   those specific conversations were, but I can tell

17   you in my own mind, from my own experience, but...

18        Q    What would you think those would be?

19        A    Well, I mean most --

20            MR. PICO PRATS:  Objection, as far as it

21       causes him to speculate about it.

22            MS. TAYLOE:  He just said he could say

23       from his own experience.

24            MR. PICO PRATS:  You can answer.

25        A    Well, I mean if GNETS operates the way



 1  going into these facilities wasn't with an eye for

 2  do the spaces meet program needs, because I didn't

 3  really understand the nature of the program needs

 4  relative to the technical experience -- I mean

 5  technical requirements, delivered instruction to

 6  those kids.

 7       Q    What were your main take-aways from the

 8  facility conditions assessments when they were

 9  completed about the conditions at GNETS facilities?

10       A    It was very similar to what we find

11  statewide.  There were some school districts and

12  some entities that were providing quality facilities

13  for those students, and there were some school

14  districts and facilities that were not, and

15  everything in between.

16       Q    Were there any kind of things that were

17  more commonly issues at GNETS facilities?

18       A    I think in general the idea that -- I

19  don't know how -- it's dangerous to quantify because

20  many sounds like a lot, and I don't know what the

21  numbers are.

22            But what I do know is that, that in some

23  cases students were housed in facilities that had

24  been phased out of facility plans for a long time,

25  and where it appeared school districts just hadn't



1  put the kind of resources into those facilities that

2  they might.

3      Q    And -- let me back up little bit.

4           Did you agree with the recommendation to

5  close --

6           MS. TAYLOE:  I'm sorry.

7      Q    Did you agree with the recommendation to

8  relocate the students from the nine facilities in

9  the summer of 2016?

10     A    Yes.

11     Q    Did you think there were other facilities

12 that it might also have been beneficial to relocate

13 students from?

14     A    I don't remember one particularly, for

15 example, that I felt like we missed, especially

16 given the fact that we were offering a grant for

17 facility improvement.

18          So there's not one that stands out, I

19 think is what I'm trying to say, other than the nine

20 that were identified in that report.

21     Q    Do you remember one of your field

22 consultants saying that they were haunted by the

23 gross inadequacies -- inadequacies that they saw?

24     A    If you say they said it, they said it.

25          I don't remember that specifically, but if



1  that we discussed earlier?

2      A    Yes.

3      Q    So you sent this to Emily and Clara

4  attaching the RFQ; is that correct?

5      A    That is correct.

6           MS. TAYLOE:  Then I would like to look at

7      the next -- the attachment ending 6913.

8           So that would be GA00196913, and identify

9      that as Exhibit 129, please.

10          We'll mark it as a separate one.

11          (WHEREUPON, Plaintiff's Exhibit-129 was

12       marked for identification.)

13          MS. TAYLOE:  It's marked as an attachment

14     but it's not in one document.

15          (Witness reviews exhibit.)

16     A    Okay.

17     Q    Do you see on -- do you see on Page 2, in

18 Item No. 1, where it says, "The Georgia Department

19 of Education, and local school districts, operate 48

20 GNETS locations throughout the state of Georgia"?

21     A    Yes.

22     Q    And that they "are in need of various

23 repairs and upgrades to meet the needs of students

24 in the GNETS program."

25     A    Yes.



1      Q    Okay.  So that was -- that reflects the

2   entity with which the contractor, the architects

3   entered into the contract?

4          The owner being GSFIC working on behalf of

5   Georgia Department of Education?

6      A    That's correct.

7          MS. TAYLOE:  Now I'd like to ask for

8       document 04089630 to be marked as Exhibit 130.

9          (WHEREUPON, Defendant's Exhibit-130 was

10       marked for identification.)

11          (Witness reviews exhibit.)

12      A    Okay.

13      Q    This is an email from you to Pat Schofill,

14   dated January 8th -- wait a minute.

15          MS. TAYLOE:  I'm sorry, that was the wrong

16       document.

17          We're going to be looking at GA04089636.

18          (Witness reviews exhibit.)

19          MS. TAYLOE:  Can we go off the record for

20       a second.

21          THE VIDEOGRAPHER:  Off the record at 3:24

22       p.m.

23          (Discussion ensued off the record.)

24          THE VIDEOGRAPHER:  Back on the record at

25       3:24 p.m.

