**In the Matter Of:**

UNITED STATES vs STATE OF GEORGIA

1:16-CV-03088-ELR

---

**AMBER MCCOLLUM**

*November 09, 2022*

---



800.211.DEPO (3376)
EsquireSolutions.com

1              UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF GEORGIA

3
   United States of America,              No.
4                                         1:16-CV-03088-ELR
        Plaintiff,
5
   vs.
6
   State of Georgia,
7
        Defendant.
8  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

9

10

11

12              VIDEOTAPED DEPOSITION OF

13                 AMBER McCOLLUM

14                November 9, 2022

15                   9:22 a.m.

16              500 14th Street NW

17               Atlanta, Georgia

18

19

20

21

22

23         Marcella Daughtry, RPR, RMR

24     Georgia License No. 6595-1471-3597-5424

25          California CSR No. 14315



```
 1                    APPEARANCES OF COUNSEL

 2   For the Plaintiff:

 3        U.S. DEPARTMENT OF JUSTICE
          MS. LAURA CASSIDY TAYLOE (IN PERSON)
 4        MS. KELLY GARDNER WOMACK (IN PERSON)
          MS. VICTORIA LILL (VIA ZOOM)
 5        MS. ANDREA HAMILTON (VIA ZOOM)
          950 Pennsylvania Avenue, N.W.
 6        Washington, D.C. 20579
          202.305.6630
 7        kelly.gardner@usdoj.gov
          andrea.hamilton@usdoj.gov
 8        laura.tayloe@usdoj.gov

 9
     For the Defendant and the Witness:
10
          ROBBINS FIRM
11        MS. MELANIE JOHNSON (IN PERSON)
          MS. ANNA EDMONDSON (VIA ZOOM)
12        MS. DANIELLE HERNANDEZ (VIA ZOOM)
          500 14th Street, NW
13        Atlanta, Georgia 30318
          404.856.3252
14        dhernandez@robbinsfirm.com
          melanie.johnson@robbinsfirm.com
15

16   Also Present:

17        Sandra LeVert (via Zoom)
          Brandon Brantley, videographer (in person)
18        Stacey Suber-Drake (in person)

19

20

21

22

23

24

25
```



```
1                    INDEX OF EXAMINATION

2     WITNESS:  AMBER McCOLLUM

3

4     EXAMINATION                                    PAGE

5     BY MS. TAYLOE                                    7

6

7

8                          *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1                        INDEX TO EXHIBITS

2    EXHIBITS                                              PAGE

3    Exhibit 581        Notice of deposition                10

4    Exhibit 582        GaDOE Organizational Chart          32
                        GEORGIA 000007 to 000032
5
     Exhibit 583        Georgia State Department of         50
6                       Education Earnings Sheet for
                        FY 2023
7
     Exhibit 584        Letter to "Gentlemen" from Brian    83
8                       Kemp dated 5/12/22

9    Exhibit 585        E-mail from Fran Whitfield to      101
                        Jacqueline Neal 6/29/18
10                      "Subject: FY 19 GNETS Grant
                        Application"
11                      GA04957978 to 7997
                        (Confidential, subject to
12                      protective order)

13   Exhibit 586        Consolidated Application           109
                        First District RESA
14                      GA00031045 to 31048

15   Exhibit 587        E-mail from Amber McCollum         125
                        to Geronald Bell 8/30/16
16                      "Subject: GNETS Student
                        Enrollment Count"
17                      GA03806083 to 6093

18   Exhibit 588        E-mail chain from Amber McCollum   133
                        to Stacey Benson 3/11/16
19                      "Subject: RE: Draft FY17 GNETs
                        Allocations"
20                      GA03803300 to 3301

21   Exhibit 589        E-mail chain from Amber McCollum   142
                        to Vickie Cleveland 2/26/18
22                      "Subject: RE: Three year averages"
                        GA00315851 to 5852
23
     Exhibit 590        E-mail chain from Amber McCollum   152
24                      to Derrick Gilchrist 3/15/16
                        "Subject: RE: Draft FY17 GNETS
25                      allocations" GA03803376 to 3377



1                      INDEX TO EXHIBITS, CONT'D

2   EXHIBITS                                              PAGE

3   Exhibit 591         E-mail chain from Cassandra        155
                        Holifield 3/16/16, "Subject:
4                       RE: GNETS meeting"
                        GA03803401 to 3403
5
    Exhibit 592         GNETS Budget Formula Information   163
6                       GA00041019

7   Exhibit 593         E-mail chain from Amber McCollum   166
                        to May Ann Seay 3/21/16
8                       "Subject: RE: Draft FY17 GNETS
                        Allocations"
9                       GA03803423 to 3425

10  Exhibit 594         E-mail chain from Vickie           174
                        Cleveland to Amber McCollum
11                      "Subject: Re: Bibb County GNETS"
                        GA04957967 to 7970
12                      (Confidential, subject to
                        protective order)
13
    Exhibit 595         E-mail from Amber McCollum to      179
14                      Amber McCollum 3/20/18
                        "Subject: GNETS training"
15                      GA04957908
                        (Confidential, subject to
16                      protective order)

17  Exhibit 596         E-mail chain from Amber McCollum   183
                        to Lisa Futch 3/15/18
18                      "Subject: RE: Aroma Therapy
                        for emotional support"
19                      GA00317500 to 317501

20  Exhibit 597         E-mail chain from Amber McCollum   187
                        to Zelphine Smith-Dixon 5/25/17
21                      "Subject: RE: Question about
                        carryover"
22                      GA00885099 to 885101

23  Exhibit 598         E-mail chain from Amber McCollum   194
                        to Vickie Cleveland 7/11/19
24                      "Subject: Re: Grant App"
                        GA03838390 to 392
25



1                    INDEX TO EXHIBITS, CONT'D

2   EXHIBITS                                          PAGE

3   Exhibit 599          E-mail chain from Amber       198
                         McCollum to Deborah Gay 10/13/16
4                        "Subject: Re: GNETS Fed-Bibb
                         County Deadline 10/19"
5                        GA00019233 to 19236

6   Exhibit 600          E-mail chain from Amber McCollum  202
                         to Vickie Cleveland 6/7/18
7                        "Subject: RE: Budget amendment"
                         GA03826080 to 082
8
    Exhibit 601          Performance Audit 09-21, dated   225
9                        October 2010
                         US0005211 to 5252

10

11

12          PREVIOUSLY MARKED AND REFERENCED EXHIBITS

13                              82

14

15                           *  *  *

16

17

18

19

20

21

22

23

24

25



 1            THE VIDEOGRAPHER:  This is the video

 2   deposition of Amber McCollum being taken in the matter of

 3   United States of America versus State of Georgia.

 4   Today's date is November 9th, 2022.  The time on the

 5   record is 9:22 a.m.  My name is Brandon Brantley.  I am

 6   the videographer.

 7            Counsel, please introduce yourselves for the

 8   record.  After which, the court reporter will swear in

 9   the witness.

10            MS. TAYLOE:  Laura Tayloe for the Department of

11   Justice.

12            MS. GARDNER WOMACK:  Kelly Gardner Womack for

13   the United States.

14            MS. JOHNSON:  Melanie Johnson for the State of

15   Georgia.

16

17                     AMBER McCOLLUM,

18   called as a witness herein, having been first duly sworn

19   by the shorthand reporter to speak the truth and nothing

20   but the truth, was examined and testified as follows:

21

22                       EXAMINATION

23   BY MS. TAYLOE:

24       Q    Good morning, Ms. McCollum.

25       A    Good morning.



1          Q    My name is Laura Tayloe.  I represent the

2     United States in U.S. v. Georgia, Civil Action

3     1:16-CV-03088.

4               Thank you for your time today and for your

5     patience and to our colleagues online for your patience

6     while we worked through those Zoom update tech issues.

7               I am here with my colleague Kelly Gardner, and

8     I am here today to take your deposition.

9               Could you please state your name for the

10    record.

11         A    Amber McCollum.

12         Q    Okay.  And am I correct that you are being

13    represented by Ms. Johnson for purposes of today's

14    deposition?

15         A    Yes.

16         Q    Okay.  Have you ever been deposed before?

17         A    No.

18         Q    Okay.  This has probably been explained to you

19    before, but I just want to go over a few preliminary

20    matters related to the process of taking a deposition.

21              The court reporter is going to be writing down

22    or recording what you and I say, so I would ask that you

23    answer orally.  No shaking or nodding of the head.  No

24    uh-huhs or huh-uhs, but yes or no to each one.

25         A    Yes.



1      Q    Okay.  And for the same reason, we are going to

2  try not to talk over each other.  I will wait until

3  you've finished answering before I ask my next question,

4  and I would ask that you try to let me finish the

5  question before answering.

6      A    I will do that.

7      Q    Okay.  If you don't understand my question,

8  feel free to let me know that, and I will try to rephrase

9  it or clarify in some way that's -- that's helpful to

10  you.  And especially with the terminology that you know

11  so well and I don't know so well, if I use a word

12  improperly or a way it doesn't make sense, you know, feel

13  free to let me know that my question doesn't make sense,

14  and we can try to figure out what I have said wrong.

15      A    Okay.

16      Q    If there comes a time later in the deposition

17  that you remember something that you didn't remember at

18  the time of a previous question, feel free to let me

19  know.  We can just supplement your answer from before at

20  that time.  It's not a problem to come back to something

21  later on.

22      A    Okay.

23      Q    If the attorney for the State objects to my

24  question, you can still answer it so long as she hasn't

25  instructed you not to -- not to answer the question.



```
 1       A    Okay.

 2            MS. TAYLOE:  Are we still agreeing to withhold

 3    objections except as to form and privilege?

 4            MS. JOHNSON:  Yes.

 5            MS. TAYLOE:  Thank you.

 6       Q    BY MS. TAYLOE:  We will take occasional breaks

 7    during this deposition.  If you need a break at any time,

 8    just let me or Ms. Johnson know, and we can work around

 9    that.  I would just ask you if there's a question

10    pending, you answer that question first, and then we will

11    take a break.

12       A    Yes.

13       Q    Is there any reason you can think of why you

14    wouldn't be able to understand and answer questions

15    completely and truthfully today?

16       A    No.

17       Q    Okay.  Okay.  So the first document I'd like to

18    introduce is a deposition notice for your appearance

19    today.  I'm going to mark it as Exhibit 581 and ask

20    Ms. Gardner to pull it up and give you control so you can

21    review the document.  This is the one we practiced on

22    before.

23            (Plaintiff's Exhibit 581 was marked for

24    identification.)

25            THE WITNESS:  Okay.
```



1      Q   BY MS. TAYLOE:  Have you seen this document

2   before?

3      A   Yes.

4      Q   Is it a subpoena to testify at a deposition in

5   a civil action?

6      A   Yes.

7      Q   And it's addressed to you?

8      A   That's correct.

9      Q   And can you confirm that you received the

10   subpoena and that your appearance today is pursuant to

11   the subpoena?

12      A   Yes.

13      Q   Thank you.

14         Do you understand this deposition is being

15   taken in connection with the litigation relating to the

16   Georgia Network for Educational and Therapeutic Support

17   program?

18      A   Yes.

19      Q   And that that is more commonly referred to as

20   the "GNETS program"?

21      A   Yes.

22      Q   When did you first learn about this litigation?

23      A   I can't remember.  I believe it was probably

24   2016 or 2017.

25      Q   So can you place that in time with relative to



1  either your work or --

2     A   Yes --

3     Q   -- litigation?

4     A   -- it was because of my job.

5     Q   Okay.  And was it around the time the lawsuit

6  was filed or was it sometime after that?  Or was there --

7     A   I imagine it was sometime after that.

8     Q   Okay.  And do you remember how you learned

9  about it?

10    A   No.

11    Q   Were you asked to do anything in connection

12 with it?

13    A   No.

14    Q   Okay.  What is your understanding of the nature

15 of the lawsuit?

16    A   I believe that this lawsuit is about the GNETS

17 program and if it has violated the rights of students

18 with disabilities.

19    Q   Do you have a sense as to what the allegations

20 are about what rights have been violated?

21    A   I feel like I have a small sense.  I think that

22 it's about if the placement options are appropriate for

23 students --

24    Q   Okay.

25    A   -- in their IEP.



1        Q   Okay.  Thank you.

2            So I'm going to ask you some questions about

3    anything you did to prepare for today's deposition, and I

4    just want to make sure you understand I'm not asking

5    about any conversations or communications you had with

6    counsel.  Okay?

7        A   (No oral response.)

8        Q   So did you meet with counsel to prepare for

9    today's deposition?

10       A   Yes.

11       Q   For about how long?

12       A   An hour.

13       Q   And was that with Ms. Johnson?

14       A   Yes.

15       Q   Okay.  Did you meet with anybody other than

16   counsel?

17       A   No.

18       Q   And was anybody other than counsel present with

19   your meeting with Ms. Johnson?

20       A   Yes.

21       Q   Who else was there?

22       A   Stacey Suber-Drake.

23       Q   Okay.  Did you review any documents in

24   preparation for today's deposition?

25       A   No.



1      Q   Okay.  Did you review any documents apart from
2   your meeting with counsel?
3      A   I'm -- no.
4      Q   In preparation for the deposition?
5      A   I did try to figure out what my first job title
6   was.  That's it.
7      Q   I appreciate that.
8          Okay.  Have you spoke with anybody who has been
9   deposed in connection with this lawsuit?
10     A   No.
11     Q   Okay.  Did you do anything to assist with the
12  State's production of documents in request -- in response
13  to our request for the production of documents?
14     A   Yes.
15     Q   What was your role in that?
16     A   I was sent the interrogatories that overlapped
17  with the job that I did, and I pulled those documents.
18     Q   Okay.  So just to be clear, you are going to be
19  correcting me on budget things, so I will -- I will make
20  a little clarification on legal things.  Interrogatories
21  would be questions that the State -- or the State wrote
22  out answers to, and document requests are requests for
23  documents.
24          You said an interrogatory and then you looked
25  for documents.  Do you know, was it a document request



 1   that you were looking for documents for, or were you

 2   helping to write answers for the interrogatories?

 3       A   I believe both.

 4       Q   Both.  Okay.

 5       A   Uh-huh.

 6           MS. JOHNSON:  Just a point of clarification.

 7   We provided documents as our response to some of the

 8   interrogatories.

 9           MS. TAYLOE:  Okay.  Thank you.

10           MS. JOHNSON:  Uh-huh.

11       Q   BY MS. TAYLOE:  Do you remember what areas that

12   fell within your job description that they sought your

13   consultation on?

14       A   Yes.  It was GNETS funding.

15       Q   Funding.  Okay.

16           And do you know what documents you -- or

17   documents on what topics you provided in response?

18       A   GNETS funding.

19       Q   Okay.  Okay.  Do you know if anybody else

20   helped in -- in that?  Is there anybody else in the

21   Department of Education who helped produce documents for

22   GNETS funding?

23       A   I don't know.  I don't know.

24       Q   Okay.  All right.  So now I'm going to go

25   through -- there is a lot of acronyms in this case and in



 1  your work and in my work, so I want to go through a few

 2  for the court reporter's sake and so that we make sure

 3  we're talking about the same things.  Okay?

 4       A   Okay.

 5       Q   We already covered, if I say the term "GNETS,"

 6  you'll understand it is the Georgia Network for

 7  Educational and Therapeutic Supports, correct?

 8       A   Yes.

 9       Q   Okay.  And if I say "DOE" or Georgia Department

10  of Education or "GaDOE," I'm referring to the Georgia

11  Department of Education?

12       A   That's correct.

13       Q   And "LEA," I mean local educational

14  authority --

15       A   Yes.

16       Q   -- or agency?

17       A   Yes.

18       Q   And "SEA" is state educational agency?

19       A   Yes.

20       Q   "SBOE" or "State BOE" is the State Board of

21  Education?

22       A   Yes.

23       Q   "OBP" (sic) is the Office of Planning and

24  Budgement -- sorry, Planning and Budget in the

25  government's -- in the governor's office?



 1      A    Yes.

 2      Q    And "RESA" is a regional educational service

 3   agency?

 4      A    Yes.

 5      Q    Okay.  And then there is some I would like you

 6   to define or explain for me so that I understand some of

 7   the abbreviations that come up in your work.  And we're

 8   gonna talk about these more in depth later.  I just kind

 9   of now want to know what the abbreviations stand for and

10   roughly what they are.  Okay?

11      A    Okay.

12      Q    Could you tell me what FTE stands for?

13      A    Full-time equivalent.

14      Q    And what is that generally?

15      A    It's -- to my understanding, it's the amount a

16   student receives in funding.  It's a -- it's an amount in

17   funding per student.

18      Q    Okay.  Is it related to student count?

19      A    It's related to student count.

20      Q    Okay.  And QBE?

21      A    Quality basic education.

22      Q    And what is that?

23      A    That is the State's formula for providing

24   funding.

25      Q    And LUA?  Okay, this isn't meant to be -- I've



1   seen some place that it says local unit of

2   administration.  I'm just not sure how that's different

3   from an LEA.

4        A   I'm not sure how it's different from an LEA

5   either.

6        Q   Okay.  That's good to know.

7        A   I've seen it in lots of documents.

8        Q   So they might be used interchangeably in some

9   places?

10       A   That's correct.

11       Q   Okay.  And we might talk about FAPE.  Do you

12   know what FAPE is?

13       A   Free appropriate education, public education.

14       Q   Okay.  And EBD?

15       A   Emotional behavior disorder.

16       Q   And LRE?

17       A   Least restrictive environment.

18       Q   Okay.  Thank you.  I think that will help to

19   make sure we're using the same terms and the same things

20   in mind.

21           Now we're gonna put your depo prep to use,

22   because I'm going to go through some of your background.

23       A   Okay.

24       Q   You'll be ready for this.  Can you tell me,

25   please, where you went to college?

```
 1       A    The University of Georgia.  I -- I went to
 2   several colleges.
 3       Q    And you graduated from the University of
 4   Georgia?
 5       A    I graduated from the University of Georgia with
 6   a bachelor's degree.
 7       Q    And what was that degree in?
 8       A    Health promotion and education.
 9       Q    And where did you go to graduate school?
10       A    Walden University for master's, and the
11   University of West Georgia for a specialist degree in
12   education.
13       Q    And what were those -- what was the master's
14   in?
15       A    Curriculum instruction.
16       Q    And the specialist degree?
17       A    Leadership in education.
18       Q    Okay.  Thank you.
19            And do you have any current certifications or
20   licenses related to your work?
21       A    I have an English, an ESOL license, which is
22   English --
23            THE REPORTER:  What is that?
24            THE WITNESS:  For -- English for speakers of
25   second languages.
```



 1          I have -- I mean, I don't know what you mean.
 2     I have lots of things, like the privacy certification
 3     that they give at work; but outside of like formal
 4     professional certifications, I can't think of any others.
 5          Q    BY MS. TAYLOE:   Okay.   I just didn't know if
 6     there was any -- like I know there's a CPA at some level,
 7     but I don't know any other kind of certifications --
 8          A    No.
 9          Q    -- or budget kind of things like that.
10          A    No, I do not.
11          Q    All right.   And then I'd like you to walk
12     through your job experience since graduation.
13          A    Okay.   I was -- I was hired as a special
14     education teacher in Rockdale County, and I worked as a
15     special education teacher for seven years.   During that
16     seven years, I also was a lead teacher for special
17     education within the school building.   It was an
18     elementary school.   I taught various parts of special
19     education, including small group and co-teaching.   I
20     taught grades preschool through 5th grade.
21          The last three years of my time at Rockdale
22     County, I worked in special education administration.   It
23     was called a compliance specialist at the time.   I also
24     managed the reading curriculum for students with
25     disabilities from kindergarten through high school, but I



 1  mostly supported elementary school throughout my time in
 2  administration.
 3       Q   Okay.  And you said that was for seven years.
 4  Can you give the approximate time frame for that?
 5       A   I was seven years as a teacher, and then I was
 6  three years as an administrator, so a total of ten years
 7  in Rockdale County in special education.
 8       Q   So let me see.  You graduated -- was that
 9  following your graduation from college or grad school?
10       A   I graduated with my undergrad in 2003.  I
11  graduated with my master's, I believe, in 2009.  That's
12  the one thing I didn't go back to verify the dates on.
13  And then I graduated with my leadership degree in 2014,
14  around 2014.
15       Q   And so was this time at Rockdale County Schools
16  during those certi- -- the -- the graduate work, too?
17       A   Uh-huh.  Yes.
18       Q   So it was in the early 2000s?
19       A   Yes.
20       Q   Okay.  And then when did you -- was it after
21  that you came to work for the Department of Education?
22       A   I came to work for the Department of Education
23  in 2014, October 1st.
24       Q   In 2014, okay.
25           And what was your first title there?



```
1        A    Research specialist.

2        Q    And how long were you in that position?

3        A    A few months.  Less than a year.

4        Q    And then what was your next position?

5        A    Program specialist.

6        Q    And how long were you in that position?

7        A    A year or two, maybe.

8        Q    And what were your responsibilities -- so when

9   you were program specialist, were you within a certain

10  division?  Or how does that work?

11       A    Yes.  I was in the division for special

12  education services and supports, and I mostly worked with

13  LEA funding for special education, both state and

14  federal.

15       Q    Okay.  And what was your position after that?

16       A    Program manager.

17       Q    In the same division?

18       A    In the same division.

19       Q    Okay.  And how long were you there?

20       A    Until last October.

21       Q    And what were your responsibilities there?  How

22  are they different from the previous position?

23       A    From the previous position, they weren't that

24  much different.  I still managed -- I managed a team, and

25  we reviewed applications for funding for both the IDEA
```



 1  grants and other special education funding.

 2          I took on more of an SEA role at that time

 3  where, you know, we discussed the funding that the SEA

 4  oversaw from the Individuals with Disabilities Education

 5  Act, federal funds and any other state funds.  I would,

 6  you know, work with the budget analyst to determine how

 7  much money we had and if we're following our grant

 8  application.  I also helped to write the grant

 9  application for our IDEA funds.

10          I worked with other program managers if they

11  had specific program manager budgets, and I managed the

12  team that did the intake of LEA grant applications for

13  various funding.  It could be state and local, but it was

14  all special education funding.

15      Q   Okay.  Thank you.  That's helpful.

16          Did that include -- when you said you reviewed

17  applications for grants for special ed funding, did that

18  include GNETS grants?

19      A   Yes.

20      Q   The whole time?

21      A   Okay.  Let me clarify that.  I did not take the

22  actual applications where they talked about the program.

23  I took the funding application, so it would be mostly

24  their budget.  And what our team reviewed in those grant

25  applications would be for federal allowability, if it was



 1   the federal funding side of it, and, you know, function

 2   and object codes for both state and federal GNETS, LEA

 3   applications.  But as far as the programmatic

 4   applications, I was not involved.

 5        Q    And when you -- I want to make sure I'm using

 6   these terms right, then.  So when you talk about state

 7   and LEA applications, is that because there's an amount

 8   that the State appropriates for the GNETS program, and

 9   then an amount from that that is allocated to LEAs?

10        A    That's correct.

11        Q    Okay.  Thank you.

12             Okay.  And so that was through October of last

13   year?

14        A    Yes.  That was through October of last year.

15        Q    Okay.  And what is your current job title?

16        A    Senior program manager.

17        Q    And have you been in that position since

18   October of last year?

19        A    Yes.

20        Q    What are your responsibilities, if to the

21   extent they're different from what you have said before,

22   in this current position?

23        A    Sure.  I supervise the team that does what I've

24   explained before.  So I supervise the fiscal team.  I

25   supervise the data and GO-IEP team within special



 1  education.  I assist with policies and procedures within

 2  special education.  I assist with State Board rules and

 3  State Board of Education items that we take on a regular

 4  basis and other duties as assigned.

 5       Q   Okay.  Thank you.  That gives me a good

 6  perspective.

 7           Who do you report to?

 8       A   The director of special education, Wina Low.

 9       Q   And do you meet with her regularly?

10       A   Daily.

11       Q   Okay.  So it's not that you have certain

12  scheduled meetings; just your daily interactions come up

13  when you are dealing with different issues?

14       A   That's correct.

15       Q   Okay.

16       A   We do have scheduled meetings as managers.

17       Q   So would that be she meets with all the

18  managers within her -- is she the head of a division or?

19       A   Yes.  She's a head of the special education

20  services supports division, and we have leadership

21  meetings on Thursdays, which is all of the program

22  managers in special education.

23       Q   Thursday.  Okay.

24       A   Including the senior program managers.

25       Q   So that would be including -- so you've been



 1  doing that for a couple of years then, because you did

 2  that as a senior program manager as well?

 3       A   Yes.  In my previous role and my current role,

 4  we did the same thing.

 5       Q   So about how many people are at those meetings,

 6  then, out of how many program managers there are?

 7       A   I think there are seven.

 8       Q   So --

 9       A   So it would be the director and the program

10  managers, two senior program managers.

11       Q   Oh, there is two senior program managers, so

12  it's seven including the --

13       A   Yes.

14       Q   Okay.  Thank you.

15           Does anybody report to you?

16       A   Yes.

17       Q   Who is that?

18       A   Our budget analyst reports to me.  Our program

19  manager over funding and special education, Malissa

20  Roberts, reports to me.  Our program manager over special

21  education data and GO-IEP, Linda Castellanos, reports to

22  me.

23       Q   And who is -- did you name the budget analyst?

24       A   Marilyn Carter.

25       Q   And I'm sorry, I missed what was



1    Ms. Castellanos's responsibility?

2        A    She manages the -- the data in special

3    education and GO-IEP.

4        Q    Can you tell me what GO-IEP is?

5        A    Yes.  It is an online IEP application that we

6    offer to LEAs free of charge.  Well, we pay for it,

7    but...

8        Q    Free of charge to the LEAs?

9        A    Free of charge to the LEAs.

10       Q    It's an online IEP application, is that what

11   you said?

12       A    It's an online IEP application, yes.

13       Q    What -- what does that do?

14       A    It -- it's similar to other software, where

15   LEAs and teachers can manager IEPs online.  So they can

16   develop the IEP and, you know, have the IEP team meeting.

17   It's -- it's similar to a software.

18       Q    Okay.  And so that allows, for instance, if a

19   student moves -- is it -- is it localized to the LEA or

20   is it a system that could be accessed between LEAs?

21       A    It's localized -- well, both.  If -- if a

22   student moves from one LEA to another LEA, they could

23   easily be able to obtain those records.  We would -- we

24   have control of that.  We have -- it's fully protected,

25   and, you know, secure, but yes, LEAs -- depending upon if



1   the LEA uses the GO-IEP program, they could potentially

2   have access -- easier access to those records when the

3   student moved to that LEA.

4        Q    Okay.  I can understand that.

5             Okay.  Then I'd like to get a sense of the

6   budgeting services within the Georgia Department of

7   Education overall.  Is there -- it sounds like you do the

8   budgeting for your division.  Does each division have

9   people who do budgets in them, or is there one sort of

10  budget division for the whole section -- I'm sorry, for

11  the whole department?

12       A    I can't speak to the budget for the whole

13  department.  I can only speak to the budget in special

14  education.  And I don't know if manage is the -- I guess

15  manage is the right word.

16            I pull together documents and make no decisions

17  about the funding.  I just pull them together and then

18  give opinions on if we need to do a drawdown or where we

19  are in terms of how much funding we have left available.

20  Even on the grant application, I don't really make any

21  decisions about that.  We just -- I communicate how much

22  we have available, how much we've used historically.  I

23  leave it to the other program managers and directors to

24  determine the needs, and then pull together the documents

25  to put them in the grant application.



1     Q   Okay.  So Ted Beck is the chief financial
2  officer?
3     A   He is no longer the chief financial officer.
4     Q   Oh.  Do you know who is?
5     A   Rusk Roam.
6         THE REPORTER:  Say the last name again.
7         THE WITNESS:  Roam, R-o-a-m.
8     Q   BY MS. TAYLOE:  So is -- is the chief financial
9  officer separate from -- I'm sorry, they oversee your
10  division or not?  Because you just are within the -- the
11  special education and service and support division?
12     A   Yes.  He oversees the -- he's the CFO for the
13  Department of Education, so yes, we would fall under him;
14  but the day-to-day operations that we do with the
15  individuals with IDEA funds, no, he doesn't manage those.
16     Q   And within your office, are there personnel who
17  are tasked with particular grants or programs?
18     A   No.  Our fiscal -- yes and no.  Our fiscal unit
19  really handles all of the special education funding
20  that -- that flows in, to my knowledge.  There may be
21  other grants that, you know, would be available to
22  special education students but also available to other
23  students that don't fall in the division, the special
24  education division.  We just review grant applications in
25  the consolidated application for special education



 1  funding.  So it could be, you know, IDEA funds or other

 2  state special education funding.

 3       Q   Okay.  And so it sounds like everyone in your

 4  office works on all of them.  There's not --

 5       A   Right.

 6       Q   -- tasks?  Okay.

 7       A   Yeah.

 8       Q   Was there a time while you were in this

 9  division that GNETS funding was handled outside of the

10  special education supports and services division?

11       A   I don't know what you mean.

12           MS. TAYLOE:  All right.  Can you do tab 2.

13       Q   BY MS. TAYLOE:  I'm going to introduce, just

14  for reference so you can refer to what I'm looking at,

15  the document is GEORGIA 000007, produced a very long time

16  ago, and it is some organizational charts that were

17  provided to us.  And I'm going to draw your attention

18  to -- let me see which page.  Look at -- can you see the

19  Bates numbers at the bottom of the pages?

20       A   I can't see anything but myself at the moment.

21       Q   It looks like it's sideways, so the Bates

22  numbers would actually be on the sides the way they were

23  produced sideways.

24       A   It's not -- oh, okay.  Yeah.

25       Q   Okay.  Can you look at the page that's marked



```
 1   GEORGIA 000015.

 2        A    Okay.  Scrolling is.

 3        Q    It's hard because it's sideways, too.

 4        A    Yeah.

 5             THE VIDEOGRAPHER:  Do we want to rotate it or

 6   leave it sideways?

 7             THE WITNESS:  Now it's not responding.  Oh, now

 8   it is.  Sorry.

 9        Q    BY MS. TAYLOE:  Temperamental.

10        A    Okay.  Did you say -- what number did you say?

11        Q    15.

12        A    15.  It either goes way down or it doesn't move

13   at all.  Now it's rolling.  I was to 13 and now I'm to

14   12.  So I was getting closer and then it went back up.

15             MS. GARDNER WOMACK:  Can we go off the record

16   for a second.

17             THE WITNESS:  I mean, I can tell that if I

18   press it too much, it's going to go too far.  But it

19   keeps rolling.

20             THE VIDEOGRAPHER:  We are off the record at

21   9:53 a.m.

22             (The deposition was at recess from 9:53 a.m. to

23   9:57 a.m.)

24             THE VIDEOGRAPHER:  Back on the record at 9:57

25   a.m.
```



 1          MS. TAYLOE:  And I'd like to note for the

 2   record that the document I introduced, GEORGIA 000007,

 3   should be marked as Exhibit -- Plaintiff's Exhibit 582.

 4          (Plaintiff's Exhibit 582 was marked for

 5   identification.)

 6      Q   BY MS. TAYLOE:  And Ms. McCollum, have you been

 7   able to get to page 15?

 8      A   Yes.

 9      Q   Okay.  Do you see sort of in the middle,

10   towards the bottom on that page, where "Georgia Network

11   of Educational Therapeutic Supports" is in a box there?

12      A   Unfortunately, I zoomed in and I now can't see

13   anything.  Let me go lower again.

14          MS. JOHNSON:  There you go.

15          THE WITNESS:  Okay.  All right.  Can you please

16   repeat that?

17      Q   BY MS. TAYLOE:  Can you see the box that has

18   the GNETS program in it?  It's -- so under "Chief of

19   Staff," there's Matt Jones, and there's a long line

20   across with a bunch of things that are under Matt Jones.

21      A   Right.

22      Q   And one of them -- the fourth one over is fed

23   programs, and it has "exceptional --

24      A   Okay.

25      Q   -- students" under there.  See, that's what I



1    think is now --

2         A    Yes.

3         Q    -- your division?

4              And then two more over from there, there's a

5    line that comes down.  It kind of looks like it was stuck

6    in, added between the --

7         A    I see it.

8         Q    -- fifth and sixth one.  And then down off that

9    one, there's a -- a box that says "Georgia Network of

10   Educational Therapeutic Supports, GNETS"?

11        A    I see it.

12        Q    Okay.  So when GNETS -- when this was the

13   structure, and this document was marked as revised in

14   August 2017, was GNETS funding handled through your

15   office at that time?

16        A    GNETS funding was never handled through our

17   office as far as appropriations.  We only -- the team,

18   the budget team that I managed, only handled the LEA

19   applications.  So...

20        Q    So were the LEA applications for GNETS handled

21   through your office during that time?

22        A    Yes.

23        Q    Okay.  I'm not sure what -- can you explain to

24   me what I said wrong so I don't keep saying it?

25        A    You asked --



1        Q   Because I said budgets.

2        A   -- was GNETS funding handled through our

3    office, and -- maybe I don't know what you mean.

4        Q   So you said -- and I understand your point that

5    you handle the budget applications, not the -- like the

6    consolidated applications for GNETS.  Is that the

7    distinction you are making?

8        A   Yes.

9        Q   Okay.  So you handle the budget applications

10   for GNETS and sort of help decide how much money will go

11   to each LEA -- or each GNETS program from the GNETS state

12   grant?

13       A   No.  No.  I did not do that.  It was decided

14   outside of what -- anything that I did.  The

15   appropriations, all of that, I did not handle.  Once it

16   was decided about the allocations, then we reviewed the

17   grant applications as they came through the consolidated

18   application for the fiscal agents.

19       Q   Okay.  I think we'll answer some of my other

20   questions as we get further in, but for right now,

21   whatever it is that you do --

22       A   Okay.

23       Q   -- did you do it for GNETS when it -- in

24   August of 2017?

25       A   Yes.



1      Q    You did?

2      A    Yes.

3      Q    Okay.  That -- I think that will work for now.

4           Do you know when it was -- it looks like it was

5    restructured, according to the subsequent organizational

6    charts, that GNETS became part of the special education

7    services and support division?

8      A    Are you asking after this restructure?

9      Q    Yes.

10     A    It -- it was part of the special education

11   division before and after this restructure.

12     Q    So do you know why it's reflected like this in

13   the org chart?

14     A    Because at that point it was with the director,

15   Nakeba Rahming.

16     Q    Okay.  And so after Nakeba Rahming left, did it

17   change structure?

18     A    No.  When -- it was under special education

19   services and supports when she was still there.  She

20   became deputy, and it -- I don't know.

21     Q    Okay.  And I don't want to -- okay.  Well, if

22   it comes up in later documents, we can try to figure out

23   who was doing what when.

24     A    Okay.

25     Q    But I think that works for now.  Thank you.



1          Can I ask you to say what is -- and I don't

2     know how to pronounce his first name.  Is it Geronald

3     Bell?

4          A    Yes.

5          Q    What is Geronald Bell's role?

6          A    It is my understanding that Geronald Bell is

7     the assistant director in budget services.

8          Q    And what does that mean with respect to what

9     your office does?

10         A    Geronald Bell currently -- I don't have as --

11    as much communication with him since he's been the

12    assistant director.

13         Q    Did he used to be in a position that you had

14    more communication with him?

15         A    Yes.

16         Q    What was that position?

17         A    I don't know what his title was, but he did

18    manage the allocations for us in special education, both

19    federal and state.

20         Q    And who does that now?

21         A    It's split up.  Carmen Freemire does the

22    federal allocations, and I believe Geronald Bell still

23    does some of the state appli- -- allocations, but I don't

24    know his -- the totality of his role.

25         Q    Okay.  And when you said he managed the



1  allocations for -- in special education, can you say what

2  that involved?

3       A   Sure.  We wanted to keep segregation of duties,

4  so he would manage the formula allocations for IDEA, and

5  then any other special education grants we had.  So

6  whether they were formula grants -- well, I think they

7  were all formula grants.  He would determine what the

8  allocations were, and then my budget team would get that,

9  and we would approve funding or review for allowable

10 funding what the LEAs submitted, more of the details,

11 so...

12      Q   Okay.  Okay.  Then you mentioned before the

13 weekly teams with -- team meetings with Wina Low and the

14 managers.  Are there other meetings within GaDOE that you

15 meet with regularly with respect to special education

16 funding?

17      A   Our -- our team had -- not anymore, no.  Our

18 team met weekly.  When I was the program manager of

19 budget, we met weekly just to talk about what's going on

20 that week.

21      Q   And when you say "not anymore," why is that?

22      A   Because Malissa Roberts is over that, and I

23 mostly just meet with the two managers that I supervise.

24      Q   Are there any reports or data reviews in

25 connection with any of these meetings, including the



1  weekly meetings with the -- the managers you talked about

2  before?

3       A   Yes.

4       Q   Can you describe them?

5       A   It would be difficult because things are

6  constantly moving, and I would not be able to tell you on

7  any specific date what data or anything that we were

8  looking at.  But it could include monitoring data or

9  draw-down data or draw-down reports or completion reports

10 or reports on how many LEAs have submitted a budget, who

11 still needs to submit a budget, things like that.

12      Q   So is it fair to say this would depend on sort

13 of where you are in the budget or allocation cycle that

14 you would be focusing on different things?

15      A   Yes, that is correct.

16      Q   Okay.  So is there an agenda for -- like does

17 someone say, okay, this week we are going to talk about X

18 and someone brings a report in connection with that?

19      A   Yes, we generally had agendas.

20      Q   Okay.  And who -- who sets those?

21      A   The manager or the team.  I guess the team

22 could say, hey, we need to talk about this, and we would

23 add it to the agenda.

24      Q   Okay.  Okay.  I think that gives me a good

25 overview of the structure going on.



1             Now I want to talk a little bit about the

2      source of funding for general education generally.

3          A    Excuse me, did you say general education?

4          Q    I'm sorry, I said special education generally,

5      just sort of the general sources of funding for special

6      education.

7          A    Okay.

8          Q    So I want to make sure I'm saying the -- does

9      your office handle -- and we'll get to what I don't

10     understand about handling, but there's some element of

11     federal -- well, let me back up.  Sorry.

12            Special education services can be funded in

13     part through federal, state, and local funds; is this

14     correct?

15         A    That's correct.

16         Q    Okay.  And I want to talk about the federal

17     funds first.  Does your office work with any of these?

18     And then we can talk about how they work with it, because

19     I'm -- that's part of the thing I'm missing.  Does your

20     office work with IDEA funds?

21         A    Yes.

22         Q    Okay.  Any other special education specific

23     funds?

24         A    Yes.

25         Q    What are they?



1        A    We have sub grants that we manage.  Part of
2   them come from IDEA funds, like our high cost grant.  We
3   also manage state categorical grants, such as the
4   preschools with disabilities grant, the residential and
5   reintegration grant.  I know we manage seven grants, and
6   I can't think of them.  Those are some examples.  I
7   cannot think of any others at the moment.
8        Q    And I just want to make sure I understand,
9   because I was asking about federal funds and you said
10  "state categorical grants."  Does that mean it comes in
11  as a federal fund and you reallocate it?
12       A    Okay.  Let me clarify an answer that I -- I had
13  earlier.  So when I say we manage state and federal funds
14  for special education, our team was only managing state
15  categorical grants for special education, which would be
16  what the -- I don't know who decides, but somebody
17  decides that -- I guess the State of Georgia gets a
18  preschool disabilities grant and residential and
19  reintegration grant, and those are state categorical
20  grants, so those are outside of the QBE special education
21  funds that go out.
22            Our office does not manage that.  That's more
23  global, and we don't really have anything to do with --
24  with QBE.  We have -- we manage the state categorical
25  grants specific to special education and then any federal



1   grants specific to education.  So that would be your IDEA

2   Part B, 611 and 619 grants.  We do not manage Part C

3   grants and any sub -- sub awards that we -- that come out

4   of that, such as the high cost grant.

5        Q   Okay.  I understood most of that.

6            The one piece I'm still missing is, are the

7   state categorical grants, they are not federal funding

8   then?  Or they are, but they are outside of IDEA?

9        A   The state categorical grants are not federal

10  funding.

11       Q   Okay.

12       A   And I really did leave off the GNETS funding,

13  is the one I couldn't think of we have.  Yeah, GNETS, a

14  state grant for LEAs and a federal grant.  And that is --

15  the federal part is coming out of IDEA funds.

16       Q   Okay.  Does your office deal with Title I funds

17  at all?

18       A   The Office of Federal Program does but not the

19  special education, the school unit.

20       Q   So Office of Federal Programs is -- is --

21  includes the special education division but also includes

22  other sections that do other federal programs?

23       A   That's correct.

24       Q   Okay.  So OFP handles Title I funds, but your

25  division does not?



1      A    Yeah.

2      Q    Title VI funds?

3      A    No.

4      Q    Do you know if OFP does, or you just know that

5   your office doesn't?

6      A    I know that our office does not.

7      Q    Okay.  And if the state got extra funds through

8   ESSA or CARES or ESSER II, did your office deal with them

9   in any way?

10     A    Yes.  There -- we did deal with ARP funding

11  that came as IDEA funding, but there's a separate office

12  that deals with CARES and ESSER and ARP.  It's not us.

13     Q    Okay.  So just -- just the ARP funding that

14  came as IDEA funding?

15     A    Yes.

16     Q    Okay.  Does your office deal with any SAMHSA

17  funding?

18     A    Not currently.

19     Q    Has it -- it has in the past?

20     A    It has in the past.

21     Q    And what changed about that?

22     A    The organizational structure.  The structure of

23  the organization.

24     Q    So who deals with SAMHSA funding now within the

25  Department of Education?



1        A    It is in the Office of Whole Child.

2             (Court reporter clarification.)

3        Q    BY MS. TAYLOE:  And is that -- so that's within

4    the Department of Education?

5        A    Yes.

6        Q    Is it its own office or is it in another?

7        A    It's its own office.

8        Q    Okay.  And what is that office geared toward?

9        A    Supports for whole child.  I shouldn't say that

10   probably.  It -- it looks at various attributes for what

11   a student may need, to my knowledge.  I'm not in that

12   office, so...

13       Q    Okay.  Are you familiar with Project AWARE?

14       A    Yes.

15       Q    What -- what do you know about Project AWARE?

16       A    It is for mental health services.  I believe

17   it's the same thing as the SAMHSA grant.

18       Q    So would that be an example of something that

19   had previously been handled through your office but now

20   it's done with the Office of Whole Child?

21       A    Yes, that's correct.  I imagine that Project

22   AWARE is -- that may be the Georgia name and it falls

23   under the SAMHSA grant.

24       Q    That's correct.  I will just say that.

25            Are you familiar with the System of Care grant?



1    A    No.

2    Q    Okay.  Do you know who -- do you know the name

3    of anybody in the Office of Whole Child who might be able

4    to -- who might be the one likely to deal with the

5    Project AWARE funding?

6    A    Well, Justin Hill is the director, and he has

7    been over people who have supervised that grant all along

8    the way, so he would know.

9    Q    Okay.  So you don't --

10   A    I believe.

11   Q    I'm sorry.  So you don't deal with anybody in

12   that office on this grant?

13   A    No.

14   Q    Okay.  Do you --

15   A    Can I clarify that?

16   Q    Sure.

17   A    Since grants left our office, they may ask me,

18   hey, what's a function code or object code or something

19   like that with just administrative questions.  But if you

20   are asking if I make decisions about any of those funds

21   or manage them in any way, I do not.  But, you know, we

22   interact as colleagues.

23   Q    Sure.  But you -- you don't coordinate to see

24   like if they are giving this money or, you know, should

25   we adjust this because of that, or there's no -- nothing



1  like that?

2       A   No, nothing like that.

3       Q   Are you familiar with -- or I won't say that.

4  Does your office deal in any way with Department of

5  Education's magnet schools, the assistance program funds?

6       A   No.

7       Q   Community development block grants?

8       A   No.

9       Q   Okay.  Does your office handle any other kind

10  of federal legislative or agency grants or funding that

11  you can think of that we haven't discussed?

12       A   We partner closely with the state personnel

13  development grant.  It is also under the Office of Whole

14  Child.  It used to be under our office, and so my team

15  has reviewed things surrounding that grant before.  We

16  also have a federal teacher retention grant.  That's all

17  I can think of.

18       Q   And I forgot to ask before.  When you said it

19  used to be under your office, when did this realignment

20  take place to the Office of the Whole Child?

21       A   Very recently it went to the Office of the

22  Whole Child.  Probably two or three months ago, maybe.

23  It left our office and went to curriculum and

24  instruction, and then it moved to the Office of the Whole

25  Child.



1        Q    Within the two or three months, or the two or

2    three months was the most recent of those?

3        A    Two or three months was the most recent.

4        Q    When did it leave your office and go to

5    curriculum and instruction?

6        A    I cannot recall.

7        Q    Years or --

8        A    Yeah, it was years ago.  I can tell you it was

9    before the pandemic.

10       Q    That's a good landmark.

11       A    My life is pre or post.

12       Q    Things marked pre or post.

13            Okay.  Do you know what prompted the

14   restructurings?

15       A    I don't.

16       Q    Okay.  And then the federal teacher retention

17   grant and the state personnel development grant, how are

18   those funds used?

19       A    The state personnel development grant has been

20   used to support MTSS.  It -- I heard the announcement

21   that we received a new award, and I believe those are

22   awarded for up to five years.  I don't know what the new

23   award is, but I know that it is in conjunction with the

24   teacher retention grant, so -- but I don't know

25   specifically what the new award would be about.  Like I



1  didn't read the grant application or anything.

2       Q   Yeah.  And just for the record, MTSS is

3  Multi-Tiered Systems of Support?

4       A   Yes.  I'm sorry.

5       Q   That's fine.  I just want to make sure we have

6  it down.

7           And who are the teachers who are eligible for

8  these grants for retention and development?

9       A   It would be specific -- so the teacher

10 retention grant, we've used it in a variety of ways.  We

11 are training leaders, so we're training teachers and

12 we're training principals to know how to retain teachers

13 and giving them supports.  Part of that grant is to allow

14 literacy and math across the state, specifically with the

15 focus on students with disabilities, but a focus on all

16 students so that we can reach all tiers.  I don't believe

17 that teachers specifically receive part of that grant.

18      Q   Okay.  That's helpful.

19          Just a few more.  Is Department of Education

20 involved in any Medicaid payments made for services

21 provided in schools, to your knowledge?

22      A   Not to my knowledge.  I don't know.

23      Q   Okay.  So the funding that we've talked about

24 that comes to the state from the federal government, do

25 those all come in connection with some restrictions on



1   use?

2        A   Can you ask that again?

3        Q   So like I know IDEA says this money is to the

4   State's -- to be used in, and then there is certain like

5   ways it's meant to be used, like it's for special

6   education and there might be further restrictions on

7   that.

8            Is that true for all the federal funding, or is

9   it sort of just a block grant and you can do with it what

10  you want?

11       A   To my knowledge, any federal grants that we've

12  ever received had a special purpose.  And specific to

13  IDEA, there are things within the grant application that

14  we are supposed to spend the money on and we budget for

15  and that we're allowed to spend the money on.

16       Q   Okay.  So these would all be at least specific

17  to special education because they are coming to your

18  division?

19       A   Yes.

20       Q   And there might be some further restrictions

21  beyond that as well?

22       A   There could be, yes.

23       Q   Okay.  But not necessarily?

24       A   But not necessarily.

25       Q   Okay.  And then any restrictions like that



 1  would also be passed on to any sub grantees?

 2       A   Yes.

 3       Q   In connection with any allocations?

 4       A   Yes.

 5       Q   It sounds like you want to qualify that.  Do

 6  you want to explain something that I said that isn't

 7  quite right?

 8       A   I don't know what you mean by "restrictions."

 9       Q   So if a grant -- if federal funds come to the

10  state with a limitation on what they can be used for and

11  then allocations are made to LEAs, the LEAs can't just

12  put that money all in a big bucket; they still have to

13  follow the same rules, whatever the original funding was

14  designated for?

15       A   Yes, that's correct.

16       Q   Okay.  And does your office handle the some

17  funds get allocated to RESAs instead of LEAs, or does it

18  always go to LEAs?

19       A   Some funds are -- RESAs can be fiscal agents,

20  so yes, some funds could get allocated.

21       Q   So do your funds always get allocated to fiscal

22  agents?  Because some LEAs --

23       A   When you say "your funds," what do you mean by

24  "your funds"?

25       Q   Well, the way you just corrected that, when I



1   said sometimes it goes to RESAs, you said yes, because

2   RESAs can be fiscal agents.  So I don't know if money can

3   only go to fiscal agents, or does it sometimes go to

4   entities that aren't fiscal agents?

5       A   I don't know if they can be or they can't be.

6   Anyone who would receive a grant would be a fiscal agent.

7   We sub grant mostly to LEAs, unless it's a specific

8   grant, and then it -- a fiscal agent could be an LEA or a

9   fiscal agent could be a RESA or a --

10          (Court reporter clarification.)

11          THE WITNESS:  I'm trying to think of what I

12   want to say.

13          It could -- my definition of fiscal agent is

14   someone who manages the grant that they receive, so.

15      Q   BY MS. TAYLOE:  Oh, so by that definition,

16   anybody who receives a grant is a fiscal agent?

17      A   Yes.

18      Q   Okay.  Okay.  And so in the case of GNETS, I

19   know that fiscal agents can be LEAs or RESAs, and they

20   would be the ones receiving the GNETS grant?

21      A   Correct.

22          MS. TAYLOE:  Okay.  Then I would like to

23   introduce as Exhibit 583 a -- an earnings sheet.

24          (Plaintiff's Exhibit 583 was marked for

25   identification.)



1    Q   BY MS. TAYLOE:  This is a document that I'm not
2  going to ask you to verify any of the numbers.
3    A   Okay.
4    Q   I just want to know how an earnings sheet like
5  this works.
6    A   Okay.
7    Q   Let me know when it's accessible to you.
8    A   It is accessible to me.  It's very tiny.
9    Q   Yeah.
10   A   I'd like to zoom.  I'm hesitant to do so, but I
11  will try.  Yeah, okay.  Let me see if I can get it
12  centered.  Okay, I think I can see it good enough.
13   Q   Okay.  Have you seen a document like this
14  before?
15   A   Yes.
16   Q   Does your office produce documents like this?
17   A   No.
18   Q   Do you know who does?
19   A   Budget services.
20   Q   And -- and who --
21   A   No, I don't know who does.  It was my
22  imagination.
23   Q   Is budget services an office of GaDOE?
24   A   Yes.
25   Q   But you're not sure they are the ones that do



1    it?

2        A    I don't know who creates this.

3        Q    Okay.  Okay.  And I just want to sort of

4    understand the different parts of it.  So can you walk me

5    through how the QBE is calculated or how QBE earnings is

6    calculated from the FTE?

7        A    No.

8        Q    That's not part of -- because someone else

9    prepares this and -- and because that includes not

10   special ed funding, so that's not part of your work?

11       A    That is not part of my work.  I'm sorry for

12   nodding.

13       Q    Okay.  Are you familiar -- so this chart on

14   the -- in the "Direct Instructional Costs" column has a

15   few lines.  Part way down it says, "Students with

16   Disability, Category I through V."

17       A    Yes.

18       Q    Do you see that?

19       A    I see it.

20       Q    Are you familiar with those categories?

21       A    I'm familiar with them.

22       Q    Can you tell me what those categories are?

23       A    No, I don't remember the -- what the specific

24   categories are.  My knowledge of these categories mostly

25   come from way back in the school districts based on what



1   I reported as a teacher, not in my role at the Department

2   of Education.

3       Q   Okay.  Are you suggesting -- so you're saying

4   that your information from this comes from your teaching

5   time, not at the --

6       A   That's correct.

7       Q   Do you know, is -- do you know who establishes

8   the categories there?

9       A   No.  I don't know who establishes the

10  categories.

11      Q   Okay.  Are you familiar with the multipliers

12  used for special education students to determine funding?

13      A   Yes and no.  I have seen them, but I cannot

14  speak to them.

15      Q   Okay.  Can you describe generally the purpose

16  of the multipliers?

17      A   To my understanding, it would be to generate

18  funding for students based on their disability.

19      Q   Okay.  Okay.  I had a number of questions I was

20  going to ask about this document, but since you're not

21  familiar with it, I'm curious who -- do you know who --

22  since you don't know what division does it, do you know

23  who would be able to speak to these -- this calculation,

24  these earnings calculations?

25      A   No, I don't know.  I don't think just one



 1  person could.

 2       Q    Because you don't know which office generates

 3  them?

 4       A    I don't know which office generates them.

 5       Q    Okay.  And I assume you also are not familiar

 6  with the state -- this is at a county level.  You are not

 7  familiar with the state earning sheet either?

 8       A    I am familiar with it.  I see it.  Just like I

 9  see these LEA applications.  I'm familiar to the extent

10  that if an LEA asked a question and -- and we -- in my

11  previous role, I did get questions about this, if -- you

12  know, should we spend money from the state dollars or

13  should we spend money from the federal dollars and, you

14  know, I could speak to federal allowability because we

15  managed the IDEA funds.  So that made me familiar with

16  this document, because a lot of time special ed directors

17  would pull this document up and say, this is how much we

18  get.  What should we be spending out of this, and what

19  should we be spending out of, you know, this over here?

20  And there are some things that are not allowable with

21  IDEA funds and some things that are allowable with IDEA

22  funds.

23            So, you know, to -- my experience would be

24  globally more should you spend state dollars on this;

25  should you spend federal dollars on this.  Not, how was



1   this generated.  Should you spend, you know, these
2   particular dollars, you know.  I would tell directors
3   that they have some flexibility in these funds.  If
4   students with disabilities need additional funding,
5   whether it's state or federal, you are required to meet
6   their needs.  So it doesn't matter what the sheet shows.
7   You must meet their needs.
8           So those would be the type of questions that I
9   would handle.  So that makes me familiar with this
10  document on that kind of level.
11      Q   Okay.  So more it's been presented to you with
12  questions than you are involved with the production of
13  it?
14      A   That's correct.
15      Q   Okay.  Okay.  I want to back up for a second,
16  because you mentioned 611 funding before when we were
17  talking about different federal grants.  Can you tell
18  me -- or federal sources of funding.  Can you tell me
19  what 611 funds are?
20      A   Yes.  611 funds are IDEA Part B funds that are
21  for 3 to -- students with disabilities that are 3 to 21
22  in age.
23      Q   And what are they used for?
24      A   They are used for the excess cost of special
25  education for students with disabilities.



1      Q   How is it different from other IDEA funds?

2      A   It is -- it's the big formula grant.  It's the

3  biggest.  611 funds encompass the LEA funds and the SEA

4  funds that we receive at the state as a pass-through

5  agency.  It is the IDEA funding.

6      Q   Okay.  So there's not another IDEA funding?

7  The 611 funds are the IDEA funds?

8      A   They are the Part B IDEA funds for 3 to 21.

9      Q   Is that an IDEA Part A?

10     A   There is a Part A and a Part C.  I don't know

11 anything about Part A.  Part C we do not manage, nor we

12 are not granted that at our office.

13     Q   Do you know who does?

14     A   Babies Can't Wait because it's -- it's a baby

15 grant.

16     Q   Okay.  And Part A you're -- you know exists,

17 but you don't know what it's for?

18     A   I just think it's Part A of the Individuals

19 with Disabilities Education Act.  I'm not sure that there

20 is funding attached.

21         Part B, IDEA funds are the funds that we

22 manage, and we manage 611 and 619.  And 619 is for ages 3

23 to 5, and 611 is for ages 3 to 21.  Those are formula

24 education grants.

25     Q   Okay.  That's very helpful.  Thank you.



1              Is there an IDEA capacity building grant?

2       A    Not anymore.

3       Q    Okay.  What was that for?

4       A    It was a sub grant for assisting with

5  graduation.  It was -- we used it for our state systemic

6  improvement plan.  We granted it out as a sub grant.

7       Q    And when did that stop?

8       A    I believe 2020 or 2021 even.  I don't recall.

9       Q    And do you know why it stopped?

10      A    Yes.  It stopped because when we originally

11  started the grant, it was based on data in our SSIP,

12  which is our State Systematic Improvement Plan for

13  graduation, and it -- it was never meant to be a

14  long-term grant.  It was to build capacity at the

15  beginning, and we always messaged the plan for

16  sustainability.  In the grant we had specific things that

17  LEAs could spend, and it was directly related to

18  graduation.

19      Q    Okay.  So it was set for a certain term, and

20  that term expired and it was not extended, the idea being

21  that they were sustainable by then?

22      A    Yes.  I mean, we had the ability to make the

23  decision every year, but as the data improved, certain

24  LEAs would no longer get the grant.  It was always meant

25  to build their capacity to carry on this work for



 1  graduation within their local agencies, so...

 2       Q   So since that was an IDEA grant, did -- did

 3  IDEA stop -- I'm sorry, did the federal government stop

 4  offering it, or did Georgia just no longer take it or did

 5  Georgia use it for different purposes?

 6       A   It was a grant within our IDEA funds that we

 7  received, part of our IDEA discretionary grant, so

 8  Georgia made the decision to give the grant.  It didn't

 9  come -- it wasn't -- the decision wasn't made by the

10  federal government.

11       Q   So in your discretionary funds, that's what

12  Georgia chose to spend it on?

13       A   Yes.

14       Q   Okay.  And do you know what those funds are

15  being spent on instead now?

16       A   I know what our IDEA funds are being spent on,

17  but I don't think it's like a swap, like we freed up this

18  and now we have this.

19       Q   What kinds of things are the discretionary

20  funds spent on now?

21       A   GNETS and GLRS, which is our regional technical

22  assistance, professional development, teacher retention,

23  and other various allowable things that's in our grant

24  application, including our state staff in special

25  education.



1        Q    What do you mean "state staff"?

2        A    Like I'm funded out of that grant.

3        Q    Okay.  And then is there something called Rule

4   10 special education funding?

5        A    It's a state interagency grant.

6        Q    It's state?

7        A    Yes.

8        Q    Okay.  And what interagency, what is -- well,

9   let me start with, what is Rule 10 special education

10  funding for?

11       A    Rule 10 special education funding is for -- to

12  help students continue to have education even when they

13  move to a crisis stabilization center.

14       Q    To provide the services?

15       A    For special education.

16       Q    In the crisis stabilization unit?

17       A    No, to provide special education services to

18  make sure we have a continuous -- we're continuously

19  providing services.  And by we, I do not mean we.  I

20  shouldn't have said it.  I mean the -- the students still

21  have a right to receive special education services even

22  when they are in a crisis stabilization center, so it

23  would be wherever that unit is, the LEA -- where that

24  unit or hospital is would provide the special education

25  services.  So it's just a little additional funding for



 1  them to be able to continue those services.

 2      Q   Understood.  And you said it was an interagency

 3  grant.  What are the other agency -- agency or agencies

 4  involved?

 5      A   Sure.  It's given to the Department of

 6  Education, but it's really meant for other state agencies

 7  even though we sub grant out to LEAs.

 8          The DBHDD -- and I'm not sure what the acronym

 9  stands for other than it's like the Department of

10  Health -- has chosen not to receive that funding.  They

11  let us manage it to -- to just give to the LEAs where the

12  crisis stabilization units are.

13          And then DOC and DJJ and GVRA, those are other

14  state agencies who receive that funding.

15          Did you ask me who received the funding?

16      Q   I did, and now I'm trying to keep up with

17  the -- I'm looking to see what she has there.

18          So DBHDD is Department of Behavioral Health and

19  Developmental Disabilities?

20      A   Yes.

21      Q   And DOC, you said that's Department of

22  Corrections?

23      A   Yes.

24      Q   And DJJ?  Department of --

25      A   Department of Juvenile Justice.



1       Q    And GVRA?

2       A    GVRA, Georgia Vocational Rehabilitation.

3       Q    Okay.  So the money is given to the LEAs where

4   the crisis intervention units are housed, and they

5   dispense the money however to the agent -- those

6   cooperating agencies?

7       A    No.  Did you --

8       Q    I'm sorry, what do they do with the money then?

9   I don't understand how the different agencies are

10  involved.

11      A    Okay.  The agencies aren't -- are not involved

12  to the extent that they don't receive the funds.  It's

13  just additional funds to support special education

14  students who may go to one of these other state agencies

15  temporarily.

16      Q    All right.  So that money goes to the LEAs

17  where those units exist?

18      A    Yes and no.  It goes to LEAs -- it does not go

19  to DBHDD.  DBHDD said -- I don't know what they said.

20  DBHDD does not take the money.  We give what should go to

21  DBHDD to LEAs instead of sending it to DBHDD.  Because

22  from my understanding, DBHDD would just have to turn

23  around and give it to the LEAs anyway, because the LEAs

24  are the ones who continue to have to support the

25  students.



1          So we do grant it out to Department of

2    Corrections --

3          Q   I see.

4          A   -- DJJ and GVRA.  We do not give it to DBHDD

5    because that would just be ridiculous, kind of.

6          Q   I see.  But so the LEAs use the funding to

7    provide services to students who are sort of receiving

8    services from those other agencies?

9          A   Yes.

10         Q   Got it.  Okay.  Thank you.

11         A   You're welcome.

12         Q   Okay.  So I think we've covered a lot of

13   federal funds.  I want to just talk briefly about local

14   funds.  I assume -- I'm not going to assume.

15         Does your division have any involvement in LEA

16   contributions to special education services?

17         A   What do you mean?

18         Q   Do you -- are you involved at all -- are you

19   aware of the amounts of money that local educational

20   agencies are paying in support of special education

21   services?

22         A   I am not aware of the amounts that they are

23   paying.

24         Q   Is your office aware of which LEAs are making

25   any payments or contributions?



1        A    Possibly, but I'm not.

2        Q    Who -- who would be?

3        A    I don't know.

4        Q    Okay.  So there is no structure in place that

5   would allow you to look up how much LEAs are paying for

6   the special education funding for students in their

7   districts?

8        A    Not for me.  I could ask, but I haven't.

9        Q    Okay.  Does the State partially fund district

10  transportation services through categorical grants?

11       A    I don't know.

12       Q    Okay.  So is any part of the State's award of

13  special education funding to an LEA impacted by any

14  contributions the LEA may be making?

15            MS. JOHNSON:  Object to form.

16            You can answer.

17            THE WITNESS:  Okay.  I -- I don't know what --

18  who or what contributes from the local level.  I know

19  that my communication -- and I can only speak to my own

20  communication -- is if a student has a need, you have to

21  provide that need.  So the only -- to answer your

22  question, I only know to the extent that LEAs do and

23  sometimes, you know, provide additional money for what's

24  needed.

25       Q    BY MS. TAYLOE:  So if one LEA is, you know,



 1  maybe a higher wealth area and they are able to

 2  contribute more than a lower wealth LEA, the State's

 3  funding doesn't take that into consideration and try to

 4  make up for the difference for the lower income LEAs?

 5          MS. JOHNSON:  Object to form.

 6          You can answer.

 7          THE WITNESS:  That's not what I'm over.  I'm --

 8  we don't do that with IDEA funds, no.  We follow formula.

 9      Q   BY MS. TAYLOE:  Okay.  Are you familiar with

10  the formula?

11      A   The IDEA formula?

12      Q   Uh-huh.

13      A   Yes.

14      Q   Could you describe the IDEA formula to me?

15      A   I can.  I do not calculate it, so it's just

16  what I'm familiar with.  It -- there is a base

17  calculation that's in statute, and we receive a document

18  from the federal government, and it shows us what our

19  base calculation should be.  And then the rest of the

20  formula is all about population of poverty.  And it's the

21  total population in the school districts, not special

22  education population.  And poverty is calculated along

23  the lines of what Title I is calculated -- or how Title I

24  is calculated.  We use their poverty formula, because

25  it's up to the states on how to define poverty.  And so,



1  yes, poverty is a factor in the IDEA formula.

2      Q    And when you talk about population, not special

3  ed population, does that mean allocations of IDEA funds

4  are based on an LEA's FTE count?

5      A    It's based on an overall student count, yes.

6      Q    Overall student count.  And is that the -- does

7  the October and March count -- days counts?

8      A    Yes.  It would be October.

9      Q    Is that weighted?  Oh, just the October one?

10     A    Just the October one goes into the IDEA federal

11  formula.  I can't speak to what other counts go for.

12     Q    Okay.  So it's not weighted; it's just however

13  many students are counted that October, that's the --

14  that's the number used for the formula?

15     A    Yeah.

16     Q    Okay.

17     A    For IDEA funds specifically.

18     Q    Okay.  So now I want to -- that's sort of good

19  background on special education funding.  Now I want to

20  talk about GNETS funding in particular.

21     A    Okay.  Can I have a break?

22     Q    Sure.  That's fine.

23         THE VIDEOGRAPHER:  We are off the record at

24  10:49 a.m.

25         (The deposition was at recess from 10:49 a.m.



```
 1   to 11:03 a.m.)

 2          THE VIDEOGRAPHER:  Back on the record at 11:03

 3   a.m.

 4       Q   BY MS. TAYLOE:  Okay.  We were about to start

 5   talking about funding for GNETS program in particular.

 6       A   Okay.

 7       Q   Do you have a sense of -- is most of the

 8   funding for GNETS federal money, state money or local

 9   money?

10       A   Most of the funding from GNETS comes from state

11   money.

12       Q   Okay.  What part of it is from federal funding?

13       A   I -- I don't know what you mean.

14       Q   Some of the IDEA funds?

15       A   Yes.

16       Q   Go to GNETS?

17       A   Yes.

18       Q   Okay.  Is that -- let's back up and do some

19   terminology.  What -- you've heard before just

20   discretionary funds.  Could you say what discretionary

21   funds are?

22       A   Yes.  Can I re -- back up to the question you

23   asked me prior?

24       Q   Sure.

25       A   When I said most of the GNETS funding came from
```



1  state, I was envisioning what we allocate from the

2  Department of Ed.  I do not know how much of the GNETS

3  funding come from local funding.  I do know it's expected

4  that students' needs are met regardless, and these

5  students do belong to an LEA.  So to that extent, I'm not

6  sure about local.

7       Now I'm ready for the next question.

8       Q   Okay.  So I was asking -- you referred before

9  to discretionary funds, and I'm asking if you can tell me

10 what that means.

11      A   Okay.  Yes.  So we have SEA funding that we get

12 from IDEA.  There is an administrative portion, and then

13 there's a maximum available we can take for -- set aside

14 for specific purposes, and that is what we call our

15 discretionary funding from IDEA.

16      Q   What is the administrative IDEA funding for?

17      A   The administration of the grant.

18      Q   Okay.  And so -- and that amount is set by the

19 federal government?

20      A   Yes.

21      Q   Okay.  And so anything that's not in the

22 administrative portion is discretionary?

23      A   Anything that's not in the administrative

24 portion and that's not in the formula maximum amount, we

25 are supposed to send to LEAs.  The rest of that is SEA



1   set aside discretionary funding, yes.

2        Q    And the LEA formula is a part, you told me

3   before, that's based on FTE.  And so you get a chunk of

4   money from the federal government for IDEA.  Some of it

5   is designated by the government as administrative.  From

6   the rest, the formula is applied, and that amount is

7   given to the LEAs.

8        A    Okay.

9        Q    And the rest of that is -- is discretionary?

10       A    Yes.  No.  But, okay, so when we get our grant

11   award, we are told how much is supposed to go to LEAs, so

12   that's automatically right off the top.  That amount is

13   going to be going out.

14            Then we have the option of taking

15   administrative funds.  And on our grant application, we

16   have to say, are we going to take administrative funds

17   and how much.  So those are the admin funds.

18            And then what's left over is there's a funding

19   table that it's kind of like a -- I wouldn't call it a

20   flowchart, but it's an "if then."  If you are going to

21   administer a high cost grant, you may take this much in

22   state initiative funding or state discretionary funding.

23   We -- we use those terms interchangeably.  You know, if

24   you don't take a high cost grant, then this much would be

25   available.  Or if you have chosen to take more than



 1  $850,000 in administrative funds, then this much would be

 2  available.

 3        So it's a chart that tells us what we can take

 4  based on decisions that we make, and that is what's our

 5  state initiatives or discretionary funding.

 6    Q   Okay.  Thank you.  That's helpful.

 7        And then from that initiative or discretionary

 8  funding, the state chooses to allocate some of that to

 9  the GNETS program?

10    A   That is correct.

11    Q   Okay.  And you've used the term "flow through"

12  also.  What does that mean?

13    A   We are considered a pass-through agency, so we

14  flow money to others.  That's what I mean by

15  flow-through.  I don't know if it's a legal term.

16    Q   So it just means the -- the federal money comes

17  to your office, and you flow it through to the LEAs or

18  the -- or the RESAs?

19    A   Yes.  I wish I didn't say it, but yes.

20    Q   Okay.  Is there some money that's not

21  flow-through?

22    A   Yes.

23    Q   What is not flow-through?

24    A   Our administrative funds stay with us.  Part of

25  our state initiative funds stay with us to pay for state



1   initiatives that we administer from the state.

2        Q   Okay.  We will come back to that.

3        Okay.  And then we've talked a little bit

4   before about indirect costs, but I'm not clear on what

5   counts as indirect costs.

6        A   I don't remember talking about indirect costs.

7        Q   Are you familiar with the concept of indirect

8   costs?

9        A   Yes.

10       Q   Could you just tell me what are indirect costs?

11       A   Indirect costs are costs that are allowable in

12  federal grants, depending on certain situations, that you

13  may take; that it's basically -- my understanding is it's

14  the cost of doing business.

15       And so I can give you an example.  If you have

16  a specific percentage you are allowed to take in indirect

17  costs based on what your indirect cost plan is in an LEA

18  or an SEA, and based on that percentage, you can spend it

19  on the costs that it -- are incurred from administering

20  the grant.  So it may be the light bill, for example.

21       Q   Is it things that nonbudget folks might refer

22  to as overhead?

23       A   I don't know what nonbudget folks would

24  refer -- would say, but I imagine it could be.

25       Q   Okay.  Okay.  And I think you said before, you



1  talked about different kinds of grants, formula grants.

2  What are the other kinds of grants?

3       A    Competitive grants.

4       Q    And can you tell us about competitive grants?

5       A    In general?

6       Q    What they are.

7       A    Okay.  Competitive grants are grants that

8  someone, an entity, organization or person may apply for

9  that's competitive.  So they may, you know, submit a

10  grant application and hope to win the award over other

11  people.

12       I don't know the official definition of

13  competitive grants, but that's what I believe they are.

14       Q    Do you know, generally, is there a pot of money

15  that people are competing for a portion of or is there a

16  competitive grant that you might get money that you don't

17  have to fight others for?

18       MS. JOHNSON:  Object to form.

19       You can answer.

20       THE WITNESS:  I'm not sure.

21       Q    BY MS. TAYLOE:  Let me rephrase that so it's --

22  are there some competitive grants that there is a -- a

23  distinct amount of money that is all that's going to be

24  available no matter how many people apply, or is there

25  some that you can -- a competitive grant and just see if



1  you can get money awarded in response to the competitive

2  grant?

3          MS. JOHNSON:  Object to form.

4          You can answer.

5          THE WITNESS:  In the world I believe that there

6  are, but not any that I manage.

7      Q   BY MS. TAYLOE:  Does your office deal with any

8  competitive grants?

9      A   Not the special education office.

10     Q   Okay.  So the grants that your office deals

11  with are all formula grants?

12     A   Yes.

13     Q   Okay.  And the GNETS grant is, therefore, a

14  formula grant?

15         THE REPORTER:  What was your answer?  I'm

16  sorry.

17         THE WITNESS:  It's a formula grant.

18     Q   BY MS. TAYLOE:  And who created the formula?

19     A   I don't know.

20     Q   How does the allocation come to your office?

21     A   How do you mean?

22     Q   I'm sorry, how do you become aware of how much

23  each LEA or each fiscal agent is entitled to under the

24  formula?

25         A   Now Vickie Cleveland sends it to our budget



1  team.

2       Q   And who is Vickie Cleveland?

3       A   She is the program manager over GNETS at the

4  Georgia Department of Education.

5       Q   Okay.  So Vickie Cleveland either gets it from

6  somewhere else or generates it, presumably, and sends you

7  the amount allocation under the formula grant?

8           MS. JOHNSON:  Object to form.

9           You can answer.

10           THE WITNESS:  That is the current procedure.

11  She gets it from someone else.

12       Q   BY MS. TAYLOE:  Do you know who she gets it

13  from?

14       A   I believe she gets it from Geronald Bell, but I

15  am not certain.

16       Q   And you said before he switched jobs, but you

17  think even in his new capacity he still does this

18  allocation?

19       A   Yes, I believe so.

20       Q   Do you know the kinds of financial or in-kind

21  contributions that LEAs provide to GNETS programs?

22       A   I know examples.

23       Q   Okay.  What are the examples you are aware of?

24       A   Sometimes it's buildings.  Sometimes it's a

25  position.  Sometimes it's actual dollars.



1       Q   And when you say "a position," what do you

2   mean?

3       A   It could be a teaching position or a

4   psychological position.  It could be a job, a position

5   that someone would hold as a job.

6       Q   And does that mean they provide services there,

7   or they actually send a person to the GNETS site?

8       A   They would send the person to the GNETS site or

9   they could provide services there.  I've seen it both in

10  the budgets that come through.

11      Q   So you -- how do you see that when the budgets

12  come through?

13      A   I do not see that anymore, but I did.  We would

14  approve those LEA grants that came through for GNETS, and

15  so we would see what they would budget to be spent on

16  GNETS programs.

17      Q   So the LEA budget that you would see would

18  include local contributions?

19      A   Oh, I'm sorry.  No, it wouldn't include local

20  contributions.

21      Q   Is there any matching required by the LEA for

22  any state funds?

23          MS. JOHNSON:  Object to form.

24          THE WITNESS:  For some state funds.

25      Q   BY MS. TAYLOE:  Which state funds?



1        A    I don't know.  All of the state funds that have
2   matching requirements.
3        Q    Are there special ed -- special education funds
4   that have matching requirements?
5        A    Yes.
6        Q    Does the IDEA require matching funds?
7        A    No.
8        Q    Which special education funds require matching?
9        A    Okay.  I'm going to answer this in two parts.
10  I know specifically that the residential and
11  reintegration grant requires -- currently requires
12  matching funds.  The IDEA does have a supplanting test,
13  so I know that.  You have to maintain your state and
14  local effort in order to receive IDEA funding, but I
15  wouldn't characterize that as matching.
16       Q    Are you familiar with the 2010 audit that the
17  State did of the GNETS program?
18       A    No.
19       Q    Have you heard of it?
20       A    I've heard of it.
21       Q    But you are not familiar with any of the
22  recommendations or conclusions contained in it?
23       A    No.
24       Q    Has it ever been discussed --
25       A    I'm not sure.  I'm not sure.



1        Q    Has it ever been discussed at any of the
2    special education team meetings?
3        A    There was a time that we discussed things,
4    recommendations for GNETS, and perhaps it was based on
5    the audit you are referring to, and that's when I say I
6    don't know.  I know we discussed improvement.
7        Q    What -- have there been any steps identified to
8    take to implement that improvement?
9        A    I know that there have been steps.  I do not
10   know what they are.
11       Q    How do you know there have been steps, then?
12       A    Because they previously would discuss taking
13   steps, but I never knew if they got -- we -- we stopped
14   talking about GNETS, so, in the leadership meetings.
15       Q    When -- when did leadership stop talking about
16   GNETS?
17       A    I couldn't tell you a specific date.
18       Q    Months ago?  Years ago?
19       A    Years ago.
20       Q    Do you know why?
21       A    It's just not a topic in -- in our program
22   manager leadership meeting.  I believe there's another
23   meeting that discusses GNETS.
24       Q    Who is in that meeting?
25       A    I'm not sure.



1        Q    What makes you think there's another meeting?

2        A    I see a GNETS meeting on my director's calendar

3   because I have access to her calendar.

4        Q    And the director is Wina Low -- Low?

5        A    Low, yes.

6        Q    And so you know that she is at least attending

7   these meetings, but you don't know who else is attending

8   with her?

9        A    No.

10        Q    So the special education services and supports

11   team meets regularly, but for the last several years has

12   not discussed GNETS?

13        A    We discuss things that could include GNETS

14   students.  We -- we discuss services and supports for all

15   special education students across the state, which would

16   include GNETS students, but we do not discuss the GNETS

17   programs specifically in our leadership meetings.

18        Q    Okay.

19        A    Some things may come up, like can you meet with

20   the GNETS, you know, directors to discuss what's

21   allowable in federal funding.  And I know that I used to

22   attend those, and now our program manager attends those.

23            That's to the extent that GNETS may come up,

24   but we don't discuss GNETS programming in our leadership

25   meetings.



1     Q   But you don't discuss GNETS budgeting either?

2     A   No, I don't discuss GNETS budgeting.

3         Well, tell me what you mean by that.

4     Q   So when you have -- you said depending upon

5  where you are in the budget cycle, you may have different

6  things come up, and someone will set the agenda and we'll

7  talk about that at a given meeting.  Would there ever be

8  a time when the GNETS budget or the GNETS grant

9  applications or allocations or something come up, you

10 wouldn't talk about those?

11    A   Yes.  So let me clarify.  If something comes up

12 about GNETS funding, it's normally, is the GNETS board

13 item ready to take, you know.  I can explain that

14 process.  I don't have any discussion about what the

15 funding would be.  I may receive the calculation and help

16 create the board item to approve GNETS funding for my

17 team, because they're going to be approving the

18 individual GNETS budgets, which is the process I

19 discussed earlier.

20    Q   Okay.  Okay.  We can talk about that when we

21 talk about the budget process.

22    A   Okay.

23    Q   All right.  Could you give us a ballpark

24 estimate on how much the state spends annually on special

25 education services and supports?



1           MS. JOHNSON:  Object to form.

2           You can answer.

3           THE WITNESS:  I don't know how much the state

4    spends annually on services and supports.

5       Q   BY MS. TAYLOE:  Go ahead.

6       A   We do have to put our maintenance and fiscal

7    support on our grant application that has an aggregate

8    total, and I just can't recall what that aggregate total

9    is.

10      Q   Okay.  Do you have a ballpark estimate about

11   how much the state spends annually for GNETS, a GNETS

12   program?

13      A   Yes.

14      Q   What is that?

15      A   65 million.  That would be a ballpark.  I know

16   it changes from year to year.

17      Q   And when it changes from year to year, is it

18   staying roughly within that, or is it trending one way or

19   the other?

20      A   I'm not sure.

21      Q   Okay.  I think this is actually a good time to

22   talk about the budget process then, since we started into

23   that.  Could you walk us through generally the process by

24   which the -- the budget item for GNETS is reached and any

25   involvement your office has in that?



1        A    I can walk you through the involvement I have

2   in it, which is receiving the allocations once they are

3   determined, and either helping to prepare or reviewing

4   documents for the GNETS board item that goes before the

5   State Board of Education.

6        Q    Okay.  Can you help me orient that?  Because I

7   thought -- well, tell me what the GNETS board item is.

8        A    It's a document that explains what GNETS is

9   about and what the funding would be used for, and it

10  shows the state and federal GNETS funding that we

11  allocate from the Department of Ed.

12       Q    So that comes after the budget has been set?

13       A    It comes after the budget has been set.  Then

14  the State Board of -- that is a process that I'm not

15  overseeing.  Budget development or the State of Georgia,

16  any -- anything that involves with State of Georgia

17  appropriations, I don't -- I don't handle that.  So I

18  think that would be our budget services team.

19            I only receive once the allocations are made.

20  That's -- that's when I receive the documents.  And now I

21  receive them from Vickie.  I used to receive them from

22  Geronald Bell.

23       Q    Okay.  I'm trying to understand the State Board

24  item role, then.  So it's after the budget and after the

25  allocations, or after the budget but before the



1   allocations?

2        A    So we haven't allocated it out to the LEAs yet,

3   but it's for the State Board of Education to approve that

4   we will allocate it out.  But the budget itself has

5   already been created, and the draft or preliminary

6   allocations have been created in some way, and then our

7   office gets it, and then we take it to the State Board of

8   Education for approval to be allocated out.

9        Q    And so are they approving the budget amount,

10  the allocations to the regional programs, or both?

11       A    I'm not sure.  I believe they are approving

12  what the Department of Education would grant out.

13       Q    So that's the State level?

14       A    Yes, the State Board of Education.

15       Q    And so what the state would grant out would be

16  to the fiscal agents?

17       A    Uh-huh.  Yes.

18       Q    So they are approving the allocations, then?

19       A    Yes, they are approving the allocations.

20       Q    Okay.  And so your involvement with the board

21  item is what?

22       A    My current role is to read all board items for

23  grammar and language and make sure there are no mistakes.

24  I don't create very many board items anymore in my

25  current role.  But in the past, I would create -- you



 1  know, there's several templates in that process, and I
 2  may create a template or add to a template.  But it
 3  does -- it's not decision-making.  It's just typing in
 4  information into templates for board approval.
 5      Q   And does that include typing in the financial
 6  information, or is that already in there when it gets to
 7  you?
 8      A   It's already in there when it gets to me.
 9      Q   Who does it come from?
10      A   Geronald Bell in the past or Vickie Cleveland.
11  But I'm not sure who creates the document or who makes
12  the allo -- determinations of allocations to begin with.
13  Specifically the state.  I -- to my extent of knowledge
14  for the -- how much federally we allocate, it would be --
15  I don't make any decisions, but I am told how much is
16  needed because I do the grant application for IDEA.  So I
17  am able to, you know, put that in -- in our budgeting
18  document that we prepare for the grant application.
19      Q   Are you familiar with the GNETS formula?
20      A   I am not familiar with the GNETS formula.  I
21  have seen it, but I couldn't repeat it to you.
22      Q   Okay.  Have you seen -- I know you're not --
23  you said you're not involved in the preparation, but have
24  you seen the budget when it comes out?
25          MS. JOHNSON:  Object to form.



1           THE WITNESS:  Which budget?

2       Q   BY MS. TAYLOE:  The State Appropriations Bill?

3       A   I have seen the State Appropriations Bill.

4           MS. TAYLOE:  Okay.  I'm going to ask to have HB

5   911 marked as Exhibit 584.

6           (Plaintiff's Exhibit 584 was marked for

7   identification.)

8       Q   BY MS. TAYLOE:  Can you see it on your screen?

9       A   I can see it.

10      Q   Okay.  Do you have control?

11      A   Yes, I think so.  It's not moving.  Hold on one

12  second.

13          Okay.  Yes.

14      Q   Okay.  So this is a really, really long

15  document.

16      A   Yes.

17      Q   This is a good one to have electronically.  I

18  want to see if you can turn to page 61.  If you can

19  search, it would be easier to search, but you are looking

20  for Section 24.

21      A   Okay.  Yes, I'm there.

22      Q   Okay.  And do you recognize this as the HB 90

23  -- 911 is the appropriations bill for the fiscal school

24  year -- I'm sorry, the fiscal year '22/'23?

25      A   Yes.



1       Q    Okay.  Do you see the entry in line 1813 for

2    total funds is 12 million, 800 -- I'm sorry,

3    $12,825,676,638?

4       A    Yes.

5       Q    Is that the total amount of appropriations for

6    the special education department?

7       A    I don't know.

8       Q    For the Department of Education generally?

9            MS. JOHNSON:  Object to form.

10           THE WITNESS:  I don't know.

11      Q    BY MS. TAYLOE:  Okay.  Let's go a few -- you

12   see right underneath the line 1820, it says, "The formula

13   calculation for Quality Basic Education funding assumes a

14   base unit cost," and it has a number there?

15      A    Yeah.

16      Q    Are you familiar with that?

17      A    I'm -- what do you mean by "familiar"?

18      Q    With the base unit cost concept?

19      A    The concept, yes.

20      Q    What is the base unit cost?

21      A    That is a per pupil on cost based on a 9th

22   grader, typical 9th grader, 9th grade student.

23      Q    And is that the base that is multiplied by

24   different variables depending upon different factors,

25   like level of school and special needs and things like

 1   that?

 2       A   That's correct, to my understanding.

 3       Q   Okay.  Do you know who sets the base unit cost?

 4       A   I do not.

 5       Q   Okay.  And -- and you said before you don't

 6   know how the QBE is funded by FTE.  Do you know who does

 7   know that?

 8       A   I don't know who knows -- who does it.

 9       Q   Okay.  All right.  Let's go a few more -- well,

10   in my case, pages.  If you can scroll down to section

11   24.8.

12       A   Do you know what page number?

13       Q   Well, it's right below line 1918.

14       A   I went way too far.

15       Q   I actually want to start a little before that

16   anyway.  If you can go to line 1913.

17       A   Okay.  I see it.

18       Q   Okay.  So 24.7.  24.7 section is "Federal

19   Programs," correct?

20       A   It says that, yes.

21       Q   Do you see the number of total funds in line

22   1913 is $1,195,922,003?

23       A   Yes.

24       Q   Is that the amount for special education

25   funding, or is it federal programs that includes things



1   beyond special education?

2          MS. JOHNSON:  Object to form.

3          THE WITNESS:  I don't know.

4     Q    BY MS. TAYLOE:  Okay.  This is the -- the

5   Education -- Department of Education part of the bill,

6   and the federal program is part of this -- of the

7   Education bill.  So would this be money that would be

8   handled by your division?

9          MS. JOHNSON:  Object to form.

10         THE WITNESS:  I'm not sure.  It could be.  I

11  don't interface with this document very much.

12    Q    BY MS. TAYLOE:  Okay.  And then below that

13  where it says 24.8 is the start for the Georgia -- the

14  GNETS program?

15    A    Yeah.

16    Q    Okay.  And in line 1919, it has total funds of

17  $65,427,745; is that correct?

18    A    Repeat the total again.

19    Q    65,427,745.

20    A    Yes, that's correct.

21    Q    Okay.  Can you read the section that says

22  "Purpose" right under 24.8?

23    A    Yes.

24    Q    Please.

25    A    "The purpose of this appropriation is to fund



 1  the Georgia Network for Educational and Therapeutic

 2  Support (GNETS), which provides services, education, and

 3  resources for students ages 3 to 21 with autism or severe

 4  emotional behavioral problems and their families."

 5      Q   Is that, to your understanding, an accurate

 6  description of the GNETS program?

 7          MS. JOHNSON:  Object to form.

 8          You can answer.

 9          THE WITNESS:  It seems to be a broad statement

10  of what GNETS does.

11      Q   BY MS. TAYLOE:  Is your understanding that

12  GNETS continues to serve people age 3 to 21?

13      A   I believe that -- no, I do not believe that

14  GNETS continues to serve ages 3 to 21.

15      Q   What ages do you think it serves?

16      A   I don't recall, but I believe we changed that a

17  few years ago to 5 or 6.

18      Q   Okay.  And when you say "we," who is "we"?

19      A   The Georgia Department of Education.

20      Q   Okay.  And does it serve students with autism

21  or severe emotional behavioral problems?

22          MS. JOHNSON:  Object to form.

23          THE WITNESS:  I don't know.

24      Q   BY MS. TAYLOE:  Okay.  And that's -- that's

25  what's -- sorry.  And what about "and their families"?



1            MS. JOHNSON:  Object to form.

2       Q   BY MS. TAYLOE:  Does the GNETS program also

3   serve their families?

4            MS. JOHNSON:  Object to form.

5            THE WITNESS:  I -- what do you mean by "serve"?

6       Q   BY MS. TAYLOE:  I'm just -- that isn't the

7   purpose of this appropriation is for that, so I'm

8   wondering if that's, in your experience, what the funding

9   is going for?

10      A   It says, "Provides services, education, and

11  resources," and it has been my experience that they do

12  provide services, education, or resources for students

13  and their families.

14      Q   Okay.  And then if you can look at line 1932,

15  please.

16      A   Okay.  I'm doing it slowly --

17      Q   Yeah.

18      A   -- so I don't pass it.

19      Q   Do you see there's a line item there that

20  discusses transferring the funds from the GNETS program

21  to the QBE program, but it has a zero funding level

22  attached to it, or zero --

23      A   Yeah, I see that.

24      Q   Do you understand what this entry means?

25      A   I don't understand what this entry means.



1     Q   Had you -- were you aware of any discussions to
2   restructure the way the GNETS program was funded?
3     A   I'm aware that there were discussions, but I
4   wasn't involved in them.
5     Q   What was your understanding of the proposal?
6     A   My understanding of the proposal, the way I
7   found out, was through stakeholders that called me to
8   say, do I understand the proposal?  Which the answer was,
9   no, I don't know anything about it.
10     Q   What do you mean by "stakeholders"?
11     A   Special ed directors, members from the Georgia
12   Council of Special Ed, G-CASE.  They thought that I would
13   know, and I did not.
14     Q   Okay.  And what was the -- so do you have any
15   understanding of what the substance of the proposal was?
16     A   I don't have any understanding of what the
17   substance of what the proposal was because I was not in
18   any of the discussion.  People who called to ask
19   questions feared that funding would be taken away, and I
20   had -- this is the first time that I'm even seeing this
21   in the bill because I don't interface with the
22   appropriations bill very much.
23     Q   So when people, stakeholders called expressing
24   concerns about funding being taken away, did you ask any
25   questions of anybody?



AMBER MCCOLLUM                                November 09, 2022
UNITED STATES vs STATE OF GEORGIA                           90

```
 1        A    Yes.

 2        Q    What -- who did you ask?

 3        A    I asked my director.

 4        Q    And what did she say?

 5        A    She doesn't know.

 6        Q    And did she ask anybody?

 7             MS. JOHNSON:  Object to form.

 8             THE WITNESS:  I don't know who she asked -- if

 9   she asked anybody.  I'm sorry.  I don't know.

10        Q    BY MS. TAYLOE:  That's okay.

11             So did you -- from any other source, did you

12   learn anything more about the proposal?

13        A    No.  I didn't learn anything more about the

14   proposal.

15        Q    What did you report back to the stakeholders?

16        A    That I didn't know.

17        Q    Okay.  And then in the line below that, 1933,

18   it says, "The Department of Education is directed to

19   evaluate, in consultation with stakeholders, the Georgia

20   Network for Educational and Therapeutic Support (GNETS)

21   program to provide strategic statutory recommendations

22   and funding formula updates to the Office of Planning and

23   Budget, the House Budget and Research Office, and the

24   Senate Budget and Evaluation Office by November 1st,

25   2022."
```



1              Do you see that?

2       A    I see it.

3       Q    Are you aware of any actions taken in

4   connection with that instruction?

5       A    I'm not directly aware of any of this.  I was

6   asked if I have consulted with anyone, and I said no, I

7   have not.

8       Q    Who asked you that?

9       A    Geronald Bell.

10      Q    And are you aware of any steps taken to prepare

11  a responsive evaluation?

12      A    After Geronald Bell asked, I asked my director,

13  and she said that would be handled -- it was her

14  understanding that it would be handled by the policy

15  division, and so she did not know anything else about it.

16      Q    The policy division is a division of GaDOE?

17      A    Yes.

18      Q    And did anyone from the policy division reach

19  out to you --

20      A    No.

21      Q    -- about this?

22      A    No.

23      Q    Anyone in your division, as far as you are

24  aware?

25      A    No.  No one reached out to me.



1      Q   I'm sorry, did anyone in the policy division

2   reach out to anyone else in your division that you're

3   aware of?

4      A   I'm not aware of if they did.

5      Q   Okay.  So we read before that the total funding

6   there for this school year is $65 million, which is close

7   to what you -- consistently what you said before.

8      A   Correct.

9      Q   Does this refresh your recollection as to

10   whether that amount is kind of consistent or has it

11   changed over time?

12      A   Can I scroll back up?

13      Q   Uh-huh.

14      A   I think it's lower than it has been in the

15   past.

16      Q   And why do you think that is?

17          MS. JOHNSON:  Object to form.

18          THE WITNESS:  I don't do the calculation, so I

19   don't know.

20      Q   BY MS. TAYLOE:  Let's take a look at line 1930.

21      A   Okay.

22      Q   Do you see that?  Okay.  It says, "Reduce

23   formula funds for enrollment and training and experience

24   decline."

25          Can you explain that?



1        A   I can't explain it other than what it says.  I

2   mean, I feel like I understand what that's saying.

3        Q   Okay.  What do you understand that to be

4   saying?  I'm not -- just to get it on the record.

5        A   Sure.  "Reduce formula funds for enrollment and

6   training and experience decline."  To me, that says that

7   enrollment would have gone down.  And training and

8   experience, the number of teachers reported for T&E, or

9   training and experience, would have declined.

10       Q   Are you familiar with the T&E component of

11   salaries?

12       A   I -- I think I have a basic understanding of

13   what it is.

14       Q   And what is that?

15       A   T&E is based on the number of years in -- that

16   you have in education and based on the higher degree.

17   It's based on your degree status or professional degrees

18   that you have.  They go into that calculation.

19       Q   Okay.  So this entry suggests that due to lower

20   number of students enrolled in GNETS and less-experienced

21   or lower-degreed teachers results in a decline in the

22   funding there?

23            MS. JOHNSON:  Object to form.

24            THE WITNESS:  It would suggest that.  That

25   would be what I would think it would mean.



1          When special education directors talk to me

2    about training and experience in overall state funds and

3    not about GNETS funds, we talk to them about this

4    periodically, because we have to -- whether it's state

5    funds or whether it's IDEA funds, if someone is trying to

6    decrease their maintenance of effort that they need for

7    IDEA funds, one of the ways that they can do that is if

8    they've -- if a teacher has retired and another teacher

9    comes in with a lower degree or brand-new fresh out of

10   college, then they could, you know, offset those

11   expenditures from the retired teacher with a retired

12   salary may be making to what the new teacher would be

13   making.

14          So when I talk to people about training and

15   experience, it's not my experience that -- or my

16   professional judgment that training and experience is

17   necessarily sub training, but it just means that it could

18   be someone out of college that's going into this

19   calculation versus someone who just retired with higher

20   degrees.

21       Q   BY MS. TAYLOE:  Can you explain -- you

22   mentioned the maintenance of effort in offsetting.  Can

23   you explain that, please?

24       A   Maintenance of effort for LEAs, basically, the

25   IDEA -- there are two supplanting tests for IDEA, and



1    it's maintenance of effort and excess cost.  And so the

2    maintenance of effort is basically maintaining your state

3    and local effort for students with disabilities, and

4    you -- and LEAs would want to maintain that effort to be

5    eligible to receive IDEA funding.

6        Q    So how does that play out if you have a

7    experienced teacher leaving and you were saying

8    offsetting something?

9        A    Yes.  So if you had -- let's say you had five

10   special education teachers that worked in your district,

11   and three of those special education teachers were

12   retiring and their salary and benefits were a hundred

13   thousand dollars, and you hired three new teachers and

14   their salary and benefits were $75,000, you wouldn't be

15   lowering services for special education students; you

16   would simply be offsetting those costs.

17        So the teacher would still be credentialed.

18   The teacher would still be able to provide those services

19   and could effectively manage that classroom, but you

20   would be able to lower your effort or the maintenance of

21   effort because you are still having five teachers, you

22   know, but they just don't cost as much.  So then we

23   wouldn't expect you to be paying as much for special

24   education services.

25        And, I mean, I don't have a lot of experience



 1   with training and experience as it involves QBE or FTE,

 2   but I have conversations with people about their

 3   maintenance of effort and, you know, training and

 4   experience in -- in that manner.  So my professional

 5   judgment, even though there's a decline there, it

 6   wouldn't suggest to me that the credentialed special

 7   education teacher wasn't there.  It would just --

 8   perhaps, could be a new teacher.

 9       Q   Do you have -- in the GNETS context in

10   particular -- and I appreciate, that was -- that was

11   helpful.  That was not in the GNETS context.

12           In the GNETS context, how does -- does a

13   decline in T&E affect the funding of a GNETS program?

14           MS. JOHNSON:  Object to form.

15           THE WITNESS:  This document suggests that it

16   does, yes, but I don't do the calculation for GNETS, so I

17   don't know for sure.

18       Q   BY MS. TAYLOE:  And in the budgets that you've

19   reviewed for GNETS programs, how does T&E affect funding

20   there?

21       A   When they're -- they're sending a budget,

22   they're just telling us at that point what they're

23   funding out of that budget, so it could be salaries or

24   positions.  They don't talk about T&E within the budgets

25   that we're reviewing.



1      Q   Okay.  That's right.  Because you are reviewing
2  the budgets that they are sending in, not the allocations
3  that are going out?
4      A   That's correct.
5      Q   Okay.  And then one last question on this
6  section.  Line 1931, "Increase funds to offset the
7  austerity reduction for GNETS grants," could you explain
8  that?
9      A   I can't explain it.
10      Q   Were there austerity reductions across the
11  special education budget any years?
12      A   I -- it's been my experience that there's been
13  an austerity reduction every year in the GNETS
14  calculations.
15      Q   What is an austerity reduction?
16      A   I'm not sure.
17      Q   Okay.  I want to back up for a second to the
18  question I asked you earlier about the line 1933, about
19  the evaluation.  Has that instruction been included in
20  previous bills that you're aware of?
21      A   I have not seen all of the appropriation bills,
22  so I wouldn't know.
23      Q   When -- I think you said your director reached
24  out to you about -- yeah, I'm sorry, Geronald Bell asked
25  you if you consulted with anyone about it.  When was



1    that?  Was that recently?

2        A    Yes.

3        Q    Okay.  So you think it was in connection with

4    this bill?

5             MS. JOHNSON:  Object to form.

6             THE WITNESS:  I believe that it was.

7        Q    BY MS. TAYLOE:  And he had never asked you a

8    question like that before?

9        A    He had never asked me a question like that

10   before.

11       Q    Okay.  Okay.  So I think we're -- I'm going to

12   stop sharing this.  I am done with that.

13            Okay.  So I wanted to learn more about after

14   the budget has been set, how the allocations are made,

15   but I feel like I'm -- I'm asking you questions that are

16   not in your realm, so I'm going to try to streamline this

17   a little bit.

18            Oh, you mentioned before about GLRS.  Could you

19   tell me what that is, please.

20       A    We do use a lot of acronyms.  Georgia Learning

21   Resource Services, I think.

22       Q    Okay.  And what do -- what does that group,

23   organization do?

24       A    Sure.  They provide technical assistance and

25   professional development across the state of Georgia.



1        Q    To whom?

2        A    To LEAs and teachers.

3        Q    And are they specifically with special

4    education services or are they all kinds of?

5        A    They are specifically with special education

6    services.

7        Q    Okay.  And so they are funded through a grant,

8    you said?

9        A    They are funded through contracts.

10       Q    Contracts.  With the state?

11       A    With the state, uh-huh.

12       Q    What is their involvement, if any, with GNETS

13   programs within their regions?

14       A    I am not sure what -- how -- to what extent

15   GLRS is involved with GNETS.  What I do know is that we

16   have collaborative community meetings with GLRS, and the

17   GNETS directors are invited.  So GNETS directors would

18   have every available resource and opportunity that any

19   special education director has in the state of Georgia,

20   and that would include access to GLRS services and

21   resources.

22       Q    And who -- you said collaborative community

23   meetings?

24       A    Yes.  So there are collaborative community

25   meetings where the GLRS holds community meetings with



1  their special education directors as part of ongoing T&E

2  and professional development, and GNETS directors would

3  be included in that, for the regions.  It's a

4  regional-based thing.

5       Q   So GNETS directors are invited to attend the

6  meetings with the special ed directors?

7       A   Yes.

8       Q   Okay.  Is that the same as an LEA

9  collaborative?

10          MS. JOHNSON:  Object to form.

11          THE WITNESS:  It could be.  I'm not sure.

12      Q   BY MS. TAYLOE:  Okay.  I have a document later.

13  When we reach there --

14      A   Okay.

15      Q   -- I will ask.

16          Why don't -- let's go off the record.

17          THE VIDEOGRAPHER:  Off the record at 12:01 p.m.

18          (The deposition was at recess from 12:01 p.m.

19  to 12:41 p.m.)

20          THE VIDEOGRAPHER:  Back on the record at 12:41

21  p.m.

22      Q   BY MS. TAYLOE:  Hi.

23      A   Hi.

24      Q   So can you just confirm that you have control

25  of the document that my colleague has shared?



1        A    Huh-uh.  No.  I can see it, but I don't have

2   control of it.  I can tell it's like a screenshot versus

3   like I can't do the...

4        Q    Well, while Sandra is working on giving you

5   control, let me mark this as Exhibit 585.

6             (Plaintiff's Exhibit 585 was marked for

7   identification.)

8        Q    BY MS. TAYLOE:  And it is document Bates

9   stamped GA04957978.  And this is an e-mail, a June 2018

10  -- I'm sorry, 2018 e-mail to you, Vickie Cleveland -- let

11  me make sure I have the right one.  I'm sorry.

12            MS. TAYLOE:  Can we go off the record.  I'm

13  sorry.

14            THE VIDEOGRAPHER:  Off the record at 12:42 p.m.

15            (The deposition was at recess from 12:42 p.m.

16  to 12:47 p.m.)

17            THE VIDEOGRAPHER:  Back on the record at

18  12:47 p.m.

19        Q    BY MS. TAYLOE:  Okay.  So we've got a temporary

20  workaround for the document sharing, and the witness has

21  before her Exhibit 585 and is going to indicate when she

22  wants to scroll up or down or zoom or whatever to be able

23  to review it.

24            I'm not sure what's showing on your screen.

25  Can you see that it's a June 20 -- June 2018 e-mail?



 1        A    Yes.

 2        Q    And it's to you, Vickie Cleveland, and Jacqie

 3   Neal?

 4        A    No.   It's to Denise Peterson.

 5             MS. JOHNSON:   It's "Karen Flowers," is the

 6   e-mail subject line.

 7             MS. TAYLOE:   Oh, gosh.   I told you the --

 8             Okay.   Can we go off the record?

 9             THE VIDEOGRAPHER:   Off the record at 12:48 p.m.

10             (The deposition was at recess from 12:48 p.m.

11   to 12:49 p.m.)

12             THE VIDEOGRAPHER:   Back on the record at 12:49

13   p.m.

14        Q    BY MS. TAYLOE:   Okay.   Sorry about that.

15             Can you now see the document we have up is a

16   June 2018 e-mail to you, Jacqie Neal, and Vickie

17   Cleveland?

18        A    Yes.

19        Q    Who is Jacqie Neal?

20        A    I believe she was a GNETS director.

21        Q    Okay.   And who is -- and it's from Fran

22   Whitfield; is that correct?

23        A    It's from Fran Whitfield, yes.

24        Q    Do you know who that is?

25        A    I believe she's a special ed director.



1     Q    Okay.  And can you tell me what this e-mail is

2   about?  And you can direct -- ask Sandra to scroll up if

3   you need some more.

4     A    Yes, could she scroll down.  That's it.  That's

5   good.  Okay.

6     Q    What is the e-mail about?

7     A    It's about her GNETS grant application.  It

8   looks to be an e-mail that's just explaining that she's

9   uploaded documents that were needed, any Assurances.

10    Q    So is June the time of the year that

11  applications are generally due?

12    A    Yes.

13    Q    And are they normally e-mailed to you?

14    A    No.

15    Q    How are they normally submitted?

16    A    They are submitted through the consolidated

17  application.

18    Q    Is that a -- a mechanism or a --

19    A    It's -- yes, it's a online grant application

20  platform that the DOE, Georgia Department of Education,

21  created to intake grant applications.

22    Q    Is that similar to or the same thing as what's

23  sometimes referred to as the portal?

24    A    It's within the portal.

25    Q    It's within the portal?



1        A    Uh-huh.

2        Q    Sub entities in the portal?

3        A    Yes.  That's correct.

4        Q    Okay.  And do you know why she e-mailed these

5   to you?

6        A    I do not know why she e-mailed -- would e-mail

7   these to me.

8        Q    Okay.  Can you explain -- she's mentioned that

9   she attached a bunch of documents.  Could you tell us

10  what the attachments are called?

11       A    The e-mail states that they are called the

12  GNETS grant application, the GNETS crisis management

13  plan, the restraint plan, the fire and tornado plans, and

14  emergency management plan.  And then she says she will

15  upload the GNETS Assurances.

16       Q    Okay.  Are all these part of the GNETS grant

17  application?

18       A    I -- I can't say that -- what's required in

19  totality, because my team and myself back in the day, we

20  only were concerned about the budget.  So, for instance,

21  I did not review the GNETS crisis management plan or the

22  restraint plan or the fire and tornado or the emergency

23  management plan.  My -- my role and my team's role was

24  strictly the funds.

25       Q    Okay.  So did you review any portions that she



1  submitted?

2      A   I can't recall if I reviewed any of those

3  things, but I probably wouldn't have because most of that

4  does not fall within my purview, except for the funding

5  portion.  So everything I review or my team reviews is

6  online.  So there -- there would have been really no need

7  for her to copy me to this e-mail.

8      Q   And you said the part you did review would be

9  the funding portion.  Where would that be found?

10     A   In the consolidated grant application that we

11  have with the DOE.

12     Q   So not in the grant application that she

13  attached here but in the portal, the consolidated

14  application?

15     A   That's correct.

16     Q   There.  Okay.

17         And then she also mentions -- I am going to

18  need you to scroll down.  There's an indirect cost letter

19  and the budget?

20     A   Uh-huh.  I see that.

21     Q   Are -- are those also part of the GNETS grant

22  application?

23     A   It -- possibly.  So this would have been

24  outside the scope of -- of what my -- my role is, really,

25  for -- to be receiving an e-mail like this.  So I was



1  never involved in the programmatic sense of GNETS grant

2  applications.  We really just looked at the funding and

3  reviewed things for allowability, sometimes like indirect

4  costs and things like that.  But we review all of those

5  online, so I think this was an over -- just to be sure on

6  her part, probably, to include me on this.

7       Q   Okay.  But the indirect cost letter and the

8  budget would fall outside the scope of your review?

9       A   I would review the budget but not in any

10  attachment.  Our formal sign-off application is online,

11  so this would not be considered a formal sign-off for me.

12       Q   Okay.

13       A   We have an audit trail that shows that all the

14  appropriate people have signed off, and so this would not

15  be formal for me.  It may have been for other people.

16       Q   Do you know if there is any step in between --

17  like when you are looking at the budget information

18  online, are you looking at the way it was submitted, or

19  is there some kind of consolidation or organization that

20  that's what you are looking at?

21           MS. JOHNSON:  Object to form.

22           THE WITNESS:  What do you mean by

23  "consolidation or organization"?

24       Q   BY MS. TAYLOE:  Do you think you're looking at

25  the same document just online or is it somehow processed



1    or organized before you see it?

2        A    Okay.  Yes.  It -- it definitely is processed

3    or organized before I see it.

4        Q    Okay.  What does that process entail?

5        A    I don't know all of it because I'm not involved

6    in it, but I do know that when I was hired, the -- the

7    totality of the GNETS program used to be managed by the

8    person who came before me, Harry Repsher, and Sandra

9    DeMuth.  And then when I became on board as a research

10   specialist, the then director at the time, Debbie Gay,

11   said, you won't really be reviewing anything that has to

12   do with GNETS applications other than the funding part.

13        So I do know that there's a process.  And

14   occasionally GNETS directors would say, hey, this was

15   part of our allocation document or our, you know, budget

16   that we needed approved -- approved -- approval for, and

17   I -- and Sandy DeMuth would always tell me, I've

18   approved it, you know, and now they're ready for the

19   budget.  And my role was strictly reviewing the budget

20   once it's in the consolidated application.

21        Q    I see.  So it was your understanding that

22   Harold Repsher and Sandy DeMuth used to look at more

23   parts of it, and then you are only looking at the budget

24   parts, or was somebody else?  I wasn't sure what you are

25   were saying changed when Sandy DeMuth left?



1       A    Yeah, I'm not sure what -- what each one of

2   them did.  I think they worked maybe in conjunction, or

3   maybe they didn't.  But Sandy DeMuth was the GNETS

4   contact at the time, so she would be in close contact

5   with Harry.  And all I know is from the training that I

6   received from Harry was that, hey, Sandy will, you know,

7   let you know if she has any questions, and then this will

8   be the part you're handling.

9           And then at some point, you know, as I was

10  learning my job, I was trying to figure out what do I

11  need to review, and Debbie was like, this is not your

12  role.  You are just reviewing what comes into the budget,

13  so...

14      Q    So does somebody take the applications and put

15  it into a form for you?  Or I'm still trying to figure

16  out what's different from what's submitted and what you

17  are reviewing.

18      A    I don't know all of the procedures that happen

19  before it gets to me, but when it gets to me, it is a --

20  it's not necessarily a form.  The consolidated

21  application is -- I don't know how to describe it.  So

22  basically, you can pick the grant that you are receiving

23  in the consolidated application and say, you know, I want

24  to manage this grant, if you are the user.  And then you

25  would type in what you want to spend in the grant, and it



 1   will automatically populate based on the allocations that

 2   were approved by the State Board.  You are receiving

 3   $50,000, and so then you would budget that $50,000 based

 4   on function codes and object codes and a description.

 5          And so that is what I would be reviewing,

 6   specifically what's in the budget, what they are spending

 7   their money on.  And it's not a separate attachment or a

 8   separate form.

 9      Q    That's very helpful.  Okay.  I understand that

10   now.  Thank you.

11      A    Uh-huh.  Yes.

12          MS. TAYLOE:  Okay.  Sandra, could you share tab

13   29, please.

14      Q    BY MS. TAYLOE:  And let me know when it's up.

15      A    It's up.

16          MS. TAYLOE:  And I'd like to mark as Exhibit

17   586 a document Bates stamped GA00031045.

18          (Plaintiff's Exhibit 586 was marked for

19   identification.)

20      Q    BY MS. TAYLOE:  And are you familiar with this

21   type of document, Ms. McCollum?

22      A    Yes.  This is the consolidated application.

23      Q    Okay.  That's what I thought.  Okay.  And so

24   earlier when you said you review the budget portion of

25   the application and it comes to you, is this the format



1  it comes in?

2      A   It comes in this format, but this I can tell

3  was printed off of the online budget.  And it comes to me

4  online.  It doesn't come to me in a -- in a document like

5  this.  This is an attachment.  The application allows you

6  to print off the budget, and so it looks like someone has

7  printed this budget off.

8      Q   Okay.

9      A   From the application.

10     Q   So these are the fields and the kinds of

11 entries --

12     A   Yes.

13     Q   -- and things that you see when you review it?

14     A   This is exactly what we see.

15     Q   Okay.  Do you know who prepares this?

16     A   No.  It -- no, I don't.

17     Q   So somehow between what's submitted, whether by

18 a person or a program, is generated -- generates a form

19 like -- or a field view like this?

20     A   That's correct.  I -- when you say do I know

21 who prepares it, I don't know who prepared this specific

22 thing.  There's an audit trail that says who entered this

23 information and signed off.  I don't know who told that

24 person anything, but there is an audit trail, so --

25     Q   Okay.



1          A    -- I would know.

2          Q    And is that audit trail you are referring to,

3    is that what shows at the top where it says, for

4    instance, "superintendent signed off"?

5          A    Yeah, that's the final status, but there's a

6    separate tab for an audit trail that shows who signed off

7    and when they signed off.

8          Q    Okay.  So does the fact that this says

9    "superintendent signed off" mean this is -- what does

10   that tell us about where it is in the process?

11         A    It would say that the -- that the

12   coordinator -- and when I say coordinator, I'm talking

13   about a term only in the consolidated application.  They

14   could be anybody.  It could be a -- whoever has been

15   granted access to enter it.  So it could be a special ed

16   director.  It could be a budget person that they've

17   dedicated to do this.  But when I see this status, I know

18   that whoever is in the coordinator role would have signed

19   off, and then whoever is in the superintendent role would

20   have signed off, and then it's ready for a program

21   manager sign-off role.

22         Q    And then after the program manager sign off,

23   are there further reviews?

24         A    Yes.  It goes to -- at this point, it went to

25   grants accounting in the Georgia Department of Ed.



1      Q    Okay.

2      A    So there is two sign-offs in the Georgia

3   Department of Ed.

4      Q    Okay.  Is that it in terms of reviews?  And

5   after that, the money is available -- it's been fully

6   allocated?

7           MS. JOHNSON:  Object to form.

8           THE WITNESS:  It is available for drawdown if

9   there has not been a revision on it.  So there is still

10  additional approvals that would go once you go to

11  drawdown funds, and that's handled in grants accounting.

12     Q    BY MS. TAYLOE:  Okay.  Is grants accounting not

13  your division?

14     A    No.  I know.

15     Q    Just when I thought I understood.

16          Okay.  In this document, it has a number for

17  allocation, total grant award, and total budgeted funds

18  for this fiscal year that are all the same number.

19     A    Uh-huh.

20     Q    Can you explain what each of those means and

21  what might make them different in some -- in some cases?

22     A    Yes, I can.  So the allocation is the

23  allocation that they have received.  It's like the

24  original allocation.

25          Okay.  The total grant award would be the



1    original allocation -- which maybe I should say original

2    allocation -- plus any additional allocations that

3    they've received, plus any carryover that they had from

4    the prior year.  The total grant award would be the sum

5    of those top three columns.

6          And then the total budgeted funds for the

7    fiscal year would be what you've budgeted down below in

8    those budget details that you see down below.  So, for

9    instance, if you budgeted only 1.5 million, then you

10   would see the other 377,000 over there on that column

11   where it says, "Not Budgeted Funds."

12         So basically, the total budgeted funds are just

13   a check between what have you done in this budget so far,

14   what have you budgeted so far.  Because, for instance,

15   you could budget a million dollars and save it and come

16   back later and budget the rest.  And so at -- it would

17   change back and forth between what you have budgeted and

18   what you have not budgeted.

19      Q   So not budgeted funds, would they be available

20   later in the year for spending on something that was not

21   in the original budget?

22      A   If anyone sent us a budget that was not

23   budgeted, we would send it back for revision.  So they

24   would need to budget all of the funds to get final

25   approval from my team.



1    Q   So was your example if you budgeted a million

2   and had the rest in not budgeted funds, that was a

3   hypothetical because that would not be approved?

4    A   If they did that and sent it through, at one

5   point there was a check that prevented them from doing

6   that; and then it was upgraded, and for a small period of

7   time they could send us a budget that was not fully

8   budgeted.  And we would say, no, you need to budget all

9   of the funds.

10        So the total budgeted funds for the fiscal year

11   and the not budgeted funds for the fiscal year is really

12   a tool for the user to determine, have I budgeted all the

13   funds yet that are available to me?  So it's more just a

14   check like you would have in an application to say, hey,

15   you're not done.  You still have this much left to

16   budget.

17        We wouldn't approve it if there were funds not

18   budgeted and if we caught it.

19    Q   And what time of year would this process be

20   happening?

21    A   It -- it generally starts July 1st, and then

22   they have until October 1st to submit the budget to us.

23   But they can still use the funds even back to July 1st,

24   as long as it's something that we've approved and then

25   it's allowable.



1        Q    Okay.  So they'd have to know by October 1st
2    how they are going to spend all the money for the year?
3        A    Yes.  They could have known long before that.
4    This is just the final document we get for the final
5    checks.  They could have known in the spring.
6        Q    Right.  But if some need arose midyear, they
7    wouldn't have budgeted for that?
8        A    They could -- you can do an amendment at any
9    time.  So if, for instance, they had something in
10   December that they needed, they can amend the budget.
11   And we encouraged them to do that so that we can see
12   what's coming through.
13       Q    And would an amendment mean transferring money
14   from one account to another, or could it mean adding
15   money?
16       A    An amendment is just a change to the budget, so
17   it could be a number of things.  For example, if you
18   received your carryover funds, you would do an amendment
19   to budget the carryover funds.  If you wanted to change
20   anything in the budget, for instance, if you had budgeted
21   for nine teachers but you ended up hiring ten teachers,
22   ten teachers and nine paras, so you could say, I need to
23   do an amendment because we're -- we have hired more
24   teachers than we thought.  So they would do an amendment,
25   and it would go back through the approval process.



1        Q    How would they -- if they hired a teacher

2   beyond what they budgeted for, how would that new teacher

3   be funded if it exceeded the originally allocated amount?

4             MS. JOHNSON:   Objection.

5             You can answer.

6             THE WITNESS:   I'm sorry, that was just a

7   hypothetical to tell you how the budget process works.

8   So they are not going to -- they're not going to be

9   allowed to budget more than they've been given in the

10  consolidated application.

11       Q    BY MS. TAYLOE:   So an amendment would mean

12  transferring it from one budgeted purpose to the new

13  budgeted purpose?

14       A    Yes.  Or if we gave them an additional

15  allocation, then it could also mean you are going to now

16  do an amendment to add in these new funds, or if -- and

17  every year, typically, most get carryover -- I won't say

18  that.  If you have carryover funds from the prior year,

19  then you would receive your carryover, and then you

20  would -- after -- after you do a completion report from

21  the prior year, you would receive carryover funds, and

22  then you would want to do another amendment.

23            I'm sorry, I feel like I've just described a

24  really complicated process.

25       Q    So even though there is a space for a carryover



1    in this budget, the carryover funds wouldn't necessarily

2    appear until later, and that would be a subject of

3    amendment?

4        A    Yes.

5        Q    Can you -- can you just describe the carryover

6    process now, like how much you are allowed to carry over

7    and what restrictions, if any, are on that?

8        A    You -- in GNETS, you may carry over all of

9    the -- all of the GNETS funding.

10       Q    State and federal?

11       A    Oh, not state.  I'm sorry.  No, you may not

12   carry over state funding.  No -- no grants that we

13   supervise, to my knowledge, you can carry over state

14   funding.

15       Q    Okay.

16       A    Because it's a specific fiscal year.

17       Q    Is there any limit to the amount of federal

18   funding that can be carried over?

19       A    For what year?

20       Q    Does it vary by year?

21       A    At one point there was a limit to how much

22   federal funding we allowed GNETS to carry over, and it

23   was limited to 25 percent.

24       Q    And that's no longer the rule?

25       A    That's no longer the rule.



1        Q   When did that change?

2        A   I can't -- don't recall.

3        Q   Again, recently or long ago?

4        A   I would think -- I mean several -- it's a few

5   years ago.

6        Q   Do you know who changed that rule?

7        A   I do not recall.

8        Q   Was it due to a change in federal carryover

9   rules or did Georgia change the -- its rules?

10       A   No.  It was -- I don't know.  Georgia made the

11  decision, but I -- I don't know the reason why.

12           I do know the reason why that the 25 percent

13  was in there in the first place, and that was to make

14  sure that all the funds were spent in a timely manner and

15  so that we could budget appropriately for how much to

16  spend the next year.  But no, I don't know who made the

17  decision.

18       Q   Okay.  Okay.  Can you -- I'm going to ask you

19  to scroll through the document, but I know that's hard

20  now with Sandra doing that for you.  But can you guide

21  Sandra to scrolling through the document for you and

22  identify which expenses are for therapeutic services?

23       A   Okay.  Sandra, can you go back to the first

24  page?

25           MS. JOHNSON:  Would it be easier if we go off



 1  the record and switch it back?

 2          MS. TAYLOE:  That's what I was thinking about.

 3          MS. GARDNER WOMACK:  That's fine.

 4          MS. TAYLOE:  Okay.  We are off the record.

 5          THE VIDEOGRAPHER:  Off the record at 1:12 p.m.

 6          (The deposition was at recess from 1:12 p.m. to

 7  1:16 p.m.)

 8          THE VIDEOGRAPHER:  Back on the record at

 9  1:16 p.m.

10      Q    BY MS. TAYLOE:  Okay.  Do you have control of

11  the document?

12      A    Okay.  I believe so.

13      Q    Okay.  Could you scroll through, please, and

14  identify which expenses are for therapeutic services?

15          MS. JOHNSON:  I'm also going to object to form.

16          THE WITNESS:  I see a line in function, 2100,

17  and object, 361 for therapeutic services.

18          I see a line in 2100, 0191 for a program

19  specialist.  I don't know if that person would be able to

20  provide therapeutic services.  I don't know the roles of

21  some of these individuals.

22          So there's 2210, 191, GNETS coordinators, I

23  don't know if they provide therapeutic services, but it's

24  possible.

25          Okay.  That's all I see.  There -- therapeutic



 1  services could be embedded within other lines, but I'm
 2  not sure.
 3      Q    Okay.  Thank you.
 4           And the first one I think you mentioned, was
 5  that 361 object code?
 6      A    I believe that was the first one I mentioned,
 7  yes.
 8      Q    Okay.  And can you state the amount for that
 9  one?
10      A    47,500.
11      Q    Okay.  And then after the description, it has
12  in parentheses "DOE Grant."  Do you see that?
13      A    Uh-huh.  Yes.
14      Q    Can you explain why that's there?
15      A    No.
16      Q    Is all of this part of the GNETS grant?
17      A    Yes.
18      Q    So does that mean that this is a different kind
19  of grant?
20           MS. JOHNSON:  Object to form.
21           THE WITNESS:  I don't know.  It could be, but I
22  doubt it.  I mean, we're budgeting for this grant, so the
23  47,500 would have to be for this grant.
24      Q    BY MS. TAYLOE:  Okay.  And it says this is
25  to -- or what does "from LPC/LMSW Seat of Resilience



 1   Consulting and Counseling" mean?

 2            MS. JOHNSON:  Object to form.

 3            THE WITNESS:  I don't know what it means.

 4        Q    BY MS. TAYLOE:  Do GNETS -- do GNETS programs

 5   sometimes contract with outside providers?

 6        A    Yes.

 7        Q    Is that likely what this is, the consulting and

 8   counseling services --

 9            MS. JOHNSON:  Object.

10        Q    BY MS. TAYLOE:  -- provider?

11            MS. JOHNSON:  Object to form.

12            THE WITNESS:  I don't know what they are.  I

13   believe -- I haven't reviewed budgets in a while, so

14   I'm -- I'm shaky, but I believe all of the 300 object

15   codes are contractual services, so I would -- it would

16   lead me to believe that this would be a contract.

17            When we review budgets, we all -- we have the

18   function, object codes in front of us, so that would be

19   just based on old knowledge.

20        Q    BY MS. TAYLOE:  Okay.  So subject to your

21   observation that others may have therapeutic services

22   embedded within them, we know of 47,500 out of 1.8 --

23   almost $1.9 million for this program that is designated

24   for therapeutic services; is that correct?

25            MS. JOHNSON:  Object to form.



1            THE WITNESS:  I don't know what else is

2    embedded in anyone else's roles or any of that, so there

3    could be more therapeutic services, but I only see the

4    word "therapeutic" in that line item.

5        Q    BY MS. TAYLOE:  Okay.  Is there any requirement

6    when you do your review of this type of document that any

7    amount be designated for therapeutic services?

8        A    We don't make those kind of decisions, so I do

9    need to back up about the process.  We are here, the

10   budget team -- and I keep saying we, even though I'm no

11   longer a part of it.  I just supervise the manager of

12   that team.  We are here to say, does it look like the

13   activity that you are doing in this grant is allowable,

14   if it's a federal grant; and if it's a state grant, we

15   don't necessarily determine allowability.  We are just

16   looking to see if the function and object codes match

17   what they're, you know, trying to -- to pay for, and we

18   make sure that all of the funds are budgeted.

19           All of these costs are reviewed prior coming --

20   to coming to us, so they would be going to Vickie

21   Cleveland.  So if Vickie tells us that it's okay to

22   approve it, then we -- the budget unit would look at it

23   from a fiscal lens, not a -- because we know Vickie has

24   already, you know, approved it.

25       Q    So when you said all of these are reviewed



1   prior to coming to us, that -- that was what you were

2   talking about, that that's what Vickie is reviewing?

3        A   Yes, she's reviewing it.  The process could be

4   different, since I'm no longer in the unit on a

5   day-to-day basis, but when I was the manager of the unit,

6   I had the specialists that are reviewing budgets send a

7   copy to Vickie before we would ever approve it.  So she

8   would have to consent for approval before we would do our

9   fiscal lens, so...

10       Q   So that was how you did it when you were in the

11  position?

12       A   That's how I did it when I was in the position.

13  I assume it's going the same way, just because I

14  supervise Malissa, and Malissa has not requested a

15  change.  But, you know, I don't really want to assume,

16  but she reports to me, so...

17       Q   So before when you said there was a -- I forgot

18  what you called it, but upward line with a sign-off date,

19  the trail?

20       A   The audit trail.

21       Q   Audit trail.  So Vickie's sign-off is not an

22  approved stop on the audit trail but is something you

23  choose to loop in?

24       A   It's we choose to loop it in.  It's not a stop,

25  but that doesn't have anything to do with because it's



 1  not part of the procedure or not.  It's because this is

 2  an older application, and there's really only four roles

 3  that the application allows for approval.  You can give

 4  read-only rights, but we thought that it was very

 5  important that who -- the person over GNETS needed to

 6  review GNETS, and that began when Nakeba Rahming was

 7  hired.

 8      Q    And do you know what the -- is it up to Vickie

 9  what she reviews them for, or is there any guidance on

10  what she is supposed to be reviewing to make sure it was

11  included or anything like that?

12          MS. JOHNSON:  Object to form.

13          THE WITNESS:  I wouldn't know what guidance

14  Vickie has been given.

15      Q    BY MS. TAYLOE:  Okay.  Are you aware of funding

16  to train educational staff or coordinators of any

17  therapeutic services?

18      A    I am aware of a therapeutic grant that we sent

19  out for a number of years, but I'm only aware to the

20  extent that I review -- I generally give one of the final

21  approvals for board items before they go -- myself or the

22  director, whoever it is at the time, reviews all the

23  board items, so I -- I don't know specifically what the

24  grant would cover.

25      Q    Okay.  Okay.  Stop sharing.



1          Okay.  I'm going to turn now to the student

2  count for GNETS.

3          MS. TAYLOE:  I'd like to mark as Exhibit 587 a

4  document produced by the State of Georgia, Bates stamped

5  GA03806083.

6          (Plaintiff's Exhibit 587 was marked for

7  identification.)

8      Q   BY MS. TAYLOE:  Can you see it?

9      A   I see it.  Sorry.

10     Q   Okay.  And you see an August -- August 2016

11  e-mail from you to Geronald Bell?

12     A   August the 30th, I see -- yeah, 2016, yes.

13     Q   Okay.  Take a minute to review it, and then let

14  me know what --

15     A   Okay.

16     Q   -- it's about.

17     A   Okay.  I've read it.

18     Q   Okay.

19     A   Well, it's very long, actually, so let me go --

20  let me scroll further.  I thought it was -- are you just

21  talking about the 038?

22     Q   Yeah, just the e-mail for now.  There's an

23  attachment we will --

24     A   Okay.  Okay.  Now I can go back up.  I have

25  messed myself up.  Just give it a second.  I have read



1   the e-mail, so we will see if this...

2        Q   Catches up?

3        A   Catches up.

4        Q   So first, can you tell me why you were sending

5   this to Mr. Bell?

6        A   I'm not sure.  Let me see if I can get this

7   e-mail back in front of me to answer these questions.

8            Are you able to scroll back to the e-mail?  No,

9   it's not.  My Internet connection is unstable, it says.

10           MS. GARDNER WOMACK:  So you are not seeing this

11   (indicating)?

12           THE WITNESS:  Now I am seeing it.  Now I'm off.

13   It's gone.

14           MS. JOHNSON:  You don't see this document?

15           THE WITNESS:  Now I see it.  It was off.  Now

16   it's back.  Okay.

17           Okay.  Now could you repeat the question?

18        Q   BY MS. TAYLOE:  I was curious why you were

19   sending this to Mr. Bell?

20        A   I don't know why I was sending this to

21   Mr. Bell.  There may have been a longer e-mail chain.

22        Q   I mean, was he new?  I thought he would --

23   would he have not have known this in his -- in his

24   position already?

25           MS. JOHNSON:  Object to form.



1           THE WITNESS:  He was not new.  I don't know
2    what he would have -- he would have known or not.
3           Q   BY MS. TAYLOE:  Okay.  Why is the FTE count not
4    used for funding GNETS students as it is for other
5    students in Georgia?
6           A   Okay.  I don't make decisions about FTE.  I --
7    I don't know the answer to that.  I can only say that I
8    was -- there's an attachment, clearly, that I'm not
9    seeing, so I was commenting about that attachment.
10          Q   All right.  You said you didn't make that
11   decision.  Do you know who does decide things like that?
12          A   I don't know who decides things like that.
13          Will you ask me the first question you asked me
14   again?
15          Q   Why you were sending it to Mr. Bell.
16          A   Yeah.  I believe I was sending this to Mr. Bell
17   because of the second to the last sentence, "This
18   enrollment count is then used to calculate a three year
19   rolling average."
20          When I came onboard at the DOE, there -- I
21   understood there to be a three-year rolling average of
22   student counts, and I kind of inherited all of Harry's
23   files, so I did not have the same role that Harry did.  I
24   know Geronald's role was to calculate GNETS and things
25   like this, and so I would sometimes send him documents



1  that used to be Harry's.  So I was probably talking about

2  that.

3       Q    Okay.  And you said that you understood there

4  to be a three-year rolling average.  Did that change?

5       A    I believe there has been a change to it, but I

6  can't speak to what it was.

7       Q    What makes you think there's been a change?

8       A    Because we -- we discussed making a change to

9  the three-year rolling average.

10      Q    Who is "we"?

11      A    I discussed it several times to -- to many

12  people.  So I can't say who, but the -- I said I didn't

13  feel like that the three-year rolling average was a good

14  indicator of student count.

15      Q    Why did you not think it was a good indicator?

16      A    The -- I did not think it was a good indicator

17  because the three-year rolling average, from what I

18  understood to be at the time, which would be about 2014,

19  2015, 2016, maybe 2017, it was a -- it's hard to explain,

20  but it was a rolling, rolling average, which makes no

21  sense.  That terminology makes no sense.

22           But basically, there was a document that had a

23  rolling average, and then for some reason those averages

24  were then the three-year count.  And I believe I stated,

25  you are taking three years of averages instead of three



1  years of counts, you know.

2      Q   I do.

3      A   So um...

4      Q   So -- so you discussed this with several people

5  that you thought it didn't make sense, and you think

6  there's been a change?

7      A   I think there's been a change until this -- you

8  forget things until you read it, and yeah, right in front

9  of you, so I've forgotten about this rolling average.

10     Q   And do you --

11     A   Until now.

12     Q   -- think you would have received notice if the

13  average had been changed?

14     A   I don't think I would have received notice

15  because I'm not doing the calculation.

16     Q   All right.  Then what -- is there anything

17  besides the fact that you had discussions about it that

18  makes you think there was a change?

19     A   I had discussed this with, like I said,

20  multiple people, including Geronald Bell, and he agreed.

21  He has a fiscal background, and he agreed, the two of us

22  agreed that we didn't understand it.  So he said he would

23  talk to people about changing that, and that -- yeah.

24     Q   Okay.  Okay.  Then the attachment to that, now

25  that you've looked at it before but we didn't read then,



1    I'm going to ask you a few questions about that.

2         A    Okay.

3         Q    So if you want to scroll to -- well, first, I

4    will identify the attachment is -- it's on a Georgia

5    Department of Education letterhead.  It says, "FY2017

6    GNETS Program Frequently Asked Questions."

7         A    Okay.  And it's in -- it's in this string?

8         Q    It should be, yeah.

9         A    Okay.  No, it's not scrolling for me.

10             MS. GARDNER WOMACK:  Try it again.

11             THE WITNESS:  Now it's back to that cross.

12   There -- there it goes.  Are you doing it?

13             MS. GARDNER WOMACK:  I'm doing it.

14             THE WITNESS:  Okay.

15             MS. GARDNER WOMACK:  But I don't know why it's

16   not working on yours.

17             THE WITNESS:  Okay.  Yeah, I see it.

18        Q    BY MS. TAYLOE:  Okay.  Can we scroll down to

19   number 3?  Okay.  Do you see where it says, "GNETS

20   programs do not meet the definition of a 'school'"?

21        A    I see that.

22        Q    Okay.  And that they are defined as special

23   entities?

24        A    Yes.

25        Q    Okay.  Do you know why that is?



1        A    I do not.

2        Q    Do you know who decided that?

3        A    No, I do not.

4        Q    Does that have any implication for funding

5    decisions?

6             MS. JOHNSON:  Object to form.

7             THE WITNESS:  Not to my knowledge.

8        Q    BY MS. TAYLOE:  Do you think that might be why

9    the FTE formula doesn't apply there?

10            MS. JOHNSON:  Object to form.

11            THE WITNESS:  I don't know about the -- I don't

12   make decisions about the FTE formula, so I don't know.

13       Q    BY MS. TAYLOE:  I understand you don't make

14   decisions about it.  I'm just wondering if that's -- if

15   you think that's why they are not counted the same way as

16   children in schools?

17            MS. JOHNSON:  Object to form.

18            THE WITNESS:  No, I don't know why.

19       Q    BY MS. TAYLOE:  Okay.  All right.  And in

20   sections 1 and 2, do you want to read them real quick and

21   I will ask you a question about that?

22       A    Sure.

23       Q    You don't have to read them aloud, I'm sorry.

24   Just familiarize yourself with them.

25       A    Okay.



1      Q   So what -- what do these sections together mean
2  in terms of student count?
3          MS. JOHNSON:  Object to form.
4          THE WITNESS:  I don't know what they mean in
5  terms of student count, but reading the questions, they
6  are talking about if a system is a system of residence,
7  and I think they are trying to explain the count.  But I
8  don't -- I'm not sure.
9      Q   BY MS. TAYLOE:  So is a student counted for
10  educational purposes in that student's resident district
11  even if they are attending a GNETS program in a different
12  district?
13     A   I'm not sure.
14     Q   Okay.  Number 1 says, "The resident system of
15  the student" -- or the question is, "Who reports the
16  GNETS students for all state level data collections?"
17         The answer is:  "The resident system of the
18  student even if the student attends non-GNETS classes in
19  a school system -- school in the system where the GNETS
20  program is located."
21     A   Yeah, so the resident system.
22     Q   Okay.  So does that mean the home -- the
23  student's home district would get special education
24  funding for that student even if that student is
25  attending classes in a GNETS program and a school



 1  associated with that GNETS program in a different

 2  district?

 3      A   I don't have that kind of knowledge of who

 4  receives the funding based on the reporting.

 5      Q   Who in your division does special education

 6  funding allocations?

 7      A   Geronald Bell does the GNETS funding

 8  allocations, and Carmen Freemire does -- calculates.

 9  When I say does, I mean calculates, calculates the IDEA

10  formula funding allocations.

11      Q   Okay.  Okay.

12          MS. TAYLOE:  I would like to mark as Exhibit

13  588 a document GA03803300.

14          (Plaintiff's Exhibit 588 was marked for

15  identification.)

16      Q   BY MS. TAYLOE:  And this is a March 2016 e-mail

17  from you to Stacey Benson; is that correct?

18      A   That is correct.

19      Q   Who is Stacey Benson?

20      A   She is -- I believe she is a GNETS director.

21      Q   Okay.  And the subject line is, "Re:  Draft

22  FY17 GNETS Allocations."

23          Did you send out the draft allocations?

24      A   I don't remember, but it's possible.

25      Q   Okay.  Can you describe what Ms. Benson's



1  question is and your response to her?

2       A   Oh, yeah.  Okay.

3            So I -- it looks like I did send out the draft

4  GNETS allocations, and then I'm not sure what Stacey --

5  okay.  So it's going in order like that (indicating).

6  Okay.

7            She's asking me about the rolling average, and

8  then I say, "That is the correct formula.  Those are not

9  the rolling averages I have in our big spreadsheet.  Let

10  me verify with paper copies and get back to you."

11            So what was your question?

12       Q   So, first of all, can you confirm this is the

13  formula we were talking about before?

14       A   In theory, I can confirm that.  Again, I did

15  not -- so sometimes I can be considered like a customer

16  service person.  I did not calculate anything.  There is

17  a lot of conversation that probably happened behind this

18  e-mail, you know, like, how is this calculated or -- so

19  that I could answer Stacey's question.

20       Q   But this is the formula that is used, at least

21  in part, to fund -- to determine GNETS allocations?

22       A   It -- it looks like that was what it was, was

23  used for fiscal year '17.

24       Q   And this is the one you described as having the

25  rolling, rolling average, because it's averaging the



 1   averages from prior years?

 2        A   I regret saying that term, but yes, that is

 3   what I said.

 4        Q   Okay.  And so what -- what is the big

 5   spreadsheet you are referring to here?

 6        A   I don't recall, but according to this e-mail,

 7   it probably would have been a calculation of GNETS

 8   funding that had these averages.

 9        Q   And when you say "our big spreadsheet," who --

10   who would have that?

11        A   Geronald would have it.  I probably would have

12   a copy of it.  I'm not sure who all would have a copy of

13   it.

14        Q   What would you use this information for?

15        A   I didn't personally use the information for

16   anything other than to communicate out.  Again, when

17   Geronald Bell took over from Harry, I sometimes had

18   Harry's documents that I would send to Geronald.

19           Before Harry left, he's a -- the role --

20   Geronald and I both kind of took over what his position

21   entailed, so Harry trained the two of us sometimes

22   together and sometimes separately.  So there would be

23   times when Geronald Bell would need documents from me,

24   so, hey, do you have this document that Harry had?  And

25   so I didn't do any of the calculations, but I would often



1  send Geronald documents.

2      Q   Okay.  So you had access to the numbers, but

3  you didn't use them?

4      A   Yes, probably.

5      Q   Okay.  And what years -- I understand you don't

6  know if there's been a change.  But when this formula was

7  in place, what years would be used as the three-year

8  parts of the formula?

9          MS. JOHNSON:  Object to form.

10         THE WITNESS:  Well, if I'm looking at this

11  e-mail, I can say it would be like a fiscal year '13

12  rolling average, a fiscal year '14 rolling average, and

13  then the fiscal year '15 actual student count.  So it was

14  a three-year glance.

15     Q   BY MS. TAYLOE:  And if you used the fiscal year

16  '13 rolling average and fiscal year '14 rolling average

17  and the actual count from the '15 -- FY '15, what year

18  would that be used to create the allocation for?

19         MS. JOHNSON:  Object to form.

20         THE WITNESS:  A number of years.  So it would

21  be the fiscal year '13 -- I'm not sure.  I'm not sure.

22     Q   BY MS. TAYLOE:  Well, let me remind -- this was

23  sent in response to the draft FY17 GNETS allocation, so

24  would these be the numbers you would use for the FY17?

25     A   These would be the numbers we would use, but if



1   you're talking about a fiscal year '13 rolling average,

2   then the fiscal year '13 rolling average would encompass

3   the years prior.  Fiscal year '14 rolling average would

4   encompass years prior.  And then the fiscal year '15, so

5   there would be a number of years of student counts that

6   would be encompassed in this formula.

7        Q   And would it be fair to say, then, that if a

8   program's student enrollment is growing, that this

9   formula would underfund them for an upcoming year's

10  student count?

11            MS. JOHNSON:  Object to form.

12            THE WITNESS:  I wouldn't say that's a fair

13  characterization.  It could -- it could underfund or it

14  could overfund.

15       Q   BY MS. TAYLOE:  How could it overfund?

16       A   In my limited fiscal realm, I wouldn't think

17  that you would want to use a rolling average in a

18  formula.  You would want to use actual student counts,

19  because an average may be higher one year because of

20  student enrollment.  And the student enrollment could

21  decline, so then it would be overfunded if the average

22  was higher, or it could be underfunded if the average was

23  lower.  So yeah.

24       Q   So I -- you said if -- if enrollment declined,

25  it would be overfunded, but you thought it would also be



1  possible to overfund if the enrollment was growing.

2  That's the part I don't understand.

3          MS. JOHNSON:  Object to form.

4          THE WITNESS:  It's an average.  An average

5  isn't, you know, exact enrollment, so...

6      Q   BY MS. TAYLOE:  Let me -- let me rephrase that.

7          If a GNETS program is -- enrollment is steadily

8  growing, growing every year, this formula would underfund

9  it; is that correct?

10         MS. JOHNSON:  Object to form.

11         THE WITNESS:  I'm not sure.  I would have to --

12 to actual -- actually run the formula to be able to

13 determine that --

14     Q   BY MS. TAYLOE:  Okay.

15     A   -- in today, yeah.

16     Q   Is this formula used only for students in GNETS

17 centers?

18         MS. JOHNSON:  Object to form.

19         THE WITNESS:  I'm not sure if it's used

20 anywhere else or not, but I wouldn't imagine.

21     Q   BY MS. TAYLOE:  Do you know if it includes

22 students in GNETS classrooms?

23     A   What do you mean by "GNETS classrooms"?

24     Q   I should have included that in my definitions,

25 I'm sorry.  So GNETS centers are what we've been using to



1  refer to standalone centers that serve only GNETS

2  students?

3      A    Right.

4      Q    And GNETS classrooms are classrooms that are

5  set in general education facilities.  The classrooms only

6  serve GNETS students, but they are in a general education

7  facility.

8      A    Okay.  I do not know if this would include

9  GNETS students in those classrooms.

10     Q    Okay.  Do you -- have you heard of consultative

11 services for GNETS?

12     A    I have heard of consul- -- no.  I have heard of

13 consultative services for special education, more

14 broadly.

15     Q    What does that entail?

16     A    It entails consulting with a specialized

17 teacher and a general ed teacher and possibly the student

18 about goals and objectives in the IEP.

19     Q    If a GNETS teacher or coordinator or someone

20 employed by a GNETS program provided such consultative

21 services in a general education setting, do you know how

22 that would be funded?

23     A    I do not.

24     Q    Okay.  Are you aware of any funds that provide

25 for consultative services?



1        A    It could be a number of funds.  You could

2    use -- if you are talking about the general ed setting,

3    you could use any funding which would be allowed.  I

4    mean, you could can use Title I funding, you could use

5    IDEA funding, you could use state funding, or you could

6    use GNETS funding, so there -- I wouldn't know how that

7    -- specifically that consultative services would be

8    funded.  It could -- you know, a lot of funds could be

9    used.

10       Q    Are you aware of any state funds that are

11   specifically designated for students with emotional or

12   behavioral disabilities in a general education setting?

13       A    I am not aware.

14       Q    All right.  Can we back up for a second to

15   carryover.  If a GNETS program has carryover funds, are

16   there any restrictions on -- you said the state funds

17   can't carry over; is that correct?

18       A    That's correct.

19       Q    Do they have any -- carried over federal funds,

20   are there any restrictions on what they can be used for?

21       A    Yes.  It could be anything that's not in -- you

22   know, that goes against the uniforms grants guidance

23   or...

24       Q    Let me rephrase it then.  So there -- they

25   would be subject to the same initial restrictions on what



 1  they could be used for?

 2      A   That's correct.

 3      Q   Are there any additional like carryover

 4  specific restrictions?

 5      A   No.

 6      Q   Okay.  If a program is -- has excess funds

 7  towards the end of the year that would exceed the amount

 8  they are allowed to carry over, what is the -- what can

 9  they do with those funds?

10          MS. JOHNSON:  Object to form.

11          THE WITNESS:  They wouldn't get them.  So

12  they -- they couldn't do anything with them.  If -- if it

13  exceeded the amount that they were allowed to carry over

14  and we did not -- so if they were allowed to carry over

15  25 percent, and let's say they have 30 percent, then the

16  additional 5 percent they wouldn't have to budget.

17      Q   BY MS. TAYLOE:  But can they use it before the

18  end of the fiscal year?

19      A   Yeah.

20      Q   Is there any restriction on that?

21      A   No.

22      Q   I mean, as long as it was in the original

23  budget or a budget amendment?

24      A   As -- as long as it was in there.  You know,

25  sometimes things are what's on the budget.  There may be



 1  some things in -- in a budget that we don't see, like

 2  supplies.  Supplies is a big, broad thing, so they could

 3  imagine that they are gonna spend -- and this is very

 4  hypothetical -- money on paper, and decide to spend it on

 5  pens and supplies.  And so we don't monitor it like that.

 6  So they could change it from an approved budget, but

 7  typically there would be no additional restrictions.

 8  They have, you know, local decisions on some of that

 9  stuff that they don't send back up to the State.  But the

10  bigger ticket items, we generally --

11      Q   Only if they change between categories of --

12      A   Right.

13      Q   -- budgeted things?

14      A   Right.

15          MS. TAYLOE:  Okay.  I'd like to mark as Exhibit

16  589 document GA00315851.

17          (Plaintiff's Exhibit 589 was marked for

18  identification.)

19          THE WITNESS:  I don't see anything.

20      Q   BY MS. TAYLOE:  Okay.  Do you see it now?

21      A   I see it.

22      Q   Okay.  And this is a February 2018 e-mail from

23  you to Vickie Cleveland and Nakeba Rahming?

24      A   Yes.

25      Q   Okay.  And this thread started with an e-mail



 1    from Jacqie Neal.  She's asking for the three-year

 2    averages for a number of counties.

 3          Can you -- do you know why she's asking for

 4    rolling averages by county?

 5      A    I don't know why.

 6      Q    Okay.

 7      A    Should I be scrolling through this?

 8      Q    Only if you want to.

 9          MS. JOHNSON:  If you need more context --

10    sorry, I didn't mean to interrupt you.

11          If you need more context, feel free to scroll

12    through.

13          THE WITNESS:  Yeah, I'm gonna scroll through.

14      Q    BY MS. TAYLOE:  I will actually give you a

15    minute to look over the whole thread then.

16      A    Okay.  I have read through all of the e-mails.

17      Q    Okay.  And she wrote to Carol -- and I don't

18    know how to pronounce the last name -- Seay?

19      A    That's correct.

20      Q    Do you know who Carol Seay is?

21      A    I do.

22      Q    Who is she?

23      A    She was our Part B data manager, IDEA Part B

24    data manager.

25      Q    Okay.  And Carol forwarded it to -- no, I guess



1  Jacqie then forwarded it to you; is that correct -- oh,

2  no.  Jacqie forwarded it to Vickie, I'm sorry, and Vickie

3  forwarded it to you?

4        A    That's correct.

5        Q    Okay.  And do you see where Jacqie expressed to

6  Vickie that there have been some frustration with

7  directors for an understanding of our budget allocations?

8        A    I am -- it's slow to scroll at the moment, but

9  I did read that.

10        Q    Okay.  Is that something you had experience

11  with?  Had directors asked you questions about

12  understanding their budget allocations, in addition to

13  the one we had seen before?

14        A    Yes.  They had asked me about their allocations

15  in the past.

16        Q    And is it fair to say there was -- well, I

17  won't ask that question.

18              And she said in the past, you, Amber, had come

19  out and talked to us about the general process.  Do you

20  remember having done that?

21        A    I don't remember having done that, but I do

22  remember that I tried to be responsive if people asked

23  questions, so I can see that it probably happened.

24        Q    What would you tell people about the general

25  process?



1      A   I would -- I don't remember what I told them,

2   but it would probably be the same thing I would tell them

3   today, which was, there's a -- you know, I must have been

4   looking at the spreadsheet and trying to read the

5   spreadsheet right along with them.  I would probably have

6   told them about the rolling average or what was in --

7   tried to interpret what's in the spreadsheet.

8           To be clear, I never did the allocations, but,

9   you know, I tried to be responsive if someone asked about

10  them, so...

11     Q   Do you know, is the rolling average the only

12  part of the allocation formula?

13     A   I don't remember all of the allocation formula,

14  but I know that it's not the only part of the allocation

15  formula.

16     Q   Did you understand it better before?

17          MS. JOHNSON:  Object to form.

18          THE WITNESS:  I can't -- I don't know how well

19  I understood it.

20     Q   BY MS. TAYLOE:  Would you have been able to

21  answer their questions; for instance, "I was told that as

22  a new director to expect $12,000 per student"?  If

23  someone had asked you that, what would you have been able

24  to tell them?

25          MS. JOHNSON:  Object to form.



1        THE WITNESS:  If it was in the allocation

2   spreadsheet, I would have been able to see that.  I no

3   longer remember if that was in the allocation

4   spreadsheet; but if it was, I probably would have been

5   looking at the allocation spreadsheet and helping them on

6   a -- on a more detailed level.

7        The difference between myself and Geronald --

8   and I think that that has changed -- is when we first

9   started, I was more the communicator, and Geronald was

10  behind the scenes doing these allocations, so he didn't

11  really respond to directors.  So some of these e-mails

12  may be out of context, because I might say something, but

13  I would have picked up the phone and called Geronald or

14  called someone else.  It didn't mean that I was the

15  expert necessarily about this, but I certainly tried to

16  provide good customer service.  I don't like to tell

17  people to go here, here, here, here, you know.  When

18  people want answers, they just want you to answer the

19  question, so I tried.

20   Q   BY MS. TAYLOE:  What do you think was meant by

21  her saying that the other directors were saying,

22  "Students being served all three years in a count earning

23  more than a student that has only served during one

24  calendar year"?

25        MS. JOHNSON:  Object to form.



1          THE WITNESS:  I don't know what she meant by

2     that.

3          Q    BY MS. TAYLOE:  And she said she used to be

4     able to confirm with Amber, but it seems like things have

5     changed.  Do you know what that means?

6          MS. JOHNSON:  Object to form.

7          THE WITNESS:  Yes.  Before I was given more of

8     the details.  When Nakeba came on board, I really did

9     not -- I received final documents.  So the first couple

10    of years of me being at the Georgia Department of Ed, I

11    was more responsive to questions like this, and then --

12    and I always tried to be even past that, but I didn't

13    have as much -- I wasn't, I guess, in-the-know as much as

14    when I first came on board.  But if I had any documents

15    that I could explain something, I certainly tried.

16         Q    BY MS. TAYLOE:  Okay.  And then Vickie wanted

17    to set up a meeting to discuss these further and asked if

18    there was anybody else that should be included, and you

19    responded "Geronald"; is that correct?

20         A    I believe I read that, yes.

21         Q    And it says that, "We discussed how to do the

22    rolling average, which I will say needs some discussion."

23         Is that the discussion we referenced earlier

24    that you had discussed with him about your concerns with

25    the formula?



1      A   (No oral response.)

2      Q   I'm sorry, can you --

3      A   Yes.

4      Q   And it says, "But we were told not to make any

5   changes."

6          Do you remember who told you not to make any

7   changes?

8      A   No.  I don't remember who told me not to make

9   changes.

10     Q   Do you remember any conversations beyond the

11  ones with Geronald about the changes to that rolling

12  average or the formula?

13     A   Not specifically, but theoretically.  I mean, I

14  don't remember specific conversations, but I did have

15  concerns about the rolling average, and I generally try

16  to make my concerns known.

17     Q   Okay.  So seeing this e-mail now, do you still

18  think changes were made after you expressed your

19  concerns?

20     A   I do believe changes were made after I

21  expressed my concerns.

22     Q   Why?

23         MS. JOHNSON:  Object to form.

24         THE WITNESS:  But -- okay.  I believe changes

25  were made because I think there -- many people wanted



```
 1  changes to be made, including stakeholders.  And I --
 2  there's a period of time where we don't want to make any
 3  changes, and then I think there was a real push to make
 4  whatever changes were necessary to do the right thing,
 5  so...  But I wasn't involved in the changes.
 6      Q   BY MS. TAYLOE:  Okay.  Do you remember -- well,
 7  strike that.
 8          Did you and Vickie meet to discuss the
 9  recommendations that Jacqie sent?
10      A   I don't remember.  I don't remember.  I would
11  have to look at my calendar.
12      Q   Okay.  Do you know if directors can now confirm
13  their student counts with your office?
14          (Court reporter clarification.)
15          MS. JOHNSON:  Object to form.
16          THE WITNESS:  Directors can confirm student
17  counts.  Anyone can confirm student counts, really.  It's
18  anyone in an LEA can ask for student count information,
19  so I believe they would be able to confirm student
20  counts.
21      Q   BY MS. TAYLOE:  And did you or -- well, did the
22  Department of Education, you or Vickie Cleveland, provide
23  training on budget allocations to the GNETS directors?
24      A   I provided training once or twice, and then
25  Malissa was the -- before she became the program manager,
```



1  she was the program specialist that supported GNETS, and

2  so then she did the trainings with Vickie.  But yeah,

3  I've -- I've given GNETS allocation training, but it was

4  more for the lens of the budget that they submit in the

5  consolidated application.

6      Q    I'm sorry, it was more through the lens of

7  what?

8      A    So the budget that they would submit in the

9  consolidated application, we continued to do that

10 training annually now.  Someone does.  So it's -- we're

11 talking about what can you -- how do you submit a budget,

12 you know, how -- things like that.

13     Q    So it was more the process of how to submit the

14 application than on what would happen with the data that

15 they submitted?

16     A    Correct.

17     Q    Okay.  So as far as you know, they have not

18 received any training on how that information is used to

19 generate allocations?

20         MS. JOHNSON:  Object to form.

21         THE WITNESS:  Can you repeat that?

22     Q    BY MS. TAYLOE:  As far as you are aware, the

23 GNETS directors have not received any training on how the

24 information they submit is used to prepare allocations or

25 determine allocations?



1          MS. JOHNSON:  Object to form.

2          THE WITNESS:  Oh, I'm not sure if they've

3    received -- I'm not sure what specific trainings have

4    entailed, but I believe that they have because Vickie has

5    told me, you know, we -- we were manually training the

6    directors, so...  But to the substance of that training,

7    I wouldn't know.

8      Q   BY MS. TAYLOE:  Okay.  And the last one she

9    asked about was training on any changes that might be

10   coming with being able to count direct services to

11   non-GNETS students, consultation, therapeutic support, et

12   cetera.

13         Are you familiar with any changes that have

14   been made to how those services are compensated?

15     A   I'm not familiar with any changes that have

16   been made to how the services are compensated.

17     Q   And you are not aware of any training to any

18   directors on that point?

19     A   I'm not aware of any training.  It could

20   happen -- have happened, but I'm not aware of it.  I do

21   know that we have given additional GNETS funding in

22   separate grants over the past several years, so...  But

23   to that specific bullet point.

24     Q   I'm sorry, you said you are aware of giving

25   separate GNETS grants; is that what you said?



1      A    We have given funding to GNETS, not GNETS

2    grants, but we have given additional funding to GNETS.

3      Q    And are you aware, is that for consultative

4    services?

5      A    I believe they could use it for consultative

6    services.  For instance, we gave additional funding

7    during COVID to specifically support all students, so it

8    could be used for that.

9      Q    Okay.

10     A    We've given supplemental funding to GNETS in a

11   separate grant than the normal annual state and federal

12   GNETS.  So yeah, some funding could be used to count

13   towards that bullet point, but...

14     Q    So some of their discretionary funding they

15   could elect to do that, but it's not funded by the amount

16   of services they are providing?

17     A    I'm not sure how -- how the decision is made to

18   arrive to the funding that goes out.  I just see that it

19   goes out, and then we -- the team reviews it in the

20   consolidated application.

21     Q    Okay.

22          MS. TAYLOE:  Okay.  I'm going to mark as

23   Exhibit 590 document GA03803376.

24          (Plaintiff's Exhibit 590 was marked for

25   identification.)



1       Q    BY MS. TAYLOE:   And this -- the top one is an

2    e-mail dated March 15th, 2016 from you to Derrick

3    Gilchrist?

4       A    Uh-huh.

5       Q    Do you see it?

6            Who is Mr. Gilchrist?

7       A    A GNETS director.

8       Q    Okay.   And I'm going to give you a moment to

9    review this thread as well.

10      A    Okay.   Okay.   I'm good.

11      Q    Okay.   So is it correct this is another

12   response to your -- when you sent out the draft FY17

13   allocations?

14      A    It looks like it.

15      Q    And he notes that the draft includes

16   information about the rolling average but does not

17   include information about our CPI data.   Do you see that?

18      A    I see that.

19      Q    What is CPI data?

20      A    I don't know what CPI stands for.   I don't

21   remember.

22      Q    Does it have to do with personnel?

23      A    Yes.

24      Q    Is it a certain kind of personnel?

25      A    I don't remember what CPI stands for.   I do



1   believe it's certified personnel.

2        Q   All right.  How does CPI information factor

3   into allocations?

4        A   I do not know how CPI information factors into

5   allocations.

6            So let me go back up to my response.  There

7   would be many times that a GNETS director would ask me a

8   question, and like I said before, I would pick up the

9   phone and say, hey, this GNETS question has been asked,

10  and then I would be the one sending the response, but I

11  would not -- I mean, it's stated so emphatically as if

12  I'm an expert on this, but I'm just the one relaying the

13  information necessarily and I'm not the expert on this.

14       Q   Is it possible for directors to review their

15  CPI data now as he requested?

16       A   I don't know if directors can or not.

17       Q   All right.  And then in your response, you say,

18  "The Office of Planning and Budget (not the GaDOE)

19  completes the initial GNETS funding allocations."

20           Can you explain that to me?

21       A   I can and I can't.  I know that the Office of

22  Planning and Budget is -- they do -- to my knowledge,

23  they work with the state appropriations, so I believe

24  they work with Geronald to do the -- to calculate the

25  formula.  But to what extent, I -- I don't know.  And to



1  what extent Geronald does, I don't know.  I mean, they

2  work together.  I don't really talk to OPB.

3       Q   So before you told us that Geronald does the

4  allocations.  So are you --

5       A   That's correct.

6       Q   Do you think -- do you know whether Geronald

7  Bell or OPB does the allocations?

8       A   Truthfully, no.  I -- sometimes you think you

9  know something and you don't.  So Geronald gives me the

10 allocations, or gave me the allocations, and -- but who

11 actually runs the formula, I -- you would want to ask

12 Geronald Bell.

13       MS. TAYLOE:  Okay.  And I would like to

14 introduce as document Exhibit 591, GA03803401.

15       (Plaintiff's Exhibit 591 was marked for

16 identification.)

17       Q   BY MS. TAYLOE:  Okay.  This is a March 2016

18 e-mail thread between Cassandra Holifield and you.

19       A   Uh-huh.

20       Q   Who is Cassandra Holifield?

21       A   A GNETS director.

22       Q   Okay.  I will let you review the --

23       A   Okay.  It stopped.  It stopped performing.  I'm

24 talking about the mouse.  I can't scroll down anymore.

25       MS. TAYLOE:  Can we go off the record for a



 1  moment.

 2          THE VIDEOGRAPHER:  Off the record at 2:22 p.m.

 3          (The deposition was at recess from 2:22 p.m. to

 4  2:32 p.m.)

 5          THE VIDEOGRAPHER:  Back on the record at

 6  2:32 p.m.

 7      Q   BY MS. TAYLOE:  Okay.  Have you had a chance to

 8  look at the document now?

 9      A   I'm reading it right now.

10          Okay.  I have read it all.

11      Q   Okay.  Do you see -- well, can you tell me what

12  the e-mail thread is about?

13      A   It's about the draft allocations for fiscal

14  year '17.

15      Q   And did Cassandra Holifield have another

16  question about that?

17      A   Yes.

18      Q   And do you see at the top of the second page

19  where she writes to you and Nakeba and says, "Are you

20  able to come to our meeting on either of those days to

21  discuss the GNETS funding formula and the T&E mystery"?

22      A   I see that.

23      Q   Do you know what she means by "the T&E mystery"

24  or the "funding formula and the T&E mystery"?

25      A   I don't know what she means by "the T&E



1   mystery."

2       Q   Okay.  Do you see immediately below that where

3   you had said, "Many of you are asking questions about the

4   funding formula, so I am attaching the guidance sheet

5   that will provide more detail"?

6       A   Yes, I see that.

7       Q   Okay.  And the response came after that, that

8   even after receiving that, they still had questions about

9   the funding formula; is that correct?

10      A   That's correct.

11      Q   And you said you were not going to be able to

12  attend the meetings next week because you have monitoring

13  visits.  Can you tell me about the monitoring visits?

14      A   Yes.  We conduct cross-functional monitoring.

15          THE REPORTER:  Cross what monitoring?

16          THE WITNESS:  Cross-functional monitoring.

17  Sorry.  And that is where we are monitoring federal

18  dollars that we allocate, and yeah.

19      Q   BY MS. TAYLOE:  And do you monitor GNETS as

20  part of that process?

21      A   We monitor GNETS federal allocations, yes.

22      Q   And what does that monitoring look like?  What

23  do you review?

24      A   Okay.  There are specific indicators that we

25  review each year, and we determine annually which



 1   indicators we will include.  They're generally the same.

 2   We just may -- may tweak them based on what we see coming

 3   in or any procedural changes we may make, maybe to the

 4   risk calculation or something like that.

 5          So these indicators would include things like

 6   the uniform grants guidance and making sure that

 7   allow- -- federal cost principles are followed and -- and

 8   things like that.

 9      Q   And you said that we select each year based on

10   what we see or change.  Who is "we" in that?

11      A   It is -- it's all of the federal programs team,

12   basically the managers.  We -- it's our normal review of

13   our policies, practices, and procedures.  We review our

14   cross-functional monitoring process on an annual basis to

15   make sure it's still working the way we want it to work.

16      Q   So whatever you choose to focus on that year,

17   you review across all federal programs?

18      A   We review across all federal programs, yes.

19   Each federal program may have specific indicators that's

20   unique to their program, but we also have overarching

21   indicators that would span all the federal programs.

22      Q   Okay.  Are there any unique indicators that you

23   are aware of for a GNETS program?

24          MS. JOHNSON:  Object to form.

25          THE WITNESS:  I don't believe there are unique



 1  indicators specific to GNETS, but we did provide two

 2  GNETS directors which indicators applied to them, because

 3  not all of the indicators apply to GNETS.  So we would be

 4  specific about which indicators apply to them.

 5           And I am speaking from the fiscal team.

 6  There's also -- in the GNETS monitoring, there is also a

 7  programmatic monitoring that takes place for students'

 8  IEPs, but I can only really speak to the fiscal part of

 9  it.

10      Q    BY MS. TAYLOE:  Do you know who does the

11  programmatic review?

12      A    Whoever is assigned to do it.  It is assigned

13  from our results-driven accountability unit.  But this is

14  our cross-functional monitoring protocol across all LEAs,

15  so it's not unique to GNETS.  It's just the fiscal agents

16  or LEAs that are designated in that year to be reviewed.

17  GNETS would be included.

18      Q    So these aren't reviews that are specific to

19  GNETS; these are reviews of the fiscal agents that

20  includes GNETS funding within it?

21      A    That's correct.

22      Q    Okay.  And how many do you review each year?

23      A    How many what?

24      Q    Of these reviews, the fiscal agent reviews.

25      A    It depends on the year.  So our



 1  cross-functional monitoring is -- it's a four-year --
 2  every four years someone would be -- you would be
 3  monitored every four years, so we have -- I'm trying to
 4  think of how to say it.  All of our LEAs and -- and/or
 5  fiscal agents are categorized into a year of funding, and
 6  you are on a list to be monitored at least once every
 7  four years.  You could be monitored more, but you are on
 8  a list to be monitored at least once every four years.
 9       Q    And what can you tell me about the indicators?
10  You said some -- you provided to the GNETS programs which
11  indicators applied to them?
12       A    Uh-huh.
13       Q    I don't know if there's so many that it's hard
14  to summarize or categorize, or is there something unique
15  about what doesn't apply to them or any way you can sort
16  of give me guidance on that?
17       A    Yes.  There would be things that's not specific
18  to GNETS, such as the excess cost calculation.  That
19  is -- the excess cost calculation is unique to the LEA,
20  so if we are preparing a GNETS director for what they
21  need to provide to us, the LEA would still need to
22  provide that excess cost calculation, but the GNETS
23  director necessarily wouldn't need to be responsive for
24  that.
25            They would respond to like, like I said, cost



 1   principles or things of that nature that's related to the

 2   funding, but it's -- some things are LEA responsibility.

 3   Or the high cost grant is a -- is a real good example.

 4   We give out high cost grants and to -- they're -- they're

 5   based on reimbursement for applications that are

 6   submitted to us, and so if GNETS did not have an

 7   application to submit to us, then that indicator may not

 8   apply to them.

 9       Q   So this makes me want to kind of go out of

10   order and ask how this all works.  When money is

11   allocated and it's been approved for a GNETS program,

12   it's -- to the fiscal agent serving that GNETS program,

13   who actually files the request or submits the request for

14   drawdown to get the money released?  Is it the GNETS

15   program or the fiscal agent?

16       A   The fiscal agent.  Someone in the fiscal agent.

17       Q   So what kinds of cost information would you be

18   reviewing at the GNETS -- at the program level?

19       A   Our cross-functional monitoring indicators are,

20   basically, we're monitoring the LEAs or fiscal agents

21   when we are looking at the -- at the funding.  GNETS

22   directors may -- it's all about local control, right?  So

23   GNETS directors may be responsible for a budget, so then

24   they would provide additional evidence to that.

25           It could be time and effort.  It could be



1   anything that's -- that's in the monitoring indicators,

2   but they wouldn't necessarily be the sole person over it.

3   It could be provided by the fiscal agent itself, so it

4   may not be the GNETS directors that provide all the

5   fiscal information to us that we're monitoring.

6       Q    Are there some parts of the GNETS budget that

7   the GNETS directors handle themselves without going

8   through the fiscal agent?

9       A    I don't know.

10          MS. JOHNSON:  Object to form.

11      Q    BY MS. TAYLOE:  I'm just trying to see if the

12  fiscal agents do the request for drawdown, what would be

13  on the GNETS directors' side that you would be

14  monitoring?

15      A    It depends on roles and responsibilities that's

16  set forth in the LEA or fiscal agent.  You know, if it's

17  a RESA, they may have duties and responsibilities

18  outlined, and we don't tell them what duties or

19  responsibilities they should have for specific roles.

20          For instance, a GNETS director may prepare

21  evidence for monitoring, or it could be an administrative

22  assistant, or it could be a bookkeeper, for instance,

23  so...

24          MS. TAYLOE:  Okay.  I would like to introduce

25  as Exhibit 592 a document GA00041019.



 1          (Plaintiff's Exhibit 592 was marked for
 2  identification.)
 3      Q   BY MS. TAYLOE:  Can you see it?
 4      A   I can see it.
 5      Q   Do you recognize this as a document that you
 6  shared with the directors in connection with the e-mail
 7  thread we just looked at?
 8      A   It is possible that I shared it in that e-mail
 9  thread.  I do -- I do recognize the document.
10      Q   Okay.  And was this an accurate summary of the
11  funding formula at the time?
12      A   I don't know, but it -- it -- I would have
13  believed that it was, in order to share it.
14      Q   Do you know who prepared this document?
15      A   No.
16      Q   Do you know where you got it?
17      A   I don't remember where I got it.
18      Q   Okay.  Would this be the kind of information
19  you would have shared with directors when you were trying
20  to be responsive to their requests for information about
21  the funding formula?
22      A   Yes.  If I had this document, I would share it
23  with them.
24      Q   Okay.  And so the rolling average, according to
25  this document, is part of the GNETS funding formula; is



1    that correct?

2         A   Yes.

3         Q   And there is a base salary cost, which allows

4    for a certain number of teachers for a certain number of

5    students; is that correct?

6         A   According to this document, yes.  I haven't

7    seen it in a long time, but you're refreshing my memory.

8         Q   Do you remember who established that ratio?

9         A   I do not.  It was before I was employed at the

10   Georgia Department of Education, I believe.

11        Q   But it would be a Georgia Department of

12   Education -- I mean, I'm not asking who within the

13   Georgia Department, but it would be a Georgia Department

14   of Education decision?

15        A   Oh, I -- I don't know that.

16        Q   This is not an IDEA requirement?

17        A   It is not an IDEA requirement, to my knowledge.

18        Q   Okay.  And then when this ratio is used for

19   students and for other -- I'm sorry, for teachers and

20   paraprofessionals and other elements here that are

21   dependent on the student count, is that also using the

22   rolling average?

23            MS. JOHNSON:  Object to form.

24            THE WITNESS:  I don't know.  I would need to

25   see the actual spreadsheet.



1     Q   BY MS. TAYLOE:  Is there an actual spreadsheet
2   that includes all of this information?
3     A   There should be.  I mean, there's an actual
4   spreadsheet that shows the GNETS calculations, so I would
5   imagine that the calculations are in there.
6     Q   Okay.  And this would be done every year?
7     A   Yes.
8     MS. TAYLOE:  Okay.  We ask that that be
9   produced as responsive to our earlier requests.
10     MS. JOHNSON:  Yeah, if you can follow up with a
11   -- with a request after the deposition.
12     MS. TAYLOE:  Okay.
13     Q   BY MS. TAYLOE:  Okay.  What is Category III
14   funding?  Do you see that?
15     A   I'm looking for it.
16     Q   In the --
17     A   No, I don't see it.
18     Q   Oh, here it is.  In "Direct Operations Cost,"
19   it said, "The direct operation cost is based on Category
20   III funding for materials/supplies, travel, textbooks,
21   and equipment replacement."
22     A   I think it is the QBE Category III funding, but
23   I'm not 100 percent sure.
24     Q   What is the "QBE Category III"?
25     A   It's the category that you showed me on the



1   document that I reviewed before.

2       Q   Oh, Category III disability?

3       A   Category III disability, yes.

4       Q   Okay.  And here it also says, "Director cost is

5   consistent across all programs."

6           Is that still true?

7           MS. JOHNSON:  Object to form.

8           THE WITNESS:  Director cost -- I don't -- I

9   don't know.

10      Q   BY MS. TAYLOE:  Do you know who establishes the

11  director's salary?

12      A   No.

13      Q   Okay.  For the other items here that just

14  include a title but not an amount or a designation of

15  amount, like "Operating Cost," do you know how those

16  things are calculated?

17      A   I don't know.

18      Q   Okay.  I think we're done with that one.

19          MS. TAYLOE:  I'd like to mark as Exhibit 593

20  GA03803423.

21          (Plaintiff's Exhibit 593 was marked for

22  identification.)

23          THE WITNESS:  I see it.

24      Q   BY MS. TAYLOE:  Okay.  And this is a March 2016

25  e-mail thread with Mary Ann Seay.  Who is she?



1      A    Okay.  Let me see.  You want me to -- I can

2    tell you Mary Ann Seay -- I'm not knowing who that is off

3    the top of my head.  There's the draft.

4      Q    Does the e-mail address suggest that she's --

5    is Crisp a county in Georgia?

6      A    Crisp is a county in Georgia, yes.

7      Q    So does Crisp Schools mean she's likely

8    affiliated with that county?

9      A    I would think, yes.  But I haven't gotten to

10   that part.

11     Q    Oh, sorry.

12     A    I don't see her.  Are we on the same exhibit?

13   A Mary Ann Seay?  I don't see Crisp County at all.  I'm

14   seeing a Donald Carter.

15          MS. TAYLOE:  Oh, I think we -- you need to let

16   her have control back and put the right document up.

17   Sorry, I skipped one in my outline.

18          THE WITNESS:  Okay.  Let me read this one.

19   Okay.

20          Can you repeat your question?

21     Q    BY MS. TAYLOE:  Who is Mary Ann Seay?

22     A    I don't know her, but yes, she -- I would

23   believe that she's affiliated with Crisp County.

24     Q    Okay.  And she writes -- this is, again,

25   following up on the draft '17 allocations, FY17 GNETS



1    allocations.  "We are trying to determine how/why our

2    budget is hit so hard.  I know our numbers are down and

3    has been for the last few years."

4         It goes on to say they are looking at an

5    estimate of about $184,000 shortage.  "We on so small

6    already and I don't know what we will do."

7         Do you see that?

8    A    I see it.

9    Q    Can you explain your response to her?  Explain

10   to us how you responded to her.

11   A    Let me get back up to it.  I explained to her

12   that her rolling average went down, which affects all of

13   the operating costs that OPB gives.  And then I said that

14   she lost 120,000 in T&E, which means experienced teachers

15   left.  And because it's a finite amount of money, if

16   other facilities allocations go up, that means somebody

17   is coming down, so...

18   Q    Okay.  So let's take those in that order.

19   Rolling average went down, which means all the operating

20   costs went down.  So that's not just the funding formula

21   but also the per teacher ratio and all the other pieces

22   that we talked about?

23   A    I do not know the ins and outs and details of

24   this cost -- of this formula.  It appears that I do, but

25   I really don't.  I mean, a lot of times I was the



1   front-facing communicator.  So, I mean, they say

2   hindsight is 20/20 for a reason.  I probably shouldn't

3   have been the one that's giving the information because

4   I'm not the one with the details, but I'm told this

5   information, and then I would give it out to the

6   directors.  So I can't really answer questions about what

7   OPB did or exactly what operating costs are, but I can

8   see why it looks like I could.

9        Q    But in the event enrollment declined, would

10  result in lower money under the allocation?

11       A    Yes.

12       Q    And it also said she lost 120,000 in T&E.  I

13  understand that means experienced teachers left.  You

14  explained that before, because they are being replaced

15  by younger?

16       A    Yeah.

17       Q    Would that limit their ability to hire

18  experienced teachers?

19       A    No.  They could hire experienced teachers.

20       Q    How would they do that if their funding went

21  down because the experienced teachers left?

22            MS. JOHNSON:  Object to form.

23            THE WITNESS:  I mean, they could hire teachers

24  within their ability to do so based on the funding given.

25       Q    BY MS. TAYLOE:  But this answer suggests that



 1   as higher paid teachers leave, the budgeting for the

 2   upcoming year is downwardly impacted by the higher salary

 3   teachers leaving?

 4        A    That's correct.  If -- you know, if they were

 5   to ask me that specific question that you are asking me,

 6   I would ask them to talk to their LEA.  Because I have

 7   communicated directly to LEAs about, you know, GNETS

 8   funding as well, and my communication has been the

 9   students need to be served, and they are -- you know, the

10   students belong to the LEA, so you would need to give

11   additional funding, if needed, to -- to serve the

12   students.  So if they needed a teacher, they would need

13   to collaborate with their local educational agencies to

14   provide it.

15        Q    Okay.  So that advice to an LEA would make

16   sense because they are the ones hiring and making that

17   decision, but now you're saying that the LEAs are the

18   ones that are ultimately responsible for providing FAPE,

19   but now you're telling a program that they need to do so

20   within this reduced budget; is that correct?

21             MS. JOHNSON:  Object to form.

22             THE WITNESS:  What do you mean when you say I'm

23   telling a program?

24        Q    BY MS. TAYLOE:  Well, the program budget is

25   set.  They don't have the ability to have additional



1  funds to replace the money from the lower T&E costs?

2     A   Yes, that's correct, that this specific GNETS

3  budget is set, but that doesn't mean that funding can't

4  come from somewhere else.

5     Q   Okay.  So a GNETS program would need to get

6  some other entity to subsidize the costs to get higher,

7  more experienced or higher degree teachers?

8          MS. JOHNSON:  Object to form.

9          THE WITNESS:  If they needed additional money

10  to support students, then they would need to talk to the

11  LEAs to support students.

12     Q   BY MS. TAYLOE:  Okay.  And then the last piece

13  of the explanation you gave, that "if other facilities

14  see an increase, it automatically takes funds from

15  someone else because it is a finite amount of money."

16          So does this mean if a program had stable

17  enrollment and didn't lose any experienced teachers or

18  degreed teachers, they could still lose funding if some

19  other program grew and was entitled to a larger share of

20  the limited GNETS state fund?

21          MS. JOHNSON:  Object to form.

22          THE WITNESS:  Again, I don't do the

23  calculation, but yes, I would -- if I looked at a

24  spreadsheet, I could conclude that based on this

25  statement that I put there, yes.



1        Q   BY MS. TAYLOE:  And you have no reason to doubt

2    that?  That mathematically makes sense?

3        A   It mathematically makes sense.

4        Q   When we looked at the budget document that you

5    see in the CON App portal, you talked about supplemental

6    funding and carryovers and stuff.  Can you describe how

7    supplemental funding comes about?

8        A   No.  I was not in the decision-making about

9    supplemental funding.  I was just told that, you know,

10   the years that we allocated it, that it was needed.

11   Those would be in other budget discussions, most likely.

12       Q   Do you do work related to the drawdown reports?

13       A   We review drawdown reports.

14       Q   Okay.  By "we", do you mean your office or?

15       A   I meant the fiscal team reviews drawdown

16   reports.

17       Q   So that means the budget analyst assigned to a

18   program reviews it, or would you also review it?

19       A   I would not -- I have -- I do not currently

20   review drawdown reports.  I have reviewed them in the

21   past when I was part of the fiscal team.

22       Q   Okay.  All right.  So we've been talking a

23   little about the federal side -- I'm sorry, the state

24   side of the grant.  Can you tell me how the federal IDEA

25   funds are allocated to regional programs, regional GNETS



 1  programs?

 2       A    What do you mean by "allocated"?

 3       Q    That is not done by -- by a formula, right?  Is

 4  that done if they fall within a certain range, they get a

 5  certain amount of federal IDEA grant?

 6       A    I don't recall exactly, but I believe that it

 7  does fall within a range, from looking at prior years'

 8  documents.

 9       Q    Okay.  And I asked before about Medicaid and

10  SAMHSA funding.  I can't remember if I asked you, who --

11  who else would -- you indicated that you weren't familiar

12  with those.  You didn't deal with those.  And if I

13  apologize -- if I -- sorry.  I apologize if I already

14  asked you this.  Who would, in the Department of

15  Education, would know about the Medicaid funding for

16  services provided in schools?

17       A    I don't know who at the Department of Education

18  would know about Medicaid funding in schools.  I'm not

19  sure.

20       Q    Okay.  And SAMHSA?

21       A    I believe I said earlier that Justin Hill might

22  know about the SAMHSA grant.

23       Q    Okay.  Thank you.  I think you did.  I'm sorry.

24            Okay.  Now I have some questions that we laid

25  the groundwork for now about allowability that I know



1  fall more within your expertise.

2         MS. TAYLOE:  I would like to mark as Exhibit

3  593 --

4         MS. GARDNER WOMACK:  594.  I think.

5         MS. TAYLOE:  594, Exhibit GA04957967.

6         (Plaintiff's Exhibit 594 was marked for

7  identification.)

8         THE WITNESS:  I see it.

9     Q   BY MS. TAYLOE:  Okay.  We'll start at the back

10  of this one and then work our way back up.

11     A   Okay.

12     Q   This is a March 2018 e-mail thread that starts

13  with Jamilah McKenzie, and she's asking Vickie about

14  guidance on what is allowable or unallowable.  Do you see

15  that at the end of the document?

16     A   I'm scrolling.  Should I read through the

17  document first?

18     Q   Sure, if you want to.  We are going to work

19  backwards, but it's fine.

20     A   It's okay.  I didn't know what you meant.  I'll

21  stop -- I'll start there.  Okay.

22     Q   Okay.  So she's asking for just guidance

23  generally; is that correct?

24     A   Yes, it appears so.

25     Q   I'm sorry?



 1        A    It appears so.

 2        Q    And then Vickie Cleveland forwarded it to you

 3   and said -- asked if there was a document on the web page

 4   that lists the function and object codes and what's

 5   allowable and not allowable.  She said she doesn't see

 6   anything.

 7             Is that correct?

 8        A    That's what it says, yes.

 9        Q    And by "web page," does she mean the Georgia

10   Department of Education website?

11             MS. JOHNSON:  Object to form.

12             THE WITNESS:  I don't know what she means, but

13   I'm assuming.

14        Q    BY MS. TAYLOE:  Is there another place where

15   she might be looking for such a document?

16             MS. JOHNSON:  Object to form.

17             THE WITNESS:  I believe she's talking about the

18   Georgia Department web page.  I believe that is what she

19   is talking about.

20        Q    BY MS. TAYLOE:  And then in response to that,

21   you say, "We have an IDEA allowable list that will be

22   coming off the website at the end of the year for a

23   number of reasons," and that "many things are allowable

24   or unallowable based on the circumstances specific to

25   that program."



1          I am going to let you read the whole thing now,
2     since I only asked for part of it.
3          A    Okay.  So I have read what I wrote to Vickie.
4     Do you want me to go further?
5          Q    No, that's okay.
6          Was IDEA allowability the only determinant?
7     Would that list have answered Jamilah's questions?
8          A    I don't know if it would have answered
9     Jamilah's questions or not.
10         Q    Would there have been other sources besides
11    IDEA that would dictate allowability?
12         MS. JOHNSON:  Object to form.
13         THE WITNESS:  Yes.  It would be things like
14    that the funds would be used for the purpose of GNETS.
15    That could detect allowability, you know.  There is
16    multiple things that go into allowability, such as,
17    what's the purpose of this funding, you know.  So I
18    imagine there would be more things than the IDEA
19    allowable list.
20         Q    BY MS. TAYLOE:  Okay.  So that would have been
21    a partial response, and you were offering that as one
22    source she could have used, but it's coming down?
23         A    That's correct.
24         Q    Do you know why it was -- you said for a number
25    of reasons.  Do you know why it was coming off their



1  website?

2       A    I do know why.

3       Q    Why?

4       A    Okay.  It was actually coming down by my

5  suggestion, because it was a list of things that was

6  created and updated by me when I came to the department.

7  But it wasn't created by me, and it was a list of things

8  that said, this is allowable or this is not allowable.

9  And I felt like there should not be a list of what's

10 allowable and what's not allowable.  I think that knowing

11 what IDEA represents, that things -- it's very gray

12 what's allowable.  Things could be allowable for one

13 student but not allowable for another district, depending

14 on how they want to use the funds.

15         So, for instance, there are some things such as

16 the selected items of costs in the uniform grants

17 guidance that we all know could be allowable or could not

18 be allowable.  But when you are talking about a specific

19 student, I can -- I can give you probably one of the

20 biggest examples of the reason why I was a proponent of

21 taking it down is because, you know, some things may

22 say -- I think one of them said medical device is not

23 allowable, and that really needed some explanation behind

24 it, because medical devices may be allowable if it's

25 needed for -- to access curriculum.  If it's a medical



 1  device that's provided, you know, by a doctor specific to
 2  a -- a student that -- it may or may not be allowable, I
 3  guess is what I am trying to say.
 4          So I didn't want a list that said something is
 5  allowable or is not allowable, because every single
 6  student is unique.  And I was a big fan of, let's discuss
 7  it if it's allowable and if it's what is needed for the
 8  students in your classroom, so...
 9      Q   Okay.  That's helpful.
10          Do you know, were there any guidance documents
11  put up in its place to give guidelines for consideration
12  about whether something might be allowable or --
13      A   Yes.
14      Q   Where were those posted?
15      A   On this -- in the same place where that list
16  was posted.
17      Q   And did you contribute to the new guidelines --
18      A   Yes.
19      Q   -- formation?  Okay.
20          And did you provide training on allowability?
21      A   Yes, to all.
22      Q   To all who?
23      A   Any stakeholders.  I provided training to --
24  for allowability at a number of conferences over the
25  years, and regional technical assistance.  And it would



 1  be -- some of the guidance that I've provided in the past
 2  would be unique to uniform grants guidance, and some
 3  would be IDEA allowability.
 4      Q   Okay.  Okay.  And then a few minutes later,
 5  based on the time stamp, you -- you said, "With all of
 6  these questions we have been receiving lately and with
 7  your new role" -- this is directed to Vickie -- "with
 8  your new role, I think it would be helpful to have a
 9  GNETS specific training to discuss allowability.  Would
10  you like to do that?"
11          Do you see that?
12      A   I see it.
13      Q   Okay.  And that is to -- let me introduce the
14  next exhibit.
15      A   All right.
16          MS. TAYLOE:  Which I would like to introduce
17  Exhibit 595, document GA04957908.
18          (Plaintiff's Exhibit 595 was marked for
19  identification.)
20      Q   BY MS. TAYLOE:  Can you see it?
21      A   I see it.
22      Q   And is this a note that you wrote to yourself?
23  Is that that e-mail?
24      A   Yes, I think so.
25      Q   And does it -- does it look to you like your



1  note is about the training that was just proposed in the

2  preceding e-mail?

3      A   I could argue that that's true.

4      Q   So allowability would be one of the topics you

5  would have proposed at that training to go over with

6  directors or other stakeholders?

7      A   I can tell that this was sent from my phone, so

8  I was probably out somewhere when I read that e-mail and

9  felt like I needed to give myself a reminder.

10     Q   That makes sense.

11         So then the third bullet there, you say, "When

12 to use sate versus federal - students are general ed

13 students first.  This is a state run program.  Federal

14 funding is supplemental."

15         Do you see that?

16     A   I see that.

17     Q   Can you explain that?

18     A   Yes.  So this would not be unique to GNETS.

19 This would be -- I -- I tell all of special education

20 directors that, you know, special education students are

21 general ed students first.  So everything that a general

22 ed student is entitled to, a special education student is

23 entitled to.  And so when you think about state funds

24 versus federal funds, think about what you are providing

25 from the state and then for all students, and any



1   specific needs that they have could be provided in state
2   funding, but then federal funding should be supplemental
3   to that based on specific needs.
4       Q   So I just want to make sure I understand that.
5   So are you saying special education needs should be
6   funded from state funds first, and then federal funds
7   being supplementary to that?
8       A   No, not necessarily.  So IDEA funding is about
9   the excess costs for students with disabilities.  So when
10  we talk about certain things that are funded in the state
11  level versus the federal level, curriculum is a good
12  example.
13          And this is not the only example, but this is
14  the example I would probably give.  Unless it's
15  specialized curriculum, if it's a curriculum for all
16  students, that everyone in the building receives, then
17  that should probably be funded out of state funds because
18  everybody would be receiving it.  If it is specific to a
19  student's need, then it could be curriculum, but it may
20  be a specific curriculum that a student needs per their
21  IEP or a group of students' needs for a special education
22  class, then that would be something that's more aligned
23  with a federal grant.
24      Q   Okay.  And then do you know what you meant by
25  "developing a mindset"?



1       A    Uh-huh.

2       Q    What does that mean?

3       A    I wanted to provide -- I really wanted to

4    provide capacity for special education directors to

5    determine allowability on their own in a pinch.  Not that

6    they could not call us, or we never discouraged anyone

7    from calling us, but I wanted to give them the

8    flexibility to be able to make a decision locally and not

9    feel like they had to ask us every time they needed to

10   make a decision about funding.

11          So it was really developing questions to say,

12   hey, you know, is this the excess cost of providing

13   special education?  You know, is this a specialized need?

14   Things like that, like teaching special ed directors how

15   to ask questions to themselves or to others in their

16   district about if funding could be allowable based on

17   specific need.

18          It was really to develop a mindset to allow

19   them more flexibility versus less flexibility, because we

20   wanted them to be able to spend the funds based on the

21   students' needs versus looking at a list that says this

22   is allowable, this is not allowable.

23       Q    Right.  So was it designed to enable them to

24   make the decisions themselves?  Did they have the

25   authority to decide that?  I don't know who -- who



1  decides allowability.

2      A   I don't know who decides allowability either.

3  I mean, when I think of allowability, I can think of a

4  number of different things.  Is it in regulatory

5  guidance?  Is it in a grant award notification?  Is it --

6  you know, there is multiple ways to look at allowability,

7  but we definitely wanted and still want to give special

8  ed directors the tools they need to make decisions about

9  the needs of their students in their districts.  So that

10  could include learning what is allowable or not allowable

11  for the grant, and do the costs that they want to spend,

12  does it support the purpose of the grant, which is to

13  provide excess costs of education to students with

14  disabilities.

15          MS. TAYLOE:  Okay.  I would like to introduce

16  as Exhibit 596, document GA00317500.

17          (Plaintiff's Exhibit 596 was marked for

18  identification.)

19          THE WITNESS:  I see it, and I'm scrolling

20  through it.

21      Q   BY MS. TAYLOE:  Okay.

22      A   Okay.

23      Q   Okay.  This is a March 2018 e-mail thread from

24  Lisa Futch to you?

25      A   Uh-huh.



1       Q    Who is Lisa Futch?

2       A    I believe she is a GNETS director.

3       Q    Okay.  And do you see how Ms. Futch offers some

4    research citations in support of her request to use

5    federal funds for diffusers and essential oils for each

6    GNETS classroom?

7       A    I see that.

8       Q    Why is she asking you this question, given that

9    she has evidence that she believes supports the purchase?

10          MS. JOHNSON:  Object to form.

11          THE WITNESS:  I don't know why she's asking me

12   this question.  Probably because she knows that I review

13   budgets.  But Vickie would have been approving them for

14   allowability before they get to me, so...

15      Q    BY MS. TAYLOE:  So I guess that's what I was

16   saying before about I don't who decides.  If you had said

17   no, could she have done it anyway; or if you had said no,

18   that would have been she can't?

19      A    I don't know.  Generally, if someone asks

20   allowability questions, we -- it's a discussion.  So a

21   lot of times I need more information, and I don't always

22   put that more information in writing.  A lot of times I

23   will pick up the phone.  And in this case, Vickie was

24   reviewing all of the budgets before it came to me, so I

25   was going to let Vickie weigh in on it, and I'm not sure



1   if she did or what the follow-up was.

2          But most of the time if it was something that

3   we were leaning towards a no, we would generally pick up

4   the phone and have a -- have a discussion.  Vickie would

5   before I would.  And then if Vickie wanted me to be a

6   part of that discussion just to see if there's something

7   that I could add to it, then she would ask me to be on

8   it.  I don't if that was the case here.  I don't

9   remember.

10     Q   So you don't remember if Vickie had a different

11  opinion?

12     A   I don't remember.

13     Q   Okay.  Why would it -- and, I'm sorry, you

14  maybe have said something I should be able to figure it

15  out from, but I can't.  Why would it be permissible to

16  use state funds for this purchase if you were saying it

17  wasn't allowable under federal funds?

18     A   If it was something that would be needed for

19  GNETS, then I think I was just giving her the option of

20  using state funds if -- if she wanted to.  I don't --

21  sometimes I would tell people not to use federal funds

22  versus state funds.  If I didn't understand the full ask

23  or if I needed more information, I would say, well, you

24  can go ahead and use it in state funds, but if you want

25  to talk about federal funding allowability, we will have

1  more of a conversation.  But it didn't mean it was a hard

2  no, and maybe she did use it in federal funds.  I don't

3  know what the follow-up was after this.

4       Q   So are the allowability discussions or

5  restrictions only on federal funds, but state funds -- is

6  there a different word than allowability?  Are there

7  restrictions on state funds what can or can't be used in

8  a GNETS program?

9       A   I don't know what restrictions, if any, are in

10  state funds at this point.  When I was first hired, I --

11  I was told that state funds have more flexibility than

12  federal funds.  So that was probably that mindset that I

13  was gearing in to 2018.

14       Q   And so you're not sure if that's still true

15  because you don't -- who in your office actually reviews

16  the requests for drawdowns or approves, I call them

17  disbursements, for certain event expenses?

18       A   Vickie reviews and approves the GNETS budgets,

19  both state and federal.  Then Malissa's team, the program

20  specialists, review the budgets that come in for more of

21  the fiscal side.  I would -- I would -- I will say I

22  would not give this same response today.

23       Q   Oh, what would you say instead?

24       A   I would say, let's have a phone call.

25       Q   Okay.  And then what would you -- what would



1  your answer be on the call?

2      A   I don't know what my answer would be.  It would

3  depend on the discussion.

4      Q   Would you need more information?

5      A   I would need more information.

6      Q   Okay.  What kinds of things would weigh one way

7  or the other in terms of your recommendation?

8      A   I'm X'ing out of this Facebook notification.

9          Generally, I ask students specific questions

10  when we're on phone calls, like what -- what do the

11  students need?  Are things -- are these needs detailed in

12  an IEP?  Why do you need this?  I can't tell you exactly

13  what would be discussed, but those are the type of things

14  I would be asking.

15          MS. TAYLOE:  Okay.  Okay.  I'd like to

16  introduce as Exhibit 597, GA00885099.

17          (Plaintiff's Exhibit 597 was marked for

18  identification.)

19      Q   BY MS. TAYLOE:  And I will give you a minute to

20  review it.

21      A   I don't even see it.

22      Q   Once it's up, I'll give you a minute to review

23  it.

24      A   It's up.  Should I review it?

25      Q   Yes, please.



1        A    Okay.  I have read it.

2        Q    Okay.  This is a May 2017 e-mail thread between

3   you and Pat Wolf; is that correct?

4        A    And Zelphine Smith-Dixon.

5        Q    And who?

6        A    Zelphine Smith-Dixon.

7        Q    And who is Pat Wolf?

8        A    I don't recall unless it says it right there in

9   the e-mail signature, so I'm going to look.

10            She's -- he or she is a GNETS director.  She.

11        Q    On her May 23rd e-mail, it says, Director GNETS

12   of Oconee?

13        A    Yeah.

14        Q    Okay.  And who is Zelphine Smith-Dixon?

15        A    I believe at the time she was the special

16   education director for the state.

17        Q    Okay.  And is that the position that's

18   currently held by Wina Low?

19        A    That is the position.

20        Q    Okay.  And in this e-mail thread, she's asking

21   for approval for an additional percentage of carryover;

22   is that correct?

23        A    It looks so -- like it is, yes.

24        Q    And what are -- she's talking about VI-B.  But

25   I assume that's Title VI-B; is that correct?



1        A    VI-B, yes.

2        Q    VI-B.  What are VI-B funds?

3        A    IDEA Part B funds.

4        Q    So the VI is the IDEA-B we were talking about

5    before?

6        A    Yes.

7        Q    Okay.  And so you told her that GNETS may carry

8    over 25 percent of the federal funds but state funds may

9    not be carried over, correct?

10       A    That's correct.

11       Q    That's like we talked about before.

12            And you said the state -- no state funds can be

13   carried over, like any state grant doesn't have any

14   carryover?

15       A    I don't know that any state grant -- I don't

16   know about all state grants.  I can't speak to all of

17   state grants, but I believe that state funds cannot be

18   carried over.

19       Q    Okay.  At least none in your division can be

20   carried over?

21       A    None in our division can be carried over.

22       Q    Okay.  And then she explains that GNETS of

23   Oconee's funds are tight because they transition from a

24   center-based program to a satellite program.

25            Do you know what that means?



 1      A    I know -- no.  I mean, I know what center-based

 2   means, I believe, and I know what the word satellite

 3   means, but specifically, no.

 4      Q    Okay.  And she also notes that the -- the six

 5   systems we serve do not intend to provide any local

 6   funding.  Do you see that?

 7      A    I see it.

 8      Q    We talked a little about that before, but now

 9   we have a concrete case.  I'm curious, does Georgia

10   Department of Education require any funding by the LEAs

11   that send their students to a GNETS program?

12           MS. JOHNSON:  Object to form.

13           THE WITNESS:  I can't speak to that.  I don't

14   know.  I don't know if we require any local funding

15   currently.  I haven't been in GNETS conversations in a

16   long time.  I do know that our message is that the

17   students have to be served, so...

18      Q    BY MS. TAYLOE:  But none of the budgets you

19   approve are ever conditioned or involve any consideration

20   of local funding?

21           MS. JOHNSON:  Object to form.

22           THE WITNESS:  No.  I do not approve local

23   funding budgets.

24      Q    BY MS. TAYLOE:  And -- and they are not taken

25   into account in the approval of state grants?



1          MS. JOHNSON:  Object to form.

2          THE WITNESS:  No.

3      Q   BY MS. TAYLOE:  And then you wrote to Zelphine

4   Smith-Dixon and asked, "Are we giving GNETS and GLRS

5   waivers every three years as we are to LEAs?  If so, are

6   we approving them in FY18?"

7          Can you explain that question, those questions?

8      A   Yes.  So I was asking if we are giving GNETS

9   and GLRS waivers, which in the past were -- we only

10  allowed 25 percent carryover of everybody.  And so every

11  three years an LEA could say, I would like to carry over

12  more than 25 percent, so we would give a waiver and allow

13  that.  The reason I was told when I was hired was because

14  we wanted people to -- or LEAs to draw down their funds,

15  so I was asking if GNETS and GLRS received those waivers

16  as well.

17     Q   So when you would allow waivers every -- yeah,

18  allow waivers every three years for extra carryover, is

19  it only for the excess in the third year?

20     A   I think within a three-year time period, LEAs

21  could have requested that.  That is no longer the

22  procedure.

23     Q   Oh, I see.  So it didn't happen -- it didn't

24  have to fall in the third year, but if sometime during

25  those three years you had a carryover, you could -- you



 1   could use the excess --

 2       A   Yes.

 3       Q   -- carryover?

 4       A   Yes.

 5       Q   Okay.  And you were not sure if this waiver was

 6   also available for GNETS and GLRS; is that correct?

 7       A   I was not sure.  It appears.

 8       Q   Do you know now if it -- if they have the same

 9   option?

10       A   We don't do waivers at all anymore.  I think

11   everybody -- well, GLRS is now on a contract, and GNETS

12   receives all of the carryover, and so do all of the LEAs,

13   if they have any carryover that we've granted.  Except

14   for state.  State cannot be carried over.

15       Q   Okay.  All right.  So I -- I asked that

16   question badly.

17           So when these waivers were still in effect, do

18   you now know whether GNETS and GLRS had the same waiver

19   options that LEAs did?

20           MS. JOHNSON:  Object to form.

21           THE WITNESS:  I don't remember.  I don't

22   remember.

23           Let me scroll back up here.  This e-mail leads

24   me to believe that I did not think that they did.

25       Q   BY MS. TAYLOE:  Okay.  And did you meet with



1  Zelphine Smith-Dixon later to talk about this or have

2  further conversations with her about it?

3       A    I don't remember.

4       Q    Okay.  Okay.  So that was when the waivers were

5  still in effect, and then that every three-year waiver

6  practice stopped.  Did that stop at the same time that

7  the sort of unlimited carryover policy went into place?

8       A    Did the waivers stop at -- are you asking about

9  the waivers?

10      Q    Yeah, you said it -- we don't do the every

11 three-years waivers anymore, but now there's not that

12 restriction of 25 percent.  I'm just wondering if those

13 happened at the same time or there was a time in between

14 where there was no carryover allowed?

15      A    Okay.  There was never a time in between, to

16 my -- that I can recall that there was no carryover

17 allowed for LEAs.  When we stopped the waivers, we went

18 to 100 percent carryover, so all IDEA funds can be

19 carried --

20      Q    At the same time?

21      A    -- over.  100 percent, yes.

22      Q    Okay.  So all federal IDEA funds -- or all

23 federal funds could be carried over unlimited?

24      A    That's correct.

25      Q    Thank you.



1          And that's still the rule now?

2      A    That's the rule.

3          MS. TAYLOE:  Okay.  Okay.  I will produce this

4    document 598 -- I'm sorry, Exhibit 598, document

5    GA03838390.

6          (Plaintiff's Exhibit 598 was marked for

7    identification.)

8          THE WITNESS:  I see a document.  Should I

9    review it?

10     Q    BY MS. TAYLOE:  Yes, please.

11     A    Okay.  I have read it.

12     Q    This is a July 2019 e-mail thread starting with

13   Stacey Benson.  And who is Stacey Benson?

14     A    I believe she is a GNETS director.

15     Q    Okay.  Can you explain this thread to me?

16     A    Which part of it?

17     Q    I mean, there's talk about charging indirect

18   costs to federal or state grants, and there seems to be

19   some confusion, and you said there is awaiting further

20   discussion of the proposal.  I just -- I'd appreciate

21   clarification of all of it.

22     A    Yes.  So the Georgia Department of Education

23   allowed 1 percent in direct costs to the state grant and

24   no indirect costs to the federal grants, and that was

25   not -- that did not align with my understanding of what



1   indirect costs were, so I requested meetings about

2   indirect costs.

3          And can -- are we allowed to charge it to the

4   federal grant instead of the state grant, because state

5   funds don't really generate indirect costs; federal

6   grants do generate indirect costs.  And I believe it's

7   referencing those conversations.

8      Q   So I need to back up a little bit, then.  Is

9   indirect -- the 1 percent indirect cost, is that the

10  charge that -- not charge, but the compensation that the

11  fiscal agent gets for serving as the fiscal agent for a

12  GNETS program?

13     A   It's -- yeah, I mean, it's kind of like an

14  administrative fee.  I mean, yeah.

15     Q   So the fiscal agent gets 1 percent of -- and

16  maybe this is what the question is about.  Does it get 1

17  percent of the whole GNETS grant or just part of -- just

18  the federal part or just the state part?

19     A   They did allow 1 percent of the state funding

20  portion and no percentage in the federal funding portion.

21     Q   And they did allow -- you said that was Georgia

22  Department of Education?

23          MS. JOHNSON:  Object to form.

24          THE WITNESS:  Or whoever made the decision,

25  when it was first made.  Someone -- we carried it out,



1   but someone made that decision at some point.  I don't

2   know who.

3       Q   BY MS. TAYLOE:  Didn't you tell me earlier that

4   IDEA funds have a certain part that is also for

5   administrative costs?

6       A   Most federal grants have -- are allowed

7   indirect costs, yes.

8           (Court reporter clarification.)

9       Q   BY MS. TAYLOE:  So would this be in addition to

10  that?

11      A   No.

12      Q   So the -- the federal grant that comes to

13  Georgia has a percentage intended to cover administrative

14  costs, the indirect costs.  What -- what happens to that

15  money?

16          MS. JOHNSON:  Object to form.

17          THE WITNESS:  Can you repeat that?

18      Q   BY MS. TAYLOE:  So the -- the indirect costs

19  portion of the federal grant, where does that money go

20  to?

21      A   I had questions about indirect costs, and my

22  direct supervisor, Chris Horton, who has since passed

23  away, I had questions about this, and I asked if he could

24  find out about it.  And he called the previous person in

25  the position, which was Harry Repsher, and Harry Repsher



1  said to Chris, the 1 percent from the state grant was

2  decided -- I don't know by whom -- but if they took 1

3  percent in administrative costs, it was actually designed

4  to give them more administrative cost and allow them more

5  flexibility.

6         So because we allowed that 1 percent in the

7  state funds, we did not allow any percentage in the

8  federal funds, and it is a state discretionary grant.

9  And so, you know, Harry told Chris that we have the

10  discretion to make that decision, which I questioned

11  several times, and I asked that we change the calc- --

12  that we allow indirect costs in federal funds, and along

13  with Amy Rowell has also questioned me about why we do

14  that, and I say I don't know.

15     Q   And so in this, you said you are awaiting

16  further discussion of the proposal.  Do you know if there

17  have been any changes?

18     A   I don't know.

19     Q   So as far as you know, the current rule is that

20  1 percent of indirect costs may be charged to the state

21  grant and none to the federal grant?

22     A   I believe that's still the case.

23     Q   Okay.  So the RESA would receive in

24  compensation for serving as the fiscal agent for GNETS

25  program 1 percent of the state portion of the GNETS



1    grant?

2         A    Yes.

3         Q    Okay.  Thank you for helping me through that.

4              MS. TAYLOE:  Okay.  And as Exhibit 599, I'd

5    like to introduce GA00019233.

6              (Plaintiff's Exhibit 599 was marked for

7    identification.)

8              THE WITNESS:  I see something.

9         Q    BY MS. TAYLOE:  Would you mind reviewing it?

10        A    Okay.  It skipped really far, and I can't get

11   it to go back to the middle.  Oh, maybe -- maybe not.

12             Okay.  I read it.

13        Q    So this is an October 2016 e-mail thread that

14   starts with Monique McCoy about a Bibb County greenhouse

15   repair; is that correct?

16        A    That's correct.

17        Q    And I'm curious because this question was first

18   directed to you and then you forwarded it to Nakeba

19   Rahming; is that right?

20        A    Yes.

21        Q    And then Nakeba Rahming looped in Debbie Gay;

22   is that correct?

23        A    That's correct.

24        Q    And then after confirming that y'all were

25   talking about federal funds, Debbie Gay asked your



 1   opinion, correct?

 2       A   Correct.

 3       Q   And I'm curious about the timing of this.  Was

 4   this during the time of turnover with new people or

 5   something that so many people were seeking each other's

 6   thoughts on this question?

 7       A   I'm not sure when Nakeba Rahming became -- came

 8   to the Department of Education, but when she came to the

 9   Department of Education, it followed the same procedure

10   that is the current procedure with Vickie Cleveland.  So

11   all of the GNETS questions and even budget approvals

12   go -- went to her first, just like they go to Vickie

13   first now.

14           So Monique McCoy was a program specialist and I

15   was her supervisor, so she asked me, and I forwarded it

16   to Nakeba.

17       Q   Okay.

18       A   And then Debbie was the director at the time,

19   so...

20       Q   Okay.  And Debbie's reaction was that she was

21   very iffy on this, did not see it as a supplemental

22   service to support student improvement.  Do you see where

23   she says that?

24       A   I read it.

25       Q   Okay.  Was that the standard for allowable



1  expenses for federal education funds at the time?

2       MS. JOHNSON:  Object to form.

3       THE WITNESS:  I don't think that that was the

4  sole determination for allowability at the time, but it

5  may have been one piece of it.

6    Q   BY MS. TAYLOE:  But that was why she was

7  expressing hesitation to approve this expense under

8  federal form -- funding?

9       MS. JOHNSON:  Object to form.

10      THE WITNESS:  I don't know why she was

11  expressing hesitation.  It -- I -- if I'm reading an

12  e-mail and trying to determine what's in somebody's head,

13  it appears that she thinks it's grounds maintenance.  So

14  I would think that that's why she is iffy on it, but

15  that's my opinion.

16   Q   BY MS. TAYLOE:  Do you have an opinion about

17  why she said it was important for her to include that she

18  does not see it as a supplemental service to support

19  student improvement?

20      MS. JOHNSON:  Object to form.

21      THE WITNESS:  Because IDEA funds generally are

22  supplemental.  We don't have the -- you know, as I stated

23  before, maintenance of effort and excess cost calculation

24  are the supplanting tests, so we don't have like a

25  one-to-one supplanting test, but we do know that they are



1    supposed to be supplemental funds.

2         Q    BY MS. TAYLOE:    Okay.    And you responded that

3    you are not sure that such expenses would be reasonable,

4    necessary or support the purpose of the grant; is that

5    correct?

6         A    I did say that.

7         Q    And would that -- are you saying that because

8    that would be relevant to a federal or a state grant

9    expense?

10        A    Yes.

11        Q    Which or both?

12        A    Well, reasonable, necessary, allocable and

13   documented, those are cost principles in the uniform

14   grants guidance.    But I need to look at the date, because

15   the uniform grants guidance didn't come into play until I

16   think -- okay.    It's 2016, so they would have been in

17   play at that point.

18             So yeah, I was -- I imagine I was talking about

19   federal cost principles.

20        Q    Okay.    And then you wrote, "Given the needs of

21   these students and the improvements we have been making

22   in this" -- I'm sorry, "making to this program, I would

23   think it prudent to receive data even if this were being

24   budgeted with state funds."

25             So first, who is the "we" in that sentence



1   referring to?

2       A   I -- I don't know specifically, but I think it

3   is -- I don't know.  I think it's the -- I think I was

4   meaning the Department of Ed or the special education

5   office.

6       Q   Okay.  And what improvements were the

7   Department of Education or the special education office

8   making to the GNETS program at that time?

9       A   I don't know all of the improvements that they

10  were making, other than it was discussed that they were

11  making improvements.

12      Q   Do you know any of the improvements?

13      A   I believe they were making improvements to

14  facilities.  I think that they were making improvements

15  as far as record reviews.  But no, I don't know all of

16  the improvements or exactly what they are.

17      Q   What do you mean by "record reviews"?

18      A   I -- I don't know what I mean.  I hear Vickie

19  saying they are doing record reviews, so I think I'm just

20  saying it.  I don't know what it entails.

21      Q   Okay.

22          MS. TAYLOE:  Okay.  And then one more.  As

23  Exhibit 600, I would like to introduce GA03826080.

24          (Plaintiff's Exhibit 600 was marked for

25  identification.)



1      Q   BY MS. TAYLOE:  And once you see it, if you can

2   review it, please.

3      A   Okay.  I have reviewed it.

4      Q   Okay.  Thank you.

5          And this is an e-mail thread spanning parts of

6   May and June of 2018, starting with Chris Briggs.  Who is

7   Chris Briggs?

8      A   I don't know Chris Briggs, but let me see the

9   -- director of GNETS Mainstay.

10      Q   Okay.  And do you know who Sheila Mincey is --

11   or I'm sorry, Shelia Mincey?

12      A   I think it's Shelia.  I think -- I think she's

13   a special ed director of a school district.

14      Q   Okay.

15      A   If I recall.

16      Q   And Ms. Briggs wrote to Ms. Mincey that

17   Mainstay finally had the money to spend on a couple

18   high-priced items that will really serve the program

19   well.  Do you see that?

20      A   I see that.

21      Q   Or did you read that?

22      A   I read it.

23      Q   One of the items is a Micro Bird bus that she

24   says is "for us to use to run our midday routes and

25   community-based roots with."



AMBER MCCOLLUM                                    November 09, 2022
UNITED STATES vs STATE OF GEORGIA                              204

1      A   I see that.

2      Q   And that e-mail was internal to prepare a

3   budget amendment to request that their funds be approved

4   for the purchase.  Do I have that right?

5      A   It looks to be so.

6      Q   Okay.  And can you just help me understand why

7   that would be a budget amendment rather than a drawdown

8   request?

9          MS. JOHNSON:  Object to form.

10         THE WITNESS:  Specifically, I'm -- I'm not

11  sure, but I imagine if they're doing a budget amendment,

12  it's because it's not already in the budget.  So they

13  would want to do a budget amendment before they drew

14  down -- they draw down funds.

15     Q   BY MS. TAYLOE:  Okay.  So they -- they must

16  have had the sufficient amounts of money, but it had not

17  been previously designated for that purpose?

18         MS. JOHNSON:  Object to form.

19         THE WITNESS:  That could be the case.

20     Q   BY MS. TAYLOE:  How -- how could it not be the

21  case, given our discussion before about how budget

22  amendments work and what she's written here?

23         MS. JOHNSON:  Object to form.

24         THE WITNESS:  It could not be the case because

25  this was May 17th, 2018, and I feel like I need a little



1   more context.  I'm assuming they're talking about the

2   current year budget, but they may be talking about the

3   upcoming budget and may be making plans for the upcoming

4   year.  So I don't know if they would have been able to

5   have an amendment.  I mean, if it was the upcoming year,

6   then they wouldn't have done even an original budget,

7   so -- but if they're asking about an amendment, then I

8   would assume it is the current year.

9        Q   BY MS. TAYLOE:  Okay.  And --

10       A   Oh, okay.

11       Q   And she said, "We then need to submit to the

12  state and make sure they approve."  And that's because

13  that's the amendment process, correct?

14       A   Yes.  Correct.

15       Q   And then Ms. Mincey forwarded it to you for

16  approval; is that correct?

17       A   Yes.

18       Q   And then on June 6th -- I'm sorry, June 7th,

19  did you forward the request to Vickie Cleveland?

20       A   Yes.

21       Q   And why is that?

22       A   Because Vickie Cleveland reviews all of the

23  GNETS funding before they come to us.

24       Q   Like you've been saying before?

25       A   Yes.



1     Q   And you said you were not sure whether it was

2     allowable from state funds.  Were you seeking Vickie's

3     opinion on that or was she the decider?

4          MS. JOHNSON:  Object to form.

5          THE WITNESS:  It appears I am seeking her

6     opinion, but I said I think it would be allowable in

7     state funds, so.

8     Q   BY MS. TAYLOE:  And then after speaking with --

9     well, the e-mail says that after speaking with Chris,

10    Vickie Cleveland wrote, "I would not approve GNETS state

11    grant funds to purchase a bus"; is that correct?

12    A   I'm scrolling back up.

13        Yes, that is correct.

14    Q   Okay.  And she indicated that Mainstay needs to

15    meet with the LEA special ed director to work something

16    out; is that correct?

17    A   It indicates that.

18    Q   Okay.  And what was your response to that?

19    A   I said, "Great."

20    Q   So why did the State deny the LEA and the

21    program the authority to use their budgeted funds to make

22    a purchase if the program determined it would be

23    beneficial and would help get GNETS students into the

24    community?

25        MS. JOHNSON:  Object to form.



1          THE WITNESS:  I don't know why the

2     determination was made because I wasn't on the phone

3     call, if she had a phone call.

4          Q    BY MS. TAYLOE:  So the GNETS program and the

5     LEA together were preparing a budget amendment and sought

6     the State's approval for it, and it was denied without

7     any further documentation besides what's in this

8     document?

9          MS. JOHNSON:  Object to form.

10         THE WITNESS:  We don't document every

11    conversation that we have when we're discussing

12    allowability.  So I can only speak to exactly what's in

13    the e-mails, but I -- I feel like they don't give all of

14    the context, because I don't know what was in the

15    conversation with her.

16         I think, if I'm only speaking for myself, I

17    originally said they wouldn't have been allowed for

18    federal but allowed for state, the bus, because

19    transportation is universal to all students, and so we

20    generally don't approve buses in special education,

21    although, we have before if there has been a documented

22    specific special education need.

23         So I forwarded it to Vickie to find out about

24    that, and then I wasn't part of the decision after that.

25    It sounds like she talked to Chris and found out more



1   about it.

2       Q   BY MS. TAYLOE:  And even though LEAs are not

3   required to make any contributions, this could be denied

4   on the grounds that that's something they should be able

5   to work out with the LEA?

6           MS. JOHNSON:  Object to form.

7           THE WITNESS:  It could be denied on -- on many

8   different grant -- multiple reasons it could be denied.

9   I don't think it's just because we expect that the LEA

10  should have the funding.  It may have been something that

11  Chris, you know, told Vickie.  There could have been

12  details that Chris told Vickie that led Vickie to believe

13  that it's not allowable, but all of this is speculation

14  because I don't know what they talked about.

15      Q   BY MS. TAYLOE:  Okay.  So even with your

16  recommendation that you found it allowable, Vickie

17  Cleveland had the authority to deny the purchase?

18          MS. JOHNSON:  Object to form.

19          THE WITNESS:  I trusted her as a colleague in

20  the conversation that she had because she's the program

21  director for GNETS, but my "great" does not mean that I

22  thought that was great.  My "great" meant I'm ready to

23  move on.

24      Q   BY MS. TAYLOE:  Yeah, I didn't take it as an

25  endorsement of, you know, denying it; just that it was



1   determined.

2       A    Right.

3       Q    But that was how you took it, it was

4   determined, like we had decided not to permit --

5       A    Yeah.

6       Q    -- this purchase?

7       A    That's how I took it, yeah.

8       Q    Okay.

9            MS. JOHNSON:  When you get to a stopping point,

10  can we take a break?

11           MS. TAYLOE:  We were actually planning on that.

12  So in 20 minutes or so?

13           MS. JOHNSON:  In 20 minutes or a 20-minute

14  break?

15           MS. TAYLOE:  No, take it now for about 20

16  minutes.

17           MS. JOHNSON:  Okay.  I mean, I don't need that

18  long, but if you want 20 minutes, that's fine.

19           MS. TAYLOE:  Is 20 minutes okay with everybody?

20           MS. JOHNSON:  Sure.

21           THE VIDEOGRAPHER:  Off the record at 4:09 p.m.

22           (The deposition was at recess from 4:09 p.m. to

23  4:33 p.m.)

24           THE VIDEOGRAPHER:  Back on the record at 4:33

25  p.m.



1    Q   BY MS. TAYLOE:  Okay.  I want to ask you a few

2    questions about the GNETS rule.  Are you familiar with

3    the GNETS rule?

4    A   I am familiar to the extent that I know that we

5    have one, but I don't know the details of it.

6    Q   Okay.  And I'd like to introduce -- I don't

7    have to have it marked -- a document previously marked as

8    Exhibit -- Plaintiff's Exhibit 82, which is the GNETS

9    rule for reference.

10    A   Would you like me to review it?

11    Q   No, it's kind of long.  I think I'll direct you

12    to places I want your attention.

13    A   Okay.

14    Q   So Section (a), if you can see there, outlines

15    what it says are the SEA responsibilities.  Do you see

16    that?

17    A   Is it the little?

18        MS. JOHNSON:  I think we're in the wrong.

19        THE WITNESS:  I'm in definitions.

20    Q   BY MS. TAYLOE:  There we go.  So it's 5(a).

21    Sorry.

22    A   Okay.  I see that.

23    Q   Okay.  So for purposes of the GNETS rule, do

24    you know who -- who is this SEA?

25    A   The Georgia Department of Education, the State



 1   Educational Agency.  That's what SEA stands for.

 2       Q   Okay.  And do you see in -- within that section

 3   (d)3 or (d)5, where they say SEA or GaDOE?

 4       A   Did you say D, as in dog, like (d)3?

 5       Q   Yes.  Sorry.

 6       A   I don't know those military letters.

 7           All right.  (d)3.  Okay.  I see (d)3.

 8       Q   Okay.  So if it's -- do you see it says SEA or

 9   GaDOE?

10       A   No.  I see that it says, "SEA and the GaDOE."

11       Q   Okay.  So do you still think SEA refers to

12   GaDOE?

13           MS. JOHNSON:  Object to form.

14           THE WITNESS:  I don't know what it refers to.

15       Q   BY MS. TAYLOE:  All right.  So we're working

16   through some of the responsibilities, and I'm going to

17   try to figure out who does some of these things.  Okay?

18       A   Okay.

19       Q   In (a) -- I'm sorry, I didn't mark all my

20   sections properly.  Where it says, SEA receive and

21   disburse funds appropriated by the General Assembly to

22   support the GNETS services, would that be the Board of

23   Education or GaDOE or both together?

24       A   Okay.  Can I --

25           MS. JOHNSON:  Object to form.



AMBER MCCOLLUM                                    November 09, 2022
UNITED STATES vs STATE OF GEORGIA                             212

```
 1             THE WITNESS:  -- read what you're reading?  Are
 2   you on page 2?  Nope.  It wouldn't be on page 2.  Let me
 3   find where SEA is.  Okay.  Is it -- are you talking about
 4   5?
 5        Q   BY MS. TAYLOE:  Yeah.
 6        A   (a)?
 7        Q   Yeah.
 8        A   Okay.  I see this.
 9        Q   So are the funds received and disbursed by the
10   Board of Education, by Department of Education or some
11   combination?
12             MS. JOHNSON:  Object to form.
13             THE WITNESS:  It says the Georgia General
14   Assembly in the rule.
15        Q   BY MS. TAYLOE:  That's who appropriates the
16   funds.  And then it says, the SEA receives and disburses
17   funds.
18        A   That's true, that it says that.
19             What's your question?
20        Q   So who receives and disburses the funds?
21             MS. JOHNSON:  Object to form.
22             THE WITNESS:  Are you asking about a person or?
23        Q   BY MS. TAYLOE:  No.
24        A   An agency?
25        Q   An agency.
```



1      A    Okay.  I -- it says, the SEA shall receive and

2  disburse funds, and I believe that that happens.

3      Q    Does it happen within GaDOE?

4      A    I believe that it happens within GaDOE.

5      Q    Okay.  And it says -- the next subsection says:

6  The rule states that SEA will collaborate with GaDOE to

7  develop rules and procedures regulating the operation of

8  the GNETS grant, including the application process?

9      A    Which part?  What's the sub?

10     Q    (a)2(i), "Develop" policies -- I'm sorry.

11 "Develop rules and procedures."

12     A    I see it.  I see that, what you're talking --

13 "Administer the grant funds by performing the following

14 in collaboration with GaDOE."  I see this, yes.

15     Q    Okay.  So has GaDOE, or has your division in

16 GaDOE developed rules and procedures regulating the

17 operation of the GNETS grant?

18          MS. JOHNSON:  Object to form.

19          THE WITNESS:  I don't know.  I'm not developing

20 rules and procedures regulating the operation of GNETS

21 myself personally.  I do assist with the development of

22 rules and procedures in special education as a whole.

23     Q    BY MS. TAYLOE:  Okay.  Has your division

24 developed rules and procedures regarding the operation of

25 a GNETS grant?



1          MS. JOHNSON:  Object to form.

2          THE WITNESS:  As grants as a whole, yes.  So we

3    have a -- you know, procedures that we follow and budget

4    amendments come in, and yes.  But it's not specific to

5    GNETS, the procedures that I follow.

6      Q    BY MS. TAYLOE:  Okay.  And the procedures for

7    grants as a whole also apply to the GNETS grants?

8      A    Yes.

9      Q    Okay.  And then in the next subsection, it

10   says, "Notify the fiscal agents regarding each fiscal

11   year's allocation and approve GNETS services budgets"?

12     A    I see that it says that.

13     Q    Does GaDOE do that?

14         MS. JOHNSON:  Object to form.

15         THE WITNESS:  Yes.  GaDOE does do that.

16     Q    BY MS. TAYLOE:  Okay.

17     A    GaDOE approves GNETS specific LEA budgets.  In

18   my office, I can't speak to what other people do, but I

19   do know that for the federal funds specifically, we do

20   send out grant award notifications, and we post how much

21   funding they'll receive in state and federal on our

22   website, so...

23         But I don't know if I'm reading this in

24   context, as like if it's a big notification or if you're

25   talking about what I do specifically.



1       Q    You answered my question.  That -- that's what
2   I meant.

3       A    Okay.

4       Q    Like the Department of Education does do those
5   things.

6       A    Okay.

7       Q    And then the next subsection is (a)2, and then
8   Roman numeral (iii).  It says, "Monitor GNETS to ensure
9   compliance with Federal and state policies, procedures,
10  rules, and the delivery of appropriate" -- sorry,
11  "appropriate instructional and therapeutic services."

12           Is GaDOE involved in that monitoring?

13           MS. JOHNSON:  Object to form.

14           THE WITNESS:  I don't know all of the
15  monitoring that takes place.  I can just speak to the
16  monitoring that I do, and I do a subset of that.

17      Q    BY MS. TAYLOE:  And what is the subset of
18  monitoring that you do?

19      A    Cross-functional monitoring, that would be more
20  federal grants.  And, you know, we -- I would want to
21  know what the definition of monitor is here, because it
22  could mean a lot of things.  I monitor drawdown -- I
23  mean, I don't specifically monitor them now, but in the
24  past I have monitored drawdowns.  I have monitored
25  procedures to overall budgets, so those are some of the



1   things, the activities that I would do as a subset of

2   that, but I can't speak to what the department does as a

3   whole.

4        Q   Okay.  And do you believe that the programmatic

5   monitoring you referred to earlier includes monitoring of

6   the delivery of appropriate instructional and therapeutic

7   services?

8            MS. JOHNSON:  Object to form.

9            THE WITNESS:  I don't do that monitoring, so I

10  don't know the specifics of it, but I do know that they

11  review GNETS IEP records during that monitoring.  I -- I

12  don't even see the outcome of that.

13       Q   BY MS. TAYLOE:  Is there any other division or

14  part of GaDOE that you believe is involved in the

15  monitoring of the delivery of appropriate instructional

16  and therapeutic services?

17           MS. JOHNSON:  Object to form.

18           THE WITNESS:  Did you ask me if -- if I knew of

19  someone?

20       Q   BY MS. TAYLOE:  If there is any other

21  department or division of GaDOE that you believe is

22  involved in that?

23       A   I believe that RDA, our results-driven

24  accountability unit, is involved in -- partially involved

25  in monitoring.  And I believe that Vickie Cleveland and



1    LaKesha would be a part of that monitoring.  Outside of

2    that, I'm not sure who else in GaDOE would be a part of

3    that monitoring, but there could be other people.

4         Q    And LaKesha is LaKesha Stevenson?

5         A    LaKesha Stevenson, yes.

6         Q    Are any reports required under the GNETS rule

7    submitted to your office?

8              MS. JOHNSON:  Object to form.

9              THE WITNESS:  This rule as -- are you meaning

10   this rule as a whole?

11        Q    BY MS. TAYLOE:  Uh-huh.

12        A    I don't know, but I would believe so.

13        Q    Which reports do you think that includes?

14        A    I don't know.  I'm guessing that they would --

15   there would be reports.  I mean, earlier we saw an e-mail

16   where someone attached several documents, and I do know

17   that Vickie collects documents and other individuals

18   collect documents, so I would -- it is speculation, but I

19   would imagine that would be happening.

20        Q    So there is no systematic process in your

21   division to review reports that are specifically provided

22   to you in accordance with the rule?

23             MS. JOHNSON:  Object to form.

24             THE WITNESS:  There may be.  There may not be.

25   I'm not aware of a -- aware or not aware of a systemic



1    practice.

2        Q    BY MS. TAYLOE:  In your current role as program

3    manager, are you aware of any process to review reports

4    submitted to your office?

5        A    That's difficult to answer, because I have

6    heard Vickie saying they're doing record reviews.  I have

7    heard our RDA team say they are doing record reviews to

8    include GNETS.  I have seen cross-functional monitoring

9    training that says GNETS records will be pulled.

10           I cannot speak to specific reports or

11    additional things that may be submitted and to whom they

12    would be submitted.

13       Q    Okay.  So you have heard about these reports or

14    reviews, but there is no process in your office to

15    collect or review them?

16       A    I can't speak to the whole office.

17       Q    As program manager, would you know if they

18    were?

19       A    I -- we really stay in our lane.  As program

20    manager of the fiscal side, I stayed in my lane on that,

21    and now I am senior program manager, but I don't interact

22    with GNETS a lot.  So I don't know if they are sending

23    reports to Vickie on a regular basis or not.  It would --

24    I would imagine they would go to Vickie, but I'm not

25    sure.



 1      Q   Okay.  Who -- who in your office would review

 2  them on the fiscal side?

 3          MS. JOHNSON:  Object to form.

 4          THE WITNESS:  Which reports?

 5      Q   BY MS. TAYLOE:  Any.  I'm saying you're not

 6  aware of any -- people stay in their lane.  Vickie

 7  reviews them.  You've said before she reviews for

 8  programmatic things.  Who in your office would review

 9  them on the fiscal issues?

10          MS. JOHNSON:  Object to form.

11          THE WITNESS:  Our budget team reviews budgets.

12  We review drawdown reports, things like that.  I don't

13  know if you are referring to a specific report.  I'm -- I

14  know you're asking me in context of this rule, but I

15  don't know what specific reports.  But I can -- I can

16  speak to what the fiscal team reviews.

17      Q   BY MS. TAYLOE:  Okay.  Okay.  In the next

18  section, I think this is section (e).  Where is fiscal

19  agents?

20          Okay.  Section (d), where it says, "The fiscal

21  agent shall"?

22      A   Yes, I see it.

23      Q   What are "restricted GNETS accounts"?  That

24  language is in the second parenthetical.

25      A   I don't know what "restricted GNETS accounts"



 1  mean.

 2      Q   And then in 3 it says they will -- the fiscal

 3  agents will submit financial reports as requested by

 4  GaDOE and SBOE.

 5          Have -- has your division ever requested

 6  reports to be submitted?

 7          MS. JOHNSON:  Object to form.

 8          THE WITNESS:  Number -- were you quoting number

 9  3?  It says "SEA and the GaDOE"?

10      Q   BY MS. TAYLOE:  Oh, I'm sorry, I misread that,

11  "as required by."

12          MS. JOHNSON:  Can you repeat the question?  I'm

13  sorry.

14          THE WITNESS:  Yes.  Please repeat your

15  question.  I'm sorry.

16      Q   BY MS. TAYLOE:  In the third parenthetical

17  there, it says, "Submit financial reports as required by

18  the SEA and the GaDOE."

19          Have you ever received any reports from the

20  fiscal agents pursuant to this provision?

21          MS. JOHNSON:  Object to form.

22          THE WITNESS:  Yes.

23      Q   BY MS. TAYLOE:  What reports are those?

24      A   We have received completion reports, which

25  shows how they submitted their grant, what their final



1  expenditures were in their grant.  We have received

2  financial reports in monitoring, and that may be -- it

3  could include -- that could include a lot of different

4  reports.  It may be a general ledger report.  It may be

5  evidence to speak to specific -- a specific item in the

6  budget.

7        So if you are asking me about overall financial

8  reports, I have seen financial reports, and I know that

9  some have been submitted.  But in the context of what

10 exactly this rule is talking about, I don't -- I'm not

11 sure.

12     Q   Okay.  When fiscal agents submit completion

13 reports, what is done with them in your office?

14     A   It is a part of what we review in monitoring.

15 We look to see if the final completion report matched the

16 budget.  Things like that.

17     Q   When you say "things like that," are there

18 other things besides the match to the budget?

19     A   There could be.  It depends on if -- if we

20 looked at a completion report and something stuck --

21 stuck out at us.  I don't -- I mean, it's not a big part

22 of what we do, but, you know, our grants accounting

23 office receives the completion reports, and they may have

24 a question at various times, but that wouldn't even be

25 specific to GNETS.  It would be just part of what we do



1  for all of the grants that we receive.

2      Q   So this would be mainly comparing their

3  expenditures to their budget and allocation, things like

4  that?

5      A   Yes.

6      Q   Okay.  It also says the fiscal agents -- the

7  next parenthetical, "The Fiscal Agents shall:  Monitor

8  facilities for safety and accessibility."

9          Have you ever received a report from a fiscal

10  agent relating to their findings on that?

11     A   Not that I recall.

12     Q   Have you ever received a request for funding or

13  a budget request in order to address a deficiency

14  identified in one of these reports?

15         MS. JOHNSON:  Object to form.

16         THE WITNESS:  Not that I recall.  It -- when I

17  was reviewing budgets, I was receiving daily requests via

18  e-mail and telephone, so I don't know if it would be --

19  if there would be a budget request for that.

20     Q   BY MS. TAYLOE:  Okay.  And then in 5, it says:

21  Submit requested data to the GaDOE -- I'm sorry.  "Report

22  requested data to SEA or GaDOE."

23         Have you ever requested or received requested

24  data?

25         MS. JOHNSON:  Object to form.



1         THE WITNESS:  I don't know if this is talking

2   about specific requested data.  I have received

3   documents, but I don't know.

4      Q   BY MS. TAYLOE:  Have you ever requested data as

5   a follow-up to anything that you have received?

6         MS. JOHNSON:  Object to form.

7         THE WITNESS:  Not that I recall, but it's

8   possible.

9      Q   BY MS. TAYLOE:  Okay.  Okay.  I think I'm done

10  with the rule.

11        For grants -- for GNETS grants that you have

12  reviewed, has -- does any funding depend on the success

13  of any prior year's use of funds for any stated

14  objective?

15        MS. JOHNSON:  Object to form.

16        THE WITNESS:  Could you repeat that?

17     Q   BY MS. TAYLOE:  Yeah.  When you review an

18  approved GNETS grant, does any funding approval depend on

19  the success of any prior year's use of funds for any

20  stated objectives?

21        MS. JOHNSON:  Object to form.

22        THE WITNESS:  I'm not sure if it does in

23  Vickie's review.  It does not in the fiscal team's

24  review.

25     Q   BY MS. TAYLOE:  Okay.  So a grant application



1    that states a particular intent, it could -- that funding

2    could be granted year after year without anyone verifying

3    that that intent has been successfully achieved or is on

4    the way to being achieved?

5              MS. JOHNSON:  Object to form.

6              THE WITNESS:  I don't make decisions about

7    state appropriations.  Our federal allocations are based

8    on need.  I, again, submit the grant application for the

9    IDEA funds, but I don't make decisions about that

10   application.

11             We have a process to which we -- the managers

12   provide information about what's needed that year, and I

13   just aggregate it and sum it up.  So yes, the federal

14   funds are based on need, and the state funds I have no

15   knowledge of that.

16       Q   BY MS. TAYLOE:  Have you ever received any

17   notification from Vickie Cleveland or anybody in her

18   position that a certain request should not be granted

19   because of compliance issues or -- or indications that it

20   is not being successful?

21             MS. JOHNSON:  Object to form.

22             THE WITNESS:  Not that I recall.

23       Q   BY MS. TAYLOE:  So Vickie may be reviewing

24   grants for, you know, substantive criteria, but she's

25   never asked you or shared any concerns or weighed in



 1  against funding on any -- for any basis, anything based

 2  on those reviews?

 3        MS. JOHNSON:  Object to form.

 4        THE WITNESS:  Not that I recall.

 5     Q   BY MS. TAYLOE:  Can you tell us what the

 6  resource gap analysis is?

 7     A   I don't know what that means.

 8     Q   Okay.  So you don't remember being assigned to

 9  complete a resource gap analysis for any GNETS programs?

10     A   I don't remember.  I don't -- I can guess as to

11  what that means, but I don't remember that.

12     Q   Okay.

13        MS. TAYLOE:  Okay.  Then as Exhibit 601, I

14  would like to introduce the 2010 audit that we mentioned

15  earlier.

16        (Plaintiff's Exhibit 601 was marked for

17  identification.)

18     Q   BY MS. TAYLOE:  Okay.  When it comes up, this

19  is a very long document, so I do not expect you to review

20  it.

21     A   Okay.

22     Q   I will ask you questions about specific places.

23     A   It would be another three hours with this

24  mouse.

25     Q   Can you see it?



1        A    Oh, no.  I'm seeing a document.

2        Q    Okay.  Have you seen this before?

3        A    Not that I recall.

4        Q    Okay.

5        A    It's possible.

6        Q    I think I forgot to ask you, too.  Have you

7   seen -- and you said you had -- you were aware there was

8   a GNETS rule before.  Have you seen the GNETS rule

9   before?

10       A    I have seen the GNETS rule before, yeah.

11       Q    Okay.  Do you remember in what context you saw

12  it?

13       A    No, I don't remember in what context I've seen

14  it.  And I've tried to review all the State Board of

15  Education rules that apply to special ed, but I can't

16  tell you them all.

17       Q    Okay.  And then, I'm sorry, back to the audit.

18  So you don't recall having seen this?

19       A    I don't recall.

20       Q    Okay.  So I'm going to ask you about some of

21  the audit department's conclusions.  And I can provide

22  page numbers if you want to see where they are.

23       A    Okay.

24       Q    But you don't have to read the whole thing.

25            One of the department's conclusions was that



1    GaDOE does not collect sufficient data to determine

2    whether a GNETS program is cost-effective.

3          Has GaDOE done any studies or analyses to

4    address this finding?

5          MS. JOHNSON:  Object to form.

6          THE WITNESS:  I'm not sure.

7    Q   BY MS. TAYLOE:  Have you been asked to provide

8    any data to help with this analysis?

9          MS. JOHNSON:  Object to form.

10         THE WITNESS:  I don't know.  I've been asked to

11   provide budgets in the past but not specific to anything

12   that -- that I would be aware that's related to this.

13   Q   BY MS. TAYLOE:  Okay.  Has GaDOE passed a rule

14   or guidance or anything to require a way to measure LEA

15   contributions?

16         MS. JOHNSON:  Object to form.

17         THE WITNESS:  I don't know.

18   Q   BY MS. TAYLOE:  Okay.  Has GaDOE collected data

19   on the number of students diverted from other placements?

20   A   I'm not sure.

21   Q   Has GaDOE developed measurable goals for GNETS

22   programs and taken steps to identify which indicators

23   could help measure performance?

24         MS. JOHNSON:  Object to form.

25         THE WITNESS:  I'm not sure.



1      Q   BY MS. TAYLOE:  Has GaDOE taken any steps to

2   allow it to identify individual programs that are not

3   performing well?

4           MS. JOHNSON:  Object to form.

5           THE WITNESS:  I'm not sure to the specifics of

6   that.  I -- I know that it was discussed that, you know,

7   measures were being taken for improvement, but I don't

8   know what they were or were in those discussions about

9   specifics other than that it is taking place.

10      Q   BY MS. TAYLOE:  Who was discussing measures to

11  be taken to improvement?

12      A   I mean, it's just been understood and said.

13  Zelphine has said it, Smith-Dixon.  Debbie has said it.

14  Nakeba had said it.  Vickie had said it.  I know they

15  have said it, but...

16      Q   I'm sorry, they have all said what?

17      A   Steps have been taken for improvement, but I

18  don't know specifics.

19      Q   For improvement, do you know of GNETS program

20  generally or of specific aspects of GNETS?

21      A   GNETS in general.

22      Q   Okay.  Has GaDOE created mechanisms to

23  disaggregate appropriate student measures of -- I'm

24  sorry.  Has GaDOE created mechanisms to disaggregate

25  appropriate student success measures of GNETS students



1   and GNETS students by program?

2       A    I'm not sure.

3       Q    Okay.  Now here's one I actually want you to

4   turn to page 25, if you can, and I will help you find

5   the...  So there's a big chart on page 25, and we'll look

6   at the paragraph under the chart.

7       A    Okay.  Okay.  I'm on page 20 of 70.

8       Q    Getting close.

9       A    It's not responding.  It says at the top.

10      Q    We were so close.

11      A    Oh, there it goes a little bit.

12           Are you doing it?

13           MS. GARDNER WOMACK:  I'm trying.  This file is

14   really big and not cooperating.

15      Q    BY MS. TAYLOE:  That's it, yeah.  The paragraph

16   below Exhibit 9.

17      A    I got it.

18      Q    Okay.  So the paragraph is called "Agency

19   Response."

20      A    Okay.

21      Q    This is GaDOE's response to the audit team's

22   finding about accountability.

23      A    Okay.

24      Q    Could you read that paragraph aloud, because I

25   want to ask you some follow-up questions, and I want the



1   comparatives to be on the record.

2        A    Okay.  "Agency Response:  GaDOE agrees that

3   GNETS programs should be held accountable but disagrees

4   that the programs are not accountable to GaDOE.  GaDOE

5   notes that it has held programs accountable by:  setting"

6   standard -- "setting targets for student performance in

7   the State Performance Plan (SPP) and in the Annual

8   Performance Plan (APR); monitoring GNETS program's

9   compliance with the Individuals with Disabilities

10  Education Act (IDEA) and State Board of Education rules;

11  requiring each GNETS program to annually submit a plan as

12  part of the Georgia Continuous Improvement Monitoring

13  Plan (GCIMP); conducting a Focused Monitoring visit of

14  two GNETS programs each year; developing a corrective

15  action plan (CAP) for compliance issues identified in the

16  monitoring process; ensuring that the CAP is implemented;

17  reviewing the IEPs of students served in the GNETS

18  program as a part of the local school district record

19  reviews, and requiring each GNETS program to annually

20  develop a safe schools plan."

21       Q    Okay.  Thank you very much.

22       A    You're welcome.

23       Q    Is GaDOE still doing each of these things to

24  ensure that regional GNETS programs are held accountable?

25       A    I'm not sure.



1        Q    Okay.  Are there any of those that you are

2    familiar with?

3        A    I think that the monitoring GNETS program's

4    compliance with the Individuals with Disabilities

5    Education Act, I believe that to the extent that we're

6    talking about federal funds, that I would have some

7    knowledge of that.  But the rest of it, I do not know.

8        Q    Okay.  Have you seen any corrective action

9    plans?

10       A    I have not seen corrective action plans from

11   focused monitoring visits.  We have -- if we're

12   monitoring any LEA and there needs to be a corrective

13   action in the fiscal team, we develop the corrective

14   action.  So I would have seen those in the monitoring

15   process, but not -- but I'm talking about

16   cross-functional monitoring, not focused monitoring, and

17   I'm not sure if they are intertwined.

18       Q    Okay.  So could GaDOE approve a budget for the

19   statewide GNETS program or an allocation for a regional

20   GNETS program without having any evidence that these

21   reviews had been conducted or the required corrective

22   actions had been taken?

23            MS. JOHNSON:  Object to form.

24            THE WITNESS:  Possibly.

25       Q    BY MS. TAYLOE:  Have, in fact, you approved



1  budgets without having evidence that these reviews have

2  been conducted?

3      A   Yes.

4          MS. JOHNSON:   Object to form.

5      Q   BY MS. TAYLOE:   And have you, in fact, approved

6  budgets without any evidence that the corrective --

7  required corrective actions have been taken?

8      A   Yes.

9          MS. JOHNSON:   Object to form.

10     Q   BY MS. TAYLOE:   Regarding the audit's findings

11  related to systems of care, has GaDOE collaborated across

12  agencies to braid funding streams and develop interagency

13  agreements regarding the provision of behavioral health

14  services?

15     A   I'm not sure.

16     Q   So you -- your division doesn't work with, for

17  instance, DBHDD or anybody else to provide services

18  jointly?

19     A   I don't personally work with DBHDD.  I'm not

20  sure who in the division would.  We do have that state

21  interagency grant that I mentioned earlier, but I'm not

22  working with DBHDD in that regard.

23     Q   The audit team found that such collaboration

24  could enable GaDOE to sign a state level agreement

25  allowing DBHDD providers into the GNETS program to



1  provide therapeutic services at the GNETS facility.

2          Has this occurred?

3      A   I'm not sure.

4      Q   Okay.  Are you familiar with the Apex Program?

5      A   No.

6      Q   Okay.  I think we're done then.  Thank you very

7  much.

8      A   Thank you.

9          MS. TAYLOE:  Do you have any?

10          MS. JOHNSON:  I do not have any questions.

11          MS. TAYLOE:  Okay.  All right.  I appreciate

12  your time.  I hope you get a good night's sleep tonight.

13          THE WITNESS:  Thank you.

14          THE VIDEOGRAPHER:  We are off the record at

15  5:12 p.m.

16          MS. JOHNSON:  We'll read and sign.

17          THE REPORTER:  Did you need a copy of the

18  transcript?

19          MS. JOHNSON:  Electronic copy, yes.

20          (The deposition concluded at 5:12 p.m.)

21

22

23

24

25



AMBER MCCOLLUM                                          November 09, 2022
UNITED STATES vs STATE OF GEORGIA                                    234

1                        CERTIFICATE OF REPORTER

2    STATE OF GEORGIA      )
                           )
3    COUNTY OF DEKALB      )

4

5            I, Marcella Daughtry, a Certified Reporter in
     the state of Georgia and state of California, do hereby
6    certify that the foregoing deposition was taken before me
     in the County of DeKalb, state of Georgia; that an oath
7    or affirmation was duly administered to the witness,
     AMBER McCOLLUM; that the questions propounded to the
8    witness and the answers of the witness thereto were taken
     down by me in shorthand and thereafter reduced to
9    typewriting; that the transcript is a full, true and
     accurate record of the proceeding, all done to the best
10   of my skill and ability;

11           The witness herein, AMBER McCOLLUM, has
     requested signature.
12
             I FURTHER CERTIFY that I am in no way related
13   to any of the parties nor am I in any way interested in
     the outcome hereof.
14

15           IN WITNESS WHEREOF, I have set my hand in my
     office in the County of DeKalb, State of Georgia, this
16   21st day of November, 2022.

17

18

19                         _Marcella Daughtry_

20                         _____
                           Marcella Daughtry, RPR, RMR
                           GA License No. 6595-1471-3597-5424
21                         California CSR No. 14315

22

23

24

25



United States of America v. State of Georgia
J8808180


                DECLARATION UNDER PENALTY OF PERJURY


                I declare under penalty of perjury that I
have read the entire transcript of my deposition taken in
the above-captioned matter or the same has been read to
me, and the same is true and accurate, save and except
for changes and/or corrections, if any, as indicated by
me on the DEPOSITION ERRATA SHEET hereof, with the
understanding that I offer these changes as if still
under oath.


Signed on the_____day
of _____20__.




_____
AMBER McCOLLUM



AMBER MCCOLLUM                                    November 09, 2022
UNITED STATES vs STATE OF GEORGIA                             236

```
1              DEPOSITION ERRATA SHEET
                      J8808180
2

3   Page No.___Line No.___Change to:_____

4   _____

5   Page No.___Line No.___Change to:_____

6   _____

7   Page No.___Line No.___Change to:_____

8   _____

9   Page No.___Line No.___Change to:_____

10  _____

11  Page No.___Line No.___Change to:_____

12  _____

13  Page No.___Line No.___Change to:_____

14  _____

15  Page No.___Line No.___Change to:_____

16  _____

17  Page No.___Line No.___Change to:_____

18  _____

19  Page No.___Line No.___Change to:_____

20  _____

21  Page No.___Line No.___Change to:_____

22  _____

23  Page No.___Line No.___Change to:_____

24  AMBER McCOLLUM

25  Signature:_____
```



AMBER MCCOLLUM                                    November 09, 2022
UNITED STATES vs STATE OF GEORGIA                              237

```
 1                    DEPOSITION ERRATA SHEET

 2                         J8808180

 3    Page No.___Line No.___Change to:_____

 4    _____

 5    Page No.___Line No.___Change to:_____

 6    _____

 7    Page No.___Line No.___Change to:_____

 8    _____

 9    Page No.___Line No.___Change to:_____

10    _____

11    Page No.___Line No.___Change to:_____

12    _____

13    Page No.___Line No.___Change to:_____

14    _____

15    Page No.___Line No.___Change to:_____

16    _____

17    Page No.___Line No.___Change to:_____

18    _____

19    Page No.___Line No.___Change to:_____

20    _____

21    Page No.___Line No.___Change to:_____

22    _____

23    Page No.___Line No.___Change to:_____

24    AMBER McCOLLUM

25    Signature:_____
```



---

**Exhibits**

8808180 Amber.
McCollum.
EXHIBIT82
 210:8

8808180 Amber.
McCollum.
EXHIBIT581
 4:3
 10:19,23

8808180 Amber.
McCollum.
EXHIBIT582
 4:4 32:3,
 4

8808180 Amber.
McCollum.
EXHIBIT583
 4:5
 50:23,24

8808180 Amber.
McCollum.
EXHIBIT584
 4:7 83:5,
 6

8808180 Amber.
McCollum.
EXHIBIT585
 4:9
 101:5,6,
 21

8808180 Amber.
McCollum.
EXHIBIT586
 4:13

109:16,
17,18

8808180 Amber.
McCollum.
EXHIBIT587
 4:15
 125:3,6

8808180 Amber.
McCollum.
EXHIBIT588
 4:18
 133:12,
 13,14

8808180 Amber.
McCollum.
EXHIBIT589
 4:21
 142:15,
 16,17

8808180 Amber.
McCollum.
EXHIBIT590
 4:23
 152:23,24

8808180 Amber.
McCollum.
EXHIBIT591
 5:3
 155:14,15

8808180 Amber.
McCollum.
EXHIBIT592
 5:5
 162:25
 163:1

8808180 Amber.
McCollum.
EXHIBIT593
 5:7
 166:19,21
 174:2,3

8808180 Amber.
McCollum.
EXHIBIT594
 5:10
 174:6

8808180 Amber.
McCollum.
EXHIBIT595
 5:13
 179:17,18

8808180 Amber.
McCollum.
EXHIBIT596
 5:17
 183:16,17

8808180 Amber.
McCollum.
EXHIBIT597
 5:20
 187:16,17

8808180 Amber.
McCollum.
EXHIBIT598
 5:23
 194:4,6

8808180 Amber.
McCollum.
EXHIBIT599
 6:3
 198:4,6

8808180 Amber.
McCollum.
EXHIBIT600
 6:6
 202:23,24

8808180 Amber.
McCollum.
EXHIBIT601
 6:8
 225:13,16

---

**$**

$1,195,922,
003
 85:22

$1.9
 121:23

$12,000
 145:22

$12,825,
676,638
 84:3

$184,000
 168:5

$50,000
 109:3

$65
 92:6

$65,427,745
 86:17

$75,000
 95:14

$850,000
 69:1

---

---

**(**

(a)

210:14
211:19
212:6

(a)2
 215:7

(d)
 219:20

(d)3
 211:3,4,7

(d)5
 211:3

(e)
 219:18

---

**0**

---

000007
 30:15
 32:2

000015
 31:1

0191
 119:18

038
 125:21

---

**1**

---

1
 131:20
 132:14
 194:23
 195:9,15,
 16,19
 197:1,2,
 6,20,25

1.5
 113:9

1.8
 121:22



AMBER MCCOLLUM
UNITED STATES vs STATE OF GEORGIA

November 09, 2022
Index: 10..377,000

**10**
59:4,9,11

**100**
165:23
193:18,21

**10:49**
65:24,25

**11:03**
66:1,2

**12**
31:14
84:2

**120,000**
168:14
169:12

**12:01**
100:17,18

**12:41**
100:19,20

**12:42**
101:14,15

**12:47**
101:16,18

**12:48**
102:9,10

**12:49**
102:11,12

**13**
31:13
136:11,
16,21
137:1,2

**14**
136:12,16
137:3

**15**
31:11,12
32:7
136:13,17
137:4

**15th**
153:2

**17**
134:23
156:14
167:25

**17th**
204:25

**1813**
84:1

**1820**
84:12

**191**
119:22

**1913**
85:16,22

**1918**
85:13

**1919**
86:16

**1930**
92:20

**1931**
97:6

**1932**
88:14

**1933**
90:17
97:18

**1:12**
119:5,6

**1:16**
119:7,9

**1:16-CV-03088**
8:3

**1st**
21:23
90:24
114:21,

**22,23**
115:1

---

2

---

**2**
30:12
131:20
212:2

**20**
101:25
209:12,
13,15,18,
19 229:7

**20-minute**
209:13

**20/20**
169:2

**2000s**
21:18

**2003**
21:10

**2009**
21:11

**2010**
75:16
225:14

**2014**
21:13,14,
23,24
128:18

**2015**
128:19

**2016**
11:24
125:10,12
128:19
133:16
153:2
155:17
166:24

**198:13**
201:16

**2017**
11:24
33:14
34:24
128:19
188:2

**2018**
101:9,10,
25 102:16
142:22
174:12
183:23
186:13
203:6
204:25

**2019**
194:12

**2020**
57:8

**2021**
57:8

**2022**
7:4 90:25

**21**
55:21
56:8,23
87:3,12,
14

**2100**
119:16,18

**22/'23**
83:24

**2210**
119:22

**23rd**
188:11

**24**
83:20

**24.7**

**85:18**

**24.8**
85:11
86:13,22

**25**
117:23
118:12
141:15
189:8
191:10,12
193:12
229:4,5

**29**
109:13

**2:22**
156:2,3

**2:32**
156:4,6

---

3

---

**3**
55:21
56:8,22,
23 87:3,
12,14
130:19
220:2,9

**30**
141:15

**300**
121:14

**30th**
125:12

**361**
119:17
120:5

**377,000**
113:10



AMBER MCCOLLUM
UNITED STATES vs STATE OF GEORGIA

November 09, 2022
Index: 47,500..actual

---

**4**

**47,500**
120:10,23
121:22

**4:09**
209:21,22

**4:33**
209:23,24

---

**5**

**5**
56:23
87:17
141:16
212:4
222:20

**5(a)**
210:20

**581**
10:19,23

**582**
32:3,4

**583**
50:23,24

**584**
83:5,6

**585**
101:5,6,
21

**586**
109:17,18

**587**
125:3,6

**588**
133:13,14

**589**
142:16,17

**590**
152:23,24

**591**
155:14,15

**592**
162:25
163:1

**593**
166:19,21
174:3

**594**
174:4,5,6

**595**
179:17,18

**596**
183:16,17

**597**
187:16,17

**598**
194:4,6

**599**
198:4,6

**5:12**
233:15,20

**5th**
20:20

---

**6**

**6**
87:17

**600**
202:23,24

**601**
225:13,16

**61**
83:18

**611**
41:2

**55**:16,19,
20 56:3,
7,22,23

**619**
41:2
56:22

**65**
79:15

**65,427,745**
86:19

**6th**
205:18

---

**7**

**70**
229:7

**7th**
205:18

---

**8**

**800**
84:2

**82**
210:8

---

**9**

**9**
229:16

**90**
83:22

**911**
83:5,23

**9:22**
7:5

**9:53**
31:21,22

**9:57**
31:23,24

**9th**
7:4
84:21,22

---

**A**

**a.m.**
7:5
31:21,22,
23,25
65:24,25
66:1,3

**abbreviatio
ns**
17:7,9

**ability**
57:22
169:17,24
170:25

**access**
28:2 77:3
99:20
111:15
136:2
177:25

**accessed**
27:20

**accessibili
ty**
222:8

**accessible**
51:7,8

**accordance**
217:22

**account**
115:14
190:25

**accountabil
ity**

**159**:13
216:24
229:22

**accountable**
230:3,4,
5,24

**accounting**
111:25
112:11,12
221:22

**accounts**
219:23,25

**accurate**
87:5
163:10

**achieved**
224:3,4

**acronym**
60:8

**acronyms**
15:25
98:20

**Act**
23:5
56:19
230:10
231:5

**action**
8:2 11:5
230:15
231:8,10,
13,14

**actions**
91:3
231:22
232:7

**activities**
216:1

**activity**
122:13

**actual**



23:22
73:25
136:13,17
137:18
138:12
164:25
165:1,3

add
38:23
82:2
116:16
185:7

added
33:6

adding
115:14

addition
144:12
196:9

additional
55:4
59:25
61:13
63:23
112:10
113:2
116:14
141:3,16
142:7
151:21
152:2,6
161:24
170:11,25
171:9
188:21
218:11

address
167:4
222:13
227:4

addressed
11:7

adjust

44:25

admin
68:17

administer
68:21
70:1
213:13

administeri
ng
70:19

administrat
ion
18:2
20:22
21:2
67:17

administrat
ive
44:19
67:12,16,
22,23
68:5,15,
16 69:1,
24 162:21
195:14
196:5,13
197:3,4

administrat
or
21:6

advice
170:15

affect
96:13,19

affects
168:12

affiliated
167:8,23

age
55:22
87:12

agencies
58:1
60:3,6,14
61:6,9,
11,14
62:8,20
170:13
232:12

agency
16:16,18
17:3
45:10
56:5 60:3
69:13
211:1
212:24,25
229:18
230:2

agenda
38:16,23
78:6

agendas
38:19

agent
50:6,8,9,
13,16
61:5
72:23
159:24
161:12,
15,16
162:3,8,
16
195:11,15
197:24
219:21
222:10

agents
34:18
49:19,22
50:2,3,4,
19 81:16
159:15,19
160:5

161:20
162:12
214:10
219:19
220:3,20
221:12
222:6,7

ages
56:22,23
87:3,14,
15

aggregate
79:7,8
224:13

agreed
129:20,
21,22

agreeing
10:2

agreement
232:24

agreements
232:13

agrees
230:2

ahead
79:5
185:24

align
194:25

aligned
181:22

allegations
12:19

allo
82:12

allocable
201:12

allocate
67:1 69:8

80:11
81:4
82:14
157:18

allocated
24:9
81:2,8
112:6
116:3
161:11
172:10,25
173:2

allocation
38:13
72:20
73:7,18
107:15
112:17,
22,23,24
113:1,2
116:15
136:18,23
145:12,
13,14
146:1,3,5
150:3
169:10
214:11
222:3
231:19

allocations
34:16
36:18,22,
23 37:1,
4,8 49:3,
11 65:3
78:9
80:2,19,
25 81:1,
6,10,18,
19 82:12
97:2
98:14
109:1
113:2



133:6,8,
10,22,23
134:4,21
144:14
145:8
146:10
150:19,
24,25
153:13
154:3,5,
19 155:4,
7,10
156:13
157:21
167:25
168:1,16
224:7

allow-
158:7

allowability
23:25
54:14
106:3
122:15
173:25
176:6,11,
15,16
178:20,24
179:3,9
180:4
182:5
183:1,2,
3,6
184:14,20
185:25
186:4,6
200:4
207:12

allowable
37:9
54:20,21
58:23
70:11
77:21

114:25
122:13
174:14
175:5,21,
23 176:19
177:8,10,
12,13,17,
18,23,24
178:2,5,
7,12
182:16,22
183:10
185:17
199:25
206:2,6
208:13,16

allowed
48:15
70:16
116:9
117:6,22
140:3
141:8,13,
14 191:10
193:14,17
194:23
195:3
196:6
197:6
207:17,18

allowing
232:25

aloud
131:23
229:24

Amber
7:2,17
8:11
144:18
147:4

amend
115:10

amendment
115:8,13,

16,18,23,
24
116:11,
16,22
117:3
141:23
204:3,7,
11,13
205:5,7,
13 207:5

amendments
204:22
214:4

America
7:3

amount
17:15,16
24:7,9
67:18,24
68:6,12
71:23
73:7 81:9
84:5
85:24
92:10
116:3
117:17
120:8
122:7
141:7,13
152:15
166:14,15
168:15
171:15
173:5

amounts
62:19,22
204:16

Amy
197:13

analyses
227:3

analysis
225:6,9

227:8

analyst
23:6
26:18,23
172:17

and/or
160:4

Ann
166:25
167:2,13,
21

announcement
46:20

annual
152:11
158:14
230:7

annually
78:24
79:4,11
150:10
157:25
230:11,19

answering
9:3,5

answers
14:22
15:2
146:18

anymore
37:17,21
57:2
74:13
81:24
155:24
192:10
193:11

Apex
233:4

apologize
173:13

App
172:5

appearance
10:18
11:10

appears
168:24
174:24
175:1
192:7
200:13
206:5

appli-
36:23

application
23:8,9,23
27:5,10,
12 28:20,
25 29:25
34:18
47:1
48:13
58:24
68:15
71:10
79:7
82:16,18
103:7,17,
19
104:12,17
105:10,
12,14,22
106:10
107:20
108:21,23
109:22,25
110:5,9
111:13
114:14
116:10
124:2,3
150:5,9,
14 152:20
161:7
213:8



223:25
224:8,10

applications
    22:25
    23:12,17,
    22,25
    24:3,4,7
    29:24
    33:19,20
    34:5,6,9,
    17 54:9
    78:9
    103:11,21
    106:2
    107:12
    108:14
    161:5

applied
    68:6
    159:2
    160:11

apply
    71:8,24
    131:9
    159:3,4
    160:15
    161:8
    214:7
    226:15

appropriated
    211:21

appropriately
    118:15

appropriates
    24:8
    212:15

appropriation
    86:25
    88:7

97:21

appropriations
    33:17
    34:15
    80:17
    83:2,3,23
    84:5
    89:22
    154:23
    224:7

approval
    81:8 82:4
    107:16
    113:25
    115:25
    123:8
    124:3
    188:21
    190:25
    205:16
    207:6
    223:18

approvals
    112:10
    124:21
    199:11

approve
    37:9
    74:14
    78:16
    81:3
    114:17
    122:22
    123:7
    190:19,22
    200:7
    205:12
    206:10
    207:20
    214:11
    231:18

approved
    107:16,18

109:2
114:3,24
122:24
123:22
142:6
161:11
204:3
223:18
231:25
232:5

approves
    186:16,18
    214:17

approving
    78:17
    81:9,11,
    18,19
    184:13
    191:6

approximate
    21:4

APR
    230:8

area
    64:1

areas
    15:11

argue
    180:3

arose
    115:6

ARP
    42:10,12,
    13

arrive
    152:18

asks
    184:19

aspects
    228:20

Assembly

211:21
212:14

assigned
    25:4
    159:12
    172:17
    225:8

assist
    14:11
    25:1,2
    213:21

assistance
    45:5
    58:22
    98:24
    178:25

assistant
    36:7,12
    162:22

assisting
    57:4

assume
    54:5
    62:14
    123:13,15
    188:25
    205:8

assumes
    84:13

assuming
    175:13
    205:1

Assurances
    103:9
    104:15

attached
    56:20
    88:22
    104:9
    105:13
    217:16

attaching
    157:4

attachment
    106:10
    109:7
    110:5
    125:23
    127:8,9
    129:24
    130:4

attachments
    104:10

attend
    77:22
    100:5
    157:12

attending
    77:6,7
    132:11,25

attends
    77:22
    132:18

attention
    30:17
    210:12

attorney
    9:23

attributes
    43:10

audit
    75:16
    76:5
    106:13
    110:22,24
    111:2,6
    123:20,
    21,22
    225:14
    226:17,21
    229:21
    232:23

audit's



232:10

**August**
33:14
34:24
125:10,12

**austerity**
97:7,10,
13,15

**authority**
16:14
182:25
206:21
208:17

**autism**
87:3,20

**automatically**
68:12
109:1
171:14

**average**
127:19,21
128:4,9,
13,17,20,
23 129:9,
13 134:7,
25
136:12,16
137:1,2,
3,17,19,
21,22
138:4
145:6,11
147:22
148:12,15
153:16
163:24
164:22
168:12,19

**averages**
128:23,25
134:9
135:1,8
143:2,4

**averaging**
134:25

**awaiting**
194:19
197:15

**award**
46:21,23,
25 63:12
68:11
71:10
112:17,25
113:4
183:5
214:20

**awarded**
46:22
72:1

**awards**
41:3

**aware**
43:13,15,
22 44:5
62:19,22,
24 72:22
73:23
89:1,3
91:3,5,
10,24
92:3,4
97:20
124:15,
18,19
139:24
140:10,13
150:22
151:17,
19,20,24
152:3
158:23
217:25
218:3
219:6
226:7
227:12

---

**B**

---

**Babies**
56:14

**baby**
56:14

**bachelor's**
19:6

**back**
9:20
21:12
31:14,24
39:11
52:25
55:15
66:2,18,
22 70:2
90:15
92:12
97:17
100:20
101:17
102:12
104:19
113:16,
17,23
114:23
115:25
118:23
119:1,8
122:9
125:24
126:7,8,
16 130:11
134:10
140:14
142:9
154:6
156:5
167:16
168:11
174:9,10
192:23
195:8

198:11
206:12
209:24
226:17

**background**
18:22
65:19
129:21

**backwards**
174:19

**badly**
192:16

**ballpark**
78:23
79:10,15

**base**
64:16,19
84:14,18,
20,23
85:3
164:3

**based**
52:25
53:18
57:11
65:4,5
68:3 69:4
70:17,18
76:4
84:21
93:15,16,
17 109:1,
3 121:19
133:4
158:2,9
161:5
165:19
169:24
171:24
175:24
179:5
181:3
182:16,20
224:7,14

225:1

**basic**
17:21
84:13
93:12

**basically**
70:13
94:24
95:2
108:22
113:12
128:22
158:12
161:20

**basis**
25:4
123:5
158:14
218:23
225:1

**Bates**
30:19,21
101:8
109:17
125:4

**Beck**
29:1

**began**
124:6

**begin**
82:12

**beginning**
57:15

**behavior**
18:15

**behavioral**
60:18
87:4,21
140:12
232:13

**believed**
163:13



AMBER MCCOLLUM
UNITED STATES vs STATE OF GEORGIA

November 09, 2022
Index: believes..budgeted

believes
  184:9
Bell
  36:3,6,
  10,22
  73:14
  80:22
  82:10
  91:9,12
  97:24
  125:11
  126:5,19,
  21
  127:15,16
  129:20
  133:7
  135:17,23
  155:7,12
Bell's
  36:5
belong
  67:5
  170:10
beneficial
  206:23
benefits
  95:12,14
Benson
  133:17,19
  194:13
Benson's
  133:25
Bibb
  198:14
big
  49:12
  56:2
  134:9
  135:4,9
  142:2
  178:6
  214:24
  221:21

229:5,14
bigger
  142:10
biggest
  56:3
  177:20
bill
  70:20
  83:2,3,23
  86:5,7
  89:21,22
  98:4
bills
  97:20,21
Bird
  203:23
bit
  39:1 70:3
  98:17
  195:8
  229:11
block
  45:7 48:9
board
  16:20
  25:2,3
  78:12,16
  80:4,5,7,
  14,23
  81:3,7,
  14,20,22,
  24 82:4
  107:9
  109:2
  124:21,23
  147:8,14
  211:22
  212:10
  226:14
  230:10
BOE
  16:20

bookkeeper
  162:22
bottom
  30:19
  32:10
box
  32:11,17
  33:9
braid
  232:12
brand-new
  94:9
Brandon
  7:5
Brantley
  7:5
break
  10:7,11
  65:21
  209:10,14
breaks
  10:6
briefly
  62:13
Briggs
  203:6,7,
  8,16
brings
  38:18
broad
  87:9
  142:2
broadly
  139:14
bucket
  49:12
Budgement
  16:24
budget
  14:19

16:24
20:9
23:6,24
26:18,23
28:10,12,
13 33:18
34:5,9
36:7
37:8,19
38:10,11,
13 48:14
51:19,23
72:25
74:15,17
78:5,8,21
79:22,24
80:12,13,
15,18,24,
25 81:4,9
82:24
83:1
90:23,24
96:21,23
97:11
98:14
104:20
105:19
106:8,9,
17
107:15,
19,23
108:12
109:3,6,
24 110:3,
6,7
111:16
113:8,13,
15,16,21,
22 114:7,
16,22
115:10,
16,19,20
116:7,9
117:1
118:15
122:10,22
141:16,

23,25
142:1,6
150:4,8,
11
154:18,22
161:23
162:6
168:2
170:20,24
171:3
172:4,11,
17 199:11
204:3,7,
11,12,13,
21 205:2,
3,6 207:5
214:3
219:11
221:6,16,
18 222:3,
13,19
231:18
budget all
  113:24
  114:8
budget allo
cations
  144:7,12
  149:23
budgeted
  112:17
  113:6,7,
  9,11,12,
  14,17,18,
  19,23
  114:1,2,
  8,10,11,
  12,18
  115:7,20
  116:2,12,
  13 122:18
  142:13
  201:24
  206:21



budgeting
  28:6,8
  78:1,2
  82:17
  120:22
  170:1

budgets
  23:11
  28:9 34:1
  74:10,11
  78:18
  96:18,24
  97:2
  121:13,17
  123:6
  184:13,24
  186:18,20
  190:18,23
  214:11,17
  215:25
  219:11
  222:17
  227:11
  232:1,6

build
  57:14,25

building
  20:17
  57:1
  181:16

buildings
  73:24

bullet
  151:23
  152:13
  180:11

bunch
  32:20
  104:9

bus
  203:23
  206:11
  207:18

buses
  207:20

business
  70:14

———————

C

calc-
  197:11

calculate
  64:15
  127:18,24
  134:16
  154:24

calculated
  52:5,6
  64:22,23,
  24 134:18
  166:16

calculates
  133:8,9

calculation
  53:23
  64:17,19
  78:15
  84:13
  92:18
  93:18
  94:19
  96:16
  129:15
  135:7
  158:4
  160:18,
  19,22
  171:23
  200:23

calculations
  53:24
  97:14
  135:25
  165:4,5

calendar
  77:2,3
  146:24
  149:11

call
  67:14
  68:19
  182:6
  186:16,24
  187:1
  207:3

called
  7:18
  20:23
  59:3
  89:7,18,
  23
  104:10,11
  123:18
  146:13,14
  196:24
  229:18

calling
  182:7

calls
  187:10

CAP
  230:15,16

capacity
  57:1,14,
  25 73:17
  182:4

care
  43:25
  232:11

CARES
  42:8,12

Carmen
  36:21
  133:8

Carol
  143:17,

20,25

carried
  117:18
  140:19
  189:9,13,
  18,20,21
  192:14
  193:19,23
  195:25

carry
  57:25
  117:6,8,
  12,13,22
  140:17
  141:8,13,
  14 189:7
  191:11

carryover
  113:3
  115:18,19
  116:17,
  18,19,21,
  25 117:1,
  5 118:8
  140:15
  141:3
  188:21
  189:14
  191:10,
  18,25
  192:3,12,
  13 193:7,
  14,16,18

carryovers
  172:6

Carter
  26:24
  167:14

case
  15:25
  50:18
  85:10
  184:23
  185:8

190:9
  197:22
  204:19,
  21,24

cases
  112:21

Cassandra
  155:18,20
  156:15

Castellanos
  26:21

Castellanos
's
  27:1

Catches
  126:2,3

categorical
  40:3,10,
  15,19,24
  41:7,9
  63:10

categories
  52:20,22,
  24 53:8,
  10 142:11

categorize
  160:14

categorized
  160:5

category
  52:16
  165:13,
  19,22,24,
  25 166:2,
  3

caught
  114:18

center
  59:13,22

center-
based



189:24
190:1

**centered**
51:12

**centers**
138:17,25
139:1

**certi-**
21:16

**certificati
on**
20:2

**certificati
ons**
19:19
20:4,7

**certified**
154:1

**cetera**
151:12

**CFO**
29:12

**chain**
126:21

**chance**
156:7

**change**
35:17
113:17
115:16,19
118:1,8,9
123:15
128:4,5,
7,8
129:6,7,
18 136:6
142:6,11
158:10
197:11

**changed**
42:21

87:16
92:11
107:25
118:6
129:13
146:8
147:5

**changing**
129:23

**characteriz
ation**
137:13

**characteriz
e**
75:15

**charge**
27:6,8,9
195:3,10

**charged**
197:20

**charging**
194:17

**chart**
35:13
52:13
69:3
229:5,6

**charts**
30:16
35:6

**check**
113:13
114:5,14

**checks**
115:5

**chief**
29:1,3,8
32:18

**child**
43:1,9,20
44:3

45:14,20,
22,25

**children**
131:16

**choose**
123:23,24
158:16

**chooses**
69:8

**chose**
58:12

**chosen**
60:10
68:25

**Chris**
196:22
197:1,9
203:6,7,8
206:9
207:25
208:11,12

**chunk**
68:3

**circumstanc
es**
175:24

**citations**
184:4

**civil**
8:2 11:5

**clarificati
on**
14:20
15:6 43:2
50:10
149:14
194:21
196:8

**clarify**
9:9 23:21
40:12

44:15
78:11

**class**
181:22

**classes**
132:18,25

**classroom**
95:19
178:8
184:6

**classrooms**
138:22,23
139:4,5,9

**clear**
14:18
70:4
145:8

**Cleveland**
72:25
73:2,5
82:10
101:10
102:2,17
122:21
142:23
149:22
175:2
199:10
205:19,22
206:10
208:17
216:25
224:17

**close**
92:6
108:4
229:8,10

**closely**
45:12

**closer**
31:14

**co-teaching**

20:19

**code**
44:18
120:5

**codes**
24:2
109:4
121:15,18
122:16
175:4

**collaborate**
170:13
213:6

**collaborate
d**
232:11

**collaborati
on**
213:14
232:23

**collaborati
ve**
99:16,22,
24 100:9

**colleague**
8:7
100:25
208:19

**colleagues**
8:5 44:22

**collect**
217:18
218:15
227:1

**collected**
227:18

**collections**
132:16

**collects**
217:17

**college**



18:25
21:9
94:10,18

colleges
19:2

column
52:14
113:10

columns
113:5

combination
212:11

commenting
127:9

commonly
11:19

communicate
28:21
135:16

communicate
d
170:7

communicati
on
36:11,14
63:19,20
170:8

communicati
ons
13:5

communicato
r
146:9
169:1

community
45:7
99:16,22,
24,25
206:24

community-
based

203:25

comparative
s
230:1

comparing
222:2

compensated
151:14,16

compensatio
n
195:10
197:24

competing
71:15

competitive
71:3,4,7,
9,13,16,
22,25
72:1,8

complete
225:9

completely
10:15

completes
154:19

completion
38:9
116:20
220:24
221:12,
15,20,23

compliance
20:23
215:9
224:19
230:9,15
231:4

complicated
116:24

component
93:10

CON
172:5

concept
70:7
84:18,19

concerned
104:20

concerns
89:24
147:24
148:15,
16,19,21
224:25

conclude
171:24

concluded
233:20

conclusions
75:22
226:21,25

concrete
190:9

conditioned
190:19

conduct
157:14

conducted
231:21
232:2

conducting
230:13

conferences
178:24

confirm
11:9
100:24
134:12,14
147:4
149:12,
16,17,19

confirming
198:24

confusion
194:19

conjunction
46:23
108:2

connection
11:15
12:11
14:9
37:25
38:18
47:25
49:3 91:4
98:3
126:9
163:6

consent
123:8

considerati
on
64:3
178:11
190:19

considered
69:13
106:11
134:15

consistent
92:10
166:5

consistentl
y
92:7

consolidate
d
29:25
34:6,17
103:16
105:10,13
107:20
108:20,23

109:22
111:13
116:10
150:5,9
152:20

consolidati
on
106:19,23

constantly
38:6

consul-
139:12

consultatio
n
15:13
90:19
151:11

consultativ
e
139:10,
13,20,25
140:7
152:3,5

consulted
91:6
97:25

consulting
121:1,7
139:16

contact
108:4

contained
75:22

context
96:9,11,
12 143:9,
11 146:12
205:1
207:14
214:24
219:14
221:9



226:11,13

continue
59:12
60:1
61:24

continued
150:9

continues
87:12,14

continuous
59:18
230:12

continuousl
y
59:18

contract
121:5,16
192:11

contracts
99:9,10

contractual
121:15

contribute
64:2
178:17

contributes
63:18

contributio
ns
62:16,25
63:14
73:21
74:18,20
208:3
227:15

control
10:20
27:24
83:10
100:24
101:2,5

119:10
161:22
167:16

conversatio
n
134:17
186:1
207:11,15
208:20

conversatio
ns
13:5 96:2
148:10,14
190:15
193:2
195:7

cooperating
61:6
229:14

coordinate
44:23

coordinator
111:12,18
139:19

coordinator
s
119:22
124:16

copies
134:10

copy
105:7
123:7
135:12
233:17,19

correct
8:12 11:8
16:7,12
18:10
24:10
25:14
38:15
39:14,15

41:23
43:21,24
49:15
50:21
53:6
55:14
69:10
85:2,19
86:17,20
92:8 97:4
102:22
104:3
105:15
110:20
121:24
133:17,18
134:8
138:9
140:17,18
141:2
143:19
144:1,4
147:19
150:16
153:11
155:5
157:9,10
159:21
164:1,5
170:4,20
171:2
174:23
175:7
176:23
188:3,22,
25 189:9,
10 192:6
193:24
198:15,
16,22,23
199:1,2
201:5
205:13,
14,16
206:11,
13,16

corrected
49:25

correcting
14:19

Corrections
60:22
62:2

corrective
230:14
231:8,10,
12,13,21
232:6,7

cost
40:2 41:4
55:24
68:21,24
70:14,17
84:14,18,
20,21
85:3
95:1,22
105:18
106:7
158:7
160:18,
19,22,25
161:3,4,
17 164:3
165:18,19
166:4,8,
15 168:24
182:12
195:9
197:4
200:23
201:13,19

cost-
effective
227:2

costs
52:14
70:4,5,6,
8,10,11,
17,19

95:16
106:4
122:19
168:13,20
169:7
171:1,6
177:16
181:9
183:11,13
194:18,
23,24
195:1,2,
5,6
196:5,7,
14,18,21
197:3,12,
20

Council
89:12

counsel
7:7 13:6,
8,16,18
14:2

counseling
121:1,8

count
17:18,19
65:4,5,6,
7 125:2
127:3,18
128:14,24
132:2,5,7
136:13,17
137:10
146:22
149:18
151:10
152:12
164:21

counted
65:13
131:15
132:9

counties



143:2

**counts**
65:7,11
70:5
127:22
129:1
137:5,18
149:13,
17,20

**county**
20:14,22
21:7,15
54:6
143:4
167:5,6,
8,13,23
198:14

**couple**
26:1
147:9
203:17

**court**
7:8 8:21
16:2 43:2
50:10
149:14
196:8

**cover**
124:24
196:13

**covered**
16:5
62:12

**COVID**
152:7

**CPA**
20:6

**CPI**
153:17,
19,20,25
154:2,4,
15

**create**
78:16
81:24,25
82:2
136:18

**created**
72:18
81:5,6
103:21
177:6,7
228:22,24

**creates**
52:2
82:11

**credentiale
d**
95:17
96:6

**crisis**
59:13,16,
22 60:12
61:4
104:12,21

**Crisp**
167:5,6,
7,13,23

**criteria**
224:24

**cross**
130:11
157:15

**cross-
functional**
157:14,16
158:14
159:14
160:1
161:19
215:19
218:8
231:16

**curious**
53:21

126:18
190:9
198:17
199:3

**current**
19:19
24:15,22
26:3
73:10
81:22,25
197:19
199:10
205:2,8
218:2

**curriculum**
19:15
20:24
45:23
46:5
177:25
181:11,
15,19,20

**customer**
134:15
146:16

**cycle**
38:13
78:5

---

D

---

**daily**
25:10,12
222:17

**data**
24:25
26:21
27:2
37:24
38:7,8,9
57:11,23
132:16
143:23,24
150:14

153:17,19
154:15
201:23
222:21,
22,24
223:2,4
227:1,8,
18

**date**
7:4 38:7
76:17
123:18
201:14

**dated**
153:2

**dates**
21:12

**day**
104:19

**day-to-day**
29:14
123:5

**days**
65:7
156:20

**DBHDD**
60:8,18
61:19,20,
21,22
62:4
232:17,
19,22,25

**deal**
41:16
42:8,10,
16 44:4,
11 45:4
72:7
173:12

**dealing**
25:13

**deals**

42:12,24
72:10

**Debbie**
107:10
108:11
198:21,25
199:18
228:13

**Debbie's**
199:20

**December**
115:10

**decide**
34:10
127:11
142:4
182:25

**decided**
34:13,16
131:2
197:2
209:4

**decider**
206:3

**decides**
40:16,17
127:12
183:1,2
184:16

**decision**
57:23
58:8,9
118:11,17
127:11
152:17
164:14
170:17
182:8,10
195:24
196:1
197:10
207:24



decision-
making
    82:3
    172:8

decisions
    28:16,21
    44:20
    69:4
    82:15
    122:8
    127:6
    131:5,12,
    14 142:8
    182:24
    183:8
    224:6,9

decline
    92:24
    93:6,21
    96:5,13
    137:21

declined
    93:9
    137:24
    169:9

decrease
    94:6

dedicated
    111:17

deficiency
    222:13

define
    17:6
    64:25

defined
    130:22

definition
    50:13,15
    71:12
    130:20
    215:21

definitions

138:24
210:19

degree
    19:6,7,
    11,16
    21:13
    93:16,17
    94:9
    171:7

degreed
    171:18

degrees
    93:17
    94:20

delivery
    215:10
    216:6,15

Demuth
    107:9,17,
    22,25
    108:3

denied
    207:6
    208:3,7,8

Denise
    102:4

deny
    206:20
    208:17

denying
    208:25

department
    7:10
    15:21
    16:9,11
    21:21,22
    28:6,11,
    13 29:13
    42:25
    43:4 45:4
    47:19
    53:1

60:5,9,
18,21,24,
25 62:1
67:2 73:4
80:11
81:12
84:6,8
86:5
87:19
90:18
103:20
111:25
112:3
130:5
147:10
149:22
164:10,
11,13
173:14,17
175:10,18
177:6
190:10
194:22
195:22
199:8,9
202:4,7
210:25
212:10
215:4
216:2,21

department'
s
    226:21,25

depend
    38:12
    187:3
    223:12,18

dependent
    164:21

depending
    27:25
    70:12
    78:4
    84:24
    177:13

depends
    159:25
    162:15
    221:19

depo
    18:21

deposed
    8:16 14:9

deposition
    7:2 8:8,
    14,20
    9:16
    10:7,18
    11:4,14
    13:3,9,24
    14:4
    31:22
    65:25
    100:18
    101:15
    102:10
    119:6
    156:3
    165:11
    209:22
    233:20

depth
    17:8

deputy
    35:20

Derrick
    153:2

describe
    38:4
    53:15
    64:14
    108:21
    117:5
    133:25
    172:6

description
    15:12
    87:6

109:4
120:11

designated
    49:14
    68:5
    121:23
    122:7
    140:11
    159:16
    204:17

designation
    166:14

designed
    182:23
    197:3

detail
    157:5

detailed
    146:6
    187:11

details
    37:10
    113:8
    147:8
    168:23
    169:4
    208:12
    210:5

detect
    176:15

determinant
    176:6

determinati
on
    200:4
    207:2

determinati
ons
    82:12

determine
    23:6
    28:24



37:7
53:12
114:12
122:15
134:21
138:13
150:25
157:25
168:1
182:5
200:12
227:1

determined
80:3
206:22
209:1,4

develop
27:16
182:18
213:7,10,
11 230:20
231:13
232:12

developed
213:16,24
227:21

developing
181:25
182:11
213:19
230:14

development
45:7,13
46:17,19
47:8
58:22
80:15
98:25
100:2
213:21

Development
al
60:19

device
177:22
178:1

devices
177:24

dictate
176:11

difference
64:4
146:7

difficult
38:5
218:5

diffusers
184:5

direct
52:14
103:2
151:10
165:18,19
194:23
196:22
210:11

directed
90:18
179:7
198:18

directly
57:17
91:5
170:7

director
25:8 26:9
35:14
36:7,12
44:6 77:4
90:3
91:12
97:23
99:19
102:20,25
107:10
111:16

124:22
133:20
145:22
153:7
154:7
155:21
160:20,23
162:20
166:4,8
184:2
188:10,
11,16
194:14
199:18
203:9,13
206:15
208:21

director's
77:2
166:11

directors
28:23
54:16
55:2
77:20
89:11
94:1
99:17
100:1,2,
5,6
107:14
144:7,11
146:11,21
149:12,
16,23
150:23
151:6,18
154:14,16
159:2
161:22,23
162:4,7
163:6,19
169:6
180:6,20
182:4,14
183:8

directors'
162:13

disabilitie
s
12:18
20:25
23:4
40:4,18
47:15
55:4,21,
25 56:19
60:19
95:3
140:12
181:9
183:14
230:9
231:4

disability
52:16
53:18
166:2,3

disaggregat
e
228:23,24

disagrees
230:3

disburse
211:21
213:2

disbursed
212:9

disbursemen
ts
186:17

disburses
212:16,20

discouraged
182:6

discretion
197:10

discretiona
ry
58:7,11,
19 66:20
67:9,15,
22 68:1,
9,22
69:5,7
152:14
197:8

discuss
76:12
77:13,14,
16,20,24
78:1,2
147:17
149:8
156:21
178:6
179:9

discussed
23:3
45:11
75:24
76:1,3,6
77:12
78:19
128:8,11
129:4,19
147:21,24
187:13
202:10
228:6

discusses
76:23
88:20

discussing
207:11
228:10

discussion
78:14
89:18
147:22,23
184:20



185:4,6
187:3
194:20
197:16
204:21

**discussions**
89:1,3
129:17
172:11
186:4
228:8

**disorder**
18:15

**dispense**
61:5

**distinct**
71:23

**distinction**
34:7

**district**
63:9
95:10
132:10,
12,23
133:2
177:13
182:16
203:13
230:18

**districts**
52:25
63:7
64:21
183:9

**diverted**
227:19

**division**
22:10,11,
17,18
25:18,20
28:8,10
29:10,11,
23,24

30:9,10
33:3
35:7,11
41:21,25
48:18
53:22
62:15
86:8
91:15,16,
18,23
92:1,2
112:13
133:5
189:19,21
213:15,23
216:13,21
217:21
220:5
232:16,20

**DJJ**
60:13,24
62:4

**DOC**
60:13,21

**doctor**
178:1

**document**
10:17,21
11:1
14:22,25
30:15
32:2
33:13
51:1,13
53:20
54:16,17
55:10
64:17
80:8
82:11,18
83:15
86:11
96:15
100:12,25
101:8,20

102:15
106:25
107:15
109:17,21
110:4
112:16
115:4
118:19,21
119:11
122:6
125:4
126:14
128:22
133:13
135:24
142:16
152:23
155:14
156:8
162:25
163:5,9,
14,22,25
164:6
166:1
167:16
172:4
174:15,17
175:3,15
179:17
183:16
194:4,8
207:8,10
210:7
225:19
226:1

**documentati
on**
207:7

**documented**
201:13
207:21

**documents**
13:23
14:1,12,
13,17,23,

25 15:1,
7,16,17,
21 18:7
28:16,24
35:22
51:16
80:4,20
103:9
104:9
127:25
135:18,23
136:1
147:9,14
173:8
178:10
217:16,
17,18
223:3

**DOE**
16:9
103:20
105:11
120:12
127:20

**dog**
211:4

**dollars**
54:12,13,
24,25
55:2
73:25
95:13
113:15
157:18

**Donald**
167:14

**doubt**
120:22
172:1

**downwardly**
170:2

**draft**
81:5
133:21,23

134:3
136:23
153:12,15
156:13
167:3,25

**draw**
30:17
191:14
204:14

**draw-down**
38:9

**drawdown**
28:18
112:8,11
161:14
162:12
172:12,
13,15,20
204:7
215:22
219:12

**drawdowns**
186:16
215:24

**drew**
204:13

**due**
93:19
103:11
118:8

**duly**
7:18

**duties**
25:4 37:3
162:17,18

———————

**E**

———————

**e-mail**
101:9,10,
25 102:6,
16 103:1,



6,8
104:6,11
105:7,25
125:11,22
126:1,7,
8,21
133:16
134:18
135:6
136:11
142:22,25
148:17
153:2
155:18
156:12
163:6,8
166:25
167:4
174:12
179:23
180:2,8
183:23
188:2,9,
11,20
192:23
194:12
198:13
200:12
203:5
204:2
206:9
217:15
222:18

e-mailed
103:13
104:4,6

e-mails
143:16
146:11
207:13

earlier
40:13
78:19
97:18
109:24

147:23
165:9
173:21
196:3
216:5
217:15
225:15
232:21

early
21:18

earning
54:7
146:22

earnings
50:23
51:4 52:5
53:24

easier
28:2
83:19
118:25

easily
27:23

EBD
18:14

ed
23:17
52:10
54:16
65:3 67:2
75:3
80:11
89:11,12
100:6
102:25
111:15,25
112:3
139:17
140:2
147:10
180:12,
21,22
182:14
183:8

202:4
203:13
206:15
226:15

education
15:21
16:10,11,
21 17:21
18:13
19:8,12,
17 20:14,
15,17,19,
22 21:7,
21,22
22:12,13
23:1,4,14
25:1,2,3,
8,19,22
26:19,21
27:3
28:7,14
29:11,13,
19,22,24,
25 30:2,
10 35:6,
10,18
36:18
37:1,5,15
39:2,3,4,
6,12,22
40:14,15,
20,25
41:1,19,
21 42:25
43:4
47:19
48:6,17
53:2,12
55:25
56:19,24
58:25
59:4,9,
11,12,15,
17,21,24
60:6
61:13

62:16,20
63:6,13
64:22
65:19
72:9 73:4
75:3,8
76:2
77:10,15
78:25
80:5
81:3,8,
12,14
84:6,8,13
85:24
86:1,5,7
87:2,19
88:10,12
90:18
93:16
94:1
95:10,11,
15,24
96:7
97:11
99:4,5,19
100:1
103:20
130:5
132:23
133:5
139:5,6,
13,21
140:12
149:22
164:10,
12,14
173:15,17
175:10
180:19,
20,22
181:5,21
182:4,13
183:13
188:16
190:10
194:22
195:22

199:8,9
200:1
202:4,7
207:20,22
210:25
211:23
212:10
213:22
215:4
226:15
230:10
231:5

Education's
45:5

educational
11:16
16:7,13,
18 17:2
32:11
33:10
62:19
87:1
90:20
124:16
132:10
170:13
211:1

effect
192:17
193:5

effectively
95:19

effort
75:14
94:6,22,
24 95:1,
2,3,4,20,
21 96:3
161:25
200:23

elect
152:15

Electronic
233:19



electronically
  83:17

element
  39:10

elementary
  20:18
  21:1

elements
  164:20

eligible
  47:7 95:5

else's
  122:2

embedded
  120:1
  121:22
  122:2

emergency
  104:14,22

emotional
  18:15
  87:4,21
  140:11

emphatically
  154:11

employed
  139:20
  164:9

enable
  182:23
  232:24

encompass
  56:3
  137:2,4

encompassed
  137:6

encouraged
  115:11

end
  141:7,18
  174:15
  175:22

ended
  115:21

endorsement
  208:25

English
  19:21,22,
  24

enrolled
  93:20

enrollment
  92:23
  93:5,7
  127:18
  137:8,20,
  24 138:1,
  5,7 169:9
  171:17

ensure
  215:8
  230:24

ensuring
  230:16

entail
  107:4
  139:15

entailed
  135:21
  151:4

entails
  139:16
  202:20

enter
  111:15

entered
  110:22

entities
  50:4

104:2
  130:23

entitled
  72:23
  171:19
  180:22,23

entity
  71:8
  171:6

entries
  110:11

entry
  84:1
  88:24,25
  93:19

environment
  18:17

envisioning
  67:1

equipment
  165:21

equivalent
  17:13

ESOL
  19:21

ESSA
  42:8

essential
  184:5

ESSER
  42:8,12

established
  164:8

establishes
  53:7,9
  166:10

estimate
  78:24
  79:10
  168:5

evaluate
  90:19

evaluation
  90:24
  91:11
  97:19

event
  169:9
  186:17

evidence
  161:24
  162:21
  184:9
  221:5
  231:20
  232:1,6

exact
  138:5

EXAMINATION
  7:22

examined
  7:20

examples
  40:6
  73:22,23
  177:20

exceed
  141:7

exceeded
  116:3
  141:13

exceptional
  32:23

excess
  55:24
  95:1
  141:6
  160:18,
  19,22
  181:9
  182:12
  183:13

191:19
  192:1
  200:23

Excuse
  39:3

exhibit
  10:19,23
  32:3,4
  50:23,24
  83:5,6
  101:5,6,
  21
  109:16,18
  125:3,6
  133:12,14
  142:15,17
  152:23,24
  155:14,15
  162:25
  163:1
  166:19,21
  167:12
  174:2,5,6
  179:14,
  17,18
  183:16,17
  187:16,17
  194:4,6
  198:4,6
  202:23,24
  210:8
  225:13,16
  229:16

exist
  61:17

exists
  56:16

expect
  95:23
  145:22
  208:9
  225:19

expected
  67:3



**expenditures**
94:11
221:1
222:3

**expense**
200:7
201:9

**expenses**
118:22
119:14
186:17
200:1
201:3

**experience**
20:12
54:23
88:8,11
92:23
93:6,8,9
94:2,15,
16 95:25
96:1,4
97:12
144:10

**experienced**
95:7
168:14
169:13,
18,19,21
171:7,17

**expert**
146:15
154:12,13

**expertise**
174:1

**expired**
57:20

**explain**
17:6
33:23
49:6
78:13

92:25
93:1
94:21,23
97:7,9
104:8
112:20
120:14
128:19
132:7
147:15
154:20
168:9
180:17
191:7
194:15

**explained**
8:18
24:24
168:11
169:14

**explaining**
103:8

**explains**
80:8
189:22

**explanation**
171:13
177:23

**expressed**
144:5
148:18,21

**expressing**
89:23
200:7,11

**extended**
57:20

**extent**
24:21
54:9
61:12
63:22
67:5
77:23

82:13
99:14
124:20
154:25
155:1
210:4
231:5

**extra**
42:7
191:18

────────────

**F**

────────────

**Facebook**
187:8

**facilities**
139:5
168:16
171:13
202:14
222:8

**facility**
139:7
233:1

**fact**
111:8
129:17
231:25
232:5

**factor**
65:1
154:2

**factors**
84:24
154:4

**fair**
38:12
137:7,12
144:16

**fall**
29:13,23
105:4

106:8
173:4,7
174:1
191:24

**falls**
43:22

**familiar**
43:13,25
45:3
52:13,20,
21 53:11,
21 54:5,
7,8,9,15
55:9
64:9,16
70:7
75:16,21
82:19,20
84:16,17
93:10
109:20
151:13,15
173:11
210:2,4
231:2
233:4

**familiarize**
131:24

**families**
87:4,25
88:3,13

**fan**
178:6

**FAPE**
18:11,12
170:18

**feared**
89:19

**February**
142:22

**fed**
32:22

**federal**
22:14
23:5,25
24:1,2
36:19,22
39:11,13,
16 40:9,
11,13,25
41:7,9,
14,15,18,
20,22
45:10,16
46:16
47:24
48:8,11
49:9
54:13,14,
25 55:5,
17,18
58:3,10
62:13
64:18
65:10
66:8,12
67:19
68:4
69:16
70:12
77:21
80:10
85:18,25
86:6
117:10,
17,22
118:8
122:14
140:19
152:11
157:17,21
158:7,11,
17,18,19,
21
172:23,24
173:5
180:12,
13,24
181:2,6,



11,23
184:5
185:17,
21,25
186:2,5,
12,19
189:8
193:22,23
194:18,24
195:4,5,
18,20
196:6,12,
19 197:8,
12,21
198:25
200:1,8
201:8,19
207:18
214:19,21
215:9,20
224:7,13
231:6

**federally**
82:14

**fee**
195:14

**feel**
9:8,12,18
12:21
93:2
98:15
116:23
128:13
143:11
182:9
204:25
207:13

**fell**
15:12

**felt**
177:9
180:9

**field**
110:19

**fields**
110:10

**fight**
71:17

**figure**
9:14 14:5
35:22
108:10,15
185:14
211:17

**file**
229:13

**filed**
12:6

**files**
127:23
161:13

**final**
111:5
113:24
115:4
124:20
147:9
220:25
221:15

**finally**
203:17

**financial**
29:1,3,8
73:20
82:5
220:3,17
221:2,7,8

**find**
196:24
207:23
212:3
229:4

**finding**
227:4
229:22

**findings**
222:10
232:10

**fine**
47:5
65:22
119:3
174:19
209:18

**finish**
9:4

**finished**
9:3

**finite**
168:15
171:15

**fire**
104:13,22

**fiscal**
24:24
29:18
34:18
49:19,21
50:2,3,4,
6,8,9,13,
16,19
72:23
79:6
81:16
83:23,24
112:18
113:7
114:10,11
117:16
122:23
123:9
129:21
134:23
136:11,
12,13,15,
16,21
137:1,2,
3,4,16
141:18

156:13
159:5,8,
15,19,24
160:5
161:12,
15,16,20
162:3,5,
8,12,16
172:15,21
186:21
195:11,15
197:24
214:10
218:20
219:2,9,
16,18,20
220:2,20
221:12
222:6,7,9
223:23
231:13

**flexibility**
55:3
182:8,19
186:11
197:5

**flow**
69:11,14,
17

**flow-
through**
69:15,21,
23

**flowchart**
68:20

**Flowers**
102:5

**flows**
29:20

**focus**
47:15
158:16

**focused**

230:13
231:11,16

**focusing**
38:14

**folks**
70:21,23

**follow**
49:13
64:8
165:10
214:3,5

**follow-up**
185:1
186:3
223:5
229:25

**forget**
129:8

**forgot**
45:18
123:17
226:6

**forgotten**
129:9

**form**
10:3
63:15
64:5
71:18
72:3 73:8
74:23
79:1
82:25
84:9
86:2,9
87:7,22
88:1,4
90:7
92:17
93:23
96:14
98:5
100:10



106:21
108:15,20
109:8
110:18
112:7
119:15
120:20
121:2,11,
25 124:12
126:25
131:6,10,
17 132:3
136:9,19
137:11
138:3,10,
18 141:10
145:17,25
146:25
147:6
148:23
149:15
150:20
151:1
158:24
162:10
164:23
166:7
169:22
170:21
171:8,21
175:11,16
176:12
184:10
190:12,21
191:1
192:20
195:23
196:16
200:2,8,
9,20
204:9,18,
23 206:4,
25 207:9
208:6,18
211:13,25
212:12,21
213:18

214:1,14
215:13
216:8,17
217:8,23
219:3,10
220:7,21
222:15,25
223:6,15,
21 224:5,
21 225:3
227:5,9,
16,24
228:4
231:23
232:4,9

**formal**
20:3
106:10,
11,15

**format**
109:25
110:2

**formation**
178:19

**formula**
17:23
37:4,6,7
56:2,23
64:8,10,
11,14,20,
24 65:1,
11,14
67:24
68:2,6
71:1
72:11,14,
17,18,24
73:7
82:19,20
84:12
90:22
92:23
93:5
131:9,12
133:10

134:8,13,
20 136:6,
8 137:6,
9,18
138:8,12,
16
145:12,
13,15
147:25
148:12
154:25
155:11
156:21,24
157:4,9
163:11,
21,25
168:20,24
173:3

**forward**
205:19

**forwarded**
143:25
144:1,2,3
175:2
198:18
199:15
205:15
207:23

**found**
89:7
105:9
207:25
208:16
232:23

**four-year**
160:1

**fourth**
32:22

**frame**
21:4

**Fran**
102:21,23

**free**

9:8,13,18
18:13
27:6,8,9
143:11

**freed**
58:17

**Freemire**
36:21
133:8

**Frequently**
130:6

**fresh**
94:9

**front**
121:18
126:7
129:8

**front-**
**facing**
169:1

**frustration**
144:6

**FTE**
17:12
52:6 65:4
68:3 85:6
96:1
127:3,6
131:9,12

**full**
185:22

**Full-time**
17:13

**fully**
27:24
112:5
114:7

**function**
24:1
44:18
109:4

119:16
121:18
122:16
175:4

**fund**
40:11
63:9
86:25
134:21
171:20

**funded**
39:12
59:2 85:6
89:2
99:7,9
116:3
139:22
140:8
152:15
181:6,10,
17

**funding**
15:14,15,
18,22
17:16,17,
24 22:13,
25 23:1,
3,13,14,
17,23
24:1
26:19
28:17,19
29:19
30:1,2,9
33:14,16
34:2
37:9,10,
16 39:2,5
41:7,10,
12 42:10,
11,13,14,
17,24
44:5
45:10
47:23



48:8
49:13
52:10
53:12,18
55:4,16,
18 56:5,
6,20
59:4,10,
11,25
60:10,14,
15 62:6
63:6,13
64:3
65:19,20
66:5,8,
10,12,25
67:3,11,
15,16
68:1,18,
22 69:5,8
75:14
77:21
78:12,15,
16 80:9,
10 84:13
85:25
88:8,21
89:19,24
90:22
92:5
93:22
95:5
96:13,19,
23 105:4,
9 106:2
107:12
117:9,12,
14,18,22
124:15
127:4
131:4
132:24
133:4,6,
7,10
135:8
140:3,4,
5,6

151:21
152:1,2,
6,10,12,
14,18
154:19
156:21,24
157:4,9
159:20
160:5
161:2,21
163:11,
21,25
165:14,
20,22
168:20
169:20,24
170:8,11
171:3,18
172:6,7,9
173:10,
15,18
176:17
180:14
181:2,8
182:10,16
185:25
190:6,10,
14,20,23
195:19,20
200:8
205:23
208:10
214:21
222:12
223:12,18
224:1
225:1
232:12

**funds**
23:5,9
29:15
30:1
39:13,17,
20,23
40:2,9,
13,21

41:15,16,
24 42:2,7
44:20
45:5
46:18
49:9,17,
19,20,21,
23,24
54:15,21,
22 55:3,
19,20
56:1,3,4,
7,8,21
58:6,11,
14,16,20
61:12,13
62:13,14
64:8
65:3,17
66:14,20,
21 67:9
68:15,16,
17 69:1,
24,25
74:22,24,
25 75:1,
3,6,8,12
84:2
85:21
86:16
88:20
92:23
93:5
94:2,3,5,
7 97:6
104:24
112:11,17
113:6,11,
12,19,24
114:2,9,
10,11,13,
17,23
115:18,19
116:16,
18,21
117:1
118:14

122:18
139:24
140:1,8,
10,15,16,
19 141:6,
9 171:1,
14 172:25
176:14
177:14
180:23,24
181:6,17
182:20
184:5
185:16,
17,20,21,
22,24
186:2,5,
7,10,11,
12 189:2,
3,8,12,
17,23
191:14
193:18,
22,23
195:5
196:4
197:7,8,
12 198:25
200:1,21
201:1,24
204:3,14
206:2,7,
11,21
211:21
212:9,16,
17,20
213:2,13
214:19
223:13,19
224:9,14
231:6

**Futch**
183:24
184:1,3

**FY**
136:17

**FY17**
133:22
136:23,24
153:12
167:25

**FY18**
191:6

**FY2017**
130:5

———————

G

———————

**G-CASE**
89:12

**GA00019233**
198:5

**GA00031045**
109:17

**GA00041019**
162:25

**GA00315851**
142:16

**GA00317500**
183:16

**GA00885099**
187:16

**GA03803300**
133:13

**GA03803376**
152:23

**GA03803401**
155:14

**GA03803423**
166:20

**GA03806083**
125:5

**GA03826080**
202:23

**GA03838390**



194:5

**GA04957908**
179:17

**GA04957967**
174:5

**GA04957978**
101:9

**Gadoe**
16:10
37:14
51:23
91:16
154:18
211:3,9,
10,12,23
213:3,4,
6,14,15,
16
214:13,
15,17
215:12
216:14,21
217:2
220:4,9,
18
222:21,22
227:1,3,
13,18,21
228:1,22,
24 230:2,
4,23
231:18
232:11,24

**Gadoe's**
229:21

**gap**
225:6,9

**Gardner**
7:12 8:7
10:20
31:15
119:3
126:10
130:10,

13,15
174:4
229:13

**gave**
116:14
152:6
155:10
171:13

**Gay**
107:10
198:21,25

**GCIMP**
230:13

**geared**
43:8

**gearing**
186:13

**general**
39:2,3,5
71:5
139:5,6,
17,21
140:2,12
144:19,24
180:12,21
211:21
212:13
221:4
228:21

**generally**
17:14
38:19
39:2,4
53:15
71:14
79:23
84:8
103:11
114:21
124:20
142:10
148:15
158:1
174:23

184:19
185:3
187:9
200:21
207:20
228:20

**generate**
53:17
150:19
195:5,6

**generated**
55:1
110:18

**generates**
54:2,4
73:6
110:18

**Georgia**
7:3,15
8:2 11:16
16:6,9,10
19:1,4,5,
11 28:6
30:15
31:1
32:2,10
33:9
40:17
43:22
58:4,5,8,
12 61:2
73:4
80:15,16
86:13
87:1,19
89:11
90:19
98:20,25
99:19
103:20
111:25
112:2
118:9,10
125:4
127:5

130:4
147:10
164:10,
11,13
167:5,6
175:9,18
190:9
194:22
195:21
196:13
210:25
212:13
230:12

**Geronald**
36:2,5,6,
10,22
73:14
80:22
82:10
91:9,12
97:24
125:11
129:20
133:7
135:11,
17,18,20,
23 136:1
146:7,9,
13 147:19
148:11
154:24
155:1,3,
6,9,12

**Geronald's**
127:24

**get allocat
ed**
49:17,20,
21

**Gilchrist**
153:3,6

**give**
10:20
20:3 21:4

28:18
58:8
60:11
61:20,23
62:4
70:15
78:23
124:3,20
125:25
143:14
153:8
160:16
161:4
169:5
170:10
177:19
178:11
180:9
181:14
182:7
183:7
186:22
187:19,22
191:12
197:4
207:13

**giving**
44:24
47:13
101:4
151:24
169:3
185:19
191:4,8

**glance**
136:14

**global**
40:23

**globally**
54:24

**GLRS**
58:21
98:18
99:15,16,



20,25
191:4,9,
15 192:6,
11,18

**GNETS**
11:20
12:16
15:14,18,
22 16:5
23:18
24:2,8
30:9
32:18
33:10,12,
14,16,20
34:2,6,
10,11,23
35:6
41:12,13
50:18,20
58:21
65:20
66:5,8,
10,16,25
67:2 69:9
72:13
73:3,21
74:7,8,
14,16
75:17
76:4,14,
16,23
77:2,12,
13,16,20,
23,24
78:1,2,8,
12,16,18
79:11,24
80:4,7,8,
10 82:19,
20 86:14
87:2,6,
10,12,14
88:2,20
89:2
90:20

93:20
94:3
96:9,11,
12,13,16,
19 97:7,
13 99:12,
15,17
100:2,5
102:20
103:7
104:12,
15,16,21
105:21
106:1
107:7,12,
14 108:3
117:8,9,
22 119:22
120:16
121:4
124:5,6
125:2
127:4,24
130:6,19
132:11,
16,19,25
133:1,7,
20,22
134:4,21
135:7
136:23
138:7,16,
22,23,25
139:1,4,
6,9,11,
19,20
140:6,15
149:23
150:1,3,
23
151:21,25
152:1,2,
10,12
153:7
154:7,9,
19 155:21
156:21

157:19,21
158:23
159:1,2,
3,6,15,
17,19,20
160:10,
18,20,22
161:6,11,
12,14,18,
21,23
162:4,6,
7,13,20
163:25
165:4
167:25
170:7
171:2,5,
20 172:25
176:14
179:9
180:18
184:2,6
185:19
186:8,18
188:10,11
189:7,22
190:11,15
191:4,8,
15 192:6,
11,18
194:14
195:12,17
197:24,25
199:11
202:8
203:9
205:23
206:10,23
207:4
208:21
210:2,3,
8,23
211:22
213:8,17,
20,25
214:5,7,
11,17

215:8
216:11
217:6
218:8,9,
22
219:23,25
221:25
223:11,18
225:9
226:8,10
227:2,21
228:19,
20,21,25
229:1
230:3,8,
11,14,17,
19,24
231:3,19,
20 232:25
233:1

**GO-IEP**
24:25
26:21
27:3,4
28:1

**goals**
139:18
227:21

**good**
7:24,25
18:6 25:5
38:24
46:10
51:12
65:18
79:21
83:17
103:5
128:13,
15,16
146:16
153:10
161:3
181:11
233:12

**gosh**
102:7

**government**
47:24
58:3,10
64:18
67:19
68:4,5

**government'
s**
16:25

**governor's**
16:25

**grad**
21:9

**grade**
20:20
84:22

**grader**
84:22

**grades**
20:20

**graduate**
19:9
21:16

**graduated**
19:3,5
21:8,10,
11,13

**graduation**
20:12
21:9
57:5,13,
18 58:1

**grammar**
81:23

**grant**
23:7,8,
12,24
28:20,25
29:24



34:12,17
40:2,4,5,
18,19
41:4,14
43:17,23,
25 44:7,
12 45:13,
15,16
46:17,19,
24 47:1,
10,13,17
48:9,13
49:9
50:6,7,8,
14,16,20
56:2,15
57:1,4,6,
11,14,16,
24 58:2,
6,7,8,23
59:2,5
60:3,7
62:1
67:17
68:10,15,
21,24
70:20
71:10,16,
25 72:2,
13,14,17
73:7
75:11
78:8 79:7
81:12,15
82:16,18
99:7
103:7,19,
21
104:12,16
105:10,
12,21
106:1
108:22,
24,25
112:17,25
113:4
120:12,

16,19,22,
23
122:13,14
124:18,24
152:11
161:3
172:24
173:5,22
181:23
183:5,11,
12
189:13,15
194:23
195:4,17
196:12,19
197:1,8,
21 198:1
201:4,8
206:11
208:8
213:8,13,
17,25
214:20
220:25
221:1
223:18,25
224:8
232:21

granted
56:12
57:6
111:15
192:13
224:2,18

grantees
49:1

grants
23:1,17,
18 29:17,
21 37:5,
6,7 40:1,
3,5,10,
15,20,25
41:1,2,3,
7,9 44:17

45:7,10
47:8
48:11
55:17
56:24
63:10
70:12
71:1,2,3,
4,7,13,22
72:8,10,
11 74:14
97:7
111:25
112:11,12
117:12
140:22
151:22,25
152:2
158:6
161:4
177:16
179:2
189:16,17
190:25
194:18,24
195:6
196:6
201:14,15
214:2,7
215:20
221:22
222:1
223:11
224:24

gray
177:11

great
206:19
208:21,22

greenhouse
198:14

grew
171:19

grounds

200:13
208:4

groundwork
173:25

group
20:19
98:22
181:21

growing
137:8
138:1,8

guess
28:14
38:21
40:17
143:25
147:13
178:3
184:15
225:10

guessing
217:14

guidance
124:9,13
140:22
157:4
158:6
160:16
174:14,22
177:17
178:10
179:1,2
183:5
201:14,15
227:14

guide
118:20

guidelines
178:11,17

GVRA
60:13
61:1,2
62:4

H

handle
34:5,9,15
39:9 45:9
49:16
55:9
80:17
162:7

handled
30:9
33:14,16,
18,20
34:2
43:19
86:8
91:13,14
112:11

handles
29:19
41:24

handling
39:10
108:8

happen
108:18
150:14
151:20
191:23
213:3

happened
134:17
144:23
151:20
193:13

happening
114:20
217:19

hard
31:3
118:19
128:19



160:13
168:2
186:1

**Harold**
107:22

**Harry**
107:8
108:5,6
127:23
135:17,
19,21,24
196:25
197:9

**Harry's**
127:22
128:1
135:18

**HB**
83:4,22

**head**
8:23
25:18,19
167:3
200:12

**health**
19:8
43:16
60:10,18
232:13

**hear**
202:18

**heard**
46:20
66:19
75:19,20
139:10,12
218:6,7,
13

**held**
188:18
230:3,5,
24

**helped**
15:20,21
23:8

**helpful**
9:9 23:15
47:18
56:25
69:6
96:11
109:9
178:9
179:8

**helping**
15:2 80:3
146:5
198:3

**hesitant**
51:10

**hesitation**
200:7,11

**hey**
38:22
44:18
107:14
108:6
114:14
135:24
154:9
182:12

**high**
20:25
40:2 41:4
68:21,24
161:3,4

**high-priced**
203:18

**higher**
64:1
93:16
94:19
137:19,22
170:1,2
171:6,7

**Hill**
44:6
173:21

**hindsight**
169:2

**hire**
169:17,
19,23

**hired**
20:13
95:13
107:6
115:23
116:1
124:7
186:10
191:13

**hiring**
115:21
170:16

**historicall
y**
28:22

**hit**
168:2

**hold**
74:5
83:11

**holds**
99:25

**Holifield**
155:18,20
156:15

**home**
132:22,23

**hope**
71:10
233:12

**Horton**
196:22

**hospital**

59:24

**hour**
13:12

**hours**
225:23

**House**
90:23

**housed**
61:4

**how/why**
168:1

**Huh-uh**
101:1

**huh-uhs**
8:24

**hundred**
95:12

**hypothetica
l**
114:3
116:7
142:4

———————

**I**

———————

**idea**
22:25
23:9
29:15
30:1 37:4
39:20
40:2
41:1,8,15
42:11,14
48:3,13
54:15,21
55:20
56:1,5,6,
7,8,9,21
57:1,20
58:2,3,6,
7,16

64:8,11,
14 65:1,
3,10,17
66:14
67:12,15,
16 68:4
75:6,12,
14 82:16
94:5,7,25
95:5
133:9
140:5
143:23
164:16,17
172:24
173:5
175:21
176:6,11,
18 177:11
179:3
181:8
189:3
193:18,22
196:4
200:21
224:9
230:10

**IDEA-B**
189:4

**identificat
ion**
10:24
32:5
50:25
83:7
101:7
109:19
125:7
133:15
142:18
152:25
155:16
163:2
166:22
174:7
179:19



183:18
187:18
194:7
198:7
202:25
225:17

**identified**
76:7
222:14
230:15

**identify**
118:22
119:14
130:4
227:22
228:2

**IEP**
12:25
27:5,10,
12,16
139:18
181:21
187:12
216:11

**IEPS**
27:15
159:8
230:17

**iffy**
199:21
200:14

**II**
42:8

**iii**
165:13,
20,22,24
166:2,3
215:8

**imagination**
51:22

**imagine**
12:7
43:21

70:24
138:20
142:3
165:5
176:18
201:18
204:11
217:19
218:24

**immediately**
157:2

**impacted**
63:13
170:2

**implement**
76:8

**implemented**
230:16

**implication**
131:4

**important**
124:5
200:17

**improperly**
9:12

**improved**
57:23

**improvement**
57:6,12
76:6,8
199:22
200:19
228:7,11,
17,19
230:12

**improvements**
201:21
202:6,9,
11,12,13,
14,16

**in-kind**
73:20

**in-the-know**
147:13

**include**
23:16,18
38:8
74:18,19
77:13,16
82:5
99:20
106:6
139:8
153:17
158:1,5
166:14
183:10
200:17
218:8
221:3

**included**
97:19
100:3
124:11
138:24
147:18
159:17

**includes**
41:21
52:9
85:25
138:21
153:15
159:20
165:2
216:5
217:13

**including**
20:19
25:24,25
26:12
37:25
58:24
129:20

149:1
213:8

**income**
64:4

**increase**
97:6
171:14

**incurred**
70:19

**indicating**
126:11
134:5

**indications**
224:19

**indicator**
128:14,
15,16
161:7

**indicators**
157:24
158:1,5,
19,21,22
159:1,2,
3,4
160:9,11
161:19
162:1
227:22

**indirect**
70:4,5,6,
7,10,11,
16,17
105:18
106:3,7
194:17,24
195:1,2,
5,6,9
196:7,14,
18,21
197:12,20

**individual**
78:18
228:2

**individuals**
23:4
29:15
56:18
119:21
217:17
230:9
231:4

**information**
53:4
82:4,6
106:17
110:23
135:14,15
149:18
150:18,24
153:16,17
154:2,4,
13  161:17
162:5
163:18,20
165:2
169:3,5
184:21,22
185:23
187:4,5
224:12

**inherited**
127:22

**initial**
140:25
154:19

**initiative**
68:22
69:7,25

**initiatives**
69:5 70:1

**ins**
168:23

**instance**
27:18
104:20
111:4
113:9,14



115:9,20
145:21
152:6
162:20,22
177:15
232:17

**instructed**
9:25

**instruction**
19:15
45:24
46:5 91:4
97:19

**instruction
al**
52:14
215:11
216:6,15

**intake**
23:12
103:21

**intend**
190:5

**intended**
196:13

**intent**
224:1,3

**interact**
44:22
218:21

**interaction
s**
25:12

**interagency**
59:5,8
60:2
232:12,21

**interchange
ably**
18:8
68:23

**interface**
86:11
89:21

**internal**
204:2

**Internet**
126:9

**interpret**
145:7

**interrogato
ries**
14:16,20
15:2,8

**interrogato
ry**
14:24

**interrupt**
143:10

**intertwined**
231:17

**interventio
n**
61:4

**introduce**
7:7 10:18
30:13
50:23
155:14
162:24
179:13,16
183:15
187:16
198:5
202:23
210:6
225:14

**introduced**
32:2

**invited**
99:17
100:5

**involve**
190:19

**involved**
24:4 37:2
47:20
55:12
60:4
61:10,11
62:18
82:23
89:4
99:15
106:1
107:5
149:5
215:12
216:14,
22,24

**involvement**
62:15
79:25
80:1
81:20
99:12

**involves**
80:16
96:1

**issues**
8:6 25:13
219:9
224:19
230:15

**item**
78:13,16
79:24
80:4,7,24
81:21
88:19
122:4
221:5

**items**
25:3
81:22,24
124:21,23

142:10
166:13
177:16
203:18,23

————————

**J**

————————

**Jacqie**
102:2,16,
19 143:1
144:1,2,5
149:9

**Jamilah**
174:13

**Jamilah's**
176:7,9

**job**
12:4
14:5,17
15:12
20:12
24:15
74:4,5
108:10

**jobs**
73:16

**Johnson**
7:14 8:13
10:4,8
13:13,19
15:6,10
32:14
63:15
64:5
71:18
72:3 73:8
74:23
79:1
82:25
84:9
86:2,9
87:7,22
88:1,4
90:7

92:17
93:23
96:14
98:5
100:10
102:5
106:21
112:7
116:4
118:25
119:15
120:20
121:2,9,
11,25
124:12
126:14,25
131:6,10,
17 132:3
136:9,19
137:11
138:3,10,
18 141:10
143:9
145:17,25
146:25
147:6
148:23
149:15
150:20
151:1
158:24
162:10
164:23
165:10
166:7
169:22
170:21
171:8,21
175:11,16
176:12
184:10
190:12,21
191:1
192:20
195:23
196:16
200:2,9,



20 204:9,
18,23
206:4,25
207:9
208:6,18
209:9,13,
17,20
210:18
211:13,25
212:12,21
213:18
214:1,14
215:13
216:8,17
217:8,23
219:3,10
220:7,12,
21
222:15,25
223:6,15,
21 224:5,
21 225:3
227:5,9,
16,24
228:4
231:23
232:4,9
233:10,
16,19

jointly
232:18

Jones
32:19,20

judgment
94:16
96:5

July
114:21,23
194:12

June
101:9,25
102:16
103:10
203:6

205:18

Justice
7:11
60:25

Justin
44:6
173:21

Juvenile
60:25

—————————

K

—————————

Karen
102:5

Kelly
7:12  8:7

kind
17:8
20:7,9
33:5  45:9
55:10
62:5
68:19
92:10
106:19
120:18
122:8
127:22
133:3
135:20
153:24
161:9
163:18
195:13
210:11

kindergarte
n
20:25

kinds
58:19
71:1,2
73:20
99:4

110:10
161:17
187:6

knew
76:13
216:18

knowing
167:2
177:10

knowledge
29:20
43:11
47:21,22
48:11
52:24
82:13
117:13
121:19
131:7
133:3
154:22
164:17
224:15
231:7

—————————

L

—————————

laid
173:24

Lakesha
217:1,4,5

landmark
46:10

lane
218:19,20
219:6

language
81:23
219:24

languages
19:25

larger
171:19

Laura
7:10  8:1

lawsuit
12:5,15,
16  14:9

LEA
16:13
18:3,4
22:13
23:12
24:2,7
27:19,22
28:1,3
33:18,20
34:11
50:8
54:9,10
56:3
59:23
62:15
63:13,14,
25  64:2
67:5  68:2
70:17
72:23
74:14,17,
21  100:8
149:18
160:19,21
161:2
162:16
170:6,10,
15  191:11
206:15,20
207:5
208:5,9
214:17
227:14
231:12

LEA's
65:4

lead

20:16
121:16

leaders
47:11

leadership
19:17
21:13
25:20
76:14,15,
22  77:17,
24

leads
192:23

leaning
185:3

learn
11:22
90:12,13
98:13

learned
12:8

learning
98:20
108:10
183:10

LEAS
24:9
27:6,8,9,
15,20,25
37:10
38:10
41:14
49:11,17,
18,22
50:7,19
57:17,24
60:7,11
61:3,16,
18,21,23
62:6,24
63:5,22
64:4
67:25



AMBER MCCOLLUM
UNITED STATES vs STATE OF GEORGIA

November 09, 2022
Index: leave..lower

68:7,11
69:17
73:21
81:2
94:24
95:4 99:2
159:14,16
160:4
161:20
170:7,17
171:11
190:10
191:5,14,
20
192:12,19
193:17
208:2

**leave**
28:23
31:6
41:12
46:4
170:1

**leaving**
95:7
170:3

**led**
208:12

**ledger**
221:4

**left**
28:19
35:16
44:17
45:23
68:18
107:25
114:15
135:19
168:15
169:13,21

**legal**
14:20
69:15

**legislative**
45:10

**lens**
122:23
123:9
150:4,6

**less-experienced**
93:20

**letter**
105:18
106:7

**letterhead**
130:5

**letters**
211:6

**level**
20:6 54:6
55:10
63:18
81:13
84:25
88:21
132:16
146:6
161:18
181:11
232:24

**license**
19:21

**licenses**
19:20

**life**
46:11

**light**
70:20

**limit**
117:17,21
169:17

**limitation**
49:10

**limited**
117:23
137:16
171:20

**Linda**
26:21

**lines**
52:15
64:23
120:1

**Lisa**
183:24
184:1

**list**
160:6,8
175:21
176:7,19
177:5,7,9
178:4,15
182:21

**lists**
175:4

**literacy**
47:14

**litigation**
11:15,22
12:3

**local**
16:13
18:1
23:13
39:13
58:1
62:13,19
63:18
66:8
67:3,6
74:18,19
75:14
95:3
142:8
161:22
170:13

190:5,14,
20,22
230:18

**localized**
27:19,21

**locally**
182:8

**located**
132:20

**long**
9:24
13:11
22:2,6,19
30:15
32:19
83:14
114:24
115:3
118:3
125:19
141:22,24
164:7
190:16
209:18
210:11
225:19

**long-term**
57:14

**longer**
29:3
57:24
58:4
117:24,25
122:11
123:4
126:21
146:3
191:21

**looked**
14:24
106:2
129:25
163:7
171:23

172:4
221:20

**loop**
123:23,24

**looped**
198:21

**lose**
171:17,18

**lost**
168:14
169:12

**lot**
15:25
54:16
62:12
95:25
98:20
134:17
140:8
168:25
184:21,22
215:22
218:22
221:3

**lots**
18:7 20:2

**Low**
25:8
37:13
77:4,5
188:18

**lower**
32:13
64:2,4
92:14
93:19
94:9
95:20
137:23
169:10
171:1



lower-
degreed
  93:21

lowering
  95:15

LPC/LMSW
  120:25

LRE
  18:16

LUA
  17:25

_____

         M
_____

made
  47:20
  49:11
  54:15
  58:8,9
  80:19
  98:14
  118:10,16
  148:18,
  20,25
  149:1
  151:14,16
  152:17
  195:24,25
  196:1
  207:2

magnet
  45:5

Mainstay
  203:9,17
  206:14

maintain
  75:13
  95:4

maintaining
  95:2

maintenance
  79:6

94:6,22,
24 95:1,
2,20 96:3
200:13,23

make
  9:12,13
  13:4
  14:19
  16:2
  18:19
  24:5
  28:16,20
  39:8 40:8
  44:20
  47:5
  57:22
  59:18
  64:4 69:4
  81:23
  82:15
  101:11
  112:21
  118:13
  122:8,18
  124:10
  127:6,10
  129:5
  131:12,13
  148:4,6,
  8,16
  149:2,3
  158:3,15
  170:15
  181:4
  182:8,10,
  24 183:8
  197:10
  205:12
  206:21
  208:3
  224:6,9

makes
  55:9 77:1
  82:11
  128:7,20,
  21 129:18

161:9
172:2,3
180:10

making
  34:7
  62:24
  63:14
  94:12,13
  128:8
  158:6
  170:16
  201:21,22
  202:8,10,
  11,13,14
  205:3

Malissa
  26:19
  37:22
  123:14
  149:25

Malissa's
  186:19

manage
  28:14,15
  29:15
  36:18
  37:4
  40:1,3,5,
  13,22,24
  41:2
  44:21
  56:11,22
  60:11
  72:6
  95:19
  108:24

managed
  20:24
  22:24
  23:11
  33:18
  36:25
  54:15
  107:7

management
  104:12,
  14,21,23

manager
  22:16
  23:11
  24:16
  26:2,19,
  20 27:15
  37:18
  38:21
  73:3
  76:22
  77:22
  111:21,22
  122:11
  123:5
  143:23,24
  149:25
  218:3,17,
  20,21

managers
  23:10
  25:16,18,
  22,24
  26:6,10,
  11 28:23
  37:14,23
  38:1
  158:12
  224:11

manages
  27:2
  50:14

managing
  40:14

manner
  96:4
  118:14

manually
  151:5

March
  65:7
  133:16

153:2
155:17
166:24
174:12
183:23

Marilyn
  26:24

mark
  10:19
  101:5
  109:16
  125:3
  133:12
  142:15
  152:22
  166:19
  174:2
  211:19

marked
  10:23
  30:25
  32:3,4
  33:13
  46:12
  50:24
  83:5,6
  101:6
  109:18
  125:6
  133:14
  142:17
  152:24
  155:15
  163:1
  166:21
  174:6
  179:18
  183:17
  187:17
  194:6
  198:6
  202:24
  210:7
  225:16



AMBER MCCOLLUM
UNITED STATES vs STATE OF GEORGIA

November 09, 2022
Index: Mary..money

Mary
    166:25
    167:2,13,
    21

master's
    19:10,13
    21:11

match
    122:16
    221:18

matched
    221:15

matching
    74:21
    75:2,4,6,
    8,12,15

materials/
supplies
    165:20

math
    47:14

mathematica
lly
    172:2,3

Matt
    32:19,20

matter
    7:2 55:6
    71:24

matters
    8:20

maximum
    67:13,24

Mccollum
    7:2,17,24
    8:11 32:6
    109:21

Mccoy
    198:14
    199:14

Mckenzie
    174:13

meaning
    202:4
    217:9

means
    67:10
    69:16
    88:24,25
    94:17
    112:20
    121:3
    147:5
    156:23,25
    168:14,
    16,19
    169:13
    172:17
    175:12
    189:25
    190:2,3
    225:7,11

meant
    17:25
    48:5
    57:13,24
    60:6
    146:20
    147:1
    172:15
    174:20
    181:24
    208:22
    215:2

measurable
    227:21

measure
    227:14,23

measures
    228:7,10,
    23,25

mechanism
    103:18

mechanisms
    228:22,24

Medicaid
    47:20
    173:9,15,
    18

medical
    177:22,
    24,25

meet
    13:8,15
    25:9
    37:15,23
    55:5,7
    77:19
    130:20
    149:8
    192:25
    206:15

meeting
    13:19
    14:2
    27:16
    76:22,23,
    24 77:1,2
    78:7
    147:17
    156:20

meetings
    25:12,16,
    21 26:5
    37:13,14,
    25 38:1
    76:2,14
    77:7,17,
    25 99:16,
    23,25
    100:6
    157:12
    195:1

meets
    25:17
    77:11

Melanie
    7:14

members
    89:11

memory
    164:7

mental
    43:16

mentioned
    37:12
    55:16
    94:22
    98:18
    104:8
    120:4,6
    225:14
    232:21

mentions
    105:17

message
    190:16

messaged
    57:15

messed
    125:25

met
    37:18,19
    67:4

Micro
    203:23

midday
    203:24

middle
    32:9
    198:11

midyear
    115:6

military
    211:6

million

79:15
    84:2 92:6
    113:9,15
    114:1
    121:23

Mincey
    203:10,
    11,16
    205:15

mind
    18:20
    198:9

mindset
    181:25
    182:18
    186:12

minute
    125:13
    143:15
    187:19,22

minutes
    179:4
    209:12,
    13,16,18,
    19

misread
    220:10

missed
    26:25

missing
    39:19
    41:6

mistakes
    81:23

moment
    30:20
    40:7
    144:8
    153:8
    156:1

money
    23:7



34:10
44:24
48:3,14,
15 49:12
50:2
54:12,13
61:3,5,8,
16,20
62:19
63:23
66:8,9,11
68:4
69:14,16,
20 71:14,
16,23
72:1 86:7
109:7
112:5
115:2,13,
15 142:4
161:10,14
168:15
169:10
171:1,9,
15
196:15,19
203:17
204:16

**Monique**
198:14
199:14

**monitor**
142:5
157:19,21
215:8,21,
22,23
222:7

**monitored**
160:3,6,
7,8
215:24

**monitoring**
38:8
157:12,
13,14,15,

16,17,22
158:14
159:6,7,
14 160:1
161:19,20
162:1,5,
14,21
215:12,
15,16,18,
19 216:5,
9,11,15,
25 217:1,
3 218:8
221:2,14
230:8,12,
13,16
231:3,11,
12,14,16

**months**
22:3
45:22
46:1,2,3
76:18

**morning**
7:24,25

**mouse**
155:24
225:24

**move**
31:12
59:13
208:23

**moved**
28:3
45:24

**moves**
27:19,22

**moving**
38:6
83:11

**MTSS**
46:20
47:2

**Multi-
tiered**
47:3

**multiple**
129:20
176:16
183:6
208:8

**multiplied**
84:23

**multipliers**
53:11,16

**mystery**
156:21,
23,24
157:1

---

**N**

---

**Nakeba**
35:15,16
124:6
142:23
147:8
156:19
198:18,21
199:7,16
228:14

**nature**
12:14
161:1

**Neal**
102:3,16,
19 143:1

**necessarily**
48:23,24
94:17
108:20
117:1
122:15
146:15
154:13
160:23

162:2
181:8

**needed**
63:24
82:16
103:9
107:16
115:10
124:5
170:11,12
171:9
172:10
177:23,25
178:7
180:9
182:9
185:18,23
224:12

**Network**
11:16
16:6
32:10
33:9 87:1
90:20

**night's**
233:12

**nodding**
8:23
52:12

**non-gnets**
132:18
151:11

**nonbudget**
70:21,23

**normal**
152:11
158:12

**note**
32:1
179:22
180:1

**notes**
153:15

190:4
230:5

**notice**
10:18
129:12,14

**notificatio
n**
183:5
187:8
214:24
224:17

**notificatio
ns**
214:20

**Notify**
214:10

**November**
7:4 90:24

**number**
31:10
53:19
65:14
84:14
85:12,21
93:8,15,
20
112:16,18
115:17
124:19
130:19
132:14
136:20
137:5
140:1
143:2
164:4
175:23
176:24
178:24
183:4
220:8
227:19

**numbers**
30:19,22



51:2
136:2,24,
25 168:2
226:22

**numeral**
215:8

———————

O

———————

**object**
24:2
44:18
63:15
64:5
71:18
72:3 73:8
74:23
79:1
82:25
84:9
86:2,9
87:7,22
88:1,4
90:7
92:17
93:23
96:14
98:5
100:10
106:21
109:4
112:7
119:15,17
120:5,20
121:2,9,
11,14,18,
25 122:16
124:12
126:25
131:6,10,
17 132:3
136:9,19
137:11
138:3,10,
18 141:10

145:17,25
146:25
147:6
148:23
149:15
150:20
151:1
158:24
162:10
164:23
166:7
169:22
170:21
171:8,21
175:4,11,
16 176:12
184:10
190:12,21
191:1
192:20
195:23
196:16
200:2,9,
20 204:9,
18,23
206:4,25
207:9
208:6,18
211:13,25
212:12,21
213:18
214:1,14
215:13
216:8,17
217:8,23
219:3,10
220:7,21
222:15,25
223:6,15,
21 224:5,
21 225:3
227:5,9,
16,24
228:4
231:23
232:4,9

**Objection**
116:4

**objections**
10:3

**objective**
223:14

**objectives**
139:18
223:20

**objects**
9:23

**OBP**
16:23

**observation**
121:21

**obtain**
27:23

**occasional**
10:6

**occasionall
y**
107:14

**occurred**
233:2

**Oconee**
188:12

**Oconee's**
189:23

**October**
21:23
22:20
24:12,14,
18 65:7,
8,9,10,13
114:22
115:1
198:13

**offer**
27:6

**offering**

58:4
176:21

**offers**
184:3

**office**
16:23,25
29:16
30:4
33:15,17,
21 34:3
36:9
39:9,17,
20 40:22
41:16,18,
20 42:5,
6,8,11,16
43:1,6,7,
8,12,19,
20 44:3,
12,17
45:4,9,
13,14,19,
20,21,23,
24 46:4
49:16
51:16,23
54:2,4
56:12
62:24
69:17
72:7,9,
10,20
79:25
81:7
90:22,23,
24 149:13
154:18,21
172:14
186:15
202:5,7
214:18
217:7
218:4,14,
16 219:1,
8 221:13,
23

**officer**
29:2,3,9

**official**
71:12

**offset**
94:10
97:6

**offsetting**
94:22
95:8,16

**OFP**
41:24
42:4

**oils**
184:5

**older**
124:2

**onboard**
127:20

**one-to-one**
200:25

**ongoing**
100:1

**online**
8:5 27:5,
10,12,15
103:19
105:6
106:5,10,
18,25
110:3,4

**OPB**
155:2,7
168:13
169:7

**operating**
166:15
168:13,19
169:7

**operation**
165:19



213:7,17,
20,24

**operations**
29:14
165:18

**opinion**
185:11
199:1
200:15,16
206:3,6

**opinions**
28:18

**opportunity**
99:18

**option**
68:14
185:19
192:9

**options**
12:22
192:19

**oral**
13:7
148:1

**orally**
8:23

**order**
75:14
134:5
161:10
163:13
168:18
222:13

**org**
35:13

**organizatio
n**
42:23
71:8
98:23
106:19,23

**organizatio
nal**
30:16
35:5
42:22

**organized**
107:1,3

**orient**
80:6

**original**
49:13
112:24
113:1,21
141:22
205:6

**originally**
57:10
116:3
207:17

**other's**
199:5

**outcome**
216:12

**outline**
167:17

**outlined**
162:18

**outlines**
210:14

**outs**
168:23

**overarching**
158:20

**overfund**
137:14,15
138:1

**overfunded**
137:21,25

**overhead**
70:22

**overlapped**
14:16

**oversaw**
23:4

**oversee**
29:9

**overseeing**
80:15

**oversees**
29:12

**overview**
38:25

─────────

          **P**

─────────

**p.m.**
100:17,
18,19,21
101:14,
15,16,18
102:9,10,
11,13
119:5,6,
7,9
156:2,3,
4,6
209:21,
22,23,25
233:15,20

**pages**
30:19
85:10

**paid**
170:1

**pandemic**
46:9

**paper**
134:10
142:4

**paragraph**
229:6,15,

18,24

**paraprofess
ionals**
164:20

**paras**
115:22

**parentheses**
120:12

**parenthetic
al**
219:24
220:16
222:7

**part**
35:6,10
39:13,19
40:1
41:2,15
47:13,17
52:8,10,
11,15
55:20
56:8,9,
10,11,16,
18,21
58:7
63:12
66:12
68:2
69:24
86:5,6
100:1
104:16
105:8,21
106:6
107:12,15
108:8
120:16
122:11
124:1
134:21
138:2
143:23
145:12,14

157:20
159:8
163:25
167:10
172:21
176:2
185:6
189:3
194:16
195:17,18
196:4
207:24
213:9
216:14
217:1,2
221:14,
21,25
230:12,18

**partial**
176:21

**partially**
63:9
216:24

**partner**
45:12

**parts**
20:18
52:4 75:9
107:23,24
136:8
162:6
203:5

**pass**
88:18

**pass-
through**
56:4
69:13

**passed**
49:1
196:22
227:13

**past**



42:19,20
81:25
82:10
92:15
144:15,18
147:12
151:22
172:21
179:1
191:9
215:24
227:11

Pat
188:3,7

patience
8:5

pay
27:6
69:25
122:17

paying
62:20,23
63:5
95:23

payments
47:20
62:25

pending
10:10

pens
142:5

people
26:5 28:9
44:7
71:11,15,
24 87:12
89:18,23
94:14
96:2
106:14,15
128:12
129:4,20,
23

144:22,24
146:17,18
148:25
185:21
191:14
199:4,5
214:18
217:3
219:6

percent
117:23
118:12
141:15,16
165:23
189:8
191:10,12
193:12,
18,21
194:23
195:9,15,
17,19
197:1,3,
6,20,25

percentage
70:16,18
188:21
195:20
196:13
197:7

performance
227:23
230:6,7,8

performing
155:23
213:13
228:3

period
114:6
149:2
191:20

periodicall
y
94:4

permissible
185:15

permit
209:4

person
54:1 71:8
74:7,8
107:8
110:18,24
111:16
119:19
124:5
134:16
162:2
196:24
212:22

personally
135:15
213:21
232:19

personnel
29:16
45:12
46:17,19
153:22,24
154:1

perspective
25:6

Peterson
102:4

phone
146:13
154:9
180:7
184:23
185:4
186:24
187:10
207:2,3

pick
108:22
154:8
184:23

185:3

picked
146:13

piece
41:6
171:12
200:5

pieces
168:21

pinch
182:5

place
11:25
18:1
45:20
63:4
118:13
136:7
159:7
175:14
178:11,15
193:7
215:15
228:9

placement
12:22

placements
227:19

places
18:9
210:12
225:22

plaintiff's
10:23
32:3,4
50:24
83:6
101:6
109:18
125:6
133:14
142:17
152:24

155:15
163:1
166:21
174:6
179:18
183:17
187:17
194:6
198:6
202:24
210:8
225:16

plan
57:6,12,
15 70:17
104:13,
14,21,22,
23 230:7,
8,11,13,
15,20

planning
16:23,24
90:22
154:18,22
209:11

plans
104:13
205:3
231:9,10

platform
103:20

play
95:6
201:15,17

point
15:6 34:4
35:14
96:22
108:9
111:24
114:5
117:21
151:18,23
152:13



186:10
196:1
201:17
209:9

policies
25:1
158:13
213:10
215:9

policy
91:14,16,
18 92:1
193:7

populate
109:1

population
64:20,21,
22 65:2,3

portal
103:23,
24,25
104:2
105:13
172:5

portion
67:12,22,
24 71:15
105:5,9
109:24
195:20
196:19
197:25

portions
104:25

position
22:2,4,6,
15,22,23
24:17,22
36:13,16
73:25
74:1,3,4
123:11,12
126:24

135:20
188:17,19
196:25
224:18

positions
96:24

possibly
63:1
105:23
139:17
231:24

post
46:11,12
214:20

posted
178:14,16

pot
71:14

potentially
28:1

poverty
64:20,22,
24,25
65:1

practice
193:6
218:1

practiced
10:21

practices
158:13

pre
46:11,12

preceding
180:2

preliminary
8:19 81:5

prep
18:21

preparation

13:24
14:4
82:23

prepare
13:3,8
80:3
82:18
91:10
150:24
162:20
204:2

prepared
110:21
163:14

prepares
52:9
110:15,21

preparing
160:20
207:5

preschool
20:20
40:18

preschools
40:4

present
13:18

presented
55:11

press
31:18

prevented
114:5

previous
9:18
22:22,23
26:3
54:11
97:20
196:24

previously

43:19
76:12
204:17
210:7

principals
47:12

principles
158:7
161:1
201:13,19

print
110:6

printed
110:3,7

prior
66:23
113:4
116:18,21
122:19
123:1
135:1
137:3,4
173:7
223:13,19

privacy
20:2

privilege
10:3

problem
9:20

problems
87:4,21

procedural
158:3

procedure
73:10
124:1
191:22
199:9,10

procedures
25:1

108:18
158:13
213:7,11,
16,20,22,
24 214:3,
5,6
215:9,25

process
8:20
78:14,18,
21 79:22,
23 80:14
82:1
107:4,13
111:10
114:19
115:25
116:7,24
117:6
122:9
123:3
144:19,25
150:13
157:20
158:14
205:13
213:8
217:20
218:3,14
224:11
230:16
231:15

processed
106:25
107:2

produce
15:21
51:16
194:3

produced
30:15,23
125:4
165:9

production



14:12,13
55:12

**professional**
20:4
58:22
93:17
94:16
96:4
98:25
100:2

**program**
11:17,20
12:17
22:5,9,16
23:10,11,
22 24:8,
16 25:21,
24 26:2,
6,9,10,
11,18,20
28:1,23
32:18
34:11
37:18
41:18
45:5 66:5
69:9 73:3
75:17
76:21
77:22
79:12
86:6,14
87:6
88:2,20,
21 89:2
90:21
96:13
107:7
110:18
111:20,22
119:18
121:23
130:6
132:11,
20,25

133:1
138:7
139:20
140:15
141:6
149:25
150:1
158:19,
20,23
161:11,
12,15,18
170:19,
23,24
171:5,16,
19 172:18
175:25
180:13
186:8,19
189:24
190:11
195:12
197:25
199:14
201:22
202:8
203:18
206:21,22
207:4
208:20
218:2,17,
19,21
227:2
228:19
229:1
230:11,
18,19
231:19,20
232:25
233:4

**program's**
137:8
230:8
231:3

**programmatic**
24:3

106:1
159:7,11
216:4
219:8

**programming**
77:24

**programs**
29:17
32:23
41:20,22
73:21
74:16
77:17
81:10
85:19,25
96:19
99:13
121:4
130:20
158:11,
17,18,21
160:10
166:5
172:25
173:1
225:9
227:22
228:2
230:3,4,
5,14,24

**Project**
43:13,15,
21 44:5

**promotion**
19:8

**prompted**
46:13

**pronounce**
36:2
143:18

**properly**
211:20

**proponent**

177:20

**proposal**
89:5,6,8,
15,17
90:12,14
194:20
197:16

**proposed**
180:1,5

**protected**
27:24

**protocol**
159:14

**provide**
59:14,17,
24 62:7
63:21,23
73:21
74:6,9
88:12
90:21
95:18
98:24
119:20,23
139:24
146:16
149:22
157:5
159:1
160:21,22
161:24
162:4
170:14
178:20
182:3,4
183:13
190:5
224:12
226:21
227:7,11
232:17
233:1

**provided**
15:7,17

30:17
47:21
139:20
149:24
160:10
162:3
173:16
178:1,23
179:1
181:1
217:21

**provider**
121:10

**providers**
121:5
232:25

**providing**
17:23
59:19
152:16
170:18
180:24
182:12

**provision**
220:20
232:13

**prudent**
201:23

**psychological**
74:4

**public**
18:13

**pull**
10:20
28:16,17,
24 54:17

**pulled**
14:17
218:9

**pupil**
84:21



purchase
  184:9
  185:16
  204:4
  206:11,22
  208:17
  209:6

purpose
  48:12
  53:15
  86:22,25
  88:7
  116:12,13
  176:14,17
  183:12
  201:4
  204:17

purposes
  8:13 58:5
  67:14
  132:10
  210:23

pursuant
  11:10
  220:20

purview
  105:4

push
  149:3

put
  18:21
  28:25
  49:12
  79:6
  82:17
  108:14
  167:16
  171:25
  178:11
  184:22

————————

        Q
————————

QBE

17:20
40:20,24
52:5 85:6
88:21
96:1
165:22,24

qualify
  49:5

Quality
  17:21
  84:13

question
  9:3,5,7,
  13,18,24,
  25 10:9,
  10 54:10
  63:22
  66:22
  67:7
  97:5,18
  98:8,9
  126:17
  127:13
  131:21
  132:15
  134:1,11,
  19 144:17
  146:19
  154:8,9
  156:16
  167:20
  170:5
  184:8,12
  191:7
  192:16
  195:16
  198:17
  199:6
  212:19
  215:1
  220:12,15
  221:24

questioned
  197:10,13

questions
  10:14
  13:2
  14:21
  34:20
  44:19
  53:19
  54:11
  55:8,12
  89:19,25
  98:15
  108:7
  126:7
  130:1,6
  132:5
  144:11,23
  145:21
  147:11
  157:3,8
  169:6
  173:24
  176:7,9
  179:6
  182:11,15
  184:20
  187:9
  191:7
  196:21,23
  199:11
  210:2
  225:22
  229:25
  233:10

quick
  131:20

quoting
  220:8

————————

        R
————————

R-O-A-M
  29:7

Rahming
  35:15,16

124:6
142:23
198:19,21
199:7

range
  173:4,7

ratio
  164:8,18
  168:21

RDA
  216:23
  218:7

reach
  47:16
  91:18
  92:2
  100:13

reached
  79:24
  91:25
  97:23

reaction
  199:20

read
  47:1
  81:22
  86:21
  92:5
  125:17,25
  129:8,25
  131:20,23
  143:16
  144:9
  145:4
  147:20
  156:10
  167:18
  174:16
  176:1,3
  180:8
  188:1
  194:11
  198:12
  199:24

203:21,22
212:1
226:24
229:24
233:16

read-only
  124:4

reading
  20:24
  132:5
  156:9
  200:11
  212:1
  214:23

ready
  18:24
  67:7
  78:13
  107:18
  111:20
  208:22

real
  131:20
  149:3
  161:3

realignment
  45:19

reallocate
  40:11

realm
  98:16
  137:16

reason
  9:1 10:13
  118:11,12
  128:23
  169:2
  172:1
  177:20
  191:13

reasonable
  201:3,12



reasons
  175:23
  176:25
  208:8
recall
  46:6  57:8
  79:8
  87:16
  105:2
  118:2,7
  135:6
  173:6
  188:8
  193:16
  203:15
  222:11,16
  223:7
  224:22
  225:4
  226:3,18,
  19
receive
  47:17
  50:6,14
  56:4
  59:21
  60:10,14
  61:12
  64:17
  75:14
  78:15
  80:19,20,
  21  95:5
  116:19,21
  197:23
  201:23
  211:20
  213:1
  214:21
  222:1
received
  11:9
  46:21
  48:12
  58:7

60:15
108:6
112:23
113:3
115:18
129:12,14
147:9
150:18,23
151:3
191:15
212:9
220:19,24
221:1
222:9,12,
23  223:2,
5  224:16
receives
  17:16
  50:16
  133:4
  181:16
  192:12
  212:16,20
  221:23
receiving
  50:20
  62:7  80:2
  105:25
  108:22
  109:2
  157:8
  179:6
  181:18
  222:17
recent
  46:2,3
recently
  45:21
  98:1
  118:3
recess
  31:22
  65:25
  100:18

101:15
102:10
119:6
156:3
209:22
recognize
  83:22
  163:5,9
recollectio
n
  92:9
recommendat
ion
  187:7
  208:16
recommendat
ions
  75:22
  76:4
  90:21
  149:9
record
  7:5,8
  8:10
  31:15,20,
  24  32:2
  47:2
  65:23
  66:2  93:4
  100:16,
  17,20
  101:12,
  14,17
  102:8,9,
  12  119:1,
  4,5,8
  155:25
  156:2,5
  202:15,
  17,19
  209:21,24
  218:6,7
  230:1,18
  233:14

recording
  8:22
records
  27:23
  28:2
  216:11
  218:9
Reduce
  92:22
  93:5
reduced
  170:20
reduction
  97:7,13,
  15
reductions
  97:10
refer
  30:14
  70:21,24
  139:1
reference
  30:14
  210:9
referenced
  147:23
referencing
  195:7
referred
  11:19
  67:8
  103:23
  216:5
referring
  16:10
  76:5
  111:2
  135:5
  202:1
  219:13
refers

211:11,14
reflected
  35:12
refresh
  92:9
refreshing
  164:7
regard
  232:22
regional
  17:2
  58:21
  81:10
  172:25
  178:25
  230:24
  231:19
regional-
based
  100:4
regions
  99:13
  100:3
regret
  135:2
regular
  25:3
  218:23
regularly
  25:9
  37:15
  77:11
regulating
  213:7,16,
  20
regulatory
  183:4
Rehabilitat
ion
  61:2



reimbursement
161:5

reintegration
40:5,19
75:11

related
8:20
17:18,19
19:20
57:15
161:1
172:12
227:12
232:11

relating
11:15
222:10

relative
11:25

relaying
154:12

released
161:14

relevant
201:8

remember
9:17
11:23
12:8
15:11
52:23
70:6
133:24
144:20,
21,22
145:1,13
146:3
148:6,8,
10,14
149:6,10
153:21,25

163:17
164:8
173:10
185:9,10,
12
192:21,22
193:3
225:8,10,
11
226:11,13

remind
136:22

reminder
180:9

repair
198:15

repeat
32:16
82:21
86:18
126:17
150:21
167:20
196:17
220:12,14
223:16

rephrase
9:8 71:21
138:6
140:24

replace
171:1

replaced
169:14

replacement
165:21

report
25:7
26:15
38:18
90:15
116:20
219:13

221:4,15,
20 222:9,
21

reported
53:1 93:8

reporter
7:8,19
8:21
19:23
29:6 43:2
50:10
72:15
149:14
157:15
196:8
233:17

reporter's
16:2

reporting
133:4

reports
26:18,20,
21 37:24
38:9,10
123:16
132:15
172:12,
13,16,20
217:6,13,
15,21
218:3,10,
13,23
219:4,12,
15 220:3,
6,17,19,
23,24
221:2,4,
8,13,23
222:14

represent
8:1

represented
8:13

represents
177:11

Repsher
107:8,22
196:25

request
14:12,13,
25 161:13
162:12
165:11
184:4
204:3,8
205:19
222:12,
13,19
224:18

requested
123:14
154:15
191:21
195:1
220:3,5
222:21,
22,23
223:2,4

requests
14:22
163:20
165:9
186:16
222:17

require
75:6,8
190:10,14
227:14

required
55:5
74:21
104:18
208:3
217:6
220:11,17
231:21
232:7

represents
177:11

requirement
122:5
164:16,17

requirements
75:2,4

requires
75:11

requiring
230:11,19

RESA
17:2 50:9
162:17
197:23

RESAS
49:17,19
50:1,2,19
69:18

research
22:1
90:23
107:9
184:4

residence
132:6

resident
132:10,
14,17,21

residential
40:4,18
75:10

Resilience
120:25

resource
98:21
99:18
225:6,9

resources
87:3
88:11,12
99:21



respect
  36:8
  37:15

respond
  146:11
  160:25

responded
  147:19
  168:10
  201:2

responding
  31:7
  229:9

response
  13:7
  14:12
  15:7,17
  72:1
  134:1
  136:23
  148:1
  153:12
  154:6,10,
  17 157:7
  168:9
  175:20
  176:21
  186:22
  206:18
  229:19,21
  230:2

responsibil
ities
  22:8,21
  24:20
  162:15,
  17,19
  210:15
  211:16

responsibil
ity
  27:1
  161:2

responsible
  161:23
  170:18

responsive
  91:11
  144:22
  145:9
  147:11
  160:23
  163:20
  165:9

rest
  64:19
  67:25
  68:6,9
  113:16
  114:2
  231:7

restraint
  104:13,22

restricted
  219:23,25

restriction
  141:20
  193:12

restriction
s
  47:25
  48:6,20,
  25 49:8
  117:7
  140:16,
  20,25
  141:4
  142:7
  186:5,7,9

restrictive
  18:17

restructure
  35:8,11
  89:2

restructure
d
  35:5

restructuri
ngs
  46:14

result
  169:10

results
  93:21

results-
driven
  159:13
  216:23

retain
  47:12

retention
  45:16
  46:16,24
  47:8,10
  58:22

retired
  94:8,11,
  19

retiring
  95:12

review
  10:21
  13:23
  14:1
  29:24
  37:9
  101:23
  104:21,25
  105:5,8
  106:4,8,9
  108:11
  109:24
  110:13
  121:17
  122:6
  124:6,20
  125:13

153:9
154:14
155:22
157:23,25
158:12,
13,17,18
159:11,22
172:13,
18,20
184:12
186:20
187:20,
22,24
194:9
203:2
210:10
216:11
217:21
218:3,15
219:1,8,
12 221:14
223:17,
23,24
225:19
226:14

reviewed
  22:25
  23:16,24
  34:16
  45:15
  96:19
  105:2
  106:3
  121:13
  122:19,25
  159:16
  166:1
  172:20
  203:3
  223:12

reviewing
  80:3
  96:25
  97:1
  107:11,19
  108:12,17

109:5
123:2,3,6
124:10
161:18
184:24
198:9
222:17
224:23
230:17

reviews
  37:24
  105:5
  111:23
  112:4
  124:9,22
  152:19
  159:18,
  19,24
  172:15,18
  186:15,18
  202:15,
  17,19
  205:22
  218:6,7,
  14 219:7,
  11,16
  225:2
  230:19
  231:21
  232:1

revised
  33:13

revision
  112:9
  113:23

ridiculous
  62:5

rights
  12:17,20
  124:4

risk
  158:4

Roam
  29:5,7



Roberts
  26:20
  37:22

Rockdale
  20:14,21
  21:7,15

role
  14:15
  23:2 26:3
  36:5,24
  53:1
  54:11
  80:24
  81:22,25
  104:23
  105:24
  107:19
  108:12
  111:18,
  19,21
  127:23,24
  135:19
  179:7,8
  218:2

roles
  119:20
  122:2
  124:2
  162:15,19

rolling
  31:13,19
  127:19,21
  128:4,9,
  13,17,20,
  23 129:9
  134:7,9,
  25
  136:12,16
  137:1,2,
  3,17
  143:4
  145:6,11
  147:22
  148:11,15
  153:16

163:24
164:22
168:12,19

Roman
  215:8

roots
  203:25

rotate
  31:5

roughly
  17:10
  79:18

routes
  203:24

Rowell
  197:13

rule
  59:3,9,11
  117:24,25
  118:6
  194:1,2
  197:19
  210:2,3,
  9,23
  212:14
  213:6
  217:6,9,
  10,22
  219:14
  221:10
  223:10
  226:8,10
  227:13

rules
  25:2
  49:13
  118:9
  213:7,11,
  16,20,22,
  24 215:10
  226:15
  230:10

run
  138:12
  180:13
  203:24

runs
  155:11

Rusk
  29:5

———————

S

———————

safe
  230:20

safety
  222:8

sake
  16:2

salaries
  93:11
  96:23

salary
  94:12
  95:12,14
  164:3
  166:11
  170:2

SAMHSA
  42:16,24
  43:17,23
  173:10,
  20,22

Sandra
  101:4
  103:2
  107:8
  109:12
  118:20,
  21,23

Sandy
  107:17,
  22,25
  108:3,6

sate
  180:12

satellite
  189:24
  190:2

save
  113:15

SBOE
  16:20
  220:4

scenes
  146:10

scheduled
  25:12,16

school
  19:9
  20:17,18,
  25 21:1,9
  41:19
  52:25
  64:21
  83:23
  84:25
  92:6
  132:19,25
  203:13
  230:18

school'
  130:20

schools
  21:15
  45:5
  47:21
  131:16
  167:7
  173:16,18
  230:20

scope
  105:24
  106:8

screen
  83:8

101:24

screenshot
  101:2

scroll
  85:10
  92:12
  101:22
  103:2,4
  105:18
  118:19
  119:13
  125:20
  126:8
  130:3,18
  143:11,13
  144:8
  155:24
  192:23

scrolling
  31:2
  118:21
  130:9
  143:7
  174:16
  183:19
  206:12

SEA
  16:18
  23:2,3
  56:3
  67:11,25
  70:18
  210:15,24
  211:1,3,
  8,10,11,
  20 212:3,
  16 213:1,
  6 220:9,
  18 222:22

search
  83:19

Seat
  120:25



AMBER MCCOLLUM
UNITED STATES vs STATE OF GEORGIA

November 09, 2022
Index: Seay..shows

Seay
143:18,20
166:25
167:2,13,
21

section
28:10
83:20
85:10,18
86:21
97:6
210:14
211:2
219:18,20

sections
41:22
131:20
132:1
211:20

secure
27:25

seeking
199:5
206:2,5

segregation
37:3

select
158:9

selected
177:16

Senate
90:24

send
67:25
74:7,8
113:23
114:7
123:6
127:25
133:23
134:3
135:18
136:1

142:9
190:11
214:20

sending
61:21
96:21
97:2
126:4,19,
20
127:15,16
154:10
218:22

sends
72:25
73:6

senior
24:16
25:24
26:2,10,
11 218:21

sense
9:12,13
12:19,21
28:5 66:7
106:1
128:21
129:5
170:16
172:2,3
180:10

sentence
127:17
201:25

separate
29:9
42:11
109:7,8
111:6
151:22,25
152:11

separately
135:22

serve

87:12,14,
20 88:3,5
139:1,6
170:11
190:5
203:18

served
146:22,23
170:9
190:17
230:17

serves
87:15

service
17:2
29:11
134:16
146:16
199:22
200:18

services
22:12
25:20
28:6
30:10
35:7,19
36:7
39:12
43:16
47:20
51:19,23
59:14,17,
19,21,25
60:1
62:7,8,
16,21
63:10
74:6,9
77:10,14
78:25
79:4
80:18
87:2
88:10,12
95:15,18,

24 98:21
99:4,6,20
118:22
119:14,
17,20,23
120:1
121:8,15,
21,24
122:3,7
124:17
139:11,
13,21,25
140:7
151:10,
14,16
152:4,6,
16 173:16
211:22
214:11
215:11
216:7,16
232:14,17
233:1

serving
161:12
195:11
197:24

set
57:19
67:13,18
68:1 78:6
80:12,13
98:14
139:5
147:17
162:16
170:25
171:3

sets
38:20
85:3

setting
139:21
140:2,12
230:5,6

severe
87:3,21

shaking
8:23

shaky
121:14

share
109:12
163:13,22
171:19

shared
100:25
163:6,8,
19 224:25

sharing
98:12
101:20
124:25

sheet
50:23
51:4 54:7
55:6
157:4

Sheila
203:10

Shelia
203:11,12

shortage
168:5

shorthand
7:19

showed
165:25

showing
101:24

shows
55:6
64:18
80:10
106:13
111:3,6



165:4
220:25

sic
16:23

side
24:1
162:13
172:23,24
186:21
218:20
219:2

sides
30:22

sideways
30:21,23
31:3,6

sign
111:22
232:24
233:16

sign-off
106:10,11
111:21
123:18,21

sign-offs
112:2

signature
188:9

signed
106:14
110:23
111:4,6,
7,9,18,20

similar
27:14,17
103:22

simply
95:16

single
178:5

site

74:7,8

situations
70:12

sixth
33:8

skipped
167:17
198:10

sleep
233:12

slow
144:8

slowly
88:16

small
12:21
20:19
114:6
168:5

Smith-dixon
188:4,6,
14 191:4
193:1
228:13

software
27:14,17

sole
162:2
200:4

somebody's
200:12

sort
28:9 32:9
34:10
38:12
39:5 48:9
52:3 62:7
65:18
160:15
193:7

sought

15:12
207:5

sounds
28:7 30:3
49:5
207:25

source
39:2
90:11
176:22

sources
39:5
55:18
176:10

space
116:25

span
158:21

spanning
203:5

speak
7:19
28:12,13
53:14,23
54:14
63:19
65:11
128:6
159:8
189:16
190:13
207:12
214:18
215:15
216:2
218:10,16
219:16
221:5

speakers
19:24

speaking
159:5
206:8,9

207:16

special
20:13,15,
16,18,22
21:7
22:11,13
23:1,14,
17 24:25
25:2,8,
19,22
26:19,20
27:2
28:13
29:11,19,
22,23,25
30:2,10
35:6,10,
18 36:18
37:1,5,15
39:4,5,
12,22
40:14,15,
20,25
41:19,21
48:5,12,
17 52:10
53:12
54:16
55:24
58:24
59:4,9,
11,15,17,
21,24
61:13
62:16,20
63:6,13
64:21
65:2,19
72:9
75:3,8
76:2
77:10,15
78:24
84:6,25
85:24
86:1

89:11,12
94:1
95:10,11,
15,23
96:6
97:11
99:3,5,19
100:1,6
102:25
111:15
130:22
132:23
133:5
139:13
180:19,
20,22
181:5,21
182:4,13,
14 183:7
188:15
202:4,7
203:13
206:15
207:20,22
213:22
226:15

specialist
19:11,16
20:23
22:1,5,9
107:10
119:19
150:1
199:14

specialists
123:6
186:20

specialized
139:16
181:15
182:13

specific
23:11
38:7
39:22



40:25
41:1 47:9
48:12,16
50:7
52:23
57:16
67:14
70:16
76:17
110:21
117:16
141:4
148:14
151:3,23
157:24
158:19
159:1,4,
18 160:17
162:19
170:5
171:2
175:24
177:18
178:1
179:9
181:1,3,
18,20
182:17
187:9
207:22
214:4,17
218:10
219:13,15
221:5,25
223:2
225:22
227:11
228:20

**specificall
y**
46:25
47:14,17
65:17
75:10
77:17
82:13

99:3,5
109:6
124:23
140:7,11
148:13
152:7
190:3
202:2
204:10
214:19,25
215:23
217:21

**specifics**
216:10
228:5,9,
18

**speculation**
208:13
217:18

**spend**
48:14,15
54:12,13,
24,25
55:1
57:17
58:12
70:18
108:25
115:2
118:16
142:3,4
182:20
183:11
203:17

**spending**
54:18,19
109:6
113:20

**spends**
78:24
79:4,11

**spent**
58:15,16,
20 74:15

118:14

**split**
36:21

**spoke**
14:8

**SPP**
230:7

**spreadsheet**
134:9
135:5,9
145:4,5,7
146:2,4,5
164:25
165:1,4
171:24

**spring**
115:5

**SSIP**
57:11

**stabilizati
on**
59:13,16,
22 60:12

**stable**
171:16

**Stacey**
13:22
133:17,19
134:4
194:13

**Stacey's**
134:19

**staff**
32:19
58:24
59:1
124:16

**stakeholder
s**
89:7,10,
23 90:15,

19 149:1
178:23
180:6

**stamp**
179:5

**stamped**
101:9
109:17
125:4

**stand**
17:9

**standalone**
139:1

**standard**
199:25
230:6

**stands**
17:12
60:9
153:20,25
211:1

**start**
59:9 66:4
85:15
86:13
174:9,21

**started**
57:11
79:22
142:25
146:9

**starting**
194:12
203:6

**starts**
114:21
174:12
198:14

**state**
7:3,14
8:9 9:23
14:21

16:18,20
22:13
23:5,13
24:2,6,8
25:2,3
30:2
34:11
36:19,23
39:13
40:3,10,
13,14,17,
19,24
41:7,9,14
42:7
45:12
46:17,19
47:14,24
49:10
54:6,7,
12,24
55:5 56:4
57:5,12
58:24
59:1,5,6
60:6,14
61:14
63:9
66:8,10
67:1
68:22
69:5,8,25
70:1
74:22,24,
25 75:1,
13,17
77:15
78:24
79:3,11
80:5,10,
14,15,16,
23 81:3,
7,13,14,
15 82:13
83:2,3
94:2,4
95:2
98:25



99:10,11,
19 109:2
117:10,
11,12,13
120:8
122:14
125:4
132:16
140:5,10,
16 142:9
152:11
154:23
171:20
172:23
180:13,
23,25
181:1,6,
10,17
185:16,
20,22,24
186:5,7,
10,11,19
188:16
189:8,12,
13,15,16,
17 190:25
192:14
194:18,23
195:4,18,
19 197:1,
7,8,20,25
201:8,24
205:12
206:2,7,
10,20
207:18
210:25
214:21
215:9
224:7,14
226:14
230:7,10
232:20,24

State's
14:12
17:23

48:4
63:12
64:2
207:6

stated
128:24
154:11
200:22
223:13,20

statement
87:9
171:25

states
7:3,13
8:2 64:25
104:11
213:6
224:1

statewide
231:19

status
93:17
111:5,17

statute
64:17

statutory
90:21

stay
69:24,25
218:19
219:6

stayed
218:20

staying
79:18

steadily
138:7

step
106:16

steps
76:7,9,

11,13
91:10
227:22
228:1,17

Stevenson
217:4,5

stop
57:7 58:3
76:15
98:12
123:22,24
124:25
174:21
193:6,8

stopped
57:9,10
76:13
155:23
193:6,17

stopping
209:9

strategic
90:21

streamline
98:16

streams
232:12

strictly
104:24
107:19

strike
149:7

string
130:7

structure
33:13
35:17
38:25
42:22
63:4

stuck

33:5
221:20,21

student
17:16,17,
18,19
27:19,22
28:3
43:11
63:20
65:5,6
84:22
125:1
127:22
128:14
132:2,5,
9,15,18,
24 136:13
137:5,8,
10,18,20
139:17
145:22
146:23
149:13,
16,17,18,
19 164:21
177:13,19
178:2,6
180:22
181:20
199:22
200:19
228:23,25
230:6

student's
132:10,23
181:19

students
12:17,23
20:24
29:22,23
32:25
47:15,16
52:15
53:12,18
55:4,21,

25 59:12,
20 61:14,
25 62:7
63:6
65:13
67:5
77:14,15,
16 87:3,
20 88:12
93:20
95:3,15
127:4,5
132:16
138:16,22
139:2,6,9
140:11
146:22
151:11
152:7
164:5,19
170:9,10,
12
171:10,11
178:8
180:12,
13,20,21,
25 181:9,
16 183:9,
13 187:9,
11
190:11,17
201:21
206:23
207:19
227:19
228:25
229:1
230:17

students'
67:4
159:7
181:21
182:21

studies
227:3

stuff
  142:9
  172:6

Suber-drake
  13:22

subject
  102:6
  117:2
  121:20
  133:21
  140:25

submit
  38:11
  71:9
  114:22
  150:4,8,
  11,13,24
  161:7
  205:11
  220:3,17
  221:12
  222:21
  224:8
  230:11

submits
  161:13

submitted
  37:10
  38:10
  103:15,16
  105:1
  106:18
  108:16
  110:17
  150:15
  161:6
  217:7
  218:4,11,
  12 220:6,
  25 221:9

subpoena
  11:4,10,
  11

subsection
  213:5
  214:9
  215:7

subsequent
  35:5

subset
  215:16,17
  216:1

subsidize
  171:6

substance
  89:15,17
  151:6

substantive
  224:24

success
  223:12,19
  228:25

successful
  224:20

successfull
y
  224:3

sufficient
  204:16
  227:1

suggest
  93:24
  96:6
  167:4

suggesting
  53:3

suggestion
  177:5

suggests
  93:19
  96:15
  169:25

sum

113:4
  224:13

summarize
  160:14

summary
  163:10

superintend
ent
  111:4,9,
  19

supervise
  24:23,24,
  25 37:23
  117:13
  122:11
  123:14

supervised
  44:7

supervisor
  196:22
  199:15

supplanting
  75:12
  94:25
  200:24,25

supplement
  9:19

supplementa
l
  152:10
  172:5,7,9
  180:14
  181:2
  199:21
  200:18,22
  201:1

supplementa
ry
  181:7

supplies
  142:2,5

support
  11:16
  29:11
  35:7
  46:20
  47:3
  61:13,24
  62:20
  79:7 87:2
  90:20
  151:11
  152:7
  171:10,11
  183:12
  184:4
  199:22
  200:18
  201:4
  211:22

supported
  21:1
  150:1

supports
  16:7
  22:12
  25:20
  30:10
  32:11
  33:10
  35:19
  43:9
  47:13
  77:10,14
  78:25
  79:4
  184:9

supposed
  48:14
  67:25
  68:11
  124:10
  201:1

surrounding
  45:15

sustainabil
ity
  57:16

sustainable
  57:21

swap
  58:17

swear
  7:8

switch
  119:1

switched
  73:16

sworn
  7:18

system
  27:20
  43:25
  132:6,14,
  17,19,21

systematic
  57:12
  217:20

systemic
  57:5
  217:25

systems
  47:3
  190:5
  232:11

_____

T

T&e
  93:8,10,
  15 96:13,
  19,24
  100:1
  156:21,
  23,24,25
  168:14



169:12
171:1

**tab**
30:12
109:12
111:6

**table**
68:19

**takes**
159:7
171:14
215:15

**taking**
8:20
68:14
76:12
128:25
177:21
228:9

**talk**
9:2 17:8
18:11
24:6
37:19
38:17,22
39:1,16,
18 62:13
65:2,20
78:7,10,
20,21
79:22
94:1,3,14
96:24
129:23
155:2
170:6
171:10
181:10
185:25
193:1
194:17

**talked**
23:22
38:1

47:23
70:3 71:1
144:19
168:22
172:5
189:11
190:8
207:25
208:14

**talking**
16:3
55:17
66:5 70:6
76:14,15
111:12
123:2
125:21
128:1
132:6
134:13
137:1
140:2
150:11
155:24
172:22
175:17,19
177:18
188:24
189:4
198:25
201:18
205:1,2
212:3
213:12
214:25
221:10
223:1
231:6,15

**targets**
230:6

**tasked**
29:17

**tasks**
30:6

**taught**
20:18,20

**Tayloe**
7:10,23
8:1 10:2,
5,6 11:1
15:9,11
20:5 29:8
30:12,13
31:9
32:1,6,17
43:3
50:15,22
51:1
63:25
64:9 66:4
71:21
72:7,18
73:12
74:25
79:5
83:2,4,8
84:11
86:4,12
87:11,24
88:2,6
90:10
92:20
94:21
96:18
98:7
100:12,22
101:8,12,
19 102:7,
14 106:24
109:12,
14,16,20
112:12
116:11
119:2,4,
10 120:24
121:4,10,
20 122:5
124:15
125:3,8
126:18

127:3
130:18
131:8,13,
19 132:9
133:12,16
136:15,22
137:15
138:6,14,
21 141:17
142:15,20
143:14
145:20
146:20
147:3,16
149:6,21
150:22
151:8
152:22
153:1
155:13,
17,25
156:7
157:19
159:10
162:11,24
163:3
165:1,8,
12,13
166:10,
19,24
167:15,21
169:25
170:24
171:12
172:1
174:2,5,9
175:14,20
176:20
179:16,20
183:15,21
184:15
187:15,19
190:18,24
191:3
192:25
194:3,10
196:3,9,

18 198:4,
9 200:6,
16 201:2
202:22
203:1
204:15,20
205:9
206:8
207:4
208:2,15,
24
209:11,
15,19
210:1,20
211:15
212:5,15,
23 213:23
214:6,16
215:17
216:13,20
217:11
218:2
219:5,17
220:10,
16,23
222:20
223:4,9,
17,25
224:16,23
225:5,13,
18 227:7,
13,18
228:1,10
229:15
231:25
232:5,10
233:9,11

**teacher**
20:14,15,
16 21:5
45:16
46:16,24
47:9 53:1
58:22
94:8,11,
12 95:7,



17,18
96:7,8
116:1,2
139:17,19
168:21
170:12

teachers
27:15
47:7,11,
12,17
93:8,21
95:10,11,
13,21
99:2
115:21,
22,24
164:4,19
168:14
169:13,
18,19,21,
23 170:1,
3 171:7,
17,18

teaching
53:4 74:3
182:14

team
22:24
23:12,24
24:23,24,
25 27:16
33:17,18
37:8,13,
17,18
38:21
40:14
45:14
73:1 76:2
77:11
78:17
80:18
104:19
105:5
113:25
122:10,12

152:19
158:11
159:5
172:15,21
186:19
218:7
219:11,16
231:13
232:23

team's
104:23
223:23
229:21

teams
37:13

tech
8:6

technical
58:21
98:24
178:25

Ted
29:1

telephone
222:18

telling
96:22
170:19,23

tells
69:3
122:21

Temperament
al
31:9

template
82:2

templates
82:1,4

temporarily
61:15

temporary

101:19

ten
21:6
115:21,22

term
16:5
57:19,20
69:11,15
111:13
135:2

terminology
9:10
66:19
128:21

terms
18:19
24:6
28:19
68:23
112:4
132:2,5
187:7

test
75:12
200:25

testified
7:20

testify
11:4

tests
94:25
200:24

textbooks
165:20

theoretical
ly
148:13

theory
134:14

therapeutic
11:16

16:7
32:11
33:10
87:1
90:20
118:22
119:14,
17,20,23,
25
121:21,24
122:3,4,7
124:17,18
151:11
215:11
216:6,16
233:1

thing
21:12
26:4
39:19
43:17
100:4
103:22
110:22
142:2
145:2
149:4
176:1
226:24

things
14:19,20
16:3
18:19
20:2,9
32:20
38:5,11,
14 45:15
46:12
48:13
54:20,21
57:16
58:19,23
70:21
76:3
77:13,19
78:6

84:25
85:25
105:3
106:3,4
110:13
115:17
127:11,
12,24
129:8
141:25
142:1,13
147:4
150:12
158:5,8
160:17
161:1,2
166:16
175:23
176:13,
16,18
177:5,7,
11,12,15,
21 181:10
182:14
183:4
187:6,11,
13 211:17
215:5,22
216:1
218:11
219:8,12
221:16,
17,18
222:3
230:23

thinking
119:2

thinks
200:13

thought
80:7
89:12
109:23
112:15
115:24



124:4
125:20
126:22
129:5
137:25
208:22

**thoughts**
199:6

**thousand**
95:13

**thread**
142:25
143:15
153:9
155:18
156:12
163:7,9
166:25
174:12
183:23
188:2,20
194:12,15
198:13
203:5

**three-year**
127:21
128:4,9,
13,17,24
136:7,14
143:1
191:20
193:5

**three-years**
193:11

**Thursday**
25:23

**Thursdays**
25:21

**ticket**
142:10

**tiers**
47:16

**tight**
189:23

**time**
7:4 8:4
9:16,18,
20 10:7
11:25
12:5
20:21,23
21:1,4,15
23:2,20
30:8,15
33:15,21
53:5
54:16
76:3 78:8
79:21
89:20
92:11
103:10
107:10
108:4
114:7,19
115:9
124:22
128:18
149:2
161:25
163:11
164:7
179:5
182:9
185:2
188:15
190:16
191:20
193:6,13,
15,20
199:4,18
200:1,4
202:8
233:12

**timely**
118:14

**times**

128:11
135:23
154:7
168:25
184:21,22
197:11
221:24

**timing**
199:3

**tiny**
51:8

**title**
14:5
21:25
24:15
36:17
41:16,24
42:2
64:23
140:4
166:14
188:25

**today**
8:4,8
10:15,19
11:10
138:15
145:3
186:22

**today's**
7:4 8:13
13:3,9,24

**told**
68:2,11
82:15
102:7
110:23
145:1,6,
21 148:4,
6,8 151:5
155:3
169:4
172:9
186:11

189:7
191:13
197:9
208:11,12

**tonight**
233:12

**tool**
114:12

**tools**
183:8

**top**
68:12
111:3
113:5
153:1
156:18
167:3
229:9

**topic**
76:21

**topics**
15:17
180:4

**tornado**
104:13,22

**total**
21:6
64:21
79:8
84:2,5
85:21
86:16,18
92:5
112:17,25
113:4,6,
12 114:10

**totality**
36:24
104:19
107:7

**trail**
106:13

110:22,24
111:2,6
123:19,
20,21,22

**train**
124:16

**trained**
135:21

**training**
47:11,12
92:23
93:6,7,9
94:2,14,
16,17
96:1,3
108:5
149:23,24
150:3,10,
18,23
151:5,6,
9,17,19
178:20,23
179:9
180:1,5
218:9

**trainings**
150:2
151:3

**transcript**
233:18

**transferrin
g**
88:20
115:13
116:12

**transition**
189:23

**transportat
ion**
63:10
207:19

**travel**
165:20



trending
79:18

true
48:8
166:6
180:3
186:14
212:18

trusted
208:19

truth
7:19,20

truthfully
10:15
155:8

turn
61:22
83:18
125:1
229:4

turnover
199:4

tweak
158:2

type
55:8
108:25
109:21
122:6
187:13

typical
84:22

typically
116:17
142:7

typing
82:3,5

_____

U

_____

U.S.

8:2

uh-huh
15:5,10
21:17
64:12
81:17
92:13
99:11
104:1
105:20
109:11
112:19
120:13
153:4
155:19
160:12
182:1
183:25
217:11

uh-huhs
8:24

ultimately
170:18

unallowable
174:14
175:24

underfund
137:9,13
138:8

underfunded
137:22

undergrad
21:10

underneath
84:12

understand
9:7 10:14
11:14
13:4 16:6
17:6 28:4
34:4
39:10
40:8 52:4

61:9
80:23
88:24,25
89:8
93:2,3
109:9
129:22
131:13
136:5
138:2
145:16
169:13
181:4
185:22
204:6

understandi
ng
12:14
17:15
36:6
53:17
61:22
70:13
85:2
87:5,11
89:5,6,
15,16
91:14
93:12
107:21
144:7,12
194:25

understood
41:5 60:2
112:15
127:21
128:3,18
145:19
228:12

uniform
158:6
177:16
179:2
201:13,15

uniforms
140:22

unique
158:20,
22,25
159:15
160:14,19
178:6
179:2
180:18

unit
18:1
29:18
41:19
59:16,23,
24 84:14,
18,20
85:3
122:22
123:4,5
159:13
216:24

United
7:3,13
8:2

units
60:12
61:4,17

universal
207:19

University
19:1,3,5,
10,11

unlimited
193:7,23

unstable
126:9

upcoming
137:9
170:2
205:3,5

update

8:6

updated
177:6

updates
90:22

upgraded
114:6

upload
104:15

uploaded
103:9

upward
123:18

user
108:24
114:12

_____

V

_____

variables
84:24

variety
47:10

vary
117:20

verify
21:12
51:2
134:10

verifying
224:2

versus
7:3 94:19
101:2
180:12,24
181:11
182:19,21
185:22

VI
42:2



189:4

**VI-B**
188:24,25
189:1,2

**Vickie**
72:25
73:2,5
80:21
82:10
101:10
102:2,16
122:20,
21,23
123:2,7
124:8,14
142:23
144:2,6
147:16
149:8,22
150:2
151:4
174:13
175:2
176:3
179:7
184:13,
23,25
185:4,5,
10 186:18
199:10,12
202:18
205:19,22
206:10
207:23
208:11,
12,16
216:25
217:17
218:6,23,
24 219:6
224:17,23
228:14

**Vickie's**
123:21
206:2

223:23

**video**
7:1

**view**
110:19

**violated**
12:17,20

**visit**
230:13

**visits**
157:13
231:11

**Vocational**
61:2

—————————

        **W**

—————————

**wait**
9:2 56:14

**waiver**
191:12
192:5,18
193:5

**waivers**
191:5,9,
15,17,18
192:10,17
193:4,8,
9,11,17

**Walden**
19:10

**walk**
20:11
52:4
79:23
80:1

**wanted**
37:3
98:13
115:19
147:16

148:25
182:3,7,
20 183:7
185:5,20
191:14

**ways**
47:10
48:5 94:7
183:6

**wealth**
64:1,2

**web**
175:3,9,
18

**website**
175:10,22
177:1
214:22

**week**
37:20
38:17
157:12

**weekly**
37:13,18,
19 38:1

**weigh**
184:25
187:6

**weighed**
224:25

**weighted**
65:9,12

**West**
19:11

**Whitfield**
102:22,23

**win**
71:10

**Wina**
25:8
37:13

77:4
188:18

**withhold**
10:2

**Wolf**
188:3,7

**Womack**
7:12
31:15
119:3
126:10
130:10,
13,15
174:4
229:13

**wondering**
88:8
131:14
193:12

**word**
9:11
28:15
122:4
186:6
190:2

**work**
10:8 12:1
16:1 17:7
19:20
20:3
21:16,21,
22 22:10
23:6 35:3
39:17,18,
20 52:10,
11 57:25
154:23,24
155:2
158:15
172:12
174:10,18
204:22
206:15
208:5

232:16,19

**workaround**
101:20

**worked**
8:6
20:14,22
22:12
23:10
95:10
108:2

**working**
101:4
130:16
158:15
211:15
232:22

**works**
30:4
35:25
51:5
116:7
161:10

**world**
72:5

**write**
15:2 23:8

**writes**
156:19
167:24

**writing**
8:21
184:22

**written**
204:22

**wrong**
9:14
33:24
210:18

**wrote**
14:21
143:17
176:3



AMBER MCCOLLUM
UNITED STATES vs STATE OF GEORGIA

November 09, 2022
Index: X'ING..zoomed

179:22
191:3
201:20
203:16
206:10

―――――――――
**X**
―――――――――

**X'ING**
187:8

―――――――――
**Y**
―――――――――

**y'all**
198:24

**year**
22:3,7
24:13,14,
18 57:23
79:16,17
83:24
92:6
97:13
103:10
112:18
113:4,7,
20
114:10,
11,19
115:2
116:17,
18,21
117:16,
19,20
118:16
127:18
134:23
136:11,
12,13,15,
16,17,21
137:1,2,
3,4,19
138:8
141:7,18

146:24
156:14
157:25
158:9,16
159:16,
22,25
160:5
165:6
170:2
175:22
191:19,24
205:2,4,
5,8
224:2,12
230:14

**year's**
137:9
214:11
223:13,19

**years**
20:15,16,
21 21:3,
5,6 26:1
46:7,8,22
76:18,19
77:11
87:17
93:15
97:11
118:5
124:19
128:25
129:1
135:1
136:5,7,
20 137:3,
4,5
146:22
147:10
151:22
160:2,3,
7,8 168:3
172:10
178:25
191:5,11,
18,25

**years'**
173:7

**younger**
169:15

―――――――――
**Z**
―――――――――

**Zelphine**
188:4,6,
14 191:3
193:1
228:13

**zoom**
8:6 51:10
101:22

**zoomed**
32:12

