

# Transcript of **Amy McCart, Ph.D.**

Tuesday, October 24, 2023

*United States of America v. State of Georgia*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 134597

1                UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF GEORGIA

3                     ATLANTA DIVISION

4      - - - - - - - - - - - - - - - X

5      UNITED STATES OF AMERICA,          :

6            Plaintiff,                    :    Civil Action No.

7            v.                           :    1:16-cv-03088-ELR

8      STATE OF GEORGIA,                   :

9            Defendant.              X

10     - - - - - - - - - - - - - - -

11                           TUESDAY, OCTOBER 24, 2023

12           Videotaped Deposition of AMY McCART,

13     Ph.D., a witness herein, called for examination by

14     counsel for defendant in the above-entitled matter,

15     pursuant to notice, the witness being duly sworn by

16     Desirae S. Jura, a Notary Public in and for the

17     District of Columbia, held at the offices of United

18     States Attorney's Office, 150 M Street, N.E.,

19     Washington, DC, at 9:14 a.m., ET, Tuesday, October

20     24, 2023, and the proceedings being taken down by

21     Stenotype by Desirae S. Jura, RPR, and transcribed

22     under her direction.

 1    APPEARANCES:

 2

 3    On behalf of the Plaintiff:

 4         MICHELLE L. TUCKER, ESQ.

 5         MATTHEW GILLESPIE, ESQ.

 6         VICTORIA LILL, ESQ.

 7         KELLY GARDNER, ESQ.

 8         LAURA TAYLOE, ESQ.

 9         JESSICA E. BERRY, Paralegal Specialist

10         U.S. DEPARTMENT OF JUSTICE

11         Civil Rights Division

12         4 Constitution Square

13         950 Pennsylvania Avenue, NW

14         Washington, DC 20530

15         (202) 305-3488

16         Michelle.Tucker@usdoj.gov

17         Matthew.Gillespie@usdoj.gov

18         Victoria.Lill@usdoj.gov

19         Kelly.Gardner@usdoj.gov

20

21

22

1    APPEARANCES (Continued):

2

3    On behalf of the Defendant:

4        JOSH BELINFANTE, ESQ.

5        MELANIE JOHNSON, ESQ.

6        ROBBINS ALLOY BELINFANTE & LITTLEFIELD, LLC

7        500 14th Street, NW

8        Atlanta, Georgia 30318

9        (678) 701-9381

10        jbelinfante@robbinsfirm.com

11        mjohnson@robbinsfirm.com

12

13    APPEARING REMOTELY VIA ZOOM:

14        ANDREA HAMILTON WATSON (United States)

15        CLAIRE CHEVRIER, ESQ. (State of Georgia)

16        JAVIER PICO PRATS (State of Georgia)

17        DANIELLE HERNANDEZ (State of Georgia)

18        STACEY SUBER-DRAKE (State of Georgia)

19        CHANTEL MULLEN (State of Georgia)

20

21    ALSO PRESENT:

22        APRIL CARTER, Videographer

1                    C O N T E N T S

2    WITNESS                      EXAMINATION BY COUNSEL FOR

3    AMY McCART, Ph.D.                    DEFENDANT

4        BY MR. BELINFANTE                    9

5

6        Afternoon Session - Page 141

7

8                    E X H I B I T S

9    McCART EXHIBIT NO.                        PAGE

10    1 - Declaration and Expert Disclosure of

11        Dr. Amy McCart                    12

12    2 - Appendix E, Materials Considered by

13        Amy McCart in the Preparation of her

14        Expert Report                    14

15    3 - Article, KU Experts Write Guide to

16        Transforming Schools Based on

17        Research in Education, Disability    89

18

19

20

21

22

1                    E X H I B I T S

2    McCART EXHIBIT NO.                           PAGE

3      4 - Article, Why Aren't Students with

4          Severe Disabilities Being Placed in

5          General Education Classrooms:

6          Examining the Relations Among

7          Classroom Placement, Learner

8          Outcomes, and Other Factors          110

9      5 - Article, Child Find Activities

10         Under the Individuals With

11         Disabilities Education Act, Recent

12         Case Law                             126

13     6 - Article, Individual Education Plan

14         Goals and Services for Adolescents

15         With Autism:  Impact of Age and

16         Educational Setting                  130

17     7 - 160-4-7-.15, Georgia Network for

18         Educational and Therapeutic Support

19         (GNETS)                              225

20

21

22

1                    E X H I B I T S

2  McCART EXHIBIT NO.                              PAGE

3    8 - Journal of School Leadership 2022,

4        Article, Issues in Statewide Scale

5        up of a Multi-Tiered System of

6        Support                                    262

7    9 - Article, Stars in Alignment               272

8   10 - Article, Reshaping Educational

9        Systems to Realize the Promise of

10       Inclusive Education                        276

11  11 - Excerpt, Build Equity, Join Justice,

12       a Paradigm for School Belonging            305

13  12 - Excerpt, page 71, Build Equity,

14       Join Justice                               307

15  13 - Excerpt, page 110, Build Equity,

16       Join Justice                               308

17  14 - Excerpt, page 111, Build Equity,

18       Join Justice                               310

19  15 - SWIFT Education Center, "Our Team"         316

20

21

22



1                    P R O C E E D I N G S

2              THE VIDEOGRAPHER:  We are now on the

3    record in the matter of United States of America

4    versus State of Georgia.  Today's date is October

5    24th.  The time is 9:14 a.m.  This is the video

6    recorded deposition of Dr. Amy McCart, being taken at

7    U.S. Department of Justice, 150 M Street, Northeast,

8    Washington, DC, 20002.

9              I'm the camera operator.  My name is April

10   Carter, in association with TP.One.  The court

11   reporter is Desirae Jura, also in association with

12   TP.One.

13             Will all attorneys please identify

14   themselves and the parties they represent, beginning

15   with the party noticing this proceeding.  And I'll

16   repeat it for our remote guests.

17             MR. BELINFANTE:  Josh Belinfante,

18   representing the State of Georgia.

19             MS. JOHNSON:  Melanie Johnson,

20   representing the State of Georgia.

21             MS. TUCKER:  Michelle Tucker for the

22   United States.



1              MR. GILLESPIE:  Matthew Gillespie for the

2    United States.

3              MS. LILL:  Victoria Lill for the United

4    States.

5              MS. GARDNER:  Kelly Gardner for the United

6    States.

7              MS. TAYLOE:  Laura Tayloe for the United

8    States.

9              THE VIDEOGRAPHER:  Thank you.  And will

10   remote attorneys please identify themselves?

11             MS. CHEVRIER:  Claire Chevrier for the

12   United States.

13             MS. WATSON:  Andrea Hamilton Watson for

14   the United States.

15             MR. PRATS:  Javier Pico Prats for the

16   State of Georgia.

17             MS. HERNANDEZ:  Yeah, we've got Danielle

18   Hernandez on behalf of the State of Georgia.  And

19   then we've got Stacey Suber-Drake and Chantel on

20   behalf of the State of Georgia.  They're corporate

21   representatives.

22             THE VIDEOGRAPHER:  Thank you.  And will

1    the court reporter please administer the oath?

2    Whereupon,

3                    AMY McCART, Ph.D.,

4    having been duly sworn by the Notary Public, was

5    examined and testified as follows:

6            EXAMINATION BY COUNSEL FOR DEFENDANT

7    BY MR. BELINFANTE:

8        Q.    Good morning, Dr. McCart.

9        A.    Good morning.

10           MR. BELINFANTE:  This is the deposition of

11   Dr. Amy McCart, taken by the defendant, the State of

12   Georgia, for purposes of discovery and all purposes

13   allowed under the Federal Rules of Civil Procedure.

14   Michelle has previously agreed, all objections except

15   those going to privilege and the form of the question

16   be reserved until the time of trial or use of the

17   deposition.

18           MS. TUCKER:  Yes, agreed.

19   BY MR. BELINFANTE:

20       Q.    Okay.  Dr. McCart, have you ever been

21   deposed before?

22       A.    No.



1          Q.     So there's just some kind of basic rules

2     that we'll try to follow, and I just want to make

3     sure they're agreeable to you.

4          A.     Okay.

5          Q.     Most importantly, we have to make sure the

6     court reporter gets everything said.  So I will

7     certainly try not to talk over you, and ask that you

8     not try to talk over me.  It's a natural thing in

9     conversation, but we'll have to stop if we do that,

10    so that the court reporter can get an accurate

11    record.  Is that okay?

12         A.     Okay.

13         Q.     All right.  Also, and I've had this

14    problem, witnesses will often answer things like

15    "uh-huh" or "huh-uh," which does not come across on a

16    trial transcript well.  So if you could answer "yes"

17    or "no," as opposed to those kind of answers.  Would

18    that be okay?

19         A.     Yes.

20         Q.     We can take a break whenever you want.

21    The only question -- or the only request I would have

22    is that if I have a question outstanding, if you

1    could answer the question, and then we can take a

2    break.  Is that agreeable?

3         A.    Sure, yes.

4         Q.    I am not going to try to ask confusing

5    questions.  I do not always succeed in doing that.

6    And I will, you know, frequently catch myself.  But

7    if a question is confusing, please feel free to ask

8    me to rephrase it, or if you don't understand what

9    I'm asking.  Is that also agreeable?

10        A.    Yes.

11        Q.    Okay, great.  So with that in mind, what

12   did you do to prepare for today's deposition?

13        A.    To prepare for today's deposition, it

14   actually started a long time ago with site visits,

15   and evaluation of thousands of documents, and review

16   of deposition transcripts, and resulting in the

17   compilation of the report.

18             And then more recently, additional review

19   of the report in preparation for today, and meeting

20   with the Department of Justice.

21        Q.    Okay.  I'm specifically not asking for any

22   conversations you had with the Department of Justice.



1   But independent of what you did to prepare for the

2   report, to prepare for today's deposition, and

3   understanding it's been rescheduled a couple times.

4        A.    Yes.

5        Q.    How much time do you think you spent with

6   the Department of Justice to prepare for your

7   deposition testimony?

8        A.    I don't recall -- I don't have a specific

9   number, but probably more than ten hours.

10        Q.    And let me go ahead and introduce your

11   report as an exhibit.  We'll mark it as Exhibit 1.

12              (McCart Exhibit No. 1 was identified

13              for the record.)

14        MR. BELINFANTE:  We'll mark this one as

15   the exhibit, and presuming -- I presume they're the

16   same.

17        MS. TUCKER:  Yeah.

18        THE WITNESS:  I'm happy to use --

19        MR. BELINFANTE:  Use that if it's easier.

20   That's totally fine.  If we see that there's an

21   issue, we can clarify it.

22   BY MR. BELINFANTE:

1        Q.      Okay.   Is this the report that you

2    prepared for this lawsuit?

3        A.      Yes.

4        Q.      Okay.   And attached to this report is an

5    Exhibit or Appendix, I believe, E; is that correct?

6        A.      Yes.

7        Q.      And Appendix E is the materials -- where

8    you've identified the materials you considered for

9    the report?

10       A.      I am turning to that right now.

11       Q.      And I'm not trying to trick you.   There is

12   an --

13       A.      I know.   Yes, Exhibit E are the materials

14   considered for this report.

15       Q.      Let me introduce what we'll mark as

16   Exhibit 2, which is, I believe, the amended Appendix

17   E.   Let me show you what we may mark as Exhibit 2.

18   And if you'll tell me if that's the amended one,

19   because it looks the same to me.

20       A.      This is the amended one.

21       Q.      That is the amended, okay.

22       A.      The one you have.

1        Q.    The one that I have --

2        A.    The one you handed me.

3        Q.    The one I just handed you?

4        A.    Yes.

5        Q.    Okay.  Let's mark the document we just

6     handed her as Exhibit 2.

7                   (McCart Exhibit No. 2 was identified

8                   for the record.)

9              THE WITNESS:  And I'm feeling like I

10    should use the report you have.

11             MR. BELINFANTE:  It's your call, whatever

12    you would prefer to use.

13             MS. TUCKER:  We can just -- if you want to

14    use that one.

15    BY MR. BELINFANTE:

16        Q.    Dr. McCart, I know there have been some

17    developments or things that have happened since you

18    provided both the Appendix E and amended Appendix E.

19    Have you read in this case the Department of

20    Justice's partial motion for summary judgment?

21        A.    No.

22        Q.    Did you read Dr. Wiley's report filed on

1    behalf of the state?

2        A.    No.

3        Q.    Did you read Dr. Putnam's report filed on

4    behalf of the United States?

5        A.    No.

6        Q.    Are you familiar with a companion -- well,

7    I'll call it companion -- are you familiar with a

8    lawsuit also against Georgia over GNETS, brought by

9    the Georgia Advocacy Office and other advocacy

10   groups?

11       A.    Yes.

12       Q.    Did you read any of the expert reports

13   that have been submitted in that case?

14       A.    No.

15       Q.    Are you familiar with Kimm Campbell from

16   Florida?

17       A.    I don't believe so.

18       Q.    Okay.  Broward County, specifically.

19       A.    No, that doesn't sound familiar.

20       Q.    Are you familiar with Dr. Judy Elliott

21   from Los Angeles?

22       A.    Yes.



1    Q.    Are you familiar with her work?

2    A.    Yes.

3    Q.    Okay.  I may have other questions about

4    that.  You're testifying today --

5    A.    Sir, I just want to clarify.  I don't

6    know -- did you say her name was Kim?

7    Q.    Kimm, K-I-M-M, Campbell?

8    A.    Yeah.  She may know me.

9    Q.    Sure.

10    A.    I don't know her.

11    Q.    Okay.  You are testifying today -- it says

12    on page 1 of your report that you have been "retained

13    to present expert testimony in this matter on behalf

14    of the United States."  That's paragraph 1 of your

15    declaration.  Do you see that?

16    A.    Yes.

17    Q.    Was that based on a contract?

18    A.    Yes.

19    Q.    Is the contract with you individually,

20    with Kansas University, or someone else?

21    A.    It's University of Kansas, but the

22    contract is with me.

1          Q.     Okay.  Outside of the travel to Georgia,

2    so once you traveled and collected information, how

3    long did you spend preparing your report?

4          A.     Oh, that is a difficult question.  Many,

5    many, many hours.

6          Q.     And would that be reflected in an invoice

7    or bills sent to the United States?

8          A.     Yes.

9          Q.     Okay.  Who contacted you about preparing a

10   report in this lawsuit?

11         A.     Ms. Lill.

12         Q.     Okay.  Did you know Ms. Lill prior to your

13   work in this case?

14         A.     No.

15         Q.     Okay.  You do work, though, for the United

16   States Department of Education, is that correct, or

17   "with," I should say?

18         A.     The center that I direct at the University

19   of Kansas receives funding through grants, like many

20   universities, to do work on behalf of the Department

21   of Education.

22         Q.     Okay.  And what's the name of the center?

1        A.      SWIFT Center, SWIFT Education Center.

2        Q.      All right.  When Ms. Lill reached out to

3   you, did she tell you -- or let me ask this.  Do you

4   know roughly when she reached out to you about

5   providing an expert report in this case?

6        A.      Yes.

7        Q.      When was that?

8        A.      In May of 2016, Ms. Lill contacted me to

9   see if I would be willing to serve as an expert

10  witness on this case.

11       Q.      Okay.  And obviously you said yes?

12       A.      Yes.

13       Q.      So my question is, why did you say yes?

14       A.      Because I was asked.

15       Q.      In your words, what is this lawsuit about?

16       A.      In my words, this lawsuit is about the

17  issues of whether or not students who have

18  disabilities in the State of Georgia, who have

19  behavior-related disabilities in the State of Georgia

20  are segregated en masse, whether or not students with

21  behavior-related disabilities in the State of Georgia

22  in the GNETS program are given fair and equal

1    educational opportunities, and whether or not

2    students with behavior-related disabilities in the

3    GNETS program, or at risk for placement in the GNETS

4    program, have appropriate supports and services.  And

5    whether or not the GNETS program is necessary to meet

6    their educational needs.

7        Q.    Is it your opinion that the existence of

8    the GNETS problem -- or excuse me, the existence of

9    the GNETS program is a, per se, bad policy?

10              MS. TUCKER:  Object to form.

11              THE WITNESS:  I don't know what you're

12   asking.  I'm sorry.

13   BY MR. BELINFANTE:

14       Q.    Is there -- do you believe that there is

15   an appropriate role for a program like GNETS, ever?

16       A.    No, not for GNETS, specifically.  If

17   you're asking whether or not it's appropriate to ever

18   segregate students, yes.

19       Q.    And is that based on the individual needs

20   of the student?

21       A.    It's based on a variety of variables,

22   including the teaching and learning process, how



1    students learn, what context they're in, what

2    supports are provided, what strategies are effective

3    in supporting their needs, et cetera.

4        Q.    And would you base that on an individual

5    student or would you apply that to populations of

6    students?  In other words, for example, would you say

7    all autistic kids, X, either should be educated in

8    the general education setting or could be

9    appropriately educated in a segregated setting, or is

10   it based on that individual student?

11           MS. TUCKER:  Object to form.  You can

12   answer.

13           THE WITNESS:  The question you're asking

14   is very complex.  And it's complex because there are

15   a multitude of variables in which students with

16   disabilities, particularly who have behavior-related

17   needs, can and do succeed in educational

18   circumstances.

19           It is, in part, important to understand

20   those individual needs of the students.  It is also

21   equally important to have a system of support that is

22   built and established for students to access.



1    BY MR. BELINFANTE:

2        Q.    If a student -- under what circumstances

3    do you believe that a student would appropriately be

4    served in a segregated educational setting?

5        A.    I have worked for many, many years, just

6    to give you a little context, with students with a

7    variety of very significant behavioral challenges and

8    disabilities.  And what I found to be the case is in

9    very limited numbers, there are certain students who

10   benefit from small environments that have very

11   structured learning opportunities, and exposure to

12   time in general education classrooms, that have less

13   noise or stimuli in that environment, and that have

14   access to highly trained specialized educators who

15   can support their needs.

16       Q.    You said highly trained, specialized

17   educators.  What would their training be?

18       A.    Teachers, certified educators, certified

19   teachers in special education and general education

20   that have an understanding of both standards-based

21   teaching, effective behavioral supports, effective

22   teaching and learning processes, understanding, for

1    example, positive behavior interventions and

2    supports, restorative practices, MTSS, effective

3    behavior intervention plans, effective and complete

4    functional -- timely functional behavior assessments,

5    and effective crisis -- individualized crisis

6    intervention plans associated with their behavior

7    plan.

8         Q.    Okay.

9         A.    To name a few.

10        Q.    Sure.  For teachers who are not that

11   highly trained, specialized educators, a teacher in a

12   sixth grade class, general education class.

13        A.    Sure.

14        Q.    What type of training is it your opinion

15   that they would have to have, in order to prevent

16   unnecessary segregation of students with emotionally

17   disturbed behavior?

18        A.    I'm going to ask you to break that down.

19   But, first, I would say that we probably want to say

20   students who have emotional behavior disorders.

21        Q.    Okay.

22        A.    And then I believe you're asking the

1    question, what would a sixth grade educator --

2    general education teacher need, in order to prevent

3    large-scale segregation of students with disabilities

4    in the State of Georgia?

5        Q.    Sure, you can answer that.  That's a good

6    question.  I'm not sure it's exactly what I asked,

7    but that's a great place to start.

8        A.    Okay.  I don't think an individual

9    teacher, in and of themselves, could prevent

10   large-scale systemic segregation.  That's an issue of

11   the system at large, not one individual teacher.

12       Q.    Okay.  What type of training would that

13   same teacher need to prevent the unnecessary

14   segregation of an individual student?  So not looking

15   systemically, but at an individual student with --

16   and I don't want to -- I'm not -- the phrase you

17   used, emotional --

18       A.    Behavior disorders.

19       Q.    Behavior disorders.

20       A.    Yeah.

21       Q.    Okay.

22       A.    Effective supports for students with

1  disabilities who have behavior-related needs respond

2  best to having general educators who understand high

3  expectations, effective teaching and learning

4  practices.  All of the typical educational

5  credentials that I previously mentioned that are

6  common for certified educators.

7          Additionally, they would need access from

8  special educators that have the additional variables

9  that I mentioned earlier, which include special

10  educators that understand, for example, functional

11  behavior assessment, behavior intervention programs,

12  crisis intervention plans, and effective teaching.

13          In addition, those individuals would need

14  to understand basic general systems of support

15  provided through the state and the district, such as

16  tiered systems of support that provide academic,

17  behavioral, social, emotional, and mental health

18  supports.

19          Did that get at what you wanted?

20      Q.    I think so.  You said one of the things

21  they need is effective practices.  Can you identify

22  those practices?



1      A.      Effective teaching practices?

2      Q.      Mm-hmm.

3      A.      Sure.  Effective teaching practices

4   include positive interactions.  It includes -- I'm

5   trying to think what I referenced in the report,

6   specifically.  Do you mind if I look for a minute?

7      Q.      Go right ahead.

8      A.      Where I'm turning is to finding 2, in

9   which I discuss the unfair and unequal access to

10  educational opportunities.  And specifically, page

11  108, where I talk about what I observed to be missing

12  when doing the extensive site visits that I went on.

13            And so one way of answering this question,

14  and there's a multitude of ways, but would be to

15  think about the inverse of what is stated here.

16            So instead of grade inappropriate

17  resources, general and special educators would have

18  access to grade appropriate resources for students

19  who have disabilities or experience behavior-related

20  disabilities.  They would have access to grade level

21  curriculum that is not functional, but rather

22  standards-based.



1              They would have teachers who understand

2    alternate assessment and alternate standards for

3    teaching of students with disabilities.  For example,

4    like on page 110.  They would have master schedules

5    that allowed students to access learning environments

6    that were purposeful and meaningful, rather than

7    functional.

8              They would have an understanding of

9    effective ways to teach students with disabilities

10   with varying learning styles and needs.  They would

11   have lesson plans in place -- and again, this is all

12   standard for teachers in the field of education, what

13   I'm describing here.

14             They would do content mapping.  And they

15   would provide, again, teaching aligned to standards

16   in the State of Georgia.  They would have learning

17   content and resources available to them, to name a

18   few.

19        Q.    How many general education schools did you

20   review?

21        A.    36.

22        Q.    36, okay.  And in doing so, did you look

1    at the factors you just identified?

2        A.    Yes.

3        Q.    And which schools were those?  Could I

4    find those in the report?

5        A.    Yes, mm-hmm.

6        Q.    Where?

7        A.    If you turn to Appendix A, I believe, but

8    let me confirm that.  D.

9        Q.    D.

10       A.    The site visit table.

11       Q.    Right.

12       A.    If you look at that table at the bottom

13   of -- your copy's a little -- it's got some extra

14   color in it, which is okay.  But if you look at page

15   7, the bottom of that site visit table, the 70

16   different sites, you can see a code that indicates

17   which sites we went to, which were repeats, et

18   cetera, per the -- per the chart.

19       Q.    Right.  Now, these look to me, at least

20   the majority are GNETS facilities, correct?

21       A.    Yes.

22       Q.    My question was about general education

TP One

1    programs, not GNETS programs.  How many general

2    education programs did you look at in the State of

3    Georgia?

4        A.    Well, there are 36 GNETS program located

5    at school-based sites, or near school-based sites.

6    And they're considered connected in some form or

7    fashion to general education sites.  While touring

8    the GNETS wing, or area, or part of the school that

9    was the GNETS part, I was also able to tour the

10   general education part.

11       Q.    And in touring the general education part,

12   did you review files of individual teachers to

13   determine their qualifications and training?

14       A.    No.

15       Q.    Did the Department of Justice ask you to

16   make any assumptions or presumptions in preparing

17   your report?

18       A.    No.

19       Q.    Prior to being contacted by the Department

20   of Justice in this case, have you ever provided

21   consulting services in the State of Georgia?

22       A.    No.



1      Q.    And let me rephrase that, just to make

2   sure it's clear.

3            Have you ever advised a Georgia school

4   district or school?

5      A.    No.

6      Q.    Okay.  And have you ever provided

7   consulting services to the Georgia Department of

8   Education?

9      A.    No.

10     Q.    To your knowledge, has SWIFT or anyone

11  associated with SWIFT ever provided consulting

12  services to the State of Georgia Department of

13  Education?

14     A.    I cannot speak to what affiliations all of

15  SWIFT people have, so I don't know that.

16     Q.    Okay.  Prior to being contacted by the

17  Department of Justice in this case, had you ever been

18  contacted about special education in Georgia in,

19  let's say, the last eight years?

20     A.    Not that I recall.

21     Q.    You mentioned earlier that the United

22  States Department of Education provides grant funding

1    to SWIFT.

2         A.    I'm sorry, can you start over?

3         Q.    Sure.  You mentioned earlier that the

4    United States Department of Education provides a

5    grant to SWIFT; is that correct?

6         A.    I'll clarify, but keep going.

7         Q.    Go ahead and clarify.

8         A.    Okay, so the Department of Education

9    Office of Special Education provides funding -- a

10   national competition for funding, in which we were

11   awarded.

12        Q.    In working as part of that grant, do you

13   often work with persons at the Department of

14   Education -- United States Department of Education

15   Office of Special Education?

16        A.    And I'll add one.  There's also the

17   effective educator development funding source.

18        Q.    Okay.

19        A.    We have several funding sources.

20              Could you ask that again?

21        Q.    Sure.

22        A.    Yeah, sorry.



1      Q.     In working with the national competition

2   for funding from the Office of Special Education, or

3   the effective education funding that you just

4   mentioned, have you worked with officials at the

5   United States Department of Education?

6      A.     Whenever there is a federal grant awarded

7   to a university, regardless of what university, there

8   is a project officer that is assigned from that

9   funding pool.  And that project officer is who we

10  communicate with --

11     Q.     Okay.

12     A.     -- regarding the project.

13     Q.     Do you communicate with anyone else at the

14  Department of Education, other than the project

15  officer, about the work funded by the grant or

16  grants?

17     A.     Can you ask that again?

18     Q.     Sure.  Other than the project officer in

19  your work in implementing the grants, or you know,

20  working pursuant to the grants.

21     A.     Mm-hmm.

22     Q.     Do you work with anyone at the United

1    States Department of Education, other than the

2    project officer?

3         A.    Not that I can recall.

4         Q.    Do you know if you have had any

5    conversations with a project officer about the State

6    of Georgia?

7         A.    Only that I am an expert witness.

8         Q.    To your recollection, has anyone from the

9    United States Department of Education expressed

10   concerns to you about the State of Georgia?

11        A.    No.

12        Q.    Are you familiar with an individual named

13   Katie Owens from the State of Georgia?

14        A.    Not that I recall.

15        Q.    How about Kimberly Smith, also from the

16   State of Georgia?

17        A.    Meaning have I met her?

18        Q.    Met or talked to, know anything.  Does the

19   name mean anything to you?

20        A.    No.

21        Q.    Okay.

22        A.    And forgive me for looking.  I have a lot

1    of people, a lot of documents.

2         Q.    I totally understand.

3         A.    You know, a lot.

4         Q.    Yes, absolutely.  And you may certainly

5    feel free to do so.

6         A.    Thank you.

7         Q.    No need to apologize for it.  Let me ask

8    you to look at Exhibit 2, which is your amended

9    exhibit E.

10        A.    Mm-hmm.

11        Q.    At the last several pages, there is a

12   chart.

13        A.    Yes.

14        Q.    Do you know -- and I point to that,

15   because on the third page of the chart, about two

16   thirds of the way down, you've got a document Bates

17   labeled GNET000381 to 382, with the label Student IEP

18   file.

19        A.    381 to 382, Student IEP file, yes, I see

20   that.

21        Q.    And then 2 under that is another Student

22   IEP file.

1      A.    Yes.

2      Q.    Right?

3      A.    Mm-hmm.

4      Q.    If you go -- skip the next page, and go to

5    the one after that, there's a document -- the first

6    one of which -- just so we're on the same page,

7    289606 is the first document on the page I'm

8    referring to.

9      A.    209 or 289?

10      Q.    289606.

11      A.    Yes, mm-hmm.

12      Q.    About two-thirds of the way down, there is

13    another document, US0306845, which is RF Student

14    Records.

15      A.    Say the number again, please?

16      Q.    US0306845.

17      A.    68 -- oh, yeah, mm-hmm.

18      Q.    Okay.  And I went through that, because

19    those were the times I saw IEP team or student record

20    in the doc file name.

21      A.    Sure.

22      Q.    Can you recall how many IEPs you examined

1   when preparing your report for the state of -- or for

2   the United States?

3        A.    Not exactly.  It was a large number.

4   Likely, I'd say more than 65 IEPs.  And the labeling

5   on the chart that you just read did not always match

6   what was in the file.

7        Q.    Okay.

8        A.    And probably more than 100, but that's my

9   best guess.  Somewhere between 65 and 100 individual

10  student IEP records.

11       Q.    Did you choose which IEPs to look at or

12  was it a random -- well, how did you choose which 100

13  to look at?

14       A.    I reviewed every IEP that was provided.

15  Every document you see here, I reviewed.

16       Q.    Did you ask for these documents or were

17  they provided to you?

18       A.    I provided a list of the kind of documents

19  that I would need to review, in order to conduct an

20  evaluation of the scale and magnitude.

21       Q.    And is it fair to say that if a document

22  is not listed in Exhibit 2, amended Appendix E, it

1    was not considered when making your report?

2        A.    That's correct.

3        Q.    In your words, what do you understand the

4    United States to be seeking as a remedy or as a

5    judicial order in this lawsuit?

6        A.    I can only speak to what I have been asked

7    to do as a special educator in this case.  And in

8    terms of my recommendations, I can speak to those.  I

9    can't speak to what the Department is trying to do.

10       Q.    You have read the complaint in this case,

11   though, correct?

12       A.    Yes.

13       Q.    Okay.  Generally, what do you understand

14   the United States to be seeking in this lawsuit, not

15   remedy or judicial order, if that's what threw you

16   off, but generally, what do you see the aims of the

17   lawsuit to be?

18       A.    Unless you have the complaint for me to

19   look at, what I can say is that as an educator and

20   within the scope of my report -- and again, this is

21   just what I can remember right here, right now, in

22   the middle of all of this -- is that the



1    recommendation is -- from my perspective, is to limit

2    or eliminate systemic segregation across the State of

3    Georgia within the GNETS program, to provide fair and

4    equal educational opportunities for students with

5    behavior-related disabilities in the GNETS program,

6    and to have the State of Georgia provide an array of

7    appropriate supports for students with

8    behavior-related disabilities in the State of

9    Georgia.

10        Q.    How does one define appropriate supports

11   in this context?

12        A.    Yes, that's a really, really big question.

13        Q.    Sure.

14        A.    So I'm thinking I should take a break and

15   run to the restroom, but if you want me to answer it

16   first, I can.

17        Q.    Why don't we do this.  I want to allow you

18   to do that for sure.  Let me ask it this way, and

19   maybe it can be a shorter answer.

20        A.    Sure.

21        Q.    If a judge is to order that the State of

22   Georgia provide appropriate supports, what does that

1    look like in a judicial order?  I'm not asking you to

2    get into legalese, but, like, if the State of Georgia

3    is trying to implement an order that says, provide

4    appropriate supports, what does that look like?

5              MS. TUCKER:  Object to form.

6              THE WITNESS:  Okay.  Again, I can speak to

7    based on my experience with state education agencies,

8    over 20 states in the U.S., what I can say in terms

9    of the role of the state in providing appropriate

10   supports, which is, in general, a system of support

11   that provides array of effective evidence-based

12   practices for -- specifically for students who have

13   disabilities that are along a continuum of support,

14   not place-based, but rather service-based.

15              And those supports are provided in the

16   context, based on what the state decides on

17   student -- students with disabilities needs within

18   the GNETS program.

19              So what the state does -- decides to do is

20   up to them.  I have made some recommendations, based

21   on my experience that -- what has worked for

22   supporting students with disabilities in other states



1    in the United States, but what they decide to do is

2    their decision.

3              MR. BELINFANTE:  Let's take a break, then.

4              THE WITNESS:  Thank you.

5              THE VIDEOGRAPHER:  Off the record.  The

6    time is 9:54.

7              (Recess.)

8              THE VIDEOGRAPHER:  On the record at 10:02.

9    BY MR. BELINFANTE:

10       Q.    Dr. McCart, let me start with some kind of

11   general questions about your report, and specifically

12   what it is not about.

13             You have no formal legal training,

14   correct?

15       A.    No.

16       Q.    Okay.  So you're not opining whether the

17   State of Georgia complies with the Americans With

18   Disabilities Act or not; is that right?

19       A.    I'm not talking about the legalities in

20   this case, that's correct.

21       Q.    Okay.  And your report is not about any

22   individual student; is that right?



1          A.      That is not right.

2          Q.      Okay, which individual students do you

3     offer an opinion about?

4          A.      I offer an opinion about the nearly 3,000

5     students that are served in the program, specifically

6     the thousands -- the thousand or so that I observed

7     directly.   But also, there are examples in the

8     report, in which I detail very specific individual

9     student cases for review.

10         Q.      And did you -- for the thousands of

11    students you observed directly, you did not read all

12    of their IEPs, correct?

13         A.      That's correct.

14         Q.      Are you providing an opinion as to whether

15    the State of Georgia administers the GNETS program?

16         A.      No.

17         Q.      What is your understanding about how a

18    local school district superintendent is hired or

19    fired in the State of Georgia?

20         A.      None.

21         Q.      What is your understanding about how a

22    local educator in a general education setting zoned

1    school is hired or fired in the State of Georgia?

2         A.    Say that one again?

3         Q.    Sure.  What is your understanding about

4    how an educator who works in a zoned school general

5    education setting is hired or fired in the State of

6    Georgia?

7         A.    I did not address that in this report.

8         Q.    What's your understanding of it?  I know

9    you didn't address it.  It's just a different

10   question.  Do you have an understanding of how that

11   teacher would be hired or fired?

12        A.    I have an understanding, in that I

13   understand general educational practices.  But

14   specifically in the State of Georgia, no.

15        Q.    Okay.  Do you have an understanding of how

16   educators who are teaching through the GNETS program

17   are hired or fired in the State of Georgia?

18        A.    Yes.  The specifics, I cannot recall right

19   now.

20        Q.    What did you review to inform your

21   decision or inform your opinion -- or let me start

22   over.



1            What did you review to inform your

2    understanding of how teachers in a GNETS program are

3    hired or fired in the State of Georgia.

4        A.    A number of documents that included

5    anything from incident reports, to parent reports, to

6    master schedules, to staffing structures, to IEPs,

7    just student education records, in general, some of

8    which referenced employees, and their time or service

9    within GNETS.

10       Q.    Okay.  What is your understanding of how

11   educators are hired and fired in the GNETS system in

12   Georgia?

13       A.    That -- what I said is all that I know on

14   that, right here, right now.  I'd have to review

15   documents and assess that.

16       Q.    What is your understanding of the State of

17   Georgia's appropriation process?  And by that, I mean

18   the state legislature's appropriation process.

19       A.    I don't know.

20       Q.    Okay.  In compiling your report, did you

21   provide any type of cost analysis as to what your

22   recommendations would cost the State of Georgia?



1        A.      Two questions, I think, you asked.  Did I

2   do a cost analysis?  No.  Did I then offer

3   recommendations regarding the cost -- or what I would

4   do -- what I was recommending would cost?  Say the

5   second part again?

6        Q.     Sure.  Well, I think you've answered it,

7   because you did no cost analysis, correct?

8        A.     Correct.

9        Q.     Okay.  And I may have more specific

10  questions later, but I think that's --

11       A.     I think the only thing I would add on that

12  is the recommendations that I made are standard for

13  SEA practice across the United States, and in no way

14  require additional resources or funding in order to

15  implement.

16       Q.     So it's your testimony that it is standard

17  across SEAs in the United States to implement MTSS?

18            MS. TUCKER:  Object to form.

19            THE WITNESS:  It is my testimony today

20  that it is common and standard practice in many

21  states, particularly the ones that I've worked with,

22  for implementation of a system of support which may

1   or may not be called MTSS.

2   BY MR. BELINFANTE:

3       Q.    Okay.  Roughly how many states -- or

4   excuse me.  Roughly how many states -- and you can

5   answer in number or percentage -- have not

6   implemented MTSS at the state level?

7       A.    I can speak to the states that I've worked

8   with, which is approximately 20.  And I can name some

9   of those, if you'd like, that have worked on

10  implementing a system of support.

11      Q.    But a system of support, you would agree

12  with me, is pretty different from MTSS, correct?

13      A.    No.

14      Q.    MTSS -- how many states that you've worked

15  with have implemented all the tiers of MTSS at every

16  school district in their state?

17      A.    You're seeking to understand how many

18  states have implemented all levels of MTSS across all

19  schools everywhere in the whole United States.

20      Q.    In the states -- you said there's about 20

21  states you've worked with that have implemented MTSS.

22            My question is, of those 20 states, how

1    many have implemented MTSS at every school within

2    those states, all levels of MTSS?

3         A.    I couldn't answer that, sitting here

4    today.  I would have to review data.

5         Q.    Where would I find that data?

6         A.    I don't know where you would find it.

7         Q.    Okay.  Where would you find it?

8         A.    A variety of sources.

9         Q.    Can you be more specific?

10        A.    Yes.  For example, implementation of PBIS

11   is an element of MTSS implementation.  There are

12   three tools utilized to assess whether or not PBIS is

13   in place.  One is SET, Schoolwide Evaluation System.

14   Another, for example, is the tiered intervention

15   framework.

16             Those tools, just by way of example, are

17   kept in a database located at the University of

18   Oregon.  And schools opt in to assessing whether or

19   not their level tiers or levels of support are in

20   place.  So that's one place in which you could find

21   that data.

22             Another place would be the University of

1    Kansas.  There are data -- fidelity data regarding

2    tiered systems of support, both self-assessments for

3    schools to utilize, as well as external fidelity

4    measures, in which the efficacy and fidelity of MTSS

5    or a system of support is implemented effectively.

6              Additionally, also at the University of

7    Kansas, there are classroom assessments that look at

8    the fidelity of implementation of tiered systems

9    within a classroom.  Those are located in a different

10   center at the University of Kansas, and can provide

11   support.

12             Also, in Florida, the University of

13   Southern Florida has a tiered fidelity instrument

14   that has been utilized to assess the efficacy of

15   social, emotional learning among many, many, many

16   other places, tools, and resources.

17        Q.    But sitting here today, you can't tell me

18   a single state where every school district in that

19   state has implemented MTSS to fidelity; is that

20   correct?

21        A.    Without looking at data, I cannot answer

22   that question.



1    Q.    You attached your biography or CV to the

2    report somewhere.  I would have to find it.

3    A.    At the end.

4    Q.    I'll just skip to it.  Let's see.

5    A.    The very end.

6    Q.    Let me come back to that.  I'll just ask

7    you some questions I have here that references that,

8    but I may have to come back to the CV.

9         Have you ever testified as an expert in

10   court before?

11   A.    No.

12   Q.    Okay.  You were involved in a case

13   involving New York Lawyers for the Public Interest

14   and Paul Weiss; is that correct?

15   A.    Yes.

16   Q.    Do you recall the name of that case?

17   A.    Can I look on the CV?

18   Q.    Sure.  If you can find it, absolutely.  I

19   think I've taken it out of my notebook, which is why

20   it's there.  Okay.  Yeah, I've taken it out.

21   A.    Do I state it on there?

22   Q.    I didn't see the name of the case.

1          A.     Then I don't recall.  If it's not stated

2    on here, I'll spare you the time of me looking for

3    it.

4          Q.     Okay.  Have you ever served --

5          A.     Should I look?

6          Q.     Have you ever served as a court monitor?

7          A.     No.

8          Q.     Okay.  On --

9          A.     Okay.  I see 2018 to 2020, I served as an

10   expert consultant for the New York Lawyers for Public

11   Interest, Paul Weiss.  And I do not name the case.

12         Q.     Okay.

13         A.     And I do not recall what it was called.

14         Q.     Okay.  The New Orleans K-12 Inclusive

15   Education Charter School, which is right above that

16   Paul Weiss reference.

17         A.     Yes.

18         Q.     Is that the name of the school or is it a

19   district?  Is it an individual school, do you recall?

20         A.     This particular example is a -- this

21   particular reference is an individual school.

22         Q.     Okay.

1          A.     K-12.

2          Q.     All right.

3          A.     In New Orleans, they're divided by

4     charter, so it's a little different.

5          Q.     All right.  What states have you

6     personally advised?  And by state, I mean State

7     Department of Education, or SEA.  I'll use those

8     interchangeably.

9          A.     Okay.

10         Q.     And if I'm not doing that correctly,

11    please tell me.

12         A.     Yeah, you are.  You are.  So I've worked

13    with Mississippi, New Hampshire, Vermont, Oregon,

14    Maryland, North Carolina, California.  Give me a

15    moment, I'm running through in my mind.

16         Q.     Sure.

17         A.     Did I say Wyoming?

18         Q.     No.

19         A.     Delaware, Wisconsin, New York, San Diego.

20    Not a state, but -- Oklahoma, Idaho, the State of

21    Washington, Washington, DC, Louisiana, among others.

22         Q.     Okay.  The recommendations that you make

1    in your report beginning on page 160.  And

2    specifically, I'm going to refer to the recommended

3    actions, which begin on 163.  Five of them.  Have any

4    of the states that you just identified implemented

5    all five recommended actions?

6         A.    These actions are in reference to the

7    State of Georgia, and I would have to look at data

8    sources to know whether or not the level or efficacy

9    of how those strategies, and to what degree might

10   have been implemented in other states.  But the

11   recommended actions that you're referencing are

12   commonplace in -- at the SEA level.

13        Q.    Commonplace in the states you've advised,

14   or commonplace across nation?

15        A.    Across the nation.

16        Q.    When did MTSS -- well, let's back up a

17   second.  Can you -- and you may have -- all right.

18   You define MTSS on page 6 of your report, is that

19   correct?  For purposes of the report at least?

20        A.    I do define it on page 6 of the report.

21        Q.    And what was -- how did you arrive at that

22   definition?



1        A.      This definition has been around, in some

2    form or another, over the course of many, many years.

3    A version of this is included in the book that I

4    wrote on the topic.  It's also included in several --

5    a version of this is included in several state and

6    federal documents, in which MTSS is reviewed or

7    outlined.  And this definition includes some of the

8    core features of MTSS definitions or system of

9    support definitions.

10       Q.      Okay.  So across the country, educators

11   may have a different or a variety -- varied

12   definition of MTSS; is that correct?

13       A.      It's certainly possible that any one

14   educator would have a varied understanding of what

15   MTSS is.

16       Q.      When you say that the recommendations that

17   you make -- or the recommended actions that you make,

18   beginning on page 163 of your report, are commonplace

19   across nation, is it your opinion that because it

20   does include MTSS in several of them, that they are

21   applying the definition you provide on page 6, or is

22   it one of the varied definitions that you just

1    identified?

2         MS. TUCKER:  Object to form.

3    BY MR. BELINFANTE:

4        Q.    Or do you know?

5        A.    I do know.

6        Q.    Okay.

7        A.    What I just said was, is it possible that

8    an educator would have a varied understanding of

9    MTSS?  And the answer to that is certainly yes.  I

10   can't speak to what educators fully understand about

11   MTSS.  But I can speak to what is a large-scale

12   system of support at the state level.

13       Q.    But did you not also say that there are

14   versions of this definition that are in federal and

15   state education law or regulations, and there are

16   versions in different states?  In other words, if I

17   went to every state in the country, they may define

18   MTSS differently, correct?

19         MS. TUCKER:  Object to the form.

20         THE WITNESS:  There are core features of

21   MTSS definitions, which is essentially a system,

22   organized system of support, and which we provide



1   educational services through.  And that has -- that

2   is common across definitions.  For example, using

3   data to make decisions, having effective tiers of

4   support in which students can move in and out of, et

5   cetera, et cetera, et cetera.

6   BY MR. BELINFANTE:

7        Q.    But there is not a standard definition

8   applied across the country?

9        A.    I don't know what you're referencing in

10  terms of a standard.

11       Q.    Are you familiar with the IDEA?

12       A.    Yes.

13       Q.    Are you familiar with the term free and

14  public education, or FAPE?

15       A.    I'm pausing for a minute.

16       Q.    Sure.

17       A.    Yes.

18       Q.    Okay.  Is there a standard definition of

19  FAPE applied across the country?

20       A.    I don't know.

21       Q.    Okay.

22       A.    Let me say, I can't recall right now.

1        Q.    Okay.  Are you familiar with -- given your

2    familiarity with the IDEA, are you familiar with the

3    term IEP team?

4        A.    Yes.

5        Q.    Do you know who makes up an IEP team?

6        A.    I do.  I would like to clarify.  You said

7    given my familiarity with IDEA.

8        Q.    Mm-hmm.

9        A.    I don't think you asked me if I was

10    familiar with IDEA.

11        Q.    I thought I did.

12        A.    Maybe.

13        Q.    But are you familiar with -- sure, either

14    way.  Are you familiar with the IDEA?

15        A.    I am.

16        Q.    Okay.  Who makes up members of an IEP team

17    formed pursuant to the IDEA?

18              MS. TUCKER:  Object to form.

19    BY MR. BELINFANTE:

20        Q.    Or what is your understanding of who makes

21    up the members of the IEP team?

22        A.    I can speak from practical experience as

1    an educator, what is typical on an IEP, who makes up

2    an IEP team.  And it is typically the student with

3    disabilities, a parent of that student with

4    disabilities, an administrator in the building, a

5    principal, if it is a student in, for example, the

6    State of Georgia, that's in special education located

7    in a general education program.  If it's a student

8    located in the GNETS program in the State of Georgia,

9    then a GNETS administrator may sit on that IEP team.

10               There is a general educator and special

11   educator.  And if the student is receiving any sort

12   of related service provision, those related service

13   providers, such as speech, et cetera, OT/PT makes it

14   on that team as well.

15        Q.    Have you ever been a member of an IEP

16   team?

17        A.    Yes.

18        Q.    Have you ever been a member of an IEP team

19   in the State of Georgia?

20        A.    No.

21        Q.    To your knowledge, are any members or

22   employees of the State Department of Education in the

1    State of Georgia on an IEP team?

2        A.    I don't know.

3        Q.    Okay.  To your knowledge, are any members

4    of the Department -- or any employees of the

5    Department of Community Health members of a state IEP

6    team -- or members of an IEP team for students in

7    Georgia?

8        A.    I don't know.

9        Q.    How about the Department of Behavioral

10   Health?  To your knowledge, are there any members or

11   employees of the Department of Behavioral Health who

12   serve on IEP teams in Georgia?

13       A.    I don't know.

14       Q.    Okay.  If a parent -- and is it your

15   understanding that an IEP team makes a recommendation

16   for an individual student, and an IEP plan or a plan

17   on how that student should receive educational

18   services?

19       A.    Can you restate that?  I mean, repeat it.

20       Q.    Sure.  Let me ask it this way.  What is

21   your understanding of what an IEP team does, in terms

22   of making recommendations for students, or plans?



1          A.      An IEP team is charged with monitoring

2     current levels of progress of students, understanding

3     student need, providing recommendations for student

4     learning, and offering suggestions regarding

5     adaptations, modifications, or additional related

6     supports that a student might need.  An IEP team is

7     only able to offer what is available for students to

8     participate in.

9          Q.      If a parent is dissatisfied with an IEP

10    team's recommendation, what is your understanding of

11    any remedies or rights they may have to challenge it?

12         A.      I can speak, again, from an educator's

13    perspective on that topic, that the parent, if

14    unsatisfied with an IEP decision, has the opportunity

15    to -- I can't think of the exact word, but they have

16    the ability to express concern over that decision.

17              What I found in the documents, that there

18    were no -- if a parent expressed concern, for

19    example, in this case with the GNETS program, there

20    were not other options available.

21         Q.      Are you familiar with what's called a due

22    process hearing?



1      A.    Yes.

2      Q.    Did you see where any parents who were

3  dissatisfied in the State of Georgia with a

4  recommendation for GNETS services filed a due process

5  hearing or took part in a due process hearing?

6      A.    I don't recall, sitting here, if I

7  reviewed documents about that.

8      Q.    Okay.  Is it your understanding that if a

9  parent were dissatisfied with a recommendation and

10  placement in a GNETS service program, that they

11  could, under the IDEA, challenge that recommendation?

12      A.    Again, speaking as an educator, if a

13  parent is dissatisfied with a decision, they could

14  challenge that.  The reality of that situation is

15  that if they challenge that, and there is no other

16  alternative, that student goes home with them.

17      Q.    Did you read any decisions in the State of

18  Georgia where that was the case, meaning a parent

19  brought a challenge, and the result of that challenge

20  was that the student went home with them?

21      A.    Yes.

22      Q.    And how many?



1        A.    I don't remember.

2        Q.    Do you remember the names of any student

3    where that occurred?

4        A.    No.

5        Q.    And if they -- and when you say went home

6    with them, what do you mean by that?

7        A.    That the option -- I referenced this in

8    here, if you'd like me to point to the example.

9        Q.    Sure.

10       A.    If you'll give me a minute to find it,

11   that way, we can talk specifics.

12             A few more minutes.  If I can't find it,

13   then I'll go about it another way.

14       Q.    If you can't, what we'll do is when we

15   break for lunch, I'll just see if you can look for it

16   then.

17       A.    Okay.

18       Q.    And we can come back to it.

19       A.    Give me one more minute here.

20             Okay, I'll take you up on your offer to

21   look in a minute.

22       Q.    All right.

1          A.     Too many pages.

2          Q.     Are you generally familiar with the

3     Americans With Disabilities Act?

4          A.     Yes.

5          Q.     Are you familiar with the term least

6     restrictive environment appropriate, as it is in the

7     Americans With Disabilities Act regulations?

8                 MS. TUCKER:   Object to form.

9                 THE WITNESS:   I am familiar with the

10    concept of least restrictive environment, as it

11    applies in the field of education.

12    BY MR. BELINFANTE:

13         Q.     Okay.

14         A.     Not from a legal perspective.

15         Q.     Okay.   What factors go into determining

16    what is the least restrictive environment appropriate

17    in the context of education?

18                MS. TUCKER:   Object to form.

19                THE WITNESS:   Are you asking what -- what

20    are you asking?

21    BY MR. BELINFANTE:

22         Q.     Let me back up a second.

1        Do you know if an IEP team is supposed to

2    look at what is the least restrictive environment

3    appropriate for the needs of that student?

4        A.    The IEP team should consider the

5    environment in which a student is learning, yes.

6        Q.    What factors go into determining what is

7    the least restrictive environment appropriate for the

8    needs of a student, do you know?

9            MS. TUCKER:    Object to form.

10   BY MR. BELINFANTE:

11       Q.    Or have an opinion on it?

12       A.    Factors as it relates to this case that go

13   into making a decision regarding the least

14   restrictive environment are related to what are the

15   available supports and services to meet students'

16   needs who have behavior-related disabilities.

17       Q.    And that is determined by the IEP team,

18   correct?

19       A.    The supports and services that are

20   available are determined by the entirety of the

21   educational system, starting with the vision,

22   guidance, and leadership at the State Department of

1   Education, then shared with local education agencies,

2   in terms of, again, that system of support that is in

3   place.  That is then utilized by an IEP team about

4   what supports can be put into place because of their

5   availability.

6           So, for example, if an IEP team thought

7   that a student would be successful if they had staff

8   from the GNETS program coming into one of their

9   classrooms, as indicated in the GNETS rule, but that

10  is not an option because the only option in the

11  region is a center-based location, then that IEP team

12  is sort of put in a position to make the

13  recommendation of the center-based location, because

14  that's all that's available.

15          Does that make sense?

16      Q.    Mm-hmm.

17      A.    Okay.

18      Q.    When the IEP team is looking at that,

19  though, it's based on the needs of an individual

20  student, correct?

21      A.    When an IEP is happening, is it based on

22  an individual student?



1      Q.    Correct.

2      A.    Yes.

3      Q.    Okay.  And if an IEP team makes a

4  recommendation, and the student does not receive the

5  services in that recommendation, do you have an

6  understanding of what that would mean under the IDEA?

7           MS. TUCKER:  Object to form.

8           THE WITNESS:  I'm not sure what you're

9  asking.

10  BY MR. BELINFANTE:

11      Q.    So let's say an IEP team recommended that

12  the student receive services through GNETS,

13  hypothetically.

14      A.    Okay.

15      Q.    And the local school district said, no,

16  and rejected the conclusion of the IEP team.  Do you

17  know if there would be any consequences to the local

18  school district for that?

19      A.    That's a hypothetical, and I'm just not

20  sure where to go with that.

21      Q.    Do you have any understanding of whether

22  the State of Georgia Department of Education has the

1    authority to override an IEP team recommendation?

2        A.    I did not look at or evaluate that.

3        Q.    Understood.  But do you have an

4    understanding of whether the State of Georgia has the

5    authority -- or the State of Georgia Department of

6    Education has the authority to override an IEP team

7    recommendation?

8        A.    I don't know.

9        Q.    Do you have an understanding of whether

10    the State of Georgia's Department of Community Health

11    has the authority to override an IEP team

12    recommendation?

13        A.    That was -- no.

14        Q.    And sorry, you're going to find these --

15    there's a series of questions that get repetitive.

16        A.    No, no, no -- yeah, yeah, yeah.

17        Q.    Do you have an understanding of whether

18    the State of Georgia Department of Behavioral Health

19    and Developmental Disabilities has the authority to

20    override an IEP team recommendation?

21        A.    No.

22            MS. TUCKER:  Object to form.

1  BY MR. BELINFANTE:

2      Q.    Are you familiar with the term unnecessary

3  segregation as it relates to claims under the ADA?

4            MS. TUCKER:  Object to form.

5            THE WITNESS:  I think at the beginning of

6  this, you said you asked questions that were friendly

7  or -- not friendly.  What did you say?

8  BY MR. BELINFANTE:

9      Q.    I'm not trying to confuse you.

10     A.    What was the -- what are you asking?

11     Q.    I'm asking if you are familiar with the

12  phrase unnecessary segregation as it relates to the

13  Americans With Disabilities Act?

14     A.    I'm familiar with the phrase of

15  unnecessary segregation, because I used it throughout

16  my report.

17     Q.    Okay.  What constitutes unnecessary

18  segregation?

19     A.    When a child is moved away from his or her

20  school-aged peers or siblings, set apart from, or

21  treated differently than students without

22  disabilities.



1        Q.    And that would be the case, even if an IEP

2    team recommended that a child be separated from their

3    peers in general educating settings, correct?

4        A.    What would be the case?

5        Q.    That that would be unnecessary

6    segregation, based on your definition?

7        A.    So you're asking if an IEP team made a

8    recommendation for unnecessary segregation?

9        Q.    No, I'm sorry.  If an IEP team makes a

10   recommendation that a student in a general -- that is

11   currently, let's say, in a general education

12   environment zoned school, receives services in a

13   separate GNETS facility, is it your opinion that that

14   IEP team has caused unnecessary segregation?

15       A.    As indicated in my report, I believe that

16   the system must be -- offer a full array of support

17   and services for students with disabilities, such

18   that unnecessary segregation isn't the only

19   alternative that an IEP team has when making a

20   decision about a student.

21            So if the state were providing guidance,

22   vision, professional learning per my recommendations,



1    then there would be a broader array of supports and

2    services that would eliminate the need for

3    unnecessary segregation.

4         Q.    But sitting here today, and understanding

5    your criticisms of the State of Georgia, every time

6    an IEP team recommends that someone receive GNETS

7    services, is that -- and causes them to, then, leave

8    their zoned school, is that segregation unnecessary

9    as you define it?

10             MS. TUCKER:  Object to form.

11             THE WITNESS:  Yeah, there were three parts

12   to that.  So given my criticism, you said --

13   BY MR. BELINFANTE:

14        Q.    I mean, I understand your criticisms of

15   the State of Georgia.  But sitting here and the

16   status quo today, can you say that every time an IEP

17   team recommends a student go to a freestanding GNETS

18   location, that that was unnecessary segregation?

19             MS. TUCKER:  The same objection.

20             THE WITNESS:  I don't want to accept the

21   premise of criticism of the State of Georgia or

22   whatever.  I don't use the word criticism, whatever.

```
 1   So not that, but the second part you're asking is

 2   what?

 3   BY MR. BELINFANTE:

 4        Q.     What I'm -- all right.  Then forget the

 5   criticism part.  Is it your opinion that every time

 6   an IEP team in the State of Georgia recommends that a

 7   student go to a GNETS facility that is separate and

 8   freestanding, that that constitutes unnecessary

 9   segregation?

10        A.     If you were to say that any -- if an IEP

11   team recommends a segregated setting, based on the

12   individual needs, would I consider that to be

13   unnecessary?  No.  The concern here is that you said

14   within the GNETS program.  And the GNETS program, as

15   indicated in finding 3, is failing to provide the

16   services that it's using to justify its existence.

17             So, for example, they aren't providing

18   opportunities for equal learning, they aren't

19   providing opportunities for learning with peers, et

20   cetera.

21        Q.     Is it your opinion that the GNETS, as you

22   just described it, is not providing a free and public
```

1    education to the students in that program?

2              MS. TUCKER:  Object to form.

3              THE WITNESS:  I'm not -- I did not look at

4    the application of FAPE in the context of the GNETS

5    program.  What I can tell you is the GNETS centers

6    and school-based sites are not even considered

7    schools.  They're considered entities.

8              And so when asking whether or not students

9    within the GNETS program are having an effective

10   education, or whether or not they're unnecessarily

11   segregated, it's very difficult to say that they are

12   not.

13   BY MR. BELINFANTE:

14        Q.    What is the basis of -- you said they're

15   not considered schools.  Can you explain that?

16        A.    Yes, that's also in here.

17        Q.    Okay.  Why don't we look for that at

18   lunch, too.

19        A.    Okay.  They're considered entities.

20        Q.    If a school fails to deliver effective

21   behavioral and therapeutic supports, does that school

22   also fail to provide a free and public education?

1              MS. TUCKER:  Object to form.

2              THE WITNESS:  Can you say that again?

3    BY MR. BELINFANTE:

4        Q.    Sure.  If a school fails to deliver

5    effective behavioral and therapeutic supports, would

6    that school also deprive students of a free and

7    public education?

8              MS. TUCKER:  The same objection.

9              THE WITNESS:  I -- I don't understand the

10   question.

11   BY MR. BELINFANTE:

12       Q.    You're familiar with the phrase free and

13   public education?

14       A.    Free and appropriate public.

15       Q.    Appropriate, thank you.

16       A.    Yes, I am.

17       Q.    This is why you said FAPE, and I should

18   have just stuck to FAPE.

19       A.    It's easier.

20       Q.    If a school -- is providing effective

21   behavioral and therapeutic supports a necessary

22   element of providing a FAPE?

1          A.    I can't speak to whether or not what I've

2    talked about in the report relates to FAPE.

3          Q.    I'm not asking you about the report.  I'm

4    asking you about your opinion, generally.  Is your

5    opinion generally that if a school district fails to

6    provide effective behavior and therapeutic supports,

7    it cannot deliver a FAPE?

8                MS. TUCKER:  Object to form.

9                THE WITNESS:  I am just not sure how to

10   answer that right now, sitting here.

11   BY MR. BELINFANTE:

12         Q.    Do you find that providing effective

13   behavior and therapeutic supports is a necessary

14   element of a FAPE?

15               MS. TUCKER:  The same objection.

16               THE WITNESS:  If you were saying school,

17   schooling experience, or something of that nature, I

18   can probably go where you're going.  But I don't know

19   when you're asking what constitutes a free and

20   appropriate public education, as it relates to what I

21   reviewed within this case?  I don't -- I can't.

22   BY MR. BELINFANTE:



1      Q.    Yeah, and I think that's where we're

2  disconnecting.  I'm not asking about the report.

3      A.    Okay.

4      Q.    I'm asking -- yeah, in your professional

5  opinion, if a school is not providing effective

6  behavior and therapeutic supports, could it provide a

7  free and appropriate public education?

8           MS. TUCKER:  Object to form.

9           THE WITNESS:  Free and appropriate public

10  education.  I'm thinking.

11  BY MR. BELINFANTE:

12      Q.    Sure.

13      A.    Can we come back to that?

14      Q.    Could you provide me an answer now, and

15  then we can come back to it, and you can correct the

16  answer later?

17      A.    Sure.

18      Q.    And I'm sorry that I have to do that.

19  That's just kind of standard.

20      A.    No problem, no problem.

21      Q.    Yeah.

22      A.    Again, in the context of being an

1    educator, the provision of a free and appropriate

2    public education is ever-changing, given what is --

3    in terms of how you would define a schooling

4    experience for a child.

5              And so children are allowed to have a free

6    and appropriate public education.  Children are

7    allowed to have -- should be allowed to have access

8    to schooling, should be allowed to have opportunities

9    to learn, regardless of whether or not they have

10   disabilities.  They should be able to engage in

11   schooling environments and experiences in which their

12   behavior-related disability does not result in

13   exclusion from those experiences.

14             So that's what I would say about that.

15   Q.    And in order to achieve what you just

16   described, is it your professional opinion that that

17   student would need effective behavior and therapeutic

18   supports in the school system, or delivered to them

19   in their school?

20   A.    It depends on the student.

21   Q.    If a school district -- and again, I

22   realize this is hypothetical, and I'm asking in your

1    professional opinion, unrelated -- you know, not

2    what's in the report.

3         A.    Unrelated to --

4         Q.    Right.

5         A.    Right.

6         Q.    Not what's in the report.  In your

7    professional opinion, if a school district offered no

8    behavior and therapeutic supports, no PBIS, no MTSS,

9    no school counselor, no wraparound services,

10   literally nothing, like just reading, writing,

11   arithmetic, period, would that school district be

12   providing a free and appropriate public education, or

13   FAPE, to all of its students?

14              MS. TUCKER:  Object to form.

15              THE WITNESS:  The context of that question

16   is so broad, I can't even hypothetically go there.

17   There's so many elements to education that I just --

18   I'm sorry.

19   BY MR. BELINFANTE:

20        Q.    Totally fair.  Let me ask this.  In order

21   to examine whether a school district is providing a

22   fair and appropriate -- or free and appropriate -- a

1    FAPE public education, does one necessarily have to

2    look at the behavioral health and therapeutic

3    services that are provided?

4            MS. TUCKER:  Object to form.

5            THE WITNESS:  I don't know.

6    BY MR. BELINFANTE:

7        Q.    In order to prevent unnecessary

8    segregation, is it your professional opinion that one

9    has to look at the services, behavioral health -- or

10   excuse me, behavioral and therapeutic services

11   provided in a school?

12       A.    Repeat that, please?

13       Q.    Sure.  If one is to consider whether a

14   student is undergoing unnecessary segregation, does

15   the question turn on the types of services offered

16   within the school -- unnecessary segregation based on

17   their -- I want to use the phrase you used --

18   behavioral disability, is that correct?

19       A.    Emotional.

20       Q.    Emotional and behavioral health

21   disability.

22       A.    Thank you.

1       Q.    If a student with emotional and behavioral

2   health disability, in order to determine whether a

3   student with emotional and behavioral health

4   disability is being unnecessarily segregated, do you

5   have to consider the services provided in the school?

6       A.    Yes.

7       Q.    Okay.  In order to determine if that same

8   student is receiving a FAPE, do you have to look at

9   the services provided in the school?

10          MS. TUCKER:  Object to form.

11          THE WITNESS:  I don't know.  I think if

12  you want me to look at FAPE and apply FAPE to -- in

13  my opinion, and as it relates to the work I'm doing

14  here, then I need to see that and look at it.  I

15  just -- I don't know what else to--

16  BY MR. BELINFANTE:

17      Q.    Because it's individualized, or is it --

18  like, why would you need to -- what would you need to

19  look at to determine if services are a factor you

20  would consider in determining what constitutes a

21  FAPE?

22      A.    Because I need to know specifically what

1  that definition is, and what it is that you're

2  referencing when you talk about FAPE, and how that

3  relates as an educator in the field, and what that

4  looks like.

5      Q.    Are you familiar with the definition of

6  FAPE in the IDEA?

7      A.    Familiar.

8      Q.    If we applied that definition, does the

9  question of whether a student is receiving a FAPE

10 turn on what services are being provided in that

11 school district?

12         MS. TUCKER:  Object to form.

13         THE WITNESS:  You keep asking the same

14 question.

15 BY MR. BELINFANTE:

16      Q.    Well, you said before you didn't know

17 where I was going with FAPE, so I'm now saying, let's

18 apply the IDEA's definition of FAPE.

19      A.    Do you have a copy of that here that I

20 could look at?

21      Q.    I can get it.

22      A.    Okay.  That would help.

1      Q.    We'll both have homework at lunch.  We'll

2   come back to that, then.

3      A.    Okay.

4      Q.    All right.  In your work across the

5   country, do other states have services similar to

6   GNETS, where some students are provided education in

7   separate facilities based on their emotional and

8   behavioral disability?

9      A.    I'm just breathing for a minute, taking an

10  in-seat break.  I don't know if that's a thing, but

11  we're making it a thing.

12          MS. TUCKER:  Josh, I don't know if it's a

13  good time for you to take a break at some point soon.

14  It's almost 11:00.  If we want to -- I know you have

15  a question pending, but just to order lunch.

16          MR. BELINFANTE:  Yeah, let me do this and

17  then I've got, like, one other thing, and we can

18  order lunch after that.

19          THE WITNESS:  Okay.  Would you ask again?

20          MR. BELINFANTE:  Sure.

21  BY MR. BELINFANTE:

22      Q.    In your work with other states, have you

1    seen programs in education where students with

2    emotional, behavioral disabilities receive education

3    services in separate facilities?

4         A.    Like the GNETS program?

5         Q.    Just separate facilities.

6         A.    Separate facilities.  In my work in other

7    states related to education, the system of education,

8    I've not seen other systems of segregation at the

9    scale and magnitude of what I've seen in the State of

10   Georgia.

11        Q.    Okay.  You added the scale and magnitude

12   piece.  I'm literally just asking about, have you

13   seen other states use separate facilities from a

14   zoned school to provide education services to

15   students with emotional and behavior disabilities?

16        A.    I've been in a lot of schools, and so I'm

17   going through the thinking on that.

18             I don't recall any specific place in which

19   I went that was a wholly segregated environment,

20   separate from the schooling experience, in other

21   states.

22        Q.    Are you familiar with the May Institute in

1    Massachusetts?

2         A.    Yes.

3         Q.    Are you aware that they run schools for

4    students with autism?

5         A.    Yes.

6         Q.    And that they are separate facilities?

7         A.    Separate from what?

8         Q.    Separate from a zoned school, they're

9    independent freestanding facilities?

10        A.    I don't know.

11        Q.    If the May Institute or anyone else were

12   operating freestanding facilities just for students

13   with autism or traumatic brain injuries, would that,

14   in every case, constitute unnecessary segregation?

15        A.    No.

16        Q.    This was that last train of questions, so

17   we can break for lunch -- or order lunch.

18             Are you familiar with the phrase

19   reasonable accommodation as it relates to the ADA?

20             MS. TUCKER:  Object to form.

21             THE WITNESS:  If you're asking me to

22   define what reasonable accommodation is, no.

1   BY MR. BELINFANTE:

2        Q.    Not yet.

3        A.    No.

4        Q.    Okay.  Is it your opinion that the

5   recommendations you make in your report, beginning on

6   page 160, are reasonable accommodations or are

7   reasonable -- let me ask that, and I'll ask the next

8   one.

9        A.    Sure.

10       Q.    Is it your opinion that the

11  recommendations you make beginning on page 160 to 167

12  of your report constitute reasonable accommodations

13  for students with emotional/behavior disabilities?

14       A.    Yes.

15            MS. TUCKER:  Object to form.

16  BY MR. BELINFANTE:

17       Q.    What goes into what constitutes the

18  reasonableness of reasonable accommodation?  What

19  factors do you consider?

20            MS. TUCKER:  Object to form.

21            THE WITNESS:  Again, you're -- it feels

22  like you're applying legal terminology, and asking me

1    to apply that in this situation and --

2    BY MR. BELINFANTE:

3        Q.    If I may interrupt, only because I want to

4    -- I'm not doing that.  I believe you just told me

5    that you believe that the recommendations you provide

6    are reasonable.

7        A.    Yes.

8        Q.    And my question is, in your opinion --

9        A.    Okay.

10       Q.    -- to make that conclusion, what factors

11   go into the conclusion that it's reasonable?

12       A.    Gotcha.

13       Q.    I'm not asking you to opine on the law.

14       A.    Okay.  Thank you.

15       Q.    Yes.  What factors go into your conclusion

16   that the recommendations are reasonable?

17       A.    It is -- the recommendations are

18   reasonable based on my extensive experience in

19   implementing statewide initiatives in and with the

20   support of the state education agencies across the

21   U.S.

22            I'm very knowledgeable about what it takes

1    to change an educational system.  And my life's work

2    has been committed to doing just that, and supporting

3    educational systems.  Therefore, from my personal

4    experience, I feel very clear on the reasonableness

5    of the asks in the recommendations I've made in the

6    report.

7         Q.    Does cost -- is cost a factor in

8    determining whether the recommendations are

9    reasonable?

10        A.    In a general sense?  Yes.

11        Q.    Is workforce availability a factor?

12        A.    Always.

13        Q.    Did you conduct a workforce study for the

14   State of Georgia?

15        A.    I did not conduct a workforce study,

16   although I certainly did look at the number of

17   educators that were available in the GNETS program

18   and their certification, et cetera.

19        Q.    Did you conduct a study of how many

20   physical therapists there are in the State of

21   Georgia, and where?

22        A.    I did not conduct a study, but I did

1    review documents that shared that information.

2        Q.    How about speech therapy?

3        A.    The same.

4        Q.    What documents did you look at, do you

5    recall?

6        A.    Yes.

7        Q.    Are they listed on Appendix E?

8        A.    Yes.

9        Q.    Did you look at -- did they include the

10   number of psychologists in the State of Georgia?

11       A.    Yes.

12       Q.    Psychiatrists as well?

13       A.    Yes.

14       Q.    And social workers?

15       A.    Yes.

16       Q.    And your conclusion is that there is a

17   sufficient number of those professionals scattered

18   across the state to provide -- to implement your

19   recommendations in every school district in Georgia?

20       A.    Multiple parts to that question.  Is there

21   a sufficient number?  There's not a sufficient number

22   of support service personnel certified in the State

1    of Georgia, or in any state, for that matter.  That's

2    a challenge in education right now, what -- so that's

3    part one.

4                Part two was whether or not -- can you say

5    part two again?

6         Q.    I think you answered my question.  I don't

7    think it was two parts.  I think it was, was there

8    enough to implement in every school district across

9    the State of Georgia.  And I think you answered my

10   question.

11        A.    I did not.

12        Q.    You did not answer it?

13        A.    No.

14        Q.    So then go ahead.

15        A.    I think you were asking, is there enough

16   to implement the recommendations in my report as they

17   are now.

18        Q.    In every school district in Georgia,

19   correct.

20        A.    The recommendations in the report are

21   similar to recommendations made in other states, and

22   have effectively been implemented with the same --

1    I'll say with similar educational staffing shortages.

2         Q.    Which states?

3         A.    Elements of the recommendation in various

4    forms in all states throughout the U.S., but in

5    particular, those I mentioned earlier.

6         Q.    Which -- the ones you've worked with?

7         A.    The 20 plus states.

8         Q.    20 or so?

9         A.    Yes.

10        Q.    So it's your contention that the State of

11   Mississippi has fully implemented MTSS in every

12   school district in the state?

13             MS. TUCKER:   Object to form.

14             THE WITNESS:   Not what I said.

15   BY MR. BELINFANTE:

16        Q.    Well, then what did you say?

17        A.    I said that various states -- many states

18   across the U.S. implemented elements of my

19   recommendations with current staffing shortages that

20   are part of the educational system.

21        Q.    Are you aware of any state that has

22   implemented all of your recommendations in every

1    school district in those states?

2        A.    You asked that earlier.  I can't remember

3    what I said earlier.

4        Q.    Well, I'm trying to determine, because

5    you're asking the court to mandate at least five

6    recommended actions to flow through to every school

7    district in the State of Georgia.  I'm asking to

8    determine if any state, to your knowledge, has ever

9    done that.

10            MS. TUCKER:  Object to form.

11            THE WITNESS:  I'm not asking that.  What

12   I'm asking is that the state establish a vision,

13   guidance, and support along a full continuum of

14   services for students with behavior-related

15   disabilities in the State of Georgia.

16            That is to include things such as

17   effective social and emotional behavior supports,

18   effective teaching and learning processes, effective

19   school climate, effective resources and support,

20   entitled students with disabilities such as students

21   without disabilities receive.

22   BY MR. BELINFANTE:



1          Q.    And those recommendations are reflected in

2   your report beginning on page 160 and ending on page

3   167?

4          A.    That is correct.

5          Q.    And again -- okay, I'll leave it at that.

6                MR. BELINFANTE:  You want to break for

7   determining lunch?  Is that what we're doing?

8                MS. TUCKER:  I think so.  And just a

9   break, in general, because we've been going for,

10  like, and hour.  Is it an okay time for you?

11               MR. BELINFANTE:  Yeah, totally fine.

12               THE VIDEOGRAPHER:  Off the record at

13  11:06.

14               (Recess.)

15               THE VIDEOGRAPHER:  On the record at 11:30.

16  BY MR. BELINFANTE:

17         Q.    Dr. McCart, I'm going to -- you've

18  recently written a book called -- with others, called

19  Build Equity, Join Justice:  A Paradigm for Social

20  Belonging; is that right?

21         A.    Yes, I've written a book.  That's not

22  quite the title, but, yes.



1         Q.    And that was with -- is it Dr. Sailor and

2   also -- is it Dr. Kelly?

3         A.    Wade Kelly.

4         Q.    All right.  I'm going to show you what

5   we'll mark as --

6               (Discussion held.)

7               MR. BELINFANTE:  I'll show you what we'll

8   mark as Exhibit 3.

9                    (McCart Exhibit No. 3 was identified

10                   for the record.)

11              MR. BELINFANTE:  I've got extras if you

12  all want.

13  BY MR. BELINFANTE:

14        Q.    This is an article from today.ku.edu.

15  Have you seen this before?

16        A.    Let me see.  Yes.  Yes.

17        Q.    Okay.  If you turn to the second page --

18  well, let me ask this first.  The recommendations

19  that you make in this report and the recommended

20  actions, are they consistent with the recommendations

21  in the book Build Equity, Join Justice?

22        A.    No.



1    Q.    What's the difference?

2    A.    The -- a multitude of differences.

3    Q.    Are you recommending in your report an

4  equity-based MTSS approach in Georgia?

5    A.    I'm recommending a system of support that

6  provides vision, guidance, and leadership from the

7  state to LEAs, to schools, to support students with

8  disabilities.  That system of support can be called

9  MTSS, but can be called other things.

10    Q.    Is the MTSS that you're recommending

11  specifically on page 164, which uses the phrase

12  "within MTSS," an equity-based MTSS?

13    A.    Where are you?

14    Q.    We can start on page 163, "Recommended

15  action:  Develop state capacity to provide guidance

16  for implementation of MTSS through direction, policy,

17  and technical assistance for districts and schools

18  throughout the state."

19    A.    Yes.

20    Q.    Page 164, "Recommended action:  Develop

21  state capacity to serve as technical support for

22  district implementation of social, emotional,

1    behavioral, and mental practices within MTSS."

2        A.    Mental health practices within MTSS, yes.

3        Q.    Page 165, "Recommended action:  Develop

4    state capacity to serve as technical support for

5    district scaling of evidence-based implementation

6    actions to support equity-based MTSS embedded within

7    social, emotional, behavioral, and mental health."

8            Do you see that?

9        A.    I do.

10       Q.    Page 165 again, "Recommended action:

11   Develop state capacity to serve as technical support

12   for district implementation of evidence-based

13   practices to support equity-based MTSS within

14   embedded social, emotional, behavioral, and mental

15   health."

16           Do you see that?

17       A.    I do.  You skipped one.

18       Q.    I did because it didn't use the phrase

19   MTSS.

20       A.    Gotcha.

21       Q.    So on page 2 of 4 of this article, when it

22   describes, at the last paragraph, "The book outlines

1    strategies for ensuring that implementation of

2    equity-based MTSS in schools is done with equity as

3    the driving force for the measure of success."

4              Is that an accurate statement of what your

5    book, Build Equity, Join Justice, outlines?

6              MS. TUCKER:  I just want to correct.  It

7    says, "and the measure of success."

8              MR. BELINFANTE:  Sorry.

9              THE WITNESS:  This book outlines

10   strategies for ensuring that implementation of

11   equity-based MTSS is done in schools -- I'm sorry,

12   MTSS in schools is done with equity as the driving

13   force and the measure of success.

14   BY MR. BELINFANTE:

15        Q.    And you're recommending equity-based MTSS

16   for the State of Georgia, correct?

17        A.    Yes.

18        Q.    And so looking at your quote in the first

19   full paragraph of the article, it says, "The book

20   hopes to inspire a deeper thinking and a fundamental

21   redesign in the way we, as educators, understand and

22   support students and structure our schools."

1             Do you see that?

2        A.    No.

3        Q.    Sorry, first full paragraph beginning with

4    the quote, "The book hopes," on page 2, the same

5    page.

6        A.    I need one more -- say that again.  Okay,

7    "The book hopes."

8        Q.    Yeah.

9        A.    I'm with you.

10       Q.    Is that an accurate quote of yours?

11   That's my only question.

12       A.    That is an accurate quote of mine, "The

13   book hopes to inspire a deeper thinking and

14   fundamental redesign in the way we, as educators,

15   understand and support students and the structure of

16   our schools."

17       Q.    Now, we were talking earlier, and you said

18   that the recommendations you have in your report in

19   this case, beginning, again, on page 163, in terms of

20   the recommended actions, are commonplace across the

21   country.

22             This article says, on page 2, starting in

1  that last paragraph, it says -- the part we've

2  already talked about, "The book outlines strategies

3  for ensuring that implementation of equity-based MTSS

4  in schools is done with equity as the driving force

5  and measure of success?"

6            It then goes on to say, "This is, in part,

7  a response to the prevalence of an educational

8  systems that routinely segregate based on placing

9  into separate classrooms or schools, those students

10 who learn or behave differently from the dominant

11 culture."

12           Do you see that?

13      A.    Yes, I see that.

14      Q.    I realize those aren't your words, but do

15 you agree with that second sentence?

16      A.    I've forgotten the start and end of your

17 question.  So is the question now -- just so I

18 understand, are you asking me, do I agree with the

19 sentence that starts at the bottom of page 2 and goes

20 on to page 3?

21      Q.    Yes.

22      A.    So you're -- this is, in part, a response

1    to the prevalence of educational systems that -- that

2    sentence?

3         Q.    Yes.

4         A.    Do I agree with that statement?

5         Q.    Yes.

6         A.    In part, yes.  The book was in response to

7    a system that -- yes.

8         Q.    So you believe there is a prevalence of

9    educational systems in the United States that

10   routinely segregate by placing into separate

11   classrooms or schools, those students who learn or

12   behave differently from the dominant culture?

13        A.    No.

14        Q.    So then what do you agree with in that

15   second sentence?

16        A.    I thought you were asking -- this is, in

17   part -- the production of this book, the writing of

18   this book --

19        Q.    Right.

20        A.    -- was in response to, in part, systems

21   that segregate.

22        Q.    Right.  My question really is about the

1  prevalence of educational systems.  Do you believe

2  that there is a prevalence of educational systems

3  that routinely segregate?

4       A.    Over the years?

5       Q.    I'm just -- from what this says.  If the

6  book is in response to that, it presumably -- well,

7  let me ask this.  Is the book to address -- it's to

8  help schools implement equity-based MTSS now,

9  correct?

10      A.    You're saying -- you're asking me now, is

11 Build Equity, Join Justice about helping schools

12 build equity-based MTSS?

13      Q.    Today, yes.

14      A.    Today?  That is one very small part of

15 this book.

16      Q.    Okay.

17      A.    My other book is all about it.

18      Q.    Okay.  In page 3, second full paragraph,

19 the sentence begins, "In the book, the authors argue

20 that a paradigm shift is needed to address the

21 inequities embedded in many aspects of the

22 educational system."

1             Do you see that?

2       A.    Yes.

3       Q.    Do you agree with that description of the

4  book?

5       A.    I do agree with that description of the

6  book.  I'll just add that the book has nothing to do

7  with my recommendations that I've made in the report

8  to the State of Georgia.

9       Q.    Your recommendations use the phrase

10  equity-based MTSS.

11      A.    That's correct.

12      Q.    Your book is based on the equity-based

13  MTSS, correct?

14      A.    This book is based on building equity and

15  joining justice around a 10-point paradigm that is

16  separate and distinct from equity-based MTSS, of

17  which a component is included, but is not the primary

18  purpose or intention of the book.

19             So was the word equity-based MTSS used in

20  Build Equity, Join Justice?  Yes.  Was this book

21  utilized as a tool for writing the report?  No.

22      Q.    So equity-based MTSS means one thing for

1    the book, and another thing for your report; is that

2    right?

3         A.    No.

4              MS. TUCKER:   Object to form.

5              THE WITNESS:   I don't -- no.

6    BY MR. BELINFANTE:

7         Q.    They mean the same thing in your book and

8    in the report?

9              MS. TUCKER:   Object to form.

10   BY MR. BELINFANTE:

11        Q.    It's a yes or no.   Do they mean the same

12   thing or not?

13             MS. TUCKER:   Same objection.

14             THE WITNESS:   Can you ask the question

15   again?

16   BY MR. BELINFANTE:

17        Q.    Does equity-based MTSS mean the same thing

18   in your book that we just talked about as it does in

19   your report on the pages we discussed?

20        A.    Not to be difficult, but there are -- MTSS

21   is considered a continuum of support.   And there are

22   gradations along a wide spectrum of educational

1   practice of what equity-based MTSS is and looks like.

2             And so are these the same words?  Yes.

3   Just like I could say teaching in the book and I

4   could say teaching in the report.  And teaching can

5   look and feel very different, because there is a

6   continuum of what those practices look like in

7   reality in the field.

8        Q.    Sure.  So equity-based MTSS could look

9   different in Mississippi, New Hampshire, Vermont,

10  Oregon, Maryland, for example, than it does in

11  Georgia; is that right?

12       A.    Yes.

13       Q.    And would MTSS look different as it would

14  -- in states like that, as it would in Georgia?

15       A.    I didn't understand what you said.

16       Q.    I was asking about equity-based MTSS in

17  the immediate prior question.  So my follow-up

18  question is, does MTSS look different in Mississippi,

19  New Hampshire, Vermont, Oregon, Maryland, for

20  example, than it would in Georgia?

21       A.    I would hope so.

22       Q.    And how does one determine fidelity to

1    MTSS if it varies by state?

2        A.    There's a number of mechanisms for

3    measuring fidelity of implementation of MTSS.  Some

4    of the tools that I mentioned earlier today help

5    measure, among many other tools.

6        Q.    If a court were to say that Georgia is to

7    implement MTSS, what standards would Georgia look to,

8    to determine fidelity?

9            MS. TUCKER:  Object to form.

10    BY MR. BELINFANTE:

11        Q.    Let me withdraw that question and ask

12    another one.  That's probably fair.

13            In terms of your recommended actions, as

14    they relate to Georgia in implementing MTSS, what

15    fidelity standards are you recommending that Georgia

16    adopt to determine if it is complying with your

17    recommended actions?

18        A.    I would have to reference my report.

19    Specifically, I don't believe I mentioned a specific

20    fidelity measure.  Rather, I made a recommendation

21    that the state consider an effective system of

22    support for meeting the needs of students with



1    disabilities who have -- who experience behaviors

2    associated with those disabilities.

3            Certainly if the opportunity -- if there

4    was the desire of the state to implement a fidelity

5    measure, certainly one could be provided.

6        Q.    Where would -- do you agree that in order

7    to implement MTSS effectively, the state has to

8    believe in MTSS?

9        A.    The state needs -- the state needs to

10   believe that having an educational system of support

11   is important for supporting student need, yes.

12       Q.    Do you have any understanding of what the

13   State Department of Education is doing with regards

14   to MTSS?

15       A.    I did not evaluate the efficacy of MTSS or

16   fidelity within the State of Georgia.  Is that what

17   you're asking?

18       Q.    I think you just answered what was

19   probably my third in line.

20       A.    Oh.

21       Q.    So you've done well.  You've saved us

22   time.



1          A.     I always like that.

2          Q.     Now for the part that nobody likes.  You

3     said that we need an effective system of support to

4     meet needs.  How does one determine effective?

5          A.     Efficacy of outcomes as it relates to the

6     students in the GNETS program, as well as other

7     students, are whether or not students have access to

8     educational opportunities as students without

9     disabilities.

10          And they have the opportunity to

11    experience the traditional schooling experience,

12    where effective and appropriate supports are

13    provided, resulting in outcomes for students that are

14    academically, socially, behaviorally sound.  Happy,

15    happy kids.

16          Q.     So the efficacy of educational services

17    turn, at least in part, on the happiness of the

18    child?

19          A.     Certainly you would hope that a child

20    would be happy.

21          Q.     Well, you would certainly hope they are.

22    But if they're not, is that a fault of the school



1    system and the services provided in that school?

2         A.    That's not what I said.

3         Q.    Okay.

4         A.    What I said is that what determines

5    student success is academic, behavioral, social,

6    emotional, and mental health outcomes that are

7    positive for students.

8         Q.    So in order to determine if Georgia is

9    providing appropriate supports, we look at outcomes.

10   Is that what you're stating?

11        A.    Look at many things.  I'm sorry, I

12   interrupted you.

13        Q.    No, but outcomes is one of the things you

14   look at?

15        A.    That is one of the things.

16        Q.    What other than outcomes?

17        A.    The data early in the report shares some

18   of that, but time in general education, and in

19   effective instruction.

20        Q.    I'm listening.

21        A.    Yeah, I'm looking.  Amount and time of

22   involvement and inclusion with general education with

1    peers, amount of time focused on high expectations

2    and access to quality, or at least appropriate

3    environments, such as cafeterias, gymnasiums,

4    after-school activities, specials, all of the, again,

5    traditional elements of a schooling experience.

6        Q.    Is spending 40 percent of the time in a

7    general education environment, is that deemed

8    indicative of effective supports?

9        A.    That depends, absolutely, on each child.

10       Q.    Okay.

11       A.    And their needs.

12       Q.    So in order to determine the efficacy of

13   services, it's an individualized consideration as

14   well?

15           MS. TUCKER:  Object to form.

16           THE WITNESS:  No.

17   BY MR. BELINFANTE:

18       Q.    So is 40 percent good or not?  At one

19   level, it's not.  At one level, it is.  I'm trying to

20   determine when is it an individualized consideration

21   and when is it a generalized consideration?

22       A.    I'm not sure I understand what your

1    question is now.

2         Q.    If a child is spending, on average, 40

3    percent of their time in general education settings,

4    is that indicative of effective services or is it

5    indicative of not effective services?

6         A.    I don't know that child, so it's

7    impossible for me to say.

8         Q.    So you have to look at the individual

9    student?

10        A.    To what?

11        Q.    To determine the efficacy of services.

12        A.    It's more than that.

13        Q.    Okay.

14        A.    That's one variable.

15        Q.    So the time spent in general education is

16   an individual variable.  What are general variables?

17        A.    That's not what I said.  I'm sorry.

18        Q.    Then please clarify what you said.

19        A.    The variables to indicate the

20   effectiveness, is that what you're asking?

21        Q.    Well, I'm specifically asking about the

22   time spent in general education.  I think you had

1    identified that as one of the things you look at when

2    considering efficacy.

3              So my question is, if a child is spending

4    40 percent of their time in general education, is

5    that indicative of an effective program or an

6    ineffective program?

7        A.    That is not -- there's not a correlation

8    between that.

9        Q.    Okay.

10       A.    Because there are a number of variables

11   that determine whether or not an educational

12   placement is effective.

13       Q.    And those variables are individualized in

14   their -- you have to consider how those variables

15   impact the individual child; is that right?

16       A.    Well, whether or not -- one example I gave

17   is the presence of a cafeteria.  I don't think that's

18   an individual determination.  But a student having

19   access to a cafeteria or a library or after-school

20   activities is important for their growth,

21   development, and success.

22       Q.    All right.



1          A.      So those are the kinds of variables that

2      are important from a systemic perspective for student

3      success that can be correlated with time in a quality

4      educational environment.

5          Q.      Are there reasons, though, that a student

6      would not be given access to a cafeteria, and

7      legitimate, non-discriminatory reasons that they

8      would not be provided access there?

9          A.      A hypothetical student?

10         Q.      Sure.

11         A.      Is there a hypothetical student that, for

12     one reason or another, it would be not in their best

13     interest to access a cafeteria?

14         Q.      Correct.

15         A.      That's right.

16         Q.      Okay.

17         A.      That's very different than a student who

18     can't access a cafeteria because it's not there.

19         Q.      Understood.  And would there be legitimate

20     reasons -- similar question, but as opposed to

21     looking at the individual student who has the

22     emotional/behavioral disability, would there be



1   appropriate reasons for the students in the general

2   zoned school, that that child would not be

3   permitted -- that child with emotional/behavioral

4   disability would not be given access to the

5   cafeteria?

6       A.    Again, another hypothetical?

7       Q.    Right.  And what I'm really getting at in

8   a probably very obtuse way is, is it legitimate, in

9   your professional opinion, to also consider the

10  students in the general zoned school, and not just

11  the student with the emotional/behavioral disability?

12  Does that make more sense?

13      A.    I'm still not able to answer because of

14  the -- the issue.  At first, the question was

15  hypothetical, like, is there ever a circumstance in

16  which there actually is a cafeteria on site, and it

17  would not be in the best interest of a student with

18  disabilities to go into that cafeteria.

19      Q.    Mm-hmm.

20      A.    And that decision is made, and that's

21  fine.  I think the follow-up was whether or not -- do

22  you want to take it from there?



1             MR. BELINFANTE:  And I just realized my

2    mic was under the thing.  Have you been able to hear

3    me okay?

4             THE VIDEOGRAPHER:  Yeah, I just turned you

5    up.

6             MR. BELINFANTE:  All right.  I'm putting

7    it back on.  My apologies.

8             THE VIDEOGRAPHER:  No worries.

9    BY MR. BELINFANTE:

10        Q.    Would it be appropriate in determining

11   whether a student has access to a cafeteria to

12   consider students who are not being segregated from

13   that cafeteria, and the safety or needs of those

14   students?

15            MS. TUCKER:  Object to form.

16            THE WITNESS:  Hypothetically, as an

17   educator, it's my goal and hope that we're always

18   attending to the safety and well-being of students.

19   BY MR. BELINFANTE:

20        Q.    So that would be an acceptable

21   consideration?

22        A.    I don't know.



1       Q.    You're familiar, and you cite in your

2    report -- or I don't know if you cite it, but it's

3    referenced in Appendix E -- and I'll make sure I'm

4    using the supplemental.

5            It looks like it's on the third

6    substantive page, an article from Agran, Kurth,

7    Ryndak, et cetera, from 2020 entitled, "Why aren't

8    students with severe disabilities being placed in

9    general education classrooms?"  Do you see that?

10           MS. TUCKER:  Can you say that again?

11           MR. BELINFANTE:  Sure.  It's on the third

12   substantive page.  It's the first article cited

13   beginning with Agran, M.

14           MS. TUCKER:  Okay.

15           MR. BELINFANTE:  I'm looking at the

16   amended one.

17           MS. TUCKER:  Got it, thank you.  I'm good.

18   Thank you.

19   BY MR. BELINFANTE:

20      Q.    I'm going to show you what I believe is

21   that article.  We'll mark it as Exhibit 4.

22                (McCart Exhibit No. 4 was identified

1                    for the record.)

2    BY MR. BELINFANTE:

3         Q.    My question is, on the first paragraph

4    under Keywords, the second sentence says, "According

5    to the recently published U.S. Department of

6    Education (2018) 40th Annual Report to Congress on

7    the Implementation of the IDEA (The Individuals with

8    Disabilities Education Improvement Act),

9    approximately one half of students with intellectual

10   or multiple disabilities spend less than 40% of their

11   time in regular classrooms per day."

12             Do you see that?

13        A.    I do see that.

14        Q.    Okay.  Have you read the U.S. Department

15   of Education's 40th Annual Report to Congress from

16   2018?

17        A.    I do not recall right now.

18        Q.    Any reason to disagree with Agran, et

19   al.'s description of that report, about 50 percent --

20   or one half of students with intellectual and

21   multiple disabilities spend less than 40 percent of

22   their time in regular classrooms per day?



1          MS. TUCKER:  Object to form.

2          THE WITNESS:  Can you just ask that

3  another way?

4  BY MR. BELINFANTE:

5      Q.    Sure.  I mean, do you disagree with their

6  description of the report?

7      A.    I do not disagree with their description

8  of that report.

9      Q.    They go on to say, and this is the next

10  sentence, furthermore, to the extent -- or excuse me,

11  "Furthermore, the extent to which students with

12  severe disabilities are provided access to the

13  general education classroom has remained largely

14  stagnant for the last decade."

15          Understanding this was written in 2020, do

16  you disagree with that statement?

17      A.    I don't disagree with the fact that they

18  wrote that sentence.

19      Q.    Do you disagree with their conclusion in

20  that sentence?

21      A.    I would need to look at the data that they

22  looked at.



1       Q.    It then says, "Nationwide, placement

2   practices for these students continue to remain

3   'distinctly separatist,' and discussions about their

4   inclusion in general education classes often become

5   'highly contentious.'"

6            Do you agreed with their conclusion that

7   placement practices for these students continue to

8   remain distinctly separatist, at least as of 2020?

9       A.    I'm not sure how they're defining

10  distinctly separatist.  But since they put quotations

11  around it, as is the practice, they're likely citing

12  the authors below, Connor and Ferri.  And since I

13  don't know what their definition of that means, I

14  can't speak to that.  If you have that article, I

15  could look.

16      Q.    I don't have that article.  But you do

17  cite this article as something that informed your

18  report, correct?

19      A.    Yes.

20      Q.    Do you agree with their statement that

21  discussions about inclusion in general education

22  classes often become, quote, highly contentious?



1    A.    Again, the same thing I mentioned before.

2  Highly contentious as determined by Connor and Ferri

3  in 2007.  I just -- I don't know how they're defining

4  that.

5    Q.    Is it your experience that it's highly

6  contentious, not using Connor and Ferri's terms, but

7  using your own terms?

8    A.    No.

9    Q.    Is it your experience that providing

10  access to general education classrooms for students

11  with severe disabilities has remained stagnant from

12  roughly 2010 to 2020?

13    A.    Again, I would need -- on that one, I need

14  to look at the data set that they looked at to make

15  that determination.

16    Q.    So sitting here today, you can't tell us

17  if there's been progress made in integrating students

18  with severe disabilities into general education

19  classrooms from 2010 to 2020?

20    A.    I didn't say that.

21    Q.    Is it your opinion that there has been

22  progress, or is it your opinion that it has been



1    stagnant from 2010 to 2020?

2        A.    All right.  So you're asking if students

3    with disabilities --

4        Q.    Severe disabilities.

5        A.    In my opinion, whether or not students

6    with severe disabilities have --

7        Q.    We'll move on.  That's fine.

8        A.    I'll just point out that the student

9    population you're referencing here, students with

10   intellectual and multiple disabilities is a specific

11   population of students.

12       Q.    Okay.

13       A.    Some of which are included in -- some of

14   which have labels that are similar to students in the

15   GNETS program, many of which don't.

16       Q.    But they don't define the terms here.  So

17   how are you confident in what it means here, but

18   you're not confident in what stagnant means or

19   distinctly separatist?

20       A.    Good question.  The distinction is because

21   of the quotation marks, because they're citing

22   somebody specific.  And that means they're



1    referencing another article in which that information

2    is not provided here, whereas the construction of

3    intellectual disabilities and multiple disabilities

4    is commonplace in the field.

5         Q.    And where would one look for those

6    definitions?

7         A.    A number of places.

8         Q.    You don't rely on the Connor and Ferri

9    article, it appears, based on exhibit A -- or excuse

10   me, Appendix E, amended?

11        A.    I -- did I cite that one?

12        Q.    You did not.

13        A.    Then likely no.  Let me turn to the back

14   of this article.  A bit of a rabbit hole.

15        Q.    Would you not agree with me, though, that

16   if, nationwide, students with severe emotional

17   disabilities are spending less time in a general --

18   or spending 40 percent or less time in a general

19   education classroom, that that would speak to the

20   reasonableness of applying a bright line approach?

21        A.    What's a bright line approach?

22        Q.    A per se approach, an all-in approach.

1        A.      I don't know what you mean at all.

2        Q.      A generalized approach.

3        A.      I really don't.  I'm lost.

4        Q.      How much time did you spend in each

5    classroom that you visited, on average?

6        A.      Are we done with this?

7        Q.      We're done with that, yes.

8        A.      Okay.

9        Q.      On average, when you visited a GNETS

10   facility, how much -- or school, how much time did

11   you spend, on average, in the classroom?

12       A.      It varied.  Anywhere from 10 minutes to 90

13   minutes, dependent on the classroom, the

14   circumstances, the site.

15       Q.      Who -- and when you say on the

16   circumstances, who is it -- who created those

17   circumstances?  In other words, was that your

18   decision to stay 10 to 90 minutes, or was that an

19   agreement reached with the school, do you know?

20       A.      It was a mix of variables.  Certainly I

21   had the ability to determine length of stay within

22   the confines of the site visit protocol that was



1   established.  And so I followed that protocol.

2          And then if anything occurred in the

3   environment, like a teacher was needing a moment or a

4   student was needing something, or whatever,

5   contextually, based on my experience, that I thought

6   it was, you know, time to step out and maybe come

7   back later, I would do so.

8      Q.    Okay.  In your review of students who are

9   receiving services through GNETS, did you find anyone

10  who was receiving those services for whom their IEP

11  team did not recommend that they receive services in

12  GNETS?

13     A.    I'm sorry to have to ask you to repeat

14  that.

15     Q.    Sure.  Of the students who you reviewed

16  that received GNETS services, did you see or find an

17  occasion where a student was receiving services

18  through the GNETS Program, and that student was not

19  recommended for GNETS services by their IEP team?

20     A.    I did not review all of the IEPs for every

21  student in the GNETS program, so I cannot speak to

22  that.  If you're asking whether or not the



1    recommendation was made for each IEP that I did

2    review, I cannot recall right now, sitting here.  I'd

3    need to take a look at those to see if there were

4    recommendations made differently by the IEP team.

5        Q.    Do you understand -- is it your

6    understanding that in order for someone to receive

7    services through GNETS, there has to be a

8    recommendation from their IEP team to do so?

9        A.    There is a referral process to GNETS that

10   includes that an IEP determine that that would be an

11   appropriate placement.

12       Q.    Is it your understanding that that

13   determination -- and you may have said this, I'm just

14   asking for the record.  Is it your understanding that

15   that IEP team recommendation is a requirement to

16   receive services through a GNETS program?

17       A.    I believe that it is part of the

18   pre-referral process to -- or the referral process to

19   the GNETS program.  Whether or not it's a

20   requirement, I don't know.

21       Q.    And so I understand that, sitting here

22   today, you can't recall any instance where a student

1    was receiving services through a GNETS program, and

2    that student's IEP did not recommend that they

3    receive GNETS services?

4        A.    I don't recall, one way or another.  I'd

5    have to review the students' IEPs again.

6        Q.    Would that concern you if a student was

7    receiving services in GNETS, and it was not

8    recommended by their IEP team?

9        A.    Yes.

10       Q.    Let's look at page 6 of your report.  It's

11   actually page 7, where you provide a series of

12   definitions.  My specific question is about the

13   definition of unfair, which you define as describing

14   "situations that are not right or fair, according to

15   a set of principles, rules, or standards.  Synonyms

16   of unfair include one-sided, discriminatory, unjust,

17   or inequitable."

18            What are the set of principles, rules, or

19   standards that you applied in reaching the

20   conclusions of your report?

21       A.    Are you asking something about unfair?

22       Q.    Well, yeah, because unfair includes, it's

1    not right or fair according to a set of principles,

2    rules, or standards.  I'm just trying to figure out,

3    when you made a determination that something was

4    unfair, which set of principles, rules, or standards

5    did you apply?

6          A.     Okay, I'm following you now.

7          Q.     Okay.

8          A.     Probably the best way to understand the

9    distinction between unfair and unequal, for example,

10   is unequal would be this group of students over here

11   has a playground, and this group of students does not

12   have a playground.  And from my perspective, that's

13   unequal.  One has something, the other doesn't have

14   something.  And I'm getting to your question.

15          Unfair, from my perspective, would be this

16   group of students has a playground, but this -- and

17   this group of students also has a playground, but

18   that playground is much smaller, of less quality,

19   of -- is in bad shape or is fenced in the middle of a

20   larger playground, as is the case at one site.  And

21   that is unfair because those students are there

22   observing other students playing on a playground in

1    which they have all they need.  That's kind of a

2    working definition of how I distinguish between

3    unequal, unfair.

4                As it relates to what was included in the

5    report, unequal would be -- or equal would be items

6    such -- items, occurrences, events, things,

7    experiences that are typical in general education

8    and/or -- general education, in which students with

9    disabilities also participate.  Whereas, fairness

10   would be whether or not those students have the

11   ability to participate in those experiences.  So I

12   don't know if that got to where you wanted.

13        Q.    Not so much.

14        A.    Okay.

15        Q.    I appreciate it.

16        A.    Let's go again.

17        Q.    It may have shortened some other

18   questions, so I mean, it's fine.

19        A.    Okay.

20        Q.    But I think that the question is probably

21   a bit theoretical anyway, so we can just move on.

22                You brought up playgrounds.  Do you have

1    any understanding of the distinctions between local

2    and state governments as it relates to providing

3    playgrounds?  And by providing, I mean making the

4    decision to use dollars to build playgrounds or

5    update them, repair them, whatever else.

6          A.    I know that it's common in schooling

7    experience for students to have access to playgrounds

8    and gymnasiums, cafeterias, libraries, et cetera.

9          Q.    Right.  But my question is, do you have an

10   understanding as to whether LEAs or state government

11   in Georgia make the decision on where to invest the

12   dollars on playgrounds or gymnasiums, et cetera?

13         A.    I do not, no.

14         Q.    Okay.  Is it your understanding that LEAs

15   and -- let me back up a second.

16              Are you familiar with the term RESA?

17         A.    Yes.

18         Q.    Okay.  Is it your understanding that LEAs

19   and RESAs are legally mandated to apply for GNETS

20   grants?

21              MS. TUCKER:  Object to form.

22              THE WITNESS:  I do not know what they're

1    legally required to do.

2    BY MR. BELINFANTE:

3        Q.    Is it your understanding that there is

4    anything in Georgia that compels LEAs and RESAs to

5    apply for GNETS grants?

6        A.    Can you ask that again?

7        Q.    I think we're fine.  I'll move on.

8        A.    Okay.

9        Q.    In your review of students in GNETS, did

10   you find in any case where someone employed by the

11   State Department of Education mandated that a child

12   receive services from GNETS?

13       A.    Are you asking if a state representative

14   of the State Department identified an individual

15   child and mandated that they receive services?

16       Q.    Mm-hmm, through GNETS.

17       A.    I'm not aware of that.

18       Q.    Okay.  The same question, did you find

19   that from an employee of the Department of Community

20   Health?

21       A.    No.

22       Q.    And the same question.  Did you find that

1    from an employee of the Department of Behavioral

2    Health and Developmental Disabilities?

3         A.    No.

4         Q.    You cite a series of articles in your

5    report on page 3 to 6.  Do you see that?

6         A.    Yes.  I'm sorry, yes.

7         Q.    No, that's fine.  Let's look at page 4.

8    The first full paragraph starts with, "When students

9    with disabilities are educated outside the general

10   education setting, in separate buildings, wings,

11   rooms, or isolated settings of any kind, they

12   experience a number of adverse outcomes across

13   academic, social, emotional, and behavioral

14   detriments."

15             Do you see that?

16        A.    Mm-hmm.

17        Q.    And you cite the -- is it Ennis?

18        A.    Mm-hmm.

19        Q.    Okay, Ennis and Katsiyannis; is that

20   correct?

21        A.    That's very good.

22        Q.    2017 article for that proposition.

1              MS. TUCKER:  I just want to correct, it

2    was "behavioral determinants."

3              MR. BELINFANTE:  Okay.  Thank you.  What

4    did I say this time?

5              MS. TUCKER:  Detriments.

6    BY MR. BELINFANTE:

7        Q.    If a student is experiencing adverse

8    outcomes across academic, social, emotional, and

9    behavioral determinants, are they being denied a

10   FAPE, in your professional opinion?

11       A.    I don't know how to apply the construct of

12   FAPE to this sentence here.

13       Q.    Okay.  Let me show you what we'll mark as

14   Exhibit 5.

15              (McCart Exhibit No. 5 was identified

16              for the record.)

17   BY MR. BELINFANTE:

18       Q.    Is this the article that you are citing on

19   page 4?

20       A.    In order to answer that question, I'm

21   going to the list of considered documents, Appendix

22   E.

1        Q.    Right.

2        A.    I'm going to the citation that begins --

3   comparing author names, because sometimes they write

4   more than one in a year.  And, yes, it appears that

5   it is.

6        Q.    Okay.

7        A.    Yep, it is.

8        Q.    Okay.  Would you agree with me that this

9   article that you cite for that conclusion is about

10  the IDEA, and not the ADA?

11       A.    I would need to read the article, but IDEA

12  is in the title.

13       Q.    And what the article is talking about is

14  the denial of FAPE, because that's an IDEA concept,

15  correct?  Stop, let me rephrase.

16            The denial of FAPE is an IDEA concept;

17  isn't that right?

18            MS. TUCKER:  Object to form.

19            THE WITNESS:  You're asking, is FAPE

20  included in the IDEA?

21  BY MR. BELINFANTE:

22       Q.    Is it an analysis of IDEA or mandated by

1    the IDEA, yes.

2              MS. TUCKER:   The same objection.

3    BY MR. BELINFANTE:

4        Q.    In other words, if someone were to apply

5    the IDEA, do you look toward, among other things,

6    sure, but do you look towards whether a student is

7    receiving a FAPE?

8              MS. TUCKER:   The same.

9              THE WITNESS:   Again, from an educator

10   perspective, the implementation of FAPE is included

11   as part of IDEA.

12   BY MR. BELINFANTE:

13       Q.    Okay.   On page 306 of this article.   306,

14   sorry, of Exhibit 5.

15       A.    And is it, like, 302 or --

16       Q.    306 of the article itself.

17       A.    306?

18       Q.    Yes.

19       A.    Okay.

20       Q.    Using the article's paginated numbers.   In

21   the second column, the last sentence starts, "School

22   personnel are allowed to exercise professional

1    judgment in addressing performance concerns" --

2        A.    Pause, pause, because I don't want you to

3    read it all before I find it.  Where?

4        Q.    Second column, right there at the bottom.

5        A.    And the sentence starts?

6        Q.    "School personnel."

7        A.    Got it.

8        Q.    "School personnel are allowed to exercise

9    professional judgment in addressing performance

10   concerns by implementing instructional and behavioral

11   interventions without referral for eligibility under

12   IDEA."

13            Do you see that?

14       A.    Yes.

15       Q.    Do you agree with that statement,

16   generally?

17            MS. TUCKER:  Object to form.

18            THE WITNESS:  Are school -- I think, are

19   you asking, are school personnel allowed to implement

20   behavioral and instructional interventions for

21   students without eligibility for IDEA?

22   BY MR. BELINFANTE:



1      Q.     Yes.

2      A.     Yeah.

3      Q.     Okay.  Going back to your report, the next

4   sentence in that first full paragraph after the

5   citation we just discussed, it begins, "Conversely,

6   when" --

7      A.     Page?

8      Q.     Page 4.

9      A.     Okay.

10     Q.     First full paragraph, second sentence.

11  "Conversely, when served in inclusive general

12  education classrooms and environments, students with

13  disabilities show growth in academic outcomes,"

14  citing Kurth and Mastergeorge from 2010.  I know it

15  goes on, but I'm going to ask about Kurth and

16  Mastergeorge first.

17            And I'll show you what we'll mark as

18  Exhibit 6.

19                 (McCart Exhibit No. 6 was identified

20                  for the record.)

21  BY MR. BELINFANTE:

22     Q.     This is the 2010 article cited in your

1    report, correct?

2         A.    I'll have to -- hang on.  Well, I'm not

3    sure, but go ahead and ask your question.

4         Q.    The study that this article talks about,

5    and you can see it on page 147, which is the second

6    page of the article under Method.

7         A.    Mm-hmm.

8         Q.    "Five special education teachers and 15

9    adolescents with autism participated in the study."

10              Do you see that?

11        A.    Yes.

12        Q.    And then it goes on to say, "three school

13   districts were ultimately enrolled in the study,

14   although six districts were contacted.  The districts

15   contacted represent diverse student populations and

16   methods of educating students with autism in Northern

17   California."

18              Do you see that?

19        A.    Yes, I do.

20        Q.    Okay.  So is it your recollection that

21   this article, from which you base that conclusion,

22   cites 15 students in Northern California?

1          A.     I do not know.  I would need to look at

2    the results section.

3          Q.     Okay.  Going back to your report, page 4.

4    The provision about increased social interactions

5    cites the Lyons, Cappadocia, Weiss study from 2011.

6          A.     Uh-huh.

7          Q.     I may need to get -- let me -- I'll move

8    on from that.  I need to get copies of that.

9               Would it surprise you if that study looked

10   at autism only, the Lyons, Cappadocia, and Weiss from

11   2011?

12         A.     No.

13         Q.     In your -- do you have any professional

14   training in statistics?

15         A.     Yes.

16         Q.     Do you consider a study of 15 students in

17   Northern California to be a sufficient sample size to

18   make a statement that students with disabilities show

19   growth in academic outcomes?

20         A.     There are a number of variables that

21   determine whether or not statistical significance can

22   be stated using a variety of measures.  Whether or



1    not the article that you're referencing has

2    statistically significant outcomes, I would need to

3    look.  Certainly it is well-documented in over 30

4    years of literature that students with disabilities

5    have better academic outcomes when in general

6    education.

7         Q.    But, Dr. McCart, you cited Kurth and

8    Mastergeorge, right?

9         A.    That is one article that I cited, yes.

10        Q.    And that's one article about 15 kids with

11   autism in Northern California, correct?

12        A.    I haven't read the article.  If you'd

13   like, I could read the results section and --

14        Q.    Well, I just presumed if you put it in

15   here, you were standing by it, and you would be

16   familiar with it.

17        A.    I am familiar with it.

18        Q.    Then you can answer the question.

19        A.    I can't answer a question --

20        Q.    15 kids in Northern California with

21   autism, correct?

22        A.    I thought we weren't going to interrupt

1   each other.

2        Q.    Continue, I'm sorry.

3        A.    If you would like me to answer the

4   question that you're asking, I need to read the

5   results section.

6        Q.    Do you need to read the results to

7   determine the cohort used?

8        A.    I don't know, because I haven't seen what

9   they've said about who they studied, and what they've

10  done.  So you're asking me to guess.

11       Q.    I'm asking you to explain your report.

12  I'm not asking you to guess anything.

13       A.    I can explain in my report that this

14  article, among others, indicate that students have

15  adverse outcomes across academic, social, emotional,

16  and behavioral determinants.

17       Q.    Jennifer Kurth, does she work with you

18  still at SWIFT?

19       A.    Jennifer Kurth is the chair of the

20  Department of Special Education, but -- chair of the

21  Department of Special Education at the University of

22  Kansas.



1    Q.    Does she work with you professionally?

2    A.    We have worked together, yes.

3    Q.    Did you consult her on your report?

4    A.    No.

5    Q.    Let's go back to your -- what is your

6    training in statistical analysis?

7    A.    I'm a senior researcher at a Research I

8    university in the top rated -- one of the top rated

9    universities in special education.  And that includes

10   a comprehensive and thorough course load and

11   experience in conducting large-scale, systemic

12   reviews, including statistical analyses.

13   Q.    And what is your training that has

14   provided you an opportunity to do that?

15   A.    A doctoral degree.

16   Q.    In statistics?

17   A.    A doctoral degree in special education, in

18   which statistical analyses and statistical courses

19   are part of that process.

20   Q.    Hypothetically, in your experience

21   involving statistics, would a study about 15 students

22   with autism in one area of one state constitute a

1    statistically significant sample?

2        A.    It very well could, yes.

3        Q.    And on what basis could it?

4        A.    Hypothetically, it could be any number of

5    things.

6        Q.    What does statistically significant mean

7    to you?

8        A.    Sitting here, I can't recall the specific

9    definition, because it is deeply complex, and it can

10   include variables, such as different methodologies,

11   different variables, different independent, dependent

12   variables.  It can -- the -- how the sample was

13   selected.  A variety of other elements can determine

14   statistical significance.

15       Q.    Forgive me, because this is probably in

16   your CV, and I just don't know the answer.  Were

17   you -- in 1990, when the ADA passed, where were you

18   at that time in your career?  For all I know, you

19   were in high school.  So, like, don't misunderstand.

20       A.    Yeah, let's go with that.  No, I had

21   children by then.  Let's see where I was in my career

22   in 1990.



1      Q.    It looks like you had graduated, I guess,

2  from the University of Kansas with a bachelor of

3  science.

4      A.    Yes.  And let's see, a few -- a few

5  statements.  I had a bachelor's degree from the

6  University of Kansas as part of the Department of

7  Applied Behavioral Sciences, with an emphasis on

8  human development and family life, with a focus on

9  students who had behavioral disabilities.

10      Q.    That's sufficient.  I don't need to get

11  into all the details.  I honestly was trying to

12  remember, like, if you had graduated college or truly

13  were in high school or something else.  But that's

14  fine.

15      A.    Well, thank you.  I want to add just a

16  little bit more, in that I was working in an

17  organization -- because it's relevant, I think, to

18  what you're saying.  I was working in an organization

19  that supports adults and students who have

20  significant disabilities, with a particular emphasis

21  on students who had a variety of different behavioral

22  disabilities.



1          Q.     Are you aware that the ADA passed in 1990,

2    thereabouts?

3          A.     I don't recall the dates right now.

4          Q.     Do you know if the ADA has been updated

5    since it passed originally?

6          A.     I do not recall --

7                 MS. TUCKER:   Object to form.

8    BY MR. BELINFANTE:

9          Q.     And just for the record, are you aware of

10   whether or not Congress has amended the ADA since

11   1990, or its original passage?

12         A.     I don't recall right now.  I know I know

13   these things, but sitting here right now, I can't

14   pull it off the top of my head.

15         Q.     Okay.  Do you know if the IDEA has been

16   amended by Congress since it originally passed?

17                MS. TUCKER:   Object to form.

18                THE WITNESS:   Again, I should know this,

19   and I may know this, but I can't recall dates right

20   now.

21   BY MR. BELINFANTE:

22         Q.     Okay.  Do you recall, sitting here today,

1    if the No Child Left Behind legislation addressed

2    special education?

3         A.    I can say that regarding IDEA, ADA,

4    implementation of No Child Left Behind, as well as a

5    number of other educational policies and practices,

6    that my understanding of those are very much related

7    to implementation of those in the field.

8         Q.    Okay.

9         A.    So although I may not recall, sitting here

10   today, the exact date or time in which a specific

11   policy, or law, or et cetera changed or transpired,

12   or whatever else, I can speak in great depth about

13   what that looks like to be implemented in the field.

14        Q.    Okay.  And I guess, is that also true for

15   the Every Student Succeeds Act, which passed in 2015?

16        A.    That is also true for that.

17        Q.    Okay.

18        A.    That's one place you can look for a

19   definition of MTSS.

20        Q.    Okay.

21             MR. BELINFANTE:  What time do you all want

22   to break for lunch?



1                    (Discussion held.)

2                    THE VIDEOGRAPHER:  Off the record at

3      12:36.

4                    (Whereupon, at 12:36 p.m., the testimony

5      in the above-entitled matter was recessed, to

6      reconvene at 1:15 p.m., this same day.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1                        AFTERNOON SESSION

2                            (1:15 p.m.)

3         EXAMINATION BY COUNSEL FOR DEFENDANT (RESUMED)

4                  THE VIDEOGRAPHER:  On the record at 13:15.

5    BY MR. BELINFANTE:

6         Q.    If I could draw your attention -- let me

7    ask this first.  And I think part of it is -- I asked

8    before.  Did you review most students' in GNETS IEP?

9    Let me rephrase.

10                Did you review the IEP of most students in

11   GNETS?  That's probably a clearer way of asking.

12        A.    I reviewed -- out of the almost 3,000

13   students in the GNETS program, I reviewed somewhere

14   between 65 to 100 IEPs.

15        Q.    And you would agree with me, that is not

16   the vast majority of students in the GNETS program,

17   correct?

18        A.    That is not the vast majority of the

19   students in the GNETS program.

20        Q.    Would you agree with me that students in

21   the GNETS program, there are certainly students who

22   are receiving GNETS services who have autism, but

1   there are also students in the GNETS program who do

2   not have autism.  Would you agree with that?

3       A.     Yes.

4       Q.     Okay.  Let's look at page 157 of your

5   report, Exhibit 1.  At the bottom of the page under

6   opinion in finding 3, the last full sentence reads,

7   they are even more concerning when one considers --

8   sorry.  "They are even more concerning when one

9   considers that the placement of most students in the

10  GNETS program is unnecessary."

11          Do you see that?

12      A.     No.  Where are we at?

13      Q.     Page 157, bottom of the page.

14      A.     Oh, yeah, I see it.

15      Q.     Okay.  So if you did not read most IEPs,

16  what was the basis of your conclusion that most

17  students in the GNETS program, the placement there is

18  unnecessary?

19      A.     Given my extensive experience and

20  understanding of students with disabilities,

21  behavior-related disabilities, autism, and other

22  needs, I am aware of the appropriate supports and

1    services that can be put in place in order to support

2    students in an environment in which they have equal

3    -- or fair and equal access to those opportunities.

4            And as I said earlier today, one

5    indication of whether or not segregation is necessary

6    or unnecessary is related to the IEP.  The other is

7    about what services and supports are provided in

8    order to make -- to have successful educational

9    placements for students.

10    Q.    Would you agree with me that if the full

11    panoply of services that you would support are being

12    provided, there are still some students who could --

13    even if they had access to those services, would

14    still need a segregated educational environment?

15    A.    I -- I don't know your definition of

16    "panoply," although that's a fun word.  Just saying.

17    Q.    I've got more fun words.

18    A.    But even if the full array of supports and

19    services were being provided, certainly there are

20    some students, under certain conditions for certain

21    periods of time, that do need placements in which

22    there are smaller numbers of students and away from



1   general education.

2        Q.    And if you could turn to page 159 of your

3   report, the last full paragraph that starts with,

4   "With any student population across the country."

5        A.    159.    And which --

6        Q.    I'm going to ask a question about this

7   last full paragraph that starts, "With any student

8   population across the country."

9        A.    Mm-hmm.

10        Q.    Certainly feel free to get there.    My

11   question is going to be about the sentence that

12   starts, "There are a small number of the nearly 1,000

13   students I observed who had very serious and extreme

14   behaviors that require highly specialized teaching

15   and behavioral support."    But I didn't know if you

16   wanted -- I can ask the question now.

17        A.    Are you -- so you're saying with any

18   student -- I'm saying with any student population

19   across the country, there are a small number of

20   students who have very serious extreme behaviors that

21   require well trained, highly specialized teaching and

22   behavior support, including carefully planned

1    schedules of interaction with others in order for

2    them to experience success.

3        Q.    My question is about the sentence after

4    the one after that.

5        A.    Okay.

6        Q.    Which is, "There are a small number of the

7    1,000 students I observed who have very serious and

8    extreme behaviors that require highly specialized

9    teaching and behavioral support."

10            MS. TUCKER:  I just want to jump in, it

11   was "nearly 1,000 students."

12   BY MR. BELINFANTE:

13       Q.    Nearly 1,000 students.

14       A.    Yes.  And it says the same is true in the

15   GNETS program, that there are a small number of

16   students who require highly specialized teaching and

17   behavior support.

18       Q.    And that's based on your observations from

19   10 to 90 minutes of students; is that correct?

20       A.    It's based on my observation of students.

21   It's based on my examination of individual student

22   records, including IEPs.  It's based on my review of



1    -- year over year of student documentation regarding

2    support and need.  It's based on my review of parent

3    documentation, incident reports, among other

4    documents.

5            It's also based on the fact that I've

6    spent an extensive period of time working with

7    students with a full range of behavior needs, but in

8    particular, with students who have very significant,

9    challenging behavior.  Therefore, I am adept at

10   identifying student need in as small a window as ten

11   minutes to up to, in the case of these observations,

12   90 minutes.

13        Q.    So do you have any -- can you point to

14   any -- because there's none cited.  Can you point to

15   any peer-reviewed articles that would say you can

16   observe what a child needs in ten minutes of

17   observation?

18        A.    I can -- well, I don't accept the premise

19   of what you're asking.

20        Q.    You just told me you could observe someone

21   within ten minutes and make a decision as to what

22   they needed.



1      A.    Based on the observations that I did, my

2  extensive experience in the field, my deep

3  understanding of students who have significant

4  behavioral needs, as well as the documents I

5  reviewed, the depositions I reviewed, and all of the

6  other supporting information, I feel very comfortable

7  in making the statement that I made here.

8      Q.    And my question is, can you point to me

9  any peer-reviewed article where someone says, you can

10  determine, based on watching someone for ten minutes,

11  what their needs are, and their appropriate needs are

12  in terms of services and therapeutic supports?

13      A.    There are thousands of peer-reviewed

14  articles.  And if you would like me to look for one

15  that talks about the length of observation time, it

16  varies over -- there's all kinds of indicators of

17  what are appropriate regarding classroom

18  observations.  You can take within a ten-minute time

19  period, sir, by way -- are you with me?

20      Q.    I'm listening.

21      A.    By way of example, within a ten-minute

22  time period in a given classroom, particularly if



1    there's a small number of students in the classroom,

2    you can observe levels of engagement of the students

3    in the classroom, numbers of problem behaviors,

4    communication styles, teaching interaction, response

5    to teaching interaction, et cetera.

6        Q.    And from that ten minutes -- well, first

7    off, can you point to me any article cited in

8    Appendix E, amended, that says what you just

9    described?

10       A.    Says what?

11       Q.    That you could observe in ten minutes what

12   someone's appropriate services would need to be?

13   Because this is what you relied on for your report.

14   So can you show me anything that's cited in here that

15   says, within ten minutes, you could make that

16   determination?

17       A.    I would have to look.

18       Q.    Okay.

19       A.    Let me do so.  I don't know if I included

20   classroom observation peer-reviewed articles.

21            It will take me a minute to read all of

22   the articles I've listed here, to determine whether

1    or not I included one that talked about the amount of

2    time it takes to assess a classroom environment.

3         Q.    If an IEP team member spent ten minutes

4    with a student, would you find that to be sufficient

5    time to make a recommendation?

6         A.    To make a recommendation on what?

7         Q.    As to whether that student needed -- what

8    types of services and supports would be appropriate

9    for that student?

10        A.    So the question again is?

11        Q.    If an IEP team -- if the members of an IEP

12    team spent ten minutes with a student, would you feel

13    confident in their recommendation for that student,

14    that they could be educated in a general education

15    setting or a separate education setting?

16        A.    No.

17        Q.    And you would agree with me that in the

18    ten minutes you observed a child, you don't have

19    access in that ten minutes to their medical file,

20    correct?

21        A.    No.

22        Q.    Could you turn to page 167 of your report?

1       A.    Am I done looking for peer-reviewed --

2       Q.    We can come back to it.  That's fine.

3       A.    Where are we?

4       Q.    I'm sorry, page 167.

5       A.    Okay.  Mm-hmm.

6       Q.    In the paragraph under Conclusion, midway

7  through, there is a sentence that starts, "Year after

8  year."

9       A.    Yes.

10      Q.    Okay.  "Year after year, the state has

11 encouraged and perpetuated this idea by dedicating

12 over $60 million to the GNETS program (most of which

13 are state funds), despite its gross lack of

14 educational opportunities, adequate resources, and

15 appropriate supports."

16           Do you see that?

17      A.    I do see that.

18      Q.    Okay.  How has the state encouraged the

19 idea, which I believe is -- I should have probably

20 gone the sentence above.  It says, "the GNETS program

21 is based upon the idea that segregating mass amounts

22 of students with behavior-related disabilities is

1    necessary in order to offer them intensive social,

2    emotional, and behavioral therapeutic services and

3    supports."

4            It then continues to the sentence that I

5    read a moment ago.  "Year after year, the state has

6    encouraged or perpetuated this idea by dedicating

7    over $60 million to the GNETS program (most of which

8    are state funds), despite its gross lack of

9    educational opportunities, adequate resources, and

10   appropriate supports."

11           How has the state's appropriation of funds

12   perpetuated an idea?

13           MS. TUCKER:  Object to form.

14   BY MR. BELINFANTE:

15       Q.    Or how has the state's appropriation of

16   funds perpetuated the idea that you describe on page

17   167 of your report?

18       A.    By dedicating over $60 million to it.

19       Q.    How has that perpetuated an idea?

20       A.    By supporting a system of systemic

21   segregation for multiple students in the GNETS

22   program year after year after year, and continuing to



1    allocate 60 million or more funds to that.  That is

2    perpetuating an ineffective system.

3         Q.    Does the state require local education

4    agencies to apply for GNETS grants?

5         A.    I don't know.

6         Q.    So if you don't know, then how do you

7    blame the state for perpetuating a system if you

8    don't know that the LEAs are the ones that are

9    applying for the grants?

10              MS. TUCKER:  Object to form.

11              THE WITNESS:  I don't know what you're

12   asking.  Can you try --

13   BY MR. BELINFANTE:

14        Q.    Well, you said that the state perpetuates

15   a system.

16        A.    By funding it.

17        Q.    By funding it.  My question is -- and so

18   then I asked, do the local education agencies have to

19   accept the funding?  Your answer is, I don't know,

20   correct?

21        A.    I don't know what you're asking.

22        Q.    I'm asking, do the LEAs have to accept any

1    of the $60 million appropriated by the Georgia

2    General Assembly for the GNETS services?

3          A.    I do not know.

4          Q.    So then how do you know or opine that the

5    state has encouraged and perpetuated an idea that you

6    described?

7          A.    Because of what I've already said.

8    There's a program in the state, across the state,

9    over 24 regions within the state, in which over $60

10   million or more has been continually committed to

11   that program year after year.  That's how.

12         Q.    Is the state mandating the program?

13         A.    I don't know.

14         Q.    Do you know if there's federal funds that

15   are also going to GNETS?

16         A.    I do not know.

17         Q.    Well, it says, "most of which are state

18   funds."  So you don't know if there's any federal

19   dollars going to the GNETS program?

20         A.    I do not know.

21         Q.    Isn't it true that this is a cause for

22   you, integration of students?



1        A.    This is a cause for me?

2        Q.    Yes.

3        A.    What do you mean?

4        Q.    I mean, you just said earlier it's your

5    life's work.  Page 167 says it's your "fervent belief

6    and expert opinion that these students do not need to

7    be segregated to be effectively served."

8             MS. TUCKER:  Where is that?

9             MR. BELINFANTE:  Page 167, two sentences

10   after -- or one sentence after what I just said.

11            THE WITNESS:  Are you asking a question

12   about cause, or are you asking a question about --

13   BY MR. BELINFANTE:

14       Q.    You say it's your fervent belief.  Why

15   don't you tell me what you mean by fervent belief.

16       A.    It's my fervent belief and expert opinion

17   that these students -- and I'm referencing students

18   currently in the GNETS program -- do not need to be

19   segregated to be effectively served.  The vast

20   majority of them can and should be served in

21   integrated settings with appropriate services and

22   support, where they are more likely to experience

1    social, emotional, behavioral, and academic success.

2            What I'm referencing here is the fact that

3    I went on over 70 site visits, hundreds of

4    classrooms, over 18 months of time, observing nearly

5    a thousand students.  And based on my expert opinion,

6    I do not believe that these particular students need

7    segregation en masse across the state.

8        Q.    And of that -- that is based -- okay, I

9    think I've asked that question.

10           Let me ask you to turn to page 157.  The

11   top of the page, first full paragraph, last sentence.

12   "It is clear that the State of Georgia contributes to

13   this hopelessness by maintaining the GNETS program in

14   its current form and failing to provide opportunities

15   for these students to succeed in their home schools."

16           Do you see that?

17       A.    I do see that.

18       Q.    Okay.  What is the State of Georgia doing

19   to maintain -- let me back up.

20           What is the State of Georgia Department of

21   Education doing to maintain the GNETS program in its

22   current form?



1      A.    That sentence comes at the end of a

2   section on hopelessness, in which I highlight some of

3   the most devastating experiences of involvement with

4   students that I've seen over the course of my career,

5   including students crying and begging to leave

6   classrooms.

7          And many of these students have been in

8   this program for more than five, six, seven years,

9   year after year after year, which is what I

10  referenced at the end of the report.  The State

11  Department of Education is supposed to provide a

12  vision, guidance, professional learning, support,

13  teaching, effective practices for LEAs and schools

14  across the state.

15         It is not intended to support a systemic

16  system of segregation for students with

17  behavior-related disabilities in programs that aren't

18  even schools.  Page 20.

19     Q.    What is the Department of Education

20  specifically doing to maintain the GNETS program in

21  its current form?  Can you point to me a specific

22  action?



1        A.    All of the things I just said.

2        Q.    You said it's supposed to --

3        A.    They are funding a -- oh, I'm sorry, go

4    ahead.

5        Q.    No, no, go ahead.

6        A.    They are funding a program that supports

7    systemic segregation across the state, 24 regions

8    across the whole state.

9        Q.    If I told you that the United States

10   Department of Education funds are also going to

11   GNETS, is the United States Department of Education

12   also responsible for what you describe as unnecessary

13   segregation?

14       A.    I don't know about that.

15       Q.    I'm asking you to presume that the United

16   States Department of Education funds are going to

17   GNETS.  If that presumption is true, is the United

18   States Department of Education causing unnecessary

19   segregation in the State of Georgia by funding the

20   program?

21       A.    I don't really feel comfortable speaking

22   hypothetically about what the United States

1    Department of Education is doing or not doing.  I'm

2    not --

3         Q.    I'm sorry you feel uncomfortable.  I'm

4    asking you to answer the question.

5         A.    I don't know.

6         Q.    You don't know.

7         A.    Hmm-mm.

8         Q.    So if the United States Department of

9    Education funds the program, you don't know.  If the

10   Department of Education, as you described, funds the

11   program, it is committing unnecessary segregation.

12           MS. TUCKER:  Object to form.

13   BY MR. BELINFANTE:

14        Q.    What's the difference?

15        A.    I was asked to evaluate the system of

16   support in the State of Georgia, and that's what I've

17   done.  And that's what I've looked at.

18        Q.    I understand.  That's not what I'm asking.

19   I'm asking -- you said the Department of Education is

20   funding.  Putting aside any disagreements on that,

21   you said, by funding the program, the DOE is leading

22   to systemic segregation.

1     A.    I did not say that.

2     Q.    Can you read back what she said about five

3 minutes ago?

4         (Reporter read back as requested.)

5 BY MR. BELINFANTE:

6     Q.    So given that the specific thing that the

7 Georgia DOE is doing, according to you, is funding a

8 program.  My question, and it is a hypothetical, is I

9 would like you to presume that there are federal

10 United States Department of Education dollars flowing

11 through to the GNETS programs through -- or to LEAs

12 who choose to apply for grants.

13        If that's true, is the United States

14 Department of Education also funding a system of

15 systemic segregation, in your opinion?

16        MS. TUCKER:  Object to form.

17        THE WITNESS:  You said earlier, what are

18 the ways in which the state is perpetuating this

19 environment.  And I said --

20 BY MR. BELINFANTE:

21     Q.    I said specifically the Department of

22 Education, which may be different.



1        A.     GaDOE.

2        Q.     Yes, yes.

3        A.     How is GaDOE --

4        Q.     Yes.

5        A.     The Georgia State Department of

6   Education --

7        Q.     Yes.

8        A.     -- perpetuating this.

9        Q.     Yes.

10       A.     And I said that the state is to provide a

11   vision, guidance, leadership, professional learning,

12   all of these array of things, rather than funding a

13   program that perpetuates systemic segregation.

14       Q.     Okay.  Putting aside differences in your

15   previous answer, what you've just described are

16   things that the Department of Education is not doing.

17   I'm asking, what is the affirmative thing that the

18   Department of Education in Georgia is doing to cause

19   the harms that you describe in your report?

20           MS. TUCKER:  Object to form.

21           THE WITNESS:  Maybe the easiest way to

22   answer that is to look at the recommendations to see

1  what would be an effective pathway for the State of

2  Georgia to -- the Georgia State Department of

3  Education to follow, in terms of creating a guidance,

4  vision, policy, direction towards educational

5  environments that provide a continuum of support.

6  BY MR. BELINFANTE:

7       Q.    We will get to that.  My question, though,

8  is about your statement on page 157 that "the State

9  of Georgia contributes to this hopelessness by

10  maintaining the GNETS program in its current form."

11           What is the Department of Education in

12  Georgia doing to maintain the GNETS program in its

13  current form?  Other than not doing the series of

14  things that you recommend, what is it affirmatively

15  doing?

16           MS. TUCKER:  Object to form.

17           THE WITNESS:  I believe that the State of

18  Georgia is not providing effective vision, guidance,

19  support, professional learning, and resources to

20  provide students with disabilities an appropriate,

21  fair, and equal education along a continuum of

22  support.



1    BY MR. BELINFANTE:

2         Q.    What is the Department of Community Health

3    doing affirmatively to cause unnecessary segregation

4    in Georgia education?

5         A.    I did not -- I don't know.

6         Q.    How about -- go ahead, sorry.

7         A.    But that's one.  What I said previously,

8    that's one of many things that I feel the State

9    Department of Education in Georgia is doing that

10   helps perpetuate a system that is not effective, but

11   go ahead.

12        Q.    What would it cost the State of Georgia,

13   in your opinion, to provide sufficient or appropriate

14   supports for all students currently receiving

15   services through the GNETS program?

16        A.    I did not do any sort of cost analysis,

17   just to make sure that I'm restating that.

18        Q.    Right.

19        A.    But based on my experience in implementing

20   across the U.S. -- different states across the U.S.,

21   the implementation of my recommendations would cost

22   the state no more money than what's already being



1    allocated to the services of students with

2    disabilities, behavior-related disabilities.

3        Q.    And the money you're talking about being

4    allocated is the appropriation to the GNETS program?

5        A.    I'm talking about the funding that's

6    allocated for students with disabilities within the

7    state, wherever that source is.

8        Q.    Did you ever look at a Georgia

9    appropriations document -- or I'm sorry,

10   appropriations act of the Georgia General Assembly.

11       A.    I do not recall.  I don't think so, but I

12   could have.

13       Q.    I didn't see it in Appendix E.  So

14   similarly, do you know how much Georgia spends, as

15   you just described, on providing care and treatment

16   for students -- for persons with behavioral and

17   emotional disabilities?

18       A.    In the GNETS program?

19       Q.    At all.  Didn't you just say that you were

20   looking broadly at everything?

21            MS. TUCKER:  Object to form.

22   BY MR. BELINFANTE:



1      Q.    So let's back up, because I think -- how

2  much would it cost, do you know, to provide the types

3  of supports and services to students -- and I mean

4  actual services, not just MTSS training, actual

5  services -- to students that would be appropriate, in

6  your opinion, in Georgia?

7      A.    Based on my experience in implementing in

8  a number of other states, the costs of implementing

9  the kinds of recommendations that I'm suggesting here

10 is no more than what is currently being spent in

11 special education dollars within the state.

12     Q.    And so by --

13     A.    I have not done a specific cost analysis.

14     Q.    So including in appropriate supports, are

15 you including group therapy?

16     A.    Umm.

17     Q.    I'm trying to determine what services you

18 think schools need to provide in order to avoid, as

19 you call it, placement in the GNETS program.  What

20 are the specific services that a school needs to

21 provide?

22     A.    So what is, like, a full array of services

1  that might be provided to any student with a

2  behavior-related disability?

3          Q.    That would be appropriate, yes.

4          A.    In the world?  I mean, in the U.S. or --

5          Q.    Yeah, what would be appropriate?  Because

6  I understand appropriate means, like, look, we would

7  all love to have, for example, individual therapy.

8  But that's not necessarily appropriate for the --

9          A.    That's not appropriate.

10         Q.    Right.  So I'm not asking you for shoot to

11  the moon and name every service eligible.  But your

12  criticism -- one of your criticisms is that Georgia

13  is not providing -- whatever Georgia is, we won't

14  argue that point on this question.  That Georgia is

15  not providing sufficient services to students in

16  schools to avoid them receiving services in GNETS.

17  Is that fair?

18              MS. TUCKER:  Object to form.

19              THE WITNESS:  I'm specifically, as far as

20  my report, which is what you just said not to do, but

21  I am doing, talking about the State Department of

22  Education.



1    BY MR. BELINFANTE:

2         Q.    Okay.

3         A.    In Georgia, GaDOE.

4         Q.    Okay.

5         A.    That's what I'm referencing.

6         Q.    So you're -- and sorry to interrupt.

7         A.    All of my stuff is GaDOE.

8         Q.    No DCH Community --

9         A.    That's correct.

10        Q.    No Department of Behavioral Health.

11        A.    I'm talking about GaDOE.

12        Q.    Got it, okay.

13        A.    That's my expertise.  That's where the

14   state education agency is, the scope of my review, in

15   this case.

16        Q.    Got it.

17        A.    So we start there.

18        Q.    So we start there.  Okay.  What is your

19   understanding of the supports and services that the

20   Georgia Department of Education provides to students

21   with emotional/behavioral disabilities in general

22   zoned schools?



1        A.    As I referenced earlier today, as a

2   general rule, students with disabilities should be

3   afforded the same opportunities that their

4   non-disabled peers have, to include things such as

5   appropriate and effective teaching and learning

6   aligned with standards, to include effective content

7   mapping and lesson planning for learning content,

8   effective, appropriate typical social, emotional

9   learning strategies and supports, among other

10  evidence-based practices and effective practices

11  commonplace in schooling today.

12       Q.    Okay.

13       A.    This is not the Cadillac, this is

14  commonplace.

15       Q.    Can you turn to page 8 of your report?

16  I'll do what I should have done a long time ago,

17  which is actually point to your report.

18       A.    What?

19       Q.    I'm doing what you told me to do a long

20  time ago, which is point to your report.

21       A.    That helps.

22       Q.    Yeah, so my question is going to be about

1    service provision separation, question number 6 -- or

2    criteria number 6.

3        A.    On page 8?

4        Q.    Yes.  This is what I'm asking about.  "Do

5    certain groups of students in the GNETS program

6    access different support services personnel" --

7    sorry.

8        A.    You're good.

9        Q.    "-- access different support services

10   personnel than their peers, either with or without

11   IEPs (e.g., speech, physical therapy, occupational

12   therapy, counseling, or other mental health supports

13   available within the general education setting)."

14           All right.  So my question is, of those

15   services identified, what is your understanding of

16   the Georgia Department of Education's role in

17   providing or contracting for those services?

18       A.    You're asking about the speech, physical

19   therapy part of this question?

20       Q.    I'm asking all of the services you

21   identify in 6.  It's more of a theoretical than a

22   specific.  Like, of these services --



1        A.    So theoretically --

2        Q.    -- support services -- of support

3  services, which ones are provided by the Georgia

4  Department of Education or persons with whom the

5  Georgia Department of Education contracts with?

6              MS. TUCKER:  Object to form.

7              THE WITNESS:  I'm trying to figure out how

8  to answer the question.  Can you ask it in another

9  way?

10  BY MR. BELINFANTE:

11        Q.    I'm trying to go back to your conclusion

12  that the State Department of Education perpetuates

13  GNETS in its current form or perpetuates an idea

14  about students with emotional and behavioral

15  disabilities.  And so what I'm trying to determine

16  is, you've identified that there are certain services

17  -- support services that some students need to avoid

18  unnecessary segregation.

19              My question is, of those support services,

20  what is your understanding about what the Georgia

21  Department of Education does, in terms of providing

22  those or contracting with providers to provide them,



1    which you can probably guess where I'm going, as

2    opposed to what an LEA does in determining what

3    support services are available in that school?

4            MS. TUCKER:  Object to form.

5            THE WITNESS:  Yeah, I'm not trying to

6    exhaust you.  And this is complicated.  And so the

7    first part of the idea that you mentioned, I don't

8    know that I agree with what you said there.  I'm just

9    really listening to the questions intently.  And this

10    is my profession.  And so I'm hung up on the details.

11            And I think what you're asking is, does

12    the state provide these services?  And essentially,

13    what you've done is you've turned to page 8, where

14    there's a list of services, and said, does the state

15    provide these?

16            And this is in a table that talks about

17    service provision as an important mechanism in

18    providing supports to students with disabilities.

19    And so any state in their effort to support students

20    with disabilities would be likely to offer avenues to

21    speech, physical therapy, occupational therapy,

22    counseling, and other mental health supports



1  available.  That is common in a continuum of services

2  for students with disabilities.

3  BY MR. BELINFANTE:

4      Q.    Is it your opinion, as reflected in this

5  report, that the state is not providing a sufficient

6  number of support services as identified in number 6

7  on page 8?

8      A.    My opinion is that the State Department

9  is -- the State Department of Education in Georgia is

10 unnecessarily segregating students en masse, and

11 providing unfair and unequal educational

12 opportunities.  And the state is perpetuating a

13 system that does not -- that's unnecessary, nor does

14 it justify the services that it purports to provide.

15     Q.    Is it your professional opinion that the

16 State of Georgia Department of Education provides an

17 insufficient number of support services to students

18 with behavioral and educational disabilities?

19     A.    Are you reading something?

20     Q.    Support services, but that's it.

21     A.    You're reading number 6 with -- you just

22 inserted "State Department"?



1      Q.    No, I just pulled the phrase support

2  services.  My question is, is it your opinion, as

3  reflected in your report, that the State of Georgia

4  Department of Education provides an insufficient

5  number of support services, an insufficient quantity

6  of support services to students who are receiving --

7  to students with emotional or behavioral

8  disabilities?

9      A.    That is not reflected in my report.

10      Q.    Okay.  Is it your professional opinion

11  that the State of Georgia is providing insufficient

12  quality of support services to students with

13  emotional and behavioral disabilities?

14      A.    In my professional opinion, the State

15  Department is supporting a program that is neither

16  fair nor equal to students without disabilities, nor

17  appropriate for students with disabilities who have

18  behavior-related needs.

19      Q.    Is the State Department of Education

20  providing insufficient quality, in terms of the

21  support services that are provided to students with

22  emotional or behavioral disabilities?



1        A.        Insomuch as it's utilizing -- as it

2   relates to the GNETS program, yes.

3        Q.        My question, though, is about -- okay, so

4   do you have an opinion about support services being

5   offered in general zoned schools?

6        A.        For students with disabilities?

7        Q.        Yes.

8        A.        That are outside the GNETS program?

9        Q.        Yes.

10       A.        No.

11       Q.        Can you --

12       A.        Let me clarify that a little.  Actually,

13   that's not the case.  Because I toured and observed a

14   number of general education schools that had programs

15   for students with disabilities who were not in GNETS,

16   I was able to see and observe students participating

17   in supports and services that were vastly different

18   than students in the GNETS program.

19            For example, in one site, I saw students

20   receiving speech therapy services in their general

21   education environment.  In another example, I saw

22   students receiving mental health supports and

1    services in the -- in the general education

2    environment.

3            And those same supports and services were

4    not being provided in the GNETS program that was in

5    closest proximity to that general education

6    environment.

7        Q.    What is your understanding of what the

8    Georgia Department of Education affirmatively did to

9    cause that differential in service between the

10   general zoned school and the GNETS program?

11       A.    What did the State Department of Education

12   in Georgia do to perpetuate the differences in

13   services between Gen Ed and -- Gen Ed and students

14   with disabilities.

15       Q.    I'm talking about the specific example you

16   gave, where a student received speech therapy and

17   another student received mental health services in a

18   general education school, but not in the GNETS

19   program.  What did the Georgia Department of

20   Education do to cause that distinction?

21       A.    The Georgia State Department of Education,

22   from my perspective, failed to provide guidance for



1    implementation of a full array of supports for

2    students with behavior-related disabilities,

3    including policy and technical assistance for

4    districts and schools, or for districts and the GNETS

5    program within those.

6              The state failed to provide effective

7    social, emotional, and behavior supports,

8    professional learning, technical assistance,

9    guidance, and vision for students in the GNETS

10   program.

11             The state failed to provide guidance,

12   vision, policy, technical support for the GNETS

13   program, in which learning was assigned with state

14   standards and alternate assessment standards for

15   students with behavior-related disabilities.

16             Therefore, students in the GNETS program

17   have less opportunities for academic engagement, and

18   less opportunities for effective social, emotional,

19   behavioral, and mental health supports, and less

20   opportunities to have educators that are certified or

21   have experience, expertise, or understanding of what

22   it means to support students with behavior-related



1    disabilities.

2            In my opinion, the State Department of

3    Education for Georgia failed to provide a coherent

4    system of social, emotional, and behavioral, mental

5    health supports for students who are currently

6    receiving services, and who have received services

7    over the last many years regarding effective common

8    educational practices and services.

9            And then lastly, the state failed to

10   provide leadership, teaching recommendations,

11   professional support, learning and understanding to

12   educators in the GNETS program on how to be effective

13   at supporting the students who have had the most

14   significant and complex needs.

15       Q.    Does that complete your answer?

16       A.    For now, among other things.

17       Q.    Do you need -- is there more?

18       A.    Yeah, there's more.

19       Q.    Okay, keep going.

20       A.    No, that's all right.  I'll stop for now.

21       Q.    Well, I'm trying to understand your --

22   what the Georgia Department of Education did.



1        A.    I just listed a lot.  Do you want more?

2        Q.    Right.  Well, I mean, I'm trying to

3    understand the breadth of your opinion.

4        A.    Okay.

5        Q.    If you're going to read the report, then

6    we can move on.  But let me ask this, then.

7        A.    Well, I don't need to read the report, but

8    I can talk about each of those recommendations

9    underneath.  There's a variety of strategies and

10   steps that I recommend for the State Department to do

11   in order to change, you know, what's occurring right

12   now.

13       Q.    We'll get to that, I promise.

14       A.    Okay.

15       Q.    If we don't, it's on me.

16       A.    All right.  Fair enough.

17       Q.    One of the things you just said is that

18   the state is not providing effective social,

19   behavioral, or emotional supports.  Did I hear you

20   correctly on that?

21       A.    To students within the GNETS program.

22       Q.    Do you know what it -- what would it cost

1    to provide what you're deeming effective social,

2    behavior, and emotional supports in Georgia to those

3    students?

4        A.    It would cost no more than what's already

5    being funded within the state.

6        Q.    And what is the basis of that opinion,

7    your experience in other states; is that correct?

8        A.    My experience in implementation of social,

9    emotional, and behavior support for students across

10    the U.S.

11        Q.    Would you agree with me that rates of

12    service provision vary across states?

13        A.    Yes.

14        Q.    And when we talk about effective -- last

15    question, and then we'll do that, because that's a

16    great idea.

17            When we talk about effective social

18    behavior, and emotional supports, those are -- what

19    we're talking about are actual services, correct?

20    Something that a student receives, whether it's in

21    the form of therapy or counseling, or whatnot.  We

22    are talking about actual services, right?



1          MS. TUCKER:  Object to form.

2          THE WITNESS:  No, we're talking about,

3    again -- and this is a broad concept, so a continuum

4    of support.  And that can mean, for example,

5    proactive teaching of -- for one example, proactive

6    teaching of school-wide expectations.  That's a

7    behavioral strategy applied to a number of students.

8          It's -- there might be small group

9    instruction that occurs within the course of a

10   typical school day.  There may be restorative

11   circles.  There may be peer-to-peer instruction.

12   There may be a varied and wide ranging mechanism by

13   which services and supports are provided to students

14   within the system of schooling.

15   BY MR. BELINFANTE:

16      Q.    Okay.  So at least included within that

17   could be some of the supports, as I described it --

18      A.    Certainly.

19      Q.    -- where we have to contract with a

20   professional provider to provide therapy or speech

21   counseling, et cetera.

22      A.    I answered your question before you

1    finished it, so I'm sorry about that.  And it is not

2    certainly, because the contracting part.  Some

3    schools and agencies provide those types of supports

4    with educators that are hired within the system.

5        Q.    Okay.  I think we're saying the same

6    thing.  And a bathroom break is --

7        A.    A bathroom break is a good idea, but I

8    don't know if we're saying the same thing.  But a

9    bathroom is a good idea.

10            THE VIDEOGRAPHER:  Off the record at

11   14:08.

12            (Recess.)

13            THE VIDEOGRAPHER:  On the record at 14:34.

14   BY MR. BELINFANTE:

15       Q.    All right.  Dr. McCart, I would you to

16   turn -- I promised you we'd get there -- to page 163.

17   I'm going to ask a series of questions about the

18   recommended actions in your report.

19            My first question, actually, though, I

20   should have said go to page 162.  You have two

21   recommendations for the State of Georgia there in

22   bold.  And am I understanding correctly that your



1    opinion is to achieve these two recommendations, the

2    State Department of Education would implement the

3    recommended actions on page 163 to 167?

4        A.    I think it's broader than that.  The first

5    eliminates statewide systemic segregation.  The

6    second being to provide fair and equal access to

7    educational opportunities are the overarching

8    recommendations in the report.  Some ways in which

9    you could achieve that are included in the actions --

10   the five actions that you see after that.

11       Q.    Okay.  One of the things I did not see in

12   the recommended actions was to defund or stop sending

13   -- or stop the GNETS grants program.  In your --

14   based on your report, what would be the role for the

15   GNETS grants to achieve the goals you set forth on

16   page 162?

17       A.    The role of the GNETS grants -- are you

18   getting at, how might -- what are you getting at?

19       Q.    Yeah, I mean, if right now the Georgia

20   General Assembly appropriates approximately -- I'll

21   use the number in your report, 60 million for a GNETS

22   grants program.  In order to achieve the goals you



1    describe on page 162, would they continue to fund the

2    GNETS grants program or would the GNETS grant program

3    and the GNETS program go away?

4        A.    I make no recommendation about funding

5    regarding the GNETS program.  That is really between

6    the state and entities involved at the state.  I

7    provide recommendations in how the state might go

8    about implementing a system of support that is not

9    segregated, and provides fair and equal access to

10   educational opportunities.

11       Q.    Is it possible that the state achieve the

12   goals you articulate on page 162 in bold, while at

13   the same time there are separate, freestanding GNETS

14   facilities in existence?

15       A.    You're saying, is it possible to achieve

16   goal 1 and 2, and have separate, freestanding GNETS

17   center-based --

18       Q.    Yes.

19       A.    The current GNETS center-based facilities

20   do not provide fair and equal access to educational

21   opportunities, nor -- and they are segregated.  So

22   it's really related to both.



1      Q.    I see one -- and tell me if I'm wrong.  I

2   see the providing fair and equal access to

3   educational opportunities is almost more qualitative;

4   that the services -- the criticisms you have of the

5   GNETS program are the services being provided there

6   are not effective, among other things.

7           What I guess I'm really trying to get to

8   is, is it possible to eliminate systemic segregation

9   and still have schools that provide education for

10  emotionally/behavior disabled students in a separate,

11  freestanding environment?

12          MS. TUCKER:  Object to form.

13          THE WITNESS:  Yeah, I'm not accepting the

14  premise of what you just said.  Is it possible to

15  have a segregated program for students with

16  behavior-related disabilities, and still not have

17  statewide systemic segregation, and have fair and

18  equal access?  Yes, as long as it is related

19  specifically to effective learning environments that

20  are matched to student need that are in line with

21  practices that are common in the field now.

22  BY MR. BELINFANTE:



1       Q.     Let's look at recommendation action --

2  I'll call it 1.  It's the one on page 163.  It says

3  that -- it looks like the third sentence, "Georgia

4  DOE should invest in local capacity through regional

5  and district structures in support of MTSS

6  implementation."

7            Do you see that?

8       A.     Yes.

9       Q.     What did you mean by invest in local

10 capacity?

11      A.      In order to effectively support any

12 student, you need state capacity and LEA capacity,

13 school capacity.  And that relies on a number of

14 variables, including teaching expertise, policy

15 implementation, among other things.

16      Q.     Do you --

17      A.      The GaDOE in the recommendations should

18 build their capacity, in order to be able to build

19 local capacity in support of students with

20 behavior-related disabilities.

21      Q.     Does that mean hire more individuals?  Is

22 that how you would build the capacity?

1          A.    No.

2          Q.    Okay.  You could train the existing

3    individuals?

4          A.    Yes.

5          Q.    Is it --

6          A.    I don't know what individuals you're

7    talking about, but theoretically, can you train

8    people to be more effective educators?  Certainly.

9          Q.    Is it your opinion that the Department of

10   Education has sufficient staff to implement your

11   recommended actions identified on pages 163 to 167 of

12   your report?

13         A.    Having worked with a number of state

14   Departments of Education, the answer is, yes, because

15   there's a reliance on systems that are established

16   already at the State Department to be able to

17   implement these recommendations.  That decision lies

18   within the State Department itself, how to do so.

19         Q.    Your first recommended action is to

20   "Develop state capacity to provide guidance for

21   implementation of MTSS through direction, policy, and

22   technical assistance for districts and schools

1   throughout the state."

2           Can you describe for me the difference

3   between MTSS and PBIS, and how the two fit together,

4   if they do?

5       A.    Mm-hmm.  One place to find that is in the

6   definitions.

7       Q.    Right.

8       A.    So if we look on page 6, you'll see that

9   MTSS "is a framework with a tiered infrastructure

10  that uses data to help match academic and

11  social-emotional behavior assessment and instruction

12  resources to each and every student's needs.  In this

13  tiered, data-informed framework, educators work to

14  ensure that the majority of students respond to core

15  instruction.  Students who need additional support

16  for enrichment or remediation are identified by the

17  data and provided that support with measured focused

18  intensity."

19          Right below that, you see the definition

20  of PBIS, which is an evidence-based, tiered system of

21  report -- I'm sorry, "tiered system supporting

22  students' behavioral, academic, social, emotional,



1    and mental health.  When implemented with fidelity,

2    PBIS improves social, emotional competence, academic

3    success, and school climate.  It also improves

4    teacher health and well-being."

5            That's the technical definitions of MTSS

6    and PBIS.  In reality, PBIS is the behavioral aspect

7    of a tiered system of support available in the

8    school, also connected to social, emotional learning

9    and mental health.

10           In the past, the terminology around MTSS

11   has been related to academic core content, and has in

12   recent years, expanded to encompass PBIS, restorative

13   practice, and a multitude of other evidence-based

14   practices within tiers of support.

15           That's why sometimes you'll hear me say

16   MTSS, meaning multi-tiered system of support, but

17   I'll also say a system of support.  It's really the

18   same thing.  What is the system by which we, in the

19   education system, are delivering our educational

20   supports and resources to students.

21       Q.    All right.  You said, in recent years,

22   MTSS has expanded from focusing on academic core



1    content to their content, behavioral, social, et

2    cetera.   Can you put a finer point on that, like, the

3    last five years, ten years, eight years?

4         A.    A long history to MTSS regarding when the

5    emergence of strategies entered in at various levels.

6    In terms of year, I can't recall, sitting here right

7    now, but it's been well more than ten years.

8         Q.    Okay.  Has it been -- do you know if MTSS

9    was expanded prior to 1990 in the way you talk about,

10   or would it be after 1990 when folks started looking

11   at it more broadly?

12        A.    I do not recall, off the top of my head.

13        Q.    Okay.  Is it fair to say that you and

14   Dr. Sailor and other folks at SWIFT have been on the

15   vanguard of expanding MTSS into these other areas?

16        A.    Speaking for myself, and not Dr. Sailor

17   and not for all the people at the SWIFT Education

18   Center.

19        Q.    That's fair.

20        A.    Certainly I have been an important

21   mechanism in implementation of tiered systems of

22   support across school districts in the United States,



1   as have -- as has been one of the missions of the

2   SWIFT Education Center.

3       Q.    And that's part of the $24.5 million grant

4   that it received from the United States Department of

5   Education Office of Special Education, was to do

6   that, expand implementation of MTSS; is that right?

7       A.    The $24.5 million grant that was received

8   from the United States Department of Education Office

9   of Special Education in 2012 was about providing

10  effective services for students with disabilities who

11  had -- were receiving -- who -- for students who had

12  disabilities.  Leave it there.

13      Q.    And --

14      A.    One strategy -- one strategy that we

15  employed, among many others, was the implementation

16  of a tiered system of support.

17      Q.    Okay.  If the state -- well, let me ask

18  this.  Are there metrics to determine whether the

19  state has -- let me back up even further.

20          If the state were to adopt your

21  recommendation -- recommended action on page 163, the

22  first one, are there metrics to determine whether it

1    has complied with your recommended action?  And if

2    so, what are those metrics?

3              MS. TUCKER:  Object to form.

4              THE WITNESS:  I've found in my

5    professional experience -- and again, this is

6    probably a distinction between our businesses -- that

7    compliance is not what we focus on.  We focus -- I

8    focus on the development of state capacity, in order

9    to implement effective strategies for what they want

10   to do.

11             Now, if you're asking, is there a specific

12   tool in which states can assess whether or not they

13   feel they are making progress on their desired goals

14   and outcomes, there are.

15   BY MR. BELINFANTE:

16        Q.    How would -- bear with me in this

17   hypothetical for a moment.

18        A.    Okay.

19        Q.    But if you're asked to make a

20   determination whether because someone's appointed you

21   a court monitor, or a consultant for the state, or

22   for the DOJ, how would you -- what tool would you use

1    to determine whether or not -- because, again, I'm

2    asking from the perspective of the state.  If the

3    state were to say, we want to do this, this makes

4    sense.  How does the state know when it has

5    successfully adopted recommended action 1?

6        A.    Recommended action 1, theoretically, a

7    state would decide, based on the information that

8    they have before them, what is the direction and

9    vision for where we want to go with this work?  And

10   they may say, we want to implement a tiered system

11   within our state, or we already have a tiered system

12   within our state.  We want to beef it up, we want to

13   do more, we want to allow more student access.

14   Whatever that is.

15          That is built into an initial guiding

16   document that the state develops and drafts, that

17   then becomes a vision for how that work is carried

18   out within the state through a state implementation

19   team.  And then a state -- I'll just leave it at

20   state implementation team for now.

21       Q.    Okay.  When you write on page 163, the

22   last paragraph -- not full paragraph, beginning with



1    "Georgia DOE should disseminate."

2        A.    Mm-hmm.

3        Q.    "Georgia DOE should disseminate inclusive

4    policy structures and practices for the purpose of

5    building strong relationships furthering equity-based

6    inclusive education."

7            Now, probably as an occupational hazard, I

8    see a bunch of words in there that I can't readily

9    define.  So from a standpoint of where could a state

10   look for a model to do that, that you would opine

11   would satisfy kind of recommended action 1?

12       A.    There are a number of -- let me think a

13   second more.

14       Q.    Mm-hmm.

15       A.    I can talk about what are common

16   indicators of inclusive policy structures and

17   practices that are commonplace in the field that

18   could be adopted, were the State Department

19   interested in providing more inclusive services,

20   along with a full continuum of support for students

21   with behavior-related disabilities.

22            And those kinds of things would be



1    non-categorical service delivery, a full array of

2    service options -- service and support options for

3    students with behavior-related disabilities that do

4    not require placement in a separate, segregated

5    facility in order to receive those services.

6              It would be the utilization of general and

7    specialized educators in support of having received

8    training from the State Department of Education

9    around how to provide effective teaching and learning

10   processes for students with behavior-related

11   disabilities across a continuum of support, among

12   others.  I'll stop there for now.

13        Q.    In terms of non-categorical service

14   delivery, can you tell me what you mean by that?

15        A.    Yeah, I referenced it a bit in the report,

16   in finding 2, on page -- I'm close.  Oh, my goodness,

17   I'm sorry.

18        Q.    No, take your time.

19        A.    It's because everybody's watching.

20              I'm pretty sure I'm close.  Could I have

21   one more minute?

22        Q.    Sure.



1        A.      And then I'll give up.

2                Okay, page 36.  I feel a sense of

3    accomplishment.  Am I done?  Before I read that, let

4    me know what you think.

5        Q.      Well, you can see the amount of ink I

6    dedicated.

7        A.      Yeah, I saw that.  I'm very impressed for

8    some reason.

9                Okay.  So when you talk about non- --

10   you're referencing the question I asked about

11   categorical service delivery.

12       Q.      Correct.

13       A.      And in general, this -- these few

14   paragraphs reference what happens when medical

15   diagnoses are used as a mechanism for providing --

16   for providing academic or behavioral supports.  And

17   I'll just read a little bit, and you can stop me

18   whenever, but "In order to qualify for special

19   education, a student must have a diagnosis from a

20   licensed psychologist or medical doctor."

21       Q.      Right.

22       A.      "This diagnosis provides educators with

1    some sense of the characteristics a student with that

2    diagnosis might present.  For example, a student with

3    autism may have difficulty with social interactions,"

4    et cetera.  "A student with Tourette's Syndrome may

5    have uncontrolled vocalizations," et cetera.

6            The provision of -- if you read further

7    down, "Students with disabilities, just like their

8    general education counterparts, need the full array

9    of educational supports and services to be

10   successful.  Students with behavior-related

11   disabilities need universal screening, progress

12   learning, effective supports."

13           So to provide a system of services that

14   are categorical, meaning you have this disability, so

15   you should have this, is categorical thinking.  And

16   the recommendation is that you understand the full

17   array of student need within your state, and you

18   provide a continuum of support across that student

19   need, rather than relying on a categorical label for

20   defining.

21       Q.    Got it.  Okay.  And I think I recall, and

22   I may be mixing it up with some of the other stuff I



1    read, but I think one of the articles you cited talks

2    about this division within academia between those who

3    approach this issue from a medical perspective, i.e.

4    you have autism, here's the range of supports.  And

5    those -- I forget the phrase used, or the term you

6    used to approach it.  I think you said

7    non-categorically, and they used a different one.

8         A.    Mm-hmm.

9         Q.    Is that accurate, that there is a kind of

10   split within the profession on how to approach these

11   issues?

12        A.    I think it would be more of an evolution

13   over time, that a long time ago, back in the '50s,

14   '60s, '70s, providing services based on a medical

15   diagnosis would be more commonplace than what you see

16   today.

17        Q.    Okay.  That looks like Lanterman's article

18   on moving the needle.  Is it your opinion, then, that

19   disability is a construct?

20        A.    Is it my opinion that disability is a

21   construct?

22        Q.    Mm-hmm.



1      A.     What do you mean by construct?

2      Q.     I mean, would you agree with this

3    statement which, "Disability is a construct that is

4    interpreted through many conceptual models"?  Or do

5    you need more context to answer that?

6      A.     For sure.

7      Q.     Okay.

8      A.     You knew that was coming.

9      Q.     I did once you agreed to the first part.

10   We'll go back to the recommendations on 163.

11          In terms of MTSS as you recommended, as I

12   understand it, the state develops the capacity to

13   provide training, but MTSS itself, the multi-tiered

14   system, is actually implemented at the school level;

15   is that correct?

16     A.     It's implemented across the entire

17   educational system.  So it's sometimes called whole

18   system engagement, at other times, it's called

19   cascading levels of influence.  It's about how do you

20   structure an educational system, such that it's

21   providing for students what they need?  And --

22     Q.     Okay.



1    A.    -- that reaches the whole system.

2    Q.    Okay.  Is it fair to say that -- well, how

3    long do you think it would take the state to develop

4    state capacity to provide guidance for implementation

5    of MTSS through direction, policy, and technical

6    assistance for districts and schools throughout the

7    state?

8    A.    It would depend on what they already had

9    in place regarding their systems of support for

10    students already, who are in the general education

11    system.

12    Q.    Do you have an opinion on what supports

13    are in place for students in the general education

14    system in Georgia?

15    A.    Yes.

16    Q.    Okay.  So given that understanding, how

17    long do you think it would take the State Department

18    of Education to implement recommended action number

19    1?

20    A.    As a general rule, when states begin

21    implementation of an effort to refine or adjust their

22    system of support, there is usually an investment of

1    approximately a year in understanding the vision,

2    direction, and desired destination of the State

3    Department, and how it would lead.

4              And then second to that -- so that first

5    year is really about that.  The second year is really

6    focused more on what is it that we have within the

7    state -- we call it resource mapping.  What do we

8    have within the state already that could help with

9    the implementation of a system that does not

10   unnecessarily segregate students or provide unfair,

11   unequal educational opportunities.  So that typically

12   happens in the second year.

13             The third year is really laying out a

14   pathway for how the state provides vision, guidance,

15   direction, and professional learning, and actually

16   begins implementing a system in which things are

17   different.

18   Q.    What if a school -- what if the State

19   Department of Education develops the capacity to

20   provide this training, et cetera, but an LEA says, we

21   don't want to do it.  Do you have an opinion on what

22   the state could do at that point?  And by state, I



1    mean the State Department of Education in Georgia.

2         A.    If an LEA says, we don't want to provide a

3    system of support that includes students with

4    disabilities?

5         Q.    No, if the State Department of Education

6    adopts an MTSS strategy that you would say is to

7    fidelity, and says, we're going to provide training

8    to you, LEAs, you know, on how to do that.  And an

9    LEA says, we think we've got it covered, we're not

10   interested.  Not because of any animus toward

11   disabled students, but just they have a different

12   vision, let's say.  What is your understanding of

13   what the Georgia Department of Education could do in

14   that circumstance?

15        A.    It is not uncommon within states to have

16   LEAs to -- deeply consider what direction the State

17   Department is putting forth.  Part of building the

18   state capacity around implementation of an effective

19   system of support that meets the needs of students

20   currently in the GNETS program is to provide training

21   to the State Department, in order to be able to know

22   how to work with LEAs who may have concerns or a



1    different vision, and help supporting them.  That's

2    the technical assistance part of this work.  So I was

3    talking about the years.  That would be part of the

4    year 3 --

5         Q.    Okay.

6         A.    -- effort.

7         Q.    Would adopting an MTSS approach, like you

8    suggest in recommended action 1, require the Georgia

9    Department of Education to adopt a particular

10   school-based curriculum?

11        A.    No.  And I want to clarify, because I used

12   the phrase MTSS, because that is what is used in a

13   number of places, that whether or not it's called

14   MTSS is not important.  It is a coherent, full system

15   of support.  A way in which services are delivered

16   throughout the state.

17        Q.    Okay.  Let's look at recommended -- what

18   I'll refer to, just because I'm doing it

19   chronologically, as recommended action number 2, page

20   164.  "Develop state capacity to serve as technical

21   support for district implementation of social,

22   emotional, behavioral, and mental health practices



1   with MTSS."

2           What would constitute technical support

3   for district implementation?

4       A.    Most states see their role as providing a

5   level of vision, guidance, and technical support or

6   technical assistance, meaning expertise or guidance

7   on how to implement current effective educational

8   practices.  In this particular case, it would be

9   that, and it would also apply, then, to students

10  currently in the GNETS program and their educators.

11      Q.    Okay.

12      A.    Teachers or staff.

13      Q.    And how would a third party measure the

14  efficacy of the state's efforts in providing

15  technical support to districts?

16      A.    There's a number of tools that offer

17  feedback and support to states on setting up systems

18  of coaching across the state, systems of technical

19  assistance and support, professional learning across

20  the state.  If the state were interested in this,

21  there would be a variety of options for how that

22  might occur.



1        Q.    So is it fair to say, there is not one

2  measure of efficacy in looking at how the technical

3  support is being prepared and provided?

4        A.    At the State Department?

5        Q.    Yes.

6        A.    There are a number.

7        Q.    Okay.  Neither recommended action 1 nor

8  recommended action 2, if implemented, would

9  immediately remove a student from the GNETS program,

10  correct?

11        A.    That's a difficult question, because,

12  again, the actions you see noted on page 163 are

13  directly tied to the broader recommendations on page

14  162 that talk about eliminating the statewide system

15  of segregation of students with behavior-related

16  disabilities in the GNETS program, and providing fair

17  and equal access to educational opportunities for

18  students with behavior-related disabilities.

19              If the state were to engage in action 1 or

20  2, there may be more immediate opportunities for

21  students who are unnecessarily placed in a systemic

22  system of segregation to have access to fair and



1    equal educational opportunities that are matched to

2    their need.

3        Q.    I mean, I guess my question is, a lot of

4    the report, a bulk of the report certainly goes to

5    and provides criticisms of the GNETS program.  And

6    frankly, as I was reading it, I was expected when I

7    got to the recommended action to be, do something in

8    the GNETS program, right?  Evaluate students,

9    something.  And what we have is an adoption of MTSS

10   at the Georgia DOE level and provide expertise there.

11           So my question is, did any of the

12   recommended actions call for, you know, an immediate

13   evaluation of students in the GNETS program by the

14   Georgia Department of Education?

15           MS. TUCKER:  Object to form.

16           THE WITNESS:  I've done a comprehensive

17   evaluation of the GNETS program right here.  And

18   based on that evaluation, what I think would help to

19   make the situation better for the students that I

20   observed are the recommended actions that you see

21   here.

22   BY MR. BELINFANTE:

1        Q.    Would you agree with me that -- and I'm

2   not criticizing the proposed efficacy of these

3   programs.  But the recommended actions you're talking

4   about do take -- I think we talked about at least one

5   to three years to fully implement; is that right?

6        A.    Or longer.

7        Q.    Or longer.

8        A.    Mm-hmm.

9        Q.    Let's look at the recommended action --

10  the second one, because I think I understand the

11  first -- sorry, let me get you to a page number.  I

12  skipped one, sorry.

13       A.    No problem.

14       Q.    164, the second one there.  "Develop state

15  capacity to serve as technical support for

16  district-focused learning aligned with high

17  expectations and standards-based" --

18       A.    That's the third.

19       Q.    -- "learning for students."

20             Does the IEP team consider whether a

21  student is learning at the level of the

22  standard-based learning of that grade or year?



1          A.      Mm-hmm.

2              MS. TUCKER:  I'm going to just object to

3    form.  And also, it's "students with behavior-related

4    disabilities."  Sorry.

5              MR. BELINFANTE:  No, no.

6              MS. TUCKER:  Just correcting for the

7    record.

8              MR. BELINFANTE:  No, you need to.

9              MS. TUCKER:  Yeah.

10              MR. BELINFANTE:  And I need to learn to

11    read better.

12              THE WITNESS:  And we're talking about the

13    recommended action that starts with, "Develop state

14    capacity to serve as technical support for

15    district-focused learning aligned with high

16    expectations and standards-based learning"?

17    BY MR. BELINFANTE:

18         Q.    Yes.

19         A.    And "for students with behavior-related

20    disabilities."

21              And your question is, if I'm

22    understanding, is there -- does an IEP team ever

1    consider whether or not students are performing

2    related to standards?

3        Q.    Yes.

4        A.    Yes.

5        Q.    Okay.  And do they make their

6    recommendations in order to -- with the goal in mind,

7    that the student will perform on standard-based

8    learning?  In other words, what is the IEP team

9    trying to solve for that student, as it relates to

10   the standards that you're discussing on page 164 and

11   165?

12       A.    Again, I'll speak hypothetically here,

13   because that's what we're talking about --

14       Q.    Sure.

15       A.    -- is, would you hope that an IEP team

16   would be helping students to learn the ways in which

17   general education students learn aligned with state

18   standards, or alternate state standards for students

19   with disabilities?  Yes.

20       Q.    Okay.  And in your experience, having

21   served on an IEP team, and also just your experience

22   generally, if an IEP team fails to do that, are there



1    potential legal consequences that you're aware of for

2    that IEP team or that district?

3            MS. TUCKER:  Object to form.

4            THE WITNESS:  I don't know what legal

5    actions apply.

6    BY MR. BELINFANTE:

7        Q.    Okay.  In that same paragraph, page 164,

8    you talk about, midway through, "Georgia DOE can also

9    serve as a source of technical support, providing

10    professional learning and resources on how to employ

11    effective and current universal screening and analyze

12    progress monitoring data for students."

13            Do you see that?

14        A.    I sure do.

15        Q.    Okay.  Did you review data collected by

16    the Georgia Department of Education as part of your

17    report in this case?

18        A.    Yes, extensively.

19        Q.    Do you have an opinion as to whether the

20    Georgia Department of Education collects sufficient

21    data in order to provide effective supports or to --

22    let me start over.



1          A.     Sure.

2          Q.     Did you form an opinion as to whether the

3     Georgia Department of Education collects sufficient

4     data to allow LEAs and RESAs to provide sufficient

5     reports -- supports, not reports -- to students with

6     emotional and behavioral disabilities?

7          A.     I sincerely do not want to ask you to

8     repeat that question.

9          Q.     Let me ask it in a really simple way.  And

10    then if we can go from there.

11         A.     There we go.

12         Q.     What I'm trying to determine is, is there

13    more data -- is it your opinion that Georgia

14    Department of Education should be collecting more

15    data than it is currently collecting?

16         A.     I have reviewed a lot of data from the

17    Georgia Department of Education, but I have not

18    reviewed all the data.  Therefore, I cannot answer

19    that question.

20         Q.     All right.  And in order to determine

21    whether the local school districts are employing

22    effective and current universal screening, what

1    specific data should the Georgia Department of

2    Education being collecting?

3        A.    It is common in education for educational

4    systems to understand and utilize universal screeners

5    and progress monitoring data in a variety of

6    different forms.  It's -- for lack of a better way of

7    saying it right now, it's a lot of data on how to

8    determine student progress.

9        Q.    And sitting here today, because you

10   haven't looked at the full universe of data, you

11   can't decide if the Georgia Department of Education

12   is collecting sufficient data to do that.  Did I

13   understand that from earlier?

14       A.    Correct.

15       Q.    Is there a place that the Georgia

16   Department of Education could look to, to determine

17   what is the appropriate criteria of data that it

18   should be examining in order to implement your

19   recommended action number 3?

20       A.    Yes, but not to conflate that with

21   progress monitoring and universal screening data,

22   which is related to student progress.



1      Q.    Okay.

2      A.    There are certainly mechanisms, and the

3  state does already collect these, regarding

4  assessments and alternate assessment outcome data,

5  which is related to recommendation number 3.

6      Q.    Okay.  I think I understand.  Let's go to

7  recommended action number 4 on page 165.  Let's see.

8          In the section under the bold, you list

9  five recommended actions.

10     A.    Mm-hmm.

11     Q.    One is "effective and clear data use."

12  That's letter (c).

13     A.    Mm-hmm.

14     Q.    Is there -- how would one measure the

15  efficacy of their data use in this context?

16     A.    You might remember, or you might not, a

17  little bit ago, I discussed this process of whole

18  system engagement, where I talked about a design or

19  vision for MTSS, or a system of support at the state.

20  And then talked about how the district and the system

21  would work together.

22          That's the second one around state,



1    district, school teaming coaching structures.

2    Effective use of data across those systems.  And then

3    establishment of priorities.  And you remember, I

4    might have mentioned resource -- or I did mention

5    resource mapping and matching earlier.

6              Effective use of data, as indicated, is

7    part of a whole system.  There are a number of tools

8    that talk about how to either make data informed

9    decisions or data-based decisions or evidence-based

10   decisions.  And how to use data in a timely fashion,

11   where you have -- you don't have too much or you

12   don't have too little, so that you can make decisions

13   not only about individual student progress, but

14   progress of schools, progress of LEAs, and progress

15   of the state in their capacity to be able to

16   effectively utilize data.

17       Q.    Okay.  In the bold section up there, it

18   says, "Develop state capacity to serve as technical

19   support for district-scaling of evidence-based

20   implementation actions to support equity-based MTSS

21   with embedded social, emotional, behavioral, and

22   mental health."



1          What did you mean by embedded in that

2  context?

3      A.    What I mentioned earlier about how MTSS,

4  PBIS, and social, emotional learning are a subset of

5  a broader umbrella called the MTSS, or system of

6  support.

7      Q.    Okay.  All right.  Let's go to the next

8  recommended action, page 165, "Develop state capacity

9  to serve as technical support for district

10  implementation of evidence-based practices to support

11  equity-based MTSS with embedded social, emotional,

12  behavioral, and mental health."

13          The first sentence under that reads,

14  "Central to effective statewide reform is a large

15  scale investment in building state, district, and

16  school leadership, and leadership teaming

17  structures."

18          Do you see that?

19      A.    Mm-hmm.

20      Q.    Okay.  Do I take from this that you deem

21  your recommended actions to constitute a reform of

22  the Georgia Department of Education?



 1          MS. TUCKER:  Object to form.

 2          THE WITNESS:  Reform is probably -- I'm

 3   not sure what to say about whether or not it is

 4   reform.  I mean, reform could be something very small

 5   or something very large.

 6          In this particular case, I am referencing

 7   statewide adjustments to the GNETS program, in order

 8   to reduce, eliminate -- I'm sorry, eliminate

 9   unnecessary segregation and lack of access to fair

10   and equal educational opportunities.

11   BY MR. BELINFANTE:

12       Q.    And that -- central to that would be

13   large-scale investment in building state, school

14   district, and school leadership teaming structures,

15   correct?

16       A.    Yes.

17       Q.    Okay.  You saw this one coming.  Can you

18   tell me what you mean by large-scale investment?

19       A.    Yeah.

20       Q.    And quantify that in the best way you can.

21       A.    Yes.  Investment, in this context, means a

22   commitment to a vision of implementation focused on



1    building capacity at the state, district, and

2    leader -- school levels around leadership and

3    leadership teaming structures.

4              This is a high leverage practice that

5    utilizes people that are already in the system, or

6    may already be in the system, to implement effective

7    strategies.  And in this case, would help support

8    students in the GNETS program having different

9    options, rather than segregation.

10    Q.    And is there a role for the current

11    educators providing services in GNETS classrooms to

12    do that?

13    A.    My personal belief is that -- I'll say

14    this.  Because of the context, a number of educators

15    struggle within the GNETS program, because of its

16    institutional, like, nature, and its segregation away

17    from general education population.

18              I think that many educators within the

19    GNETS program, if they were in an enabling context

20    that was not segregated, and were provided with

21    appropriate professional learning resources and

22    support, aligned with a vision in the state that did



1    not uphold the current system of segregation, that

2    those educators would be effective in providing

3    supports to students who are currently served in the

4    program in a different way.

5        Q.    Could current -- and I think this may be

6    what you just said.  But could current GNETS

7    instructors, educators, through training, provide

8    education -- an education that would satisfy your two

9    recommendations on page 162?

10       A.    Certainly educators within the GNETS

11   program, if given a different context environment,

12   and appropriate professional learning and support,

13   could provide effective supports to students in

14   general education settings within the state.

15       Q.    So does that mean that a person who is now

16   teaching in a GNETS classroom would be teaching in a

17   general zoned classroom?

18       A.    It depends.

19       Q.    Would that be required in order to satisfy

20   the two --

21       A.    No.

22       Q.    -- recommendations?



1          A.     I'm sorry.

2          Q.     Yeah, I think the answer may be the same.

3     But that would be required for the two

4     recommendations on page 162?

5          A.     No.

6          Q.     Okay.  If you could turn to page 161, the

7     last sentence of the first paragraph, not full

8     paragraph, but the last paragraph reads, "My hope is

9     that educators within the GNETS program will embrace

10    the recommendations and see themselves as part of a

11    movement toward better support for themselves,

12    professionally, and better outcomes for students with

13    behavior-related disabilities."

14              Do you see that?

15         A.     I do.

16         Q.     What did you mean by a movement?

17         A.     The -- all the things we've just been

18    discussing regarding providing supports and services

19    to students within -- currently served within the

20    GNETS program, to be served in a system that is not

21    segregated and provides fair and equal access to

22    those students.



1       Q.    In terms of equal access, what specific

2   education services and support did you find were

3   offered, other than -- I think we talked about, in

4   one example, the speech therapy.  In another example,

5   there was mental health counseling.  What specific

6   services and supports did you find were offered to

7   students in general zoned schools, but not GNETS?

8       A.    That is really all of finding 2.

9       Q.    Okay.

10      A.    Would you like to go there?

11      Q.    I will.  And I think I probably will in a

12  little bit longer, because I think there is a lot in

13  there that I'm not talking about.  So for example,

14  I'm not talking about gymnasiums, I'm not talking

15  about the status of the air conditioning thing that I

16  saw in finding 2.

17          What I'm -- that question that I just

18  asked was more specific to things -- yes, you

19  discussed them in finding 2, but it's a narrower

20  question, if that makes sense.

21      A.    Okay.  So you're not talking about unfair,

22  unequal, and harmful facilities?



1    Q.    I'm not.

2    A.    Okay.

3    Q.    I'm not.  I'm talking about the services

4  and supports.  But I think we probably -- we may have

5  covered that earlier today, unless --

6    A.    I can look.

7    Q.    Sure.

8    A.    You're also not referencing the

9  distinctions between the interior of the buildings.

10    Q.    No, nothing involving physical plans.

11    A.    Okay.  Okay, the same with conditions of

12  classrooms, then.  You're not referencing that.

13    Q.    No.

14    A.    If it was the morning, I could say all of

15  these things off the top of my head.  But right now,

16  I'm going to flip pages.  Also, not the restrooms,

17  you're not referencing.

18    Q.    No, nothing physical.

19    A.    I gotcha.

20    Q.    It's really just the -- you know, in zoned

21  schools, there was speech therapy, and in GNETS,

22  there was not.  That kind of service.



1        A.      Mm-hmm.  In zoned or home schools, there

2    were gymnasiums.  In many GNETS programs, there were

3    not, or they were inferior.  The same with

4    playgrounds.  The same with other outdoor common

5    spaces, for example, at high schools or middle

6    schools.

7                In zoned or home schools or general

8    education environments, there were grade level

9    appropriate resources for students in general

10   education, including those who had disabilities.

11   There were --

12       Q.    I'm sorry, when you say disabilities, you

13   mean behavioral/emotional disabilities?

14       A.    I mean students who receive -- who have

15   disabilities that are not in the GNETS program.

16       Q.    Right.  But because you corrected me on

17   this earlier.  We're not talking about, like, a

18   student with a physical disability, for example,

19   like, may be confined to a wheelchair, or something,

20   versus what we've been talking about, the

21   emotional/behavioral health disability?

22       A.    I was correcting how you said the word,



1    but --

2         Q.    Okay.

3         A.    What I'm actually talking about right now

4    is -- or how you said the words, the sequence of the

5    words.

6         Q.    Okay.

7         A.    But what I'm talking about here is

8    students who have disabilities, have IEPs, may have

9    behavior-related disabilities, accessing general

10   education or in the general education environment,

11   but still receiving special education services, as

12   compared to -- or as -- for purposes of this question

13   to students who are receiving services in the GNETS

14   program with behavior-related disabilities.

15        Q.    Got it.  Okay.

16        A.    So I mentioned grade appropriate

17   resources, the standards-based content, rather than

18   child-like -- young child preschool-like materials

19   for students who were not in preschool, but rather in

20   high school.

21             So they had -- in general education

22   environments, they had standards-based learning,

1  rather than functional curriculum.  They had lesson

2  planning aligned with standards-based instruction on

3  grade level and appropriate for student age.  They

4  had content mapping, knowing when they were going to

5  teach what throughout the course of the year.  That

6  was not in place in GNETS program sites.  There was a

7  lack of learning content and resources in GNETS

8  programs.

9           Therefore, I think your question was

10  related to what was in general education sites that

11  wasn't in GNETS programs, in general, and a lack of

12  learning content and resources.

13           There was the use -- overuse and reliance

14  on online instruction in place of certified educators

15  in GNETS, as opposed to in general education.  You'll

16  have to forgive me.  I think I'm switching back and

17  forth to what has and doesn't have, but it's in the

18  report.

19       Q.    I'm following you.

20       A.    Okay.  Then the general education

21  environments had what is typical scheduling, master

22  schedules from students across the spectrum, that was

1    in place.  And I can go on, but I'm just wondering if

2    I could hear the question one more time.  I want to

3    make sure I'm not wandering.

4         Q.    Sure.  What I'm trying to determine is,

5    what are the specific services that are offered --

6    that you conclude are offered in general zoned

7    schools versus in a GNETS program.

8         A.    Okay.

9         Q.    And I'm not talking about, again, the

10   comparative physical plan.  That was the piece I'm

11   excluding.

12        A.    Okay, so we're still on the same page.

13        Q.    Yeah.

14        A.    So additionally, in general education

15   sites, there is regular access to specials,

16   connections and exploratory classes.  That is not the

17   case in GNETS sites.  Transportation within the GNETS

18   program is segregated or different from what you find

19   if you were going to a home school.

20             And I can continue going on and on, if you

21   would like, including poor school climate and

22   culture --



1          Q.    Let me ask it this way.  If there is a

2     service that you're opining is available in a general

3     zoned school, but not in a GNETS school, I would find

4     it in the report; is that right?

5          A.    Yes.

6          Q.    Okay.  I mean, you've given --

7          A.    I stopped at page 129, and it goes on for

8     a while.  And I would encourage -- I just don't want

9     to keep reading this out loud, but it goes from 129

10    to, I believe, page 157.

11         Q.    And you can tell by the amount of ink that

12    is on the pages, I have read it.

13         A.    I see that.  Again, I know, thank you.

14    Just thank you for that, I'm just going to say.  But

15    on that note, I need to have a little break, if this

16    is an okay time.

17              MR. BELINFANTE:  I think it's a good time.

18              THE VIDEOGRAPHER:  Off the record at

19    15:40.

20              (Recess.)

21              THE VIDEOGRAPHER:  On the record at 15:57.

22    BY MR. BELINFANTE:



1          Q.    Dr. McCart, I'm going to show you what

2     we'll mark as Exhibit 7, which is the GNETS rule --

3     what I'll call the GNETS rule, and is included in

4     amended Appendix E.

5                    (McCart Exhibit No. 7 was identified

6                     for the record.)

7     BY MR. BELINFANTE:

8          Q.    So I'm going to presume you have seen this

9     before.  Is that accurate?

10         A.    I have seen the GNETS rule.  This looks a

11    little different, but --

12         Q.    The formatting is probably different.

13         A.    Yes.

14         Q.    Okay.  My question is, is there any -- is

15    it your opinion that there is anything in the GNETS

16    rule that is, per se, discriminatory?  That's not a

17    good question.

18              Is there anything in the GNETS rule that

19    you find automatically causes unnecessary

20    segregation?

21                    MS. TUCKER:  Object to form.

22                    THE WITNESS:  Can you repeat the question?

1    BY MR. BELINFANTE:

2        Q.    Sure.  Is there anything in the text of

3    the GNETS rule that you opine or understand causes

4    unnecessary segregation?

5        A.    I can't draw the line between words in a

6    rule and unnecessary segregation.  There are

7    certainly concerns when looking at the rule.

8        Q.    Okay.  Could you identify for me what your

9    concerns with the rule are?

10        A.    And maybe what I meant to say is, concerns

11    in implementation, and how it plays out within the

12    GNETS program.

13            So, for example, on the bottom of page 3

14    of the GNETS rule, sub -- section (4), sub (c), it

15    says, "The GNETS continuum of services by

16    environment," and then it proceeds to list one, two,

17    three, four, five, six possible service provision

18    and/or placement options for students who are in the

19    GNETS program.

20            And based on my multi-year review, I was

21    surprised at the number of students served in --

22    solely in GNETS centers for the school day, like one



1    through five were skipped.

2        Q.    And what is your understanding of who

3    decides where those students are going to receive

4    services as in 1 through 6?  Is it at the LEA level

5    or the state DOE level?

6             MS. TUCKER:  Object to form.

7             THE WITNESS:  As I stated earlier in the

8    day, if an IEP team is meeting regarding supports and

9    services for a student who has a behavior-related

10   disability, they can only offer what's available.

11            So for example, if in North Fannin,

12   Georgia, the only option available is a center, then

13   any student in that region that is referred to the

14   GNETS program has to attend a center, as opposed to

15   any of the other options that are listed as part of

16   this rule.

17   BY MR. BELINFANTE:

18       Q.    And --

19       A.    Therefore, unnecessarily segregated.

20       Q.    Okay.  And they're unnecessarily

21   segregated because the service is only provided in

22   the GNETS facility?  Is that what I understand you to

1    say?

2         A.    In the segregated GNETS center-based

3    facility, yes, the ones that are separate and

4    distinction from any relationship or connection to

5    the general education sites.

6         Q.    Okay.  Let's take your example of North

7    Fannin County.  If in North Fannin County School

8    District, there are four students who qualify with

9    emotional/behavioral disability, is it your opinion

10   that that school district can partner with other

11   school districts in the area, and provide services in

12   order to achieve economies of scale, even if that

13   means providing education services in a segregated

14   environment?

15        A.    I don't know what you're asking.

16        Q.    Okay.  So let's say -- you're familiar

17   with RESAs.  We talked about that.

18        A.    Yes.

19        Q.    And in a RESA, school districts can work

20   across geographic boundaries, in terms of county

21   school districts, et cetera, to pool resources and

22   provide services; is that right?



1          A.     I don't know about providing resources,

2     but I understand where you're going.

3          Q.     Okay.  Do you have -- have you, in your

4     report, looked at -- and I may have asked this

5     before, and I apologize.

6          A.     That's okay.

7          Q.     How LEAs -- what is the authority of an

8     LEA to raise funds independent of any state

9     appropriations?

10             MS. TUCKER:  Object to form.

11     BY MR. BELINFANTE:

12          Q.     And by raise funds, I mean taxing, not

13     bake sales.

14          A.     I -- did you ask if I opined on that?

15          Q.     Do you have an understanding of whether or

16     how LEAs can raise tax revenue to obtain resources,

17     independent of what the state may provide through

18     appropriations?

19             MS. TUCKER:  The same objection.

20             THE WITNESS:  No, it was not in the scope

21     of my review of this case.

22     BY MR. BELINFANTE:

1        Q.    If a school district -- let's take North

2    Fannin again, within the entire district -- I realize

3    this is a hypothetical --

4        A.    Yeah.

5        Q.    -- has three students with an

6    emotional/behavioral disability scattered.  One's in

7    lower school, one is in what I'll call middle school,

8    and then one is in upper school, high school.  How

9    would that school district address the needs of those

10   students in an economically feasible manner?

11   Feasible understanding being subjective.

12       A.    Sure.

13       Q.    But I think you see where I'm going.

14       A.    I do.  And the easiest answer to that is

15   by following the recommendations that I put on --

16   starting on page 160, because those recommendations

17   lead to a system of support in which efficiencies are

18   created, service provision is appropriate based on

19   the student need, and support students with

20   disabilities, including those with behavior-related

21   disabilities without the need to unnecessarily

22   segregate those students based on geography.



1        Q.    You mentioned one of your concerns with

2    the GNETS rule was on page 3, which is rule (4)(c).

3    Do you have any others that you're concerned with, in

4    terms of the GNETS rule itself?

5               MS. TUCKER:  Object to form.

6               THE WITNESS:  I would need to review this

7    in greater depth than you likely want -- you likely

8    want me to right now, to determine whether or not I

9    have any other concern regarding this rule.

10   BY MR. BELINFANTE:

11       Q.    Let me ask this.  If you had concerns with

12   the rule as written, would it be reflected in your

13   report?

14       A.    It may or may not be reflected in the

15   report.

16       Q.    Okay.

17       A.    It's only reflected insomuch as it relates

18   to my findings and recommendations.

19       Q.    Okay.  Let's put that aside, then.  Let's

20   look at page 41 -- not 41.  Page 41 -- okay, in the

21   back of the report --

22       A.    I just want to add one more time that I'm

1    not exactly sure if this is the same.  So Exhibit 7.

2         Q.    Okay.

3         A.    Only to just check that.

4         Q.    Okay.  And we can do that, because I think

5    you identify the reg, based on Georgia Department of

6    Education's website.  So it does look different.

7         A.    Yes.  And I think this is from Westlaw,

8    Yeah.

9         Q.    If you could turn to Appendix A of your

10   report, the data tables and graphs.

11        A.    Mm-hmm.  Oh, I said mm-hmm, but I'm not

12   there.

13        Q.    That's okay.

14        A.    Yes.

15        Q.    Okay.  This is -- the work that's

16   reflected here was done by one of your colleagues; is

17   that correct?

18        A.    This is my work.  I had support from my

19   colleague, Jeong Choi, as noted in the beginning of

20   the report.

21        Q.    Got it.  If we can look at figure B.

22        A.    Figure B in the report, I'm guessing?



1          Q.    I'm sorry.

2          A.    Which is --

3          Q.    Yeah, which goes back -- it refers to

4     that.

5          A.    Yeah.

6          Q.    Yeah.  And that's on page 14 of the

7     report.

8          A.    Correct.

9          Q.    Okay.  You would agree with me, and I

10    think the report says this, that the overall number

11    of students who are receiving services through GNETS

12    has declined from school year '15 to '16 to school

13    year '21 to '22, correct?

14         A.    I speak to that directly in the report on

15    page 15.  "Even though total placement numbers" in

16    the GNETS program "indicate a decline in student

17    population in the GNETS program, the percentage of

18    new students admitted to the GNETS program has

19    remained steady.  New student admission comprised

20    over 21% of the total GNETS program student

21    population in school year 2016-'17, and remained near

22    20% for the school year 2021-'22, as indicated in



1    Figure D."

2        Q.    Okay.

3        A.    The sum of that being the -- although the

4    overall numbers of students in the program are

5    reducing, the number of students being admitted are

6    still hundreds a year.

7        Q.    Did you consider, in looking at this data,

8    if the numbers were reducing because students are

9    graduating, or because students are returning to

10   their zoned schools, or a combination?

11       A.    There are no -- yes, I did consider that.

12       Q.    Okay.  And what did you find to be the

13   leading cause of the total number of students in

14   GNETS declining by almost half, not quite?  Almost

15   half is lawyer math for 4400 to 2995.

16       A.    Four minus two.  That's half.

17       Q.    I had to correct myself before you did it

18   for me.

19       A.    Yeah.

20       Q.    But my question is, and I'll repeat it.

21   Were you able to make a determination as to what

22   number graduated versus what number returned to their

1    zoned schools?

2        A.    There's much more to the picture than

3    that, as you might expect, in that indicators such as

4    numbers of referrals to the program may have

5    decreased.  Students being expelled or leaving the

6    program, but not graduating may have occurred.  An

7    increase in district or regional area ability to

8    provide supports to students with behavioral related

9    disabilities without use of the GNETS program.  So

10   there are a number of reasons, including concerns

11   with the quality of the program and the outcomes

12   experienced by students in the program.

13       Q.    Okay.

14       A.    Why those numbers have decreased.  Again,

15   what is of concern is the number of students still

16   being admitted each year.

17       Q.    And does your report -- and I may have

18   just missed it, but does your report actually explain

19   or provide an opinion as to why the number has

20   decreased?  And by the number, I mean total students

21   receiving GNETS services.

22       A.    Beyond what I've just stated, I'm not sure



1    that's --

2         Q.    Let's look at Figure D on page 16.

3         A.    Mm-hmm.

4         Q.    Figure D is what you're referring to as

5    new students being placed in GNETS; is that correct?

6         A.    New student placement in the GNETS program

7    by grade from '15-'16 to '21-'22.

8         Q.    Okay.  And here, would you agree with me

9    that the trend is downward from school year '16 to

10   '17 to school year '21-'22?

11        A.    In total student enrollment?

12        Q.    Yes.

13        A.    Yes.

14        Q.    Total new students, I'm sorry, being

15   admitted.

16        A.    Oh, no.

17        Q.    Okay.

18        A.    The percentage of students being admitted

19   to the program each year remains the same.

20        Q.    I'm sorry, but I'm looking at Figure D,

21   which is just the raw numbers.  I'm not trying to be

22   tricky.  I'm just trying to make sure I understand

1    the graphic.

2            It looks to me -- and am I reading this

3    correctly, that in school year '16 to '17, there were

4    898 new admittants to GNETS?

5        A.    Mm-hmm.

6        Q.    And so in school year '21 to '22, there

7    were 576?

8        A.    Yes.  So if the question is, is 898 higher

9    than the number 576, the answer is yes.  When you

10   look at the proportion, because there are different

11   data sets.  When you look at the proportion of

12   students, new students enrolled, that's what is

13   remaining constant at 20 percent.

14       Q.    Okay.

15       A.    Again, making the point of hundreds of

16   students being admitted each year.

17       Q.    Does your report contain any analysis or

18   opinion as to why the overall number of new students

19   has declined from -- and declined consistently from

20   school year '16 to '17 to school year '21 to '22?

21       A.    I'm just going to reference what I said

22   earlier to the question you asked, which was similar

1    or the same.

2        Q.    Okay.  And when you talk about the

3    percentage remaining the same, is that reflected in

4    one of the figures?  The percentage of new student

5    admits to overall student population?

6        A.    That is at the bottom of page 15.

7        Q.    Okay.

8        A.    It's actually -- that paragraph is

9    actually under Figure C, which talks about the number

10   of students -- proportion of students that are in

11   center-based sites versus school-based sites.

12           But what you're asking about is Figure D,

13   and the language you see at the bottom is what I

14   already read, which is the total placement numbers of

15   students, students placed in the program indicate a

16   decline in the student population, that the

17   percentage is still concerning, in that there are

18   hundreds of students each year still being admitted

19   to the GNETS program.

20           So we would look at whether or not, based

21   on the number of students in the program, is the

22   proportionate number of new admittants decreasing at

1    the same rate as the number of students in the

2    program.

3         Q.    Why would you look at that as opposed to

4    the overall population within the program?

5         A.    Because there's a disproportionate impact

6    on students who enter the program and remain over

7    multiple years.  So you want -- so for example, if in

8    '21-'22, a new student is admitted to the program,

9    and that student's a kindergartner, they could be --

10   data would indicate that there's a likelihood that

11   that student would remain in the GNETS program for

12   many, many years.

13        Q.    I guess -- and this is why lawyers

14   shouldn't play statistician for sure.  But where I'm

15   getting confused on that is, if the overall number is

16   declining and people are coming in, it would seem to

17   me, based on that -- and the number of people who are

18   coming in is also declining, that people are cycling

19   in and out, it would suggest to me that they are

20   moving in and out, or they're not staying.  Because

21   if they were staying, the overall number would stay

22   the same, given that there is, as you say, hundreds



1    of people coming in every year.

2        A.    Hundreds of children.

3        Q.    Yeah.  So how am I misunderstanding

4    your --

5        A.    I think maybe -- I know you looked at this

6    already, but maybe Figure E and F would be more

7    helpful in understanding that.  I think the

8    misunderstanding is coming -- related to in and out.

9        Q.    Okay.

10       A.    So when you look, for example, at Figure

11   E, you see what's highlighted here, second graders in

12   '15-'16, year after year, 35 percent of those

13   students remained in the GNETS program for multiple

14   years.

15       Q.    Okay.

16       A.    So given the length of time students

17   remain in the program once admitted, there's a

18   disproportionate negative impact on the students who

19   enter the program at a younger age.

20       Q.    Okay.

21       A.    That's what this graph references.

22       Q.    Okay.

1          A.      And the same with the next graph.  So a

2     student can just -- the data indicates that students

3     can be there for many years.

4          Q.      And so just to --

5          A.      And are.

6          Q.      Just so I'm understanding the graphic,

7     let's take Figure E.  In school year '15, there were

8     247 students admitted in the second grade for the

9     GNETS program.  And by school year '21-'22, of that

10    247, 88 remained.

11         A.      Yes.

12         Q.      Am I reading that correctly?

13         A.      You are reading that correctly.

14         Q.      Okay.  Is there anywhere I could go to

15    look at national data for -- comparative national

16    data to what I'm seeing in Tables B, C, D, E, and F?

17         A.      B, C, D, E, and F.

18         Q.      In other words -- let me back up a second,

19    because I'm looking at this in a vacuum as it relates

20    to Georgia.

21         A.      Right.

22         Q.      If I were to look at how -- let's just

1    pick on a state, Alabama, because they're next door,

2    Alabama's special education.  And if I wanted to

3    track, you know, students who were in a special

4    education classroom and students who are not, is

5    there a place I could go to try to find that type of

6    information?

7        A.    The uniqueness of the situation in Georgia

8    is the fact -- and why you're seeing it a bit in a

9    vacuum, as you said, is because it is a systemic,

10   statewide issue.  And so there aren't comparative

11   national data, because this is a statewide system of

12   segregation.

13       Q.    Is it -- okay.  Is Georgia the only state

14   you're aware of that has freestanding -- public

15   freestanding schools for students with

16   emotional/behavioral disabilities?

17       A.    The State of Georgia does not have

18   freestanding schools for students with

19   behavior-related disabilities.  They have entities.

20       Q.    What's the difference between a school and

21   an entity?

22       A.    An entity is what the -- I don't know.

1    It's what it's called.  Let me -- it's on page 20.

2    Let me take a look.

3        Q.    Sure.

4        A.    Starting at the full paragraph number 2,

5    it states, "unlike traditional special education

6    programs that operate within home schools, districts,

7    and sites within the GNETS program" -- "the sites

8    within the GNETS program are organized into a

9    regional GNETS program, and are viewed as special

10   entities, not schools."

11       Q.    What's the authority for that sentence?

12       A.    I would need to look again.  You had asked

13   before the break if it was in my report, and I found

14   it in my report.  But I would have to check the

15   documents again to see where that was located.

16       Q.    Okay.  Putting aside the phraseology, are

17   there other states that have freestanding buildings

18   for students with emotional and behavioral

19   disabilities, public -- in the context of public

20   education?

21       A.    I was not asked to look at that as part of

22   this analysis.  I was asked to specifically look at



1    the State of Georgia.

2        Q.    Okay.

3        A.    So whether or not there's the existence of

4    a freestanding school for students with

5    behavior-related disabilities, in and of itself, I

6    can't speak --

7        Q.    I guess -- I mean, because a lot of times

8    today, you've told us, fairly or unfairly, but based

9    on your experience and your years of service and

10   looking at different states, et cetera, in all of

11   that experience, understanding it's not what you were

12   to look for in this report.  But are there other

13   states that offer freestanding buildings where

14   students who have a diagnosis of an emotional or

15   behavioral disability receive an education, separate

16   from a generalized school?

17       A.    Certainly if you think about -- oh, with

18   emotional and behavioral disorder.  Certainly in

19   other states, there are environments in which

20   students who have behavior-related disabilities might

21   attend school that have segregated environments.

22            The distinction between that and this,



1    between that example and the GNETS program is the

2    systemic nature.  And when you look, for example, at

3    the map and how many places and how many sites, just

4    referencing the ones I went to, the 70 sites that I

5    went to, the 26 centers -- 27 centers that I went to,

6    GNETS centers, the 36 school sites I went to, 33

7    counties, across a year-and-a-half time, that sheer

8    number is what is at issue here.

9              There's 24 different regional programs of

10   segregation across the state, which is different

11   than, is there a school somewhere in one of the

12   states that provides services to kids who have

13   behavior-related disabilities that is segregated.

14        Q.    Well, isn't it better that the student

15   receive services closer to home?  So if you're

16   looking at a freestanding building, take the State of

17   Wyoming, I think you mentioned earlier.  If Wyoming

18   only had one versus Georgia that has several, where

19   folks can remain close to home, isn't that better and

20   less discriminatory?

21              MS. TUCKER:  Object to form.

22              THE WITNESS:  Students in the State of



1    Georgia that I observed were in segregated

2    environments that were very far from their homes.

3    BY MR. BELINFANTE:

4        Q.    They would be further from their homes in

5    most cases, however, if there was only one location,

6    isn't that right?

7        A.    You mean like in North Fannin?

8        Q.    Sure.  No, I mean, if like there was only

9    one GNETS facility in Atlanta, and so if an IEP team

10   said, you need to go to a GNETS facility, and the kid

11   lives in Savannah, or the kid lives in North Fannin

12   or Albany, take your pick.  I mean, clearly, that

13   would be more segregating than breaking it out into

14   the 26 regions.

15       A.    All of this is hypothetical.  And again,

16   it's referencing the statewide systemic nature of

17   segregation.  What would be better is if an IEP team

18   would be able to offer the full array of supports and

19   services that did not require unnecessary segregation

20   and lack of access to fair and equal educational

21   opportunities.

22       Q.    What's the difference between fair and



1    equal educational opportunities and fair and

2    appropriate public education?

3              MS. TUCKER:  Object to form.

4              THE WITNESS:  I think I need you to

5    restate that.

6    BY MR. BELINFANTE:

7         Q.    What's the difference between fair and

8    equal educational opportunities and fair and

9    appropriate public education, or FAPE?

10             MS. TUCKER:  The same objection.

11             THE WITNESS:  I don't know, at this point

12   in time, that I can articulate that.  Right now,

13   right here.

14   BY MR. BELINFANTE:

15        Q.    Okay.  Could I ask you to go back to page

16   8 of your report.  And sorry I'm skipping around.

17   The good news is that means I'm actually finishing.

18        A.    Yeah.  I mean, take your time.

19        Q.    Right.

20        A.    Page, I'm sorry, 8 you said?

21        Q.    Page 8.

22        A.    Mm-hmm.

1        Q.     The question I have is about the chart or

2    Table 1 that begins on page 8, and continues on page

3    9.  But equally, the Table 2 that's there and Table 3

4    on page 11.  Is this a chart or a criteria that you

5    developed, is it one that you borrowed from

6    peer-reviewed studies or whatnot?

7        A.     It is tables that I developed based on

8    well-documented indicators of segregated or

9    institutional environments within the field of

10   special education.

11       Q.     Okay.  Understanding that the articles

12   that are cited, or at least most of them, I won't say

13   all of them, because I know there's, like, news

14   articles and so on.  But the field of special

15   education articles that are cited in Appendix --

16   amended Appendix E, would I find -- is there an

17   article that points to these factors, or is it just

18   based on your collection of the various articles that

19   are out there?

20       A.     It's -- you would find in the appendix

21   some articles -- a number of articles that speak to

22   the indicators you see in Table 1, 2, and 3 in

1    different forms and formats.

2        Q.    Okay.

3        A.    Also, I've used my experience, having

4    worked in classroom environments, institutional

5    settings, community living organizations, and

6    students with behavior-related disabilities over the

7    course of my professional career.

8        Q.    Can you look at page 9 of your report?

9    One of the things you look to is number 15.  "Are

10   there spaces in which students in the GNETS program

11   are placed in time out or otherwise isolated based on

12   their behavior?"

13       A.    Yes.

14       Q.    Is it your experience that there are

15   places in general zoned schools where students may be

16   placed in time out or otherwise isolated based on

17   their behavior?

18       A.    No.

19       Q.    You've never seen a zoned school where

20   students are placed in time out or otherwise isolated

21   because of their behavior?

22       A.    Not in the manner in which I'm referencing

1    in this report.

2            Q.    Okay.

3            A.    If you're asking, have I ever worked in a

4    preschool where a teacher had a student -- a

5    two-year-old sit down for a few minutes, yes.  That's

6    not what we're talking about here.

7            Q.    Okay.

8            A.    Here, we're talking about widespread

9    isolation rooms.  I know you looked at the pictures.

10           Q.    Yeah.

11           A.    And saw them.

12           Q.    Okay.  Let's go back to page 162.  And the

13   first full paragraph there under that formula, if you

14   will?

15           A.    Graphic.

16           Q.    Graphic, yeah.

17           A.    Formula, yes, thanks.

18           Q.    Three or four sentences down.  Or

19   actually, I'll just start with the second full

20   sentence.  "This guidance includes statewide mapping

21   of what currently works within the state and the use

22   of current national evidence-based practices for

1    large scale implementation.  Such effective practices

2    include, but are not limited to, standards-based

3    learning, MTSS, PBIS, social-emotional learning,

4    restorative practices, and readily available mental

5    health supports."

6              Do you see that?

7         A.    Yes.

8         Q.    What do you mean by restorative practices?

9         A.    I believe I defined that also on page 6.

10   Let me take a quick look.  I may not have.

11             No, I did not.

12             So restorative practices is a mechanism --

13   let me say, a set of practices implemented with

14   evidence behind them to support students in restoring

15   relationships with other students or adults in their

16   life.

17             This can include, for example, restorative

18   circles or teaching ways in which, if something has

19   happened between a student and another student, they

20   are able to work through that together, and restore

21   their relationship.  It's a very oversimplified

22   definition of it, but that's the basic idea.



1        Q.      That's okay.  If you got more specific,

2    I'd probably -- no, not fall asleep.  You'd probably

3    lose me.

4              What type of qualifications would someone

5    need to provide restorative practices?

6        A.      They would need -- depending on what kind

7    of support they were providing, they would need

8    professional development and learning, maybe some

9    coaching on that.  Those trainings can -- or

10   professional development sessions can last anywhere

11   from six hours to several days, depending on the type

12   of -- or level or intensity of practices that are

13   being utilized.

14       Q.      Could someone without formal training in

15   psychology -- and by that, I mean at least a degree

16   in psychology or a licensed psychologist.  Could they

17   provide effective restorative practices?

18       A.      Absolutely.

19       Q.      Okay.  In that same sentence, right after

20   restorative practices, one of the effective practices

21   you identify are "readily available mental health

22   supports."  How do you quantify whether mental health



1    supports are readily available?

2        A.    In many of the documents, parents who were

3    not able to receive mental health services or

4    supports through the GNETS program accessed mental

5    health resources and supports in their community,

6    separate from their child's learning environment.

7    That's what I'm referencing.  There's mental health

8    agencies and resources across the State of Georgia.

9        Q.    Are you familiar with the term Community

10   Service Board as it relates to Georgia?

11       A.    I don't think so.

12       Q.    Okay.  Let's --

13       A.    I may have seen a document.

14       Q.    Sure.

15       A.    I don't recall right now.

16       Q.    Let's take a hypothetical student with

17   emotional/behavioral disability.  Let's presume that

18   student's IEP says they need mental health services.

19   The student receives mental health services paid for

20   by Medicaid, but outside the school setting.  If they

21   receive it outside the school setting, is it your

22   professional opinion that that leads to unnecessary



1    segregation in the school?

2        A.    I don't see those as related.

3        Q.    Okay.  Then I think I misunderstood what

4    you were talking about a moment ago, when I asked

5    about how do you quantify or determine what is

6    readily mental health support?

7        A.    I was giving an example of what I saw in

8    some of the documents in which mental health services

9    were not provided in the GNETS program, and which

10   parents sought out mental health services in their

11   community.  So that's what I meant by readily

12   available.

13       Q.    Okay.  So is it your opinion that Georgia,

14   putting aside -- well, is it your opinion that

15   students should be receiving mental health services

16   in schools and not outside of the school?

17            MS. TUCKER:  Object to form.

18   BY MR. BELINFANTE:

19       Q.    If such mental health services would be

20   appropriate to their needs?

21            MS. TUCKER:  The same objection.

22            THE WITNESS:  It is my opinion that



1    students have -- that have behavioral needs based on

2    their disability, that might include the need for

3    mental health supports, should be included in their

4    schooling experience, in order for them to be

5    successful.

6    BY MR. BELINFANTE:

7        Q.    And I'm sorry, I may have misunderstood

8    what you said.  You mean the mental health supports

9    should be included in their schooling experience?

10       A.    Yes.

11       Q.    Okay.

12       A.    When a student has a behavior-related

13   disability, if part of the supports and services that

14   they need to be successful in school is mental health

15   support -- and again, remember, earlier, we talked

16   about how there's a continuum of service provision

17   around mental health supports as well, that they

18   should be able to receive those services and supports

19   in connection with their schooling or learning

20   experience.

21       Q.    Okay.  The same paragraph, right at the

22   end there -- well, I guess not right at the end.  The

1    last set of three sentences.  It begins, "Central to

2    the success of this work is the implementation of

3    effective practices within enabling contexts.

4    Enabling contexts exist in environments where

5    students are not segregated and have fair and equal

6    access to educational opportunities.  This approach

7    will result in significant improvement (including

8    social, academic, behavioral, psychological) in

9    outcomes for the thousands of students currently

10   served in the GNETS program."

11           Do you see that?

12       A.    I do.

13       Q.    So if the state were to adopt your

14   recommended actions on the following pages, is this

15   paragraph saying that that would not work as long as

16   students are in a GNETS program?

17       A.    No.

18           MS. TUCKER:  Object to form.

19   BY MR. BELINFANTE:

20       Q.    What do you mean, then, that it has to

21   happen in an environment where students are not

22   segregated and have fair and equal access to



1    educational opportunities?

2        A.    If you look above at the formula we talked

3    about earlier, that sentence is referencing the

4    formula which talks -- and this is about -- the

5    formula is about national -- years and years of

6    national data on implementation -- systems level

7    implementation of educational and other initiatives.

8            That formula suggests if you put into

9    place effective practices, like we've talked about

10   today, that continuum of supports, and you have

11   effective implementation, we've also talked about

12   that today, like teacher efficacy and fidelity of

13   those effective practices, and you have a context

14   that is enabling to that, meaning that context

15   supports and promotes effective implementation,

16   supports and promotes effective practices, that those

17   three variables are key in resulting in socially

18   significant outcomes in this case for students in the

19   GNETS program.

20           When referencing not segregated, you could

21   say not unnecessarily segregated as part of a

22   statewide systemic system, because that's not an



1    enabling context.  Does that make sense?

2         Q.    I think so.  And I'm going to ask a

3    question, because what I'm struggling with is, it

4    seems like a chicken and egg problem.  In other

5    words, you could do these things, have effective

6    practice, effective implementation, but if there's

7    still students in the GNETS program, will it reach

8    them?  Or does what you're describing apply only in

9    the zoned school to prevent children from having

10   their IEP team recommend GNETS services?  Does that

11   make sense?

12        A.    I understand -- what I understand is that

13   -- or what I think I understand is that whether or

14   not a student is in a segregated setting is not the

15   only determinant of an enabling context.

16            And in the case of the GNETS program, its

17   large-scale systemic segregation, as you said

18   earlier, over 24 regional programs across the state,

19   that systemic part of this equation is what's

20   problematic.  That's what makes it not an enabling

21   condition.

22        Q.    And I should have asked this to start.  It

1    is your opinion that the GNETS program is not an

2    enabling context, correct?

3        A.    Correct.

4        Q.    As you describe it.  Okay.  So for those

5    students in the GNETS program, which you say is not

6    an enabling context, how does this formula reach

7    them, if an enabling context is critical to achieving

8    the socially significant outcomes?

9        A.    An enabling context would offer a system

10   of support that included an array of services that

11   were not based on placement -- putting students in a

12   place as an intervention.  Rather, building a system

13   of support in which students had access to the

14   resources they needed in order to be successful,

15   particularly for students who have behavior-related

16   disabilities.

17       Q.    Okay.

18       A.    It is not -- I'll stop there.

19       Q.    You have described systemic adoption of

20   MTSS as transformational; is that right?

21       A.    Where are you referencing?

22       Q.    I've cheated.  I've read articles and

1    books, so -- do you believe that --

2         A.    Very studious.

3         Q.    Yeah.  Do you believe that if Georgia were

4    to adopt the recommended actions you identify on page

5    163 to 167, it would be transforminal --

6              MS. TUCKER:  Object to form.

7              THE WITNESS:  Transformative?

8    BY MR. BELINFANTE:

9         Q.    Thank you.  I should have taken you up on

10   the offer of Coca-Cola, yeah.

11        A.    Okay.  I think the recommendations

12   included in the report, based upon my experience in

13   implementing these types of supports and services in

14   SEAs in other states, would be an effective way for

15   the state to consider how they might provide services

16   for students with behavior-related disabilities that

17   did not result in unnecessary or inappropriate

18   segregation, and a failure to provide effective

19   educational resources and supports.

20             MS. TUCKER:  I just want to pause.  I did

21   object to that one.  It's not on the record.

22             MR. BELINFANTE:  No objection to the

1    objection.  I'm not saying I agree with the

2    objection.

3              MS. TUCKER:  I understand.

4    BY MR. BELINFANTE:

5        Q.    For the states that you have worked in and

6    have done that, is it your conclusion that there is

7    no unnecessary segregation of students with

8    emotional/behavioral disabilities in those states?

9              And let me clarify it.  By states, I mean

10   the SEA, the Department of Education, not like if you

11   did work for a district in the state.

12       A.    It's an impossible question to answer.

13   You've asked if -- it's -- the magnitude is so great

14   on that question, I can't -- I don't know how to

15   respond.

16       Q.    Okay.  Have you worked with the California

17   Department of Education or school districts within

18   California, or both?

19       A.    Both.

20       Q.    Let me show you what we'll mark as Exhibit

21   8, which is an article, I believe, of yours, as well

22   as others, from 2022.



1              (McCart Exhibit No. 8 was identified

2              for the record.)

3    BY MR. BELINFANTE:

4        Q.    Are you familiar with this article?

5        A.    Yes.

6        Q.    My questions, at least right now, are

7    truly just factual, and I want to understand what

8    California did.  And I'm looking at page 515, using

9    the pages of the article.

10        A.    Mm-hmm.

11        Q.    It says, in the first paragraph, "In late

12    2015, the California legislature appropriated $10

13    million to be directed to a competition restricted to

14    one or more (in collaboration) with the state's 58

15    County Offices of Education to undertake a four-year

16    statewide scale up of MTSS with a whole child

17    perspective across all grade levels, Assembly Bill

18    104."

19              Do you see that?

20        A.    Yes.

21        Q.    Are the California County Offices of

22    Education the LEAs in California?



1       A.      No.

2       Q.      Okay, what are they?

3       A.      They're county offices.

4       Q.      Okay.  Is an LEA in California, do they

5   extend beyond individual counties?

6       A.      I --

7       Q.      Let me ask it this way.  In Georgia, we

8   have school districts, right?

9       A.      Mm-hmm.

10      Q.      Is a school district the equivalent of a

11  County Office of Education in California?

12      A.      No.

13      Q.      What's the difference?

14      A.      One is a county office of education, maybe

15  similar to a RESA.  I have not looked at that, but

16  just for some sort of context.

17      Q.      Okay.

18      A.      A county office that might provide

19  resources and supports to local education agencies

20  within the state.

21      Q.      Got it, okay.  So a county office of

22  education could be, for example -- you were in Fulton

1    County, Georgia?

2        A.    (Nodding head.)

3        Q.    And in Fulton County, we have the county

4    government, Fulton County Board of Commissions, and

5    then the Fulton County Board of Education, which are

6    just different government agencies.

7        A.    Uh-huh.

8        Q.    Or just presume they are.  But in terms of

9    what you're talking about in the County Offices of

10   Education in California, are they under a county

11   board of education or are they under a county

12   government, like, you know, board of commissioners,

13   so to speak?

14       A.    I would have to look at that.

15       Q.    Okay.

16       A.    I don't recall right now.

17       Q.    Do you know how much of the $10 million --

18   or how many county boards of education received any

19   of the $10 million?

20       A.    No.

21       Q.    The effort -- continuing in the same

22   article, "the effort had the potential to reach more

1    than 1,000 school districts and more than 10,000

2    schools."  Is that effort the one -- the 2015 effort?

3         A.    I'm assuming so from the -- yes, from the

4    article.

5         Q.    Okay.  And then it says, "In 2016, the

6    Governor's budget added $20 million more to the

7    effort.  And in 2018, the legislature appropriated an

8    additional $15 million to the scale-up the project,

9    bringing the total appropriation at that time to $45

10   million and extending the timeline to 2023."

11           To your knowledge, how many school

12   districts in California have scaled-up MTSS, as is

13   described in this paragraph?

14        A.    What I can say is that we were responsible

15   for the implementation of MTSS across every single

16   region within the states through --

17        Q.    I'm sorry to interrupt.  You said within

18   the states?

19        A.    State.  Sorry, state.  Within the state.

20        Q.    Got it.

21        A.    And local education agencies within those

22   regions took up various degrees of implementation of



1   MTSS.

2        Q.    Okay.

3        A.    There was a statewide effort.

4        Q.    But not all LEAs took up all levels of

5   MTSS?

6        A.    No.  I don't know.

7        Q.    Okay.  Could you turn to page 517 of the

8   article.  In the second paragraph, under

9   Implementation Issues, it starts, "At present, MTSS

10  in the US, and to a lesser extent internationally, is

11  clearly in its ascendancy.  In configuration with

12  Universal Design for Learning, it affords schools the

13  opportunity to subsume interrelated services under

14  one overarching umbrella framework."  And I'm

15  skipping the citations.

16            My question is about the next one -- the

17  next sentence.  "That said, however, recent research

18  indicates that the process of installing and

19  implementing MTSS to a criterion of full

20  implementation is proving to be a very difficult

21  undertaking, one that requires extensive professional

22  learning and intensive TA, particularly directed at



1    the local education agency capacity to support the

2    effort at the level of the schools."

3          Do you see that?

4    A.    I do.

5    Q.    This was written in 2022.  Any reason that

6    that conclusion has changed, as you sit here today?

7    A.    No.

8    Q.    What is intensive TA?

9    A.    It's providing professional learning

10   support and coaching, as we've been talking about

11   today, to local education agencies to provide

12   effective supports to schools.

13   Q.    I'm sorry, what does just TA stand for?

14   A.    Technical assistance.

15   Q.    Got it.

16   A.    Helping.  Helping.

17   Q.    Okay.  The study goes on to say, "A study

18   of schools that received intensive TA to install MTSS

19   found only 11% of schools secured a fidelity of full

20   implementation score that exceeded the criterion of

21   80% within four years."

22          Do you see that?



1          A.      I do.

2          Q.      Any reason to disagree with that

3    conclusion today?

4          A.      Any reason to disagree with that

5    conclusion today.

6          Q.      Let me ask another question.  Have you

7    seen a study that has updated those numbers since

8    2022, when this was published?

9          A.      This references a Hicks et al. article

10   that was published in 2017 -- 2017.  I think I might

11   be an author on it as well.  So I might be

12   confounding the issue here, but I don't think there's

13   any reason to disagree with the sentence that is

14   here.

15         Q.      Okay.  Any reason to believe that what you

16   describe here would not be the case in Georgia?

17         A.      You're asking me to pick up the words from

18   this report, or this article and what you've just

19   said, and apply that to the State of Georgia?

20         Q.      I'm asking -- yeah, I'll phrase it this

21   way.  Any reason to believe that the process of

22   installing and implementing MTSS to a criterion of



1    full implementation would be something other than

2    very difficult in the State of Georgia?

3         A.    I don't know --

4         Q.    Okay.

5         A.    -- whether or not that would be very

6    difficult.  As I've outlined in the recommendations,

7    it requires a commitment, and I can't remember the

8    exact wording, but an investment.  That was the word.

9    Investment of -- and a belief that MTSS is an

10   effective strategy for providing supports.  And then

11   having the state outline the vision and guidance for

12   that implementation across the state.

13        Q.    Okay.  I understand.

14        A.    That journey for Georgia is unique to

15   Georgia.

16        Q.    But is there any reason to believe -- I

17   understand it's unique to Georgia, but is there any

18   reason to believe that it would be any easier to

19   fully implement MTSS at the LEA level in Georgia than

20   Mr. Choi, and perhaps you as well, in this 2019

21   article -- I don't know if you were part of the et

22   al. -- concluded.



1            MS. TUCKER:  Object to form.

2            THE WITNESS:  Can you say that again?

3    BY MR. BELINFANTE:

4        Q.    Sure.  And I got lost in citing the

5    article.

6        A.    Go ahead.

7        Q.    Is there any reason to believe that the

8    conclusions that were found in that 2019 Choi

9    article, that it would be easier to implement and

10   install MTSS to a full criterion in Georgia than was

11   the experience in that article?

12       A.    From an SEA perspective?

13       Q.    From an LEA perspective.  Because

14   ultimately, it's the LEAs that are implementing this,

15   correct?

16       A.    This is a statewide effort of

17   implementation, statewide scale-up of MTSS.  And I

18   believe this is a reference to how LEAs responded to

19   the statewide direction, guidance, and vision for

20   implementing MTSS.

21       Q.    Okay.

22       A.    And so how -- the sheer magnitude of the

 1   State of California and the number of students, the

 2   number of districts, the number of regions, the

 3   number of counties, the number of schools certainly

 4   contribute to the complexity of implementation like a

 5   State of California.  How that would play out in

 6   Georgia is yet to be seen.

 7        Q.    Okay.  Again, this is truly a factual

 8   question.  Page 522 of the article talks about

 9   schools participating in the CAMTSS and SWIFT-FIA.

10        A.    Show me where you're at.

11        Q.    The bottom, where it says, "Participants."

12        A.    522?

13        Q.    522.  Is that where the appropriations

14   that we talked about that are discussed on page 515

15   of the article --

16        A.    No.

17        Q.    Something totally different?

18        A.    What this -- you're talking about the --

19   well, I interrupted you.  Why don't you go ahead and

20   ask your --

21        Q.    I think you answered the question.  I was

22   trying to understand if there was a link between the

1    two.

2         A.    The dollars and the FIA?

3         Q.    Correct.

4         A.    Okay, there is no linkage there.

5         Q.    Okay.

6         A.    The FIA is an example, you asked earlier,

7    of a fidelity measure for implementation of a system

8    of support.  And the FIA is another one of those.

9         Q.    Okay.  Got it.  We can put that one away.

10   Let me show you what we'll mark as Exhibit 9.

11                    (McCart Exhibit No. 9 was identified

12                    for the record.)

13   BY MR. BELINFANTE:

14        Q.    And this is an older article, one from

15   2014, you wrote with -- is it Dr. Sailor?

16        A.    Yes.

17        Q.    Okay, with Dr. Sailor.

18        A.    Mm-hmm.

19        Q.    My question is about -- this is right at

20   the time, I believe -- at or around the time that

21   SWIFT received the $24.5 million grant?

22        A.    Two years after.



1        Q.      Two years after?

2        A.      Mm-hmm.

3        Q.      And it was at that time, in the first

4    paragraph, you note that "federal data sources

5    indicate percentages of students served" --

6        A.      Hang on.

7        Q.      Sure.

8        A.      Where are we at?

9        Q.      First paragraph under the

10   Kleinhammer-Tramill, Burrello, and Sailor quote.

11       A.      Uh-huh.  I'm with you, "Federal data

12   sources" --

13       Q.      -- "increased percentages of students

14   served under the Individuals With Disabilities

15   Education Improvement Act (IDEA) 80% or more of the

16   time in the general education classroom, but most of

17   the variance is associated with students who require

18   fewer support needs, while remaining dismal for those

19   with more needs," citing McLeskey and others' article

20   in 2012.

21       A.      Yes.

22       Q.      Has that distinction remained today in

1   2023, where there's greater variance with students

2   who require fewer supports and -- from those who have

3   more needs?

4          A.     Variance of what kind of supports?

5          Q.     Variance in -- for two different

6   populations, right?  The students who require fewer

7   supports, and those who have more needs.  As I

8   understand your description of the federal data,

9   students who are spending 80 percent or more time in

10  general education, if they have fewer needs, that

11  number has varied.

12          But students who have, in the words of the

13  article, more needs, that number had remained low or

14  dismal.  My question is, has that changed since 2012,

15  based on -- and I'm citing 2012, because that's the

16  article cited.

17         A.     Mm-hmm.  This citation is from James

18  McLeskey and others, and how they describe students

19  with more or less needs.  And again, not to be

20  challenging, but rather just for clarity, how you

21  determine student need is varied, based on the source

22  of data that they're utilizing to make this decision.



1            So it's hard for me to say whether or not

2    the fact that was stated in 2012 by James McLeskey is

3    the same today.

4        Q.    Okay.

5        A.    Without knowing a little bit more.

6        Q.    Okay.  If I wanted to find data on that,

7    because I know we've talked about, there was a report

8    to Congress from U.S. DOE Special -- Office of

9    Special Education.  Where would I look to find that

10   most recent data?

11       A.    You could find that data in likely some of

12   the documents considered here.

13       Q.    Okay.

14       A.    In the list of materials.  I can't recall

15   the name.  Again, if it was morning, maybe I could.

16       Q.    Okay.

17            MR. BELINFANTE:  All right.  Why don't we

18   do this.  If we could take another ten-minute break.

19   This is my -- I can start to close things up, which

20   does not mean expect only 15 minutes left.

21            THE VIDEOGRAPHER:  Off the record at

22   17:07.



1                    (Recess.)

2                    THE VIDEOGRAPHER:   On the record at 17:22.

3    BY MR. BELINFANTE:

4        Q.    Dr. McCart, I'm going to show you another

5    one of your articles from 2020, which we'll mark as

6    Exhibit 10.

7                         (McCart Exhibit No. 10 was identified

8                         for the record.)

9    BY MR. BELINFANTE:

10       Q.    Do you recall this article?

11       A.    Yes.

12       Q.    Okay.   In the abstract, the first couple

13   sentences say, "Inclusive educational practices are

14   rooted in a body of research indicating that when

15   students in need of support through special education

16   are meaningfully included in schools, academic and

17   social outcomes improve for all students.   To realize

18   this promise of better outcomes, traditional schools

19   with separate classrooms and even schools designated

20   to exclusively serve various learner subgroups (e.g.,

21   students identified for special education) will

22   require reorganized systems, structures, and



1    resources."

2            Do you see that?

3        A.    Yes.

4        Q.    Any reason why that would not apply to the

5    State of Georgia?

6            MS. TUCKER:  Object to form.

7            THE WITNESS:  As a researcher, it's

8    difficult to pick up words that were written a while

9    ago, and apply them to a separate context.

10   BY MR. BELINFANTE:

11       Q.    You're articulating here a general rule,

12   though, that better outcomes -- to achieve better

13   outcomes, "schools designated to exclusively serve

14   various learner subgroups (e.g., students identified

15   for special education) will require reorganized

16   systems, structures, and resources."  That's what

17   you're applying as a general rule, correct?

18           MS. TUCKER:  Object to form.

19           THE WITNESS:  What is written here is a

20   sentence to introduce the concept of the -- what

21   occurs in the article.  To take a sentence written

22   many years ago, and just apply it wherever, however,

1  is not something I feel comfortable doing.  But if

2  you want to ask something more specifically.

3  BY MR. BELINFANTE:

4      Q.    Do you believe that in order to increase

5  better outcomes in Georgia, "schools designated to

6  exclusively serve various learner subgroups (e.g.,

7  students identified for special education) will

8  require reorganized systems, structures, and

9  resources"?

10     A.    I believe that the GNETS program, which is

11  currently operating as a segregated program, will

12  need to implement the recommendations that I have in

13  the report, which include implementations of more

14  effective systems, structures, and resources, yes.

15     Q.    And it will require not a reorganization

16  of existing systems; is that right?

17     A.    What -- again, you're asking me to pull a

18  word out of an article written many years ago before

19  I was even involved in this case.  And so again,

20  would there be any reorganization that might occur as

21  determined by the state, based on my recommendations?

22  That would be entirely up to the state.



1    Q.    Did you write the abstract?

2    A.    I do not recall.

3    Q.    Okay.  Do you approve the abstract or do

4    you know if it's written by the journal?

5    A.    The abstract, in almost all cases in

6    education, is written by the authors.

7    Q.    By the authors, okay.  So you stand behind

8    at least, then, the statement that we've talked about

9    and read now a couple times?

10    A.    As it relates to this article.

11    Q.    As it relates to the article?  Okay.  As

12    you sit here today, any reason to believe this

13    statement that you have articulated would not apply

14    to the State of Georgia?

15    A.    I can't apply this to the State of

16    Georgia.

17    Q.    On the next page, page 9 of the article,

18    one, two, three -- the third full paragraph, the last

19    sentence starts, "Further, despite a long history of

20    federal lawsuits, Supreme Court decisions, and U.S.

21    Department of Education policy imperatives and a

22    preponderance of research evidence challenging the



1   utility of segregated places, widespread categorical

2   segregation of students identified for special

3   education continues to this day."

4            Do you see that?

5       A.    I was behind you in finding it.  Where did

6   it start?

7       Q.    I'm sorry.  "Further," and the word

8   "further" is all the way on the right, in the third

9   full paragraph.  It's the last sentence.

10      A.    Okay, sorry.  I can read it now.

11      Q.    Just let me know when you're done.

12      A.    Okay, I've read it.

13      Q.    Do you believe that was accurate as of

14  2020?

15      A.    This cites a report from the National

16  Center of Education Statistics in 2017.

17      Q.    Mm-hmm.

18      A.    So.

19      Q.    But it's in your 2020 article.

20      A.    Yeah, the publication process takes a

21  while.

22      Q.    Sure.



1          A.      And you can cite different time periods,

2    but the statement that is above is related to the

3    2017 reference.

4          Q.      All right.  Continuing to the next

5    paragraph, the first two sentences read, "Recent data

6    suggest some progress is evident in providing greater

7    access to a general education curriculum for students

8    considered to have high incidence or 'mild and/or

9    moderate' disabilities," skipping the citation.

10   "However, for students considered to have low

11   incidence, or 'severe' disabilities, few

12   opportunities exist to learn from the general

13   education curriculum alongside non-disabled peers,"

14   citing a Kurth article from 2014 and the NCES article

15   -- or study from 2017.

16             Do you see that?

17        A.      I do.

18        Q.      Okay.  And that was accurate at the time

19   that this was submitted for publication?

20        A.      Yes.

21        Q.      Okay.  Starting on page 10.

22        A.      I'm going to -- let me pause for a second.

1        Q.     Sure.

2        A.     I don't want my tiredness to have me short

3   cut my reflection on the question you asked.  And I

4   think you asked whether or not that statement was

5   true as it was stated and referenced in 2017.

6        Q.     Well, I said at the time of publication --

7   or at the time that it was submitted to publication.

8        A.     I think there are elements of that

9   statement that are true.  Meaning that -- and let me

10  clarify.  Meaning that the relevance of high

11  incidence and/or mild or moderate disabilities, as

12  compared to low incidence or more significant

13  disabilities, sometimes there are distinctions made

14  in how those students are provided supports in

15  general education curriculum.  And in that way, this

16  statement is correct.

17       Q.     Are you aware of any reports that further

18  update the findings of Kurth, Morningstar, and

19  Kozleski from 2014, or the NCES from 2017?

20       A.     I would have to look.

21       Q.     Okay.  Could we turn to page 10?  Have you

22  concluded --



1        A.      Mm-hmm.

2        Q.      Okay.  The first sentence on page 10

3    reads, "Much of the somewhat contentious discourse

4    around least restrictive environment has been linked

5    to the term 'inclusion.'"

6            Do you see that?

7        A.      Yes.

8        Q.      What did you mean by contentious

9    discourse?

10       A.      Although typically it is difficult to

11   identify who might have said what in any given

12   article, I can absolutely affirm that my colleague,

13   Dr. Sailor, made this statement.  And I'm not sure

14   what he meant about the contentious discourse.

15       Q.      Okay.  But your name is on here with it,

16   correct?

17       A.      Yes, it is.

18       Q.      So presumably, you would agree with that;

19   is that right?

20       A.      No.

21       Q.      You don't agree with the statement --

22           MS. TUCKER:  Object to form.



1    BY MR. BELINFANTE:

2         Q.     -- in the first sentence on page 10?

3         A.     What I said was, I don't know what he

4    meant by the contentious discourse statement, and as

5    it relates to inclusion, which is what I thought you

6    were asking me.

7         Q.     That's fair.

8         A.     Okay.

9         Q.     Do you agree with the statement that "Much

10   of the somewhat contentious discourse around least

11   restrictive environment has been linked to the term

12   'inclusion'"?

13        A.     Since I'm not sure what he means by

14   contentious discourse, I can't say that I agree with

15   this statement.

16        Q.     Dr. McCart, do you normally put out

17   journal articles with your name, where you disagree

18   with statements in the journal?

19        A.     No.

20        Q.     The last sentence, first paragraph says,

21   "The inclusion movement, while making progress with

22   students labeled as having mild or moderate

1   disabilities, has been largely unsuccessful with

2   students labeled as having 'severe' disabilities."

3         Do you see that?

4   A.    No, I didn't see where you were.

5   Q.    Last sentence, the same paragraph, the

6   first paragraph on page 10.

7   A.    Did you say it started "with these

8   approaches"?

9   Q.    "The inclusion movement."

10  A.    I need help.

11        MS. TUCKER:  Can I point it out to her?

12        MR. BELINFANTE:  Of course.

13        MS. TUCKER:  That's where I did that.

14        THE WITNESS:  Yes.

15  BY MR. BELINFANTE:

16  Q.    Is it a fair reading that in 2020 -- at or

17  around the time of 2020, when this was submitted for

18  publication, the inclusion movement had been largely

19  unsuccessful for students labeled as having severe

20  disabilities?

21  A.    "The inclusion movement, while making

22  progress with students labeled as having mild or



1    moderate disabilities, has been largely unsuccessful

2    with students labeled as having 'severe'

3    disabilities."

4              If you're asking me, do I agree with the

5    fact that Kurth, who cited that, has that belief, I

6    do.

7        Q.    Do you have that belief, or did you in

8    2020 when this was published?

9        A.    That students with more significant

10   disabilities have had more difficulties regarding

11   being included?

12       Q.    At or around the time that you submitted

13   this article for publication, did you agree with the

14   statement that the inclusion movement, while making

15   progress with students labeled as having mild or

16   moderate disabilities, has been largely unsuccessful

17   with students labeled as having severe disabilities?

18       A.    Forgive my pausing, as we are near the end

19   of the day.  And the preparation and writing of this

20   article occurred likely in 2018.  And you're asking

21   me, back at that time, if I felt or agreed with this

22   perspective.  And it's a lot to remember and a lot to



1    recall, so that's the pause here.

2            When you publish an article with

3    coauthors, there's a bit of a negotiation around the

4    language that occurs.  And so it would be difficult

5    for me to suggest that the inclusion movement, per

6    se, has been largely unsuccessful.  Certainly there

7    is more work to be done, so that students could

8    access general education curriculum.  How that

9    relates to the GNETS case, I'm not sure.

10        Q.    Has the inclusion movement been largely

11   unsuccessful for students labeled as having severe

12   disabilities?

13        A.    I just answered that.

14        Q.    You said it has been largely -- you can't

15   say it's been largely unsuccessful overall, or you

16   didn't have the limitation about students with severe

17   disabilities.  So my question is about, has the

18   inclusion movement been largely unsuccessful for

19   students labeled as having severe disabilities?

20        A.    I think how I might rephrase that is, the

21   inclusion movement, in general, has been difficult

22   for students having disabilities, including those



1    with severe disabilities.

2         Q.    Okay.  Do you consider yourself part of

3    the inclusion movement?

4         A.    No.

5         Q.    When you said in your report that you want

6    teachers -- and this is on page 161, that your hope

7    that "educators within the GNETS program will embrace

8    the recommendations and see themselves as part of a

9    movement toward better support themselves

10   professionally and better outcomes for students with

11   behavior-related disabilities."  Do you consider

12   them -- are you hoping that they will see themselves

13   as part of the inclusion movement?

14        A.    No.

15        Q.    What is the inclusion movement as defined

16   in your article from 2020 with coauthors Choi and

17   Sailor?

18        A.    I would have to look and see what, again,

19   they're referencing.  But they're referencing a Kurth

20   article in 2014.  I can say that what I'm referencing

21   in the GNETS report related to students in the GNETS

22   program is not about an inclusion movement.

1      Q.    Page 11 of the same article, the second

2  full paragraph beginning, "We argue."  "We argue that

3  the time has come, through the advent of

4  whole-school, equity-based inclusive MTSS, to replace

5  the medical model construct of disability with a

6  human capability construct that reflects the

7  significant contribution of the learning ecology to

8  individual students' response to instruction."

9          Do you see that?

10     A.    Yes.

11     Q.    Is that like what we were talking about

12 before, in terms of having -- where someone has a

13 particular diagnosis, i.e., autism, and then they get

14 a panoply or a series of services based on that

15 diagnosis?  Is that what that's referencing here?

16     A.    In part.

17     Q.    Okay.

18     A.    It's larger than that, but you're in the

19 same zone.

20     Q.    All right.  Is it your professional

21 opinion that Georgia local education agencies employ

22 a medical model construct of disability?



1        A.    No.

2        Q.    I wish I could -- what was the phrase we

3   used --

4              THE VIDEOGRAPHER:  I don't want to

5   interrupt your flow, sorry.  Could you raise your mic

6   a little bit?

7              MR. BELINFANTE:  It would be helpful if I

8   put it on, right?  Thank you.

9              THE VIDEOGRAPHER:  Thank you.

10  BY MR. BELINFANTE:

11       Q.    Do you recall the phrase that that was

12  that we talked about?

13             MS. TUCKER:  Object to form.

14  BY MR. BELINFANTE:

15       Q.    Categorical service delivery.  Is that it?

16       A.    Non-categorical service.

17       Q.    Non-categorical service delivery.  Is it

18  your professional opinion that Georgia employs --

19  Georgia's LEAs provide a categorical service delivery

20  system?

21       A.    No.

22       Q.    Is it your opinion that Georgia LEAs

1    employ a human capability construct that reflects the

2    significant contribution of the learning ecology to

3    individual students' response to instruction?

4         A.    You're making a lot of leaps from an

5    article, and again, published in 2020, written

6    several years before about what kind of services and

7    supports are in place in the State of Georgia.  And

8    I'm having trouble trying to, again, draw the line

9    between what you're asking.

10        Q.    Did Georgia IEP teams, in your review of

11   them, tend to employ what I'll refer to as the

12   medical model, as described here on page 11, or as we

13   talked about earlier, the -- I'll get there --

14   categorical service delivery model?

15        A.    IEP teams -- based on the IEP -- IEPs that

16   I reviewed, employed a variety of interventions and

17   supports, some of which may be more closely aligned

18   with a medical model, some which may be more closely

19   aligned with a human capability construct.

20        Q.    Okay.  So there's variety within the IEP

21   team -- or IEP reports you reviewed, is that fair?

22        A.    Yes.



1          Q.    So that would, then, lean to indicate that

2     the Georgia Department of Education is not dictating

3     the model that the IEP team should use, correct?

4              MS. TUCKER:  Object to form.

5              THE WITNESS:  No.

6     BY MR. BELINFANTE:

7          Q.    Well, if there's variety, then what is the

8     Georgia Department of Education doing to cause either

9     an IEP team to adopt either a medical construct or a

10    human capability construct?

11         A.    That leads back to the issue we discussed

12    earlier about systemic segregation.  And when a

13    systemic model of segregation is in place, the use of

14    categorical service delivery is more likely to be

15    prevalent.

16              So by supporting -- perpetuating funding

17    the GNETS program, as I have seen it and evaluated it

18    in my report, that is how the state is implementing

19    categorical service delivery options.

20         Q.    But it's really not implementing it if

21    some of the IEP teams are adopting something very

22    counter to that, correct?



1        A.    IEP teams can only implement what is

2   available.

3        Q.    And so if the Department of Education were

4   imposing systemic segregation, how are teams -- IEP

5   teams adopting a human capability construct approach?

6            MS. TUCKER:  Object to form.

7            THE WITNESS:  An IEP team can look at an

8   individual student and implement a strategy that is

9   focused on human capabilities.

10           For example, an IEP team might say, the

11  student who has autism needs support in order to be

12  able to communicate.  The IEP team all agrees.  It's

13  a human capability approach to establishing a goal or

14  an intervention for a student who has a

15  behavior-related disability.

16           The ability to implement that depends on

17  the context, the proximity, and the opportunity of

18  that student to be able to access that system of

19  communication.  And, for example, in the GNETS

20  program, again, which is unnecessarily systemically

21  segregating, there are no effective communication

22  systems in place for students with behavior-related



1  disabilities, for students with autism in all of the

2  sites that I went to.

3           So an IEP team can say, hey, it would be a

4  good idea for us to put a communication system in

5  place to help this student.  Everybody agrees.  The

6  only place the student can go is GNETS, because

7  that's all we've got.  So they send the kid to

8  GNETS -- the child to GNETS.  And the system can't be

9  implemented because there's no communication system.

10      Q.    How would an IEP team recommend GNETS if

11  there's not the service that they're recommending

12  there?  Are you saying that they send them to GNETS,

13  but there's not the service there.  So if they've

14  identified the service, and they recommend placement

15  in GNETS, putting aside placement if that's the right

16  term, but -- and the service isn't there, hasn't the

17  IEP team failed to identify the service and recommend

18  placement that achieves that service?

19           MS. TUCKER:  Object to form.

20           THE WITNESS:  You're asking me to state

21  whether or not an IEP team has failed because the

22  large-scale segregation system that's in place within



1    the state does not offer and provide effective

2    individualized strategies, consistent with what's

3    available to students with disabilities in general

4    education environments.

5    BY MR. BELINFANTE:

6        Q.    No.  Because if that's what I was asking,

7    then they would have the service available in the

8    general education environment.  You keep saying

9    large-scale systemic discrimination, and I still

10   can't identify what the IEP team is doing based on a

11   decision or an affirmative act of the Georgia

12   Department of Education.

13           So we first talked about the hypothetical

14   where the student has autism, and needs speech or

15   communication services.  They're referred to GNETS.

16   You stated that GNETS does not have communication

17   services for students with autism.  Am I right so

18   far?

19       A.    Mm-hmm.

20           MS. TUCKER:  Object to form.

21           THE WITNESS:  Oh.

22   BY MR. BELINFANTE:



1          Q.    So an IEP team that recommended that

2    student with autism to GNETS for communications

3    services would not be recommending a placement that

4    provides a FAPE for that student, would they?

5              MS. TUCKER:  Same objection.

6              THE WITNESS:  I'm not sure you're

7    understanding the construct of what a large-scale

8    systemic system of segregation can do to service

9    provision within a state.

10              And so an IEP team may meet and make a

11    decision in the hopes that a communication strategy

12    or program could be put in place for a student with

13    autism.

14              But in reality, that system is not put in

15    place, and that's, again, because it is not an

16    enabling context.  It's not fair and appropriate.

17    There aren't the same resources, supports,

18    interventions that are in place in general education

19    environments, even for students with disabilities --

20    behavior-related disabilities in those environments.

21    BY MR. BELINFANTE:

22          Q.    Is it your understanding and opinion that

1  a student in Georgia can get services in their

2  general education -- or general zoned school, and the

3  IEP team recommends them to GNETS anyway?

4       A.    I don't know why that would be the case.

5       Q.    And -- well, okay.  I don't, either, so I

6  guess we're in agreement there.

7       A.    Are we?

8       Q.    I think so.

9       A.    I don't.

10       Q.    Well, then tell me why an IEP team would

11  come to a conclusion that an autistic student needs

12  communication services, the zoned school offers

13  communication services, and the IEP team recommends

14  the student for GNETS.

15       A.    The GNETS program purports that it

16  provides behavioral and therapeutic supports and

17  services for students who have behavior-related

18  disabilities.  The IEP team, like, it's supposed to

19  be the service provision mechanism for students who

20  have behavior-related disabilities.

21            So the IEP team might make the assumption

22  that the GNETS program, given their behavioral

 1    therapeutic system of support, could provide a system

 2    of communication as indicated as part of the

 3    student's IEP, when, in fact, in reality, those

 4    services and supports are not occurring.

 5         Q.    Isn't the responsibility of the IEP team

 6    to look at the reality and not make assumptions?

 7              MS. TUCKER:   Object to form.

 8    BY MR. BELINFANTE:

 9         Q.    In order to make sure that a student is

10    provided with a FAPE?

11         A.    I don't know.  I don't know what you're

12    asking, I should say.

13         Q.    Well, you said the IEP team assumes that

14    something will be provided at GNETS.  My question is,

15    shouldn't they be making -- not assuming things, but

16    base it on what you've referred to as the reality?

17         A.    You're asking, should the IEP team go or

18    something?

19         Q.    I'm saying should the IEP team make its

20    decisions based on assumptions or based on what

21    you're describing as the reality of GNETS?

22         A.    The IEP team is making their decisions

1    based on what they have been told by the state as

2    being provided as part of the system of education.

3        Q.    Okay.  Show me in Appendix E, amended,

4    where the state has told the IEP team anything about

5    GNETS.

6            MS. TUCKER:  Object to form.

7    BY MR. BELINFANTE:

8        Q.    Where has the state told an IEP team about

9    GNETS?

10           MS. TUCKER:  The same objection.

11           THE WITNESS:  I'm looking at the GNETS

12   rule, page 4.  Your copy is Exhibit 7.

13   BY MR. BELINFANTE:

14       Q.    Sure.

15       A.    That talks about the SEA shall.  "The SEA

16   shall:" -- looking under 5, Duties and

17   Responsibilities.  "The SEA shall:" (A), looking at

18   number iii, "Monitor GNETS to ensure compliance with

19   federal and state policies, procedures, rules, and

20   the delivery of appropriate instructional and

21   therapeutic services."

22           That's one place, from my perspective,



1    that I believe it states that.

2        Q.    This is the document where you believe

3    that the state is communicating to IEP teams that

4    they need to send someone to GNETS?

5        A.    No.

6        Q.    Okay, that was my question.

7        A.    You asked what -- could I point to one

8    document in which the state made a recommendation

9    about whether or not IEPs -- the IEP team should or

10   could be involved.

11       Q.    And your answer is (5)(a)(iii) that begins

12   with "Monitor"?

13       A.    "The SEA shall:  Monitor GNETS to ensure

14   compliance with federal and state policies,

15   procedures, rules, and the delivery of appropriate

16   instructional and therapeutic services" as it relates

17   to students within the GNETS program who have

18   behavior-related disabilities.  That's one place.

19       Q.    Where is the others?  I mean, did you see

20   an email where the state said, this person needs to

21   go to GNETS?  Did you see an IEP file where the state

22   DOE said, this person needs to go to GNETS, anything



1    like that?

2         A.    You're asking if I saw any documents that

3    discussed whether or not students should go to the

4    GNETS program?

5         Q.    From the State Department of Education to

6    an IEP team.

7         A.    I do not recall right now.  I would have

8    to review the documents again to answer that.

9         Q.    And you agree with me that the rule on

10   page 3, paragraph (4)(a) says, "The IEP team must

11   determine that GNETS services are necessary for

12   students to receive FAPE"?

13            MS. TUCKER:  Object to form.

14   BY MR. BELINFANTE:

15        Q.    Do you see that?

16        A.    No, I don't know where you are.

17        Q.    Page 3, paragraph (4)(a), first sentence.

18            MS. TUCKER:  On page 3.

19            THE WITNESS:  Page 3, (4)(a).  Mm-hmm.

20   BY MR. BELINFANTE:

21        Q.    Okay?

22        A.    Yes, I see where you are at.

1        Q.    So the IEP team is -- in order to have

2    GNETS services, the IEP team has to determine "that

3    GNETS services are necessary for the student to

4    receive FAPE."  Do you see that?

5        A.    Mm-hmm.  Yes, I do see that.

6        Q.    So if an IEP team determines that -- and I

7    realize I'm now asking you a different question than

8    I just did -- and the state says, no, you can't send

9    that child to GNETS, the state would be disagreeing

10   with the IEP team on what is necessary to receive

11   FAPE.  Isn't that correct?

12       A.    If you go two bullets down, "The GNETS

13   continuum of services."

14       Q.    Mm-hmm.

15       A.    Established by the state talks about the

16   types of services available within the GNETS program

17   for IEP teams to consider when thinking about

18   placement in the GNETS program for student IEP teams.

19       Q.    What is the basis of your statement that

20   the GNETS continuum of services is, quote, provided

21   by the state?

22            MS. TUCKER:  Object to form.

1                THE WITNESS:  Can you ask the question

2    again?

3    BY MR. BELINFANTE:

4        Q.    Sure.  What is the basis of your statement

5    made just a moment ago that GNETS "continuum of

6    services" is provided by the state?

7        A.    That the title of this document, Title

8    160.  Rules of the Georgia Department of Education,

9    Chapter 160-4-7, Special Education.  That is my --

10   that's why I have that perspective.

11       Q.    Okay.  We talked earlier about your book

12   and that of others.  Actually, before we get there,

13   what is the National Center on Inclusion Toward

14   Rightful Presence?

15       A.    Sir?

16       Q.    Yes.

17       A.    How much time is left?

18       Q.    I'm not sure.

19       A.    Can we ask?

20               THE VIDEOGRAPHER:  About -- at 18:24,

21   you'll be at seven -- seven hours.

22   BY MR. BELINFANTE:



1          Q.     It's about 24 minutes left.

2          A.     24 minutes left?

3                 MR. BELINFANTE:  Is that correct?

4                 THE VIDEOGRAPHER:  Yes.

5                 MR. BELINFANTE:  All right.

6                 THE WITNESS:  Okay.

7     BY MR. BELINFANTE:

8          Q.     Are you familiar with the National Center

9     on Inclusion Toward Rightful Presence?

10         A.     I am.

11         Q.     Is there any recommendation in your report

12    that is coming from, or consistent with the National

13    Center on Inclusion Toward Rightful Presence?

14         A.     I see you're looking at a document.  Are

15    you referencing that document?

16         Q.     No, I'm asking right now if there's any --

17    I haven't yet, so I'm just asking right now, is there

18    anything in your report that stems from the National

19    Center on Inclusion Toward Rightful Presence?

20         A.     No.

21         Q.     Okay.  Let's talk about your book, Build

22    Equity, Join Justice.  If we can mark this Exhibit

```
 1    11.

 2                    (McCart Exhibit No. 11 was identified

 3                     for the record.)

 4              THE WITNESS:  I'm not finding --

 5              MS. TUCKER:  We'll worry about that later.

 6    BY MR. BELINFANTE:

 7        Q.    What don't we try to do here, just for the

 8    ease of record, is put the cover page, and then there

 9    will be specific pages behind.  So there's not a

10    question about the source of the document.  And I've

11    got a copy of it with me if we need to check it,

12    but --

13        A.    You've got a copy of the book?

14        Q.    Yes.  I hope you get royalties from the

15    articles, too.  Page 1, which is in this Exhibit

16    Number 11.

17        A.    Mm-hmm.

18        Q.    Talks about, at the beginning of the book,

19    "There is confusion, there is sadness, and there is a

20    restlessness.  Mental health services are being

21    stretched to the limit as our country, grappling with

22    economic instability, political unrest, and a violent
```



1    scourge of deadly school shootings, searches for the

2    answers.  Within this storm of uncertainty, and in

3    direct response to it, we call for sweeping systems

4    change in education."

5           Do you see that?

6       A.    I do.

7       Q.    This book was published when?  I need to

8    look.  Here it is.

9       A.    And tabbed.

10      Q.    This book was published, copyright 2023,

11   so this year.  Does that sound right?

12      A.    Yes.

13      Q.    So is that statement still true?

14      A.    Yes.

15      Q.    That mental health services are being

16   stretched -- I'm sorry, you said yes?

17      A.    Yes.

18      Q.    Okay, perfect.  Then I don't have to keep

19   going.

20           Also true, then, that our system of

21   education is strained, our teachers and school

22   leaders are exhausted.

1          A.      Yes.

2          Q.      Let's look at page 71 of the book, which

3     we'll mark as Exhibit 12.

4          A.      Are we done with this one?

5          Q.      Yes.  And some of these do not get the

6     page printed on them, but again, if we want to check

7     it, the book's here.

8                        (McCart Exhibit No. 12 was identified

9                        for the record.)

10    BY MR. BELINFANTE:

11         Q.      My question here, because this is 2023, is

12    in the third full paragraph.  It begins with the

13    sentence, "To be clear, putting MTSS in place in a

14    school is not easy."

15                   Do you see that?

16         A.      I do.

17         Q.      Do you still agree with that statement,

18    sitting here today?

19         A.      Yes.

20         Q.      The last sentence of that paragraph reads,

21    "This system differs so substantially from

22    traditional models of school that it requires

1    organizing and adopting new practices, which means it

2    takes time to install and implement with measurable

3    fidelity."

4            Do you see that?

5        A.    I do see that.

6        Q.    Agree with that, sitting here today?

7        A.    Yes.  To be clear, when it says, "This

8    system," it may or may not -- may or may not be

9    referencing just MTSS.  I would need to see the other

10   parts of this to know for sure what it's referencing.

11       Q.    Well, that whole paragraph only talks

12   about MTSS, right?

13       A.    Yes, but this whole book talks about a lot

14   more.  And I don't know if this sentence is about the

15   book or if it's about MTSS.

16       Q.    What would help you answer that question?

17       A.    The book.

18       Q.    Unfortunately, as you know, we're running

19   short on time for that.  Let's look at page 110 of

20   the book, which we'll mark as Exhibit 13.

21               (McCart Exhibit No. 13 was identified

22               for the record.)



1   BY MR. BELINFANTE:

2        Q.    Page 110 is in the Chapter 5, Leading With

3   Equity.  The first full paragraph beginning, "Popular

4   feel-good stories about 'principal heroes' who turn

5   around struggling schools in a year do a great

6   disservice to educators.  The reality is that an

7   average school transformation process requires five

8   to seven years to complete," citing Fullan from 2001.

9              What is the transformation process you're

10  talking about there, do you know?

11       A.    I'm not sure what Fullan is referencing,

12  but my guess -- and I shouldn't guess, but it is just

13  a guess, that he is referencing transformation in

14  California schools.  That can mean anything from

15  implementation of PBIS strategies in broad measure

16  within a school.  It can mean implementation of MTSS.

17  It might mean implementation of a new curriculum.

18  Any educational initiative.

19       Q.    Okay.  Did you look at the rates of

20  principal turnover in Georgia as part of your

21  analysis?

22       A.    For general education --



1          Q.    Yes.

2          A.    -- schools?

3          Q.    Yes.

4          A.    No.

5          Q.    Okay.  In the context of your book, Build

6    Equity, Join Justice, the phrase "equity leader"

7    appears.

8          A.    Mm-hmm.

9          Q.    What is an equity leader?

10         A.    I would need the book to articulate that

11   at this time of day.

12         Q.    Okay.  Fair enough.

13         A.    Just to be honest.

14         Q.    I appreciate the honesty.

15         A.    I'm sorry.

16         Q.    That's fair.  Let me go ahead and mark

17   this anyway, Exhibit 14.

18                    (McCart Exhibit No. 14 was identified

19                    for the record.)

20   BY MR. BELINFANTE:

21         Q.    I think we have just looked at 110.  This

22   is page 111.  And the first full paragraph starts,

1    "The list of topics to be addressed as an equity

2    leader is long, and these ways of thinking and being

3    require a great deal of work to make equity happen."

4              Is it your recommendations in your report,

5    do they require equity leaders as described here on

6    page 111?

7         A.    No.

8         Q.    Okay.  It continues, "Based on our work

9    with leaders from varied backgrounds all over the

10   United States, equity leaders who embrace MTSS for

11   development of the structural elements of the school

12   are able to give their attention to the important

13   relational factors that are at the heart of an equity

14   ecosystem."

15             Do you see that?

16        A.    Did you start with, "Based on our work"?

17        Q.    I did, yes, ma'am.

18        A.    Yes, I see that.

19        Q.    Okay.  Is your report recommending MTSS

20   for development of the structural elements of the

21   school?

22        A.    My -- you're asking is my report?



1       Q.     Yes.

2       A.     My report is recommending building state

3  capacity regarding guidance, vision, and

4  implementation for -- implementation of MTSS or a

5  system of support.

6       Q.     What is the vision that you're

7  recommending the State Department of Education adopt?

8       A.     That vision is included -- if you'll allow

9  me a moment.

10       Q.     Sure, take your time.

11       A.     My vision is located in two places.  One,

12  if you look at page 160, where we talk about -- or

13  161, where we talk about -- where I talk about the --

14  I'm sorry, 162, the elimination of statewide systemic

15  segregation of students with behavior-related

16  disabilities for the GNETS program, and the provision

17  of fair and equal access to educational opportunities

18  for students with behavior-related disabilities.

19  That's part of the vision that I would hope that the

20  state would consider.

21           Beyond that, the rest of the vision I

22  would hope that they would consider is included in



1    the five recommendations and the conclusion of the

2    report that -- and where I state, I believe in the

3    educators in the State of Georgia, and I believe that

4    these educators can and will refine practices to

5    support students with behavior-related disabilities

6    who have been marginalized for far too long through

7    systems of segregation and unfair and unequal

8    educational opportunities.  It is my hope that the

9    state adopts a vision with guidance from these

10   actions to do those things.

11        Q.    Looking at your amended Appendix E,

12   Exhibit Number 2.

13        A.    I didn't hear you.

14        Q.    I'm sorry, looking at your amended Exhibit

15   E, Exhibit 2.

16        A.    I think I'm missing -- that might be one I

17   lost track of here in the pile.

18              MS. TUCKER:  Are you okay with her looking

19   at mine?

20              MR. BELINFANTE:  Sure, that's totally

21   fine.  Yeah, thank you, by the way.

22   BY MR. BELINFANTE:



1          Q.    Did you find in any of the deposition

2    transcripts that you've identified here where a state

3    official testified that they support systemic

4    segregation of students with behavior-related

5    disabilities?

6          A.    I can't recall --

7          Q.    Okay.

8          A.    -- what I read in thousands of words of

9    transcripts of depositions.

10          Q.    That would kind of stick out, though,

11    wouldn't it, if a state official said, I support

12    statewide systemic segregation of students with

13    behavior-related disabilities?

14          A.    I don't know.

15          Q.    Okay.  Did you find any state official

16    testifying that they opposed providing fair and equal

17    access to educational opportunities for students with

18    behavioral-related disabilities?

19          A.    I don't recall --

20          Q.    So --

21          A.    -- at this time.

22          Q.    Is it your testimony that the State of

1    Georgia currently has a vision that supports

2    statewide systemic segregation of students with

3    behavior-related disabilities?

4        A.    That they have a vision?

5        Q.    Yes.

6        A.    Of statewide systemic segregation?

7        Q.    Yes.  That they have adopted a vision of

8    statewide systemic segregation of students with

9    behavior-related disabilities.

10              MS. TUCKER:  Object to form.

11              THE WITNESS:  The state has a system of

12    statewide segregation with unfair and unequal

13    educational opportunities that is unnecessary and

14    inappropriate for students with behavior-related

15    disabilities, and does not provide the services that

16    it purports to provide.  So it's not a vision.  It's

17    actuality.

18    BY MR. BELINFANTE:

19        Q.    Is it your testimony that that's

20    intentional?

21              MS. TUCKER:  Object to form.

22              THE WITNESS:  I cannot speak to the

1    intentionality of what any person is doing.  It

2    certainly does exist.

3    BY MR. BELINFANTE:

4         Q.    I'm going to show you what we'll mark as

5    Exhibit 15, which is a screenshot from the SWIFT

6    Education Center.

7                      (McCart Exhibit No. 15 was identified

8                      for the record.)

9    BY MR. BELINFANTE:

10        Q.    On your bio, you can see it says,

11   "Unwavering.  Radical.  Mama."

12        A.    Mm-hmm.

13        Q.    Are those your words?

14        A.    Yes.

15             MR. BELINFANTE:  If you will give me five

16   minutes to wrap up.  How much time do I have?  Like,

17   three minutes?

18             THE VIDEOGRAPHER:  Off the record at

19   18:15.

20             (Recess.)

21             THE VIDEOGRAPHER:  Back on the record at

22   18:26.



1    BY MR. BELINFANTE:

2         Q.    All right.  We're back on the record.

3               Dr. McCart, I'm not going to ask you any

4    further questions unless the United States has

5    questions for you.  I will, however, as I did with

6    Dr. Putnam, suspend the deposition pending any -- if

7    you were to file a report in response to Dr. Wiley.

8    And I realize the Department of Justice disagrees

9    with me on this, but we may ask the court for an

10   opportunity to revisit for all of nine minutes your

11   testimony.  And we would do so virtually.

12              MS. TUCKER:  The United States has no

13   questions for Dr. McCart at this time.  But we also

14   do object to holding this deposition open, and want

15   to make sure that's on the record.

16              MR. BELINFANTE:  Sure.  And expert

17   discovery closes October 31, now, based on the

18   amended report?

19              All right.  We can go off the record.

20              MS. TUCKER:  And Dr. McCart would like to

21   read and sign the transcript.

22              MR. BELINFANTE:  Absolutely.  Okay.  And

1    on the record, thank you, Dr. McCart, for your time

2    today, and previous times that we've rescheduled.

3    I'm sorry you got sick as well.  So I'm glad we were

4    able to do this.

5              THE WITNESS:  Thank you.  Me, too.

6              THE VIDEOGRAPHER:  Thank you.  And off the

7    record at 18:27.

8              (Whereupon, at 6:27 p.m., the instant

9    deposition ceased.)

10

11

12

13

14

15

16

17

18

19

20

21

22

CERTIFICATE OF REPORTER

UNITED STATES OF AMERICA ) ss:

DISTRICT OF COLUMBIA           )

    I, Desirae S. Jura, RPR, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically to the best of my ability and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any parties to this case and have no interest, financial or otherwise, in its outcome.



Notary Public in and for

The District of Columbia

My commission expires: 1/31/2025

Notice Date: 10/27/2023

Deposition Date: 10/24/2023

Deponent: Amy McCart, Ph.D.

Case Name: United States of America v. State of Georgia

Page:Line              Now Reads                    Should Read

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

20__, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES:

## WORD INDEX

**< $ >**
**$10**  262:*12*
264:*17, 19*
**$15**  265:*8*
**$20**  265:*6*
**$24.5**  189:*3, 7*
272:*21*
**$45**  265:*9*
**$60**  150:*12*
151:*7, 18*  153:*1, 9*

**< 1 >**
**1**  4:*10*  12:*11, 12*
16:*12, 14*  142:*5*
182:*16*  184:*2*
191:*5, 6*  192:*11*
198:*19*  201:*8*
203:*7, 19*  227:*4*
248:*2, 22*  305:*15*
**1,000**  144:*12*
145:*7, 11, 13*
265:*1*
**1/31/2025**  319:*22*
**1:15**  140:*6*  141:*2*
**1:16-cv-03088-**
**ELR**  1:*7*
**10**  6:*8*  117:*12,*
*18*  145:*19*  276:*6,*
*7*  281:*21*  282:*21*
283:*2*  284:*2*
285:*6*
**10,000**  265:*1*
**10:02**  39:*8*
**100**  35:*8, 9, 12*
141:*14*
**104**  262:*18*
**108**  25:*11*
**10-point**  97:*15*
**11**  6:*11*  248:*4*
267:*19*  289:*1*
291:*12*  305:*1, 2,*

*16*
**11:00**  78:*14*
**11:06**  88:*13*
**11:30**  88:*15*
**110**  5:*8*  6:*15*
26:*4*  308:*19*
309:*2*  310:*21*
**111**  6:*17*  310:*22*
311:*6*
**12**  4:*11*  6:*13*
307:*3, 8*
**12:36**  140:*3, 4*
**126**  5:*12*
**129**  224:*7, 9*
**13**  6:*15*  308:*20,*
*21*
**13:15**  141:*4*
**130**  5:*16*
**14**  4:*14*  6:*17*
233:*6*  310:*17, 18*
**14:08**  180:*11*
**14:34**  180:*13*
**141**  4:*6*
**147**  131:*5*
**14th**  3:*7*
**15**  6:*19*  131:*8,*
*22*  132:*16*
133:*10, 20*
135:*21*  233:*12,*
*15*  238:*6*  241:*7*
249:*9*  275:*20*
316:*5, 7*
**15:40**  224:*19*
**15:57**  224:*21*
**150**  1:*18*  7:*7*
**15-'16**  236:*7*
240:*12*
**157**  142:*4, 13*
155:*10*  161:*8*
224:*10*
**159**  144:*2, 5*
**16**  233:*12*  236:*2,*
*9*  237:*3, 20*

**160**  50:*1*  81:*6,*
*11*  88:*2*  230:*16*
303:*8*  312:*12*
**160-4-7**  303:*9*
**160-4-7-.15**  5:*17*
**161**  217:*6*  288:*6*
312:*13*
**162**  180:*20*
181:*16*  182:*1, 12*
203:*14*  216:*9*
217:*4*  250:*12*
312:*14*
**163**  50:*3*  51:*18*
90:*14*  93:*19*
180:*16*  181:*3*
184:*2*  185:*11*
189:*21*  191:*21*
197:*10*  203:*12*
260:*5*
**164**  90:*11, 20*
201:*20*  205:*14*
207:*10*  208:*7*
**165**  91:*3, 10*
207:*11*  211:*7*
213:*8*
**167**  81:*11*  88:*3*
149:*22*  150:*4*
151:*17*  154:*5, 9*
181:*3*  185:*11*
260:*5*
**17**  236:*10*  237:*3,*
*20*
**17:07**  275:*22*
**17:22**  276:*2*
**18**  155:*4*
**18:15**  316:*19*
**18:24**  303:*20*
**18:26**  316:*22*
**18:27**  318:*7*
**1990**  136:*17, 22*
138:*1, 11*  188:*9,*
*10*

**< 2 >**

**2**  4:*12*  13:*16, 17*
14:*6, 7*  25:*8*
33:*8, 21*  35:*22*
91:*21*  93:*4, 22*
94:*19*  182:*16*
193:*16*  201:*19*
203:*8, 20*  218:*8,*
*16, 19*  243:*4*
248:*3, 22*  313:*12,*
*15*
**20**  38:*8*  44:*8, 20,*
*22*  86:*7, 8*
156:*18*  233:*22*
237:*13*  243:*1*
**20002**  7:*8*
**2001**  309:*8*
**2007**  114:*3*
**2010**  114:*12, 19*
115:*1*  130:*14, 22*
**2011**  132:*5, 11*
**2012**  189:*9*
273:*20*  274:*14,*
*15*  275:*2*
**2014**  272:*15*
281:*14*  282:*19*
288:*20*
**2015**  139:*15*
262:*12*  265:*2*
**2016**  18:*8*  265:*5*
**2016-'17**  233:*21*
**2017**  125:*22*
268:*10*  280:*16*
281:*3, 15*  282:*5,*
*19*
**2018**  48:*9*  111:*6,*
*16*  265:*7*  286:*20*
**2019**  269:*20*
270:*8*
**202**  2:*15*
**2020**  48:*9*  110:*7*
112:*15*  113:*8*
114:*12, 19*  115:*1*
276:*5*  280:*14, 19*

285:*16, 17*  286:*8*
288:*16*  291:*5*
**2021-'22**  233:*22*
**2022**  6:*3*  261:*22*
267:*5*  268:*8*
**2023**  1:*11, 20*
265:*10*  274:*1*
306:*10*  307:*11*
**20530**  2:*14*
**209**  34:*9*
**21**  233:*13, 20*
237:*6, 20*
**21-'22**  236:*7, 10*
239:*8*  241:*9*
**22**  233:*13*  237:*6,*
*20*
**225**  5:*19*
**24**  1:*11, 20*
153:*9*  157:*7*
245:*9*  258:*18*
304:*1, 2*
**247**  241:*8, 10*
**24th**  7:*5*
**26**  245:*5*  246:*14*
**262**  6:*6*
**27**  245:*5*
**272**  6:*7*
**276**  6:*10*
**289**  34:*9*
**289606**  34:*7, 10*
**2995**  234:*15*

**< 3 >**
**3**  4:*15*  68:*15*
89:*8, 9*  94:*20*
96:*18*  125:*5*
142:*6*  201:*4*
210:*19*  211:*5*
226:*13*  231:*2*
248:*3, 22*  301:*10,*
*17, 18, 19*
**3,000**  40:*4*
141:*12*

**30**  133:*3*
**302**  128:*15*
**30318**  3:*8*
**305**  6:*12*
**305-3488**  2:*15*
**306**  128:*13, 16, 17*
**307**  6:*14*
**308**  6:*16*
**31**  317:*17*
**310**  6:*18*
**316**  6:*19*
**33**  245:*6*
**35**  240:*12*
**36**  26:*21, 22*
28:*4*  194:*2*  245:*6*
**381**  33:*19*
**382**  33:*17, 19*

**< 4 >**
**4**  2:*12*  5:*3*
91:*21*  110:*21, 22*
125:*7*  126:*19*
130:*8*  132:*3*
211:*7*  226:*14*
299:*12*
**4)(a**  301:*10, 17,*
*19*
**4)(c**  231:*2*
**40**  104:*6, 18*
105:*2*  106:*4*
111:*10, 21*  116:*18*
**40th**  111:*6, 15*
**41**  231:*20*
**4400**  234:*15*

**< 5 >**
**5**  5:*9*  126:*14, 15*
128:*14*  299:*16*
309:*2*
**5)(a)(iii**  300:*11*
**50**  111:*19*
**500**  3:*7*
**50s**  196:*13*

**515**  262:*8*  271:*14*
**517**  266:*7*
**522**  271:*8, 12, 13*
**576**  237:*7, 9*
**58**  262:*14*

**< 6 >**
**6**  5:*13*  50:*18, 20*
51:*21*  120:*10*
125:*5*  130:*18, 19*
168:*1, 2, 21*
171:*6, 21*  186:*8*
227:*4*  251:*9*
**6:27**  318:*8*
**60**  152:*1*  181:*21*
**60s**  196:*14*
**65**  35:*4, 9*  141:*14*
**678**  3:*9*
**68**  34:*17*

**< 7 >**
**7**  5:*17*  27:*15*
120:*11*  225:*2, 5*
232:*1*  299:*12*
**70**  27:*15*  155:*3*
245:*4*
**701-9381**  3:*9*
**70s**  196:*14*
**71**  6:*13*  307:*2*

**< 8 >**
**8**  6:*3*  167:*15*
168:*3*  170:*13*
171:*7*  247:*16, 20,*
*21*  248:*2*  261:*21*
262:*1*
**80**  267:*21*
273:*15*  274:*9*
**88**  241:*10*
**89**  4:*17*
**898**  237:*4, 8*

**< 9 >**

**9**  4:*4*  6:*7*  248:*3*
249:*8*  272:*10, 11*
279:*17*
**9:14**  1:*19*  7:*5*
**9:54**  39:*6*
**90**  117:*12, 18*
145:*19*  146:*12*
**950**  2:*13*

**< A >**
**a.m**  1:*19*  7:*5*
**ability**  57:*16*
117:*21*  122:*11*
235:*7*  293:*16*
319:*10*
**able**  28:*9*  57:*7*
73:*10*  108:*13*
109:*2*  173:*16*
184:*18*  185:*16*
200:*21*  212:*15*
234:*21*  246:*18*
251:*20*  253:*3*
255:*18*  293:*12,*
*18*  311:*12*  318:*4*
**above-entitled**
1:*14*  140:*5*
**absolutely**  33:*4*
47:*18*  104:*9*
252:*18*  283:*12*
317:*22*
**abstract**  276:*12*
279:*1, 3, 5*
**academia**  196:*2*
**academic**  24:*16*
103:*5*  125:*13*
126:*8*  130:*13*
132:*19*  133:*5*
134:*15*  155:*1*
175:*17*  186:*10,*
*22*  187:*2, 11, 22*
194:*16*  256:*8*
276:*16*
**academically**
102:*14*

**accept** 67:*20*
146:*18* 152:*19, 22*
**acceptable** 109:*20*
**accepting** 183:*13*
**access** 20:22
21:*14* 24:7 25:9,
*18, 20* 26:5 73:7
102:7 104:2
106:*19* 107:*6, 8,
13, 18* 108:4
109:*11* 112:*12*
114:*10* 123:7
143:*3, 13* 149:*19*
168:6, 9 181:6
182:9, *20* 183:2,
*18* 191:*13*
203:*17, 22* 214:9
217:*21* 218:*1*
223:*15* 246:*20*
256:6, 22 259:*13*
281:7 287:*8*
293:*18* 312:*17*
314:*17*
**accessed** 253:*4*
**accessing** 221:9
**accommodation**
80:*19, 22* 81:*18*
**accommodations**
81:*6, 12*
**accomplishment**
194:*3*
**accurate** 10:*10*
92:4 93:*10, 12*
196:9 225:9
280:*13* 281:*18*
**achieve** 73:*15*
181:*1, 9, 15, 22*
182:*11, 15*
228:*12* 277:*12*
**achieves** 294:*18*
**achieving** 259:7
**Act** 5:*11* 39:*18*
60:*3, 7* 65:*13*
111:8 139:*15*

163:*10* 273:*15*
295:*11*
**Action** 1:*6* 90:*15,
20* 91:*3, 10*
156:22 184:*1*
185:*19* 189:*21*
190:*1* 191:5, 6
192:*11* 198:*18*
201:8, *19* 203:7,
8, *19* 204:7
205:9 206:*13*
210:*19* 211:7
213:8
**actions** 50:*3, 5, 6,
11* 51:*17* 87:6
89:*20* 91:6
93:*20* 100:*13, 17*
180:*18* 181:*3, 9,
10, 12* 185:*11*
203:*12* 204:*12,
20* 205:*3* 208:5
211:9 212:*20*
213:*21* 256:*14*
260:*4* 313:*10*
**Activities** 5:9
104:*4* 106:*20*
**actual** 164:*4*
178:*19, 22*
**actuality** 315:*17*
**ADA** 65:*3* 80:*19*
127:*10* 136:*17*
138:*1, 4, 10* 139:*3*
**adaptations** 57:5
**add** 30:*16* 43:*11*
97:6 137:*15*
231:22
**added** 79:*11*
265:6
**addition** 24:*13*
**additional** 11:*18*
24:8 43:*14* 57:5
186:*15* 265:8
**Additionally** 24:7
46:6 223:*14*

**address** 41:7, *9*
96:7, *20* 230:9
**addressed** 139:*1*
311:*1*
**addressing** 129:*1,
9*
**adept** 146:9
**adequate** 150:*14*
151:9
**adjust** 198:*21*
**adjustments**
214:7
**administer** 9:*1*
**administers** 40:*15*
**administrator**
55:*4, 9*
**admission** 233:*19*
**admits** 238:5
**admittants** 237:4
238:22
**admitted** 233:*18*
234:5 235:*16*
236:*15, 18*
237:*16* 238:*18*
239:8 240:*17*
241:8
**Adolescents** 5:*14*
131:9
**adopt** 100:*16*
189:*20* 201:9
256:*13* 260:*4*
292:9 312:7
**adopted** 191:5
192:*18* 315:7
**adopting** 201:7
292:*21* 293:5
308:*1*
**adoption** 204:9
259:*19*
**adopts** 200:6
313:9
**adults** 137:*19*
251:*15*
**advent** 289:*3*

**adverse** 125:*12*
126:7 134:*15*
**advised** 29:*3*
49:6 50:*13*
**Advocacy** 15:9
**affiliations** 29:*14*
**affirm** 283:*12*
**affirmative**
160:*17* 295:*11*
**affirmatively**
161:*14* 162:*3*
174:8
**afforded** 167:*3*
**affords** 266:*12*
**Afternoon** 4:6
141:*1*
**after-school**
104:*4* 106:*19*
**Age** 5:*15* 222:*3*
240:*19*
**agencies** 38:7
62:*1* 82:*20*
152:*4, 18* 180:*3*
253:8 263:*19*
264:6 265:*21*
267:*11* 289:*21*
**agency** 166:*14*
267:*1*
**ago** 11:*14* 151:5
159:*3* 167:*16, 20*
196:*13* 211:*17*
254:*4* 277:*9, 22*
278:*18* 303:5
**Agran** 110:*6, 13*
111:*18*
**agree** 44:*11*
94:*15, 18* 95:4,
*14* 97:*3, 5* 101:6
113:*20* 116:*15*
127:8 129:*15*
141:*15, 20* 142:2
143:*10* 149:*17*
170:8 178:*11*
197:2 205:*1*

233:*9*  236:*8*
261:*1*  283:*18*, *21*
284:*9*, *14*  286:*4*,
*13*  301:*9*  307:*17*
308:*6*
**agreeable**  10:*3*
11:*2*, *9*
**agreed**  9:*14*, *18*
113:*6*  197:*9*
286:*21*
**agreement**
117:*19*  297:*6*
**agrees**  293:*12*
294:*5*
**ahead**  12:*10*
25:*7*  30:*7*  85:*14*
131:*3*  157:*4*, *5*
162:*6*, *11*  270:*6*
271:*19*  310:*16*
**aims**  36:*16*
**air**  218:*15*
**al**  268:*9*  269:*22*
**al.'s**  111:*19*
**Alabama**  242:*1*
**Alabama's**  242:*2*
**Albany**  246:*12*
**aligned**  26:*15*
167:*6*  205:*16*
206:*15*  207:*17*
215:*22*  222:*2*
291:*17*, *19*
**Alignment**  6:*7*
**all-in**  116:*22*
**allocate**  152:*1*
**allocated**  163:*1*, *4*,
*6*
**allow**  37:*17*
191:*13*  209:*4*
312:*8*
**allowed**  9:*13*
26:*5*  73:*5*, *7*, *8*
128:*22*  129:*8*, *19*
**ALLOY**  3:*6*
**alongside**  281:*13*

**alternate**  26:*2*
175:*14*  207:*18*
211:*4*
**alternative**  58:*16*
66:*19*
**amended**  13:*16*,
*18*, *20*, *21*  14:*18*
33:*8*  35:*22*
110:*16*  116:*10*
138:*10*, *16*  148:*8*
225:*4*  248:*16*
299:*3*  313:*11*, *14*
317:*18*
**AMERICA**  1:*5*
7:*3*  319:*3*
**Americans**  39:*17*
60:*3*, *7*  65:*13*
**Amount**  103:*21*
104:*1*  149:*1*
194:*5*  224:*11*
**amounts**  150:*21*
**AMY**  1:*12*  4:*3*,
*11*, *13*  7:*6*  9:*3*, *11*
**analyses**  135:*12*,
*18*
**analysis**  42:*21*
43:*2*, *7*  127:*22*
135:*6*  162:*16*
164:*13*  237:*17*
243:*22*  309:*21*
**analyze**  208:*11*
**and/or**  122:*8*
226:*18*  281:*8*
282:*11*
**ANDREA**  3:*14*
8:*13*
**Angeles**  15:*21*
**animus**  200:*10*
**Annual**  111:*6*, *15*
**answer**  10:*14*, *16*
11:*1*  20:*12*  23:*5*
37:*15*, *19*  44:*5*
45:*3*  46:*21*  52:*9*
71:*10*  72:*14*, *16*

85:*12*  108:*13*
126:*20*  133:*18*,
*19*  134:*3*  136:*16*
152:*19*  158:*4*
160:*15*, *22*  169:*8*
176:*15*  185:*14*
197:*5*  209:*18*
217:*2*  230:*14*
237:*9*  261:*12*
300:*11*  301:*8*
308:*16*
**answered**  43:*6*
85:*6*, *9*  101:*18*
179:*22*  271:*21*
287:*13*
**answering**  25:*13*
**answers**  10:*17*
306:*2*
**anyway**  122:*21*
297:*3*  310:*17*
**apart**  65:*20*
**apologies**  109:*7*
**apologize**  33:*7*
229:*5*
**APPEARANCES**
2:*1*  3:*1*
**APPEARING**
3:*13*
**appears**  116:*9*
127:*4*  310:*7*
**Appendix**  4:*12*
13:*5*, *7*, *16*  14:*18*
27:*7*  35:*22*  84:*7*
110:*3*  116:*10*
126:*21*  148:*8*
163:*13*  225:*4*
232:*9*  248:*15*, *16*,
*20*  299:*3*  313:*11*
**application**  69:*4*
**applied**  53:*8*, *19*
77:*8*  120:*19*
137:*7*  179:*7*
**applies**  60:*11*

**apply**  20:*5*
76:*12*  77:*18*
82:*1*  121:*5*
123:*19*  124:*5*
126:*11*  128:*4*
152:*4*  159:*12*
202:*9*  208:*5*
258:*8*  268:*19*
277:*4*, *9*, *22*
279:*13*, *15*
**applying**  51:*21*
81:*22*  116:*20*
152:*9*  277:*17*
**appointed**  190:*20*
**appreciate**
122:*15*  310:*14*
**approach**  90:*4*
116:*20*, *21*, *22*
117:*2*  196:*3*, *6*,
*10*  201:*7*  256:*6*
293:*5*, *13*
**approaches**  285:*8*
**appropriate**  19:*4*,
*15*, *17*  25:*18*
37:*7*, *10*, *22*  38:*4*,
*9*  60:*6*, *16*  61:*3*,
*7*  70:*14*, *15*
71:*20*  72:*7*, *9*
73:*1*, *6*  74:*12*, *22*
102:*12*  103:*9*
104:*2*  108:*1*
109:*10*  119:*11*
142:*22*  147:*11*,
*17*  148:*12*  149:*8*
150:*15*  151:*10*
154:*21*  161:*20*
162:*13*  164:*5*, *14*
165:*3*, *5*, *6*, *8*, *9*
167:*5*, *8*  172:*17*
210:*17*  215:*21*
216:*12*  220:*9*
221:*16*  222:*3*
230:*18*  247:*2*, *9*

254:*20*  296:*16*
299:*20*  300:*15*
**appropriated**
153:*1*  262:*12*
265:*7*
**appropriately**
20:*9*  21:*3*
**appropriates**
181:*20*
**appropriation**
42:*17, 18*  151:*11,
15*  163:*4*  265:*9*
**appropriations**
163:*9, 10*  229:*9,
18*  271:*13*
**approve**  279:*3*
**approximately**
44:*8*  111:*9*
181:*20*  199:*1*
**APRIL**  3:*22*  7:*9*
**area**  28:*8*
135:*22*  228:*11*
235:*7*
**areas**  188:*15*
**argue**  96:*19*
165:*14*  289:*2*
**arithmetic**  74:*11*
**array**  37:*6*
38:*11*  66:*16*
67:*1*  143:*18*
160:*12*  164:*22*
175:*1*  193:*1*
195:*8, 17*  246:*18*
259:*10*
**arrive**  50:*21*
**Article**  4:*15*  5:*3,
9, 13*  6:*4, 7, 8*
89:*14*  91:*21*
92:*19*  93:*22*
110:*6, 12, 21*
113:*14, 16, 17*
116:*1, 9, 14*
125:*22*  126:*18*
127:*9, 11, 13*

128:*13, 16*
130:*22*  131:*4, 6,
21*  133:*1, 9, 10,
12*  134:*14*  147:*9*
148:*7*  196:*17*
248:*17*  261:*21*
262:*4, 9*  264:*22*
265:*4*  266:*8*
268:*9, 18*  269:*21*
270:*5, 9, 11*
271:*8, 15*  272:*14*
273:*19*  274:*13,
16*  276:*10*
277:*21*  278:*18*
279:*10, 11, 17*
280:*19*  281:*14*
283:*12*  286:*13,
20*  287:*2*  288:*16,
20*  289:*1*  291:*5*
**articles**  125:*4*
146:*15*  147:*14*
148:*20, 22*  196:*1*
248:*11, 14, 15, 18,
21*  259:*22*  276:*5*
284:*17*  305:*15*
**article's**  128:*20*
**articulate**  182:*12*
247:*12*  310:*10*
**articulated**
279:*13*
**articulating**
277:*11*
**ascendancy**
266:*11*
**aside**  158:*20*
160:*14*  231:*19*
243:*16*  254:*14*
294:*15*
**asked**  18:*14*
23:*6*  36:*6*  43:*1*
54:*9*  65:*6*  87:*2*
141:*7*  152:*18*
155:*9*  158:*15*
190:*19*  194:*10*

218:*18*  229:*4*
237:*22*  243:*12,
21, 22*  254:*4*
258:*22*  261:*13*
272:*6*  282:*3, 4*
300:*7*
**asking**  11:*9, 21*
19:*12, 17*  20:*13*
22:*22*  38:*1*
60:*19, 20*  63:*9*
65:*10, 11*  66:*7*
68:*1*  69:*8*  71:*3,
4, 19*  72:*2, 4*
73:*22*  77:*13*
79:*12*  80:*21*
81:*22*  82:*13*
85:*15*  87:*5, 7, 11,
12*  94:*18*  95:*16*
96:*10*  99:*16*
101:*17*  105:*20,
21*  115:*2*  118:*22*
119:*14*  120:*21*
124:*13*  127:*19*
129:*19*  134:*4, 10,
11, 12*  141:*11*
146:*19*  152:*12,
21, 22*  154:*11, 12*
157:*15*  158:*4, 18,
19*  160:*17*
165:*10*  168:*4, 18,
20*  170:*11*
190:*11*  191:*2*
228:*15*  238:*12*
250:*3*  268:*17, 20*
278:*17*  284:*6*
286:*4, 20*  291:*9*
294:*20*  295:*6*
298:*12, 17*  301:*2*
302:*7*  304:*16, 17*
311:*22*
**asks**  83:*5*
**asleep**  252:*2*
**aspect**  187:*6*
**aspects**  96:*21*

**Assembly**  153:*2*
163:*10*  181:*20*
262:*17*
**assess**  42:*15*
45:*12*  46:*14*
149:*2*  190:*12*
**assessing**  45:*18*
**assessment**  24:*11*
26:*2*  175:*14*
186:*11*  211:*4*
**assessments**  22:*4*
46:*7*  211:*4*
**assigned**  31:*8*
175:*13*
**assistance**  90:*17*
175:*3, 8*  185:*22*
198:*6*  201:*2*
202:*6, 19*  267:*14*
**associated**  22:*6*
29:*11*  101:*2*
273:*17*
**association**  7:*10,
11*
**assumes**  298:*13*
**assuming**  265:*3*
298:*15*
**assumption**
297:*21*
**assumptions**
28:*16*  298:*6, 20*
**ATLANTA**  1:*3*
3:*8*  246:*9*
**attached**  13:*4*
47:*1*
**attend**  227:*14*
244:*21*
**attending**  109:*18*
**attention**  141:*6*
311:*12*
**attorneys**  7:*13*
8:*10*
**Attorney's**  1:*18*
**author**  127:*3*
268:*11*

authority  64:*1*, 5, 6, *11*, *19*  229:7  243:*11*

authors  96:*19*  113:*12*  279:*6*, 7

Autism  5:*15*  80:*4*, *13*  131:*9*, *16*  132:*10*  133:*11*, *21*  135:22  141:22  142:2, *21*  195:*3*  196:*4*  289:*13*  293:*11*  294:*1*  295:*14*, *17*  296:2, *13*

autistic  20:7  297:*11*

automatically  225:*19*

availability  62:5  83:*11*

available  26:*17*  57:7, *20*  61:*15*, *20*  62:*14*  83:*17*  168:*13*  170:*3*  171:*1*  187:7  224:2  227:*10*, *12*  251:4  252:*21*  253:*1*  254:*12*  293:2  295:*3*, 7  302:*16*

Avenue  2:*13*

avenues  170:*20*

average  105:2  117:*5*, *9*, *11*  309:7

avoid  164:*18*  165:*16*  169:*17*

awarded  30:*11*  31:*6*

aware  80:*3*  86:*21*  124:*17*  138:*1*, *9*  142:22  208:*1*  242:*14*

282:*17*

< B >

bachelor  137:2

bachelor's  137:*5*

back  47:*6*, 8  50:*16*  59:*18*  60:22  72:*13*, *15*  78:2  109:7  116:*13*  118:7  123:*15*  130:*3*  132:*3*  135:*5*  150:2  155:*19*  159:2, *4*  164:*1*  169:*11*  189:*19*  196:*13*  197:*10*  222:*16*  231:*21*  233:*3*  241:*18*  247:*15*  250:*12*  286:*21*  292:*11*  316:*21*  317:2

backgrounds  311:*9*

bad  19:*9*  121:*19*

bake  229:*13*

base  20:*4*  131:*21*  298:*16*

Based  4:*16*  16:*17*  19:*19*, *21*  20:*10*  38:7, *16*, *20*  62:*19*, *21*  66:6  68:*11*  75:*16*  78:7  82:*18*  94:8  97:*12*, *14*  116:*9*  118:*5*  145:*18*, *20*, *21*, 22  146:2, *5*  147:*1*, *10*  150:*21*  155:*5*, 8  162:*19*  164:7  181:*14*  191:7  196:*14*  204:*18*  226:*20*  230:*18*, 22  232:*5*  238:*20*  239:*17*

244:*8*  248:*7*, *18*  249:*11*, *16*  255:*1*  259:*11*  260:*12*  274:*15*, *21*  278:*21*  289:*14*  291:*15*  295:*10*  298:*20*  299:*1*  311:*8*, *16*  317:*17*

basic  10:*1*  24:*14*  251:22

basis  69:*14*  136:*3*  142:*16*  178:*6*  302:*19*  303:4

Bates  33:*16*

bathroom  180:*6*, 7, *9*

bear  190:*16*

beef  191:*12*

begging  156:*5*

beginning  7:*14*  50:*1*  51:*18*  65:5  81:*5*, *11*  88:2  93:*3*, *19*  110:*13*  191:22  232:*19*  289:2  305:*18*  309:*3*

begins  96:*19*  127:2  130:*5*  199:*16*  248:2  256:*1*  300:*11*  307:*12*

behalf  2:*3*  3:*3*  8:*18*, *20*  15:*1*, *4*  16:*13*  17:*20*

behave  94:*10*  95:*12*

behavior  22:*1*, *3*, *4*, 6, *17*, *20*  23:*18*, *19*  24:*11*  71:6, *13*  72:6  73:*17*  74:8  79:*15*  87:*17*  144:22  145:*17*  146:7, *9*

175:7  178:2, *9*, *18*  186:*11*  249:*12*, *17*, *21*

behavioral  21:7, *21*  24:*17*  56:*9*, *11*  64:*18*  69:*21*  70:*5*, *21*  75:*2*, *9*, *10*, *18*, *20*  76:*1*, *3*  78:*8*  79:*2*  91:*1*, *7*, *14*  103:*5*  125:*1*, *13*  126:2, *9*  129:*10*, *20*  134:*16*  137:7, *9*, *21*  144:*15*  145:*9*  147:*4*  151:2  155:*1*  163:*16*  166:*10*  169:*14*  171:*18*  172:7, *13*, 22  175:*19*  176:*4*  177:*19*  179:7  186:22  187:*6*  188:*1*  194:*16*  201:22  209:*6*  212:*21*  213:*12*  235:8  243:*18*  244:*15*, *18*  255:*1*  256:8  297:*16*, 22

behavioral/emotio nal  220:*13*

behaviorally  102:*14*

behavioral-related  314:*18*

behavior-related  18:*19*, *21*  19:2  20:*16*  24:*1*  25:*19*  37:*5*, 8  61:*16*  73:*12*  87:*14*  142:*21*  150:22  156:*17*  163:2  165:2  172:*18*  175:2, *15*, 22  183:*16*  184:*20*  192:*21*

193:*3*, *10*  195:*10*
203:*15*, *18*  206:*3*,
*19*  217:*13*  221:*9*,
*14*  227:9  230:20
242:*19*  244:5, *20*
245:*13*  249:6
255:*12*  259:*15*
260:*16*  288:*11*
293:*15*, 22
296:20  297:*17*,
*20*  300:*18*
312:*15*, *18*  313:5
314:*4*, *13*  315:*3*,
*9*, *14*
**behaviors**  101:*1*
144:*14*, *20*  145:8
148:*3*
**belief**  154:5, *14*,
*15*, *16*  215:13
269:9  286:5, *7*
**believe**  13:5, *16*
15:*17*  19:*14*
21:*3*  22:22  27:7
66:*15*  82:4, *5*
95:8  96:*1*
100:*19*  101:*8*, *10*
110:20  119:*17*
150:*19*  155:6
161:*17*  224:*10*
251:9  260:*1*, *3*
261:*21*  268:*15*,
*21*  269:*16*, *18*
270:7, *18*  272:20
278:4, *10*  279:*12*
280:*13*  300:*1*, 2
313:*2*, *3*
**BELINFANTE**
3:*4*, *6*  4:*4*  7:*17*
9:*7*, *10*, *19*  12:*14*,
*19*, 22  14:*11*, *15*
19:*13*  21:*1*  39:*3*,
*9*  44:2  52:*3*
53:6  54:*19*
60:*12*, *21*  61:*10*

63:*10*  65:*1*, 8
67:*13*  68:*3*
69:*13*  70:*3*, *11*
71:*11*, 22  72:*11*
74:*19*  75:6
76:*16*  77:*15*
78:*16*, 20, *21*
81:*1*, *16*  82:2
86:*15*  87:22
88:*6*, *11*, *16*  89:*7*,
*11*, *13*  92:8, *14*
98:*6*, *10*, *16*
100:*10*  104:*17*
109:*1*, 6, 9, *19*
110:*11*, *15*, *19*
111:2  112:*4*
124:2  126:*3*, 6,
*17*  127:*21*  128:*3*,
*12*  129:22
130:*21*  138:*8*, *21*
139:*21*  141:5
145:*12*  151:*14*
152:*13*  154:9, *13*
158:*13*  159:5, *20*
161:6  162:*1*
163:22  166:*1*
169:*10*  171:*3*
179:*15*  180:*14*
183:22  190:*15*
204:22  206:5, *8*,
*10*, *17*  208:6
214:*11*  224:*17*,
*22*  225:7  226:*1*
227:*17*  229:*11*,
*22*  231:*10*  246:*3*
247:*6*, *14*  254:*18*
255:6  256:*19*
260:*8*, 22  261:*4*
262:*3*  270:*3*
272:*13*  275:*17*
276:*3*, 9  277:*10*
278:*3*  284:*1*
285:*12*, *15*  290:7,
*10*, *14*  292:6

295:5, *22*  296:*21*
298:*8*  299:*7*, *13*
301:*14*, *20*  303:*3*,
22  304:*3*, 5, 7
305:6  307:*10*
309:*1*  310:*20*
313:20, 22
315:*18*  316:*3*, 9,
*15*  317:*1*, *16*, 22
**Belonging**  6:*12*
88:*20*
**benefit**  21:*10*
**BERRY**  2:9
**best**  24:2  35:9
107:*12*  108:*17*
121:8  214:*20*
319:*10*
**better**  133:5
204:*19*  206:*11*
210:6  217:*11*, *12*
245:*14*, *19*
246:*17*  276:*18*
277:*12*  278:5
288:9, *10*
**Beyond**  235:22
263:5  312:*21*
**big**  37:*12*
**Bill**  262:*17*
**bills**  17:7
**bio**  316:*10*
**biography**  47:*1*
**bit**  116:*14*
122:*21*  137:*16*
193:15  194:*17*
211:*17*  218:*12*
242:8  275:5
287:*3*  290:6
**blame**  152:7
**Board**  253:*10*
264:*4*, 5, *11*, *12*
**boards**  264:*18*
**body**  276:*14*

**bold**  180:22
182:*12*  211:8
212:*17*
**book**  51:*3*  88:*18*,
*21*  89:*21*  91:22
92:5, 9, *19*  93:*4*,
7, *13*  94:2  95:*6*,
*17*, *18*  96:*6*, 7, *15*,
*17*, *19*  97:*4*, 6, *12*,
*14*, *18*, *20*  98:*1*, 7,
*18*  99:*3*  303:*11*
304:*21*  305:*13*,
*18*  306:7, *10*
307:*2*  308:*13*, *15*,
*17*, *20*  310:5, *10*
**books**  260:*1*
**book's**  307:7
**borrowed**  248:5
**bottom**  27:*12*, *15*
94:*19*  129:*4*
142:*5*, *13*  226:*13*
238:6, *13*  271:*11*
**boundaries**
228:*20*
**brain**  80:*13*
**breadth**  177:*3*
**break**  10:*20*
11:2  22:*18*
37:*14*  39:*3*
59:*15*  78:*10*, *13*
80:*17*  88:6, 9
139:22  180:6, 7
224:*15*  243:*13*
275:*18*
**breaking**  246:*13*
**breathing**  78:9
**bright**  116:*20*, *21*
**bringing**  265:9
**broad**  74:*16*
179:*3*  309:*15*
**broader**  67:*1*
181:*4*  203:*13*
213:5

**broadly** 163:*20*
188:*11*
**brought** 15:*8*
58:*19* 122:22
**Broward** 15:*18*
**budget** 265:*6*
**Build** 6:*11, 13, 15,*
*17* 88:*19* 89:*21*
92:5 96:*11, 12*
97:*20* 123:*4*
184:*18, 22*
304:*21* 310:5
**building** 55:*4*
97:*14* 192:5
200:*17* 213:*15*
214:*13* 215:*1*
245:*16* 259:*12*
312:2
**buildings** 125:*10*
219:9 243:*17*
244:*13*
**built** 20:22
191:*15*
**bulk** 204:*4*
**bullets** 302:*12*
**bunch** 192:*8*
**Burrello** 273:*10*
**businesses** 190:*6*

**< C >**
**Cadillac** 167:*13*
**cafeteria** 106:*17,*
*19* 107:*6, 13, 18*
108:*5, 16, 18*
109:*11, 13*
**cafeterias** 104:*3*
123:*8*
**California** 49:*14*
131:*17, 22*
132:*17* 133:*11,*
*20* 261:*16, 18*
262:*8, 12, 21, 22*
263:*4, 11* 264:*10*

265:*12* 271:*1, 5*
309:*14*
**call** 14:*11* 15:*7*
164:*19* 184:2
199:*7* 204:*12*
225:*3* 230:*7*
306:*3*
**called** 1:*13* 44:*1*
48:*13* 57:*21*
88:*18* 90:*8, 9*
197:*17, 18*
201:*13* 213:*5*
243:*1*
**camera** 7:*9*
**Campbell** 15:*15*
16:*7*
**CAMTSS** 271:*9*
**capabilities** 293:*9*
**capability** 289:*6*
291:*1, 19* 292:*10*
293:*5, 13*
**capacity** 90:*15,*
*21* 91:*4, 11*
184:*4, 10, 12, 13,*
*18, 19, 22* 185:*20*
190:*8* 197:*12*
198:*4* 199:*19*
200:*18* 201:*20*
205:*15* 206:*14*
212:*15, 18* 213:*8*
215:*1* 267:*1*
312:*3*
**Cappadocia**
132:*5, 10*
**care** 163:*15*
**career** 136:*18, 21*
156:*4* 249:*7*
**carefully** 144:22
**Carolina** 49:*14*
**carried** 191:*17*
**CARTER** 3:22
7:*10*
**cascading** 197:*19*

**Case** 5:*12* 14:*19*
15:*13* 17:*13*
18:*5, 10* 21:*8*
28:*20* 29:*17*
36:*7, 10* 39:*20*
47:*12, 16, 22*
48:*11* 57:*19*
58:*18* 61:*12*
66:*1, 4* 71:*21*
80:*14* 93:*19*
121:*20* 124:*10*
146:*11* 166:*15*
173:*13* 202:*8*
208:*17* 214:*6*
215:*7* 223:*17*
229:*21* 257:*18*
258:*16* 268:*16*
278:*19* 287:*9*
297:*4* 319:*13*
**cases** 40:*9* 246:*5*
279:*5*
**catch** 11:*6*
**categorical**
194:*11* 195:*14,*
*15, 19* 280:*1*
290:*15, 19*
291:*14* 292:*14, 19*
**cause** 153:*21*
154:*1, 12* 160:*18*
162:*3* 174:*9, 20*
234:*13* 292:*8*
**caused** 66:*14*
**causes** 67:*7*
225:*19* 226:*3*
**causing** 157:*18*
**ceased** 318:*9*
**Center** 6:*19*
17:*18, 22* 18:*1*
46:*10* 188:*18*
189:*2* 227:*12, 14*
280:*16* 303:*13*
304:*8, 13, 19*
316:*6*

**center-based**
62:*11, 13* 182:*17,*
*19* 228:2 238:*11*
**centers** 69:*5*
226:22 245:*5, 6*
**Central** 213:*14*
214:*12* 256:*1*
**certain** 21:*9*
143:*20* 168:*5*
169:*16*
**certainly** 10:*7*
33:*4* 51:*13* 52:*9*
83:*16* 101:*3, 5*
102:*19, 21*
117:*20* 133:*3*
141:*21* 143:*19*
144:*10* 179:*18*
180:*2* 185:*8*
188:*20* 204:*4*
211:2 216:*10*
226:*7* 244:*17, 18*
271:*3* 287:*6*
316:*2*
**CERTIFICATE**
319:*1*
**certification**
83:*18*
**certified** 21:*18*
24:*6* 84:22
175:*20* 222:*14*
**certify** 319:*7*
**cetera** 20:*3*
27:*18* 53:*5*
55:*13* 68:*20*
83:*18* 110:*7*
123:*8, 12* 139:*11*
148:*5* 179:*21*
188:*2* 195:*4, 5*
199:*20* 228:*21*
244:*10*
**chair** 134:*19, 20*
**challenge** 57:*11*
58:*11, 14, 15, 19*

85:2
**challenges** 21:7
**challenging** 146:9
274:20 279:22
**change** 83:1
177:11 306:4
**changed** 139:11
267:6 274:14
**CHANTEL** 3:19
8:19
**Chapter** 303:9
309:2
**characteristics**
195:1
**charged** 57:1
**chart** 27:18
33:12, 15 35:5
248:1, 4
**Charter** 48:15
49:4
**cheated** 259:22
**check** 232:3
243:14 305:11
307:6
**CHEVRIER** 3:15
8:11
**chicken** 258:4
**Child** 5:9 65:19
66:2 73:4
102:18, 19 104:9
105:2, 6 106:3,
15 108:2, 3
124:11, 15 139:1,
4 146:16 149:18
221:18 262:16
294:8 302:9
**child-like** 221:18
**children** 73:5, 6
136:21 240:2
258:9
**child's** 253:6
**Choi** 232:19
269:20 270:8
288:16

**choose** 35:11, 12
159:12
**chronologically**
201:19
**circles** 179:11
251:18
**circumstance**
108:15 200:14
**circumstances**
20:18 21:2
117:14, 16, 17
**citation** 127:2
130:5 274:17
281:9
**citations** 266:15
**cite** 110:1, 2
113:17 116:11
125:4, 17 127:9
281:1
**cited** 110:12
130:22 133:7, 9
146:14 148:7, 14
196:1 248:12, 15
274:16 286:5
**cites** 131:22
132:5 280:15
**citing** 113:11
115:21 126:18
130:14 270:4
273:19 274:15
281:14 309:8
**Civil** 1:6 2:11
9:13
**claims** 65:3
**CLAIRE** 3:15
8:11
**clarify** 12:21
16:5 30:6, 7
54:6 105:18
173:12 201:11
261:9 282:10
**clarity** 274:20
**class** 22:12

**classes** 113:4, 22
223:16
**Classroom** 5:7
46:7, 9 112:13
116:19 117:5, 11,
13 147:17, 22
148:1, 3, 20
149:2 216:16, 17
242:4 249:4
273:16
**Classrooms** 5:5
21:12 62:9 94:9
95:11 110:9
111:11, 22
114:10, 19
130:12 155:4
156:6 215:11
219:12 276:19
**clear** 29:2 83:4
155:12 211:11
307:13 308:7
**clearer** 141:11
**clearly** 246:12
266:11
**climate** 87:19
187:3 223:21
**close** 193:16, 20
245:19 275:19
**closely** 291:17, 18
**closer** 245:15
**closes** 317:17
**closest** 174:5
**coaching** 202:18
212:1 252:9
267:10
**coauthors** 287:3
288:16
**Coca-Cola** 260:10
**code** 27:16
**coherent** 176:3
201:14
**cohort** 134:7
**collaboration**
262:14

**colleague** 232:19
283:12
**colleagues** 232:16
**collect** 211:3
**collected** 17:2
208:15
**collecting** 209:14,
15 210:2, 12
**collection** 248:18
**collects** 208:20
209:3
**college** 137:12
**color** 27:14
**Columbia** 1:17
319:4, 19
**column** 128:21
129:4
**combination**
234:10
**come** 10:15 47:6,
8 59:18 72:13,
15 78:2 118:6
150:2 289:3
297:11
**comes** 156:1
**comfortable**
147:6 157:21
278:1
**coming** 62:8
197:8 214:17
239:16, 18 240:1,
8 304:12
**commission**
319:22
**commissioners**
264:12
**Commissions**
264:4
**commitment**
214:22 269:7
**committed** 83:2
153:10
**committing**
158:11

common 24:6
43:20 53:2
123:6 171:1
176:7 183:21
192:15 210:3
220:4
commonplace
50:12, 13, 14
51:18 93:20
116:4 167:11, 14
192:17 196:15
communicate
31:10, 13 293:12
communicating
300:3
communication
148:4 293:19, 21
294:4, 9 295:15,
16 296:11
297:12, 13 298:2
communications
296:2
Community 56:5
64:10 124:19
162:2 166:8
249:5 253:5, 9
254:11
companion 15:6,
7
comparative
223:10 241:15
242:10
compared 221:12
282:12
comparing 127:3
compels 124:4
competence 187:2
competition
30:10 31:1
262:13
compilation 11:17
compiling 42:20
complaint 36:10,
18

complete 22:3
176:15 309:8
complex 20:14
136:9 176:14
complexity 271:4
compliance 190:7
299:18 300:14
complicated
170:6
complied 190:1
complies 39:17
complying 100:16
component 97:17
comprehensive
135:10 204:16
comprised 233:19
concept 60:10
127:14, 16 179:3
277:20
conceptual 197:4
concern 57:16, 18
68:13 120:6
231:9 235:15
concerned 231:3
concerning 142:7,
8 238:17
concerns 32:10
129:1, 10 200:22
226:7, 9, 10
231:1, 11 235:10
conclude 223:6
concluded 269:22
282:22
conclusion 63:16
82:10, 11, 15
84:16 112:19
113:6 127:9
131:21 142:16
150:6 169:11
261:6 267:6
268:3, 5 297:11
313:1
conclusions

120:20 270:8
condition 258:21
conditioning
218:15
conditions 143:20
219:11
conduct 35:19
83:13, 15, 19, 22
conducting
135:11
confident 115:17,
18 149:13
configuration
266:11
confined 220:19
confines 117:22
confirm 27:8
conflate 210:20
confounding
268:12
confuse 65:9
confused 239:15
confusing 11:4, 7
confusion 305:19
Congress 111:6,
15 138:10, 16
275:8
connected 28:6
187:8
connection 228:4
255:19
connections
223:16
Connor 113:12
114:2, 6 116:8
consequences
63:17 208:1
consider 61:4
68:12 75:13
76:5, 20 81:19
100:21 106:14
108:9 109:12
132:16 200:16
205:20 207:1

234:7, 11 260:15
288:2, 11 302:17
312:20, 22
consideration
104:13, 20, 21
109:21
Considered 4:12
13:8, 14 28:6
36:1 69:6, 7, 15,
19 98:21 126:21
275:12 281:8, 10
considering 106:2
considers 142:7, 9
consistent 89:20
295:2 304:12
consistently
237:19
constant 237:13
constitute 80:14
81:12 135:22
202:2 213:21
constitutes 65:17
68:8 71:19
76:20 81:17
Constitution 2:12
construct 126:11
196:19, 21 197:1,
3 289:5, 6, 22
291:1, 19 292:9,
10 293:5 296:7
construction
116:2
consult 135:3
consultant 48:10
190:21
consulting 28:21
29:7, 11
contacted 17:9
18:8 28:19
29:16, 18 131:14,
15
contain 237:17
content 26:14, 17
167:6, 7 187:11

188:*1*  221:*17*
222:*4, 7, 12*
**contention**  86:*10*
**contentious**  113:*5,
22*  114:*2, 6*
*283:3, 8, 14*
*284:4, 10, 14*
**context**  20:*1*
21:*6*  37:*11*
38:*16*  60:*17*
69:*4*  72:*22*
74:*15*  197:*5*
211:*15*  213:*2*
214:*21*  215:*14,
19*  216:*11*
243:*19*  257:*13,
14*  258:*1, 15*
259:*2, 6, 7, 9*
263:*16*  277:*9*
293:*17*  296:*16*
310:*5*
**contexts**  256:*3, 4*
**contextually**
118:*5*
**continually**
153:*10*
**continue**  113:*2, 7*
134:*2*  182:*1*
223:*20*
**Continued**  3:*1*
**continues**  151:*4*
248:*2*  280:*3*
311:*8*
**continuing**
151:*22*  264:*21*
281:*4*
**continuum**  38:*13*
87:*13*  98:*21*
99:*6*  161:*5, 21*
171:*1*  179:*3*
192:*20*  193:*11*
195:*18*  226:*15*
255:*16*  257:*10*
302:*13, 20*  303:*5*

**contract**  16:*17,
19, 22*  179:*19*
**contracting**
168:*17*  169:*22*
180:*2*
**contracts**  169:*5*
**contribute**  271:*4*
**contributes**
155:*12*  161:*9*
**contribution**
289:*7*  291:*2*
**conversation**  10:*9*
**conversations**
11:*22*  32:*5*
**Conversely**  130:*5,
11*
**copies**  132:*8*
**copy**  77:*19*
299:*12*  305:*11, 13*
**copyright**  306:*10*
**copy's**  27:*13*
**core**  51:*8*  52:*20*
186:*14*  187:*11, 22*
**corporate**  8:*20*
**correct**  13:*5*
17:*16*  27:*20*
30:*5*  36:*2, 11*
39:*14, 20*  40:*12,
13*  43:*7, 8*  44:*12*
46:*20*  47:*14*
50:*19*  51:*12*
52:*18*  61:*18*
62:*20*  63:*1*  66:*3*
72:*15*  75:*18*
85:*19*  88:*4*  92:*6,
16*  96:*9*  97:*11,
13*  107:*14*
113:*18*  125:*20*
126:*1*  127:*15*
131:*1*  133:*11, 21*
141:*17*  145:*19*
149:*20*  152:*20*
166:*9*  178:*7, 19*
194:*12*  197:*15*

203:*10*  210:*14*
214:*15*  232:*17*
233:*8, 13*  234:*17*
236:*5*  259:*2, 3*
270:*15*  272:*3*
277:*17*  282:*16*
283:*16*  292:*3, 22*
302:*11*  304:*3*
319:*8*
**corrected**  220:*16*
**correcting**  206:*6*
220:*22*
**correctly**  49:*10*
177:*20*  180:*22*
237:*3*  241:*12, 13*
**correlated**  107:*3*
**correlation**  106:*7*
**cost**  42:*21, 22*
43:*2, 3, 4, 7*  83:*7*
162:*12, 16, 21*
164:*2, 13*  177:*22*
178:*4*
**costs**  164:*8*
**counsel**  1:*14*  4:*2*
9:*6*  141:*3*  319:*12*
**counseling**
168:*12*  170:*22*
178:*21*  179:*21*
218:*5*
**counselor**  74:*9*
**counter**  292:*22*
**counterparts**
195:*8*
**counties**  245:*7*
263:*5*  271:*3*
**country**  51:*10*
52:*17*  53:*8, 19*
78:*5*  93:*21*
144:*4, 8, 19*
305:*21*
**County**  15:*18*
228:*7, 20*  262:*15,
21*  263:*3, 11, 14,

18, 21*  264:*1, 3, 4,
5, 9, 10, 11, 18*
**couple**  12:*3*
276:*12*  279:*9*
**course**  51:*2*
135:*10*  156:*4*
179:*9*  222:*5*
249:*7*  285:*12*
**courses**  135:*18*
**COURT**  1:*1*
7:*10*  9:*1*  10:*6,
10*  47:*10*  48:*6*
87:*5*  100:*6*
190:*21*  279:*20*
317:*9*
**cover**  305:*8*
**covered**  200:*9*
219:*5*
**created**  117:*16*
230:*18*
**creating**  161:*3*
**credentials**  24:*5*
**crisis**  22:*5*  24:*12*
**criteria**  168:*2*
210:*17*  248:*4*
**criterion**  266:*19*
267:*20*  268:*22*
270:*10*
**critical**  259:*7*
**criticism**  67:*12,
21, 22*  68:*5*
165:*12*
**criticisms**  67:*5,
14*  165:*12*  183:*4*
204:*5*
**criticizing**  205:*2*
**crying**  156:*5*
**culture**  94:*11*
95:*12*  223:*22*
**current**  57:*2*
86:*19*  155:*14, 22*
156:*21*  161:*10,
13*  169:*13*
182:*19*  202:*7*

208:*11*  209:*22*
215:*10*  216:*1, 5,*
*6*  250:*22*
**currently**  66:*11*
154:*18*  162:*14*
164:*10*  176:*5*
200:*20*  202:*10*
209:*15*  216:*3*
217:*19*  250:*21*
256:*9*  278:*11*
315:*1*
**curriculum**  25:*21*
201:*10*  222:*1*
281:*7, 13*  282:*15*
287:*8*  309:*17*
**cut**  282:*3*
**CV**  47:*1, 8, 17*
136:*16*
**cycling**  239:*18*

**< D >**
**DANIELLE**  3:*17*
8:*17*
**data**  45:*4, 5, 21*
46:*1, 21*  50:*7*
53:*3*  103:*17*
112:*21*  114:*14*
186:*10, 17*
208:*12, 15, 21*
209:*4, 13, 15, 16,*
*18*  210:*1, 5, 7, 10,*
*12, 17, 21*  211:*4,*
*11, 15*  212:*2, 6, 8,*
*10, 16*  232:*10*
234:*7*  237:*11*
239:*10*  241:*2, 15,*
*16*  242:*11*  257:*6*
273:*4, 11*  274:*8,*
*22*  275:*6, 10, 11*
281:*5*
**database**  45:*17*
**data-based**  212:*9*
**data-informed**

186:*13*
**date**  7:*4*  139:*10*
**dates**  138:*3, 19*
**day**  111:*11, 22*
140:*6*  179:*10*
226:*22*  227:*8*
280:*3*  286:*19*
310:*11*
**days**  252:*11*
**DC**  1:*19*  2:*14*
7:*8*  49:*21*
**DCH**  166:*8*
**deadly**  306:*1*
**deal**  311:*3*
**decade**  112:*14*
**decide**  39:*1*
191:*7*  210:*11*
**decides**  38:*16, 19*
227:*3*
**decision**  39:*2*
41:*21*  57:*14, 16*
58:*13*  61:*13*
66:*20*  108:*20*
117:*18*  123:*4, 11*
146:*21*  185:*17*
274:*22*  295:*11*
296:*11*
**decisions**  53:*3*
58:*17*  212:*9, 10,*
*12*  279:*20*
298:*20, 22*
**Declaration**  4:*10*
16:*15*
**decline**  233:*16*
238:*16*
**declined**  233:*12*
237:*19*
**declining**  234:*14*
239:*16, 18*
**decreased**  235:*5,*
*14, 20*
**decreasing**  238:*22*
**dedicated**  194:*6*

**dedicating**
150:*11*  151:*6, 18*
**deem**  213:*20*
**deemed**  104:*7*
**deeming**  178:*1*
**deep**  147:*2*
**deeper**  92:*20*
93:*13*
**deeply**  136:*9*
200:*16*
**Defendant**  1:*9,*
*14*  3:*3*  4:*3*  9:*6,*
*11*  141:*3*
**define**  37:*10*
50:*18, 20*  52:*17*
67:*9*  73:*3*  80:*22*
115:*16*  120:*13*
192:*9*
**defined**  251:*9*
288:*15*
**defining**  113:*9*
114:*3*  195:*20*
**definition**  50:*22*
51:*1, 7, 12, 21*
52:*14*  53:*7, 18*
66:*6*  77:*1, 5, 8,*
*18*  113:*13*
120:*13*  122:*2*
136:*9*  139:*19*
143:*15*  186:*19*
251:*22*
**definitions**  51:*8,*
*9, 22*  52:*21*  53:*2*
116:*6*  120:*12*
186:*6*  187:*5*
**defund**  181:*12*
**degree**  50:*9*
135:*15, 17*  137:*5*
252:*15*
**degrees**  265:*22*
**Delaware**  49:*19*
**deliver**  69:*20*
70:*4*  71:*7*

**delivered**  73:*18*
201:*15*
**delivering**  187:*19*
**delivery**  193:*1,*
*14*  194:*11*
290:*15, 17, 19*
291:*14*  292:*14,*
*19*  299:*20*  300:*15*
**denial**  127:*14, 16*
**denied**  126:*9*
**DEPARTMENT**
2:*10*  7:*7*  11:*20,*
*22*  12:*6*  14:*19*
17:*16, 20*  28:*15,*
*19*  29:*7, 12, 17,*
*22*  30:*4, 8, 13, 14*
31:*5, 14*  32:*1, 9*
36:*9*  49:*7*  55:*22*
56:*4, 5, 9, 11*
61:*22*  63:*22*
64:*5, 10, 18*
101:*13*  111:*5, 14*
124:*11, 14, 19*
125:*1*  134:*20, 21*
137:*6*  155:*20*
156:*11, 19*
157:*10, 11, 16, 18*
158:*1, 8, 10, 19*
159:*10, 14, 21*
160:*5, 16, 18*
161:*2, 11*  162:*2,*
*9*  165:*21*  166:*10,*
*20*  168:*16*  169:*4,*
*5, 12, 21*  171:*8, 9,*
*16, 22*  172:*4, 15,*
*19*  174:*8, 11, 19,*
*21*  176:*2, 22*
177:*10*  181:*2*
185:*9, 16, 18*
189:*4, 8*  192:*18*
193:*8*  198:*17*
199:*3, 19*  200:*1,*
*5, 13, 17, 21*
201:*9*  203:*4*

204:*14* 208:*16*, *20* 209:*3*, *14*, *17* 210:*1*, *11*, *16* 213:*22* 232:*5* 261:*10*, *17* 279:*21* 292:*2*, *8* 293:*3* 295:*12* 301:*5* 303:*8* 312:*7* 317:*8*
**Departments** 185:*14*
**depend** 198:*8*
**dependent** 117:*13* 136:*11*
**depending** 252:*6*, *11*
**depends** 73:*20* 104:*9* 216:*18* 293:*16*
**deposed** 9:*21*
**Deposition** 1:*12* 7:*6* 9:*10*, *17* 11:*12*, *13*, *16* 12:*2*, *7* 314:*1* 317:*6*, *14* 318:*9*
**depositions** 147:*5* 314:*9*
**deprive** 70:*6*
**depth** 139:*12* 231:*7*
**describe** 151:*16* 157:*12* 160:*19* 182:*1* 186:*2* 259:*4* 268:*16* 274:*18*
**described** 68:*22* 73:*16* 148:*9* 153:*6* 158:*10* 160:*15* 163:*15* 179:*17* 259:*19* 265:*13* 291:*12* 311:*5*
**describes** 91:*22*

**describing** 26:*13* 120:*13* 258:*8* 298:*21*
**description** 97:*3*, *5* 111:*19* 112:*6*, *7* 274:*8*
**design** 211:*18* 266:*12*
**designated** 276:*19* 277:*13* 278:*5*
**Desirae** 1:*16*, *21* 7:*11* 319:*5*
**desire** 101:*4*
**desired** 190:*13* 199:*2*
**despite** 150:*13* 151:*8* 279:*19*
**destination** 199:*2*
**detail** 40:*8*
**details** 137:*11* 170:*10*
**determinant** 258:*15*
**determinants** 126:*2*, *9* 134:*16*
**determination** 106:*18* 114:*15* 119:*13* 121:*3* 148:*16* 190:*20* 234:*21*
**determine** 28:*13* 76:*2*, *7*, *19* 87:*4*, *8* 99:*22* 100:*8*, *16* 102:*4* 103:*8* 104:*12*, *20* 105:*11* 106:*11* 117:*21* 119:*10* 132:*21* 134:*7* 136:*13* 147:*10* 148:*22* 164:*17* 169:*15* 189:*18*, *22* 191:*1* 209:*12*, *20* 210:*8*, *16*

**223:*4* 231:*8* 254:*5* 274:*21* 301:*11* 302:*2*
**determined** 61:*17*, *20* 114:*2* 278:*21*
**determines** 103:*4* 302:*6*
**determining** 60:*15* 61:*6* 76:*20* 83:*8* 88:*7* 109:*10* 170:*2*
**detriments** 125:*14* 126:*5*
**devastating** 156:*3*
**Develop** 90:*15*, *20* 91:*3*, *11* 185:*20* 198:*3* 201:*20* 205:*14* 206:*13* 212:*18* 213:*8*
**developed** 248:*5*, *7*
**development** 30:*17* 106:*21* 137:*8* 190:*8* 252:*8*, *10* 311:*11*, *20*
**Developmental** 64:*19* 125:*2*
**developments** 14:*17*
**develops** 191:*16* 197:*12* 199:*19*
**diagnoses** 194:*15*
**diagnosis** 194:*19*, *22* 195:*2* 196:*15* 244:*14* 289:*13*, *15*
**dictating** 292:*2*
**Diego** 49:*19*
**difference** 90:*1* 158:*14* 186:*2* 242:*20* 246:*22* 247:*7* 263:*13*

**differences** 90:*2* 160:*14* 174:*12*
**different** 27:*16* 41:*9* 44:*12* 46:*9* 49:*4* 51:*11* 52:*16* 99:*5*, *9*, *13*, *18* 107:*17* 136:*10*, *11* 137:*21* 159:*22* 162:*20* 168:*6*, *9* 173:*17* 196:*7* 199:*17* 200:*11* 201:*1* 210:*6* 215:*8* 216:*4*, *11* 223:*18* 225:*11*, *12* 232:*6* 237:*10* 244:*10* 245:*9*, *10* 249:*1* 264:*6* 271:*17* 274:*5* 281:*1* 302:*7*
**differential** 174:*9*
**differently** 52:*18* 65:*21* 94:*10* 95:*12* 119:*4*
**differs** 307:*21*
**difficult** 17:*4* 69:*11* 98:*20* 203:*11* 266:*20* 269:*2*, *6* 277:*8* 283:*10* 287:*4*, *21*
**difficulties** 286:*10*
**difficulty** 195:*3*
**direct** 17:*18* 306:*3*
**directed** 262:*13* 266:*22*
**direction** 1:*22* 90:*16* 161:*4* 185:*21* 191:*8* 198:*5* 199:*2*, *15* 200:*16* 270:*19*
**directly** 40:*7*, *11* 203:*13* 233:*14*

**Disabilities** 5:*4,*
*11* 18:*18, 19, 21*
19:2 20:*16* 21:8
23:*3* 24:*1* 25:*19,*
*20* 26:*3, 9* 37:*5,*
*8* 38:*13, 17, 22*
39:*18* 55:*3, 4*
60:*3, 7* 61:*16*
64:*19* 65:*13, 22*
66:*17* 73:*10*
79:2, *15* 81:*13*
87:*15, 20, 21*
90:8 101:*1, 2*
102:9 108:*18*
110:8 111:*8, 10,*
*21* 112:*12*
114:*11, 18* 115:*3,*
*4, 6, 10* 116:*3, 17*
122:9 125:2, *9*
130:*13* 132:*18*
133:*4* 137:*9, 20,*
*22* 142:*20, 21*
150:22 156:*17*
161:*20* 163:2, *6,*
*17* 166:*21* 167:2
169:*15* 170:*18,*
*20* 171:2, *18*
172:8, *13, 16, 17,*
*22* 173:6, *15*
174:*14* 175:2, *15*
176:*1* 183:*16*
184:*20* 189:*10,*
*12* 192:*21* 193:*3,*
*11* 195:7, *11*
200:*4* 203:*16, 18*
206:*4, 20* 207:*19*
209:6 217:*13*
220:*10, 12, 13, 15*
221:8, *9, 14*
230:20, *21* 235:9
242:*16, 19*
243:*19* 244:*5, 20*
245:*13* 249:*6*
259:*16* 260:*16*

261:*8* 273:*14*
281:9, *11* 282:*11,*
*13* 285:*1, 2, 20*
286:*1, 3, 10, 16,*
*17* 287:*12, 17, 19,*
*22* 288:*1, 11*
294:*1* 295:*3*
296:*19, 20*
297:*18, 20*
300:*18* 312:*16,*
*18* 313:*5* 314:*5,*
*13, 18* 315:*3, 9, 15*
**Disability** 4:*17*
73:*12* 75:*18, 21*
76:2, *4* 78:8
107:*22* 108:*4, 11*
165:2 195:*14*
196:*19, 20* 197:*3*
220:*18, 21*
227:*10* 228:9
230:6 244:*15*
253:*17* 255:2, *13*
289:*5, 22* 293:*15*
**disabled** 183:*10*
200:*11*
**disagree** 111:*18*
112:*5, 7, 16, 17,*
*19* 268:2, *4, 13*
284:*17*
**disagreeing** 302:9
**disagreements**
158:*20*
**disagrees** 317:8
**Disclosure** 4:*10*
**disconnecting**
72:2
**discourse** 283:*3,*
*9, 14* 284:*4, 10, 14*
**discovery** 9:*12*
317:*17*
**discrimination**
295:9

**discriminatory**
120:*16* 225:*16*
245:20
**discuss** 25:9
**discussed** 98:*19*
130:5 211:*17*
218:*19* 271:*14*
292:*11* 301:*3*
**discussing** 207:*10*
217:*18*
**Discussion** 89:*6*
140:*1*
**discussions** 113:*3,*
*21*
**dismal** 273:*18*
274:*14*
**disorder** 244:*18*
**disorders** 22:20
23:*18, 19*
**disproportionate**
239:5 240:*18*
**dissatisfied** 57:9
58:*3, 9, 13*
**disseminate**
192:*1, 3*
**disservice** 309:*6*
**distinct** 97:*16*
**distinction**
115:2*0* 121:9
174:2*0* 190:6
228:4 244:22
273:22
**distinctions** 123:*1*
219:9 282:*13*
**distinctly** 113:*3,*
*8, 10* 115:*19*
**distinguish** 122:2
**DISTRICT** 1:*1, 2,*
*17* 24:*15* 29:*4*
40:*18* 44:*16*
46:*18* 48:*19*
63:*15, 18* 71:*5*
73:*21* 74:*7, 11,*
*21* 77:*11* 84:*19*

85:*8, 18* 86:*12*
87:*1, 7* 90:*22*
91:*5, 12* 184:*5*
201:*21* 202:*3*
208:2 211:*20*
212:*1* 213:*9, 15*
214:*14* 215:*1*
228:*8, 10* 230:*1,*
*2, 9* 235:*7*
261:*11* 263:*10*
319:*4, 19*
**district-focused**
205:*16* 206:*15*
**districts** 90:*17*
131:*13, 14* 175:*4*
185:22 188:22
198:*6* 202:*15*
209:*21* 228:*11,*
*19, 21* 243:*6*
261:*17* 263:*8*
265:*1, 12* 271:*2*
**district-scaling**
212:*19*
**disturbed** 22:*17*
**diverse** 131:*15*
**divided** 49:*3*
**DIVISION** 1:*3*
2:*11* 196:*2*
**doc** 34:*20*
**doctor** 194:*20*
**doctoral** 135:*15,*
*17*
**document** 14:*5*
33:*16* 34:*5, 7, 13*
35:*15, 21* 163:*9*
191:*16* 253:*13*
300:2, *8* 303:*7*
304:*14, 15* 305:*10*
**documentation**
146:*1, 3*
**documents** 11:*15*
33:*1* 35:*16, 18*
42:*4, 15* 51:*6*
57:*17* 58:*7* 84:*1,*

*4* 126:*21* 146:*4*
147:*4* 243:*15*
253:2 254:*8*
275:*12* 301:2, 8
**DOE** 158:*21*
159:7 184:*4*
192:*1, 3* 204:*10*
208:*8* 227:*5*
275:8 300:*22*
**doing** 11:*5*
25:*12* 26:22
49:*10* 76:*13*
82:*4* 83:2 88:7
101:*13* 155:*18,
21* 156:20 158:1
159:7 160:*16, 18*
161:*12, 13, 15*
162:3, *9* 165:*21*
167:*19* 201:*18*
278:*1* 292:*8*
295:*10* 316:*1*
**DOJ** 190:*22*
**dollars** 123:*4, 12*
153:*19* 159:*10*
164:*11* 272:2
**dominant** 94:*10*
95:*12*
**door** 242:*1*
**downward** 236:*9*
**Dr** 4:*11* 7:6 9:*8,
11, 20* 14:*16, 22*
15:3, *20* 39:*10*
88:*17* 89:*1, 2*
133:7 180:*15*
188:*14, 16* 225:*1*
272:*15, 17* 276:*4*
283:*13* 284:*16*
317:3, *6, 7, 13, 20*
318:*1*
**drafts** 191:*16*
**draw** 141:*6*
226:*5* 291:*8*
**driving** 92:*3, 12*

94:*4*
**due** 57:*21* 58:*4, 5*
**duly** 1:*15* 9:*4*
**Duties** 299:*16*

**< E >**
**e.g** 168:*11*
276:*20* 277:*14*
278:*6*
**earlier** 24:*9*
29:*21* 30:*3* 86:*5*
87:*2, 3* 93:*17*
100:*4* 143:*4*
154:*4* 159:*17*
167:*1* 210:*13*
212:*5* 213:*3*
219:*5* 220:*17*
227:7 237:22
245:*17* 255:*15*
257:*3* 258:*18*
272:6 291:*13*
292:*12* 303:*11*
**early** 103:*17*
**ease** 305:*8*
**easier** 12:*19*
70:*19* 269:*18*
270:*9*
**easiest** 160:*21*
230:*14*
**easy** 307:*14*
**ecology** 289:7
291:2
**economic** 305:*22*
**economically**
230:*10*
**economies** 228:*12*
**ecosystem** 311:*14*
**Ed** 174:*13*
**educated** 20:7, *9*
125:*9* 149:*14*
**educating** 66:*3*
131:*16*
**Education** 4:*17*
5:5, *11, 13* 6:*10,*

*19* 17:*16, 21*
18:*1* 20:8 21:*12,
19* 22:*12* 23:2
26:*12, 19* 27:22
28:2, *7, 10, 11*
29:*8, 13, 18, 22*
30:*4, 8, 9, 14, 15*
31:2, *3, 5, 14*
32:*1, 9* 38:7
40:22 41:5 42:7
48:*15* 49:7
52:*15* 53:*14*
55:*6, 7, 22* 60:*11,
17* 62:*1* 63:22
64:6 66:*11* 69:*1,
10, 22* 70:7, *13*
71:*20* 72:7, *10*
73:2, *6* 74:*12, 17*
75:*1* 78:*6* 79:*1,
2, 7, 14* 82:*20*
85:2 101:*13*
103:*18, 22* 104:7
105:*3, 15, 22*
106:*4* 110:*9*
111:6, *8* 112:*13*
113:*4, 21* 114:*10,
18* 116:*19* 122:*7,
8* 124:*11* 125:*10*
130:*12* 131:*8*
133:6 134:*20, 21*
135:*9, 17* 139:2
144:*1* 149:*14, 15*
152:3, *18* 155:*21*
156:*11, 19*
157:*10, 11, 16, 18*
158:*1, 9, 10, 19*
159:*10, 14, 22*
160:6, *16, 18*
161:*3, 11, 21*
162:*4, 9* 164:*11*
165:22 166:*14,
20* 168:*13* 169:*4,
5, 12, 21* 171:*9,
16* 172:*4, 19*

173:*14, 21* 174:*1,
5, 8, 11, 18, 20, 21*
176:*3, 22* 181:2
183:*9* 185:*10, 14*
187:*19* 188:*17*
189:*2, 5, 8, 9*
192:6 193:*8*
194:*19* 195:*8*
198:*10, 13, 18*
199:*19* 200:*1, 5,
13* 201:*9* 204:*14*
207:*17* 208:*16,
20* 209:*3, 14, 17*
210:2, *3, 11, 16*
213:22 215:*17*
216:*8, 14* 218:2
220:*8, 10* 221:*10,
11, 12* 222:*10, 15,
20* 223:*14* 228:*5,
13* 242:2, *4*
243:*5, 20* 244:*15*
247:2, *9* 248:*10,
15* 261:*10, 17*
262:*15, 22*
263:*11, 14, 19, 22*
264:*5, 10, 11, 18*
265:*21* 267:*1, 11*
273:*15, 16*
274:*10* 275:*9*
276:*15, 21*
277:*15* 278:*7*
279:*6, 21* 280:*3,
16* 281:*7, 13*
282:*15* 287:*8*
289:*21* 292:2, *8*
293:*3* 295:*4, 8,
12* 296:*18* 297:2
299:*2* 301:*5*
303:*8, 9* 306:*4,
21* 309:22 312:7
316:*6*
**Educational** 5:*16,
18* 6:*8* 19:*1, 6*
20:*17* 21:*4* 24:*4*

25:*10*  37:*4*
41:*13*  53:*1*
56:*17*  61:*21*
83:*1*, *3*  86:*1*, *20*
94:*7*  95:*1*, *9*
96:*1*, *2*, *22*  98:*22*
101:*10*  102:*8*, *16*
106:*11*  107:*4*
139:*5*  143:*8*, *14*
150:*14*  151:*9*
161:*4*  171:*11*, *18*
176:*8*  181:*7*
182:*10*, *20*  183:*3*
187:*19*  195:*9*
197:*17*, *20*
199:*11*  202:*7*
203:*17*  204:*1*
210:*3*  214:*10*
246:*20*  247:*1*, *8*
256:*6*  257:*1*, *7*
260:*19*  276:*13*
309:*18*  312:*17*
313:*8*  314:*17*
315:*13*

**Education's**
111:*15*  168:*16*
232:*6*

**educator**  23:*1*
30:*17*  36:*7*, *19*
40:*22*  41:*4*
51:*14*  52:*8*  55:*1*,
*10*, *11*  58:*12*
73:*1*  77:*3*
109:*17*  128:*9*

**educators**  21:*14*,
*17*, *18*  22:*11*
24:*2*, *6*, *8*, *10*
25:*17*  41:*16*
42:*11*  51:*10*
52:*10*  83:*17*
92:*21*  93:*14*
175:*20*  176:*12*
180:*4*  185:*8*
186:*13*  193:*7*

194:*22*  202:*10*
215:*11*, *14*, *18*
216:*2*, *7*, *10*
217:*9*  222:*14*
288:*7*  309:*6*
313:*3*, *4*

**educator's**  57:*12*

**effective**  20:*2*
21:*21*  22:*2*, *3*, *5*
23:*22*  24:*3*, *12*,
*21*  25:*1*, *3*  26:*9*
30:*17*  31:*3*
38:*11*  53:*3*  69:*9*,
*20*  70:*5*, *20*  71:*6*,
*12*  72:*5*  73:*17*
87:*17*, *18*, *19*
100:*21*  102:*3*, *4*,
*12*  103:*19*  104:*8*
105:*4*, *5*  106:*5*,
*12*  156:*13*  161:*1*,
*18*  162:*10*  167:*5*,
*6*, *8*, *10*  175:*6*, *18*
176:*7*, *12*  177:*18*
178:*1*, *14*, *17*
183:*6*, *19*  185:*8*
189:*10*  190:*9*
193:*9*  195:*12*
200:*18*  202:*7*
208:*11*, *21*
209:*22*  211:*11*
212:*2*, *6*  213:*14*
215:*6*  216:*2*, *13*
251:*1*  252:*17*, *20*
256:*3*  257:*9*, *11*,
*13*, *15*, *16*  258:*5*,
*6*  260:*14*, *18*
267:*12*  269:*10*
278:*14*  293:*21*
295:*1*

**effectively**  46:*5*
85:*22*  101:*7*
154:*7*, *19*  184:*11*
212:*16*

**effectiveness**
105:*20*

**efficacy**  46:*4*, *14*
50:*8*  101:*15*
102:*5*, *16*  104:*12*
105:*11*  106:*2*
202:*14*  203:*2*
205:*2*  211:*15*
257:*12*

**efficiencies**
230:*17*

**effort**  170:*19*
198:*21*  201:*6*
264:*21*, *22*  265:*2*,
*7*  266:*3*  267:*2*
270:*16*

**efforts**  202:*14*

**egg**  258:*4*

**eight**  29:*19*  188:*3*

**either**  20:*7*
54:*13*  168:*10*
212:*8*  292:*8*, *9*
297:*5*

**element**  45:*11*
70:*22*  71:*14*

**elements**  74:*17*
86:*3*, *18*  104:*5*
136:*13*  282:*8*
311:*11*, *20*

**eligibility**  129:*11*,
*21*

**eligible**  165:*11*

**eliminate**  37:*2*
67:*2*  183:*8*  214:*8*

**eliminates**  181:*5*

**eliminating**
203:*14*

**elimination**
312:*14*

**Elliott**  15:*20*

**email**  300:*20*

**embedded**  91:*6*,
*14*  96:*21*  212:*21*
213:*1*, *11*

**embrace**  217:*9*
288:*7*  311:*10*

**emergence**  188:*5*

**emotional**  22:*20*
23:*17*  24:*17*
46:*15*  75:*19*, *20*
76:*1*, *3*  78:*7*
79:*2*, *15*  87:*17*
90:*22*  91:*7*, *14*
103:*6*  116:*16*
125:*13*  126:*8*
134:*15*  151:*2*
155:*1*  163:*17*
167:*8*  169:*14*
172:*7*, *13*, *22*
175:*7*, *18*  176:*4*
177:*19*  178:*2*, *9*,
*18*  186:*22*  187:*2*,
*8*  201:*22*  209:*6*
212:*21*  213:*4*, *11*
243:*18*  244:*14*, *18*

**emotional/behavio
r**  81:*13*

**emotional/behavio
ral**  107:*22*  108:*3*,
*11*  166:*21*
220:*21*  228:*9*
230:*6*  242:*16*
253:*17*  261:*8*

**emotionally**  22:*16*

**emotionally/behavi
or**  183:*10*

**emphasis**  137:*7*,
*20*

**employ**  208:*10*
289:*21*  291:*1*, *11*

**employed**  124:*10*
189:*15*  291:*16*
319:*12*

**employee**  124:*19*
125:*1*

**employees**  42:*8*
55:*22*  56:*4*, *11*

employing  209:*21*
employs  290:*18*
en  18:*20*  155:*7*
171:*10*
enabling  215:*19*
256:*3, 4*  257:*14*
258:*1, 15, 20*
259:*2, 6, 7, 9*
296:*16*
encompass  187:*12*
encourage  224:*8*
encouraged
150:*11, 18*  151:*6*
153:*5*
engage  73:*10*
203:*19*
engagement
148:2  175:*17*
197:*18*  211:*18*
Ennis  125:*17, 19*
enrichment
186:*16*
enrolled  131:*13*
237:*12*
enrollment
236:*11*
ensure  186:*14*
299:*18*  300:*13*
ensuring  92:*1, 10*
94:*3*
enter  239:*6*
240:*19*
entered  188:*5*
entire  197:*16*
230:*2*
entirely  278:*22*
entirety  61:*20*
entities  69:*7, 19*
182:*6*  242:*19*
243:*10*
entitled  87:*20*
110:*7*
entity  242:*21, 22*

environment
21:*13*  60:6, *10,*
*16*  61:*2, 5, 7, 14*
66:*12*  79:*19*
104:*7*  107:*4*
118:*3*  143:*2, 14*
149:*2*  159:*19*
173:*21*  174:*2, 6*
183:*11*  216:*11*
221:*10*  226:*16*
228:*14*  253:*6*
256:*21*  283:*4*
284:*11*  295:*8*
environments
21:*10*  26:*5*
73:*11*  104:*3*
130:*12*  161:*5*
183:*19*  220:*8*
221:*22*  222:*21*
244:*19, 21*  246:2
248:*9*  249:*4*
256:*4*  295:*4*
296:*19, 20*
equal  18:*22*  37:*4*
68:*18*  122:*5*
143:*2, 3*  161:*21*
172:*16*  181:*6*
182:*9, 20*  183:*2,*
*18*  203:*17*  204:*1*
214:*10*  217:*21*
218:*1*  246:*20*
247:*1, 8*  256:*5,*
*22*  312:*17*  314:*16*
equally  20:*21*
248:*3*
equation  258:*19*
**Equity**  6:*11, 13,*
*15, 17*  88:*19*
89:*21*  92:*2, 5, 12*
94:*4*  96:*11*
97:*14, 20*  304:*22*
309:*3*  310:*6, 9*
311:*1, 3, 5, 10, 13*

equity-based
90:*4, 12*  91:*6, 13*
92:*2, 11, 15*  94:*3*
96:*8, 12*  97:*10,*
*12, 16, 19, 22*
98:*17*  99:*1, 8, 16*
192:*5*  212:*20*
213:*11*  289:*4*
equivalent  263:*10*
**ESQ**  2:*4, 5, 6, 7,*
*8*  3:*4, 5, 15*
essentially  52:*21*
170:*12*
establish  87:*12*
established  20:*22*
118:*1*  185:*15*
302:*15*
establishing
293:*13*
establishment
212:*3*
**ET**  1:*19*  20:*3*
27:*17*  53:*4, 5*
55:*13*  68:*19*
83:*18*  110:*7*
111:*18*  123:*8, 12*
139:*11*  148:*5*
179:*21*  188:*1*
195:*4, 5*  199:*20*
228:*21*  244:*10*
268:*9*  269:*21*
evaluate  64:*2*
101:*15*  158:*15*
204:*8*
evaluated  292:*17*
evaluation  11:*15*
35:*20*  45:*13*
204:*13, 17, 18*
events  122:*6*
ever-changing
73:*2*
**Everybody**  294:*5*
everybody's
193:*19*

evidence  251:*14*
279:*22*
evidence-based
38:*11*  91:*5, 12*
167:*10*  186:*20*
187:*13*  212:*9, 19*
213:*10*  250:22
evident  281:*6*
evolution  196:*12*
exact  57:*15*
139:*10*  269:*8*
exactly  23:*6*
35:*3*  232:*1*
examination  1:*13*
4:*2*  9:*6*  141:*3*
145:*21*
examine  74:*21*
examined  9:*5*
34:22
**Examining**  5:*6*
210:*18*
example  20:*6*
22:*1*  24:*10*  26:*3*
45:*10, 14, 16*
48:*20*  53:2  55:*5*
57:*19*  59:*8*  62:*6*
68:*17*  99:*10, 20*
106:*16*  121:*9*
147:*21*  165:*7*
173:*19, 21*
174:*15*  179:*4, 5*
195:*2*  218:*4, 13*
220:*5, 18*  226:*13*
227:*11*  228:*6*
239:*7*  240:*10*
245:*1, 2*  251:*17*
254:*7*  263:*22*
272:*6*  293:*10, 19*
examples  40:*7*
exceeded  267:*20*
**Excerpt**  6:*11, 13,*
*15, 17*
excluding  223:*11*
exclusion  73:*13*



**exclusively**
276:20  277:13
278:6
**excuse**  19:8  44:4
75:10  112:10
116:9
**exercise**  128:22
129:8
**exhaust**  170:6
**exhausted**  306:22
**EXHIBIT**  4:9
5:2  6:2  12:11,
12, 15  13:5, 13,
16, 17  14:6, 7
33:8, 9  35:22
89:8, 9  110:21,
22  116:9  126:14,
15  128:14
130:18, 19  142:5
225:2, 5  232:1
261:20  262:1
272:10, 11  276:6,
7  299:12  304:22
305:2, 15  307:3,
8  308:20, 21
310:17, 18
313:12, 14, 15
316:5, 7
**exist**  256:4
281:12  316:2
**existence**  19:7, 8
68:16  182:14
244:3
**existing**  185:2
278:16
**expand**  189:6
**expanded**  187:12,
22  188:9
**expanding**  188:15
**expect**  235:3
275:20
**expectations**  24:3
104:1  179:6

205:17  206:16
**expected**  204:6
**expelled**  235:5
**experience**  25:19
38:7, 21  54:22
71:17  73:4
79:20  82:18
83:4  101:1
102:11  104:5
114:5, 9  118:5
123:7  125:12
135:11, 20
142:19  145:2
147:2  154:22
162:19  164:7
175:21  178:7, 8
190:5  207:20, 21
244:9, 11  249:3,
14  255:4, 9, 20
260:12  270:11
**experienced**
235:12
**experiences**
73:11, 13  122:7,
11  156:3
**experiencing**
126:7
**Expert**  4:10, 14
15:12  16:13
18:5, 9  32:7
47:9  48:10
154:6, 16  155:5
317:16
**expertise**  166:13
175:21  184:14
202:6  204:10
**Experts**  4:15
**expires**  319:22
**explain**  69:15
134:11, 13  235:18
**exploratory**
223:16
**exposure**  21:11
**express**  57:16

**expressed**  32:9
57:18
**extend**  263:5
**extending**  265:10
**extensive**  25:12
82:18  142:19
146:6  147:2
266:21
**extensively**
208:18
**extent**  112:10, 11
266:10
**external**  46:3
**extra**  27:13
**extras**  89:11
**extreme**  144:13,
20  145:8

**< F >**
**facilities**  27:20
78:7  79:3, 5, 6,
13  80:6, 9, 12
182:14, 19  218:22
**facility**  66:13
68:7  117:10
193:5  227:22
228:3  246:9, 10
**fact**  112:17
146:5  155:2
242:8  275:2
286:5  298:3
**factor**  76:19
83:7, 11
**Factors**  5:8  27:1
60:15  61:6, 12
81:19  82:10, 15
248:17  311:13
**factual**  262:7
271:7
**fail**  69:22
**failed**  174:22
175:6, 11  176:3,
9  294:17, 21

**failing**  68:15
155:14
**fails**  69:20  70:4
71:5  207:22
**failure**  260:18
**fair**  18:22  35:21
37:3  74:20, 22
100:12  120:14
121:1  143:3
161:21  165:17
172:16  177:16
181:6  182:9, 20
183:2, 17  188:13,
19  198:2  203:1,
16, 22  214:9
217:21  246:20,
22  247:1, 7, 8
256:5, 22  284:7
285:16  291:21
296:16  310:12,
16  312:17  314:16
**fairly**  244:8
**fairness**  122:9
**fall**  252:2
**familiar**  15:6, 7,
15, 19, 20  16:1
32:12  53:11, 13
54:1, 2, 10, 13, 14
57:21  60:2, 5, 9
65:2, 11, 14
70:12  77:5, 7
79:22  80:18
110:1  123:16
133:16, 17
228:16  253:9
262:4  304:8
**familiarity**  54:2, 7
**family**  137:8
**Fannin**  227:11
228:7  230:2
246:7, 11
**FAPE**  53:14, 19
69:4  70:17, 18,
22  71:2, 7, 14

74:*13*  75:*1*  76:*8*, *12*, *21*  77:2, *6*, *9*, *17*, *18*  126:*10*, *12*  127:*14*, *16*, *19*  128:*7*, *10*  247:*9*  296:*4*  298:*10*  301:*12*  302:*4*, *11*

**far**  165:*19*  246:2  295:*18*  313:*6*

**fashion**  28:*7*  212:*10*

**fault**  102:22

**feasible**  230:*10*, *11*

**features**  51:*8*  52:20

**Federal**  9:*13*  31:*6*  51:6  52:*14*  153:*14*, *18*  159:*9*  273:*4*, *11*  274:*8*  279:20  299:*19*  300:*14*

**feedback**  202:*17*

**feel**  11:*7*  33:*5*  83:*4*  99:*5*  144:*10*  147:*6*  149:*12*  157:*21*  158:*3*  162:*8*  190:*13*  194:2  278:*1*

**feel-good**  309:*4*

**feeling**  14:*9*

**feels**  81:*21*

**felt**  286:*21*

**fenced**  121:*19*

**Ferri**  113:*12*  114:2  116:*8*

**Ferri's**  114:*6*

**fervent**  154:*5*, *14*, *15*, *16*

**fewer**  273:*18*  274:2, *6*, *10*

**FIA**  272:2, *6*, *8*

**fidelity**  46:*1*, *3*, *4*, *8*, *13*, *19*  99:22  100:*3*, *8*, *15*, *20*  101:*4*, *16*  187:*1*  200:*7*  257:*12*  267:*19*  272:*7*  308:*3*

**field**  26:*12*  60:*11*  77:*3*  99:*7*  116:*4*  139:*7*, *13*  147:2  183:*21*  192:*17*  248:*9*, *14*

**figure**  121:2  169:*7*  232:*21*, *22*  234:*1*  236:2, *4*, *20*  238:*9*, *12*  240:*6*, *10*  241:*7*

**figures**  238:*4*

**file**  33:*18*, *19*, *22*  34:*20*  35:*6*  149:*19*  300:*21*  317:*7*

**filed**  14:*22*  15:*3*  58:*4*

**files**  28:*12*

**financial**  319:*13*

**Find**  5:*9*  27:*4*  45:*5*, *6*, *7*, *20*  47:2, *18*  59:*10*, *12*  64:*14*  71:*12*  118:*9*, *16*  124:*10*, *18*, *22*  129:*3*  149:*4*  186:*5*  218:2, *6*  223:*18*  224:*3*  225:*19*  234:*12*  242:*5*  248:*16*, *20*  275:*6*, *9*, *11*  314:*1*, *15*

**finding**  25:*8*  68:*15*  142:6  193:*16*  218:*8*, *16*, *19*  280:*5*  305:*4*

**findings**  231:*18*  282:*18*

**fine**  12:*20*  88:*11*  108:*21*  115:*7*  122:*18*  124:*7*  125:*7*  137:*14*  150:2  313:*21*

**finer**  188:2

**finished**  180:*1*

**finishing**  247:*17*

**fired**  40:*19*  41:*1*, *5*, *11*, *17*  42:*3*, *11*

**first**  22:*19*  34:*5*, *7*  37:*16*  89:*18*  92:*18*  93:*3*  108:*14*  110:*12*  111:*3*  125:*8*  130:*4*, *10*, *16*  141:*7*  148:*6*  155:*11*  170:*7*  180:*19*  181:*4*  185:*19*  189:22  197:*9*  199:*4*  205:*11*  213:*13*  217:*7*  250:*13*  262:*11*  273:*3*, *9*  276:*12*  281:*5*  283:2  284:*2*, *20*  285:*6*  295:*13*  301:*17*  309:*3*  310:22

**fit**  186:*3*

**Five**  50:*3*, *5*  87:*5*  131:*8*  156:*8*  159:2  181:*10*  188:*3*  211:*9*  226:*17*  227:*1*  309:*7*  313:*1*  316:*15*

**flip**  219:*16*

**Florida**  15:*16*  46:*12*, *13*

**flow**  87:*6*  290:*5*

**flowing**  159:*10*

**focus**  137:*8*  190:*7*, *8*

**focused**  104:*1*  186:*17*  199:*6*  214:22  293:*9*

**focusing**  187:22

**folks**  188:*10*, *14*  245:*19*

**follow**  10:2  161:*3*

**followed**  118:*1*

**following**  121:*6*  222:*19*  230:*15*  256:*14*

**follows**  9:*5*

**follow-up**  99:*17*  108:*21*

**force**  92:*3*, *13*  94:*4*

**foregoing**  319:*6*, *7*

**forget**  68:*4*  196:*5*

**forgive**  32:22  136:*15*  222:*16*  286:*18*

**forgotten**  94:*16*

**form**  9:*15*  19:*10*  20:*11*  28:*6*  38:*5*  43:*18*  51:2  52:*2*, *19*  54:*18*  60:*8*, *18*  61:*9*  63:*7*  64:22  65:*4*  67:*10*  69:2  70:*1*  71:*8*  72:*8*  74:*14*  75:*4*  76:*10*  77:*12*  80:*20*  81:*15*, *20*  86:*13*  87:*10*  98:*4*, *9*  100:*9*  104:*15*  109:*15*  112:*1*  123:*21*  127:*18*  129:*17*  138:*7*, *17*  151:*13*  152:*10*  155:*14*, *22*  156:*21*  158:*12*  159:*16*  160:*20*  161:*10*, *13*, *16*  163:*21*  165:*18*

169:*6*, *13*  170:*4*
178:*21*  179:*1*
183:*12*  190:*3*
204:*15*  206:*3*
208:*3*  209:*2*
214:*1*  225:*21*
227:*6*  229:*10*
231:*5*  245:*21*
247:*3*  254:*17*
256:*18*  260:*6*
270:*1*  277:*6*, *18*
283:*22*  290:*13*
292:*4*  293:*6*
294:*19*  295:*20*
298:*7*  299:*6*
301:*13*  302:*22*
315:*10*, *21*
**formal**  39:*13*
252:*14*
**formats**  249:*1*
**formatting**  225:*12*
**formed**  54:*17*
**forms**  86:*4*
210:*6*  249:*1*
**formula**  250:*13*,
*17*  257:*2*, *4*, *5*, *8*
259:*6*
**forth**  181:*15*
200:*17*  222:*17*
**found**  21:*8*
57:*17*  190:*4*
243:*13*  267:*19*
270:*8*
**four**  226:*17*
228:*8*  234:*16*
250:*18*  267:*21*
**four-year**  262:*15*
**framework**  45:*15*
186:*9*, *13*  266:*14*
**frankly**  204:*6*
**free**  11:*7*  33:*5*
53:*13*  68:*22*
69:*22*  70:*6*, *12*,
*14*  71:*19*  72:*7*, *9*

73:*1*, *5*  74:*12*, *22*
144:*10*
**freestanding**
67:*17*  68:*8*  80:*9*,
*12*  182:*13*, *16*
183:*11*  242:*14*,
*15*, *18*  243:*17*
244:*4*, *13*  245:*16*
**frequently**  11:*6*
**friendly**  65:*6*, *7*
**full**  66:*16*  87:*13*
92:*19*  93:*3*
96:*18*  125:*8*
130:*4*, *10*  142:*6*
143:*10*, *18*  144:*3*,
*7*  146:*7*  155:*11*
164:*22*  175:*1*
191:*22*  192:*20*
193:*1*  195:*8*, *16*
201:*14*  210:*10*
217:*7*  243:*4*
246:*18*  250:*13*,
*19*  266:*19*
267:*19*  269:*1*
270:*10*  279:*18*
280:*9*  289:*2*
307:*12*  309:*3*
310:*22*
**Fullan**  309:*8*, *11*
**fully**  52:*10*
86:*11*  205:*5*
269:*19*
**Fulton**  263:*22*
264:*3*, *4*, *5*
**fun**  143:*16*, *17*
**functional**  22:*4*
24:*10*  25:*21*
26:*7*  222:*1*
**fund**  182:*1*
**fundamental**
92:*20*  93:*14*
**funded**  31:*15*
178:*5*

**funding**  17:*19*
29:*22*  30:*9*, *10*,
*17*, *19*  31:*2*, *3*, *9*
43:*14*  152:*16*, *17*,
*19*  157:*3*, *6*, *19*
158:*20*, *21*  159:*7*,
*14*  160:*12*  163:*5*
182:*4*  292:*16*
**funds**  150:*13*
151:*8*, *11*, *16*
152:*1*  153:*14*, *18*
157:*10*, *16*  158:*9*,
*10*  229:*8*, *12*
**further**  189:*19*
195:*6*  246:*4*
279:*19*  280:*7*, *8*
282:*17*  317:*4*
**furthering**  192:*5*
**furthermore**
112:*10*, *11*

**< G >**
**GaDOE**  160:*1*, *3*
166:*3*, *7*, *11*
184:*17*
**GARDNER**  2:*7*
8:*5*
**Gen**  174:*13*
**General**  5:*5*
20:*8*  21:*12*, *19*
22:*12*  23:*2*  24:*2*,
*14*  25:*17*  26:*19*
27:*22*  28:*1*, *7*, *10*,
*11*  38:*10*  39:*11*
40:*22*  41:*4*, *13*
42:*7*  55:*7*, *10*
66:*3*, *10*, *11*
83:*10*  88:*9*
103:*18*, *22*  104:*7*
105:*3*, *15*, *16*, *22*
106:*4*  108:*1*, *10*
110:*9*  112:*13*
113:*4*, *21*  114:*10*,
*18*  116:*17*, *18*

122:*7*, *8*  125:*9*
130:*11*  133:*5*
144:*1*  149:*14*
153:*2*  163:*10*
166:*21*  167:*2*
168:*13*  173:*5*, *14*,
*20*  174:*1*, *5*, *10*,
*18*  181:*20*  193:*6*
194:*13*  195:*8*
198:*10*, *13*, *20*
207:*17*  215:*17*
216:*14*, *17*  218:*7*
220:*7*, *9*  221:*9*,
*10*, *21*  222:*10*, *11*,
*15*, *20*  223:*6*, *14*
224:*2*  228:*5*
249:*15*  273:*16*
274:*10*  277:*11*,
*17*  281:*7*, *12*
282:*15*  287:*8*, *21*
295:*3*, *8*  296:*18*
297:*2*  309:*22*
**generalized**
104:*21*  117:*2*
244:*16*
**Generally**  36:*13*,
*16*  60:*2*  71:*4*, *5*
129:*16*  207:*22*
**geographic**
228:*20*
**geography**  230:*22*
**GEORGIA**  1:*2*, *8*
3:*8*, *15*, *16*, *17*, *18*,
*19*  5:*17*  7:*4*, *18*,
*20*  8:*16*, *18*, *20*
9:*12*  15:*8*, *9*
17:*1*  18:*18*, *19*,
*21*  23:*4*  26:*16*
28:*3*, *21*  29:*3*, *7*,
*12*, *18*  32:*6*, *10*,
*13*, *16*  37:*3*, *6*, *9*,
*22*  38:*2*  39:*17*
40:*15*, *19*  41:*1*, *6*,
*14*, *17*  42:*3*, *12*,

22  50:7  55:6, 8,
19  56:1, 7, 12
58:3, 18  63:22
64:4, 5, 18  67:5,
15, 21  68:6
79:10  83:14, 21
84:10, 19  85:1, 9,
18  87:7, 15  90:4
92:16  97:8
99:11, 14, 20
100:6, 7, 14, 15
101:16  103:8
123:11  124:4
153:1  155:12, 18,
20  157:19
158:16  159:7
160:5, 18  161:2,
9, 12, 18  162:4, 9,
12  163:8, 10, 14
164:6  165:12, 13,
14  166:3, 20
168:16  169:3, 5,
20  171:9, 16
172:3, 11  174:8,
12, 19, 21  176:3,
22  178:2  180:21
181:19  184:3
192:1, 3  198:14
200:1, 13  201:8
204:10, 14  208:8,
16, 20  209:3, 13,
17  210:1, 11, 15
213:22  227:12
232:5  241:20
242:7, 13, 17
244:1  245:18
246:1  253:8, 10
254:13  260:3
263:7  264:1
268:16, 19  269:2,
14, 15, 17, 19
270:10  271:6
277:5  278:5
279:14, 16

289:21  290:18,
22  291:7, 10
292:2, 8  295:11
297:1  303:8
309:20  313:3
315:1
**Georgia's**  42:17
64:10  290:19
**getting**  108:7
121:14  181:18
239:15
**GILLESPIE**  2:5
8:1
**give**  21:6  49:14
59:10, 19  194:1
311:12  316:15
**given**  18:22  54:1,
7  67:12  73:2
107:6  108:4
142:19  147:22
159:6  198:16
216:11  224:6
239:22  240:16
283:11  297:22
**giving**  254:7
**glad**  318:3
**GNET000381**
33:17
**GNETS**  5:19
15:8  18:22  19:3,
5, 8, 9, 15, 16
27:20  28:1, 4, 8,
9  37:3, 5  38:18
40:15  41:16
42:2, 9, 11  55:8,
9  57:19  58:4, 10
62:8, 9  63:12
66:13  67:6, 17
68:7, 14, 21  69:4,
5, 9  78:6  79:4
83:17  102:6
115:15  117:9
118:9, 12, 16, 18,
19, 21  119:7, 9,

16, 19  120:1, 3, 7
123:19  124:5, 9,
12, 16  141:8, 11,
13, 16, 19, 21, 22
142:1, 10, 17
145:15  150:12,
20  151:7, 21
152:4  153:2, 15,
19  154:18
155:13, 21
156:20  157:11,
17  159:11
161:10, 12
162:15  163:4, 18
164:19  165:16
168:5  169:13
173:2, 8, 15, 18
174:4, 10, 18
175:4, 9, 12, 16
176:12  177:21
181:13, 15, 17, 21
182:2, 3, 5, 13, 16,
19  183:5  200:20
202:10  203:9, 16
204:5, 8, 13, 17
214:7  215:8, 11,
15, 19  216:6, 10,
16  217:9, 20
218:7  219:21
220:2, 15  221:13
222:6, 7, 11, 15
223:7, 17  224:3
225:2, 3, 10, 15,
18  226:3, 12, 14,
15, 19, 22  227:14,
22  228:2  231:2,
4  233:11, 16, 17,
18, 20  234:14
235:9, 21  236:5,
6  237:4  238:19
239:11  240:13
241:9  243:7, 8, 9
245:1, 6  246:9,
10  249:10  253:4

254:9  256:10, 16
257:19  258:7, 10,
16  259:1, 5
278:10  287:9
288:7, 21  292:17
293:19  294:6, 8,
10, 12, 15  295:15,
16  296:2  297:3,
14, 15, 22  298:14,
21  299:5, 9, 11,
18  300:4, 13, 17,
21, 22  301:4, 11
302:2, 3, 9, 12, 16,
18, 20  303:5
312:16
**go**  12:10  25:7
30:7  34:4  59:13
60:15  61:6, 12
63:20  67:17
68:7  71:18
74:16  82:11, 15
85:14  108:18
112:9  122:16
131:3  135:5
136:20  157:3, 5
162:6, 11  169:11
180:20  182:3, 7
191:9  197:10
209:10, 11  211:6
213:7  218:10
223:1  241:14
242:5  246:10
247:15  250:12
270:6  271:19
294:6  298:17
300:21, 22  301:3
302:12  310:16
317:19
**goal**  109:17
182:16  207:6
293:13
**Goals**  5:14
181:15, 22
182:12  190:13

**goes** 58:*16* 81:*17* 94:6, *19* 130:*15* 131:*12* 204:*4* 224:7, *9* 233:*3* 267:*17*

**going** 9:*15* 11:*4* 22:*18* 30:6 50:2 64:*14* 71:*18* 77:*17* 79:*17* 88:9, *17* 89:*4* 110:*20* 126:*21* 127:2 130:*3, 15* 132:*3* 133:22 144:6, *11* 153:*15, 19* 157:*10, 16* 167:22 170:*1* 176:*19* 177:5 180:*17* 200:7 206:2 219:*16* 222:4 223:*19, 20* 224:*14* 225:*1, 8* 227:*3* 229:2 230:*13* 237:*21* 258:2 276:*4* 281:22 306:*19* 316:*4* 317:*3*

**Good** 9:8, *9* 23:*5* 78:*13* 104:*18* 110:*17* 115:*20* 125:*21* 168:8 180:7, *9* 224:*17* 225:*17* 247:*17* 294:*4*

**goodness** 193:*16*

**Gotcha** 82:*12* 91:*20* 219:*19*

**government** 123:*10* 264:*4, 6, 12*

**governments** 123:*2*

**Governor's** 265:*6*

**gradations** 98:*22*

**grade** 22:*12* 23:*1* 25:*16, 18, 20* 205:22 220:*8* 221:*16* 222:*3* 236:7 241:*8* 262:*17*

**graders** 240:*11*

**graduated** 137:*1, 12* 234:22

**graduating** 234:*9* 235:*6*

**grant** 29:22 30:*5, 12* 31:*6, 15* 182:2 189:*3, 7* 272:*21*

**grants** 17:*19* 31:*16, 19, 20* 123:*20* 124:*5* 152:*4, 9* 159:*12* 181:*13, 15, 17, 22* 182:*2*

**graph** 240:*21* 241:*1*

**graphic** 237:*1* 241:*6* 250:*15, 16*

**graphs** 232:*10*

**grappling** 305:*21*

**great** 11:*11* 23:*7* 139:*12* 178:*16* 261:*13* 309:*5* 311:*3*

**greater** 231:*7* 274:*1* 281:*6*

**gross** 150:*13* 151:*8*

**group** 121:*10, 11, 16, 17* 164:*15* 179:*8*

**groups** 15:*10* 168:*5*

**growth** 106:*20* 130:*13* 132:*19*

**guess** 35:*9* 134:*10, 12* 137:*1*

**139**:*14* 170:*1* 183:7 204:*3* 239:*13* 244:7 255:22 297:*6* 309:*12, 13*

**guessing** 232:*22*

**guests** 7:*16*

**guidance** 61:*22* 66:*21* 87:*13* 90:6, *15* 156:*12* 160:*11* 161:*3, 18* 174:22 175:9, *11* 185:*20* 198:*4* 199:*14* 202:*5, 6* 250:*20* 269:*11* 270:*19* 312:*3* 313:*9*

**Guide** 4:*15*

**guiding** 191:*15*

**gymnasiums** 104:*3* 123:*8, 12* 218:*14* 220:*2*

**< H >**

**half** 111:*9, 20* 234:*14, 15, 16*

**HAMILTON** 3:*14* 8:*13*

**Hampshire** 49:*13* 99:9, *19*

**handed** 14:2, *3, 6*

**hang** 131:2 273:*6*

**happen** 256:*21* 311:*3*

**happened** 14:*17* 251:*19*

**happening** 62:*21*

**happens** 194:*14* 199:*12*

**happiness** 102:*17*

**happy** 12:*18* 102:*14, 15, 20*

**hard** 275:*1*

**harmful** 218:*22*

**harms** 160:*19*

**hazard** 192:*7*

**head** 138:*14* 188:*12* 219:*15* 264:*2*

**health** 24:*17* 56:5, *10, 11* 64:*10, 18* 75:2, *9, 20* 76:2, *3* 91:*2, 7, 15* 103:*6* 124:*20* 125:2 162:2 166:*10* 168:*12* 170:22 173:22 174:*17* 175:*19* 176:5 187:*1, 4, 9* 201:*22* 212:22 213:*12* 218:*5* 220:*21* 251:*5* 252:21, *22* 253:*3, 5, 7, 18, 19* 254:*6, 8, 10, 15, 19* 255:*3, 8, 14, 17* 305:*20* 306:*15*

**hear** 109:*2* 177:*19* 187:*15* 223:2 313:*13*

**hearing** 57:22 58:*5*

**heart** 311:*13*

**held** 1:*17* 89:*6* 140:*1*

**help** 77:22 96:*8* 100:*4* 186:*10* 199:*8* 201:*1* 204:*18* 215:*7* 285:*10* 294:*5* 308:*16*

**helpful** 240:*7* 290:*7*

**helping** 96:*11* 207:*16* 267:*16*

**helps** 162:*10*
167:2*1*
**HERNANDEZ**
3:*17* 8:*17, 18*
**heroes** 309:*4*
**hey** 294:*3*
**Hicks** 268:*9*
**high** 24:2 104:*1*
136:*19* 137:*13*
205:*16* 206:*15*
215:*4* 220:*5*
221:*20* 230:*8*
281:*8* 282:*10*
**higher** 237:*8*
**highlight** 156:*2*
**highlighted**
240:*11*
**highly** 21:*14, 16*
22:*11* 113:*5, 22*
114:2, *5* 144:*14,*
*21* 145:*8, 16*
**hire** 184:*21*
**hired** 40:*18* 41:*1,*
*5, 11, 17* 42:*3, 11*
180:*4*
**history** 188:*4*
279:*19*
**Hmm-mm** 158:7
**holding** 317:*14*
**hole** 116:*14*
**home** 58:*16, 20*
59:5 155:*15*
220:*1, 7* 223:*19*
243:6 245:*15, 19*
**homes** 246:2, *4*
**homework** 78:*1*
**honest** 310:*13*
**honestly** 137:*11*
**honesty** 310:*14*
**hope** 99:2*1*
102:*19, 21*
109:*17* 207:*15*
217:*8* 288:6

305:*14* 312:*19,*
22 313:*8*
**hopelessness**
155:*13* 156:2
161:*9*
**hopes** 92:*20*
93:*4, 7, 13* 296:*11*
**hoping** 288:*12*
**hour** 88:*10*
**hours** 12:9 17:*5*
252:*11* 303:2*1*
**huh-uh** 10:*15*
**human** 137:*8*
289:*6* 291:*1, 19*
292:*10* 293:*5, 9,*
*13*
**hundreds** 155:*3*
234:6 237:*15*
238:*18* 239:22
240:2
**hung** 170:*10*
**hypothetical**
63:*19* 73:22
107:9, *11* 108:*6,*
*15* 159:*8* 190:*17*
230:*3* 246:*15*
253:*16* 295:*13*
**hypothetically**
63:*13* 74:*16*
109:*16* 135:*20*
136:*4* 157:*22*
207:*12*

**< I >**
**i.e** 196:*3* 289:*13*
**Idaho** 49:*20*
**IDEA** 53:*11*
54:2, *7, 10, 14, 17*
58:*11* 63:6 77:*6*
111:*7* 127:*10, 11,*
*14, 16, 20, 22*
128:*1, 5, 11*
129:*12, 21*
138:*15* 139:*3*

150:*11, 19, 21*
151:*6, 12, 16, 19*
153:*5* 169:*13*
170:7 178:*16*
180:*7, 9* 251:22
273:*15* 294:*4*
**IDEA's** 77:*18*
**identified** 12:*12*
13:*8* 14:*7* 27:*1*
50:*4* 52:*1* 89:*9*
106:*1* 110:22
124:*14* 126:*15*
130:*19* 168:*15*
169:*16* 171:*6*
185:*11* 186:*16*
225:*5* 262:*1*
272:*11* 276:*7, 21*
277:*14* 278:*7*
280:2 294:*14*
305:2 307:*8*
308:*21* 310:*18*
314:2 316:7
**identify** 7:*13*
8:*10* 24:*21*
168:*21* 226:*8*
232:5 252:*21*
260:*4* 283:*11*
294:*17* 295:*10*
**identifying** 146:*10*
**IEP** 33:*17, 19, 22*
34:*19* 35:*10, 14*
54:*3, 5, 16, 21*
55:*1, 2, 9, 15, 18*
56:*1, 5, 6, 12, 15,*
*16, 21* 57:*1, 6, 9,*
*14* 61:*1, 4, 17*
62:*3, 6, 11, 18, 21*
63:*3, 11, 16* 64:*1,*
*6, 11, 20* 66:*1, 7,*
*9, 14, 19* 67:*6, 16*
68:*6, 10* 118:*10,*
*19* 119:*1, 4, 8, 10,*
*15* 120:2, *8*
141:*8, 10* 143:*6*

149:*3, 11* 205:*20*
206:22 207:*8, 15,*
*21, 22* 208:2
227:8 246:*9, 17*
253:*18* 258:*10*
291:*10, 15, 20, 21*
292:*3, 9, 21*
293:*1, 4, 7, 10, 12*
294:*3, 10, 17, 21*
295:*10* 296:*1, 10*
297:*3, 10, 13, 18,*
*21* 298:*3, 5, 13,*
*17, 19, 22* 299:*4,*
*8* 300:*3, 9, 21*
301:*6, 10* 302:*1,*
*2, 6, 10, 17, 18*
**IEPs** 34:22 35:*4,*
*11* 40:*12* 42:6
118:*20* 120:*5*
141:*14* 142:*15*
145:22 168:*11*
221:8 291:*15*
300:*9*
**iii** 299:*18*
**immediate** 99:*17*
203:20 204:*12*
**immediately**
203:*9*
**Impact** 5:*15*
106:*15* 239:*5*
240:*18*
**imperatives**
279:*21*
**implement** 38:*3*
43:*15, 17* 84:*18*
85:*8, 16* 96:*8*
100:7 101:*4, 7*
129:*19* 181:2
185:*10, 17* 190:*9*
191:*10* 198:*18*
202:7 205:*5*
210:*18* 215:*6*
269:*19* 270:*9*

278:*12*  293:*1, 8, 16*  308:*2*

**implementation**
43:*22*  45:*10, 11*
46:*8*  90:*16, 22*
91:*5, 12*  92:*1, 10*
94:*3*  100:*3*
111:*7*  128:*10*
139:*4, 7*  162:*21*
175:*1*  178:*8*
184:*6, 15*  185:*21*
188:*21*  189:*6, 15*
191:*18, 20*  198:*4, 21*  199:*9*  200:*18*
201:*21*  202:*3*
212:*20*  213:*10*
214:*22*  226:*11*
251:*1*  256:*2*
257:*6, 7, 11, 15*
258:*6*  265:*15, 22*
266:*9, 20*  267:*20*
269:*1, 12*  270:*17*
271:*4*  272:*7*
309:*15, 16, 17*
312:*4*

**implementations**
278:*13*

**implemented**
44:*6, 15, 18, 21*
45:*1*  46:*5, 19*
50:*4, 10*  85:*22*
86:*11, 18, 22*
139:*13*  187:*1*
197:*14, 16*  203:*8*
251:*13*  294:*9*

**implementing**
31:*19*  44:*10*
82:*19*  100:*14*
129:*10*  162:*19*
164:*7, 8*  182:*8*
199:*16*  260:*13*
266:*19*  268:*22*
270:*14, 20*
292:*18, 20*

**important**  20:*19, 21*  101:*11*
106:*20*  107:*2*
170:*17*  188:*20*
201:*14*  311:*12*

**importantly**  10:*5*
**imposing**  293:*4*
**impossible**  105:*7*
261:*12*

**impressed**  194:*7*
**improve**  276:*17*
**Improvement**
111:*8*  256:*7*
273:*15*

**improves**  187:*2, 3*
**inappropriate**
25:*16*  260:*17*
315:*14*

**incidence**  281:*8, 11*  282:*11, 12*

**incident**  42:*5*
146:*3*

**include**  24:*9*
25:*4*  51:*20*  84:*9*
87:*16*  120:*16*
136:*10*  167:*4, 6*
251:*2, 17*  255:*2*
278:*13*

**included**  42:*4*
51:*3, 4, 5*  97:*17*
115:*13*  122:*4*
127:*20*  128:*10*
148:*19*  149:*1*
179:*16*  181:*9*
225:*3*  255:*3, 9*
259:*10*  260:*12*
276:*16*  286:*11*
312:*8, 22*

**includes**  25:*4*
51:*7*  119:*10*
120:*22*  135:*9*
200:*3*  250:*20*

**including**  19:*22*
135:*12*  144:*22*

145:*22*  156:*5*
164:*14, 15*  175:*3*
184:*14*  220:*10*
223:*21*  230:*20*
235:*10*  256:*7*
287:*22*

**inclusion**  103:*22*
113:*4, 21*  283:*5*
284:*5, 12, 21*
285:*9, 18, 21*
286:*14*  287:*5, 10, 18, 21*  288:*3, 13, 15, 22*  303:*13*
304:*9, 13, 19*

**Inclusive**  6:*10*
48:*14*  130:*11*
192:*3, 6, 16, 19*
276:*13*  289:*4*

**increase**  235:*7*
278:*4*

**increased**  132:*4*
273:*13*

**independent**  12:*1*
80:*9*  136:*11*
229:*8, 17*

**indicate**  105:*19*
134:*14*  233:*16*
238:*15*  239:*10*
273:*5*  292:*1*

**indicated**  62:*9*
66:*15*  68:*15*
212:*6*  233:*22*
298:*2*

**indicates**  27:*16*
241:*2*  266:*18*

**indicating**  276:*14*
**indication**  143:*5*
**indicative**  104:*8*
105:*4, 5*  106:*5*

**indicators**  147:*16*
192:*16*  235:*3*
248:*8, 22*

**Individual**  5:*13*
19:*19*  20:*4, 10,*

20  23:*8, 11, 14, 15*  28:*12*  32:*12*
35:*9*  39:*22*  40:*2, 8*  48:*19, 21*
56:*16*  62:*19, 22*
68:*12*  105:*8, 16*
106:*15, 18*
107:*21*  124:*14*
145:*21*  165:*7*
212:*13*  263:*5*
289:*8*  291:*3*
293:*8*

**individualized**
22:*5*  76:*17*
104:*13, 20*
106:*13*  295:*2*

**individually**  16:*19*
**Individuals**  5:*10*
24:*13*  111:*7*
184:*21*  185:*3, 6*
273:*14*

**ineffective**  106:*6*
152:*2*

**inequitable**
120:*17*

**inequities**  96:*21*
**inferior**  220:*3*
**influence**  197:*19*
**inform**  41:*20, 21*
42:*1*

**information**  17:*2*
84:*1*  116:*1*
147:*6*  191:*7*
242:*6*

**informed**  113:*17*
212:*8*

**infrastructure**
186:*9*

**initial**  191:*15*
**initiative**  309:*18*
**initiatives**  82:*19*
257:*7*

**injuries**  80:*13*

ink 194:*5* 224:*11*
in-seat 78:*10*
inserted 171:*22*
Insomuch 173:*1*
231:*17*
inspire 92:*20*
93:*13*
instability 305:*22*
install 267:*18*
270:*10* 308:*2*
installing 266:*18*
268:*22*
instance 119:*22*
instant 318:*8*
Institute 79:*22*
80:*11*
institutional
215:*16* 248:*9*
249:*4*
instruction
103:*19* 179:*9, 11*
186:*11, 15* 222:*2,*
*14* 289:*8* 291:*3*
instructional
129:*10, 20*
299:*20* 300:*16*
instructors 216:*7*
instrument 46:*13*
insufficient
171:*17* 172:*4, 5,*
*11, 20*
integrated 154:*21*
integrating
114:*17*
integration
153:*22*
intellectual 111:*9,*
*20* 115:*10* 116:*3*
intended 156:*15*
intensity 186:*18*
252:*12*
intensive 151:*1*
266:*22* 267:*8, 18*

intention 97:*18*
intentional 315:*20*
intentionality
316:*1*
intently 170:*9*
interaction 145:*1*
148:*4, 5*
interactions 25:*4*
132:*4* 195:*3*
interchangeably
49:*8*
Interest 47:*13*
48:*11* 107:*13*
108:*17* 319:*13*
interested 192:*19*
200:*10* 202:*20*
interior 219:*9*
internationally
266:*10*
interpreted 197:*4*
interrelated
266:*13*
interrupt 82:*3*
133:*22* 166:*6*
265:*17* 290:*5*
interrupted
103:*12* 271:*19*
intervention 22:*3,*
*6* 24:*11, 12*
45:*14* 259:*12*
293:*14*
interventions
22:*1* 129:*11, 20*
291:*16* 296:*18*
introduce 12:*10*
13:*15* 277:*20*
inverse 25:*15*
invest 123:*11*
184:*4, 9*
investment
198:*22* 213:*15*
214:*13, 18, 21*
269:*8, 9*
invoice 17:*6*

involved 47:*12*
182:*6* 278:*19*
300:*10*
involvement
103:*22* 156:*3*
involving 47:*13*
135:*21* 219:*10*
isolated 125:*11*
249:*11, 16, 20*
isolation 250:*9*
issue 12:*21*
23:*10* 108:*14*
196:*3* 242:*10*
245:*8* 268:*12*
292:*11*
Issues 6:*4* 18:*17*
196:*11* 266:*9*
items 122:*5, 6*
its 68:*16* 74:*13*
138:*11* 150:*13*
151:*8* 155:*14, 21*
156:*21* 161:*10,*
*12* 169:*13*
215:*15, 16*
258:*16* 266:*11*
298:*19* 319:*14*

< J >
James 274:*17*
275:*2*
JAVIER 3:*16*
8:*15*
jbelinfante@robbi
nsfirm.com 3:*10*
Jennifer 134:*17,*
*19*
Jeong 232:*19*
JESSICA 2:*9*
JOHNSON 3:*5*
7:*19*
Join 6:*11, 14, 16,*
*18* 88:*19* 89:*21*
92:*5* 96:*11*

97:*20* 304:*22*
310:*6*
joining 97:*15*
JOSH 3:*4* 7:*17*
78:*12*
Journal 6:*3*
279:*4* 284:*17, 18*
journey 269:*14*
judge 37:*21*
judgment 14:*20*
129:*1, 9*
judicial 36:*5, 15*
38:*1*
Judy 15:*20*
jump 145:*10*
Jura 1:*16, 21*
7:*11* 319:*5*
JUSTICE 2:*10*
6:*11, 14, 16, 18*
7:*7* 11:*20, 22*
12:*6* 28:*15, 20*
29:*17* 88:*19*
89:*21* 92:*5*
96:*11* 97:*15, 20*
304:*22* 310:*6*
317:*8*
Justice's 14:*20*
justify 68:*16*
171:*14*

< K >
K-12 48:*14* 49:*1*
Kansas 16:*20, 21*
17:*19* 46:*1, 7, 10*
134:*22* 137:*2, 6*
Katie 32:*13*
Katsiyannis
125:*19*
keep 30:*6* 77:*13*
176:*19* 224:*9*
295:*8* 306:*18*
KELLY 2:*7* 8:*5*
89:*2, 3*

Kelly.Gardner@us
doj.gov 2:19
kept 45:17
key 257:17
Keywords 111:4
kid 246:10, 11
294:7
kids 20:7 102:15
133:10, 20 245:12
Kim 16:6
Kimberly 32:15
Kimm 15:15
16:7
K-I-M-M 16:7
kind 10:1, 17
35:18 39:10
72:19 122:1
125:11 192:11
196:9 219:22
252:6 274:4
291:6 314:10
kindergartner
239:9
kinds 107:1
147:16 164:9
192:22
Kleinhammer-
Tramill 273:10
knew 197:8
know 11:6 13:13
14:16 16:6, 8, 10
17:12 18:4
19:11 29:15
31:19 32:4, 18
33:3, 14 41:8
42:13, 19 45:6
50:8 52:4, 5
53:9, 20 54:5
56:2, 8, 13 61:1,
8 63:17 64:8
71:18 74:1 75:5
76:11, 15, 22
77:16 78:10, 12,
14 80:10 105:6

109:22 110:2
113:13 114:3
117:1, 19 118:6
119:20 122:12
123:6, 22 126:11
130:14 132:1
134:8 136:16, 18
138:4, 12, 15, 18,
19 143:15
144:15 148:19
152:5, 6, 8, 11, 19,
21 153:3, 4, 13,
14, 16, 18, 20
157:14 158:5, 6,
9 162:5 163:14
164:2 170:8
177:11, 22 180:8
185:6 188:8
191:4 194:4
200:8, 21 204:12
208:4 219:20
224:13 228:15
229:1 240:5
242:3, 22 247:11
248:13 250:9
261:14 264:12,
17 266:6 269:3,
21 275:7 279:4
280:11 284:3
297:4 298:11
301:16 308:10,
14, 18 309:10
314:14
knowing 222:4
275:5
knowledge 29:10
55:21 56:3, 10
87:8 265:11
knowledgeable
82:22
Kozleski 282:19
KU 4:15
Kurth 110:6
130:14, 15 133:7

134:17, 19
281:14 282:18
286:5 288:19

< L >
label 33:17
195:19
labeled 33:17
284:22 285:2, 19,
22 286:2, 15, 17
287:11, 19
labeling 35:4
labels 115:14
lack 150:13
151:8 210:6
214:9 222:7, 11
246:20
language 238:13
287:4
Lanterman's
196:17
large 23:11 35:3
213:14 214:5
251:1
largely 112:13
285:1, 18 286:1,
16 287:6, 10, 14,
15, 18
larger 121:20
289:18
large-scale 23:3,
10 52:11 135:11
214:13, 18
258:17 294:22
295:9 296:7
lastly 176:9
late 262:11
LAURA 2:8 8:7
Law 5:12 52:15
82:13 139:11
lawsuit 13:2
15:8 17:10
18:15, 16 36:5,

14, 17
lawsuits 279:20
lawyer 234:15
Lawyers 47:13
48:10 239:13
laying 199:13
LEA 170:2
184:12 199:20
200:2, 9 227:4
229:8 263:4
269:19 270:13
lead 199:3
230:17
leader 215:2
310:6, 9 311:2
leaders 306:22
311:5, 9, 10
Leadership 6:3
61:22 90:6
160:11 176:10
213:16 214:14
215:2, 3
leading 158:21
234:13 309:2
leads 253:22
292:11
lean 292:1
leaps 291:4
learn 20:1 73:9
94:10 95:11
206:10 207:16,
17 281:12
Learner 5:7
276:20 277:14
278:6
learning 19:22
21:11, 22 24:3
26:5, 10, 16
46:15 57:4 61:5
66:22 68:18, 19
87:18 156:12
160:11 161:19
167:5, 7, 9 175:8,
13 176:11

183:*19*   187:*8*
193:*9*   195:*12*
199:*15*   202:*19*
205:*16, 19, 21, 22*
206:*15, 16*   207:*8*
208:*10*   213:*4*
215:*21*   216:*12*
221:*22*   222:*7, 12*
251:*3*   252:*8*
253:*6*   255:*19*
266:*12, 22*   267:*9*
289:*7*   291:*2*
**LEAs**   90:*7*
123:*10, 14, 18*
124:*4*   152:*8, 22*
156:*13*   159:*11*
200:*8, 16, 22*
209:*4*   212:*14*
229:*7, 16*   262:*22*
266:*4*   270:*14, 18*
290:*19, 22*
**leave**   67:*7*   88:*5*
156:*5*   189:*12*
191:*19*
**leaving**   235:*5*
**Left**   139:*1, 4*
275:*20*   303:*17*
304:*1, 2*
**legal**   39:*13*
60:*14*   81:*22*
208:*1, 4*
**legalese**   38:*2*
**legalities**   39:*19*
**legally**   123:*19*
124:*1*
**legislation**   139:*1*
**legislature**
262:*12*   265:*7*
**legislature's**   42:*18*
**legitimate**   107:*7,*
*19*   108:*8*
**length**   117:*21*
147:*15*   240:*16*
**lesser**   266:*10*

**lesson**   26:*11*
167:*7*   222:*1*
**letter**   211:*12*
**level**   25:*20*   44:*6*
45:*19*   50:*8, 12*
52:*12*   104:*19*
197:*14*   202:*5*
204:*10*   205:*21*
220:*8*   222:*3*
227:*4, 5*   252:*12*
257:*6*   267:*2*
269:*19*
**levels**   44:*18*   45:*2,*
*19*   57:*2*   148:*2*
188:*5*   197:*19*
215:*2*   262:*17*
266:*4*
**leverage**   215:*4*
**libraries**   123:*8*
**library**   106:*19*
**licensed**   194:*20*
252:*16*
**lies**   185:*17*
**life**   137:*8*   251:*16*
**life's**   83:*1*   154:*5*
**likelihood**   239:*10*
**likes**   102:*2*
**LILL**   2:*6*   8:*3*
17:*11, 12*   18:*2, 8*
**limit**   37:*1*   305:*21*
**limitation**   287:*16*
**limited**   21:*9*
251:*2*
**line**   101:*19*
116:*20, 21*
183:*20*   226:*5*
291:*8*
**link**   271:*22*
**linkage**   272:*4*
**linked**   283:*4*
284:*11*
**list**   35:*18*   126:*21*
170:*14*   211:*8*

226:*16*   275:*14*
311:*1*
**listed**   35:*22*   84:*7*
148:*22*   177:*1*
227:*15*
**listening**   103:*20*
147:*20*   170:*9*
**literally**   74:*10*
79:*12*
**literature**   133:*4*
**little**   21:*6*   27:*13*
49:*4*   137:*16*
173:*12*   194:*17*
211:*17*   212:*12*
218:*12*   224:*15*
225:*11*   275:*5*
290:*6*
**LITTLEFIELD**
3:*6*
**lives**   246:*11*
**living**   249:*5*
**LLC**   3:*6*
**load**   135:*10*
**local**   40:*18, 22*
62:*1*   63:*15, 17*
123:*1*   152:*3, 18*
184:*4, 9, 19*
209:*21*   263:*19*
265:*21*   267:*1, 11*
289:*21*
**located**   28:*4*
45:*17*   46:*9*   55:*6,*
*8*   243:*15*   312:*11*
**location**   62:*11, 13*
67:*18*   246:*5*
**long**   11:*14*   17:*3*
167:*16, 19*
183:*18*   188:*4*
196:*13*   198:*3, 17*
256:*15*   279:*19*
311:*2*   313:*6*
**longer**   205:*6, 7*
218:*12*

**look**   25:*6*   26:*22*
27:*12, 14, 19*
28:*2*   33:*8*   35:*11,*
*13*   36:*19*   38:*1, 4*
46:*7*   47:*17*   48:*5*
50:*7*   59:*15, 21*
61:*2*   64:*2*   69:*3,*
*17*   75:*2, 9*   76:*8,*
*12, 14, 19*   77:*20*
83:*16*   84:*4, 9*
99:*5, 6, 8, 13, 18*
100:*7*   103:*9, 11,*
*14*   105:*8*   106:*1*
112:*21*   113:*15*
114:*14*   116:*5*
119:*3*   120:*10*
125:*7*   128:*5, 6*
132:*1*   133:*3*
139:*18*   142:*4*
147:*14*   148:*17*
160:*22*   163:*8*
165:*6*   184:*1*
186:*8*   192:*10*
201:*17*   205:*9*
210:*16*   219:*6*
231:*20*   232:*6, 21*
236:*2*   237:*10, 11*
238:*20*   239:*3*
240:*10*   241:*15,*
*22*   243:*2, 12, 21,*
*22*   244:*12*   245:*2*
249:*8, 9*   251:*10*
257:*2*   264:*14*
275:*9*   282:*20*
288:*18*   293:*7*
298:*6*   306:*8*
307:*2*   308:*19*
309:*19*   312:*12*
**looked**   112:*22*
114:*14*   132:*9*
158:*17*   210:*10*
229:*4*   240:*5*
250:*9*   263:*15*
310:*21*

**looking** 23:*14* 32:22 46:*21* 48:2 62:*18* 92:*18* 103:*21* 107:*21* 110:*15* 150:*1* 163:*20* 188:*10* 203:2 226:7 234:7 236:*20* 241:*19* 244:*10* 245:*16* 262:8 299:*11, 16, 17* 304:*14* 313:*11, 14, 18*

**looks** 13:*19* 77:4 99:*1* 110:5 137:*1* 139:*13* 184:*3* 196:*17* 225:*10* 237:2

**Los** 15:*21*

**lose** 252:*3*

**lost** 117:*3* 270:4 313:*17*

**lot** 32:22 33:*1, 3* 79:*16* 177:*1* 204:*3* 209:*16* 210:7 218:*12* 244:7 286:22 291:*4* 308:*13*

**loud** 224:*9*

**Louisiana** 49:*21*

**love** 165:7

**low** 274:*13* 281:*10* 282:*12*

**lower** 230:7

**lunch** 59:*15* 69:*18* 78:*1, 15, 18* 80:*17* 88:7 139:22

**Lyons** 132:*5, 10*

**< M >**

**ma'am** 311:*17*

**magnitude** 35:*20* 79:*9, 11* 261:*13* 270:22

**maintain** 155:*19, 21* 156:20 161:*12*

**maintaining** 155:*13* 161:*10*

**majority** 27:*20* 141:*16, 18* 154:20 186:*14*

**making** 36:*1* 56:22 61:*13* 66:*19* 78:*11* 123:3 147:7 190:*13* 237:*15* 284:*21* 285:*21* 286:*14* 291:*4* 298:*15, 22*

**Mama** 316:*11*

**mandate** 87:*5*

**mandated** 123:*19* 124:*11, 15* 127:22

**mandating** 153:*12*

**manner** 230:*10* 249:22

**map** 245:*3*

**mapping** 26:*14* 167:7 199:7 212:*5* 222:*4* 250:20

**marginalized** 313:*6*

**mark** 12:*11, 14* 13:*15, 17* 14:*5* 89:*5, 8* 110:*21* 126:*13* 130:*17* 225:2 261:*20* 272:*10* 276:*5* 304:22 307:*3* 308:*20* 310:*16* 316:*4*

**marks** 115:*21*

**Maryland** 49:*14*

99:*10, 19*

**mass** 150:*21*

**Massachusetts** 80:*1*

**masse** 18:*20* 155:7 171:*10*

**master** 26:*4* 42:6 222:*21*

**Mastergeorge** 130:*14, 16* 133:*8*

**match** 35:*5* 186:*10*

**matched** 183:*20* 204:*1*

**matching** 212:*5*

**Materials** 4:*12* 13:7, *8, 13* 221:*18* 275:*14*

**math** 234:*15*

**matter** 1:*14* 7:*3* 16:*13* 85:*1* 140:*5*

**MATTHEW** 2:*5* 8:*1*

**Matthew.Gillespie @usdoj.gov** 2:*17*

**McCART** 1:*12* 4:*3, 9, 11, 13* 5:*2* 6:*2* 7:*6* 9:*3, 8, 11, 20* 12:*12* 14:*7, 16* 39:*10* 88:*17* 89:*9* 110:22 126:*15* 130:*19* 133:7 180:*15* 225:*1, 5* 262:*1* 272:*11* 276:*4, 7* 284:*16* 305:*2* 307:*8* 308:*21* 310:*18* 316:7 317:*3, 13, 20* 318:*1*

**McLeskey** 273:*19* 274:*18* 275:*2*

**mean** 32:*19* 42:*17* 49:*6*

56:*19* 59:6 63:6 67:*14* 98:7, *11, 17* 112:*5* 117:*1* 122:*18* 123:3 136:6 154:*3, 4, 15* 164:*3* 165:*4* 177:2 179:*4* 181:*19* 184:9, *21* 193:*14* 197:*1, 2* 200:*1* 204:*3* 213:*1* 214:*4, 18* 216:*15* 217:*16* 220:*13, 14* 224:6 229:*12* 235:*20* 244:7 246:7, *8, 12* 247:*18* 251:*8* 252:*15* 255:*8* 256:*20* 261:*9* 275:*20* 283:*8* 300:*19* 309:*14, 16, 17*

**Meaning** 32:*17* 58:*18* 187:*16* 195:*14* 202:6 257:*14* 282:9, *10*

**meaningful** 26:*6*

**meaningfully** 276:*16*

**means** 97:*22* 113:*13* 115:*17, 18, 22* 165:*6* 175:22 214:*21* 228:*13* 247:*17* 284:*13* 308:*1*

**meant** 226:*10* 254:*11* 283:*14* 284:*4*

**measurable** 308:*2*

**measure** 92:*3, 7, 13* 94:*5* 100:*5, 20* 101:*5* 202:*13* 203:2 211:*14* 272:7 309:*15*

**measured** 186:*17*

measures 46:4
132:22
measuring 100:3
mechanism
170:17 179:12
188:21 194:15
251:12 297:19
mechanisms
100:2 211:2
Medicaid 253:20
medical 149:19
194:14, 20 196:3,
14 289:5, 22
291:12, 18 292:9
meet 19:5 61:15
102:4 296:10
meeting 11:19
100:22 227:8
meets 200:19
MELANIE 3:5
7:19
member 55:15,
18 149:3
members 54:16,
21 55:21 56:3, 5,
6, 10 149:11
mental 24:17
91:1, 2, 7, 14
103:6 168:12
170:22 173:22
174:17 175:19
176:4 187:1, 9
201:22 212:22
213:12 218:5
251:4 252:21, 22
253:3, 4, 7, 18, 19
254:6, 8, 10, 15,
19 255:3, 8, 14,
17 305:20 306:15
mention 212:4
mentioned 24:5,
9 29:21 30:3
31:4 86:5 100:4,
19 114:1 170:7

212:4 213:3
221:16 231:1
245:17
met 32:17, 18
Method 131:6
methodologies
136:10
methods 131:16
metrics 189:18,
22 190:2
mic 109:2 290:5
MICHELLE 2:4
7:21 9:14
Michelle.Tucker@
usdoj.gov 2:16
middle 36:22
121:19 220:5
230:7
midway 150:6
208:8
mild 281:8
282:11 284:22
285:22 286:15
million 150:12
151:7, 18 152:1
153:1, 10 181:21
189:3, 7 262:13
264:17, 19 265:6,
8, 10 272:21
mind 11:11 25:6
49:15 207:6
mine 93:12
313:19
minus 234:16
minute 25:6
53:15 59:10, 19,
21 78:9 148:21
193:21
minutes 59:12
117:12, 13, 18
145:19 146:11,
12, 16, 21 147:10
148:6, 11, 15
149:3, 12, 18, 19

159:3 250:5
275:20 304:1, 2
316:16, 17 317:10
missed 235:18
missing 25:11
313:16
missions 189:1
Mississippi 49:13
86:11 99:9, 18
misunderstand
136:19
misunderstanding
240:3, 8
misunderstood
254:3 255:7
mix 117:20
mixing 195:22
mjohnson@robbin
sfirm.com 3:11
Mm-hmm 25:2
27:5 31:21
33:10 34:3, 11,
17 54:8 62:16
108:19 124:16
125:16, 18 131:7
144:9 150:5
186:5 192:2, 14
196:8, 22 205:8
206:1 211:10, 13
213:19 220:1
232:11 236:3
237:5 247:22
262:10 263:9
272:18 273:2
274:17 280:17
283:1 295:19
301:19 302:5, 14
305:17 310:8
316:12
model 192:10
289:5, 22 291:12,
14, 18 292:3, 13
models 197:4
307:22

moderate 281:9
282:11 284:22
286:1, 16
modifications
57:5
moment 49:15
118:3 151:5
190:17 254:4
303:5 312:9
money 162:22
163:3
monitor 48:6
190:21 299:18
300:12, 13
monitoring 57:1
208:12 210:5, 21
months 155:4
moon 165:11
morning 9:8, 9
219:14 275:15
Morningstar
282:18
motion 14:20
move 53:4 115:7
122:21 124:7
132:7 177:6
moved 65:19
movement
217:11, 16
284:21 285:9, 18,
21 286:14 287:5,
10, 18, 21 288:3,
9, 13, 15, 22
moving 196:18
239:20
MTSS 22:2
43:17 44:1, 6, 12,
14, 15, 18, 21
45:1, 2, 11 46:4,
19 50:16, 18
51:6, 8, 12, 15, 20
52:9, 11, 18, 21
74:8 86:11 90:4,
9, 10, 12, 16 91:1,

2, 6, *13*, *19*  92:2,
*11*, *12*, *15*  94:*3*
96:8, *12*  97:*10*,
*13*, *16*, *19*, *22*
98:*17*, *20*  99:*1*, *8*,
*13*, *16*, *18*  100:*1*,
*3*, *7*, *14*  101:*7*, *8*,
*14*, *15*  139:*19*
164:*4*  184:*5*
185:*21*  186:*3*, *9*
187:*5*, *10*, *16*, *22*
188:*4*, *8*, *15*
189:*6*  197:*11*, *13*
198:*5*  200:*6*
201:*7*, *12*, *14*
202:*1*  204:*9*
211:*19*  212:*20*
213:*3*, *5*, *11*
251:*3*  259:*20*
262:*16*  265:*12*,
*15*  266:*1*, *5*, *9*, *19*
267:*18*  268:*22*
269:*9*, *19*  270:*10*,
*17*, *20*  289:*4*
307:*13*  308:*9*, *12*,
*15*  309:*16*
311:*10*, *19*  312:*4*
**MULLEN**  3:*19*
**Multiple**  84:*20*
111:*10*, *21*
115:*10*  116:*3*
151:*21*  239:*7*
240:*13*
**Multi-Tiered**  6:*5*
187:*16*  197:*13*
**multitude**  20:*15*
25:*14*  90:2
187:*13*
**multi-year**  226:*20*

**< N >**
**N.E**  1:*18*
**name**  7:*9*  16:*6*
17:*22*  22:*9*

26:*17*  32:*19*
34:*20*  44:*8*
47:*16*, *22*  48:*11*,
*18*  165:*11*
275:*15*  283:*15*
284:*17*
**named**  32:*12*
**names**  59:2
127:*3*
**narrower**  218:*19*
**nation**  50:*14*, *15*
51:*19*
**national**  30:*10*
31:*1*  241:*15*
242:*11*  250:22
257:*5*, *6*  280:*15*
303:*13*  304:*8*, *12*,
*18*
**Nationwide**  113:*1*
116:*16*
**natural**  10:*8*
**nature**  71:*17*
215:*16*  245:2
246:*16*
**NCES**  281:*14*
282:*19*
**near**  28:*5*
233:*21*  286:*18*
**nearly**  40:*4*
144:*12*  145:*11*,
*13*  155:*4*
**necessarily**  75:*1*
165:*8*
**necessary**  19:*5*
70:*21*  71:*13*
143:*5*  151:*1*
301:*11*  302:*3*, *10*
**need**  23:2, *13*
24:*7*, *13*, *21*  33:*7*
35:*19*  57:*3*, *6*
67:2  73:*17*
76:*14*, *18*, *22*
93:6  101:*11*
102:*3*  112:*21*

114:*13*  119:*3*
122:*1*  127:*11*
132:*1*, *7*, *8*  133:2
134:*4*, *6*  137:*10*
143:*14*, *21*  146:2,
*10*  148:*12*  154:*6*,
*18*  155:6  164:*18*
169:*17*  176:*17*
177:7  183:*20*
184:*12*  186:*15*
195:*8*, *11*, *17*, *19*
197:*5*, *21*  204:2
206:8, *10*  224:*15*
230:*19*, *21*  231:6
243:*12*  246:*10*
247:*4*  252:*5*, *6*, *7*
253:*18*  255:2, *14*
274:*21*  276:*15*
278:*12*  285:*10*
300:*4*  305:*11*
306:7  308:*9*
310:*10*
**needed**  96:*20*
146:22  149:7
259:*14*
**needing**  118:*3*, *4*
**needle**  196:*18*
**needs**  19:6, *19*
20:*3*, *17*, *20*
21:*15*  24:*1*
26:*10*  38:*17*
61:*3*, *8*, *16*  62:*19*
68:*12*  100:22
101:9  102:*4*
104:*11*  109:*13*
142:22  146:7, *16*
147:*4*, *11*  164:*20*
172:*18*  176:*14*
186:*12*  200:*19*
230:9  254:*20*
255:*1*  273:*18*, *19*
274:*3*, *7*, *10*, *13*,
*19*  293:*11*

295:*14*  297:*11*
300:*20*, *22*
**negative**  240:*18*
**negotiation**  287:*3*
**neither**  172:*15*
203:7  319:*12*
**Network**  5:*17*
**never**  249:*19*
**New**  47:*13*
48:*10*, *14*  49:*3*,
*13*, *19*  99:*9*, *19*
233:*18*, *19*  236:*5*,
*6*, *14*  237:*4*, *12*,
*18*  238:*4*, *22*
239:*8*  308:*1*
309:*17*
**news**  247:*17*
248:*13*
**nine**  317:*10*
**Nodding**  264:2
**noise**  21:*13*
**non**  194:9
**non-categorical**
193:*1*, *13*  290:*16*,
*17*
**non-categorically**
196:7
**non-disabled**
167:*4*  281:*13*
**non-**
**discriminatory**
107:7
**normally**  284:*16*
**North**  49:*14*
227:*11*  228:6, *7*
230:*1*  246:7, *11*
**Northeast**  7:7
**NORTHERN**  1:2
131:*16*, *22*
132:*17*  133:*11*, *20*
**Notary**  1:*16*  9:*4*
319:*18*
**note**  224:*15*

273:*4*
**notebook** 47:*19*
**noted** 203:*12*
232:*19*
**notice** 1:*15*
**noticing** 7:*15*
**number** 12:*9*
34:*15* 35:*3* 42:*4*
44:*5* 83:*16*
84:*10, 17, 21*
100:2 106:*10*
116:7 125:*12*
132:20 136:*4*
139:*5* 144:*12, 19*
145:6, *15* 148:*1*
164:8 168:*1, 2*
171:*6, 17, 21*
172:5 173:*14*
179:7 181:*21*
184:*13* 185:*13*
192:*12* 198:*18*
201:*13, 19*
202:*16* 203:*6*
205:*11* 210:*19*
211:*5, 7* 212:7
215:*14* 226:*21*
233:*10* 234:*5, 13,*
*22* 235:*10, 15, 19,*
*20* 237:*9, 18*
238:*9, 21, 22*
239:*1, 15, 17, 21*
243:*4* 245:*8*
248:*21* 249:*9*
271:*1, 2, 3*
274:*11, 13*
299:*18* 305:*16*
313:*12*
**numbers** 21:*9*
128:20 143:22
148:*3* 233:*15*
234:*4, 8* 235:*4,*
*14* 236:*21*
238:*14* 268:7

**NW** 2:*13* 3:7

**< O >**
**oath** 9:*1*
**Object** 19:*10*
20:*11* 38:*5*
43:*18* 52:*2, 19*
54:*18* 60:*8, 18*
61:*9* 63:7 64:*22*
65:*4* 67:*10* 69:*2*
70:*1* 71:*8* 72:*8*
74:*14* 75:*4*
76:*10* 77:*12*
80:*20* 81:*15, 20*
86:*13* 87:*10*
98:*4, 9* 100:*9*
104:*15* 109:*15*
112:*1* 123:*21*
127:*18* 129:*17*
138:*7, 17* 151:*13*
152:*10* 158:*12*
159:*16* 160:*20*
161:*16* 163:*21*
165:*18* 169:*6*
170:*4* 179:*1*
183:*12* 190:*3*
204:*15* 206:*2*
208:*3* 214:*1*
225:*21* 227:*6*
229:*10* 231:*5*
245:*21* 247:*3*
254:*17* 256:*18*
260:*6, 21* 270:*1*
277:*6, 18* 283:*22*
290:*13* 292:*4*
293:*6* 294:*19*
295:*20* 298:*7*
299:*6* 301:*13*
302:*22* 315:*10,*
*21* 317:*14*
**objection** 67:*19*
70:*8* 71:*15*
98:*13* 128:*2*
229:*19* 247:*10*

254:*21* 260:*22*
261:*1, 2* 296:*5*
299:*10*
**objections** 9:*14*
**observation**
145:20 146:*17*
147:*15* 148:*20*
**observations**
145:*18* 146:*11*
147:*1, 18*
**observe** 146:*16,*
*20* 148:*2, 11*
173:*16*
**observed** 25:*11*
40:*6, 11* 144:*13*
145:7 149:*18*
173:*13* 204:*20*
246:*1*
**observing** 121:*22*
155:*4*
**obtain** 229:*16*
**obtuse** 108:*8*
**obviously** 18:*11*
**occasion** 118:*17*
**occupational**
168:*11* 170:*21*
192:7
**occur** 202:*22*
278:20
**occurred** 59:*3*
118:2 235:*6*
286:20
**occurrences** 122:6
**occurring** 177:*11*
298:*4*
**occurs** 179:*9*
277:*21* 287:*4*
**OCTOBER** 1:*11,*
*19* 7:*4* 317:*17*
**offer** 40:*3, 4*
43:2 57:7 59:*20*
66:*16* 151:*1*
170:20 202:*16*
227:*10* 244:*13*

246:*18* 259:*9*
260:*10* 295:*1*
**offered** 74:7
75:*15* 173:*5*
218:*3, 6* 223:*5, 6*
**offering** 57:*4*
**offers** 297:*12*
**Office** 1:*18* 15:*9*
30:*9, 15* 31:*2*
189:*5, 8* 263:*11,*
*14, 18, 21* 275:*8*
**officer** 31:*8, 9, 15,*
*18* 32:*2, 5* 319:*5*
**offices** 1:*17*
262:*15, 21* 263:*3*
264:*9*
**official** 314:*3, 11,*
*15*
**officials** 31:*4*
**Oh** 17:*4* 34:*17*
101:*20* 142:*14*
157:*3* 193:*16*
232:*11* 236:*16*
244:*17* 295:*21*
**Okay** 9:*20* 10:*4,*
*11, 12, 18* 11:*11,*
*21* 13:*1, 4, 21*
14:*5* 15:*18* 16:*3,*
*11* 17:*1, 9, 12, 15,*
*22* 18:*11* 22:*8,*
*21* 23:*8, 12, 21*
26:*22* 27:*14*
29:*6, 16* 30:*8, 18*
31:*11* 32:*21*
34:*18* 35:*7*
36:*13* 38:*6*
39:*16, 21* 40:*2*
41:*15* 42:*10, 20*
43:*9* 44:*3* 45:*7*
47:*12, 20* 48:*4, 8,*
*9, 12, 14, 22* 49:*9,*
*22* 51:*10* 52:*6*
53:*18, 21* 54:*1,*
*16* 56:*3, 14* 58:*8*

59:17, 20   60:13, 15   62:17   63:3, 14   65:17   69:17, 19   72:3   76:7   77:22   78:3, 19   79:11   81:4   82:9, 14   88:5, 10   89:17   93:6   96:16, 18   103:3   104:10   105:13   106:9   107:16   109:3   110:14   111:14   115:12   117:8   118:8   121:6, 7   122:14, 19   123:14, 18   124:8, 18   125:19   126:3, 13   127:6, 8   128:13, 19   130:3, 9   131:20   132:3   138:15, 22   139:8, 14, 17, 20   142:4, 15   145:5   148:18   150:5, 10, 18   155:8, 18   160:14   166:2, 4, 12, 18   167:12   172:10   173:3   176:19   177:4, 14   179:16   180:5   181:11   185:2   188:8, 13   189:17   190:18   191:21   194:2, 9   195:21   196:17   197:7, 22   198:2, 16   201:5, 17   202:11   203:7   207:5, 20   208:7, 15   211:1, 6   212:17   213:7, 20   214:17   217:6   218:9, 21   219:2, 11   221:2, 6, 15   222:20   223:8, 12

224:6, 16   225:14   226:8   227:20   228:6, 16   229:3, 6   231:16, 19, 20   232:2, 4, 13, 15   233:9   234:2, 12   235:13   236:8, 17   237:14   238:2, 7   240:9, 15, 20, 22   241:14   242:13   243:16   244:2   247:15   248:11   249:2   250:2, 7, 12   252:1, 19   253:12   254:3, 13   255:11, 21   259:4, 17   260:11   261:16   263:2, 4, 17, 21   264:15   265:5   266:2, 7   267:17   268:15   269:4, 13   270:21   271:7   272:4, 5, 9, 17   275:4, 6, 13, 16   276:12   279:3, 7, 11   280:10, 12   281:18, 21   282:21   283:2, 15   284:8   288:2   289:17   291:20   297:5   299:3   300:6   301:21   303:11   304:6, 21   306:18   309:19   310:5, 12   311:8, 19   313:18   314:7, 15   317:22

**Oklahoma** 49:20
**older** 272:14
**once** 17:2   197:9   240:17
**ones** 43:21   86:6   152:8   169:3

228:3   245:4
**One's** 230:6
**one-sided** 120:16
**online** 222:14
**open** 317:14
**operate** 243:6
**operating** 80:12   278:11
**operator** 7:9
**opine** 82:13   153:4   192:10   226:3
**opined** 229:14
**opining** 39:16   224:2
**opinion** 19:7   22:14   40:3, 4, 14   41:21   51:19   61:11   66:13   68:5, 21   71:4, 5   72:5   73:16   74:1, 7   75:8   76:13   81:4, 10   82:8   108:9   114:21, 22   115:5   126:10   142:6   154:6, 16   155:5   159:15   162:13   164:6   171:4, 8, 15   172:2, 10, 14   173:4   176:2   177:3   178:6   181:1   185:9   196:18, 20   198:12   199:21   208:19   209:2, 13   225:15   228:9   235:19   237:18   253:22   254:13, 14, 22   259:1   289:21   290:18, 22   296:22
**opportunities** 19:1   21:11

25:10   37:4   68:18, 19   73:8   102:8   143:3   150:14   151:9   155:14   167:3   171:12   175:17, 18, 20   181:7   182:10, 21   183:3   199:11   203:17, 20   204:1   214:10   246:21   247:1, 8   256:6   257:1   281:12   312:17   313:8   314:17   315:13
**opportunity** 57:14   101:3   102:10   135:14   266:13   293:17   317:10
**opposed** 10:17   107:20   170:2   222:15   227:14   239:3   314:16
**opt** 45:18
**option** 59:7   62:19   227:12
**options** 57:20   193:2   202:21   215:9   226:18   227:15   292:19
**order** 22:15   23:2   35:19   36:5, 15   37:21   38:1, 3   43:14   73:15   74:20   75:7   76:2, 7   78:15, 18   80:17   101:6   103:8   104:12   119:6   126:20   143:1, 8   145:1   151:1   164:18   177:11   181:22   184:11, 18   190:8

193:5  194:18  200:21  207:6  208:21  209:20  210:18  214:7  216:19  228:12  255:4  259:14  278:4  293:11  298:9  302:1
**Oregon**  45:18  49:13  99:10, 19
**organization**  137:17, 18
**organizations**  249:5
**organized**  52:22  243:8
**organizing**  308:1
**original**  138:11
**originally**  138:5, 16
**Orleans**  48:14  49:3
**OT/PT**  55:13
**outcome**  211:4  319:14
**Outcomes**  5:8  102:5, 13  103:6, 9, 13, 16  125:12  126:8  130:13  132:19  133:2, 5  134:15  190:14  217:12  235:11  256:9  257:18  259:8  276:17, 18  277:12, 13  278:5  288:10
**outdoor**  220:4
**outline**  269:11
**outlined**  51:7  269:6
**outlines**  91:22  92:5, 9  94:2

**Outside**  17:1  125:9  173:8  253:20, 21  254:16
**outstanding**  10:22
**overall**  233:10  234:4  237:18  238:5  239:4, 15, 21  287:15
**overarching**  181:7  266:14
**override**  64:1, 6, 11, 20
**oversimplified**  251:21
**overuse**  222:13
**Owens**  32:13

**< P >**
**p.m**  140:4, 6  141:2  318:8
**Page**  4:6, 9  5:2  6:2, 13, 15, 17  16:12  25:10  26:4  27:14  33:15  34:4, 6, 7  50:1, 18, 20  51:18, 21  81:6, 11  88:2  89:17  90:11, 14, 20  91:3, 10, 21  93:4, 5, 19, 22  94:19, 20  96:18  110:6, 12  120:10, 11  125:5, 7  126:19  128:13  130:7, 8  131:5, 6  132:3  142:4, 5, 13  144:2  149:22  150:4  151:16  154:5, 9  155:10, 11  156:18  161:8  167:15  168:3  170:13  171:7  180:16, 20  181:3,

16  182:1, 12  184:2  186:8  189:21  191:21  193:16  194:2  201:19  203:12, 13  205:11  207:10  208:7  211:7  213:8  216:9  217:4, 6  223:12  224:7, 10  226:13  230:16  231:2, 20  233:6, 15  236:2  238:6  243:1  247:15, 20, 21  248:2, 4  249:8  250:12  251:9  260:4  262:8  266:7  271:8, 14  279:17  281:21  282:21  283:2  284:2  285:6  288:6  289:1  291:12  299:12  301:10, 17, 18, 19  305:8, 15  307:2, 6  308:19  309:2  310:22  311:6  312:12
**pages**  33:11  60:1  98:19  185:11  219:16  224:12  256:14  262:9  305:9
**paginated**  128:20
**paid**  253:19
**panoply**  143:11, 16  289:14
**Paradigm**  6:12  88:19  96:20  97:15
**paragraph**  16:14  91:22  92:19  93:3  94:1  96:18

111:3  125:8  130:4, 10  144:3, 7  150:6  155:11  191:22  208:7  217:7, 8  238:8  243:4  250:13  255:21  256:15  262:11  265:13  266:8  273:4, 9  279:18  280:9  281:5  284:20  285:5, 6  289:2  301:10, 17  307:12, 20  308:11  309:3  310:22
**paragraphs**  194:14
**Paralegal**  2:9
**parent**  42:5  55:3  56:14  57:9, 13, 18  58:9, 13, 18  146:2
**parents**  58:2  253:2  254:10
**part**  20:19  28:8, 9, 10, 11  30:12  43:5  58:5  68:1, 5  85:3, 4, 5  86:20  94:1, 6, 22  95:6, 17, 20  96:14  102:2, 17  119:17  128:11  135:19  137:6  141:7  168:19  170:7  180:2  189:3  197:9  200:17  201:2, 3  208:16  212:7  217:10  227:15  243:21  255:13  257:21  258:19  269:21  288:2, 8, 13  289:16  298:2

299:2  309:*20*
312:*19*
**partial**  14:*20*
**Participants**
271:*11*
**participate**  57:*8*
122:*9, 11*
**participated**
131:*9*
**participating**
173:*16*  271:*9*
**particular**  48:*20,*
*21*  86:*5*  137:*20*
146:*8*  155:*6*
201:*9*  202:*8*
214:*6*  289:*13*
**particularly**
20:*16*  43:*21*
147:*22*  259:*15*
266:*22*
**parties**  7:*14*
319:*13*
**partner**  228:*10*
**parts**  67:*11*
84:*20*  85:*7*
308:*10*
**party**  7:*15*
202:*13*
**passage**  138:*11*
**passed**  136:*17*
138:*1, 5, 16*
139:*15*
**pathway**  161:*1*
199:*14*
**Paul**  47:*14*
48:*11, 16*
**Pause**  129:*2*
260:*20*  281:*22*
287:*1*
**pausing**  53:*15*
286:*18*
**PBIS**  45:*10, 12*
74:*8*  186:*3, 20*
187:2, *6, 12*

213:*4*  251:*3*
309:*15*
**peer-reviewed**
146:*15*  147:*9, 13*
148:*20*  150:*1*
248:*6*
**peers**  65:*20*  66:*3*
68:*19*  104:*1*
167:*4*  168:*10*
281:*13*
**peer-to-peer**
179:*11*
**pending**  78:*15*
317:*6*
**Pennsylvania**
2:*13*
**people**  29:*15*
33:*1*  185:*8*
188:*17*  215:*5*
239:*16, 17, 18*
240:*1*
**percent**  104:*6, 18*
105:*3*  106:*4*
111:*19, 21*
116:*18*  237:*13*
240:*12*  274:*9*
**percentage**  44:*5*
233:*17*  236:*18*
238:*3, 4, 17*
**percentages**
273:*5, 13*
**perfect**  306:*18*
**perform**  207:*7*
**performance**
129:*1, 9*
**performing**  207:*1*
**period**  74:*11*
146:*6*  147:*19, 22*
**periods**  143:*21*
281:*1*
**permitted**  108:*3*
**perpetuate**
162:*10*  174:*12*

**perpetuated**
150:*11*  151:*6, 12,
16, 19*  153:*5*
**perpetuates**
152:*14*  160:*13*
169:*12, 13*
**perpetuating**
152:2, *7*  159:*18*
160:*8*  171:*12*
292:*16*
**person**  216:*15*
300:*20, 22*  316:*1*
**personal**  83:*3*
215:*13*
**personally**  49:*6*
**personnel**  84:*22*
128:*22*  129:*6, 8,
19*  168:*6, 10*
**persons**  30:*13*
163:*16*  169:*4*
**perspective**  37:*1*
57:*13*  60:*14*
107:*2*  121:*12, 15*
128:*10*  174:*22*
191:*2*  196:*3*
262:*17*  270:*12,
13*  286:*22*
299:*22*  303:*10*
**Ph.D**  1:*13*  4:*3*
9:*3*
**phrase**  23:*16*
65:*12, 14*  70:*12*
75:*17*  80:*18*
90:*11*  91:*18*
97:*9*  172:*1*
196:*5*  201:*12*
268:*20*  290:2, *11*
310:*6*
**phraseology**
243:*16*
**physical**  83:*20*
168:*11, 18*
170:*21*  219:*10,
18*  220:*18*  223:*10*

**pick**  242:*1*
246:*12*  268:*17*
277:*8*
**PICO**  3:*16*  8:*15*
**picture**  235:2
**pictures**  250:*9*
**piece**  79:*12*
223:*10*
**pile**  313:*17*
**place**  23:7  26:*11*
45:*13, 20, 22*
62:*3, 4*  79:*18*
139:*18*  143:*1*
186:*5*  198:*9, 13*
210:*15*  222:*6, 14*
223:*1*  242:*5*
257:*9*  259:*12*
291:*7*  292:*13*
293:*22*  294:*5, 6,
22*  296:*12, 15, 18*
299:*22*  300:*18*
307:*13*
**place-based**  38:*14*
**Placed**  5:*4*  110:*8*
203:*21*  236:*5*
238:*15*  249:*11,
16, 20*
**Placement**  5:*7*
19:*3*  58:*10*
106:*12*  113:*1, 7*
119:*11*  142:*9, 17*
164:*19*  193:*4*
226:*18*  233:*15*
236:*6*  238:*14*
259:*11*  294:*14,
15, 18*  296:*3*
302:*18*
**placements**  143:*9,
21*
**places**  46:*16*
116:*7*  201:*13*
245:*3*  249:*15*
280:*1*  312:*11*

placing 94:8 95:10

Plaintiff 1:6 2:3

Plan 5:13 22:7 56:16 223:10

planned 144:22

planning 167:7 222:2

plans 22:3, 6 24:12 26:11 56:22 219:10

play 239:14 271:5

playground 121:11, 12, 16, 17, 18, 20, 22

playgrounds 122:22 123:3, 4, 7, 12 220:4

playing 121:22

plays 226:11

please 7:13 8:10 9:1 11:7 34:15 49:11 75:12 105:18

plus 86:7

point 33:14 59:8 78:13 115:8 146:13, 14 147:8 148:7 156:21 165:14 167:17, 20 188:2 199:22 237:15 247:11 285:11 300:7

points 248:17

policies 139:5 299:19 300:14

policy 19:9 90:16 139:11 161:4 175:3, 12 184:14 185:21 192:4, 16 198:5 279:21

political 305:22

pool 31:9 228:21

poor 223:21

Popular 309:3

population 115:9, 11 144:4, 8, 18 215:17 233:17, 21 238:5, 16 239:4

populations 20:5 131:15 274:6

position 62:12

positive 22:1 25:4 103:7

possible 51:13 52:7 182:11, 15 183:8, 14 226:17

potential 208:1 264:22

practical 54:22

practice 43:13, 20 99:1 113:11 187:13 215:4 258:6

practices 22:2 24:4, 21, 22 25:1, 3 38:12 41:13 91:1, 2, 13 99:6 113:2, 7 139:5 156:13 167:10 176:8 183:21 187:14 192:4, 17 201:22 202:8 213:10 250:22 251:1, 4, 8, 12, 13 252:5, 12, 17, 20 256:3 257:9, 13, 16 276:13 308:1 313:4

PRATS 3:16 8:15

prefer 14:12

premise 67:21 146:18 183:14

Preparation 4:13 11:19 286:19

prepare 11:12, 13 12:1, 2, 6

prepared 13:2 203:3

preparing 17:3, 9 28:16 35:1

preponderance 279:22

pre-referral 119:18

preschool 221:19 250:4

preschool-like 221:18

presence 106:17 303:14 304:9, 13, 19

PRESENT 3:21 16:13 195:2 266:9

presumably 96:6 283:18

presume 12:15 157:15 159:9 225:8 253:17 264:8

presumed 133:14

presuming 12:15

presumption 157:17

presumptions 28:16

pretty 44:12 193:20

prevalence 94:7 95:1, 8 96:1, 2

prevalent 292:15

prevent 22:15 23:2, 9, 13 75:7 258:9

previous 160:15 318:2

previously 9:14 24:5 162:7

primary 97:17

principal 55:5 309:4, 20

principles 120:15, 18 121:1, 4

printed 307:6

prior 17:12 28:19 29:16 99:17 188:9

priorities 212:3

privilege 9:15

proactive 179:5

probably 12:9 22:19 35:8 71:18 100:12 101:19 108:8 121:8 122:20 136:15 141:11 150:19 170:1 190:6 192:7 214:2 218:11 219:4 225:12 252:2

problem 10:14 19:8 72:20 148:3 205:13 258:4

problematic 258:20

Procedure 9:13

procedures 299:19 300:15

proceeding 7:15

proceedings 1:20 319:6, 8, 9

proceeds 226:16

process 19:22 42:17, 18 57:22 58:4, 5 119:9, 18 135:19 211:17 266:18 268:21 280:20 309:7, 9

processes 21:22 87:18 193:10
production 95:17
profession 170:10 196:10
professional 66:22 72:4 73:16 74:1, 7 75:8 108:9 126:10 128:22 129:9 132:13 156:12 160:11 161:19 171:15 172:10, 14 175:8 176:11 179:20 190:5 199:15 202:19 208:10 215:21 216:12 249:7 252:8, 10 253:22 266:21 267:9 289:20 290:18
professionally 135:1 217:12 288:10
professionals 84:17
program 18:22 19:3, 4, 5, 9, 15 28:4 37:3, 5 38:18 40:5, 15 41:16 42:2 55:7, 8 57:19 58:10 62:8 68:14 69:1, 5, 9 79:4 83:17 102:6 106:5, 6 115:15 118:18, 21 119:16, 19 120:1 141:13, 16, 19, 21 142:1, 10, 17 145:15 150:12, 20 151:7, 22 153:8, 11, 12, 19 154:18

155:13, 21 156:8, 20 157:6, 20 158:9, 11, 21 159:8 160:13 161:10, 12 162:15 163:4, 18 164:19 168:5 172:15 173:2, 8, 18 174:4, 10, 19 175:5, 10, 13, 16 176:12 177:21 181:13, 22 182:2, 3, 5 183:5, 15 200:20 202:10 203:9, 16 204:5, 8, 13, 17 214:7 215:8, 15, 19 216:4, 11 217:9, 20 220:15 221:14 222:6 223:7, 18 226:12, 19 227:14 233:16, 17, 18, 20 234:4 235:4, 6, 9, 11, 12 236:6, 19 238:15, 19, 21 239:2, 4, 6, 8, 11 240:13, 17, 19 241:9 243:7, 8, 9 245:1 249:10 253:4 254:9 256:10, 16 257:19 258:7, 16 259:1, 5 278:10, 11 288:7, 22 292:17 293:20 296:12 297:15, 22 300:17 301:4 302:16, 18 312:16
programs 24:11 28:1, 2 79:1 156:17 159:11 173:14 205:3 220:2 222:8, 11

243:6 245:9 258:18
progress 57:2 114:17, 22 190:13 195:11 208:12 210:5, 8, 21, 22 212:13, 14 281:6 284:21 285:22 286:15
project 31:8, 9, 12, 14, 18 32:2, 5 265:8
Promise 6:9 177:13 276:18
promised 180:16
promotes 257:15, 16
proportion 237:10, 11 238:10
proportionate 238:22
proposed 205:2
proposition 125:22
protocol 117:22 118:1
provide 24:16 26:15 37:3, 6, 22 38:3 42:21 46:10 51:21 52:22 68:15 69:22 71:6 72:6, 14 79:14 82:5 84:18 90:15 120:11 155:14 156:11 160:10 161:5, 20 162:13 164:2, 18, 21 169:22 170:12, 15 171:14 174:22 175:6, 11 176:3, 10 178:1 179:20 180:3 181:6 182:7, 20

183:9 185:20 193:9 195:13, 18 197:13 198:4 199:10, 20 200:2, 7, 20 204:10 208:21 209:4 216:7, 13 228:11, 22 229:17 235:8, 19 252:5, 17 260:15, 18 263:18 267:11 290:19 295:1 298:1 315:15, 16
provided 14:18 20:2 24:15 28:20 29:6, 11 35:14, 17, 18 38:15 75:3, 11 76:5, 9 77:10 78:6 101:5 102:13 103:1 107:8 112:12 116:2 135:14 143:7, 12, 19 165:1 169:3 172:21 174:4 179:13 183:5 186:17 203:3 215:20 227:21 254:9 282:14 298:10, 14 299:2 302:20 303:6
provider 179:20
providers 55:13 169:22
provides 29:22 30:4, 9 38:11 90:6 166:20 171:16 172:4 182:9 194:22 199:14 204:5 217:21 245:12 296:4 297:16

providing 18:5 38:9 40:14 57:3 66:21 68:17, 19, 22 70:20, 22 71:12 72:5 74:12, 21 103:9 114:9 123:2, 3 161:18 163:15 165:13, 15 168:17 169:21 170:18 171:5, 11 172:11, 20 177:18 183:2 189:9 192:19 194:15, 16 196:14 197:21 202:4, 14 203:16 208:9 215:11 216:2 217:18 228:13 229:1 252:7 267:9 269:10 281:6 314:16

proving 266:20
provision 55:12 73:1 132:4 168:1 170:17 178:12 195:6 226:17 230:18 255:16 296:9 297:19 312:16

proximity 174:5 293:17

Psychiatrists 84:12

psychological 256:8

psychologist 194:20 252:16

psychologists 84:10

psychology 252:15, 16

Public 1:16 9:4 47:13 48:10 53:14 68:22 69:22 70:7, 13, 14 71:20 72:7, 9 73:2, 6 74:12 75:1 242:14 243:19 247:2, 9 319:18

publication 280:20 281:19 282:6, 7 285:18 286:13

publish 287:2
published 111:5 268:8, 10 286:8 291:5 306:7, 10

pull 138:14 278:17

pulled 172:1
purports 171:14 297:15 315:16

purpose 97:18 192:4

purposeful 26:6
purposes 9:12 50:19 221:12

pursuant 1:15 31:20 54:17

put 62:4, 12 113:10 133:14 143:1 188:2 230:15 231:19 257:8 272:9 284:16 290:8 294:4 296:12, 14 305:8

Putnam 317:6
Putnam's 15:3
putting 109:6 158:20 160:14 200:17 243:16 254:14 259:11

294:15 307:13

< Q >
qualifications 28:13 252:4
qualify 194:18 228:8
qualitative 183:3
quality 104:2 107:3 121:18 172:12, 20 235:11
quantify 214:20 252:22 254:5
quantity 172:5
question 9:15 10:21, 22 11:1, 7 17:4 18:13 20:13 23:1, 6 25:13 27:22 37:12 41:10 44:22 46:22 70:10 74:15 75:15 77:9, 14 78:15 82:8 84:20 85:6, 10 93:11 94:17 95:22 98:14 99:17, 18 100:11 105:1 106:3 107:20 108:14 111:3 115:20 120:12 121:14 122:20 123:9 124:18, 22 126:20 131:3 133:18, 19 134:4 144:6, 11, 16 145:3 147:8 149:10 152:17 154:11, 12 155:9 158:4 159:8 161:7 165:14 167:22 168:1, 14, 19 169:8, 19

172:2 173:3 178:15 179:22 180:19 194:10 203:11 204:3, 11 206:21 209:8, 19 218:17, 20 221:12 222:9 223:2 225:14, 17, 22 234:20 237:8, 22 248:1 258:3 261:12, 14 266:16 268:6 271:8, 21 272:19 274:14 282:3 287:17 298:14 300:6 302:7 303:1 305:10 307:11 308:16

questions 11:5 16:3 39:11 43:1, 10 47:7 64:15 65:6 80:16 122:18 170:9 180:17 262:6 317:4, 5, 13

quick 251:10
quite 88:22 234:14

quo 67:16
quotation 115:21
quotations 113:10
quote 92:18 93:4, 10, 12 113:22 273:10 302:20

< R >
rabbit 116:14
Radical 316:11
raise 229:8, 12, 16 290:5
random 35:12
range 146:7

196:*4*

**ranging** 179:*12*

**rate** 239:*1*

**rated** 135:*8*

**rates** 178:*11* 309:*19*

**raw** 236:*21*

**reach** 258:7 259:6 264:22

**reached** 18:2, *4* 117:*19*

**reaches** 198:*1*

**reaching** 120:*19*

**read** 14:*19, 22* 15:*3, 12* 35:5 36:*10* 40:*11* 58:*17* 111:*14* 127:*11* 129:3 133:*12, 13* 134:*4, 6* 142:*15* 148:*21* 151:5 159:2, *4* 177:*5, 7* 194:*3, 17* 195:6 196:*1* 206:*11* 224:*12* 238:*14* 259:22 279:9 280:*10, 12* 281:5 314:8 317:*21*

**readily** 192:8 251:*4* 252:*21* 253:*1* 254:6, *11*

**reading** 74:*10* 171:*19, 21* 204:6 224:9 237:2 241:*12, 13* 285:*16*

**reads** 142:6 213:*13* 217:8 283:3 307:*20*

**reality** 58:*14* 99:7 187:6 296:*14* 298:*3, 6, 16, 21* 309:6

**Realize** 6:9 73:22 94:*14*

230:2 276:*17* 302:7 317:8

**realized** 109:*1*

**really** 37:*12* 95:22 108:7 117:*3* 157:*21* 170:9 182:5, *22* 183:7 187:*17* 199:*5, 13* 209:9 218:8 219:*20* 292:*20*

**reason** 107:*12* 111:*18* 194:8 267:5 268:2, *4, 13, 15, 21* 269:*16, 18* 270:7 277:*4* 279:*12*

**reasonable** 80:*19, 22* 81:6, *7, 12, 18* 82:*6, 11, 16, 18* 83:9

**reasonableness** 81:*18* 83:*4* 116:*20*

**reasons** 107:*5, 7, 20* 108:*1* 235:*10*

**recall** 12:8 29:20 32:3, *14* 34:22 41:*18* 47:*16* 48:*1, 13, 19* 53:22 58:6 79:*18* 84:5 111:*17* 119:2, *22* 120:*4* 136:8 138:*3, 6, 12, 19, 22* 139:9 163:*11* 188:6, *12* 195:*21* 253:*15* 264:*16* 275:*14* 276:*10* 279:2 287:*1* 290:*11* 301:7 314:6, *19*

**receive** 56:*17* 63:*4, 12* 67:6

79:2 87:*21* 118:*11* 119:6, *16* 120:*3* 124:*12, 15* 193:5 220:*14* 227:*3* 244:*15* 245:*15* 253:*3, 21* 255:*18* 301:*12* 302:*4, 10*

**received** 118:*16* 174:*16, 17* 176:6 189:*4, 7* 193:7 264:*18* 267:*18* 272:*21*

**receives** 17:*19* 66:*12* 178:*20* 253:*19*

**receiving** 55:*11* 76:8 77:9 118:*9, 10, 17* 120:*1, 7* 128:7 141:*22* 162:*14* 165:*16* 172:6 173:*20, 22* 176:6 189:*11* 221:*11, 13* 233:*11* 235:*21* 254:*15*

**Recess** 39:7 88:*14* 180:*12* 224:*20* 276:*1* 316:*20*

**recessed** 140:5

**recollection** 32:8 131:*20*

**recommend** 118:*11* 120:2 161:*14* 177:*10* 258:*10* 294:*10, 14, 17*

**recommendation** 37:*1* 56:*15* 57:*10* 58:*4, 9, 11* 62:*13* 63:*4, 5* 64:*1, 7, 12, 20* 66:*8, 10* 86:*3*

100:*20* 119:*1, 8, 15* 149:*5, 6, 13* 182:*4* 184:*1* 189:*21* 195:*16* 211:5 300:8 304:*11*

**recommendations** 36:8 38:*20* 42:22 43:*3, 12* 49:22 51:*16* 56:22 57:*3* 66:22 81:5, *11* 82:5, *16, 17* 83:5, *8* 84:*19* 85:*16, 20, 21* 86:*19, 22* 88:*1* 89:*18, 20* 93:*18* 97:7, *9* 119:*4* 160:22 162:*21* 164:9 176:*10* 177:8 180:*21* 181:*1, 8* 182:7 184:*17* 185:*17* 197:*10* 203:*13* 207:6 216:9, *22* 217:*4, 10* 230:*15, 16* 231:*18* 260:*11* 269:6 278:*12, 21* 288:8 311:*4* 313:*1*

**recommended** 50:2, *5, 11* 51:*17* 63:*11* 66:2 87:6 89:*19* 90:*14, 20* 91:*3, 10* 93:*20* 100:*13, 17* 118:*19* 120:8 180:*18* 181:*3, 12* 185:*11, 19* 189:*21* 190:*1* 191:5, *6* 192:*11* 197:*11* 198:*18* 201:8, *17, 19* 203:7, *8* 204:7,

*12*, *20*  205:*3*, *9*
206:*13*  210:*19*
211:*7*, *9*  213:*8*,
*21*  256:*14*  260:*4*
296:*1*
**recommending**
43:*4*  90:*3*, *5*, *10*
92:*15*  100:*15*
294:*11*  296:*3*
311:*19*  312:*2*, *7*
**recommends**
67:*6*, *17*  68:*6*, *11*
297:*3*, *13*
**reconvene** 140:*6*
**record** 7:*3*  10:*11*
12:*13*  14:*8*
34:*19*  39:*5*, *8*
88:*12*, *15*  89:*10*
111:*1*  119:*14*
126:*16*  130:*20*
138:*9*  140:*2*
141:*4*  180:*10*, *13*
206:*7*  224:*18*, *21*
225:*6*  260:*21*
262:*2*  272:*12*
275:*21*  276:*2*, *8*
305:*3*, *8*  307:*9*
308:*22*  310:*19*
316:*8*, *18*, *21*
317:*2*, *15*, *19*
318:*1*, *7*  319:*8*
**recorded** 7:*6*
**Records** 34:*14*
35:*10*  42:*7*
145:*22*
**redesign** 92:*21*
93:*14*
**reduce** 214:*8*
**reduced** 319:*10*
**reducing** 234:*5*, *8*
**refer** 50:*2*
201:*18*  291:*11*
**reference** 48:*16*,
*21*  50:*6*  100:*18*

194:*14*  237:*21*
270:*18*  281:*3*
**referenced** 25:*5*
42:*8*  59:*7*  110:*3*
156:*10*  167:*1*
193:*15*  282:*5*
**references** 47:*7*
240:*21*  268:*9*
**referencing** 50:*11*
53:*9*  77:*2*  115:*9*
116:*1*  133:*1*
154:*17*  155:*2*
166:*5*  194:*10*
214:*6*  219:*8*, *12*,
*17*  245:*4*  246:*16*
249:*22*  253:*7*
257:*3*, *20*  259:*21*
288:*19*, *20*
289:*15*  304:*15*
308:*9*, *10*  309:*11*,
*13*
**referral** 119:*9*, *18*
129:*11*
**referrals** 235:*4*
**referred** 227:*13*
295:*15*  298:*16*
**referring** 34:*8*
236:*4*
**refers** 233:*3*
**refine** 198:*21*
313:*4*
**reflected** 17:*6*
88:*1*  171:*4*
172:*3*, *9*  231:*12*,
*14*, *17*  232:*16*
238:*3*
**reflection** 282:*3*
**reflects** 289:*6*
291:*1*
**reform** 213:*14*,
*21*  214:*2*, *4*
**reg** 232:*5*
**regarding** 31:*12*
43:*3*  46:*1*  57:*4*

61:*13*  139:*3*
146:*1*  147:*17*
176:*7*  182:*5*
188:*4*  198:*9*
211:*3*  217:*18*
227:*8*  231:*9*
286:*10*  312:*3*
**regardless** 31:*7*
73:*9*
**regards** 101:*13*
**region** 62:*11*
227:*13*  265:*16*
**regional** 184:*4*
235:*7*  243:*9*
245:*9*  258:*18*
**regions** 153:*9*
157:*7*  246:*14*
265:*22*  271:*2*
**regular** 111:*11*,
*22*  223:*15*
**regulations** 52:*15*
60:*7*
**rejected** 63:*16*
**relate** 100:*14*
**related** 55:*12*
57:*5*  61:*14*  79:*7*
139:*6*  143:*6*
182:*22*  183:*18*
187:*11*  207:*2*
210:*22*  211:*5*
222:*10*  235:*8*
240:*8*  254:*2*
281:*2*  288:*21*
319:*12*
**relates** 61:*12*
65:*3*, *12*  71:*2*, *20*
76:*13*  77:*3*
80:*19*  102:*5*
122:*4*  123:*2*
173:*2*  207:*9*
231:*17*  241:*19*
253:*10*  279:*10*,
*11*  284:*5*  287:*9*

300:*16*
**relational** 311:*13*
**Relations** 5:*6*
**relationship**
228:*4*  251:*21*
**relationships**
192:*5*  251:*15*
**relevance** 282:*10*
**relevant** 137:*17*
**reliance** 185:*15*
222:*13*
**relied** 148:*13*
**relies** 184:*13*
**rely** 116:*8*
**relying** 195:*19*
**remain** 113:*2*, *8*
239:*6*, *11*  240:*17*
245:*19*
**remained** 112:*13*
114:*11*  233:*19*,
*21*  240:*13*
241:*10*  273:*22*
274:*13*
**remaining** 237:*13*
238:*3*  273:*18*
**remains** 236:*19*
**remediation**
186:*16*
**remedies** 57:*11*
**remedy** 36:*4*, *15*
**remember** 36:*21*
59:*1*, *2*  87:*2*
137:*12*  211:*16*
212:*3*  255:*15*
269:*7*  286:*22*
**remote** 7:*16*  8:*10*
**REMOTELY**
3:*13*
**remove** 203:*9*
**reorganization**
278:*15*, *20*
**reorganized**
276:*22*  277:*15*

278:8
repair 123:5
repeat 7:16
56:19 75:12
118:13 209:8
225:22 234:20
repeats 27:17
repetitive 64:15
rephrase 11:8
29:1 127:15
141:9 287:20
replace 289:4
Report 4:14
11:17, 19 12:2,
11 13:1, 4, 9, 14
14:10, 22 15:3
16:12 17:3, 10
18:5 25:5 27:4
28:17 35:1 36:1,
20 39:11, 21
40:8 41:7 42:20
47:2 50:1, 18, 19,
20 51:18 65:16
66:15 71:2, 3
72:2 74:2, 6
81:5, 12 83:6
85:16, 20 88:2
89:19 90:3
93:18 97:7, 21
98:1, 8, 19 99:4
100:18 103:17
110:2 111:6, 15,
19 112:6, 8
113:18 120:10,
20 122:5 125:5
130:3 131:1
132:3 134:11, 13
135:3 142:5
144:3 148:13
149:22 151:17
156:10 160:19
165:20 167:15,
17, 20 171:5
172:3, 9 177:5, 7

180:18 181:8, 14,
21 185:12
186:21 193:15
204:4 208:17
222:18 224:4
229:4 231:13, 15,
21 232:10, 20, 22
233:7, 10, 14
235:17, 18
237:17 243:13,
14 244:12
247:16 249:8
250:1 260:12
268:18 275:7
278:13 280:15
288:5, 21 292:18
304:11, 18 311:4,
19, 22 312:2
313:2 317:7, 18
reporter 7:11
9:1 10:6, 10
159:4 319:1
reports 15:12
42:5 146:3
209:5 282:17
291:21
represent 7:14
131:15
representative
124:13
representatives
8:21
representing 7:18,
20
request 10:21
requested 159:4
require 43:14
144:14, 21 145:8,
16 152:3 193:4
201:8 246:19
273:17 274:2, 6
276:22 277:15
278:8, 15 311:3, 5

required 124:1
216:19 217:3
requirement
119:15, 20
requires 266:21
269:7 307:22
309:7
RESA 123:16
228:19 263:15
RESAs 123:19
124:4 209:4
228:17
rescheduled 12:3
318:2
Research 4:17
135:7 266:17
276:14 279:22
researcher 135:7
277:7
reserved 9:16
Reshaping 6:8
resource 199:7
212:4, 5
resources 25:17,
18 26:17 43:14
46:16 87:19
150:14 151:9
161:19 186:12
187:20 208:10
215:21 220:9
221:17 222:7, 12
228:21 229:1, 16
253:5, 8 259:14
260:19 263:19
277:1, 16 278:9,
14 296:17
respond 24:1
186:14 261:15
responded 270:18
response 94:7, 22
95:6, 20 96:6
148:4 289:8
291:3 306:3
317:7

Responsibilities
299:17
responsibility
298:5
responsible
157:12 265:14
rest 312:21
restate 56:19
247:5
restating 162:17
restlessness
305:20
restorative 22:2
179:10 187:12
251:4, 8, 12, 17
252:5, 17, 20
restore 251:20
restoring 251:14
restricted 262:13
restrictive 60:6,
10, 16 61:2, 7, 14
283:4 284:11
restroom 37:15
restrooms 219:16
result 58:19
73:12 256:7
260:17
resulting 11:16
102:13 257:17
results 132:2
133:13 134:5, 6
RESUMED 141:3
retained 16:12
returned 234:22
returning 234:9
revenue 229:16
review 11:15, 18
26:20 28:12
35:19 40:9
41:20 42:1, 14
45:4 84:1 118:8,
20 119:2 120:5
124:9 141:8, 10
145:22 146:2

166:*14* 208:*15*
226:20 229:*21*
231:6 291:*10*
301:8
**reviewed** 35:*14,*
*15* 51:6 58:7
71:*21* 118:*15*
141:*12, 13* 147:5
209:*16, 18*
291:*16, 21*
**reviews** 135:*12*
**revisit** 317:*10*
**RF** 34:*13*
**right** 10:*13*
13:*10* 18:2 25:7
27:*11, 19* 34:2
36:*21* 39:*18, 22*
40:*1* 41:*18*
42:*14* 48:*15*
49:2, *5* 50:*17*
53:22 59:22
68:4 71:*10* 74:*4,*
*5* 78:4 85:2
88:*20* 89:*4*
95:*19, 22* 98:2
99:*11* 106:*15, 22*
107:*15* 108:7
109:6 111:*17*
115:2 119:2
120:*14* 121:*1*
123:9 127:*1, 17*
129:*4* 133:8
138:*3, 12, 13, 19*
162:*18* 165:*10*
168:*14* 176:*20*
177:2, *11, 16*
178:22 180:*15*
181:*19* 186:*7, 19*
187:*21* 188:6
189:6 194:*21*
204:8, *17* 205:5
209:*20* 210:7
213:7 219:*15*
220:*16* 221:*3*

224:*4* 228:22
231:8 241:*21*
246:6 247:*12, 13,*
*19* 252:*19*
253:*15* 255:*21,*
*22* 259:20 262:6
263:8 264:*16*
272:*19* 274:6
275:*17* 278:*16*
280:8 281:*4*
283:*19* 289:*20*
290:8 294:*15*
295:*17* 301:7
304:5, *16, 17*
306:*11* 308:*12*
317:2, *19*
**Rightful** 303:*14*
304:*9, 13, 19*
**Rights** 2:*11*
57:*11*
**risk** 19:*3*
**ROBBINS** 3:6
**role** 19:*15* 38:9
168:*16* 181:*14,*
*17* 202:4 215:*10*
**rooms** 125:*11*
250:9
**rooted** 276:*14*
**roughly** 18:*4*
44:*3, 4* 114:*12*
**routinely** 94:8
95:*10* 96:3
**royalties** 305:*14*
**RPR** 1:*21* 319:5
**rule** 62:9 167:2
198:*20* 225:2, *3,*
*10, 16, 18* 226:*3,*
*6, 7, 9, 14* 227:*16*
231:2, *4, 9, 12*
277:*11, 17*
299:*12* 301:9
**Rules** 9:*13* 10:*1*
120:*15, 18* 121:2,

*4* 299:*19* 300:*15*
303:8
**run** 37:*15* 80:*3*
**running** 49:*15*
308:*18*
**Ryndak** 110:7

**< S >**
**sadness** 305:*19*
**safety** 109:*13, 18*
**Sailor** 89:*1*
188:*14, 16*
272:*15, 17*
273:*10* 283:*13*
288:*17*
**sales** 229:*13*
**sample** 132:*17*
136:*1, 12*
**San** 49:*19*
**satisfy** 192:*11*
216:8, *19*
**Savannah** 246:*11*
**saved** 101:*21*
**saw** 34:*19*
173:*19, 21* 194:7
214:*17* 218:*16*
250:*11* 254:7
301:2
**saying** 71:*16*
77:*17* 96:*10*
137:*18* 143:*16*
144:*17, 18* 180:*5,*
*8* 182:*15* 210:7
256:*15* 261:*1*
294:*12* 295:8
298:*19*
**says** 16:*11* 38:*3*
92:7, *19* 93:22
94:*1* 96:5 111:*4*
113:*1* 145:*14*
147:9 148:8, *10,*
*15* 150:*20*
153:*17* 154:5
184:2 199:*20*

200:*2, 7, 9*
212:*18* 226:*15*
233:*10* 253:*18*
262:*11* 265:5
271:*11* 284:*20*
301:*10* 302:8
308:7 316:*10*
**Scale** 6:*4* 35:*20*
79:*9, 11* 213:*15*
228:*12* 251:*1*
262:*16*
**scaled-up** 265:*12*
**scale-up** 265:8
270:*17*
**scaling** 91:5
**scattered** 84:*17*
230:6
**schedules** 26:*4*
42:6 145:*1*
222:22
**scheduling** 222:*21*
**School** 6:*3, 12*
28:8 29:*3, 4*
40:*18* 41:*1, 4*
44:*16* 45:*1*
46:*18* 48:*15, 18,*
*19, 21* 63:*15, 18*
66:*12* 67:8
69:*20, 21* 70:*4, 6,*
*20* 71:*5, 16* 72:5
73:*18, 19, 21*
74:7, *9, 11, 21*
75:*11, 16* 76:5, *9*
77:*11* 79:*14*
80:8 84:*19* 85:8,
*18* 86:*12* 87:*1, 6,*
*19* 102:22 103:*1*
108:2, *10* 117:*10,*
*19* 128:*21* 129:*6,*
*8, 18, 19* 131:*12*
136:*19* 137:*13*
164:*20* 170:*3*
174:*10, 18*
179:*10* 184:*13*

187:*3*, *8*   188:*22*
197:*14*   199:*18*
209:*21*   212:*1*
213:*16*   214:*13*,
*14*   215:2   221:*20*
223:*19*, *21*   224:*3*
226:*22*   228:*7*, *10*,
*11*, *19*, *21*   230:*1*,
*7*, *8*, *9*   233:*12*, *21*,
*22*   236:*9*, *10*
237:*3*, *6*, *20*
241:*7*, *9*   242:*20*
244:*4*, *16*, *21*
245:*6*, *11*   249:*19*
253:*20*, *21*   254:*1*,
*16*   255:*14*   258:*9*
261:*17*   263:*8*, *10*
265:*1*, *11*   297:*2*,
*12*   306:*1*, *21*
307:*14*, *22*   309:*7*,
*16*   311:*11*, *21*
**school-aged**   65:*20*
**school-based**
  28:5   69:6
  201:*10*   238:*11*
**schooling**   71:*17*
  73:*3*, *8*, *11*   79:*20*
  102:*11*   104:*5*
  123:6   167:*11*
  179:*14*   255:*4*, *9*,
  *19*
**Schools**   4:*16*
  26:*19*   27:*3*
  44:*19*   45:*18*
  46:*3*   69:*7*, *15*
  79:*16*   80:*3*   90:*7*,
  *17*   92:*2*, *11*, *12*,
  *22*   93:*16*   94:*4*, *9*
  95:*11*   96:*8*, *11*
  155:*15*   156:*13*,
  *18*   164:*18*
  165:*16*   166:*22*
  173:*5*, *14*   175:*4*
  180:*3*   183:*9*

185:*22*   198:*6*
212:*14*   218:*7*
219:*21*   220:*1*, *5*,
*6*, *7*   223:*7*
234:*10*   235:*1*
242:*15*, *18*   243:*6*,
*10*   249:*15*
254:*16*   265:*2*
266:*12*   267:*2*, *12*,
*18*, *19*   271:*3*, *9*
276:*16*, *18*, *19*
277:*13*   278:*5*
309:*5*, *14*   310:*2*
**Schoolwide**   45:*13*
**school-wide**   179:*6*
**science**   137:*3*
**Sciences**   137:*7*
**scope**   36:*20*
  166:*14*   229:*20*
**score**   267:*20*
**scourge**   306:*1*
**screeners**   210:*4*
**screening**   195:*11*
  208:*11*   209:*22*
  210:*21*
**screenshot**   316:*5*
**se**   19:*9*   116:*22*
  225:*16*   287:*6*
**SEA**   43:*13*   49:*7*
  50:*12*   261:*10*
  270:*12*   299:*15*,
  *17*   300:*13*
**searches**   306:*1*
**SEAs**   43:*17*
  260:*14*
**second**   43:*5*
  50:*17*   60:*22*
  68:*1*   89:*17*
  94:*15*   95:*15*
  96:*18*   111:*4*
  123:*15*   128:*21*
  129:*4*   130:*10*
  131:*5*   181:*6*
  192:*13*   199:*4*, *5*,

*12*   205:*10*, *14*
211:*22*   240:*11*
241:*8*, *18*   250:*19*
266:*8*   281:*22*
289:*1*
**section**   132:*2*
  133:*13*   134:*5*
  156:*2*   211:*8*
  212:*17*   226:*14*
**secured**   267:*19*
**see**   12:*20*   16:*15*
  18:*9*   27:*16*
  33:*19*   35:*15*
  36:*16*   47:*4*, *22*
  48:*9*   58:*2*   59:*15*
  76:*14*   89:*16*
  91:*8*, *16*   93:*1*
  94:*12*, *13*   97:*1*
  110:*9*   111:*12*, *13*
  118:*16*   119:*3*
  125:*5*, *15*   129:*13*
  131:*5*, *10*, *18*
  136:*21*   137:*4*
  142:*11*, *14*
  150:*16*, *17*
  155:*16*, *17*
  160:*22*   163:*13*
  173:*16*   181:*10*,
  *11*   183:*1*, *2*
  184:*7*   186:*8*, *19*
  192:*8*   194:*5*
  196:*15*   202:*4*
  203:*12*   204:*20*
  208:*13*   211:*7*
  213:*18*   217:*10*,
  *14*   224:*13*
  230:*13*   238:*13*
  240:*11*   243:*15*
  248:*22*   251:*6*
  254:*2*   256:*11*
  262:*19*   267:*3*, *22*
  277:*2*   280:*4*
  281:*16*   283:*6*
  285:*3*, *4*   288:*8*,

*12*, *18*   289:*9*
300:*19*, *21*
301:*15*, *22*   302:*4*,
*5*   304:*14*   306:*5*
307:*15*   308:*4*, *5*,
*9*   311:*15*, *18*
316:*10*
**seeing**   241:*16*
  242:*8*
**seeking**   36:*4*, *14*
  44:*17*
**seen**   79:*1*, *8*, *9*, *13*
  89:*15*   134:*8*
  156:*4*   225:*8*, *10*
  249:*19*   253:*13*
  268:*7*   271:*6*
  292:*17*
**segregate**   19:*18*
  94:*8*   95:*10*, *21*
  96:*3*   199:*10*
  230:*22*
**segregated**   18:*20*
  20:*9*   21:*4*   68:*11*
  69:*11*   76:*4*
  79:*19*   109:*12*
  143:*14*   154:*7*, *19*
  182:*9*, *21*   183:*15*
  193:*4*   215:*20*
  217:*21*   223:*18*
  227:*19*, *21*   228:*2*,
  *13*   244:*21*
  245:*13*   246:*1*
  248:*8*   256:*5*, *22*
  257:*20*, *21*
  258:*14*   278:*11*
  280:*1*
**segregating**
  150:*21*   171:*10*
  246:*13*   293:*21*
**segregation**   22:*16*
  23:*3*, *10*, *14*   37:*2*
  65:*3*, *12*, *15*, *18*
  66:*6*, *8*, *14*, *18*
  67:*3*, *8*, *18*   68:*9*

75:*8*, *14*, *16*  79:8
80:*14*  143:5
151:*21*  155:7
156:*16*  157:7, *13*,
*19*  158:*11*, *22*
159:*15*  160:*13*
162:*3*  169:*18*
181:5  183:*8*, *17*
203:*15*, *22*  214:*9*
215:*9*, *16*  216:*1*
225:20  226:*4*, *6*
242:*12*  245:*10*
246:*17*, *19*  254:*1*
258:*17*  260:*18*
261:7  280:2
292:*12*, *13*  293:4
294:22  296:*8*
312:*15*  313:7
314:*4*, *12*  315:2,
*6*, *8*, *12*
**selected**  136:*13*
**self-assessments**
46:2
**send**  294:7, *12*
300:*4*  302:*8*
**sending**  181:*12*
**senior**  135:7
**sense**  62:*15*
83:*10*  108:*12*
191:*4*  194:2
195:*1*  218:*20*
258:*1*, *11*
**sent**  17:7
**sentence**  94:*15*,
*19*  95:2, *15*
96:*19*  111:*4*
112:*10*, *18*, 20
126:*12*  128:*21*
129:5  130:*4*, *10*
142:6  144:*11*
145:*3*  150:7, *20*
151:*4*  154:*10*
155:*11*  156:*1*
184:*3*  213:*13*

217:7  243:*11*
250:*20*  252:*19*
257:*3*  266:*17*
268:*13*  277:*20*,
*21*  279:*19*  280:*9*
283:2  284:2, *20*
285:5  301:*17*
307:*13*, *20*  308:*14*
**sentences**  154:*9*
250:*18*  256:*1*
276:*13*  281:5
**separate**  66:*13*
68:7  78:7  79:*3*,
*5*, *6*, *13*, *20*  80:*6*,
*7*, *8*  94:*9*  95:*10*
97:*16*  125:*10*
149:*15*  182:*13*,
*16*  183:*10*  193:*4*
228:*3*  244:*15*
253:6  276:*19*
277:*9*
**separated**  66:2
**separation**  168:*1*
**separatist**  113:*3*,
*8*, *10*  115:*19*
**sequence**  221:*4*
**series**  64:*15*
120:*11*  125:4
161:*13*  180:*17*
289:*14*
**serious**  144:*13*,
20  145:7
**serve**  18:*9*  56:*12*
90:*21*  91:*4*, *11*
201:20  205:*15*
206:*14*  208:*9*
212:*18*  213:*9*
276:20  277:*13*
278:6
**served**  21:4  40:*5*
48:*4*, *6*, *9*  130:*11*
154:7, *19*, *20*
207:*21*  216:*3*
217:*19*, *20*

226:*21*  256:*10*
273:5, *14*
**service**  42:*8*
55:*12*  58:*10*
84:22  165:*11*
168:*1*  170:*17*
174:*9*  178:*12*
193:*1*, 2, *13*
194:*11*  219:*22*
224:2  226:*17*
227:*21*  230:*18*
244:*9*  253:*10*
255:*16*  290:*15*,
*16*, *17*, *19*  291:*14*
292:*14*, *19*
294:*11*, *13*, *14*, *16*,
*17*, *18*  295:7
296:*8*  297:*19*
**service-based**
38:*14*
**Services**  5:*14*
19:*4*  28:*21*  29:7,
*12*  53:*1*  56:*18*
58:*4*  61:*15*, *19*
63:*5*, *12*  66:*12*,
*17*  67:2, 7  68:*16*
74:*9*  75:*3*, *9*, *10*,
*15*  76:*5*, *9*, *19*
77:*10*  78:*5*  79:*3*,
*14*  87:*14*  102:*16*
103:*1*  104:*13*
105:*4*, *5*, *11*
118:*9*, *10*, *11*, *16*,
*17*, *19*  119:7, *16*
120:*1*, *3*, 7
124:*12*, *15*
141:22  143:*1*, 7,
*11*, *13*, *19*  147:*12*
148:*12*  149:*8*
151:2  153:2
154:*21*  162:*15*
163:*1*  164:3, *4*, *5*,
*17*, *20*, *22*  165:*15*,
*16*  166:*19*  168:*6*,

9, *15*, *17*, *20*, *22*
169:2, *3*, *16*, *17*,
*19*  170:*3*, *12*, *14*
171:*1*, *6*, *14*, *17*,
*20*  172:2, *5*, *6*, *12*,
*21*  173:*4*, *17*, *20*
174:*1*, *3*, *13*, *17*
176:6, *8*  178:*19*,
*22*  179:*13*  183:*4*,
5  189:*10*  192:*19*
193:5  195:*9*, *13*
196:*14*  201:*15*
215:*11*  217:*18*
218:2, *6*  219:*3*
221:*11*, *13*  223:5
226:*15*  227:*4*, *9*
228:*11*, *13*, *22*
233:*11*  235:*21*
245:*12*, *15*
246:*19*  253:*3*, *18*,
*19*  254:*8*, *10*, *15*,
*19*  255:*13*, *18*
258:*10*  259:*10*
260:*13*, *15*
266:*13*  289:*14*
291:*6*  295:*15*, *17*
296:*3*  297:*1*, *12*,
*13*, *17*  298:*4*
299:*21*  300:*16*
301:*11*  302:2, *3*,
*13*, *16*, *20*  303:*6*
305:*20*  306:*15*
315:*15*
**Session**  4:*6*  141:*1*
**sessions**  252:*10*
**SET**  45:*13*
65:20  114:*14*
120:*15*, *18*  121:*1*,
*4*  181:*15*  251:*13*
256:*1*
**sets**  237:*11*
**Setting**  5:*16*
20:*8*, *9*  21:*4*
40:22  41:5

68:*11* 125:*10*
149:*15* 168:*13*
202:*17* 253:*20*,
*21* 258:*14*
**settings** 66:*3*
105:*3* 125:*11*
154:*21* 216:*14*
249:*5*
**seven** 156:*8*
303:*21* 309:*8*
**Severe** 5:*4* 110:*8*
112:*12* 114:*11*,
*18* 115:*4*, *6*
116:*16* 281:*11*
285:*2*, *19* 286:*2*,
*17* 287:*11*, *16*, *19*
288:*1*
**shape** 121:*19*
**shared** 62:*1* 84:*1*
**shares** 103:*17*
**sheer** 245:*7*
270:*22*
**shift** 96:*20*
**shoot** 165:*10*
**shootings** 306:*1*
**short** 282:*2*
308:*19*
**shortages** 86:*1*, *19*
**shortened** 122:*17*
**shorter** 37:*19*
**show** 13:*17* 89:*4*,
*7* 110:*20* 126:*13*
130:*13*, *17*
132:*18* 148:*14*
225:*1* 261:*20*
271:*10* 272:*10*
276:*4* 299:*3*
316:*4*
**siblings** 65:*20*
**sick** 318:*3*
**sign** 317:*21*
**significance**
132:*21* 136:*14*

**significant** 21:*7*
133:*2* 136:*1*, *6*
137:*20* 146:*8*
147:*3* 176:*14*
256:*7* 257:*18*
259:*8* 282:*12*
286:*9* 289:*7*
291:*2*
**similar** 78:*5*
85:*21* 86:*1*
107:*20* 115:*14*
237:*22* 263:*15*
**similarly** 163:*14*
**simple** 209:*9*
**sincerely** 209:*7*
**single** 46:*18*
265:*15*
**Sir** 16:*5* 147:*19*
303:*15*
**sit** 55:*9* 250:*5*
267:*6* 279:*12*
**site** 11:*14* 25:*12*
27:*10*, *15* 108:*16*
117:*14*, *22*
121:*20* 155:*3*
173:*19*
**sites** 27:*16*, *17*
28:*5*, *7* 69:*6*
222:*6*, *10* 223:*15*,
*17* 228:*5* 238:*11*
243:*7* 245:*3*, *4*, *6*
294:*2*
**sitting** 45:*3*
46:*17* 58:*6* 67:*4*,
*15* 71:*10* 114:*16*
119:*2*, *21* 136:*8*
138:*13*, *22* 139:*9*
188:*6* 210:*9*
307:*18* 308:*6*
**situation** 58:*14*
82:*1* 204:*19*
242:*7*
**situations** 120:*14*

**six** 131:*14* 156:*8*
226:*17* 252:*11*
**sixth** 22:*12* 23:*1*
**size** 132:*17*
**skip** 34:*4* 47:*4*
**skipped** 91:*17*
205:*12* 227:*1*
**skipping** 247:*16*
266:*15* 281:*9*
**small** 21:*10*
96:*14* 144:*12*, *19*
145:*6*, *15* 146:*10*
148:*1* 179:*8*
214:*4*
**smaller** 121:*18*
143:*22*
**Smith** 32:*15*
**social** 24:*17*
46:*15* 84:*14*
87:*17* 88:*19*
90:*22* 91:*7*, *14*
103:*5* 125:*13*
126:*8* 132:*4*
134:*15* 151:*1*
155:*1* 167:*8*
175:*7*, *18* 176:*4*
177:*18* 178:*1*, *8*,
*17* 186:*22* 187:*2*,
*8* 188:*1* 195:*3*
201:*21* 212:*21*
213:*4*, *11* 256:*8*
276:*17*
**social-emotional**
186:*11* 251:*3*
**socially** 102:*14*
257:*17* 259:*8*
**solely** 226:*22*
**solve** 207:*9*
**somebody** 115:*22*
**someone's** 148:*12*
190:*20*
**somewhat** 283:*3*
284:*10*
**soon** 78:*13*

**sorry** 19:*12* 30:*2*,
*22* 64:*14* 66:*9*
72:*18* 74:*18*
92:*8*, *11* 93:*3*
103:*11* 105:*17*
118:*13* 125:*6*
128:*14* 134:*2*
142:*8* 150:*4*
157:*3* 158:*3*
162:*6* 163:*9*
166:*6* 168:*7*
180:*1* 186:*21*
193:*17* 205:*11*,
*12* 206:*4* 214:*8*
217:*1* 220:*12*
233:*1* 236:*14*, *20*
247:*16*, *20* 255:*7*
265:*17*, *19*
267:*13* 280:*7*, *10*
290:*5* 306:*16*
310:*15* 312:*14*
313:*14* 318:*3*
**sort** 55:*11* 62:*12*
162:*16* 263:*16*
**sought** 254:*10*
**sound** 15:*19*
102:*14* 306:*11*
**source** 30:*17*
163:*7* 208:*9*
274:*21* 305:*10*
**sources** 30:*19*
45:*8* 50:*8* 273:*4*,
*12*
**Southern** 46:*13*
**spaces** 220:*5*
249:*10*
**spare** 48:*2*
**speak** 29:*14*
36:*6*, *8*, *9* 38:*6*
44:*7* 52:*10*, *11*
54:*22* 57:*12*
71:*1* 113:*14*
116:*19* 118:*21*
139:*12* 207:*12*

233:*14*  244:*6*
248:*21*  264:*13*
315:*22*
**speaking**  58:*12*
157:*21*  188:*16*
**special**  21:*19*
24:*8, 9*  25:*17*
29:*18*  30:*9, 15*
31:2  36:7  55:*6,*
*10*  131:*8*  134:*20,*
*21*  135:*9, 17*
139:2  164:*11*
189:*5, 9*  194:*18*
221:*11*  242:2, *3*
243:*5, 9*  248:*10,*
*14*  275:*8, 9*
276:*15, 21*
277:*15*  278:7
280:2  303:*9*
**Specialist**  2:*9*
**specialized**  21:*14,*
*16*  22:*11*  144:*14,*
*21*  145:8, *16*
193:7
**specials**  104:*4*
223:*15*
**specific**  12:*8*
40:*8*  43:*9*  45:*9*
79:*18*  100:*19*
115:*10, 22*
120:*12*  136:*8*
139:*10*  156:*21*
159:*6*  164:*13, 20*
168:*22*  174:*15*
190:*11*  210:*1*
218:*1, 5, 18*
223:*5*  252:*1*
305:*9*
**specifically**  11:*21*
15:*18*  19:*16*
25:*6, 10*  38:*12*
39:*11*  40:*5*
41:*14*  50:2
76:*22*  90:*11*

100:*19*  105:*21*
156:*20*  159:*21*
165:*19*  183:*19*
243:*22*  278:2
**specifics**  41:*18*
59:*11*
**spectrum**  98:*22*
222:*22*
**speech**  55:*13*
84:2  168:*11, 18*
170:*21*  173:*20*
174:*16*  179:*20*
218:*4*  219:*21*
295:*14*
**spend**  17:*3*
111:*10, 21*  117:*4,*
*11*
**spending**  104:*6*
105:2  106:*3*
116:*17, 18*  274:*9*
**spends**  163:*14*
**spent**  12:*5*
105:*15, 22*  146:*6*
149:*3, 12*  164:*10*
**split**  196:*10*
**Square**  2:*12*
**ss**  319:*3*
**STACEY**  3:*18*
8:*19*
**staff**  62:7
185:*10*  202:*12*
**staffing**  42:*6*
86:*1, 19*
**stagnant**  112:*14*
114:*11*  115:*1, 18*
**stand**  267:*13*
279:7
**standard**  26:*12*
43:*12, 16, 20*
53:7, *10, 18*  72:*19*
**standard-based**
205:*22*  207:7
**standards**  26:2,
*15*  100:7, *15*

120:*15, 19*  121:2,
*4*  167:*6*  175:*14*
207:2, *10, 18*
**standards-based**
21:*20*  25:*22*
205:*17*  206:*16*
221:*17, 22*  222:2
251:2
**standing**  133:*15*
**standpoint**  192:*9*
**Stars**  6:7
**start**  23:7  30:2
39:*10*  41:*21*
90:*14*  94:*16*
166:*17, 18*
208:*22*  250:*19*
258:*22*  275:*19*
280:*6*  311:*16*
**started**  11:*14*
188:*10*  285:7
**starting**  61:*21*
93:*22*  230:*16*
243:*4*  281:*21*
**starts**  94:*19*
125:*8*  128:*21*
129:*5*  144:*3, 7,*
*12*  150:7  206:*13*
266:*9*  279:*19*
310:*22*
**STATE**  1:*8*  3:*15,*
*16, 17, 18, 19*  7:*4,*
*18, 20*  8:*16, 18,*
*20*  9:*11*  15:*1*
18:*18, 19, 21*
23:*4*  24:*15*
26:*16*  28:2, *21*
29:*12*  32:*5, 10,*
*13, 16*  35:*1*  37:2,
*6, 8, 21*  38:2, *7, 9,*
*16, 19*  39:*17*
40:*15, 19*  41:*1, 5,*
*14, 17*  42:*3, 16,*
*18, 22*  44:*6, 16*
46:*18, 19*  47:*21*

49:*6, 20*  50:7
51:*5*  52:*12, 15,*
*17*  55:*6, 8, 19, 22*
56:*1, 5*  58:*3, 17*
61:*22*  63:*22*
64:*4, 5, 10, 18*
66:*21*  67:*5, 15,*
*21*  68:*6*  79:*9*
82:*20*  83:*14, 20*
84:*10, 18, 22*
85:*1, 9*  86:*10, 12,*
*21*  87:*7, 8, 12, 15*
90:*7, 15, 18, 21*
91:*4, 11*  92:*16*
97:*8*  100:*1, 21*
101:*4, 7, 9, 13, 16*
123:2, *10*  124:*11,*
*13, 14*  135:*22*
150:*10, 13, 18*
151:*5, 8*  152:*3, 7,*
*14*  153:*5, 8, 9, 12,*
*17*  155:*7, 12, 18,*
*20*  156:*10, 14*
157:*7, 8, 19*
158:*16*  159:*18*
160:*5, 10*  161:*1,*
*2, 8, 17*  162:*8, 12,*
*22*  163:7  164:*11*
165:*21*  166:*14*
169:*12*  170:*12,*
*14, 19*  171:*5, 8, 9,*
*12, 16, 22*  172:*3,*
*11, 14, 19*  174:*11,*
*21*  175:*6, 11, 13*
176:2, *9*  177:*10,*
*18*  178:*5*  180:*21*
181:2  182:*6, 7,*
*11*  184:*12*
185:*13, 16, 18, 20*
186:*1*  189:*17, 19,*
*20*  190:*8, 21*
191:2, *3, 4, 7, 11,*
*12, 16, 18, 19, 20*
192:*9, 18*  193:*8*

195:*17*  197:*12*
198:*3, 4, 7, 17*
199:*2, 7, 8, 14, 18,*
22  200:*1, 5, 16,*
*18, 21*  201:*16, 20*
202:*18, 20*  203:*4,*
*19*  205:*14*
206:*13*  207:*17,*
*18*  211:*3, 19, 22*
212:*15, 18*  213:*8,*
*15*  214:*13*  215:*1,*
22  216:*14*  227:*5*
229:*8, 17*  242:*1,*
*13, 17*  244:*1*
245:*10, 16, 22*
250:*21*  253:*8*
256:*13*  258:*18*
260:*15*  261:*11*
263:*20*  265:*19*
268:*19*  269:*2, 11,*
*12*  271:*1, 5*
277:*5*  278:*21, 22*
279:*14, 15*  291:*7*
292:*18*  294:*20*
295:*1*  296:*9*
299:*1, 4, 8, 19*
300:*3, 8, 14, 20,*
*21*  301:*5*  302:*8,*
*9, 15, 21*  303:*6*
312:*2, 7, 20*
313:*2, 3, 9*  314:*2,*
*11, 15, 22*  315:*11*
**stated**  25:*15*
48:*1*  132:*22*
227:*7*  235:*22*
275:*2*  282:*5*
295:*16*
**statement**  92:*4*
95:*4*  112:*16*
113:*20*  129:*15*
132:*18*  147:*7*
161:*8*  197:*3*
279:*8, 13*  281:*2*
282:*4, 9, 16*

283:*13, 21*  284:*4,*
*9, 15*  286:*14*
302:*19*  303:*4*
306:*13*  307:*17*
**statements**  137:*5*
284:*18*
**STATES**  1:*1, 5,*
*18*  3:*14*  7:*3, 22*
8:*2, 4, 6, 8, 12, 14*
15:*4*  16:*14*  17:*7,*
*16*  29:*22*  30:*4,*
*14*  31:*5*  32:*1, 9*
35:*2*  36:*4, 14*
38:*8, 22*  39:*1*
43:*13, 17, 21*
44:*3, 4, 7, 14, 18,*
*19, 20, 21, 22*
45:*2*  49:*5*  50:*4,*
*10, 13*  52:*16*
78:*5, 22*  79:*7, 13,*
*21*  85:*21*  86:*2, 4,*
*7, 17*  87:*1*  95:*9*
99:*14*  157:*9, 11,*
*16, 18, 22*  158:*8*
159:*10, 13*
162:*20*  164:*8*
178:*7, 12*  188:*22*
189:*4, 8*  190:*12*
198:*20*  200:*15*
202:*4, 17*  243:*5,*
*17*  244:*10, 13, 19*
245:*12*  260:*14*
261:*5, 8, 9*
265:*16, 18*  300:*1*
311:*10*  317:*4, 12*
319:*3*
**state's**  151:*11, 15*
202:*14*  262:*14*
**Statewide**  6:*4*
82:*19*  181:*5*
183:*17*  203:*14*
213:*14*  214:*7*
242:*10, 11*
246:*16*  250:*20*

257:*22*  262:*16*
266:*3*  270:*16, 17,*
*19*  312:*14*
314:*12*  315:*2, 6,*
*8, 12*
**stating**  103:*10*
**statistical**  132:*21*
135:*6, 12, 18*
136:*14*
**statistically**  133:*2*
136:*1, 6*
**statistician**  239:*14*
**statistics**  132:*14*
135:*16, 21*  280:*16*
**status**  67:*16*
218:*15*
**stay**  117:*18, 21*
239:*21*
**staying**  239:*20, 21*
**steady**  233:*19*
**stems**  304:*18*
**stenographically**
319:*9*
**Stenotype**  1:*21*
**step**  118:*6*
**steps**  177:*10*
**stick**  314:*10*
**stimuli**  21:*13*
**stop**  10:*9*  127:*15*
176:*20*  181:*12,*
*13*  193:*12*
194:*17*  259:*18*
**stopped**  224:*7*
**stories**  309:*4*
**storm**  306:*2*
**strained**  306:*21*
**strategies**  20:*2*
50:*9*  92:*1, 10*
94:*2*  167:*9*
177:*9*  188:*5*
190:*9*  215:*7*
295:*2*  309:*15*
**strategy**  179:*7*
189:*14*  200:*6*

269:*10*  293:*8*
296:*11*
**Street**  1:*18*  3:*7*
7:*7*
**stretched**  305:*21*
306:*16*
**strong**  192:*5*
**structural**  311:*11,*
*20*
**structure**  92:*22*
93:*15*  197:*20*
**structured**  21:*11*
**structures**  42:*6*
184:*5*  192:*4, 16*
212:*1*  213:*17*
214:*14*  215:*3*
276:*22*  277:*16*
278:*8, 14*
**struggle**  215:*15*
**struggling**  258:*3*
309:*5*
**stuck**  70:*18*
**student**  19:*20*
20:*5, 10*  21:*2, 3*
23:*14, 15*  33:*17,*
*19, 21*  34:*13, 19*
35:*10*  38:*17*
39:*22*  40:*9*  42:*7*
55:*2, 3, 5, 7, 11*
56:*16, 17*  57:*3, 6*
58:*16, 20*  59:*2*
61:*3, 5, 8*  62:*7,*
*20, 22*  63:*4, 12*
66:*10, 20*  67:*17*
68:*7*  73:*17, 20*
75:*14*  76:*1, 3, 8*
77:*9*  101:*11*
103:*5*  105:*9*
106:*18*  107:*2, 5,*
*9, 11, 17, 21*
108:*11, 17*
109:*11*  115:*8*
118:*4, 17, 18, 21*
119:*22*  120:*6*

126:7  128:6
131:*15*  139:*15*
144:*4, 7, 18*
145:*21*  146:*1, 10*
149:*4, 7, 9, 12, 13*
165:*1*  174:*16, 17*
178:*20*  183:*20*
184:*12*  191:*13*
194:*19*  195:*1, 2,
4, 17, 18*  203:*9*
205:*21*  207:*7, 9*
210:*8, 22*  212:*13*
220:*18*  222:*3*
227:*9, 13*  230:*19*
233:*16, 19, 20*
236:*6, 11*  238:*4,
5, 16*  239:*8, 11*
241:*2*  245:*14*
250:*4*  251:*19*
253:*16, 19*
255:*12*  258:*14*
274:*21*  293:*8, 11,
14, 18*  294:*5, 6*
295:*14*  296:*2, 4,
12*  297:*1, 11, 14*
298:*9*  302:*3, 18*
**Students**  5:*3*
18:*17, 20*  19:*2,
18*  20:*1, 6, 15, 20,
22*  21:*6, 9*  22:*16,
20*  23:*3, 22*
25:*18*  26:*3, 5, 9*
37:*4, 7*  38:*12, 17,
22*  40:*2, 5, 11*
53:*4*  56:*6, 22*
57:*2, 7*  61:*15*
65:*21*  66:*17*
69:*1, 8*  70:*6*
74:*13*  78:*6*  79:*1,
15*  80:*4, 12*
81:*13*  87:*14, 20*
90:*7*  92:*22*
93:*15*  94:*9*
95:*11*  100:*22*

102:*6, 7, 8, 13*
103:*7*  108:*1, 10*
109:*12, 14, 18*
110:*8*  111:*9, 20*
112:*11*  113:*2, 7*
114:*10, 17*  115:*2,
5, 9, 11, 14*
116:*16*  118:*8, 15*
120:*5*  121:*10, 11,
16, 17, 21, 22*
122:*8, 10*  123:*7*
124:*9*  125:*8*
129:*21*  130:*12*
131:*16, 22*
132:*16, 18*  133:*4*
134:*14*  135:*21*
137:*9, 19, 21*
141:*8, 10, 13, 16,
19, 20, 21*  142:*1,
9, 17, 20*  143:*2, 9,
12, 20, 22*  144:*13,
20*  145:*7, 11, 13,
16, 19, 20*  146:*7,
8*  147:*3*  148:*1, 2*
150:*22*  151:*21*
153:*22*  154:*6, 17*
155:*5, 6, 15*
156:*4, 5, 7, 16*
161:*20*  162:*14*
163:*1, 6, 16*
164:*3, 5*  165:*15*
166:*20*  167:*2*
168:*5*  169:*14, 17*
170:*18, 19*  171:*2,
10, 17*  172:*6, 7,
12, 16, 17, 21*
173:*6, 15, 16, 18,
19, 22*  174:*13*
175:*2, 9, 15, 16,
22*  176:*5, 13*
177:*21*  178:*3, 9*
179:*7, 13*  183:*10,
15*  184:*19*
186:*14, 15, 22*

187:*20*  189:*10,
11*  192:*20*  193:*3,
10*  195:*7, 10*
197:*21*  198:*10,
13*  199:*10*  200:*3,
11, 19*  202:*9*
203:*15, 18, 21*
204:*8, 13, 19*
205:*19*  206:*3, 19*
207:*1, 16, 17, 18*
208:*12*  209:*5*
215:*8*  216:*3, 13*
217:*12, 19, 22*
218:*7*  220:*9, 14*
221:*8, 13, 19*
222:*22*  226:*18,
21*  227:*3*  228:*8*
230:*5, 10, 19, 22*
233:*11, 18*  234:*4,
5, 8, 9, 13*  235:*5,
8, 12, 15, 20*
236:*5, 14, 18*
237:*12, 16, 18*
238:*10, 15, 18, 21*
239:*1, 6*  240:*13,
16, 18*  241:*2, 8*
242:*3, 4, 15, 18*
243:*18*  244:*4, 14,
20*  245:*22*  249:*6,
10, 15, 20*  251:*14,
15*  254:*15*  255:*1*
256:*5, 9, 16, 21*
257:*18*  258:*7*
259:*5, 11, 13, 15*
260:*16*  261:*7*
271:*1*  273:*5, 13,
17*  274:*1, 6, 9, 12,
18*  276:*15, 17, 21*
277:*14*  278:*7*
280:*2*  281:*7, 10*
282:*14*  284:*22*
285:*2, 19, 22*
286:*2, 9, 15, 17*
287:*7, 11, 16, 19,*

22  288:*10, 21*
289:*8*  291:*3*
293:*22*  294:*1*
295:*3, 17*  296:*19*
297:*17, 19*
300:*17*  301:*3, 12*
312:*15, 18*  313:*5*
314:*4, 12, 17*
315:*2, 8, 14*
**student's**  120:*2*
186:*12*  239:*9*
253:*18*  298:*3*
**studied**  134:*9*
**studies**  248:*6*
**studious**  260:*2*
**study**  83:*13, 15,
19, 22*  131:*4, 9,
13*  132:*5, 9, 16*
135:*21*  267:*17*
268:*7*  281:*15*
**stuff**  166:*7*
195:*22*
**styles**  26:*10*
148:*4*
**sub**  226:*14*
**SUBER-DRAKE**
3:*18*  8:*19*
**subgroups**
276:*20*  277:*14*
278:*6*
**subjective**  230:*11*
**submitted**  15:*13*
281:*19*  282:*7*
285:*17*  286:*12*
**subset**  213:*4*
**substantially**
307:*21*
**substantive**  110:*6,
12*
**subsume**  266:*13*
**succeed**  11:*5*
20:*17*  155:*15*
**Succeeds**  139:*15*

success  92:*3*, *7*, *13*  94:*5*  103:*5*  106:*21*  107:*3*  145:*2*  155:*1*  187:*3*  256:*2*

successful  62:*7*  143:*8*  195:*10*  255:*5*, *14*  259:*14*

successfully  191:*5*

sufficient  84:*17*, *21*  132:*17*  137:*10*  149:*4*  162:*13*  165:*15*  171:*5*  185:*10*  208:*20*  209:*3*, *4*  210:*12*

suggest  201:*8*  239:*19*  281:*6*  287:*5*

suggesting  164:*9*

suggestions  57:*4*

suggests  257:*8*

sum  234:*3*

summary  14:*20*

superintendent  40:*18*

supervision  319:*11*

supplemental  110:*4*

Support  5:*18*  6:*6*  20:*21*  21:*15*  24:*14*, *16*  38:*10*, *13*  43:*22*  44:*10*, *11*  45:*19*  46:*2*, *5*, *11*  51:*9*  52:*12*, *22*  53:*4*  62:*2*  66:*16*  82:*20*  84:*22*  87:*13*, *19*  90:*5*, *7*, *8*, *21*  91:*4*, *6*, *11*, *13*  92:*22*  93:*15*  98:*21*  100:*22*  101:*10*  102:*3*

143:*1*, *11*  144:*15*, *22*  145:*9*, *17*  146:*2*  154:*22*  156:*12*, *15*  158:*16*  161:*5*, *19*, *22*  168:*6*, *9*  169:*2*, *17*, *19*  170:*3*, *19*  171:*6*, *17*, *20*  172:*1*, *5*, *6*, *12*, *21*  173:*4*  175:*12*, *22*  176:*11*  178:*9*  179:*4*  182:*8*  184:*5*, *11*, *19*  186:*15*, *17*  187:*7*, *14*, *16*, *17*  188:*22*  189:*16*  192:*20*  193:*2*, *7*, *11*  195:*18*  198:*9*, *22*  200:*3*, *19*  201:*15*, *21*  202:*2*, *5*, *15*, *17*, *19*  203:*3*  205:*15*  206:*14*  208:*9*  211:*19*  212:*19*, *20*  213:*6*, *9*, *10*  215:*7*, *22*  216:*12*  217:*11*  218:*2*  230:*17*, *19*  232:*18*  251:*14*  252:*7*  254:*6*  255:*15*  259:*10*, *13*  267:*1*, *10*  272:*8*  273:*18*  276:*15*  288:*9*  293:*11*  298:*1*  312:*5*  313:*5*  314:*3*, *11*

supporting  20:*3*  38:*22*  83:*2*  101:*11*  147:*6*  151:*20*  172:*15*  176:*13*  186:*21*  201:*1*  292:*16*

supports  19:*4*  20:*2*  21:*21*  22:*2*  23:*22*  24:*18*  37:*7*, *10*, *22*  38:*4*, *10*, *15*  57:*6*  61:*15*, *19*  62:*4*  67:*1*  69:*21*  70:*5*, *21*  71:*6*, *13*  72:*6*  73:*18*  74:*8*  87:*17*  102:*12*  103:*9*  104:*8*  137:*19*  142:*22*  143:*7*, *18*  147:*12*  149:*8*  150:*15*  151:*3*, *10*  157:*6*  162:*14*  164:*3*, *14*  166:*19*  167:*9*  168:*12*  170:*18*, *22*  173:*17*, *22*  174:*3*  175:*1*, *7*, *19*  176:*5*  177:*19*  178:*2*, *18*  179:*13*, *17*  180:*3*  187:*20*  194:*16*  195:*9*, *12*  196:*4*  198:*12*  208:*21*  209:*5*  216:*3*, *13*  217:*18*  218:*6*  219:*4*  227:*8*  235:*8*  246:*18*  251:*5*  252:*22*  253:*1*, *4*, *5*  255:*3*, *8*, *13*, *17*, *18*  257:*10*, *15*, *16*  260:*13*, *19*  263:*19*  267:*12*  269:*10*  274:*2*, *4*, *7*  282:*14*  291:*7*, *17*  296:*17*  297:*16*  298:*4*  315:*1*

supposed  61:*1*  156:*11*  157:*2*  297:*18*

Supreme  279:*20*

sure  10:*3*, *5*  11:*3*  16:*9*  22:*10*, *13*  23:*5*, *6*  25:*3*  29:*2*  30:*3*, *21*  31:*18*  34:*21*  37:*13*, *18*, *20*  41:*3*  43:*6*  47:*18*  49:*16*  53:*16*  54:*13*  56:*20*  59:*9*  63:*8*, *20*  70:*4*  71:*9*  72:*12*, *17*  75:*13*  78:*20*  81:*9*  99:*8*  104:*22*  107:*10*  110:*3*, *11*  112:*5*  113:*9*  118:*15*  128:*6*  131:*3*  162:*17*  193:*20*, *22*  197:*6*  207:*14*  208:*14*  209:*1*  214:*3*  219:*7*  223:*3*, *4*  226:*2*  230:*12*  232:*1*  235:*22*  236:*22*  239:*14*  243:*3*  246:*8*  253:*14*  270:*4*  273:*7*  280:*22*  282:*1*  283:*13*  284:*13*  287:*9*  296:*6*  298:*9*  299:*14*  303:*4*, *18*  308:*10*  309:*11*  312:*10*  313:*20*  317:*15*, *16*

surprise  132:*9*

surprised  226:*21*

suspend  317:*6*

sweeping  306:*3*

SWIFT  6:*19*  18:*1*  29:*10*, *11*, *15*  30:*1*, *5*  134:*18*  188:*14*, *17*  189:*2*  272:*21*  316:*5*

**SWIFT-FIA**
271:*9*
**switching** 222:*16*
**sworn** 1:*15* 9:*4*
**Syndrome** 195:*4*
**Synonyms** 120:*15*
**System** 6:*5*
20:*21* 23:*11*
38:*10* 42:*11*
43:22 44:*10, 11*
45:*13* 46:5 51:*8*
52:*12, 21, 22*
61:*21* 62:2
66:*16* 73:*18*
79:7 83:*1* 86:*20*
90:5, 8 95:7
96:22 100:*21*
101:*10* 102:*3*
103:*1* 151:*20*
152:2, 7, *15*
156:*16* 158:*15*
159:*14* 162:*10*
171:*13* 176:*4*
179:*14* 180:*4*
182:8 186:*20, 21*
187:7, *16, 17, 18,
19* 189:*16*
191:*10, 11*
195:*13* 197:*14,
17, 18, 20* 198:*1,
11, 14, 22* 199:*9,
16* 200:*3, 19*
201:*14* 203:*14,
22* 211:*18, 19, 20*
212:7 213:5
215:5, 6 216:*1*
217:20 230:*17*
242:*11* 257:22
259:9, *12* 272:7
290:20 293:*18*
294:4, 8, 9, 22
296:8, *14* 298:*1*
299:2 306:*20*

307:*21* 308:8
312:5 315:*11*
**systemic** 23:*10*
37:2 107:2
135:*11* 151:20
156:*15* 157:7
158:22 159:*15*
160:*13* 181:5
183:8, *17* 203:*21*
242:9 245:2
246:*16* 257:22
258:*17, 19*
259:*19* 292:*12,
13* 293:4 295:9
296:8 312:*14*
314:*3, 12* 315:2,
6, 8
**systemically**
23:*15* 293:20
**Systems** 6:9
24:*14, 16* 46:2, 8
79:8 83:*3* 94:8
95:*1, 9, 20* 96:*1,
2* 185:*15* 188:*21*
198:9 202:*17, 18*
210:4 212:2
257:6 276:22
277:*16* 278:8, *14,
16* 293:22 306:*3*
313:7

**< T >**
**TA** 266:22
267:8, *13, 18*
**tabbed** 306:9
**table** 27:*10, 12,
15* 170:*16* 248:2,
3, 22
**tables** 232:*10*
241:*16* 248:7
**take** 10:*20* 11:*1*
37:*14* 39:3
59:20 78:*13*
108:22 119:*3*

147:*18* 148:*21*
193:*18* 198:3, *17*
205:4 213:20
228:6 230:*1*
241:7 243:2
245:16 246:*12*
247:*18* 251:*10*
253:*16* 275:*18*
277:*21* 312:*10*
**taken** 1:*20* 7:6
9:*11* 47:*19, 20*
260:9 319:6, *9*
**takes** 82:22
149:2 280:*20*
308:2
**talk** 10:7, *8*
25:*11* 59:*11*
77:2 177:8
178:*14, 17* 188:9
192:15 194:9
203:*14* 208:8
212:8 238:2
304:*21* 312:*12, 13*
**talked** 32:*18*
71:2 94:2 98:*18*
149:*1* 205:*4*
211:*18, 20* 218:*3*
228:*17* 255:*15*
257:2, 9, *11*
271:*14* 275:7
279:8 290:*12*
291:*13* 295:*13*
303:*11*
**talking** 39:*19*
93:*17* 127:*13*
163:*3, 5* 165:*21*
166:*11* 174:*15*
178:*19, 22* 179:2
185:7 201:*3*
205:3 206:*12*
207:*13* 218:*13,
14, 21* 219:3
220:*17, 20* 221:*3,
7* 223:9 250:6, 8

254:4 264:9
267:*10* 271:*18*
289:*11* 309:*10*
**talks** 131:*4*
147:*15* 170:*16*
196:*1* 238:9
257:4 271:*8*
299:*15* 302:*15*
305:*18* 308:*11, 13*
**tax** 229:*16*
**taxing** 229:*12*
**TAYLOE** 2:*8*
8:7
**teach** 26:9 222:5
**teacher** 22:*11*
23:2, *9, 11, 13*
41:*11* 118:*3*
187:*4* 250:*4*
257:*12*
**Teachers** 21:*18,
19* 22:*10* 26:*1,
12* 28:12 42:2
131:8 202:*12*
288:6 306:*21*
**teaching** 19:22
21:*21, 22* 24:*3,
12* 25:*1, 3* 26:*3,
15* 41:*16* 87:*18*
99:*3, 4* 144:*14,
21* 145:9, *16*
148:4, 5 156:*13*
167:5 176:*10*
179:5, 6 184:*14*
193:9 216:*16*
251:*18*
**Team** 6:*19*
34:*19* 54:3, 5, *16,
21* 55:2, 9, *14, 16,
18* 56:*1, 6, 15, 21*
57:*1, 6* 61:*1, 4,
17* 62:3, 6, 11, 18
63:3, 11, 16 64:1,
6, 11, 20 66:2, 7,
9, 14, 19 67:6, 17

68:*6*, *11*  118:*11*, *19*  119:*4*, *8*, *15*  120:*8*  149:*3*, *11*, *12*  191:*19*, *20*  205:20  206:22  207:*8*, *15*, *21*, *22*  208:2  227:*8*  246:*9*, *17*  258:*10*  291:*21*  292:*3*, *9*  293:*7*, *10*, *12*  294:*3*, *10*, *17*, *21*  295:*10*  296:*1*, *10*  297:*3*, *10*, *13*, *18*, *21*  298:*5*, *13*, *17*, *19*, *22*  299:*4*, *8*  300:*9*  301:*6*, *10*  302:*1*, *2*, *6*, *10*

**teaming**  212:*1*  213:*16*  214:*14*  215:*3*

**teams**  56:*12*  291:*10*, *15*  292:*21*  293:*1*, *4*, *5*  300:*3*  302:*17*, *18*

**team's**  57:*10*

**technical**  90:*17*, *21*  91:*4*, *11*  175:*3*, *8*, *12*  185:22  187:*5*  198:*5*  201:2, *20*  202:2, *5*, *6*, *15*, *18*  203:2  205:*15*  206:*14*  208:9  212:*18*  213:9  267:*14*

**tell**  13:*18*  18:*3*  46:*17*  49:*11*  69:5  114:*16*  154:*15*  183:*1*  193:*14*  214:*18*  224:*11*  297:*10*

**ten**  12:*9*  146:*10*, *16*, *21*  147:*10*

148:*6*, *11*, *15*  149:*3*, *12*, *18*, *19*  188:*3*, *7*

**tend**  291:*11*

**ten-minute**  147:*18*, *21*  275:*18*

**term**  53:*13*  54:*3*  60:*5*  65:2  123:*16*  196:*5*  253:9  283:*5*  284:*11*  294:*16*

**terminology**  81:22  187:*10*

**terms**  36:*8*  38:*8*  53:*10*  56:*21*  62:2  73:*3*  93:*19*  100:*13*  114:*6*, *7*  115:*16*  147:*12*  161:*3*  169:*21*  172:*20*  188:*6*  193:*13*  197:*11*  218:*1*  228:*20*  231:*4*  264:*8*  289:*12*

**testified**  9:*5*  47:9  314:*3*

**testifying**  16:*4*, *11*  314:*16*

**testimony**  12:7  16:*13*  43:*16*, *19*  140:*4*  314:22  315:*19*  317:*11*

**text**  226:2

**Thank**  8:*9*, *22*  33:6  39:*4*  70:*15*  75:22  82:*14*  110:*17*, *18*  126:*3*  137:*15*  224:*13*, *14*  260:9  290:*8*, *9*  313:*21*  318:*1*, *5*, *6*

**thanks**  250:*17*

**theoretical**  122:*21*  168:*21*

**theoretically**  169:*1*  185:7  191:*6*

**Therapeutic**  5:*18*  69:*21*  70:*5*, *21*  71:*6*, *13*  72:6  73:*17*  74:*8*  75:*2*, *10*  147:*12*  151:*2*  297:*16*  298:*1*  299:*21*  300:*16*

**therapists**  83:*20*

**therapy**  84:2  164:*15*  165:7  168:*11*, *12*, *19*  170:*21*  173:*20*  174:*16*  178:*21*  179:*20*  218:*4*  219:*21*

**thereabouts**  138:*2*

**thing**  10:*8*  43:*11*  78:*10*, *11*, *17*  97:22  98:*1*, *7*, *12*, *17*  109:2  114:*1*  159:6  160:*17*  180:*6*, *8*  187:*18*  218:*15*

**things**  10:*14*  14:*17*  24:*20*  87:*16*  90:*9*  103:*11*, *13*, *15*  106:*1*  122:*6*  128:*5*  136:*5*  138:*13*  157:*1*  160:*12*, *16*  161:*14*  162:*8*  167:*4*  176:*16*  177:*17*  181:*11*  183:6  184:*15*  192:22  199:*16*  217:*17*  218:*18*  219:*15*  249:9  258:*5*  275:*19*  298:*15*  313:*10*

**think**  12:*5*  23:*8*  24:*20*  25:*5*, *15*  43:*1*, *6*, *10*, *11*  47:*19*  54:9  57:*15*  65:5  72:*1*  76:*11*  85:*6*, *7*, *9*, *15*  88:*8*  101:*18*  105:22  106:*17*  108:*21*  122:*20*  124:7  129:*18*  137:*17*  141:7  155:9  163:*11*  164:*1*, *18*  170:*11*  180:*5*  181:*4*  192:*12*  194:*4*  195:*21*  196:*1*, *6*, *12*  198:*3*, *17*  200:9  204:*18*  205:*4*, *10*  211:6  215:*18*  216:*5*  217:2  218:*3*, *11*, *12*  219:*4*  222:*9*, *16*  224:*17*  230:*13*  232:*4*, *7*  233:*10*  240:*5*, *7*  244:*17*  245:*17*  247:*4*  253:*11*  254:*3*  258:2, *13*  260:*11*  268:*10*, *12*  271:*21*  282:*4*, *8*  287:*20*  297:*8*  310:*21*  313:*16*

**thinking**  37:*14*  72:*10*  79:*17*  92:*20*  93:*13*  195:*15*  302:*17*  311:2

**third**  33:*15*  101:*19*  110:*5*, *11*  184:*3*  199:*13*  202:*13*  205:*18*  279:*18*  280:8  307:*12*

**thirds** 33:*16*
**thorough** 135:*10*
**thought** 54:*11*
  62:*6* 95:*16*
  118:*5* 133:*22*
  284:*5*
**thousand** 40:*6*
  155:*5*
**thousands** 11:*15*
  40:*6*, *10* 147:*13*
  256:*9* 314:*8*
**three** 45:*12*
  67:*11* 131:*12*
  205:*5* 226:*17*
  230:*5* 250:*18*
  256:*1* 257:*17*
  279:*18* 316:*17*
**threw** 36:*15*
**tied** 203:*13*
**tiered** 24:*16*
  45:*14* 46:2, *8*, *13*
  186:*9*, *13*, *20*, *21*
  187:*7* 188:*21*
  189:*16* 191:*10*, *11*
**tiers** 44:*15*
  45:*19* 53:*3*
  187:*14*
**time** 7:*5* 9:*16*
  11:*14* 12:*5*
  21:*12* 39:*6* 42:*8*
  48:2 67:*5*, *16*
  68:*5* 78:*13*
  88:*10* 101:*22*
  103:*18*, *21* 104:*1*,
  *6* 105:*3*, *15*, *22*
  106:*4* 107:*3*
  111:*11*, *22*
  116:*17*, *18* 117:*4*,
  *10* 118:*6* 126:*4*
  136:*18* 139:*10*,
  *21* 143:*21* 146:*6*
  147:*15*, *18*, *22*
  149:2, *5* 155:*4*
  167:*16*, *20*

182:*13* 193:*18*
196:*13* 223:2
224:*16*, *17*
231:*22* 240:*16*
245:*7* 247:*12*, *18*
249:*11*, *16*, *20*
265:*9* 272:*20*
273:*3*, *16* 274:*9*
281:*1*, *18* 282:*6*,
*7* 285:*17* 286:*12*,
*21* 289:*3* 303:*17*
308:2, *19* 310:*11*
312:*10* 314:*21*
316:*16* 317:*13*
318:*1*
**timeline** 265:*10*
**timely** 22:*4*
  212:*10*
**times** 12:*3* 34:*19*
  197:*18* 244:*7*
  279:*9* 318:2
**tiredness** 282:2
**title** 88:*22*
  127:*12* 303:*7*
**today** 11:*19*
  16:*4*, *11* 43:*19*
  45:*4* 46:*17* 67:*4*,
  *16* 96:*13*, *14*
  100:*4* 114:*16*
  119:*22* 138:*22*
  139:*10* 143:*4*
  167:*1*, *11* 196:*16*
  210:*9* 219:*5*
  244:*8* 257:*10*, *12*
  267:*6*, *11* 268:*3*,
  *5* 273:*22* 275:*3*
  279:*12* 307:*18*
  308:*6* 318:2
**today.ku.edu**
  89:*14*
**Today's** 7:*4*
  11:*12*, *13* 12:2

**told** 82:*4* 146:*20*
  157:*9* 167:*19*
  244:*8* 299:*1*, *4*, *8*
**tool** 97:*21*
  190:*12*, 22
**tools** 45:*12*, *16*
  46:*16* 100:*4*, *5*
  202:*16* 212:*7*
**top** 135:*8*
  138:*14* 155:*11*
  188:*12* 219:*15*
**topic** 51:*4* 57:*13*
**topics** 311:*1*
**total** 233:*15*, *20*
  234:*13* 235:*20*
  236:*11*, *14*
  238:*14* 265:*9*
**totally** 12:*20*
  33:2 74:*20*
  88:*11* 271:*17*
  313:*20*
**tour** 28:*9*
**toured** 173:*13*
**Tourette's** 195:*4*
**touring** 28:*7*, *11*
**TP.One** 7:*10*, *12*
**track** 242:*3*
  313:*17*
**traditional**
  102:*11* 104:*5*
  243:*5* 276:*18*
  307:22
**train** 80:*16*
  185:2, *7*
**trained** 21:*14*, *16*
  22:*11* 144:*21*
**training** 21:*17*
  22:*14* 23:*12*
  28:*13* 39:*13*
  132:*14* 135:*6*, *13*
  164:*4* 193:*8*
  197:*13* 199:*20*
  200:*7*, *20* 216:*7*

252:*14*
**trainings** 252:*9*
**transcribed** 1:*21*
**transcript** 10:*16*
  317:*21* 319:*7*
**transcripts** 11:*16*
  314:2, *9*
**transformation**
  309:*7*, *9*, *13*
**transformational**
  259:*20*
**Transformative**
  260:*7*
**transforminal**
  260:*5*
**Transforming**
  4:*16*
**transpired** 139:*11*
**Transportation**
  223:*17*
**traumatic** 80:*13*
**travel** 17:*1*
**traveled** 17:*2*
**treated** 65:*21*
**treatment** 163:*15*
**trend** 236:*9*
**trial** 9:*16* 10:*16*
**trick** 13:*11*
**tricky** 236:*22*
**trouble** 291:*8*
**true** 139:*14*, *16*
  145:*14* 153:*21*
  157:*17* 159:*13*
  282:*5*, *9* 306:*13*,
  *20* 319:*7*
**truly** 137:*12*
  262:*7* 271:*7*
**try** 10:2, *7*, *8*
  11:*4* 152:*12*
  242:*5* 305:*7*
**trying** 13:*11*
  25:*5* 36:*9* 38:*3*
  65:*9* 87:*4*
  104:*19* 121:2

137:*11*  164:*17*
169:*7, 11, 15*
170:*5*  176:*21*
177:2  183:7
207:9  209:*12*
223:4  236:*21, 22*
271:*22*  291:*8*
**TUCKER**  2:*4*
7:*21*  9:*18*  12:*17*
14:*13*  19:*10*
20:*11*  38:*5*
43:*18*  52:2, *19*
54:*18*  60:*8, 18*
61:*9*  63:7  64:*22*
65:4  67:*10, 19*
69:2  70:*1, 8*
71:*8, 15*  72:*8*
74:*14*  75:4
76:*10*  77:*12*
78:*12*  80:*20*
81:*15, 20*  86:*13*
87:*10*  88:*8*  92:6
98:*4, 9, 13*  100:*9*
104:*15*  109:*15*
110:*10, 14, 17*
112:*1*  123:*21*
126:*1, 5*  127:*18*
128:2, *8*  129:*17*
138:7, *17*  145:*10*
151:*13*  152:*10*
154:8  158:*12*
159:*16*  160:*20*
161:*16*  163:*21*
165:*18*  169:*6*
170:*4*  179:*1*
183:*12*  190:*3*
204:*15*  206:2, *6,*
*9*  208:*3*  214:*1*
225:*21*  227:*6*
229:*10, 19*  231:*5*
245:*21*  247:*3, 10*
254:*17, 21*
256:*18*  260:*6, 20*
261:*3*  270:*1*

277:*6, 18*  283:*22*
285:*11, 13*
290:*13*  292:*4*
293:*6*  294:*19*
295:*20*  296:*5*
298:7  299:*6, 10*
301:*13, 18*
302:*22*  305:*5*
313:*18*  315:*10,*
*21*  317:*12, 20*
**TUESDAY**  1:*11,*
*19*
**turn**  27:7  75:*15*
77:*10*  89:*17*
102:*17*  116:*13*
144:2  149:*22*
155:*10*  167:*15*
180:*16*  217:*6*
232:9  266:7
282:*21*  309:*4*
**turned**  109:*4*
170:*13*
**turning**  13:*10*
25:*8*
**turnover**  309:*20*
**two**  33:*15*  43:*1*
85:*4, 5, 7*  154:*9*
180:*20*  181:*1*
186:*3*  216:*8, 20*
217:*3*  226:*16*
234:*16*  272:*1, 22*
273:*1*  274:*5*
279:*18*  281:*5*
302:*12*  312:*11*
**two-thirds**  34:*12*
**two-year-old**
250:*5*
**type**  22:*14*  23:*12*
42:*21*  242:*5*
252:*4, 11*
**types**  75:*15*
149:8  164:2
180:*3*  260:*13*
302:*16*

**typewriting**
319:*11*
**typical**  24:*4*
55:*1*  122:7
167:*8*  179:*10*
222:*21*
**typically**  55:*2*
199:*11*  283:*10*

**< U >**
**U.S**  2:*10*  7:7
38:*8*  82:*21*  86:*4,*
*18*  111:*5, 14*
162:*20*  165:*4*
178:*10*  275:*8*
279:*20*
**uh-huh**  10:*15*
132:*6*  264:7
273:*11*
**ultimately**  131:*13*
270:*14*
**umbrella**  213:*5*
266:*14*
**Umm**  164:*16*
**uncertainty**  306:*2*
**uncomfortable**
158:*3*
**uncommon**
200:*15*
**uncontrolled**
195:*5*
**undergoing**  75:*14*
**underneath**  177:*9*
**understand**  11:*8*
20:*19*  24:2, *10,*
*14*  26:*1*  33:*2*
36:*3, 13*  41:*13*
44:*17*  52:*10*
67:*14*  70:*9*
92:*21*  93:*15*
94:*18*  99:*15*
104:*22*  119:*5, 21*
121:*8*  158:*18*
165:*6*  176:*21*

177:*3*  195:*16*
197:*12*  205:*10*
210:*4, 13*  211:*6*
226:*3*  227:*22*
229:2  236:*22*
258:*12, 13*  261:*3*
262:*7*  269:*13, 17*
271:*22*  274:*8*
**understanding**
12:*3*  21:*20, 22*
26:*8*  40:*17, 21*
41:*3, 8, 10, 12, 15*
42:*2, 10, 16*
51:*14*  52:*8*
54:*20*  56:*15, 21*
57:*2, 10*  58:*8*
63:*6, 21*  64:*4, 9,*
*17*  67:*4*  101:*12*
112:*15*  119:*6, 12,*
*14*  123:*1, 10, 14,*
*18*  124:*3*  139:*6*
142:*20*  147:*3*
166:*19*  168:*15*
169:*20*  174:7
175:*21*  176:*11*
180:*22*  198:*16*
199:*1*  200:*12*
206:*22*  227:*2*
229:*15*  230:*11*
240:7  241:*6*
244:*11*  248:*11*
296:7, *22*
**Understood**  64:*3*
107:*19*
**undertake**  262:*15*
**undertaking**
266:*21*
**unequal**  25:*9*
121:*9, 10, 13*
122:*3, 5*  171:*11*
199:*11*  218:*22*
313:7  315:*12*
**unfair**  25:*9*
120:*13, 16, 21, 22*

121:*4*, *9*, *15*, *21*
122:*3*  171:*11*
199:*10*  218:*21*
313:7  315:*12*
**unfairly**  244:*8*
**Unfortunately**
308:*18*
**unique**  269:*14*, *17*
**uniqueness**  242:7
**UNITED**  1:*1*, *5*,
*17*  3:*14*  7:*3*, *22*
8:2, *3*, *5*, *7*, *12*, *14*
15:4  16:*14*  17:7,
*15*  29:21  30:*4*,
*14*  31:5, *22*  32:9
35:2  36:*4*, *14*
39:*1*  43:*13*, *17*
44:*19*  95:9
157:9, *11*, *15*, *17*,
*22*  158:8  159:*10*,
*13*  188:22  189:*4*,
*8*  311:*10*  317:*4*,
*12*  319:*3*
**universal**  195:*11*
208:*11*  209:22
210:*4*, *21*  266:*12*
**universe**  210:*10*
**universities**  17:*20*
135:9
**University**  16:*20*,
*21*  17:*18*  31:7
45:*17*, *22*  46:*6*,
*10*, *12*  134:*21*
135:8  137:2, *6*
**unjust**  120:*16*
**unnecessarily**
69:*10*  76:4
171:*10*  199:*10*
203:*21*  227:*19*,
*20*  230:2*1*
257:*21*  293:*20*
**unnecessary**
22:*16*  23:*13*
65:2, *12*, *15*, *17*

66:*5*, *8*, *14*, *18*
67:*3*, *8*, *18*  68:*8*,
*13*  75:7, *14*, *16*
80:*14*  142:*10*, *18*
143:*6*  157:*12*, *18*
158:*11*  162:*3*
169:*18*  171:*13*
214:9  225:*19*
226:*4*, *6*  246:*19*
253:22  260:*17*
261:7  315:*13*
**unrelated**  74:*1*, *3*
**unrest**  305:22
**unsatisfied**  57:*14*
**unsuccessful**
285:*1*, *19*  286:*1*,
*16*  287:*6*, *11*, *15*,
*18*
**Unwavering**
316:*11*
**update**  123:*5*
282:*18*
**updated**  138:*4*
268:7
**uphold**  216:*1*
**upper**  230:*8*
**US0306845**  34:*13*,
*16*
**use**  9:*16*  12:*18*,
*19*  14:*10*, *12*, *14*
49:7  67:22
75:*17*  79:*13*
91:*18*  97:9
123:*4*  181:2*1*
190:22  211:*11*,
*15*  212:2, *6*, *10*
222:*13*  235:9
250:*21*  292:*3*, *13*
**uses**  90:*11*
186:*10*
**usually**  198:22
**utility**  280:*1*
**utilization**  193:*6*

**utilize**  46:*3*
210:*4*  212:*16*
**utilized**  45:*12*
46:*14*  62:*3*
97:*21*  252:*13*
**utilizes**  215:*5*
**utilizing**  173:*1*
274:*22*

**< V >**
**vacuum**  241:*19*
242:9
**vanguard**  188:*15*
**variable**  105:*14*,
*16*
**variables**  19:2*1*
20:*15*  24:*8*
105:*16*, *19*
106:*10*, *13*, *14*
107:*1*  117:*20*
132:20  136:*10*,
*11*, *12*  184:*14*
257:*17*
**variance**  273:*17*
274:*1*, *4*, *5*
**varied**  51:*11*, *14*,
*22*  52:*8*  117:*12*
179:*12*  274:*11*,
*21*  311:9
**varies**  100:*1*
147:*16*
**variety**  19:2*1*
21:7  45:*8*  51:*11*
132:22  136:*13*
137:*21*  177:9
202:*21*  210:*5*
291:*16*, *20*  292:7
**various**  86:*3*, *17*
188:*5*  248:*18*
265:22  276:*20*
277:*14*  278:*6*
**vary**  178:*12*
**varying**  26:*10*

**vast**  141:*16*, *18*
154:*19*
**vastly**  173:*17*
**Vermont**  49:*13*
99:9, *19*
**version**  51:*3*, *5*
**versions**  52:*14*, *16*
**versus**  7:*4*
220:*20*  223:7
234:*22*  238:*11*
245:*18*
**VICTORIA**  2:*6*
8:*3*
**Victoria.Lill@usd**
**oj.gov**  2:*18*
**video**  7:*5*
**Videographer**
3:*22*  7:*2*  8:*9*, *22*
39:*5*, *8*  88:*12*, *15*
109:*4*, *8*  140:*2*
141:*4*  180:*10*, *13*
224:*18*, *21*
275:*21*  276:*2*
290:*4*, *9*  303:*20*
304:*4*  316:*18*, *21*
318:*6*
**Videotaped**  1:*12*
**viewed**  243:*9*
**violent**  305:22
**virtually**  317:*11*
**vision**  61:2*1*
66:22  87:*12*
90:*6*  156:*12*
160:*11*  161:*4*, *18*
175:9, *12*  191:9,
*17*  199:*1*, *14*
200:*12*  201:*1*
202:*5*  211:*19*
214:22  215:22
269:*11*  270:*19*
312:*3*, *6*, *8*, *11*, *19*,
*21*  313:9  315:*1*,
*4*, *7*, *16*

**visit** 27:*10*, *15* 117:22
**visited** 117:5, *9*
**visits** 11:*14* 25:12 155:3
**vocalizations** 195:5

**< W >**
**Wade** 89:*3*
**wandering** 223:*3*
**want** 10:2, *20* 14:*13* 16:5 22:19 23:16 37:*15*, *17* 67:20 75:17 76:*12* 78:*14* 82:*3* 88:6 89:*12* 92:6 108:22 126:*1* 129:2 137:*15* 139:*21* 145:10 177:*1* 190:9 191:*3*, *9*, *10*, *12*, *13* 199:21 200:2 201:*11* 209:7 223:2 224:8 231:7, *8*, 22 239:7 260:*20* 262:7 278:2 282:2 288:5 290:4 307:6 317:*14*
**wanted** 24:*19* 122:12 144:*16* 242:2 275:6
**Washington** 1:*19* 2:*14* 7:*8* 49:*21*
**watching** 147:*10* 193:*19*
**WATSON** 3:*14* 8:*13*
**way** 25:*13* 33:16 34:*12* 37:*18* 43:*13* 45:16

54:*14* 56:20 59:*11*, *13* 92:21 93:*14* 108:8 112:3 120:4 121:8 141:*11* 147:*19*, 21 160:*21* 169:*9* 188:9 201:*15* 209:9 210:6 214:20 216:4 224:*1* 260:*14* 263:7 268:21 280:8 282:15 313:21
**ways** 25:*14* 26:9 159:*18* 181:8 207:*16* 251:*18* 311:2
**website** 232:6
**Weiss** 47:*14* 48:*11*, *16* 132:5, *10*
**well** 10:*16* 15:6 28:4 35:*12* 43:6 46:*3* 50:16 55:*14* 77:*16* 84:*12* 86:*16* 87:4 89:*18* 96:6 101:*21* 102:6, *21* 104:*14* 105:21 106:*16* 120:22 131:2 133:*14* 136:2 137:*15* 139:*4* 144:21 146:*18* 147:4 148:6 152:*14* 153:*17* 176:*21* 177:2, *7* 188:7 189:*17* 194:5 198:2 245:*14* 254:*14* 255:*17*, 22 261:*21* 268:*11* 269:*20* 271:*19* 282:6

292:7 297:*5*, *10* 298:*13* 308:*11* 318:3
**well-being** 109:*18* 187:4
**well-documented** 133:*3* 248:8
**went** 25:12 27:17 34:*18* 52:17 58:*20* 59:5 79:*19* 155:3 245:*4*, *5*, *6* 294:2
**we're** 34:6 72:*1* 78:*11* 88:7 109:*17* 117:7 124:7 178:*19* 179:2 180:5, *8* 200:7, *9* 206:*12* 207:*13* 220:17 223:*12* 250:6, *8* 297:6 308:*18* 317:2
**Westlaw** 232:7
**we've** 8:*17*, *19* 88:9 94:*1* 200:9 217:*17* 220:*20* 257:9, *11* 267:*10* 275:7 279:8 294:7 318:2
**whatnot** 178:*21* 248:6
**wheelchair** 220:*19*
**whole-school** 289:4
**wholly** 79:*19*
**wide** 98:22 179:12
**widespread** 250:8 280:*1*
**Wiley** 317:7
**Wiley's** 14:22

**willing** 18:*9*
**window** 146:*10*
**wing** 28:8
**wings** 125:*10*
**Wisconsin** 49:*19*
**wish** 290:2
**withdraw** 100:*11*
**witness** 1:*13*, *15* 4:2 12:*18* 14:9 18:*10* 19:*11* 20:*13* 32:7 38:6 39:4 43:*19* 52:20 60:9, *19* 63:8 65:5 67:*11*, *20* 69:*3* 70:2, *9* 71:9, *16* 72:9 74:*15* 75:5 76:*11* 77:*13* 78:*19* 80:*21* 81:21 86:*14* 87:*11* 92:9 98:5, *14* 104:*16* 109:*16* 112:2 123:22 127:*19* 128:9 129:*18* 138:*18* 152:*11* 154:*11* 159:*17* 160:*21* 161:*17* 165:*19* 169:7 170:*5* 179:2 183:*13* 190:*4* 204:*16* 206:*12* 208:*4* 214:2 225:22 227:7 229:*20* 231:6 245:22 247:*4*, *11* 254:22 260:7 270:2 277:7, *19* 285:*14* 292:5 293:7 294:*20* 295:21 296:6 299:*11* 301:*19* 303:*1* 304:6

305:*4*  315:*11, 22*
318:*5*
**witnesses**  10:*14*
**wondering**  223:*1*
**word**  57:*15*
67:*22*  97:*19*
143:*16*  220:*22*
269:*8*  278:*18*
280:*7*
**wording**  269:*8*
**words**  18:*15, 16*
20:*6*  36:*3*  52:*16*
94:*14*  99:*2*
117:*17*  128:*4*
143:*17*  192:*8*
207:*8*  221:*4, 5*
226:*5*  241:*18*
258:*5*  268:*17*
274:*12*  277:*8*
314:*8*  316:*13*
**work**  16:*1*  17:*13,
15, 20*  30:*13*
31:*15, 19, 22*
76:*13*  78:*4, 22*
79:*6*  83:*1*
134:*17*  135:*1*
154:*5*  186:*13*
191:*9, 17*  200:*22*
201:*2*  211:*21*
228:*19*  232:*15,
18*  251:*20*  256:*2,
15*  261:*11*  287:*7*
311:*3, 8, 16*
**worked**  21:*5*
31:*4*  38:*21*
43:*21*  44:*7, 9, 14,
21*  49:*12*  86:*6*
135:*2*  185:*13*
249:*4*  250:*3*
261:*5, 16*
**workers**  84:*14*
**workforce**  83:*11,
13, 15*

**working**  30:*12*
31:*1, 20*  122:*2*
137:*16, 18*  146:*6*
**works**  41:*4*
250:*21*
**world**  165:*4*
**worries**  109:*8*
**worry**  305:*5*
**wrap**  316:*16*
**wraparound**  74:*9*
**Write**  4:*15*
127:*3*  191:*21*
279:*1*
**writing**  74:*10*
95:*17*  97:*21*
286:*19*
**written**  88:*18, 21*
112:*15*  231:*12*
267:*5*  277:*8, 19,
21*  278:*18*  279:*4,
6*  291:*5*
**wrong**  183:*1*
**wrote**  51:*4*
112:*18*  272:*15*
**Wyoming**  49:*17*
245:*17*

**< Y >**
**Yeah**  8:*17*  12:*17*
16:*8*  23:*20*
30:*22*  34:*17*
47:*20*  49:*12*
64:*16*  67:*11*
72:*1, 4, 21*  78:*16*
88:*11*  93:*8*
103:*21*  109:*4*
120:*22*  130:*2*
136:*20*  142:*14*
165:*5*  167:*22*
170:*5*  176:*18*
181:*19*  183:*13*
193:*15*  194:*7*
206:*9*  214:*19*
217:*2*  223:*13*

230:*4*  232:*8*
233:*3, 5, 6*
234:*19*  240:*3*
247:*18*  250:*10,
16*  260:*3, 10*
268:*20*  280:*20*
313:*21*
**year**  127:*4*
146:*1*  150:*7, 8,
10*  151:*5, 22*
153:*11*  156:*9*
188:*6*  199:*1, 5,
12, 13*  201:*4*
205:*22*  222:*5*
233:*12, 13, 21, 22*
234:*6*  235:*16*
236:*9, 10, 19*
237:*3, 6, 16, 20*
238:*18*  240:*1, 12*
241:*7, 9*  306:*11*
309:*5*
**year-and-a-half**
245:*7*
**years**  21:*5*  29:*19*
51:*2*  96:*4*  133:*4*
156:*8*  176:*7*
187:*12, 21*  188:*3,
7*  201:*3*  205:*5*
239:*7, 12*  240:*14*
241:*3*  244:*9*
257:*5*  267:*21*
272:*22*  273:*1*
277:*22*  278:*18*
291:*6*  309:*8*
**Yep**  127:*7*
**York**  47:*13*
48:*10*  49:*19*
**young**  221:*18*
**younger**  240:*19*

**< Z >**
**zone**  289:*19*
**zoned**  40:*22*
41:*4*  66:*12*  67:*8*

79:*14*  80:*8*
108:*2, 10*  166:*22*
173:*5*  174:*10*
216:*17*  218:*7*
219:*20*  220:*1, 7*
223:*6*  224:*3*
234:*10*  235:*1*
249:*15, 19*  258:*9*
297:*2, 12*
**ZOOM**  3:*13*



**Contact**

Christina Knott
Life Span Institute

christinaknott@ku.edu

Follow @kulifespan

# KU EXPERTS WRITE GUIDE TO TRANSFORMING SCHOOLS BASED ON RESEARCH IN EDUCATION, DISABILITY [1]

Tue, 05/09/2023



LAWRENCE — When University of Kansas researchers were invited to write a book for a W.W. Norton & Company series focused on inclusive education for students with disabilities, they worked with the editors of the series to rethink the concept of "inclusion" itself.

For decades, educational leaders have worked to make education more inclusive, yet these efforts have ultimately not produced sufficiently meaningful change for many students who have historically been excluded from the general education classroom, the researchers said. These conclusions led Amy McCart, Wade Kelly and Wayne Sailor of SWIFT Education Center, a part of the KU Life Span Institute, to frame their contribution to the series as "Build Equity, Join Justice: A Paradigm for School Belonging[2]," published recently by Norton.



EXHIBIT 3
WIT: McCart
DATE: 10.24.23
DJura, RPR

Rather than focusing solely on disability, the book explores ways that race, socioeconomic status and other social hierarchies intersect, resulting in systems that regularly exclude certain students and fail to provide a sense of true belonging. By broadening the focus to include all the systems that place certain students on the margins of their schools, the authors hope to inspire a more ambitious goal for education than simply including students in a dominant culture that was not designed for them. The book offers 10 principles, or points, designed to promote equity and justice in education. These points are primarily inspired by the writings, research and lived experiences of centuries of Black, brown, Indigenous and queer people of all genders.

"The book hopes to inspire a deeper thinking and a fundamental redesign in the way we as educators understand and support students and the structure of our schools," said Amy McCart, SWIFT co-director, noting that it also reflects how SWIFT Education Center has undergone its own transformation.



"At SWIFT, we knew if we wanted to lead schools across the nation in their efforts to support students who have been pushed to the margins, we had to first deepen our own understanding of the role of race and disability in education. At SWIFT, we have committed ourselves to understanding the intersectional nature of student lives and have designed a way for schools to work toward building spaces that create student wholeness," McCart said.

The center's work, which is foundational for the book, supports schools in implementing a practice referred to as "Equity-based Multi-Tiered System of Support (MTSS)," a framework for organizing student support which combines data sources with knowledge of context, science, and systems in education to benefit all students, not just those with disabilities. It is a mechanism through which schools determine how they will support each of their students.

The book outlines strategies for ensuring that implementation of Equity-based MTSS in schools is done with equity as the driving force and the measure of success. This is, in part, a response to the

prevalence of educational systems that routinely segregate by placing into separate classrooms or schools those students who learn or behave differently from the dominant culture.

"We as educators must challenge ourselves to personally understand the harm that is occurring to Black and Brown children across our nation and commit to changing our system of education, including special education, to do better. We believe we have created a resource to help guide that work," McCart said.

In the book, the authors argue that a paradigm shift is needed to address the inequities embedded in many aspects of the educational system. The book's 10 Point Paradigm presents different facets of equity that need to be considered to move toward an ecosystem in education that prioritizes the needs of students who have historically been excluded.

"Although we developed the 10 Point Paradigm in the context of education and wrote this book with a mind toward those that educate and advocate for students, it is at its essence an invitation to all people to use education as the lens through which we can dream a new vision of life in this country and society as a whole," said author Wade Kelly, assistant director, content creation, at SWIFT. "The principles nested within the 10 Point Paradigm are meant to recalibrate our moral compass in such a way that it points toward liberation, validation and solidarity rather than marginalization and the tired, senselessly punitive strategies and practices of the past."

The book is intended to provide educators and administrators at all levels several entry points to redesign schools into "equity-advancing, justice-centered institutions," ones that address the learning needs and well-being of students while joining the larger struggle toward justice for many of those who are marginalized.

"Build Equity. Join Justice: A Paradigm for School Belonging," part of the Norton Series on Inclusive Education for Students with Disabilities, is edited by KU Life Span Institute researchers Michael Wehmeyer, chair of the KU Department of Special Education and director of the Beach Center on Disabilities, and Jennifer Kurth, associate professor of special education.

**Top photo:** Students work on projects at a school where SWIFT has worked with school leaders to create better learning conditions for students.

The University of Kansas is a major comprehensive research and
teaching university. The university's mission is to lift students and
society by educating leaders, building healthy communities and
making discoveries that change the world. The KU News Service is
the central public relations office for the Lawrence campus.

kunews@ku.edu[3] | 1450 Jayhawk Blvd., Suite 37, Lawrence, KS 66045

## Links on this page:

1. https://today.ku.edu/2023/05/09/ku-experts-author-guide-transforming-schools-based-research-
   education-disability

2. https://wwnorton.com/books/9781324030270

3. kunews@ku.edu

**Contact The University of Kansas**

☎ 785-864-2700
  1450 Jayhawk Blvd.
  Lawrence, KS 66045
  ☎ 785-864-2700




*All social media at KU »*

The University of Kansas prohibits discrimination on the basis of race, color, ethnicity, religion, sex, national origin, age, ancestry, disability, status as a veteran, sexual orientation, marital status, parental status, gender identity, gender expression, and genetic information in the university's programs and activities. Retaliation is also prohibited by university policy. The following person has been designated to handle inquiries regarding the nondiscrimination policies and is the Title IX coordinator for all KU and KUMC campuses: Associate Vice Chancellor for the Office of Civil Rights and Title IX, civilrights@ku.edu, Room 1082, Dole Human Development Center, 1000 Sunnyside Avenue, Lawrence, KS 66045, 785-864-6414, 711 TTY.




The Journal of Special Education
44(3) 146–160
© Hammill Institute on Disabilities 2010
Reprints and permission: http://www.
sagepub.com/JournalsPermissions.nav
DOI: 10.1177/0022466908329825
http://journalofspecialeducation
.sagepub.com
(S)SAGE

# Individual Education Plan Goals and Services for Adolescents With Autism: Impact of Age and Educational Setting

Jennifer Kurth[1] and Ann M. Mastergeorge[2]

## Abstract

The purpose of this study is to describe the educational programs for adolescents with autism (age 12–16 years) in inclusion and noninclusion settings as reflected in their Individual Education Plan (IEP) goals, services, and curricular adaptations. Students who were included in general education math and language arts instruction had fewer overall IEP goals, but goals focused more on applied skill development, whereas students in noninclusion had goals addressing primarily rote and procedural skills. For students in both groups, all IEP goals were derived from kindergarten through fourth-grade standards. Likewise, for students in both groups, most IEP goals addressed core symptoms of autism (e.g., communication skills) as opposed to academic skill development, along with fewer overall goals and more curricular adaptations as students entered adolescence. Implications for practitioners are discussed.

## Keywords

autism, Individual Education Plan, adolescence, inclusion, academic

The incidence of students with autism in our middle schools has increased dramatically in recent years (National Center for Educational Statistics, 2005). Despite this increase in number of students with autism served in schools, autism research has continued to focus primarily on young children in early intervention settings, leaving elementary, middle, and high school teachers and parents with little guidance as to how to best serve these students (Iovnannone, Dunlap, Huber, & Kincaid, 2003; Wilczynski, Menousek, Hunter, & Mugdal, 2007).

Further compounding the difficulty of developing and providing effective services for youth with autism is the varied contexts of education settings. A significant factor in educational contexts is the provision of special education services to youth with autism in special education settings, general education settings, or a combination of both settings (Connor & Ferri, 2007; M. Fisher & Meyer, 2002; Lindsay, 2007; Simpson, de Boer-Ott, & Smith-Myles, 2003). As of 2006, 32.3% of students with autism in the United States spent 80% or more of their day instructed in general education settings, whereas approximately 38.7% spent less than 40% of their day in general education, and 9% of students with autism were educated at a separate school, indicating increases in the prevalence of inclusion in general education in just two years (Individuals with Disabilities Education Act [IDEA] Data, 2006).

Yet students with autism have complex educational needs that require comprehensive services, making it a significant challenge to provide them with an appropriate education regardless of setting (Simpson et al., 2003). An oft-cited challenge of inclusion is a lack of systematic or skilled support in these settings for students with autism (Volkmar, Lord, Bailey, Schultz, & Klin, 2004). Many teachers and paraeducators working with students with autism simply do not have adequate training in evidence-based methods for teaching and managing the behavior needs of these children (Bryson, Rogers, & Fombonne, 2003; Williams, Johnson, & Sukhodolsky, 2005). In addition, the idea of maintaining a continuum of service delivery options is considered standard in the educational landscape. Although the benefits of inclusion have been noted for students with significant disabilities (e.g., Causton-Theoharis & Malmgren, 2005; Cawley, Hayden, Cade, & Baker-Kroczynski, 2002; Dore, Dion, Wagner, & Brunet, 2002; M. Fisher & Meyer, 2002; Hedeen & Ayres, 2002; McCleskey, Henry, & Hodges, 1998; Meyer, 2001), many families and professionals prefer specialized placements for students with autism.

[1]Northern Arizona University, Flagstaff, AZ, USA
[2]University of California Davis, CA, USA

**Corresponding Author:**
Jennifer Kurth, Northern Arizona University, College of Education, P.O. Box 5774, Flagstaff, AZ 86011
E-mail: Jennifer.Kurth@nau.edu.


EXHIBIT 6
WIT: McCart
DATE: 10·24·23
DJura, RPR

For all students receiving special education services, whether included in general education or instructed in special education settings, special education teams are required to develop student Individual Education Plans (IEPs) for all students receiving special education services. The IEP must contain several key components, including (a) a description of what kind of special education program a student will receive, (b) what related services a school district will provide to the student with disabilities, and (c) measurable annual goals and objectives (Drasgow, Yell, & Robinson, 2001). A description of the educational program includes the setting in which education will be delivered, including the amount of time students will spend in general education and a rationale for that decision. Educational services, such as speech therapy or paraeducator support, are also described in terms of their frequency, duration, and educational purpose. Educational goals and objectives, as outlined by the Individuals with Disabilities Education Improvement Act (2004), have two purposes: (a) to enable the child to be involved in and progress in the general curriculum and (b) to meet the child's other educational needs that result from his or her disability. Lastly, IEP goals and objectives are intended to be written so that students make reasonable progress on goals within the time frame allowed (Drasgow et al., 2001) while providing an educational benefit to the student with disabilities (Shinn, 2007).

Despite these legal mandates, teachers struggle with how to provide access to the general education curriculum for students with significant disabilities such as autism (Clayton, Burdge, Denham, Klienert, & Kearns, 2006). Many teachers believe that establishing connections to the general education curriculum is less important for students with significant disabilities, such as autism, than for students with more mild disabilities, such as attention-deficit disorder, resulting in instruction based on content outside of general education standards for students with significant disabilities (Lee et al., 2006).

As for all students, the purpose of the IEP for students with autism is to obtain access to and participation in an appropriate educational program in the least restrictive environment. Students with autism have complex educational needs due to the nature of autism. Students with autism have needs in communication, social skills, behavior, and sensory regulation; students with autism also often have comorbid conditions such as mental retardation; and finally, students with autism have wide-ranging skill development needs along with skill generalization requirements (Simpson, 2003). As such, the development of academic skills for students with autism is often overlooked, with IEP goals and services focused instead on the core symptoms of autism (Wilczynski et al., 2007).

An absence of academic goals can result in more restrictive placements with less access to the general education curriculum and diminished contact with typical peers and experiences (Boutot & Bryant, 2005; D. Fisher & Frey, 2001; Taylor, 2004). This limited access to the core general education curriculum may serve to further limit skill development and may be based on assumptions that students with autism cannot learn academic skills in a useful manner (Greenspan & Wieder, 2006). Despite the limited focus on academic skill development for students with autism, the growing increase in the number of students with autism in public schools necessitates an increased understanding of the skills and needs of these students. Yet there is little recent information described in the literature related to IEP development and resulting skill development for students with autism, subjecting IEP teams to rely on judgment and experience rather than empirical evidence when developing goals, services, and programs for students with autism (Wilczynski et al., 2007).

Although all IEP goals and services are by definition individualized and unique to the individual needs of students, variables including setting (inclusion and noninclusion) and grade may influence IEP team decisions when developing IEP programs and goals for adolescents with autism. Thus, three questions are addressed in this study, with the aim of providing additional information for the IEP teams of students with autism. First, what appear to be areas of focus in IEP goals for students with autism? Second, what seem to be trends in goals and objectives as students with autism enter adolescence? Finally, do IEP goals and objectives appear to vary by student placement in inclusion and noninclusion settings?

## Method

### Participants

Five special education teachers and 15 adolescents with autism participated in the study. Students and teachers were recruited for participation in the study via a letter sent to school administrators. Due to the difficulty of establishing contact with school administrators, three school districts were ultimately enrolled in the study, although six districts were contacted. The districts contacted represented diverse student populations and methods of educating students with autism in Northern California. Participants did not receive incentives for participation in the study, although of the three school districts in which contact was made with school administrators, a 100% response and participation rate was obtained for both students and teachers. Upon gaining permission from school administrators, the principals identified and invited teacher participants, who in turn identified possible student participants. Teachers contacted and invited parents and students to consent to participation in the study. Signed assent and consent forms were obtained from students, parents, and teachers.

*Adolescents with autism.* Fifteen students with autism (12 boys and 3 girls) participated in this study. These students

*The Journal of Special Education 44(3)*

had independent diagnoses of autism; none of the students had a diagnosis of Asperger syndrome. To determine the long-term impact of inclusion or noninclusion in general education, the student participants were in middle school at the time of the study, or between sixth and ninth grade, which is when students typically enter adolescence and exit elementary and enter secondary school. Student participants met the following criteria:

1. The students in this study have diagnoses of autism, rather than Asperger syndrome or other related conditions such as pervasive developmental disorder (PDD). Youth with Asperger and PDD are overrepresented in the literature on autism, and as such are excluded from this study.

2. Students in the study do not have any comorbid conditions, ensuring that any differences are due to autism and not other conditions such as Down syndrome.

3. The students are native English speakers so that there is no confounding effect between English-language-learning status and academic abilities.

4. The students have IEPs for the current school year, as well as IEPs dating to at least kindergarten, to ensure that they are presently and continuously have been enrolled in special education.

5. The students have been continuously enrolled in either inclusion or noninclusion educational settings since kindergarten.

As shown in Table 1, seven students were enrolled in inclusion programs, spending 80% or more of their instructional day in general education. These students received math and language arts instruction in general education settings. Eight students were nonincluded, spending less than 50% of their instructional day in general education and received their math and language arts instruction in special education settings. The students were enrolled in four schools in three school districts in Northern California.

Efforts were made to determine the relative equivalence of students in both groups, using cognitive, adaptive, and academic assessments (Ozonoff, Goodlin-Jones, & Solomon, 2005). As depicted in Table 2, the mean IQs of student participants, as measured by the *Wechsler Intelligence Scale for Children*, were not significantly different, as calculated using ANOVA techniques, indicating that intelligence scores do not differ by placement. In other words, students with more significant autism were not more likely to be placed in noninclusion settings. Likewise, the mean adaptive behavior score for these students, as measured by the *Vineland Adaptive Behavior Scales*, was not significantly different by placement in inclusion and noninclusion settings, again indicating that skill level did not necessarily affect placement. The mean academic achievement of students placed in inclusion and noninclusion

**Table 1.** Student Demographic Information

| Student ID | Program | Grade | Age | School | Gender |
| --- | --- | --- | --- | --- | --- |
| 1 | Inclusion | 8 | 14 | A | Male |
| 2 | Inclusion | 9 | 15 | C | Male |
| 3 | Noninclusion | 7 | 13 | B | Male |
| 4 | Noninclusion | 7 | 12 | B | Male |
| 5 | Inclusion | 7 | 13 | A | Female |
| 6 | Noninclusion | 8 | 14 | B | Male |
| 7 | Noninclusion | 8 | 15 | B | Male |
| 8 | Inclusion | 9 | 15 | A | Male |
| 9 | Noninclusion | 8 | 14 | B | Male |
| 10 | Inclusion | 7 | 13 | A | Female |
| 11 | Noninclusion | 9 | 15 | D | Male |
| 12 | Noninclusion | 9 | 15 | D | Male |
| 13 | Noninclusion | 7 | 12 | D | Male |
| 14 | Inclusion | 8 | 13 | C | Male |
| 15 | Inclusion | 7 | 13 | C | Female |

**Table 2.** Student Assessment Scores

| Variables | Included | Not Included | $p$ Value | $F$ Value | Effect Size |
| --- | --- | --- | --- | --- | --- |
| Number of students | 7 | 8 | NA | NA | NA |
| Mean IQ | 64.9 | 60.0 | .66 | 0.851 | |
| Mean adaptive behavior | 44.4 | 42.3 | .88 | 1.029 | |
| Mean achievement | 75.4 | 14.6 | .000**** | 56.115 | .419 |

****$p < .001$.

settings was significantly different, however, demonstrating that those students in inclusion settings performed significantly better on the *Woodcock-Johnson Tests of Academic Achievement* than students who were not included. It is possible that placement in inclusion settings positively affected academic skill development or that those students with higher academic aptitude were more likely to be placed in inclusion settings.

*Special education teachers.* The special education teachers included in this study are the primary special education teachers for the focal students with autism in the study. The primary teachers (also referred to as case managers) of the focal students with autism were selected for participation in this study because they best know the needs and development of the students and could assist in the records review. The teachers have case managed and taught the student participants during middle school, or for the past one to three years, depending on the student's grade level. Furthermore, these teachers provide daily instruction to the adolescents with autism in this study. The teachers are all fully credentialed by the state of California and have a minimum of two years of experience teaching special education, the necessary amount for a full (clear) credential in the state of

California. All special education teachers had a clear credential to teach students with severe disabilities (SH credential). Full credentialing was a criterion for this study so that teacher preparation and experience do not confound student instruction or IEP development.

## Design

A quasi-experimental design was employed in this study, as random assignment of students to inclusion and noninclusion settings was not possible. Instead, students in existing placements were evaluated. During the review of IEP records, placement decision discussions were sought to determine why teams decided to place students in inclusion and noninclusion settings. Unfortunately, these decisions were rarely specified in student cumulative IEP records, making it impossible to know why some students were included in general education and others were not. However, teachers and principals described that two of the schools were not inclusive: one was a school only for students with autism (School D), and another school had segregated classes for students with disabilities on a general education campus (School B). The other two schools, which were in the same school district, had "full inclusion" philosophies (Schools A and C), whereby all students with disabilities attended general education classes at their neighborhood school. It appears, then, that residence greatly affected placement decisions, so that students who resided in noninclusion districts were not included, whereas students residing in inclusion districts were included.

## Procedure

The cumulative IEP records for the student participants were reviewed to determine the types and numbers of IEP goals, objectives, services, and curricular adaptations from kindergarten through middle school for each student participant. These records were obtained with permission from the parents of the student participants, their teachers, and administrators overseeing the educational programs of the students. Each IEP record from kindergarten through middle school was analyzed. There was at least one IEP record generated each school year as part of the student's annual IEP meeting. Often, however, IEP teams convened more than once a year to discuss changes in services, the needs or concerns of IEP team members, or assessment results. In such cases, this IEP addendum was also reviewed as part of this study.

The records were reviewed and coded on-site by the first author, at district or county offices, where such records were stored. A coding sheet was developed to allow for on-site data collection (see Appendix A). Basic student demographic for each record was collected, including student grade, setting (inclusion or noninclusion and percentage of time in general education), the date of the meeting, and

any plans included in the IEP (namely, behavior support plans or health care plans). Next, information on academic goals was collected. Academic goals were divided between reading, writing, and math skill areas, as determined by the teachers who wrote the goal. Any baseline information provided by teachers pertaining to these academic goals was recorded. For example, in a reading goal area, a teacher could record the baseline information that a student decodes all letter names and reads five high-frequency sight words.

Next, the method of determining this baseline information was recorded. That is, did teachers report assessment results or anecdotal information? The IEP objectives in each content area (math, reading, and writing) were recorded verbatim next. The progress-monitoring strategy incorporated into each objective was also recorded, including the persons responsible for measuring the student's goal progress. Next, the California content standard the goal was based on was also described. In such cases when no standard was cited, the appropriate standard was found by examining the California content standards to determine and cite the appropriate standard (Ong, 1998, 1999). In cases when goals were not based on California standards, a nonstandard (functional or compensatory) category was created and cited (Browder et al., 2003). Goals were deemed nonstandard when both authors agreed that the goal was not tied to any derivation of a California state standard. Finally, a notation was made if the teacher reported that the goal was met or unmet.

*Number and types of goals.* To determine the role of nonacademic goals and objectives in student IEPs, the number of communication, social, motor/sensory, self-help, and behavior goals was also recorded. Goals were coded by the first author and subsequently checked for errors. The goals coded were included in one of these groups, based the following criteria: Communication goals are those goals addressing all communication areas, including developing nonverbal communication through means such as the Picture Exchange Communication System, improving articulation, and improving pragmatics. Motor and sensory goals address fine and gross motor skill development as well as sensory regulation, such as the use of tactile brushes to soothe students. Self-help goals address independence and self-care skills. Finally, behavior goals targeting improving on-task, appropriate behaviors as well as goals to reduce inappropriate behaviors were also noted.

*Curricular standards for goals.* Upon completion of IEP goal data collection, it became apparent that another layer of analysis was needed. A second data collection form, found in Appendix B, was used to note the content standard of the goal, its associated grade level, an example of a goal, and then the students who had the goal and in which grade they had the goal. This allowed for an analysis of goal repetition, out-of-grade-level goal documentation, and an understanding of which goals were common to students in terms of type of goals, standard area, and grade level of the standard. For

example, it was found that a seventh-grade student had a goal based on a first-grade reading comprehension standard in his third, fourth, fifth, sixth, and seventh grades.

*Adaptations and services.* In addition to describing goals and objectives, the curricular adaptations and services developed to support student learning as part of the IEP were also recorded. Again, although curricular adaptations and services are unique to individual student needs, the types and amounts of accommodations and services provided in IEPs were reported to determine if student age and placement affected IEP team decision making regarding types and amounts of adaptations and services. Curricular adaptations in the IEP serve to provide students the supports and resources needed to access curriculum, such as providing students with calculators to complete math problems or word processors to participate in written expression. Services were reported in terms of the type of service and the frequency and duration of that service. Services included speech therapy, occupational therapy, paraeducator support, and behavioral support services.

*Data analysis.* Data analysis of the records review began by describing the numbers and types of goals and services for each student. Descriptive statistics and frequency counts were used to describe basic information about goals and services, including goals met, how progress was monitored, and what standards goals were based on. To describe mean differences in goals between adolescents who were and who were not included in general education, a multivariate analysis was computed to describe the impact of setting (inclusion vs. noninclusion) on the dependent variables (types of goals). Statistical significance and effect sizes were calculated and reported for each set of dependent variables. To control for power in this small sample size, the alpha level was adjusted to .15 (Stevens, 1996).

## Results

### IEP Goals

A review of the cumulative IEP files reveals that students have on average 19 IEP goals each year. As shown in Figure 1, the average number of goals varies by age, with students having more goals in elementary school (kindergarten through Grade 5) and fewer average goals in middle school (Grades 6–9). The number of goals rises between second and sixth grades and then begins to decline, so that at the transition from elementary to middle school (Grades 6–9), the number of IEP goals decreases for the students in this sample. Instructional setting is also associated with number of IEP goals for students with autism: Students who are included have fewer average goals (average 12.4 goals each year between kindergarten and ninth grade) than students who are not included (average 18.5 goals each year between kindergarten and ninth grade).



**Figure 1.** Average number of goals, kindergarten through middle school.

*Domains of IEP goals.* An analysis of student IEP goals reveals that goals fall within six primary domains: communication, self-help, motor/sensory, social, academic, and behavior. For all students with autism in this sample, communication goals constituted the largest percentage of IEP goals, at approximately 40.7% of all goals for those students who are included and 37.3% for students who are not included, as seen in Table 3. Self-help goals were the second most frequent goals for both groups, followed by social goals for students who were included and motor/sensory goals for students who were not included. For all students, academic goals constituted a small percentage of the total goals: 11.1% of all goals for students who are included and 8.3% of all goals for students who are not included. There were no significant between-group differences in terms of mean number of IEP goals in each domain. These results indicate that most goals target core deficits in autism (communication) as opposed to academic development (academic goals) for both groups of students.

Within academic goals, students in both inclusion and noninclusion groups have an approximately equal proportion of reading, writing, and math goals, with each goal area constituting about one third of the total academic goals (see Table 4).

All academic goals in the sample were derived from kindergarten through fourth-grade California content standards. For example, although a student is in seventh grade, he or she has goals derived from a second-grade content standard. Some goals were not based on California content standards and are referred to as nonstandard goals. Although these goals are not California state standards verbatim, the mode of the standard has been changed to address a learning need for the student in the sample. For example, a nonstandard reading goal in this sample was to read a picture schedule. Reading picture schedules is not explicitly part of the core curriculum in California but addresses a learning need for a particular student and addresses reading for meaning in an alternate mode. As shown in Figure 2, most of the goals for both students who are included and nonincluded came from kindergarten through second-grade

**Table 3.** Percentage of Individual Education Plan (IEP) Goals by Domain

| IEP Goal Domain | Inclusion Goals by Domain | Noninclusion Goals by Domain |
|---|---|---|
| Communication | 40.7 | 37.3 |
| Self-help | 17.7 | 20.8 |
| Motor/sensory | 13.0 | 19.9 |
| Social | 15.4 | 9.8 |
| Academic | 11.1 | 8.3 |
| Behavior | 2.1 | 3.9 |

**Table 4.** Percentage of Academic Goals

| Academic Goals | Inclusion | Noninclusion |
|---|---|---|
| Reading | 34.2 | 37.4 |
| Writing | 26.2 | 27.0 |
| Math | 39.6 | 35.6 |



**Figure 2.** Percentage of goals from california standard grade level.
Note: IEP = Individual Education Plan.

standards (65% and 70%, respectively). The remaining goals came from third- and fourth-grade standards for the students who are included and nonincluded (27% and 11%, respectively). Approximately 9% of the goals were non–standards based for the students who are included in general education, whereas 19% of goals were non–standards based for students who were not included.

Although all students had an approximately equal number of total academic goals, differences were found in the types of goals within each academic domain when IEP goals were analyzed by *English–Language Arts Content Standards for California* (ELA Standards; Ong, 1998). The ELA Standards identify three areas for reading in the kindergarten through fourth-grade standards: (a) word analysis, fluency, and vocabulary, which addresses decoding words fluently and accurately using phonics and sight-reading strategies; (b) reading comprehension, which addresses reading for meaning; and (c) literary response and analysis, which addresses character analysis, figurative language, and other elements of text analysis. A fourth goal area, non-standards-based goals, was added during this analysis because some goals did not correspond exactly with California standards.

*IEP goals by setting.* Between-group differences were found in this analysis, as depicted in Table 5. Students in inclusion settings have more reading goals addressing reading comprehension than any other area (48.8%), suggesting that priority needs for this group of students involves reading for meaning and understanding. For students with autism who were not included, the primary goal area was non-standards-based reading skills (37.1%). A multivariate analysis of variance was conducted to explore the impact of setting (inclusion vs. noninclusion) on the four dependent variables (type of reading goal). To control for power in this

small sample size, the alpha level was adjusted to .15 (Stevens, 1996). Statistically significant between-group differences were detected in that students who are included have more reading comprehension goals, $F(1, 13) = 2.789$, $p = .119$, with a large effect size of .177, calculated using eta-squared. Statistically significant differences were also found in literary response and analysis goals, $F(1, 13) = 5.648$, $p = .034$; however, the students who are not included had no literary response and analysis goals in this sample. Finally, a significant difference was found in non-standards-based goals, with the students who are not included having more non-standards-based goals, $F(1, 13) = 3.528$, $p = .83$, and a large effect size of .213.

Similar between-group differences were found in writing goals. The California ELA standards identify four writing areas in kindergarten through fourth grade standards: writing strategies, writing conventions, listening and speaking strategies, and speaking applications. Writing strategies goals include expressive writing via sentences and paragraphs, whereas writing conventions address writing neatly with proper punctuation and capitalization. Listening and speaking applications and strategies address speaking in complete sentences and understanding oral directions.

As shown in Table 5, students with autism who were included in general education had writing goals addressing writing passages (writing strategies) in approximately 50% of their writing IEP goals, whereas the students who were not included had goals largely addressing writing conventions such as writing neatly and using proper punctuation (approximately 50% of their writing goals). The students with autism who were included had statistically significantly more goals addressing writing strategies than their nonincluded peers, $F(1, 13) = 3.128$, $p = .100$, with a large effect size of .194 calculated using eta-squared. Although not statistically significant at $p < .15$, the students who were not included had more non-standards-based writing goals than students who were included, as shown with an effect size of .148, indicating that, again, the students who were

**Table 5.** Percentage of Reading Goals by California Standard Area

| Standard Domain | Inclusion | Noninclusion | p Value | F Value | Effect Size |
|---|---|---|---|---|---|
| Reading | | | | | |
| Word analysis | 28.9 | 30.7 | .916 | 0.011 | |
| Reading comprehension | 48.8 | 32.2 | .119[a] | 2.789 | .177 |
| Literary response and analysis | 4.7 | 0 | .034[***] | 5.648 | |
| Nonstandard/ functional | 17.6 | 37.1 | .083[**] | 3.528 | .213 |
| Writing | | | | | |
| Writing strategies | 50.1 | 26.7 | .100[**] | 3.128 | .194 |
| Writing conventions | 41.2 | 49.7 | .805 | 0.063 | |
| Listening and speaking | 1.5 | 2.5 | .651 | 0.215 | |
| Speaking applications | 0 | 0 | NA | NA | |
| Nonstandard/ functional | 7.2 | 21.1 | .156 | 2.269 | .148 |
| Math | | | | | |
| Algebra and functions | 0 | 2.7 | .059[**] | 4.267 | |
| Number sense | 65.6 | 71.3 | .502 | 0.478 | |
| Mathematical reasoning | 20.7 | 7.5 | .057[***] | 4.356 | .251 |
| Measurement and geometry | 8.1 | 17.5 | .535 | 0.406 | |
| Statistics, data analysis, and probability | 3.2 | 1.0 | .223 | 1.636 | |
| Nonstandard/ functional | 2.4 | 0 | .044[***] | 4.964 | |

[a] p < .15. [**] p < .10. [***] p < .05.

not included were more likely to have writing goals not based on state standards. Examples of non-standards-based writing goals in this sample included stamping one's first name on a paper and composing a sentence using pictures.

Math goals were also analyzed using the *Mathematics Content Standards for California Public Schools* (Ong, 1999). The California math standards fall into five domains in the kindergarten through fourth-grade standards: algebra and functions; number sense; mathematical reasoning; measurement and geometry; and statistics, data analysis, and probability. Algebra and functions address sorting and classifying objects by attribute. Number sense includes counting and calculation. Mathematical reasoning primarily is concerned with determining the approach and materials needed to solve mathematics problems, such as word problems. Measurement and geometry addresses using tools such as clocks and rulers to measure, as well as understanding shapes and spatial relationships. Statistics and probability is concerned with patterns at the kindergarten

through fourth-grade level. Finally, a sixth goal area, non-standards-based goals, was included for those goals that were not related to the above mentioned California math standards.

As in reading and writing goal areas, significant between-group differences were found in the math content standards for those students with autism who are included in general education and those who are not. As depicted in Table 5, both students who were included and those who were not included had math goals primarily drawn from the number sense goal area. That is, approximately 70% of all math goals for both groups address counting and calculation. Closer inspection reveals some group differences, however. Namely, although most goals for the students who are included address the domain number sense, approximately 21% of their IEP goals address mathematical reasoning, or the ability to set up and solve applied problems, whereas only about 8% of the students who were not included had goals in this area. This finding is statistically significant at $F(1, 13) = 4.356$, $p = .057$, with a large effect size of .251. The students who were included had significantly more non-standards-based math goals, although these goals only account for 2.4% of all goals; none of the students who were not included had non-standards-based math goals. Finally, the students who were not included had statistically significantly more algebra and functions goals. Again, however, this goal area only accounted for 2.7% of their entire math goals; the students who were included had no algebra and functions goals in this sample.

### Progress in Meeting IEP Goals

The students with autism in this sample had goals derived from kindergarten through fourth-grade content standards in addition to non-standards-based goal areas. Despite having goals based on early academic content areas, students were largely unsuccessful in attaining their IEP goals in reading, writing, and math. As shown in Figure 3, students met on average fewer than 70% of their IEP goals each year. Between-group differences in goal attainment are evident. Those students who are included in general education met on average 55.3% of the IEP goals between kindergarten and eighth grade; those students who were not included met on average 34.3% of their IEP goals between kindergarten and eighth grade. Ninth-grade progress reports are not available for either group, as students were currently in ninth grade at the time of the study, and therefore their final goal progress for ninth grade was not yet available.

Although students did not meet many of their goals, the teachers of these students did not report goal progress a significant percentage of the time, with a substantial downward trend over time, as illustrated in Figure 4. In kindergarten, special education teachers reported progress in the cumulative file on average 75% of the time for the students who





**Figure 3.** Progress in meeting Individual Education Plan (IEP) goals, kindergarten through middle school.
Note: IEP = Individual Education Plan.

**Figure 4.** Percentage of time teachers report progress, kindergarten through eighth grade.
Note: IEP = Individual Education Plan.

were included and 71% of the time for the students who were not included. By eighth grade, progress was reported on average only 50% of the time in the cumulative records for students who were included and 32% of the time for students who were not included. Inspection of Figure 4 reveals that the teachers of students in inclusion programs reported goal progress more frequently than teachers in noninclusion programs in five of the nine reporting periods. Overall, however, teachers in both inclusion and noninclusion programs did not report progress on IEP goals a substantial percentage of the time. Although it is possible that progress on IEP goals was reported to families in some other form, no permanent record of this reporting could be found in the cumulative IEP records. These findings are consistent with those of others who note that although monitoring student progress on IEP goals is required under IDEA, there is less compliance with this component than with any other (Etscheidt, 2006).

As there was insufficient data to determine which academic goals were more or less likely to be met by students with autism, the number of times a specific goal was repeated at each IEP cycle was determined. It is assumed that when a goal is repeated the student did not adequately attain that goal, and it was therefore repeated in the next IEP in hopes the student would meet the goal with additional practice and instruction in the upcoming IEP year. For example, a student had a math goal to state the name and value of four coins. This goal first appeared in second grade but was repeated without any change in third and fourth grade. In such a case, the same goal appeared three times in the student records, suggesting to the researchers that a plausible explantion is that the student was likely not successful in identifying the coins in previous IEPs. However, it is important to note that IEP goals may have been continued or discontinued for a variety of reasons, including the applicabilty and meaningfulness of the IEP goal over time, which is an area that requires further investigation in future studies.

In analyzing the IEP goals, it was determined that IEP goals appeared only one time about 50% of the time. That is, in half of all goals the goal was discontinued after one year; it is therefore assumed that half of the goals were met

during the first year a student had the goal. However, this indicates that half of the goals were *not* met during the initial year of instruction and were therefore repeated. As depicted in Table 6, the average number of times a reading goal was repeated is 2.67 times for students who were included and 2.52 times for students who were not included, indicating that the same reading goal appeared in a student's IEP records for on average two and a half years. Reading goals were the most likely goals to be repeated in both groups, with the number of times a goal is repeated ranging from one to nine, indicating that some students had the same reading goal for all nine years of their education. Math goals were the least likely to be repeated for both groups, with the number of times math goals being repeated ranging from one to eight and 2.09 mean repeats for students who were included and 1.66 mean repeats for students who were not included. Writing goals were repeated on average 2.32 times for students who were included and 1.67 times on average for students who were not included, with a range of one to eight repeated goals.

Although there are no significant differences in the types of goals repeated for students who are included and not included in the three broad curricular areas, an inspection of the types of goals reveals some statistically significant differences, as depicted in Table 7. For example, students who were included were more likely to have repeated reading comprehension goals (on average the same goal for 3.92 IEPs), whereas the students who were not included had more word analysis goals repeated (on average the same IEP goal for 2.61 IEPs). Within the broad area of reading, non-standards-based goals were the least likely to be repeated (and presumably the most likely goals to be met), whereas reading comprehension was overall the most likely to be repeated (and presumably the least likely goal type to be met).

Among writing goals, writing strategies (writing sentences or paragraphs) was the most likely goal to be repeated for both students in inclusion and noninclusion programs. These goals were repeated on average for 2.39 years for both groups, indicating students in both groups had more success in meeting noncompositional writing goals, such as

The Journal of Special Education 44(3)

**Table 6.** Average Annual Repetition of Goals

|  | Inclusion Mean | Noninclusion Mean | p Value |
|---|---|---|---|
| Reading goals repeated | 2.67 | 2.52 | .740 |
| Writing goals repeated | 2.32 | 1.67 | .212 |
| Math goals repeated | 2.09 | 1.66 | .290 |

spelling, using correct punctuation, and non-standards-based writing skills. Students in both groups were overall most successful in attaining their math goals in that these goals have the lowest mean number of repeated goals, ranging from 0.27 to 1.99 mean repeated goals. Although only repeated approximately twice, number sense, mathematical reasoning, and measurement and geometry content areas were the most likely math goals to be repeated. Mathematical reasoning had the highest mean number of repeated goals (2.5 for students who were included), indicating that students were least successful in attaining their goals in this content area.

### Service and Adaptations

The number and types of IEP services and adaptations were collected from the students' cumulative IEP records to determine if age and setting influence services and adaptations written into IEP documents. Adaptations are changes in the environment, instruction, or materials that assist students in participating in an instructional activity (Westling & Fox, 2000). As illustrated in Figure 5, the students in this study were provided with a number of adaptations in their IEPs. Adaptations included adjustments to how students would be taught ("input"), such as access to modified or alternative curriculum, and adjustments to how students would demonstrate their knowledge ("output"), such as allowing students to take alternative tests. Other adaptations included personnel adaptations such as consultation between professionals serving the student, along with adaptations to support student learning style such as extended time and the use of positive behavioral supports.

As seen in Figure 5, the number of adaptations present in student IEP varies by placement and grade, although individual student need must drive the development of adaptations and services. Students in early elementary grades (kindergarten through Grade 4) have fewer adaptations than do students in middle grades (Grades 5–9). Likewise, students in inclusion programs have more adaptations present in their IEPs than do students who are not included. Early elementary students in inclusion settings have on average 14.6 adaptations, whereas students who were included in middle grades have on average 19.2 adaptations. This suggests that as students enter higher grades with increasingly abstract curricula (Mastropieri & Scruggs, 2001), more adaptations are provided to students to enable

**Table 7.** Average Number of Goals Repeated by Content Area

| Standard Area | Inclusion | Noninclusion | p Value | F Value | Overall Mean |
|---|---|---|---|---|---|
| Reading |  |  |  |  |  |
| Reading comprehension | 3.92 | 2.34 | .022*** | 6.739 | 3.19 |
| Word analysis | 1.57 | 2.61 | .139 | 2.486 | 2.06 |
| Literary response | 0.5 | 0 | .029*** | 6.067 | 0.27 |
| Functional | 1.08 | 1.5 | .037*** | 5.405 | 0.53 |
| Writing |  |  |  |  |  |
| Writing strategies | 2.46 | 2.31 | .859 | 0.033 | 2.39 |
| Writing conventions | 1.46 | 0.33 | .046*** | 4.859 | 0.95 |
| Listening and speaking | 1.25 | 0.57 | .562 | 0.354 | 0.93 |
| Speaking applications | 0 | 0 | NA | NA | NA |
| Functional | 0.75 | 1.27 | .379 | 0.830 | 0.99 |
| Math |  |  |  |  |  |
| Number sense | 2.15 | 1.82 | .551 | 0.375 | 1.99 |
| Measurement and geometry | 1.73 | 1.71 | .980 | 0.001 | 1.72 |
| Mathematical reasoning | 2.5 | 1.0 | .149* | 2.348 | 1.80 |
| Algebra and functions | 0.63 | 0.71 | .791 | 0.073 | 0.67 |
| Statistics, data analysis, and probability | 0.25 | 0.29 | .926 | 0.009 | 0.27 |
| Functional | 0.25 | 0.5 | .400 | 0.758 | 0.37 |

*p < .15. ***p < .05.



**Figure 5.** Average number of adaptations in student Individual Education Plans.

access to and participation in the curriculum. Furthermore, students who were not included have far fewer adaptations in their IEPs across grade levels, suggesting that curricular changes that occur in general education settings have a lesser impact on these students in that a personalized curriculum is already being provided without the need for extensive adaptations or that students who are not included simply have less access to the core curriculum and thus less need for adapted materials.

The number of support services provided in student IEPs also varied by age and educational setting. As shown in Table

**Table 8.** Student Individual Education Plan Services

| | Setting | Grade | Occupational Therapy | Speech | Para- educator | Beha- viorist |
|---|---|---|---|---|---|---|
| Setting | — | | | | | |
| Grade | −.387** | — | | | | |
| Occupational therapy | | −.374* | — | | | |
| Speech | | | | — | | |
| Paraeducator | −.563** | .668** | | | — | |
| Behaviorist | | .464** | | | | — |

*$p < .15$. **$p < .10$.

8, four services appeared in student IEPs: speech and language therapy (speech), occupational therapy (OT), paraeducator support, and behavioral support. The grade of the students was significantly correlated with setting (inclusion vs. noninclusion) and services (OT, paraeducator, and behavioral). Younger students with autism (kindergarten through Grade 4) were more likely to have OT services in their IEPs, whereas older students (Grades 5–9) were more likely to have behaviorist and paraeducator supports in their IEPs. Setting was also significantly correlated with paraeducator support, in that students who were included in general education were more likely to have paraeducator supports written into their IEPs than were students who were not included.

## Discussion

The students with autism in this study had a significant number of IEP goals and services throughout their education. However, we found a shift in the number of goals, services, and accommodations as students enter adolescence for both students who were included and students who were not included. Students in elementary school had more goals than did students in middle school, along with more curricular adaptations in middle school. Students in elementary school were more likely to have remedial services (e.g., OT), whereas students in middle school were more likely to have support services (e.g., behaviorist and paraeducator supports). Although the type and amount of services and adaptations were correlated with student placement in inclusion and noninclusion settings, it is possible that factors such as student maturation and development exerted a powerful influence on IEP team decision making as well. Altogether, however, these results suggest that educational priorities shift as students enter adolescence and that age appears to influence IEP development and content. During elementary school, IEP teams developed more total goals, likely in an effort to remediate skill deficits while participating in elementary grade curriculum. However, by middle school, curriculum becomes more abstract and inferential and is delivered at a faster pace, and students are

expected to work independently and demonstrate adultlike work habits in terms of organization and thoroughness (Mastropieri & Scruggs, 2001). When this curricular shift occurs, we found that students have fewer goals, more curricular adaptations, and more support services.

As such, it appears that IEP teams have lesser expectations of student ability to participate in the core general education curriculum over time. This is evident in the finding that students did not have goals tied to middle school standards; middle school students were being instructed in kindergarten through fourth-grade standards presumably because students lacked the skills to access this more abstract curriculum. Furthermore, students were provided more curricular adaptations likely because the students were being provided instruction that differed from their same-age peers, thus necessitating curriculum adaptations. Finally, student IEPs contained support services so that student individualization needs, via paraeducator supports, could be provided, along with behavioral supports so that students would be provided positive supports to maintain their ability to participate in school activities.

Students in inclusion and noninclusion programs both had a high number of IEP goals and services and had limited success in attaining each of their goals. This suggests that the number of goals and skill development may have an inverse relationship. In other words, with more goals, students become less likely to make sufficient educational progress to meet their goals. Wilczynski and colleagues (2007) have suggested that providing a large number of goals in IEPs can be detrimental in that sufficient time to teach the skills and monitor progress on each goal is not feasible. This claim appears to be substantiated in the results of this study: Students had a high number of goals and were unlikely to meet their goals, as evidenced by teacher reports of goal progress and the frequency with which IEP goals were repeated. It is likely that students did not receive the amount of instruction needed to make reasonable progress on each goal. Other factors certainly contribute to student IEP progress, including the quality of instruction and relevance of goals to the daily lives of students. However, the sheer volume of goals present in this sample indicate that even high-quality teachers delivering instruction focused on high-quality goals would have insufficient time and attention to adequately provide instruction for each goal.

Likewise, teacher ability to monitor progress on each goal was clearly lacking in this sample. Teachers were unsuccessful in reporting goal progress a large percentage of the time, indicating that perhaps there were simply too many goals, services, and accommodations to balance in each IEP. It is likely that teachers were unable to devote adequate time and resources to provide instruction in and measure progress on each goal. This balancing act is further complicated when No Child Left Behind and IDEA requirements for participation in and access to the core general education

curriculum are accounted for. Teachers have the task not only of providing instruction in IEP goals and objectives that target individual learning needs but also of providing instruction in the core curriculum. With a large number of IEP goals, teachers likely did not have enough instructional time to provide adequate instruction in each area. It is possible that teachers would be more successful in allocating appropriate instructional time on each goal if there was more similarity between IEP goals and the core curriculum.

The results of this study further indicate significant differences in educational programs for students with autism who are placed in inclusion and noninclusion settings. Although the students in the sample had statistically equivalent intelligence and adaptive behavior skills, the types of educational goals in student IEPs varied by setting. Students who were included in general education had more IEP goals targeting higher order academic skills such as reading comprehension, writing passages for expressive communication, and solving word problems. Students in noninclusion programs had goals primarily addressing functional rote and procedural learning tasks such as writing neatly, calculating sums and differences, and reading word lists. Altogether, these results suggest that educational setting influences IEP development and contents.

Although students who were included also had goals derived from kindergarten through fourth-grade standards, their goals were more likely to reflect applied skills, suggesting that students received instruction in these skill areas and participated in higher order thinking skills such how, when, and why to apply these procedures. These problem-solving skills have both academic and quality-of-life applications. Academically, the ability to solve increasingly complex problems allows one to progress in a curriculum and achieve greater skill development. This is evidenced in the introductory statements in both the California mathematics and English language arts content standards. Both acknowledge the foundational nature of procedural and rote tasks but insist that these foundational skills should lead to participation in and understanding of the applied uses of these skills. For example, the ELA standards note, "It is assumed that earlier skills are foundational and requisite for later, more complex higher-order skills and knowledge" (Ong, p. 10, 1998).

In this study, we found that, regardless of age, students in noninclusion settings were more likely to have goals addressing procedural skills rather than applied skills, suggesting they were likewise not receiving instruction in the applied uses of these skills. In terms of quality-of-life outcomes, the ability to solve problems and apply knowledge has broad implications. Applied instruction and learning advances competence and independence in that students learn to identify, solve, and self-monitor the problems and potential solutions in their own lives (Agran, Blanchard, Wehmeyer, & Hughes, 2002). Although the IEP is a highly individualized document, it appears that IEP teams consider student placement in developing goals. It further appears that placement in noninclusion settings limits student skill development via access to higher order skill instruction.

## Limitations and Implications

In all, the results of this study suggest that placement and age may influence IEP team decisions and IEP development for adolescents with autism. That is, IEP teams appear to be influenced both by individual student characteristics and by student age and placement when developing IEP goals, services, and adaptations. This is striking given that IEP contents (i.e., goals, adaptations, and services) are intended to be driven solely by individual student need. Based on the findings of this study, it appears that teachers may consider classroom settings and the age of students as important factors in student IEP development. More research is needed to understand the basis for these IEP team decisions and to determine why and how the variables of placement, age, and disability diagnosis influence the content of student IEPs.

Emerging research indicates positive student outcomes when instruction and IEP goals are tied to state standards (Browder, Spooner, Wakeman, Trela, & Baker, 2006; Clayton et al., 2006; Cushing, Clark, Carter, & Kennedy, 2005; D. Fisher & Frey, 2001). For example, Browder and colleagues note that by linking goals to grade-level standards, students are provided with a sequential and increasingly challenging curriculum. Despite the good intentions of linking IEP goals to state standards, in practice teachers struggle with how to effectively accomplish this (Agran, Alper, & Wehmeyer, 2002; Browder, Spooner, et al., 2006; Flowers, Ahlgrim-Delzell, Browder, & Spooner, 2005; Lynch & Adams, 2008; Walsh, 2001). Continued research is needed to describe how to effectively incorporate IEP goals and individualized instruction within the context of the general education curriculum, particularly in secondary schools.

Furthermore, the importance of a challenging and sequential curriculum cannot be underestimated for students with autism. The curriculum provided in general education is generally tied to state content standards and assessments, ensuring that teaching practice targets the skills students need to meet standards and pass mandated assessments (Browder, Wakeman, & Flowers, 2006; Ward, Van De Mark, & Ryndak, 2006). Often, however, it has been our experience that the special education curriculum is rather piecemeal, largely because special educators use a catalog approach to selecting and implementing the curriculum (Spooner & Browder, 2006). For example, a special education teacher wishing to address a goal related to telling time may purchase and use a workbook, or use pages from a workbook, addressing telling time. Although the IEP goal is being targeted for instruction, a scope and sequence for this instruction is missing, and as a result the student

may not receive increasingly challenging instruction or instruction in generalized contexts.

This suggests the importance of providing instruction based on a general education curriculum to students with autism. A strong research base further supports the success of embedding IEP goals into the general education curriculum (e.g., Jameson, McDonnell, Johnson, Riesen, & Polychronis, 2007; Johnson, McDonnell, Holzwarth, & Hunter, 2004). By providing instruction in IEP goals along with instruction in core curriculum, students with autism are provided instruction that targets individualized, functional needs, while accessing and participating in a challenging curriculum. Thus, aligning IEP goals to content standards is not inconsistent with providing a unique, special education to students with autism, nor is it an expectation that students with autism should perform at grade level. Rather, alignment ensures that instruction is based on a challenging core curriculum that will enable the student to make academic progress at his or her individual level. As previously discussed, academic progress has life-enhancing implications in terms of developing work and independence skills. In short, aligning IEP goals to content standards provides instruction that is based on, not necessarily equivalent to, the core curriculum. Further research is needed to describe methods for adapting the core general education curriculum to be meaningful and enriching for adolescents with autism.

In addition to aligning IEP goals with state standards in general education, teachers must also develop and implement effective data collection strategies for monitoring student progress on IEP goals. Data help teachers to evaluate the success of their teaching, to document skill acquisition, and to determine when more instruction or supports are needed (Raver, 2004; Stecker, Lembke, & Foegen, 2008). In addition, data provides authentic measures of student ability in day-to-day situations in naturalistic contexts (Gettinger & Stoiber, 1998). Clearly, ongoing data collection is an important tool for special education teachers to utilize during their regular instruction and assessment routines. As demonstrated in these results, however, teachers were not successful in documenting student progress on IEP goals, suggesting that teachers were likewise unsuccessful in documenting student progress with routine data collection. This illustrates the need to provide teachers with efficient, effective, and objective data collection procedures that can be used with relative ease across settings. More research is needed to describe effective and efficient methods to collect and report progress data.

The results of this study indicate positive outcomes for students with autism who are included in general education settings. Several limitations apply to the generality of these findings, however. First, the study's small sample size and the limited geography prohibits broad generalizations of these findings. Future research is needed to recruit a larger number of student participants from geographically diverse areas, including urban and rural areas. Second, we did not

place the participants in inclusion or noninclusion settings, and we therefore were unable to carefully document why individual students were placed in inclusion or noninclusion settings. In the comments sections of some IEP records, a discussion regarding placement was noted. In several instances, students appeared to be placed in "autism classes" simply by nature of having an autism diagnosis. However, one school district in the study had a full-inclusion philosophy and no segregated classes existed, and therefore, all students were included by default. Efforts were made to match students by IQ and adaptive behavior regardless of setting, but future studies are needed to control for placement decisions and to further describe why students may or may not be placed in more restrictive settings.

Third, our efforts to determine what kinds of IEP goals were more or less likely to be met were thwarted by the lack of data recorded in cumulative IEP records for these participants. In addition, due to a lack of available data documenting student success in meeting IEP goals, one plausible explanation appeared to be that repeated goals were those that had not yet been mastered and discontinued goals were hypothesized to have been met. It is clear, however, that a number of factors may contribute to a goal being retained or dropped from subsequent IEPs, including the meaningfulness, the age appropriateness, and the value of the goals for the student. Thus, future research is warranted to explore what kinds of goals students are more or less likely to attain in various settings, controlling for these and other factors. Fourth, evaluating the quality of goals and accommodations, including their meaningfulness to individual students and the myriad of student variables that contribute to student goal progress, was beyond the scope of the present study. The implementation of goals and accommodations from the written IEP document to actual classroom practice was likewise not included in this study. Future research is needed to determine the correlation between the quality of goals and accommodations in terms of student meaningfulness and student progress in the curriculum, as well as the actual implementation of written goals and accommodations in daily classroom life.

In addition, this study is limited in that California standards were used explicitly and verbatim to link IEP goals to state standards. As the field struggles to determine how goals and standards are linked, this simplified strategy was used. As a result, it is possible that goals were deemed "nonstandard," when in fact they are associated with a different mode of a standard (e.g., reading a picture schedule addresses reading for meaning). Furthermore, only one researcher coded IEP goals as relating or not relating to California standards. Thus, interrater reliability was not undertaken due to the clear specifications of the alignment of IEP goals to a standard. Future research is needed, however, to further our understanding of the linkages of IEP goals to state standards in light of the potential bias inherent in this data analysis

scheme. Finally, the possibility of staff turnover affecting student IEP development and progress monitoring was not accounted for in this study. Special education teachers experience a high rate of turnover (Hunter Quartz, 2003), and as such students in special education may have a different special education teacher each year. All students in our sample had numerous special education teachers during the course of their education. It is possible that staff turnover plays a

role in what kinds of goals are developed and how progress is monitored. For example, a teacher who has known a student for three years will have different information and presumably write different goals for the student than a teacher who has known the student for only a few months. Future research is warranted to determine the impact staff turnover has on student IEP development and subsequent implementation and accountability.

## Appendix A

*Individual Education Plan (IEP) Goals*

**Student ID #:**
**Date:**
**Grade:**
**Setting:**
**Plans:**

**IEP Goals:**

| Area | Baseline information | Determined by: | Summarize objectives | Progress measured by: | Standard | Was goal met? |
|---|---|---|---|---|---|---|
| Reading | | | | | | |
| Math | | | | | | |
| Writing | | | | | | |

| | Total | Academic | Speech | Social | Motor | Self-Help | Behavior |
|---|---|---|---|---|---|---|---|
| # Goals | | | | | | | |
| % of Total | 100 | | | | | | |

**Adaptations: (verbatim)**
**Services: (frequency and duration)**
**Speech/Language:**              **Paraeducator:**                    **Other:**
**Occupational Therapy:**         **Behaviorist:**

## Appendix B

*Individual Education Plan Goals Analysis Form*

| Standard Framework | Goal Area | Standard Grade Level | Example | Student ID | Grade of ID |
|---|---|---|---|---|---|
| | | | | | |

## Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interests with respect to the authorship and/or publication of this article.

## Funding

The author(s) received no financial support for the research and/or authorship of this article.

## References

Agran, M., Alper, S., & Wehmeyer, M. (2002). Access to the general curriculum for students with significant disabilities: What it means to teachers. *Education and Training in Mental Retardation and Developmental Disabilities, 37*(2), 123–133.

Agran, M., Blanchard, C., Wehmeyer, M., & Hughes, C. (2002). Increasing the problem-solving skills of students with developmental disabilities participating in general education. *Remedial and Special Education, 23*(5), 279–288.

Boutot, E. A., & Bryant, D. P. (2005). Social integration of students with autism in inclusive settings. *Education and Training in Mental Retardation and Developmental Disabilities, 40*(1), 14–23.

Browder, D., Spooner, F., Ahlgrim-Delzell, L., Flowers, C., Algozzine, B., & Karvonen, M. (2003). A content analysis of the curricular philosophies reflected in states' alternate assessment performance indicators. *Research and Practice for Persons with Severe Disabilities, 28*(4), 165–181.

Browder, D., Spooner, F., Wakeman, S., Trela, K., & Baker, J. (2006). Aligning instruction with academic content standards: Finding the link. *Research and Practice for Persons With Severe Disabilities, 31*(4), 309–321.

Browder, D., Wakeman, S., & Flowers, C. (2006). Assessment of progress in the general curriculum for students with disabilities. *Theory Into Practice, 45*(3), 249–259.

Bryson, S., Rogers, S., & Fombonne, E. (2003). Autism spectrum disorders: Early detection, intervention, education, and psychopharmacological management. *Canadian Journal of Psychiatry, 48*(8), 506–516.

Causton-Theoharis, J. N., & Malmgren, K. W. (2005). Increasing peer interactions for students with severe disabilities and their peers via paraprofessional training. *Exceptional Children, 71*(4), 431–444.

Cawley, J., Hayden, S., Cade, E., & Baker-Kroczynski, S. (2002). Including students with disabilities into the general education science classroom. *Exceptional Children, 68*(4), 423–435.

Clayton, J., Burdge, M., Denham, A., Klienert, H., & Kearns, J. (2006). A four-step process for accessing the general curriculum for students with significant cognitive disabilities. *Teaching Exceptional Children, 38*(5), 20–27.

Connor, D., & Ferri, B. (2007). The conflict within: Resistance to inclusion and other paradoxes in special education. *Disability and Society, 22*(1), 63–77.

Cushing, L. S., Clark, N. M., Carter, E. W., & Kennedy, C. H. (2005). Access to the general education curriculum for students with significant cognitive disabilities. *Teaching Exceptional Children, 38*(2), 6–13.

Dore, R., Dion, A., Wagner, S., & Brunet, J.-P. (2002). High school inclusion of adolescents with mental retardation: A multiple case study. *Education and Training in Mental Retardation and Developmental Disabilities, 37*(3), 253–261.

Drasgow, E., Yell, M., & Robinson, T. R. (2001). Developing legally correct and educationally appropriate IEPs. *Remedial and Special Education, 22*(6), 359–373.

Etscheidt, S. (2006). Progress monitoring: Legal issues and recommendations for IEP teams. *Teaching Exceptional Children, 38*(3), 56–60.

Fisher, D., & Frey, N. (2001). Access to the core curriculum: Critical ingredients for student success. *Remedial and Special Education, 22*(3), 148–157.

Fisher, M., & Meyer, L. H. (2002). Development and social competence after two years for students enrolled in inclusive and self-contained educational programs. *Research and Practice for Persons With Severe Disabilities, 27*(3), 165–174.

Flowers, C., Ahlgrim-Delzell, L., Browder, D., & Spooner, F. (2005). Teachers' perceptions of alternate assessments. *Research and Practice for Persons With Severe Disabilities, 30*(2), 81–92.

Gettinger, M., & Stoiber, K. (1998). Critical incident reporting: A procedure for monitoring children's performance and maximizing progress in inclusive settings. *Early Childhood Education Journal, 26*(1), 39–46.

Greenspan, S., & Wieder, S. (2006). *Engaging autism: Using the Floortime approach to help children relate, communicate, and think.* Cambridge, MA: De Capo.

Hedeen, D. L., & Ayres, B. J. (2002). "You want me to teach him to read?" Fulfilling the intent of IDEA. *Journal of Disability Policy Studies, 13*(3), 180–189.

Hunter Quartz, K. (2003). Too angry to leave: Supporting new teachers' commitment to transform urban schools. *Journal of Teacher Education, 54*(2), 99–111.

Individuals with Disabilities Education Act (IDEA) Data. (2006). Retrieved, February 12, 2008, from www.ideadata.org

Individuals with Disabilities Education Improvement Act, H.R. 1350 (2004).

Iovannone, R., Dunlap, G., Huber, H., & Kincaid, D. (2003). Effective educational practices for students with autism spectrum disorders. *Focus on Autism and Other Developmental Disabilities, 18*(3), 150–165.

Jameson, M., McDonnell, J., Johnson, J. W., Riesen, T., & Polychronis, S. C. (2007). A comparison of one-to-one embedded instruction in the general education classroom and one-to-one massed practice instruction in the special education classroom. *Education and Treatment of Children, 30*(1), 23–44.

Johnson, J. W., McDonnell, J., Holzwarth, V. N., & Hunter, K. (2004). The efficacy of embedded instruction for students with developmental disabilities enrolled in general education classes. *Journal of Positive Behavior Interventions, 6*(4), 214–227.

Lee, S., Amos, A., Gragoudas, S., Lee, Y., Shogren, K., Theoharis, R., et al. (2006). Curriculum augmentation and adaptation

strategies to promote access to the general curriculum for students with intellectual and developmental disabilities. *Education and Training in Developmental Disabilities, 41*(3), 199–212.

Lindsay, G. (2007). Educational psychology and the effectiveness of inclusive education/mainstreaming. *British Journal of Educational Psychology, 77*(1), 1–24.

Lynch, S., & Adams, P. (2008). Developing standards-based individualized education program objectives for students with significant needs. *Teaching Exceptional Children, 40*(4), 36–39.

Mastropieri, M. A., & Scruggs, T. E. (2001). Promoting inclusion in secondary classrooms. *Learning Disability Quarterly, 24*(4), 265–274.

McCleskey, J., Henry, D., & Hodges, D. (1998). Inclusion: Where is it happening? *Teaching Exceptional Children, 30,* 4–10.

Meyer, L. H. (2001). The impact on inclusion on children's lives: Multiple outcomes, and friendship in particular. *International Journal of Disability, Development and Education, 48,* 9–31.

National Center for Educational Statistics. (2005). *Digest of education statistics tables and figures, Table 52.* Retrieved September 2006 from http://nces.ed.gov/programs/digest/d05/tables/dt05_052.asp

Ong, F. (Ed.). (1998). *English–Language Arts content standards for California public schools, kindergarten through grade twelve.* Sacramento, CA: Department of Education.

Ong, F. (Ed.). (1999). *Mathematics content standards for California public schools, kindergarten through grade twelve.* Sacramento, CA: Department of Education.

Ozonoff, S., Goodlin-Jones, B., & Solomon, M. (2005). Evidence-based assessment of autism spectrum disorders in children and adolescents. *Journal of Clinical Child and Adolescent Psychology, 34*(3), 523–540.

Raver, S. (2004). Monitoring child progress in early childhood special education settings. *Teaching Exceptional Children, 36*(6), 52–57.

Shinn, M. (2007). Identifying students at risk, monitoring performance, and determining eligibility within response to intervention: Research on educational need and benefit from academic intervention. *School Psychology Review, 36*(4), 601–617.

Simpson, R. (2003). Policy-related research issues and perspectives. *Focus on Autism and Other Developmental Disabilities, 18*(3), 192–196.

Simpson, R., de Boer-Ott, S. R., & Smith-Myles, B. (2003). Inclusion of learners with autism spectrum disorders in general education settings. *Topics in Language Disorders, 23*(2), 116–133.

Spooner, F., & Browder, D. M. (2006). Why teach the general curriculum? In D. M. Browder & F. Spooner (Eds.), *Teaching language arts, math, and science to students with significant cognitive disabilities* (pp. 1–14). Baltimore, MD: Paul H. Brooks.

Stecker, P., Lembke, E., & Foegen, A. (2008). Using progress-monitoring data to improve instructional decision making. *Preventing School Failure, 52*(2), 48–58.

Stevens, J. (1996). *Applied multivariate statistics for the social sciences.* Mahwah, NJ: Lawrence Erlbaum.

Taylor, S. (2004). Caught in the continuum: A critical analysis of the principle of the least restrictive environment. *Research and Practice for Persons With Severe Disabilities, 29*(4), 218–230.

Volkmar, F., Lord, C., Bailey, A., Schultz, R., & Klin, A. (2004). Autism and pervasive developmental disorders. *Journal of Child Psychology and Psychiatry, 45*(1), 135–170.

Walsh, J. (2001). Getting the big picture of IEP goals and state standards. *Teaching Exceptional Children, 33*(5), 18–26.

Ward, T., Van De Mark, C., & Ryndak, D. (2006). Balanced literacy classrooms and embedded instruction for students with severe disabilities: Literacy for all in the age of school reform. In D. M. Browder & F. Spooner (Eds.), *Teaching language arts, math, and science to students with significant cognitive disabilities* (pp. 125–171). Baltimore, MD: Paul H. Brookes.

Westling, D., & Fox, L. (2000). *Teaching students with severe disabilities* (2nd ed.). Upper Saddle River, NJ: Prentice-Hall

Wilczynski, S., Menousek, K., Hunter, M., & Mugdal, D. (2007). Individualized Education Programs for youth with autism spectrum disorders. *Psychology in the Schools, 44*(7), 653–666.

Williams, S., Johnson, C., & Sukhodolsky, D. (2005). The role of the school psychologist in the inclusive education of school-age children with autism spectrum disorders. *Journal of School Psychology, 43,* 117–136.

## About the Authors

**Jennifer Kurth**, PhD, is a faculty member in special education at Northern Arizona University. Her interests are in the inclusion of students with significant disabilities in general education settings.

**Ann M. Mastergeorge**, PhD, is a developmental and educational psychologist and is a faculty member in human development and family studies at the University of California, Davis, and the U.C. Davis M.I.N.D. Institute. Her research interests are in typical and atypical developmental trajectories, early intervention, and inclusion of students with disabilities in instructional contexts



*Empirical*

# Issues in Statewide Scale up of a Multi-Tiered System of Support

Journal of School Leadership
2022, Vol. 32(5) 514–536
© The Author(s) 2022
Article reuse guidelines:
sagepub.com/journals-permissions
DOI: 10.1177/10526846211067650
journals.sagepub.com/home/jsl

$\circledS$SAGE

**Jeong Hoon Choi[1]** 🟢**, Amy B. McCart[1], Dawn H. Miller[1], and Wayne Sailor[1]**

## Abstract

Tiered instructional supports are on a steep growth trajectory in the US and getting underway internationally as a means to providing equitable education to all student groups. In the US, the Department of Education funded the expansion of multi-tiered system of support (MTSS) through school and personnel improvement grants to states. This retrospective article examines the history of MTSS and California's significant investment to scale up the practice statewide, with an eye to identifying key issues that are likely to surface in other such ambitious state efforts. We examine the infrastructure support methodology to develop local capacity to support school-level implementation with measured fidelity. We present some preliminary results from a small sample comparison study that demonstrate students' academic achievement increased when the California MTSS efforts resulted in implementation with adequate fidelity. These findings suggest long-term replication of this initiative will mirror other student-level impact studies showing positive gains on measures of academic progress, in this case, English Language Arts and Math.

## Keywords

equity, inclusive education, multi-tiered system of support, scale-up

[1]University of Kansas, Lawrence, KS, USA

**Corresponding Author:**
Jeong Hoon Choi, Life Span Institue, University of Kansas, SWIFT Education Center, 1315 Wakarusa Drive, Suite 208, Lawrence, KS 66049, USA.
Email: yes5150@ku.edu



EXHIBIT 8
WIT: McCart
DATE: 10.24.23
DJura, RPR

Tiered instructional supports are on a steep growth trajectory in the US and getting underway internationally. The process began in the 1980s with Positive Behavior Interventions and Support (PBIS), academics were added in the 1990s with Response to Intervention (RTI), and the two systems merged and became fully integrated in the 2000s within a Multi-tiered System of Support (MTSS). In the US, the Department of Education funded the expansion of MTSS through school and personnel improvement grants to states. In late 2015, the California legislature appropriated 10 million dollars to be directed to a competition restricted to one or more (in collaboration) of the State's 58 County Offices of Education to undertake a 4-year statewide scale up of MTSS with a whole child perspective across all grade levels (Assembly Bill 104). The effort had the potential to reach more than 1,000 school districts and more than 10,000 schools. In 2016, the Governor's budget added 20 million dollars more to the effort; and in 2018, the legislature appropriated an additional 15 million dollars to the scale-up project, bringing the total appropriation at that time to 45 million dollars and extending the timeline to 2023 (www.camtss.org). In this retrospective study, we examine the path of this historic endeavor; its infrastructure support methodology and some preliminary results thus far, with an eye to identifying key issues that are likely to surface in other such ambitious state efforts.

## History

In April 2016, the Orange County Department of Education (OCDE) was selected on the basis of a statewide competition among several California County Offices of Education to scale up the development, alignment, and improvement of academic, social, emotional, and behavioral supports in the State through the use of an MTSS process and framework. OCDE entered into a partnership with the Butte County Office of Education (BCOE) and SWIFT (Schoolwide Integrated Framework for Transformation) Education Center at the University of Kansas to implement the proposed process. The project was ultimately named the California Scale-up of MTSS Statewide Initiative, or CAMTSS (www.camtss.org).

Orange county department of education chose to partner with Butte County Office of Education (BCOE), which was positioned to ensure that the highly specialized needs of schools serving California's rural communities (about 50% of the state's schools) would be adequately addressed in MTSS scale-up plans. OCDE, which serves schools in the most densely populated county in the State, had a long history of providing services and implementing initiatives directed to urban schools.

Orange county department of education selected SWIFT Education Center (www.swiftschools.org) to join this partnership on the basis of its successful implementation of the National Center on Inclusive School Reform funded by the Office of Special Education Programs (OSEP) from 2012 to 2017. This project assisted 64 schools in 17 school districts across five states to implement equity-based MTSS as a driver for inclusive education (Sailor, 2017). The SWIFT Framework guided the transformation effort by scaffolding MTSS installation and implementation through parallel

implementation of four additional domains of evidence-based practices: administrative leadership; fully integrated educational support system; family and community engagement; and inclusive policy and practice (Gross et al., 2018; Kozleski & Choi, 2018; Kurth et al., 2018; Schuh et al., 2018).

The additional 2018 funding appropriated by the legislature for ongoing project activity had stipulations that focus be placed on improving school climate and that a California Institution of Higher Education (IHE) be added to the effort. OCDE chose the UCLA Center on Transformation in Schools (CTS; http://transformschools.ucla.edu/) for this portion of the ongoing CAMTSS implementation. That work is underway as of this writing.

## Why MTSS?

Multi-tiered system of support provides a framework within which to extend evidence-based instruction and supportive interventions to serve all students, including those who need extensive academic, behavioral, social and emotional support and may be assessed with alternate assessments based on alternate achievement standards (AA-AAS) (Choi et al., 2019; Sailor & McCart, 2014). Further, MTSS is a comprehensive set of academic, behavioral, and social supports that rely on data to mobilize and coordinate diverse resources for all students. Similarly, the US Department of Education (2014) described MTSS as a framework designed to respond to the needs of all students within a system which integrates, but is not limited to, tiered behavior academic support, and a whole-school, data driven, prevention-based framework for improving student learning outcomes for all students through a layered continuum of evidence-based practices and systems. MTSS, particularly when applied in concert with an equity-based definition of inclusion, can function as a driver for re-organizing schools in a manner that contributes to solving the weighty problems of inclusive education for students with needs for extensive supports and services (Giangreco & Suter, 2015; McCart et al., 2014; Sailor, 2017; Stelitano et al., 2019; Waitoller & Kozleski, 2013a, 2013b). We should note here, however, that this approach is not without its stalwart critics (i.e., Maag et al., 2019).

Stemming from its origins in RTI and PBIS (Stewart et al., 2007), MTSS continues to amass evidence for its efficacy in contributing to improving reading skills with struggling learners (Scinchetti, 2017). Further, MTSS is emerging as an innovative practice in *School Psychology* (O'Connell et al., 2017; Sopp et al., 2019) and in early childhood education (Shepley & Grisham-Brown, 2019). Likewise, the evidence base for secondary school MTSS with integrated academic, behavior and social support are emerging at present (e.g., Bohanon et al., 2021). A growing research and development movement on MTSS in the field of counseling psychology is evident as well (Sink & Ockerman, 2016). For example, *The Professional Counselor* devoted a special issue devoted to applications of MTSS including data-based decision making (i.e., Vanlommel & Schildkamp, 2018); in social and emotional learning (Harrington et al., 2016); and an

MTSS-approved framework to support students of color experiencing behavior problems (Belser et al., 2016); among other ongoing studies.

## Implementation Issues

The term MTSS originated with a state initiative undertaken by the Kansas State Department of Education in 2007 focused on the provision of technical assistance (TA) to the State's districts and schools seeking to combine tiered intervention practices for PBIS directed to behavior impeding learning, and RTI directed to improvement in reading and math performance (Freeman et al., 2015; McIntosh & Goodman, 2016; Sailor, 2009; Sugai & Horner, 2009). The US Department of Education, impressed with the growing body of research on MTSS, particularly in helping to turn around low performing schools, steadily provided expanded funding through its School Improvement Grants (SIG) program to move MTSS to scale. As a result, many State Education Agency's (SEAs) include MTSS in their Every Student Succeeds Act (ESSA) state plans and in their Special Education State Systemic Improvement Plans (SSIP) (e.g., www.cde.ca.gov; www.kansasmtss.org).

At present, MTSS in the US, and to a lesser extent internationally, is clearly in its ascendency (McIntosh & Goodman, 2016). In configuration with Universal Design for Learning (UDL; CAST, 2018), it affords schools the opportunity to subsume interrelated services under one overarching umbrella framework (Sailor & McCart, 2014). That said, however, recent research indicates that the process of installing and implementing MTSS to a criterion of full implementation is proving to be a very difficult undertaking, one that requires extensive professional learning and intensive TA; particularly directed to Local Education Agency (LEA) capacity to support the effort at the level of schools (Choi et al., 2019).

A study of schools that received intensive TA to install MTSS found only 11% of schools secured a fidelity of full implementation score that exceeded the criterion of 80% within 4 years (Hicks et al., 2017). Analysis revealed that academic support systems were more resistant to MTSS implementation than behavior support systems, possibly reflecting the more widespread acquaintance with PBIS in general education than tiered instructional strategies directed to academics, largely the purview of special education. This finding is of concern because poor implementation often undermines innovative practices (Braun et al., 2018; Bryk et al., 2015).

A report prepared for the Institute of Education Science (IES) revealed the potential harm of poor implementation as a case in point (Balu et al., 2015). This report focused on RTI as a method to mobilize resources to best support students with disabilities. Comparison of RTI and non-RTI schools found that students at risk for low reading performance made better reading gains in non-RTI implementing schools. This finding contradicts the extant knowledge base of the time (see Fuchs & Vaughn, 2012 for a review of RTI literature), yet Maier et al. (2016) suggest that allowance for poor implementation resolves the issue. Efficacy of an intervention depends in part on maintaining high levels of fidelity of implementation as measured by a rigorous and

valid tool, while adopting its implementation to fit the local context (Hulleman & Cordray, 2009). Coyne et al. (2018) provided an evaluation of statewide MTSS initiatives and found positive effects for reading outcomes, concluding the importance of the systems, infrastructure, and capacity building to implement sustainable MTSS.

## California Definition of MTSS

In 2016, the California Department of Education (CDE) published the definition of MTSS, which incorporates the focus on instruction (e.g., student-centered, differentiated learning) and system alignment for student needs. CDE further buttressed its definition of MTSS by differentiating it from its previous definition of RTI and clarifying its relationship to special education identification criteria by stating that MTSS also includes: (a) system alignment of initiatives, supports, and resources; (b) district participation in identifying and supporting systems for alignment of resources, as well as site and grade level; (c) systematic support for all students, including gifted and high achievers; (d) paradigm shift for providing support and higher expectations for all students through intentional design and redesign of integrated services and supports, rather than selection of a few components of RTI; (e) UDL instructional strategies so all students have opportunities for learning through differentiated content, processes, and product; and (f) school staff challenge to change the way in which they have traditionally worked across settings (CDE, 2016).

California's whole child approach to MTSS amplified attention to social and emotional learning (SEL) within the integrated tiered framework of support (CDE, 2018). Behavioral and SEL programs similarly adopt evidence-based instructional systems and practices with positive proactive teaching, and they utilize data to prevent academic or social failure (Cook et al., 2015). Evidence supports effective behavior and SEL within MTSS at the universal level or core instructional level (Albrecht & Brunner, 2019; Cook et al., 2015; Cressey, 2019). These studies suggest that when SEL instruction and support are well integrated within the components of MTSS (e.g., screening, progress monitoring, fidelity, tiered levels of support, data-informed decisions), the system can effectively build SEL competencies in students. Finally, in its MTSS definition paper, CDE (2016) stated, "…the MTSS process has a broader approach, addressing the needs of all students by aligning the entire system of initiatives, supports, and resources, and by implementing continuous improvement processes at all levels of the system" (p. 7).

## California Scale-Up Initiative: A Four Level Infrastructure of Support

This issue of scaling up educational innovation and promising or evidence-based practice accelerated in the US following publication of Elmore's 1996 paper on the topic in *The Harvard Educational Review*. The term scale, however, is not a homogenous construct. Morel et al. (2019) identified at least four distinct conceptualizations of scale which they labeled adoption, replication, adaptation, and reinvention.

Among these, the two concepts that most closely apply to the California initiative are adoption and adaptation. *Adoption* assumes a homogeneous innovation can be installed in widely disparate educational configurations. The CAMTSS initiative utilizes the SWIFT Framework for MTSS and employed its fidelity of implementation tools, SWIFT Fidelity Integrity Assessment (SWIFT-FIA; SWIFT Education Center, 2013) and SWIFT Fidelity of Implementation Tool (SWIFT-FIT; Algozzine et al., 2016; Morsbach Sweeney et al., 2014), to estimate the progress of installation and implementation. The infrastructure for support of the scale-up effort could be considered to enable some of the advantages of the adoption concept, such as the network effect, where benefits increase as more people adopt the innovation and weave them into everyday practice (DiMaggio & Garip, 2012; Morel et al., 2019).

Elements of *adaptation* can also be gleaned from the CAMTSS approach. California schools inhabit about 50% urban/suburban areas and roughly the same population in rural areas. The myriad of differences between the needs of urban (large, diverse) and rural (small, often homogenous populations of students) schools were address by the OCDE and BCOE partnership as local actors who know their context and can use this knowledge to effectively adapt innovations for effective implementation (Morel et al., 2019).

## Method

This paper provides an analysis of the preliminary outcomes of the California initiative to scale-up equity-based MTSS statewide.

### Context and Procedure

*Intervention: Four-level Scale-up Support Infrastructure.* Given the adoption/adaptation approach to scaling up MTSS, California presents some unique challenges. We know from existing research findings that MTSS is a complex and transformative process that requires external (to schools) support of various forms (e.g., professional learning opportunities; ongoing technical assistance) and that it takes multiple years to move from installation to initial implementation and then to full implementation with sustainability (Sailor et al., 2018). With CDE's stated intent to reach as many of its 10,000 schools as possible over a 4 year period, and given the impossibility of directly providing that many schools TA from an MTSS provider using a consultation delivery system, the CAMTSS partnership chose a capacity building approach geared to the State's Local Control Central Accountability Plans (LCAP; Humphrey & Koppich, 2014).

The capacity-building system consists of a four-tier, train-the-trainer infrastructure for statewide professional learning and technical assistance. The professional learning series was constructed around the SWIFT delineation of MTSS components together with the aforementioned four evidence-based scaffolding domains, shown from

previous research to enhance the initial installation and early implementation of MTSS (Algozzine et al., 2016; McCart et al., 2014; Sailor et al., 2018).

Orange county department of education established four tiers of teams to address the capacity needs of the State's educational infrastructure to, in turn, address MTSS scale-up. First, a State Leadership Team was constituted with top leadership representatives from CDE, OCDE, BCOE, and SWIFT Education Center. Second, a Regional Transformation Team was formed with a designated member from each of the 11 California County Superintendents Educational Services Association (CCSESA) designated regions. Each region is made up of several counties in the state with the exception of Region 11, Los Angeles County, which is its own region due to its large population of schools. Each Region Lead was supported by a team of trainers from within their region. All designated Regional Training Teams completed a professional learning series conducted by OCDE and SWIFT Education Center's experienced trainers. The third tier consisted of the 58 County Transformation Teams, which were led by a County Office of Education Trainer and School District Leads from LEAs within their counties. The fourth tier was LEA Implementation Teams that included the LEA leads, LEA top leadership, and stakeholders (e.g., family representatives).

SWIFT Education Center provided five Facilitators to work with the State Leadership and Regional Transformation Teams. Each Facilitator provided the initial training and TA on the SWIFT Framework and on SWIFT-FIA, and SWIFT Education Center staff trained identified county leads on SWIFT-FIT. OCDE provided a team of TA specialists to support Region Leads. The designated specialists provided expertise in areas such as UDL, behavior, social and emotional learning, and academic content and instruction. Each Region Lead participated in a Community of Practice (COP) with the other Region Leads and their Transformation Teams. This COP underwent regional training provided by SWIFT Facilitators. Upon completing the professional learning series, the Transformation Teams had attained the capacity to provide on-going TA to participating LEAs and were supported by their Trainers in doing so. Each County Office of Education selected a Trainer to complete the professional learning series, which then enabled them to serve as liaisons to the Region Leads and LEAs for CDE updates, resources, and emerging research on MTSS initiatives, as well as provide ongoing TA to their respective County Transformation Teams on academic, behavioral, social and emotional supports.

## Financing Infrastructure Capacity: A Mini-grant Strategy

Orange county department of education seeded the implementation of MTSS through a mini-grant strategy. Subgrants were structured to provide funds for participation in training events and conferences, coverage for substitute teachers, and technology enhancements to enable specialists (e.g., school psychologists) to participate in professional learning activities remotely. Further, these mini-grants were intended to help LEA's develop the capacity to begin districtwide scale-up.

Orange county department of education established a Request for Proposals (RFP) process directed to LEAs across the State, encouraging them to apply for subgrant funding. Proposals were to indicate how each project would develop, align, or enhance evidence-based supports within the MTSS framework, and be implementable within an 18-month timeline. Each LEA subgrant winner then nominated an LEA Lead to participate with their County Transformation Team and provide leadership to their LEA Implementation Team. The LEA Lead was responsible for reporting progress on implementation, as well as impact on student outcomes as part of the ongoing OCDE program evaluation process.

Orange county department of education allocated between 2 and 3 million dollars each year for the first 3 years of the scale-up effort to the mini-grant process. One-school LEAs (e.g., charters, some remote rural districts) were eligible to receive between $2,500 to $5,000; 12 multi-school LEAs or combinations of several collaborating Charter LEAs could receive between $2,500 to $25,000; and multiple LEAs collaborating as partners could receive $2,500 to $50,000. Additional funds were allocated to support Regional Transformation Teams to cover of travel, staff, and materials.

## Statewide Professional Learning Institute (PLI)

Orange county department of education, together with BCOE, SWIFT Education Center, and recently, CTS, put on a statewide PLI in July of each year. The intent of the PLI was to bring together experts, professional associations and teams from each tier of infrastructure support to review, showcase, extend new knowledge and report outcomes on the MTSS scale-up effort. These PLIs, held in a different city each time, were well attended from within the state and welcomed participation by professionals from other states. By the third year (2019), more than 1,500 educators attended.

## Institutes of Higher Education (IHE)

In recognition of the importance of having a flow of new teachers and administrators entering the transformational shift underway in California schools, OCDE and its partners reached out to the Center for Collaboration for Effective Educator Development, Accountability and Reform (CEEDAR Center: https://ceedar.education.ufl. edu/) based at the University of Florida and funded by the US Department of Education, Office of Special Education Programs, to assist the partnership to form a network of IHEs in the state with the intent of focusing on MTSS in pre-service personnel preparation courses. CEEDAR was already engaged with several IHEs on innovation in special education preparation, so it was a strong potential conveyor for expanding the outreach to all interested California IHEs, and shifting the focus to include all teacher preparation programs (e.g., general education, gifted, English Learners). As a result of this engagement with CEEDAR Center, a new statewide organization was formed with support from Chapman University, the California State University System and

CEEDAR, called the California Alliance for Inclusive Education (CAIS). As of this writing, a large and increasing number of IHEs in the state send faculty to attend the annual meeting of CAIS. Further, CAIS has stimulated sufficient interest in the scale-up activity that increasing numbers of faculty from across California attend the annual PLI. The CEEDAR Center and SWIFT Education Center co-hosted sessions at recent PLIs for IHE teachers and administrator educators focused on MTSS and the SWIFT Framework.

## Innovation Configuration (IC)

To further enhance the effort to engage California IHEs in the MTSS scale-up program need for highly trained entry-level personnel, CEEDAR, SWIFT, and OCDE jointly introduced the IC (Sailor et al., 2021) as an adjunct to faculty developing new courses or modifying existing course content to focus on MTSS and the scaffolding practices of the SWIFT Framework. The IC is a rubric that enables faculty to construct or adapt a course syllabus addressed to core components of MTSS, other domains of the SWIFT Framework, and component such as UDL. For each component selected by a faculty member to be included in a syllabus, information, and resources are provided under the headings, Disposition, Knowledge, and Skills. Further, the IC enables the faculty member to use a four-point scale to evaluate each component of the IC in determination of the adequacy of the course syllabus to address topics under each heading (Sailor et al., 2021). Other national efforts directed to professional learning and MTSS are revisited in Castillo et al. (2018), Hoover and Soltero-González (2018), and Prasse et al. (2012).

Thus far, we have described California's ambitious effort to scale-up MTSS across the state, potentially affecting millions of students. Further, we described the various infrastructure components of the support system created to facilitate the effort. In the sections to follow, we describe the evaluative methods, formative and summative, to assess the degree to which necessary support components were put in place to facilitate the effort and to assess their contributions to the process. Finally, we provide some preliminary indication of the likely impact on student educational success, recognizing that CAMTSS is funded wholly to be a technical assistance and professional learning effort, not a research project. All student outcome data afford, at best, preliminary correlational results, the implications of which will need to undergo experimental evaluation through controlled design research as well as qualitative or mixed method investigations in the future.

## Participants

Over a 2 year window, a total of 610 schools actually participated in CAMTSS and administered SWIFT-FIA (294 schools in SY 2017–18 and 395 schools in SY 2018–19). A total of 79 schools, of which 42 were elementary schools, continuously

administered SWIFT-FIA for these two school years. The 42 elementary schools were selected as the implementation group.

The implementation group schools included 7 charter schools, 26 confirmed schoolwide Title I schools (10 schools' data were missing or not applicable), and 3 magnet schools (2 schools' data were not applicable). Their average number of enrolled students was 501, and about 60% of students were receiving Free and Reduced Meals (FARM). On the other hand, the matched control group included 38 charter schools, 15 confirmed schoolwide Title I schools (22 schools' data were missing or not applicable), and no magnet schools (4 schools' data were not applicable). The average FARM rate for the matched control group was 52%, and about 658 students were enrolled in the schools on average.

For the 3-year longitudinal outcome comparison (i.e., SY 2016–17 for before implementation, SY 2017–18 for partial implementation, and SY 2018–19 for more robust implementation), 36 matched control group schools were identified through propensity score matching among all other elementary schools in California. The number of matched schools were 36 instead of 42 since not every school had outcome data available in the public database for all 3 years. The matching criteria included academic outcome (i.e., 3rd grade averages of state summative assessment (i.e., Smarter Balanced Assessment Consortium: Smarter Balanced Assessment Consortium [SBAC], 2018) scores and proportion of 3rd grade students who scored at or above the proficiency standard; and the number of students who took the SBAC at 3rd grade level (i.e., school size). The school-level data were analyzed to match implementation schools to comparable schools to establish the baseline equivalence. In addition to the academic outcome, the number of students tested was included due to the possible impact of school size on system change and academic achievement.

## Measures

*SWIFT-FIA.* SWIFT-FIA is a school-level self-assessment that is highly correlated with SWIFT-FIT, and which has established technical adequacy (i.e., reliable and valid) (Algozzine et al., 2016). As a shorter version of SWIFT-FIT, SWIFT-FIA was specifically developed for schools to self-assess and understand their own progress toward implementation of MTSS and scaffolding practices and to guide TA. SWIFT-FIA has 22 items reflecting the SWIFT Framework, which teams rate using a Likert scale. SWIFT-FIA scores are available for the total mean and 10 SWIFT features nested in five domains (i.e., two features in each domain). As foundations for sustainable MTSS implementation at a school-level, the Administrative Leadership and Inclusive Policy Structure and Practice domains address administrator's instructional leadership, reciprocal communication, trust building with a clear vision, and strong relationship with and support from LEAs. The Integrated Educational Framework is related to creating organizational structures and positive school culture to include all students in learning. The Family and Community Engagement is focusing on sharing instructional

information with families and inviting them to meaningful participation in educational decisions. A previous evaluation of this measure with 61 schools' data in SY2015-16 shows its scores correlated with the technically validated SWIFT-FIT, $r$ (59) = .45, $p <$ .001. The reliability of internal consistency of the SWIFT-FIA was measured by Cronbach's alpha. Cronbach's alpha for the SWIFT-FIA was .92 ($n = 61$), which indicated high and acceptable internal consistency.

### Smarter Balanced Assessment Consortium

Smarter balanced assessment consortium English Language Arts (ELA) and Math scores were considered as outcome indicators of CAMTSS implementation because the State used SBAC for its annual summative assessment. SBAC is aligned to Common Core State Standards, an acceptable measure for federal accountability purposes that reports psychometric properties that demonstrate technical adequacy (Mbella et al., 2016b, 2016a; SBAC, 2018). Publicly available school-level SBAC data were collected from the California Assessment of Student Performance and Progress (CAASPP) site. Average 3rd grade scores were analyzed for both ELA and Math.

### Analysis

*Relationship Study.* A Pearson correlation analysis was conducted to examine whether there were significant relationships between SWIFT-FIA and SBAC scores in each year. Average scores of 3rd grade ELA and math on SBAC were dependent variables, and the total mean score of SWIFT-FIA served as predictors. Since SWIFT-FIA was administered for the implementation group only, the 42 elementary schools' data were analyzed.

### Quasi-Experimental Comparison Study

Descriptive statistics, independent sample $t$-tests, effect size analyses, and a repeated measure Analysis of Variance (ANOVA) were conducted to examine if each group (i.e., implementation and matched control group) made statistically significant improvements on the average 3rd grade SBAC scores over the three school years. Additionally, a repeated measure ANOVA with between-subject factor (i.e., implementation group) and within-subject factor (i.e., year) was conducted to examine statistical significance in growth difference between two groups. Cohen's (1988) effect size (ES) was calculated based on the formula, $d$ = (mean of pretest – mean of posttest)/Standard Deviation difference.

## Results

The 42 implementation schools improved their MTSS status with participation in CAMTSS. The average SWIFT-FIA total mean score was 33.87% in SY 2017–18 and

**Table 1.** SWIFT-FIA Domain and Total Mean Score Changes.

| SWIFT Domain | SY 2017–18 | | SY 2018–19 | |
|---|---|---|---|---|
| | M | SD | M | SD |
| Administrative leadership | 45.44% | 23.94 | 62.30% | 23.80 |
| Multi-tiered system of support | 33.07% | 23.21 | 44.97% | 18.84 |
| Integrated education framework | 28.97% | 24.22 | 50.99% | 29.46 |
| Family and community engagement | 37.50% | 22.03 | 53.57% | 25.71 |
| Inclusive policy structure and practice | 24.80% | 22.35 | 45.24% | 31.35 |
| Total mean score | 33.95% | 18.70 | 50.81% | 20.19 |

increased to 50.83% in SY 2018–19. The scaffolding practices known as Integrated Education Framework made the biggest increase over the 2 years of implementation, with a 0.66 average score improvement from 0.87 to 1.53 (out of the maximum 3 points on the 0–3 scale). The second largest increase was in the scaffolding practices known as Inclusive Policy Structure and Practice, which increased from 0.74 to 1.36. In the SY 2018–19, the lowest score was observed in the MTSS practices, followed by the Inclusive Policy Structure and Practice practices. Table 1 shows domain and total mean scores of SWIFT-FIA in the two implementation years.

## Relationship between CAMTSS and Student Outcomes

The results of the Pearson correlation analyses indicated that the CAMTSS implementation status measured by SWIFT-FIA was significantly correlated with students' gains in academic performance represented by SBAC ELA and Math scores. In SY 2017–18, the total mean score of SWIFT-FIA was statistically and significantly correlated with both ELA, $r(40) = .44$, $p < .01$, and Math, $r(40) = .45$, $p < .01$. The correlations were statistically significant again for ELA, $r(40) = .36$, $p < .05$, and Math, $r(40) = .45$, $p < .01$ in SY 2018–19.

## Outcome Difference between Implementation and Matched Control Groups

In terms of the baseline equivalence, ELA and Math SBAC scores of the implementation schools were not different from the matched control group schools in SY 2016–17. The independent sample $t$-test results with SY 2016–17 data showed that the 36 implementation group schools had no significantly different scores than the 36 matched control group schools on ELA, $t(70) = 1.47$, $p = .15$, and Math, $t(70) = 1.70$, $p = .09$.

Descriptive statistics and repeated measure ANOVA results showed that the 36 implementation group schools made better improvement than the 36 matched control group schools for 3rd grade SBAC ELA and Math scores (see Figure 1 and Table 2). For the implementation group, the mean of average 3rd grade scores on ELA improved



**Figure 1.** Third grade ELA and Math SBAC score changes for implementation and matched control groups.

**Table 2.** Year Effects in the Repeated Measure ANOVA.

|  | Effect | Subject | df | SS | MS | F | p |
|---|---|---|---|---|---|---|---|
| Implementation | Year | ELA | 2 | 2137.44 | 1068.72 | 4.21 | <.05 |
|  | Error |  | 70 | 17,758.09 | 253.69 |  |  |
|  | Year | Math | 2 | 1776.67 | 888.34 | 4.78 | <.05 |
|  | Error |  | 70 | 13,015.15 | 888.34 |  |  |
| Matched control | Year | ELA | 2 | 386.10 | 193.05 | 0.57 | 0.57 |
|  | Error |  | 70 | 23,705.37 | 338.65 |  |  |
|  | Year | Math | 2 | 323.01 | 161.50 | 0.46 | 0.63 |
|  | Error |  | 70 | 24,372.22 | 348.17 |  |  |

from 2419.91 ($SD = 46.89$) to 2423.08 ($SD = 43.12$) in SY 2017–18 and increased again to 2430.53 ($SD = 41.90$) in SY 2018–19, which was about 10.61 point score increase over the three school years. In contrast, the matched control group made only a 2.39 point increase between SY 2016–17 ($M = 2403.21$, $SD = 49.29$) and SY 2018–19 ($M = 2405.61$, $SD = 45.57$). The effect size for the score increase was about medium for the implementation group, $ES = 0.43$, which can be interpreted that about 69% of the SY 2016–17 scores are below the mean of SY 2018–19. However, the effect size was negligible for the matched control group, $ES = 0.10$.

A similar increase pattern was observed for Math. In the implementation group, the mean average score continuously increased from 2427.94 ($SD = 42.85$) to 2437.85 ($SD = 38.26$) between SY 2016–17 and SY 2018–19 (i.e., 9.92 point increase). The Math score increase in the matched control group, however, was 2.10 points. The effect size was medium for the implementation group, $ES = 0.57$, which indicates that about 71% of the scores of the SY 2016–17 are below the mean of SY 2018–19; however, the effect size was trivial for the matched control group, $ES = 0.07$.

The repeated measure ANOVA results revealed that the ELA score improvement across three school years were statistically significant for the implementation group, $F(2, 70) = 4.21$, $p < .05$, but not for the matched control group, $F(2, 70) = .57$, $p < .57$. Math score analysis results were consistent with the ELA showing that the statistically significant score improvement was observed in the implementation group, $F(2, 70) = 4.78$, $p < .05$, but not in the matched control group, $F(2, 70) = .46$, $p = .63$. Table 2 summarizes the results of the repeated measure ANOVA. The interaction effects between the time and implementation group status were not significant even with the additional SY 2016–17 data on both ELA, $F(2, 140) = 1.66$, $p = .20$, and Math, $F(2, 140) = 1.34$, $p = .27$.

## Discussion

The results of the present study demonstrated that students' academic achievement increased when the CAMTSS scale-up efforts resulted in implementation with adequate fidelity. The correlation analysis results revealed that CAMTSS implementation status

(i.e., fidelity of the implementation) was positively and significantly associated with the implementation group students' academic achievement. When implementation and the matched control groups were compared for the outcomes, students in the implementation group achieved higher ELA and Math SBAC scores than those in the matched control group.

These findings support previous studies indicating that MTSS implementation is associated with better student academic outcomes (Choi et al., 2017, 2020a, 2020b; Sailor et al., 2006, 2018). In particular, the present study buttresses the potential of the four-tiered, train-the-trainer statewide implementation model empowered by IHE engagement and IC. The 3-year score improvements were statistically significant for both ELA and Math in the implementation group but neither ELA nor Math score improvements (i.e., interaction effects) were significant in the matched control group schools. The positive relationship between the fidelity of implementation and student achievement strengthens the evidence for CAMTSS.

The complex transformative MTSS process takes time to develop installation to the sustainable stage. Although the total mean score of the SWIFT-FIA increased between the two school years, the MTSS domain scored the lowest, which has been typically observed in previous SWIFT Education Center studies (Choi et al., 2020a; Kozleski & Choi, 2018; Sailor et al., 2018). The lack of significance in the interaction effects, therefore, is likely due to the short implementation period. Student outcome improvement, especially, can occur when MTSS is implemented with an adequate level of fidelity (McIntosh & Goodman, 2016; Sugai & Horner, 2008). Two years of implementation is likely insufficient time for many schools to move to an adequate level of fidelity of implementation in MTSS.

The positive academic progress associated with the implementation fidelity along with the fidelity improvement and score pattern provides potential that the adoption and adaptation of CAMTSS scale up might occur more easily and quickly for more schools when LEA, County, and Region reach a critical point, where all capacity reaches an enculturation at each level of organization (Kincaid & Horner, 2017). The Administrative Leadership feature in particular provides a foundation for the school transformation and sustainable implementation. MTSS can be fully implemented and efficiently maintained within the continuous improvement cycle when the foundational scaffolding domain is well established. Choi et al. (2019) found that the improvement of Administrative Leadership mediates the relationship between technical assistance efforts and MTSS improvements in both academic and behavior MTSS areas. Those findings support the importance of school leadership as a cornerstone of effective inclusive education, which is an ultimate goal of equity-based MTSS (McLeskey & Waldron, 2015). The highest score in the current study was the Administrative Leadership domain, which suggests that building leadership capacity is a strong pathway to sustainable implementation. The large fidelity improvement in the Inclusive Policy Structure and Practice feature (the second largest improvement from SY2017–18, 20.44%) can also be considered as an indicator of improvement in capacity to sustain implementation. The Policy Structure and Practice specifically addresses school

district's capacity to provide such supports as professional learning, coaching, and clear processes to remove barriers and change policies in collaboration with school leaders.

## Limitations

Although the present study provides preliminary indications, a few limitations lead to nuanced interpretations of findings. First, school selection was not conducted with random sampling. The implementation schools were selected from among the LEA subgrant winners; therefore, implementing schools possibly received better support from LEAs with a stronger commitment to implement MTSS. A randomized waitlist control group design with a larger number of schools may be considered for more rigorous future studies. Second, the current study investigated only 2 years of data focusing on third grade. The 2 year period was too short to expect a strong effect on student outcomes from a system change effort. Longitudinal data with expanded graded-level investigation (e.g., K-8th) including secondary schools would support understanding of various malleable factors for implementation and capacity. CAMTSS embedded strong capacity-building approaches with its four-tier infrastructure. Analysis of longitudinal data with individual student growth across years will provide a better opportunity to study its effect as well. Third, only school-level data were used to conduct analyses in the present study. Matching at the individual student level could be expected to provide better baseline equivalence for the quasi-experimental design, and effects of higher-level nesting structure (e.g., school or LEA) may be investigated with individual student data in a future study.

## Conclusion

Against the backdrop of rapidly expanding statewide and large school district MTSS scale-up initiatives, this investigation considered the ongoing California statewide initiative with an eye to identifying issues that could apply to all such ambitious systems change efforts. The origins and recent history of MTSS development and current extensions of implementation practices involved across various subfields of education were reviewed. Infrastructure development for the California initiative was examined to reveal that State's effort to develop local support and capacity to, in turn, support school-level implementation with measured fidelity. The role of IHEs in these processes was discussed including uses of the heuristic, innovative configuration. Preliminary, short-term results from a small sample comparison study were presented that suggest long-term replication will mirror other student-level impact studies that show positive gains on measures of academic progress, in this case, ELA and Math.

### Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

*Journal of School Leadership 32(5)*

## Funding

The author(s) disclosed receipt of the following financial support for the research, authorship, and/or publication of this article: The data for this paper was produced with funding from the California Department of Education's initiative, California Scale Up MTSS Statewide.

## ORCID iD

Jeong Hoon Choi ⬤ https://orcid.org/0000-0003-1144-1330

## References

Albrecht, N. M. R., & Brunner, M. (2019). How positive behavioral supports and social-emotional curriculum impact student learning. *The European Journal of Social & Behavioural Sciences*, *24*10526846211067650(1), 2789–2804. https://doi.org/10.15405/ejsbs. 245

Algozzine, B., Sweeney, H. M., Choi, J. H., Horner, R., Sailor, W., McCart, A. B., Satter, A., & Lane, K. L. (2016). Development and preliminary technical adequacy of the schoolwide integrated framework for transformation fidelity of implementation tool. *Journal of Psychoeducational Assessment*, *35*10526846211067650(3), 302–322. https://doi.org/10.1177/0734282915626303

Balu, R., Zhu, P., Doolittle, F., Schiller, E., Jenkins, J., & Gersten, R. (2015). *Evaluation of response to intervention practices for elementary school reading*. http://ies.ed.gov/ncee/pubs/20164000/pdf/20164000.pdf

Belser, C. T., Shillingford, M. A., & Joe, J. R. (2016). The ASCA model and a multi-tiered system of supports: A framework to support students of color with problem behavior. *The Professional Counselor*, *6*10526846211067650(3), 251–262. https://doi.org/10.15241/cb.6.3. 251

Bohanon, H. S., Wu, M.-J., Kushki, A., LeVesseur, C., Harms, A., Vera, E., Carlson-Sanei, J., & Shriberg, D. (2021). The role of school improvement planning in the implementation of MTSS in secondary schools. *Preventing School Failure: Alternative Education for Children and Youth*, *65*10526846211067650(3), 230–242. https://doi.org/10.1080/1045988x.2021. 1908215

Braun, G., Kumm, S., Brown, C., Walte, S., Hughes, M. T., & Maggin, D. M. (2018). Living in tier 2: Educators' perceptions of MTSS in urban schools. *International Journal of Inclusive Education*, *24*10526846211067650(2), 1–15. https://doi.org/10.1080/13603116.2018. 1511758

Bryk, A. S., Gomez, L. M., Grunow, A., & LeMahieu, P. G. (2015). *Learning to improve: How America's schools can get better at getting better*. Harvard Education Press.

California Department of Education. (2016). *The California Department of Education's definition of multi-tiered system of supports and a comparison between it and response to instruction and intervention*. https://www.cde.ca.gov/ci/cr/ri/mtsscomprti2.asp

California Department of Education. (2018). *Social and emotional learning guiding principles*. https://www.cde.ca.gov/eo/in/documents/selguidingprincipleswb.pdf

CAST. (2018). *Universal design for learning guidelines version 2.2*. http://udlguidelines.cast.org

Castillo, J. M., Wang, J. H., Daye, J. G., Shum, K. Z., & March, A. L. (2018). A longitudinal analysis of the relations among professional development, educators' beliefs and perceived skills, and response-to-intervention implementation. *Journal of Educational and Psychological Consultation*, *28*10526846211067650(4), 413–444. https://doi.org/10.1080/10474412.2017.1394864

Choi, J. H., McCart, A. B., Hicks, T. A., & Sailor, W. (2019). An analysis of mediating effects of school leadership on MTSS implementation. *The Journal of Special Education*, *53*10526846211067650(1), 15–27. https://doi.org/10.1177/0022466918804815

Choi, J. H., McCart, A. B., & Sailor, W. (2020b). Achievement of students with IEPs and associated relationships with an inclusive MTSS framework. *The Journal of Special Education*. Advanced Online Publication. https://doi.org/10.1177/0022466919897408

Choi, J. H., McCart, A. B., & Sailor, W. (2020a). Reshaping educational systems to realize the promise of inclusive education. *FIRE: Forum for International Research in Education*, *6*10526846211067650(1), 8–23. https://doi.org/10.32865/fire202061179

Choi, J. H., Meisenheimer, J. M., McCart, A. B., & Sailor, W. (2017). Improving learning for all students through equity-based inclusive reform practices. *Remedial and Special Education*, *38*10526846211067650(1), 28–41. https://doi.org/10.1177/0741932516644054

Cohen, J. (1988). *Statistical power analysis for the behavioral sciences* (2nd ed.). L. Erlbaum Associates.

Cook, C. R., Frye, M., Slemrod, T., Lyon, A. R., Renshaw, T. L., & Zhang, Y. (2015). An integrated approach to universal prevention: Independent and combined effects of PBIS and SEL on youths' mental health. *School Psychology Quarterly*, *30*10526846211067650(2), 166–183. https://doi.org/10.1037/spq0000102

Coyne, M. D., Oldham, A., Dougherty, S. M., Leonard, K., Koriakin, T., Gage, N. A., Burns, D., & Gillis, M. (2018). Evaluating the effects of supplemental reading intervention within an MTSS or RTI reading reform initiative using a regression discontinuity design. *Exceptional Children*, *84*10526846211067650(4), 350–367. https://doi.org/10.1177/0014402918772791

Cressey, J. (2019). Developing culturally responsive social, emotional, and behavioral supports. *Journal of Research in Innovative Teaching & Learning*, *12*10526846211067650(1), 53–67. https://doi.org/10.1108/jrit-01-2019-0015

DiMaggio, P., & Garip, F. (2012). Network effects and social inequality. *Annual Review of Sociology*, *38*10526846211067650(1), 93–118. https://doi.org/10.1146/annurev.soc.012809.102545

Elmore, R. F. (1996). Getting to scale with good educational practice. *Harvard Educational Review*, *66*10526846211067650(1), 1–26. https://doi.org/10.17763/haer.66.1.g73266758j348t33

Freeman, R. L., Miller, D. R., & Newcomer, L. L. (2015). Integration of academic and behavioral MTSS at the district level using implementation science. *Learning Disabilities: A Contemporary Journal*, *13*10526846211067650(1), 59–72.

Fuchs, L. S., & Vaughn, S. (2012). Responsiveness-to-Intervention. *Journal of Learning Disabilities*, *45*10526846211067650(3), 195–203. https://doi.org/10.1177/0022219412442150

Giangreco, M. F., & Suter, J. C. (2015). Precarious or purposeful? proactively building inclusive special education service delivery on solid ground. *Inclusion*, *3*10526846211067650(3), 112–131. https://doi.org/10.1352/2326-6988-3.3.112

*Journal of School Leadership 32(5)*

Gross, J. M. S., Choi, J. H., & Francis, G. L. (2018). Perceptions of family engagement and support in SWIFT schools. *Inclusion*, 610526846211067650(1), 60–74. https://doi.org/10.1352/2326-6988-6.1.60

Harrington, K., Griffith, C., Gray, K., & Greenspan, S. (2016). A grant project to initiate school counselors' development of a multi-tiered system of supports based on social-emotional data. *The Professional Counselor*, 610526846211067650(3), 278–294. https://doi.org/10.15241/kh.6.3.278

Hicks, T., McCart, A., Choi, J., & Sailor, W. (2017). Exploring the relationship between mtss and inclusion: Fixed effects modeling with bayesian analysis. Submitted Manuscript.

Hoover, J. J., & Soltero-González, L. (2018). Educator preparation for developing culturally and linguistically responsive MTSS in rural community elementary schools. *Teacher Education and Special Education: The Journal of the Teacher Education Division of the Council for Exceptional Children*, 4110526846211067650(3), 188–202. https://doi.org/10.1177/0888406417753689

Hulleman, C. S., & Cordray, D. S. (2009). Moving from the lab to the field: The role of fidelity and achieved relative intervention strength. *Journal of Research on Educational Effectiveness*, 210526846211067650(1), 88–110. https://doi.org/10.1080/19345740802539325

Humphrey, D. C., & Koppich, J. E. (2014). Toward a grand vision: Early implementation of California's local control funding formula (Research Brief). http://glenpricegroup.com/BP2/files/Toward%20a%20Grand%20Vision%20-%20Early%20Implementation%20of%20LCFF%20(Humphrey%20and%20Koppich).pdf

Kincaid, D., & Horner, R. H. (2017). Changing systems to scale up an evidence-based educational intervention. *Evidence-Based Communication Assessment and Intervention*, 1110526846211067650(3–4), 99–113. https://doi.org/10.1080/17489539.2017.1376383

Kozleski, E. B., & Choi, J. H. (2018). Leadership for equity and inclusivity in schools: The cultural work of inclusive schools. *Inclusion*, 610526846211067650(1), 33–44. https://doi.org/10.1352/2326-6988-6.1.33

Kurth, J. A., Morningstar, M. E., Hicks, T. A., & Templin, J. (2018). Exploring the relationship between school transformation and inclusion: A Bayesian multilevel longitudinal analysis. *Inclusion*, 610526846211067650(1), 19–32. https://doi.org/10.1352/2326-6988-6.1.19

Maag, J. W., Kauffman, J. M., & Simpson, R. L. (2019). The amalgamation of special education? on practices and policies that may render it unrecognizable. *Exceptionality*, 2710526846211067650(3), 185–200. https://doi.org/10.1080/09362835.2018.1425624

Maier, M. P., Pate, J. L., Gibson, N. M., Hilgert, L., Hull, K., & Campbell, P. C. (2016). A quantitative examination of school leadership and response to intervention. *Learning Disabilities Research & Practice*, 3110526846211067650(2), 103–112. https://doi.org/10.1111/ldrp.12100

Mbella, K., Zhu, M., Karkee, T., & Lung, H. (2016a). *The North Carolina testing program technical report, 2012-2015: English language arts/reading assessments (ELA) end-of-grade 3-8 and end-of-course English II.* Department of Public Instruction.

Mbella, K., Zhu, M., Karkee, T., & Lung, H. (2016b). *The North Carolina testing program technical report, 2012-2015: Mathematics assessments end-of-grade 3-8 and end-of-course math I.* Department of Public Instruction.

McCart, A. B., Sailor, W. S., Bezdek, J. M., & Satter, A. L. (2014). A framework for inclusive educational delivery systems. *Inclusion, 2*10526846211067650(4), 252–264. https://doi. org/10.1352/2326-6988-2.4.252

McIntosh, K., & Goodman, S. (2016). *Integrated multi-tiered systems of support: Blending academic RTI and schoolwide PBIS.* Guilford.

McLeskey, J., & Waldron, N. (2015). Effective leadership makes schools truly inclusive. *Phi Delta Kappan, 96*10526846211067650(5), 68–73. https://doi.org/10.1177/0031721715569474

Morel, R. P., Coburn, C., Catterson, A. K., & Higgs, J. (2019). The multiple meanings of scale: Implications for researchers and practitioners. *Educational Researcher, 48*10526846211067650(6), 369–377. https://doi.org/10.3102/0013189x19860531

Morsbach Sweeney, H., Horner, R., Algozzine, B., Lane, K., Roger, B., Choi, H., McCart, A., & Sailor, W. (2014). *Schoolwide integrated framework for transformation fidelity implementation tool: Implementation manual* (Version 1.4). SWIFT Center.

O'Connell, L., Burch, A., & Shea, E. (2017). School psychologists as facilitators of multi-tiered systems of support in postsecondary education. *The School Psychologist, 71*(3), 15–26, 10526846211067650. https://apadivision16.org/wp-content/uploads/2018/01/TSP-Special-Edition.pdf.

Prasse, D. P., Breunlin, R. J., Giroux, D., Hunt, J., Morrison, D., & Thier, K. (2012). Embedding multi-tiered system of supports/response to intervention into teacher preparation. *Learning Disabilities: A Contemporary Journal, 10*10526846211067650(2), 75–93.

Sailor, W. (2009). *Making RTI work: How smart schools are reforming education through schoolwide response-to-intervention.* Wiley.

Sailor, W. (2017). Equity as a basis for inclusive educational systems change. *Australasian Journal of Special Education, 41*10526846211067650(1), 1–17. https://doi.org/10.1017/jse. 2016.12

Sailor, W., & McCart, A. B. (2014). Stars in alignment. *Research and Practice for Persons with Severe Disabilities, 39*10526846211067650(1), 55–64. https://doi.org/10.1177/ 1540796914534622

Sailor, W., McCart, A. B., & Choi, J. H. (2018). Reconceptualizing inclusive education through multi-tiered system of support. *Inclusion, 6*10526846211067650(1), 3–18. https://doi.org/ 10.1352/2326-6988-6.1.3

Sailor, W., Skrtic, T. M., Cohn, M., & Olmstead, C. (2021). Preparing teacher educators for statewide scale-up of multi-tiered system of support (MTSS). *Teacher Education and Special Education: The Journal of the Teacher Education Division of the Council for Exceptional Children, 44*10526846211067650(1), 24–41. https://doi.org/10.1177/ 0888406420938035

Sailor, W., Zuna, N., Choi, J.-H., Thomas, J., McCart, A., & Roger, B. (2006). Anchoring Schoolwide Positive Behavior Support in Structural School Reform. *Research and Practice for Persons with Severe Disabilities, 31*10526846211067650(1), 18–30. https://doi.org/10. 2511/rpsd.31.1.18

Schuh, M. C., Knackstedt, K. M., Cornett, J., Choi, J. H., Pollitt, D. T., & Satter, A. L. (2018). All means all: Connecting federal education policy and local implementation practice through

evidence and equity. *Inclusion*, 610526846211067650(1), 45–59. https://doi.org/10.1352/2326-6988-6.1.45

Shepley, C., & Grisham-Brown, J. (2019). Multi-tiered systems of support for preschool-aged children: A review and meta-analysis. *Early Childhood Research Quarterly*, 4710526846211067650, 296–308. https://doi.org/10.1016/j.ecresq.2019.01.004

Sink, C. A., & Ockerman, M. S. (2016). Introduction to the special issue - school counselors and a multi-tiered system of supports: Cultivating systemic change and equitable outcomes. *The Professional Counselor*, 610526846211067650(3), 5–9. https://doi.org/10.15241/csmo.6.3.v

Smarter Balanced Assessment Consortium (SBAC). (2018). *Smarter balanced assessment consortium: Usability, accessibility, and accommodations guidelines.* Author. https://portal.smarterbalanced.org/library/en/usability-accessibility-andaccommodations-%5C%5Cguidelines.pdf

Sopp, T. J., Bender, L., & Azevedo, S. A. (2019). A shark, a swiss army knife, and a school psychologist. *California Association of School Psychologists*, 69(3), 1-5, 10526846211067650. https://casponline.org/pdfs/ct/c2d-summer-2019_web-final.pdf.

Stelitano, L., Russell, J. L., & Bray, L. E. (2019). Organizing for meaningful inclusion: Exploring the routines that shape student supports in secondary schools. *American Educational Research Journal*. textupAdvanced Online Publication. https://doi.org/10.3102/0002831219859307

Stewart, R. M., Benner, G. J., Martella, R. C., & Marchand-Martella, N. E. (2007). Three-tier models of reading and behavior. *Journal of Positive Behavior Interventions*, 910526846211067650(4), 239–253. https://doi.org/10.1177/10983007070090040601

Sugai, G., & Horner, R. H. (2008). What we know and need to know about preventing problem behavior in schools. *Exceptionality*, 1610526846211067650(2), 67–77. https://doi.org/10.1080/09362830801981138

Sugai, G., & Horner, R. H. (2009). Responsiveness-to-intervention and school-wide positive behavior supports: Integration of multi-tiered system approaches. *Exceptionality*, 1710526846211067650(4), 223–237. https://doi.org/10.1080/09362830903235375

SWIFT Education Center. (2013). *SWIFT fidelity integrity assessment.* Author.

U. S. Department of Education. (2014). *Promising practices: Inclusion, equity, opportunity.* https://www2.ed.gov/about/inits/ed/earlyliteracy/k-3-literacy-multi-tiered-systems-of-support.pdf

Vanlommel, K., & Schildkamp, K. (2018). How do teachers make sense of data in the context of high-stakes decision making? *American Educational Research Journal*, 5610526846211067650(3), 792–821. https://doi.org/10.3102/0002831218803891

Waitoller, F., & Kozleski, E. B. (2013a). Understanding and dismantling barriers for partnerships for inclusive education: A cultural historical activity theory perspective. *International Journal of Whole Schooling, (9)1*, 23.

Waitoller, F., & Kozleski, E. B. (2013b). Working in boundary practices: Identity development and learning in partnerships for inclusive education. *Teaching and Teacher Education*, 31(3), 35–45. https://doi.org/10.1016/j.tate.2012.11.006

## Author Biographies

**Jeong Hoon Choi** is an Assistant Research Professor and Associate Director of Research and Evaluation at the University of Kansas SWIFT Education Center. He has been involved in various research projects on inclusive education and school system change. His research interests have included leadership, school climate, and student outcomes associated with frameworks such as multi-tiered system of support (MTSS), schoolwide positive behavior support (SWPBS), and schoolwide integrated framework for transformation (SWIFT). His current research is focused on equity-based inclusive education for all students including marginalized students. He is particularly interested in equity-based MTSS, data- based decision support system, and related student outcomes. He is co-investigating the Equity Leadership in High Need School research and Data Support System develop research funded through the U.S. Department of Education Office of Elementary and Secondary Education and Institute of Education Sciences.

**Amy B. McCart** is a Research Professor with Life Span Institute and Co- Director of SWIFT Education Center at the University of Kansas. The focus of her work is to bring about equity and justice for students through implementation of restorative educational ecosystems; and preparing effective, equity-minded instructional leaders who work to improve student outcomes, with emphasis on students of color and those who need for intensified support. At this writing, she is Co-Principal Investigator for the Equity Leadership in High Need Schools research grant, funded through the U.S. Department of Education Office of Elementary and Secondary Education; and leads a dynamic team of leadership developers working in districts and schools across the nation.

**Dawn H. Miller** is Associate Director of Technical Assistance at SWIFT. Dr. Miller is part of leading planning, professional learning, implementation, and evaluation for MTSS efforts in various research projects. Dr. Miller has directly been involved in transformation at the district level, while maintaining participation in a national network of colleagues advancing the field across the country. As a successful leader of the integrated academic and behavior efforts, she has consulted with several states on their MTSS policies, training systems, and integration efforts and is co-author with Dr. McCart of a bestselling book, Leading Equity-based MTSS for All Students, for school teams to explore the why, what, and how of equity-based MTSS practices.

**Wayne Sailor** is a Professor in the Department of Special Education and Co-Director of the SWIFT Education Center at the University of Kansas. SWIFT Education Center is a resource center, which leads the nation in equity-based MTSS and inclusive education research and services. His academic pursuits are focused on comprehensive school reform with the aim of transforming systems to integrate resources for the benefit of all students through equity-based, inclusive education. He has carried out research within the framework of a multi-tiered system of support, response to intervention (MTSS/RTI), and schoolwide applications of positive behavior interventions and supports (PBIS). He has published extensively in articles and books. His present research and

teaching are focused on emancipating marginalized students through comprehensive school reform, emphasizing coherence within and across schools, state agencies, local education agencies and regional systems in aligning systems of support to remove barriers to learning and equitably apply all resources, including new technologies, to all students in whole-school contexts driven by MTSS and UDL strategies.

*FIRE: Forum for International Research in Education*
*Vol. 6, Iss. 1, 2020, pp. 8-23*

# RESHAPING EDUCATIONAL SYSTEMS TO REALIZE THE PROMISE OF INCLUSIVE EDUCATION

Jeong Hoon Choi[1]
*University of Kansas, USA*

Amy B. McCart
*University of Kansas, USA*

Wayne Sailor
*University of Kansas, USA*

### Abstract

    Inclusive educational practices are rooted in a body of research indicating that when students in need of support through special education are meaningfully included in schools, academic and social outcomes improve for all students. To realize this promise of better outcomes, traditional schools with separate classrooms and even schools designated to exclusively serve various learner subgroups (e.g., students identified for special education) will require reorganized systems, structures, and resources. A school with a fully integrated educational framework is better positioned to meet the needs of all students, including those who live in poverty, who experience high mobility, who benefit from an accelerated curriculum, or who struggle to learn for other reasons. This paper describes an example of a transformational framework and technical assistance provided to a whole interlocking education systems (i.e., state, district, school) to reshape and increase school capacity to implement and sustain an equity-based, inclusive multi-tiered system of support. Statistical analyses that compared academic achievements of students with Individualized Education Programs (IEPs, i.e., disability) in schools reflecting early stages of transformation with that of students with IEPs in schools reflecting advanced transformation. The extent of school transformation to the framework significantly predicted improved outcomes for students with IEPs.

**Keywords**: inclusion, school reform, multi-tiered system of support, MTSS

[1] *Correspondence*: The University of Kansas, 1314 Wakarusa Drive, Suite 208, Lawrence, KS 66045, USA; Email: yes5150@ku.edu.

*Acknowledgement*: This data in article was produced under U.S. Department of Education, Office of Special Education Programs Grant No. H326Y120005, University of Kansas. Grace Zamora Duran and Tina Diamond serve as the OSEP project officers. The views expressed herein do not necessarily represent the positions or policies of the U.S. Department of Education. No official endorsement by the U.S. Department of Education of any product, commodity, service or enterprise mentioned in this publication is intended or should be inferred.



EXHIBIT 10
WIT: McCart
DATE: 10·24·23
DJura, RPR

### Reshaping Educational Systems to Realize the Promise of Inclusive Education

Special education in the U.S. began in earnest with passage of the Education of the Handicapped Amendments (EHA) to the Elementary and Secondary Education Statute (ESEA), passed by Congress and signed into law by President Ford in 1975. The proposed funding from Congress included up to 40% of the cost of educating students with disabilities to be paid by the federal government with the balance to be shouldered by state and local entities. During nearly five decades of special education law, the 40% target never came close to being realized. At present, the federal contribution is approximately 15%. Moreover, the basic framework of special education with its categorical descriptive language structure remains essentially unchanged for the past half century of praxis.

None of the above would be grounds for contention if results were promising. They are not. By almost any yardstick, post-graduation quality of life issues for individuals served under special education law in the U.S. are relatively, and in some cases extremely, dismal (Newman et al., 2011). Meaningful change is needed to improve long range quality of life outcomes for students addressed through resources provided under Public Law 108-446, the Individuals with Disabilities Education Improvement Act of 2004, or IDEA, as it is generally referenced. The purpose of the research reported in this paper is to present some preliminary results from implementation of an alternative framework for education, one that fully encompasses and integrates special education and all other categorical "silos" into a unified system of education for all children, while remaining consistent with extant U.S. federal laws and regulations.

The framers of the first special education laws recognized that it might lead to construction of a separate system of education for students labeled as having one or more disabilities. Therefore, they introduced the concept of the least restrictive environment, often referred to as LRE, linked to a complex eligibility determination process, and they used of the term "placement" to describe various environments. To receive federal special education funding, state education agencies had to report the proportion of students served in placement options ranging from fully integrated into general education (i.e., grade-level class) to totally segregated (i.e., special class, special school, special school district). This regulatory requirement led to acceptance by the field of the concept of a "continuum of placements" that could be employed by school districts when deciding what the least restrictive environment would be for particular students. This idea persists today, although no law mandates that school districts must maintain various placement options. Further, despite a long history of federal lawsuits, Supreme Court decisions, U.S. Department of Education policy imperatives and a preponderance of research evidence challenging the utility of segregated placements, widespread categorical segregation of students identified for special education continues to this day (U.S. Department of Education, National Center for Education Statistics [NCES], 2017).

Recent data suggest that some progress is evident in providing greater access to the general education curriculum for students considered to have high incidence or "mild and/or moderate" disabilities (NCES, 2017; Rojewski, Lee, & Gregg, 2015). However, for students considered to have low incidence, or "severe" disabilities, few opportunities exist to learn from the general education curriculum alongside non-disabled peers (Kurth, Morningstar, & Kozleski, 2014; NCES, 2017). We question the premise of the dichotomy between "disabled" and "non-disabled" children. This distinction leads to significant expenditures of federal and state funds directed to determination of student eligibility for special education; funds that are sorely needed in the realm of praxis (e.g., Koski, 2017).

Much of the somewhat contentious discourse around least restrictive environment has been linked to the term "inclusion." This term, which began to appear in special education research literature in the 1980s, became identified with a quasi-resistance movement that emerged in response to increasing segregation of students identified for special education (Skrtic, 1991; Skrtic, Sailor, & Gee, 1996). Various models for implementing inclusion emerged during this period, and several continue to be advanced today (Mitchiner, McCart, Kozleski, Sweeney, & Sailor, 2014). What virtually all such models have in common is a focus on the *place* where education is imparted. These models take the form of designing ways that students served in a self-contained environment with Individualized Education Programs (IEPs) can increase time in a grade-level or content-specific general education classroom. These approaches have engendered ongoing criticism from sectors of the special education research communities and practitioners, who have argued forcefully for concentrated services in self-contained settings (Kauffman, McGee, & Brigham, 2004). The inclusion movement, while making progress with students labeled as having mild or moderate disabilities, has been largely unsuccessful with students labeled as having "severe" disabilities (Kurth et al., 2014).

The *place-based* definitions of inclusion are further buttressed by the federal reporting system for measuring inclusion by the least restrictive environment placement options. The yardstick is pegged at "percentage of time in the general education classroom" with reporting categories set as "80% or more in general education"; "40–79%"; "Less than 40%." The reporting requirement focused on a single environment, the general education classroom, problematizes the place-based inclusion agenda. Seating students in the room during reading time or an algebra class when they are not engaged in the curriculum content is counterproductive to the students, the teacher, and quite possibly entire class. However, issues impeding those students' engagement need not constitute grounds for segregating them in a self-contained, disability-only environment.

The advent of whole-school Multi-Tiered System of Support (MTSS) creates an opportunity to reframe the concept of inclusion such that the general education classroom is one of several integrated educational environments available for instruction within a tiered framework for instruction. Students with specialized need for supports and services might be in the grade-level classroom for those portions of the curriculum in which they can be measurably engaged under Universal or Tier 1 level of instruction, or even with an additional, Tier 2 level of support within the classroom; and in other integrated environments within the confines of the school and perhaps, the surrounding community in the case of higher grade-level students. MTSS thus raises the possibility of eliminating self-contained classrooms for any students, including those who receive support from special education, gifted, language acquisition, and other programs. The net result of full implementation of MTSS under a reframed, equity-based definition of inclusion is that every student engages the general education curriculum in a measurable format in accordance with a flexible master schedule; a more effective and efficient use of all paid school staff and volunteers; a more efficient use of all existing school space; and utilizing three tiers of intensity of instruction directed to academics, behavior, and social-emotional development (Lane, Oakes, & Menzies, 2019; McCart & Miller, 2020).

Grounded in the scholarship of Artiles, Kozleski, and colleagues (2006; 2016), we call this reframed inclusion concept *equity-based* inclusive MTSS. The focus under a whole-school MTSS framework is less concerned with including students (because we assume from the beginning that all are included), and is more concerned with including staff, supports, and services in an equitable manner such that each and every student receives whatever needed supports are available, from whatever source. The issue for educators is forming an

instructional match between the measured instructional needs of students and the best educational supports and or services available to the school that will enable successful engagement with various elements of the curriculum (Burrello, Sailor, & Kleinhammer-Tramill, 2013).

The construct of disability further problematizes inclusion by any definition. Special education was originally framed as a medical-model profession (Massoumeh & Leila, 2012). Issues of impediments to learning are considered to be lodged within the individual. These endemic limitations can be categorized (e.g., autism, severe behavior disorder, specific learning disability). If their impediments are labeled as severe, students are typically routed, through diagnosis and referral, into specialized curricula delivered to them in self-contained classrooms or schools. General educators are often taught in their pre-service programs that the presence of one or more disabilities in a student renders that student someone else's problem, namely a special education teacher. Special educators are prepared to address students' learning needs based on the categorical label affixed to the student in a disability determination process. Student learning needs, however, are frequently a poor fit for the category to which they are assigned. This reality renders the federal reporting categories in special education grossly unreliable (Skrtic, 2005). The problem of over representation of ethnic minorities is an example of a failure of the categorical placement system (Artiles, Kozleski, Dorn & Christensen, 2006; Cooc & Kiru, 2018).

We argue that the time has come, through the advent of whole-school, equity-based inclusive MTSS, to replace the medical model construct of disability with a human capability construct that reflects the significant contribution of the learning ecology to individual students' response to instruction (Burrello et al., 2013). As such, the human capabilities frame represents a sociological model that reflects the importance of school organization, both space and personnel considerations, in creating an interactive match between characteristics of the student affecting learning and characteristics of the teaching/learning ecology. Many years ago, the psychologist Kurt Lewin (1936) introduced the concept as a simple formula, known as Lewin's equation: behavior is a function of the person and the environment, that is, $B = f(P, E)$.

All of the above said, establishment and implementation of schoolwide MTSS is no easy task. It implies nothing less than a complete transformation of school from "business as usual" to a new form (Sailor, 2017). The National Technical Assistance Center on Inclusive School Reform, which was funded by the U.S. Department of Education, Office of Special Education Programs (OSEP) from 2012 to 2018, assisted 64 schools in 17 school districts within 5 states to install, implement, sustain and scale-up schoolwide MTSS under a scaffolded framework called SWIFT for Schoolwide Integrated Framework for Transformation (Sailor, 2012). The Center selected four domains of practice for which a body of evidence existed suggesting that, compiled together, would serve as a "scaffold" to enhance the transformational effort. These scaffolding domains are: *Administrative Leadership*, defined as strong and engaged site leadership and strong educator support system; *Integrated Educational Framework*, defined as fully integrated organizational structure and a strong and positive school culture; *Family and Community Engagement*, defined as trusting family partnerships and trusting community partnerships; and *Inclusive Policy Structure and Practice*, defined as strong LEA/school relationship and an LEA policy framework (McCart, Sailor, Bezdek, & Satter, 2014). A fidelity of implementation tool called SWIFT-FIT (Morsbach-Sweeney, Horner, Algozzine et al., 2014) was developed and standardized. This tool was administered across the implementing schools at least once per year beginning in 2014 to document progress in implementation and to use when estimating the framework's impact

on student academic and behavioral outcomes through modeling and regression (e.g., Kozleski & Choi, 2018; Kurth, Morningstar, & Hicks, 2018; Sailor, McCart, & Choi, 2018).

Since the inception of the SWIFT framework, other potential scaffolding supports are beginning to emerge in the research literature. Charlton, Sabey, Dawson, Pyle, Lund, and Ross (2018), for example, reported a qualitative investigation of state MTSS scale-up efforts in 27 states to ascertain which educational practices were perceived by administrators as "helping categories" for MTSS implementation, and which could be identified as "hindering categories." Helping categories included: multi-disciplinary leadership, access to professional development, consistent language practices, consultation with external partners, and a focus on student outcomes. For example, the California Department of Education awarded a contract to the Orange County Department of Education (OCDE) in 2016 to create an infrastructure of county and district-level support to schools to begin scale up implementation of MTSS in each of the state's more than 1,000 school districts, with a potential reach of up to 10,000 schools in the first wave of the work (www.camtss.org). OCDE partnered with a rural county office, Butte County Office of Education (BDOE), and with SWIFT Education Center at the University of Kansas to define a California-specific MTSS framework and train personnel to support implementation in schools through a "mini grant" process. These important MTSS efforts have affected the way in which schools provide education, how districts sustain educational efforts, and how states support districts.

The SWIFT framework for providing technical assistance to whole education systems (i.e., state, district, school) to reshape and increase the system's capacity through MTSS to implement, scale up, and sustain integrated, inclusive education to enhance academic success for all students has an evidence base for overall student outcomes (Sailor, McCart, & Choi, 2018). The purpose of this study was to investigate the efficacy of this equity-based framework on academic achievement for students with IEPs.

We begin with a summary of overall changes of the proficiency status (i.e., students who met the proficiency standard) for all participating schools and then report results of statistical analyses for a particular state to examine outcomes of the study. The analyses were conducted to address the following research questions.

Research Question #1. What is the probability of students with IEPs being proficient in English Language Arts (ELA) and math over time?

Research Question #2. Do probabilities of this student group being proficient in ELA and math change over time?

Research Question #3. What do these students' ELA and math proficiency trends look like over time?

Research Question #4. Does implementation with fidelity explain these students' likelihood of being proficient in ELA and math over time?

## Method

### Participants

SWIFT researchers purposively selected 5 state education agencies (SEAs) based on self-assessed readiness for the transformation effort, including their current policy, organizational, demographic, and performance context and needs (Mitchiner, 2014). After

the SEAs were engaged, they nominated 17 local educational agencies (LEAs or districts); and finally the LEAs nominated the 64 kindergarten through 8th grade-level schools. Due to administrative turnover in participants, 54 schools among the original 64 consistently participated in SWIFT implementation from 2013-14 through 2016-17 school years.

Academic proficiency changes were investigated with data from students with IEPs in consistently implementing schools that took the same state assessment for two years ($n$ = 1,131 for ELA; $n$ = 1,119 for math). Since all states changed their annual state assessment tests during the four implementation years, only the last two years data were available to study as consecutive years in which each state administered the same state assessment. Table 1 provides the standardized assessment, number of participating schools, the grade-level range served, Title I status, and number of students with IEPs by state.

Table 1

*Schools that Administered the Same State Assessment and Participated in the Equity-based Inclusion Implementation for Two Consecutive Years*

| State | LEAs | Schools by Grade level served | | Title I Schools | Total Schools |
|-------|------|-------------------------------|-----|-----------------|---------------|
| A | 4 | Elementary | 9 | 14 | 16 |
| | | Middle | 5 | – | – |
| | | PK or KG -8 | 2 | – | – |
| B | 4 | Elementary | 11 | 16 | 16 |
| | | Middle | 5 | – | – |
| | | PK or KG -8 | 0 | – | – |
| C | 4 | Elementary | 5 | 8 | 8 |
| | | Middle | 2 | – | – |
| | | PK or KG -8 | 1 | – | – |
| D | 4 | Elementary | 11 | 8 | 16 |
| | | Middle | 2 | – | – |
| | | PK or KG -8 | 3 | – | – |
| E | 1 | Elementary | 2 | 5 | 5 |
| | | Middle | 0 | – | – |
| | | PK or KG -8 | 3 | – | – |

Note: PK or KG-8 = pre-Kindergarten or Kindergarten through 8th grade

The statistical analyses were conducted with schools in "state A" because it was the only participating state that administered the same state assessment (i.e., Partnership for Assessment of Readiness for College and Careers [PARCC]) for the longest number of consecutive implementation years (i.e., 3 out of the 4 implementation years); and all schools in this state consistently participated in the implementation throughout the 4 years. State A had a total of 16 participating schools; however, data from 15 schools were analyzed because one school had no students with IEPs assessed by PARCC for three consecutive school years. Thus, the analysis includes 214 students with IEPs who took PARCC for the three

consecutive years. About 58% of the students in these schools were White, 31% African American, 4% Hispanic, and 7% were multi-race. About 71% of these students were receiving free or reduced-price lunch due to family low socio-economic status.

### Measurements

**SWIFT-FIT.** This assessment was designed to measure the fidelity of the framework's implementation status. Trained assessors visited schools and spent a full day administering SWIFT-FIT. Assessors conducted interviews with the leadership team, educators, parents, and other staff; reviewed documents; and observed classrooms to gather information to score fidelities for the total mean and sub-scales for 10 features nested in 5 domains. As part of the technical assistance process, the results of SWIFT-FIT assessments were shared with each school leadership team to identify strengths and opportunities for improvement at their school.

SWIFT-FIT is a valid and reliable assessment for assessing equity-based, inclusive MTSS implementation (Algozzine et al., 2016). Its preliminary technical adequacy study indicates that the average Content Validity Index (CVI) for SWIFT features ranged from 0.87 (for Strong Educator Support System) to 1.0 (for Fully Integrated Organizational Structure and Trusting Family Partnership), which suggests evidence of expert validity (Lynn, 1986; Polit & Beck, 2006). Internal consistency analysis results revealed that Cronbach's Alpha for the SWIFT-FIT total mean score was 0.96, and an average inter-rater agreement was 82.3%. Construct validity was analyzed by comparing six exemplifying effective schools and sampled initial partner schools, and results showed that the sampled initial partner school score ($M = 37.83, SD = 11.34$) was significantly different from the exemplifying effective school score ($M = 57.94, SD = 15.69$), $t = -2.32$, $p < 0.05$, $ES = 1.77$. Its usability was assessed by checking SWIFT-FIT's ease of use for assessors; an overall mean of 3.1 was obtained out of 4 (i.e., a 4-point Likert scale) (Algozzine et al., 2016).

**State summative assessments.** As an annual state standardized academic assessment State A administered PARCC, which is one of the two major Common Core consortia. PARCC is considered to be a valid and reliable tool to measure proficiency of grade-level Common Core standards (PARCC, 2016). Initially, a total of 11 states and the District of Columbia were administrating PARCC. Smarter Balanced Assessment Consortium (SBAC), the other major Common Core consortia, was consistently administered for the last two years of implementation in States C, D, and E. SBAC aligns with common core state standards and the official psychometric report documents its technical adequacy (SBAC, 2016). For State B, their own state assessment was administered for the final two years of implementation. This assessment was designed to measure student achievement on the state's College-and Career-Readiness Standards for ELA and math, and was conducted with the aim of providing valid and reliable results with which to guide instruction through data-based instruction.

Results for ELA and math were collected and analyzed across all states. The overall proficiency status change analysis utilized all states' assessment data collected from the final two implementation years, and the statistical analysis focused on the three-year longitudinal PARCC data from State A.

### Practices and Procedures

Equity-based, inclusive MTSS installation began in 2013-14 and continued with assistance through 2016-17 school year. The differentiated, intensive technical assistance provided by SWIFT Education Center for equity-based, inclusive MTSS was designed to sustainably improve student outcomes. Six major transformation in action practices were

employed: (a) design/visioning, (b) data snapshot reviews, (c) priority and practice planning, (d) resource mapping and matching, (e) teaming, and (f) coaching (for more information, see McCart, McSheehan, Sailor, Mitchiner, & Quirk, 2016). Through these practices, schools built a shared understanding about their ideal future with respect to inclusive education. Using schoolwide student data and other measures of organizational capacity, they reviewed their strengths and opportunities for achieving their vision. They set priorities for the next few months and created action plans. In the meantime, they mapped out their available resources (e.g., building space, staff, or other untapped resources) and then matched them with planned actions, reorganizing and reallocating resources when needed. They used teaming practices and received coaching support as overarching transformation practices. Teams connected multiple organizations with communication strategies, while coaching maintained ongoing intensive relationships between technical assistance providers and school teams as they installed MTSS and the scaffolding domains (McCart et al., 2016). SWIFT Education Center also hosted a 3-day intensive professional learning institute (PLI) at the beginning of implementation, and 2-day PLIs were held regionally or nationally each year after that. The PLIs included school, LEA, and SEA leadership teams to provided necessary knowledge and skills for equity-based inclusion (e.g., sessions for essentials of academic and behavior MTSS, Universal Design for Learning (UDL), differentiated instruction, family engagement, and so on). The technical assistance providers also had weekly meetings with school principals and LEA staff to exchange information and build LEA leadership team meeting agendas as the practices became naturally embedded in their regular bi-weekly leadership meeting agendas.

## Data Analysis

First, we analyzed overall proficiency status change using descriptive statistics (i.e., number and percentage of students who met proficiency standards) among students with IEPs who took the state assessments for the two consecutive implementation years as described above. Second, we analyzed three-year longitudinal data using logistic generalized estimating equation analyses and linear mixed-model analyses for the dichotomous outcome (i.e., met the proficiency standard or not). In examining the effect of implementation with fidelity, ROC curve analyses were conducted to find optimum cut-off points of SWIFT-FIT for PARCC ELA and math scores. A dichotomous variable was created to distinguish schools that met the fidelity standards and those that did not.

We began with a basic model including main effects for time (i.e., school year), then added the implementation fidelity status, and next added the time by fidelity status for the interaction effect. Time was treated as a categorical variable to assess implementation effects at the different time points, which were school years in this analysis. The cut-off score of SWIFT-FIT for PARCC ELA was 64% for both ELA and math, and a dichotomous variable for schools' implementation fidelity (i.e., above or below 64%) served as a covariate. The estimated main effects for implementation at different years and interaction effects between implementation with fidelity and year under the different models were presented as odds ratios with 95% confidence intervals for remission rates.

The repeated-measures outcomes in two parameters were specified to describe the intercept and time-related slopes as follows.

$$\eta_{ij} = \log(\pi_{ij}/(1 - \pi_{ij})) = \beta_0 + \beta_1 time \tag{1}$$

$$\eta_{ij} = \log(\pi_{ij}/(1 - \pi_{ij})) = \beta_0 + \beta_1 time + \beta_2 \text{fidelity} \tag{2}$$

In Equation 1, *time* is coded to indicate the interval between successive measurements, where $\eta_{ti}$ is the underlying transformed predictor of the dichotomous response at time $t$ for individual $i$, $\beta_0$ is an intercept, and $\beta_1$ describes the rate of change on a logit scale in the fraction of positive responses in the population of subjects per unit time. The between-subject predictor (i.e., SWIFT fidelity) is added in Equation 2. The predicted probability of proficiency can be calculated from the following equation.

$$\pi_{ti} = 1/(1 + e^{(\eta_{ti})}) \tag{3}$$

## Results

### *Overall proficiency status change*

Based on observed data, the proportions of students with IEPs meeting proficiency standards in state summative assessments increased for both ELA and math across the two years of implementation (i.e., 2015-16 and 2016-17 school years). A total of 1,131 students with IEPs from 61 schools participated in both years' ELA, and the proportion of students who met the proficiency standard increased from 12.0% ($n = 136$) to 13.1% ($n = 148$). For math, 9.7% students ($n = 109$) out of 1,119 met the proficiency standard in the 2015-16 school year, and the proportion increased to 11.1% in the 2016-17 school year. Table 2 shows the number and proportion changes.

### Longitudinal impact of equity-based inclusion on proficiency

Recall that logistic generalized estimating equation analyses and linear mixed-model analyses were conducted to examine the probabilities of students with IEPs being proficient (i.e., research question (RQ) #1), its change (i.e., RQ #2) and trends (i.e., RQ #3), and its relationship with implementation fidelity (i.e., RQ #4). The results of this analysis revealed that the likelihood of students with IEPs being proficient significantly increased during the implementation period. Further, the students in schools that implemented the framework with fidelity had a significantly larger probability of being proficient than those in schools that did not meet minimum fidelity standards. These results were found for both ELA and math scores.

In the basic model for the overall School Year effect, students' likelihood of being proficient increased significantly over each interval for both ELA (log odds = 0.54, $p < 0.001$) and math (log odds = 0.51, $p < 0.001$) (see Model I in Table 2). The odds ratio showed that individual students are almost 0.04 times more likely to be proficient than non-proficient at the beginning year of the study (i.e., 2014-15 school year) for both ELA and math. The initial proportion of students who were proficient in ELA at the beginning of the trend was about 3.3%, which was calculated by Equation 3. For math, the initial proportion was about 3.7%.

The growth trends were analyzed in Model II. At the second school year (i.e., 2015-16; log odds = 0.999, $p < 0.01$) and the third school year (i.e., 2016-17; log odds = 1.22, $p < 0.001$), students were significantly higher in the probability of being proficient in ELA relative to their proficiency status at the first school year (i.e., 2014-15). The odds of being proficient at the second year versus the first year were multiplied by 2.716 (or increased by 171.6%). At the third year, the odds of being proficient were multiplied by 3.39 (or increased by 238.8%) compared to the first year. The estimated probability of being proficient at the second year was about 8.4%, and the probability at the third year was 10.3%. The same improvement in probability was observed in math. The log odds at the second year was 0.73

($p < 0.05$) and third year was 1.08 ($p < 0.001$), which suggested a higher probability of being proficient compared to the first year. The estimated probability of being proficient at the second year was 7.3% and the third year was 10.1%.

*Figure 1.*
Proportion of students with IEPs who met PARCC proficiency standard in schools implementing equity-based, inclusive MTSS with fidelity and without fidelity each year. Please note that the number of schools implementing with fidelity changed each year. Among the 15 schools, 4 schools were implementing with fidelity in SY2014–15; 12 schools in SY2015–16; and 11 schools in SY2016–17.



(*figure continues*)

In the model for the impact of meeting implementation fidelity (i.e., Model III in Table 2), students with IEPs in the schools that met implementation fidelity (i.e., schools that scored 64% or higher on SWIFT-FIT) were more likely to be proficient in PARCC than those in schools that did not meet fidelity (i.e., scored less than 64%) at the first year (i.e., 2014–2015). For ELA, the likelihood of students with IEPs being proficient in schools that did not implement with fidelity was -3.66 and the estimated probability was about 2.5%. In contrast, for schools that met fidelity, the likelihood of being proficient at initial status was -2.88 and the estimated probability was about 5.5%, which was higher than schools that did not meet fidelity. The analysis for math did not reveal a significant effect of implementation fidelity (log odds = 0.38, $p$ = 0.13) while other variables were controlled. Year effect was still significant (log odds = 0.44, $p$ < 0.01) for math.

To investigate the longitudinal impact of meeting implementation fidelity on the students with IEPs being proficient, covariate interactions were added to the model. Results of the final model (see Model IV in Table 2) showed that the interaction effects with high SWIFT-FIT (i.e., 64% or higher) were significant and positive in both ELA and math. This finding could be interpreted to mean that change in student proficiency status over time is linked to SWIFT-FIT scores representing the extent to which the equity-based, inclusive education framework is implemented in the school. More specifically, over time, the probability of students in schools with high SWIFT-FIT scores (i.e., 64% or higher) being proficient improved more sharply than among peers in low SWIFT-FIT score schools (p < 0.001). In particular, the odds of being proficient for students in schools that met fidelity (i.e., 64% or higher) were multiplied by 3,775 for each yearly interval. The same results were observed, and odds were even higher for math. The odds of being proficient in schools that met fidelity were multiplied by 147,165 for each interval for math. Figure 1 depicts the interaction effect, in which different proportion growth of students with IEPs met the proficiency standard for schools that implemented with and without fidelity.

## Discussion

The current study investigated longitudinal changes of PARCC proficiency in ELA and math for students with IEPs who consistently enrolled in schools implementing an equity-based, inclusive MTSS framework. Results of descriptive analysis indicated that the proportion of students with IEPs who met the proficiency standard increased in both ELA and math during the two consistently measurable years of education in schools using this framework. With schools in one state with three years of longitudinal data, logistic generalized estimating equation analyses and linear mixed-model analyses results showed that students were 0.04 times more likely to be proficient than non-proficient for both ELA and math at the beginning of the study year, and the likelihood increased significantly over each year. The growth trends showed that the estimated probability of being proficient continuously increased at the second and third study years in ELA and math. Finally, the change in probability of students being proficient in ELA and math was significantly related to implementation the MTSS framework with fidelity.

This study sought to examine the efficacy of educating students receiving supports and services through special education, who were fully included within a whole-school, equity-based operational definition of inclusion as a component of an MTSS framework. A fidelity of implementation tool was used to compare schools in early stages of transformation, that is, still reliant on traditional, categorical, place-based inclusion tactics such as "push in – pull out," separate class placement or seating students in a general education classroom without enough pedagogical resources to engage them in curriculum activities; with schools

in later stages of transformation wherein students with IEPs were educated alongside their general education peers in fully integrated school environments and were fully exposed to the general education curriculum through inclusive instructional strategies. The fidelity tool (SWIFT-FIT) differentiated schools fully implementing equity-based, inclusive MTSS practices from those implementing traditional place-based practices. The statistical analysis provided suggestive evidence for enhanced outcomes in ELA and math over time for students in schools implementing the MTSS framework with fidelity.

The findings of the current study must be interpreted with caution in light of several limitations. Data analyzed in the study were derived from a grant-funded technical assistance project and therefore may not be generalizable to all students with IEPs. Sampled students with IEPs in the analyses were purposively selected due to the national change of state summative assessments. This study was able to analyze only the last two implementation years data for the overall proficiency status change, and the three-year longitudinal statistical analyses included schools in only one state. Future randomized controlled trials or waitlist-control trials with larger sample sizes will be able to provide better evidence on the efficacy of equity-based, inclusive MTSS practices in the future.

The dependent variable for the current study was limited to academic outcomes of students with IEPs in the current study. Disruptive behavior may play an important role in ELA and math performance on assessments, especially for students with IEPs. Future studies should be conducted on social/behavioral issues that impede student learning and should investigate the relationships among equity-based inclusion (and its fidelity), academic outcomes, and behavior outcomes of students with IEPs to provide a more nuanced evaluation of efficacy as defined in this MTSS framework.

Finally, efficacy investigations of equity-based, inclusive MTSS on students with significant disability who take an alternate assessment based on alternate achievement standards (AA-AAS) need to be conducted in the future. The current study included students with IEPs taking the regular state summative assessment. Findings in the current study, therefore, might not be appropriate to be generalized for students with significant cognitive disabilities who take the AA-AAS.

Although these results are limited, it is noteworthy that through the implementation of equity-based, inclusive MTSS the probability of students with IEPs scoring in the proficient range of the ELA and math state assessments continuously increased as their schools implemented equity-based, inclusive MTSS.

20    *J. H. Choi, A. B. McCart, & W. Sailor*

Table 2
*Association Between Academic Proficiency and Equity-based Inclusion Implementation Fidelity Overtime*

| | Model I | | | Model II | | | Model III | | | Model IV | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LO(OR) | 95%-CI | $p$ | LO(OR) | 95%-CI | $p$ | LO(OR) | 95%-CI | $p$ | LO(OR) | 95%-CI | $p$ |
| | | | | | | ELA | | | | | | |
| Intercept | -3.14(0.04) | 0.02-0.08 | <.001 | -3.39(0.03) | 0.02-0.07 | <.001 | -3.66(0.03) | 0.01-0.06 | <.001 | -10.61(0.00) | 0.00-0.00 | <.001 |
| Year | 0.54(1.71) | 1.32-2.21 | <.001 | | | | 0.41(1.51) | 1.12-2.03 | <.01 | -6.50(0.00) | 0.00-0.01 | <.001 |
| SY 2015-16 | | | | 1.00(2.72) | 1.41-5.22 | <.01 | | | | | | |
| SY 2016-17 | | | | 1.22(3.39) | 1.72-6.67 | <.001 | | | | | | |
| Fidelity | | | | | | | 0.80(2.24) | 1.24-4.02 | <.01 | 3.26(26.00) | 1.83-369.03 | <.05 |
| Year × Fidelity | | | | | | | | | | 8.24(3,775) | 396-35,938 | <.001 |
| | | | | | | Math | | | | | | |
| Intercept | -3.16(0.04) | 0.02-0.08 | <.001 | -3.27(0.04) | 0.02-0.08 | <.001 | -3.38(0.03) | 0.02-0.07 | <.001 | -7.85(0.00) | 0.00-0.00 | <.001 |
| Year | 0.51(1.66) | 1.29-2.15 | <.001 | | | | 0.44(1.56) | 1.18-2.05 | <.01 | -9.68(0.00) | 0.00-0.00 | <.001 |
| SY 2015-16 | | | | 0.73(2.01) | 1.17-3.68 | <.05 | | | | | | |
| SY 2016-17 | | | | 1.08(2.95) | 1.66-5.23 | <.001 | | | | | | |
| Fidelity | | | | | | | 0.38(1.46) | 0.90-2.37 | 0.13 | -0.52(0.60) | 0.02-17.80 | 0.77 |
| Year × Fidelity | | | | | | | | | | 11.90 (147,165) | 12,499-1,732,730 | <.001 |

Note: $n$ = 214 students with IEPs who participated in PARCC for 3 consecutive school years
LO = log odds; OR = odds ratio

## References

Algozzine, B., Sweeney, H. M., Choi, J. H., Horner, R., Sailor, W., McCart, A. B., … Lane, K. L. (2016). Development and preliminary technical adequacy of the schoolwide integrated framework for transformation fidelity of implementation tool. *Journal of Psychoeducational Assessment, 35,* 302-322. doi:10.1177/0734282915626303

Artiles A., Kozleski E., Trent S., Osher D., Ortiz A. (2010). Justifying and explaining disproportionality, 1968–2008: A critique of underlying views of culture. *Exceptional Children, 76,* 279–299. doi:10.1177/001440291007600303

Artiles, A. J., & Kozleski, E. B. (2016). Inclusive education's promises and trajectories: Critical notes about future research on a venerable idea. *Education Policy Analysis Archives/Archivos Analíticos de Políticas Educativas, 24,* 1-29.

Artiles, A. J., Kozleski, E. B., Dorn, S., & Christensen, C. (2006). Chapter 3: Learning in inclusive education research: Re-mediating theory and methods with a transformative agenda. *Review of Research in Education, 30,* 65-108. doi:10.3102/0091732X030001065

Burrello, L., Kleinhammer-Tramill, J., & Sailor. W. (Eds.). (2013). *Unifying education systems.* New York: Routledge/Taylor and Francis Group.

Charlton, C. T., Sabey, C. V., Dawson, M. R., Pyle, D., Lund, E. M., & Ross, S. W. (2018). Critical incidents in the scale-up of state multitiered systems of supports. *Journal of Positive Behavior Interventions,* doi:1098300718770804.

Cooc, N., & Kiru, E. W. (2018). Disproportionality in special education: A synthesis of international research and trends. *The Journal of Special Education, 52,* 163-173. doi:0022466918772300

Kauffman, J. M., McGee, K., & Brigham, M. (2004). Enabling or disabling? Observations on changes in special education. *Phi Delta Kappan, 85,* 613-620. doi:10.1177/003172170408500810

Koski, W. S. (2017). Beyond Dollars? The Promises and Pitfalls of the Next Generation of Educational Rights Litigation. *Columbia Law Review, 117*(7), 1897-1931.

Kozleski, E. B., & Choi, J. H. (2018). Leadership for equity and inclusivity in schools: The cultural work of inclusive schools. *Inclusion, 6,* 33-44. doi:10.1352/2326-6988.6.1.33

Kurth, J. A., Morningstar, M. E., & Kozleski, E. B. (2014). The persistence of highly restrictive special education placements for students with low-incidence disabilities. *Research and Practice for Persons with Severe Disabilities, 39*(3), 227-239.

Kurth, J. A., Morningstar, M. E., Hicks, T. A., & Templin, J. (2018). Exploring the relationship between school transformation and inclusion: A Bayesian multilevel longitudinal analysis. *Inclusion, 6,* 19-32. doi:10.1352/2326-6988-6.1.19

Lane, K. L., Oakes, W. P. & Menzies, H. M. (2019). Comprehensive, integrated, three-tiered (CI3T) models of prevention: The role of systematic screening to inform instruction (In Paige C. Pullen and Michael J. Kennedy, Eds., *Handbook of response to intervention and multi-tiered systems of support,* pp. 63-76). New York: Routledge.

Lewin, K. (1936). *Principles of Topological Psychology.* New York: McGraw-Hill.

Lynn, M. R. (1986). Determination and quantification of content validity. *Nursing Research, 35,* 382–385. doi:10.1097/00006199-198611000-00017

Massoumeh, Z., & Leila, J. (2012). An investigation of medical model and special education methods. *Procedia-Social and Behavioral Sciences, 46,* 5802-5804. doi:10.1016/j.sbspro.2012.06.518

McCart, A., & Miller, D. (2020). *Leading through equity-based MTSS: Educator practices for all students.* Thousand Oaks, CA: Corwin Press.

22   *J. H. Choi, A. B. McCart, & W. Sailor*

McCart, A., McSheehan, M., Sailor, W., Mitchiner, M., & Quirk, C. (2016). *SWIFT differentiated technical assistance* (White paper). Lawrence, KS: SWIFT Center. Retrieved from http://www.swiftschools.org/shelf.

McCart, A., Sailor, W., Bezdek, J., & Satter, A. (2014). A framework for inclusive educational delivery systems. *Inclusion, 2*, 252-264. doi:10.1352/2326-6988-2.4.252

Mitchiner, M. (2014). *Assessing state readiness for change to participate in schoolwide inclusive school reform: A state selection process using broad factors of the Hexagon Tool* (Doctoral dissertation). Lawrence, KS. ProQuest Document ID 1651251106.

Mitchiner, M., McCart, A., Kozleski, E., Sweeney, H., & Sailor, W. (2014). Emerging trends and future directions in effective, inclusive elementary schools for students with extensive support needs. (In J. McLeskey, N. Waldron, F. Spooner, & B. Algozzine (Eds.), *Handbook of research and practices for effective inclusive schools*, pp. 477-491). New York: Routledge.

Morsbach Sweeney, H., Horner, R., Algozzine, B., Lane, K., Roger, B., Choi, H., McCart, A., & Sailor, W. (2014). *SWIFT Fidelity of Implementation Tool. Version 1.5.* Lawrence, KS: National Center on Schoolwide Inclusive School Reform: SWIFT Center.

Newman, L., Wagner, M., Knokey, A.-M., Marder, C., Nagle, K., Shaver, D., Wei, X., with Cameto, R., Contreras, E., Ferguson, K., Greene, S., and Schwarting, M. (2011). *The Post-High School Outcomes of Young Adults With Disabilities up to 8 Years After High School.* A Report From the National Longitudinal Transition Study-2 (NLTS2) (NCSER 2011-3005). Menlo Park, CA: SRI International.

Partnership for Assessment of Readiness for College and Careers. (2016). *PARCC accessibility features and accommodations manual 2016- 2017* (5th edition). Washington, DC: PARCC Assessment Consortia.

Polit, D. F., & Beck, C. T. (2006). The content validity index: Are you sure you know what's being reported? critique and recommendations. *Research in Nursing & Health, 29*, 489-497. doi:10.1002/nur.20147

Rojewski, J. W., Lee, I. H., & Gregg, N. (2015). Causal effects of inclusion on postsecondary education outcomes of individuals with high-incidence disabilities. *Journal of Disability Policy Studies, 25*, 210-219. doi:10.1177/1044207318505648

Sailor, W. (2012). *National Technical Assistance Center for Inclusive School-wide Reform.* (PR# H326Y120005). Washington. DC: U.S. Department of Education, Office of Special Education Programs.

Sailor, W. (2017). Equity as a basis for inclusive educational systems change. *Australasian Journal of Special Education, 41*, 1-17. doi:10.1017/jse.2016.12

Sailor, W., McCart, A. B., & Choi, J. H. (2018). Reconceptualizing inclusive education through multi-tiered system of support. *Inclusion, 6*, 2-18. doi:10.1352/2326-6988-6.1.3

Skrtic, T. (1991). The special education paradox: Equity as the way to excellence. *Harvard educational review, 61*, 148-207. doi:10.17763/haer.61.2.0q702751580h0617

Skrtic, T. M., Sailor, W., & Gee, K. (1996). Voice, collaboration, and inclusion: Democratic themes in educational and social reform initiatives. *Remedial and Special Education, 17*, 142-157. doi:10.1177/074193259601700304

Skrtic, T. M. (2005). A political economy of learning disabilities. *Learning Disability Quarterly, 28*, 149-155. doi:10.2307/1593616

U.S. Department of Education, National Center for Education Statistics. (2017). *Digest of Education Statistics, 2016* (NCES 2017-094), Chapter 2. Inclusion of students with disabilities. Retrieved from https://nces.ed.gov/fastfacts/display.asp?id=59

## About the Authors

*Jeong Hoon Choi* is an Assistant Research Professor and Associate Director of Research and Evaluation at the University of Kansas SWIFT Education Center. He has been involved in various research projects on inclusive education and school system change. His research interests have included leadership, school climate, and student outcomes associated with frameworks such as multi-tiered system of support (MTSS), schoolwide positive behavior support (SWPBS), and schoolwide integrated framework for transformation (SWIFT). His current research is focused on equity-based inclusive education for all students including marginalized students. He is particularly interested in equity-based MTSS, data-based decision support system, and related student outcomes. He is co-investigating the Equity Leadership in High Need School research and Data Support System develop research funded through the U.S. Department of Education Office of Elementary and Secondary Education and Institute of Education Sciences.

*Amy B. McCart* is an Associate Research Professor with Life Span Institute and Co-Director of SWIFT Education Center at the University of Kansas. The focus of her work is to bring about equity in student outcomes by developing high quality, effective instructional leaders who are prepared to improve outcomes for all students, with emphasis on students of color and those with the most extensive need for support. At this writing, she is Co-Principal Investigator for the Equity Leadership in High Need Schools research grant, funded through the U.S. Department of Education Office of Elementary and Secondary Education; and leads a dynamic team of leadership developers working in districts and schools across the nation.

*Wayne Sailor* is a Professor in the Department of Special Education and Co-Director of the SWIFT Education Center at the University of Kansas. SWIFT Education Center is a resource center, which leads the nation in equity-based MTSS and inclusive education research and services. His academic pursuits are focused on comprehensive school reform with the aim of transforming systems to integrate resources for the benefit of all students through equity-based, inclusive education. He has carried out research within the framework of a multi-tiered system of support, response to intervention (MTSS/RTI), and schoolwide applications of positive behavior interventions and supports (PBIS). He has published extensively in articles and books. His present research and teaching is focused on emancipating marginalized students through comprehensive school reform, emphasizing coherence within and across schools, state agencies, local education agencies and regional systems in aligning systems of support to remove barriers to learning and equitably apply all resources, including new technologies, to all students in whole-school contexts driven by MTSS and UDL strategies.

# BUILD EQUITY, JOIN JUSTICE

## A PARADIGM FOR SCHOOL BELONGING

AMY B. McCART, WADE KELLY, AND
WAYNE SAILOR

FOREWORD BY SEENA M. SKELTON



**Norton Professional Books**

*An Imprint of W. W. Norton & Company*
*Celebrating a Century of Independent Publishing*

EXHIBIT ___11___
WIT: McCart
DATE: 10·24·23
DJura, RPR

# BUILD EQUITY, JOIN JUSTICE

## A PARADIGM FOR SCHOOL BELONGING

AMY B. McCART, WADE KELLY, AND
WAYNE SAILOR

FOREWORD BY SEENA M. SKELTON



**Norton Professional Books**

*An Imprint of W. W. Norton & Company*
*Celebrating a Century of Independent Publishing*



# The Case for a Paradigm Shift in Education

> Connection to each other is the most important thing
> to cultivate in the face of hopelessness—we don't want
> to cling to outdated paradigms; we want to cling to each
> other and shift the paradigms.
>
> —adrienne maree brown, *Emergent Strategy*

As we write this book, our collective ability to find hope is being tested. Amidst the backdrop of a global pandemic, the ongoing and often lethal systemic racism plaguing Black, Brown, and Indigenous populations, as well as a dramatic shift in the ability of millions of Americans to make decisions regarding their bodies, there is loss. There is confusion; there is sadness; and there is a restlessness. Mental health services are being stretched to the limit as our country, grappling with economic instability, political unrest, and a violent scourge of deadly school shootings, searches for the answers. Within this storm of uncertainty, and in direct response to it, we call for sweeping systems change in education.

Our system of education is strained; our teachers and school leaders are exhausted. This system is rooted in assumptions and pedagogy derived from ongoing research and educational theory that could never have predicted this kind of reality. And now, mounting evidence indicates our assumptions about the educational system are untenable at best and, more often than not, destructive for many. In this context, we believe we should not and cannot continue to provide education, including special education, as we have over the past 50



# The Case for a Paradigm Shift in Education

> Connection to each other is the most important thing
> to cultivate in the face of hopelessness—we don't want
> to cling to outdated paradigms; we want to cling to each
> other and shift the paradigms.
>
> —adrienne maree brown, *Emergent Strategy*

As we write this book, our collective ability to find hope is being tested. Amidst the backdrop of a global pandemic, the ongoing and often lethal systemic racism plaguing Black, Brown, and Indigenous populations, as well as a dramatic shift in the ability of millions of Americans to make decisions regarding their bodies, there is loss. There is confusion; there is sadness; and there is a restlessness. Mental health services are being stretched to the limit as our country, grappling with economic instability, political unrest, and a violent scourge of deadly school shootings, searches for the answers. Within this storm of uncertainty, and in direct response to it, we call for sweeping systems change in education.

Our system of education is strained; our teachers and school leaders are exhausted. This system is rooted in assumptions and pedagogy derived from ongoing research and educational theory that could never have predicted this kind of reality. And now, mounting evidence indicates our assumptions about the educational system are untenable at best and, more often than not, destructive for many. In this context, we believe we should not and cannot continue to provide education, including special education, as we have over the past 50

years. In our view, we are now facing a moment, on the threshold of a major shift, a sweeping sea change that will root our system of schooling and all its structures in equity. We seek to realize the promise of freedom for students for whom it has perpetually been denied.

To make a case for systemic reform of an ongoing professional service system is to engender controversy. We know many educators have been at equity work for a number of years, and some of you are at the beginning of the journey. Wherever you are, it is important work. Dugan (2021) cautions that there are challenges in doing this work, and we must be aware of those and the missteps that can occur. It is all too easy to "do" equity work that is not actually the work that needs to be done (e.g., siloing equity, becoming an equity warrior, tokenizing equity). Our hope is that you take note of these pitfalls and not engage in inconsequential or incremental equity work. We hope that the following chapters provoke reasoned thought and stimulate authentic and meaningful work to build equity. We begin with special education, as it is in dire need of a course correction and as such offers the potential to serve as a catalyst in the pursuit of justice.

## Special Education Reform

Special education as we know it today had its origins in the early 1970s, culminating in Public Law 94-142, the Education for All Handicapped Children Act of 1975, which amended the Education of the Handicapped Act of 1970. The intended purpose of this law was to allow students who were previously excluded from school based on their disability to be included in their school community. Special education law contains the principle of the least restrictive environment (LRE), which mandates that children with disabilities be educated "to the maximum extent appropriate" with children who are nondisabled, and that segregated placements be employed only "if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily" (Sec. 300, 114 (a) (2), https://sites.ed.gov/idea/regs/b/b/300.114; quoted in Wehmeyer & Kurth, 2021). LRE poses many issues, including legitimizing restrictive environments. Additionally, it perpetuates a readiness model (i.e., students with disabilities have to be "ready" to enter general education), and leaves educational opportunity to judgments of student "appropriateness" (Taylor, 1988).

years. In our view, we are now facing a moment, on the threshold of a major shift, a sweeping sea change that will root our system of schooling and all its structures in equity. We seek to realize the promise of freedom for students for whom it has perpetually been denied.

To make a case for systemic reform of an ongoing professional service system is to engender controversy. We know many educators have been at equity work for a number of years, and some of you are at the beginning of the journey. Wherever you are, it is important work. Dugan (2021) cautions that there are challenges in doing this work, and we must be aware of those and the missteps that can occur. It is all too easy to "do" equity work that is not actually the work that needs to be done (e.g., siloing equity, becoming an equity warrior, tokenizing equity). Our hope is that you take note of these pitfalls and not engage in inconsequential or incremental equity work. We hope that the following chapters provoke reasoned thought and stimulate authentic and meaningful work to build equity. We begin with special education, as it is in dire need of a course correction and as such offers the potential to serve as a catalyst in the pursuit of justice.

## Special Education Reform

Special education as we know it today had its origins in the early 1970s, culminating in Public Law 94-142, the Education for All Handicapped Children Act of 1975, which amended the Education of the Handicapped Act of 1970. The intended purpose of this law was to allow students who were previously excluded from school based on their disability to be included in their school community. Special education law contains the principle of the least restrictive environment (LRE), which mandates that children with disabilities be educated "to the maximum extent appropriate" with children who are nondisabled, and that segregated placements be employed only "if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily" (Sec. 300, 114 (a) (2), https://sites.ed.gov/idea/regs/b/b/300.114; quoted in Wehmeyer & Kurth, 2021). LRE poses many issues, including legitimizing restrictive environments. Additionally, it perpetuates a readiness model (i.e., students with disabilities have to be "ready" to enter general education), and leaves educational opportunity to judgments of student "appropriateness" (Taylor, 1988).

behavioral, social, and
them at varying levels
student need without
range of other factors
ned by a school lead-
er teams to fit a local
human resources to

wever, when designed
rces and flexibility to
tainable. As an orga-
ent, coaching, data
n the building based
ed. We expect that as
at the table, efficien-
privileged resources
ent, especially those

at other contextual
TSS, educators pay
nction as a scaffold
district-level support
th carrying into the
inking and remove
entation of schools
a vision for equity,
trust one another
and justice as well

tion of MTSS and
adership (Kozleski
alignment with a
s when faced with
t system for edu-
They also heavily
establishment of

a leadership team, and instill this team with decision-making authority. They recruit personnel who share the school vision for equity and create safe spaces for all staff to develop and explore as they build their practice in ways that truly meet their students' needs.

Equity-driven MTSS asks for personnel and established departments (or silos) within schools to rethink, reorganize, and regroup into one seamless system of support. Categorical service delivery is replaced with collaborative teaching and fully integrated service delivery. All resources are matched to all students based on their learning needs rather than an eligibility label. A community of practice can emerge wherein all school personnel (e.g., security guards, paraprofessionals, school psychologists, office staff) are directly involved in the teaching-learning process (Wenger, 2010); grade-level teams include both general and special educators, specialists, and support staff; and all the adults collaboratively plan for the full student population. When these features exist in a school culture, both the students and adults are uplifted through high-quality relationships, effective problem solving, predictability, and a supportive culture that encourages growth in interest areas.

We would be remiss if we did not mention the importance of family and community voice and partnerships as giving life to school communities of practice. These partners offer support when schools struggle and generate excitement and energy for success. Research supports the value of family and community partnerships and indicates that it is necessary for the success of equity-based MTSS (Haines et al., 2015).

To be clear, putting MTSS in place in a school is not easy. To design, install, and truly use MTSS for equity is transformational and, as such, requires learning and putting into place new teaching practices, different ways of maximizing utilization of space at the school, and a broader scope of employing the diverse talents of school employees. This system differs so substantially from traditional models of school that it requires organizing and adopting new practices, which means it takes time to install and to implement with measurable fidelity.

As we write in the shadow of the COVID-19 pandemic, the need for clarity is especially important, particularly where inferences about the potential sources of students' academic difficulties, namely suspected learning disabilities or other factors impeding student learning, are assumed. Contextual factors must be given careful consideration so that we are vigilant against inferring

EXHIBIT 12
WIT: McCart
DATE: 10·24·23
DJura, RPR





# SWiFT
education center

Resources

SWIFT > Our Team

## Our Team

We are a group of people who are passionate about transforming U.S. public education so that students are welcome, valued, and have a sense of belonging in their community's schools, and that they are well supported to achieve in age-appropriate general education classrooms. We work at the University of Kansas Lifespan Institute.









**Amy Jablonski**
Leadership Development and Research Project Director

**Amy McCart**
Co-Director and Research Professor

**Andre Mitchell**
Leadership Development and Research Project Director

**Andrea Mayfield**
Leadership Development and Research Project Director


EXHIBIT 15
WIT: McCart
DATE: 10-24-23
DAWN PPR