1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION

3

4   UNITED STATES OF AMERICA,
                               )CIVIL ACTION
5            Plaintiff,        )NO. 1:16-cv-03088-ELR
                               )
6   vs.                        )
                               )
7   STATE OF GEORGIA,          )
                               )
8            Defendants.       )
                               )
9   - - - - - - - - - - - - - - )

10

11              VIDEOTAPE DEPOSITION OF

12              JUDITH ANN FITZGERALD

13

14       Tuesday, August 16, 2022, 9:08 a.m., EST

15

16

17

18

19

20        HELD AT:

21        Robbins Alloy Belinfante Littlefield LLC
          500 14th Street, N.W.
22        Atlanta, Georgia  30318

23        ----------------------------------------------

24

25        WANDA L. ROBINSON, CRR, CCR, No. B-1973
          Certified Shorthand Reporter/Notary Public



1                    APPEARANCES OF COUNSEL

2

3    Appearing on Behalf of the Plaintiff:

4

         FRANCES COHEN, ESQUIRE
5        MICHELLE TUCKER, ESQUIRE
         KELLY GARDNER, ESQUIRE
6        U.S. Department of Justice
         Civil Rights Division
7        950 Pennsylvania Avenue, N.W.
         Washington, D.C. 20579
8        T:  202.305.6630   F:
         E-mail:  frances.cohen@usdoj.gov
9                  michelle.tucker@usdoj.gov.
                   kelly.gardner@usdoj.gov
10

11              - and -

12       AILEEN BELL HUGHES, ESQUIRE
         Assistant United States Attorney
13       600 U.S. Courthouse
         75 Ted Turner Drive SW
14       Atlanta, Georgia  30303
         T:  404.581.6000   F:  404.581.6181
15       E-mail:  Aileen.bell.hughes@usddoj.gov

16

17

18   Appearing on Behalf of the Defendant:

19

20       JOSHUA BELINFANTE, ESQUIRE
         Robbins Alloy Belinfante Littlefield LLC
21       500 14th Street, N.W.
         Atlanta, Georgia  30318
22       T:  404.856.3261
         E-mail:  jbelinfante@robbinsfirm.com
23

24

25



```
 1   ALSO PRESENT:

 2        MONICA PATEL, ESQUIRE (DBHDD)

 3

 4

 5   ALSO PRESENT:

 6   VIA ZOOM:

 7

 8           For U.S. Attorney's Office:

 9           PATRICK HOLKINS, ESQUIRE

10           SANDRA LEVERT, ESQUIRE

11           LAURA CASSIDY TAYLOE, ESQUIRE

12           ANDREA HAMILTON, ESQUIRE

13           RENEE WOLENHAUS, ESQUIRE

14

15           For State of Georgia:

16           DANIELLE HERNANDEZ, ESQUIRE

17           MELANIE JOHNSON, ESQUIRE

18           ANNA EDMONDSON, ESQUIRE

19

20

21   ALSO PRESENT:

22           BRANDON BRANTLEY, VIDEOGRAPHER

23

24

25
```



```
 1                  INDEX OF EXAMINATIONS

 2

 3   JUDITH ANN FITZGERALD

 4   By Ms. Cohen                              Page 6

 5

 6

 7                   INDEX OF EXHIBITS

 8   PLAINTIFF'S

 9   NO.              DESCRIPTION              PAGE

10   Exhibit 361   Behavioral Health Planning and     83
                   Advisory Council - Evergreen
11                 Conference Center - July 14, 2015
                   PowerPoints
12                 GA00099111.001-GA00099111.022

13   Exhibit 362   9/16/2016 Email From Judy          121
                   Fitzgerald to Nakeba Rahming
14                 GA01184034

15

     Exhibit 363   October 2016 Email From Nakeba     130
16                 Rahming to Dante McKay
                   GA00585313-GA00585314
17

18   Exhibit 364   SOC State Plan Pocket Guide Terms  133
                   4.12.18
19                 GA00043612-GA00043623

20

     Exhibit 365   6/19/2019 Email Chain From Monica  138
21                 Johnson To Judy Fitzgerald
                   GA00004807
22

23   Exhibit 366   5/28/2019 Email From Dante McKay   144
                   To Judy Fitzgerald
                   GA00125561
24

25
```



1              INDEX OF EXHIBITS (Continued)

2    PLAINTIFF'S

3    NO.                    DESCRIPTION                    PAGE

4    Exhibit 367   9/4/2020 Email Chain From Judy         154
                   Fitzgerald To Monica Johnson
5                  GA00018599-GA00018602

6    Exhibit 368   Georgia Code Title 73 Mental Health    160
                   Section 37-1-2
7

     Exhibit 369   2020 Georgia Code Title 37 - Mental    175
8                  Health Chapter 1, Article 2,
                   Section 37-1-20
9

     Exhibit 370   2/12/2019 Email Chain From Garry       195
10                 McGiboney To Judy Fitzgerald
                   GA00003148
11

     Exhibit 371   Georgia Uniform Application            214
12                 FY 2020/2021 Community Mental
                   Health Services Block Grant
13                 R0003371-R0003664

14   Exhibit 372   DBHDD OCYF Behavioral Health           215
                   Continuum of Care Phases &
15                 Services Provided
                   GA00056438-GA00056439
16

17   Exhibit 373   (Not Used)                              -

18   Exhibit 374   The Georgia Apex Program Annual        238
                   Evaluation Results
19                 July 2019-June 2020 PowerPoint
                   Presented by COE Leadership Meeting
20                 April 12, 2021
                   GA04896745-GA04896764
21

22

23

24

25



1              INDEX OF EXHIBITS (Previously Marked)

2   PLAINTIFF'S

3   NO.                   DESCRIPTION                    PAGE

4   Exhibit 4    DBHDD Organizational Structure Chart   38
                 GEORGIA 000009-000016
5
    Exhibit 150 Georgia System of Care State Plan        241
6                2020 - Created by the Interagency
                 Directors Team
7                GA04312718-GA04312738

8   Exhibit 358 Apex 3.0 Frequently Asked Questions     202

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1          THE VIDEOGRAPHER:  This will be the video

2     deposition of Commissioner Judy Fitzgerald,

3     being taken in the matter of United States of

4     America versus the State of Georgia.

5          Today's date is August 16th, 2022.

6          The time on the record is 9:08 a.m.

7          My name is Brandon Brantley.  I'm the

8     videographer.  Wanda Robinson is the court

9     reporter.

10          Counsel, please introduce yourselves for

11     the record, after which the court reporter will

12     swear in the witness.

13          MS. COHEN:  Morning.

14          Frances Cohen for the United States.

15          MS. TUCKER:  Michelle Tucker for the

16     United States.

17          MS. HUGHES:  Aileen Bell Hughes for the

18     United States.

19          MS. GARDNER:  Kelly Gardner Womack for the

20     United States.

21          MR. BELINFANTE:  Josh Belifante for the

22     State of Georgia.

23                    - - - - - -

24               JUDITH A. FITZGERALD,

25     being duly sworn, was examined and testified as



1   follows:

2                   - - - - - - -

3   EXAMINATION

4   BY MS. COHEN:

5       Q    Commissioner, could you state your full

6   name for the record, please.

7       A    Judith Ann Fitzgerald.

8       Q    And, Commissioner, thank you for coming in

9   today.  My name is Fran Cohen.  I represent the

10  United States.

11          This is your deposition in the lawsuit

12  entitled United States versus Georgia.

13          MS. COHEN:  The stipulations that we've

14      had, Josh, are all objections except as to form

15      and motions to strike are reserved until time

16      of trial, and we will waive notarization and

17      the transcript may be signed under penalty of

18      perjury within 30 days of receipt.

19          THE VIDEOGRAPHER:  Five seconds, Frances.

20          MS. COHEN:  Sure.

21          (Pause.)

22          MR. BELINFANTE:  That's agreeable.

23  BY MS. COHEN:

24      Q    Commissioner, what is your current job

25  title in full?

9

1       A    I am the Commissioner of the Georgia

2   Department of Behavioral Health and Developmental

3   Disabilities.

4       Q    And do you -- are you represented by

5   counsel here today?

6       A    Yes.

7       Q    And that's Mr. Belinfante?

8       A    Yes.

9       Q    And have you had your deposition taken

10  before?

11      A    No.

12      Q    This is your first deposition?

13      A    Oh, ever?  You mean in my role as

14  Commissioner?

15      Q    Yes.  In any role.

16      A    Yes.  I've had one prior deposition.

17      Q    What kind of case was that?

18      A    It was our deaf services lawsuit.

19      Q    So that was right here in Atlanta as well?

20      A    Yes.

21      Q    Well, let me just go over some simple

22  rules --

23      A    Thank you.

24      Q    -- that I'd like to follow.

25           First of all, if you don't understand



1  something, let me know and I will consider how to

2  rephrase the question.

3      A    Okay.

4      Q    The court reporter can't take down nods of

5  the head or shakes of the head, so we both have to

6  confine ourselves to verbal answers.  Understood?

7      A    Yes.

8      Q    And you can take a break any time on

9  request, except that I'll ask you not to take a

10  break while there's a question pending.

11      A    Okay.

12      Q    You'll hear your counsel, Mr. Belinfante,

13  note his objections to a question.  Unless I

14  withdraw the question, you will answer it unless Mr.

15  Belinfante were to instruct you not to answer, and

16  he would use those specific words.

17          So the word "objection" does not mean you

18  don't have to respond to the question.  Understood?

19      A    Understood.

20      Q    And only one of us can talk at once.  So I

21  will try like heck not to step on your questions,

22  and I'll ask -- your answers, and I'll ask you not

23  to step on my questions.

24      A    Okay.

25          MS. COHEN:  Brandon, do you have a



 1      question?

 2           (Discussion ensued off the record.)

 3  BY MS. COHEN:

 4      Q    Did you meet -- did you meet with counsel

 5  to prepare for this deposition?

 6      A    Yes.

 7      Q    When was that?

 8      A    Last week, for about an hour.

 9      Q    And where did that take place?

10      A    It was virtual.

11      Q    You mean --

12      A    Was it --

13      Q    -- a Zoom session?

14      A    Yes.

15      Q    Apart from that one-hour meeting with

16  counsel that was virtual, what else have you done to

17  prepare for this deposition?

18      A    Nothing.

19      Q    Have you discussed your appearance today

20  with anyone?

21      A    My executive team is aware that this is

22  where I am today.

23      Q    Is that Ms. Rogers and --

24      A    Ms. Rogers is my executive assistant, and

25  members of the executive leadership team at DBHDD.



1    Q    And is -- who comprises the executive

2    leadership team at DBHDD?

3    A    Jeff Minor, who's our COO; Mary Price, who

4    is our CFO; Ashley Fielding, our assistant

5    commissioner; and then Monica Johnson is the

6    director of the Division of Behavioral Health; Ron

7    Wakefield is the director of the Division of

8    Intellectual and Developmental Disabilities; and

9    Greg Hoyt is the director of Hospital Operations.

10   Q    And did you, did you communicate with all

11   of those people to indicate that you would be in a

12   deposition today?

13   A    Yes.

14   Q    Did you say any more than that about the

15   deposition?

16   A    No.

17   Q    Okay.  Prior to your testimony being

18   noticed, did you receive briefings about this case

19   from any counsel?

20   A    None that I can recall.

21   Q    You recall this was a complaint that was

22   filed by the United States in 2016?

23   A    Uh-hum.  (Affirmative.)

24   Q    And did you receive a copy at this time --

25   at that time?



```
 1        A     A written copy --

 2        Q     Yes.

 3        A     -- are you referencing?

 4        Q     Written or electronic, but a form of

 5   complaint.  Have you seen the complaint in this

 6   action?

 7        A     I believe I have.

 8        Q     And have you been briefed on the progress

 9   of this action from time to time?

10        A     Occasionally.

11        Q     And is that by Mr. Belinfante?

12        A     Yes.

13        Q     And also by your counsel at DBHDD, Amy

14   Howell?

15        A     Possibly.  Yes, I do recall.

16        Q     And have you been present at any meetings

17   where representatives of other agencies were also

18   present where the case was discussed?

19        A     None that I can recall.

20        Q     Have you been present at any meeting where

21   any state employees have discussed the case?

22        A     Yes.

23        Q     And were those meetings at which counsel

24   was also present?

25        A     Not that I recall.
```



JUDITH A. FITZGERALD                              August 16, 2022
UNITED STATES vs STATE OF GEORGIA                            14

1    Q    What were the meetings at which you

2  discussed, you were present when state employees

3  discussed the case?

4    A    So what I recall at the moment is most

5  specifically when Clara was working for DBHDD and

6  her primary role was working with the GNETS programs

7  to make improvements, and so in some regular

8  conversations with her we were discussing GNETS'

9  performance and activities, not so much the lawsuit

10  but actually what was happening in her efforts to

11  improve GNETS' performance.

12    Q    When you say Clara, you're referring to

13  Ms. Keith?

14    A    Yes.

15    Q    A former employee of the Department of

16  Education?

17    A    Yes.

18    Q    And she came to work for the DBHDD?

19    A    Yes.

20    Q    Other than the conversations that you had

21  with Ms. Keith, have you had any other conversations

22  with state employees about this case?

23    A    Not that I can recall, other than

24  Commissioner Frank Berry, of course.  So I don't

25  know if you're referencing internal conversations I



1  would have had when he was Commissioner at DBHDD.

2      Q    Did you have conversations with him about

3  the case when he was Commissioner?

4      A    Yes.

5      Q    And what did you -- when was the first

6  such conversation?

7      A    I don't recall.

8      Q    Do you recall the substance of any of the

9  conversations?

10     A    Not with a great deal of specificity.

11  Certainly as we came into the department and the

12  issues regarding this case were brought to our

13  attention, we would have conversations about our

14  understanding of this issue, and certainly were in a

15  position to be responsive to requests that were

16  being made of the department as they related to

17  GNETS.

18     Q    And how do you understand the case,

19  Commissioner?

20     A    It's my understanding that the case that

21  was originally brought was the United States

22  suggesting that youth in Georgia were being

23  segregated in their educational experience as a

24  result of their behavioral and related disabilities,

25  and that they were not given the opportunity to be



1  educated in their zoned schools by virtue of the

2  existence of GNETS.

3      Q    Did you agree with those allegations of

4  the United States when you came into DBHDD?

5      A    I can't recall having an opinion about --

6  about that.

7      Q    Do you have an opinion now?

8      A    I do not.

9      Q    By the way, you were one of the principal

10  representatives of DBHDD in the prior United States

11  versus Georgia relating to adult mental health?  I

12  believe you know Aileen Bell Hughes, my colleague,

13  from that case?

14      A    I like that you call it prior, as if it's

15  not current.

16      Q    You're familiar with that one?

17      A    Yes.

18      Q    And were you one of the principal people

19  charged with responding on behalf of DBHDD in that

20  case?

21      A    Yes.

22      Q    Is the same thing true with respect to

23  this case, that you're one of the principal people

24  charged with responding on behalf of DBHDD --

25      A    Certainly.



1      Q    -- to the allegations against the State?

2      A    To the degree that I'm asked, absolutely.

3      Q    Let's see.

4           What has been your formal education since

5  high school, Commissioner?

6      A    I attended the University of Scranton in

7  Pennsylvania, received a psychology degree and --

8      Q    What year was that?

9      A    1987.  Then I earned a Master's degree in

10 social work at the University of Georgia in 1992.

11 '91, '92.

12     Q    Have you ever held any professional

13 licenses?

14     A    No.

15     Q    So you're not licensed as a social worker?

16     A    No.

17     Q    And never have been?

18     A    Correct.

19     Q    Okay.  What has been your employment since

20 you earned your Master's in social work in 1992?

21     A    My first role following my graduate degree

22 was at the Carter Center, where I served as the

23 assistant director of the mental health program at

24 the Carter Center.

25          Following that, I did a brief stint at a



 1  Community Service Board, the Gwinnett Rockdale

 2  Newton Community Service Board.

 3          Following that, I worked for a boutique

 4  consulting firm called Human Systems and Outcomes,

 5  in Tallahassee, Florida.

 6          Following that, I was the executive

 7  director of the Mental Health Association of

 8  Georgia.

 9          Following that, I returned to the Gwinnett

10  Rockdale Newton Community Service Board, now known

11  as Viewpoint Health.

12          And following that, I came to the State in

13  2012, initially in the role of deputy commissioner.

14     Q    I'm going to stop you right there because

15  I want to get some dates.

16     A    Sure.

17     Q    During what dates were you the assistant

18  director for mental health at the Carter Center?

19     A    '90 -- I'm sorry, I'm bad at dates and it

20  probably says it on my resume.  If my graduate

21  degree was maybe '93, I think I was at the Carter

22  Center '94 to '98.

23     Q    And then you said you worked for a CSB?

24     A    Briefly, yes.

25     Q    Which CSB was that?



1        A     Gwinnett Rockdale Newton.

2        Q     And how long were you there before you

3   went to your boutique consulting firm in

4   Tallahassee, Florida?

5        A     I would say about nine months.

6        Q     And so then did you join in the boutique

7   consulting firm in Tallahassee, Florida, in 1999?

8        A     Yes.

9        Q     And how long did you remain there?

10       A     Until 2001.  2000 or 2001.  Maybe the end

11   of 2000.

12       Q     And did you move to Tallahassee during

13   that period?

14       A     I did.

15       Q     Did the boutique consulting firm do work

16   in state government?

17       A     Yes.

18       Q     What was the nature of the work?

19       A     The principal in the consulting firm was a

20   court monitor in an Alabama child welfare lawsuit

21   and they were engaged in other state government work

22   in Arizona, Hawaii, and Florida, and the principals

23   of that firm developed a methodology for testing the

24   capacity and performance of human service entities,

25   and so I assisted with the development of protocols



 1  and actually reviewing human service delivery

 2  systems, sometimes at a local level, sometimes at a

 3  state level, in other states.

 4       Q    What was the methodology that they -- that

 5  your firm used to measure the capacity and

 6  performance of human service systems?

 7       A    It was called Service Testing, where they

 8  partnered with the State or locality to develop a

 9  location specific protocol for interviewing key

10  stakeholders and moving towards a process

11  improvement and program improvement in partnership

12  with the evaluators so that there would be local

13  ownership of the review process.

14       Q    I see.  When you referred to location, you

15  were referring to local ownership?

16       A    Yes.

17       Q    And is that local in the sense of

18  municipal or county entities, or were you referring

19  to the state?

20       A    In Alabama, for example, it was county

21  entities.  In Arizona, they were regional entities.

22       Q    What was the name of your consulting firm

23  in Tallahassee?

24       A    Human Systems and Outcomes.

25       Q    With respect to the Alabama



1  responsibilities, was that case in litigation?  Was

2  it in compliance?  What was the status of it when

3  you first became involved?

4      A    It was a consent decree, the RC consent

5  decree.  So the work at hand -- the principal in the

6  company, Dr. Ivor Groves, was the court monitor and

7  reporting to the judge.  They used the service

8  testing methodology to assert county compliance with

9  the consent decree county by county.

10     Q    So you're familiar with the concept of

11 compliance --

12     A    Yes.

13     Q    -- with consent decrees?

14     A    Yes.

15     Q    For governmental entities?

16     A    Yes.

17     Q    And you also have experience in that

18 regard in the United States versus Georgia case that

19 settled in 2010?

20     A    Yes.

21     Q    And then you went to become the executive

22 director of the Mental Health Association of

23 Georgia?

24     A    Yes.

25     Q    What year was that?



1      A      2001.

2      Q      How long were you at the boutique

3  consulting firm in Tallahassee?

4      A      I think it was about two years.

5      Q      From 1999 to 2001?

6      A      '1, yeah.

7      Q      I'm not familiar with the Mental Health

8  Association of Georgia.  Who are its constituent

9  members?

10      A      So they are the state association

11  affiliated with the National Mental Health

12  Association, now called Mental Health America.

13          So at the state chapter of this national

14  organization was an advocacy organization.

15  Stakeholders would be both consumers of services,

16  providers of services, people in the state

17  interested in promoting and advocating for mental

18  health.

19          We also did provide some small programs

20  because we had absorbed the Atlanta chapter of the

21  Mental Health Association, and they more directly

22  provided services.

23      Q      And how long did you serve as executive

24  director of the Mental Health Association of

25  Georgia?



1       A     Until probably December of 2001.  No, I'm
2  sorry.  Hold on a second.  Sorry.

3             The dates are hard for me.  That's the
4  problem with being old.

5             So I left -- I'm trying to figure out my
6  daughter's birthday because I left a month before --
7  or actually a week before.

8       Q     Before your first child?

9       A     Before my first child was born.  I'm
10 working the math here.

11      Q     I don't need the precision on the back end
12 of the date, but were you there for about a year?

13      A     It was a little bit more than that.

14      Q     About two years?

15      A     Yeah.

16      Q     So from 2001 to 2003?

17      A     Till 2000 -- so she's born January '04.

18      Q     And what were the principal initiatives
19 that the Mental Health Association was seeking to
20 advance during the time period you were there from
21 2001 to 2004?

22      A     So, again, raising awareness about mental
23 health, the need for mental health services, parity
24 in mental health coverage, and supporting local
25 chapters in their efforts to engage people in



1  awareness about mental health.

2      Q    Did this concern children and adolescent

3  psychiatry mental health or --

4      A    Across the life span.  Both.

5      Q    And then what year did you join the

6  Gwinnett Rockdale Newton Service Board?

7      A    I began with contract work.  I was not a

8  full-time employee.

9      Q    Contract work, do you mean you served as a

10  consultant under an independent contractor

11  arrangement?

12      A    Yes.  Yeah, yeah, doing some project work.

13  It was later in 2004.  So probably early fall of

14  2004.

15      Q    And how long did you -- so you started as

16  a contractor?

17      A    Yeah.

18      Q    And then how long did you remain there?

19      A    Several years.  I remained a contractor

20  for a period of time, and then I ultimately came on

21  as a full-time employee.

22      Q    When did you start as a full-time

23  employee?

24      A    I don't recall.

25      Q    When did you leave Gwinnett Rockdale



 1  Newton?

 2      A    I left Gwinnett --

 3      Q    Was it in 2012?

 4      A    '12, to become -- to come to the State,

 5  yeah.

 6      Q    You left in 2012 to become chief of staff?

 7      A    Deputy commissioner was my first role.

 8      Q    To deputy commissioner, okay.  Well, let's

 9  not get ahead of ourselves.

10      A    Yes.

11      Q    What was the nature of the contract work

12  that you were doing at Gwinnett Rockdale Newton?

13           I'm going to call it Viewpoint.

14      A    You can.

15      Q    Does that make sense to you?

16      A    Yes, sure.

17           Essentially, I took on special projects in

18  support of Frank Berry, who was then the CEO, and I

19  worked closely before.  So wherever special project

20  work was needed, I did that.

21           I don't recall the distinction, really,

22  between when I was doing contract work and when I

23  ultimately became a full-time employee there.

24      Q    In any case, it's fair to say you never

25  acted as a social worker for the entity Rockdale



1  Gwinnett or Viewpoint in the sense of providing

2  social work services to clients?

3       A    If you mean direct care to clients,

4  correct, never.

5       Q    And so, generally, what was the nature of

6  your work?

7       A    In program development and oversight, and

8  then ultimately strategy for the organization.

9       Q    Where you had first worked with

10 Commissioner Berry?

11      A    When I was -- we first met when I was at

12 the Carter Center, and he was at the Department of

13 Juvenile Justice.  So we struck up a friendship at

14 that time.

15           Later, when he still was at the Department

16 of Justice and I was at the Mental Health

17 Association, they experienced some youth suicides in

18 the Department of Justice, and he asked the Mental

19 Health Association to come in and do a review of

20 what was happening in the facilities.

21      Q    Did you lead that review?

22      A    Yes.

23      Q    Apart from your work at the Carter Center

24 and the work at the Mental Health Association

25 relating to these suicides, did you do any work with

1  Mr. Berry prior to joining Viewpoint?

2       A    Not that I can recall, but I -- not that I

3  can recall at the moment.

4       Q    When did you last speak to Mr. Berry,

5  Commissioner Berry?

6       A    On the -- oh, last speak to him?  Um,

7  what's today?  Tuesday?  Yesterday.

8       Q    Yesterday?

9       A    Yes.

10      Q    And what was the subject matter of that

11  call?

12      A    We both dropped off our daughters at

13  college.

14      Q    Congratulations.

15      A    Thank you.  Yes.  That was the nature of

16  the call.

17      Q    You keep in touch with him as a personal

18  friend?

19      A    Yes.

20      Q    Has he introduced himself to you in his

21  new capacity on behalf of Ernst & Young?

22      A    Not to do any work in the State of

23  Georgia, no.

24      Q    But you know he's working there?

25      A    Yes.  Yeah.

1      Q      Have you gone out to dinner with him since

2   he started working at Ernst & Young?

3      A      Yes.

4      Q      How many times?

5      A      Just once.

6      Q      Just once?

7      A      Yeah.  There was a large group.

8      Q      What group was it?

9      A      Just a group of former professional

10  colleagues.  Just -- not a work dinner, friend

11  dinner.

12     Q      Did Commissioner Berry host that dinner?

13     A      No.

14     Q      Now, you said that you were in charge of

15  program development, oversight and strategy during

16  your years at Viewpoint?

17     A      Uh-hum.  (Affirmative.)

18     Q      What were the principal projects that you

19  were responsible for during your eight years at

20  Viewpoint?

21     A      One of the principal projects -- there

22  were several.  I oversaw the rebranding of GRN

23  Community Service Board to become Viewpoint Health.

24          I had oversight of the implementation of

25  clinical productivity standards, which was a big



1  change for the organization.

2        Q    How so?

3        A    Culture shift.  It was happening all

4  across the landscape in behavioral health, moving

5  from delivery of services in clinical settings to

6  meeting productivity standards and having those be

7  transparent for the organization.

8             So, for example, a number of billable

9  hours that a clinician would have to meet.

10       Q    So there was a shift to billable hours

11 rather than just seeing --

12       A    Right.

13       Q    -- whoever came in the door?

14       A    Exactly, yes.

15            And then the other large initiative that

16 comes to mind was Viewpoint Health's implementation

17 of a care management entity, which was Viewpoint

18 Health's child and adolescent service delivery

19 option for the organization.

20       Q    Let be back up a little bit.

21            What is a Community Service Board as it's

22 understood in Georgia?

23       A    So it's essentially a community mental

24 health center.  It has an unusual designation in

25 that it's an instrumentality of the State, in the



1  long -- sometimes people use the term quasi

2  governmental.  I don't like that term.  It's simply

3  an instrumentality of the State, but they are the

4  public safety net in the designated area for GRN.

5  It was the three county, Gwinnett Rockdale Newton

6  Community Service Board, or people with mental

7  illness, substance use disorders, and intellectual

8  and developmental disabilities.

9      Q    And when did the term come into common

10  usage in Georgia?  CSB?

11     A    With the passage of House Bill 100.

12     Q    What year was that?  2009?

13     A    I should know.  No.

14     Q    Earlier?

15     A    It's earlier than that.

16     Q    So when you came to Viewpoint, it was a

17  Community Service Board --

18     A    Yes.

19     Q    -- serving both -- and it served both

20  children and adolescents --

21     A    Yes.

22     Q    -- as well as adults, across the life

23  span, as you say?

24     A    Yes.

25     Q    And you worked with Commissioner Berry?



 1      A    He was the chief executive in my second

 2   stint there.

 3      Q    What do you mean your second -- oh, right.

 4      A    So my first stint, he was, he was not

 5   there.

 6      Q    So your second stint was from 2004 to

 7   2012?

 8      A    Yeah.

 9      Q    Your principal stint there, I suppose?

10      A    Yeah.

11      Q    Were any of the other players at DBHDD

12   working with you at Viewpoint.

13           MR. BELINFANTE:  Object to form.

14      Q    Between 2004 and 2012?

15           MR. BELINFANTE:  You can answer.

16      A    I'm not sure I understand the question,

17   actually.

18      Q    Sure.  Were any of the other current

19   employees at DBHDD working with you at Viewpoint?

20      A    Not that I can recall.  So at Viewpoint

21   Health and DBHDD, I don't think so.

22      Q    When you say you've been a consultant to

23   other states on child and adolescent services, are

24   you referring to the work you did when you were in

25   Tallahassee?



1       A    Yes.

2       Q    And that is Arizona, Hawaii, and Georgia?

3       A    I did not engage in the Hawaii work.  So

4   it was -- for me it was Arizona, Alabama, and

5   Georgia.

6       Q    Did you have any Florida work?

7       A    Minimal.

8       Q    In mid-2012, Commissioner Berry was

9   appointed as the commissioner of DBHDD, correct?

10      A    Correct.

11      Q    And did he ask you to move with him?

12      A    He did.

13      Q    And was that the first time you've been

14  employed by the State of Georgia?

15      A    Yes.

16      Q    And when did you start at DBHDD?

17      A    August of 2012.

18      Q    And have you been employed continuously by

19  DBHDD since August of 2012?

20      A    Yes.

21      Q    What, what positions or titles have you

22  had during your time there?

23      A    So I began as deputy commissioner, and

24  then I shifted to chief of staff, and then moved

25  into the role of commissioner.



1      Q    You were appointed as Commissioner in

2   February of 2016?

3      A    I believe it was December of 2016.  As you

4   can see, my dates are --

5      Q    Let me try to refresh your recollection a

6   little bit.

7           Commissioner --

8      A    The record will reflect this, I'm sure,

9   yes.

10     Q    Commissioner Berry left in December of

11  2015.

12     A    Okay.

13     Q    And do you remember a few months after

14  that, Governor Deal appointed you as the

15  Commissioner?

16     A    That is the sequence of what happened,

17  yes.

18     Q    So it was roughly February of 2016?

19     A    Okay.

20     Q    How did your responsibilities change

21  between being the deputy commissioner and being the

22  chief of staff?

23     A    So when I was deputy commissioner, when --

24  so when Frank Berry, myself and Jeff Minor, the

25  previously referenced CEO, first came to the -- the



1  three of us came together, our primary task was

2  really to assess the work of the department as a

3  whole.

4          So coming from a single community service

5  board, stepping into trying to get a handle on a

6  very large department with statewide

7  responsibilities, we spent several months really

8  trying to make sure we understood the landscape

9  broader than what we had experienced out of GRN

10 Community Service Board.

11         So, really, it was a broad role of trying

12 to understand the totality of the hospital system,

13 DD services in the community, mental health services

14 in the community, substance abuse services in the

15 community.  So that was the deputy role -- I'm

16 sorry.  Did you ask, and then what was the shift

17 when I was chief of staff?

18    Q    I did ask how they were different, but I'm

19 going to withdraw that question and put a different

20 question.

21         So you were trying -- the component parts

22 of DBHDD are the State hospital system; is that

23 correct?  That's one component?

24    A    Uh-hum.  (Affirmative.)

25    Q    And then behavioral health --



JUDITH A. FITZGERALD                                   August 16, 2022
UNITED STATES vs STATE OF GEORGIA                              35

1        A    Uh-hum.  (Affirmative.)

2        Q    -- services?

3             MR. BELINFANTE:  Try to say yes or no.

4        A    Yes.

5        Q    Thank you.

6             MS. COHEN:  Thank you, Josh.

7   BY MS. COHEN:

8        Q    And then the developmental disabilities

9   piece?

10       A    Yes.

11       Q    And did you have a specific portfolio as

12  deputy commissioner or were you just No. 2 to the

13  Commissioner?

14       A    No. 2 to the Commissioner.

15       Q    And how many months did you remain as

16  deputy commissioner?

17       A    I would say it was more than a year in

18  that role.

19       Q    Was that a governor's appointment?

20       A    No.

21       Q    It was an appointment at the pleasure of

22  Commissioner Berry?

23       A    Correct.

24       Q    And when you refer to hospital services,

25  what hospitals do you -- are you referring to?



1      A     The five state hospitals run by DBHDD.

2      Q     Are those mental health facilities?

3      A     Primarily.

4      Q     And do they also have a component for

5   developmental disorders?

6      A     Two of them still do.

7      Q     Which are the two?

8      A     Atlanta and Augusta.

9      Q     And which are the other three?

10     A     Central State in Milledgeville, Savannah,

11  and Columbus.

12     Q     And so Central State in Milledgeville,

13  Savannah, and Columbus are exclusively charged with

14  mental health disorders?

15     A     Yes.

16     Q     And have no DD component?

17     A     Correct.

18     Q     You understand I mean developmental

19  disorders?

20     A     Yes.

21     Q     And if I say ID, you understand I'm

22  referring to intellectual disorders?

23     A     Yes.

24     Q     Now, how did your portfolio change when

25  you became chief of staff?  What's the difference



1  between a chief of staff and deputy commissioner,

2  who is the No. 2 person?

3      A    As Commissioner Berry, in his role, made

4  it a priority to travel around the State and see

5  programs that the department was contracting for,

6  that accelerated in the first and second year of his

7  administration.

8           What we learned was that as he did that,

9  and it was important for him in that role to be

10  visible, there were still quite a bit of personnel

11  and other activities that needed to be attended to

12  within the department.  What we agreed at that time

13  was I would transition to become chief of staff and

14  take on more of the direct reporting of other

15  executives and provide more hands-on support to the

16  actual work in the role of chief of staff, and

17  Commissioner Berry would continue a more external

18  facing, both in terms of travel and legislative and

19  other meetings that he would conduct while he was

20  around the State.  And my primary focus would be

21  leading the internal team in the role of chief of

22  staff.

23      Q    So did the principal offices of DBHDD

24  report in to you when you were chief of staff?

25      A    Yes.



1     Q    Were there any exceptions?

2     A    The medical director still reported to the

3   Commissioner.  And I can't think of any other at the

4   moment, but not that I'm aware of.

5     Q    So you functioned in that role through

6   December of 2015, when Commissioner Berry left?

7     A    Yes.

8     Q    And then did you have an acting role in

9   running the agency until your formal appointment as

10  Commissioner?

11    A    I must have.  That's not how I remember it

12  but given the dates you described.

13    Q    Let's look at the organizational chart.

14  The one I have is undated.

15    A    Okay.

16    Q    I believe it's been previously marked as

17  Exhibit 4.

18         (WHEREUPON, Plaintiff's Exhibit-4 was

19     previously marked for identification.)

20  BY MS. COHEN:

21    Q    Does this chart reflect essentially the

22  current organizational structure at DBHDD, Exhibit

23  4, that I've put in front of you, which is stamped

24  Georgia 00009 through 16.

25    A    No.  This is outdated.



1        Q    How it is different?

2        A    So there are several people who are on

3   here who have since left the department, and the

4   organization is different now.

5        Q    Okay.  When do you think this chart dates

6   from?

7        A    Probably -- it's pre-COVID, I know that.

8             I would say 2017.

9        Q    Looking at Page 9, which of it is accurate

10  and which reflects positions that have been changed

11  or individuals who have moved on?

12       A    Okay.  I'll just go person by person here.

13            Amy Howell is no longer with DBHDD.

14       Q    And is Ms. Patel currently the general

15  counsel?

16       A    No.  Brenda Woodard is general counsel.

17       Q    W-O-O-D-A-R-D?

18       A    Correct.  Dr. Risby still serves as chief

19  medical officer and reports directly to me.

20            David Sofferin is still with the

21  organization and still in that role, but there's

22  been a person added to the executive team.  Ashley

23  Fielding is the assistant commissioner.  She reports

24  directly to me.  She's assistant commissioner for

25  Agency Affairs.



1    Q    And Mr. Sofferin reports to her?

2    A    To her, uh-huh.

3    Q    Okay.

4    A    Jeff Minor is chief operating officer.

5         Ron Wakefield is still the director of the

6    Division of Developmental Disabilities and reports

7    to me.

8         Monica Johnson is the director of the

9    Division of Behavioral Health and reports to me.

10         Robert Dorr has retired.

11         And Melissa Sperbeck reports to me.  Her

12    role has been expanded.  She is now the director of

13    the Division of Strategy, Technology and

14    Performance.

15    Q    And does that encompass the two divisions

16    that were previously held by -- headed by Robert

17    Dorr and Melissa Sperbeck?

18    A    Yes.  Lavin Gartland Briggs is no longer

19    with the department.

20         Greg Hoyt is with the department and he

21    reports directly to me with a dotted line to Jeff

22    Minor, and he is the director of Hospital

23    Operations.

24         Doug Engel has retired.  We have a new

25    director of the Office of Information Technology



1  named Jason McSwain.  He reports to Melissa.

2          Mark Green remains as the director of HR.

3  He reports to Ashley Fielding.

4          And Mary Price is the chief financial

5  officer and she reports to me.

6     Q    Now I'm going to direct your attention to

7  Page 12.  Do you have that in front of you?

8     A    I do.

9     Q    This page shows the direct reports to

10 Monica Johnson?

11    A    Uh-hum.  (Affirmative.)

12    Q    Who remains the director of the Division

13 of Behavioral Health?

14    A    Uh-hum.  Yes.

15    Q    Thank you.

16         Do her direct reports remain the same?

17    A    There are several changes.

18    Q    What are the changes?

19    A    We have a new director of the Office of

20 Crisis Coordination.  That's Dawn Peel.

21         Dante McKay is still the director of the

22 Office of Children, Young Adults & Families.

23         Cassandra Price remains the same.

24         Jill Mays remains the same.

25         Dr. Timberlake has -- is no longer with



1   the department.  Carol Caraballo --

2   C-A-R-A-B-E-L-L-O -- no.  A-L-L-O, sorry -- is now

3   in that role.

4          We do have a director of the Office of

5   Deaf Services, Kelly Sterling.

6          Adrian Johnson is still the Office of

7   Field Operations.

8          The Office of Recovery Transformation is

9   Dana McCrary.

10          And I believe the Office of Behavioral

11   Health Prevention has been absorbed by Jill Mays.

12      Q    I don't think we need to go into the

13   regions, but let me ask you, is one of the principal

14   divisions of the Department of Behavioral Health and

15   Developmental Disabilities the behavioral health

16   side?

17      A    Yes.

18      Q    And is it called the Behavioral Health

19   organization?

20      A    Yes.

21      Q    So the division name remains the same?

22      A    Yes.

23      Q    And then the other principal divisions are

24   the Hospital Division, correct?

25      A    Yes.



1       Q    And the Developmental Disabilities
2   Division, correct?
3       A    Yes.
4       Q    And --
5       A    And then we consider strategy, technology
6   and performance another division.
7       Q    So have you a fourth division?
8       A    Yes.
9       Q    Is that the Accountability Division?
10      A    Yes.
11      Q    Has there been an up-to-date -- has there
12  been an up-to-date chart produced, organizational
13  chart, since this time?
14      A    Yes.
15      Q    Yes?
16      A    Yes.
17      Q    Can you get us a copy of the current
18  organizational chart?
19      A    Yes.
20      Q    Same colors?
21      A    I believe so.
22      Q    We'll put this to the side for a minute.
23           And who do you report to as Commissioner?
24      A    Kristyn Long in the Governor's Office.
25      Q    How do you spell her name, L-O-N-G?



1          A     L-O-N-G.

2          Q     And what is her title?

3          A     She is deputy chief operating officer.

4          Q     And who does she report to?

5          A     Lauren Curry.

6          Q     And Lauren's title?

7          A     Chief operating officer.

8          Q     And does Lauren Curry report to?

9          A     I believe it's Trey Kilpatrick, the

10   governor's chief of staff.

11         Q     And Mr. Kilpatrick, I take it, reports to

12   Governor Kemp?

13         A     As I understand it.

14         Q     Now, with regard to the division of

15   department functions between behavioral health and

16   developmental disabilities, is it the department of

17   -- does the Division of Developmental Disabilities

18   provide services for children and adolescents?

19         A     Yes.

20         Q     And what age-group does it provide

21   services to?

22         A     Across the life span, if they're eligible

23   for our DD services.

24         Q     What is the eligibility criteria?

25         A     It's established in policy through our



1  waiver program of -- an individual would have to

2  qualify by virtue of their intellectual or

3  developmental disability as tested through various

4  validated instruments to determine the extent of

5  functional and developmental and intellectual

6  impairment.

7       Q    So is there a line of demarcation between

8  behavioral health, the population served by

9  behavioral health and developmental disabilities, or

10  is -- or do -- are some served by both divisions?

11      A    There is a line of demarcation.

12      Q    What is it?

13      A    Driven by the individual's diagnostic

14  profile and needs.

15      Q    So what are the diagnoses associated with

16  the Division of Behavioral Health?

17      A    So behavioral health would be serving

18  individuals with mental health and substance use

19  disorders.  So mental health issues, such as

20  depression, anxiety, schizophrenia.  And those items

21  listed in the DSM-IV, or V now, which essentially

22  establishes the definition of various mental health

23  disorders.

24      Q    And what about the Division of

25  Developmental Disability, what are the diagnoses



1    that it's responsible for?

2         A    So intellectual and developmental

3    disabilities that impair -- that exhibit impairment

4    of functioning and intellectual or developmental

5    progress.  Once again, as defined by -- or as

6    measured by validated testing, like an IQ test or

7    other developmental assessment.

8         Q    What about if the individual -- are there

9    any individuals who are duly diagnosed in that they

10   have intellectual disability and a mental health or

11   substance abuse disorder?

12        A    Yes.

13        Q    And is the ID label the controlling label?

14        A    The primary diagnosis is the --

15        Q    Primary diagnosis?

16        A    -- controlling label.

17        Q    And is that usually ID?

18        A    It depends on the individual circumstances

19   and the acuity or functional impairment of the

20   individual.

21        Q    And the Office of Children, Youth &

22   Families provides services to both mental health

23   disorders and substance abuse disorders; is that

24   right?

25        A    They contract with providers that provide



 1  behavioral health services.

 2      Q    Thank you.  I was using provide services,

 3  but they're concerned --

 4          MS. COHEN:  Let me rephrase it.

 5  BY MR. HOLKINS:

 6      Q    The OCYF -- which you understand is the

 7  Office of Children, Young Adults & Families --

 8      A    Yes.

 9      Q    -- is concerned with mental health

10  disorders and behavioral disorders -- sorry -- with

11  mental health disorders and substance abuse,

12  correct?

13      A    Yes.

14      Q    And it's not concerned with intellectual

15  disabilities and impairments?

16      A    At times there are occasions where

17  personnel and programs that are in OCYF are drawn

18  into complex cases where an identified individual

19  might have an intellectual and developmental

20  disabilities -- or disability and there may be

21  co-occurring behavioral health issues that requires

22  the two divisions to come together.

23      Q    Apart from those circumstances, in

24  general, OCYF's principal focus, it's fair to say,

25  is on mental health and substance abuse?



1      A    Yes.

2      Q    Now, what are your duties and

3  responsibilities as Commissioner?

4           MR. BELINFANTE:  Object to the form.

5      A    I am responsible for planning, oversight,

6  and execution of the department's responsibilities,

7  including budgetary, operational, and clinical.

8      Q    I'm sorry -- let's see.  Budgetary,

9  operational, and clinical?

10     A    Yes.

11     Q    What is the population that DBHDD has

12  budgetary responsible for?

13     A    Individuals in Georgia who have mental

14  illness, substance use disorders, and intellectual

15  and developmental disabilities with a priority on

16  individuals who are uninsured or receiving Medicaid

17  and at the highest level of need.

18     Q    So the Department of Behavioral Health and

19  Developmental Disabilities has budgetary responsible

20  for all individuals in Georgia who have mental

21  illness, substance use disorders, and intellectual

22  and developmental disabilities?

23           MR. BELINFANTE:  Object to the form.

24     A    No.  Not in the way -- could you say your

25  -- we don't have responsibility for all individuals

1   in the State who have --

2        Q    I asked you previously what is the

3   population that DBHDD has responsibility, budgetary

4   responsibility for, and you said individuals in

5   Georgia who have mental illness, substance use

6   disorders, and intellectual and developmental

7   disabilities, and then you mentioned the priority

8   being individuals receiving Medicaid and at the

9   highest level of need.

10       A    And individuals who are uninsured is the

11  designated priority population.

12       Q    So does the DBHDD have responsibility for

13  all individuals in --

14           MS. COHEN:  I'm sorry.  Withdraw that.

15  BY MS. COHEN:

16       Q    Does DBHDD have responsibilities for all

17  individuals in the State of Georgia who receive

18  public services for mental health, developmental

19  disabilities, and substance abuse disorder?

20           MR. BELINFANTE:  Object to form.

21       A    No.  We have responsibility for the ones

22  that we administer.

23       Q    And which are the ones that you

24  administer?

25       A    That varies a lot by program areas.  So,



1    for example, there are people with intellectual and

2    developmental disabilities that might be on a

3    waiver, like the Katie Beckett waiver program.

4    DBHDD does not oversee that waiver program.  So I

5    would not say that we have responsibility for all

6    individuals receiving public services.

7        Q    Does DBHDD develop a provider care manual

8    that outlines the behavioral health services that

9    are provided in the State of Georgia?

10       A    For the services that the department

11   contracts for, yes, we have a provider manual.

12       Q    And are there other services that are

13   subject to a different provider manual?

14       A    I can only speak to the ones that we

15   contract for and how we contract with a provider,

16   hold them accountable for the services that they

17   deliver.

18            Our providers receive funds from other

19   sources.  Those other sources might dictate the

20   service provision guidelines and accountability.

21       Q    What I'd like to know, Commissioner, is

22   what are the provider care manuals that are

23   applicable to the provision of behavioral health

24   services in Georgia, whether by DBHDD or any other

25   state agency, that you're aware of?



1    A    So I'm not sure I understand the question.

2    Again, I'll speak to DBHDD --

3    Q    Well, let me, let me interrupt you so we

4    don't waste any time.

5         DBHDD puts out a provider care manual that

6    covers the services that the agency administers?

7    A    We -- yes.

8    Q    And DCH puts out a provider manual for the

9    services that it contracts for, correct?

10    A    Yes.

11    Q    Do you -- are you aware of any other

12    provider manuals that cover the provision of public

13    behavioral health services in Georgia?

14         MR. BELINFANTE:  Object to form.

15    A    I'm not familiar with any.

16    Q    And with respect to the provider manual

17    that's put out by DBHDD and the provider manual

18    that's put out by DCH, there is a tremendous effort

19    within your agency to coordinate those two manuals,

20    right?

21    A    Yes.

22    Q    Who leads that effort?

23    A    Wendy Tiegreen is essentially our liaison

24    between the Department of Community Health and

25    DBHDD, but in our representative program areas we



 1  have program experts in behavioral health and in

 2  intellectual and developmental disabilities who

 3  would also be engaged in very detailed work.

 4      Q    Now, what are the services that DBHDD

 5  contracts for in behavioral health as distinct from

 6  the services that DCH contracts for?

 7      A    So DBHDD has a four-hour -- we have

 8  three-tiers of providers, and those tiers are

 9  designated by the services they provide.

10          So Tier I provides a set of core services,

11  which we use that term, "core services."  That's

12  essentially the continuum of services, the minimum

13  continuum of services that a CSB should provide.

14      Q    And does DCH similarly provide for those

15  services?

16      A    I'm not sure how to answer that question

17  in that way.

18      Q    Maybe I'm asking you the wrong question.

19  Let me back up a little bit.

20      A    Okay.

21      Q    Who is the population that DBHDD contracts

22  services for?

23      A    The individuals with severe -- serious and

24  persistent mental illness, and for youth, youth with

25  serious emotional disturbances.



1          That's the prime population for the state

2    funds.  We also receive federal funds to do other

3    things.  But assuming you're talking about the state

4    funds here.

5          Q    Is that population with serious and

6    persistent mental illness in use, with serious

7    emotional disturbances, are all services to that

8    population provided by DBHDD, or are some provided

9    by DCH?

10         A    It depends on the individual's insurance

11   in some cases.

12         Q    So your answer is yes, some are provided

13   by DBHDD and some are provided by DCH?

14         A    Through DCH contracted providers.

15         Q    And working off the behavioral manual that

16   presumably describes common services?

17              THE WITNESS:  God bless you.

18              MR. BELINFANTE:  Thank you.

19         A    Yes.

20         Q    And the dividing line is, between DCH and

21   DBHDD is the type of insurance an individual has or

22   whether they're insured or not?

23         A    Primarily.

24         Q    And which individuals does DBHDD contract

25   for services for with regard to their insurance or



 1  lack thereof?

 2      A    Yeah, so generally individuals who are

 3  uninsured are DBHDD's responsibility.

 4           Also, our provider network, it may also be

 5  serving individuals receiving Medicaid or possibly

 6  Medicare, and some insured individuals.  It depends

 7  on whether or not the providers are on the insurer's

 8  panel.

 9      Q    And is that determined by the CMO who is

10  on the insurer's panel?

11      A    It might be determined by the organization

12  themselves, if they've applied to be on the

13  insurance panel.

14      Q    So what you're talking about is, is it a

15  difference in funding where DBHDD contracts for some

16  services and funds them, and DCH contracts for

17  services for individuals with different kinds of

18  insurance and funds that?

19      A    Yes.  But individuals have choice of

20  provider.  Let me just say that, right.

21           So if there's an individual with serious

22  and persistent mental illness in a local community,

23  they may be able to choose what provider they're

24  going to.  I think that's why I'm a little confused

25  -- or it's not quite as cut and dry at the system



1  level.  It is influenced by what's available to the

2  individual, what they can choose locally.

3       Q    And what's available to the individual and

4  what dictates their choice is the type of insurance

5  that they have available?

6       A    Largely.

7       Q    Okay.  So what we have are two

8  organizations, two state agencies, DCH and DBHDD,

9  both contracting for behavioral health services,

10 correct?

11      A    Correct.

12      Q    And as far as you know, that represents

13 the universe of publicly provided behavioral health

14 services in the State of Georgia?

15           MR. BELINFANTE:  Object to the form.

16      A    Well, I'm also aware that behavioral

17 health services are being delivered in the GNETS

18 program, and almost all the child serving state

19 agencies also provide behavioral health services.

20      Q    Let me back up.

21           Which state agencies provide behavioral

22 health services paid for by Medicaid?

23      A    Department of Behavioral Health and

24 Developmental Disabilities, Department of Community

25 Health, DFCS.  And DJJ, although I think DJJ is all



1  state funded.  I'm not entirely sure about that.

2         And then DOE through GNETS is paying for

3  behavioral health services, small percentage in

4  public health, DPH for the zero to three population,

5  and a small percentage in the DECAL, the Department

6  of Early Care and Learning.

7     Q    What you're saying, Commissioner -- I

8  don't want to put words in your mouth, but I want to

9  summarize my understanding of what you're saying,

10 and you can tell me whether it's accurate -- is that

11 the Department of Education provides behavioral

12 services through its GNETS program?

13    A    Correct.

14    Q    And do you -- are you aware of any other

15 behavioral services that are provided by the

16 Department of Education?

17    A    I don't know if I would consider them

18 behavioral services, but I do know enough about

19 other initiatives in DOA -- DOE that impact mental

20 health in the school system.

21         For example, PBIS.

22    Q    Do you have my question in mind?

23         Are you aware of any other behavioral

24 services that are provided by the Department of

25 Education other than GNETS?



1      A    No.

2           MR. BELINFANTE:  Object to form.

3      Q    I probably should have come to this

4    earlier, but let me just ask you, how do you define

5    behavioral health services?

6      A    So behavioral health is the term used to

7    describe mental health and/or substance abuse

8    disorders.  So behavioral health services are those

9    activities, supports and interventions which address

10   the early identification or response to those

11   conditions or symptoms that are indication of a

12   mental health or substance use disorder.

13     Q    So as you're using the term "behavioral

14   health services," does it refer only to clinical

15   services or to other services as well?

16     A    Other services as well.

17     Q    So does the Department of Education

18   through the GNETS program provide clinical

19   behavioral health services?

20     A    It's my understanding that they do.

21     Q    And are the clinical behavioral health

22   services that are provided by the Department of

23   Education, are those the services that are

24   identified in either the provider manual put out by

25   DBHDD or by DCH?

1      A    I can't say.  I don't know.

2      Q    What kind of reporting do you receive from

3   DCH with regard to the clinical services that it

4   provides?

5      A    I do not receive reporting from DCH on

6   their provision of services.

7      Q    And do you provide reporting to DCH

8   regarding your provision of services?

9      A    We report to DCH on services delivered

10  through the IDD waiver program.

11     Q    Apart from the IDD waiver program, do you

12  report to DCH in any way on clinical services

13  provided?

14     A    No.

15     Q    And I'm using report in the sense of

16  provide data.

17     A    We do share data with DCH.

18     Q    In what circumstances?

19     A    Where it's aggregate data and allowable,

20  and we do share data around the utilization of

21  PRTFs.

22     Q    F?

23     A    PRTF, Psychiatric Residential Treatment

24  Facility.

25     Q    Apart from that, do you share any data?



1      A     Again, we have a cooperative relationship

2   with DCH, so we do share data.

3      Q     But your regular data sharing arrangement

4   with DCH relates to sharing of data relating to

5   PRTFs?

6      A     That's been more specific and project

7   focused in recent years.

8      Q     Now, when I asked you what behavioral,

9   clinical behavioral health services were provided by

10  DOE through the GNETS program and whether they were

11  covered with regard to either of the two major

12  provider manuals, DCH or DBHDD, you said you didn't

13  know.  What services does D -- excuse me.

14          What clinical health services does DOE,

15  behavioral health services, what clinical behavioral

16  health services does DOE provide through the GNETS

17  program?

18     A     It's my understanding that they provide

19  behavior aids and supports to youth who maybe need

20  behavioral intervention in order to be in the

21  learning environment.

22     Q     Anything else?

23     A     Not that I'm directly aware of.

24     Q     Does the Department of Education or the

25  GNETS programs or anyone bill Medicaid for those



1  services?

2      A    I'm not sure.

3      Q    Who would have that information?

4      A    Somebody from the Department of Education.

5      Q    Who?

6      A    Oh.  I don't know.

7      Q    Well -- so I think we've been talking

8  about provision of behavioral health services in the

9  sense of contracting.  Is DBHDD also responsible for

10  the design or selection of behavioral health

11  services?

12      A    Yes.

13      Q    What behavioral health services is DBHDD

14  responsible for the design or selection of?

15      A    We're responsible for the articulation of

16  what is in -- what is made available through the

17  core package of services that providers deliver.

18      Q    And is that core package essentially the

19  same for both DCH and DBHDD?

20      A    I can't speak to that.  I know what

21  DBHDD's core service package is.

22      Q    Sure.

23      A    And what's in the Medicaid State Plan,

24  which is what drives DCH's service delivery package.

25  That's where it's articulated.



1      Q    So it's fair to say that DBHDD sets the

2   policy for what clinical behavioral health services

3   are provided?

4           MR. BELINFANTE:  Object to the form.

5      A    Yes.

6      Q    That's statewide?

7      A    That's for the services that we

8   administer.

9      Q    Is it fair to say that the services that

10   you administer and the services that DCH provides

11   are essentially identical based on the provider

12   manuals for the two organizations?

13          MR. BELINFANTE:  Object to form.

14     A    Not exactly.

15     Q    Are you aware of any services that DBHDD

16   provides through its provider manual that are not

17   provided by DCH?

18     A    I believe there are some.

19     Q    Can you identify them, Commissioner?

20     A    Not at this moment.

21     Q    So as far as the bulk of the services with

22   which you're familiar, they're identical between DCH

23   and DBHDD?

24     A    The bulk of services, yes.

25     Q    Referring to behavioral health services?



1      A    Yes.

2      Q    Now, does DCH have a role in selecting

3  what behavioral health services the State provides,

4  or is that role reserved to DBHDD?

5      A    DBHDD is the behavioral health authority,

6  but we work in concert with the Department of

7  Community Health.  So if there were a program or

8  service area that we deemed important or necessary

9  to be included, we would likely be in conversation

10 with DCH about why that was, how that might play out

11 in the network of service delivery.

12     Q    And so it's fair to say that you work in

13 concert with DCH on selection of behavioral health

14 services, and DBHDD has the final authority?

15          MR. BELINFANTE:  Object to form.

16     A    Yes, DBHDD is the authority.

17     Q    So let's just take an example of the

18 Georgia Apex program.

19          You're familiar with that, Commissioner?

20     A    Yes.

21     Q    We'll talk about it in a little more

22 detail later, but let's just take it as an example.

23          So the Georgia Apex Program represents an

24 initiative by DBHDD to advance certain services in

25 certain settings to children and adolescents with



1  behavioral health needs?

2      A    Yes.

3      Q    And some of those services are paid for by

4  DBHDD and some are paid for by DCH?

5      A    Yes.

6      Q    But the control of the program rests with

7  DBHDD?

8      A    Yes.

9          MR. BELINFANTE:  Object to form.

10         THE WITNESS:  May I, before we go?

11     Because it looks like we're going into a line

12     of question here.  I just need a quick bathroom

13     break.

14         MS. COHEN:  Sure.

15         THE WITNESS:  Can we do that?

16         MS. COHEN:  We can do that, and I don't

17     know of how urgent it is, but we can also order

18     lunch if you like to do that now, Josh.

19         MS. ROSS:  Okay.

20         THE WITNESS:  I need more water.

21         THE VIDEOGRAPHER:  We're off the record at

22     10:33 a.m.

23         (A recess was taken.)

24         THE VIDEOGRAPHER:  Back on the record at

25     11:02 a.m.



1   BY MS. COHEN:

2       Q    So I think, Commissioner, when we broke

3   before I had asked you about an example which was

4   taking as an example the Georgia Apex Program.

5   That's an initiative by DBHDD to advance certain

6   services where it's paid for some by DBHDD and some

7   by DCH but control of the program rests with DBHDD?

8       A    Correct.

9       Q    And is that true, as far as you know, of

10  all of the programs that are jointly contracted for

11  by DBHDD and DCH?

12      A    So your --

13           MR. BELINFANTE:  Object to form.

14      A    -- your terminology, I think I'm not

15  connecting to the language that you're using there

16  of joint program.

17           Can I make sure I'm understanding?

18      Q    Sure.  As far as you know, all of the

19  behavioral health services that DCH provides are

20  subject to the ultimate control of DBHDD?

21      A    So I want to clarify language that you're

22  using.  Again, DCH doesn't provide the service,

23  right.  They act as an insurance and regulatory

24  body.  They contract with providers who deliver

25  services that are allowable within the design



 1  program.

 2       Q    So you feel more comfortable with the

 3  terminology "contracted for"?

 4       A    Yes.

 5       Q    Is there other of my terminology that you

 6  wanted to correct?

 7       A    Let's just keep going through and where I

 8  think about it differently, I want to make sure that

 9  I'm describing exactly how I understand it to

10  actually occur.

11       Q    Thank you.

12       A    Yeah.

13       Q    So where services, behavioral health

14  services for children and adolescents are contracted

15  for by DCH, as far as you know DBHDD has control of

16  what services are provided?

17       A    When I say we act as the behavioral health

18  authority, that means we have the expertise to

19  advise as to the service array that should be

20  available, but there are other controlling forces

21  that would decide what actually is available in the

22  State.

23       Q    And do any other agencies have expertise

24  in behavioral health services?

25            MR. BELINFANTE:  Object to form.



1    A    Yes.

2    Q    What are they?

3    A    I can give a few examples that I'm aware

4 of.

5    Q    Sure.

6    A    I know the Department of Juvenile Justice,

7 for instance, has a -- I don't know what the

8 official title is but they have a director of

9 behavioral health services.

10         I know in the Department of Early Care and

11 Learning they have a director of Infant and Early

12 Childhood Services.

13         And then at DCH they have a position that

14 I believe is director of Behavioral Health Services.

15         And at the Department of Human Services,

16 which oversees DFCS, I believe they also have a

17 director of mental health or behavioral health

18 services.

19    Q    As you know, this lawsuit focuses on

20 GNETS, the GNETS program.

21         As Commissioner of the Department of

22 Behavioral Health, what responsibilities do you have

23 that relate specifically to GNETS?

24         MR. BELINFANTE:  I object to the form.

25    A    I don't have any responsibilities that



 1  relate to the provision of GNETS.

 2      Q    Who on your staff has primary

 3  responsibility for the delivery of behavioral health

 4  services through GNETS?

 5           MR. BELINFANTE:  Object to form.

 6      A    We do not deliver -- DBHDD does not

 7  deliver behavioral health services through GNETS.

 8      Q    I understand that, but who on your staff

 9  is responsible for interacting with DOE regarding

10  the provision of behavioral health services through

11  GNETS?

12           MR. BELINFANTE:  Object to form.

13      A    Dante McKay is the director of the Office

14  of Children, Youth & Families.  So he is our primary

15  point of contact for services that relate to

16  children and adolescents.

17      Q    Is there anyone that has more specific

18  involvement with the GNETS program than Mr. McKay?

19      A    Not that I'm aware of.

20      Q    Did you ever designate Monica Johnson as a

21  point person for coordinating with GNETS?

22      A    There may have been a time early in our

23  engagement at DBHDD where Monica would have been the

24  point person.  Monica oversees the full continuum of

25  behavioral health services now, so it would be most





1   appropriate for Dante and his office to be more

2   directly engaged with services related to children

3   and adolescents.

4        Q    As you sit here today, are you able to say

5   who is the point person at DBHDD for interfacing

6   with DOE regarding GNETS?

7        A    Not regarding GNETS.  We have a staff

8   person named Layla Fitzgerald, who coordinates with

9   DOE, but it is not my understanding that is in

10  relation to GNETS.

11       Q    So your answer to my question, as you sit

12  here today, are you able to say who the point person

13  at DBHDD is for interfacing with DOE regarding GNETS

14  is that you're not aware of one?

15       A    I would hold Dante McKay accountable for

16  information that I needed.

17       Q    But my question relates to who is

18  designated as the point person for interfacing with

19  DOE with regard to GNETS.  Who is that?

20       A    I'm not aware of someone in that

21  designated role.

22       Q    In terms of your personal involvement, if

23  you have questions about the GNETS program, who do

24  you meet with on your staff?

25       A    I would start with Dante McKay.



1      Q     Anyone else?

2      A     No.

3      Q     Who are the key individuals employed by

4   DOE who you've met with regarding GNETS?

5            MR. BELINFANTE:  Object to form.

6      A     I have not met with anyone from DOE

7   regarding GNETS in recent history.

8      Q     Well, apart from being briefed about this

9   case, in other words, apart from this litigation, in

10   the course of, regular course of your duties, who on

11   your staff have you had conversations with about

12   GNETS?

13      A     Apart from the case, probably only Dante

14   McKay.

15      Q     Have you ever spoken to the Governor's

16   Office, by which I mean the Governor, the governor's

17   counsel, the governor's chief of staff, your

18   reporting chain, have you ever spoken to anyone in

19   that chain at the Governor's Office about GNETS?

20      A     Only reported to them my deposition today.

21      Q     Let's go back in time to 2015 to 2016.

22            That was just about when you were ending

23   your time as chief of staff, correct?

24      A     Yes.

25      Q     And in that year Commissioner Berry, I



1  think you testified, or agreed with my suggestion,

2  transitioned in December of 2015?

3      A    Yes.

4      Q    And Governor Deal appointed you in early

5  2016.

6           Now, with regard to the Georgia Apex

7  Program, was that something that had been developed

8  before you and Commissioner Berry came to the agency

9  in 2012, or was it developed subsequently?

10     A    Developed subsequently.

11     Q    And was its pilot year 2015 to 2016?

12     A    I believe that's correct.

13     Q    When did the germ of the idea for the Apex

14 program, maybe even before the name evolved, when

15 did that develop with DBHDD?

16     A    So the concept of school-based mental

17 health programs -- and by that I mean the provision

18 of mental health services in the school setting --

19 has been around for a long time.  I believe early

20 discussions about that started in 2014, led by

21 Monica Johnson, who had previously worked in the

22 community and had seen successful school-based

23 mental health programs and had mentioned that if

24 there were ever extra funding available at -- you

25 know, as sometimes happens at the end of a fiscal



1  year, that might be a pilot program she would be

2  interested in implementing.

3       Q    So as far as you know, it was her

4  brainchild?

5       A    Yes, based on experience.

6       Q    And how did you get the initial funding?

7  Was it end-of-the-year scraps, or did you do a

8  grant?

9       A    My recollection was end of year for the

10  initial pilot.

11       Q    The general assembly of the Georgia

12  legislature granted money to the department, and

13  from that money a pilot program was set up?

14       A    I believe the initial pilot might have

15  just been funds within the Office of Children, Youth

16  & Families that enabled us to just begin, but I

17  don't recall --

18       Q    Fair enough.

19       A    -- the first pilot.

20       Q    I'm going to move you even further back in

21  time, to Viewpoint/Gwinnett Rockdale Newton.

22            When you were working at Viewpoint, did

23  you have any responsibilities or involvement with

24  school-based mental health programs?

25       A    So Viewpoint Health was the recipient of a



1  federal System of Care grant.  I don't remember what

2  year that was, but we had tried several times and

3  been unsuccessful.  So it was the First Federal

4  System of Care grant that came into the State.

5           In that context of that federal grant, we

6  tried to do a number of community-based activities,

7  one of which was school-based mental health, to

8  bring school -- mental health services into the

9  school setting.

10          My reflection is we were met with general

11  resistance from local school settings in the

12  Gwinnett and Rockdale systems.

13     Q    Were those the two counties that you

14  engaged with at Viewpoint with regard to

15  school-based behavioral mental health services?

16     A    I primarily recall Rockdale County.  I

17  can't recall if we made other efforts in Newton and

18  perhaps some in Gwinnett, but Rockdale was initially

19  the primary focus.

20     Q    Did you write -- did you write that grant?

21     A    I did not.

22     Q    Did you participate in it?

23     A    Yes.

24     Q    And who wrote the grant?

25     A    We had a grant writer at the department.



 1  Frank participated and some other team members from

 2  Viewpoint Health.

 3        Q    And you --

 4        A    Collective effort.

 5        Q    And you were involved in that effort?

 6        A    Yes.

 7        Q    And what was the scope of the grant?

 8        A    It was -- so the federal System of Care

 9  grants have sort of a defined set of parameters of

10  activities and System of Care approach supports and

11  services that they want to incentivize.

12            So we look to what the federal grant

13  offers, and then we proposed a program in Georgia

14  called Kids Net Georgia, which seeks to align with

15  the goals and values of System of Care, and

16  essentially have more youth-centered and

17  collaborative and coordinated services for youth at

18  risk or in need of behavioral health services in the

19  community.

20        Q    Now, I'm probably going to get in trouble

21  because I haven't asked you to define System of

22  Care.

23            How do you understand that term?

24        A    So I understand it as a federal

25  designation, and very specifically it's considered



1 | an approach to care, not a program itself, but it's
2 | a way of approaching services for youth with either
3 | at risk or in need of behavioral health services.
4 |        So it's a collection of activities, values
5 | and approaches that are used to assist youth and
6 | their families in accessing the care they need.
7 |    Q    And it is a hallmark of that approach that
8 | the provision of services by different agencies are
9 | integrated to the greatest extent possible?
10 |    A    I think the hallmark is that agencies
11 | collaborate.
12 |    Q    The hallmark is collaboration between
13 | agencies?
14 |    A    One of the hallmarks, yes.
15 |    Q    In terms of the Rockdale County System of
16 | Care grant, which ultimately grew into KidsNet, the
17 | collaborating agencies were DBHDD, the providers,
18 | and the local education authorities?
19 |    A    As I recall.
20 |    Q    And did the Department of Education have
21 | any involvement?
22 |    A    Not that I recall.
23 |    Q    And were you also involved in
24 | administering the grant once you got the funds?
25 |    A    Probably more accurate to say oversight of



1    the administration.

2        Q    Were you involved in oversight of the

3    administration when you got the funds?

4        A    The grant, yes.

5        Q    The grant.   Thank you.

6             Then when it was expanded to KidsNet, that

7    was across the State of Georgia; is that right?

8        A    Yes.

9        Q    And were you again working at Viewpoint

10   and responsible for the oversight of the

11   administration of those grants?

12       A    Yes.

13       Q    And as a result of that experience, by the

14   time you joined DBHDD in 2012, were you a proponent

15   of the System of Care approach?

16       A    Yes.

17       Q    Why?

18       A    I think that the core values embedded in

19   the System of Care approach are good guiding values

20   for the delivery of services to youth and families.

21       Q    And what are those core guiding values?

22       A    That services should be guided by the

23   youth and their family, cultural and linguistically

24   competent, involve collaboration among community

25   partners and agencies.



1              Those are just a few examples.

2      Q    So I am not, as you know, a public service

3  administrator or a psychologist, but in lay terms

4  what is the reason that it's important to have the

5  services be guided by youth and their families?

6      A    I think evidence would suggest when

7  individuals have a say in the treatment modalities

8  and services being delivered, they're more likely to

9  have successful engagement and successful outcomes.

10     Q    So that's why it's important -- what does

11 it mean to have the services be guided by the youth

12 and the family?

13     A    To me, in this context, it means --

14     Q    I'm really asking -- you've been a

15 proponent of this for a long time.  I really want to

16 get your understanding.

17     A    So that in an individual clinical setting,

18 a family, a youth that's seeking services is asked

19 for their preferences in the type of clinician,

20 might have some say in the treatment modalities, and

21 that the family would be brought in to conversation

22 about progress being made and that -- just like any

23 of us in our own healthcare setting would want the

24 doctor to know what's working, what we like -- that

25 youth and even seriously disabled youth should have



1   the opportunity to state their preferences.

2        Q    And is that an important principle by

3   which you're guided in the administration of DBHDD?

4        A    Yes.

5        Q    So you came to DBHDD with that experience,

6   and was Commissioner Berry a proponent as well, as

7   far as you know, of System of Care principles?

8        A    In my experience, yes.

9        Q    So I think you told us it was Monica

10  Johnson's brainchild, but what were the principal

11  goals of the Apex program at the time the pilot was

12  launched?

13       A    At the time the pilot was launched, the

14  national landscape was beginning to change.

15       Q    The national landscape with respect to the

16  provision of behavioral health services?

17       A    In school settings.

18            I described the Rockdale experience where

19  I felt there was resistance of schools who did not

20  want mental health services delivered in the school

21  setting.  That was our, generally, our experience.

22  It was hard to get in the door.

23            I do believe the national landscape was

24  changing and there was greater receptivity to

25  recognizing that it might be helpful if services for



 1  youth were more accessible, such as having them

 2  right in the school setting.

 3          So there were some identified schools that

 4  Monica certainly believed might be receptive to if

 5  we wanted to pilot doing something in the school,

 6  that there might be an ability to have someone

 7  partner with us to do that.

 8      Q    And when do you date this change in the

 9  landscape in favor of school-based mental health

10  services or increasing receptivity to them?

11      A    I would say in the early -- you know,

12  really, around the time, in that 2010 -- 2010, 2011,

13  2012, things are popping up in different states in

14  different ways, and the federal government, SAMHSA,

15  the Substance Abuse and Mental Health Services

16  Administration, that guides our federal granting,

17  seemed to be promoting more opportunities for

18  school-based mental health and the like.

19          So there was just more conversation about

20  it.  I don't think it's a flip of the switch.  I

21  think there's sort of a slow roll towards

22  acceptance.

23      Q    So for school-based mental health, when

24  you say it's provided in the school, what do you

25  mean provided in the school?  How is it different



1  from services provided in a clinic setting?

2      A    So primary difference is the location,

3  which being right in the school setting.  So

4  presumably that might make it easier for a student

5  to access a clinician who is right there within the

6  walls of the place, that maybe they take a bus ride

7  there.  And so having that clinical support right on

8  campus or within the walls of the building would

9  make it presumably for some people easier to access.

10     Q    So there have been guidance counselors and

11 mental health professionals in schools for many,

12 many years predating the 2010 era; isn't that right?

13     A    Yes.

14     Q    So how do you distinguish school-based

15 mental health services from what was happening

16 before the movement towards school-based mental

17 health services?

18     A    My experience was that what was available

19 in the school setting varied depending on what the

20 local school -- what the local education authority

21 had determined.

22          So, for example, a guidance counselor

23 might be more focused on guiding youth towards

24 post-high school options and helping them pick the

25 right course work.  That's very different than a



1   clinical counselor who might help a youth who's

2   having an anxiety issue in the classroom.  So their

3   functions might be different.

4          My experience was that was highly

5   localized, what that looked like in any given school

6   setting.

7      Q    So what you're talking about is providing

8   clinical services of the kind that are identified in

9   the manuals we've spoken about directly in the

10  schools?

11     A    That's part of what the Apex program does,

12  but I don't want to suggest that's the only thing

13  that Apex does.  So that's my only hesitation there.

14     Q    Okay.  So my question is, is it accurate

15  to say that the shift to school-based mental health

16  services was to provide -- to having clinicians

17  directly provide clinical services to students in

18  schools?

19     A    Again, that's only one aspect of --

20     Q    No --

21     A    -- Apex.

22     Q    My question is, does it include, not

23  whether it's the totality.

24     A    Yes, that's one aspect of what's included.

25     Q    What are the other aspects of the Apex



1  program?

2      A    So one of the important elements is to

3  assist the faculty and administration with their

4  understanding of mental health issues in the school.

5  So an Apex -- that is one thing, and I don't want to

6  forget the other.

7           The Apex program is defined to be a

8  partnership between the school and a community-based

9  provider.  So both of those elements are important

10 in the design, in addition to the third element,

11 which you've already pointed to, the direct

12 provision of services to youth.

13     Q    So the elements that you're referring to

14 are the partnership between the school

15 administration or faculty and a community-based

16 provider?

17     A    Yes.

18     Q    The provision of direct clinical services

19 to youth --

20     A    Yes.

21     Q    -- in the school?

22          Now, when was Dante McKay hired?

23     A    I don't know the date.

24     Q    Was it roughly 2015?

25     A    Honestly, I don't know.  That sounds



1  reasonably accurate.  He's been with us for a little

2  while.

3          It was during our tenure.

4      Q    And were you involved in the search

5  process that led to his hiring?

6      A    No.

7      Q    Was that led by Ms. Johnson?

8      A    Yes.

9      Q    Did she have previous relationship with

10 Mr. McKay?

11     A    I don't know.

12     Q    Was leadership at the Apex program one of

13 the principal responsibilities that Mr. McKay was

14 hired for?

15     A    I don't know.

16     Q    All right.  Let me back up to the

17 priorities of DBHDD in 2015, which, as you've said,

18 was the year the Apex pilot was launched.

19          Launching the school-based mental health

20 program became one of the priorities for you and

21 Commissioner Berry in his administration; is that

22 correct?

23     A    I want to be clear, we started it as a

24 pilot, with the intent to learn, one, was it going

25 to be effective, was it going to work, all of that.



1          So we started it truly in the spirit of

2     this is a pilot, and then we'll take steps from

3     there.

4          Q    How did the pilot work out?

5          A    Well enough that we have continued the

6     program.

7          Q    Has the program become an important

8     priority of yours as Commissioner of DBHDD?

9          A    Yes.

10         Q    So going back to the pilot era.

11              MS. COHEN:  I'm going to mark the next

12         exhibit.

13              Is it 361, Wanda?

14              THE COURT REPORTER:  Yes.

15              MS. COHEN:  A presentation made on July

16         14th, 2015.

17              (WHEREUPON, Plaintiff's Exhibit-361 was

18          marked for identification.)

19     BY MS. COHEN:

20         Q    I'll give you a chance to look at it.

21     This is a presentation with the logo of DBHDD with

22     the Bates Nos. GA00099111, and the individual pages

23     are numbered .1 through .20, and the title page is

24     "Behavioral Health Planning and Advisory Council,

25     Judy Fitzgerald, DBHDD Chief of Staff, Evergreen



1   Conference Center, Stone Mountain, Georgia, July 14,

2   2015."

3           Here is one for you.

4           MS. COHEN:  Here is one for you, Josh.

5           MR. BELINFANTE:  Thank you.

6           MS. COHEN:  I think we'd all like to be at

7       a Stone Mountain conference.

8           THE WITNESS:  How old this is.

9   BY MS. COHEN:

10      Q    Can you identify this Exhibit 361,

11  Commissioner?

12      A    I see that you have put it before me.  I

13  don't, don't recall, but I bet looking through this

14  will bring back some memories.

15      Q    Take a minute.

16          (Witness reviews exhibit.)

17      A    It looks like I have a second one.

18      Q    You want to give one to Monica?

19      A    I'd be happy to.

20      Q    Thank you.

21          Does flipping through the presentation

22  remind you of giving this presentation?

23      A    Yes.

24      Q    Is this a presentation that you wrote and

25  delivered on July 14, 2015, to the best of your



1  memory?

2     A    It appears that way.

3     Q    And what was the occasion?

4     A    Looks like I was delivering to the

5  Behavioral Health Planning and Advisory Council,

6  which is a federally designated group that the State

7  is required to have a Planning and Advisory Council

8  to oversee its behavioral health work.

9          So they are an important group of

10 stakeholders in the State.

11    Q    When you say it's required by the Federal

12 Government, do you mean that the Behavioral Health

13 Planning and Advisory Council is required by

14 Medicaid or by the requirements of federal grants?

15    A    By SAMHSA federal grant.

16    Q    By the federal grant.

17    A    Our block grant requires us to have a

18 Planning and Advisory Council.

19    Q    And is it the same as the Behavioral

20 Health Coordinating Council established by statute?

21    A    No.  Entirely different.

22    Q    Another group?

23    A    Yes.

24    Q    And when was that formed?

25    A    This?



1      Q    The Behavioral Health Planning and

2  Advisory Council, when was that formed?

3      A    I track it as a requirement of receiving

4  your federal block grant.  So that's the money that

5  we get from the Federal Government to deliver mental

6  health and substance abuse services.

7           When you receive that money from SAMHSA,

8  and it's a significant portion of funds from the

9  Federal Government, you're required to have an

10  appointed Planning and Advisory Council to provide

11  support and -- I don't want to use the word

12  "oversight," but that is who we present the

13  implementation of our block grant, to this body.

14      Q    And does SAMHSA have certain requirements

15  for who will serve on the Advisory Council?

16      A    Yes.

17      Q    And what are they?

18      A    I no longer know that level of detail.

19      Q    Do you recall that it includes providers

20  of behavioral health services?

21      A    Yes.

22      Q    And does it also include advocacy groups?

23      A    Yes.

24      Q    Are you familiar with the term "protection

25  and advocacy organization"?



 1        A    I am.

 2        Q    Is the P&A -- it's sometimes referred to

 3   as P&A?  Have you heard that?

 4        A    Yes.

 5        Q    Are they part of the Behavioral Health

 6   Planning and Advisory Council?

 7        A    I don't recall.

 8        Q    How many people was it, approximately?

 9        A    I'd say somewhere around 15, 20 people

10   maybe were on the actual council.

11        Q    The same group as in place now with regard

12   to DBHDD's SAMHSA grants, correct?

13        A    Yes.

14        Q    Who are the members who you're aware?

15        A    Some of the same categories you have

16   described.  So providers, advocates, people with

17   lived experience are represented, people with

18   interest in child and adolescent services, substance

19   abuse professionals.

20             So -- but I can't -- I don't know the

21   entire group.

22        Q    So it's fair to say you were speaking to

23   an audience of interested stakeholders in the

24   behavioral health world?

25        A    Yes.



1      Q    And you were the chief of staff at that

2    time?

3      A    Yes.

4      Q    Now, harking back to what you said

5    previously, there's a reference here on Page 2 to

6    "Vision.  Easy access to high-quality care that

7    leads to a life of recovery and independence for the

8    people we several"?

9      A    Yes.

10     Q    Whose vision was that?

11     A    That vision statement was developed I

12   think in the -- within the first two years of

13   Commissioner Berry's administration.

14     Q    And it was one that you endorsed as well

15   as his deputy commissioner?

16     A    We had an executive group that

17   participated and defined and ultimately came to

18   consensus on a vision and mission statement.

19     Q    And when you refer to "easy access to

20   care," school-based mental health services is one of

21   the avenues that you refer to; is that correct?

22     A    Yes.

23     Q    And the -- I'm going to go back and ask

24   you a little bit about Gwinnett Rockdale Viewpoint,

25   and KidsNet.



1            What community service providers were

2    involved on those grants?

3        A    I'm sorry, I didn't hear the question.

4        Q    I think you testified earlier that there

5    were school-based mental health grants to Viewpoint

6    and its predecessors?

7        A    No, not that I'm aware of.

8        Q    I'm sorry, I misspoke.

9            I think you testified earlier that there

10   were grants to Viewpoint and its predecessors that

11   enabled the provision of school-based mental health

12   services in Rockdale County?

13       A    I don't know about that in Rockdale

14   County.  When we received the System of Care grant,

15   we endeavored to bring some --

16       Q    Got it.

17       A    -- services into the school setting but

18   were largely unsuccessful.

19       Q    But thereafter, Viewpoint was more

20   successful in growing a System of Care model through

21   KidsNet; correct?

22       A    There were elements of the System of Care

23   model that we brought to fruition through KidsNet.

24       Q    And who were the principal community

25   service providers who were involved in that effort?



1      A    So Viewpoint Health was the lead agency,

2    and we partnered with -- my recollection is the DFCS

3    office and the local Department of Juvenile Justice

4    office.  I don't remember much beyond that.

5      Q    So it's fair to say that Viewpoint Health

6    is a pioneer in the System of Care services for

7    children and adolescents in Georgia?

8      A    Yes.

9      Q    And when you and Commissioner Berry came

10   to the administration in 2012, that was the

11   experience you brought with you?

12     A    Part of the experience, yes.

13     Q    Now, there's also a reference on the other

14   side of the slide to "Mission.  Leading an

15   accountable and effective continuum of care to

16   support Georgians with behavioral challenges, and

17   intellectual and developmental disabilities in a

18   dynamic healthcare environment."

19          What do you refer to -- how do you

20   understand continuum of care?  What are you

21   referring to there?

22     A    We generally use the word "continuum" to

23   reflect an array of services that might go from

24   early screening, early identification, intervention,

25   all the way up to more intensive and what we call



1  late intervention across a spectrum.

2      Q    It's called a -- you refer to it as a

3  continuum of care.  Is an element of it that there

4  might be movement for an individual client from one

5  place on the spectrum to another?

6      A    Yes.  And that's the general -- federal

7  nomenclature, too, would be to call it a continuum

8  of care.  We didn't invent that.  That's what's

9  described nationally.

10     Q    Now, the next slide, Slide 3, refers to

11 Phase I and Phase II, and these are your words:

12 "What you will hear today, Review of Phase I,

13 Re-organization, and Preview of Phase II."

14          What are you referring to here?  What was

15 Phase I?  Was that a year of listening?

16     A    Yes.

17     Q    Now, this is being given in 2015?

18     A    Uh-huh.

19     Q    So you had been at the department for more

20 than a year; isn't that right.

21     A    Uh-hum.  (Affirmative.)

22     Q    So did Phase I last for more than a year?

23     A    I think so.  Yes.

24     Q    I think you said there were initially two

25 years of --



1        A     Look and listen before we made any drastic

2   changes.

3        Q     So 2015 was really the year when you were

4   kicking things off?

5        A     It looks that way.

6        Q     Is that your memory?

7        A     Yes.  Yeah, it probably was about two

8   years of, of kind of the look and listen.  And then

9   -- so that takes us up to 2014.  And then

10  contemplating a reorganization of the department,

11  which was pretty significant.

12       Q     And what was the reorganization?

13       A     I'm referring to Slide 11, so I can --

14       Q     Sure.  Absolutely.

15       A     -- look back exactly at how I said it.

16             So one of the things -- look and listen,

17  again, I want to give the context that when we came

18  in, the experience that we had was specific to being

19  a single community provider entity.  And so you

20  think there are a lot of ways you can fix the

21  universe when you sit in your seat at the local, and

22  when you come to the state, when you have statewide

23  responsibilities, your perspective changes a little

24  bit because you understand some of the constraints

25  and guidance that a state agency has to attend to as



 1  it thinks about transformation.

 2      Q    So is that what you're covering in -- is

 3  that was learned in the listening phase?  Is that

 4  what you're covering here -- was covered here in

 5  Slide 4 and 5?

 6      A    Yes.

 7      Q    And what did you learn in the year of

 8  listening?  I know that your first title is that you

 9  heard some things that you didn't expect.

10      A    Right.  Again, we came with our own

11  individualized experience as a Community Service

12  Board.  We had limited interface, some but limited

13  interface, with the hospital system.  At DBHDD we

14  only knew our, and we had some awareness of other

15  CSB experience, but there are many other providers

16  in the network.

17           And a lot of variation around the State is

18  dictated by geography.  So there was a lot to learn

19  about how other people were experiencing being a

20  DBHDD contractor.  And -- so you see that.

21           I think this was an accurate, overall

22  picture, people reporting some fragmentation.  They

23  wanted to hear more, communication wasn't always

24  effective, and there were some great things

25  happening but inconsistent.



1          This still rings true.

2     Q    What were the pockets of excellence that

3    you referred to in 2015?

4     A    None come to mind that I can say

5    specifically or that I can assure you were related

6    to 2015.

7          What my experience was that many

8    providers, and I was more familiar with the CSBs,

9    often had a signature project or program that they

10   did really well.  It wasn't always easy for others

11   to replicate but many of them had one that was

12   really good and was receiving state level

13   recognition.

14    Q    So was it one of your goals to make those

15   pockets of excellence more consistent across the

16   system?

17    A    Where it seemed possible in a program or

18   initiative was scalable, I'd always be interested in

19   hearing was that possible.

20         Sometimes they were the result of very

21   specific local infusion of funds that you couldn't

22   rely what's going to happen in another setting.  So

23   it really varied throughout the state.

24    Q    Now, in your Slide 4 you refer to what

25   providers were saying about DBHDD.  What were they



1  saying?

2         These are the CSBs primarily?

3     A    Some -- lots of other -- there were lots

4  of other providers outside of the CSBs.

5         So I think typical -- you know, what I now

6  understand is typical network provider complaints

7  that we don't get information in a timely way, it's

8  too hard to make changes, the bureaucracy is too

9  much.  Pretty typical challenges of a provider

10  within a network.

11    Q    And when you use the term "stakeholders"

12  on that same Slide 4, who are you referring to?

13    A    Some of those -- that might have been

14  individuals actually receiving services, but it

15  might have also been sister agencies or other folks

16  that we rely on to do our work.

17    Q    So folks with lived experience?

18    A    In some cases.

19    Q    And advocacy groups?

20    A    In some cases, yes.

21    Q    And other state agencies?

22    A    If we considered them stakeholders.

23    Q    Now, the next slide is the mixed pictures

24  puzzle slide.  Are you looking at that, Slide 5?

25    A    Uh-hum.  (Affirmative.)



1      Q    And there's a reference to five bullets:

2    Partnership, Communication, Accountability,

3    Credibility, Consistency.

4           I'm going to go out on a limb and say that

5    each of these applied to both the behavioral health

6    services and the developmental disability side?

7      A    Yes, probably true.  But I was speaking to

8    the behavioral health audience here.  So yeah.

9      Q    So you're talking about -- this is geared

10   to the behavioral health audience?

11     A    Yes.

12     Q    Thank you.

13          So let's look at some of the solutions

14   that you talk about in your PowerPoint.

15          The first is Partnership.  Can't do this

16   alone, you say:  "Only as strong as our provider

17   network."

18          What did you say on that subject at the

19   meeting?

20     A    So of course I don't remember my exact

21   language, but I probably would have said something

22   to the effect of DBHDD as the contracting body and

23   authority sets forth policy and programmatic vision

24   and goals, but it's actually in the delivery of

25   those services where people's needs are met.



1          So DBHDD, you can have a great plan on
2   paper and a great policy manual, but it's actually
3   in the delivery of services that people achieve
4   recovery.
5          So we need our provider network.  They're
6   critical partners.
7     Q    And that's also captured on the slide
8   where it says "Need cooperative relationships with
9   other agencies and advocates"?
10    A    Uh-hum.  (Affirmative.)
11    Q    The next bullet says:  "DOJ is not the
12  enemy."
13         Does that refer to the Department of
14  Justice?
15    A    Yes.
16    Q    And my employer.
17         And does that refer to the -- a particular
18  initiative by the Department of Justice?
19    A    So I'm certain that at this point in time
20  in 2015 this comment would have been in relation to
21  our ADA settlement agreement, and the general
22  feeling in many circles was that DOJ was beating the
23  State up and we're at war with DOJ, and my belief in
24  the role that I was in was that it was going to be
25  more productive to talk about the things that we



1  wanted, that were not that different than I

2  perceived that the good folks at DOJ wanted.

3        So I thought it was important to make it

4  clear that that was the approach that our

5  administration was going to take; that there are

6  cooperative interests and it's better to think of it

7  in that way.

8     Q    And that was, that was also at the time of

9  the DOJ investigation of GNETS?

10    A    That probably did not rise to my awareness

11  at that time.

12    Q    But with regard to the DOJ investigation

13  of GNETS, are there aspects in which you think that

14  you and the Department of Justice, you DBHDD, and

15  the Department of Justice, shared the same vision?

16        MR. BELINFANTE:  Object to the form.

17    A    I can't speak to that through the lens of

18  GNETS.

19    Q    Fair enough.

20        When we were talking about a shared vision

21  with the Department of Justice in so far as it

22  related to what you called the ADA case and access

23  for adult mental health services, was part of the

24  vision that you shared with the Department of

25  Justice the System of Care approach?



1       A    We don't use that term.  Sorry if this
2    sounds technical.  That's a term that we used --
3    that we use and is the nomenclature for child and
4    adolescent services.  That term isn't generally used
5    for adult services.  Not that --
6       Q    Is the term with regard to adult services
7    integrated health systems?
8       A    It wasn't at that time.
9       Q    What was it at time?
10      A    A continuum of care.
11      Q    So was the notion of a continuum of care
12   something that you were saying that DBHDD might
13   share with the Department of Justice?
14      A    Yes.  Continuum of care and serving people
15   in the least restrictive environment I think were
16   the things -- that we wanted to have community
17   services available and that we wanted people to be
18   able to access them, that we were not in opposition
19   to.
20      Q    Was there another aspect to this,
21   Commissioner?
22           Am I correct the Carter Center had been an
23   advocate for evidence-based practices?
24      A    I would assume they would be.
25      Q    And so was using evidence-based practices



1  also an element of the common vision that you saw in

2  2015 between the Department of Justice and DBHDD?

3      A    I can certainly say that's DBHDD's intent,

4  is to use evidence-based practices.

5      Q    Now, looking at Slide 8, it refers to

6  Accountability.  The first bullet is "Problems" and

7  the second bullet is "Solutions."

8          Do you see that?

9      A    Yes.

10     Q    You've mentioned accountability earlier

11  today.  You established -- I think you said you

12  established a separate division or section of

13  accountability?

14     A    That was an office already when we came to

15  DBHDD.  So we didn't --

16     Q    What were the accountability issues that

17  you were talking about to this group then in

18  connection with the System of Care grant?

19     A    It was well beyond the System of Care

20  grant.  So accountability in -- probably in this

21  setting just refers to we as an agency are

22  contracting with providers to deliver services.  So

23  to ensure fidelity to the services that are being

24  delivered and ultimately to ensure that people are

25  receiving services and those services are in fact



1  helping people to move towards recovery.

2      Q    And what were the solutions that you

3  talked about on that day?

4      A    So you see there the development of KPIs.

5  That's key performance indicators for providers.

6          So, again, it's not -- it wasn't enough

7  just to say here's your money, go and do good work.

8  We had benchmarks, key performance indicators and

9  then benchmarks that we would be measuring to assess

10  whether providers were delivering the care as

11  outlined in the contract.

12          The second one is a transition to fee for

13  service.

14      Q    Before we get there, can you give me an

15  example of some KPIs?

16      A    Sure.  So in behavioral health service

17  delivery you would want -- if a person calls a

18  provider and says they want -- they think they want

19  to come and receive services, you should have their

20  first appointment scheduled by X period of time.

21  That would be a key performance indicator.  What

22  percentage of people who call this agency and desire

23  services can get their first appointment within

24  three days.

25      Q    Understood.



1        And who developed those metrics, the key

2   performance indicators?

3        A    DBHDD.  With input -- with some input from

4   providers as well.  Probably led my Monica Johnson.

5        Q    Now, I'm going to move along a little bit

6   because of time.

7             So let's go to Slide 10.

8             I'm sorry.  It's Slide 9.

9             And this is another slide in which you

10   talk about the problem and solutions?

11        A    Uh-hum.  (Affirmative.)

12        Q    And one problem was perception that DBHDD

13   does not deliver on promises or is not trustworthy.

14             What did you say that on subject?

15        A    Probably, again, not remembering my exact

16   language, but in the listening efforts, you know,

17   when you accept open feedback from folks you hear

18   that not everything is going how people in the

19   community want it to.  So I was careful here in

20   saying there was a perception that at times DBHDD

21   didn't deliver on their promises or perception that

22   DBHDD is not trustworthy.

23             It was important to acknowledge back to

24   this audience that we hear you, that you don't think

25   it's always going well in the partnership.



1      Q    Were there certain promises or areas in

2   which DBHDD was regarded as not having kept up its

3   end of the bargain at that time?

4      A    I don't recall at that time what I was

5   speaking to specifically.

6      Q    What do you see as the solutions?  Or what

7   did you see as the solutions?

8      A    So embracing our role as state authority.

9      Q    What does that mean --

10     A    Probably in using that terminology at that

11  time, it would be to assert that DBHDD has expertise

12  in its understanding of evidence-based behavioral

13  health services and supports, and that we would

14  endeavor to make those available and --

15     Q    How did you, how did you see that

16  expertise as important to your credibility with

17  stakeholders?

18     A    So among the stakeholders are people who

19  are familiar with evidence-based services and

20  supports that are known nationally.  So I think what

21  I'm trying to reflect here is just we as an agency

22  would assert that knowledge and expertise in

23  conversations and in thinking about program design

24  and what's available in the State of Georgia.  That

25  we understood that as our responsibility and that we



1    would embrace opportunities to bring ideas forward.

2        Q    So you understood it's your responsibility

3    to bring expertise forward with regard to the use of

4    evidence-based practices?

5        A    Yes.

6            MR. BELINFANTE:  Object to the form.

7        Q    And then the next slide, Slide 10, refers

8    to CSB legislation?

9        A    Uh-hum.  (Affirmative.)

10       Q    What was that?

11       A    I believe we did some tweaks that year in

12   enhancing CSB accountability through legislation.

13           Frankly, I don't remember the details at

14   that time, from 2015 or 2016, of what we actually

15   changed.

16       Q    Let's look at Slide 12.  This is the slide

17   that's titled "DBHDD's Reorganization:  What."

18           The first bullet is "Functional

19   alignment."  What was the functional alignment that

20   you saw needed to be reorganized?

21       A    So when we first arrived at the department

22   there were regional offices in each of the divided

23   regions of -- the State was divided into regions.

24   There were -- there was a DBHDD office in each of

25   those regions, and they would -- those offices would



1  carry out a variety of functions for the local

2  region.

3          That led to some variation in how things

4  happened in Region 1 versus how they happened in

5  Region 6.  So we decided to align the function.  So

6  that if you are in the accountability chain, no

7  matter where you sit you report into the

8  accountability chain, not just to your regional

9  director.

10          We felt like we would get better

11  consistency if we did that.

12      Q     And has that in fact been the case?

13      A     That's my experience.

14      Q     And then there's reference to "concern

15  about CSB administration infrastructure and

16  inconsistency is also a concern at DBHDD."

17          What topic were you speaking to,

18  Commissioner?

19      A     Always the CSB network has had a great

20  deal of variability in its local delivery of

21  service.  So some would be doing well, others were

22  more challenged.  That's the inconsistency that I

23  was referencing.

24          And in my role, in administrative

25  leadership at the department, the CSB administrative



1  infrastructure references that every CSB had a COO,

2  a CFO, a director of HR, carrying out those local

3  functions, had a fair amount of administrative

4  infrastructure, and that that was duplicated

5  throughout the State in each of the providers.

6         So always wanted CSBs and others to be

7  looking at that administrative infrastructure to run

8  the delivery of service programs.

9     Q    To make it more standardized?

10    A    Standardized.

11    Q    And how did the department do that?  Was

12 it through regulations or --

13    A    We did not end up activating anything at

14 that time around that issue.

15    Q    There's a reference in the second-to-last

16 bullet, "Go-live date July 1."

17         What does that refer to?

18    A    Go-live date of the reorganization.

19 People would be in the new roles as of July --

20 probably were -- went live July 1st.

21         THE VIDEOGRAPHER:  Frances, can we take a

22    quick break?

23         MS. COHEN:  Sure.

24         THE VIDEOGRAPHER:  We're off the record at

25    12:12 p.m.



```
 1              (A luncheon recess was taken.)

 2              THE VIDEOGRAPHER:  We're back on the

 3         record at 1:03 p.m.

 4    BY MS. COHEN:

 5         Q    I'm going to ask you about some terms that

 6    we've been throwing around a little bit, and I want

 7    to get a little more precise in terms of how you

 8    understand them.

 9              So we've been talking about evidence-based

10    practices, and that is -- is it your understanding

11    that that's a concept that's been pushed by SAMHSA

12    of recognizing the best available scientific

13    evidence, identifying practices for which there's

14    the best scientific evidence?

15         A    Yes.

16         Q    And there's also the notion that the

17    practices have been replicated across different

18    groups?

19         A    Yes.

20         Q    In terms of federal laws that you have to

21    abide by, like Medicaid or the grant rules, is there

22    a requirement that a practice has to be evidence

23    based?

24              MR. BELINFANTE:  Object to the form.

25         A    What do you mean by a requirement?
```



1    Q    I mean I know you were talking about some

2    of the requirements that led you to form the

3    Behavioral Health and Advisory Council.  Are there

4    similar requirements that relate to evidence-based

5    practices?

6    A    So the designation of evidence based for

7    us comes through SAMHSA, Substance Abuse and Mental

8    Health Services Administration, but I want to add

9    that in the delivery of services that are Medicaid

10   billable CMS would be the regulatory body that would

11   determine whether the provision -- a service would

12   be allowable.

13        And the description of detail about that

14   is guided by the center for Medicaid and Medicare

15   services.

16   Q    So what does SAMHSA require with respect

17   to evidence-based practices?

18        MR. BELINFANTE:  Object to the form.

19        Excuse me.

20   A    I wouldn't describe it as what SAMHSA

21   requires, but they put forward the repository of

22   what evidence -- what practices, programs have

23   achieved that status, but they don't -- but in your

24   block grant, when we receive federal funds from the

25   Feds, it doesn't say you must do all of these



1   evidence-based programs.

2           So that's why I'm distinguishing.  It's

3   not a requirement, that because it exists in the

4   repository of evidence-base that you must therefore

5   do that when you receive funding.  But you can't

6   just make up your own services, particularly if

7   they're Medicaid billable.

8           Again, that's why I'm making the

9   distinction CMS puts forward an array of options

10  that they deem acceptable for Medicaid billing.

11      Q    Is there a concept of well-supported

12  practices?

13      A    The term we've used or I'm more familiar

14  with is promising practices.

15      Q    Promising practices are programs that

16  include some practices based on programs that

17  include some measurable result but there's not

18  enough evidence yet to call it an evidence-based

19  practice?

20      A    That's my understanding.

21      Q    And have you heard promising practices and

22  well -- and evidence-based practices referred to as

23  well-supported practices?

24      A    That's not familiar terminology to me.

25      Q    And I think we've already talked about



 1  System of Care, and that is, as you mentioned,

 2  actually been the subject of legislation in Georgia?

 3      A    Yes.

 4      Q    And were you part of the design of that

 5  legislation?

 6      A    No.

 7      Q    No.  You're familiar with the statute,

 8  though?

 9      A    Yes.

10      Q    495-5, Sections 220 and following?

11      A    If you say.

12      Q    Okay.  And then we've talked about the

13  concept of a single state authority.

14      A    The term I've referenced is the behavioral

15  health authority.

16      Q    The behavioral health authority?

17      A    Uh-hum.  (Affirmative.)

18      Q    And how do you understand that term?

19      A    That DBHDD in its role as the behavioral

20  health authority has the technical expertise to

21  advise on matters related to behavioral health,

22  which is one component of how decisions get made but

23  we have the technical expertise.

24      Q    And under the Georgia statute there's also

25  a requirement to the System of Care plan; is that



1  right?

2       A    Yes.

3       Q    And I know there is a plan drafted in

4  2010.  Are you familiar with that?

5       A    I probably have seen it at some point and

6  it was probably a three-year-plan-ish, that would

7  have covered --

8       Q    So which System of Care plans have you

9  participated in designing during your tenure at

10 DBHDD?

11      A    I have not participated in the design of

12 the plan for any of the plans that have existed.

13      Q    Fair enough.  Which, which of the System

14 of Care plans have you provided oversight for during

15 your tenure at DBHDD as deputy commissioner and then

16 as chief of staff and now as Commissioner?

17      A    The System of Care plans that I'm

18 referencing are sort of the -- they're generally a

19 three-year window.  So any that were in place during

20 the time that I've been at DBHDD.

21      Q    Which is the most recent one?

22      A    I'm not sure if I'm correct on the years

23 here, but we -- I think there's one that covers 2020

24 to 2023.

25      Q    And as a member of the public, where is



1  the best place for me to find that?

2      A    The best place would be the Georgia State

3  University Center of Excellence website.  They are

4  contracted evaluator for System of Care activities.

5           MS. COHEN:  And, Josh, we just ask that

6      the State provide us with one.  I don't think

7      it's controversial.

8           MR. BELINFANTE:  For all of these, if you

9      all could just send me an email.

10          MS. COHEN:  Absolutely.

11          MR. BELINFANTE:  Great.

12  BY MS. COHEN:

13     Q    And we talked about the Behavioral Health

14  Advisory Council in connection with the SAMHSA

15  behavioral health grants.  Is there also a

16  Behavioral Health Collaborative Council?

17     A    It's called the Behavioral Health

18  Coordinating Council.

19     Q    Coordinating.  Thank you.

20     A    Uh-hum.  (Affirmative.)

21     Q    And that is the board or committee that

22  oversees public or private agencies providing

23  behavioral health services?

24     A    It's a council designated in law that

25  consists of several state agencies, also has



1  representation of individuals receiving services.

2  They are not -- they are an advisory council.

3  They're not --

4        Q    So there are various stakeholders

5  included?

6        A    Yes.

7        Q    And was that required as a condition of

8  the 2010 settlement with the United States?

9        A    It's my understanding that the -- if I can

10 use BHCC -- that the Behavioral Health Coordinating

11 Council, that that was established when the

12 department was established in 2009.

13       Q    And does that body also play any role in

14 connection with the federal grants that you receive?

15       A    Tangential.  Let me describe.

16            A subcommittee of the Behavioral Health

17 Coordinating Council is the IDT, the Interagency

18 Directors Team.

19            That is the body that leads the production

20 of the State's System of Care Plan.

21       Q    I see.

22       A    So it comes -- when IDT creates either --

23 anything related to The State System of Care Plan,

24 they present it to the Behavioral Health

25 Coordinating Council for approval.  So that's the



1  relationship.

2       Q    Understood.

3            What about if there's a conflict?

4            The Interagency Directors Team includes

5  some of the stakeholders you've talked about

6  previously, right, state agencies?

7       A    Yes.

8       Q    Advocacy groups?

9       A    Yes.

10      Q    And people with lived experiences?

11      A    Uh-hum.  (Affirmative.)

12      Q    What happens if there's a conflict among

13 the various members of the IDT, how is that

14 resolved?

15      A    I don't have direct knowledge of that.

16      Q    You haven't seen that.

17           And were you a chair of the IDT?

18      A    No.

19      Q    Has anyone from DBHDD chaired the IDT?

20      A    Yes.

21      Q    Who?

22      A    Dante McKay did for a period of time.

23           Monica Johnson, I believe, both previously

24 and currently chairs the Executive Committee of the

25 IDT, which is not the same as chairing the IDT.



 1  There's a larger body.  I believe Monica has only

 2  chaired the Executive Committee.

 3      Q    What agencies are represented on the

 4  Executive Committee?

 5      A    I should say I think it's individuals and

 6  not agencies by designation.

 7      Q    I see.

 8      A    So I know in recent memory there's been a

 9  Department of Justice -- I'm sorry.  Department of

10  Juvenile Justice representative, a Department of

11  Education representative, and DFCS representative,

12  and then an advocacy representative.

13      Q    Who is the advocacy representative?

14      A    In the past it was Voices for Georgia's

15  Children, and Erica Fener-Sitkoff was the executive

16  director.  She has since departed Georgia.

17      Q    And who is the representative in recent

18  memory of the Department of Education?

19      A    I don't remember her name.  It will come

20  to me but at this moment I don't remember her name.

21      Q    So I just also want to circle back on the

22  concept of school-based mental health services, and

23  I think you said the goal is to enable students and

24  families to participate in the communities in which

25  they live and receive services there?



1      A     That's a goal.

2      Q     And it also refers, as you've said, to the

3  concept of collaboration among agencies providing

4  behavioral health services?

5      A     Not specific to Apex?

6      Q     Yeah.

7      A     Just want to make sure I'm distinguishing

8  here.

9            Apex is at the heart and really

10 importantly a local partnership between the school

11 and the local community behavioral health provider.

12 Less state agency involvement.

13     Q     So do you consider GNETS to be a

14 school-based mental health service?

15     A     I do not, but it is not a program we

16 administer, so I don't know how it's characterized

17 by DOE.

18     Q     My question is do you, Commissioner,

19 consider GNETS to be a school-based mental health

20 service?

21     A     I don't know.  I haven't thought about it

22 in that way.

23     Q     Well, what are the characteristics of

24 school-based mental health services?

25            MS. COHEN:  Strike that.  Let's move on.



 1  BY MS. COHEN:

 2      Q    So GNETS, you've said, provides behavioral

 3  health services to children and adolescents,

 4  correct?

 5      A    As I understand it, behavioral health

 6  services and supports.

 7      Q    Do you distinguish between services and

 8  supports?

 9      A    I do.

10      Q    What are behavioral health services?

11      A    In our language, services usually

12  references more directly clinical therapeutic

13  services.  Supports might be behavioral assistance

14  and functional assistance.

15      Q    You've heard of functional behavioral

16  assessments?

17      A    Yes.

18      Q    Is that a behavioral health service?

19      A    I consider it a behavioral service.

20      Q    And I think you said you didn't know what

21  behavioral health services GNETS provides?

22      A    Correct.

23      Q    What diagnoses does the GNETS system

24  serve?

25      A    I do not know.



1      Q    Do you have any information?

2      A    Very limited.

3      Q    What does it tell you?

4      A    That individuals who need support to be in

5    a learning environment because of their emotional,

6    behavioral or other related issues are receiving

7    services in those settings.

8      Q    Did you have any knowledge of GNETS before

9    you came to DBHDD?

10     A    I don't believe I did.

11     Q    Do you know any clinicians who worked at a

12   GNETS center?

13     A    I do not.

14     Q    Or a classroom, GNETS classroom?

15     A    No.  Not that I'm aware of.

16     Q    And as chief of staff, you had no

17   involvement with GNETS?

18     A    Not until -- had some awareness of the

19   program as it existed, but did not have any direct

20   involvement in oversight or influence or -- it was a

21   program that the Department of Education ran.  We

22   were not intregally connected to it.

23     Q    Sounds like you weren't even tangentially

24   connected to it?

25         MR. BELINFANTE:  Object to form.



1      A     Minimal is I guess what I would say across

2   child-serving agencies.

3      Q     Are you aware of the approximate size of

4   GNETS' annual grant from the legislature?

5      A     No.

6      Q     If I said $70.00 million to you, is that a

7   ballpark number?

8      A     I don't have a way to reflect that.

9      Q     What role does DBHDD play in the provision

10  of behavioral health services to GNETS students?

11     A     None that I'm directly aware of.

12     Q     Have you ever discussed any aspect of

13  GNETS with Dante McKay?

14     A     Not in recent memory.

15     Q     At any time?

16     A     None that I can recall.

17     Q     Did you ever suggest to Dante McKay that

18  OCYF limits interactions with GNETS?

19     A     No.

20     Q     Did you ever discuss with Dante McKay any

21  collaboration between GNETS and DBHDD?

22     A     None that I recall.

23     Q     Have you had any discussion -- have you

24  participated in any discussions with DOE about

25  collaboration between Apex and GNETS?



1       A    No.

2       Q    Have you participated in any discussions

3  with any employee of DOE about coordination between

4  Apex and GNETS?

5       A    None that I recall.

6       Q    So has DBHDD ever been approached by GNETS

7  to coordinate on different aspects?

8       A    Not that I --

9            MR. BELINFANTE:  Object to the form.

10      A    Not that I'm aware of.

11      Q    DBHDD runs the System of Care Academy; is

12  that right?

13      A    Correct.

14      Q    What is that?

15      A    The academy is the annual conference that

16  brings together people from around the State for

17  sort of a three- or four-day learning, CEUs

18  gathering.

19      Q    What is the focus of the three- or

20  four-day learning/gathering?

21      A    Sharing information, promoting best

22  practices, enhancing collaboration and coordination

23  and conversation among child serving and child

24  interested parties.

25      Q    Has GNETS ever been included in the System



 1  of Care Academy?

 2      A    I don't know.

 3      Q    Let me show you another document.  I just

 4  wanted to make sure I didn't skip one.

 5           This is an email having the Bates No.

 6  GA01184034, from Commissioner Fitzgerald to Nakeba

 7  Rahming.

 8           Is that how you pronounce her name?

 9      A    I don't recall.  Nakeba, Nakeba is

10  correct.

11      Q    Dated September 16th, 2016.

12           MS. COHEN:  We'll mark this as Exhibit

13      362.

14           (WHEREUPON, Plaintiff's Exhibit-362 was

15       marked for identification.)

16  BY MS. COHEN:

17      Q    Here is one for you and one for counsel.

18           MR. BELINFANTE:  Thank you.

19           (Witness reviews exhibit.)

20  BY MS. COHEN:

21      Q    Have you had a chance to look it over?

22      A    Yes.

23      Q    And it says, quote:  "Thank you for your

24  follow-up from the recent DOE/DBHDD meeting to

25  discuss GNETS.  We are eager to remain active and



1   collaborative partners."

2          Is this an email that you wrote in

3   September of 2016?

4      A    It appears to be.

5      Q    In what sense were you, were you and your

6   staff at DBHDD active and collaborative partners

7   with GNETS?

8      A    We had regular meetings with Clara Keith,

9   who would inform us of her activities with GNETS.

10     Q    Anything further?

11     A    Not that I recall.

12     Q    Do you recall the meeting referred to in

13  your -- in the email to Nakeba?

14     A    I don't.  What I -- the context of this

15  makes me think that it was a transition from when

16  Clara was leaving to when Nakeba was coming into the

17  role, that we probably had a follow-up to the end of

18  Clara's tenure and we were welcoming Nakeba into the

19  role that Clara had held.

20     Q    Well, let's back up.

21          What was Clara Keith's title at the

22  Department of Education?

23     A    I don't know.

24     Q    What was her role?

25     A    I can't speak to her role at the



 1  Department of Education.  She became a DBHDD

 2  employee some time --

 3       Q    What role -- did Nakeba step into a role

 4  that was vacated by Clara Keith?

 5       A    Yes.

 6       Q    And what was that role?

 7       A    I don't know what the formal title was.

 8       Q    That's okay.

 9       A    Clara was our -- she was pursuing GNETS

10  improvements and was reporting monthly on what was

11  happening in that effort to DBHDD.

12       Q    I'm still confused.  Did you say Nakeba

13  Rahming stepped into a role that was vacated by

14  Clara Keith?

15       A    Yes.

16       Q    What role was that?

17       A    So Clara's role as liaison -- so Clara's

18  role, whatever she did at DOE, I don't know what the

19  title was, she was involved in GNETS.  Then she

20  stepped in at DBHDD and continued with her GNETS

21  technical assistance and improvement efforts.  She

22  did that for some period of time.  And then it's my

23  -- I believe my recollection is that she retired and

24  Nakeba was the person appointed to come in and

25  continue in that role of GNETS connectivity.



1      Q    And so did Nakeba Rahming work for DBHDD?

2      A    I actually don't believe she did.

3      Q    Is it fair to say then that Nakeba Rahming

4  fulfilled the same role that Clara Keith had

5  fulfilled at DBHDD but she remained at DOE while she

6  was doing that?

7      A    That's possible.  I don't recall,

8  actually.

9      Q    Who paid Clara Keith's salary when she was

10  at DBHDD?

11      A    I'm not sure.  I would think DBHDD did,

12  but I'm not sure.

13      Q    What were the reasons for her hiring Clara

14  Keith since DBHDD had no role essentially, as you've

15  described it, with GNETS?

16      A    I don't recall.

17      Q    Who did she report to?

18      A    I don't remember technically.  What I do

19  recall is -- what I recall was monthly meetings

20  where she -- Clara would meet with Commissioner

21  Berry, Jeff Minor, and myself.

22          I don't remember where it fell on the

23  actual org chart.

24      Q    Yeah.  Let's look at Exhibit 4, which I

25  know is imperfect, but that's what I have.  It's



1   this --

2        A    The structure?

3        Q    Yes.  Where exactly within the DBHDD

4   organizational structure did Clara Keith sit?

5        A    As I mentioned, I don't recall what the

6   formal reporting structure was.  As I recollect,

7   when she would provide updates, it would be to

8   myself, the Commissioner, and Jeff Minor.

9        Q    Did she report to Dante McKay at OCYF?

10       A    No.

11       Q    Did she report to Monica Johnson in the

12  Behavioral Health Division?

13       A    I don't believe so.

14       Q    So she would meet with -- I'm sorry,

15  Commissioner Berry, and who else?

16       A    Myself and Jeff Minor.

17       Q    Jeff Minor.

18            And over what period of time was this?

19       A    Honestly, I do not recall that.

20       Q    What responsibilities did she have at

21  DBHDD?

22       A    I don't recall her having any specific

23  responsibilities outside of facilitating and

24  providing technical assistance and performance

25  improvement activities with GNETS.



1      Q    And what was the nature of the technical

2   assistance that she provided to DBHDD with regard to

3   GNETS?

4      A    I'm sorry, she did not provide technical

5   assistance to us.  She only reported her GNETS

6   technical assistance activity to DBHDD.

7      Q    And what was the technical assistance that

8   she reported?

9      A    That I don't recall.  She was an education

10   expert, and none of us had that background.  So it

11   was helpful for her to have that educational

12   experience and background when she was talking about

13   the work of GNETS.

14      Q    How is it helpful to you, Commissioner, in

15   the performance of your duties either as chief of

16   staff or as Commissioner, to have the expertise that

17   Clara Keith provided?

18      A    I did not have expertise in educational

19   settings.  So hearing about GNETS work from someone

20   who was steeped in educational administration and

21   support was very helpful because there were many

22   aspects of -- many aspects of educational

23   administration that we, and certainly I, was not

24   familiar with.

25      Q    So can you think of anything specific that



1   Ms. Keith brought to you or to the meetings with

2   Commissioner Berry and Mr. Minor and yourself?

3        A    No.  I don't have good recollection of

4   that.

5        Q    How long was she with DBHDD?

6        A    I don't recall.

7        Q    You say in your email, Exhibit 362:  "We

8   are eager to remain active and collaborative

9   partners."

10            Do you see that?

11       A    I do.

12       Q    When you say "we," does that refer to

13   DBHDD?

14       A    Yes.

15       Q    And it's referring to a partnership with

16   DOE regarding GNETS?

17       A    Presumably.

18       Q    And so in what way was DBHDD a partner

19   with DOE regarding GNETS?

20       A    Really, a recipient of information.

21       Q    And do you recall what information that

22   was?

23       A    I really don't.

24       Q    Was the hiring of Clara Keith part of the

25   collaboration?



1        A     Yes.

2        Q     Were there other -- any other elements to

3    it?

4        A     None that I can speak to.

5        Q     The email says that Monica and Dante --

6    that's Ms. Johnson and Mr. McKay?

7        A     Yes.

8        Q     Quote:  "Will be our programmatic expert

9    participants in the technical discussions."

10             What technical discussions are you

11   referring to?

12       A     I don't recall any specifically.  That's

13   language I would use if they were going to have

14   further discussion about specific programmatic,

15   clinical and service delivery elements that are

16   beyond my expertise and knowledge.

17       Q     As you sit here today, can you recall

18   which programmatic or clinical details were part of

19   a collaboration between DBHDD and DOE in 2016 with

20   reference to GNETS?

21       A     No.

22       Q     You also say that Amy Howell, your general

23   counsel, quote:  "Will remain in the discussions as

24   well."

25             Did Ms. Howell also attend the meetings



1  with Clara Keith that you've referred to?

2      A    She may have on some occasions, but I

3  don't remember that consistently.

4      Q    Well, what aspect of the discussions did

5  you anticipate that Ms. Howell participate in?

6      A    Probably if there were strategic

7  conversations.

8           Amy also functioned as assistant

9  commissioner over the course of time.  So she was

10  both general counsel and she would also be engaged

11  in strategic conversation.

12      Q    So what strategic conversations are you

13  referring to when you say that Amy Howell will

14  remain in the discussions as well?

15      A    Again, I think it was putting forward to

16  Nakeba, new to her role, if you're talking

17  programmatic and clinical details, Monica and Dante

18  are your people.  If there's a larger conversation

19  where higher level folks are going to be involved,

20  Amy and I would be -- possibly be present for those.

21           MS. COHEN:  Let me mark another one of

22      these emails.

23           This is an email chain.  We'll mark it as

24      Exhibit 363, an email chain between Nakeba

25      Rahming and Dante McKay, from October of 2016.



1              (WHEREUPON, Plaintiff's Exhibit-363 was

2         marked for identification.)

3              MS. COHEN:  Why don't we take a

4         five-minute break.

5              MR. BELINFANTE:  Sure.

6              THE VIDEOGRAPHER:  We're off the record at

7         1:39 p.m.

8              (A recess was taken.)

9              THE VIDEOGRAPHER:  We're back on the

10        record at 1:51 p.m.

11             MS. COHEN:  Okay.

12   BY MS. COHEN:

13        Q    Commissioner, thank you for your courtesy,

14   and to your counsel.  We were having trouble finding

15   a copy of the exhibit, so we've projected it on to

16   the Zoom screen.

17             MS. COHEN:  It is Exhibit 363, and it's

18        got the Bates-stamp GA00585313 to 314.

19             And it purports to be an email from Nakeba

20        Rahming to Dante, in October of 2016, and one

21        from Dante back to Nakeba Rahming.

22   BY MS. COHEN:

23        Q    You see in the first email Ms. Rahming is

24   asking Mr. McKay to participate at a GNETS meeting

25   on October 18th in Milledgeville?



1      A     If you can scroll down.  I can't see the

2  full of Nakeba's.

3            There we go.  Thank you.  Okay.

4            Okay, I see Nakeba's.

5      Q     Were you aware of that meeting in

6  Milledgeville?

7      A     I was not.

8      Q     Do you know what she was talking about?

9      A     I do not know any details about that.

10     Q     And then Mr. McKay writes back.

11     A     If you can scroll.

12     Q     In the top email, which is October 6th.

13  Can you see it now?

14     A     Uh-hum.

15     Q     He writes back:  "Following a meeting

16  attended by chief of staff Judy F. recently with the

17  DOE and DOJ attorneys, Monica will now serve as the

18  GNETS point person on behalf of DBHDD.

19  Unfortunately, the CYF team will not be joining you

20  in Milledgeville."

21           Were you aware of this communication at

22  the time?

23     A     This is not familiar to me.

24     Q     Is Mr. McKay accurately reflecting a

25  conversation with you that after a meeting with DOE



1  and DOJ attorneys, Monica Johnson will now serve as

2  the point person on behalf of DBHDD?

3        A    I don't recall a conversation about this.

4        Q    Do you recall that -- does this refresh

5  your recollection that there was a switch in who the

6  contact person was from Dante and Monica Johnson to

7  just Monica Johnson?

8        A    That's a detail I don't recall.

9        Q    Was this discussed by you at a meeting

10  with the Department of Education and DOJ attorneys?

11       A    If it was, I do not recall that

12  conversation.

13       Q    Was Mr. McKay reluctant to serve as a

14  DBHDD point person for GNETS?

15       A    Not that I'm aware of.

16       Q    Did you ever hear that from anyone?

17       A    No.

18       Q    Did anyone from DBHDD attend a GNETS

19  meeting?

20       A    Could you be more specific?

21       Q    Yeah.  It sounds from this email as though

22  it was a meeting at a DBHDD hospital perhaps in

23  Milledgeville?  Are you familiar with the facility

24  in Milledgeville?

25       A    I think it's unlikely that we would hold a



1  meeting at the hospital in Milledgeville.  So I

2  don't have any familiarity with this specific

3  meeting.

4       Q    Okay.

5            MS. COHEN:  I think I did miss one

6       exhibit.  I'm going to give you a copy right

7       now and we can mark it as Exhibit 364.

8            (WHEREUPON, Plaintiff's Exhibit-364 was

9        marked for identification.)

10           MS. COHEN:  It's stamped GA0043612 through

11      3623, and it's titled "SOC State Plan Pocket

12      Guide Terms," dated April 12, 2018.

13 BY MS. COHEN:

14      Q    Here's a copy for you, Commissioner, which

15 I think Wanda will put a stamp on.

16           MS. COHEN:  And here's a copy for you,

17      Jeff -- Josh.

18           MS. TUCKER:  I've been called much worse.

19           (Discussion ensued off the record.)

20 BY MS. COHEN:

21      Q    Can you identify this document,

22 Commissioner?

23      A    By the title.

24      Q    What is it?

25      A    I know that we have -- DBHDD has often



1  made efforts to make available to the public

2  descriptions of what our acronyms actually mean.

3      Q    So you believe this is a document

4  generated by DBHDD?

5      A    Or the System of Care.  So the IDT group

6  were the creators of the System of Care plan, DBHDD

7  playing a role in that.

8      Q    And it refers to children and adolescents

9  System of Care?

10     A    It looks to, but some of these things are

11 broader than that, but...

12     Q    So you believe it's a DBHDD document,

13 though, or IDT document?

14     A    I see it as a System of Care -- so the

15 System of Care State Plan is a multipage document.

16 So in an effort for the public to understand some of

17 the terminology that's in the plan, I would guess

18 this is a ride-along, so to speak, a pocket guide,

19 so people could understand the terminology in the

20 state plan.

21     Q    I just want to be clear.  Do you believe

22 it was prepared by DBHDD or by the IDT?

23     A    I can't say, actually.  DBHDD certainly

24 would have informed it, as there are some DBHDD

25 specific programs, but some of these things are more



1  general.

2      Q    Let me ask you this, Items 12 and 13,

3  Blending of Funds and Braiding of Funds, are those

4  concepts that you're familiar with?

5      A    Yes.

6      Q    Are you a proponent of blending and

7  braiding of funds?

8          MR. BELINFANTE:  Object to the form.

9      A    I understand what they mean conceptually.

10     Q    What does it mean?

11     A    Well, as you see here, the blending -- and

12  these are terms that the Federal Government uses in

13  its conversations around System of Care.

14          So blending references where you use

15  different pots of money, and the braiding is when

16  those pots come together to support a program.

17     Q    And how is that relevant to the System of

18  Care?

19     A    In the delivery of services, different

20  financing mechanisms can sometimes lead to confusion

21  or fragmentation.  So the idea that you would bring

22  these funds together in service of youth or family

23  meeting their needs, it's an ideal.

24     Q    Are you a proponent to that concept?

25     A    When it is possible.



1     Q    Have you found instances where it's

2   possible with respect to school-based mental health?

3          MR. BELINFANTE:  Object to form.

4     A    So in our Apex program we do have two

5   different pots of money at work towards achieving

6   successful implementation of Apex.

7          So to that degree we have state funds, and

8   then the provider, the community-based mental health

9   provider, can also bill Medicaid for some of the

10  services they deliver.

11    Q    So that's an example of blending and

12  braiding --

13    A    Blending.

14    Q    -- of funds?  Or blending?

15    A    Uh-hum.  (Affirmative.)

16    Q    Do you know of any examples of braiding of

17  funds that are relevant to your programs at DBHDD?

18    A    Not -- no.

19    Q    I think I neglected to ask you, going back

20  to those meetings with Clara Keith, how frequently

21  were they?

22    A    My recollection is monthly.

23    Q    And how long did they last?

24    A    You mean the meeting itself?

25    Q    Yes.



1      A    An hour probably.

2      Q    And who set the agenda for your meetings?

3      A    Clara.

4      Q    Were there written agendas?

5      A    Not that I recall.

6      Q    So just to be sure I'm understanding your

7  testimony, she reported to you and Mr. Minor and Ms.

8  Johnson?

9      A    No.  It is my -- I do not recall where we

10  landed her officially on the org chart or in

11  technical reporting.

12         What I do recall is the monthly meetings

13  were generally attended by myself, Jeff Minor, and

14  Commissioner Berry, and presumably Amy Howell was

15  possibly in some of those meetings as well.

16     Q    So is that a direct line reporting

17  relationship to you and Commissioner Berry?

18     A    I don't recall if we ever had an org chart

19  that reflected that.

20     Q    Are you required as supervisor of a state

21  employee to prepare performance review plans on an

22  annual or bi-annual basis?

23     A    Yes.

24     Q    And who signed the performance evaluation

25  plans for Ms. Keith?



1      A    I don't recall having a performance

2   evaluation for Ms. Keith.

3      Q    Well, apart from meeting with you all, was

4   there any work that she did at DBHDD that was

5   different from the work that she had done at DOE?

6      A    Not that I recall.

7      Q    I'm going to switch now to a different

8   email string.  I'm going to put in front of you an

9   email dated June 19th, 2019, from Monica Johnson,

10  and it has the Bates-stamp GA00004807.

11          MS. COHEN:  Here's one for you, Josh.

12          (WHEREUPON, Plaintiff's Exhibit-365 was

13      marked for identification.)

14  BY MS. COHEN:

15     Q    So looking at Exhibit 365, starting at the

16  bottom, which is how we read emails in litigation --

17     A    Sure.

18     Q    -- the first one is an email dated May 28,

19  2019, at 11:44 a.m., Judy Fitzgerald wrote.

20          Do you recognize this as an email you

21  sent?

22     A    Yes.

23     Q    Do you recall sending it?

24     A    No.

25     Q    The email says, quote:  "I want to make a



1  recommendation to you that I believe will ultimately

2  strengthen the work we are trying to do because you

3  know we never do it alone."

4          Do you see that?

5      A    I do.

6      Q    And what was the suggestion that you made

7  to Mr. McKay?

8      A    I suggested that he personally reach out

9  to Garry McGiboney from DOA -- DOE and Tom Rawlings

10 from DFCS to have a strategy update conversation, so

11 that they could be more knowledgeable about our Apex

12 program.

13     Q    So prior to you writing your email to Mr.

14 McKay on May 28, 2019, had you heard from Mr.

15 Rawlings or Mr. McGiboney?

16     A    Not directly.

17     Q    Had you heard from them indirectly?

18     A    I had heard that either of them were

19 making public comments about DBHDD services.

20     Q    And what was the nature of those comments?

21     A    What I recall is a frequent complaint that

22 Tom Rawlings, in his role as DFCS director, would

23 make that the CSBs were not serving youth in the

24 school settings.  And I thought that should be

25 corrected.



1          And I think Garry McGiboney in this

2    context was something similar, questioning whether

3    or not these services were actually being delivered

4    in the school setting, as the program was designed

5    to do.

6          Q    Was the issue raised whether the CSBs were

7    providing services in the school setting location

8    versus clinic?  Was that the issue?

9          A    Yes.  As I recall.

10         Q    And who did you hear that from?

11         A    That I don't recall.

12         Q    And that was Mr. Rawlings' comment that

13   you had heard?

14         A    And something similar from Mr. McGiboney.

15         Q    What was Mr. McGiboney's title at the

16   time?

17         A    Something -- some role at D -- he was in a

18   leadership role at DOE.  I can't recall what his

19   title was.

20         Q    Before you wrote to Mr. McGiboney, had you

21   raised with Mr. McKay the topic of keeping Rawlings

22   and McGiboney updated on the subject?

23         A    Not that I recall.

24         Q    Why did you think it was important to keep

25   these two gentlemen knowledgeable about the Apex



 1  program?

 2      A    Both DFCS and DOE are important partners

 3  in the state for DBHDD, and so if leaders in those

 4  departments are suggesting that the Apex program

 5  isn't working as it was intended to, I thought it

 6  was important that they hear directly from Dante,

 7  who has full knowledge of what the program's

 8  performance was, and that Dante reach out to them to

 9  provide them with some data driven updates about

10  what actually was happening in the Apex program so

11  that we could avoid public commentary that was not

12  accurate.

13      Q    Now, your email to Dante McKay is dated

14  May 28th, 2019.  The email on top from Monica

15  Johnson to you is some three weeks later, dated June

16  19, 2019.  Had you blind-copied your email to Mr.

17  McKay to Ms. Johnson, or how -- or did you forward

18  the email to Ms. Johnson?

19      A    I don't recall.

20      Q    But she had a copy of the email and wrote

21  you back about it?

22      A    Yes.

23      Q    And do you recall her email?

24      A    I do not, but I see it here, and that

25  looks like a typical response.

1        Q    And she's referring to a supervisory

2   chain?

3        A    Yes.

4        Q    And at that time were you Ms. Johnson's

5   direct supervisor?

6        A    Yes.

7        Q    And she directly supervised Mr. McKay?

8        A    Yes.

9        Q    And Monica Johnson refers -- or says,

10   quote:  "Adding this to my now really long

11   supervision list for our meeting, I'll be keenly

12   interested in the context behind what triggered this

13   email."

14             What meeting was she referring to?

15        A    You mean when she says, "long supervision

16   list for our meeting"?

17        Q    Yes.

18        A    That would have been our one-on-one -- she

19   and I would meet one-on-one probably monthly at this

20   time, and so she had a -- she comes to me with a

21   list of things to be discussed.  So I read this as

22   she's adding this to a list of things that she and I

23   should discuss.

24        Q    Understood.

25             How long have you known Ms. Johnson at



1  this time?

2      A     Since I came to the department.

3      Q     And is she someone you felt you could

4  speak openly with?

5      A     Yes.

6      Q     So what did you say to her on the topics

7  raised in this email?

8      A     I can't recall the actual specific

9  language.  I do recall the general context here.

10      Q     Is that as you've recently described it,

11  that you had received --

12      A     Yes

13      Q     -- heard indirectly --

14      A     Yes.

15      Q     -- about complaints?

16      A     Yes.  Third-hand parties who heard either

17  Tom Rawlings or Garry McGiboney saying something

18  about we don't believe that the CSBs in particular

19  are doing what DBHDD is saying they're doing, which

20  is delivering schools -- services in the

21  school-based setting.

22           So I heard that.  I have great trust in

23  Monica and her supervision of Dante, but my writing

24  to Dante would be an indication to everybody this

25  has reached my ears and I feel like it's important



1  that we correct the record here.

2       Q    Are you someone who is thought of as being

3  very discrete and disciplined in your emails?

4       A    I hope so.

5            MR. BELINFANTE:  Object to the form.

6       Q    I'm trying -- what I'm getting at with

7  that question is Monica writes:  "I am fluent in

8  Judy-speak so can read behind the lines."

9       A    Between the lines.

10      Q    Excuse me.  "Between the lines."

11           Thank you

12           Do you know what she was referring to?

13      A    I can't say other than, other than there's

14 clearly more to the story here, and she anticipates

15 when we're face-to-face we'll talk about that story.

16      Q    Understood.

17           MS. COHEN:  Now, I think there's one more

18      email in that chain, which is marked GA0012561.

19           We'll mark it as Exhibit 366.

20           (WHEREUPON, Plaintiff's Exhibit-366 was

21       marked for identification.)

22 BY MS. COHEN:

23      Q    It's an email from Dante McKay to you

24 dated May 28, 2019, and it appends your email that

25 we've previously discussed.



1          Here is a copy for you and a copy for

2    counsel.

3          Commissioner, can you identify this as a

4    copy of the email Mr. McKay sent in reply to your

5    email of May 28, 2019?

6      A    Yes.

7      Q    In his email Mr. McKay says he will reach

8    out to schedule 1:1s with Mr. Rawlings and Mr.

9    McGiboney.

10          Did he ever report to you that that had

11    occurred?

12      A    Not directly me but --

13      Q    Did you hear indirectly?

14      A    Through Monica.

15      Q    What did you hear?

16      A    My memory of this is that data was

17    provided to both Mr. McGiboney and Mr. Rawlings to

18    demonstrate evidence that actually services were

19    being delivered in the school setting, and showed

20    specifically services delivered in the school

21    setting and when requested outside of the school

22    setting.

23      Q    And did you reach out to anyone, Mr.

24    Rawlings or Mr. McGiboney, on this topic?

25      A    Not on this topic, that I recall.



1      Q    I think you mentioned earlier that Layla
2   Fitzgerald has some DOE facing responsibilities?
3      A    Yes.
4      Q    What is her role at DBHDD?
5           (Pause.)
6      A    I think that she's our liaison part-time
7   at DBHDD and part-time at DOE.
8      Q    At the time when she became a liaison, was
9   she the program manager for the Apex program?
10      A    I don't recall that detail.
11      Q    What were the circumstances under which
12   she became part-time at DOE and part-time at DBHDD?
13      A    I don't recall.
14      Q    Does it refresh your recollection if I
15   suggest it was a request of DOE that they have
16   someone who could provide direct information about
17   the Apex program?
18      A    Actually, described in that way is not
19   familiar to me.
20      Q    Do you recall who paid her salary?
21      A    I thought it was a joint contribution from
22   DBHDD and DOE equally.
23      Q    Did you know that OCYF made it clear to
24   GNET -- to DOE that Ms. Fitzgerald wouldn't work on
25   any GNETS matters in her role as liaison?



1        A     No, that's not familiar to me.

2        Q     That never reached you?

3        A     No.

4        Q     Would that be consistent with your

5   understanding of the purposes for which she was

6   part-time liaison to DOE?

7        A     I can't say.  That's just a level of

8   detail -- I don't really know what the expectation

9   was.

10       Q     How did you hear she was going to be

11  part-time at DOE and part-time at DBHDD?

12       A     I don't recall.

13       Q     Did you learn of it from Monica Johnson?

14       A     That seems probable given my regular

15  interface with Monica and my trust in Monica's

16  oversight of that very large division.

17       Q     Do you recall that there was discussion

18  before Layla accepted the position about the extent

19  to which the DBHDD person who acted as a liaison

20  would become involved in GNETS?

21       A     No, I have no knowledge of that.

22       Q     If I told you that Layla Fitzgerald told

23  her DOE collaborator that she would not collaborate

24  in any way with regard to the GNETS program, does

25  that -- how do you understand that?



1            MR. BELINFANTE:  Object to the form.

2      A    That is surprising news to me.  I don't

3  have any familiarity with that.

4      Q    Does it reflect DBHDD policy?

5      A    We don't have policy that would guide --

6      Q    Does it reflect the tenor of discussion

7  around DBHDD not to get involved with GNETS?

8      A    No.  I strive for us to be a collaborative

9  agency, but I also am not clear about what Layla's

10  specific responsibilities were, as dictated by both

11  departments.  So I can't say more about that.

12      Q    What do you understand Layla is doing as

13  part of her collaboration?

14      A    I don't have detailed knowledge of that.

15      Q    What data does DBHDD receive from GNETS?

16      A    I'm not aware of any data that DBHDD

17  receives.

18      Q    In some circumstances information flows to

19  COE from DCH, or DBHDD for COE, the Center of

20  Excellence, to Amalgamy.  Are you aware of that?

21      A    Not in the way you're describing it.

22      Q    How are you aware -- how do you understand

23  the circumstances in which the Center for Excellence

24  receives information about behavioral health from

25  either DCH or DBHDD?



1       A    I know that COE serves as an evaluator for

2  several of the programs that we do.  So I would

3  expect that there's a transfer of information in

4  order for them to do adequate either fidelity or

5  outcome of evaluations of our program areas.

6            So that's what I'm familiar with.

7       Q    So are you aware of whether COE receives

8  any information?

9       A    From GNETS?

10      Q    Yeah.

11      A    I am not aware other than I am aware of a

12  recent child and adolescent behavioral health

13  financing mapping project in which all of the

14  child-serving agencies have brought forward

15  information to IDT.  It's a project of the IDT.  So

16  all child-serving agencies have submitted

17  information about their behavioral health

18  expenditures.

19            So I'm familiar with that.

20      Q    Does that include client level data?

21      A    No.

22      Q    Are you aware of any client level data

23  coming from GNETS to the Center of Excellence?

24      A    I'm not.

25      Q    What Center of Excellence data does the



1   Department of Education have access to?

2       A    Repeat the question.

3       Q    Yeah.  You've been referring to DCH data

4   being provided, IDT data being provided, and DBHDD

5   providing information to the Center for Excellence.

6           Does DOE have access to the information

7   provided by those agencies to the Center for

8   Excellence?

9       A    Probably only if it's made public, right.

10          So I'll give you an example.  COE does our

11  Apex evaluation, and then -- so we submit lots of

12  information in service of that evaluation effort.

13  COE then produces a report of Apex performance in

14  year whatever.  That information is made available,

15  so DOE would have access to the report of the

16  information.

17      Q    But not to the information itself?

18      A    Correct.

19      Q    Now, are you familiar with a 2010 audit by

20  the Georgia Department of Audits and Accounts

21  Performance, audit of GNETS?

22      A    I am not.

23      Q    Did you ever hear that GNETS was audited

24  by the State auditors?

25      A    I have a vague recollection of that.



1      Q    Did you hear that when you were at

2   Viewpoint Health or --

3      A    Not likely.  I think it's more likely when

4   I came to the department, you would hear about

5   audits that were done on various subjects.

6           So I imagine I heard it in that context.

7      Q    What did you hear about the GNETS audit?

8      A    I really don't recall other than Audits

9   does reports that are never favorable.  So in that

10  context of an audit done by the Department of

11  Audits.

12     Q    Did you learn that the Department of

13  Audits had concluded that the Department of

14  Education couldn't demonstrate that the services

15  provided to students in GNETS have resulted in

16  improvements to their behavior?

17     A    I don't recall that specific finding, but

18  I don't dispute that that's what it said.

19     Q    Did you ever hear that there was no

20  improvements to academic performance either as a

21  result of the GNETS program?

22     A    Again, my memory is not specific about the

23  report, only a recollection that it was a negative

24  report.  So I'm not -- or dispute.

25     Q    Do you recall the general conclusion that



1  the GNETS program was useless?

2     A    I don't recall that terminology, but,

3  again, what my memory was, was it was a negative

4  report.

5     Q    And did you learn about inappropriate

6  incidents at GNETS facilities or classrooms?

7     A    I don't have direct knowledge --

8         MR. BELINFANTE:  Object to form.

9     A    -- of that.

10    Q    My question doesn't relate to your direct

11 knowledge.

12    A    Oh.

13    Q    My question is, did you learn about any --

14 that there were inappropriate incidents reported at

15 GNETS facilities or classrooms?

16        MR. BELINFANTE:  Object to form.

17    A    Possibly.  That's not an unusual finding

18 in any facility-based care across state services.

19 So if I was aware there was a negative report about

20 a GNETS facility-based program, it would not be

21 surprising to me that there were specific

22 incidences.

23    Q    My question is not whether it's surprising

24 or whether it's unusual, but did you learn that

25 there were inappropriate incidents reported in GNETS



 1  facilities or classrooms?

 2          MR. BELINFANTE:  Object to the form.

 3      A    I don't recall.

 4      Q    Did you ever hear that?

 5      A    Not to my recollection.

 6      Q    Now, does GNETS use evidence-based

 7  practices?

 8      A    I do not have knowledge of --

 9      Q    Are the --

10      A    -- their practices.

11      Q    Where are the GNETS students drawn from,

12  to your understanding?

13      A    I understand those decisions are made

14  locally by local education authorities.

15      Q    Do you understand that the GNETS students

16  are residents of the State of Georgia?

17      A    Yes.

18      Q    And that they have received a mental

19  health diagnosis?

20      A    I don't know that that's true in every

21  case.

22      Q    You don't know that?

23      A    No.

24      Q    Do you consider them to be clients of

25  DBHDD?



1      A    Not if they're not receiving DBHDD

2   services.

3      Q    Do you consider that DBHDD is charged with

4   providing services to individuals within the

5   Commonwealth of -- excuse me -- within the State of

6   Georgia who have received a mental health diagnosis?

7           MR. BELINFANTE:  Object to the form.

8      A    Again, not all children in the State of

9   Georgia are DBHDD's responsibility.

10     Q    Commissioner, I'm going to mark another

11  email chain.  I'll hand you a copy in a minute.

12          MS. COHEN:  It will be 367.

13          (WHEREUPON, Plaintiff's Exhibit-367 was

14       marked for identification.)

15          (Witness reviews exhibit.)

16  BY MS. COHEN:

17     Q    This email relates to the resignation of

18  Garry McGiboney?  Is that right?

19     A    I'm just catching up here.

20     Q    Okay.  Take your time.  Tell me when

21  you're ready.

22     A    Yeah.

23          (Witness reviews exhibit.)

24     A    Oh, I'm caught up.

25          MS. TUCKER:  What page number?



1            MS. COHEN:  GA00018599 to 602.  And that's

2      been marked as Exhibit 367.

3  BY MS. COHEN:

4      Q    How did you learn, Commissioner, that

5  Dr. McGiboney had resigned?

6      A    An advocate called me.

7      Q    And who was that?

8      A    I believe it was Sue Smith, who is the

9  executive director of the Georgia Parents Support

10  Network.

11      Q    And what did she say to you and you say to

12  her in that call?

13      A    I believe it was as simple as her saying

14  that Garry left DOE and it wasn't his choice, and

15  she didn't know much more about it and she was

16  concerned about him.

17      Q    Did you ever find out -- did you ever hear

18  from anyone else on this subject?

19      A    No.  I heard speculation from people but I

20  didn't hear anything.

21      Q    What speculation did you hear?

22      A    Is that Garry must have said something to

23  make somebody angry and that must have done him in

24  at DOE.

25            I really don't know more about what



1  happened.

2      Q    How long had you known -- is it

3  Dr. McGiboney or Mr. McGiboney?

4      A    Yes.  Dr. McGiboney.

5           I knew him from when I was at Viewpoint

6  Health.

7      Q    So this was in 2020.  So at least 10

8  years?

9      A    Uh-hum.  (Affirmative.)

10     Q    And did you reach out to Dr. McGiboney?

11     A    I believe I sent him a text, just to say I

12  was sorry to hear what had happened.

13     Q    Did you speak to him after that?

14     A    I don't believe I did.

15     Q    Was Garry McGiboney a proponent of

16  evidence-based practices?

17     A    Yes.

18     Q    And was he also a proponent of an

19  integrated System of Care?

20     A    You're using language that I wouldn't use,

21  but he was certainly interested in SED youth and

22  using System of Care principles to serve youth with

23  serious emotional disturbances.

24     Q    Was there a power struggle between

25  Dr. McGiboney and Matt Jones at DOE?



1      A    I don't have any --

2           MR. BELINFANTE:  Object to form.

3      A    I don't have any knowledge of that.

4      Q    Did you hear speculation that Mr. -- that

5   Dr. McGiboney had been -- that his responsibilities

6   had been curtailed because he was an advocate for

7   either evidence-based practices or System of Care?

8      A    I heard speculation that because he was an

9   advocate, he often spoke up, but I never heard any

10  confirmation from any DOE staff, or Garry for that

11  matter.  I just heard people speculating.

12     Q    You heard people speculating that he was

13  dismissed -- or his responsibilities limited because

14  he was an advocate --

15     A    I didn't know about his responsibilities

16  being limited.  I only heard about his dismissal.

17  So if there had been a transition prior to that, I

18  wasn't aware.

19     Q    Did you hear they had been dismissed

20  because he was an advocate for evidence-based

21  practices?

22     A    Again, when I heard from the advocate that

23  I heard from, it was more just in the lane of

24  because he speaks up, and I think a lot of people

25  would know Garry as an advocate who speaks up.  I



1  didn't hear it connected to evidence-based

2  practices.

3      Q    Did you hear it connected to GNETS?

4      A    No.

5      Q    Did Dr. McGiboney have a point of view on

6  that subject?

7      A    Not that I'm aware of.

8      Q    Okay.

9          MS. COHEN:  I am advised I gave the wrong

10      Bates number of that email chain relating to

11      Dr. McGiboney.  That it starts at GA000018599

12      and ends at GA0018602.

13  BY MS. COHEN:

14      Q    When did you last see Dr. McGiboney?

15      A    I saw him virtually a couple weeks ago.

16  Does that count?  That's how we see people now.

17      Q    I think any contact will count for these

18  purposes.

19      A    He was in -- we were both called to a

20  meeting together.

21      Q    What kind of meeting was that?

22      A    It was an informal advisory meeting called

23  by a legislator, Chairman Mary Margaret Oliver, who

24  is interested in the implementation of the MATCH

25  Committee, which is required in the new mental



1  health law.

2          So she has a group of informal advisors

3  that she wanted to bring to a conversation about how

4  did we think this could best be planned and

5  implemented.

6      Q    What were the issues on that?

7      A    DBHDD is the responsible agency.  The

8  MATCH Committee is a team that used to be in place

9  decades ago.  It is now being revised in the

10 legislation.  So Chairman Oliver just wanted to get

11 everyone's opinion about what were some tangible

12 steps forward for this to be successful.

13         So Garry is one of her advisors.

14     Q    So you see Dr. McGiboney from time to

15 time?

16     A    Occasionally.  He works, he works for

17 Sharecare is now what I -- that was his employment

18 at the time of this call a couple weeks ago.  So I

19 see him less.  I don't know about his current

20 engagement in state activities.

21     Q    What is Sharecare?

22     A    That's the State's -- State Health Benefit

23 Plans wellness provider.

24     Q    And what is his title there?

25     A    I don't know, actually.



1      Q    Do you know if he's a senior member of the

2  team at Sharecare?

3      A    I don't.  He's got a lovely library

4  background, is what I now know.  The Zoom

5  environment of what I know.

6      Q    Let's move on to looking at Georgia

7  statute -- Georgia Code 37-1-2.

8           Here's a copy for you.

9           MS. COHEN:  Oh, and I'm sorry, we're going

10     to mark this as Exhibit 368.

11          (WHEREUPON, Plaintiff's Exhibit-368 was

12      marked for identification.)

13  BY MS. COHEN:

14     Q    A copy for you and a copy for counsel.

15          MR. BELINFANTE:  Thank you.

16          What number was this again?

17          MS. COHEN:  368.

18          I'm sorry, I gave the wrong section.  Take

19     that back.

20  BY MS. COHEN:

21     Q    I'll give you Georgia Code Title 37,

22  Mental Health Section 37-1-2.

23          MS. COHEN:  And we can still mark it as

24     Exhibit 368.  That's what we'll do.

25



 1  BY MS. COHEN:

 2      Q    Are you familiar with this statute?

 3      A    I am.

 4      Q    Is this one of the statutes that you're

 5  charged with implementing?

 6      A    Yes.

 7      Q    It is the enabling legislation for the

 8  Department of Behavioral Health and Developmental

 9  Disabilities?

10      A    Yes.

11      Q    And when I use the term "enabling

12  legislation," do you understand that I refer to

13  legislation that sets forth the statutory authority

14  for agency action?

15      A    Yes.

16      Q    Did you have any involvement in drafting

17  the enabling legislation related to DBHDD?

18      A    No.

19      Q    Do you remember at the time the agency was

20  being considered by the legislature?

21      A    I was not involved in state level

22  activities at that time, so I don't have a lot --

23      Q    You were not the director of a state

24  mental health agency at that time?

25      A    No.



1      Q     Currently, it's your job, anyway, as

2   Commissioner to implement the statute?

3      A     Yes.

4      Q     And I think you were at Viewpoint when

5   DBHDD was created?

6      A     Yes.

7      Q     And did you have any advocacy role with

8   regard to the creation of DBHDD?

9      A     No.

10      Q     And the statute refers to the General

11   Assembly?

12      A     Yes.

13      Q     Do you understand that to be a fancy word

14   for the Georgia legislature?

15      A     Yes.

16      Q     And it says that in connection with the

17   creation of DBHDD, the General Assembly found that

18   "a comprehensive range of quality services and

19   opportunities is vitally important to the existence

20   and well-being of individuals with mental health,

21   developmental disability, or addictive disease needs

22   and their families"?

23      A     Yes.

24      Q     And do you consider a comprehensive range

25   of quality services and opportunities to be vitally



1  important to the existence and well-being of

2  individuals in GNETS facilities or classrooms with

3  mental health issues?

4      A    Could you say it again?

5      Q    Sure.  Do you consider a comprehensive

6  range of quality services and opportunities to be

7  vitally important to the existence and well-being of

8  individuals in GNETS facilities or classrooms with

9  mental health issues?

10         MR. BELINFANTE:  Object to form.

11     A    I understand that as a responsibility of

12 DOE and not what's in here, since DBHDD does not

13 operate those facilities.

14     Q    So is it your testimony, Commissioner,

15 that DBHDD has no responsibility to create a

16 comprehensive range of quality services and

17 opportunities for individuals at GNETS?

18     A    Not while they are reside -- receiving

19 their education in GNETS.  I don't understand DBHDD

20 to have responsibility.

21     Q    DBHDD --

22     A    -- for that.

23     Q    -- has responsibility to pay for mental

24 health services for uninsured individuals?

25     A    Those that are eligible for services, yes.



1    Q    And if there -- let me just ask you, if
2  there are individuals in GNETS facilities or
3  classrooms who are uninsured, does DBHDD have any
4  responsibility to those individuals?
5              MR. BELINFANTE:  Object to the form.
6    A    If they're not receiving services that
7  they need, they might come to the attention of
8  DBHDD.
9    Q    My question to you was, if there are
10  individuals in GNETS facilities or classrooms with
11  mental health diagnoses who are uninsured, does
12  DBHDD have any responsibility to those individuals?
13              MR. BELINFANTE:  Object to the form.
14    A    I'm not certain.
15    Q    What is the basis of your uncertainty?
16    A    It's my understanding that GNETS, in an
17  effort to provide the appropriate educational
18  information, is providing therapeutic supports and
19  services that enable that education.
20    Q    So my question to you is, if there are
21  individuals in GNETS facilities or classrooms with
22  mental health diagnoses who are uninsured, does
23  DBHDD have any responsibility to those individuals?
24              MR. BELINFANTE:  Object to the form.
25    A    If they present to DBHDD services, then,



1  then a DBHDD provider might provide services to them

2  that should be coordinated with services and

3  supports that they would be receiving in the GNETS

4  environment.

5      Q    Does DBHDD have any responsibility to

6  reach out to individuals who it knows has mental

7  health diagnoses to ensure that they are receiving

8  adequate services?

9           MR. BELINFANTE:  Object to the form.

10     A    We make information publicly available to

11 the public, as best we can, and we are resourced to

12 do, but that is different than saying we do active

13 recruiting of certain populations.

14     Q    Well, you know there's a population at --

15 being serviced by the Department of Education that

16 have or may have mental health diagnoses, right?

17     A    Yes.

18     Q    And do you know how big that population

19 is?

20     A    I do not.

21     Q    If I said 4,000 to 5,000, would that sound

22 right to you?

23     A    I don't have a way to assess that.

24     Q    Has any outreach been made by DBHDD to see

25 whether those individuals are receiving adequate



1  mental health services?

2       A    Not that I'm aware of.

3       Q    Now, looking at 37-1-2, sub (a), the

4  enabling legislation.

5            Let me put my glasses on, too.  It's

6  awfully small and I apologize.

7            It says:  "The General Assembly further

8  finds that the state has an obligation and

9  responsibility to develop and implement planning and

10 service delivery systems which focus on a core set

11 of consumer oriented, community based values and

12 principles" --

13      A    I'm sorry.  Where are you reading from?

14      Q    I'm sorry.  Probably going too fast.

15      A    I just don't know where you're pulling it

16 from.

17      Q    I'm looking at --

18      A    Could you reference the letter --

19      Q    -- Georgia Code Title 37 --

20      A    Yeah.

21      Q    -- -1-2.

22      A    Uh-hum.

23      Q    Subparagraph a, which is the first

24 paragraph.

25            Do you see that?



1        A    Oh, you're at the last sentence here.

2   Okay, now I'm tracking.   Thank you.

3        Q    Are you aware of that provision of the

4   statute?

5        A    Yes.

6        Q    And you, Commissioner, have responsibility

7   to develop and implement the provision of such

8   services?

9        A    Yes.

10       Q    And the legislature made these findings at

11  the time it created DBHDD in 2009?

12       A    Yes.

13       Q    And as Commissioner, you're aware of the

14  legislative charge that service delivery systems

15  focus on a core set of community-oriented,

16  community-based values and principles?

17       A    Yes.

18       Q    And do those values and principles guide

19  DBHDD today?

20       A    Generally speaking, yes.

21       Q    Are there any exceptions?

22       A    Item No. 2 that references "a single point

23  of accountability should exist for fiscal service,

24  and administrative issues to ensure better

25  coordination of services among all programs and

1  providers," I consider that an ideal but because

2  there are different funding sources for mental

3  health services, there is not in fact a single point

4  of accountability for fiscal service and

5  administrative issues across the board.

6     Q    Are there any other exceptions other than

7  the difference between the ideal and the reality in

8  Item No. 2?

9     A    In Item No. 10, regional planning boards

10  no longer exist.

11     Q    They've been replaced by RIATs?

12     A    No.

13     Q    There's no role for regional planning

14  boards now?

15     A    No.  It's a different construct now.  They

16  used to have different authority and role back then.

17  We now have Regional Advisory Councils but it's a

18  different construct.

19     Q    RAC --

20     A    RAC, but that's different than the RIAT.

21  Sorry.

22     Q    Any other exceptions, Commissioner?

23     A    That's all I see for now.

24     Q    Looking at Item No. 1, "Consumers and

25  families should have choices about services and



1  providers and should have substantive input into the

2  planning and delivery of all services," I think

3  you've already said today that you understand that

4  to be one of the responsibilities of DBHDD?

5      A    Yes.

6      Q    And also that DBHDD has the responsibility

7  to ensure that the system of providing services to

8  individuals with mental health needs is met at the

9  appropriate service levels?

10     A    That's the goal.

11     Q    Look at Item No. 9, on the second page of

12 Exhibit 368.  One of the charges by the General

13 Assembly is that "consumers and families should have

14 a single, community based point of entry into the

15 system."

16         Do you see that?

17     A    I do.

18     Q    Do you understand that to be part of the

19 legislative charge to DBHDD?

20     A    I do.

21         MR. BELINFANTE:  Object to the form.

22     Q    What is the meaning of a single, specific

23 community based point of entry?

24         MR. BELINFANTE:  Object to the form.

25     A    The idea is we make it easy for people who



 1  want to seek mental health services to go to the

 2  nearest provider, and they have easy entry.  And if

 3  that point of entry is not exactly what they need,

 4  that that service provider would help them find what

 5  they need.

 6       Q    And is one of the ways in which DBHDD

 7  satisfies this charge to the legislature by

 8  providing school-based mental health services?

 9            MR. BELINFANTE:  Object to the form.

10       A    I think that's one element of access.

11       Q    And do you know what points of access the

12  individuals in GNETS have?

13       A    I don't.

14       Q    Looking at Subparagraph 11, it states,

15  quote:  "The department is responsible for ensuring

16  the appropriate use of state, federal, and other

17  funds to provide quality services for individuals

18  with mental health, developmental disabilities, or

19  addictive disease needs who are served by the public

20  system and to protect consumers of those services

21  from abuse and maltreatment."

22            Are you familiar with that?

23       A    Yes.

24       Q    Are there any exceptions to that charge?

25            MR. BELINFANTE:  Object to the form.



1      A      No.

2      Q      So one of your responsibilities as

3   Commissioner is to ensure the use of state, federal,

4   and other funds to provide quality services for

5   individuals with mental health and developmental

6   disabilities?

7           MR. BELINFANTE:  Object to the form.

8      A      Yes.

9      Q      And is that true with respect to all

10  services the State provides to treat individuals

11  with mental health and developmental disabilities?

12     A      Is what true?  Using funds appropriately?

13     Q      Yes.

14     A      Is that what you mean?

15           Yes, for all of the programs we administer

16  and contract for.

17     Q      So if the General Assembly appropriates

18  funds to GNETS, do you have responsibility for

19  ensuring the appropriate use of those funds or not?

20     A      No.

21           MR. BELINFANTE:  Object to form.

22     Q      Looking at sub 3, back on the first page

23  of Exhibit 368.  It says the department shall,

24  quote, "Plan for and implement the coordination of

25  mental health, developmental disability, and



1  addictive services -- disease services with physical

2  health services, and the prevention of any of these

3  diseases or conditions, and develop and promulgate

4  rules and regulations to require that all health

5  services be coordinated."

6         Do you see that?

7     A    No.  Actually, where are you reading from?

8  I thought you said 3.

9     Q    I thought I said 3, too.  I'm sorry.  I

10  was looking at my outline.

11    A    I'm familiar with that language.  I'm just

12  not reading it right now.

13    Q    I think it's 37-1-20.

14    A    Yeah.

15    Q    Do you consider that the department has

16  that responsibility with respect to the individuals

17  in GNETS?

18         MR. BELINFANTE:  Object to the form.

19    A    I do not.

20         MS. COHEN:  Let's look at that statute.

21    We can take a break and then we'll come back to

22    it.

23         THE VIDEOGRAPHER:  Off the record at 2:59

24    p.m.

25         (A recess was taken.)



```
 1              THE VIDEOGRAPHER:  We're back on the
 2      record at 3:22 p.m.
 3 BY MS. COHEN:
 4      Q    Okay.  Commissioner, I just had a couple
 5 of questions.  I want to go back to Clara Keith for
 6 a minute.
 7              Did she have an office at -- in your
 8 building at DBHDD during the time that she worked at
 9 DBHDD?
10      A    I don't believe so.
11      Q    Where was her office?
12      A    I don't recall.
13      Q    Are you familiar with Larry Winter?
14      A    The name sounds familiar but I don't have
15 an --
16      Q    On the State --
17      A    -- who he is.
18      Q    -- on the State Board?
19      A    Now that you say it, that rings a bell.
20      Q    Did you ever hear that Larry Winter had
21 suggested that Clara Keith work for DBHDD?
22      A    I did not hear that.
23      Q    At the meetings, what you've described is
24 that Clara Keith was reporting to you and Mr. Minor
25 and Commissioner Berry about the program at GNETS.
```



1   Is that correct?

2        A    Yes.

3        Q    Did she ever ask you any questions about

4   how to integrate any of the programs at DBHDD with

5   the GNETS services?

6        A    Not that I recall.

7        Q    Did you provide in the course of those

8   meetings -- when I say you, I mean to the collective

9   group you -- did you provide any information about

10  services that DBHDD provided?

11       A    Not that I recall explicitly.

12       Q    Did she talk to you about any services

13  that -- or any improvements that she was making at

14  that time or proposing to make to GNETS?

15       A    I believe she did.  I don't remember any

16  of the specifics of her technical assistance.

17       Q    When you say that she came on to report

18  about improvements at GNETS, was there a consensus

19  that improvements were needed at GNETS?

20       A    It was my --

21            MR. BELINFANTE:  Object to the form.

22       A    It was my understanding that she was

23  tasked as a result of her experience to provide

24  technical assistance that would assist the GNETS

25  locations with their provision of education and



1   other services and supports.

2       Q    She had not previously worked for GNETS or

3   in the GNETS program?

4       A    I don't know that.

5       Q    Do you know that she worked closely with

6   Nakeba Rahming at DOE?

7       A    Yes.

8       Q    And did you know anything more about her

9   background or expertise?

10      A    At one point I'm sure I saw her resume,

11  but I don't have a recollection of that.

12      Q    Understood.

13          MS. COHEN:  All right.  So let's go back

14      to the exciting area of state statutes.

15          Now we'll look at 37-1-20, and we'll mark

16      this as 369.

17          (WHEREUPON, Plaintiff's Exhibit-369 was

18          marked for identification.)

19  BY MS. COHEN:

20      Q    So I was asking you about Section 3 of the

21  wrong statute.  I want to ask you about Section 3 of

22  this statute.

23          Can you identify this statute for us

24  first, though, that we marked as Exhibit 369,

25  37-1-20, Obligations of the Department of Behavioral



1  Health and Developmental Disabilities?

2      A    Yes.

3      Q    What is it?

4      A    What is this chapter?

5      Q    Yeah.

6      A    This is the legislative intent for the

7  responsibilities of DBHDD.

8      Q    And you're familiar with this statute as

9  well?

10     A    Yes.

11     Q    This is also enabling legislation?

12     A    Yes.

13     Q    So with regard to Paragraph 3, it says:

14  "The department shall," Paragraph 3, quote:  "Plan

15  for and implement the coordination of mental health,

16  developmental disability, addictive disease services

17  with physical health services, and the prevention of

18  any of these diseases or conditions, and develop and

19  promulgate rules and regulations to require that all

20  health services be coordinated."

21          Do you see that?

22     A    I do.

23     Q    And do you view this as a responsibility

24  or obligation of the department?

25     A    I see that this is what the legislature



1  intended for the department.

2      Q    Is this an obligation that the legislature

3  has charged the department with?

4           MR. BELINFANTE:  Object to the form.

5      A    I see this is what they have asked DBHDD

6  to do.

7      Q    It says the legislature -- it says that

8  "the department shall."

9           Do you see the portion of Paragraph 3 that

10  I've read to be an obligation of DBHDD enacted by

11  the legislature?

12          MR. BELINFANTE:  Object to the form.

13     A    I see that that's what's intended.

14     Q    Do you understand that to be one of your

15  obligations as Commissioner of the Department of

16  Behavioral Health and Developmental Disabilities --

17          MR. BELINFANTE:  Object to the form.

18     Q    -- to plan for and coordinate mental

19  health and services with physical services?

20     A    I understand that these are the desires

21  enumerated here by the General Assembly.

22     Q    Do you consider it to be optional?

23          MR. BELINFANTE:  Object to form.

24     A    I consider it to be the goal for the

25  department and for me in my role as Commissioner.



1      Q    And are the individuals in the GNETS

2    program part of that obligation?

3           MR. BELINFANTE:  Object to the form.

4      A    I don't consider them to be in the

5    responsibility of DBHDD.

6      Q    In any way?

7      A    Correct.

8      Q    Are there any services provided with state

9    funds for behavioral health that DBHDD -- that DBHDD

10   does not have responsibility to implement and

11   coordinate?

12          MR. BELINFANTE:  Object to the form.

13     A    Repeat the first part.

14     Q    Sure.  Are there any services for

15   behavioral health provided with state funds that

16   DBHDD does not have responsibility to implement and

17   coordinate?

18     A    Yes.

19          MR. BELINFANTE:  Same objection.

20     Q    What are those?

21     A    As I mentioned, several child-serving

22   agencies deliver behavioral health services to their

23   client population.  We do not have oversight of

24   those services.

25     Q    Under Subparagraph 24, it says:  "The



1  department shall assign specific responsibility to

2  one or more units of the department for the

3  development of programs designed to serve disabled

4  infants, children and youth."  And "To the extent

5  practicable, such units will" -- "shall cooperate

6  with the Georgia Department of Education and the

7  University System of Georgia in developing such

8  programs."

9          Do you see --

10          MR. BELINFANTE:  Just for the record, you

11      said 24, but you read 23.

12          You intended 23?

13          MS. COHEN:  No.  I intended 24.  Where do

14      you see 23?

15          MR. BELINFANTE:  I've got one pulled up

16      online.  That's why.  It's a different version.

17      I'm sorry.

18          MS. COHEN:  That's okay, Josh.

19  BY MS. COHEN:

20      Q    So just that the record is clear,

21  Subparagraph 24 says:  "The department shall assign

22  specific responsibility to one or more units of the

23  department for the development of programs designed

24  to serve disabled infants, children and youth." And

25  "To the extent practicable, such units shall



1  cooperate with the Georgia Department of Education

2  and the University System of Georgia in developing

3  such programs."

4        Do you see that?

5    A    Yes.

6    Q    And as far as you're concerned,

7  responsibility with regard to children and youth has

8  been assigned to the Office of Children, Young

9  Adults and Family, headed by Dante McKay?

10   A    Yes.

11   Q    And that's the only unit of the department

12  with specific responsibility to provide behavioral

13  services for infants, children and youth in need of

14  behavioral services?

15   A    Yes.

16   Q    Now, in your view, does GNETS provide a

17  comprehensive range of quality services and

18  opportunities, including a course of

19  consumer-oriented, community-based values and

20  principles?

21   A    I don't have any knowledge about that.

22   Q    In your view, does GNETS provide families

23  with behavioral health needs with choices about

24  services and providers?

25   A    I don't have knowledge about that.



1      Q    Does GNETS ensure that mental health
2    services are provided and coordinated with physical
3    health services?
4           MR. BELINFANTE:  Object to the form.
5      A    I don't have any direct knowledge of that.
6      Q    If there were abuse or maltreatment at
7    GNETS, would DBHDD have responsibility to protect
8    the individuals maltreated?
9           MR. BELINFANTE:  Object to form.
10     A    No.
11     Q    Who would be responsible to protect those
12   individuals with mental health needs from abuse and
13   maltreatment in the GNETS program?
14          MR. BELINFANTE:  Object to the form.
15     A    I assume the local education authority.
16     Q    Have you ever inquired?
17     A    No.
18     Q    I want to ask you about the Apex program,
19   and I think you said one of the organizing
20   principles is that it's based on school-based mental
21   health services.
22          Now, in terms of the Community Service
23   Boards that participate as Apex providers, how many
24   are there?
25     A    How many Apex providers are there?



1      Q    Yes.

2      A    I don't know.

3      Q    Approximately 20?

4      A    I don't know -- that sounds about right.

5  I know the number of schools we were in at the end

6  of Year 6.

7      Q    How many?

8      A    Which was 731.

9      Q    Congratulations.

10      A    Yes.  But I -- providers obviously serve

11  multiple schools, so I don't have an exact number.

12  And also some of the providers -- some providers are

13  CSBs.  We also have non-CSB providers in the Apex

14  program as well.

15      Q    Non-CSB providers, they are Level II

16  providers, or Tier I?

17      A    Tier II.

18      Q    Tier II?

19      A    They could be, yes.

20      Q    Now, is it a feature of the Apex program

21  that compensation is provided to the CSBs in excess

22  of compensation for -- the insurance compensation

23  for their services?

24      A    Yes.

25      Q    And is that something that was new with



1  the Apex program?

2      A    I'm not sure what you mean by new because

3  doing school-based mental health services itself was

4  new for DBHDD.  So --

5      Q    So it is a feature of the program as it

6  was rolled out to the CSBs that DBHDD would provide

7  additional compensation beyond what they could

8  charge insurance?

9      A    Yes.

10     Q    And how did that work?  What was the

11  reason for it?  What was the mechanism?

12     A    So the Apex program, again to reinforce,

13  is a partnership between the school and the

14  community behavioral health provider.  The provision

15  of direct clinical supports is just one feature of

16  that partnership, right, providing access to youth

17  who are identified as having a need and desiring to

18  receive services in that school-based setting.

19          One of the other partnership features is

20  that teachers, administrators and others may have

21  questions about mental health needs or things

22  they're observing, and they might want to have the

23  opportunity to seek some guidance or some expertise.

24          So the staff would be available for that

25  in addition to possibly providing one-on-one direct



1  clinical care.

2      Q    And in those circumstances for the second

3  component, conferencing with teachers,

4  administrators, et cetera, and parents -- are

5  parents also included?

6      A    Yes.  And then providing mental health

7  awareness activities in the school environment.

8      Q    How are the CSBs compensated?

9      A    So, again, I just want to be clear, it's

10  beyond CSBs.  They're providers.

11     Q    How are the providers compensated?

12     A    I don't know how the allocation currently

13  works.  We get an allocation from the General

14  Assembly.  Schools apply to be Apex schools within

15  the provider, but that's a level of detail I'm not

16  familiar with anymore, about how the actual

17  financing mechanism works.

18     Q    Schools apply to be Apex schools, and at

19  that point, under the Apex program, they enter into

20  contracts with DBHDD?

21     A    No.  The schools -- the contract is with

22  the provider.  The schools have to --

23     Q    I'm sorry.

24         MS. COHEN:  Let me withdraw that question.

25



 1  BY MS. COHEN:

 2      Q    So providers enter into -- apply to DBHDD

 3  for the opportunity to participate in the Apex

 4  program, correct?

 5      A    Yes.

 6      Q    And if they're accepted into the Apex

 7  program, then they enter into a contract with DBHDD;

 8  is that right?

 9      A    They have to be an enrolled DBHDD provider

10  in order to be an Apex partner.

11      Q    And they're subject to the contract?

12      A    Yes.

13      Q    And that contract provides for

14  compensation for certain services; isn't that right?

15      A    Yes.

16      Q    And what are the services that provides

17  compensation for it?

18      A    I don't have that level of detail.

19      Q    Is it your understanding that it provides

20  for some of the administration and mental health

21  awareness that you previously described?

22      A    Yes.

23      Q    And is this money provided every year or

24  only as an initial seed money?

25      A    So we -- funding for the Apex program has



1  been depended on allocation from the General

2  Assembly.  So year over year we hope to sustain that

3  program, and we have expanded that program year over

4  year.  And so contingent upon funding received from

5  the General Assembly, we endeavor to continue the

6  program.

7      Q    And is the annual payment approximately

8  between $250,000 and $300,000 to a provider to

9  participate in the Apex program?

10     A    I don't recall.

11     Q    You don't have any knowledge of that?

12     A    (Witness shakes head negatively.)

13     Q    Do you know how much money is allocated in

14  total, Commissioner?

15     A    I think it's in the neighborhood of $7

16  million.

17     Q    And these providers receive only one

18  contract and one payment per year for participating

19  in the Apex program, or is it dependent on how many

20  schools they have partnerships with?

21     A    Again, I'm not -- no longer versed in the

22  details here.  We're now in Year 7, and so I don't

23  know the details.  But given the number of providers

24  we've outlined and the number of schools we've

25  outlined, I would assume the provider allocation is



1   contingent upon how many schools they're trying to

2   reach.

3        Q    Do you recall if it's a capitation

4   mechanism or per school mechanism?

5        A    I assume it's per school, but if that's

6   changed, I'm not aware.

7        Q    Who is the person at DBHDD most

8   knowledgeable about those contracts?

9        A    Dante McKay.

10       Q    Is there anyone on the accountability side

11  who's familiar with those contracts?

12       A    I don't know a specific name of someone

13  who's...

14       Q    So the providers in the Apex program

15  receive payments for entering into partnerships with

16  schools, and the other way they receive payment is

17  by Medicaid billing?

18       A    Yes.

19       Q    And that is for direct clinical supports

20  provided within the school building?

21       A    I believe so.

22       Q    And what types of facilities are made

23  available to the Apex providers in the schools?

24       A    So this is a part of the program that's

25  changed over the course of time, and --



1      Q    How so?

2      A    In the early days, again when we were in

3  pilot and just learning, schools making space

4  available was not necessarily an explicit

5  requirement.  We have learned over the course of

6  time that if we did not explicitly state some things

7  we needed the school to do -- for example, provide

8  available space for private counseling sessions.  We

9  now have requirements of what the school must agree

10  to in order to be considered to be an Apex school.

11      Q    Has, has your department assessed how much

12  it would cost the State to allocate, to support

13  expansion of Apex to all the schools in the State?

14      A    I don't believe so.

15      Q    Is that something you would support,

16  Commissioner?

17      A    My current concern about that would be the

18  workforce shortages that would make that not

19  possible to fulfill.  So it's beyond just --

20      Q    So it's a capacity issue?

21      A    Yeah.  It's beyond --

22      Q    Apart from the capacity issue, assuming we

23  are some day able to expand the workforce in the

24  State of Georgia, would you support expansion of the

25  Apex program to all of the schools in the State of



1  Georgia?

2      A    I would support it to any school that is

3  willing to hold up their part of the agreement,

4  which has not been true in every case.

5      Q    With regard -- you're talking about the

6  school administration.

7           Are there any students who you believe are

8  not suitable for the Apex program?

9      A    Yes.

10     Q    Who are those?

11     A    Those might be students whose needs are

12  beyond -- when identified, they might begin with

13  initial access to be the services in that school

14  setting, and it might be determined that their needs

15  cannot be met in that school-based environment.

16     Q    Let me ask you this -- I have one other

17  question about this.

18          What are the types of reporting that the

19  department receives from Apex participants?

20     A    I'm not conversant in the details anymore.

21  I am familiar with COE's report, evaluation report,

22  of -- but I'm not -- I don't know what the actual

23  transfer of data collection points is.

24     Q    Are you aware that the Center for

25  Excellence receives monthly programmatic reports?



```
 1       A    Yes.

 2       Q    And also monthly encounter reports?

 3       A    Yes.

 4       Q    And what are the metrics that are used to

 5  measure the success of the Apex program?

 6            You've told us it's in 700 plus schools,

 7  but how do you evaluate whether or not it's

 8  effective?

 9       A    What COE has used as some of its measures

10  of evaluation are parental satisfaction and parents

11  believing that their youth's mental health was

12  improving, and reduced days of out of school

13  suspension.

14            Those are the two that come to mind.

15  We're working on developing some other outcome

16  metrics as well.

17       Q    You've discussed that with the Center of

18  Excellence?

19       A    Pre-COVID, is the last conversation I

20  recall about that.

21       Q    When did post-COVID begin?

22       A    All I can say it was before COVID.

23       Q    So back to March 2020?

24       A    Yes.  Prior to then.

25       Q    And you don't recall any discussions since
```



1  then?

2      A    Not, not at my level, which doesn't mean

3  they didn't happen.  Just not, not that I was

4  engaged in.

5      Q    Does GNETS measure its performance by

6  parental satisfaction?

7      A    I don't have any idea.

8      Q    Does GNETS measure its performance by out

9  of school time?

10     A    I have no knowledge.

11     Q    I know you said you didn't recall any

12 specific meetings with anyone from DOE about GNETS,

13 but let me ask if it would refresh your recollection

14 if I were to suggest to you that Superintendent Wood

15 requested a meeting with the DBHDD leadership at

16 some point to discuss collaboration between Apex and

17 GNETS?  Do you recall that?

18     A    I do not recall any discussion about

19 collaboration between Apex and GNETS.  I do recall a

20 discussion with Superintendent Woods and an Apex

21 provider, but that was solely about Apex, in my

22 recollection.

23     Q    Who was present at that meeting?

24     A    I don't recall.

25     Q    Was Superintendent Wood present?



1      A    Yes.

2      Q    Were you present?

3      A    Yes.

4      Q    Who was the provider?

5      A    If you showed me the name I would remember

6  it, but -- and I remember the young woman who was

7  the executive director.  I don't remember the name

8  of the provider.  It's years ago.

9      Q    What's the name of the executive director?

10 You can't remember that?

11     A    Uh-uh.  (Negative.)

12          Long black hair.

13     Q    And what was the -- where did that meeting

14 take place?

15     A    I believe it was in Superintendent Wood's

16 office.

17     Q    And did anyone else come with you from

18 DBHDD?

19     A    I don't recall.

20     Q    And what did Superintendent Woods say and

21 what did you respond?

22     A    I don't have a lot of recollection about

23 the meeting.  There was enthusiasm about Apex.

24          I remember -- my recollection is he wanted

25 to understand more how it worked from the provider's



1  experience.  This was a non-CSB provider, I can tell

2  you that, and I do believe that a big part of the

3  conversation was also about the fact that through

4  their Apex grant they also provided summer

5  programming, and the superintendent was very

6  interested in that.

7       Q    In fact, it's one of the requirements of

8  the Apex participation, that the CSB provide summer

9  programming, right?

10      A    That's my understanding.

11      Q    And Superintendent Wood was enthusiastic

12  about that?

13      A    In this individual meeting with the

14  provider, my recollection is they were one of the

15  first ones who had a pretty robust summer

16  programming.  They had initiated that on their own

17  and it, just as happens in pilot programs, somebody

18  starts to do something and it becomes a really

19  critical part of the program going forward.

20      Q    In advance of the meeting, did you ask Mr.

21  McKay to research what collaboration was already

22  taking place between Apex and GNETS?

23      A    I don't have any memory of Apex and GNETS

24  being at the core of that conversation.

25      Q    Do you have any memory of asking Mr. McKay



1  to do some research in anticipation of this meeting?

2       A    I don't.

3       Q    Did Mr. McKay ever report to you that

4  there effectively was not any cooperation between

5  Apex and GNETS?

6       A    I don't recall that.

7       Q    And when I say Apex, I'm referring to the

8  Apex providers and the GNETS program.

9       A    I don't have any recollection of a

10  conversation about that.

11       Q    What did you do after Superintendent -- on

12  this issue after you met with Superintendent Wood?

13       A    I don't remember any specific action steps

14  that came out of it, other than it was a positive

15  partnership between DBHDD and DOE, specifically

16  Apex.  That they saw this as positive for their Apex

17  involved schools.  They were pleased that DBHDD was

18  seeking continued funding for Apex, was viewed

19  positively.

20            And I can't recall if at that time we also

21  had information about Apex working particularly well

22  in schools where PBIS was incorporated, positive

23  behavior supports.

24       Q    Did the conversation relate in any way to

25  GNETS programs?



1     A    I recall no conversation about GNETS with

2  the superintendent.

3     Q    Commissioner, I'm going to mark as Exhibit

4  370 a copy of an email chain between yourself and

5  Dr. McGiboney from February of 2019, with the

6  Bates-stamp GA00003148.

7          Here's a copy for you, which I'll ask

8  Wanda to mark, and here's a copy for counsel.

9          (WHEREUPON, Plaintiff's Exhibit-370 was

10        marked for identification.)

11  BY MS. COHEN:

12     Q    By the way, before you -- we get into

13  Exhibit 370, can I just ask you, did Mr. McKay

14  attend the meeting with Superintendent Woods and the

15  provider?

16     A    I don't believe so.

17     Q    Did Ms. Johnson?

18     A    I don't recall.  It's possible that --

19  usually I would bring someone with me, but I simply

20  don't recall from that day.

21     Q    Okay.  All right.

22          Now, with regard to Exhibit 370, this is

23  an email exchange between yourself and

24  Dr. McGiboney?

25     A    Uh-hum.  (Affirmative.)



1    Q    And you wrote in the second full

2 paragraph:  "I just wanted to let you know that I

3 had -- "I had an opportunity to highlight PBIS, and

4 that our data shows that when schools have adopted

5 PBIS, Apex is more successful."

6    A    Uh-hum.  (Affirmative.)

7    Q    Is that data that you had received from

8 the Center for Excellence?

9    A    Yes.

10    Q    And is that information that you had

11 communicated to superintendent -- to Superintendent

12 Wood when you met with him?

13    A    I believe I did.

14    Q    And why did you send an email on this

15 subject to superintendent -- to Dr. McGiboney?

16    A    Dr. McGiboney was the recognized statewide

17 champion and leader of implementing PBIS, and so I

18 knew it would be welcome news to him that, one, I

19 had the opportunity to talk about this with the

20 Governor and a positive impact that it has; and,

21 two, that we recognized that that positive impact on

22 school climate enabled more success with Apex.

23         I thought that would be welcome news and I

24 didn't want him to get blindsided if someone from

25 the Governor's Office or elsewhere circled back to



1  him.

2       Q    Understood.

3            Does this refresh your recollection at all

4  about the timing of you meeting with Superintendent

5  Wood?

6       A    No.  This is completely separate.

7       Q    Well, when you met with Superintendent

8  Wood, I think you said that you had data showing

9  that when schools have adopted PBIS, Apex is more

10 successful?

11      A    Yes.  It doesn't clarify the timetable for

12 me, though.  So that would have been a data point

13 that I would have talked about for an extended

14 period of time in support of --

15      Q    Now PBIS --

16      A    -- PBIS.

17      Q    -- refers to what?

18      A    Positive behavior supports.

19      Q    What's the "I" for?

20      A    I'm blanking right now.  We should ask

21 Dr. McGiboney.  We always reference it as positive

22 behavior supports.  I don't think it's intervention?

23 Is it?  Yeah, okay, it is.

24           Phone a friend.  I knew we'd get there.

25      Q    There you go.



1           So PBIS was not a requirement of

2   participation in Apex?

3       A    Correct.

4       Q    And DBHDD didn't require the school

5   district to implement a PBIS system; is that right?

6       A    Correct.

7       Q    PBIS is a three-tiered system of

8   regulating climate and the situation for individuals

9   with mental health diagnoses in the school?

10      A    I'm not an expert in PBIS.

11      Q    Did you understand that the schools had to

12  have a three-tiered system to be an Apex partner?

13      A    No.

14      Q    Were there any structural impediment --

15  let me ask you one other thing.

16           What is the paperwork between the school

17  and DBHDD or the provider with regard to Apex?

18           MR. BELINFANTE:   Object to form.

19      A    I can only say it's a contractual

20  relationship.

21      Q    And does it run from the State of Georgia

22  to the participating school?

23      A    It runs from DBHDD to the community-based

24  behavioral health provider.

25      Q    And is the school, participating school,



1  also required to enter into a contract?

2      A    I actually am not sure whether that's

3  expressed as a contract.  I don't think that it is

4  but I'm no longer sure of those details.

5      Q    Early on I think -- earlier today you had

6  mentioned that the Apex program has requirements for

7  participating schools?

8      A    That's correct.

9      Q    And you don't know as you sit here now

10 whether those requirements are expressed as a

11 contract or in some other way?

12     A    Right.  For example, a way some of those

13 requirements might be expressed is in the

14 application process, right.

15     Q    I see.

16     A    That you agree to A, B, C.  And so that

17 may appear later in a contract.  I'm just not -- I'm

18 not sure now as we've grown the program.

19     Q    Who is the principal custodian at DBHDD

20 for the applications to participate in the Apex

21 process?

22     A    Either Dante McKay or someone on his team.

23     Q    Layla Fitzgerald?

24     A    Not that I'm aware of, but I don't know

25 who's delegated that.



1      Q    Are there any structural impediments to a

2   collaboration between a standalone GNETS program and

3   the Apex program?

4      A    I'm not sure what you mean by a structural

5   impediment.

6      Q    Were there any commitments on the school

7   program side that are inconsistent with your

8   understanding of the GNETS program?

9      A    I'm not sure that I know enough about the

10  GNETS program to be certain about that.

11     Q    If you're not certain, are there any

12  elements that you think likely would cause conflict

13  with GNETS?

14          MR. BELINFANTE:  Object to the form.

15     A    I don't think conflict so much as capacity

16  challenges.  In an Apex environment a limited

17  portion of the students in that school are in need

18  of and seek mental health services.  It's not every

19  youth in the school.  The provider would not be

20  equipped to handle the entirety of the school and

21  provide behavioral health services to everyone in

22  the school.

23          So they can do sort of -- as I've

24  mentioned, these awareness raising and other things

25  that touch everyone in the school, but to provide



1  one-on-one services to everyone in the school, that

2  was never the expectation or intent.

3      Q    Are there any other issues that you think

4  would present impediments to collaboration between a

5  GNETS facility and the Apex program?

6      A    I don't know enough about diagnoses of the

7  youth in the GNETS setting to assess that.

8      Q    Have you ever inquired?

9      A    No.

10      Q    Is there a particular legislature or

11  legislators who are advocates for the GNETS program?

12          MR. BELINFANTE:  Object to the form.

13      A    I know there are elected officials who are

14  pleased to know that there are -- there is

15  school-based mental health in their local community.

16      Q    My question didn't relate to school-based

17  mental health.  It related to the GNETS program.

18      A    Oh.

19      Q    Do you know which elected officials are

20  specifically identified with the GNETS program?

21      A    I have no knowledge of that.

22          MS. COHEN:  Let's mark -- I don't have to

23      mark it at all.

24  BY MS. COHEN:

25      Q    I'm going to show you what has been



1  previously marked as Exhibit 358.

2              (WHEREUPON, Plaintiff's Exhibit-358 was

3        previously marked for identification.)

4              MS. COHEN:  And here is a copy for

5        counsel.

6              MR. BELINFANTE:  Thank you.

7  BY MS. COHEN:

8     Q    Commissioner, I will represent to you that

9  Exhibit 358 is --

10             (Discussion ensued off the record.)

11  BY MS. COHEN:

12     Q    358 is titled "Apex 3.0 Frequently Asked

13  Questions," and it was downloaded from the Georgia

14  Department of Behavioral Health and Developmental

15  Disabilities site in July of 2022.

16             Are you familiar with these questions?

17     A    I'm familiar with the fact that we have an

18  FAQ on our website, as we do for many of our service

19  areas.

20     Q    When did you last refer to it?

21     A    I can't tell you the last time I looked at

22  this.  Not any time recently.

23     Q    Now, I'm looking at the second page, two

24  out of three.  Do you see that?

25     A    Uh-hum.  (Affirmative.)



1      Q    The question is:  "What is the Apex

2    model?"

3      A    Uh-hum.  (Affirmative.)

4      Q    And it says:  "The Apex model is a

5    multi-tiered system -- "service delivery model"?

6      A    Uh-hum.  (Affirmative.)

7      Q    Does that refresh your recollection that

8    Apex is a multitiered system model?

9      A    Yes.

10      Q    And "providers embed into schools and

11    implement services across all three tiers"?

12      A    Yes.

13      Q    Does that refresh your recollection that

14    it is a program that requires participation across

15    three tiers?

16      A    Yes.  I think when you asked this question

17    previously, this is not at all what I thought you

18    were referencing.

19      Q    So we had a miscommunication?

20      A    Yeah.  My apologies.  Yeah.

21      Q    Then the question below is:  "In which

22    types of schools can Apex be implemented?"

23           And the answer is on Page 3.  Do you see

24    that?

25      A    Yes.



1      Q    And it says:  "Apex therapists/clinicians

2   and behavioral health support staff are embedded

3   within public schools and public charter schools,

4   pre-kindergarten to 12th grade."

5           Is that correct?

6      A    Yes.

7      Q    And "they also help with life skills

8   development and other non-therapeutic activities,"

9   correct?

10     A    Yes.

11     Q    And then it says, "Apex services cannot be

12  provided in private charter schools, GNETS

13  standalone facilities, private schools, or

14  homeschooled/cyber public schools."

15          Do you see that?

16     A    I do.

17     Q    And what is the reason for this policy of

18  exclusion of GNETS standalone facilities?

19     A    In general, I would say that at a GNETS

20  standalone facility it's my understanding that those

21  students have already been identified as in need of

22  supports and services, maybe at a certain level of

23  intensity.

24          One of the goals of Apex has always been

25  early identification of youth who were not



 1  previously identified, and so it would be my

 2  understanding that all the youth at GNETS are

 3  already identified and have some connection to

 4  services.

 5       Q    What would -- is that something you know

 6  or are you speculating, Commissioner?

 7       A    I'm speculating at the moment about why we

 8  would have limitations on capacity and prioritize

 9  other public schools.

10       Q    Because you wouldn't adopt a policy just

11  based on speculation, correct?

12       A    Correct.

13       Q    So did you make any inquiry of your staff

14  to determine why this policy is in effect?

15       A    I did not.

16       Q    Did you participate in any discussions

17  with your staff about this policy?

18       A    Not that I recall.

19       Q    Do you know what the diagnostic criteria

20  are for entry into GNETS?

21       A    I do not.

22       Q    Have you heard discussion that OCYF

23  believed that a GNETS standalone facility could not

24  form an effective partnership with Apex?

25       A    I have not heard that.



1     Q    Have you heard that individuals at DBHDD
2  believed that there were issues about having
3  behavioral health team embedded in the school?
4     A    I'm not sure what you mean by that.
5     Q    Well, it's a feature of the Apex
6  partnership that the participating school provide an
7  office space --
8     A    Yes.
9     Q    -- and clinicians to administer services
10  on the school site?
11     A    Yes.
12     Q    So when I use the term "embedded," that's
13  what I'm referring to.
14          Did you ever learn of any unwillingness or
15  hear a discussion -- did you ever hear anyone talk
16  about unwillingness of the GNETS programs to have
17  providers embed within the schools?
18     A    I have no knowledge of that.
19     Q    Did you ever hear that providers were
20  reluctant to embed in GNETS facilities?
21     A    I did not hear that.
22     Q    Are you familiar with the GNETS rule, the
23  GNETS regulations promulgated by the Department of
24  Education?
25     A    No.



1     Q    Has your department promulgated any

2   regulations with regard to school-based mental

3   health services?

4     A    I don't -- not to my knowledge.  I don't

5   believe we've promulgated any regulations.

6          MS. COHEN:  Let's take a break.

7          THE VIDEOGRAPHER:  Off the record at 4:15

8      p.m.

9          (A recess was taken.)

10         THE VIDEOGRAPHER:  Back on the record at

11     4:34 p.m.

12  BY MS. COHEN:

13    Q    So I want to direct your attention to the

14  discussion of the three-tier Apex model?

15    A    Uh-hum.  (Affirmative.)

16    Q    I think when I asked you previously about

17  positive behavior supports, or positive behavior

18  intervention and supports, that is a three-tier

19  model, right?

20    A    That I can't speak to.

21    Q    You don't know?

22    A    No.

23    Q    Don't know either way?

24    A    I'm not on PBIS, no.

25    Q    And -- but Apex is a three-tiered service



1  delivery model --

2        A    Yes.

3        Q    -- is that right?

4        A    Yes.

5        Q    And what is Tier I?

6        A    Tier I are the things that the Apex

7  provider would do that benefit the entire school.

8  So preventive activities, sort of the mental health

9  awareness raising or mental health fair they might

10  have at a school, family meetings, parent/teacher.

11        Q    And what is Tier II?

12        A    As you see the language here, targeted

13  interventions where students who are identified as

14  at risk receive intervention and contact with mental

15  health professionals.

16        Q    And then what is Tier III?

17        A    That's the most intensive level of

18  intervention for students who are identified with

19  more serious needs.

20        Q    And what are the interventions that are

21  provided in Tier III?

22        A    Depending on what the youth needs are, but

23  they could be crisis intervention, individual

24  therapy.  If warranted, might be -- might involve

25  family therapy or other clinical direct services.



1     Q     Has your department started a program for
2   wraparound services?
3     A     We contract with providers.
4           I referenced this area earlier, care
5   management, CMEs, care management entities, who
6   provide specialized wraparound services in a
7   fidelity-based model.
8     Q     When you say in a fidelity-based model,
9   that's based on evidence-based practices?
10    A     Yes.  And you have to --
11    Q     And previously -- the subject of trials?
12    A     Yes.  There's rigor to the delivery.
13          So, for example, anyone could provide
14   something and call it wraparound services, but
15   high-fidelity wraparound explicitly means you are
16   following the evidence-based model as it was
17   intended.
18    Q     And that's what DBHDD contracts for?
19    A     Yes.
20    Q     Do you know if GNETS provides
21   high-fidelity wraparound services to its students?
22    A     I don't have any idea.
23    Q     What does the high-fidelity wraparound
24   include?
25          MR. BELINFANTE:  Object to the form.



1      A    So I have some knowledge of the program,

2   but essentially it's intensive engagement with the

3   family to design a team approach to a plan of care

4   for youth that has mental -- behavioral and

5   emotional difficulties.

6           So it involves gathering all the people

7   involved in the young person's life and following a

8   plan of care that the family decides together with

9   the care coordinator.

10     Q    Is one of the goals of wraparound services

11  prevention of having to put the individual in a

12  Psychiatric Residential Treatment Facility?

13          MR. BELINFANTE:  Object to the form.

14     A    I think it's important to say the goal is

15  to, as best as possible, to provide that youth with

16  the most appropriate level of care.

17          So it is intended to be a community-based

18  service delivery.

19     Q    When you say community based, you're

20  talking about not in a Psychiatric Residential

21  Treatment Facility, which is generally viewed as

22  removing the individual from his community?

23     A    Yes.

24     Q    And is another goal of the wraparound

25  service to shorten stays in highly restrictive



1  facilities?

2         MR. BELINFANTE:  Object to the form.

3     A    So in some cases the high-fidelity

4  wraparound team receives the youth as they're

5  discharging from one of those facilities, but it's

6  important that the discharge planning -- that the

7  course of treatment in that setting is achieved and

8  as best as possible the discharge planning moves

9  toward readiness for the community-based service

10 delivery system.

11    Q    My question was, is it another goal of the

12 wraparound service to shorten stays in highly

13 restrict -- in Psychiatric Residential Treatment

14 Facilities?

15         MR. BELINFANTE:  Object to the form.

16    A    That's a goal.

17    Q    And with regard to the GNETS program,

18 Commissioner, are you able to say based on your

19 knowledge whether it is a highly restrictive

20 setting?

21    A    I don't have knowledge of that.

22    Q    Can you say whether or not it's more

23 highly restrictive as a setting than any of the

24 settings that are provided in the Apex program?

25    A    I can't say that for sure.



1      Q    Do you have any information that's
2   pertinent to that question?
3           MR. BELINFANTE:  Object to the form.
4      A    I don't.
5      Q    Have you ever inquired?
6      A    No.
7      Q    Is that because you don't think it's your
8   obligation to explore what settings are provided and
9   services are provided to GNETS students?
10     A    That's out of the purview of DBHDD, yes.
11     Q    Are you aware of any efforts by your
12  agency, DBHDD, to divert children from GNETS by
13  providing school-based mental health services in
14  general education settings?
15     A    When --
16          MR. BELINFANTE:  Object to the form.
17          You can answer.
18     A    When DBHDD is providing services to
19  identify youth, it's in an effort to meet their
20  individualized needs in the best way that we can.
21     Q    And is one of the goals to keep the youth
22  out of highly restrictive settings?
23     A    If that's possible.
24     Q    And is it one of the goals to divert
25  children from GNETS?



1     A    I haven't described it explicitly as that,

2  but it is true that the value of a System of Care is

3  to provide services in the least restrictive

4  setting.

5          So we certainly are aligned with that

6  value.

7     Q    You are aware that the United States has

8  deposed other DBHDD employees in this matter?

9     A    Yes.

10    Q    And have you reviewed any of the

11 transcripts from them?

12    A    I have not.

13    Q    Have you reviewed any of the documents

14 marked as exhibits?

15    A    I -- not recently.

16    Q    What do you mean not recently?  Ever?

17    A    So you're showing me things I've seen

18 before, but I have not seen them in recent years.

19    Q    Got it.

20         MS. COHEN:  I'm going to mark as the next

21     exhibit -- is it 371?

22         THE COURT REPORTER:  Yes.

23         MS. COHEN:  371, a copy of the Georgia

24     Uniform Application, Fiscal Year 2021 Community

25     Mental Health Services Block Grant Plan.



1            And it has the -- this is something that
2        we have downloaded from the SAMHSA website, and
3        we have given it the Production Nos. R0003371
4        to R0003663.
5            (WHEREUPON, Plaintiff's Exhibit-371 was
6         marked for identification.)
7            MS. COHEN:  Josh, here's a copy for you.
8            MR. BELINFANTE:  Thank you.
9            MS. COHEN:  And here's a copy for the
10       Commissioner.
11   BY MS. COHEN:
12       Q    Are you familiar with this document,
13   Commissioner?
14       A    Yes.
15       Q    What is it?
16       A    As a recipient of the block grant, DBHDD
17   has to comply with the rules of the block grant, and
18   that requires us to spell out in extensive detail
19   about how -- essentially how the portions of our
20   service delivery system that are funded by the block
21   grant are carried out.
22       Q    Are there also references to aspects of
23   the service delivery that are not funded by the
24   block grant?
25       A    There may be.  Just in describing the



1  totality of what we do.

2      Q    Before we get into this Exhibit 371, you

3  can put it aside for a second.  I want to look at

4  something else with you.

5          MS. COHEN:  We'll mark as Exhibit 372 a

6      document Bates-stamped with the numbers

7      GA00056438.

8          (WHEREUPON, Plaintiff's Exhibit-372 was

9       marked for identification.)

10         MS. COHEN:  Here is a copy for counsel.

11 BY MS. COHEN:

12     Q    This is a document on the letterhead of

13 DBHDD.  I'll ask if you can identify for us,

14 Commissioner, and we'll mark it as 372.

15         Can you identify this for us,

16 Commissioner?

17     A    Yes.  This is a document produced by DBHDD

18 that is a summary of the continuum of services

19 supported by DBHDD.

20     Q    What purpose is it provided for?

21     A    It is a depiction of what people often

22 experience as a complex system.  So this was an

23 effort to depict what it means to deliver service

24 across the continuum in this bell curve, to

25 describe, as you see, provide clear definitions of



1    our acronyms.

2              And then on the second page to describe

3    the structure of the network, and then finally

4    describing importantly how insurance status drives

5    accessibility to care in Georgia.

6         Q    Is this the behavioral health map that you

7    mentioned?

8         A    Yep.

9         Q    Okay.  Let me see if I can understand this

10   then.

11             I start with the centered paragraph at the

12   top of the document.

13        A    Uh-hum.  (Affirmative.)

14        Q    "The focus of DBHDD's Office of Children,

15   Young Adults, and Families (OCYF) is to support

16   Georgia's System of Care for uninsured children and

17   young adults, or those with SSI Medicaid, and their

18   families, that are accessing the public behavioral

19   health system."

20        A    Yes.

21        Q    OCYF actually, as we discussed earlier,

22   provides insurance or coverage to uninsured children

23   and young adults or those with SSI Medicaid,

24   correct?

25        A    Yes.



1              MR. BELINFANTE:  Object to the form.

2      Q    But its responsibility in connection with

3  public behavioral health services is broader?

4              MR. BELINFANTE:  Object to the form.

5      A    I'm not sure I understood the distinction

6  about what you were saying.  I'm sorry.

7      Q    DBHDD not only provides insurance for

8  certain categories of individuals, but it also

9  determines what services will be provided through

10 the broader behavioral -- public behavioral health

11 system?

12     A    So to your former point, we do not provide

13 insurance.

14     Q    I'm sorry.  Okay.  Let me rephrase the

15 question.

16     A    Yeah, okay.

17     Q    DBHDD provides services?

18     A    Contracts with provider to make services

19 available.

20     Q    DBHDD -- thank you.  I'm learning.  I'll

21 keep working on it.

22     A    You're good.

23     Q    DBHDD contracts with providers to provide

24 behavioral health services to uninsured children and

25 young adults and those with SSI Medicaid?



1      A    Yes.

2      Q    DBHDD is responsible for selecting the

3   broader array of behavioral health services that are

4   provided under the State Medicaid plan?

5      A    As a behavioral health authority, we

6   provide expertise, which is taken into account in

7   the provision of -- in the design of the array of

8   services that are available.

9      Q    And you do it in concert with other

10  agencies?

11     A    DCH in particular, who's guided by Centers

12  for Medicaid and Medicare Services.

13     Q    But ultimately DBHDD has the final word?

14     A    Not exactly.

15     Q    No?

16     A    We're the authority.  We have the

17  expertise.  We make a recommendation but, for

18  example, we can't pick an idea out of the air, say

19  we think this is good, it should be delivered, if

20  ultimately it was not acceptable to CMS.

21     Q    I think your previous testimony on the

22  subject is clear and I don't want to muddy the

23  waters at this point.

24     A    Okay.

25     Q    Let's go back to that paragraph.



1     A     Uh-hum.

2     Q     It says:  "We accomplish this," that is

3   supporting Georgia's System of Care, "through the

4   development non-traditional treatment and supports

5   for youth and families that support the traditional

6   array of services available through Medicaid."

7           What is, what is the development of

8   nontraditional treatment?

9     A     So I think in our language here we're

10  describing any service that's outside of Medicaid

11  billable service.

12    Q     Can you give me some examples?

13    A     A clubhouse for youth, which we fund a

14  nontraditional service called the Youth Clubhouse,

15  which is for eligible youth, and it's a

16  community-based program that provides recreation,

17  support, and therapeutic services in a clubhouse,

18  literally, figuratively.

19          A space that is a clubhouse where teens

20  would want to hang out.  I would consider that a

21  nontraditional service.

22    Q     Are all of the services shown on this

23  diagram on 372, on the first page, nontraditional

24  services?

25    A     No.



1      Q    Which are the nontraditional services?

2      A    You see something here called Community

3  Innovation Pilots.  Those would be examples of a

4  program or idea that we may have some pilot funding

5  for, that we're testing out to see if it works in a

6  given environment or setting.

7           So that would be an example I think of

8  nontraditional.

9      Q    Are there any other nontraditional

10  services shown in the diagram?

11      A    None other that I identify right at this

12  moment.

13      Q    Is this the entire continuum of behavioral

14  health services provided?

15      A    By DBHDD?

16      Q    And DCH.

17      A    I can only speak to DBHDD's, that this is

18  DBHDD's continuum of services.

19      Q    And is GNETS on this continuum?

20      A    I don't see it here.

21      Q    Does this continuum depict the System of

22  Care?

23      A    Again, System of Care is an approach to

24  service delivery, not a program itself.

25      Q    Does this diagram depict programs that are



 1  within the System of Care?

 2      A    Some of these programs, yes, would be

 3  considered part of a continuum that is part of

 4  Georgia's System of Care.

 5      Q    And is the continuum a spectrum from

 6  prevention and early screening through late

 7  intervention?

 8      A    Yes.

 9      Q    And what is the bottom bar, which says,

10  "Mobile Crisis Core Benefit Package, Center of

11  Excellence, and trainings"?

12      A    I think that's meant to indicate that

13  we've tried to delineate what category of

14  intervention across -- so prescreening, early

15  intervention, intervention, late intervention.

16          Mobile Crisis might cover anyone in the

17  spectrum.  You don't have to qualify.  It might be

18  the first time someone engages in our system is

19  through a Mobile Crisis call.

20          So, obviously, Center of Excellence

21  involvement, they evaluate programs across this

22  spectrum.  So that's what I interpret that to mean.

23      Q    And what is the vertical axis?

24      A    The distinction between the phases of

25  intervention.



1    Q    I'm not sure I understand that.  So Apex

2    provides early intervention and late intervention --

3    and other intervention?

4    A    The Apex, right, is considered both early

5    intervention.  For some youth that might be the

6    first detection of a program.  Then it's also

7    considered intervention because there are some youth

8    who receive ongoing services at a higher level of

9    need that would -- therefore, it's crossing both

10   early intervention and intervention.

11   Q    So this looks like the continuum that's on

12   the horizontal axis.  I see up arrows and down

13   arrows on vertical lines.  What do those reference?

14   A    I'm sorry, say it again.  Which arrows are

15   you referencing here?

16   Q    I'm referring to arrows with the vertical

17   dotted lines.  What do those axes refer to?

18   A    I'm sorry.  So vertical axes are dividing

19   between the phases of intervention.

20        Horizontal are dividing between the volume

21   of youth impacted.

22   Q    I see.  So LIPT is the highest on the

23   curve, and that would mean that LIPT, local

24   intervention --

25   A    Interagency.



1      Q    -- interagency prevention team?

2      A    Planning.

3      Q    Planning.

4           Local interagency planning teams are the

5   highest on the chart.  So does that mean they serve

6   the largest population?

7      A    Actually, the core benefit package, I

8   think which is our basic intervention package, it's

9   across the spectrum, but the majority of services

10  delivered through the core benefit package --

11     Q    Flow through LIPT --

12     A    -- would be -- yeah, would be -- no, they

13  don't flow through LIPT.  That would be the highest

14  volume of service that we deliver, is through the

15  core package.

16     Q    And how is that represented on the chart?

17     A    I think it's -- as you see, core is

18  delivered in each one.  There's screening in core,

19  there's early intervention in core.  There's

20  intervention in core.  And --

21     Q    I see.  So that's the top of the curve?

22     A    Yes, essentially.  I'm sorry, yeah, you're

23  right.  That's not fully depicted there but core

24  services are the greatest volume of services

25  delivered.



1      Q    Understood.

2           And when does this date from?

3      A    I couldn't tell you.  I just think it's

4  not current.

5      Q    What is the SOC EASS refer to?

6      A    Where are you looking?

7      Q    I'm looking in the second --

8      A    Yeah, okay.  Early adult, emerging

9  adult -- sorry.  Emerging adult support services.

10          So looks like that's the term that's being

11  used here for the 16- to 26-year-old population.  So

12  some versions of children services across the

13  country.

14          Technically it goes up to 18, but the

15  category of youth 18 to 26 are called emerging

16  adults, and they're treated in some ways different

17  than the adult population.  So there's some

18  allowance there.

19      Q    So what is the reference to SOC there

20  above --

21      A    Yeah --

22      Q    -- early -- emerging adult support

23  services?

24      A    I don't know whether there's a specific

25  designation, that they're a System of Care early --



1   emerging adult support services.  I'm not quite sure

2   about the connection of those two acronyms there.

3        Q    Was this prepared before the expiration of

4   the CBAY waiver?

5        A    This document?

6        Q    Yes.

7        A    I can't tie the date of this.  It's been

8   around for a while and there have been different

9   iterations.  So I can't mark when was the first

10  iteration of this.

11       Q    What is the CBAY waiver?

12       A    So CBAY was a federal waiver program,

13  community-based alternatives for youth.  It was a

14  five-year demonstration waiver that essentially

15  sunsetted in the State, and from that was birthed --

16  the high-fidelity wraparound was an element of the

17  CBAY waiver.

18            High-fidelity wraparound has stuck around

19  as part of now an entity called Care Management

20  Entities.

21       Q    And what are the elements that went away

22  with the expiration of the CBAY waiver?

23       A    I think just funding through the

24  demonstration waiver structure, as happens for

25  demonstration waivers.  They have a time limited



1  period and the Feds determine whether or not the

2  waiver itself will continue.

3      Q    Did DBHDD apply for an extension of that

4  waiver?

5      A    I don't recall.

6      Q    How successful was that program with

7  providers?

8      A    I don't know about with providers.  I know

9  there were elements of the program that were deemed

10  helpful.

11     Q    What were those?

12     A    High-fidelity wraparound and utilization

13  of the care management entities for youth with high

14  intensity needs and their families who agreed to

15  participate in high-fidelity wrap activities.

16     Q    Let's go back to 371.

17          Is this the most recent application for

18  the Community Mental Health Services Block Grant

19  that the department has submitted?

20     A    I'm not sure.  I think not, since this one

21  says it expires on April 30th of 2022.

22     Q    Is there a new one?

23     A    I can't say definitively.  But I would

24  expect that there is but year over year they look

25  similar.  So...



1            MS. COHEN:  We'd like to request that the

2       department and the State produce a copy of

3       that.

4            MR. BELINFANTE:  If you all will just

5       email these so I can keep them straight.  I

6       believe we've already covered that.

7            MS. COHEN:  Understood.

8   BY MS. COHEN:

9       Q    How much money is provided to the

10  department annually under the Community Mental

11  Health Services Block Grant?

12      A    I don't know.

13      Q    Is it more than $70 million for children

14  and adolescent services?

15      A    I'm not sure.

16      Q    Are you the principal contact for this

17  grant?

18      A    No.  I'm signator but -- you mean in

19  practical terms?

20      Q    I mean in any sense, are you the principal

21  contact for this block grant?

22      A    I'm signator but we have an appointed

23  individual who is -- who oversees our federal grants

24  and programs.

25      Q    My question relates to whether or not you,



1    Commissioner, are the contact person for this block

2    grant?

3              MR. BELINFANTE:   Object to the form.

4        A    Yes.

5        Q    And it says that clear on Page 1 of 293, I

6    think the second page of Exhibit 371 that I've

7    handed you, that you are the contact person?

8        A    Okay.

9        Q    And as the contact person you review this

10   for accuracy before it's submitted?

11       A    Yes.

12       Q    And if we look through here to the page

13   that's Bates-stamped R0003381, do you see that?

14       A    Yes.

15       Q    What is this?

16       A    The State is required to have a letter

17   from the Governor's Office delegating the authority

18   for the block grant to DBHDD.

19       Q    So DBHDD, pursuant to this delegation

20   that's on page R0003381, dated August 19, 2019, was

21   delegated -- was identified as the single state

22   authority for community mental health.  Is that

23   correct?

24       A    Yes.

25       Q    And this has been a designation that has



1  remained in force for as long as you have been

2  Commissioner?

3        A     Yes.

4        Q     And you actually signed this on R0003387?

5        A     Yes.

6        Q     Now, the first section on Page 21 of 293,

7  do you have that?

8        A     I do.

9        Q     And I'm going back and forth between the R

10 number and the page number out of 293, depending on

11 which is most legible.

12       A     Okay.

13       Q     This presents the State Overview?

14       A     Okay.

15       Q     And this really presents the Behavioral

16 Health Division as it exists under your tenure for

17 the period of time referenced in the grant?

18       A     Yes.

19       Q     Does it indicate anywhere in this grant

20 that the services provided by the Department of

21 Behavioral Health are limited to certain

22 individuals?

23       A     In that first paragraph, the final

24 sentence is an expression of our primary

25 responsibility to serve individuals who are



1 | uninsured, as well as individuals receiving

2 | Medicaid.

3 |     Q    That is your primary contracting

4 | responsibility, right?

5 |     A    Yes.

6 |     Q    But you are also the single state

7 | authority for the determination of what services,

8 | behavioral health services, should be provided?

9 |     A    Yes.  Although we are not the -- again,

10 | we're the experts who make recommendations as to

11 | what should be in the array of services provided.

12 |     Q    It says on Page 31 of 293, under DBHDD

13 | Community Providers:  "DBHDD is responsible for

14 | delivery of services for adults and youth with

15 | mental illness, et cetera" and "children with

16 | serious emotional disturbances."

17 |         You don't mention any exclusions from that

18 | responsibility, do you?

19 |         MR. BELINFANTE:  Sorry, where are you on

20 |     31?

21 |         MS. COHEN:  I'm on Page 31 of 293, the

22 |     third full paragraph, titled, "DBHDD Community

23 |     Providers," the first sentence.

24 |         MR. BELINFANTE:  Okay.  Thank you.

25 |     A    Yes.  So I see here in this description it



1  does not attach the other description about our

2  priority population, but --

3       Q    Let me ask you this, Commissioner on --

4            MR. BELINFANTE:  Are you finished?  Did

5       you have --

6       Q    -- Page 120 --

7            MR. BELINFANTE:  Did you need to finish,

8       Commissioner?

9       A    The allocation of our resources is

10  directed towards individuals who are uninsured and

11  receiving Medicaid.

12       Q    Now, is GNETS described in this

13  application?

14       A    Not that I recall, but it's a lengthy

15  document, so I don't remember every element of it.

16       Q    Take a look.

17            (witness reviews exhibit.)

18       Q    Let me direct your attention to Page 118

19  -- 119.

20       A    119.

21       Q    As far as I can tell, Commissioner, I'll

22  inform you, the only mention of GNETS is at Pages

23  118 to 119?

24       A    Thank for you that direction.

25       Q    I wasn't quizzing you.  I actually had



 1   lost my page number.  But --

 2        A    That would have been impressive if I told

 3   you it was on Page 118.

 4        Q    And so the discussion on Page 118 to 119,

 5   a description of GNETS falls under Criterion III:

 6   Children's Services:  System of Integrated

 7   Services."

 8        A    Uh-hum.

 9        Q    Do you see that?

10        A    I do.

11        Q    And in this section DBHDD describes a

12   coordinated System of Care for children and youth

13   with serious emotional disturbances.

14             Is that correct?

15        A    I'm sorry, repeat -- repeat again what

16   you're asking me.

17        Q    Sure.  In this section, response to

18   Criterion III, which starts on Page 116, DBHDD

19   describes a coordinated System of Care for children

20   and youth with serious emotional disturbances.

21        A    It seems like you're reading from

22   somewhere, and in that same Criterion III, the first

23   sentence says "Georgia does not have one agency

24   responsible for all children's services."

25        Q    Do you see that there's a description of

1   "eight state agencies responsible for service"?

2        A    Yes.

3        Q    And that "all agencies must work together

4   to provide a system of care" --

5        A    Yes.

6        Q    -- "for children and youth with SED"?

7        A    Yes.

8        Q    And the -- at the end of the carryover

9   paragraph, on Page 117, it says:  "The services

10  provided by the primary child-serving agencies are

11  discussed below."

12            Do you see that?

13       A    Yes.

14       Q    And then there's a discussion of the role

15  of the Department of Education on 118?

16       A    Okay.

17       Q    And the discussion of GNETS begins on Page

18  119.  Do you see that?

19       A    Yes.

20       Q    Supporting the -- and it says, and I

21  quote, on Page 119:  Supporting the 186 school

22  systems in Georgia, the Georgia Network for

23  Education and Therapeutic Support provides

24  comprehensive special education and therapeutic

25  support for the children involved."



1              Do you see that?

2      A    I do.

3      Q    And "the purpose of the GNETS is to

4  prevent children from requiring residential or other

5  more restrictive placements by offering

6  comprehensive services in local areas."

7              Do you see that?

8      A    I do.

9      Q    And there's a discussion of the purpose of

10 GNETS.

11             Did you verify this information?

12     A    Not personally.

13     Q    Did anyone verify it?

14     A    I rely on my team to -- I think in each

15 one of these sections we are reliant on our partner

16 agencies to describe their work and --

17     Q    But just to be --

18     A    -- assure that it's accurate.

19     Q    But just to be clear, GNETS is not part of

20 any comprehensive system of care?

21             MR. BELINFANTE:  Object to the form.

22     A    That's your statement --

23     Q    Yeah.

24     A    -- or...

25     Q    I'm not asking you based on the document.



1  I'm just asking you --

2     A    Oh, I'm sorry, I didn't realize there was

3  a question on the table.  What is the question?

4     Q    The question is, GNETS is not part of any

5  coordinated system of care?

6         MR. BELINFANTE:  Object to the form.

7     A    I'm not in a position to say what DOE's

8  implementation of a GNETS program.

9     Q    You don't know?

10     A    I do not.

11     Q    Okay.  And then let's just make reference

12  to Pages 280 of 293, and the following pages.  This

13  is what I think you referred to earlier as the

14  Georgia Behavioral Health Planning & Advisory

15  Council attestation of -- that it acts as it needs

16  to for SAMHSA requirements?

17     A    Let me take a moment what I'm looking at

18  here.

19         (Witness reviews exhibit.)

20     A    Okay.  I see.  So these are minutes from a

21  meeting of the Georgia Behavioral Health Planning &

22  Advisory Council.

23     Q    And that's the council I think we started

24  with earlier in the day, correct?

25     A    Yes.



1      Q    And you mentioned that it was a

2  requirement of SAMHSA that there be such an entity?

3      A    Yes.

4           (Discussion ensued off the record.)

5           MS. COHEN:  I'm going to ask the court

6       reporter to mark as the next exhibit.

7           Is this 373?

8           THE COURT REPORTER:  Yes.

9           MS. COHEN:  The Georgia System of Care

10       State Plan for 2020, and it has the numbers

11       GA04312718 to 38.

12           (WHEREUPON, Plaintiff's Exhibit-373 was

13        marked for identification.)

14  BY MS. COHEN:

15      Q    Are you familiar with this document?

16      A    I am.

17      Q    What is this?

18      A    It's in -- Josh, you're giving Josh a

19  copy, too?

20           MS. COHEN:  I'm sorry, Josh.  Low on

21       copies.

22           MR. BELINFANTE:  Thank you.

23      A    The State is required to develop a system

24  of care plan for the State, and this is a draft of

25  the 2020 plan.



1      Q    Did a system of care plan issue?

2      A    Let me check my dates here.  I believe it

3   did.

4      Q    I asked you earlier whether you were

5   familiar with the statutory reference to Section

6   49-5-220.  I see it on the first page here.

7           Does that refresh your recollection about

8   the State statute that refers to the promulgation of

9   a System of Care State Plan?

10     A    Yes.

11     Q    And this is on the letterhead of the

12  Center for Excellence, correct?

13     A    Yes.

14     Q    But it is in fact a DBHDD document?

15     A    It's a system of care document.

16     Q    A system of care document.

17          And is the GNETS program described in

18  here?

19     A    I don't believe so.

20     Q    Does this otherwise -- does this -- has

21  this draft been finalized?

22     A    I believe that it has.

23     Q    Has there been one issued for 2022?

24     A    I think that it's -- I think this covers

25  the period of 2020 to 2023.  I'll have to check my



1  dates on that, though.

2      Q    As far as you know, this is the document

3  that governs --

4      A    This is --

5      Q    -- this period?

6      A    Yeah, this is -- the one I'm most familiar

7  with.

8      Q    Do you know why it has a draft watermark

9  on the first page?

10     A    I see it has the draft watermark

11  throughout.  We'll have to double-check.

12          MS. COHEN:  We'd just ask for the final.

13          And then I'm going mark as Exhibit 373 --

14      374 a document that is titled on the first page

15      "Georgia Apex Program Evaluation Results, July

16      2019-June 2020."

17          It has the stamps GA04896745 to 764.

18          And here is a copy for counsel.

19          (WHEREUPON, Plaintiff's Exhibit-374 was

20       marked for identification.)

21  BY MS. COHEN:

22      Q    Can you identify this document,

23  Commissioner?

24      A    This looks like a PowerPoint presentation

25  of a report of the annual evaluation.  I actually



1  have not seen this PowerPoint presentation but I

2  have seen a summary evaluation.  I don't believe

3  I've seen this PowerPoint before, though.

4       Q    Is this the most recent report?

5       A    I believe this is -- let me get my dates

6  right.

7            I think this is a Year 6 report and we are

8  awaiting Year 7's report, which is imminent, but I

9  haven't seen the draft yet but I understand it's

10  being produced.

11       Q    And as far as you know --

12       A    Actually, this is Year 5 as I'm seeing

13  this.

14       Q    The program is in Year 7.  Are you waiting

15  for a Year 6 report?

16       A    We're awaiting -- maybe it's a -- I have

17  Year 6 data is the last data that I have.

18       Q    Thank you.

19       A    So that's why --

20       Q    Is one of these produced every year?

21       A    An annual report is produced, this

22  PowerPoint format.  I don't know who this was

23  presented to in April.

24       Q    Is this public information?

25       A    Yes.



1      Q    And is there one prepared for every year?

2      A    There's a report prepared but I -- I'm

3   saying this format.  I don't know there's been a

4   PowerPoint version of it.

5      Q    I see.

6      A    That's all I'm referencing.

7      Q    Got it.

8           Do you know if there's a PowerPoint every

9   year?

10     A    This is the first one that I've seen with

11  this level of comprehensive information.  Again, I

12  don't know who the audience was here, though.

13          It doesn't seem to indicate on there.

14     Q    And are these available on the Center of

15  Excellence website to the general public?

16     A    If they're on the website, they are -- is

17  that where you got this one?  As I said, I haven't

18  seen this one.

19          I know their website is very

20  user-friendly.

21     Q    No.  I got this one from the State's

22  production.

23     A    Okay.

24     Q    But that's where you go to see

25  information?



1     A     That's where I would go.  Yes.

2           MS. COHEN:  All right.  Why don't we take

3     a short break and hopefully we can wrap this

4     up.

5           THE VIDEOGRAPHER:  Off the record at 5:32

6     p.m.

7           (A recess was taken.)

8           THE VIDEOGRAPHER:  We're back on the

9     record at 5:47 p.m.

10  BY MS. COHEN:

11    Q     I just want to correct a couple of things.

12          First of all, Commissioner, I see that it

13  was 2016, not 2015 that you were appointed, and I

14  apologize.

15    A     That's okay.  Glad we corrected the

16  record.

17    Q     And then I have received information from

18  my office that what we have marked as Exhibit 374 --

19  373, excuse me, was previously marked as Exhibit

20  150, and I'm going to ask Wanda to sticker it.

21          (WHEREUPON, Plaintiff's Exhibit-150 was

22    previously marked for identification.)

23          MS. COHEN:  Subject to any

24    cross-examination, I have nothing further.

25          MR. BELINFANTE:  I have no cross.



1        THE VIDEOGRAPHER:  We're off the record at

2   5:48 p.m.

3        (Whereupon, the deposition concluded at

4   5:48 p.m.)



JUDITH A. FITZGERALD                                August 16, 2022
UNITED STATES vs STATE OF GEORGIA                              243

1                        C E R T I F I C A T E

2

3    STATE OF GEORGIA:

4    FULTON COUNTY:

5

6            I hereby certify that the foregoing

7    transcript of JUDITH ANN FITZGERALD was taken down,

8    as stated in the caption, and the questions and

9    answers thereto were reduced by stenographic means

10   under my direction;

11           That the foregoing Pages 1 through

12   242 represent a true and correct transcript of

13   the evidence given upon said hearing;

14           And I further certify that I am not of kin

15   or counsel to the parties in this case; am not in

16   the regular employ of counsel for any of said

17   parties; nor am I in anywise interested in the

18   result of said case.

19

20           IN WITNESS WHEREOF, I have hereunto

21   subscribed my name this 22nd day of August, 2022.

22                         *Wanda L. Robinson*

23   _____

24           Wanda L. Robinson, CRR, CCR No. B-1973
               My Commission Expires 10/11/2023

25



1                    D I S C L O S U R E

2    STATE OF GEORGIA  ) VIDEOTAPE DEPOSITION OF
     FULTON COUNTY     ) JUDITH ANN FITZGERALD - 8/16/22
3                    Pursuant to Article 10.B of the Rules and

4    Regulations of the Board of Court Reporting

5    of the Judicial Council of Georgia, I make the

6    following disclosure:

7                    I am a Georgia certified court reporter.

8    I am here as a representative of Esquire Deposition

9    Solutions, LLC, and Esquire Deposition Solutions,

10   LLC was contacted by the offices of U.S. Attorney's

11   Office to provide court reporter services for this

12   deposition.  Esquire Deposition Solutions, LLC will

13   not be taking this deposition under any contract

14   that is prohibited by O.C.G.A. 9-11-28 (c).

15                    Esquire Deposition Solutions, LLC has no

16   contract/agreement to provide court reporter

17   services with any party to the case, or any counsel

18   in the case, or any reporter or reporting agency

19   from whom a referral might have been made to cover

20   this deposition.

21                    Esquire Deposition Solutions, LLC will

22   charge the usual and customary rates to all parties

23   in the case, and a financial discount will not be

24   given to any party to this litigation.

25

```
 1              ERRATA SHEET FOR THE TRANSCRIPT OF:

 2   Deponent Name:  JUDITH ANN FITZGERALD

 3   Case Caption:   United States of America vs. State
                     of Georgia
 4

 5   Case No. :  1:16-cv-03088-ELR

 6        I do hereby certify that I have read all
     questions propounded to me and all answers given by
 7   me on the 16th day of August 2022, taken before
     Wanda L. Robinson, and that:
 8

 9   _____1) There are no changes noted.

10   _____2) The following changes are noted:

11        Pursuant to state rules of Civil Procedure
     and/or the Official Code of Georgia Annotated
12   9-11-30(e), both of which read in part:  Any changes
     in form or substance which you desire to make shall
13   be entered upon the deposition with a statement of
     the reason given for making them.
14        Accordingly, to assist you in effecting
     corrections, please use the form below:
15

16   CORRECTIONS:

17   _____

18   Page      Line          Change        Reason For Change

19   _____

20   _____

21   _____

22   _____

23   _____

24

25
```



1                      CERTIFICATE  OF DEPONENT

2

3        I hereby certify that I have read and examined

4    the foregoing transcript, and the same is a true and

5    accurate record of the testimony given by me.  Any

6    additions or corrections that I feel are necessary,

7    I will attach on a separate sheet of paper to the

8    original transcript.

9

10                       _____

11                              Signature of Deponent

12

13        I hereby certify that the individual

14    representing himself/herself to be the above-named

15    individual, appeared before me this _____ day of

16    _____, 2022, and executed the above

17    certificate in my presence.

18

19

20                       _____

21                              NOTARY PUBLIC

22

23    MY COMMISSION EXPIRES:

24

25

