1              UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF GEORGIA

3   United States of America,            No.
                                         1:16-CV-03088-ELR
4       Plaintiff,

5   vs.

6   State of Georgia,

7       Defendant.
    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
8

9

10

11

12            VIDEOTAPED ZOOM DEPOSITION OF

13                 SONIA SHAUN OWEN

14                December 12, 2022

15                   9:06 a.m.

16               Atlanta, Georgia

17

18

19

20

21         Marcella Daughtry, RPR, RMR
       Georgia License No. 6595-1471-3597-5424
22          California CSR No. 14315

23

24

25



```
 1                    APPEARANCES OF COUNSEL

 2      For the Plaintiff:

 3           U.S. DEPARTMENT OF JUSTICE
             MS. LAURA CASSIDY TAYLOE
 4           MS. KELLY GARDNER WOMACK
             MS. VICTORIA LILL
 5           MS. ANDREA HAMILTON
             MS. RENEE WOHLENHAUS
 6           MS. MICHELLE TUCKER
             MS. CRYSTAL ADAMS
 7           MS. CLAIRE CHEVRIER
             950 Pennsylvania Avenue, N.W.
 8           Washington, D.C. 20579
             202.305.6630
 9           kelly.gardner@usdoj.gov
             andrea.hamilton@usdoj.gov
10           laura.tayloe@usdoj.gov

11
        For the Defendant and the Witness:
12
             ROBBINS FIRM
13           MS. MELANIE JOHNSON
             MS. ANNA EDMONDSON
14           MS. DANIELLE HERNANDEZ
             500 14th Street, NW
15           Atlanta, Georgia 30318
             404.856.3252
16           dhernandez@robbinsfirm.com
             melanie.johnson@robbinsfirm.com
17           jbelinfante@robbinsfirm.com

18
        Also Present:
19
             Sandra LeVert
20           Patrick Murphy, videographer
             Stacey Suber-Drake
21           Chantel Mullen

22

23
          *** ALL PARTICIPANTS APPEARED REMOTELY ***
24

25
```



SONIA SHAUN OWEN                                    December 12, 2022
UNITED STATES vs STATE OF GEORGIA                              3

```
 1                    INDEX OF EXAMINATION

 2   WITNESS:  SONIA SHAUN OWEN

 3

 4   EXAMINATION                                   PAGE

 5   BY MS. HAMILTON                                 6

 6

 7

 8

 9

10

11

12

13                          *   *   *

14

15

16

17

18

19

20

21

22

23

24

25
```



800.211.DEPO (3376)
EsquireSolutions.com

1                    INDEX TO EXHIBITS

2    EXHIBITS                                          PAGE

3    Exhibit 695         Notice of deposition          8

4    Exhibit 696         Curriculum vitae of Shaun     15
                         Owen
5
     Exhibit 697         E-mail from Matt Jones to     30
6                        Matt Jones 10/9/2020
                         "Subject: Announcements"
7                        GA01852181 to 52182

8    Exhibit 698         E-mail from Richard Woods     34
                         to DOE Users 9/9/16
9                        "Subject: Revised Organizational
                         Chart and Strategic Plan"
10                       GA01764366 to 392

11   Exhibit 699         E-mail from Matt Jones to     43
                         Shaun Owen 3/31/19
12                       "Subject: Fw: To Do List"
                         GA00697832 to 7836
13
     Exhibit 700         E-mail chain from Shaun Owen  80
14                       to Vickie Cleveland 1/28/20
                         "Subject: RE: Introduction and
15                       Next Steps"
                         GA00702975 to 2977
16
     Exhibit 701         E-mail from Shaun Owen to     83
17                       Jaquenetta Dugger 4/29/20
                         "Subject: RE: GNETS"
18                       GA00707281 to 282

19   Exhibit 702         E-mail from Vickie Cleveland  85
                         to Shaun Owen 8/19/20
20                       "Subject: Weekly agenda"
                         GA05057496 to 7499
21
     Exhibit 703         Letter to Mr. Belinfante and  161
22                       Ms. Morris dated 5/23/22 from
                         Andrea Hamilton
23

24                            *  *  *

25



 1              THE VIDEOGRAPHER:  We are now on the record.

 2   Today is Monday, December 12th, 2022, and the time is

 3   9:06 a.m. Eastern Time.  This begins the videoconference

 4   deposition of Shaun Owen taken in the matter of United

 5   States of America versus State of Georgia, Case Number

 6   1:16-cv-03088-ELR, pending in the US District Court for

 7   the Northern District of Georgia, Atlanta Division.

 8              My name is Patrick Murphy.  I am the remote

 9   videographer today.  Our remote court reporter is Marcie

10   Daughtry, and we are both representing Esquire Deposition

11   Solutions.

12              If counsel could please introduce themselves

13   for the record, and then our court reporter will swear in

14   the witness.

15              MS. HAMILTON:  Andrea Hamilton for the United

16   States.

17              MS. JOHNSON:  Melanie Johnson for the State of

18   Georgia.

19

20                   SONIA SHAUN OWEN,

21   called as a witness herein, having been first duly sworn

22   by the shorthand reporter to speak the truth and nothing

23   but the truth, was examined and testified as follows:

24   >>>

25   >>>



                      EXAMINATION

BY MS. HAMILTON:

    Q    Good morning, Ms. Owen.  We'll get started with
your deposition.  Again, how are you doing today?

    A    I'm fine.  How are you?

    Q    I'm doing very well.  Thank you very much.

         My name is Andrea Hamilton, and I represent the
United States.  I will be taking your deposition today.

         Would you please state your full name for the
record.

    A    Sonia Shaun Owen.

    Q    I will be asking you a series of questions, and
you are under oath to provide complete and honest answers
to those questions.  Do you understand?

    A    Yes.

    Q    If you do not understand a question that I ask,
you should feel free to let me know, and I will try to
rephrase or repeat the question.  Okay?

    A    Okay.

    Q    If you are not sure of an answer or don't have
a complete answer, you also must still answer the
question to the extent that you can.  Okay?

    A    Okay.

    Q    If you need a break at any point during the
deposition, please tell me or your attorney.  We will let



1  you finish your answer, if you are in the midst of

2  answering your question, and then discuss when or if to

3  break.  Also, we typically break probably every 90

4  minutes or so, and we will also take a lunch break

5  halfway through the deposition; but if you need a break

6  outside of those times, don't hesitate to let me or your

7  attorney know.

8       Does that make sense?

9  A    Yes.

10  Q    We are taking your deposition virtually via

11  Zoom today, and as you can see, the court reporter is

12  recording all that we are saying here.  Because she can

13  only record our words, please be sure to speak clearly

14  and answer every question with a verbal response.

15       Do you understand?

16  A    Yes.

17  Q    Also, I want us to avoid talking over each

18  other to the extent possible.  I will try not to

19  interrupt you when you are answering my questions, and

20  likewise, I ask that you do your best to let me finish my

21  questions before starting to answer.  Okay?

22  A    Okay.

23  Q    Is there any reason that you can think of that

24  you will not be able to answer my questions fully and

25  truthfully today?



1    A   No.

2         MS. HAMILTON:  And I just want to note on the

3    record that the United States and the State of Georgia

4    have agreed that all objections except as to form and

5    privilege will be reserved until trial.

6         MS. JOHNSON:  Agreed.

7    Q   BY MS. HAMILTON:  The exhibits for today's

8    deposition will be shared electronically, and I am going

9    to ask the court reporter to mark this first document

10   that I'm about to share on the screen as Plaintiff's

11   Exhibit 695.

12        (Plaintiff's Exhibit 695 was marked for

13   identification.)

14   Q   BY MS. HAMILTON:  Ms. Owen, will you let me

15   know when you see a document that's on the screen?

16   A   I can see it.

17   Q   Okay.  Great.  So I am now showing you

18   Plaintiff's Exhibit 695.  You can take a moment.  I'm

19   going to give you control.  You can practice.  Again, I

20   will give you control of the document, and I will give

21   you a moment to review it.  Let me know when you are

22   finished.

23   A   Okay.

24   Q   All right.  So this is a notice to testify at a

25   deposition in a civil action.  The deposition notice is



1  directed to Shaun Owen; is that correct?

2      A   Correct.

3      Q   And is that you?

4      A   Yes.

5      Q   Have you seen this document before today?

6      A   Yes.

7      Q   Who showed the document to you?

8      A   It was sent by our attorneys.

9      Q   Okay.  And who are your attorney or attorneys

10 today?

11     A   Melanie Johnson, Anna Edmondson, and then our

12 attorney for the Department of Education, Stacey

13 Suber-Drake.

14     Q   Okay.  And are you here today on account of

15 this deposition notice?

16     A   Yes.

17     Q   The top of this document has the case name

18 United States of America versus State of Georgia.  Do you

19 see that?

20     A   Yes.

21     Q   Do you understand that this deposition is being

22 taken in connection with litigation against the State of

23 Georgia relating to the Georgia Network for Educational

24 and Therapeutic Support Program?

25     A   Correct.  Yes.



1       Q   Are you aware that this program is commonly

2   referred to as the "GNETS program"?

3       A   Yes.

4       Q   So if I use the term "GNETS," do you understand

5   that I am referring to the Georgia Network for

6   Educational and Therapeutic Support Program?

7       A   Yes.

8       Q   When did you first learn about the GNETS

9   litigation?

10      A   I believe shortly after I took on the role as

11  deputy superintendent back in February or March of 2020.

12      Q   What is your understanding of what this case is

13  about?

14      A   It is about equal access and least restrictive

15  environment for -- for students with social, emotional

16  and behavioral challenges being integrated more into the

17  general ed setting and having equal access to resources

18  and supports.

19      Q   I am going to ask you a few questions about

20  your preparation for this deposition.  Please note that I

21  am not asking you to reveal the substance of any

22  communications that you had with your attorneys.

23          Generally, what did you do to prepare for this

24  deposition?

25      A   I looked over the resources that we have



 1  available on the GNETS website, and I reviewed my resume,

 2  and I read back over some of the board rules and some of

 3  the other documents that we have listed on the website.

 4      Q   And when you said you looked at some of the

 5  resources and documents on the website, what are those --

 6  what were those documents and resources?

 7      A   The board rule, the strategic plan, the listing

 8  of the GNETS site, the FAQ.

 9      Q   Were there any other documents that you

10  reviewed?

11      A   Not that I can recall at this time.

12      Q   Did you bring any of those documents with you

13  to today's deposition?

14      A   No.

15      Q   In preparation for the deposition, did you meet

16  with counsel?

17      A   Yes.

18      Q   Okay.  Without going into the substance of what

19  you discussed, who was present during the meeting?

20      A   Stacey Suber-Drake and Melanie Johnson, and

21  then at a different time, Anna Edmondson.

22      Q   Okay.  So were there two -- two meetings?

23      A   Yes.

24      Q   And approximately how long did those meetings

25  last?



1      A    I believe the one with Anna Edmondson may have
2   been about 45 minutes, and the one with Anna and Stacey
3   Suber-Drake I believe was maybe ten minutes.
4      Q    Okay.  And just to confirm, the one with Stacey
5   Suber-Drake was also with Melanie Johnson?
6      A    Yes.
7      Q    Okay.  And you said that was ten minutes?
8      A    Approximately.
9      Q    Okay.  Did you speak to anyone else besides the
10  attorneys in preparation for the deposition?
11     A    Not that I can recall.
12     Q    Did you do anything else to prepare?
13     A    I looked over the 2015/2016 document, I think
14  that the original document from the DOJ.
15     Q    Do you recall if that document was the letter
16  of findings from the United States?
17     A    I believe so.
18     Q    Were there any other documents that -- or
19  anything else that you did to prepare that we haven't
20  already discussed?
21     A    Not that I can recall.
22     Q    Have you ever had your deposition taken before?
23     A    No.
24     Q    All right.  Before we get too far into the
25  deposition, I also wanted to walk through some acronyms



SONIA SHAUN OWEN                                      December 12, 2022
UNITED STATES vs STATE OF GEORGIA                                  13

1  and abbreviations that I may be using today for brevity.

2  I'll run through a few of those now to make sure we're on

3  the same page.

4           If I say "Georgia DOE" or the "State DOE," do

5  you -- will you know that I am referring to the Georgia

6  Department of Education?

7       A   Yes.

8       Q   If I say the "State Board" or the "Georgia

9  Board," will you understand that I am referring to the

10  State Board of Education?

11      A   Yes.

12      Q   If I use the acronym "DBHDD," will you

13  understand that I am referring to the Georgia Department

14  of Behavioral Health and Developmental Disabilities?

15      A   Yes.

16      Q   If I say "DCH," do you understand that that is

17  short for Georgia Department of Community Health?

18      A   Yes.

19      Q   If I use "LEA," will you understand that I am

20  referring to local education agency?

21      A   Yes.

22      Q   If I say "RESA," will you understand that I am

23  referring to Regional Educational Service Agency?

24      A   Yes.

25      Q   If I say "GNETS centers," will you understand



1   that I am referring to the stand-alone GNETS facility

2   location?

3       A   Yes.

4       Q   In contrast, if I use the term "GNETS

5   school-based location," will you understand that I am

6   referring to the GNETS locations that are based in

7   general education school settings?

8       A   Yes.

9       Q   If I say "EBD," will you understand that I am

10  referring to the disability category of emotional and

11  behavioral disabilities?

12      A   Yes.

13      Q   And then finally, if I refer to "general

14  education settings," will you understand that I am

15  referring to public schools in Georgia where children

16  with EBD and other behavioral health conditions are able

17  to receive instruction and services alongside children

18  who do not have disabilities?

19      A   (No oral response.)

20      Q   And I'm sorry, did you say yes?

21      A   Yes.

22      Q   Okay.  There's a slight delay in the sound and

23  the video.  Thank you.

24      A   Yes.

25      Q   Okay.  I'm going to put another document on the



 1   screen, and I would like for the court reporter to mark

 2   this next document as Plaintiff's Exhibit 696.

 3          (Plaintiff's Exhibit 696 was marked for

 4   identification.)

 5      Q   BY MS. HAMILTON:  Ms. Owen, I am now showing

 6   you Plaintiff's Exhibit 696.  This is a copy of the

 7   resume for you that we received from counsel.  I'm going

 8   to give you a moment just to scroll through just to

 9   confirm that this is a document that you are familiar

10   with.

11          Let me know -- first of all, let me give you

12   control, and then let me know once you have scrolled

13   through and you're ready.

14      A   I'm sorry.  I didn't know if you were waiting

15   on me or not.

16      Q   Okay.  Yes, I just wanted confirmation when you

17   are ready.

18      A   I'm sorry.  Yes.  Yes, I'm ready.  Sorry.

19      Q   Okay.  Fantastic.

20          Do you recognize this document?

21      A   Yes.

22      Q   Is this an accurate and true version of your

23   resume currently?

24      A   No.  This is -- this is not a current resume.

25   This is, I believe, the last resume that I -- that I have



1  had, but I have not updated it since taking my role.  I

2  don't typically keep my resume updated.

3       Q    That -- that's fine, and that's not a problem.

4  I just want to make sure we get on the record what has

5  changed since this was created.

6            So the title of the document that we received

7  was Shaun Owen resume December 2019.  Would you -- would

8  you say that that is an accurate time frame for when this

9  resume would have been created?

10      A    Not created but updated.

11      Q    Okay.  And so since that time period, what

12 additional positions have you held, if any?

13      A    So -- so in February or March of 2020, I took

14 on the role of deputy superintendent of federal programs.

15      Q    And do you remember exactly when you took on

16 the role as deputy superintendent?

17      A    It was February or March.

18      Q    Okay.  But you don't remember a specific day?

19      A    I -- I don't, no.

20      Q    Okay.

21      A    I believe February, because March the pandemic

22 came about, so...

23      Q    Okay.  Great.  And would it also be accurate to

24 then conclude that the other positions that state

25 "present," like 2019 to present or 2016 to present, that



 1  those positions ended?

 2       A   Yes, that's correct.

 3       Q   All right.  That is helpful.  Thank you.

 4           I want to start by discussing your educational

 5  background, which I know is also included here in your

 6  resume, as well.

 7           My first question for you is, when -- sorry,

 8  where did you obtain your undergraduate degree?

 9       A   Augusta State University.

10       Q   Okay.  What year?

11       A   1995.

12       Q   And in what field?

13       A   Middle grades education, a bachelor of art's

14  degree.

15       Q   Okay.  And as we are going through, if there is

16  anything that's -- that you recall that's inconsistent

17  with what's on the resume, don't hesitate to let me know.

18           After you obtained your undergraduate degree,

19  what professional or graduate degrees did you obtain?

20       A   A master's in educational leadership from Troy

21  State and a specialist degree in educational leadership

22  from Lincoln Memorial.

23       Q   Okay.  When did you obtain those degrees?

24       A   2002 for the master's.  2003 for the

25  specialist.



1       Q    And what is the focus of a master degree

2   program in educational leadership?

3       A    It teaches you about going into administration

4   and leading from the -- leading, what is it, the

5   principal or district level or state level leadership in

6   education.

7       Q    Okay.  What is the difference between the

8   master degree program in educational leadership and the

9   specialist degree program in educational leadership?

10      A    They just -- they build off one another, so the

11  specialist degree is an additional -- typically, it's an

12  additional two years, depending on the program that

13  you're in, but it just builds on the master's degree.

14      Q    Do you have any other professional or graduate

15  degrees?

16      A    No.

17      Q    Do you have any professional licenses or

18  certificates in the area of education generally?

19      A    I'm sorry, could you repeat that?

20      Q    Sure.  Do you have any professional licenses or

21  certificates in education generally?

22      A    Licenses or certificates, what -- what do you

23  mean exactly?

24      Q    Just as an educator or just being in the

25  education field, are there any like non-degrees but



1  licenses, like teaching licenses or --

2      A    Oh.

3      Q    -- certificates?

4      A    Okay.  No, I mean, there is a number of courses

5  that I have taken or classes, training, professional

6  learning, but they're usually not certificates, no.

7      Q    Or any licenses or certificates that are

8  recognized by the State Department of Education?

9      A    Yes, I have a -- I think it's a T4 for the

10  bachelor's.  It's been a while.  And a L4 and a L6, I

11  believe, are the -- the -- what you hold for your

12  license.

13     Q    Okay.  And can you speak a little bit more

14  about what a P -- what the -- I think you said P4, L4 and

15  L6, what each of those stand for?

16     A    T, yeah, sorry.  It's the -- the level of the

17  degree, so -- and it's been a -- it's been a number of

18  years, but your bachelor's degree you have to pass a GACE

19  in whatever, so that's a -- a test that Georgia has for

20  licensing teachers, so you have to pass that particular

21  GACE for whatever it is that you are trying to get a

22  license or certificate in.  And the same is true for your

23  leadership degrees, and the L just stands for leadership

24  and the -- the level.

25     Q    Okay.  So just to clarify, are each of those



 1   designations associated with a degree that you've

 2   received?

 3        A    Yes.

 4        Q    Okay.  And so the T4 is associated with your

 5   bachelor's degree, the L4 with the master's, and the L6

 6   with your specialist degree?

 7        A    Well, it's -- so it's the degree plus passing

 8   the -- the test, the state test that goes along with

 9   that.

10        Q    Okay.  So thank you for clarifying that.

11             Do you have any professional or graduate

12   degrees in the area of special education?

13        A    Degrees, no.

14        Q    Yes.  Do you have any licenses or certificates

15   in the area of special education?

16        A    No.  That would be the -- the same.  No.

17        Q    Do you have any other credentials in the area

18   of special education?

19        A    Credentials, no.

20        Q    Do you have any formal training in working with

21   students with disabilities?

22        A    I do have -- I -- yes.  I'm trying to think

23   through the last number of years.  So I have always

24   worked closely with special education teachers, and I

25   have always had students with disabilities in my



1  classrooms, and I have worked with, at the state level,

2  the GAA assessment and the curricular part of special

3  education for accommodations for some of the work that --

4  that they've done.

5      Q   Okay.  So it sounds like you've had experience

6  working with students with disabilities and with teachers

7  in the area of special education.  Did you receive any

8  formal training specific to working with students with

9  disabilities?

10         MS. JOHNSON:  Object to form.

11         You can answer.

12         THE WITNESS:  Okay.  As part of my -- as part

13  of my undergrad.

14     Q   BY MS. HAMILTON:  And what did that look like?

15     A   A course with -- in special education, and then

16  practicums with special education students.  And as part

17  of my work with the undergrad in sociology, I spent -- I

18  did several practicums with students with disabilities

19  over there in different camp-type settings.  One of those

20  was Camp Future, which was general ed and special

21  education students together.  Another was two years with

22  a camp where I was learning sign language.  It was a deaf

23  and hard of hearing camp, which was the reason I changed

24  my major from sociology to -- to education.

25     Q   Okay.  All right.  And then since graduating



 1  from your undergraduate college, have you had any formal

 2  training in working with students with disabilities?

 3         MS. JOHNSON:  Form.

 4         You can answer.

 5         THE WITNESS:  Okay.  I would have to go back

 6  and look.  I have had -- taken a number of classes and

 7  professional development courses, so I can't -- over the

 8  last 20 something years, so I can't think right off the

 9  top of my head of specific courses.

10     Q   BY MS. HAMILTON:  Okay.  So it sounds like you

11  say you've taken courses in professional development.

12  Just to confirm, none of those courses of professional

13  development resulted in any licenses or formal --

14     A   Right.

15     Q   -- certificates?  Okay.

16     A   And I shouldn't say courses.  I'm sorry.  I

17  should say training or classes.  Courses is more formal.

18     Q   Okay.  All right.  So as you noted earlier, you

19  currently serve as the deputy superintendent of federal

20  programs at the Georgia DOE; is that correct?

21     A   Correct.

22     Q   And you've been in that position since

23  approximately February 2020; is that correct?

24     A   Correct.

25     Q   Okay.  Who held that position before you?



1        A    Nakeba Rahming.

2        Q    Did you have to apply for the position of

3   deputy superintendent of federal programs?

4        A    Yes.

5        Q    Who, if anyone, interviewed you for the

6   position?

7        A    Let me think back.  Faya Paul, Matt Jones, and

8   there was a third person.  I can't recall who the third

9   person is at this time.

10            (Court reporter clarification.)

11        Q    BY MS. HAMILTON:  What was Faya Paul's position

12   at the time?

13        A    I believe she was director in school and

14   district effectiveness.

15        Q    Who was Matt Jones?

16        A    He's the chief of staff.

17        Q    Are they both still in those positions?

18        A    Well, Faya is deceased, and Matt Jones is still

19   in his position.

20        Q    And you said you don't remember the name of the

21   third person; is that correct?

22        A    No, I don't.

23        Q    Did they tell you why you were chosen for the

24   position?

25        A    Well, real quick, just if I could clarify, the



 1  position isn't just special education.  So federal

 2  programs, special education is only part of the role.  A

 3  large percentage of the role is over most all of the ESSA

 4  programs, just to clarify that point.

 5       Did they tell me why I -- sorry, let me think

 6  back for a second.  It's been -- it's been --

 7     Q   That's fine.  Take your time.

 8     A   We've been through a pandemic.  I'm sorry, let

 9  me just think through.

10       From my understanding, it was implementing the

11  superintendent's goals and initiatives and creating the

12  consolidation of funds initiatives with additional

13  flexibility and resources and support and being able to

14  move federal programs forward according to the

15  superintendent's vision.

16     Q   So just to repeat my last question, it was, did

17  they -- when -- when you were interviewed for the

18  position and were hired, did they tell you why you

19  specifically were chosen for this position?

20     A   Sorry, I'm thinking back.  So I think it was a

21  phone call to say that I have gotten the position, and I

22  think it was just the work that I had previously done in

23  federal programs overall and being able to -- yeah, the

24  work that I had done in federal programs and the success

25  that I had had with the initiatives, and -- I'm trying



```
 1   to -- and implementing the superintendent's vision.

 2        Q   Okay.  In your current role, who do you report

 3   to?

 4        A   Matt Jones.

 5        Q   Okay.  And I guess just to make sure we're

 6   using the term report similarly, is he your former -- my

 7   apologies.  Is he your formal supervisor?

 8        A   Yes.

 9        Q   Okay.  Does he perform performance evaluations

10   for you?

11        A   I don't believe we've received any formal

12   evaluations.

13        Q   Okay.  Have you received one from anyone else?

14        A   Yes.  The -- in my previous roles, I had

15   received evaluations from Craig Geers, who was the

16   associate superintendent, and Bill Crenshaw, who was a

17   program manager when I first started.

18        Q   Okay.  But so far in your current role as

19   deputy superintendent, you haven't received a performance

20   evaluation?

21        A   Not a -- not a formal performance evaluation.

22        Q   Okay.  As the deputy superintendent for the

23   State Georgia Board of Education, do you routinely meet

24   with the State Board of Education for any reason?

25        A   No.
```



1       Q    Do you regularly meet with the superintendent

2    in your current position?

3       A    No.

4       Q    Do you regularly meet with Matt Jones in his

5    capacity as the chief of staff in your current position?

6       A    It's not a regular set meeting, but yes, we

7    communicate -- we communicate as needed.

8       Q    In addition to Mr. Jones serving as your

9    supervisor, what other types of things would you discuss

10   in meeting with him?

11      A    Any -- anything regarding any of the federal

12   programs, so whether that was any -- anything regarding

13   ESSA or grant funding, possibly new allocations coming

14   down.  If there was an issue of some sort, I would touch

15   base with him.  Yeah, any updates that I need to share

16   with him as well.

17      Q    Okay.  Do you regularly meet with the other

18   deputy superintendents?

19      A    By regularly, you mean a set meeting?

20      Q    Yes, just a reoccurring or --

21      A    Or --

22      Q    -- set meeting.

23      A    No.  Well, wait.

24      Q    Are there opportunities -- I was gonna say, are

25   there other opportunities --



1        A    I'm sorry, let me go back.

2        Q    Sure, go ahead.

3        A    Let me back up on that one.  I'm sorry.

4             We do meet every -- every two weeks the direct

5   reports, I'm sorry, do meet, and the superintendent and

6   Matt are at those meetings.

7        Q    Okay.  Do those meetings have a -- a particular

8   name?

9        A    I think it's biweekly leadership meetings.

10       Q    What is discussed during those meetings?

11       A    Any updates from the superintendent or Matt

12  Jones or communications or the ESSER funding or anything

13  that -- anything programmatically or division-wise that

14  anybody is doing or wants to talk about; or if there is

15  updated trending or something coming out, demonstration

16  of that, as well.

17       Q    Okay.  Who sets the agenda for the biweekly

18  leadership meetings?

19       A    I -- I don't know.

20       Q    Can you, as a deputy superintendent, propose

21  items to add to the agenda?

22       A    Yes.

23       Q    Is the GNETS program ever a topic that is on

24  the agenda in the biweekly leadership meetings?

25       A    Not that -- not that I can recall.



1    Q   Okay.  And I also want to talk about the

2    structure of the federal programs.  Making sure I'm using

3    the right terminology, do you refer to where you work, is

4    that an office, a department?  Is there a proper term

5    when I refer to the federal -- federal program?

6    A   Just probably division is fine.

7    Q   Division, okay.

8         THE VIDEOGRAPHER:  I'm sorry to interrupt.

9    Real quickly, I just want to see if we are through with

10   the image of the document on the screen for now?

11        MS. HAMILTON:  No.  Well, we are about to

12   switch to a different one, but we're -- we're still using

13   it.

14        THE VIDEOGRAPHER:  Okay.  Sorry.  Go ahead.

15   Q   BY MS. HAMILTON:  All right.  So within your

16   division for federal programs, is the GNETS program one

17   of the programs that falls under your office's

18   supervision?

19        MS. JOHNSON:  Object to form.

20        You can answer.

21        THE WITNESS:  Well, GNETS is -- so the GNETS

22   program manager and program specialist are -- yes, they

23   are part of federal programs.

24   Q   BY MS. HAMILTON:  Okay.  And why do their roles

25   fall under federal programs?



1      A   Because it's part of -- because the students
2   served are students with disabilities.
3      Q   And if you can elaborate a bit further, I just
4   want to make sure I understand the connection.  So to the
5   extent that the GNETS program manager and specialist are
6   working with a program that serves students with
7   disabilities, why would that fall under federal programs?
8      A   Because federal programs is -- includes the
9   ESSA programs and IDEA and the state allotments relative
10  to students with disabilities.
11     Q   Okay.  And so you mentioned those two
12  individuals.  Who is currently the GNETS program manager?
13     A   Vickie Cleveland.
14     Q   And who is currently the GNETS specialist?
15     A   LaKesha Stevens.
16     Q   And is that LaKesha Stevenson or LaKesha
17  Stevens?
18     A   It -- Stevenson?
19     Q   Did you say LaKesha Stevenson?
20     A   It may be Stevenson.  Sorry.
21     Q   Have their positions always been under the
22  federal programs division?
23     A   Since I've been in -- in federal programs, I
24  believe they've been.  I think ESSA and IDEA have been
25  under federal programs.  I don't -- I don't know when



1  that change took place or if they were separate at one

2  point in time.

3      Q   Okay.  And I just want to make sure from a

4  visual standpoint that I also have a clear picture of how

5  your division -- like what falls underneath your

6  division.  So I'm going to share another document with

7  you.

8          I'd like for the court reporter -- let me make

9  sure this is on the screen.  I'd like the court reporter

10  to mark this next document as Plaintiff's -- Plaintiff's

11  Exhibit 697.

12          (Plaintiff's Exhibit 697 was marked for

13  identification.)

14      Q   BY MS. HAMILTON:  And Ms. Owen, I am now

15  showing you Plaintiff's Exhibit 697.  This is an

16  October 9th, 2020 e-mail from Matt Jones with the subject

17  line "Announcements."  The "To" line also lists Matt

18  Jones' name.  It's not clear if this was sent out like as

19  a blind carbon copy document or not, but the main thing

20  I'm going to have you focus on is the attachment.

21          For the record, the Bates number on this

22  document has -- for the first page is GA01852181.  And as

23  I mentioned, there's also an attachment.

24          Ms. Owen, I am going to give you control of the

25  screen in a moment so that you can scroll through just to



 1  become familiar with what's on the screen, and then when

 2  you are ready, let me know.

 3      A   Okay.

 4      Q   And again, the main thing I will be focused on

 5  during this discussion is on the attachment, which is

 6  page 2.

 7      A   Okay.

 8      Q   All right.  And I want to make sure you can

 9  also see this document clearly.

10          All right.  So focusing on the attachment, do

11  you recognize this document?

12      A   I do.

13      Q   Okay.  What is this document?

14      A   It's the org chart for the Department of Ed.

15      Q   Okay.  And I want to note for the record, at

16  the bottom, this particular document has an effective

17  date of October 9th, 2020.

18          Ms. Owen, do you see that?

19      A   I --

20      Q   It's in the bottom left corner.

21      A   There's -- there's no way that -- I can scroll

22  up and down, but I can't -- I can't scroll over.

23      Q   There's a bar at the very bottom of the screen.

24  Okay.

25      A   I don't -- I don't know if the zoom thing is



SONIA SHAUN OWEN                          December 12, 2022
UNITED STATES vs STATE OF GEORGIA                          32

1  covering up the bar.  I know typically I can see that.  I

2  can't.  It's not popping up, so...

3      Q   Here, I can show you.  I'm going to make it a

4  little larger, and then here at the bottom there's -- I

5  don't know if you see this gray bar that I'm moving back

6  and forth, but that will let you control it --

7      A   Yes.

8      Q   -- from left to right.

9      A   Let me see.  I don't.

10         MS. JOHNSON:  It may be covered by the --

11         THE WITNESS:  I think it's covered by the zoom.

12  If there's a way to -- there was a way to minimize that.

13         MS. JOHNSON:  Yeah, this does look different

14  than on my screen.

15         MS. HAMILTON:  Oh, okay.  I didn't realize your

16  view was different.

17         MS. JOHNSON:  Well, just on my screen, I can

18  see the bar, but on her's, it's not there.  That is

19  strange.

20         MS. HAMILTON:  Okay.  That is strange.  Okay.

21  No worries.

22      Q   BY MS. HAMILTON:  The main thing I just wanted

23  to --

24      A   I could probably just minimize.

25      Q   Yeah.  If you minimize it, I just wanted to



 1  give you a chance to confirm the date that was in the

 2  bottom left corner.

 3       A   Yeah, I can't -- I can't see it.

 4       Q   Okay.  Let me see if I can adjust it for you.

 5  Can you see -- can you see the bottom left corner now

 6  where the mouse is?

 7       A   Let me move.  Hold on.  No, I -- I can't see it

 8  on mine.

 9       Q   Okay.  Let me see if I can move this up.  Okay.

10  Can you see it now?

11       A   There you go.  Now I can see, yes.  Yes, I can

12  see it.

13       Q   Okay.  My apologies that the -- your -- the

14  view that you have is different from -- from what I can

15  see.

16           All right.  So just to confirm for the record,

17  given that confusion there, can you please confirm that

18  the date on this document has -- that this document has

19  an effective date of October 9th, 2020?

20       A   Yes.

21       Q   Okay.  And I want to focus our time just

22  looking at the part of the organizational chart for

23  federal programs, and I just want to give you a brief

24  moment to look at this to confirm whether this is --

25  these programs still fall within your division.



 1        A    So one change on here is that MTSS is now part

 2   of the Division of Whole Child.

 3        Q    Thank you.  Are there any other changes?

 4        A    That's the -- that's the only thing that I see.

 5        Q    And the Georgia Network for Educational and

 6   Therapeutic Support Program, or GNETS, is also listed

 7   within your division; is that correct?

 8        A    Yes.

 9        Q    And is that referencing the individuals who you

10   mentioned a moment ago who serve as the GNETS program

11   manager and specialist?

12        A    Yes.

13        Q    I'm going to stop sharing.  Okay.

14             All right.  I just put a new document on the

15   screen that I would like for the court reporter to mark

16   as Plaintiff's Exhibit 698.

17             (Plaintiff's Exhibit 698 was marked for

18   identification.)

19        Q    BY MS. HAMILTON:  And Ms. Owen, I am now

20   showing you Plaintiff's Exhibit 698.  This is a

21   September 9th, 2016 e-mail from superintendent Richard

22   Woods to DOE -- "DOE Users" and "Other Agency Users" with

23   a subject line, "Revised -- Revised Organizational Chart

24   and Strategic Plan."  The Bates number on the first page

25   is GA01764366, and this document has an attachment.



1          Ms. Owen, you should have control, just to take

2    a brief moment, and again, I want to focus on the

3    attachment for --

4        A   Okay.  Okay.

5        Q   So scrolling down to the attachment, I want to

6    confirm, first of all, the title here says, "Georgia

7    Department of Education, GaDOE Organizational Chart

8    Revised September 1st, 2016."

9          Do you see that?

10       A   I do.

11       Q   Okay.  I also want to confirm, if you see here

12   near the bottom of the organizational chart, there is a

13   box for Georgia Network of Education and Therapeutic

14   Supports (GNETS).  It says here, Director, Nakeba Rahming

15   at the time.

16         Do you see where GNETS is located on the

17   organizational chart here?

18       A   Oh, okay.  Let me -- I do.

19       Q   Okay.  So according to this org chart, were you

20   aware that the GNETS program did not always fall under

21   federal programs?

22       A   No.

23       Q   Okay.  And do you see here that the GNETS

24   director during this time period in 2016 reported

25   directly to Matt Jones, the chief of staff?



 1      A    Yes.

 2      Q    Okay.  Do you know what prompted the change in

 3   the reporting structure such that the GNETS director no

 4   longer reports to Matt Jones?

 5      A    I do not.

 6      Q    Is there any reason that you think there is a

 7   benefit to the GNETS program director directing -- sorry,

 8   the GNETS program director reporting directly to Matt

 9   Jones, the chief of staff?

10           MS. JOHNSON:  Object to form.

11           You can answer.

12           THE WITNESS:  Okay.  I'm sorry, would you --

13   would you repeat the question?

14      Q    BY MS. HAMILTON:  Sure.  Can you see any

15   benefit to the GNETS director reporting directly to the

16   chief of staff, Matt Jones?

17           MS. JOHNSON:  Object to form.

18           THE WITNESS:  I mean, I really don't want to

19   speculate about what the benefit would be because I don't

20   even -- I don't know why it moved to begin with.

21      Q    BY MS. HAMILTON:  I'm going to stop sharing my

22   screen.

23           And Ms. Owen, can you speak briefly to your

24   duties and responsibilities as the deputy superintendent

25   of federal programs?



1       A    I oversee around 1 point billion dollars of

2   federal funding that comes through the various ESSA

3   programs and IDEA.  I oversee about 130 staff members as

4   part of that.  We have to make sure that we are adhering

5   to federal guidelines for the -- for the grant.  We

6   monitor and oversee the grants and provide technical

7   assistance and support to the LEAs and the sub grant

8   recipients as part of what we do.

9            Look for ways to -- to implement flexibility

10  where we can to better support the districts under the

11  superintendent's vision and mission, and that ties back

12  to what you had mentioned earlier.  So one of the reasons

13  that I assume the role was growing, consolidation of

14  funds from a few small districts to over 40 something

15  across the state with that, additional aspects of

16  consolidation were for federal programs out of the

17  guidance that we received from U.S. Ed on that.

18           We run the allocations through the -- for

19  approval through the State Board.  We do all of our

20  end-of-year reporting for the grant to the U.S.

21  Department of Education; develop resources; training;

22  oversee the -- the funds; ensuring adherence to the

23  federal regulations for each of the individual grants,

24  all unique with their own set of requirements; and make

25  sure that we're -- we are hitting all of our targets and



 1  reporting requirements for -- for the grants that we

 2  oversee.

 3      Q    Thank you.

 4           As deputy superintendent, do you have any job

 5  responsibilities that specifically involve GNETS?

 6           MS. JOHNSON:  Form.

 7           THE WITNESS:  Well, it -- it falls under

 8  federal programs, so as far as job responsibilities, I'm

 9  just trying to think how to -- I mean, yes, as far as

10  that's part of the oversight of the -- the funds.  We

11  have the application process that flows through us, and

12  that -- the grants management piece, the reporting out

13  and that all -- I mean, ultimately, that all falls under

14  my shop.

15      Q    BY MS. HAMILTON:  All right.  So it sounds like

16  there are a number of grant-related responsibilities and

17  reporting responsibilities.  Are there any others?

18      A    Well, I mean, part of it is -- is the -- the --

19  you know, the visits.  But as far as what I -- my actual

20  role in it is more that Vickie, you know, does her

21  responsibilities as part of her role and then ultimately

22  reports to Wina Low, the director of special education,

23  and then Wina reports to me.  But Vickie is not my actual

24  direct report, but it's just part of the overall program.

25      Q    Okay.  That's helpful.



1          And a moment ago you said some of your
2    responsibilities pertained to this, and you said like the
3    visits.  What were you referring to?
4         A    Just, I mean, part of -- part of what I had to
5    assume as part of this role is the -- the -- the
6    litigation aspect, which is -- yeah.
7         Q    And what are the expectations for you as deputy
8    superintendent as it pertains to the litigation aspects
9    as you just referred to?
10        A    Well, any -- anything that is sent from the DOJ
11   regarding anything that we have to provide for you all,
12   either Wina Low or myself to attend the site visits,
13   along with the DOJ staff that goes to that, and any, you
14   know, additional discussions that we might have with our
15   lawyers relative to -- to GNETS.
16        Q    All right.  I want to turn back to your resume
17   now.  I want to share my screen again.
18             And this was Plaintiff's Exhibit 696.  Let me
19   just...  Ms. Owen, do you see Plaintiff's Exhibit 696,
20   your resume, on the screen?
21        A    Yes.
22        Q    Okay.  All right.  I want to discuss some of
23   the other positions you've held with the Georgia
24   Department of Education.  What position or positions did
25   you hold immediately before you became deputy



1   superintendent?

2        A   I was in three different roles at the time.   I

3   was director of consolidated federal initiatives, state

4   ombudsman, the role that came out of ESSA, and deputy

5   chief of staff.

6        Q   And let's take each of those one at a time, and

7   let's start with the deputy chief of staff.  What was the

8   time frame that you served as deputy chief of staff?

9        A   2019 until I assumed the role of deputy

10  superintendent of federal programs.

11       Q   How did you obtain that position?

12       A   The -- how did I obtain the role of deputy

13  chief of staff?

14       Q   Yes.

15       A   Okay.  I was appointed by Matt Jones.

16       Q   Prior to you serving in that role, had there

17  previously been a deputy chief -- chief of staff?

18       A   No, no.  Well, let me -- to my knowledge, not

19  that I recall.

20       Q   And did Mr. Jones tell you why you were chosen

21  for that role or appointed to that role?

22       A   Because of being -- because of the work that I

23  had done in federal programs with consolidation, growing

24  and -- growing that program, which along with the

25  superintendent's vision and mission, and the -- I'm sure



 1  the work that I had done as the role of ombudsman, and it
 2  was both at the -- the state and national level, and --
 3  and just seeing how I could streamline policies and
 4  procedures and be successful in -- in implementing the --
 5  the flexibility with federal programs that the -- that
 6  the superintendent was wanting as part of his strategic
 7  plan.
 8      Q   Who did you report to when you served as the
 9  deputy chief of staff?
10      A   Matt Jones.
11      Q   Okay.  Was there anyone else that you reported
12  to directly?
13      A   Well, I was split-funded, so I was reporting
14  for -- for my role under -- for my role with director of
15  consolidated federal initiatives and state ombudsman,
16  that was -- that role still reported to Craig Geers, and
17  then -- for half of the time, and then the other half of
18  the time was reporting to Matt Jones.
19          And essentially it was just -- I had been very
20  successful with the -- with the initiatives that I was
21  overseeing.
22      Q   Did your position as the deputy chief of staff
23  fall within any particular offices or departments?
24      A   I don't think so.  I -- I believe that -- I
25  believe you -- the org chart, I think it shows as a



1  direct report to Matt Jones.

2      Q    Okay.  In your role as deputy chief of staff,

3  did you supervise anyone?

4      A    No.

5      Q    What were your core responsibilities as deputy

6  chief of staff?

7      A    Looking at initiatives across the agency;

8  working with multiple divisions across the agency;

9  streamlining processes and procedures; looking at

10  efficiency and effectiveness; implementing the

11  superintendent's vision; developing the -- looking for

12  areas that we needed to work on our processes, like

13  the -- the travel course that you see right there; and

14  pulling together various divisions across the agency.

15      Q    I want to ask you a few follow-up questions

16  about some of the things that you just stated and also on

17  your resume.

18          In this first bullet point on your resume where

19  it says you supported the work of the superintendent and

20  the chief of staff, what did that job responsibility

21  entail on a day-to-day basis?

22      A    Anything that they might want implemented or

23  looked at across the agency, employing various

24  stakeholders to the table to try to resolve any -- I

25  won't say resolve any issues.  Streamline any processes



 1  or work on anything that needed to sort of be approved at

 2  an agency level.

 3      Q   Okay.  In supporting the work of the

 4  superintendent and the chief of staff, were there ever

 5  issues involving the GNETS program that rose to that

 6  level?

 7          MS. JOHNSON:  Object to form.

 8          You can answer.

 9          THE WITNESS:  Not that I recall.

10      Q   BY MS. HAMILTON:  Okay.  I'm going to share a

11  new document that I would like for the court reporter to

12  mark as Plaintiff's Exhibit 699.

13          (Plaintiff's Exhibit 699 was marked for

14  identification.)

15      Q   BY MS. HAMILTON:  And Ms. Owen, I am now

16  showing you Plaintiff's Exhibit 699.  This is a

17  March 31st, 2019 e-mail from Matt Jones to Shaun Owen

18  with the subject, "Forward:  To Do List."  That includes

19  a forwarded message and an attachment.  The Bates number

20  at the bottom of the first page is GA00697832.

21          I will give you a moment.  Let me give you

22  control just to scroll through to familiarize yourself

23  with what's on the screen.  Let me know when you are

24  ready.

25      A   Okay.  All right.  Give me one second.



1    Q   Okay.

2    A   Did you -- I'm sorry, did you want me to scroll

3  down?

4    Q   Yes.  You can scroll down and look at the

5  attachment as well.

6    A   Okay.

7    Q   And let me know when you're ready.

8    A   Okay.

9    Q   I'm going to return to the top of this

10  document.  Do you recognize this document?

11    A   Yes.

12    Q   Did you receive this document in your capacity

13  as the deputy chief of staff?

14    A   Yes.

15    Q   And to the extent that it says, "Forward: To Do

16  list," was the "To Do List" a reoccurring document that

17  you received in this role?

18    A   Not that I recall.

19    Q   Okay.  Why did you receive this particular Work

20  To Do List?

21        MS. JOHNSON:  Object to form.

22        You can answer.

23        THE WITNESS:  Okay.  I -- I think it was to

24  give me an idea of just sort of the -- the scope of some

25  of the things that the superintendent was looking at



1    agency wide.

2        Q   BY MS. HAMILTON:  The cover e-mail from Matt

3    Jones says, "We'll go over this on Monday/Tuesday too."

4            Did you have a meeting with Matt Jones to

5    discuss this document?

6        A   We did have -- we did have a meeting and looked

7    over the document, I think.

8        Q   Okay.  Did anyone else participate in that

9    meeting?

10       A   No.

11       Q   Okay.  I want to scroll down to the To Do List

12   and look at item number 78, which says, "GNETS: FBA/BIP,"

13   or B-I-P, "Online Learning Modules."

14           What does this item refer to?

15           MS. JOHNSON:  Object to form.

16           You can answer.

17           THE WITNESS:  I'm assuming, because nothing

18   sticks out at me, it's a list of 100 different things.

19   I -- I would be speculating about that.  I'm assuming to

20   develop online modules for FBAs and BIPs, but again, I

21   don't recall anything specific about -- about GNETS

22   coming from that meeting.

23       Q   BY MS. HAMILTON:  To the extent that this GNETS

24   item about the FBA/BIP online learning modules is on the

25   To Do List that the superintendents had provided to Matt



1    Jones, would that have indicated this was an area of

2    interest for the superintendent?

3            MS. JOHNSON:  Object to form.

4            You can answer.

5            THE WITNESS:  Again, I'm -- I'm speculating

6    that if it's on the list, then it's something that the

7    superintendent would be -- you know, of interest to the

8    superintendent.

9        Q    BY MS. HAMILTON:  Do you remember if any

10   specific action was taken with regard to this item?

11       A    I do not remember.  I can -- I seem to recall

12   Vickie mentioning that they may have hired a contractor.

13   I don't know if it was specifically for online modules,

14   but for some type of training for the FBA and the BIP.

15       Q    Okay.

16       A    But not in -- not in this role.  This is much

17   later.

18       Q    And do you remember if GNETS was discussed in

19   the context of any of the other items that are on this To

20   Do List?

21       A    I don't recall GNETS coming up.

22       Q    And near the end there is a bullet point that

23   just says "Nakiba."  Do you remember what the topic of

24   discussion was with regard to "Nakiba"?

25       A    No, but a point of clarification, just because



1   it's on here does not mean we went over all of these

2   points.  I think at that time Nakeba may have been out on

3   medical leave, but I'm -- again, I'm -- I don't want to

4   speculate.

5           But yeah, we didn't -- and again, I'm trying to

6   go back three years to remember this, but I do not think

7   we -- I think there was a list, but as far as actually

8   going over each one of these points, I don't -- I do not

9   think that -- I don't think we did that at all.

10      Q   Okay.  All right.  I'd like to return back to

11  your resume, which was Plaintiff's Exhibit 696.  Let me

12  know when you see it on the screen.

13      A   I see it.

14      Q   Okay.  And I want to talk through a few more of

15  the bullet points listed here for your deputy chief of

16  staff position.  There is another one here.  This is the

17  second bullet point that says, "Work with Human

18  Resources, Policy and General Counsel to update and

19  improve policies and procedures across the Georgia DOE."

20          What did that particular responsibility entail?

21      A   So with human resources, we were trying to --

22  we had some antiquated processes that were time-consuming

23  and in a paper format, so we were looking at ways of

24  getting our processes more streamlined and in a

25  electronic format regarding leave and regarding the -- I



1  believe it was that -- I'm trying to think -- the hiring

2  process, to try to see if we can get those -- those

3  processes streamlined.

4          Policy -- and again, it's been a few years -- I

5  would think that that's also to update some of the

6  processes and procedures that were in place and look at

7  updating any of the policies -- excuse me -- that we --

8  that we had in place.

9          And general counsel, I cannot recall, but

10 anything -- sometimes there is just an overlap with those

11 three -- those three divisions.

12    Q   Okay.  Did any of your work in carrying out

13 this responsibility pertain to the GNETS program?

14    A   Not that I recall.

15    Q   I want to skip down to the bullet point that

16 says "Participate in all Cabinet meetings to provide

17 input and update the Chief of Staff."

18          Who participates in the cabinet meetings?

19    A   It -- well, it's grown a little bit over the

20 years.  Any deputy superintendent, associate

21 superintendent.  We have directors, and budget, policy,

22 and sometimes it could be a program manager or a program

23 specialist, depending on the item or the topic for

24 discussion.  And general counsel participates, and

25 possibly the -- the CFO, the finance in general.



1      Q   Okay.  Are these meetings distinct from the

2  biweekly leadership meetings that you mentioned

3  participating in as a deputy superintendent earlier?

4      A   They are.

5      Q   Okay.  What was your role as deputy chief of

6  staff during the meetings, the cabinet meetings?

7      A   So the chief of staff can't be in a lot of

8  those meetings, so essentially I would just listen to the

9  items being discussed, whether that's board items or

10  rules for policy, and then report back to him on any

11  updates, or there was a potential issue, and if need be,

12  I might weigh in, but -- but usually it's to -- to keep

13  the chief of staff informed.

14      Q   How frequently did the cabinet meetings take

15  place?

16      A   Cabinet is every Thursday.

17      Q   Was GNETS ever a topic during the cabinet

18  meetings?

19      A   I really can't say because -- well, it would --

20  it would definitely come up, because there's a state and

21  federal allocation that goes to GNETS.  So if there is an

22  allocation that goes out, if it's going to go to board,

23  then it would go to -- it would go to cabinet for review

24  and input, and really just to look over and -- and make

25  sure that the board item was accurate and the -- the



1  funding codes were -- were accurate to pull from.

2       Q   Other than funding, was GNETS a topic of --

3  ever a topic of discussion for other reasons during the

4  cabinet meetings?

5       A   I -- I do not recall.  I'm just -- I can't say

6  with a hundred percent certainty, but I do not recall

7  GNETS coming up as -- as something for discussion.

8       Q   And that's set aside for funding-related

9  topics?

10      A   Typically if GNETS were to go to cabinet, it

11  would be related to funding.

12      Q   All right.  And I just want to ask you about

13  two or three more items here, and then if you want, we

14  can take a break.

15          There's another bullet point under deputy chief

16  of staff here that says, "Work with Steering Committee

17  (Chief of Staff and Deputy Superintendents) to

18  collaborate, plan and administer the Strategic Plans and

19  Georgia DOE goals and initiatives."

20          What was the purpose of the Steering Committee?

21      A   Well, the Steering Committee was in place

22  before I took my role, and I believe the purpose was for

23  the deputy superintendents to meet with the chief of

24  staff to keep him updated, look for opportunities to

25  collaborate across the agency, see if there were any



1   issues that needed to be discussed.

2       Q   Okay.  And now that you are a deputy

3   superintendent, is the Steering Committee structure still

4   in place?

5       A   No.  I mean, a number of things.  So just to --

6   one point of clarification on that.  A number of things

7   changed after the pandemic.  So we were all in the

8   building every -- well, every single day unless we were

9   traveling; but after that, we are no longer in the

10  building unless the State Board or as needed.  But the --

11  after the -- after the pandemic, the -- those Steering

12  Committees in that format did not -- did not start back.

13  But prior to the pandemic, we didn't have the biweekly

14  leadership meetings.

15      Q   And I should have asked you when you were

16  talking about the cabinet meetings a moment ago.  Is that

17  structure still in place --

18      A   Yes.

19      Q   -- now that you are a deputy superintendent?

20      A   Yes.  We -- we have to have the cabinet to --

21  to review -- to review the rules before we -- or, I'm

22  sorry, to review the board items before we take those to

23  board.

24      Q   Okay.  All right.  So returning back to this

25  bullet point, at the time when you were deputy chief of



1  staff, there's a mention here of strategic plans.  What

2  strategic plans were the Steering Committee working on?

3       A   Well, there is the overall agency strategic

4  plan that had a number of goals and missions that we were

5  to look at to see, to support the superintendent's vision

6  to see how we could, through our divisions and

7  collaborations, work together to -- to support that, to

8  see what work we were already doing and how we could

9  collaborate better to support the LEAs.

10      Q   Okay.  And did any of the -- it also notes here

11  that you all worked on State DOE goals and initiatives.

12  Did any of these goals, initiatives or plans involve the

13  GNETS program?

14      A   Not that I can recall.

15      Q   And then this last bullet point here says,

16  "Identify areas of improvement across State DOE and

17  collaborate with divisions and leadership to implement

18  change."

19          What did this job responsibility entail?

20      A   Looking to see if we -- just with the strategic

21  plan, it's a -- it's a large agency.  I think it's about

22  1300 individuals that -- approximately -- that work at

23  GaDOE.  So a lot of times we're doing -- we're all doing

24  work to try to support the district so they can support

25  the students, but a lot of times we may not be aware of



1   what the other divisions are doing or there may be areas

2   where we could better pull together to streamline what we

3   are doing, reduce redundancy, and increase our

4   effectiveness, and just work together on things that help

5   the agency as a whole.

6       Q   In this position as deputy chief of staff, did

7   you identify any areas of improvement related to the

8   GNETS program?

9       A   No.  Again, I don't recall GNETS being a topic

10  of discussion for the collaborative work.

11      Q   And I guess relatedly -- and your answer may be

12  the same, we'll see -- did you collaborate -- just

13  looking at this last bullet point, was there any

14  collaboration with the different divisions, including fed

15  programs and leadership, to implement changes related to

16  GNETS?

17      A   Again, I don't believe -- I do not recall GNETS

18  being part of the work that we were doing.

19          MS. HAMILTON:  All right.  I'm just looking at

20  the time, and let's see, I -- Ms. Owen, Ms. Johnson,

21  would this be a good time to take a break, or do you all

22  want to keep going?  We can take like a 10-minute break.

23          MS. JOHNSON:  Yeah, I'd like to take a

24  10-minute break.

25          MS. HAMILTON:  Okay.  Great.



1          THE VIDEOGRAPHER:  Hearing no objections --

2          MS. HAMILTON:  So why don't we come back at 11

3    o'clock.

4          MS. JOHNSON:  Great.

5          THE VIDEOGRAPHER:  Okay.  We'll go off the

6    record now at 10:51 a.m.

7          (The deposition was at recess from 10:51 a.m.

8    to 11:02 a.m.)

9          THE VIDEOGRAPHER:  We are back on the record at

10   11:02 a.m.  Please proceed.

11     Q   BY MS. HAMILTON:  Ms. Owen, we are going to

12   pick back up with your resume, which is Plaintiff's

13   Exhibit 696, and I'd like to move on to your next

14   position that you held, which was director of

15   consolidated federal initiative.

16         When did you hold this position?

17     A   I started in, I believe, August of 2016.

18         Do you have the resume that you were going to

19   put up or?

20     Q   Yes, I'm sorry.  I thought that was on the

21   screen.  Let me reshare.  Thank you for flagging that.

22         Let me know when you see the resume on the

23   screen.

24     A   Yes, I can see it.

25     Q   Great.  And let me make sure you have control



1    if you need it.

2        Okay.  So what was the time frame for when you

3    held the position of director of consolidated federal

4    initiatives?

5        A    2016 until I took the role as deputy

6    superintendent of federal programs.

7        Q    And how did you obtain the position of director

8    of consolidated funds initiatives?

9        A    I --

10       Q    Or federal initiatives.

11       A    -- interviewed for the position.

12           Did you hear me?

13       Q    And I apologize for cutting you off.

14           Yes.  Did you say you interviewed for the

15    position?

16       A    I did.

17       Q    Who conducted your interview?

18       A    There were three.  I believe it was the HR

19    director, and I believe it was Avis King.  And I -- I

20    don't know who the third person was.  I'm not -- I'm not

21    sure if I knew the third person.

22       Q    Okay.

23       A    But someone was in the --

24       Q    Okay.  Do you know the HR director's name at

25    the time?



1      A    Denise.  I'm not a hundred percent sure.

2      Q    Okay.  But you believe her first name was

3    Denise?

4      A    Yes.

5      Q    Okay.  And then you mentioned Avis King.  What

6    was his role?

7      A    I believe she was -- I believe she was deputy

8    superintendent of school and district effectiveness or

9    school improvement, but I -- but I'm not a hundred

10   percent certain on that.

11     Q    Okay.  Did they explain why you were selected

12   for this role?

13     A    I mean, it's harder when you're -- I know you

14   are asking these, but it's hard to recall exact

15   conversations about what was said.

16     Q    And I can reframe that.

17     A    Yeah, I'm --

18     Q    What was your understanding of why you were

19   hired?

20     A    Well, I -- and again, I'm speculating because I

21   don't recall the -- the whole conversation on this.  I

22   don't -- I'm trying to even think if there is sort of an

23   explanation of why you are hired or, you know, you've got

24   the position sort of thing when -- when you're hired for

25   positions.  That's why it's throwing me a little bit.



1            But I -- I had been at the department for a
2    number of years, and I had demonstrated success in other
3    programs and projects across the agency and was looking
4    to move over to federal programs, and so -- but I don't
5    know as far as an explanation of why.  I don't want to
6    speculate on something from, you know, six years ago.
7        Q   Did you say a moment ago that this position
8    falls under federal programs?
9        A   Yes.  This was a -- this was a brand-new
10   initiative, and it -- yes, that was under federal
11   programs.
12       Q   Okay.  Who did you report to in that role?
13       A   Craig Geers.
14       Q   And did you supervise anyone?
15       A   Yes.  Well, not originally, but as the program
16   grew, then I hired -- I hired Carly Ambler to assist with
17   the growth of the program for this, and -- and equitable
18   services.
19       Q   Okay.  And I know you mentioned the
20   consolidated funds and it should have -- or consolidated
21   federal initiatives a few times during the deposition
22   today.  How would you summarize what the purpose of the
23   initiatives -- what the purpose of the initiative was?
24       A   So getting to the, as you heard me say, the
25   superintendent mission and vision, the sense was that, in



1   general, that the federal programs as a whole were being

2   administered, and the interpretation of the statute was

3   far too stringent and that we weren't allowing the LEAs

4   the flexibility that -- that they needed to be innovative

5   and flexible with their -- their allocations.

6          So the superintendent, a big part of his goals

7   were to take our federal programs division and look to

8   see any area that we as a state agency were overstepping

9   what the federal government was requiring.  And that's

10  how the consolidation of funds initiative came to be, and

11  it essentially was taking multiple pots of funding

12  streams, including state and local and federal funds,

13  combining them together, and then under allowable

14  statutes from the U.S. Department of Education, providing

15  the LEAs with additional flexibility, so that the funds

16  essentially were treated more as state funds with that

17  additional flexibility for the use of the funds, and

18  essentially wanting to take that model and -- or just

19  the -- the flexibility and not overreaching as a state

20  agency, wanting to take that across the entire federal

21  programs division.

22     Q   Your second bullet point underneath the

23  director of consolidated federal initiatives position

24  says that, "The consolidation of funds initiative grew

25  from four LEAs to over 30 LEAs in three years."



1          What was the goal in terms of how many LEAs

2     would ultimately be able to benefit from this initiative?

3          A    Well, the goal is as many LEAs as -- as many

4     LEAs that want to be part of it.  I mean, the

5     superintendent is a big believer in local control, and

6     he's a big believer in flexibility while still being in

7     compliance with federal statute.  But as -- it was a --

8     it was just -- it was a huge, huge undertaking, because

9     the way people looked at federal funds and possibly some

10    of -- what some of the practices that had been put in

11    place for years were really more of a -- they went beyond

12    what the scope of the -- what the federal regulations

13    called for.  And it was -- but it was a really

14    frightening endeavor for some of the districts because of

15    the compliance aspect and just sort of the years of how

16    they had -- our federal programs had sort of overseen and

17    interpreted statute.

18          So it was -- it was a major, major undertaking,

19    and I -- I think the idea was to get somebody maybe with

20    a different perspective outside of federal, because

21    essentially trying to undo what you had always been

22    taught is a -- is a different undertaking.  But this

23    was -- this concept of flexibility within the scope of

24    the law was -- was a huge initiative for the

25    superintendent.



1      Q    I know you said the -- the focus of the

2   consolidated federal initiatives seemed to primarily be

3   helping LEAs figure out how to combine these multiple

4   pots of funding or funding stream.  How, if at all, would

5   the GNETS program be able to benefit from the

6   consolidated federal initiative?

7            MS. JOHNSON:  Form.

8            THE WITNESS:  Well, that's -- it's difficult

9   to -- that's a little difficult to answer because, one, I

10  don't recall that coming up as a point of discussion.

11  GNETS is a program that -- and this is -- essentially,

12  the flexibility goes to the LEAs, and GNETS funding comes

13  through a state item allocation.  So you have a -- a

14  state allotment that goes to GNETS, and then you have an

15  IDEA allotment, and these funds, though you can

16  consolidate IDEA as part of this, it -- it gives

17  additional flexibilities to the LEAs.  But I don't recall

18  specifically something relative to GNETS coming up

19  because it was more work directly with the LEAs.

20     Q    BY MS. HAMILTON:  And does the consolidated

21  federal initiative still exist?

22     A    Yes.  We have grown it to over 40.  I think

23  currently there may be 43 LEAs.  And we're asked to

24  co-present with the U.S. Department of Education, I think

25  in March of 2020, because of the success of the program.



 1  And no other state is -- consolidates the number of

 2  programs that we do in Georgia or has the number of LEAs

 3  participating, so it's looked to as a model for -- for

 4  other states.

 5      Q   So I want to scroll down to the state ombudsman

 6  position listed here as well.  What was the time frame

 7  that you served as state ombudsperson?

 8      A   I was delegated the role as part of ESSA,

 9  probably maybe two months -- and again, this is from

10  memory -- after I took the role of the director of

11  consolidated federal initiatives, and held that role,

12  along with the deputy chief of staff and the director of

13  consolidated federal initiatives until I took the role as

14  deputy chief of staff.

15      Q   Okay.  And how did you obtain the position of

16  state ombudsman?

17      A   I was delegated the role.  My -- the associate

18  superintendent, Craig Geers, it was written into ESSA.

19  We were looking at, you know, ESSA implementation, and he

20  asked me to think about it, and then -- and then he

21  delegated the role to me.

22      Q   Okay.  So you didn't have to apply for this

23  role?

24      A   No, this -- no.

25      Q   And am I correct that this -- I think you list



1   here that -- this was in the second bullet -- a role that
2   was new to federal programs?
3       A   Yeah, both -- both of the -- both of the roles,
4   because both of the responsibilities were new to federal
5   programs.
6           And if I could just clarify for one of the
7   questions you had asked earlier about, you know, becoming
8   deputy.  One of the big charges was bringing both sides
9   of the house together, ESSA and IDEA, to work as one
10  federal program, and I had a lot of experience pulling
11  together different groups and programs across the agency,
12  so this was part of that as well.
13          But both of those positions, we never had a
14  consolidated -- consolidation of funds.  We were just
15  starting it.  And then the role of the ombudsman had
16  never -- had never existed.
17      Q   Okay.  Did you supervise anyone as the
18  ombudsman?
19      A   Not at first, but then later on, Carly Ambler.
20  But, also, part of -- so not supervised but work with all
21  of the programs that you see there, just like above that,
22  working with the 12 to 15 different federal programs.
23      Q   And did you say that you reported to Craig
24  Geers for this position as well?
25      A   Yes.



1      Q    And I guess if you just had to summarize at a
2   high level what you did as a state ombudsman, how would
3   you describe your role?
4      A    To implement the ESSA, which would be oversee
5   equitable services in those six different -- those six
6   different programs.  Work with the -- both roles were
7   essentially like a liaison.  So for this, I was a --
8   essentially a liaison between the private schools and the
9   LEAs and helped to implement ESSA across the state and
10  training across the state in resolving conflicts and
11  issues between them.
12           And the same was true for the role above, which
13  was sort of a liaison between our federal programs and
14  the LEAs and the -- because the LEAs felt that we were
15  far too restrictive in our implementation of statute, and
16  a number of federal programs did not think so, so it --
17  and back to your earlier question about the role of
18  deputy, this gave me a unique perspective, because in
19  most cases people only work with one federal program.  So
20  we might have Title I, and that's all they do is Title I,
21  but I was able to work with 12 to 15 different programs
22  to gain knowledge of -- of those programs and build
23  relationships so that we could work together to implement
24  some of these changes.
25      Q    Okay.  And I know you used the term "equitable



1    services" a moment ago.  What does that term mean in the

2    context of your role?

3         A    So for the programs that you see listed, IA,

4    IC, IIA, IIIA, IVA and IVB, as part of -- as part of the

5    allocation that comes down to the LEAs, there is a

6    portion of that funding that may be allowable for use for

7    students who are in private schools.  Each one of those

8    programs has different stipulations and regulations

9    around it.  But if those funds that are held out are the

10   equitable services and the funds go to support the -- the

11   private school students, through those various programs

12   they're implemented by the LEA, and the LEA is the -- the

13   fiscal agent for these.  So the -- the services are what

14   the private school students receive, not the funding.

15   But this role was created to ensure that that -- that was

16   actually happening for private school students.

17        Q    And as state ombudsman, did you have any

18   responsibilities that involved the GNETS program

19   specifically?

20        A    No.

21        Q    As state ombudsman, were there any

22   responsibilities that impacted the GNETS program?  Any

23   responsibilities that you held in that role that impacted

24   the GNETS program?

25        A    No, not that I can recall, because also this is



1   a -- these are ESSA funds; whereas, GNETS, they would be

2   receiving the state allocation in IDEA funds.  But

3   there -- there is -- there's equitable -- no, sorry.

4        Q   All right.  I just want to make sure I

5   understand.  A moment ago you were saying there was an

6   equitable.  I just want to make sure I understand what

7   you were referring to.

8        A   There are equitable services that relate to

9   IDEAs, but this role was created under ESSA, so this was

10  dealing with the -- the ESSA funds; that Title IA, IC,

11  IIA, IIIA, IVA and IVB are -- are ESSA funds on the ESSA

12  side of the house.

13       Q   Okay.  And you mentioned this earlier.  I just

14  want to make sure I -- I capture this.  So in these three

15  roles as state ombudsman, director of consolidated

16  federal initiatives, and deputy chief of staff, when you

17  held all three of those for the period of time, it sounds

18  like you were saying half of your time was spent serving

19  as deputy chief of staff and half of your time was spent

20  on the other two positions.  Is that correct?

21       A   Yes, that's correct.

22       Q   Okay.  And then during the time period when you

23  were just serving as director of consolidated federal

24  initiatives and state ombudsman, how was your time split?

25       A   Well, it was -- it was paid for out of the same



1  funding stream, the consolidated application.  So as

2  far -- from the financial point, I didn't have to worry

3  about the splitting of time, but essentially I -- I tried

4  to divide it as much as I could so that I could

5  address -- you know, fulfill the goals of both of the --

6  the programs.

7       Q   Okay.  And then lastly on these roles, when you

8  became deputy superintendent, did anyone replace you as

9  deputy chief of staff?

10      A   No.

11      Q   Did anyone replace you as director of

12 consolidated federal initiatives?

13      A   No.  Carly Ambler -- and also let me just go

14 back real quick.  So no was the answer, but we also -- I

15 took the position, I think in February, and March was the

16 pandemic, so, you know, we're very much in ESSA mode and

17 getting the funds out.

18          And regarding the other, Carly Ambler became

19 the senior program manager and -- in that, and we ended

20 up adding two additional staff to her team.

21      Q   Okay.  When you became deputy superintendent,

22 did anyone replace you as the state ombudsman?

23      A   Yes, Carly Ambler.

24      Q   Okay.  So moving further down into your

25 professional history, you were at the Department of



1  Education for quite some time.  It looks like you also

2  held the role of program specialist and state program

3  manager for social studies K-12.  Is that correct?

4      A   Yes, but that -- the 2017 should actually be

5  2016.

6      Q   Okay.  So what was the complete time frame?

7      A   Yes, so 2008 until I took the role in 2016, so

8  I don't know why it says '17.

9      Q   Okay.  How did you obtain this position?

10     A   I -- which position?

11     Q   The program specialist and state program

12 manager for social studies.

13     A   The -- so the specialist role, I interviewed

14 for.  That was to help resolve some issues that had

15 arisen with the state testing, and with five people in

16 that division, and eventually through attrition and the

17 time frame being the recession, ended up with one person

18 in that division.

19     Q   Okay.  And similarly, how did you obtain the

20 state program manager for the social studies position?

21     A   I'm trying to think back.  I think I was in the

22 role for quite some time, and then was made program

23 coordinator, and then I think promoted to program

24 manager.

25     Q   Okay.  What department did these positions fall



1   under with the Department of Education?

2        A   Curriculum instruction and assessment.

3        Q   Okay.  Who did you report to in these roles?

4        A   My -- originally I reported to Bill Crenshaw,

5   the program manager.  When he was no longer there, I

6   believe I reported to the director, the director of

7   curriculum instruction and assessment.

8        Q   Okay.  I know a moment ago you were talking

9   about the various people who were in the department when

10  you were in the program specialist role, but did you

11  supervise anyone when you served in these positions?

12       A   Originally no, and then I was able to -- to

13  hire someone.

14       Q   And I see here you've listed a number of

15  responsibilities.  I guess just at a very high level, how

16  would you summarize what you did as the program

17  specialist and state program manager for social studies?

18       A   Well, I came in to help resolve the issue in

19  the year under Kathy Cox when they had to throw out the

20  state assessment results, so I was brought in to help

21  resolve that contentious issue, and then help develop

22  the -- the training, help revise the assessment, help

23  revise the standards for -- for the sixth and seventh

24  grade at that time.  And then also over time, and then

25  deliver the training across the state, and then the role



1   grew for including K through 12.  And I worked with all
2   of our assessment items, the Georgia high school
3   graduation portion for social studies, the EOCs, the
4   EOGs, developing training resources, working on standards
5   revision for the entire state, running statewide
6   initiatives, such as the governor's civics project, medal
7   of honor and -- yeah.
8           And then after the -- after the precision
9   review, I think I had been there about seven years and
10  was ready for a new challenge.  And then also building --
11  building and fixing relationships was one of the charges
12  that I had also in that role from the deputy
13  superintendent.
14      Q   And in these roles, did you have any
15  involvement with the GNETS program?
16      A   So I would not have had like direct
17  involvement, but I conducted a lot of training.  So just
18  as you asked me earlier, courses I've taken, I've taken a
19  lot of professional development, I couldn't tell you, but
20  I have also conducted, in that role in particular, a
21  tremendous amount of professional development across the
22  state.  So if there were GNETS teachers who attended any
23  of the trainings, I would not have known that, but there
24  could have been.
25      Q   Okay.  And in terms of the subject matter or



 1    focus of those trainings, would they all have been

 2    related to social studies?

 3         A    Yes.

 4         Q    Okay.  And when you left these positions, who

 5    replaced you?

 6         A    In this particular instance, it was Joy

 7    Hatcher, who had been my program specialist.  And then

 8    they ended up hiring two additional staff, and I think

 9    possibly over the next few years, three additional staff

10    to rebuild that -- that department.

11         Q    Okay.  All right.  Working our way down your

12    resume, it also says here that you were a business owner.

13    And what was the time frame for that?

14         A    2005 to 2008.

15         Q    Okay.  And what did you do when you served as a

16    business owner during this time period?

17         A    I was contracted by different LEAs to teach the

18    teachers how to be more effective teachers, more engaging

19    use of IT strategies in a big part of that.  To one of

20    your questions earlier is, a lot of use of visual stimuli

21    to engage a variety of learners, learners with

22    disabilities, but -- and use of IT strategies to try to

23    keep all kids engaged.

24         Q    Which LEAs did you work with during this time

25    frame?



1        A    I'm not going to be able to recall all of them.

2        Q    I should say, approximately how many did you

3   work with?

4        A    I don't -- I really don't recall.  I know it

5   was -- I remember DeKalb, Meriwether; I believe Burke

6   County, and did some contract work with CSRA RESAs with

7   their TAPP teachers for their educational --

8            THE REPORTER:  Did you say with their TAPP

9   teachers?

10           THE WITNESS:  TAPP.  Yes, sorry, TAPP, T-A-P-P.

11   It's a training program for teachers that are seeking

12   certification through alternative means outside of their

13   four-year program, if they have a four-year degree.

14           And then I -- when I accepted the role at -- in

15   2008 at the Department of Ed, I had to -- I had a

16   training scheduled, but I couldn't do that because you

17   can't -- you couldn't do both, so I had to cancel that,

18   that training.

19       Q    BY MS. HAMILTON:  Okay.  And when you were

20   serving in this role, did you provide any services to

21   GNETS programs?

22       A    Not -- no, not to the programs, but again, the

23   same as before, so I would have been hired by -- I would

24   have been hired by the LEAs or the RESA, and there could

25   have been teachers who were GNETS teachers in there, but



1   I -- I would not have known.

2        Q   Okay.  All right.  And then it also appears

3   that you worked at two different middle schools.  Is that

4   correct?

5        A   Yes.

6        Q   Okay.  What -- where did you work and when?

7        A   Greenbrier Middle 2000 to 2008, and then

8   Hephzibah Middle 1995 to 2000.

9        Q   And what did you teach when you were working as

10  a teacher at these schools?

11       A   Social studies, science, reading.  I'm trying

12  to -- oh, and when I transferred over to Greenbrier in

13  Columbia, initially moved over to connections, their

14  connections classes, and that was French, Spanish and

15  Latin, and then moved over to a team where I was teaching

16  social studies and science.

17       Q   Okay.  And just a few additional questions

18  about your resume.  When you were a teacher, did you ever

19  serve as a special education teacher?

20       A   I did not.  No, I didn't serve as a special

21  education teacher.

22       Q   And I believe earlier you mentioned that you

23  did have some students with disabilities who were in your

24  classes; is that correct?

25       A   Yes.  I always had students with disabilities



 1  in my classes and worked with the special education

 2  teachers always.  I shouldn't say always, but throughout

 3  my career I recall things -- I always had students with

 4  disabilities in my classroom and worked closely with the

 5  special education teachers to -- and -- and the general

 6  ed team that we were on to -- to try to serve and support

 7  their needs and meet their IEP goals or their SST goals.

 8      Q   Do you have any particular expertise working

 9  with students with EBD?

10      A   Particular expertise?

11      Q   Yes.  Just do you have any expertise working

12  with students with EBD?

13      A   I don't have certification working with

14  students with EBD.

15      Q   Do you have any expertise assessing the

16  appropriate levels of integration for students with

17  disabilities?

18          MS. JOHNSON:  Object to form.

19          THE WITNESS:  I'm sorry, could you repeat that?

20      Q   BY MS. HAMILTON:  Sure.  Do you have any

21  expertise assessing the appropriate levels of integration

22  for students with disabilities?

23      A   I don't have any -- I don't have any specific

24  certification in that.

25      Q   Okay.  I'm going to stop sharing my screen.



1          All right.  And we're gonna switch gears.  We

2    are going to move on from your resume now, and I just

3    have some general questions for you about the GNETS

4    program.  When did you first learn about the GNETS

5    program?

6       A   I don't -- I don't recall when I first learned

7    about it.  I remember Nakeba doing a board presentation

8    when she was in the role of -- as a director, but just I

9    didn't have a lot of, you know, additional information

10   regarding that.

11      Q   And what would have been the time frame when

12   Nakeba gave that presentation about GNETS?

13      A   I -- I don't know, and I don't want to -- I

14   don't want to speculate.  It was prior to -- it was prior

15   to her taking the role as the deputy superintendent of

16   federal programs.

17      Q   Okay.  Would that have been when Nakeba was

18   serving as the GNETS director?

19      A   Yes.

20      Q   Okay.  And what was your understanding of the

21   purpose of the GNETS program?

22      A   To serve students with severe emotional,

23   behavioral -- social, emotional and behavioral disorders

24   that occur with such frequency and duration and intensity

25   that their needs cannot be met successfully in a general



1    ed classroom or a setting.

2        Q    Excuse me.  How are the GNETS programs

3    structured around the state?

4        A    I mean, they're -- they're all different.

5    There is 24 different GNETS I think at 150 different

6    sites, and I've been on some site visits, but this is

7    not -- I mean, because we don't run the program, I -- and

8    it's locally controlled, I really would not be able to

9    answer that.

10       Q    But just to make sure I understand, a moment

11   ago you were saying there is 24 different GNETS programs?

12       A    Well, yeah, 20 different -- 24 different

13   programs, so there are GNETS programs across the state,

14   but they are served in like 150 different locations.

15       Q    Okay.  How does a student become eligible to

16   participate in the GNETS program?

17       A    They -- so we have a board rule that -- that

18   addresses that, and they should have been through the

19   continuum of services to ensure that a multitude of, you

20   know, things have been tried before moving to the

21   evaluation.

22           The IEP team ultimately would make the decision

23   if the criteria has been met for that.  And they should

24   have an SEA; they should have a BIP, but it should be

25   made with an IEP team after careful evaluation of the



 1  student.

 2      Q   And roughly how many students are enrolled in

 3  the GNETS program statewide?

 4      A   I believe it's around 3100.

 5      Q   Has that number changed over time?

 6      A   From my understanding, it has.  It's reduced

 7  over time.

 8      Q   Uh-huh.  What is your understanding of why that

 9  number has decreased or been reduced?

10      A   Well, that calls for some -- some speculation

11  on my part as to why that has happened.

12      Q   Have you been part of any discussions about the

13  reasons that the number of students have been reduced?

14      A   Sorry, I'm thinking through discussions.

15      Q   Sure.

16      A   So yes.

17      Q   And what was in the nature -- what was the

18  nature of those discussions about why the numbers have

19  reduced -- reduced or been decreased over time?

20      A   So like I was at training, you know, and

21  messaging to make sure that LEAs are looking very closely

22  at their programs, at the continuum of services that they

23  have available, and that these children truly are in

24  their least restrictive environment.  The fact that DOJ

25  is conducting site visits, and there is two lawsuits,



1    might also have led to -- to the reduction as well.

2         Q   And to the extent that there have been

3    discussions about reducing the number of students in the

4    program, who typically participated in those discussions

5    with you?

6         A   It -- well, it wasn't a -- it wasn't a meeting

7    about the reduction of GNETS.  So I don't always know,

8    but when I came into the role, I would sometimes attend

9    meetings with -- with the GNETS program manager and the

10   state director just regarding -- well, we actually --

11   there are weekly meetings with all the different

12   programs, so it's not unique to GNETS.  There is weekly

13   meetings to all of the programs that we have.  Usually it

14   would be with the programs and then the director.  And

15   then I might have an invite to the meeting, but

16   originally was attending a number of those meetings.

17   Like I said, obviously there is a -- a lawsuit around

18   this, and to hear some of the discussions.

19        Q   Speaking of the meetings that you had, you are

20   saying that they are -- as deputy superintendent, you

21   have weekly meetings with a lot of your programs; is that

22   correct?

23        A   No, I don't.

24        Q   No?

25        A   The --



1    Q   Oh.

2    A   The directors do, so a lot of the -- you know,

3  if it gets too specific or granular, because of the

4  number of programs I oversee, typically I'm not going to

5  be sitting in on those.

6        Most of mine is going to be high-level

7  interactions and, you know, problem solving, things of

8  that nature, information that I get from the directors.

9  But I will sit in on meetings, and originally I was

10  sitting in on a number of the -- the weekly meetings.

11    Q   Okay.  Do you have regular meetings currently

12  with anyone on the GNETS program staff?

13    A   I have it on my calendar.  Like I'm just

14  included as an invite, but I -- I don't necessarily

15  attend.  It's sort of, you know, as needed at this point.

16  Because a lot of time has been dedicated to GNETS, and I

17  have a lot of other programs to oversee in my role.

18    Q   Okay.  Have there been periods in serving as

19  the deputy superintendent when you did attend the

20  meetings with the GNETS program staff?

21    A   Yes.  Yes.

22    Q   Okay.  Who participated in those meetings?

23    A   Originally, I believe it was Dr. Zelphine

24  Smith-Dixon, the state director at that time, and Vickie,

25  the program manager, and sometimes LaKesha may be in the



1  meetings.  And then now it's Wina Low, who is the state

2  director, and Vickie, and I don't know if LaKesha attends

3  on a regular basis or not.

4       Q   Okay.  And when you say state director with

5  regard to Zelphine and Wina Low, is that the state

6  director of special education?

7       A   Yes.  We have a -- or did have a state director

8  of the ESSA programs and then a state director of the

9  special ed programs.

10       Q   What was the general time frame when you were

11  meeting with Zelphine Smith-Dixon and Vickie Cleveland?

12       A   What do you mean by "general time frame"?

13       Q   You said originally you met with Zelphine and

14  Vickie, and I'm just trying to get a sense of since you

15  started in the role as deputy superintendent, when you

16  would have been holding those meetings.

17       A   I'm not sure at first, because when March 13th,

18  2020 came about, you know, we stopped -- we started

19  working from home; and to be honest with you, a lot of

20  the focus at that time was on the federal funding coming

21  down through ESSER and trying to get that money out.  So

22  a lot of my focus was on that and the -- and across the

23  agency.

24            So I -- I can't really tell you whether or not

25  I was attending those meetings.  I know at some point,



1  you know, I started trying to attend those meetings to

2  listen in to, you know, to hear what was -- what was

3  happening.

4       Q   Okay.  And I actually want to ask you some

5  questions about a few e-mails I have related to those

6  meetings, so let me pull those up.  This may help.

7            I'd like for the court reporter to mark this

8  next document as Plaintiff's Exhibit 700.

9            (Plaintiff's Exhibit 700 was marked for

10  identification.)

11      Q   BY MS. HAMILTON:  And Ms. Owen, I have shared

12  with you Plaintiff's Exhibit 700.  This is a January

13  28th, 2020 e-mail -- e-mail chain, and the subject line

14  here at the end says, "RE:  Introduction and Next Steps."

15  And the Bates number on the first page is GA00702975.

16           I will give you -- I will just give you a quick

17  moment to take a look at this, but I will actually kind

18  of guide you through with the specific questions that I

19  have.  So you should have control over the -- the mouse.

20  So if you can just let me know when you've looked at it,

21  if you recognize the document.

22      A   On this, I'm trying to see, because it looks

23  like it's cut off.  Do -- is that -- was that to all

24  federal program staff?  I'll read through it, but usually

25  it will tell you who it's to, and I don't see that.



1    Q   This was what was provided to us.  I --

2    A   Okay.

3    Q   That information wasn't on the particular

4  document when it was given to us from the State.

5    A   Okay.  All right.  Let me enlarge this.

6    Q   And for what it's worth, I'm actually not going

7  to be focused on this e-mail, this particular e-mail, but

8  I just want to get a sense from you if you recognize this

9  e-mail chain.

10       MS. JOHNSON:  Take your time and look through

11  it.  You don't have to read every line unless you --

12       THE WITNESS:  Do you mind if I just read it for

13  context?  Because this is a 2019 e-mail.

14       MS. HAMILTON:  That's fine.

15       THE WITNESS:  Okay.

16    Q   BY MS. HAMILTON: All right.  So scrolling

17  down, I do want to note, so this initial e-mail that was

18  sent out January 28th, 2020, it appears that you are

19  sharing that you had been selected as the deputy

20  superintendent of federal programs.  Is that correct?

21    A   Correct.

22    Q   And then it appears --

23    A   Well, it had already been shared out.  This was

24  just a follow-up e-mail.

25    Q   Okay.  And then it appears that Vickie



1   Cleveland then wrote you directly to congratulate you; is

2   that right?

3       A   Yes.

4       Q   Okay.  And then continuing to work through the

5   chain, you had responded to her, and there's a line here

6   where you say, "I am going to ask Jackie to set a

7   standing meeting for you and I, as she said this was

8   something Nakeba did to stay updated on GNETS.  Will that

9   work?"

10          First of all, who is Jackie?

11      A   She was my administrative assistant.

12      Q   Okay.  And what was her full name?

13      A   Jaquenetta Dugger.

14      Q   Okay.  And so just to be clear, you -- you were

15  letting Vickie know that you wanted to have a standing

16  meeting.  Why -- why did you propose setting a standing

17  meeting?

18      A   Well, because I was -- I don't know if Jackie

19  told me or, but somehow I came to the information that

20  she had a standing meeting with Nakeba, who was my

21  predecessor.

22      Q   Okay.  And did you see value in having the

23  standing meeting with Vickie Cleveland every -- and this

24  doesn't get into the time frame, but did you see value in

25  having a standing meeting with Vickie Cleveland?



1        A    Well, and it wasn't just for -- for Vickie.  It

2   was -- yes, there is value in it, you know, particularly

3   gaining more knowledge about the programs, but I was also

4   trying to, you know, meet with all of the program

5   directors to, you know, get insight to, you know, how

6   their programs were -- were going, as well.

7             But yes, so I assume, though, I was trying to

8   follow along with what Nakeba had been doing.

9        Q    Okay.  All right.  I'm going to show you -- and

10  that basically was just the end of the e-mail there.

11            I'm going to show you another document, and I'd

12  like for the court reporter to mark this as Plaintiff's

13  Exhibit 701.

14            (Plaintiff's Exhibit 701 was marked for

15  identification.)

16       Q    BY MS. HAMILTON:  This is an April 29th, 2020

17  e-mail.  This last one is from Shaun Owen to Jaquenetta

18  Dugger, but it's basically an e-mail exchange between the

19  two of you.  He subject line is "GNETS," and the Bates

20  number for this first page is GA00707281.

21            All of the content is basically here on this

22  one page.  So do you want to take a quick moment and let

23  me know if you recognize this document?

24       A    Okay.

25       Q    Do you recognize this document?



1       A    No, because it was -- but obviously, I sent it.

2   But yeah, no, I don't recall this.  But yeah, obviously,

3   I sent that.

4       Q    And do you have any reason to believe that this

5   wouldn't be an accurate representation of what you would

6   have sent by e-mail?

7       A    No, no, no.  When you ask me do I recognize it,

8   no, I mean, it doesn't just pop up to mind, is what I'm

9   saying.

10      Q    Okay.  Okay.  And so I see here this is an

11  e-mail exchange between you and Ms. Dugger.  Is this the

12  same Jackie that we were talking about from the other

13  e-mail chain, your administrative assistant?

14      A    Yeah.

15      Q    Okay.  And in this initial e-mail from

16  Ms. Dugger, she notes that she spoke with Vickie and

17  then, quote, she would like a monthly standing meeting

18  with you and Zelphine.  And then it goes on where your

19  assistant says, "Would you prefer a biweekly or keep it

20  monthly?"

21           Do you see that?

22      A    Yes.

23      Q    And then in your response, you say, "Let's do

24  weekly."

25           Do you see that here?



1       A   I do.  I don't know -- I don't know if that was

2   a typo.

3       Q   Okay.  But do you see that here?

4       A   But yeah, I -- I see it.  I see it, uh-huh.

5       Q   Okay.  What was your understanding of why

6   Ms. Cleveland wanted to set a monthly standing meeting?

7       A   So I think it was just to continue what she had

8   been doing with Nakeba.

9       Q   Okay.  And then to the extent that it appears

10  here that you would propose let's do weekly, do you know

11  or remember if those meetings actually did take place

12  weekly?

13      A   I -- I don't recall.  This was -- this was

14  4/29.  It -- I really -- I don't recall because I had so

15  many meetings at that time.  But I do remember, you know,

16  of the programs, hers would be the one, and I do remember

17  weekly meetings at some point.  I just don't know when

18  they started.

19      Q   Okay.  And this -- this e-mail exchange was at

20  the end of April 2020; is that right?

21      A   Yes.

22      Q   All right.  I'm going to show you another

23  document, and I'd like for the court reporter to mark

24  this as Plaintiff's Exhibit 702.

25          (Plaintiff's Exhibit 702 was marked for



 1  identification.)

 2      Q   BY MS. HAMILTON:  This is an August 19th, 2020

 3  e-mail from Vickie Cleveland to Shaun Owen and Zelphine

 4  Smith-Dixon with the subject line "Weekly agenda."  The

 5  Bates number of the first page of this document is

 6  GA05057496, and there's also an attachment.

 7          Ms. Owen, I will give you -- see if you still

 8  have control.  Okay.  I will give you control just to

 9  take a look at the document, and let me know when you are

10  ready.

11      A   Okay.  Okay.

12      Q   All right.  Great.  So as I mentioned a moment

13  ago, the subject line here says "Weekly agenda," and this

14  is from Vickie Cleveland, addressed to you and Zelphine

15  Smith-Dixon.

16          Is Ms. Cleveland referring to the weekly

17  meetings that she would have been having with you and

18  Zelphine Smith-Dixon?

19          MS. JOHNSON:  Object to form.

20          THE WITNESS:  I'm sorry.  I'm sorry.  Could you

21  repeat that?

22      Q   BY MS. HAMILTON:  Sure.  So Ms. Cleveland

23  e-mailed you and Zelphine Smith-Dixon, and here in her

24  e-mail she says, "See attached agenda for our meeting

25  today," with the subject line of "Weekly agenda."



1            Is she referring to the weekly meetings that

2    she had with you and Zelphine Smith-Dixon?

3            MS. JOHNSON:  Form.

4            THE WITNESS:  The -- the schedule -- because

5    let me clarify.  I don't -- you know, I don't -- I don't

6    know how -- I know I was in a number of meetings, but I

7    can't tell you which meetings I was in and which I had to

8    skip for other obligations, but yes, that's what she

9    would be talking about.

10       Q   BY MS. HAMILTON:  And I just want to confirm at

11   the top of her -- of the agenda she circulated, the title

12   also says "GNETS weekly meeting."  Is that correct?

13       A   Yes.

14       Q   Okay.  For the meetings that you participated

15   in, were there -- was there always a written agenda that

16   was provided for the meetings?

17       A   I don't -- this seems more structured.  I think

18   that -- I don't know when Wina assumed the role.  I

19   don't -- I don't recall having, you know, something this

20   detailed written out every time.  So I don't -- I don't

21   know that it was always this detailed or provided, but

22   she -- I would think she would probably have a layout

23   and, you know, topics, updates that she wanted to

24   provide, whether it was in this form or a little less

25   formal.



SONIA SHAUN OWEN                                December 12, 2022
UNITED STATES vs STATE OF GEORGIA                            88

1      Q   Okay.  And then it looks like the agenda is
2  split up by topics.  The first topic here is "Legal
3  Updates."  And I just want to note for the record that
4  the section was redacted in the document that we received
5  from the state.
6          The second topic here, it says "Budget."  Why
7  was it important for you to discuss budget issues with
8  Ms. Cleveland and Ms. Smith-Dixon?
9          MS. JOHNSON:  Form.
10          You can answer.
11          THE WITNESS:  Okay.  Well, first, just to
12  clarify, I'm not creating this agenda, so it's not that I
13  think it's -- you see what I am saying?  Like I didn't
14  create it, so I think it would probably be more of what
15  Vickie felt was important to update us on would be my --
16  you know, my take on that.
17      Q   BY MS. HAMILTON:  Okay.  Why were you
18  discussing budget issues during the meeting?
19      A   Let's see.  Okay.  So I'm recalling one of the
20  meetings, so I'm just going to do the best I can from --
21  from recollection on this topic.
22          I recall Vickie -- and I don't know if it was
23  at the request of the LEAs; I'm sure that some of it
24  initiated from that -- wanting to have more transparency
25  in how their allocations were determined, and Geronald is



1  the person who runs that.  So I believe that Vickie, in

2  order to be, you know, transparent about the budget, was

3  meeting with Geronald to see if we could have a

4  presentation that sort of walked them through how he

5  derived the funding formula that drives the allocation.

6  And I believe there was a presentation to that effect.

7       Q   Okay.  And to the extent that it looks like

8  here, Ms. Cleveland had replied here, "Will there be any"

9  addition -- "any consideration for additional funding for

10 GNETS," is that a question that in your capacity as

11 deputy superintendent you are able to respond to?

12      A   It -- I mean, if I had -- if I had knowledge of

13 it, then I could respond to it.  But I don't -- I'm

14 trying to recall if this was -- and again, I'm going from

15 memory here.  If this was about the time that there was

16 great concern over the state budget overall, and a

17 recession and the Governor asking state agencies to look

18 at the potential of a 10 percent cut, at which case -- I

19 mean, everybody always wants more funding no matter what

20 it is, but I believe this was more in relation to concern

21 that there would be a 10 percent cut to the overall

22 budget for GNETS because it is a state allocation.

23      Q   And in your capacity as deputy superintendent,

24 would you have been able to respond directly to any

25 questions that she had about budget issues during one of



1  these meetings?

2     A   Typically -- typically for something like this,

3  you know, the budget is a -- it's a General

4  Assembly/Governor decision.  However, so that is more of

5  a CFO interaction, as far as that, and we essentially get

6  what is coming down the pipe to us.  But -- but I'm sure

7  she would still want to make me aware that if there was

8  any concern on the part of the LEAs for funding and

9  supporting the GNETS program and, you know.  And then if

10  I could probably convey that up the chain of command

11  to -- you know, to express to the CFO or to Matt Jones,

12  the chief of staff, the concern.

13     Q   Okay.  And in the interest of time, I'm going

14  to skip through some of these other items.

15        Let's see, the next topic is "LEA

16  Collaborative."  What -- what -- I don't know if I should

17  say what is or what was the LEA collaborative?

18     A   So Vickie meets with -- since the -- you know,

19  the folks that -- now, for this one, she was having

20  meetings with the GNETS directors.  So as far as the LEA

21  collaborative, I'm -- I don't want to speculate.  It may

22  be -- because we have a lot of different collaboratives

23  across federal programs, but, you know, it may have been

24  the groups that have students in GNETS programs would be,

25  you know.  And again, I'm -- I'm speculating on that

SONIA SHAUN OWEN                              December 12, 2022
UNITED STATES vs STATE OF GEORGIA                        91

1  because we have a lot of different collaboratives.

2      Q   I'm just curious, why do you think she would

3  have brought this to your attention during one of these

4  meetings?

5      A   Again, it's not just my attention.  This is

6  how -- this is how -- this, what you are seeing here, is

7  no different than if you were to pull up a 21st Century

8  ESSA; they would be doing the exact same thing.

9          So in other words, our, at the time the

10 director of the ESSA programs, he meets with his program

11 managers each week, and they go through a variety of

12 topics, mainly to keep the program -- to keep the

13 director updated.  And then typically, I receive my

14 update at a higher level from -- from the directors.  But

15 this is a -- this would be a common practice across

16 federal programs.

17     Q   Okay.  And so she is providing you with an

18 update on the plans for the LEA collaborative?

19     A   (No oral response.)

20     Q   Okay.  And then likely for the next topic,

21 "Supplemental Instruction (iReady)/Assessments,"

22 Ms. Cleveland is providing you with an update on this

23 topic as well, correct?

24     A   Yes.

25     Q   Are there any items -- I guess I'm just trying



1   to understand, are there any action items that she would

2   be expecting from you in sharing this particular update

3   with you, for example?

4           MS. JOHNSON:  Object to form.

5           THE WITNESS:  I would -- okay.  Is there any

6   action items?  I would have to read through it again to

7   see whether or not there was anything that came out of

8   that.  With the -- with the budget there was -- I recall

9   there was an action item where she wanted me to -- to

10  meet with budget to see if they could -- they could go

11  in.  It's not something I think that -- particularly that

12  particular person would do typically in their role, but

13  again, you know, we're trying to be very transparent.

14  And so for that, I think the request was for me to -- to

15  actually reach out in my capacity to see if -- if I could

16  get that moving along.

17      Q   BY MS. HAMILTON:  I see.  Okay.  And then the

18  same for LEA collaborative or the supplemental

19  instruction assessment.  Is there any action item, like

20  if you are looking at this, that would have been expected

21  of you, or were those purely just updates?

22      A   Let's see.  No, this -- so this is an update,

23  because the board item -- this is 2020, so I don't know

24  if it was all combined.  So we -- anyhow, the last board

25  item I saw, which was not this one, had the GNETS



1   allocation, state and federal i-Ready, and then for --

2   and then you will see down there the 11 for the GNETS

3   receiving the therapeutic support.  So this would be an

4   update on the board item, which would have already gone

5   through.

6         So again, just, you know, as grants go and

7   contracts go, particularly if you have to have a contract

8   that's tied to a grant like this one does, just to keep

9   us, you know, updated as far as how things are

10  progressing.

11       Q   Okay.  And since we are talking about the

12  therapeutic support topic here, I guess, what grant --

13  what grant is she referring to?

14       A   So that's a -- and I'm trying to think of a --

15  it's around a $900,000 grant, and from what Vickie shared

16  with me, I think that was based off of a needs assessment

17  that Nakeba had conducted for the -- the sites that

18  typically had a greater need and potentially less

19  funding, so that they could get additional funding to

20  provide the additional therapeutic supports for the

21  licensed clinical social worker and the master's of

22  social work, so that -- that additional therapeutics

23  could be provided.  And we're still -- we're still doing

24  that.

25       Q   Okay.  And then going back up to strategic plan



 1  review, was this purely an update or are there action

 2  items that were intended to come out of this one?

 3       A   Okay.  If I could read it over real quick --

 4       Q   Sure.

 5       A   -- again.

 6           All that sticks out with this one is just,

 7  again, Vickie -- and I'm not going back to this because I

 8  don't recall this meeting, obviously, from two years ago,

 9  but that at one point they had updated their -- their

10  strategic plan.

11       Q   Then let's look at these other topics.  "GOIEP

12  updates," what is GO-IEP?

13       A   It's an online portal system that we pay for

14  out of federal funds, and we make that available to any

15  LEA that wants to participate.  And it's a way of --

16  unlike the paper -- you know, the paper forms that we

17  used to use where you'd have to go in and sign in, it

18  basically digitizes and streamlines everything, and it

19  puts it in this portal, so that it expedites if a student

20  transfers from one location to the next, you are not

21  waiting on the paper documents; and it also feeds into

22  the monitoring and determination so that that information

23  is -- is in the portal.

24           So it's a -- it's an online platform to collect

25  and house students' IEP information and the documents



1  relative to that.

2      Q   Okay.  And are there any actions that in your

3  role you would be taking specific to the GO-IEP

4  information that's shared here?

5      A   No, and this would -- this would have been more

6  of a -- something at the director level.  It looks like

7  she's just -- it's -- this is a system that we do update

8  and enhance, and when we do -- we have to provide

9  training on -- on that.  So this would not be anything

10  for -- for me.

11      Q   Okay.  What about the GNETS monthly webinars?

12  What were those webinars?

13      A   And I don't -- I just know that she was -- she

14  was meeting with the -- just like any of the programs do,

15  where they provide technical assistance and updates to --

16  and every -- every program does it a little bit

17  differently in how they want to provide the updates, but

18  I do know that she was meeting with the directors to

19  share this.

20          We fund those integration -- content

21  integration specialists in curriculum instruction and

22  assessment, so I'm sure she was wanting them to talk

23  about their roles and any resources that they can

24  provide.

25      Q   Okay.  And speaking of meetings that



1   Ms. Cleveland had with GNETS directors, are you familiar
2   with the statewide GNETS director meetings?
3        A   I -- I know that they do meet from time to
4   time, but I don't have any idea, as far as I don't see
5   the agenda or know when they are meeting or anything like
6   that.  I don't -- I don't know if Vickie -- I don't --
7   I'm not even sure if Vickie is -- is part of that.  I
8   know we were invited to be part of one of those, but
9   beyond that, I don't really know much about it.
10       Q   Okay.  Do you ever participate in the meetings?
11       A   One that -- wait.  No, two.  I believe two.  I
12  believe one was virtual, and one was face-to-face with
13  other collaboratives that are directors collaboratives
14  that are different, and a GNETS director might be in that
15  collaborative; but specifically the GNETS folks, I recall
16  twice where I was invited to attend.
17       Q   Okay.  And for the two meetings that you
18  attended, approximately what was the time frame for those
19  meetings?
20       A   What do you mean by "the time frame"?
21       Q   Uh-huh.  The two meetings that you attended,
22  when did they occur?
23       A   Oh, okay.  The first one, that was virtual.  I
24  think the face-to-face one was in -- was in June, but I'm
25  sorry, I don't know off the top of my head.  The other,



1  probably a few months prior to that.  I really don't know

2  without my calendar in front of me.

3       Q   Okay.  And to the extent that you're saying

4  approximately June and then approximately a few months

5  before that, what -- are you referring to 2022?

6       A   Yes.

7       Q   Okay.

8       A   Yes.  But that first one, I could be off.

9  Again, I would need to look at my calendar.

10      Q   Okay.  Would you say that both of those

11 meetings were likely in the last year or so?

12      A   Oh, yeah.  Yes, yes.

13      Q   Okay.  And what was your role in those

14 meetings?

15      A   Well, the first meeting came about because

16 they -- the directors were very anxious because there had

17 been information regarding the budget that was coming out

18 in the General Assembly, that the allocations that GNETS

19 currently received might be integrated into a QBE funding

20 formula instead of as a separate allocation that would

21 then go directly to the LEAs.  And there was a tremendous

22 amount of concern and anxiety on the part of the GNETS

23 directors regarding their programs, so they just -- they

24 wanted -- I did not have additional information to give

25 them regarding the funding, because that happens at the

1   General Assembly level.

2       Q   Okay.  So were you involved in any of the

3   discussions about those proposed changes to the GNETS

4   funding?

5       A   No.  That's a General Assembly thing, so I

6   wasn't involved in those discussions.

7       Q   Okay.  And to the extent that the GNETS

8   directors were asking questions, how did you respond to

9   their questions during that meeting?

10      A   I mean, I -- I just shared with them the fact

11  that we -- you know, the education budget is part of the,

12  you know, $27 billion state budget, and it's allocated as

13  it's determined by the General Assembly and the Governor,

14  and that we -- you know, I didn't have any additional

15  information to share regarding that.  And, you know, I

16  mean, that's -- that's really all I could -- could say.

17      Q   How did the GNETS directors respond to that

18  response?

19      A   They -- it was not a satisfactory response for

20  them.

21      Q   And I guess I am just curious as we're -- as

22  we're talking about the funding proposal that came up

23  last year, how did you feel about this proposed change to

24  shift the funding source for GNETS away from the state

25  grant and more toward the QBE formula?



1     A    So this is where it's -- I don't know that my

2    feelings should be a part of this.  I mean, you know,

3    I -- I implement what -- if that's what the General

4    Assembly wants to do, then, you know, that's -- that's

5    what we are going to do at the -- at the state level.  I

6    don't know that my feelings are relevant, because we --

7    you know, we will do what the Governor and the General

8    Assembly want us to do.

9     Q    Did you have any views, though, on what would

10   be best for serving -- sorry, what would be the best way

11   to fund the GNETS program?

12          MS. JOHNSON:  Form.

13          THE WITNESS:  I -- I will just say, you know,

14   at the end of the day, I just want to make sure that

15   these kids' needs are being served and that they are

16   getting the supports that they need.  And it's difficult

17   to answer that question because, also, every program is

18   different.  Because there are 24 different programs, you

19   know, run across the -- the state, like schools, they all

20   vary.  So that's -- that's a difficult one to answer.

21    Q    BY MS. HAMILTON:  Have you been part of any

22   discussions pertaining to funding that would be allotted

23   to the GNETS program for the upcoming school year?

24    A    I'm sorry, there was a ding when you were

25   giving me the question.



1     Q   Yeah, I heard that, too.

2          I was saying, have you been part of any

3     discussions pertaining to any funding changes for GNETS

4     for next school year?

5     A   Meaning what it should look like or -- because

6     those are -- those really aren't decisions that we --

7     that we make.  And no, I have not sat down.  I have not

8     been invited to -- one second.

9          MS. JOHNSON:  Can we take just a short break to

10    clarify the bounds of attorney-client privilege here?

11         MS. HAMILTON:  Sure.  And --

12         MS. JOHNSON:  Just for a minute or so?

13         MS. HAMILTON:  Yeah, that's fine, and we'll

14    probably end up taking a break for lunch soon, too.

15         And I do just want to state for the record that

16    I don't want you to reveal anything that's been discussed

17    with your attorney.  So yeah, you all can take a quick

18    moment.

19         THE VIDEOGRAPHER:  Okay.

20         MS. JOHNSON:  Thank you.

21         THE VIDEOGRAPHER:  We will go off the record

22    now at 12:46 p.m.

23         (The deposition was at recess from 12:46 p.m.

24    to 12:48 p.m.)

25         THE VIDEOGRAPHER:  We are back on the record at



1   12:48 p.m.  Please proceed.

2        Q   BY MS. HAMILTON:  Okay.  And Ms. Owen, my -- I

3   will repeat the question that I asked previously, which

4   was, have you been part of any discussions pertaining to

5   changes to GNETS funding for next school year?

6        A   So there -- there have been discussions, but I

7   believe that falls under attorney-client privilege.

8            MS. HAMILTON:  Okay.  And I -- I don't know,

9   Melanie, if there is an objection you want to invoke just

10  for the record related to this?

11           MS. JOHNSON:  So I object to any questions

12  regarding the -- the substance of the conversations

13  beyond that if a conversation has occurred and on the

14  basis of -- of attorney-client privilege.

15       Q   BY MS. HAMILTON:  Okay.  So besides --

16           MS. JOHNSON:  Thank you.

17       Q   BY MS. HAMILTON:  -- the discussion --

18           Oh, thank you, Melanie, sorry.

19           So Ms. Owen, besides the discussions that you

20  have had with counsel, have you been part of any other

21  discussions pertaining to GNETS funding for next school

22  year?

23       A   I've not been included in any -- any

24  discussions relative to making decisions on funding.

25       Q   And are you aware of any plans by the General



1  Assembly to make changes to funding for the GNETS program

2  next school year?

3        A    So the -- the information that I have is

4  essentially what -- what came out in the -- in the

5  proposed legislation.

6        Q    Okay.  And when you say "proposed legislation,"

7  you are referring to the legislation affecting the

8  current school year?

9        A    No, because the -- they would -- so it didn't

10  pass last year, so any -- the General Assembly will start

11  meeting in January, and budgets won't even be finalized

12  until months later.  So any -- any changes, if they were

13  to occur, would -- either they would give them a year to

14  make the adjustment because of the sudden change, or they

15  would go into effect next year, if -- if that -- that

16  passed.  But again, that's -- that's a General Assembly

17  thing, but yeah.

18        Q    Okay.  And in your position as deputy

19  superintendent, are you able to make recommendations for

20  how the GNETS program can be funded or should be funded?

21        A    Well, again, it's a -- it's a little bit of a

22  unique position because we don't -- we don't run the

23  program, so I don't -- I think this would be more -- this

24  would be more discussions between the General Assembly,

25  the Governor, and, you know, potentially the CFO or, you



 1  know, OPB, that -- but no, I really -- I don't know that
 2  I would be making personal suggestions about that.
 3       Q   Okay.  Have you ever made recommendations to
 4  any legislators about GNETS funding?
 5       A   I -- there's a chain of command.  I don't
 6  even -- I don't talk to legislators.  We have policy --
 7  our policy people would be the ones interacting with the
 8  legislature.
 9       Q   Okay.  And similarly, have you ever made
10  recommendations to the State Board of Education or
11  superintendent related to, again, these types of
12  high-level funding changes?
13           MS. JOHNSON:  I'm gonna instruct the witness
14  not to answer on the basis of attorney-client privilege.
15       Q   BY MS. HAMILTON:  And I can rephrase that.
16           Do you -- in your capacity as deputy
17  superintendent, do you make recommendations regarding how
18  GNETS is funded to the State Board of Education and
19  superintendent?
20           MS. JOHNSON:  I think the same objection.
21           MS. HAMILTON:  And, I guess, just to make sure
22  I understand your objection, Melanie, I'm trying to get a
23  sense of whether Shaun in her individual capacity can
24  make recommendations.  And you're objecting that that's
25  privileged?



1          MS. JOHNSON:  Okay.  So I think I -- I think I

2     understood a different question.

3          So okay, so the objection is withdrawn, and you

4     can say whether you have the ability to make

5     recommendations to the superintendent.

6          THE WITNESS:  I mean, I might have the

7     ability -- I might have the ability to, but, again, I

8     think that the reason is just because it's a -- it's a

9     state allocation.  We don't run the program.  I -- I

10     don't know that that's -- that wouldn't be a typical

11     occurrence.

12     Q    BY MS. HAMILTON:  Okay.  And I'm going to

13     recommend that we take a break maybe around 1 o'clock for

14     lunch, but I just wanted to wrap up the topic we were

15     just discussing.

16          You had mentioned that there were two different

17     GNETS director meetings that you attended.  One of them

18     was the meeting where discussions came up about funding

19     for the GNETS program.  What was the second meeting?

20     A    They -- that was a face-to-face meeting, and

21     they wanted -- again, I think at the end of the day, they

22     wanted information regarding funding, which we didn't

23     have.  We don't really have a lot of updates regarding

24     litigation, but I just -- I essentially went through

25     the -- the State Board rule, and just again emphasized to



1  make sure that you are adhering to all portions of the --

2  the State Board rule.

3      Q   Okay.  And do you participate in any other

4  regular meetings as the deputy superintendent that

5  involved the GNETS program?

6      A   Regular meetings, no.  I mean, we have in all

7  federal programs, but that's for all staff members, and

8  that's -- there's nothing particular to GNETS.  It's just

9  a staff meeting.

10         MS. HAMILTON:  Okay.  All right.  This might be

11  a good time to take a lunch break, if that works for you,

12  Ms. Owen and Ms. Johnson.  About how much time do you

13  think you all would need?  Like 30, 40?

14         MS. JOHNSON:  I'm fine with 30.

15         THE WITNESS:  Yeah, that's fine.

16         MS. JOHNSON:  But if you need more time.

17         THE WITNESS:  That's fine.

18         MS. JOHNSON:  30 minutes.

19         MS. HAMILTON:  Okay.  All right.  So why don't

20  we say 1:30 we will reconvene.

21         MS. JOHNSON:  Great.  Thank you.

22         MS. HAMILTON:  Thank you.

23         THE VIDEOGRAPHER:  We'll go off the record now

24  at 12:57 p.m.

25         (The deposition was at recess from 12:57 p.m.



SONIA SHAUN OWEN                                    December 12, 2022
UNITED STATES vs STATE OF GEORGIA                            106

1   to 1:37 p.m.)

2          THE VIDEOGRAPHER:  We are back on the record at

3   1:37 p.m.  Please proceed.

4       Q   BY MS. HAMILTON:  Ms. Owen, I'd like to pick up

5   with a new topic.  When was the first time that you ever

6   visited a GNETS facility?

7       A   I -- I don't have the -- I don't have the exact

8   date.  I really don't.  I don't know.  I don't know.

9       Q   Okay.  And I don't need an exact date.  I'm

10  just trying to get a sense of when was the first time

11  you've ever visited a GNETS facility.

12          So, I guess, start from the premise, you have

13  visited a GNETS facility, correct?

14      A   Correct.

15      Q   Okay.

16      A   So after the pandemic, the first would have

17  been when you all started your -- your visits back up.

18      Q   Okay.  And so, I guess, just to clarify, in

19  your role working with the Department of Education, you

20  had never visited a GNETS facility until the United

21  States began conducting visits?

22      A   I believe that is correct.

23      Q   Okay.  All right.  So then, I guess, then,

24  starting with the United States' visits, I know just

25  working with the United States there were a number of



1  GNETS facility site visits.  Approximately how many

2  visits did you participate in that were part of the

3  United States' site inspections?

4      A   I would -- I'm just -- I'm guessing here.

5  Maybe 20, but I'm -- I'm just guessing at that number.

6      Q   Okay.  And when you say approximately 20, are

7  you referring to 20 individual sites or are you saying

8  like you spent 20 days on-site?  I'm just trying to

9  clarify what the number represents.

10     A   20 days.  And some of them -- many of them,

11 multiple sites in a day.

12     Q   Okay.  Roughly how many GNETS facilities did

13 you visit?

14     A   I feel like I'm -- I'm just throwing out

15 numbers here.  I don't know, because I don't have the --

16 I don't have the dates in front of me to really -- to

17 know that.  I'm -- I'm not sure.  I don't feel

18 comfortable speculating.  I just didn't keep a running

19 tally of it.

20     Q   Is there anything that would help you refresh

21 your recollection of how many sites you visited?

22     A   Well, I think the -- I think that you all have

23 the -- the calendar and the list of who attended what --

24 what sites.

25     Q   Did you maintain a list of what sites you were



1  visiting?

2      A   I have been in multiple places as part of, you

3  know, yes, but I don't have them in front of me, is what

4  I am saying.  I just don't want to be inaccurate in

5  providing you information.

6      Q   Okay.  All right.  So, I guess, you know, we

7  want you to be able to answer our questions based on what

8  you recall.  With that said, you are saying that you do

9  have a list or a documentation somewhere that indicates

10  what sites you visited?

11      A   Yes.  I think we received everything from you

12  all regarding the dates, and then, you know, the

13  determination would be made of who would go, and then

14  that was sent back -- back to you all, I believe.

15      Q   Okay.  And what were the general time frames

16  for when you participated in the visits?  I don't need

17  exact days, but were there particular times when these

18  visits were occurring?

19      A   I think it all relates to the same question.

20  I'm not trying to -- I will answer your question if I --

21  but we've had site visits on and off for the last year,

22  so it's -- you know, it's hard for me to just pull up

23  without looking at my calendar because it's just -- it's

24  one of, you know, other things that I'm doing, so I...

25      Q   All right.  And I'm just really trying to get a



1   rough estimate.  So, for example, did you participate in

2   any site visits with us in the last month, with the

3   United States in the last month?

4       A   No, I think the site -- we -- I don't think

5   we've done in the last month.

6       Q   Okay.  And so to the extent that there were

7   site visits -- I'm just trying to look at some of these

8   dates myself.  The site visits that were conducted with

9   one of our experts named Bob Putnam at the beginning of

10  December, you didn't participate in those?

11      A   Okay.  Oh, I'm sorry.  Yeah, so Wina Low went

12  on the last two -- Wina Low went on the ones, I think the

13  2nd and the 3rd, and I went on those visits prior to

14  that, to Rockdale, Gwinnett, and a few other sites.

15          The last two, though, that you all have done,

16  Wina Low went on those, and I did the visits before that

17  time with your -- your expert and the two lawyers.

18      Q   Okay.  And the United States also conducted

19  site visits in late October -- sorry, late October into

20  the early November time period with our expert Amy

21  McCart.  Did you participate in any of those site visits?

22      A   Oh, Amy.

23      Q   Yes.

24      A   Jamie or Amy?

25      Q   Yes, Amy McCart.



 1      A   Yes.  Yes, I did.

 2      Q   The United States also conducted a number of

 3  site visits during the April to May of 2022 time frame.

 4  Did you participate in any of the site visits during that

 5  time frame?

 6      A   I did, yes, and I -- I believe Wina may have as

 7  well.

 8      Q   Okay.  The United States also conducted site

 9  visits during the November to December period of 2021.

10  Did you participate in any of those site visits?

11      A   Yes, I believe so.

12      Q   Okay.  And I'm just giving out some of those

13  time periods just to get a general gauge.  There

14  certainly may have been other weeks --

15      A   Yeah.

16      Q   -- that we conducted visits, but those all

17  would have occurred in the last year.  So just trying to

18  get a --

19      A   Right.

20      Q   -- ballpark of when you went on visits.

21          When you conducted -- sorry, when you

22  participated in those visits, were you acting in your

23  capacity as the deputy superintendent of federal

24  programs?

25          MS. JOHNSON:  Form.



 1          You can answer.

 2          THE WITNESS:  Yes.

 3     Q    BY MS. HAMILTON:  Why did you participate in

 4  the site visits with the United States?

 5     A    So that we would have a DOE representative.  I

 6  believe Nakeba had gone to the ones prior to that.  But

 7  in reality, I would have probably had the -- our -- our

 8  state director attend more, but she was relatively new to

 9  her role, and because she was new to her role, then I

10  attended a number of visits.

11     Q    Okay.  And when you say "state director," are

12  you referring to Ms. Cleveland?

13     A    No.  She's a program manager of GNETS.  Wina

14  Low --

15     Q    Oh.

16     A    -- replaced director Zelphine Smith-Dixon.

17     Q    Okay.  So you're referring to the state

18  director of special education?

19     A    Yes.

20     Q    Okay.  And I know you mentioned a moment ago

21  that Ms. Low did attend some of the site visits.  What

22  was the reason then -- I'm just trying to make sure I

23  understand.  What was the reason that she didn't attend

24  more of them?

25     A    Because she was new to her role as state



1  director, so that would give her more time to do that.

2  There were -- the ones in, I believe November, those

3  November -- October and November time frames conflicted

4  with the annual -- the G-CASE conference.  It's the big

5  annual conference for special ed directors across the

6  state, and she was also delivering the keynote.

7      Q   Were there particular -- when you say she was

8  new to the role, were there particular skill sets or

9  qualifications that you wanted her to have before she

10 conducted the site visit?

11     A   I'm not sure I am understanding that -- that

12 question.

13     Q   Sure.  You were saying that you didn't have

14 her -- you didn't have Ms. Low attend more of the visits

15 initially because she was new to the role, and I am just

16 trying to better understand, with her being new to the

17 role, were there particular skill sets or knowledge that

18 you wanted her to have before she started doing the

19 visits?

20     A   No.  She's -- so she's retired from -- she was

21 a special ed director.  She actually held a number of

22 roles, but that's her background.  And she's been at the

23 DOE for, I don't know, eight, nine years.

24         No, she has all the skill sets, but the issue

25 is she's having to manage, you know, multiple programs,



1  as well, and, you know, the LEAs were not -- didn't know

2  her, so she had to reach out and spend time with the

3  LEAs, reach out and spend time with the staff.  So it --

4  that -- that's very important for them to see her in her

5  new role and for her to have an opportunity to engage

6  with -- with the staff and the stakeholders.  So

7  that's -- that's the reason.

8      Q   Okay.  I know a moment ago you had also

9  mentioned that you have probably spent -- you spent

10  approximately 20 days on-site, some days included

11  multiple sites.  In terms of the number of sites that you

12  would have seen, I know you don't recall the exact

13  number, but would you say somewhere between 50 and 100

14  sites?

15     A   That -- that seems rather high.  I don't -- I

16  don't know if it was that many.  And again, I just -- I

17  don't want to be inaccurate, but 50 sites seems --

18  certainly, nowhere near 100.  There were -- we would

19  go -- well, the -- the last -- the last few visits have

20  been different, in that we are sitting down all day

21  with -- not all day, for, I think, three hours with one

22  LEA or GNETS.  The prior visit -- and that was more of a

23  conversation asking questions -- the prior visits we

24  might go to two, three sites in a day, so -- but, you

25  know, but I could be wrong on that, so I just don't want



1   to give you inaccurate information.

2        Q   What do those site visits entail?  I know you

3   were saying the most recent ones you were sitting down

4   for an hour.  What do you mean when you say "sitting

5   down"?

6        A   So the previous visits with Amy, she spent the

7   majority of the time going into individual classrooms,

8   GNETS classrooms, and observing, and she might ask a few

9   questions.  The more recent ones with your experts, most

10  of the time was spent -- rather than visiting, the

11  majority of the time seemed to be spent asking the

12  various people around the table a variety of questions

13  regarding GNETS and various program aspects.

14       Q   Okay.  And just returning back to the site

15  visits that you did with your expert Amy McCart, you

16  mentioned that you attended a number of classroom

17  observations with her where she might ask a few

18  questions.  Were there any other -- any other parts to

19  the site inspections with Amy McCart that you

20  participated in?

21       A   What do you -- what do you mean?

22       Q   So in addition to classroom observations, did

23  you do anything else during the site visits with our

24  expert, Amy McCart?

25       A   Well, she would -- she would -- what would I



1  do?  Did I do anything else?  That's -- that's -- I'm --

2  that's the part I'm not understanding.  Or did she do

3  anything else?

4      Q   Were there any --

5      A   Other than --

6      Q   Right.  I'm just trying to get a sense like

7  what the -- what the visits entailed.  So you mentioned

8  that with our expert, Amy McCart, there were classroom

9  observations, and I'm just inquiring whether there were

10  any other components to the visit.

11      A   Mainly she visited the classroom.  There was --

12  you know, there were times that -- so she would ask

13  different questions of the GNETS director running the --

14  running the site.  She might ask them questions about,

15  you know, the number of students or more of the -- the

16  details day to day.  And then she might wrap it up at the

17  end; there may be a few other questions.  She would take

18  pictures throughout the site.  But mainly, most of the

19  time was just going into classrooms and -- and observing.

20  And, you know, it would vary the times she would spend in

21  one class versus another class, and I -- you know.

22          But she set the -- she set the itinerary.  So

23  whatever amount of time or what she wanted to look at or

24  wherever she wanted to go, I mean, that's -- you know,

25  that's how the site visits were conducted.



1     Q    And did you all tour the facilities in addition

2    to doing the observations?

3     A    Well, I mean, every site is different, so let

4    me just think through.  So yes, they would go and ask.

5    They would want to see -- if it was a center, they would

6    want to see where the library or media center was, where

7    the cafeteria was.  They would want to know their

8    gymnasium, their playground.  So they would want to go to

9    that.

10          In a school setting, they would oftentimes want

11   to go and see if a -- if a child was transitioning some

12   or taking some general ed classes, they would want to go

13   and see those classrooms where that -- that child

14   attended.

15          And I'm trying to think if there is anything

16   else.  Yeah, that's -- that seems to be the bulk of it.

17    Q    Okay.  Did you document your visits when --

18   when you attended the United States site inspection?

19    A    I would -- I would take some notes, and Amy was

20   taking pictures, and I wasn't always taking pictures, but

21   then I -- but then I did take some pictures of just

22   what -- whatever she had taken pictures of.

23    Q    You mentioned that you took some notes.  What

24   was the form in which you took your notes?

25    A    Some were on paper; some were on an iPad.



1      Q   And you also mentioned that you took some
2  pictures.  What did you use to take your -- your
3  pictures?
4      A   The iPad.
5      Q   And you mentioned that you took pictures of
6  what our expert, Amy McCart, took pictures of.  Why did
7  you choose to do that?
8          MS. JOHNSON:  I'm going to object here on the
9  basis of attorney-client privilege and instruct the
10  witness not to answer.
11     Q   BY MS. HAMILTON:  Did you share your notes with
12  anyone after the site inspections?
13         MS. JOHNSON:  You can indicate if you did.
14  Well, I'm going to caution you not to reveal -- in
15  responding to the question, I'm not instructing you not
16  to answer, but I'll caution you not to reveal the content
17  of any of your notes in answering the question.
18         THE WITNESS:  So when you say did I -- did I
19  share, are you saying the actual physical notes, or
20  what -- what are you -- what do you mean?
21     Q   BY MS. HAMILTON:  Yes, did you share your
22  physical, either paper or electronic notes with anyone
23  after the site visits?
24     A   No.  There -- there is a protected folder where
25  some things have been shared.



1      Q    Okay.  And I guess I'm just trying to get a --

2      A    Not the -- not the upload.  I'm just saying

3  like scanned of the -- do you see what I am saying?

4      Q    Yeah.  I guess I'm just trying to get a sense

5  in terms of if you -- did you share the documents with

6  other individuals.  And I'm just trying to get a sense

7  of, were there other people who received your notes after

8  the site visit?

9      A    No, I don't believe so.

10     Q    Okay.  So you didn't share -- you didn't share

11 your notes with -- your written notes with any of your

12 State DOE colleagues?

13     A    No, I don't believe so.

14     Q    Okay.  And you didn't share your written notes

15 with counsel?

16          MS. JOHNSON:  Object, and instruct the witness

17 not to answer.

18          MS. HAMILTON:  And I guess -- I guess my --

19 just to clarify, Melanie, the basis of the objection.

20 I'm just trying to get a sense of if there is a privilege

21 being asserted, is this because those notes were shared

22 with counsel?  Or I'm just trying to get that.

23          MS. JOHNSON:  Sure.  So we're objecting to the

24 contents of the notes and anything that has been done

25 with the notes; anything that has or has not been done



 1   with the notes on the basis of work product and

 2   attorney-client privilege and, you know, whether she's

 3   been instructed to do anything with them or not.

 4        Q   BY MS. HAMILTON:  And then, relatedly, with the

 5   photographs, what did you do with your photographs,

 6   Ms. Owen, after the site visits?

 7        A   Some have been -- some have been uploaded to a

 8   protected folder.

 9        Q   And I know you've mentioned a protected folder

10   in connection with the notes and in connection with the

11   photographs.  Just so I understand the protocol that you

12   all have in place at the DOE, what is the protected

13   folder?

14        A   So if we're sharing anything that is related to

15   this or -- it's kept in a shared folder.

16        Q   Okay.  And did any of your colleagues, besides

17   the attorneys on this matter, have access to that shared

18   folder?

19        A   I'm not sure.  Wina and Vickie may have access.

20        Q   Okay.  And so -- and those are the GNETS

21   program staff, correct?

22        A   I'm sorry, what?

23        Q   You -- you said Vickie, and who was the other

24   person?

25        A   Wina, the state director.



1      Q   Wina, okay.

2          Would they be able to access your notes from

3  the site visits?

4      A   No.

5      Q   And why is that if they're on the shared

6  folder?

7      A   They're not all on the shared folder.

8      Q   Okay.  So just to make sure I understand, did

9  you say Wina Low and Vickie Cleveland have access to the

10  shared folder?

11     A   I believe they do.  I'm not a hundred percent

12  certain.

13     Q   Okay.  And I'm just trying to clarify, can they

14  access your notes from the site visits?

15     A   No, not -- no, not at this time.

16     Q   Okay.  And why is that, if they have access to

17  the shared folder?

18     A   Because I haven't transferred it all over.

19     Q   Are your photographs, also, you said on the --

20  on the shared folder, correct?

21     A   Some are.  I just haven't uploaded all of them.

22     Q   So for the ones that are on the shared folder,

23  can your colleagues, besides the attorneys, access those

24  photographs on the shared folder?

25     A   Well, going back to the same thing, I believe



 1  they have access to that folder.  I'm not sure.  We have

 2  a number of folders, and there is different levels of

 3  access.  And I didn't -- I did not create the folders, so

 4  I'm not -- I'm not a hundred percent certain in that.

 5       Q   Okay.  You are aware that the United States

 6  issued subpoenas to conduct the site inspections of the

 7  GNETS facilities connected to the litigation, correct?

 8       A   Correct.

 9       Q   Okay.  And how did you learn about the

10  subpoenas for the site visits?

11       A   Through our attorneys.

12       Q   Okay.  How many -- so I know you were saying

13  earlier that you spent approximately 20 days on-site;

14  went to multiple sites.  Do you have a sense of how many

15  of the GNETS programs you were able to see during the

16  site visits?  To the extent that there are 24 regional

17  programs, do you have a sense of how many of the programs

18  you visited?

19       A   Maybe half or more.  And again, I'm -- I'm

20  speculating on that.

21       Q   Is there anything that you would be able to

22  reference that would enable you to give a more accurate

23  number?

24       A   All the calendar invites on my -- on my

25  computer.  I think it's the same that -- that you all



1  have because you all set the meeting schedule.

2       Q   But I'm asking from your vantage point, is

3  there anything that you can reference?  So you said your

4  calendar invite; is that correct?

5       A   Right.  But do you mean in front of me?

6       Q   Well, both, really.  So it sounds like you

7  don't have anything in front of you, correct?

8       A   I don't.

9       Q   Right.  So I'm just trying to get a general

10  sense that if you were able to go back to pull up

11  information, do you have documentation in some form that

12  would tell you --

13       A   Yes.

14       Q   -- how many of the programs you visited?

15       A   Yes.

16       Q   Okay.  And what is that documentation?

17       A   My calendar invites, travel documents, and then

18  the sort of -- it's not an agenda but each one of the

19  sites listed out for the -- where we were going and what

20  days.

21       Q   Did you do anything to prepare for the site

22  visits?

23       A   No.  I was just going as a -- a DOE

24  representative, and I wasn't -- I wasn't engaging or

25  asking questions or -- or anything of that nature.



1        Q    Did you have conversations with anyone on the

2   GNETS program staff from the State Department of Ed in

3   advance of the visit?

4        A    I have -- okay, I'm sorry, one more time.

5        Q    Uh-huh.  Did you have conversations with anyone

6   on the GNETS program staff from the State Department of

7   Education in advance of the visit?

8        A    Not that I can recall.

9        Q    And just to be clear on what I am referring to,

10  did you have any conversations with Vickie Cleveland in

11  advance of the visits about the site visits?

12       A    No, I -- I thought you -- did you ask about the

13  GNETS directors?

14       Q    No.  My question was -- my initial question

15  was, did you have conversations with anyone on the GNETS

16  program staff from the State Department of Education in

17  advance of the visits?

18       A    Oh, okay, I'm sorry.  Regarding -- regarding

19  the upcoming visits?

20       Q    Yes.

21       A    I -- I may have.  I may have informed her

22  where -- I'm -- I may have had conversations beforehand,

23  but I don't -- I don't recall specific conversations

24  relative to the visits.

25       Q    To the extent that you're saying you may have



1  had conversations, what would have been discussed in

2  those conversations?

3      A   Well, that's the part that I'm like -- I don't

4  know what would have been discussed about the -- the

5  visits, because I was just going, like I said, as the DOE

6  representative, just to be there and observe.  So I don't

7  know.  If anything -- if there was any discussions, she

8  might have told me just an overview of the -- the program

9  or the layout or something of that nature, but I don't --

10 I don't recall specific conversations relative to the

11 visits.

12     Q   Okay.  And when you're saying "she," are you

13 referring to Ms. Cleveland?

14     A   Yes.

15     Q   Is there anyone else from the State DOE who you

16 would have had conversations with in advance of the visit

17 outside of counsel?  I don't need to know about those

18 conversations.

19     A   Right.  There would have been probably Wina Low

20 to coordinate our schedules, to see who might be able to

21 attend.  And then on a few, I might -- I think I may have

22 sent a -- if you're gonna be out of the office sort of

23 protocol, to send a calendar invite to your direct

24 supervisor letting them know that you are going to be out

25 of the office.  So I believe I sent just some calendar



 1  invites to -- to let Matt Jones know that I wasn't gonna
 2  be available.
 3       Q   Did you have conversations with anyone on the
 4  GNETS program staff -- again, Ms. Cleveland or
 5  Ms. Stevenson -- from the State DOE after the site visit?
 6       A   I'm sure after some of the -- I am sure after
 7  some of the visits there -- there was -- you know, we may
 8  have talked about the -- you know, the visit, but -- but
 9  not always.  It just depend on the -- the schedule.
10       Q   After which visits did you have those
11  conversations?
12           MS. JOHNSON:  Form.
13           THE WITNESS:  I have no idea.
14       Q   BY MS. HAMILTON:  Did you document anywhere
15  where you would've -- when you would have had those
16  conversations?
17       A   No.
18       Q   Would there have been meetings scheduled to
19  have those conversations?
20       A   I'm sorry, would there have been?
21       Q   Would there have been meetings scheduled?
22       A   Oh, meetings scheduled.  Specific to a site
23  visit?
24       Q   After the visit.
25       A   Right.  Let me just -- I don't -- I don't



 1   recall that -- I don't recall scheduling a meeting after

 2   the -- after the visits.

 3       Q   Okay.  You had mentioned that it was important

 4   for someone from DOE to be present at the United States

 5   site visits.  Why was it important that someone from the

 6   State DOE be present?

 7       A   This -- our -- our counsel had advised us to

 8   have someone present.

 9       Q   Did you have conversations with anyone from the

10   regional GNETS program staff in advance of the site

11   visits?  And by "regional GNETS program staff," now I am

12   talking about the staff who were at those facilities.

13       A   I don't recall having any conversations prior

14   to visits about an upcoming visit.

15       Q   Yeah.

16       A   And now -- yeah, and there were times where I

17   was -- I know I was in a collaborative community meeting,

18   and I was informed that we would have -- there would be a

19   visit that I didn't -- I didn't know about, that that

20   showed up later; that we were just trying to coordinate

21   schedules to attend.  So I -- I think the -- I think -- I

22   think the directors were receiving the information and

23   the subpoenas prior to -- to our visits or our -- our

24   being informed of them.

25       Q   Okay.  And when you say you were at a



1  collaborative community meeting when you found out about

2  one of the visits, what do you mean?  Was it a topic of

3  discussion at the meeting?  Or how did you find out at

4  the meeting?

5       A   No.  So just as, you know, we were saying

6  earlier, there are different collaboratives, and Wina Low

7  is new to her position, and as part of that, we were --

8  we would attend some of the -- it's where the special ed

9  directors pull together to discuss different topics, and

10  oftentimes a GNETS representative would be there.  And

11  I -- I think it was randomly mentioned that you all would

12  be visiting, and I just happened to be -- be in the room

13  when that was mentioned.

14       Q   And I know earlier you mentioned that you

15  wanted to eventually have Ms. Low attend more of the site

16  visits.  Did you consider having Ms. Cleveland attend any

17  of the site visits?

18       A   I think that was a decision that, again, was

19  made by our general counsel, that -- that it would either

20  be myself or -- or Wina Low attending the visits.

21       Q   Returning back to the question regarding any

22  conversations with the regional GNETS program staff, did

23  you provide any guidance to the regional GNETS program

24  staff prior to the visits about any steps that they

25  should take in preparation?



 1      A   I don't recall providing any guidance in
 2   advance of -- of visits.
 3      Q   Okay.  Did you have conversations with anyone
 4   from the regional GNETS program staff about the site
 5   visits the morning of or right before they occurred?
 6      A   I'm sorry, what -- I'm sorry, can you repeat
 7   that?
 8      Q   Uh-huh.  Did you have conversations with anyone
 9   from the regional GNETS program staff about site visits
10   the morning of or right before the visits occurred?
11      A   I don't recall conversations.  Yeah, I -- I
12   can't recall conversations about that.
13      Q   So, for example, prior to the United States and
14   the United States' expert visit at the North Metro Buice
15   Center, did you participate in a meeting that morning
16   with the principal of the Buice Center, counsel for
17   Gwinnett County, the Gwinnett County special education
18   director, the director of the North Metro GNETS program,
19   and counsel for the RESA and DOE?
20      A   When -- when was that?
21      Q   This would have been to the visit -- the North
22   Metro visit to the Buice Center, which would have been in
23   around May of this year.
24          (Court reporter clarification.)
25          THE WITNESS:  Now, there were occasions when we



 1  were sitting -- before people may have gotten there, that

 2  people were sitting around at a table, but I -- I don't

 3  know, but it wasn't a meeting with us.

 4      Q   BY MS. HAMILTON:  Was the United States invited

 5  to participate in those conversations around the table?

 6      A   I -- well, it typically was just at the site

 7  whenever they showed up, so people might be sitting

 8  around waiting.  So it wasn't a meeting, per se, without.

 9  It was just waiting until the DOJ arrived.

10      Q   What was the nature of the discussion that you

11  had during that discussion prior to the start of the

12  visit?

13          MS. JOHNSON:  Form.

14          You can answer.

15          THE WITNESS:  I'm -- I'm not -- I'm not sure

16  what you're -- what you're referencing.

17      Q   BY MS. HAMILTON:  Sure.  So this meeting

18  that -- of the people who I listed a moment ago, I was

19  just saying what --

20      A   Okay.

21      Q   -- was the nature of the discussions?

22          MS. JOHNSON:  Object to form.

23          THE WITNESS:  I'm trying to -- I think -- I'm

24  trying to remember what this is referencing.  The -- I --

25  I don't recall what -- what was -- I don't recall what



1  was being discussed.  And at some point, I don't know if

2  we were -- if we had to be out of the room so that the

3  people that were in the meeting could have a

4  conversation.

5      Q   BY MS. HAMILTON:  And you had said a moment ago

6  that you all were in the room until the United States

7  arrived.  Were you aware that the United States had been

8  asked to remain outside of the room so that the group

9  could conclude its meeting before the site visit started?

10      A   And again, I'm just trying to remember back

11  to -- to any specifics.  I don't know.  I think that may

12  have happened a few times where people were waiting; if

13  they were waiting on their lawyers to arrive, then they

14  may not want -- if they -- if they were waiting on their

15  lawyers to arrive, they may not want any DOJ staff to be

16  in there.  But I don't recall any -- any specifics.

17      Q   And, I guess, just to make sure I understand,

18  was it your understanding that they were okay with

19  counsel for the State of Georgia being in the room but

20  not the United States' counsel?

21          MS. JOHNSON:  Object to form.

22          THE WITNESS:  There -- and I don't recall

23  specifics, but where we also were not allowed in the

24  room.  But sometimes they -- it wasn't even that they

25  were talking about anything in particular.  They just



1   didn't -- different sites may run it differently and just

2   not want anybody -- may not want the DOJ in there.  And

3   they may not be talking about anything in particular;

4   they just wanted to ensure that all their parties were

5   there before, you know, entering.

6       Q   BY MS. HAMILTON:  Okay.  I want to ask you

7   about another -- another meeting that took place.  So

8   prior to the United States and the United States' expert

9   beginning the site visit at the Hamilton Holmes

10  Elementary School in the North Metro GNETS program, did

11  you participate in a meeting with your counsel, the

12  principal of Hamilton Holmes, counsel for the Fulton

13  County School District, the director of the North Metro

14  GNETS program, and counsel for the Metro RESA?

15          MS. JOHNSON:  Object to form.

16          THE WITNESS:  Do you -- can you provide the --

17  the dates or the -- the actual location, like city that

18  it occurred in?

19      Q   BY MS. HAMILTON:  I -- so this also -- this was

20  a North Metro site visit that also would have taken place

21  in May of 2022, and this was part of North Metro, so it

22  would have been in the Metro Atlanta area.

23      A   Okay.

24      Q   Hamilton Holmes Elementary School.

25      A   And am I -- am I aware of what?



1      Q   Did you participate in a meeting with the

2   individuals that I listed?  And I can repeat their titles

3   and their names if that's helpful.

4      A   Yeah.

5           MS. JOHNSON:  Object to form.

6           You can answer.

7           THE WITNESS:  Okay.  Yes, please, if you don't

8   mind.

9      Q   BY MS. HAMILTON:  So the question was, did you

10  participate in a meeting prior to the start of the site

11  visit at Hamilton Holmes Elementary School with your

12  counsel, Alexa Ross; the principal of Hamilton Holmes,

13  Adrienne Grainger; counsel for the Fulton County schools,

14  Jeff Daniels; director of the North Metro GNETS program,

15  Cassandra Holifield; one of the North Metro GNETS site

16  coordinators, Samad Knight; and counsel for Metro RESA,

17  Reagan Sauls?

18          MS. JOHNSON:  Object to form.

19          THE WITNESS:  No, I think -- I think what --

20  you are saying "meetings".  It -- I think some of these

21  things were just a matter of who arrived when, not -- not

22  an actual meeting, just -- just waiting.  And -- and as I

23  said, I think there was a meeting where I recall, and I

24  don't know if this was the one where we were told we

25  would need to -- we would need to leave and not be in



SONIA SHAUN OWEN                                     December 12, 2022
UNITED STATES vs STATE OF GEORGIA                                133

 1  there, because I think they wanted to be able to have an

 2  actual meeting or a discussion without us.

 3          But, you know, on a number of occasions, people

 4  were really just -- it's whoever is there, and then they

 5  make the determination of if a team is arriving late or

 6  if they decide that they want to wait for certain parties

 7  before they do that.  So it's not a meeting before, and

 8  people might be discussing any and everything or not

 9  anything at all.

10      Q   BY MS. HAMILTON:  While you were in the room

11  with these individuals, did you discuss the scope of the

12  site visit?

13          MS. JOHNSON:  Object to form.

14          THE WITNESS:  What do you mean by the "scope of

15  the site visit"?

16      Q   BY MS. HAMILTON:  What would take place during

17  the site visit.  Did you discuss while you were in the

18  room with these individuals what would take place during

19  the site visit?

20      A   I don't recall that.  I mean, they had the

21  information.  And honestly, they talked to one another.

22  I mean, as soon as one site visit occurs, I -- I have a

23  strong suspicion that they call one another and discuss

24  amongst themselves what had occurred.

25      Q   All right.  And I'm just trying to get a sense



1  of what was discussed while you were in the room with

2  these individuals.  Again, I don't know, were you -- I

3  guess a question for you, were you aware that the United

4  States was asked to wait in the site coordinator's office

5  while you all were in that room?

6      A   I -- I remember -- and again, I don't remember

7  specific sites, but I remember once or twice that

8  happened, but I don't -- again, I don't think it was to

9  discuss anything; I think it was not everybody from their

10  party was present.  And probably -- in some cases,

11  possibly being instructed by counsel not to -- to, you

12  know, move forward until that was the -- the case.

13      Q   Okay.  So again, for this particular visit at

14  Hamilton Holmes, while you all were in the room together,

15  was there any discussion about what questions could be

16  answered and not answered?

17          MS. JOHNSON:  Object to form.

18          THE WITNESS:  I don't recall any discussions

19  about -- about any of that.  You're saying, and what

20  questions could be answered or not answered?

21      Q   BY MS. HAMILTON:  Uh-huh, correct.  I'm just,

22  again, asking you -- if the answer is no, that's fine.

23  I'm just trying to understand.

24      A   Yeah, I don't -- I don't recall any of that.

25      Q   Okay.  When you were in the room with those



1  individuals, was there any discussion about what portions

2  of the building the group would tour?

3         MS. JOHNSON:  Object to form.  And I'm also

4  just going to note an objection on foundation.  I don't

5  think we have established that Ms. Owen even remembers

6  this particular site visit or meeting.

7         But to the extent that you remember, please go

8  ahead and answer.

9         THE WITNESS:  I -- I don't recall having a

10  conversation on -- on any of that.  I think all that was

11  worked out in a -- I don't think any of that was a

12  surprise.  I think all that was worked out in advance,

13  you know, and they were aware of what was -- what was

14  transpiring.

15     Q   BY MS. HAMILTON:  And Ms. Owen, I guess just to

16  confirm, did you -- were you in the room with the

17  individuals who I listed a moment ago at Hamilton Holmes

18  Elementary School before the site visit started?

19     A   Again, I'm trying to -- I've been to a lot of

20  different site visits.  I'm trying to remember the one

21  that you're -- you're talking about.  And if it's the one

22  I am thinking of, I think counsel and I were in the room,

23  but then I think we were -- I think like the DOJ, we were

24  told to -- to wait at some point, because they wanted to

25  have a discussion, the -- the parties that were there.



1    Q   And Ms. Owen, did you participate in any

2    conversations with anyone from the regional GNETS program

3    staff after site visits were completed?

4    A   Now, there may have been a time where we stayed

5    after just to -- just to talk, because -- just to --

6    yeah, because we -- we work with some of these folks.

7    But nothing -- I mean, nothing pops up specifically about

8    specific conversations.

9    Q   And when you say "stayed after just to talk,"

10   who would have been the individuals who you would have

11   been speaking with after those visits?

12   A   Well, again, I can't think of any specific

13   places or -- or people.  But if I -- you know, if I have

14   known somebody a while, I might stay and -- and talk to

15   them, but a lot of times, though, I'm also just getting

16   in the car and going -- most of these sites were just

17   going to the next location unless it's the end of the

18   day.

19   Q   And just as an example, Ms. Owen, after the

20   United States completed its site visit at the last Sand

21   Hills GNETS facility, did you participate in a meeting

22   with your counsel, Javier Pico-Prats, the director of the

23   GNETS program, Talithia Newsome, and counsel for the

24   fiscal agent, Pete Fletcher and Kim Fletcher?

25           MS. JOHNSON:  Form.



```
 1              THE WITNESS:  I'm just -- I'm trying to think
 2   real quick.  I -- I don't recall.  I think -- I think we
 3   were -- I think everybody was going to the restroom, and
 4   I think the DOJ may have left out before -- before we
 5   did.  Yeah, I'm -- I'm just trying to think through it.
 6   But to hold a meeting, no.
 7        Q   BY MS. HAMILTON:  Do you remember going into
 8   the room and the door being closed with these
 9   individuals?
10              MS. JOHNSON:  Form.
11              THE WITNESS:  After -- after the meeting?
12        Q   BY MS. HAMILTON:  After the site visit, yes.
13        A   So for this one, okay, I'm thinking through.
14   Yeah, for this one, I -- I -- I did speak to the -- the
15   director regarding one thing, in my other role regarding
16   something I wanted to bring to her attention.
17        Q   And when you say you spoke to her in your
18   "other role," what other role are you referring to?
19        A   Well, not as part of the -- the visit, but my
20   role as deputy superintendent and -- yeah.
21        Q   And what did you speak to her about?
22        A   A classroom, a concern I had relative to
23   interactions between a teacher and a child in a classroom
24   observation.
25        Q   Was this an observation that occurred during
```



1   the site inspection?

2       A   Yes.

3       Q   What was the nature of the concern that you had

4   about the interaction that you saw?

5       A   I -- I felt that the -- I felt that the teacher

6   was escalating a situation with a student that I had a

7   concern about, rather than de-escalating the situation.

8       Q   What was happening at the time when you

9   observed -- when you observed this interaction?

10          MS. JOHNSON:  Form.

11          You can answer.

12          THE WITNESS:  What do you mean "what was

13  happening"?

14      Q   BY MS. HAMILTON:  Sure.  So in the classroom,

15  what was happening to the extent that you felt the

16  teacher was escalating the situation?

17      A   There were -- there were two teachers in the

18  room, and the -- and one of the students -- there were

19  only a few students in the room, and one of the students,

20  I felt like a situation was being created between the --

21  where the child, it should have been a de-escalation, and

22  it appeared to me that the teacher continued to inflame

23  the situation and make the situation progressively worse.

24  And I felt that the -- the child was embarrassed, and the

25  situation just seemed to be unnecessarily escalating, and



1   it concerned me.

2       Q   And you mentioned your concern particularly in

3   your role as deputy superintendent.  In what way did that

4   implicate your -- your position as deputy superintendent

5   seeing that interaction?

6       A   I typically do not say anything.  I don't ask

7   any questions at all, but if -- if a -- if a situation

8   arises that I feel is of concern regarding the

9   instruction of a -- in this case a student with a

10   disability, then, you know, I felt compelled to mention

11   that to that particular director so that it could be

12   resolved and that situation did not occur again, yeah.

13       Q   Did you have any other conversations with the

14   regional GNETS staff after the site visit concluded?

15       A   I -- I don't recall.  I don't recall any

16   others.  I just -- I wanted to address that particular --

17   that matter.

18       Q   Okay.  And I guess just to see if I can better

19   understand what happened with that particular matter,

20   what exactly did the teacher do to inflame the situation?

21       A   She kept -- she kept calling on the child and

22   wanting the child to talk about his feelings as part of a

23   restorative circle, but I didn't feel like the practices

24   had actually been put into place.  Because she had

25   mentioned in advance we are going to do a restorative



1   circle, and the class didn't seem to understand what that

2   was, so I didn't know if that was just part of us being

3   there.

4          But at any point in time, she could have just

5   let the child not -- not answer.  And when she continued

6   in front of this group and there was, you know, some

7   cussing going back and forth and the situation was

8   escalating, and it was becoming concerning, and I thought

9   that potentially a fight could break out at any point in

10  time, and I felt that was being exacerbated by the

11  teacher, and it -- it could have been de-escalated.

12      Q    Okay.

13      A    And the director shared that concern.

14      Q    You said the director did share that concern?

15      A    Yes.

16      Q    Do you know if any action was taken after the

17  site visit in connection with that particular teacher or

18  student?

19      A    I don't -- I don't know, but the -- the sense

20  that I received was that -- the sense I received was that

21  she was going to address the matter.

22      Q    How many times, roughly, did you raise these

23  kinds of concerns with GNETS directors during the course

24  of the site visit?

25          MS. JOHNSON:  Object to form.



```
 1            THE WITNESS:  I really didn't -- I didn't
 2    really see -- that's the only one that -- that comes to
 3    mind.  That was just concerning to me, and again, my fear
 4    of -- my fear of it escalating to physical violence in
 5    the classroom and someone getting hurt was -- was a
 6    driving factor in that.
 7       Q   BY MS. HAMILTON:  Do you have any view, based
 8    on what you saw in the moment that day, as to why the
 9    teacher would have announced a restorative circle that
10    the students were unfamiliar with?
11            MS. JOHNSON:  Object to form.
12            You can answer.
13            THE WITNESS:  You know, it's difficult to --
14    it's difficult to speculate, and I -- but, you know, when
15    you -- when someone is being observed and they know that
16    there are -- you know, the purpose of GNETS, a big
17    purpose is to provide therapeutic support to, you know,
18    our most severely at-risk students with severe emotional,
19    behavioral and social challenges, and therapeutics is
20    supposed to be a big aspect of that, and, you know, I
21    don't know like with a classroom observation, if she was
22    looking for opportunities.
23            The situation had already escalated and, you
24    know, then the -- and there was, you know, cussing back
25    and forth.  And like I said, I was concerned, and that's
```



 1   when she mentioned the restorative circle, and then it

 2   just continued, I thought, to get -- to get worse.

 3          And yeah, I was just -- I was concerned for

 4   the -- for the students' safety, for the safety of the

 5   children and staff in the room and, you know, felt like I

 6   needed to -- I would have been remiss had I left and not

 7   addressed it with that executive director, as the one

 8   responsible for that program, so that she could do

 9   something to retrain that staff member, assist them.

10   Because I -- I want to make sure these children are

11   receiving the help and assistance and the skills and the

12   tools they need.

13      Q   BY MS. HAMILTON:  Okay.  Is this an issue that

14   you also would have brought to the attention of

15   Ms. Cleveland?

16      A   This particular one, I -- this particular one,

17   I am -- yeah, I'm certain that I would have probably

18   mentioned this to -- to Vickie, yes.

19      Q   And do you know if there was any follow-up on

20   the part of Ms. Cleveland to check back in with the

21   particular GNETS program regarding the issue -- or I

22   should say regarding the incident?

23      A   I -- I don't know.  And again, this was a --

24   because we don't oversee the program because we can't --

25   we don't mandate or run it, and it's local control.



1  This, to me, was a safety concern, and so I don't -- in

2  her role as GNETS, I don't know that she would have

3  followed up on this.  I'm not -- I'm not certain.

4      Q    Do you know if anyone from the State DOE

5  besides Ms. Cleveland followed up afterwards?

6      A    I -- I do not.

7      Q    As you were attending the site visits, were

8  there particular things that you were observing for?

9      A    Well, I mean, I was looking through the -- I

10  mean, what was mentioned in the -- in the lawsuit.

11      Q    And when you say "what was mentioned in the

12  lawsuit," what are you referring to?

13      A    Is this the least restrictive environment for

14  children with disabilities?  Are there equity of

15  services?  Do they have an opportunity to interact with

16  their nondisabled peers?

17      Q    Did you rely on any particular training or

18  experience as you were making those observations at your

19  site visit?

20      A    I've been an educator for, I think, 28 years,

21  and I've conducted site visits.  You know, I've had

22  students with disabilities in my classroom and just basic

23  interacting skills with -- with students and

24  de-escalating situations in the classroom.

25      Q    And when you say that you relied on your



1   experience as an educator for 28 years, how did that

2   assist you in being able to look at the issues related to

3   this case that you listed a moment ago?

4           MS. JOHNSON:  Form.

5           THE WITNESS:  So -- okay.  So I -- did that

6   question switch?  Which?

7       Q   BY MS. HAMILTON:  No, we are still talking

8   about the same topic.  So a moment ago I asked did you

9   rely on any particular training or experience when you

10  were making your observations during the site visits, and

11  one of the things you said --

12      A   Oh, I'm sorry.

13      Q   -- was your experience as an educator, and so I

14  was just asking for more clarification about what aspects

15  of your experience as an educator that helped you as you

16  were making your observation.

17      A   Okay.  All right.  I thought you meant that

18  particular scenario.

19      Q   Just in general.

20      A   Yes.  I mean, yeah, so the same answer.  Years

21  and years of -- of experience in the field.  Studying,

22  research, or reading up on different things.  But, I

23  mean, 28 years in the field and working with students and

24  knowing best practices in the classroom, and then --

25  yeah.



1       Q    And to the extent that -- one of the things you

2    mentioned a moment ago was a consideration of visits at

3    LRE.  Does -- what does LRE stand for?

4       A    Least restrictive environment.

5       Q    Okay.  So like to the extent that one of the

6    things that you were looking for is this the least

7    restrictive environment, what, from your training or

8    experience, informed that?

9            MS. JOHNSON:  Form.

10           THE WITNESS:  The same -- same answer as

11   before.

12      Q    BY MS. HAMILTON:  And can you remind me what --

13   what that would be?

14      A    Experience in education for 28 years.  13 years

15   in the classroom.  Working with critical instruction and

16   assessment.  Working with practitioners.  Working with

17   children.  I mean, I taught students with disabilities.

18      Q    And then similarly, in conducting the facility

19   tours, was there any particular training or experience

20   that you relied on in making your observations?

21      A    The same as before.  I mean, so you're looking

22   at access.  You're looking at transitioning back.  You're

23   looking at integration into the general ed classroom,

24   opportunities.

25           However, that being said, I just want to note,



1  again, we don't run this program, so going into the

2  classrooms, primarily, you know, just observing, not

3  asking any questions.  I don't have these children's

4  IEPs, so I don't know what -- I don't know what's

5  involved in all of that.

6        So when we go into a classroom, I'm really

7  just -- I'm not getting nearly the information that your

8  expert, nor am I asking to, because again, we don't -- we

9  don't run these.  We don't sit in on the IEP meetings,

10  the evaluation, the assessment, the planning.  So I -- I

11  don't have the -- the data that -- that -- that she has.

12        So all I can see is what's directly there

13  happening at that moment in front of me.  I don't have

14  any additional information regarding the situation or the

15  students.  So to that degree, then no, I don't have that

16  information.

17      Q   Did you receive any requests from the GNETS

18  directors or other regional GNETS staff for copies of

19  your photographs?

20      A   No.

21      Q   Did any of the --

22      A   Not that I recall.

23      Q   Go ahead.

24      A   I'm sorry.  Not that I recall, no.

25      Q   Okay.  Did any of the GNETS directors or



1  regional program staff ask for the opportunity to review

2  your photographs that you took during the site visits?

3      A    No.  They were in the room the entire time, and

4  it was -- I think what they may have done was ask for --

5  I think they can receive the photographs that you all

6  took, and they're -- they're pretty much identical.

7      Q    Okay.  Did you receive any requests from the

8  attorneys for the fiscal agent for the GNETS program for

9  copies of your photographs?

10     A    No, not that I recall.

11     Q    Did any of them -- did any of the attorneys for

12  the fiscal agents of the GNETS program ask to review the

13  photographs that you took during the site visits?

14     A    So -- so there were occasions when your expert

15  at different times was -- would take pictures of

16  different things, and there were a few occasions where

17  the attorneys were concerned that there might have been

18  student data on there, in which case they would review

19  Amy's pictures, your expert's pictures.  And then if she

20  had a picture that was of concern, then the lawyers would

21  discuss that.

22          And she would -- and if they agreed to erase

23  it, then she would delete it, and then she would delete

24  it from her deleted folder.  And if I had that same --

25  because she was ahead of me, so I would not have all the



1  pictures that she has, typically, but if I did have that,

2  then I would -- I would also delete that picture.

3       Q   Okay.  And you said that the photos that you

4  and Amy took were pretty much identical.  How do you --

5  how do you know that that was true?

6       A   Because we were in the room at the same time,

7  so if she took a picture, I would just take a picture of

8  the same thing.

9       Q   Did you take pictures of anything beyond what

10  you saw Amy take?

11      A   I don't -- I don't believe so.  I -- sometimes

12  I would think to take pictures of the outside of the

13  building so that I could recall which site.  But I don't

14  know if -- I don't know.  Amy may have done that as well.

15  That's the only thing I can think of.

16      Q   Okay.  And I know a moment ago you were saying

17  that if counsel for the fiscal agent for the GNETS

18  program asked Amy or Ms. McCart to delete one of her

19  photos, that you would also go back and delete the same

20  or similar picture on your end?  That's correct?

21      A   Correct.

22      Q   Did counsel for the regional GNETS programs

23  ever give you directions during the site visits to take

24  specific pictures?

25      A   No.  No, there might be an occasion, so I



1   would -- sometimes I might inform them, just so that they

2   know, because there's always concern around students and

3   student identity, so I may just say that we were -- that

4   I would -- I might take pictures of what the expert was

5   taking pictures of.  So they were in the room as well,

6   and they might say, she took a picture of this, if I --

7   if I wasn't aware of it, but that's it.

8       Q   Okay.  And just as a specific example, during

9   your visit to the Tri-Cities High School, this is in

10  North Metro, did the attorney for Metro RESA, Reagan

11  Sauls, direct you to photograph a de-escalation room?

12          MS. JOHNSON:  Object to form.

13          You can answer.

14          THE WITNESS:  No, I think -- I think -- I don't

15  recall that, but as close as I would recall might be that

16  Amy -- typically, it would be if -- if I was just behind,

17  and -- and they realized that the -- that the expert had

18  taken a picture and I had missed it.  That's the only

19  thing I recall, but not specifically directing me to take

20  pictures of anything.

21      Q   BY MS. HAMILTON:  Okay.  Just to make sure I

22  understand before moving on, when we were talking about

23  the role of counsel for the regional GNETS program, I

24  said role of the fiscal agents for the regional GNETS

25  programs, and I had asked you did they ever ask for an



1  opportunity to review your photographs directly, what --

2  what was your answer to that?

3       A    Typically, they would want to review the

4  experts, and then the expert would show -- if it was a --

5  if the lawyers agreed that it was to be removed then, the

6  expert would show me the picture, and then I would go

7  through, and if I had the same picture, I would delete

8  it.

9       Q    Correct.  But did they ever ask you on the

10 front end to review your pictures, the counsel for the --

11      A    I don't believe --

12      Q    -- regional GNETS program?

13      A    I don't believe so, because again, I was taking

14 pictures of -- of whatever the expert was taking pictures

15 of.

16      Q    And to the extent that there were some

17 situations where it sounds like the attorneys for the

18 regional programs or fiscal agents were advising you

19 about taking photos that you might have missed, what was

20 the basis for why they would have been asking you to do

21 that?

22           MS. JOHNSON:  Object to form.

23           You can answer.

24           THE WITNESS:  Only because I -- if at the

25 beginning I might have said I'm just taking pictures.



1   Because my concern was, I just didn't want them to think

2   I was, you know, just taking various pictures.  It was

3   because, again, they have a lot of concerns around

4   student privacy, so that would be the only reason.

5          MS. HAMILTON:  All right.  And I note we've

6   been going about an hour and a half since our last break.

7   Ms. Owen or Ms. Johnson, do either of you need a break?

8          MS. JOHNSON:  I'm okay.

9          THE WITNESS:  I'm okay.

10         MS. JOHNSON:  We can keep going.

11         MS. HAMILTON:  All right.  Let me know if there

12  is a point, Ms. Owen, where you want to take another

13  break.  And maybe if -- yeah, we will play it by ear, but

14  maybe by 3:30, if we haven't taken one at that point,

15  maybe we will just pause for like five or ten minutes.

16      Q   BY MS. HAMILTON:  All right.  Ms. Owen, what

17  were your general impressions of the GNETS program, based

18  on your participation in the United States site

19  inspections?

20         MS. JOHNSON:  Form.

21         THE WITNESS:  Well, it's -- it's difficult

22  because every site is run differently.  Every site looks

23  different.  So it's -- you know, if you were to ask me,

24  you know, what's my general impression of all schools

25  across Georgia or all districts across Georgia, it's



```
 1   local control.  They all look different.  They all run
 2   their programs differently.
 3           So -- and again, I don't -- I don't have these
 4   children's IEPs to really know is this the least
 5   restrictive environment for this child, you know, what --
 6   what needs does this child have?  I really don't have --
 7   I don't have that information, so it's hard to just make
 8   a generalized statement about GNETS in general.
 9      Q   BY MS. HAMILTON:  So based on your experience
10   serving as the deputy superintendent, were there any
11   things that you observed at the GNETS facilities that you
12   felt were particularly effective?
13           MS. JOHNSON:  I'm sorry, particularly what?
14           MS. HAMILTON:  Effective.
15           MS. JOHNSON:  Object to form.
16           You can answer.
17           THE WITNESS:  How are you -- how are you
18   defining "effective"?
19      Q   BY MS. HAMILTON:  I kind of want to give you
20   flexibility in determining how broadly you want to
21   interpret that, but that you felt were particularly
22   effective or helpful in serving the students' population
23   for GNETS?
24           MS. JOHNSON:  Form.
25           But you can answer.
```



1           THE WITNESS:  Again, it's -- it's hard to say.

2     You're in the -- you're in the classroom for -- you know,

3     there are times we were in a classroom for two minutes

4     observing children.  There were other times we might be

5     observing for 40 minutes a child on a computer.  It's --

6     it's just hard -- it's hard for me to say, because I

7     really -- I don't -- at the end of the day, I don't know

8     what these children's needs are.  With a number of these

9     students, you don't know do they transition to a general

10    ed classroom.

11          There are overall questions that are asked

12    about opportunities to, but I don't -- I don't really --

13    there's just a lot of information I don't have to be able

14    to make that -- that kind of a determination on

15    effectiveness.  And it also depends on how you define

16    "effectiveness."  So it's just difficult to answer that

17    question.

18       Q   BY MS. HAMILTON:  I just want to make sure I

19    understand.  So GNETS falls under the federal program

20    division; is that correct?

21       A   Yes.  Yes.

22       Q   And as the deputy superintendent of federal

23    programs, you meet with Ms. Cleveland about -- about the

24    GNETS program; is that correct?

25       A   Sometimes, yes.



1    Q   And there are -- and, well, correct me if I'm

2   wrong, but there are expectations about how the GNETS

3   programs should be operating according to the board

4   rules; is that correct?

5           MS. JOHNSON:  Object to form.

6           THE WITNESS:  Yes.  Yes.

7    Q   BY MS. HAMILTON:  Okay.  So I'm -- I'm really

8   just trying to get your opinion on whether in your

9   capacity as deputy superintendent you were seeing the

10  GNETS programs operating the way that they are supposed

11  to be operating according to the rules.

12          And so, for example, my last question was, are

13  there any things that you observed at the facilities that

14  you thought were particularly -- like done particularly

15  effectively.  You don't have an opinion on whether there

16  was anything that was being done effectively?

17          MS. JOHNSON:  Object to form.

18          THE WITNESS:  Well, okay, so if I could go back

19  to your -- the -- the previous part, when you say,

20  according to the -- the board rule.  So, you know, if you

21  look at the scope of what we do at the department, it --

22  you know, we receive the funds.  We flow through the

23  funds to the LEA.  There's an application process that

24  Vickie looks at that has numerous components to it.

25  There's the budget aspect of it as well.



1           The policies and procedures, that's done, you

2    know, with a cross-functional monitoring and our -- and

3    our RDA team, and -- but as far as the -- the

4    effectiveness, you know, we're just -- we're not -- we

5    don't run these programs.  We're not in those classrooms.

6    We don't sit on the IEP meetings.  We don't -- you know,

7    we flow through Title -- you know, 5-, 600 million of

8    Title I funds, but we're not in those classrooms to see

9    how it's implemented.

10          We have end-of-the-year data regarding student

11   achievement, but beyond that, it's just -- it's -- you

12   know, it's very difficult to -- to make that

13   determination.  There's certain components that GNETS

14   have to fulfill relative to the grant, but beyond that,

15   the -- you know, the day-to-day operations, who they're

16   going to hire, what students are in, you know, their

17   GNETS program, if they're gonna run it as a -- you know,

18   as a school or a site based, every bit of that falls

19   in -- you know, that's -- it's all GNETS, so local

20   control.

21          So it's just very difficult to answer your

22   question.

23     Q   BY MS. HAMILTON:  Okay.  And just to be clear,

24   I wasn't asking who was controlling the programs; I was

25   just asking in your capacity as deputy superintendent



1  observing these facilities, was there anything that you

2  felt was particularly effective that you observed or that

3  was done well?  So you're saying you don't have an

4  opinion on --

5      A    Okay.

6      Q    -- on that?

7          MS. JOHNSON:  Objection.

8          You can answer.

9          THE WITNESS:  The -- so given the purpose of

10  GNETS, the GNETS facilities that have -- that have more

11  therapeutic supports, more resources for kids, more

12  training for teachers, more integration back into a

13  general ed setting, greater opportunity and access, like

14  their nondisabled peers, then, yeah, those -- those

15  programs -- those programs would be ones that I would say

16  would be more effective.

17          The transition plan back for students, so that

18  they can transition back into a general ed classroom to

19  the greatest extent possible, that would be what I would

20  say, for effectiveness, that's what would be more

21  effective to -- to me, to better serve and support these

22  children.

23      Q    BY MS. HAMILTON:  And during your site visits,

24  did you observe any facilities that were doing the things

25  that you just named, and I should say that were doing it



1   well?

2       A   Yes, yes, but -- well, again, and I'm not --

3   there is just so many site visits, and I'm trying to --

4   to think through.  And I didn't always -- a lot of times

5   I didn't have the information, but there were times

6   where -- there were times when we were going, and you

7   would see that this child was, you know, going to a

8   general ed auto mechanics class and fully engaged.  There

9   were, you know, times where if a student was half day or

10  was able to be on the sports team or, you know, serve

11  on after-school activities, things like that.

12          There were, you know, others where, you know,

13  there were a number of opportunities, the staff, where

14  they might have, you know, counselors or school

15  psychologists or a tremendous amount of Wraparound

16  services, or places in the school where outside agencies

17  might come in and work with the kids or work with the

18  families for that additional level of support.  Those

19  would be -- I would -- you know, I would say more

20  effective for -- for students.

21      Q   Were there any specific facilities that you

22  remember that stood out in a positive way for -- for

23  doing any of the things that you just named?

24      A   And again, I think if I had not been on so many

25  site visits, I would have been able to go through and



 1  give you specifics.  But there -- yeah, there are some

 2  sites that -- that do that.  I just -- I can't think off

 3  the top of my head.  It's really more of an amalgam of

 4  things that I saw that I was pulling from, and hearing

 5  the directors talk about the resources that they provide

 6  for students.

 7      Q   If you had your notes in front of you, would

 8  that help you to recall?

 9          MS. JOHNSON:  Objection.  That would require

10  her to reveal contents of her notes, so I would instruct

11  the witness not to answer.

12      Q   BY MS. HAMILTON:  Is there anything that you

13  can reference, Ms. Owen, that would help you to recall

14  the facilities that stood out to you in a positive way?

15      A   Not off the top of my head.  Not off the top of

16  my head.  I'd have to -- I'd have to sit down and -- and

17  think about it some more, just go through the site

18  visits.  And then, you know, the budget always helps, to

19  see where the resources are spent as well.  But I

20  don't -- you know, I don't have any of that.  But that's

21  not something I would typically even -- I'm not at that

22  level.

23          But just like with all schools there -- there's

24  clearly -- you know, there is -- there is a difference

25  in, you know, how the -- the schools are administrated



1  and how they -- how they utilize their resources.

2      Q   Okay.  Sitting here today, you can't cite one

3  program where you remember the things that you saw that

4  were done particularly well?

5          MS. JOHNSON:  Form, and asked and answered.

6          You can answer.

7          THE WITNESS:  But please don't take the fact

8  that I can't recall that they don't -- that there aren't

9  any.  I just -- I can't -- you know, I can't -- I just

10 can't recall off the top of my head.  And, you know, some

11 might be -- you know, be strong in certain areas and not

12 as strong in others.

13          And also, just keep in mind, my visits were

14 just a snapshot of going in and out of these classes and

15 listening to the questions that were -- were asked by

16 your expert, and trying to glean from that what -- what I

17 could.  A lot of information I just don't have access to

18 to really have the full picture.

19          MS. HAMILTON:  All right.  I think it would be

20 helpful to take maybe a five-minute break, unless,

21 Ms. Owen or Ms. Johnson, you all need any more time?

22          MS. JOHNSON:  That works for me, if it works

23 for Shaun.

24          MS. HAMILTON:  All right.  So we will pick back

25 up at 3:30.



 1          THE VIDEOGRAPHER:  Okay.  We are going off the
 2   record now at 3:25 p.m.
 3          (The deposition was at recess from 3:25 p.m. to
 4   3:35 p.m.)
 5          THE VIDEOGRAPHER:  We are back on the record at
 6   3:35 p.m.  Please proceed.
 7      Q   BY MS. HAMILTON:  Okay.  Just give me one
 8   second.  I'm trying to organize my notes here.
 9          All right.  Ms. Owen, I wanted to ask you about
10   some of the specific programs and facilities that you
11   visited as part of the United States site inspections.
12   You participated in the Horizon Academy site inspection
13   in Valdosta; is that correct?
14      A   Yes.
15      Q   And that took place in May of this year; is
16   that right?
17      A   I'm relying on your dates.
18      Q   Do you remember it taking place within the last
19   few months?
20      A   Well, if it was in May, then no.  But are you
21   talking about the -- the second visit?  You are saying
22   the first one occurred in May; then there was a second
23   visit within the last few months.
24      Q   I'm referring to --
25      A   There were two different visits, I believe.



1        Q    The one at Valdosta?

2        A    Right.  There were -- there were two to

3    Valdosta, I believe.

4        Q    Okay.  And then there was also a site visit to

5    the Moultrie location as well for Horizon Academy.  Did

6    you participate in that one as well?

7        A    I -- I believe so.  Was it on the same visit?

8    I believe -- I believe so.

9        Q    Okay.  Well, I want to focus on the Horizon

10   Academy site inspection in Valdosta.  Who is the GNETS

11   director of the Horizon Academy GNETS program?

12       A    Sam Clemons, I believe is his name.

13       Q    Okay.  And I'm going to share a document with

14   you.  I'd like for the court reporter -- I'd like for the

15   court reporter to mark this as Plaintiff's Exhibit 702

16   (sic).

17            (Plaintiff's Exhibit 703 was marked for

18   identification.)

19       Q    BY MS. HAMILTON:  This is a May 23rd, 2022

20   letter from Victoria Lill and Andrea Hamilton to Josh

21   Belinfante and Beth Morris.  It's a little over two

22   pages.

23            Ms. Owen, have you seen this document before?

24            MS. JOHNSON:  Andrea, I just want to point out

25   there was a message that we're on Exhibit 703.  I don't



 1  know if you need to correct anything.

 2          MS. HAMILTON:  Okay.  Ms. -- Ms. Daughtry, can

 3  you confirm that in terms of the exhibit count, is this

 4  Exhibit 703?  I can correct that for the record.

 5          THE COURT REPORTER:  Yeah, it will be 703.

 6          MS. HAMILTON:  Okay.  Great.

 7      Q   BY MS. HAMILTON:  So Ms. Owen, I am showing you

 8  Plaintiff's Exhibit 703.

 9          MS. HAMILTON:  And Ms. Daughtry, I just want to

10  correct that for the record, for you to mark this as

11  Exhibit 703.  Thank you.

12      Q   BY MS. HAMILTON:  Ms. Owen, returning back to

13  my question, are you -- have you seen this document

14  before?

15      A   I would need to actually read it.

16      Q   And again, Ms. Owen, just so you know what

17  you're looking for, my question is, have you seen this

18  document before?

19      A   Yes, I have.

20          Are you going to ask me questions relevant to

21  it?  Because I would like to finish reading it.  If not,

22  that's fine.

23      Q   We'll walk through it together, and you're

24  welcome to scroll up and down as we go, but I think it

25  might actually be helpful for me to start asking the



 1  questions so you'll have a better sense of what -- what

 2  you are looking for.

 3      A   Okay.

 4          MS. JOHNSON:  If you feel like you need to read

 5  the entire thing for context, though, then feel free to

 6  finish reading.

 7          THE WITNESS:  Can I scroll to the bottom?  Do

 8  you mind?

 9      Q   BY MS. HAMILTON:  Yeah.

10      A   Okay.  Thank you.

11          MS. JOHNSON:  Sorry, I didn't mean to

12  interrupt.  There's a bit of a delay.

13          THE WITNESS:  Okay.

14      Q   BY MS. HAMILTON:  And Ms. Owen, so just

15  starting here at the beginning of this letter, it notes

16  here that the attendees at the site visit included

17  Victoria Lill and Allison Ewers from the United States,

18  Danielle Hernandez from the State of Georgia, along with

19  Shaun Owen, the deputy superintendent for federal

20  programs, and Hieu Nguyen as counsel for Horizon

21  Academy's fiscal agent.

22          So you do see here where we have noted that you

23  were in attendance at this site visit; is that correct?

24      A   Correct.

25      Q   And you remember being at this visit; is that



1    correct?

2         A    I do.

3         Q    The letter here states that -- sorry, I'm in

4    the second paragraph, that "The Horizon Academy is

5    located within a wing of a sprawling building that once

6    housed Valdosta High School."

7              Is it correct that the Horizon Academy was

8    located in a separate wing of the school?

9         A    Yes.

10        Q    And then the letter goes on to state, here in

11   the third paragraph, "Grass and plants -- Grass and

12   plants grew in cracks throughout the sprawling parking

13   lot and in gutters all around the building."

14             Do you agree with that statement?

15        A    Yes.

16        Q    And then as it continues on, it says, "Light

17   posts across the exterior of the facility were rusted and

18   tilting sideways, with dirty, broken lamps atop."

19             Do you agree with that statement?

20        A    I don't recall that specifically, but I'm

21   assuming if it's in this document, it's accurate.

22        Q    Is there anything in particular about it that

23   you would disagree with?

24        A    No, I'm just -- you asked me if I recall that.

25   I -- I don't recall that specific thing.



1    Q   And then moving on to the next sentence, it

2    says, "Fencing surrounding the building, parking lots and

3    athletic facilities was broken, severely bent and

4    rusted."

5            Do you agree with that statement?

6    A   I -- I believe -- I believe that's accurate.

7    Q   The letter goes on to state here in this

8    sentence, "As we approached from the parking lot near the

9    entrance to the portion of the building used by the

10   Horizon Academy, we passed multiple broken gutter

11   downspouts lining the facade of the brick building."

12           Do you see that, what I just read?

13   A   Yes, I -- I do.  I don't recall that, but

14   again, I'm -- I'm assuming it's accurate if it's in this

15   document.

16   Q   And then in this next sentence, it says, "In

17   those locations, the ground and base of the building

18   where the drain downspouts had broken off was blackened

19   with rot, raising concerns about the integrity of the

20   building's foundation."

21           Do you agree with that characterization of the

22   facility's condition?

23           MS. JOHNSON:  Object to form.

24           You can answer.

25           THE WITNESS:  Again, I don't recall that



1   specifically, but I'm -- I'm not -- I'm not objecting, if
2   it's -- if it's in this document.
3        Q   BY MS. HAMILTON:  Based on your own
4   observations, what were your -- what were your personal
5   takeaways as the deputy superintendent regarding the
6   exterior of the Horizon Academy facility?
7             MS. JOHNSON:  Object to form.
8             THE WITNESS:  In line with this report, or this
9   letter?
10       Q   BY MS. HAMILTON:  Consistent with the letter,
11  but sort of apart from what the United States has noted
12  here, based on your own observations, did you have any
13  other takeaways regarding the exterior of the building?
14            MS. JOHNSON:  Form.
15            THE WITNESS:  That it was located behind a
16  closed high school.
17       Q   BY MS. HAMILTON:  And what in particular is
18  relevant about it being located behind a closed high
19  school?
20            MS. JOHNSON:  Object to form.
21            THE WITNESS:  Well, I mean, I've just never
22  seen that before where you have a high school that's
23  closed and you have students in a facility attached to
24  a -- a closed facility.  So that you're going around the
25  building to get to the back of the building to get into



1   GNETS.  I've just never seen that before.

2        Q   BY MS. HAMILTON:  Given that arrangement, did

3   that create any concerns for you about the students'

4   experience attending school in this facility?

5        A   Yes.

6        Q   And what were those concerns?

7        A   That that was not an appropriate environment

8   for children to be in.

9        Q   Did you have any other concerns -- and

10  actually, I guess, let me just ask one quick follow-up.

11  When you -- when you say that it's not an appropriate

12  environment for the students to attend, what -- what

13  about that makes it inappropriate?

14             MS. JOHNSON:  Form.

15             THE WITNESS:  Well, you would want -- you would

16  want children attending, you know, a well-kept facility,

17  not attached to something that's closed, and not with the

18  health concerns that were mentioned.

19        Q   BY MS. HAMILTON:  All right.  So continuing on

20  in the letter where it starts to talk about the condition

21  of the interior, so the second sentence reads, "As we

22  entered the wing of the building where the GNETS

23  classrooms are located, we saw water damage and a hole in

24  the ceiling.  Each ceiling vent in the hallways,

25  bathrooms and classrooms were covered -- was covered in



1    and surrounded by thick -- thick black dust."

2            Do you agree with that statement?

3        A   Yes.

4        Q   In the next sentence, it reads, "In one of the

5    first classrooms we entered where students were present,

6    the ceiling was buckling and warped, particularly so

7    within a foot of where countless live electrical wires

8    were routed in clumps into the ceiling."

9            Do you agree with this statement?

10       A   I don't -- I don't recall that -- that

11   specifically, but again, I'm not contesting it.  I just

12   don't recall that particular portion.

13       Q   The letter then goes on to state, "The boys and

14   girls restrooms utilized by the GNETS students nearest to

15   their classrooms - and the hallway outside of where they

16   are located - reeked of sewage, were filthy and had

17   deteriorating equipment.  In the boys restroom, one of

18   three toilets had no partition whatsoever surrounding it,

19   while the other two toilets had dilapidated stall

20   partitions that were pulling away from the wall and stall

21   doors that would not close or lock."

22           Do you agree with this characterization of the

23   restroom?

24       A   Yes, I don't -- I don't know about the -- the

25   sewage smell, but again, I'm not -- I'm not contesting



 1  it, but -- but the rest of that, yes.

 2       Q   Okay.  Do you remember a smell when you were in

 3  the bathroom?

 4       A   Well, I mean, there's a smell in a lot of

 5  bathrooms.  It's not attached, so I just -- I'm sure it

 6  smelled.  I just don't remember the -- the sewage portion

 7  of it.

 8       Q   Okay.  And based on your observations, did you

 9  have any other concerns about the condition of the

10  interior of the building -- of the buildings?

11       A   Yes, what's mentioned here.

12       Q   Did you have any concerns beyond what's

13  mentioned here?

14       A   No, I think -- I think that captures it.

15       Q   I know we were talking about the exterior

16  earlier, but what -- what were your takeaways regarding

17  whether these issues related to the interior of the

18  building posed a risk to the health and safety of

19  students in the building?

20           MS. JOHNSON:  Form.

21           THE WITNESS:  The -- the black mold in the --

22  or whatever it was, and I don't know that it was that,

23  but there was black around the air vents.  Now, that --

24  that is in some other schools, but -- over the years, but

25  I don't -- but, yeah, that -- that was -- that was

1   concerning, and the other things mentioned.

2        Q   BY MS. HAMILTON:  Okay.  Did you conduct any

3   class -- I'm sorry, did you participate in any of the

4   classroom observations at the Horizon Academy facility?

5        A   I did.

6        Q   What were your takeaways regarding the quality

7   of the instruction at the Horizon Academy facility?

8             MS. JOHNSON:  Form.

9             THE WITNESS:  Well, you know, with all things,

10  it -- it varies.  One class, students might be

11  appropriately engaged with the teacher; and in another

12  class, not so much.  So it -- it just varied depending on

13  the class.

14       Q   BY MS. HAMILTON:  With regard to the concerns

15  about the facility, do you know if any action was taken

16  to address those concerns after the site visit?

17       A   I believe that was -- the person who took the

18  lead on that was Pat Schofield, who is over buildings and

19  facilities, and I believe he sent someone down to -- to

20  look at it.  I believe changes were made in -- in the

21  restrooms, but I don't have any additional information

22  beyond that.

23       Q   Okay.  And I'm just looking at some other parts

24  of the letter here.  It looks like you toured more parts.

25  Here it says, "While touring the area used as a lunchroom



 1  and ad hoc music room, we saw numerous live cockroaches."

 2           Do you agree with this statement?

 3      A    I remember -- I remember one or two

 4  cockroaches.  I don't know if they were alive or not.

 5      Q    And then this last part here, "The bathrooms,

 6  locker rooms and adjacent hallways in this part of the

 7  facility were covered in a thick layer of dust and dirt."

 8           Do you agree with this statement?

 9      A    I believe that's accurate.

10      Q    I know that you were saying a moment ago that

11  you believe Pat Schofield may have been looking into some

12  of these issues, who is at the State Department of

13  Education.  Are students still being served in this

14  facility this school year?

15           MS. JOHNSON:  Form.

16           THE WITNESS:  Yes.

17           MS. HAMILTON:  I'm going to stop sharing my

18  screen.

19      Q    BY MS. HAMILTON:  All right.  I'm trying to get

20  a general sense just with regard to the site inspections

21  that you conducted, if there were any -- well, you'll

22  see.  I just have some specific questions about things

23  that you may have seen at any of the sites that you

24  visited.  I'm just going to run through a few questions

25  here.



1          Did you visit any school-based GNETS program
2     locations where GNETS students were in separate wings of
3     buildings for their classes?
4          A   I recall one that comes to mind.  That doesn't
5     mean that there is only one.  That just means I -- I do
6     recall -- I do recall one.
7          Q   Okay.  Which -- which program was that?
8          A   I -- I don't recall the program.  I think it
9     was in Putnam County.
10         Q   And you are saying that's the only program that
11    you remember where GNETS students were in separate wings?
12             MS. JOHNSON:  Form.
13             THE WITNESS:  There -- there may be -- I'm
14    trying to think of a more recent visit if -- in Rockdale.
15    I -- I don't recall if that was -- if that entire hallway
16    was students with disabilities or if there were a number
17    of them, their classrooms grouped together.  I don't
18    recall, but I do remember there were a number of
19    classrooms in the same area that -- and that -- now, that
20    was one that there wasn't a GNETS at because they were in
21    a --
22         Q   BY MS. HAMILTON:  When you say --
23         A   -- a separate facility.
24         Q   I'm sorry, say that again.
25         A   That was the -- that was the Rockdale site.



1   And from my understanding, I don't know that there's a

2   GNETS there.  I think their students may go to a -- they

3   may go to a site-based -- or is that Rockdale?  Hang on.

4   Or was it Trion's?

5          It was the last one that we visited that day.

6   I'm just -- I'm trying to think through.  That wasn't

7   Rockdale.  I think it was the one after Rockdale.  I

8   don't recall exactly, but I know the site did not have

9   a -- didn't have a GNETS there, and students were --

10  there were a number of students with disabilities

11  classrooms all in the same area, but again, I don't know

12  if that was the entire hallway.

13      Q   And is there anything that would help to

14  refresh your recollection on the specifics?

15      A   Looking at the calendar for that day to see

16  what site that was.

17      Q   Did you observe any school-based GNETS program

18  locations where GNETS students used separate entrances

19  from students in the general education environment?

20      A   Yes.

21      Q   Do you remember which ones in particular?

22      A   I believe one in -- I believe it's Savannah.

23  It's attached to a large, newer high school.  There was,

24  I believe, one of the -- the Elam -- one of the Elam

25  facilities, I believe, that's attached to a high school.



1          Those are the -- those are the two that are --
2    that are -- that are coming to mind right off the top of
3    my head.
4         Q    Okay.  And is it possible that there are other
5    facilities where students are using separate entrances,
6    but you don't remember the details about them?
7               MS. JOHNSON:  Object to the form.
8               THE WITNESS:  It is possible.
9         Q    BY MS. HAMILTON:  For the locations, the two
10   locations that you did mention just now where GNETS
11   students used separate entrances, did any of those
12   entrances have medical -- not medical, excuse me -- metal
13   detectors?
14        A    I think -- I think the one in Savannah had a
15   metal detector, but it may not -- it may have been pushed
16   to the side and not in use.  The one in Elam, I
17   believe -- I believe may have had a metal detector, but I
18   believe so did the general -- the general ed high school,
19   the entrance.  But again, I could be wrong, but I do
20   remember metal detectors.
21        Q    Okay.  Did you visit any school-based GNETS
22   program locations where GNETS students had separate
23   playground equipment from the equipment used by students
24   in the general education school setting?
25              MS. JOHNSON:  Object to form.



1          THE WITNESS:  Yes, and -- and again, this

2    doesn't mean this is all of them, but Columbia, I think,

3    I believe that one is attached to an elementary school

4    and has a separate playground area.  And there may be

5    more; I'm just not sure off the top of my head.

6       Q   BY MS. HAMILTON:  Did you visit any

7    school-based GNETS program locations where the GNETS

8    students ate lunch in their classrooms separate from

9    students in the general education setting?

10      A   I'm sorry, will you repeat that?

11      Q   Sure.  Did you visit any school-based GNETS

12   program locations where GNETS students ate lunch in their

13   classrooms separate from students in the general

14   education setting?

15          MS. JOHNSON:  Object to form.

16          THE WITNESS:  Yes.

17      Q   BY MS. HAMILTON:  Which programs in particular?

18      A   Again, I -- just one that comes to mind was in

19   the North Georgia High School, but I think in that

20   instance, the students had the choice of whether or not

21   they wanted to eat with the general ed students or not.

22   And also, this is -- some of this occurred during COVID,

23   so in some instances, everybody was eating in their

24   classroom.  So I'm just adding that for context.

25      Q   During your site visits, did you observe



1    therapeutic services and supports being offered at each

2    of the GNETS program locations?

3           MS. JOHNSON:  Form.

4           THE WITNESS:  Now, that's -- that's hard to

5    answer, because if the question was specifically asked,

6    then you might know, but there could be therapeutic

7    supports and services that weren't happening at the time.

8    Because again, we were only there for just a small

9    portion of time.

10    Q    BY MS. HAMILTON:  Would you observe high levels

11    of student engagement across all of the GNETS program

12    locations that you visited?

13           MS. JOHNSON:  Form.

14           THE WITNESS:  No.

15    Q    BY MS. HAMILTON:  Okay.  Were there any

16    particular programs that stood out to you that were

17    either -- that were good examples of providing

18    instruction that resulted in high levels of student

19    engagement?

20           MS. JOHNSON:  Form.

21           THE WITNESS:  Well, as a -- just as a general

22    rule, the classrooms where teachers were either up doing

23    direct instruction or in some cases sitting down in small

24    groups with the students or in some cases one-on-one

25    instruction with students.



1      Q    BY MS. HAMILTON:  Okay.  And I guess the

2    reverse of that, what would it have looked like to see,

3    like in a program that would have had low levels of

4    student engagement, what would that have looked like?

5               MS. JOHNSON:  Form.

6               THE WITNESS:  Students disengaged, not paying

7    attention.  Solely computer-based instruction, yeah.

8      Q    BY MS. HAMILTON:  Do you remember, I guess,

9    like specific program names where you saw high levels of

10   student engagement, taking what you just said into

11   account?

12     A    No, because again, we might go into ten

13   different classrooms at varying levels, and then, you

14   know, head to the next site, so it -- I mean, if I went

15   into a general ed school and did observations, I would

16   expect, you know, there's a variety of levels of

17   engagement, so -- but -- but it's hard -- it's hard for

18   me to recall that program, you know, and that teacher,

19   because again, there were so many classrooms that we --

20   we went into.

21     Q    And were there any specific programs where you

22   consistently saw low levels of student engagement?

23               MS. JOHNSON:  Form.

24               THE WITNESS:  Well, I mean, again, just as a

25   general rule, if all of your instruction is primarily on



1  a computer, then just typically, that doesn't provoke a

2  lot of student engagement.  So typically, if there is

3  student engagement, the teacher is actively involved, or

4  there's a project of some sort that the kids are involved

5  with.

6      Q    BY MS. HAMILTON:  And I know earlier we were

7  talking about the condition of the facilities at the

8  Horizon Academy Valdosta site.  Were there any other

9  GNETS program locations where you had concerns about the

10 condition of the facility?

11     A    Give me a minute, if you will.

12     Q    Sure.

13     A    Nothing -- nothing comes to mind with, you

14 know, the condition of the facility that -- that's

15 standing out with me.  Yeah, I'm just trying to think

16 through.  I -- I can't recall off the top of my head

17 something that's sticking out.

18     Q    Is there anything that would help you remember

19 if there were particular facilities that stood out due to

20 the quality of the facility?

21     A    I would -- I would just have to go back and

22 think through the -- think through the visits.  Nothing

23 on hand that -- that would jog my memory.

24          Sorry, I'm -- I'm trying to think through.  I

25 can't think of anything right this second.



1        Q    Are you familiar with the term "seclusion

2   rooms"?

3        A    Yes.

4        Q    What are seclusion rooms?

5        A    Well, they are not supposed to exist.  They're,

6   hopefully, an antiquated practice where children would be

7   put by themselves and isolated.

8        Q    Okay.  Are there any particular markers that

9   would identify a room as a seclusion room?

10           MS. JOHNSON:  Object to form.

11           THE WITNESS:  Well, that's a little -- that's a

12   little difficult, because I know some rooms are -- are

13   larger and used for -- you know, according to what the

14   GNETS facilitators have shared, they are used for, you

15   know, timeout.  But I think the marker would be a -- a

16   small room that has a -- has a door that potentially

17   locks.  But again, those are not supposed to be in

18   existence.

19        Q    BY MS. HAMILTON:  And when you say they are not

20   supposed to be in existence, is there a particular rule

21   or a policy to that effect?

22        A    Our seclusion and restraint rule.

23        Q    And is that a board rule?

24        A    Yes.

25        Q    During your participation -- sorry.  During



1   your participation in the United States site visits, did

2   you visit any GNETS program locations where you observed

3   seclusion rooms?

4        A    There was a -- I believe it was Savannah, their

5   elementary and middle school facility had, I believe, two

6   rooms that would have potentially met that criteria and

7   may have at one point prior to the board rule been used

8   for that purpose.  They -- I don't believe they have -- I

9   don't believe they have doors.  There may have been three

10   at that facility.

11          And I think you mentioned earlier about someone

12   mentioning taking a picture, telling me to take a

13   picture.  I think that was what -- one of the more recent

14   sites where your expert had taken a picture where there

15   was a large room, and at one point, possibly before the

16   board rule, that may have been used as a seclusion room.

17   But the -- the door had been removed, and we were told

18   that it was no longer used for that purpose.

19        Q    Okay.  And I don't know if this helps, but when

20   I mentioned that earlier, it was in connection with the

21   Tri-City High School GNETS facility.

22        A    Okay.

23        Q    Do you recall if that's the one that you are

24   thinking of?

25        A    Do you have a date for that?  Was it a more



 1  recent visit?

 2      Q   It would have been the North Metro during the

 3  May -- late April, early May site visit of this year.

 4      A   I don't -- I'm not too sure.  May sounds too

 5  far -- May sounds too far back, so I -- I'm not sure on

 6  that one.  I'm not sure on that one.

 7      Q   The one that you remember, are you thinking

 8  that's more in the time frame of the last month or so?

 9      A   The last month or two.

10      Q   Okay.  Are there any other GNETS program

11  locations where you either observed seclusion rooms or

12  rooms that had the potential markers that it could have

13  been a seclusion room?

14          MS. JOHNSON:  Form.

15          THE WITNESS:  You know, again, it's hard --

16  it's hard to tell because, you know, we don't run them,

17  so we are going by what the director is telling us.

18          I know that Rutland Academy upstairs, I think

19  had one or two rooms upstairs; that they're large rooms

20  and they've got -- and I believe they called those

21  "cool-down rooms."  And a number of these facilities have

22  areas where, you know, whether they are de-escalation

23  rooms or things of that nature.  But when the question is

24  asked, you know, we're always told that they're -- they

25  don't do that and it's not used for that purpose.



1      Q   BY MS. HAMILTON:  Okay.  And I guess for the

2   two rooms that you mentioned in Savannah that have --

3   looked like they could have potentially been seclusion

4   rooms, did the director indicate what those rooms were

5   used for?

6      A   It's -- it's been a while.  I'm trying to think

7   back.  I believe he said that it's -- it's used for kids

8   to sort of calm down, yeah.  And because then I think the

9   expert had said something about making it more visually

10  appealing for children so that it doesn't resemble a

11  seclusion room.

12     Q   Okay.  All right.  I'm going to ask you about a

13  few more specific GNETS programs that you visited.  I

14  know we were talking about Horizon Academy in Valdosta

15  earlier; and as you had noted, there was a second Horizon

16  Academy facility that we visited, and it was the location

17  at Moultrie, M-o-u-l-t-r-i-e.

18         Do you recall that visit?

19     A   I mean, it's not sticking out in my -- it's not

20  sticking out in my head.

21     Q   And I don't know if this helps at all, but it

22  took place on Friday, October 28th, of this year.

23     A   Okay.  It's not sticking out, but, I mean, I'll

24  do the best I can to answer your questions.

25     Q   Okay.  That's fine.  And just let me know if



 1  you don't remember.

 2          But that visit, I'm trying to confirm what type

 3  of GNETS program you would have seen.  Was that a

 4  center-based or a school-based GNETS program?

 5      A   I'm just not -- I'm not -- I'm not recalling

 6  that particular site.  It's -- it's just not sticking out

 7  with me, I'm sorry.

 8      Q   Okay.  And I guess just to confirm, you are not

 9  recalling the site.  Do you remember visiting it, just

10  you don't remember details about it, or you don't

11  remember the visit?

12      A   Yeah, I just don't -- I think it was at the end

13  of a -- yeah, I don't -- that particular site is just

14  not -- not standing out in my mind.

15      Q   All right.  I want to return back to the Sand

16  Hills GNETS program, program visits that were conducted

17  in May.  So one of the sites that we visited was the

18  Tubman Education Center.  This is the site where you gave

19  the example about the incident when the teacher was using

20  the restorative circle.

21          What were your impressions of the condition of

22  the facility?

23      A   It's an old, I believe high school building.  I

24  mean, nothing really -- nothing stood out in particular

25  regarding the condition of the building at that site.



1    Q   And I know we talked a bit about the -- the

2  incident that you observed.  Did you have any other

3  observations regarding the quality of instruction at that

4  particular location?

5          MS. JOHNSON:  Form.

6          THE WITNESS:  I know what -- but I think -- I

7  think de-escalating and therapeutic supports are -- are

8  important to keep -- keep kids engaged, so...  But yeah,

9  that's...  Yeah.

10   Q   BY MS. HAMILTON:  And the Sand Hills GNETS

11 program had two locations.  We also visited the first

12 location in Thomson.

13   A   Yeah.

14   Q   What were your impressions of the condition of

15 the Thomson facility?

16   A   I'm -- it's an old building that could probably

17 use some maintenance and upkeep.

18   Q   Were there any particular -- were there any

19 particular things that you observed about the facility

20 that could benefit from maintenance and upkeep?

21   A   Yes.  I -- I just -- one of the rooms, I

22 remember, was -- seemed to be an issue with the

23 air-conditioning unit, the exterior, you know, the

24 general upkeep, and then access to services.

25   Q   And what do you mean by "access to services"?





 1      A   A playground, a gym.  I don't know that there

 2  was a -- a library there.  I don't know that there was a

 3  cafeteria there.  Yeah.

 4      Q   Okay.  And relatedly, did you have any concerns

 5  about the quality of the instruction that you observed?

 6          MS. JOHNSON:  Form.

 7          THE WITNESS:  Nothing -- nothing's standing out

 8  in particular regarding the -- regarding instruction,

 9  that I can recall at this time.

10      Q   BY MS. HAMILTON:  Okay.  And I know if we

11  continued going through every single program you visited,

12  we would be here for many more hours, so I'm going to

13  transition from that.  But just as a wrap-up, based on

14  your observations while visiting all of these GNETS

15  program locations, what recommendations would you make,

16  if any, to improve the GNETS program?

17          MS. JOHNSON:  Form.

18          THE WITNESS:  I mean, in a perfect world, a

19  great deal of therapeutic support, transitioning back as

20  much as possible to a general education setting,

21  wraparound services for the child and for the family.

22  You know, access to -- access to -- to everything that a

23  general ed student would have so that these children have

24  good quality school experience.

25          MS. HAMILTON:  Okay.  And I want to pause just



 1 | to do a quick time check.  Patrick, can you let us know

 2 | how long we've been going?

 3 |         THE VIDEOGRAPHER:  We are pushing six and a

 4 | half hours at this point.

 5 |     Q   BY MS. HAMILTON:  All right.  Ms. Owen, I want

 6 | to transition now to talk a bit about funding and budget

 7 | responsibilities that you have as deputy superintendent,

 8 | particularly as it pertains to GNETS.

 9 |         In the Governor's budget each year, GNETS has a

10 | line item, correct?

11 |     A   Correct.

12 |     Q   How much did GNETS receive for the current

13 | fiscal year total?

14 |     A   I don't have exact in front of me, but it was

15 | approximately 53 million in state funds, 7.3 million in

16 | federal funds.  Around 900,000 in -- that went to the 11

17 | sites for additional therapeutic support.  Around 92,000

18 | for i-Ready to support math and English language arts

19 | instruction.  And then I believe through ESSER, we

20 | received a three-year grant that may be around 3 million

21 | total that was specifically designed for a three-year

22 | increment; 60,000 a year going to the 24 GNETS facilities

23 | specifically and only for therapeutic supports and

24 | services.

25 |         And I believe that we received -- when the



1  budget cuts came originally, I believe in 2020, when we

2  were talking about the 10 percent decline earlier, I

3  believe we received maybe 6 million -- I don't have the

4  board item in front of me -- for -- to make up the

5  difference of the 10 percent cut that we were -- we were

6  looking at, that went out by an allocation similar to the

7  methodology used for the preliminary allocations.

8          So that's -- and I may be missing something,

9  but I -- I think that's primarily -- I think that's

10 primarily it.

11     Q   Okay.  Particularly for the state and federal

12 allotment, you mentioned 53 million for state, 7.3

13 million for federal, so is that accurate to say that from

14 the state grant and the federal funds, that that's around

15 60 million that they received this school year?

16     A   Yeah, around there.

17     Q   Okay.  And I know you mentioned the budget

18 cuts.  What's been the range of the GNETS total state and

19 federal allotments over the last few years?

20     A   It's been in that -- in that range.  I think

21 three years ago there was a -- there was a drop.  There

22 was actually a -- there's been a decline.  I think a

23 couple of years ago it was almost at 70 million, then it

24 went to 60 million.  Again, I don't have the board item

25 in front of me, but then I noticed a notable drop, and so



1  I -- I did ask Vickie about that, just as a board item

2  topic, and she said that it was due to the -- the

3  reduction in GNETS students, and that's what impacted

4  that overall decline in funds.  But it's been lower the

5  last several years than it was five years prior.

6      Q   Okay.  And I know earlier you mentioned the

7  reduction in GNETS students as well, and you mentioned

8  one of the reasons for that was the training and

9  messaging that had been provided to LEAs to look more

10 closely at the continuum of services to ensure students

11 are truly in their LRE.

12         What training and messaging were you referring

13 to?

14     A   I -- I think after -- well, I mean, that's been

15 our messaging all along, that the -- you have to ensure

16 that there is continuum services, because it truly has to

17 be the child's least restrictive environment, and the --

18 and essentially keeping them out of residential treatment

19 facilities.

20         But I think probably the impetus behind that

21 also was, I believe after the DOJ letter, I believe that

22 Nakeba Rahming and Alexa Ross, I think they had gone out

23 and were actually going through IEPs and -- and looking

24 at a much deeper level at that.  So I'm sure that was

25 probably their messaging.  It's certainly been our



SONIA SHAUN OWEN                                    December 12, 2022
UNITED STATES vs STATE OF GEORGIA                              189

1  messaging as well.

2      Q   And by -- when you say going through IEPs, by

3  doing so, is it your understanding that they were then

4  identifying students who no longer needed to be served in

5  GNETS?

6          MS. JOHNSON:  I'm going to object to this

7  question, to the extent it requires you to reveal any

8  attorney-client privileged communications if Alexa was

9  involved.

10         THE WITNESS:  Okay.

11         MS. JOHNSON:  But if you are able to respond

12 without revealing any privilege.

13         THE WITNESS:  And I really, I can't answer.  I

14 don't know the specifics of that.

15     Q   BY MS. HAMILTON:  Okay.  And then I know

16 earlier when we were talking, you mentioned earlier that

17 there was a high amount of anxiety and concern among the

18 GNETS directors when the possibility arose about the

19 change in the funding stream for GNETS.

20         What was your understanding of the reason for

21 their anxiety and concern?

22     A   Well, just like any program where anybody

23 running -- you know, if you were a school building

24 leader, you need to know your budget so that you can

25 plan.  And the bulk of it goes to hire staff, and staff



1  wants to know if they are going to have a position

2  available or if they need to seek employment elsewhere.

3  But, you know, a lot goes into -- a lot of early planning

4  has to go into running a program or running a school,

5  either way.

6      Q   Was it your understanding that the GNETS

7  directors were concerned that these changes in funding

8  would have an impact on their ability to staff their

9  programs and serve their students?

10     A   Yes.

11     Q   Based on your experience at the State DOE and

12  with the GNETS program in general, do you think that the

13  GNETS students' needs could be served, or if they could

14  still be served if the funding formula for GNETS shifted

15  from a line item in the state budget to the QBE formula?

16         MS. JOHNSON:  Object to form.

17         THE WITNESS:  Well, as long as there's funding

18  there to support the needs of -- of the students, then

19  they should be able to be served.  It's not as though the

20  funding is, you know, going away completely.  It would --

21  it's just changing the way in which it's allocated out to

22  the LEAs.

23     Q   BY MS. HAMILTON:  Based on your experience at

24  the State DOE and with the GNETS program, do you

25  anticipate that if there were a change in the funding of



1  GNETS from a line item to the QBE structure, that it

2  would have a negative impact on the GNETS program in any

3  way?

4         MS. JOHNSON:  Form.

5         THE WITNESS:  You know, that -- it's hard for

6  me to answer that because, one, it's been done this way

7  for so long.  I really -- it's hard for me to -- to -- to

8  say.  But the main thing is the students receiving the

9  funding they need for the -- for their support, and that

10  ultimately resides with the LEAs, regardless of how --

11  whether it's administered through a program or within the

12  LEA itself, it still -- the LEAs still have the

13  responsibility to fight for these children.

14     Q   BY MS. HAMILTON:  Okay.  And I know earlier you

15  said the General Assembly and the Governor's office, that

16  they are the ones who ultimately make these decisions

17  about the -- like how GNETS gets funded.  If you were in

18  control and could decide the manner through which GNETS

19  could be funded, whether that be the line items in the

20  current form or using the QBE structure, is there a

21  particular method that you would choose?

22     A   You know, I -- I really -- I don't know.  I

23  know I keep saying it, but honestly, I just -- at the end

24  of the day, I just want to make sure these kids, yeah,

25  that their needs are met.



1     Q   Okay.  And is there any reason to think that

2  there would be a decrease in the GNETS funding provided

3  to the program if the structure switched from a line item

4  in the state budget to the QBE structure?

5           MS. JOHNSON:  Object to form.

6           THE WITNESS:  That's hard to speculate, but,

7  you know, I think that -- I think that they're aware that

8  students need additional support and that it cost money,

9  and I -- I think they're just looking to support the

10  students, you know, one way or the other.  But -- but

11  it's hard to speculate on that.

12           MS. HAMILTON:  Okay.  Patrick, I want to do

13  another time check.  Can you let me know exactly how much

14  time we've been on the clock?

15           THE VIDEOGRAPHER:  Yeah.  I show seven hours

16  occurring at 5:09 p.m., if that helps.

17           MS. HAMILTON:  At 5:09, okay.  Thanks.

18           I'd like to take a five-minute break, and then

19  we can reconvene.

20           MS. JOHNSON:  Is five long enough?  Do you need

21  more?

22           THE WITNESS:  Yeah, that's fine.

23           THE VIDEOGRAPHER:  Okay.  We will go off the

24  record at 4:52 p.m.

25           (The deposition was at recess from 4:52 p.m. to



```
 1   5:01 p.m.)

 2           THE VIDEOGRAPHER:  We are back on the record at

 3   5:01.  Please proceed.

 4       Q   BY MS. HAMILTON:  Ms. Owen, I'm just going to

 5   ask you a few other questions about other things related

 6   to the GNETS program.  Are you familiar with the GNETS

 7   strategic plan?

 8       A   Yes.

 9       Q   Okay.  And what is the strategic plan?

10       A   It's a -- it's a six-part plan that the GNETS

11   facilities have to complete every year and then evaluate

12   that, and then it also ties into their budget.  So they

13   are looking at six different areas, and then providing

14   evidence of whether it's operational or emergent or

15   nonexistent.

16       Q   Okay.  What are those six areas?

17       A   It's leadership and accountability.  It's

18   therapeutics and behavioral support.  It's academic

19   instruction.  It's financial and fiscal management.  It's

20   engage -- I know this isn't exactly, but engagement with

21   community support and parent is, I think, one of them.

22   And then the last one is the actual fiscal -- physical

23   structures.

24       Q   And what role, if any, does the strategic plan

25   play with regard to the funding for the GNETS program?
```



1   In other words, is it used in any way to determine

2   whether the programs are complying with their

3   requirement?

4          MS. JOHNSON:  Object to form.

5          THE WITNESS:  Yes.  So it's part of about 20

6   different pieces and documents that have to be provided

7   as part of the application process before the -- they can

8   receive the funding, and then it's also used to sort

9   of -- like with any grant, you have to evaluate the

10  program and the effectiveness of the program that you are

11  running.  So it's sort of used in that -- in that way so

12  that they can continue to reevaluate and self-assess and

13  make changes as needed and sort of decide on what their

14  priorities are for that upcoming year based on that needs

15  assessment.

16     Q   BY MS. HAMILTON:  Have you been involved in any

17  of the changes to the strategic plan process?

18     A   No.  That was done, I think, in 2020, about the

19  time I came on.  I can't remember exactly, but I was not

20  involved in that.

21     Q   Okay.  And there was -- I want to return back

22  to, let's see, I believe it was Plaintiff's Exhibit 701

23  (sic).  I will put this back up on the screen.

24          So on the screen I'm sharing the document that

25  we previously introduced as Plaintiff's Exhibit 701



SONIA SHAUN OWEN                                    December 12, 2022
UNITED STATES vs STATE OF GEORGIA                              195

1   (sic).  And this was the e-mail from Vickie Cleveland to

2   you, Ms. Owen, and Zelphine Smith-Dixon, that had a

3   weekly agenda.  And I wanted to turn back to this weekly

4   agenda item for strategic plan reviews and ask you a few

5   quick questions here.

6         One of the things that Ms. Cleveland had noted

7   here at the top, she had said, "Discuss strategic plan

8   rating change with Zel and Shaun."

9         And I wanted to see if you could explain what

10  she was referring to when she referenced a "strategic

11  plan rating change"?

12     A   I -- honestly, I don't -- I don't recall.  I

13  don't know what it was prior.  And again, this is one of

14  a bunch of other items on there, so probably this would

15  be something, I'm sure, that she might have worked with

16  Zel on and maybe mentioned it.  And I'm not saying that

17  she didn't.  I'm just saying that that conversation from

18  two years ago does not stand out in my mind.

19     Q   And then a little further down, she mentions

20  here, "Eight GNETS scheduled for reviews for FY21; do we

21  need to consider putting them all back into rotation?"

22        Were you aware that --

23     A   Again --

24     Q   No, go ahead.

25     A   No, no, I'm sorry.  I interrupted.



1      Q    Yeah, I guess, I'm, first of all, just curious

2   if you were aware that the GNETS program switched from

3   doing reviews, like including like site visits for all of

4   the GNETS programs, and shifted to just doing it for a

5   select number during this time frame?

6      A    Well, you know, just for context, we shut down,

7   period, with the site visits.  So we used to in federal

8   programs travel extensively.  And for the most part, for

9   almost two years, we were doing very, very little

10  traveling actually across the entire agency.

11          So I don't -- and I don't know if that's a

12  direct impact of that.  I'm not sure.  I know that

13  Vickie, you know, said that they were trying to

14  streamline processes, so anyplace they could, if they

15  could put things, you know, in the grant application so

16  that they weren't being redundant with the work that they

17  were requiring of the GNETS.  So I know that was one of

18  the focuses.

19          But she does meet with -- like this strategic

20  plan, they are doing -- she's doing end-of-the-year

21  wrap-ups this year, where they've gone through and she's

22  met with all 24 sites to -- to review, you know, their

23  information, everything that's -- that they've been

24  working on.

25      Q    To the extent that changes are made to the



1   review process, would you be part of that decision-making

2   process?

3       A   You know, typically -- typically I -- at my

4   level, I wouldn't.  I would see it in some cases,

5   depending on I might review it.  I am obviously more

6   involved with this program due to the ongoing litigation,

7   but -- but typically, that would be something that the

8   program manager, the specialist, with input from the LEAs

9   or the GNETS would be working on in conjunction with

10  their director.

11      Q   Have you ever participated in one of the

12  strategic plan reviews alongside Ms. Cleveland in one of

13  the GNETS programs?

14      A   No, not that I can -- no, not that I can

15  recall.

16      Q   Okay.  All right.  Switching gears, the

17  question I have for you with regard to interagency

18  collaboration, do you collaborate with or work with any

19  of the officials at -- let me stop sharing.

20          MS. HAMILTON:  Okay.  Let's see.  All right.  I

21  see a message saying that was Exhibit 702, and I do not

22  have -- I noted in my notes that that was 701.  I don't

23  know, Marcie, if there's a way that you would be able to

24  double-check.

25          THE REPORTER:  Let me search for 702.



1          MS. HAMILTON:  Okay.  So that should be what I

2     was sharing a moment ago.  So if I can, again, just

3     correct on the record that that last document that was

4     shared was previously marked as 702, not 701.  Great.

5          Q   BY MS. HAMILTON:  And then, Ms. Owen, I was

6     about to ask you if you ever collaborated with any of the

7     officials at the department -- sorry, at DBHDD in

8     connection with the GNETS program?

9          A   I recall Dr. Smith-Dixon would have meetings

10     with DBHDD.  I sat in on a couple of those meetings.  I

11     don't -- I don't recall anything specific to GNETS as

12     part of those.

13          Q   Okay.  To the extent that Zelphine Smith-Dixon

14     was meeting with individuals at DBHDD and that you sat in

15     on those meetings, what was the subject matter at those

16     meetings?

17          A   It's been a -- it's been a couple years ago,

18     and I -- I really -- I don't recall off the top of my

19     head, just because it was one of many, many meetings that

20     we've had.

21          Oh, one thing I do recall is just the -- the

22     ability for more step-down facilities within the state of

23     Georgia relative to the residential treatment facilities,

24     where a number of our students are outside of state.  So

25     more opportunities for step-down facilities within the



1  state of Georgia is the primary thing that I recall.

2      Q    Is GNETS considered a step-down facility?

3          MS. JOHNSON:  Object to form.

4          THE WITNESS:  I mean, not in the eyes of how --

5  how I think they were discussing it, which is,

6  essentially, a transition more -- I think they may be

7  looking at it more as somewhat of an, also, residential,

8  where there's a -- possibly a living component to that.

9  Whereas, GNETS does not have that.

10         But I believe it's -- it was -- it was more

11 along those lines, to actually help kids transition back

12 to their home environment.

13         MS. HAMILTON:  Okay.  Patrick, can you do one

14 more time check, please?

15         THE VIDEOGRAPHER:  Sorry there.  My buttons

16 weren't working.

17         Yeah, I show at seven hours occurring in about

18 four minutes.

19         MS. HAMILTON:  In how many minutes?  I'm sorry,

20 I didn't hear you.

21         THE VIDEOGRAPHER:  Four minutes.

22         MS. HAMILTON:  Okay.  Thank you.

23     Q  BY MS. HAMILTON:  All right.  And Ms. Owen, my

24 last question about your communications with DBHDD, have

25 you had any communications with the agency with regard to



 1  increasing service -- I'm sorry, increasing the

 2  availability of therapeutic and behavioral health

 3  services for students with disabilities in Georgia?

 4      A   So I -- I have not had those discussions.  I

 5  know that there was discussions around Apex and it being

 6  more pervasive throughout GNETS, but then from my

 7  understanding, the stance was that it would be a

 8  redundancy of services because Apex serves the LEA, and

 9  the LEA, the children ultimately are part of that, that

10  LEA.

11          But that's the only -- you know, that's the

12  only discussion that I know of relative to that.  That's

13  not to say there weren't some.  I just was not part or

14  privy to that.

15      Q   Okay.  And who else was part of the discussion

16  that you just mentioned about Apex?

17      A   Again, I -- I think that may have been

18  Dr. Smith-Dixon.

19      Q   Okay.  And what would have been the time frame

20  for when that discussion occurred?

21      A   That one I -- that one I don't really know.

22      Q   Okay.  I guess, just roughly, are you -- was

23  that a discussion that occurred in the last month -- last

24  few months, or is it a discussion from a few years ago?

25      A   No, because Dr. Smith-Dixon has been -- she's



1  been gone maybe a year now from the -- from the DOE, so

2  it would have been earlier.  And again, if she was the --

3  more than likely that would have been the contact person

4  for something of that nature.

5      Q   Okay.  So a few years ago when Dr. Smith-Dixon

6  was in her position as a state director?

7      A   I believe.

8          MS. HAMILTON:  Okay.  So switching gears, I

9  would just like to note for the record that the United

10 States has requested Ms. Owen's notes and photographs of

11 site visits in discovery.  The State has objected to

12 producing those notes and photographs on the grounds that

13 they are privileged.  Subject to any additional questions

14 that the United States may have, should the privilege

15 asserted by the State be overcome or otherwise changed,

16 we have no further questions at this time.

17         MS. JOHNSON:  And I don't have any questions.

18         THE VIDEOGRAPHER:  Okay.  If I can just confirm

19 orders before we go off the record.  Plaintiff would like

20 the transcript and synchronized video, correct,

21 Ms. Hamilton?

22         MS. HAMILTON:  Yes, consistent with our

23 standing order.

24         THE VIDEOGRAPHER:  Okay.  And the same thing

25 for the defense, Ms. Johnson?



SONIA SHAUN OWEN                                    December 12, 2022
UNITED STATES vs STATE OF GEORGIA                              202

1              MS. JOHNSON:  No, we just need the transcript.

2    No video.

3              THE VIDEOGRAPHER:  Okay.  Very good.  If there

4    is nothing else for today's record, we'll now go off the

5    recorded at 5:18 p.m.

6              (The deposition concluded at 5:18 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                          CERTIFICATE OF REPORTER

2     STATE OF GEORGIA      )
                            )
3     COUNTY OF DEKALB      )

4

5            I, Marcella Daughtry, a Certified Reporter in
      the State of Georgia and State of California, do hereby
6     certify that the foregoing deposition was taken before me
      in the County of DeKalb, State of Georgia; that an oath
7     or affirmation was duly administered to the witness,
      SONIA SHAUN OWEN; that the questions propounded to the
8     witness and the answers of the witness thereto were taken
      down by me in shorthand and thereafter reduced to
9     typewriting; that the transcript is a full, true and
      accurate record of the proceeding, all done to the best
10    of my skill and ability;

11           The witness herein, SONIA SHAUN OWEN, has
      requested signature.
12
             I FURTHER CERTIFY that I am in no way related
13    to any of the parties nor am I in any way interested in
      the outcome hereof.
14

15           IN WITNESS WHEREOF, I have set my hand in my
      office in the County of DeKalb, State of Georgia, this
16    21st day of December, 2022.

17

18

19                         _Marcella Daughtry_

20                         Marcella Daughtry, RPR, RMR
                           GA License No. 6595-1471-3597-5424
21                         California CSR No. 14315

22

23

24

25



```
1   United States of America v. State of Georgia
    J8828138
2

3              DECLARATION UNDER PENALTY OF PERJURY

4

5                   I declare under penalty of perjury that I

6   have read the entire transcript of my deposition taken in

7   the above-captioned matter or the same has been read to

8   me, and the same is true and accurate, save and except

9   for changes and/or corrections, if any, as indicated by

10  me on the DEPOSITION ERRATA SHEET hereof, with the

11  understanding that I offer these changes as if still

12  under oath.

13

14  Signed on the_____day

15  of _____20__.

16

17

18

19  _____
    SONIA SHAUN OWEN
20

21

22

23

24

25
```



SONIA SHAUN OWEN                                    December 12, 2022
UNITED STATES vs STATE OF GEORGIA                              205

```
1                      DEPOSITION ERRATA SHEET
                            J8828138
2

3    Page No.____Line No.____Change to:_____

4    _____

5    Page No.____Line No.____Change to:_____

6    _____

7    Page No.____Line No.____Change to:_____

8    _____

9    Page No.____Line No.____Change to:_____

10   _____

11   Page No.____Line No.____Change to:_____

12   _____

13   Page No.____Line No.____Change to:_____

14   _____

15   Page No.____Line No.____Change to:_____

16   _____

17   Page No.____Line No.____Change to:_____

18   _____

19   Page No.____Line No.____Change to:_____

20   _____

21   Page No.____Line No.____Change to:_____

22   _____

23   Page No.____Line No.____Change to:_____

24   SIGNATURE:_____DATE:_____

25              SONIA SHAUN OWEN
```



SONIA SHAUN OWEN                                    December 12, 2022
UNITED STATES vs STATE OF GEORGIA                              206

```
1              DEPOSITION ERRATA SHEET

2                    J8828138

3   Page No.___Line No.___Change to:_____

4   _____

5   Page No.___Line No.___Change to:_____

6   _____

7   Page No.___Line No.___Change to:_____

8   _____

9   Page No.___Line No.___Change to:_____

10  _____

11  Page No.___Line No.___Change to:_____

12  _____

13  Page No.___Line No.___Change to:_____

14  _____

15  Page No.___Line No.___Change to:_____

16  _____

17  Page No.___Line No.___Change to:_____

18  _____

19  Page No.___Line No.___Change to:_____

20  _____

21  Page No.___Line No.___Change to:_____

22  _____

23  Page No.___Line No.___Change to:_____

24  SIGNATURE:_____DATE:_____

25            SONIA SHAUN OWEN
```

