```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3

 4   UNITED STATES OF AMERICA,
                                  ) CIVIL ACTION
 5            Plaintiff,          )NO. 1:16-cv-03088-ELR
                                  )
 6   vs.                          )
                                  )
 7   STATE OF GEORGIA,            )
                                  )
 8            Defendants.         )
                                  )
 9   - - - - - - - - - - - - - - )

10

11                    VIDEO DEPOSITION OF

12                 STEPHANIE PEARSON, Ph.D.

13

14        Monday, March 28, 2022, 9:04 a.m., EST

15

16

17

18

19

20        HELD AT:

21        Robbins Alloy Belinfante Littlefield LLC
          500 14th Street, N.W.
22        Atlanta, Georgia  30318

23        ----------------------------------------------

24

25        WANDA L. ROBINSON, CRR, CCR, No. B-1973
          Certified Shorthand Reporter/Notary Public
```



```
 1

 2                    APPEARANCES OF COUNSEL

 3

 4   Appearing on Behalf of the Plaintiff:

 5

 6        PATRICK M. HOLKINS, ESQUIRE
          FRANCES S. COHEN, ESQUIRE
          U.S. Department of Justice
 7        Civil Rights Division
          950 Pennsylvania Avenue, N.W.
 8        Washington, D.C. 20579
          T:  202.305.6630   F:
 9        E-mail:  Patrick.Holkins@usdoj.gov
                   Frances.Cohen@usdoj.gov
10

11                   - and -

12        AILEEN BELL HUGHES, ESQUIRE (Via Zoom)
          Assistant United States Attorney
13        600 U.S. Courthouse
          75 Ted Turner Drive SW
14        Atlanta, Georgia  30303
          T:  404.581.6000   F:  404.581.6181
15        E-mail:  Aileen.bell.hughes@usddoj.gov

16

17

18   Appearing on Behalf of the Defendant:

19

20        JAVIER PICO PRATS, ESQUIRE
          DANIELLE HERNANDEZ, ESQUIRE
          Robbins Alloy Belinfante Littlefield LLC
21        500 14th Street, N.W.
          Atlanta, Georgia  30318
22        T:  404.856.3261
          E-mail:  javier.picoprats@robbinsfirm.com
23                 dhernandez@robbinsfirm.com

24

25
```



 1  ALSO PRESENT:

 2  VIA ZOOM:

 3          RENEE WOHLENHAUS, ESQUIRE

 4          CLAIRE CHEVRIER, ESQUIRE

 5          ANDREA HAMILTON, ESQUIRE

 6          LAURA CASSIDY TAYLOE, ESQUIRE

 7          ROBERT PUTNAM, Expert For Plaintiff

 8          VICTORIA LILL, Paralegal

 9          SANDRA LeVERT, Paralegal

10

11

12

13

14  ALSO PRESENT:

15      ROBERT PACHECO, Videographer

16

17

18

19

20

21

22

23

24

25



1                      INDEX OF EXAMINATIONS

2

3    STEPHANIE PEARSON, Ph.D.

4    By Mr. Holkins                                    Page 8

5

6

7                       INDEX OF EXHIBITS

8    PLAINTIFF'S

9    NO.                  DESCRIPTION                    PAGE

10   Exhibit 32   Notice of Deposition of                10
                  Stephanie Pearson
11
     Exhibit 33   November 17, 2020 Meeting Minutes       20
12                ACER Collaborative
                  GA01420538
13
     Exhibit 34   November 5, 2015 Email                  37
14                Stephanie Pearson To Monica Parker
                  GA00238245 With Attachment
15
     Exhibit 35   February 19, 2015 Email                 40
16                Pearson To Recipients
                  With Attachment
17                GA0000382059

18   Exhibit 36   July 5, 2016 Email                      69
                  Pearson To McKay
19                GA00583025

20   Exhibit 37   GNETS Strategic Plan Activities         78
                  For FY12
21                GA_DOE_001620

22

23

24

25



```
 1                INDEX OF EXHIBITS (Previously Marked)

 2   PLAINTIFF'S

 3   NO.                    DESCRIPTION                    PAGE

 4   Exhibit 8    February 12, 2021 Robbins Letter    88
                  From Alexa Ross To Hamilton/Lill
 5

 6   Exhibit 15   Active Provider By Service - 4/11/19 109
                  The Georgia Collaborative ASO
 7                GA00023273 - GA00023313

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1        THE VIDEOGRAPHER:  We are now on the

2    record.  Today's date is the 28th, 2022.  The

3    time is 9:04 a.m., Eastern Standard Time.

4        This begins the videoconference deposition

5    of Dr. Stephanie Pearson, in the matter of the

6    United States of America, plaintiff, versus

7    State of Georgia, defendant, in the United

8    States District Court, for the Northern

9    District of Georgia, Atlanta Division, Civil

10   Action 1:16-cv-03088-ELR.

11       My name is Robert Pacheco.  I am your

12   remote videographer.  The court reporter today

13   is Wanda Robinson.  Both representing Esquire

14   Deposition Solutions.

15       Would counsels please introduce yourselves

16   and your affiliation and the witness will be

17   sworn in.

18       MR. HOLKINS:  Patrick Holkins for the

19   United States.

20       MS. COHEN:  Fran Cohen for the United

21   States.

22       MS. HERNANEZ:  Danielle Hernandez for the

23   State of Georgia.

24       MR. PICO PRATS:  And Javier Pico with the

25   State as well.



```
 1            MR. HOLKINS:  Could folks on the Zoom
 2       introduce themselves, please.
 3            MR. PUTNAM:  Dr. Robert Putnam, expert for
 4       the Department of Justice.
 5            MS. HAMILTON:  Andrea Hamilton, trial
 6       attorney for the United States.
 7            MS. TAYLOR:  Laura Cassidy Taylor,
 8       attorney for United States.
 9            THE WITNESS:  Dr. Pearson, Georgia
10       Departments of Behavioral Health.
11            MS. HUGHES:  Aileen Bell Hughes, United
12       States Attorney's Office.
13            THE COURT REPORTER:  Can you repeat that?
14            MS. HUGHES:  Aileen Bell Hughes, United
15        States Attorney's Office, Department of
16        Justice.
17            MR. HOLKINS:  I think we're good.
18                   - - - - - - -
19              STEPHANIE PEARSON, Ph.D.,
20  being duly sworn, was examined and testified as
21  follows:
22                   - - - - - - -
23            THE COURT REPORTER:  Please speak up.
24
25  ///
```



```
 1   EXAMINATION
 2   BY MR. HOLKINS:
 3        Q    Good morning, Dr. Pearson.  How are you?
 4        A    Good morning.  Well.  Thank you.
 5        Q    As the court reporter noted, this is the
 6   deposition of Dr. Stephanie Pearson in the lawsuit
 7   entitled United States v. Georgia, Case No.
 8   1:16-cv-03088.
 9             My name is Patrick Holkins.  I represent
10   the United States.
11             Dr. Pearson, could you state and spell
12   your full name for the record, please.
13        A    Dr. Stephanie Pearson, P-E-A-R-S-O-N.
14        Q    Dr. Pearson, I'm going to walk through
15   some instructions before we get started.
16             We have roughly four hours for the
17   deposition today.  My plan is to take a break at
18   around the 90 minute mark.  If you need a break
19   before then, please let me know and we can take one.
20   However, if there is a question pending, I would ask
21   you to answer the question before we take that
22   break.
23             Is that okay?
24        A    Yes, fine.
25        Q    So this deposition is occurring remotely
```



1   via Zoom.  I think, as the court reporter noted, it
2   will be particularly important that you speak loudly
3   and clearly today so that we can get an accurate
4   record.
5           We'd also ask that you avoid uh-huhs and
6   responses like that and respond with yes or no, and
7   also that you let me finish my questions before you
8   start your answers.
9           Does that sound all right?
10      A    Yes.
11      Q    Where are you calling in from right now,
12  Dr. Pearson?
13      A    From my home.
14      Q    Is anyone else with you?
15      A    No.
16      Q    Are you communicating with anyone via
17  email?
18      A    No.
19      Q    So, for exhibits, what I'm going to be
20  doing today, Dr. Pearson, is sharing my screen, and
21  then I will give you control of the document, which
22  will allow you to scroll through the document to
23  confirm that you've read it, and then I'll take
24  control back from you, so I can show you specific
25  parts of the document.



1          Does that sound all right?

2     A    Yes.

3     Q    Okay.  So I'm going to do -- I'm going to

4  show you the first exhibit, which is the notice of

5  deposition, which you received.

6          Give me one second.

7          Dr. Pearson, can you see the notice of

8  deposition?

9     A    Yes.

10         MR. HOLKINS:  So for the record, this is

11      Exhibit 32.

12         (WHEREUPON, Plaintiff's Exhibit-32 was

13       marked for identification.)

14  BY MR. HOLKINS:

15     Q    Dr. Pearson, what I'm going to do now, if

16  I can, is give you control of the document.  If you

17  click on the document now, you should be able to

18  scroll down.  What I ask you to do is review the

19  document and let me know when you're finished.

20         (Witness reviews exhibit.)

21     A    There's an error on the third line.  I am

22  not an M.D.

23     Q    Thank you for letting us know.

24     A    I have a Ph.D.

25         I guess that's it.



```
 1        Q    That's good.  Thank you very much.
 2             Dr. Pearson, have you seen this notice
 3   before today?
 4        A    Yes.
 5        Q    Who showed this notice to you?
 6        A    Um, I believe it came from the attorney
 7   for Georgia.
 8        Q    Before today, Dr. Pearson, had you heard
 9   about this case?
10        A    Gosh, I think some years ago.
11        Q    And what's your understanding of what this
12   case is about?
13        A    It references Georgia's GNETS program.
14        Q    Dr. Pearson, are you aware Dante McKay was
15   deposed in this matter?
16        A    I -- yes, I believe so.
17        Q    Did you review the transcript of Mr.
18   McKay's deposition?
19        A    No.
20        Q    Dr. Pearson, do you understand that your
21   testimony today is under oath?
22        A    Yes.
23        Q    Is there any reason at all why you cannot
24   testify accurately and truthfully today?
25        A    No.
```



```
1        Q    Are you taking any medication or other
2   substances that would interfere with your ability to
3   answer my questions fully and truthfully today?
4        A    No.
5        Q    Have you ever been deposed before?
6        A    Yes.
7        Q    In what context?
8        A    As a psychologist when I lived in
9   California and it was regarding a case.
10       Q    And approximately when was that?
11       A    Boy.  Probably more than 25 years ago.
12       Q    Okay.  Have you been deposed since joining
13  DBHDD?
14       A    No.
15       Q    Have you ever been a plaintiff or a
16  defendant in a lawsuit?
17       A    No.
18       Q    Just so you know, I'm going to be using
19  some abbreviations during the deposition today just
20  to speed things along.  I'm going to go through with
21  you what those abbreviations are to make sure that
22  we're on the same page.
23            The first one, which I've already used, is
24  "DBHDD."  When I say that, will you understand that
25  I'm referring to the Georgia Department of
```



1  Behavioral Health and Developmental Disabilities?
2      A    Yes.
3      Q    And when I use the abbreviation "DCH,"
4  will you understand I'm referring to the Georgia
5  Department of Community Health?
6      A    Yes.
7      Q    And will you understand when I use GADOE,
8  I'm referring to the Georgia Department of
9  Education?
10     A    Yes.
11     Q    Will you understand when I use the
12  abbreviation "CMO," I'm referring to Care Management
13  Organizations?
14     A    Yes.
15     Q    Will you understand that SED means Serious
16  Emotional Disturbances?
17     A    Yes.
18     Q    And the term CSB means Community Service
19  Boards?
20     A    Yes.
21     Q    When I refer to general education
22  settings, what I'm talking about are public schools
23  in Georgia where children with SED and other
24  behavioral health conditions receive instruction and
25  services alongside children who do not have



STEPHANIE PEARSON, PH.D.                                    March 28, 2022
UNITED STATES vs STATE OF GEORGIA                                      14

 1  disabilities.

 2          Do you understand that?

 3      A   Yes.

 4      Q   And when I refer to "GNETS," I'm referring

 5  to the Georgia Network for Educational and

 6  Therapeutic Support.

 7          Do you understand that?

 8      A   Yes.

 9      Q   And "OCYF" will refer to Office of

10  Children, Young Adults and Families.

11          Do you understand that?

12      A   Yes.

13      Q   And finally, when I refer to "COE," I'm

14  referring to the Georgia State University Center of

15  Excellence.

16          Do you understand that?

17      A   Yes.

18      Q   Dr. Pearson, I think we've already

19  established you have a Ph.D.  Could you tell us when

20  you received that degree and in what field?

21      A   I received it in 1983 in psychology.

22      Q   Do you have a current clinical license?

23      A   Yes.

24      Q   And is that also in psychology?

25      A   Yes.



STEPHANIE PEARSON, PH.D.                                    March 28, 2022
UNITED STATES vs STATE OF GEORGIA                                      15

```
 1        Q     Dr. Pearson, what's your current job
 2   title?
 3        A     Clinical director, Office of Children,
 4   Young Adults and Families, Georgia Department of
 5   Behavioral Health and Developmental Disabilities.
 6        Q     When did you assume that position?
 7        A     Probably more than -- maybe about six
 8   years ago now.
 9        Q     As clinical director, who do you report
10   to?
11        A     Dante McKay.
12        Q     Does anyone report directly to you?
13        A     Yes.
14        Q     And who are those individuals?
15        A     Toni Simms and Diana Askerwall.
16        Q     And what are their roles?
17        A     Program managers, one, Toni Simms, with
18   the crisis stabilization units.
19              Diana Askerwall fits in many roles.  She
20   primarily oversees what we call the bed board, young
21   people who are trying to get crisis stabilization.
22        Q     Thank you.
23              Do either of those individuals have
24   clinical training?
25        A     Toni Simms is a social worker.
```



1      Q     And is Ms. Simms currently licensed as a

2   social worker?

3      A     I don't believe she has her LCSW yet.

4      Q     Before you became clinical director at

5   OCYF, did you have any other jobs for the State of

6   Georgia?

7      A     Yes.

8      Q     What were those jobs?

9      A     Prior to becoming clinical director with

10  the department, I was a program manager.

11     Q     And how long were you a program manager,

12  and also in which department?

13     A     I was a program manager in the Office of

14  Children, Young Adults and Families.  Before it had

15  that title, it was Child and Adolescent Mental

16  Health with DBHDD, and -- let's see.

17           This is my 13th year.  So probably about

18  six or seven years -- I'm trying to do the math -- I

19  was program manager before becoming clinical

20  director.  It all adds up to about 13 years.

21     Q     Okay.  Thank you.

22           And before you joined the State of

23  Georgia, where did you work immediately prior to

24  becoming program manager?

25     A     The DeKalb Community Service Board



STEPHANIE PEARSON, PH.D.                               March 28, 2022
UNITED STATES vs STATE OF GEORGIA                               17

1      Q    What was your role at that Community

2   Service Board?

3      A    I was hired as the child and adolescent

4   services director.

5      Q    What were your duties, briefly, as child

6   and adolescent services director?

7      A    I supervised the programs that comprised

8   the services offered to children and families, and

9   sat on a number of committees, work groups, task

10  forces.

11          Let's see.  Supervised the -- the

12  treatment program as well as the community-based

13  programs, sat on what was known then at the MATC

14  Committee.

15     Q    Thank you.

16          And in that capacity, did you oversee

17  school-based behavioral health services for

18  children?

19     A    We did have a school-based program, small

20  group there, yes.

21     Q    Have you ever worked in a clinical

22  capacity in a school?

23     A    In a school, no.

24     Q    The two individuals that you supervise at

25  OCYF, do you know whether either of them has worked



1  in a clinical capacity in a school?

2      A    I don't believe so.

3      Q    Let's talk about your current work as

4  clinical director at OCYF.

5          Could you describe your duties, please?

6      A    I have clinical oversight of the

7  Psychiatric Residential Treatment Facilities, though

8  the State of Georgia does not directly operate them.

9  We have contracts with them.

10          So I am the one who is kind of the point

11  person for the PRTFs.  As I said, I also supervise

12  two other individuals who work closely with the

13  CSUs.

14          I've worked also collaboratively with our

15  DD partners, our partners in the Division of

16  Developmental Disabilities, in developing and

17  implementing the autism services Crisis

18  Stabilization Unit, which is a more recent CSU for

19  young people who are living with -- on the autism

20  spectrum.

21          Also sit on a number of statewide

22  committees, including those that are the Georgia --

23  the Children's Justice Advisory Committee, the Child

24  Fatality Review Panel.  I do that.  I represent the

25  office of those capacities.



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                           19

```
 1            And any time that there is a particularly
 2   complex clinical issue with a young person that may
 3   be served by a variety of child service agencies.
 4   Sometimes those families come to my attention and we
 5   convene case staffings.  I do that as well.
 6        Q    Thank you very much, Dr. Pearson.
 7            Would it be fair to describe you as the
 8   clinical Subject Matter Expert at OCYF?
 9        A    Yes.
10        Q    I'd like to ask you about some of the
11   committees and work groups that you referenced
12   serving on, and perhaps a few others that I don't
13   think I heard about.
14            The first is the ACER Collaborative.
15            Are you familiar with that?
16        A    Yes.
17        Q    What is the ACER Collaborative?
18            MS. COHEN:  A-C-E-R.
19        A    I'm sorry?
20        Q    I'll reask.
21            What is the ACER Collaborative?
22        A    The ACER group or meeting that I attend is
23   the school-based mental health program that our COE
24   convenes.  I'm there pretty much as kind of the
25   clinician in the background since I no longer
```



1  directly deal with the ACER program.

2      Q    You no longer directly deal with the ACER

3  program?

4      A    I'm not the director of the ACER program,

5  no.

6          MR. HOLKINS:  I'd like to just quickly

7      introduce an exhibit here, which will be 33.

8          Give me one second.

9  BY MR. HOLKINS:

10     Q    Dr. Pearson, I'll just represent for the

11 record that this is minute meetings from the ACER

12 Collaborative, dated November 17, 2020.

13         At the bottom screen you'll see a Bates

14 number.  It's GA01420538.

15         MR. HOLKINS:  I'm introducing this as

16     Exhibit 33.

17         (WHEREUPON, Plaintiff's Exhibit-33 was

18      marked for identification.)

19 BY MR. HOLKINS:

20     Q    Dr. Pearson, I'm going to briefly allow

21 you to review this document.  If you give me one

22 second, I will give you control.

23         You've got control of the document, Dr.

24 Pearson.  Please take a moment to familiarize

25 yourself.



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                           21

```
 1              (Witness reviews exhibit.)
 2      Q    Just let me know whenever you're finished.
 3      A    I went too fast.
 4              It looks like the minutes from an ACER
 5   meeting.
 6      Q    Right.  And I'm not going to ask you about
 7   the details of the minutes.  I just want to kind of
 8   confirm the attendees and your role in these
 9   meetings.
10      A    Right.  I'm there -- yeah, I'm there as
11   the OCYF clinical director, and I see other folks
12   with OCYF there.
13      Q    So what are the kind of things that are
14   discussed at these ACER meetings?
15      A    The ACER Collaboratives bring together the
16   CMOs, DBHDD.  You can see them listed on the
17   attendee sheet.  In order to -- you can see the
18   objectives at the top of the sheet.  That's the work
19   that gets done in those committees.
20              That committee.  That's what I mean.
21      Q    Can you describe the work that's occurring
22   through the ACER Collaborative to achieve that third
23   objective, which is "to reduce the perceived
24   fragmentation in communities related to public
25   behavioral health services"?
```



1      A    I mean I guess it's what it says, to try
2  to really diminish work in silos.
3      Q    Is that just through this meeting, or are
4  there other activities, recommendations that the
5  ACER Collaborative is making to achieve that goal?
6      A    Well, I don't chair the ACER
7  Collaborative, so my knowledge primarily is this,
8  although I think that's certainly the objective
9  anywhere, to reduce working in silos.
10     Q    Do you think the ACER Collaborative has
11  been effective in that goal?
12     A    I'd say so.
13     Q    Why?
14     A    Well, all these partners come together
15  routinely to talk about issues of mutual concern.
16  So that where problems are identified, solutions can
17  also be identified.  So these agencies come together
18  to come up with some collaborative resolution.
19     Q    Could you give examples of the kinds of
20  problems that have been identified in these
21  meetings?
22     A    It's difficult off the top of my head.  I
23  would suggest going back through the agenda to see
24  what items are listed there.
25          More recently, we've been talking about



1  the impact of COVID and how that's impacted service
2  delivery.  So there are a lot of things relative to
3  that, but I think, again, if you look at any record
4  of the meeting, the minutes, you'll see what those
5  issues have been.
6      Q    And just to be clear, outside of what's in
7  the minutes, do you have any recollection today of
8  the problems that have been identified to the ACER
9  Collaborative?
10     A    No.  It's really contained in the minutes.
11     Q    Are you still participating in these
12  meetings?
13     A    Yes.
14     Q    And just to quickly wrap this up, when did
15  these meetings start, to your knowledge?
16     A    I don't recall.  I don't recall.
17     Q    We can put this exhibit aside.
18          Dr. Pearson, you also referenced the Child
19  Fatality Review Panel.
20          Can you describe what that panel does?
21     A    It's a committee of the CAPTA, Child Abuse
22  and Prevention Treatment Act, that was -- gosh, I
23  don't remember when that came into being, but that's
24  one of the committees fulfilling the CAPTA mission.
25          Gosh, it's so many things.



1           Deb Farrell has been the person who has

2    chaired that committee for many years, and I've been

3    on the committee as a representative with the

4    department for the issues about children.

5           A lot of it really revolves around child

6    welfare, so a lot of the discussion is kind of held

7    by people from child welfare.  The person who

8    directs the -- what's the -- I believe she's on the

9    committee, and people from law enforcement.

10          So there are a variety of stakeholders.

11     Q    Do you review as part of your work on this

12   panel children who are or have been enrolled in

13   GNETS?

14     A    For the Children's Justice Act?  I don't

15   know that it's that specific.  I don't recall.  It

16   may have come up, but, again, there's so many

17   meetings over such a long period of time.  I can't

18   say specifically.

19     Q    Dr. Pearson, are you familiar with the

20   Mobile Crisis Response Services Coalition?

21     A    Yes.

22     Q    Do you serve or have you served on that

23   coalition?

24     A    I have attended those meetings.

25     Q    Are those meetings ongoing?



STEPHANIE PEARSON, PH.D.                    March 28, 2022
UNITED STATES vs STATE OF GEORGIA                        25

1     A     Not lately.

2     Q     When did they stop?

3     A     I don't recall.

4     Q     Do you recall when they started?

5     A     I can't give you a date, no.

6     Q     Can you give a year?

7     A     I don't recall.  It's not something that I

8  originated or ever chaired, so no.

9     Q     What was your role on the -- in attending

10  the Mobile Crisis Response Services Coalition?

11     A     As an attendee, to be there if there were

12  any questions that were particular to the office of

13  child -- Children, Young Adults and Families.  To,

14  you know, hear how the mobile crisis services would

15  be reconfigured as they worked to blend in.

16          I think they may have had other providers

17  from the Developmental Disabilities.  So the

18  Developmental Disabilities Team and the Behavioral

19  Health Teams, they come together.

20     Q     What is the current status of that effort?

21     A     Again, I don't know.  That effort comes

22  out of Adult Mental Health.  So you'd have to talk

23  to someone in Adult Mental Health as opposed to my

24  office.

25     Q     So to be clear, this Mobile Crisis



1  Response Services Coalition is only working in the

2  arena of adults, not children?

3       A    No, that's not what I said.  It originated

4  from adult mental health and has been chaired by

5  people from the -- the co-chairs were from Adult

6  Mental Health and the Division of Developmental

7  Disabilities, but certainly mobile crisis is

8  available to children.

9       Q    And what is -- could you describe the

10  current availability of mobile crisis services to

11  children in the State of Georgia?

12       A    When someone calls the GCAL number,

13  emergency service, they sometimes request a team to

14  come to the home, and Mobile Crisis will go to the

15  home to assess the young person's eligibility for

16  that level of care.

17       Q    Is that service available in every county

18  in Georgia?

19       A    That's my understanding.

20       Q    Is it a face-to-face response available to

21  every county in Georgia?

22       A    I believe that's what the contracts call

23  for, but I don't manage the contracts.

24       Q    Do you know who does manage those

25  contracts?



STEPHANIE PEARSON, PH.D.                                    March 28, 2022
UNITED STATES vs STATE OF GEORGIA                                        27

1        A     No.

2        Q     Would that be someone in DBHDD?

3        A     Yes.

4        Q     Do you take as part of your role as

5   clinical --

6              MR. HOLKINS:  Let me start again.

7        Q     Do you undertake as part of your role as

8   clinical director at OCYF any analysis of the

9   availability of community-based mental health

10  services, like Mobile Crisis Response?

11       A     I'm not sure I understand what you're

12  asking me.

13       Q     So I'm asking -- let's just take Mobile

14  Crisis Response as a concrete example.  As part of

15  your official duties as clinical director, are you

16  undertaking any analysis of the availability of that

17  service statewide?

18       A     No.

19       Q     Is that true for other community-based

20  health services?

21       A     I'm not sure.  I can't speak for other

22  services.

23       Q     We'll talk about that a bit later.

24             Dr. Pearson, you mentioned that as part of

25  your duties as clinical director you will review



STEPHANIE PEARSON, PH.D.                        March 28, 2022
UNITED STATES vs STATE OF GEORGIA                         28

1  complex cases of specific children.  Is that

2  correct?

3       A    Yes.

4       Q    How do those cases come to your attention?

5       A    A variety of ways.  Sometimes it is a

6  provider reaching out saying they would like some

7  assistance.  Sometimes it's another stakeholder

8  asking for some assistance.

9            Sometimes a parent calls directly to the

10  department and the call gets sent to our office.

11  Sometimes it comes through -- because someone has

12  contacted the director of behavioral health, and she

13  sends it to our office.

14            So a variety of ways.

15       Q    And what kinds of cases are these?  What

16  are the issues that are being presented to you?

17       A    Usually it's a child maybe who has had a

18  lot of contacts with crisis system and maybe the

19  parent is seeking a level of residential care and

20  trying to navigate that; a child who is maybe served

21  by multiple agencies, and there needs to be a way

22  that all the agencies come together to assist the

23  family to get to the appropriate level of care.

24       Q    And what is your role once you receive

25  these referrals?



1       A    Make sure we have all the pertinent

2   information.  If we need to get releases of

3   information from the parents that allow us as an

4   office to, you know, reach out or contact other

5   providers who may have been involved with the child,

6   trying to coordinate that.

7            Sometimes our office is the office that

8   calls the case staffing meetings.  Other times it

9   might be our partners at the Department of Family

10  and Children Services that call the meetings.

11           Sometimes it's our providers themselves

12  that call the meeting and ask us to come to the

13  clinical case staffings.

14      Q    Do you ever make recommendations in these

15  cases for community-based services that may be

16  available and appropriate for the child at issue?

17      A    Yes.

18      Q    What kinds of services have you

19  recommended?

20      A    Well, I -- it's not that I make a personal

21  recommendation; it's the team that comes together.

22      Q    Right.

23      A    Depending on what the level of need is

24  that the child has, what the child's treatment

25  history might be, to -- and also since the parent or



1    guardian is a part of these treatment team meetings,

2    what is the parent or guardian's wish for their

3    child.

4         Q    Understood.

5         A    So all of that comes together.

6         Q    And could you identify some of the

7    community-based services that the team recommends

8    for children who come to their attention through

9    this process?

10        A    Again, given all those variables to be

11   considered, there's the Family Intervention Program.

12   That's a -- well, pre-COVID and now kind of coming

13   back, it's a home-based intensive level of care,

14   often seen as the community alternative to

15   residential care.

16            So where there are IFI teams, I-F-I teams,

17   IFI services might be recommended, connecting to the

18   local community.

19            Providers like service boards, for

20   example, for an array of services that they offer

21   where appropriate.

22            If there is -- well, the IC3, intensive

23   care communication -- coordination that's delivered

24   by the CMEs, care management entities, Viewpoint

25   Health and Lookout Mountain, those kinds of things.



1     Q    Thank you.  I apologize if you said this
2  already and I just missed it, but could you tell me
3  who are the other participants in this discussion?
4          I know parents and guardians and community
5  service providers are sometimes participants, but
6  are there other representatives from state agencies
7  that are involved that this discussion?
8     A    Again, it varies depending on who the
9  child is, what the child's needs are.  But, yeah,
10 DFCS is another partner.  Sometimes the Department
11 of Education might be represented or a local school
12 district might be represented.
13         Sometimes the Department of Criminal
14 Justice might be represented.
15    Q    Have you had cases come to your attention
16 through this process of children who are currently
17 -- or were enrolled in the GNETS system?
18    A    Some may have been, yes.
19    Q    Can you recall the last time that
20 occurred?
21    A    No.
22    Q    Is it a frequent occurrence?
23    A    By frequent, you mean?
24    Q    Does it happen --
25    A    Every -- every week?  Every month?



STEPHANIE PEARSON, PH.D.                                    March 28, 2022
UNITED STATES vs STATE OF GEORGIA                                    32

1       Q    Well, let me just ask it this way:  Would

2   you say that you've received more than 10 referrals

3   for kids enrolled in GNETS or fewer than 10?

4       A    Well, again, over what time period?

5   Because sometimes children -- I guess I could say

6   with a little bit more confidence that the kids

7   typically either have IEPs or are in the process of

8   getting an IEP, and then the Individualized

9   Educational Plan, you know, then makes some

10  determination about what level of educational

11  services that child needs.

12           So, so often there may be an IEP involved.

13  I can say that more definitively than I can say a

14  kid's been in a GNETS program or not.

15      Q    I appreciate that.  I want to ask again,

16  though, whether you think more than 10 kids involved

17  in GNETS have been referred to you through this

18  process during the --

19      A    I can't say.  I can't say because it's so

20  scattered over a period of years.  It goes on, you

21  know, month end, month out, over a year.  So it

22  would be difficult to say 10 or more.

23      Q    How long have you been involved in this

24  review of high needs cases?

25      A    It's been pretty much since I've been



1  there.

2      Q    Since you became clinical director?

3      A    Yeah.

4      Q    So that's about six years?

5      A    And, and probably before then.  I think

6  because the whole team and the whole clinical team

7  and the office gets pulled in some way or another.

8  So it's been years.

9      Q    You mentioned that some of the children

10 who come to your attention through this process have

11 or are being considered for an IEP.  Is that

12 correct?

13     A    Yes.

14     Q    Do you coordinate at all directly with the

15 IEP Plan Team?

16     A    No.

17     Q    Does anyone on your staff?

18     A    No.  That's a school function.

19     Q    Just one second, Dr. Pearson.

20         (Pause.)

21     Q    We're going to move on from this soon, but

22 I just want to summarize, and please correct me if

23 I've got this wrong, that over the past six years --

24         MR. HOLKINS:  Let me try this again.

25     Q    Based on your work over the past six years



1  reviewing these high needs cases, you can't recall

2  whether or not you have reviewed cases for more than

3  10 children enrolled in GNETS?

4            MR. PICO PRATS:  Objection.

5       Q    Is that accurate?

6       A    That's right.

7       Q    Dr. Pearson, do you communicate with staff

8  -- well, let me just start with something more

9  specific.

10            Do you communicate directly with staff at

11  DCH as part of your official duties?

12       A    I'm sorry, you said DCH?

13       Q    DCH.

14       A    Yes.

15       Q    With whom at DCH do you coordinate

16  directly?

17       A    I communicate with Catherine Ivy

18  sometimes.  Sometimes Jamie -- I can't think of her

19  last name right now.  She's on Catherine's team, I

20  think.

21       Q    And what are you communicating with

22  Catherine Ivy about?

23       A    Usually we're trying to find out -- well,

24  I guess typically now it's young people who have

25  been approved for a PRTF level of care, who have



1  been -- even though they're eligible for that level

2  of care, the Georgia PRTFs have all denied the young

3  person.  So now the family may be seeking that level

4  of care out of state, and that is the providence of

5  DCH.

6          So they would be reaching out to Catherine

7  to start the process of seeking a PRTF level of care

8  outside of Georgia, since the Georgia PRTFs all

9  deny.

10     Q    Okay.  And do you communicate with

11 Catherine Ivy about anything other than what you've

12 just described?

13     A    That's pretty much it.

14     Q    Do you communicate with anyone at DCH

15 about any other topic?

16     A    That's pretty much what we're talking

17 about, how we can navigate out of state PRTFs.

18     Q    Do you ever receive any data reports from

19 DCH?

20     A    Well, I'm not recalling any.  If it's

21 specific to a child that we've reached out to DCH

22 about, then they may get back to us to say this is

23 the history.  This child is currently served by this

24 particular CMO, for example.

25          We do communicate around those young



 1  people who --

 2        Q    Okay.

 3        A    We've discovered -- this person is

 4  discovered by a CMO.

 5        Q    So the reporting that you receive from DCH

 6  is child specific; is that accurate?

 7        A    Yes.

 8        Q    Do you receive any -- I may have just

 9  interrupted you.  I'm sorry, Dr. Pearson.

10        A    No, you didn't.

11        Q    Okay.  I think my connection is just

12  lagging.  I apologize.

13             So just to be clear, you don't receive any

14  aggregate reporting from DCH, for example, showing

15  Medicaid utilization across the State?

16        A    No.

17        Q    Dr. Pearson, do you have responsibilities

18  as clinical director as OCYF for monitoring the

19  quality of community-based health services across

20  the State?

21        A    No.  There's a quality -- gosh, I don't

22  remember the exact title, but that's not part of my

23  -- my responsibility, no.

24        Q    Just to make sure I understand, there's

25  another component within DBHDD that's responsible



1  for assessing the quality of behavioral health

2  services; is that accurate?

3       A    Right.  That's correct.  And I think --

4  yeah.

5       Q    Who lead that component?

6       A    That has changed over time, so I'm not

7  sure who's leading it now.

8       Q    Do you know whether it's -- the person

9  running that component is a clinician?

10      A    I don't.

11      Q    I'd like to show you another exhibit.  I

12  think we're on 34.  Just give me one second and I'll

13  pull it up, Dr. Pearson.

14           (WHEREUPON, Plaintiff's Exhibit-34 was

15       marked for identification.)

16  BY MR. HOLKINS:

17      Q    Dr. Pearson, can you see my screen?

18      A    Yes, uh-huh.

19      Q    So I'm just showing you this email for

20  identification purposes.  This is an email that you

21  sent November 5th, 2015, to Monica Parker, and the

22  Bates-stamp is GA00238245, and there's a spreadsheet

23  that's attached to this email.

24           The spreadsheet is titled "Copy of QN

25  Spreadsheet November 15."  The title -- or the



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                      38

1  subject of the email is "Behavioral Health Quality

2  Council Project."

3          Let me first ask you, Dr. Pearson, who is

4  Monica Parker?

5      A    Monica Parker is now Monica Johnson.

6  She's the director of behavioral health.

7      Q    Thank you very much.

8          What I'm going to do now is put this down

9  and then show you the attachment to this email.

10  Give me one second.

11          Dr. Pearson, can you see the workbook

12  titled "Behavioral Health Quality Management

13  Framework"?

14      A    Yes.

15      Q    Do you recall seeing or sending this

16  document?

17      A    I saw the date that said 2015.  So, no, I

18  certainly don't.

19      Q    And what is the Behavioral Health Quality

20  Management Framework?

21      A    It is -- you know, again, this happened so

22  long ago, I don't recall it at all.

23          So I guess it is -- this may have been

24  something that was derived from Monica that we had

25  to fill out our part and send it back to her.



1          So it wasn't a form that I generated.

2      Q    I understand.  Do you recall what your

3  part would have been?  Was it Apex school-based

4  mental health?

5      A    That may have been part of it.  I'd have

6  to look at the whole thing, but in 2015, probably,

7  yeah, I was working more directly with Apex than I

8  do now.

9      Q    At that time, in 2015, were you the lead

10  for the Apex project within OCYF?

11      A    I believe so.  Yeah, if Matt Yancey was

12  still at DBHDD at that time, since he started Apex,

13  I was working directly under his direction, before

14  Dante McKay arrived.

15          So probably I was the point person in

16  2015.

17      Q    Okay.  So when Dante McKay joined OCYF, he

18  took on lead responsibilities for Apex; is that

19  accurate?

20      A    Not the day-to-day.  He hired somebody to

21  do that.

22      Q    Okay.  And what's your current

23  responsibilities with respect to Apex?

24      A    I'm there kind of just as the clinical

25  consult.  I'm not actively doing anything with Apex



1  unless there is a training that the COE is putting

2  on and they've asked me to do a presentation of some

3  kind.

4           I kind of sit in the background.

5      Q    Thank you.

6           Let me just ask whether you're still using

7  this Behavioral Health Quality Management Framework?

8      A    I'm not.

9      Q    Are you using any kind of centralized

10 resource to track outcomes related to behavioral

11 health service quality?

12     A    I personally am not.

13     Q    All right.  You can put this one aside.

14          Just one second.

15          Dr. Pearson, I'd like to show you another

16 exhibit?

17          MR. HOLKINS:  This one is going to be

18     marked Exhibit 35.

19          (WHEREUPON, Plaintiff's Exhibit-35 was

20      marked for identification.)

21 BY MR. HOLKINS:

22     Q    If you give me one second, I'm going to

23 pull up the email and then I'll show you the

24 attachment to the email.

25          Dr. Pearson, can you see my screen?



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                            41

 1      A    Yes.

 2      Q    So, for the record, this is an email that

 3   you wrote and sent on February 19, 2018.  It's

 4   directed to a number of recipients.

 5           The tile is "Agenda for Today's PRTF

 6   Meeting."  And there's an attachment.  It's a

 7   document PRTF Agenda 2/19/18.

 8           For the record, this is GA00382059.

 9           Let me just ask you broadly, Dr. Pearson,

10   what was this PRTF agenda about -- not specifically

11   this agenda.  What is this meeting about?

12      A    It looks like a consortium of the PRTF

13   getting together to talk about issues that were

14   pertinent to the PRTFs.

15      Q    And how long has the PRTF consortium been

16   meeting to talk about issues related to the PRTFs?

17      A    For several years.

18      Q    Are you the lead on that meeting?

19      A    We have not had the consortium meeting now

20   for several years.  But I had been, yes.

21      Q    Why did the consortium stop meeting?

22      A    I think primarily it was COVID-related.

23   We used to meet in person at the System of Care

24   Academy.  So when that went virtual, the PRTF

25   consortiums weren't organized.  I no longer



STEPHANIE PEARSON, PH.D.                        March 28, 2022
UNITED STATES vs STATE OF GEORGIA                          42

1  organized them.

2          And so our meetings have been -- they're

3  not meetings per se.  We've had individual meetings

4  with PRTFs and talking about ways that we could

5  reconnect and come together again.  It just hasn't

6  happened yet, but certainly we are talking about

7  doing that and looking at a date with the Center of

8  Excellence.

9      Q    And while you guys are talking about

10 reconvening these meetings, do you have any ongoing

11 responsibilities with respect to reviewing quality

12 of services in the PRTFs?

13     A    Well, since the PRTFs are really not

14 managed by DBHDD but by DCH, that is not something

15 that we do.

16         Now, the COE has been collecting data on

17 particular outcome measures for a while, and we

18 review those in these PRTF meetings, to talk about

19 what, you know, particular maybe challenges were,

20 what kinds of things the PRTFs had pretty much

21 accomplished.  They were maybe at 90 to 100 percent

22 compliance, and if those items still need to be on

23 those reports or not.  If all the PRTFs agree, yeah,

24 we kind of got this, we don't need to be monitoring

25 this anymore.



1           We would, you know, discuss removing that

2   item.  But the Center of Excellence would be the

3   body that would send those reports out.  They would

4   collect the data from the PRTFs, send the reports

5   out, and then those reports would be made available

6   to the PRTFs during these meetings.

7       Q    Understood.  What kind of outcomes related

8   to the PRTFs is the COE tracking?

9       A    Things like are the families, caregivers

10  involved; are the families involved with discharge

11  planning; does discharge planning begin at

12  admission; is there any recidivism; does the child

13  return to a PRTF level of care post-discharge.

14          That's what I'm thinking, remembering off

15  the top of my head.  I don't recall all the items.

16      Q    Did you participate in selecting those

17  outcomes, or was that something that the COE did by

18  itself?

19      A    No.  We did it together.

20      Q    Are you receiving that data now on an

21  ongoing fashion?

22      A    The PRTFs have asked to revisit that whole

23  process partly due to the impact of the workforce

24  shortage that COVID has brought.  It's difficult for

25  them to have staff assigned to do those kinds of



1  reports, and so they're asking for some relief, and

2  that's a part of what we would be meeting to discuss

3  with them.

4      Q    Recognizing that the PRTF providers have

5  concerns about capacity, are you receiving those

6  reports right now on a regular basis?

7      A    No.

8      Q    So the COE is not currently collecting

9  that data from the PRTFs, to your knowledge?

10     A    Not to my knowledge.

11     Q    Do you have a sense of how many referrals

12 are made to the PRTFs each month?

13     A    I don't have a number.

14     Q    Is that something that the COE tracks, to

15 your knowledge?

16     A    The referrals to PRTFs?

17     Q    Correct.

18     A    No.  No.  That, that -- because the PRTFs

19 would have to report that to the COE.  So it's not

20 like they would have a way of knowing, and since

21 that reporting process is kind of in limbo right

22 now.

23     Q    Dr. Pearson, I think you referenced

24 providing training as part of your official duties

25 as a clinical director.  Is that part of your job?



STEPHANIE PEARSON, PH.D.                                    March 28, 2022
UNITED STATES vs STATE OF GEORGIA                                      45

1      A    I don't organize and do training.  We have

2  an office of -- what is OLO.  The learning office of

3  DBHDD is responsible for that, but if I am asked to

4  do a presentation on a particular issue, like

5  whatever the issue was, like a lot of it was in

6  COVID, you know, the impact of COVID on emotional

7  health or something like that.

8      Q    And when you make those presentations, is

9  that to an audience of providers?  Who are you

10 presenting to?

11     A    Providers, other stakeholders.  It's

12 opened up to anyone who chooses to register.

13     Q    Do you provide any trainings to providers

14 in Georgia about evidence-based services for

15 children who have behavioral health conditions?

16     A    Again, I personally don't, but the office

17 of the learning and training office at DBHDD is

18 responsible for training providers.

19     Q    Do you know whether that office provides

20 any training to providers about evidence-based

21 services for children with behavioral health

22 conditions?

23     A    I'm thinking that they do.  I couldn't

24 name a particular one for you at this time, but I'm

25 sure you could find that out by contacting that



 1  office directly.

 2       Q    And who heads that office?

 3       A    That director just changed.  Gosh, I can't

 4  think of his name right now.

 5       Q    Do you know whether the individuals

 6  providing training through that office are

 7  clinicians?

 8            MR. PICO PRATS:  Objection.

 9       A    No, I don't.  But I think what they do is

10  really sometimes they get clinicians in.  I remember

11  they'll have licensed mental health professionals

12  who can do training that's specific -- if it's

13  clinical training, they have clinical people doing

14  the training.  But they do training about other

15  things, like family, whatever, that's relevant to

16  the provider, to facilitate the, you know, the

17  provision of appropriate services.

18       Q    Have you ever participated in one of these

19  trainings as an attendee?

20       A    Yes.

21       Q    When is the last time that happened?

22       A    Probably through -- let's see.  Well, the

23  required training that we have to do about like

24  cybersecurity and things like that, that's almost

25  every other month.



STEPHANIE PEARSON, PH.D.                    March 28, 2022
UNITED STATES vs STATE OF GEORGIA                        47

1        Q    Understood.

2        A    I have to -- those are required and I have

3   to do those.

4             Relative to clinical training, we have the

5   behavioral health symposium that's coming up.  It's

6   annual.  I do those.

7             The Care Academy, I do those.  I help --

8   I'm on the committee but I also attend.  That's

9   coming up.

10       Q    You mentioned that you're on the

11  committee.  Is that for the System of Care Academy?

12       A    Yes.

13       Q    And could you just briefly describe what

14  the work of the System of Care Academy is?

15       A    It's to bring together providers, both

16  community-based and residential, and other

17  interested stakeholders, families, advocates, to

18  really be exposed to a variety of subject matter

19  experts in a variety of areas.

20            Every year the System of Care Academy

21  planning team gets the surveys and reviews the data

22  gathered on the surveys about which workshops people

23  liked, which ones they didn't like, what they would

24  like to see in the future.  And that informs the

25  planning for the subsequent System of Care Academy.





```
 1              In years past, we would gather
 2   face-to-face.  In the last several years it's been
 3   virtual, and it will be virtual again this year.
 4              Part of my role on the Planning Committee
 5   is to review the work for proposals, to review those
 6   proposals.  And according to a rubric that Dr.
 7   Flowers -- Dr. Flowers coordinates and oversees all
 8   of this -- and then we evaluate the workshops based
 9   on that rubric, and then those get planned for
10   presentation.
11        Q    And just for the record, what is the first
12   name of Dr. Flowers and what is her role or title?
13        A    Dr. Adell Flowers.  And she's -- I believe
14   her title has something to do with workforce
15   development.
16        Q    Thank you.
17             Do GNETS program directors or other
18   representatives from the GNETS program participate
19   in the System of Care Academy?
20        A    As attendees -- I couldn't tell you if
21   they are attending or not.
22        Q    And what about as committee members?
23        A    No.
24        Q    They don't participate as committee
25   members; is that accurate?
```



```
 1       A     That's accurate.

 2       Q     How long have you been involved with the

 3  committee for the System of Care Academy?

 4       A     Probably more than -- maybe seven, eight

 5  years or so.

 6       Q     And for that entire span of time, seven or

 7  eight years, have GNETS' program directors ever

 8  participated in the committee for the System of Care

 9  Academy?

10       A     No.

11       Q     Give me one second.  I think we may be

12  ready for a brief break, but I want to confer with

13  my colleague.

14             Actually, I do have another question for

15  you, Dr. Pearson.

16             Are you familiar with the term "early

17  periodic screening diagnostic and treatment," or

18  EPSDT?

19       A     Somewhat.  A little bit.

20       Q     What's your understanding of EPSDT?

21       A     I think it's a program that is

22  administered by DCH.  I'm not well-versed in it at

23  all.

24       Q     Okay.  Just to confirm, do you have any

25  role in your official duties as clinical director at
```



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                        50

 1  OCYF in assessing whether the State is providing

 2  required EPSDT screening and services to children

 3  with behavioral health conditions?

 4       A    No.

 5            MR. HOLKINS:  Give me one second, Dr.

 6       Pearson.

 7            I think this is a good time for a

 8       ten-minute break.

 9            We could try to come back, let's call it

10       12 minutes, at 10:25.  I think that would be

11       great.

12            THE VIDEOGRAPHER:  Going off video record,

13       10:12 a.m.

14            (A recess was taken.)

15            THE VIDEOGRAPHER:  We're now back on video

16       record, 10:27 a.m.

17  BY MR. HOLKINS:

18       Q    Dr. Pearson, I'd like to ask you some

19  questions about the System of Care in Georgia

20  broadly before we talk specifically about GNETS.

21            Would that be all right?

22       A    Yes.

23       Q    We talked a bit about the Community

24  Service Boards and community providers broadly, and

25  I'm curious to get your thoughts on what you see as



STEPHANIE PEARSON, PH.D.                    March 28, 2022
UNITED STATES vs STATE OF GEORGIA                      51

1  DBHDD's role vis-a-vis providers of community health
2  services in Georgia.
3       A    DBHDD has contracts with providers that
4  offer different levels of care.  The Community
5  Service Boards being the public providers that offer
6  the largest array of services for their
7  constituencies, depending on what regions, where
8  they're located.
9            There are other providers that may be more
10 specialized, like the Intensive Family Intervention
11 providers.  We have contracts with all of those.
12           Contracts with some of the other service
13 providers that are not necessarily serving the
14 public, like some of the private hospitals, who will
15 -- we purchase what we call overflow beds, when our
16 crisis stabilization units are full, and people who
17 need that level of care can't get in where we can
18 purchase a bed for one of those providers.  So we
19 have contracts with them as well.
20           And then The Division of Developmental
21 Disabilities has its own host of contracts with
22 providers that serve people with developmental
23 disabilities.
24      Q    And how would you describe DBHDD's
25 relationship, if any, with respect to schools where



1  children may be receiving behavioral health

2  services, whether through Apex or otherwise?

3      A    Well, we don't have contracts with

4  schools.  The Apex contracts went through the

5  community providers, like the Community Service

6  Boards.  Initially, only to community service boards

7  and they determined the schools that they would send

8  their license and issues to, to do SCHOOL-BASED

9  mental health.

10     Q    How would you describe DBHDD's

11 relationship, if any, with respect to the GNETS

12 program?

13     A    I would not describe any relationship

14 outside of DBHDD oversees behavioral health.  GNETS

15 is overseen by the Department of Education, another

16 state agency.

17          I mean there's no real direct relationship

18 between the Department of Behavioral Health and

19 GNETS.  That's a school program.  It's not our

20 program.

21     Q    You said that GNETS is overseen by the

22 Georgia Department of Education; is that correct?

23     A    That's how I understand it.

24     Q    And based on your understanding, is that

25 pursuant to some state statute or other authority?



1     A     That's just my understanding of what the

2  Georgia Department does for its children who have

3  special needs who can't be served in traditional

4  classrooms.

5     Q     And is it your understanding that DBHDD is

6  a state agency charged with overseeing the

7  behavioral health service system in the state?

8     A     Yes.

9     Q     And just to be clear, is it your testimony

10  today that DBHDD has no role with respect to the

11  GNETS system?

12     A     That's how I understand it.  Again,

13  behavioral health is our lane.  Education belongs to

14  the Department of Education.

15          MS. COHEN:  I'm sorry, Dr. Pearson, did

16     you say link or lane?

17          THE WITNESS:  Lane.

18          MS. COHEN:  Lane.  Thank you.

19  BY MR. HOLKINS:

20     Q     Dr. Pearson, do you interact with Care

21  Management Organizations at all as part of your

22  duties as clinical director at OCYF?

23     A     Primarily through our ACER meetings where

24  the Care Management Organizations are present and

25  more indirectly because the person that I supervise



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                        54

1   has the responsibility of monitoring the bed board

2   to alerting DCH when a child covered by a CMO shows

3   up on the bed board, and then DCH reaches out to the

4   CMO, and I'm copied on all those emails.

5         Q    Could you explain what the bed board is?

6   I'm not sure if I understood that correctly.  Is

7   that the term you used, bed board?

8         A    The bed board, yes.

9              It's -- it's the place where -- that's

10  managed by our GCAL system, where young people -- I

11  don't know all the mechanics of it, except that when

12  young people show up in an ED somewhere across the

13  State, and GCAL has been contacted about hospitals

14  or something to say there's a young person having a

15  psychiatric or behavioral health crisis, in our

16  emergency room, and they really need a crisis

17  stabilization service, or bed.

18             They show up on this, this reporting

19  system that my staff monitors all through the day.

20  And when those children are covered by Care

21  Management Organization, Diana Litz, Catherine or

22  someone on her staff know we have this young person,

23  he's covered by Sympatico, whatever, these are the

24  issues, and then Catherine forwards it on, and I

25  just get copied on all of those emails.



1    Q    And by Catherine, were you referring to
2  Catherine Ivy at DCH?

3    A    Yes, uh-uh.

4    Q    So would it be fair to describe your role
5  in this context as you just described as kind of a
6  care coordination function?

7    A    That's not what I personally do.  Again,
8  it's more supervising the person who monitors that
9  -- those reports coming in and Diana is shepherding
10 it through to DCH, who then shepherds it through to
11 the CMO.

12        So it's my team that's doing it, and I'm
13 -- not me.

14   Q    I understand.  So once the connection is
15 made by your staff to DCH, is there any further
16 involvement for your staff at that point?

17   A    Well, again, that board is monitored many
18 times during the day, and my team might notice, for
19 example, that the child's name is still on the
20 board, is still being reporting as needing a bed.
21 So they reach back out and say, hey, here's this
22 particular child, we've reached out to you a day or
23 so ago, the child's name is still on the board, has
24 there been any action with this child.

25        And they again -- and then the CMO reports



 1  back, this is what we've been trying, et cetera,

 2  this is what's going to happen.  Or sometimes the

 3  board is mistaken.  The child has been moved but the

 4  name still shows up.

 5           So that kind of follow-up is routine.

 6      Q    Understood.  Thank you.

 7           Just ballpark figures, about how many

 8  children are on this board at any given time?

 9  What's the range?

10           MR. PICO PRATS:  Objection.

11      A    I can't tell you.

12      Q    Is it because you don't monitor the board

13  yourself or for some other reason?

14      A    I don't monitor the board myself, no.  I

15  am aware because I get the emails, but I'm not

16  tracking how many of those emails I get per day.

17           It can wax and wane seasonally.  You know,

18  Christmas season might be busier than summer, for

19  example.

20           But the ones that come to my attention are

21  the ones that might linger for long periods of time

22  because a child can't get into a crisis unit or the

23  CMO has tried, you know, reaching out to other

24  places and they've not been successful.

25           So, you know, those, those kind of pop up



STEPHANIE PEARSON, PH.D.                    March 28, 2022
UNITED STATES vs STATE OF GEORGIA                         57

1  over and over, but I'm not really tracking I got

2  five today, 10 tomorrow, that kind of thing.

3       Q    Understood.

4            Have there been occasions where children

5  have been on this board, as you described it, for a

6  longer period of time because the services that they

7  needed were not available to them?

8       A    Yes.  Yes.

9       Q    Would that be, for example, crisis

10  stabilization services?

11      A    Yes.

12      Q    What other service, because of a lack of

13  availability, would result in children being on this

14  list for a longer period of time?

15      A    They're on the board because they need

16  crisis stabilization.

17      Q    Understood.

18           Does your office maintain a board, like

19  the one you've just described, for accessing any

20  other service --

21      A    No.

22      Q    -- besides crisis stabilization?

23      A    No.

24      Q    Dr. Pearson, are you familiar with the

25  Georgia Collaborative Administrative Services



1   Organization?

2       A     The Georgia Collaborative -- yes, I

3   believe so.

4       Q     I think it's also known by the

5   abbreviation Georgia Collaborative ASO.

6       A     Uh-huh.  Yes.

7       Q     Could you describe what the Georgia

8   Collaborative ASO does?

9       A     Administrative Services Organization

10  contains the Beacon function, the Beacon services

11  that -- gosh.  They actually chair the joint

12  meetings -- we have the joint clinical meetings that

13  we have over a number of administrative things.

14          But Beacon is our primary arm for

15  reviewing those services -- those requests rather,

16  for PRTF levels of care.  They go through -- when

17  the child is covered by Medicaid only, or if the

18  child is uninsured, those requests go to Beacon.

19          And the CMOs, of course, handle their own.

20  We're not responsible for those.

21      Q     Just to make sure that I understand,

22  Beacon's role with respect to the population you

23  just described is to conduct medical necessity

24  evaluations for PRTF levels of care?  Is that

25  accurate?



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                            59

1        A    Yes, that would be accurate.  They have

2   their medical director and their clinicians on staff

3   to review those application packets.  Wherever

4   someone is seeking that level of care that's covered

5   by Medicaid.

6        Q    And does Beacon conduct medical necessity

7   evaluations with respect to any other service or

8   level of care?

9        A    Right.  You have to get authorization to

10  provide services through Beacon.  So it's not just a

11  PRTF level of care, but that's the one I'm most

12  focused on.

13       Q    So, again, this is to make sure I'm

14  tracking, is Beacon performing that same medical

15  necessity evaluation for all Medicaid reimbursable

16  services?

17       A    Right.

18       Q    Do you have any responsibility as clinical

19  director at OCYF for overseeing the medical

20  necessity evaluations being conducted by Beacon?

21       A    No.

22       Q    Does anyone in DBHDD have that

23  responsibility?

24       A    Well, Beacon is the ASO with which DBHDD

25  contracts to provide that service.



1      Q    I -- sorry.  Go ahead.

2      A    Go ahead.

3      Q    I apologize for interrupting you.

4           I understand that the ASO is responsible

5  for doing the medical necessity evaluations.  My

6  question, though, is whether anyone in DBHDD is

7  reviewing the assessments that Beacon does?

8      A    I'm not sure that anybody is actually

9  reviewing the actual assessments.

10          I know that their folks that are working

11 with Beacon just relative to the overall function if

12 there are some concerns, but, no, not the actual

13 assessments that come in, no.

14     Q    Got it.

15     A    Or the requests, rather, that come in.

16     Q    So you're not aware of any audit process,

17 regular audit process, for the medical necessity

18 evaluation to be performed by Beacon at DBHDD?

19     A    I mean, no, I'm not aware of them.  I'm

20 not saying that they don't exist.  I'm just not part

21 of it.  I'm unaware.

22     Q    Do you have a sense of who at the Georgia

23 Collaborative Administrative Services organization

24 is responsible for medical necessity evaluations in

25 connection with children's behavioral health



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                            61

1  services?

2       A    At Beacon?

3       Q    Yes, at Beacon.

4       A    Everybody's name is -- I know the medical

5  director comes to the meetings.  His name is

6  escaping me right now.

7            The person who chairs the meetings that I

8  know is Ashley Triquet, and one of her staff is

9  named Cheryl Harvey.  Those are the two people that

10  I have the most contact with relative to the status

11  of a particular request for a PRTF level of care.

12       Q    Thank you.

13       A    I'm just not getting the other guy's name.

14       Q    When you just referenced meetings right

15  now, are you talking about the joint clinical

16  meetings?

17       A    Yes.

18       Q    Would you describe what happens at the

19  joint clinical meetings?

20       A    Well, there are agendas that Ashley

21  publishes in advance of every meeting, and there's a

22  wide range of issues that get covered there that are

23  not all purely clinical.  Some of them are more

24  administrative, data related.  There may be some

25  quality issues that come up, but the agenda --



1  there's some set items on the agenda from

2  week-to-week.  Like there are people who have long

3  lengths of stay and there needs to be some kind of

4  discussion around problem solving, that a person has

5  had an extended length of stay beyond what would be

6  typical.

7         So all of that comes up as well.  Updates

8  from different parts of the agency, et cetera.

9         So the agenda can vary, but they can also

10  have fixed items.

11     Q    Thank you.

12         Is this a weekly meeting, the joint

13  clinical?

14     A    I believe it's -- it moved from weekly to

15  monthly -- it's monthly -- or is it every other

16  week?

17         The meetings kind of mash together.  It's

18  no longer weekly.  It used to be but it no longer

19  is.

20     Q    Are you a regular participant in this

21  meeting?

22     A    Pretty regular.

23     Q    Do any representatives of the GNETS

24  program participate in joint clinical meetings?

25     A    No.



STEPHANIE PEARSON, PH.D.                    March 28, 2022
UNITED STATES vs STATE OF GEORGIA                        63

1      Q    Is GNETS ever a topic of discussion at
2   joint clinical meetings?
3      A    I can't recall.
4      Q    You can't recall a time when GNETS was a
5   topic of discussion at a joint clinical meeting?
6      A    I can't.  I can't.  It may have come up at
7   some point in all the years of the joint clinical
8   meetings, but I just can't recall them.
9      Q    PRTFs are a topic of discussion at the
10   joint clinical meetings, correct?
11      A    Sometimes.
12      Q    Would you say that PRTFs are more often a
13   topic of discussion at joint clinical meetings than
14   GNETS?
15          MR. PICO PRATS:  Objection.
16      A    Could be.
17      Q    Well, when is the last time you can recall
18   that an issue related to PRTFs came up at a joint
19   clinical meeting?
20      A    It just -- I can't.  You know, like I
21   said, the agendas vary.  I just -- I can't tell you
22   it was last month or the month before.  They happen
23   too frequently for me to track like that.
24      Q    I think I referenced earlier in the
25   deposition the Georgia State University Center of



1   Excellence.  Are you familiar with that entity?

2        A    Yes.

3        Q    How would you describe the relationship

4   between DBHDD and the Center of Excellence?

5        A    We have a contract with the Center of

6   Excellence.  They have been partners in data

7   gathering for different programs, producing reports

8   for various reasons.

9             They also sit on the IDT, the directors

10  meeting, of which I am not a part, but I know that

11  they are represented there as well.

12            They come to the ACER meetings, and they

13  have just been kind of thought partners in a lot of

14  different programming.

15       Q    Do you interact directly with the Center

16  of Excellence as part of your job duties at OCYF?

17       A    In some instances.

18       Q    What are those instances?

19       A    In the meetings that I just described.

20       Q    So that was ACER, correct?

21       A    Right.

22       Q    You mentioned IDT as well, but also that

23  you don't participate in IDT.  Is that accurate?

24       A    Correct.

25       Q    So is it just ACER?



1       A    There are Apex meetings that COE chairs,

2   and those are, I believe, every other week, unless

3   there is some other project coming up, and then

4   there might be more ACER meetings that are

5   scheduled.

6       Q    How long has the COE been leading those

7   Apex meetings with DBHDD?

8       A    I don't, I don't remember.  It's been

9   going on for years.  I just don't know how long.

10      Q    And what is your role in participating in

11  those Apex meetings with COE?

12      A    As I mentioned earlier, since I no longer

13  have direct oversight of Apex, I'm there kind of as

14  a clinical consultant when necessary.  You know, IF

15  there's a training on a particular issue, I may get

16  asked to present.  I'm there just kind of as an

17  observer these days, because Apex has its own team.

18      Q    Are you familiar with an individual who

19  works at the Center of Excellence by the name of

20  Dimple Desai?

21      A    Yes.

22      Q    How would you describe Dimple Desai's

23  responsibilities with respect to Apex?

24      A    She chairs the meetings.  She organizes

25  the agendas.  She is probably the lead on whenever



1  there are gatherings for the Apex providers, and I

2  believe she oversees the team that does the surveys

3  or the data gathering and making sure that the

4  reports get generated.

5       Q    Are you familiar with the Georgia Advocacy

6  Office, or GAO?

7       A    I have -- I'm aware of them.

8       Q    Do you interact with the Georgia Advocacy

9  Office at all as part of your job duties?

10      A    Not very much at all.  Very little.

11      Q    I'd like to shift gears now, Dr. Pearson,

12 and ask you some questions about GNETS.

13           Is that all right?

14      A    Yes.

15      Q    What is your understanding of what the

16 GNETS program is?

17      A    It's a program that's run by the

18 Department of Education for their students who are

19 unable to be successful in a traditional classroom

20 because of either behavioral health challenges or

21 developmental delay challenges.

22      Q    Are you familiar with the admission

23 requirements for GNETS programs?

24      A    Just that -- what I just described, that

25 those young people who have difficulty being



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                          67

1  successful in a traditional classroom for whatever,

2  but I don't know what instruments they use to

3  determine who would be eligible to go into GNETS.

4       Q    When did you first become aware of GNETS?

5       A    Some years ago.  I can't give you a

6  specific year when I first heard of GNETS.

7       Q    Is this something you've known about since

8  you started your current role as clinical director?

9       A    Yes.

10      Q    When is the last time you visited the

11 GNETS facility?

12      A    It's been years.

13      Q    Do you recall which facility you last

14 visited?

15      A    One in DeKalb County, if memory serves --

16 DeKalb County.

17      Q    What was the purpose of that visit to the

18 GNETS facility in DeKalb County?

19      A    I was invited to go by my director to

20 meet.  There was a director there of that program,

21 and we went to meet her, and I believe tour the

22 facility.

23      Q    When you say you were invited by your

24 director, are you referring to Dante McKay?

25      A    Yes.



STEPHANIE PEARSON, PH.D.                    March 28, 2022
UNITED STATES vs STATE OF GEORGIA                       68

1    Q    And since that occurred, have you been

2  invited by Dante McKay or anyone else to visit a

3  GNETS facility?

4    A    There was -- again, this was years ago and

5  I'm not recalling which year, but it's been a while,

6  where there was a group of child surveying agencies,

7  I think -- I'm not even remembering who all was

8  invited, but they were hosted at different

9  locations.  I think this must have been some DOE

10  meeting and they were hosted at different DOE

11  locations, and one of the locations was a GNET

12  school, I'm remembering.

13          I don't remember which one or where it

14  was.  I just remember that was one of the locations

15  where a meeting was hosted.

16          But beyond them providing a space for a

17  group of people to gather to meet around a

18  particular agenda, there was nothing else noteworthy

19  about that visit.

20    Q    Thank you.

21          Dr. Pearson, I'd like to show you another

22  exhibit, if I could.

23          MR. HOLKINS:  I think we're at 35 --

24          MS. COHEN:  36.

25          MR. HOLKINS:  36.  Thank you.



```
 1              Give me one second.  I'll pull this up on
 2      the screen.
 3              (WHEREUPON, Plaintiff's Exhibit-36 was
 4       marked for identification.)
 5  BY MR. HOLKINS:
 6      Q    Dr. Pearson, can you see my screen?
 7      A    Yes.
 8           MR. HOLKINS:  So I'll represent for the
 9      record this is an email from you dated July 5,
10      2016, to Dante McKay.  The subject is "Re.
11      GNETS Site Visit."
12              And the Bates number is GA00583025.
13  BY MR. HOLKINS:
14      Q    Dr. Pearson, I'm going to give you control
15  of this document so that you can take a moment to
16  review it.
17              Give me one second.
18              You have control.  You should be able to
19  move through the document.  Please let me know when
20  you've had an opportunity to review it briefly.
21              (Witness reviews exhibit.)
22      A    Okay, I've seen it.
23      Q    Thank you.  I'm going to take control
24  back.
25              So, Dr. Pearson, let me first ask whether
```



STEPHANIE PEARSON, PH.D.                                    March 28, 2022
UNITED STATES vs STATE OF GEORGIA                                      70

1  this email chain is about coordinating the site

2  visit that you were just describing to the GNETS

3  facility in DeKalb County?

4       A    This appears to be it.

5       Q    So the visit was in 2016, based on this

6  email chain; is that correct?

7       A    That's the date on the email.

8       Q    So you mentioned that you toured GNETS

9  facilities as part of this visit.  Could you

10 describe what that tour entailed?

11      A    That was 2016.  I don't recall the details

12 of that visit.

13      Q    I want to direct you to an email that is

14 within this chain, and it was sent to Nakeba Rahming

15 to Dante McKay on May 26, 2016.  The title of the

16 email is "Trauma Informed Care."

17           First, let me ask you, Dr. Pearson, do you

18 know who Nakeba Rahming is?

19      A    I met her that particular time, but,

20 again, that was 2016.

21      Q    And is it your understanding that at the

22 time Ms. Nakeba Rahming was program manager for the

23 GNETS program?

24      A    That's what's in her signature line, so

25 yeah.



1      Q    Ms. Rahming wrote in her email to Dante,

2   on May 26th:  "I am working on a trauma informed

3   care service delivery model for GNETS.  I wanted to

4   know if DBHDD has been doing any work in this area

5   and if so can we collaborate on things related to

6   it?"

7           Do you see that text in her email?

8      A    Yes.

9      Q    Did any collaboration between DBHDD and

10   GNETS with respect to trauma informed care service

11   delivery occur after this email, to your knowledge?

12      A    Not to my knowledge.

13      Q    Ms. Rahming also writes in that same

14   email:  "I also would like to talk about ideas for

15   integrating mental health agency services into this

16   model."

17           Do you see that text?

18      A    Yes.

19      Q    And to your knowledge, has there been any

20   coordination between DBHDD and GNETS since this

21   email toward integrating mental health agency

22   services into the GNETS model?

23      A    Not to my knowledge.

24      Q    And I just want to clarify your testimony,

25   Dr. Pearson, that this was the most recent official



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                          72

 1  site visit that you conducted at a GNETS facility.

 2  Is that accurate?

 3       A    I wouldn't say that we conducted a site

 4  visit.  I would say that we visited this particular

 5  program in response to an invitation.

 6       Q    So let me again ask whether this was the

 7  last time, to your knowledge, that OCYF has visited

 8  a GNETS facility for the purposes of touring it?

 9       A    Well, because I -- I mean it could be.

10  The other reference that I made earlier by a GNETS

11  site hosting a meeting, I don't know, it could have

12  been before or after this.  So I don't want to

13  commit to saying, yeah, that's the last time I was

14  ever visited a GNETS site, because I don't have the

15  dates when a GNETS site was a host for another

16  meeting.  I just, I just don't recall those dates.

17            But in terms of going for the purposes of

18  seeing a facility, this could be the last time.  I'm

19  not recalling anything outside of what I already

20  described.

21       Q    Have you conducted any visits to GNETS

22  facilities in the last year?

23       A    No.

24       Q    Have you conducted any visits to GNETS

25  facilities in the last two years?



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                            73

1       A     No.

2       Q     In the last three years?

3       A     No.

4       Q     In the last five years?

5       A     I do not recall visiting a GNETS facility.

6       Q     In the last five years?

7       A     Right.  Beyond whatever is in these

8    emails.

9       Q     Thank you, Dr. Pearson.

10            You can put this email aside.

11            Dr. Pearson, do you have any ongoing

12   responsibilities in your capacity as clinical

13   director specifically with respect to GNETS?

14      A     No.

15      Q     In your official capacity as clinical

16   director, do you coordinate with GNETS' program

17   directors?

18      A     No.

19      Q     Do you coordinate with Debbie Gay?

20      A     No.

21      Q     Do you coordinate with Vickie Cleveland?

22      A     No.

23      Q     Do you coordinate with Zelphine

24   Smith-Dixon?

25      A     I have spoken to Dr. Smith-Dixon about



1  another matter, but do I coordinate with her?  No.

2  But I'm aware of who she is.

3       Q    I understand.  Just to make sure I'm

4  clear, you don't coordinate with Dr. Smith-Dixon

5  with respect to GNETS; is that accurate?

6       A    That's correct.

7       Q    And what do you coordinate with Dr.

8  Smith-Dixon about?

9       A    Again, she and I have spoken about a

10  particular child who was one of those children who

11  was requiring out-of-state care.  So around trying

12  to coordinate services for him we spoke.

13       Q    And what is Dr. Smith-Dixon's role within

14  the State?

15       A    I'm sorry?

16       Q    Where does Dr. Smith-Dixon work?

17       A    For the Department of Education, as far as

18  I know.

19       Q    Do you recall why Dr. Smith-Dixon was

20  involved in that discussion about a particular child

21  who required care out of state?

22       A    She was referred to us by Dr. McGiboney's

23  office.

24       Q    The child was referred?

25       A    No.  Dr. Smith-Dixon.  We were seeking



1  some assistance around this child's educational

2  needs, and we reached out to Dr. Garry McGiboney's

3  office, and Dr. McGiboney's office directed us to

4  Dr. Smith-Dixon.

5      Q    And just for the record, what was Dr.

6  Garry McGiboney's role at that time?

7      A    I can't remember his official title, but

8  he was the person that we knew in the Department of

9  Education.  So we just reached out to someone that

10 we knew.

11     Q    And what was Dr. Smith -- excuse me.

12         What was Dr. Smith-Dixon's contributions

13 to that discussion about the particular child who

14 may have needed out-of-state care?

15     A    She was trying to help us to understand

16 the, the child's whole county's educational system,

17 was not that involved with his services out of

18 state, and we were trying to get them to be more

19 involved with his services out of state and to see

20 what the -- Dr. Smith-Dixon could explain what the

21 funding mechanisms might be to cover his educational

22 costs in this out-of-state facility.

23     Q    Is that the only instance you can recall

24 coordinating with Dr. Smith-Dixon about a specific

25 case?



1      A    That was my only time coordinating with

2  her.

3      Q    Do you coordinate on a regular basis with

4  anyone else at the Georgia Department of Education

5  about specific cases?

6      A    No.

7      Q    Do you recall whether the child at issue

8  in the case you've been describing was diagnosed

9  with autism?

10     A    I don't recall his diagnoses.

11     Q    Do you recall the name of the child?

12     A    I do.

13     Q    Could you share the name of the child,

14  please?

15     A    Can I ask why you need his name?

16     Q    So we can't answer questions in the course

17  of a deposition.

18         Is there a reason why you are not

19  comfortable answering?

20     A    Well, we typically don't talk about

21  children by name in these -- in any meetings.  We

22  use their initials.

23         MS. COHEN:  There's not a direction by

24     counsel not to answer, is there?

25         MR. PICO PRATS:  I'll put an objection



1        here, and I'll let her answer and we can talk

2        about it later.

3   BY MR. HOLKINS:

4        Q    You can answer the question, Dr. Pearson.

5        A    His initials are "TW."

6        Q    And what's the name of the child?

7        A    His name is Tyrese Wiley.

8        Q    Tyrese Wiley, W-I-L-E-Y, is that accurate?

9        A    Yes.

10       Q    Dr. Pearson, are you aware whether the

11  GNETS program has a strategic plan?

12       A    I'm not sure I know what you mean.  You

13  mean GNETS in general?  If they have a strategic

14  plan that's general, or is it specific to particular

15  children?

16            I'm not sure what you mean.

17       Q    I'm asking about the program as a whole,

18  whether the State --

19       A    I don't know what -- beyond what I've

20  described about my knowledge of GNETS, that -- you

21  know, what it's designed for, the children that they

22  are supposed to be serving, that's pretty much it.

23       Q    Just to confirm, you're not aware of

24  whether the GNETS statewide program has a strategic

25  plan; is that accurate?



1            MR. PICO PRATS:  Objection.

2       A    I just don't know what it is.  If they

3    have -- I'm sure they -- was, but I don't know what

4    it is.  I can't tell you what it was chapter and

5    verse.

6       Q    Have you had any role as clinical director

7    at OCYF with respect to assessments conducted under

8    the GNETS strategic plan?

9       A    No.

10      Q    Dr. Pearson, do you present -- excuse me.

11           Do you provide training or technical

12   assistance to GNETS staff?

13      A    No.

14      Q    Does anyone within OCYF provide training

15   or technical assistance to GNETS staff?

16      A    Not to my knowledge.

17      Q    If I can, I'd like to show you another

18   exhibit.

19           MR. HOLKINS:  Which will be 37.

20           (WHEREUPON, Plaintiff's Exhibit-37 was

21       marked for identification.)

22   BY MR. HOLKINS:

23      Q    Just give me a second and I will pull it

24   up.

25           Bear with me.  I'm actually just



1   converting the document so I can search for words

2   within it.  This may take a minute or two.  I

3   apologize for the delay.

4          MS. COHEN:  Why don't we take a brief

5      break anyway.  We've been going for an hour.

6          MR. HOLKINS:  Yes.  Let's take a

7      ten-minute break.

8          THE VIDEOGRAPHER:  Going off video record,

9      11:14 a.m.

10          (A recess was taken.)

11          THE VIDEOGRAPHER:  We're now back on video

12      record, 11:26 a.m.

13   BY MR. HOLKINS:

14      Q   Dr. Pearson, as I mentioned before we went

15   off record, I'd like to show you another exhibit and

16   this is Exhibit 37.

17          I've got it pulled up, so let me just

18   share my screen.

19          MR. HOLKINS:  I'll note for the record the

20      title of this document is "GNETS Strategic Plan

21      Activities for FY12."  And the Bates number is

22      GA-DOE-001620, produced by the State to the

23      United States in this matter.

24   BY MR. HOLKINS:

25      Q   Dr. Pearson, I know this document is from



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                         80

1  a while ago.  I'll just ask you whether you have any
2  recollection of seeing it?
3      A    No.
4      Q    So I'm going to use the control find
5  function to fast-forward to places where your name
6  appears.
7          The first is in this chart titled, GNETS
8  -- excuse me -- "GNETS Strategic Plans Steering
9  Committee."  And you'll see that you're listed on
10 that list at No. 17, Dr. Stephanie Pearson, Clinical
11 and Quality Director.
12         Do you see that text?
13     A    Yes.
14     Q    So there are checkmarks here in this chart
15 indicating attendance at meetings occurring at
16 different sites:  August 24 meeting at Elam
17 Alexander; November 2nd meeting, Macomey; February
18 8, 2012, Savannah; and May 31st, 2012, at Forsyth.
19     A    Uh-hum.  (Affirmative.)
20     Q    Do know what Elam Alexander is, Dr.
21 Pearson?
22     A    I assume it's a site that a GNETS school
23 is located at.
24     Q    So if we scroll down to where your name
25 appears, the checkmarks indicate that you attended



1  three of these meetings, correct?

2      A    Correct.

3      Q    Do you recall what your role was --

4  actually, let me go back.

5           Do you recall what the purpose of these

6  meetings was?

7      A    That was 2012.  That was 10 years ago.  I

8  guess if it says Strategic Planning Steering

9  Committee, that's what it was, but, again, I do not

10 remember well all of the groups that I've attended,

11 you know, 10 years ago.

12          I did mention, if you recall earlier,

13 having been to meetings that were hosted at

14 different GNETS sites.  So this must be it.  But

15 that was as far as I could remember.

16          I can't remember any details associated

17 with it, but you obviously have my name on a

18 document.  I was there but I'm not recalling the

19 gist of a meeting that occurred in 2012.

20     Q    Aside from what's on this paper here, do

21 you have any recollection of any of these visits in

22 2012?

23     A    Not beyond what's on the paper.

24     Q    And do you recall participating in any

25 GNETS Strategic Plan Steering Committee meetings



 1  since 2012?

 2       A    No.

 3       Q    I'd like to fast-forward to the next place

 4  where your name appears.

 5            This is on Page 10 of the document.

 6            So there is a description of individual

 7  work group reports, and within that is a heading

 8  called "Program Operations."

 9            I want to direct you to a bullet within

10  that heading, and this is under "Issues discussed in

11  the work group," and then more specifically "funding

12  and mental health services."

13            The document reflects that you talked

14  about mental health services through DBHDD in

15  relation to school services.  Do you see that text?

16       A    Yes.

17       Q    Does that help to refresh your

18  recollection about what your role may have been in

19  connection with the GNETS Strategic Plan Steering

20  Committee?

21       A    I guess it was as is reported here in the

22  description.

23       Q    And have you presented to GNETS staff

24  since 2012 regarding mental health services through

25  DBHDD in relation to school services?



STEPHANIE PEARSON, PH.D.                           March 28, 2022
UNITED STATES vs STATE OF GEORGIA                            83

1      A    I don't have a specific recollection, but

2   perhaps.  I don't know.  I mean -- but I don't have

3   a specific recollection.  This is all historical,

4   and I'm not recalling a great deal of detail, so.

5      Q    I'm going to set aside this document.

6           Recognizing your prior testimony, that

7   it's been some time since you visited GNETS

8   facilities, I'm curious as to whether you have ever

9   in your capacity as clinical director at OCYF

10  conducted observation of students in GNETS

11  classrooms?

12     A    I'm not recalling.

13     Q    Do you know whether anyone within OCYF

14  conducts observations of students in GNETS

15  classrooms?

16     A    I don't believe so.

17     Q    Dr. Pearson, in your official capacity as

18  clinical director at OCYF, do you receive data or

19  documents relating to enrollment in GNETS?

20     A    No.

21     Q    Do you receive data or documents relating

22  to length of placement in GNETS?

23     A    No.

24     Q    Do you receive data or documents relating

25  to the availability of behavioral health services to



1  students enrolled in GNETS?

2      A    No.

3      Q    Do you receive data or documents relating

4  to the utilization of behavioral health services by

5  students enrolled in GNETS?

6      A    No.

7      Q    Do you receive data or documents relating

8  to the quality of behavioral health services

9  received by students enrolled in GNETS?

10     A    No.

11     Q    Do you receive data or documents relating

12 to staffing at GNETS?

13     A    No.

14     Q    Do you receive data or documents relating

15 to coordination between GNETS programs and community

16 service providers in Georgia?

17     A    No.

18     Q    Do you receive data or documents relating

19 to transition planning for students exiting GNETS

20 and enrolling in general education schools?

21     A    No.

22     Q    Do you receive data or documents relating

23 to the use of GNETS to divert children from

24 placement in a PRTF?

25     A    No.



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                              85

```
1              MR. HOLKINS:  Just one second, Dr.
2        Pearson.
3   BY MR. HOLKINS:
4        Q    Dr. Pearson, what would be needed
5   generally to divert from residential placement --
6              MR. HOLKINS:  Strike that.  Let me think
7        this one through.
8   BY MR. HOLKINS:
9        Q    Dr. Pearson, in your experience, what
10  services are effective in diverting children who
11  have behavioral health conditions from placement in
12  a PRTF?
13       A    There are services through community
14  providers that would include things like Intensive
15  Family Intervention, or IFI.  If a family is willing
16  -- of course, it has to be parental or guardian
17  consent for home-based services, and if a family is
18  willing to receive those services.  That's one.
19            The ICC, through the Intensive Care
20  Coordination, that's offered through the CMEs.  I
21  mentioned earlier Lookout Mountain, CSB is one,
22  Viewpoint.
23            CSB is the other CME, and they have a
24  range of more intensive kinds of services available
25  in the community.  I can't name them all, but they
```



1   are more like the community-based alternatives to a

2   PRTF.

3              Again, it is the parent or guardian's

4   choice to determine whether or not they wish to be

5   diverted from a PRTF or if they are seeking

6   residential treatment.

7        Q    Does GNETS provide the services that you

8   just described, including IFI and IC3?

9              MR. PICO PRATS:  Objection.

10       A    I can't tell you what GNETS does because

11  GNETS is not a program through my department.  I'm

12  note aware of GNETS doing that, but I don't know

13  because I don't know all of the things that they do.

14       Q    Do you know anything about the services,

15  the behavioral health services, that are provided to

16  students enrolled in GNETS?

17       A    Again, I don't, I don't know the range of

18  what the GNETS services offer to children nowadays,

19  other than the broad description that I gave you

20  earlier.

21       Q    Do you know who Clara Keith is?

22       A    I'm sorry?

23       Q    Are you familiar with the name Clara

24  Keith?

25       A    No.  Clara Keith, I'm not sure I know that



1  person.

2       Q    If I told you that she previously worked

3  at DBHDD, would that refresh your recollection?

4       A    There are a lot of people that work at

5  DBHDD that I don't know.  So it wouldn't really.

6       Q    I want to go back to the site visit that

7  we were talking about from 2016 at the GNETS

8  facility in DeKalb.

9            Could you share your impressions of the

10  GNETS programs you visited in connection with that

11  site visit?

12           MR. PICO PRATS:  Objection.

13       A    I don't remember it.  It's 2016.  I just

14  remember we were invited.  We went.  And I'm

15  assuming we walked through the building.  I can't

16  say more than that.  I just don't remember.  It's

17  not something that I held onto.

18       Q    Dr. Pearson, are you aware of whether the

19  State measures whether GNETS diverts children from

20  placement in PRTFs?

21       A    Am I aware that the State measures?  Is

22  that what you're saying?

23       Q    Right.  I'm asking you whether you're

24  aware of whether the State is assessing whether

25  GNETS diverts children from placement into PRTF?



STEPHANIE PEARSON, PH.D.                              March 28, 2022
UNITED STATES vs STATE OF GEORGIA                              88

1      A    I'm not aware.

2      Q    Do you have a sense of how DBHDD would go

3  about measuring such a thing?

4          MR. PICO PRATS:  Objection.

5      A    No.

6      Q    Dr. Pearson, is it fair to say you're

7  generally familiar with the publicly funded

8  community behavioral health services available to

9  children in the State of Georgia?

10     A    Yes.

11     Q    It's part of your job to be familiar with

12 those services, correct?

13     A    Yes.

14     Q    So at this time I'd like to direct your

15 attention to a previously introduced exhibit.

16         MR. HOLKINS:  This is Exhibit 8.  Give me

17     one second and I'll pull it up.

18         (WHEREUPON, Plaintiff's Exhibit-8 was

19      previously marked for identification.)

20 BY MR. HOLKINS:

21     Q    I'm going to share my screen with you, Dr.

22 Pearson.

23         Can you see my screen, Dr. Pearson?

24     A    Yes.

25     Q    So as I mentioned, this document was



1  previously mentioned -- excuse me -- introduced as

2  Exhibit 8.

3          It's a letter from counsel for the

4  state -- counsel for the United States, dated

5  February 12, 2021.  The subject of the letter is the

6  caption for this case, United States v. Georgia.

7          I want to direct you, Dr. Pearson, to a

8  portion of this letter which starts on Page 2 and

9  carries to Page 3.

10         I'll represent that this is -- this is

11 State's Supplemental Response to the United States

12 Interrogatory No. 17.

13         I'm going to give you control of the

14 document, Dr. Pearson, so you can take a moment to

15 review the State's response.  Please let me know

16 when you finish.

17         Just give me one second and I'll give you

18 control.

19         You have control of the document, Dr.

20 Pearson.

21         (Witness reviews exhibit.)

22    A    I believe I've seen it.

23    Q    Thank you very much, Dr. Pearson.

24         I'm going to take back control of this

25 document.  Give me one second.



 1          So I'm going to ask you some questions,
 2    Dr. Pearson, about some of the services identified
 3    by the state in its supplemental response to
 4    Interrogatory No. 17, but first let me ask, are you
 5    familiar with the term "evidence-based service"?
 6       A    Yes.
 7       Q    What is an evidence-based service, as you
 8    understand it?
 9       A    It's a service that is supported by
10    empirical data.
11       Q    Is it important, in your view, that
12    Georgia's behavioral health service providers use
13    evidence-based services?
14          MR. PICO PRATS:   Objection.
15       A    Yes.
16       Q    Why?
17       A    Because they are the services that are
18    supported to be shown to be most efficient for a
19    particular diagnostic category.
20       Q    Are you familiar with the term "promising
21    practice" as distinct from an evidence-based
22    service?
23       A    Yes.
24       Q    What is a promising practice?
25       A    A promising practice has not reached the



1  level of an EBP, but it shows promise, thus the

2  title.

3       Q    Let me first ask you, Dr. Pearson, to

4  identify from this list, which starts on Page 3 --

5  excuse me -- 2 and carries to Page 3 of the current

6  exhibit, Exhibit 8, which of these services are

7  evidence-based services?

8            And I will give you control.

9       A    That's broad.  Evidence-based practice --

10      Q    I'll give you control of the document.

11  Sorry.

12      A    I don't need control of the document.

13      Q    Okay.

14      A    Evidence-based practices are specific

15  treatment services.  What you see on this list has a

16  lot of different assessments that would not

17  necessarily be considered the same.  But it would be

18  considered good practice, for example, to do a

19  thorough behavioral health assessment so that a

20  clinician would know -- have more data relative to

21  what a diagnostic picture might be.  But then having

22  formed a diagnosis, then look at an evidence-based

23  practice as the most appropriate treatment strategy

24  for that particular diagnosis.

25            So what you're seeing here would not



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                         92

1  really lend itself to that kind of understanding

2  about an EBP, but these would be commonly accepted

3  practices, assessments, consultation, nursing, et

4  cetera, to offer a comprehensive array of services.

5       Q    Okay.  So let's talk about some specific

6  services that are on this list.

7            You mentioned Behavioral Health

8  Assessments, which is identified on Page 2.

9            Do you see that text?

10      A    Yes.

11      Q    In your words, what are behavioral health

12  assessments?

13      A    Assessments done at the beginning of an

14  intervention to determine just what the needs are.

15      Q    Who performs that assessment?

16      A    It could be, depending on how an agency is

17  set up, it could be somebody who is designated as a

18  person who only does intakes and then transfers the

19  case to -- pardon me -- to a therapist; or it could

20  be the therapist who's assigned to that particular

21  client, who starts off by doing the assessment and

22  then goes forward with the treatment.

23      Q    Are you familiar with the term "core

24  service" as used in the context of Georgia's

25  behavioral health services for children?



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                          93

1       A    Yes.

2       Q    And for the record, what is a core service

3  in Georgia?

4       A    The core services are fundamental services

5  that are provided by those agencies who used to be

6  called core providers.  They offered everything in

7  the service array that was found in the provider

8  management.

9            So a core provider would be a provider

10  that would be able to do assessments, do individual

11  or group or family therapy, do medication

12  management, do nursing assessment, do all the things

13  that the -- the range of service in the Community

14  Service Boards for those community providers that

15  were able to offer that range of services.

16           So a core provider was different from like

17  a more niche provider who only did a highly

18  specialized service.

19      Q    Is behavioral health assessment a core

20  service in Georgia?

21      A    Yes.

22      Q    Is behavioral health assessment an

23  evidenced-based service in Georgia?

24      A    Not in the same way that I have just

25  described what an evidence-based practice is.  It's



1  good clinical practice.

2          Is there evidence that supports that you

3  need to do a behavioral -- it's not the same kind of

4  thing.

5     Q    Could you identify -- I understand your

6  point, that behavioral health assessment, as you

7  understand it, is not an evidence-based service.

8  Could you identify what some, what some

9  evidence-based services are?

10    A    For example -- what is -- DBT, trauma

11  informed.  Some of the trauma informed Crisis

12  Services.

13          I can't think of all the ones they do.

14  PRTF, for example, or community providers.

15          I'm just blanking right now, but the

16  motivational interviewing is one.

17          There's one specifically for borderline

18  personality disorders.

19          The names just escape me right now, but

20  they're tied to like, for example, cognitive

21  behavioral therapy for depression.  Those kind of

22  things.  They're tied to specific diagnoses.

23    Q    You mentioned DBT.  I'm going to take a

24  crack at that.  Does that mean dialytical behavioral

25  therapy?



STEPHANIE PEARSON, PH.D.                                    March 28, 2022
UNITED STATES vs STATE OF GEORGIA                                      95

1        A     Yes.

2        Q     Is DBT an evidence-based service that is

3   available in Georgia?

4        A     Yes.

5        Q     Does the State assess fidelity with

6   connection to DBT?

7        A     I don't know what the -- what the

8   reviewing practices are by the part of the agency

9   that does that.  So I couldn't speak to that.  It's

10  not a part of what my office does.

11       Q     Just to be clear, do you have any

12  responsibilities in your official capacity at OCYF

13  for assessing fidelity with evidence-based services

14  in Georgia?

15       A     No.

16       Q     Dr. Pearson, are you aware of whether

17  behavioral health service is a service available in

18  every region of the state?

19       A     That's my understanding.

20       Q     Based on what?

21       A     That that's the expectation.

22       Q     Have you reviewed any documents or data

23  demonstrating that behavioral health assessment is

24  available in every region of the state?

25       A     No.



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                              96

1      Q    Do you know whether behavioral health

2  assessments are available in general education

3  school settings in Georgia?

4      A    No.

5      Q    Do you know whether behavioral health

6  assessments are available to children enrolled in

7  GNETS?

8      A    No.

9      Q    I believe you described behavioral health

10  services as a good practice.  Is that accurate?

11     A    Yes.

12     Q    Why is it a good practice?

13          MS. COHEN:  Behavioral health assessments?

14     Your question refers to behavioral health

15     assessments?

16          MR. HOLKINS:  Yes.

17     A    As I said before, before a clinician can

18  determine the most appropriate strategy to address

19  the presenting concerns, you have to have a thorough

20  assessment.

21     Q    And do those thorough assessments help

22  children remain in general education settings and

23  avoid placement to segregated settings?

24          MR. PICO PRATS:  Objection.

25     A    I'm thinking -- I'm not talking about a



STEPHANIE PEARSON, PH.D.                    March 28, 2022
UNITED STATES vs STATE OF GEORGIA                      97

1  behavioral health assessment relative to a school

2  placement.  I'm talking about a behavioral health

3  assessment in a clinical setting in the pursuit of a

4  treatment strategy.

5      Q    Are you familiar with the term "functional

6  behavioral assessment," Dr. Pearson?

7      A    I've heard of it.

8      Q    What's your understanding of what a

9  functional behavioral assessment is?

10     A    One that determines a level of

11 functioning.

12     Q    What are the components of functional

13 behavioral assessment?

14     A    I don't know.

15     Q    Have you received any training with

16 respect to functional behavioral assessments since

17 becoming clinical director at OCYF?

18     A    No.

19     Q    Do you know whether functional behavioral

20 assessments are available to children in Georgia

21 through the State's publicly funded system?

22     A    I would think so.

23     Q    Based on what?

24     A    Just that it would be part of what happens

25 in any assessment that's thorough.



STEPHANIE PEARSON, PH.D.                    March 28, 2022
UNITED STATES vs STATE OF GEORGIA                      98

1    Q    Have you reviewed any data or
2  documentation demonstrating that functional
3  behavioral assessments are being provided to
4  children in the State of Georgia?
5    A    No.
6    Q    But it's your expectation that it is
7  provided; is that accurate?
8    A    I'm sorry?
9    Q    Is it your expectation that functional
10 behavioral assessments are provided to children in
11 Georgia?
12   A    I could only speak to what's in the
13 provider manual.  So whatever is in the provider
14 manual, that's what my expectation is.
15   Q    Dr. Pearson, you have mentioned in this
16 deposition a service known as IC3, which I believe
17 stands for Intensive Customized Care Coordination.
18 Is that correct?
19   A    Yes.
20   Q    What is IC3?
21   A    It is -- again, that's not something that
22 I supervise or oversee, but it is the -- called IC3
23 because the customized care coordination level is
24 provided by the CMEs, are at a higher level than
25 what you would normally get through your just basic



1  community core provider.

2          So you have the service where the needs of

3  the child and family are coordinated in such a way

4  that it can be not completely a substitute for

5  residential but a way to help a child stay in his or

6  her community instead of going to a residential

7  level of care.

8      Q    Is the State's IC3 service evidence-based?

9      A    I don't know if there's been a body of

10  researched literature that undergirds it, but -- you

11  know, in that specific formal way, it is

12  evidence-based.  But I do believe that there is

13  certainly foundational -- there's a foundation for

14  it, in that it can be a community-based alternative

15  to residential care.

16      Q    Is it fair to say that one of the goals of

17  IC3 is to help children who have behavioral health

18  conditions remain in their homes and communities?

19      A    Yeah, I think that's -- that's just what I

20  said, yeah.

21      Q    Do you know what the State does to assess

22  whether, as you put it, the foundational elements of

23  IC3 are being met by providers of that service?

24      A    Beyond whatever the provider reports as

25  what their efforts are?



STEPHANIE PEARSON, PH.D.                                    March 28, 2022
UNITED STATES vs STATE OF GEORGIA                                      100

1        Q    Right.

2        A    I don't know if the person who oversees

3   IC3 also has that in his or her job description.  I

4   would imagine that that could be part of that

5   person's job description, to ensure that IC3 is

6   being efficiently administered.

7        Q    And is that person within OCYF?

8        A    That position is now vacant.  The person

9   recently left to take another opportunity.  So the

10  search is on.

11       Q    And who was that person who just vacated

12  the role?

13       A    Tricia Mills.

14       Q    Is I3C -- excuse me.

15            Is IC3 a service available in every region

16  in the state?

17       A    I don't know if it's available in every

18  region of the state.  IC3 is administered by the two

19  CMEs I mentioned earlier, and so in terms of what

20  their -- I guess you can call it a catchment area,

21  would be -- when IC3 is recommended, the family who

22  chooses to receive that service can choose to work

23  with either Lookout Mountain or Viewpoint Health.

24            So I guess in that way, in that sense, you

25  could say it's available to every region, but there



 1  are only two CMEs that administer it, so.

 2       Q    Have you reviewed any data or

 3  documentation demonstrating that IC3 is provided to

 4  children in every region in the state?

 5       A    No.

 6       Q    Have you reviewed any data or

 7  documentation demonstrating that IC3 has been

 8  provided to children enrolled in GNETS?

 9       A    No.

10       Q    Dr. Pearson, I'd like to point you to

11  another service that's identified in the State's

12  supplement response to Interrogatory 17, Crisis

13  Intervention.  This is on Page 3.

14            Is that the same service as the global

15  crisis response we were talking about earlier?

16       A    Global crisis response is but one

17  component of crisis intervention.

18       Q    Thank you for that clarification.

19            Can you describe all the components of

20  crisis intervention?

21       A    I don't know if I can describe all of

22  them.

23            I know that community-based providers are

24  required to develop crisis planning and crisis plans

25  for the people that they serve.  And if necessary, a

1  crisis occurs beyond the time that the individual is

2  being seen by their ongoing provider, then of course

3  you have Crisis Stabilization Units and BHCCs, and

4  I'm blocking on the last --

5          THE COURT REPORTER:  I'm sorry.  Speak up.

6      A   The BHCCs.  BHCC is another level of

7  crisis stabilization.  Primarily those are adult

8  oriented, though.  That's why I'm not very

9  conversant on those.

10         But Crisis Stabilization Units are part of

11 the crisis continuum, as is Mobile Crisis.

12     Q   Thank you for that description.

13         So let's start with Crisis Stabilization

14 Units.

15         Let me first ask you whether you have

16 reviewed any data or documentation demonstrating

17 that Crisis Stabilization Units are available and

18 accessed in every region of the state?

19     A   I have not reviewed data or documentation,

20 outside of the fact that we know which Crisis

21 Stabilization Units are available for -- in our

22 purview in my office, of course, is for children and

23 adolescents.

24         We know which ones those are; and we know

25 which children show up on the bed board, as we



1  talked about earlier; which Crisis Stabilization

2  Unit is able to accept a young person into their

3  unit.  And if they are not available to accept a

4  young person, they are asked to provide why they're

5  not available, and then what we do from there.

6       Q    Thank you.

7            Let me first ask, how many Crisis

8  Stabilization Units serve children and adolescents

9  in the state?

10      A    I believe we have four at present.

11 Separate from our crisis services for youth with

12 autism.  That's a separate entity that is operated

13 by DCH -- overseen, rather, by DCH predominantly.

14           Ours are -- I believe there are four, and

15 they are divided according to age.  So younger

16 children would go to one separate than an adolescent

17 would go to.

18      Q    Do you know what the total bed capacity is

19 across the four CSUs that you just referenced?

20      A    Not offhand, no.

21      Q    Does each of those CSUs have a dedicated

22 catchment area?

23      A    Well, I mean they're certainly located

24 across the State, but they are open to -- you know,

25 if you live in one part of the state and they have a



```
 1  bed available, it may not be as convenient as
 2  another one, but if and when -- we try to place
 3  children, of course, close to their homes.
 4            But if the bed is available someplace
 5  that's not close to their home -- of course it's up
 6  to the guardian or parent to decide if they want to
 7  access a bed that might not be geographically as
 8  close as they would prefer.
 9       Q    So just to confirm, children residing in
10  another part of the state can be admitted to a CSU
11  even if they don't live in the region?
12       A    Right.
13       Q    Sorry.  Go ahead.
14       A    That's correct.
15       Q    Thank you.
16            You mentioned trying to place children as
17  close as possible to their homes.  Is that
18  important?
19       A    Yes.
20       Q    Why is that important?
21       A    Well, it facilitates family involvement.
22  It -- primarily, yeah.  And it's easier when the
23  young person is getting ready to discharge out.
24            A crisis stay, of course, is a short -- is
25  a brief stay.  So it's not like they're there for
```



1  weeks or months at a time.  But it facilitates

2  primarily the family, the parent, the guardians,

3  involvement with a course of care.

4      Q    What is the average length of stay at the

5  four Crisis Stabilization Units that we're

6  discussing?

7      A    It could be anywhere from four to seven

8  days, ideally.  It could be extended if necessary.

9  So it's not set in stone.

10          But much beyond seven to 10 days, that

11  would be somewhat long length of stay, and the

12  crisis unit -- of course, discharge planning is

13  occurring the whole time the person is in CSU.  So

14  that in the case of a child, of course, the parent

15  or guardian is involved with discharge planning.

16          So there's a clear next step by the time

17  the person is discharged.  So the family is clear --

18  this is a very, short brief stay, simply to

19  stabilize the crisis, and then to move a young

20  person on to the next level of care.

21      Q    How do you know that discharge planning is

22  occurring the whole time a child is in the CSU?

23  What's the basis for that statement?

24      A    It's the expectation of the contract and

25  they attest to it.  The CSUs attest to it.



1      Q    And who at DBHDD, if anyone, is monitoring
2   whether that expectation is met?
3      A    I don't know that there's one particular
4   person that's monitoring that particular expectation
5   is met, unless it's something that an audit team
6   might do by checking records.  But I can't speak to
7   that specifically.
8      Q    Who within DBHDD --
9           MR. HOLKINS:  Let me rephrase.
10     Q    Which component within DBHDD is
11  responsible for audits of CSU?
12     A    Again, I'm not sure if they -- what the
13  department that does the audits, if they -- how they
14  monitor CSUs differently from community-based
15  providers that do core services.
16          So I can't really speak to that.  I just
17  don't have that information.
18     Q    And just to confirm for the record, do you
19  have any role with respect to monitoring the
20  services provided to children in CSUs in Georgia?
21     A    I don't do any audit monitoring or
22  auditing function at all.
23     Q    Another service you mentioned today is
24  Intensive Family Intervention, or IFI.
25          I think you described that service



1  already.  Let me ask whether Intensive Family

2  Intervention is evidence-based in Georgia?

3       A    It's evidence-based, to my understanding,

4  as it is -- it's been a service in the continuum of

5  care for many years.  So it's nothing new.

6            So that's my kind of understanding of

7  Intensive Family Intervention, based on, as we

8  understand, a System of Care philosophy that looks

9  like it's got a continuum of care.

10      Q    I'm trying to understand your testimony.

11 I think you said that Intensive Family Intervention

12 has existed for a while in Georgia; is that right?

13      A    Yes.

14      Q    And beyond that fact, what is the basis,

15 if any, for believing that Intensive Family

16 Intervention is an evidence-based service in

17 Georgia?

18      A    I believe that it is a part of --

19 somewhere in the literature that talked -- that

20 first started to describe what a System of Care

21 would look like in any region or state, and that

22 home-based services would be -- were shown to be

23 efficacious in serving youth with complex needs and

24 keeping them out of residential care.

25            Beyond that, you know, I'm -- I can't say



1   more.  I'm speaking on just kind of my memory of

2   those System of Care texts, but it's not something I

3   consulted in recent years.  I haven't read those

4   kind of foundational texts that people use across

5   the nation, really, to build their systems of care.

6        Q    Okay.  Have you reviewed any data or

7   documentation demonstrating whether Intensive Family

8   Intervention is available and accessible in every

9   region of the state?

10       A    No.

11       Q    Have you reviewed any data or

12  documentation demonstrating whether Intensive Family

13  Intervention is provided to students enrolled in

14  GNETS?

15       A    No.

16       Q    Do you know whether DBHDD evaluates

17  whether community-based services are diverting kids

18  from placement in a PRTF?

19       A    Evaluates?  DBHDD certainly actively

20  offers these community-based programs as a way to

21  divert children from residential care.  When

22  residential care is appropriate and the child meets

23  eligibility for admission, of course it occurs.

24            But does it evaluate in some kind of,

25  what, formal way how many kids get diverted from



STEPHANIE PEARSON, PH.D.                                    March 28, 2022
UNITED STATES vs STATE OF GEORGIA                                    109

 1  residential?  No, I don't think so.

 2      Q    Dr. Pearson, at this time I would like to

 3  show you another document.

 4           I'm going to pull down the one that I've

 5  got up, and I'm going to show you a new one.

 6           This was previously introduced to the

 7  deposition of Dr. MacKay as Exhibit 15.

 8           Give me one second and I'll pull it up for

 9  you.

10           (WHEREUPON, Plaintiff's Exhibit-15 was

11      previously marked for identification.)

12  BY MR. HOLKINS:

13      Q    I'm going to share my screen.  Give me one

14  second.

15           Dr. Pearson, can you see this document

16  marked Exhibit 15?

17      A    Yes.

18      Q    So just for the record, this is a document

19  titled, "Active Provider By Service," as of

20  04/11/2019.  In the top corner it's stamped "Georgia

21  Collaborative ASO."

22           The Bates number is GA00023273, and as I

23  referenced, it's Exhibit No. 15.

24           Dr. Pearson, have you ever seen a report

25  like this before?



1              I'm sorry, I should have given you the

2    opportunity to take a look at this.  I'm going to

3    transfer control to you, Dr. Pearson, so you can

4    take a moment to familiarize yourself with the

5    document.  There's no need to review every page but

6    I want to give you a chance to look through it.

7              You have control.

8              (Witness reviews exhibit.)

9       A    I don't think I've seen this document

10   before, but I have -- I think I have seen some time

11   in the past provider listings, but I'm not sure

12   about this particular provider listing.

13      Q    Okay, thank you, Dr. Pearson.

14              So when you have received provider

15   listings in the past, who provided them to you?

16      A    Well, again, I'm not receiving them.  This

17   is from the Georgia Collaborative, the ASO.  So if

18   this were a document, what we were talking about

19   providers, they would bring it to the meeting.

20              So that's how I have access to those kinds

21   of things.  The ASO certainly is the Administrative

22   Services Organization, has been for some time.  So

23   that information would be compiled by them and

24   presented in a meeting, but it's not like I

25   regularly received reports from them about who the



 1  providers are.

 2      Q    That was my next question, and I'll just

 3  ask it to make sure the record is clear.

 4           Are you as a matter of course regularly

 5  reviewing reports identifying active providers by

 6  service?

 7      A    No.

 8      Q    Are you regularly -- excuse me.

 9           Are you regularly reviewing any other

10  reports generated by the Georgia Collaborative ASO?

11      A    The reports that may be pertinent to a

12  joint clinical meeting, I'm reviewing those as they

13  may relate to children services, if there have been

14  some issues.  But in terms of weekly or anything

15  like that, reports about providers, it's not a

16  matter of course.

17      Q    So we could put this aside.

18           I do want to ask you about one other

19  service that was identified in the previous exhibit,

20  which was Exhibit 8, and that's Community Support.

21           What is your understanding of the

22  Community Support Service of Georgia?

23      A    The CSI, Community Support - Individual.

24  It's kind of like case management function, almost

25  where the person could get services that were not



1  necessarily or predominantly clinical in nature, but

2  we're still fairly instrumental in meeting a

3  client's needs.

4      Q    And within community provider

5  organizations within Georgia, which staff are

6  responsible for providing Community Support

7  Services?

8      A    Well, historically, they have been people

9  who were hired specifically to do CS-I.  So they

10 weren't -- they were separate from there because it

11 didn't require a clinical license to do CS-I.

12          If there were staffing shortages,

13 workforce shortages, like everybody is experiencing

14 now, the CS-I duties might be rolled up into what a

15 clinician does.

16          So you might not have a separate person

17 doing CS-I.

18     Q    I just want to make sure we've got this

19 acronym right.  CS-I, what does that stand for?

20     A    It's community support -- in my day, I

21 don't know if the jargon has changed, but it was

22 Community Support - Individual.

23          Community support in a group.

24     Q    I understand.  Thank you.

25          Is CS-I an evidence-based service in



1  Georgia?

2      A    I'm not sure if it is, what the empirical

3  evidence would be to support CS-I.  Just that it was

4  identified as a need and it was identified as a

5  service that could be effective, that didn't require

6  clinicians but could still be helpful to the client.

7      Q    Have you reviewed any data or

8  documentation demonstrating whether a Community

9  Support - Individual is available and accessible in

10  every region in the state?

11      A    No.

12      Q    Have you reviewed any data or

13  documentation demonstrating whether a Community

14  Support - Individual is provided to children

15  enrolled in GNETS?

16      A    No.

17          MR. HOLKINS:  So we've got about half an

18      hour left.  If it's all right with everyone,

19      I'd like to just press forward.  I have another

20      line of questions but I do expect to finish my

21      1:00 p.m., as we anticipated.

22      Q    Would that be all right, Dr. Pearson, if

23  we went ahead and just continue?

24      A    I may need about a five-minute break.

25      Q    Let's take it now.



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                          114

1      A     Okay.

2            MR. HOLKINS:  We can go off the record,

3      Robert.

4            THE VIDEOGRAPHER:  Going off video record,

5      12:32 p.m.

6            (A recess was taken.)

7            THE VIDEOGRAPHER:  We are now back on

8      video record, 12:37 p.m.

9   BY MR. HOLKINS:

10     Q     Dr. Pearson, I've just got a few more

11  questions for you, and they generally concern the

12  Apex program, which we talked about a little bit

13  before.

14           First, could you describe what the Georgia

15  Apex program?

16     A     The school-based mental health program

17  that was developed under the directorship of Matt

18  Yancey, and basically was designed to offer services

19  that young people would normally get in a

20  traditional mental health facility in the school, so

21  that they can get assessments, behavioral health

22  assessments.  They could get individual therapy.

23           The thing that they were not able to get

24  in the school was the medication monitoring.  There

25  were no psychiatrists available at schools, as



1   conditions were.

2          But as I mentioned before, the funding was

3   given to the Community Service Boards.  Every

4   Community Service Board in the state was given the

5   funding to start school-based mental health in the

6   schools that the Community Service Boards determined

7   they would be serving.

8          And it has grown from there.  It started

9   out with just Community Service Boards and then

10  other providers have come on board.  So it's grown

11  from there, in elementary schools, middle schools,

12  and high schools.

13      Q    Within the State, is it accurate that

14  DBHDD is the entity primarily that's administering

15  the Apex program?

16      A    Yes.

17      Q    What is the Georgia Department of

18  Education's involvement in the Apex program?

19      A    Well, we've been working in partnership to

20  ensure as much as we could that schools -- for

21  example, with maybe greatest need were recipients of

22  the services, understanding again that the Community

23  Service Boards themselves chose the schools.  The

24  Department of Education was offering some, some --

25  maybe some consultation or suggestions about, again,



1  those schools where the need appeared to be great

2  and that maybe asking the Community Service Boards

3  to consider those schools if they hadn't already.

4       Q    Do you know whether the Georgia Department

5  of Education is providing ongoing input about that,

6  the schools where Apex may be most needed?

7       A    I don't know because I'm not in regular

8  contact with the Department of Education.

9       Q    Do you know how the decision was made that

10  DBHDD and not the Georgia Department of Education

11  would principally administer the Apex program?

12      A    The funding came from DBHDD.

13      Q    But since this is a program, as you

14  described it, that's intended to provide services in

15  schools, what's your understanding of why despite

16  that fact DBHDD is responsible for administering the

17  program?

18      A    The funding came from DBHDD.

19      Q    Does the Georgia Department of Education

20  provide any funding in support of Apex, to your

21  knowledge?

22      A    Not to my knowledge.

23      Q    Are there specific clinical criteria for

24  youth to be eligible for services through Apex?

25      A    The young people who get referred to Apex



1  are referred either by school counselors, sometimes

2  maybe a school principal, teachers.  But they've

3  been identified in their academic environments as in

4  need of that kind of level of clinical support, that

5  they were not previously accessing that kind of

6  level of support, for whatever reason.

7         And so those children would come to the

8  attention of the Apex provider.  Again, it's up to

9  the parent or guardian to determine whether or not,

10 even if they're recommended by their teacher or

11 school counselor or whomever, the parent or guardian

12 has to be the one to say I am, you know, interested

13 in having that service for my child.

14        Absent that, there's no provision of any

15 service.

16    Q    Are there exclusionary criteria in the

17 Apex program for children?

18        Let me just --

19    A    I'm not aware.  If a child is in school,

20 as I mentioned, and they have a clinical need and

21 they're not being served by some other clinical

22 program, I guess that would be the exclusion.  If

23 you're already getting services in a clinical

24 program, there wouldn't be a duplication of services

25 by also being enrolled in Apex.



1        Q    Are children duly diagnosed with
2   behavioral health conditions in developmental
3   disabilities eligible to receive --
4            THE COURT REPORTER:  Could you say that
5   again.
6            MR. HOLKINS:  I'm going to repeat that
7        because I went to fast for the court reporter.
8        She's trying to wave me down.
9   BY MR. HOLKINS:
10       Q    Are children duly diagnosed with
11  behavioral health conditions and developmental
12  disability eligible to receive services through the
13  Apex program?
14       A    They've been identified.  They have a
15  behavioral health need.  Somebody refers them, and
16  the parent agrees.  They can proceed.
17       Q    So that's a yes?
18       A    Yes.  With those stipulations, of course.
19       Q    Are you aware of any categorical exclusion
20  from eligibility for Apex based on a history of
21  aggression?
22       A    I'm not aware of a categorical exclusion,
23  no.
24       Q    Are you aware of a categorical exclusion
25  from eligibility for Apex based on a history of



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                          119

```
 1  residential placement?
 2       A    No.
 3       Q    Are you aware of whether children who have
 4  a history of aggression have been served through
 5  Apex?
 6       A    I'm not aware of that personally, but,
 7  again, since it's not an exclusionary criteria, I
 8  imagine that they have.
 9       Q    Would you also imagine that children who
10  have a history of residential placement have been
11  served through the Apex program?
12       A    Yes.
13       Q    Are uninsured children eligible to receive
14  services through Apex?
15       A    Yes.
16       Q    Does DBHDD allow Apex providers to serve
17  students who are enrolled in GNETS?
18       A    Not to my knowledge.
19       Q    And why not?
20       A    If there's -- again, the expectation is
21  that the children are already getting services if
22  they're enrolled in GNETS.  So you'd have a
23  duplication if you also enroll them in Apex.
24       Q    Do you know whether Apex providers receive
25  training on evidence-based services?
```



1     A    I believe that they do.

2     Q    And would that be through the same DBHDD

3  component that you described earlier, or through the

4  COE?

5     A    It could be either or both.  It could be

6  System of Care Academy as well.

7     Q    Do you personally provide any training to

8  Apex providers on evidence-based services?

9     A    No.

10     Q    Do any of the staff who report to you at

11  OCYF provide training on evidence-based services to

12  Apex providers?

13     A    No.

14     Q    For children who are referred to Apex who

15  have a diagnosis of ADHD, what evidence-based

16  services would you recommend?

17     A    With ADHD?  If that was their only

18  diagnosis, I would not be making a recommendation,

19  but the therapist working in concert with the family

20  and the teacher, or whoever made the referral, would

21  be developing a service plan that would include best

22  practice.  But I personally would not be doing that.

23     Q    What best practices would you expect that

24  treatment team to recommend?

25          MR. PICO PRATS:  Objection.



STEPHANIE PEARSON, PH.D.                          March 28, 2022
UNITED STATES vs STATE OF GEORGIA                          121

1      A    I don't know what I would expect.  Again,

2   it is left to the discretion of the therapist who is

3   a licensed mental health professional and the rest

4   of the treatment team to come up with that

5   information.

6      Q    Let me try it this way:  What

7   evidence-based services in Georgia are available to

8   meet the needs of a child diagnosed with ADHD?

9      A    I can't say what evidence-based practices

10  are available in the State of Georgia because it is

11  the current view of the clinicians offering the

12  care, the agencies for which they work, licensed

13  clinicians who I think maintain the license, would

14  be receiving the kind of training they need to serve

15  populations that they serve.

16     Q    So I'm trying to understand --

17     A    Beyond that -- beyond that, I can't

18  comment.

19     Q    Do you view it as part of your job to know

20  what evidence-based services are available to

21  children with behavioral health conditions in the

22  State of Georgia?

23          MR. PICO PRATS:  Objection.

24     A    Um, again, I've been aware that the State

25  expects mental -- licensed mental health



1  professionals to be conversant in and trained in a

2  best based practice, but we don't prescribe which

3  evidence-based practice a provider will offer.

4      Q    Acknowledging that, the question again is

5  whether or not you view it as part of your

6  responsibility to know what is available as an

7  evidence-based service in Georgia?

8           MR. PICO PRATS:  Same objection.

9      A    It could be.

10     Q    It could be part of your job?

11     A    It could be.

12     Q    How are student or client outcomes in the

13 Apex program measured?

14     A    I think that's a better question for the

15 Center of Excellence because they do the surveys.

16 There's reports.  I'm not privy to those, but I do

17 know they are regularly assessing Apex providers on

18 a number of items, and there's been some discussion

19 about what the outcomes would be.

20          Do they change over time?  You know, what

21 seems to be the most relevant kinds of outcomes that

22 schools are interested in, stakeholders are

23 interested in, families are interested in.

24          So the Center of Excellence is the

25 repository of all that data.



1      Q    Do you provide any input to assist the

2   Center of Excellence in determining the outcome

3   measures for the Apex program?

4      A    We've had discussions.

5      Q    You participated in --

6      A    More in the past -- more in the past than

7   now, though, because I'm not the Apex manager.  The

8   Apex manager would also be a good person to talk to

9   about that.

10     Q    And who is that person?

11     A    Layla Fitzgerald.

12     Q    Do you have any role in assessing the

13  sustainability of the Apex program?

14     A    No.

15     Q    As a matter of course, do you review data

16  reported by the Center of Excellence with respect to

17  student outcomes in Apex?

18     A    Not as a matter of course.  On occasion.

19          MS. COHEN:  Is that for just one student

20      at a time or is that systemwide?

21  BY MR. HOLKINS:

22     Q    So the question that we just posed is

23  whether in the agencies where you have reviewed data

24  on student outcomes in Apex, that was limited to a

25  specific student or systemwide?



1        A     Oh.   Probably more systemwide.

2        Q     When is the last time you reviewed

3    systemwide data on student outcomes in the Apex

4    program?

5        A     I can't recall.

6        Q     Dr. Pearson, were you asked to collect

7    documents as part of the State's effort to respond

8    to the U.S. Department of Justice's responses in

9    this case?

10       A     No.

11       Q     I'm going to ask you some questions, Dr.

12   Pearson, about what you did to prepare for this

13   deposition.  I want to be clear I'm not asking for

14   you to divulge any substantive information about

15   your discussions with counsel in preparation for

16   this deposition.

17             And with that caveat, what did you do to

18   prepare for this deposition?

19       A     I went through my archived emails.

20       Q     Dating back how far?

21       A     To 2016.

22       Q     For what purpose?

23       A     To refresh my memory about -- since my

24   name had come up in this whole proceeding, to try to

25   get some sense of why my name came up, since I am no



1   longer the point person for Apex, nor do I have

2   regular contact with GNETS.  So it was to help me to

3   try to get some understanding of why my name came

4   up.

5        Q    In preparation for this deposition, did

6   you discuss your testimony with anyone other than

7   counsel for the State?

8        A    No.

9        Q    Were any documents provided to you

10  specifically for the purpose of this deposition?

11       A    Beyond that copy of the letter that you

12  showed me?

13       Q    And you're referring to the notice of your

14  deposition; is that right?

15       A    That's it.

16            MR. HOLKINS:  Just one second.

17            (Pause.)

18            MR. HOLKINS:  We are all done.

19            Thank you very much, Dr. Pearson, for your

20       time and for answering my questions today.

21            I hope you have a great day.

22            THE WITNESS:  All right.

23            MR. PICO PRATS:  Thank you, Dr. Pearson.

24            THE COURT REPORTER:  Just hold on a

25       second.



1          (Discussion ensue off the record.)

2          THE VIDEOGRAPHER:  We are concluding the

3    videotape deposition.  The time is 12:57 p.m.

4          We're going off the record now.

5          (Whereupon, the deposition concluded at

6    12:57 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



C E R T I F I C A T E

STATE OF GEORGIA:

FULTON COUNTY:

         I hereby certify that the foregoing

transcript of STEPHANIE PEARSON, Ph.D. was taken

down, as stated in the caption, and the questions

and answers thereto were reduced by stenographic

means under my direction;

         That the foregoing Pages 1 through

126 represent a true and correct transcript of

the evidence given upon said hearing;

         And I further certify that I am not of kin

or counsel to the parties in this case; am not in

the regular employ of counsel for any of said

parties; nor am I in anywise interested in the

result of said case.


         IN WITNESS WHEREOF, I have hereunto

subscribed my name this 1st day of April, 2022.

_____

         Wanda L. Robinson, CRR, CCR No. B-1973
              My Commission Expires 10/11/2023



1                    D I S C L O S U R E

2    STATE OF GEORGIA  ) 03/28/22 VIDEOTAPE DEPOSITION OF
     FULTON COUNTY     ) STEPHANIE PEARSON, Ph.D.

3                    Pursuant to Article 10.B of the Rules and

4    Regulations of the Board of Court Reporting

5    of the Judicial Council of Georgia, I make the

6    following disclosure:

7                    I am a Georgia certified court reporter.

8    I am here as a representative of Esquire Deposition

9    Solutions, LLC, and Esquire Deposition Solutions,

10   LLC was contacted by the offices of U.S. Attorney's

11   Office to provide court reporter services for this

12   deposition.  Esquire Deposition Solutions, LLC will

13   not be taking this deposition under any contract

14   that is prohibited by O.C.G.A. 9-11-28 (c).

15                   Esquire Deposition Solutions, LLC has no

16   contract/agreement to provide court reporter

17   services with any party to the case, or any counsel

18   in the case, or any reporter or reporting agency

19   from whom a referral might have been made to cover

20   this deposition.

21                   Esquire Deposition Solutions, LLC will

22   charge the usual and customary rates to all parties

23   in the case, and a financial discount will not be

24   given to any party to this litigation.

25

1              ERRATA SHEET FOR THE TRANSCRIPT OF:

2    Deponent Name:  STEPHANIE PEARSON, Ph.D.

3    Case Caption:   United States of America vs. State
                     of Georgia

4

5    Case No. :  1:16-cv-03088-ELR

6        I do hereby certify that I have read all
     questions propounded to me and all answers given by
7    me on the 28th day of March 2022, taken before Wanda
     L. Robinson, and that:

8

9    _____1) There are no changes noted.

10   _____2) The following changes are noted:

11       Pursuant to state rules of Civil Procedure
     and/or the Official Code of Georgia Annotated
12   9-11-30(e), both of which read in part:  Any changes
     in form or substance which you desire to make shall
13   be entered upon the deposition with a statement of
     the reason given for making them.
14       Accordingly, to assist you in effecting
     corrections, please use the form below:

15

16   CORRECTIONS:

17   _____

18   Page      Line           Change        Reason For Change

19   _____

20   _____

21   _____

22   _____

23   _____

24

25



STEPHANIE PEARSON, PH.D.                              March 28, 2022
UNITED STATES vs STATE OF GEORGIA                              130

1                    CERTIFICATE  OF DEPONENT

2

3        I hereby certify that I have read and examined

4    the foregoing transcript, and the same is a true and

5    accurate record of the testimony given by me.  Any

6    additions or corrections that I feel are necessary,

7    I will attach on a separate sheet of paper to the

8    original transcript.

9

10                      _____

11                                Signature of Deponent

12

13        I hereby certify that the individual

14    representing himself/herself to be the above-named

15    individual, appeared before me this _____ day of

16    _____, 2022, and executed the above

17    certificate in my presence.

18

19

20                      _____

21                                NOTARY PUBLIC

22

23    MY COMMISSION EXPIRES:

24

25

 ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com