```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                       ATLANTA DIVISION

 3

 4  UNITED STATES OF AMERICA,
                                )CIVIL ACTION
 5           Plaintiff,         )NO. 1:16-cv-03088-ELR
                                )
 6  vs.                         )
                                )
 7  STATE OF GEORGIA,           )
                                )
 8           Defendants.        )
                                )
 9  - - - - - - - - - - - - - - )

10

11              VIDEOTAPE DEPOSITION OF

12                 WENDY W. TIEGREEN

13

14       Tuesday, June 21, 2022, 9:17 a.m., EST

15

16

17

18

19

20          HELD AT:

21          Robbins Alloy Belinfante Littlefield LLC
            500 14th Street, N.W.
22          Atlanta, Georgia  30318

23          ----------------------------------------------

24

25          WANDA L. ROBINSON, CRR, CCR, No. B-1973
            Certified Shorthand Reporter/Notary Public
```



```
 1                   APPEARANCES OF COUNSEL

 2

 3    Appearing on Behalf of the Plaintiff:

 4

 5        FRANCES COHEN, ESQUIRE
          PATRICK HOLKINS, ESQUIRE
 6        U.S. Department of Justice
          Civil Rights Division
 7        950 Pennsylvania Avenue, N.W.
          Washington, D.C. 20579
 8        T:  202.305.6630   F:
          E-mail:  fcohen@usdoj.gov
 9                  pholkins@usdoj.gov.

10

11    Appearing on Behalf of the Defendant:

12

13        DANIELLE HERNANDEZ, ESQUIRE
          Robbins Alloy Belinfante Littlefield LLC
14        500 14th Street, N.W.
          Atlanta, Georgia  30318
15        T:  404.856.3261
          E-mail:  dhernandez@robbinsfirm.com

16

17    ALSO PRESENT:

18    VIA ZOOM:

19            KELLY GARDNER, ESQUIRE

20            VICTORIA LILL, ESQUIRE

21            MEGAN ERICKSON, ESQUIRE

22            LAURA TAYLOE, ESQUIRE

23            ALISON EWERS, PARALEGAL

24            JESSICA BERRY, PARALEGAL

25            JASON SILLING, VIDEOGRAPHER
```



```
 1                    INDEX OF EXAMINATIONS

 2

 3   WENDY W. TIEGREEN

 4   By Mr. Holkins                                    Page 7

 5

 6

 7                     INDEX OF EXHIBITS

 8   PLAINTIFF'S

 9   NO.                 DESCRIPTION               PAGE

10   Exhibit 136   Notice of Deposition                8

11   Exhibit 137   3/18/2020 Email From Wendy Tiegreen  15
                   To Erika Stinson With Attachments
12                 GA04295422-GA04295423

13   Exhibit 138   8/25/2016 Email From Wendy Tiegreen 104
                   To Marcey Alter
14                 GA04199954-GA04199955.001

15   Exhibit 139   9/23/2015 Email From Wendy Tiegreen 121
                   To Alrich, Yancey With Attachments
16                 GA04179924-GA04179926

17   Exhibit 140   1/3/2018 Email From Wendy Tiegreen  130
                   To Dante McKay
18                 GA05023066

19   Exhibit 141   8/21/2017 Email Chain From Wendy    138
                   Tiegreen To Recipients
20                 GA00381117-GA000381119

21   Exhibit 142   5/4/2020 Email From Tricia Mills    161
                   To Tiegreen, Quesenberry
22                 With Attachment
                   GA04301608-GA04301630
23
     Exhibit 143   Approved Medicaid Provider List     177
24                 Behavioral Health (C&A)
                   Confidential Information
25                 GA05027310-GA05027320
```



```
1                    INDEX OF EXHIBITS (Continued)

2      PLAINTIFF'S

3      NO.                 DESCRIPTION                PAGE

4      Exhibit 144  4/14/2020 Email Chain From Wendy   185
                    Tiegreen To Melissa Sperbeck
5                   With Attachments
                    GA04298133-GA04298146
6
       Exhibit 145  1/23/2020 Email Chain From Wendy   195
7                   Tiegreen To Recipients
                    With Attachments
8                   GA04288334-GA04288374

9      Exhibit 146  1/3/2018 Email From Wendy Tiegreen  220
                    To Melissa Sperbeck With Attachment
10                  GA04225637-GA04225639

11     Exhibit 147  4/18/2018 Email Chain From Amy      229
                    Howell To Wendy Tiegreen
12                  GA04234690-GA04234691

13     Exhibit 148  10/28/2020 Email From Wendy         236
                    Tiegreen To Melissa Sperbeck
14                  GA04324126

15     Exhibit 149  5/15/2017 Email From Wendy Tiegreen 245
                    To Marcey Alter
16                  GA04205173

17     Exhibit 150  7/31/2020 Email Chain From Dante    252
                    McKay To Recipients With Attachments
18                  GA04312715-GA04312738

19     Exhibit 151  5/13/2020 Email From Breyanna       255
                    Marshay Mikel To Recipients
20                  With Attachments
                    GA04303079-GA04303084
21
       Exhibit 152  SOC State Plan: School Based Mental 259
22                  Health Year 3 Survey Results
                    GA04307352-GA04307375
23
       Exhibit 153  2/11/2020 Email Chain From Wendy    272
24                  Tiegreen To Recipients
                    With Attached PowerPoint
25                  GA04292483-GA04292485.001
```



1                    INDEX OF EXHIBITS (Continued)

2    PLAINTIFF'S

3    NO.                    DESCRIPTION                    PAGE

4    Exhibit 154   10/9/2019 Email Chain From Jeffrey   275
                   Minor To Dante McKay
5                  With Attachments
                   GA04278558-GA04278569
6
     Exhibit 155   1/7/2018 Email Chain From Wendy     279
7                  Tiegreen To Dante McKay
                   GA04225691-GA04225694
8

9

10

11

12

13             INDEX OF EXHIBITS (Previously Marked)

14   PLAINTIFF'S

15   NO.                    DESCRIPTION                    PAGE

16   Exhibit 8    February 12, 2021 Robbins Letter      92
                  Alexa Ross To Andrea Hamilton and
17                Victoria Lill

18

19

20

21

22

23

24

25



 1              THE VIDEOGRAPHER:  This is the video

 2         deposition of Wendy Tiegreen, taken in the

 3         matter of United States of America versus State

 4         of Georgia.

 5              Today's date is June 21st, 2022.

 6              Time on the record is 9:17.

 7              My name is Jason Silling.  I'm the

 8         videographer.

 9              The court reporter is Wanda Robinson.

10              Counsel, please introduce yourselves,

11         after which the court reporter will swear in

12         the witness.

13         MR. HOLKINS:  Patrick Holkins for the

14         United States.

15         MS. COHEN:  Frances Cohen for the United

16         States.

17         MS. HERNANDEZ:  Danielle Hernandez for the

18         State of Georgia.

19                   - - - - - - -

20              WENDY W. TIEGREEN,

21    being duly sworn, was examined and testified as

22    follows:

23                   - - - - - - -

24         MS. PATEL:  Monica Patel with the DBHDD.

25    ///



```
 1    EXAMINATION
 2    BY MR. HOLKINS:
 3         Q    Ms. Tiegreen, thank you for coming today.
 4         Good morning.
 5         A    Good morning.
 6         Q    Could you please state and spell your full
 7    name for the record.
 8         A    Sure.  Wendy, W-E-N-D-Y, White, W-H-I-T-E,
 9    Tiegreen, T-I-E-G-R-E-E-N.
10         Q    Before we get started, I'm going to run
11    through some instructions, a bit of a roadmap for
12    the day.
13         So we're going to go I expect most of the
14    day, but we'll take breaks.  About every hour and a
15    half at least we'll break.
16         A    Okay.
17         Q    If you need a break earlier than that, let
18    me know.  The one request I have is that if a
19    question is pending, that you answer the question
20    before we break.
21         A    Sure.
22         Q    As you know, the deposition is being
23    recorded.  We have a stenographer who is taking
24    everything down.  We also have a videographer who is
25    filming.
```



1            For clarity of the record, it would be

2    great if you could let me finish my question before

3    you start your answer, and also respond audibly with

4    yes, no, as opposed to words like uh-huh, uh-uh.

5            Is that okay?

6        A    That's good.  Thank you.  Yes.

7        Q    So I'm going to now show you the first

8    exhibit of the day, which is 136.

9            All exhibits will be shown electronically

10   today.

11           I'm going to share my screen and give you

12   an opportunity to control the document.  Please let

13   me know once you've reviewed it and I'll ask you a

14   few questions.

15           MR. HOLKINS:  Just give me one second.

16           (WHEREUPON, Plaintiff's Exhibit-136 was

17       marked for identification.)

18   BY MR. HOLKINS:

19       Q    I've now given you control of the

20   document.  Please take a moment to review it and let

21   me know when you've finished.

22           (Witness reviews exhibit.)

23       A    I've completed the review.

24       Q    Thank you.

25           I'm going to take control of the document



1  back.

2           Ms. Tiegreen, this is the notice of your

3  deposition in this case; is that correct?

4      A    That is correct.

5      Q    Have you seen this document before?

6      A    Yes, I have.

7      Q    Who showed it to you?

8      A    Danielle Hernandez.

9      Q    I'm guessing that was last week, since

10  this was served last week?

11     A    That was this morning.

12     Q    This morning, okay.

13          Before you reviewed this notice of

14  deposition this morning, had you heard about this

15  case?

16     A    Yes.

17     Q    And what did you know about this case

18  before this morning?

19     A    I have been a respondent to some

20  interrogatories on behalf of the Department, and

21  then received notice that I would be here today from

22  Danielle and from our team as well, and so that was

23  basically the advance notice.

24     Q    Do you recall which interrogatories -- and

25  these are interrogatories served by the United



1   States in this litigation; is that right?

2        A    Correct -- let me just say I think.

3   Really, our legal counsel just really puts forth

4   questions to our team, and we as team members

5   respond.

6        Q    Okay.  We may talk a little bit more about

7   that in a bit.

8             What's your understanding of what this

9   litigation is about?

10       A    Basically the generalist understanding

11  that I have is it's about access to supports in the

12  GNETS program.

13       Q    What kind of supports specifically?

14       A    Behavioral health supports.

15       Q    Ms. Tiegreen, are you aware Dante McKay,

16  John Quesenberry, and Stephanie Pearson were all

17  deposed in this matter?

18       A    I'm aware Dante and John Quesenberry were.

19  I was not aware that Dr. Pearson had.

20       Q    And for the record, Dante McKay, John

21  Quesenberry and Stephanie Pearson are all DBHDD

22  employees, correct?

23       A    Yes.  They are all colleagues, yes.

24       Q    Did you review the transcripts of any of

25  their depositions in this matter?



 1       A    No.

 2       Q    Ms. Tiegreen, do you understand that your

 3   testimony today is under oath?

 4       A    Yes.

 5       Q    And do you understand that being under

 6   oath means you have an obligation to tell the truth?

 7       A    Yes.

 8       Q    Is there any reason at all why you cannot

 9   testify accurately and truthfully today?

10       A    No.

11       Q    Are you taking any medication or other

12   substance that would interfere with your ability to

13   answer my questions fully and truthfully today?

14       A    No.

15       Q    Have you ever been deposed before?

16       A    It's been many years, but I have been

17   deposed before.

18       Q    Were you deposed as an employee of DBHDD?

19       A    Yes.

20       Q    What was the matter that you were deposed

21   in?

22       A    It was related to provider -- a provider

23   fraud case.

24       Q    Was that a Medicaid fraud issue?

25       A    Yes.



WENDY W. TIEGREEN                                      June 21, 2022
UNITED STATES vs STATE OF GEORGIA                                  12

```
 1        Q    Who was the provider?
 2        A    I do not even recall.
 3        Q    Do you know if it was a Community Service
 4   Board?
 5        A    It was not a Community Service Board.
 6        Q    Okay.  Do you recall when this deposition
 7   occurred?
 8        A    This would have been back in the 2000 oo's
 9   at some point.  Many, many years ago.
10        Q    Have you ever been a plaintiff or a
11   defendant in a lawsuit?
12        A    No.
13        Q    I'm going to be using some acronyms today.
14   I know this business has lots of acronyms and I want
15   to make sure that we're all on the same page.  So
16   I'm going to run through the acronyms and make sure
17   you understand what I'm referring to.
18        A    Uh-hum.  (Affirmative.)
19        Q    The first one is "DBHDD."  Will you
20   understand that I'm referring to the Georgia
21   Department of Behavioral Health and Developmental
22   Disabilities?
23        A    Yes, I will.
24        Q    And when I use the acronym "DCH," will you
25   understand that I'm referring to the Georgia
```



WENDY W. TIEGREEN                                     June 21, 2022
UNITED STATES vs STATE OF GEORGIA                              13

1   Department of Community Health?

2        A    Yes.

3        Q    When I refer to "GaDOE," or "DOE," will

4   you understand I'm referring to the Georgia

5   Department of Education?

6        A    Yes.

7        Q    And when I say "CMO," will you understand

8   I'm referring to Care Management Organizations?

9        A    Yes.

10       Q    And when I say "SED," will you understand

11  that I'm referring to serious emotional

12  disturbances?

13       A    Yes.

14       Q    When I say "DBHDD education setting," what

15  I mean is a public school in Georgia where children

16  with SED and other behavioral health conditions

17  receive instruction in services alongside children

18  who do not have disabilities.  Do you understand

19  that?

20       A    I have, I have not heard that acronym

21  before, but I will try to retain it for the purposes

22  of this continued interview process.

23       Q    And if I do ask the question where I'm

24  using the term "general education setting," I'll

25  clarify that's what I mean.



 1        A    Thank you.

 2        Q    When I use the term "GNETS," will you

 3    understand I'm referring to the Georgia Network for

 4    Educational and Therapeutic Support?

 5        A    Yes.

 6        Q    When I use the term "CYF" or "OCYF," will

 7    you understand that I'm referring to the Office of

 8    Children, Young Adults and Families within DBHDD?

 9        A    Yes.

10        Q    When I refer to "COE," will you understand

11    that I am referring to the Georgia State University

12    Center of Excellence?

13        A    Yes.

14        Q    I already used the term "CSB."  Will you

15    understand that refers to Community Service Board?

16        A    Yes.

17        Q    And when I refer to "EPSDT," will you

18    understand that it means early periodic screening,

19    diagnosis and treatment?

20        A    Yes.

21        Q    And just "SAMHSA" refers to Substance

22    Abuse and Mental Health Services Administration

23    within the U.S. Department of Health & Human

24    Services, correct?

25        A    Yes.



1      Q    And, finally, "NASMHPD" refers to the
2   National Association of State Mental Health Program
3   Directors, correct?
4      A    Yes.
5      Q    So I'm going to virtually set aside this
6   first exhibit and move on to the next one, which
7   will be 137.
8           (WHEREUPON, Plaintiff's Exhibit-137 was
9       marked for identification.)
10          MR. HOLKINS:  Give me one second.
11   BY MR. HOLKINS:
12      Q    So this exhibit has three documents, an
13   email with two attachments.  I'm going to show you
14   the email first and then I'll show you the
15   attachments.
16          Do you see the email on your screen?
17      A    I do.
18          I'll note for the record that this
19   document was produced by the State of Georgia to the
20   United States.  It's marked as GA04295422, and this
21   appears to be an email from you, Ms. Tiegreen, sent
22   in March of 2020 with the subject "Bio/Resume," and
23   it has, as I mentioned, two attachments.
24          Let me just first confirm, this is an
25   email that you sent, correct?



1        A    I'm moving the camera again.  I'm sorry.

2        Q    Let me actually give you control.  I'm

3   sorry.  It will make it a bit easier.

4             You have control now.

5             MS. HERNANDEZ:  Is there a way to give two

6        people control at one time?

7             MR. HOLKINS:  I wish.  If you need control

8        of a document, let me know and I will give it

9        to you.

10            MS. HERNANDEZ:  Thank you.

11       A    Yes, as far as I can tell, because there's

12  no subject writing.  Like I can't tell my style, but

13  clearly it looks like it would have been sent from

14  me.

15       Q    Okay, thank you.

16            I'm going to take back control, and then

17  also stop sharing this document so I can move on to

18  the first attachment.

19            I'll note for the record that this

20  document was produced as GA04295423.  It was

21  attached to the email that we just discussed.

22            Ms. Tiegreen, this appears to be a bio for

23  you; is that correct?

24       A    That is correct.

25       Q    I'm going to quickly show you the other



1  exhibit, which is going to be the real focus for us.

2           MS. COHEN:  You mean the other page of

3      Exhibit 136, Patrick?

4           MR. HOLKINS:  Yes.  Sorry.  The other

5      attachment.

6  BY MR. HOLKINS:

7      Q    So this is the second attachment to

8  Exhibit 137.  I'll note for the record it was

9  produced as GA04295424.

10          I am going to give you control of the

11 document, Ms. Tiegreen, and please just take a

12 moment to review it and let me know when you've

13 finished.

14          You've got control.

15          (Witness reviews exhibit.)

16     A    My apologies for the time.

17     Q    No, take your time.

18     A    It is -- the system is moving quite slow,

19 so I just want to be sure to --

20     Q    No apologies.

21     A    -- be thorough in the review.

22          Yes, I recognize this document.

23     Q    Is this document your resume?

24     A    It is the resume, I presume, that was

25 selected at the time.  It's updated on a regular



1  basis.

2       Q    Was this resume accurate as of the time

3  you sent it in March of 2020?

4       A    Yes.

5       Q    I'm going to scroll back up to the top.

6            On Page 1, under "Related Work

7  Experience," you identify yourself as the Director

8  of Medicaid and Health System Innovation at DBHDD,

9  correct?

10      A    Correct.

11      Q    Is that your current title?

12      A    That is my current title.

13      Q    And you assumed that position in August of

14 2011, correct?

15      A    Correct.

16      Q    In this role, who do you report to?

17      A    I report to Melissa Spurbeck.

18      Q    What is Ms. Sperbeck's title at DBHDD?

19      A    She is division director of the Division

20 of Strategy, Technology and Performance.

21      Q    Broadly, what is the mandate of the

22 Division of Strategy, Technology and Performance at

23 DBHDD?

24      A    So the division is considered like an

25 enterprise, operations division for the Department.



```
 1              So we do not assume authority for any of
 2     the direct lines of service.  So if you think about
 3     mental health as a line of service, substance use as
 4     a line of service, developmental disabilities,
 5     they're offices and division for that.  We serve
 6     kind of as like a buttress or an adjunct to those
 7     teams in supporting those lines of work.
 8              So, for instance, if we need to look at
 9     performance related to a specific program, there's a
10     team who would look at the performance of those
11     programs.  If there is like a Medicaid negotiation
12     that we need to have with the Department of
13     Community Health, then my office would facilitate
14     that conversation and dialogue.
15              So it's really like what we call
16     enterprise roles to support the direct lines of
17     service business.
18        Q    And do you have a specific programmatic
19     focus within this office?
20        A    No, I do not.
21        Q    So that would mean that you're doing work
22     on behalf of potentially all of the offices within
23     --
24        A    Yes.
25        Q    -- DBHDD; is that correct?
```



1        A     Yes, that is correct.

2        Q     And that includes OCYF?

3        A     Yes.

4        Q     I think you mentioned that one of the

5   roles or tasks within this division is reviewing

6   performance; is that accurate?

7        A     Within the division, yes.

8        Q     Within the Department?

9        A     Within the division.  When you were asking

10  me the specific role for our -- the division, yes,

11  that is one of them.

12       Q     Understood.

13             Are you doing performance reviews that are

14  specific to OCYF?

15       A     I don't track that level of detail, so I

16  can't respond to that.  Sorry.  That's not under my

17  auspices, my office's authority.  I'm again like a

18  linear adjunct to that.  The division is quite

19  large.

20       Q     I'm just trying to understand.  If the

21  role of the Division of Strategy, Technology and

22  Performance is to review performance, whose

23  performance are they reviewing?

24       A     Generally, it's about the contracts that

25  the Department would be entering into and is their



 1 | accountability to some of those contracts.
 2 |     Q    Would that include contracts with Apex
 3 | providers?
 4 |     A    I can't say for sure.  I've not looked at
 5 | any of that specific detail.  We have a vast line of
 6 | business, so I just -- I'm not attuned to what the
 7 | specific priorities are of that, that small group
 8 | right now.
 9 |     Q    Do you know who within your office would
10 | have knowledge about performance reviews in
11 | connection with Apex contracts?
12 |     A    Well, certainly Melissa Sperbeck would.
13 | And then there's a team up underneath her.  But I
14 | think that would be the best name for
15 | accountability.
16 |     Q    So stepping back from that question, more
17 | broadly could you just describe your duties
18 | currently in this role as director of Medicaid and
19 | Health Systems Innovation?
20 |     A    Sure.  So basically there are what I
21 | bucket into kind of three large areas:  One,
22 | Medicaid.  The creation of Medicaid partnerships.
23 |          So from DBHDD we do not have role in
24 | federal law as a Medicaid authority.  The Medicaid
25 | agency, the Department of Community Health, holds



1    that responsibility.  And so when we want to

2    implement a program that might have an impact to

3    Medicaid beneficiaries who we serve, then we would

4    work with the Department of Community Health to

5    negotiate the pathway for that, and there are a

6    myriad of Medicaid mechanisms that would facilitate

7    that.  So that's one bucket.

8              The second bucket, Health System

9    Innovation, is really to kind of consider emerging

10   health practices that are beneficial to individual's

11   DBHDD serves and to consider whether or not there

12   might be some development, and then research and

13   commitment to embarking on maybe the creation of a

14   pathway for that innovation.

15             And then third, in my role just kind of as

16   being around for a really long time, I serve as the

17   editor for the community-based behavioral health

18   provider manual.  So the final editor.

19             So, again, as I indicated, there are lines

20   of business where -- like the Office of Children,

21   Young Adults and Families, if they want to make a

22   policy change in the community-based manual, they

23   propose that and then that information comes through

24   me.  It's more of a standardization, single voice

25   writing kind of model for them to then bring that



 1   policy to my office to be sure it comports with the

 2   voicing of some of that policy.

 3        Q    And to make sure I understand, are you the

 4   final reviewer of all changes to the DBHDD program

 5   manual?

 6        A    I'm the final editor, and that's mediative

 7   role, so I don't -- I'm not the final approver, but

 8   I will bring together the right parties to be sure

 9   that the right policy is decided upon.

10        Q    And is the final approver the Commissioner

11   of DBHDD?

12        A    Actually, not generally for the Behavioral

13   Health Provider Manual.  It would be a group of

14   division directors who together would make some of

15   those decisions.

16             We've never had to raise a policy concern

17   up as high as to the Commissioner generally for that

18   level of administration.

19        Q    Just to make sure I understand, would that

20   be individuals at Monica Johnson's level within

21   DBHDD?

22        A    Monica Johnson, and like, again, Melissa

23   Sperbeck, and there are other leaders that are

24   periodically brought in as well, but generally it's

25   facilitated through those offices.



 1          Q     Thank you.

 2                So I'm going to ask you some questions

 3     about specific lines in your resume.

 4          A     Uh-hum.  (Affirmative.)

 5          Q     We're still on Page 1.  I want to direct

 6     you to the first bullet, which reads:  "Those for

 7     Office of Medicaid Coordination and staff which

 8     manage the partnership between the state's Medicaid

 9     and Behavioral Health authorities and all related

10     oversight, policy, and financing for these

11     collaborative Medicaid programs."

12                Do you see that text?

13          A     Yes.

14          Q     What does managing this partnership

15     between the State's Medicaid and behavioral health

16     authorities entail?

17          A     Well, it is dynamic, depending on kind of

18     what the issues of the month or the year are, and so

19     it's variable.

20                In general, as a standard over the course

21     of many years, and I'll harken back to a statement I

22     made a few moments ago, for instance, if there is a

23     new service line that is generating a lot of

24     research or evidence in the country in terms of a

25     new practice line, our department, as a group



 1   behavioral health experts, may review a service and
 2   say there's not really a good Medicaid financing
 3   mechanism for this service at this point, let us
 4   make a proposal to the Medicaid agency and have then
 5   mutual considerations for what might be financing,
 6   what might be policy, and what might be the approval
 7   pathways for that type of service.
 8           It also includes determining some basic
 9   eligibility for those services in terms of like
10   medical necessity criteria and the associated
11   policy.  So, for instance, who are the practitioners
12   who are best to deliver this service?  What is the
13   rate that would best reimburse this service?  What
14   are -- is the best unit of implementation for this
15   particular practice.  And then we enter into
16   dialogue with Medicaid about that body of work.
17           So then subsequently, like -- again,
18   management also would include looking at some use
19   trends.  So, for instance, how much individual
20   counseling is used versus physicians assessment.
21   And then the department then also has a lens on
22   provider performance through our Administrative
23   Services Organization, and we allow that group to do
24   some monitoring of, of compliance and quality, and
25   then I also sit in on those dialogues in the event



 1  there's a concern or issue to bring to the Medicaid
 2  authority.
 3       Q    That was a helpful overview.  There's a
 4  couple of things I want to dive into a little bit
 5  more deeply.
 6            The first is the new financing
 7  mechanism -- sorry.  Exploring financing mechanisms
 8  for, for instance, new service.  Would those
 9  mechanisms include state plan amendments to the
10  Medicaid State Plan?
11       A    Uh-hum.  That's one, yeah.  So there's
12  other mechanisms that are identified federally, and
13  we often examine them before we would make a choice
14  whether or not that's a pathway or not.  But in
15  general the behavioral health benefit that DBHDD
16  assists Medicaid agency in administering is all done
17  through a state plan amendment.
18       Q    Would Medicaid waivers also be an example
19  of a financing mechanism?
20       A    It would be an example but not one we have
21  for behavioral health.
22       Q    Is that because there are no waivers
23  currently being used by the State for behavioral
24  health services?
25       A    That is correct.  In Georgia right now and



1   it's -- yeah.  It's just more difficult to use a

2   waiver for behavioral health, federally.

3        Q    Could you briefly explain why?

4        A    I think I would mostly defer to the

5   Department of Community Health on the why.  But

6   basically when you're waiving something, you're

7   waiving institutionalization, and

8   institutionalization has been historically defined

9   as not including behavioral health.

10       Q    Is it fair to say that your office would

11  be involved in any state plan amendments relating to

12  services administered by DBHDD?

13       A    For services administered by DBHDD, yes.

14       Q    That would -- just to be clear, that would

15  be all the services that are identified in the DBHDD

16  manual, correct?

17       A    In the program manual there are several

18  services that are not Medicaid approved.  So for

19  those state plan services that are within our

20  manual, then the answer to that is yes.

21       Q    Understood.  Thank you for that

22  clarification.

23            You also mentioned being involved in

24  developing medical necessity criteria and associated

25  policy for new services; is that correct?



```
 1        A    Correct.  Uh-hum.

 2        Q    Just to make this concrete, would that

 3   include the State's Intensive Customized Care

 4   Coordination service?

 5        A    Yes.

 6        Q    So you drafted the medical necessity

 7   criteria and associated police --

 8             MR. HOLKINS:  Or let me rephrase.

 9        Q    Were you involved in drafting the medical

10   necessity criteria and associated policy for IC3?

11        A    Yes.  I was part of the team who developed

12   that.

13        Q    And for the record, IC3 refers to

14   Intensive Customized Care Coordination?

15        A    Yes.

16        Q    Thank you.

17             You also mentioned looking at use trends,

18   correct?

19        A    Correct.

20        Q    Would it be fair to say that means

21   tracking utilization of specific services

22   administered by DBHDD?

23        A    Yes, that is correct.

24        Q    Do you evaluate utilization of the full

25   range -- actually, let me hold on to that.  I'm
```



 1   going to wait so you can see another document to ask

 2   that question.

 3           You referenced Administrative Services

 4   Organization.  Is that The Georgia Collaborative

 5   ASO?

 6       A    Yes.

 7       Q    I believe you testified that the ASO, part

 8   of their responsibilities include reviewing provider

 9   performance; is that correct?

10       A    They do what's called a quality review

11   that includes aspects of quality as well as some

12   compliance elements.

13       Q    And who defines the parameters of the

14   quality review done by Georgia ASO?

15       A    There's a --

16           MS. HERNANDEZ:  Objection.

17           Go ahead.  You can answer.

18       A    There's a team who pulled together to

19   craft the first instrument when it was rolled out,

20   and then subsequently there is a team in-house who

21   continues to review that.

22           I'm not a part of that review.

23       Q    Is this a team within DBHDD?

24       A    Correct.

25       Q    And who leads that team?



1       A    Virginia Sizemore under the direction of

2   Melissa Sperbeck.

3       Q    Thank you.

4            I think you mentioned you sit in on some

5   of the -- some meetings in connection with the

6   Georgia Collaborative ASO; is that correct?

7       A    Correct.

8       Q    What is your role?  Can you describe what

9   your role is in those meetings?

10      A    So my role, again, is mostly adjunct in

11  that.  I think it's important to denote my office is

12  two staff, so I attend on typically a periodic basis

13  to get trend information on how the providers in

14  general are doing related to their quality reviews.

15           It gives me a sense of what I may need to

16  interface with the Medicaid agency related to the

17  global performance of the system.

18      Q    Could you provide an example of a trend

19  that emerged from one of these meetings?

20      A    Just give me a minute.

21      Q    Take your time.

22      A    Sure.  So, for instance, recently there's

23  been dialogue about electronic medical records and

24  how some companies who provide electronic medical

25  records, their background documentation is not



 1   easily accessible or there's elements that, that

 2   aren't as neatly recorded from some of these

 3   software programs.  So we made some modifications to

 4   the provider manual as a result of that to be sure

 5   we are getting the highest level of accountability

 6   in medical records.

 7        Q    Do you know whether the Georgia ASO

 8   collaborative is assessing quality of services

 9   provided in GNETS programs?

10             MS. HERNANDEZ:  Objection.

11             You can answer.

12        A    They do a random sampling, and so they are

13   not going into the GNETS programs to look at any

14   program specifically.

15             The random sampling is based on the

16   consumer information and dates of service.  So

17   that's how that's pulled.  It's not -- it's not

18   pulled by, let's focus on this particular area, like

19   a GNETS program.

20             And GNETS is not under DBHDD's authority

21   or role in any way, and therefore we wouldn't even

22   have that as a sampling group in our quality

23   reviews.

24        Q    Just to make sure I understand your

25   testimony, GNETS would be excluded, you expect, from



1   this sample review performed by Georgia

2   Collaborative ASO?

3        A    They --

4             MS. HERNANDEZ:  Object.  You can answer.

5        A    They would not be excluded, because if a

6   young person were to be receiving a service, his or

7   her record might be pulled but it wouldn't be a

8   review of the youth in GNETS, it would be a review

9   of the service which was provided to the youth in

10  GNETS.

11       Q    Understood.  So this is a survey built on

12  client level service data?

13       A    Yes.

14       Q    Which is inclusive of services that may

15  have been received by a child enrolled in GNETS?

16       A    Correct.

17       Q    Do you know who is responsible within the

18  Georgia ASO Collaborative for leading these quality

19  reviews?

20       A    Nicole Griep is the director.

21       Q    Could you spell her last name?

22       A    G-R-I-E-P.

23       Q    Have any trends relating to GNETS emerged

24  from these meetings with the Georgia ASO

25  Collaborative that you've sat in on?



1          A     Not that I'm aware of.

2          Q     You mentioned you have two staff working

3    under you; is that correct?

4          A     One.   There's two of us in the office.

5    One staff.

6          Q     Who is that person?

7          A     Erica Stinson

8          Q     What is Erica Stinson's title?

9          A     She is a program manager up under me for

10   the office.

11         Q     And since you assumed this role in August

12   of 2011, have you always had just one staff working

13   under you?

14         A     Yes.   I was about to say briefly, or less.

15               Yes, just one.

16         Q     One more question on this first bullet and

17   then we'll move on.

18               Who are your primary counterparts at the

19   Department of Community Health for your work in

20   managing the partnership?

21         A     So our -- like my liaisons at the

22   Department of Community Health.

23               Up until recently, Catherine Ivy, who is

24   no longer with the DCH.   Brian Dowd, Lynette Rhoads,

25   and then there's a myriad of other partners,



1    depending on the project, right.  So it really

2    depends if we're looking at a financing model, I may

3    be working with the financing team briefly, and then

4    moving on to work with folks who may be building IT

5    systems and the like.

6          So it is diverse, but primarily the points

7    of access have been Brian Dowd, Catherine Ivy, and

8    Lynette Rhoads.

9      Q    How often are you in touch with Brian

10   Dowd?

11     A    Weekly at a minimum.

12     Q    Do you have a standing meeting?

13     A    We have a standing meeting, yes, once a

14   month, on children's issues with the Office of

15   Children, Young Adults and Families, and the

16   Medicaid agency.

17     Q    How often are you in contact with Lynette

18   Rhoads?

19     A    At least twice a month, depending on the

20   month.  There, there are ebbs and flows in that

21   contact depending on what projects are emerging.

22     Q    I want to skip to the second bullet, which

23   reads:  "Responsible for the Children's Health

24   Insurance Program, Reauthorization Act Grant to

25   achieve.  The second sub bullet is Integration in



1   Development of high-fidelity wraparound into the

2   youth behavioral health system."

3           Do you see that text?

4       A   I do.

5       Q   Is this reference to high-fidelity

6   wraparound the same thing as IC3?

7       A   High-fidelity wraparound is the practice

8   model.  What we named it in Georgia is Incentive

9   Customized Coordination, yes.

10      Q   Could you describe the genesis of

11  high-fidelity wraparound in Georgia?

12      A   So high-fidelity wraparound is -- it's

13  complex.  I'm sorry.

14          It first starts as a philosophy of care

15  where you have -- there's a model of practice where

16  you bring together many partners to coordinate and

17  collaborate on behalf of a young person and his or

18  her family.  In order to connect them to a various

19  array of services and supports, which may be in the

20  behavioral health medical model, or it may be in

21  school setting, or it may be interfaced with natural

22  supporters, either churches or community programs.

23          So it really is about wrapping resources

24  around the child and family in order for he or she

25  to have recovery and wellness.  So that's the



 1   philosophy.

 2          The national model which emerged in the

 3   late 2000s really was around how -- what is the

 4   amount of frequency that comes to bear with that?

 5   What are the types of practitioners?  What kinds of

 6   trainings are necessary then for this program to

 7   work best?

 8          That's kind of where the high-fidelity

 9   part of wraparound then came together.

10          And then, of course, in Georgia, and in

11   other states, you can ultimately then take those

12   principles and craft a service design, which may or

13   may not be approved by the Medicaid authority, but

14   in Georgia was designed, created in partnership with

15   the Medicaid agency, submitted to Federal CMS and

16   approved for service delivery.

17     Q    I think I understand how that evolved, but

18   I want to ask you, and please tell me if I'm

19   mistaken.

20          So it started as a waiver service and it

21   evolved into a state plan amendment; is that

22   accurate?

23     A    It began as a waiver demonstration.  So

24   there was not a federal pathway to have a waiver for

25   this type of service.  So through CHIPRA there were



1  some opportunities to have some model design, and

2  prior to that there was a demonstration waiver in

3  the mid-oo's, where there was what was called a PRTF

4  waiver demonstration, which then created that

5  short-term waiver, but that was not reauthorized by

6  Congress.  And so our pathway then for the future

7  for that was to create IC3 through a state plan

8  amendment.

9       Q    When did that happen?

10      A    The state plan amendment, 2017.

11      Q    In connection with your work developing

12 the high-fidelity wraparound service in Georgia, did

13 you or your staff perform an assessment of need

14 within the State for the service?

15      A    My office did not.  We partnered with the

16 Office of Children, Young Adults and Families and

17 the COE to do some developmental work on that

18 pathway.

19      Q    Could you describe that developmental

20 work?

21      A    Yes, just give me a second to --

22      Q    Take your time?

23      A    -- to harken back.

24           The CHIPRA grant started in the early

25 teens, so we applied for the grant.  The design



```
 1   process was about really kind of taking the
 2   learnings from early developmental work here in
 3   Georgia with a couple of providers, a handful of
 4   providers, and to kind of study and learn what they
 5   had practiced in terms of the, the emerging model of
 6   high-fidelity wraparound, and then to take those
 7   learnings in partnership with two other states.
 8            So the CHIPRA Reauthorization Grant in
 9   Georgia was a tri-state initiative that included
10   Maryland and Wyoming.
11            So we had a collaborative learning grant,
12   and we then were able to also bring in as a result
13   of that grant national experts on high-fidelity
14   wraparound as well as other states who were
15   exceeding in the practice of high-fidelity
16   wraparound, as well as were achieving some success
17   in having it approved and reimbursed by Medicaid
18   authorities.
19       Q    Do you know if this effort by OCYF and COE
20   determined how many children in the State of Georgia
21   or estimated how many children in the State of
22   Georgia need IC3?
23            MS. HERNANDEZ:  Objection.
24            You can answer.
25       A    Not that I recollect.  We, we did know
```



1   from other states that it was a very small in who
2   ended up meeting -- a very small number.  Sorry, I
3   want to be clear -- a very small number of youth for
4   whom this would be a target population.
5           So that was based on their emerging
6   experiences.  So, for instance, we actually went to
7   the State of Louisiana and spent some time with them
8   studying an implementation that had occurred just
9   ahead of ours in order to see kind of what the
10  potential volume would be, how they were
11  implementing their practice model and the like.
12  That was the benefit of that grant, to have that
13  learning opportunity.
14      Q    Do you have ongoing responsibilities with
15  respect to IC3 in Georgia?
16      A    Only as a partner to Dante.
17      Q    Dante McKay?
18      A    Dante McKay, correct.
19      Q    And what are your contributions as a
20  partner to Dante McKay with respect to IC3?
21      A    So, for instance, if there, if there is
22  something like a meeting or a quality review team
23  where there's some emerging dialogue or conversation
24  about IC3 and how the providers are managing, how
25  the work is emerging, trends and innovation that are



1  coming out nationally, he and his team will bring me

2  in to dialogue to just consider was the

3  implementation, what it needed to be initially, is

4  the criteria what it needed to be initially, like

5  any of those questions where there might be

6  dialogue, then he would bring me in almost like as a

7  preparatory process for doing to go back to the

8  Medicaid agency and change any context or

9  consideration for this.

10      Q    Have you had any discussion with Dante

11  McKay about targeting IC3 to students who are

12  enrolled in GNETS?

13      A    No.  Not that I recall.

14      Q    I'd like to skip to another bullet in your

15  resume.  This is under your current position.  It

16  reads:  "Steers cross-Departmental initiatives."

17          It identifies a number of initiatives,

18  including "Coordination of Provider Manuals,

19  Medicaid Systems Design, Administrative Services

20  Organization products."

21          Do you see that text?

22      A    I do.

23      Q    You talked about the coordination program

24  manuals already.  Can you explain what you mean by

25  Medicaid systems design?



WENDY W. TIEGREEN                                  June 21, 2022
UNITED STATES vs STATE OF GEORGIA                            41

1        A    So, for instance, when there is a -- like
2    a new IT roll-out, myself, John Quesenberry, we will
3    come together as like a project team, a temporary
4    project team, to be sure that the new pilot system
5    design still connects with our system, still helps
6    our system function in terms of prior authorization,
7    the registration of individuals, the transaction of
8    prior authorizations from our agency to the Medicaid
9    agency, et cetera.

10            And then when there are roll-outs, for
11   instance like for the Care Management Organization
12   in Georgia, we are asked for feedback on what our
13   thoughts are.  We are not the authority, so we just
14   provide our feedback and influence, and then they
15   can make decisions about whether or not they accept
16   some of that feedback, don't accept that feedback
17   and the like.

18            So those are two examples I can offer.
19       Q    When you say roll-outs for the Care
20   Management Organizations, what are you referring to?
21       A    Generally like -- there's several parts of
22   that.  There's the procurement and design phase, and
23   depending on those events and who is in leadership,
24   there's been a lot of involvement or less
25   involvement, again ebbs and flows in policy and



WENDY W. TIEGREEN                                  June 21, 2022
UNITED STATES vs STATE OF GEORGIA                          42

1   design.

2          When, for instance, there are readiness

3   reviews, our agency will -- let me be more clear.  I

4   have participated in on the readiness reviews, just

5   to be sure like to sit at the table with the

6   Medicaid agency to say, you know, do they have a

7   website that says that they've served behavioral

8   health and is that kind of a generalist, good

9   generalist language for that.

10          At any kind of sublevel, in terms of any

11   administrative authority, we don't have that role or

12   functionality.  We serve as -- again, I'm going to

13   use this word a lot -- like an adjunct voice related

14   to behavioral health when the Medicaid agency has an

15   interest in, in needing some additional information

16   on that.

17     Q    I believe you testified that your

18   influence over this process ebbs and flows?

19     A    Yes.

20     Q    Depending on leadership?

21     A    Leadership, bandwidth, how much time there

22   is in the day, how much pressure is coming through,

23   in terms of behavioral health changes and dynamics

24   that Medicaid may be considering.

25          So many factors.



WENDY W. TIEGREEN                                                      June 21, 2022
UNITED STATES vs STATE OF GEORGIA                                            43

1    Q    How would you describe your level of
2    influence under the current leadership?
3    A    That seems quite subjective.  They still
4    -- they call for advice sometimes.  Yeah, it just --
5    that's hard to define.  So I'm --
6    Q    When you say "they," are you referring to
7    DCH?
8    A    DCH, yes.  Yes, DCH.
9         So I mean I think they know we're here.
10   They lean in where it's an area where they feel like
11   they don't have a set of expertise.  But beyond
12   that, it's -- relationship is imprecise, right.  So
13   I'm struggling a little bit with how to, to define
14   that relationship.
15   Q    Well, let's make it concrete.
16        How many times a month would you say
17   you're consulting with DCH with respect to Care
18   Management Organizations?
19   A    So I -- Dante and myself, we lead a
20   standing once a month meeting on behavioral health
21   issues with the CMOs.  So that is a very concrete
22   way where we influence.  We set the agenda for that
23   meeting.
24        It is not necessarily content about how
25   they practice.  It is about information sharing for



1   how the public sector behavioral health system

2   functions as a whole in Georgia.

3           So, again, I want to give an example,

4   because I think relationship, again it's like a

5   nebulous thing to define.

6           The State is about to implement a federal

7   law related to using 988 as a new crisis call line,

8   and our department is in charge of that initiative.

9   It will have impact for all Georgia citizens,

10  including those who will be covered by the CMOs.  So

11  we've been doing episodic presentations to them

12  since we learned about our role and began the

13  roll-out work for that, so that they are fully

14  informed and aware.

15          They may or may not change their practice

16  as a result of that information, but we share it.

17          Another subject that we've had on our

18  agenda quite a bit in the past year is about suicide

19  prevention.  So we have the authority to hold the

20  suicide prevention office for the State, and so our

21  suicide prevention director will attend these

22  meetings and share information about emerging, you

23  know, epidemiological numbers and events that we are

24  rolling out.  Again, the CMOs then are the

25  recipients of that information, so that we are a



```
 1   more communicative system but they do not take any
 2   direction or lead from us in those dialogues.  It's
 3   more -- I call it -- it's more about kind of
 4   creating global access, collaboration, engagement,
 5   across different payors who may have different
 6   policy.
 7        Q    Is it accurate to say that the CMOs are
 8   contractors of the Department of Community Health in
 9   Georgia?
10        A    That is correct.
11        Q    So DCH has authority over the CMOs; is
12   that correct?
13        A    Yes.
14        Q    Do you in your capacity at DBHDD ever
15   provide feedback on the contracts between DCH and
16   the CMOs?
17        A    No.  Not feedback on the contracts per se.
18   If we hear, for instance, that a young person has
19   certain coverage and there's an access challenge,
20   we'll refer that to the Medicaid agency.  But in
21   terms of feedback on the contracts, rarely, if ever.
22        Q    So you wouldn't be shaping the CMOs'
23   responsibilities under the contract with DCH for
24   reimbursing behavioral health services, correct?
25        A    No.
```



1    Q    The last item listed in this bullet is

2    "design and development of autism benefit."

3         Do you see that language?

4    A    Yes.

5    Q    Could you describe what autism benefit

6    you're referring to?

7    A    So the State of Georgia created a more

8    robust autism benefit in the mid to late teens, and

9    so I served as chair briefly of the roll-out for the

10   design process.

11        So in the first year and a half we brought

12   together the Department of Community Health, the

13   Department of Public Health, and DBHDD in a

14   collaboration to roll out what was charged to us by

15   the executive branch in terms of creating a more

16   robust autism benefit.

17        So we were advisory on some part of that

18   work, and we took some responsibility for a

19   contractor to, but largely non-Medicaid, related to

20   what DBHDD implemented on that work.

21   Q    Did the Georgia Department of Education

22   have any role in the design or roll-out of the

23   autism benefit you just described?

24   A    They were listed kind of as the secondary

25   agency, so Child Welfare, the Department of



1   Education, and the Department of Juvenile justice

2   were advisory adjunct, understanding that the heavy

3   policy lift and design would come from those three

4   initial agencies.

5        Q    Understood.  Who within the Georgia

6   Department of Education was working on the autism

7   benefit?

8        A    At the time -- who advised was I think

9   Garry McGiboney was in one advisory meeting, and

10  anybody else I would have to go back and look up

11  because each agency just brought like a handful of

12  folks, again only periodically in terms of advising

13  that process.

14       Q    Could you describe just operationally what

15  this expanded autism benefit looks like from a

16  service perspective?

17       A    Sure.  So the benefit that was created was

18  an outpatient benefit for youth with autism who were

19  Medicaid beneficiaries, and that outpatient benefit

20  was to be administered, and is continued to be

21  administered, by the Department of Community Health.

22            So we sat again in advisement to the

23  Medicaid agency to contemplate what a good service

24  benefit would look like, and that included services,

25  rates, the units of rates, in terms of design



 1   process.  Ultimately, the Department of Community

 2   Health then submitted that as a Medicaid State Plan

 3   to CMS, which was approved and then implemented.

 4         There were aspects of the plan which were

 5   also not identified in what is now called the autism

 6   outpatient benefit but was put into what was

 7   considered the physicians benefit in terms of doing

 8   some screenings and having a process for reimbursing

 9   for those screenings in the physicians benefit.

10         And then kind of the, the third bucket of

11   implementation was specific to some more intensive

12   programs.  So, one, there was a PRTF autism benefit

13   created, and so specifically understanding that many

14   youth needed some long-term engagement, longer term

15   residential treatment, that would benefit from a

16   PRTF model.  And so that benefit was created, again

17   through the Department of -- excuse me -- Department

18   of Community Health.

19         We advised that process, but they

20   continued to manage that directly.

21         And then the other intensive benefits,

22   there was not national evidence on some of the best

23   models for this.  So ultimately the State created

24   just some test pilots, implementation models, that

25   DBHDD took responsibility for.  So we in turn



1   contracted for two crisis respite homes for youth

2   with autism and for an autism Crisis Stabilization

3   Unit, which again none of which were crafted to be

4   Medicaid benefits.  They were stand-alone state

5   funded benefits, which has not been governed in any

6   way by the Medicaid authority, yet Medicaid youth

7   could access them, but it was not determined at the

8   time for there to be enough kind of clinical

9   evidence on models to take it to be in a full state

10  plan.

11       Q    Thank you very much.

12            I'd like to go back to the autism

13  outpatient benefit that you were describing.

14            I think you said there was a state plan

15  amendment in connection with that benefit, correct?

16       A    Yes.

17       Q    Did you draft the state plan amendment for

18  the autism outpatient benefit?

19       A    In partnership with Marcey Alter, who was

20  with the Department of Community Health.

21            So we collaboratively wrote that.

22       Q    Marcy Altar is no longer with DCH,

23  correct?

24       A    Correct.

25       Q    Is Brian Dowd in the role that Marcy Altar



1   was previously in?

2        A    I can't say that for sure.

3        Q    That's fine.

4        A    The title was never the same.  I think

5   every time someone leaves, they kind of slightly

6   tweak things.

7            So I liaison with he and Catherine Ivy the

8   way I used to liaison with Marcey Alter.

9        Q    Thank you.  That's helpful.

10           Do the therapies available under the

11  autism outpatient benefit include applied behavioral

12  analysis?

13       A    Applied behavioral analysis is -- I'm

14  going to go back to the high-fidelity wraparound

15  conversation for a minute.

16           Applied behavioral analysis is a practice.

17  A billable service could be different.  So it is a

18  way, for instance, to do specific services.

19           Like there's 500 ways to do individual

20  therapy.  The code is just called individual

21  therapy.

22       Q    Understood.

23       A    So there is a pathway to do applied

24  behavioral analysis through the autism benefit.

25       Q    And be reimbursed for it, correct?



1        A     And be reimbursed for it, correct.

2        Q     Would it also be true for cognitive

3    behavioral analysis?

4        A     I'm not sure about that.  I think so but I

5    have not done any analysis of that particular

6    evidence-based practice to contemplate it in, in

7    that path.  So sorry.

8        Q     Thank you.

9              What about functional behavioral

10   assessments, is that a practice that could be

11   reimbursed under the autism outpatient benefit?

12       A     Yes.

13       Q     Is it accurate to say that when a service

14   is added to Georgia's state plan, Medicaid state

15   plan, that there is a requirement to provide that

16   service statewide when medically necessary?

17             MS. HERNANDEZ:  Objection.

18             You can answer.

19       A     I feel like that's really ultimately the

20   Medicaid authorities to answer, but that has always

21   been my understanding.

22             MS. HERNANDEZ:  Patrick, if we can take a

23       quick five-minute break.  If you're still --

24             MR. HOLKINS:  You know what, that's

25       totally fine.  We can take five.  That's great.



1            MS. HERNANDEZ:  Thank you.

2            MR. HOLKINS:  You're welcome.

3            THE VIDEOGRAPHER:  Off the record at

4      10:22.

5            (A recess was taken.)

6            THE VIDEOGRAPHER:  Back on the record at

7      10:30.

8    BY MR. HOLKINS:

9       Q    Ms. Tiegreen, we were discussing still

10   your resume, which is Exhibit 137.  I have some more

11   questions for you.

12           First, going back to the DBHDD program

13   manual, is it accurate to say that the authority for

14   designing and defining the services in DBHDD's

15   program manual rests with DBHDD?

16      A    It is -- it is -- it rests with us.

17   However, it is strongly influenced by Medicaid

18   practice parameters and the bounds of some those

19   parameters.

20      Q    Could you describe practically what that

21   means, the influence of Medicaid parameters on

22   DBHDD's program manual?

23      A    So, for instance, Medicaid does not allow

24   billing in a residential setting greater than 16

25   beds.  So you'll see several references throughout



1   our manual that you can bill Medicaid if it's within

2   these parameters.

3              So that's a concrete example.

4      Q    That's helpful.

5              So you're designing services within the

6   boundaries established under Medicaid for receiving

7   reimbursement for the service?

8      A    Correct.

9      Q    And do any other agencies beyond DBHDD

10  have responsibility for designing the behavioral

11  health services in DBHDD's program manual?

12     A    No.

13     Q    Do agencies outside of DBHDD have

14  involvement in designing the services in DBHDD's

15  program manual?

16     A    I would --

17             MS. HERNANDEZ:  Object.  Sorry.

18             You can answer.

19     A    I would just say rarely.  I would just say

20  rarely.

21             If another agency came to us and had some

22  ideas or interest, we would kind of have those

23  dialogues separate and be coordinating and

24  collaborating, but they wouldn't be saying I'm

25  coming to influence the manual.



1          So we continue great partnerships and we

2     learn together as agencies, but I can't think of an

3     example where that's occurred.

4          Q    Are all of the publicly funded behavioral

5     health services available in Georgia listed in

6     DBHDD's program manual?

7          A    No.

8          Q    There are other services that are funded

9     by the State of Georgia not listed in the manual?

10         A    Correct.

11         Q    Which are those?

12         A    So Medicaid has other program manuals for

13    behavioral health that would not be in our manual.

14    So we already mentioned the autism benefit from PRTF

15    is not in a DBHDD manual.  That's a good example.

16         There's another category of service called

17    Children's Intervention School Supports, not under

18    the purvey in any way of DBHDD.

19         Q    Is the Children's Intervention Support

20    Services under the purview of DCH?

21         A    Yes.

22         Q    Could you describe briefly what the

23    Children's Intervention Support Services are?

24         Let me just --

25         A    I'd rather not because it's been a long



 1  time since I've looked at the manual.  So I just --
 2  I think in a nutshell is, is some basic outpatient
 3  services for, for young people who would be a
 4  specific age, very, very young.  And I can't, I
 5  don't -- we don't have purview over that program, so
 6  I don't spend a lot of time in that manual.
 7       Q    We'll talk a little bit more about this
 8  later but I'm trying to understand just broadly
 9  whether these are EPSDT services or a different
10  subset of services defined by DCH?
11       A    Medicaid would have to clarify that
12  ultimately, but the federal law is services that are
13  under 21 through 20, you know, or have the EPSDT
14  overlay, but that would be Medicaid's to define and
15  respond to.
16       Q    Does DOE have any involvement --
17            MR. HOLKINS:  Let me rephrase.
18       Q    Has DOE had any involvement, to your
19  knowledge, in shaping service design for DBHDD's
20  program manual?
21            MS. HERNANDEZ:  Objection.
22            You can answer.
23       A    Not directly.  Indirectly, as a partner,
24  like a -- as children's agencies come together and
25  work, for instance, like through the Interagency



1   Directors Team, we learn together about what needs

2   are.  So indirectly those needs could come into

3   shaping the provider manual, but not directly.

4        Q    Can you give an example of a conversation

5   you've had with DOE staff through an IDT meeting,

6   for example, that has shaped services under DBHDD's

7   program manual?

8        A    Certainly.  The Department of Education,

9   maybe 2018, 2019, came to us with their student

10  survey data and did a presentation on their student

11  survey data.  And then all of us who were in the

12  room, obviously listening to the conversation, then

13  have the lens of what are the needs of young people,

14  how they said they were feeling related to their

15  emotional health.  And therefore when I walk out of

16  that room, I don't leave that behind.  That is

17  imprinted on me as a policymaker.

18           I would imagine the same for my partners

19  Dante and Dr. Pearson as well, when we hear that

20  information.  But limited to that.  That would be

21  the type of dialogue that was occurring.

22       Q    Do you recall whether there were specific

23  changes made to DBHDD's program manual in response

24  to this presentation about students survey -- survey

25  data?  Excuse me.



1      A    No, I do not recall any specific related

2   to that.

3      Q    I want to skip down to a prior role that

4   you had that's listed on this resume.

5           This is on Page 1 still.  The resume

6   identifies you as Deputy Chief of Staff from March

7   2009 to July 2011.  Is that correct?

8      A    Correct.

9      Q    The second bullet under that position

10  identifies you as the primary author of the Medicaid

11  State Plan, which includes peer support home health

12  and wellness services with the State of Georgia?

13     A    Correct.

14     Q    We've talked a bit about this already, but

15  for the record it would be helpful if you could

16  describe what it means to be the primary author of

17  the Medicaid State Plan amendment?

18     A    So that means my fingers on the keys.  So

19  very, very concretely that.

20          But with the influence of leaders, such as

21  Dante.  So if he says we need this new children's

22  service, then I would work with him in drafting that

23  content, writing that content, and then proposing it

24  to the Department of Community Health, who would be

25  the final kind of arbiter of the language that would



1   go forward, and that would be with a lot of dialogue

2   and negotiation.

3        Q    Who within DCH is the final arbiter, to

4   use your word, on state plan amendments?

5             MS. HERNANDEZ:  Objection.

6             You can answer.

7        A    The process in Georgia has been that it

8   goes through the Division of Medicaid, which would

9   be Lynette Rhoads.  Ultimately, the Commissioner

10  decides if it goes in front of the Board, and then

11  the Board actually embarks on the process of

12  proposing the state plan amendment, creating the

13  public hearing process for that, and then if

14  approved, then it's submitted to CMS.

15       Q    And when you say "Commissioner," were you

16  referring to the Commissioner of DCH?

17       A    The Commissioner of DCH.

18       Q    And when you said "Board," what did you

19  mean?

20       A    The Board of DCH.

21       Q    Did you consult at all with the Governor's

22  Office when working on the Medicaid State Plan

23  between 2009 and 2011?

24       A    I did not directly.

25       Q    Indirectly?



1          A    So yes, indirectly.  It would be -- any
2   time we would have done something as large as a
3   Medicaid State Plan, then our commissioner would
4   have had a dialogue through his or her leadership --
5   his at the time -- his leadership with the
6   Governor's Office, but I was never privy to that.
7               Like I would be directed, we have the
8   green light, move ahead, but I was not part of those
9   dialogues.
10         Q    When you said "our commissioner," you're
11  referring to DBHDD's commissioner, correct?
12         A    DBHDD's.
13         Q    Did provider organizations have input on
14  the Medicaid State Plan that you worked on?
15         A    Yes.
16         Q    Could you describe that process?
17         A    Sure.  It's largely dependent on the type
18  of service that would be rolled out, but as I
19  indicated earlier, like, for instance, on IC3, we
20  had a handful of providers who were already
21  implementing the model in Georgia.  So they came to
22  collaborative meetings where we talked about the
23  model and considered the design that we would
24  ultimately put into a Medicaid State Plan.
25              So they were part of that, that whole



1   CHIPRA grant process, in terms of where we -- we

2   actually had money to develop this through that

3   grant.  So we had the opportunity to facilitate a

4   lot of robust meetings specific to that.

5           On other services, we would then bring in

6   niche providers who were skilled at that particular

7   service and have them inform and shape.

8       Q    Did you specifically consult with

9   Community Service Boards during the drafting process

10  for this Medicaid State Plan?

11      A    For -- let's see.

12          I'm thinking of the years.  Just bear with

13  me for one second.

14          Yes, yes.  We worked a lot then, yes, with

15  CSBs.  Thank you.  I just needed a minute to think

16  through what services were in that Medicaid State

17  Plan and then consider the process and, yes, we

18  worked with several providers on that.

19      Q    I know that peer support is identified in

20  your resume as one of the services under the state

21  plan.  What were the other services?

22      A    For instance, we -- and this may not be an

23  exhaustive list, but we added addiction services for

24  peer support during this time frame.  We also added

25  more content to the assertive community treatment



1   service, designating a more rural model for delivery

2   for that.

3           We split up a service that used to be more

4   globalized in order to be accountable to the

5   Department of Justice, splitting out a service that

6   used to be skills training and case management.  We

7   separated those two areas so that we could count

8   case management with more accountability.

9           That's -- may not be complete but that's

10  about the gist of what we were probably working on

11  during that time frame.

12      Q    Do you have ongoing responsibilities with

13  respect to implementation of the DOJ settlement you

14  just referenced?

15      A    I do not.  I do not.

16      Q    And, generally, what was the subject of

17  that settlement, as you understand it?

18      A    The subject of the settlement was to

19  create more community-based alternatives to

20  individuals to prevent them needing services in high

21  end and intensive acute settings so they could

22  remain in the community and have meaningful lives.

23      Q    Was that settlement about services for

24  both youth and adults?

25      A    Adults only.



1    Q    Adults only.

2         To your knowledge, is the State of Georgia

3    under any settlement currently with respect to youth

4    behavioral health services?

5    A    Not that I am aware of directly.  Or that

6    I'm involved with directly.  I can't think of

7    either, actually.

8    Q    In your view, have efforts to implement

9    DOJ's settlement with respect to adult mental health

10   services been effective in expanding community-based

11   services for those individuals?

12   A    Yes.

13        MS. HERNANDEZ:  Objection.

14   A    Too quick.  Yes.

15   Q    Could you explain why?

16        MS. HERNANDEZ:  Objection.

17        You can answer.

18   A    Okay.  We have developed more robust

19   services.  We've been able to create new service

20   models and emphasize that the institution is not the

21   first pathway for care.  Really prevention and early

22   intervention are better forms of treatment in

23   healthcare.

24   Q    Have the new or more robust services

25   developed as a result of the sentiment been



1  effective in keeping adults out of institutions, in

2  your opinion?

3      A    In my opinion, yes.

4      Q    Also, under your Deputy Chief of Staff

5  position, the resume identifies you as having

6  responsibilities for "Medicaid financing,

7  compliance, and quality oversight for approximately

8  $175 million of Medicaid behavioral health

9  administration and services."

10          Do you see that text?

11     A    Yes, I do.

12     Q    Could you describe what you meant by

13 compliance and quality oversight for 175 million of

14 Medicaid behavioral health administration and

15 services?

16     A    So in that role, at that time, the work

17 that was ongoing through a vendor -- it was not the

18 ASO model at the time.  It was what was -- it's

19 precursor.

20          The administration of that and the

21 oversight of that was under my authority.  So the

22 localized quality audits at the time of providers

23 that looked at their compliance with the policy and

24 the quality at that point in time was under my

25 leadership.



1    Q    When you say "the policy," are you

2    referring to DBHDD's program manual?

3    A    Yes, the program manual.  Yes.

4    Q    So you were assessing provider compliance

5    with the DBHDD program manual?

6    A    Through the external review organization,

7    yes.

8    Q    And when did ASO come online?

9    A    Approximately 2015, best to my

10   recollection.  It was a process to pull them live,

11   but it was in the mid-teens.

12   Q    And when did the State of Georgia shift to

13   a managed care model?

14   A    2006.

15   Q    Did you have any involvement in that

16   transition?

17   A    Yes.

18   Q    Could you describe what that involvement

19   was?

20   A    Yes.  Prior to 2006, the behavioral health

21   benefit package under the Medicaid State Plan was

22   fully administered by our department.  At the time

23   of this transition, then that targeted population

24   then was segmented and moved to the Care Management

25   Organizations.



1            So for about a year and a half we were

2    engaged with the Medicaid authority to understand

3    what their procurement would look like.  We were

4    reviewers of the procurements, of the proposals, but

5    not scoring reviewers.  We just read them cold and

6    just answered questions to the Medicaid agency about

7    that process, and then once the work went live, then

8    we actually at that point in time pulled back from

9    any work related to those covered lives.

10           (Discussion ensued off the record.)

11   BY MR. HOLKINS:

12       Q    Okay.  So just to confirm for the record,

13   it's now the Georgia ASO Collaborative that's

14   responsible for this function of overseeing the

15   reviewing provider compliance with DBHDD's program

16   manual?

17       A    Through our oversight and contract.

18           Since we had a little break there, I just

19   want to go back and confirm, the ASO does those

20   reviews only for DBHDD covered lives, not for

21   managed care covered lives.

22           So because, because you left on that

23   question, there was a pause and came back, I just

24   want to be sure that that's clear.

25       Q    So who is responsible for reviewing



 1  provider compliance for the Medicaid covered

 2  lives -- is that correct?  Covered lines?

 3      A    Lives.

 4      Q    Lives?

 5      A    Lives.  So Medicaid covered lives through

 6  DBHDD are only used, in this case that we're talking

 7  about today, youth who would be determined aged,

 8  blind and disabled.  So it's a very small number of

 9  youth.

10          The remainder of youth are covered by the

11  managed care companies.

12          So what I was clarifying is that the ASO

13  does not review any of the quality compliance or

14  oversight for the managed care covered lives.

15      Q   I want to give a concrete example, just to

16  make sure we understand what you're saying.  I think

17  it's clear but I want to be certain.

18          If a child is enrolled in Medicaid but

19  does not fit into the narrow subset of population

20  that is directly served by DBHDD and receives a

21  Medicaid reimbursable service like IC3, the Georgia

22  collaborative ASO wouldn't be reviewing quality

23  compliance with respect to that service?

24      A    Correct.

25      Q    Who would?



1        A    With respect to that youth?

2        Q    With respect to that youth, yes.

3        A    With respect to that youth, correct.

4        Q    Do you know who is responsible for

5    reviewing that service for that youth?

6        A    I do not.  I have a sense -- Let me just

7    say -- like I want to be completely honest.

8             I have a sense that the CMOs have

9    responsibility for that, and then there's quality

10   folks embedded in DCH, but I do not know with great

11   visibility or great accountability to this process

12   how to define that.

13       Q    Right.  So it's fair to say -- as --

14            MR. HOLKINS:  Let me rephrase.

15   BY MR. HOLKINS:

16       Q    Would it be your best guess that the

17   quality oversight responsibility for the services

18   that we were describing for the youth that I offered

19   in the hypothetical would rest with the CMOs per

20   contract with DCH?

21       A    That is my understanding, that that is the

22   first line of quality.

23       Q    Okay.  So thank you for bearing with me.

24   We do have a little bit more to discuss from your

25   resume.



1           I want to go to the position described on

2    Pages 1 and 2, Section Director, Provider Network

3    Management, August 2006 to March 2009.

4           Do you see that text?

5       A    I do.

6       Q    Your resume references creating and

7    operating the section responsible for providing

8    network management with specific responsibilities

9    for provider enrollment and expansion for behavioral

10   health and developmental disability providers.

11   Correct?

12      A    Correct.

13      Q    What did your work entail in performing

14   this function, provider enrollment and expansion for

15   behavioral health and developmental disability

16   providers?

17      A    Sure.  So prior to about 2003, DBHDD only

18   had about 30 provides with whom it worked, and

19   beginning in 2006 or so we began to want to expand

20   behavioral health capacity, and so in doing so

21   needed an office in order to manage that, to kind of

22   vet providers to be sure they met qualifications.

23          We began more Medicaid State Plan

24   expansion, and so we needed to create, for instance

25   -- this is a little old school -- databases for



1  being sure that we had providers in the system, that

2  we had all their basic accreditation information,

3  their fundamental credential information in the

4  system, and then to begin to track how many

5  providers we had for which type of services at the

6  time, and to then be sure we also had the capacity

7  within the ERO, the precursor to the ASO, External

8  Review Organization, that we had the capacity then

9  to get out and do those quality reviews.

10           So it was a developmental time for our

11  department moving from being a very small operator

12  to a much larger operator of services.

13           So it was creating the infrastructure in

14  order to be able to grow from the early oo's to now,

15  where we have many more providers.

16      Q    And to be clear, the providers that you're

17  bringing online are serving both youth that are

18  direct DBDHH beneficiaries and other Medicaid

19  eligible youth?

20      A    Potentially.  We don't govern that.  So we

21  approve the providers based on our policy, our

22  credentialing expectations.  The Care Management

23  Organizations have the prerogative to recognize them

24  or not, or even recognize them in the same way or

25  not.



1       Q     Okay.

2       A     So we may have an agency.  They may want

3    to recognize practitioner level detail.  So it's not

4    always even comporting with the same provider

5    network model.

6       Q     Is it fair to say that approval by DBHDD

7    as a provider doesn't guarantee that a provider will

8    be recognized by a CMO?

9       A     That is correct.

10      Q     Is there ongoing work within DBHDD with

11   respect to a behavioral health provider enrollment

12   and expansion?

13      A     Provider enrollment, yes.  We don't

14   necessarily have a plan for expansion.  So at this

15   point in time this was a huge growth moment from 30

16   to over 200 during this tenure, but we do have an

17   infrastructure and operations now to continue

18   provider enrollment but there's not a very specific

19   expansion plan.

20      Q     What is the -- who within DBHDD has direct

21   responsibility for provider enrollment?

22      A     It's under the direction of Camille

23   Richins.

24      Q     Could you spell her last name?

25      A     R-I-C-H-I-N-S.



1       Q     Thank you.

2             So also under this position, which is

3    Section Director, Provider Network Management, from

4    August 2006 to March 2009, you reference tracking

5    access to community behavioral health service.

6             Do you see that text?

7       A     Yes.

8       Q     What did that work entail?

9       A     So for us, for instance, it meant looking

10   regionally, did we have certain types of providers

11   in certain parts of the state, did we have coverage

12   of all of the counties.  So that type of access.

13      Q     That would have been done at the service

14   level?

15      A     It would have been done -- what I would

16   call like in groupings.  So if you think about

17   community outpatient services.  It's not linearly

18   each service.  It's about our community outpatient

19   services kind of as a group, accessible in that way.

20            So not by very specific granular line

21   items but kind of global buckets of service.

22      Q     And do you know whether there were

23   assessments or were you directly involved in

24   assessments of access to school-based behavioral

25   health services?



1      A    No.  School-based behavioral health

2    services were just part and parcel of being a

3    general outpatient service.

4           So we had allowances for services to occur

5    in homes, in schools, in churches, wherever we need

6    to meet the person, but there was no tracking aspect

7    or even kind of tagging of where the service would

8    occur.

9      Q    Do you know whether currently there are

10   ongoing efforts to track school-based behavioral

11   health services statewide in Georgia?

12           MS. HERNANDEZ:  Object.

13           You can answer.

14     A    There -- there are efforts.  It's very

15   difficult to tag a claim to determine where a

16   service occurs.  Where we have contracts for some

17   school-based services, then we can ask those

18   providers for that.  So we have that as a group but

19   other providers can still do school-based services

20   without one of those contracts.  We have that

21   allowance, which we've had in place since, since I

22   understood Medicaid at all, back in 1999.

23           There was an allowance to do school-based

24   services.  So providers can do that work at any

25   point in time and it not be under a specific



WENDY W. TIEGREEN                                June 21, 2022
UNITED STATES vs STATE OF GEORGIA                          73

1   contract with us, and therefore in the absence of

2   any kind of tracking tag for that, we wouldn't have

3   knowledge that that is occurring.

4        Q    And when you say --

5        A    We promote it.  We just don't have

6   knowledge where it always is occurring.

7        Q    Okay.  When you say "tracking tag," are

8   you talking about something in the Medicaid claims

9   data that would say this service was provided in a

10  school?

11       A    Yes.  Yes.  Place of service, which is a

12  type of code, has not always included school.  And

13  early on with Medicaid we -- there's what's called a

14  community mental health place of service code, and

15  everyone who did community-based mental health was

16  instructed to do use that as the place of service.

17  So then historically there's not been an IT

18  construct to tag where services were happening.

19            So that is evolving from the federal level

20  at this point, more place of service codes, but

21  historically that's not been a pathway for us to do

22  that kind of tracking.

23       Q    You also reference training and

24  orientation to the behavioral health system, and

25  this is under the bullet Developing and Managing an



 1   External Review Organization.

 2              Do you see that text?

 3        A    I do.

 4        Q    What work was being done at this time with

 5   respect to training and orienting to the behavioral

 6   health system?

 7        A    So, again, this is a narrow time frame

 8   that's identified here, but we were bringing on

 9   board very new providers to the system, right, again

10   referencing that period of growth.  So we were

11   training them on like some generalist kind of

12   Medicaid 101 constructs that have to do with like

13   federal policy, like no self-referral.  Like you

14   can't just refer folks in-house.  That was a

15   Medicaid rule at the time.

16              So general, very global Medicaid rules.

17   But then expectations about how to engage with the

18   External Review Organization, how to fill out the

19   forms of the External Review Organization.

20              And then we were doing some orientation to

21   some emerging services at the time.  So like

22   intensive family intervention is a child-centered

23   service, and we would roll out some training

24   specific to some of the child centered services on

25   an episodic basis.



1          So that's kind of the gist of the types of

2     trainings we were doing at the time.

3          Q    And, to your knowledge, are there ongoing

4     efforts to provide training and orientation to the

5     behavioral system to providers?

6          A    Yes.

7          Q    Within DBHDD?

8          A    Yes.

9          Q    Could you describe those efforts?

10         A    I can't because I'm not, I'm not over

11    those.  So I just don't have intimate knowledge of

12    that, but I'm aware that we continue to do some

13    orientation work but that we also continue to do

14    like evidence-based practice training, offer free

15    CEUs to providers and the like.

16         Q    Who leads those trainings within DBHDD?

17         A    Dante's office leads some of the more

18    evidence-based trainings.  We have a contract with

19    the Center of Excellence to lead some of those

20    trainings.

21         We acquire other subject matter experts to

22    lead those trainings.  But then Camille Richins'

23    office works with the ASO to do some basic provider

24    orientation and onboarding for providers.

25         Q    And do those trainings include trainings



1   related to Medicaid?

2       A    The Medicaid agency has been participating

3   in those historically.  During the pandemic, we had

4   a modified model, so I can't very specifically to

5   their ongoing participation in that.

6            But during this time frame, the Medicaid

7   agency was participating in some of our orientation.

8       Q    Just in terms of the subject areas covered

9   in the ongoing trainings, does that include

10  Medicaid?

11      A    It does.  It does.

12      Q    So we're almost done with this document.

13           I did see your list of presentations as

14  well and I wanted to ask about one specific

15  presentation from 2013, which I know is a little

16  while ago.

17           If you'll see -- I can probably highlight

18  this for you.

19           Sorry, wrong one.

20           Do you see the text I've highlighted?

21      A    I do.

22      Q    So this is a presentation which you gave

23  in 2013, along with several others, titled, "At

24  Home, In-School, with Better Care, at Lower Costs:

25  How to Implement Innovative Fiscal, Administrative,



1   and Clinical Approaches for Youths with Complex

2   Needs."

3           Do you see that text?

4           MS. COHEN:  And you're referring to

5       Exhibit 137, page GA0429528?

6           MR. HOLKINS:  Yes.

7       A    I'm just -- I'm referring to what I see on

8   the screen.  I'm not sure if it's that, but I see --

9   I see exactly what you're highlighting.

10      Q    Okay.

11      A    I just had to move the camera.  It was

12  blocking part of it.  So yes, yes.  I remember this,

13  this presentation.

14      Q    What was the presentation about?  If you

15  could expand?

16      A    Right.  So we were largely talking about

17  high-fidelity wraparound and parent and youth peer

18  support as come national emerging practices to

19  better support young people in the community early,

20  ahead of institutionalization.

21          So, again, with that then it then bends --

22  in this case bends the cost curve.

23          So these partners, Sheila Pires, Diana

24  Simons, and Eric Bruns, are national experts in

25  high-fidelity wraparound.  Michelle Zabel, who is



1   mentioned, she was in the State of Maryland, which

2   was one of the partner states to us in the CHIPRA

3   Reauthorization Act Grant, studying peer support and

4   IC3, high-fidelity wraparound.

5        Q    Is it fair to say that the general thesis

6   of the presentation was that states, and Georgia

7   specifically, can save money by meeting the needs of

8   youth through IC3 and peer support as opposed to

9   serving them in institutions?

10       A    That was the -- that was the premise of

11  the presentation.

12       Q    Have you presented on this topic since

13  then?

14       A    Not specifically that I recall.

15            MS. COHEN:  What is that noise?

16            THE WITNESS:  Is that a ring tone?

17            MS. COHEN:  Thank you.

18       A    Not specific that I can recall.  I've done

19  many other child-centered presentations on service

20  delivery, but I don't think one about bending the

21  cost curve that I can recall, but if I scan through

22  this document, I can tell you.

23            I present a lot.

24       Q    So your resume also references consulting

25  work that you've done with SAMHSA?



1      A    Uh-huh.  (Affirmative.)

2      Q    Could you just describe at the 10,000 foot

3   level the consulting work you've done with SAMHSA?

4      A    Sure.  With SAMHSA, it's very specific to

5   adult peer support in general.  So have been --

6   early in the 2000s Georgia implemented the peer

7   support program.  We were the first in the country.

8   So SAMHSA and NASMHPD and CMS actually asked the

9   State of Georgia to help other states on that

10  process.

11         So largely adult centered.

12     Q    So I'm just going to ask a few more

13  questions about your duties and background, and then

14  we'll take another break and we can order lunch.

15         Do you serve on any committees or work

16  groups currently as part of your job duties?

17     A    Yes.

18     Q    Could you list them?

19     A    I don't know.  There are a few.

20         Okay.  So the couple that I think are most

21  germane I'll start with.

22         So there is the Interagency Directors Team

23  for Children's Mental Health, and there is a

24  collaborative implementation on infant and early

25  childhood mental health with the Department of Early



1  Childhood Learning, where we are focused on

2  considerations for policy and financing programs for

3  infant and toddler mental health, advancing that

4  body of work for the State.

5          I mentioned ACER, which is a, a

6  collaboration between the Georgia Medicaid CMOs, the

7  Georgia Medicaid agency, Child Welfare, and our

8  agency to have shared information and coordination

9  related to children and young persons behavioral

10  health.

11          There are kind of ad hoc coordination

12  committees that I serve on, on a -- you know, kind

13  of on an episodic basis, depending on what the need

14  is, but I'm thinking that that is the majority.

15          With IDT there's sub and subcommittees and

16  working groups of that, with the infant early

17  childhood mental health is the same.

18          I think those are the ones I'm most active

19  in at the moment.

20     Q    Are there any ad hoc coordination

21  committees that specifically relate to children's

22  behavioral health services that you serve on?

23     A    The ACER group is, is child centered.  The

24  infant and early childhood, that is child centered.

25     Q    I'm just trying to make sure there weren't



1    others beyond the ones that you specifically

2    identified.

3         A    Not that I can think of.

4              Again, with Interagency Directors Team,

5    that work is so vast, there are subcommittees and

6    working committees as a subpart of that that I spent

7    a lot of time on.

8              But I think if you think about the

9    umbrella, that kind of covers the bases for that.

10        Q    We'll talk about some of those committees

11   in more detail a bit later on.

12             I want to ask you about your coordination

13   with entities outside of DBHDD.  I'll just run

14   through a list.

15        A    Okay.

16        Q    Let's start with the Georgia State

17   University Center of Excellence, or COE.

18        A    Uh-hum.  (Affirmative.)

19        Q    Do you coordinate with COE on a regular

20   basis?

21        A    Yes.

22        Q    With whom specifically?

23        A    Almost all of their staff off and on.

24   Again, there are projects that ebb and flow.  So in

25   the IDT meetings, of course their whole team comes



 1　and participates, so I'm interfacing there.

 2　　　　　　And then in subwork groups, it depends.

 3　So I mean I could just start naming a lot of names,

 4　but I don't know how helpful that is.

 5　　　Q　　Let me just try to narrow the field a

 6　little bit.  Do you coordinate with Dimple Desai?

 7　　　A　　Yes.

 8　　　Q　　Do you coordinate with Susan McLaren?

 9　　　A　　Yes.

10　　　Q　　Do you coordinate with Ann DiGirolamo?

11　　　A　　Yes.

12　　　Q　　I hope I said that right.

13　　　A　　DiGirolamo.

14　　　Q　　I know you have coordination with the

15　Center of Excellence through the monthly meetings

16　that you described, I think ACER meetings; is that

17　right?

18　　　A　　They attend, yes.

19　　　Q　　Do you have stand-alone meetings of your

20　own separate from the committees with the Center of

21　Excellence?

22　　　A　　Only project specific, not standing.  So,

23　for instance, we are working on renewing like a data

24　use agreement that the COE has with the Department

25　of Community Health, and so I will, you know, just



1   call a 30-minute meeting with the DOE -- excuse me

2   -- the COE team and just ask them for updates on how

3   that negotiation is going.

4          We're not a responsible party, but we are

5   beneficiary of the data when it happens.  Dante

6   holds the contract with the COE.  So for them to

7   accomplish their work, that's a helpful product, and

8   so then what that allows me to do is also, as a

9   state agency, partner to DCH to say, hey, how is

10  that data use agreement work coming.

11         So there's little tiny ad hocs, where I

12  would pull off to the side to have some specific

13  meetings, but it is rare that I would be in a

14  meeting with them 101 -- one-on-one where I would

15  call them regular meetings in any way.

16     Q    Do you have any ongoing coordination with

17  the Carter Center?

18     A    Ad hoc.

19     Q    About what?

20     A    So generally about peer support.

21  Sometimes about parity, and there have been -- when

22  they were launching their school-based mental health

23  policy work, just some incoming phone calls about,

24  you know, how does this look?  Like how does this

25  look in Georgia?  Because they were trying to learn

1    some of that content.  But generally that was always

2    done in coordination with Dante's office since he's

3    the contract holder and bearer of that.

4              And so I haven't participated in any

5    ongoing meetings or standing meetings with them on

6    that at all.

7         Q    Do you have ongoing coordination with the

8    Georgia Ombudsperson For Children?

9         A    No.

10        Q    Are you familiar with Melissa D. Carter?

11        A    Yes, but just very peripherally.

12        Q    Never worked with her directly?

13        A    Not really.  Like we've like been in

14   meetings together, or, you know, like when there's

15   been like a children's collaborative is brought

16   together, like I've seen her name.  I know her name.

17   She would say she knows mine.

18             We've seen each other on the screen, but

19   not in any way that's been like the two of us

20   concertedly working on anything ever.

21        Q    Do you coordinate on an ongoing basis with

22   Voices for Georgia's Children?

23        A    Yes.

24        Q    About what?

25        A    Primarily in detail around a specific



1  project.  So I serve as the co-chair of a

2  subcommittee of IDT to focus on behavioral health

3  services mapping, and my co-chair is Melissa

4  Haberlen DeWolf with Georgia Voices, and so I talk

5  with her on a regular basis about some of that

6  coordination work.

7            And then episodically, again just very ad

8  hoc, whatever is kind of bubbling out in mental

9  health policy work where they need some

10 interpretation of how does that work, which I would

11 respond to almost any children's advocacy

12 organization like that in the same way.  Just, you

13 know, how does this happen?  How does this work?

14 What is your lens on this?  That type of thing.

15     Q    Could you briefly describe the behavioral

16 health services mapping that you referenced

17 happening as part of the IDT effort?

18     A    Sure.  It is an initiative where we are

19 trying to look at the finances and funding for

20 children's work to map what agencies kind of hold

21 those lines of work and lines of authority.

22            So the project's incomplete.  It is a work

23 in progress, but basically every public agency who

24 is a partner in IDT, who has some investment in

25 children's behavioral health in some form or fashion



1   has been surveyed about the types of programs that

2   they might target for children's behavioral health

3   and where it was possible about how much money was

4   targeted to each of those kinds of lines of business

5   in order to document that.

6       Q    What is the deliverable that you all are

7   working toward?

8       A    A map.  Basically just an overview of all

9   the ways that behavioral health is paid for and

10  supported for children in Georgia.

11          So that is the hope.  It has been a bit of

12  a rocky road because behavioral health services and

13  supports are so vast and they're so diverse, and

14  many of them are nonquantifiable.

15          Like if we do suicide prevention, that's a

16  marketing campaign.  So it's very difficult to

17  quantify that.  So it is a long work in progress.

18      Q    Would you face the same challenges in

19  trying to quantify Tier II and Tier III services?

20      A    Because those services are generally what

21  is called in healthcare a traditional

22  fee-for-service model, where a unit is delivered and

23  it's paid and it's put into an IT system, that is

24  the easier part of the work.

25          So that is not problematic for, for us at



 1   DBHDD, and for the other agency -- the only other

 2   agencies who pay for that is the Medicaid agency.

 3            So it just will really -- it's about

 4   translation for the CMOs because they organize

 5   sometimes their content differently that things get

 6   a little more gray, but we are in the process of

 7   trying to discern all of that detail.

 8       Q    Just to be clear, has your subcommittee

 9   completed work on mapping the Tier I and Tier III

10   services?

11       A    Not completed.

12       Q    Any obstacle to that is the CMOs?

13       A    No.  The obstacle is really the

14   amalgamation right now of that information.  We did

15   have some delay on the CMO data, but that has been

16   resolved.  So at this point it's really about

17   looking across all those agencies and bringing that

18   information together.

19       Q    Is IDT also looking at access to specific

20   services for every region of the state?

21       A    I guess, for the record, there was a wreck

22   outside.

23            So for -- I cannot recall specifically if

24   there is a committee for -- that's targeting access

25   specifically, but it is a common theme of



```
 1   conversation for the IDT.
 2       Q    Do you have regular coordination in your
 3   official responsibilities at DBHDD with the Georgia
 4   Advocacy Office?
 5       A    No.
 6       Q    Are you directly responsible for providing
 7   any training or technical assistance to DBHDD staff?
 8       A    No.
 9       Q    Are you directly responsible for providing
10   any trainings or technical assistance to community
11   service providers in Georgia?
12       A    Episodically.  Not on a regular basis.
13       Q    And when you do these episodic
14   presentations for providers, what are they about?
15       A    Generally, they're about a unique service.
16   For instance, if we're implementing a new service
17   for a Medicaid roll-out, I would present on that.
18            So, you know, like I indicated that 988 is
19   a new body of work.  I'm on the team for the
20   department rolling that out.  The providers are
21   seeing an awful lot of me on that.  That's not a
22   Medicaid program.  It's Medicaid supported but not
23   necessarily what you would call a Medicaid program.
24   But the providers are seeing me a lot right now on
25   that topic.
```



1      Q     I bet.

2            Your presentation specifically about

3   implementation of 988, are those open to all

4   providers in the State who are participating?

5      A     Yes, yes.  If there are -- if it's a

6   targeted service, then it's a targeted distribution

7   list, of course, but generally most of these

8   trainings that I would do are pretty open access.

9      Q     Have you led presentations directed at

10  providers with respect to IC3?

11     A     Yes.

12     Q     With respect to the autism outpatient

13  benefit we discussed earlier?

14     A     Only at its initial opening, because,

15  again, like my only participation was in the first

16  year and a half to two years as being kind of the

17  chair, facilitator, bringing that together.

18           So I would have been in presentations

19  about the whole of the benefit but I was not the

20  voice of articulating the ASD outpatient benefit.

21  In that case I was co-presenting.

22           For instance, Marcey Alter would have been

23  the collaborative partner at DCH who would have been

24  the voice of that, although I would have been in the

25  panel and having facilitated the training actually

```
 1   occurring.
 2       Q    Are you directly responsible for providing
 3   trainings or technical assistance to the Care
 4   Management Organizations?
 5       A    There's no official responsibility of mine
 6   for that.
 7       Q    Have you unofficially presented to them?
 8       A    ACER serves as the space where we
 9   collaborate, and so, yes, in that space I have
10   provided information.  I wouldn't necessarily call
11   training; it's just more -- because the whole
12   purpose of that group is about collaboration.
13   Myself and then many other partners at DBHDD, we try
14   to bring information in, and the CMOs also bring
15   information to the table in that same way.
16            So I think it depends on the -- how
17   formalized you're couching presentation, whether or
18   not that's kind of upper case or just less formally.
19       Q    So I'm just going to quickly pivot back to
20   your bio, which was attachment -- the first
21   attachment to Exhibit 137.
22            In the middle of this paragraph, you
23   reference that the majority of your career has been
24   spent as liaison to the State Medicaid Authority.
25            Do you see that text?
```



```
 1        A     Uh-huh.   (Affirmative.)

 2              Yes.

 3        Q     Prior to joining -- thank you.

 4              Prior to your taking on this role, was

 5     there anyone serving as liaison to the State

 6     Medicaid agency?

 7        A     No.

 8              MR. HOLKINS:  I think now is a good time

 9        for us to take a break.

10              What I would propose is we break for as

11        long as we need to to order lunch, use the

12        restroom, and then go back on the record for

13        maybe another 45 minutes until lunch arrives,

14        and then we can take lunch.

15              Is that okay?

16              MS. HERNANDEZ:  That works.

17              MR. HOLKINS:  Thank you.

18              THE VIDEOGRAPHER:  Off record at 11:29.

19              (A recess was taken.)

20              THE VIDEOGRAPHER:  Back on the record at

21        11:47.

22     BY MR. HOLKINS:

23        Q     So the first thing that we're going to do,

24     Ms. Tiegreen, is to introduce a new document.

25              We can put aside virtually the resume and
```



1   bio.  I'm going to show you a document that was
2   previously admitted.
3            (WHEREUPON, Plaintiff's Exhibit-8
4       previously marked for identification.)
5   BY MR. HOLKINS:
6       Q    Okay.  So you should now see what was
7   marked previously as Plaintiff's Exhibit 8, and I
8   will represent for the record that this was a letter
9   that the United States received from counsel from
10  the State of Georgia on February 12, 2021.  It
11  contains on Pages 2 and 3 supplemental information
12  in response to the United States Interrogatory No.
13  17, and specifically the State identifies Medicaid
14  available community health behavioral health
15  services available to children in schools in
16  Georgia.
17           Ms. Tiegreen, you mentioned that you have
18  had some involvement in preparing responses to the
19  United States discovery requests.
20           Did you have any involvement in preparing
21  the State's response to Interrogatory No. 17?
22      A    Yes, I did.
23      Q    Did you pull together this list of
24  services?
25      A    Yes, I did.



1    Q    And just so you know, when I refer to or
2  ask questions about community behavioral health
3  services for children in Georgia, will you
4  understand that I'm referencing this list of
5  services?
6    A    Yes.
7    Q    We've talked a bit about already -- we can
8  put this aside for now.  You need to see it?  Would
9  you like to --
10    A    No.  I was just moving the camera in case
11  I needed to.  So I'm good.
12    Q    Okay.  We talked a little bit about the
13  various ways the State pays for behavioral health
14  services for children.  It would be helpful if you
15  could just give kind of a list, a comprehensive
16  list, of the ways in which the State is financing
17  behavioral health services for children.
18    A    I'll give it a shot.  That's pretty big.
19         So I will -- where to begin.
20         Let me just begin with DBHDD.  DBHDD pays
21  for Medicaid services for Medicaid beneficiaries who
22  have been adjudicated through a disability process.
23  the federal term would be aged, blind, disabled.
24         So there are certain Medicaid
25  beneficiaries who have been through an adjudication



 1  process where they have been determined to have a

 2  disability, and those individuals DBHDD

 3  collaboratively provides a service benefit for with

 4  the Department of Community Health.

 5          So the list that was just previously shown

 6  in that document, for those beneficiaries we and the

 7  Department of Community Health together implement

 8  those benefits for those youth.

 9          DBHDD likewise, to create policy

10  synchronicity, cover those exact same benefits for

11  uninsured youth.  There should be very few of those

12  in Georgia but there are, and we provide the exact

13  same service list, so that those youth have the

14  exact same access to those services.  Those are

15  reimbursed through funds that are appropriated to

16  DBHDD that are pure state funds.

17          So that same list access exists for those

18  folks.

19          Additionally, there are some services

20  which are not, intuitively or via policy, allowed or

21  either easy to be allowed through a Medicaid benefit

22  that DBHDD provides via state money.

23          For both of those beneficiary types -- so

24  they may be Medicaid but we may provide services.

25  So we have a service called Mobile Crisis, and in a



1  crisis situation it's often difficult to verify

2  insurance coverage in that moment.  The crisis is so

3  acute.

4          So we have made a collaborative decision

5  with the Medicaid agency, but that's not a Medicaid

6  service.  It's available to Medicaid beneficiaries

7  but it is not what we would call Medicaid State Plan

8  service.

9          So we have an additional set of services

10  in that vein, which are also available through state

11  appropriations or either through what is called the

12  federal block grants through SAMHSA, who you

13  referenced earlier, where we have block grants to do

14  certain types of services and provide those for

15  beneficiaries.

16          So that's a radical oversimplification of

17  what DBHDD does in terms of financing.

18      Q    Okay.  Let's just actually stop there and

19  I'll ask you a couple of questions and then we can

20  cover agencies outside of DBHDD.

21          For the state appropriations funded

22  service, like Mobile Crisis, which you just

23  described, when those are funded in that way and not

24  through a block grant, is it done fee for service?

25      A    No.  It's done through a contract, a



1    capacity contract.

2            It would depend on the service.  So that

3    answer is very specific to Mobile Crisis.  We have

4    some contracts that are capacity.  So for Mobile

5    Crisis, for instance, we say you're available 24/7,

6    your practitioners are sitting waiting.  It is not a

7    fee-for-service model.  It's about a performance

8    expectation.  So when a crisis call comes, you

9    deploy and you are there within 59 minutes, right.

10   That's more of a performance and capacity contract.

11           Other services could be paid for based on

12   a unit of service provided.  Where we can quantify

13   that, then we do so in our, our encounter base

14   system through the Administrative Services

15   Organization where we can say, oh, a unit of this

16   was provided, please submit a billable unit, tell us

17   to whom it is attached, right, the person served,

18   and then we can count that.

19           So a lot of it depends on the type of

20   service, how we count and gather that information,

21   or even if we can account and gather for that

22   information.

23       Q    What services specifically is DBHDD

24   relying on the block grant from SAMHSA to fund right

25   now?



1       A    I can give you a handful that I am aware

2    of, but I will not be able to give you the

3    comprehensive list because I'm not overseeing any of

4    that block grant.

5            But, for instance, we are right now

6    leveraging some funds for our Georgia Crisis and

7    Access Line through the block grant to be sure we

8    have enough call consultants answering the phones

9    for the Georgia Crisis and Access Line, in the

10   up-ramp to the 988 implementation.  So that's one

11   example.

12           We are using some of the block grant funds

13   for some of adult peer support services and through

14   ARPA and some of the block grant monies that are

15   coming like as part of rescue funds.  There's a lot

16   of pilot initiatives we're rolling out, for

17   instance.  But the list is deep.  So I just won't be

18   able to speak to them --

19       Q    Understand.

20       A    -- comprehensively here.

21       Q    Sorry.  And thank you.

22           Do you know whether the State is using the

23   block grant through SAMHSA to fund any school-based

24   behavioral health services for children?

25       A    I do not know that.



1        Q     Do you know whether the State is using any

2    ARPA or rescue fund money to support school-based

3    behavioral health services for children?

4        A     I don't know that either.

5        Q     Who within DBHDD has direct responsibility

6    for the block grant from SAMHSA?

7        A     So Jill Mays is the federal block grant

8    director, the administrator for our departments, and

9    then of course very much like my role, she is shaped

10   and influenced in the creation of that plan, for

11   that federal grant, through the service line

12   administrator.

13            So, for instance, Dante creates the list

14   of content that he would want developed for the

15   Office of Children and Young Adults and Families,

16   and he works with Jill on creating that body of

17   work.

18       Q     And who within DBHDD -- let me ask it this

19   way:  Is Jill Mays also responsible for

20   administering or making recommendations with respect

21   to use of the ARPA funds by DBHDD?

22       A     She --

23            MS. HERNANDEZ:  Objection.

24            You can answer.

25       A     She coordinated the ARPA response for the



1   SAMHSA ARPA funds.

2        Q    As distinguished from non-SAMHSA?

3        A    Yeah.  There were other ARPA funds that

4   came into the state that are vast but not -- they

5   weren't running through SAMHSA into our department.

6        Q    So going back to my original question

7   about the ways that the State pays for community

8   behavioral health services, we talked a bit about

9   DCH and the CMOs and their role in funding Medicaid

10  reimbursable services for non-DBHDD beneficiaries?

11       A    Uh-hum.  (Affirmative.)

12       Q    I think we could probably set that aside

13  for now.

14            Do you have any understanding of the role

15  played by local education agencies, or LEAs, in

16  financing services --

17            MS. HERNANDEZ:  Objection.

18       Q    -- for children with behavioral health

19  conditions?

20            MS. HERNANDEZ:  Objection.

21            You can answer.

22       A    I'm aware of what LEAs are.  I am aware of

23  their role, but I am not involved in any kind of

24  administration or committees or understandings.  So

25  I can't really speak to how vast or deep their role



1   is and I can't speak directly to any of that policy

2   either.  So I'm just aware of what they are and how

3   they function, but that's the extent of my

4   knowledge.

5        Q    Can you describe what they are and how

6   they function?

7        A    They are -- hardly.  Let me just say that.

8        Q    I was just taking your word for it.

9        A    Hardly.

10            So I mean that they are local education

11  agencies who have made some -- who have hit some

12  threshold of qualification to provide some services

13  directly themselves through the Medicaid agency, but

14  we did just a brief learning about them in the

15  autism initiative in terms of how any of that policy

16  might need to be impacted or not, and with that it

17  was almost like a touch-and-go in terms of my

18  understanding of what their role would be.

19            And so I don't directly really understand

20  how robust the benefit is or how it's described or

21  defined.  So I can't speak anymore to that.

22        Q    Let me just ask this:  Can LEAs enroll as

23  a Medicaid provider?

24        A    I'm reluctant to say so.  I think the

25  Medicaid agency should answer that question because



1    I don't feel assured about an answer.

2        Q    Have you ever been aware of an LEA

3    enrolling as a Medicaid provider?

4        A    It makes sense to me because there's an

5    LEA manual, and someone has to provide that, but I

6    can't answer for that specifically.  That's just not

7    a body of policy I've gotten into.

8        Q    What is the role of school districts in

9    financing community behavioral health services for

10   children?

11            MS. HERNANDEZ:  Objection.

12            You can answer.

13       A    I'm aware that schools can invest in doing

14   some behavioral health provision of services

15   locally, but I have no in-depth knowledge of how

16   that plays out to Georgia or to the extent it plays

17   out in Georgia.

18            I am aware through dialogue and IDT that

19   that can occur, does occur, but I don't have any

20   breadth or depth of knowledge of that.

21       Q    Would you expect that the Georgia

22   Department of Education to know about whether

23   schools are enrolling as Medicaid providers?

24            MS. HERNANDEZ:  Objection.

25            You can answer.



WENDY W. TIEGREEN                                           June 21, 2022
UNITED STATES vs STATE OF GEORGIA                                     102

1      A    I would just hate to conjecture.  Again, I
2   haven't worked with them in that level of weeds at
3   all on how they implement service.
4      Q    You mentioned this is a topic that has
5   come up in IDT meetings?
6      A    Uh-hum.  Uh-hum.  (Affirmative.)
7      Q    Who has raised the issue of schools
8   directly financing school-based behavioral health
9   services in IDT meetings?
10      A    Dr. McGiboney, who was with the Department
11   of Education for many years, would often make
12   reference to that, and then Ashley Harris briefly
13   was a liaison in IDT from the Department of
14   Education and would make reference to that, but is
15   not the subject of any extensive dialogue or
16   conversation that I've ever participated in within
17   the IDT.
18      Q    Do you have any awareness of the State's
19   financing of school-based behavioral health services
20   through the GNETS program?
21      A    No, I do not.
22      Q    So I'm going to stop sharing Exhibit 8 and
23   show you a new document.
24           Give me one second and I'll pull it up.
25      A    If I can just clarify my last statement.



1          When you said through the GNETS program, I
2    said I do not.  If those youth have Medicaid
3    coverage, they would have access to a benefit plan,
4    and so I am aware they would have access to plan
5    services.  But I'm not aware of any direct services
6    through GNETS.
7          Q    Understood.
8          A    I have no knowledge or information about
9    anybody they have there or content or aspects of
10   that program.  But I felt like I probably should
11   clarify that based on your phrasing of the question.
12         Q    Okay.  I just want to make sure that I
13   understand.
14              So you would have awareness about access
15   to the general menu of Medicaid services --
16         A    Exactly.
17         Q    -- by GNETS enrolled students?
18         A    Exactly.
19         Q    Okay.  But not specifically services they
20   are accessing through GNETS?
21         A    Correct.
22         Q    I have just published the next exhibit,
23   which is 138.
24              This is an email with an attachment.  I'm
25   going to put them together as one exhibit.



1              (WHEREUPON, Plaintiff's Exhibit-138 was

2         marked for identification.)

3    BY MR. HOLKINS:

4         Q    The email is marked GA 04199954 and this

5    appears to be an email from you, dated 8/25/2016, to

6    Marcey Altar with the subject:  "CMO Work."

7              Is that accurate?

8         A    Uh-hum.  Yes.

9         Q    You reference in the body of the email a

10   presentation, which I believe is attached, "2015 RFP

11   DCH CMO Briefing."

12             Is that accurate?

13        A    Yes.

14        Q    I'd like to show you that attachment.

15   Give me one second and I'll pull it up.

16        A    Okay.  Thank you.

17        Q    So this is the attachment for the email we

18   just reviewed, and for the record the Bates-stamp is

19   GA04199955.001.

20             If you would like, please take a moment to

21   familiarize yourself with this PowerPoint.  I'm

22   going to give you control.

23             MS. COHEN:  That exhibit number will be

24        Exhibit 39 that has the GA0419954 and 55?

25             MR. HOLKINS:  This is 138.



1                MS. COHEN:  138.  Excuse me.

2                MR. HOLKINS:  Yeah.

3                (Witness reviews exhibit.)

4       A     Okay.  Yep, I'm familiar with it.

5       Q     So I'm going to take control back and

6    scroll up to the top of the document, which as Fran

7    mentioned is part of Exhibit 138.

8                Ms. Tiegreen, can you explain what this

9    presentation was about?

10      A     Certainly.  So the DCH extended an

11   invitation to DBHDD, as well as to the Department of

12   Juvenile Justice and the Department of Child

13   Welfare, DFCS, Georgia, as well as the Department of

14   Public Health, to be Subject Matter Expert reviewers

15   of the proposals to award the potential CMOs for

16   Georgia.

17               And in doing so -- as a result of doing

18   the Subject Matter Expert consultation, this is a

19   summary of the comments as I saw them in my role for

20   DBHDD, in order to share and present with the DCH

21   team summation and to inform our internal leadership

22   post the award, because I couldn't do it before the

23   award, post the award of my reflections on the

24   take-aways, the large trend take-aways from that

25   procurement review process.



WENDY W. TIEGREEN                                    June 21, 2022
UNITED STATES vs STATE OF GEORGIA                            106

1      Q    So why couldn't you provide this feedback

2    internally to DBHDD leadership until after the

3    award?

4      A    So just in keeping with the, the standard

5    of kind of procurement expectations put forth on

6    reviewers, that whole process is protected and until

7    contracts were fully negotiated.

8      Q    So this is a summary of review work that

9    you assembled from the summer of 2015, correct?

10     A    Uh-hum.  (Affirmative.)

11     Q    Have you had occasion to put together a

12   summary like this since then?

13     A    No.  No, because this was very specific to

14   the proposal review process.  So there's not been a

15   proposal review process since then.

16     Q    Have there been contract renewals with the

17   Care Management Organizations since the summer of

18   2015?

19     A    I hear from DCH peripherally that there

20   are, but we have not been asked to inform that

21   process.

22     Q    I just want to make sure I understand.

23          Who were the Subject Matter Expert

24   providing the comments?  Were those individual staff

25   within DBHDD, for example?



1       A    There was one rep from each of those

2   agencies that I named who were identified to be

3   subject matter reviewers.

4       Q    And were you that person for DBHDD?

5       A    I was that person.

6       Q    Oh, thank you.

7            So I'm going to skip down some pages to

8   ask you about some of the overarching trends, which

9   is a section that starts on Page 4.

10      A    Sure.

11      Q    At the bottom of Page 5 there was a

12  recommendation that DBHDD assist in connecting the

13  CMOs elect with the Center of Excellence for

14  resource leveraging.

15           Do you see that?

16      A    Yes.

17      Q    Do you know whether in fact DBHDD did

18  connect the CMOs with the Center of Excellence as a

19  result?

20      A    Yes.  They were all invited to be

21  long-standing, permanent members of the Interagency

22  Directors Team, and they all participate on a

23  regular basis.

24      Q    On Page 7, at the top of the page, there

25  is a recommendation with respect to EPSDT.



```
 1              Do you see that?
 2       A    I do.
 3       Q    The recommendation reads:  "DCH
 4   clarification with the CMOs-elect on the full scope
 5   of EPSDT to include processes and protocols for
 6   off-plan services when identified as medically
 7   necessary."
 8              Do you see that text?
 9       A    I do.
10       Q    And above it:  The observation, I think
11   that you summarized from the review, is that "EPSDT
12   seems to be generally discussed as a list of
13   required 'exams' or 'test' or 'interventions.' It
14   appears the respondents are considering it as
15   wellcheck content only."
16              Do you see that?
17       A    I do.
18       Q    What did you mean when you said -- or when
19   you wrote that "respondents are considering it as
20   wellcheck content only"?
21       A    So I'm harkening back, this is aways, but
22   there are general -- the EPS part of EPSDT named
23   some general screening that should happen for young
24   people at certain developmental stages, and the
25   tenor of some of these responses was largely
```



1   affiliated or seemed to spend a lot of time on that

2   EPS part of EPSDT.

3           So that's when I'm thinking about like

4   well-check and exams and tests, that there are

5   identified benchmarks that are part of the early

6   childhood screening processes for healthcare

7   conditions that typically occur.

8           So that is what that references.

9       Q    Okay.  Is it fair to say the concern was

10  that based on the proposals you were seeing from the

11  CMOs elect that they were focused on the early and

12  periodic screens but not on the medically necessary

13  services and interventions that may be required?

14          MS. HERNANDEZ:  Objection.

15          You can answer.

16      A    That is -- was kind of the basic sense

17  from those responses, which is why we called this to

18  the attention of DCH.

19      Q    And what was the result of the

20  recommendation with respect to this particular

21  issue?

22      A    I do not know because this would have been

23  a DCH to CMO clarification and not anything our

24  department was responsible for recommending.

25      Q    Skipping down to -- first off, would Brian



1  Dowd, to the best of your knowledge, have

2  responsibility for implementing this recommendation

3  with respect to EPSDT?

4      A    At the time, Marcy Altar had this role and

5  functionality, so I can only speak to at the time.

6  It wasn't Brian who I was working directly with on

7  this type of content.  It was Marcy Altar.

8      Q    I think you testified previously that

9  Brian Dowd has stepped into a similar role as

10  Marcey; is that correct?

11      A    A similar role.  Again, post-Marcey, the

12  work was redefined and kind of spread.  And so it is

13  not, I don't think, a direct one-to-one, but we

14  continue to work with Brian on many aspects of the

15  Medicaid program.

16      Q    On Page 8, your presentation identifies "a

17  significant lack of attention across all proposals

18  to individuals with Intellectual and Developmental

19  Disabilities (IDD (with a couple of small exceptions

20  in Care Coordination sections)."

21          The recommendations you make are, one,

22  "DCH can request additional supporting information

23  to assure that IDD issues will be coordinated and

24  addressed."  And "DBHDD can provide technical

25  assistance to the DCH."



1            Do you see that text?

2       A    I do.

3       Q    I note that in the left -- to the left of

4    the text there's a red stop sign?

5       A    Uh-hum.  (Affirmative.)

6       Q    What does that signify?

7       A    So for purposes of this presentation what

8    I was signaling to the Medicaid agency is my

9    personal lens as the Subject Matter Expert on the

10   criticality at which they should be addressing some

11   of these issues, and so in this case signaling that

12   I found this, from our Department's lens, of course,

13   with our mission and purpose, this to be a critical

14   aspect that they should begin to address with the

15   vendors.

16       Q    Are you aware of what the result was of

17   the recommendation you made here?

18       A    I am aware of what I specifically did

19   related to this, and we did a very high-level

20   orientation to the CMOs on some role and

21   functionality, very specifically related to care

22   coordination, because of the service that's embedded

23   within the intellectual developmental disabilities

24   waivers in Georgia, where care coordination happens

25   under a service construct called support



1    coordination.

2           So we did do a training orientation, like

3    a kick-off, to all four CMOs, where that was shared

4    with their leadership.

5        Q    Anything beyond that?

6        A    No.

7        Q    And do you have any knowledge of whether

8    DCH in fact requested additional supporting

9    information to assure that IDD issues would be

10   coordinated and addressed?

11          MS. HERNANDEZ:  Objection.

12          You can answer.

13       A    I am aware of the process that DCH used to

14   gather more information.  So there were a series of

15   what DCH called readiness reviews, where they had to

16   -- where the CMOs were asked to submit policy, and

17   then the Medicaid authority was asked to approve and

18   vet that policy before implementation as part of

19   readiness review.  And so I do know that care

20   coordination policy was part of that review but I

21   cannot speak to the rigor, the outcome, the

22   back-and-forth dialogue between they and any of the

23   awardees in terms of how much work was done on that

24   specific issue.

25       Q    You testified much earlier today that part



1   of your job includes looking at youths of specific

2   service within DBHDD's service menu, correct?

3        A    Uh-hum.  (Affirmative.)

4        Q    Are you -- is that yes?

5        A    Yes.

6        Q    Do you specifically look at utilization of

7   services for children who have IDD?

8        A    Not specifically.  So generally what we

9   look at is some global trends for the services list

10  that was named earlier, and so I look at those

11  services trends but those are behavioral health

12  services.  So not specific to IDD.

13       Q    So just to confirm, are you tracking

14  utilization of the autism outpatient benefit?

15       A    No.

16       Q    Is there anyone, to your knowledge, at

17  DBHDD who is doing that?

18       A    Not at DBHDD.  Those services are

19  administered and managed by DCH.  So we do not have

20  any purview or lens into that program.

21       Q    Is that even the case for youth who are

22  direct DBHDD beneficiaries?

23       A    So that autism benefit is a separate

24  benefit program, and DBHDD does not administer a

25  companion benefit for that.  That was purely a



 1  Medicaid initiative, Medicaid services, and other

 2  than the roll-out period, the developmental period,

 3  DBHDD has not been in an advisory role or a review

 4  role or an oversight role or monitoring role of that

 5  body of work.

 6       Q    I want to draw your attention to the next

 7  entry on the same page, which is Page 8.  It reads:

 8  "Vendors seem to be lacking knowledge of the gamut

 9  of current community-based services and the breadth

10  and depth of those services."  In parenthesis, "in

11  almost all proposals, physician assessment and

12  individual counseling are the only named

13  interventions, and while peer support is named, it

14  is referenced as a service provided by the vendor,

15  not a service provided by the provider network."

16            Do you see that text?

17       A    I do.

18       Q    You recommend that "once vendors are

19  engaged, provide training on the scope of

20  rehabilitative and recovery-oriented supports."

21            Was your expectation that DBHDD would

22  provide that training?

23       A    I hoped for that, and we did do some

24  overview work on that but the recommendation is to

25  DCH in this case because they would be the one



1   holding the contract with the CMOs.

2        Q    So what's the difference between what you

3   had hoped for and what happened?

4        A    So we did roll out the global overview of

5   services.  And, again, I will reference back to my

6   comment earlier about relationship.  It depends on

7   so much, right.  Time, capacity, resources.

8             And in an ideal world we would be all

9   defining every service aspect the same way.  In

10  reality, federal Medicaid gives managed care

11  companies a lot of leverage and leeway through

12  federal guidance to implement services in accordance

13  with a state plan, but as they believe to be kind of

14  the benefit designed for that specific subvendor.

15            So one of the Care Management

16  Organizations can define services more uniquely

17  under the framework of the state plan.  So, so of

18  course we have an interest in defining recovery as

19  broadly as possible, and some of the CMOs will then

20  say this is our understanding of the best practice

21  for releasing this, and then sometimes those things

22  are variable.

23       Q    So, again, I'm just trying to understand

24  what your expectation was and what in fact occurred.

25  You mentioned the definition of recovery oriented



1   services, wanting that to be as broad as possible?

2       A    Right.

3       Q    Have you seen a narrower definition of

4   recovery oriented services than you had expected?

5            MS. HERNANDEZ:  Objection.

6            You can answer.

7       A    I find that the way DBHDD often defines

8   services in our Behavioral Health Provider Manual,

9   that it is often more narrowly defined by the CMOs,

10  and in other cases, to be fair, there are some

11  places where they may define a bit more broadly,

12  more often not in the realm of medical necessity,

13  but more in like who is the provider network.  And

14  it's service dependent, and so there's a lot of

15  variation in that related to specific services.

16      Q    Do you have concerns right now about the

17  knowledge of CMOs relating to community-based

18  service and the breadth and depth of those services?

19           MS. HERNANDEZ:  Objection.

20           You can answer.

21      A    I find it to be a continuous dialogue, and

22  I, I -- so this is all subjective.  And I have no

23  data upon which to base this, so I want to

24  contextually offer that before I then say, there are

25  often scenarios where we will hear that a youth



1   needed a service and couldn't get it, and I will

2   often answer the question why.

3           And it's in the state plan.  Or they

4   couldn't get it from a certain practitioner, and I

5   will say why, and it will be related to how they

6   define practitioners who can do the service.

7           So that is the very narrow lens through

8   which I get a chance to see this, because we don't

9   see data, we don't see the global snapshot, and we

10  don't see any broad evaluation content for the CMOs.

11  So I just have a very limited lens through which to

12  answer that question.

13      Q    Is there anyone at DBHDD -- recognizing

14  that you are the official liaison to the State's

15  Medicaid agency, who would be in a better position

16  to have line insight on CMO awareness of

17  community-based behavioral services?

18      A    No.  Dante is my -- probably my greatest

19  partner in that because so many children are

20  covered.  While there are adults covered by the

21  CMOs, there are so many children covered.  He would

22  probably be -- have an equal lens on that, and --

23  but I don't think anybody else knows it better than

24  he or I do.

25      Q    If you were to call, pick up the phone and



1  call someone at DCH to ask a question about CMO

2  awareness of community-based services, who would

3  call?

4      A    Brian Dowd right now.  A month ago that

5  would have been Catherine Ivy, prior to her

6  departure, but right now it would be Brian Dowd.

7      Q    Could you -- just a brief detour --

8  describe what Catherine Ivy's scope of work was, as

9  you understand it, before she retired?

10          MS. HERNANDEZ:  Objection.

11          You can answer.

12     A    My perspective was that she was over all

13 of the programmatic and service delivery aspects of

14 the Medicaid services benefit.  So not just for

15 behavioral health but globally.

16          And, um -- so that would include almost

17 most -- almost all of the clinical practice that

18 would be set forth in the Medicaid benefit.

19          At the time she was doing kind of the

20 practice aspects, and then Brian was doing more

21 regulatory aspects of this, but in her absence and

22 those positions not being filled in this moment,

23 Brian is our point.  But I hope that globally

24 captures Catherine's role.

25     Q    I'd like to set this document aside and



1    show you another one.

2              I think after this document, we can take

3    our lunch break.

4              Actually, I'm sorry, I deceived you.  I

5    want to go back and ask you one more question about

6    the email that you sent attaching the presentation

7    we just described.  This again is Exhibit 138.  Give

8    me a second.

9              So you recall this is the email that I

10        showed you previously?

11        A    Uh-hum.  (Affirmative.)

12        Q    It is marked as Exhibit 138.

13             Why did you think it was timely to re-send

14   this presentation?

15        A    So I cannot pinpoint the implementation

16   deadlines without looking back at other documents.

17   So I'm just going to state my recollection of the

18   historical framework.

19             Summer 2015 we reviewed the procurements,

20   and then there were months that went by before then

21   the awards were announced, at which point then I was

22   able to share the information in the slide

23   presentation.  So that was January.  So while I

24   don't specifically recollect the link from the GNETS

25   suit, I imagine that it was saying to the Medicaid

1    agency, I hope you've had a chance to implement and

2    have all the dialogues related to this that are

3    necessary for good practice to occur from the CMOs,

4    but I cannot pinpoint when the CMOs went live

5    without looking at -- back at a record of when that

6    actually happened, since we were not the contract

7    managers for that.  And even so, several of them, at

8    least in the 2006 implementation, went live in

9    stages.  That's all I can say to that.

10        Q    Just to put a finer point on this, for my

11   own understanding, did you think at the time you

12   sent this email that implementing the

13   recommendations in your presentation would help the

14   State address the allegations that the United States

15   complained in its litigation?

16             MS. HERNANDEZ:  Objection.

17             You can answer.

18        A    The first thing, I just want to be clear

19   about is whatever came across back then in 2016, I,

20   I can't fully remember what was in that suit versus

21   what is in the dialogue we're talking about for

22   sure, but whatever it was, I knew it was child

23   specific and I knew the CMOs had the largest and

24   greatest purview and opportunity to impact

25   children's administration because of the number of



1    their covered lives.

2            So in any kind of inquiry into the State's

3    performance on children, I would have been like as a

4    partner, have you, have you dotted all these I's and

5    crossed all these T's.

6        Q    Got it.

7            The GNETS suit that you reference in this

8    email is this litigation, correct, to the best of

9    your understanding?

10       A    I think.  I am not -- I am not positive

11   but I think that would be the only one from that

12   time frame.

13       Q    All right.

14           Okay, so let's put this aside.  I am going

15   to show you another exhibit, which will be 139.

16           (WHEREUPON, Plaintiff's Exhibit-139 was

17           marked for identification.)

18   BY MR. HOLKINS:

19       Q    Do you see the email that I just

20   published?

21           MR. HOLKINS:  For the record, this is GA

22           04179924.

23       A    It's up now, yes.  Let me see.

24           Do I have control?

25       Q    I will give it to you.  Give me one



```
 1    second.
 2              The wrong button.  Okay.
 3              MS. COHEN:  Patrick, what was the number?
 4        Q    You now have control?
 5              MR. HOLKINS:  This is Exhibit 139.
 6              MS. COHEN:  And the Bates number is?
 7              MR. HOLKINS:  I've already given it.
 8              MS. COHEN:  Okay.  I know.  I didn't hear
 9        it.
10        A    Okay, yes.
11        Q    So I will take control back of this
12    document.
13              For the record, it is an email that you
14    sent -- the top of this document I should say, is an
15    email that you sent on September 23rd, 2015, with
16    the subject "Re:  Apex Billing Webinar."  Correct?
17        A    Yep.
18        Q    And you attached to the email a document
19    titled, "Apex Billing and Reimbursement," and there
20    are in parentheses initials "MY" and "WT."  Correct?
21        A    Correct.
22        Q    So were you providing comments in the
23    document on this email?
24        A    Yes.
25        Q    I am now going to show you the attachment.
```



1              So this is also part of Exhibit 139.  The
2      Bates number is GA04179926.
3              Is this the attachment to the email we
4      just looked at?
5              I can give you control.
6      A      Thank you.  I was wondering.  Thank you.
7      Q      You've got it.
8      A      Thank you.
9              (Witness reviews exhibit.)
10     A      To the best of my recollection, this is
11     the -- what would have been a document that Matt
12     Yancey and I would have responded to.
13     Q      Thank you.  I'm going to take control of
14     the document back.
15             I want to direct your attention to some of
16     the texts in this document.
17     A      Uh-hum.  (Affirmative.)
18     Q      Specifically, on Page 2 of the document,
19     do you see the bullet that reads:  "Some services
20     can be challenging to get authorized through CMOs"?
21     A      Yes.
22     Q      And underneath there is a sub-bullet that
23     reads:  "Wendy, every service in the Medicaid State
24     Plan is required to be provided by the CMOs when
25     medically necessary for the child."



1      A    Yes.

2      Q    Is this Wendy you?

3      A    Yes.  This is me.

4      Q    Okay.  And is it your understanding -- is

5   it your understanding now that this is still the

6   truth, every service in the Medicaid State Plan is

7   required to be provided by the CMOs when medically

8   necessary for the child?

9      A    Yes, that is my understanding.

10     Q    And that would include IC3?

11     A    Yes.

12     Q    Would that include the autism outpatient

13  benefit we discussed earlier?

14     A    While our agency does not administer it,

15  it would still be the same premise, yes.

16     Q    In fact, that includes all of the

17  community-based behavioral health services --

18     A    Yes.

19     Q    -- that we described -- let me just finish

20  the question.

21          So this statement would apply to all of

22  the services that were identified in the State's

23  supplemental response to the United States

24  Interrogatory No. 17?

25     A    Yes.



1      Q    Do you agree with the statement that some
2   services can be challenging to get authorized
3   through the CMOs?
4           MS. HERNANDEZ:  Objection.
5           You can answer.
6      A    It is the self-report of provider agencies
7   that they have had a challenge with authorization.
8   So I can only represent what I hear through our
9   provider agencies since I do not have any lens or
10  data or direct information to that process.
11     Q    So you're not, as part of your regular
12  duties at DBHDD, looking at systemwide data relating
13  to authorizations and denials for services by the
14  CMOs?
15     A    Not by the CMOs, no.  Our agency does not
16  do that.
17          We have had a quality improvement project
18  or two with the Medicaid agency where we have been a
19  party, or like a SME, a Subject Matter Expert, to a
20  conversation on that, but in general we do not have
21  any data information on that work, that policy, that
22  protocol.
23     Q    So under this bullet there's a statement
24  that it's attributed to Matt.  Which I believe is
25  Matt Yancey?



1      A    Uh-hum.  (Affirmative.)

2      Q    Is he still with DBHDD?

3      A    He is not.

4      Q    What was his role at the time?

5      A    He was in the role of the director of

6  Office of Children, Young Adults and Families.  So

7  he was Dante McKay's predecessor.

8      Q    So Matt -- the statement attributed to him

9  in this document, the bullet we were just

10  discussing, again stresses the importance of sharing

11  this in your monthly reports with your TA providers,

12  et cetera, "so that we can take these problems to

13  the State Medicaid authority and work on them."

14      A    Uh-hum.  (Affirmative.)

15      Q    Do you -- you reference kind of provider

16  self-reports.  Is this what you were talking about

17  through these monthly check-ins?

18      A    Yes.  This presentation was to the early

19  recipients of Apex contracts from DBHDD.  So we are

20  responding to the COE in their role convening the

21  providers who did the Apex contracts at this moment

22  in time.

23           So what I recall and am reminded by this

24  document is that Matt was indicating that the more

25  data we could get from the providers on where these



1  challenges were at that point in time gave us then

2  the type of information we needed to take to the

3  DCH, so that they could inform and shape the

4  performance of the CMOs.

5      Q    And do you know whether in fact DBHDD is

6  taking information about CMO denials to DCH?

7      A    We --

8          MS. HERNANDEZ:  Objection.

9          You can answer.

10     A    We do so, again, episodically.

11         So as a result of this dialogue and

12  conversation, we began conversation with the

13  Department of Community Health, which then resulted

14  actually in a CMO panel coming to present to these

15  agencies, to talk with the agencies about the prior

16  authorization protocols and the way they each

17  operationalized it so that the providers were better

18  able to respond to what the CMO desired, and so that

19  the CMOs were able to get what they needed from the

20  providers providing these services, hoping to build

21  a better connective process so that the beneficiary

22  was the winner in that, in that administrative

23  smoothing.

24         So very specifically that was one outcome

25  of this.



1        Subsequently, you know, there are -- have

2    been moments where we've indicated some challenges

3    back to the DCH and they take those to the CMOs and

4    we're not -- that's not in our visibility, how it

5    gets resolved.  But that was one example of where

6    there was a very collaborative manifestation of an

7    improvement process.

8        Q    Are you aware of any provider complaints

9    about the CMO authorization process, specifically

10   with respect to school-based behavioral health

11   services?

12             MS. HERNANDEZ:  Objection.

13             You can answer.

14        A    Not in my recent times.  So it has not

15   been top of conversation in a bit.

16             For some time after this and before that

17   paneling that we brought together with the CMOs,

18   there were tremendous complaints, and then I think

19   the more we kept presenting in IDT about the role of

20   Apex and the goal of Apex, then I think the CMOs'

21   practice just in those shared settings with us

22   probably began to create better understanding

23   related to access.

24             So there was not a concerted -- we had

25   some concerted effort early, which you see as a



1   result of here.  After that, it was more continuous

2   education and information sharing about the goals of

3   Apex towards the end of it being -- school-based

4   services being more accessible.

5         And so we've not had a gathering of

6   complaints, at least that's been in front of me,

7   lately, unless Dante has had anything of that

8   nature.  But I've not been involved in anything

9   related to authorizations related to Apex complaints

10  in quite some time.

11      Q    Okay.  But just to clarify, you're not

12  looking at data around authorizations and denials

13  for school-based behavioral health services through

14  Apex or otherwise billed to the CMOs?

15      A    No.  Because, again, that's not our

16  purview.  We just don't get a lot of information.

17  If we get it, it's anecdotal.  Our providers

18  generally now know that we're not the catcher on

19  those types of direct complaints, that that is a

20  Medicaid authority dialogue.

21      Q    Understood.

22         When was this panel, the presentation by

23  the CMOs, done, do you remember?

24      A    I do not, not without looking.  It would

25  have been subsequent to this because we had a lot of



1   concern and complaints that bubbled for a few

2   months, and then we were able to get that panel

3   presentation done, but I cannot recollect when that

4   was precisely.

5       Q    And just kind of pivoting back in the

6   email, so it's clear for the record, you made these

7   comments in September of 2015, correct?

8       A    Uh-hum.  (Affirmative.)

9       Q    So the panel would have occurred

10  presumably --

11      A    After that, right.

12      Q    So I would like to just --

13      A    Because -- let me just say, it would have

14  occurred after the CMO implementation.  So just

15  couching that from the last document, it would have

16  probably at least been in 2016.

17      Q    Okay.  So I do want to show you just a

18  couple of documents real quick before we take our

19  break, because this is related to the same line of

20  questioning.  And then we'll take, I think, about 10

21  minutes.

22          MR. HOLKINS:  So I've just published an

23      email which is marked GA05023066.  I'm

24      introducing this document as Exhibit 140.

25          (WHEREUPON, Plaintiff's Exhibit-140 was



```
 1            marked for identification.)
 2    BY MR. HOLKINS:
 3        Q    I will give you control so you can
 4    familiarize yourself with it.  Just one second.
 5             You have control.
 6        A    Thank you.
 7             (Witness reviews exhibit.)
 8        A    Okay.  That is the panel that I was
 9    referencing.
10        Q    I'm sorry, what are you looking at?
11        A    The panel down at the bottom where Dante
12    asks can we invite them to a panel with us.  Second
13    sentence.  "CMO panel to talk through their
14    representative philosophies and practices."
15             That was the panel I was referencing a
16    moment ago where I wasn't sure of the date.
17        Q    Okay.  So this is -- let's kind of go back
18    here.
19             This is an email chain in early 2018
20    between you and Dante McKay, correct?
21        A    Uh-hum.  (Affirmative.)
22             Correct.
23        Q    You just referenced Dante suggesting this
24    CMO panel you previously testified about?
25        A    Uh-hum.  (Affirmative.)
```



1    Q    Is that yes?

2    A    Yes.

3    Q    And then above, in your response to Dante

4    from January 3rd, 2018, you write:  "That being

5    said, it might expose to the DCH the CMOs'

6    disconnect with our providers problematically so I

7    am willing to endorse this."

8         Correct?

9    A    Correct.

10   Q    Could you expand on what you viewed as the

11   time, as the disconnect between the CMOs and the

12   provider problematic?

13   A    Sure.  So very specifically, there are

14   service increments going back to the list that we

15   provided in the interrogatories about how things are

16   billed.  So there are services in the Medicaid plan

17   that are billed.

18        Then there are program models where you

19   pull together a handful of those things to really

20   make a program work.  So very specifically, for

21   instance, with Apex, Apex is a framework and in that

22   framework children's behavioral health services can

23   occur.  They are promoted to occur.  And those

24   services could be individual counseling, they could

25   be family counseling, they could be community



1    support.  So those things are sub-increments of, of

2    the Apex program model.

3              So Apex is a program.  It pulls together

4    some of those sub-elements of service, which then

5    create school-based mental health programs.  So a

6    program, big umbrella, there would be sub-elements.

7              So when the CMOs were going live, it was

8    becoming more apparent to myself, as reflected here

9    in this email, that the CMOs were not clear on how

10   some services should come together as a programmatic

11   umbrella.

12             So when we would talk about Apex, for

13   instance, or Substance Abuse Intensive Outpatient,

14   which is mentioned here, SAIOP, those were

15   programmatic models of service delivery where they

16   had all of these sub-elements, but the CMOs just

17   read the state plan and all they saw was the

18   sub-elements.  They didn't see the variety of ways

19   that the State talked about services and programs

20   coming together, braiding different strands of

21   service together to make a program.

22             So when I'm talking about

23   programmatically, sometimes our providers would --

24   this was per their self-report -- would call a CMO

25   and they would say, we want authorization for Apex,



1   and the CMOs didn't understand that because for the

2   CMOs it was like the child needs individual

3   counseling, community support, physician assessment.

4   It didn't matter if it was in the school or not,

5   they were just thinking about the a la carte list

6   and not the programs.

7            So that is really the crux of my statement

8   in this context.

9       Q    And what was the practical effect of that

10  disconnect?

11      A    If it -- the practical disconnect for me

12  comes back to the last exhibit that authorizations

13  were sometimes more fraught with dialogue or appeal

14  or revisiting because there was not common language

15  shared between the provider and the CMO, which was

16  then our point for let's get folks together and

17  learn about this as soon as we can, so that we are

18  able to dispel any of these concerns related to

19  access.

20      Q    Okay.  Thank you.

21           I've got one more document.  We're almost

22  done and ready for lunch.  Give me one second.

23           Not done, just ready for lunch.

24           Actually, I'm going to hold that document

25  but let me just ask, beyond the panel that you



1  referenced led by CMOs, was there any other effort

2  to address -- by DBHDD to address this disconnect

3  between providers and the CMOs?

4       A    Yeah.   I mean the creation of ACER did not

5  happen until probably 2018 as well.  I can't speak

6  to the genesis date precisely, but the ACER group,

7  the coordination that we embarked on with DCH and

8  the CMOs was largely to really target -- the

9  acronym, it's access engagement -- sorry.

10           Access Coordination Engagement and

11  Recalibration, which was the terms that we

12  collaboratively came up with with the CMOs to say,

13  okay, we've got to be at a table talking with more

14  regularity so that we do a better job talking the

15  same language and implementing systematically some

16  of these programmatic models that we really feel

17  like are the best practices for Georgia's children

18  and youth.

19           So that's really how we came to bring that

20  group together, and it was -- the two departments

21  and the CMOs together, recognizing the opportunity

22  to be in a more shared collaboration, despite our

23  agencies not having any authority over those

24  contracts.

25           So, again, functioning as a Subject Matter



1  Expert, offering some interpretation of some

2  programs, even sharing like where we had pilots

3  beginning to emerge onto specific areas so that the

4  CMOs were aware that some of this content was

5  emerging, some of the ways we were looking at some

6  opportunities for practice of the future, right,

7  because none of this should be stagnant.

8         So that was really the largest and most

9  permanent manifestation of some of those early

10  frustrations and challenges, was to create that

11  space, to have an hour and a half to two hours a

12  month to just put a ton of stuff on an agenda and

13  really better communicate.

14        So Medicaid agreed for us to assume the

15  chairmanship role of that.  And so DBHDD, my office,

16  convenes that monthly.

17     Q    Okay.  Just to recap, the two remedial

18  measures taken by DBHDD to address this disconnect

19  between providers and CMOs was the CMO panel that

20  you described and the formation of an ACER committee

21  that meets monthly --

22     A    Correct.

23     Q    -- with the CMOs and DBHDD and DCH?

24     A    Correct.  I do want to be specific,

25  though.



1            The panel was created specifically related

2     to Apex.

3         Q    Okay.

4         A    But we also recognized, as you saw in the

5     exhibit, that Substance Abuse Intensive Outpatient

6     this was occurring for, and we initiated several

7     trainings for the CMOs, like related to their

8     understanding of IC3 because it was a new service

9     that was again put in the state plan fall of 2017.

10           So there are iterative processes for that.

11    So it's not like a one and done.  So just as you

12    just named a one and two, I just want to be clear,

13    one was that panel, but it was very specific to

14    Apex.  Two is an ongoing process, but, again,

15    periodically when we hear of these concerns, we at

16    DBHDD, again not the authority, are trying to use

17    the ACER now as the space to create that hardier

18    dialogue, specific to whatever is merging as some

19    place where we need to have better collaboration and

20    communication.

21           MR. HOLKINS:  Okay.  Let's go ahead and

22        break.  I think we can take an hour, give

23        everyone a bit of time.  Come back at 2

24        o'clock.

25           Is that okay?



1          MS. HERNANDEZ:  Yes.

2          THE VIDEOGRAPHER:  Off record at 1:02.

3          (A recess was taken.)

4          THE VIDEOGRAPHER:  Back on the record at

5     1:48.

6  BY MR. HOLKINS:

7     Q    Welcome back, Ms. Tiegreen.

8     A    Thank you.

9     Q    I'd like to jump right into another

10 exhibit.  Give me a second and I will pull it up for

11 you.

12         MR. HOLKINS:  I've just published what I'm

13      introducing as Exhibit 141.  For the record,

14      this is marked GA00381117.

15         (WHEREUPON, Plaintiff's Exhibit-141 was

16      marked for identification.)

17 BY MR. HOLKINS:

18    Q    It's an email from you, dated August 21,

19 2016, with the subject "Re: Medicaid Question."

20    A    Correct.  I can see that.

21    Q    I'm going to give you control of the

22 document so you can take a moment to take a look.

23         (Witness reviews exhibit.)

24    A    This is just taking a moment because it's

25 like a very unique question from one person, and so



1   it's taking me a second.  I apologize.

2        Q    Please take your time.  There's no rush.

3        A    Okay, I've just finished.  Thank you.

4        Q    Thank you.  I'm going to take control

5   back.

6             Let me first ask, who is Rebecca Blanton?

7        A    Rebecca Blanton worked for the Department

8   of Education as a grant manager for them specific to

9   some behavioral health initiatives that they were

10  implementing, and as such served as a member of the

11  Interagency Directors Team, and at one point even

12  for about two years held the chairmanship for that.

13            So she was a counterpart with the DOE who

14  I worked within several committees off and on.

15       Q    Is Rebecca Blanton still employed by the

16  Georgia Department of Education?

17       A    I believe she's retired.

18       Q    And in this email, the most recent one in

19  the chain, which is 8/21/2017, you're responding to

20  an email from Rebecca Blanton, correct?

21       A    I'm responding to -- it looks like a chain

22  from the Center of Excellence at Georgia State

23  University, fielding a question from someone who

24  worked for Georgia State University, and then they

25  kicked it over to Rebecca and myself, where she just



1  says:  "Wendy would be the expert on this and I

2  would love to know the answer, too."

3          And then of course I laughed because I'm

4  not the expert on this, although I appreciated the

5  vote of confidence.

6      Q    So the "this" that you're referring to,

7  unless I'm mistaken, is whether or not a child who

8  is receiving Children's Intervention School Services

9  would have their claims paid by CMOs?

10          Is that the question that's being posed?

11      A    To me it is -- there's two aspects of

12  this.  It looks like it's asking some parameters of

13  the Children's Intervention School Services, and

14  then there's also content about LEAs.

15          So, again, like I've already articulated,

16  I'm a studier of this information, but I have no

17  policy authority, or do not touch this policy on a

18  regular basis, which is why I also kicked this over

19  to individuals at the Department of Community

20  Health.

21      Q    And specifically you referred this query

22  to Brian Dowd and Sandra Middlebrooks at DCH,

23  correct?

24      A    Correct.

25      Q    Still in your response you provide some



1  information based on your review of the CISS policy,

2  correct?

3      A    Uh-hum.  (Affirmative.)

4           Correct.

5      Q    And just to be clear, CISS, or Children's

6  Intervention School Services, is one of the avenues

7  you explained earlier for children to receive

8  behavioral health services in schools, correct?

9      A    Correct.  And just to rearticulate, one of

10  the avenues through the Department of Community

11  Health, which DBHDD does not impact, interface or

12  have any authority for, which is why I'm merely, in

13  this case, copying and pasting some content from

14  that policy, and then kicking it to the Medicaid

15  authority.

16      Q    You write in your email, dated 8/21/2017,

17  based on the review of the CISS policy:  "This leads

18  me to believe" -- excuse me.

19           "This leads me to believe there may be

20  different approaches in different geographic

21  catchments."

22      A    Uh-hum.  (Affirmative.)

23      Q    What did you mean by that?

24      A    I don't have these policy citations in

25  front of me, but I -- basically my understanding is



 1   that schools can provide funds which are matched

 2   through the Department of Community Health, but

 3   they're not all jurisdictionally the same, but the

 4   Medicaid agency would have to reply to that because,

 5   again, this is -- I'm indicating here that I skimmed

 6   the policy in order to respond.  I'm giving them the

 7   citations, but, again, I just am indicating back to

 8   these folks that I am no expert on this.

 9        Q    Do you recall --

10        A    And I'll -- and I'll state that for this

11   group, too.

12        Q    Do you recall whether Brian Dowd or Sandra

13   Middlebrooks responded to your email?

14        A    I do not recall.

15        Q    And --

16        A    And they could have just replied to Dr.

17   Snyder, and I would not have known.

18        Q    And sitting here today, do you have any

19   further understanding of whether CMOs can be billed

20   for services through the CISS program?

21        A    It is still my understanding that if it's

22   in the Medicaid State Plan, that they are

23   responsible for that coverage.  That's the global

24   understanding.

25        Q    But that there may be some geographic



 1  differences in terms of the matching funds provided

 2  by LEAs?

 3      A    Correct.  Just, again, based on this read,

 4  and I can tell from my sense of response that those

 5  paragraphs gave me that indication, but, again, this

 6  was from quite a ways back and this is not my area

 7  of expertise.

 8      Q    Okay.  So let's set this aside.

 9           As part of your job duties, do you review

10  or assess information relating to the availability

11  of community behavioral health services for children

12  in Georgia?

13      A    In as much as we can, not being the

14  authority for all services.  So when I think about

15  access and reviewing access on behalf of the

16  Department, again, I think about things, am I seeing

17  utilization in all communities?  Understanding that

18  there are many other behavioral health services that

19  the Department of Community Health administers that

20  we don't have lens into specific to that

21  utilization.

22           So I'm always having to look at data with

23  those caveats.

24      Q    I want to just make this really concrete,

25  because I know sometimes it can be amorphous.



1           I'm going to pull back up the list of
2    services that we discussed from the State's
3    supplemental response --
4        A    Sure.
5        Q    -- interrogatory No. 17.  Give me one
6    second.
7           So let's take a concrete example.  First
8    of all, do you see the document?
9        A    I do.
10       Q    Okay.  This is, for the record, Exhibit 8
11   previously introduced.
12          I want to take a concrete example here.
13   Let's choose one that you have familiarity with, I
14   imagine, which would be youth peer support.
15          Is that a service you're familiar with?
16       A    I am.
17       Q    Do you review data with respect to the
18   availability of youth peer support in Georgia?
19       A    I do.
20       Q    And what data do you review?
21       A    I review data for utilization, so claims
22   submitted for those services.  But only for the
23   small subset of covered lives for which DBHDD has
24   some authority for.
25       Q    And how small is this subset of --



1    compared to the overall number of children receiving

2    Medicaid funded services in the state?

3         A    So we serve approximately 10,000 youth a

4    year, but many of those are served in a brief

5    eligibility type.  So, for instance, a youth can

6    approach one of our providers and he or she has no

7    coverage for Medicaid, and we have policy that says

8    if that youth is uninsured, that the agency will

9    assist them in making an application to CMO

10   Medicaid, at which point then our coverage ends,

11   right.

12             So sometimes we are the covering authority

13   for some of those 10,000 youth, for sometimes only

14   anywhere from four to six weeks.  Before then they

15   become enrolled in a CHIP Medicaid plan.

16             So the numbers are higher than the scope

17   of coverage might suggest.

18        Q    Understood.  Just to go back to my

19   question, what is the overall population of children

20   receiving Medicaid funded services, behavioral

21   health services in Georgia?

22        A    I do not know that answer because that

23   Medicaid data is separate from our department's

24   lens.

25             MS. COHEN:  Patrick --



1        Q     Is this -- is the statement you made with

2    respect to your review of utilization data specific

3    to the youth peer support group service true for all

4    of the other services identified in the State's

5    response to supplemental Interrogatory No. 17?

6        A     Yes.  The same conceptual framework

7    applies to all of these services, in that we only

8    look at utilization data for that which our

9    department has had coverage responsibility.

10       Q     Have you ever requested data from DCH

11   about utilization of any of these services outside

12   of DBHDD's small subset of --

13       A     As the chairperson of that work group that

14   I indicated under the IDT, I have.  But not in the

15   role as DBHDD.

16            So DCH is pretty clear with us that our

17   authority does not extend into the CMO practice.  So

18   in my role at DBHDD I have not seen or requested

19   that data.

20            In my role as a chairperson of a working

21   group of IDT, focused on behavioral health mapping,

22   I have been a partner in requesting that information

23   because it is for a System of Care request for all

24   of the collaborative state agencies who participate

25   in IDT.



1    Q    And what specifically did you request in

2  your capacity as a member of the IDT?

3    A    So for the financial mapping process we

4  requested claims data from the CMOs.

5    Q    Claims data capturing utilization of each

6  of these services?

7    A    And others.  So it would be -- the IDT is

8  interested in the whole of Medicaid services for

9  behavioral health purposes, and so services beyond

10  this would also have been requested.

11    Q    What was the collection period for this

12  claims data that you requested from the CMOs?

13    A    It was for a year, fiscal year '19, if I

14  recollect correctly, because we were trying to look

15  at pre-pandemic practice, and look at a whole year

16  that would be kind of unimpacted by the PHE.

17    Q    PHE?

18    A    The Public Health Emergency.

19    Q    Thank you.

20        Is that data, the claims data you just

21  described for the CMOs, in hand?  Have you received

22  it?

23    A    No.  We had -- there was a struggle in the

24  initial report, and we had to modify that data

25  request.  So it was not able to be provided to us at



 1   that level of granularity.  We had to get it rolled
 2   into some bigger buckets.
 3              So, no.  The way we requested it is not in
 4   hand.
 5       Q    What was the struggle from the initial
 6   request that you referenced?
 7       A    I'm not sure what the struggle was.  I
 8   know what the output was.
 9              So the initial output, there was a report
10   provided to the co-chair and myself and the COE
11   team, and we didn't feel like it had face validity
12   based on what we understood of the system.  And so
13   we regrouped and went back to the Medicaid agency
14   with some questions about, are you sure this is
15   right?
16              And we let them go back in-house to have
17   whatever dialogue they needed to have, and the
18   counter response to us was, this is the way we can
19   make this available, kind of in these big buckets in
20   this way.
21              So I don't know what the, what the
22   dialogue or the issue or the challenge was in the
23   background.  We didn't make that our business.  We
24   were just really totally focused on getting kind of
25   product and output so that we could look at that



1   against all other payor sources as well.

2        Q    And what year did you receive this initial

3   output, which you testified did not have face

4   validity?

5        A    It was either this year or late calendar

6   year '21.

7        Q    Okay.

8        A    It's been quite recently.

9        Q    And who provided that output to you?  Was

10  it someone at DCH?

11       A    Catherine Ivy and Daphne Keit, who is one

12  of their data leads.  K-E-I-T.

13       Q    Thank you.

14            So I want to go back and ask you about the

15  utilization review you do.  We can stick with our

16  example, which is youth peer support.

17       A    Uh-hum.  (Affirmative.)

18       Q    So what are you looking for in your review

19  of that utilization data?

20       A    So, for instance, youth peer support is a

21  young service.  So you picked an example of a

22  service that's quite young.

23            So for our office what we are looking for

24  is how many providers have enrolled, the geographic

25  location of those providers.  And, for instance,



1   parent and youth were implemented at the same time

2   for -- to be the -- the target is the young person.

3   Parent/youth peer support could support both, the

4   parents and that young person who is targeted.

5           So we would also be looking to see if both

6   were being rolled out for them because it's called a

7   diab model, where two things kind of come together

8   to support the whole family.

9           So that's the type of utilization result

10  that I'm looking for.  Medicaid -- again, that meant

11  the other Medicaid, the other Medicaid data.  The

12  CMO data is not in our lens.  So it's not a whole

13  picture but it helps us kind of do a barometric read

14  for is the service getting out there, are providers

15  hiring these peer specialists, and are they

16  beginning to implement it.

17          And if it's slow or lagging, what might we

18  do in terms of some grants on behalf of DBHDD, some

19  technical assistance, or whatever it might take to

20  be sure that's lifted up to full implementation.

21          Again, that service was one that was ruled

22  out in late 2017.  So very new.  So when I look at

23  utilization for that one in particular, I'm looking

24  for are we moving toward some statewide access.

25      Q    So I'm trying to understand what this



1   review, given its limited scope, per your testimony,

2   would tell you about statewide access, given that it

3   excludes claims for CMO reimbursed services.

4        A    Sure.

5             MS. HERNANDEZ:  Object.

6             You can answer.

7        A    That is -- it is a challenge, but for us

8   -- again, that's why it's kind of narrowly focused

9   to do we see GEO access?  Do we see providers

10  statewide?  Do we see a provider at least in each

11  regional area, that kind of thing, and if not, then

12  what can we do to lift that up?

13            Where we see -- like we knew we were

14  rolling this service out in fall of 2017.  We did

15  some initial scan of our provider network and saw

16  that it was pretty low, and then we took that

17  actually in ACER as an agenda topic to talk about

18  expanding that and had some presentations on that,

19  but we never knew what the yield is ultimately for

20  that in the absence of that data.

21       Q    I'm wondering if you could pick out an

22  example of an older service?  So I know you

23  identified youth peer group as a younger service.

24       A    Sure.

25       Q    What would be an example of an older



1   service on this list?

2        A    Sure.  Like family outpatient service.

3   That's a very traditional service.  It's been part

4   of Medicaid's plan since the 1970s or '80s.

5        Q    Okay.  That's a great example.

6             How does your review of utilization data

7   specific to that service differ at all, if at all,

8   from what you do for youth peer support?

9        A    Sure.  There's much more maturity for that

10  service for sure, but one of the things that then we

11  look at still is the geo access, is it accessible

12  everywhere, and we at DBHDD know that answer to be

13  yes because we contract with the Community Service

14  Boards and we require them to do that service.

15            So we have some additional assurance.  So

16  I don't have to look at deeply about geo access with

17  that.  I am interested in choice, right.  So that

18  there's always choices.

19            So we would look to see if there's like

20  providers in all the geographic areas to cover, you

21  know, and having choice, right.  So I can kind of

22  say 159 counties are covered because of the CSBs,

23  because DBHDD requires them to do this, but then I

24  look at other providers to be sure that there are

25  some choice operating in play.  So that.



WENDY W. TIEGREEN                                June 21, 2022
UNITED STATES vs STATE OF GEORGIA                         153

1           And then you look at different things,
2    again according to different services.  For young
3    people, if I were separating utilization trends for
4    youth, I'm going to want to see almost as much
5    family happening as individual because I need the
6    family to be educated about what he or she -- what
7    his or her's plan needs are.  I want the parents to
8    be trained.  There's family training service, and
9    there's a family counseling service.
10          You see those.  They are three apart on
11   your list.
12       Q    Uh-hum, I do see that.
13       A    And so we want families to be educated.
14   We want them to understand about what is, what is
15   SED, back to that acronym.  Do you understand
16   medication treatment?  Those types of things.
17          So then I'm wanting to look to see that
18   there is a lot of family work going on for youth as
19   well, and I don't know then how the CMOs would look
20   at that one.  You know, I'm hoping they would look
21   at that with the same philosophical lens.
22       Q    Understood.  Are you familiar with the
23   term "amount, frequency, duration" in the context of
24   Medicaid services?
25       A    Uh-hum.  (Affirmative.)





1       Q    Yes?

2       A    Yes.

3       Q    Are you looking at the amount, frequency,

4   and duration of services provided for each of the

5   services listed here?

6       A    Amount, yes.  Less frequency and duration.

7   Just because of bandwidth.  Not because it's

8   unimportant in any way, but just our utilization

9   capacities haven't been looking at duration and

10  frequency as often.

11      Q    Okay.  So the amount would tell you how

12  many units of service were provided, correct?

13      A    Yes.

14      Q    But you wouldn't know necessarily from

15  that data the frequency or duration of services

16  received by any individual child?

17      A    We look at average per -- average per

18  youth, which gives some sense of frequency, but we

19  don't necessarily look at duration, and again those

20  metrics are a lot more complicated because, again,

21  for our covered lives, many of them we're just

22  seeing really briefly before they change plans.

23  They actually access coverage, so it really skews

24  our data because often they are coming in and we see

25  that they get assessment and they might get an



 1   individual counseling or physician's assessment, and

 2   then they change coverage to a CMO.

 3              So even though -- what we call case mix,

 4   we actually look at what's called case mix, which is

 5   like a service pie chart, where we look at kind of

 6   what's the average that someone is getting.

 7              And for youth, we always have to have in

 8   mind that we have that set of youth who transitioned

 9   rapidly to another coverage group, and so they're

10   getting kind of that first set of services that are

11   delivered, but then we don't see the whole clinical

12   picture because they've moved in coverage.

13        Q    Understood.

14              Did you as part of your request for CMO

15   data, in your capacity as an IDT member, ask for

16   data that would show amount, frequency and duration

17   of services?

18        A    Our original request, which would have

19   been a whole claims extract, would have given us the

20   capability to do that.  It was not one of the goals

21   of the map.  It was a financial mapping and use

22   mapping.  So that wouldn't have been our goal.

23              The original request could have told that,

24   but the data that ultimately came over, we could not

25   have done a study like that related to that data.



1   It was just too, too high level, too rolled up to be

2   at that granular --

3        Q    The output that you got --

4        A    -- level.

5        Q    -- was too high level?

6        A    Yes.

7        Q    And you're not -- and you've revised the

8   request now?

9        A    Uh-hum.  (Affirmative.)

10       Q    Is that correct?

11       A    We didn't revise the request.  We asked

12  Medicaid for certain information, received it,

13  questioned the validity, asked them to go back,

14  check the validity and reliability, at which point

15  they came back and said you're right, there were

16  questions about this, we can provide it in this

17  manner, and they provided it.

18           But it is a very macro, high level, what I

19  would call a rolled-up utilization into four large

20  buckets, like outpatient, inpatient, residential, et

21  cetera.

22       Q    So the output that you received, correct

23  me if I'm mistaken, doesn't break down service data

24  specific to youth?

25       A    It is specific to youth.



1    Q    Okay, that's right.

2    A    But it is not specific in any way to these

3   subline items.

4    Q    Okay.

5    A    And it is not claims level detail.

6    Q    Are you waiting -- just to kind of close

7   the loop, are you expecting to receive any more data

8   or information in connection with the request you

9   made to the CMOs?

10    A    No, not right now.  We're kind of settling

11   into what we've got and just not letting perfect be

12   the enemy of good at this point.  So we are moving

13   ahead with what we have, and there's no additional

14   request at this point in time.

15    Q    If you had more staff working directly

16   under you, would you want to be looking at amount,

17   frequency, and duration for each of the services

18   listed on this exhibit?

19         MS. HERNANDEZ:  Objection.

20         You can answer.

21    A    Certainly -- yeah.  I mean I'm a policy

22   wonk, so.  So this is -- my subjective answer, of

23   course.

24         The role and functionality and the way the

25   system is designed at this point, it's not our



1   functional role to do so because that's all been

2   carved out.  Now, again, you know, in a -- in a

3   world where there was a lot more transparency and

4   transactional data and information, that would be

5   lovely to have a good snapshot of that behavioral

6   health content.

7        Q    And is it -- when you say "snapshot," are

8   you talking about a comprehensive snapshot across

9   both CMO reimbursement and DBHDD reimbursement?

10       A    It would certainly tell us a lot more

11  about the public sector behavioral health system,

12  certainly.  It's just impossible to answer that any

13  other way.  It would be a bigger snapshot, more

14  comprehensive snapshot.

15       Q    And again this is just to make it clear

16  for the record.

17            You said that during that comprehensive

18  analysis is just not your functional role at this

19  point?

20       A    Right.

21       Q    Is it DCH's functional role?

22       A    DCH --

23            MS. HERNANDEZ:  Object.

24            You can answer.

25       A    DCH doesn't have authority into our data



1   either.  So it would not be their functional role to

2   look at uninsured claims.

3        Q    So there --

4        A    There's no --

5        Q    I'm so sorry.  I didn't mean to interrupt

6   you.  Go ahead.

7        A    They have no authority over that either.

8        Q    Is it fair to say that there is no single

9   state agency within the State of Georgia that is

10  looking comprehensively at provision of community

11  behavioral health services in Georgia?

12             MS. HERNANDEZ:  Objection.

13             You can answer.

14       A    That's subjective as well.  So I'm just

15  measuring, measuring my statements.

16             There are efforts underway recently to try

17  to bring some more of that information together.

18  The IDT is identified in law, under the System of

19  Care law, to bring some of this together for

20  children, but it is not a state agency.

21             It is -- there's some purview given to the

22  DBHDD to look at this information, but it is not set

23  forth in law the way to garner all of that data or

24  pull it all together.  So it becomes then a function

25  of these subcommittees and of asks instead of there



```
 1   being kind of a singular mandate related to that
 2   having a hub right now for the system.
 3        Q    Okay.  I just want to make sure your
 4   testimony is clear.  Is there any other entity aside
 5   from DBHDD that is assessing access to community
 6   behavioral health services for DBHDD grantees?
 7             MS. HERNANDEZ:  Objection.
 8             You can answer.
 9        A    When you say DBHDD grantees --
10        Q    I --
11        A    -- do you mean the beneficiaries?
12        Q    I do, yes.
13        A    Okay, okay.
14        Q    Let me, let me -- let me go ahead and
15   restate the question because it will be clear this
16   way.
17             Is there any other entity aside from DBHDD
18   that is assessing provision of community-based
19   behavioral health services to DBHDD beneficiaries?
20             MS. HERNANDEZ:  Objection.
21             Can you answer?
22        A    No.
23             Can I add a caveat to that?
24        Q    Yes.
25        A    I want to be sure that for the uninsured
```



 1  that answer is no.  For the Medicaid beneficiaries
 2  who fall into the aged, blind, disabled category, as
 3  I articulated earlier today, there's a joint
 4  collaboration process.
 5          So the Department of Community Health
 6  could very well look at utilization for our shared
 7  population, those who are Medicaid as a result of
 8  being aged, blind, disabled in accordance with that
 9  federal policy.
10          So they could indeed have some oversight
11  to that subline of eligibility, but they would not
12  have any authority or oversight to the uninsured
13  line of eligibility under our department.
14      Q   So DCH's review of provision of
15  community-based behavioral health services to
16  children is incomplete, just as DBHDD's review is
17  incomplete?
18          MS. HERNANDEZ:  Objection.
19          You can answer.
20      A   That is at least my lens on that, yes.
21      Q   So I'd like to show you another exhibit.
22          I'm going to stop sharing this.  So this
23  would be 142.
24          (WHEREUPON, Plaintiff's Exhibit-142 was
25           marked for identification.)



1    BY MR. HOLKINS:

2        Q    I'm note for the record this email was

3    produced by the State of Georgia to the United

4    States in this litigation as GA04301608.  It's an

5    email that include an attachment, which I'll also be

6    showing you as part of the same exhibit.

7             I'll give you a chance to review the

8    email.

9        A    Okay.

10       Q    Give me one second and I'll give you

11   control.

12            You have control.

13            (Witness reviews exhibit.)

14       A    Okay.

15       Q    So this is an email, if I'm not mistaken,

16   sent by Tricia Mills to you and a number of other

17   recipients, dated May 4th, 2020.  Is that correct?

18       A    Correct.

19       Q    Who is Tricia Mills?

20       A    Tricia Mills was a program director who

21   worked under Dante McKay in his division -- his

22   office under the Division of Behavioral Health, and

23   she's no longer with the Department, but she oversaw

24   some specific programs for Dante.

25       Q    My understanding of this email, and



 1  correct me if I'm mistaken, is that Tricia Mills is

 2  sending you a statement of need in connection with a

 3  service supported education/supported employment.

 4          Is that accurate?

 5      A    That's accurate.

 6      Q    Her email indicates that you and John --

 7  who I'm guessing is John Quesenberry?

 8      A    Correct.

 9      Q    -- met with Tricia Mills before she sent

10  this email --

11      A    Sure.

12      Q    -- to discuss the service?

13      A    Yes.

14      Q    So I'd like to now pivot over to the

15  attachment.

16          Do you see the attachment?

17      A    I do.

18      Q    This is GA04301611.  It's a part of

19  Exhibit 142.

20          Would you like to take a moment to review

21  the document?

22      A    I know it's quite long.  I remember the

23  gist of it, so.

24      Q    That's fine.

25      A    If you just wanted to highlight.  Yeah, I



1   recall the document.  If there's anything in

2   particular I need to skim or scan as you go, I will

3   feel comfortable doing so.

4       Q    So what I wanted to direct your attention

5   to is the introduction, which starts on Page 1 of

6   the document.

7            MS. COHEN:  You're referring to Page 1?

8       611 is Page 1?

9            MR. HOLKINS:  Yes, 611.

10           MS. COHEN:  Thank you.

11  BY MR. HOLKINS:

12      Q    The second paragraph under 1.1, Purpose of

13  Statement of Need, reads:  "Although Georgia has

14  made significant improvements to its children's

15  behavioral health system over the last few years" --

16  excuse me -- "past few years, opportunities remain

17  for state agencies, providers and communities to

18  further improve the delivery of children's

19  behavioral health programs and services.  Children's

20  behavioral health challenges continue to present at

21  home, school, and community settings.  Children and

22  families, particularly in rural areas of the state,

23  still face difficulties in accessing basic and

24  specialized children's behavioral health services."

25           Do you see that text?



1        A    I do.

2        Q    I want to direct your attention to the

3   last line I read:  "Children and families,

4   particularly in rural areas of the state, still face

5   difficulties in accessing basic and specialized

6   children's behavioral health services."

7             Do you agree with that statement?

8        A    I do.

9        Q    And what challenges do children and

10  families, particularly in rural areas of the state,

11  face in accessing basic and specialized children's

12  behavioral health services?

13            MS. HERNANDEZ:  Objection.

14            You can answer.

15       A    I mean I think the biggest challenge we

16  are experiencing right now is prior to the COVID-19

17  Public Health Emergency, we had 151 of 159 counties

18  that were behavioral health professional shortage

19  areas.  So while we do our best in recruiting

20  provider agencies, there are still access challenges

21  related to the workforce, and those have been

22  exacerbated by the pandemic.

23            So at the time when this was being

24  written, we knew distinctly about the behavioral

25  health workforce challenge, and also given the time



1  that this was written, also understood that

2  telehealth still was a challenge in the -- in terms

3  of access through kind of broadband communications

4  and the like.

5      Q    What specific basic or specialized

6  children's behavioral health services are children

7  and families struggling to access?

8          MS. HERNANDEZ:  Objection.

9          You can answer.

10     A    So in this case, this particular statement

11  of need, the rollout for these services that Ms.

12  Mills was defining are supported employment and

13  supported education, neither of which are Medicaid

14  covered services.

15         So these were targeted.  This, this

16  particular response is indicating that we are aware

17  that these services were not available and we were

18  seeding them for the first time for these young

19  people.

20     Q    I understand that you're speaking about

21  this document.

22     A    Uh-hum.  (Affirmative.)

23     Q    I'm asking you more broadly.

24     A    Okay.

25     Q    What are the gaps in either basic or



1   specialized community-based behavioral health
2   services for children and their families?
3              MS. HERNANDEZ:  Objection.
4              You can answer.
5        A    If I could target one thing right now,
6   it's the workforce.  And so it is -- we're in a kind
7   of critical time related to the numbers of
8   practitioners we have and being able to meet the
9   needs of young people in terms of access, and that
10  is not just a Georgia issue, that's a national
11  challenge right now as we're experiencing it.
12       Q    So we're going to do this another way.
13  Let's take a look back at Exhibit 8, the State's
14  supplemental response to Interrogatory No. 17.
15             Let's start at the top of the list.  Do
16  children and families have adequate access to
17  behavioral health services in the State of Georgia?
18             MS. HERNANDEZ:  Objection.
19             You can answer.
20       A    For an initial -- let me just caveat.
21  Right now, because of the behavioral health
22  workforce challenges, I think there is a global
23  challenge with accessing behavioral health services.
24       Q    I'm not asking about a global challenge.
25  I'm asking about challenges in the State of Georgia.



1   So let me ask again.

2           Do children and families in the State of

3   Georgia have adequate access to behavioral health

4   assessments?

5           MS. HERNANDEZ:  Objection.

6           You can answer.

7       A    I think yes.  I do.  Again, that's -- that

8   is largely pandemic related right now, and so I just

9   -- I don't think there's a better way to answer

10  that.

11          I think for all of these services, there

12  are access challenges right now in Georgia.

13      Q    Okay.  For all of the services listed in

14  the State's Supplemental Response to Interrogatory

15  No. 17 there are access challenges, correct?

16      A    Yes.

17      Q    And you state this without having reviewed

18  utilization data in connection with Care Management

19  Organization refunded services, correct?

20      A    Correct.

21      Q    What specifically are the access

22  challenges with respect to Intensive Customized Care

23  Coordination?

24          MS. HERNANEZ:  Objection.

25          You can answer.



1    A    So right now for Intensive Customized Care

2  Coordination, we have identified that we want to

3  expand the provider network, and there has been a

4  statement of need release from Dante's office to

5  bring on new providers for that service, and so it

6  is that hope and expectation that that would again

7  hopefully increase access to that very important

8  service.

9    Q    And has DBHDD set a target for how much it

10  wants to increase access to IC3?

11    A    So we are trying to take the provider

12  network from two to four, and the two we have now,

13  the two providers have statewide coverage

14  expectation.

15        The two of them cover, though, 159

16  counties each, and that is like quite a stretch from

17  an administrative management perspective, which is

18  why we identified after this initial go live that we

19  needed to bring on two more providers for that

20  specific service.

21    Q    And do you believe that expanding from two

22  to four providers of IC3 is sufficient to meet the

23  need for the service?

24        MS. HERNANDEZ:  Object.

25        You can answer.



1       A     It is my hope that it will.  The original

2  service, Intensive Customized Care Coordination,

3  again, in the national work that we did and based on

4  utilization trends from other states, there is a

5  small number of young people who medically

6  necessarily qualify for that service, and so taking

7  it from two providers to four is what we hope is

8  going to be a good first step in being sure that we

9  can maintain fidelity, because it does have a

10  high-fidelity standard to the service delivery

11  model, while making it more accessible to young

12  people.

13       Q     Who reviews fidelity with the IC3 model?

14       A     It is individuals who work for Dante in

15  partnership with the Center of Excellence.

16       Q     And who specifically within Dante's staff

17  is working on reviewing fidelity with the IC3 model?

18       A     I --

19             MS. HERNANDEZ:  Objection.

20             You can answer.

21       A     I know Tricia Mills, while she has left

22  service, she has been on a contract to continue some

23  of that work.

24             And that Dr. Pearson also has oversight on

25  the global clinical package of content, and they



1  both meet with the Center of Excellence related to

2  that.

3       Q    Let's go back to Exhibit 142, the

4  statement of need for the supported employment and

5  supported education programs for youth and emerging

6  adults with severe mental illness.

7            What is the current status of this

8  program?

9       A    I actually haven't had an update on this

10  since it was implemented.  So, again, in my narrow

11  scope of capacity in my office, I frequently am in

12  the development stages of this work, just to be sure

13  that it comforts with any necessary Medicaid policy

14  or is considering Medicaid eligibility and coverage,

15  but this service was not targeted for Medicaid, and

16  therefore I've not stayed actively engaged with it.

17            Supported employment, nor supported

18  education are covered services in the Medicaid

19  package.

20       Q    Are there specific geographical areas of

21  the state that you would identify as particularly in

22  need of additional community-based behavioral health

23  services for children?

24            MS. HERNANDEZ:  Objection.

25            You can answer.



1      A    I think, again, we are experiencing in our
2   most rural areas, so the southwest and southeast,
3   still some challenges in hiring because of the
4   behavioral health workforce shortage.  So if I were
5   targeting an area, those would be the areas that I
6   would be considering.
7      Q    Have you reviewed data or documents
8   showing regional disparities in the availability of
9   community-based behavioral health services for
10  children?
11     A    I have not looked at that particular issue
12  during the pandemic.  We have been focused on a lot
13  of other staffing challenges, and so have not -- I
14  have not looked at that in recent months.
15     Q    When is the last time you looked at data
16  showing regional disparities in the availability of
17  community-based behavioral health services?
18     A    It's probably been nine months or so.
19     Q    What's --
20     A    Nine months to a year maybe.
21     Q    Sorry.  Thank you.
22     A    I look at utilization quite a bit.  We've
23  been trying to be sure that the utilization globally
24  is recovering in the pandemic, and that's where a
25  lot of our energies have been focused most recently.



1     Q    And when you did review this data, where
2   did you get it?
3     A    It comes from the Administrative Services
4   Organization and through, through partnership with
5   John Quesenberry's office, kind of structuring those
6   reports in a way that they are then accessible to
7   our team as managers.
8     Q    So, again, this would just be data that's
9   specific to service provision to DBHDD
10   beneficiaries?
11     A    Uh-hum.  (Affirmative.)
12          Correct.
13     Q    Do you track any data with respect to the
14   utilization of evidence-based practices?
15     A    There are some evidence-based practices
16   that we have highlighted for the COE to do some
17   deeper study and review of, but we do not
18   necessarily capture by IT coding the unique EBP
19   utilization.  EBP, evidence-based practice.
20          So, for instance, the intensive customized
21   care coordination has been a high-fidelity model
22   that we have invested a lot of infrastructure,
23   analysis and support on, and therefore have put into
24   a contract with the COE to study that with rigor, to
25   check that with rigor, to be engaged in looking at




1   some evidence-based outcomes and performance

2   outcomes related to that service.

3          So where we have bandwidth and capacity,

4   we do those kinds of deep dives.  However, if you

5   think about a service like individual counseling

6   that I mentioned earlier, where there are maybe a

7   hundred ways to deliver an EBP, we can't track it

8   with that granularity, and we don't.

9      Q    What informs your opinion that you can't

10  track it with that granularity?

11     A    So in basic claims data, through like a

12  standard Medicaid claim, there are not national code

13  sets that say -- within the individual counseling

14  code there are not nationally norm codes that would

15  distinguish a service like dialectical behavioral

16  therapy from cognitive behavioral therapy, to

17  functional family therapy, and so on.

18         So there -- the way that system is

19  designed does not allow that kind of subcoding.

20     Q    Could DBHDD hypothetically survey

21  providers to learn about provision of evidence-based

22  services?

23     A    Yes, we can.  And there have been some

24  periodic efforts to do so.

25         So, again, but that's based on kind of



 1   capacity and bandwidth.  So where we've had capacity
 2   and funds to say to the COE, can we focus in on this
 3   for a moment, we have done those types of surveys.
 4   So it is possible.  We have done it.
 5        It is not anything that has had the
 6   capacity to be sustained for the long haul in terms
 7   of budget and management, but we have entered into
 8   those types of surveys before.
 9        Q    Do you review -- and let's go back, just
10   to again make this concrete, to Exhibit 8, which
11   we've been talking about a lot, the list of services
12   identified in the State's supplemental response to
13   Interrogatory No. 17.
14        Do you review any data with respect to
15   outcomes for youth who receive these services?
16        A    I do not.
17        Q    Do you know if anyone at DBHDD does that?
18             MS. HERNANDEZ:  Objection.
19             You can answer.
20        A    I do know that our performance group that
21   I mentioned earlier, under our division, is
22   designing new kind of outcomes, oriented constructs
23   to be able to look at some of this content but,
24   again, that is just emerging and it is again -- it
25   would have to be DBHDD focused and not whole system



1   because of the CMO data being separate from our

2   entity.

3        Q    And the division that is creating these

4   new kind of outcome measures, that's the division

5   under Melissa Sperbeck's control?

6        A    Yes, correct.

7        Q    Do you know whether that group as part of

8   this assessment of outcomes will be looking at

9   whether youth who receive these services end up in

10  GNETS?

11            MS. HERNANDEZ:  Objection.

12            You can answer.

13       A    I'm not aware of any dialogue related to

14  that, not at all.

15            The national HEDIS metrics, healthcare

16  metrics that are available, don't really focus on

17  that type of content.  So that's been a guiding

18  force in what we've begun to think about related to

19  outcome measures.  So it is still very preliminary.

20       Q    Could you just make sure for the record,

21  the national metrics, could you explain what those

22  are?

23       A    HEDIS, H-E-D-I-S, and I can't even bring

24  to mind what that stands for, but it is a very

25  nationally normed healthcare set of metrics which



1    focus on some real process oriented outcomes.  At

2    this point it's kind of the state of the industry.

3    So, for instance, when a young person leaves

4    inpatient care, do they get an outpatient

5    appointment in seven days.  Very high level, global

6    national metrics that are mandated across healthcare

7    providers.

8        Q    Thank you.

9             So I'd like to pivot to another exhibit.

10   I'll note for the record this document was produced

11   by the State of Georgia to the United States in this

12   case.  The Bates number is GA05027310, and I'm

13   introducing it as Exhibit 143.

14             (WHEREUPON, Plaintiff's-Exhibit-143 was

15   marked for identification.)

16   BY MR. HOLKINS:

17       Q    I would also note for the record that this

18   exhibit was marked confidential by the state, so

19   we'll obviously take measures to maintain its

20   confidentiality in the record.

21             MS. COHEN:  Well, that said, is the State

22        going to take the position that the testimony

23        related to this exhibit is confidential?

24             MS. HERNANDEZ:  I don't believe so, no.

25             MS. COHEN:  No.  Okay.  Then -- thanks.



```
 1              MR. HOLKINS:  Thanks, Frannie.

 2              MS. COHEN:  And then does that apply to

 3         the exhibit as well?

 4              MS. HERNANDEZ:  The exhibit itself is

 5         confidential.

 6              MS. COHEN:  The exhibit is confidential

 7         but not the testimony?

 8              MS. HERNANDEZ:  As long as we don't go

 9         into the personal information of these

10         individuals listed on these.

11              MS. COHEN:  Got it.

12              MR. HOLKINS:  Understood.  I won't.

13              I'll just note for the record this

14         document is titled, "Approved Medicaid Provider

15         List - Behavioral Health," in parentheses,

16         "(C&A) Active As of 03/01/2020," and the top

17         left corner is the text "The Georgia

18         Collaborative ASO."

19    BY MR. HOLKINS:

20         Q    Ms. Tiegreen, have you seen this document

21    before?

22         A    I have.

23         Q    Do you regularly review a list of approved

24    Medicaid providers?

25         A    I do not.  Not in this format.  I see the
```



1  list of providers on utilization tables.

2          So when I look at services, I can see all

3  the providers doing the service.  I don't look at a

4  table like this that has this level detail with any

5  regularity.

6      Q    You did look at this specific list,

7  though, correct?

8      A    I did.

9      Q    Before today?

10     A    I have seen this before.

11     Q    For what purpose?

12     A    I think it was in response to this

13 request.

14     Q    By "this request," what do you mean?

15     A    The interrogatories having been copied.  I

16 mean I'm not sure if that's what this was from, but

17 I've seen a list quite similar to this that was a

18 response to some interrogatories.

19     Q    So I take it you're not looking at this

20 exact format with any regularity?

21     A    Right.

22     Q    But you say you are looking at lists of --

23     A    Service providers.

24     Q    Okay.

25     A    Related to services.



1        Q    And just so I'm clear, what is the purpose
2   of looking at a list of approved Medicaid providers
3   in this format or any other on a regular basis?
4        A    So there's a benefit to knowing where
5   providers are located and to where they're serving.
6             In this case, this is too limited by
7   having a mailing address to be beneficial to think
8   about access.  But when you look at a regional
9   utilization chart, you can see services and
10  providers.
11            So while a hardy list is fine.  If they
12  only serve a three-mile square block, it's not
13  beneficial.
14       Q    You reference regional utilization charts;
15  is that right?
16       A    Regional utilization, correct.
17       Q    Is that a document that you're accessing
18  regularly?
19       A    It's not a standard document that we use.
20  It's just been periodically pulled before.
21       Q    Pulled from where?
22       A    So, again, the ASO can do any specialized
23  reports to look at any special requests that are
24  made by leadership, in as much as the bandwidth is
25  available.



1      Q    So you would be, if I'm not mistaken,

2   making an ad hoc request to the Georgia ASO

3   Collaborative for a list of Medicaid -- approved

4   Medicaid providers --

5      A    Correct.

6      Q    -- correct?

7      A    And it is mostly our regional offices who

8   have some responsibility and purview for that.

9           So under Dante's leadership, he has

10   regional staff who look at regional content related

11   to that access, and then they in particular bring

12   any access issues back through him as well.

13           So it's not just my responsibility.

14   There's actually regional staff who have a lot of

15   responsibility in this particular area.

16      Q    You're referring to the DBHDD regional

17   offices, correct?

18      A    Correct.

19      Q    Is it accurate that the list of approved

20   Medicaid providers that you're reviewing on an ad

21   hoc basis is limited to what's given to you by the

22   Georgia Collaborative ASO?

23      A    Yes.  For our body of business.

24      Q    I'm going to give you control of the

25   document.  I'm just curious whether you can scroll



1   through it and let me know whether there are any

2   schools identified as approved Medicaid providers on

3   this list.

4              (Witness reviews exhibit.)

5        A    None that I would recognize as functioning

6   in that manner.

7              So, again, here's where my lack of

8   knowledge of LEA programs is hindering my response

9   more accurately.  If an LEA was functioning within a

10  school, with like a different naming convention, I

11  wouldn't recognize that.  But most of these

12  providers I know and are not schools.

13       Q    Mostly the providers are Community Service

14  Boards and other direct provider organizations,

15  correct?

16       A    Correct.

17       Q    Do you recognize any names of schools on

18  this list?

19       A    I do not.

20       Q    Do you recognize any names of school

21  districts on this list?

22       A    I do not.

23       Q    Do you recognize any names of LEAs on this

24  list?

25       A    I do not.



1      Q    Set this aside.

2           Do you track any data with respect to the

3    number of students receiving mental health services

4    who are admitted to PRTFs?

5      A    I do not.

6      Q    And let me reask it a different way.

7      A    Can I -- yeah.

8      Q    Do you track any data with respect to the

9    number of children admitted to PRTFs?

10     A    I do, and for the states it's very low.

11          We have just completed a two-year study

12   with the Department of Community Health where we

13   worked collaboratively to look at some PRTF

14   utilization.  So for the past two years Dante McKay

15   and myself have both been involved with the

16   Department of Community Health, where we've actually

17   been able to see some CMO utilization data specific

18   to PRTF as well.

19          So we have been looking at PRTF

20   utilization in a much more studied manner as a

21   result of some requests from the PRTF to do some

22   additional analysis of that service.

23     Q    So let me try to understand correctly.

24          You're accessing CMO data with respect to

25   PRTF utilization?



1      A    Accessing it and the CMOs are providing it

2   and bringing it to the DCH.  The DCH is bringing it

3   to meetings with our department to look at more

4   global PRTF utilization.

5      Q    So this is in response to your request by

6   DBHDD?

7      A    This is in response to a request from the

8   PRTFs.

9      Q    Are the PRTFs operated by DBHDD?

10     A    They are not.

11     Q    They're all private?

12     A    They are all private.

13     Q    Are they licensed by DBHDD?

14     A    They are not.  They are licensed as

15  specialty hospitals by the Department of Community

16  Health.

17     Q    Okay.  Does DBHDD have any direct

18  oversight responsibility with respect to the PRTFs?

19     A    We have oversight as related to our

20  covered lives.  So we have policy procedure,

21  admissions, parameters set forth with the ASO, just

22  like we do other services, but that does not give us

23  authority over the PRTFs.

24          We purchase the service on behalf of our

25  beneficiaries, and we do so, though, in accordance



1   with medical necessity standards and expectations

2   that are set forth in their contracts or in policy

3   that they are asked to adhere to via those

4   contracts.

5        Q    Does the data that you've received with

6   respect to PRTF utilization show how many youth are

7   referred to PRTFs from GNETS facilities?

8        A    No.

9        Q    Would you be able to access that data?

10       A    No.  Not without something like you were

11  just saying, which would be a very specific targeted

12  survey.  It's not sitting somewhere and we're just

13  not pulling it, to be more specific to your

14  question.

15       Q    So I have just a couple more documents I'd

16  like to get through in this line and we'll take a

17  brief break, if that's all right.

18       A    Okay.

19       Q    So I've just produced what I'm introducing

20  as Exhibit 144.

21            (WHEREUPON, Plaintiff's Exhibit-144 was

22         marked for identification.)

23  BY MR. HOLKINS:

24       Q    For the record, this document is

25  identified as GA04298133.  There's an attachment to



```
 1   the email that we'll be including in the exhibit,
 2   and we'll discuss that separately.
 3            I'll give you a minute to review the email
 4   chain.  Give me one second.
 5            You should have control.
 6            (Witness reviews exhibit.)
 7       A    Okay.
 8       Q    So this is an email from you to Melissa
 9   Sperbeck, dated April 14, 2020, with the subject
10   "Re: DCH Paper."
11            Is that correct?
12       A    Correct.
13       Q    And you're attaching a document entitled,
14   "DBHDD Proposal for DCH 2020 04 14 wwt."  Correct?
15       A    Correct.
16       Q    We're going to take a look at the
17   attachment now and we'll discuss it.  Give me one
18   second.
19            For the record, this is GA04298134, and
20   it's being offered as part of Exhibit 144.
21            I'll give you a second to take a look at
22   this document.
23       A    Thank you.
24       Q    You have control.
25            (Witness reviews exhibit.)
```



1        A    I apologize.  It's a long document, so I'm

2    just taking a minute.

3        Q    Take your time.  My questions will just be

4    on a few specific pieces toward the top of the

5    document, but you can take all the time you need to

6    review it.

7             (Witness reviews exhibit.)

8        A    Okay.  There are several attachments which

9    helped me move more quickly to the end.  Thank you.

10       Q    You're welcome.

11            So I'm taking back control of the

12   document.  I'm going to scroll to the top.

13            My understanding of what this is is a

14   draft of a state plan amendment prepared by DBHDD

15   for review by DCH during the COVID-19 emergency.  Is

16   that correct?

17       A    Yes.  And I want to be clear that the

18   disaster state plan amendments had very particular

19   parameters around them to be responsive to the

20   disaster.  And so I just think that is probably

21   important to say in the context for this, and this

22   was very early on.  As you can see, we're just a

23   month into the declared public health emergency and,

24   yeah, Federal Medicaid was just trying to help

25   states at this point, as you see from the

1   attachments, trying to help states figure out what

2   pathways it would and could implement through a

3   state plan that would be specific for disaster

4   response.

5        Q    Thank you for that clarification.

6             So I'm going to point you to some specific

7   lines in this draft, but let me first ask you, what

8   were your contributions to this document?

9        A    So I'm the primary, primary author of the

10  document.

11       Q    The first sentence on Page 1, and again

12  this is GA04298134, which is part of Exhibit 144,

13  the first line reads:  "DBHDD serves as the

14  day-to-day operating authority for the DCH category

15  of service (COS) 440 and the sole administrator for

16  state funded behavioral health services."

17            My question, my first question is, what is

18  DCH category of service 440?

19       A    That is the community behavioral health

20  rehabilitation services numbering.  So category of

21  service is how Medicaid numbers different programs

22  in its purview.

23            So this becomes -- this emanates from the

24  state plan chapter called the Medicaid

25  Rehabilitation Option, which locally is called



1    CBHRS.

2         Q    Okay.  So this category of service would

3    encompass the rehabilitation services on Georgia's

4    state Medicaid plan?

5         A    It encompasses the subset of services that

6    is in the list we were previously looking at in the

7    interrogatory.

8         Q    Okay.  That's very helpful.

9              So toggling back to Exhibit 8, you're

10   referring to this list of community-based behavioral

11   health services identified by the State?

12        A    Correct.  These are the only services that

13   are in category of service 440.

14        Q    And so this statement is accurate, that

15   DBHDD is the day-to-day operating authority for that

16   full list of services?

17        A    For that full list of services for --

18   notice the very last statement -- for individuals

19   covered in Medicaid fee for service, which is the

20   other, the other term, the other language used for

21   Medicaid aged, blind, disabled.

22             So we are not the day-to-day operating

23   authority for any of those same services when they

24   are provided by the managed care organizations.

25        Q    I'm confused, though, because -- let me



1  phrase this as a question.

2       The last line is referencing paying for

3  state match for those services, correct?

4       A    Correct.

5       Q    The first line, if I'm not mistaken, just

6  says:  "DBHDD services the day-to-day operating

7  authority for the category of service 440," which

8  you stated includes all of the services identified

9  in the State's response to Interrogatory No. 17,

10  correct?

11      A    Except for Medicaid then delegates

12  sub-authority to the Medicaid managed care companies

13  for those services when they are provided to those

14  other beneficiaries.

15      Q    But if DBHDD serves as the day-to-day

16  operating authority and the sole administrator for

17  state funded behavioral health services, how is that

18  DCH's authority to delegate?

19      A    Medicaid has authority for everything that

20  Medicaid oversees.  So in this scenario what, what

21  we were saying to the Medicaid agency is, is we, we

22  are your partner and administrator for these

23  services.  That shouldn't be construed as meaning

24  that this statement subsumes and takes over all the

25  other authorities that are already in place.



1          So law says that we are the authority for
2     state funded behavioral health services.  Law also
3     says that Medicaid is in charge of all of Medicaid
4     services.  So there's overlapping authorities in
5     that scenario.
6          So Medicaid in that case has other
7     authorities that it can also exercise.
8     Q    Let's take another -- let's take a closer
9     look at what Georgia law says.
10          I want to turn to Page 3.  I'm
11     specifically looking at the bullet that starts "In
12     Georgia Code."
13          Do you see where I am?
14     A    I do.
15     Q    It reads:  "In Georgia Code," in
16     parentheses "(Section 37-1-20) DBHDD is charged," in
17     quote, "to provide an adequate array of services and
18     choice of providers for consumers.' And, in quote,
19     'to establish a system for local administration of
20     mental health, developmental disabilities and
21     addictive disease services in institutions and in
22     the community."
23          Further, in quote, "The department
24     designated and empowered as the agency of the State
25     responsible for supervision and administrative



 1  control of programs for the care, custody and

 2  treatment" and then it goes on, ultimately in quote.

 3          So what is your interpretation of this

 4  statutory language with respect to DHBDD's mandate?

 5          MS. HERNANDEZ:  Objection.

 6          You can answer.

 7      A   So in this document -- this is a proposal

 8  to DCH.  So we did not also define DCH's role.  We

 9  didn't take the prerogative to define their role,

10  which is overlapping to ours, which says they are in

11  charge of all healthcare services for Medicaid

12  beneficiaries.

13          So in this -- this is what I would call,

14  right, this is a proposal.  It's our pitch paper,

15  don't forget us, DCH, as you make a proposal on a

16  state plan amendment related to COVID.

17          So this is reminding them of our

18  authorities, understanding and not taking away their

19  authority, which is not named herein, that they are

20  in charge of all healthcare for Medicaid

21  beneficiaries, behavioral health and other.

22          So we have in law some concentric

23  responsibilities for the same beneficiaries.

24      Q   How do you interpret the phrase which you

25  included from Georgia Code, "The DBHDD is charged to



1  provide an adequate array of services and choice of

2  providers for consumers"?  What does that mean, in

3  your view?

4            MS. HERNANDEZ:  Objection.

5            You can answer.

6     A     In my view -- in my view, as an employee

7  of the behavioral health authority, that would

8  presume that we have some of this power.

9            The co-existing other law gives Medicaid

10 that same footing and therefore creates this dynamic

11 relationship that I was alluding to at the beginning

12 of our conversation, that neither is fully the

13 authority as long as there is concentric overlap for

14 many of those covered lives, and in some cases by

15 executive design then some of this has been pulled

16 away from the behavioral health authority and given

17 to the CMOs to set medical necessity, to set

18 systems, to say whether or not there's an adequate

19 array of services and choices for consumers.  That

20 also sits with the Medicaid agency separate from our

21 department for the managed care covered lives.

22           So there's, there's the law, and then

23 there is how this plays out in administrative

24 functionality.

25    Q     Would it be fair to say that DBHDD and DCH



1    share jointly the responsibility providing an

2    adequate array of services and choice of providers

3    for consumers of community behavioral health

4    services?

5             MS. HERNANDEZ:  Objection.

6             You can answer.

7        A    If you think about the whole of public

8    beneficiaries, in large part DBHDD and the Medicaid

9    agency together cover all of those lives.

10       Q    I want to direct you to some stats,

11   statistics, that appear in this document,

12   specifically on Page 1 of GA04298134, part of

13   Exhibit 144.

14            The second-to-last bullet reads:  "Georgia

15   is ranked 47th in the country for per capita

16   spending on mental health."

17            Do you see that stat?

18       A    I do.

19       Q    What is KFF.

20       A    Kaiser Family Foundation.

21       Q    Have you seen updated rankings from --

22       A    I have not.

23       Q    Let me just finish the question.

24            Have you seen updated rankings from KFF

25   with respect to Georgia's per capita spending on



1  mental health?

2      A    I have not.

3      Q    One more document and then we'll take a

4  break.

5           So I'm showing a document that is part of

6  the next exhibit, 145.

7           MR. HOLKINS:  145.

8           (WHEREUPON, Plaintiff's Exhibit-145 was

9       marked for identification.)

10  BY MR. HOLKINS:

11      Q    This is an email produced by the State to

12  the United States, marked GA04288334.

13           It's an email from you dated January 23rd,

14  2020, sent to a number of recipients.

15           I'll give you a minute to review the

16  email.  Please let me know when you're finished.

17      A    It's very short.  I was able to look at it

18  while you were talking.

19      Q    Great.

20      A    Thank you.

21      Q    Thank you.

22           The subject of the email is "Document2 -

23  Compatibility Mode."

24           In the body you reference a "product we

25  use to recommend the right design for Foster Care or



1    Managed Care when DCH took this back."

2              First off, what did you mean when you said

3    "DCH took this back"?

4         A    So prior to 2007-ish, the children who

5    were covered by Medicaid, who also had -- who were

6    foster care enrollees, they were covered by a

7    Medicaid program called TRIS, the Therapeutic

8    Residential Intervention Services plan.

9              It was a different category of service, a

10   different program manual for Medicaid, and at some

11   point there was some federal review of the program,

12   and federal CMS asked the State to change the design

13   model.  All of the money for that program was

14   collaboratively managed up until that point by the

15   Division of Family and Children Services with the

16   Department of Community Health.

17             When the corrective action response was

18   sent to federal CMS, what was decided on by the

19   State was that foster care children would no longer

20   be covered through an interagency working agreement

21   between Child Welfare and Medicaid, but they wanted

22   to bring more medical credibility, they wanted to

23   bring external review to bear, prior authorization.

24   And so the executive team for the State, including

25   the Governor's Office, made the recommendation that



1  DBHDD begin to manage the foster care covered lives.

2          We assumed that in 2009-ish or so, and

3  about two years later it was decided that it was

4  best to take foster care into a whole health model

5  and to put it all into managed care, to be procured

6  to a managed care company and managed by a single

7  CMO.

8          So the -- what is it, take it back?  Or

9  when DCH took this back, that comment is DCH and

10  child welfare managed it together.  Briefly it was

11  transitioned as part of the corrective action plan

12  for DBHDD, and Medicaid to collaboratively manage,

13  and then Medicaid took the funds assigned to foster

14  care back into their budget to pay for a procurement

15  product, contract with the winner, proposal winner,

16  who was Amerigroup.

17      Q    Okay.  Did you draft the attachment that

18  you reference in this email?

19      A    I did.

20      Q    Let's take a look at it.

21          MS. COHEN:  Is this 145?

22          MR. HOLKINS:  Yes.

23          MS. COHEN:  What's the document number?

24          MR. HOLKINS:  The document number for the

25      email is GA04288334.



1           MS. COHEN:   Thank you.

2    BY MR. HOLKINS:

3        Q    This is the attachment part of Exhibit

4    145.  The Bates number is GA04288335.

5             Is this the document that we just

6    discussed that you drafted and attached to the

7    email?

8        A    Yes.

9        Q    It's dated November 1, 2002.  It's titled

10   "Department of Behavioral Health and Developmental

11   Disabilities Response to Department of Community

12   Health's Call For Feedback to the foster care,

13   managed care issue, right?

14       A    2012.

15       Q    2012.  Excuse me.  The date is November 1,

16   2012?

17       A    Yes.

18       Q    I want to ask you just about some specific

19   pieces of this, this document, starting with the

20   values that you identify for a youth recovery

21   oriented System of Care.

22            Do you see those on Page 1?

23       A    I do.

24       Q    Do you have any updates to this list of

25   values for recovery oriented system of care?



1       A     Let me read them for a moment.

2       Q     Please take your time.  I'll give you

3   control if you need it.

4       A     No, I'm fine.  Thank you.

5             (Witness reviews exhibit.)

6       A     These are very far-reaching philosophical

7   statements, so I might could wax further

8   philosophical, but I don't see anything that's

9   missing.

10             Basically, I still see these as the

11   guiding tenents for a recovery oriented system of

12   care.

13       Q     Speaking broadly, what is the value of, of

14   recovery oriented system of care for you?

15             MS. HERNANDEZ:  Object.

16             You can answer.

17       A     Thank you.

18             A recovery oriented system of care

19   recognizes the complexity of the impact of a

20   behavioral health condition.  That it impacts

21   friendships, it impacts family relationships, it

22   impacts school performance, it impacts general

23   healthcare and wellness.  It impacts sleep.  It

24   impacts exercise.

25             And so the complexity of the condition,



1   that it yields a response that brings together

2   entities and agencies who may have a vested interest

3   in a young person in a way that gets quite

4   complicated for the child and family.

5          And so a system of care, to just take that

6   phrase, contemplates the idea that providers and

7   formal supporters, such as state agencies and the

8   like, should come together to work collaboratively

9   on behalf of the youth and the family.

10          The recovery oriented part of this is

11   about focusing on the child and family strengths,

12   not the deficits, and working towards an outcome end

13   without being bogged down into the symptoms and the

14   functional challenges of the young person.

15          So approaching the young person from a

16   space of you can get better, people with the same

17   condition get better, there is hope, there is high

18   expectation of your wellness, and leaning into it in

19   a positive framing, while bringing together that

20   collaboration, which then is about all these systems

21   may be involved in working with you but let's really

22   create a space where those systems are working

23   together.

24          The one other thing I would like to say is

25   just, for the record, I know it's identified in



1  Paragraph 1, but this is a product that I chaired

2  through which many voices sat at a table, such as

3  this, and said we want to design kind of the epitome

4  of what this product would look like.  And so it is

5  my fingers again at the keyboard but listening to

6  the voices of several of the partners who are

7  acknowledged within this document.

8         So I want to say while you ask me did I

9  write this, yes, I did.  I wrote this, though, with

10  a collaboration of leadership and advocates.

11    Q    Are you referencing the first paragraph,

12  the meetings between DCH, DBHDD, DCFS, DJJ, and DPH?

13    A    This -- and the partners at the top.  So

14  it says as a component of the partners' ongoing

15  dialogue.  The partners also included

16  representatives from some advocacy organizations and

17  some provider organizations, as you see about three

18  lines into that first paragraph.  This paper

19  represents discussion between.

20         So it was multiple partners who came to

21  the table to share a vision about what we wanted to

22  offer in this particular time as this was being

23  designed.

24    Q    Okay.

25    A    So while, while you're asking me some very



1  specific things about the paper, I also want to

2  represent that it was not a DBHDD product.  It was a

3  -- it was DBHDD facilitated through the person of

4  me, but it was a pretty sophisticated group of

5  partners who had some investor interest in youth and

6  foster care.

7       Q    Well, thank you for that clarification.

8            Let's skip down to the next list, also on

9  Page 1 of this document.

10           If I'm understanding you correctly, the

11 bullets under Behavioral Health Services and

12 Supports Musts are identifying what you, in

13 collaboration with these partners, identify as the

14 key components of a recovery oriented system of care

15 for youth.  Is that accurate?

16      A    We are setting our wish list through this

17 paper to the Department of Community Health in

18 designing their procurement.

19      Q    And is this -- is this wish list, I guess

20 as you use the term, have applicability broadly to

21 community-based behavioral health services in

22 Georgia?

23      A    Yes.  In Georgia and nationally.  So the

24 system of care frameworks are national frameworks,

25 thus some of the citations in the documents that



1  come from some national global products.

2       Q    Does your office undertake any evaluation

3  of whether or not the elements identified here as

4  components of recovery oriented system of care for

5  youth are actually being implemented in Georgia?

6       A    I wouldn't say a standard evaluation is

7  occurring through my office because it's so tiny.

8  My scope and capacity can't, can't carry that.

9            However, I am aware that many of these

10 items -- if you think about what we are assessing

11 and evaluating through the Center of Excellence, we

12 are hitting some of the sub-priorities of this

13 through that limited process, to try to give us a

14 sense of whether or not some of this is occurring.

15      Q    What specific components identified here

16 do you understand the COE and DBHDD is attracting?

17      A    So, for instance, Bullet 2, we are talking

18 about linkage and where -- that the support should

19 provide linkage where there's high acuity in

20 providing intensive care coordination using

21 high-fidelity wraparound.

22           So really wanted the CMO at this time to

23 embark on using high-fidelity wraparound, while also

24 not waiting for that, and putting it into the State

25 plan beginning in 2017, which was some years later,



1  but we really wanted to seed this in the CMO for

2  foster care at the time because the Care Management

3  Organizations can do early implementation.  They can

4  do specialized services implementation.

5        So we wanted to go ahead and put that in

6  even though it was still under development in the

7  CHIPRA grant that we referred earlier.  We knew it

8  was under development but we wanted to go ahead and

9  plant that seed here for that CMO, particularly

10  given the high acuity needs for youth in foster

11  care.

12     Q    Are you aware of any analysis by DBHDD of

13  whether the behavioral health services and supports

14  received by children enrolled in GNETS contain the

15  elements identified here as key components of the

16  recovery oriented system of care for youth?

17     A    I'm not aware of any study that has that

18  set of parameters.

19     Q    I'd like to skip down.  Bear with me.  I'm

20  going to be searching for some things here.

21        On Page 2, under No. 5, you reference a

22  state statute.  Do you see where I am, O.C.G.A. 37?

23     A    I do.

24     Q    You write:  "Our charge is to be a

25  'visible and accountable leader across state



1  government - and a skilled resource - integral to

2  the coordination of public behavioral health care

3  across multiple agencies, involving many funding

4  streams and delivery systems.'"

5          To your knowledge, has that provision of

6  state law changed since you wrote this document in

7  2012?

8          MS. HERNANDEZ:  Object.

9          You can answer.

10     A    Not to my knowledge.  Again, I would like

11  to state in many cases when we're stating this in

12  documents to the DCH, we are reminding them of that

13  duality in law, that they look at their own law and

14  they're like we're the authority over this whole

15  domain.

16          So in many cases we are writing as a

17  sister agency about our role in law to be a reminder

18  to them of our functional stance in this dialogue

19  and role, particularly having understood, circa

20  2006, that the design which was implemented, was we,

21  DCH, are taking the behavioral health components for

22  service delivery for the Medicaid managed care

23  covered lives and we are now delegating to the Care

24  Management Organizations the design, management, and

25  implementation of that behavioral health benefit.



1  Again, allowed in law by Federal CMS but not

2  necessarily recognizing then the role that's set

3  forth for DBHDD in accordance with law.

4       So the overlapping authorities then create

5  some of this challenge in role implementation.

6       Q    So I'm going to ask a simple question.

7  Does this statement reflect reality:  "Our charge is

8  to be a visible and accountable leader across state

9  government - and a skilled resource - integral to

10 the coordination of public behavioral health care

11 across multiple agencies, involving many funding

12 streams and delivery systems."

13       Is that statement an accurate statement of

14 reality?

15       MS. HERNANDEZ:  Objection.

16       You can answer.

17       A    That is our charge.

18       Q    Okay.  Let's move on.

19       In the next page, under General

20 Considerations, the second bullet references

21 Georgia's ADA settlement, the Americans with

22 Disabilities Act, and the Olmstead Act.

23       The language of the text, the text

24 specifically reads:  The state shall ensure that the

25 community behavioral health services system adheres



1   to expectations set forth in Georgia's ADA

2   Settlement, Americans with Disabilities Act (ADA)

3   and the Olmstead Act."

4           Do you see that language?

5       A    I do.

6       Q    What specifically were you contemplating

7   when you wrote this?

8       A    So, again, understanding the framework as

9   it was implemented in 2006, the movement of that

10  authority and the governance of that day-to-day work

11  for Medicaid behavioral health that was delegated to

12  the CMOs, in many cases the lens over that was not

13  always contemplative of the settlement agreements

14  that were emerging.

15          So think about the time of this document,

16  around 2012, the settlement was still relatively

17  new.  Olmstead was in place but the settlement was

18  new.  So what we were doing here was just reminding

19  the Medicaid partner:  Just be sure you are

20  contemplating these expectations that the State

21  holds in the settlements as part of what you

22  consider as you contract with this new vendor.

23      Q    And have those expectations changed since

24  you drafted this in 2012?

25      A    They have not.



1    Q    And what specifically are your

2    expectations with respect to the ADA settlement, the

3    American with Disabilities Act, and the Olmstead

4    Act, as you read here?

5              MS. HERNANDEZ:  Objection.

6              You can answer?

7    A    Again, the American Disabilities Act

8    settlement is adult centric, but there is a small

9    covered live overlap for foster care, in that young

10   people who sign themselves back into care can

11   continue to be covered -- at this point in time it

12   was through age 20, but for foster care, in

13   accordance with the ACA, the Affordable Care Act,

14   extended to 26, trying to be sure they were

15   recognizing for adults that we needed to be

16   contemplating early intervention in communities

17   ahead of institutional settings.

18   Q    Do you have that same expectation with

19   respect to children's behavioral health services

20   broadly?

21             MS. HERNANDEZ:  Objection.

22             You can answer.

23   A    Of course that is subjective, but, yes,

24   that is my daily hope.

25   Q    Let's scroll down to Page 9.  I have a



1  question about a term you used toward the bottom of

2  the page, "geographical access standards."

3            Do you see that?

4            The second to the bottom paragraph.

5       A    I do.

6       Q    What are you referring to?

7       A    So this is a document recommending what

8  the hopes are for the vendor, and so what we are

9  saying here is that, that the outcome would be that

10 they have geo access standards related to the basic

11 services package and then further promoting access

12 to specialists, or in this case like specialized

13 service access, in that second or third sentence.

14      Q    And do you know whether in fact any vendor

15 in connection with this proposal has implemented

16 geographic access standards per your recommendation?

17           MS. HERNANDEZ:  Objection.

18           You can answer.

19      A    I think the DCH would have to answer that.

20 I've not seen any geo access measures from the CMOs.

21      Q    And does DBHDD use geographic access

22 standards?

23      A    We do not have those in place either.

24      Q    Let's scroll down --

25      A    That I'm aware of.



1    Q    Thank you.

2         MS. HERNANDEZ:  Patrick, how much longer

3    with this exhibit?

4         MR. HOLKINS:  Five minutes.  I'm sorry I

5    know I've gone on a bit long.  Just five more

6    minutes and we'll take a break.

7    A    I do want to harken back to, though,

8    again, we are in a unique position related to

9    coverage because of the Community Service Boards in

10   that we have statewide -- we know we are covering

11   all counties through the Community Service Boards or

12   through other Tier I vendors that we have that

13   statewide access

14        So we, we in a lot of ways are able to

15   operate based on the knowledge that we have that

16   coverage and that we are contracting for that

17   coverage separate from geo access standards that

18   would be typical to a provider network management

19   model that would come from an insurance company.

20        So I think that's why we are able to

21   operate in some manner slightly differently, because

22   we are the administrator of a safety net via

23   contract through the Community Service Boards and

24   their role is set forth in law.

25   Q    So is your point that there is no added



 1  value to having geographic access standards since

 2  you have the safety net --

 3      A    No, no.  There would be.  I'm not saying

 4  that at all.  All I'm saying is that we are able to

 5  operate with some functional confidence that we have

 6  at least statewide coverage everywhere because of

 7  our contractual relationships and the role of the

 8  Community Service Boards as a safety net, as

 9  identified in law.

10      Q    Are you confident that you have statewide

11  coverage for IC3 even though you have two providers,

12  which by your own admission each are serving 150

13  plus counties?

14      A    So we --

15           MS. HERNANDEZ:  Objection.

16           You can answer.

17      A    So there has been review of the provider

18  use, the utilization trends for access related to

19  IC3.  It was a result of that service review and

20  looking at that that then we embarked on adding two

21  new providers to the network.

22           So at a point in time we assessed --

23  again, we went live 2017.  2018, 2019-ish we looked

24  at utilization trends and then made some decisions

25  in the past two years to expand that network



1    capacity in order to address that.

2        Q    You're expanding the capacity because you

3    felt that the existing capacity was insufficient?

4        A    It --

5             MS. HERNANDEZ:  Objection.

6             You can answer.

7        A    Uh-hum.  (Affirmative.)

8        Q    Okay.  So skipping down, on Page 12, you

9    write:  "Resistant to treatment is often a phrase

10   used when" -- excuse me.  Let me start again.

11            "'Resistant to treatment' is often a

12   phrase used which should not describe a

13   youth/family, but is traditionally used when a

14   system has not found the engagement strategies

15   necessary to begin a course of treatment towards

16   recovery."

17            Was that statement accurate when you

18   drafted it?

19            MS. HERNANDEZ:  Objection.

20            You can answer it.

21       A    Yes.  And it is still an industry

22   challenge, that many people use the phrase

23   'resistant to treatment' to describe a family or

24   young person when the system has not been flexible

25   enough to figure out the best pathway to serve a



1   child and family.

2         So by putting that statement in here, it

3   is asking the DCH to ask its proposing vendor to not

4   settle with those types of statements and to push

5   the envelope to be more responsive in creatively

6   finding the pathway to best serve the family and

7   young person.

8         Q    Last question and then we'll stop.

9         Let's scroll down Page 14, which describes

10  ESPDT service.  Do you see where I am?

11        A    I do.

12        Q    Let me first ask you whether the list on

13  Page 14 and 15 of the essential basic benefits under

14  EPSDT is complete?

15        I'll give you control.  You can actually

16  jump in, if you like.

17        A    Thank you.

18             (Witness reviews exhibit.)

19        A    So let me just say there is nothing about

20  EPSDT where a list for me would indicate complete.

21        Q    Could you explain why?

22        A    EPSDT, in my read and interpretation,

23  really defines that any medically necessary service

24  could potentially be a match for a young person

25  served, and there could be a new emerging best



1    practice, a publication being published today that

2    we don't know about.

3            So any law -- any list, pardon me.

4            Any list that would purport to be "the

5    list" is not complete, and that's why this language,

6    the precursor language says, that the essential

7    basic benefit shall include.

8            So it was meant to be a signal that in

9    general these are kind of what is on most lists

10   nationally for a public sector behavioral health

11   benefit, but indeed at no point do I ever consider

12   an EPSDT list to be complete.

13       Q    Thank you for the helpful clarification.

14            School-based behavioral health services

15   are identified on this list, correct?

16       A    Yes.

17       Q    Would they still be identified on this

18   list today?

19       A    I would have them there, yes.

20       Q    How would you define school-based

21   behavioral health services as used in this document?

22       A    I will harken back to the response this

23   morning, that school-based behavioral health

24   services is a large umbrella, and there could be a

25   myriad of services provided underneath that



1  umbrella.

2          So when I look above, medication

3  management could be provided in the school.  Brief

4  intervention could be provided in the school.

5  Psychiatric treatment could be provided in the

6  school.

7          So there's not a box that is prohibitive.

8  It is really about how the particular school setting

9  can kind of tolerate in terms of space, how they

10  could bring to bear the right practitioners in that

11  right space to do services, but for me school-based

12  mental health, behavioral health services is a large

13  umbrella under which several sub-billable items can

14  fit.

15          MR. HOLKINS:  Okay.  Let's go ahead and

16     take a break for 20 minutes.

17          Thank you, everyone, for your patience.

18          THE VIDEOGRAPHER:  Off the record at 3:43.

19          (A recess was taken.)

20  We're back after recess.

21          Back on the record at 3:57.

22  BY MR. HOLKINS:

23     Q    Just one follow-up question from our

24  previous line.

25          We were talking about EPSDT benefits,



1   correct?

2        A     Correct.

3        Q     Is DCH the entity in the state that's

4   charged with implementing EPSDT services?

5        A     Yes.  EPSDT is a Medicaid regulation, and

6   as such the Medicaid authority is responsible for

7   them.

8        Q     Do you have any responsibilities with

9   respect to the implementation of EPSDT benefits?

10       A     Again, as partner on the category of

11  service 440, the list of service you saw for

12  individuals who would meet the Medicaid aged, blind,

13  disabled eligibility type, we would partner with the

14  DCH in any needs specific to those young people in

15  terms of implementation.

16       Q     Let's shift gears.  I want to ask you some

17  questions about GNETS.

18             Let me first ask you when you became aware

19  of GNETS?

20       A     Under a different name, almost as soon as

21  I came to work for the State, late '90s.  Back when

22  it was maybe the title Psycho Educational Programs.

23             Old school.  I've been around for long.

24       Q     So I'm looking at your resume.  I believe

25  you started at DBHDD in 1997; is that correct?



 1        A    Correct.

 2        Q    That's when you first became aware of

 3   GNETS?

 4        A    Yeah.  On or about that time.

 5             MS. COHEN:  24 years ago.

 6             THE WITNESS:  Longer.

 7        Q    What is your understanding of what GNETS

 8   -- I'm sorry.

 9        A    She said about -- she said about 24 years

10   ago and I said longer.

11        Q    What is your understanding of the GNETS

12   program?

13        A    So, again, as I articulated this morning,

14   that they are specialized educational facilities

15   where young people with some particular --

16   particularly challenging needs in terms of meeting

17   their educational goals, where those particular

18   educational goals can be more targeted and more

19   focused.

20             So that's about the extent of what I know

21   of the GNETS programs.

22        Q    What informs their understanding?

23        A    Basically being on IDT, just having heard

24   a presentation or two over the course of my years

25   with the IDT, and I was a family member, so I've



1    been around since it began.

2         However, I have not ever visited a GNETS

3    program, or I've never read any specific policy for

4    that.  So my in-depth knowledge is limited.

5         Q    Do you know what the target population is

6    for the GNETS program?

7         A    Not in any more detail than I just

8    articulated, which is individuals who are unable to

9    achieve some of their educational goals because of a

10   myriad of factors and need some targeted and

11   specialized supports in order to achieve those

12   goals.

13        Q    Do you have any duties currently with

14   respect to the GNETS program?

15        A    No.

16        Q    Have you ever had duties with respect to

17   the GNETS program since joining DBHDD in 1997?

18        A    No.  And I think it's 1995.

19             I just wanted to say that for the record.

20   I know you have my resume as part of the record, but

21   '95.

22        Q    That title may not be reflected on the

23   resume but I have no reason to question you, so

24   thank you for your clarification.

25             I want to show you --



1             MS. COHEN:  This is it, Patrick.  Sorry.

2             (Discussion ensued off the record.)

3   BY MR. HOLKINS:

4       Q    Are you a part of DBHDD's enterprise

5   leadership?

6       A    Yes-ish.  There is -- we talk about

7   enterprise functioning as being a support of the

8   Division's line of business, and so am I part of

9   that leadership?  Yes.

10            We don't call it that per se, so I'm just

11  -- I'm struggling to answer it because we don't

12  necessarily call it that.

13      Q    Have you heard the term "DBHDD enterprise

14  leadership" before?

15      A    We talk about enterprise functionality.

16  That there is a enterprise functionality that

17  supports the lines of business, and I am an office

18  director in that.  So I am part of like the

19  management team that is inclusive of a lot of this

20  work, but we just talk about enterprise

21  functionality as being like supports to the main

22  lines of business.

23            So, again, harkening back to -- so I'm a

24  counterpart like to Dante, but he oversees a line of

25  service delivery to young people.  It has to be paid



1   for.  The paid for part is an enterprise

2   functioning.

3           It has to be captured in IT systems.  So

4   John Quesenberry is a counterpart of mine doing IT

5   functionality.

6           I help build Medicaid policy and practice

7   around that children's delivery line.  So enterprise

8   is how we talk about all of the buttresses that

9   support the actual building, which is the service

10  lines.

11          So that's my best way of describing that.

12      Q    Thank you.

13          I'd like to show you a document.  This

14  will be Exhibit 146.  Give me one second.

15          (WHEREUPON, Plaintiff's Exhibit-146 was

16       marked for identification.)

17  BY MR. HOLKINS:

18      Q    I've just shared Exhibit 146.

19          For the record, this document is

20  Bates-stamped GA04225637.  It includes an attachment

21  that will be a part of the same exhibit.

22          This appears to be an email from you dated

23  January 3rd, 2018, to Melissa Sperbeck, with the

24  subject "Re:  1115 brainstorming Values/Drivers."

25          Is that correct?



1    A    Uh-hum.  (Affirmative.)

2    Q    Yes?

3    A    Yes.

4    Q    Thank you.

5         And in this email you indicate that you

6    are attaching a document, and it appears to be a

7    document with 1115 brainstorming considerations.

8         Is that accurate?

9    A    Correct.

10   Q    First, was DBHDD at this time considering

11   applying for 1115 Medicaid waiver?

12   A    So the Department of Community Health had

13   indicated some interest in considering an 1115 at

14   the time, and so we were beginning some

15   brainstorming considerations to inform some dialogue

16   related to that if it were to come to pass.

17   Q    So let's shift now to the attachment.

18   Give me one second.

19        This is the second part of Exhibit 146.

20   It's Bates-stamped GA04225638.

21        I will give you a moment to review the

22   document.  Give me a second and I will give you

23   control.

24        (Witness reviews exhibit.)

25   A    Okay.  The one comment that I want to make



1 | is that it looks like this was printed and scanned,
2 | so the color coding is not available.
3 |      So I recognize there is a color spectrum
4 | cited in here and I can't --
5 |    Q   I understand your point.
6 |    A   -- see that.
7 |      So that may impact kind of how adequately
8 | I'm able to address your questions, but I just --
9 | having made that comment, we can continue.
10 |    Q   Let's just briefly address that.
11 |      So I recognize this is -- it's not a
12 | document in color.  This is how it was produced to
13 | us by the State.
14 |    A   Got it.
15 |    Q   This is the only version we have.
16 | However, there are still -- there is a gradient of
17 | shading which you can discern on the document.  Is
18 | that accurate?
19 |      And you still have control.
20 |    A   Thank you.  Let me just.
21 |      Yeah, I think it's relatively clear.  It's
22 | just a little bit more difficult in the absence of
23 | the coloration, but I think it's pretty
24 | understandable.
25 |    Q   And just to complete this discussion, the



1   more darkly shade entries in this chart, which lists

2   potential target populations for an 1115

3   demonstration waiver, the more darkly shaded entries

4   are less favorable.  Is that accurate?

5        A    Yes.  I just want to be clear that in --

6   related to an 1115, favorable does not always mean

7   preferred.  An 1115 requires something called cost

8   neutrality, and so what I want to be clear for in

9   terms of finalizing this for the record is that less

10  favorable in many cases also is related to criteria

11  based on how much savings the State can demonstrate

12  through an 1115.  Because if you fail cost

13  neutrality, there's penalties to the State.

14            So there's some dynamics with that, that I

15  just want to be sure, that favorable is not, oh,

16  this isn't a priority for us philosophically.

17  Favorable related to an 1115 also is about can the

18  State have the type of outcome that is mandated as a

19  fundamental element of that Medicaid pathway.

20       Q    Understood.  So let's first, before we

21  jump to that, on Page 1 -- first of all, you drafted

22  this document, correct?

23       A    I did.  Uh-hum.

24       Q    On Page 1 you list some desired outcomes.

25  Among the desired outcomes you identify are



1  decreased out-of-home/out-of-community services.

2  Correct?

3       A    Correct.

4       Q    Why did you chose that as a desired

5  outcome?

6       A    Because it is the mission of our agency to

7  have early intervention and prevention long before

8  somebody would need to be removed from home or

9  receive services in an institution or the like.

10           So our -- one of our founding drivers and

11  almost all decisions we make is to be sure that we

12  are serving as early as we possibly can in terms of

13  service design to mitigate the need for a young

14  person to be removed from family, an adult to be

15  removed from community, for anybody to have to

16  receive a service in a more restrictive place versus

17  in their communities, in their place of work, in

18  their homes.

19           So that is kind of a driving philosophy of

20  our departments.

21       Q    Skipping down to the section we were

22  discussing previously, which is titled, "Potential

23  Target Populations," I want to focus on the first

24  entry, which is Child and Adolescent SED, and in

25  parenthesis SOC.



1           SED, as we discussed earlier, means

2     serious emotional disturbances?

3        A    Yes.

4        Q    SOC, means System of Care?

5        A    Correct.

6        Q    There are a number of opportunities

7     identified for this target population.  One is

8     System of Care/Cross Agency Opportunities, correct?

9        A    Correct.

10       Q    And another is GNETS Review, correct?

11       A    Correct.

12       Q    What did you mean by GNETS Review?

13       A    So at this point in time, again looking at

14    the date on this document, we were aware of that

15    there was inquiry occurring to the State related to

16    GNETS and were trying to consider all of the factors

17    in play to be sure we could do early services for

18    young people, again long before they would need any

19    kind of removal from community or from home.

20       Q    And by removal, you mean placement in

21    GNETS?

22       A    Placement anywhere external.  And let me

23    just be clear.

24           Placement is a construct of like needing

25    somewhere to live, but there are also out-of-home



1  treatment alternatives, which we also put less value

2  on because, again, from the removal from

3  communities, removal from home, removal from

4  parents.

5        So, like, for instance, a PRTF is a

6  treatment removal.  It's not a placement.  It's not

7  we're saying the kid needs to live here, we're just

8  saying the youth needs to go for treatment and it is

9  externally removed.

10        So I wanted to caveat the term

11  "placement."

12     Q    That's a very helpful clarification.

13        So as you just described, would a child

14  being enrolled in GNETS facility outside of their

15  home community qualify as external treatment?

16     A    Because I don't know the reason for the

17  child being removed -- again, like I don't know the

18  parameters of even how a young person necessarily

19  moves to GNETS.  Is that about their educational

20  goals or their treatment goals?  Then -- and I've

21  not seen that eligibility criteria.  I just don't

22  want to presume that they are being removed for

23  treatment versus being removed for their educational

24  goals.

25        So I've not seen the admission or



1    placement or any of that criteria.  I don't think

2    ever.

3              So while I hear and I've articulated my

4    perspective on the gist of what it is, I don't want

5    to say that they're being removed from the community

6    for treatment purposes without having seen that

7    criteria.

8        Q    Understood.  And so whether it's for

9    educational reasons or for treatment reasons, it

10   still is a removal from the community, correct?

11             MS. HERNANDEZ:  Object.

12             You can answer.

13       A    If I'm thinking about like physical

14   location, yes, it is a removal from their community,

15   and therefore from our value perspective that would

16   be a least desirable pathway.

17       Q    What came to pass with this recommendation

18   of this specific target population for an 1115

19   demonstration?

20       A    So, in general, all of these target

21   populations, the conversations ended as Medicaid

22   began having some kind of alternative conversations

23   about where they might want to go next.  So none of

24   these dialogues continued.

25             But specifically to this target



WENDY W. TIEGREEN                                June 21, 2022
UNITED STATES vs STATE OF GEORGIA                          228

1  population, you see in the third column the risks
2  are noted in that the cost for these young people
3  are managed through a capitated payment arrangement.
4  So the demonstrable evidence of how much we saved as
5  a state was not really going to be a potential yield
6  in this dialogue for DBHDD's perspective because it
7  has to be cost savings related to Federal Medicaid.
8          So it could have been a cost for the young
9  people for the State of Georgia through the
10 Department of Education, but 1115 was not really the
11 mechanism that DBHDD needed or wanted to then
12 consider because of some of these dynamics.
13         So, again, we took some of this
14 conversation to the DCH and ultimately this -- the
15 whole concept of an 1115 was tabled.
16    Q    Okay.  So no 1115 demonstration waiver
17 application resulted from this discussion?
18    A    No.
19    Q    And the principal reason for this
20 particular target population, including review of
21 GNETS students, not being viable is the cost
22 neutrality concern that you just raised?
23    A    Yes.
24         MS. HERNANDEZ:  Object.
25         You can answer.



1               THE WITNESS:  Sorry.  Too fast.

2        Q    And since this time, have you discussed

3   any other waiver opportunities that would be

4   targeting students enrolled in GNETS?

5        A    No.

6        Q    Let's set this aside and skip to the next

7   document.

8               MR. HOLKINS:  I've just produced what I'm

9        introducing as Exhibit 147.

10              (WHEREUPON, Plaintiff's Exhibit-147 was

11         marked for identification.)

12   BY MR. HOLKINS:

13       Q    For the record, this is GA04234690.  It's

14   an email chain from April 2018.  It includes emails

15   to and from you.

16              I'll give you a chance to review the

17   thread.

18              MS. COHEN:  Did you say 90?

19              MR. HOLKINS:  It's GA04234690.

20              MS. COHEN:  Thank you.

21   BY MR. HOLKINS:

22       Q    You have control.

23              (Witness reviews exhibit.)

24       A    Okay.

25       Q    So the title of the email is "Re:



 1   Appointment Request:  Update on GNETS."  Correct?

 2        A    Correct.

 3        Q    So let's go back to the first email in the

 4   chain, which is dated January 12th, 2018, and this

 5   is from you to Amy Howell.  Is that correct?

 6        A    Correct.

 7        Q    Who is Amy Howell?

 8        A    She was our chief legal officer at the

 9   time.

10        Q    Okay.

11             MR. HOLKINS:  Do we have any concerns?

12             MS. PATEL:  Yes.

13             MR. HOLKINS:  Okay.

14             MS. PATEL:  Can you give us a second?

15             MR. HOLKINS:  Yes.

16             You guys want to discuss?

17             (Discussion ensued off the record.)

18             THE VIDEOGRAPHER:  Off record at 4:22.

19             (A recess was taken.)

20             THE VIDEOGRAPHER:  Back on record at 4:29.

21   BY MR. HOLKINS:

22        Q    So, Ms. Tiegreen, I was directing you to

23   the first email in this chain, and, for the record,

24   we're talking about Exhibit 147 Bates-stamped at

25   GA04234690.



1           I want to ask you about your email on

2    January 12, 2018, where you write:  "Melissa and I

3    have conferred with Commissioner on this subject and

4    she recommended a brief appointment with myself and

5    you to receive an update on the status on the

6    following," and then you included a link.  Is that

7    correct?

8           A    Correct.

9           Q    That link appears to be to a summary of a

10   complaint filed in another matter concerning the

11   GNETS program; is that correct?

12          A    Correct.

13          Q    And you reference the Commissioner in your

14   email.  Is that the Commissioner of DBHDD?

15          A    Of DBHDD, yes.

16          Q    Was that Judy Fitzgerald at the time?

17          A    I think so.  It's right on the cusp.

18          I'm pretty sure it's Commissioner

19   Fitzgerald at the time.

20          Q    You write that Commissioner Fitzgerald, or

21   the Commissioner of DBHDD at the time, recommended a

22   brief appointment.

23          Was this appointment with respect to

24   GNETS?

25          A    Yes.  It was -- we had -- I had received



1   this actually in my inbox, being on Bazelon's

2   LISTSERV, and had been like, um, I sit on IDT and

3   might need some information about this.

4          So that's kind of the genesis of where

5   this had come from.  So Melissa and I had a meeting

6   with Commissioner, not specific to GNETS, but just

7   in general, and I was like what -- what's going on

8   with this?

9          And so she suggested a conversation with

10  Amy Howell at that point in time.

11     Q    What was the -- what was intended to be

12  the subject of the conversation?

13     A    So just to get a status update on what was

14  going on with the case, because, again, I allude to

15  further up that Dante and I sit in meetings with

16  some of these folks and just wanted to be briefed.

17     Q    So you're referring to another email in

18  the chain dated April 18, 2018, where you write

19  that:  "Dante and I are in a lot on dialogues with

20  DOE, DCH and others who are involved and feel like

21  we need to get an update on the status."

22     A    Right.  Again, with IDT we are in a lot of

23  meetings collaborative with other organizations.

24  And so I just did not want to be taken off guard by

25  anything going on with the suits, and that was the



1  first time I had seen the update on that, was

2  through Bazelon.

3          So that was the nature of the request.

4      Q    And when you wrote that "DOE, DCH, and

5  others who are involved," are you talking about

6  involved in the GNETS program?  What are you

7  referring to?

8      A    So I presumed from reading the statement

9  of Bazelon that DOE and DCH would both be involved

10  in that process, and we sat in meetings with them

11  all the time on just child centered issues.  So just

12  wanting to be sure that we were informed on whatever

13  the status was, so that we could, again, not be

14  taken aback by anything that came up specific to

15  that in those just generalist collaborative

16  meetings.

17     Q    And did you in fact have an appointment as

18  a result of this email chain?

19     A    I don't think we did.  I don't think we

20  did.

21     Q    Did you ever receive an update around this

22  time regarding the status of the GNETS litigation?

23     A    I don't think I did.  I mean I think we

24  were just very busy, and Amy left service -- I'm not

25  even sure when.  So I'm not sure if that was related



1   to that or not, but, yeah.

2        Q    Why did you think it was important for you

3   not to be taken aback?  I think were your words.

4        A    Correct.

5             MS. HERNANDEZ:  Objection.

6             You can answer.

7        A    So what we did not want to be -- what I

8   did not want to be in a position of and the reason

9   why I brought this up to the specific group is we do

10  a lot of cross-agency coordination and collaboration

11  with our sister agencies, and if there was anything

12  going on in particular that was related to our

13  agency's involvement in this or not, I just felt

14  like it was better to know about it than not to know

15  about it.

16            And so -- but there are -- we are a large

17  department and there are a lot of complex issues

18  that we navigate all the time, and so if I had not

19  gotten an update on it, I would have been just like,

20  Amy's busy and we'll get to it or I'll learn about

21  it later.  But I was never in anything specific

22  subsequent meetings with DOA -- DOE or DCH related

23  to GNETS.

24       Q    And do you feel now it would be valuable

25  for you to have more information about what's



 1   happening with respect to the GNETS program?

 2              MS. HERNANDEZ:  Object.

 3              You can answer.

 4        A    Hard to know.  I mean that's just

 5   subjective.  I -- again, most youth in Georgia are

 6   covered by DCH, and so in that case we're always

 7   kind of navigating about what is really our

 8   knowledge, authority and purview.

 9              And so it might be helpful, but, again, I

10   saw the interrogatories -- began to see the

11   interrogatories soon after this, and so began to

12   know that my voice was going to be asked for and

13   affirmed and that we would be at least responding to

14   the questions on behalf of the inquiries.

15              And so, really, there's sometimes so much

16   water coming through the fire hose that not getting

17   the update also did not make me lose sleep.  Like I

18   wanted to be involved but I also have great trust in

19   our teams and our representatives who are working on

20   this.

21        Q    Are you --

22        A    So just to them.

23        Q    Understood.

24              Are you aware of whether there are any

25   DBHDD beneficiaries currently enrolled in GNETS



```
 1   programs?
 2        A    Not specifically.  I might guess that
 3   there would be some youth in GNETS programs that
 4   would meet the age, blind, disabled qualifications
 5   for Medicaid, but I've not looked at any data
 6   specific to that.
 7        Q    Have you reviewed or performed any
 8   assessments of the quality of services provided to
 9   DBHDD beneficiaries who are enrolled in GNETS?
10        A    No.
11        Q    So let's put this aside.  I've got another
12   document to show you, which will be 148.
13             (WHEREUPON, Plaintiff's-Exhibit-148 was
14        marked for identification.)
15   BY MR. HOLKINS:
16        Q    I've just produced what I'm introducing as
17   Exhibit 148.  You'll note at the bottom of the Bates
18   number for this document is --
19             MS. COHEN:  I'm sorry, did you mark an
20        exhibit?
21             MR. HOLKINS:  Yes.
22             MS. COHEN:  What number?
23             MR. HOLKINS:  This is 148.
24             MS. COHEN:  And the Bates number is?
25             MR. HOLKINS:  GA04324126.
```



1          MS. COHEN:  Thank you.

2          MR. HOLKINS:  Okay.

3    BY MR. HOLKINS:

4      Q    This appears to be an email from you to

5    Melissa Sperbeck, dated 10/28/2020, correct?

6      A    Correct.

7      Q    And there are -- there's a list of things

8    in the email.  Among them is GNETS, BHA, Telehealth,

9    a number of others.

10         Could you describe what this email is?

11     A    Can you scan all the way down or can I

12   take control?

13     Q    I'll give you control.

14         (Witness reviews exhibit.)

15     A    Candidly, it is hard to figure it out

16   without the context.  So I don't know if -- so

17   Melissa, as my supervisor, and I would often be

18   going back and forth about -- it looks like almost

19   it would be agenda items of outstanding content that

20   would be pertinent for just in general behavioral

21   health conversation.

22         So I'm not sure if she was going into a

23   meeting where she was asking about kind of what

24   opportunities were for some collaboration between us

25   and the Department of Community Health, but clearly



1    it is all lines of Medicaid service, and these are

2    kind of what I would be considering in 2020 what

3    would have been like open items that would be for

4    potential updates.

5              So that's my best guess, having no other

6    contextual frame here.  Because even some of these

7    things were like point-in-time items.  So like the

8    evaluation management codes, E/M Codes, pre and

9    post-time being allowed, like that was a federal

10   change in the way that coding was done, and it

11   doesn't comport with how we have rates set, like in

12   our Medicaid State Plan.  So it would have been

13   like, hey, DCH, do you -- are you aware of this?  Do

14   we need to share this with you?

15             So it looks almost like it's kind of

16   things that are in the ether related to behavioral

17   health where she might have been trying to get a

18   high-level expectation or understanding or sense of

19   what were kind of topic points at the time that were

20   kind of in the frame for behavioral health.

21        Q    What specific issues with respect to GNETS

22   were in the frame at the time of this email?

23        A    It would have been really just that we

24   were aware of the interrogatories and just being

25   sure that there was communication between the two



1  departments, that we were responding and

2  anticipating that they were also responding,

3  because, again, we've not done any collaborative

4  planning with the DCH on anything related to GNETS.

5           So -- again, like QRTP, like that is

6  something that DFCS just had an idea for.  So,

7  again, when I'm talking about, these feel like

8  things that were kind of in the ether.

9           Like I know QRTP was something that was on

10  the natural slate for foster care children, but it

11  wasn't like we were necessarily adopting it, we

12  weren't moving forward with it.  It was just a point

13  of reference to be like, hey, we hear Child Welfare

14  talking about this.  Are you thinking about this?

15  Are you doing anything?  Are you reading anything

16  about this?

17           So that's kind of the way I read this

18  list.  Because some of these things are just really

19  quite big and they are conceptual, and so they

20  weren't necessarily like things we were working on.

21  They were like elements of, hey, are we both aware

22  of this?  Are we both kind of tracking on this?

23           Again, like the DOAS Tele Procurement, the

24  Department of Administrative Services for Georgia

25  was releasing a telemedicine procurement.  We



1   weren't in charge.  DCH wasn't in charge.  But, hey,

2   DCH, do you know about this, is kind of the spirit

3   at which I read these subject lines.

4        Q    Okay.  You state at the top line, "EPSDT

5   and DCH - get with BF."

6             What is BF?

7        A    I was trying to think if those were

8   somebody's initials I can think of right away, but I

9   can't think of -- I can't -- get with BF.  I'm not

10  sure who BF is, actually.

11       Q    That's okay.

12            What do Penetration Reports refer?

13       A    To penetration reports are cost accounting

14  principle reports.  So we have a cost accountant --

15  cost accounting plan with federal CMS, which talks

16  about, of the people DBHDD serves, what penetration

17  are Medicaid eligible beneficiaries, and then how we

18  can use those reports to do official administrative

19  claiming for the department.

20            So we were in the process of working with

21  the ASO to reconstruct those penetration reports.

22  So, again, it's like one of those things where it

23  was like, hey, DCH, we're working on reconstruction

24  of these reports.  You know, stand by and we'll get

25  more information to you.



1          Again, that one reinforces the type of

2    nature of what that list looks like to me.

3          Q    Stepping back from that exhibit, which

4    we've set aside, in connection with GNETS and in

5    your official capacity at DBHDD, do you coordinate

6    --

7          MR. HOLKINS:  Let me start again.

8          Q    In connection with GNETS in your official

9    capacity at DBHDD, have you coordinated directly

10   with Nakeba Rahming?

11         A    I don't even know who that person is, no.

12         Q    Do you know who Debbie Gay is?

13         A    Yes, I do know who Debbie Gay is.

14         Q    Have you coordinated with her with respect

15   to the GNETS program?

16         A    No.  She's just participated in IDT, is

17   the only way I know her.

18         Q    Do you know -- sorry.  Go ahead.

19              Do you know who Vickie Cleveland is?

20         A    No.

21         Q    Do you recognize the name Zelphine

22   Smith-Dixon?

23         A    It sounds familiar but it's nobody I've

24   worked with.  She might have been copied on

25   something once or twice, but I -- it's an unusual



```
 1   enough name where I think I've seen it, but I've not

 2   been in any kind of coordinating meetings or

 3   conversations that I recall.

 4        Q    Are you familiar with Clara Keith?

 5        A    No.

 6        Q    Have you coordinated with any directors

 7   for individual GNETS programs?

 8        A    No.

 9        Q    Have you ever visited a GNETS facility?

10        A    No.

11        Q    Have you ever provided training or

12   technical assistance to GNETS staff?

13        A    No.

14        Q    You mentioned earlier doing some --

15   leading some trainings that are -- for instance, on

16   the 988 system?

17        A    Yes.

18        Q    That are broadly available in the State,

19   correct?

20        A    Correct.

21        Q    Do you know whether any GNETS program

22   staff participated in those trainings?

23        A    No.

24             MS. HERNANDEZ:  Objection.

25             You can answer.
```



1       A    They've not ever been a target.  So if it

2  was -- if I was like presenting something that was

3  like made available to the general public, they

4  could have participated, but they wouldn't have ever

5  been a target on our invitation list.

6       Q    Their participation would have just been

7  incidental?

8       A    Incidental, yes.

9       Q    Do you review any information regularly

10  with respect to the GNETS program?

11       A    No.

12       Q    And that includes information with respect

13  to utilization of behavioral health services by

14  students in GNETS?

15       A    Correct.  I've never -- our utilization

16  information is not at any of that kind of granular

17  level to have identified the youth as being in GNETS

18  or not in GNETS.

19       Q    Have you seen any data or information

20  specifically for DBHDD beneficiaries with respect to

21  the length of their placement in the GNETS program?

22       A    No.

23       Q    Have you seen any data specific to the

24  DBHDD beneficiary group with respect to referrals

25  from school districts to the GNETS program?



1      A      No.

2      Q      Have you seen any data or documents

3   showing referrals to specific services like IC3 for

4   students enrolled in GNETS?

5      A      No.

6      Q      Have you ever spoken with Dante McKay

7   regarding GNETS?

8      A      Yes.

9      Q      When is the last time you spoke with Dante

10  McKay about GNETS?

11     A      Months ago.  And I can't even remember a

12  specific, but I just know enough to know that --

13  like, for instance, in this email where I was like,

14  hey, what's -- should we get some information about

15  GNETS?

16            But I've not had any regular dialogue with

17  him on GNETS at all.

18            So it would -- there's been just a

19  tremendous amount of time that has passed but I

20  can't pinpoint how long that would have been.

21     Q      So as best as you recall, the subject of

22  that conversation with Dante regarding GNETS was to

23  potentially seek out more information?

24     A      To be like, hey, what's up?  Or have you

25  heard anything lately about the process?



1          We were mutually copied on some of the

2    interrogatories and so I do know that we had

3    transactional visibility in our responses on that,

4    and so that's really the last specific interchanges

5    I remember with him.

6          Q    I'd like to show you another document.

7    This will be Exhibit 149.  If you give me a second,

8    I will tell you the Bates-stamp.

9               (WHEREUPON, Plaintiff's-Exhibit-149 was

10   marked for identification.)

11   BY MR. HOLKINS:

12         Q    So I just produced Exhibit 149.  For the

13   record, this is GA04205173.

14              I'll give you control in a second, but

15   I'll note for the record this is an email from you

16   to Marcey Alter, dated May 15, 2017.  Correct?

17         A    Correct.

18         Q    I will give you a second to review the

19   document.

20              You have control.

21         A    Thank you.

22              (Witness reviews exhibit.)

23         A    Okay.

24         Q    So I want to scroll down to the first

25   email in the chain, which is dated May 12, 2017.



1   This is from you to Marcey Alter and Linda Wiant,

2   and cc's Melissa Carter.  Correct?  Who is --

3        A    I want to just clarify, when you asked me

4   about Melissa Carter earlier, is it this Melissa

5   Carter you were asking?  You said Melissa D. Carter,

6   so I did not presume that this is a link.

7             Can, can you clarify for me?

8        Q    Yes.  I was referring to this one.

9        A    Okay.  So this is a staff person of the

10  DCH.  There is another Melissa Carter somewhere in

11  children's advocacy, I think.  So in my earlier

12  response --

13       Q    Yeah.  I think that's fair.

14            I think that question was within the

15  context of the Georgia Ombudsperson for Children.

16  So that could be a different Melissa Carter.

17       A    Thank you.

18       Q    Yes.

19       A    This Melissa Carter worked for the

20  Department of Community Health and was a staff who

21  was appointed by the Department of Community Health

22  at the time to help coordinate some of the work

23  within DCH specific to the autism benefit roll-out.

24            So when I saw this name, I wanted to be

25  sure we didn't have any confusion earlier.  So thank



1  you for clarifying.

2          This is a different Melissa Carter.  She

3  is no longer with the Department of Community

4  Health.

5     Q    Thank you.  And Linda Wiant, she's

6  identified here I believe as a DCH employee?

7     A    She was the chief Medicaid director who

8  has left the organization as well and was replaced

9  by Lynette Rhoads.

10    Q    Thank you.

11         You write in this email dated May 12,

12  2017:  "At the Carter Center today, there was a

13  reference to Autism related to the GNETS settlement

14  and needing services in schools.  While we can say

15  there will be allowances for this, we may need to

16  build something specific into our infrastructure ask

17  on developing this."

18         Correct?

19    A    Correct.

20    Q    Could you expand on this statement, "we

21  may need to build something specific into our

22  infrastructure ask"?

23    A    So at this point in time was when we were

24  doing the budget and design for the autism benefit

25  rollout.  So if you will recall from my earlier



1   statement, the Governor's Office charged the three

2   agencies, DPH, DCH, and DBHDD, to coordinate what

3   would be the design model for the autism benefit.

4          And so having heard someone on the stage,

5   and knowing the date, this would have been the

6   Carter Center Mental Health Day, where panelists get

7   on the stage and just say what they wish and desire

8   in the realm of behavioral health policy.

9          Having been an audience member, I heard it

10  and said, I know there's going to be allowances for

11  providing services in schools.  We had already

12  designed that.  So while I can say there will be

13  allowances for this, I am saying to Medicaid, in

14  their projection on their infrastructure design and

15  their ask related to the finances for this program

16  that they be specific in being sure to have that as

17  part of that budget ask related to that specific

18  benefit design that they administer, that we don't.

19  But, again, we were serving as Subject Matter

20  Experts and collaborative partners on the design for

21  that initial implementation.

22     Q   So the thinking here is that DCH may need

23  to seek additional appropriations to fund the autism

24  benefit in GNETS schools?

25     A   It wasn't additional at the time.  It was



1   developmental.  So it was the first budget ask for

2   their outpatient benefit design.  So it was -- I

3   knew we were in the process of building that into

4   that moment, and so I am just sending them an extra

5   tag, be sure you're mindful of this, DCH, as you're

6   thinking about this design.

7        Q    Again, I want to return to my question.

8             You're asking them to be mindful of

9   financing this benefit specifically for the GNETS

10  population, correct?

11       A    I am hearing the folks on the stage say

12  that -- they were speaking to autism in the

13  settlement.  I'm aware that we're designing an

14  autism benefit.  So the folks on the stage say we

15  need more autism services in schools, and I am

16  saying related to the design that is in the middle

17  of being built -- I know we've already been

18  designing this to be available -- to have the

19  allowance to be provided in the school but let's

20  just remember that you might want to plan in your

21  budget, be sure that there is budget capacity to

22  really promote that.

23       Q    Okay.

24       A    So I wasn't saying design this to target

25  GNETS.  I'm hearing GNETS speakers on the stage



1   talking about the GNETS settlement and they mention

2   autism needing the services in schools.  I am

3   understanding that -- I'm sitting over here

4   designing some autism work with DCH and saying, hum,

5   this makes me think we've got to be sure and be

6   mindful that we are developing this product in a way

7   that is responsive to the voices I'm hearing from

8   the panel on the stage.

9       Q     What GNETS settlement are you referring

10  to?

11      A     Whatever the one was that they were

12  talking about on the stage.  I can't -- I haven't

13  kept up with any of the detail.

14            I know people talk about GNETS I and GNETS

15  II.  I know what interrogatories I replied to, but

16  I'm not tracking that granularity.  Whatever was

17  being presented that day from the Carter Center.

18  Whoever made a reference to the GNETS settlement,

19  that would be the source.

20            I don't recall who was sitting on the

21  panel that day because there's hour after hour.

22  There's different panels talking on a Mental Health

23  Day at the Carter Center.

24      Q     Why did you reach out to DCH about this?

25      A     Because DCH was crafting -- and they were



1   the ultimate holder of the autism benefit.  So,

2   again, back to the conversation from this morning,

3   three agencies were charged in terms of considering

4   implementation pathways for service.  DCH was going

5   to be the primary holder of designer governance

6   structure, monitoring and payor for the autism

7   outpatient benefit.  So any of those benefits that

8   would happen in an outpatient setting were going to

9   be governed and directed by the DCH.

10          And they continued to be governed and

11  directed by the DCH.

12     Q    Have you made any other recommendations

13  based on information about the GNETS case?

14     A    No.

15     Q    So let's shift gears.  I'm going to stop

16  sharing this document.

17          We've talked a bit today about IDT which I

18  believe is the Interagency Directors Team, correct?

19     A    Correct.

20     Q    I think you've described yourself as a

21  founding member of IDT.  Is that accurate?

22     A    That's accurate.

23     Q    So you've been involved with this entity

24  since its formation?

25     A    Yes.



1       Q    And you're still involved today?

2       A    I am.

3       Q    And you sit on the subcommittee for IDT,

4  correct?

5       A    I do.

6       Q    What is the name of that subcommittee

7  again?

8       A    Busted on a couple, but I chair what's

9  called the Behavioral Health Financial Mapping Work

10  Group.  And then I also sit on a committee for

11  parent and youth peer support development.

12      Q    And the IDT committee works on

13  implementing Georgia's System of Care plan.

14      A    Yes.

15      Q    Is that accurate?

16      A    Correct.

17      Q    I'd like to show you some documents

18  related to the System of Care.  I'd like to show you

19  what I'm about to introduce as Exhibit 150.

20           I'll give it a document number in a

21  second.

22           (WHEREUPON, Plaintiff's Exhibit-150 was

23       marked for identification.)

24  BY MR. HOLKINS:

25      Q    This is GA04312715.  It's Part 1 of



1  Exhibit 150, which is an email that includes an

2  attachment, which will be Part 2.

3           I'll note for the record this is an email

4  sent from Dante McKay, dated July 21, 2020, to a

5  long list of recipients, which I believe includes

6  you.

7           I'll give you a second to review the

8  email.  Let me share it with you.  I'll give you

9  control.

10          You have it now.

11     A    Thank you.

12          (Witness reviews exhibit.)

13     A    Okay.

14     Q    I will take control back.

15          So if I'm not mistaken, with this email

16  Dante McKay is forwarding the final draft of the

17  State's System of Care plan for 2020.  Is that

18  correct?

19     A    Uh-hum.  That's correct.  And he's

20  forwarding it to internal DBHDD members.

21          So I would have received it as a result of

22  being on IDT.  He is sending it to DBHDD only staff

23  here to give them the FYI, but I am of course copied

24  again.

25     Q    Understood.  So you would have received



1  this as a member of IDT in addition to being a

2  member of DBHDD?

3       A    Yes.  And informed it, the design creation

4  of it.

5            So the IDT members actually craft the

6  state plan.

7       Q    Understood.  Let's pull up the final draft

8  that's attached to this email.

9            For the record, this is GA04312718, and it

10 is the attachment to the email we just discussed and

11 is Part 2 of Exhibit 150.

12           There's no need for you to review this at

13 length.  I just want to confirm that this is the

14 final draft of Georgia's System of Care state plan

15 for 2020?

16      A    As Dante references in the email, this was

17 the version that went to the Behavioral Health

18 Coordinating Council for approval.

19           So I do not recollect there having been

20 made any changes to it from that group as the final

21 endorser.  So I presume this is substantially the

22 final.

23      Q    Okay, thank you.

24           The final document, which I understand

25 would be approved by the Behavioral Health



1   Coordinating Committee, is that publicly available?

2        A    Yes.  It's on the IDT website now.  And I

3   think it's is also on the DBHDD website as well.

4        Q    So let's put this aside.

5             I want to show you now another document

6   from the same time period relating to the System of

7   Care.  We'll start with an email.

8             This is Part 1 of what I'd like to mark as

9   Exhibit 151.

10            (WHEREUPON, Plaintiff's Exhibit-151 was

11       marked for identification.)

12  BY MR. HOLKINS:

13       Q    The Bates-stamp is GA04303079.

14            This is an email from somebody named

15  Breyanna Marshay Mikel, who appears to be an

16  employee of Georgia State University.

17            Is that correct?

18       A    I think -- if so, she may have been an

19  admin assistant.  Not anybody I worked with with

20  regularity.  But of course the tag looks like it

21  would be -- someone from COE.

22       Q    You received this email, correct?

23       A    I did.

24       Q    The subject is "System of Care State Plan

25  - Access Session."  Correct?



1    A    Correct.

2    Q    It's dated 5/13/2020.

3         MS. COHEN:  This is still 150, right?

4         MR. HOLKINS:  We are 151.

5         MS. COHEN:  151.  Sorry.  What is the

6    Bates number?

7         MR. HOLKINS:  GA043 -- I'm sorry.

8         GA04303079.

9         MS. COHEN:  Thank you.

10   BY MR. HOLKINS:

11   Q    So the main purpose of showing you this is

12   to direct you to an attachment.  I'll pull that up.

13        This is the first attachment to the email

14   we just described as part of Exhibit 151.  The Bates

15   number is GA04303081.

16        I'll give you a second to review this

17   document.  Let me know when you finish.

18        You have control.

19   A    Thank you.

20        (Witness reviews exhibit.)

21   Q    What is this document?

22   A    So the state plan has, for the System of

23   Care, has different header types, and so this one is

24   specific to access, and then there were

25   sub-strategies for ways to consider, and then



1   potentially promote access.

2          So, for instance, 1.1 is the behavioral

3   health services mapping that I've been referencing

4   throughout the course of the day.

5      Q   Is it fair to say this is a progress

6   tracking document?

7          MS. HERNANDEZ:  Object.

8          You can answer.

9      A   This was an initial step towards

10  actualizing the plan.  So I wouldn't call this a

11  progress document because this was really from the

12  time where we were wrapping up the plan draft and

13  taking it to BHCC that summer.

14         This was a representation of really kind

15  of what is happening with that work, and then -- can

16  I ask a clarifying question?

17         This was dated which -- this is dated what

18  date?

19     Q   The title of the document reflects updates

20  from 2017 to 2020.

21     A   So I think it is then representative --

22  because the plan that you were showing a moment ago

23  was adopted in 2020.  This is a document attached,

24  which is an update representing 2017 through 2020.

25  So then for me this -- I'm just trying to



1    recalibrate a little bit now having seen this date

2    timestamp at the top, that it's an update document.

3           It looks to be progress on the previous

4    plan to establish some readiness for the next steps

5    that needed to come from the plan that was being

6    approved in 2020.

7        Q    So this document is updating IDT's

8    progress in implementing goals from previous

9    versions of the System of Care program?

10       A    Right.  As a launch, it looks like from

11   the email, as a launch for what we need to do next.

12       Q    Okay.

13       A    So then I want to just go back, having now

14   seen the date at the top.  The service mapping that

15   is defined here, I was not chairing the leadership

16   of that until 2020, which is the end period for this

17   2017 through 2020.

18       Q    1.2 identifies the following strategy

19   increase behavioral health services in schools."

20       A    Uh-hum.  (Affirmative.)

21       Q    That was the strategy under a prior

22   version of the System of Care plan, correct?

23       A    Yes.

24       Q    The accomplishment identified is "School

25   Based Mental Health services and support survey,"



1    correct?

2         A    Yes.

3         Q    Do you have any familiarity with that

4    survey?

5         A    We received a summation of that in IDT

6    after the fact, but I was not involved in that

7    sub-plan work group, so I don't have a lot of detail

8    related to that.

9         Q    Give me one second.

10        MR. HOLKINS:  I've just shared another

11        document which I'd like to introduce as Exhibit

12        152.

13        The Bates-stamp for this document is

14        GA04307352.

15        (WHEREUPON, Plaintiff's Exhibit-152 was

16        marked for identification.)

17   BY MR. HOLKINS:

18        Q    Have you seen this document before, Ms.

19   Tiegreen?

20        A    I think I have.  I could have been in the

21   IDT meeting when it was presented, but I might not

22   have been as well.  So I can't recollect without

23   checking calendars and the like.

24        Q    So the date of this presentation, based on

25   the first slide, is May 27, 2020.  The title is



1    "System of Care State Plan:  School Based Mental

2    Health Year 3 Survey Results."  Correct?

3         A    Correct.

4         Q    If we flip back to Exhibit 151, does this

5    appear to be the school-based mental health and

6    support survey that's referenced in this document?

7         A    It does.

8         Q    So you received a presentation, as best

9    you can recall, as a member of IDT regarding this

10   survey?

11        A    I would have -- I would have received it.

12   I just don't remember the results of it.  So I may

13   have -- may or may not have been in that particular

14   meeting.  So I'm just -- I'm not positive.

15             But as an IDT member, it would have been

16   in my inbox for sure.

17             And I would just like to state this is

18   right still in the throes of the first quarter of

19   the PHE.  So a lot of my standard work that I would

20   have been involved with I was being diverted to

21   rewrite and recraft and restructure a lot of our

22   community-based policy for behavioral health.

23             So there were many standing meetings on my

24   agenda and on my calendar that I actually was not

25   present in.  So -- or was partially present in.  So



1  I am just going to be as clear as possible that this
2  was a whirlwind time for us as administrators, and
3  so there were no Saturdays or Sundays or evenings
4  for several months at the onset of the pandemic.
5          So I'm looking at it and going, uh-hum, I
6  see it.  I know it would have been in my inbox but
7  was it read?  I can't say that it was.
8      Q    So you've got control -- or I'll give you
9  control of Exhibit 151, which is the updates to the
10 System of Care plan implementation, 2017 to 2020?
11     A    Sure.  Yes.
12     Q    Are there any updates with respect to
13 services and supports provided to students enrolled
14 in GNETS?
15     A    Not that I'm aware of.  And, again, I
16 don't participate in any like subgroups or working
17 groups on 1.2.
18         So I was heavily involved in 1.1 and 1.3
19 and 1.4, but not in as much as 1.2.
20         So, again, as a committee member there
21 would been report-outs, but, again, I can't recall
22 any specific detail about this because I'm not like
23 a priority to this subject line.  I'm an adjacent
24 and adjunct to the subject line.
25     Q    Have there been any report-outs to the



1   full IDT committee specifically relevant to the

2   GNETS population?

3        A    Not that I have seen or that I

4   participated in.  Could have been on a docket and I

5   might not have been there, but, again, because I

6   don't make every meeting, or I don't make all of

7   every meeting.

8        Q    Have you ever specifically raised the

9   subject of access to behavioral health services for

10  children enrolled in GNETS in an IDT meeting?

11       A    No.

12       Q    Can you recall a time when an employee of

13  the Department of Community Health raised the issue

14  of access to behavioral health services for students

15  enrolled in GNETS in an IDT meeting?

16       A    No.

17       Q    Can you recall a time when an employee of

18  the Georgia Department of Education raised the issue

19  of access to the behavioral health services in GNETS

20  schools in an IDT meeting?

21       A    I can't remember a specific time, but

22  certainly when Dr. McGiboney was an active member,

23  that topic came up more than once, but again he's

24  not been involved in IDT for many years.

25       Q    Who are the current representatives for



1    the Georgia Department of Education on the

2    Interagency Directors Team?

3        A    Since Ashley Harris has left, I have not

4    heard the voice very strong of anybody from DOE.

5    And again, it's a large group that's grown.  So

6    there's about 60 members who participate, and so in

7    a two-hour session me not hearing from a DOE

8    representative would not be an unusual thing with

9    that number of participants and with having a

10   structured agenda but since Ashley Harris is no

11   longer attending, I'm not sure who the DOE

12   representative is.

13             We do have a liaison who works under

14   Dante, who partners with the school system, and so

15   she becomes most often my internal kind of point on

16   school-related issues, but we've had no

17   conversations about GNETS.

18       Q    Is that internal liaison to the schools

19   Layla Fitzgerald?

20       A    Yes.

21       Q    How often are you communicating with Layla

22   Fitzgerald regarding services available to students

23   in schools?

24       A    Maybe once every couple of months.  It's

25   not within any regularity.



1        Q    What's your understanding of Layla
2   Fitzgerald's duties in her current role as liaison
3   between DBHDD and the Georgia Department of
4   Education?

5             MS. HERNANDEZ:  Object.

6             You can answer.

7        A    Okay.  And again it's very generalist
8   since I don't supervise her.

9             It's more relational and how she
10  self-represents, but as being someone who's focused
11  on kind of behavioral health services and how they
12  might could be best provided to any kind of school
13  age young person within the scope of what DBHDD
14  manages.

15       Q    Have you had any discussions with Layla
16  Fitzgerald specifically about children enrolled in
17  GNETS?

18       A    No.

19       Q    Have you had any -- to the best your
20  understanding, is Layla Fitzgerald working on
21  service access issues specifically with respect to
22  the GNETS program?

23       A    I'm am not aware specifically of that at
24  all.

25            MR. HOLKINS:  So I just want to note for



1          the record there is a third attachment --

2          excuse me, a second attachment to exhibit --

3          the email that's Exhibit 151, and this is, for

4          the record, GA04303083.

5               This is Part 3 to Exhibit 151.

6    BY MR. HOLKINS:

7          Q    I just want to acknowledge that this is

8    the Georgia System of Care State Plan for 2017.  Is

9    that accurate?

10              Feel free to take some time to review the

11   document.

12         A    Thank you.

13              (Witness reviews exhibit.)

14         A    Yes.  To the best of my recollection and

15   understanding, yes.

16         Q    How often is the System of Care plan

17   updated?

18         A    The goal is for it to be I think every

19   three years.  Yeah, I think it's about three years.

20   I don't have great assurance in my answer on that.

21   I'm saying approximately.

22         Q    So I believe based on your testimony that

23   there was a System of Care plan that was released in

24   2020, correct?

25         A    Yes.



1      Q    And the previous version was released in

2   2017, and that's this version?

3      A    Yes.

4      Q    Would it be your expectation the next

5   edition or update to the System of Care plan would

6   be in 2023?

7      A    Yes.  I mean as far as my recollection.  I

8   can't remember the parameters that are set forth for

9   it specifically or if there is any capability for it

10  to be extended if some of the goals weren't

11  substantially met.  But I'm -- to the best of my

12  knowledge, yes, about every three years.

13     Q    Let's set aside the documents.

14          Broadly, what is the goal of Georgia's

15  System of Care framework?

16          MS. HERNANDEZ:  Objection.

17          You can answer.

18     A    So, again, I'll harken back to the concept

19  of System of Care we discussed earlier, which is

20  about multiple partners who have an interest in not

21  just from an agency perspective and scope of law,

22  but external partners who are invested in children's

23  behavioral health service, working collaboratively

24  toward the goal of, of having the best public sector

25  behavioral health response for kids for the state.



```
 1            And so, again, understanding that we each
 2   have some stake in law, at least the State agency,
 3   some stake in law to support children in certain
 4   ways, in each of our scope of law we have
 5   overlapping children, and we're all kind of pointed
 6   to those children in terms of providing them the
 7   best supports to achieve their health, their
 8   education, their welfare.
 9            And so if all of us are collectively in
10   scope of law invested in that and we are then not
11   coordinating and collaborating, then we really
12   aren't using our resources the most efficiently and
13   effectively on behalf of those youths.
14            So for me the system care is about being
15   sure that we are not duplicating effort, that we are
16   complementing one another's efforts, and then doing
17   our best to be sure for the child and family that
18   what they experience is a more coordinated and
19   collaborative system through which that child is his
20   or her best self.
21       Q    Thank for you that explanation.
22            So I want to refer back to the testimony
23   you just gave regarding the overarching purpose of
24   the System of Care framework, which I believe you
25   said is working collaboratively toward the goal of
```



1  having the best public sector behavioral health

2  response for kids for the state.

3            Does that sound right?

4      A    That's -- that is how it comes into my

5  brain and out of my mouth.  That is not a memorized

6  statement for sure, but it is, it is my best

7  operating definition of that.

8      Q    Would services for children who are

9  enrolled in GNETS fall within the scope of that, of

10  that mandate?

11            MS. HERNANDEZ:  Object.

12            You can answer.

13      A    I think it falls within the expectation.

14  I can't say it falls within a mandate because I

15  don't know the scope of law for DOE well in terms of

16  what its charge is in terms of its written mandates,

17  but I do know that educational goals for young

18  people is part and parcel to how Georgia wants kids

19  to be well and thrive.  So, yes, I consider that to

20  be a part of how DOE wants kids to be well and

21  thrive.

22      Q    So you would consider services, behavioral

23  health services for children enrolled in GNETS as

24  part -- or a piece of the mission for the System of

25  Care framework?



1       A    For any kids, yes.  But behavioral

2    healthcare for any kids, yes.

3       Q    Which includes kids in GNETS?

4       A    Yes.

5            MR. HOLKINS:  I know we're running out of

6       time.  I'd like to take a couple minute break

7       to organize my material.

8            Can we take five minutes?

9            How much time do I have left?

10           THE VIDEOGRAPHER:  You have 20 minutes.

11           Off record at 5:40 -- 6:40.  Five.

12           (A recess was taken.)

13           THE VIDEOGRAPHER:  Back on record at 5:42.

14   BY MR. HOLKINS:

15      Q    Ms. Tiegreen, I'd like to ask just a

16   couple more questions about the System of Care

17   before changing gears.

18           Is it your understanding that the State of

19   Georgia is required under state law to implement a

20   System of Care framework?

21           MS. HERNANDEZ:  Object.

22           You can answer.

23      A    There is law about System of Care but I

24   don't recall if the language says that we shall

25   implement it.



1          So it talks about facilitating and

2    bringing together state agencies and it talks about

3    planning collaboratively, but I cannot recall the

4    language precisely enough to answer that question in

5    the affirmative or the negative.

6          Q    Do you have any involvement in applying

7    for System of Care grants from SAMHSA on behalf of

8    the State of Georgia?

9          A    I don't have any direct responsibility,

10   but I would be kind of an informant to the process

11   if one were going after or if we had an interest in

12   making application, I would likely be a reviewer of

13   that.

14         Q    And have you reviewed an application on

15   behalf of State of Georgia or a System of Care grant

16   from SAMHSA?

17         A    Many years ago, yes, but it's been a long

18   time.  Maybe, maybe the late -- I mean the early

19   teens, maybe the last one I can recall.

20         Q    Early 2010s?

21         A    Yes.

22         Q    Do you know whether there are, as a

23   condition of receiving a System of Care grant from

24   SAMHSA, requirements that the State implement a

25   System of Care framework?



1              MS. HERNANDEZ:  Objection.

2              You can answer.

3        A     Generally states kind of set forth the

4   goals of System of Care.  I will just say from doing

5   children's work for a long time that an actualized

6   System of Care is aspirational, and not a definitive

7   this is it and we're done.

8              And so I think in terms of if we made a

9   commitment to the Feds, it would be some

10  developmental goals towards advancing our work, but

11  it wouldn't be, here, we're there, done, crossing

12  the finish line.

13       Q     So I'd like to shift gears now and ask you

14  just a few questions about Apex, which is a program

15  we discussed a few times today.

16       A     Sure.

17       Q     Apex is a mechanism for delivering

18  school-based behavioral health services, correct?

19       A     Apex is an initiative to promote the

20  development of school-based mental health services,

21  restating it the way I understand it.

22       Q     I'd like to show you another exhibit,

23  which will be 153.  It has two parts, an email and

24  attachment.

25             The email is Bates-stamped GA04292483.



```
 1              (WHEREUPON, Plaintiff Exhibit-153 was

 2         marked for identification.)

 3   BY MR. HOLKINS:

 4      Q     This is an email from you, dated February

 5   11, 2020, with the title "Billing & Reimbursement

 6   Webinar Tomorrow," and attaching a PowerPoint

 7   presentation titled "Billing and Claims Improvement

 8   Opportunities 2020 Final."

 9           Is that all accurate?

10      A     Yes.  Uh-hum.

11      Q     I'd now like to shift to Part 2.

12           This is the presentation you attached,

13   correct?

14      A     It is.

15      Q     For the record, this is GA04292485.001.

16   The title of the document is Apex Billing & Claims

17   Improvement Opportunities."

18           Did you give this presentation?

19      A     I did.

20      Q     To whom?

21      A     To the Apex providers who are brought

22   together by the Georgia State University Center of

23   Excellence.

24      Q     Is that all of the Apex providers at this

25   time?
```



1        A     They are invited.  I don't know if

2    everyone participated, but they are all invited.

3        Q     And just to by clear, this is a

4    presentation from February 2020, correct?

5        A     Correct.

6        Q     Have you given any presentations about

7    Apex billing and claims since February of 2020?

8        A     It feels like I might have done later in

9    2020 or either early in 2021.  But I can't recall

10   for sure.

11       Q     Do you remember whether you used the same

12   slide deck or whether you made updates to this

13   presentation?

14       A     I don't recall.  It would have been

15   fundamentally based on this, because we don't have

16   significant -- we haven't had significant change in

17   any of this content, but I can't say for sure.

18       Q     Scrolling to Page 4, 5, and 6 of the

19   presentation, I believe this is the entry in DBHDD's

20   program manual for the Georgia Apex program?

21       A     Uh-hum.  (Affirmative.)

22       Q     Is that accurate?

23       A     That's accurate.

24       Q     Do you know whether this entry has changed

25   since you gave this presentation in February of



1    2020?

2            MS. HERNANDEZ:  Objection.

3            You can answer.

4       A    I can't say right off.  The provider

5    manual is so vast, I can't remember.  We make

6    adjustments to different program lines every

7    quarter, so I can't speak with certainty without

8    checking that document.

9            MR. HOLKINS:  I'm just making note in the

10        record to the extent that Ms. Tiegreen has

11        given further presentations regarding Apex

12        billing and claims, it would be responsive to

13        the United States' request for documents, and

14        we'll follow up to request that separately.

15        MS. COHEN:  I see Danielle nodding her

16        head, but I don't know if the record reflects

17        her ascent.

18        MS. HERNANDEZ:  I heard what he said.

19    BY MR. HOLKINS:

20       Q    I wanted to show you another document

21    which will be 153 -- give me a second.  154.

22        MS. COHEN:  Give me that number.

23        MR. HOLKINS:  154.

24        MS. COHEN:  Yeah.

25        MR. HOLKINS:  Thank you.



1              (WHEREUPON, Plaintiff's Exhibit-154 was

2        marked for identification.)

3    BY MR. HOLKINS:

4        Q    I just produced what's been identified and

5    introduced as Exhibit 154.  This, for the record, is

6    GA04278558.

7              There a number of emails in this chain,

8    including an email from you dated October 8, 2019.

9              I'll give you a moment to review the

10   document.

11       A    Do I have -- thank you.  I see the

12   controls now.

13             (Witness reviews exhibit.)

14       A    Okay.

15       Q    So in your email, as I understand it,

16   you're identifying an issue of Apex providers

17   failing to bill Medicaid for billable services and

18   instead relying on the DBHDD grant.  Is that

19   accurate?

20       A    That is --

21             MS. HERNANDEZ:  Objection of.

22             You can answer.

23       A    Yes.  So for the record, Dante has brought

24   forth a list and some content of aspects where the

25   providers have said we need to keep getting state



1   money because these things aren't reimbursable, and

2   the pushback that I have provided here, where I say

3   I'm perplexed, is content where if you look at the

4   scope of what's in the Medicaid service description,

5   I feel, as the writer, a lot of that service

6   definition content, that these things actually are

7   billable.

8           So a lot of times that comes down to

9   perhaps a local clinical director feeling like

10  something is not very medically oriented.  They

11  might have a real medicalized background and not

12  think about recovery supports as being more

13  flexible, more nontraditional and able to be

14  implemented.

15          So these are items where I am saying back

16  to the group, hum, I think these things are

17  potentially still billable and it perplexes me that

18  when providers say they're not, which is why then

19  sometimes the COE periodically will bring me in to

20  present on billing opportunities, such as were

21  referenced in the last slides.

22      Q    Are you aware of any analysis by DBHDD,

23  systemwide, of under-billing for Medicaid billable

24  services through Apex?

25      A    There -- I wouldn't call it under-billing



 1    necessarily.  I would call it more conservative

 2    approach to the service parameters.

 3              So the service has a range as defined in

 4    the provider manual, and there are occasions where

 5    provider agencies may say, I'm just not sure about

 6    that or I'm a little concerned if we do this that we

 7    might be audited and somebody might take that back

 8    because it's less traditional.

 9              And so it is a push/pull between the

10    flexibility and the policy and providers feeling

11    like there are a variety of interpretations around

12    this.  And they also have other payors.  The CMOs

13    also are interpretive voices in their ear for some

14    of this, which then can make them put themselves in

15    a position of being like, well, if this CMO said

16    this for our agency, let's implement in this more

17    narrow pathway instead of this more broad one.

18              So I don't want to say that they're

19    under-billing.  I think the more fair representation

20    is that they have varieties of approaches to

21    content.  Some may be more conservative, some may be

22    more liberal when reading the policy.

23        Q    So let's make this concrete.  In this

24    email you identify participation in IEP or 504 plans

25    as a billable service?



 1      A    Uh-hum.  (Affirmative.)

 2      Q    Is that accurate?

 3      A    Yes.

 4      Q    And some providers, based on your

 5  understanding, were not billing Medicaid for that

 6  service?

 7           MS. HERNANDEZ:  Objection.

 8           You can answer.

 9      Q    Is that correct?

10      A    I need to look at the detail.

11           Is there a particular line you're looking

12  at to expedite my find?

13      Q    So I'm looking here, your email dated

14  October 8, 2019, where you write:  "Some of the

15  'non-billable' items are things that I've consulted

16  'older' Apex providers on as billable.  These items

17  here still perplex me."

18           The first bullet is "Participation," if

19  you scroll up, "in IEP or 504 plans."

20      A    Hold on.  I think my camera is blocking

21  when I'm scrolling down between pages.  I'm sorry.

22           THE VIDEOGRAPHER:  Five minutes left.

23      A    I see it now.  I had the camera across --

24  the screen across the bottom.

25           Yes.  So, again, as long as an IEP is



1   child centered, yes, participation can be billed via

2   the service, community support.

3        Q    Has DBHDD, to your understanding,

4   undertaken any analysis of the full extent to which

5   Apex providers are not billing for participation in

6   an IEP or 504 plan?

7        A    No --

8             MR. ROWLEN:   Objection.

9        A    -- we have not.

10            MS. HERNANDEZ:   You can answer.

11       Q    Is that likewise true for parent

12   education, the next item identified?

13       A    There's been no systematic analysis to

14   what extent that is not being billed.

15            Again, we've provided TA after the fact of

16   what parts can be billed, but we have not done a

17   systematic analysis of where it is not being billed.

18   That I'm aware of.

19       Q    So very quickly, I wanted to show you one

20   more document, which will be 155, Exhibit 155.

21            (WHEREUPON, Plaintiff's Exhibit-155 was

22        marked for identification.)

23   BY MR. HOLKINS:

24       Q    For the record, this is GA04225691.

25            Scrolling up, this is an email from you



1  dated January 7, 2018, to Dante McKay, cc'ing a

2  number of recipients.  The subject is "DCH, CMO

3  Invitation to Peer Learning Event."

4       A    Uh-hum.  (Affirmative.)

5       Q    I want to focus you on the text of your

6  email, where you write:  "Apex is a school-based

7  behavioral health program, DBHDD pays for the

8  infrastructure that Dante describes, and Medicaid

9  (or other Third-party payers) cover the counseling,

10 community support, nursing," et al.

11           Do you see that text?

12      A    I do.

13      Q    Can you expand on what you mean here, this

14 distinction between paying for the infrastructure

15 versus covering specific services?

16      A    Sure.  So when DBHDD enters into a

17 contract for Apex, it is doing so in a developmental

18 framework.  So it is trying to create the motivation

19 and the development of a community-based provider to

20 go into the school, to build a relationship with the

21 school, to integrate into the school culture, so

22 that they can begin the process of delivering

23 behavioral health supports and services within that

24 school.

25           While they are kind of being -- they're



1  inculcating into that culture, there is not

2  necessarily billing beginning.  So we are paying for

3  a lot of the developmental parts of relationship and

4  for a lot of what's called nonproductive time in

5  healthcare, where in a clinic you might have

6  productivity of 50 percent.  20 hours a week of your

7  40-hour week has to be billable to like support your

8  salary and the direct and indirect costs.  That's

9  how our rate is set.

10         When you go into a school system, it may

11 be several weeks before you can achieve the amount

12 of billing that would start to pay for salaries, or

13 it could be several months before you're at that

14 place.

15         So DBHDD is paying for this ramp-up of

16 relationship and development that occurs,

17 understanding sometimes that means attending a PTA

18 meeting.  That's not billable.  It may be attending

19 a school carnival on a Saturday, not billable.

20         But we want that practitioner to be

21 available and accessible and seen as a trusted

22 partner in that school.  In that way, we are paying

23 for kind of some infrastructure to build towards the

24 ability to then really be actualizing, doing

25 counseling, doing community support, doing nursing,



 1  peer support, med management, and the like, and

 2  billing for that.

 3       Q    Is the expectation that once that

 4  relationship is built, Apex providers would be

 5  increasing the relying on Medicaid to fund services?

 6       A    Medicaid and other third-party payors,

 7  private insurance and the like.

 8       Q    What did you to prepare for this

 9  deposition today?

10       A    We just had a brief orientation last week

11  in terms of --

12            MS. HERNANDEZ:  Don't -- sorry.

13            Don't say what we talked about but you can

14       say we met.

15       A    Yeah.  We just met briefly on that and

16  that's really the extent of it.

17            MR. HOLKINS:  Okay.  That's it.

18            Thank you very much for your time, Ms.

19       Tiegreen.

20            THE VIDEOGRAPHER:  We're off the record at

21       6:00 p.m.

22            (Whereupon, the deposition concluded at

23       6:00 p.m.)

24

25



WENDY W. TIEGREEN                                             June 21, 2022
UNITED STATES vs STATE OF GEORGIA                                      283

1                   C E R T I F I C A T E

2

3   STATE OF GEORGIA:

4   FULTON COUNTY:

5

6            I hereby certify that the foregoing

7   transcript of WENDY W. TIEGREEN was taken down, as

8   stated in the caption, and the questions and answers

9   thereto were reduced by stenographic means under my

10  direction;

11           That the foregoing Pages 1 through

12  282 represent typically a true and correct

13  transcript of the evidence given upon said hearing;

14           And I further certify that I am not of kin

15  or counsel to the parties in this case; am not in

16  the regular employ of counsel for any of said

17  parties; nor am I in anywise interested in the

18  result of said case.

19

20           IN WITNESS WHEREOF, I have hereunto

21  subscribed my name this 26th day of June, 2022.

22

23  _____

24       Wanda L. Robinson, CRR, CCR No. B-1973
              My Commission Expires 10/11/2023

25



WENDY W. TIEGREEN                                    June 21, 2022
UNITED STATES vs STATE OF GEORGIA                          284

1                    D I S C L O S U R E

2    STATE OF GEORGIA  ) VIDEOTAPE DEPOSITION OF
     FULTON COUNTY     ) WENDY W. TIEGREEN - 6/21/22
3                    Pursuant to Article 10.B of the Rules and

4    Regulations of the Board of Court Reporting

5    of the Judicial Council of Georgia, I make the

6    following disclosure:

7                    I am typically a Georgia certified court

8    reporter.  I am here as a representative of Esquire

9    Deposition Solutions, LLC, and Esquire Deposition

10   Solutions, LLC was contacted by the offices of U.S.

11   Attorney's Office to provide court reporter services

12   for this deposition.  Esquire Deposition Solutions,

13   LLC will not be taking this deposition under any

14   contract that is prohibited by O.C.G.A. 9-11-28 (c).

15                   Esquire Deposition Solutions, LLC has no

16   contract/agreement to provide court reporter

17   services with any party to the case, or any counsel

18   in the case, or any reporter or reporting agency

19   from whom typically a referral might have been made

20   to cover

21   this deposition.

22                   Esquire Deposition Solutions, LLC will

23   charge the usual and customary rates to all parties

24   in the case, and typically a financial discount will

25   not be given to any party to this litigation.



1                    ERRATA SHEET FOR THE TRANSCRIPT OF:

2    Deponent Name:  WENDY W. TIEGREEN

3    Case Caption:   United States of America vs. State
                     of Georgia
4

5    Case No. :  1:16-cv-03088-ELR

6         I do hereby certify that I have read all
     questions propounded to me and all answers given by
7    me on the 21st day of June 2022, taken before Wanda
     L. Robinson, and that:
8

9    _____1) There are no changes noted.

10   _____2) The following changes are noted:

11        Pursuant to state rules of Civil Procedure
     and/or the Official Code of Georgia Annotated
12   9-11-30(e), both of which read in part:  Any changes
     in form or substance which you desire to make shall
13   be entered upon the deposition with a statement of
     the reason given for making them.
14        Accordingly, to assist you in effecting
     corrections, please use the form below:
15

16   CORRECTIONS:

17   _____

18   Page      Line           Change          Reason For Change

19   _____

20   _____

21   _____

22   _____

23   _____

24

25



```
 1                  CERTIFICATE  OF DEPONENT

 2

 3        I hereby certify that I have read and examined

 4    the foregoing transcript, and the same is a true and

 5    accurate record of the testimony given by me.  Any

 6    additions or corrections that I feel are necessary,

 7    I will attach on a separate sheet of paper to the

 8    original transcript.

 9

10                      _____

11                             Signature of Deponent

12

13        I hereby certify that the individual

14    representing himself/herself to be the above-named

15    individual, appeared before me this _____ day of

16    _____, 2022, and executed the above

17    certificate in my presence.

18

19

20                      _____

21                             NOTARY PUBLIC

22

23    MY COMMISSION EXPIRES:

24

25
```

