1             IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION

3

4  UNITED STATES OF AMERICA,      )
                                  )CIVIL ACTION
5          Plaintiff,             )NO. 1:16-cv-03088-ELR
                                  )
6  vs.                            )
                                  )
7  STATE OF GEORGIA,              )
                                  )
8          Defendants.            )
                                  )
9  - - - - - - - - - - - - - - -  )

10

11               VIDEOTAPE DEPOSITION OF

12                      WINA LOW

13

14      Tuesday, February 28, 2023, 8:58 a.m., EST

15

16

17

18

19

20          HELD AT:

21          Robbins Firm
            500 14th Street, N.W.
22          Atlanta, Georgia  30318

23          ----------------------------------------------

24

25          WANDA L. ROBINSON, CRR, CCR, No. B-1973
          Certified Shorthand Reporter/Notary Public



```
1                   APPEARANCES  OF  COUNSEL

2

3   Appearing on Behalf of the Plaintiff:

4

5       MICHELLE L. TUCKER, ESQUIRE
        KELLY GARDNER, ESQUIRE
6       U.S. Department of Justice
        Civil Rights Division
7       950 Pennsylvania Avenue, N.W.
        Washington, D.C. 20579
8       T:  202.305.6630   F:  202.305.3488
        E-mail:  Michelle.Tucker@usdoj.gov
9                kelly.gardner@usdoj.gov

10

11

12  Appearing on Behalf of the Defendant and the
    Witness:
13

14      ED BEDARD, ESQUIRE
        Robbins Alloy Belinfante Littlefield LLC
15      500 14th Street, N.W.
        Atlanta, Georgia  30318
16      T:  404.856.3261
        E-mail:  ebedard@robbinsfirm.com
17

18

19

20

21

22

23

24

25
```



```
 1   ALSO PRESENT VIA ZOOM:

 2      U.S. Attorney's Office:

 3              VICTORIA LILL, ESQUIRE

 4              SANDRA LeVERT, ESQUIRE

 5              LAURA CASSIDY-TAYLOE, ESQUIRE

 6

 7

 8              STACEY SUBER-DRAKE, ESQUIRE
                Georgia Department of Education
 9

10

11

12

13

14

15

16

17

18

19   ALSO PRESENT:

20        TODD PARKER, Videographer

21

22

23

24

25
```



```
1                    INDEX OF  EXAMINATIONS

2    WINA LOW

3    By Ms. Tucker                                        Page 8

4

5

6                     INDEX OF EXHIBITS

7    PLAINTIFF'S

8    NO.                    DESCRIPTION                    PAGE

9    Exhibit 920   Notice of Deposition of Wina Low     11

10   Exhibit 921   7/10/2015 Email Thread From Wina Low 60
                   To Desiree Woods
11                 GA03549245

12   Exhibit 922   8/2/2015 Email Thread From Wina Low  68
                   To Stacey Benson
13                 GA03549486 - GA03549488

14   Exhibit 923   11/30/2015 Email Thread From Linda   72
                   Castellanos To Wina Low
15                 GA03552093- GA03552094

16   Exhibit 924   4/10/2018 Email Thread From Vickie   81
                   Cleveland To Wina Low
17                 GA03584228

18   Exhibit 925   8/2/2018 Email Thread From Wina Low  88
                   To Vickie Cleveland
19                 With Attachment
                   GA00330300 - GA00330305
20
     Exhibit 926   8/17/2018 Email From Vickie          91
21                 Cleveland To Peavy, Low
                   With Attachment
22                 GA03590706 - GA03590707

23   Exhibit 927   4/10/2018 Email Thread From Wina     93
                   Low To Paula Gibson
24                 GA03584360 - GA03584361

25
```



1                    INDEX OF EXHIBITS (Continued)

2    PLAINTIFF'S

3    NO.                    DESCRIPTION                  PAGE
     Exhibit 928    9/28/2017 Email From Monica           99
4                   Henderson To Wina Low
                    GA03575906
5
     Exhibit 929    8/31/2021 Email Thread From Matt      104
6                   Jones To Wina Low
                    GA03670897 - GA03670898
7
     Exhibit 930    9/1/2021 Email Invite From Shaun      111
8                   Owen To Wina Low
                    GA03670906
9
     Exhibit 931    9/8/2021 Email From Wina Low          133
10                  To Jaquenetta Dugger
                    With Attachments
11                  GA03671090 - GA03671094

12   Exhibit 932    10/19/2021 Email Thread From Wina     174
                    Low To Linda Castellanos
13                  GA03676946 - GA03676948

14   Exhibit 933    10/22/2021 Email From Vickie          192
                    Cleveland To Owen, Low
15                  With Attachments and Spreadsheet
                    GA03677596 - GA03677601,
16                  GA03677601 2, GA03677601 3

17   Exhibit 934    9/9/2021 Email Thread From Wina Low 221
                    To Castellanos, White, Cleveland
18                  GA02892188 - GA02892189

19   Exhibit 935    8/17/2016 Email Thread From Lynn      260
                    Holland To Wina Low
20                  GA03558135 - GA03558138

21   Exhibit 936    11/10/2016 Email From Nakeba          265
                    Rahming To Recipients
22                  With Attachment
                    GA03559361 - GA03559364
23
     Exhibit 937    10/4/2018 Email From Glenda           274
24                  Henderson To Wina Low
                    GA03593480 - GA03593482
25



1                  INDEX OF EXHIBITS  (Continued)

2   PLAINTIFF'S

3   NO.                    DESCRIPTION                    PAGE

4   Exhibit 938  2/19/2019 Email From Vickie         277
                 Cleveland To Wina Low
5                With Attachment
                 GA03601209 - GA03601211
6
    Exhibit 939  3/2/2021 Email From Annette Murphy  280
7                To Wina Low
                 With Attachments
8                GA03655014 - GA03655022

9   Exhibit 940  9/18/2020 Email Thread From Paula   285
                 Gumpman To Wina Low
10               GA03644534 - GA03644535

11  Exhibit 941  3/20/2018 Email Thread From Monica  298
                 Henderson To Wina Low
12               GA04918894 - GA04918896

13

14

15           INDEX OF EXHIBITS  (Previously Marked)

16  PLAINTIFF'S

17  NO.                    DESCRIPTION                    PAGE

18  Exhibit 82   GNETS State Board Rule              227

19  Exhibit 380  5/20/2019 Email Chain From Vickie   219
                 Cleveland To Lakesha Stevenson
20               With Attachment
                 GA00346118 - GA00346120
21
    Exhibit 670  11/14/2018 Email Chain From Vickie  179
22               Cleveland To Recipients
                 With Attachments and Spreadsheets
23               GA00336618 - GA00336620

24  Exhibit 697  10/9/2020 Email From Matt Jones       30
                 To Matt Jones With Attached Org Chart
25               GA01852181 - GA01852182



1           THE VIDEOGRAPHER:  This is the video

2      deposition of Wina Low, in the matter of the

3      United States of America versus State of

4      Georgia.

5           Today's date is February 28, 2023.  The

6      time on the record is 8:58.

7           My name is Todd Parker.  I am the

8      videographer.

9           The court reporter is Wanda Robinson.

10          Counsel, please introduce yourselves and

11     state whom you represent, after which the court

12     reporter will swear the witness.

13          MS. TUCKER:  Michelle Tucker for the

14     United States.

15          MS. GARDNER:  Kelly Gardner for the United

16     States.

17          MR. BEDARD:  Ed Bedard, on behalf of the

18     State of Georgia.

19                  - - - - - -

20                  WINA LOW,

21   being duly sworn, was examined and testified as

22   follows:

23                  - - - - - - -

24

25



1  EXAMINATION

2  BY MS. TUCKER:

3      Q   Good morning, Ms. Low.

4      A   Hi.

5      Q   How are you this morning?

6      A   Good to see you.

7      Q   Good to see you.

8          Thank you for coming in today.  Again,

9  this is the deposition of Wina Low in the U.S.

10 District Court for the Northern District Georgia.

11         I know we've met, but for the record, my

12 name is Michelle Tucker and I'm a senior trial

13 attorney in the Educational Opportunity section of

14 the Civil Rights Division of the U.S. Department of

15 Justice, and I represent the United States in this

16 matter, and I'll be taking your deposition today.

17     A   Okay.

18     Q   Would you please state and spell your full

19 name for the record.

20     A   Wina, W-I-N-A, Low, L-O-W.

21     Q   Thank you.  And I'm sure your attorney has

22 explained much of this to you, but we're basically

23 going to have a conversation today.  I'm going to

24 ask you questions, and then your job is to just

25 answer the questions honestly and completely.  Okay?



```
 1        A    Yes.

 2        Q    And you were just sworn to tell the truth

 3   by the court reporter.  The oath you took is the

 4   same oath you would take if you were testifying in a

 5   court of law, and it puts you under that same

 6   obligation to tell the truth that you would be under

 7   in court.

 8             Do you understand that?

 9        A    I do.

10        Q    My questions and your answers will be

11   recorded by the court reporter.  So please

12   understand that you will need to speak clearly and

13   answer all questions orally so that the court

14   reporter can capture your answers.

15             For example, she's not going to be able to

16   record a head nod or a head shake.

17        A    Right.

18        Q    The other thing that you and I will need

19   to do is avoid talking over one another.  I will do

20   my best not to interrupt you when you're answering a

21   question, and I just ask that you do your best not

22   to interrupt me when asking a question, even if you

23   know, you know the answer already.

24             Okay?

25        A    Okay.
```



1      Q    If at any point you don't understand a

2    question, feel free to let me know and I will

3    clarify.  Okay?

4      A    Okay.

5      Q    Note that your attorney may occasionally

6    object to my questions.  This is to put their

7    objections on the record.  It does not mean that you

8    should not answer unless he explicitly tells you not

9    to.

10          Does that make sense?

11     A    Yes.

12     Q    Okay.  If you want to take a break for any

13   reason, that's fine.  I just ask that if there's a

14   question pending or if we're in the middle of

15   something that we wait a moment.  Is that okay?

16     A    Sure.

17     Q    Sometimes it happens that you'll give an

18   answer and then five minutes later or an hour later

19   you'll remember that there's more to say to answer

20   the question completely.  Totally fine.  Just let me

21   know and we can go back to that.

22     A    Okay.

23     Q    How are you feeling today?

24     A    I'm fine.

25     Q    Good.  Is there any reason that you would



1  not be able to answer my questions truthfully today?

2        A    No.

3        Q    For example, are you taking any

4  medications that would inhibit your ability to

5  answer these questions?

6        A    No.

7        Q    Okay.  Any questions before we proceed?

8        A    I think I understand.

9        Q    Great.

10       MS. TUCKER:  I'd like the court reporter

11       to mark this document as Plaintiff's Exhibit

12       920.

13            (WHEREUPON, Plaintiff's Exhibit-920 was

14        marked for identification.)

15  BY MS. TUCKER:

16       Q    Ms. Low, this is a deposition notice that

17  we served for your deposition in connection with

18  this lawsuit, and this is the lawsuit against the

19  State of Georgia related to the Georgia Network for

20  Educational and Therapeutic Support Program,

21  commonly referred to as the GNETS program?

22       A    Uh-hum.  (Affirmative.)

23       Q    Have you seen this deposition notice

24  before?

25       A    I have.



1      Q      When?

2      A      The exact date?

3      Q      Approximately?

4      A      Last week.

5      Q      Last week.  And who showed you?

6      A      Our general counsel, Stacey Suber-Drake.

7      Q      Did she know you in person or did she

8   share the email?

9      A      I think it was actually over a virtual

10   meeting where the screen was shared.

11      Q      Thank you.

12             What is your understanding of what this

13   lawsuit is about?

14      A      I'm trying to think how to put this into

15   words.

16             The lawsuit is about making sure that all

17   children are protected under the IDEA law, is the,

18   the overarching basis for it.

19      Q      And what is your basis for that

20   understanding?

21             MR. BEDARD:  Object to form.  I object to

22      form.

23             I'll object to the extent that you learned

24      anything from conversations with counsel, not

25      to divulge those conversations, but if you



1          understand something about the lawsuit from

2          something outside of conversations with

3          counsel, you can go ahead and answer.

4          A    To ensure that all children have, again,

5    the protection of the IDEA law.  That's the most

6    comprehensive way that I can say it, to ensure that

7    they have equal access to the general curriculum.

8    You know, when and all possible that they're with

9    nondisabled peers.  That they have teachers that are

10   well qualified as any teacher would be anywhere.

11          I mean do you want me to keep going?

12         Q    That's helpful.  Thank you, Ms. Low.

13          Have you read any court filings in

14   connection with this lawsuit?

15         A    Court filings?

16         Q    Yes, ma'am.  Any documents that have been

17   filed in court.

18         A    No.

19         Q    Do you recall reading a document called

20   "Complaint" that identified different allegations in

21   the lawsuit?

22          MR. BEDARD:  Object to form.

23         A    I don't think I've seen the actual legal

24   document, no.

25         Q    Did you receive a notice in connection



```
 1   with this lawsuit advising you not to destroy any
 2   documents or delete any documents?
 3        A    I have been verbally told that.
 4        Q    And when was that?
 5        A    I would say that's when I transitioned to
 6   the director role.
 7        Q    And by director role, what do you mean?
 8        A    The State Director of Special Education.
 9   I was interim first, and then director.
10        Q    And when did you take on the State
11   Director role?
12        A    Interim was in September 2021.
13        Q    Okay.  And what about the State Director
14   role?
15        A    I'm sorry.  That's what I just answered.
16        Q    You answered about interim state director?
17        A    Oh, interim.  Okay.
18             Then the State Director role, a year ago,
19   March.
20        Q    March.  So March '22.  Thank you.
21             Have you been asked to collect documents
22   as part of the State's efforts to respond to the
23   Department of Justice's requests in this lawsuit?
24        A    To collect?
25        Q    Yeah.  Have you been directed to collect,
```



1   look through your emails or different documents as

2   part of the State's efforts to respond to requests

3   in this lawsuit?

4        A    I have been asked to look through email

5   and other documents in response to requests from the

6   Department of Justice, but not necessarily -- I

7   thought you were asking it more for the department

8   side.

9             In response to some requests that have

10  come in from the Department of Justice or the

11  advocacy office.

12       Q    Yes, ma'am.  So just to clarify, you have

13  reviewed emails in response to Department of Justice

14  requests in this lawsuit?

15       A    Yes.

16       Q    And I'm correct that you're being

17  represented by Mr. Bedard for purposes of the

18  deposition today?

19       A    Yes.

20       Q    Did you talk to anyone to prepare today

21  for this deposition?

22       A    Well, I talked with the lawyer

23  representing today.  I have spoken with Stacey

24  Suber-Drake about this, and I've talked with my

25  senior program manager, as well as my immediate



 1  supervisor, the deputy superintendent.

 2     Q    Let's start with counsel.  Did you -- who

 3  else was present when you met with counsel, with Mr.

 4  Bedard?

 5           MR. BEDARD:  You can -- I'll say you can

 6      just -- don't say anything about the substance

 7      of the conversation we had, and she's not

 8      asking about the substance, but you can answer

 9      if anybody else was on the call, when it was,

10      that sort of thing.  Nothing about substance.

11           THE WITNESS:  This was just last week but

12      I'm not remembering anybody being on the call

13      other than us.  Was someone else on the call?

14           MR. BEDARD:  I can't answer.

15     Q    You don't recall?

16     A    I don't recall.

17     Q    The call was last week, you said?

18     A    Yes.  It was a Teams meeting or Zoom or

19  whatever.

20     Q    And how long did you all meet?

21     A    Less than an hour.

22     Q    Okay.  You also mentioned that you met

23  with Stacey Suber-Drake?

24     A    Yes.

25     Q    When was that meeting?



1       A    Well, I meet with Stacey for various

2   reasons, but I believe it was last week that we

3   spoke briefly.  Stacey just briefly explained, you

4   know, what it --

5            MR. BEDARD:  Again, I'll say don't talk

6       about substance, what you talked to Stacey

7       about.

8       A    I'm not.  It's not as extensive as what --

9       Q    I understand.  Thank you.

10           Was anyone else present for your meeting

11  with Stacey?

12      A    I think Shaun was there but, honestly,

13  that's all I can recall.  We have so many different

14  meetings.  Not necessarily about this.

15      Q    Then when you say Shaun, who are you

16  referring to?

17      A    That's the deputy superintendent, Shaun

18  Owen.

19      Q    And you said you also advised her about --

20  you talked to her in advance of today about the

21  deposition?

22      A    Yes.

23      Q    And what did you talk to Ms. Owen about?

24      A    She just briefly explained sort of what

25  the day was like.  Nothing of substance, just what



```
 1   to expect.
 2        Q    And what did she say the day was like?
 3        A    That it's long and that there are lots of
 4   questions.  You know, basically just to hang in
 5   there.  Just encouragement.
 6        Q    And this was last week as well?
 7        A    Yes, must have been.
 8        Q    You mentioned you also spoke with your
 9   senior program manager.  Who was that?
10        A    My senior program manager, Amber McCollum,
11   called me following her deposition just to explain
12   the experience.
13        Q    And what did she say?
14        A    It was late in the afternoon.  You know,
15   I've been there all day.  That type of thing.
16             Nothing, again, of any real substance.
17   Just explaining her experience.  And I directly
18   supervise Amber.
19        Q    Did you speak to any other of your GaDOE
20   colleagues?
21        A    Vickie Cleveland called me after her
22   deposition as well on the way home, again it was
23   maybe 7 o'clock at night, and she was just
24   explaining what a long day it had been.  But that's
25   about all I recall from it.
```



```
 1        Q    Did any of your GaDOE colleagues tell you
 2   what types of questions they were asked?
 3        A    I don't remember any specific about
 4   something that was substantive.  I recall Shaun
 5   saying that they asked her about her background,
 6   that type thing.
 7        Q    Did they advise you of any specific
 8   documents to look at in preparation?
 9        A    No, they did not.
10        Q    Did you speak to Matt Jones in advance of
11   your deposition today?
12        A    No.
13        Q    Apart from any documents shown to you by
14   counsel, did you look at any documents to prepare
15   for today's deposition?
16        A    I did not.
17        Q    Did you bring any documents with you
18   today?
19        A    I did not.
20        Q    Did you ask anyone about documents that
21   could be relevant for today?
22        A    No.
23        Q    Did you do anything else to prepare for
24   today?
25        A    No.
```



1       Q     Have you been deposed before, Ms. Low?

2       A     Once.

3       Q     When was that?

4       A     Last year.

5       Q     In 2022?

6       A     Yes, it was in 2022.  I can't recall the

7    exact date.

8       Q     And what was that underlying lawsuit

9    about?

10      A     I'm not even -- I guess it was a lawsuit.

11   I'm not even sure of that.  I was just contacted a

12   few days before.  They wanted to talk to me and it

13   had something to do with -- I'm not even sure which

14   charter school.  Charter school and funding, and the

15   responsibility of the LEA.  If the State sent

16   funding directly, that kind of thing.

17      Q     So this was in your professional capacity?

18      A     Yes.

19      Q     Have you ever been a plaintiff in a

20   lawsuit?

21      A     No.

22      Q     Have you ever been a defendant in a

23   lawsuit?

24      A     No.

25      Q     So there are a few acronyms and



1  definitions I'd like to go over to confirm that we

2  have the same understanding today. okay?

3      A    Okay.

4      Q    When I refer to "GaDOE" or "DOE," you

5  understand I mean the Georgia Department of

6  Education, correct?

7      A    I do.

8      Q    When I refer to "GNETS" or "GNETS

9  program," you understand that I'm referring to the

10  Georgia Network for Educational and Therapeutic

11  Support program, correct?

12      A    Yes.

13      Q    When I refer to the -- a "regional GNETS

14  program," I'm referring -- you understand that I'm

15  referring to one of the 24 regional GNETS programs

16  across the State of Georgia?

17      A    Yes.

18      Q    When I refer to "GNETS centers," or

19  "centers," you understand that I'm referring to

20  standalone GNETS locations?

21      A    Yes.

22      Q    When I refer to a "GNETS school-based

23  location," you understand that I'm referring to

24  GNETS locations that are based in a general

25  education setting?



1        A    Yes.

2        Q    When I refer to "general education

3   settings," you understand that I'm referring to a

4   public school in Georgia where students with

5   emotional and behavior disorders and other

6   behavioral health conditions receive instruction and

7   services alongside students who do not have

8   disabilities?

9        A    Yes.

10       Q    When I refer to the "State," you

11  understand that I'm referring to the State of

12  Georgia?

13       A    Yes.

14       Q    When I refer to "EBD," you understand that

15  I'm referring to emotional and behavior disorders?

16       A    Yes.

17       Q    When I refer to "LEA," you understand that

18  I'm referring to a Local Education Agency, or school

19  district?

20       A    Yes.

21       Q    When I refer to "SEA," you understand that

22  I'm referring to State Education Agency?

23       A    Yes.

24       Q    When I refer to a "RESA," you understand

25  that I'm referring to the Regional Education Service



```
 1   Agency?
 2        A    Yes.
 3        Q    When I refer to an "IEP," you understand
 4   that I'm referring to an Individual Education
 5   Program?
 6        A    Yes.
 7        Q    When I refer to a "BIP," you understand
 8   that I'm referring to a Behavior Intervention Plan?
 9        A    Yes.
10        Q    When I refer to an "FBA," you understand
11   that I'm referring to a Functional Behavior
12   Assessment?
13        A    Yes.
14        Q    When I refer to "DBHDD," you understand
15   that I'm referring to the Georgia Department of
16   Behavioral Health and Developmental Disabilities?
17        A    Yes.
18        Q    When I refer to "DCH," you understand that
19   I'm referring to the Georgia Department of Community
20   Health?
21        A    Yes.
22        Q    When I refer to "state director," you
23   understand that I'm referring to state director for
24   Special Education Services and Supports at the
25   Georgia Department of Education?
```

1    A    Yes.

2    Q    When I refer to "interim state director,"

3    you understand that I'm referring to the interim

4    state director for Special Education Services and

5    Supports at the Georgia Department of Education?

6    A    Yes.

7    Q    Thank you.  Just want to make sure we have

8    the same understanding as we move forward.

9         Ms. Low, where to you currently reside?

10   A    The city?

11   Q    Uh-hum.  (Affirmative.)

12   A    My mailing address is Jasper, Georgia.

13   Q    Okay.  How long have you lived in Jasper?

14   A    This time?  I grew up in Jasper.

15   Q    Okay.

16   A    Until I was 29, before we relocated, but

17   we just moved back to Pickens County.  It's a Jasper

18   address, too.  In December 2020, in the middle of

19   the pandemic.

20   Q    Okay.  How far is that from Atlanta?

21   A    It's about 50 miles.

22   Q    So how long did it take you to get here

23   today?

24   A    Two hours.

25   Q    Two hours, okay.



1        A    Traffic.

2        Q    I understand.

3             The GaDOE's office is located in Atlanta,

4   right?

5        A    Yes.

6        Q    How often are you coming into the office?

7        A    We have the option to work from home since

8   the -- when the pandemic caused the shutdown, but we

9   had that option several months later.

10            So I come to the office of course when I

11  need to.  I often come on a Board work session today

12  or maybe a Board meeting day.

13            I would say on average maybe twice a month

14  at the most, and sometimes it's more.

15       Q    And when you refer to a Board work session

16  day, are you referring to the State Board of

17  Education?

18       A    I am.

19       Q    Are a lot of your colleagues remote at

20  this point?

21       A    Yes.

22       Q    Ms. Low, what is your highest level of

23  education?

24       A    I hold a specialist degree, a six-year.

25       Q    And where is that degree from?



1        A    University of West Georgia.

2        Q    And what is it in?

3        A    Special education administration.

4        Q    And when did you receive that degree?

5        A    Maybe 2002 or 2001.  I don't honestly

6   remember now.

7        Q    Okay.  And where did you attend college?

8        A    For my undergraduate?

9        Q    Yes, ma'am.

10       A    Brenau University.  It was Brenau College

11   at the time.

12       Q    And when did you graduate from Brenau?

13       A    1983.

14       Q    And what was your degree in?

15       A    Education.  Middle grades education.

16       Q    Middle grades education.

17            Did you take any coursework in special

18   education when you were at Brenau?

19       A    A diagnosis in corrections of breathing

20   difficulties.

21       Q    Any other coursework in special education?

22       A    I don't believe in my undergraduate.  An

23   exceptional children's course that everybody has to

24   take.

25       Q    Thank you.  A moment ago you said your



1    current job title is State Director of Special

2    Education Services and Supports, correct?

3        A    Yes.

4        Q    And who is your employer?

5        A    Georgia Department of Education.

6        Q    And you assumed this in March 2022?

7        A    The --

8        Q    State Director?

9        A    Yes, the -- without the interim.

10       Q    And you said that you were interim

11   starting in September 2021, correct?

12       A    Yes.

13       Q    So about six months as interim?

14       A    Uh-hum.  (Affirmative.)

15       Q    And who do you report to?

16       A    Well, directly now I report to John White,

17   and Shaun Owen is our deputy.

18       Q    John White?

19       A    Is our associate superintendent.

20       Q    How long has John White been the associate

21   superintendent?

22       A    Since October of '22.

23       Q    And do you also report to Shaun Owen or --

24       A    As it's explained to me, when the

25   associate superintendent position was added, I



1  really report directly to him, and Shaun said you're

2  also reporting to me.  That's -- I don't -- I don't

3  know how to express it any further.

4       Q    Okay.  Who evaluates you?

5       A    Well, I'm not sure since -- I would assume

6  it would be John.

7       Q    When would you typically be evaluated?

8       A    It would probably be later in the spring,

9  but John just accepted that role in October of '22.

10      Q    Prior to October of the '22, were you

11  reporting directly to Shaun Owen?

12      A    Yes.

13      Q    And Shaun Owen evaluated you in the past?

14      A    She has not formally evaluated me since

15  I've been in this role.  She gives me feedback

16  consistently.

17      Q    When is the last time you had a formal

18  evaluation at GaDOE?

19      A    It was as our former state director was

20  leaving.  So that would have been September 2021.

21  Or maybe it was August.  It was somewhere in that

22  time frame.

23      Q    So before you were interim state director?

24      A    Yes.

25      Q    And who was your former state director



1   that you're referring to?

2        A    Dr. Zelphine Smith-Dixon.

3        Q    And am I correct that Shaun Owen is deputy

4   superintendent for Federal Programs?

5        A    Yes.

6        Q    And what is meant by Federal Programs?

7             MR. BEDARD:  Object to form.

8             I said object to form.  You can answer.

9        A    Okay.  Well, it's the way we refer to it

10  in the Georgia Department of Education.  I'm not

11  sure it's referred to in the same manner in other

12  departments of education, but it may be.  But it's

13  all the Federal Programs that are funded federally.

14  IDEA is one side of the house, as we say, and the

15  other side is the title programs, like Title I,

16  Title II, Title III, Title IIA, Title IV.  And on

17  down the line.

18             So together we make up Federal Programs.

19        Q    Thank you.  And so Special Education

20  Services and Supports falls under this heading?

21        A    Yes.

22        Q    How many direct reports do you have as

23  state director?

24        A    I would have to -- I have 10 program

25  managers, but I don't directly supervise all of



1  them.  Some have a senior program manager in

2  between.

3          Do you want me to actually count up?

4      Q   I think I'm going to show you something in

5  a moment and we can go through it that way.

6          But you have 10 program offices that are

7  under you?

8      A   I have 10 program managers and/or senior

9  program managers.  Two senior program managers.  So

10 eight program managers.

11         Of course, I have an administrative

12 assistant.

13     Q   So two senior program managers, eight

14 program managers, and one administrative assistant?

15     A   Uh-hum.  (Affirmative.)

16     Q   I'm going to show you what was previously

17 marked as Plaintiff's Exhibit 697.

18         (WHEREUPON, Plaintiff's Exhibit-697 was

19      marked for identification.)

20 BY MS. TUCKER:

21     Q   Ms. Low, this is an email dated October 9,

22 2020, from Matt Jones to Matt Jones, with the

23 subject:  "Announcements."

24         The Bates number on the bottom of the

25 first page reads GA01852181, and this document was



1   produced to us by the State and there's one

2   attachment.

3            Do you recognize this email?

4   A    I would have been copied on it.

5   Q    Let's turn to the attachment, so the

6   second page, with Bates No. GA01852182 on the

7   bottom.

8            Do you recognize this chart?

9   A    To be honest with you, I can't really read

10  the fine print here.  I have my contacts in, but it

11  is very small.

12  Q    Okay.

13  A    Do you have something to magnify it?

14  Q    Maybe we can show it electronically.

15           MS. TUCKER:  One second.

16           It's loading for me and then I'll share my

17      screen with you.

18           (Discussion ensued off the record.)

19           MS. TUCKER:  I want her to be able to

20      control and zoom in if she needs to.

21           So I'm going to share it.

22           Are you able to give her control?

23           THE VIDEOGRAPHER:  You want to go off the

24      record for a second while we set this up?

25           MS. TUCKER:  Yes.  Thank you.



1          THE VIDEOGRAPHER:  Going off the record at

2      9:27.

3          (Discussion ensued off the record.)

4          THE VIDEOGRAPHER:  We're back on the

5      record at 9:28.

6  BY MS. TUCKER:

7      Q    Ms. Low, you now have on the screen in

8  front of you the attachment, which is GA01852182.

9          Do you recognize this Georgia Department

10  of Education organizational chart?

11      A    I do.

12      Q    At the bottom it reads that it was

13  effective October 9th, 2020.

14          Do you see that?

15      A    Yes.

16      Q    And I'm looking at the third row.  Do you

17  see a box on the left that reads "Federal Programs"?

18      A    Yes.

19      Q    And underneath that, it says "ESSA

20  Programs" and "Special Education Services and

21  Supports"?

22      A    Uh-hum.  (Affirmative.)

23      Q    And are the ESSA programs the title

24  programs you were speaking to earlier?

25      A    Yes, they are.



1    Q    And over to the right is the Special

2    Education Services and Supports.  Do you refer to

3    this as a division or an office?

4    A    Division.

5    Q    Division.  Thank you.

6         And then looking underneath Special

7    Education Services and Supports, I see eleven

8    sub-bullets.

9    A    Okay.

10   Q    I'm going to go over those now.

11        Do you see the start of the sub-bullets?

12   A    You're talking about Budgets and Grants?

13   Q    Yes, ma'am.

14        So do you see "Budgets and Grants"?

15   A    I did.

16   Q    Do you see "Results Driven

17   Accountability"?

18   A    Yes.

19   Q    "Discretionary Projects"?

20   A    Yes.

21   Q    "Post-school Outcomes and Professional

22   Learning"?

23   A    Uh-hum.  (Affirmative.)

24   Q    "Family Engagement"?

25   A    Yes.



1        Q     "Dispute Resolution"?

2        A     Uh-hum.  (Affirmative.)

3        Q     The sixth one is "Data and Georgia Online

4   IEP" and then "GO-IEP" in parenthesis?

5        A     Uh-hum.  (Affirmative.)

6        Q     The seventh is "Georgia Network for

7   Educational and Therapeutic Support," in parenthesis

8   "GNETS"?

9        A     Yes.

10       Q     The eighth is "Tiered Systems of Supports

11  for Students," parenthesis, "MTSS"?

12       A     Yes.

13       Q     The ninth is "Georgia Learning Resources

14  System," in parenthesis "GLRS"?

15       A     Yes.

16       Q     The tenth is "State Systemic Improvement

17  Plan," in parenthesis "SSIP"?

18       A     Yes.

19       Q     And the eleventh, the "Georgia

20  Instructional Materials Center," "GIMC," in

21  parenthesis?

22       A     Yes.

23       Q     Are these eleven sub-bullets eleven

24  separate offices within your division?

25       A     No.  There are major pieces of work.  You



1   know, some are, as we call them, units.  The office

2   of Federal Programs is a division of Special

3   Education, and then we have units that work, but

4   there has never been a separate unit for Systemic

5   Improvement.  It's always been part of another one.

6       Q    Are these same eleven units in existence

7   today?

8       A    Budget and Grants, RDA, Results Driven

9   Accountability.  We don't have a unit called State

10  Initiatives and Discretionary Projects.  I mean that

11  reference is really the funding mechanism there.  We

12  certainly have work going on in that area but we

13  don't have a unit called that.

14          Post-school Outcomes and Professional

15  Learning, that work continues, it's just under a

16  different name, Outreach now.  Outreach and Family

17  Engagement.

18      Q    Okay.  And then going further, are they

19  all the same?

20      A    Dispute Resolution, so Family Engagement

21  moved with Outreach rather than being with Dispute.

22          We still have Data and GO-IEP.

23          GNETS, we have a program manager.

24          And the MTSS unit is not with us any

25  longer.  It moved to the Office of Whole Child.



1       Q     When did that move?

2       A     I'm trying to recall exactly.  It already

3   happened before I became interim director, but

4   somewhere probably earlier in '21.

5       Q     And why did it move?

6       A     Multitierd System of Support, of course,

7   is the full continuum.  MTSS, you know, the services

8   of special education could be identified on that

9   continuum, but it was very associated being housed

10  in our division as a part of Special Education.  Of

11  course it should not be.  So moving it to the Office

12  of Whole Child made sense about the perception.

13      Q     Can you provide a little bit more context

14  by "of course it should not be"?

15            You said it should not be under your

16  division.  Can you just provide a bit more context?

17      A     If I said that, I didn't mean that

18  exactly.  It could be under Special Education, but

19  it would be better if it were under a more neutral

20  stance, so that it wouldn't be thought of as a way

21  to special ed, I guess is one thing.  It's to cover

22  all tiers of instruction:  Tier I, just basic

23  classroom instruction; Tier II, interventions; or

24  Tier III, specialized.

25      Q     Thank you, Ms. Low.  And then moving down,



1   do you still have the Georgia Learning Resources

2   System under your division.

3       A    We do.  It's not a separate unit but it

4   falls under Instruction and Systemic Improvement

5   Unit.

6       Q    That's the next one.  And when did that

7   change happen?

8       A    It was while I was interim director, and I

9   would say late in 2021, or early '22.

10      Q    And why did that change happen?

11      A    Why did that change happen?  Because I

12  wanted an emphasis on instruction for students with

13  disabilities.  And although there had been some work

14  being done, not as explicitly, and I wanted a

15  message.  I wanted that to be conveyed to any

16  stakeholder, within our division, outside our

17  division, that instruction is important to us.

18      Q    How is this message to your stakeholders?

19      A    I speak about it when I have keynote

20  talks.  I talked about it with state advisory panel,

21  of course talked about it with our internal

22  stakeholders within our division and the ESSA side

23  of the house, as well as when we partner with other

24  divisions, like Teaching and Learning, Office of

25  Whole Child, School Initiative Effectiveness.  We



 1   talk about our emphasis on instruction.

 2          That unit often is the one that is

 3   interfacing across divisions, and our directors'

 4   webinars when we talk to directors monthly.  It's in

 5   our email blast when I meet with Parent to Parent,

 6   our PTI for Georgia.

 7          Anybody that is an audience.

 8      Q    Understood.  And then the last one is the

 9   Georgia Instructional Materials Center.  Is that

10   still a unit?

11      A    We actually have contracted the work with

12   Georgia Tech to provide our Braille in large print.

13   I still have a specialist that's the liaison with

14   that.  Two now, actually, that work with that.  A

15   new position that's focused on students with visual

16   impairments and deaf/hard of hearing, and our sister

17   technology specialist has been the key contact there

18   as well.

19          It just made sense to look at the ability

20   to contract rather than trying to make sure that we

21   were able to deliver the requests on time when there

22   is a state partner that is providing services like

23   that for many other states in the nation, too.

24      Q    Are there any units that are not

25   represented in this chart under your division?



1      A     Instruction and Systemic Improvement.

2      Q     Any others?

3      A     Outreach.  Outreach and Family Engagement.

4            I believe that's it.

5      Q     So let's go back.  You mentioned you had

6  two senior program managers?

7      A     Yes.

8      Q     Who are they?

9      A     Amber McCollum and Jamila Pollard.

10     Q     What's Jamila's last name?

11     A     Pollard.

12     Q     What does Amber McCollum oversee?

13     A     Officially she oversees budget, grants and

14 data, but both senior program managers assume that

15 -- you know, that position has also in the past been

16 called assistant director, but the way that our

17 state labels it now, it's senior program manager.

18           In other words, they might step up and

19 lead a meeting.  They of course serve as contact for

20 a lot of other program managers that go to them for

21 advice or support.  They collaborate across the

22 whole division as necessary.

23     Q     Does Jamila Pollard have a focus area as

24 well?

25     A     Jamila is also our legal officer.  So she



1   is a top leader for Dispute Resolution, although

2   there's a program manager as well.  Of course,

3   Jamila's work cuts across every aspect of Special

4   Education.  So you might find her collaborating with

5   Results Driven Accountability or collaborating with

6   Instruction Outreach.  You know, even budget, data

7   reporting, things of that nature, for her

8   perspective and review.

9        Q    And did you add these two senior program

10  managers when you became interim state director?

11       A    Jamila was already a senior program

12  manager.  We promoted Amber rather quickly after I

13  became interim, within maybe the first month.

14       Q    And then who are your eight program

15  managers?

16       A    Okay.  Dr. Scott Smith, he works under

17  Jamila, in Dispute.

18            Vickie Cleveland with our GNETS.

19            Dr. Latonya Barclay Washington leads

20  Outreach and Family Engagement, transitions also in

21  that unit.

22            Results Driven Accountability, it's Lynn

23  Holland and Felicia Peavy. it's such a big unit.

24            So they're both -- they're co-leads.

25            Katherine -- Dr. Katherine Johnson leads



1    Instruction and Systemic Improvement.

2            Malissa Roberts is our budget manager.

3            Linda Castellanos is our data and GO-IEP

4    manager.

5            I'm leaving somebody out.  The two senior

6    program managers.  That makes the 10.

7        Q    And then you mentioned administrative

8    assistant.  What's her name?

9        A    Linda Rawlins.

10       Q    Thank you.  You mentioned that the State

11   Director prior to you holding the position was

12   Zelphine Smith-Dixon, correct?

13       A    Yes.

14       Q    And how long did Dr. Smith-Dixon hold the

15   position?

16       A    I believe five years.

17       Q    What led to Dr. Smith-Dixon's departure?

18       A    Departure?

19       Q    Uh-hum.  (Affirmative.)

20       A    She had an opportunity to join a Local

21   Education Agency.

22       Q    And what Local Education Agency is that?

23       A    Rockdale County schools.  She lives in

24   Rockdale.  Her children go to Rockdale.

25       Q    Before working as state director and



 1  interim state director, am I correct that you held

 2  the title of program manager senior within the

 3  Special Education Services and Supports Division?

 4       A    I did.

 5       Q    And what time period were you in that

 6  position?

 7       A    2018 -- honestly, can't tell you.  March

 8  or April 2018.  Until I was interim.

 9       Q    So until September of 2021?

10       A    Uh-hum.  (Affirmative.)

11       Q    And did you have a focus area as program

12  manager senior within the Division?

13       A    I did.  The area that's about state

14  initiatives and discretionary projects, I did a lot

15  with that.  So teacher retention work.

16            I am the education lead for the -- we call

17  it the CEEDAR work, CEEDAR, C-E-E-D-A-R, is the

18  technical assistant center funded by OSEP out of the

19  University of Florida --

20            THE COURT REPORTER:  Then technical --

21       A    -- technical assistant center from the

22  University of Florida, that worked with states about

23  recruitment, retention of teachers, collaborate with

24  programs with professional standards in Georgia.

25            That's a significant amount of work, but



1  we have an OSEP grant focusing on teacher retention.

2  So I'm the principal investigator on that, applied

3  for the grant, managed the grant.

4           I also work with the University of Kansas

5  with transition.  That was through an IES grant, in

6  collaboration with Dr. Michael Wayne Meyer from the

7  University of Kansas.

8           So it had a lot of active participation in

9  working with all of our LEAs across the State.

10          Transition, Post-Secondary Outcomes were

11 an area of focus.

12          I supervised assistive technology.

13          I worked on accessible materials, led

14 professional learning.

15          Keeping up with all of that, I had -- I

16 was the co-lead on our new Directors Academy that we

17 call SELDA, Special Education Leadership Development

18 Academy.  S-E-L-D-A.

19          Of course, they met monthly.

20          I'm sure I'm leaving out some of my other

21 major areas of focus, but...

22     Q    So there was a lot under your work?

23     A    I did -- I did hire the initial staff for

24 Multi-Tiered System Of Support, when we got that

25 grant through the -- State Personnel Development



1   Grant.  So that would have been -- that was one of

2   my first acts as senior program manager, was getting

3   that grant staffed and off the ground.

4        Q    Do any of these responsibilities still

5   fall directly with you as state director?

6        A    A few.

7        Q    Which ones?

8        A    I'm still the principal investigator on

9   the teacher retention grant.  Slowly moving that

10  forward over to our instructional program manager.

11           I'm still listed as a co-investigator on

12  the work with the University of Kansas.

13           I'm still the education lead with the

14  CEEDAR group.

15           Again, these are all important areas that

16  we have commitments on, and it just made sense to do

17  that.  I'm having a lot of support with the program

18  manager for instruction.

19       Q    When you were a program manager senior,

20  was there another person in that position as well?

21       A    Yes.

22       Q    And who was that?

23       A    Kachelle White.  And Jamila.

24       Q    So there were three?

25       A    Uh-hum.  (Affirmative.)



1　　　Q　　You did not mention Kachelle White

2　earlier.  So Kachelle White is no longer in that

3　position?

4　　　A　　Right.  She left the agency in February --

5　the end of February 2022, to go to Rockdale County

6　as a coordinator.

7　　　Q　　With Dr. Smith-Dixon?

8　　　A　　Well, she was hired in a related field,

9　yes.

10　　　Q　　As program manager senior, who did you

11　report to?

12　　　A　　The state director.

13　　　Q　　So Dr. Smith-Dixon?

14　　　A　　Yes.

15　　　Q　　And earlier you said the last time you

16　were formally evaluated was when you were in this

17　position, correct?

18　　　A　　Yes.

19　　　Q　　And how frequently were you evaluated in

20　this position?

21　　　A　　Typically annually.

22　　　Q　　When you were program manager senior, did

23　you have any direct reports?

24　　　A　　I did.

25　　　Q　　How many?



1   A   I really just had three direct reports, in

2   the later time.  Prior to that I had the whole MDSS

3   team also.  Of course they had a program manager.

4   So their program manager reported directly to me.

5   Q   Who are the three direct reports you're

6   referring to?

7   A   Paula Gumpman, our AT specialist; Elise

8   James, our transition post-secondary specialist; and

9   Kris -- or Kristen Rhee.  She was our PL specialist.

10  She developed some of our modules.

11  Q   Did you evaluate these three individuals?

12  A   Yes, I did.

13  Q   Did you also evaluate the MTSS team that

14  fell under you?

15  A   It would have been Karen, but actually she

16  moved under Dr. Smith-Dixon before it was time to

17  evaluate her formally.

18  Q   Then before working as program manager

19  senior, am I correct that you held the role of

20  education program specialist within the Special

21  Education Services and Supports Division?

22  A   I did hold that role, but I was -- before

23  I was program manager senior, I was a program

24  manager.

25  Q   And how long was that?



1        A     How long was I a program manager?

2        Q     Uh-hum.  (Affirmative.)

3        A     I think it was really only a year.

4        Q     So 2017 to '18?

5        A     I believe that's right.

6        Q     What was your focus area then?

7        A     Results Driven Accountability.

8        Q     And who did you report to?

9        A     Kachelle White.

10       Q     Did you have direct reports then?

11       A     I did.

12       Q     How many did you have?

13       A     I don't remember the exact number.  Eight,

14   nine.  It varied a little bit.  It was half of the

15   Results Driven Accountability unit, the compliance

16   arm.

17       Q     Compliance with what?

18       A     IDEA.

19       Q     And prior to that, you were an education

20   program specialist?

21       A     I was.

22       Q     And what years were you in that position?

23       A     I think 2015 until I became program

24   manager 2017.

25       Q     And what was your focus area then?



1    A    Oh, I was in Results Driven

2  Accountability.  So I was direct liaison, is what we

3  typically refer to the position.

4    Q    How many districts were you a liaison for?

5    A    I supported South GLRS.  It was 12 or 13

6  LEAs in it.  I don't recall the exact number.

7    Q    And just for the record, when you say GLRS

8  you mean --

9    A    Georgia Learning Resource System.  Our

10  regional arm.

11    Q    And who did you report to as a program

12  specialist for RDA?

13    A    Lynn Holland.

14    Q    And did you have direct reports at that

15  time?

16    A    No.

17    Q    Before that, am I correct you were an

18  evaluation systems specialist?  Is that correct?

19    A    That's right.

20    Q    And this was in the division -- which

21  division?

22    A    I think it was called Teacher Leader

23  Effectiveness at that time, I think.

24    Q    So that's not in the Special Education and

25  Supports Division?



1          A    Well, I was doing the special populations.

2    This was during the Race to the Top days and this

3    was the teacher evaluation instrument and student

4    learning objectives, and as it had rolled out, some

5    of the special populations work had been delayed for

6    a few years.  So I supported generally but I did the

7    special populations.

8          Q    And just for the record, you said Race to

9    the Top Days?

10         A    Yes.

11         Q    Thank you.

12              And what time period were you the

13   education -- the evaluation systems specialist?

14         A    From November 2013 until I accepted a

15   position in Special Education in 2015.

16              It was in the summertime.  I don't

17   remember exactly which month, but I want to say July

18   maybe.

19         Q    And who did you report to as the

20   evaluation systems specialist?

21         A    Michelle Purvis was my program manager.

22         Q    Did Michelle Purvis evaluate you?

23         A    Yes.

24         Q    Annually?

25         A    Yes.



1     Q    And did you have direct reports at that
2   time?
3     A    No.
4     Q    Did you hold any other roles at the
5   Georgia Department of Ed?
6     A    No.
7     Q    What was your job directly prior to that?
8     A    Director of Student Services with
9   Carrollton City schools.
10     Q    And what was your time period for this
11   position?
12     A    1997 through September 30th, 2013.
13     Q    As Director of Student Services, did you
14   interact with the Burwell GNETS program?
15     A    I did.
16     Q    In what ways?
17     A    Well, I was a special ed director for the
18   district as a part of my student services
19   responsibility.  So any of our students that were
20   being considered as needing referral, of course I
21   attended IEP meetings, met with the Burwell
22   personnel and our collaborating LEAs in our area,
23   which is Carroll County and Heard County, to ensure
24   we had a cooperative agreement in place to provide
25   the services and supports above and beyond any



1  funding that may have come from the state funds.

2      Q    Who was the regional director of the

3  Burwell GNETS program at that time?

4      A    David Cruddock was the first director,

5  Linda Phillips was the next, and Steve Raines was

6  the last Burwell director, and he was still there

7  when I retired.

8      Q    Is he still there now?

9      A    I don't think so.  I think he retired.

10     Q    Approximately how much of your week was

11 spent interacting with the Burwell regional GNETS

12 program?

13     A    That would just vary on what might be

14 happening, but not -- not a major portion of an

15 entire week.  I tried to attend all IEP meetings

16 with our students.  Of course, we had personnel

17 there for them.

18          It just depended again on what might be

19 happening.

20     Q    How many sites did the Burwell regional

21 GNETS program have when you were there?

22     A    Carroll County, Carrollton City, and Heard

23 were together, and there were two facilities.  That

24 was in this northern cluster.

25          I think Coweta had two with just Coweta



1  kids, and then Meriwether and Troup County were

2  together, and I know that they had an integrated

3  high school wing that was built specifically as

4  Callaway High was built, which we were all really

5  excited about.

6          I don't honestly know where their younger

7  age program was, but I assume it was somewhere on a

8  campus there.

9      Q    So you mentioned integrated high school

10 wing, but you mentioned four other facilities in

11 Burwell.  Were those centers?  Separate GNETS

12 locations?

13     A    I probably really can only speak to mine

14 because, again, geographically, we were almost down

15 to Columbus and, you know, all the way up to I-20.

16 But Carrollton City, Carroll County, and Heard

17 County were that northern cluster.  And we had a

18 center-based program and a high school program

19 integrated into Central High, Carroll County

20 schools.

21     Q    Thank you.  Prior to being Director of

22 Student Services, you were also a teacher in Carroll

23 County?

24     A    No.

25     Q    No?  Okay.



1      A     I was a diagnostician in Carroll County.

2            My title was diagnostic lead teacher, but

3    I worked --

4            THE COURT REPORTER:  I'm sorry.  Your

5        title was what?

6      A     Diagnostic lead teacher.  There were three

7    of us to serve the whole county and we worked with

8    the psychologists.  So we worked out of the

9    psychological services for Carroll County schools.

10           I evaluated students, the academics, the

11   behavior rating scales or adaptive scales, things

12   like that.  I was the first person to see the child.

13   If I needed to do an observation, I did that.

14   The -- turn over to my partner, school psychologist,

15   and then typically the diagnosticians got back the

16   eligibility.

17           This is a long time ago when it was a

18   centralized eligibility process, before the law even

19   had parents involved in that.  So we wrote the

20   eligibilities and sent it back out to the school,

21   and they of course had the IEP meetings, the

22   eligibility meetings, whatever they needed.

23     Q     Did you evaluate students who were being

24   referred to GNETS at that time?

25     A     It wasn't called GNETS, but we evaluated



1   any student that was referred in Carroll County

2   schools.

3        Q    What was it called?

4        A    Psycho Ed program.

5        Q    And what year was this or what years?

6        A    I went to work for Carroll County schools

7   early in 1990.  I moved to -- from Jasper to

8   Carrollton in January, February 1990, and until I

9   was hired as student services director in Carrollton

10  City.  So there was a county and state system.

11       So that would have been summer of '97.

12  Roughly eight years as a diagnostician.

13       Q    Got it.  Did you also visit the Burwell

14  regional GNETS program while you were a

15  diagnostician?

16       A    Only on rare occasions.

17       Q    And what would those rare -- what would

18  lead to that type of occasion?

19       A    I might be invited to attend an IEP

20  meeting.  That would have been unusual but I might

21  have gone on that occasion, either in place of the

22  assistant director or director of special education

23  for the county.  We reported directly to the

24  director and assistant director.

25       Q    I believe a moment ago you said you had



1   moved there from Jasper; is that correct?

2        A    Uh-hum.  (Affirmative.)

3        Q    And were you employed in Jasper?

4        A    Pickens County schools.

5        Q    And what was your position?

6        A    I was a teacher.  Middle grades teacher.

7        Q    And how long were you a middle grades

8   teacher?

9        A    Six years.

10       Q    Did you have any interaction with the

11  Northstar Regional GNETS program while you were a

12  teacher?

13       A    I don't think it was called Northstar.  I

14  don't recall anything about a Psycho Ed program.

15  You know, I had some students in my classroom that

16  were serving in special education, but not aware of

17  any children that were served anywhere other than on

18  our own campus.

19       Q    And you had students in your classroom

20  that were receiving special education services?

21       A    I did.

22       Q    And were you a general education middle

23  school teacher?

24       A    I was.  Uh-hum.  (Affirmative.)

25       Q    Any jobs prior to that?



1        A    Worked in a pharmacy as a pharmacy tech.

2        Q    Any jobs in education prior to that?

3        A    No.

4        Q    And was pharmacy tech before or after

5   college?

6        A    After high school and during part of

7   college.

8        Q    Thank you for going through your job

9   history.

10            Did we miss anything?

11       A    I don't think so.

12       Q    I'd like to turn back to your position --

13  some of your positions within the Georgia Department

14  of Education.

15            So let's start with the evaluation system

16  specialist, which you said you held from November

17  2013 through the summer of 2015.  Is that correct?

18       A    That's right.

19       Q    Did you work with the GNETS program

20  manager for GaDOE while you were evaluation system

21  specialist?

22       A    As a matter of fact, I did but there

23  wasn't a manager position.  There was a contact

24  person, Sandy DeMuth.  And I would say collaborate

25  is maybe the word.



1    Q    You said collaborate?

2    A    Well, we were two different areas, in two

3  different offices, divisions, and I supported the

4  GNETS programs in the roll-out of the student

5  learning objectives.

6         So Sandy was my contact to attend their

7  monthly meetings or retreat or whatever I needed to

8  do with the collective group.

9    Q    And you attended monthly meetings?

10   A    I didn't attend every month.  It was just

11  when -- if I might be on an agenda or asked to come.

12  I went to one of their retreats.

13   Q    You went to one retreat with the GNETS

14  directors?

15   A    Because we were -- the program, uh-hum.

16   Q    Because you were presenting on --

17   A    Yes.

18   Q    -- the program?

19   A    I was presenting on the student learning

20  objectives and someone else was presenting on the

21  evaluation piece, the observation for leaders and

22  teachers.

23   Q    And when was this retreat?

24   A    It was in the summertime.  So I would say

25  that it was the summer of 2014, but I'm not



1   absolutely positive.  It would have been summer of

2   2014 or '15.

3        Q    Okay.  Did you work with anyone else at

4   GaDOE on matters related to the GNETS program when

5   you were an evaluation system specialist?

6        A    I didn't interact a lot with the Special

7   Ed Division other than with Sandy.  Some with Lynn

8   Holland, and that would have involved assessment and

9   -- I'm trying to remember the name.

10       Q    What type of assessment?

11       A    Like assessing students.  You know,

12   testing, evaluating work, and that type of thing.

13   Because student learning objectives went along with

14   that and assessment development.  So we would teach

15   the teachers, leaders to develop quality assessments

16   to measure how the students were doing, you know,

17   based off the standards and the depth of knowledge

18   of the questions, and things like that.

19       Q    You just said based off the standards.

20   What standards?

21       A    The Georgia standards, but I don't

22   remember what we exactly called them then.  They

23   weren't the Georgia standards of excellence.  I

24   don't think then.  I'm not sure of what the name was

25   at the time.  But the Georgia standards.



1    Q    And you said you worked with the regional

2  GNETS programs as their student learning objective

3  contact?

4    A    Yes.  So I helped them with building

5  assessments and what the concept was completely.

6  Again, as I mentioned about depth of knowledge and

7  the true/false questions or multiple choice or week

8  test items.  You know, that type of instruction.

9    Q    Were -- was it just the regional GNETS

10  program under your purview.

11    A    No, no.

12    Q    What --

13    A    I -- I had 64 LEAs and the GNETS.  So I

14  guess we could take away the 24 GNETS.

15    Q    So just to make sure I understand, so you

16  had 40 LEAs and 24 GNETS?

17    A    Uh-hum.  (Affirmative.)

18    Q    So the GNETS were separate from their

19  LEAs?

20    A    Not necessarily.  They may have attended

21  collective sessions because we would host two,

22  three, four days at a time of assessment building,

23  and if it was hosted in Carroll County, or

24  Carrollton City, the GNETS would come and

25  participate along with everybody else.



1      Q    But you counted them separately in your

2    count, the 64?

3      A    I said I had 64, just because I know we

4    have 24 GNETS.  That would be 40 others.

5      Q    Okay.

6           MS. TUCKER:  I'd like the court reporter

7      to mark the following document as Plaintiff's

8      Exhibit 921.

9           (WHEREUPON, Plaintiff's Exhibit-921 was

10          marked for identification.)

11   BY MS. TUCKER:

12     Q    Ms. Low, this is an email thread produced

13   by the State.  The most recent email is dated July

14   10, 2015, and it is from you to Desiree Woods.

15          The subject reads:  "Spreadsheet-Needs

16   corrections."

17          And the Bates number on the bottom of the

18   first page reads GA03549245.

19          Ms. Low, do you recognize this email

20   thread?

21     A    I don't recall specifically.  It looks

22   like something that I would have written at that

23   time based on the work that I was doing.

24     Q    Do you have any reason to doubt its

25   accuracy?



1     A     No.

2     Q     And am I correct that at the time of this

3   email, Desiree Woods was the director of the

4   DeKalb-Rockdale GNETS program?

5     A     Yes.

6     Q     Does she still hold that position?

7     A     She retired.

8     Q     She retired.  When was that?

9     A     Recently.  They just replaced her.  There

10  was an interim, and they just have a permanent

11  replacement now.  So I'm guessing Desiree retired

12  some time over the summer.

13    Q     Do you see -- let's look at your top

14  email.  You wrote, quote:  "Your spreadsheet still

15  has concerns.  Please review the individual

16  calculated expected and high targets.  Many are the

17  same despite the differences and the pre-assessment

18  scores.  If you don't provide the correct

19  calculation, it will highly impact growth

20  calculations."

21          Do you see that?

22    A     Yes.  Uh-hum.  (Affirmative.)

23    Q     What type of spreadsheet was Desiree Woods

24  sending you?

25          MR. BEDARD:  Object to form.



1          You can answer.

2     A    So, again, this was all about building

3   student learning objectives, and, you know, that was

4   an opportunity for the schools or the district to

5   determine, based on the standards, they got to

6   choose what student learning objectives they felt

7   were -- we used to say sometimes the power

8   standards -- the most important standards to

9   measure.

10         And the spreadsheet -- so if we're looking

11  at pre-assessment scores, your hope would be your

12  pre-assessment scores are lower, that the kids don't

13  know the content, and that the post would be higher

14  and you would show growth.

15         But I don't remember the exact, but, in

16  other words, I was probably telling her that she was

17  setting targets that were -- she wasn't going to

18  show growth with, that she was not being ambitious

19  enough to raise the target or something like that.

20         We did everything with spreadsheets back

21  then instead of like a -- an application that they

22  interface with now if they were doing it.

23    Q    So I'm looking at the second sentence:

24  "Many are the same despite the differences in the

25  pre-assessment scores."



1              You see that?

2         A    Uh-hum.   (Affirmative.)

3         Q    So based on what you were explaining, it

4    seems as there was no growth for this regional GNETS

5    program?

6         A    This is when they're setting targets.  So

7    they were not -- they were not setting the targets

8    so they could allow any growth.

9         Q    Got it.  Can you give me an example of a

10   type of target?

11             I know you don't remember this one

12   particularly but --

13        A    I don't.

14        Q    But an example of what a program --

15        A    It would have been multiple -- oh, you

16   could take any standard.  I don't know.  Multiply

17   with two digit numbers, that type thing, and that

18   would be -- we might say that is a key standard for

19   second graders, and everybody in second grade in

20   that school district would be measured by that same

21   standard.  It wasn't classroom by classroom so that

22   you could compare growth.

23        Q    And in this instance the regional GNETS

24   program can select their standard to be measured?

25        A    They typically went with one of the LEAs.



1   In the cluster that I was director in, Carroll

2   County was the largest system by far, three times

3   the size of Carrollton City, and three or four times

4   the size of Heard County.  So the textbooks were

5   adopted that were Carroll County books, and things

6   like that.  So with assessment, all their

7   assessments mirrored whatever Carroll County schools

8   did just because it was the larger, and that was in

9   the memorandum of understanding or agreement that we

10  all had.

11          We called it really informally the

12  collaborative agreement, and it would say that they

13  would mirror whatever Carroll County did because

14  they were just the dominant group.

15      Q   And that was your recollection from when

16  you were head of Carroll County?

17      A   Oh, yeah.  I can remember being at Central

18  High doing some of this development, and GNETS was

19  there.

20      Q   Got it.  And then -- but this is -- but

21  this example is DeKalb-Rockdale sending something

22  separately from DeKalb and Rockdale Counties?

23      A   I don't think so.  I think it was

24  something that she was working on, but it would have

25  been in conjunction with DeKalb and Rockdale.



1      Q    And you received other spreadsheets like

2   this from regional GNETS programs?

3      A    I did and from every LEA that I supported.

4      Q    And every LEA, okay.

5           And then what steps were taken if there

6   was no growth reported?

7      A    You mean at this level or like when

8   everything came out in the summative results?

9      Q    When everything came out in the summative

10  results.

11     A    Student growth was rolled out during the

12  -- again, under the grant of Race to the Top, and it

13  was eventually generalized to everybody across the

14  State.

15          The growth measures of course were

16  reported in conjunction with assessment division,

17  but the growth measures were supposed to be

18  calculated into the evaluation for the teacher and

19  the leader.  So it had an impact.

20          Of course, growth measures were used on an

21  individual basis with students, too.

22     Q    But would there be any steps if there was

23  minimal or no growth that you would take in GaDOE?

24     A    I wouldn't have had direct -- GaDOE, no.

25  But -- again, it was in the TKES and LKES, teacher



1   keys, effectiveness system, and leader keys

2   effectiveness system, which this all fell under.  It

3   would impact the evaluation, the employee's

4   evaluation, the teacher's evaluation, and the

5   leaders.  The same thing fed into the leaders.

6          So I was not involved with talking with

7   anybody about how it might have impacted or taken a

8   step like that because that wasn't my role to do,

9   but, you know, certainly I'm sure that their

10   supervisors probably spoke with them.

11      Q    So what was your role once you received

12   the summative results?

13      A    It came out of another part of the work.

14      Q    Okay.

15      A    Not mine.

16      Q    Okay.  So you helped them set the student

17   learning objectives and --

18      A    And I, again, helped them develop the

19   actual assessment.  Whether it was about -- oh, I

20   don't know what the name of the class is now, to

21   tell you the truth.  But like I was helping one

22   teacher develop about the marking of pig's ears, you

23   know, like in an agriculture course.  So we

24   literally used whatever content standards the course

25   taught and tried to help them come up with quality

1   assessments to measure this.

2       Q    How many assessments did you help develop

3   for a regional GNETS program, as an example?

4       A    My recollection is GNETS were all

5   integrated with their -- when their LEAs came

6   together.

7       Q    Then how many assessments would you

8   create?

9       A    Hundreds.

10      Q    Okay.

11      A    Because you'd have teams -- might have 150

12  teachers working on every course that they had.  You

13  know, elementary, middle, and of course all those

14  high school courses that went out into the

15  vocational areas, too.

16      Q    Thank you.

17          MR. BEDARD:  If you're done with that,

18      it's been an hour and 20.  You want to take a

19      break, or if you have a section to finish up?

20          MS. TUCKER:  Just a couple more pages.

21      Like maybe five or 10 minutes, if that's okay.

22          MR. BEDARD:  Great.

23          MS. TUCKER:  Thank you.

24          I'm going to ask the court reporter to

25      mark the following document as Plaintiff's



```
 1        Exhibit 922.
 2             (WHEREUPON, Plaintiff's Exhibit-922 was
 3         marked for identification.)
 4   BY MS. TUCKER:
 5        Q    This is an email thread produced by the
 6   State.  The most recent email is August 2nd, 2015.
 7             The subject reads:  "New SLO Contact
 8   information."
 9             And the Bates number on the bottom first
10   page reads GA03549486
11             Ms. Low, do you recognize this email
12   thread?
13        A    I don't recognize the email.  I do see
14   that it was from me and between Stacey Benson.
15        Q    But you have no reason to doubt that it
16   was yours?
17        A    I don't.  I collaborated with Stacey and
18   supported her in the work we've been discussing with
19   SLOs.
20        Q    Am I correct that Stacey Benson was the
21   director of the Futures Regional GNETS program?
22        A    As I recall, she was director already.
23        Q    Do you know if she still holds that
24   position?
25        A    She does.
```



1      Q    Then if with go down to her signature

2   block in the middle, do you see that it says Futures

3   Program GNETS Director?

4      A    Yes.

5      Q    Let's look at the first email in the

6   thread.  It's from you on July 31st, 2015.  It's at

7   the bottom of the second page.

8      A    Oh.

9      Q    Do you see that?  From you at 1:19 p.m.

10          It reads, quote:  "It has been a pleasure

11  to serve as your SLO contact.  I'm extremely proud

12  of the work accomplished and your ongoing commitment

13  to the effective use of Student Learning

14  Objectives."

15          Do you see that?

16     A    Uh-hum.  (Affirmative.)

17     Q    And this is what we were just talking

18  about that you were doing with DeKalb-Rockdale as

19  well, the student learning objectives?

20     A    Yes.

21     Q    Let's look at the top email.

22     A    On the first page?

23     Q    Yes.  The third paragraph.

24          Do you see, quote:  "I want you to know

25  that I loved working with the GNETS.  There is not a



1  better group of professionals.  I appreciate all

2  that you do"?

3        Do you see that?

4    A    I do.

5    Q    And then what type of work were you

6  referring to, just the student learning objectives?

7    A    Yes, just the student learning objectives.

8    Q    And how often were you communicating with

9  the regional GNETS programs related to the student

10  learning objectives?

11    A    Depended on what time of the year it was.

12  If they had things due, then I might be talking to

13  them multiple times a day.  But it just varied.

14  Just the same frequency I would have with any LEA.

15    Q    Got it.  And just to give me the calendar

16  year, can you tell me when the busy time is?

17    A    It was at -- like August, the summer and

18  August, because they were setting the objectives and

19  getting everything ready for the school year.

20        And then we had three different reporting

21  periods, that they only had to really report at the

22  beginning and the end, but we had those interim

23  reporting periods because we could tell them if they

24  were missing data, were off track, you know, things

25  of that nature.  And most people complied with the



1   interim reporting, so that we didn't wait until the
2   end of the year and then get to a thousand errors or
3   something in it.  Which happened with one large
4   district.
5       Q   So you're speaking from experience with
6   those errors.
7            And then I see you are speaking to the
8   GNETS director here and with the other exhibit we
9   looked at.  Did you also connect with other regional
10  GNETS program staff --
11      A   Yes.
12      Q   -- when you were an SLO?
13      A   Sure.  I mean I worked directly with their
14  teachers, if that's what you mean.
15      Q   Any other staff?
16      A   Coordinators.  I mean the person that
17  served like the principal, and then the director.
18  But the teachers primarily built assessment.  So
19  that was -- I might speak to the directors, but then
20  when they sent them to the session to do the -- you
21  know, they needed experts in that content to come.
22      Q   Thank you.  Just one more exhibit and then
23  we'll take a break.
24           MS. TUCKER:  I would like the court
25       reporter to mark the following document as



1        Plaintiff's Exhibit 923.

2            (WHEREUPON, Plaintiff's Exhibit-923 was

3        marked for identification.)

4   BY MS. TUCKER:

5        Q    This is an email thread produced by the

6   state dated November 30, 2015.  The most recent

7   email thread is from Linda Castellanos to you and

8   the subject reads:  "SLO question."

9            The Bates number on the bottom of the

10  first page reads GA03552093.

11           Ms. Low, do you recognize this email

12  thread?

13       A    Now where am I in?

14           MR. BEDARD:  Can you say that number

15       again?  I've got -- the number I've got is

16       03549403.

17           MS. TUCKER:  Thank you.

18           MR. BEDARD:  That's the one I've got.

19           MS. TUCKER:  Let's take that one back.

20       Thank you.

21           MR. BEDARD:  Yep.

22           MS. TUCKER:  We'll start again.  This will

23       be Plaintiff's Exhibit 923.

24           MR. BEDARD:  3552093?

25           MS. TUCKER:  Yes.  I'm going to introduce



1       it again.

2   BY MS. TUCKER:

3       Q    This is an email thread produced by the

4   State, dated November 30, 2015.  The most recent

5   email of the thread is from Linda Castellanos to

6   you, and the subject reads:  "SLO question."

7            The Bates number on the bottom of the

8   first page reads GA03552093.

9            Do you recognize this email thread,

10  Ms. Low?

11      A    I don't recall it, but it appears it is

12  with Linda.

13      Q    And no reason to doubt it?

14      A    I don't.

15      Q    And then am I correct that Linda

16  Castellanos is sending this to you after you no

17  longer serve as an SLO contact?

18      A    Yeah.  It does look like she sent it to me

19  when I already was in the division.  The Special Ed

20  Division, I should say.

21      Q    And looking at her email, is she asking

22  you for guidance about reporting information related

23  to the SLOs?

24      A    Let me read it.

25      Q    Take a moment.



1              (Witness reviews exhibit.)

2     A    Yes.  What did you want to know?

3     Q    I wanted to make sure you saw that and

4    then we can talk about the document.

5              So Linda Castellanos is asking you

6    questions about reporting for the SLOs, correct?

7     A    Yes.

8     Q    Your response, do you see that?  At

9    November 30, 2015, at 11:50 a.m., you wrote that,

10   quote:  "GNETS were established as their own LEA for

11   the SLO reporting purposes because of some of these

12   challenges."

13             Do you see that?

14    A    Yes.

15    Q    What do you mean by some of these

16   challenges?

17    A    Because we have a lot of shared services

18   in GNETS.  So there are rare instances that -- well,

19   for example, Coweto County kids were served in

20   Coweta County buildings, so that's not a problem.

21   But when you have the Carrollton City, Carroll

22   County, and Heard County, where did the scores rest?

23             And it was just as I was explaining about

24   the go-back to the teacher and to the leader.

25             So I didn't make this decision but



1   somebody in our department or the -- I think they

2   used to call it the TAC, the technical assistants,

3   whatever, the national experts too -- said it's not

4   really right to send it back to teachers' classes in

5   the home school when they didn't even instruct the

6   child.

7           So they had to establish them like an LEA.

8   They were not an LEA.  So that the reporting would

9   feed back to the leader of the building and the

10  teacher that taught the child.

11          The certificate number, like we referenced

12  in here, that's how it went back.

13      Q    Understood.

14      A    And then there are rules how many days

15  they have been in the class.  They had to have been

16  in a certain number to count.

17      Q    So the regional GNETS programs were

18  distinct in this instance, correct, for the

19  reporting?

20      A    It was just tracking it back to the

21  teacher and leader, where the instruction was

22  provided.

23      Q    Are there instances of data reporting

24  where GNETS are also identified as their own LEA

25  that you're --



1        A     No.  I mean they feed back to the origin,

2   the home school, the home district.

3             MS. TUCKER:  Let's go ahead and take

4        break.

5             It's 10 -- almost 10:30.

6             THE VIDEOGRAPHER:  Going off the record at

7        10:27.

8             (A recess was taken.)

9             THE VIDEOGRAPHER:  We're back on the

10       record at 10:50.

11  BY MS. TUCKER:

12       Q     Welcome back, Ms. Low.

13             So let's move on to your role as the

14  education program specialist within the Special

15  Education Supports -- Services and Supports

16  Division.

17             Then earlier you testified that you held

18  that position from 2015 to 2017, correct?

19       A     Yes.

20       Q     Did you work with the GNETS program

21  manager for GaDOE while you were an education

22  program specialist?

23       A     I don't think we had a program manager for

24  GNETS until -- I don't know, maybe 2016 or

25  something.



1    Q    So prior to 2016, when you were an

2  education program specialist, did you work with

3  anyone in GaDOE related to the GNETS program?

4    A    No, I didn't work with them that I recall.

5    Q    Were you no longer working with Sandy

6  DeMuth?

7    A    Well, when I came to the Special Ed

8  Division it was not one of may duties to collaborate

9  with Sandy.

10    Q    And you just said that in 2016 you believe

11  is when GaDOE hired a GNETS program manager?

12    A    Somewhere in that time, while I was --

13  while I was still a program specialist, the first

14  program manager that I know anything about was hired

15  and her cubicle was across from mine.  That's the

16  only reason I know that.

17    Q    And who was that?

18    A    Nakeba Rahming.

19    Q    But you did not interact with her?

20    A    Not more than just hey.

21    Q    Office friends?

22    A    Logistical kind of things.

23    Q    When you were education program

24  specialist, did you work with the regional GNETS

25  programs?



1      A    When I was a program specialist?  Well, if

2   they came to our collaborative communities that we

3   meet monthly, I may have interacted.

4      Q    What are collaborative communities?

5      A    It's essentially bringing the special ed

6   directors together in a -- it's a GLRS region as

7   opposed to a RESA region, but they're essentially

8   the same thing.

9          To meet monthly and to collaborate with

10   each other collegially.  Of course there's a time

11   for professional learning, and the district liaison,

12   the position you were talking about, typically

13   attends.

14      Q    Thank you.  Then you were the program

15   manager from 2017 to 2018.  At that time did you

16   work with the GNETS program manager for GaDOE?

17      A    I don't recall any.

18      Q    Did you work with anyone else related to

19   the GNETS program at GaDOE when you were in that

20   position?

21      A    I don't recall at all if there was any

22   interaction.

23      Q    And then did you work with the regional

24   GNETS program when you were a program manager at

25   GaDOE?



1      A    Is that not the same thing we just said?

2      Q    I was asking you about the GNETS program

3  office within GaDOE before, and I'm now asking if

4  you interacted with any of the regional GNETS

5  programs specifically?

6      A    Only if they were in the collaborative

7  communities.

8      Q    So same answer?

9      A    Yeah, they're not an LEA, so working

10 directly with LEAs included them but maybe I wasn't

11 working directly with them.

12     Q    Thank you.

13          And then following you served as a program

14 manager senior within the Special Education Services

15 and Supports Division?

16     A    Yes.

17     Q    And that was from March or April 2018

18 through September of 2021?

19     A    Yes.

20     Q    And did you apply for this position?

21     A    For the senior program manager?

22     Q    Uh-hum.  (Affirmative.)

23     A    I did.

24     Q    What led you to apply for the position?

25     A    I was encouraged.



1     Q    By whom?

2     A    By Zelphine Smith-Dixon.

3     Q    And did you interview for the position?

4     A    I did.

5     Q    Who did you interview with?

6     A    I'm not sure that I remember.  I think it

7  was Kachelle and John White.  And Zel.

8     Q    And as program manager senior, did you

9  work with Nakeba Rahming?

10    A    No.

11    Q    Did you work with other people at GaDOE

12 related to the GNETS program office when you were

13 program manager senior?

14    A    You know, in the spring of 2018 is when

15 Nakeba had surgery, so her position was vacant for a

16 while.  Vickie Cleveland was working as one of our

17 district liaisons and I was her supervisor, and she

18 was tapped to be the GNETS program manager in the

19 interim there.

20         So the only interactions that I

21 particularly would have had with the GNETS would

22 have been if somebody asked me to interact with

23 them.

24         We did some training, of course,

25 specifically for GNETS, if we were asked by Vickie.



1  Like some transition, you know, training, things

2  like that.

3       Q    What do you mean by transition training?

4       A    Transition planning for students with

5  disabilities.  By the ninth grade, or when they turn

6  16, whichever comes first, you have to have a formal

7  transition plan, and whatever resources we provided

8  to every LEA, of course that would be available to

9  the GNETS, too.

10       Q    And this was transitioning -- for

11  transitioning out of school?

12       A    Uh-hum.  To post-secondary.

13       Q    Who tapped Vickie Cleveland for this

14  position?

15       A    I'm' assuming Zel did, but I don't know.

16  I mean I just was notified that Vickie was going to

17  serve in that role and that we would have to replace

18  her.

19       Q    As a district liaison?

20       A    Yes.

21            MS. TUCKER:  I'd like the court reporter

22       to mark the following document as Plaintiff's

23       Exhibit 924.

24            (WHEREUPON, Plaintiff's Exhibit-924 was

25        marked for identification.)



1   BY MS. TUCKER:

2       Q     This is an email thread produced by the

3   State.  The most recent email in the thread is dated

4   April 10, 2018.  It's from Vickie Cleveland to you.

5             The subject reads:  "E-Performance."

6             The Bates number on the bottom of the

7   document is GA03584228.

8             Ms. Low, do you recognize this email

9   thread?

10      A     I don't remember it, but I do believe that

11  it was to me and a response from me.

12      Q     And you have no reason to doubt it?

13      A     No.

14      Q     Okay.  Let's look at the bottom email

15  that's from Vickie Cleveland, where she wrote,

16  quote:  "Nakeba would like for you to complete my

17  e-performance for this year."

18            Do you see that?

19      A     Uh-hum.  I do.

20      Q     What is an e-performance?

21      A     It's just an electronic platform to enter

22  the evaluation.

23            I think the difference we're referencing

24  here is we did evaluations on paper for a long time,

25  and this was probably the year that there was a push



1  to make sure that they were in a platform.

2        Q    So this is her performance evaluation?

3        A    It is.

4        Q    Does this mean that Vickie Cleveland

5  reported directly to you as GNETS program manager?

6        A    No, she has not.  I don't recall the

7  specifics of the timing of all this, but it sounds

8  like Nakeba had told Vickie she had worked for me

9  the majority of the year as a DL and Nakeba was just

10  saying would you go head and do the annual

11  evaluation.

12        Q    So the following year, you also evaluate

13  Vickie Cleveland?

14        A    I don't remember evaluating her, but I, I

15  do vaguely, after reading this, remember that that's

16  typical for us to do, if somebody has had the

17  employee for the majority of the year, and let's say

18  the last two months they've changed to a new

19  manager, we very often will ask the previous manager

20  to do that.

21             But I don't think I evaluated her after

22  that.

23        Q    Okay.  How would you characterize Vickie

24  Cleveland's evaluations when you did evaluate her?

25        A    Vickie's evaluation was good.  She's a



1  high performer, goes over and above.

2      Q    Have you noted any areas of improvement on

3  her evaluations in the past?

4      A    I don't recall any.

5      Q    Since Vickie Cleveland has been GNETS

6  program manager, how often do you communicate with

7  her?

8      A    I may communicate with her frequently at

9  times because of events or situations that may

10  happen, but we have a regular standing meeting every

11  other week, on Wednesdays at 9:00, and she meets in

12  leadership every Thursday at 2:00.

13      Q    When you say that you have an every other

14  week meeting with her on Wednesdays at 9:00, who

15  else attends those meetings?

16      A    Typically, Lakesha Stevenson, who is the

17  program specialist.  Sometimes Shaun attends.

18          I don't recall anybody else attending that

19  meeting.

20      Q    And when did these meetings, every other

21  week meetings, start?

22      A    They had already started when I assumed

23  the interim role.  This was the pattern that they

24  had.

25          We have met weekly but I felt like every



1   other week would be sufficient.

2          Vickie calls me if anything she needs to

3   tell me or ask me.  So I'm very accessible to her

4   and she's very, very good about contacting me.

5      Q    And when was the change from weekly to

6   every other week for these meetings?

7      A    I think since I've been interim and

8   director, it was just every other week, but it was

9   previously weekly.

10     Q    And what's discussed at these meetings?

11     A    It depends on what's going on.  If she has

12  news from the field that a director has called

13  concerned about something.

14         If she has any kind of concerns or

15  positive things that have happened, any kind of

16  resources that she may need or ideas that she has to

17  support them.  We don't have control of the program.

18  It's the local LEAs, so.

19     Q    Does she send an agenda prior to these

20  meetings?

21     A    Every now and then.  Not necessarily each

22  meeting.

23     Q    You also mentioned she attends a

24  leadership meeting every Thursday at 2:00?

25     A    Uh-hum.  Yes.



1      Q    What leadership?

2      A    It's the leadership meeting with my

3   program managers and senior program managers.

4      Q    So leadership within the Special Education

5   Services?

6      A    Yes.

7      Q    -- and Supports Division?

8      A    Uh-hum.

9      Q    We'll do our best to not --

10     A    I'm sorry.

11     Q    It's okay.  It makes sense in conversation

12   but for the record.  Thank you.

13          A moment ago you -- you stated, "I may

14   communicate with her frequently at times because of

15   events or situations that may happen."

16          What types of events or situations would

17   lead for to you speak with her more frequently?

18     A    Well, it could be something that we're

19   trying to roll out from the Division, and she's

20   calling to ask me who to call about something.  Or

21   when we have a contract renewal, it may be something

22   of that nature.

23     Q    What type of contracts would she be

24   involved with?

25     A    She has a contract with the company that



1  owns iReady.  That's been a source of conversation

2  recently about renewing it or not and things like

3  that.

4       Q    What's iReady?

5       A    It's just an online program that helps

6  measure the student's growth and also does

7  remediation.  It's a very typical program.  A lot of

8  school districts have it.

9       Q    And this is something that the GNETS

10  program uses?

11       A    It is something that is available, that

12  the program uses, if they choose to, at their

13  regional level.

14       Q    And what is the discussion right now

15  surrounding keeping it?

16       A    To provide the funding for it if the

17  regional areas want it, but let them have the

18  contract.

19       Q    And who's involved in these conversations?

20       A    Just Vickie and I have talked about that.

21       Q    Have you made a decision yet?

22       A    No.

23       Q    A moment ago you mentioned Lakesha

24  Stevenson?

25       A    Uh-hum.  (Affirmative.)



1    Q    What's her role?

2    A    She's a program specialist.

3    Q    For GNETS?

4    A    For GNETS.

5         MS. TUCKER:  I'd like the court reporter

6    to mark the following document as Plaintiff's

7    Exhibit 925.

8         (WHEREUPON, Plaintiff's Exhibit-925 was

9     marked for identification.)

10   BY MS. TUCKER:

11   Q    This is an email thread produced by the

12   State.  The most recent email in this thread is

13   dated August 2nd, 2018.  It's from you to Vickie

14   Cleveland.  The subject reads:  "GNETS Program

15   Specialist Interviews," and there's one attachment.

16        The Bates number on the bottom of the

17   first page of this document reads GA00330300.

18        Mrs. Low, do you recognize this email

19   thread?

20   A    I don't recall it but yes.  I mean it --

21   Q    Do you have any reason to doubt it?

22   A    I don't.

23        THE VIDEOGRAPHER:  Going off the record at

24   11:08.

25        (Discussion ensued off the record.)



```
 1              THE VIDEOGRAPHER:  We're back on the
 2         record at 11:08.
 3    BY MS. TUCKER:
 4         Q    Let's go to the bottom email from Vickie
 5    Cleveland to Felicia Peavy.
 6              Do you see that email?
 7         A    I do.
 8         Q    You mentioned Felicia Peavy earlier.  What
 9    role did she have when Vickie sent this email?
10         A    When I became senior program manager, she
11    became program manager in my place.
12         Q    So program manager?
13         A    Yes.
14         Q    Is she still in that role?
15         A    Yes.
16         Q    And am I correct from looking at this
17    email that Vickie Cleveland is including you in
18    GNETS program specialist interviews?
19         A    That's the way it appears.
20         Q    Why is that?
21         A    Well, I was the senior program manager by
22    this point.  So I guess she wanted to include one of
23    the senior program managers, and then she's
24    including Felicia.
25         Q    Felicia.  Thank you.
```



1           So when you were senior program manager,
2    was the GNETS program under your responsibilities?
3        A    No.  When we do interviews, we typically
4    like to have managers serve on that.  So I'm sure
5    she was trying to round up some managers to be on
6    the interview committee.
7        Q    And do you -- was there a different senior
8    program manager that oversaw the GNETS program at
9    that time?
10       A    No.
11       Q    Is there now?
12       A    No.
13       Q    Did you participate in these interviews?
14       A    I don't remember if I did, but I may have.
15   You probably have something to prompt my memory.
16       Q    Why was GaDOE hiring a GNETS program
17   specialist?
18       A    You know, again, Nakeba had had surgery
19   and she was out, and Vickie had been appointed to do
20   this, and I don't remember if she had been hired in
21   the role officially at that point, but it was a lot
22   of work to do and especially trying to analyze data
23   and look at performance and things like that, that
24   she felt like it was necessary to have someone to
25   support her.



1       Q     So it was a workload?

2       A     It was.

3       Q     Whose decision was it to add this

4    position?

5       A     I'm unsure.

6       Q     What type of candidate was GaDOE looking

7    for to fill the role of GNETS program specialist?

8             MR. BEDARD:  Object to form.

9       A     Again, this is just from my impression

10   more than -- and I don't even know if I ought to

11   answer that because I don't know directly.

12      Q     You were involved in the hiring or you

13   don't recall?

14      A     Lakesha has a very strong background in

15   behavior management, and I believe that's the reason

16   that she was interested and ultimately chosen.

17            MS. TUCKER:  I'd like the court reporter

18        to mark the following document as Plaintiff's

19        Exhibit 926.

20            (WHEREUPON, Plaintiff's Exhibit-926 was

21         marked for identification.)

22   BY MS. TUCKER:

23      Q     This is an August 17th, 2018 email from

24   Vickie Cleveland to Felicia Peavy and you.

25            The subject is:  "GNETS Program Specialist



1    Interviews."  There's one attachment.

2            The Bates number on the bottom of the

3    first page is GA03590706.

4            Ms. Low, do you recognize this email

5    thread, or email and attachment?

6       A    I honestly don't have any memory of it.

7       Q    Do you have any reason to doubt it?

8       A    No.  I mean it says my name is on here.

9       Q    And it was produced by the State?

10      A    Yes.

11      Q    So this doesn't help jog your memory for

12   participating in the interviews?

13      A    No, it does not.  The names do not seem

14   familiar to me at all other than Lakesha.

15      Q    If you participated in interviews, would

16   you be part of the discussions around selection?

17      A    My input would be considered, but I would

18   not necessarily be the one to make the decision.

19      Q    Lakesha Stevenson was at GaDOE prior to

20   this position?

21      A    Yes.

22      Q    Correct?

23      A    Yes.

24      Q    Had you worked with her prior?

25      A    Yes.  She was in our Results Driven



1   Accountability unit prior to joining Vickie.

2       Q    So you oversaw her work?

3       A    I don't think I did.  I think it was the

4   other program manager.

5            MS. TUCKER:  I'd like the court reporter

6       to mark the following document as Plaintiff's

7       Exhibit 927.

8            (WHEREUPON, Plaintiff's Exhibit-927 was

9        marked for identification.)

10  BY MS. TUCKER:

11      Q    This is an April 10th, 2018 email thread

12  produced by the State.  The most recent email is to

13  -- is from you to Paula Gibson, and the subject

14  reads:  "Dispute Resolution Letter

15  Requirements/Butts County."

16           The Bates number on the bottom document is

17  GA03584360.

18           Ms. Low, do you recognize this email

19  thread?

20      A    I don't remember it.

21      Q    Do you have any reason to doubt it?

22      A    No.

23      Q    Who is Paula Gibson?

24      A    Paula is a program specialist still in

25  Results Driven Accountability.  She previously



1   worked in Dispute Resolution, and it appears from

2   the content of this she probably was working in

3   Dispute at that time.

4        Q    Let's go to her first email at the bottom

5   of the page.  Do you see where she wrote, quote:

6   "Butts County," in parentheses, "Mainstay Academy -

7   GNETS) was found non-compliant in three separate

8   resolution letters for the following IDEA issues:

9   1) Development, review, and revision of the IEP, 2)

10  Confidentiality, 3) FAPE."

11          Do you see this?

12       A    I do.

13       Q    Why is Paula Gibson reaching out to you

14  with this information?

15       A    Probably -- Lakesha was probably assigned

16  to me at that time.  You know, sometimes, because

17  the two program managers work so much in sync, it's

18  not like you've got two different units.  So she

19  could have been just reaching out to me as one of

20  the two RDA managers, but I would speculate that

21  Lakesha was the district liaison for that region,

22  South Metro, and because there were two -- well,

23  that would -- yeah, South Metro, I guess.

24          Because there were three dispute and

25  resolution letters that related to Mainstay Academy,



1    I'm thinking they were asking for our DL to go in

2    and work with them on the specific issues with some

3    professional learning.

4         Q    And by DL, you mean district liaison?

5         A    I do.

6         Q    How was Butts County found noncompliant?

7         A    How were they found noncompliant?

8         Q    Yeah.

9         A    Through the investigative process that we

10   have for every dispute that comes in, formal

11   complaint.

12        Q    What is that investigative process?

13        A    Well, we receive a complaint and we decide

14   if there's enough reason to move forward with it.

15   In other words, you know, is the complaint about

16   something related to IDEA.  So we either accept it

17   or we inform the complainant why we're unable to,

18   and then we assign an investigator.

19             We have contract people investigating.

20   Some are attorneys.  There are a number that are

21   formal special education directors.  Other people

22   with extensive experience in this field may do an

23   investigation.  And then of course there are

24   responses from whoever the complaint was filed

25   against, back and forth.  Then it eventually all



1   comes back to our dispute resolution unit.  They

2   review it.  They check, double-check to make sure

3   that anything that seemed to be out of line was true

4   to them, too.  Then we issue a letter.

5        Q    And this would be noncompliance with the

6   IDEA?

7        A    Yes.

8        Q    And you said complaints -- they're

9   triggered by a complaint.  Who sends a complaint?

10       A    It could be anybody.  I don't know in this

11  case who sent the complaint, but, you know, it could

12  be a teacher in the school, a parent, an advocate.

13  Anybody.

14       Q    And then am I correct that Paula Gibson

15  suggested someone assist Lakesha Stevenson with the

16  review process?

17            Do you see that in her email?

18       A    I do.  I'm just trying to read.

19            She's just asking for somebody to support

20  Lakesha, too, because there appears to be -- she's

21  concerned about Mainstay and she thinks we need to

22  provide support.

23       Q    And she's concerned about Mainstay because

24  of these findings?

25       A    Yes.



1    Q    Do you recall these findings?

2    A    Oh, I don't.  I didn't see the resolution

3    letters in my capacity as senior program manager.

4         I might have had.  Just like this email,

5    as an RDA program manager, after the complaint and

6    the resolution letter to follow the corrective

7    action, it goes back to the district liaison.

8    Q    And that would be Lakesha?

9    A    It would have been apparently, and Monica

10   did leave before the end of the year.  So that

11   probably all made sense.

12   Q    Who is Monica?

13   A    She was a program specialist with us.

14   Q    In RDA?

15   A    Yes.

16   Q    And then looking at your email, you write:

17   "I am happy to support this process with Lakesha."

18   A    Yes.

19   Q    So you -- would you have seen the

20   documents then?

21   A    I believe what I would have meant is I'm

22   happy for Lakesha to work on this and if Lakesha has

23   any questions, she can come to me.

24   Q    Can you look at the second sentence:  "Can

25   you forward a copy of the Policies, Practices and



1   Procedures that Mainstay submitted?"

2          Do you see that?

3      A   I do.

4      Q   You don't think you reviewed the

5   documents?

6      A   I probably did in conjunction with

7   Lakesha, but I don't recall anything specific.

8      Q   You had conducted other noncompliance

9   reviews involving regional GNETS programs?

10     A   I don't think I have -- GNETS, I've

11  certainly done compliance reviews in my role as a

12  specialist, and then in signing off and reviewing

13  with the specialist assistant manager.

14         MS. GARDNER:  Off the record.

15         (Discussion ensued off the record.)

16         THE VIDEOGRAPHER:  Going off the record at

17     11:21.

18         (Discussion ensued off the record.)

19         THE VIDEOGRAPHER:  We are back on the

20     record at 11:29.

21         MS. TUCKER:  Thank you.

22  BY MS. TUCKER:

23     Q   Ms. Low, earlier you mentioned that you

24  had been discussing potential changes to the iReady

25  contract with Vickie Cleveland, correct?  Correct?



1       A    Yes.

2       Q    What prompted the discussion about the

3  potential change in the iReady contract?

4            MR. BEDARD:  Object to form.

5       A    Vickie brought that up to me and said she

6  would like to distribute the funds to the GNETS, so

7  that they could make their own decision.  Because

8  some LEAs in each region were using that, it made

9  more sense for certain GNETS to mirror that, and

10 then in other places they were using some other

11 tool.

12           So she was not trying to pull funding

13 back; she was just trying to make it more flexible.

14      Q    Thank you.

15           MS. TUCKER:  I'd like the court reporter

16      to mark the following document as Plaintiff's

17      Exhibit 928.

18           (WHEREUPON, Plaintiff's Exhibit-928 was

19        marked for identification.)

20 BY MS. TUCKER:

21      Q    This is a September 28, 2017 email

22 produced by the State.  It's from Monica Henderson

23 to you with the subject:  "Teleworking today."

24           The Bates number on the bottom of the

25 document reads GA03575906.



1              Ms. Low, do you recognize this email?

2       A    I do.

3       Q    And then who is Monica Henderson again?

4       A    Monica came to work for us and she was

5  with us less than a year.  She was excellent at her

6  job, but she was offered a position as an assistant

7  director closer to her home.

8       Q    And this was when you were in the Special

9  Education Division?

10      A    When I was?

11      Q    Uh-hum.  (Affirmative.)

12      A    Yes.

13      Q    And when did she leave?

14      A    Oh, I think she left about April because

15  the district insisted that they needed her to go

16  ahead and leave her position to come there.

17      Q    So April 2018?

18      A    Um, I don't honestly remember which year,

19  but probably.

20      Q    Was she one of your direct reports?

21      A    She did.

22      Q    Looking at her email, do you see where she

23  wrote, quote:  "I plan to work on the GNETS

24  Implementation Manual."

25             Do you see that?



1    A    I do.

2    Q    What is the GNETS Implementation Manual?

3    A    I don't -- I didn't ask her to do this,

4  but I do recall she was part of two or three people

5  working on a GNETS Implementation Manual, and I

6  don't recall why or who asked her to do this.

7    Q    Does this manual still exist?

8    A    I don't think it was ever finished or I

9  don't know -- I don't know of any remnants of

10  anything about it that actually became a product.

11    Q    And who was the audience for this manual?

12  Was it for GaDOE or for the programs?

13    A    I don't even recall.

14    Q    Why was she telling you this then?

15         MR. BEDARD:  Object to form.

16    A    It sounds like she was just telling me

17  that she was teleworking and she was naming some

18  things that she was going to work on while she was

19  teleworking.

20    Q    But this was not under your review?

21    A    I was not directing the work on that

22  manual and, again, I don't even recall who was.

23         I think it never got off the ground.

24    Q    Thank you.  So following your role as

25  program manager senior, you became interim state



1   director for Special Education Services and

2   Supports?

3        A    Yes.

4        Q    And that was in September 2021?

5        A    Yes.

6        Q    Did you apply for this position?

7        A    I was contacted by the deputy

8   superintendent and asked if I would serve as an

9   interim.

10       Q    And by deputy superintendent, you're

11  referring to --

12       A    Shaun Owen.

13       Q    Did you interview?

14       A    I was promoted when -- after the interim

15  was taken off in March.

16       Q    You're speaking to when you were state

17  director, correct?

18       A    Yes.  From interim to state director.  And

19  then when you were asking me if I interviewed, I was

20  just promoted.

21       Q    For both positions?

22       A    Well, the interim, as I understand it,

23  would be at the discretion of the deputy to do and

24  just to serve in that interim capacity.

25       Q    Okay.  And then promotion when you were



1   state director?

2        A    Yes.

3        Q    What did you understand the role of

4   interim state director to be when Shaun Owen

5   contacted you?

6        A    To act in the role of director.

7        Q    What did you -- what did you think your

8   core responsibilities would be?

9        A    Anything that fell in the purview of the

10  state director.

11       Q    Did your -- in reality, has your job

12  matched what you expected?

13       A    Yes.

14       Q    Has it been different in any ways?

15       A    No, not really.

16       Q    What are your main responsibilities as

17  interim director, when you were interim director?

18       A    The same responsibilities that I have now.

19  You know, the whole comprehensive nature of special

20  education of -- you know, our role in ensuring that

21  the rights of students with disabilities were

22  carried out according to our state regulations and

23  of course federal law.

24            You know, we have compliance obligations,

25  but we also have the direction for state



1   initiatives, you know, with providing resources,

2   professional learning and support, best practices.

3   Of course, you know, many, many different aspects.

4   Approving budgets, distributing funds, collecting

5   data.

6        We operate the Georgia online IEP platform

7   that around 190 of the 223 districts utilize at this

8   point and have a support network with that.  So the

9   Call Desk, anything about family engagement, dispute

10   resolution of course is required, operating,

11   instructional materials.

12       Q    So the units we talked about earlier?

13       A    Yes.

14       Q    Okay.  Thank you.

15       MS. GARDNER:  I'd like the court reporter

16       to mark the following document as Plaintiff's

17       Exhibit 929.

18            (WHEREUPON, Plaintiff's Exhibit-929 was

19        marked for identification.)

20   BY MS. TUCKER:

21       Q    This is an August 31st, 2021 email thread

22   produced by the State.  The most recent email in the

23   thread is from Matt Jones and was sent to you, and

24   Shaun Owen is copied.  The subject reads:  "This

25   Afternoon."



1           The Bates number on the bottom of the

2    first page is GA03670897.

3           Ms. Low, do you recognize this email

4    thread?

5       A    Yes, I do.

6       Q    Let's start with the earliest email.  So

7    it's from Matt Jones, and he sent it at 7:48 a.m. on

8    August 31st, 2021.

9           Do you see that?

10      A    I do.

11      Q    Okay.  Mr. Jones wrote, quote, he "looked

12   forward to touching base with you."

13          Do you see that?

14      A    I do.

15      Q    And he, quote, was "excited about the

16   leadership you'll bring to the team."

17          Do you see that?

18      A    I do.

19      Q    And he's referring to you being interim

20   state director?

21      A    Yes.

22      Q    You had met with Matt Jones prior to being

23   interim state director?

24      A    I don't think I've had a meeting with Matt

25   prior to being interim.



1       Q    Had you communicated with Mr. Jones in any

2  way prior?

3       A    I don't recall it off the top of my head,

4  but I mean he could have reached out to me for some

5  specific topic from time to time.

6       Q    Do any topics come to mind?

7       A    No, not really.  He had reached out to me

8  a few times just on a personal note and that was it.

9       Q    Mr. Jones wrote that he identified topics

10  to discuss at a meeting that afternoon, correct?

11      A    Yes.

12      Q    Did anyone else attend this meeting?

13      A    Shaun was there, Shaun Owen.

14      Q    So it was you, Shaun Owen, and Matt Jones?

15      A    Uh-hum.  Yes.

16      Q    Let's look at his email.  Do you see that

17  he notes topics to "Focus," "Evaluate," and

18  "Discuss"?

19      A    Yes.

20      Q    What did he mean by the heading "Focus"?

21           MR. BEDARD:  Object to form.

22           You can answer.

23      A    We had a meeting set and it was really the

24  first meeting that I was included in with our chief

25  of staff, to talk about me transitioning into the



1   interim role, and he was just telling me what he

2   wanted me to be prepared to talk about.

3       Q    Okay.  Did you see any distinction between

4   the Focus, Evaluate, and Discuss categories?

5       A    Yes.

6       Q    Can you explain the distinction?

7       A    Well, I think in Focus he's telling me

8   that's where I want your focus to be.  I want to

9   improve or -- well, the teacher pipeline would be

10  more of a focus.  And then compliance, he wants us

11  to of course continue our work with that.

12          He was talking about evaluating the

13  assistive technology, and PBIS, GRLS, about where

14  are we, what direction do we need to go, and then to

15  discuss MTSS, GNETS, and ASPIRE.

16      Q    What is MTSS?

17      A    Multitiered System and Supports.

18      Q    What did Mr. Jones discuss with you

19  requiring MTSS at this meeting?

20      A    I don't recall any specifics about it.

21  Probably just how we all interfaced together.

22          This was pretty recently after they had

23  moved into the Office of Whole Child.

24      Q    So how the two divisions interfaced

25  together?



1     A     Worked together.

2     Q     What is ASPIRE?

3     A     It's our Georgia own student-led IEP

4  process.

5     Q     How long has ASPIRE existed?

6     A     More than 10 years.  Maybe 12 to 15 years.

7     Q     And what did Mr. Jones discuss with you

8  regarding ASPIRE?

9     A     I don't even remember us talking about

10  that at all in the meeting.

11     Q     And then GNETS, what did Mr. Jones discuss

12  with you during this meeting about GNETS?

13          MR. BEDARD:  I'll just object here to the

14      extent you guys talked about the litigation.

15          Don't, don't talk about anything you guys

16      discussed about the litigation.  If it's

17      anything else, feel free to discuss.

18     A     I don't think I have anything to answer

19  then.

20     Q     Okay.  Did Mr. Jones discuss his vision

21  for the GNETS program?

22     A     I think it was all related to just

23  briefing me on where we were.

24     Q     In the lawsuit?

25          MR. BEDARD:  Again, if it's about the



1          lawsuit, you know, then I'd instruct you not to

2          answer.

3          Q     Separate from this meeting, has he

4     discussed his vision for the GNETS program with you?

5          A     I do not recall discussing it with him.

6          Q     How about GaDOE's vision for the GNETS

7     program?

8                MR. BEDARD:   Object to form.

9          A     I couldn't add anything to that because of

10    the litigation.   I mean it all falls there.

11         Q     Has he discussed in any meeting you had

12    with Mr. Jones specific steps that you were to take

13    with the GNETS program in your division?

14         A     Again, I don't think that any discussion

15    we've had in regards to something like that.   It

16    would have been related to litigation.

17         Q     In your email back to Mr. Jones, you

18    wrote, quote:   "I look forward to ensuring the

19    vision of the department is fully aligned with the

20    division."

21               Do you see that?

22         A     Yes, I do.

23         Q     What did you mean?

24         A     I wanted to make sure the Special

25    Education Division is aligned with the overall



1   Georgia Department of Education vision.

2        Q    And what is the overall vision for GaDOE?

3             MR. BEDARD:  Object to form.

4        A    One of the main points that Mr. Jones

5   wanted to emphasize was our division has an

6   obligation to carry out compliance, but, on the

7   other hand, he wanted me to look at the division to

8   see if there were ways that we could not always be

9   about compliance.  You know, how could we also focus

10  on instruction and best practice with students with

11  disabilities, and there's a balance.  This is my

12  opinion.  There is a balance.  And, you know, I

13  believe that we're very aligned in our thinking on

14  that topic.

15       Q    And what is your division's vision?  That

16  was just GaDOE's vision.  What is your vision?  So

17  what is your vision?

18            MR. BEDARD:  Object to form.

19       A    Our vision is their vision.

20       Q    Okay.

21       A    You know, we're in one.

22       Q    So it's aligned?

23       A    Yes.

24       Q    How frequently did you meet with Mr. Jones

25  while you were interim state director?



1      A    Oh, not frequently.  I don't interact with

2   the chief of staff frequently at all.  Our deputy

3   does.

4      Q    Have you met with him more often as state

5   director?

6      A    No.  The frequency hasn't really changed.

7      Q    In addition to the meeting we just saw in

8   this email, have you met with Mr. Jones at other

9   times regarding the GNETS program?

10      A    Only in regard to the litigation.

11      Q    And would it be -- approximately how many

12   times?

13      A    Only three meetings come to my mind,

14   including this one that you're referencing.

15           MS. TUCKER:  I'd like the court reporter

16       to mark the following document as Plaintiff's

17       Exhibit 930.

18           (WHEREUPON, Plaintiff's Exhibit-930 was

19        marked for identification.)

20   BY MS. TUCKER:

21      Q    This is a September 1st, 2021 email invite

22   produced by the State.  It's from Shaun Owen to you.

23           The subject reads:  "GNETS weekly," and it

24   indicates the invite recurrence is for weekly, and

25   the required attendees are you, Vickie Cleveland,



1  and Zelphine Smith-Dixon.

2        The Bates number on the bottom document

3  reads GA03670906.

4        Ms. Low, do you recognize this invite?

5     A    Yes.

6     Q    Is this the same weekly meeting we spoke

7  about earlier?

8     A    It is.  She's just forwarding me the

9  electronic meeting invitation because this is

10 exactly during the transition time when Dr.

11 Smith-Dixon was leaving.

12    Q    And it was still weekly at that point?

13    A    It was.

14    Q    And what led for it to be bi-weekly now?

15    A    Well, I think that our meeting topics that

16 -- I don't think.  I suggested it.  I don't know

17 exactly which of the group, but at some point we

18 said unless there's something that we need to

19 discuss every week, and we can always have a called

20 meeting like that, we would move to every other

21 week.

22    Q    Is the lawsuit discussed at these

23 meetings?

24        MR. BEDARD:  You can say if the lawsuit is

25     discussed at the meeting.  Just don't --



1    A    Sometimes.

2    Q    And you became state director in March

3  2022?

4    A    Yes.

5    Q    And did your job change at all from

6  interim to state director?  Any responsibilities

7  added?

8    A    No.

9    Q    Can you describe a typical day for you as

10  state director?

11    A    I have a lot of meetings, a lot of

12  prescheduled meetings that go along.  Of course,

13  I've referenced some of the things that are standing

14  meetings, like leadership every Thursday at 2

15  o'clock, and of course I have meetings with our

16  deputy superintendent and our associate

17  superintendent.

18         So in between those meetings, of course

19  I'm looking at emails, signing off on financial

20  things, personnel matters, that type of thing.

21         I'm never bored.  I have lot of people

22  that reach out and contact me during the day that

23  are surprises that they may need help with, program

24  managers primarily.

25         And I meet quite frequently with our data



1   manager, just because there's a lot of data

2   collection and trying to make sure that it's

3   accurate.

4          I also collaborate a lot with outside

5   agencies, such as Georgia Vocational Rehabilitation

6   Agency.  I'm on the State Rehab Council, you know,

7   as appointed -- as the DOE representative.

8          I'm responsible for the teacher retention

9   grant.  So we have a state implementation team

10  meeting each month, and we have weekly activities

11  with that.

12         Of course, we have monthly meetings with

13  all of our GLRS regional centers, and those meetings

14  typically are two days, about the third week of the

15  month.

16         I host monthly directors' webinars.  We

17  have numerous professional learning events going on.

18  A lot of them I'm not involved in, but certainly if

19  something is in person or a statewide hosting, like

20  we had a discipline, two-day discipline training in

21  March about the new discipline guides from OSEP.  I

22  was there all day those two days.

23         Leading the State Advisory Panel.

24         I mean the list could go on and on.

25  Q     You're busy.



1    A    But good busy.

2    Q    I understand.

3         Within GaDOE, we discussed a few regularly

4  scheduled meetings, correct?

5    A    Yes.

6    Q    Your leadership meeting?

7    A    Yes.

8    Q    And then your GNETS bi-weekly meeting?

9    A    Yes.

10    Q    And then you said you meet with the deputy

11  superintendent?

12    A    I do.

13    Q    And is that a weekly?

14    A    It's scheduled for twice a week.

15  Sometimes we only meet once a week.  We talk

16  multiple times each day by phone or either by a

17  Teams meeting.  The same with the associate

18  superintendent.

19    Q    Any other regularly scheduled meetings?

20    A    I meet every Tuesday afternoon with our

21  instructional program manager.  Of course, I attend

22  cabinet.

23    Q    What is cabinet?

24    A    That's when we review various things, like

25  Board items, to see that they're reviewed by the



1    cabinet before they move through the process.

2         Q    Who attends cabinet meetings?

3         A    A lot of the leadership.  Of course,

4    several people from the Policy Division and

5    typically the directors or associate superintendents

6    or whoever from each division would be represented

7    there.

8              You know, Stacey, of course, is a part of

9    it.

10             I'm sure I'm leaving out some major

11   components, but --

12        Q    How often are cabinet meetings?

13        A    They're typically weekly.

14        Q    And who leads those?

15        A    Allan Meyer from our policy division. I

16   believe he's director.

17        Q    Do you attend every cabinet meeting, or is

18   it when there's an area for you to discuss?

19        A    I try to attend every meeting, but of

20   course I don't have business every time.

21        Q    Has your business at a cabinet meeting

22   ever involved GNETS?

23        A    The GNETS allocations, probably.

24        Q    What do you mean by GNETS allocations?

25        A    From federal funds we have some



1    allocations that would have gone through cabinet.

2        Q    Anything else that would go through

3    cabinet related to GNETS?

4        A    I don't recall a specific item.  Of course

5    any items that go through for Special Education

6    would also be extended to GNETS, anything we were

7    doing for everybody.

8        Q    Got it.  Thank you.

9             Do the allocations of state funds for the

10   GNETS program go through the cabinet?

11       A    No.

12       Q    Who do they go through?

13       A    Well, they're just allocated from the

14   legislature.

15       Q    Okay.  The ones for the GNETS program?

16       A    The state funds.

17       Q    And the regional GNETS program

18   allocations?

19       A    The allocations I was talking about were

20   some federal funds we pass along.

21       Q    Understood.  Thank you.

22            How often do you discuss the GNETS program

23   with Shaun Owen?

24       A    It's hard to say.  It varies, you know, by

25   weeks or days.  Certainly we have more discussion



1  when -- she's out on some visits this week, I'm

2  here.  I'll go out on some visits later on in the

3  week.  Just coordinating our schedules.

4          So we probably have more conversation if

5  there are things like that going on.

6      Q    How about with John White?

7      A    John has not been involved in these

8  discussions prior to October, and he's typically not

9  in that conversation.  That's sort of a division of

10 duties that they have, and Shaun is my contact.  Of

11 course, Shaun takes things to Stacey if necessary.

12     Q    Have you met with Superintendent Woods in

13 your role as state director?

14     A    Yes.

15     Q    Have you discussed the GNETS program with

16 Superintendent Woods?

17     A    Yes, but it involved litigation.

18     Q    How often or how many times?

19     A    I think only one.

20     Q    And when was that?

21     A    When was that?  I believe it was December.

22     Q    Of this year -- or of 2022?

23     A    I believe that is right.

24     Q    Who was present for that meeting?

25          MR. BEDARD:  You can answer who was



1       present.

2       A    Stacey was there, chief of staff Matt

3    Jones was there, Superintendent Woods was there,

4    Shaun was there, I was there, Vickie.

5            There could have been someone else there

6    but it's not coming to my mind.

7       Q    About how long was that meeting?

8       A    At least an hour, maybe an hour and a

9    half.

10      Q    Who do you --

11      A    I want to add something.

12      Q    Yes, ma'am.

13      A    I believe that somebody was here from the

14   Robbins Law Firm.  I think it was Josh Belinfante.

15      Q    Thank you.

16           Who do you meet with outside GaDOE related

17   to the GNETS program?

18      A    I mean nobody, unless it's something

19   related to GNETS.  It might be a special ed

20   director, a GLRS.  Somebody that is directly

21   involved and provides support.

22      Q    And then do you as state director, do you

23   communicate with the regional GNETS programs?

24      A    It typically goes through Vickie.  You

25   know, I -- I do include them in meetings.  I have



1  included all of our GNETS directors in our regular

2  monthly GLRS meeting.

3           I want to make sure they have a direct

4  line of communication and have that second in-depth

5  discussion that's in a much smaller group.  You

6  know, where we have our regional leaders and we may

7  take it a step further than just saying we're going

8  to do multisensory reading and this is the

9  initiative and opportunity.

10           I wanted to make sure that the GNETS

11  directors are included in that.

12           I have gone to their retreat.  I have

13  attended their retreat in the summer.

14      Q    As state director?

15      A    Yes, as state director.

16      Q    Where was --

17      A    They attend collaborative communities.

18  Everybody is collaborative community, but I've made

19  it a priority of mine to go to each of the

20  collaborative communities at least once a year and

21  be there in person with the directors from that

22  region.  So I see GNETS directors there typically.

23      Q    Where was the retreat for the regional

24  GNETS programs?

25      A    It was at Jekyll Island.



1        Q     And how long was the retreat?

2        A     We were there for just one day.  I believe

3   they might have been there for two days.

4        Q     By "we," who are you referring to?

5        A     Shaun and I were there, as well as Vickie.

6        Q     Did Vickie stay longer?

7        A     No.

8        Q     Do you speak with the RESAs in your role

9   as state director?

10       A     Only rarely.  I do send out a Friday email

11  blast that's our once a week, try to limit it once a

12  week, communication and try to cover everything in

13  it that we need to announce or emphasize or stress

14  or deadlines.

15             The RESA directors are all copied on that

16  because most RESA directors are fiscal agents for

17  the GLRS.  And some are fiscal agents for GNETS

18  programs, too.

19       Q     Who else receives this weekly blast?

20       A     All of our directors, our other special ed

21  leadership that are listed in the -- as you said,

22  the GaDOE portal.  So their school district, each

23  district has a security officer to decide who can be

24  assigned rights as a special ed director or the

25  transportation director, or whatever the role is.



1          So if the district has assigned them
2     officially through that, the portal, then they're
3     going to pick up and be on the listserv, because I
4     don't control that listserv.  That's whatever it
5     populates.

6          So larger districts may have six people
7     they listed as director but really only one is
8     director and others are their key leadership in the
9     district.

10         So it also goes to all GNETS directors.
11    It goes to all GLRS directors.  It goes to my staff.

12         It is distributed to Parent to Parent of
13    Georgia; to the chair of our State Advisory Panel;
14    some internal folks within the Department of
15    Education, like the deputy superintendent of
16    curriculum; the associate superintendent of Office
17    of Whole Child.  They have requested to be added to
18    that.

19         It's four or five hundred people each
20    week.  I'm sometimes surprised that it circulates
21    beyond that, but it's posted on our website, too.
22    So it's very transparent.

23    Q     Thank you.

24         Back to the RESAs, have you communicated
25    with the RESAs about the GNETS program as state



1    director?

2         A    No.

3         Q    As interim state director?

4         A    No.

5         Q    Have you worked directly with anyone in

6    Governor Kemp's office?

7         A    No.

8         Q    Have you had conversations with anyone in

9    Governor Kemp's office about the GNETS program?

10        A    I don't think I have.  I have been

11   contacted by the Governor's Office a few times about

12   different issues, primarily related to some of the

13   funding that came because of the pandemic and, you

14   know, distributing it for like teacher supplies and

15   things.

16        Q    Has Governor Kemp's office reached out to

17   you related to the GNETS program?

18        A    No.

19        Q    Do you coordinate with DBHDD?

20        A    Yes.

21        Q    In what ways?

22        A    I just had a meeting with DBHDD less than

23   a month ago, also with Office of Whole Child,

24   talking about our relationship and how we

25   collaborate.



1    Q    Do you coordinate with DBHDD regarding the
2  GNETS program?
3    A    It was briefly brought up in the meeting
4  that we held just a few weeks ago, but, you know,
5  they certainly provide some support but I haven't
6  been involved in those conversations.
7    Q    What was raised in the meeting a few weeks
8  ago?
9         MR. BEDARD:  Objection.
10        I'll just say again if it was about the
11        litigation, I'll instruct you not to answer.
12        Otherwise, you're fine.
13   A    It was just an overview of all their
14  various services and aspects and trying to make sure
15  that the education agency and DBHDD were on the same
16  page, that we each update on what we're doing.
17        It was not focused solely on GNETS at all.
18  It was a passing comment that was made, is all.
19   Q    What was the passing comment?
20   A    I don't remember exactly.  Just that's the
21  subject for another day or something like that.  It
22  was --
23   Q    GNETS is a subject for another day?
24   A    I think that's -- I mean, again, that may
25  not be the direct quote but something to that



1   effect.

2            So nothing specific.  It was just -- it

3   wasn't said by me.  It was said by -- I've lost his

4   name now.  He's the director of the division that

5   primarily supports our kids.

6            It will come to me.

7       Q    Is he within GaDOE or DBHDD?

8       A    No.  DBHDD.

9       Q    Who all attended that meeting?

10      A    Dante McKay.

11           He had three or four people with him from

12  DBHDD, and they were really very sharp and excited

13  about work and the resources that they had.

14           And then there were three, four, maybe

15  five people from Office of Whole Child.  The

16  associate superintendent, Justin Hill, was there and

17  part of his team.

18           They really were the ones that had the

19  meeting scheduled together, and they invited me

20  because DBHDD asked for Special Education to be

21  there, too.

22      Q    Was Vickie Cleveland there?

23      A    No.  She wasn't invited to the meeting.

24  It was not focused on GNETS.  It was just in whole

25  how we collaborate.



1    Q    And a moment ago you said Dante McKay.  I

2  just want to confirm, you were attributing that

3  statement, passing comment about GNETS?

4    A    He's director of whichever division in --

5  and I'd have to honestly look to know the actual

6  division but Dante is who we communicate with if I

7  were going to talk director to director.

8    Q    And he's the one that made the passing

9  comment?

10    A    Yes.

11    Q    Okay.

12    A    It was not disrespectful.  It was quite

13  respectful.

14    Q    Yes.  I just wanted to confirm for the

15  record, because the name came separately from the

16  conversation.

17        Do you coordinate with DCH?

18    A    Yes.  More indirectly than directly.

19    Q    What do you mean by that?

20    A    Babies Can't Wait, the preschool arm

21  before we pick up preschoolers.

22        We hold a grant about teacher retention

23  and provider retention, and so we collaborate on

24  that constantly.

25    Q    Do you coordinate with DCH regarding the



1   GNETS program?

2        A    I don't recall discussing that.

3        Q    Have you communicated with them regarding

4   the GNETS program?

5        A    Not that I recall.

6        Q    Are there other agencies in Georgia that

7   you coordinate with?

8        A    Georgia Voc Rehab.  Family Connections

9   some, but not as much as in the past.

10            I mentioned Parent to Parent of Georgia.

11            Our parent training and information

12   center, we collaborate with them.

13            The inclusive for secondary programs,

14   which are University of Georgia, you know, East

15   Georgia, Georgia Southern, Columbus State.  There

16   are eight or nine currently in the state, and meet

17   with them regularly.

18            I'm on the State Rehab Council, of course

19   the State Advisory Panel for Special Education, and

20   there are agency representatives at the table for

21   that.  Department of Corrections, Juvenile Justice,

22   GVRA, somebody from Babies Can't Wait.

23            I'm sure I'm leaving out a few, but that's

24   a monthly-type meeting.

25        Q    So for Georgia Vocational Rehab Agency, do



1   you speak with them regarding the GNETS program?

2        A     I have.

3        Q     In what way?  Or about what?

4        A     In two previous roles.  As program

5   specialist I focused on transition and

6   post-secondary outcomes, and I was the contact with

7   GVRA.  So this is from 2015, 2017.

8              One of my concerns was that I wanted to

9   make sure that the students at GNETS had equal

10  access to GVRA.

11       Q     Were you able to accomplish that?

12       A     It's much improved.

13       Q     Have you coordinated with GVRA related to

14  the provision of mental or behavioral health support

15  to students in the State of Georgia?

16       A     That's not really their role.  I have had

17  conversations with them along those lines, to ensure

18  that they are open to providing support to our

19  students.  I don't know their rules like they know

20  their rules, but they're somewhere along that line

21  of communication that that might be an exclusionary

22  factor, and I'm trying to explain that the kids are

23  multifaceted and may have diagnoses but that doesn't

24  mean that's -- would be preventing them from being

25  able to work directly with the students and their



1    families.

2         Q    Also you mentioned Family Connections as

3    well?

4         A    Yes.

5         Q    Have you coordinated with Family

6    Connections regarding the GNETS program?

7         A    At a local level more than at the State

8    level.

9         Q    Can you elaborate?

10        A    Family Connections was very active in the

11   area that, you know, I was a local director for 17

12   years, almost 17 years.  You know, they equally

13   provided support to GNETS programming, as they did

14   -- they were our children.  So that was just a

15   continuum.

16        Q    What about Parent to Parent of Georgia,

17   have you communicated with Parent to Parent of

18   Georgia regarding the GNETS program?

19        A    I communicate with Parent to Parent of

20   Georgia.  I have made a priority to increase

21   communications and have scheduled regular monthly

22   meetings with them in an effort to make sure that we

23   stay on track together, and that they tell us if

24   there are things they've got patterns about or not.

25             I don't remember a specific comment about



1   GNETS, but in these monthly meetings the two leaders

2   from Parent to Parent I meet with, they would tell

3   me if they were seeing a surge of phone calls or

4   something like that, just as they would about any

5   topic.

6        Q    How --

7        A    But I don't recall anything specific

8   having been discussed.

9        Q    Have they mentioned a surge of phone calls

10  related to the GNETS program?

11       A    No.  That was simply an example.  That's

12  all.

13       Q    Yes, ma'am.

14            Do you coordinate with Parent to Parent

15  regarding the provision of mental or behavioral

16  health supports to students in the State of Georgia?

17       A    We have not discussed that, not to say it

18  might not come up, but it's a very open dialogue,

19  but I don't recall that.

20       Q    You also mentioned the inclusive

21  post-secondary programs?

22       A    Uh-hum.  (Affirmative.)

23       Q    Have you communicated with the inclusive

24  post-secondary programs related to the GNETS

25  program?



1    A    I don't recall any discussion that we've

2    had about that.  You know, I've been actively

3    involved with the IPSE programs for years, since I

4    became a program specialist in special ed.  That's

5    not really the population of students that the

6    inclusive post-secondary serves because they're

7    primarily focused on intellectual disabilities.

8         But I -- I'm sure they would be open to

9    any student that applies and meets their criteria,

10   but it has not been brought up by GNETS.

11   Q    Have you communicated with the State Rehab

12   Council during your meetings regarding the GNETS

13   program?

14   A    I don't recall GNETS ever being mentioned

15   at a State Rehab Council meeting.

16   Q    Ms. Low, what is the Georgia General

17   Assembly?

18   A    It's our state body that -- you know, the

19   elected officials that are representatives and

20   senators and they make laws and appropriate funds

21   and things like that.

22   Q    Your state legislature?

23   A    Yes.

24   Q    Do you coordinate with the Georgia General

25   Assembly as state director?



1      A    I haven't been asked to, no.
2      Q    Ms. Low, earlier you mentioned the State
3  Board of Education, correct?
4      A    Yes.
5      Q    Have you participated in meetings with the
6  Georgia State Board of Education?
7      A    I have attended.
8      Q    How many, about?
9      A    Less than 12.
10     Q    When you have attended meetings with the
11  Georgia State Board of Education, has the GNETS
12  program been discussed?
13     A    No.  Not that I recall.
14     Q    Have you received requests for information
15  from the State Board of Education related to the
16  GNETS program?
17     A    I haven't received requests.
18     Q    Are you aware of others at GaDOE receiving
19  requests from the Georgia State Board of Education?
20     A    I'm not aware.  Not to say that they
21  haven't, but I'm not aware.
22     Q    I understand.
23          MS. TUCKER:  I'd like the court reporter
24       to mark the following document as Plaintiff's
25       Exhibit 931.



1              (WHEREUPON, Plaintiff's Exhibit-931 was

2          marked for identification.)

3    BY MS. TUCKER:

4         Q    This is a September 8, 2021 email produced

5    by the State from you to Jaquenetta Dugger.  There

6    is no subject but there are three attachments.

7              The Bates number on the bottom of the

8    first page reads GA03671090.

9              Ms. Low, do you recognize the email?

10        A    It looks like I sent it.  To be honest, I

11   don't know what ARP means, so I'll have to read the

12   context of it to refresh my memory.

13        Q    Yes, ma'am.  Do you have a reason to doubt

14   that you sent this email?

15        A    No.

16        Q    Who is Jaquenetta Dugger?

17        A    She was the deputy superintendent's

18   administrative assistant.  She's no longer with us.

19        Q    So she was Shaun's administrative

20   assistant?

21        A    Yes.

22        Q    And you see where you wrote:  "Please find

23   attached the GNETS ARP board item"?

24        A    I do.

25        Q    Do you want to take a moment to review the



WINA LOW                                              February 28, 2023
UNITED STATES vs STATE OF GEORGIA                             134

 1  attachments?

 2       A    Sure.

 3            (Witness reviews exhibit.)

 4       A    Okay, I'm back.

 5       Q    And what was meant by the GNETS ARP board

 6  item?

 7       A    It's American Rescue Plan funds that we

 8  received as -- during the pandemic, and it of course

 9  came to the Department of Education, and we made a

10  request to receive funding for therapeutic services

11  to enhance the therapeutic services in the GNETS

12  program, and Vickie wrote the request.  It's a very

13  short request describing how we would use it.

14            She did consult with me about that.  That

15  was prior to my role as interim.

16            It looks like this was the 8th of

17  September.  So I assumed the role on the 7th, but I

18  was trying to determine why did I send that?  But I

19  guess I was in the interim role officially.

20            And it was 1.5 million.

21       Q    Okay.  Let's go back to the email.  We can

22  take it piece by piece.

23            You write that "the talking points are

24  included but should not be posted."

25            Do you see that?



1       A    I do.

2       Q    Posted where?

3       A    Posted on Simbli, the e-board platform.

4       Q    The eBoard -- so electronic platform for

5  the State Board of Education?

6       A    Uh-hum.  (Affirmative.)

7       Q    It's called Simbli?

8       A    Simbli.  S-I-M-B-L-I, I believe.

9       Q    Why should the talking points not be

10  posted?

11      A    Talking points are simple something that

12  Shaun asked for, our federal program manager --

13  Federal Programs deputy superintendent.  She wants

14  us to write a brief talking points so that if she's

15  presenting the item that she can refresh her memory

16  prior to that.

17           Any item that we're bringing forward to

18  the Board, Shaun's been in the discussion, Shaun and

19  John now.  So it's not that she doesn't know about

20  it, it's just mainly for her -- a refresher, but we

21  don't post the talking points because that's not one

22  of the required documents.  It's not that we

23  wouldn't mind anybody seeing the talking points, but

24  it's just a Shaun request.

25      Q    Not practice?



1      A    Not practice for anybody else, yeah.

2      Q    Earlier you said that Vickie Cleveland was

3  interested in this to enhance therapeutic services

4  in the GNETS program?

5      A    Yes.

6      Q    And why was that?

7           MR. BEDARD:  Object to form.

8           You can answer.

9           THE WITNESS:  I can answer.

10          MR. BEDARD:  Uh-hum.  (Affirmative.)

11     A    Therapeutics are very important.  There

12 always seems like the more funding you can use, the

13 more therapeutics would be welcomed.

14          And of course this is designated for that

15 use, and it's not a narrow scope but it is a

16 specific scope of work that the GNETS could choose

17 to work with them.

18     Q    This is not a narrow scope but it's a

19 specific scope of work the GNETS could choose to

20 work?

21     A    It could be a licensed social worker,

22 extra psychologist, extra counselors, psychiatric

23 consultation.

24          That's what I mean.  It is broad, but yet

25 it falls within the narrow scope of therapeutic



1    services.  So they can't go buy playground equipment

2    or something like that.

3         Q    Let's go to the first attachment, which is

4    the Bates number on the bottom reads GA03671091.

5              Do you recognize this document?

6         A    Uh-hum.  (Affirmative.)

7              It's our Board template for grants.

8         Q    So it's a recommendation to the State

9    Board to approve a grant?

10        A    Yes.  I mean we would recommend this

11   action technically to the superintendent, and then

12   he would decide if it would move forward to the

13   Board.

14        Q    Would this document go to the

15   superintendent?

16        A    He would have access to it.  I do not

17   believe that -- I mean Superintendent Woods would

18   have other people reviewing this prior to that, but

19   I'm sure he looks at it prior to establishing the

20   agenda.

21        Q    And --

22        A    I'm not really involved in that level of

23   work.

24        Q    Yes, ma'am.

25             So in bringing this to the State Board,



1  Superintendent Woods has already approved it?

2      A    Again, my work at the local level was we

3  could recommend to a superintendent, the

4  superintendent could take it to the Board.  I don't

5  know that's the way that it works at the State

6  level, but I'm not sure.

7      Q    Okay.

8      A    You know, you have the cabinet review

9  process, and that responsibility may have been

10 designated at the cabinet level.  I don't know.

11     Q    So would it be fair to say someone in

12 GaDOE's cabinet approved this before it goes to the

13 State Board?

14     A    Oh, absolutely.  Maybe even multiple

15 reviews.

16     Q    Thank you.

17          And this was a grant not to exceed 1.5

18 million?

19     A    For the year.

20     Q    And was this grant awarded?

21     A    Yes.

22     Q    At what amount?

23     A    I was trying to remember the total.  It

24 was for three years and I think that it's $1.5 per

25 year.  But I probably need to look at the talking



1    points myself.

2        Q    So if this was 2021, this is still an

3    active grant?

4        A    Yes, it is active.

5        Q    And are the amounts distributed equally

6    among the 24 regional GNETS programs?

7        A    62,000 each.

8        Q    A year?

9        A    Yes.  For the length of this award.

10       Q    And what led GaDOE to create this award?

11            MR. BEDARD:  Object to form.

12       A    It's just a part of the American Rescue

13   Plan funds, and the leadership would determine where

14   that funding was used, but there was -- I don't know

15   the dollar amount but there was an opportunity for

16   us to reach out to the manager handling that and to

17   submit some recommendations and requests, and that's

18   how this came about.

19       Q    And one of the recommendations was

20   therapeutic services for GNETS?

21       A    Uh-hum, for students with disabilities.

22       Q    But this one was specific to GNETS?

23       A    It was.

24       Q    Can you look to Page 2.  Do you see under

25   -- do you see a box that reads "Performance" at the



1   top?

2       A    Uh-hum.  Yes.

3       Q    And do you see it says, "Describe how the

4   grant will be monitored to ensure satisfactory

5   performance"?

6       A    Yes.

7       Q    So it appears that the regional GNETS

8   program submits grant performance reports to address

9   performance metrics; is that correct?

10      A    When Vickie and Lakesha meet with each

11  GNETS program annually, that's when they look to

12  talk about the performance of this.

13      Q    So when it states, "The GNETS will submit

14  final grant performance reports," do you see that?

15      A    Uh-hum.  Yes.  I think it's all embedded

16  when they're doing their strategic plan.

17      Q    What's a strategic plan?

18      A    It's just simple a written plan to discuss

19  what their priorities were and areas of focus.  Of

20  course, with database decision-making.

21      Q    And it's submitted by each regional GNETS

22  program?

23      A    To the program manager.

24      Q    To Vickie Cleveland?

25      A    It's -- yes.



1      Q    And that's annual?

2      A    Yes.

3      Q    So Vickie Cleveland and Lakesha Stevenson

4   review the final grant performance report that's

5   embedded in the strategic plan?

6      A    How they're using the funds, what they

7   actually did with the funds, what specific services

8   may be provided.

9      Q    And then let's look to the talking points,

10  which start on GA03671093.

11          Do you see those?

12     A    Yes.

13     Q    Do you recognize these talking points?

14     A    I do.

15     Q    And these are the talking points referred

16  to in your first email?

17     A    Yes.

18     Q    And did you draft them?

19     A    Probably.  I don't remember specifically

20  but probably I did.

21     Q    Let's look at the first paragraph.  Do you

22  see where it reads, quote:  "GNETS programs provide

23  therapeutic counseling services to children

24  identified with significant mental and behavioral"

25  -- "mental health," excuse me, "and behavioral



 1   needs."

 2           Do you see that?

 3      A    Yes, I do.

 4      Q    Do you agree with that statement?

 5      A    It could vary by location.

 6      Q    What would vary?

 7      A    The available services.

 8      Q    Are you talking about the available

 9   therapeutic services?

10      A    Yes.

11      Q    Do all regional GNETS programs provide

12   therapeutic counseling services to their students?

13      A    I'd have to answer that by that's the

14   expectation.  I don't have the data in front of me

15   to confirm that.

16      Q    Is that something that the GNETS program

17   manager looks at in the strategic plan?

18      A    It is something that she collects, and we

19   have reviewed that together, but I don't recall the

20   exact specifics but we have.

21      Q    Do you see in the next sentence, quote:

22   "The requested funding will provide clinical staff

23   for all 24 GNETS programs to support the therapeutic

24   and behavioral needs of students receiving GNETS

25   services"?



```
1        A    I do.

2        Q    And do you see -- let's look at the third

3   paragraph, starting with "The project goal is to

4   provide clinical staff in (i.e., psychologists,

5   social worker, BCBA, etc) for each GNETS to

6   implement evidence-based behavioral interventions."

7             Do you see that?

8        A    Yes, I do.

9        Q    Has this happened?

10       A    I think in most of the recipients that it

11  has.  They've been able to locate especially

12  contract staff to come in and support that.  I can't

13  verify to you that absolutely everyone was able to

14  do that, but we will have that information at some

15  point.

16       Q    When would you have that information?

17       A    I'm sure Vickie already has that for the

18  first year.

19       Q    Have you discussed first year results with

20  Vickie Cleveland?

21       A    I don't recall seeing the written report.

22  Verbally we have.  There were a few locations that

23  were unable to locate these providers due to rural

24  areas, and that's something that of course we want

25  to help support them in that if there's any
```



1  possibility of some shared services or other

2  contract options.

3       Q    Which regional GNETS programs are those?

4       A    I don't recall.

5       Q    But GaDOE is going to assist in shared

6  services?

7       A    We talked with them about that.  We don't

8  have services to send to them, but in giving them

9  the idea about contacting people and the area that

10 might be able to share a provider, and it's nothing

11 sure.  It would just be if they might reach out.

12      Q    Do you see in the next sentence where you

13 write:  "It is critical that students receive

14 systemic therapeutic supports for reintegration to

15 their home schools."

16      A    I do.

17      Q    Why is reintegration, quote, "critical"?

18      A    Because that's what we want to do.  We

19 want to support them to help the needs, the crisis

20 they may be in, that require these services, and to

21 return them back to their regular classroom and with

22 their peers and nondisabled peers, and all the

23 things.

24           That is what our desire is for every

25 student.



1      Q      Has GaDOE monitored reintegration of GNETS

2    students back to their home schools?

3      A      We have.

4             MR. BEDARD:   Object to form.

5      Q      How have you done that?

6      A      With data.

7      Q      And when is that data submitted?

8      A      I don't know the particular date when that

9    data is submitted but it's something that the

10   program manager collects.

11     Q      Is that part of the strategic plan or

12   separate?

13     A      I don't really know.

14     Q      Have you seen that data?

15     A      I've discussed that data.  I don't know

16   that I have seen that data, but I have had reports

17   about it.

18     Q      And what have you discussed regarding that

19   data?

20     A      Well, the reintegration rate is not what

21   we would like it to be.

22     Q      And what do you mean by that?

23     A      There are not as many students returning

24   back to their home setting as we would like to see.

25     Q      Is GaDOE taking any steps to address that?



1       A    Yes, we are.  I mean, for example, this

2   grant award is one of those things.

3       Q    What other steps?

4       A    Encouragement and professional learning.

5   Those kinds of steps.

6       Q    Thank you.

7       A    Other professional learning to give them

8   the skill.

9       Q    When we first started talking about this

10  grant, you mentioned that therapeutic services are

11  important.  Why is that?

12      A    Well, if the child has a severe enough

13  issue, concern, and it should be an emotional and

14  behavioral basis for GNETS services that are found

15  in Georgia, then there has to be value to bring to

16  the program that would be different than what

17  they're receiving otherwise.  And therapeutic

18  services in the variety of settings designed for

19  their specific need would be part of the process to

20  serve them, to -- a treatment plan.

21      Q    Thank you.

22          What specific data do you look for for the

23  purposes of monitoring reintegration of GNETS

24  students to their home schools?

25      A    How many students return to their home



1  school or how many segments a day they returned, and

2  those types of things.

3      Q    How many segments are there in a day?

4      A    Well, defined by our state reporting, it's

5  six segments in a day, but that doesn't mean some

6  people have seven segments or eight, or a 4-by-4

7  block.

8           But for Georgia's FTE reporting, whatever

9  schedule they run gets translated into six segments

10 a day for reporting and funding.

11     Q    And is this annually submitted?

12     A    No.  It's submitted twice a year, in

13 October and in March.

14     Q    And does the GNETS program manager review

15 that with you twice a year?

16     A    No, not necessarily, not that data.

17     Q    Does she provide feedback to the regional

18 GNETS program about the data?

19     A    About the submission of their FTE data?

20     Q    About what she's seeing.  Yeah, like the

21 substance, not whether they --

22     A    I think she mainly reviews the student

23 record, which is the June submission that is

24 cumulative for the whole year, anybody that has come

25 in or out.



1           And the FTE reporting is more of a

2    snapshot of moment in time.  That's who's in your

3    building and has been served in the prior 10 days.

4        Q    Okay.

5        A    But the GNETS don't report this

6    themselves; they go back to the LEA for reporting.

7        Q    Okay.  Thank you.

8           What other items have you addressed with

9    the State Board of Education?

10           MR. BEDARD:  Object to form.

11       A    About GNETS?

12       Q    We can start with GNETS, yeah.

13       A    This therapeutic grant is one of the items

14    that's gone before them.

15           I mean I interact with Board items every

16    month, but it's just on a variety of topics.

17       Q    Are there other ones related to GNETS that

18    you recall right now?

19       A    No.  I have a capacity building grant

20    opportunity that's been released, and GNETS can

21    apply for that, as well as LEAs.  And that's just in

22    a way, just like it sounds, capacity building, if

23    they have a request.  That has not been awarded yet

24    but it is presently posted.

25           Most of our items are more holistic for



1  everybody, so not GNETS specific.

2      Q    And when did that capacity building grant,

3  when did that come out?

4      A    Friday, last Friday.

5      Q    So very recent?

6      A    Very.

7           MS. TUCKER:  I think now is potentially a

8      good time to break.

9           We'll go off the record.

10          THE VIDEOGRAPHER:  Going Off the record at

11     12:36.

12          (A recess was taken.)

13          THE VIDEOGRAPHER:  We're back on the

14     record at 1:32.

15 BY MS. TUCKER:

16     Q    Welcome back, Ms. Low.

17          I wanted to follow up on two items we

18 discussed prior to lunch.

19          First is earlier you said there was a

20 lower than desirable rate of student reintegration

21 from the GNETS program back to their home schools?

22     A    I do.

23     Q    Have you identified the reasons for the

24 lower than desirable rate for reintegration?

25     A    Not at this point.  I mean clearly this



1  has been something I've been aware of as a local

2  director as well.  There are several things that I

3  feel that we can do to increase that, but number one

4  is offering a full continuum in all of our schools,

5  but, no, that's just something that we always want

6  to change.

7       Q    And you just said that there's several

8  things that you could do to increase the

9  reintegration rate, that GaDOE could do.  What would

10 those be?

11           MR. BEDARD:  Object to form.

12      A    I don't know that it's the Georgia

13 Department of Education, but local agencies, you

14 know, run their programs and make these changes, but

15 certainly as a department we will continue to

16 reinforce the expectations and try to provide

17 supports in place.  Preventive measures, especially.

18      Q    What type of preventative measures?

19      A    Additional professional learning in

20 behavior management, functional behavior assessment,

21 behavior intervention plans.  Those types of things.

22 The whole array.

23      Q    Thank you.  And I asked if you had

24 identified the reasons for the lower than desirable

25 rates for student reintegration and you said not



1  yet.  Has anyone else at GaDOE started working on

2  this?

3      A    It's something we've all worked on for

4  years, but we haven't solved it yet.

5      Q    Is Vickie Cleveland currently working on

6  this?

7      A    Of course.  I mean this is part of

8  everyone's work, is we want children to return to

9  their home setting.

10     Q    You said that the No. 1 thing is offering

11  a full continuum in all of your schools.  What did

12  you mean by a full continuum?

13     A    A full continuum of services is what law

14  identifies now.  Larger districts can have -- you

15  know, grouped together for specific programs, but I

16  think we need to ensure that we are taking all those

17  steps first.

18     Q    What do you mean, what steps first?

19     A    An example might be if you have a student

20  with very intense behaviors, what have you done in

21  your own school to try to support the student and to

22  maintain safety, too.  It could be a very, very

23  small class setting or even one student and a

24  teacher or para.  But what are we doing in the

25  regular full continuum of services first.  It's

1    easier to integrate -- reintegrate that way.

2        Q    So prior to GNETS placement?

3        A    Yes.

4        Q    And is there not a full continuum of

5    services at all schools?

6        A    I hope that there is.  That is my message,

7    something that I talk about with directors, I've

8    talked about in two keynote speeches that I've given

9    for GK's, with 500 special ed leaders present.

10           So it's -- I think with so much emphasis

11   on inclusive services, which is also extremely

12   important to do, that we don't need to forget that

13   we also may need very intense services.

14       Q    What do you mean by inclusive services?

15       A    Children included in the classroom, which

16   is what we all want.  That's the place that you

17   start, how can we bring services in there.

18           But that doesn't mean that we still don't

19   have the full continuum of options.

20       Q    Do you see the full continuum of options

21   at GNETS' sites?

22           MR. BEDARD:  Object to form.

23       A    That's hard to say.  I would be worried

24   about it.

25       Q    Can you elaborate why you're worried about



1   it?

2       A    Well, you don't have nondisabled students

3   in center-based, certainly.  So that would be hard

4   to create an inclusive setting.

5            In a school-based program you may be able

6   to do that.

7       Q    Do you see school-based programs doing

8   that?

9       A    Yes, some.

10      Q    And some have not?

11      A    I don't know the specifics.

12      Q    Earlier we also talked about the Dispute

13  Resolution process.

14      A    Yes.

15      Q    And you identified there was a letter that

16  GaDOE issued after the Dispute Resolution process

17  comes to an end.  Do you recall that?

18      A    Resolution letter.

19      Q    What is the purpose of the resolution

20  letter?

21      A    It's to identify --

22           MR. BEDARD:  Object to form.

23           Sorry.  Go ahead.

24      A    It's to recap what the complaint was

25  about, what the complainant said, what the school



1  said, what the investigator found.  And we go

2  through the whole laundry list.  Sometimes our

3  resolution letters are very, very long.

4        And then we come to a conclusion about

5  each allegation and state whether it was in

6  compliance or wasn't in compliance.  And then of

7  course we have recommendations for things that have

8  to occur to have corrective action.

9     Q    And those are GaDOE's findings and GaDOE's

10  recommendations and corrective actions?

11     A    Yes, in the formal complaint process.

12     Q    Thank you.

13        When did you first become familiar with

14  the GNETS program?

15     A    I would say when I was an educational

16  diagnostician in Carroll County schools.

17     Q    And when was that again, approximately?

18     A    January, February '90 till -- through June

19  30th of 1997.

20     Q    Please describe the GNETS program for me.

21     A    The GNETS program as the State network or

22  --

23     Q    Yes, the State network?

24     A    It is on the continuum of services.  It's

25  a shared services, regionally-based program, which



1   could be center-based or school-based, for children

2   with emotional/behavioral disorders.

3           We used to call it severe emotional

4   behavioral disorders, but it's really intended for

5   having an emotional basis, not just a behavioral

6   basis.

7           You know, a professor at the University of

8   Georgia started the concept.  It was a half-day

9   program for a long, long time.  Services came to the

10  student.  And consulted with staff and over time it

11  evolved.

12          When I first knew the program, it was

13  already some separate centers and some school-based

14  programs.  It's for children with very intense

15  behavior.  Very, very intense emotional concerns,

16  and sometimes they do of course have outward

17  behaviors, too.

18          That's the intent.  And of course if they

19  could receive therapeutic services and even

20  psychiatric consultation, things like that, and then

21  return to their home school setting.

22          It wasn't intended to be a place to stay

23  forever.

24      Q   Do you see students spending their

25  academic careers in GNETS?



1    A    I don't have specifics on that, but I have

2    known of some students that stayed the rest of their

3    academic career.  A lot of times parents have

4    requested that as well.

5    Q    Does that concern you?

6         MR. BEDARD:  Object to form.

7    A    It does concern me that the parents are

8    frustrated, too.  And it's less likely they receive

9    so many phone calls, but, you know, that's more

10   anecdotal.

11   Q    Does it concern you that some students

12   have stayed in GNETS for their entire academic

13   career?

14   A    It always concerns me, but if it's the

15   right individual decision for the student and that's

16   where they can meet their goals, then it may be the

17   right place to be and to stay.

18        You know, I can't second-guess an IEP

19   decision when you have the people that are the

20   stakeholders and required members of that.

21   Q    A moment ago you said that GNETS was for

22   children with emotional and behavioral disorders.

23   You said it used to be severe but that's --

24   A    That's just a term we used to use.  We

25   used to say SEBD, but that was dropped a number of



1   years ago.

2        Q    By Georgia or --

3        A    Just Georgia.

4        Q    And when was that change?

5        A    I don't remember the exact date.  I mean I

6   was still a local director when that change came

7   about.

8        Q    It was before you went to GaDOE?

9        A    Yes.

10       Q    You described the GNETS program, but what

11  purpose does it serve?

12            MR. BEDARD:  Object to form.

13       A    It's a full continuum to meet the needs of

14  all students, and those with the most severe

15  emotional/behavioral difficulties should have a

16  therapeutic option.

17       Q    What is your basis for that understanding?

18       A    What is my basis for that understanding?

19  That's the stated purpose of the program.  Plus that

20  is the population that they're really geared to

21  serve.

22       Q    Has your understanding of the GNETS

23  program changed since working at GaDOE?

24       A    No.

25       Q    And does the GNETS program target a



1   particular student population based on disability

2   eligibility?

3           MR. BEDARD:  Object to form.

4       A    No, not necessarily.  Some children have

5   other disability areas, some other health

6   impairment.

7           There are a number of children that are

8   identified as autistic now.  That's a more recent

9   development, in the last 15 years, I would say.

10  It's much more frequently diagnosed now than it was

11  20 years ago.

12      Q    Are you speaking about autism?

13      A    Autism.

14      Q    What is the target student population?

15          MR. BEDARD:  Object to form.

16      A    It started out to be emotional behavioral.

17      Q    How does GNETS serve these students?

18          MR. BEDARD:  Object to form.

19      A    I'm not exactly sure of what you are

20  asking.

21      Q    Sure.  I'm curious how GNETS works with

22  the students that attend, that it serves, to assist

23  them?  What does GNETS do?

24      A    If they are a full-day placement?

25      Q    Sure, we'll start with full day.



1          A     It could vary by each center what they do,

2     but they're going to provide for their academic as

3     well as their emotional/behavioral needs.  And

4     that's talking about something that is a fully

5     self-contained-type program.  There are many

6     variations in between.

7          Q     Does GaDOE review both the academic and

8     behavioral services provided by GNETS?

9          A     The data from it, the outcome data?

10         Q     Uh-hum.  (Affirmative.)

11         A     Yes, we do.  But, again, the data is

12    reported back to the home school system.  So you

13    have to disaggregate by students that are served

14    through GNETS.

15         Q     What services and supports does the GNETS

16    program offer?

17         A     They are supposed to provide therapeutic

18    services that would be identified through the IEP

19    process that they may need.  It could be counseling.

20    It could be what a lot of them call a treatment

21    team.  It could be working with a psychologist,

22    behavior management, BCBAs, social workers.  It

23    could even be nursing that is a supportive

24    therapeutic type of service.

25               But all the while also making sure that



1   they cover their grade level content.

2       Q    Do all regional GNETS programs cover their

3   grade level content?

4       A    To my knowledge.

5       Q    To your knowledge?

6       A    To my knowledge, but I don't supervise or

7   run the GNETS programs.  Those are all local

8   regional and LEA decisions, but that's what they are

9   supposed to do.

10      Q    Do all regional GNETS programs offer the

11  therapeutic services you identified a moment ago?

12      A    I believe they all offer some form.  Some

13  offer more, some may offer less.  And it may depend

14  on the needs of the student in the program and, you

15  know, some regions have a harder time locating

16  providers.  And it's just a reality, that's not

17  necessarily that's what should be, but in some cases

18  it's a reality.

19      Q    What's the basis for your answer related

20  to services?  How do you know this?

21      A    Data, as well as observation and

22  conversations.

23      Q    Conversations with whom?

24      A    Various providers:  LEAs, GNETS directors,

25  Vickie.



1        Q     And what types of observations?

2        A     When I have been a local director?  I mean

3    I visit sites.  I go to IEP meetings.

4        Q     Have you visited sites as state director?

5        A     I have.

6        Q     Outside of this litigation?

7        A     No.

8        Q     Approximately how many students are in the

9    GNETS program this school year?  And by this school

10   year I mean the 2022-23 school year.

11       A     Okay.  This is going to be not everybody

12   that came in or out, because I'm not going to give

13   you a student record answer.  But it's a few

14   students below 3,000, is what the count looked like.

15             But if you look at it from student record

16   count, you're going to see thirty two, 3300, but

17   that's everybody that moved in, moved out throughout

18   a year.

19       Q     And how do you receive this less than

20   3,000 number?

21       A     Through FTE reporting or student record

22   reporting, and, you know, we have a whole unit.

23   That's what they do, is data collection reporting.

24       Q     How frequently are you looking at this

25   number for the GNETS program?



1        A    It depends on what I'm doing, but every
2    time we have new data, it comes out.  Of course, we
3    have reporting requirements as well to OSEP, so
4    that's when I see all the data and the various
5    disaggregated pieces.
6        Q    Is that monthly, every few months?
7        A    No, it's not monthly.  It depends on what
8    we're talking about.  It could be a few times a
9    year, especially based on FTE count.
10            Student record count will be a third one
11   in there, and then when we have other data released
12   -- you know, we don't receive the academic data
13   until a delay behind.  The schools get it before we
14   do.
15       Q    Is this data maintained on a database that
16   you can easily access?
17       A    I don't access this, but my program
18   manager for data and my data managers can.
19       Q    Can Vickie Cleveland access it?
20       A    Vickie would probably have to make a data
21   request to.
22       Q    What's that database called?
23       A    Just the big network that we have.
24   Honestly, I could say Student Longitudinal Data
25   System, and it probably is in there, but I don't



1  know if it's coming from a separate database on top

2  of that.

3      Q    Has the GNETS student population been

4  relatively stable during your time at GaDOE?

5      A    It's been decreasing.

6      Q    What is your understanding of the reason

7  for the decrease in the GNETS student population?

8      A    I think an emphasis on providing a full

9  continuum, providing the therapeutic services,

10  preventative services at the LEA level.  All those

11  things come together, being very, very careful about

12  placement.  You know, additional professional

13  learning, professional guidance about students that

14  may need this service.

15      Q    And then what is the basis for that

16  answer?  How do you know that to be the case?

17      A    I know that's what the actions that we've

18  taken, and of course watching the numbers fall from

19  around 6,000 down to just under 3,000.  That's a

20  significant change.

21      Q    During your time just as state director,

22  have you seen a decrease as well?

23      A    Nothing appreciable.  It dropped maybe two

24  or three hundred students from one year to the next.

25      Q    You mentioned that there was 6,000



1   students at a time?

2       A    At one point, uh-hum.

3       Q    Where are the students that were formally

4   served by GNETS now receiving services?

5       A    I can't answer that accurately because

6   some may have graduated, some may have moved out of

7   state.  You know, all those kinds of things.

8            But they reintegrated into their school

9   system.

10      Q    So you expect that they're continuing to

11  receive special education services at their home

12  schools?

13      A    I would expect that's the case, but I

14  don't know.

15      Q    Ms. Low, what is your understanding of

16  least restrictive environment, or LRE?

17           MR. BEDARD:  Object to form.

18           Go ahead.

19      A    It's the -- it's where the student can

20  receive the services they need to meet their

21  established goals in the least restrictive

22  environment, starting with general ed and working

23  your way from there.

24      Q    So for students that once had their LRE as

25  GNETS, their LRE changed to their home school in



1    receiving -- going to general education environment?

2          A      Probably didn't --

3                 MR. BEDARD:  Object to form.

4          A      They probably did not go directly from a

5    GNETS center to all general education, certainly

6    not.  It would be the individual students' least

7    restrictive environment.

8                 My least restrictive environment could be

9    in a self-contained class with all day services or

10   four segments a day.  But that has to be determined

11   by the committee, the IEP team, in determining --

12   again, you want to determine the goals of the

13   student, and then you start talking about where can

14   we provide those goals, to meet those goals for the

15   student, and that's how you work your way into what

16   their least restrictive environment is.

17                Of course, the option of services always

18   starts with general ed first.  What do they need to

19   meet their goal, and then it would be, well, what

20   can we bring into the classroom?  Will that meet

21   their goal?  What type of assistive technology could

22   we provide?

23                Then you would revert to the next level if

24   necessary, talk through those same things, until you

25   reach a place that the IEP team felt like that was a



1   place they could meet their goal and that would be
2   their least restrictive environment.
3         There's no one place that's the LRE for
4   everybody.
5         Q    Yes, ma'am.
6         A    It depends on the child's needs and what
7   their least restrictive environment is.
8         Q    Are you -- are there any school districts
9   that have stopped participating in the GNETS program
10  since you've been at GaDOE?
11        A    Since I've been at -- well, yes, during
12  the time I've been at the department, but not
13  necessarily as director.
14        Q    But the time you were at the department?
15        A    Yes.
16        Q    Which school districts are those?
17        A    I don't have a comprehensive list.
18  Cherokee County is one that comes to mind.
19        Q    How do you know this?
20        A    Heard it from the director, heard it from
21  Vickie.  Things like that.
22        Q    Has Vickie identified other school
23  districts that have left the program?
24        A    There are a few others but I honestly
25  can't name who they are at this point.  Leave it at



1   that.

2        Q    Why have those districts left the GNETS

3   program?

4        A    I'm sure it was a variety of reasons,

5   which I may or may not know, but they felt like they

6   could serve their own students.

7        Q    In their general education environment?

8        A    In their schools.

9        Q    In their schools?

10       A    In their schools, but then the -- their

11  least restrictive environment would be determined by

12  their team.

13       Q    Does GaDOE provide any guidance to the

14  regional GNETS programs?

15       A    Some, but we don't run the program.  So

16  that would be a concern that the folks that do run

17  the program, whether or not they followed the

18  guidance.

19       Q    What type of guidance has GaDOE provided

20  to the regional GNETS programs?

21       A    We provide all kinds of guidance about

22  things like transition, about academic achievement.

23  You know, they participate in all the things that we

24  offer, all the array of services.  Low incident

25  students, assistive technology.  Everything that we



1   do.  But we don't mandate.  We don't have the

2   authority to do that.

3        Q    Does GaDOE provide any best practices

4   documents to regional GNETS programs?

5        A    Everything we provide for every LEA is

6   also provided to GNETS.  So, yes, we do a lot of

7   things with best practice.

8        Q    How about documents that are guidance

9   that's specific to the GNETS programs?

10       A    We wouldn't look at it that way.

11       Q    Is it correct GNETS students are served in

12  centers and school-based locations?

13       A    Yes.

14       Q    How many standalone centers are being used

15  for the 2022-23 school year?

16       A    I don't have that number.

17       Q    Is that a number you could get?

18       A    Yes.

19       Q    How?

20       A    Vickie and Lakesha have it.

21       Q    Is it something that they've advised you

22  on in the past?

23       A    We have discussed it.

24       Q    Do you have a ballpark number?

25       A    I don't, really.  I mean there are pockets



1   of different regions that have no centers.  There

2   are children all served in school buildings in a

3   much more inclusive setting, and there's more of

4   that than not.  But there are still some centers.

5        Q    Do you know the percentage of students

6   being served in GNETS centers this school year?

7        A    I don't know.  Again, we do have that

8   data.

9        Q    Do you know if it's changed during your

10  time at GaDOE?  If it's increased or decreased?

11       A    I'm sorry, I don't know.

12       Q    Do you know how many school-based

13  locations are being used this school year?

14       A    I don't, but just in one region that comes

15  to mind every school district has all their classes

16  in their schools.  So it would be multiple, multiple

17  locations.

18       Q    And what region are you referring to?

19       A    I'm thinking right now as an example

20  Northwest.

21       Q    Are Vickie and Lakesha tracking this

22  information as well?

23       A    Uh-hum.  They do.

24       Q    Do students and centers, GNETS centers,

25  have the opportunity to interact with their



1   nondisabled peers?

2        A    It depends on the center and the location.

3        Q    In what ways could they in a center?

4        A    Because some centers are located in school

5   buildings with other programs in them that have

6   nondisabled peers.

7             You know, certainly school-based

8   locations, they would interact with nondisabled

9   peers.

10       Q    Right.  With the centers, you're saying

11  some centers are located in buildings with other

12  programs?

13       A    Yes.

14       Q    What type of programs?

15       A    I know of one specifically that there's an

16  alternative program in the same building.

17       Q    And what do you mean by alternative

18  program?

19       A    I don't know if that particular district

20  uses it for some true alternatives by choice, or if

21  it's all disciplinary, but I know that they have an

22  opportunity to eat lunch together and things like

23  that.

24       Q    So the GNETS students have an opportunity

25  to eat with the students in the alternative school?



1      A    But, again, I don't know if it's a choice,

2   alternate-type education, or if it's all

3   disciplinary.

4      Q    And how are you aware of that setup?

5   what's the basis for your awareness?

6      A    I have been told about it.

7      Q    By whom?

8      A    The director.

9      Q    And who is that?

10      A    Pam McKinnon.

11      Q    Which program is that?

12      A    I'm not sure which program it's called,

13   but that's Glenn County's special ed director.

14   Because, you know, one is coastal, and one is

15   coastal something else.

16      Q    Does GaDOE track the opportunities for

17   students in centers to interact with their

18   nondisabled peers?

19      A    I don't think we have that data.

20      Q    Do you think this would be helpful

21   information?

22           MR. BEDARD:  Object to form.

23      A    It would be helpful information.  It would

24   be difficult to find.  I mean it would be much more

25   efficient to go directly to the LEAs to do that or



1  to the regional program, but...

2      Q    Why do you think it would be helpful

3  information?

4           MR. BEDARD:  Object to form.

5      A    To make sure that they are having an

6  opportunity to interact with nondisabled peers.  I

7  mean that's always helpful.

8      Q    And why is that helpful?

9      A    Because you should be able to do that.

10  You should see role models that are different.

11      Q    Do students in school-based GNETS

12  locations have opportunities to interact with their

13  nondisabled peers?

14      A    Yes.

15      Q    All students?

16      A    I don't know about all.

17      Q    Has GaDOE provided guidance to the

18  regional GNETS programs about opportunities for

19  GNETS students to interact with their nondisabled

20  peers?

21      A    Through Vickie's leadership, as well as

22  Nakeba, and I will say that both have stressed the

23  importance of being able to be with their

24  nondisabled peers and have tried to suggest some

25  various examples of how that could occur.



1       Q    And how do you know this?

2       A    From talking with Vickie and, you know,

3   hearing what Nakeba had to say when she was leading

4   it.

5       Q    What type of examples did Vickie or Nakeba

6   provide?

7       A    Well, you can talk about co-curricular

8   activities.  You know, outings that you do for work

9   based learning, for community involvement, things

10  like that.

11           Of course, encouraging reintegration.

12  Maybe it's only even a period out of the day, but to

13  be able to transport the child to be back at the

14  home school to reintegrate and provide the support

15  necessary for them to be successful.

16      Q    Does GaDOE track how many students are in

17  GNETS for six daily segments?

18      A    We have that data.

19      Q    Are there any students in a school-based

20  GNETS who are with the GNETS program for six daily

21  segments?

22      A    I don't know.  We'd have to check the

23  data.

24      Q    The data would be able to tell you?

25      A    Yes.



1              MS. TUCKER:  I'd like the court reporter

2         to mark the following document as Plaintiff's

3         Exhibit 932.

4              (WHEREUPON, Plaintiff's Exhibit-932 was

5          marked for identification.)

6    BY MS. TUCKER:

7         Q    Ms. Low, this is an October 19, 2021 email

8    thread produced by the State.  The most recent email

9    in the thread was from you to Linda Castellanos.

10   The subject reads:  "Clarification on data request."

11              The Bates number on the bottom of the

12   first page reads GA03676946.

13              Ms. Low, do you recognize this email

14   thread?

15        A    Looks like, yes.

16        Q    Okay.  Let's go to the first email on the

17   thread from Linda Castellanos, was sent October 19,

18   2021.  And what is Linda Castellanos' position when

19   this email was sent?

20        A    She is the Data and GO-IEP program

21   manager.

22        Q    And am I correct she's seeking

23   clarification from you on a data request that you

24   made?

25        A    Let me read it.



1    Q    Yes, ma'am.

2    A    And try to figure out what we were talking

3  about.

4    Q    Take a moment.

5         (Witness reviews exhibit.)

6    Q    You're good.

7         Okay.  So going back, am I correct Linda

8  Castellanos was seeking clarification on a data

9  request that you made?

10   A    Yes.

11   Q    Let's look at the email sent from her at

12  1:20 p.m., so the first email.

13        What was your request?

14   A    This was a group out of Georgia State

15  University and they had -- it was primarily just

16  Georgia State University professors, but they did

17  have some outside -- and I don't even.  I don't even

18  know.  I didn't serve on that council.  I wasn't

19  involved in it.  I got kind of dropped into it as I

20  assumed the interim role.

21        But this group had been working on trying

22  to see how many children were served with behavioral

23  needs and to kind of write a State of the State

24  Address for kids with behavioral needs, emotional

25  needs, and how much money we were spending on all of



1    them.

2            Well, what I was trying to do here is to

3    pull anybody that would fit GNETS, or "T," for

4    emotional/behavioral disorders.  And it's a long

5    story, but the data that they really wanted really

6    didn't exist in some form or fashion.  You know, you

7    couldn't just divide the total allotment for the

8    areas and say that was exactly how it came in

9    either.

10           But that's what it was, trying to respond

11   to the request to this group.

12       Q    And why was Georgia State University

13   looking at this?

14       A    They had been commissioned by someone.

15   Again, I wasn't in any of the discussions other than

16   I met with two or three professors one time, and

17   they asked won't this be helpful, and you really --

18   I didn't think it was really helpful because none of

19   it was exact.  We were having to make estimations

20   about a lot of it.

21       Q    You said they were commissioned by

22   someone.  Would that be a state entity?

23       A    I don't know.  I honestly don't remember

24   or recall.

25       Q    So looking at your reply, 1:23 p.m., you



1   want to include all students reported as 4 despite

2   disability area, and 4 meant GNETS?

3        A    Uh-hum.  (Affirmative.)

4        Q    Then any segment marked as T, which is

5   EBD --

6        A    Yes.

7        Q    -- is fine.  Okay.

8             So why wasn't this data available?

9        A    We do have -- we can tell you everybody

10  that's a 4 and we can tell you everybody that's a T,

11  but it was -- the way the request came in to say

12  then how much did you spend per student was going to

13  just be sort of swagging it to -- I mean we weren't

14  going to figure that out, the amount, but all things

15  are not equal because services vary.

16       Q    Have you made other requests to your data

17  unit related to numbers of GNET students and EBD

18  students after this?

19       A    Vickie typically has made a request and

20  discussed it with me.

21       Q    Is Vickie still communicating with the

22  Georgia State University folks?

23       A    No.  That was a project that...

24       Q    And are you?

25       A    No.  I mean I have relationships with



1   Georgia State faculty but not this group that we're

2   talking about.

3        Q    Do you review data related to academic

4   outcomes for the GNETS program?

5        A    I do.

6        Q    What type of data do you review?

7        A    We would look at Milestones data.

8        Q    What is Milestones?

9        A    It's Georgia's academic, you know,

10  summative measure.

11       Q    And how often do you review Milestones

12  data for the GNETS program?

13       A    That's only -- we receive it once a year.

14  That doesn't mean that we don't use it more often.

15       Q    When do you receive it?

16       A    Well, this year we didn't receive the

17  official data from assessment until December, even

18  though there had been data released to the schools

19  much earlier than that, as well as some published.

20            But the clean-up data for assessment to

21  release it to us, that they're sure they have just

22  the right data, not duplicates, or things like, that

23  was in December.

24       Q    And what story did the most recent data

25  tell related to Milestones in the GNETS program?



1        A    I have not looked at the GNETS data for

2    the Milestones for this year.  Our achievement data

3    is not where we want it to be at all, and that's one

4    of the reasons for the instructional unit.

5        Q    And is your achievement data where you

6    want it to be for GNETS program?

7        A    I haven't reviewed that to segregate it

8    out of this year.  When I have in the past, it was

9    not what I wanted.  Of course, we've been through a

10   pandemic, a lot of challenges over the last three

11   years.

12            That's not to be an excuse, that's just to

13   -- it is.

14        Q    And you think Milestones isn't a helpful

15   assessment?

16        A    I think it's a helpful assessment.  I do.

17        Q    I'm going to show you what was already

18   introduced as Plaintiff's Exhibit 670.

19            There's some paper but there's also

20   something I'll show you on the screen.

21            MS. TUCKER:  I'll just get it.

22            (WHEREUPON, Plaintiff's Exhibit-670 was

23        marked for identification.)

24   BY MS. TUCKER:

25        Q    This is a November 14, 2018 email produced



1   by the State, from Vickie Cleveland to the regional

2   GNETS directors.  The subject of the email reads

3   2017-18 Milestone data," and there's two

4   attachments.

5           Before we look at those, let's look at the

6   email.

7           Do you see where Vickie Cleveland wrote:

8   "See the attached 2017-18 EOG and EOC milestones

9   data."

10      A    Uh-hum.  (Affirmative.)

11      Q    What does EOG mean?

12      A    End of grade.

13      Q    And what does that mean?

14      A    That means for our primary students it's

15  at the end of the grade level, in the late spring.

16      Q    Okay.

17      A    So it's measuring the standards that were

18  taught for that year.

19      Q    Okay.  And then you said for the primary

20  students.  What grades would that be?

21      A    That would be three through eight, at the

22  various levels that they're mandated for assessment.

23      Q    And what does EOC mean?

24      A    End of class.

25      Q    And what does that actually mean?



1       A     So if I take U.S. History, I'm going to

2   get an exam at the end of the class, I'm not going

3   to wait until the end of the year.

4       Q     What grade levels does this --

5       A     High school.  Some eighth graders, mainly

6   possibly some step of seventh graders.  If they're

7   advanced and take high school classes, they also

8   have to take the assessment, too, even though

9   they're not a high school student.

10      Q     Have you seen the 2017-18 Milestone data

11  for the GNETS program?

12      A     Probably have, but 2017-18 is quite a

13  while ago now.

14      Q     What is the last batch of Milestones data

15  you've received for the GNETS program?

16      A     I can't specify a particular year.  Vickie

17  typically brings it.  We discuss it.

18      Q     Okay.  Let's look at the first attachment.

19  I'm going to show it to you.

20           You see how it says that it's available

21  electronically?

22      A     Uh-hum.  (Affirmative.)

23      Q     I'm going to show that to you.

24           And this is the spreadsheet that ends in

25  336619.



```
 1              Ms. Low, do you see this spreadsheet?
 2      A    I do.
 3      Q    I gave you control, so you are able to
 4   zoom in and move around.
 5              You want to try?
 6      A    I want it to go full screen but it
 7   doesn't.  There maybe.
 8      Q    Is that helpful or are you still --
 9      A    I think I can navigate.  What would you
10   like for me to --
11      Q    Before I get into the questions, I want to
12   show you on the bottom right corner, you see there's
13   like a line that says minus and plus 100 percent?
14      A    Uh-hum.  (Affirmative.)
15      Q    You can zoom in that way.
16      A    I still don't have it full screen.  That
17   would be helpful.
18      Q    Wait one second.  We'll see if we can get
19   that for you.
20              MR. BEDARD:  You want to go off the
21      record?
22              MS. TUCKER:  Yes, we can go off the
23      record.  Thank you.
24              THE VIDEOGRAPHER:  Going off record at
25      2:17.
```



1            (Discussion ensued off the record.)

2            THE VIDEOGRAPHER:  We're back on the

3       record at 2:22.

4   BY MS. TUCKER:

5       Q    Ms. Low, you're looking at this Excel

6   spreadsheet, correct?

7       A    Yes.

8       Q    The top says this is the "Milestones End

9   of Course Assessment Results for High School

10  Students by GNETS Program"?

11      A    Uh-hum.  Yes.

12      Q    Am I correct that this spreadsheet shows

13  all of the regional GNETS programs?

14           Do you want me to scroll through?  Or you

15  got it?

16      A    I'm trying to go down.

17      Q    I see you moving it.

18      A    It doesn't have all the GNETS programs.

19      Q    I don't know if you started at the top.

20  I'm happy for you --

21      A    There's a whole nother.  Then it probably

22  does.

23      Q    I'll let you scroll to the top.

24           You agree that all of the regional GNETS

25  programs are identified?



1    A    I do.  I'm not sure what they're referring

2  to with Alpine.

3    Q    And this also shows the number, total

4  number of students that were tested in a subject

5  area and their test results and the scores?  Would

6  you agree?

7    A    Let me scroll over to see that.

8         Yes.

9    Q    And the score labeled as PL3 is

10  proficient; is that correct?

11    A    That's right.

12    Q    And PL2 and PL1 are below proficient?

13    A    That's right.

14    Q    And PL4 is above proficient?

15    A    Distinguished.

16    Q    Looking at the scores, do you agree that

17  the significant majority of GNETS students' scores

18  fall below proficient?

19    A    I'm scrolling through the data.

20    Q    Please.

21    A    Yes, that would be correct.

22    Q    And the majority of these students, GNETS

23  students' scores, fall under PL1, the lowest score?

24    A    They do.

25    Q    What do you make of these scores?



1              MR. BEDARD:  Object to form.

2        A    I'm concerned about it, highly.  They're

3    not acceptable.  I'm concerned that the students

4    certainly have challenges, and their behavior and

5    emotional state may have interfered with them being

6    able to attend a class, participate, you know,

7    however you want to put that.

8              But, you know, it would highly concern me

9    that this is not what the student wants for

10   themselves, nor is it what the parent wants.

11       Q    Have any steps been taken related to the

12   low Milestone scores?

13       A    Well, part of that with the iReady was to

14   encourage them to do incremental benchmark

15   assessments along the way and to be able to monitor

16   progress, but we don't supervise the academic

17   program.  We don't direct them about that, the

18   materials.  And there would be probably 24 different

19   approaches at a minimum, probably more than that,

20   because of the various districts they serve.

21       Q    Has Vickie Cleveland raised concerns about

22   the Milestones data with you?

23       A    Oh, yes.

24       Q    And what has she said?

25       A    That we have to improve the scores.



1       Q    And has -- please.

2       A    We're not preparing the students for the

3   next phase.

4       Q    Has Vickie Cleveland suggested other steps

5   in addition to iReady?

6       A    The emphasis on instruction, providing

7   instruction and good instruction, good instructional

8   practices, resources, the use of the assistive

9   technology, all those things that we recommend for

10  everyone.

11      Q    I'm going to show you -- I'm going to stop

12  sharing for a second to bring up the second

13  spreadsheet.

14          Ms. Low, do you see the second

15  spreadsheet?

16      A    Yes.

17      Q    I gave you control again.  Is it working?

18      A    No.

19          MS. TUCKER:  We'll go off the record

20      again.

21          THE VIDEOGRAPHER:  Going off record at

22      2:27.

23          (Discussion ensued off the record.)

24          THE VIDEOGRAPHER:  Back on the record at

25      2:30.



1  BY MS. TUCKER:

2      Q    Ms. Low, you see that we're looking at a

3  second attachment now?  Is that correct?

4      A    Same year, though.

5      Q    Same year and this is the end of grade

6  data.  Is that --

7      A    I still see end of course.

8      Q    Hold on.

9           End of grade data?

10     A    Yes.

11     Q    Okay.  And it's -- the top reads

12  "Milestones End of Grade Assessment Results for

13  Elementary/Middle School GNETS Students by GNETS

14  Program and Grade Level"?

15     A    Yes.

16     Q    Am I correct this spreadsheet has all of

17  the regional GNETS programs?

18     A    It appears to.

19     Q    And it also shows the total number of

20  students that were tested in a subject area, those

21  test results and the scores?

22     A    Yes.

23     Q    And again, PL3 is a proficient score?

24     A    Yes.

25     Q    PL2 and PL1 are below proficient?



1        A    They are.  But PL2 is developing.  So

2    there's some progress there.

3        Q    But below proficient?

4        A    It is.

5        Q    And PL4 is above proficient?

6        A    Distinguished.

7        Q    Looking at the scores again, do you agree

8    a significant majority of GNETS students' scores

9    fall below proficient?

10            I'll let you --

11       A    Yes.

12       Q    Yes.  And are the majority of those GNETS

13   students' scores falling in the PL1 category the

14   lowest score?

15       A    Yes, they are.

16       Q    And what do you make of these scores?

17       A    Well, I know you want me to repeat my

18   answer, but it's the same thing that I just said, is

19   they're well below where they need to be, concerned

20   of the impact on their future classes and mastery

21   that builds.

22            It certainly is not what the student

23   wants, nor the parent, and what can we do to change

24   these results, provide the support that they need,

25   is what I think when I see these.



1       Q    Thank you.

2            And have you also discussed these scores

3  with -- these end of grade scores with Vickie

4  Cleveland?

5       A    I don't think I've discussed 2017-18, no.

6       Q    But end of grade Milestones scores?

7       A    Yes.  We've discussed all the academic

8  scores.

9       Q    Thank you.

10           Do you also review iReady data?

11      A    I don't.

12      Q    Does Vickie Cleveland?

13      A    I think Vickie and/or Lakesha.  I don't

14 know that they have access to login to the various

15 sites, but I believe they have some collection of

16 data, but I'm not confident of that.

17      Q    Do you -- does GaDOE review post-secondary

18 outcomes for the GNETS programs?

19      A    Yes.  We review secondary outcomes for all

20 students.

21      Q    In what ways?

22      A    It's Indicator 14 in our federal

23 indicators.  So a year after exiting, so I won't say

24 graduation, but where they exit or should have

25 exited at the time, we have to contact the student



1   and find out what they're doing.  Are they engaged

2   in work or an activity, whatever is appropriate.

3   Are they attending school part-time or full-time,

4   full-time job.

5           There's several different options, but we

6   have to collect that individually, and then of

7   course it also is reported cumulatively.

8       Q    Has GaDOE looked at this for the students

9   that were in GNETS?

10      A    I don't know that Vickie is pulling from

11  Indicator 14.  She probably is pulling from data

12  reporting that she may ask the centers, the programs

13  about.

14          You know, you have very few exiters by the

15  time you get older, too.  So it would be easier to

16  know where each one went.

17      Q    Why do you have very few exiters?

18      A    You always have less students served in

19  special education in high school than you do in the

20  younger grades, just the need.  But some leave by

21  other means.  They may drop out or things like that.

22  Like it would not differ from the way that it

23  happens in the regular school, too.

24      Q    Has Vickie Cleveland spoken with you about

25  the post-secondary outcomes for GNETS students?



1      A    In a holistic manner, when we're talking

2    about scores and outcomes, that they're not where we

3    want them to be.

4      Q    And why is that?  Where are they?

5      A    Where are they?

6      Q    The post-secondary outcomes, if they're

7    not where you want them to be?

8      A    No, I don't have the exact number to tell

9    you but we don't have as many students graduating

10   that should.

11     Q    Has Vickie raised this with the regional

12   GNETS programs?

13     A    I can't tell you specifically.  My guess

14   is she probably did, but it would be a guess.

15     Q    Do you review data related to therapeutic

16   services offered by the GNETS program?

17     A    I have reviewed some data within the last

18   year about that.  That was collected and compiled by

19   Vickie and/or Lakesha.

20     Q    Have you looked at the number of social

21   workers?

22     A    I'm trying to remember if it was broken

23   down by different services.  I'm not sure about

24   that.

25     Q    So just therapeutic in general?



WINA LOW                                                February 28, 2023
UNITED STATES vs STATE OF GEORGIA                                    192

1        A    Again, I can kind of see the sheet in my

2    mind, but I don't remember if we had an accounting

3    for each type of service.  It was just primarily

4    overall that I recall.

5        Q    Got it.  Thank you.

6             MS. TUCKER:  I'd like the court reporter

7        to mark the following document as Plaintiff's

8        Exhibit 933.

9             (WHEREUPON, Plaintiff's Exhibit-933 was

10        marked for identification.)

11   BY MS. TUCKER:

12       Q    Ms. Low, this is an October 22nd, 2021

13   email produced by the State.  It is to you and Shaun

14   Owen, from Vickie Cleveland, and the subject reads:

15   "Clinical Support."

16            There are four attachments.

17            And the Bates number on the bottom of the

18   first page is GA03677596.

19            Ms. Low, do you recognize this email?

20       A    I do.  This is what I was referring to.

21       Q    Okay.  In her email Vickie Cleveland wrote

22   she attached documents that were to be discussed at

23   a meeting that morning.  So October 22nd, 2021; is

24   that correct?

25       A    I'd have to check my calendar to make sure



1    it was the 22nd.

2        Q    Do you see how Vickie writes:  "See

3    attachments discussed at our meeting this morning"?

4        A    I think she's talking about our Wednesday

5    meeting.  She often sends things just prior to the

6    meeting to have them at hand.

7        Q    Understood.

8            Do you recall speaking to Vickie Cleveland

9    about these documents?

10       A    I do.

11       Q    Let's look at the first -- did anyone else

12   join those conversations?

13       A    Shaun was in this conversation.  I don't

14   remember if it was this exact time or if it was at

15   another time that we scheduled to talk with her, but

16   she was -- she definitely has had this information.

17       Q    Let's look at the first attachment.  So

18   that's the document that has GA3677597 at the

19   bottom.  So it should be the second page.

20           Do you see it?

21       A    Yes.

22       Q    At the top does it read "FY22 Georgia

23   Network for Educational and Therapeutic Support

24   (GNETS) Clinical Supports Map"?

25       A    It does.



1    Q    Am I correct that it is showing the

2    clinical staff to student ratio at the 24 regional

3    GNETS programs?

4    A    Yes.

5    Q    And there's color shading whether there is

6    one clinical staff for seven to 19 students, one

7    clinical staff for 20 to 49 students, and one

8    clinical staff for 50 to 110 students?

9    A    Yes.

10   Q    Am I correct that for one clinical staff

11   for seven to 19 students there are eight out of the

12   24 regional GNETS programs shaded?

13   A    Yes.

14   Q    And then am I correct for one clinical

15   staff for 20 to 49 students there's also eight

16   regional GNETS programs shaded?

17   A    Yes.

18   Q    And then for the one clinical staff for 50

19   to 110 students, am I also correct that there are

20   eight out of 24 regional GNETS programs shaded?

21   A    Yes.

22   Q    Do any of these ratios concern you?

23   A    They certainly do.

24        MR. BEDARD:  Object to form.

25   Q    Which ratios concern you?



1              MR. BEDARD:  Object to form.

2        A    The 20 to 49, 50 to 110.

3        Q    And why do they concern you?

4        A    The level of support that this implies

5   that we're providing, that the regions are

6   providing.

7        Q    Has GaDOE taken any steps to respond to

8   these concerns?

9              MR. BEDARD:  Object to form.

10       A    We have internally discussed this.  We

11  have the funds flowing to this.  We have discussed

12  some changes possibly with our funding to increase

13  therapeutic services on top of that, but nothing has

14  been determined.  Collecting the information,

15  talking to the GNETS about this.

16             But we don't have control over who they

17  hire.

18       Q    And you say there's funds flowing.  What

19  do you mean by that?

20       A    The grant fund that we examined, the

21  American Rescue Plan funds, that was designated

22  completely for therapeutic services.  So they can't

23  even enter anything in a budget through the

24  consolidated application for something other than

25  that.



1            And then of course we're encouraging them

2    to use their federal funds more related to the

3    therapeutic services, but we are not their fiscal

4    agent and -- nor their advisory committee through

5    their special ed directors.

6        Q    And you said you've made some changes.

7    What changes are you referring to, in GaDOE?

8        A    I don't believe I said we made some

9    changes.   We're considering.

10       Q    And what are those changes that you're

11   considering?

12       A    Possibly to specify that an additional

13   portion of the federal funds may be restricted to

14   therapeutic services, but no decision has been made.

15       Q    Who makes that decision?

16       A    The decision would be made in conjunction

17   with myself, Vickie, and Shaun.   Shaun, of course,

18   is our supervisor.

19       Q    And I believe you said that you're

20   collecting information from the GNETS, regional

21   GNETS programs?

22       A    This is the information collected.

23       Q    But this is an ongoing discussion?

24       A    It is.

25       Q    When is the last time you discussed this?



1      A      December, January.

2      Q      So December '22 or January '23?

3      A      Yes.

4      Q      And was this discussed at one of your

5    bi-weekly Wednesday meetings?

6      A      It has been.

7      Q      Also in separate meetings?

8      A      I can't really say beyond that because it

9    was a litigation discussion.

10     Q      Was it shared with you by counsel?

11     A      The idea?

12     Q      Uh-hum.  For it to be related to

13   litigation.

14            MR. BEDARD:  You know, I don't know --

15         well, I can't speak to who shared it with you.

16         So if you've -- again, if you guys have been

17         having internal discussions about the

18         litigation or anything, about the litigation

19         itself, then I instruct you not to answer.  But

20         if it's about the program outside of being

21         related to the litigation, you can answer that

22         question.

23     A      What I've been discussing was certainly

24   not a part of litigation, but it was probably

25   mentioned when we had counsel with us in a



 1   discussion later.

 2        Q    And does Vickie Cleveland have any ongoing

 3   requests related to this issue that she's looking

 4   into and working on right now?

 5        A    To make them aware to, you know, collect

 6   this again.  She stresses therapeutic services and

 7   making that a priority with the funding.

 8        Q    Let's look at the fourth attachment.  So

 9   at the bottom -- this is more electronic.

10        A    The one with the bar graph?

11        Q    No.  We're going to get to that.  I'm

12   going to show you some electronic exhibits again.

13             MR. BEDARD:  The native format, the last

14        page.

15             MS. TUCKER:  One second.

16   BY MS. TUCKER:

17        Q    You should have control over my screen.

18             Do you see this?

19        A    I do see the -- I'm just trying to move

20   around.

21        Q    And it looks like you are able to with the

22   arrows?

23        A    Yes.  Would you all like to know the

24   secret?

25        Q    We can learn it later.



1       A     It's by touching the pad, because a

2    message came up after your last trip that said you

3    got to touch that before you can have control.

4       Q     You'll be very prepared for the next time

5    we show you an electronic exhibit.

6             So this spreadsheet has two tabs.  So

7    we're going to look at the first sheet, which is the

8    one you are currently looking at.

9             What does this spreadsheet show?

10      A     This looks like the data that -- exactly

11   what we were discussing, and it is collected by the

12   actual type of service.

13      Q     By actual type of service, you mean that

14   --

15      A     A nurse, a BCBA, school counselor, things

16   that you typically think about with therapeutics.

17      Q     So I'm correct that it identifies the 24

18   regional GNETS programs and then lists the number of

19   certain clinical and therapeutic staff members that

20   they have?

21      A     I haven't scrolled all the way down.

22      Q     I'll let you do that.

23      A     Yes, it appears to have everybody.

24      Q     Are you surprised by any of these values?

25      A     We were very shocked.



1    Q    Let's look at Rutland Academy, if you're
2    able to toggle there.  Let me know when you get
3    there.
4          The top one.
5    A    Yes.
6    Q    Am I correct looking at this Rutland
7    Academy services 110 students but does not have a
8    BCBA/ABA behavior specialist?
9    A    Right.
10    Q    It does not have a therapist, psychiatrist
11    or psychologist?
12          It doesn't have a school counselor?
13    A    It does not.
14    Q    I'm going to ask those again because I
15    know you were nodding.
16    A    I'm sorry.
17    Q    That's okay.  Let's start again.
18          Rutland Academy does not have a BCBA/ABA
19    behavior specialist?
20    A    No.
21    Q    Rutland Academy does not have a therapist,
22    psychiatrist, psychologist?
23    A    No.
24    Q    Rutland Academy does not have a school
25    counselor?



```
1         A     No.

2         Q     Rutland Academy does not have a nurse?

3         A     No.

4         Q     Rutland Academy does not have an

5    RBT/behavior?

6         A     No.

7         Q     What is that?

8         A     It's the stepdown from a BCBA.  It's a

9    quicker registered behavior therapist, quicker

10   program and not so many hours to intern to receive

11   that.

12              A lot of school districts are having

13   parapros achieve that credential.

14        Q     Rutland Academy has one LPC/LCSW/social

15   worker/tech?

16        A     Yes.

17        Q     And Rutland Academy does not have a

18   music/art therapist?

19        A     No.

20        Q     And so Rutland Academy has one clinical

21   staff; is that correct?

22        A     That's what this shows.

23        Q     And that is funded by the State grant?

24        A     Yes.  And federal funds.

25        Q     Can you move over to that -- over where --
```



1   all the way to the right.

2        A    Back to the right on my screen?

3        Q    Yeah.  Okay.  Got it.

4             Now let's look at sheet two.  Do you see

5   the option on the bottom to click sheet two?  If

6   not, I can get control and do it.

7        A    Change it.  I can't see it.  It's hidden

8   behind.

9        Q    No problem.  I'm going to stop sharing.

10  Okay.  Let me stop sharing and pull it up.

11            Do you see this now?

12       A    Yes.

13       Q    Okay.  And does this have similar data if

14  you're looking at Rutland?

15       A    What's the difference in the two?  That's

16  what I'm --

17       Q    Let's look at the Columns B through H.

18  That's the same data, correct?  That it has zero

19  BCBA/ABA behavior specialist?

20       A    For Rutland?

21       Q    Yes.

22       A    Yes.  But what's the difference in the two

23  sheets?

24       Q    So I think the difference is if you go all

25  the way over to the right.  I want you to look at



1   it.  You let me know if you see this is different.

2          Do you see this additional column?

3      A    I see.

4      Q    This Column N, which reads Percentage?

5      A    Yes.

6      Q    And you see that the entries are

7   highlighted in red, yellow, and blue?

8      A    I see a little corner of it, but I'm

9   trying to make it -- there.

10         Yes.

11     Q    What do red, yellow, and blue highlight

12  represent?

13     A    I don't recall what her key to that was.

14  But I would say the red is not good from looking at

15  the data.

16     Q    And this was related to the ratios to

17  students to clinical staff?

18     A    Yes.

19     Q    Has GaDOE requested an update on this

20  data?

21     A    Does this have a date on it?

22     Q    The email, if you recall --

23     A    It probably was last spring.

24     Q    If we go back to the first email, do you

25  see it's dated October 22nd, 2021?



1     A    '21?

2     Q    Uh-hum.  (Affirmative.)

3     A    No, I don't think she's updated.  I think

4  this is the only one we've got at this point.

5     Q    Are there plans to update it?

6     A    Yes.

7     Q    Have those requests been made?

8     A    I don't believe the requests have been

9  made but this is something that we have determined.

10  Of course, we want to watch.

11     Q    Let's look at the second attachment, which

12  I'm going to start sharing.

13          This is the second map in the packet, and

14  the Bates number on the bottom reads GA03677598.

15     A    Yes.  I see that.

16     Q    And at the top it reads:  "FY22 Georgia

17  Network for Educational and Therapeutic Support

18  (GNETS) LEA Funded Staff."

19          Is that correct?

20     A    Yes.

21     Q    And why were you-all reviewing this

22  information?

23     A    We were trying to see which regions that

24  the LEAs were contributing for -- to ensure the

25  appropriate services were there.



1        Q     And --

2        A     And it varies across the State.

3        Q     So it's the number of LEA funded staff at

4    regional GNETS programs?

5        A     Yes.

6        Q     The map notes with a little asterisk that

7    most of these positions are teachers and

8    paraprofessionals; is that correct?

9        A     That's right.

10       Q     Okay.  And then am I correct that seven of

11   the 24 regional GNETS programs are shaded as having

12   zero LEA funded staff members?

13       A     Yes.

14       Q     Am I also correct that nine out of 24

15   regional GNETS programs are shaded as having between

16   two and seven LEA funded staff members?

17       A     Yes.

18       Q     If the positions are not funded by the

19   LEA, are they funded by the State?

20       A     They're funded through the State funds

21   that the GNETS program receives, or they could be

22   funded by some of the federal money that we send.

23   Not through the therapeutic services grant, but the

24   other federal money, or they could be LEA funded.

25       Q     Well, if they were LEA funded, would they



1   have been a different shade?

2       A    No.  This is by LEA funding.

3       Q    Right.  So I'm asking about those that are

4   numbered LEA funded, where it says zero.  So those

5   would not be LEA funded?

6       A    Based on what we were looking for, this

7   indicates that regions were not putting in extra

8   money through some type of a collaborative

9   arrangement to fund teachers or parapros or whatever

10  it may be needed.

11      Q    And has GaDOE requested updated data of

12  this kind?

13      A    We have not done that since this report.

14      Q    Are there plans to do so?

15      A    Of course.

16      Q    Let's look at the next attachment.  It's

17  the next page and it ends -- the first page ends in

18  599.

19           Do you see that?

20      A    Yes.

21      Q    Do you see at the top it says, "Analysis

22  of Possible Next Steps"?

23      A    I do.

24      Q    What does this document represent?

25           MR. BEDARD:  Object to form.



1      A    What does this page represent?

2      Q    Yes.  What is this document?

3      A    These were suggestions that were made, and

4   I think Vickie created them, Vickie or Lakesha, but

5   as I recall they came with the data when we

6   discussed this, and they were outlining next steps

7   that they felt would be appropriate to take.

8      Q    Let's look at the first bullet.  It reads,

9   quote:  "Vickie and Lakesha will review data on the

10  number of students receiving GNETS services with

11  MI/MOID/OHI eligibility."

12         Do you see that?

13     A    I do.

14     Q    Let's go over those abbreviations.  What

15  do they stand for?

16     A    Mild intellectual disabilities, moderate

17  intellectual disability, other health impaired.

18     Q    And who directed Vickie and Lakesha to

19  look at this data?

20     A    They are aware of the concern, but I

21  certainly have discussed this with them as well.

22     Q    And what did that data tell you all?

23     A    It tells us in some regions that we have

24  several -- a lot of students that are identified

25  mild or moderate intellectual disability.



1        Q    In GNETS?

2        A    In GNETS.

3        Q    And why is that concern?

4        A    That would not be the target audience.

5    There could be more to the story than it looks like,

6    of course.  They could have, you know, another code

7    -- existing condition, but if you felt like a child

8    had a severe emotional/behavioral, did you really

9    measure intellect -- are they really mild or

10   moderate, or was it the mental health, the

11   behavioral issue?  But GNETS was not designed to

12   serve students with intellectual disabilities.

13       Q    Are there certain regional GNETS programs

14   that have more students with these eligibility areas

15   than others?

16       A    Yes.

17       Q    And which are those?

18       A    The one that comes to my mind, without

19   reviewing the data, is Elam Alexander.

20       Q    Has any of these concerns been

21   communicated to Elam Alexander?

22       A    Yes.

23       Q    And what has Elam Alexander been told?

24            MR. BEDARD:  Object to form.

25       A    What have they been told?



1      Q    Uh-hum.  (Affirmative.)

2      A    We've had several conversations with the

3  director.  She is fully aware of that.  She has

4  talked with the directors from their region, but in

5  particular two districts that seem to refer a lot of

6  students.

7           She has also more recently visited the

8  superintendent of the fiscal agent to discuss with

9  him the concerns about that.

10     Q    And by more recently, when was that,

11  approximately?

12     A    It was the school year.

13     Q    The 2022-2023 school year?

14     A    Yes.  They have a new superintendent, and

15  she's been to see him, according to what she

16  reported to me.

17     Q    What else did she report to you about that

18  conversation?

19     A    I didn't hear the outcome.  She just told

20  me that she had an appointment with him to discuss

21  this.

22     Q    And this is Brook Cole?

23     A    This is Brook Cole, yes.

24     Q    Have you asked for a follow-up from Brook

25  Cole?



1    A    I don't believe I have spoken with Brook

2    further about that.  I mean Brook definitely has

3    opinions about it, too.

4    Q    Has she shared those opinions with you?

5    A    She has shared those opinions with me.

6    Q    What are her opinions she's shared with

7    you?

8    A    Let's see how I can -- that she receives a

9    lot of pressure about the referrals that come.

10   Q    From whom?

11   A    From a couple of systems that feel like

12   that these services are appropriate, and she really

13   does not agree that they are.  But, again, it is a

14   team decision.

15   Q    Looking at the next bullet, it's

16   indicating there's 2020 through 2021 student record

17   count for a number of students receiving services

18   with MI/MOID eligibility in regional GNETS programs.

19   Is that correct?

20   A    Yes.

21   Q    And then if you look at the chart, would I

22   be correct both Elam Alexander and the North Metro

23   Regional GNETS programs have over 25 students with

24   MID/MOID eligibility?

25   A    Yes.



1    Q    Have you also spoken to North Metro about
2  this?
3    A    I have not had a conversation with them.
4  Vickie may have.
5    Q    Let's look at the third bullet.  Do you
6  see where it reads:  "Review of LEAs that only have
7  their students receiving GNETS services."
8         Do you see that?  It's above the chart.
9    A    Yes.  Review of LEAs that only have their
10  students receiving GNETS services.
11    Q    Do you know what that means?
12    A    I think she's referencing what I just
13  said.
14    Q    Being?
15    A    That there's a concern that Brook has
16  expressed that two LEAs may not provide that service
17  in their continuum and feel like this is the
18  appropriate place, location for services.
19    Q    Let's look at the fourth bullet.  Am I
20  correct that Vickie Cleveland and Lakesha Stevenson
21  were going to review the number of students
22  receiving GNETS services for each GNETS who have
23  MI/MOID or OHI?  Do you see that?
24    A    Yes, I do.
25    Q    Has that been done?



```
1        A    Well, this is what they did.  I mean --

2        Q    I wasn't sure because it says the

3   information will be reviewed --

4        A    Uh-hum.  (Affirmative.)

5        Q    -- in the future.  No?

6        A    But we did.

7        Q    Okay, got it.  So you're saying this

8   bullet is referring to what they did?

9        A    Yes.

10       Q    Okay.  Thank you.

11            And looking at the fifth bullet, do you

12   see that Vickie and Lakesha would, quote:  "Develop

13   a guidance document for LEAs to consider when

14   reviewing student files for considering

15   reintegration"?

16       A    Tell me where -- I got you.

17       Q    It's the bullet that starts "After review

18   of the data," quote:  "Develop a guidance document

19   for LEAs to consider when reviewing student files

20   for consideration for reintegration."

21            Do you see that?

22       A    Yes.

23       Q    Has that been done?

24       A    Not to my knowledge.

25       Q    Is that still something that's going to be
```



1    done?

2         A    Yes, that should be done.

3         Q    Is that something that you followed up

4    with?

5         A    We have not discussed it recently.

6         Q    When is the last time you discussed it?

7         A    I'm not sure.

8         Q    Let's go to the next page.

9              Do you see the last bullet that starts

10   with "Review"?

11        A    Yes.

12        Q    Does it read:  "Review districts that are

13   participating in GNETS and services are provided

14   only to their students in their school buildings"?

15        A    Yes.

16        Q    What does that mean?

17        A    That means that they -- okay.  That means

18   that their children are in the buildings, so that's

19   good.  And the only children that are in their

20   buildings belong to that district that they're in.

21   There's no sharing.  They had enough students that

22   they only had to serve their children in their

23   building.

24        Q    I see.

25        A    And that is about talking with those



 1  districts.  You know, you're already there, why do

 2  you not want to just do this on your own?

 3       Q    So just to make sure I understand, this is

 4  looking for districts -- let's just take Gwinnett

 5  County as is an example.  I'm not talking about

 6  their data -- in which they have GNETS students that

 7  are only participating in GNETS sites in Gwinnett

 8  County --

 9       A    Schools.

10       Q    -- schools.  In their home schools?

11       A    Uh-hum.  (Affirmative.)

12            MR. BEDARD:  Object to form.

13       A    They may not be their -- sorry.  They may

14  not be their home school.

15       Q    Okay.  But their LEA?

16       A    Yes.

17       Q    Has that been reviewed?

18       A    Yes.

19       Q    And what's that data look like?

20       A    I can't tell you every system but there

21  are quite a few, and there have been occasions,

22  typically one-on-one, that we've encouraged the

23  special education director in the district to

24  consider what they want to do moving forward.

25       Q    So there's been conversations with some



1   school districts about this?

2       A    They're serving their own children, doing

3   a good job in their buildings --

4       Q    What about --

5       A    -- providing the continuum.

6       Q    What about the school districts that are

7   sending their students to GNETS facilities in other

8   school districts, have they been communicated to?

9            MR. BEDARD:  Object to form.

10      A    What you're asking is -- of course they've

11  heard a lot of things about the situation that's

12  going on and the proposal from the legislature last

13  year.  So there has been a lot of ongoing

14  consideration through the fiscal agent, through the

15  RESAs, to discuss how they may want to proceed.

16      Q    What proposal from the legislature are you

17  referring to?

18      A    There was a temporary I guess proposal

19  that the funding go directly to the LEA rather than

20  to the regional GNETS.

21      Q    And what do you think about that proposal?

22           MR. BEDARD:  Object to form.

23      A    I don't do funding.  It's -- that's up to

24  the legislature.

25      Q    Do you have any thoughts based on the fact



1    that you're state director?

2             MR. BEDARD:  You can answer.

3             You can answer.  It's not privileged.  So

4        you can answer.

5        A    I thought it was a good idea.

6        Q    Did you express that to anyone?

7        A    I don't have the authority to talk to the

8    legislature or anything.

9        Q    Did you tell anyone at GaDOE?

10       A    Um, I did.  I discussed it with Shaun, I

11   know.  I discussed it with Vickie.

12            I don't recall directly discussing it with

13   anybody else.  This was a very short time period

14   that -- three or four days that -- you know, things

15   go back and forth when you're in session.

16       Q    When you told Shaun that you thought it

17   was a good idea, what was her response?

18            MR. BEDARD:  Object to form.

19       A    I don't recall that she had a particular

20   response one way or the other.

21       Q    Did she express whether she agreed with

22   the proposal?

23            MR. BEDARD:  Object to form.

24       A    I don't recall that she did.  I don't

25   recall that she expressed she didn't either.  I just



1    don't remember.

2         Q     What about Vickie, did she have a reaction

3    when you said that you thought this was a good idea?

4              MR. BEDARD:  Object to form.

5         A     Vickie --

6              MR. BEDARD:  Go ahead.  Sorry.

7         A     Vickie seemed to think that was also a

8    good idea, but we both -- our jobs are to carry out

9    however it goes.

10             So that was not so much as a -- any kind

11   of an official recommendation, as, hum, that might

12   be good idea.

13             That's literally about the way that that

14   went.

15        Q     Right.  And why do you think it's a good

16   idea in your role as state director?

17        A     In my role as state director, sometimes

18   gets convoluted with my previous experience as a

19   local director.

20        Q     Why do you think that this is a good idea?

21        A     I think that local decisions are where --

22   they know the students.  They can make those

23   decisions.  They often have all these resources that

24   we've been talking about, nurses, counselors, social

25   workers, BCBAs.  All those support services are



1  typically already in place, which makes it easy to

2  expand or to provide services.

3           But, again, I would answer that more from

4  having been a local director than I would from a

5  state director.

6      Q    As a state director, are there any changes

7  to your answer?

8      A    It's just not my role to necessarily say

9  that, but -- no, I think the LEAs have a lot of

10 choices if they had the funding because LEAs still

11 have shared services of all kinds:  Hearing

12 services, vision teachers, audiological services.

13          So if there were small districts that had

14 a need to pool services, they could.  But, again,

15 that's just an experience that, that I would feel.

16 That's not the LEA position.

17     Q    I understand, but it's your opinion based

18 on your professional experiences?

19          MR. BEDARD:  Object to form.

20     Q    Is that correct?

21     A    Yes, my experience.

22     Q    Are you aware of a proposal like this

23 being discussed right now?

24     A    I don't know.  I'm not in that circle.

25     Q    I'm going to show you what was previously



1   introduced as Plaintiff's Exhibit 380.

2            (WHEREUPON, Plaintiff's Exhibit-380 was

3        marked for identification.)

4   BY MS. TUCKER:

5        Q    This is a document that was produced by

6   the State.

7            Ms. Low, please turn to the third page of

8   the exhibit where the Bates number is GA00346120.

9            MR. BEDARD:  I just object to this on the

10       grounds I don't think she's on this email that

11       this is attached to.

12           But obviously we can continue with it.

13           MS. TUCKER:  Thank you.

14  BY MS. TUCKER:

15       Q    Ms. Low, have you seen this document

16  before?

17       A    Yes, I have.

18       Q    Okay, thank you.

19           I'm correct this is a two-page handout

20  titled, "Georgia Network for Educational and

21  Therapeutic Supports," and the GaDOE logo is on the

22  bottom left-hand corner?

23       A    Yes.

24       Q    Where have you seen this document before?

25       A    I have seen it.  We, we like what we call



1  one-pagers, informational that, you know, we have

2  posted on our website available for parents and for

3  information like that.

4          This is a very general overview.

5    Q    Do you know who created it?

6    A    I did not.

7    Q    And then am I correct that the top box

8  provides an overview of the GNETS program?

9    A    Let me read it.

10   Q    Yes, I'd like you to read it.

11         (Witness reviews exhibit.)

12   A    Yes.

13   Q    And do you see that it reads the regional

14  GNETS programs, quote:  "Provide comprehensive

15  educational and therapeutic support services to

16  students who might otherwise require residential or

17  other more restrictive placements due to the

18  severity of one or more of the characteristics of

19  the disability category of emotional and behavioral

20  disorders."  And then in parenthesis "EBD."

21   A    Yes.

22   Q    Are you aware of any study that has

23  assessed the impact of GNETS services on the need

24  for residential or more restrictive placements for

25  students in Georgia?



1        A    I'm not aware of a study.

2        Q    Does GaDOE collect any data that reflects

3   the impact of GNETS services on the need for

4   residential placement?

5        A    I'm not aware, and I'm not exactly sure

6   you'd have -- how would you have that judgment to

7   know.

8        Q    What do you mean by that?

9        A    How do we know that the student would have

10  needed it if they don't go.  It would be a judgment.

11       Q    Got it.

12            I'm going to show you another exhibit.

13            MS. TUCKER:  This is going to be marked as

14       Plaintiff's Exhibit 934.

15            (WHEREUPON, Plaintiff's Exhibit-934 was

16        marked for identification.)

17  BY MS. TUCKER:

18       Q    This is a September 9th, 2021 email thread

19  produced by the State.  The most recent email is

20  from you, with a timestamp of 7:36 and 28 seconds

21  p.m., and it was sent to Linda Castellanos, Kachelle

22  White, and Vickie Cleveland.

23            The subject reads:  "Students who

24  transferred from RTF to GNETS."

25            The Bates-stamp number on the bottom of



1  the document is GA02892188.

2          Ms. Low, do you recognize this email

3  thread?

4      A    I don't recall it, but it does appear to

5  be an email thread that I was on.

6      Q    And no reason to doubt it?

7      A    No.

8      Q    What was Linda Castellanos' role when this

9  email was sent?

10     A    She was the Data and GO-IEP program

11 manager.

12     Q    What about Kachelle White?

13     A    Senior program manager over Results Driven

14 Accountability.  And Linda actually.  That was her

15 program manager, too, senior program manager.

16     Q    Are you saying Linda was on this email and

17 I missed it or --

18     A    It's from Linda.

19     Q    Linda, yes.  Thank you.

20          And what does RTF stand for?

21     A    Residential treatment facility.

22     Q    Let's look at the first email sent from

23 Linda.  It starts at the bottom of the first page

24 and goes on to the second.

25          Starting with the paragraph that reads



1   "Previously."  Do you see that paragraph?
2        A    I do.
3        Q    Quote -- do you see where she writes:
4   "Previously when Zel and I were talking, we thought
5   it might be helpful to see if we can get data from
6   data collections that would help us analyze the # of
7   students who transferred from RTF to GNETS or from
8   GNETS to RTF.  If this is something we still want to
9   do, I would like to talk about this in an upcoming
10  meeting with Data Collections."
11            Do you see that?
12       A    I do.
13       Q    She then continues:  "I think it will
14  involve some work by the data collections team and
15  perhaps additional work by my team since there is no
16  report with that information."
17            Do you see that?
18       A    I do.
19       Q    And then she proposes a way to compile the
20  data?
21       A    Yes.
22       Q    And let's look at your reply.  Do you see
23  where you wrote:  "It would be great data to know.
24  Would there be any unintended outcomes from
25  collecting this data at the state level?"



1           Do you see that?

2      A    I do.

3      Q    Why was this great data to know?

4      A    Of how many GNETS students went to

5   residential treatment, that would be of a high

6   interest to us, as well as in the reverse order.

7      Q    Why?

8      A    Because we could see how many students

9   GNETS did not provide enough support, as well as

10  students coming back if they had been successful

11  after, or if they went right back into residential.

12     Q    Let's look at your second sentence:  What

13  did you mean by asking if there would be unattended

14  outcomes from collecting this data at the state

15  level?

16     A    First of all, this was my second day as

17  interim state director, by the date.  So I probably

18  have to be forgiven for anything I wrote at that

19  time.

20          But Linda is a wonderfully detailed,

21  diligent leader, but this would have involved data

22  collections creating a whole new report and recoding

23  things.  So those types of things really bogged work

24  down and sometimes prevented Data Collections from

25  being able to do their job.  They were having a lot



1  of fatigue with that type of thing coming out of

2  Special Ed.

3        So that was really what I was getting at,

4  is let's think about our relationship with Data

5  Collections and prioritize the things that we need

6  to do.

7     Q    And did you receive a response to your

8  question?

9     A    Did I receive a response?  That's kind of

10  a rhetorical with Linda.

11     Q    Okay.

12     A    But in a round-about way I received a

13  response from Data Collection.  They asked us to

14  stop thinking up things to ask, only to come forward

15  with things we have to have or really, really

16  believe we need.

17     Q    So this data wasn't compiled?

18     A    Not to my knowledge.

19     Q    Because it would have been difficult and

20  Data was busy; is that what you're saying?

21        MR. BEDARD:  Object to the form.

22     A    It's creating a whole different report out

23  of our very complicated data collections system.  So

24  when you're looking at things like that, the other

25  thing we have a lot of concern about is asking



1  districts to report information when it's not a

2  required component, because they have thousands of

3  pieces of data they report right now.

4        I mean I think that the local district

5  would have more meaning in tracking this, and they

6  would know without a new report.

7        Q    At the bottom you see how Linda

8  Castellanos said Zelphine Smith-Dixon and her talked

9  about this?

10       A    Uh-hum.  (Affirmative.)

11       Q    Is that a yes?

12       A    Yes, that's what she said.

13       Q    Had you spoken with Dr. Smith-Dixon about

14 this as well?

15       A    We had not.

16            MS. TUCKER:  Do you all want to take a

17       break?

18            MR. BEDARD:  Sure.

19            THE VIDEOGRAPHER:  Going off the record at

20       3:22.

21            (A recess was taken.)

22            THE VIDEOGRAPHER:  We're back on the

23       record at 3:34.

24 BY MS. TUCKER:

25       Q    Welcome back, Ms. Low.



1              Are you familiar with the GNETS rule?

2      A     The GNETS Board Rule?

3      Q     Yes, ma'am.

4      A     Yes.  Not intimately but yes.

5      Q     What is the purpose of the GNETS rule?

6              MR. BEDARD:  Object to form.

7      Q     The GNETS Board Rule?

8              MR. BEDARD:  Same objection.

9              You can answer.

10     A     I wasn't a part of the development.  That

11   was, of course, when Nakeba was here, and I

12   literally had no involvement with it at all.  But it

13   was to try to better define what the program was and

14   wasn't.  You know, to ensure that we had a clear

15   rule and expectation about the program.

16     Q     And was there a rule prior to the one

17   you're referring to that Nakeba worked on?

18     A     I honestly don't know.

19     Q     Were you a part of any commenting related

20   to the GNETS rule when it was being developed?

21     A     Oh, no.

22     Q     I'm going to show you the GNETS State

23   Board Rule.  This was previously marked as

24   Plaintiff's Exhibit 82.

25              (WHEREUPON, Plaintiff's Exhibit-82 was



1          marked for identification.)

2    BY MS. TUCKER:

3        Q    At the top it reads:  "160-4-7-.15 Georgia

4    Network for Educational and Therapeutic Support

5    (GNETS.)"

6             Do you see that?

7        A    I do.

8        Q    And you agree this is the GNETS State

9    Board Rule?

10       A    Yes.

11       Q    Let's go to Page 4.  Let me know when

12   you're there?

13       A    Okay.

14       Q    Do you see where it has five duties and

15   responsibilities in bold?

16       A    Yes.

17       Q    And then you see underneath that it says

18   "The SEA shall"?

19       A    Yes.

20       Q    What is meant by SEA?

21       A    State Educational Agency.

22       Q    And what is that?

23       A    That's us.  That's State Education

24   Department.

25       Q    And GaDOE?



1    A    Yes.

2    Q    Let's look at -- do you see where the "SEA

3    shall" and then under 2. "Administer the grant funds

4    for performing the following in collaboration with

5    GaDOE."

6         Do you see that?

7    A    I do.

8    Q    The first is -- one second.

9         Let's look at the third one:  "Monitor

10   GNETS to ensure compliance with Federal and state

11   policies, procedures, rules, and the delivery of

12   appropriate instructional and therapeutic services."

13        Do you see that?

14   A    I do.

15   Q    How does GaDOE monitor GNETS to ensure

16   compliance with federal policies, procedures, and

17   rules?

18   A    We -- Federal Programs have a

19   cross-functional monitoring that is a four-year

20   cycle.  So every LEA comes up every four years.

21        You also may be monitored in between that

22   cycle if there are risk factors that are identified.

23        When we monitor an LEA, we pull at least

24   two GNETS files for every LEA that we monitor, and

25   that's how we are following the compliance there.



1      Q    By two GNETS files, do you mean two

2   student files --

3      A    Yes --

4      Q    -- for GNETS?

5      A    -- two student files for review.  And of

6   course overall we review the LEAs financing and, you

7   know, other factors like that in addition to the

8   other Federal Programs.

9      Q    Then what role do you play with this

10  cross-functional monitoring you're referring to?

11     A    I don't have a direct role, that I'm not

12  going out to do monitoring.  I did more of that when

13  I worked in Results Driven Accountability, but I

14  have to sign off on completion and see the results

15  and if there's a need for a corrective action plan,

16  list the deadline as I communicate with the final

17  sign-off to the district.

18     Q    And then how does GaDOE monitor GNETS to

19  ensure compliance with state policies, procedures,

20  and rules?

21     A    Well, that's at the same time that we're

22  looking for federal.

23     Q    Okay.  So your role is the same as what

24  you just discussed?

25     A    Yes.



1     Q     And how does GaDOE monitor GNETS to

2  ensure, quote, "the delivery of appropriate

3  instructional and therapeutic services"?

4     A     That is honestly an LEA responsibility.

5     Q     Do you agree with me it's under the SEA in

6  this rule?

7     A     I do agree that it is listed here.

8     Q     Is there any role that you can -- that the

9  SEA plays here?

10    A     Let me look at some of the data.

11          We certainly provide professional learning

12  and resources for instruction.  And, again, as I

13  mentioned, we have an assistive technology project.

14  So they have free use of software provided for

15  everyone, the lending library, every -- all of the

16  resources that we have are available to GNETS, just

17  like they are to any LEA.

18    Q     What step --

19    A     But we don't supervise the instruction.

20  We don't decide the curriculum.  That all would come

21  from the fiscal agent working with the LEA, or FBAs.

22    Q     What steps are taken if a regional GNETS

23  program does not comply with the GNETS rule?

24    A     With the GNETS rule?

25    Q     Uh-huh.  (Affirmative.)



1      A    It would have to -- it would depend on the
2   severity of the infraction.  So it would just depend
3   situationally.
4      Q    Are you aware of a regional GNETS program
5   not complying with the GNETS State Board Rule?
6      A    I'm not aware of a situation.
7      Q    Ms. Low, when was the first time that you
8   visited GNETS program facility?
9      A    When I was an educational diagnostician in
10  Carroll County.
11     Q    And what was the context for that visit?
12     A    I think I was sent to attend an IEP
13  meeting in a, you know, a role from the district
14  office.
15     Q    What location was that?
16     A    That was the Carrollton-Burwell.
17     Q    Did you visit other GNETS sites when you
18  were a diagnostician?
19     A    Well, there's only two sites in that
20  region.  So I don't recall going in my capacity as a
21  diagnostician to the other location.  I had been
22  there as a director, not state director but local
23  director.
24     Q    Got it.  Thank you.
25          When was the first time you visited a



1    GNETS facility when you were working at GaDOE?

2         A    Can you repeat that?

3         Q    Sure.  Once you started working at GaDOE,

4    when was the first time you visited a GNETS

5    facility?

6         A    It was based on one of the visits.

7         Q    In connection with the litigation brought

8    by the United States?

9         A    Yes.

10        Q    Have you also completed visits in

11   conjunction with the lawsuit by the advocacy

12   organization related to GNETS?

13        A    Yes.

14        Q    How many site visits have you been on with

15   the United States litigation?

16        A    I'd have to go back and count on my

17   calendar.

18        Q    Ballpark, more than five?

19        A    More than five.  Probably more than 10.

20   You know, some days we do multiple sites in one day.

21        Q    How about how many regional GNETS programs

22   have you visited in conjunction with this lawsuit?

23        A    That's what I thought we were just talking

24   about.

25        Q    I think you were mentioning the sites.



1    I'm now talking about out of the 24.  You were

2    talking about specific sites, I believe.

3        A    You're talking about the region?

4        Q    How many regional GNETS programs have you

5    visited?

6        A    I don't -- I don't have that number on the

7    top of my head.

8        Q    And you said you also visited GNETS

9    locations related to the litigation brought by the

10   advocacy organization?

11       A    Yes.

12       Q    About how many GNETS sites have you

13   visited with that lawsuit?

14       A    Probably 10, maybe a little more.

15       Q    Have you visited a GNETS site outside of

16   these two lawsuits since you've been working at

17   GaDOE?

18       A    Just a site or a program?

19       Q    Let's start with a site.

20       A    I probably have been to a site to do some

21   training, like we were speaking earlier this morning

22   about learning objectives, student learning

23   objectives.  But I wasn't there to observe the

24   program.

25       Q    And have you been to any to observe the



1  program outside of the visits related to the

2  lawsuits?

3       A    As a state director, I don't believe so.

4       Q    As interim state director?

5       A    I don't think so.

6       Q    As program manager senior?

7       A    Not coming to my memory.

8       Q    Program manager?

9       A    Not that I'm aware of.

10      Q    And education program specialist?

11      A    I don't think so.  I'm trying to think if

12  we were at any particular site to do like transition

13  training, but I don't recall one.

14      Q    When did you start visiting the GNETS

15  locations in conjunction with this litigation?

16      A    I'm trying to remember when the first

17  visit came.

18           I could tell you if I looked at my

19  calendar.

20           As interim director it wasn't too long

21  until the visits started being scheduled.  If I had

22  to guess, I'd say January of '22, but it may have

23  been in the fall of '21.

24      Q    Thank you.

25           Are you aware that the United States



1  issued subpoenas to conduct these site inspections?

2      A    I am.

3      Q    How did you learn about the subpoenas?

4      A    I don't remember exactly who told me

5  first.  Stacey may have.  But districts, special ed

6  directors have said, I got a subpoena.  Because they

7  were alarmed about that.

8      Q    And they reached out to you?

9      A    Well, they reached out to me or they saw

10 me somewhere.

11     Q    And did someone ask you to participate in

12 the site visits?

13     A    Yes.  I was asked to participate.

14     Q    And who asked you?

15     A    Shaun and Stacey.

16     Q    Did you do anything to prepare for those

17 site visits?

18          MR. BEDARD:  Object to form.

19          I'm going to instruct -- well, withdrawn.

20          You can say if you met with counsel or

21     anybody, you can say you did.  But to the

22     extent you did meet with counsel, I'd instruct

23     you not to answer what you did in those

24     meetings.

25     A    No.



1        Q    Did you meet with counsel in preparation

2    for these meetings?

3        A    To the visits?

4        Q    Uh-hum.  (Affirmative.)

5        A    No, I don't believe so.

6        Q    Okay.  I'm just confirming.

7        A    It was more of an email, there's a site

8    visit, you need to go and be an observer.

9        Q    Did you look at any documents prior to

10   those visits?

11       A    No.

12       Q    Did you have conversation with anyone on

13   the GNETS program staff with GaDOE, so Vickie

14   Cleveland, or Lakesha Stevenson, in advance of those

15   visits?

16       A    I probably had conversation with Vickie,

17   just saying, hey, we've been asked to go on some

18   visits and wherever we were going.

19       Q    And what did you discuss with Vickie?

20   Just where you were going or more details?

21       A    Just we have visits.  Or if a -- or if the

22   director said, I've got a subpoena.  A lot of the

23   GNETS directors would reach out when an invitation

24   would come, and Vickie would call me to say that

25   they're coming to visit us.  Often we didn't even



1   know it before they did.

2       Q    Did you have conversations with anyone in

3   the GNETS program staff at GaDOE after the site

4   visits?

5       A    Sometimes.

6       Q    So you spoke with Vickie Cleveland after

7   the site visits?

8       A    Vickie or Stacey.

9       Q    Did you speak with Vickie one-on-one after

10  the site visits?

11      A    I probably did at some point, but if we

12  had a reason to discuss something that had been

13  seen, it may have been with Shaun.  You know, we

14  would typically meet together.

15      Q    What would a reason be?

16          MR. BEDARD:  I'm going to object to form

17      and instruct you not to answer to the extent

18      you were reaching conclusions based on the site

19      visits that were made in connection with this

20      litigation.

21          If you've got an answer outside of that,

22      you can answer.

23          THE WITNESS:  I don't think I do have an

24      answer outside of that.

25          MS. TUCKER:  And you're asserting her



1       conclusions are privileged?
2              MR. BEDARD:  And work product.
3              MS. TUCKER:  And work product?
4              MR. BEDARD:  Uh-hum.  Both.
5   BY MS. TUCKER:
6       Q    Did you have conversations with anyone
7   else at GaDOE after the site visits?
8       A    Probably in our leadership meeting, and if
9   we had requests or had a reason to provide any
10  assistance.
11      Q    And what type of assistance are you
12  speaking to?
13      A    I don't really have a specific example,
14  but it may have been that the director asked for
15  something or the other while we were there.
16      Q    So a regional director asked for
17  information while you were there that you were
18  following up with someone at GaDOE?
19      A    If they thought that maybe one of our
20  specialists in a particular area could come help
21  them, or if we were doing something with assistive
22  technology transition, that type of thing.
23      Q    Did you have any conversations with the
24  regional GNETS program staff before the site visits?
25      A    I didn't.



1      Q     Did Vickie?

2      A     I don't know.

3      Q     Did GaDOE provide any guidance to the

4    regional GNETS programs prior to the visits?

5      A     No.  Not to my knowledge.  Not from our

6    office.

7      Q     Did you have conversations with anyone

8    from the regional GNETS program staff after the site

9    visits occurred?

10     A     Did we talk with them?

11     Q     Uh-hum, after the site visits.

12     A     Maybe while we were there, but I don't

13   recall afterwards.

14     Q     And while you were there after the

15   Department of Justice had left, did you speak with

16   them?

17     A     I don't think I stayed behind just talk.

18   It may have been just while we were there on the

19   visit.

20     Q     With attending the site visits are there

21   particular things that you are observing for?

22           MR. BEDARD:  Object to and instruct you

23        not to answer to the extent you're looking at

24        anything in particular based on instructions

25        from counsel, or really frankly any conclusions



1        you're make from the site visits.

2        A    I was just serving as an observer.

3        Q    Did you assess the quality of instruction

4   during these visits?

5             MR. BEDARD:  Same instruction -- let me

6        back up.

7             You can answer that one.

8        A    No.  That was not my purpose.  My purpose

9   was to see what the visitor saw.

10       Q    Did you assess the quality of the physical

11  facilities?

12            MR. BEDARD:  Same instruction.

13            You can answer.

14       A    I didn't do a physical check, no.

15       Q    Did you assess the quality of therapeutic

16  services and supports?

17            MR. BEDARD:  Same objection.

18            Instruct you not to answer.

19            I instruct you not to answer that one.

20            THE WITNESS:  Don't answer?

21            MR. BEDARD:  No.

22  BY MS. TUCKER:

23       Q    Did you document your observations in any

24  form while you were on site visits?

25       A    I did not take notes.



WINA LOW                                              February 28, 2023
UNITED STATES vs STATE OF GEORGIA                                  242

1    Q    Did you take photographs?

2    A    Of one particular site I did.

3    Q    Which site was that?

4    A    I can't remember the official name.  It

5  was in Savannah.

6    Q    In Savannah.  And what led you to take

7  photos of that site?

8         MR. BEDARD:  I'll instruct you not to

9         answer to the extent your decision to do so is

10        based on conclusions you were making.

11        While on that tour if you were taking

12        photos solely because the United States' expert

13        was taking photos, then you can answer.  But

14        otherwise, I'll instruct you not to answer.

15   A    I can't answer then.

16   Q    And this was in Savannah?

17   A    In Savannah.

18   Q    Were you asked to take photos?

19   A    No.

20   Q    For the one photo you took, did you

21  receive a request from the regional GNETS program to

22  see it?

23   A    No.

24   Q    Did you receive a request from counsel for

25  the regional GNETS program to see it?



1      A    No.

2      Q    Did you observe any GNETS -- school-based

3   GNETS programs where GNETS students were in separate

4   wings?

5      A    Is that not a --

6           MR. BEDARD:  You can answer if you saw --

7      if you went to a location and it was a center

8      versus a different type of GNETS location,

9      which is what I think the question is.

10          MS. TUCKER:  Yes.

11          MR. BEDARD:  The school-based GNETS

12     location, you can answer that.

13     A    I did see a few school-based locations

14   that were in a separate wing.

15     Q    How many?

16     A    Two are coming to my mind.

17     Q    Which two?

18     A    One was Crab Apple, I guess elementary,

19   Fulton County.

20          That's the one I'm trying to decide, is it

21   Fulton County or Clayton County.  And I can't even

22   remember the school name, but it was a special ed

23   hallway.

24          Again, it wasn't just GNETS.  It was other

25   classes that they had.



1    Q    Did you observe school-based GNETS

2    programs with separate wings that were locked or

3    required a key or badge to access them?

4    A    I did not see that.

5    Q    Did you visit Southwest High School for

6    Elam Alexander?

7    A    I don't know.  I did quite a few schools

8    on that Elam visit.  So I may have.

9    Q    You don't recall them?

10   A    It's just running together.  I remember

11   going to a middle school and an elementary school.

12   So it could have even been another day.

13        Shaun has been exemplary in sharing the

14   visits with me, and then if there was something

15   going on, to allow me to be back doing that.  So we

16   could have even swapped the next day.  I don't

17   remember.  I could tell from my calendar if I had

18   it.

19   Q    Did you observe any school-based GNETS

20   program locations where GNETS students used separate

21   entrances from students in the general education

22   environment?

23        MR. BEDARD:  You can answer that.

24   A    Yes.

25   Q    How many?



1        A    I don't have a particular number, but more

2    than three probably.

3        Q    Do any come to mind?

4        A    The Crab Apple one has a separate

5    entrance.

6             There was high school program and I can't

7    -- I mean I can see it in my mind, but I do not

8    remember where we were.  May have been the school

9    you were just talking about, because I think it was

10   in Bibb County, but there is a separate entrance.

11   You actually drive around to it.

12             Gwinnett County, too.

13       Q    Did you observe any school-based GNETS

14   program locations where the entrances used by the

15   GNETS students had metal detectors?

16       A    They're so commonplace now in every

17   school, of any type, that they may have been there,

18   but it's just so typical to see it I don't know that

19   I specifically noticed.

20       Q    Did you visit any school-based GNETS

21   program locations where GNETS students had separate

22   playground equipment from the students in the

23   general education environment?

24       A    I'm not aware of that, if they had

25   separate playground equipment.



1       Q    Did you visit any school-based GNETS
2   programs where GNETS students ate lunch in their
3   classrooms separate from students in the general
4   education environment?
5       A    Yes.
6       Q    How many?
7       A    It was not typical.  It was more atypical.
8   I don't know that I have a number.
9       Q    But you saw this?
10      A    I did.  I saw them go get their tray
11  before everybody else and go back to their class.
12      Q    Are there any sites that are sticking out
13  in your mind right now?
14      A    That was in Gwinnett, too.
15      Q    Did you observe high quality instruction
16  at the GNETS locations you visited?
17           MR. BEDARD:  Object to form.
18           I'm going to instruct you not to answer.
19           THE WITNESS:  Yeah.
20           MR. BEDARD:  And I'll move to strike her
21       answer "yeah," or at least just note on the
22       record I think she was just agreeing with my
23       objection.  She wasn't agreeing in the
24       affirmative to the question.
25           MS. TUCKER:  And the basis is?



1          MR. BEDARD:  Work product.

2          MS. TUCKER:  Can we break?

3          MR. BEDARD:  Sure.

4          MS. TUCKER:  Thank you.

5          THE VIDEOGRAPHER:  Going any of the record

6     at 4:02.

7          (A recess was taken.)

8          THE VIDEOGRAPHER:  Back on the record at

9     4:22.

10  BY MS. TUCKER:

11     Q    Welcome back.

12          Ms. Low, did you observe high quality

13  instruction across the regional GNETS programs at

14  the locations that you visited?

15          MR. BEDARD:  Object and instruct you not

16     to answer on work product grounds.

17          Same objection as prior.

18  BY MS. TUCKER:

19     Q    And what is the rationale whether or not

20  Ms. Low saw -- what she saw is work product?

21          MR. BEDARD:  I think the dividing line

22     here is it's a matter of factors.  It's kind of

23     opinion in evaluating judgments.  She's there

24     at the direction of counsel in connection with

25     this litigation, so anything she's seen there,



1    any conclusions she's reaching there, have been

2    done at the direction of counsel as part of

3    their investigatory obligations as part of the

4    litigation.

5         So it's kind of the dividing line I'm

6    going off of.

7         MS. GARDNER:  So she's -- you know,

8    probably going to go back to her colloquy and

9    have you put that objection in response to

10   every question that challenges that these same

11   questions were asked of the deputy

12   superintendent of Federal Programs with whom

13   she has indicated they split responsibility for

14   site visits, and none of these objections were

15   lodged.

16        We personally don't see the basis for

17   something that is -- it's a fact, just as if

18   she observed a metal detector, misbehavior.

19        MR. BEDARD:  Well, for what it's worth, I

20   think there's an argument to be made that the

21   questions about, you know, metal detector or

22   anything like that are also frankly work

23   product because she's there, again, at the

24   direction of counsel as part of the litigation.

25        I've let those slide a little bit because



1         I think they are somewhat equivalent to did you
2         go to this location, did you go to that
3         location.
4              But I think the question of high quality
5         instruction or something like that is clearly
6         an evaluating term that carries with it an
7         opinion and conclusions that are based on the
8         facts that she's observing on the ground.
9              So that's the basis of the objection.  If
10    we want to go through and lodge those
11    objections with every question, we can of
12    course do that, but that's just so you guys
13    know where I'm coming from.
14              MS. GARDNER:  I understand.
15              MS. TUCKER:  We'll go through them.
16              MR. BEDARD:  Cool.
17              MS. TUCKER:  Thank you.
18    BY MS. TUCKER:
19        Q    Ms. Low, did you have conversations with
20    anyone at GaDOE after the site visits about what you
21    saw?
22              MR. BEDARD:  Object to form.
23              You can answer.
24        A    Shaun and Stacey, and Vickie.  Vickie
25    sometimes was in the conversation but we talked



```
 1   about it either at -- together or Vickie and I may
 2   have talked separately.
 3        Q    Outside of the presence of counsel, did
 4   you have conversations?
 5        A    I don't recall.  We -- I mean
 6   conversations about?
 7        Q    About the site visits.  Have you and Shaun
 8   Owen discussed what -- the site visits outside of
 9   conversations with counsel?
10        A    Yes.
11        Q    And what did you-all discuss?
12             MR. BEDARD:  I'll -- objection and I'll
13        instruct you not to answer to the extent that
14        you discussed conclusions you made on the site
15        tours.
16             MS. TUCKER:  Same rationale?
17             MR. BEDARD:  Uh-hum.  (Affirmative.)
18   BY MS. TUCKER:
19        Q    Did you have conversations with Vickie
20   after the site visits about what you observed?
21        A    Yes.
22        Q    And what did you discuss?
23        A    Not every time but just --
24             MR. BEDARD:  Same objection.
25             Instruct you not to answer to the extent
```



```
 1        they are based on conclusions you reached while
 2        on the site visits, same rationale.
 3            MS. TUCKER:  Mr. Bedard, is it the same
 4        rationale?
 5            MR. BEDARD:  Yes.
 6        Q    And then were there particular things you
 7    were looking for on the site visits, Ms. Low?
 8            MR. BEDARD:  Same objection.
 9            Instruct you not to answer to the extent
10        you were looking at certain things at the
11        instruction of counsel.
12            For the record, if we want to make it go
13        faster, you want to do the same objection,
14        instruct not to answer?  That will shorten it.
15            MS. GARDNER:  Yeah.  Same objection, same
16        rationale?
17            MS. TUCKER:  Same objection, same
18        rationale?
19            MR. BEDARD:  Yep.
20            MS. TUCKER:  Okay.  Cool.
21    BY MS. TUCKER:
22        Q    Did you assess the quality of instruction
23    during these visits?
24            MR. BEDARD:  Same objection, same
25        rationale.
```



1       Q    Did you assess the quality of physical
2   facilities?
3            MR. BEDARD:  Same objection, same
4       rationale.
5       Q    Did you assess the quality of therapeutic
6   services and supports?
7            MR. BEDARD:  Same objection, same
8       rationale.
9       Q    Did you rely on any particular training or
10  experience when conducting your observations?
11           MR. BEDARD:  Same objection, same
12      rationale.
13      Q    Did you observe high quality instruction
14  at any GNETS program location you visited?
15           MR. BEDARD:  Same objection, same
16      rationale.
17      Q    Did you observe consistent compliance with
18  the Georgia standards of excellence during the GNETS
19  program locations you visited?
20           MR. BEDARD:  Same object, same rationale.
21      Q    Did you observe particularly poor quality
22  instruction at any GNETS programs or locations you
23  visited?
24           MR. BEDARD:  Same objection, same
25      rationale.



1        Q    Did you observe any trends with respect to

2    the GNETS program locations you visited?

3             MR. BEDARD:  Object to form, and same

4        objection, same rationale.

5        Q    What was your assessment of the

6    instruction at the GNETS program locations based on?

7             MR. BEDARD:  Same objection, same

8        rationale.

9        Q    Did you observe high level of student

10   engagement across the GNETS programs you visited?

11            MR. BEDARD:  Same objection, same

12       rationale.

13       Q    Did you observe any other trends related

14   to student engagement at the GNETS programs you

15   visited?

16            MR. BEDARD:  Same objection, same

17       rationale.

18       Q    Did you observe therapeutic services and

19   supports being offered at the regional GNETS

20   programs that you visited?

21            MR. BEDARD:  You can answer that one.

22       A    Did I directly observe therapeutics going

23   on?  In several locations I -- of course, you're not

24   going to be in the room with them listening if

25   they're doing something like counseling or whatever,



1    but an adult and a child were in the room and the

2    person guiding the tour said that that was what they

3    were doing.

4         Q    How many sites did you see that?

5         A    I don't know that I can place a number,

6    but certainly not every site.

7         Q    How did you assess the quality of the

8    therapeutic services and supports that you observed?

9              MR. BEDARD:  Same object and same

10        rationale.

11        Q    Did any GNETS program location stand out

12   to you due to their lack of therapeutic services and

13   supports?

14             MR. BEDARD:  Same objection, same

15        rationale.

16        Q    What were your observations regarding the

17   condition of the GNETS program facilities you

18   visited?

19             MR. BEDARD:  Same objection, same

20        rationale.

21        Q    Are you familiar with seclusion rooms?

22             MR. BEDARD:  You can answer that.

23        A    Am I familiar with what that is?

24        Q    Yes, ma'am.

25        A    Yes.



1    Q    What are they?

2    A    They can be a lot of different things, but

3    a place that you are secluding the student.  It can

4    be that you're -- have a door on it, and it

5    certainly shouldn't have that.

6         It could be behind a screen blocked off

7    from everybody else.  It can be in a lot of ways,

8    but I do know what they are, yes.

9    Q    Are there any other markers besides the

10   closed door that identifies a seclusion room?

11   A    Well, again, in my definition of

12   seclusion, it can even be behind screens in a

13   regular classroom.

14   Q    During your site visits, did you observe

15   any seclusion rooms?

16        MR. BEDARD:  Object to form.

17        You can answer that one.

18   A    I observed rooms that appeared to be

19   seclusion rooms at one point, but the doors were

20   removed.

21   Q    What led you to believe they were

22   seclusion rooms at one point?

23   A    The director or coordinator, whoever was

24   showing us around, would have brought attention to

25   that, say they are no longer used in that manner.



1       Q    Did you observe high levels of PBIS with

2    fidelity at the GNETS programs you visited?

3            MR. BEDARD:  Same objection, same

4        rationale.

5       Q    Did any GNETS program location stand out

6    in a positive way for further implementation of

7    PBIS?

8            MR. BEDARD:  Same objection, same

9        rationale.

10      Q    Did you have any concerns about the GNETS

11   programs you visited, about how they were

12   implementing PBIS during your site visits?

13           MR. BEDARD:  Same objection, same

14       rationale.

15      Q    Based on your observations visiting the

16   regional GNETS programs and the facilities, what

17   recommendations would you make, if any, to improve

18   the GNETS program?

19           MR. BEDARD:  Hold on.

20           Same objection, same rationale.

21      Q    What additional resources do you think the

22   GNETS program could benefit from based on your

23   observations?

24           MR. BEDARD:  Same objection, same

25       rationale.



1    Q    Am I correct you've also visited general
2    education schools in connection with DOJ's
3    litigation?
4              MR. BEDARD:  You can answer that.
5    A    Yes.
6    Q    How many?
7    A    A few.  Not as many of course as the site
8    visits for the GNETS, but a few with them.
9    Q    More than 10?  Less than 10?
10   A    Less than 10.
11             MS. TUCKER:  So the State has objected on
12        numerous occasions to questions that get at the
13        nature of the things Ms. Low observed during
14        the visits to the GNETS facilities, and we, the
15        United States, maintain these questions get at
16        the facts of what Ms. Low saw personally, and
17        those facts are not protected by work product.
18             So to the extent that the State seeks to
19        introduce factual information from Ms. Low
20        regarding her visits, the United States has a
21        continuing objection given the assertion of
22        work product.
23             MR. BEDARD:  Sure.  And I'll say for the
24        record that the State's position is not -- it's
25        not an issue of the facts that are being



1        asserted, but opinions that are being generated
2        based off of those facts, which are protected.
3        She hasn't been designated as an expert.  She
4        was there at the instruction of counsel in
5        connection with the litigation.
6              So as far as we see it, it's an issue of
7        opinion and conclusions, not facts.
8              But just so we have that on the record and
9        we can obviously work that out later when it
10        comes up
11             MS. TUCKER:  Okay.  And as Mr. Gardner
12        mentioned a moment ago, we did take the
13        deposition of deputy superintendent Shaun Owen,
14        and we asked similar questions and the State
15        did not lodge the same objections.
16        Q    And I know, Ms. Low, you indicated that
17    you and Ms. Owen shared the responsibilities.  Is
18    that correct?
19        A    Yes.
20             MS. TUCKER:  So we don't understand the
21        reason why those objections are being lodged
22        now and they were not lodged for Ms. Owen.
23             So I wanted to put that on the record as
24        well.
25             MR. BEDARD:  Understand.



1    BY MS. TUCKER:

2        Q     Ms. Low, what is PBIS?

3        A     Positive behavior intervention and

4    supports.

5        Q     And how does PBIS relate to school

6    climate?

7        A     They're greatly related.

8        Q     How?

9        A     Well, creating a positive climate and

10   having your norms and rules and the various supports

11   you put in place for PBIS lead to a better climate

12   overall.  You know, improving the behavior in

13   classrooms because of the reinforcers and things

14   like that the kids are working toward would lead to

15   them being more apt to be able to receive

16   instruction, more teachers to be happier about their

17   work environment, you know, with the students being

18   more managed.

19            PBIS can also eliminate a lot of

20   opportunities that may have happened by being

21   organized and creating a structure.

22       Q     Have you worked to champion PBIS within

23   the State of Georgia?

24       A     I don't know that I've had an opportunity

25   to champion PBIS, but very supportive of it.



1     Q    Has GaDOE taken any steps related to

2    implementation of PBIS at GNETS programs?

3     A    I don't think I know the answer to that

4    question.  The State certainly has had a main focus

5    on PBIS for a number of years, in excess of 10

6    years, and there's evidence of that across the

7    State, as well as in GNETS facilities.

8     Q    And who would know the answer to that, for

9    the GNETS programs?

10    A    Who would know the answer to?

11    Q    The steps the State has taken, if any?

12    A    Well, I would say it would be Justin Hill.

13    Q    Okay.  Thank you.

14         Ms. Low, we spoke about the GVRA earlier;

15   is that correct?

16    A    Yes.

17    Q    What does that stand for again?

18    A    Georgia Vocational Rehabilitation Agency.

19         MS. TUCKER:  I'd like the court reporter

20        to mark the following document as Plaintiff's

21        Exhibit 935.

22         (WHEREUPON, Plaintiff's Exhibit-935 was

23         marked for identification.)

24   BY MS. TUCKER:

25    Q    This is an email thread produced by the



1  State.  The most recent email in the thread is dated

2  August 17, 2017, and it is from Lynn Holland to you.

3          The subject reads "video."

4          And the Bates number on the bottom of the

5  first page is GA03558135.

6          Ms. Low, do you recognize this email

7  thread?

8      A   I don't remember the details, but, yes, I

9  was involved in this work.  Yes.

10     Q   And when you sent this email, you were

11  education program specialist?

12     A   I was, and Lynn was my supervisor.

13     Q   Okay.  Let's look at the email from you to

14  Lynn Holland on August 17th, at 11:16 a.m.

15         Do you see it?

16     A   I do.

17     Q   Looking at the second paragraph, you

18  wrote, quote:  "I have a bunch happening today.  We

19  need to discuss GVRA and GNETS.  GNETS are wanting

20  their own contract.  That may be best but want to be

21  sure it aligns with the big picture."

22         Do you see that?

23     A   Yes.  Wait a minute.  I was looking at the

24  wrong one.

25     Q   It's on the first page, at the bottom.



1        A    Oh, you're reading just partial.

2        Q    Yes.  The second paragraph.  I'm happy to

3   read it again.

4        A    Okay.

5        Q    Do you see where it reads:  "I have a

6   bunch happening today.  We need to discuss GVRA and

7   GNETS.  GNETS are wanting their own contact.  That

8   may be best but want to be sure it aligns with the

9   big picture."

10            Do you see that?

11       A    I do.  I'm trying to remember what that

12  was about and what kind of contact they're asking

13  about.

14       Q    What did you want to discuss related to

15  GVRA and GNETS with Lynn Holland?

16       A    Let me read the rest of the email to try

17  to figure out --

18       Q    I'll give you a moment.

19       A    -- figure out what I said.

20            (Witness reviews exhibit.)

21       A    I think the paragraph you're referencing

22  to doesn't necessarily apply to the one above it.

23  This is just me reporting to my program manager

24  about things I've been sent out to do, and part of

25  my role in that was the collaboration with outside



1   agencies.  That was, you know, specified as a -- I

2   think it was on my evaluation, as a matter of fact,

3   that.

4           But the first part that we haven't read

5   yet is about training through SREB and our CTEA

6   staff, our career and technical education staff,

7   wanting to collaborate with us to provide support to

8   our 50 intensive districts for systemic improvement.

9      Q    Yes.  I'm focused just on that second

10  paragraph.

11     A    I know, but I'm trying to -- I don't think

12  that where I said I need to discuss GVRA and GNETS

13  had anything to do with the first part.  So GNETS is

14  asking to have their own person.  In other words,

15  they wanted a rehab counselor assigned to them

16  instead of just the rehab counselors that were

17  assigned to the districts they served.

18     Q    And how was that messaged to you from the

19  GNETS programs?

20     A    I don't remember.

21     Q    And why were they wanting a contact

22  outside of their LEA contact?

23          MR. BEDARD:  Object to form.

24          THE WITNESS:  Can I answer?

25          MR. BEDARD:  You can answer.



1        A    Ease of work, not having to collaborate

2    with GVRA may have rehab counselors assigned

3    one-to-one county, one to another.  There may be six

4    rehab counselors in the region that the GNETS

5    serves.  So they wanted GVRA to say, you know, for

6    Sand Hills GNETS this is your person to call.

7        Q    What did you mean by, quote, "that may be

8    best but want to assure it aligns with the big

9    picture"?

10       A    I guess I need to answer that.

11       Q    Yes.

12       A    It really means -- you know, just as I

13   said about the cross-functional monitoring, we're

14   monitoring the GNETS files that the students of that

15   particular LEA is sending, because they're still

16   their students.  So any time that we start to

17   designate separate people, it was always a concern

18   that it becomes -- morphs into something else rather

19   than just a service on the continuum.

20       Q    And what's the big picture?  Just to make

21   sure I understand.

22       A    Well, just any kind of decisions that we

23   make, we start assigning GNETS like they are a

24   standalone LEA, which they're not.  That's what I

25   mean by the big picture.



1           We're very careful about decisions like

2    that and how they may impact down the road.

3        Q    Did GVRA end up -- did GNETS end up

4    getting their own GVRA contact?

5        A    I think at the time they did.  I don't

6    think that they have that now.

7        Q    Do you know what led to that change?

8        A    I don't know the specifics of what led to

9    that change.

10        Q    When was that change made?

11        A    I -- I can't name a date of when.  They've

12   had a lot of changes.  They've had a lot of change

13   in leadership and philosophies.

14        Q    Are you referring to GVRA?

15        A    Yes.

16        Q    Okay.

17        A    So they've just changed the way they

18   deliver.

19           MS. TUCKER:  I'd like the court reporter

20       to mark the following document as Plaintiff's

21       Exhibit 936.

22           (WHEREUPON, Plaintiff's Exhibit-936 was

23        marked for identification.)

24   BY MS. TUCKER:

25        Q    This is a November 10, 2016 email produced



1   by the State.  The email is from Nakeba Rahming to

2   you and the directors of the regional GNETS

3   programs.  The subject reads:  "GVRA Services (2

4   minute survey)."And there's one attachment.

5           The Bates number on the bottom of the

6   first page reads GA03559361.

7           Ms. Low, do you recognize this email?

8       A   I didn't remember it, but probably.

9       Q   Do you have any reason to doubt it?

10      A   No.

11      Q   And when Nakeba Rahming sent this email,

12  she was the state director for GNETS; is that

13  correct?

14      A   She was.

15      Q   And you were an education program

16  specialist?

17      A   Yes.

18      Q   And then do you see Nakeba Rahming wrote

19  to the directors, quote:  "Due to some of your

20  concerns regarding access to GVRA services, Wina and

21  I are working on establishing protocols to ensure

22  the students assigned to GNETS programs are provided

23  access to GVRA assisted counselors and services."

24          Do you see that?

25      A   Yes, I do.



1      Q    Were you coordinating with Nakeba Rahming

2   at this time?

3      A    She was the state director.  I was a

4   specialist who was the district liaison to a region,

5   but my other primary role was to lead transition in

6   the State, including collaboration with other

7   agencies that support students when they leave the

8   school district.

9           I don't recall that I did the survey.  I

10  think that Nakeba may have done the survey, but I

11  recall conversations with Nakeba where she talked

12  with me about the fact that the GNETS was having a

13  hard time accessing services through GVRA, and so we

14  were trying to determine who is, who isn't.  It's a

15  big state.  And there are regional offices for GVRA,

16  that they act within law and regulation but on their

17  own about how they assign people, and it can vary

18  from one region to another.

19          So I think we were trying to figure out,

20  is this an assumption we're making, or is this true

21  across the State or just a few people are having

22  concerns.

23     Q    And what did you all find out from the

24  survey?

25     A    Unfortunately, that it was consistent



1   across the State, that they were having a difficult

2   time accessing services.

3        Q    And students are typically able to access

4   services through their LEAs?

5        A    Yes.

6        Q    The GNETS students were having challenges

7   of accessing the GVRA services through their LEAs?

8        A    Well, GVRA service -- when the contact

9   comes to visit the LEA, they weren't necessarily

10  checking in to see who in the GNETS needed

11  something.

12            And all about the same time frame we were

13  very, very involved with GVRA and had some great

14  partners from GVRA.  They had a big law change.  You

15  know, Workforce and Innovation something act.  I've

16  forgotten what the O stands for, but WIOA.

17            And when I was speaking with my two

18  contacts that we met very regularly, I said, you

19  know, what's the deal with GNETS.  And they said,

20  well, typically their disability is an exclusionary

21  factor.

22            So we worked on that a long time to try to

23  get past that road block, and I believe we did.

24       Q    So they were given a contact?  The GNETS

25  programs were given GVRA contacts?



1     A    I think they had somebody listed beside

2   their name, and the leaders I was speaking of, Lori

3   Tuten and Dale -- I can't think of his last name at

4   the moment.  They even met with the GNETS, you know,

5   like during a meeting that was hosted by Nakeba or

6   Vickie or whoever it was.

7     Q    And you said their contacts are now taken

8   away?

9     A    I don't know that because I'm not as

10  intimately involved.

11         The other agency had so many changes and

12  they lost an enormous number of counselors.  I think

13  part of it was they needed to make some change, and

14  that was probably how it was driven, but that's just

15  how it turned out.  But regular schools lost

16  contact, too, because of the extensive vacancies

17  across the State.

18    Q    Has Vickie Cleveland raised concerns about

19  GVRA access for the GNETS programs?

20    A    She has in the past.  Not since I've been

21  state director.  Interim I don't recall.  It would

22  have been while I was in my other role.

23    Q    Program manager senior?

24    A    Probably, yes.

25    Q    Ms. Low, are you familiar with the -- yes.



1            Earlier we spoke about the Georgia

2   Learning Resources System --

3       A    Yes.

4       Q    -- correct?

5            And what does this Georgia Learning

6   Resources System do?

7       A    We fund GLRS.  So they serve as a regional

8   arm for us.  So we have a scope of work determined

9   with state priorities.  They can also have regional

10  priorities because there will be some regional

11  priorities.

12           You know, let's say that they still need

13  additional professional learning with co-teaching

14  strategies, but another region is like, we're good

15  there.  So they may not offer exactly the same

16  thing, but they provide support in numerous ways,

17  especially re-delivering professional learning and

18  meeting with directors in the field, supporting

19  directors out in the field.

20           But their -- they can even go to the

21  classroom level.  We -- now we have, with the

22  teacher induction grant, we also send money for

23  coaches to actually go out and coach the teachers

24  participating in the induction grant.

25           So that's a different thought.  We



1  couldn't do that if we didn't have this regional

2  network everywhere to support our work, but, you

3  know, having hundreds of classroom visits, we are

4  really proud of that and that's how we accomplish

5  things like that.  Almost every major initiative

6  that we have, GLRS are part of the plan to reach

7  every place in the State.

8          They live there, work there.  You know,

9  there's a lot of trust.  We've been able to -- we

10  don't hire them.  They are Board of Control.  The

11  fiscal agent would.  But we had some strong

12  leadership through this regional collaboration.

13      Q    And GLRS is under your division, correct?

14      A    Yes.

15      Q    How effective do you think it is at its

16  mission?

17      A    GLRS?

18      Q    Uh-hum.  (Affirmative.)

19      A    I think they are very effective.  We have

20  a project tracking system to track all their

21  activities and what they do.

22      Q    What interactions does GLRS have with the

23  GNETS program?

24      A    GNETS is involved in all the work that

25  they do, just like any of the LEAs.  They attend



1    their meetings.  They support them with whatever
2    they're offering.
3        Q    Does GaDOE track whether GLRS provides
4    services to the regional GNETS programs?
5        A    It would show up in their tracking log.
6        Q    Does GaDOE track what trainings are
7    provided by GLRS to the regional GNETS programs?
8        A    I'm sure they would customize something,
9    to just say GLRS region if requested.  But GNETS is
10   included when everybody else is invited.
11       Q    Does GaDOE track what supports are
12   provided by GLRS to regional GNETS programs?
13       A    The project tracking system lists all
14   their activities.  They're on a contract with us, is
15   how the funding goes, not an allocation.
16            Now, I don't honestly know if they can
17   track -- they can track which system that they came
18   from.  I have to look to see if the GNETS was a
19   separate track.
20       Q    Have you talked to Shaun Owen about the
21   interaction between the GNETS program and GLRS?
22       A    I don't know that Shaun and I have had a
23   specific conversation about that.  We talk about
24   GLRS and GNETS, but I don't know that we've talked
25   about that interaction.



1       Q    How about with Vickie Cleveland?

2       A    I don't even know that Vickie and I have

3   talked about something like that.  She knows that

4   everything that's open to any LEA is open to the

5   GNETS.

6       Q    Ms. Low, earlier we spoke about SELDA; is

7   that correct?

8       A    Uh-hum.

9       Q    And what does SELDA stand for again?

10      A    Yes.  Special Ed Leadership Development

11  Academy.

12      Q    Who participates in SELDA?

13      A    New special education directors.  They can

14  come as first year.  They can come back as second

15  year directors.  That's our suggestion.

16           Sometimes they don't want to leave the

17  nest and they come back as a third year director.

18           They develop a great affinity toward their

19  group that came in together, and it's kind of a

20  double-dip.  Whatever we are talking about and

21  whenever it's timely, whether it's, it's time to

22  submit your budget, it's time to do a data

23  collection, they get that more intensely and

24  delivered in a much smaller group than just through

25  a webinar, like we might do with a veteran.



1              So they like to kind of hang on and have

2     that reinforcement.

3         Q    Thank you.

4              MS. TUCKER:  I'd like the court reporter

5         to mark the following document as Plaintiff's

6         Exhibit 937.

7              (WHEREUPON, Plaintiff's Exhibit-937 was

8          marked for identification.)

9     BY MS. TUCKER:

10        Q    This is an October 4th, 2018 email

11    produced by the State.  It's from Glenda Henderson

12    to you and the subject reads:  "New Directors for

13    District 5."

14             The Bates number on the bottom of the

15    first page of the document reads GA03593480.

16             Ms. Low, do you recognize this email?

17        A    Yes.

18        Q    And who is Glenda Henderson?

19        A    She's a program specialist in our Results

20    Driven Accountability unit.  So she supports

21    District 5.  She doesn't now, but she did.

22        Q    What does she do now?

23        A    She supports our metro districts.

24        Q    And that's another one of the districts?

25        A    That's another region.  Metro East and



1    West.

2        Q     And what does Ms. Henderson mean by new

3    directors for District 5?

4        A     She means she's -- she knows before we do,

5    because when she's in the collaborative community

6    meetings with the directors, people will say I'm

7    retiring, this is contact information for who is

8    replacing me, or either the GLRS director finds that

9    out.

10           But we are always trying to know before

11   they'll actually get put in our portal, so that we

12   can invite them to any summer training.  We do a

13   little bit like a boot camp for two intense days, in

14   July, before -- early-ish July, and we don't want to

15   miss anybody.  So we ask the DLs to also go out and

16   scour anybody so that we can get them on our list

17   and start sending communication.

18       Q     Thank you.

19       A     So that's all Glenda is doing, is telling

20   me what she knows and who is going to be new to us

21   this time.

22       Q     And these are special education directors?

23       A     Yes.

24       Q     If you look to the second page, I see that

25   Celest Ngeve is listed separately for the Rutland



1    Academy.

2            Do you see that?

3        A    I do.

4        Q    She would attend SELDA as well as a

5    special education director in her LEA?

6        A    Yes, she would have been invited to and

7    been part of the cohort.

8        Q    So GNETS instructors are invited

9    separately?

10       A    They're invited as a part of the SELDA

11   group, not -- I mean not as a separate group to

12   support, but they're included with everybody else.

13       Q    Right.  But distinct from their LEA

14   special education director?

15       A    Oh, she would get an email to her inviting

16   her to attend, just like we send to every new

17   director.

18       Q    Okay.  So new special education directors

19   and new regional GNETS directors?

20       A    Anybody that has to follow our process is

21   about budget submission.  Anything that we do we

22   would invite them.

23            Also, we provide just good quality

24   professional learning on various topics.

25            MS. TUCKER:  I'd like the court reporter



1          to mark the following document as Plaintiff's

2          Exhibit 938.

3               (WHEREUPON, Plaintiff's Exhibit-938 was

4           marked for identification.)

5    BY MS. TUCKER:

6        Q    This is a February 19th, 2019 email

7    produced by the State.  It is from Vickie Cleveland

8    to you.  The subject reads:  "SELDA Agenda update."

9               There's one attachment.

10              And the Bates number on the bottom of the

11   first page reads GA03601209.

12              Do you recognize this email thread?

13       A    Yes.

14       Q    And am I correct that Vickie Cleveland was

15   providing you with updates on a SELDA meeting

16   agenda?

17       A    Yes.

18       Q    And why did she send this to you?

19       A    Because I would send it out to every

20   presenter, that they would know which month they may

21   be called on, but we would say, you know, we hope

22   you'll present at SELDA.  And when it came time to

23   do the draft agenda, I would send it out to the

24   presenters and say, do these times look okay, have I

25   listed a description of what you're going to do?



1    And that's what she's talking about.

2         Q    Did -- how often was GNETS discussed at

3    SELDA meetings?

4              MR. BEDARD:  Object to form.

5         A    Well, the topics that come up at SELDA

6    meetings are generally visited one time during the

7    year, unless it's something that's recurring.

8              So she would have discussed briefly what

9    GNETS is, but she was also there to provide

10   discussion about behavior and supports like that.

11        Q    So looking at the attachment, do you see

12   that it's an agenda for the meeting?

13             If you go to the next page.

14        A    Yes.

15        Q    If you go to the second page, you see

16   Vickie Cleveland was slated to speak at 2:00 p.m.;

17   is that correct?

18        A    It is, right.

19        Q    Did you ask Vickie Cleveland what to cover

20   during her presentation?

21        A    I probably had something drafted in the

22   agenda.  As you can see from her email, she's -- may

23   have changed the wording around a little bit.  I

24   don't really recall.

25        Q    And then in addition to the bullets you



1    see there, what other topics related to the GNETS

2    program have been covered at SELDA?

3         A    I don't know specific to, but, remember

4    this is a new group directors.  So we're trying to

5    explain to them what everything is, what GLRS is,

6    what GNETS is, and we have to prioritize what comes

7    where on the sequence.

8              You know, they are typically in survival

9    mode, to make sure they don't miss anything, and

10   February has traditionally been the time that we

11   usually talk about GNETS.  It's not to say they

12   don't ask a question about GNETS or if something

13   came up, somebody would say it.  But most of our

14   topics are just for everybody.

15        Q    Was GNETS covered in February 2023 SELDA

16   meeting?

17        A    I could look at the agenda and tell you.

18   I don't remember.

19        Q    You don't recall, okay.

20             When was that meeting held?

21        A    I can look at the date, but it's usually

22   the third week of the month.

23        Q    So pretty recent?

24        A    Yes.  Very recently.

25             MS. TUCKER:  I'd like the court reporter



1          to mark the following document as Plaintiff's

2          Exhibit 939.

3               (WHEREUPON, Plaintiff's Exhibit-939 was

4           marked for identification.)

5    BY MS. TUCKER:

6         Q    This is a March 2nd, 2021 email thread

7    produced by the State.  It's from Annette Murphy to

8    you, and the subject is "February invoice."

9               There are two attachments.

10              The Bates number on the bottom of the

11   first page reads GA03655014.

12              Ms. Low, do you recognize this email?

13        A    It looks like something Annette would send

14   me.

15        Q    Who is Annette Murphy?

16        A    Annette Murphy contracts with us to

17   provide executive coach support to SELDA.  She

18   previously worked for the Department as a program

19   specialist.  Prior to that, she worked in Carrollton

20   City, so we worked together.  She was my assistant

21   director at one time.  She assumed my role as

22   director of student services for a few years before

23   she came to the Department of Education.

24        Q    Did you hire Annette Murphy as a

25   contractor consultant?



1      A     I did hire her as a contractor.

2      Q     How long has she been contracting with

3   GaDOE?

4      A     We received the teacher induction grant,

5   would be September 2020.  So I think we had her

6   contract start about February, maybe.

7      Q     So since February 2020?

8      A     It would be 2021.

9      Q     2021, excuse me.  And she's still --

10     A     She's still contracting with us.

11     Q     Looking at her email, she writes to you

12   that she has attached her February invoice, correct?

13     A     Yes.

14     Q     She then writes, quote:  "Since February

15   17th I have made 119 + phone calls to SELDA members

16   and our grant partners.  I have also sent over 60 +

17   follow-up emails."

18           Do you see that?

19     A     Yes.  She's reporting -- by the date up

20   here, she's reporting on what she did just in that

21   partial month of February when she started.

22     Q     Okay.  Thank you.

23           Looking down, she identifies topics that

24   she's discussed.  Do you see that?

25     A     I do.



1    Q    And she lists GNETS?

2    A    I do.

3    Q    What is Annette Murphy sharing about

4    GNETS?

5    A    She is primarily responding to questions

6    from new directors.  It's not that Annette has a

7    specific agenda at all.  She attends SELDA meetings,

8    so she knows what they just discussed.

9         Of course, having been a director herself

10   for a long time, in both sides of Federal Programs,

11   she knows what it means to do a completion report.

12   She knows what it means to submit your budget on

13   time, to fill out the Con-App, all those things.

14        So she knows what is coming up and is

15   timely for the directors, which mirrors the agenda

16   for SELDA for that time.  But they call her and ask

17   her anything.

18        I think they like her even more because

19   she's not an actual employee of the Department of

20   Education, and they say they're more comfortable

21   asking questions that they think they should know

22   already to her.

23   Q    When she's asked questions about GNETS,

24   does she connect with someone at GaDOE?

25   A    She would call Vickie, but these questions



1  are usually so basic.  Like what is GNETS?  How do I

2  refer a student?

3       Q    What is GaDOE's assistive technology

4  partnership?

5       A    With Georgia Tech.  Of course, Georgia

6  tech is a big entity.  They have different divisions

7  within it.  You may see us reference it as Tools for

8  Life.

9            They renamed themselves really Center for

10 Innovation and Design, maybe -- there's another "I"

11 word in there.  It's CIDI.  But it's just an arm of

12 Georgia Tech's work.

13           It's our tech AT center for Georgia.

14      Q    Is this an active partnership?

15      A    Yes.

16      Q    And then what purpose does this

17 partnership serve?

18      A    So we developed the partnership to try to

19 leverage expertise, funds, to provide resources to

20 the entire state and across to the district.  So we

21 wanted to be able to offer the same software that

22 students that are a part of the Regents system of

23 Georgia have.  So if their disability offices are

24 supporting the students in the colleges,

25 universities and technical colleges, we didn't want

1  the students to transition and have to start over

2  with a whole new software suite about the screen

3  reader, this or that or the other.  That was

4  indicated as a problem for employers.

5      Q    Okay.

6      A    Indicates it's a problem for students,

7  that sometimes the transition in just these little

8  things were so great that they didn't come back

9  after first semester.

10        So we asked Georgia Tech to partner with

11  us, and they decide the software because they're

12  just mirroring what they're giving everybody else

13  because they are the contract arm for the university

14  and technical college systems to do that.

15      Q    Okay.

16      A    They also provide the Braille, the large

17  print, you know, the whole bit to the University

18  system.  So, of course, that partnership has

19  expanded to include that for us, too.

20        We have a lending library where they have

21  all kinds of devices and software that any public

22  school can call them up and they will send it out to

23  them for six weeks or eight weeks, and let them use

24  it for as long as they need to, providing somebody

25  else is not calling in asking to borrow that, but it



1  gives them the opportunity to try devices with

2  students and make sure they work, because there's

3  such a high abandonment rate of buying expensive

4  equipment and then it doesn't work.

5          We have a new initiative we're about to

6  launch called Ed Trade, so school districts can say

7  I have a standard that fits this size child, we're

8  not using it right now.  You know, and the two

9  districts can work it out, if they want to borrow it

10  through an MOU, that kind of thing, and they can

11  call them up and say, hey, we need it.

12          The consultative services are also

13  provided.  So they can call and say, I have a child

14  with X, Y, Z, and they don't give personal

15  identified information, and they'll talk them

16  through some possibilities of solutions.

17     Q    Thank you.

18          So there's a lot that they --

19     A    There's a lot.

20          MS. TUCKER:  I'm going to ask the court

21     reporter to mark the following document as

22     Plaintiff's Exhibit 940.

23          (WHEREUPON, Plaintiff's Exhibit-940 was

24      marked for identification.)

25

1    BY MS. TUCKER:

2        Q    This is a September 18th, 2020 email

3    thread produced by the State.  The most recent email

4    is from Paula Gumpman to you.  There's no subject.

5            And the Bates number on the first page of

6    the document is GA03644534.

7            Ms. Low, do you recognize the email

8    thread?

9        A    Yes.

10       Q    And then what position did Paula Gumpman

11   hold when she emailed you?

12       A    She's a program specialist.  She's our

13   assistive technology specialist.  She's also the

14   liaison with Georgia Tech that I just described.  So

15   she has the access to materials, too.

16       Q    Do you see your email sent at 11:00 a.m.

17   below?

18       A    I do.

19       Q    You sent this to spedemailblast within

20   GaDOE.

21       A    Special ed email blast.

22       Q    Thank you.  That's what we talked about

23   earlier then?

24       A    It is.

25       Q    Okay.



1    A    And this would have been -- Zel would have

2  been doing the email blasts then.  But we could

3  submit items that we wanted to run in the e-blast to

4  get out to all directors.

5    Q    Understood.  Looking at the text, you

6  indicate "139 LEAs were registered through the AT

7  portal plus 5 GNETS and 3 State Schools."

8    Is that correct?

9    A    At that time.

10    Q    What is the AT portal?

11    A    It's through the Georgia Tech partnership.

12  So it's like a one-stop shop.  And we started out

13  giving access to all the special ed directors, all

14  the GNETS directors.  They could delegate if other

15  people in their system needed access to it, but we

16  wanted the teachers, or whoever is asking for

17  something, to have to run through a district office

18  person, because they may be asking for a piece of

19  equipment that they already have and they didn't

20  realize it.

21    Q    Got it.

22    A    So the portals where they go to request

23  consultation, software, whatever.

24    Q    Thank you.

25    And then when you say five GNETS, do you



1    mean five regional GNETS programs?

2        A    That's what we're referring to.

3        Q    Okay.  And a regional GNETS program would

4    register the portal separate from its LEA?

5        A    They asked to do that, so that they could

6    just be direct instead of having to go, you know,

7    through somebody else.

8        Q    Awesome.

9        A    We want them to use assistive technology,

10   so we're trying to remove any barrier.

11       Q    I understand.  Thank you.

12            MS. TUCKER:  We're going to go off the

13       record for a moment.

14            THE VIDEOGRAPHER:  Going off the record at

15       5:12.

16            (Discussion ensued off the record.)

17            THE VIDEOGRAPHER:  Back on the record at

18       5:30.

19   BY MS. TUCKER:

20       Q    Mr. Lowe, have you received complaints

21   from families about their experiences with the

22   regional GNETS program?

23       A    Yes.

24       Q    And what did those complaints detail?

25            MR. BEDARD:  I'll object to the -- can we



1        go off the record for one second, not to talk

2        with her but to confer with Ms. Suber-Drake?

3             MS. TUCKER:  Yes.

4             THE VIDEOGRAPHER:  Going off the record at

5        5:30.

6             (A recess was taken.)

7             THE VIDEOGRAPHER:  Back on the record at

8        5:32.

9             MR. BEDARD:  Great.  I'll instruct you not

10       to answer only to the extent that I would just

11       ask you not to share any identifying

12       information with any individual student because

13       of our obligations under FERPA, but otherwise

14       feel free to answer.

15            So it's just an issue with the identifying

16       information for any individual student.

17            MS. TUCKER:  Thank you.

18   Q    I can go ahead and repeat the question.

19            Have you received any complaints from

20   families about experiences with the regional GNETS

21   programs?

22   A    Yes, I have.

23   Q    And what did their complaints detail?

24   A    I'm trying to think of a way to answer it

25   without giving details.



1       Q     I think Mr. Bedard was speaking to like

2   names.

3              MS. TUCKER:  Is that correct?

4              MR. BEDARD:  Yes.  You can speak in a

5         generalized sense to what the complaint was,

6         just not identifying information for any

7         individual student.

8       A     One earlier this year was a change of

9   which program operated in a particular county,

10  brought in a different philosophy, and the parent

11  was concerned about that, that his son was not

12  responding well and having frequent outbursts.

13      Q     What regional GNETS program was this?

14      A     This was the Harrell.

15      Q     Just to make sure I understand, a

16  different -- actually, can you explain it?

17      A     Camden was with -- and the coastal area

18  there, which I can't -- they have two different

19  names.  One is coastal something and one is coastal

20  something else.

21             But they decided to change to go with

22  Herrall because they had moved their affiliation

23  with the RESA over to Okefenokee.  So this was the

24  GNETS that served all the other districts.

25             It's just -- the State's big, and to go to



1    meetings they had to travel like 60, 70 miles to get

2    there.

3        Q    And what did GaDOE do in response to this

4    complaint?

5        A    So to that particular complaint?

6        Q    Yes, ma'am.

7        A    I went down to visit.

8        Q    You went down to visit?

9        A    I went down to visit the center and talk

10   to the special education director and the

11   coordinator and GNETS director.

12       Q    And this was when?

13       A    August.

14       Q    So this was a visit to a GNETS program

15   outside of the DOJ litigation?

16       A    Yes.

17       Q    Have you visited other GNETS programs

18   outside of the DOJ litigation?

19       A    You know, I guess earlier you asked me and

20   I said no, but I did go to that one.

21       Q    Okay.

22       A    It was an incident that I felt merited

23   that.

24       Q    And how did that conversation go?

25       A    Well --



1              MR. BEDARD:  Object to form.

2      Q    When you went to Herrall and you spoke to

3  them, what was discussed?

4      A    Well, they were very open and cooperative.

5  We just discussed some of the allegations that were

6  made, and if that was true or not, and talked about

7  other ways it could be handled, and supports and

8  services that were available or not available, and I

9  suggested how that could occur.

10     Q    And what were these allegations?

11     A    The outbursts were resulting in the parent

12  being called a lot, but also the philosophy, the

13  previous site director of that, he handled things

14  with a little less confrontation, and if the child

15  wanted to go outside and go swing, that's what they

16  did, because he had learned over the years that

17  giving another direction would result in an

18  explosion.  And the Herrall group that came in, they

19  did not feel that way.  They had a different

20  structure and a different approach to the behavior

21  management.

22     Q    And what was that approach?

23     A    Much stricter and that he needed to

24  comply.

25     Q    What actions were they taking?



1      A    They did restrain him.

2      Q    More than once?

3      A    Yes.  Of course, they were brief, and they

4    always about safety for the child or others.

5      Q    Have you followed up with Herrall since

6    your visit?

7      A    Yes.  Vickie has been the one following

8    up.

9           Vickie also came about a week later to

10   visit the same center and talk with everyone.

11     Q    Have you followed up with the parent?

12     A    The parent follows up with us pretty

13   frequently.  My program manager that handles

14   outreach.

15     Q    And what has the parent expressed since

16   your visit to Herrall?

17     A    It has improved over time.

18     Q    What other complaints have you received

19   from families related to the GNETS program?

20     A    We of course receive minor complaints, and

21   more significant complaints, and sometimes there are

22   formal complaints.

23          I don't see every formal complaint that

24   comes in, and I certainly don't hear about every

25   Help Desk call but, you know, if it was anything of



1  a major event, I certainly would be informed about

2  that.

3      Q    Since you've been interim -- starting with

4  when you were interim state director, moving to

5  state director, that time period, how many

6  complaints have you seen related to the GNETS

7  program?

8      A    I'm going to have to give you an estimate

9  because I don't have an exact number.

10          Less than 20.

11     Q    Okay.

12     A    I know that there are three formal

13  complaints that have recently been filed.

14     Q    With -- who are the formal complaints

15  filed with?

16     A    With us.

17     Q    To you?

18     A    To ask for an investigation.

19     Q    What are the allegations?

20     A    I don't recall.  I was informed that there

21  were three, and I haven't seen the details.

22     Q    And how recent was this?

23     A    Very recent.  Days ago.

24     Q    And what regional programs?

25     A    I don't even think I know that yet.



1    Q    You said that some complaints require more
2    attention than others; is that a correct
3    characterization?
4    A    Well, sometimes parents complain about
5    methodology, you know, instruction or something that
6    really is outside of our control.  The bus, when the
7    bus comes.  You know, things of that nature.
8         But certainly if we believe that FAPE is
9    compromised or safety in any way, we would raise
10   that to a much higher level.
11        Typically, the outreach manager, and
12   that's her job, that's what she does all day, is
13   talk to parents and take calls from the helpline and
14   tries to be a quick intermediary to contact the
15   special director or GNETS director and say, hey,
16   so-and-so called and, you know, is this really
17   happening?
18        If they say yes, it is, then she'll give
19   them, of course, the discussion about the law and
20   the things that need to happen and ask the director
21   to reach out to the parent.  She will give them
22   guidance about what they should do.  And typically
23   they are happy to do so.  Sometimes the director
24   that we speak with is not even aware of the problem
25   because it's happened at a school site.



1       Q    Have other complaints led to you visiting

2    a regional GNETS program?

3       A    That's the first one that I've had a quick

4    visit to.

5       Q    Have other complaints led to you

6    communicating with a regional GNETS program via

7    email?

8       A    Telephone typically.

9       Q    About how many of the 20, approximately

10   20?

11      A    I had a lot of conversation back and forth

12   with one of the regions.  I can't tell you now.  I

13   think it was last school year.  It was either

14   earlier in the fall or last -- it was last school

15   year.

16           And we probably talked 10 or 15 times back

17   and forth, and Vickie talked to the director and I

18   generally talked to the special ed director in the

19   district.

20      Q    And what was the reason behind those

21   calls?

22      A    It was a young child and they just

23   continued to have lot of trouble.  Didn't seem that

24   anybody could get a handle on things.  They moved

25   him from one center to another, and it was a great



1   deal of distance in between.  That, of course, was

2   pretty easy to predict because it was a young child

3   and transporting a long distance each day.

4           But we were just trying to work out a

5   closer option that would provide the supports and

6   services that he needed.

7       Q    What regional GNETS program was that?

8       A    Pioneer.

9       Q    Pioneer.  Okay.

10          Are there other ones that have led to a

11  few calls?

12      A    Nothing is coming to my mind right now,

13  but if something does, I will let you know.  But

14  it's not uncommon for school districts.  I mean we

15  receive phone calls from concerned parents multiple

16  times each day, and typically we're able to support

17  them and resolve the concern quickly with the school

18  district or a program, but, you know, there is of

19  course the recourse of formal complaints or due

20  process if needed.

21          We also have facilitated IEP, so we assign

22  facilitators to go and facilitate meetings.

23          MS. CHEVRIER:  I'm going to request on the

24      record that the three formal complaints that

25      Ms. Low just referenced be produced.



1          MR. BEDARD:  We can have a conversation

2      about that.

3      A    I don't even know if they've accepted

4  them.  I mean it's that new.

5          MS. TUCKER:  I'd like the court reporter

6      to mark the following document as Plaintiff's

7      Exhibit 941.

8          (WHEREUPON, Plaintiff's Exhibit-941 was

9      marked for identification.)

10  BY MS. TUCKER:

11     Q    This is an email thread produced by the

12  State.  The most recent email on the thread is dated

13  March 20, 2018 from Monica Henderson to you.

14          The subject reads:  "Serious civil rights

15  violations in Henry, Clayton and Hall Counties."

16          The Bates number on the bottom of the

17  first page reads GA04918894.

18          Ms. Low, to you recognize this email?

19     A    I recognize that it is in our email

20  system, but I don't remember the situation, so I'll

21  have to read it.

22     Q    Okay.  I'll give you a moment to read it.

23          (Witness reviews exhibit.)

24     A    That's a serious situation, but I promise,

25  I have no recollection of that at all.



1        Q    And you respond -- when you say this is a
2   serious situation --
3        A    Well, the allegations that the advocate is
4   making.
5        Q    And you're speaking to the email from
6   Libby McCullough sent March 19, 2018 in the thread?
7        A    Yes.
8        Q    Okay.  And if you're looking at No. 2, do
9   you see where she writes:  "Children in Hall,
10  Clayton and Henry with Autism are not receiving
11  Functional Analysis which leads to proper
12  identification" -- or improper -- no -- "proper
13  identification of interventions or goals.  I'm
14  hearing of many students"-- "children, some who I am
15  assisting, and a systemic failure in that FA's are
16  not done properly for children, including those on
17  the Autism Spectrum.  Sensory integration
18  dysfunction is real and is not considered seriously
19  as an antecedent for behavior.  Situations snowball
20  quickly, then children are labeled as needing EBD
21  eligibility, and they are denied a FAPE at any one
22  of the GNETS around the state.  This needs
23  intervention, monitoring, and enforcement."
24            Is this what you were referring to?
25        A    I was actually referring to the first



1  | email.  That is also a concern.  The first email is

2  | very concerning as well.

3  |     Q    And you don't recall these allegations?

4  |     A    I don't, and that would be unusual because

5  | I was on the email thread, it looks like.

6  |          I was Monica's supervisor, and Debbie's.

7  | So I can understand how I got copied in.  That was

8  | when I was the RDA manager, changing over to the

9  | senior program manager.

10 |          Where they're saying Wina says just hold,

11 | I probably said just hold because we were going to

12 | talk to Zel about moving forward and how she wanted

13 | that handled.

14 |          You know, there are two sides to every

15 | story, and just because an advocate calls and says

16 | things, that doesn't necessarily mean that's

17 | happening.

18 |          So Zel very likely wanted to reach out to

19 | the director herself.  But I don't -- I don't really

20 | recall.

21 |     Q    Okay.  But would you have likely reached

22 | out to Dr. Smith-Dixon about this?

23 |     A    Oh, absolutely.  That would have been -- I

24 | would have been straight to her office about it.

25 | But I don't remember the circumstances.  I could



1  have been out in the field somewhere and just trying

2  to tell them, now, hold on, before you start calling

3  the district to talk about this.

4       Q    Thank you.  Earlier, when we were speaking

5  about complaints, you referenced one with the

6  Pioneer GNETS.  Are you referring to the Pioneer

7  RESA?

8       A    Yes, I am.  And they're Futures, aren't

9  they?

10      Q    Futures GNETS?

11      A    Uh-hum.  (Affirmative.)

12      Q    Just wanted you to confirm?

13      A    Yes.

14      Q    Thank you.

15           Ms. Low, have you heard the phrase "GNETS

16  2.0" used at GaDOE?

17      A    Yes.

18      Q    What is GNETS 2.0 short for?

19      A    That would be short for the litigation

20  filed by the Georgia Efficacy Office.

21      Q    So -- okay.

22           Have you participated in discussions of

23  what GNETS could look like in the future?

24           MR. BEDARD:  I'll object and instruct you

25      not to answer just to the extent it's a



1        conversation with counsel.  But otherwise you

2        can answer.

3        A    I think it would have all been involving

4   litigation.

5        Q    Have they been conversations with counsel?

6        A    Yes.

7        Q    What about conversations without counsel

8   about GNETS in the future?

9        A    Well, I would have to answer that between

10  Shaun, Vickie, and I.

11       Q    And what have you all discussed?

12            MR. BEDARD:  You can answer that question,

13       unless counsel was there.

14       A    I'm trying to think of any specifics

15  there.  Just --

16            MR. BEDARD:  Let me back up.

17            You can -- you can answer if counsel was

18       not there and you are not discussing something

19       that counsel said to you or that you -- that

20       came from conversation with counsel.

21            But otherwise --

22            THE WITNESS:  No, it came from

23       conversation with counsel.

24            MR. BEDARD:  Okay.

25            THE WITNESS:  And we met together to try



```
 1        to put together some options.
 2             MR. BEDARD:  Okay.  Then I will instruct
 3        you not to answer then.
 4    BY MS. TUCKER:
 5        Q    Do you anticipate any needs -- need for
 6    changes in the GNETS program in the future?
 7             MR. BEDARD:  Object to form.
 8             You can answer.
 9        A    I think there's always room for continuous
10    improvement.
11        Q    And --
12        A    We --
13        Q    Go ahead.
14        A    That's what I was going to say.  There's
15    room to grow and change and ensure that all children
16    have the services they need.
17        Q    And in what way can that be improved?
18             MR. BEDARD:  I'm sorry.
19             THE WITNESS:  Is it okay for me to answer?
20             MR. BEDARD:  You can answer.  I'll object
21        to form but you can answer.
22        A    I think our districts are rich with
23    resources, and I want to make sure that all children
24    have access to the resources, have access to
25    nondisabled peers, services and supports,
```



1  therapeutic services and counseling, things of that
2  nature.
3       Q    Do you think this is a viable possibility?
4            MR. BEDARD:  Object to form.
5            You can answer.
6       A    To continue to grow and change?
7       Q    To work more with the LEAs.
8       A    LEAs have responsibility for the children.
9  Never -- it's been given to anyone.  Their
10  responsibility and obligation is there.  So I mean I
11  think anything is possible.
12       Q    What specific changes for improvement
13  would you put into place?
14            MR. BEDARD:  Object to form.
15            You can answer.
16       A    Again, I think that our LEAs are rich with
17  these resources and supports.  We need to make sure
18  that our funding and support goes to not just
19  replicating school, that there's funding for very
20  rich supports and opportunities for all children.
21       Q    Have you discussed this with anyone?
22       A    Shaun, Vickie, Stacey.
23       Q    With Shaun and Vickie, what have they
24  responded, when you shared this?
25            MR. BEDARD:  Object to form.



1      A    It feels like I'm answering on their

2    behalf.

3      Q    If they shared anything with you verbally

4    that you heard, back when you responded?

5      A    I think I can safely say that they want

6    the very best for all students.  If any changes are

7    necessary, they're supportive to make sure that we

8    ensure that for all students, and that would be all

9    students in any setting.

10     Q    Ms. Low, what is Apex?

11     A    It's a DBHDD program for mental health

12   services.

13     Q    Do you think GNETS students could benefit

14   from Apex services?

15          MR. BEDARD:  Object to form.

16          You can answer.

17     A    I don't know a lot about Apex.  I was

18   already out of the school district by the time Apex

19   came into the districts, and I don't have any

20   knowledge like that.

21          It hasn't been something I've been

22   involved in meetings.  I have been in a meeting

23   where it was discussed briefly recently, but it

24   hasn't been a part of my work focus prior to serving

25   in the director role.



1              The connection with the Department of
2     Education with Apex was really coming out through
3     the school climate division.  I mean now they are a
4     part of Office of Whole Child, and they were doing
5     work like mental health, First Aid and coordinating
6     with Apex.
7         Q    When you say that you went to a meeting
8     where it was discussed briefly recently, are you
9     referring to GNETS and Apex?
10        A    No.  I'm just referring to a meeting that
11    was scheduled with Dante McKay and the Office of
12    Whole Child, and I was invited.  That's all.  And it
13    was just in a list of programs and services.
14        Q    And this was a meeting we spoke about
15    earlier --
16        A    Yes.
17        Q    -- with Dante McKay?
18        A    Yes.
19        Q    Are the services available through Apex
20    also available for the regional GNETS programs?
21        A    I don't know if that is happening.  I just
22    honestly don't know.
23        Q    Okay.
24        A    But just anecdotal comments that directors
25    have made, I'm talking about just LEA directors,





1  it's not widespread available.  It's not -- it's not

2  always available to every system, and I don't know

3  what the reason is.  That's something that, you

4  know, needs to continue to be explored.

5          Vickie probably has a lot more knowledge

6  about that, as well as Lakesha.  She serves on an

7  intergovernmental agency group.

8      Q    Has collaboration with DBHDD been

9  considered to provide Apex services to GNETS?

10     A    Yes.  But the answer is always a qualified

11 answer.  So that's -- my impression from them --

12 well, I probably don't need to give an impression,

13 but everybody that wants it doesn't seem to have

14 availability to get it, and I don't understand fully

15 enough why that's not possible.

16     Q    And by everybody who wants it, you're

17 referring to regional GNETS programs that want it?

18     A    I don't know.  I don't have specific

19 knowledge of any GNETS program saying that they want

20 it.  They may have.  I just don't know.

21     Q    Are you aware that the Apex program

22 provides mental health services during the summer?

23     A    Yes.

24     Q    Is there an importance to continuing

25 services through the summer for students with



1    disabilities -- or with EBD?  Excuse me.

2         A    It's an individual decision but, yes,

3    extended day or extended school year is always of

4    high importance.  The capacity building grant that I

5    have out for GNETS and districts to consider, that

6    is one of the options, therapeutic services and

7    supports.

8              I list some examples and I also make the

9    suggestion that it would be great to provide for

10   extended day or extended school year.  The money is

11   short, a short availability, but it certainly would

12   provide a significant amount of funding for the

13   summer.

14             I just tell you that to say it is a

15   priority to me.  I do try to find ways to encourage,

16   but when it goes back to the individual students,

17   it's about an IEP decision on whether they need

18   extended school year.

19        Q    Does GNETS provide mental health services

20   during the summer?

21        A    I'm sure that some probably do.  I don't

22   have specific knowledge of that.

23             The GNETS that -- when I was a local

24   director, we always had an extended school year, and

25   the same therapists, psychologists, the consulting



1    psychiatrists, they were there in the summer just as
2    well as they were anywhere.
3         Q    Okay.  Thank you.
4              When you were speaking about coordination
5    with DBHDD, you said that the answer is always a
6    qualified answer.
7              What did you mean by that?
8         A    I think it's really a better question for
9    Dante because he does provide the leadership for
10   that area, but my understanding is districts have to
11   do something, and then they've got to determine if
12   they have people in the region that can provide the
13   support.  Just a lot of if's, barriers that have to
14   be crossed.
15             So that's about the extent of my knowledge
16   on that, is a lot of people want to be involved but
17   they say that they haven't been able to make it
18   happen.
19             But this is passing comments.
20        Q    And who are these passing comments from?
21        A    Oh, typically directors, and it's been
22   over a course of time, years.
23        Q    And by directors, do you mean regional
24   GNETS directors?
25        A    I don't think I've had a conversation with



1    a GNETS director about it.  It would be more special

2    ed directors.

3            MR. BEDARD:  Counsel, what's our time at?

4            THE VIDEOGRAPHER:  6/39.

5        Q    When you went to Harrell regarding that

6    parent complaint, did you visit multiple locations?

7        A    No.  I visited one site in Camden County.

8        Q    Did you do classroom observation while you

9    were there?

10       A    No.

11       Q    What did you do while you were there?

12       A    Well, I talked with the GNETS director.  I

13   talked with the Camden County special ed director.

14           I had asked that one of our program

15   specialists that was located in that region to come

16   over and be a part of the discussion, too, and I was

17   trying to anticipate if I needed to send somebody

18   back to provide any support or professional

19   learning.

20           So Belinda Tiller was with me.  And

21   Bridget Still, I think.  I know Bridget was invited.

22   I'm just trying to remember if she was able to come.

23   She's a behavioral specialist and a former GNETS

24   coordinator in another part of the State.

25       Q    And they're with GaDOE?



1    A    Yes.  Yes, they are employees.

2         Vickie was unable to.  I think it had to

3  do with -- might be deposition preparation, but it

4  was an important reason, so she could not go.

5         And, again, she followed up with a visit

6  about a week later.

7         I asked them about the incident and asked

8  them about services that they provided and plans,

9  and their staffing in the building.  We of course

10  discussed the situation that the parent had brought

11  up about the restraint and, you know, talked through

12  all those situations.

13    Q    Thank you.

14         MS. TUCKER:  Subject to the disagreement

15         we had earlier about Ms. Low's ability to

16         answer questions related to the site visits,

17         we're going to keep the deposition open, but

18         we'll end for today.

19         MR. BEDARD:  Okay.  That sounds fine.

20         I'll also note for the record that I think

21         there's only five minutes left in the seven

22         hours, give or take.

23         THE VIDEOGRAPHER:  We're at six hours and

24         41 minutes.

25         MR. BEDARD:  I'm sorry.  When he said 6/39



1    is total, not where we left.

2         MS. TUCKER:  It's over 18 minutes.

3         MR. BEDARD:  Sounds good.  Thank you.

4         MS. TUCKER:  Thank you for your time

5    today.

6         THE VIDEOGRAPHER:  Going off the record at

7    6:04.

8         (Whereupon, the deposition concluded at

9    6:04 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



WINA LOW                                February 28, 2023
UNITED STATES vs STATE OF GEORGIA                    313

```
1              C E R T I F I C A T E

2

3   STATE OF GEORGIA:

4   FULTON COUNTY:

5

6            I hereby certify that the foregoing

7   transcript of WINA LOW was taken down, as stated in

8   the caption, and the questions and answers thereto

9   were reduced by stenographic means under my

10  direction;

11           That the foregoing Pages 1 through

12  312 represent a true and correct transcript of

13  the evidence given upon said hearing;

14           And I further certify that I am not of kin

15  or counsel to the parties in this case; am not in

16  the regular employ of counsel for any of said

17  parties; nor am I in anywise interested in the

18  result of said case.

19

20           IN WITNESS WHEREOF, I have hereunto

21  subscribed my name this 8th day of March, 2023.

22

23  _____

24       Wanda L. Robinson, CRR, CCR No. B-1973
            My Commission Expires 10/11/2023
25
```



1      D I S C L O S U R E

2    STATE OF GEORGIA  ) VIDEOTAPE DEPOSITION OF
     FULTON COUNTY     ) WINA LOW - 2/28/23
3              Pursuant to Article 10.B of the Rules and

4    Regulations of the Board of Court Reporting

5    of the Judicial Council of Georgia, I make the

6    following disclosure:

7              I am a Georgia certified court reporter.

8    I am here as a representative of Esquire Deposition

9    Solutions, LLC, and Esquire Deposition Solutions,

10   LLC was contacted by the offices of U.S. Attorney's

11   Office to provide court reporter services for this

12   deposition.  Esquire Deposition Solutions, LLC will

13   not be taking this deposition under any contract

14   that is prohibited by O.C.G.A. 9-11-28 (c).

15             Esquire Deposition Solutions, LLC has no

16   contract/agreement to provide court reporter

17   services with any party to the case, or any counsel

18   in the case, or any reporter or reporting agency

19   from whom a referral might have been made to cover

20   this deposition.

21             Esquire Deposition Solutions, LLC will

22   charge the usual and customary rates to all parties

23   in the case, and a financial discount will not be

24   given to any party to this litigation.

25



```
 1                    ESQUIRE ERRATA SHEET

 2

 3

 4   Esquire Job ID:  J9266904

 5   Case Caption:  USA v. State of Georgia

 6

 7

 8           DECLARATION UNDER PENALTY OF PERJURY

 9

10           I declare under penalty of perjury that I

11   have read the entire transcript of my deposition taken

12   in the above-captioned matter or the same has been read

13   to me, and the same is true and accurate, save and

14   except for changes and/or corrections, if any, as

15   indicated by me on the DEPOSITION ERRATA SHEET hereof,

16   with the understanding that I offer these changes as if

17   still under oath.

18           Signed on this _____ day of

19   _____, 2023.

20

21

22

23                   _____

24                   WINA LOW

25
```



```
 1                    DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____ Change to:_____

 3    _____

 4    Reason for change: _____

 5    Page No._____Line No._____ Change to:_____

 6    _____

 7    Reason for change: _____

 8    Page No._____Line No._____ Change to:_____

 9    _____

10    Reason for change: _____

11    Page No._____Line No._____ Change to:_____

12    _____

13    Reason for change: _____

14    Page No._____Line No._____ Change to:_____

15    _____

16    Reason for change: _____

17    Page No._____Line No._____ Change to:_____

18    _____

19    Reason for change: _____

20    Page No._____Line No._____ Change to:_____

21    _____

22    Reason for change: _____

23

24    SIGNATURE:_____DATE:_____

25              WINA LOW
```



WINA LOW                                    February 28, 2023
UNITED STATES vs STATE OF GEORGIA                        317

1           DEPOSITION ERRATA SHEET

2   Page No._____Line No._____ Change to:_____

3   _____

4   Reason for change: _____

5   Page No._____Line No._____ Change to:_____

6   _____

7   Reason for change: _____

8   Page No._____Line No._____ Change to:_____

9   _____

10  Reason for change: _____

11  Page No._____Line No._____ Change to:_____

12  _____

13  Reason for change: _____

14  Page No._____Line No._____ Change to:_____

15  _____

16  Reason for change: _____

17  Page No._____Line No._____ Change to:_____

18  _____

19  Reason for change: _____

20  Page No._____Line No._____ Change to:_____

21  _____

22  Reason for change: _____

23

24  SIGNATURE:_____DATE:_____

25          WINA LOW

