UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION FILE |
| v. ) | |
| ) | NO. 1:16-CV-03088-ELR |
| STATE OF GEORGIA, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S MOTION TO EXCLUDE TESTIMONY
OF DR. ROBERT PUTNAM AND INCORPORATED MEMORANDUM
OF LAW IN SUPPORT THEREOF**

Pursuant to Federal Rule of Evidence 702, Defendant, State of Georgia, by and through its counsel of record submit this Motion to Exclude the Testimony of Robert Putnam, Ph.D. ("Dr. Putnam"). This Motion applies for trial and this Court's consideration of Motions for Summary Judgment. See Chapman v. Procter & Gamble Distrib., LLC, 766 F.3d 1296, 1313 (11th Cir. 2014) (citation omitted) (providing that only admissible evidence can be considered on a motion for summary judgment).

**I. Introduction.**

Dr. Putnam is a psychologist, behavior analyst and a board-certified behavior analyst-doctoral. [Putnam Rep. at 1].[1] The Department of Justice

---

[1] A true and accurate copy of Dr. Putnam's report is attached as **Exhibit 1.**

(the "Department" or "DOJ") proffers Dr. Putnam as an expert to testify about (1) "standards of care for serving students with behavior-related disabilities;" (2) the sufficiency of services provided to students with behavior-related disabilities in Georgia; and (3) what he describes as "reasonable steps Georgia could take to prevent unnecessary GNETS placements." (Putnam Rep. at 6, 32, 54.)

For numerous reasons, Dr. Putnam's testimony cannot survive the scrutiny imposed by the Federal Rules of Evidence. First, his testimony about the "standard of care" is wholly inadmissible and irrelevant. The Supreme Court of the United States been clear that Title II of the Americans with Disabilities Act (the "ADA") does not "impose[] on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.'" Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 603 (1999) (plurality opinion).[2] Second, Dr. Putnam's analysis on appropriateness of services is not relevant to the allegations before the Court because he conducted no individualized analyses for what are inherently individualized

---

[2] As recently recognized by the United States Court of Appeals for the Fifth Circuit in a decision rejecting the Department's attempt to expand the reach of the ADA beyond its text, Justice Kennedy's narrowing concurrence in Olmstead provides the controlling opinion. United States v. Mississippi, 82 F.4th 387, 394 n.11 (5th Cir. 2023) (citing Marks v. United States, 430 U.S. 188, 193 (1977)).

determinations. Third, Dr. Putnam's failure to conduct a workforce or cost study when the effectiveness of his recommendations necessarily rely on both is fatal to his testimony. Lastly, Dr. Putnam offers no discernable methodology, and to the extent he does, he does not apply it to his recommendations.

## II. Facts: Dr. Putnam's Testimony.

Dr. Putnam's report indicates that he will testify about Medicaid-covered behavioral health services provided to Georgia's students with behavior-related disabilities. (Report at 1.) More specifically, Dr. Putnam will testify that (1) Georgia's current provision of services are insufficient to "help divert students from unnecessary placement in the Georgia Network for Educational and Therapeutic Support (GNETS) Program," and (2) "Georgia" can make "reasonable changes to its service system" to "decrease its reliance on the GNETS Program" (Id.)

His report identifies several proposed policy mandates that he recommends Georgia adopt and impose on local schools in the hopes that his preferred policy choices will reduce the existing and future number of students who are referred to the GNETS program by their local individualized education plan ("IEP") team. (Report at 54-63.) These include: (1) expanding Medicaid-funded, in-school behavioral health services for the 3%-5% of students across Georgia who are in need of intensive

services; (2) increasing State-policy and -program's dependence on federal Medicaid funding; (3) collecting more data and intensifying State "monitoring" of local school districts; (4) implementing intensive PBIS services in more of Georgia's schools; (5) "expanding and enhancing" training efforts for both school staff and providers of behavioral health services; and (6) mandating that independent State and local agencies share information, data, and impose "accountability mechanisms." (Id.)

At the heart of Dr. Putnam's testimony is his belief that "if the students are provided with appropriate services at the appropriate intensity … they don't need to be segregated." (Putnam Dep. 59:19-22.)[3] His report does not provide a definition of "appropriate services" based on any authority of scholarship, (see generally Report), so Dr. Putnam created his own definition (Putnam Dep. 60:2-5.) Specifically, he opined that the measure of "appropriate services" are determined by their outcome: "appropriate services [are those] that improve the student's social, emotional, behavioral, and academic status." (Id.) In other words, Dr. Putnam contends that a service is only "appropriate" if it is *effective.* Importantly, Dr. Putnam acknowledges and agrees that what constitutes "appropriate services" is an individualized

---

[3] The Deposition of Dr. Putnam is attached hereto as **Exhibit 2**.

determination based on the unique needs of each student. (Id. 19:18-21; 63:1-8; 121:15-18.)

Given this individualized focus, it is not surprising that Dr. Putnam could not opine whether every student in GNETS that he considered could be served in a general education setting—even with "appropriate services." (Putnam Dep. 37:23-74:9.) This makes sense given Dr. Putnam's credible and candid concession that some students may be afforded "with appropriate services at the appropriate intensity" and still need to "receive educational services … in a separate or segregated setting." (Putnam Dep. 63:9-16.)

Nevertheless, Dr. Putnam claims that the provision of "appropriate services" would allow an unquantified "vast majority of students with behavior-related disabilities … [to] be served effectively in general education schools." (Report at 1.) While Dr. Putnam also neglects to cite any authority for his definition of "served effectively," he posits once again that effectiveness is based on individual student outcomes, which may include consideration of decreased office system referrals, increased academic performance, and enhanced social-emotional status. (Putnam Dep. 70:3-9.) Consequently, Dr. Putnam's testimony demonstrates the highly individualized inquiry that determines what constitutes "the most integrated setting appropriate to the needs of qualified individuals with disabilities," 28 C.F.R. § 35.130(d), and that local IEP Teams' recommendations that a

student receive educational services through a GNETS program is not always inappropriate.[4] (Putnam Dep. 18:11-14.)

When considering whether a service is effective, Dr. Putnam acknowledged that cost is "obviously" a factor in determining whether a service is effective and, in his words, appropriate for that student. (Putnam Dep. 71:20-25.) Despite recognizing the necessity of considering cost, he did not actually consider it. His analysis is completely devoid of any cost report or other fiscal analysis of his policy recommendations. (Putnam Dep. 97:6-10; 88:8-12; 97:6-10; 282:11-16.) Similarly, and even after acknowledging the need for a sufficient number of professionals to provide the services he recommends (Putnam Dep. 137:2-6), Dr. Putnam also chose not to consider Georgia's available workforce as part of his report or testimony. (Putnam Dep. at 97:6-10; 215:11-16; 282:11-22.)

Dr. Putnam also acknowledged he "do[esn't] know a lot about GNETS, because that wasn't what [he] was asked" to consider. (Putnam Dep. 18:19-22; see also 175:12-18). He also professed to not know other aspects of Georgia state government, despite making numerous and significant policy recommendations. For example, Dr. Putnam did not know or had a

---

[4] Consequently, neither Dr. Putnam's report nor his testimony can support the idea that the provision of education services in GNETS is "unjustified institutional isolation" under the ADA. Olmstead, 527 U.S. at 600 (plurality opinion).

misunderstanding about **(1)** how the GNETS program is funded (Putnam Dep. 88:25-90:13; 92:7-20), **(2)** whether the Georgia Department of Education ("DOE") is authorized to hire or fire school principals (Id. 158:5-9); **(3)** whether the Department of Community Health ("DCH") or Department of Behavioral Health and Developmental Disabilities ("DBHDD") could compel community behavioral health providers to participate on a team that implements his recommended multi-tiered systems of support ("MTSS") platform (id. 180:25-181:13); **(4)** how the DOE trains local school districts on positive behavioral interventions and supports ("PBIS")[5] (id. 245:5-16); and **(5)** who provides Functional Behavior Assessments ("FBAs") to students[6] (e.g., whether State or local officials). (Id., 106:23-107:9.)

Dr. Putnam's deposition testimony also revealed fundamental misunderstandings of Georgia's education system. These include his belief that State agencies could "mandate [that] Georgia school districts adopt a PBIS program" (Putnam Dep. 54:19-55:7), when, in fact, Georgia law provides that local school districts are only "encouraged" and not required to implement PBIS. O.C.G.A. § 20-2-741(b). Similarly, Dr. Putnam opined that

---

[5] One of Dr. Putnam's recommendations is that the State improve training on PBIS. (Report at 62.)
[6] This matters, because Dr. Putnam's report cites FBAs as a "core set of interventions" that are "effective" at keeping students in integrated settings. (See, e.g., Report at 6, 7.)

funds for the GNETS program do not "flow to" local school districts. (Putnam Dep. 92:7-20.) This too is incorrect. Regional GNETS Programs apply to the DOE for GNETS grants; if DOE awards them, the funds flow to the LEA or RESA who then have significant discretion on how to apply the funds. See Ga. Comp. R. & Regs. 160-4-7-.15. See also Gwinnett Cty. Sch. Dist. v. Cox, 289 Ga. 265, 265 (2011) (deciding that Georgia's "constitution embodies the fundamental principle of exclusive local control of general primary and secondary ("K–12") public education").

Dr. Putnam's report does not much describe the methodology he employed. (Report at 4-6.) Instead, it identifies the information he considered and explains that he relied on his "expertise" in the field. (Id. at 5.) He did not review any individual student's FBA. (Putnam Dep. 107:10-12.) Dr. Putnam's report indicates he "pulled the records of [seven] students at random [who, in school years 2020 and 2022 received services through] GNETS" and were Medicaid beneficiaries. (Report at 52.) The Report discusses only two of the seven students, and Dr. Putnam does not opine that the limited sample is "statistically significant." (Putnam Dep. 258:25-259:4.) Dr. Putnam could not affirm that the analysis and methodology he employed in the Report was subject to peer review. (Putnam Dep. 99:6-23.)

**III.   Analysis.**

    A.    The <u>*Daubert* Standard</u>

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. Trial courts are tasked with acting as "gatekeepers" to ensure that a proposed expert's testimony is not only relevant, but reliable. <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 592 (1993). To that end, district courts are "charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." <u>Corwin v. Walt Disney Co.</u>, 475 F.3d 1239, 1250 (11th Cir. 2007).

As the gatekeeper, the trial court must make a "rigorous three-part inquiry" to determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the

> expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (internal cit. omitted). Although the three prongs overlap, trial courts must be cautious not to conflate them, and the proponent of expert testimony bears the burden to show that *each* requirement is met. Id. (emphasis added); Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla., 402 F.3d 1092, 1113-14 (11th Cir. 2005).

The analysis for "reliability" considers "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community." Allison v McGhan Med. Corp., 184 F.3d 1300, 1312 (11th Cir. 1999) (citation omitted).  The relevance prong requires the party offering the testimony to show that the proffered testimony "logically advances a material aspect of the proposing party's case." Id.

The burden of establishing that Dr. Putnam's testimony satisfies *each* requirement lies exclusively with the Plaintiff. Frazier, 387 F.3d at 1260 (emphasis added).

Dr. Putnam's testimony fails both the relevance and reliability prongs of the *Daubert* test.

B.     Relevance.

First, Dr. Putnam's testimony on what constitutes "appropriate services" is not relevant because, as Dr. Putnam himself acknowledges, this is an individualized determination that will vary based on the student. Dr. Putnam did not analyze any individual student for what would constitute appropriate services based on the unique needs of that student. He cannot, therefore, show any causal connection between a proposed service and an outcome. Nor can he offer any objective criteria for the Court to follow in making determinations of appropriateness.

In addition, Dr. Putnam's testimony is not relevant to the allegations before the Court because his conclusions do not account for present realities in Georgia. As noted above, Dr. Putnam did not consider Georgia's available workforce as part of his report or testimony. (Putnam Dep. p. 97:6-10; 215:11-16; 282:11-22.) Yet Dr. Putnam acknowledges that the effectiveness of his proposed modifications necessarily depends on the availability of a sufficient number of professionals to provide the services he recommends. (Putnam Dep. 137:2-6.) Dr. Putnam cannot, therefore, show that his recommendations are even feasible in Georgia because he has not conducted a workforce study to confirm the existence of the resources necessary for

-11-

implementation of his recommendations. Had Dr. Putnam conducted such a workforce analysis, he would have been confronted with the reality that there is a serious and ongoing shortage of mental health professionals in Georgia.[7] Put simply, the current workforce shortage in Georgia renders Dr. Putnam's recommendations impossible and, thus, not relevant to this case.

Similarly, though Dr. Putnam acquiesced that cost is a factor in the effective implementation of a service, (Putnam Dep. 71:20-25), he failed to conduct any cost analysis that would show his recommendations are actually feasible in a balanced budget state such as Georgia. (Putnam Dep. 97:6-10; 88:8-12; 97:6-10; 282:11-16; *see generally*, GA CONST Art. 3, § 9, ¶ IV; Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, n16 (1999).) In other words, Dr. Putnam did not do any of the work necessary to understand what the cost of his proposals would be--or whether the workforce exists to support it. This undermines not only his opinion on appropriateness, but also his opinions on reasonableness.

---

[7] *See, e.g.*, "Health care workforce shortage in 'state of emergency' DBHDD commissioner says," attached hereto as **Exhibit 3**, available at https://www.gpb.org/news/2023/05/19/health-care-workforce-shortage-in-state-of-emergency-dbhdd-commissioner-says; affidavit of Dante McKay at ¶¶ 6, 11, attached hereto as **Exhibit 4**; Georgia Apex Program Annual Evaluation Results at GA05558537, -8542, -8561, -8565, -8569, -8572, attached hereto as **Exhibit 5**.

C.   Methodology.

Dr. Putnam's methodology underlying his conclusions contains a series of critical flaws, rendering his testimony too unreliable to be considered in this case.

First, Dr. Putnam employed little to no methodology in reaching his conclusions. (Report at 4-6.)  Dr. Putnam purports to have reviewed the records of just seven students who received GNETS services in 2020 and 2022 and were Medicaid beneficiaries. (Report at 52.) But his report fails to include his process for reviewing the records, whether such process was standardized and uniform for each record review, what he was looking for, whether he utilized any field-approved tools or other measures, why he chose to review seven records, and how those seven records were chosen. This casts serious doubt on the reliability of Dr. Putnam's findings, as there is no indication Dr. Putnam employed a standardized method to reduce or eliminate bias and subjectivity in his review.

More importantly, though, Rule 702 requires expert testimony be "the product of reliable principles and methods" and the expert must have "reliably applied the principles and methods to the facts." Here, there was a wholesale lack of any principles and methods used by Dr. Putnam in his record review. It would be impossible to test his technique as there is no information or detail provided on what Dr. Putnam actually did to reach his

-13-

conclusions in his record review. Dr. Putnam also could not confirm that the sample was statistically significant, (Putnam Dep. 258:25-259:4), or that the methodology he claims to have employed in reviewing the sample was subject to peer review. (Putnam Dep. 99:6-23.) None of Dr. Putnam's methodology in his record review satisfies the requirements of Rule 702.

Next, Dr. Putnam relies on his own definitions of "appropriate services" and "served effectively" in support of his claims that the provision of "appropriate services" would allow an unquantified "vast majority of students with behavior-related disabilities … [to] be served effectively in general education schools." (Report at 1; Putnam Dep. 60:2-5; 70:3-9.) Dr. Putnam defines "appropriate services" as individualized and determined by their outcome: those "that improve the student's social, emotional, behavioral, and academic status." (Putnam Dep. 60:2-5; 19:18-21; 63:1-8; 121:15-18.) Dr. Putnam's definition for "served effectively" is also based on the individual student and includes outcomes such as decreased office system referrals, increased academic performance, and enhanced social-emotional status. (Putnam Dep. 70:3-9.)

Dr. Putnam provides absolutely no authority in support of either of his proposed definitions which casts doubt on the reliability of his conclusion that "appropriate services" would allow the vast majority of students with behavior-related disabilities to be "served effectively" in the general

-14-

education setting. Dr. Putnam specifies that he relied on his "expertise" in the field as the basis for his opinions, (Report at 5), which subjects his methodology to additional scrutiny in order to ensure the reliability of his methods. Indeed, in United States v. Frazier, 387 F.3d 1244, 1261 (11th Cir. 2004), the Eleventh Circuit underscored the importance of a proposed expert's explanation of *how* and *why* an expert's experience leads him to his proffered conclusions:

> [T]he Committee Note to the 2000 Amendments of Rule 702 expressly says that, "[i]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, *why* that experience is a sufficient basis for the opinion, and *how* that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 advisory committee's note (2000 amends.) (emphasis added); see also Daubert v. Merrell Dow Pharmaceuticals, Inc. (on remand), 43 F.3d 1311, 1316 (9th Cir. 1995) (observing that the gatekeeping role requires a district court to make a reliability inquiry, and that "the expert's bald assurance of validity is not enough").

Here, Dr. Putnam provides no authority for the self-made definitions he utilizes to render his conclusions, nor does he provide the required explanation for how or why his professional experience leads him to his conclusions as to the effect of "appropriate services" on students in the GNETS program. Instead, it appears this Court is supposed to simply "tak[e] the expert's word for it." Frazier, 387 F.3d 1261. This is not enough to satisfy the reliability prong as developed by Daubert and Frazier and it is fatal to

Dr. Putnam's admissibility as an expert. Indeed, "[i]f admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." Id (emphasis in original).

This Court has previously excluded the testimony of proffered experts who did not satisfy the heightened admissibility analysis applicable to an expert who relies on his experience. In Scheinfeld, this Court held that an expert's "conclusory statements devoid of factual or analytical support is simply not enough" to demonstrate reliability and that "more is required if an expert is relying solely or primarily on experience as the basis for his opinions." Scheinfeld v. LM Gen. Ins. Co., 472 F. Supp. 3d 1329 (N.D. Ga. 2020) (relying on Frazier, 387 F.3d at 1261.) As demonstrated above and for the same reasons, the Court should exclude Dr. Putnam's testimony.

Lastly, Dr. Putnam's deposition testimony also revealed either a complete lack of knowledge or fundamental misunderstanding of certain critical aspects of Georgia's state government and education system that cast serious doubts on the reliability of his testimony. This is especially concerning when considering that these very same critical aspects are incorporated into Dr. Putnam's recommendations. Putnam Dep. 54:19-55:7 (State's ability to mandate implementation of PBIS); Putnam Dep. 245:5-16 (how DOE trains local school districts on PBIS); Putnam Dep. 88:25-90:13;

92:7-20 (GNETS program funding); Putnam Dep. 180:25-181:13 (DCH and DBHDD authority to compel providers to participate in MTSS). Such doubt is further compounded by the fact that Dr. Putnam acknowledged that both cost and workforce are important factors in the delivery of his own definition of effective services, but then outright excluded any analysis of either factor in his report and conclusions. Putnam Dep. 137:2-6; 97:6-10; 215:11-16; 282:11-22; 71:20-25, 97:6-10; 88:8-12; 97:6-10; 282:11-16.

## IV. Conclusion.

For the foregoing reasons, the Court should exclude Dr. Putnam's expert testimony because his opinions are irrelevant and too unreliable to be considered in this case.

Respectfully submitted this 7th day of November, 2023.

| | |
|---|---|
| Christopher M. Carr<br>*Attorney General*<br>Georgia Bar No. 112505<br>Bryan K. Webb<br>*Deputy Attorney General*<br>Georgia Bar No. 743580<br>Russell D. Willard<br>*Senior Assistant Attorney General*<br>Georgia Bar No. 760280<br>Susan R. Haynes<br>*Assistant Attorney General*<br>Georgia Bar No. 901269<br>Office of the Attorney General 40 Capitol Square, S.W. Atlanta, Georgia 30334 Telephone: (404) 656-3357 | */s/ Josh Belinfante*<br>Josh Belinfante<br>Georgia Bar No. 047399<br>jbelinfante@robbinsfirm.com<br>Melanie Johnson<br>Georgia Bar No. 466756<br>mjohnson@robbinsfirm.com<br>Edward Bedard<br>Georgia Bar No. 926148<br>ebedard@robbinsfirm.com<br>Danielle Hernandez<br>Georgia Bar No. 736830<br>dhernandez@robbinsfirm.com<br>Javier Pico Prats<br>Georgia Bar No. 664717<br>jpicoprats@robbinsfirm.com<br>Anna Edmondson |

Georgia Bar No. 289667
aedmondson@robbinsfirm.com
**Robbins Alloy Belinfante Littlefield LLC**
500 14th Street NW
Atlanta, GA 30318
Telephone: (678) 701-9381
Facsimile: (404) 856-3255

Alexa R. Ross
Georgia Bar No. 614986
alexarross@icloud.com
**AlexaRossLaw, LLC**
2657 Danforth Lane
Decatur, Georgia 30033

Special Assistant Attorneys General
*Attorneys for Defendant*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing MOTION TO EXCLUDE TESTIMONY OF DR. ROBERT PUTNAM was prepared double-spaced in 13-point Century Schoolbook font, approved by the Court in Local Rule 5.1(C).

*/s/Josh Belinfante*
Josh Belinfante