

# Transcript of **Robert F. Putnam**

Thursday, September 7, 2023

*United States of America v. State of Georgia*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 133069

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF GEORGIA

3                   ATLANTA DIVISION

4

5    UNITED STATES OF AMERICA           :

6              Plaintiff,               :

7              v.                       :Civil Action No.

8    STATE OF GEORGIA,                  :1:16-cv-03088-ELR

9              Defendant.               :

10             Thursday, September 7, 2023

11                  Washington, D.C.

12

13   Videotaped deposition of ROBERT F. PUTNAM, pursuant

14   to notice, the witness being sworn by BARBARA

15   MOORE, a Notary Public in and for the District of

16   Columbia, taken at the offices of United States

17   Attorney's Office, 150 M Street, N.E., Washington,

18   D.C., commencing at 9:43 a.m., and the proceedings

19   being taken down by Stenotype by BARBARA MOORE,

20   CRR, RMR and transcribed under her direction.

21

22

23

24

25

```
1    APPEARANCES:

2         On Behalf of the Plaintiff:

3              PATRICK HOLKINS, AUSA

4              FRANCES COHEN, AUSA

5              JESSICA POLANSKY, AUSA

6              CRYSTAL ADAMS, AUSA

7              U.S. DEPARTMENT OF JUSTICE

8              CIVIL RIGHTS DIVISION

9              150 M. Street, N.E.

10             Washington, D.C.  20002

11             patrick.holkins@usdoj.gov

12

13

14        On Behalf of the Defendant:

15             JOSH BELINFANTE, ESQ.

16             EDWARD BEDARD, ESQ.

17             ROBBINS, ALLOY, BELINFANTE &

18             LITTLEFIELD, LLC

19             500 14th Street NW,

20             Atlanta, GA 30318

21             jbelinfante@robbinsfirm.com

22

23   Vytautas Skripkauskas, Videographer

24

25
```

1                       TABLE OF CONTENTS

2                          WITNESSES

3    WITNESS                                      PAGE

4    ROBERT F. PUTNAM

5    BY ATTORNEY BELINFANTE                        5

6

7

_____EXHIBITS_____

8
     EXHIBIT        DESCRIPTION                    PAGE
9
     Exhibit 1      Expert report                   9
10
     Exhibit 2      May Institute document         25
11
     Exhibit 3      Article                        37
12
     Exhibit 4      Article                        125
13
     Exhibit 5      Article                        141
14
     Exhibit 6      Article                        151
15
     Exhibit 7      Article                        160
16
     Exhibit 8      Article                        162
17
     Exhibit 9      Website page                   191
18
     Exhibit 10     GNETS rule                     193
19
     Exhibit 11     Binder of documents            205
20
     Exhibit 12     Contract                       210
21
     Exhibit 12     Footnote 52                    218
22
     Exhibit 13     Email                          231
23
     Exhibit 14     Document entitled "A pathway to  273
24                  Recovery and Resilience for our
                    Children and Youth
25



1          P R O C E E D I N G S

2          THE VIDEOGRAPHER:  We are now on

3     the record in the matter of the United

4     States of America v. State of Georgia.

5     Today's date is September 7, 2023.  The

6     time is 9:43.

7          This is the video recorded

8     deposition of Dr. Robert Putnam being

9     taken at the U.S. Department of Justice,

10    150 M Street NE, Washington, D.C.  I am

11    the camera operator, my name is Vytautas

12    Skripkauskas in association with TP One.

13    The court reporter is Barbara Moore, also

14    in association with TP One.

15          Will all attorneys please identify

16    themselves and the parties they

17    represent, beginning with the party

18    noticing this proceeding.

19          ATTORNEY BELINFANTE:  Josh

20    Belinfante.  Special Assistant Attorney

21    General for the State of Georgia.

22          ATTORNEY BEDNARD:  Ed Bednard,

23    Assistant Attorney General for the State

24    of Georgia.

25          ATTORNEY HOLKINS:  Patrick Holkins

1              for the United States.

2                   ATTORNEY COHEN:  Frances Cohen for

3         the United States.

4                   ATTORNEY POLANSKY:  Jessica

5         Polansky for the United States.

6                   ATTORNEY ADAMS:  Crystal Adams for

7         the United States.

8                   THE VIDEOGRAPHER:  Will the court

9         reporter please administer the oath.

10                  **********************

11                  ROBERT F. PUTNAM,

12    having been called as a witness on behalf of the

13    Plaintiff and having been first duly sworn, was

14    examined and testified as follows:

15    EXAMINATION BY

16    ATTORNEY BELINFANTE:

17         Q.    Dr. Putnam, can you provide just

18    your work address for the record.

19         A.    Yeah.  It's May Institute,

20    41 Pacella Park Road, Randolph,

21    Massachusetts, 02368.

22         Q.    Great, thank you, sir.

23         My name is Josh Belinfante.  I'm one of the

24    outside counsel for the State of Georgia in this

25    case.  I'll be asking you some questions today.

1                    ATTORNEY BELINFANTE:  Patrick, are

2          we going to continue to reserve all

3          objections except to the form of the

4          question, privilege issues until the time

5          of trial?

6                    ATTORNEY HOLKINS:  Correct.

7     BY ATTORNEY BELINFANTE:

8          Q.    Dr. Putnam, have you ever been

9     deposed before?

10         A.    No.

11         Q.    There's some key rules here, that

12    some of it is counterintuitive, but most of it is

13    pretty easy.  Part of the key is the most important

14    person who is sitting next to me.  And the court

15    reporter is making sure she can get everything

16    detailed.  In normal conversation, people will talk

17    over one another.  We just can't do that, so I'll

18    try not to do that to you and I would ask that you

19    not do it for me.

20              You will hear occasionally your counsel

21    will object.  Unless they instruct you not to

22    answer, you may proceed to answer, but obviously

23    listen to your counsel in terms of what to do with

24    that.

25              One of the hardest things to do in a



1    deposition is people sometimes want to answer with

2    an "uh-huh" or "uh-uh."  That doesn't come across

3    on the court reporter's reports.  So if you can

4    answer with a yes or a no, that would be helpful.

5    And then if at any time you need to take a break,

6    just let us know, we will take a break.  The only

7    thing I ask is if I ask you a question if you can

8    answer the question, and then we'll take a break

9    after that.

10            Is that agreeable?

11            A.      Yes.

12                    ATTORNEY COHEN:  I'm hearing from

13            the folks on Zoom that they are having

14            trouble hearing Dr. Putnam.  Is there

15            anything you can adjust?

16                    THE VIDEOGRAPHER:  Let me see what

17            I can do.

18                        (Discussion held off the

19                    record.)

20    BY ATTORNEY BELINFANTE:

21            Q.      Last thing before we get started,

22    Dr. Putnam, I am not trying to ask confusing

23    questions.  If at any point I do, please just let

24    me know and say "I don't understand the question"

25    or something to that nature.

1          A.     Yes.

2          Q.     Thank you.  What did you do to

3     prepare for today's deposition?

4          A.     I looked at various documents.  I

5     reviewed and attended depositions.  I reviewed some

6     data, and I also looked at my own research and also

7     other research that was pertinent to this matter.

8          Q.     In terms of the documents that you

9     reviewed in preparation for today's deposition, are

10    there documents that are listed attached to your

11    expert report, things you relied on for the expert

12    report, I believe it's Appendix B?

13         A.     Yes.

14         Q.     Okay.  And I notice you have in

15    front of you -- is that your expert report?

16         A.     Yes.

17         Q.     Okay.  And how long or how much time

18    did you spend preparing for today's deposition

19    today, would you say?

20         A.     Well, I've been asked to work on the

21    case last year and then prepared my report and then

22    had a number of conversations with the Department

23    of Justice.

24         Q.     Okay.  But in terms of preparing for

25    today in your deposition, how much time did you

1    spend, do you think, preparing for today?

2           A.    Oh.  Today?  Well, probably since I

3    prepared the report.

4           Q.    Okay.

5           A.    Yeah.

6           Q.    All right.  And you are testifying

7    today pursuant to an agreement between the United

8    States Department of Justice and the May Institute;

9    is that correct?

10          A.    That's correct.

11          Q.    Okay.  Let's go ahead and introduce

12   as Exhibit 1 the -- your report.  We've got a copy,

13   and you can use your copy or use ours, it doesn't

14   matter.

15          A.    Okay, thank you.

16          Q.    It may make sense just to use yours.

17          A.    Okay.

18          Q.    To be sure the pagination is the

19   same.

20                      (Exhibit 1 was marked for

21                 identification.)

22          Q.    Doctor, I realize I just handed you

23   a lot of paper, but that does appear to be your

24   report; correct?

25          A.    From what I see on the first page;

1    right.

2         Q.    We'll be spending a lot of time with

3    it today, so you can always tell me if something is

4    wrong.

5         How long did it take you to write the

6    actual report, from the time you sat down to begin

7    writing, not talking about the visits to Georgia

8    and that kind of thing, but in terms of writing the

9    report, how long do you think that took?

10        A.    I would guess about six weeks.

11        Q.    Six weeks?

12        A.    Yeah.

13        Q.    And you said a moment ago that

14   somebody had reached out to you.  Do you recall who

15   reached out to you to about providing your service

16   for this lawsuit?

17        A.    I believe it was attorney Laura

18   Tayloe.

19        Q.    Do you recall roughly when that was?

20        A.    Probably February of last year.

21        Q.    Okay.  Do you recall if you were

22   asked to make any presumptions in terms of your

23   report?

24             ATTORNEY HOLKINS:  Object to form.

25             THE WITNESS:  No.

1      BY ATTORNEY BELINFANTE:

2          Q.     Were you provided a copy of the

3      complaint as part of -- when you were contacted by

4      Ms. Tayloe?

5          A.     No.

6          Q.     At any time were you provided a copy

7      of the complaint in this case?

8          A.     I believe so at some point in time,

9      yes.

10         Q.     Okay.  In your own words, could you

11     tell me what you think the case is about.

12         A.     Well, I can take it from my report

13     in terms of that.  That basically is could the

14     State of Georgia do something different to prevent

15     students to go to more segregated placements, which

16     is GNETS.

17         Q.     Are you familiar with the Americans

18     with Disabilities Act?

19         A.     Somewhat, yes.

20         Q.     Do you understand this case to be

21     about the Americans with Disabilities Act?

22         A.     Part of it, yes.

23         Q.     What other -- you said part of the

24     Americans with Disabilities Act.  Could you tell me

25     what other parts you're thinking the case is about?

1                    ATTORNEY HOLKINS:  Object to form.

2                    THE WITNESS:  The homestead

3          agreement, the homestead.

4      BY ATTORNEY BELINFANTE:

5          Q.      Have you read any of the court

6      orders in this case?

7          A.      I don't believe so.

8          Q.      In preparing for your report -- and

9      I realize that we've got the Appendix B and I've

10     gone through it, but I'm checking myself as much as

11     anything else.

12              In preparing for the report, did you review

13     any federal statutes?

14         A.      No, I don't believe so.

15         Q.      How about federal regulations?

16         A.      Well, I'm familiar with IDEA in

17     terms of that.  So it's not like I had to review

18     it, but I'm familiar with it.

19         Q.      Okay.  And the IDEA, is that what

20     you said?

21         A.      Yes.

22         Q.      And what is, just for the record,

23     what is the IDEA?

24         A.      It's a special education law.

25         Q.      We know you looked at the state's

1    GNETS regulations issued by the Department of

2    Education, state Department of Education, did you

3    look at any other state regulations as part of your

4    work?

5                       ATTORNEY HOLKINS:  Object to form.

6                       THE WITNESS:  Well, I looked at

7             the -- the provider manual, looked at the

8             block grant.  I looked at various other

9             documents that were related to the

10            Georgia system of care.

11    BY ATTORNEY BELINFANTE:

12        Q.      Okay.  But in terms of the

13    regulations promulgated by Georgia's state agency,

14    other than that which is the GNETS regulation which

15    we'll get to, did you look at any other state

16    regulations, to your knowledge?

17                       ATTORNEY HOLKINS:  Object to form.

18        Q.      In preparing your report.

19        A.      I believe so.  I don't remember at

20    this point in time.

21        Q.      If you did, would they have been

22    listed in Appendix B?

23        A.      It would have been, yes.

24        Q.      Okay.  And did you look at any state

25    statutes to prepare your report, State of Georgia

1  statutes?

2          A.      I believe I did as well, but I don't

3  remember.

4          Q.      Okay.  They would also be listed in

5  Appendix B if you did?

6          A.      Right.

7          Q.      Are you familiar with a case that

8  has been filed by others against the State of

9  Georgia, similar case entitled The Georgia Advocacy

10  Office, et al., versus the State of Georgia?

11          A.      No.

12          Q.      Okay.  What do you understand or

13  what is your understanding of what the Department

14  of Justice is seeking in this case?  In other

15  words, what are they asking the court to do?

16                  ATTORNEY HOLKINS:  Object to form.

17                  THE WITNESS:  To -- from my

18              perspective, to make reasonable

19              modifications to the Georgia system of

20              care.

21      BY ATTORNEY BELINFANTE:

22          Q.      Okay.  Is that in your opinion,

23  because -- do you agree with the goal of the

24  Department of Justice in this case?

25                  ATTORNEY HOLKINS:  Object to form.



1          THE WITNESS:  Well, that they --

2      the goal from the Department of Justice

3      for me was to ask after I looked at all

4      the information that was available and

5      analyzed that information is if I found

6      there are things lacking whether I could

7      make reasonable recommendations.

8    BY ATTORNEY BELINFANTE:

9      Q.    Okay.  And do you support the effort

10   of the Department of Justice in its -- in what it

11   is seeking in this case?

12         ATTORNEY HOLKINS:  Object to form.

13         THE WITNESS:  I'm not sure what

14      you mean by "seeking in this case."

15      Q.    Do you personally believe that the

16   State of Georgia can make reasonable accommodations

17   to prevent IPT teams from recommending students for

18   GNETS services?

19         ATTORNEY HOLKINS:  Object to form.

20         THE WITNESS:  I reasonably feel

21      that the State of Georgia can make

22      changes in its system of care to prevent

23      students from going to GNETS.

24    BY ATTORNEY BELINFANTE:

25      Q.    And how do you understand that a

1    student is referred to GNETS services?  What's your

2    understanding of how that process works?

3              A.      Well, one of the leading indicators

4    of students being placed in more restrictive

5    settings is oftentimes office disciplinary

6    referrals for their behavior.

7              So if a school or district can't manage

8    those behaviors, then they may seek options in

9    terms of, you know, where a student can be

10   better -- where from their perspective a student

11   can be better served.

12             Q.      And who at that school makes that

13   decision?

14                     ATTORNEY HOLKINS:  Object to form.

15                     THE WITNESS:  It's usually the IEP

16         team.

17      BY ATTORNEY BELINFANTE:

18             Q.      Do you know who makes up the IEP

19   team for the student?

20                     ATTORNEY HOLKINS:  Object to form.

21                     THE WITNESS:  It depends.

22      BY ATTORNEY BELINFANTE:

23             Q.      To your knowledge, are there any

24   employees from the Georgia Department of Education

25   that serve on an IEP team?



1          A.       Usually not.

2          Q.       To your knowledge, are there any

3     employees from the Georgia Department of Community

4     Health that serves on an IEP team?

5          A.       Usually not.

6          Q.       Okay.  And to your knowledge, are

7     there any employees of the Georgia Department of

8     Behavioral Health and Developmental Disabilities

9     that serve on an IEP team?

10         A.       Usually not.

11         Q.       Okay.  If you spoke to anyone in

12     Georgia to prepare for your report, would that also

13     be listed in Exhibit B?

14         A.       Yes.

15              ATTORNEY HOLKINS:  Object to form.

16         Q.       One follow-up.  Do parents of the

17     student who has the IEP team convened, do that

18     student's parents typically -- are they members of

19     the IEP team?

20              ATTORNEY HOLKINS:  Object to form.

21              THE WITNESS:  Usually invited.

22     BY ATTORNEY BELINFANTE:

23         Q.       Now, Dr. Putnam, you're not

24     providing an opinion in your report about whether

25     Georgia complies with the Americans with

1    Disabilities Act; correct?

2         A.    That's correct.

3         Q.    All right.  And you're not providing

4    in your report an opinion on any individual

5    decision of an IEP team convened in the state of

6    Georgia; correct?

7         A.    That's correct.

8         Q.    And you're not opining that the

9    GNETS program should be abolished; is that correct?

10        A.    That's correct.

11        Q.    Because there's a role for services

12   like GNETS, isn't that right, for students?

13                ATTORNEY HOLKINS:  Object to form.

14                THE WITNESS:  That's correct.

15      BY ATTORNEY BELINFANTE:

16        Q.    For some students' GNETS placement,

17   even if it means going to a separate school, is

18   appropriate, would you agree?

19        A.    Well, I don't know a lot about

20   GNETS, because that wasn't what I was asked to do.

21   So if you are suggesting a restrictive placement,

22   then yes.

23        Q.    Okay.  Then let me ask this:  If an

24   IEP team recommends that a student have a

25   restrictive setting away from their general

1  education classroom, that can be appropriate under

2  certain circumstances; is that correct?

3          A.      Yes, but there are a lot of things

4  that influence that decision.

5          Q.      Sure.  But in terms of a per se, you

6  know, it's not always -- let me ask it this way.

7  It is not always inappropriate that a student

8  receive education services in a separate setting

9  than their general education school; correct?

10         A.      That's correct.

11         Q.      Okay.  And so it needs to be -- is

12 it an individualized determination for that

13 student, what would be appropriate?

14                 ATTORNEY HOLKINS:  Object to form.

15         Q.      Let me ask it this way, because I

16 think that's right.  It was a poorly worded

17 question.

18         Is the question of what are appropriate

19 services for a student to receive an individualized

20 inquiry?

21         A.      Yes, that's correct.

22         Q.      Okay.  You attached to your expert

23 report your CV as an Appendix A.  Is the document

24 that you produced there -- and take your time -- is

25 it still accurate?

1          A.      It's accurate as of June 16.

2          Q.      Okay.  Any major additions or

3     anything that's needed between June and today?

4          A.      Well, I've conducted more research.

5          Q.      Okay.  All right.  Now, you

6     mentioned a moment ago that you have not been

7     deposed before, so I'm presuming, is it correct,

8     that you have not served as an expert witness in

9     litigation before?

10         A.      That's correct.

11         Q.      Okay.  Have you ever served as a

12    court monitor for a case?

13         A.      No.

14         Q.      Okay.  Have you ever worked for a

15    state agency that is designated to administer the

16    Medicaid program?

17         A.      Not worked.

18         Q.      Have you consulted with agencies

19    that are designated to administer the Medicaid

20    program?

21         A.      Yes.

22         Q.      Okay.  Have you ever been involved

23    in the submission of a Medicaid waiver application

24    to CMS, and by "involved" I mean helped write it.

25         A.      No.

1          Q.      To your knowledge, is the May

2    Institute a Medicaid provider?

3          A.      No.

4          Q.      Have you ever, to your knowledge,

5    worked for a Medicaid provider?

6          A.      Yes.

7          Q.      Who was what or what institute was

8    that?

9          A.      That was the Social Mental Health

10   Center, Coastal Community Counseling Center.

11         Q.      When was that again?

12         A.      Probably about 29 years ago.

13         Q.      Okay.  All right.  In looking at

14   your CV under --

15         A.      Let me correct.  The May Institute

16   at one point was provider of Medicaid services,

17   yes.

18         Q.      And what Medicaid services did the

19   May Institute provide?

20         A.      Day habilitation, outpatient

21   services, day treatment services.  I believe

22   that's -- those were the services that were

23   provided.

24         Q.      Was it providing those services

25   while you worked for the May Institute?

1          A.       Correct.

2          Q.       Okay.  And it does not contract with

3     Medicaid today, the May Institute, that is?

4          A.       Yes.  It still does for day

5     habilitation services.

6          Q.       Are day habilitation services, is

7     that for persons with intellectual and

8     developmental disabilities?

9          A.       Yes.

10          Q.       In your CV, I'm looking at page 3,

11     under first the May Institute, the senior vice

12     president for school consultation.

13          A.       Yes, I see that.

14          Q.       Okay.  I notice that you have

15     provided consulting and clinical delivery of

16     consultation and school support services to over

17     100 school districts in New England, the

18     Mid-Atlantic, and the southeastern United States.

19          Do you see that?

20          A.       Yes.

21          Q.       Have you provided clinical delivery

22     of consultation and school support services to any

23     states as opposed to school districts?

24                    ATTORNEY HOLKINS:  Object to form.

25          I just want to note that the text says

1           "oversee" and not provide.

2      BY ATTORNEY BELINFANTE:

3           Q.    Okay.  Have you overseen -- let me

4   ask you this way just so we're clear on the record.

5   Have you overseen the clinical delivery of

6   consultation and support services to any state as

7   opposed to school districts?

8           A.    Yes.

9           Q.    Which state?

10          A.    The state of Vermont and the state

11   of Massachusetts.

12          Q.    Okay.  Was that through the May

13   Institute?

14          A.    Correct.

15          Q.    Okay.  And which states in the

16   southeastern United States when you talk about

17   school districts in that paragraph, which states

18   were you working in the southeastern United States?

19          A.    At one point Maryland, Georgia,

20   Florida.

21          Q.    What services -- to whom were you

22   providing services in Georgia?

23          A.    We have an autism clinic that's

24   insurance-funded.  And sometimes school districts

25   would reach out to us to provide support around

1    students with challenging behavior, and we would

2    provide consultation to that school.

3          Q.    In your work in Georgia, do you

4    recall if you worked with a Marcus Center of

5    Autism?

6          A.    No.

7          Q.    Okay.  In the next paragraph on your

8    CV where it talks about your role as vice president

9    of consultation and school support services, it

10   says that you oversee the delivery of consultation

11   and school support services to over 100 school

12   districts within the Commonwealth of Massachusetts

13   and numerous other states.

14         Do you see that?

15         A.    Yes.

16         Q.    That paragraph with the work you

17   were doing as vice president of consultation and

18   school support services, did you consult with any

19   other states as opposed to school districts?

20               ATTORNEY HOLKINS:  Object to form.

21               THE WITNESS:  I believe at that

22         point in time that I was providing

23         consultation to the state of Vermont.

24         And the other thing I've worked for for

25         just about the last 20 years is the

1              National Technical Assistance Center for

2              Positive Behavior Intervention and

3              Support.  It's a grant through the Office

4              of Special Education Program.

5                   And our center's responsibility is

6              to provide support to the states.  And so

7              literally for the last 20 years to that

8              center we've supported states across the

9              country in terms of the implementation of

10             PBS and ISF.

11    BY ATTORNEY BELINFANTE:

12         Q.     All right.  And through that center,

13    are you part of a team that would work with states,

14    or would it be you individually work with the

15    states?

16         A.     Oftentimes it would be part of a

17    team.

18         Q.     Do you know if the State of Georgia

19    is one of the states that worked with that center?

20         A.     Yes.

21         Q.     Show you what we'll mark as

22    Exhibit 2.

23                   (Exhibit 2 was marked for

24              identification.)

25         Q.     Doctor, I will represent to you, and

1    you can see the time stamp that I've pulled this

2    from the May Institute website.  Do you see, does

3    that appear to be an accurate reflection of the May

4    Institute's mission and vision there on the first

5    page -- second page?

6         A.    I actually prefer to look at the

7    website itself rather than a document that's pulled

8    from the website.

9         Q.    Well, let me ask this:  Is the May

10   Institute's website Mayinstitute.org?

11        A.    That's correct.

12        Q.    Okay.  I'm not sure how we can get

13   it where you can see the website as opposed to a

14   print page.

15             THE VIDEOGRAPHER:  I can blow it

16        up on the screen.

17        Q.    Let's do that.  I'll hand you a copy

18   of the document, and the website address is on the

19   bottom.

20             (Pause)

21             ATTORNEY BELINFANTE:  I'll note

22        for the record that the screen is showing

23        the same web page was at the bottom of

24        page 2.  It is lacking some of the

25        graphics, but it is showing some of the



1              web page.

2       BY ATTORNEY BELINFANTE:

3           Q.    Dr. Putnam, is this, what you're

4   looking at on the screen, the May Institute's

5   mission and vision?

6           A.    Yes.

7           Q.    All right.  And would you agree with

8   me that what's shown in the first paragraph on the

9   screen is the same as what's shown on the first

10  paragraph on the document, Exhibit 2, that I

11  provided to you?

12          A.    Yes.

13          Q.    All right.  So based on that, would

14  you agree -- do you agree with the May Institute's

15  mission that it provides -- or mission statement --

16  that it provides consulting services grounded in

17  evidence-based practice?

18          A.    Yes.

19               ATTORNEY BELINFANTE:  All right.

20          If you could scroll down.  We're going to

21          need to zoom in on this.

22               THE VIDEOGRAPHER:  Roll the scroll

23          forward.

24       BY ATTORNEY BELINFANTE:

25          Q.    Dr. Putnam, if you can look at

1    what's on the screen --

2              A.      Is this an eye test?

3              Q.      No.   I would not be doing that.

4    I'll represent to you that it's on page 3 of 4.

5              A.      Yes.

6              Q.      Do you see where it says there that

7    the May Institute does not discriminate on the

8    basis of race, color, religion?   Sorry.   I thought

9    that was still going on.

10                              (Discussion held off the

11                        record.)

12                         THE VIDEOGRAPHER:   Going off the

13              record at 10:16.

14                              (Discussion held off the

15                        record.)

16                         THE VIDEOGRAPHER:   We are back on

17              the record at 10:36.

18      BY ATTORNEY BELINFANTE:

19              Q.      All right, Dr. Putnam.   We had just

20    before we left the May Institute website up which

21    is also reflected on page 3 of 4 of Exhibit 2.

22              Do you see there where it says, "The May

23    Institute does not discriminate on the basis of

24    race, color, religion, ancestry, national origin,

25    age, physical or mental disability" in that first

1   line?

2          A.      Yes.

3          Q.      And do you agree with that

4   statement?

5          A.      Yes.

6          Q.      It continues, after listing a series

7   of statuses, at the third line it says "Is there

8   any other category affected under the applicable or

9   law employment at the institute, admission or

10  access to the institute or any other aspect of

11  educational programs and activities that the

12  institute operates?"

13         Do you see that?

14         A.      Yes.

15         Q.      And do you agree with that

16  statement?

17         A.      Yes.

18         Q.      Let's go -- we talked about it a

19  little bit before.  So in terms of -- and it's also

20  on page 3 of your report -- you talk about

21  providing consultation services to schools across

22  the country.

23         In your experience in providing such

24  services, do you find that schools in different

25  states have different types of administration?

1                    ATTORNEY HOLKINS:  Object to form.

2                    THE WITNESS:  Can you ask that

3          question again.

4      BY ATTORNEY BELINFANTE:

5          Q.    Sure.  You have consulted with

6   school districts across the country; correct?

7          A.    Correct.

8          Q.    And in looking at schools across the

9   country, do the schools operate differently in

10  different parts of the country?

11                   ATTORNEY HOLKINS:  Object to form.

12                   THE WITNESS:  Can you describe

13         what you mean by "operate."

14     BY ATTORNEY BELINFANTE:

15         Q.    Sure.  Are you familiar with a

16  phrase "local control"?

17         A.    Yes.

18         Q.    Okay.  And in your experience in

19  dealing with school districts across the country,

20  do you find that there's varying degrees of local

21  control between states?

22                   ATTORNEY HOLKINS:  Object to form.

23                   THE WITNESS:  Can you ask that

24         question again.

25

1        BY ATTORNEY BELINFANTE:

2            Q.    Sure.  In looking at schools across

3    the country, do you find that there are varying

4    degrees in which they operate with local control,

5    or is it your opinion that schools across the

6    country operate generally the same way in regard to

7    how much control or authority the local school

8    districts have as opposed to the state?

9                    ATTORNEY HOLKINS:  Object to form.

10                   THE WITNESS:  I think the state

11            has definitely influence over what

12            happens in their schools.

13       BY ATTORNEY BELINFANTE:

14           Q.    But the amount of influence, do you

15    find that that differs across states?  Some states

16    the state will have more influence than other

17    states, for example?

18           A.    Yes.

19           Q.    Okay.  You say on page 2 of your

20    report, first line, that you began your career with

21    roles at a large state institution for individuals

22    with intellectual and developmental disabilities in

23    a school for students with IDD.

24           What was the large state institution you

25    were referring to?

1           A.      The Paul A. Dever State School.

2           Q.      And is that in Massachusetts?

3           A.      That's correct.

4           Q.      Okay.  And does Massachusetts -- did

5    the state of Massachusetts operate that school?

6           A.      Yes.

7           Q.      Okay.  And that was -- you were the

8    director of the blind unit; is that correct?

9           A.      In one of my positions, yes.

10          Q.      I see.  I can see it now, all right.

11          A.      Yes.

12          Q.      And you say that it was a large

13   state institution, what did you mean by the word

14   "institution"?

15          A.      It had 1600 individuals with IDD,

16   and they were all in a congregate setting run by

17   the state.

18          Q.      Do you view general education

19   schools within the State of Georgia as an

20   institution?

21                  ATTORNEY HOLKINS:  Object to form.

22          Q.      Do you know what I mean by "general

23   education schools"?

24          A.      Yes.  And what do you mean by

25   "institutions"?



1      Q.     Hang on a second.  Let me ask

2  because it's more important.  When I say "general

3  education schools," what does that mean to you?  I

4  think we're talking the same thing.  It's just one

5  of the things we have to do for the record.

6      A.     Sure.  So for me general education

7  schools are schools that serve students without

8  disabilities and students with disabilities.

9      Q.     Okay.  I think it's sometimes

10 referred to as a zone school.  Is that also fair in

11 terms of where a student would go but for a

12 placement somewhere else in the public school

13 system?

14              ATTORNEY HOLKINS:  Object to form.

15              THE WITNESS:  I'm not familiar

16      with that term.

17   BY ATTORNEY BELINFANTE:

18      Q.     You're not familiar with the term

19 "zone school"?

20      A.     Yes.

21      Q.     Fair enough.  Is it your opinion --

22 and you went to some general education schools in

23 the State of Georgia; correct?

24              ATTORNEY HOLKINS:  Object to form.

25              THE WITNESS:  Yes.

1      BY ATTORNEY BELINFANTE:

2          Q.    All right.  And so do you view

3   general education schools as institutions?

4                  ATTORNEY HOLKINS:  Object to form.

5                  THE WITNESS:  No.

6      BY ATTORNEY BELINFANTE:

7          Q.    Why are general education schools

8   not institutions, in your opinion, in the State of

9   Georgia?

10                 ATTORNEY HOLKINS:  Same objection.

11                 THE WITNESS:  I don't know what

12             institutions are in Georgia.  I can speak

13             across my experience, and institutions

14             tend to be large congregate settings for

15             individuals primarily with IDD.

16     BY ATTORNEY BELINFANTE:

17         Q.    On your -- back to your report on

18  the second page -- and I'm looking for the quote --

19  but it says you provided services to a large school

20  district in Massachusetts.

21                 ATTORNEY HOLKINS:  Where?  Where

22             are you on the second page?

23                 ATTORNEY BELINFANTE:  That's what

24             I was looking for.

25

1          BY ATTORNEY BELINFANTE:

2          Q.      It's the second paragraph.  It looks

3    like about the second sentence, says, "That work

4    morphed into a new role in which I provided

5    behavioral health consultation to a large school

6    district in Massachusetts concerning students at

7    risk of segregated institutional placement."

8          Do you see that?

9          A.      Yes.

10         Q.      What was the large school in

11   Massachusetts that that refers to?

12         A.      Brockton public schools.

13         Q.      And Brockton, would you consider

14   that an urban or suburban school district?

15         A.      Urban.

16         Q.      All right.  Roughly how many

17   students were in the Brockton public schools when

18   you were doing the work there?

19         A.      Probably about 15,000.

20         Q.      All right.  You go on to say in the

21   next sentence, "With my guidance, the district was

22   able to achieve some of the highest rates of

23   inclusionary services among the 14 largest school

24   districts in the state."

25         Do you see that?



1           A.      Yes.

2                   ATTORNEY HOLKINS:  I want to

3           acknowledge for the record this includes

4           serving more children in inclusive,

5           placements in general education schools

6           and spending less per capita on

7           unrestrictive placements.

8                   ATTORNEY COHEN:  Could you take it

9           easy on Barbara?

10                  ATTORNEY HOLKINS:  The rest of the

11          sentence reads, "Serving more children in

12          inclusive placements in general education

13          schools and spending less per capita on

14          restricted placement."

15     BY ATTORNEY BELINFANTE:

16          Q.      Do you recall what the rate of

17     inclusionary services were?  You describe it as the

18     highest.  Do you recall just kind of quantifying

19     what that number was?

20          A.      Yes.  If we go over to Section 8.

21          Q.      Yes.

22          A.      If you look on page 56.

23          Q.      Okay.

24          A.      And figure 15.

25          Q.      I see.

1          A.      So the Brockton public school

2    district is F on this graph.

3          Q.      Okay.  And the school districts all

4    listed on the X axis below, those are school

5    districts within the state of Massachusetts; is

6    that right?

7          A.      The 15 largest urban districts, yes.

8          Q.      All right.  Because -- that comes

9    from figure 15, which looking at the footnote comes

10   from your article in 2022 on that; is that right?

11         A.      Yes.

12         Q.      Okay.  Let's talk about that

13   article.  Show you what we'll mark as Exhibit 3.

14                      (Exhibit 3 was marked for

15                   identification.)

16         Q.      And your article it looks like

17   starts on page 17 of this document.  And for the

18   record, this is the same article that's cited in

19   footnote 1 on page 2 of your expert report; is that

20   correct?  Sorry, I realize I just sent you to three

21   different places at once.

22                 ATTORNEY HOLKINS:  Could you

23         direct him.

24         Q.      On his report, page 2, footnote 1.

25         A.      Hang on, let me get there.  I'm

1    there.   What's the question?

2           Q.      So this is your article, looking at

3    Exhibit 3, beginning on page 17; correct?

4           A.      That's correct.

5           Q.      And it's the same article that's

6    cited in footnote 1 on page 2 of your report; is

7    that right?

8           A.      That's correct.

9           Q.      Okay.   And so looking at page 18 of

10   the article, under Method, it says that the data on

11   expenditure costs for the 15 school districts

12   during fiscal year 1995 and fiscal year 1997 were

13   gathered from statistics published by the

14   Massachusetts Department of Education.

15          Do you see that?

16          A.      Yes.

17          Q.      So that's the period of time that

18   you were looking at in terms of measuring cost was

19   1995 to 1997?

20          A.      It was for the year, fiscal year

21   1995 and for the year -- fiscal year 1997.

22          Q.      Okay.   And you said this a moment

23   ago, that this study looked at the 15 largest urban

24   districts in the state of Massachusetts; is that

25   right?



1          A.       Correct.

2          Q.       Okay.  And if you go to page 19 at

3    the top, the communities involved, as I understand

4    this, had approximately 93,000 residents with an

5    enrollment of more than 16,000 students.  Is that

6    correct?

7          A.       Yes.

8          Q.       All right.  And you would agree with

9    me that the findings of your report do not

10   necessarily apply to rural school districts.  Is

11   that right?

12                     ATTORNEY HOLKINS:  Object to form.

13                     THE WITNESS:  Well, I have a lot

14              of experience in urban school districts.

15              And I find similar findings that I find

16              in this report.

17     BY ATTORNEY BELINFANTE:

18          Q.       All right.  Let's go to page 22

19   then.  In terms of this report, the second sentence

20   of the first paragraph reads, "The districts

21   selected were the largest urban locations in the

22   state.  Therefore, extrapolating these findings to

23   smaller rural districts may be problematic."

24          Do you see that?

25          A.       Correct.

1          Q.      Do you still agree with that

2    statement?

3          A.      If you look specifically at this

4    report, I would agree.  However, my experience in

5    terms of working with a lot of different rural

6    districts, we find the same type of findings.

7          Q.      And -- but have you published

8    anything on those findings in rural districts?

9          A.      Yes.

10          Q.      Does your report cite to anything

11    about rural districts?

12                    ATTORNEY COHEN:  I'm just going to

13              interject for a second because I think

14              it's confusing.  Dr. Putnam is pointing

15              at the article Exhibit 3 and referring to

16              this report, and now you're asking

17              questions about the report that I bet you

18              mean Exhibit 1.

19                    ATTORNEY BELINFANTE:  Fair.

20      BY ATTORNEY BELINFANTE:

21          Q.      In terms of your report, Exhibit 1,

22    the report for this specific lawsuit, to your

23    knowledge, does it cite to any studies applying --

24    looking at cost savings that are described in your

25    article here, Exhibit 3, in rural districts?

1          A.      I don't believe so.

2          Q.      Okay.  If you turn to page 23 of

3    Exhibit 3, that study.

4          A.      (Witness complies with request.)

5          Q.      It concludes at the end of the first

6    paragraph, the last sentence says, "Obviously,

7    additional finances would have to be spent to

8    improve practices and supports within these public

9    schools.  This allocation should improve

10   considerably the intensity, comprehensiveness, and

11   positive outcomes of special education services."

12          Do you see that?

13          A.      Yes.

14          Q.      Do you have any quantification, or

15   does this article contain any quantification of the

16   additional finances that would have to be spent to

17   include the practices and supports within the

18   public school?

19          A.      Well, the findings of this report --

20   hang on one second -- in terms of what we found was

21   that the -- let me go back.

22          Q.      Sure.

23                  ATTORNEY HOLKINS:  Counsel, I'm

24            just going to give the witness the use of

25            the real time.



1              ATTORNEY BELINFANTE:  Sure.

2              THE WITNESS:  So what we found was

3         that the criterion school district is

4         significantly less.  If you look at in

5         terms of both figures 3 and 2 that, as

6         you can see, per capita cost for

7         District F was $100 versus L was about

8         $700.  So that was a huge saving.

9              If you look at the savings of that

10        and then you look at figure 3 and you

11        look at F in terms of percent of total

12        school expenditures, it was only

13        2 percent in F, and it's approximately

14        7 percent.  And what we did was looking

15        at extrapolating those numbers statewide,

16        so if you look on page 23, really just

17        above that statement, that for example,

18        do you see that?  Four lines down from

19        the top on page 23.

20    BY ATTORNEY BELINFANTE:

21        Q.    Yes.

22        A.    For example, if on a statewide basis

23    the targeted school's district percent of total

24    expenditures for out-of-district placements was

25    applied during FY97, the school districts within

1    Massachusetts would have saved over $150 million.

2           Q.      Right.

3           A.      Okay.

4           Q.      But that's based on money not spent

5    on what you refer to as out-of-district placements;

6    correct?

7           A.      Correct.

8           Q.      Okay.  But that doesn't -- but you

9    still have to -- and this is what the next sentence

10   is about -- increase funding in order to achieve

11   that savings; is that right?

12          A.      Well, in this particular district

13   they took those cost savings and applied it to

14   include inclusionary services.  And if you look at

15   it in terms of figure 4, that was one of the

16   reasons why they got the highest by far, almost

17   68 percent of their students included, was taking

18   those cost savings, which is really what I'm

19   suggesting Georgia do, and to take those cost

20   savings and apply it to services that would support

21   students in inclusion.

22          So that's really the whole premise of the

23   article is you can allocate, reallocate funds and

24   do it more efficiently and more effectively to

25   improve inclusionary placements.



1          So I would go back to the $150 million

2     saved; right?

3          Q.     Right.

4          A.     So we would have to improve -- it's

5     basically taking those services, that money,

6     $150 million, and putting it toward improving

7     services for students to improve inclusionary

8     services.

9          Q.     But they still had to, as I read

10    this report -- and tell me if I'm incorrect --

11    additional finances would have to be spent to

12    improve the practices; right?  So it's not just

13    taking 150 million in savings and applying that to

14    what you referred to as inclusionary savings or

15    inclusionary services, you would have to then spend

16    on top of the savings to achieve that.

17         A.     I disagree with your conclusion.

18         Q.     Okay.  Then what is the additional

19    finances to be spent?

20         A.     Because sometimes you have to get

21    the ball rolling to get the $150 million.

22         That's where this particular district,

23    Brockton, has used their state funds to basically

24    get the ball rolling so that basically they could

25    achieve the savings that, you know, they only spent

1    2 percent on out-of-district placements as compared

2    to these other districts who spent 7 percent of

3    their operating budget on that.  Or if you go over

4    here and look at in terms of per capita cost, they

5    spent $100 on per capita costs versus 700 capital

6    costs.

7          So what -- meaning by that statement is

8    sometimes you have to get the ball rolling, and in

9    this particular case this district was smart in

10   that they basically used their state funds to get

11   the ball rolling.  And once they got the ball

12   rolling, they were able to achieve significant

13   savings in terms of -- for inclusion.

14         Q.    Okay.  And Brockton is, some would

15   call it a suburb or not, but it is close to Boston;

16   correct?

17         A.    It's about 25 miles away from

18   Boston.

19         Q.    And what did you mean in the next

20   sentence after the one we just talked about which

21   says, "The cost-efficacy analysis is clearly

22   limited by the fact that behavior supports of the

23   comparative school districts were unknown" (as

24   read)?

25         A.    Because we didn't know precisely

1    what the behavioral support practices were, which

2    is why we put it in the article.  Because I've

3    worked in the state of Massachusetts for many, many

4    years, I knew in terms of what some districts were

5    doing, but it wasn't -- I wasn't putting it in this

6    article because that wasn't the focus of our study.

7         Q.    Okay.  Further down in that

8    paragraph it says -- the sentence beginning "At the

9    same time."  It says, "At the same time, it should

10   be acknowledged that reduced out-of-district

11   expenditures cannot by itself be used as an index

12   of effective behavior support.  That is, the

13   quality of behavior support practices cannot be

14   assessed solely by the number of students being

15   educated in the public schools versus those placed

16   in out-of-district programs."

17        Do you see that?

18        A.    Let me see if I can find that.

19        Q.    Sure.

20        A.    Yes.

21        Q.    All right.  What did you mean by

22   that?

23             ATTORNEY HOLKINS:  Object to form.

24             THE WITNESS:  Well -- can I have

25        my water?  I'm sorry.  Let me go back



1                again.  So what sentence again?

2          BY ATTORNEY BELINFANTE:

3          Q.      Yes.  "At the same time," which is

4    in about the middle of that paragraph.

5          A.      Yes.

6          Q.      The next two sentences.

7          A.      Okay.  So the out-of-district

8    expenditures really are a proxy in terms of, from

9    my perspective, behavior support practices in terms

10   of that.  So even though I knew what was being

11   provided, which is basically if you want to look at

12   Table 1, it was functional behavioral assessment;

13   preparation of written behavior; intervention plan;

14   social skills assessment; social skills training;

15   database progress monitoring; parent training;

16   competency-based staff training, classroom

17   behavioral intervention; school-wide behavioral

18   intervention.

19         Q.      Uh-huh.

20         A.      Even though I knew that's what we

21   were providing and both the administration of the

22   Brockton public schools who are coauthors on this

23   and myself knew that's why we got reductions in our

24   district placements that -- let me go back to find

25   where that says that.  That wasn't -- we weren't

1    measuring behavior support.

2            Q.      Okay.  So is it true then as I read

3    this on page 23 that just because students are no

4    longer being served in out-of-school placements,

5    that doesn't mean that they are receiving effective

6    behavior support?

7            A.      Well, if you go down to the next

8    sentence, right, our suggestion is that like other

9    dependent measures available to public school

10   systems, office referrals, suspensions, inclusions,

11   which are those leading indicators for restrictive

12   placements, but the data can be used in combination

13   with those indices to evaluate properly the effects

14   of district-wide behavioral interventions.

15           We didn't put this in the report, but we

16   had reductions in office discipline referrals, we

17   had reductions in suspensions, we had reductions in

18   inclusions.  The purpose of this study was

19   basically to look at it from a, as it says, a

20   cost-efficacy analysis, but, you know, I have

21   plenty of other research I've done or research of

22   my colleagues that basically say if you reduce

23   office discipline referrals, which is the leading

24   indicator, you end up with less restrictive

25   placements.



1          Q.      Okay.  But even in that situation,

2    you could have a student who stays in their general

3    education classroom, but that is not an indicator

4    by itself of effective behavior support; correct?

5          A.      Repeat that question.

6          Q.      Sure.  A student could be in their

7    general education classroom as opposed to an

8    out-of-school placement, but that doesn't

9    necessarily mean that that student is receiving

10   effective behavior support; is that right?

11                 ATTORNEY HOLKINS:  Object to form.

12                 THE WITNESS:  Well, they may not

13        need behavioral support.

14     BY ATTORNEY BELINFANTE:

15         Q.      Correct.  But then effective would

16   kind of measure that.  If the student -- let's take

17   a student who needs behavior support, they are in

18   their general education classroom as opposed to an

19   out-of-school placement.  Just because they are in

20   that general education classroom, it doesn't mean

21   that they are receiving effective behavior support;

22   correct?

23                 ATTORNEY HOLKINS:  Object to form.

24                 THE WITNESS:  That's a really long

25        question.

1      BY ATTORNEY BELINFANTE:

2          Q.    I'll just stick with what the

3      article says.

4                    (Discussion held off the

5                     record.)

6          Q.    Let's go to page 3 of your report,

7      your report for this case, Exhibit 1.

8          A.    Okay.

9          Q.    You talked about that you are a

10     national authority on various -- and I'm in the

11     second paragraph where you bring up MTSS,

12     Multitiered Systems of Support.

13         A.    Right.

14         Q.    If I wanted to find a singular

15     definition of MTSS, would I be able to do that?

16         A.    Sure.

17         Q.    Where would I look for that

18     definition?

19         A.    You can probably look at the federal

20     Department of Education.

21         Q.    So when you talk about fidelity to

22     MTSS, are you referring to the United States DOE's

23     definition?

24                    ATTORNEY HOLKINS:  Objection to

25              form.

 1                      THE WITNESS:  And its consensus

 2           across the field as well.

 3      BY ATTORNEY BELINFANTE:

 4           Q.     So if I wanted to find fidelity

 5  measurements for MTSS, where would I look for that?

 6           A.      Well, positive behavior

 7  interventions and supports, which is MTSS, has a

 8  number of different fidelity measures.

 9           Q.      So, in other words, to find fidelity

10  to MTSS, I have to look to PBIS; is that correct?

11           A.      That they have the best, in my

12  opinion.  The best fidelity measures.

13           Q.      Is that opinion, to your knowledge,

14  unanimous within the education community?

15                      ATTORNEY HOLKINS:  Objection to

16           form.

17                      THE WITNESS:  I don't know if you

18           can say anything is.  I mean, I think the

19           consensus is if you look at the national

20           technical assistance center, which has

21           all of the documents approved by the

22           office of special education, Department

23           of Education, those are -- those

24           documents, they are fidelity tools on

25           that website.

1          BY ATTORNEY BELINFANTE:

2               Q.      Okay.  But there are people that

3     disagree with -- you say there's consensus.  To me

4     that means that there are people that disagree that

5     you can use the fidelity standards that you just

6     identified as the basis for measuring PBIS in every

7     circumstance.

8               Would you agree that there are at least

9     people that disagree with your conclusions?

10                        ATTORNEY HOLKINS:  Object to form.

11                        THE WITNESS:  I'm sure there are

12               people that disagree with whether the

13               earth is round too.

14          BY ATTORNEY BELINFANTE:

15               Q.      Okay.  Let's talk about PBIS.  Can

16     you define that term?

17               A.      Sure.

18               Q.      What's your definition?

19               A.      My definition is a multitiered

20     system of support around social, emotional behavior

21     that uses database decisions and evidence-based

22     practices.

23               Q.      Okay.  And is there -- if I wanted

24     to look up the definition of PBIS and find the

25     national standard, where would I go for that?

1          A.     I would say our National Technical

2     Assistance Center, positive behavior interventions

3     and support.

4          Q.     Tell me about -- who makes up the

5     National Technical Center?

6                    ATTORNEY HOLKINS:  Object to form.

7                    THE WITNESS:  Various universities

8          and agencies.

9     BY ATTORNEY BELINFANTE:

10         Q.     Is it a government entity or a

11    private entity?

12         A.     It's a grant from the Department of

13    Education that they award every five years to an

14    entity, which the University of Oregon is the lead

15    partner.  So it's between -- in terms of from a

16    fiduciary perspective, it's between the Department

17    of Education and the University of Oregon.

18         Q.     Okay.  Who implements PBIS in

19    schools?  Is it done at the local level?  Does each

20    school implement a PBIS system for itself?

21                    ATTORNEY HOLKINS:  Object to form.

22                    THE WITNESS:  What do you mean by

23          "implement"?

24     BY ATTORNEY BELINFANTE:

25         Q.     If a school district says we want to



1    do PBIS, is that -- can you have schools within the

2    district where, for example, one is implementing

3    PBIS or having a PBIS system and then another

4    school is not, or is it something that has to be

5    done on a district basis, a district-wide basis?

6          A.     It could be at one school and not in

7    another.

8          Q.     Okay.  Is it your understanding that

9    Georgia's state government, whether the Department

10   of Education, Department of Community Health, or

11   the Department of Behavioral Health and

12   Developmental Disabilities could mandate that every

13   school district in Georgia adopt and implement a

14   PBIS program?

15              ATTORNEY HOLKINS:  Object to form.

16              THE WITNESS:  Could you repeat

17       that again.

18   BY ATTORNEY BELINFANTE:

19         Q.     Sure.  Is it your understanding that

20   Georgia state government, whether the Department of

21   Education, Department of Community Health, or the

22   Department of Behavioral Health and Developmental

23   Disabilities could mandate the Georgia school

24   districts adopt a PBIS program?

25              ATTORNEY HOLKINS:  Same objection.



1                    THE WITNESS:  Well, obviously they

2          could mandate.

3      BY ATTORNEY BELINFANTE:

4          Q.      What is the basis of that opinion?

5          A.      Well, because Georgia can mandate

6   anything they want -- right? -- in terms of that.

7   So any initiative they could mandate.

8          Q.      Is that the Georgia Department of

9   Education that would do that?

10         A.      Well, usually PBS is under the

11  auspices of the state Department of Education.

12         Q.      Do you know or do you have an

13  opinion as to whether there's a role for the

14  Georgia Department of Community Health in requiring

15  PBIS in local school districts?

16         A.      In my experience it usually comes

17  from the state Department of Education.

18         Q.      Okay.  So you don't know which

19  Georgia state government agency would be

20  required -- let me start over.

21         If the State of Georgia were to choose to

22  mandate PBIS, is it true that you do not know which

23  state agency would be the one to do that?

24                    ATTORNEY HOLKINS:  Object to form.

25                    THE WITNESS:  Yes.



```
 1        BY ATTORNEY BELINFANTE:

 2             Q.      Are you familiar with Dr. Amy

 3   McCart?

 4             A.      Yes.

 5             Q.      Okay.  And have you read her report

 6   in this case?

 7             A.      No.

 8             Q.      Do you know if she defines PBIS the

 9   same -- do you know if -- what her definition of

10   PBIS is?

11                    ATTORNEY HOLKINS:  Object to form.

12                    THE WITNESS:  No.

13        BY ATTORNEY BELINFANTE:

14             Q.      Let's talk generally about the IDEA.

15   You're generally familiar with the IDEA; correct?

16             A.      Yes.

17             Q.      All right.  And can you tell me

18   under the IDEA what is a free appropriate public

19   education, your understanding of that term?

20             A.      Well, when it's free to -- for

21   individuals with disabilities.  Appropriate would

22   be if you look at the Andrew decision by the

23   Supreme Court, that would be meaningful gains.  And

24   so those would be kind of some of the standards you

25   would look at.
```

1          Q.      Okay.  And we talked about this

2    earlier.  You're familiar with the term "IEP team";

3    correct?

4          A.      Correct.

5          Q.      All right.  Have you ever served as

6    a member of an IEP team?

7          A.      Yes.

8          Q.      Okay.  In Massachusetts only?

9          A.      No.

10          Q.      Have you ever served as a member of

11    an IEP team in the State of Georgia?

12          A.      Yes.

13          Q.      Do you recall which school

14    districts?

15          A.      No.

16          Q.      Okay.  Do you recall roughly when

17    you served as a member of an IEP team in Georgia?

18          A.      Approximately, you know, five to ten

19    years ago.

20          Q.      Okay.  Do you have a level of

21    understanding of the Americans with Disabilities

22    Act as it relates to education?

23                    ATTORNEY HOLKINS:  Object to form.

24                    THE WITNESS:  None.  Not really.

25

1      BY ATTORNEY BELINFANTE:

2          Q.    Okay.  Are you familiar with the

3    term "least restrictive environment" as it relates

4    to a student in education?

5          A.    Yes.

6          Q.    Okay.  Is it the goal -- is it your

7    understanding that an IEP team is to consider what

8    is the least restrictive environment appropriate

9    for a student to receive education services?

10         A.    Yes.

11         Q.    Okay.  And if an IEP team refers a

12   student for a restrictive setting, is the IEP team

13   supposed to consider whether that is the least

14   restrictive environment effective for the student

15   or appropriate for the student?

16              ATTORNEY HOLKINS:  Object to form.

17              THE WITNESS:  Can you repeat that

18         question.

19      BY ATTORNEY BELINFANTE:

20         Q.    Sure.  If an IEP team recommends a

21   restrictive setting for a student's education, is

22   the IEP team, before it makes that

23   recommendation -- does the IEP team need to

24   conclude that that would still be the least

25   restrictive environment appropriate for that



1     student?

2                    ATTORNEY HOLKINS:  Same objection.

3                    THE WITNESS:  I think within the

4          context of kind of what they know.

5     BY ATTORNEY BELINFANTE:

6          Q.     Okay.  And "they" being the members

7     of the IEP team?

8          A.     That's correct.

9     BY ATTORNEY BELINFANTE:

10         Q.     Okay.  On page 13 of your report,

11    Exhibit 1, the first full paragraph begins with the

12    sentence, "The unnecessary segregation of students

13    with disabilities leads to serious problems that

14    are well documented in the research literature."

15         Do you see that?

16         A.     Yes.

17         Q.     What do you mean by -- or just

18    define the term, please, "unnecessary segregation."

19         A.     Because in my experience that if the

20    students are provided with appropriate services at

21    the appropriate intensity that they don't need to

22    be segregated.

23         Q.     All right.  What is your definition

24    of "segregated"?

25         A.     With limited access to general

1    education.

2            Q.       What is your definition of

3    "appropriate services"?

4            A.       Services that improve the student's

5    social, emotional, behavioral, and academic status.

6            Q.       So at the time that a decision is

7    made to decide what would be appropriate services,

8    the goal is to improve the status; correct?  Their

9    social, emotional, academic status?

10           A.       Can you repeat the question?

11           Q.       Sure.  To determine whether under

12   your definition of appropriate services, which I

13   understood to be those that would improve a

14   student's academic, social, emotional behavior,

15   it's forward looking; correct?  I mean, it's not a

16   situation where you're seeking to do something in

17   the future.  You hope that the service provided

18   will cause this improvement; is that right?

19                   ATTORNEY HOLKINS:  Object to form.

20                   THE WITNESS:  I'm sorry, I'm

21        having a hard time following you.

22      BY ATTORNEY BELINFANTE:

23           Q.       In determining what is appropriate,

24   is it a forward-looking analysis?

25           A.       And a backward-looking analysis.

```
 1                  ATTORNEY HOLKINS:  Object to form.
 2         Q.     What's the backward-looking
 3   analysis?
 4         A.     My perspective is what the services
 5   were that are currently provided to the student.
 6         Q.     Okay.  And then what would be your
 7   definition of "appropriate intensity" as you
 8   discussed?
 9         A.     Intensity of what?
10         Q.     Services.
11         A.     And which services are you talking
12   about?
13         Q.     I don't know.  Because you said what
14   makes something unnecessary segregation would be if
15   they were provided with appropriate services at the
16   appropriate intensity, there would be no need.  So
17   I'm trying to determine what you mean by "the
18   appropriate intensity."
19         A.     Okay.  And I think that's the basis
20   of my report is it's basically looking at -- one
21   would be, you know, if students were provided with
22   a function behavioral assessment with a behavioral
23   intervention plan with IC3 services, with IFI
24   services, with individual therapy, community
25   support services, and that, you know, there are
```



1   standards relative to what the appropriate

2   intensity would be for those particular students.

3           Q.      Where would I find those standards

4   if I wanted to look them up?

5           A.      One is we can look at it in the

6   provider manual in terms of what those standards

7   would be.

8           Q.      Okay.  Anything else besides a

9   provider manual?

10          A.      Well, there's also consensus in the

11  field that students with, as it says here, serious

12  behaviors should have a functional behavioral

13  assessment and behavioral intervention plan.

14          Q.      Okay.  But I guess, would you

15  consider an FBA and a BIP services?

16          A.      Well, a BIP list in terms of the

17  interventions that classroom teachers or other

18  people in the school would do to improve the

19  student's behavioral status.

20          Q.      Okay.  In terms of -- would you

21  agree with me that in determining what is

22  appropriate it is an individualized inquiry based

23  on each student?

24                  ATTORNEY HOLKINS:  Object to form.

25          Q.      Let me ask this.  Let me try to ask

1    it this way:  Does the question of what is an

2    appropriate service depend on the needs of an

3    individual student?

4            A.      Yes.

5            Q.      Does the question of appropriate

6    intensity depend on the needs of an individual

7    student?

8            A.      Yes.

9            Q.      And are there students who could be

10   provided with appropriate services at the

11   appropriate intensity and still be -- the most

12   appropriate place for that student to receive

13   educational services would be in a separate or

14   segregated setting?

15                  ATTORNEY HOLKINS:  Object to form.

16                  THE WITNESS:  Yes.

17      BY ATTORNEY BELINFANTE:

18           Q.      Okay.  And who, in your opinion, is

19   in the best position to make the determination of

20   what is appropriate for a particular student, and

21   I'm going to give an inanimate amount to back that

22   up a little bit in terms of is -- are individuals

23   in a local school district well positioned to make

24   a determination of appropriateness for a student's

25   needs?



1                    ATTORNEY HOLKINS:  Object to form.

2                    THE WITNESS:  Yes, can you repeat

3          that.

4      BY ATTORNEY BELINFANTE:

5          Q.      Sure.  Are persons at a local school

6    district, can they, in your opinion, make a

7    determination of what is appropriate for a

8    student's needs --

9                    ATTORNEY HOLKINS:  Object to form.

10          Q.      -- in terms of both services and

11   intensity?

12          A.      Yes, but I also have to -- you have

13   to look at the context.  In other words, it's also

14   looking at what's available and, you know, I just

15   went through a whole litany of services along those

16   lines.

17          So, you know, if a local district team has

18   really not been trained well in terms of doing FBA

19   and BIP or if, in fact, there is not access to the

20   IC3 services or individual therapy or intensive

21   family intervention or community support, then, you

22   know, oftentimes the choices and what they know are

23   limited.

24          Q.      And if services would be appropriate

25   but not available, is it your opinion that that

1    would deprive a student of a free and appropriate

2    public education?

3                    ATTORNEY HOLKINS:  Object to form.

4                    THE WITNESS:  Well, I think people

5            would have to determine that.  In other

6            words, the family, you know, could look

7            at the IEP and basically say this is not

8            an appropriate program for my son or

9            daughter.

10   BY ATTORNEY BELINFANTE:

11       Q.    If a family objects to an IEP team's

12   conclusion, even understanding that a family has

13   the right to sit in on the IEP team, could the

14   majority of the IEP team overrule the family?

15                   ATTORNEY HOLKINS:  Object to form.

16                   THE WITNESS:  No.  I think the

17           family has the ability to, you know, have

18           the due process if they need to.

19   BY ATTORNEY BELINFANTE:

20       Q.    Due process would be under the IDEA?

21       A.    Correct.

22       Q.    So if the family objected to an IEP

23   team's recommendation, they have an opportunity to

24   challenge that recommendation, is that what I

25   understand you to say?

1                   ATTORNEY HOLKINS:  Object to form.

2          I just want to clarify that I think that

3          counsel is calling for a legal opinion

4          from Dr. Putnam, who is not being held

5          out as an attorney.

6                   ATTORNEY BELINFANTE:  I'm asking

7          what his understanding is as opposed to

8          whether it's true or not.

9      BY ATTORNEY BELINFANTE:

10         Q.      But is it your understanding that if

11    a family member objected to an IEP team's

12    recommendation, that it has a means to challenge

13    that recommendation?

14                  ATTORNEY HOLKINS:  Same objection.

15                  THE WITNESS:  Yes.

16     BY ATTORNEY BELINFANTE:

17         Q.      Okay.  Let's look at -- and don't

18    worry, I know everybody got excited when I jumped

19    ahead, I'm going back.  But there's a method.

20         If you can turn to page 1 of your report.

21    Trust me, I've sat on that side plenty.  Never been

22    an expert myself.

23         A.      Yes.

24         Q.      Okay.  In the summary of your

25    report, on page 1, first sentence, "The vast

1    majority of students with behavior-related

2    disabilities, including students at serious risk of

3    educational placement, can be served effectively in

4    the general education school within their

5    communities."

6              Do you see that?

7                    ATTORNEY HOLKINS:  Protected

8              restricted educational placement, just

9              for the record.

10                   ATTORNEY BELINFANTE:  Sorry, I

11             thought I said something else.

12        BY ATTORNEY BELINFANTE:

13        Q.    Do you see that first sentence,

14   Dr. Putnam?

15        A.    Yes.

16        Q.    Can you quantify for me "vast

17   majority"?

18        A.    Most, if you want to say, students.

19        Q.    What would constitute a

20   behavior-related disability for purposes of your

21   report?

22        A.    Well, I defined it in my report as

23   certain diagnoses that would be and certain

24   behaviors.

25        Q.    Okay.  Would you agree with me that

```
1    all persons with behavior-related disabilities do
2    not need IC3 services?
3           A.    Correct.
4           Q.    Okay.  And similarly, all persons
5    with behavior-related disabilities do not need IFI
6    services as you've described them in your report?
7           A.    Correct.
8           Q.    Okay.  And all persons with
9    behavior-related disabilities would not need
10   individual therapy as described within your report?
11          A.    Correct.
12          Q.    When you say in that same sentence
13   that students are at serious risk of restricted
14   educational placement, what do you mean by "serious
15   risk"?
16          A.    So for me serious risk would be that
17   they are engaging in certain behavior that the
18   local school or the classroom cannot feel that they
19   can serve them.
20          Q.    Okay.  How would a school district
21   go about identifying persons who are at serious
22   risk of restrictive educational placement?
23          A.    One of the leading indicators is
24   office discipline referrals.
25          Q.    Okay.  And that's when somebody, a
```

1    student gets sent to the principal's office, is

2    that kind of what that constitutes?

3         A.    That's correct.

4         Q.    Okay.  But not every person who gets

5    sent to the principal's office or has an ORD, as I

6    believe it's referred to, has a behavior-related

7    disability; correct?

8              ATTORNEY HOLKINS:  Object to form.

9              ATTORNEY COHEN:  Do you mean ODR?

10             ATTORNEY BELINFANTE:  Thank you,

11        ODR, yes.

12             THE WITNESS:  Can you repeat that

13        question.

14             ATTORNEY BELINFANTE:  Yes, I will

15        do my best.

16    BY ATTORNEY BELINFANTE:

17        Q.    Not every person who is a student

18    that has an ODR has a behavior-related disability;

19    is that correct?

20        A.    That could be true, yes.

21        Q.    I think we've covered this already,

22    but in that same first sentence you say that the

23    vast majority of students with behavior-related

24    disabilities, including students at serious risk of

25    restrictive educational placement, can be served

1    effectively in the general education schools within

2    their communities.

3            What do you mean by "served effectively"?

4            A.    If we were going to use the metric

5    of office system referrals, then we would see

6    decrease in terms of that.  Or if we were looking

7    at in terms of academic performance or if we look

8    at social-emotional schools that we can see

9    improvement in that.

10           Q.    Okay.  In terms of looking at

11   effectiveness of the service, is there a cost

12   component to that?  In other words, is that a

13   factor in determining what is an effective --

14   serving a student effectively?

15                ATTORNEY HOLKINS:  Object to form.

16                THE WITNESS:  I'm not sure I

17          understand the question.

18   BY ATTORNEY BELINFANTE:

19           Q.    Hypothetically I can spend

20   $6 million on one student and provide them with

21   every conceivable service; correct?

22           A.    Yes.

23           Q.    Would that mean I wasn't serving

24   that student effectively, or do you just not

25   consider cost?

1                    ATTORNEY HOLKINS:  Object to form.

2                    THE WITNESS:  To go back to that

3          article, probably most of the work I've

4          done is looking at cost-effectiveness in

5          terms of that.  My experience is schools

6          oftentimes can provide more effective

7          services, some cases at less cost.

8      BY ATTORNEY BELINFANTE:

9          Q.    So cost, does that mean that cost is

10  a component of determining what is an effective

11  service?

12         A.    Let's go back in terms of

13  effectiveness; right.  I defined effectiveness as

14  improvements in ODR, which is reductions in

15  social-emotional, which is -- so there are metrics.

16  And we've done a lot of research looking at PBS

17  that shows that schools actually can reduce costs

18  in terms of what they do and effectively serve

19  students in general settings.

20         Q.    But my question is a bit more

21  targeted than that.  In terms of what is an

22  effective service for a student, do you consider

23  cost or do you not?

24                    ATTORNEY HOLKINS:  Object to form.

25                    THE WITNESS:  Obviously.

1          BY ATTORNEY BELINFANTE:

2          Q.      Okay.

3          A.      You need to look at costs; right.

4   However, I think the underlying is

5   cost-effectiveness.  That's what I published on,

6   that's what we've done.  So for me that's kind of a

7   theoretical question rather than, you know, what

8   actually happens in the real world.

9          Q.      Did you identify any individual

10  students who are currently receiving services

11  through a GNETS program that could be served

12  effectively in their general education schools?

13                  ATTORNEY HOLKINS:  Object to form.

14                  THE WITNESS:  Could you repeat

15      your question.

16      BY ATTORNEY BELINFANTE:

17          Q.      In preparing your report and looking

18  at the data that you did for the State of Georgia,

19  did you identify any student currently receiving

20  services through the GNETS program that could be

21  served effectively in the general education schools

22  if provided with appropriate services and support?

23          A.      Well, we looked at students in --

24  basically in Section 7 that are enrolled in GNETS.

25  And looked at the services they received and, you

1    know, that the services they received were -- the

2    students were pretty limited in terms of receiving

3    what we'd say Medicaid services as well as the

4    intensity of those services.

5            Q.       But in terms of any individual

6    students, I know you pulled seven files and you

7    discussed two.  Did you find anyone, any individual

8    students who you believed could be served

9    effectively in the general education schools but

10   were in the GNETS program?

11                   ATTORNEY HOLKINS:  Object to form.

12                   THE WITNESS:  Yes.

13      BY ATTORNEY BELINFANTE:

14           Q.       Okay.  Who were those students?

15           A.       We had by name every student that

16   was enrolled in GNETS in SY20 and SY22.

17           Q.       Of those students, which one

18   individually could be served in a general education

19   environment?  Did you form an opinion as to an

20   individual student and which one could be served

21   effectively in a general education school?

22                   ATTORNEY HOLKINS:  Object to form.

23                   THE WITNESS:  What we did was look

24          at the services provided to those, that

25          whole set of students that were enrolled.

1              And my opinion is that if they were

2              provided appropriate services, which from

3              my opinion is they weren't and at the

4              appropriate intensity, they could be

5              served in general ed settings.

6       BY ATTORNEY BELINFANTE:

7              Q.     Is that true of every student you

8       looked at in the GNETS program?

9              A.     I don't know that for a fact.

10             Q.     Okay.  Also in the next sentence on

11      page 1 says that the therapeutic services and

12      supports that help students remain in integrated

13      settings are well established, as are the

14      frameworks of implementing and sustaining those

15      services at the system level.

16             Do you see that?

17             A.     Yes.

18             Q.     Okay.  In Georgia where are

19      therapeutic services provided to students?  What

20      setting?

21                    ATTORNEY HOLKINS:  Object to form.

22                    THE WITNESS:  Well, Georgia has an

23             Apex program that provides school mental

24             health services in the schools in

25             Georgia.  It has a PBS program that

1                provides services in schools.

2        BY ATTORNEY BELINFANTE:

3            Q.    Is Apex the only program through

4    which students can receive certain services?

5                    ATTORNEY HOLKINS:  Object to form.

6            Q.    Let me rephrase.  Is it your

7    understanding that Apex is the only program through

8    which students can receive support and services

9    that you describe in your article -- I'm sorry, in

10   your report?

11                   ATTORNEY HOLKINS:  Object to form.

12                   THE WITNESS:  No.

13       BY ATTORNEY BELINFANTE:

14           Q.    Do you know if students -- is it

15   your understanding that students can receive

16   education supports that are not paid for by

17   Medicaid --

18                   ATTORNEY HOLKINS:  Object to form.

19           Q.    -- in Georgia?

20           A.    Yes.

21           Q.    Okay.  Do you know if a school is

22   going to provide services and supports, do you know

23   where the discussion is made to provide those

24   services?  Is it done at the school, individual

25   school level -- and again in Georgia -- is it done

1    at the district level on kind of what menu of

2    supports are going to be provided?

3                    ATTORNEY HOLKINS:  Object to form.

4                    THE WITNESS:  What services are

5            you specifically referring to?

6        BY ATTORNEY BELINFANTE:

7            Q.    The services, the therapeutic

8    services you refer to in the second sentence of

9    your first page of your report.

10           A.    Can you repeat the question.

11           Q.    Sure.  When you write, "The

12   therapeutic services and support that helps

13   students remain at an integrated educational

14   services are well established," my question is for

15   those therapeutic services and supports, who

16   decides what a school is going to offer?  Is it the

17   local school district, is it the school itself?  Is

18   it someone else?

19                   ATTORNEY HOLKINS:  Same objection.

20                   THE WITNESS:  So let's break this

21           out in terms of PBS services.

22       BY ATTORNEY BELINFANTE:

23           Q.    Sure.

24           A.    The state has a PBS team that will

25   provide support to local schools districts along

1    those lines; right.  And the local school districts

2    can decide in terms of, based upon the amount and

3    quality of PBS services and types of coaching,

4    whether they want to participate in PBS.  And from

5    there the local school could decide whether they

6    want to participate in the PBS initiative.

7              So, you know, it comes down from the state

8    to the district to the school.

9         Q.    Okay.  I'm sorry.  Were you --

10        A.    Go ahead.

11        Q.    Let's take another service, IC3, for

12   example.

13        A.    Yes.

14        Q.    Does a school district have to make

15   the affirmative decision to provide IC3 services?

16              ATTORNEY HOLKINS:  Object to form.

17        A.    No.

18        Q.    Who makes the determination of

19   whether IC3 services will be made available in a

20   particular school district?  Rephrase that.

21             Who makes the determination if IC3 services

22   will be made available to a particular student in a

23   district?

24              ATTORNEY HOLKINS:  Object to form.

25              THE WITNESS:  Well, if you go at

1          state PBHD level, it's whether IC3

2          services are available; right.  And then

3          from what I understand there's only two

4          CSBs in the State of Georgia, at least

5          when I was putting this report together,

6          that have the availability of IC3.  And

7          then it comes down to probably the

8          treating clinician in terms of, one, is

9          it available; right.  And then two, do I

10         think this would help the individual.

11    BY ATTORNEY BELINFANTE:

12         Q.     And for the state in terms of DBHDD,

13    did you see in any case where a student was

14    referred IC3 services and denied access to those

15    services?

16                     ATTORNEY HOLKINS:  Object to form.

17                     THE WITNESS:  Can you repeat that

18         question.

19    BY ATTORNEY BELINFANTE:

20         Q.     Sure.  In your review of the State

21    of Georgia that you made for your report, did you

22    see an example of a student who was referred for

23    IC3 services and denied access to those services?

24                     ATTORNEY HOLKINS:  Same objection.

25                     THE WITNESS:  I didn't see one,

1                    although there were people from the CSB,

2                    I believe, they were saying that they had

3                    students who could benefit from IC3, but

4                    it wasn't available.

5          BY ATTORNEY BELINFANTE:

6               Q.      Which CSBs -- and by CSBs, I presume

7    you mean community service boards?

8               A.      Yes.

9               Q.      Which CSBs, do you recall?

10              A.      I don't remember.

11              Q.      When you say -- and I'm sorry we're

12   back on the same sentence -- when you say there

13   that the therapeutic services and support that help

14   students remain in more integrated educational

15   setting are well established, as are the frameworks

16   for implementing and sustaining those services at

17   the system level," what did you mean by

18   "sustaining"?

19              A.      Well, the goal would be that once

20   services are initiated, that they continue to be

21   provided.

22              Q.      Is there a way that that is

23   measured?  In terms of, is it just annually you

24   look and see the services?

25              A.      Well, one would be, look at what the

1    expectations might be.  What the expectations are

2    in terms of that service and whether the services

3    in terms of number of sessions or duration, that

4    criteria.

5            Q.    Okay.  How would a state implement a

6    program -- what measures could a state take to make

7    sure that its program is sustainable?

8                    ATTORNEY HOLKINS:  Object to form.

9            Q.    And by "program" I mean the

10   provision of therapeutic services and supports to

11   help students remain in a more integrated setting.

12           A.    Which services are you referring to?

13           Q.    The therapeutic services and

14   supports that help students remain in a more

15   integrated educational setting.

16           A.    Can you repeat that question.

17           Q.    Sure.  How does a state -- what

18   effort can a state take to make sure those services

19   are sustainable, that the provision of such

20   services are sustainable?

21           A.    Take, for example, PBS; right.  The

22   state has a PBS plan in terms of that.  And that

23   one is having the resources to be able to basically

24   support that.

25                  Two would be to provide training and



1  coaching and data systems to support the

2  sustainability of that.  So those would be a number

3  of factors relative to that.

4         Q.     Okay.  Last in that same sentence

5  when you say "those services at the system level,"

6  what system are you referring to?

7         A.     Well, I would say one is we're

8  looking at the PBS system.  That's a systems

9  approach in terms of that.  Our MTSS, the other is

10  basically the system of care.

11         Q.     Okay.  What is your understanding of

12  the role of the Georgia Department of Education in

13  that system?

14                ATTORNEY HOLKINS:  Object to form.

15                THE WITNESS:  Georgia Department

16       of Education receives the PBS initiative.

17    BY ATTORNEY BELINFANTE:

18         Q.     Okay.  What is your understanding of

19  the role of the Department of Behavioral Health and

20  Disabilities dollars system?

21                ATTORNEY HOLKINS:  Same objection.

22                THE WITNESS:  What system are you

23       talking about?

24    BY ATTORNEY BELINFANTE:

25         Q.     The systemic level needed to sustain

1    services.

2         A.    Well --

3         Q.    The system you're referring to in

4    page 1, second sentence of your report.

5         A.    DBHD oversees the delivery of mental

6    health services.  And in terms of that is, you

7    know, are they providing appropriate resources

8    through the Apex program.  Are they maximizing

9    their Medicaid dollars to really take advantage of

10   the services that have been shown to be effective.

11        Q.    Okay.  In terms of maximizing

12   Medicaid dollars, is there -- what do you mean by

13   that?

14        A.    Well, my understanding is is for

15   every dollar that the state provides they almost

16   get $2 back from the federal government.  And if,

17   in fact, they maximize their Medicaid services and

18   use their state dollars to pay for Medicaid

19   services, they would be getting $2 back, so they

20   would be getting more services.

21        So it's kind of like when you go back to

22   that Brockton thing.  It's basically using your

23   resources wisely and putting your money into

24   prevention services that are funded by the federal

25   government rather than just state dollars.



1          Q.      When you say "maximizing Medicaid

2    dollars," you don't necessarily mean funding,

3    always increasing the Medicaid dollars, but it's

4    maximizing the use of the Medicaid program as

5    opposed to -- is that what you mean by it's more

6    programmatic?

7                  ATTORNEY HOLKINS:  Object to form.

8                  THE WITNESS:  I'm not sure I

9          understand what you're saying.

10   BY ATTORNEY BELINFANTE:

11         Q.      When you say "maximizing Medicaid

12   dollars," is that more of an emphasis on providing

13   Medicaid-funded services as opposed to state-only

14   funded services?

15         A.      Yes.  It's really taking the state

16   dollars; right?

17         Q.      Right.

18         A.      And it's through Medicaid, they are

19   going to get $2 more of services.  And so you

20   invest a dollar, you're going to get $2 more back

21   in terms of that.  That's a wiser use of state

22   dollars than them using their own state dollars to

23   fund those services.

24         Q.      Okay.  What is your opinion of the

25   role of Georgia's local school districts in

1    providing therapeutic supports and services to help

2    students remain more -- in more integrated

3    educational settings?

4            A.    Are you reading something?

5            Q.    Just the therapeutic supports.  I

6    was reading from that second sentence again.  My

7    question is, what is your opinion of the role of

8    local school districts in working to make sure that

9    therapeutic supports and services to help students

10   remain in more integrated educational services are

11   provided?

12           A.    One of the roles is really to

13   maximize state dollars that they can use to deliver

14   those services.  And, you know, and using the

15   dollars cost effectively to deliver effective

16   services.

17           Q.    Anything else?

18           A.    Well, also federal dollars.

19           Q.    Okay.  Anything else?

20           A.    Not that I can think of.

21           Q.    All right.

22           A.    If we can take a quick break, would

23   that work?

24           Q.    Absolutely.

25                 THE VIDEOGRAPHER:  Going off the

1                    record at 11:48.

2                         (Recess taken from

3                    11:48 a.m. to 12:51 p.m.)

4                    THE VIDEOGRAPHER:  We are back on

5              the record at 12:51.

6        BY ATTORNEY BELINFANTE:

7        Q.      Dr. Putnam, if we can stay on page 1

8  of your report, Exhibit 1.  I've actually moved to

9  the third paragraph by now, it says that Georgia

10 can decrease its reliance on the GNETS program by

11 making reasonable changes to its service system,

12 including expanding existing therapeutic services

13 and support, including coordination and data across

14 the state's child service agencies and community

15 partners including robust training and technical

16 systems."

17            Do you see that?

18       A.      Yes.

19       Q.      Okay.  What did you mean by

20 "decreases reliance on the GNETS program"?

21       A.      Well, I believe they made -- if they

22 followed through on these recommendations, that

23 they wouldn't need to have many students going to

24 the GNETS program.

25       Q.      What made you think -- first off,

1    you said Georgia can decrease its reliance on the

2    GNETS program.  What did you mean by "Georgia"?

3    Did you mean the state Department of Education?

4            A.      Yes, yes and DBHDD.

5            Q.      Is it your opinion that the

6    Department of Community Health is reliant on the

7    GNETS program?

8                    ATTORNEY HOLKINS:  Object to form.

9                    THE WITNESS:  Well, the Department

10              of Community Health provides the Medicaid

11              services.  So those are in here

12              including -- including expanding existing

13              therapeutic services.

14      BY ATTORNEY BELINFANTE:

15            Q.      What is the state Department of

16    Education doing to show that it is relying on the

17    GNETS program?  "It" being the Department of

18    Education.

19            A.      It -- well, for example, in terms of

20    the PBS program, my perspective is it's really not

21    providing enough resources to increase the number

22    of schools that are implementing the PBS program

23    across all tiers.

24            Q.      Isn't that true across most states,

25    though?



1                    ATTORNEY HOLKINS:  Object to form.

2          Q.      That most states are not -- most

3    school districts in those states are not fully

4    implementing PBIS at all levels?

5          A.      That's true.

6          Q.      Is Georgia -- anything other than

7    your comments just now about PBS, is what Georgia

8    Department of Education is doing is it's

9    demonstrating its reliance on the GNETS program?

10         A.      Well, I think they also can

11   influence school staff, IEPTs, by providing as I

12   make in the last phrase of that paragraph, it's

13   providing robust training and technical assistance

14   to its school districts and schools.

15         Q.      What would constitute robust

16   training?  And by that I'm specifically looking for

17   their objective metrics that you can identify that

18   to you would be sufficient training.

19         A.      Well, I think a couple different

20   things I think they can do.  It's one, have

21   increased resources to the PBS state team so they

22   can provide more trainers.  They can do more online

23   training to school districts.  That they also --

24   they have the ability to track office discipline

25   referrals.  They also have the ability to share

1    that data with DBHDD so that the mental health

2    providers could really focus on the students that

3    are most at risk of going to more restrictive

4    placements.

5         So there's a variety of things they can do

6    to, you know, to decrease its reliance on the GNETS

7    program.

8         Q.    As part of your report, did you

9    conduct any type of cost estimate as to what it

10   would cost to do what you just described in terms

11   of the robust training?

12        A.    No.

13        Q.    If you could skip ahead in your

14   report to page 22.

15             ATTORNEY COHEN:  No going back.

16             ATTORNEY BELINFANTE:  Famous last

17        words.

18        Q.    Specifically II?

19        A.    Yes.

20        Q.    Okay.  I'm sorry.  Just above II,

21   the last sentence there, "Finally, Georgia GaDOE

22   funds and administers GNETS statewide."

23        Do you see that?

24        A.    Yes.

25        Q.    How does the Georgia Department of

1    Education fund the GNETS program, or what's your

2    understanding?

3            A.    My understanding from looking at

4    several documents is that the DOE provides about

5    $50 million to fund the program.

6            Q.    Do you know if it's a grant or if

7    it's funding from the Georgia Department of

8    Education?

9            A.    I don't know the source.

10           Q.    Okay.  Have you looked at in the

11   documents that you talked about, that you looked

12   at, would they be included in Exhibit B or

13   Appendix B to your report?

14           A.    I believe so.

15           Q.    Okay.  I don't recall seeing it, but

16   did you ever look at a Georgia state budget or an

17   appropriations act in preparing your report?

18           A.    No, I don't believe so.

19           Q.    Okay.  Is it your understanding that

20   the Department of Education mandates how local

21   school districts will spend GNETS' funds?

22                 ATTORNEY HOLKINS:  Object to form.

23                 THE WITNESS:  Can you ask that

24         again.

25

1        BY ATTORNEY BELINFANTE:

2            Q.      Sure.   Is it your understanding that

3    the state Department of Education mandates how

4    local school districts will spend GNETS' funds?

5            A.      No.

6            Q.      Okay.   Do you understand that

7    local -- is it your understanding that local school

8    districts have discretion in how to spend GNETS'

9    funds?

10                   ATTORNEY HOLKINS:   Object to form.

11                   THE WITNESS:   I don't believe that

12               the local school districts are -- receive

13               in most cases GNETS funds.

14       BY ATTORNEY BELINFANTE:

15           Q.      Okay.   Are you familiar with the

16   term RESA, R-E-S-A?

17           A.      Yes.

18           Q.      Okay.   What is a RESA in Georgia, or

19   what's your understanding of what a RESA is?

20           A.      It's a regional educational program.

21           Q.      Dollars case a RESA would be,

22   perhaps, a group of two or more local school

23   districts that pull resources?

24           A.      I don't know that.

25           Q.      Okay.   Let me ask a hypothetical.

1    Let's say that a Georgia local school district

2    operates a GNETS program and it wants to expand the

3    playground on the site of the GNETS facility.  Is

4    it your understanding that it needs to get the

5    state's permission to do so?

6                    ATTORNEY HOLKINS:  Object to form.

7                    THE WITNESS:  Can you ask that

8          question again.

9      BY ATTORNEY BELINFANTE:

10         Q.    Sure.  It's a hypothetical, so let's

11   presume that local school districts has a RESA or,

12   excuse me, a GNETS program in its district and it

13   wants to expand the playground at the GNETS

14   facility.  Does it need the state's permission to

15   do so?

16                   ATTORNEY HOLKINS:  Same objection.

17                   THE WITNESS:  My understanding is

18         that local school districts do not get

19         the GNETS funding.

20     BY ATTORNEY BELINFANTE:

21         Q.    Okay.  So your understanding is that

22   the funding for GNETS stays within the state

23   Department of Education?

24         A.    Yes.  What I understand through some

25   local authority who administers that funding.

1          Q.      The local authority, is it your

2     understanding that that is a state entity as

3     opposed to -- when you say "local authority," I'm

4     just trying to determine who has control of it, a

5     state entity or a local entity?

6          A.      I'm confused.

7          Q.      So I guess what I'm trying to figure

8     out is the money that comes from the Georgia

9     Department of Education for GNETS --

10         A.      Yeah.

11         Q.      -- where do you -- tell me where you

12    think it flows in order to get to the actual

13    students on the ground, so to speak.

14         A.      The best I know is there is an

15    authority which could be a RESA.  It's not an LEA.

16    Because you keep talking about a local authority,

17    which defines what a local authority is.

18         Q.      LEA?

19         A.      Yes.  So my understanding is it

20    doesn't flow to the LEA.

21         Q.      Okay.  All right.  So when you

22    then -- the next part of that phrase there, and I'm

23    back on page 22 of your report, which is

24    Exhibit 1 --

25         A.      Yeah.



1          Q.      -- is that the Georgia Department of

2   Education funds and administers GNETS statewide.

3   What did you mean by "administer"?

4          A.      What I understand is there is a

5   state GNETS rule, which governs the administration

6   of the GNETS program.

7          Q.      Okay.  Anything other than the rule

8   that is the basis of your opinion that the state

9   administers the GNETS program?

10         A.      My understanding is that, you know,

11  that the state has the GNETS rule, and I'm sure, I

12  don't know specifically, that they have some

13  regulations relative to the operation of GNETS.

14         Q.      Okay.  Can you just tell me what

15  you -- how would you define the word "administers"

16  for purposes of that sentence?

17         A.      I would look at it in terms of

18  providing funds, guiding the use of those funds.

19         Q.      And is "administer" a word that you

20  chose on your own to use here, or was that a word

21  that was suggested to you by anyone?

22         A.      No, that's my word.

23         Q.      Okay.  And you can tell it probably

24  matters to us lawyers.  When you say that the

25  Georgia Department of Education funds and

1    administers the GNETS statewide, you're not making

2    an opinion or rendering an opinion on whether it

3    administers for purposes of the Americans with

4    Disabilities Act, are you?

5                    ATTORNEY HOLKINS:  Object to form.

6                    THE WITNESS:  I'm not sure I

7         understand the question.

8    BY ATTORNEY BELINFANTE:

9         Q.    Okay.  Your report does not opine

10   that for purposes of the Americans with

11   Disabilities Act that the Department of Education

12   funds and administers GNETS statewide; is that

13   right?

14                    ATTORNEY HOLKINS:  Object to form.

15                    THE WITNESS:  I don't believe I

16        referenced the Americans with

17        Disabilities Act.

18   BY ATTORNEY BELINFANTE:

19        Q.    Okay.  Zeroing in on this sentence,

20   that the Department of Behavioral Health and

21   developmental disabilities funds or administers

22   GNETS.

23        A.    That's not my understanding.

24        Q.    Okay.  Is it your understanding or

25   opinion that the Department of Community Health

1   funds or administers the GNETS program?

2          A.      That's not my understanding.

3          Q.      In order for a student to receive

4   services from a GNETS program, must -- is it your

5   understanding that they must be referred to GNETS

6   services by their IEP team?

7                       ATTORNEY HOLKINS:  Object to form.

8                       THE WITNESS:  They -- they must be

9           referred by their school.  By assumption

10          it would be involving the IEP team.

11     BY ATTORNEY BELINFANTE:

12          Q.      Okay.  And is it your understanding

13   that any student referred for GNETS services, that

14   referral is based on an individualized

15   determination?

16                       ATTORNEY HOLKINS:  Object to form.

17                       THE WITNESS:  Can you repeat that

18          question.

19     BY ATTORNEY BELINFANTE:

20          Q.      Sure.  Is it your understanding that

21   any student who is referred for GNETS services,

22   that referral is based on an individualized

23   determination?

24                       ATTORNEY HOLKINS:  Object to form.

25                       THE WITNESS:  Yes.



```
 1        BY ATTORNEY BELINFANTE:

 2        Q.      Don't panic.  The nice thing is,

 3   Dr. Putnam, you put your opinions at the start of

 4   your report, so it lets me go there and ask a bunch

 5   of questions.  It alleviates the need for me to do

 6   it later.

 7        Let me go back to page 1.  I'm still on

 8   that sentence that's the third paragraph of the

 9   report.  "Georgia can decrease its reliance on

10   GNETS' program by making reasonable changes to its

11   service system."

12        What did you mean by "reasonable changes"?

13        A.      That from my perspective, and we're

14   talking about reasonable changes, are things

15   clearly within their power in terms of being able

16   to do that -- so, for example, part of that is

17   expanding the rest of that paragraph, expanding

18   existing therapeutic services and supports by

19   improving coordination and data collection across

20   state child-serving agencies and community partners

21   and providing robust training and technical

22   assistance.

23        So those are what I considered to be

24   reasonable changes.

25        Q.      Okay.
```



1                    ATTORNEY COHEN:  I'm just going to

2            caution the witness to slow down because

3            the court reporter is genius but not

4            supernaturally powered.  She's close.

5      BY ATTORNEY BELINFANTE:

6          Q.      In terms of making that

7   determination that Georgia could make reasonable

8   changes, did you perform any kind of cost analysis

9   for your report?

10         A.      No.

11         Q.      Is it possible that Georgia can

12  make -- and using your language here -- that

13  Georgia could make all the reasonable changes in

14  the world that you prescribe, but that an IEP team

15  still refers a child for services in a segregated

16  education setting?

17                    ATTORNEY HOLKINS:  Object to form.

18                    THE WITNESS:  Well, I think you

19            have to talk about IEP teams in context.

20            So I'm suggesting that they could expand

21            Apex, right, and if an Apex provider was

22            sitting on an IEP team that they could

23            come to a different conclusion.  I'm

24            suggesting that they expand PBS.

25                    And so if somebody had training

1          experience in PBS, the IEP team could

2          come to a different conclusion.

3               My 40 years of experience has been

4          here is an IEP team that basically

5          suggests a restrictive placement.  And

6          the school district brings me in to say

7          can you influence the IEP team to come up

8          with a less restrictive program.

9               So my 40 years experience

10         indicates the IEP teams operate within

11         the context of what -- where they are.

12         And that if they, in fact have other

13         supports, other services that are

14         provided to them that many cases they

15         come to a different conclusion relative

16         to restrictive...

17    BY ATTORNEY BELINFANTE:

18         Q.    Many cases but not all; correct?

19         A.    Correct.

20         Q.    All right.  Let's go to page 4 of

21    your report, Exhibit 1.

22         A.    Yes.

23         Q.    In the part that you described here

24    as part 2, the methodology, did anyone review the

25    methodology that you used here in kind of a peer

1    review sense?

2                        ATTORNEY HOLKINS:  Object to form.

3                        THE WITNESS:  I'm not sure what

4          the question is.

5        BY ATTORNEY BELINFANTE:

6          Q.      Okay.  Did any peers review your

7    report before you finalized it?

8          A.      No.

9          Q.      In terms of the methodology, did you

10   pull from peer-reviewed studies that use a similar

11   methodology to reach the conclusions, the

12   conclusions you did?

13         A.      This is a similar methodology that

14   I've used for literally 40 years in terms of doing

15   program evals.  So it's been replicated over and

16   over again in terms of that.  So it's worked in

17   terms of coming up with reasonable modifications

18   for whatever organization has contacted me.

19         Q.      To your knowledge, has any of those

20   program evaluations that you just described been

21   peer reviewed?

22                       ATTORNEY HOLKINS:  Object to form.

23                       THE WITNESS:  I'm not sure.

24       BY ATTORNEY BELINFANTE:

25         Q.      Okay.  Let's go to page 6.  First

1  sentence under part 3 reads, "There is broad

2  scientific consensus that students with

3  behavior-related disabilities who receive timely,

4  appropriate services can avoid restrictive

5  educational placements and be served in more

6  integrated educational settings within their

7  communities."

8          Do you see that?

9          A.    No.  Where are we?

10         Q.    Page 6.

11         A.    Oh, page 6, I'm sorry.

12         Q.    You didn't expect me to jump two

13  pages.

14         A.    Yes.

15         Q.    Take a look at the first sentence.

16         A.    Yes.

17         Q.    Okay.  My question is, you say that

18  services need to be provided timely.  What

19  standard -- what would constitute timely delivering

20  services?  Is there a standard or benchmark?

21         A.    So what I would suggest would be

22  that one example is early in a student's career we

23  can begin to look at whether they are receiving

24  office discipline referrals.  And we would want to

25  identify services at that particular point in time



1    that are provided to them.  So one is -- really

2    goes to early identification in terms of providing

3    timely services.

4          Q.     Okay.  At what stage does a child

5    begin to have ODRs that warrants identifying

6    services?

7                      ATTORNEY HOLKINS:  Object to form.

8                      THE WITNESS:  What do you mean by

9          "stage"?

10    BY ATTORNEY BELINFANTE:

11          Q.     Elementary, middle school, high

12    school.

13          A.     Really across the board.

14          Q.     Okay.  All right.

15          Going back to your methodology I know that

16    there were visits you had at GNETS' program in

17    Georgia.  How did you choose -- excuse me, that

18    there was -- yes.  How did you choose the schools

19    that you visited?

20          A.     So I -- at the bottom of page 5, I

21    suggested factors such as the rate in which schools

22    and districts were listed as home and school and

23    district for GNETS students, the student enrollment

24    in the school, whether the school participated in

25    Apex or PBS, and the school's geographical



1  location.

2         Q.      Were there any schools that you

3  wanted to visit but did not have an opportunity to

4  do so?

5         A.      No.

6         Q.      Let me ask another question based on

7  that sentence on page 6 about serving students in a

8  more integrated educational setting within their

9  communities.  I think I know the answer, this is

10  one of the things more for the record.

11         Let's say a student lives in Macon,

12  Georgia, and their school is in Macon, Georgia, and

13  there is a separate GNETS facility in Macon,

14  Georgia.  Is that considered serving a student

15  within their community if they are dollars separate

16  GNETS facility?

17         A.      I think it's really important if

18  they are in a generalized setting.  That is not

19  what I consider to be a generalized setting.

20         Q.      In terms of serving someone in their

21  community, what you mean by that is in their

22  general education setting?

23         A.      Correct.

24         Q.      Okay.  The next sentence there on

25  page 6 is, "To work as intended, the therapeutic

1    services described below must be provided by

2    trained and qualified professionals with sufficient

3    intensity and with fidelity to the recognized

4    standards."

5              Do you see that?

6         A.    Yes.

7         Q.    What kind of qualifications does

8    someone need to provide the services?

9                   ATTORNEY HOLKINS:  Object to form.

10                  THE WITNESS:  Which services are

11           you referring to?

12       BY ATTORNEY BELINFANTE:

13        Q.    The therapeutic services described

14   below.  So do they vary based on the service?

15        A.    Yes.

16        Q.    Okay.  Does someone typically -- let

17   me ask this:  Is there any service for which you do

18   not need a master's degree to provide that you

19   identified?

20                  ATTORNEY HOLKINS:  Object to form.

21        Q.    At least a master's degree?

22                  ATTORNEY HOLKINS:  Same objection.

23                  THE WITNESS:  Can you repeat the

24           question.

25

1    BY ATTORNEY BELINFANTE:

2        Q.    For the services that you identify

3    below, it looks like FBA and BIP wraparound

4    services, family and community supports, individual

5    and group therapy, for any of those services, can

6    someone who has an education which is less than a

7    master's degree provide those services?

8                    ATTORNEY HOLKINS:  Object to form.

9                    THE WITNESS:  Yes.

10    BY ATTORNEY BELINFANTE:

11        Q.    Yes, okay.  And so -- and I think I

12    understood the qualifications there is based on the

13    service provided?

14        A.    That's correct.

15        Q.    Okay.  What is your understanding of

16    LEA's role in providing training to educators --

17                    ATTORNEY HOLKINS:  Object to form.

18        Q.    -- in Georgia?

19        A.    That's one of their functions.

20        Q.    Did you see anything in your

21    examination of Georgia where the state, whether it

22    was the Department of Education, Department of

23    Behavioral Health and Developmental Disabilities,

24    the Department of Community Health prevented LEAs

25    from providing training to their own employees?

1          A.       No.

2          Q.       Let's look at the Core Services

3    section starting with the functional behavior

4    assessments and behavior and prevention plans on

5    page 7.

6          Page 7, the first sentence says, "A

7    student's needs and behaviors must be well assessed

8    before a clinician can identify needed services."

9          Do you see that?

10         A.       That's correct.

11         Q.       Okay.  What kind of clinician is

12    needed to identify the services?

13                    ATTORNEY HOLKINS:  Object to form.

14                    THE WITNESS:  Can you repeat that

15             question again.

16    BY ATTORNEY BELINFANTE:

17         Q.       Sure.  Just reading from your thing,

18    it says a clinician has to identify the needed

19    services.  What did you mean by "clinician," what

20    type of --

21         A.       It could be a teacher.  It could be

22    other people that have more qualifications.

23         Q.       So a person with an education degree

24    alone, no master's degree, to identify needed

25    services under an FBA?



1        A.        Correct.

2        Q.        Okay.  Is there a national standard

3   for that or national standard of care to determine

4   who can do it?

5        A.        Well, I would say it depends on the

6   intensity and the complexity of the student's

7   behavior.

8        Q.        Is it fair to say the more complex

9   and intense the student's behavior, the more

10   training that the person needs to complete the FBA?

11        A.        Yes.

12        Q.        Okay.  Do you know in Georgia are

13   FBAs conducted at the LEA level or the individual

14   school level, do you know?

15        A.        I'm sorry, can you repeat the

16   question.

17        Q.        Sure.  In Georgia are FBAs conducted

18   on like the individual school level, there's

19   someone at, for example, that high school that does

20   it, or is there someone do you know at the LEA

21   district-wide that conducts FBAs?

22        A.        It's various situations.

23        Q.        Okay.  To your knowledge, does

24   anyone at the Georgia Department of Education

25   provide FBAs to students?



1          A.      Can you define what you mean by the

2     Georgia Department of Education?

3          Q.      Sure.  An employee of the Georgia

4     state Department of Education as opposed to the

5     local school district.

6          A.      Well, there are various employees in

7     Georgia.  Along that continuum.  I don't know who

8     is employed by the Georgia State Department of

9     Education or not.

10          Q.      Okay.  Did you review any Georgia

11     students' FBAs?

12          A.      No.

13          Q.      To your knowledge, does the State of

14     Georgia impose any barriers or impediments to

15     students obtaining an FBA?

16               ATTORNEY HOLKINS:  Object to form.

17               THE WITNESS:  No.

18     BY ATTORNEY BELINFANTE:

19          Q.      You also say on page 7 -- and this

20     is the third full paragraph -- "If conducted with

21     fidelity, FBAs provide information necessary for

22     staff to design interventions that successfully

23     modify the context in which such behaviors occur,

24     teach replacement behaviors matched to the function

25     of the original behaviors, and design systems that



1    reinforce the desired and replacement behaviors."

2          Do you see that?

3          A.      Yes.

4          Q.      Okay.  What would be the fidelity

5    standards for FBA, and where would I find them?

6                        ATTORNEY HOLKINS:  Object to form.

7                        THE WITNESS:  Well, there are what

8            we call brief FBAs, and then there are

9            more complex FBAs.

10      BY ATTORNEY BELINFANTE:

11          Q.      And where would I look to find those

12    fidelity standards?

13          A.      I think if you look at the PBS.org

14    website, it will describe in terms of what a brief

15    FBA is.  And then a lot of research that describes

16    what a more complex FBA would be.

17          Q.      Okay.  If, for example, the Court

18    were to say in an order based on this litigation

19    Georgia has to provide an FBA for every student

20    who's been identified with an emotional behavior

21    disorder and that FBA has to be conducted with

22    fidelity, where would the Court or the state look

23    to determine specifically what that fidelity looks

24    like?

25                        ATTORNEY HOLKINS:  Object to form.

1                    THE WITNESS:  I would say one is

2            go on the PBS.org website and click,

3            suggest a number of textbooks that

4            basically describe that.

5        BY ATTORNEY BELINFANTE:

6            Q.     Are those textbooks cited in your

7    report, do you know?

8            A.     I don't believe so.

9            Q.     Let's talk about wraparound

10   services, page 9.

11           A.     Okay.

12           Q.     Would you agree with me that what

13   you define as wraparound services are not delivered

14   exclusively in the school settings?

15           A.     Can you repeat that question.

16           Q.     Sure.  Would you agree with me that

17   in Georgia wraparound services are not delivered

18   exclusively in the school settings?

19           A.     That's correct.

20           Q.     Okay.  To your knowledge, are

21   wraparound services and what you describe here as

22   IC3, are those available in both low income

23   Medicaid and age-blind disabled Medicaid?

24           A.     I'm not sure I understand those

25   terms.

1          Q.      Are you familiar with the term "low

2     income Medicaid"?

3          A.      No.

4          Q.      How about age-blind disabled

5     Medicaid?

6                      ATTORNEY COHEN:  Did you say "age

7          blind disabled"?

8                      ATTORNEY BELINFANTE:  Yes, ABD.

9        BY ATTORNEY BELINFANTE:

10         Q.      Do you know what kind of

11    providers -- and by that I mean the type of

12    training a clinician, whether a social worker,

13    psychiatrist, psychologist, et cetera -- what kind

14    of procedures provide wraparound services?

15                     ATTORNEY HOLKINS:  Object to form.

16                     THE WITNESS:  I believe Georgia

17         has standards around that in terms of

18         IC3.

19       BY ATTORNEY BELINFANTE:

20         Q.      In looking at the wraparound

21    services and your opinion about wraparound services

22    in Georgia, did you consider any issue regarding

23    workforce in Georgia?

24         A.      No.

25         Q.      Did you look at -- and just to be

1   more specific, did you look at any workforce data

2   for psychiatrists in Georgia?

3          A.    No, I wasn't asked to opine on that.

4          Q.    Sorry if I'm being repetitive.  It's

5   the rules we have to play by on the lawyers side.

6          Did you look at any workforce data

7   requiring psychologists in Georgia?

8          A.    No.

9          Q.    Okay.  If we jump ahead to page 33,

10  you discuss IC3 services there as well.

11              ATTORNEY HOLKINS:  If I can flip

12          to the page.

13              ATTORNEY BELINFANTE:  Sure.

14              ATTORNEY POLANSKY:  Can you repeat

15          the page number.

16              ATTORNEY BELINFANTE:  Sure.  33.

17          Larry Bird.

18                  (Discussion held off the

19                  record.)

20    BY ATTORNEY BELINFANTE:

21          Q.    Anyway, so the -- looking at

22  page 33.

23          A.    Yes.

24          Q.    I think we at least got that, you

25  say that the IC3 services are especially scarce in

1    Georgia, and that is in the middle of that full

2    paragraph, it starts with the third sentence,

3    "However, IC3 services" -- I'm sorry.  "However,

4    IC3 is especially scarce in Georgia."

5            A.      Yes.

6            Q.      Okay.  I know -- was that based on a

7    comparative analysis?  In other words, that Georgia

8    on a per population basis had fewer IC3 type of

9    services than other states, or what was the basis

10   of that conclusion that IC3 is especially scarce in

11   Georgia?

12           A.      Well, Georgia is a big state, and

13   there are only two providers when I wrote the

14   report that provided this.  So I don't know what

15   the square mileage is, but it's pretty huge and

16   there's only two providers for that, so that's one.

17           The next sentence says, "740 students

18   statewide received an IC3."  And, you know, that's

19   less than 7 percent of the total number of children

20   in Georgia with emotional disturbance enrolled in

21   Medicaid PeachCare.

22           Even in the next sentence, "Two years later

23   there are fewer students, 545 that apply."  And the

24   next sentence says, "By contrast, more than five

25   times as many students, 3,000 were in the GNETS

1    program," right.  So look at those numbers as

2    compared to look at students that are without

3    serious mental health disabilities.  That's pretty

4    low.

5         And literally even going back to in terms

6    of how many actual service units that people --

7    that students provide, it's pretty limited as

8    compared to looking at the provider handbook.

9         So I can point that out if you want in

10   terms of what the paucity of services were versus

11   what they established.

12        Q.    We'll get to those in a moment.

13        But the idea that something is scarce, is

14   there a state that you can identify that offers

15   what you would say is a model in terms of its ratio

16   of having wraparound -- I'm sorry, not

17   wraparound -- in terms of customized care

18   coordination?

19             ATTORNEY HOLKINS:  Object to form.

20        Q.    So Georgia -- and I'll put it this

21   way:  If Georgia wanted to -- if the Georgia --

22   pick a department, wanted to look and say we want

23   to expand, this state is doing it right.  Where

24   would you recommend they look?  What state would

25   you recommend they look to?



1          A.      I don't have a state.  I think what

2   I'm suggesting is those students that are at high

3   risk and have serious emotional disabilities, the

4   goal would be to provide access to that service.

5          Q.      To your knowledge, in your review of

6   data for your report, did you see any situation

7   where a student was referred IC3 services and did

8   not obtain it?

9          A.      I believe in the depositions that

10  there was a part that there could be more, IC3

11  services could be more available.

12         Q.      Did you find in your review of

13  students or individuals anybody that was referred

14  IC3 services and did not receive them?

15         A.      Not that I'm aware of.

16         Q.      Okay.  And would you agree with me

17  that IC3 services are intense services on the

18  scale, they tend to be on the more intense side?

19         A.      For community-based services, yes.

20         Q.      When I look at footnote 101 which is

21  cited on page 7 -- I'm sorry, not 7, page 33 --

22  footnote 101 refers to a Department of Education

23  statistic that in FY 2019 5.45 of students with

24  disabilities were identified as emotional

25  disturbance.



1           Do you see that?

2           A.      Uh-huh.

3           Q.      Would every student with emotional

4    disturbance need IC3 services?

5                   ATTORNEY HOLKINS:  Object to form.

6           Asked and answered.

7                   THE WITNESS:  No.

8       BY ATTORNEY BELINFANTE:

9           Q.      Okay.  Going back to page 17, would

10   you deem IC3 -- and I'm just, I'll ask the question

11   and you can see where I'm going with it -- but

12   would you deem IC3 services to be tier 3 services

13   under a PBS model?

14          A.      Where are you referring to?

15          Q.      At the top of page 17 it says,

16   "Tier 3 offers the most individualized and

17   intensive supports and services generally to a very

18   small subset of students with the highest needs,

19   typically 3 to 5 percent of the population."

20          My question is do IC3 services, would they

21   fall under tier 3 services?

22          A.      Hang on.  Can I just read the

23   context of that paragraph?

24          Q.      Yes, absolutely.

25                  (Pause)

1          A.          Would you mind repeating your

2    question.

3          Q.          Sure.   The IC3 services, would they

4    fall under tier 3 services under a PBIS model?

5          A.          Yes.

6          Q.          You did not review the contracts for

7    the two providers for IC3 services; correct?

8                    ATTORNEY HOLKINS:   Object to form.

9                    THE WITNESS:   No.

10      BY ATTORNEY BELINFANTE:

11          Q.          And -- okay.   If you can turn to

12    page 34.

13          A.          (Witness complies with request.)

14          Q.          And this is an example, but it's

15    kind of more of a generalized question.   Midway

16    into that paragraph right after footnote 104, you

17    write, "State officials have recognized that

18    Georgia needed more staff capacity to deliver IC3."

19          Do you see that?

20          A.          Yes.

21          Q.          There you cite in footnote 105, the

22    Wendy Tiegreen deposition.

23          Do you see that?

24          A.          Yes.

25          Q.          Can I presume that when you are

1    citing Wendy Tiegreen's deposition, that

2    Ms. Tiegreen's deposition is the only basis of your

3    conclusion dollars sentence?

4                    ATTORNEY HOLKINS:  Object to form.

5                    THE WITNESS:  I don't believe so.

6        BY ATTORNEY BELINFANTE:

7        Q.      So what else led you to the

8    conclusion that state officials have recognized

9    that Georgia needed more staff capacity to deliver

10   IC3?

11       A.      I actually sat in on Chad Jones's

12   deposition, which I don't believe is cited here.

13   He said the same thing.

14       Q.      Okay.  Anyone else?

15       A.      I don't remember.

16       Q.      Is there a reason why you had not

17   cited Chad Jones's deposition there?

18       A.      No.

19       Q.      You say in that paragraph, the last

20   sentence that "Given the two IC3 providers in prior

21   years, I have serious concerns about whether four

22   IC3 providers would have the capacity to adequately

23   serve the state's students with the highest needs."

24           Do you see that?

25       A.      Yes.



1          Q.      Is that based on any national ratio

2    or guidelines, your conclusion?

3          A.      No.

4          Q.      Let's talk about family and

5    community support, which is discussed on page 10.

6          A.      Sure.

7                  ATTORNEY HOLKINS:  I'm sorry?

8                  ATTORNEY BELINFANTE:  Page 10.

9      BY ATTORNEY BELINFANTE:

10         Q.      Are family and community supports

11   delivered in the school always, or are they

12   sometimes delivered at home?  Do you know where

13   they're delivered in Georgia?

14         A.      They could be delivered in the

15   school or delivered at home.

16         Q.      Okay.

17         A.      Or in a clinic.

18         Q.      Okay.  And then looking ahead to

19   page 37, okay.  The sentence in the first full

20   paragraph that starts, "Further."

21         A.      Yes.

22         Q.      "Further, that same month April

23   2021, Apex providers did not deliver group

24   outpatient services in 95 percent of the schools,

25   see figure 1 below, did not conduct any diagnostic

1    assessments in 75 percent of the schools, did not

2    provide any psychiatric treatment to 56 percent of

3    the schools, see figure 3 below, and did not

4    deliver any community support of participating

5    schools."  I'm sorry, "in 49 percent of

6    participating schools."

7            Do you see that?

8            A.    Yes.

9            Q.    Okay.  Specifically about that, in

10   school year -- or in April 2021 do you know the

11   status of COVID as it was impacting schools in

12   Georgia?

13                    ATTORNEY HOLKINS:  Object to form.

14                    THE WITNESS:  The reason why I

15            selected that month, that was the highest

16            month across the entire year in terms of

17            service provision, and I wanted to be

18            fair to the state and give -- look at the

19            highest month in which they provided

20            services.

21       BY ATTORNEY BELINFANTE:

22            Q.    Okay.  Of the participating schools

23   that was participating in the Apex program; is that

24   correct?

25            A.    That's correct.

1          Q.      So community and family supports

2    were being provided outside of the Apex program,

3    that would not be picked up in your description

4    there on page 37; is that right?

5          A.      That's correct.

6          Q.      Okay.  And did you see any -- in

7    your review -- did you find any evidence of a

8    student who was referred for family and community

9    support but denied it?

10         A.      No.

11         Q.      Let's go back to individual and

12   group therapy on page 11.

13         Would you agree that individuals in group

14   therapy can occur in Georgia outside of the

15   Medicaid context?  Let me rephrase that.

16         Is it your understanding that students can

17   receive individual and group therapy in Georgia but

18   not have Medicaid pay for it?

19         A.      Correct.

20         Q.      Okay.  Let's look at footnote 12

21   there on page 11.

22         A.      Yes.

23         Q.      The first sentence says, "It is

24   important to note that individual therapy, like any

25   appropriate intervention, must be tailored to meet

1    the individual needs of each student with EBD."

2          Do you see that?

3          A.    Yes.

4          Q.    How do you balance tailoring therapy

5    requirements with a goal of maintaining fidelity to

6    national standards?

7                    ATTORNEY HOLKINS:  Object to form.

8                    THE WITNESS:  Repeat that

9        question.

10    BY ATTORNEY BELINFANTE:

11          Q.    Sure.  In terms of individual

12    therapy, as I read your first sentence in footnote

13    12 --

14          A.    Yeah.

15          Q.    -- it's individualized, because any

16    appropriate intervention must be tailored to meet

17    the individual needs of each student.

18          A.    Correct.

19          Q.    Do you see any tension between the

20    needs of individualized services and the need to

21    demonstrate fidelity to standards?

22          A.    I'm still not sure I understand your

23    question.

24          Q.    Okay.  So when you talk about

25    maintaining fidelity, what do you mean?



1    "Maintaining fidelity," what does that phrase mean?

2         A.    In this context, I was looking at in

3    terms of the DBHD provider manual in terms of what

4    they laid out as fidelity in terms of services.

5         Q.    Okay.  So if someone is staying

6    within the provider manual, that would satisfy your

7    concerns about fidelity?

8              ATTORNEY HOLKINS:  Object to form.

9              THE WITNESS:  Well, there are

10             certainly interventions that we would

11             like to see that happens with the

12             intensity that is like the professional

13             expectations.

14    BY ATTORNEY BELINFANTE:

15         Q.    Where would one look to find those

16    professional expectations?

17         A.    One is the DBHD manual that lays out

18    in terms of what the expectations are for certain

19    services.  And then, you know, I think the

20    consensus of the professional services, those

21    students with really serious emotional problems

22    should get individual therapy either weekly or

23    every other week.

24         Q.    What's the basis of that latter

25    opinion, the weekly or every other week?

1          A.     It would be the consensus of the

2    social workers, psychological community.

3          Q.     Okay.  Is that consensus identified

4    in the study cited in your report?

5          A.     I don't remember.

6          Q.     Okay.  The first sentence of that

7    section on page 11 under "Service Intensity and

8    Fidelity," it says, "Research demonstrates the

9    effect that services must be delivered with

10   sufficient intensity and assessed for fidelity to

11   establish the standards."

12         And I think you kind of answered this as it

13   relates to individual therapy, but in terms of

14   services that you're talking about generally, is it

15   your opinion that there are fidelity measurements

16   or fidelity standards for each of the services you

17   identify in your report?

18               ATTORNEY HOLKINS:  Object to form.

19               THE WITNESS:  We're talking about

20          a student with behavior-related

21          disabilities who is at serious risk of

22          restrictive educational placement.

23          That's who we're talking about, correct.

24   BY ATTORNEY BELINFANTE:

25         Q.     Well, I'm just looking at that first

1    sentence.  So you tell me, this research

2    demonstrates that effective services must be

3    delivered with sufficient intensity and assessed

4    for fidelity to established standards.

5            And the next sentence goes on to talk about

6    a student with behavior-related disabilities who is

7    at serious risk of restrictive educational

8    placement.

9            So if that's what you meant by the first

10   sentence, I just need to know.

11           A.     Okay.

12                  ATTORNEY HOLKINS:  Object to form.

13                  THE WITNESS:  So that's really --

14           I mean, if you look at in terms of the

15           citation here, right, that I have, you

16           know, Bierman and Sanders that talks

17           about, you know, the need for fidelity.

18           So there are, you know, accepted

19           standards in terms of what the services

20           should be delivered with.

21   BY ATTORNEY BELINFANTE:

22           Q.     And where would one look to find

23   those accepted standards?

24           A.     In the professional literature.  And

25   I would also say in the DBHDD provider manual.



1          Q.      Okay.  And in terms of the

2     professional literature, if the Court were to say

3     you have to maintain fidelity standards, how would

4     DBHDD or DOE implement that?  Is there not a single

5     document you can point me to like a, you know, DOE,

6     United States Department of Education says X or

7     something of that nature, or is it I just have to

8     read a bunch of journals and come to a conclusion?

9          A.      No.

10                    ATTORNEY HOLKINS:  Object to form.

11                    THE WITNESS:  I would say that,

12              you know, the American Psychological

13              Association would have potential

14              standards.

15        BY ATTORNEY BELINFANTE:

16          Q.      Okay.  You mentioned the Bierman

17     article, and you cite the Bierman article on

18     footnote 15.  I'll get you a copy of that which we

19     will mark as Exhibit 4.

20                         (Exhibit 4 was marked for

21                         identification.)

22          Q.      For the record, is this the Bierman

23     article that you were referring to?

24          A.      Yes, I believe so.

25          Q.      Okay.  Page 14 of that article,

1    which I believe is the first page, about midway

2    through the first paragraph there, it says, "These

3    children find it difficult to initiate and sustain

4    high-quality friendships, interact comfortably in

5    the social context of the classroom and playground,

6    and avoid peer exclusion or victimization," citing

7    a MAG article from 2006.

8              Do you see that?

9         A.    Yes.

10        Q.    Do you agree with that conclusion?

11                  ATTORNEY HOLKINS:  Object to form.

12                  THE WITNESS:  Let's talk about

13            when they say "these children" who we're

14            talking about here.

15      BY ATTORNEY BELINFANTE:

16        Q.    As I read it, it's students with or

17    at risk of emotional or behavioral disorder, but if

18    you have a different conclusion, please let me

19    know.

20        A.    I just want to make sure we're

21    talking about the same thing.

22        Q.    So with those students, do you agree

23    with the characterization that the authors make

24    that I read?

25        A.    Yes.



1          Q.       On page 15, the first sentence says,

2     "However, to date evidence-based social-emotional

3     skill training programs are rarely used

4     systematically to provide Tier 2 services in

5     schools to the 15 to 20 percent of children

6     experiencing significant peer difficulties."

7          Do you see that?

8          A.       No.

9          Q.       First sentence on page 15.

10         A.       Okay, yeah, okay, yeah.

11         Q.       Do you agree with that statement?

12         A.       No.

13         Q.       Yes?

14         A.       No, I don't agree with it.

15         Q.       What is your disagreement with it?

16         A.       That schools do use some

17    evidence-based programs, so I would, you know,

18    disagree with the rarely used systematically.

19         Q.       Do you know roughly what percentage

20    of schools in the United States use evidence-based

21    social-emotional skill training programs?

22         A.       I don't.

23         Q.       It says that about 15 to 20 percent

24    of children experiencing significant peer

25    difficulties would need Tier 2 services.  Do you

1    agree with that number?

2                    ATTORNEY HOLKINS:  Object to form.

3                    THE WITNESS:  Yes.  Actually, let

4         me correct.  I would say it's more in the

5         ballpark between 5 and 10 to 15 percent.

6    BY ATTORNEY BELINFANTE:

7         Q.    Okay.  Page 16 of the article, the

8    second sentence under the heading "Processes

9    Supporting or Impending Self-Regulatory

10   Development," the second sentence says, "Students

11   with or at risk of EBD are more likely than

12   students without disabilities to live in poverty,

13   have a single or unemployed parent, and have

14   another household member who has a disability."

15        Do you see that?

16        A.    Yes.

17        Q.    Do you agree with that statement?

18                    ATTORNEY HOLKINS:  Object to form.

19                    THE WITNESS:  Yes.

20   BY ATTORNEY BELINFANTE:

21        Q.    If you'll look on that same page

22   over in the next column, one, two, three, fourth

23   full paragraph, begins, "Peers also influence

24   developing social-emotional and self-regulation

25   skill development in schools characterized by high

1  levels of student disadvantaged, e.g., high levels

2  of student poverty and low levels of student

3  achievement, rates of classroom destructive

4  behavior are elevated," citing a power study from

5  2015._

6          Do you agree with that?

7          A.      Yes.

8          Q.      Do you agree with the statement by

9  Dr. Bierman and Dr. Sanders right there?

10                  ATTORNEY HOLKINS:  Object to form.

11                  THE WITNESS:  Well, I think you

12            need to read the rest of that paragraph.

13          Do you want me to do that?

14    BY ATTORNEY BELINFANTE:

15          Q.      Sure.

16          A.      "When children are in classrooms

17  with many aggressive classmates, they're likely to

18  show increased aggression over time likely due to

19  increased peer modeling and reinforcement of

20  disruptive-aggressive behaviors and social norms

21  that reduce social censure for these behaviors,"

22  which really speaks to when you have students in

23  alternative settings, restrictive settings.

24  They -- this is what you see.

25          So this really, from my perspective comes



1    to why we want to have these students educated with

2    their typical peers because in restrictive settings

3    this is what I've seen over and over again is

4    basically children who are in classrooms with many

5    aggressive classmates that are likely to show

6    increased aggression over time, likely to increase

7    peer modeling and reinforcement of disruptive, and

8    that's why you see the Y trajectories of kids in

9    more restrictive settings to be not as good as in

10   typical settings.

11          Q.     Doctor, this paragraph in this

12   report -- and by "this report" I mean the Bierman

13   and Saunders article -- is not talking about

14   restrictive settings, is it?

15          A.     When you look at it in terms of that

16   sentence, what they're describing is restrictive

17   settings.

18          Q.     Where?

19          A.     When children are in classrooms with

20   many aggressive classmates, which is what you see

21   in restrictive settings, they are likely to show

22   increased aggression over time.

23                 ATTORNEY COHEN:  Hey, hey, hey.

24          Slow down.

25                 THE WITNESS:  Sorry.



1              This is really what they're

2         describing in terms of restrictive

3         settings.

4    BY ATTORNEY BELINFANTE:

5         Q.     It says here that they are saying

6    schools characterized by high levels of student

7    disadvantaged, e.g., student poverty and low levels

8    of student achievement.  Where do you get

9    restrictive settings out of what they describe in

10   the previous sentence?

11             A.     Because --

12                  ATTORNEY HOLKINS:  Object to form.

13                  THE WITNESS:  That last sentence

14         talks about when children are in

15         classrooms with many aggressive

16         classmates, which is what I see in these

17         restrictive settings.  Likely due to

18         increased peer modeling and reinforcement

19         of disruptive-aggressive behaviors and

20         social norms that reduce social censure

21         for these behaviors.

22   BY ATTORNEY BELINFANTE:

23        Q.     Those behaviors, aggressive

24   classmates, et cetera, are also present in general

25   education classrooms; correct?

1                    ATTORNEY HOLKINS:  Object to form.

2                    THE WITNESS:  But much less so.

3       BY ATTORNEY BELINFANTE:

4            Q.     In terms of the general education

5    classrooms, at least this article is suggesting

6    that they are more prevalent in schools

7    characterized by high levels of student

8    disadvantaged, i.e, high levels of student poverty

9    and low levels of student achievement.

10                   ATTORNEY HOLKINS:  Object to form.

11                   THE WITNESS:  Well, I would also

12              say that if you look at PBS schools with

13              full implementation, at least at

14              Tier 1 versus PBS or non-PBS schools that

15              you really see less rates of classroom

16              disruptive behavior.

17       BY ATTORNEY BELINFANTE:

18            Q.     Okay.  But in your experience, would

19    you say that you see more disruptive behavior in

20    schools that are characterized by high levels of

21    student disadvantage?

22                   ATTORNEY HOLKINS:  Object to form.

23                   THE WITNESS:  I think you have to

24              look at the context in terms of what's

25              happening in those schools.

1      BY ATTORNEY BELINFANTE:

2          Q.      This idea that they are talking

3      about is, I think it's called peer contagion.  Is

4      that a fair statement?

5          A.      Yes.

6          Q.      The students will act like their

7      peers in the classroom.  Is that a fair way to

8      describe it?

9          A.      That's correct.

10         Q.      And that's not unique to segregated

11     settings.  That happens in general education

12     classrooms as well; is that right?

13         A.      Yes.

14         Q.      Okay.

15             ATTORNEY HOLKINS:  We can put this

16         one aside?

17             ATTORNEY BELINFANTE:  Yes.

18     BY ATTORNEY BELINFANTE:

19         Q.      Let's go to page 12 of your report,

20     Exhibit 1.

21         A.      May I take a quick break?  Use the

22     restroom?

23         Q.      Sure.

24             THE VIDEOGRAPHER:  We are going

25         off the record at 13:54.

```
 1                        (Recess taken from 1:54 p.m.

 2              to 2:08 p.m.)

 3                   THE VIDEOGRAPHER:  We are back on

 4          the record at 14:08.

 5      BY ATTORNEY BELINFANTE:

 6           A.    Can we go back to that individual

 7  therapy?

 8           Q.    Sure.

 9           A.    You asked me about a standard.  So

10  if you could turn to page 51 of my report.

11           Q.    51?

12           A.    Yes.

13           Q.    Yes, sir.

14           A.    So this looks at students in GNETS,

15  enrolled in GNETS in SY20 who received individual

16  counseling during 2017, the amount of individual

17  counselings that students receive in 365 days

18  before.  And the students in GNETS, according to

19  the GNETS rule, are the most serious students in

20  Georgia.

21           And if you look at in terms of the

22  percentage of what services those particular

23  students receive, and, you know, one is you can

24  look at, you know, two to less than five, which is

25  probably 75 percent of the kids.  I don't know
```

1   anyone who would basically, you know, worked with

2   the most serious emotionally disabled students for

3   the state would have an intervention for those that

4   would only take two to five sessions.

5          Q.    Do you know of anyone who was

6   recommended for more sessions and denied it, or did

7   you see evidence of anyone, students, who were

8   recommended for more sessions and denied it?

9          A.    No.  Why don't we refer to

10  figure 14, which is varied so that you wanted to

11  look at that year, those students in SY20, this is

12  students in SY22, and again, 365 days, again you

13  can see, you know, about, you know, 75 percent of

14  those students get two to five sessions.

15         So, you know, I don't know of an

16  intervention for the most seriously disabled,

17  behaviorally disabled students in the state that

18  they would respond to in two to five sessions.

19         Q.    But even considering figure 14, that

20  doesn't show you any student who was recommended

21  for more services and denied that; correct?

22         A.    That's correct.

23         Q.    Okay.  And -- go ahead.

24         A.    It doesn't say that those services

25  were made available to them and was denied.



1          Q.      Okay.  Figure 13 and figure 14 both

2     look at Medicaid data; is that right?

3          A.      That's correct.

4          Q.      So that would not include individual

5     therapy or counseling sessions that was provided in

6     a school system or otherwise for which Medicaid is

7     not the payer; isn't that right?

8          A.      That's correct.  But if you look at

9     my report, over 80 percent of the students that are

10    enrolled in GNETS have availability of Medicaid.

11    And there's an opportunity to a state in terms of

12    my recommendations to actually provide those

13    services to those particular, because they have the

14    availability of Medicaid as a funding source.

15         Q.      And to that point, the availability

16    of Medicaid is different from not having access.

17    In other words, they could -- your report

18    recommends that we use Medicaid for those services.

19    Your report tracks Medicaid utilization, but it

20    doesn't look at non-Medicaid spending for those

21    services; correct?

22         A.      Correct.  Again, what we're

23    suggesting is the state take advantage of the

24    Medicaid spending because any state dollars that

25    goes into Medicaid, it's -- they get three times



1   the amount in terms of efficiency.

2        Q.     And -- okay.  As long as there are

3   providers to agree to the Medicaid program and

4   providing services pursuant to it; correct?

5                    ATTORNEY HOLKINS:  Object to form.

6                    THE WITNESS:  Correct.

7      BY ATTORNEY BELINFANTE:

8        Q.     If we could, let's go back to the

9   early -- I'm sorry, page 12, early identification.

10  Page 12 of your report, Exhibit 1.

11       The first paragraph there under Number 2

12  early identification, that's describing situations

13  that are not unique to Georgia; correct?

14                   ATTORNEY HOLKINS:  Object to form.

15                   THE WITNESS:  What specifically

16        are you talking about?

17     BY ATTORNEY BELINFANTE:

18       Q.     Well, the first sentence says,

19  "research disrates that while some schools offer

20  some mental health services, many students who need

21  these services do not receive them."

22       That's not unique to Georgia, is it?

23       A.     That's correct.

24       Q.     And the research that demonstrates

25  it, you're not citing research that is limited to



1    Georgia; correct?

2            A.      Correct.

3            Q.      All right.  The next, the same would

4    be true of the next sentence, that even if a child

5    is identified as needing additional supports,

6    teachers may lack training and resources to provide

7    evidence-based social skills intervention.  That's

8    a national phenomenon and not one that is unique to

9    Georgia; correct?

10           A.      Correct.

11           Q.      All right.  And the same is true of

12   the last sentence, "In addition, schools pay face

13   competing demands such as academic achievement for

14   standardized testing that may take priority over

15   social-emotional development and mental health."

16           That is a national conclusion; correct?

17                   ATTORNEY HOLKINS:  Object to form.

18                   THE WITNESS:  Correct.

19      BY ATTORNEY BELINFANTE:

20           Q.      All right.  And is it your opinion

21   that it's illegitimate that schools -- is that

22   those competing demands that you identify, academic

23   achievement or standardized testing are

24   unimportant?

25                   ATTORNEY HOLKINS:  Object to form.

1                      THE WITNESS:  No.

2        BY ATTORNEY BELINFANTE:

3           Q.     Okay.  And is it your conclusion

4    that schools facing those competing demands, LEAs

5    or schools themselves have to make the decisions

6    and balance how to balance the competing demands?

7                      ATTORNEY HOLKINS:  Object to form.

8                      THE WITNESS:  Can you ask that

9           question again.

10       BY ATTORNEY BELINFANTE:

11          Q.     Is it your opinion that schools or

12   LEAs are the ones that are charged with balancing

13   those competing demands?

14          A.     Yes.

15          Q.     Footnote 17 on page 13.

16          A.     Footnote 17?

17          Q.     Yes.

18          A.     Yes.

19          Q.     Yoshikawa article.

20          A.     Yes.

21          Q.     That -- and I'm just going based on,

22   candidly, the title.  I did not get a chance to

23   read that one.  Is the Yoshikawa article about

24   preschool alone?

25          A.     I would have to look at the article.

1          Q.      Okay.  Do you have an understanding

2    of any role that the Georgia Department of

3    Education plays in preschool education in Georgia?

4          A.      I'm not clear about that.

5          Q.      Okay.  Let's go to the section "The

6    Harms of Segregation" beginning on page 13.

7          A.      Okay.

8          Q.      You say in the second sentence,

9    "Students who were removed from the general

10   education setting for significant periods have less

11   exposure to general education, academic curriculum,

12   and few interactions with students without

13   disabilities."

14          Do you see that?

15          A.      Yes.

16          Q.      What did you mean by "significant

17   periods"?

18          A.      Well, one would be stand-alone

19   programs or more than 50 percent of the time out of

20   general education.

21          Q.      And there you cite the Dishion

22   article.  Thomas Dishion in footnote 21.

23          A.      Dishion --

24                  ATTORNEY HOLKINS:  Footnote 21

25          does not.  I'm just confused.  That's



```
 1                  later in the paragraph and it's

 2                  unattached to the --

 3                            ATTORNEY BELINFANTE:  I've moved

 4                  on.

 5                            ATTORNEY HOLKINS:  I'm sorry.

 6         BY ATTORNEY BELINFANTE:

 7             Q.      Footnote 21, it's Dishion?

 8             A.      Yes.

 9             Q.      Let me show you that article, which

10     we'll mark as Exhibit 5.

11                            (Exhibit 5 was marked for

12                       identification.)

13         BY ATTORNEY BELINFANTE:

14             Q.      That's the article that you

15     referenced?

16             A.      Yes.

17             Q.      This article does not distinguish

18     between general education settings and separate

19     settings; correct?

20                            ATTORNEY HOLKINS:  Object to form.

21                  The article is maybe 40 pages.  Is there

22                  a specific portion of the article you're

23                  referencing?

24                            ATTORNEY BELINFANTE:  All of it.

25                  I'm asking if the article itself
```

1                    separates or addresses segregated

2                    settings as has been described in the

3                    report.

4                         THE WITNESS:  I have to really

5                    look at it.

6          BY ATTORNEY BELINFANTE:

7              Q.      Would you agree with me -- well, the

8     article will speak for itself, correct, in terms

9     of --

10                        ATTORNEY HOLKINS:  Object to form.

11             Q.      You would agree with me that if it

12    does speak to -- well, why -- how long would it

13    take you to look at it?  Do you need to read the

14    whole article?

15             A.      It's a long article.

16             Q.      That's fine.  We'll leave it at

17    that.  It will just speak for itself.

18             Let's look at page 14.  The second sentence

19    there says, "I have repeatedly seen students

20    achieve better social-emotional and behavioral

21    outcomes and academic performance when they are

22    placed in inclusive settings."

23             Do you see that?

24             A.      Yes.

25             Q.      Is that because the inclusive

1    setting was the most appropriate for that student?

2                         ATTORNEY HOLKINS:   Object to form.

3                         THE WITNESS:   Can you repeat that

4           question.

5       BY ATTORNEY BELINFANTE:

6           Q.     Sure.   For those students that

7    you've seen achieve better social-emotional and

8    behavioral outcomes in academic performance in

9    inclusive settings, did someone determine that that

10   inclusive setting was the most appropriate

11   placement for their needs?

12                        ATTORNEY HOLKINS:   Object to form.

13                        THE WITNESS:   In some cases the

14          recommendation for the IEP team was to

15          move to a more restrictive placement.

16          The school administration asked me to get

17          involved and develop -- use what I have

18          written in my report and suggested, and

19          have the student be maintained in an

20          exclusive -- in an inclusion setting.

21                So that's really where it comes.

22          It's basically not, you know, that you

23          know -- that's been my career is helping

24          school districts just like I did in the

25          Brockton study to basically support kids

1              with inclusion settings.

2       BY ATTORNEY BELINFANTE:

3          Q.     Dollars case you concluded that an

4    inclusive setting was the most appropriate for

5    their needs; correct?

6                   ATTORNEY HOLKINS:  Object to form.

7                   THE WITNESS:  No.  The IEP team

8          concluded that.

9       BY ATTORNEY BELINFANTE:

10         Q.     Okay.

11         A.     But they had supports around them to

12   be able to make that decision.

13         Q.     If you look at the last sentence, it

14   says, "Indeed, the consensus among professionals

15   who work with these students, including myself, is

16   that in most cases they can be served in integrated

17   settings in their home schools and attend classes

18   with general education students provided they

19   receive proper support."

20         Do you see that?

21         A.     Yes.

22         Q.     Any quantification to in most cases?

23                   ATTORNEY HOLKINS:  Object to form.

24                   THE WITNESS:  I'm saying in most

25         cases.  That's what I'm saying.

1      BY ATTORNEY BELINFANTE:

2          Q.     So 50 plus one?

3          A.     I would say more than that.

4          Q.     Okay.  Do you have any

5    quantification of that?

6                     ATTORNEY HOLKINS:  Same objection.

7                     THE WITNESS:  Probably at least

8          90 percent.

9      BY ATTORNEY BELINFANTE:

10         Q.     And I notice there's no citation

11   there.  Is that based on a specific report, is that

12   based on anything specific?

13         A.     It's based on the vast literature

14   that's available then.

15         Q.     Okay.  And that literature would be

16   cited in your report?

17                     ATTORNEY HOLKINS:  Object to form.

18                     THE WITNESS:  Some is cited in my

19         report, yes.  On the harms of

20         segregation.

21     BY ATTORNEY BELINFANTE:

22         Q.     Okay.  You're saying a majority of

23   all students with EBD could be served in integrated

24   settings if they were given proper support?

25         A.     Can you repeat that question.

1          Q.     Sure.  In looking at the students

2     that you're referring to that you're opining in

3     most cases can be served in integrated settings,

4     are you talking about students with EBD?

5          A.     Correct.  If we read the whole

6     sentence, provided they receive proper support.

7          Q.     Those proper supports could include

8     time out of the general education classroom,

9     though; correct?  In other words -- and I'm talking

10    in a school day, so not what they do at home.

11         But for a period a day they go to a

12    different classroom.  Would that still be

13    considered attend class with general education

14    students?

15                    ATTORNEY HOLKINS:  Object to form.

16                    THE WITNESS:  Yes.

17    BY ATTORNEY BELINFANTE:

18         Q.     Okay.  Looking at page 14, the

19    section on factors that put students with

20    behavior-related disabilities at higher risk of

21    restrictive placement.  Your first sentence reads,

22    "Students at the highest risk of placement in

23    segregated educational settings typically are those

24    whose behavior include aggression, violence, severe

25    defiance and disruption, property damage or



1    elopement, running away from a classroom or

2    building."

3           Do you see that?

4           A.    Yes.

5           Q.    Would you agree that students who

6    display those behaviors can reasonably be punished

7    by a school system?

8                     ATTORNEY HOLKINS:  Object to form.

9                     THE WITNESS:  What do you mean,

10          "punished"?

11    BY ATTORNEY BELINFANTE:

12           Q.    I think -- what is the term we're

13    talking, ODR.  That they could have an ODR

14    incident, and that would be reasonable under the

15    circumstances.

16                     ATTORNEY HOLKINS:  Object to form.

17                     THE WITNESS:  Could you rephrase

18          that question, because you asked a couple

19          sentence --

20    BY ATTORNEY BELINFANTE:

21           Q.    Students' behaviors include

22    aggression, violence, severe defiance, disruption,

23    property damage or elopement, would it be

24    reasonable for those students to have an ODR

25    incident?

1           ATTORNEY HOLKINS:  Object to form.

2       Q.     Am I using that phrase correctly,

3   ODR?

4       A.     Office disciplinary referral.  That

5   depends on the severity of the program.

6       Q.     So there are circumstances where ODR

7   would be appropriate for students displaying those

8   behaviors?

9       A.     Yes.

10      Q.     And that has to be an individualized

11  determination; correct?

12      A.     Yes.  Oftentimes it's the teacher

13  that makes that determination.

14      Q.     All right.  You say in the last

15  paragraph on that page, "In elementary and

16  secondary school when teachers do not have

17  sufficient support or training, they often use

18  exclusionary discipline such as office disciplinary

19  referrals, ODRs, and in and out of school

20  suspension, ISS and OSS to remove such students

21  from the classroom."

22          Do you see that?

23      A.     Yes.

24      Q.     What would constitute sufficient

25  support or training, and where would one look to



1    determine that standard?

2                    ATTORNEY HOLKINS:  Object to form.

3                    THE WITNESS:  Well, what's used,

4             PBS, positive behavior intervention

5             supports.  If, in fact, PBS at Tier 1 was

6             implemented to fidelity as measured by

7             one of the fidelity tools that is on the

8             PBS.org site and, in fact, there's

9             reference in Georgia, that if that was in

10            place, that oftentimes provides guidance

11            and what we would call sufficient support

12            to reduce the amount of exclusionary

13            discipline dollars school classroom.

14       BY ATTORNEY BELINFANTE:

15            Q.    Anything other than PBIS that would

16       provide the sufficient support or training?

17            A.    Usually within, you know, they could

18       receive classroom management training that embodies

19       PBS principles.

20            Q.    Anything else?

21            A.    That's primarily.

22            Q.    Okay.  May Institute provides that

23       kind of training; correct?

24                    ATTORNEY HOLKINS:  Object to form.

25            Q.    PBS training?

1          A.      Yes.

2          Q.      Do you know what the risks are of

3    what it would charge a school district for that?

4                  ATTORNEY HOLKINS:  Object to form.

5                  THE WITNESS:  It depends on the

6          school.

7     BY ATTORNEY BELINFANTE:

8          Q.      Is it based on population?  I mean,

9    is there a formula to it?  I'm not trying to get

10   into any protective information.

11         A.      No, no.  But, I mean, I think the

12   National Technical Assistance Center has come up

13   with -- it could be five to $10,000 per school.

14         Q.      Okay.  And is that for one-time

15   training?

16         A.      Well, really the goal is to build

17   capacity at the state level.  Because we have

18   studies that show when you build capacity at the

19   state level in terms of building it out in terms of

20   training and coaches, that you have better

21   stability and it becomes less expensive the more

22   you do it.

23         So one of the critical things is the state

24   endorsing this and the state doing appropriate

25   training and then building out coaching cadres in

1    terms of that as well as building internal capacity

2    for the school, so that's basically it.  That's

3    training school staff in terms of doing that.

4            Q.    Okay.  Footnote 23 on page 15 cites

5    Daniel, is it Loosen?

6            A.    Losen.

7            Q.    Losen article?

8                    ATTORNEY COHEN:  Is it Exhibit 6?

9                    ATTORNEY BELINFANTE:  It is.

10            You've figured out my method.  It's so

11            mysterious, I know.

12                        (Exhibit 6 was marked for

13                        identification.)

14      BY ATTORNEY BELINFANTE:

15            Q.    This is the article that it cites;

16    is that right?

17            A.    Yes, I believe so.

18            Q.    Okay.  If you turn to page 1 of the

19    article, which is, I guess, the fifth page of the

20    exhibit.

21            A.    (Witness complies with request.)

22            Q.    This is the page titled Discipline

23    Policies?

24            A.    That's it, yes.

25            Q.    It says in your report, quotes



1    dollars second full paragraph, second sentence,

2    "Disruptions tend to increase or decrease with the

3    skill of the teacher in providing engaging

4    instruction and in managing the classroom, areas

5    many teachers say they would like help improving."

6          Do you see that?

7          A.    Correct.

8          Q.    Okay.  How does -- if the state

9    Department of Education were to say you know what,

10   Dr. Putnam is right, Dr. Losen is right, or

11   Mr. Losen, I'm not sure which is what.

12         A.    Dr. Losen.

13         Q.    How is the state supposed to decide

14   how teachers engage in instruction.  In other

15   words, I'm trying to take what is in this and put

16   it into something practical.

17                ATTORNEY HOLKINS:  Object to form.

18                THE WITNESS:  What's the question

19        again?

20     BY ATTORNEY BELINFANTE:

21         Q.    How does a state -- if a state wants

22   to agree and accept this statement, the disruptions

23   tend to increase or decrease with the skill of the

24   teacher in providing engaging instructions, how is

25   the state supposed to implement something to ensure



1    that teachers in the classrooms across the state

2    are providing engaging instruction in the

3    classroom?

4                    ATTORNEY HOLKINS:  Same objection.

5                    THE WITNESS:  Well, one, I think

6            if they implemented PBS in their schools

7            with fidelity -- and, again, I think

8            we're talking about those students at

9            risk of GNETS.  So a state has the

10           ability to track office discipline

11           referrals.  They have the ability to look

12           at in terms of where they are coming

13           from, and they certainly could

14           potentially target and provide incentives

15           and influence schools in terms of

16           enrolling in terms of PBS.

17       BY ATTORNEY BELINFANTE:

18           Q.    Okay.  PBS -- PBS level -- excuse

19    me -- PBS Tier 1, or it would have to be PBS

20    Tier 1, 2 and 3?

21           A.    Tier 1 is primarily looking at

22    classrooms.

23           Q.    Okay.  So Tier 1 would be sufficient

24    for engaging instruction?

25           A.    Well, the goal at Tier 1 is really

1    to look at really changing staff behavior, and

2    that's really all we're talking about changing

3    staff behavior in terms of that.

4         So that's the goal is that we oftentimes

5    see reductions in office discipline referrals when

6    Tier 1 is implemented, and it's not oftentimes.

7    Basically we've had a lot of research that

8    demonstrates schools that implement with

9    Tier 1 fidelity see less office discipline

10   referrals than exclusionary disciplines.

11        Q.    In your experience, are there states

12   you work with that you would say are a model for

13   Tier 1 PBIS implementation?

14        A.    There are a number of states.  I'm

15   not sure that I can pick out one.

16        Q.    Can you give me a few examples of

17   them.

18                  ATTORNEY HOLKINS:  Object to form.

19                  THE WITNESS:  I think state of

20        Vermont does a pretty good job.

21    BY ATTORNEY BELINFANTE:

22        Q.    Do you know roughly how many schools

23   are in the state of Vermont?

24        A.    No.

25                  ATTORNEY HOLKINS:  Object to form.

1          Q.      Page 14 and 15 of your report --

2          A.      Are we done with this?

3          Q.      Yes, sir.

4          A.      Okay.

5          Q.      Generally this section talks about

6    tracking principals to see, looking at suspensions

7    and ODRs, et cetera --

8                      ATTORNEY COHEN:   Tracking

9              principals, p-a-l-s?

10                     ATTORNEY BELINFANTE:   Yes.

11                     THE WITNESS:   Where are you

12             talking about?

13       BY ATTORNEY BELINFANTE:

14         Q.      That's what I was looking for.   It's

15   actually 15 to 16.   Last sentence on the page

16   begins "Research demonstrates that tracking

17   principals from one school to another, principals

18   will build out high numbers of suspensions and

19   expulsions in one school would do the same with the

20   next."

21             Do you see that?

22         A.      Yes.

23         Q.      Okay.   What it is your understanding

24   of -- do you have an understanding or an opinion as

25   to whether anyone in Georgia -- and by "anyone" I

1    mean, organizations, LEAs, state DOE -- has an

2    obligation under current -- under the current

3    situation to provide the tracking that you're

4    addressing in this report?

5                    ATTORNEY HOLKINS:  Object to form.

6              What do you mean by "under the current

7              situation"?

8         Q.    In Georgia today do you have an

9    opinion as to whether an LEA or the state is

10   required to track principals as you described?

11        A.    From what I understand, the State of

12   Georgia has schools' complete disciplinary

13   information for every school that goes to the State

14   of Georgia.

15        Q.    Is that sufficient information in

16   terms of what you're describing about tracking

17   principals from one school to another?

18                   ATTORNEY HOLKINS:  Object to form.

19                   THE WITNESS:  Not sure I

20             understand the question.

21   BY ATTORNEY BELINFANTE:

22        Q.    Okay.  Basically you've described

23   what you think Georgia is doing now in terms of

24   collecting data.

25        A.    Yes.



1          Q.    My question is, is that sufficient

2   to meet what you're describing on paragraphs 15 and

3   16 of your report?

4                    ATTORNEY HOLKINS:  Object to form.

5                    THE WITNESS:  What I mean is

6               Georgia collects information on

7               suspensions and expulsions by school, and

8               my assumption would be by principal.  And

9               they could use that information to look

10              at where they want to target their

11              professional development to improve

12              school climate.

13      BY ATTORNEY BELINFANTE:

14          Q.    So what that data collection is

15   really going to or the purpose of the data

16   collection would be to train school administrators

17   like principals.  Is that correct?

18          A.    Yes.

19                    ATTORNEY HOLKINS:  Object to form.

20                    THE WITNESS:  They have what's

21              considered dangerous schools in Georgia,

22              which has a certain criteria that would

23              be -- which I believe would be

24              suspensions and expulsions.  Georgia

25              tracks that at this particular point in

1              time.  And I think Georgia suggests some

2              interventions around those seriously

3              persistent, dangerous schools.

4      BY ATTORNEY BELINFANTE:

5          Q.    What is your understanding of the

6   authority of the state Department of Education to

7   hire and fire principals?

8                    ATTORNEY HOLKINS:  Object to form.

9                    THE WITNESS:  I don't know.

10     BY ATTORNEY BELINFANTE:

11         Q.    Okay.  Looking at MTSS and PBIS, we

12  talked about this a little bit earlier on pages 16

13  and 17 of your report, where would one look for an

14  accepted standard definition of MTSS?

15                   ATTORNEY HOLKINS:  Objection.

16              Asked and answered.

17                   THE WITNESS:  I would certainly

18              look to the federal Department of

19              Education.

20     BY ATTORNEY BELINFANTE:

21         Q.    Okay.  To your knowledge, to your

22  knowledge, is the state Department of Education

23  doing anything to prevent LEAs from adopting MTSS?

24         A.    No.

25         Q.    Is the same true of the Department

1   of Community Health and Department of Behavioral

2   Health and Developmental Disabilities?

3                         ATTORNEY HOLKINS:   Object to form.

4                         THE WITNESS:   What are you asking?

5      BY ATTORNEY BELINFANTE:

6         Q.      I can ask it differently.

7         To your knowledge, is the Department of

8   Community Health or the Department of Behavioral

9   Health and Disabilities doing anything to prevent

10  LEAs from adopting MTSS?

11                        ATTORNEY HOLKINS:   Object to form.

12                        THE WITNESS:   No.

13     BY ATTORNEY BELINFANTE:

14        Q.      Do you know roughly how many schools

15  in the United States have adopted PBIS or what

16  percentage?

17        A.      Through the National Technical

18  Assistance Center, there's probably about a little

19  less than 30,000 schools, but that doesn't count

20  many other schools that are doing PBS.  It just

21  basically counts the schools that the National

22  Technical Assistance Center providers have some

23  involvement.

24        Q.      And would the other schools be

25  private, or they are just not involved with the



1    national center?

2            A.      Could you repeat that.

3            Q.      Of the schools that are not involved

4    in the national center --

5            A.      Yeah.

6            Q.      -- are they -- I mean, is it all

7    private schools, or could it be public schools not

8    involved in the national center?

9            A.      Yeah, it could be any school.

10            Q.      Okay.  Got it.  Let me show you what

11    we'll mark as Exhibit 7.

12                            (Exhibit 7 was marked for

13                        identification.)

14            A.      Thank you.

15            Q.      Have you seen this document before,

16    Doctor?

17            A.      I believe so.

18            Q.      Okay.  Is this --

19            A.      It was a while ago.

20            Q.      Down at the bottom here, PBIS, is

21    this the technical center you're talking about?

22            A.      That's correct.

23            Q.      If I turn to the second page of this

24    document, it says that PBIS is a multi-tier

25    behavior system currently implemented in over



1    26,000 schools.

2             Do you see that?

3        A.      Yes.

4        Q.      Okay.  And that's consistent with

5    what you said about being just around shy of

6    30,000?

7        A.      That's correct.

8        Q.      Okay.

9                ATTORNEY HOLKINS:  It may help if

10            we just introduce what this document is

11            for the record.

12                ATTORNEY BELINFANTE:  Document

13            appears to be a fact sheet interconnected

14            systems framework 101 and introduction

15            from the mental health technology

16            transfer center network.

17                ATTORNEY COHEN:  Is there a date

18            for this -- for this document?

19                ATTORNEY BELINFANTE:  I can't

20            recall if it was one we pulled from the

21            report or if we just pulled on our own.

22            I think the document, at least, speaks

23            for itself.  If I can find another date

24            or something, we'll get it to you.

25                ATTORNEY HOLKINS:  Thank you.

1          BY ATTORNEY BELINFANTE:

2          Q.      All right.  I'm going to now show

3    you what we'll mark as Exhibit 8 -- you can hold on

4    to it.  I'm going to go back to it.  Exhibit 8 is

5    pretty quick.

6                              (Exhibit 8 was marked for

7                         identification.)

8          Q.      An article from Education Week.

9    That is not in your report?

10         A.      Okay.

11         Q.      And the only thing I have a question

12   here is are you familiar with Education Week?

13         A.      Yes.

14         Q.      Okay.  Do you find it to be

15   generally reliable --

16                      ATTORNEY HOLKINS:  Object to form.

17         Q.      -- information?

18         A.      Sometimes.

19         Q.      Fair enough.  I would say that about

20   just about everything.

21         Let me ask you to turn to the second page

22   of the article where it just says there's 128,961

23   public and private K-12 schools in the U.S.

24         Do you see that?

25         A.      Yes.

1          Q.      Okay.  Do you generally -- does that

2     seem like a reasonable number to you?

3          A.      I've known it as less than that, but

4     probably doesn't include any private K to 12

5     schools.

6          Q.      If you turn and look at page 3, they

7     break it down a little more between traditional

8     public, public charters schools, and total public

9     schools at 98,469.

10         Do you see that.  They break it down above?

11         A.      And that's probably what I would

12    tend to say.

13         Q.      A reasonable number?

14         A.      Yes.

15         Q.      All right.  Going back to the

16    question of how widespread is PBIS implemented

17    being 26,000 schools, roughly, somewhere between 26

18    and 30,000 we'll say, does that include -- is that

19    public and private schools, do you know, that

20    number?

21         A.      We don't really track private

22    schools.

23         Q.      Okay.  So --

24         A.      We're using the public schools'

25    database because that's, you know, private schools



1    don't have to register with the Department of

2    Education.  They are outside, so we tend to use the

3    federal Department of Education database.

4           Q.     Okay.  And so when you say "we," do

5    you mean the National Technical Assistance?

6           A.     Yeah.  I mean, it's just that

7    database not available for us.

8                     ATTORNEY BELINFANTE:  Patrick,

9              Exhibit 7 is the reference on footnote

10             33.

11                    ATTORNEY HOLKINS:  On page 18 of

12             his report?

13                    ATTORNEY BELINFANTE:  Yes.

14                    THE WITNESS:  I'm sorry, I'm lost.

15                    ATTORNEY HOLKINS:  On page --

16             that's the article cited on footnote 33.

17                    THE WITNESS:  Yes.

18      BY ATTORNEY BELINFANTE:

19           Q.     All right.  I think we can put away

20    Exhibit 7 for a minute.

21                    ATTORNEY COHEN:  Did you

22             mark Education Week?

23                    ATTORNEY BELINFANTE:  I did, I

24             believe.

25

1          BY ATTORNEY BELINFANTE:

2          Q.     Doctor, looking at questions of

3    PBIS, let's take Tier 1, for example, and this is a

4    hypothetical.  Could two school districts adopt

5    PBIS Tier 1 and have different strategies but still

6    maintain fidelity to PBIS Tier 1?

7          A.     Can you explain to me -- could you

8    repeat that question, I'm not sure I understand the

9    question.

10         Q.     If there's two school districts and

11   both agree that they wanted to adopt and implement,

12   let's say, PBIS Tier 1 --

13         A.     Yes.

14         Q.     -- could they do it in a way -- does

15   it have to be done the exact same way in order to

16   maintain fidelity, or does fidelity allow for some

17   discretion in the local school district?

18         A.     Well, the advantage of PBS is it's

19   organically developed by the school to fit the

20   context and the culture of the school.  However,

21   there's the tier fidelity inventory measure that

22   measures the components of Tier 1 that we would

23   expect to see reach fidelity in order to get

24   student outcomes.

25         Q.     Okay.  So it's fair to say that



1    generally there's fidelity standards but within

2    those standards there's some discretion.  Is that a

3    fair way to describe it?

4                        ATTORNEY HOLKINS:  Object to form.

5                        THE WITNESS:  The goal is really

6              to look at kind of one of the problems in

7              the school.  Some schools have more

8              problems with aggression or with

9              disruption and really design it based on

10             culture and context of the school.

11    BY ATTORNEY BELINFANTE:

12         Q.    Okay.  In looking at PBIS, if you

13    could turn to page 17, my question is going to be

14    about footnote 29.

15         A.    Yes.

16         Q.    And questions of ratio of praise

17    statements to error correction statements.

18         A.    Yes.

19         Q.    How would an LEA track the ratio of

20    praise statements to error correction statements?

21                        ATTORNEY HOLKINS:  Object to form.

22                        THE WITNESS:  An LEA, one could

23             just have their teachers count those

24             statements in their classrooms in terms

25             of praise correction.  An LEA could train

1                people to go in and do brief observations

2                to be able to track that as well.  So

3                that's been my experience in working with

4                LEAs.

5        BY ATTORNEY BELINFANTE:

6        Q.      Have you seen that at the

7    elementary, middle, and high school levels?

8        A.      Yes.

9        Q.      Okay.  Is there an appropriate

10   ratio, is there a national standard on what the

11   right ratio is of praise statements to error

12   correction statements?

13                ATTORNEY HOLKINS:  Object to form.

14                THE WITNESS:  Usually in general

15           we would say five to one, and, in fact,

16           there are Georgia documents that actually

17           say that.

18        BY ATTORNEY BELINFANTE:

19        Q.      Okay.

20        A.      And there are actually -- when I

21   interviewed school principals they actually said

22   that as well.

23        Q.      Which school principals did you

24   interview?

25        A.      I don't remember.  Part of my 25

1    general ed schools that I visited.

2         Q.    Okay.  And do you know if all 25

3    said that or some said that?

4         A.    Some.

5         Q.    Okay.  Can you give me a definition

6    of what services would fall under a PBIS

7    Tier 2 service?

8              ATTORNEY HOLKINS:  Object to form.

9              THE WITNESS:  So typically we

10             would look at a program called Check

11             In/Check Out.  Or we would look at small

12             group interventions.

13    BY ATTORNEY BELINFANTE:

14         Q.    Okay.  If you can go back to the

15    Bierman article, I have written Exhibit 6, but I

16    don't think that's correct.

17             ATTORNEY POLANSKY:  Four.

18             ATTORNEY BELINFANTE:  Thank you.

19    BY ATTORNEY BELINFANTE:

20         Q.    Bierman on page 17, 18, and 19

21    describes Tier 2 skills or this is a question -- is

22    what she's describing the collaborative life skills

23    program coping power and cognitive behavior

24    intervention for trauma schools.  Is that also

25    Tier 2?



1          A.      I'd have to look at this in a little

2    more detail.  Can I have some time to read this?

3          Q.      Sure.

4                          (Pause)

5          Q.      Okay.  So my question is, are those

6    services that they describe in the article,

7    collaborative life skills program, coping power,

8    cognitive behavior intervention for trauma in the

9    schools, your understanding of those Tier 2

10   intervention services?

11                  ATTORNEY HOLKINS:  Object to form.

12                  THE WITNESS:  Those are examples

13      of them.

14     BY ATTORNEY BELINFANTE:

15          Q.      That would be in addition to what

16   you describe in your report on page 17; is that

17   right?

18          A.      I'm not sure where you are now.

19          Q.      Tier 2 interventions include -- this

20   is the third line from the bottom, it says Tier 2

21   interventions include the implementation of

22   standard protocols such as Check In/Check Out,

23   group therapy or small group social skills

24   interventions.

25          A.      Correct.



1          Q.      I just didn't know if these things

2    that Bierman talks about would fall under those

3    categories or if they are yet additional Tier 2

4    interventions.

5          A.      Those would fall into Tier 2.

6          Q.      Okay.

7          A.      Are we done with this?

8          Q.      For now, yes, sir.  Page 18.

9          A.      Yes.

10          Q.      You describe in the first full

11    paragraph the importance of data collection

12    particularly around ODRs.

13          A.      Where are you to you?

14          Q.      Page 18, first full paragraph.

15          A.      Okay, yes.

16          Q.      Did you look at -- and we talked

17    about this a little bit ago.  Did you look at the

18    data that the state DOE collects in terms of

19    disciplinary referrals, suspensions, attendance,

20    grades, and other factors?

21          A.      I was I never given that data.

22          Q.      Did you ask for it?

23          A.      I asked for whatever they would have

24    relative to PBS.  Although I asked the department

25    to get whatever data they could get relative to

1    PBS, and we got what we got.

2            Q.      Okay.  When you say "department,"

3    did you mean the Department of Justice or the

4    Department of Education?

5            A.      I asked the Department of Justice in

6    discovery to get whatever they could relative to

7    PBS and whatever DOE was doing relative to

8    discipline or whatever.

9            Q.      Okay.  In terms of implementing

10   PBIS, can you turn back to Exhibit 7, which is the

11   Barrett/Eber technical assistance center document.

12           A.      Yes.

13           Q.      On page 2 in the column on the

14   right, the second paragraph begins, "While PBIS has

15   improved behavioral and academic outcomes for

16   students over two decades, schools often struggle

17   to provide adequate support for students displaying

18   higher level needs."

19           Do you see that?

20           A.      Yes.

21           Q.      Do you agree with that?

22           A.      Well, it's -- first you're looking

23   to implement Tier 1, PBS and then, you know, the

24   next step at times can be, you know, it moves to a

25   little bit more intensive level.

1          Q.     And the problems of providing that

2     adequate support at least as this article talks

3     about, that's occurring nationwide and not just in

4     Georgia; correct?

5                         ATTORNEY HOLKINS:  Object to form.

6                         THE WITNESS:  Correct.

7        BY ATTORNEY BELINFANTE:

8          Q.     Is that possible because it is

9     difficult to implement PBIS Tier 2 and 3?

10                        ATTORNEY HOLKINS:  Object to form.

11                        THE WITNESS:  No.

12       BY ATTORNEY BELINFANTE:

13         Q.     No?

14         A.     No.

15         Q.     Why are schools struggling to

16    provide adequate support for students displaying

17    higher needs?

18                        ATTORNEY HOLKINS:  Object to form.

19                        THE WITNESS:  Can you repeat that

20          question.

21       BY ATTORNEY BELINFANTE:

22         Q.     Sure.  If it's not because it's

23    difficult to implement, why are PBIS levels 2 and

24    3 -- why are schools often struggling to provide

25    adequate support for students displaying higher

1  level needs?

2          A.      Let me correct it.  It can be more

3  difficult to do that, yes.

4          Q.      Okay.  And why is it more difficult?

5          A.      One is really training staff in

6  terms of Tier 2 interventions.  Training them

7  around to do data collection in terms of that.  And

8  to use the data to make databases.

9          Q.      That's true in school districts

10  outside of Georgia; correct?

11          A.      Yes.  And a lot of times, to make it

12  clear, that a lot of times schools will implement

13  Tier 2 interventions, but they don't implement it

14  within a Tier 2 system, which is what we find is

15  basically those schools that implement that, it's

16  more effective and more efficient than just them

17  doing it isolated.

18          Q.      Okay.  You can -- we'll move on from

19  that document.

20          A.      All right.

21          Q.      Going to page 18 of your report,

22  Exhibit 1, you talk about interconnected systems

23  framework.

24          A.      Uh-huh.

25          Q.      And the second sentence dollars

1    paragraph under Interconnected Systems Framework

2    reads, "ISF refers to a strategic plan that

3    synergizes the efforts of different subsystems such

4    as mental health and behavior support to provide

5    holistic care for students."

6            Do you see that?

7            A.    Yes.

8            Q.    What did you mean by "holistic care

9    for students"?

10            A.    Because we're always trying to look

11    at a student from the holistic perspective that

12    we're both looking at their academic and the social

13    behavioral concerns.  So when we talk about a

14    holistic care, we're really looking at the whole

15    person.

16            Q.    Okay.  The next sentence reads,

17    "Instead of subsystems existing in silos through

18    the ICF, they are thought of as part a larger

19    single system that delivers a continuum support

20    based on need."

21            Do you see that?

22            A.    I think it's ISF, not ICF.

23            Q.    Okay.  I'm sorry.  But otherwise you

24    see the sentence there?

25            A.    Yes.



1       Q.      Does the continuum -- is there a

2  role for program like GNETS on that continuum of

3  support, in your opinion?

4       A.      I want to read the line again.

5              ATTORNEY COHEN:  Objection.

6              THE WITNESS:  Usually in terms of

7          ISF, we're talking about the services

8          through GA DOE and services through the

9          mental health community organizations, so

10          that's really what we're talking about.

11  BY ATTORNEY BELINFANTE:

12       Q.      But within that continuum of support

13  that's delivered, as you said through DOE and the

14  community providers, is there a role for GNETS and

15  GNETS-type services?

16              ATTORNEY HOLKINS:  Object to form.

17       Q.      In your opinion?

18       A.      Well, I don't know about GNETS.

19  But, you know, there is a continuum of care, and if

20  students get the right supports in the right

21  intensity, then the continuum of care really moves

22  towards much more inclusionary setting.

23       Q.      In your opinion, is there a role or

24  a place on the continuum of care for what you've

25  referred to as segregated settings?

1          A.      Yes.

2          Q.      Is there a role beyond segregated

3    settings for residential settings which as you

4    understand it is where a child learns on their own

5    and are much more isolated -- forget that.

6          It's not in your report.  It's not in your

7    report, so I don't want to just get into it.

8          Page 19.  The second full paragraph.  And

9    you'll probably want to read the full paragraph for

10   context, but my question will be about the last

11   sentence.  "This underscores the critical

12   importance of integrating community mental health

13   clinicians into MTSS teams so that they can

14   participate in data sharing and intervention

15   planning."

16         My questions will be about that sentence,

17   but if you want to read the paragraph, certainly

18   feel free.

19         A.      Okay.

20         Q.      Who would make up an MTSS team?

21              ATTORNEY HOLKINS:  Object to form.

22              THE WITNESS:  So I think there are

23         different levels that -- yeah.  One is at

24         the school level, one might be at the

25         community level in terms of that.  So

1              when we look at ISF, we're already

2              looking at, you know, ISF in some ways,

3              we're looking at DBHD, the DOE, but at

4              the school level it would be like their

5              PBS team that we would be integrating

6              community mental health into their PBS

7              team.

8         BY ATTORNEY BELINFANTE:

9              Q.    Is there a role for the Georgia

10    Department of Education on an MTSS team?

11             A.    Well --

12                  ATTORNEY HOLKINS:  Object to form.

13                  THE WITNESS:  Again, I think the

14             question comes down when we're looking at

15             ISF, we're really looking at the

16             integration between GA DOE and DBHD.

17        BY ATTORNEY BELINFANTE:

18             Q.    But I'm just to -- because you used

19    the phrase "MTSS team," and I know who makes up an

20    IEP team.  I'm just trying to figure out who are

21    the persons on an MTSS team.

22             A.    School-wide PBS team primarily or a

23    school-wide or a district PBS team.

24             Q.    Okay.  Understood.

25             How would the state Department of Education

1    compel integrating community mental health

2    clinicians into an MTSS team?  Do you have an

3    opinion as to whether the state -- let me start

4    over.

5            Do you have an opinion as to whether the

6    state Department of Education can compel

7    integrating community mental health clinicians into

8    an MTSS team?

9                    ATTORNEY HOLKINS:  Object to form.

10                   THE WITNESS:  Can you ask that --

11           that's a long question.

12       BY ATTORNEY BELINFANTE:

13           Q.    Do you have an opinion as to whether

14   or not the state Department of Education can compel

15   community mental health clinicians into an MTSS

16   team?

17                   ATTORNEY HOLKINS:  Same objection.

18                   THE WITNESS:  No.

19                   ATTORNEY COHEN:  Would you like to

20           take a break, Bob?

21                   THE WITNESS:  We can take a break.

22                   THE VIDEOGRAPHER:  We are off the

23           record at 15:07.

24                   (Recess taken from 3:07 p.m.

25           to 3:19 p.m.)

1                    THE VIDEOGRAPHER:  We are back on

2          the record at 15:19.

3      BY ATTORNEY BELINFANTE:

4          Q.     Are you ready, Dr. Putnam?

5          A.     Ready to go.

6          Q.     Question, Dr. Putnam, about fidelity

7   in PBIS again.  Is fidelity, as you understand it,

8   based on process, or is fidelity based on outcome?

9          A.     It's based on process.

10         Q.     Okay.  Do you have understanding --

11  and I'm going back to page 19, that last

12  sentence -- do you have an opinion as to whether

13  the Department of Behavioral Health and

14  Developmental Disabilities can require the

15  integration of community mental health clinicians

16  into MTSS teams?

17                    ATTORNEY HOLKINS:  Object to form.

18          Asked and answered.

19                    THE WITNESS:  Well, the DBHD has

20          Apex, which is the school mental health

21          program.  They develop the contract with

22          the CSBs.  They can certainly encourage

23          that their mental health clinicians serve

24          as part of their MTSS school MTSS teams,

25          and that's really what we mean by ISF.

1                   And in some cases it's a school that

2                   basically had a community health provider

3                   on one of their teams.

4         BY ATTORNEY BELINFANTE:

5              Q.    And you would agree with me that

6    encouraging providers is different from compelling

7    them; correct?

8              A.    Well, within that DBHD Apex

9    contract, they certainly, you know, lay out what

10   the expectations are.  So clearly in terms of

11   filling out the Apex data, they could put that as a

12   question, if you serve on the team and make it a

13   much clearer expectation that schools are involved

14   with, that the community mental health clinician

15   actually serves on the team.

16             Q.    If the mental health clinician,

17   though, is not -- let me rephrase.

18             The Apex program is voluntary for community

19   health providers; correct?  They're not required to

20   do it as part of a license or anything else.  Isn't

21   that right?

22                   ATTORNEY HOLKINS:  Object to form.

23                   THE WITNESS:  That's correct.

24        BY ATTORNEY BELINFANTE:

25             Q.    Okay.  So if a provider, a community

1  health or community mental health clinician who is

2  not on an Apex team, to your knowledge, is there

3  anything that the Department of Health and

4  Behavioral Health disabilities can do to require

5  that provider to participate on an MTSS team?

6          A.     I'm not sure they can require, but

7  they could influence that.

8          Q.     Same question for the Department of

9  Community Health.  Do you have an opinion as to

10  whether the Department of Community Health can

11  require clinicians who are not contracting with

12  Apex to serve on an MTSS team?

13          A.     I don't know if they can require.

14          Q.     Page 19 again, the next paragraph

15  which is the last one that starts on the page, the

16  second sentence reads, "Coordination among schools,

17  mental health providers, community providers, and

18  other affiliated entities as part of an ICF is,

19  therefore, crucial for identifying students in need

20  of services and developing a full understanding of

21  the students' needs because their behaviors and

22  needs may present differently across settings."

23          Do you see that?

24          A.     Yes.  You mean ISF, not ICF; right?

25          Q.     Did I say ICF again?



1          A.     Yes.

2                  ATTORNEY HOLKINS:  Different case.

3          Q.     If I start talking about elections,

4     you know I really lost it.

5          Dollars sentence I can pretty much, I

6     think, understand who all the folks are, but who

7     are you thinking when you said "affiliated

8     entities"?

9                  ATTORNEY COHEN:  I'm lost.  What

10          page are you on?

11                 ATTORNEY BELINFANTE:  Sorry.

12          Page 19, last paragraph, second sentence.

13                 ATTORNEY COHEN:  Thank you.

14     BY ATTORNEY BELINFANTE:

15          Q.     I'm just trying to figure out who --

16     an example of the affiliated entities that would be

17     involved in the coordination.

18          A.     I think probably that's -- yeah, as

19     I think now, they may not be community providers.

20     They could be social organizations.  And -- or they

21     could be parent organizations that are affiliated.

22     I mean, we're looking at the broad coordination in

23     terms of that.

24          Q.     All right.  Let's go to Part 5,

25     Georgia System of Care for Students with



1    Behavior-Related disabilities.  Roles and

2    Responsibilities for State Agencies, page -- starts

3    on page 21.

4            A.    Okay.

5            Q.    We've already talked about Georgia

6    funds and administers a range of services and

7    programs for students with behavior-related

8    disabilities.  We talked about that in regards to

9    GNETS in terms of what are the services and

10   programs for students with behavior-related

11   disabilities.  Is that those that are described in

12   the report?

13                 ATTORNEY HOLKINS:  Object to form.

14           Q.    Those the ones you're talking about?

15           A.    I don't know which -- where you're

16   at.

17           Q.    I'm sorry.  Page 21.

18           A.    Yes.

19           Q.    First sentence.  "Georgia funds and

20   administers a range of services and programs for

21   students with behavior-related disabilities."

22           A.    Yes.

23           Q.    Okay.  Are you talking about when

24   you say the range of services and supports, is that

25   in reference to those described in your report,

1    Exhibit 1 report?

2         A.    I believe so.

3         Q.    Okay.  Let's talk about those

4    services that are administered by DCH, Department

5    of Community Health.  Can you identify those?

6         A.    Those would be the Medicaid

7    services.

8         Q.    Okay.  Other than Apex, do you have

9    an opinion on the Medicaid services in Georgia for

10   students with behavior-related disabilities?

11              ATTORNEY HOLKINS:  Object to form.

12              THE WITNESS:  That's a pretty

13         broad question.  Can you make it more

14         specific?

15   BY ATTORNEY BELINFANTE:

16        Q.    Sure.  Did you consider the

17   provision of Medicaid services outside of the

18   context of Apex in the state of Georgia for

19   students with behavior-related disabilities?  And

20   I'm talking about services for their

21   behavior-related disabilities, not if they go to a

22   children's hospital and break their leg.

23        A.    Yes.

24        Q.    Okay.  What services did you look at

25   for students -- for students' behavior-related

1    disabilities within the Medicaid system outside of

2    Apex?

3          A.     Well, clearly that the constellation

4    of services that are in the DBHD provider manual

5    are all services that could be provided outside of

6    Apex.

7          Q.     Okay.  Did you have an opinion as to

8    whether the services that are identified in the

9    provider manual, the DBHD provider manual, did you

10   form an opinion as to whether those services were

11   insufficient in the State of Georgia?

12                ATTORNEY HOLKINS:  Object to form.

13                THE WITNESS:  Can you repeat that

14       question.

15    BY ATTORNEY BELINFANTE:

16          Q.     Sure.  Did you form an opinion as to

17   whether the services identified in the DBHDD

18   provider manual for students with

19   behavioral-related disabilities are sufficient?  In

20   other words, is there a service that DBHDD is not

21   providing that it should be providing?  Did you

22   form an opinion as to that?

23                ATTORNEY HOLKINS:  Object to form.

24                THE WITNESS:  You're talking about

25       service or the intensity?

1      BY ATTORNEY BELINFANTE:

2          Q.      Service.

3          A.      I think the constellation of

4    services that are dollars provider manual are

5    sufficient.

6          Q.      In terms of the intensity, did you

7    form an opinion based upon the provider manual

8    whether what is documented dollars provider manual

9    is sufficient?

10                 ATTORNEY HOLKINS:  Object to form.

11                 THE WITNESS:  Where there is

12          specification of standards?  I thought

13          they were sufficient.

14     BY ATTORNEY BELINFANTE:

15          Q.      Okay.  Did you review any individual

16    child's -- never mind.  I know where that's going

17    to come up.

18          Specifically what services does the Georgia

19    Department of Education fund and administer for

20    students with behavioral-related disabilities?

21                 ATTORNEY HOLKINS:  Object to form.

22          Q.      Let me phrase it this way:  In your

23    report, did you make a conclusion or in your report

24    did you conclude that the Georgia Department of

25    Education funds and administers a range of services

1    and programs for students with behavioral-related

2    disabilities?

3                    ATTORNEY COHEN:  Object.

4                    ATTORNEY HOLKINS:  You can answer.

5                    THE WITNESS:  I thought there was

6         an interruption.  Would you mind

7         repeating that question.

8      BY ATTORNEY BELINFANTE:

9         Q.    Did your report conclude that the

10    Georgia Department of Education funds and

11    administers a range of services and programs for

12    students with behavior-related disabilities?

13        A.    Primarily I've looked at the PBS

14    programs.

15        Q.    Okay.

16        A.    Yeah.

17        Q.    Anything else?  I know you said

18    "primarily."  If it's in your report, then that's

19    fine.  I'm trying to understand if there's anything

20    outside the report that led to your conclusion.

21                    ATTORNEY HOLKINS:  Object to form.

22                    THE WITNESS:  That's primarily

23        what I looked at.

24      BY ATTORNEY BELINFANTE:

25        Q.    Okay.

1          A.      On the page.

2          Q.      Let's look at page 21, the last

3    sentence that starts on that page reads, "Georgia

4    DOE is responsible through its Office of Whole

5    Child Supports for assisting districts and schools

6    with their implementation of positive behavioral

7    interventions and supports, PBIS."

8          Do you see that?

9          A.      Yes.

10         Q.      Just to be clear, their

11   implementation refers to districts and schools; is

12   that right?

13         A.      I'm looking at some of the document

14   that state also have completed a statewide fidelity

15   inventory.  I don't have that listed in my report.

16         Q.      All right.  But in terms of the

17   entity that is actually implementing PBIS, that is

18   districts and schools; correct?

19                  ATTORNEY HOLKINS:  Object to form.

20                  THE WITNESS:  Well, actually when

21          you look at the statewide fidelity

22          inventory, it's looking at the

23          implementation of PBS at the state level.

24   BY ATTORNEY BELINFANTE:

25         Q.      So is it your opinion that the state

1    is implementing -- the state Department of

2    Education has implemented PBIS?

3              A.     So the -- so through the National

4    Technical Assistance Center we look at fidelity at

5    the statewide level, the district level, and the

6    individual school level.  So when we're looking at

7    the implementation of PBS, we're looking at it at

8    all three levels.

9              Q.     And what is the state Department of

10   Education -- how does the state Department of

11   Education implement PBIS?

12             A.     I have to bring up that document.  I

13   can go through it with you.  It's on the PBIS

14   website, if you want, that lists what activities

15   the state should do to implement PBS.

16             Q.     But this sentence says the

17   Department of Education is responsible through its

18   Office of Whole Child Support for assisting

19   districts and schools with their implementation.

20             A.     Correct.

21             Q.     So the districts and schools have to

22   implement PBIS in order for it to exist in Georgia;

23   correct?

24                    ATTORNEY HOLKINS:  Object to form.

25                    THE WITNESS:  Can you ask that



1              question again.

2         BY ATTORNEY BELINFANTE:

3         Q.     Sure.  In other words, if the state

4    Department of Education says we're going to

5    implement PBS, it doesn't end there.  In order for

6    it to reach the students, there has to be some

7    implementation by districts and schools; correct?

8         A.     Correct.

9         Q.     Okay.  Page 22 talks about at the

10   very top federal grants and Project Aware.

11              ATTORNEY HOLKINS:  That's on

12         page 22?

13              ATTORNEY BELINFANTE:  Georgia

14         receives federal grants --

15              ATTORNEY HOLKINS:  I'm sorry.

16              ATTORNEY BELINFANTE:  It's

17         elsewhere too.

18              ATTORNEY HOLKINS:  Thank you.

19         BY ATTORNEY BELINFANTE:

20         Q.     Do you see that?

21         A.     Yes.

22         Q.     Okay.  Is it your understanding --

23   why don't you tell me what your understanding of

24   how Project Aware grant funds flow --

25              ATTORNEY HOLKINS:  Object to form.

1      Q.     -- in Georgia.

2      A.     Yeah.  It comes from, I believe, the

3  federal government who's SAMSA, they apply for

4  Project Aware funds that really are implementing

5  ISF in Georgia.  Or in any other state that applies

6  and gets the Project Aware funds.

7      Q.     Let me show you what we'll mark as

8  Exhibit 9.

9                    (Exhibit 9 was marked for

10                   identification.)

11     Q.     What we marked --

12     A.     Can you actually bring this up on

13  the website?

14     Q.     That one?

15     A.     Yes.  I would much prefer to see

16  what's actually on the website rather than a copy.

17     Q.     It looks like footnote 87.

18     A.     In my report?

19     Q.     Yes, sir.

20            ATTORNEY BELINFANTE:  Patrick, it

21        looks like the document I gave you-all is

22        footnote 87.

23            ATTORNEY HOLKINS:  Great.

24            ATTORNEY BELINFANTE:  Footnote 87

25        on page 30.

1                    ATTORNEY HOLKINS:  Thank you.

2        BY ATTORNEY BELINFANTE:

3             Q.     You know what, while he's doing

4   this, Dr. Putnam, let me ask you this:  Do you know

5   of any school district in Georgia that applied for

6   Aware grants and did not receive them?

7             A.     No, I'm not aware of any school

8   districts.

9                         (Discussion held off the

10                        record.)

11            Q.     All right.  Looking at the section

12  on page 22 entitled GNETS --

13            A.     Page 22?

14            Q.     Yes.

15            A.     Thank you.

16            Q.     It looks like the first footnote in

17  that section is at the end of the first sentence,

18  footnote 39, and the last footnote dollars section

19  is on page 23, and it's footnote 44.

20            Do you agree with that?

21            A.     Do I agree with what?

22            Q.     That the first footnote in Section 2

23  beginning on page 22 is footnote 39, and the last

24  footnote dollars section is footnote 44.

25                    ATTORNEY HOLKINS:  I didn't

1              understand.  You're asking to confirm

2              which footnote is on which pages?

3                        ATTORNEY BELINFANTE:  Correct.

4                        ATTORNEY HOLKINS:  The first

5              footnote on page 22 is footnote 38.

6                        THE WITNESS:  In the GNETS

7              section?

8                        ATTORNEY HOLKINS:  Yes.

9        BY ATTORNEY BELINFANTE:

10            Q.     What I'm looking for is basically

11   the authority or the citations you have for the

12   GNETS is exclusively footnote 39 through 44, the

13   GNETS section, II.  Is that right?

14            A.     I believe so.

15            Q.     Okay.  And each of those citations

16   is to the GNETS rule; correct?

17            A.     Correct.

18            Q.     Let me show you what we've marked as

19   Exhibit 10.

20                        (Exhibit 10 was marked for

21                   identification.)

22            Q.     This is the GNETS rule that you

23   considered, Doctor.  Poorly phrased.  That was a

24   question.

25            Is this the GNETS rule that you considered,

1    Doctor?

2            A.      I believe so.

3            Q.      All right.

4                    ATTORNEY COHEN:  I'm sorry.  What

5        number is it?

6                    THE WITNESS:  The one I have is in

7            a different format.

8      BY ATTORNEY BELINFANTE:

9            Q.      Let's look at in this document

10   page 3.

11           A.      Can I take a little bit of time to

12   look at this before?  I haven't seen this in a

13   while.

14           Q.      Sure.

15                        (Pause)

16           A.      Thank you very much.

17           Q.      Looking at page 3 of that document,

18   Paragraph 4(c) of the rule, the first sentence

19   says, "The IEP team must determine that GNETS

20   services are necessary for the student to receive

21   FAPE."

22           Do you see that?

23           A.      4(c)?

24           Q.      4(a).

25           A.      Okay.

1          Q.      I should have taken you up on the

2    second coffee.

3          A.      So 4(a)?

4          Q.      "The IEP team must determine the

5    GNETS are necessary for the student to

6    receive FAPE."

7          A.      Yes.

8          Q.      In your review of the documents for

9    your report, did you see any situation where a

10   student was receiving GNETS services, but the IEP

11   team did not make that determination?

12                    ATTORNEY HOLKINS:  Object to form.

13                    THE WITNESS:  I wasn't aware of

14            that.

15     BY ATTORNEY BELINFANTE:

16          Q.      Okay.  You opine on page 22 in the

17   middle of that full paragraph -- and the footnote

18   is the 41 -- "GNETS services are additionally

19   supposed to be available in general education

20   settings in students' zoned or other public

21   schools.  In recognition of the requirement, the

22   students with documented special education needs

23   receive their education in the least restrictive

24   environment appropriate based on their individual

25   needs."

1          My question is about the citation in

2   footnote 41, which is to subparagraph 4(c) of the

3   rule.

4          A.     I'm sorry.  Go ahead again.  Where

5   are you now?

6          Q.     In your report, page 22, the

7   citation footnote 41.

8          A.     "GNETS services are additionally

9   supposed to be available in general education

10  settings and the students zoned are in the public

11  schools," okay.

12         Q.     Your citation to that is subsection

13  4(c) of the GNETS rule.

14         A.     4(c), okay.  Different than what we

15  were just talking about.

16         Q.     We were in 4(a).

17         A.     Okay.

18         Q.     Now we're at 4(c).

19         A.     Yeah.

20         Q.     4(c) says that -- what language -- I

21  guess my question is what language in Section 4(c)

22  led you to the conclusion that GNETS services are

23  supposed to be available in general education

24  settings in the students' zoned or public schools?

25         A.     I'm not sure of the question.

1          Q.      Well, you cite 4(c)?

2          A.      Yeah.

3          Q.      As authority for the proposition

4    that GNETS services are additionally supposed to

5    be -- to be available in general education settings

6    in the students zoned or public schools.

7          My question is what language in 4(c) led

8    you to that conclusion?

9          A.      Well, if you look at 4(c)(1),

10   "services provided in the general education setting

11   in the students' zoned school or public school."

12         Q.      Okay.  But 4(c), backing up, says,

13   "the GNETS continuum of services by environment may

14   be delivered as follows."  And then lists six

15   different places.

16         A.      Sorry, I don't know which document

17   what you're referring to.

18         Q.      I'm back on the rule.

19         A.      Yes, okay.

20         Q.      4(c), before you get to --

21         A.      4(c), okay.  Yes.

22         Q.      Just C.

23         A.      Yes.

24         Q.      It says, "The continuum of services

25   the GNETS' continuum of services by environment may

1    be delivered as follows."

2              A.      Okay.

3              Q.      May be delivered?

4              A.      Yes.

5              Q.      And then it lists six.

6              A.      What's six?

7              Q.      One through six?

8              A.      Oh, one through six, I'm sorry,

9    okay.  It's on the next page.  Sorry.

10             Q.      Okay.

11             A.      Yeah.

12             Q.      My question is, if GNETS services

13   are delivered in any one of those six, doesn't the

14   rule -- is it your understanding that the rule

15   allows GNETS services to be delivered in any one of

16   those six settings?

17                     ATTORNEY HOLKINS:  Object to form.

18                     THE WITNESS:  Yes.

19      BY ATTORNEY BELINFANTE:

20             Q.      Okay.  In looking at the rule, is it

21   your opinion that the Department of Behavioral

22   Health and Developmental Disabilities has any role

23   in referring a student for GNETS services?

24                     ATTORNEY HOLKINS:  Object to form.

25                     THE WITNESS:  Can you repeat the

1          question.

2     BY ATTORNEY BELINFANTE:

3          Q.     Sure.  Having now looked at the rule

4     and specifically 4(a) --

5          A.     4(a), okay.  We're back to 4(a)?

6          Q.     Yes.

7          A.     Okay.

8          Q.     Is it your understanding that the

9     Department of Behavioral Health and Developmental

10    Disability plays any role in referring a student

11    for GNETS services?

12                    ATTORNEY HOLKINS:  Same objection.

13                    THE WITNESS:  Not that I'm aware

14          of.

15     BY ATTORNEY BELINFANTE:

16          Q.     Looking again at 4(a), is it your

17    understanding that the Department of Community

18    Health plays any role in referring students for

19    GNETS services?

20                    ATTORNEY HOLKINS:  Same objection.

21                    THE WITNESS:  Well, the only --

22          let's back up a little bit.  In my

23          report, I suggest that DBHDD and DCH

24          could provide Medicaid-available services

25          or services through Apex that in my

1                experience would influence the IEP team

2                making a referral to GNETS.

3        BY ATTORNEY BELINFANTE:

4            Q.      But it would influence the IEP team,

5    but it would not -- would not be determinative of

6    the IEP team's recommendation; correct?

7                        ATTORNEY HOLKINS:   Object to form.

8                        THE WITNESS:   I don't know what

9            you mean by "determinative."

10        BY ATTORNEY BELINFANTE:

11            Q.      What did you mean by "could

12    influence"?

13            A.      Well, I think if there was an Apex

14    clinician sitting on that IEP team and a staff

15    person that's trained in PBS setting, that IEP

16    team, that they may come to a different

17    determination in terms of whether the student

18    should, you know, need GNETS.

19            Q.      But it's still the IEP team's

20    decision, correct, not DBHDD's or DCH's?

21            A.      That's correct.  But my experience

22    in doing this for 40 years is whoever sits at that

23    meeting, you know, in terms of their roles makes a

24    difference in terms of the IEP team coming up with

25    a decision.

```
 1          Q.      Who decides who sits at IEP team

 2   meetings?

 3                   ATTORNEY HOLKINS:   Object to form.

 4          Q.       Is it the local school district, the

 5   LEA?   Is it the individual schools or individual

 6   school administrator?

 7                   ATTORNEY HOLKINS:   Object to form.

 8                   THE WITNESS:   It could be all of

 9          those people.

10     BY ATTORNEY BELINFANTE:

11          Q.      Okay.   Does the state Department of

12   Education, to your knowledge, decide who sits in an

13   IEP team meeting?

14          A.      No.

15          Q.      Does the Department of Behavioral

16   Health and Developmental Disabilities, to your

17   understanding, decide who sits at an IEP team

18   meeting?

19          A.      No.   But, again, through their Apex

20   program they can strongly suggest that an Apex

21   provider be sitting at these IEP team meetings.

22          Q.      And to your knowledge, does the

23   community of Community Health decide who sits in an

24   IEP team meeting?

25          A.      No.
```



1          Q.      Okay.  And you said that Georgia

2     provides Apex services.  Is that your understanding

3     that Georgia contracts with providers to provide

4     Apex services?

5          A.      Can you ask that question again.

6          Q.      Sure.  When you say that Georgia

7     either DBH or GCH provides services, Apex services,

8     did you more specifically mean that Georgia

9     contracts with providers to provide Apex services?

10          A.      That's correct.

11          Q.      Okay.  In other words, it's not a

12     Department of Community Health employee that goes

13     out and is providing Apex services; correct?

14          A.      That's correct.

15          Q.      Okay.  Nor is it a Department of

16     Behavioral Health and Developmental Disabilities

17     employee that goes out and does it.  The Department

18     of Behavioral Health is contracting with a private

19     provider; correct?

20          A.      Contracting with CSB.

21          Q.      Okay.  Or is it your understanding

22     that the Apex program is limited to CSBs, or can

23     other providers agree to contract with DBHDD to

24     provide Apex services?

25          A.      My understanding is it's limited to

1    CSBs.

2         Q.    Okay.  You can put the rule away for

3    a minute.

4         A.    (Witness complies with request.)

5         Q.    Do you know roughly how many CSBs

6    are in the State of Georgia?

7         A.    Approximately 25.

8         Q.    Okay.  And do you know of any CSB

9    that applied to provide Apex services and was

10   denied?

11        A.    I'm not sure.

12        Q.    Do you know why any CSB would choose

13   not to contract with DBHDD to provide Apex

14   services?

15             ATTORNEY HOLKINS:  Object to form.

16             THE WITNESS:  Can you repeat the

17        question.

18   BY ATTORNEY BELINFANTE:

19        Q.    Sure.  Do you know why or have an

20   opinion as to why any CSB would choose not to

21   contract with DBHDD to provide Apex services?

22        A.    No.

23        Q.    Do you know if the Department of

24   Behavioral Health has prevented Apex services from

25   being provided in any school in Georgia?



```
 1                    ATTORNEY BELINFANTE:  Object to
 2          form.
 3                    THE WITNESS:  No.
 4      BY ATTORNEY BELINFANTE:
 5          Q.    Do you have an opinion as to whether
 6   the Department of Behavioral Health has prevented
 7   Apex services from being provided in any school in
 8   Georgia?
 9                    ATTORNEY HOLKINS:  Same objection.
10                    THE WITNESS:  Can you repeat that
11          question.
12      BY ATTORNEY BELINFANTE:
13          Q.    Do you have an opinion -- I asked
14   you before if you knew if it occurred.  My next
15   question is do you have an opinion as to whether
16   the Department of Behavioral Health and
17   Developmental Disabilities has prevented any CSB or
18   other provider from providing Apex services to the
19   schools in Georgia?
20                    ATTORNEY HOLKINS:  Same objection.
21                    THE WITNESS:  I'm still not
22          understanding.  The follow-up question,
23          I'm not understanding.
24      BY ATTORNEY BELINFANTE:
25          Q.    Okay.  The question is have you
```

1    formed an opinion as to whether DBHDD has actively

2    prevented any provider from providing Apex

3    services?

4                        ATTORNEY HOLKINS:  Same objection.

5                        THE WITNESS:  No.

6        BY ATTORNEY BELINFANTE:

7            Q.      Okay.  All right.  Can we get 16.

8    Now comes the fun part.  I promised you we would

9    look at the provider manuals.  It makes up two

10   boxes that we brought from Atlanta.

11           A.      I hope you shipped them or have a

12   good airline.

13           Q.      I don't know how you want to mark

14   them.  It says Exhibit 16 in here.  That's

15   incorrect.  I'll put the sticker on this as

16   Exhibit 11.  The good news is, Doctor, we're

17   obviously not going to look at a lot of pages in

18   here.  For completion, it's just one of the things

19   we had to do.

20                        (Exhibit 11 was marked for

21                        identification.)

22           A.      No worries, thank you.

23                        ATTORNEY HOLKINS:  And I need one

24           myself.

25                        THE WITNESS:  Are these souvenir

1           copies?

2      BY ATTORNEY BELINFANTE:

3           Q.     Well, the court reporter gets to

4    especially keep it.  You never know because

5    sometimes you just print out what you need because

6    people get frustrated because you didn't print out

7    the whole thing.

8           Let's turn to page 56.

9           A.     All right.

10                      (Discussion held off the

11                 record.)

12                 ATTORNEY HOLKINS:  Before we start

13            with the questions, just so the record is

14            clear, can we just clarify which version

15            of the manual we're talking about here.

16                 ATTORNEY BELINFANTE:  This is

17            fiscal year 23, quarter 1.  I believe it

18            is the version that is cited in

19            Dr. Putnam's report at least at footnotes

20            48 and 49.

21                 ATTORNEY HOLKINS:  Great, thank

22            you.

23                 ATTORNEY COHEN:  Which quarter?

24                 ATTORNEY BELINFANTE:  It's

25            January, quarter 1, yeah, which I took to

1          be January 1, 2023.

2               THE WITNESS:  Are you sure it's

3          the right version?

4               ATTORNEY HOLKINS:  Actually the

5          one cited on pages, it should be 48 and

6          49, January 1, 2023.  This looks like

7          it's quarter 1.

8               ATTORNEY BELINFANTE:  Well, all

9          right.  I'll ask the questions on this

10          and you-all can figure out.  It may be

11          the same on this part.  I think it is.

12     BY ATTORNEY BELINFANTE:

13          Q.    Looking at page -- let's go to

14     page 57, Dr. Putnam.  I think I originally told you

15     56, but we'll go to 57.  Do you see the column

16     "Required Components"?

17          A.    Yes.  And do you have objections if

18     I look at this document?

19          Q.    Well, unfortunately we're running a

20     bit short on time and it's a large document.  It

21     looks like Apex is covered on 57 to 58.

22          A.    Okay.  Even if I just looked at the

23     Apex information, is that what we'll be referring

24     to?

25          Q.    Because I've only got a question

1    right now based on one sentence.

2              A.    Okay.  No worries, okay.  Give me a

3    couple minutes.

4              Q.    Sure.

5                          (Discussion held off the

6                    record.)

7              Q.    Doctor, if you can turn to page 57

8    of the Exhibit 11.

9              A.    Yeah.

10              Q.    Under Required Components, Number 1

11    says, "The Apex program may be implemented in

12    designated public" -- excuse me.  "The Apex program

13    may only be implemented in designated public school

14    settings."

15          Do you know what a designated public school

16    setting is for purposes of the Apex program?

17              A.    No, I don't.

18              Q.     It also says on page 56 under

19    Admission Criteria --

20                    ATTORNEY COHEN:  That's the prior

21          page; right?

22                    ATTORNEY BELINFANTE:  Yes, prior

23          page.

24                    THE WITNESS:  Yes.

25

1        BY ATTORNEY BELINFANTE:

2        Q.    Number 2 under Admission Criteria,

3    that's the bottom section, "Youth must meet core

4    customer criteria for child and adolescent services

5    in DBHDD's provider manual for community-based

6    Behavioral Health providers, Part 1, Section 1."

7        Do you see that?

8        A.    Yes.

9        Q.    When forming your opinions, did you

10   determine what a core customer criteria is?

11       A.    Well, can we take a look at Part 1,

12   Section 1?

13       Q.    So we can, but my question is did

14   you look at it when forming your opinion in the

15   report?

16       A.    Yes.

17       Q.    Okay.  That's all I need to know.

18       A.    Okay.

19       Q.    What is your understanding about

20   what a local school district needs to do, if

21   anything, to bring Apex services to its students?

22       A.    One, they have to express interest

23   that they are interested.  And if we look at --

24   give me another minute because it talks about in

25   terms of what the expectations are for the schools.



1    If not, we may need to look at the Apex contract,

2    if you have that available.

3         Q.    Let me show you instead what we'll

4    mark as Exhibit 12, I think, which was previously

5    used by the United States in the deposition

6    Exhibit 978.

7         A.    Okay.

8                    (Exhibit 12 was marked for

9              identification.)

10        A.    So we may not even have to look at

11   it.  If you look at on page 57 and you look at

12   number 7.

13                    ATTORNEY HOLKINS:  Hold up, Bob.

14        Page 57?

15                    THE WITNESS:  Page 57, Item 7.

16                    ATTORNEY BEDARD:  For the record,

17        we're talking about Exhibit 11.

18                    ATTORNEY HOLKINS:  Exhibit 11,

19        yes.

20                    THE WITNESS:  It says here,

21        "Providers must obtain and maintain

22        commitment by the school leadership to

23        support school-based behavioral health

24        services, e.g., a designated space for

25        treatment and confidential file storage,

1              a communication plan for parents and

2              teachers to announce and coordinate the

3              implementation of services.  Evidence

4              that the student support professionals

5              support the new service and collaborate

6              with the mental health professionals

7              assigned to their school."

8                   And then "Providers must

9              coordinate any needed treatment with the

10             student, their family, teacher, and other

11             resources as indicated, probation

12             officer, student support teams, response

13             intervention teams, natural supports,

14             physicians, school, student support

15             professionals including professional

16             school counselors, school psychologists,

17             school social workers, school nurses, or

18             local IEP teams."

19        BY ATTORNEY BELINFANTE:

20             Q.    So based on that, is it your

21   understanding that in order for Apex to go into a

22   local school, first providers have to agree to

23   contract with the Department of Behavioral Health,

24   then the providers need a commitment by the local

25   school leadership to support the application?

1                    ATTORNEY HOLKINS:  Object to form.

2                    THE WITNESS:  And also I

3           understand there's some criterias in

4           terms of which schools are selected.

5     BY ATTORNEY BELINFANTE:

6           Q.     Do you know the basis of that

7     criteria, where I'd find it?

8           A.     It's in one of the documents, but I

9     don't remember off the top of my head.

10          Q.     Okay.  But it would be true, at

11    least, that in order for Apex to get into a school,

12    a provider has to want to contract and meet those

13    provider qualifications?

14          A.     Right.

15          Q.     Agree to contract and then get the

16    support of the local school; correct?

17                   ATTORNEY HOLKINS:  Object to form.

18                   (Discussion held off the

19                   record.)

20    BY ATTORNEY BELINFANTE:

21          Q.     Okay.

22                   ATTORNEY HOLKINS:  Are we setting

23          aside Exhibit 12 as well?

24                   ATTORNEY BELINFANTE:  Yes, I'm

25          just renumbering Exhibit 12 because I

1              didn't ask any questions on it, so let's

2              just take it out.  We'll go from there.

3                    ATTORNEY COHEN:  Exhibit 12 is

4              former 978?

5                    ATTORNEY BELINFANTE:  Yes, being

6              withdrawn.

7                    (Exhibit 12 is withdrawn.)

8       BY ATTORNEY BELINFANTE:

9          Q.    When forming your opinions about the

10   Apex program in Georgia, did you make any

11   presumptions about school system eligibility, or

12   did you base it on your understanding from the

13   provider manual and other resources cited in your

14   report?

15                    ATTORNEY HOLKINS:  Object to form.

16                    THE WITNESS:  Can you repeat that

17              question again, I'm sorry.

18       BY ATTORNEY BELINFANTE:

19          Q.    Sure.  When you were forming your

20   opinions about the availability of the Apex program

21   in Georgia and school eligibility to participate in

22   the Apex program, did you make any presumptions or

23   did you base your opinions solely on the sources

24   cited in your report?

25                    ATTORNEY HOLKINS:  Same objection.

1                    THE WITNESS:  There's two other

2              things I used.  One was I understood

3              there was some criteria used in terms of

4              selection of schools before they were

5              asked to participate.  I also during my

6              25 school visits asked about that in

7              terms of -- and those schools that were

8              aware of Apex, they basically said we

9              would love it or we would love more of

10             it.

11     BY ATTORNEY BELINFANTE:

12         Q.    Okay.  And for those schools who say

13  we would love it and didn't have it, is it possible

14  that the reason they didn't have it is that they

15  were not providers dollars area either willing

16  and/or able to contract with DBHDD to provide

17  Apex-related services?

18                    ATTORNEY HOLKINS:  Object to form.

19                    THE WITNESS:  I wouldn't know.

20     BY ATTORNEY BELINFANTE:

21         Q.    Okay.  But if -- presume for a

22  moment that there were not providers of sufficient

23  quantity in the area to provide Apex, you could end

24  up with a situation where a school system wanted

25  Apex services but could not provide them; is that

1    correct?

2                    ATTORNEY HOLKINS:  Object to form.

3                    THE WITNESS:  Can you repeat that

4            question again, because it's a little bit

5            confusing.

6        BY ATTORNEY BELINFANTE:

7        Q.      You would agree with me that it

8    takes two to get an Apex program.  You need willing

9    providers and the school district; correct?

10        A.      Correct.

11        Q.      So you could be describing a

12    situation where you had a school district that

13    wanted Apex services, but they were not willing or

14    qualified providers to do, though?  Isn't that

15    possible?

16        A.      That's possible.

17        Q.      Okay.  To your knowledge, did the

18    state Department of Behavioral Health and

19    Developmental Disabilities impose barriers on

20    providers from being Apex -- behavioral health

21    service providers from being Apex providers?

22                    ATTORNEY HOLKINS:  Object to form.

23                    THE WITNESS:  Well, from my

24            perspective they provided limited funds.

25

1      BY ATTORNEY BELINFANTE:

2          Q.      Did you have any conversations with

3   Apex -- let me ask this:  Did you have any

4   conversations with behavioral health service

5   providers in Georgia who said that but for funding

6   they would establish an Apex program?

7                      ATTORNEY HOLKINS:  Object to form.

8                      THE WITNESS:  You're going to have

9          to repeat that question again.

10     BY ATTORNEY BELINFANTE:

11         Q.      Did you talk to any Behavioral

12  Health service providers in Georgia?

13         A.      What do you mean, "as behavioral

14  health service providers"?

15         Q.      People who would contract with DBHDD

16  to provide behavioral health services.

17         A.      So are we talking about community

18  support?

19         Q.      Yes.

20         A.      Okay.  We're defining what the

21  providers are.  Support organizations, okay.  Now

22  ask the question.

23         Q.      Did you have any conversations with

24  community support Medicaid behavioral health

25  providers in Georgia?

1          A.    I sat in on depositions.

2          Q.    Okay.

3                ATTORNEY HOLKINS:  Just to be

4          clear, are we talking about community

5          service boards?

6                THE WITNESS:  CSBs, yes.

7     BY ATTORNEY BELINFANTE:

8          Q.    So my question is did you talk to

9     any CSB that said if only the -- something along

10    the lines of if the state offered more funding for

11    Apex we would do it?

12               ATTORNEY COHEN:  Other than what's

13         in the deposition you mean?

14               ATTORNEY BELINFANTE:  Other than

15         what's in the deposition if it's in the

16         deposition.

17               THE WITNESS:  You know, I only sat

18         in a deposition or read depositions.  But

19         my understanding was that people felt if

20         they have more resources they could

21         provide more services.

22    BY ATTORNEY BELINFANTE:

23         Q.    And that was based on the

24    depositions?

25         A.    That's correct.

 1          Q.     Okay.  Have you worked with Medicaid

 2    providers across the country?

 3          A.     What do you mean by "Medicaid

 4    providers across the country"?

 5          Q.     Have you ever worked with providers

 6    of Medicaid in states other than Georgia or talked

 7    to Medicaid providers in states other than Georgia

 8    about delivering the types of services that Apex

 9    provides?

10               ATTORNEY HOLKINS:  Object to form.

11               THE WITNESS:  I don't remember.

12      BY ATTORNEY BELINFANTE:

13          Q.     Okay.  You had mentioned earlier

14    contracts with DBHDD.  I'm going to show you what

15    we'll mark as the new Exhibit 12.  New and

16    improved, which I'll represent to you is

17    footnote 52 in your report.

18               (Exhibit 12 was marked for

19               identification.)

20               ATTORNEY COHEN:  Put this away

21          right now.

22               ATTORNEY HOLKINS:  This was

23          footnote 52?

24               ATTORNEY BELINFANTE:  Yes.

25               ATTORNEY HOLKINS:  Thank you.

1       BY ATTORNEY BELINFANTE:

2           Q.      And Doctor, I realize this is a

3   large document.  Out of the interest of time, I'm

4   going to ask you to look at page 22, which is an

5   appendix to the larger contract.

6           A.      Can I take a couple minutes to

7   review this?

8           Q.      If you could briefly.

9           A.      Okay.

10          Q.      But, again, I've got one question,

11  and it's going to be based on --

12          A.      Well, I just want to put that all in

13  context, that's all.

14          Q.      Sure.  22 and 23.

15                      (Pause)

16          Q.      Actually my question will be on 24.

17          A.      Page 24?

18          Q.      Yes.

19                  ATTORNEY POLANSKY:  Which footnote

20          did you say?

21                  ATTORNEY BELINFANTE:  52.

22                  ATTORNEY POLANSKY:  Sorry.

23                  THE WITNESS:  Reading as fast as I

24          can, I'm sorry.

25

1      BY ATTORNEY BELINFANTE:

2          Q.     That's all right.

3                       (Discussion held off the

4               record.)

5                       (Ms. Cohen leaves

6               deposition.)

7      BY ATTORNEY BELINFANTE:

8          Q.     Dr. Putnam, if you don't mind me

9   asking, what page are you on?

10         A.     17.

11         Q.     Let me do this.  I may not have to

12  ask specific questions about it, but I am concerned

13  about time.  So let me ask this question:  Is it

14  your understanding that for contractors providing

15  Apex services, Georgia State University developed

16  surveys that providers were required to complete

17  those surveys within stated deadlines?

18         A.     Where is that?

19         Q.     Page 24 under "Deliverables."

20         A.     I'm almost there, sorry.  Got one

21  more to go, sorry.

22         Q.     All right.

23                       (Pause)

24         A.     Okay, now where are you?  24?

25         Q.     Page 24 under "Deliverables,"

1    number 1.

2             A.      Yes.

3             Q.      Were you aware that the contract

4    required providers to complete all surveys

5    developed, that were created by the Georgia state

6    University Center Of excellence for Children's

7    Behavioral Health?

8             A.      Yes.

9             Q.      Did you review any of those surveys?

10            A.      I don't think those surveys were

11   made available to me.

12            Q.      Okay.  Did you request them?

13            A.      I requested any information that is

14   relative to Apex from the Department of Justice in

15   terms of discovery.

16            Q.      All right.  Putting that document

17   aside for a moment.

18            A.      And I just want to go back to, if

19   you say 23, 3, to go back to a further question,

20   "Targeted schools will be selected based on factors

21   including, but not limited, to Title 1 status

22   attendance data, CCRPI data, school of PBS status

23   and school climate star rating."

24            Now, I don't know what those surveys are.

25   Do you have a copy of what those surveys are?



1          Q.      I do not have one with me.

2          A.      Because I may have seen those

3    surveys.  I don't know exactly what they refer to

4    in those surveys.

5          Q.      Okay.  Understood.

6          A.      So I don't feel like I can answer

7    that question since I don't know what those surveys

8    might be, and I may have reviewed them and not

9    thought they were a survey.

10          Q.      If you reviewed them, would they be

11    cited in your report?

12          A.      No.  Because I didn't cite

13    everything that basically might be available.

14          Q.      Let me ask this.  Looking at page 25

15    of your report.

16          A.      Okay.  Are we putting this away?

17          Q.      Yes.

18          A.      Thank you very much.

19          Q.      Thank you.  It looks like the second

20    full sentence on the page dollars first paragraph

21    says, "In addition, the state does not collect any

22    individualized data about the students attending

23    Apex-participating schools.  If it collected such

24    data, the state could use it to assess whether Apex

25    services the students receive were effective and to



1    identify other interventions that might help

2    students return to or remain in general education

3    classrooms."

4            Do you see that?

5            A.    Yes.

6            Q.    My question is if the state doesn't

7    collect the data, how can you decide or opine that

8    Apex is an effective service?

9                    ATTORNEY HOLKINS:  Object to form.

10                   THE WITNESS:  Not sure I

11        understand the question.

12    BY ATTORNEY BELINFANTE:

13            Q.    You didn't see any individualized

14    data about Apex-participating schools; right?

15            A.    That's correct.

16            Q.    Okay.  And is it your opinion that

17    if that data were collected, the state could use it

18    to assess whether the Apex services the students

19    received were effective and to identify other

20    interventions that might help students return to or

21    remain in general education classrooms; correct?

22            A.    Yes.

23            Q.    So if you didn't see that data, do

24    you have an opinion as to whether Apex services the

25    students received are effective?



1                    ATTORNEY HOLKINS:  Object to form.

2                    THE WITNESS:  Well, let's just

3            take a look at this Apex contract.  In

4            terms of what they're asking the schools

5            to collect, right.  I have to go back

6            through it and look at it in terms of

7            what they're -- so I don't think this

8            is -- when is this dated, this one?

9    BY ATTORNEY BELINFANTE:

10        Q.     It looks like fiscal year 2021.

11        A.     Yes.  So I wish you would -- had

12   brought out a previous Apex contract, because the

13   early Apex contract calls for office discipline

14   referral data, which was not collected.

15        And if you look at in terms of what the

16   goals and objectives are -- hang on just one

17   second, I'm going to have to find it -- if you look

18   on page 23, you have the hoped-for result will

19   include a reduction of children and youth in

20   Georgia with unmet mental health needs."  Fewer

21   discipline referrals, right, which is what the

22   original contracts basically ask for and increased

23   academies performance in terms of that.

24        So the reality is Georgia didn't collect

25   what they suggested they wanted to collect in the

1    original contracts to figure out whether the Apex

2    program was actually effective or not.

3          Q.      Doctor, my question is it's your

4    opinion in your report on page 25 that because

5    Georgia did not collect individualized data about

6    students attending Apex participating schools, that

7    Georgia could not determine or assess whether the

8    Apex services are effective.

9          So my question is, first, do you have an

10   opinion as to whether Apex services in Georgia are

11   an effective tool to reduce the amount of placement

12   in segregated educational environments?

13         A.      Well, I think we need to read that

14   sentence the way it's accurately reported here.  It

15   says, "In addition, the state does not collect any

16   individualized data about students attending Apex

17   schools"; right?

18         And what I said is if it collected such

19   data, the state could use it to assess whether Apex

20   services that students received were effective and

21   to identify other interventions that might help

22   students return to or remain in a general education

23   classroom."

24         Q.      Try to answer the question I asked,

25   though.  That specifically was do you find that

1    Apex services delivered in the State of Georgia are

2    effective at reducing segregation in education

3    settings?

4          A.    So what I can look at is utilization

5    of Apex services in terms of the limited number of

6    schools, the limited number of kids, the limited

7    number of individual services being provided and

8    looking at that in terms of what at least my

9    expectations would be for students with serious

10   mental health needs.  I don't think that, given all

11   those factors, that basically, you know if Apex was

12   really implemented the way it should be in terms of

13   form increased number of schools, increased number

14   of kids, increased number of services, you'd have a

15   fair evaluation of that.

16         Q.    So, Doctor, your opinion then is

17   that we cannot fairly evaluate Apex today in

18   Georgia?

19              ATTORNEY HOLKINS:  Object to form.

20              THE WITNESS:  I think given

21          standards in terms of the number of

22          schools, the number of kids who got

23          services, the amount of services they

24          got, basically what you would look at in

25          terms of standards of care, I don't think

1                    the way it's implemented at this point in

2                    time, really you've got to see the

3                    outcomes.

4          BY ATTORNEY BELINFANTE:

5                Q.    So is your opinion -- and I just

6     need a concise as you can make it -- is your

7     opinion we don't know if Apex is effective?  Is

8     your opinion that Apex is effective, or is your

9     opinion that Apex is not effective in reducing

10    placement in segregated settings for students in

11    Georgia schools?

12                        ATTORNEY HOLKINS:  Object to form.

13                        THE WITNESS:  Well, again, the

14                    original Apex contracts --

15         BY ATTORNEY BELINFANTE:

16               Q.    Which is not cited in footnote 52.

17               A.    But the original Apex contract

18    looked at schools who participated to indicate

19    office discipline referral data.

20               Q.    I understand that.  We've been

21    through that.  I'm really just trying to ask do you

22    have an opinion, is it your opinion that you can

23    tell whether Georgia Apex services are effective at

24    reducing placement in segregated schools?  Yes or

25    no?

```
 1                    ATTORNEY HOLKINS:  Object to form.

 2                    THE WITNESS:  Well, the way it's

 3            implemented at this point in time, I

 4            don't see where we reduce office

 5            discipline referrals, and that's the

 6            leading indicator of students going into

 7            more restrictive placement.

 8      BY ATTORNEY BELINFANTE:

 9          Q.    Okay.  So your opinion is that Apex

10   in Georgia is currently not effective at reducing

11   placement in segregated school settings?

12                    ATTORNEY HOLKINS:  Object to form.

13                    THE WITNESS:  Well, I can't --

14            based on what I can see, you know,

15            obviously I can't, you know -- there's

16            not enough information to make that

17            decision.  However, looking at in terms

18            of what's available, you know, it doesn't

19            seem to me that as the way it's currently

20            constituted that it will make a

21            difference.

22      BY ATTORNEY BELINFANTE:

23          Q.    Can you -- well, no.  I'm not going

24   to ask that.

25                    ATTORNEY HOLKINS:  You're in the
```

1              middle of a line, but whenever you need a

2              break, I can use the restroom.

3                   ATTORNEY BELINFANTE:  It may be

4              now.  Just a few more questions, if you

5              don't mind.

6                   ATTORNEY HOLKINS:  That's fine.

7         BY ATTORNEY BELINFANTE:

8         Q.     Is it your understanding that Apex

9    services, would they fall in line with PBS Tier 2

10   or PBIS Tier 3?  Do you have an opinion on that?

11        A.     I would say it's both.

12        Q.     Okay.  And it is your opinion on

13   page 25 -- and I'm looking for the precise

14   location -- that PBIS in Georgia has stalled?  I

15   think that was the word you used.

16        A.     Yes.

17        Q.     Okay.  And is that -- that's based

18   on PBIS Tier 2 implementation, Tier 3

19   implementation, or Tier 1 implementation?

20        A.     Well, it's -- one is, if we look at

21   my report, right, and let me see if I can find this

22   section.

23        Q.     It's on the top of page 27 is where

24   the stalled statement comes in, despite --

25        A.     Okay.  Let me just, I think --

1    sorry.  I'm just looking for my exact number.

2    Well, one is I believe there were only a couple

3    hundred schools that had -- that had participating

4    training after we got to -- I'm pretty sure it's in

5    my report, but I don't see it at this point in

6    time.

7            After, you know, it was about 1200 schools

8    and now in February '23 there's 1400 schools.  And

9    that's people that schools had participated in

10   Tier 1 training.  That doesn't mean that they're

11   doing it with fidelity.  That there's only 400

12   schools that are implementing Tier 2.

13           The state had indicated that they were

14   going to roll out Tier 3 in school year 2021, and

15   they still haven't rolled out Tier 3.

16           Q.    Do you know if COVID had an impact

17   on the rollout in school year 2021?

18                 ATTORNEY HOLKINS:  Object to form.

19                 THE WITNESS:  It could, yeah.

20                 ATTORNEY BELINFANTE:  We can take

21           a break.  Thank you very much.

22                 THE VIDEOGRAPHER:  We are now

23           going off the record at 16:37.

24                 (Recess taken from 4:37 p.m.

25           to 4:49 p.m.)



1                    THE VIDEOGRAPHER:  We are back on

2          the record at 16:49.

3      BY ATTORNEY BELINFANTE:

4          Q.      Dr. Putnam, when we just left, you

5  were talking about your opinion that Georgia has,

6  quote, stalled in its implementation of PBIS.  Is

7  it your understanding that approximately 50 percent

8  of Georgia's schools have implemented at least

9  Tier 1?

10         A.      Can you repeat that question.

11         Q.      Sure.  Is it your understanding that

12 approximately 50 percent of Georgia's state schools

13 have implemented PBIS at least Tier 1?

14         A.      No.

15         Q.      Let me show you what we'll mark as

16 Exhibit 13, which was previously introduced as the

17 United States Exhibit 972.  It was an email cited

18 in your report.  I'll find it.

19         A.      Thank you.

20                 (Exhibit 13 was marked for

21             identification.)

22             ATTORNEY HOLKINS:  This was cited

23        in Dr. Putnam's report?

24             THE WITNESS:  Yes.

25             ATTORNEY HOLKINS:  Are you able to

```
1                    find it?  It's in the Justin Hill
2                    deposition.
3                         ATTORNEY BELINFANTE:  It looks
4                    like, based on the Bates Number 3425886,
5                    it's cited as footnote 76.
6                         ATTORNEY HOLKINS:  It's on
7                    page 28.
8                         THE WITNESS:  Twenty-eight, okay.
9                    Thank you very much.  Just reading the
10                   document.
11                        ATTORNEY POLANSKY:  What exhibit
12                   number is it?
13                        ATTORNEY BELINFANTE:  13.
14                        I think it's because we had two
15                   12s.
16                        THE WITNESS:  Okay.
17         BY ATTORNEY BELINFANTE:
18              Q.    Doctor, can you see there on the
19    first page of this document the -- I don't know why
20    these paragraphs, I guess because they were
21    highlighted, came out looking like scotch plaid or
22    something, but the second paragraph says, "The DOE
23    feels that in order to extend support in the areas
24    of classroom Tiers 2 and 3 to our current
25    district/schools, 50 percent of the state and new
```

1    districts, we need to have adequate DOE technical

2    assistance personnel (TAs, a/k/a state coaches or

3    trainers) to coach the RESA."

4            Do you see that?

5            A.    Yes.

6            Q.    Do you understand that to mean that

7    50 percent of the state is already implementing

8    PBIS?

9                    ATTORNEY HOLKINS:  Object to form.

10                   THE WITNESS:  Well, this doesn't

11           say anything about -- this basically

12           says -- doesn't say they are implementing

13           with fidelity.

14    BY ATTORNEY BELINFANTE:

15           Q.    Okay.  Would you agree though, that

16    if the state schools are at 50 percent with

17    fidelity, that exceeds the national average of PBIS

18    in schools?

19                   ATTORNEY HOLKINS:  Object to form.

20                   THE WITNESS:  Let me -- go back

21           and ask that question again.

22    BY ATTORNEY BELINFANTE:

23           Q.    Sure.  If the state is implementing

24    PBIS or if schools in the state are implementing

25    PBIS with fidelity and it's 50 percent of those

1    schools, wouldn't that exceed the national average?

2                    ATTORNEY HOLKINS:  Object to form.

3                    THE WITNESS:  And when was this

4         written?

5       BY ATTORNEY BELINFANTE:

6           Q.     2017.

7           A.     This is 2017.  The issue is this is

8    why I'm saying it's stalled; right?  Because that

9    particular point in time there are a number of

10   schools trained.  There's not been that many

11   additional schools trained.  We don't know about

12   fidelity in terms of that.  So that's -- this is

13   2017.  This is not 2023.

14          Q.     And your report doesn't indicate how

15   many schools in Georgia have implemented PBIS with

16   fidelity or without, does it?  It doesn't quantify

17   it?

18          A.     Because we never got that

19   information from the GA DOE.

20          Q.     Did you request that of the Georgia

21   Department of Education or did you request that of

22   the Department of Justice?

23                    ATTORNEY HOLKINS:  Object to form.

24                    THE WITNESS:  I requested the

25        Department of Justice to request of

1              Georgia any information that they had

2              relative to PBS.

3         BY ATTORNEY BELINFANTE:

4              Q.    Okay.  Let's look at page 27 of your

5    report.  It says in the last full sentence,

6    "However, as of March 2023 the Georgia Department

7    of Education had never provided training to support

8    Georgia's schools in their adoption of Tier 3

9    despite GA DOE's formal support of PBIS starting 15

10   years ago and its determination in 2015 that it

11   would roll out Tier 3 training during school year

12   2021."

13            Do you see that?

14            A.    No, I'm sorry.  Where are you here,

15   I'm sorry.

16            Q.    It's the last sentence on the page

17   of page 27, starting with "However."

18            A.    It's the last sentence, okay, I'm

19   sorry.  I was in the wrong paragraph.

20            Q.    That's okay.

21            A.    Is what you're asking me is however,

22   as of March 2023 Georgia provided support in the

23   adoption of Tier 3 despite GaDOE's support of PBS

24   starting three years ago?

25            Q.    Right.  My question is, are you



1    aware of any school districts in Georgia, LEAs,

2    asking for Tier 3 training and not receiving it?

3                        ATTORNEY HOLKINS:  Object to form.

4                        THE WITNESS:  No.

5      BY ATTORNEY BELINFANTE:

6         Q.      Isn't it true that nationally it's

7    very difficult for school districts to implement

8    Tier 3 with fidelity in their school system?

9                        ATTORNEY HOLKINS:  Object to form.

10                        THE WITNESS:  I don't know what

11           you mean by "difficult."

12      BY ATTORNEY BELINFANTE:

13         Q.      In your experience, would you say

14    the majority of school districts in the United

15    States have implemented Tier 3 PBIS with fidelity?

16         A.      No.

17         Q.      They have?

18         A.      Repeat the question.

19         Q.      Sure.  Have the majority of school

20    districts in the United States based on your

21    experience implemented Tier 3 PBIS with fidelity?

22         A.      No.

23         Q.      And part of that is it's difficult

24    to implement PBIS Tier 3, is it not?

25                        ATTORNEY HOLKINS:  Object to form.

1                    THE WITNESS:  And I also think

2              part of it is not having the state take

3              the leadership in terms of providing

4              training to their schools around Tier 3

5              implementation.

6      BY ATTORNEY BELINFANTE:

7          Q.     To your knowledge, does the state do

8  anything -- the State of Georgia -- whether DOE,

9  DBHDD or DCH, to prevent local school districts

10 from obtaining training in Tier 3 PBIS?

11                    ATTORNEY HOLKINS:  Object to form.

12                    THE WITNESS:  Well, if it's not

13             accessible, it's hard for them to get

14             that.

15     BY ATTORNEY BELINFANTE:

16         Q.     Right.  But, for example, the May

17 Institute provides training on PBIS Tier 3;

18 correct?

19         A.     Correct.

20         Q.     And, to your knowledge, has the

21 state prevented any local school districts from

22 obtaining training from any source on PBIS Tier 3?

23         A.     Can you repeat that question again.

24         Q.     Sure.  Has the state of Georgia,

25 whether DOE, DCH, or DBHDD, to your knowledge, done

1    anything to prevent local school districts, LEAs,

2    from obtaining training in Tier 3 PBIS?

3                        ATTORNEY HOLKINS:  Object to form.

4                        THE WITNESS:  If it's not

5              accessible to the state, it's hard for

6              them to say, you know, how it turned out;

7              right?

8        BY ATTORNEY BELINFANTE:

9        Q.      But they could retain May Institute,

10   for example, and get the training, correct, the

11   local school districts?

12       A.      They could.

13       Q.      Okay.  My question is to your

14   knowledge, has Georgia said you can only do it

15   through us, for example?  That would be a barrier,

16   the state saying, you know, you can't get PBIS

17   Tier 3 training.

18             To your knowledge, has the state done

19   anything to prevent an LEA from obtaining Tier 3

20   PBIS training?

21       A.      Well, I think in terms of providing

22   the resources to be able to do that, I don't see

23   where Georgia has provided the resources to do

24   that.

25       Q.      Okay.  But it's not enacted a rule

1    or a statute or a policy that says training only

2    has to come from the state; correct?

3           A.    Correct.

4           Q.    All right.  And nothing in Georgia,

5    to your knowledge, says local school districts,

6    LEAs, are prevented from spending their own money

7    on Tier 3 PBIS training; is that correct?

8           A.    That's correct.

9           Q.    Okay.  Let me ask you to look back

10   at Exhibit 4, which is the Bierman article from

11   2021.

12          A.    Sure, okay.  And we never read this,

13   so, if you have a question, I want to make sure you

14   give it to me.

15          Q.    No, we read the Bierman article.

16          A.    I never read the whole thing.

17          Q.    Okay.

18          A.    I have no objection to you asking

19   questions.  I just want to be able to read the

20   article.

21          Q.    I'll tell you what.  We'll save it

22   and then come back to it.  I don't want to overstay

23   my welcome with our federal hosts.

24          A.    Okay.

25                ATTORNEY HOLKINS:  You're always

1             welcome.

2                     ATTORNEY BELINFANTE:  That's what

3             concerns me.

4       BY ATTORNEY BELINFANTE:

5             Q.    All right.  Did you observe schools

6    in Georgia that were attempting to implement PBIS

7    but not doing so with fidelity?

8             A.    Yes.

9             Q.    Which school?

10            A.    I don't remember.

11            Q.    Roughly what percentage of the

12    schools you saw that were implementing PBIS were

13    not doing so with fidelity?

14            A.    I don't remember.

15            Q.    Do you have any opinion as to why

16    they were not implementing PBIS with fidelity?

17                    ATTORNEY HOLKINS:  Object to form.

18                    THE WITNESS:  I don't believe they

19            had the resources from the state to help

20            support them in terms of coaching and

21            training.

22       BY ATTORNEY BELINFANTE:

23            Q.    Okay.  Let me ask this:  The schools

24    you looked at, were a majority them of implementing

25    PBIS Tier 1 with fidelity?

1          A.     I don't remember.

2          Q.     How about Tier 2?

3                 ATTORNEY BELINFANTE:  Object to

4            form.

5                 THE WITNESS:  I don't remember.

6      BY ATTORNEY BELINFANTE:

7          Q.     Now, you said on page 29 of your

8   report, first line, "No school that I saw had a

9   fully functioning Tier 3 system."

10         Do you see that?

11         A.     That's correct.

12         Q.     Okay.  Going back to your report at

13  page 17, you say that Tier 3 services would be

14  utilized typically by 3 to 5 percent of the

15  population.

16                ATTORNEY HOLKINS:  We're still

17           getting to the page.

18                THE WITNESS:  Where is that on the

19           page?

20     BY ATTORNEY BELINFANTE:

21         Q.     The top of the page.

22         A.     Okay.

23                ATTORNEY HOLKINS:  What was the

24           line, I'm sorry?

25         Q.     "Tier 3 offers the most meaningful

1    individualized intensive support services generally

2    to a very small set of students with the highest

3    needs, typically 3 to 5 percent of the population."

4              Do you see that?

5         A.       Correct.

6         Q.       Okay.  So putting those two

7    together, it's no school had a fully functioning

8    Tier 3 system which would typically be needed only

9    by 3 to 5 percent of the student population.

10             Is that a fair way to look at those two

11   together?

12                      ATTORNEY HOLKINS:  Object to form.

13                      THE WITNESS:  Can you repeat the

14        question.

15   BY ATTORNEY BELINFANTE:

16        Q.       Sure.  No school -- and I'm on

17   page 29 -- no school had a fully functioning Tier 3

18   system that would cover 3 to 5 percent of their

19   student population typically.  Is that right?

20        A.       Yes.

21        Q.       Okay.  And by "fully functioning,"

22   you mean to fidelity standards?

23        A.       Well, that's where -- I mean, they

24   may have pieces of a Tier 3 system, but, you know,

25   to really have it in place to improve the

```
 1    effectiveness and the efficiency that we would

 2    expect that with fidelity.

 3             Q.      All right.  Back on page 29.

 4             A.      Yes.

 5             Q.      First full paragraph.  Second

 6    sentence reads, "Yet, many of the schools I

 7    observed failed to integrate school or community

 8    clinical professionals into their PBIS team."

 9             Do you see that?

10             A.      No.

11             Q.      29, first full paragraph, the second

12    sentence.

13             A.      You're on 29?

14             Q.      Yes.

15             A.      In the second paragraph, I'm sorry.

16             Q.      First full paragraph?

17             A.      It's getting late.

18             Q.      Understood.  We're all in the same

19    boat, I assure you.

20             A.      So go back to --

21             Q.      My question is, based on that second

22    sentence, you say "many of the schools."

23             Can you quantify that any more for us?

24                     ATTORNEY HOLKINS:  Object to form.

25                     THE WITNESS:  Let me read the
```



1                    sentence again.

2        BY ATTORNEY BELINFANTE:

3             Q.      Sure.  I'll let you read it.

4             A.      Okay.

5                          (Pause)

6             A.      I found very few of the schools that

7    basically had the school or community

8    professionals, and then I asked as part of my

9    interviews of the schools who served on their PBS

10   teams.

11            Q.      To your knowledge, did the

12   department, Georgia Department of Community Health

13   prevent the schools from having clinical

14   professionals on their PBIS team?

15                     ATTORNEY HOLKINS:  Object to form.

16                     THE WITNESS:  No.

17       BY ATTORNEY BELINFANTE:

18            Q.      To your knowledge, did the

19   Department of Behavioral Health and Developmental

20   Disabilities prevent them from having clinical

21   professionals on their PBIS team?

22                     ATTORNEY HOLKINS:  Object to form.

23                     THE WITNESS:  No.

24       BY ATTORNEY BELINFANTE:

25            Q.      To your knowledge, did the

1    Department of Education provide training that

2    suggested that clinical professionals should be

3    part of the PBIS team?

4                    ATTORNEY HOLKINS:  Object to form.

5                    THE WITNESS:  Well, my -- I didn't

6              see the training that the Department

7              of -- that GaDOE provided to their PBIS

8              teams.  I know it's encouraged that

9              school or community clinical

10             professionals participate on their PBS

11             teams.  Just in general in terms of PBS

12             across the country, but I've never -- I

13             never got -- again, I asked for any

14             information around PBS, and I never got a

15             document that indicated what their

16             training was.

17    BY ATTORNEY BELINFANTE:

18        Q.    Did you review by chance the

19    strategic plan?

20                    ATTORNEY HOLKINS:  Object to form.

21        Q.    Never mind.  Exhibit, I think --

22    yes, okay.  If I have a chance I'll come back to

23    it.

24             All right.  Also on page 29, that same

25    paragraph that we were just talking about, which is

1    the first full or second, you know, just above the

2    Project Aware, the last sentence reads, "Instead, I

3    observed that even students who attended a school

4    with operational -- and operational PBIS program

5    were largely denied the benefits of community

6    supports integrated into the PBIS framework." (As

7    read)

8          Do you see that?

9          A.    Yes.

10         Q.    Okay.  Now, I'm just trying to

11   understand exactly what was said there.  Is the

12   criticism that students were denied access to

13   community supports or that those community supports

14   were not integrated or fractured from their PBIS

15   system?

16                    ATTORNEY HOLKINS:  Object to form.

17                    THE WITNESS:  That the community

18           supports were not integrated into the PBS

19           framework.

20     BY ATTORNEY BELINFANTE:

21         Q.    So you're not saying at least

22   dollars sentence that students were denied

23   community support?

24         A.    No.  But to improve the

25   effectiveness and efficiency of both community



1    supports and PBS, it's strongly recommended that

2    they are integrated.

3          Q.    Okay.  Let's go to part 6, which

4    starts on page 32.  My question is going to be on

5    the second sentence, which is, "For students with

6    behavior-related disabilities to avoid unnecessary

7    GNETS placements and remain in their home schools

8    they must be able to access appropriate therapeutic

9    services to help meet their needs in more

10   integrated educational settings."

11         Do you see that?

12         A.    Yes.

13         Q.    Can you identify for me what the

14   state Department of Community Health is doing to

15   prevent students from accessing therapeutic

16   services?

17         A.    Can you repeat that question.

18         Q.    Sure.  Can you tell me what the

19   state Department of Community Health is doing to

20   prevent students from accessing appropriate

21   therapeutic services?

22               ATTORNEY HOLKINS:  Object to form.

23               THE WITNESS:  Would you mind, it's

24         getting late in the day.  Would you mind

25         just repeating that question.



 1          BY ATTORNEY BELINFANTE:

 2               Q.     That's fine.  Can you tell me what,

 3     if anything, the Georgia Department of Community

 4     Health is doing to prevent students from accessing

 5     appropriate therapeutic services?

 6                    ATTORNEY HOLKINS:  Same objection.

 7                    THE WITNESS:  No.

 8          BY ATTORNEY BELINFANTE:

 9               Q.     Okay.  Can you tell me what, if

10     anything, the Georgia Department of Behavioral

11     Health and Developmental Disabilities is doing to

12     prevent students from accessing appropriate

13     therapeutic services?

14                    ATTORNEY HOLKINS:  Object to form.

15                    THE WITNESS:  Well, they

16             administer the Apex program.  And they

17             have limited the resources dollars Apex

18             program that could be used to access

19             appropriate therapeutic services.

20          BY ATTORNEY BELINFANTE:

21               Q.     Right.  And how did they limit the

22     resources?  Is it purely financial?

23                    ATTORNEY HOLKINS:  Object to form.

24                    THE WITNESS:  I think it's a

25             couple.  It's financial.  It's also, as

1          we've talked about previously, is not

2          encouraging, you know, the use of their

3          state dollars used for Medicaid services.

4          It's also part of their Apex contracts

5          where basically that they are not really

6          identifying those students with

7          behavioral-related disabilities.

8                  So, for example, they are not

9          using office discipline referrals to

10         really identify those students who are

11         most at risk for unnecessary GNETS

12         placement.  That information is available

13         in schools.

14                 So they, one, have not encouraged

15         as part of their Apex contract, which

16         they originally did, and then basically

17         took it out.  And actually one of the

18         depositions, I believe one of the CSBs

19         said that that information was very

20         valuable.

21                 So when you look back at the

22         students related disability to avoid

23         unnecessary GNETS, one is really being

24         able to identify those students.  Two is

25         really to target those students with

1                    appropriate services so that they could

2                    help meet their needs in more integrated

3                    settings.

4         BY ATTORNEY BELINFANTE:

5              Q.     Do you know of any student in

6    Georgia who was recommended for or referred to

7    therapeutic services that did not receive it?

8                         ATTORNEY HOLKINS:  Object to form.

9                         THE WITNESS:  Can you repeat the

10                   question.

11        BY ATTORNEY BELINFANTE:

12             Q.     Sure.  Do you know of any student in

13   Georgia who was recommended for or referred to

14   therapeutic services but did not receive them?

15                        ATTORNEY HOLKINS:  Object to form.

16                        THE WITNESS:  Well, when I talked

17                   to school folks who had understood Apex

18                   and basically participated in the Apex

19                   program, they had students that they

20                   wanted to refer to Apex.  And there

21                   wasn't folks able to take them.

22        BY ATTORNEY BELINFANTE:

23             Q.     Is that because there were too many

24   people already there or because the services were

25   not provided, do you know?

```
 1                    ATTORNEY HOLKINS:  Object to form.

 2                    THE WITNESS:  I'm not sure I

 3           understand the question.

 4      BY ATTORNEY BELINFANTE:

 5           Q.     Do you know why the Apex program

 6      was, in your words, I believe, not able to take

 7      them?

 8           A.     The schools felt that there weren't

 9      sufficient clinicians to be able to provide them

10      due to resources.

11           Q.     Okay.  So the schools made the

12      determination that the Apex program was not able to

13      take them?

14           A.     Well, the schools wanted to refer

15      them, and the Apex providers said they didn't have

16      sufficient resources to take them.

17           Q.     And were those resources, did they

18      prevent the Apex program in these cases you're

19      talking about from offering the services, or were

20      they too full, so to speak?

21                    ATTORNEY HOLKINS:  Object to form.

22           Q.     Not taking any more patients.

23                    ATTORNEY HOLKINS:  Object to form.

24                    THE WITNESS:  Can you repeat that

25           question.
```

1      BY ATTORNEY BELINFANTE:

2          Q.      Why was the Apex program not taking

3   the students?

4                      ATTORNEY HOLKINS:  Object to form.

5                      THE WITNESS:  I don't know.  I

6          didn't ask the Apex folks.  I was just

7          really talking to the school folks.

8      BY ATTORNEY BELINFANTE:

9          Q.      Was this more than one school that

10  you talked to that was relayed to you?

11         A.      Yes.

12         Q.      Do you know which school districts

13  that was?

14         A.      No.

15         Q.      Page 32, the next sentence that

16  we -- the one we were just talking about says,

17  "However, Georgia's own data show that those

18  services are not available or not provided in

19  sufficient quantities to children across the

20  state."

21         Do you see that?

22         A.      Yes.

23         Q.      Is that explained in more detail

24  later in your report?  Is that where you get into

25  the figures and whatnot, or is that statement --

1                       ATTORNEY HOLKINS:  Object to form.

2          Q.      I'll just leave it at that?

3          A.      Repeat the question.

4          Q.      Where would I look to understand the

5    basis of your conclusion that Georgia's own data

6    showed that those services are not available or not

7    provided in sufficient quantities to children

8    across the state?

9          A.      It's in the rest of my -- the rest

10   of this section.

11         Q.      Okay.

12         A.      Yeah.

13         Q.      This is just stating that statement

14   and then you're explaining it?

15         A.      Yeah.

16         Q.      Perfect.  Now, some of the services

17   that would be therapeutic services, again, would be

18   provided outside of -- well, is it possible that a

19   school could provide therapeutic services and not

20   bill Medicaid for them?

21                      ATTORNEY HOLKINS:  Object to form.

22             Asked and answered.

23                      THE WITNESS:  Yes.

24      BY ATTORNEY BELINFANTE:

25         Q.      And those would not be picked up in



1  your examination because your review was for

2  billing data for Medicaid services; is that

3  correct?

4                    ATTORNEY HOLKINS:  Object to form.

5          Asked and answered.

6                    THE WITNESS:  Yes.

7      BY ATTORNEY BELINFANTE:

8          Q.      Page 34.  The first full paragraph

9  says, "Even when Medicaid-enrolled children in

10  Georgia receive behavioral health services, those

11  services are often provided only in limited

12  quantities that, based on my training and

13  experience, are insufficient to meet the needs of

14  many students at serious risk of GNETS placement."

15          Do you see that?

16          A.      Yes.

17          Q.      Do you have an opinion as to why the

18  services were provided in what you describe as only

19  limited quantities?

20          A.      No.

21          Q.      Sorry, I'm actually skipping ahead.

22  So...

23          You may have answered this already, and so

24  I'm sure your counsel will remind me, but looking

25  at figures 2 and 4 on pages 39 and 40.  That looks

1    at services as I understand it that were provided

2    in March of 2020.

3            Am I reading that correctly?

4            A.    Which figure are you referring to?

5            Q.    Figure 2 and figure 4 on page 39 and

6    40.

7            A.    Yes, okay, yes.  Figure 2 and

8    figure 4, yes.

9            Q.    Okay.  Let's look at page 41.  First

10   paragraph that's up there, first complete sentence

11   says, "However, the state delivered Tier 2 and

12   Tier 3 services to only 13,778 total students that

13   school year."

14           Do you see that?

15           A.    Yes.

16           Q.    Okay.  My question is when you say

17   "the state delivered," who do you mean

18   specifically, or what entity is the state?

19           A.    Hang on.  I have to kind of look

20   back.

21           Q.    Sure.

22           A.    So those are Apex -- students served

23   through Apex.

24           Q.    Okay.  So when you say "the state

25   delivered," what specifically did you mean?

1          A.       That Apex providers who had a

2     contract with the state.

3          Q.       Okay.  Looking down at page -- at

4     the bottom of page 41, the first sentence in the

5     last paragraph says, "In addition, the state has

6     failed to utilize Apex-supervised some of its most

7     high intensity services."

8          Do you see that?

9          A.       Yes.

10         Q.       What did you mean by "the state"

11    dollars sentence?

12         A.       If the state had contracts with Apex

13    providers?

14         Q.       Yes.

15         A.       To provide some of its most high

16    intensity services, and as well as had contracts

17    with the other CSBs to provide some of the most

18    high-intensity services.

19         Q.       Okay.  The -- I may have asked this

20    before.  Do you know of any providers that

21    attempted to contract with DBHDD but -- to provide

22    Apex services, but were told by DBHDD that they

23    didn't qualify?

24                   ATTORNEY HOLKINS:  Object to form.

25              Asked and answered.



```
 1                    THE WITNESS:  I don't remember.
 2                    ATTORNEY BELINFANTE:  Okay.  I
 3           tell you what, Patrick.  If it's okay
 4           with you-all, we can take a 5- to 10
 5           minute break, I can probably shorten a
 6           lot of where I've got to go.
 7                    ATTORNEY HOLKINS:  Great.
 8                    THE VIDEOGRAPHER:  We are going
 9           off the record at 17:22.
10                         (Recess taken from 5:22 p.m.
11                to 5:34 p.m.)
12                    THE VIDEOGRAPHER:  We are back on
13           the record at 17:34.
14      BY ATTORNEY BELINFANTE:
15           Q.     Dr. Putnam, are you ready?
16           A.     All set.
17           Q.     Let's go to page 52 of your report.
18           A.     Okay.
19           Q.     All right.  Here is where you talk
20      about you pulled a few students at random in GNETS'
21      SY2020 and SY2022 who enrolled in Medicare
22      PeachCare.  It looks like a total of seven
23      students.
24           Do you see that dollars first paragraph?
25           A.     Correct.
```

1          Q.     You discuss in the report two

2     students, one which we'll refer to or you refer to

3     as Tyler and another you refer to as Kevin.

4          Do you agree with that?

5          A.     Yes.

6          Q.     There's no discussion of the other

7     five students individually; correct?

8          A.     Well, actually there is because it's

9     notable that out of the seven, at least two from

10    each cohort were enrolled in Medicaid PeachCare and

11    were admitted to GNETS but received no Medicaid

12    services in 2022.  So there were two that basically

13    got nothing.

14         Q.     Okay.  So we're up to four out of

15    seven now; right?

16         A.     Correct.

17         Q.     Because Tyler and Kevin are not the

18    two you're referring to that received no services?

19         A.     That's correct.

20         Q.     Okay.  What was the reason or the

21    basis that you used to choose seven files?

22         A.     It was really to illustrate in terms

23    of a couple students in terms of what they

24    received.

25         Q.     Okay.  So to be clear, you're not

1    making an opinion or offering an opinion that that

2    seven is a statistically significant sample; is

3    that correct?

4            A.    No.

5            Q.    Okay.  That just shortened a lot of

6    questions.

7            Let's talk about Tyler, if we can.

8            A.    Yeah.

9            Q.    Do you know what Tyler's diagnosis

10   was sitting here today?

11                 ATTORNEY HOLKINS:  Object to form.

12           Q.    Do you know if Tyler was recommended

13   for any therapeutic Medicaid services prior to his

14   admission to GNETS?

15           A.    No.

16           Q.    Do you know if Tyler had incidents

17   involving violence at school?

18                 ATTORNEY HOLKINS:  Object to form.

19                 THE WITNESS:  No.

20    BY ATTORNEY BELINFANTE:

21           Q.    It says that even after -- and I'm

22   looking for it -- yeah, the top of page 53, even

23   after Tyler entered GNETS, Tyler did not receive

24   sufficient therapeutic Medicaid services to support

25   his transition back to a more integrated placement.



1          Do you see that?

2          A.     Yes.

3          Q.     To your knowledge, are therapeutic

4    services provided in a GNETS setting and not billed

5    to Medicaid?

6                    ATTORNEY HOLKINS:  Object to form.

7                    THE WITNESS:  It could be.

8       BY ATTORNEY BELINFANTE:

9          Q.     All right.  You would agree with me,

10   though, that Apex services are not provided in a

11   GNETS setting; correct?

12                   ATTORNEY HOLKINS:  Object to form.

13                   THE WITNESS:  They could be.

14      BY ATTORNEY BELINFANTE:

15         Q.     All right.  So do you know if Apex

16   services are provided in a GNETS setting?  And by

17   that I mean literally through an Apex program as

18   opposed to intensive care that you might get

19   through Apex and then you can get it without Apex.

20                   ATTORNEY HOLKINS:  Object to form.

21         Q.     Let me try to phrase it this way.

22   To your knowledge, did any Apex providers provide

23   services in GNETS' program?

24         A.     Well, in this particular case I

25   don't think we were just looking at Apex.  We were



1    looking at Medicaid services.

2         Q.    Right.  Okay.  Let's talk about --

3    oh, yeah.  The last sentence dollars same first

4    paragraph on page 53 said, "Had Tyler received

5    therapeutic interventions through Medicaid prior to

6    his referral to GNETS, he might have spent his

7    seventh and eighth grade years in a general

8    education environment."

9         Do you see that?

10        A.    Yes.

11        Q.    When you say, "Might have spent his

12   seventh and eighth grade years," is there a way to

13   quantify that any more?

14        A.    Well, I am -- I'm really, if you

15   look at what Tyler got, you know, he -- as I report

16   here, he received nothing, therapeutic Medicaid

17   until a full year after admission.  When he did

18   receive some therapeutic Medicaid services, he did

19   receive small amounts, and during school year 2021

20   he received 23 units of individual counseling, and

21   he did not receive any community support.

22        And to '22, and there's no indication in

23   the record that Tyler received IC3 and that during

24   school year 2021 and school year 2022 he received

25   19 units of individual counseling.  An average of



1    less than one per month.

2        Now, this is a student, because he's in

3    GNETS has service behavioral issues as defined by

4    the GNETS rule, and, you know, when you look at in

5    terms of two years and he received 19 units of

6    individual counseling, less than an average of one

7    per month, that's really not a whole lot.

8        And, you know, he received no community

9    support until 2022.  Never received any IC3.  So

10   when you begin to look at somebody with, you know,

11   serious behavioral disabilities, the reality is

12   he's received a very limited amount.

13        Q.    But we don't know, we have to make

14   some level of presumption that had he received the

15   services when he was younger he could have stayed

16   in a general educational environment?  Isn't that

17   right?

18                ATTORNEY HOLKINS:  Object to form.

19        Q.    We have to still make some

20   presumption that had he received the services when

21   he was younger he could have stayed in a general

22   education environment; is that correct?

23                ATTORNEY HOLKINS:  Same objection.

24                THE WITNESS:  Yes, it's possible.

25

1          BY ATTORNEY BELINFANTE:

2               Q.     In other words, it's not like you

3      get a bacterial infection, you get an antibiotic,

4      it's going to kill the bacteria.  Here we have to

5      presume that the services would work, and that is

6      how you determine that he might have spent

7      seventh or eighth grade.  It's a presumption;

8      correct?

9                          ATTORNEY HOLKINS:  Object to form.

10                         THE WITNESS:  I'm not sure I

11              understand the question.

12         BY ATTORNEY BELINFANTE:

13              Q.     Okay.  Might have spent his

14      seventh and eighth grade years in the general

15      education environment, that's a presumption you're

16      making.  Isn't that right?

17                         ATTORNEY HOLKINS:  Object to form.

18                         THE WITNESS:  Presumption that if

19              he received appropriate Medicaid

20              services?

21         BY ATTORNEY BELINFANTE:

22              Q.     Yes.

23              A.     Yes.  And what were our analysis --

24      or my analysis was that he didn't.  And so I think

25      certainly that could be a contributing factor to

1  him spending his two years in a restrictive GNETS

2  placement that both in terms of prevention as well

3  as intervention, once he was in GNETS.

4          Q.      So it's a contributing factor?

5                ATTORNEY HOLKINS:  Object to form.

6                THE WITNESS:  Lack of services,

7       yes.

8  BY ATTORNEY BELINFANTE:

9          Q.      Okay.  Is it your experience that

10  children also go through a great deal or

11  significant amount of growth and development in

12  their seventh and eighth grade years?

13          A.      I'm not sure what you mean by

14  "significant development."

15          Q.      Is it your experience that students

16  mature a good deal during their seventh and

17  eighth grade years?

18                ATTORNEY HOLKINS:  Object to form.

19                THE WITNESS:  I think the whole

20       developmental trajectory is important.

21  BY ATTORNEY BELINFANTE:

22          Q.      I'm not going to get into that with

23  you.

24          A.      I have both personal experience

25  having two kids.



1          Q.     Okay.  Let's talk about Kevin then,

2     who is the next person discussed on page 53.

3          A.     Yes.

4          Q.     Same thought here, that you have to

5     make a presumption.  We don't know that if Kevin

6     received Medicaid-funded services prior to entering

7     GNETS he may not have had to enter GNETS.  Isn't

8     that right?

9               ATTORNEY HOLKINS:  Object to form.

10              THE WITNESS:  What I think

11          were- what I'm saying is it reduces the

12          probability if he got Medicaid services,

13          if he had access to those Medicaid

14          services and if he had the appropriate

15          intensity that from my experience in the

16          research, that it reduces the

17          probability.

18     BY ATTORNEY BELINFANTE:

19          Q.     Okay.  Do you recall where Kevin is

20     from in the State of Georgia?

21          A.     No.

22          Q.     Do you recall where Tyler is from in

23     the State of Georgia?

24          A.     No.

25          Q.     Okay.  Do you recall what Kevin --

1    if Kevin had a more specific diagnosis than EBD?

2            A.     No.

3            Q.     Do you recall if Kevin was involved

4    in incidents of violence at school prior to his

5    receiving services at GNETS?

6            A.     No.

7            Q.     Let's take a look at part 8.

8            A.     Yes.

9            Q.     Reasonable steps that Georgia could

10   take to prevent unnecessary GNETS placements.  The

11   good news is based on the way your report is

12   written, and I'm thankful for it, we've already

13   covered a lot of this ground.

14           A.     Okay.

15           Q.     And so I think we'll be able to get

16   through it.

17           One question I had involved the citation to

18   your article again on page 145 -- I'm sorry,

19   page 56, footnote 145.

20           A.     Yes.

21           Q.     That's the article we looked at

22   earlier.  Isn't that right?

23           A.     That's correct.

24           Q.     Okay.

25                  ATTORNEY HOLKINS:  To be clear for

1              the record, you're talking about

2              Exhibit 3?

3                      ATTORNEY BELINFANTE:  Yes.

4              Exhibit 3.

5                      ATTORNEY HOLKINS:  Thank you.

6                      ATTORNEY BELINFANTE:  Good call.

7      BY ATTORNEY BELINFANTE:

8          Q.     And that article as we talked about

9   looked at schools or analyzed district level

10  decisions.  Isn't that right?

11                     ATTORNEY HOLKINS:  Object to form.

12                     THE WITNESS:  I'm not sure what

13             you mean by that.

14     BY ATTORNEY BELINFANTE:

15         Q.     Sure.  Your 2002 article looked at

16  district level decisions and district level

17  spending; isn't that right?

18                     ATTORNEY HOLKINS:  Object to form.

19                     THE WITNESS:  Can we bring that

20             article up?

21                     I haven't looked at this in a

22             while.  Can I look at this?

23                     ATTORNEY HOLKINS:  Sure.

24                     THE WITNESS:  Finding a page

25             number.  17.

1      BY ATTORNEY BELINFANTE:

2          Q.    Let me ask the question this way:

3    The analysis conducted here is on a school district

4    level.  Isn't that right?  You didn't look at the

5    state of Massachusetts.  It's comparing districts;

6    isn't that right?

7          A.    Well, what I did was basically

8    looked at one school district, which was a large

9    urban district.  And I looked at Table 1, service

10   components of district-wide approach to behavior

11   support, which is functional behavior assessments;

12   preparation of written behavior intervention plans;

13   social skills assessment; social skills training;

14   database progress monitoring; parent training;

15   competency-based staff training; classroom-based

16   behavioral intervention; school-wide behavioral.

17          And what the district did was look at in

18   terms of doing this, particularly targeting those

19   students that were most at risk for restrictive

20   placement.  And we then looked at the cost relative

21   to both per capita costs for out-of-district

22   placements, stand-alone, they basically could be

23   one in the same.

24          And we looked at percent of the public

25   school budget consumed by our district placements.



```
1   And that particular district as compared to the

2   other 14 largest districts in Massachusetts -- we

3   went on size -- they were -- as you can see in

4   figure 2, they spent $100 per capita of their

5   students.  And we used the per capita basis because

6   we wanted to make it even.  If you look at the

7   district, how they spent $650.  And then it went

8   all the way down to $400, $300; right?

9           And then if you look at in terms of the

10  percent of the public school budget consumed by

11  out-of-district placements, it went from this

12  district had less than 2 percent of their budget

13  that was on out-of-district placements as compared

14  to -- you can see a number of others that spent 7

15  or 8 percent of their budget on out-of-district

16  input.

17          So we took this district that, you know,

18  had practices that I listed in my report that

19  had -- could be implemented, and then looked at in

20  terms of comparative districts in terms of the

21  spending.  And then we also looked at in terms of

22  inclusion entity, because this district used those

23  savings to improve inclusionary services.

24          So literally the purpose of this was to

25  inform states and inform districts no matter
```



1    whether they are small or large of what they could

2    do to better leverage their funding to provide

3    services that would improve inclusion.

4            And so that was really the purpose was to

5    be able to -- in fact, we got a lot of comments in

6    this article saying this is really enlightening in

7    terms of really how we should look at our service

8    delivery system to one -- as it indicates on the

9    thing when we look at it on a statewide basis,

10   about $250 million savings.  It is to reallocate

11   resources to support students for the inclusionary

12   services.

13           Q.    On page 57, recognizing that that

14   report focused on district level, page 57 says in

15   the first sentence, "My experience working with

16   this district and others to implement

17   exclusionary" -- excuse me -- "inclusionary

18   services and supports to help students with

19   behavior-related disabilities, avoid restrictive

20   placement is grounded in extensive research

21   demonstrating not only the effectiveness of the

22   services and supports, see Part 3, but also

23   strategies that could be used to achieve and

24   sustain wide scale reform."

25           Do you see that?



1          A.      Yes.

2                  ATTORNEY HOLKINS:    Object to form.

3          Q.      That sites the NASSP bulletin?

4          A.      Yes.

5          Q.      All right.  You then go on to say,

6    "To prevent unnecessary GNETS placement and serve

7    moire students with behavior-related disabilities

8    in integrated classrooms, Georgia need not reinvent

9    the wheel.  The roadmap for reform is well

10   established."

11         Can you identify for us what states Georgia

12   should look to to provide the roadmap for reform as

13   you describe it?

14         A.      I think they need to look at the

15   research in terms of that.

16         Q.      What research?

17         A.      Well, one is this article.

18         Q.      This article being Exhibit 3, your

19   article?

20         A.      Yeah.  There are also other articles

21   on the PBIS website.

22         Q.      But you can't, sitting here today,

23   point to a state and say this is a state that's

24   implemented what I'm suggesting and therefore

25   establishing the road map for reform?



1                    ATTORNEY HOLKINS:  Object to form.

2                    THE WITNESS:  Not off the top of

3          my head.

4                    ATTORNEY HOLKINS:  I just want to

5          go back.  Counsel, you asked Dr. Putnam

6          whether this support for the previous

7          statement that you reference was the

8          NAASP bulletin.  And Dr. Putnam answered

9          yes.  I just want the record to reflect

10         that there are other studies referenced

11         in that same footnote 146.

12                    ATTORNEY BELINFANTE:  Fair.

13      BY ATTORNEY BELINFANTE:

14         Q.     You cite in the next sentence, "The

15   successes I have witnessed at the district level

16   could be used statewide using the same prudent

17   strategies," and you site for that the School and

18   Community Healing Collaborative from 2023,

19   footnote 147.

20         Do you see that?

21         A.     Yes.

22         Q.     Okay.  To no one's great surprise I

23   will show you what we've marked as Exhibit 14,

24   which is I believe and hope the document which you

25   referred to in footnote 147.

```
 1              A.      Uh-huh.

 2                          (Exhibit 14 was marked for

 3                      identification.)

 4              A.      May I take a little time to look at

 5      this?

 6              Q.      A little, sure.  Let me just ask

 7      this before you do that.  You were part of the

 8      authors of this study; correct?

 9              A.      Correct.

10              Q.      Okay.

11                          (Pause)

12              A.      Okay.

13              Q.      All right.  Let's go to page 3 of

14      that document.

15              A.      Uh-huh.

16              Q.      This is Exhibit 14.  It says there

17      that the document is -- and this is in the second

18      paragraph under the shaded part.

19              "This document is an expression of hope

20      that in this moment of crisis we can overcome or we

21      can come together and generate true and impactful

22      change in America's schools, keeping what is

23      working, but also innovating new approaches to

24      mitigate systemic harm to students, families,

25      caregivers and staff to support academic rigor
```

1    alongside mental and social health for all involved

2    in the educational system."

3            Do you see that?

4            A.      Yes.

5            Q.      So the document as described in your

6    report says that what's witnessed district level

7    can be replicated statewide using the same proven

8    strategies, but this document describes itself as

9    an expression of hope.

10           How do you reconcile those two?

11                  ATTORNEY HOLKINS:   Object to form.

12                  THE WITNESS:  Well, I think you

13       have to look at the actual practices.

14    BY ATTORNEY BELINFANTE:

15           Q.      Okay.

16           A.      So, for example, it suggests in a

17   number of practices in classrooms that basically I

18   believe that I witnessed it at a district level.

19   So when you look at in terms of the classroom,

20   welcomed and greeted, I witnessed that as district

21   level.  You know, I witnessed districts providing

22   higher rates of feedback and acknowledgment.  I

23   witnessed directly teaching -- taught and support

24   the use of effective social skills,

25   self-regulation, and coping skills.



1       So, you know, that's just one.  And then if

2  we go and vision in terms of staff, which in my

3  report I suggested increased professional

4  development for administrative and staff and, you

5  know, welcome and greeted warmly into a set of

6  consistent predictableness for educators and staff,

7  encourage and provided opportunities.

8       So, you know, I clearly witnessed these

9  things.  That sentence is the successes I've

10 witnessed which have resulted -- these things have

11 resulted directly in reduced office discipline

12 referrals that's the leading indicator.  Hang on

13 one second.  I'm not finished.

14      And if we go over to two, you know, it's

15 basically -- it suggests specifically the state

16 actions that could be taken in terms of this and

17 part of the National Technical Assistance Center.

18 These are the things that we witnessed states doing

19 to improve what's going on in their schools to

20 reduce the office discipline referrals that

21 impact -- lead to more restrictive settings.

22      Q.    And appreciating that, Doctor, back

23 on page 3, despite what the document provides, and

24 we can get into -- and I'll ask some specific

25 questions about what's in the back.



1          A.      Sure.

2          Q.      Back on page 3, the sentence after

3    the one I just read said that this document is not

4    intended to be a comprehensive how-to guide for

5    recovery.  Instead, it is presenting as a starting

6    place and a call for ongoing dialogue and learning

7    that leads to meaningful action.

8          Do you see that?

9          A.      Yes.

10          Q.      My question goes back to your

11    report.  If this report, which is cited as

12    footnote 147, is the basis for the State of Georgia

13    to conclude that your strategies that you recommend

14    can be replicated statewide, how is the state

15    supposed to use this when this report says it's not

16    a how-to guide?

17                    ATTORNEY HOLKINS:  Object to form.

18          Q.      It's a starting point, starting

19    place.

20                    ATTORNEY HOLKINS:  Object to form.

21                    THE WITNESS:  Well, one of the

22              things that you need to look at is the

23              systemic care plan.  If you look at

24              Georgia's system of care plan.

25

1         BY ATTORNEY BELINFANTE:

2              Q.      Right.

3              A.      That aligns with this particular

4    document.  If you look at their PBS, strategic

5    plan, it aligns with this document.  So Georgia's

6    already taken many of these things and already put

7    in their strategic plans for what they would like

8    Georgia to do moving forward.

9              So I don't see this as a hopeful thing

10   when, in fact, Georgia has already in their own

11   words outlined in terms of many of these things in

12   their current strategic plans.

13             Q.      And -- but this document calls for,

14   in its own words, radical change in how we

15   prioritize actions.  Isn't that right?

16                     ATTORNEY HOLKINS:  Object to form.

17        Are you referencing Exhibit 14 or --

18                     ATTORNEY BELINFANTE:  Exhibit 14.

19                     THE WITNESS:  Where is that?

20   BY ATTORNEY BELINFANTE:

21             Q.      Page 5, second bullet point.

22             A.      I don't see that.

23             Q.      Second bullet point, first sentence

24   reads, "There also needs to be an acknowledgment

25   that everyone has experienced a global disaster in

1    the combination of COVID-19, social injustice,

2    racial injustice, political divisiveness,

3    environmental impact, and gun violence requires

4    radical change in how we prioritize action."

5          Do you see that?

6          A.    No.   I don't know where you are.

7          Q.    Page 5 of Exhibit 14, the second

8    bullet point.

9          A.    The second bullet point.   Well, it

10   may be in some places that requires radical change.

11   However, if we go back to the Georgia system of

12   care, strategic plan, this aligns beautifully with

13   this document.

14         And also go back to the PBS, the Georgia

15   strategic plan.   So I didn't see that as, you know,

16   as radical change where Georgia has already

17   indicated this is the direction they want to go.

18         Q.    Let's go to page 9 of Exhibit 14.

19   Looking at the bottom paragraph, two-thirds of the

20   way through there's a sentence that says, "For

21   those youth who are poor and from minority and

22   marginalized communities, this will likely include

23   significant funding and staffing efforts to help

24   bring those students into academic competency."

25         Do you see that?



1           A.      Yes.

2           Q.      Do you agree with that statement?

3                   ATTORNEY HOLKINS:  Object to form.

4                   THE WITNESS:  Well, I think what

5             I've continued to say is there are

6             resources in Georgia that can be

7             reallocated to provide the services that

8             these students need to not need more

9             restrictive placements.

10      BY ATTORNEY BELINFANTE:

11          Q.      But to use this document,

12      Exhibit 14, as a plan, it's going to require

13      significant funding and staffing.  Isn't that

14      right?

15                  ATTORNEY HOLKINS:  Object to form.

16                  THE WITNESS:  Depends on the

17            state, and it depends on the district.

18            Again, I just go back to the Georgia

19            system of care plan that aligns with this

20            document, that's already -- Georgia has

21            committed to moving forward.

22                  I go back to the PBS strategic

23            plan that aligns with this particular

24            document.  They've already committed to

25            moving in this particular direction.

1          BY ATTORNEY BELINFANTE:

2              Q.      But I understand part of your

3      criticisms of Georgia's efforts has been a lack of

4      resources.  And here is another document showing

5      that there needs to be significant funding.

6              So even if Georgia has said that this is

7      going to happen or that Georgia intended to happen,

8      it is still going to require significant funding in

9      the words of Exhibit 14, which you cite as the

10     basis to conclude that what happened in one school

11     district in Massachusetts can be replicated

12     statewide.  Isn't that right?

13                        ATTORNEY HOLKINS:  Object to form.

14                        THE WITNESS:  No.

15         BY ATTORNEY BELINFANTE:

16              Q.      Okay.  Then how is it, the

17     document -- you have said repeatedly that Georgia's

18     challenge is a commitment of resources.  Isn't that

19     right?

20                        ATTORNEY HOLKINS:  Object to form.

21                        THE WITNESS:  I've said there are

22            resources in Georgia that can be

23            reallocated to support these students.

24         BY ATTORNEY BELINFANTE:

25              Q.      And those resources are currently,

1    in your opinion, being spent on GNETS facilities;

2    is that right?

3                        ATTORNEY HOLKINS:  Object to form.

4                        THE WITNESS:  Some.

5        BY ATTORNEY BELINFANTE:

6            Q.    Because in going to page 58 of your

7    report, you write in the last sentence of the first

8    full paragraph, "By contrast, Georgia uses

9    state-only funds for Behavioral Health services in

10   GNETS facilities."

11           Do you see that?

12           A.    No.  Where is that?

13           Q.    The last sentence of the first full

14   paragraph on page 58.

15           A.    Yes.  Okay, I see that, yeah.

16           Q.    So your argument is or it is your

17   argument that Georgia should redirect funds

18   currently dedicated to GNETS to Medicaid-based

19   services?

20                       ATTORNEY HOLKINS:  Object to form.

21                       THE WITNESS:  That's just one

22           component.

23       BY ATTORNEY BELINFANTE:

24           Q.    Just one component, okay.

25           So that would be the redirection of

1    services.  There would still have to be, using the

2    words of the Exhibit 14 report, significant funding

3    and staffing efforts to help bring these students

4    into academic competency.  Isn't that right?

5                    ATTORNEY HOLKINS:  Object to form.

6                    THE WITNESS:  Again, I will go

7            back to what Georgia has already put in

8            writing in terms of their strategic plans

9            of what they want to do to achieve this.

10    BY ATTORNEY BELINFANTE:

11        Q.    And you've not conducted yourself

12    any cost analysis as to what it would take to fully

13    implement the strategic -- the systems of care

14    plan; isn't that right?

15                    ATTORNEY HOLKINS:  Object to form.

16                    THE WITNESS:  Correct.

17    BY ATTORNEY BELINFANTE:

18        Q.    And you have not done any cost

19    analysis to see what it would cost to fully

20    implement the state's PBIS program.  Isn't that

21    right?

22        A.    Correct.

23        Q.    Okay.  Let's go to page 60 under

24    "Service Intensity."

25        A.    Yes.

1          Q.     The second paragraph, the first full

2    sentence reads, "Specifically, Georgia can set

3    expectations around behavioral health service

4    delivery and student outcomes, including through

5    its Apex and PBIS programs and can expand and

6    enhance existing effort to collect and analyze data

7    in these areas."

8          Do you see that?

9          A.     Yes.

10         Q.     Okay.  When you say "Georgia can set

11   expectations around Behavioral Health service

12   delivery and student outcomes," what is the role

13   for the Department of Community Health in setting

14   those expectations?  Or do you have an opinion as

15   to whether there is a role for the Department of

16   Community Health in setting those expectations?

17                    ATTORNEY HOLKINS:  Object to form.

18                    THE WITNESS:  Well, through the

19           DBHDD manual, they've set expectations

20           for Behavioral Health service delivery.

21      BY ATTORNEY BELINFANTE:

22         Q.     Okay.  And you don't have any

23   criticisms of what is in the provider manual; is

24   that right?

25                    ATTORNEY HOLKINS:  Object to form.

```
 1                    THE WITNESS:  I think that's a --
 2           they set reasonable expectations, yes.
 3      BY ATTORNEY BELINFANTE:
 4           Q.     Okay.  Let's look at page 62.
 5           A.     62.
 6           Q.     Yes.  I'm looking for the specific
 7  piece that I had.  If anyone wants to jump ahead,
 8  it's the baseline of knowledge phrase.
 9                    ATTORNEY HOLKINS:  Looking at the
10           first sentence.
11           Q.     Okay.  Dr. Putnam, as you said, it's
12  getting late in the day.
13           A.     Right.
14           Q.     That first sentence says,
15  "Providing" -- I'm on page 62 under III, "Providing
16  effective services for students with
17  behavioral-related disabilities requires that
18  educators, school administrators, and service
19  providers all have a baseline of knowledge,
20  training, and experience consistent with
21  established standards of care."
22           Do you see that?
23           A.     Correct.
24           Q.     What do you mean by "baseline of
25  knowledge"?
```

1          A.      Well, one would be PBS, both at

2   Tier 1 and classroom as well as some knowledge of

3   what we mean by Tier 2 and some knowledge of what

4   we mean by Tier 3.

5          Q.      Okay.  Is there a place that one

6   could go look to determine what would be a

7   sufficient baseline of knowledge that educators are

8   required to have to be within established standards

9   of care?

10                    ATTORNEY HOLKINS:  Object to form.

11                    THE WITNESS:  Again, I would go to

12              the PBS website.

13      BY ATTORNEY BELINFANTE:

14          Q.      Okay.

15          A.      Which is the National Technical

16   Assistance Center funded by the office of special

17   education.

18          Q.      All right.

19          Talk about the data collection in IV.  Is

20   it your opinion that the state is not doing enough

21   to collect data or that the state is affirmatively

22   hampering the collection of data?

23                    ATTORNEY HOLKINS:  Object to form.

24                    THE WITNESS:  As I say in my

25              report, the state can address this by



```
 1                taking reasonable steps to fully

 2                implement objectives as set forth in its

 3                system of care plan, which includes

 4                improving coordination and data sharing

 5                between the state's child serving

 6                agencies, local school district and

 7                school-based service provider

 8                organizations and other community

 9                partners.

10                     ATTORNEY BELINFANTE:  This is now

11                everybody's favorite part of the

12                deposition.  I should say second favorite

13                part.  If you all give me five minutes, I

14                could be done.

15                     THE VIDEOGRAPHER:  We are going

16                off the record at 18:15.

17                          (Recess taken from

18                     6:15 p.m. to 6:23 p.m.)

19                     THE VIDEOGRAPHER:  We are back on

20                the record at 18:23.

21           BY ATTORNEY BELINFANTE:

22                Q.    Dr. Putnam, literally just a few

23      questions left.

24                Did you happen to read Dr. Wiley's report

25      in this case?
```

1          A.      No.

2          Q.      Do you plan to read it?

3                  ATTORNEY HOLKINS:  Object to form.

4                  THE WITNESS:  If I'm directed by

5          counsel to read it, yes.

6    BY ATTORNEY BELINFANTE:

7          Q.      Do you plan to opine on it at trial?

8                  ATTORNEY HOLKINS:  Object to form.

9                  THE WITNESS:  I don't know.

10   BY ATTORNEY BELINFANTE:

11         Q.      If you do plan to provide an opinion

12   on Dr. Wiley's report at trial, do you plan to

13   write a report summarizing your opinion?

14                 ATTORNEY COHEN:  Object to form.

15                 THE WITNESS:  I don't know.

16                 ATTORNEY BELINFANTE:  I don't have

17         any more questions, and unless there's

18         redirect I will reserve any more

19         questions.

20                 ATTORNEY HOLKINS:  The United

21         States has no more questions for

22         Dr. Putnam.  One more thing on the

23         record, Dr. Putnam would like to read and

24         sign.

25                 ATTORNEY BELINFANTE:  The only

1           thing I will do, and I don't think this

2           will be an issue or at least it will be

3           one that I can resolve later is I will

4           now suspend the deposition pending if he

5           does issue a report or plan to opine on

6           Dr. Wiley's testimony.

7                   ATTORNEY HOLKINS:  The United

8           States would object to holding this

9           deposition open.  We understand that

10          you're making the record, but we also

11          want our objection to be noted.

12                  ATTORNEY BELINFANTE:  Dr. Putnam,

13          that means you are done for the day, and

14          thank you for making the trip to D.C.

15                  THE VIDEOGRAPHER:  We are going

16          off the record at 18:25.

17                  THE COURT REPORTER:  Would you

18          like to state your transcript order on

19          the record now?

20                  ATTORNEY HOLKINS:  Yes, we would

21          like to order a rough transcript.  We

22          will be in touch, I believe, with your

23          agency about that.

24                  ATTORNEY BELINFANTE:  We would

25          also like a rough transcript.  And then

1          whatever we need to review.

2                          (Proceedings adjourned at

3                  6:25 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    DISTRICT OF COLUMBIA:                    SS.

2         I, Barbara Moore, a Registered Court Reporter

3    of the District of Columbia, do hereby certify that

4    these proceedings took place before me at the time

5    and place herein set out, and the proceedings were

6    recorded stenographically by me and this transcript

7    is a true record of the proceedings.

8

9         I further certify that I am not of counsel to

10   any of the parties, nor an employee of counsel nor

11   related to any of the parties, nor in any way

12   interested in the outcome of this action.

13

14

15

16   _____

17        BARBARA MOORE, CRR, RMR

18

19   _____

20   My Commission Expires:

21   July 31, 2028

22

23

24

25



Notice Date: 09/13/2023

Deposition Date: 9/7/2023

Deponent: Robert F. Putnam

Case Name: United States of America v. State of Georgia

Page:Line                Now Reads                    Should Read

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this \_\_\_\_\_ day of _____,

20\_\_, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES:



**WORD INDEX**

**< $ >**
**$10,000** 150:*13*
**$100** 42:*7* 45:*5* 269:*4*
**$150** 43:*1* 44:*1, 6, 21*
**$2** 82:*16, 19* 83:*19, 20*
**$250** 270:*10*
**$300** 269:*8*
**$400** 269:*8*
**$50** 89:*5*
**$6** 70:*20*
**$650** 269:*7*
**$700** 42:*8*

**< 0 >**
**02368** 5:*21*

**< 1 >**
**1** 3:*5* 9:*12, 20* 37:*19, 24*
38:*6* 40:*18, 21* 47:*12*
50:*7* 59:*11* 66:*20, 25*
74:*11* 82:*4* 85:*7, 8*
92:*24* 96:*7* 98:*21*
118:*25* 132:*14* 133:*20*
137:*10* 149:*5* 151:*18*
153:*19, 20, 21, 23, 25*
154:*6, 9, 13* 165:*3, 5, 6,
12, 22* 171:*23* 173:*22*
184:*1* 206:*17, 25* 207:*1,
6, 7* 208:*10* 209:*6, 11, 12*
221:*1, 21* 229:*19* 230:*10*
231:*9, 13* 240:*25* 268:*9*
285:*2*
**1:16-cv-03088-ELR** 1:*8*
**1:54** 134:*1*
**10** 3:*5* 118:*5, 8* 128:*5*
193:*19, 20* 257:*4*
**10:16** 28:*13*
**10:36** 28:*17*
**100** 22:*17* 24:*11*
**101** 114:*20, 22* 161:*14*
**104** 116:*16*
**105** 116:*21*
**11** 3:*5* 120:*12, 21* 123:*7*
205:*16, 20* 208:*8* 210:*17,
18*
**11:48** 85:*1, 3*
**12** 3:*5* 120:*20* 121:*13*
133:*19* 137:*9, 10* 163:*4*
210:*4, 8* 212:*23, 25*
213:*3, 7* 218:*15, 18*
**12:51** 85:*3, 5*
**1200** 230:*7*
**125** 3:*5*
**128,961** 162:*22*
**12s** 232:*15*
**13** 3:*5* 59:*10* 136:*1*
139:*15* 140:*6* 231:*16, 20*
232:*13*

**13,778** 255:*12*
**13:54** 133:*25*
**14** 3:*5* 35:*23* 125:*25*
135:*10, 19* 136:*1* 142:*18*
146:*18* 155:*1* 269:*2*
272:*23* 273:*2, 16* 277:*17,
18* 278:*7, 18* 279:*12*
280:*9* 282:*2*
**14:08** 134:*4*
**1400** 230:*8*
**141** 3:*5*
**145** 266:*18, 19*
**146** 272:*11*
**147** 272:*19, 25* 276:*12*
**14th** 2:*19*
**15** 36:*24* 37:*7, 9* 38:*11,
23* 125:*18* 127:*1, 5, 9, 23*
128:*5* 151:*4* 155:*1, 15*
157:*2* 235:*9*
**15,000** 35:*19*
**15:07** 178:*23*
**15:19** 179:*2*
**150** 1:*17* 2:*9* 4:*10*
44:*13*
**151** 3:*5*
**16** 20:*1* 128:*7* 155:*15*
157:*3* 158:*12* 205:*7, 14*
**16,000** 39:*5*
**16:37** 230:*23*
**16:49** 231:*2*
**160** 3:*5*
**1600** 32:*15*
**162** 3:*5*
**17** 37:*17* 38:*3* 115:*9, 15*
139:*15, 16* 158:*13*
166:*13* 168:*20* 169:*16*
220:*10* 241:*13* 267:*25*
**17:22** 257:*9*
**17:34** 257:*13*
**18** 38:*9* 164:*11* 168:*20*
170:*8, 14* 173:*21*
**18:15** 286:*16*
**18:23** 286:*20*
**18:25** 288:*16*
**19** 39:*2* 168:*20* 176:*8*
179:*11* 181:*14* 182:*12*
261:*25* 262:*5*
**191** 3:*5*
**193** 3:*5*
**1995** 38:*12, 19, 21*
**1997** 38:*12, 19, 21*

**< 2 >**
**2** 3:*5* 25:*22, 23* 26:*24*
27:*10* 28:*21* 31:*19*
37:*19, 24* 38:*6* 42:*5, 13*
45:*1* 98:*24* 127:*4, 25*
137:*11* 153:*20* 168:*7, 21,
25* 169:*9, 19, 20* 170:*3, 5*
171:*13* 172:*9, 23* 173:*6,
13, 14* 192:*22* 209:*2*

**229**:*9, 18* 230:*12* 232:*24*
241:*2* 254:*25* 255:*5, 7,
11* 269:*4, 12* 285:*3*
**2:08** 134:*2*
**20** 24:*25* 25:*7* 127:*5, 23*
**20002** 2:*10*
**2002** 267:*15*
**2006** 126:*7*
**2015** 129:*5* 235:*10*
**2017** 134:*16* 234:*6, 7, 13*
**2019** 114:*23*
**2020** 255:*2*
**2021** 118:*23* 119:*10*
224:*10* 230:*14, 17*
235:*12* 239:*11* 261:*19,
24*
**2022** 37:*10* 258:*12*
261:*24* 262:*9*
**2023** 1:*10* 4:*5* 207:*1, 6*
234:*13* 235:*6, 22* 272:*18*
**2028** 290:*21*
**205** 3:*5*
**21** 140:*22, 24* 141:*7*
183:*3, 17* 188:*2*
**210** 3:*5*
**218** 3:*5*
**22** 39:*18* 88:*14* 92:*23*
190:*9, 12* 192:*12, 13, 23*
193:*5* 195:*16* 196:*6*
219:*4, 14* 261:*22*
**23** 41:*2* 42:*16, 19* 48:*3*
151:*4* 192:*19* 206:*17*
219:*14* 221:*19* 224:*18*
230:*8* 261:*20*
**231** 3:*5*
**24** 219:*16, 17* 220:*19, 24,
25*
**25** 3:*5* 45:*17* 167:*25*
168:*2* 203:*7* 214:*6*
222:*14* 225:*4* 229:*13*
**26** 163:*17*
**26,000** 161:*1* 163:*17*
**27** 229:*23* 235:*4, 17*
**273** 3:*5*
**28** 232:*7*
**29** 21:*12* 166:*14* 241:*7*
242:*17* 243:*3, 11, 13*
245:*24*

**< 3 >**
**3** 3:*5* 22:*10* 28:*4, 21*
29:*20* 37:*13, 14* 38:*3*
40:*15, 25* 41:*3* 42:*5, 10*
50:*6* 100:*1* 115:*12, 16,
19, 21* 116:*4* 119:*3*
153:*20* 163:*6* 172:*9, 24*
194:*10, 17* 221:*19*
229:*10, 18* 230:*14, 15*
232:*24* 235:*8, 11, 23*
236:*2, 8, 15, 21, 24* 237:*4,
10, 17, 22* 238:*2, 17, 19*

**239**:*7* 241:*9, 13, 14, 25*
242:*3, 8, 9, 17, 18, 24*
255:*12* 267:*2, 4* 270:*22*
271:*18* 273:*13* 275:*23*
276:*2* 285:*4*
**3,000** 112:*25*
**3:07** 178:*24*
**3:19** 178:*25*
**30** 191:*25*
**30,000** 159:*19* 161:*6*
163:*18*
**30318** 2:*20*
**31** 290:*21*
**32** 247:*4* 252:*15*
**33** 111:*9, 16, 22* 114:*21*
164:*10, 16*
**34** 116:*12* 254:*8*
**3425886** 232:*4*
**365** 134:*17* 135:*12*
**37** 3:*5* 118:*19* 120:*4*
**38** 193:*5*
**39** 192:*18, 23* 193:*12*
254:*25* 255:*5*

**< 4 >**
**4** 3:*5* 28:*4, 21* 43:*15*
98:*20* 125:*19, 20* 239:*10*
254:*25* 255:*5, 8*
**4(a** 194:*24* 195:*3*
196:*16* 199:*4, 5, 16*
**4(c** 194:*18, 23* 196:*2, 13,
14, 18, 20, 21* 197:*1, 7, 12,
20, 21*
**4(c)(1** 197:*9*
**4:37** 230:*24*
**4:49** 230:*25*
**40** 98:*3, 9* 99:*14* 141:*21*
200:*22* 254:*25* 255:*6*
**400** 230:*11*
**41** 5:*20* 195:*18* 196:*2, 7*
255:*9* 256:*4*
**44** 192:*19, 24* 193:*12*
**48** 206:*20* 207:*5*
**49** 119:*5* 206:*20* 207:*6*

**< 5 >**
**5** 3:*5* 101:*20* 115:*19*
128:*5* 141:*10, 11* 182:*24*
241:*14* 242:*3, 9, 18*
257:*4* 277:*21* 278:*7*
**5.45** 114:*23*
**5:22** 257:*10*
**5:34** 257:*11*
**50** 140:*19* 145:*2* 231:*7,
12* 232:*25* 233:*7, 16, 25*
**500** 2:*19*
**51** 134:*10, 11*
**52** 3:*5* 218:*17, 23*
219:*21* 227:*16* 257:*17*
**53** 259:*22* 261:*4* 265:*2*
**545** 112:*23*

**56** 36:22 119:2 206:8
207:15 208:18 266:19
**57** 207:14, 15, 21 208:7
210:11, 14, 15 270:13, 14
**58** 207:21 281:6, 14

**< 6 >**
**6** 3:5 99:25 100:10, 11
102:7, 25 151:8, 12
168:15 247:3
**6:15** 286:18
**6:23** 286:18
**6:25** 289:3
**60** 282:23
**62** 284:4, 5, 15
**68** 43:17

**< 7 >**
**7** 1:10 3:5 4:5 42:14
45:2 72:24 105:5, 6
107:19 112:19 114:21
160:11, 12 164:9, 20
171:10 210:12, 15
269:14
**700** 45:5
**740** 112:17
**75** 119:1 134:25 135:13
**76** 232:5

**< 8 >**
**8** 3:5 36:20 162:3, 4, 6
266:7 269:15
**80** 136:9
**87** 191:17, 22, 24

**< 9 >**
**9** 3:5 109:10 191:8, 9
278:18
**9:43** 1:18 4:6
**90** 145:8
**93,000** 39:4
**95** 118:24
**972** 231:17
**978** 210:6 213:4
**98,469** 163:9

**< A >**
**a.m** 1:18 85:3
**a/k/a** 233:2
**ABD** 110:8
**ability** 65:17 87:24, 25
153:10, 11
**able** 35:22 45:12 50:15
80:23 96:15 144:12
167:2 214:16 231:25
238:22 239:19 247:8
249:24 250:21 251:6, 9,
12 266:15 270:5
**abolished** 18:9
**Absolutely** 84:24 115:24

**academic** 60:5, 9, 14
70:7 138:13, 22 140:11
142:21 143:8 171:15
174:12 273:25 278:24
282:4
**academies** 224:23
**accept** 152:22
**accepted** 124:18, 23
158:14
**access** 29:10 59:25
64:19 78:14, 23 114:4
136:16 246:12 247:8
248:18 265:13
**accessible** 237:13 238:5
**accessing** 247:15, 20
248:4, 12
**accommodations** 15:16
**accurate** 19:25 20:1
26:3
**accurately** 225:14
**achieve** 35:22 43:10
44:16, 25 45:12 142:20
143:7 270:23 282:9
**achievement** 129:3
131:8 132:9 138:13, 23
**acknowledge** 36:3
**acknowledged** 46:10
**acknowledgment** 274:22
277:24
**Act** 11:18, 21, 24 18:1
57:22 89:17 94:4, 11, 17
133:6
**Action** 1:7 276:7 278:4
290:12
**actions** 275:16 277:15
**actively** 205:1
**activities** 29:11 189:14
**actual** 10:6 92:12 113:6
274:13
**ADAMS** 2:6 5:6
**addition** 138:12 169:15
222:21 225:15 256:5
**additional** 41:7, 16
44:11, 18 138:5 170:3
234:11
**additionally** 195:18
196:8 197:4
**additions** 20:2
**address** 5:18 26:18
285:25
**addresses** 142:1
**addressing** 156:4
**adequate** 171:17 172:2,
16, 25 233:1
**adequately** 117:22
**adjourned** 289:2
**adjust** 7:15
**administer** 5:9 20:15, 19
93:3, 19 186:19 248:16
**administered** 184:4

**administers** 88:22 91:25
93:2, 9, 15 94:1, 3, 12, 21
95:1 183:6, 20 186:25
187:11
**administration** 29:25
47:21 93:5 143:16
**administrative** 275:4
**administrator** 201:6
**administrators** 157:16
284:18
**admission** 29:9 208:19
209:2 259:14 261:17
**admitted** 258:11
**adolescent** 209:4
**adopt** 54:13, 24 165:4,
11
**adopted** 159:15
**adopting** 158:23 159:10
**adoption** 235:8, 23
**advantage** 82:9 136:23
165:18
**Advocacy** 14:9
**affiliated** 181:18 182:7,
16, 21
**affirmative** 77:15
**affirmatively** 285:21
**age** 28:25 110:6
**age-blind** 109:23 110:4
**agencies** 20:18 53:8
85:14 96:20 183:2
286:6
**agency** 13:13 20:15
55:19, 23 288:23
**aggression** 129:18 130:6,
22 146:24 147:22 166:8
**aggressive** 129:17 130:5,
20 131:15, 23
**ago** 10:13 20:6 21:12
38:23 57:19 160:19
170:17 235:10, 24
**agree** 14:23 18:18 27:7,
14 29:3, 15 39:8 40:1, 4
52:8 62:21 67:25
109:12, 16 114:16
120:13 126:10, 22
127:11, 14 128:1, 17
129:6, 8 137:3 142:7, 11
147:5 152:22 165:11
171:21 180:5 192:20, 21
202:23 211:22 212:15
215:7 233:15 258:4
260:9 279:2
**agreeable** 7:10
**agreement** 9:7 12:3
**ahead** 9:11 66:19 77:10
88:13 111:9 118:18
135:23 196:4 254:21
284:7
**airline** 205:12
**al** 14:10

**aligns** 277:3, 5 278:12
279:19, 23
**alleviates** 96:5
**allocate** 43:23
**allocation** 41:9
**allow** 165:16
**allows** 198:15
**ALLOY** 2:17
**alongside** 274:1
**alternative** 129:23
**AMERICA** 1:5 4:4
**American** 125:12
**Americans** 11:17, 21, 24
17:25 57:21 94:3, 10, 16
**America's** 273:22
**amount** 31:14 63:21
77:2 134:16 137:1
149:12 225:11 226:23
262:12 264:11
**amounts** 261:19
**Amy** 56:2
**analysis** 45:21 48:20
60:24, 25 61:3 97:8
112:7 263:23, 24 268:3
282:12, 19
**analyze** 283:6
**analyzed** 15:5 267:9
**ancestry** 28:24
**and/or** 214:16
**Andrew** 56:22
**announce** 211:2
**annually** 79:23
**answer** 6:22 7:1, 4, 8
102:9 187:4 222:6
225:24
**answered** 115:6 123:12
158:16 179:18 253:22
254:5, 23 256:25 272:8
**antibiotic** 263:3
**anybody** 114:13
**Anyway** 111:21
**Apex** 74:23 75:3, 7
82:8 97:21 101:25
118:23 119:23 120:2
179:20 180:8, 11, 18
181:2, 12 184:8, 18
185:2, 6 199:25 200:13
201:19, 20 202:2, 4, 7, 9,
13, 22, 24 203:9, 13, 21,
24 204:7, 18 205:2
207:21, 23 208:11, 12, 16
209:21 210:1 211:21
212:11 213:10, 20, 22
214:8, 23, 25 215:8, 13,
20, 21 216:3, 6 217:11
218:8 220:15 221:14
222:24 223:8, 18, 24
224:3, 12, 13 225:1, 6, 8,
10, 16, 19 226:1, 5, 11, 17
227:7, 8, 9, 14, 17, 23
228:9 229:8 248:16, 17

249:4, 15 250:17, 18, 20
251:5, 12, 15, 18 252:2, 6
255:22, 23 256:1, 12, 22
260:10, 15, 17, 19, 22, 25
283:5
**Apex-participating**
222:23 223:14
**Apex-related** 214:17
**Apex-supervised** 256:6
**appear** 9:23 26:3
**APPEARANCES** 2:1
**appears** 161:13
**Appendix** 8:12 12:9
13:22 14:5 19:23 89:13
219:5
**applicable** 29:8
**application** 20:23 211:25
**applied** 42:25 43:13
192:5 203:9
**applies** 191:5
**apply** 39:10 43:20
112:23 191:3
**applying** 40:23 44:13
**appreciating** 275:22
**approach** 81:9 268:10
**approaches** 273:23
**appropriate** 18:18 19:1,
13, 18 56:18, 21 58:8, 15,
25 59:20, 21 60:3, 7, 12,
23 61:7, 15, 16, 18 62:1,
22 63:2, 5, 10, 11, 12, 20
64:7, 24 65:1, 8 72:22
74:2, 4 82:7 100:4
120:25 121:16 143:1, 10
144:4 148:7 150:24
167:9 195:24 247:8, 20
248:5, 12, 19 250:1
263:19 265:14
**appropriateness** 63:24
**appropriations** 89:17
**approved** 51:21
**approximately** 39:4
42:13 57:18 203:7
231:7, 12
**April** 118:22 119:10
**area** 214:15, 23
**areas** 152:4 232:23
283:7
**argument** 281:16, 17
**Article** 3:5 37:10, 13, 16,
18 38:2, 5, 10 40:15, 25
41:15 43:23 46:2, 6
50:3 71:3 75:9 125:17,
23, 25 126:7 128:7
130:13 132:5 139:19, 23,
25 140:22 141:9, 14, 17,
21, 22, 25 142:8, 14, 15
151:7, 15, 19 162:8, 22
164:16 168:15 169:6
172:2 239:10, 15, 20

266:18, 21 267:8, 15, 20
270:6 271:17, 18, 19
**articles** 271:20
**aside** 133:16 212:23
221:17
**asked** 8:20 10:22 18:20
111:3 115:6 134:9
143:16 147:18 158:16
170:23, 24 171:5 179:18
204:13 214:5, 6 225:24
244:8 245:13 253:22
254:5 256:19, 25 272:5
**asking** 5:25 14:15
40:16 66:6 141:25
159:4 193:1 220:9
224:4 235:21 236:2
239:18
**aspect** 29:10
**assess** 222:24 223:18
225:7, 19
**assessed** 46:14 105:7
123:10 124:3
**assessment** 47:12, 14
61:22 62:13 268:13
**assessments** 105:4 119:1
268:11
**assigned** 211:7
**Assistance** 25:1 51:20
53:2 87:13 96:22
150:12 159:18, 22 164:5
171:11 189:4 233:2
275:17 285:16
**Assistant** 4:20, 23
**assisting** 188:5 189:18
**association** 4:12, 14
125:13
**assumption** 95:9 157:8
**assure** 243:19
**ATLANTA** 1:3 2:20
205:10
**attached** 8:10 19:22
**attempted** 256:21
**attempting** 240:6
**attend** 144:17 146:13
**attendance** 170:19
221:22
**attended** 8:5 246:3
**attending** 222:22 225:6,
16
**ATTORNEY** 3:5 4:19,
20, 22, 23, 25 5:2, 4, 6, 16
6:1, 6, 7 7:12, 20 10:17,
24 11:1 12:1, 4 13:5, 11,
17 14:16, 21, 25 15:8, 12,
19, 24 16:14, 17, 20, 22
17:15, 20, 22 18:13, 15
19:14 22:24 23:2 24:20
25:11 26:21 27:2, 19, 24
28:18 30:1, 4, 11, 14, 22
31:1, 9, 13 32:21 33:14,
17, 24 34:1, 4, 6, 10, 16,

21, 23 35:1 36:2, 8, 10,
15 37:22 39:12, 17
40:12, 19, 20 41:23 42:1,
20 46:23 47:2 49:11, 14,
23 50:1, 24 51:3, 15
52:1, 10, 14 53:6, 9, 21,
24 54:15, 18, 25 55:3, 24
56:1, 11, 13 57:23 58:1,
16, 19 59:2, 5, 9 60:19,
22 61:1 62:24 63:15, 17
64:1, 4, 9 65:3, 10, 15, 19
66:1, 5, 6, 9, 14, 16 67:7,
10, 12 69:8, 9, 10, 14, 16
70:15, 18 71:1, 8, 24
72:1, 13, 16 73:11, 13, 22
74:6, 21 75:2, 5, 11, 13,
18 76:3, 6, 19, 22 77:16,
24 78:11, 16, 19, 24 79:5
80:8 81:14, 17, 21, 24
83:7, 10 85:6 86:8, 14
87:1 88:15, 16 89:22
90:1, 10, 14 91:6, 9, 16,
20 94:5, 8, 14, 18 95:7,
11, 16, 19, 24 96:1 97:1,
5, 17 98:17 99:2, 5, 22,
24 101:7, 10 103:9, 12,
20, 22 104:1, 8, 10, 17
105:13, 16 107:16, 18
108:6, 10, 25 109:5
110:6, 8, 9, 15, 19 111:11,
13, 14, 16, 20 113:19
115:5, 8 116:8, 10 117:4,
6 118:7, 8, 9 119:13, 21
121:7, 10 122:8, 14
123:18, 24 124:12, 21
125:10, 15 126:11, 15
128:2, 6, 18, 20 129:10,
14 130:23 131:4, 12, 22
132:1, 3, 10, 17, 22 133:1,
15, 17, 18 134:5 137:5, 7,
14, 17 138:17, 19, 25
139:2, 7, 10 140:24
141:3, 5, 6, 13, 20, 24
142:6, 10 143:2, 5, 12
144:2, 6, 9, 23 145:1, 6, 9,
17, 21 146:15, 17 147:8,
11, 16, 20 148:1 149:2,
14, 24 150:4, 7 151:8, 9,
14 152:17, 20 153:4, 17
154:18, 21, 25 155:8, 10,
13 156:5, 18, 21 157:4,
13, 19 158:4, 8, 10, 15, 20
159:3, 5, 11, 13 161:9, 12,
17, 19, 25 162:1, 16
164:8, 11, 13, 15, 18, 21,
23 165:1 166:4, 11, 21
167:5, 13, 18 168:8, 13,
17, 18, 19 169:11, 14
172:5, 7, 10, 12, 18, 21
175:5, 11, 16 176:21
177:8, 12, 17 178:9, 12,

17, 19 179:3, 17 180:4,
22, 24 182:2, 9, 11, 13, 14
183:13 184:11, 15
185:12, 15, 23 186:1, 10,
14, 21 187:3, 4, 8, 21, 24
188:19, 24 189:24 190:2,
11, 13, 15, 16, 18, 19, 25
191:20, 23, 24 192:1, 2,
25 193:3, 4, 8, 9 194:4, 8
195:12, 15 198:17, 19, 24
199:2, 12, 15, 20 200:3, 7,
10 201:3, 7, 10 203:15,
18 204:1, 4, 9, 12, 20, 24
205:4, 6, 23 206:2, 12, 16,
21, 23, 24 207:4, 8, 12
208:20, 22 209:1 210:13,
16, 18 211:19 212:1, 5,
17, 20, 22, 24 213:3, 5, 8,
15, 18, 25 214:11, 18, 20
215:2, 6, 22 216:1, 7, 10
217:3, 7, 12, 14, 22
218:10, 12, 20, 22, 24, 25
219:1, 19, 21, 22 220:1, 7
223:9, 12 224:1, 9
226:19 227:4, 12, 15
228:1, 8, 12, 22, 25 229:3,
6, 7 230:18, 20 231:3, 22,
25 232:3, 6, 11, 13, 17
233:9, 14, 19, 22 234:2, 5,
23 235:3 236:3, 5, 9, 12,
25 237:6, 11, 15 238:3, 8
239:25 240:2, 4, 17, 22
241:3, 6, 16, 20, 23
242:12, 15 243:24 244:2,
15, 17, 22, 24 245:4, 17,
20 246:16, 20 247:22
248:1, 6, 8, 14, 20, 23
250:4, 8, 11, 15, 22 251:1,
4, 21, 23 252:1, 4, 8
253:1, 21, 24 254:4, 7
256:24 257:2, 7, 14
259:11, 18, 20 260:6, 8,
12, 14, 20 262:18, 23
263:1, 9, 12, 17, 21 264:5,
8, 18, 21 265:9, 18
266:25 267:3, 5, 6, 7, 11,
14, 18, 23 268:1 271:2
272:1, 4, 12, 13 274:11,
14 276:17, 20 277:1, 16,
18, 20 279:3, 10, 15
280:1, 13, 15, 20, 24
281:3, 5, 20, 23 282:5, 10,
15, 17 283:17, 21, 25
284:3, 9 285:10, 13, 23
286:10, 21 287:3, 6, 8, 10,
14, 16, 20, 25 288:7, 12,
20, 24
**attorneys** 4:15
**Attorney's** 1:17
**AUSA** 2:3, 4, 5, 6
**auspices** 55:11

authority 31:7 50:*10*
91:*25* 92:*1, 3, 15, 16, 17*
158:*6* 193:*11* 197:*3*
authors 126:*23* 273:*8*
autism 23:*23* 24:*5*
availability 78:*6* 136:*10,
14, 15* 213:*20*
available 15:*4* 48:*9*
64:*14, 25* 77:*19, 22* 78:*2,
9* 79:*4* 109:*22* 114:*11*
135:*25* 145:*14* 164:*7*
195:*19* 196:*9, 23* 197:*5*
210:*2* 221:*11* 222:*13*
228:*18* 249:*12* 252:*18*
253:*6*
average 233:*17* 234:*1*
261:*25* 262:*6*
avoid 100:*4* 126:*6*
247:*6* 249:*22* 270:*19*
award 53:*13*
aware 114:*15* 190:*10, 24*
191:*4, 6* 192:*6, 7* 195:*13*
199:*13* 214:*8* 221:*3*
236:*1* 246:*2*
axis 37:*4*

< B >
back 28:*16* 34:*17* 41:*21*
44:*1* 46:*25* 47:*24* 63:*21*
66:*19* 71:*2, 12* 79:*12*
82:*16, 19, 21* 83:*20* 85:*4*
88:*15* 92:*23* 96:*7*
101:*15* 113:*5* 115:*9*
120:*11* 134:*3, 6* 137:*8*
162:*4* 163:*15* 168:*14*
171:*10* 179:*1, 11* 197:*18*
199:*5, 22* 221:*18, 19*
224:*5* 231:*1* 233:*20*
239:*9, 22* 241:*12* 243:*3,
20* 245:*22* 249:*21*
255:*20* 257:*12* 259:*25*
272:*5* 275:*22, 25* 276:*2,
10* 278:*11, 14* 279:*18, 22*
282:*7* 286:*19*
backing 197:*12*
backward-looking 60:*25*
61:*2*
bacteria 263:*4*
bacterial 263:*3*
balance 121:*4* 139:*6*
balancing 139:*12*
ball 44:*21, 24* 45:*8, 11*
ballpark 128:*5*
BARBARA 1:*14, 19*
4:*13* 36:*9* 290:*2, 17*
Barrett/Eber 171:*11*
barrier 238:*15*
barriers 107:*14* 215:*19*
base 213:*12, 23*
based 27:*13* 43:*4* 62:*22*
77:*2* 95:*14, 22* 102:*6*

103:*14* 104:*12* 108:*18*
112:*6* 118:*1* 139:*21*
145:*11, 12, 13* 150:*8*
166:*9* 174:*20* 179:*8, 9*
186:*7* 195:*24* 208:*1*
211:*20* 217:*23* 219:*11*
221:*20* 228:*14* 229:*17*
232:*4* 236:*20* 243:*21*
254:*12* 266:*11*
baseline 284:*8, 19, 24*
285:*7*
basically 11:*13* 44:*5, 23,
24* 45:*10* 47:*11* 48:*19,
22* 61:*20* 65:*7* 72:*24*
80:*23* 81:*10* 82:*22* 98:*4*
109:*4* 130:*4* 135:*1*
143:*22, 25* 151:*2* 154:*7*
156:*22* 159:*21* 173:*15*
180:*2* 193:*10* 214:*8*
222:*13* 224:*22* 226:*11,
24* 233:*11* 244:*7* 249:*5,
16* 250:*18* 258:*12* 268:*7,
22* 274:*17* 275:*15*
basis 28:*8, 23* 42:*22*
52:*6* 54:*5* 55:*4* 61:*19*
93:*8* 112:*8, 9* 117:*2*
122:*24* 212:*6* 253:*5*
258:*21* 269:*5* 270:*9*
276:*12* 280:*10*
Bates 232:*4*
beautifully 278:*12*
BEDARD 2:*16* 210:*16*
BEDNARD 4:*22*
began 31:*20*
beginning 4:*17* 38:*3*
46:*8* 140:*6* 192:*23*
begins 59:*11* 128:*23*
155:*16* 171:*14*
Behalf 2:*2, 14* 5:*12*
behavior 16:*6* 24:*1*
25:*2* 45:*22* 46:*12, 13*
47:*9, 13* 48:*1, 6* 49:*4, 10,
17, 21* 51:*6* 52:*20* 53:*2*
60:*14* 68:*17* 105:*3, 4*
106:*7, 9* 108:*20* 129:*4*
132:*16, 19* 146:*24* 149:*4*
154:*1, 3* 160:*25* 168:*23*
169:*8* 174:*4* 268:*10, 11,
12*
Behavioral 17:*8* 35:*5*
46:*1* 47:*12, 17* 48:*14*
49:*13* 54:*11, 22* 60:*5*
61:*22* 62:*12, 13, 19*
81:*19* 94:*20* 104:*23*
126:*17* 142:*20* 143:*8*
159:*1, 8* 171:*15* 174:*13*
179:*13* 181:*4* 188:*6*
198:*21* 199:*9* 201:*15*
202:*16, 18* 203:*24* 204:*6,
16* 209:*6* 210:*23* 211:*23*
215:*18, 20* 216:*4, 11, 13,*

16, 24* 221:*7* 244:*19*
248:*10* 254:*10* 262:*3, 11*
268:*16* 281:*9* 283:*3, 11,
20*
behaviorally 135:*17*
behavioral-related
185:*19* 186:*20* 187:*1*
249:*7* 284:*17*
behavior-related 67:*1, 20*
68:*1, 5, 9* 69:*6, 18, 23*
100:*3* 123:*20* 124:*6*
146:*20* 183:*1, 7, 10, 21*
184:*10, 19, 21, 25* 187:*12*
247:*6* 270:*19* 271:*7*
behaviors 16:*8* 62:*12*
67:*24* 105:*7* 107:*23, 24,
25* 108:*1* 129:*20, 21*
131:*19, 21, 23* 147:*6, 21*
148:*8* 181:*21*
believe 8:*12* 10:*17* 11:*8*
12:*7, 14* 13:*19* 14:*2*
15:*15* 21:*21* 24:*21* 41:*1*
69:*6* 79:*2* 85:*21* 89:*14,
18* 90:*11* 94:*15* 109:*8*
110:*16* 114:*9* 117:*5, 12*
125:*24* 126:*1* 151:*17*
157:*23* 160:*17* 164:*24*
184:*2* 191:*2* 193:*14*
194:*2* 206:*17* 230:*2*
240:*18* 249:*18* 251:*6*
272:*24* 274:*18* 288:*22*
believed 73:*8*
BELINFANTE 2:*15, 17*
3:*5* 4:*19, 20* 5:*16, 23*
6:*1, 7* 7:*20* 11:*1* 12:*4*
13:*11* 14:*21* 15:*8, 24*
16:*17, 22* 17:*22* 18:*15*
23:*2* 25:*11* 26:*21* 27:*2,
19, 24* 28:*18* 30:*4, 14*
31:*1, 13* 33:*17* 34:*1, 6,
16, 23* 35:*1* 36:*15* 39:*17*
40:*19, 20* 42:*1, 20* 47:*2*
49:*14* 50:*1* 51:*3* 52:*1,
14* 53:*9, 24* 54:*18* 55:*3*
56:*1, 13* 58:*1, 19* 59:*5, 9*
60:*22* 63:*17* 64:*4* 65:*10,
19* 66:*6, 9, 16* 67:*10, 12*
69:*10, 14, 16* 70:*18* 71:*8*
72:*1, 16* 73:*13* 74:*6*
75:*2, 13* 76:*6, 22* 78:*11,
19* 79:*5* 81:*17, 24* 83:*10*
85:*6* 86:*14* 88:*16* 90:*1,
14* 91:*9, 20* 94:*8, 18*
95:*11, 19* 96:*1* 97:*5*
98:*17* 99:*5, 24* 101:*10*
103:*12* 104:*1, 10* 105:*16*
107:*18* 108:*10* 109:*5*
110:*8, 9, 19* 111:*13, 16,
20* 115:*8* 116:*10* 117:*6*
118:*8, 9* 119:*21* 121:*10*
122:*14* 123:*24* 124:*21*

125:*15* 126:*15* 128:*6, 20*
129:*14* 131:*4, 22* 132:*3,
17* 133:*1, 17, 18* 134:*5*
137:*7, 17* 138:*19* 139:*2,
10* 141:*3, 6, 13, 24* 142:*6*
143:*5* 144:*2, 9* 145:*1, 9,
21* 146:*17* 147:*11, 20*
149:*14* 150:*7* 151:*9, 14*
152:*20* 153:*17* 154:*21*
155:*10, 13* 156:*21*
157:*13* 158:*4, 10, 20*
159:*5, 13* 161:*12, 19*
162:*1* 164:*8, 13, 18, 23*
165:*1* 166:*11* 167:*5, 18*
168:*13, 18, 19* 169:*14*
172:*7, 12, 21* 175:*11*
177:*8, 17* 178:*12* 179:*3*
180:*4, 24* 182:*11, 14*
184:*15* 185:*15* 186:*1, 14*
187:*8, 24* 188:*24* 190:*2,
13, 16, 19* 191:*20, 24*
192:*2* 193:*3, 9* 194:*8*
195:*15* 198:*19* 199:*2, 15*
200:*3, 10* 201:*10* 203:*18*
204:*1, 4, 12, 24* 205:*6*
206:*2, 16, 24* 207:*8, 12*
208:*22* 209:*1* 211:*19*
212:*5, 20, 24* 213:*5, 8, 18*
214:*11, 20* 215:*6* 216:*1,
10* 217:*7, 14, 22* 218:*12,
24* 219:*1, 21* 220:*1, 7*
223:*12* 224:*9* 227:*4, 15*
228:*8, 22* 229:*3, 7*
230:*20* 231:*3* 232:*3, 13,
17* 233:*14, 22* 234:*5*
235:*3* 236:*5, 12* 237:*6,
15* 238:*8* 240:*2, 4, 22*
241:*3, 6, 20* 242:*15*
244:*2, 17, 24* 245:*17*
246:*20* 248:*1, 8, 20*
250:*4, 11, 22* 251:*4*
252:*1, 8* 253:*24* 254:*7*
257:*2, 14* 259:*20* 260:*8,
14* 263:*1, 12, 21* 264:*8,
21* 265:*18* 267:*3, 6, 7, 14*
268:*1* 272:*12, 13* 274:*14*
277:*1, 18, 20* 279:*10*
280:*1, 15, 24* 281:*5, 23*
282:*10, 17* 283:*21* 284:*3*
285:*13* 286:*10, 21* 287:*6,
10, 16, 25* 288:*12, 24*
benchmark 100:*20*
benefit 79:*3*
benefits 246:*5*
best 51:*11, 12* 63:*19*
69:*15* 92:*14*
bet 40:*17*
better 16:*10, 11* 142:*20*
143:*7* 150:*20* 270:*2*
beyond 176:*2*

**Bierman** 124:*16* 125:*16, 17, 22* 129:9 130:*12* 168:*15, 20* 170:2 239:*10, 15*
**big** 112:*12*
**bill** 253:*20*
**billed** 260:*4*
**billing** 254:*2*
**Binder** 3:*5*
**BIP** 62:*15, 16* 64:*19* 104:*3*
**Bird** 111:*17*
**bit** 29:*19* 63:*22* 71:*20* 158:*12* 170:*17* 171:*25* 194:*11* 199:22 207:*20* 215:*4*
**blind** 32:8 110:7
**block** 13:8
**blow** 26:*15*
**board** 101:*13*
**boards** 79:7 217:5
**boat** 243:*19*
**Bob** 178:*20* 210:*13*
**Boston** 45:*15, 18*
**bottom** 26:*19, 23* 101:*20* 160:*20* 169:*20* 209:*3* 256:*4* 278:*19*
**boxes** 205:*10*
**break** 7:5, 6, *8* 76:20 84:*22* 133:*21* 163:*7, 10* 178:*20, 21* 184:*22* 229:2 230:*21* 257:5
**brief** 108:8, *14* 167:*1*
**briefly** 219:8
**bring** 50:*11* 189:*12* 191:*12* 209:*21* 267:*19* 278:*24* 282:*3*
**brings** 98:6
**broad** 100:*1* 182:22 184:*13*
**Brockton** 35:*12, 13, 17* 37:*1* 44:*23* 45:*14* 47:22 82:22 143:*25*
**brought** 205:*10* 224:*12*
**budget** 45:*3* 89:*16* 268:*25* 269:*10, 12, 15*
**build** 150:*16, 18* 155:*18*
**building** 147:2 150:*19, 25* 151:*1*
**bullet** 277:*21, 23* 278:8, *9*
**bulletin** 271:*3* 272:8
**bunch** 96:*4* 125:8

**< C >**
**cadres** 150:*25*
**call** 45:*15* 108:8 149:*11* 267:6 276:6
**called** 5:*12* 133:*3* 168:*10*

**calling** 66:*3*
**calls** 224:*13* 277:*13*
**camera** 4:*11*
**candidly** 139:22
**capacity** 116:*18* 117:*9, 22* 150:*17, 18* 151:*1*
**capita** 36:6, *13* 42:6 45:*4, 5* 268:*21* 269:*4, 5*
**capital** 45:*5*
**care** 13:*10* 14:20 15:22 81:*10* 106:*3* 113:*17* 174:*5, 8, 14* 175:*19, 21, 24* 182:25 226:25 260:*18* 276:23, *24* 278:*12* 279:*19* 282:*13* 284:*21* 285:9 286:*3*
**career** 31:*20* 100:22 143:*23*
**caregivers** 273:*25*
**case** 5:25 8:*21* 11:7, *11, 20, 25* 12:6 14:7, *9, 14, 24* 15:*11, 14* 20:*12* 45:9 50:7 56:6 78:*13* 90:*21* 144:*3* 182:2 260:24 286:25
**cases** 71:7 90:*13* 98:*14, 18* 143:*13* 144:*16, 22, 25* 146:*3* 180:*1* 251:*18*
**categories** 170:*3*
**category** 29:8
**cause** 60:*18*
**caution** 97:2
**CCRPI** 221:22
**censure** 129:*21* 131:*20*
**Center** 21:*10* 24:4 25:*1, 8, 12, 19* 51:20 53:2, 5 150:*12* 159:*18, 22* 160:*1, 4, 8, 21* 161:*16* 171:*11* 189:*4* 221:6 275:*17* 285:*16*
**center's** 25:5
**certain** 19:2 67:*23* 68:*17* 75:4 122:*18* 157:22
**certainly** 122:*10* 153:*13* 158:*17* 176:*17* 179:22 180:9 263:25
**certify** 290:*3, 9*
**cetera** 110:*13* 131:*24* 155:7
**Chad** 117:*11, 17*
**challenge** 65:*24* 66:*12* 280:*18*
**challenging** 24:*1*
**chance** 139:22 245:*18, 22*
**change** 273:22 277:*14* 278:*4, 10, 16*
**changes** 15:22 85:*11* 96:*10, 12, 14, 24* 97:8, *13*

**changing** 154:*1, 2*
**characterization** 126:*23*
**characterized** 128:*25* 131:6 132:7, *20*
**charge** 150:*3*
**charged** 139:*12*
**charters** 163:8
**Check** 168:*10* 169:22
**checking** 12:*10*
**child** 85:*14* 97:*15* 101:*4* 138:*4* 176:*4* 188:*5* 189:*18* 209:*4* 286:5
**Children** 3:*24* 36:*4, 11* 112:*19* 126:*3, 13* 127:*5, 24* 129:*16* 130:*4, 19* 131:*14* 224:*19* 252:*19* 253:7 254:9 264:*10*
**children's** 184:22 221:6
**child's** 186:*16*
**child-serving** 96:*20*
**choices** 64:22
**choose** 55:*21* 101:*17, 18* 203:*12, 20* 258:*21*
**chose** 93:*20*
**circumstance** 52:7
**circumstances** 19:2 147:*15* 148:6
**citation** 124:*15* 145:*10* 196:*1, 7, 12* 266:*17*
**citations** 193:*11, 15*
**cite** 40:*10, 23* 116:*21* 125:*17* 140:*21* 197:*1* 222:*12* 272:*14* 280:9
**cited** 37:*18* 38:6 109:6 114:*21* 117:*12, 17* 123:*4* 145:*16, 18* 164:*16* 206:*18* 207:5 213:*13, 24* 222:*11* 227:*16* 231:*17, 22* 232:5 276:*11*
**cites** 151:*4, 15*
**citing** 117:*1* 126:6 129:*4* 137:*25*
**Civil** 1:*7* 2:8
**clarify** 66:2 206:*14*
**class** 146:*13*
**classes** 144:*17*
**classmates** 129:*17* 130:*5, 20* 131:*16, 24*
**classroom** 19:*1* 47:*16* 49:*3, 7, 18, 20* 62:*17* 68:*18* 126:5 129:*3* 132:*15* 133:*7* 146:8, *12* 147:*1* 148:*21* 149:*13, 18* 152:*4* 153:*3* 225:*23* 232:*24* 274:*19* 285:2
**classroom-based** 268:*15*
**classrooms** 129:*16* 130:*4, 19* 131:*15, 25* 132:5 133:*12* 153:*1, 22* 166:24 223:*3, 21* 271:8 274:*17*

**clear** 23:4 140:*4* 173:*12* 188:*10* 206:*14* 217:*4* 258:*25* 266:25
**clearer** 180:*13*
**clearly** 45:*21* 96:*15* 180:*10* 185:*3* 275:8
**click** 109:2
**climate** 157:*12* 221:*23*
**clinic** 23:*23* 118:*17*
**clinical** 22:*15, 21* 23:5 243:8 244:*13, 20* 245:2, *9*
**clinician** 78:8 105:8, *11, 18, 19* 110:*12* 180:*14, 16* 181:*1* 200:*14*
**clinicians** 176:*13* 178:*2, 7, 15* 179:*15, 23* 181:*11* 251:*9*
**close** 45:*15* 97:*4*
**CMS** 20:*24*
**coach** 233:*3*
**coaches** 150:*20* 233:2
**coaching** 77:*3* 81:*1* 150:*25* 240:*20*
**Coastal** 21:*10*
**coauthors** 47:22
**coffee** 195:2
**cognitive** 168:*23* 169:8
**COHEN** 2:*4* 5:*2* 7:*12* 36:8 40:*12* 69:9 88:*15* 97:*1* 110:6 130:*23* 151:8 155:8 161:*17* 164:*21* 175:5 178:*19* 182:9, *13* 187:*3* 194:*4* 206:23 208:*20* 213:*3* 217:*12* 218:*20* 220:5 287:*14*
**cohort** 258:*10*
**collaborate** 211:*5*
**collaborative** 168:22 169:7 272:*18*
**colleagues** 48:22
**collect** 222:*21* 223:7 224:5, *24, 25* 225:5, *15* 283:6 285:*21*
**collected** 222:23 223:*17* 224:*14* 225:*18*
**collecting** 156:*24*
**collection** 96:*19* 157:*14, 16* 170:*11* 173:7 285:*19, 22*
**collects** 157:6 170:*18*
**color** 28:8, *24*
**Columbia** 1:*16* 290:*1, 3*
**column** 128:22 171:*13* 207:*15*
**combination** 48:*12* 278:*1*
**come** 7:2 97:*23* 98:2, 7, *15* 125:8 150:*12* 186:*17* 200:*16* 239:2, *22* 245:22 273:*21*

**comes** 37:*8, 9* 55:*16* 77:*7* 78:*7* 92:*8* 129:*25* 143:*21* 177:*14* 191:*2* 205:*8* 229:*24*

**comfortably** 126:*4*

**coming** 99:*17* 153:*12* 200:*24*

**commencing** 1:*18*

**comments** 87:*7* 270:*5*

**Commission** 290:*20*

**commitment** 210:*22* 211:*24* 280:*18*

**committed** 279:*21, 24*

**Commonwealth** 24:*12*

**communication** 211:*1*

**communities** 39:*3* 67:*5* 70:*2* 100:*7* 102:*9* 278:22

**Community** 17:*3* 21:*10* 51:*14* 54:*10, 21* 55:*14* 61:*24* 64:*21* 79:*7* 85:*14* 86:*6, 10* 94:*25* 96:*20* 102:*15, 21* 104:*4, 24* 118:*5, 10* 119:*4* 120:*1, 8* 123:*2* 159:*1, 8* 175:*9, 14* 176:*12, 25* 177:*6* 178:*1, 7, 15* 179:*15* 180:*2, 14, 18, 25* 181:*1, 9, 10, 17* 182:*19* 184:*5* 199:*17* 201:*23* 202:*12* 216:*17, 24* 217:*4* 243:*7* 244:*7, 12* 245:*9* 246:*5, 13, 17, 23, 25* 247:*14, 19* 248:*3* 261:*21* 262:*8* 272:*18* 283:*13, 16* 286:*8*

**community-based** 114:*19* 209:*5*

**comparative** 45:*23* 112:*7* 269:*20*

**compared** 45:*1* 113:*2, 8* 269:*1, 13*

**comparing** 268:*5*

**compel** 178:*1, 6, 14*

**compelling** 180:*6*

**competency** 278:*24* 282:*4*

**competency-based** 47:*16* 268:*15*

**competing** 138:*13, 22* 139:*4, 6, 13*

**complaint** 11:*3, 7*

**complete** 106:*10* 156:*12* 220:*16* 221:*4* 255:*10*

**completed** 188:*14*

**completion** 205:*18*

**complex** 106:*8* 108:*9, 16*

**complexity** 106:*6*

**complies** 17:*25* 41:*4* 116:*13* 151:*21* 203:*4*

**component** 70:*12* 71:*10* 281:22, *24*

**components** 165:*22* 207:*16* 208:*10* 268:*10*

**comprehensive** 276:*4*

**comprehensiveness** 41:*10*

**conceivable** 70:*21*

**concerned** 220:*12*

**concerning** 35:*6*

**concerns** 117:*21* 122:*7* 174:*13* 240:*3*

**concise** 227:*6*

**conclude** 58:*24* 186:*24* 187:*9* 276:*13* 280:*10*

**concluded** 144:*3, 8*

**concludes** 41:*5*

**conclusion** 44:*17* 65:*12* 97:*23* 98:*2, 15* 112:*10* 117:*3, 8* 118:*2* 125:*8* 126:*10, 18* 138:*16* 139:*3* 186:*23* 187:*20* 196:*22* 197:*8* 253:*5*

**conclusions** 52:*9* 99:*11, 12*

**conduct** 88:*9* 118:*25*

**conducted** 20:*4* 106:*13, 17* 107:*20* 108:*21* 268:*3* 282:*11*

**conducts** 106:*21*

**confidential** 210:*25*

**confirm** 193:*1*

**confused** 92:*6* 140:*25*

**confusing** 7:*22* 40:*14* 215:*5*

**congregate** 32:*16* 34:*14*

**consensus** 51:*1, 19* 52:*3* 62:*10* 100:*2* 122:*20* 123:*1, 3* 144:*14*

**consider** 35:*13* 58:*7, 13* 62:*15* 70:*25* 71:*22* 102:*19* 110:*22* 184:*16*

**considerably** 41:*10*

**considered** 96:*23* 102:*14* 146:*13* 157:*21* 193:*23, 25*

**considering** 135:*19*

**consistent** 161:*4* 275:*6* 284:*20*

**constellation** 185:*3* 186:*3*

**constitute** 67:*19* 87:*15* 100:*19* 148:*24*

**constituted** 228:*20*

**constitutes** 69:*2*

**consult** 24:*18*

**consultation** 22:*12, 16, 22* 23:*6* 24:*2, 9, 10, 17, 23* 29:*21* 35:*5*

**consulted** 20:*18* 30:*5*

**consulting** 22:*15* 27:*16*

**consumed** 268:*25* 269:*10*

**contacted** 11:*3* 99:*18*

**contagion** 133:*3*

**contain** 41:*15*

**CONTENTS** 3:*1*

**context** 59:*4* 64:*13* 97:*19* 98:*11* 107:*23* 115:*23* 120:*15* 122:*2* 126:*5* 132:*24* 165:*20* 166:*10* 176:*10* 184:*18* 219:*13*

**continue** 6:*2* 79:*20*

**continued** 279:*5*

**continues** 29:*6*

**continuum** 107:*7* 174:*19* 175:*1, 2, 12, 19, 21, 24* 197:*13, 24, 25*

**Contract** 3:*5* 22:*2* 179:*21* 180:*9* 202:*23* 203:*13, 21* 210:*1* 211:*23* 212:*12, 15* 214:*16* 216:*15* 219:*5* 221:*3* 224:*3, 12, 13* 227:*17* 249:*15* 256:*2, 21*

**contracting** 181:*11* 202:*18, 20*

**contractors** 220:*14*

**contracts** 116:*6* 202:*3, 9* 218:*14* 224:*22* 225:*1* 227:*14* 249:*4* 256:*12, 16*

**contrast** 112:*24* 281:*8*

**contributing** 263:*25* 264:*4*

**control** 30:*16, 21* 31:*4, 7* 92:*4*

**convened** 17:*17* 18:*5*

**conversation** 6:*16*

**conversations** 8:22 216:*2, 4, 23*

**coordinate** 211:*2, 9*

**coordination** 85:*13* 96:*19* 113:*18* 181:*16* 182:*17, 22* 286:*4*

**copies** 206:*1*

**coping** 168:*23* 169:*7* 274:*25*

**copy** 9:*12, 13* 11:*2, 6* 26:*17* 125:*18* 191:*16* 221:*25*

**Core** 105:*2* 209:*3, 10*

**Correct** 6:*6* 9:*9, 10, 24* 18:*1, 2, 6, 7, 9, 10, 14* 19:*2, 9, 10, 21* 20:*7, 10* 21:*15* 22:*1* 23:*14* 26:*11* 30:*6, 7* 32:*3, 8* 33:*23* 37:*20* 38:*3, 4, 8* 39:*1, 6, 25* 43:*6, 7* 45:*16* 49:*4, 15, 22* 51:*10* 56:*15* 57:*3, 4* 59:*8* 60:*8, 15* 65:*21* 68:*3, 7, 11* 69:*3, 7, 19* 70:*21* 98:*18, 19* 102:*23* 104:*14* 105:*10* 106:*1* 109:*19* 116:*7* 119:*24, 25* 120:*5, 19* 121:*18* 123:*23*

128:*4* 131:*25* 133:*9* 135:*21, 22* 136:*3, 8, 21, 22* 137:*4, 6, 13, 23* 138:*1, 2, 9, 10, 16, 18* 141:*19* 142:*8* 144:*5* 146:*5, 9* 148:*11* 149:*23* 152:*7* 157:*17* 160:*22* 161:*7* 168:*16* 169:*25* 172:*4, 6* 173:*2, 10* 180:*7, 19, 23* 188:*18* 189:*20, 23* 190:*7, 8* 193:*3, 16, 17* 200:*6, 20, 21* 202:*10, 13, 14, 19* 212:*16* 215:*1, 9, 10* 217:*25* 223:*15, 21* 237:*18, 19* 238:*10* 239:*2, 3, 7, 8* 241:*11* 242:*5* 254:*3* 257:*25* 258:*7, 16, 19* 259:*3* 260:*11* 262:*22* 263:*8* 266:*23* 273:*8, 9* 282:*16, 22* 284:*23*

**correction** 166:*17, 20, 25* 167:*12*

**correctly** 148:*2* 255:*3*

**cost** 38:*18* 40:*24* 42:*6* 43:*13, 18, 19* 45:*4* 70:*11, 25* 71:*7, 9, 23* 84:*15* 88:*9, 10* 97:*8* 268:*20* 282:*12, 18, 19*

**cost-effectiveness** 71:*4* 72:*5*

**cost-efficacy** 45:*21* 48:*20*

**costs** 38:*11* 45:*5, 6* 71:*17* 72:*3* 268:*21*

**counsel** 5:*24* 6:*20, 23* 41:*23* 66:*3* 254:*24* 272:*5* 287:*5* 290:*9, 10*

**Counseling** 21:*10* 134:*16* 136:*5* 261:*20, 25* 262:*6*

**counselings** 134:*17*

**counselors** 211:*16*

**count** 159:*19* 166:*23*

**counterintuitive** 6:*12*

**country** 25:*9* 29:*22* 30:*6, 9, 10, 19* 31:*3, 6* 218:*2, 4* 245:*12*

**counts** 159:*21*

**couple** 87:*19* 147:*18* 208:*3* 219:*6* 230:*2* 248:*25* 258:*23*

**COURT** 1:*1* 4:*13* 5:*8* 6:*14* 7:*3* 12:*5* 14:*15* 20:*12* 56:*23* 97:*3* 108:*17, 22* 125:*2* 206:*3* 288:*17* 290:*2*

**cover** 242:*18*

**covered** 69:*21* 207:*21* 266:*13*

**COVID** 119:*11* 230:*16*

**COVID-19** 278:*1*

created 221:5
crisis 273:20
criteria 80:4 157:22
  208:19 209:2, 4, 10
  212:7 214:3
criterias 212:3
criterion 42:3
critical 150:23 176:11
criticism 246:12
criticisms 280:3 283:23
CRR 1:20 290:17
crucial 181:19
CRYSTAL 2:6 5:6
CSB 79:1 202:20 203:8,
  12, 20 204:17 217:9
CSBs 78:4 79:6, 9
  179:22 202:22 203:1, 5
  217:6 249:18 256:17
culture 165:20 166:10
current 156:2, 6 232:24
  277:12
currently 61:5 72:10, 19
  160:25 228:10, 19
  280:25 281:18
curriculum 140:11
customer 209:4, 10
customized 113:17
CV 19:23 21:14 22:10
  24:8

< D >
D.C 1:11, 18 2:10 4:10
  288:14
damage 146:25 147:23
dangerous 157:21 158:3
Daniel 151:5
data 8:6 38:10 48:12
  72:18 81:1 85:13 88:1
  96:19 111:1, 6 114:6
  136:2 156:24 157:14, 15
  170:11, 18, 21, 25 173:7,
  8 176:14 180:11 221:22
  222:22, 24 223:7, 14, 17,
  23 224:14 225:5, 16, 19
  227:19 252:17 253:5
  254:2 283:6 285:19, 21,
  22 286:4
database 47:15 52:21
  163:25 164:3, 7 268:14
databases 173:8
date 4:5 127:2 161:17,
  23
dated 224:8
daughter 65:9
Day 21:20, 21 22:4, 6
  146:10, 11 247:24
  284:12 288:13
days 134:17 135:12
DBH 202:7

DBHD 82:5 122:3, 17
  177:3, 16 179:19 180:8
  185:4, 9
DBHDD 78:12 86:4
  88:1 124:25 125:4
  185:17, 20 199:23
  202:23 203:13, 21 205:1
  214:16 216:15 218:14
  237:9, 25 256:21, 22
  283:19
DBHDD's 200:20 209:5
DCH 184:4 199:23
  237:9, 25
DCH's 200:20
deadlines 220:17
deal 264:10, 16
dealing 30:19
decades 171:16
decide 60:7 77:2, 5
  152:13 201:12, 17, 23
  223:7
decides 76:16 201:1
decision 16:13 18:5
  19:4 56:22 60:6 77:15
  144:12 200:20, 25
  228:17
decisions 52:21 139:5
  267:10, 16
decrease 70:6 85:10
  86:1 88:6 96:9 152:2,
  23
decreases 85:20
dedicated 281:18
deem 115:10, 12
Defendant 1:9 2:14
defiance 146:25 147:22
define 52:16 59:18
  93:15 107:1 109:13
defined 67:22 71:13
  262:3
defines 56:8 92:17
defining 216:20
definitely 31:11
definition 50:15, 18, 23
  52:18, 19, 24 56:9 59:23
  60:2, 12 61:7 158:14
  168:5
degree 103:18, 21 104:7
  105:23, 24
degrees 30:20 31:4
deliver 84:13, 15 116:18
  117:9 118:23 119:4
Deliverables 220:19, 25
delivered 109:13, 17
  118:11, 12, 13, 14, 15
  123:9 124:3, 20 175:13
  197:14 198:1, 3, 13, 15
  226:1 255:11, 17, 25
delivering 100:19 218:8
delivers 174:19

delivery 22:15, 21 23:5
  24:10 82:5 270:8 283:4,
  12, 20
demands 138:13, 22
  139:4, 6, 13
demonstrate 121:21
demonstrates 123:8
  124:2 137:24 154:8
  155:16
demonstrating 87:9
  270:21
denied 78:14, 23 120:9
  135:6, 8, 21, 25 203:10
  246:5, 12, 22
DEPARTMENT 2:7 4:9
  8:22 9:8 13:1, 2 14:13,
  24 15:2, 10 16:24 17:3,
  7 38:14 50:20 51:22
  53:12, 16 54:9, 10, 11, 20,
  21, 22 55:8, 11, 14, 17
  81:12, 15, 19 86:3, 6, 9,
  15, 17 87:8 88:25 89:7,
  20 90:3 91:23 92:9
  93:1, 25 94:11, 20, 25
  104:22, 24 106:24 107:2,
  4, 8 113:22 114:22
  125:6 140:2 152:9
  158:6, 18, 22, 25 159:1, 7,
  8 164:1, 3 170:24 171:2,
  3, 4, 5 177:10, 25 178:6,
  14 179:13 181:3, 8, 10
  184:4 186:19, 24 187:10
  189:1, 9, 10, 17 190:4
  198:21 199:9, 17 201:11,
  15 202:12, 15, 17 203:23
  204:6, 16 211:23 218:15
  221:14 234:21, 22, 25
  235:6 244:12, 19 245:1,
  6 247:14, 19 248:3, 10
  283:13, 15
depend 63:2, 6
dependent 48:9
depends 16:21 106:5
  148:5 150:5 279:16, 17
deposed 6:9 20:7
deposition 1:13 4:8 7:1
  8:3, 9, 18, 25 116:22
  117:1, 2, 12, 17 210:5
  217:13, 15, 16, 18 220:6
  232:2 286:12 288:4, 9
depositions 8:5 114:9
  217:1, 18, 24 249:18
deprive 65:1
describe 30:12 36:17
  75:9 108:14 109:4, 21
  131:9 133:8 166:3
  169:6, 16 170:10 254:18
  271:13
described 40:24 68:6, 10
  88:10 98:23 99:20

103:1, 13 142:2 156:10,
  22 183:11, 25 274:5
describes 108:15 168:21
  274:8
describing 130:16 131:2
  137:12 156:16 157:2
  168:22 215:11
DESCRIPTION 3:5
  120:3
design 107:22, 25 166:9
designated 20:15, 19
  208:12, 13, 15 210:24
desired 108:1
despite 229:24 235:9, 23
  275:23
destructive 129:3
detail 169:2 252:23
detailed 6:16
determination 19:12
  63:19, 24 64:7 77:18, 21
  95:15, 23 97:7 148:11,
  13 195:11 200:17
  235:10 251:12
determinative 200:5, 9
determine 60:11 61:17
  65:5 92:4 106:3 108:23
  143:9 149:1 194:19
  195:4 209:10 225:7
  263:6 285:6
determining 60:23
  62:21 70:13 71:10
develop 143:17 179:21
developed 165:19
  220:15 221:5
developing 128:24
  181:20
Development 128:10, 25
  138:15 157:11 264:11,
  14 275:4
Developmental 17:8
  22:8 31:22 54:12, 22
  94:21 104:23 159:2
  179:14 198:22 199:9
  201:16 202:16 204:17
  215:19 244:19 248:11
  264:20
Dever 32:1
diagnoses 67:23
diagnosis 259:9 266:1
diagnostic 118:25
dialogue 276:6
difference 200:24 228:21
different 11:14 29:24,
  25 30:10 37:21 40:5
  51:8 87:19 97:23 98:2,
  15 126:18 136:16
  146:12 165:5 174:3
  176:23 180:6 182:2
  194:7 196:14 197:15
  200:16

**differently** 30:9 159:6 181:22
**differs** 31:15
**difficult** 126:3 172:9, 23 173:3, 4 236:7, 11, 23
**difficulties** 127:6, 25
**direct** 37:23
**directed** 287:4
**direction** 1:20 278:17 279:25
**directly** 274:23 275:11
**director** 32:8
**Disabilities** 11:18, 21, 24 17:8 18:1 22:8 31:22 33:8 54:12, 23 56:21 57:21 59:13 67:2 68:1, 5, 9 69:24 81:20 94:4, 11, 17, 21 100:3 104:23 113:3 114:3, 24 123:21 124:6 128:12 140:13 146:20 159:2, 9 179:14 181:4 183:1, 8, 11, 21 184:10, 19, 21 185:1, 19 186:20 187:2, 12 198:22 201:16 202:16 204:17 215:19 244:20 247:6 248:11 249:7 262:11 270:19 271:7 284:17
**disability** 28:25 67:20 69:7, 18 128:14 199:10 249:22
**disabled** 109:23 110:4, 7 135:2, 16, 17
**disadvantage** 132:21
**disadvantaged** 129:1 131:7 132:8
**disagree** 44:17 52:3, 4, 9, 12 127:18
**disagreement** 127:15
**disaster** 277:25
**disciplinary** 16:5 148:4, 18 156:12 170:19
**discipline** 48:16, 23 68:24 87:24 100:24 148:18 149:13 151:22 153:10 154:5, 9 171:8 224:13, 21 227:19 228:5 249:9 275:11, 20
**disciplines** 154:10
**discovery** 171:6 221:15
**discretion** 90:8 165:17 166:2
**discriminate** 28:7, 23
**discuss** 111:10 258:1
**discussed** 61:8 73:7 118:5 265:2
**Discussion** 7:18 28:10, 14 50:4 75:23 111:18 192:9 206:10 208:5 212:18 220:3 258:6

**Dishion** 140:21, 22, 23 141:7
**disorder** 108:21 126:17
**display** 147:6
**displaying** 148:7 171:17 172:16, 25
**disrates** 137:19
**disruption** 146:25 147:22 166:9
**Disruptions** 152:2, 22
**disruptive** 130:7 132:16, 19
**disruptive-aggressive** 129:20 131:19
**distinguish** 141:17
**DISTRICT** 1:1, 2, 15 16:7 34:20 35:6, 14, 21 37:2 42:3, 7, 23 43:12 44:22 45:9 47:24 53:25 54:2, 5, 13 63:23 64:6, 17 68:20 76:1, 17 77:8, 14, 20, 23 91:1, 12 98:6 101:23 107:5 150:3 165:17 177:23 189:5 192:5 201:4 209:20 215:9, 12 267:9, 16 268:3, 8, 9, 17, 25 269:1, 7, 12, 17, 22 270:14, 16 272:15 274:6, 18, 20 279:17 280:11 286:6 290:1, 3
**district/schools** 232:25
**districts** 22:17, 23 23:7, 17, 24 24:12, 19 30:6, 19 31:8 35:24 37:3, 5, 7 38:11, 24 39:10, 14, 20, 23 40:6, 8, 11, 25 42:25 45:2, 23 46:4 54:24 55:15 57:14 76:25 77:1 83:25 84:8 87:3, 14, 23 89:21 90:4, 8, 12, 23 91:11, 18 101:22 143:24 165:4, 10 173:9 188:5, 11, 18 189:19, 21 190:7 192:8 233:1 236:1, 7, 14, 20 237:9, 21 238:1, 11 239:5 252:12 268:5 269:2, 20, 25 274:21
**district-wide** 48:14 54:5 106:21 268:10
**disturbance** 112:20 114:25 115:4
**DIVISION** 1:3 2:8
**divisiveness** 278:2
**Doctor** 9:22 25:25 130:11 160:16 165:2 193:23 194:1 205:16 208:7 219:2 225:3 226:16 232:18 275:22
**document** 3:5 19:23 26:7, 18 27:10 37:17

125:5 160:15, 24 161:10, 12, 18, 22 171:11 173:19 188:13 189:12 191:21 194:9, 17 197:16 207:18, 20 219:3 221:16 232:10, 19 245:15 272:24 273:14, 17, 19 274:5, 8 275:23 276:3 277:4, 5, 13 278:13 279:11, 20, 24 280:4, 17
**documented** 59:14 186:8 195:22
**documents** 3:5 8:4, 8, 10 13:9 51:21, 24 89:4, 11 167:16 195:8 212:8
**DOE** 89:4 125:4, 5 156:1 170:18 171:7 175:8, 13 177:3, 16 188:4 232:22 233:1 234:19 237:8, 25
**DOE's** 50:22 235:9
**doing** 24:17 28:3 35:18 46:5 64:18 86:16 87:8 99:14 113:23 150:24 151:3 156:23 158:23 159:9, 20 171:7 173:17 192:3 200:22 230:11 240:7, 13 247:14, 19 248:4, 11 268:18 275:18 285:20
**dollar** 82:15 83:20
**dollars** 81:20 82:9, 12, 18, 25 83:2, 3, 12, 16, 22 84:13, 15, 18 90:21 102:15 117:3 136:24 144:3 149:13 152:1 173:25 182:5 186:4, 8 192:18, 24 214:15 222:20 246:22 248:17 249:3 256:11 257:24 261:3
**Dr** 4:8 5:17 6:8 7:14, 22 17:23 27:3, 25 28:19 40:14 56:2 66:4 67:14 85:7 96:3 129:9 152:10, 12 179:4, 6 192:4 206:19 207:14 220:8 231:4, 23 257:15 272:5, 8 284:11 286:22, 24 287:12, 22, 23 288:6, 12
**due** 65:18, 20 129:18 131:17 251:10
**duly** 5:13
**duration** 80:3

**< E >**
**e.g** 129:1 131:7 210:24
**earlier** 57:2 158:12 218:13 266:22
**early** 100:22 101:2

137:9, 12 224:13
**earth** 52:13
**easy** 6:13 36:9
**EBD** 121:1 128:11 145:23 146:4 266:1
**Ed** 4:22 74:5 168:1
**educated** 46:15 130:1
**education** 12:24 13:2 16:24 19:1, 8, 9 25:4 32:18, 23 33:3, 6, 22 34:3, 7 36:5, 12 38:14 41:11 49:3, 7, 18, 20 50:20 51:14, 22, 23 53:13, 17 54:10, 21 55:9, 11, 17 56:19 57:22 58:4, 9, 21 60:1 65:2 67:4 70:1 72:12, 21 73:9, 18, 21 75:16 81:12, 16 86:3, 16, 18 87:8 89:1, 8, 20 90:3 91:23 92:9 93:2, 25 94:11 97:16 102:22 104:6, 22 105:23 106:24 107:2, 4, 9 114:22 125:6 131:25 132:4 133:11 140:3, 10, 11, 20 141:18 144:18 146:8, 13 152:9 158:6, 19, 22 162:8, 12 164:2, 3, 22 171:4 177:10, 25 178:6, 14 186:19, 25 187:10 189:2, 10, 11, 17 190:4 195:19, 22, 23 196:9, 23 197:5, 10 201:12 223:2, 21 225:22 226:2 234:21 235:7 245:1 261:8 262:22 263:15 285:17
**educational** 29:11 63:13 67:3, 8 68:14, 22 69:25 76:13 79:14 80:15 84:3, 10 90:20 100:5, 6 102:8 123:22 124:7 146:23 225:12 247:10 262:16 274:2
**educators** 104:16 275:6 284:18 285:7
**EDWARD** 2:16
**effect** 123:9
**effective** 46:12 48:5 49:4, 10, 15, 21 58:14 70:13 71:6, 10, 22 82:10 84:15 124:2 173:16 222:25 223:8, 19, 25 225:2, 8, 11, 20 226:2 227:7, 8, 9, 23 228:10 274:24 284:16
**effectively** 43:24 67:3 70:1, 3, 14, 24 71:18 72:12, 21 73:9, 21 84:15
**effectiveness** 70:11 71:13 243:1 246:25

270:*21*

**effects** 48:*13*
**efficiency** 137:*1* 243:*1*
246:*25*
**efficient** 173:*16*
**efficiently** 43:*24*
**effort** 15:*9* 80:*18* 283:*6*
**efforts** 174:*3* 278:*23*
280:*3* 282:*3*
**eighth** 261:*7, 12* 263:*7,
14* 264:*12, 17*
**either** 122:*22* 202:*7*
214:*15*
**elections** 182:*3*
**Elementary** 101:*11*
148:*15* 167:*7*
**elevated** 129:*4*
**eligibility** 213:*11, 21*
**elopement** 147:*1, 23*
**Email** 3:*5* 231:*17*
**embodies** 149:*18*
**emotional** 52:*20* 60:*5, 9,
14* 108:*20* 112:*20* 114:*3,
24* 115:*3* 122:*21* 126:*17*
**emotionally** 135:*2*
**emphasis** 83:*12*
**employed** 107:*8*
**employee** 107:*3* 202:*12,
17* 290:*10*
**employees** 16:*24* 17:*3, 7*
104:*25* 107:*6*
**employment** 29:*9*
**enacted** 238:*25*
**encourage** 179:*22* 275:*7*
**encouraged** 245:*8*
249:*14*
**encouraging** 180:*6* 249:*2*
**endorsing** 150:*24*
**engage** 152:*14*
**engaging** 68:*17* 152:*3,
24* 153:*2, 24*
**England** 22:*17*
**enhance** 283:*6*
**enlightening** 270:*6*
**enrolled** 72:*24* 73:*16, 25*
112:*20* 134:*15* 136:*10*
257:*21* 258:*10*
**enrolling** 153:*16*
**enrollment** 39:*5* 101:*23*
**ensure** 152:*25*
**enter** 265:*7*
**entered** 259:*23*
**entering** 265:*6*
**entire** 119:*16*
**entities** 181:*18* 182:*8, 16*
**entitled** 3:*5* 14:*9* 192:*12*
**entity** 53:*10, 11, 14* 92:*2,
5* 188:*17* 255:*18* 269:*22*
**environment** 58:*3, 8, 14,
25* 73:*19* 195:*24* 197:*13,*

25 261:*8* 262:*16, 22*
263:*15*
**environmental** 278:*3*
**environments** 225:*12*
**error** 166:*17, 20* 167:*11*
**especially** 111:*25* 112:*4,
10* 206:*4*
**ESQ** 2:*15, 16*
**establish** 123:*11* 216:*6*
**established** 74:*13* 76:*14*
79:*15* 113:*11* 124:*4*
271:*10* 284:*21* 285:*8*
**establishing** 271:*25*
**estimate** 88:*9*
**et** 14:*10* 110:*13* 131:*24*
155:*7*
**evals** 99:*15*
**evaluate** 48:*13* 226:*17*
**evaluation** 226:*15*
**evaluations** 99:*20*
**everybody** 66:*18*
**everybody's** 286:*11*
**evidence** 120:*7* 135:*7*
211:*3*
**evidence-based** 27:*17*
52:*21* 127:*2, 17, 20*
138:*7*
**exact** 165:*15* 230:*1*
**exactly** 222:*3* 246:*11*
**EXAMINATION** 5:*15*
104:*21* 254:*1*
**examined** 5:*14*
**example** 31:*17* 42:*17, 22*
54:*2* 77:*12* 78:*22* 80:*21*
86:*19* 96:*16* 100:*22*
106:*19* 108:*17* 116:*14*
165:*3* 182:*16* 237:*16*
238:*10, 15* 249:*8* 274:*16*
**examples** 154:*16* 169:*12*
**exceed** 234:*1*
**exceeds** 233:*17*
**excellence** 221:*6*
**excited** 66:*18*
**exclusion** 126:*6*
**exclusionary** 148:*18*
149:*12* 154:*10* 270:*17*
**exclusive** 143:*20*
**exclusively** 109:*14, 18*
193:*12*
**excuse** 91:*12* 101:*17*
153:*18* 208:*12* 270:*17*
**EXHIBIT** 3:*5* 9:*12, 20*
17:*13* 25:*22, 23* 27:*10*
28:*21* 37:*13, 14* 38:*3*
40:*15, 18, 21, 25* 41:*3*
50:*7* 59:*11* 85:*8* 89:*12*
92:*24* 98:*21* 125:*19, 20*
133:*20* 137:*10* 141:*10,
11* 151:*8, 12, 20* 160:*11,
12* 162:*3, 4, 6* 164:*9, 20*
168:*15* 171:*10* 173:*22*

184:*1* 191:*8, 9* 193:*19,
20* 205:*14, 16, 20* 208:*8*
210:*4, 6, 8, 17, 18* 212:*23,
25* 213:*3, 7* 218:*15, 18*
231:*16, 17, 20* 232:*11*
239:*10* 245:*21* 267:*2, 4*
271:*18* 272:*23* 273:*2, 16*
277:*17, 18* 278:*7, 18*
279:*12* 280:*9* 282:*2*
**EXHIBITS** 3:*5*
**exist** 189:*22*
**existing** 85:*12* 86:*12*
96:*18* 174:*17* 283:*6*
**expand** 91:*2, 13* 97:*20,
24* 113:*23* 283:*5*
**expanding** 85:*12* 86:*12*
96:*17*
**expect** 100:*12* 165:*23*
243:*2*
**expectation** 180:*13*
**expectations** 80:*1*
122:*13, 16, 18* 180:*10*
209:*25* 226:*9* 283:*3, 11,
14, 16, 19* 284:*2*
**expenditure** 38:*11*
**expenditures** 42:*12, 24*
46:*11* 47:*8*
**expensive** 150:*21*
**experience** 29:*23* 30:*18*
34:*13* 39:*14* 40:*4* 55:*16*
59:*19* 71:*5* 98:*1, 3, 9*
132:*18* 154:*11* 167:*3*
200:*1, 21* 236:*13, 21*
254:*13* 264:*9, 15, 24*
265:*15* 270:*15* 284:*20*
**experienced** 277:*25*
**experiencing** 127:*6, 24*
**Expert** 3:*5* 8:*11, 15*
19:*22* 20:*8* 37:*19* 66:*22*
**Expires** 290:*20*
**explain** 165:*7*
**explained** 252:*23*
**explaining** 253:*14*
**exposure** 140:*11*
**express** 209:*22*
**expression** 273:*19* 274:*9*
**expulsions** 155:*19* 157:*7,
24*
**extend** 232:*23*
**extensive** 270:*20*
**extrapolating** 39:*22*
42:*15*
**eye** 28:*2*


**< F >**
**face** 138:*12*
**facilities** 281:*1, 10*
**facility** 91:*3, 14* 102:*13,
16*
**facing** 139:*4*

**fact** 45:*22* 64:*19* 74:*9*
82:*17* 98:*12* 149:*5, 8*
161:*13* 167:*15* 270:*5*
277:*10*
**factor** 70:*13* 263:*25*
264:*4*
**factors** 81:*3* 101:*21*
146:*19* 170:*20* 221:*20*
226:*11*
**failed** 243:*7* 256:*6*
**fair** 33:*10, 21* 40:*19*
106:*8* 119:*18* 133:*4, 7*
162:*19* 165:*25* 166:*3*
226:*15* 242:*10* 272:*12*
**fairly** 226:*17*
**fall** 115:*21* 116:*4* 168:*6*
170:*2, 5* 229:*9*
**familiar** 11:*17* 12:*16, 18*
14:*7* 30:*15* 33:*15, 18*
56:*2, 15* 57:*2* 58:*2*
90:*15* 110:*1* 162:*12*
**families** 273:*24*
**family** 64:*21* 65:*6, 11,
12, 14, 17, 22* 66:*11*
104:*4* 118:*4, 10* 120:*1, 8*
211:*10*
**Famous** 88:*16*
**FAPE** 194:*21* 195:*6*
**far** 43:*16*
**fast** 219:*23*
**favorite** 286:*11, 12*
**FBA** 62:*15* 64:*18* 104:*3*
105:*25* 106:*10* 107:*15*
108:*5, 15, 16, 19, 21*
**FBAs** 106:*13, 17, 21, 25*
107:*11, 21* 108:*8, 9*
**February** 10:*20* 230:*8*
**federal** 12:*13, 15* 50:*19*
82:*16, 24* 84:*18* 158:*18*
164:*3* 190:*10, 14* 191:*3*
239:*23*
**feedback** 274:*22*
**feel** 15:*20* 68:*18* 176:*18*
222:*6*
**feels** 232:*23*
**felt** 217:*19* 251:*8*
**fewer** 112:*8, 23* 224:*20*
**fidelity** 50:*21* 51:*4, 8, 9,
12, 24* 52:*5* 103:*3*
107:*21* 108:*4, 12, 22, 23*
121:*5, 21, 25* 122:*1, 4, 7*
123:*8, 10, 15, 16* 124:*4,
17* 125:*3* 149:*6, 7* 153:*7*
154:*9* 165:*6, 16, 21, 23*
166:*1* 179:*6, 7, 8* 188:*14,
21* 189:*4* 230:*11* 233:*13,
17, 25* 234:*12, 16* 236:*8,
15, 21* 240:*7, 13, 16, 25*
242:*22* 243:*2*
**fiduciary** 53:*16*

**field** 51:2 62:*11*
**fifth** 151:*19*
**figure** 36:24 37:9 42:*10*
43:*15* 92:7 118:*25*
119:*3* 135:*10, 19* 136:*1*
177:20 182:*15* 207:*10*
225:*1* 255:4, *5, 7, 8*
269:*4*
**figured** 151:*10*
**figures** 42:5 252:*25*
254:*25*
**file** 210:*25*
**filed** 14:*8*
**files** 73:6 258:*21*
**filling** 180:*11*
**finalized** 99:7
**Finally** 88:*21*
**finances** 41:7, *16* 44:*11,*
*19*
**financial** 248:*22, 25*
**find** 29:24 30:20 31:*3,*
*15* 39:*15* 40:6 46:*18*
47:*24* 50:*14* 51:4, *9*
52:24 62:*3* 73:7 108:*5,*
*11* 114:*12* 120:7 122:*15*
124:22 126:*3* 161:*23*
162:*14* 173:*14* 212:7
224:*17* 225:*25* 229:*21*
231:*18* 232:*1*
**Finding** 267:*24*
**findings** 39:*9, 15, 22*
40:6, *8* 41:*19*
**fine** 142:*16* 187:*19*
229:6 248:2
**finished** 275:*13*
**fire** 158:*7*
**first** 5:*13* 9:25 22:*11*
26:*4* 27:8, *9* 28:*25*
31:*20* 39:*20* 41:5 59:*11*
66:*25* 67:*13* 69:22 76:9
85:*25* 99:*25* 100:*15*
105:6 118:*19* 120:*23*
121:*12* 123:6, *25* 124:*9*
126:*1, 2* 127:*1, 9* 137:*11,*
*18* 146:*21* 170:*10, 14*
171:22 183:*19* 192:*16,*
*17, 22* 193:4 194:*18*
211:22 222:20 225:*9*
232:*19* 241:8 243:*5, 11,*
*16* 246:*1* 254:8 255:*9,*
*10* 256:*4* 257:24 261:*3*
270:*15* 277:*23* 281:7, *13*
283:*1* 284:*10, 14*
**fiscal** 38:*12, 20, 21*
206:*17* 224:*10*
**fit** 165:*19*
**five** 53:*13* 57:*18* 112:24
134:24 135:4, *14, 18*
150:*13* 167:*15* 258:7
286:*13*

**flip** 111:*11*
**Florida** 23:*20*
**flow** 92:20 190:*24*
**flows** 92:*12*
**focus** 46:6 88:2
**focused** 270:*14*
**folks** 7:*13* 182:6 250:*17,*
*21* 252:6, *7*
**followed** 85:22
**following** 60:*21*
**follows** 5:*14* 197:*14*
198:*1*
**follow-up** 17:*16* 204:22
**Footnote** 3:5 37:9, *19,*
*24* 38:6 114:20, *22*
116:*16, 21* 120:20
121:*12* 125:*18* 139:*15,*
*16* 140:22, *24* 141:7
151:*4* 164:9, *16* 166:*14*
191:*17, 22, 24* 192:*16, 18,*
*19, 22, 23, 24* 193:2, *5, 12*
195:*17* 196:2, *7* 218:*17,*
*23* 219:*19* 227:*16* 232:5
266:*19* 272:*11, 19, 25*
276:*12*
**footnotes** 206:*19*
**forget** 176:*5*
**form** 6:*3* 10:24 12:*1*
13:*5, 17* 14:*16, 25* 15:*12,*
*19* 16:*14, 20* 17:*15, 20*
18:*13* 19:*14* 22:24
24:20 30:*1, 11, 22* 31:9
32:*21* 33:*14, 24* 34:*4*
39:*12* 46:23 49:*11, 23*
50:25 51:*16* 52:*10* 53:6,
*21* 54:*15* 55:24 56:*11*
57:23 58:*16* 60:*19* 61:*1*
62:*24* 63:*15* 64:*1, 9*
65:*3, 15* 66:*1* 69:8
70:*15* 71:*1, 24* 72:*13*
73:*11, 19, 22* 74:21 75:*5,*
*11, 18* 76:*3* 77:*16, 24*
78:*16* 80:8 81:*14* 83:7
86:*8* 87:*1* 89:22 90:*10*
91:6 94:*5, 14* 95:7, *16,*
*24* 97:*17* 99:2, *22* 101:*7*
103:*9, 20* 104:*8, 17*
105:*13* 107:*16* 108:6, *25*
110:*15* 113:*19* 115:5
116:*8* 117:*4* 119:*13*
121:*7* 122:*8* 123:*18*
124:*12* 125:*10* 126:*11*
128:*2, 18* 129:*10* 131:*12*
132:*1, 10, 22* 137:*5, 14*
138:*17, 25* 139:*7* 141:20
142:*10* 143:*2, 12* 144:*6,*
*23* 145:*17* 146:*15* 147:*8,*
*16* 148:*1* 149:*2, 24*
150:*4* 152:*17* 154:*18, 25*
156:*5, 18* 157:*4, 19*
158:*8* 159:*3, 11* 162:*16*

166:*4, 21* 167:*13* 168:*8*
169:*11* 172:*5, 10, 18*
175:*16* 176:*21* 177:*12*
178:*9* 179:*17* 180:22
183:*13* 184:*11* 185:*10,*
*12, 16, 22, 23* 186:7, *10,*
*21* 187:*21* 188:*19*
189:24 190:*25* 195:*12*
198:*17, 24* 200:7 201:*3,*
*7* 203:*15* 204:2 212:*1,*
*17* 213:*15* 214:*18* 215:*2,*
*22* 216:7 218:*10* 223:*9*
224:*1* 226:*13, 19* 227:*12*
228:*1, 12* 230:*18* 233:*9,*
*19* 234:2, *23* 236:*3, 9, 25*
237:*11* 238:*3* 240:*17*
241:*4* 242:*12* 243:24
244:*15, 22* 245:4, *20*
246:*16* 247:22 248:*14,*
*23* 250:*8, 15* 251:*1, 21,*
*23* 252:4 253:*1, 21*
254:*4* 256:24 259:*11, 18*
260:6, *12, 20* 262:*18*
263:9, *17* 264:5, *18*
265:*9* 267:*11, 18* 271:2
272:*1* 274:*11* 276:*17, 20*
277:*16* 279:*3, 15* 280:*13,*
*20* 281:*3, 20* 282:5, *15*
283:*17, 25* 285:*10, 23*
287:*3, 8, 14*
**formal** 235:*9*
**format** 194:7
**formed** 205:*1*
**former** 213:*4*
**forming** 209:9, *14* 213:9,
*19*
**formula** 150:*9*
**forth** 286:2
**forward** 27:23 60:*15*
277:8 279:*21*
**forward-looking** 60:*24*
**found** 15:5 41:20 42:2
244:6
**Four** 42:*18* 117:*21*
168:*17* 258:*14*
**fourth** 128:22
**fractured** 246:*14*
**framework** 161:*14*
173:*23* 174:*1* 246:6, *19*
**frameworks** 74:*14* 79:*15*
**FRANCES** 2:*4* 5:2
**free** 56:*18, 20* 65:*1*
176:*18*
**friendships** 126:*4*
**front** 8:*15*
**frustrated** 206:*6*
**full** 59:*11* 107:20 112:*1*
118:*19* 128:*23* 132:*13*
152:*1* 170:*10, 14* 176:*8,*
*9* 181:20 195:*17* 222:20
235:*5* 243:5, *11, 16*

246:*1* 251:20 254:8
261:*17* 281:8, *13* 283:*1*
**fully** 87:*3* 241:9 242:7,
*17, 21* 282:*12, 19* 286:*1*
**fun** 205:8
**function** 61:22 107:*24*
**functional** 47:*12* 62:*12*
105:*3* 268:*11*
**functioning** 241:9 242:7,
*17, 21*
**functions** 104:*19*
**fund** 83:*23* 89:*1, 5*
186:*19*
**funded** 82:24 83:*14*
285:*16*
**funding** 43:*10* 83:2
89:7 91:*19, 22, 25*
136:*14* 216:5 217:*10*
270:2 278:*23* 279:*13*
280:5, *8* 282:2
**funds** 43:23 44:*23*
45:*10* 88:22 89:*21* 90:4,
*9, 13* 93:2, *18, 25* 94:*12,*
*21* 95:*1* 183:6, *19*
186:25 187:*10* 190:24
191:4, *6* 215:24 281:9,
*17*
**Further** 46:7 118:*20, 22*
221:*19* 290:*9*
**future** 60:*17*
**FY** 114:*23*
**FY97** 42:*25*

**< G >**
**GA** 2:*20* 175:8 177:*16*
234:*19* 235:*9*
**GaDOE** 88:*21* 245:7
**GaDOE's** 235:*23*
**gains** 56:*23*
**gathered** 38:*13*
**GCH** 202:7
**General** 4:*21, 23* 18:25
19:*9* 32:*18, 22* 33:2, *6,*
*22* 34:*3, 7* 36:5, *12* 49:2,
*7, 18, 20* 59:25 67:4
70:*1* 71:*19* 72:*12, 21*
73:9, *18, 21* 74:5 102:22
131:*24* 132:4 133:*11*
140:9, *11, 20* 141:*18*
144:*18* 146:8, *13* 167:*14*
168:*1* 195:*19* 196:9, *23*
197:5, *10* 223:2, *21*
225:22 245:*11* 261:7
262:*16, 21* 263:*14*
**generalized** 102:*18, 19*
116:*15*
**generally** 31:6 56:*14, 15*
115:*17* 123:*14* 155:5
162:*15* 163:*1* 166:*1*
242:*1*

**generate** 273:*21*
**genius** 97:*3*
**geographical** 101:*25*
**GEORGIA** 1:2, *8* 4:*4*,
*21*, *24* 5:24 10:7 11:*14*
13:*10, 25* 14:9, *10, 19*
15:*16, 21* 16:*24* 17:*3, 7,
12, 25* 18:6 23:*19, 22*
24:*3* 25:*18* 32:*19* 33:23
34:9, *12* 43:*19* 54:*13, 20,
23* 55:*5, 8, 14, 19, 21*
57:*11, 17* 72:*18* 74:*18,
22, 25* 75:*19, 25* 78:*4, 21*
81:*12, 15* 85:*9* 86:*1, 2*
87:6, *7* 88:*21, 25* 89:*7,
16* 90:*18* 91:*1* 92:8
93:*1, 25* 96:*9* 97:*7, 11,
13* 101:*17* 102:*12, 14*
104:*18, 21* 106:*12, 17, 24*
107:*2, 3, 7, 8, 10, 14*
108:*19* 109:*17* 110:*16,
22, 23* 111:*2, 7* 112:*1, 4,
7, 11, 12, 20* 113:*20, 21*
116:*18* 117:*9* 118:*13*
119:*12* 120:*14, 17*
134:*20* 137:*13, 22* 138:*1,
9* 140:*2, 3* 149:*9* 155:*25*
156:*8, 12, 14, 23* 157:*6,
21, 24* 158:*1* 167:*16*
172:*4* 173:*10* 177:*9*
182:*25* 183:*5, 19* 184:*9,
18* 185:*11* 186:*18, 24*
187:*10* 188:*3* 189:*22*
190:*13* 191:*1, 5* 192:*5*
202:*1, 3, 6, 8* 203:*6, 25*
204:*8, 19* 213:*10, 21*
216:*5, 12, 25* 218:*6, 7*
220:*15* 221:*5* 224:*20, 24*
225:*5, 7, 10* 226:*1, 18*
227:*11, 23* 228:*10*
229:*14* 231:*5* 234:*15, 20*
235:*1, 6, 22* 236:*1* 237:*8,
24* 238:*14, 23* 239:*4*
240:*6* 244:*12* 248:*3, 10*
250:*6, 13* 254:*10* 265:*20,
23* 266:*9* 271:*8, 11*
276:*12* 277:*8, 10* 278:*11,
14, 16* 279:*6, 18, 20*
280:*6, 7, 22* 281:*8, 17*
282:*7* 283:*2, 10*
**Georgia's** 13:*13* 54:*9*
83:*25* 231:*8, 12* 235:*8*
252:*17* 253:*5* 276:*24*
277:*5* 280:*3, 17*
**getting** 82:*19, 20* 241:*17*
243:*17* 247:*24* 284:*12*
**give** 41:*24* 63:*21*
119:*18* 154:*16* 168:*5*
208:*2* 209:*24* 239:*14*
286:*13*

**Given** 117:*20* 145:*24*
170:*21* 226:*10, 20*
**global** 277:*25*
**GNETS** 3:*5* 11:*16* 13:*1,
14* 15:*18, 23* 16:*1* 18:*9,
12, 16, 20* 72:*11, 20, 24*
73:*10, 16* 74:*8* 85:*10, 20,
24* 86:*2, 7, 17* 87:*9* 88:*6,
22* 89:*1, 21* 90:*4, 8, 13*
91:*2, 3, 12, 13, 19, 22*
92:*9* 93:*2, 5, 6, 9, 11, 13*
94:*1, 12, 22* 95:*1, 4, 5, 13,
21* 96:*10* 101:*16, 23*
102:*13, 16* 112:*25*
134:*14, 15, 18, 19* 136:*10*
153:*9* 175:*2, 14, 18*
183:*9* 192:*12* 193:*6, 12,
13, 16, 22, 25* 194:*19*
195:*5, 10, 18* 196:*8, 13,
22* 197:*4, 13, 25* 198:*12,
15, 23* 199:*11, 19* 200:*2,
18* 247:*7* 249:*11, 23*
254:*14* 257:*20* 258:*11*
259:*14, 23* 260:*4, 11, 16,
23* 261:*6* 262:*3, 4* 264:*1,
3* 265:*7* 266:*5, 10* 271:*6*
281:*1, 10, 18*
**GNETS-type** 175:*15*
**go** 9:*11* 11:*15* 29:*18*
33:*11* 35:*20* 36:*20* 39:*2,
18* 41:*21* 44:*1* 45:*3*
46:*25* 47:*24* 48:*7* 50:*6*
52:*25* 68:*21* 71:*2, 12*
77:*10, 25* 82:*21* 96:*4, 7*
98:*20* 99:*25* 109:*2*
120:*11* 133:*19* 134:*6*
135:*23* 137:*8* 140:*5*
146:*11* 162:*4* 167:*1*
168:*14* 179:*5* 182:*24*
184:*21* 189:*13* 196:*4*
207:*13, 15* 211:*21* 213:*2*
220:*21* 221:*18, 19* 224:*5*
233:*20* 243:*20* 247:*3*
257:*6, 17* 264:*10* 271:*5*
272:*5* 273:*13* 275:*2, 14*
278:*11, 14, 17, 18* 279:*18,
22* 282:*6, 23* 285:*6, 21*
**goal** 14:*23* 15:2* 58:*6*
60:*8* 79:*19* 114:*4* 121:*5*
131:*13* 153:*25* 154:*4*
166:*5*
**goals** 224:*16*
**goes** 101:*2* 124:*5*
136:*25* 156:*13* 202:*12,
17* 276:*10*
**going** 6:*2* 15:*23* 18:*17*
27:*20* 28:*9, 12* 40:*12*
41:*24* 63:*21* 66:*19* 70:*4*
75:*22* 76:*2, 16* 83:*19, 20*
84:*25* 85:*23* 88:*3, 15*
97:*1* 101:*15* 113:*5*

115:*9, 11* 133:*24* 139:*21*
157:*15* 162:*2, 4* 163:*15*
166:*13* 173:*21* 179:*11*
186:*16* 190:*4* 205:*17*
216:*8* 218:*14* 219:*4, 11*
224:*17* 228:*6, 23* 230:*14,
23* 241:*12* 247:*4* 257:*8*
263:*4* 264:*22* 275:*19*
279:*12* 280:*7, 8* 281:*6*
286:*15* 288:*15*
**good** 130:*9* 154:*20*
205:*12, 16* 264:*16*
266:*11* 267:*6*
**government** 53:*10* 54:*9,
20* 55:*19* 82:*16, 25*
191:*3*
**governs** 93:*5*
**grade** 261:*7, 12* 263:*7,
14* 264:*12, 17*
**grades** 170:*20*
**grant** 13:*8* 25:*3* 53:*12*
89:*6* 190:*24*
**grants** 190:*10, 14* 192:*6*
**graph** 37:*2*
**graphics** 26:*25*
**Great** 5:*22* 191:*23*
206:*21* 257:*7* 264:*10*
272:*22*
**greeted** 274:*20* 275:*5*
**ground** 92:*13* 266:*13*
**grounded** 27:*16* 270:*20*
**group** 90:*22* 104:*5*
118:*23* 120:*12, 13, 17*
168:*12* 169:*23*
**growth** 264:*11*
**guess** 10:*10* 62:*14* 92:*7*
151:*19* 196:*21* 232:*20*
**guidance** 35:*21* 149:*10*
**guide** 276:*4, 16*
**guidelines** 118:*2*
**guiding** 93:*18*
**gun** 278:*3*

< H >
**habilitation** 21:*20* 22:*5,
6*
**hampering** 285:*22*
**hand** 26:*17*
**handbook** 113:*8*
**handed** 9:*22*
**Hang** 33:*1* 37:*25* 41:*20*
115:*22* 224:*16* 255:*19*
275:*12*
**happen** 280:*7* 286:*24*
**happened** 280:*10*
**happening** 132:*25*
**happens** 31:*12* 72:*8*
122:*11* 133:*11*
**hard** 60:*21* 237:*13*
238:*5*

**hardest** 6:*25*
**harm** 273:*24*
**Harms** 140:6 145:*19*
**head** 212:9 272:*3*
**heading** 128:*8*
**Healing** 272:*18*
**Health** 17:*4, 8* 21:*9*
35:*5* 54:*10, 11, 21, 22*
55:*14* 74:*24* 81:*19* 82:*6*
86:*6, 10* 88:*1* 94:*20, 25*
104:*23, 24* 113:*3* 137:*20*
138:*15* 159:*1, 2, 8, 9*
161:*15* 174:*4* 175:*9*
176:*12* 177:*6* 178:*1, 7,
15* 179:*13, 15, 20, 23*
180:*2, 14, 16, 19* 181:*1, 3,
4, 9, 10, 17* 184:*5* 198:*22*
199:*9, 18* 201:*16, 23*
202:*12, 16, 18* 203:*24*
204:*6, 16* 209:*6* 210:*23*
211:*6, 23* 215:*18, 20*
216:*4, 12, 14, 16, 24*
221:*7* 224:*20* 226:*10*
244:*12, 19* 247:*14, 19*
248:*4, 11* 254:*10* 274:*1*
281:*9* 283:*3, 11, 13, 16,
20*
**hear** 6:*20*
**hearing** 7:*12, 14*
**held** 7:*18* 28:*10, 14*
50:*4* 66:*4* 111:*18* 192:*9*
206:*10* 208:*5* 212:*18*
220:*3*
**help** 74:*12* 78:*10* 79:*13*
80:*11, 14* 84:*1, 9* 152:*5*
161:*9* 223:*1, 20* 225:*21*
240:*19* 247:*9* 250:*2*
270:*18* 278:*23* 282:*3*
**helped** 20:*24*
**helpful** 7:*4*
**helping** 143:*23*
**helps** 76:*12*
**Hey** 130:*23*
**high** 101:*11* 106:*19*
114:*2* 128:*25* 129:*1*
131:*6* 132:*7, 8, 20*
155:*18* 167:*7* 256:*7, 15*
**higher** 146:*20* 171:*18*
172:*17, 25* 274:*22*
**highest** 35:*22* 36:*18*
43:*16* 115:*18* 117:*23*
119:*15, 19* 146:*22* 242:*2*
**high-intensity** 256:*18*
**highlighted** 232:*21*
**high-quality** 126:*4*
**Hill** 232:*1*
**hire** 158:*7*
**hold** 162:*3* 210:*13*
**holding** 288:*8*
**holistic** 174:*5, 8, 11, 14*

**HOLKINS** 2:*3* 4:*25* 6:*6* 10:*24* 12:*1* 13:*5, 17* 14:*16, 25* 15:*12, 19* 16:*14, 20* 17:*15, 20* 18:*13* 19:*14* 22:*24* 24:*20* 30:*1, 11, 22* 31:*9* 32:*21* 33:*14, 24* 34:*4, 10, 21* 36:*2, 10* 37:*22* 39:*12* 41:*23* 46:*23* 49:*11, 23* 50:*24* 51:*15* 52:*10* 53:*6, 21* 54:*15, 25* 55:*24* 56:*11* 57:*23* 58:*16* 59:*2* 60:*19* 61:*1* 62:*24* 63:*15* 64:*1, 9* 65:*3, 15* 66:*1, 14* 67:*7* 69:*8* 70:*15* 71:*1, 24* 72:*13* 73:*11, 22* 74:*21* 75:*5, 11, 18* 76:*3, 19* 77:*16, 24* 78:*16, 24* 80:*8* 81:*14, 21* 83:*7* 86:*8* 87:*1* 89:*22* 90:*10* 91:*6, 16* 94:*5, 14* 95:*7, 16, 24* 97:*17* 99:*2, 22* 101:*7* 103:*9, 20, 22* 104:*8, 17* 105:*13* 107:*16* 108:*6, 25* 110:*15* 111:*11* 113:*19* 115:*5* 116:*8* 117:*4* 118:*7* 119:*13* 121:*7* 122:*8* 123:*18* 124:*12* 125:*10* 126:*11* 128:*2, 18* 129:*10* 131:*12* 132:*1, 10, 22* 133:*15* 137:*5, 14* 138:*17, 25* 139:*7* 140:*24* 141:*5, 20* 142:*10* 143:*2, 12* 144:*6, 23* 145:*6, 17* 146:*15* 147:*8, 16* 148:*1* 149:*2, 24* 150:*4* 152:*17* 153:*4* 154:*18, 25* 156:*5, 18* 157:*4, 19* 158:*8, 15* 159:*3, 11* 161:*9, 25* 162:*16* 164:*11, 15* 166:*4, 21* 167:*13* 168:*8* 169:*11* 172:*5, 10, 18* 175:*16* 176:*21* 177:*12* 178:*9, 17* 179:*17* 180:*22* 182:*2* 183:*13* 184:*11* 185:*12, 23* 186:*10, 21* 187:*4, 21* 188:*19* 189:*24* 190:*11, 15, 18, 25* 191:*23* 192:*1, 25* 193:*4, 8* 195:*12* 198:*17, 24* 199:*12, 20* 200:*7* 201:*3, 7* 203:*15* 204:*9, 20* 205:*4, 23* 206:*12, 21* 207:*4* 210:*13, 18* 212:*1, 17, 22* 213:*15, 25* 214:*18* 215:*2, 22* 216:*7* 217:*3* 218:*10, 22, 25* 223:*9* 224:*1* 226:*19* 227:*12* 228:*1, 12, 25* 229:*6* 230:*18* 231:*22, 25* 232:*6* 233:*9, 19* 234:*2,* 23 236:*3, 9, 25* 237:*11* 238:*3* 239:*25* 240:*17* 241:*16, 23* 242:*12* 243:*24* 244:*15, 22* 245:*4, 20* 246:*16* 247:*22* 248:*6, 14, 23* 250:*8, 15* 251:*1, 21, 23* 252:*4* 253:*1, 21* 254:*4* 256:*24* 257:*7* 259:*11, 18* 260:*6, 12, 20* 262:*18, 23* 263:*9, 17* 264:*5, 18* 265:*9* 266:*25* 267:*5, 11, 18, 23* 271:*2* 272:*1, 4* 274:*11* 276:*17, 20* 277:*16* 279:*3, 15* 280:*13, 20* 281:*3, 20* 282:*5, 15* 283:*17, 25* 284:*9* 285:*10, 23* 287:*3, 8, 20* 288:*7, 20*

**home** 101:*22* 118:*12, 15* 144:*17* 146:*10* 247:*7*

**homestead** 12:*2, 3*

**hope** 60:*17* 205:*11* 272:*24* 273:*19* 274:*9*

**hoped-for** 224:*18*

**hopeful** 277:*9*

**hospital** 184:*22*

**hosts** 239:*23*

**household** 128:*14*

**how-to** 276:*4, 16*

**huge** 42:*8* 112:*15*

**hundred** 230:*3*

**hypothetical** 90:*25* 91:*10* 165:*4*

**Hypothetically** 70:*19*

**< I >**

**i.e** 132:*8*

**IC3** 61:*23* 64:*20* 68:*2* 77:*11, 15, 19, 21* 78:*1, 6, 14, 23* 79:*3* 109:*22* 110:*18* 111:*10, 25* 112:*3, 4, 8, 10, 18* 114:*7, 10, 14, 17* 115:*4, 10, 12, 20* 116:*3, 7, 18* 117:*10, 20, 22* 261:*23* 262:*9*

**ICF** 174:*18, 22* 181:*18, 24, 25*

**IDD** 31:*23* 32:*15* 34:*15*

**IDEA** 12:*16, 19, 23* 56:*14, 15, 18* 65:*20* 113:*13* 133:*2*

**identification** 9:*21* 25:*24* 37:*15* 101:*2* 125:*21* 137:*9, 12* 141:*12* 151:*13* 160:*13* 162:*7* 191:*10* 193:*21* 205:*21* 210:*9* 218:*19* 231:*21* 273:*3*

**identified** 52:*6* 103:*19* 108:*20* 114:*24* 123:*3* 138:*5* 185:*8, 17*

**identify** 4:*15* 72:*9, 19* 87:*17* 100:*25* 104:*2* 105:*8, 12, 18, 24* 113:*14* 123:*17* 138:*22* 184:*5* 223:*1, 19* 225:*21* 247:*13* 249:*10, 24* 271:*11*

**identifying** 68:*21* 101:*5* 181:*19* 249:*6*

**IEP** 16:*15, 18, 25* 17:*4, 9, 17, 19* 18:*5, 24* 57:*2, 6, 11, 17* 58:*7, 11, 12, 20, 22, 23* 59:*7* 65:*7, 11, 13, 14, 22* 66:*11* 95:*6, 10* 97:*14, 19, 22* 98:*1, 4, 7, 10* 143:*14* 144:*7* 177:*20* 194:*19* 195:*4, 10* 200:*1, 4, 6, 14, 15, 19, 24* 201:*1, 13, 17, 21, 24* 211:*18*

**IEPTs** 87:*11*

**IFI** 61:*23* 68:*5*

**II** 88:*18, 20* 193:*13*

**III** 284:*15*

**illegitimate** 138:*21*

**illustrate** 258:*22*

**impact** 230:*16* 275:*21* 278:*3*

**impactful** 273:*21*

**impacting** 119:*11*

**impediments** 107:*14*

**Impending** 128:*9*

**implement** 53:*20, 23* 54:*13* 80:*5* 125:*4* 152:*25* 154:*8* 165:*11* 171:*23* 172:*9, 23* 173:*12, 13, 15* 189:*11, 15, 22* 190:*5* 236:*7, 24* 240:*6* 270:*16* 282:*13, 20* 286:*2*

**implementation** 25:*9* 132:*13* 154:*13* 169:*21* 188:*6, 11, 23* 189:*7, 19* 190:*7* 211:*3* 229:*18, 19* 231:*6* 237:*5*

**implemented** 149:*6* 153:*6* 154:*6* 160:*25* 163:*16* 189:*2* 208:*11, 13* 226:*12* 227:*1* 228:*3* 231:*8, 13* 234:*15* 236:*15, 21* 269:*19* 271:*24*

**implementing** 54:*2* 74:*14* 79:*16* 86:*22* 87:*4* 171:*9* 188:*17* 189:*1* 191:*4* 230:*12* 233:*7, 12, 23, 24* 240:*12, 16, 24*

**implements** 53:*18*

**importance** 170:*11* 176:*12*

**important** 6:*13* 33:*2* 102:*17* 120:*24* 264:*20*

**impose** 107:*14* 215:*19*

**improve** 41:*8, 9* 43:*25* 44:*4, 7, 12* 60:*4, 8, 13*

62:*18* 157:*11* 242:*25* 246:*24* 269:*23* 270:*3* 275:*19*

**improved** 171:*15* 218:*16*

**improvement** 60:*18* 70:*9*

**improvements** 71:*14*

**improving** 44:*6* 96:*19* 152:*5* 286:*4*

**In/Check** 168:*11* 169:*22*

**inanimate** 63:*21*

**inappropriate** 19:*7*

**incentives** 153:*14*

**incident** 147:*14, 25*

**incidents** 259:*16* 266:*4*

**include** 41:*17* 43:*14* 136:*4* 146:*7, 24* 147:*21* 163:*4, 18* 169:*19, 21* 224:*19* 278:*22*

**included** 43:*17* 89:*12*

**includes** 36:*3* 286:*3*

**including** 67:*2* 69:*24* 85:*12, 13, 15* 86:*12* 144:*15* 211:*15* 221:*21* 283:*4*

**inclusion** 43:*21* 45:*13* 143:*20* 144:*1* 269:*22* 270:*3*

**inclusionary** 35:*23* 36:*17* 43:*14, 25* 44:*7, 14, 15* 175:*22* 269:*23* 270:*11, 17*

**inclusions** 48:*10, 18*

**inclusive** 36:*4, 12* 142:*22, 25* 143:*9, 10* 144:*4*

**income** 109:*22* 110:*2*

**incorrect** 44:*10* 205:*15*

**increase** 43:*10* 86:*21* 130:*6* 152:*2, 23*

**increased** 87:*21* 129:*18, 19* 130:*6, 22* 131:*18* 224:*22* 226:*13, 14* 275:*3*

**increasing** 83:*3*

**index** 46:*11*

**indicate** 227:*18* 234:*14*

**indicated** 211:*11* 230:*13* 245:*15* 278:*17*

**indicates** 98:*10* 270:*8*

**indication** 261:*22*

**indicator** 48:*24* 49:*3* 228:*6* 275:*12*

**indicators** 16:*3* 48:*11* 68:*23*

**indices** 48:*13*

**individual** 18:*4* 61:*24* 63:*3, 6* 64:*20* 68:*10* 72:*9* 73:*5, 7, 20* 75:*24* 78:*10* 104:*4* 106:*13, 18* 120:*11, 17, 24* 121:*1, 11, 17* 122:*22* 123:*13* 134:*6, 15, 16* 136:*4* 186:*15*

189:6  195:24  201:5
226:7  261:20, 25  262:6
**individualized**  19:12, 19
62:22  95:14, 22  115:16
121:15, 20  148:10
222:22  223:13  225:5, 16
242:1
**individually**  25:14  73:18
258:7
**individuals**  31:21  32:15
34:15  56:21  63:22
114:13  120:13
**infection**  263:3
**influence**  19:4  31:11, 14,
16  87:11  98:7  128:23
153:15  181:7  200:1, 4,
12
**inform**  269:25
**information**  15:4, 5
107:21  150:10  156:13,
15  157:6, 9  162:17
207:23  221:13  228:16
234:19  235:1  245:14
249:12, 19
**initiate**  126:3
**initiated**  79:20
**initiative**  55:7  77:6
81:16
**injustice**  278:1, 2
**innovating**  273:23
**input**  269:16
**inquiry**  19:20  62:22
**Institute**  3:5  5:19  9:8
21:2, 7, 15, 19, 25  22:3,
11  23:13  26:2  28:7, 20,
23  29:9, 10, 12  149:22
237:17  238:9
**Institute's**  26:4, 10  27:4,
14
**institution**  31:21, 24
32:13, 14, 20
**institutional**  35:7
**institutions**  32:25  34:3,
8, 12, 13
**instruct**  6:21
**instruction**  152:4, 14
153:2, 24
**instructions**  152:24
**insufficient**  185:11
254:13
**insurance-funded**  23:24
**integrate**  243:7
**integrated**  74:12  76:13
79:14  80:11, 15  84:2, 10
100:6  102:8  144:16
145:23  146:3  246:6, 14,
18  247:2, 10  250:2
259:25  271:8
**integrating**  176:12
177:5  178:1, 7

**integration**  177:16
179:15
**intellectual**  22:7  31:22
**intended**  102:25  276:4
280:7
**intense**  106:9  114:17, 18
**intensity**  41:10  59:21
61:7, 9, 16, 18  62:2  63:6,
11  64:11  73:4  74:4
103:3  106:6  122:12
123:7, 10  124:3  175:21
185:25  186:6  256:7, 16
265:15  282:24
**intensive**  64:20  115:17
171:25  242:1  260:18
**interact**  126:4
**interactions**  140:12
**interconnected**  161:13
173:22  174:1
**interest**  209:22  219:3
**interested**  209:23  290:12
**interject**  40:13
**internal**  151:1
**interruption**  187:6
**Intervention**  25:2  47:13,
17, 18  61:23  62:13
64:21  120:25  121:16
135:3, 16  138:7  149:4
168:24  169:8, 10  176:14
211:13  264:3  268:12, 16
**interventions**  48:14  51:7
53:2  62:17  107:22
122:10  158:2  168:12
169:19, 21, 24  170:4
173:6, 13  188:7  223:1,
20  225:21  261:5
**interview**  167:24
**interviewed**  167:21
**interviews**  244:9
**introduce**  9:11  161:10
**introduced**  231:16
**introduction**  161:14
**inventory**  165:21  188:15,
22
**invest**  83:20
**invited**  17:21
**involved**  20:22, 24  39:3
143:17  159:25  160:3, 8
180:13  182:17  266:3, 17
274:1
**involvement**  159:23
**involving**  95:10  259:17
**IPT**  15:17
**ISF**  25:10  174:2, 22
175:7  177:1, 2, 15
179:25  181:24  191:5
**isolated**  173:17  176:5
**ISS**  148:20
**issue**  110:22  234:7
288:2, 5

**issued**  13:1
**issues**  6:4  262:3
**Item**  210:15
**its**  15:10, 22  51:1  80:7
85:10, 11  86:1  87:9, 14
88:6  91:12  96:9, 10
113:15  188:4  189:17
209:21  231:6  235:10
256:6, 15  277:14  283:5
286:2
**IV**  285:19

< J >
**January**  206:25  207:1, 6
**jbelinfante@robbinsfirm.c
om**  2:21
**JESSICA**  2:5  5:4
**job**  154:20
**Jones's**  117:11, 17
**JOSH**  2:15  4:19  5:23
**journals**  125:8
**July**  290:21
**jump**  100:12  111:9
284:7
**jumped**  66:18
**June**  20:1, 3
**JUSTICE**  2:7  4:9  8:23
9:8  14:14, 24  15:2, 10
171:3, 5  221:14  234:22,
25
**Justin**  232:1

< K >
**K-12**  162:23
**keep**  92:16  206:4
**keeping**  23:22
**Kevin**  258:3, 17  265:1, 5,
19, 25  266:1, 3
**key**  6:11, 13
**kids**  130:8  134:25
143:25  226:6, 14, 22
264:25
**kill**  263:4
**kind**  10:8  36:18  49:16
56:24  59:4  69:2  72:6
76:1  82:21  97:8  98:25
103:7  105:11  110:10, 13
116:15  123:12  149:23
166:6  255:19
**knew**  46:4  47:10, 20, 23
204:14
**know**  7:6, 24  12:25
16:9, 18  18:19  19:6
25:18  32:22  34:11
44:25  45:25  48:20
51:17  55:12, 18, 22  56:8,
9  57:18  59:4  61:13, 21,
25  64:14, 17, 22  65:6, 17
66:18  72:7  73:1, 6  74:9
75:14, 21, 22  77:7  82:7
84:14  88:6  89:6, 9

90:24  92:14  93:10, 12
101:15  102:9  106:12, 14,
20  107:7  109:7  110:10
112:6, 14, 18  118:12
119:10  122:19  124:10,
16, 17, 18  125:5, 12
126:19  127:17, 19
134:23, 24, 25  135:1, 5,
13, 15  143:22, 23  149:17
150:2  151:11  152:9
154:22  158:9  159:14
163:19, 25  168:2  170:1
171:23, 24  175:18, 19
177:2, 19  180:9  181:13
182:4  183:15  186:16
187:17  192:3, 4  197:16
200:8, 18, 23  203:5, 8, 12,
19, 23  205:13  206:4
208:15  209:17  212:6
214:19  217:17  221:24
222:3, 7  226:11  227:7
228:14, 15, 18  230:7, 16
232:19  234:11  236:10
238:6, 16  242:24  245:8
246:1  249:2  250:5, 12,
25  251:5  252:5, 12
256:20  259:9, 12, 16
260:15  261:15  262:4, 8,
10, 13  265:5  269:17
274:21  275:1, 5, 8, 14
278:6, 15  287:9, 15
**knowledge**  13:16  16:23
17:2, 6  21:1, 4  40:23
51:13  99:19  106:23
107:13  109:20  114:5
158:21, 22  159:7  181:2
201:12, 22  215:17  237:7,
20, 25  238:14, 18  239:5
244:11, 18, 25  260:3, 22
284:8, 19, 25  285:2, 3, 7
**known**  163:3

< L >
**lack**  138:6  264:6  280:3
**lacking**  15:6  26:24
**laid**  122:4
**language**  97:12  196:20,
21  197:7
**large**  31:21, 24  32:12
34:14, 19  35:5, 10
207:20  219:3  268:8
270:1
**largely**  246:5
**larger**  174:18  219:5
**largest**  35:23  37:7
38:23  39:21  269:2
**Larry**  111:17
**late**  243:17  247:24
284:12
**Laura**  10:17



**law** 12:24 29:9
**lawsuit** 10:16 40:22
**lawyers** 93:24 111:5
**lay** 180:9
**lays** 122:17
**LEA** 92:15, 18, 20
106:13, 20 156:9 166:19,
22, 25 201:5 238:19
**lead** 53:14 275:21
**leadership** 210:22
211:25 237:3
**leading** 16:3 48:11, 23
68:23 228:6 275:12
**leads** 59:13 276:7
**learning** 276:6
**learns** 176:4
**LEAs** 104:24 139:4, 12
156:1 158:23 159:10
167:4 236:1 238:1
239:6
**LEA's** 104:16
**leave** 142:16 253:2
**leaves** 220:5
**led** 117:7 187:20
196:22 197:7
**left** 28:20 231:4 286:23
**leg** 184:22
**legal** 66:3
**lets** 96:4
**level** 53:19 57:20 74:15
75:25 76:1 78:1 79:17
81:5, 25 106:13, 14, 18
150:17, 19 153:18
171:18, 25 173:1 176:24,
25 177:4 188:23 189:5,
6 262:14 267:9, 16
268:4 270:14 272:15
274:6, 18, 21
**levels** 87:4 129:1, 2
131:6, 7 132:7, 8, 9, 20
167:7 172:23 176:23
189:8
**leverage** 270:2
**license** 180:20
**life** 168:22 169:7
**limit** 248:21
**limited** 45:22 59:25
64:23 73:2 113:7
137:25 202:22, 25
215:24 221:21 226:5, 6
248:17 254:11, 19
262:12
**line** 29:1, 7 31:20
169:20 175:4 229:1, 9
241:8, 24
**lines** 42:18 64:16 77:1
217:10
**list** 62:16
**listed** 8:10 13:22 14:4
17:13 37:4 101:22

**188**:15 269:18
**listen** 6:23
**listing** 29:6
**lists** 189:14 197:14
198:5
**litany** 64:15
**literally** 25:7 99:14
113:5 260:17 269:24
286:22
**literature** 59:14 124:24
125:2 145:13, 15
**litigation** 20:9 108:18
**little** 29:19 63:22
158:12 159:18 163:7
169:1 170:17 171:25
194:11 199:22 215:4
273:4, 6
**LITTLEFIELD** 2:18
**live** 128:12
**lives** 102:11
**LLC** 2:18
**local** 30:16, 20 31:4, 7
53:19 55:15 63:23 64:5,
17 68:18 76:17, 25 77:1,
5 83:25 84:8 89:20
90:4, 7, 12, 22 91:1, 11,
18, 25 92:1, 3, 5, 16, 17
107:5 165:17 201:4
209:20 211:18, 22, 24
212:16 237:9, 21 238:1,
11 239:5 286:6
**location** 102:1 229:14
**locations** 39:21
**long** 8:17 10:5, 9 49:24
137:2 142:12, 15 178:11
**longer** 48:4
**look** 13:3, 15, 24 26:6
27:25 36:22 40:3 42:4,
9, 10, 11, 16 43:14 45:4
47:11 48:19 50:17, 19
51:5, 10, 19 52:24 56:22,
25 62:4, 5 64:13 65:6
66:17 70:7 72:3 73:23
79:24, 25 89:16 93:17
100:15, 23 105:2 108:11,
13, 22 110:25 111:1, 6
113:1, 2, 22, 24, 25
114:20 119:18 120:20
122:15 124:14, 22
128:21 130:15 132:12,
24 134:21, 24 135:11
136:2, 8, 20 139:25
142:5, 13, 18 144:13
148:25 153:11 154:1
157:9 158:13, 18 163:6
166:6 168:10, 11 169:1
170:16, 17 174:10 177:1
184:24 188:2, 21 189:4
194:9, 12 197:9 205:9,
17 207:18 209:11, 14, 23
210:1, 10, 11 219:4

**224**:3, 6, 15, 17 226:4, 24
229:20 235:4 239:9
242:10 249:21 253:4
255:9, 19 261:15 262:4,
10 266:7 267:22 268:4,
17 269:6, 9 270:7, 9
271:12, 14 273:4 274:13,
19 276:22, 23 277:4
284:4 285:6
**looked** 8:4, 6 12:25
13:6, 7, 8 15:3 38:23
72:23, 25 74:8 89:10, 11
187:13, 23 199:3 207:22
227:18 240:24 266:21
267:9, 15, 21 268:8, 9, 20,
24 269:19, 21
**looking** 21:13 22:10
27:4 30:8 31:2 34:18,
24 37:9 38:2, 9, 18
40:24 42:14 60:15
61:20 64:14 70:6, 10
71:4, 16 72:17 81:8
87:16 89:3 110:20
111:21 113:8 118:18
122:2 123:25 146:1, 18
153:21 155:6, 14 158:11
165:2 166:12 171:22
174:12, 14 177:2, 3, 14,
15 182:22 188:13, 22
189:6, 7 192:11 193:10
194:17 198:20 199:16
207:13 222:14 226:8
228:17 229:13 230:1
232:21 254:24 256:3
259:22 260:25 261:1
278:19 284:6, 9
**looks** 35:2 37:16 104:3
108:23 134:14 191:17,
21 192:16 207:6, 21
222:19 224:10 232:3
254:25 257:22
**Loosen** 151:5
**Losen** 151:6, 7 152:10,
11, 12
**lost** 164:14 182:4, 9
**lot** 9:23 10:2 18:19
19:3 39:13 40:5 71:16
108:15 154:7 173:11, 12
205:17 257:6 259:5
262:7 266:13 270:5
**love** 214:9, 13
**low** 109:22 110:1 113:4
129:2 131:7 132:9

**< M >**
**Macon** 102:11, 12, 13
**MAG** 126:7
**maintain** 125:3 165:6,
16 210:21
**maintained** 143:19

**maintaining** 121:5, 25
122:1
**major** 20:2
**majority** 65:14 67:1, 17
69:23 145:22 236:14, 19
240:24
**making** 6:15 85:11
94:1 96:10 97:6 200:2
259:1 263:16 288:10, 14
**manage** 16:7
**management** 149:18
**managing** 152:4
**mandate** 54:12, 23 55:2,
5, 7, 22
**mandates** 89:20 90:3
**manual** 13:7 62:6, 9
122:3, 6, 17 124:25
185:4, 9, 18 186:4, 7, 8
206:15 209:5 213:13
283:19, 23
**manuals** 205:9
**map** 271:25
**March** 235:6, 22 255:2
**Marcus** 24:4
**marginalized** 278:22
**mark** 25:21 37:13
125:19 141:10 160:11
162:3 164:22 191:7
205:13 210:4 218:15
231:15
**marked** 9:20 25:23
37:14 125:20 141:11
151:12 160:12 162:6
191:9, 11 193:18, 20
205:20 210:8 218:18
231:20 272:23 273:2
**Maryland** 23:19
**Massachusetts** 5:21
23:11 24:12 32:2, 4, 5
34:20 35:6, 11 37:5
38:14, 24 43:1 46:3
57:8 268:5 269:2
280:11
**master's** 103:18, 21
104:7 105:24
**matched** 107:24
**matter** 4:3 8:7 9:14
269:25
**matters** 93:24
**mature** 264:16
**maximize** 82:17 84:13
**maximizing** 82:8, 11
83:1, 4, 11
**Mayinstitute.org** 26:10
**McCart** 56:3
**mean** 15:14 20:24
30:13 32:13, 22, 24 33:3
40:18 45:19 46:21 48:5
49:9, 20 51:18 53:22
59:17 60:15 61:17
68:14 69:9 70:3, 23

71:9  79:7, 17  80:9
82:12  83:2, 5  85:19
86:2, 3  93:3  96:12
101:8  102:21  105:19
107:1  110:11  121:25
122:1  124:14  130:12
140:16  147:9  150:8, 11
156:1, 6  157:5  160:6
164:5, 6  171:3  174:8
179:25  181:24  182:22
200:9, 11  202:8  216:13
217:13  218:3  230:10
233:6  236:11  242:22, 23
255:17, 25  256:10
260:17  264:13  267:13
284:24  285:3, 4
**meaning**  45:7
**meaningful**  56:23
241:25  276:7
**means**  18:17  52:4
66:12  288:13
**meant**  124:9
**measure**  49:16  165:21
**measured**  79:23  149:6
**measurements**  51:5
123:15
**measures**  48:9  51:8, 12
80:6  165:22
**measuring**  38:18  48:1
52:6
**Medicaid**  20:16, 19, 23
21:2, 5, 16, 18  22:3  73:3
75:17  82:9, 12, 17, 18
83:1, 3, 4, 11, 18  86:10
109:23  110:2, 5  112:21
120:15, 18  136:2, 6, 10,
14, 16, 18, 19, 24, 25
137:3  184:6, 9, 17  185:1
216:24  218:1, 3, 6, 7
249:3  253:20  254:2
258:10, 11  259:13, 24
260:5  261:1, 5, 16, 18
263:19  265:12, 13
**Medicaid-available**
199:24
**Medicaid-based**  281:18
**Medicaid-enrolled**  254:9
**Medicaid-funded**  83:13
265:6
**Medicare**  257:21
**meet**  120:25  121:16
157:2  209:3  212:12
247:9  250:2  254:13
**meeting**  200:23  201:13,
18, 24
**meetings**  201:2, 21
**member**  57:6, 10, 17
66:11  128:14
**members**  17:18  59:6
**Mental**  21:9  28:25
74:23  82:5  88:1  113:3

137:20  138:15  161:15
174:4  175:9  176:12
177:6  178:1, 7, 15
179:15, 20, 23  180:14, 16
181:1, 17  211:6  224:20
226:10  274:1
**mentioned**  20:6  125:16
218:13
**menu**  76:1
**Method**  38:10  66:19
151:10
**methodology**  98:24, 25
99:9, 11, 13  101:15
**metric**  70:4
**metrics**  71:15  87:17
**Mid-Atlantic**  22:18
**middle**  47:4  101:11
112:1  167:7  195:17
229:1
**Midway**  116:15  126:1
**mileage**  112:15
**miles**  45:17
**million**  43:1  44:1, 6, 13,
21  70:20  89:5  270:10
**mind**  116:1  186:16
187:6  220:8  229:5
245:21  247:23, 24
**minority**  278:21
**minute**  164:20  203:3
209:24  257:5
**minutes**  208:3  219:6
286:13
**mission**  26:4  27:5, 15
**mitigate**  273:24
**model**  113:15  115:13
116:4  154:12
**modeling**  129:19  130:7
131:18
**modifications**  14:19
99:17
**modify**  107:23
**moire**  271:7
**moment**  10:13  20:6
38:22  113:12  214:22
221:17  273:20
**money**  43:4  44:5  82:23
92:8  239:6
**monitor**  20:12
**monitoring**  47:15  268:14
**month**  118:22  119:15,
16, 19  262:1, 7
**MOORE**  1:15, 19  4:13
290:2, 17
**morphed**  35:4
**move**  143:15  173:18
**moved**  85:8  141:3
**moves**  171:24  175:21
**moving**  277:8  279:21, 25
**MTSS**  50:11, 15, 22
51:5, 7, 10  81:9  158:11,
14, 23  159:10  176:13, 20

177:10, 19, 21  178:2, 8,
15  179:16, 24  181:5, 12
**multi-tier**  160:24
**Multitiered**  50:12  52:19
**mysterious**  151:11

**< N >**
**N.E**  1:17  2:9
**NAASP**  272:8
**name**  4:11  5:23  73:15
**NASSP**  271:3
**National**  25:1  28:24
50:10  51:19  52:25  53:1,
5  106:2, 3  118:1  121:6
138:8, 16  150:12  159:17,
21  160:1, 4, 8  164:5
167:10  189:3  233:17
234:1  275:17  285:15
**nationally**  236:6
**nationwide**  172:3
**natural**  211:13
**nature**  7:25  125:7
**NE**  4:10
**necessarily**  39:10  49:9
83:2
**necessary**  107:21  194:20
195:5
**need**  7:5  27:21  49:13
58:23  59:21  61:16
65:18  68:2, 5, 9  72:3
85:23  91:14  96:5
100:18  103:8, 18  115:4
121:20  124:10, 17
127:25  129:12  137:20
142:13  174:20  181:19
200:18  205:23  206:5
209:17  210:1  211:24
215:8  225:13  227:6
229:1  233:1  271:8, 14
276:22  279:8  289:1
**needed**  20:3  81:25
105:8, 12, 18, 24  116:18
117:9  211:9  242:8
**needing**  138:5
**needs**  19:11  49:17  63:2,
6, 25  64:8  91:4  105:7
106:10  115:18  117:23
121:1, 17, 20  143:11
144:5  171:18  172:17
173:1  181:21, 22  195:22,
25  209:20  224:20
226:10  242:3  247:9
250:2  254:13  277:24
280:5
**network**  161:16
**Never**  66:21  170:21
186:16  206:4  234:18
235:7  239:12, 16  245:12,
13, 14, 21  262:9
**New**  22:17  35:4  211:5

218:15  232:25  273:23
**news**  205:16  266:11
**nice**  96:2
**non-Medicaid**  136:20
**non-PBS**  132:14
**normal**  6:16
**norms**  129:20  131:20
**NORTHERN**  1:2
**notable**  258:9
**Notary**  1:15
**note**  22:25  26:21  120:24
**noted**  288:11
**notice**  1:14  8:14  22:14
145:10
**noticing**  4:18
**number**  8:22  36:19
46:14  51:8  80:3  81:2
86:21  109:3  111:15
112:19  128:1  137:11
154:14  163:2, 13, 20
194:5  208:10  209:2
210:12  221:1  226:5, 6, 7,
13, 14, 21, 22  230:1
232:4, 12  234:9  267:25
269:14  274:17
**numbers**  42:15  113:1
155:18
**numerous**  24:13
**nurses**  211:17
**NW**  2:19

**< O >**
**oath**  5:9
**object**  6:21  10:24  12:1
13:5, 17  14:16, 25  15:12,
19  16:14, 20  17:15, 20
18:13  19:14  22:24
24:20  30:1, 11, 22  31:9
32:21  33:14, 24  34:4
39:12  46:23  49:11, 23
52:10  53:6, 21  54:15
55:24  56:11  57:23
58:16  60:19  61:1  62:24
63:15  64:1, 9  65:3, 15
66:1  69:8  70:15  71:1,
24  72:13  73:11, 22
74:21  75:5, 11, 18  76:3
77:16, 24  78:16  80:8
81:14  83:7  86:8  87:1
89:22  90:10  91:6  94:5,
14  95:7, 16, 24  97:17
99:2, 22  101:7  103:9, 20
104:8, 17  105:13  107:16
108:6, 25  110:15  113:19
115:5  116:8  117:4
119:13  121:7  122:8
123:18  124:12  125:10
126:11  128:2, 18  129:10
131:12  132:1, 10, 22
137:5, 14  138:17, 25
139:7  141:20  142:10

143:2, *12*  144:6, *23*
145:*17*  146:*15*  147:*8, 16*
148:*1*  149:2, *24*  150:*4*
152:*17*  154:*18, 25*  156:5,
*18*  157:*4, 19*  158:8
159:*3, 11*  162:16  166:*4,
21*  167:13  168:8  169:*11*
172:5, *10, 18*  175:16
176:21  177:12  178:9
179:17  180:22  183:*13*
184:*11*  185:*12, 23*
186:*10, 21*  187:*3, 21*
188:*19*  189:24  190:25
195:*12*  198:*17, 24*  200:7
201:*3, 7*  203:*15*  204:*1*
212:*1, 17*  213:*15*  214:*18*
215:2, *22*  216:7  218:*10*
223:9  224:*1*  226:*19*
227:*12*  228:*1, 12*  230:*18*
233:9, *19*  234:2, *23*
236:*3, 9, 25*  237:*11*
238:*3*  240:*17*  241:*3*
242:*12*  243:24  244:*15,
22*  245:*4, 20*  246:*16*
247:*22*  248:*14, 23*  250:8,
*15*  251:*1, 21, 23*  252:*4*
253:*1, 21*  254:*4*  256:24
259:*11, 18*  260:6, *12, 20*
262:*18*  263:9, *17*  264:5,
*18*  265:9  267:*11, 18*
271:2  272:*1*  274:*11*
276:*17, 20*  277:16  279:*3,
15*  280:*13, 20*  281:*3, 20*
282:5, *15*  283:*17, 25*
285:*10, 23*  287:*3, 8, 14*
288:8
**objected**  65:22  66:*11*
**objection**  34:*10*  50:24
51:*15*  54:25  59:2  66:*14*
76:*19*  78:24  81:*21*
91:*16*  103:22  145:6
153:*4*  158:*15*  175:5
178:*17*  199:*12, 20*  204:9,
*20*  205:*4*  213:25  239:*18*
248:6  262:23  288:*11*
**objections**  6:*3*  207:*17*
**objective**  87:*17*
**objectives**  224:*16*  286:2
**objects**  65:*11*
**obligation**  156:2
**observations**  167:*1*
**observe**  240:5
**observed**  243:7  246:*3*
**obtain**  114:8  210:*21*
**obtaining**  107:*15*  237:*10,
22*  238:2, *19*
**obviously**  6:22  41:*6*
55:*1*  71:25  205:*17*
228:*15*
**occasionally**  6:*20*

**occur**  107:*23*  120:*14*
**occurred**  204:*14*
**occurring**  172:*3*
**ODR**  69:9, *11, 18*  71:*14*
147:*13, 24*  148:*3, 6*
**ODRs**  101:*5*  148:*19*
155:*7*  170:*12*
**offer**  76:*16*  137:*19*
**offered**  217:*10*
**offering**  251:*19*  259:*1*
**offers**  113:*14*  115:*16*
241:*25*
**Office**  1:*17*  14:*10*  16:5
25:*3*  48:*10, 16, 23*  51:22
68:24  69:*1, 5*  70:5
87:24  100:24  148:*4, 18*
153:*10*  154:5, *9*  188:*4*
189:*18*  224:*13*  227:*19*
228:*4*  249:9  275:*11, 20*
285:*16*
**officer**  211:*12*
**offices**  1:*16*
**officials**  116:*17*  117:8
**oftentimes**  16:5  25:*16*
64:22  71:6  148:*12*
149:*10*  154:*4, 6*
**Oh**  9:2  100:*11*  198:8
261:*3*
**Okay**  8:*14, 17, 24*  9:*4,
11, 15, 17*  10:*21*  11:*10*
12:*19*  13:*12, 24*  14:*4, 12,
22*  15:9  17:*6, 11*  18:23
19:*11, 22*  20:2, 5, *11, 14,
22*  21:*13*  22:2, *14*  23:*3,
12, 15*  24:7  26:*12*  30:*18*
31:*19*  32:4, *7*  33:9
36:*23*  37:*3, 12*  38:9, 22
39:2  41:2  43:*3, 8*  44:*18*
45:*14*  46:7  47:*7*  48:2
49:*1*  50:8  52:2, *15, 23*
53:*18*  54:8  55:*18*  56:5
57:*1, 8, 16, 20*  58:2, 6, *11*
59:6, *10*  61:6, *19*  62:*8,
14, 20*  63:*18*  66:*17, 24*
67:25  68:*4, 8, 20, 25*
69:*4*  70:*10*  72:2  73:*14*
74:*10, 18*  75:*21*  77:*9*
80:5  81:*4, 11, 18*  82:*11*
83:*24*  84:*19*  85:*19*
88:*20*  89:*10, 15, 19*  90:6,
*15, 18, 25*  91:*21*  92:*21*
93:*7, 14, 23*  94:9, *19, 24*
95:*12*  96:25  99:6, *25*
100:*17*  101:*4, 14*  102:24
103:*16*  104:*11, 15*
105:*11*  106:2, *12, 23*
107:*10*  108:*4, 17*  109:*11,
20*  111:*9*  112:6  114:*16*
115:9  116:*11*  117:*14*
118:*16, 18, 19*  119:9, 22
120:6, *20*  121:*24*  122:5

123:*3, 6*  124:*11*  125:*1,
16, 25*  127:*10*  128:7
132:*18*  133:*14*  135:23
136:*1*  137:2  139:*3*
140:*1, 5, 7*  144:*10*  145:*4,
15, 22*  146:*18*  149:22
150:*14*  151:*4, 18*  152:8
153:*18, 23*  155:*4, 23*
156:22  158:*11, 21*
160:*10, 18*  161:*4, 8*
162:*10, 14*  163:*1, 23*
164:*4*  165:25  166:*12*
167:9, *19*  168:2, 5, *14*
169:5  170:6, *15*  171:2, *9*
173:*4, 18*  174:*16, 23*
176:*19*  177:24  179:*10*
180:25  183:*4, 23*  184:*3,
8, 24*  185:7  186:*15*
187:*15, 25*  190:9, 22
193:*15*  194:25  195:*16*
196:*11, 14, 17*  197:*12, 19,
21*  198:2, 9, *10, 20*  199:5,
7  201:*11*  202:*1, 11, 15,
21*  203:2, 8  204:25
205:7  207:22  208:2
209:*17, 18*  210:7  212:*10,
21*  214:*12, 21*  215:*17*
216:20, *21*  217:2  218:*1,
13*  219:9  220:24  221:*12*
222:5, *16*  223:*16*  228:9
229:*12, 17, 25*  232:8, *16*
233:*15*  235:*4, 18, 20*
238:*13, 25*  239:9, *12, 17,
24*  240:23  241:*12, 22*
242:6, *21*  244:*4*  245:22
246:*10*  247:*3*  248:9
251:*11*  253:*11*  255:7, 9,
16, 24*  256:*3, 19*  257:2, *3,
18*  258:*14, 20, 25*  259:5
261:2  263:*13*  264:9
265:*1, 19, 25*  266:*14, 24*
272:22  273:*10, 12*
274:*15*  280:*16*  281:*15,
24*  282:23  283:*10, 22*
284:*4, 11*  285:5, *14*
**once**  37:*21*  45:*11*  79:*19*
264:*3*
**ones**  139:*12*  183:*14*
**one's**  272:22
**one-time**  150:*14*
**ongoing**  276:6
**online**  87:22
**open**  288:9
**operate**  30:9, *13*  31:*4, 6*
32:5  98:*10*
**operates**  29:*12*  91:2
**operating**  45:*3*
**operation**  93:*13*
**operational**  246:*4*
**operator**  4:*11*

**opine**  94:9  111:*3*
195:*16*  223:7  287:7
288:5
**opining**  18:8  146:2
**opinion**  14:22  17:*24*
18:*4*  31:5  33:*21*  34:8
51:*12, 13*  55:*4, 13*  63:*18*
64:6, 25*  66:*3*  73:*19*
74:*1, 3*  83:*24*  84:7  86:5
93:8  94:2, 25*  110:*21*
122:25  123:*15*  138:*20*
139:*11*  155:*24*  156:9
175:*3, 17, 23*  178:*3, 5, 13*
179:*12*  181:9  184:9
185:7, *10, 16, 22*  186:7
188:25  198:*21*  203:*20*
204:5, *13, 15*  205:*1*
209:*14*  223:*16, 24*  225:*4,
10*  226:*16*  227:5, 7, 8, 9,
22*  228:9  229:*10, 12*
231:5  240:*15*  254:*17*
259:*1*  281:*1*  283:*14*
285:*20*  287:*11, 13*
**opinions**  96:*3*  209:*9*
213:9, *20, 23*
**opportunities**  275:7
**opportunity**  65:*23*  102:*3*
136:*11*
**opposed**  22:*23*  23:7
24:*19*  26:*13*  31:8  49:7,
*18*  66:7  83:5, *13*  92:*3*
107:*4*  260:*18*
**options**  16:8
**ORD**  69:5
**order**  43:*10*  92:*12*  95:*3*
108:*18*  165:*15, 23*
189:22  190:5  211:*21*
212:*11*  232:23  288:*18,
21*
**orders**  12:6
**Oregon**  53:*14, 17*
**organically**  165:*19*
**organization**  99:*18*
**organizations**  156:*1*
175:9  182:*20, 21*  216:*21*
286:8
**origin**  28:*24*
**original**  107:*25*  224:22
225:*1*  227:*14, 17*
**originally**  207:*14*  249:*16*
**OSS**  148:*20*
**outcome**  179:8  290:*12*
**outcomes**  41:*11*  142:*21*
143:8  165:24  171:*15*
227:*3*  283:*4, 12*
**outlined**  277:*11*
**out-of-district**  42:*24*
43:5  45:*1*  46:*10, 16*
47:7  268:*21*  269:*11, 13,
15*

**out-of-school** 48:4 49:8, 19
**outpatient** 21:20 118:24
**outside** 5:24 120:2, 14 164:2 173:10 184:17 185:1, 5 187:20 253:18
**overcome** 273:20
**overrule** 65:14
**oversee** 23:1 24:10
**overseen** 23:3, 5
**oversees** 82:5
**overstay** 239:22

**< P >**
**p.m** 85:3 134:1, 2 178:24, 25 230:24, 25 257:10, 11 286:18 289:3
**Pacella** 5:20
**PAGE** 3:3, 5 9:25 22:10 26:5, 14, 23, 24 27:1 28:4, 21 29:20 31:19 34:18, 22 36:22 37:17, 19, 24 38:3, 6, 9 39:2, 18 41:2 42:16, 19 48:3 50:6 59:10 66:20, 25 74:11 76:9 82:4 85:7 88:14 92:23 96:7 98:20 99:25 100:10, 11 101:20 102:7, 25 105:5, 6 107:19 109:10 111:9, 12, 15, 22 114:21 115:9, 15 116:12 118:5, 8, 19 120:4, 12, 21 123:7 125:25 126:1 127:1, 9 128:7, 21 133:19 134:10 137:9, 10 139:15 140:6 142:18 146:18 148:15 151:4, 18, 19, 22 155:1, 15 160:23 162:21 163:6 164:11, 15 166:13 168:20 169:16 170:8, 14 171:13 173:21 176:8 179:11 181:14, 15 182:10, 12 183:2, 3, 17 188:1, 2, 3 190:9, 12 191:25 192:12, 13, 19, 23 193:5 194:10, 17 195:16 196:6 198:9 206:8 207:13, 14 208:7, 18, 21, 23 210:11, 14, 15 219:4, 17 220:9, 19, 25 222:14, 20 224:18 225:4 229:13, 23 232:7, 19 235:4, 16, 17 241:7, 13, 17, 19, 21 242:17 243:3 245:24 247:4 252:15 254:8 255:5, 9 256:3, 4 257:17 259:22 261:4 265:2 266:18, 19 267:24 270:13, 14 273:13 275:23 276:2 277:21

278:7, 18 281:6, 14 282:23 284:4, 15
**pages** 100:13 141:21 158:12 193:2 205:17 207:5 254:25
**pagination** 9:18
**paid** 75:16
**p-a-l-s** 155:9
**panic** 96:2
**paper** 9:23
**paragraph** 23:17 24:7, 16 27:8, 10 35:2 39:20 41:6 46:8 47:4 50:11 59:11 85:9 87:12 96:8, 17 107:20 112:2 115:23 116:16 117:19 118:20 126:2 128:23 129:12 130:11 137:11 141:1 148:15 152:1 170:11, 14 171:14 174:1 176:8, 9, 17 181:14 182:12 194:18 195:17 222:20 232:22 235:19 243:5, 11, 15, 16 245:25 254:8 255:10 256:5 257:24 261:4 273:18 278:19 281:8, 14 283:1
**paragraphs** 157:2 232:20
**parent** 47:15 128:13 182:21 268:14
**parents** 17:16, 18 211:1
**Park** 5:20
**Part** 6:13 11:3, 22, 23 13:3 25:13, 16 88:8 92:22 96:16 98:23, 24 100:1 114:10 167:25 174:18 179:24 180:20 181:18 182:24 205:8 207:11 209:6, 11 236:23 237:2 244:8 245:3 247:3 249:4, 15 266:7 270:22 273:7, 18 275:17 280:2 286:11, 13
**participate** 77:4, 6 176:14 181:5 213:21 214:5 245:10
**participated** 101:24 227:18 230:9 250:18
**participating** 119:4, 6, 22, 23 225:6 230:3
**particular** 43:12 44:22 45:9 62:2 63:20 77:20, 22 100:25 134:22 136:13 157:25 234:9 260:24 269:1 277:3 279:23, 25
**particularly** 170:12 268:18
**parties** 4:16 290:10, 11
**partner** 53:15

**partners** 85:15 96:20 286:9
**parts** 11:25 30:10
**party** 4:17
**pathway** 3:5
**patients** 251:20
**PATRICK** 2:3 4:25 6:1 164:8 191:20 257:3
**patrick.holkins@usdoj.go v** 2:11
**paucity** 113:10
**Paul** 32:1
**Pause** 26:20 115:25 169:4 194:15 219:15 220:23 244:5 273:11
**pay** 82:18 120:18 138:12
**payer** 136:7
**PBHD** 78:1
**PBIS** 51:10 52:6, 15, 24 53:18, 20 54:1, 3, 14, 24 55:15, 22 56:8, 10 87:4 116:4 149:15 154:13 158:11 159:15 160:20, 24 163:16 165:3, 5, 6, 12 166:12 168:6 171:10, 14 172:9, 23 179:7 188:7, 17 189:2, 11, 13, 22 229:10, 14, 18 231:6, 13 233:8, 17, 24, 25 234:15 235:9 236:15, 21, 24 237:10, 17, 22 238:2, 16, 20 239:7 240:6, 12, 16, 25 243:8 244:14, 21 245:3, 7 246:4, 6, 14 271:21 282:20 283:5
**PBS** 25:10 55:10 71:16 74:25 76:21, 24 77:3, 4, 6 80:21, 22 81:8, 16 86:20, 22 87:7, 21 97:24 98:1 101:25 115:13 132:12, 14 149:4, 5, 19, 25 153:6, 16, 18, 19 159:20 165:18 170:24 171:1, 7, 23 177:5, 6, 22, 23 187:13 188:23 189:7, 15 190:5 200:15 221:22 229:9 235:2, 23 244:9 245:10, 11, 14 246:18 247:1 277:4 278:14 279:22 285:1, 12
**PBS.org** 108:13 109:2 149:8
**PeachCare** 112:21 257:22 258:10
**peer** 98:25 99:21 126:6 127:6, 24 129:19 130:7 131:18 133:3
**peer-reviewed** 99:10
**peers** 99:6 128:23

130:2 133:7
**pending** 288:4
**people** 6:16 7:1 52:2, 4, 9, 12 62:18 65:4 79:1 105:22 113:6 167:1 201:9 206:6 216:15 217:19 230:9 250:24
**percent** 42:11, 13, 14, 23 43:17 45:1, 2 112:19 115:19 118:24 119:1, 2, 5 127:5, 23 128:5 134:25 135:13 136:9 140:19 145:8 231:7, 12 232:25 233:7, 16, 25 241:14 242:3, 9, 18 268:24 269:10, 12, 15
**percentage** 127:19 134:22 159:16 240:11
**Perfect** 253:16
**perform** 97:8
**performance** 70:7 142:21 143:8 224:23
**period** 38:17 146:11
**periods** 140:10, 17
**permission** 91:5, 14
**persistent** 158:3
**person** 6:14 69:4, 17 105:23 106:10 174:15 200:15 265:2
**personal** 264:24
**personally** 15:15
**personnel** 233:2
**persons** 22:7 64:5 68:1, 4, 8, 21 177:21
**perspective** 14:18 16:10 47:9 53:16 61:4 86:20 96:13 129:25 174:11 215:24
**pertinent** 8:7
**phenomenon** 138:8
**phrase** 30:16 87:12 92:22 122:1 148:2 177:19 186:22 260:21 284:8
**phrased** 193:23
**physical** 28:25
**physicians** 211:14
**pick** 113:22 154:15
**picked** 120:3 253:25
**piece** 284:7
**pieces** 242:24
**place** 63:12 149:10 175:24 242:25 276:6, 19 285:5 290:4, 5
**placed** 16:4 46:15 142:22
**placement** 18:16, 21 33:12 35:7 36:14 49:8, 19 67:3, 8 68:14, 22 69:25 98:5 123:22 124:8 143:11, 15 146:21,

*22* 225:11 227:10, 24
228:7, 11 249:12 254:14
259:25 264:2 268:20
270:20 271:6
**placements** 11:15 36:5,
7, 12 42:24 43:5, 25
45:1 47:24 48:4, 12, 25
88:4 100:5 247:7
266:10 268:22, 25
269:11, 13 279:9
**places** 37:21 197:15
278:10
**plaid** 232:21
**Plaintiff** 1:6 2:2 5:13
**plan** 47:13 61:23 62:13
80:22 174:2 211:1
245:19 276:23, 24 277:5
278:12, 15 279:12, 19, 23
282:14 286:3 287:2, 7,
11, 12 288:5
**planning** 176:15
**plans** 105:4 268:12
277:7, 12 282:8
**play** 111:5
**playground** 91:3, 13
126:5
**plays** 140:3 199:10, 18
**please** 4:15 5:9 7:23
59:18 126:18
**plenty** 48:21 66:21
**plus** 145:2
**point** 7:23 11:8 13:20
21:16 23:19 24:22
100:25 113:9 125:5
136:15 157:25 227:1
228:3 230:5 234:9
271:23 276:18 277:21,
23 278:8, 9
**pointing** 40:14
**POLANSKY** 2:5 5:4, 5
111:14 168:17 219:19,
22 232:11
**Policies** 151:23
**policy** 239:1
**political** 278:2
**poor** 278:21
**poorly** 19:16 193:23
**population** 112:8 115:19
150:8 241:15 242:3, 9,
19
**portion** 141:22
**position** 63:19
**positioned** 63:23
**positions** 32:9
**Positive** 25:2 41:11
51:6 53:2 149:4 188:6
**possible** 97:11 172:8
214:13 215:15, 16
253:18 262:24
**potential** 125:13
**potentially** 153:14

**poverty** 128:12 129:2
131:7 132:8
**power** 96:15 129:4
168:23 169:7
**powered** 97:4
**practical** 152:16
**practice** 27:17
**practices** 41:8, 17 44:12
46:1, 13 47:9 52:22
269:18 274:13, 17
**praise** 166:16, 20, 25
167:11
**precise** 229:13
**precisely** 45:25
**predictableness** 275:6
**prefer** 26:6 191:15
**premise** 43:22
**preparation** 8:9 47:13
268:12
**prepare** 8:3 13:25
17:12
**prepared** 8:21 9:3
**preparing** 8:18, 24 9:1
12:8, 12 13:18 72:17
89:17
**preschool** 139:24 140:3
**prescribe** 97:14
**present** 131:24 181:22
**presenting** 276:5
**president** 22:12 24:8, 17
**presume** 79:6 91:11
116:25 214:21 263:5
**presuming** 20:7
**presumption** 262:14, 20
263:7, 15, 18 265:5
**presumptions** 10:22
213:11, 22
**pretty** 6:13 73:2 112:15
113:3, 7 154:20 162:5
182:5 184:12 230:4
**prevalent** 132:6
**prevent** 11:14 15:17, 22
158:23 159:9 237:9
238:1, 19 244:13, 20
247:15, 20 248:4, 12
251:18 266:10 271:6
**prevented** 104:24
203:24 204:6, 17 205:2
237:21 239:6
**prevention** 82:24 105:4
264:2
**previous** 131:10 224:12
272:6
**previously** 210:4 231:16
249:1
**primarily** 34:15 149:21
153:21 177:22 187:13,
18, 22
**principal** 157:8

**principals** 155:6, 9, 17
156:10, 17 157:17 158:7
167:21, 23
**principal's** 69:1, 5
**principles** 149:19
**print** 26:14 206:5, 6
**prior** 117:20 208:20, 22
259:13 261:5 265:6
266:4
**prioritize** 277:15 278:4
**priority** 138:14
**private** 53:11 159:25
160:7 162:23 163:4, 19,
21, 25 202:18
**privilege** 6:4
**probability** 265:12, 17
**probably** 9:2 10:20
21:12 35:19 50:19 71:3
78:7 93:23 134:25
145:7 159:18 163:4, 11
176:9 182:18 257:5
**probation** 211:11
**problematic** 39:23
**problems** 59:13 122:21
166:6, 8 172:1
**procedures** 110:14
**proceed** 6:22
**proceeding** 4:18
**proceedings** 1:18 289:2
290:4, 5, 7
**process** 16:2 65:18, 20
179:8, 9
**Processes** 128:8
**produced** 19:24
**professional** 122:12, 16,
20 124:24 125:2 157:11
211:15 275:3
**professionals** 103:2
144:14 211:4, 6, 15
243:8 244:8, 14, 21
245:2, 10
**program** 18:9 20:16, 20
25:4 54:14, 24 65:8
72:11, 20 73:10 74:8, 23,
25 75:3, 7 80:6, 7, 9
82:8 83:4 85:10, 20, 24
86:2, 7, 17, 20, 22 87:9
88:7 89:1, 5 90:20 91:2,
12 93:6, 9 95:1, 4 96:10
98:8 99:15, 20 101:16
113:1 119:23 120:2
137:3 148:5 168:10, 23
169:7 175:2 179:21
180:18 201:20 202:22
208:11, 12, 16 213:10, 20,
22 215:8 216:6 225:2
246:4 248:16, 18 250:19
251:5, 12, 18 252:2
260:17, 23 282:20
**programmatic** 83:6

**programs** 29:11 46:16
127:3, 17, 21 140:19
183:7, 10, 20 187:1, 11,
14 283:5
**progress** 47:15 268:14
**Project** 190:10, 24 191:4,
6 246:2
**promised** 205:8
**promulgated** 13:13
**proper** 144:19 145:24
146:6, 7
**properly** 48:13
**property** 146:25 147:23
**proposition** 197:3
**Protected** 67:7
**protective** 102:10
**protocols** 169:22
**proven** 274:7
**provide** 5:17 21:19
23:1, 25 24:2 25:6
70:20 71:6 75:22, 23
76:25 77:15 80:25
87:22 103:8, 18 104:7
106:25 107:21 108:19
110:14 113:7 114:4
119:2 127:4 136:12
138:6 149:16 153:14
156:3 171:17 172:16, 24
174:4 199:24 202:3, 9,
24 203:9, 13, 21 214:16,
23, 25 216:16 217:21
245:1 251:9 253:19
256:15, 17, 21 260:22
270:2 271:12 279:7
287:11
**provided** 11:2, 6 21:23
22:15, 21 27:11 34:19
35:4 47:11 59:20 60:17
61:5, 15, 21 63:10 72:22
73:24 74:2, 19 76:2
79:21 84:11 98:14
100:18 101:1 103:1
104:13 112:14 119:19
120:2 136:5 144:18
146:6 185:5 197:10
203:25 204:7 215:24
226:7 235:7, 22 238:23
245:7 250:25 252:18
253:7, 18 254:11, 18
255:1 260:4, 10, 16
275:7
**provider** 13:7 21:2, 5,
16 62:6, 9 97:21 113:8
122:3, 6 124:25 180:2,
25 181:5 185:4, 9, 18
186:4, 7, 8 201:21
202:19 204:18 205:2, 9
209:5 212:12, 13 213:13
283:23 286:7
**providers** 88:2 110:11
112:13, 16 116:7 117:20,

*22* 118:*23* 137:*3* 159:*22*
175:*14* 180:*6, 19* 181:*17*
182:*19* 202:*3, 9, 23*
209:*6* 210:*21* 211:*8, 22,
24* 214:*15, 22* 215:*9, 14,
20, 21* 216:*5, 12, 14, 21,
25* 218:*2, 4, 5, 7* 220:*16*
221:*4* 251:*15* 256:*1, 13,
20* 260:*22* 284:*19*
**provides** 27:*15, 16*
74:*23* 75:*1* 82:*15* 86:*10*
89:*4* 149:*10, 22* 202:*2, 7*
218:*9* 237:*17* 275:*23*
**providing** 10:*15* 17:*24*
18:*3* 21:*24* 23:*22* 24:*22*
29:*21, 23* 47:*21* 82:*7*
83:*12* 84:*1* 86:*21* 87:*11,
13* 93:*18* 96:*21* 101:*2*
104:*16, 25* 137:*4* 152:*3,
24* 153:*2* 172:*1* 185:*21*
202:*13* 204:*18* 205:*2*
220:*14* 237:*3* 238:*21*
274:*21* 284:*15*
**provision** 80:*10, 19*
119:*17* 184:*17*
**proxy** 47:*8*
**prudent** 272:*16*
**psychiatric** 119:*2*
**psychiatrist** 110:*13*
**psychiatrists** 111:*2*
**psychological** 123:*2*
125:*12*
**psychologist** 110:*13*
**psychologists** 111:*7*
211:*16*
**Public** 1:*15* 33:*12*
35:*12, 17* 37:*1* 41:*8, 18*
46:*15* 47:*22* 48:*9* 56:*18*
65:*2* 160:*7* 162:*23*
163:*8, 19, 24* 195:*20*
196:*10, 24* 197:*6, 11*
208:*12, 13, 15* 268:*24*
269:*10*
**published** 38:*13* 40:*7*
72:*5*
**pull** 90:*23* 99:*10*
**pulled** 26:*1, 7* 73:*6*
161:*20, 21* 257:*20*
**punished** 147:*6, 10*
**purely** 248:*22*
**purpose** 48:*18* 157:*15*
269:*24* 270:*4*
**purposes** 67:*20* 93:*16*
94:*3, 10* 208:*16*
**pursuant** 1:*13* 9:*7*
137:*4*
**put** 46:*2* 48:*15* 96:*3*
113:*20* 133:*15* 146:*19*
152:*15* 164:*19* 180:*11*
203:*2* 205:*15* 218:*20*
219:*12* 277:*6* 282:*7*

**PUTNAM** 1:*13* 3:*4* 4:*8*
5:*11, 17* 6:*8* 7:*14, 22*
17:*23* 27:*3, 25* 28:*19*
40:*14* 66:*4* 67:*14* 85:*7*
96:*3* 152:*10* 179:*4, 6*
192:*4* 207:*14* 220:*8*
231:*4* 257:*15* 272:*5, 8*
284:*11* 286:*22* 287:*22,
23* 288:*12*
**Putnam's** 206:*19* 231:*23*
**putting** 44:*6* 46:*5* 78:*5*
82:*23* 221:*16* 222:*16*
242:*6*

**< Q >**
**qualifications** 103:*7*
104:*12* 105:*22* 212:*13*
**qualified** 103:*2* 215:*14*
**qualify** 256:*23*
**quality** 46:*13* 77:*3*
**quantification** 41:*14, 15*
144:*22* 145:*5*
**quantify** 67:*16* 234:*16*
243:*23* 261:*13*
**quantifying** 36:*18*
**quantities** 252:*19* 253:*7*
254:*12, 19*
**quantity** 214:*23*
**quarter** 206:*17, 23, 25*
207:*7*
**question** 6:*4* 7:*7, 8, 24*
19:*17, 18* 30:*3, 24* 38:*1*
49:*5, 25* 58:*18* 60:*10*
63:*1, 5* 69:*13* 70:*17*
71:*20* 72:*7, 15* 76:*10, 14*
78:*18* 80:*16* 84:*7* 91:*8*
94:*7* 95:*18* 99:*4* 100:*17*
102:*6* 103:*24* 105:*15*
106:*16* 109:*15* 115:*10,
20* 116:*2, 15* 121:*9, 23*
139:*9* 143:*4* 145:*25*
147:*18* 152:*18* 156:*20*
157:*1* 162:*11* 163:*16*
165:*8, 9* 166:*13* 168:*21*
169:*5* 172:*20* 176:*10*
177:*14* 178:*11* 179:*6*
180:*12* 181:*8* 184:*13*
185:*14* 187:*7* 190:*1*
193:*24* 196:*1, 21, 25*
197:*7* 198:*12* 199:*1*
202:*5* 203:*17* 204:*11, 15,
22, 25* 207:*25* 209:*13*
213:*17* 215:*4* 216:*9, 22*
217:*8* 219:*10, 16* 220:*13*
221:*19* 222:*7* 223:*6, 11*
225:*3, 9, 24* 231:*10*
233:*21* 235:*25* 236:*18*
237:*23* 238:*13* 239:*13*
242:*14* 243:*21* 247:*4, 17,
25* 250:*10* 251:*3, 25*

253:*3* 255:*16* 263:*11*
266:*17* 268:*2* 276:*10*
**questions** 5:*25* 7:*21*
40:*17* 96:*5* 165:*2*
166:*16* 176:*16* 206:*13*
207:*9* 213:*1* 220:*12*
229:*4* 239:*19* 259:*6*
275:*25* 286:*23* 287:*17,
19, 21*
**quick** 84:*22* 133:*21*
162:*5*
**quote** 34:*18* 231:*6*
**quotes** 151:*25*

**< R >**
**race** 28:*8, 24*
**racial** 278:*2*
**radical** 277:*14* 278:*4, 10,
16*
**Randolph** 5:*20*
**random** 257:*20*
**range** 183:*6, 20, 24*
186:*25* 187:*11*
**rarely** 127:*3, 18*
**rate** 36:*16* 101:*21*
**rates** 35:*22* 129:*3*
132:*15* 274:*22*
**rating** 221:*23*
**ratio** 113:*15* 118:*1*
166:*16, 19* 167:*10, 11*
**reach** 23:*25* 99:*11*
165:*23* 190:*6*
**reached** 10:*14, 15*
**read** 12:*5* 44:*9* 45:*24*
48:*2* 56:*5* 115:*22*
121:*12* 125:*8* 126:*16, 24*
129:*12* 139:*23* 142:*13*
146:*5* 169:*2* 175:*4*
176:*9, 17* 217:*18* 225:*13*
239:*12, 15, 16, 19* 243:*25*
244:*3* 246:*7* 276:*3*
286:*24* 287:*2, 5, 23*
**reading** 84:*4, 6* 105:*17*
219:*23* 232:*9* 255:*3*
**reads** 36:*11* 39:*20*
100:*1* 146:*21* 174:*2, 16*
181:*16* 188:*3* 243:*6*
246:*2* 277:*24* 283:*2*
**ready** 179:*4, 5* 257:*15*
**real** 41:*25* 72:*8*
**reality** 224:*24* 262:*11*
**realize** 9:*22* 12:*9* 37:*20*
219:*2*
**reallocate** 43:*23* 270:*10*
**reallocated** 279:*7* 280:*23*
**really** 42:*16* 43:*18, 22*
47:*8* 49:*24* 57:*24* 64:*18*
82:*9* 83:*15* 84:*12* 86:*20*
88:*2* 101:*1, 13* 102:*17*
122:*21* 124:*13* 129:*22,
25* 131:*1* 132:*15* 142:*4*

143:*21* 150:*16* 153:*25*
154:*1, 2* 157:*15* 163:*21*
166:*5, 9* 173:*5* 174:*14*
175:*10, 21* 177:*15*
179:*25* 182:*4* 191:*4*
226:*12* 227:*2, 21* 242:*25*
249:*5, 10, 23, 25* 252:*7*
258:*22* 261:*14* 262:*7*
270:*4, 6, 7*
**reason** 117:*16* 119:*14*
214:*14* 258:*20*
**reasonable** 14:*18* 15:*7,
16* 85:*11* 96:*10, 12, 14,
24* 97:*7, 13* 99:*17*
147:*14, 24* 163:*2, 13*
266:*9* 284:*2* 286:*1*
**reasonably** 15:*20* 147:*6*
**reasons** 43:*16*
**recall** 10:*14, 19, 21* 24:*4*
36:*16, 18* 57:*13, 16* 79:*9*
89:*15* 161:*20* 265:*19, 22,
25* 266:*3*
**receive** 19:*8, 19* 58:*9*
63:*12* 75:*4, 8, 15* 90:*12*
95:*3* 100:*3* 114:*14*
120:*17* 134:*17, 23*
137:*21* 144:*19* 146:*6*
149:*18* 192:*6* 194:*20*
195:*6, 23* 222:*25* 250:*7,
14* 254:*10* 259:*23*
261:*18, 19, 21*
**received** 72:*25* 73:*1*
112:*18* 134:*15* 223:*19,
25* 225:*20* 258:*11, 18, 24*
261:*4, 16, 20, 23, 24*
262:*5, 8, 9, 12, 14, 20*
263:*19* 265:*6*
**receives** 81:*16* 190:*14*
**receiving** 48:*5* 49:*9, 21*
72:*10, 19* 73:*2* 100:*23*
195:*10* 236:*2* 266:*5*
**Recess** 85:*2* 134:*1*
178:*24* 230:*24* 257:*10*
286:*17*
**recognition** 195:*21*
**recognized** 103:*3* 116:*17*
117:*8*
**recognizing** 270:*13*
**recommend** 113:*24, 25*
276:*13*
**recommendation** 58:*23*
65:*23, 24* 66:*12, 13*
143:*14* 200:*6*
**recommendations** 15:*7*
85:*22* 136:*12*
**recommended** 135:*6, 8,
20* 247:*1* 250:*6, 13*
259:*12*
**recommending** 15:*17*
**recommends** 18:*24*

58:20 136:18
**reconcile** 274:10
**record** 4:3 5:18 7:19
12:22 23:4 26:22 28:11,
13, 15, 17 33:5 36:3
37:18 50:5 67:9 85:1, 5
102:10 111:19 125:22
133:25 134:4 161:11
178:23 179:2 192:10
206:11, 13 208:6 210:16
212:19 220:4 230:23
231:2 257:9, 13 261:23
267:1 272:9 286:16, 20
287:23 288:10, 16, 19
290:7
**recorded** 4:7 290:6
**Recovery** 3:24 276:5
**redirect** 281:17 287:18
**redirection** 281:25
**reduce** 48:22 71:17
129:21 131:20 149:12
225:11 228:4 275:20
**reduced** 46:10 275:11
**reduces** 265:11, 16
**reducing** 226:2 227:9,
24 228:10
**reduction** 224:19
**reductions** 47:23 48:16,
17 71:14 154:5
**refer** 43:5 76:8 135:9
222:3 250:20 251:14
258:2, 3
**reference** 149:9 164:9
183:25 272:7
**referenced** 94:16 141:15
272:10
**referencing** 141:23
277:17
**referral** 95:14, 22 148:4
200:2 224:14 227:19
261:6
**referrals** 16:6 48:10, 16,
23 68:24 70:5 87:25
100:24 148:19 153:11
154:5, 10 170:19 224:21
228:5 249:9 275:12, 20
**referred** 16:1 33:10
44:14 69:6 78:14, 22
95:5, 9, 13, 21 114:7, 13
120:8 175:25 250:6, 13
272:25
**referring** 31:25 40:15
50:22 76:5 80:12 81:6
82:3 103:11 115:14
125:23 146:2 197:17
198:23 199:10, 18
207:23 255:4 258:18
**refers** 35:11 58:11
97:15 114:22 174:2
188:11

**reflect** 272:9
**reflected** 28:21
**reflection** 26:3
**reform** 270:24 271:9, 12,
25
**regard** 31:6
**regarding** 110:22
**regards** 183:8
**regional** 90:20
**register** 164:1
**Registered** 290:2
**regulation** 13:14
**regulations** 12:15 13:1,
3, 13, 16 93:13
**reinforce** 108:1
**reinforcement** 129:19
130:7 131:18
**reinvent** 271:8
**related** 13:9 249:22
290:11
**relates** 57:22 58:3
123:13
**relative** 62:1 81:3
93:13 98:15 170:24, 25
171:6, 7 221:14 235:2
268:20
**relayed** 252:10
**reliable** 162:15
**reliance** 85:10, 20 86:1
87:9 88:6 96:9
**reliant** 86:6
**relied** 8:11
**religion** 28:8, 24
**relying** 86:16
**remain** 74:12 76:13
79:14 80:11, 14 84:2, 10
223:2, 21 225:22 247:7
**remember** 13:19 14:3
79:10 117:15 123:5
167:25 212:9 218:11
240:10, 14 241:1, 5
257:1
**remind** 254:24
**remove** 148:20
**removed** 140:9
**rendering** 94:2
**renumbering** 212:25
**Repeat** 49:5 54:16
58:17 60:10 64:2 69:12
72:14 76:10 78:17
80:16 95:17 103:23
105:14 106:15 109:15
111:14 121:8 143:3
145:25 160:2 165:8
172:19 185:13 198:25
203:16 204:10 213:16
215:3 216:9 231:10
236:18 237:23 242:13
247:17 250:9 251:24
253:3

**repeatedly** 142:19
280:17
**repeating** 116:1 187:7
247:25
**repetitive** 111:4
**rephrase** 75:6 77:20
120:15 147:17 180:17
**replacement** 107:24
108:1
**replicated** 99:15 274:7
276:14 280:11
**report** 3:5 8:11, 12, 15,
21 9:3, 12, 24 10:6, 9, 23
11:12 12:8, 12 13:18, 25
17:12, 24 18:4 19:23
29:20 31:20 34:17
37:19, 24 38:6 39:9, 16,
19 40:4, 10, 16, 17, 21, 22
41:19 44:10 48:15 50:6,
7 56:5 59:10 61:20
66:20, 25 67:21, 22 68:6,
10 72:17 75:10 76:9
78:5, 21 82:4 85:8 88:8,
14 89:13, 17 92:23 94:9
96:4, 9 97:9 98:21 99:7
109:7 112:14 114:6
123:4, 17 130:12 133:19
134:10 136:9, 17, 19
137:10 142:3 143:18
145:11, 16, 19 151:25
155:1 156:4 157:3
158:13 161:21 162:9
164:12 169:16 173:21
176:6, 7 183:12, 25
184:1 186:23 187:9, 18,
20 188:15 191:18 195:9
196:6 199:23 206:19
209:15 213:14, 24
218:17 222:11, 15 225:4
229:21 230:5 231:18, 23
234:14 235:5 241:8, 12
252:24 257:17 258:1
261:15 266:11 269:18
270:14 274:6 275:3
276:11, 15 281:7 282:2
285:25 286:24 287:12,
13 288:5
**reported** 225:14
**reporter** 4:13 5:9 6:15
97:3 206:3 288:17
290:2
**reporter's** 7:3
**reports** 7:3
**represent** 4:17 25:25
28:4 218:16
**request** 41:4 116:13
151:21 203:4 221:12
234:20, 21, 25
**requested** 221:13 234:24
**require** 179:14 181:4, 6,
11, 13 279:12 280:8

**required** 55:20 156:10
180:19 207:16 208:10
220:16 221:4 285:8
**requirement** 195:21
**requirements** 121:5
**requires** 278:3, 10
284:17
**requiring** 55:14 111:7
**RESA** 90:16, 18, 19, 21
91:11 92:15 233:3
**R-E-S-A** 90:16
**research** 8:6, 7 20:4
48:21 59:14 71:16
108:15 123:8 124:1
137:19, 24, 25 154:7
155:16 265:16 270:20
271:15, 16
**reserve** 6:2 287:18
**residential** 176:3
**residents** 39:4
**Resilience** 3:24
**resolve** 288:3
**resources** 80:23 82:7, 23
86:21 87:21 90:23
138:6 211:11 213:13
217:20 238:22, 23
240:19 248:17, 22
251:10, 16, 17 270:11
279:6 280:4, 18, 22, 25
**respond** 135:18
**response** 211:12
**Responsibilities** 183:2
**responsibility** 25:5
**responsible** 188:4 189:17
**rest** 36:10 96:17 129:12
253:9
**restricted** 36:14 67:8
68:13
**restrictive** 16:4 18:21,
25 48:11, 24 58:3, 8, 12,
14, 21, 25 68:22 69:25
88:3 98:5, 8, 16 100:4
123:22 124:7 129:23
130:2, 9, 14, 16, 21 131:2,
9, 17 143:15 146:21
195:23 228:7 264:1
268:19 270:19 275:21
279:9
**restroom** 133:22 229:2
**result** 224:18
**resulted** 275:10, 11
**retain** 238:9
**return** 223:2, 20 225:22
**review** 12:12, 17 78:20
98:24 99:1, 6 107:10
114:5, 12 116:6 120:7
186:15 195:8 219:7
221:9 245:18 254:1
289:1
**reviewed** 8:5, 9 99:21
222:8, 10

**right** 9:6  10:1  14:6
18:3, 12  19:16  20:5
21:13  25:12  27:7, 13, 19
28:19  32:10  34:2  35:16,
20  37:6, 8, 10  38:7, 25
39:8, 11, 18  43:2, 11
44:2, 3, 12  46:21  48:8
49:10  50:13  55:6  56:17
57:5  59:23  60:18  65:13
71:13  72:3  77:1  78:2, 9
80:21  83:16, 17  84:21
92:21  94:13  97:21
98:20  101:14  113:1, 23
116:16  120:4  124:15
129:9  133:12  136:2, 7
138:3, 11, 20  148:14
151:16  152:10  162:2
163:15  164:19  167:11
169:17  171:14  173:20
175:20  180:21  181:24
182:24  188:12, 16
192:11  193:13  194:3
205:7  206:9  207:3, 9
208:1, 21  212:14  218:21
220:2, 22  221:16  223:14
224:5, 21  225:17  229:21
234:8  235:25  237:16
238:7  239:4  240:5
242:19  243:3  245:24
248:21  257:19  258:15
260:9, 15  261:2  262:17
263:16  265:8  266:22
267:10, 17  268:4, 6
269:8  271:5  273:13
277:2, 15  279:14  280:12,
19  281:2  282:4, 14, 21
283:24  284:13  285:18
**RIGHTS** 2:8
**rigor** 273:25
**risk** 35:7  67:2  68:13,
15, 16, 22  69:24  88:3
114:3  123:21  124:7
126:17  128:11  146:20,
22  153:9  249:11  254:14
268:19
**risks** 150:2
**RMR** 1:20  290:17
**Road** 5:20  271:25
**roadmap** 271:9, 12
**ROBBINS** 2:17
**ROBERT** 1:13  3:4  4:8
5:11
**robust** 85:15  87:13, 15
88:11  96:21
**role** 18:11  24:8  35:4
55:13  81:12, 19  83:25
84:7  104:16  140:2
175:2, 14, 23  176:2
177:9  198:22  199:10, 18
283:12, 15

**roles** 31:21  84:12  183:1
200:23
**Roll** 27:22  230:14
235:11
**rolled** 230:15
**rolling** 44:21, 24  45:8,
11, 12
**rollout** 230:17
**rough** 288:21, 25
**roughly** 10:19  35:16
57:16  127:19  154:22
159:14  163:17  203:5
240:11
**round** 52:13
**rule** 3:5  93:5, 7, 11
134:19  193:16, 22, 25
194:18  196:3, 13  197:18
198:14, 20  199:3  203:2
238:25  262:4
**rules** 6:11  111:5
**run** 32:16
**running** 147:1  207:19
**rural** 39:10, 23  40:5, 8,
11, 25

**< S >**
**sample** 259:2
**SAMSA** 191:3
**Sanders** 124:16  129:9
**sat** 10:6  66:21  117:11
217:1, 17
**satisfy** 122:6
**Saunders** 130:13
**save** 239:21
**saved** 43:1  44:2
**saving** 42:8
**savings** 40:24  42:9
43:11, 13, 18, 20  44:13,
14, 16, 25  45:13  269:23
270:10
**saw** 240:12  241:8
**saying** 79:2  83:9  131:5
144:24, 25  145:22  234:8
238:16  246:21  265:11
270:6
**says** 22:25  24:10  28:6,
22  29:7  34:19  35:3
38:10  41:6  45:21  46:8,
9  47:25  48:19  50:3
53:25  62:11  74:11  85:9
105:6, 18  112:17, 24
115:15  120:23  123:8
125:6  126:2  127:1, 23
128:10  131:5  137:18
142:19  144:14  151:25
160:24  162:22  169:20
189:16  190:4  194:19
196:20  197:12, 24
205:14  208:11, 18
210:20  222:21  225:15
232:22  233:12  235:5

239:1, 5  252:16  254:9
255:11  256:5  259:21
270:14  273:16  274:6
276:15  278:20  284:14
**scale** 114:18  270:24
**scarce** 111:25  112:4, 10
113:13
**school** 16:7, 12  18:17
19:9  22:12, 16, 17, 22, 23
23:7, 17, 24  24:2, 9, 11,
18, 19  30:6, 19  31:7, 23
32:1, 5  33:10, 12, 19
34:19  35:5, 10, 14, 23
37:1, 3, 4  38:11  39:10,
14  41:18  42:3, 12, 25
45:23  48:9  53:20, 25
54:4, 6, 13, 23  55:15
57:13  62:18  63:23  64:5
67:4  68:18, 20  73:21
74:23  75:21, 24, 25
76:16, 17  77:1, 5, 8, 14,
20  83:25  84:8  87:3, 11,
14, 23  89:21  90:4, 7, 12,
22  91:1, 11, 18  95:9
98:6  101:11, 12, 22, 24
102:12  106:14, 18, 19
107:5  109:14, 18  118:11,
15  119:10  136:6  143:16,
24  146:10  147:7  148:16,
19  149:13  150:3, 6, 13
151:2, 3  155:17, 19
156:13, 17  157:7, 12, 16
160:9  165:4, 10, 17, 19,
20  166:7, 10  167:7, 21,
23  173:9  176:24  177:4
179:20, 24  180:1  189:6
192:5, 7  197:11  201:4, 6
203:25  204:7  208:13, 15
209:20  210:22  211:7, 14,
16, 17, 22, 25  212:11, 16
213:11, 21  214:6, 24
215:9, 12  221:22, 23
228:11  230:14, 17
235:11  236:1, 7, 8, 14, 19
237:9, 21  238:1, 11
239:5  240:9  241:8
242:7, 16, 17  243:7
244:7  245:9  246:3
250:17  252:7, 9, 12
253:19  255:13  259:17
261:19, 24  266:4  268:3,
8, 25  269:10  272:17
280:10  284:18  286:6
**school-based** 210:23
286:7
**schools** 29:21, 24  30:8, 9
31:2, 5, 12  32:19, 23
33:3, 7, 22  34:3, 7  35:12,
17  36:5, 13  41:9  46:15
47:22  53:19  54:1  70:1,
8  71:5, 17  72:12, 21

73:9  74:24  75:1  76:25
86:22  87:14  101:18, 21
102:2  118:24  119:1, 3, 5,
6, 11, 22  127:5, 16, 20
128:25  131:6  132:6, 12,
14, 20, 25  137:19  138:12,
21  139:4, 5, 11  144:17
153:6, 15  154:8, 22
156:12  157:21  158:3
159:14, 19, 20, 21, 24
160:3, 7  161:1  162:23
163:5, 8, 9, 17, 19, 22, 24,
25  166:7  168:1, 24
169:9  171:16  172:15, 24
173:12, 15  180:13
181:16  188:5, 11, 18
189:19, 21  190:7  195:21
196:11, 24  197:6  201:5
204:19  209:25  212:4
214:4, 7, 12  221:20
222:23  223:14  224:4
225:6, 17  226:6, 13, 22
227:11, 18, 24  230:3, 7, 8,
9, 12  231:8, 12  233:16,
18, 24  234:1, 10, 11, 15
235:8  237:4  240:5, 12,
23  243:6, 22  244:6, 9, 13
247:7  249:13  251:8, 11,
14  267:9  273:22  275:19
**school's** 42:23  101:25
**school-wide** 47:17
177:22, 23  268:16
**scientific** 100:2
**scotch** 232:21
**screen** 26:16, 22  27:4, 9
28:1
**scroll** 27:20, 22
**se** 19:5
**second** 26:5  33:1  34:18,
22  35:2, 3  39:19  40:13
41:20  50:11  76:8  82:4
84:6  128:8, 10  140:8
142:18  152:1  160:23
162:21  171:14  173:25
176:8  181:16  182:12
195:2  222:19  224:17
232:22  243:5, 11, 15, 21
246:1  247:5  273:17
275:13  277:21, 23  278:7,
9  283:1  286:12
**secondary** 148:16
**Section** 36:20  72:24
105:3  123:7  140:5
146:19  155:5  192:11, 17,
18, 22, 24  193:7, 13
196:21  209:3, 6, 12
229:22  253:10
**see** 7:16  9:25  22:13, 19
24:14  26:1, 2, 13  28:6,
22  29:13  32:10  35:8, 25
36:25  38:15  39:24

41:*12* 42:6, *18* 46:17, *18*
59:*15* 67:6, *13* 70:5, *8*
74:*16* 78:*13*, *22*, *25*
79:*24* 85:*17* 88:*23*
100:*8* 103:5 104:*20*
105:*9* 108:2 114:*6*
115:*1*, *11* 116:*19*, *23*
117:*24* 118:*25* 119:*3*, *7*
120:6 121:2, *19* 122:*11*
126:*8* 127:7 128:*15*
129:*24* 130:*8*, *20* 131:*16*
132:*15*, *19* 135:7, *13*
140:*14* 142:*23* 144:*20*
147:*3* 148:*22* 152:*6*
154:*5*, *9* 155:*6*, *21* 161:2
162:*24* 163:*10* 165:*23*
171:*19* 174:6, *21*, *24*
181:*23* 188:*8* 190:*20*
191:*15* 194:*22* 195:*9*
207:*15* 209:7 223:*4*, *13*,
*23* 227:2 228:*4*, *14*
229:*21* 230:5 232:*18*
233:*4* 235:*13* 238:*22*
241:*10* 242:*4* 243:*9*
245:*6* 246:*8* 247:*11*
252:*21* 254:*15* 255:*14*
256:*8* 257:*24* 260:*1*
261:*9* 269:*3*, *14* 270:*22*,
*25* 272:*20* 274:*3* 276:*8*
277:*9*, *22* 278:*5*, *15*, *25*
281:*11*, *15* 282:*19* 283:*8*
284:*22*
**seeing** 89:*15*
**seek** 16:*8*
**seeking** 14:*14* 15:*11*, *14*
60:*16*
**seen** 130:*3* 142:*19*
143:*7* 160:*15* 167:*6*
194:*12* 222:2
**segregated** 11:*15* 35:7
59:*22*, *24* 63:*14* 97:*15*
133:*10* 142:*1* 146:*23*
175:*25* 176:2 225:*12*
227:*10*, *24* 228:*11*
**segregation** 59:*12*, *18*
61:*14* 140:6 145:*20*
226:2
**selected** 39:*21* 119:*15*
212:*4* 221:*20*
**selection** 214:*4*
**self-regulation** 128:*24*
274:*25*
**Self-Regulatory** 128:*9*
**senior** 22:*11*
**sense** 9:*16* 99:*1*
**sent** 37:*20* 69:*1*, *5*
**sentence** 35:*3*, *21* 36:*11*
39:*19* 41:6 43:*9* 45:*20*
46:*8* 47:*1* 48:*8* 59:*12*
66:*25* 67:*13* 68:*12*
69:*22* 74:*10* 76:*8* 79:*12*

81:*4* 82:*4* 84:*6* 88:*21*
93:*16* 94:*19* 96:*8* 100:*1*,
*15* 102:*7*, *24* 105:*6*
112:*2*, *17*, *22*, *24* 117:*3*,
*20* 118:*19* 120:*23*
121:*12* 123:*6* 124:*1*, *5*,
*10* 127:*1*, *9* 128:*8*, *10*
130:*16* 131:*10*, *13*
137:*18* 138:*4*, *12* 140:*8*
142:*18* 144:*13* 146:*6*, *21*
147:*19* 152:*1* 155:*15*
173:*25* 174:*16*, *24*
176:*11*, *16* 179:*12*
181:*16* 182:*5*, *12* 183:*19*
188:*3* 189:*16* 192:*17*
194:*18* 208:*1* 222:*20*
225:*14* 235:*5*, *16*, *18*
243:*6*, *12*, *22* 244:*1*
246:*2*, *22* 247:*5* 252:*15*
255:*10* 256:*4*, *11* 261:*3*
270:*15* 272:*14* 275:*9*
276:*2* 277:*23* 278:*20*
281:*7*, *13* 283:*2* 284:*10*,
*14*
**sentences** 47:*6*
**separate** 18:*17* 19:*8*
63:*13* 102:*13*, *15* 141:*18*
**separates** 142:*1*
**September** 1:*10* 4:*5*
**series** 29:*6*
**serious** 59:*13* 62:*11*
67:*2* 68:*13*, *14*, *16*, *21*
69:*24* 113:*3* 114:*3*
117:*21* 122:*21* 123:*21*
124:*7* 134:*19* 135:*2*
226:*9* 254:*14* 262:*11*
**seriously** 135:*16* 158:*2*
**serve** 16:*25* 17:*9* 33:*7*
68:*19* 71:*18* 117:*23*
179:*23* 180:*12* 181:*12*
271:*6*
**served** 16:*11* 20:*8*, *11*
48:*4* 57:*5*, *10*, *17* 67:*3*
69:*25* 70:*3* 72:*11*, *21*
73:*8*, *18*, *20* 74:*5* 100:*5*
144:*16* 145:*23* 146:*3*
244:*9* 255:*22*
**serves** 17:*4* 180:*15*
**service** 10:*15* 60:*17*
63:*2* 70:*11*, *21* 71:*11*, *22*
77:*11* 79:*7* 80:*2* 85:*11*,
*14* 96:*11* 103:*14*, *17*
104:*13* 113:*6* 114:*4*
119:*17* 123:*7* 168:*7*
185:*20*, *25* 186:*2* 211:*5*
215:*21* 216:*4*, *12*, *14*
217:*5* 223:*8* 262:*3*
268:*9* 270:*7* 282:*24*
283:*3*, *11*, *20* 284:*18*
286:*7*

**services** 15:*18* 16:*1*
18:*11* 19:*8*, *19* 21:*16*, *18*,
*21*, *22*, *24* 22:*5*, *6*, *16*, *22*
23:*6*, *21*, *22* 24:*9*, *11*, *18*
27:*16* 29:*21*, *24* 34:*19*
35:*23* 36:*17* 41:*11*
43:*14*, *20* 44:*5*, *7*, *8*, *15*
58:*9* 59:*20* 60:*3*, *4*, *7*, *12*
61:*4*, *10*, *11*, *15*, *23*, *24*, *25*
62:*15* 63:*10*, *13* 64:*10*,
*15*, *20*, *24* 68:*2*, *6* 71:*7*
72:*10*, *20*, *22*, *25* 73:*1*, *3*,
*4*, *24* 74:*2*, *11*, *15*, *19*, *24*
75:*1*, *4*, *8*, *22*, *24* 76:*4*, *7*,
*8*, *12*, *14*, *15*, *21* 77:*3*, *15*,
*19*, *21* 78:*2*, *14*, *15*, *23*
79:*13*, *16*, *20*, *24* 80:*2*, *10*,
*12*, *13*, *18*, *20* 81:*5* 82:*1*,
*6*, *10*, *17*, *19*, *20*, *24* 83:*13*,
*14*, *19*, *23* 84:*1*, *9*, *10*, *14*,
*16* 85:*12* 86:*11*, *13* 95:*4*,
*6*, *13*, *21* 96:*18* 97:*15*
98:*13* 100:*4*, *18*, *20*, *25*
101:*3*, *6* 103:*1*, *8*, *10*, *13*
104:*2*, *4*, *5*, *7* 105:*2*, *8*, *12*,
*19*, *25* 109:*10*, *13*, *17*, *21*
110:*14*, *21* 111:*10*, *25*
112:*3*, *9* 113:*10* 114:*7*,
*11*, *14*, *17*, *19* 115:*4*, *12*,
*17*, *20*, *21* 116:*3*, *4*, *7*
118:*24* 119:*20* 121:*20*
122:*4*, *19*, *20* 123:*9*, *14*,
*16* 124:*2*, *19* 127:*4*, *25*
134:*22* 135:*21*, *24*
136:*13*, *18*, *21* 137:*4*, *20*,
*21* 168:*6* 169:*6*, *10*
175:*7*, *8*, *15* 181:*20*
183:*6*, *9*, *20*, *24* 184:*4*, *7*,
*9*, *17*, *20*, *24* 185:*4*, *5*, *8*,
*10*, *17* 186:*4*, *18*, *25*
187:*11* 194:*20* 195:*10*,
*18* 196:*8*, *22* 197:*4*, *10*,
*13*, *24*, *25* 198:*12*, *15*, *23*
199:*11*, *19*, *24*, *25* 202:*2*,
*4*, *7*, *9*, *13*, *24* 203:*9*, *14*,
*21*, *24* 204:*7*, *18* 205:*3*
209:*4*, *21* 210:*24* 211:*3*
214:*17*, *25* 215:*13*
216:*16* 217:*21* 218:*8*
220:*15* 222:*25* 223:*18*,
*24* 225:*8*, *10*, *20* 226:*1*, *5*,
*7*, *14*, *23* 227:*23* 229:*9*
241:*13* 242:*1* 247:*9*, *16*,
*21* 248:*5*, *13*, *19* 249:*3*
250:*1*, *7*, *14*, *24* 251:*19*
252:*18* 253:*6*, *16*, *17*, *19*
254:*2*, *10*, *11*, *18* 255:*1*,
*12* 256:*7*, *16*, *18*, *22*
258:*12*, *18* 259:*13*, *24*
260:*4*, *10*, *16*, *23* 261:*1*,
*18* 262:*15*, *20* 263:*5*, *20*

264:6 265:*6*, *12*, *14*
266:5 269:*23* 270:*3*, *12*,
*18*, *22* 279:7 281:*9*, *19*
282:*1* 284:*16*
**serving** 36:*4*, *11* 70:*14*,
*23* 102:*7*, *14*, *20* 286:*5*
**sessions** 80:*3* 135:*4*, *6*, *8*,
*14*, *18* 136:5
**set** 73:*25* 242:2 257:*16*
275:*5* 283:*2*, *10*, *19*
284:*2* 286:*2* 290:*5*
**setting** 18:*25* 19:*8*
32:*16* 58:*12*, *21* 63:*14*
74:*20* 79:*15* 80:*11*, *15*
97:*16* 102:*8*, *18*, *19*, *22*
140:*10* 143:*1*, *10*, *20*
144:*4* 175:*22* 197:*10*
200:*15* 208:*16* 212:*22*
260:*4*, *11*, *16* 283:*13*, *16*
**settings** 16:*5* 34:*14*
71:*19* 74:*5*, *13* 84:*3*
100:*6* 109:*14*, *18* 129:*23*
130:*2*, *9*, *10*, *14*, *17*, *21*
131:*3*, *9*, *17* 133:*11*
141:*18*, *19* 142:*2*, *22*
143:*9* 144:*1*, *17* 145:*24*
146:*3*, *23* 175:*25* 176:*3*
181:*22* 195:*20* 196:*10*,
*24* 197:*5* 198:*16* 208:*14*
226:*3* 227:*10* 228:*11*
247:*10* 250:*3* 275:*21*
**seven** 73:6 257:*22*
258:*9*, *15*, *21* 259:2
**seventh** 261:*7*, *12* 263:*7*,
*14* 264:*12*, *16*
**severe** 146:*24* 147:*22*
**severity** 148:*5*
**shaded** 273:*18*
**share** 87:*25*
**sharing** 176:*14* 286:*4*
**sheet** 161:*13*
**shipped** 205:*11*
**short** 207:*20*
**shorten** 257:*5*
**shortened** 259:*5*
**Show** 25:*21* 37:*13*
86:*16* 129:*18* 130:*5*, *21*
135:*20* 141:*9* 150:*18*
160:*10* 162:2 191:*7*
193:*18* 210:*3* 218:*14*
231:*15* 252:*17* 272:*23*
**showed** 253:*6*
**showing** 26:*22*, *25* 280:*4*
**shown** 27:*8*, *9* 82:*10*
**shows** 71:*17*
**shy** 161:*5*
**side** 66:*21* 111:*5* 114:*18*
**sign** 287:*24*
**significant** 45:*12* 127:*6*,
*24* 140:*10*, *16* 259:2

**264**:*11*, *14*  **278**:*23*
**279**:*13*  **280**:*5*, *8*  **282**:*2*
**significantly**  42:*4*
**silos**  174:*17*
**similar**  14:*9*  39:*15*
99:*10*, *13*
**similarly**  68:*4*
**single**  125:*4*  128:*13*
174:*19*
**singular**  50:*14*
**sir**  5:*22*  134:*13*  155:*3*
170:*8*  191:*19*
**sit**  65:*13*
**site**  91:*3*  149:*8*  272:*17*
**sites**  271:*3*
**sits**  200:*22*  201:*1*, *12*, *17*,
*23*
**sitting**  6:*14*  97:*22*
200:*14*  201:*21*  259:*10*
271:*22*
**situation**  49:*1*  60:*16*
114:*6*  156:*3*, *7*  195:*9*
214:*24*  215:*12*
**situations**  106:*22*  137:*12*
**six**  10:*10*, *11*  197:*14*
198:*5*, *6*, *7*, *8*, *13*, *16*
**size**  269:*3*
**skill**  127:*3*, *21*  128:*25*
152:*3*, *23*
**skills**  47:*14*  138:*7*
168:*21*, *22*  169:*7*, *23*
268:*13*  274:*24*, *25*
**skip**  88:*13*
**skipping**  254:*21*
**Skripkauskas**  2:*23*  4:*12*
**slow**  97:*2*  130:*24*
**small**  115:*18*  168:*11*
169:*23*  242:*2*  261:*19*
270:*1*
**smaller**  39:*23*
**smart**  45:*9*
**Social**  21:*9*  47:*14*  52:*20*
60:*5*, *9*, *14*  110:*12*  123:*2*
126:*5*  129:*20*, *21*  131:*20*
138:*7*  169:*23*  174:*12*
182:*20*  211:*17*  268:*13*
274:*1*, *24*  278:*1*
**social-emotional**  70:*8*
71:*15*  127:*2*, *21*  128:*24*
138:*15*  142:*20*  143:*7*
**solely**  46:*14*  213:*23*
**somebody**  10:*14*  68:*25*
97:*25*  262:*10*
**Somewhat**  11:*19*
**son**  65:*8*
**Sorry**  28:*8*  37:*20*  46:*25*
60:*20*  67:*10*  75:*9*  77:*9*
79:*11*  88:*20*  100:*11*
106:*15*  111:*4*  112:*3*
113:*16*  114:*21*  118:*7*
119:*5*  130:*25*  137:*9*

**141**:*5*  164:*14*  174:*23*
182:*11*  183:*17*  190:*15*
194:*4*  196:*4*  197:*16*
198:*8*, *9*  213:*17*  219:*22*,
*24*  220:*20*, *21*  230:*1*
235:*14*, *15*, *19*  241:*24*
243:*15*  254:*21*  266:*18*
**source**  89:*9*  136:*14*
237:*22*
**sources**  213:*23*
**southeastern**  22:*18*
23:*16*, *18*
**souvenir**  205:*25*
**space**  210:*24*
**speak**  34:*12*  92:*13*
142:*8*, *12*, *17*  251:*20*
**speaks**  129:*22*  161:*22*
**Special**  4:*20*  12:*24*  25:*4*
41:*11*  51:*22*  195:*22*
285:*16*
**specific**  40:*22*  111:*1*
141:*22*  145:*11*, *12*
184:*14*  220:*12*  266:*1*
275:*24*  284:*6*
**specifically**  40:*3*  76:*5*
87:*16*  88:*18*  93:*12*
108:*23*  119:*9*  137:*15*
186:*18*  199:*4*  202:*8*
225:*25*  255:*18*, *25*
275:*15*  283:*2*
**specification**  186:*12*
**spend**  8:*18*  9:*1*  44:*15*
70:*19*  89:*21*  90:*4*, *8*
**spending**  10:*2*  36:*6*, *13*
136:*20*, *24*  239:*6*  264:*1*
267:*17*  269:*21*
**spent**  41:*7*, *16*  43:*4*
44:*11*, *19*, *25*  45:*2*, *5*
261:*6*, *11*  263:*6*, *13*
269:*4*, *7*, *14*  281:*1*
**spoke**  17:*11*
**square**  112:*15*
**SS**  290:*1*
**stability**  150:*21*
**staff**  47:*16*  87:*11*
107:*22*  116:*18*  117:*9*
151:*3*  154:*1*, *3*  173:*5*
200:*14*  268:*15*  273:*25*
275:*2*, *4*, *6*
**staffing**  278:*23*  279:*13*
282:*3*
**stage**  101:*4*, *9*
**stalled**  229:*14*, *24*  231:*6*
234:*8*
**stamp**  26:*1*
**stand-alone**  140:*18*
268:*22*
**standard**  52:*25*  100:*19*,
*20*  106:*2*, *3*  134:*9*  149:*1*
158:*14*  167:*10*  169:*22*
**standardized**  138:*14*, *23*

**standards**  52:*5*  56:*24*
62:*1*, *3*, *6*  103:*4*  108:*5*,
*12*  110:*17*  121:*6*, *21*
123:*11*, *16*  124:*4*, *19*, *23*
125:*3*, *14*  166:*1*, *2*
186:*12*  226:*21*, *25*
242:*22*  284:*21*  285:*8*
**star**  221:*23*
**start**  55:*20*  96:*3*  178:*3*
182:*3*  206:*12*
**started**  7:*21*
**starting**  105:*3*  235:*9*, *17*,
*24*  276:*5*, *18*
**starts**  37:*17*  112:*2*
118:*20*  181:*15*  183:*2*
188:*3*  247:*4*
**STATE**  1:*8*  4:*4*, *21*, *23*
5:*24*  11:*14*  13:*2*, *3*, *13*,
*15*, *24*, *25*  14:*8*, *10*  15:*16*,
*21*  18:*5*  20:*15*  23:*6*, *9*,
*10*  24:*23*  25:*18*  31:*8*, *10*,
*16*, *21*, *24*  32:*1*, *5*, *13*, *17*,
*19*  33:*23*  34:*8*  35:*24*
37:*5*  38:*24*  39:*22*  44:*23*
45:*10*  46:*3*  54:*9*, *20*
55:*11*, *17*, *19*, *21*, *23*
57:*11*  72:*18*  76:*24*  77:*7*
78:*1*, *4*, *12*, *20*  80:*5*, *6*, *17*,
*18*, *22*  82:*15*, *18*, *25*
83:*15*, *21*, *22*  84:*13*  86:*3*,
*15*  87:*21*  89:*16*  90:*3*
91:*22*  92:*2*, *5*  93:*5*, *8*, *11*
96:*20*  104:*21*  107:*4*, *8*,
*13*  108:*22*  112:*12*
113:*14*, *23*, *24*  114:*1*
116:*17*  117:*18*  119:*18*
135:*3*, *17*  136:*11*, *23*, *24*
150:*17*, *19*, *23*, *24*  152:*8*,
*13*, *21*, *25*  153:*1*, *9*
154:*19*, *23*  156:*1*, *9*, *11*,
*13*  158:*6*, *22*  170:*18*
177:*25*  178:*3*, *6*, *14*
183:*2*  184:*18*  185:*11*
188:*14*, *23*, *25*  189:*1*, *9*,
*10*, *15*  190:*3*  191:*5*
201:*11*  203:*6*  215:*18*
217:*10*  220:*15*  221:*5*
222:*21*, *24*  223:*6*, *17*
225:*15*, *19*  226:*1*  230:*13*
231:*12*  232:*25*  233:*2*, *7*,
*16*, *23*, *24*  237:*2*, *7*, *8*, *21*,
*24*  238:*5*, *16*, *18*  239:*2*
240:*19*  247:*14*, *19*  249:*3*
252:*20*  253:*8*  255:*11*, *17*,
*18*, *24*  256:*2*, *5*, *10*, *12*
265:*20*, *23*  268:*5*  271:*23*
275:*15*  276:*12*, *14*
279:*17*  285:*20*, *21*, *25*
288:*18*
**stated**  220:*17*

**statement**  27:*15*  29:*4*,
*16*  40:*2*  42:*17*  45:*7*
127:*11*  128:*17*  129:*8*
133:*4*  152:*22*  229:*24*
252:*25*  253:*13*  272:*7*
279:*2*
**statements**  166:*17*, *20*, *24*
167:*11*, *12*
**state-only**  83:*13*  281:*9*
**STATES**  1:*1*, *5*, *16*  4:*4*
5:*1*, *3*, *5*, *7*  9:*8*  22:*18*, *23*
23:*15*, *16*, *17*, *18*  24:*13*,
*19*  25:*6*, *8*, *13*, *15*, *19*
29:*25*  30:*21*  31:*15*, *17*
50:*22*  86:*24*  87:*2*, *3*
112:*9*  125:*6*  127:*20*
154:*11*, *14*  159:*15*  210:*5*
218:*6*, *7*  231:*17*  236:*15*,
*20*  269:*25*  271:*11*
275:*18*  287:*21*  288:*8*
**state's**  12:*25*  85:*14*
91:*5*, *14*  117:*23*  282:*20*
286:*5*
**statewide**  42:*15*, *22*
88:*22*  93:*2*  94:*1*, *12*
112:*18*  188:*14*, *21*  189:*5*
270:*9*  272:*16*  274:*7*
276:*14*  280:*12*
**stating**  253:*13*
**statistic**  114:*23*
**statistically**  259:*2*
**statistics**  38:*13*
**status**  60:*5*, *8*, *9*  62:*19*
119:*11*  221:*21*, *22*
**statuses**  29:*7*
**statute**  239:*1*
**statutes**  12:*13*  13:*25*
14:*1*
**stay**  85:*7*
**stayed**  262:*15*, *21*
**staying**  122:*5*
**stays**  49:*2*  91:*22*
**stenographically**  290:*6*
**Stenotype**  1:*19*
**step**  171:*24*
**steps**  266:*9*  286:*1*
**stick**  50:*2*
**sticker**  205:*15*
**storage**  210:*25*
**strategic**  174:*2*  245:*19*
277:*4*, *7*, *12*  278:*12*, *15*
279:*22*  282:*8*, *13*
**strategies**  165:*5*  270:*23*
272:*17*  274:*8*  276:*13*
**Street**  1:*17*  2:*9*, *19*  4:*10*
**strongly**  201:*20*  247:*1*
**struggle**  171:*16*
**struggling**  172:*15*, *24*
**student**  16:*1*, *9*, *10*, *19*
17:*17*  18:*24*  19:*7*, *13*, *19*
33:*11*  49:*2*, *6*, *9*, *16*, *17*

58:4, 9, 12, 14, 15   59:1
61:5   62:23   63:3, 7, 12,
20   65:1   69:1, 17   70:14,
20, 24   71:22   72:19
73:15, 20   74:7   77:22
78:13, 22   95:3, 13, 21
101:23   102:11, 14
108:19   114:7   115:3
120:8   121:1, 17   123:20
124:6   129:1, 2   131:6, 7,
8   132:7, 8, 9, 21   135:20
143:1, 19   165:24   174:11
194:20   195:5, 10   198:23
199:10   200:17   211:4, 10,
12, 14   242:9, 19   250:5,
12   262:2   283:4, 12
students   11:15   15:17, 23
16:4   18:12, 16   24:1
31:23   33:7, 8   35:6, 17
39:5   43:17, 21   44:7
46:14   48:3   59:12, 20
61:21   62:2, 11   63:9
67:1, 2, 18   68:13   69:23,
24   71:19   72:10, 23   73:2,
6, 8, 14, 17, 25   74:12, 19
75:4, 8, 14, 15   76:13
79:3, 14   80:11, 14   84:2,
9   85:23   88:2   92:13
100:2   101:23   102:7
106:25   107:11, 15
112:17, 23, 25   113:2, 7
114:2, 13, 23   115:18
117:23   120:16   122:21
126:16, 22   128:10, 12
129:22   130:1   133:6
134:14, 17, 18, 19, 23
135:2, 7, 11, 12, 14, 17
136:9   137:20   140:9, 12
142:19   143:6   144:15, 18
145:23   146:1, 4, 14, 19,
22   147:5, 21, 24   148:7,
20   153:8   171:16, 17
172:16, 25   174:5, 9
175:20   181:19, 21
182:25   183:7, 10, 21
184:10, 19, 25   185:18
186:20   187:1, 12   190:6
195:20, 22   196:10, 24
197:6, 11   199:18   209:21
222:22, 25   223:2, 18, 20,
25   225:6, 16, 20, 22
226:9   227:10   228:6
242:2   246:3, 12, 22
247:5, 15, 20   248:4, 12
249:6, 10, 22, 24, 25
250:19   252:3   254:14
255:12, 22   257:20, 23
258:2, 7, 23   264:15
268:19   269:5   270:11, 18
271:7   273:24   278:24

279:8   280:23   282:3
284:16
student's   17:18   58:21
60:4, 14   62:19   63:24
64:8   100:22   105:7
106:6, 9
studies   40:23   99:10
150:18   272:10
study   38:23   41:3   46:6
48:18   123:4   129:4
143:25   273:8
submission   20:23
subparagraph   196:2
subsection   196:12
subset   115:18
subsystems   174:3, 17
suburb   45:15
suburban   35:14
successes   272:15   275:9
successfully   107:22
sufficient   87:18   103:2
123:10   124:3   148:17, 24
149:11, 16   153:23
156:15   157:1   185:19
186:5, 9, 13   214:22
251:9, 16   252:19   253:7
259:24   285:7
suggest   100:21   109:3
199:23   201:20
suggested   93:21   101:21
143:18   224:25   245:2
275:3
suggesting   18:21   43:19
97:20, 24   114:2   132:5
136:23   271:24
suggestion   48:8
suggests   98:5   158:1
274:16   275:15
summarizing   287:13
summary   66:24
supernaturally   97:4
support   15:9   22:16, 22
23:6, 25   24:9, 11, 18
25:3, 6   43:20   46:1, 12,
13   47:9   48:1, 6   49:4, 10,
13, 17, 21   50:12   52:20
53:3   61:25   64:21   72:22
75:8   76:12, 25   79:13
80:24   81:1   85:13   118:5
119:4   120:9   143:25
144:19   145:24   146:6
148:17, 25   149:11, 16
171:17   172:2, 16, 25
174:4, 19   175:3, 12
189:18   210:23   211:4, 5,
12, 14, 25   212:16   216:18,
21, 24   232:23   235:7, 9,
22, 23   240:20   242:1
246:23   259:24   261:21
262:9   268:11   270:11

272:6   273:25   274:23
280:23
supported   25:8
Supporting   128:9
supports   41:8, 17   45:22
51:7   74:12   75:16, 22
76:2, 15   80:10, 14   84:1,
5, 9   96:18   98:13   104:4
115:17   118:10   120:1
138:5   144:11   146:7
149:5   175:20   183:24
188:5, 7   211:13   246:6,
13, 18   247:1   270:18, 22
supposed   58:13   152:13,
25   195:19   196:9, 23
197:4   276:15
Supreme   56:23
sure   6:15   9:18   15:13
19:5   26:12   30:5, 15
31:2   33:6   41:22   42:1
46:19   49:6   50:16   52:11,
17   54:19   58:20   60:11
64:5   70:16   76:11, 23
78:20   80:7, 17, 18   83:8
84:8   90:2   91:10   93:11
94:6   95:20   99:3, 23
105:17   106:17   107:3
109:16, 24   111:13, 16
116:3   118:6   121:11, 22
126:20   129:15   133:23
134:8   143:6   146:1
152:11   154:15   156:19
165:8   169:3, 18   172:22
181:6   184:16   185:16
190:3   194:14   196:25
199:3   202:6   203:11, 19
207:2   208:4   213:19
219:14   223:10   230:4
231:11   233:23   236:19
237:24   239:12, 13
242:16   244:3   247:18
250:2   251:2   254:24
255:21   263:10   264:13
267:12, 15, 23   273:6
276:1
surprise   272:22
survey   222:9
surveys   220:16, 17
221:4, 9, 10, 24, 25   222:3,
4, 7
suspend   288:4
suspension   148:20
suspensions   48:10, 17
155:6, 18   157:7, 24
170:19
sustain   81:25   126:3
270:24
sustainability   81:2
sustainable   80:7, 19, 20
sustaining   74:14   79:16,

18
sworn   1:14   5:13
SY20   73:16   134:15
135:11
SY2020   257:21
SY2022   257:21
SY22   73:16   135:12
synergizes   174:3
system   13:10   14:19
15:22   33:13   52:20
53:20   54:3   70:5   74:15
79:17   81:5, 6, 8, 10, 13,
20, 22   82:3   85:11   96:11
136:6   147:7   160:25
173:14   174:19   182:25
185:1   213:11   214:24
236:8   241:9   242:8, 18,
24   246:15   270:8   274:2
276:24   278:11   279:19
286:3
systematically   127:4, 18
systemic   81:25   273:24
276:23
systems   48:10   50:12
81:1, 8   85:16   107:25
161:14   173:22   174:1
282:13

< T >
TABLE   3:1   47:12
268:9
tailored   120:25   121:16
tailoring   117:18
take   7:5, 6, 8   10:5
11:12   19:24   36:8   43:19
49:16   77:11   80:6, 18, 21
82:9   84:22   100:15
133:21   135:4   136:23
138:14   142:13   152:15
165:3   178:20, 21   194:11
209:11   213:2   219:6
224:3   230:20   237:2
250:21   251:6, 13, 16
257:4   266:7, 10   273:4
282:12
taken   1:16, 19   4:9   85:2
134:1   178:24   195:1
230:24   257:10   275:16
277:6   286:17
takes   215:8
talk   6:16   23:16   29:20
37:12   50:21   52:15
56:14   97:19   109:9
118:4   121:24   124:5
126:12   173:22   174:13
184:3   216:11   217:8
257:19   259:7   261:2
265:1   285:19
talked   29:18   45:20
50:9   57:1   89:11   158:12
170:16   183:5, 8   218:6

249:*1* 250:*16* 252:*10*
267:*8*
**talking** 10:*7* 33:*4* 61:*11*
81:*23* 92:*16* 96:*14*
123:*14*, *19*, *23* 126:*14*, *21*
130:*13* 133:*2* 137:*16*
146:*4*, *9* 147:*13* 153:*8*
154:*2* 155:*12* 160:*21*
175:*7*, *10* 182:*3* 183:*14*,
*23* 184:*20* 185:*24*
196:*15* 206:*15* 210:*17*
216:*17* 217:*4* 231:*5*
245:*25* 251:*19* 252:*7*, *16*
267:*1*
**talks** 24:*8* 124:*16*
131:*14* 155:*5* 170:*2*
172:*2* 190:*9* 209:*24*
**target** 153:*14* 157:*10*
249:*25*
**targeted** 42:*23* 71:*21*
221:*20*
**targeting** 268:*18*
**TAs** 233:*2*
**taught** 274:*23*
**Tayloe** 10:*18* 11:*4*
**teach** 107:*24*
**teacher** 105:*21* 148:*12*
152:*3*, *24* 211:*10*
**teachers** 62:*17* 138:*6*
148:*16* 152:*5*, *14* 153:*1*
166:*23* 211:*2*
**teaching** 274:*23*
**team** 16:*16*, *19*, *25* 17:*4*,
*9*, *17*, *19* 18:*5*, *24* 25:*13*,
*17* 57:*2*, *6*, *11*, *17* 58:*7*,
*11*, *12*, *20*, *22*, *23* 59:*7*
64:*17* 65:*13*, *14* 76:*24*
87:*21* 95:*6*, *10* 97:*14*, *22*
98:*1*, *4*, *7* 143:*14* 144:*7*
176:*20* 177:*5*, *7*, *10*, *19*,
*20*, *21*, *22*, *23* 178:*2*, *8*, *16*
180:*12*, *15* 181:*2*, *5*, *12*
194:*19* 195:*4*, *11* 200:*1*,
*4*, *14*, *16*, *24* 201:*1*, *13*, *17*,
*21*, *24* 243:*8* 244:*14*, *21*
245:*3*
**teams** 15:*17* 97:*19*
98:*10* 176:*13* 179:*16*, *24*
180:*3* 211:*12*, *13*, *18*
244:*10* 245:*8*, *11*
**team's** 65:*11*, *23* 66:*11*
200:*6*, *19*
**Technical** 25:*1* 51:*20*
53:*1*, *5* 85:*15* 87:*13*
96:*21* 150:*12* 159:*17*, *22*
160:*21* 164:*5* 171:*11*
189:*4* 233:*1* 275:*17*
285:*15*
**technology** 161:*15*
**tell** 10:*3* 11:*11*, *24*
44:*10* 53:*4* 56:*17* 92:*11*

93:*14*, *23* 124:*1* 190:*23*
227:*23* 239:*21* 247:*18*
248:*2*, *9* 257:*3*
**ten** 57:*18*
**tend** 34:*14* 114:*18*
152:*2*, *23* 163:*12* 164:*2*
**tension** 121:*19*
**term** 33:*16*, *18* 52:*16*
56:*19* 57:*2* 58:*3* 59:*18*
90:*16* 110:*1* 147:*12*
**terms** 6:*23* 8:*8*, *24* 10:*8*,
*22* 11:*13* 12:*17* 13:*12*
16:*9* 19:*5* 25:*9* 29:*19*
33:*11* 38:*18* 39:*19* 40:*5*,
*21* 41:*20* 42:*5*, *11* 43:*15*
45:*4*, *13* 46:*4* 47:*8*, *9*
53:*15* 55:*6* 62:*6*, *16*, *20*
63:*22* 64:*10*, *18* 70:*6*, *7*,
*10* 71:*5*, *12*, *18*, *21* 73:*2*,
*5* 76:*21* 77:*2* 78:*8*, *12*
79:*23* 80:*2*, *3*, *22* 81:*9*
82:*6*, *11* 83:*21* 86:*19*
88:*10* 93:*17* 96:*15* 97:*6*
99:*9*, *14*, *16*, *17* 101:*2*
102:*20* 108:*14* 109:*25*
110:*17* 113:*5*, *10*, *15*, *17*
119:*16* 121:*11* 122:*3*, *4*,
*18* 123:*13* 124:*14*, *19*
125:*1* 130:*15* 131:*2*
132:*4*, *24* 134:*21* 136:*11*
137:*1* 142:*8* 150:*19*
151:*1*, *3* 153:*12*, *15*, *16*
154:*3* 156:*16*, *23* 166:*24*
170:*18* 171:*9* 173:*6*, *7*
175:*6* 176:*25* 180:*10*
182:*23* 183:*9* 186:*6*
188:*16* 200:*17*, *23*, *24*
209:*25* 212:*4* 214:*3*, *7*
221:*15* 224:*4*, *6*, *15*, *23*
226:*5*, *8*, *12*, *21*, *25*
228:*17* 234:*12* 237:*3*
238:*21* 240:*20* 245:*11*
258:*22*, *23* 262:*5* 264:*2*
268:*18* 269:*9*, *20*, *21*
270:*7* 271:*15* 274:*19*
275:*2*, *16* 277:*11* 282:*8*
**test** 28:*2*
**testified** 5:*14*
**testifying** 9:*6*
**testimony** 288:*6*
**testing** 138:*14*, *23*
**text** 22:*25*
**textbooks** 109:*3*, *6*
**thank** 5:*22* 8:*2* 9:*15*
69:*10* 160:*14* 161:*25*
168:*18* 182:*13* 190:*18*
192:*1*, *15* 194:*16* 205:*22*
206:*21* 218:*25* 222:*18*,
*19* 230:*21* 231:*19* 232:*9*
267:*5* 288:*14*

**thankful** 266:*12*
**theoretical** 72:*7*
**therapeutic** 74:*11*, *19*
76:*7*, *12*, *15* 79:*13* 80:*10*,
*13* 84:*1*, *5*, *9* 85:*12*
86:*13* 96:*18* 102:*25*
103:*13* 247:*8*, *15*, *21*
248:*5*, *13*, *19* 250:*7*, *14*
253:*17*, *19* 259:*13*, *24*
260:*3* 261:*5*, *16*, *18*
**therapy** 61:*24* 64:*20*
68:*10* 104:*5* 120:*12*, *14*,
*17*, *24* 121:*4*, *12* 122:*22*
123:*13* 134:*7* 136:*5*
169:*23*
**thing** 7:*7*, *21* 10:*8*
24:*24* 33:*4* 82:*22* 96:*2*
105:*17* 117:*13* 126:*21*
162:*11* 206:*7* 239:*16*
270:*9* 277:*9* 287:*22*
288:*1*
**things** 6:*25* 8:*11* 15:*6*
19:*3* 33:*5* 87:*20* 88:*5*
96:*14* 102:*10* 150:*23*
170:*1* 205:*18* 214:*2*
275:*9*, *10*, *18* 276:*22*
277:*6*, *11*
**think** 9:*1* 10:*9* 11:*11*
19:*16* 31:*10* 33:*4*, *9*
40:*13* 51:*18* 59:*3* 61:*19*
65:*4*, *16* 66:*2* 69:*21*
72:*4* 78:*10* 84:*20* 85:*25*
87:*10*, *19*, *20* 92:*12*
97:*18* 102:*9*, *17* 104:*11*
108:*13* 111:*24* 114:*1*
122:*19* 123:*12* 129:*11*
132:*23* 133:*3* 147:*12*
150:*11* 153:*5*, *7* 154:*19*
156:*23* 158:*1* 161:*22*
164:*19* 168:*16* 174:*22*
176:*22* 177:*13* 182:*6*, *18*,
*19* 186:*3* 200:*13* 207:*11*,
*14* 210:*4* 221:*10* 224:*7*
225:*13* 226:*10*, *20*, *25*
229:*15*, *25* 232:*14* 237:*1*
238:*21* 245:*21* 248:*24*
260:*25* 263:*24* 264:*19*
265:*10* 266:*15* 271:*14*
274:*12* 279:*4* 284:*1*
288:*1*
**thinking** 11:*25* 182:*7*
**third** 29:*7* 85:*9* 96:*8*
107:*20* 112:*2* 169:*20*
**Thomas** 140:*22*
**thought** 28:*8* 67:*11*
174:*18* 186:*12* 187:*5*
222:*9* 265:*4*
**three** 37:*20* 128:*22*
136:*25* 189:*8* 235:*24*
**Thursday** 1:*10*

**Tiegreen** 116:*22*
**Tiegreen's** 117:*1*, *2*
**tier** 115:*12*, *16*, *21* 116:*4*
127:*4*, *25* 132:*14* 149:*5*
153:*19*, *20*, *21*, *23*, *25*
154:*6*, *9*, *13* 165:*3*, *5*, *6*,
*12*, *21*, *22* 168:*7*, *21*, *25*
169:*9*, *19*, *20* 170:*3*, *5*
171:*23* 172:*9* 173:*6*, *13*,
*14* 229:*9*, *10*, *18*, *19*
230:*10*, *12*, *14*, *15* 231:*9*,
*13* 235:*8*, *11*, *23* 236:*2*, *8*,
*15*, *21*, *24* 237:*4*, *10*, *17*,
*22* 238:*2*, *17*, *19* 239:*7*
240:*25* 241:*2*, *9*, *13*, *25*
242:*8*, *17*, *24* 255:*11*, *12*
285:*2*, *3*, *4*
**tiers** 86:*23* 232:*24*
**time** 4:*6* 6:*4* 7:*5* 8:*17*,
*25* 10:*2*, *6* 11:*6*, *8* 13:*20*
19:*24* 24:*22* 26:*1* 38:*17*
41:*25* 46:*9* 47:*3* 60:*6*,
*21* 100:*25* 129:*18* 130:*6*,
*22* 140:*19* 146:*8* 158:*1*
169:*2* 194:*11* 207:*20*
219:*3* 220:*13* 227:*2*
228:*3* 230:*6* 234:*9*
273:*4* 290:*4*
**timely** 100:*3*, *18*, *19*
101:*3*
**times** 112:*25* 136:*25*
171:*24* 173:*11*, *12*
**title** 139:*22* 221:*21*
**titled** 151:*22*
**today** 5:*25* 8:*19*, *25* 9:*1*,
*2*, *7* 10:*3* 20:*3* 22:*3*
156:*8* 226:*17* 259:*10*
271:*22*
**Today's** 4:*5* 8:*3*, *9*, *18*
**told** 207:*14* 256:*22*
**tool** 225:*11*
**tools** 51:*24* 149:*7*
**top** 39:*3* 42:*19* 44:*16*
115:*15* 190:*10* 212:*9*
229:*23* 241:*21* 259:*22*
272:*2*
**total** 42:*11*, *23* 112:*19*
163:*8* 255:*12* 257:*22*
**touch** 288:*22*
**TP** 4:*12*, *14*
**track** 87:*24* 153:*10*
156:*10* 163:*21* 166:*19*
167:*2*
**tracking** 155:*6*, *8*, *16*
156:*3*, *16*
**tracks** 136:*19* 157:*25*
**traditional** 163:*7*
**train** 157:*16* 166:*25*
**trained** 64:*18* 103:*2*
200:*15* 234:*10*, *11*
**trainers** 87:*22* 233:*3*

**training** 47:*14, 15, 16* 80:*25* 85:*15* 87:*13, 16, 18, 23* 88:*11* 96:*21* 97:*25* 104:*16, 25* 106:*10* 110:*12* 127:*3, 21* 138:*6* 148:*17, 25* 149:*16, 18, 23, 25* 150:*15, 20, 25* 151:*3* 173:*5, 6* 230:*4, 10* 235:*7, 11* 236:2 237:*4, 10, 17, 22* 238:2, *10, 17, 20* 239:*1, 7* 240:*21* 245:*1, 6, 16* 254:*12* 268:*13, 14, 15* 284:*20*
**trajectories** 130:*8*
**trajectory** 264:*20*
**transcribed** 1:*20*
**transcript** 288:*18, 21, 25* 290:*6*
**transfer** 161:*16*
**transition** 259:*25*
**trauma** 168:*24* 169:*8*
**treating** 78:*8*
**treatment** 21:*21* 119:*2* 210:*25* 211:*9*
**trial** 6:*5* 287:*7, 12*
**trip** 288:*14*
**trouble** 7:*14*
**true** 48:2 55:22 66:*8* 69:*20* 74:7 86:*24* 87:*5* 138:*4, 11* 158:*25* 173:*9* 212:*10* 236:6 273:*21* 290:*7*
**Trust** 66:*21*
**try** 6:*18* 62:25 225:*24* 260:*21*
**trying** 7:22 61:*17* 92:*4, 7* 150:*9* 152:*15* 174:*10* 177:*20* 182:*15* 187:*19* 227:*21* 246:*10*
**turn** 41:2 66:*20* 116:*11* 134:*10* 151:*18* 160:*23* 162:*21* 163:*6* 166:*13* 171:*10* 206:*8* 208:*7*
**turned** 238:*6*
**Twenty-eight** 232:*8*
**two** 47:6 73:*7* 78:*3, 9* 80:*25* 90:*22* 100:*12* 112:*13, 16, 22* 116:*7* 117:*20* 128:*22* 134:*24* 135:*4, 14, 18* 165:*4, 10* 171:*16* 205:*9* 214:*1* 215:*8* 232:*14* 242:*6, 10* 249:*24* 258:*1, 9, 12, 18* 262:*5* 264:*1, 25* 274:*10* 275:*14*
**two-thirds** 278:*19*
**Tyler** 258:*3, 17* 259:*7, 12, 16, 23* 261:*4, 15, 23* 265:*22*
**Tyler's** 259:*9*

**type** 40:*6* 88:*9* 105:*20* 110:*11* 112:*8*
**types** 29:*25* 77:*3* 218:*8*
**typical** 130:2, *10*
**typically** 17:*18* 103:*16* 115:*19* 146:*23* 168:*9* 241:*14* 242:*3, 8, 19*

< U >
**U.S** 2:*7* 4:*9* 162:*23*
**uh-huh** 7:*2* 47:*19* 115:*2* 173:*24* 273:*1, 15*
**uh-uh** 7:*2*
**unanimous** 51:*14*
**unattached** 141:2
**underlying** 72:*4*
**underscores** 176:*11*
**understand** 7:*24* 11:*20* 14:*12* 15:*25* 39:*3* 65:*25* 70:*17* 78:*3* 83:*9* 90:*6* 91:*24* 93:*4* 94:*7* 109:*24* 121:*22* 156:*11, 20* 165:*8* 176:*4* 179:*7* 182:*6* 187:*19* 193:*1* 212:*3* 223:*11* 227:*20* 233:*6* 246:*11* 251:*3* 253:*4* 255:*1* 263:*11* 280:*2* 288:*9*
**understanding** 14:*13* 16:2 54:*8, 19* 56:*19* 57:*21* 58:*7* 65:*12* 66:*7, 10* 75:*7, 15* 81:*11, 18* 82:*14* 89:*2, 3, 19* 90:*2, 7, 19* 91:*4, 17, 21* 92:*2, 19* 93:*10* 94:*23, 24* 95:*2, 5, 12, 20* 104:*15* 120:*16* 140:*1* 155:*23, 24* 158:*5* 169:*9* 179:*10* 181:*20* 190:*22, 23* 198:*14* 199:*8, 17* 201:*17* 202:*2, 21, 25* 204:*22, 23* 209:*19* 211:*21* 213:*12* 217:*19* 220:*14* 229:*8* 231:*7, 11*
**understood** 60:*13* 104:*12* 177:*24* 214:2 222:*5* 243:*18* 250:*17*
**unemployed** 128:*13*
**unfortunately** 207:*19*
**unimportant** 138:*24*
**unique** 133:*10* 137:*13, 22* 138:*8*
**unit** 32:*8*
**UNITED** 1:*1, 5, 16* 4:*3* 5:*1, 3, 5, 7* 9:*7* 22:*18* 23:*16, 18* 50:22 125:*6* 127:*20* 159:*15* 210:*5* 231:*17* 236:*14, 20* 287:*20* 288:*7*
**units** 113:*6* 261:*20, 25* 262:*5*
**universities** 53:*7*

**University** 53:*14, 17* 220:*15* 221:*6*
**unknown** 45:*23*
**unmet** 224:*20*
**unnecessary** 59:*12, 18* 61:*14* 247:*6* 249:*11, 23* 266:*10* 271:*6*
**unrestrictive** 36:*7*
**urban** 35:*14, 15* 37:*7* 38:*23* 39:*14, 21* 268:*9*
**use** 9:*13, 16* 41:*24* 52:*5* 70:*4* 82:*18* 83:*4, 21* 84:*13* 93:*18, 20* 99:*10* 127:*16, 20* 133:*21* 136:*18* 143:*17* 148:*17* 157:*9* 164:*2* 173:*8* 222:*24* 223:*17* 225:*19* 229:*2* 249:*2* 274:*24* 276:*15* 279:*11*
**uses** 52:*21* 281:*8*
**usually** 16:*15* 17:*1, 5, 10, 21* 55:*10, 16* 149:*17* 167:*14* 175:*6*
**utilization** 136:*19* 226:*4*
**utilize** 256:*6*
**utilized** 241:*14*

< V >
**valuable** 249:*20*
**varied** 135:*10*
**variety** 88:*5*
**various** 8:*4* 13:*8* 50:*10* 53:*7* 106:*22* 107:*6*
**vary** 103:*14*
**varying** 30:*20* 31:*3*
**vast** 66:*25* 67:*16* 69:*23* 145:*13*
**Vermont** 23:*10* 24:*23* 154:*20, 23*
**version** 206:*14, 18* 207:*3*
**versus** 14:*10* 42:*7* 45:*5* 46:*15* 113:*10* 132:*14*
**vice** 22:*11* 24:*8, 17*
**victimization** 126:*6*
**video** 4:*7*
**Videographer** 2:*23* 4:*2* 5:*8* 7:*16* 26:*15* 27:22 28:*12, 16* 84:*25* 85:*4* 133:*24* 134:*3* 178:*22* 179:*1* 230:*22* 231:*1* 257:*8, 12* 286:*15, 19* 288:*15*
**Videotaped** 1:*13*
**view** 32:*18* 34:*2*
**violence** 146:*24* 147:*22* 259:*17* 266:*4* 278:*3*
**vision** 26:*4* 27:*5* 275:*2*
**visit** 102:*3*
**visited** 101:*19* 168:*1*
**visits** 10:*7* 101:*16* 214:*6*

**voluntary** 180:*18*
**Vytautas** 2:*23* 4:*11*

< W >
**waiver** 20:*23*
**want** 7:*1* 22:*25* 36:2 47:*11* 53:*25* 55:6 66:2 67:*18* 77:*4, 6* 100:*24* 113:*9, 22* 126:*20* 129:*13* 130:*1* 157:*10* 175:*4* 176:*7, 9, 17* 189:*14* 205:*13* 212:*12* 219:*12* 221:*18* 239:*13, 19, 22* 272:*4, 9* 278:*17* 282:*9* 288:*11*
**wanted** 50:*14* 51:*4* 52:*23* 62:*4* 102:*3* 113:*21, 22* 119:*17* 135:*10* 165:*11* 214:*24* 215:*13* 224:*25* 250:*20* 251:*14* 269:*6*
**wants** 91:*2, 13* 152:*21* 284:*7*
**warmly** 275:*5*
**warrants** 101:*5*
**Washington** 1:*11, 17* 2:*10* 4:*10*
**water** 46:*25*
**way** 19:*6, 15* 23:*4* 31:*6* 63:*1* 79:*22* 113:*21* 133:*7* 165:*14, 15* 166:*3* 186:*22* 225:*14* 226:*12* 227:*1* 228:*2, 19* 242:*10* 260:*21* 261:*12* 266:*11* 268:*2* 269:*8* 278:*20* 290:*11*
**ways** 177:*2*
**web** 26:*23* 27:*1*
**Website** 3:*5* 26:*2, 7, 8, 10, 13, 18* 28:*20* 51:*25* 108:*14* 109:*2* 189:*14* 191:*13, 16* 271:*21* 285:*12*
**week** 122:*23, 25* 162:*8, 12* 164:*22*
**weekly** 122:*22, 25*
**weeks** 10:*10, 11*
**welcome** 239:*22* 240:*1* 275:*5*
**welcomed** 274:*20*
**Well** 8:*20* 9:*2* 11:*12* 12:*16* 13:*6* 14:*2* 15:*1* 16:*3* 18:*19* 20:*4* 26:*9* 39:*13* 41:*19* 43:*12* 46:*24* 48:*7* 49:*12* 51:*2, 6* 55:*1, 5, 10* 56:*20* 59:*14* 62:*10, 16* 63:*23* 64:*18* 65:*4* 67:*22* 72:*23* 73:*3* 74:*13, 22* 76:*14* 77:*25* 79:*15, 19, 25* 81:*7* 82:*2, 14* 84:*18* 85:*21*

86:9, *19*   87:*10*, *19*   97:*18*
105:7   106:5   107:6
108:7   111:*10*   112:*12*
122:9   123:25   129:*11*
132:*11*   133:*12*   137:*18*
140:*18*   142:7, *12*   149:*3*
150:*16*   151:*1*   153:5, *25*
165:*18*   167:2, *22*   171:22
175:*18*   177:*11*   179:*19*
180:*8*   185:*3*   188:*20*
197:*1*, *9*   199:*21*   200:*13*
206:*3*   207:8, *19*   209:*11*
212:23   215:23   219:*12*
224:2   225:*13*   227:*13*
228:2, *13*, *23*   229:*20*
230:2   233:*10*   237:*12*
238:*21*   242:*23*   245:5
248:*15*   250:*16*   251:*14*
253:*18*   256:*16*   258:*8*
260:24   261:*14*   264:2
268:7   271:9, *17*   274:*12*
276:*21*   278:*9*   279:*4*
283:*18*   285:*1*, *2*
**Wendy**  116:22   117:*1*
**went**  33:22   64:*15*   269:*3*,
*7*, *11*
**we're**  23:*4*   27:20   33:*4*
79:*11*   81:7   96:*13*
123:*19*, *23*   126:*13*, *20*
136:22   147:*12*   153:*8*
154:2   163:*24*   174:*10*, *12*,
*14*   175:7, *10*   177:*1*, *3*, *14*,
*15*   182:22   189:6, *7*
190:*4*   196:*18*   199:*5*
205:*16*   206:*15*   207:*19*
210:*17*   216:20   241:*16*
243:*18*   258:*14*
**We've**  9:*12*   12:9   25:*8*
69:*21*   71:*16*   72:6   154:7
183:*5*   193:*18*   227:*20*
249:*1*   266:*12*   272:*23*
**whatnot**  252:*25*
**wheel**  271:9
**wide**  270:*24*
**widespread**  163:*16*
**Wiley's**  286:*24*   287:*12*
288:*6*
**willing**  214:*15*   215:*8*, *13*
**wisely**  82:*23*
**wiser**  83:*21*
**wish**  224:*11*
**withdrawn**  213:6, *7*
**witness**  1:*14*   3:3   5:*12*
10:*25*   12:2   13:6   14:*17*
15:*1*, *13*, *20*   16:*15*, *21*
17:*21*   18:*14*   20:8   24:*21*
30:2, *12*, *23*   31:*10*   33:*15*,
*25*   34:5, *11*   39:*13*   41:*4*,
*24*   42:2   46:*24*   49:*12*, *24*
51:*1*, *17*   52:*11*   53:7, *22*
54:*16*   55:*1*, *25*   56:*12*

57:*24*   58:*17*   59:*3*   60:*20*
63:*16*   64:2   65:*4*, *16*
66:*15*   69:*12*   70:*16*   71:2,
*25*   72:*14*   73:*12*, *23*
74:22   75:*12*   76:*4*, *20*
77:*25*   78:*17*, *25*   81:*15*,
*22*   83:*8*   86:9   89:*23*
90:*11*   91:7, *17*   94:6, *15*
95:*8*, *17*, *25*   97:2, *18*
99:*3*, *23*   101:*8*   103:*10*,
*23*   104:9   105:*14*   107:*17*
108:7   109:*1*   110:*16*
115:7   116:9, *13*   117:*5*
119:*14*   121:*8*   122:9
123:*19*   124:*13*   125:*11*
126:*12*   128:*3*, *19*   129:*11*
130:*25*   131:*13*   132:2, *11*,
*23*   137:6, *15*   138:*18*
139:*1*, *8*   142:*4*   143:*3*, *13*
144:7, *24*   145:7, *18*
146:*16*   147:9, *17*   149:*3*
150:5   151:*21*   152:*18*
153:5   154:*19*   155:*11*
156:*19*   157:5, *20*   158:9,
*17*   159:*4*, *12*   164:*14*, *17*
166:5, *22*   167:*14*   168:9
169:*12*   172:6, *11*, *19*
175:6   176:22   177:*13*
178:*10*, *18*, *21*   179:*19*
180:*23*   184:*12*   185:*13*,
*24*   186:*11*   187:5, *22*
188:*20*   189:*25*   193:6
194:6   195:*13*   198:*18*, *25*
199:*13*, *21*   200:*8*   201:*8*
203:*4*, *16*   204:*3*, *10*, *21*
205:5, *25*   207:2   208:*24*
210:*15*, *20*   212:2   213:*16*
214:*1*, *19*   215:*3*, *23*
216:*8*   217:6, *17*   218:*11*
219:*23*   223:*10*   224:2
226:*20*   227:*13*   228:2, *13*
230:*19*   231:*24*   232:*8*, *16*
233:*10*, *20*   234:*3*, *24*
236:*4*, *10*   237:*1*, *12*
238:*4*   240:*18*   241:5, *18*
242:*13*   243:*25*   244:*16*,
*23*   245:5   246:*17*   247:*23*
248:7, *15*, *24*   250:9, *16*
251:2, *24*   252:5   253:*23*
254:6   257:*1*   259:*19*
260:7, *13*   262:*24*   263:*10*,
*18*   264:6, *19*   265:*10*
267:*12*, *19*, *24*   272:2
274:*12*   276:*21*   277:*19*
279:*4*, *16*   280:*14*, *21*
281:*4*, *21*   282:6, *16*
283:*18*   284:*1*   285:*11*, *24*
287:*4*, *9*, *15*
**witnessed**  272:*15*   274:6,
*18*, *20*, *21*, *23*   275:8, *10*,

*18*
**WITNESSES**  3:2
**word**  32:*13*   93:*15*, *19*,
*20*, *22*   229:*15*
**worded**  19:*16*
**words**  11:*10*   14:*15*   51:9
64:*13*   65:6   70:*12*   88:*17*
112:7   136:*17*   146:9
152:*15*   185:*20*   190:*3*
202:*11*   251:6   263:2
277:*11*, *14*   280:9   282:2
**work**  5:*18*   8:*20*   13:*4*
24:*3*, *16*   25:*13*, *14*   35:*3*,
*18*   71:*3*   84:*23*   102:*25*
144:*15*   154:*12*   263:*5*
**worked**  20:*14*, *17*   21:5,
*25*   24:*4*, *24*   25:*19*   46:*3*
99:*16*   135:*1*   218:*1*, *5*
**worker**  110:*12*
**workers**  123:2   211:*17*
**workforce**  110:*23*   111:*1*,
*6*
**working**  23:*18*   40:5
84:*8*   167:*3*   270:*15*
273:*23*
**works**  16:2
**world**  72:*8*   97:*14*
**worries**  205:22   208:2
**worry**  66:*18*
**wraparound**  104:*3*
109:9, *13*, *17*, *21*   110:*14*,
*20*, *21*   113:*16*, *17*
**write**  10:5   20:24   76:*11*
116:*17*   281:7   287:*13*
**writing**  10:7, *8*   282:*8*
**written**  47:*13*   143:*18*
168:*15*   234:*4*   266:*12*
268:*12*
**wrong**  10:*4*   235:*19*
**wrote**  112:*13*

< Y >
**Yeah**  5:*19*   9:5   10:*12*
92:*10*, *25*   121:*14*   127:*10*
160:5, *9*   164:6   176:*23*
182:*18*   187:*16*   191:2
196:*19*   197:2   198:*11*
206:25   208:9   230:*19*
253:*12*, *15*   259:*8*, *22*
261:*3*   271:20   281:*15*
**year**  8:*21*   10:20   38:*12*,
*20*, *21*   119:*10*, *16*   135:*11*
206:*17*   224:*10*   230:*14*,
*17*   235:*11*   255:*13*
261:*17*, *19*, *24*
**years**  21:*12*   24:*25*   25:7
46:*4*   53:*13*   57:*19*   98:*3*,
*9*   99:*14*   112:22   117:*21*
200:22   235:*10*, *24*   261:7,
*12*   262:5   263:*14*   264:*1*,

*18*
**Yoshikawa**  139:*19*, *23*
**you-all**  191:*21*   207:*10*
257:*4*
**younger**  262:*15*, *21*
**Youth**  3:*24*   209:*3*
224:*19*   278:2*1*

< Z >
**Zeroing**  94:*19*
**zone**  33:*10*, *19*
**zoned**  195:*20*   196:*10*, *24*
197:6, *11*
**Zoom**  7:*13*   27:21

12, *17*