IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

STATE OF GEORGIA,

    *Defendant*.

CIVIL ACTION

NO. 1:16-CV-03088-ELR

DEFENDANT STATE OF GEORGIA'S
BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Introduction ....................................................................................................1

Background ....................................................................................................4

   I.    State Agencies Identified in the Complaint ....................................5

   II.   Local Education Agencies and the GNETS Program.....................6

Legal Standard ...............................................................................................9

Argument......................................................................................................10

   I.    DOJ lacks Article III standing. ...................................................10

      A. DOJ cannot prove an injury-in-fact for any individual student. ..............11

      B. Any injuries are neither traceable to nor redressable by the State. ..........13

   II.   DOJ's claims fail on the merits....................................................16

      A. The State does not administer the GNETS Program in any way relevant to DOJ's claims.................................................................17

      B. Individual students are not subject to discrimination by the State because of their disabilities. ........................................................19

         1. DOJ has failed to prove the three elements of an Olmstead unjustified-isolation claim.................................................................19

         2. DOJ fails to prove its unequal-education theory. ...............................27

Conclusion ...................................................................................................31

# TABLE OF AUTHORITIES

## Cases

A.R. v. Dudek, No. 1260460CIVZLOCHHUNT, 2016 WL 3221140 at *1 (S.D. Fla. June 9, 2016) ..........................................................................4

Bacon v. City of Richmond, Va., 475 F.3d 633 (4th Cir. 2007)........................ 16, 18

Badaracco v. Comm'r, 464 U.S. 386 (1984)................................................................14

Bircoll v. Miami-Dade Cty., 480 F.3d 1072 (11th Cir. 2007) .................... 20, 24, 25

Brooklyn Ctr. for Psychotherapy, Inc. v. Phila. Indem. Ins. Co., 955 F.3d 305 (2d Cir. 2020) ...........................................................................28

Canon U.S.A., Inc. v. SED Int'l, Inc., 1:15-CV-01363-ELR, 2016 WL 11499503, at *1 (N.D. Ga. Apr. 14, 2016) (Ross, J.)...........................................9

Clapper v. Amnesty Int'l USA, 568 U.S. 398 (2013) ..............................................13

Dekalb Cty. v. HSBC N. Am. Holdings Inc., 1:12-CV-03640-ELR, 2015 WL 8699229, at *1 (N.D. Ga. Nov. 16, 2015) (Ross, J.)....................................10

Fair Fight Action, Inc. v. Raffensperger, 634 F. Supp. 3d 1128 (N.D. Ga. 2022) (Jones, J.) ...........................................................................................13

Fitzpatrick v. City of Atlanta, 2 F.3d 1112 (11th Cir. 1993) ...................................24

Fry v. Napoleon Cmty. Sch., 580 U.S. 154 (2017) ...................................................29

Gwinnett Cty. Sch. Dist. v. Cox, 289 Ga. 265 (2011)...........................................3, 6

Jacobson v. Fla. Sec'y of State, 974 F.3d 1236 (11th Cir. 2020)...........11, 13, 14, 16

Knox Cty., Tennessee v. M.Q., 62 F.4th 978 (6th Cir. 2023)..................................28

L.C. by Zimring v. Olmstead, 138 F.3d 893 (11th Cir. 1998), aff'd in part, vac. in part, remanded, 527 U.S. at 581 ................................................. 1, 20, 21

L.E. v. Superintendent of Cobb Cty. Sch. Dist., 55 F.4th 1296 (11th Cir. 2022) ..............................................................................................................17

Lewis v. Governor of Ala., 944 F.3d 1287 (11th Cir. 2019) ...................................13

Marks v. United States, 430 U.S. 188 (1977) ...........................................................1

Massachusetts v. E.P.A., 549 U.S. 497 (2007)..........................................................10

N. Georgia Reg'l Educ. Serv. Agency v. Weaver, 272 Ga. 289 (2000) ...............6, 14

Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999) .................................. passim

Ramirez v. Tilton, No. C 07-04681 SBA PR, 2010 WL 889988, at *1
  (N.D. Cal. Mar. 8, 2010) ..................................................................18

Rylee v. Chapman, 316 F. App'x 901 (11th Cir. 2009)............................17

School Bd. of Nassau Cty. v. Arline, 480 U.S. 273 (1987).....................22

TransUnion LLC v. Ramirez, 141 S. Ct. 2190 (2021)...........................10

Trichell v. Midland Credit Mgmt., Inc., 964 F.3d 990 (11th Cir. 2020) ................12

United States v. Florida (Florida I), 938 F.3d 1221 (11th Cir. 2019) ............... 10, 23

United States v. Florida (Florida III), 12-CV-60460, 2023 WL 4546188,
  at *1 (S.D. Fla. July 14, 2023) ..................................................... 12, 22

United States v. Georgia, 461 F. Supp. 3d 1315 (N.D. Ga. 2020) .........................18

United States v. Lopez, 514 U.S. 549 (1995) ...........................................1

United States v. Mississippi, 82 F.4th 387 (5th Cir. 2023) ............................ passim

United States v. Sec'y Fla. Agency for Health Care Admin. (Florida II),
  21 F.4th 730 (11th Cir. 2021) ...................................................................11

United States v. Texas, 599 U.S. 670 (2023) ..........................................10

Walker v. Sec'y of Corr., No. 221CV0364TLNACP, 2023 WL 2333555,
  at *1 (E.D. Cal. Mar. 2, 2023), r&r adopted, 2023 WL 3380445 (E.D.
  Cal. May 11, 2023)..........................................................................18

Whitmore v. Arkansas, 495 U.S. 149 (1990) ...........................................11

Wilf v. Bd. of Regents of the Univ. Sys. of Georgia, No.
  109CV01877RLVGGB, 2012 WL 12888680, at *1 (N.D. Ga. Oct. 15,
  2012), aff'd, 544 F. App'x 906 (11th Cir. 2013).........................................27

Willis v. Conopco, Inc., 108 F.3d 282 (11th Cir. 1997).........................24

Wilson v. Smith, 567 F. App'x 676 (11th Cir. 2014) ..............................18

**Statutes**

20 U.S.C. § 1401 .......................................................................... passim

20 U.S.C. § 1412 ...................................................................................29

20 U.S.C. § 1414 .............................................................................. 7, 8, 24

20 U.S.C. § 1415 ...................................................................................24

20 U.S.C. § 1416 ...................................................................................29

42 U.S.C. § 12133 ..........................................................................10, 11

42 U.S.C.A. § 12132 ...................................................................................17

O.C.G.A. § 20-2-152 ............................................................................5, 14

O.C.G.A. § 20-2-243 ...............................................................................16

O.C.G.A. § 20-2-270 .............................................................................6, 7

O.C.G.A. § 20-2-271 ...............................................................................15

O.C.G.A. § 20-2-520 ...............................................................................15

O.C.G.A. § 20-2-943 ...............................................................................15

O.C.G.A. § 37-1-20 ...................................................................................6

O.C.G.A. § 49-4-142 .................................................................................6

O.C.G.A. §§ 20-2-34 .................................................................................5

**Rules**

Fed. R. Civ. P. 56 ......................................................................................9

**Regulations**

28 C.F.R. § 35.130 ............................................................. 17, 19, 23, 27

Ga. Comp. R. & Regs. 160-4-7-.07 .......................................................15

Ga. Comp. R. & Regs. 160-4-7-.15 ........................................... 7, 8, 15

**Constitutional Provisions**

Ga. Const. art. VIII, § 6, ¶ I .................................................................16

# INTRODUCTION

The United States Department of Justice ("DOJ") has described this lawsuit as a first-of-its kind.[1] On that score, it is correct. No binding precedent has held that Title II of the Americans with Disabilities Act (the "ADA") empowers the federal government to impose statewide standards governing the efficacy, quantity, or location of publicly funded behavioral-health services for school-age children. Indeed, the opposite is true. "States historically have been sovereign" in matters of education policy. United States v. Lopez, 514 U.S. 549, 564 (1995). The ADA imposes no standard of care on states' provision of services, and it affords the "greatest deference" to government officials' and treatment professionals' decisions regarding the highly individualized question of what constitutes "appropriate" services for the disabled. Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 603 n.14 (1999) (plurality opinion); id. at 613–14 (Kennedy, J., concurring).[2]

Undaunted, DOJ seeks to impose a sweeping injunction on the State of

---

[1] Press Release, U.S. Dep't of Justice, Justice Department Sues Georgia for Unnecessarily Segregating Students with Disabilities (August 23, 2016), https://www.justice.gov/opa/pr/justice-department-sues-georgia-unnecessarily-segregating-students-disabilities ("The Lawsuit is the First Challenge to a State-Run School System for Segregating Students with Disabilities").

[2] As recently recognized by the United States Court of Appeals for the Fifth Circuit, Justice Kennedy's narrowing concurrence in Olmstead provides the controlling opinion. United States v. Mississippi, 82 F.4th 387, 394 n.11 (5th Cir. 2023) (citing Marks v. United States, 430 U.S. 188, 193 (1977)).

Georgia because it claims the "vast majority" of children in the state-funded GNETS Program are "unnecessarily segregated" in separate facilities and receive "unequal educational opportunities." [ECF 1 ¶ 1]. But these theories are not only out of step with established precedent, they are unsupported by the record in this case and are based upon fundamental misunderstandings of Georgia law.

*First*, DOJ has failed to produce any *individualized* evidence supporting a conclusion that any individual student—let alone the "vast majority"—are "unduly institutionalized," as described by the Supreme Court in <u>Olmstead</u>. 527 U.S. at 597–98. Relevant to DOJ's claims here, DOJ has failed to identify any individual student that is (1) currently receiving GNETS-funded services in a less than fully integrated setting; (2) opposes receiving those services in their current setting; and (3) has been assessed by their treating professionals to be more appropriately suited for the general-education setting. This not only vitiates DOJ's Article III standing, it also dispositively undermines its claims on the merits of its unjustified-isolation claim.

*Second*, the State does not discriminate against any students in the GNETS Program because it does not control the decisions alleged in this case. Even assuming DOJ has established individualized injuries through unjustified isolation or unequal treatment, Georgia law makes clear that only local authorities make the decisions DOJ challenges here, *i.e.*, the decision about *where* to GNETS-funded services are provided and *where* students receive them. This division between the State and local

authorities affirms a principle in Georgia law that has remained "unbroken since it was memorialized in the 1877 Constitution of Georgia": only local boards of education possess the authority to "establish[] and maintain[] general K-12 schools." Gwinnett Cty. Sch. Dist. v. Cox, 289 Ga. 265, 266 (2011). This history demonstrates that DOJ wrongly sued the State of Georgia (the "State") for decisions made at the local level about unique, individual students. Again, this not only vitiates Article III's traceability and redressability requirements, but also conclusively undermines any claims of ADA liability attaching to the State.

*Third*, DOJ has not met its burden of identifying a "reasonable" modification of State programs and services that could alleviate any alleged injuries to individual students. Putting aside the fact that Eleventh Circuit precedent requires a case-by-case analysis of what constitutes a "reasonable" modification, neither of DOJ's experts conducted any workforce, or cost assessments, which they both acknowledged were essential to determining the feasibility of their proffered modifications. Moreover, the ADA does not establish or require any set "standard" or "quantity" of services, despite what DOJ seeks in this case.

*Fourth*, DOJ's unequal-treatment claim fails because DOJ has failed to provide any evidence of discriminatory intent, the ADA does not establish a specific standard for the provision of services, and because DOJ's unequal-treatment theory is essentially an IDEA claim.

– 3 –

The issues raised in this lawsuit involve "hard decisions" about education policy, allocation of resources, and competing views of "appropriate" learning environments. Olmstead, 527 U.S. at 610 (Kennedy, J., concurring). When faced with similar decisions, the Supreme Court has said that courts are to defer to state policymakers. See, e.g., id. Most recently, the Fifth Circuit reversed a decision to grant DOJ a "sweeping" injunction against the State of Mississippi for similar allegations of systemic ADA violations. Mississippi, 82 F.4th at 401. See also A.R. v. Dudek, No. 1260460CIVZLOCHHUNT, 2016 WL 3221140 (S.D. Fla. June 9, 2016).

The Court should follow their example. Any of these reasons discussed above warrant summary judgment; collectively, precedent necessitates it.

## BACKGROUND

This lawsuit alleges that an unquantified number of unnamed students for whom local education professionals have recommended or could recommend for Georgia Network for Educational and Therapeutic Support ("GNETS") services are "unnecessarily segregated," because their unique and unidentified service needs are not being met in an integrated education environment. [Doc 1 at 1.] DOJ also contends that students receiving GNETS services are not afforded the same educational opportunities as those in general-education settings. [Id. at 17, ¶ 47.]

The breadth of DOJ's claims cannot be understated, as the complaint seeks a

– 4 –

wholesale overhaul of the provision of special education in Georgia. It seeks to enjoin at least the State's Departments of Education ("GaDOE"), Behavioral Health and Developmental Disabilities ("DBHDD"), and Community Health ("DCH"), and to decide how the State legislature will appropriate education funds. The lawsuit also seeks to decide policy and the allocation of resources for healthcare providers in Georgia's community service boards ("CSBs"), as well as for local administrators and educators in Georgia's 219 school districts and 2,306 schools.[3]

## I.    State Agencies Identified in the Complaint

The Georgia Department of Education ("DOE") is the State Educational Agency ("SEA") for purposes of the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1401(32). It is governed by the State School Superintendent, an independent and elected constitutional officer, and the State Board of Education. O.C.G.A. §§ 20-2-34 (State School Superintendent), 20-2-1 (State Board). Among other duties, the DOE is charged with adopting the "criteria used to determine eligibility of students for state funded special education programs." O.C.G.A. § 20-2-152(a). The DOE is also authorized to provide grants to regional educational service agencies ("RESAs") and local school districts for the provision of special

_____

[3] See GaDOE, Quick Facts on Georgia Education, https://www.gadoe.org/External-Affairs-and-Policy/communications/Pages/Quick-Facts-on-Georgia-Education.aspx; DBHDD, Find a Community Service Board, https://dbhdd.georgia.gov/locations/community-service-board.

education services.[4] O.C.G.A. § 20-2-152(c)(1).

DBHDD focuses on "state programs for mental health, developmental disabilities, and addictive diseases." O.C.G.A. § 37-1-20(1). It does *not* have responsibility for "all individuals who receive public services for mental health." [Fitzgerald Dep. 49:16–21.] To provide access to some of Georgia's uninsured and Medicaid beneficiaries, DBHDD frequently contracts with government and private providers of behavioral health services, including CSBs. [Id. at 217:23–218:1] An example is the Apex Program, a DBHDD initiative through which it contracts with providers that have partnered with local schools to offer some in-school behavioral health services. [Id. at 62:23–63:5.]

DCH is the State Medicaid agency. See O.C.G.A. § 49-4-142. It acts as an "insurance and regulatory body" for various healthcare providers throughout the State. [Fitzgerald Dep. 64:20–65:1.]

## II.  Local Education Agencies and the GNETS Program

Public education in Georgia, including special education, is provided by local schools that are governed "exclusive[ly]" by local school boards. Cox, 289 Ga. at 265. These local schools, either directly or through RESAs, "*provide special education programs* for all eligible students with special needs who are residents of

---

[4] RESAs are "not state agencies." O.C.G.A. § 20-2-270(f); see also N. Georgia Reg'l Educ. Serv. Agency v. Weaver, 272 Ga. 289, 291 (2000).

their local school systems" or RESAs. O.C.G.A. § 20-2-152(b) (emphasis added). The IDEA refers to local boards as "local educational agencies" or "LEAs." 20 U.S.C. § 1401(19).

Only one state statute refers to GNETS (and not by name), O.C.G.A. § 20-2-270.1(c), and a GaDOE regulation defines it as a "service," administered by the LEAs, that is "available within the continuum of supports for LEAs to consider when determining the least restrictive environment" for purpose of an individual student's IDEA-required individualized education program ("IEP"). Ga. Comp. R. & Regs. 160-4-7-.15(2)(a) (the "GNETS Rule"); see also 20 U.S.C. § 1401(14), Id. § 1414(d)(1)(A) (defining IEP). As its name suggests, the IEP is based on the individual needs of a particular child. See 20 U.S.C. § 1414(d)(1)(A).

GNETS services are funded by a *voluntary* grant program comprised of State and federal (United States Department of Education ("USDOE")) funds appropriated by the General Assembly. In Fiscal Year 2024, State funds represented 82% of the total appropriation of $65,427,745. [Ex. S at 105–06]. LEAs who chose to apply for and receive GNETS grants are given broad discretion on where they can provide services, ranging from fully integrated to wholly separate settings. Ga. Comp. R. & Regs. 160-4-7-.15(4)(c); [Owen Dep. 155:13–20; Cleveland Dep. at 114:11–14].

Students can only access the GNETS Program if the team creating the IEP

(the "IEP Team") recommends it and concludes that it provides the least restrictive environment for a student to obtain a free and appropriate public education ("FAPE") under the IDEA.[5] Ga. Comp. R. & Regs. 160-4-7-.15(4)(a), (5)(b)(1); 20 U.S.C. § 1401(9) (defining FAPE).[6] LEAs are also charged with "monitor[ing]" the student's IEP to "determine students' progress and access to services in a lesser restrictive environment." Ga. Comp. R. & Regs 160-4-7-.15(5)(b)(8).

The State also has no role in staffing decisions for GNETS Programs—those are made solely by local education agencies. GNETS Directors are employed by, paid by, and report to LEAs/RESAs.[7] LEAs/RESAs make all GNETS Program staffing and hiring decisions.[8] The State has no role in these hiring and staffing decisions and is not consulted by the fiscal agents before hiring decisions are made.[9] Indeed, the State does not conduct performance evaluations of GNETS Directors or

---

[5] DOJ has not argued or shown evidence of any individual student receiving GNETS services without a recommendation from their IEP Team.

[6] No State officials sit on the IEP Teams. See 20 U.S.C. § 1414(d)(1)(B).

[7] [Cleveland Dep. at 147:5–14; Livingston Dep. at 11:16–20, 277:8–14; Braddock Dep. at 77: 16–20; Newsome Dep. at 52:15–53:23; Holifield Dep. at 332:16–19; Gilchrist Dep. at 19:10–18, 256:4–6; Cole Dep. at 24:5–13; Ngeve Dep. at 23:9–11].

[8] [Newsome Dep. at 107:2–111:2; Livingston Dep. at 277:8–12; 278:1–12; Futch Dep. at 349:8–14; Owen Dep. at 155:13–20; Gilchrist Dep. at 254:14–255:5].

[9] [Livingston Dep. at 278:10–12; Newsome Dep. at 111:24–112:4; Holifield Dep. at 332:12–15; 147:6–18; Ngeve Dep. at 128:3–131:18, 280:18–281:5; Cleveland Dep. at 146:14–23; Low Dep. at 195:16–17; Ackerman Dep. at 85:4–7].

their staff.[10] LEAs/RESAs also determine the use and layout of facilities and provide transportation to and from these facilities.[11]

Taken together, this authority and the record evidence demonstrate that local officials decide *whether* to seek GNETS grants, for *whom* GNETS services are appropriate, *when* it is appropriate for a student to return to the general education setting, *where* to provide GNETS services (e.g., an integrated or separate environment), and *by whom* those services are provided.

## LEGAL STANDARD

Summary judgment is warranted when there are no "genuine dispute[s] as to any material fact" and the defendant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "The party requesting summary judgment bears the initial burden of showing the Court, by reference to the record, the absence of genuine issues of material fact." Canon U.S.A., Inc. v. SED Int'l, Inc., 1:15-CV-01363-ELR, 2016 WL 11499503, at *2 (N.D. Ga. Apr. 14, 2016) (citation omitted). Once this occurs, the nonmoving party must provide "significant, probative evidence" establishing a question of material fact. Id. Conclusory statements or allegations "have no

---

[10] [Livingston Dep. at 277:19–25; Holifield Dep. at 333:4–12; Cleveland Dep. at 146:24–147:1].

[11] [Ackerman Dep. at 95:18–20, 139:12–24; Newsome Dep. at 84:17–22, 85:2–6, 236:20–237:3; Futch Dep. at 167:9–18; Livingston Dep. at 153:4–11; Ngeve Dep. at 139:2–5].

probative value" at summary judgment. <u>Dekalb Cty. v. HSBC N. Am. Holdings Inc.</u>, 1:12-CV-03640-ELR, 2015 WL 8699229, at *3 (N.D. Ga. Nov. 16, 2015).

## ARGUMENT

The State is entitled to summary judgment for several reasons, including: (1) DOJ's lack of constitutional standing; (2) the absence of evidence for each element under the ADA; and (3) the preclusive effect of the IDEA. Each is dispositive.

## I.    **DOJ lacks Article III standing.**

Constitutional or Article III standing requires a party to demonstrate that it (1) suffered a concrete, particularized, and actual or imminent injury in fact; (2) that is traceable to the defendant; and (iii) that could be redressed by judicial relief.[12] <u>TransUnion LLC v. Ramirez</u>, 141 S. Ct. 2190, 2203 (2021). This is a jurisdictional requirement that applies equally to DOJ. <u>See</u> <u>United States v. Texas</u>, 599 U.S. 670 (2023) (public entities must have Article III standing); <u>see also</u> <u>Massachusetts v. E.P.A.</u>, 549 U.S. 497, 538 (2007) (a public entity "asserting quasi-sovereign interests

---

[12] *Constitutional* standing is independent of the question of *statutory* standing at issue in <u>United States v. Florida (Florida I)</u>, 938 F.3d 1221, 1241–45 (11th Cir. 2019). However, the State still contends that DOJ also lacks statutory standing under the ADA because it is not a "person alleging discrimination" under Title II of the ADA. 42 U.S.C. § 12133. Georgia recognizes that the Eleventh Circuit held otherwise in <u>Florida I</u> and raises this lack of statutory standing again here to preserve the issue for appeal. 938 F.3d 1221 (11th Cir. 2019).

as parens patriae must still show that *its citizens* satisfy Article III.") (Roberts, C.J.,

dissenting) (emphasis added). Article III's standing elements "must be supported …

with the manner and degree of evidence required at the successive stages of the

litigation.'" Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1245 (11th Cir. 2020)

(citation omitted). As a jurisdictional issue, Article III standing must be considered

before the merits. Whitmore v. Arkansas, 495 U.S. 149, 154 (1990).

DOJ has failed to establish Article III standing sufficient to survive summary

judgment because it failed to produce evidence that any individual student has

suffered a concrete injury-in-fact and, alternatively, any injury is not traceable to or

capable of being redressed by the State.

**A. DOJ cannot prove an injury-in-fact for any individual student.**

To the extent DOJ has authority to sue under the ADA at all, it's standing

arises "on behalf of the aggrieved person, rather than as the person." United States

v. Sec'y Fla. Agency for Health Care Admin. (Florida II), 21 F.4th 730, 732–34, 737

(11th Cir. 2021) (denying rehearing *en banc*) (emphasis added).[13] Thus, DOJ must

demonstrate an injury to an *individual* in order to satisfy Article III. Id. at 733

---

[13] Indeed, the Eleventh Circuit repeatedly emphasized the representative nature of
DOJ's standing and used it as a basis to reject the dissent's argument that DOJ lacked
a necessary injury because it was not a "person alleging discrimination." Florida II,
21 F.4th at 733 ("Because the Attorney General brings this lawsuit on behalf of a
person alleging discrimination, the dissental's (and the dissent's) arguments about
why the Attorney General does not qualify as a 'person' under § 12133 miss the mark
entirely.").

(emphasis added).[14] And these injuries must be "real" and "concrete," not "abstract." Trichell v. Midland Credit Mgmt., Inc., 964 F.3d 990, 996 (11th Cir. 2020).

Here, it has not done so. DOJ has not cited to any individual student who suffered discrimination. See infra § II.B (discussing lack of individualized evidence); cf. United States v. Florida (Florida III), 12-CV-60460, 2023 WL 4546188, at *40 (S.D. Fla. July 14, 2023) (reviewing medical records of and reaching individualized conclusions about each of the 139 plaintiffs). Instead, DOJ relies on what, theoretically, could or might be the "most integrated setting" for hypothetical students with undefined support needs who may oppose receiving GNETS services. See Trichell, 964 at 996 (rejecting conjectural or hypothetical injuries). Similarly, the unidentifiable "at risk" population is equally abstract and comprised of students who may (or may not) be entitled to an IEP, and whose IEP team may (or may not) refer them for GNETS, in a school district where the LEA may (or may not) use the funds to support services in separated settings. Cf.

---

[14] In this way, the United States' position is similar to that of numerous other "representatives" in various contexts throughout the law, in which the representative's standing is dependent on the standing of the individual whom they are representing. See, e.g., Vermont Agency, 529 U.S. at 773 (2000) (qui tam plaintiff); Reneker v. Offill, No. CIV.A.3:08-CV-1394-D, 2009 WL 3365616, at *2 (N.D. Tex. Oct. 20, 2009) (receiver); Clearview Imaging, LLC v. Progressive Am. Ins. Co., No. 8:19-CV-1299-T-35CPT, 2020 WL 11563551, at *1 (M.D. Fla. Sept. 23, 2020) (assignee)' N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare, 781 F.3d 182, 191 (5th Cir. 2015) (healthcare providers).

Mississippi, 82 F.4th at 398 (criticizing at-risk theories). This is insufficient to establish Article III standing.[15]

**B. Any injuries are neither traceable to nor redressable by the State.**

Even if DOJ established an injury, the harm is neither traceable to nor redressable by a judgment against the State. An injury lacks Article III traceability if the "challenged action [is] the result of the independent action of some third party not before the court." Jacobson, 974 F.3d at 1253 (citation omitted). Redressability considers the named party's legal "authority to redress the alleged injury." Fair Fight Action, Inc. v. Raffensperger, 634 F. Supp. 3d 1128, 1186 (N.D. Ga. 2022) (Jones, J.) (citing Jacobson, 974 F.3d at 1269). It also considers whether the challenged conduct could continue based on the acts of an "absent third party." Lewis v. Governor of Ala., 944 F.3d 1287, 1301 (11th Cir. 2019).

Precedent holds that the legal ability of a party to compel non-parties is essential; mere allegations of "general supervision and administration" are insufficient to establish traceability or redressability. Jacobson, 974 F.3d at 1253–

---

[15] To the extent DOJ intends to rely upon its allegations about children "at risk" of entering GNETS, it lacks Article III standing because it has not produced any evidence identifying any children who are at a "certainly impending" risk of being referred for GNETS services, let alone established that mere referral for GNETS services constitutes a real, concrete injury. Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (a "threatened injury must be certainly impending to constitute injury in fact, ... [a]llegations of possible future injury are not sufficient.").

54.[16] <u>Jacobson</u> also explains that federal courts lack the authority to rewrite state laws or compel state parties to promulgate a regulation. 974 F.3d at 1255, 1257. <u>See also</u> <u>Badaracco v. Comm'r</u>, 464 U.S. 386, 398 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement."). Thus, any injunction issued in this case could only prevent State actors from enforcing an existing statute or regulation. <u>Id.</u> at 1255. It could not reach LEAs or RESAs, which are not State entities. <u>See</u> <u>Weaver</u>, 272 Ga. at 291.

Such limited relief is not what DOJ seeks, but it is all that Georgia statutory law and binding precedent will allow. Non-party LEAs are statutorily charged with "provid[ing] special education programs," and will not be impaired by an injunction against the State. O.C.G.A. § 21-2-152(b). And indeed, the record evidence confirms that LEAs make the decisions about where GNETS funds are spent and where GNETS-funded services are provided.[17] Consequently, the only relief available would not prevent IEP Teams (that do not include State actors) from recommending a student for GNETS services if it decided that GNETS services are the most appropriate given the student's unique needs. Nor would an injunction against the

---

[16] While this Court concluded that DOJ had "alleged" sufficient facts to overcome a <u>Jacobson</u>-based challenge on a motion for judgment on the pleadings, that is no longer the case at summary judgment. <u>See</u> ECF 94. Moreover, the Court did not previously consider the fact that Georgia law requires judicial involvement in any enforcement actions which vitiates traceability. <u>Jacobson</u>, 974 F.3d at 1253.

[17] [Cleveland Dep. at 114:11–14].

State impair the LEAs and RESAs from exercising other aspects of their exclusive statutory authority to: (1) decide whether to apply for GNETS grants; (2) allocate "supports and resources … to facilitate flexible models of service delivery and best practices for equitable educational support as appropriate[18]; (3) collaborate with community service providers that deliver mental health services[19]; (4) maintain school buildings, including those in that provide GNETS services[20]; (5) contract for the employment of individual educators[21]; (6) train educators, including on identifying the least restrictive environment appropriate to the needs of individual students[22]; (7) decide the setting to provide GNETS services;[23] (8) determine, on an individualized basis, whether GNETS services are necessary for each student who receives them[24]; or (10) provide transportation for students receiving GNETS services.[25] See also supra at 6–9.

Indeed, even if the State concluded that an LEA or RESA failed to comply

---

[18] Ga. Comp. R. & Regs. 160-4-7-.15(5)(b)(10).

[19] Ga. Comp. R. & Regs. 160-4-7-.15(5)(b)(11).

[20] O.C.G.A. § 20-2-520.

[21] O.C.G.A. § 20-2-943.

[22] O.C.G.A. § 20-2-271 (addressing RESAs); Ga. Comp. R. & Regs. 160-4-7-.07(6)(b) (addressing training on least restrictive environment).

[23] Ga. Comp. R. & Regs. 160-4-7-.15(4)(c).

[24] Ga. Comp. R. & Regs. 160-4-7-.15(4)(a).

[25] Ga. Comp. R. & Regs. 160-4-7-.15(5)(b).

– 15 –

with these (or other) obligations, it cannot withhold state funds without judicial involvement. O.C.G.A. § 20-2-243. As the Eleventh Circuit held in Jacobson, Article III's traceability and redressability are not satisfied when (as here) a state must obtain judicial relief to compel the conduct of local government actors. 974 F.3d at 1253.

Put simply, an injunction against the State will not redress DOJ's alleged harms, because the relief would not prevent LEAs and RESAs from deciding *whether* to apply for GNETS grants; *where* to provide GNETS services (*e.g.*, an integrated or separate facility); *who* has needs that makes GNETS services appropriate; *what* transportation to and from GNETS facilities includes; *how* GNETS facilities appear; and *how* GNETS instructors provide special education to students. Consequently, DOJ cannot satisfy the constitutional and jurisdictional requirements of traceability and redressability.[26]

## II.  **DOJ's claims fail on the merits.**

ADA plaintiffs must show that they: (1) are qualified individuals with ...

---

[26] DOJ attempts to answer this authority by relying on the General Assembly's decision to appropriate funds for voluntary GNETS grants. This falls short of satisfying Article III's traceability or redressability requirement for three reasons. *First*, funding alone is insufficient to establish ADA liability. See Bacon v. City of Richmond, Va., 475 F.3d 633, 638 (4th Cir. 2007). If the reverse were true, the same theory would render the USDOE liable for ADA violations it funds about 17% of the GNETS grants. [See Ex. S at 105–06]. *Second*, GNETS grants defer to the LEAs' and RESAs' decisions on *where* to provide GNETS services. *Third*, if the State were enjoined from funding GNETS grants, LEAs are constitutionally authorized to levy taxes for school revenue. Ga. Const. art. VIII, § 6, ¶ I.

disabilities; (2) excluded from, denied participation in or the benefits of a public entity's services, programs, or activities, or were otherwise discriminated against by the public entity; (3) by reason of their disability. L.E. v. Superintendent of Cobb Cty. Sch. Dist., 55 F.4th 1296, 1301–02 (11th Cir. 2022). DOJ alleges that the GNETS Program as the relevant service or program, and it contends that the program causes unjustified isolation and results in "unequal educational opportunities." [ECF 1 ¶¶ 68–69].[27] Each allegation fails.

### A. The State does not administer the GNETS Program in any way relevant to DOJ's claims.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities *of a public entity*, or be subjected to discrimination *by any such entity*." 42 U.S.C.A. § 12132 (emphasis added). DOJ's regulation attaches liability if the public entity "administers" or "provides" the relevant service. 28 C.F.R. §§ 35.130(b)(1)(iii) (addressing provision of services);

---

[27] To the extent the United States tries to characterize its second theory as a reasonable-accommodation claim, it fails for the independent reason that the United States has not provided evidence that any individual students have made "specific demand[s]" on the State for an accommodation. Rylee v. Chapman, 316 F. App'x 901, 906 (11th Cir. 2009) ("In cases alleging a failure to make reasonable accommodations, the defendant's duty to provide a reasonable accommodation is not triggered until the plaintiff makes a 'specific demand' for an accommodation.").

130.50(d) (addressing administration of services).[28] In other words, the public entity must be the one discriminating against a qualified person. See Wilson v. Smith, 567 F. App'x 676, 679 (11th Cir. 2014) (Title II claims requires evidence that the plaintiff was "discriminated against *by the public entity*") (emphasis added); Walker v. Sec'y of Corr., No. 221CV0364TLNACP, 2023 WL 2333555, at *2 (E.D. Cal. Mar. 2, 2023), r&r adopted, 2023 WL 3380445 (E.D. Cal. May 11, 2023) ("the proper defendant in an ADA action is the public entity that is responsible for the claimed discrimination."); Ramirez v. Tilton, No. C 07-04681 SBA PR, 2010 WL 889988, at *3 (N.D. Cal. Mar. 8, 2010) ("The proper defendants to Plaintiff's disability discrimination claims are the public entities that allegedly denied him equal access to their programs"). Indeed, "remedies may be imposed only on responsible parties." Bacon, 475 F.3d at 639.

When considering this question at the motion to dismiss stage, this Court identified various factors to answer the central question presented by the "administer" requirement: whether *this* public entity discriminated against *this* plaintiff. United States v. Georgia, 461 F. Supp. 3d 1315, 1320–23 (N.D. Ga. 2020).

---

[28] The United States has separately moved for partial summary judgment on this element, which the State opposes. Because the State is entitled to summary judgment on this element for the same reasons the United States' motion should be denied, the State incorporates its arguments in its forthcoming opposition and reasserts them here.

Having now had the benefit of discovery, the answer is "no." To the extent that GNETS placement represents discrimination at all, the students at issue in this case were not discriminated against *by the State* because the State does not make the decisions that are challenged here, namely, where GNETS-funded services are provided and where students receive them. See supra § I.B; see also supra 6–9.

**B. Individual students are not subject to discrimination by the State because of their disabilities.**

DOJ alleges two types of discrimination in this case: (1) unjustified isolation, pursuant to the Supreme Court's decision in Olmstead, and (2) disparate treatment through the provision of unequal educational opportunities. As discussed below, both theories of discrimination fail.[29]

**1. DOJ has failed to prove the three elements of an Olmstead unjustified-isolation claim.**

DOJ's unjustified isolation claim is based on a regulation that it implemented. 28 C.F.R. § 35.130(d). As applied in Olmstead, the regulatory mandate to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities" does not preclude all separation based on disability—the isolation must be "unjustified" to be

---

[29] To the extent DOJ seeks to rely on a "risk of institutionalization" theory of ADA violation, its claim not only fails for a lack of Article III standing, see supra n.15, but it also fails because the ADA does not recognize such "at risk" theories of violation. See Mississippi, 82 F.4th at 391–98.

actionable. 500 U.S. at 600. "Unjustified" isolation occurs when (1) *an individual* prefers an integrated setting; (2) *the individual's* "responsible, treating physician" determines that providing services in an integrated setting is "appropriate" for the individual; and (3) *the individual's* requested modification is reasonable and does not cause a fundamental alteration of the state's programs. See id. at 610 (Kennedy, J., concurring); Bircoll v. Miami-Dade Cty., 480 F.3d 1072, 1082 (11th Cir. 2007). DOJ fails to create an issue of material fact on each of these elements.

**Appropriateness.** DOJ has not shown any evidence that a "responsible, treating physician" has observed and decided that any individual—much less the unidentified "vast majority" of—student(s) currently served in GNETS Programs could be "appropriately" served in the general education classroom. Olmstead, 527 U.S. at 610 (Kennedy, J., concurring).

It is undisputed—as a legal and factual matter—that there "'may be times [when] a patient can be treated in the community, and others whe[n] an institutional placement is necessary.'" Olmstead, 527 U.S. at 604 (quoting L.C. by Zimring v. Olmstead, 138 F.3d 893, 903 (11th Cir. 1998), aff'd in part, vac. in part, remanded, 527 U.S. at 581); see also McCart Dep. 143:10–144:1 (acknowledging separate schooling can be appropriate); Putnam Dep. 18:8–21 (same). This is true "even if the full array of supports and services [are] being provided" to students. Id. 143:18-144:1. Thus, DOJ cannot rely on a *per se* theory (*e.g.*, every recommendation in

GNETS is discriminatory), nor is it entitled to any presumption that students receiving GNETS services are the victims of discrimination. Instead, the question of whether a student can "appropriately" be served in a general education classroom is necessarily individualized, and it is of "central importance, then, that courts apply [the Olmstead] decision with great deference to the medical decisions of the responsible, treating physicians." Olmstead, 527 U.S. at 610 (Kennedy, J., concurring); see also [Putnam Dep. 19:18–21 ("Q: Is the question of what are appropriate services for a student to receive an individualized inquiry? A: Yes, that's correct.")].

Summary judgment is warranted because DOJ has provided no testimony of a "responsible, treating physician" who has examined *any* (much less the "vast majority") of students receiving GNETS services. Olmstead, 527 U.S. at 610 (Kennedy, J., concurring). As binding Eleventh Circuit authority states, "[w]here there is no such finding … *nothing in the ADA requires the deinstitutionalization of that patient*[.]" See Zimring, 138 F.3d at 903 (emphasis added). [30] Under these

---

[30] The Supreme Court affirmed this portion of the Eleventh Circuit's Olmstead opinion. 527 U.S. at 596–603. If anything, the Supreme Court *added* to the Eleventh Circuit's opinion by requiring that "the *State's* treatment professionals determine that [community-based] treatment is appropriate," in addition to the individual's treating physician. Id. at 607; see also id. at 602 ("Absent such qualification [from the State's treatment professionals], it would be inappropriate to remove a patient from the more restrictive setting"). But whether or not the Supreme Court's opinion requires the *State's* treatment professionals to recommend a community placement, the Eleventh

circumstances, they cannot overcome the "great deference" afforded here to IEP Teams' recommendations that students receiving GNETS services are doing so appropriately. <u>Olmstead</u>, 527 U.S. at 610; <u>see also</u> <u>School Bd. of Nassau Cty. v. Arline</u>, 480 U.S. 273, 288 (1987) ("[C]ourts normally should defer to the reasonable medical judgments of public health officials.").

The strategy employed by DOJ here is the polar opposite of the one it utilized in <u>Florida III</u>). 2023 WL 4546188 at *40. There, expert witnesses "conducted an individualized review of the medical records of *all* 139 Institutionalized Children" at issue. <u>Id.</u> (emphasis added). In this case, Dr. McCart acknowledged that she did not review the "vast majority" of IEPs, and she does not opine that her review of about 3% of student files (chosen for her by DOJ) was statistically significant. [McCart Dep. 141:12–19]. For his part, Dr. Putnam admitted that his review of seven student files was not "statistically significant." [Putnam Dep. 258:25–259:4]. But as the Fifth Circuit recently held, "Olmstead cannot support a mandate for court-superintended institution-wide changes based on … survey[s] 'generalizing' from" a subset of an entire population because "'[a]ppropriate treatment of those with serious mental illness, as <u>Olmstead</u> clearly understood, must be individualized." <u>Mississippi</u>, 82 F.4th at 396.

_____

Circuit's holding—affirmed in <u>Olmstead</u>—that such a recommendation must come, at a minimum, from the *individual's* treating physician remains binding.

– 22 –

Under these circumstances, DOJ has not created an issue of material fact on whether any individual placement is inappropriate, and its claim for "systemic relief" based on allegations about the unknown "vast majority" of students cannot overcome summary judgment. This is not a close call. See id., 82 F.4th at 396, 396 n.13 (deciding that DOJ lacked a viable Olmstead claim where "not one individual's treating physician testified about the 'justifiability' of that person's" institutionalization).

**Non-opposition.** Notwithstanding its lack of evidence of the appropriateness of community placement, DOJ has provided no evidence indicating that an individual referred by that student's IEP Team for GNETS services seeks community placement.[31] 28 C.F.R. § 35.130(e)(1) (barring integration if opposed by the individual). The IDEA provides a possible explanation. Parents or guardians are entitled to participate in the IEP Team meetings, and the IDEA requires that parents

---

[31] In its MTD Order, the Court held the non-opposition element did not apply to an Olmstead claim unless the students were "institutionalized[.]" ECF 61 at 16–17. Respectfully, the State believes the Court was mistaken and requests that it revisit its prior holding. The "unjustified isolation" theory of a Title II violation stems directly from Olmstead, which is not restricted only to full-time institutionalization. Indeed, if it were, then the United States would have no Olmstead claim whatsoever. 527 U.S. at 602. Moreover, the implementing regulation on which an "unjustified isolation" theory relies itself requires evidence of non-opposition. 28 C.F.R. § 35.130(e)(1). And other courts have required evidence of non-opposition in a variety of cases seeking community-based services. See, e.g., Mississippi, 82 F.4th at 394, 397; U.S. v. Florida, 2023 WL 4546188 at *46–51.

be "members of any group that makes decisions on the educational placement of their child." 20 U.S.C. § 1414(d)(B)–(C), (e). And, if a parent or guardian is unsatisfied with the IEP Team's recommendation, the IDEA provides the parent or guardian with remedies. Id. § 1415. DOJ has not provided evidence that a single individual opposes their IEP Team's recommendation or has exhausted their administrative remedies under the IDEA. Given this, DOJ falls well short of showing that the "vast majority" of students receiving GNETS services do not oppose community-placement. See Mississippi, 82 F.4th at 394 (whether "the 'affected individual' agrees with the treating professional's recommendation for community care" is "necessarily patient-specific") (citing Olmstead, 527 U.S. at 587). At the very least, DOJ's claim of "systemic" discrimination fails. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993) (requiring evidence of every "essential element" to overcome summary judgment).

**Reasonable accommodation.** Finally, DOJ has not satisfied the third element of an Olmstead claim: that the accommodation sought is reasonable and does not constitute a fundamental alteration of the state's delivery system.[32] Bircoll, 480 F.3d at 1082. While "reasonableness" is typically a fact question, in this case, DOJ's approach in this case fails as a matter of law for several reasons.

---

[32] Reasonableness is an element of any ADA plaintiffs' case, and fundamental alteration is a defense. Willis v. Conopco, Inc., 108 F.3d 282, 286 (11th Cir. 1997).

*First*, the Eleventh Circuit has held that reasonableness is determined on an individualized, case-by-case basis. Bircoll, 480 F.3d at 1086. DOJ has not even tried to satisfy this requirement.

*Second*, whether a proposed accommodation is reasonable necessarily turns on questions of cost and workforce availability. 527 U.S. at 606 n.16.[33]. Beyond the legal requirement of providing some evidence on reasonableness, DOJ's own experts agreed that cost and workforce are essential in determining the reasonableness of any proposed modifications. [McCart Dep. 83:11–12; Putnam Dep. 136:22–137:4, 215:11–16]. Despite this concession (and DOJ's evidentiary burden), neither Dr. Putnam nor Dr. McCart performed any kind of cost or workforce study to measure the reasonableness of their recommendations. [McCart Dep. 43:6–8, 83:13–15, 162:12–17; Putnam Dep. 97:6–10, 110:10–111:8, 137:2–6, 215:11–16, 282:11–22].

Consequently, the only analysis of cost and workforce (for Dr. Putnam's proposed remedy) currently in the record is provided by the Declaration of Dante McKay of DBHDD. [Ex. I]. He states that, in addition to the workforce shortage, the cost of expanding Apex into every school exceeds $313 million. [Id. ¶¶ 7–8]. For context, in the Fiscal Year 2024 budget, the legislature appropriated $55.4 million in

---

[33] Indeed, there are significant, well-documented workforce shortages that persist. [Ex. I at ¶ 6; McGiboney Dep. 46:7–20, 187:1–7, 209:4–10, 225:21–226:1; Futch Dep. 115:24–116:25, 305:12–22, 348:14–18, Holifield Dep. at 293:3–7].

state funds to child and adolescent mental health services, thus requiring the State to appropriate an *additional $219.5 million*. [Id. ¶ 8; Ex. S at 46]. The only admissible evidence on reasonableness therefore demonstrates that DOJ's proposed modifications are not reasonable and would constitute a fundamental alteration of the State's programs, thus warranting summary judgment.

*Third*, to the extent that DOJ adopts its experts' opinions for purposes of liability, its theory improperly challenges the *quality* of services and the *range* of services offered to students with disability-related behaviors. But Olmstead expressly rejected the idea that the ADA "imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.'" 527 U.S. at 603 n.14.

Despite this, the Complaint is filled with allegations about quality of care, *e.g.*, "the State fails to provide *adequate* training" and "the State does not make available *adequate or effective* integrated mental health and therapeutic educational services and supports." [ECF 1 ¶¶ 40, 42 (emphasis added)] These types of claims are not actionable under the ADA.

Similarly, Justice Kennedy's controlling concurrence in Olmstead also explained that states cannot be liable under the ADA for providing an insufficient quantity of services:

– 26 –

> Grave constitutional concerns are raised when a federal
> court is given the authority to review the State's choices in
> basic matters such as establishing or declining to establish
> new programs. It is not reasonable to read the ADA to
> permit court intervention in these decisions. In addition,
> … by regulation a public entity is required only to make
> 'reasonable modifications in policies, practices, or
> procedures' when necessary to avoid discrimination and is
> not even required to make those if 'the modifications
> would fundamentally alter the nature of the service,
> program, or activity.' 28 CFR § 35.130(b)(7) (1998). It
> follows that a State may not be forced to create a
> community-treatment program where none exists.

527 U.S. at 612–13 (Kennedy, J., concurring). Ignoring Justice Kennedy's

admonition, the Complaint alleges that an "expansion … of existing resources" are

needed for an effective remedy. [Doc. 1 at 22, ¶ 61.] As the Fifth Circuit recently

recognized, the ADA does not authorize this commandeering of State resources:

"expanding existing programs" is nothing more than "simply a request for more …

funding," which is "something the ADA does not permit." Mississippi, 82 F.4th at

398 (quotations omitted).

### 2. DOJ fails to prove its unequal-education theory.

DOJ's unequal-education theory of discrimination likewise fails. *First*, DOJ's

disparate treatment claim requires an additional element not present in an Olmstead

claim: proof of discriminatory intent. Wilf v. Bd. of Regents of the Univ. Sys. of

Georgia, No. 109CV01877RLVGGB, 2012 WL 12888680, at *17 (N.D. Ga. Oct. 15,

2012), aff'd, 544 F. App'x 906 (11th Cir. 2013) ("[d]isparate treatment involves

discriminatory intent and occurs when a disabled person is singled out for disadvantage because of his disability."). "Proof of discriminatory motive is critical" in disparate treatment claims. Knox Cty., Tennessee v. M.Q., 62 F.4th 978, 1000 (6th Cir. 2023) (quoting Brooklyn Ctr. for Psychotherapy, Inc. v. Phila. Indem. Ins. Co., 955 F.3d 305, 311 (2d Cir. 2020)). And importantly, this requires "evidence of something more than a [public entity's] failure to provide a FAPE." Id.

Here, DOJ has failed to provide any evidence that the State discriminated against GNETS students at all, let alone that it did so intentionally. There is no evidence that a student is receiving GNETS services without being recommended by their IEP Team. There is no evidence that any State actor overrode an IEP Team's recommendation that a student remain in their zoned school. There is no evidence of animus. And to the extent that DOJ's theory relies upon how LEAs and RESAs staff or maintain GNETS program facilities, offer instruction, provide transportation, or offer extra-curricular activities, those decisions are made by local officials, and DOJ has failed to provide evidence demonstrating that State has compelled the challenged conduct or has the authority to do so. See supra § I.B; see also supra 6–9.

*Second*, as discussed above, the ADA does not mandate a specific "standard" or "quantity" of care. Thus, to the extent DOJ's unequal-education claim is premised on a theory that the State doesn't provide (in DOJ's mind) "ideal" services to achieve the "best" outcomes, its claim fails.

*Finally*, DOJ's unequal-education claim is barred by the IDEA. The IDEA requires states that accept federal education funds to provide a "free and appropriate public education" ("FAPE") to students with disabilities. 20 U.S.C. § 1412(a)(1)(A). Among other things, a FAPE must "meet the standards of the State educational agency; and include an appropriate preschool, elementary school, or secondary school education in the State involved." 20 U.S.C. §§ 1401(9)(B) and (9)(C). The IDEA is enforced by the USDOE and not the DOJ. 20 U.S.C. § 1416. Consequently, if this lawsuit arises under the IDEA, DOJ lacks the authority to bring it before this Court.

The Supreme Court described the IDEA as guaranteeing "individually tailored educational services," which is the gravamen of DOJ's complaint (their decision to forego demonstrating any individual's need notwithstanding). Fry v. Napoleon Cmty. Sch., 580 U.S. 154, 171 (2017). To determine whether or not an alleged ADA claim actually arises under IDEA, the Supreme Court provided two hypothetical questions: (1) could the plaintiff have brought the same claim "if the alleged conduct had occurred at a public facility that was *not* a school;" and (2) could an adult at the school bring the lawsuit (e.g., "an employee or visitor"). Id. If the "answer is no, then the complaint probably does concern a FAPE, even though it does not explicitly say so." Id. Here, the answer is unquestionably "no." There is no doubt that the lawsuit is about education, which is unique to schools. [ECF 1 at 17 ¶ 47 (emphasis

added).] It would also not apply to school employees or visitors. This should end the inquiry. Any remaining doubt is resolved by the language of the Complaint itself, which uses the *same language* as the IDEA's definition of FAPE:

- **IDEA:** "The term 'free appropriate public education' means special education and related services that -- … *meet the standards* of the State educational agency;"

- **Complaint:** "Students in GNETS generally do not receive grade-level instruction that *meets Georgia's State Standards*."

Compare 20 U.S.C. § 1401(9)(B) (emphasis added) [Doc. 1 at 17 ¶ 47 (emphasis added).] This is dispositive.

Indeed, the USDOE has described an IDEA claim in nearly identical terms to how DOJ describes its claims in this case. [See, e.g., Ex. V at 9–10 ("It is incumbent upon IEP Teams to implement IDEA's procedural and substantive requirements to ensure that children with disabilities receive the behavioral supports they need … A failure to … provide needed behavioral supports to a child with a disability could … constitute a denial of FAPE and/or a denial of placement in the LRE (i.e., an unduly restrictive placement).")]. As the USDOE explains,

> [c]ircumstances that may indicate that the child's place-ment in the LRE may not be appropriate [and thus an *IDEA* issue] include, but are not limited to, a scenario in which a continuum of placements that provides behavioral sup-ports is not made available … and, as a result, the IEP in-appropriately calls for the child to be placed in special classes, separate schooling, or another restrictive place-ment outside the regular educational environment[.]

– 30 –

[Id. at 10].

This Court previously denied the State's motion to dismiss on these grounds, citing DOJ's allegations of "systemic discriminatory practice which result in unlawful stigmatization, deprivation of advantages that come from integrated learning environments, denial of access to public institutions, and unjustified segregation." [ECF 61 at 19.] Given the benefit of discovery, it is now apparent that DOJ's second claim is about establishing standards of education provided to students in the GNETS Program. Dr. McCart's report dedicates significant text to this idea. E.g., [Ex. E at 160–67]. Thus, while the IDEA should preclude the lawsuit in its entirety, at the very least, DOJ should be barred from bringing an IDEA claim disguised in the ADA's clothing.

## CONCLUSION

For the reasons stated above, the State of Georgia respectfully requests that the Court grant its motion for summary judgment in its favor.

Respectfully submitted, this 7th day of November, 2022.

| | | /s/ Josh Belinfante | |
|---|---|---|---|
| Christopher M. Carr | 112505 | Josh Belinfante | 047399 |
| *Attorney General* | | Melanie Johnson | 466759 |
| Bryan Webb | 743580 | Edward A. Bedard | 926148 |
| *Deputy Attorney General* | | Danielle Hernandez | 736830 |
| Russell D. Willard | 760280 | Javier Pico Prats | 664717 |
| *Sr. Assistant Attorney General* | | Anna Edmondson | 289667 |
| Susan R. Haynes | 901269 | ROBBINS ALLOY BELINFANTE | |
| *Assistant Attorney General* | | LITTLEFIELD, LLC | |
| Office of the Attorney General | | 500 14th St. NW | |

40 Capitol Square, SW
Atlanta, Georgia 30334

Atlanta, GA 30318
T: (678) 701-9381
F: (404) 856-3255
E: jbelinfante@robbinsfirm.com
   mjohnson@robbinsfirm.com
   ebedard@robbinsfirm.com
   dhernandez@robbinsfirm.com
   jpicoprats@robbinsfirm.com
   aedmondson@robbinsfirm.com

/s/ Alexa R. Ross
Alexa R. Ross          614986
AlexaRossLaw, LLC
2657 Danfroth Lane
Decatur, Georgia 30033
E: alexarross@icloud.com

*Special Assistant Attorneys General*

*Attorneys for Defendant*
*State of Georgia*

## LOCAL RULE 7.1(D) CERTIFICATION

I certify that this State of Georgia's Brief in Support of Its Motion for Summary Judgment has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1. Specifically, this document has been prepared using 14-pt Times New Roman font and type.

*/s/ Josh Belinfante*
Josh Belinfante