IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | CIVIL ACTION |
| v. | NO. 1:16-CV-03088-ELR |
| STATE OF GEORGIA, | |
| *Defendant*. | |

## DEFENDANT STATE OF GEORGIA'S STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.      Defendant State of Georgia**

**A. Georgia Department of Education**

1.      The Georgia Department of Education (GaDOE) is the state agency charged with the fiscal and administrative management of certain aspects of K-12 public education in the State of Georgia, including the implementation of federal and state mandates. *See* Ga Comp. R. & Regs. 160-4-7-.15, which is attached hereto as Exhibit A.

2.      It is the State Educational Agency for purposes of the IDEA. *See* 20 U.S.C. § 1401(32).

3.      Code Sections 20-2-34 and 20-2-1 provide that GaDOE is administered by the State School Superintendent and the State Board of Education. O.C.G.A. §§ 20-2-34 (State School Superintendent), 20-2-1 (State Board of Education).

4.      To date, there are over 2,200 schools in 181 school districts in this State. *See* AskDOE, *Schools and Districts* available at https://www.gadoe.org/External-Affairs-and-Policy/AskDOE/Pages/Schools-and-Districts.aspx#:~:text=There%20are%20currently%20181%20school,in%20the%20state%20of%20Georgia and attached hereto as Exhibit B.

5.      Code Section 20-2-152 provides that GaDOE is charged with, among other duties, adopting the "criteria used to determine eligibility of students for state funded special education programs." O.C.G.A. §20-2-152(a).

6.      Code Section 20-2-152 further provides that GaDOE is also authorized to provide grants to regional educational service agencies ("RESAs") and local school districts for the provision of special education services. *See* O.C.G.A. § 20-2-152(c)(1).

7.      Code Section 20-2-270 provides that RESAs are "not state agencies." O.C.G.A. § 20-2-270(f).

8.     Pursuant to statutory authority, GaDOE promulgated Rule 160-4-7-.15 (the "GNETS Rule") creating the Georgia Network for Educational and Therapeutic Support (GNETS) Program. *See* Ex. A.

**B. Georgia Department of Behavioral Health and Developmental Disabilities**

9.     The Georgia Department of Behavioral Health and Developmental Disabilities (DBHDD) focuses on "state programs for mental health, developmental disabilities, and addictive diseases." O.C.G.A. § 37-1-20(1); Deposition of Frank Berry at 89:12-19.[1]

10.     It does <u>not</u> have responsibility for "all individuals who receive public services for mental health." Deposition of Judy Fitzgerald at 49:16-21.

11.     DBHDD does not deliver direct services or care, but instead it contracts with its network of providers and community service boards ("CSBs") to fund the delivery of services and care. Deposition of Frank Berry at 147:14-148:8; 167:16-18; 90:19-91:5; Deposition of Judy Fitzgerald at 217:17-20.

12.     DBHDD frequently contracts with government and private providers of behavioral health services, including CSBs, to provide some behavioral health

---

[1] All deposition transcripts cited herein have been filed in full on the record. If cited herein, exhibits to deposition transcripts are included with their respective deposition transcript filings on the record. All other document exhibits are attached hereto.

services to some of Georgia's uninsured Medicaid beneficiaries. Deposition of Judy Fitzgerald at 217:23-218:1.

13.    DBHDD contracts for the delivery of services and care for individuals with serious and persistent mental illness and for youth with serious emotional disturbances. Deposition of Judy Fitzgerald at 52: 21-25.

14.    Not all children in the State of Georgia are the financial responsibility of DBHDD. Deposition of Judy Fitzgerald at 154:8-9.

15.    DBHDD is only responsible for uninsured children that do not have any other coverage, and they have a limited amount of funding to support those children. Deposition of Frank Berry at 91:6-20; Judy Fitzgerald at 53:24-54:3; 231: 9-11.

16.    DBHDD plays a limited role in ensuring that mental health services are readily available to children across the State of Georgia in their own communities because their funding supports only uninsured children. Deposition of Frank Berry at 184:13-20.

17.    DBHDD does not have any role in providing behavioral health services to GNETS Programs. Deposition of Frank Berry at 185:14-18; Judy Fitzgerald at 66:19-67:7; 119: 9-11.

18.    According to Dr. Stephanie Pearson, the Clinical Director of the Office of Children, Young Adults and Families ("OCYF") for DBHDD, there is no

direct relationship between DBHDD and GNETS. Deposition of Stephanie Pearson at 52:10-20; 53:9-18; Deposition of Wendy Tiegreen at 31:2-23.

19.    Neither Dr. Pearson nor Dante McKay, OCYF's Director, have any ongoing responsibilities with respect to GNETS and do not work with GNETS Program directors. Deposition of Stephanie Pearson at 73:11-18; Deposition of Dante McKay at 49:8-14.

20.    To Dr. Pearson's knowledge, no employee within OCYF provides training or technical assistance to GNETS staff. Deposition of Stephanie Pearson at 78:14-16.

21.    Further, as Clinical Director of OCYF, Dr. Pearson does not receive data or documents relating to enrollment in GNETS, or to the length of placement in GNETS. Deposition of Stephanie Pearson at 83:17-23.

22.    Dr. Pearson does not receive data or documents relating to the availability, utilization, or the quality of behavioral health services to students enrolled in GNETS. Deposition of Stephanie Pearson at 83:24-84:10.

23.    Dr. Pearson does not receive data or documents relating to staffing at GNETS or to coordination between GNETS Programs and community service providers in Georgia. Deposition of Stephanie Pearson at 84:11-17.

### C. Georgia Department of Community Health

24.     Code Section 49-4-142 provides that the Geogia Department of Community Health (DCH) is the State's designee for purposes of Medicaid. *See* O.C.G.A. § 49-4-142.

25.     It acts as an "insurance and regulatory body" for various health care providers throughout the State. Judy Fitzgerald at 64:20-65:1.

26.     DCH is charged with support of other agencies as an insurance company. Deposition of Frank Berry at 173:15-20.

27.     DCH is not a service provider; and Medicaid is an insurance plan, rather than a service delivery plan. Deposition of Frank Berry at 173:15-20.

28.     DCH's involvement with GNETS is minimal to none as staff at DCH do not have duties or responsibilities with respect to the GNETS program. Deposition of Brian Dowd at 166:4-11; 168:13-20.

## II.     The Department of Justice and its Proffered Experts

29.     The Department of Justice (the "Department's") allegations are "the first challenge" of the ADA to the provision of individualized services and supports in the education setting. *See*, Press Release, U.S. Dep't of Justice, Justice Department Sues Georgia for Unnecessarily Segregating Students with Disabilities (August 23, 2016), <u>available at</u> https://www.justice.gov/opa/pr/justice-department-sues-georgia-unnecessarily-segregating-students-disabilities and attached hereto as

Exhibit C ("The Lawsuit is the First Challenge to a State-Run School System for Segregating Students with Disabilities").

### A. Dr. Amy McCart

30.    Dr. Amy McCart is a self-described "radical." Deposition of Amy McCart at 316:10-14, Ex. 15.

31.    The Department reached out to Dr. McCart to potentially testify months before it filed suit against the State of Georgia. Deposition of Amy McCart at 18:8-14.

32.    Dr. McCart has never testified as an expert in court. Deposition of Amy McCart at 47:9-11.

33.    Dr. McCart has never served as a court monitor. Deposition of Amy McCart at 48:6-7.

34.    Dr. McCart offers three conclusions in her expert report: (1) ████
████████████████████████████████ (2) ███████████
████████████████████████████ ████████ and (3) ████████████████████
████████████████████████████ Expert Report of Amy McCart at 1, attached hereto as Exhibit E.

35.    Dr. McCart's opinions are based only on the policies of the Georgia Department of Education; she did not consider any policies, acts, or programs of the Departments of Community Health or Behavioral Health and Developmental Disabilities. Deposition of Amy McCart at 165:19-22; 166:7-15.

36.    Despite the report's expressed concerns with the GNETS Program, Dr. McCart has never spoken to anyone at the United States Department of Education (USDOE) about the State of Georgia. Deposition of Amy McCart at 32:4-11.

37.    USDOE enforces the IDEA. 20 U.S.C. § 1416.

38.    Federal funds from USDOE make up a portion of the GNETS budget. *See generally*, General Appropriations Act FY2024, attached hereto as Exhibit S.

39.    Dr. McCart offers two recommendations in her report: ███████████ ███████████████████████████████████████████ ██████████████████████████ (2) ████████████████ ████████████████████████████████████████████ Ex. E at 162.

40.    Dr. McCart further offers specific action needed to carry out her proposed recommendations. Ex. E at 162. First, ███████████████ ███████████████████████████████████████████ ██████████████████████████████████████ ███████████████████ Ex. E at 163.

41.    Second, ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████ Ex. E at 164.

42.    Third, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Ex. E at 164.

43.    Fourth, ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ Ex. E at

165.

44.    Fifth, █████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ Ex. E at 165.

45.    Dr. McCart claims █████████████  ███████████████

████████████████████████████████████████████████

███████████████████████████ Ex. E at 12.

46.    According to Dr. McCart, this methodology included 70 site visits to

27 center-based GNETS Program sites and 36 school-based GNETS Program sites.

Ex. E at 12.

47.    At the site visits Dr. McCart claims to have ███████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████ Ex. E at 12.

48.    Dr. McCart did not review the files of any individual Georgia teachers to determine their qualifications and training as part of her methodology. Deposition of Amy McCart at 28:11-14.

49.    Dr. McCart's recommendations are based on her observations of GNETS program classrooms which varied from "10 minutes to 90 minutes." Deposition of Amy McCart at 117:9-14.

50.    Dr. McCart would not be confident in the recommendation of an IEP team that spent just ten minutes with a student. Deposition of Amy McCart at 149:11-16.

51.    Dr. McCart used a series of self-authored questions as shown in the tables on pages 8-11 of her report ████████████████████████████ ██████ Ex. E at 12; 8-11.

52.    Dr. McCart herself "developed" the tables identified on pages 8-11 of her report, and while the report cites no authority for the construct, she testified that it was based on what she described (but did not identify) as "well-documented

indicators of segregated or institutional environments within the field of special education." Ex. E at 8-11; Deposition of Amy McCart at 248:7-10.

53.    Dr. McCart also claims to have reviewed thousands of records including IEPs, incident reports, handbooks, programmatic reporting, and other documents related to program operations. Ex. E at 12.

54.    She attended or reviewed depositions of various fact witnesses and lastly, ██████████████████████████████████████████████████ ██████████ Ex. E at 12.

55.    While Dr. McCart repeatedly opined that what constitutes "appropriate services" for students with emotional or behavioral disabilities is an individualized analysis, and while she claims that the "vast majority" of students in GNETS could be educated in their zoned school in a general setting classroom, she concedes that she did not review IEPs of the "vast majority" of GNETS students. Deposition of Amy McCart at 141:12-19.

56.    At her deposition, Dr. McCart testified she reviewed "[s]omewhere between 65 and 100 student IEP records" that were provided to her by the Department of Justice. Deposition of Amy McCart at 34:22-35:15.

57.    The IEPs reviewed by Dr. McCart "employed a variety of interventions and supports, some of which may be more closely aligned with the

medical model, some of which may be more aligned with a human capability construct." Deposition of Amy McCart at 291:15-19.

58.    Documents not listed on Appendix E to her report, as amended, were not considered when making the report. Deposition of Amy McCart at 35:21-36:2.

59.    While Dr. McCart claims that her opinion is about the "nearly 3,000 students that are served in the [GNETS] program," she acknowledges that she observed about a "thousand" or so students along with the 65-100 IEPs she reviewed. Deposition of Amy McCart at 40:3-9; 34:22-35:15.

60.    Dr. McCart, who does not hold a degree in statistical analysis, opined that a study considering 15 students with autism in northern California could be statistically significant, but she did not say that it necessarily was. Deposition of Amy McCart at 135:20-136:2, Ex. 6; Ex. E at 4.

61.    She has never provided any consulting services to the State of Georgia, including GaDOE, nor has she previously advised any Georgia school district or school. Deposition of Amy McCart at 28:19-29:9.

62.    Dr. McCart testified that she provided consulting services to state departments of education in Mississippi, New Hampshire, Vermont, Oregon, Maryland, North Carolina, California, Wyoming, Delaware, Wisconsin, New York, Oklahoma, Idaho, Washington, Washington, DC, and Louisiana, and she claims to

have advised others but could not identify them. Deposition of Amy McCart at 49:12-21.

63.    Dr. McCart could not identify whether states she consulted with have implemented her recommendations, or with the degree of efficacy, but she claimed that her "recommended actions … are commonplace" at unidentified state departments of education. Deposition of Amy McCart at 50:6-12.

64.    Dr. McCart testified that it was "impossible … to answer" a question asking her to opine whether, in the states where she has consulted the state education agency, "unnecessary segregation of students with emotional/behavioral disabilities" occurred. Deposition of Amy McCart at 261:5-15.

65.    Dr. McCart could not articulate the expectations of how her recommendations would flow through or be implemented by local school districts; instead, she often spoke broadly of a "vision, guidance, and support along a full continuum of services" being offered by the Georgia Department of Education. Deposition of Amy McCart at 87:11-15; 161:17-22.

66.    Dr. McCart opined that her recommendations are to explain "how the state might go about implementing a system of support that is not segregated, and provides fair and equal access to educational opportunities." Deposition of Amy McCart at 182:7-10.

67.     Dr. McCart recommends that the State Department of Education adopt her "vision." Deposition of Amy McCart at 312:11-20.

68.     Her "vision" is for the "elimination" of what she contends is Georgia's "statewide systemic segregation of students with behavior related disabilities for the GNETS program, and the provision of fair and equal access to educational opportunities for students with behavior-related disabilities." Deposition of Amy McCart at 312:14-20.

69.     Her "vision" that she seeks to impose on the State Department of Education includes the adoption of her recommendations. Deposition of Amy McCart at 312:21-313:10.

70.     In an article published by Dr. McCart and others at the SWIFT Center in 2020, Dr. McCart, citing a 2017 U.S. Department of Education study, wrote that "despite a long history of federal lawsuits, Supreme Court decisions, and U.S. Department of Education policy imperatives and a preponderance of research evidence challenging the utility of segregated places, widespread categorical segregation of students identified for special education continues to this day." Deposition of Amy McCart at 279:17-280:12, Ex. 10.

71.     In the same article, Dr. McCart and her co-authors write and cite 2014 and 2017 articles for the conclusion that "some progress is evident in providing greater access to general education curriculum for students considered to have high

14

incidence or 'mild and/or moderate' disabilities, … However, for students considered to have low incidence, or 'severe' disabilities, few opportunities exist to learn from the general education curriculum alongside non-disabled peers." Deposition of Amy McCart at 281:5-13, Ex. 10.

72.    Dr. McCart opined that the "inclusion movement, in general, has been difficult for students having disabilities, including those with severe disabilities." Deposition of Amy McCart at 287:20-288:1.

73.    This conclusion is supported by the updated version of the 2017 study, the United States Department of Education's "44th Annual Report to Congress on the Implementation of the Individuals with Disabilities Education Act, 2022." *See generally*, 44th Annual Report to Congress on the Implementation of the Individuals with Disabilities Education Act, 2022 available at https://sites.ed.gov/idea/files/44th-arc-for-idea.pdf.

74.    Exhibit 64 of the 44th Annual Report shows that every state reporting data provides a separate school setting for students, and that the percentage of Georgia students with emotional disturbances that are served in separate schools is in the middle of the pack. Id. at 150-51, attached hereto as Exhibit F.

75.    And, several of the States where Dr. McCart provided consulting services have a significantly higher percentage of students with emotional disturbances being educated in separate schools. *See* Ex. F.

76.    Dr. McCart testified could not identify specific indicators that demonstrate the efficacy of a "system of support" to meet individual student needs; instead, she identified various undefined factors like "access to [the same] educational opportunities as students without disabilities … the opportunity to experience the traditional schooling experience … outcomes for students that are academically, socially, behaviorally sound.  Happy, happy kids." Deposition of Amy McCart at 102:2-15.

77.    Dr. McCart offered her belief that the recommended actions articulated in her report would "help to make the situation better for the students that [she] observed" in GNETS classrooms. Deposition of Amy McCart at 204:16-21.

78.    Dr. McCart acknowledged, however, that it could take more than three years to implement her recommendations. Deposition of Amy McCart at 205:1-7.

79.    Along with some colleagues from the SWIFT Center, Dr. McCart has written that "[i]nclusive educational practices" lead to overall better student outcomes, that "traditional schools with separate classrooms and even schools designated to exclusively serve various learner subgroups (e.g., students identified for special education) will require reorganized systems, structures, and resources." Deposition of Amy McCart at 276:12-277:3, Ex. 10 (emphasis added.)

80.     Dr. McCart's report states that Georgia must ███████████████

████████████████████████████████████████████████████████████

██████████ Ex. E at 165; Deposition of Amy McCart at 214:12-215:9.

81.     Dr. McCart does know the full universe of student data that the State

Department of Education already collects, nor could she testify that Georgia's

efforts to collect the data she recommends is sufficient. Deposition of Amy McCart

at 209:12-19; 210; 10-14.

82.     Dr. McCart acknowledges that, at least in a "general sense," cost is a

factor in determining whether recommendations to address students with disability-

related behaviors are reasonable. Deposition of Amy McCart at 83:7-10.

83.     Dr. McCart's report does not contain a cost analysis, and she did not

perform one. *See generally*, Ex. E; Deposition of Amy McCart at 43:6-8; 162:12-

17.

84.     Dr. McCart agrees that workforce availability is "always" a factor in

determining what is reasonable. Deposition of Amy McCart at 83:11-12.

85.     Dr. McCart did not perform a workforce study for the State of

Georgia. Deposition of Amy McCart at 83:13-15.

86.     Dr. McCart's report does not opine that the "State of Georgia

Department of Education provides an insufficient number of support services, an

insufficient *quantity* of support services to students who are receiving – to students

with emotional or behavioral disabilities." Deposition of Amy McCart at 172:1-9
(emphasis added).[2]

87.    Dr. McCart articulated her opinion that the "State Department of
Education [is] providing insufficient *quality*, in terms of support services that are
provided to students with emotional or behavioral disabilities … as it relates to the
GNETS program." Deposition of Amy McCart at 172:19-2 (emphasis added).

88.    Dr. McCart also opined that the State Department of Education "failed
to provide effective social, emotional, and behavioral supports, professional
learning, technical assistance, guidance, and vision for students in the GNETS
program." Deposition of Amy McCart at 175:6-10.

89.    She further states GaDOE "failed to provide a coherent system of
social, emotional, and behavioral, mental health supports for students who are
currently receiving services, and who have received services over the last many
years regarding effective common educational practices and services." Deposition
of Amy McCart at 176:2-8; 177:17-21.

90.    Despite repeatedly—in her report and deposition testimony—opining
that there is a role for segregated settings in education, Dr. McCart revealed her

---

[2] Dr. McCart has conflicting testimony on whether she opines on the *quantity* of
services provided, as she also blames DOE for the lack of available services for
IEP Teams to consider and recommend to students who are referred to the GNETS
Program. Deposition of Amy McCart at 62:6-14.

wholly contrary opinion: "It is my opinion that students have – that have behavioral needs based on their disability, that might include the need for mental health supports, should be included in their schooling experience in order for them to be successful." Deposition of Amy McCart at 254:22-255:5.

91.    Dr. McCart's opinion is that "mental health supports should be included in [students with emotional or behavioral disabilities'] schooling experience." Deposition of Amy McCart at 255:7-10.

### B. Dr. Robert Putnam

92.    The Department's other proffered expert, Dr. Robert Putnam, opined that "Georgia can make reasonable modifications to its service system to enable such students to remain in their home schools and prevent their unnecessary placement in GNETS facilities." Expert Report of Robert Putnam at 54, attached hereto as Exhibit G.

93.    Dr. Putnam offered four ways for "Georgia" to achieve his recommendation: "(1) expanding its existing programs to ensure timely access to individualized planning, services, and supports as appropriate, including intensive behavioral health services for students at serious risk of restrictive educational placement; (2) ensuring that those services are provided consistent with established standards relating to service intensity, early identification and intervention, and PBIS; (3) ensuring that school administrators and teachers receive ongoing,

effective training and mentoring on inclusionary practices and services for students with behavior-related disabilities; and (4) improving coordination through its existing System of Care, including data collection and information exchange between and by the relevant child-serving State agencies and other relevant stakeholders." Ex. G at 54.

94.    When considering whether a service is effective, Dr. Putnam acknowledged that cost is "obviously" a factor. Deposition of Robert Putnam at 71:20-25.

95.    Despite this, his analysis is completely void of any cost report or other fiscal analysis of his policy recommendations. Deposition of Robert Putnam at 97:6-10; 88:8-12; 97:6-10; 215:11-16; 282:11-22.

96.    Similarly, though he acknowledged the importance of a sufficient number of professionals to provide the services he recommends, Dr. Putnam did not consider Georgia's workforce shortage of mental health professionals when making the recommendations in his report. Deposition of Robert Putnam at 97:6-10; 215:11-16; 282:11-22; 137:2-6.

97.    Nor did Dr. Putnam conduct his own workforce analysis to determine whether Georgia had sufficient workforce for expanding services. Deposition of Robert Putnam at 110:10-111:8.

98.    Dr. Putnam based his cost-savings recommendations for Georgia on his experience in one school district in Massachusetts. Deposition of Robert Putnam at 38:9-43:25; 82:11-25.

## III.    The Delivery of Educational Services in the State of Georgia

### A. Georgia is a Local Control State

99.    The Georgia Constitution delegates the "management and control" of each school system to a locally-elected board of education. Ga. Const. art. VIII, § 5, ¶ II.

100.    The IDEA refers to these local boards as "local educational agencies" or "LEAs." 20 USC § 1401(19); *see also*, Ga Comp. R. & Regs. 160-4-7-.15(1) (defining LEA for purposes of the GNETS Rule).

101.    Code Section 20-2-152 provides that LEAs, either directly or through RESAs, "provide special education programs for all eligible students with special needs who are residents of their local school systems" or RESAs. O.C.G.A. § 20-2-152(b).

102.    Code Section 20-2-152 provides statutory authority for state funded, but locally operated, special-education programs like GNETS.

103.    Code Section 20-2-152 further provides that the State shall set "eligibility criteria" for such programs, but that "local school systems shall … provide special education programs for all eligible students with special needs,"

21

including by "establishing and maintaining such educational facilities and employing such professional workers as are needed by these students[.]" O.C.G.A. § 20-2-152(b).

104.    The Supreme Court of Georgia has said, "the fundamental principle of exclusive local control of general primary and secondary ("K–12") public education" applies. Gwinnett Cty. Sch. Dist. v. Cox, 289 Ga. 265, 266 (2011).

105.    GaDOE recognizes this principal of local authority. *See, e.g.*, Deposition of Wina Low at 150:7–17 (GaDOE reinforces expectations and provides supports to local agencies regarding their GNETS reintegration rates); Id. at 167:13–168:2 (GaDOE provides guidance in areas like transition, academic achievement, and assistive technology but does not have the authority to issue mandates); Id. at 85:17–18; Deposition of Garry McGiboney at 48:18–49:7 (GaDOE cannot require public schools to offer mental health services but it can encourage and facilitate same).

106.    GaDOE encourages schools to offer mental health services as a method of increasing access to such services but it cannot require schools to do so. Deposition of Garry McGiboney at 48:18–49:7.

107.    It also encourages schools to work with CSBs to enhance access to mental health in schools. Deposition of Garry McGiboney at 39:19–23; 41:2–18.

### B.  The IEP Process

108.   Federal law provides that a child's individualized education program ("IEP") is based on the individual needs of the particular child. *See* 20 U.S.C. § 1414(d)(1)(A).

109.   State and federal statutes provide that a child's IEP team is responsible for determining the setting from the continuum of services required by IDEA in which the child is to receive education and related services. Ga Comp. R. & Regs. 160-4-7-.15(4);  Ga. Comp. R. & Regs. 160-4-7-.07; 34 C.F.R. § 300.115; Deposition of Garry McGiboney at 75:5-10.

110.   This decision is based on the goals and individual needs of the child and the least restrictive environment ("LRE") in which they can reach those goals. Ga. Comp. R. & Regs. 160-4-7-.07; Deposition of Garry McGiboney at 75:11-14; Deposition of Wina Low at 165:10–166:7.

111.   The child's IEP team determines whether the child should be recommended to receive education and related services through the GNETS Program. Deposition of Garry McGiboney at 27:14–28:3.

112.   LEAs are empowered with the discretion to offer GNETS services in settings ranging from fully integrated ("in the general education setting") to wholly separate ("in a facility dedicated to GNETS"). Ga. Comp. R. & Regs. 160-4-7-.15(4)(c).

113.   LEAs are charged with ensuring that GNETS services are provided the least restrictive environment for the student to obtain a free appropriate public education ("FAPE"). Ga. Comp. R. & Regs. 160-4-7-.15(5)(b)(1).

114.   On August 1, 2016, USDOE released a "Dear Colleague" letter ("USDOE Letter") stating that, "when a child with a disability experiences behavioral challenges, including those that result in suspensions or other exclusionary disciplinary measures, appropriate behavioral supports may be necessary to ensure that the child receives FAPE." USDOE Letter at 6. The USDOE Letter is attached hereto as Exhibit V.

115.   The USDOE Letter further states that "[a] determination of whether there is a denial of FAPE is a fact based determination, to be made on a case by case basis." Ex. V at 9.

116.   The USDOE Letter provides that "[a] determination of whether there is a denial of placement in the LRE is also a fact based determination." Ex. V at 10.

117.   The USDOE Letter states that "[t]herefore, a failure to provide appropriate behavioral supports (because they are not offered or because teachers and other staff are not adequately trained to implement such supports) that results in the child not receiving a meaningful educational benefit may constitute a denial of FAPE." Ex. V at 12.

118.    Once a student begins receiving GNETS services, the LEA is charged with "monitor[ing]" the student's IEP to "determine students' progress and access to services in a lesser restrictive environment." Ga. Comp. R. & Regs 160-4-7-.15(5)(b)(8).

119.    Whether a child can be appropriately served in the general education setting depends on the individual. Deposition of Garry McGiboney at 223:22–224:3.

120.    Dr. McCart has never been a member of an IEP team in the State of Georgia. Deposition of Amy McCart at 55:18-20.

121.    Dr. McCart agrees that IEPs are based on the needs of individual students. Deposition of Amy McCart at 62:18-63:2.

122.    The national consideration of whether a student spends "40 percent of the time in a general education environment" is not "indicative of effective supports," because, according to Dr. McCart, considerations of efficacy "depend[], absolutely on each child … and their needs." Deposition of Amy McCart at 104:6-11; 106:3-12.

123.    Dr. McCart acknowledges that there can be "appropriate" reasons to "segregate students." Deposition of Amy McCart at 19:14-18; 21:5-15; 145:14-17; 183:13-21.

124.    Dr. McCart also acknowledges that, even if students with emotional or behavioral disabilities were provided with "the full array of supports and services," some would need to be educated away from the general education setting. Deposition of Amy McCart at 143:18-144:1.

125.    Dr. McCart did not articulate a consistent definition of "unnecessary segregation." At one point, she defined the phrase as being "moved away from his or her school-aged peers or siblings, set apart from, or treated differently than students without disabilities." Deposition of Amy McCart at 65:17-22.

126.    At another, she says that if an IEP team recommends a segregated setting it does not result in "unnecessary segregation." Deposition of Amy McCart at 68:10-16; *see also* Deposition of Amy McCart at 80:11-15.

127.    Dr. McCart equated discrimination in education as being denied a free and appropriate public education ("FAPE"). Deposition of Amy McCart at 73:5-13.

128.    Dr. McCart frequently used the phrase "fair and appropriate public education" in her deposition, but she could not articulate the difference between it and a "free and appropriate public education" or FAPE. Deposition of Amy McCart at 247:11-13.

129.    The kinds of behavioral health services that should be provided to students with emotional and behavioral disabilities depends on the student's IEP. Deposition of Garry McGiboney at 167:6–168:7.

130.   An IEP team is made up of the classroom teacher, special education director, the student, the parent, other related service providers, LEA representatives, sometimes a building administrator, and any other invited related service provider or stakeholder that has a role in supporting the student. Deposition of Samuel Clemons at 327:13-17; Deposition of Brooke Cole at 401:2-9; Deposition of Derrick Gilchrist at 257:15-22. *See also* 20 U.S.C. § 1414(d)(1)(B) (listing members of IEP team).

131.   When a student is being considered for receiving services through the GNETS Program, staff from the GNETS Program being considered attends as well. Deposition of Celest Ngeve at 206:2-13.

132.   Dr. McCart does not know if employees of the Georgia Departments of Education, Community Health, and Behavioral Health and Developmental Disabilities serve on IEP teams. Deposition of Amy McCart at 55:21-56:13.

133.   She does not know if the Georgia Departments of Education, Community Health, or Behavioral Health and Developmental Disabilities can override the recommendations of an IEP team. Deposition of Amy McCart at 64:9-21.

134.   The State has no role on an IEP team. Deposition of Haley Livingston at 278:22-279:7; Deposition of Cassandra Holifield at 333:13-20; Deposition of Samuel Clemons at 327:18-22; Deposition of Brooke Cole at 401:2-9; Deposition

of Derrick Gilchrist at 257:23-258:9; Deposition of Patricia Wolf at 277: 24-278:2; Deposition of Whitney Braddock at 232:6-12; *see also* 20 U.S.C. § 1414(d)(1)(B).

135.   Parents are always involved in IEP team decisions. Deposition of Haley Livingston at 102:13-22.

136.   Federal law provides that a parent can request a meeting at any time and such request must be granted. *See* 20 USC 1414.

137.   A parent can unilaterally decline GNETS services. Deposition of Talithia Newsome at 196:24-197:1.

138.   The Department has not produced any evidence that any individual student opposes receiving services in a GNETS Program school-based location or center.

139.   In contrast, in some instances, parents have requested for their child to spend their entire academic career in GNETS. Deposition of Wina Low at 155:24– 156:4.

140.   No GNETS Director testified that they were aware of any instance in which the State compelled a GNETS Program to make a particular decision regarding a student's placement. *See e.g.*, Deposition of Derrick Gilchrist at 258:10-13.

141.   No GNETS Director testified that the State has encouraged their program to keep a student in GNETS when the IEP recommended otherwise. *See*

*e.g.*, Deposition of Derrick Gilchrist at 258:14-16; Deposition of Whitney Braddock at 232:23- 233:1.

142.   As reflected by the absence of such information in her report and her deposition testimony, Dr. McCart is not aware of any individual for whom a State employee—from GaDOE, DCH, or DBHDD—mandated a particular student receive GNETS services. Deposition of Amy McCart at 124:13-125:3; *see generally* Ex. E.

143.   The length of time a student receives services through GNETS is dependent on what is in the student's IEP and how quickly the student reaches the goals identified in the IEP. Deposition of Clara Keith Brown at 23:24-24:3; Deposition of Samuel Clemons at 329:20-1.

144.   Exit criteria are developed by the IEP team. Wolf Dep. 81: 14-16. The IEP team determines the student's IEP goals and goals they need to meet in order to exit the GNETS Program. Deposition of Patricia Wolf at 81: 7-13; Deposition of David Ackerman at 234: 10-21.

145.   Student reintegration into general education from a GNETS Program is entirely reliant on the student's individualized IEP. Deposition of Samuel Clemons at 327:5-12.

146.   The Department has offered no evidence that any individual student has been wrongly placed in a GNETS Program by the student's IEP team.

147.   Indeed, Dr. McCart could not recall—and her report does not identify—any student receiving GNETS services who was not recommended for the GNETS Program by his or her IEP. Deposition of Amy McCart at 119:21-120:5.

148.   There is no evidence that any single student would be better educated in a less restrictive setting than that of a GNETS school-based location or center.

149.   The Department has not produced any evidence demonstrating any individual student would not be in the GNETS Program had they received any particular service in a general education setting.

150.   The Department has not produced evidence of even one identified student who currently receives services through the GNETS Program but could be served in a more integrated setting if provided with appropriate services and supports.

151.   The Department has not produced any evidence demonstrating that a student's IEP team would recommend placement in the general education setting if only the student could receive specialized services there.

152.   Evidence has not identified a single student for whom an observing, treating clinician has opined that general education is the most appropriate setting for their needs.

153.   The Department has failed to produce any evidence that demonstrates non-opposition of any single student or parent to a community-based setting.

154.   Dr. McCart's report contains information demonstrating that overall new student recommendations to the GNETS Program declined from 898 in school year 16-17 to 576 in school year 21-22. Ex. E at 16, Figure D.

155.   Similarly, the report shows that the total population of students in the GNETS Program has declined from 4,492 in school year 15-16 to 2,925 in school year 21-22. Ex. E at 16, Figure D.

156.   Despite the significant decline in IEP teams' referrals of new students to the GNETS program, Dr. McCart expressed concern with GNETS enrollment data as the "number of students still being admitted each year." Deposition of Amy McCart at 235:14-16.

157.   Although Dr. McCart testified that the "concern" was new student enrollment in GNETS, Deposition of Amy McCart at 235:14-16, she later testified that another issue is how long students remain in the program. Deposition of Amy McCart at 240:16-19.

158.   But Dr. McCart's report shows that, of the 4,492 students receiving GNETS services in school year 15-16, only 527 (11.73%) were still receiving GNETS services in school year 21-22. Ex. E at 16, Figure E.

159.   While Dr. McCart devotes a significant amount of weight to her recommendation that Georgia adopt her "vision," she could not recall whether the information she reviewed for her report contained a statement where a state official "testified that they support systemic segregation of students with behavior-related disabilities." Deposition of Amy McCart at 314:1-6.

160.   The Department has not identified any reasonable accommodation needed by an individual student

## C. Implementation of PBIS and MTSS in Georgia Public Schools

161.   Positive behavioral interventions and support (PBIS) is a three-tiered framework in which schools operate to make sure that behavior and expectations are set and taught. Deposition of Jason Byars at 43:3-9.

162.   PBIS addresses problematic and challenging behaviors. O.C.G.A. § 20-2-741; Deposition of Jason Byars at 45:15-47:8.

163.   PBIS is an example of a multitiered system of support (MTSS). Deposition of Jason Byars at 117:3-13.

164.   Code Section 20-2-741 provides that local school districts are only "encouraged" and not required to implement PBIS. O.C.G.A. § 20-2-741(b). Thus, schools' implementation of PBIS is voluntary in Georgia. Deposition of Garry McGiboney at 160:2–20.

165.    According to former GaDOE employee Garry McGiboney, voluntary implementation is an essential component of effective PBIS. Deposition of Garry McGiboney at 160:2–20.

166.    According to former GaDOE employee Jason Byars, local buy-in of school administrators, specifically including the district superintendent, is essential for effective implementation of PBIS. Deposition of Jason Byars at 133:15-23; 134:12-16.

167.    According to Byars, GaDOE's previous PBIS program manager, it "all begins with the principal." Deposition of Jason Byars at 52:1-5; 26:10-14.

168.    The Department's proffered expert, Dr. Robert Putnam, agreed that PBIS must be implemented at the local level - by local districts and schools. Deposition of Robert Putnam at 190:3-8.

169.    Dr. McCart "did not evaluate the efficacy of MTSS or fidelity [to MTSS standards] within the State of Georgia." Deposition of Amy McCart at 100:12-17.

170.    GaDOE supports and endorses PBIS and has done so since 2006 or 2007. Deposition of Jason Byars at 47:1-3; 56: 16-18; 209:11-13; 30(b)(6) Deposition of Justin Hill at 28:2-25.

171.    GaDOE works diligently to expand PBIS to as many schools as possible. Deposition of Garry McGiboney at 34:12–21.

172.   For example, GaDOE supports school districts in PBIS implementation by committing resources including personnel, salaries, web services, trainings, travel, and a budget for PBIS. Deposition of Jason Byars at 58:10-20; 30(b)(6) Deposition of Justin Hill at 34:11-35:6.

173.   To date, approximately 60% of school districts and at least 1,400 schools in Georgia have implemented PBIS. Deposition of Garry McGiboney at 34:12–21; 30(b)(6) Deposition of Justin Hill at 35:17-24.

174.   There are schools in Georgia that have fully implemented PBIS at every tier. Deposition of Garry McGiboney at 153:20–22.

175.   Full implementation of PBIS, however, is challenging in part because of teacher and staff turnover that is common in the education field. If there is significant staff turnover, the school may have to go back to a previous implementation phase while the new staff members are trained and caught up. Thus, it is unsurprising that there are GNETS Programs that have not yet fully implemented PBIS. Deposition of Garry McGiboney at 163:25–164:20.

176.   Less than 30,000 public schools nationwide have implemented PBIS thus far. Deposition of Robert Putnam at 160:20-161:7, Ex. 7.

177.   Dr. McCart did not consider the rates of principal turnover in Georgia's generally zoned schools. Deposition of Amy McCart at 309:19-310:4.

178.  She describes the education system, including mental health services, as "stretched to the limit." Deposition of Amy McCart at 305:18-307:1, Ex. 11.

179.  Although the Department's proffered expert, Dr. Putnam, contended that Georgia could do more to provide PBIS training, he did not review any training document created or used by the Georgia Department of Education. Deposition of Robert Putnam at 245:5-16.

180.  Dr. McCart describes implementing her MTSS recommendation is "not easy." Deposition of Amy McCart at 307:11-19, Ex. 12.

181.  During her deposition testimony, Dr. McCart opined that it would take the state three years to implement MTSS as she recommends in four of her five recommended actions. Deposition of Amy McCart at 198:16-199:17; Ex. E at 163-167.

182.  Dr. McCart's report does not identify a state that has implemented MTSS at every school (as she recommends), nor could she identify such a state during her deposition. Deposition of Amy McCart at 44:3-45:4; 46:17-22; *see generally*, Ex. E.

183.  At one point, Dr. McCart claims that, to serve children with disabilities, educators need only "the typical educational credentials that … are common for certified teachers." Deposition of Amy McCart at 23:22-24:6.

184.   Yet, she continues to state that general education teachers need "access [to] special educators" with additional training, as well as an understanding of what she describes as "basic general systems of support provided through the state and the district such as tiered systems of support that provide academic, behavioral, social, emotional, and mental health supports." Deposition of Amy McCart at 24:7-18.

185.   As confirmed through her deposition testimony, Dr. McCart's report recommends that Georgia adopt an "equity-based MTSS." Deposition of Amy McCart at 92:15-17.

186.   Dr. McCart has described her book on equity-based MTSS, Build Equity, Join Justice, as being written with the hope "to inspire deeper thinking and fundamental redesign in the way we, as educators, understand and support students and the structure of our schools." Deposition of Amy McCart at 93:10-16, Ex. 3.

187.   Dr. McCart opined that her recommended equity-based MTSS is highly variable and should "look different" in each state that attempts to adopt it. Deposition of Amy McCart at 99:8-21.

188.   Dr. McCart's report does not identify or recommend a fidelity standard to allow Georgia policymakers to know if they are implementing or training her type of equity-based MTSS with fidelity. Deposition of Amy McCart at 100:11-101:5; *see generally*, Ex. E.

189.    Dr. McCart has written and confirmed her continued belief in the conclusion that "recent research indicates that the process of installing and implementing MTSS to a criterion of full implementation is proving to be a very difficult undertaking, one that requires extensive professional learning and intensive [technical assistance], particularly directed at the local education agencies to support the effort at the level of the schools." Deposition of Amy McCart at 266:16-267:7, Ex. 8.

190.    Dr. McCart does not know if "full implementation" of MTSS as she recommends would be something other than "very difficult in the State of Georgia." Deposition of Amy McCart at 268:20; 269:3.

191.    In California, which contracted for $45 million with Dr. McCart's SWIFT Center to implement MTSS, the "local education agencies within those regions took up various degrees of implementation of MTSS." Deposition of Amy McCart at 265:21-266:1, Ex. 8.

## IV.    The Delivery of Mental Health Services in the State of Georgia

### A. System of Care

192.    The Georgia General Assembly has "declare[d] its intention and desire to: (6) Develop a coordinated system of care so that children and adolescents with a severe emotional disturbance and their families will receive appropriate

educational, nonresidential and residential mental health services, and support services, as prescribed in an individualized plan." O.C.G.A. § 49-5-220(a).

193.   The General Assembly has not passed a law requiring implementation of a system of care.

194.   The Geogia General Assembly further stated that it "intends that" DBHDD have the primary responsibility for planning, developing, and implementing any system of care. O.C.G.A. § 49-5-220(b).

195.   The General Assembly has not passed a law requiring DBHDD have the primary responsibility for any system of care in Georgia.

196.   System of Care is not a service, but is an approach to care. Deposition of Judy Fitzgerald at 73:20-74:6; 220:23-24.

197.   System of Care is a comprehensive wraparound providing a variety of services to children to support them in their communities. Deposition of Frank Berry at 47:5-11.

198.   Services offered by entities such as CSBs play a role in a community's system of care. Deposition of Frank Berry at 48:20-49:9.

**B. The Apex Program**

199.   The Georgia Apex Program (Apex) is a school-based mental health program designed to build infrastructure and increase access to mental health services for school-aged youth by placing mental health providers in school

settings to deliver therapeutic support. *See* Georgia Apex Program Annual Evaluation Results July 2021-June 2022 at GA05558502, attached hereto as Exhibit H.

200.   Apex is a DBHDD initiative, and Apex Program services are reimbursed with a mixture of funds from DBHDD and DCH. Deposition of Judy Fitzgerald at 62:23-63:5.

201.   The Apex program provides funding for CSBs to provide infrastructure including staffing to build a school-based mental health partnership. Deposition of Frank Berry at 115:22-25; Deposition of Marnie Braswell at 87:15-20.

202.   Apex is a programmatic framework through which certain unbundled services are made available within public schools. *See* Affidavit of Dante McKay at ¶ 3, attached hereto as Exhibit I.

203.   It does not produce any new services that are not already available as part of DBHDD's core service package. Deposition of Dante McKay at 55:10-15; Deposition of Marnie Braswell at 53:10-17.

204.   Qualified providers of behavioral health services can become eligible for Medicaid reimbursement for certain behavioral health services offered to school age children and youth. Ex. I at ¶ 4.

205.   As an example, individual counseling is a behavioral health service which is available through Apex. Deposition of Dante McKay at 55:16-20; Deposition of Marnie Braswell at 48:25-49:9.

206.    Currently, 735 public schools have partnered with Apex program providers. Ex. I at ¶ 5.

207.   As of June 2022, 704 schools report "engaged partnerships," defined to be schools submitting three or more months of reported data. Ex. H at GA05558511; Deposition of Garry McGiboney at 47:11–18.

208.   To be an eligible Apex program provider, the contracting entity must satisfy regulatory criteria and have the written support of a local school system. Ex. I at ¶ 4; Deposition of Dante McKay at 144:9-21.

209.   DBHDD encourages schools to take advantage of Apex services. Deposition of Garry McGiboney at 47:11–18.

210.   Whether a student enrolled in a GNETS program is eligible for Apex services is a decision made between community providers and the local school district. Deposition of Dante McKay at 139:2-20.

211.   DBHDD does not direct a school to become a part of the Apex program. Deposition of Dante McKay at 139:6-8.

212.   DBHDD and DCH issue provider care manuals for the behavioral health services DBHDD contracts for and that are Medicaid reimbursable by DCH.

Deposition of Judy Fitzgerald at 50:7-11; Deposition of Frank Berry at 164:18-166:13.

213.   The manual contains a service guideline about the Apex Program. Deposition of Dante McKay at 50:6-11.

214.   The Department's proffered expert, Dr. Robert Putnam, had no criticisms of the types of services or intensity of services made available in the Apex program. Deposition of Robert Putnam at 185:16-186:13.

215.   The Apex program model does not align with the GNETS program model because the model of Apex is to serve all three tiers, which are: prevention, at risk, and intensive services. Deposition of Dante McKay at 141:1-20.

216.   GNETS students mostly fit in Tier 3, while some may potentially fit in Tier 2, which the Apex model is not funded to serve. Deposition of Dante McKay at 141:5-21.

217.   Standalone GNETS program models do not align with the Apex program. Deposition of Dante McKay at 142:4-5.

218.   Apex providers would not be equipped to handle the entirety of a GNETS center and provide behavioral health services to everyone in it. Deposition of Judy Fitzgerald at 200:15-201:2.

219.   Accordingly, Apex services are not provided in GNETS centers. *See* Apex 3.0 Frequently Asked Questions, *In which types of schools can Apex services*

*be implemented?* <u>available at</u> https://dbhdd.georgia.gov/be-supported/mental-health-children-young-adults-and-families/apex-3-faqs and attached hereto as Exhibit J.

220.   GNETS centers are not the only exclusion from Apex services, as Apex services also cannot be provided in homeschooled/cyber public schools, private charter schools, or private schools. *See* Ex. J.

221.   DBHDD did not create the three-tier model utilized by Apex; it adopted it, as the three-tier model is generally accepted practice within the field. Deposition of Dante McKay at 142:6-16; 149:21-150:10.

222.   In the Georgia Apex Program Annual Evaluation Results July 2021 – June 2022, Apex providers reported comparatively little problems with Medicaid payors and, instead, complained most about private pay insurance that is not regulated by DBHDD, DCH, or GaDOE. *See* Ex. H at GA05558524.

223.   The Report also showed that Apex providers were also challenged by school districts who hired their own employees and clinicians, which demonstrates that the same services can be provided in the school setting even if not part of an Apex collaboration. *See* Ex. H at GA05558572.

224.   Apex expansion is most challenged by workforce issues. Deposition of Garry McGiboney at 47:11–18; 187:1–7; 200:16–21.

225.    Indeed, the Georgia Apex Program Annual Evaluation Results July 2021 – June 2022 revealed that providers identified workforce shortages as the primary barrier to expanding the program. *See* Ex. H at GA05558542.

226.    Dante McKay, OCYF Director, confirms that cost and workforce shortages are the material impediments to Apex expansion to every public school. Ex. I at ¶ 6.

227.    Apex is also challenged by transportation and the location of schools and providers. Deposition of Garry McGiboney at 187:1–7.

228.    Workforce shortages in the area of mental health has been a challenge in Georgia for decades. Deposition of Garry McGiboney at 225:21–226:1; 46:7–20.

229.    There is a significant, ongoing, and well-documented workforce shortage of mental health professionals and educators in the State of Georgia. Deposition of Lisa Futch at 348:14-18; 115:24-116:25, 305:12-22; Deposition of Cassandra Holifield at 293:3-7; Deposition of Garry McGiboney at 187:1–7; 209:4–10.

230.    There is a shortage of psychiatrists, clinical psychologists, licensed professional counselors, psychiatric social workers, and any field that touches on mental health. Deposition of Garry McGiboney at 46:7–20.

231.  The Department's proffered expert, Dr. Putnam, agreed that it is possible that schools could not receive services from Apex providers because of workforce shortages. Deposition of Robert Putnam at 215:11-16.

232.  An informal cost estimate conducted by DBHDD estimates that it would cost $313.5 million, with an estimated attributed cost to the State of Georgia of more than $219.5 million, to include Apex at all 2,308 of the public schools in Georgia at a 1:50 therapist to student ratio. Ex. I at ¶¶ 7-8.

233.  Such expansion would require the General Assembly to appropriate an additional $219.5 million to DBHDD; federal funds would not supplement this amount. Ex. I at ¶ 8.

234.  This estimate contemplates a gradual expansion with full implementation by fiscal year 2032. Ex. I at ¶ 10.

235.  This estimate is subject to workforce availability in all 2,308 public schools. Ex. I at ¶ 11.

236.  Dr. Putnam suggested that the Apex program was also limited by the number of funds provided to it (Deposition of Robert Putnam at 215:17-24), but he performed no kind of cost analysis for any of his recommendations. Deposition of Robert Putnam at 97:6-10; 282:11-22.

## V.  The Georgia Network for Educational and Therapeutic Supports

237.  The Georgia Network for Educational and Therapeutic Supports ("GNETS") is a network of 24 programs throughout the State that "provides comprehensive educational and therapeutic support services to students who exhibit intense social, emotional and/or behavioral challenges with a severity, frequency or duration such that the provision of education and related services in the general education environment has not enabled him or her to benefit educationally based on the IEP." Ga Comp. R. & Regs. 160-4-7-.15.

238.  It is a service administered by the LEAs and "available within the continuum of supports for LEAs to consider when determining the least restrictive environment" for a student's IEP. Ga. Comp. R. & Regs. 160-4-7-.15(2)(a); *see also* 20 U.S.C. §§ 1401(14), 1414(d)(1)(A) (defining IEP).

239.  GNETS services are provided to students who have been referred to the GNETS Program by his or her IEP team. Ga Comp. R. & Regs. 160-4-7-.15; Deposition of Clara Keith Brown at 20:25-21:7; Deposition of David Ackerman at 82:16-21.

240.  The GNETS Rule lays out certain eligibility criteria which students must meet in order to be eligible for services paid for by GNETS grant funds. Ga Comp. R. & Regs. 160-4-7-.15.

45

241.   The regional GNETS Programs may serve, and typically do serve, more than one school district. Deposition of Garry McGiboney at 74:14-17.

242.   Each regional Program has either a local educational agency ("LEA") or regional educational service agency ("RESA ") that acts as its fiscal agent. Ga Comp. R. & Regs. 160-4-7-.15(1)(d)-(e).

243.   The fiscal agent is responsible for the fiscal management and budgeting of GNETS funding. Ga Comp. R. & Regs. 160-4-7-.15(1)(b); *see, e.g.*, Deposition of Patricia Wolf at 61:17-20 (role of GNETS of Oconee's fiscal agent is to provide oversight in terms of budgets, and fiscal and personnel issues.)

244.   The goal of the GNETS Program is the same as the goal for each child in their individualized IEP, which all look different. Deposition of Garry McGiboney at 75:3-76:4.

245.   According to the GNETS Rule, services provided through the GNETS Program aim to support students with social, emotional and/or behavioral challenges that may include but are not limited to, significant, aggressive, self-destructive, atypical, and withdrawal behaviors. Ga Comp. R. & Regs. 160-4-7-.15.

246.   Based on her interpretation of the title of GNETS Rule, Dr. McCart explained her belief that "GNETS continuum of services [is] established by the

state," and that it is "provided by state." Deposition of Amy McCart at 302:12-303:10.

247.    Dr. McCart claims she is not providing an opinion on whether the State of Georgia "administers" the GNETS program. Deposition of Amy McCart at 40:14-16.

248.    Code Section 20-2-152(c)(1)(E) provides for the operation of "special schools" by the State of Georgia, specifically, the Georgia School for the Deaf, the Georgia Academy for the Blind, and the Atlanta Area School for the Deaf. GNETS is not a special school.

249.    The therapeutic services provided in GNETS are need-based for each child as determined by the IEP team; they look differently for every child and in every program. Deposition of Vickie Cleveland at 81:8-18; Deposition of Wina Low at 158:21–159:6.

250.    There is no text in the GNETS Rule explicitly dictating a location where services must be provided.

251.    During her deposition, Dr. McCart could not identify anything in the text of the GNETS rule that causes "unnecessary segregation." Deposition of Amy McCart at 226:2-7.

252.    During her deposition, Dr. McCart explained her recommendations as: "[1] to limit or eliminate systemic segregation across the State of Georgia within

the GNETS program, [2] to provide fair and equal educational opportunities for students with behavior-related disabilities in the GNETS program, and [3] to have the State of Georgia provide an array of appropriate supports for students with behavior-related disabilities in the State of Georgia." Deposition of Amy McCart at 37:1-9 (brackets and emphasis added).

253.    Dr. McCart provides many, and sometimes inconsistent, definitions of "appropriate supports." For example, she describes them as "in general a system of support that provides an array of effective evidence-based practices for – specifically for students who have disabilities that are along a continuum of support, not place-based, but rather service-based. And those supports are provided in context, based on what the state decides on student – students with disabilities needs within the GNETS program." Deposition of Amy McCart at 38:9-18.

254.    Despite her significant criticisms of the GNETS program implemented by LEAs and RESAs, Dr. McCart acknowledged that the "what the state does – decides to do is up to [it] … what [the State] decide[s] to do is [its] decision." Deposition of Amy McCart at 38:19-39:2.

255.    The evidence shows that it is the LEA or RESA that determine the setting in which to provide services through the GNETS Program. Decisions on whether to operate as a school-based site or self-contained facility are local decisions. Deposition of Shaun Owen at 155:13-20.

48

256.    And, IEP teams determine the setting – whether in general education, a separate facility, or somewhere else—in which a specific child should receive services through the GNETS Program. Ga Comp. R. & Regs. 160-4-7-.15(4).

257.    Dr. McCart's underlying theory is that IEP teams refer students to GNETS programs because they conclude it is the only option available. Deposition of Amy McCart at 62:6-14.

258.    No LEA or RESA has testified that they are incentivized by GaDOE to provide GNETS services in settings other than the general education setting.

259.    GNETS Program decisions are made at the local level. Decisions to close programs or locations are local decisions. Deposition of Vickie Cleveland at 114:11-14.

260.    Which counties a program will serve is a local decision. Deposition of Lisa Futch at 115:15-23; Deposition of Haley Livingston at 113:6-114:6.

261.    Policies and procedures for GNETS Programs are made and changed at the local level. Deposition of Haley Livingston at 60:9-61:7.

262.    Students receiving GNETS services are taught the Georgia performance standards. Deposition of Vickie Cleveland at 81:8-13.

263.    But curriculum decisions are locally made decisions and GNETS Programs follow the curriculum of their local district. Deposition of Lisa Futch at

237:12-238:4; Deposition of Cassandra Holifield at 30:20-31:17; Deposition of Wina Low at 63:15–64:14.

264.    Thus, every Program does something different for their curriculum. Deposition of Lakesha Stevenson at 137:17-20.

265.    Dr. McCart's testimony identified several services (excluding physical plant concerns) that she claims are available in zoned schools but not in the GNETS program, including: (1) grade appropriate resources like standards-based content; (2) standards-based learning instead of functional curriculum; (3) content-mapping; (4) less online instruction; (5) specials, connections, and exploratory classes; and (6) integrated transportation. Deposition of Amy McCart at 221:15-223:19.

266.    GNETS Directors are employees of the LEA/RESA and report to supervisors employed by the LEA/RESA. Deposition of Talithia Newsome at 52:15-53:23; Deposition of Haley Livingston at 11:16-20; 277:8-10; Deposition of Cassandra Holifield at 332:16-19; Deposition of Derrick Gilchrist at 256:4-6; 19:10-18; Deposition of Brooke Cole at 24:5-13; Deposition of Celest Ngeve at 23:9-11.

267.    GNETS Program Directors' salaries are paid by either the LEA or RESA, depending on who the fiscal agent is. Deposition of Vickie Cleveland at

147:5-10; Deposition of Haley Livingston at 277:13-14; Deposition of Whitney Braddock at 77: 16-20.

268.    Similarly, all GNETS Program staffing and hiring decisions are determined and handled by the county. Deposition of Talithia Newsome at 107:2-111:2; Deposition of Haley Livingston at 277:8-12; 278:1-12; Deposition of Lisa Futch at 349:8-14; Deposition of Shaun Owen at 155:13-20; Deposition of Derrick Gilchrist at 254:14-255:5.

269.    The State has no role in the Programs' staffing and hiring decisions. Deposition of Haley Livingston at 278:10-12; Deposition of Talithia Newsome at 111:24-112:4; Deposition of Cassandra Holifield at 332:12-15; 147:6-18; Deposition of Celest Ngeve at 280:18-281:5.

270.    Each fiscal agent has its own process for how it hires staff and the State is not consulted before a director is selected. Deposition of Vickie Cleveland at 146:14-23; Deposition of Celest Ngeve at 128:3-131:18.

271.    GaDOE has no involvement or control over who is hired in GNETS Programs. Deposition of Wina Low at 195:16-17; Deposition of David Ackerman at 85:4-7.

272.    Dr. McCart does not have an understanding about how local school district superintendents or teachers are hired or fired in Georgia. Deposition of Amy McCart at 40:21-41:15.

273. She could not recall how GNETS teachers are hired or fired, and her report says nothing about it. Deposition of Amy McCart at 41:15-42:15; *see generally*, Ex. E.

274. No GNETS Program has staff employed by GaDOE. Deposition of Vickie Cleveland at 147:11-14.

275. The State of Georgia does not conduct performance evaluations of GNETS Directors or their staff. Deposition of Haley Livingston at 277:19-25; Deposition of Cassandra Holifield at 333:4-12.

276. Nor does the GNETS Program Manager evaluate GNETS Directors. Deposition of Vickie Cleveland at 146:24-147:1.

277. GNETS students belong to their home school's LEA. Deposition of Amber McCollum at 67:3-6; Deposition of Garry McGiboney at 178:9–13.

278. Facility maintenance and concerns are handled by the county. Deposition of Talithia Newsome at 71:25-73:11; Deposition of Lisa Futch at 238:5-15; Deposition of Cassandra Holifield at 286:15-24; Deposition of David Ackerman at 90:1-3; Deposition of Whitney Braddock at 230:17-21. Indeed, GNETS facilities are county-owned buildings. Deposition of Cassandra Holifield at 286:15-24.

279.    Dr. McCart does not know who—whether LEAs or the State government—makes decisions on where to invest dollars on playgrounds, gymnasiums, and the like. Deposition of Amy McCart at 123:9-13.

280.    Facility layout and use is determined by the school. Deposition of David Ackerman at 95: 18-20; 139: 12-24.

281.    Bus service is determined, provided, and paid for by the LEA/RESA. Deposition of Talithia Newsome at 84:17-22; 85:2-6; 236:20-237:3; Deposition of Lisa Futch at 167:9-18; Deposition of Haley Livingston at 153:4-11; Deposition of Celest Ngeve at 139:2-5; Deposition of David Ackerman at 19-21.

282.    Bus concerns are, therefore, brought to the county. Deposition of Talithia Newsome at 86:12-87:17.

283.    Restraint policies are approved by the local authority, not GaDOE. Deposition of Lisa Futch at 353:9-18.

284.    The GNETS Rule requires the Board of Education to "Administer the grant funds by performing the following in collaboration with the GaDOE: Monitor GNETS to ensure compliance with Federal and state policies, procedure, rules, and the delivery of appropriate instructional and therapeutic services." Ga Comp. R. & Regs. 160-4-7-.15.

285.    This is done through GaDOE's cross-functional monitoring by its Results-Driven Accountability Unit, through the strategic plan review, and through

the budgeting division when budgets are submitted by the fiscal agents. Deposition

of Vickie Cleveland at 166:12-167:16; Deposition of Shaun Owen at 154:1-155:9.

286.    As GaDOE does with all LEAs and students, the Results-Driven

Accountability Unit has district liaisons that conduct monitoring of LEAs'

compliance through cross functional monitoring visits in which they pull student

folders and, in so doing, always pull two GNETS student folders. Deposition of

Lakesha Stevenson at 61:1-13; Deposition of Shaun Owen at 155:1-3; Deposition

of Vickie Cleveland at 44:13-19; 45:1-8; 166:16-19.

287.    While the State may "monitor" the LEAs' compliance with state and

federal law in this manner, the State has no direct enforcement authority over the

LEAs. Code Section 20-2-243 provides that the only enforcement mechanism the

State has is the ability to seek to withhold state funds from LEAs, a process which

is subject to judicial review before any withholding action can be taken. O.C.G.A.

§ 20-2-243.

288.    GNETS Directors have created documents such as the "Consideration

of Services" packet, "Request for GNETS consultation" document, and "Guidance

and Planning Document for Student Integration from GNETS" document that they

share and use for guidance. Deposition of Talithia Newsome at 150:13-151:10;

180:16-22; Deposition of Cassandra Holifield at 279:8-18; Deposition of Vickie

Cleveland at 124:23-125:10; 141:19-142:22; 128:18-21.

289.   There is no requirement by GaDOE to use these documents. Deposition of Talithia Newsome at 150:13-151:10; 180:16-22; Deposition of Cassandra Holifield at 279:8-18.

290.   Similarly, there is no requirement by GaDOE to use the "Guiding Questions for Consideration of GNETS Services" document or the GNETS Operations Manual which are also guidance documents. Deposition of Cassandra Holifield at 252:9-14; Deposition of Talithia Newsome at 162:13-17.

291.   In fact, GaDOE does not require use of any specific documents related to consideration of services. Deposition of Vickie Cleveland at 128:4-129:15.

292.   GaDOE provides guidance to regional GNETS Programs in areas such as transition, academic achievement, and reintegration. Deposition of Wina Low at 167:13–168:2; 150:7–17.

293.   Because GaDOE does not mandate Programs' adherence to the guidance, compliance with the guidance is the concern of the local agencies who run the GNETS Programs. Deposition of Wina Low at 167:13–168:2; 150:7–17.

294.   Similarly, because GaDOE does not supervise the Programs' academic programming, it does not have authority to take steps in response to issues such as, for example, low Milestone scores other than to provide tools and direction to materials such as iReady. Deposition of Wina Low at 185:11–20.

295.    GNETS Programs who wish to collaborate with CSBs do so at the local level. For example, South Metro GNETS contracts directly with View Point Health for two clinicians to provide behavioral health services at South Metro GNETS. Deposition of Jennifer Hibbard at 74:24-75:14; 76:4-13.

296.    Dr. McCart's report asserts that ███████████████████

█████████████████████████████████████████████████

██████████████ Ex. E at 162 (emphasis in original).

297.    Dr. McCart testified that GNETS is not an "enabling context." Deposition of Amy McCart at 258:16-259:3.[3]

## A. GNETS Funding

298.    Each year, the General Assembly appropriates money for the GNETS Programs' use via a grant process. *See generally*, General Appropriations Acts FY2019 through FY2024, attached hereto as Exhibits K through T; Deposition of Derrick Gilchrist at 255:6-256:3.

299.    The total allocation to GNETS Programs is made up of state and federal dollars. Deposition of Haley Livingston at 199:13-17; Deposition of Cassandra Holifield at 266:13-17; Deposition of Derrick Gilchrist at 255:6-256:3;

---

[3] This means her recommendations would not work within the GNETS Program, meaning it needs to be abolished for her plans to work.

Deposition of Celest Ngeve at 281:6-9; Deposition of Patricia Wolf at 62: 4-6; *see generally*, Exs. K through T.

300.    In Fiscal Year 2024, federal funds flowing through USDOE represented 17% of the total appropriation of $65,427,745 for the GNETS budget. *See* Ex. S.

301.    In Fiscal Year 2024, State funds represented 82% of the total appropriation of $65,427,745 for the GNETS budget. *See* Ex. S.

302.    GNETS grant funding is driven by enrollment. Deposition of Vickie Cleveland at 266:14-17.

303.    The GNETS population is consistently trending down. Deposition of Vickie Cleveland at 88:13-19.

304.    The GNETS grant has accordingly trended down each year. *See generally*, Exhibits Exs. K through T.

305.    In addition, local funds are contributed from LEAs in the form of in-kind services. Deposition of Derrick Gilchrist at 255:6-256:3; Deposition of Lisa Futch at 237:12-238:20.

306.    Many staff positions are funded by the county. Deposition of Talithia Newsome at 115:16-117:2; 118:20-22; 123:6-127:7; Deposition of Cassandra Holifield at 55:8-11; 133:21-23.

307.   Others are funded by the State grant. Deposition of Talithia Newsome at 118:16-19; 119:1-4.

308.   Dr. McCart has no knowledge of the State appropriations process. Deposition of Amy McCart at 42:16-19.

309.   Nor does Dr. McCart know how LEAs can raise revenue independent from State appropriations. Deposition of Amy McCart at 229:14-21.

310.   Dr. McCart does not know if LEAs must accept or apply for GNETS grants, nor does she know if GaDOE mandates the program. Deposition of Amy McCart at 152:22-153:13.

311.   Grants are not mandatory. There is no evidence that LEAs and RESAs are required to apply for the GNETS grant.

312.   Despite having never read an appropriations act enacted by the General Assembly, Dr. McCart identifies only the State's appropriation of State and federal dollars to fund GNETS grants as █████████████████████ ████████████████████████████████████████ ████████████████████████████████ ████████ Ex. E at 167; Deposition of Amy McCart at 151:15-18; 157:6-8.

313.   Although Dr. McCart claims that the State "perpetuates" alleged systemic segregation in the GNETS program by providing funds for GNETS grants (and, she did not understand the funding to be grant-based or discretionary), she

did not "feel comfortable" applying the same standard to the United States Department of Education when asked to presume that some of its federal funds are used to provide GNETS grants. Deposition of Amy McCart at 157:15-158:7.

314.   GaDOE is a flowthrough agency for state and federal funds to the fiscal agent, either the LEA or RESA as the case may be. Deposition of Shaun Owen at 154:22-23.

315.   The RESA/LEA is a flowthrough for state and federal funds to the individual GNETS Programs. Deposition of Haley Livingston at 75:18-25; Deposition of Cassandra Holifield at 49:18-50:4; 50:11-12.

316.   The fiscal agent receives funds from GaDOE and has the responsibility for appropriately accounting for the expenditure of those funds. Deposition of Clara Keith Brown at 31:2-6.

317.   Dr. McCart explained during her deposition that she makes "no recommendation about funding regarding the GNETS program." Deposition of Amy McCart at 182:4-5.

318.   She, instead, acknowledged that such decisions are "really between the state and the entities involved at the state." Deposition of Amy McCart at 182:4-6.

319.   There are fiscal assurances signed between the GNETS Programs and their respective RESAs/LEAs as the fiscal agents for the GNETS Programs. Deposition of Lakesha Stevenson at 145:4-12; 144:17-20.

320.   There are no assurances between the GNETS Programs and GaDOE. Deposition of Lakesha Stevenson at 145:13-15.

321.   The funding for GNETS is held for reimbursement after the GNETS programs have made certain expenditures. Deposition of Geronald Bell at 34:19-22.

322.   The GNETS Program submits requests or purchase orders to the fiscal agent for approval and to receive payment. Deposition of Cassandra Holifield at 50:16-51:13.

323.   GNETS Programs must get budget approval from their fiscal agents. Deposition of Cassandra Holifield at 105:24-106:6.

324.   Some RESAs prepare and handle their respective GNETS Programs' budgets. *See, e.g.,* Deposition of Haley Livingston at 118:9-10; 199:25-200:4; 229:12-18 (explaining Harrell Learning Center's RESA prepares its budget).

325.   To receive GNETS grant funds, GNETS Programs submit a grant application. Deposition of Celest Ngeve at 263:16-264:24.

326.   In reviewing the grant application, the GNETS Program Manager simply makes sure the various components are complete. Deposition of Lakesha Stevenson at 128:2-5.

327.   The grant application requirements and assurances are the same for all programs. Deposition of Vickie Cleveland at 250:24-251:6; 251:12-14.

328.   The grant does not include language that provides for termination if noncompliance by the GNETS Program is found. Deposition of Vickie Cleveland at 255:16-21.

329.   Scores such as the GAA and GAA 2.0 do not impact funding. Deposition of Vickie Cleveland at 266:14-17.

**B. GNETS Program Manager and GNETS Program Specialist**

330.   The GNETS Program Manager and GNETS Program Specialist roles fall under the purview of the Federal Programs Division of GaDOE. Deposition of Shaun Owen at 28:21-25.

331.   When the role that ultimately became the GNETS Program Manager was created, Clara Keith Brown wanted to make sure the person hired knew the State did not control or administer GNETS; that the GNETS Programs were independent of GaDOE in that they have their own directors who did not report to anyone at GaDOE; and that GaDOE has a State Board rule that GaDOE provides implementation guidance on. Deposition of Clara Keith Brown at 85:16-25.

332.   Today, the role of the GNETS Program Manager is to provide technical assistance to the 24 programs; to work with the budget division in looking at allocations for GNETS funding and allocating funds to the GNETS programs; to work with the budget division within special education to review budgets; strategic plan technical assistance; training on the Board rule; and professional learning and technical assistance as needed for GNETS Directors. Deposition of Vickie Cleveland at 36:12-37:1; 50:14-16.

333.   The GNETS Program Manager provides trainings to GNETS Directors, not to GNETS teachers. Deposition of Vickie Cleveland at 176:18-22.

334.   The GNETS Program Manager and Specialist are not there for day-to-day implementation of the program. Deposition of Vickie Cleveland at 169:18-22.

335.   They do not provide consultation regarding improvement to the GNETS Programs. Deposition of Lakesha Stevenson at 48:23-49:1.

336.   Nor do they provide recommendations regarding appropriateness of GNETS Programs' therapeutic interventions or classroom instruction. Deposition of Lakesha Stevenson at 113:2-5; 112:2-5.

337.   They do not provide recommended changes or feedback on reintegration data because the decisions are local and the Program Manager cannot make decisions or recommendations for what IEP teams are going to recommend for their students. Deposition of Vickie Cleveland at 136:12-137:14.

338.   They do not look at compliance with Functional Behavior Assessment (FBA) or Behavior Improvement Plan (BIP) requirements. Deposition of Vickie Cleveland at 172:18-25.

### C. GNETS Strategic Plan

339.   The Strategic Plan was created by a collaboration of the GNETS Program Manager and GNETS Directors. Deposition of Clara Keith Brown at 177:11-178:6.

340.   The ultimate decision as to the content of the Strategic Plan was a collaborative decision of the GNETS Program Manager and GNETS Directors. Deposition of Clara Keith Brown at 177:11-178:6.

341.   The Strategic Plan is a six-part plan that the GNETS Programs complete every year. Deposition of Shaun Owen at 193:4-15.

342.   The six parts are: Program Leadership and Accountability; Behavior Support and Therapeutic Services; Instructional and Academic Support; Program Funding and Fiscal Management; Integration of Services and Capacity Building; and Facilities Management and Safety. *See* GNETS Strategic Plan at GA00362005, attached hereto as Exhibit U.

343.   Each Program provides evidence of whether the Program is operational, emergent, or nonexistent as to each of the six areas of the plan. Ex. U at GA00362010; Deposition of Shaun Owen at 193:4-15.

344.   The Strategic Plan is used by Programs to continue to reevaluate and self-assess their Programs, make changes as needed, and decide on their priorities for the upcoming year based on the needs identified by the assessment. *See generally*, Ex. U at GA00362005-23; Deposition of Shaun Owen at 194:11-15.

345.   The GNETS Program Manager and GNETS Program Specialist do not receive each Program's Strategic Plan; they receive mid-year and end of year summaries when the regional Program's grant application is uploaded to the GaDOE portal. Deposition of Vickie Cleveland at 208:9-21; Deposition of Lakesha Stevenson at 150:23-151:8.

346.   The Programs rate themselves; GaDOE does not provide a rating. Deposition of Vickie Cleveland at 207:4-10; Deposition of Lakesha Stevenson at 151:9-21.

347.   Implementation of Strategic Plan goals is monitored through the Programs' own ratings. Deposition of Vickie Cleveland at 215:8-14; *see generally*, Ex. U at GA00362005-23.

348.   If a Program does not meet a goal, the GNETS Program Manager typically has follow up conversations about what the Program is doing to get implementation in place. Deposition of Vickie Cleveland at 217:20-218:1.

349.   The GNETS Program Manager and GNETS Program Specialist conduct visits to GNETS locations as part of the Strategic Plan process to observe

academic instruction and programming and as an opportunity for programs to share information. Deposition of Vickie Cleveland at 179:23-180:9.

350.   The GNETS Program Manager and GNETS Program Specialist do not provide feedback after a location visit. Deposition of Vickie Cleveland at 183:7-20; Deposition of Lakesha Stevenson at 194:13-19.

351.   The GNETS Program Manager looks at the Programs' Strategic Plan self-assessments for what the Programs have done, what information and artifacts they have presented, and may provide feedback. Deposition of Vickie Cleveland at 185:1-4; 214:20-24.

352.   The Strategic Plan is not tied to anything, including the receipt of any funding. Deposition of Lakesha Stevenson at 154:9-10; 160:1-2.

353.   A Program can still be funded by the grant even if the goals in the Strategic Plan are not met. Deposition of Vickie Cleveland at 219:9-12.

**D. Therapeutic Services Grant**

354.   The therapeutic services grant is a grant based off of a needs assessment conducted to identify and assist GNETS locations that have greater need and less funding so that they can provide additional therapeutic supports. Deposition of Shaun Owen at 93:11-24.

355.   Eleven programs receive the need-based therapeutic grant. Deposition of Vickie Cleveland at 105:3-5.

356.   Those programs submit monthly logs and then the GNETS Program Specialist pulls a report showing what therapeutic services are provided. Deposition of Vickie Cleveland at 105:3-17; 107:22-25.

357.   In the reports, the GNETS Program Manager looks to see if therapists are using evidence-based interventions and that they are documenting what they are doing with students in providing the interventions. Deposition of Vickie Cleveland at 105:3-17; 107:22-25.

358.   There are no separate assurances for the therapeutic services grant; it is a subgrant. Deposition of Vickie Cleveland at 150:8-11.

359.   The GNETS Program Specialist completes a year end summary of social worker logs submitted for the therapeutic services grant, including things such as the average number of students who receive support and the most common types of support received. Deposition of Lakesha Stevenson at 70:2-17.

360.   Neither she nor the GNETS Program Manager take any action or make any suggestions based on the summary. Deposition of Lakesha Stevenson at 70:9-17.

Respectfully submitted, this 7th day of November, 2022.

*/s/ Josh Belinfante*

| | |
|---|---|
| Christopher M. Carr | Josh Belinfante |
| *Attorney General* | Georgia Bar No. 047399 |
| Georgia Bar No. 112505 | jbelinfante@robbinsfirm.com |

Bryan Webb
*Deputy Attorney General*
Georgia Bar No. 743580
Russell D. Willard
*Senior Assistant Attorney General*
Georgia Bar No. 760280
Susan R. Haynes
*Assistant Attorney General*
Georgia Bar No. 901269

Office of the Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334
Telephone: (404) 656-3357

Melanie Johnson
Georgia Bar No. 466756
mjohnson@robbinsfirm.com
Edward Bedard
Georgia Bar No. 926148
ebedard@robbinsfirm.com
Danielle Hernandez
Georgia Bar No. 736830
dhernandez@robbinsfirm.com
Javier Pico Prats
Georgia Bar No. 664717
javier.picoprats@robbinsfirm.com
Anna Nicole Edmondson
Georgia Bar No. 289667
aedmondson@robbinsfirm.com
Robbins Alloy Belinfante Littlefield LLC
Atlanta, GA 30318
Telephone: (678) 701-9381
Facsimile:  (404) 856-3255

/s/ Alexa R. Ross
Alexa R. Ross
Georgia Bar No. 614986
alexarross@icloud.com
AlexaRossLaw, LLC
2657 Danforth Lane
Decatur, Georgia  30033

Special Assistant Attorneys General

*Attorneys for Defendants*