UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,    )
)
Plaintiff,    )
)      CIVIL ACTION FILE
v.    )
)      NO. 1:16-CV-03088-ELR
STATE OF GEORGIA,    )
)
Defendant.    )

## DEFENDANT'S MOTION TO EXCLUDE TESTIMONY
## OF DR. AMY MCCART AND SUPPORTING MEMORANDUM OF LAW

Pursuant to Federal Rule of Evidence 702, Defendant, State of Georgia, by and through its counsel of record submits this Motion to Exclude the Testimony of Amy McCart, Ph.D. ("Dr. McCart"). This Motion applies for trial and this Court's consideration of Motions for Summary Judgment. See Chapman v. Procter & Gamble Distrib., LLC, 766 F.3d 1296, 1313 (11th Cir. 2014) (citation omitted) (providing that only admissible evidence can be considered on a motion for summary judgment).

## I.    Introduction.

Dr. McCart possesses a Ph.D. in special education, and she is a senior researcher at the University of Kansas. (Rep. at 2[1].) Before it filed suit in

_____

[1] A true and accurate copy of Dr. McCart's report is attached as **Exhibit 1.**

August 2016, the United States Department of Justice (the "DOJ" or the "Department") retained Dr. McCart in May of that year to



(Rep. at 1; McCart Dep. at 18:8-14.)[2]  Given this conclusory framing of her investigation, it is not surprising that Dr. McCart opined that the GNETS Program ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ students with behavior related disabilities, and that it provides them with ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ (Rep. at 1.)  Dr. McCart's report also opines that the purported ▮▮▮▮▮▮▮▮" of such students is ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ (Id.)

Dr. McCart's opinions do not survive the scrutiny required by Federal Rule of Evidence 702.  First, her opinions on the qualitative and quantitative behavioral health services (that she wrongly believes are provided by the Georgia Department of Education ["DOE"]) are per se irrelevant to

---

[2] The Deposition of Dr. Amy McCart is attached hereto as **Exhibit 2**.

allegations arising under Title II of the Americans with Disabilities Act (the

"ADA"). <u>Olmstead v. L.C. ex rel. Zimring</u>, 527 U.S. 581, 603 (1999) (plurality

opinion).[3]

Second and relatedly, Dr. McCart's opinions on whether local school

officials' recommendations that students receive GNETS services are

"unnecessary" is inadmissible for a few reasons. One, Dr. McCart employs a

different definition of "unnecessary segregation" than the one articulated by

the Supreme Court of the United States in <u>Olmstead</u>. 527 U.S. at 600. This

renders it categorically irrelevant for purposes of a lawsuit about a claim

arising under Title II of the ADA. Two, Dr. McCart acknowledges that: (1)

determinations of what constitutes "appropriate services" is a highly

individualized inquiry; and (2) that educating students in segregated settings

is not always inappropriate. These concessions matter, because Dr. McCart

opined about the "vast majority" of GNETS students while acknowledging

that she had not reviewed documentation of their individual circumstances.

(McCart Dep. 141:10-19.)

---

[3] As recently recognized by the United States Court of Appeals for the Fifth
Circuit, Justice Kennedy's narrowing concurrence in <u>Olmstead</u> provides the
controlling opinion. <u>United States v. Mississippi</u>, 82 F.4th 387, 394 n.11 (5th
Cir. 2023) (citing <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977)).

Third, Dr. McCart cannot offer admissible testimony that her proposed recommendations are reasonable.  See 28 C.F.R. § 35.130(b)(7).  She presumes that the DOE has the authority to implement her recommendations, but she did not consider any authority for this presumption.  In addition, Dr. McCart acknowledges that any measure of reasonableness must consider cost and workforce, but she chose not to perform any kind of cost or workforce study or analysis.

Fourth, Dr. McCart relies on her "experience" advising state education agencies ("SEAs") like the DOE.  But, she cannot identify—in her report or her testimony—how that experience relates to Georgia. Frazier, 387 F.3d 1244, 1261.

Finally, several of Dr. McCart's opinions are unhelpful to the trier of fact, and, therefore, inadmissible.  See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1107 (11th Cir. 2005).  Specifically, Dr. McCart limited her review to the policies of the DOE, but she opines on "funding that's allocated for students with disabilities within the state, wherever that source is." (McCart Dep. 163:3-7; 165:19-22; 166:7-15.)  In addition, all of Dr. McCart's recommendations are based on the implementation of what she calls a multi-tiered system of supports ("MTSS"), but she failed to consider the DOE's current efforts on implementation.

Finally, Dr. McCart could not articulate specific or quantifiable recommendations, which leaves them unhelpful to the trier of fact.

## II. Facts: Dr. McCart's Testimony.

Dr. McCart has never testified as an expert witness, nor has she served as a court monitor. (McCart Dep. at 47:9-11, 48:6-7.) She is a self-described "radical."[4] (Id. at 316:10-14; Ex. 15.) She has never provided consulting services to the DOE, advised any Georgia school district or individual school, or served on an IEP Team in Georgia. (Id. 28:19-29:9; 55:18-20.)

Nevertheless, Dr. McCart repeatedly criticizes and blames DOE for purportedly causing the unnecessary segregation of, and unfair and unequal opportunities for students with behavior related disabilities. (Rep. at 1.) She based this opinion, in part, on her ███████████ that students receiving GNETS services could be educated in their zoned school's general classrooms. (Rep. at 167.) Indeed, Dr. McCart opines that the unquantified "vast majority of [students receiving GNETS services] can and should be served in integrated settings with appropriate services and support." (McCart Dep.

---

[4] Dr. McCart's report reflects her subjective approach. Her report describes her "██ ██ ████ ██ ████ ████ ████ ████ ████ ██ ████████████████████████████████████████████ (Rep. at 161 (emphasis added).) She also describes her own view as ██████████ (Id. at 167.)

154:19-22.)  Dr. McCart reached this conclusion despite conceding that she did not review the individual IEPs of the "vast majority" of the 2,925 individual students receiving services in GNETS during the 2021-2022 school year. (McCart Dep. 141:12-19; Rep. at 18, Figure G.).  Indeed, her observations are limited to **(1)** a review of only 65-100 IEPs selected by the DOJ (McCart Dep. 34:22-35:15); and **(2)** spending as little as ten minutes in GNETS classrooms.[5]  (Id. 117:9-14.)

These deficiencies are inconsistent with Dr. McCart's acknowledgement that,  at least in part, a determination of what constitutes "effective supports … depends, absolutely on each child … [a]nd their needs."[6]  (Id. 104:8-11.) Indeed, IEPs must be tailored to and based on the needs of each individual student.[7]  (Id. 62:18-63:2.)  According to Dr. McCart, the consideration of individual students' needs may create a situation where it is "appropriate" to "segregate students" from the general education environment.  (McCart Dep.

---

[6] Later, Dr. McCart said that the individualized considerations are "one variable" in a multi-factored analysis.  See McCart Dep. 105:8-14.

[7] This is also consistent with the Olmstead decision, where the plurality cited with approval the Eleventh Circuit's conclusion that "[T]here may be times [when] a patient can be treated in the community, and others whe[n] an institutional placement is necessary."  527 U.S. at 604 (quoting L.C. by Zimring v. Olmstead, 138 F.3d 893, 903 (11th Cir. 1998), aff'd in part, vacated in part, remanded sub nom. Olmstead, 527 U.S. at 581.

19:14-18; 21:5-15; 145:14-17; 183:13-21.)  This is true even if the student is provided with the "full array of supports and services."  (Id. 143:18-144:1.)

As also discussed more fully below, Dr. McCart had difficulty identifying anything other than the General Assembly's decision to fund GNETS grants as an affirmative act of the DOE to cause these alleged harms.  (Rep. at 167; McCart Dep. 151:15-18, 157:6-8, 15-158:7.)  Consequently, she focused her criticisms on DOE's purported inaction and supposed failure to affirmatively "provide effective social, emotional, and behavior supports, professional learning, technical assistance, guidance, and vision for students in the GNETS program."  (McCart Dep. 175:6-10.)

Dr. McCart's analysis is based on the quality of services provided to students with behavior-related disabilities.  She testified that DOE:

- Provid[es] an insufficient **quality**, in terms of support services that are provided to students with emotional or behavioral disabilities … as it relates to the GNETS program.  (McCart Dep. 172:19-173:2 (emphasis added).)

- [F]ailed to provide **effective** social, emotional, and behavioral supports, professional learning, technical assistance, guidance, and vision for students in the GNETS program." (McCart Dep. 175:6-10 (emphasis added).)

- [F]ailed to provide a **coherent system** of social, emotional, and behavioral, mental health supports."  (Id. 176:2-8, 177:17-21 (emphasis added).)

Indeed, Dr. McCart's description of her recommendations explains that they

███████████████████████████████████████████████████████████

(Rep. at 161 (emphasis added)).

Dr. McCart has conflicting testimony on the quantity of services

provided to students in the GNETS Program. At one point in her deposition,

she confirmed that her report does not opine that the "State of Georgia

Department of Education provides an insufficient number of support services,

an insufficient quantity of support services to students who are receiving – to

students with emotional or behavioral disabilities." (McCart Dep. 172:1-9.)

Yet, later, she blamed DOE for the lack of available services for IEP Teams to

consider and recommend to students who are referred to the GNETS

Program. (Id. 62:6-14.)

In addition to these criticisms, Dr. McCart's report makes several

recommendations for the DOE. (Rep. at 163-67.) She testified that her

proffered policies are "reasonable."[8] (McCart Dep. 81:10-14.) Dr. McCart's

proffered solution to "help make the situation better for the students [she]

---

[8] Interestingly, despite Dr. McCart's ██████████ held beliefs and concerns about the quality of services provided in the GNETS program, she does not recommend (1) removing any student currently receiving GNETS services from the program; or (2) prohibiting any future IEP Teams from referring students for GNETS services. (Rep. at 163-67.)

observed" in GNETS classrooms is for the DOE to develop and implement her

version of "equity-based MTSS" throughout each of Georgia's 2,306 schools.[9]

(McCart Dep. 204:16-21; Rep. at 162-67.)  Specifically, this means requiring

the DOE to develop the capacity to:

- Provide guidance for implementation of MTSS through direction, policy, and technical assistance for districts and schools throughout the State.

- Serve as technical support for district implementation of social, emotional, behavioral, and mental health practices within MTSS.

- Serve as technical support for district-focused learning aligned with high expectations and standards-based learning for students with behavior-related disabilities.

- Serve as technical support for district scaling of evidence-based implementation actions to support equity-based MTSS with embedded social, emotional, behavioral, and mental health.

- Serve as technical support for district implementation of evidence-based practices to support equity-based MTSS with embedded social, emotional, behavioral, and mental health.

(Rep. at 163-66.)

---

[9] *See* Georgia Department of Education "Quick Facts on Georgia Education 2021-2022" <u>available at</u> https://www.gadoe.org/External-Affairs-and-Policy/communications/Pages/Quick-Facts-on-Georgia-Education.aspx and attached hereto as **Exhibit 3**.

A. *Dr. McCart's Misunderstanding or Lack of Knowledge About Georgia Education Policy.*

During her deposition, it became quickly apparent that Dr. McCart lacks knowledge about or misunderstands fundamental aspects of Georgia education policy and applicable considerations of school governance.  These errors and omissions infected various aspects of her analysis.

For example, Dr. McCart has no knowledge of the State appropriations process, (McCart Dep. 42:16-19), and she did not review an appropriations act passed by the General Assembly.  (Id. 163:8-12; Rep., appx. E[10].)  She is also unaware of how LEAs can independently raise revenue independent from State appropriations (e.g., school taxes).  (Id. 229:14-21.)  Beyond aspects of LEAs', DOE's, or other agencies' budgetary constraints and governance, Dr. McCart admits she lacks knowledge of fundamental aspects of the ability of state agencies to control decisions made at the local school level: She does not know whether the DOE can hire or fire local school district superintendents or teachers.[11]  (McCart Dep. 40:21-41:15.)  Nor does she claim to understand whether the DOE, or the Georgia Departments of Community Health

---

[10] Dr. McCart testified that documents not listed on the Amended Appendix E to her report were not considered when preparing the report.  (McCart Dep. 35:21-36:2; Ex. 2.)
[11] Dr. McCart testified that she could not recall how GNETS teachers are hired or fired, and her report does not address the issue.  (McCart Dep. 41:15-42:15.)

("DCH") or Behavioral Health and Developmental Disabilities ("DBHDD")

can override the recommendations of an IEP team or even serve on IEP

teams.[12] (McCart Dep. 64:9-21, 55:21-56:13.)

Much of Dr. McCart's opinions supporting her conclusion that students

in GNETS receive ████████████████████████████ is based on

questions of how, where, and in what type of facility GNETS services are

provided.  (See generally Rep. at 68-157.)  In the light of her lack of

information about the governance of GNETS services is Dr. McCart's

erroneous belief that the "GNETS continuum of services [is] **established by**

**the State**," and that it is "**provided** by the State."[13] (McCart Dep. 302:12-

303:10 (emphasis added).).  See, e.g., Ga. Comp. R. & Regs. 160-4-7-.15(b)(10)

(expressly imposing the duty on LEAs to "[a]llocate supports and resources,

which may include in-kind services to GNETS to facilitate flexible models of

service delivery and best practices for equitable educational support as

appropriate.")

_____

[12] As reflected by the absence of such information in her report and her
deposition testimony, Dr. McCart is also unaware of any individual for whom
a State employee—from DOE, DCH, or DBHDD—mandated that a particular
student receive GNETS services. (McCart Dep. 124:13-125:3.)

[13] Dr. McCart does not provide opinions on the "legalities" of the case.
(McCart Dep. 39:13-20.)  The DOJ claims it is not intending to use Dr.
McCart's testimony to show that Georgia "administers" the GNETS programs
for purposes of Title II of the ADA.  (Doc. 395-1 at 2 n.4)

Similarly, Dr. McCart claimed (without specific evidence) that DOE "perpetuates" "██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" (Rep. at 167; McCart Dep. 151:15-18; 157:6-8.)  But, Dr. McCart does not know whether LEAs must accept or apply for GNETS grants, or if the DOE mandates LEA participation in the program.  (McCart Dep. 152:22-153:13.)  Nor could she explain whether LEAs or the DOE decide where to invest dollars (GNETS grants or otherwise) on playgrounds, gymnasiums, and the like.  (McCart Dep. 123:9-13.)  See also Ga. Comp. R. & Regs. 160-4-7-15(b)(10); 160-4-7-15(c) (authorizing GNETS funds to be spent in the full spectrum of environments from fully integrated to wholly separate).

B. *Dr. McCart's Testimony and the* <u>*Olmstead*</u> *Decision.*

The DOJ's complaint alleges that the State violates Title II through the unjustified isolation and segregation of students receiving services in GNETS.  [Doc. No. 1 at 1.]  Dr. McCart seeks to offer testimony on key elements of liability, but her views and opinions are inconsistent with controlling precedent.

(i)    "<u>Unjustified Isolation</u>."

In <u>Olmstead</u>, the Supreme Court recognized that providing services in institutional setting does not always violate the ADA—the isolation must be "unjustified" to be actionable.  500 U.S. at 600.  To prove "unjustified" isolation, a plaintiff must show that (1) the individual prefers an integrated setting; (2) the "responsible, treating physician" determines that providing services in an integrated setting is "appropriate" for the individual; and (3) the requested modification is reasonable and does not cause a fundamental alteration of the state's programs.  <u>See</u> <u>id.</u> at 610 (Kennedy, J., concurring); <u>Bircoll v. Miami-Dade Cty.</u>, 480 F.3d 1072, 1082 (11th Cir. 2007).

Dr. McCart employs a materially different definition of "unnecessary segregation."  Although her report does not define the term, when asked during her deposition to articulate what "constitutes unnecessary segregation," Dr. McCart stated it means whenever a student is "moved away from his or her school-aged peers or siblings, set apart from, or treated differently than students without disabilities."  (McCart Dep. 65:17-22.)  This definition eliminates the necessary qualifier "unnecessary" altogether and is not relevant to an ADA analysis.

        (ii)    <u>Quality and Quantity of Services</u>.

The <u>Olmstead</u> plurality took pains to clarify—particularly in the light of Justice Kennedy's concurrence and the dissent of Justices Thomas, Chief

Justice Rehnquist, and Justice Scalia—that the ADA does not "impose[] on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.'" 527 U.S. at 603 n.14. In other words, ADA liability cannot be based on *qualitative* concerns.

Justice Kennedy's controlling concurrence in Olmstead also explained that states cannot be liable under the ADA for providing an insufficient *quantity* of services:

> Grave constitutional concerns are raised when a federal court is given the authority to review the State's choices in basic matters such as establishing or declining to establish new programs. It is not reasonable to read the ADA to permit court intervention in these decisions. In addition, … by regulation a public entity is required only to make "reasonable modifications in policies, practices, or procedures" when necessary to avoid discrimination and is not even required to make those if "the modifications would fundamentally alter the nature of the service, program, or activity." 28 CFR § 35.130(b)(7) (1998). It follows that a State may not be forced to create a community-treatment program where none exists.

527 U.S. at 612–13 (Kennedy, J., concurring).

Dr. McCart's opinions and conclusions focus on these irrelevant questions of quantity and quality. As shown, she makes a foundational error of presuming that the DOE itself provides behavioral services. See supra at

II.A.  This is simply not the case, but it is baked into each of Dr. McCart's criticisms and recommendations.  (Rep. at 160-167.)  Thus, implementing any of her recommendations would require the DOE itself to "create … community treatment program[s] where none exist." 527 U.S. at 613 (Kennedy, J., concurring).

In addition to this seminal error and its consequences, to the extent that Dr. McCart claims that DOE provides an insufficient quantity of services, her testimony is inconsistent with the limitations imposed by the Olmstead decision.  For example, and notwithstanding Dr. McCart's testimony to the contrary (McCart Dep. 172:1-9), Dr. McCart's report opines that GNETS personnel ███████████████████ and must be trained in "███████████████████████████████████████████ ███████████████████ (Rep. at 150.)  More generally, the report opines that ███████████████████████████ ████████████████████████████████████████ ███████████ and opines that there is not just a qualitative issue but an absence of services: ██████████████████████████ (Rep. at 151.)  Similarly, Dr. McCart claims that there is a ██████████ ███████████████████████████ ████████████████████████████

▅▅▅▅▅▅▅▅▅▅▅▅ (Rep. at 160.)  Dr. McCart recommends that these

services be provided, and it is axiomatic that the implementation of a new

service or strategy requires "establishing" or "create[ing]" a new program

where one does not exist.  Olmstead, 527 U.S. at 612, 613 (Kennedy, J.,

concurring).

    C. *Reasonable Accommodations & Experience*

The ADA, its implementing regulations, and the Olmstead decision all

make clear that any requested accommodation must be reasonable and not

result in a fundamental alteration of a state's programs.  See Olmstead, 527

U.S. at 603 (Ginsberg, J., plurality).  Reasonableness is an element of a

plaintiff's case, and fundamental alteration is a defense.  Willis v. Conopco,

Inc., 108 F.3d 282, 286 (11th Cir. 1997).  The Eleventh Circuit has held that

reasonableness is decided on a case-by-case basis.  Bircoll, 480 F.3d at 1086.

Olmstead, 527 U.S. at 606 n.16.

Dr. McCart's testimony does not adopt this individualized and case-by-

case approach.  First, her testimony groups students together as an

undefined "vast majority," and does not adopt the case-by-case approach

required by Bircoll, or the complete review used by the DOJ in United States

v. Florida.  (Rep. at 22, 159, 167.)

When considering the reliability of Dr. McCart's testimony on the reasonableness of implementing her version of "equity-MTSS" (McCart Dep. 92:15-17), it is important to acknowledge that she herself defines it as a "fundamental redesign," (Id. 93:10-16; Ex. 3), that requires "reorganized systems, structures, and resources" (Id. 276:12-277:3; Ex. 10), and "extensive professional learning and intensive [technical assistance], particularly directed at LEAs and individual schools." (Id. 266:16-267:7; Ex. 8.)

Against this backdrop, it matters that, contrary to the Supreme Court's analysis in Olmstead and her own testimony, Dr. McCart did not consider or perform any cost or workforce study. She testified that cost is relevant at least in a "general sense," and workforce availability is "always" a factor. (McCart Dep. 83:7-10, 11-12.) But, she performed no cost analysis or workforce study, and her report does not reference one. (Id. 43:6-8, 162:12-17 (cost analysis) and 83:13-15 (workforce analysis)). In addition, Dr. McCart did not consider the rates of principal turnover in Georgia's generally zoned schools. (Id. 309:19-310:4.)

In a possible effort to address this shortcoming, Dr. McCart testified that her ███████████████████████████████████████████ ██████████████████████████████████████ provide the requisite expertise to support her conclusion. (Rep. at 160.) However, Dr. McCart has

not explained how that experience relates to her recommendations for the

DOE.  Specifically, Dr. McCart acknowledges that implementing her MTSS

recommendation is "not easy," (McCart Dep. 307:11-19, Ex. 12), and would

look different in Georgia than in the other states where she has provided

consultation services.  (McCart Dep. 99:8-21.)   Dr. McCart's reliance on her

experience is also questionable given that her report does not, and during her

deposition she could not, identify a state that has achieved full

implementation of MTSS at each school, nor does her report identify one.

(McCart Dep. 44:3-45:4, 46:17-22.)  She does not know how implementation

will fare in Georgia.  (Id. 268:20, 269:3.)  These concerns are compounded by

Dr. McCart's failure to identify a fidelity standard to allow the fact-finder or

Georgia policymakers to know if her recommendations are being

implemented with fidelity.  (Id. 100:11-101:5.)

## III.   Analysis.

### A.   The *Daubert* Standard

Federal Rule of Evidence 702, which governs the admissibility of expert

testimony, provides that:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  Trial courts are tasked with acting as "gatekeepers" to ensure that a proposed expert's testimony is not only relevant, but reliable. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592 (1993). To that end, district courts are "charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." Corwin v. Walt Disney Co., 475 F.3d 1239, 1250 (11th Cir. 2007).

As the gatekeeper, the trial court must make a "rigorous three-part inquiry" to determine whether:

(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (internal cit.

omitted). Although the three prongs overlap, trial courts must be cautious not

to conflate them, and the proponent of expert testimony bears the burden to show that *each* requirement is met. <u>Id</u>. (emphasis added); <u>Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.</u>, 402 F.3d 1092, 1113-14 (11th Cir. 2005).

The analysis for "reliability" considers "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community." <u>Allison v McGhan Med. Corp.</u>, 184 F.3d 1300, 1312 (11th Cir. 1999) (citation omitted).  The relevance prong requires the party offering the testimony to show that the proffered testimony "logically advances a material aspect of the proposing party's case."  <u>Id</u>.

The burden of establishing that Dr. McCart's testimony satisfies *each* requirement lies exclusively with the Plaintiff. <u>Frazier</u>, 387 F.3d at 1260 (emphasis added).

Dr. McCart's testimony fails both the relevance and reliability prongs of the <u>Daubert</u> test.

B.    <u>Relevance</u>.

The requirement that expert opinions be relevant limits three aspects of Dr. McCart's testimony, specifically her opinions on: (1) the quantity and

quality of behavioral health services; (2) the reasonableness of her recommendations; and (3) the appropriateness of GNETS services for the "vast majority" of students.

Dr. McCart's testimony about the quantity or quality of services is irrelevant to the questions before the Court at summary judgment and, potentially, trial. The ADA does not impose any "standard of care" on states' provision of services. Olmstead, 527 U.S. at 603 n.14. Nor does it require states to augment the number of services provided. Yet, Dr. McCart's criticisms are based on her qualitative and quantitative attacks. Such testimony is not relevant opinion testimony and is inadmissible. Daubert, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."). This is also true because Dr. McCart did not consider DBHDD or DCH, but she appears to question the efficacy of behavioral support services offered by DOE.

Similarly, Dr. McCart should be precluded from providing testimony on whether her recommendations are reasonable. As an initial matter, she acknowledged she does not know if implementation of her recommendations in Georgia will be difficult. (McCart Dep. 268:20, 269:3.) Dr. McCart acknowledged the historical challenges and significance of her proposals that she previously described as requiring "reorganized systems, structures, and

resources." (McCart Dep. 276:12-277:3; Ex. 10), See also Id. 93:10-16; 266:16-267:7; Exs. 3,8). The Supreme Court was wary of imposing such burdens on states and required the consideration of at least the factors of cost and workforce when evaluating the reasonableness of a proposed accommodation. Olmstead, 527 U.S. at 606 n.16. Dr. McCart herself does not disagree. (McCart Dep. 83:7-10, 11-12.) Despite this, Dr. McCart did not provide or consider a cost study or workforce analysis. (Id. 43:6-8, 162:12-17 (cost analysis) and 83:13-15 (workforce analysis)). Thus, any testimony she provides on reasonableness is irrelevant in the light of the binding precedent of Olmstead and its mandate to consider cost and workforce.

Nor can Dr. McCart reasonably rely on her experience to save her testimony. As shown, Dr. McCart agreed that any implementation of MTSS would look different in Georgia than in the states she relies on to form that experience. (McCart Dep. 99:8-21.) Moreover, Dr. McCart could not identify a state that had implemented the robust recommendations she makes for Georgia. (McCart Dep. 44:3-45:4, 46:17-22.) Thus, she has not provided the mandatory link between her experience and her opinions about Georgia.

Indeed, in Frazier, 387 F.3d at 1261, the Eleventh Circuit underscored the importance of a proposed expert's explanation of how and why an expert's experience leads her to her proffered conclusions:

> [T]he Committee Note to the 2000 Amendments of Rule 702 expressly says that, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 advisory committee's note (2000 amends.) (emphasis added); see also Daubert v. Merrell Dow Pharmaceuticals, Inc. (on remand), 43 F.3d 1311, 1316 (9th Cir. 1995) (observing that the gatekeeping role requires a district court to make a reliability inquiry, and that "the expert's bald assurance of validity is not enough").

Dr. McCart fails to meet this standard. She has not explained how her experience leads to the conclusions she reached for Georgia and how she applied that experience to reach her conclusions, as required under <u>Frazier</u>. 387 F.3d at 1261. This is exceptionally apparent when Dr. McCart concedes that the rates of service provisions vary across states, <u>McCart Dep.</u> 178:11-13, she could not identify a state that has achieved full implementation of MTSS at each school (nor does her report identify one) <u>Id.</u> 44:3-45:4, 46:17-22, and she does not know how implementation will fare in Georgia, <u>Id.</u> 268:20, 269:3. All of Dr. McCart's uncertainty undermines the extent to which Dr. McCart reliably applied (if at all) her experience in other states to her conclusions about Georgia.

Dr. McCart's opinions about reasonableness are also inconsistent with Eleventh Circuit precedent. Where Dr. McCart spoke in generalized terms

about the "vast majority" of students receiving GNETS services, the Bircoll decision mandates a case-by-case analysis.  (McCart Dep. 141:10-19; 480 F.3d at 1086.  Thus, her collectivist and systemic approach is irrelevant to questions of reasonableness in the Eleventh Circuit.

      C.    <u>Helpfulness to the Trier of Fact</u>

Dr. McCart's testimony about her recommendations is also not helpful to the trier of fact for several reasons.  <u>Daubert</u>, 509 U.S. at 591–92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.") First, Dr. McCart recommends that the DOE implement and provide training on her model of equity-based MTSS, but she does not know what the DOE is currently doing in this space.  Consequently, her opinion testimony that criticizes DOE's activities should be inadmissible as it is not helpful to the trier of fact.

To the extent that Dr. McCart opines that LEAs must accept her recommended training from the DOE, the same is true. Dr. McCart does not know if the DOE can require the LEAs to implement her recommendations, nor does she have any understanding about the hiring or firing of local education officials by the DOE.  (Dep. at 40:17-41:14.)

      D.    <u>Methodology</u>.

Dr. McCart's methodology is too unreliable to sustain scrutiny under Rule 702 and the Eleventh Circuit case law applying it because Dr. McCart employed little to no methodology in reaching her conclusions and associated recommendations. Dr. McCart purports to have conducted ███████

████████████████████████████████████████████████

████████████████████ to develop her opinions. (Rep. at 12.) According to Dr. McCart, this methodology included 70 site visits to 27 center-based GNETS Program sites and 36 school-based GNETS Program sites. (Id.) At the site visits Dr. McCart claims to have "generally toured each facility; spent time observing classrooms, students, and staff; conducted informal interviews of regional GNETS program personnel and, where present, school (general education) and district personnel; and documented my observations and impressions through notes and photographs." (Id.)

Most questionably, Dr. McCart used a series of self-authored questions as shown in the tables on pages 8-11 of her report ████████████

████████████████ (Id. at 12; 8-11). Dr. McCart herself "developed" the tables identified on pages 8-11 of her report, and while the report cites no authority for the construct, she testified that it was based on what she described (but did not identify) as ████████████████████

████████████████████████████████ (Id. at 8-

11; Dep. at 248:7-10.) This is not enough. The Court cannot simply "tak[e] the expert's word for it." Am. Pegasus SPC by & through Sybersma v. Clear Skies Holding Co., LLC, No. 1:13-CV-03035-ELR, 2016 WL 11710067 (N.D. Ga. Jan. 14, 2016) (internal citation omitted). Indeed, "[i]f admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." United States v. Frazier, 387 F.3d 1244, 1261 (11th Cir. 2004) (emphasis in original).

Dr. McCart's wholesale failure to include a defensible methodology is further highlighted in her testimony regarding her IEP review. According to Dr. McCart, she reviewed "[s]omewhere between 65 and 100 student IEP records" that were provided to her by the Department of Justice. (Dep. at 34:22-35:15.) While Dr. McCart claims that her opinion is about the "nearly 3,000 students that are served in the [GNETS] program," she acknowledges that she observed about a "thousand" or so students along with the 65-100 IEPs she reviewed. (Dep. at 40:3-9; 34:22-35:15.) Dr. McCart does not even attempt to explain how this non-statistical sample was utilized to extrapolate her conclusion to the broader entirety of the GNETS population.

Dr. McCart's report also notably fails to include the process she employed for reviewing the 65-100 IEPs, including whether she utilized any

field-approved tools or other measures in her review, whether her review was standardized and uniform, what she was looking for, why she chose to review those IEPs in particular, and how those IEPs were chosen. Even worse, Dr. McCart conceded that the IEPs she reviewed were hand-picked by the DOJ, and she has no idea whether they were selected at random. (Dep. at 35:11-36:2.) This casts serious doubt on the reliability of Dr. McCart's findings, as there is no indication she employed a standardized method to reduce or eliminate bias and subjectivity in her review.

Rule 702 requires expert testimony be "the product of reliable principles and methods" and the expert must have "reliably applied the principles and methods to the facts." Here, there was a wholesale lack of any principles and methods used by Dr. McCart in her IEP review. It would be impossible to test her technique as there is no information or detail provided on what Dr. McCart actually did to reach her conclusions. None of this purported methodology satisfies the requirements of Rule 702.

This Court has previously excluded the testimony of proffered experts who did not satisfy the heightened admissibility analysis applicable to an expert who relies on his experience. In <u>Scheinfeld</u>, this Court held that an expert's "conclusory statements devoid of factual or analytical support is simply not enough" to demonstrate reliability and that "more is required if an

expert is relying solely or primarily on experience as the basis for his opinions." <u>Scheinfeld v. LM Gen. Ins. Co.</u>, 472 F. Supp. 3d 1329 (N.D. Ga. 2020) (relying on <u>Frazier</u>, 387 F.3d at 1261.) For the reasons above, the Court should do the same here.

Lastly, coupled with her lack of review and understanding of GNETS funding, discussed *supra*, II.A, Dr. McCart's conclusions becomes a general wish list of changes that have not been proven to be applicable to Georgia. The Court cannot test the reliability of Dr. McCart's opinions. <u>See</u> <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 158–59 (1999) (Scalia, J. concurring) (the trial court's "discretion in choosing the manner of testing expert reliability ... is not discretion to abandon the gatekeeping function."); <u>Scheinfeld</u> at 1340 (citing <u>Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.</u>, 402 F.3d 1092, 1113 (11th Cir. 2005) ("'[P]resenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough' to demonstrate reliability."). Her testimony should be excluded accordingly.

Respectfully submitted this 7th day of November, 2023.

| | |
|---|---|
| Christopher M. Carr | */s/ Josh Belinfante* |
| *Attorney General* | Josh Belinfante |
| Georgia Bar No. 112505 | Georgia Bar No. 047399 |
| Bryan K. Webb | jbelinfante@robbinsfirm.com |
| *Deputy Attorney General* | Melanie Johnson |

Georgia Bar No. 743580
Russell D. Willard
*Senior Assistant Attorney General*
Georgia Bar No. 760280
Susan R. Haynes
*Assistant Attorney General*
Georgia Bar No. 901269
Office of the Attorney General
40 Capitol Square, S.W. Atlanta,
Georgia 30334
Telephone: (404) 656-3357

Georgia Bar No. 466756
mjohnson@robbinsfirm.com
Edward Bedard
Georgia Bar No. 926148
ebedard@robbinsfirm.com
Danielle Hernandez
Georgia Bar No. 736830
dhernandez@robbinsfirm.com
Javier Pico Prats
Georgia Bar No. 664717
jpicoprats@robbinsfirm.com
Anna Edmondson
Georgia Bar No. 289667
aedmondson@robbinsfirm.com
**Robbins Alloy Belinfante
Littlefield LLC**
500 14th Street NW
Atlanta, GA 30318
Telephone: (678) 701-9381
Facsimile: (404) 856-3255

Alexa R. Ross
Georgia Bar No. 614986
alexarross@icloud.com
**AlexaRossLaw, LLC**
2657 Danforth Lane
Decatur, Georgia 30033

Special Assistant Attorneys General
*Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing

MOTION TO EXCLUDE TESTIMONY OF DR. AMY MCCART was prepared

double-spaced in 13-point Century Schoolbook font, approved by the Court in

Local Rule 5.1(C).

*/s/Josh Belinfante*
Josh Belinfante