

# Transcript of **Amy McCart, Ph.D.**

Tuesday, October 24, 2023

*United States of America v. State of Georgia*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 134597

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF GEORGIA

3                    ATLANTA DIVISION

4     - - - - - - - - - - - - - - X

5     UNITED STATES OF AMERICA,          :

6            Plaintiff,               :   Civil Action No.

7            v.                       :   1:16-cv-03088-ELR

8     STATE OF GEORGIA,                   :

9            Defendant.               X

10    - - - - - - - - - - - - - - -

11                        TUESDAY, OCTOBER 24, 2023

12            Videotaped Deposition of AMY McCART,

13    Ph.D., a witness herein, called for examination by

14    counsel for defendant in the above-entitled matter,

15    pursuant to notice, the witness being duly sworn by

16    Desirae S. Jura, a Notary Public in and for the

17    District of Columbia, held at the offices of United

18    States Attorney's Office, 150 M Street, N.E.,

19    Washington, DC, at 9:14 a.m., ET, Tuesday, October

20    24, 2023, and the proceedings being taken down by

21    Stenotype by Desirae S. Jura, RPR, and transcribed

22    under her direction.

```
 1    APPEARANCES:

 2

 3    On behalf of the Plaintiff:

 4         MICHELLE L. TUCKER, ESQ.

 5         MATTHEW GILLESPIE, ESQ.

 6         VICTORIA LILL, ESQ.

 7         KELLY GARDNER, ESQ.

 8         LAURA TAYLOE, ESQ.

 9         JESSICA E. BERRY, Paralegal Specialist

10         U.S. DEPARTMENT OF JUSTICE

11         Civil Rights Division

12         4 Constitution Square

13         950 Pennsylvania Avenue, NW

14         Washington, DC 20530

15         (202) 305-3488

16         Michelle.Tucker@usdoj.gov

17         Matthew.Gillespie@usdoj.gov

18         Victoria.Lill@usdoj.gov

19         Kelly.Gardner@usdoj.gov

20

21

22
```

1    APPEARANCES (Continued):

2

3    On behalf of the Defendant:

4          JOSH BELINFANTE, ESQ.

5          MELANIE JOHNSON, ESQ.

6          ROBBINS ALLOY BELINFANTE & LITTLEFIELD, LLC

7          500 14th Street, NW

8          Atlanta, Georgia 30318

9          (678) 701-9381

10         jbelinfante@robbinsfirm.com

11         mjohnson@robbinsfirm.com

12

13   APPEARING REMOTELY VIA ZOOM:

14         ANDREA HAMILTON WATSON (United States)

15         CLAIRE CHEVRIER, ESQ. (State of Georgia)

16         JAVIER PICO PRATS (State of Georgia)

17         DANIELLE HERNANDEZ (State of Georgia)

18         STACEY SUBER-DRAKE (State of Georgia)

19         CHANTEL MULLEN (State of Georgia)

20

21   ALSO PRESENT:

22         APRIL CARTER, Videographer

1                    C O N T E N T S

2    WITNESS                    EXAMINATION BY COUNSEL FOR

3    AMY McCART, Ph.D.                    DEFENDANT

4        BY MR. BELINFANTE                    9

5

6        Afternoon Session - Page 141

7

8                    E X H I B I T S

9    McCART EXHIBIT NO.                    PAGE

10      1 - Declaration and Expert Disclosure of

11          Dr. Amy McCart                    12

12      2 - Appendix E, Materials Considered by

13          Amy McCart in the Preparation of her

14          Expert Report                    14

15      3 - Article, KU Experts Write Guide to

16          Transforming Schools Based on

17          Research in Education, Disability    89

18

19

20

21

22

```
1                       E X H I B I T S

2    McCART EXHIBIT NO.                              PAGE

3      4 - Article, Why Aren't Students with

4          Severe Disabilities Being Placed in

5          General Education Classrooms:

6          Examining the Relations Among

7          Classroom Placement, Learner

8          Outcomes, and Other Factors          110

9      5 - Article, Child Find Activities

10         Under the Individuals With

11         Disabilities Education Act, Recent

12         Case Law                             126

13     6 - Article, Individual Education Plan

14         Goals and Services for Adolescents

15         With Autism:  Impact of Age and

16         Educational Setting                  130

17     7 - 160-4-7-.15, Georgia Network for

18         Educational and Therapeutic Support

19         (GNETS)                              225

20

21

22
```

1                    E X H I B I T S

2    McCART EXHIBIT NO.                          PAGE

3      8 - Journal of School Leadership 2022,

4          Article, Issues in Statewide Scale

5          up of a Multi-Tiered System of

6          Support                              262

7      9 - Article, Stars in Alignment          272

8     10 - Article, Reshaping Educational

9          Systems to Realize the Promise of

10         Inclusive Education                  276

11    11 - Excerpt, Build Equity, Join Justice,

12         a Paradigm for School Belonging      305

13    12 - Excerpt, page 71, Build Equity,

14         Join Justice                         307

15    13 - Excerpt, page 110, Build Equity,

16         Join Justice                         308

17    14 - Excerpt, page 111, Build Equity,

18         Join Justice                         310

19    15 - SWIFT Education Center, "Our Team"    316

20

21

22

1                  P R O C E E D I N G S

2           THE VIDEOGRAPHER:   We are now on the

3      record in the matter of United States of America

4      versus State of Georgia.   Today's date is October

5      24th.   The time is 9:14 a.m.   This is the video

6      recorded deposition of Dr. Amy McCart, being taken at

7      U.S. Department of Justice, 150 M Street, Northeast,

8      Washington, DC, 20002.

9           I'm the camera operator.   My name is April

10     Carter, in association with TP.One.   The court

11     reporter is Desirae Jura, also in association with

12     TP.One.

13           Will all attorneys please identify

14     themselves and the parties they represent, beginning

15     with the party noticing this proceeding.   And I'll

16     repeat it for our remote guests.

17           MR. BELINFANTE:   Josh Belinfante,

18     representing the State of Georgia.

19           MS. JOHNSON:   Melanie Johnson,

20     representing the State of Georgia.

21           MS. TUCKER:   Michelle Tucker for the

22     United States.



 1                    MR. GILLESPIE:  Matthew Gillespie for the

 2     United States.

 3                    MS. LILL:  Victoria Lill for the United

 4     States.

 5                    MS. GARDNER:  Kelly Gardner for the United

 6     States.

 7                    MS. TAYLOE:  Laura Tayloe for the United

 8     States.

 9                    THE VIDEOGRAPHER:  Thank you.  And will

10     remote attorneys please identify themselves?

11                    MS. CHEVRIER:  Claire Chevrier for the

12     United States.

13                    MS. WATSON:  Andrea Hamilton Watson for

14     the United States.

15                    MR. PRATS:  Javier Pico Prats for the

16     State of Georgia.

17                    MS. HERNANDEZ:  Yeah, we've got Danielle

18     Hernandez on behalf of the State of Georgia.  And

19     then we've got Stacey Suber-Drake and Chantel on

20     behalf of the State of Georgia.  They're corporate

21     representatives.

22                    THE VIDEOGRAPHER:  Thank you.  And will

1    the court reporter please administer the oath?

2    Whereupon,

3                    AMY McCART, Ph.D.,

4    having been duly sworn by the Notary Public, was

5    examined and testified as follows:

6         EXAMINATION BY COUNSEL FOR DEFENDANT

7    BY MR. BELINFANTE:

8         Q.    Good morning, Dr. McCart.

9         A.    Good morning.

10         MR. BELINFANTE:  This is the deposition of

11    Dr. Amy McCart, taken by the defendant, the State of

12    Georgia, for purposes of discovery and all purposes

13    allowed under the Federal Rules of Civil Procedure.

14    Michelle has previously agreed, all objections except

15    those going to privilege and the form of the question

16    be reserved until the time of trial or use of the

17    deposition.

18         MS. TUCKER:  Yes, agreed.

19    BY MR. BELINFANTE:

20         Q.    Okay.  Dr. McCart, have you ever been

21    deposed before?

22         A.    No.



1      Q.    So there's just some kind of basic rules

2   that we'll try to follow, and I just want to make

3   sure they're agreeable to you.

4      A.    Okay.

5      Q.    Most importantly, we have to make sure the

6   court reporter gets everything said.  So I will

7   certainly try not to talk over you, and ask that you

8   not try to talk over me.  It's a natural thing in

9   conversation, but we'll have to stop if we do that,

10  so that the court reporter can get an accurate

11  record.  Is that okay?

12     A.    Okay.

13     Q.    All right.  Also, and I've had this

14  problem, witnesses will often answer things like

15  "uh-huh" or "huh-uh," which does not come across on a

16  trial transcript well.  So if you could answer "yes"

17  or "no," as opposed to those kind of answers.  Would

18  that be okay?

19     A.    Yes.

20     Q.    We can take a break whenever you want.

21  The only question -- or the only request I would have

22  is that if I have a question outstanding, if you

1    could answer the question, and then we can take a

2    break.  Is that agreeable?

3         A.    Sure, yes.

4         Q.    I am not going to try to ask confusing

5    questions.  I do not always succeed in doing that.

6    And I will, you know, frequently catch myself.  But

7    if a question is confusing, please feel free to ask

8    me to rephrase it, or if you don't understand what

9    I'm asking.  Is that also agreeable?

10        A.    Yes.

11        Q.    Okay, great.  So with that in mind, what

12   did you do to prepare for today's deposition?

13        A.    To prepare for today's deposition, it

14   actually started a long time ago with site visits,

15   and evaluation of thousands of documents, and review

16   of deposition transcripts, and resulting in the

17   compilation of the report.

18             And then more recently, additional review

19   of the report in preparation for today, and meeting

20   with the Department of Justice.

21        Q.    Okay.  I'm specifically not asking for any

22   conversations you had with the Department of Justice.



1    But independent of what you did to prepare for the

2    report, to prepare for today's deposition, and

3    understanding it's been rescheduled a couple times.

4         A.    Yes.

5         Q.    How much time do you think you spent with

6    the Department of Justice to prepare for your

7    deposition testimony?

8         A.    I don't recall -- I don't have a specific

9    number, but probably more than ten hours.

10        Q.    And let me go ahead and introduce your

11   report as an exhibit.  We'll mark it as Exhibit 1.

12                  (McCart Exhibit No. 1 was identified

13                   for the record.)

14             MR. BELINFANTE:  We'll mark this one as

15   the exhibit, and presuming -- I presume they're the

16   same.

17             MS. TUCKER:  Yeah.

18             THE WITNESS:  I'm happy to use --

19             MR. BELINFANTE:  Use that if it's easier.

20   That's totally fine.  If we see that there's an

21   issue, we can clarify it.

22   BY MR. BELINFANTE:



1        Q.    Okay.  Is this the report that you

2   prepared for this lawsuit?

3        A.    Yes.

4        Q.    Okay.  And attached to this report is an

5   Exhibit or Appendix, I believe, E; is that correct?

6        A.    Yes.

7        Q.    And Appendix E is the materials -- where

8   you've identified the materials you considered for

9   the report?

10       A.    I am turning to that right now.

11       Q.    And I'm not trying to trick you.  There is

12   an --

13       A.    I know.  Yes, Exhibit E are the materials

14   considered for this report.

15       Q.    Let me introduce what we'll mark as

16   Exhibit 2, which is, I believe, the amended Appendix

17   E.  Let me show you what we may mark as Exhibit 2.

18   And if you'll tell me if that's the amended one,

19   because it looks the same to me.

20       A.    This is the amended one.

21       Q.    That is the amended, okay.

22       A.    The one you have.

1      Q.      The one that I have --

2      A.      The one you handed me.

3      Q.      The one I just handed you?

4      A.      Yes.

5      Q.      Okay.  Let's mark the document we just

6   handed her as Exhibit 2.

7                  (McCart Exhibit No. 2 was identified

8                  for the record.)

9              THE WITNESS:  And I'm feeling like I

10  should use the report you have.

11             MR. BELINFANTE:  It's your call, whatever

12  you would prefer to use.

13             MS. TUCKER:  We can just -- if you want to

14  use that one.

15  BY MR. BELINFANTE:

16      Q.      Dr. McCart, I know there have been some

17  developments or things that have happened since you

18  provided both the Appendix E and amended Appendix E.

19  Have you read in this case the Department of

20  Justice's partial motion for summary judgment?

21      A.      No.

22      Q.      Did you read Dr. Wiley's report filed on

1    behalf of the state?

2        A.    No.

3        Q.    Did you read Dr. Putnam's report filed on

4    behalf of the United States?

5        A.    No.

6        Q.    Are you familiar with a companion -- well,

7    I'll call it companion -- are you familiar with a

8    lawsuit also against Georgia over GNETS, brought by

9    the Georgia Advocacy Office and other advocacy

10   groups?

11       A.    Yes.

12       Q.    Did you read any of the expert reports

13   that have been submitted in that case?

14       A.    No.

15       Q.    Are you familiar with Kimm Campbell from

16   Florida?

17       A.    I don't believe so.

18       Q.    Okay.  Broward County, specifically.

19       A.    No, that doesn't sound familiar.

20       Q.    Are you familiar with Dr. Judy Elliott

21   from Los Angeles?

22       A.    Yes.



1    Q.    Are you familiar with her work?

2    A.    Yes.

3    Q.    Okay.  I may have other questions about

4    that.  You're testifying today --

5    A.    Sir, I just want to clarify.  I don't

6    know -- did you say her name was Kim?

7    Q.    Kimm, K-I-M-M, Campbell?

8    A.    Yeah.  She may know me.

9    Q.    Sure.

10    A.    I don't know her.

11    Q.    Okay.  You are testifying today -- it says

12    on page 1 of your report that you have been "retained

13    to present expert testimony in this matter on behalf

14    of the United States."  That's paragraph 1 of your

15    declaration.  Do you see that?

16    A.    Yes.

17    Q.    Was that based on a contract?

18    A.    Yes.

19    Q.    Is the contract with you individually,

20    with Kansas University, or someone else?

21    A.    It's University of Kansas, but the

22    contract is with me.

1    Q.    Okay.  Outside of the travel to Georgia,

2    so once you traveled and collected information, how

3    long did you spend preparing your report?

4    A.    Oh, that is a difficult question.  Many,

5    many, many hours.

6    Q.    And would that be reflected in an invoice

7    or bills sent to the United States?

8    A.    Yes.

9    Q.    Okay.  Who contacted you about preparing a

10    report in this lawsuit?

11    A.    Ms. Lill.

12    Q.    Okay.  Did you know Ms. Lill prior to your

13    work in this case?

14    A.    No.

15    Q.    Okay.  You do work, though, for the United

16    States Department of Education, is that correct, or

17    "with," I should say?

18    A.    The center that I direct at the University

19    of Kansas receives funding through grants, like many

20    universities, to do work on behalf of the Department

21    of Education.

22    Q.    Okay.  And what's the name of the center?

1        A.      SWIFT Center, SWIFT Education Center.

2        Q.      All right.  When Ms. Lill reached out to

3    you, did she tell you -- or let me ask this.  Do you

4    know roughly when she reached out to you about

5    providing an expert report in this case?

6        A.      Yes.

7        Q.      When was that?

8        A.      In May of 2016, Ms. Lill contacted me to

9    see if I would be willing to serve as an expert

10   witness on this case.

11       Q.      Okay.  And obviously you said yes?

12       A.      Yes.

13       Q.      So my question is, why did you say yes?

14       A.      Because I was asked.

15       Q.      In your words, what is this lawsuit about?

16       A.      In my words, this lawsuit is about the

17   issues of whether or not students who have

18   disabilities in the State of Georgia, who have

19   behavior-related disabilities in the State of Georgia

20   are segregated en masse, whether or not students with

21   behavior-related disabilities in the State of Georgia

22   in the GNETS program are given fair and equal

1    educational opportunities, and whether or not

2    students with behavior-related disabilities in the

3    GNETS program, or at risk for placement in the GNETS

4    program, have appropriate supports and services.  And

5    whether or not the GNETS program is necessary to meet

6    their educational needs.

7         Q.    Is it your opinion that the existence of

8    the GNETS problem -- or excuse me, the existence of

9    the GNETS program is a, per se, bad policy?

10             MS. TUCKER:  Object to form.

11             THE WITNESS:  I don't know what you're

12   asking.  I'm sorry.

13   BY MR. BELINFANTE:

14        Q.    Is there -- do you believe that there is

15   an appropriate role for a program like GNETS, ever?

16        A.    No, not for GNETS, specifically.  If

17   you're asking whether or not it's appropriate to ever

18   segregate students, yes.

19        Q.    And is that based on the individual needs

20   of the student?

21        A.    It's based on a variety of variables,

22   including the teaching and learning process, how



1    students learn, what context they're in, what

2    supports are provided, what strategies are effective

3    in supporting their needs, et cetera.

4        Q.    And would you base that on an individual

5    student or would you apply that to populations of

6    students?  In other words, for example, would you say

7    all autistic kids, X, either should be educated in

8    the general education setting or could be

9    appropriately educated in a segregated setting, or is

10   it based on that individual student?

11            MS. TUCKER:  Object to form.  You can

12   answer.

13            THE WITNESS:  The question you're asking

14   is very complex.  And it's complex because there are

15   a multitude of variables in which students with

16   disabilities, particularly who have behavior-related

17   needs, can and do succeed in educational

18   circumstances.

19            It is, in part, important to understand

20   those individual needs of the students.  It is also

21   equally important to have a system of support that is

22   built and established for students to access.



1    BY MR. BELINFANTE:

2        Q.    If a student -- under what circumstances

3    do you believe that a student would appropriately be

4    served in a segregated educational setting?

5        A.    I have worked for many, many years, just

6    to give you a little context, with students with a

7    variety of very significant behavioral challenges and

8    disabilities.  And what I found to be the case is in

9    very limited numbers, there are certain students who

10   benefit from small environments that have very

11   structured learning opportunities, and exposure to

12   time in general education classrooms, that have less

13   noise or stimuli in that environment, and that have

14   access to highly trained specialized educators who

15   can support their needs.

16       Q.    You said highly trained, specialized

17   educators.  What would their training be?

18       A.    Teachers, certified educators, certified

19   teachers in special education and general education

20   that have an understanding of both standards-based

21   teaching, effective behavioral supports, effective

22   teaching and learning processes, understanding, for

1    example, positive behavior interventions and

2    supports, restorative practices, MTSS, effective

3    behavior intervention plans, effective and complete

4    functional -- timely functional behavior assessments,

5    and effective crisis -- individualized crisis

6    intervention plans associated with their behavior

7    plan.

8         Q.    Okay.

9         A.    To name a few.

10         Q.    Sure.  For teachers who are not that

11    highly trained, specialized educators, a teacher in a

12    sixth grade class, general education class.

13         A.    Sure.

14         Q.    What type of training is it your opinion

15    that they would have to have, in order to prevent

16    unnecessary segregation of students with emotionally

17    disturbed behavior?

18         A.    I'm going to ask you to break that down.

19    But, first, I would say that we probably want to say

20    students who have emotional behavior disorders.

21         Q.    Okay.

22         A.    And then I believe you're asking the

1   question, what would a sixth grade educator --

2   general education teacher need, in order to prevent

3   large-scale segregation of students with disabilities

4   in the State of Georgia?

5       Q.    Sure, you can answer that.  That's a good

6   question.  I'm not sure it's exactly what I asked,

7   but that's a great place to start.

8       A.    Okay.  I don't think an individual

9   teacher, in and of themselves, could prevent

10  large-scale systemic segregation.  That's an issue of

11  the system at large, not one individual teacher.

12      Q.    Okay.  What type of training would that

13  same teacher need to prevent the unnecessary

14  segregation of an individual student?  So not looking

15  systemically, but at an individual student with --

16  and I don't want to -- I'm not -- the phrase you

17  used, emotional --

18      A.    Behavior disorders.

19      Q.    Behavior disorders.

20      A.    Yeah.

21      Q.    Okay.

22      A.    Effective supports for students with

1    disabilities who have behavior-related needs respond

2    best to having general educators who understand high

3    expectations, effective teaching and learning

4    practices.  All of the typical educational

5    credentials that I previously mentioned that are

6    common for certified educators.

7            Additionally, they would need access from

8    special educators that have the additional variables

9    that I mentioned earlier, which include special

10   educators that understand, for example, functional

11   behavior assessment, behavior intervention programs,

12   crisis intervention plans, and effective teaching.

13           In addition, those individuals would need

14   to understand basic general systems of support

15   provided through the state and the district, such as

16   tiered systems of support that provide academic,

17   behavioral, social, emotional, and mental health

18   supports.

19           Did that get at what you wanted?

20      Q.    I think so.  You said one of the things

21   they need is effective practices.  Can you identify

22   those practices?



1          A.      Effective teaching practices?

2          Q.      Mm-hmm.

3          A.      Sure.  Effective teaching practices

4    include positive interactions.  It includes -- I'm

5    trying to think what I referenced in the report,

6    specifically.  Do you mind if I look for a minute?

7          Q.      Go right ahead.

8          A.      Where I'm turning is to finding 2, in

9    which I discuss the unfair and unequal access to

10   educational opportunities.  And specifically, page

11   108, where I talk about what I observed to be missing

12   when doing the extensive site visits that I went on.

13              And so one way of answering this question,

14   and there's a multitude of ways, but would be to

15   think about the inverse of what is stated here.

16              So instead of grade inappropriate

17   resources, general and special educators would have

18   access to grade appropriate resources for students

19   who have disabilities or experience behavior-related

20   disabilities.  They would have access to grade level

21   curriculum that is not functional, but rather

22   standards-based.



1              They would have teachers who understand

2     alternate assessment and alternate standards for

3     teaching of students with disabilities.  For example,

4     like on page 110.  They would have master schedules

5     that allowed students to access learning environments

6     that were purposeful and meaningful, rather than

7     functional.

8              They would have an understanding of

9     effective ways to teach students with disabilities

10    with varying learning styles and needs.  They would

11    have lesson plans in place -- and again, this is all

12    standard for teachers in the field of education, what

13    I'm describing here.

14             They would do content mapping.  And they

15    would provide, again, teaching aligned to standards

16    in the State of Georgia.  They would have learning

17    content and resources available to them, to name a

18    few.

19        Q.    How many general education schools did you

20    review?

21        A.    36.

22        Q.    36, okay.  And in doing so, did you look

1    at the factors you just identified?

2         A.    Yes.

3         Q.    And which schools were those?  Could I

4    find those in the report?

5         A.    Yes, mm-hmm.

6         Q.    Where?

7         A.    If you turn to Appendix A, I believe, but

8    let me confirm that.  D.

9         Q.    D.

10        A.    The site visit table.

11        Q.    Right.

12        A.    If you look at that table at the bottom

13   of -- your copy's a little -- it's got some extra

14   color in it, which is okay.  But if you look at page

15   7, the bottom of that site visit table, the 70

16   different sites, you can see a code that indicates

17   which sites we went to, which were repeats, et

18   cetera, per the -- per the chart.

19        Q.    Right.  Now, these look to me, at least

20   the majority are GNETS facilities, correct?

21        A.    Yes.

22        Q.    My question was about general education

1    programs, not GNETS programs.  How many general

2    education programs did you look at in the State of

3    Georgia?

4         A.    Well, there are 36 GNETS program located

5    at school-based sites, or near school-based sites.

6    And they're considered connected in some form or

7    fashion to general education sites.  While touring

8    the GNETS wing, or area, or part of the school that

9    was the GNETS part, I was also able to tour the

10   general education part.

11        Q.    And in touring the general education part,

12   did you review files of individual teachers to

13   determine their qualifications and training?

14        A.    No.

15        Q.    Did the Department of Justice ask you to

16   make any assumptions or presumptions in preparing

17   your report?

18        A.    No.

19        Q.    Prior to being contacted by the Department

20   of Justice in this case, have you ever provided

21   consulting services in the State of Georgia?

22        A.    No.



1      Q.    And let me rephrase that, just to make

2    sure it's clear.

3          Have you ever advised a Georgia school

4    district or school?

5      A.    No.

6      Q.    Okay.  And have you ever provided

7    consulting services to the Georgia Department of

8    Education?

9      A.    No.

10      Q.    To your knowledge, has SWIFT or anyone

11    associated with SWIFT ever provided consulting

12    services to the State of Georgia Department of

13    Education?

14      A.    I cannot speak to what affiliations all of

15    SWIFT people have, so I don't know that.

16      Q.    Okay.  Prior to being contacted by the

17    Department of Justice in this case, had you ever been

18    contacted about special education in Georgia in,

19    let's say, the last eight years?

20      A.    Not that I recall.

21      Q.    You mentioned earlier that the United

22    States Department of Education provides grant funding



1    to SWIFT.

2         A.    I'm sorry, can you start over?

3         Q.    Sure.  You mentioned earlier that the

4    United States Department of Education provides a

5    grant to SWIFT; is that correct?

6         A.    I'll clarify, but keep going.

7         Q.    Go ahead and clarify.

8         A.    Okay, so the Department of Education

9    Office of Special Education provides funding -- a

10   national competition for funding, in which we were

11   awarded.

12        Q.    In working as part of that grant, do you

13   often work with persons at the Department of

14   Education -- United States Department of Education

15   Office of Special Education?

16        A.    And I'll add one.  There's also the

17   effective educator development funding source.

18        Q.    Okay.

19        A.    We have several funding sources.

20               Could you ask that again?

21        Q.    Sure.

22        A.    Yeah, sorry.



1      Q.      In working with the national competition

2   for funding from the Office of Special Education, or

3   the effective education funding that you just

4   mentioned, have you worked with officials at the

5   United States Department of Education?

6      A.      Whenever there is a federal grant awarded

7   to a university, regardless of what university, there

8   is a project officer that is assigned from that

9   funding pool.  And that project officer is who we

10  communicate with --

11     Q.      Okay.

12     A.      -- regarding the project.

13     Q.      Do you communicate with anyone else at the

14  Department of Education, other than the project

15  officer, about the work funded by the grant or

16  grants?

17     A.      Can you ask that again?

18     Q.      Sure.  Other than the project officer in

19  your work in implementing the grants, or you know,

20  working pursuant to the grants.

21     A.      Mm-hmm.

22     Q.      Do you work with anyone at the United

1    States Department of Education, other than the

2    project officer?

3        A.    Not that I can recall.

4        Q.    Do you know if you have had any

5    conversations with a project officer about the State

6    of Georgia?

7        A.    Only that I am an expert witness.

8        Q.    To your recollection, has anyone from the

9    United States Department of Education expressed

10   concerns to you about the State of Georgia?

11       A.    No.

12       Q.    Are you familiar with an individual named

13   Katie Owens from the State of Georgia?

14       A.    Not that I recall.

15       Q.    How about Kimberly Smith, also from the

16   State of Georgia?

17       A.    Meaning have I met her?

18       Q.    Met or talked to, know anything.  Does the

19   name mean anything to you?

20       A.    No.

21       Q.    Okay.

22       A.    And forgive me for looking.  I have a lot

1    of people, a lot of documents.

2        Q.    I totally understand.

3        A.    You know, a lot.

4        Q.    Yes, absolutely.  And you may certainly

5    feel free to do so.

6        A.    Thank you.

7        Q.    No need to apologize for it.  Let me ask

8    you to look at Exhibit 2, which is your amended

9    exhibit E.

10        A.    Mm-hmm.

11        Q.    At the last several pages, there is a

12    chart.

13        A.    Yes.

14        Q.    Do you know -- and I point to that,

15    because on the third page of the chart, about two

16    thirds of the way down, you've got a document Bates

17    labeled GNET000381 to 382, with the label Student IEP

18    file.

19        A.    381 to 382, Student IEP file, yes, I see

20    that.

21        Q.    And then 2 under that is another Student

22    IEP file.

1          A.    Yes.

2          Q.    Right?

3          A.    Mm-hmm.

4          Q.    If you go -- skip the next page, and go to

5    the one after that, there's a document -- the first

6    one of which -- just so we're on the same page,

7    289606 is the first document on the page I'm

8    referring to.

9          A.    209 or 289?

10         Q.    289606.

11         A.    Yes, mm-hmm.

12         Q.    About two-thirds of the way down, there is

13    another document, US0306845, which is RF Student

14    Records.

15         A.    Say the number again, please?

16         Q.    US0306845.

17         A.    68 -- oh, yeah, mm-hmm.

18         Q.    Okay.  And I went through that, because

19    those were the times I saw IEP team or student record

20    in the doc file name.

21         A.    Sure.

22         Q.    Can you recall how many IEPs you examined

1    when preparing your report for the state of -- or for

2    the United States?

3        A.    Not exactly.  It was a large number.

4    Likely, I'd say more than 65 IEPs.  And the labeling

5    on the chart that you just read did not always match

6    what was in the file.

7        Q.    Okay.

8        A.    And probably more than 100, but that's my

9    best guess.  Somewhere between 65 and 100 individual

10   student IEP records.

11       Q.    Did you choose which IEPs to look at or

12   was it a random -- well, how did you choose which 100

13   to look at?

14       A.    I reviewed every IEP that was provided.

15   Every document you see here, I reviewed.

16       Q.    Did you ask for these documents or were

17   they provided to you?

18       A.    I provided a list of the kind of documents

19   that I would need to review, in order to conduct an

20   evaluation of the scale and magnitude.

21       Q.    And is it fair to say that if a document

22   is not listed in Exhibit 2, amended Appendix E, it



1    was not considered when making your report?

2          A.    That's correct.

3          Q.    In your words, what do you understand the

4    United States to be seeking as a remedy or as a

5    judicial order in this lawsuit?

6          A.    I can only speak to what I have been asked

7    to do as a special educator in this case.  And in

8    terms of my recommendations, I can speak to those.  I

9    can't speak to what the Department is trying to do.

10         Q.    You have read the complaint in this case,

11   though, correct?

12         A.    Yes.

13         Q.    Okay.  Generally, what do you understand

14   the United States to be seeking in this lawsuit, not

15   remedy or judicial order, if that's what threw you

16   off, but generally, what do you see the aims of the

17   lawsuit to be?

18         A.    Unless you have the complaint for me to

19   look at, what I can say is that as an educator and

20   within the scope of my report -- and again, this is

21   just what I can remember right here, right now, in

22   the middle of all of this -- is that the



1  recommendation is -- from my perspective, is to limit

2  or eliminate systemic segregation across the State of

3  Georgia within the GNETS program, to provide fair and

4  equal educational opportunities for students with

5  behavior-related disabilities in the GNETS program,

6  and to have the State of Georgia provide an array of

7  appropriate supports for students with

8  behavior-related disabilities in the State of

9  Georgia.

10      Q.    How does one define appropriate supports

11  in this context?

12      A.    Yes, that's a really, really big question.

13      Q.    Sure.

14      A.    So I'm thinking I should take a break and

15  run to the restroom, but if you want me to answer it

16  first, I can.

17      Q.    Why don't we do this.  I want to allow you

18  to do that for sure.  Let me ask it this way, and

19  maybe it can be a shorter answer.

20      A.    Sure.

21      Q.    If a judge is to order that the State of

22  Georgia provide appropriate supports, what does that

1    look like in a judicial order?  I'm not asking you to

2    get into legalese, but, like, if the State of Georgia

3    is trying to implement an order that says, provide

4    appropriate supports, what does that look like?

5                MS. TUCKER:  Object to form.

6                THE WITNESS:  Okay.  Again, I can speak to

7    based on my experience with state education agencies,

8    over 20 states in the U.S., what I can say in terms

9    of the role of the state in providing appropriate

10   supports, which is, in general, a system of support

11   that provides array of effective evidence-based

12   practices for -- specifically for students who have

13   disabilities that are along a continuum of support,

14   not place-based, but rather service-based.

15               And those supports are provided in the

16   context, based on what the state decides on

17   student -- students with disabilities needs within

18   the GNETS program.

19               So what the state does -- decides to do is

20   up to them.  I have made some recommendations, based

21   on my experience that -- what has worked for

22   supporting students with disabilities in other states



1   in the United States, but what they decide to do is

2   their decision.

3              MR. BELINFANTE:  Let's take a break, then.

4              THE WITNESS:  Thank you.

5              THE VIDEOGRAPHER:  Off the record.  The

6   time is 9:54.

7              (Recess.)

8              THE VIDEOGRAPHER:  On the record at 10:02.

9   BY MR. BELINFANTE:

10       Q.    Dr. McCart, let me start with some kind of

11  general questions about your report, and specifically

12  what it is not about.

13             You have no formal legal training,

14  correct?

15       A.    No.

16       Q.    Okay.  So you're not opining whether the

17  State of Georgia complies with the Americans With

18  Disabilities Act or not; is that right?

19       A.    I'm not talking about the legalities in

20  this case, that's correct.

21       Q.    Okay.  And your report is not about any

22  individual student; is that right?



1      A.     That is not right.

2      Q.     Okay, which individual students do you

3  offer an opinion about?

4      A.     I offer an opinion about the nearly 3,000

5  students that are served in the program, specifically

6  the thousands -- the thousand or so that I observed

7  directly.  But also, there are examples in the

8  report, in which I detail very specific individual

9  student cases for review.

10      Q.     And did you -- for the thousands of

11  students you observed directly, you did not read all

12  of their IEPs, correct?

13      A.     That's correct.

14      Q.     Are you providing an opinion as to whether

15  the State of Georgia administers the GNETS program?

16      A.     No.

17      Q.     What is your understanding about how a

18  local school district superintendent is hired or

19  fired in the State of Georgia?

20      A.     None.

21      Q.     What is your understanding about how a

22  local educator in a general education setting zoned

1    school is hired or fired in the State of Georgia?

2         A.    Say that one again?

3         Q.    Sure.  What is your understanding about

4    how an educator who works in a zoned school general

5    education setting is hired or fired in the State of

6    Georgia?

7         A.    I did not address that in this report.

8         Q.    What's your understanding of it?  I know

9    you didn't address it.  It's just a different

10   question.  Do you have an understanding of how that

11   teacher would be hired or fired?

12        A.    I have an understanding, in that I

13   understand general educational practices.  But

14   specifically in the State of Georgia, no.

15        Q.    Okay.  Do you have an understanding of how

16   educators who are teaching through the GNETS program

17   are hired or fired in the State of Georgia?

18        A.    Yes.  The specifics, I cannot recall right

19   now.

20        Q.    What did you review to inform your

21   decision or inform your opinion -- or let me start

22   over.

1           What did you review to inform your

2   understanding of how teachers in a GNETS program are

3   hired or fired in the State of Georgia.

4       A.    A number of documents that included

5   anything from incident reports, to parent reports, to

6   master schedules, to staffing structures, to IEPs,

7   just student education records, in general, some of

8   which referenced employees, and their time or service

9   within GNETS.

10      Q.    Okay.  What is your understanding of how

11  educators are hired and fired in the GNETS system in

12  Georgia?

13      A.    That -- what I said is all that I know on

14  that, right here, right now.  I'd have to review

15  documents and assess that.

16      Q.    What is your understanding of the State of

17  Georgia's appropriation process?  And by that, I mean

18  the state legislature's appropriation process.

19      A.    I don't know.

20      Q.    Okay.  In compiling your report, did you

21  provide any type of cost analysis as to what your

22  recommendations would cost the State of Georgia?



1        A.       Two questions, I think, you asked.  Did I

2    do a cost analysis?  No.  Did I then offer

3    recommendations regarding the cost -- or what I would

4    do -- what I was recommending would cost?  Say the

5    second part again?

6        Q.       Sure.  Well, I think you've answered it,

7    because you did no cost analysis, correct?

8        A.       Correct.

9        Q.       Okay.  And I may have more specific

10   questions later, but I think that's --

11       A.       I think the only thing I would add on that

12   is the recommendations that I made are standard for

13   SEA practice across the United States, and in no way

14   require additional resources or funding in order to

15   implement.

16       Q.       So it's your testimony that it is standard

17   across SEAs in the United States to implement MTSS?

18            MS. TUCKER:  Object to form.

19            THE WITNESS:  It is my testimony today

20   that it is common and standard practice in many

21   states, particularly the ones that I've worked with,

22   for implementation of a system of support which may



1    or may not be called MTSS.

2    BY MR. BELINFANTE:

3        Q.    Okay.  Roughly how many states -- or

4    excuse me.  Roughly how many states -- and you can

5    answer in number or percentage -- have not

6    implemented MTSS at the state level?

7        A.    I can speak to the states that I've worked

8    with, which is approximately 20.  And I can name some

9    of those, if you'd like, that have worked on

10   implementing a system of support.

11       Q.    But a system of support, you would agree

12   with me, is pretty different from MTSS, correct?

13       A.    No.

14       Q.    MTSS -- how many states that you've worked

15   with have implemented all the tiers of MTSS at every

16   school district in their state?

17       A.    You're seeking to understand how many

18   states have implemented all levels of MTSS across all

19   schools everywhere in the whole United States.

20       Q.    In the states -- you said there's about 20

21   states you've worked with that have implemented MTSS.

22                My question is, of those 20 states, how

1    many have implemented MTSS at every school within

2    those states, all levels of MTSS?

3         A.    I couldn't answer that, sitting here

4    today.  I would have to review data.

5         Q.    Where would I find that data?

6         A.    I don't know where you would find it.

7         Q.    Okay.  Where would you find it?

8         A.    A variety of sources.

9         Q.    Can you be more specific?

10        A.    Yes.  For example, implementation of PBIS

11   is an element of MTSS implementation.  There are

12   three tools utilized to assess whether or not PBIS is

13   in place.  One is SET, Schoolwide Evaluation System.

14   Another, for example, is the tiered intervention

15   framework.

16             Those tools, just by way of example, are

17   kept in a database located at the University of

18   Oregon.  And schools opt in to assessing whether or

19   not their level tiers or levels of support are in

20   place.  So that's one place in which you could find

21   that data.

22             Another place would be the University of

1    Kansas.  There are data -- fidelity data regarding

2    tiered systems of support, both self-assessments for

3    schools to utilize, as well as external fidelity

4    measures, in which the efficacy and fidelity of MTSS

5    or a system of support is implemented effectively.

6               Additionally, also at the University of

7    Kansas, there are classroom assessments that look at

8    the fidelity of implementation of tiered systems

9    within a classroom.  Those are located in a different

10   center at the University of Kansas, and can provide

11   support.

12              Also, in Florida, the University of

13   Southern Florida has a tiered fidelity instrument

14   that has been utilized to assess the efficacy of

15   social, emotional learning among many, many, many

16   other places, tools, and resources.

17       Q.    But sitting here today, you can't tell me

18   a single state where every school district in that

19   state has implemented MTSS to fidelity; is that

20   correct?

21       A.    Without looking at data, I cannot answer

22   that question.



1    Q.    You attached your biography or CV to the

2    report somewhere.  I would have to find it.

3    A.    At the end.

4    Q.    I'll just skip to it.  Let's see.

5    A.    The very end.

6    Q.    Let me come back to that.  I'll just ask

7    you some questions I have here that references that,

8    but I may have to come back to the CV.

9          Have you ever testified as an expert in

10   court before?

11   A.    No.

12   Q.    Okay.  You were involved in a case

13   involving New York Lawyers for the Public Interest

14   and Paul Weiss; is that correct?

15   A.    Yes.

16   Q.    Do you recall the name of that case?

17   A.    Can I look on the CV?

18   Q.    Sure.  If you can find it, absolutely.  I

19   think I've taken it out of my notebook, which is why

20   it's there.  Okay.  Yeah, I've taken it out.

21   A.    Do I state it on there?

22   Q.    I didn't see the name of the case.



1          A.     Then I don't recall.  If it's not stated

2    on here, I'll spare you the time of me looking for

3    it.

4          Q.     Okay.  Have you ever served --

5          A.     Should I look?

6          Q.     Have you ever served as a court monitor?

7          A.     No.

8          Q.     Okay.  On --

9          A.     Okay.  I see 2018 to 2020, I served as an

10   expert consultant for the New York Lawyers for Public

11   Interest, Paul Weiss.  And I do not name the case.

12         Q.     Okay.

13         A.     And I do not recall what it was called.

14         Q.     Okay.  The New Orleans K-12 Inclusive

15   Education Charter School, which is right above that

16   Paul Weiss reference.

17         A.     Yes.

18         Q.     Is that the name of the school or is it a

19   district?  Is it an individual school, do you recall?

20         A.     This particular example is a -- this

21   particular reference is an individual school.

22         Q.     Okay.

1      A.    K-12.

2      Q.    All right.

3      A.    In New Orleans, they're divided by

4  charter, so it's a little different.

5      Q.    All right.  What states have you

6  personally advised?  And by state, I mean State

7  Department of Education, or SEA.  I'll use those

8  interchangeably.

9      A.    Okay.

10      Q.    And if I'm not doing that correctly,

11  please tell me.

12      A.    Yeah, you are.  You are.  So I've worked

13  with Mississippi, New Hampshire, Vermont, Oregon,

14  Maryland, North Carolina, California.  Give me a

15  moment, I'm running through in my mind.

16      Q.    Sure.

17      A.    Did I say Wyoming?

18      Q.    No.

19      A.    Delaware, Wisconsin, New York, San Diego.

20  Not a state, but -- Oklahoma, Idaho, the State of

21  Washington, Washington, DC, Louisiana, among others.

22      Q.    Okay.  The recommendations that you make

1    in your report beginning on page 160.  And

2    specifically, I'm going to refer to the recommended

3    actions, which begin on 163.  Five of them.  Have any

4    of the states that you just identified implemented

5    all five recommended actions?

6         A.    These actions are in reference to the

7    State of Georgia, and I would have to look at data

8    sources to know whether or not the level or efficacy

9    of how those strategies, and to what degree might

10   have been implemented in other states.  But the

11   recommended actions that you're referencing are

12   commonplace in -- at the SEA level.

13        Q.    Commonplace in the states you've advised,

14   or commonplace across nation?

15        A.    Across the nation.

16        Q.    When did MTSS -- well, let's back up a

17   second.  Can you -- and you may have -- all right.

18   You define MTSS on page 6 of your report, is that

19   correct?  For purposes of the report at least?

20        A.    I do define it on page 6 of the report.

21        Q.    And what was -- how did you arrive at that

22   definition?



1    A.    This definition has been around, in some

2    form or another, over the course of many, many years.

3    A version of this is included in the book that I

4    wrote on the topic.  It's also included in several --

5    a version of this is included in several state and

6    federal documents, in which MTSS is reviewed or

7    outlined.  And this definition includes some of the

8    core features of MTSS definitions or system of

9    support definitions.

10    Q.    Okay.  So across the country, educators

11    may have a different or a variety -- varied

12    definition of MTSS; is that correct?

13    A.    It's certainly possible that any one

14    educator would have a varied understanding of what

15    MTSS is.

16    Q.    When you say that the recommendations that

17    you make -- or the recommended actions that you make,

18    beginning on page 163 of your report, are commonplace

19    across nation, is it your opinion that because it

20    does include MTSS in several of them, that they are

21    applying the definition you provide on page 6, or is

22    it one of the varied definitions that you just



1    identified?

2              MS. TUCKER:  Object to form.

3    BY MR. BELINFANTE:

4         Q.    Or do you know?

5         A.    I do know.

6         Q.    Okay.

7         A.    What I just said was, is it possible that

8    an educator would have a varied understanding of

9    MTSS?  And the answer to that is certainly yes.  I

10   can't speak to what educators fully understand about

11   MTSS.  But I can speak to what is a large-scale

12   system of support at the state level.

13        Q.    But did you not also say that there are

14   versions of this definition that are in federal and

15   state education law or regulations, and there are

16   versions in different states?  In other words, if I

17   went to every state in the country, they may define

18   MTSS differently, correct?

19             MS. TUCKER:  Object to the form.

20             THE WITNESS:  There are core features of

21   MTSS definitions, which is essentially a system,

22   organized system of support, and which we provide

1  educational services through.  And that has -- that

2  is common across definitions.  For example, using

3  data to make decisions, having effective tiers of

4  support in which students can move in and out of, et

5  cetera, et cetera, et cetera.

6  BY MR. BELINFANTE:

7       Q.    But there is not a standard definition

8  applied across the country?

9       A.    I don't know what you're referencing in

10  terms of a standard.

11       Q.    Are you familiar with the IDEA?

12       A.    Yes.

13       Q.    Are you familiar with the term free and

14  public education, or FAPE?

15       A.    I'm pausing for a minute.

16       Q.    Sure.

17       A.    Yes.

18       Q.    Okay.  Is there a standard definition of

19  FAPE applied across the country?

20       A.    I don't know.

21       Q.    Okay.

22       A.    Let me say, I can't recall right now.

1        Q.    Okay.  Are you familiar with -- given your

2    familiarity with the IDEA, are you familiar with the

3    term IEP team?

4        A.    Yes.

5        Q.    Do you know who makes up an IEP team?

6        A.    I do.  I would like to clarify.  You said

7    given my familiarity with IDEA.

8        Q.    Mm-hmm.

9        A.    I don't think you asked me if I was

10   familiar with IDEA.

11       Q.    I thought I did.

12       A.    Maybe.

13       Q.    But are you familiar with -- sure, either

14   way.  Are you familiar with the IDEA?

15       A.    I am.

16       Q.    Okay.  Who makes up members of an IEP team

17   formed pursuant to the IDEA?

18             MS. TUCKER:  Object to form.

19   BY MR. BELINFANTE:

20       Q.    Or what is your understanding of who makes

21   up the members of the IEP team?

22       A.    I can speak from practical experience as

1    an educator, what is typical on an IEP, who makes up

2    an IEP team.  And it is typically the student with

3    disabilities, a parent of that student with

4    disabilities, an administrator in the building, a

5    principal, if it is a student in, for example, the

6    State of Georgia, that's in special education located

7    in a general education program.  If it's a student

8    located in the GNETS program in the State of Georgia,

9    then a GNETS administrator may sit on that IEP team.

10            There is a general educator and special

11    educator.  And if the student is receiving any sort

12    of related service provision, those related service

13    providers, such as speech, et cetera, OT/PT makes it

14    on that team as well.

15        Q.    Have you ever been a member of an IEP

16    team?

17        A.    Yes.

18        Q.    Have you ever been a member of an IEP team

19    in the State of Georgia?

20        A.    No.

21        Q.    To your knowledge, are any members or

22    employees of the State Department of Education in the



1    State of Georgia on an IEP team?

2        A.    I don't know.

3        Q.    Okay.  To your knowledge, are any members

4    of the Department -- or any employees of the

5    Department of Community Health members of a state IEP

6    team -- or members of an IEP team for students in

7    Georgia?

8        A.    I don't know.

9        Q.    How about the Department of Behavioral

10   Health?  To your knowledge, are there any members or

11   employees of the Department of Behavioral Health who

12   serve on IEP teams in Georgia?

13       A.    I don't know.

14       Q.    Okay.  If a parent -- and is it your

15   understanding that an IEP team makes a recommendation

16   for an individual student, and an IEP plan or a plan

17   on how that student should receive educational

18   services?

19       A.    Can you restate that?  I mean, repeat it.

20       Q.    Sure.  Let me ask it this way.  What is

21   your understanding of what an IEP team does, in terms

22   of making recommendations for students, or plans?

1    A.    An IEP team is charged with monitoring

2    current levels of progress of students, understanding

3    student need, providing recommendations for student

4    learning, and offering suggestions regarding

5    adaptations, modifications, or additional related

6    supports that a student might need.  An IEP team is

7    only able to offer what is available for students to

8    participate in.

9    Q.    If a parent is dissatisfied with an IEP

10   team's recommendation, what is your understanding of

11   any remedies or rights they may have to challenge it?

12   A.    I can speak, again, from an educator's

13   perspective on that topic, that the parent, if

14   unsatisfied with an IEP decision, has the opportunity

15   to -- I can't think of the exact word, but they have

16   the ability to express concern over that decision.

17        What I found in the documents, that there

18   were no -- if a parent expressed concern, for

19   example, in this case with the GNETS program, there

20   were not other options available.

21   Q.    Are you familiar with what's called a due

22   process hearing?



1      A.     Yes.

2      Q.     Did you see where any parents who were

3  dissatisfied in the State of Georgia with a

4  recommendation for GNETS services filed a due process

5  hearing or took part in a due process hearing?

6      A.     I don't recall, sitting here, if I

7  reviewed documents about that.

8      Q.     Okay.  Is it your understanding that if a

9  parent were dissatisfied with a recommendation and

10  placement in a GNETS service program, that they

11  could, under the IDEA, challenge that recommendation?

12     A.     Again, speaking as an educator, if a

13  parent is dissatisfied with a decision, they could

14  challenge that.  The reality of that situation is

15  that if they challenge that, and there is no other

16  alternative, that student goes home with them.

17     Q.     Did you read any decisions in the State of

18  Georgia where that was the case, meaning a parent

19  brought a challenge, and the result of that challenge

20  was that the student went home with them?

21     A.     Yes.

22     Q.     And how many?



1          A.     I don't remember.

2          Q.     Do you remember the names of any student

3    where that occurred?

4          A.     No.

5          Q.     And if they -- and when you say went home

6    with them, what do you mean by that?

7          A.     That the option -- I referenced this in

8    here, if you'd like me to point to the example.

9          Q.     Sure.

10         A.     If you'll give me a minute to find it,

11   that way, we can talk specifics.

12                A few more minutes.  If I can't find it,

13   then I'll go about it another way.

14         Q.     If you can't, what we'll do is when we

15   break for lunch, I'll just see if you can look for it

16   then.

17         A.     Okay.

18         Q.     And we can come back to it.

19         A.     Give me one more minute here.

20                Okay, I'll take you up on your offer to

21   look in a minute.

22         Q.     All right.



1        A.    Too many pages.

2        Q.    Are you generally familiar with the

3   Americans With Disabilities Act?

4        A.    Yes.

5        Q.    Are you familiar with the term least

6   restrictive environment appropriate, as it is in the

7   Americans With Disabilities Act regulations?

8             MS. TUCKER:  Object to form.

9             THE WITNESS:  I am familiar with the

10  concept of least restrictive environment, as it

11  applies in the field of education.

12  BY MR. BELINFANTE:

13       Q.    Okay.

14       A.    Not from a legal perspective.

15       Q.    Okay.  What factors go into determining

16  what is the least restrictive environment appropriate

17  in the context of education?

18            MS. TUCKER:  Object to form.

19            THE WITNESS:  Are you asking what -- what

20  are you asking?

21  BY MR. BELINFANTE:

22       Q.    Let me back up a second.

1          Do you know if an IEP team is supposed to

2    look at what is the least restrictive environment

3    appropriate for the needs of that student?

4        A.    The IEP team should consider the

5    environment in which a student is learning, yes.

6        Q.    What factors go into determining what is

7    the least restrictive environment appropriate for the

8    needs of a student, do you know?

9          MS. TUCKER:  Object to form.

10   BY MR. BELINFANTE:

11       Q.    Or have an opinion on it?

12       A.    Factors as it relates to this case that go

13   into making a decision regarding the least

14   restrictive environment are related to what are the

15   available supports and services to meet students'

16   needs who have behavior-related disabilities.

17       Q.    And that is determined by the IEP team,

18   correct?

19       A.    The supports and services that are

20   available are determined by the entirety of the

21   educational system, starting with the vision,

22   guidance, and leadership at the State Department of

1    Education, then shared with local education agencies,

2    in terms of, again, that system of support that is in

3    place.  That is then utilized by an IEP team about

4    what supports can be put into place because of their

5    availability.

6              So, for example, if an IEP team thought

7    that a student would be successful if they had staff

8    from the GNETS program coming into one of their

9    classrooms, as indicated in the GNETS rule, but that

10   is not an option because the only option in the

11   region is a center-based location, then that IEP team

12   is sort of put in a position to make the

13   recommendation of the center-based location, because

14   that's all that's available.

15             Does that make sense?

16        Q.    Mm-hmm.

17        A.    Okay.

18        Q.    When the IEP team is looking at that,

19   though, it's based on the needs of an individual

20   student, correct?

21        A.    When an IEP is happening, is it based on

22   an individual student?



1          Q.      Correct.

2          A.      Yes.

3          Q.      Okay.  And if an IEP team makes a

4   recommendation, and the student does not receive the

5   services in that recommendation, do you have an

6   understanding of what that would mean under the IDEA?

7                  MS. TUCKER:  Object to form.

8                  THE WITNESS:  I'm not sure what you're

9   asking.

10  BY MR. BELINFANTE:

11         Q.      So let's say an IEP team recommended that

12  the student receive services through GNETS,

13  hypothetically.

14         A.      Okay.

15         Q.      And the local school district said, no,

16  and rejected the conclusion of the IEP team.  Do you

17  know if there would be any consequences to the local

18  school district for that?

19         A.      That's a hypothetical, and I'm just not

20  sure where to go with that.

21         Q.      Do you have any understanding of whether

22  the State of Georgia Department of Education has the

1    authority to override an IEP team recommendation?

2         A.    I did not look at or evaluate that.

3         Q.    Understood.  But do you have an

4    understanding of whether the State of Georgia has the

5    authority -- or the State of Georgia Department of

6    Education has the authority to override an IEP team

7    recommendation?

8         A.    I don't know.

9         Q.    Do you have an understanding of whether

10   the State of Georgia's Department of Community Health

11   has the authority to override an IEP team

12   recommendation?

13        A.    That was -- no.

14        Q.    And sorry, you're going to find these --

15   there's a series of questions that get repetitive.

16        A.    No, no, no -- yeah, yeah, yeah.

17        Q.    Do you have an understanding of whether

18   the State of Georgia Department of Behavioral Health

19   and Developmental Disabilities has the authority to

20   override an IEP team recommendation?

21        A.    No.

22             MS. TUCKER:  Object to form.

1   BY MR. BELINFANTE:

2       Q.    Are you familiar with the term unnecessary

3   segregation as it relates to claims under the ADA?

4           MS. TUCKER:  Object to form.

5           THE WITNESS:  I think at the beginning of

6   this, you said you asked questions that were friendly

7   or -- not friendly.  What did you say?

8   BY MR. BELINFANTE:

9       Q.    I'm not trying to confuse you.

10      A.    What was the -- what are you asking?

11      Q.    I'm asking if you are familiar with the

12  phrase unnecessary segregation as it relates to the

13  Americans With Disabilities Act?

14      A.    I'm familiar with the phrase of

15  unnecessary segregation, because I used it throughout

16  my report.

17      Q.    Okay.  What constitutes unnecessary

18  segregation?

19      A.    When a child is moved away from his or her

20  school-aged peers or siblings, set apart from, or

21  treated differently than students without

22  disabilities.



1      Q.    And that would be the case, even if an IEP

2  team recommended that a child be separated from their

3  peers in general educating settings, correct?

4      A.    What would be the case?

5      Q.    That that would be unnecessary

6  segregation, based on your definition?

7      A.    So you're asking if an IEP team made a

8  recommendation for unnecessary segregation?

9      Q.    No, I'm sorry.  If an IEP team makes a

10  recommendation that a student in a general -- that is

11  currently, let's say, in a general education

12  environment zoned school, receives services in a

13  separate GNETS facility, is it your opinion that that

14  IEP team has caused unnecessary segregation?

15      A.    As indicated in my report, I believe that

16  the system must be -- offer a full array of support

17  and services for students with disabilities, such

18  that unnecessary segregation isn't the only

19  alternative that an IEP team has when making a

20  decision about a student.

21      So if the state were providing guidance,

22  vision, professional learning per my recommendations,



1  then there would be a broader array of supports and

2  services that would eliminate the need for

3  unnecessary segregation.

4       Q.    But sitting here today, and understanding

5  your criticisms of the State of Georgia, every time

6  an IEP team recommends that someone receive GNETS

7  services, is that -- and causes them to, then, leave

8  their zoned school, is that segregation unnecessary

9  as you define it?

10            MS. TUCKER:  Object to form.

11            THE WITNESS:  Yeah, there were three parts

12  to that.  So given my criticism, you said --

13  BY MR. BELINFANTE:

14       Q.    I mean, I understand your criticisms of

15  the State of Georgia.  But sitting here and the

16  status quo today, can you say that every time an IEP

17  team recommends a student go to a freestanding GNETS

18  location, that that was unnecessary segregation?

19            MS. TUCKER:  The same objection.

20            THE WITNESS:  I don't want to accept the

21  premise of criticism of the State of Georgia or

22  whatever.  I don't use the word criticism, whatever.



1    So not that, but the second part you're asking is

2    what?

3    BY MR. BELINFANTE:

4        Q.    What I'm -- all right.    Then forget the

5    criticism part.    Is it your opinion that every time

6    an IEP team in the State of Georgia recommends that a

7    student go to a GNETS facility that is separate and

8    freestanding, that that constitutes unnecessary

9    segregation?

10       A.    If you were to say that any -- if an IEP

11   team recommends a segregated setting, based on the

12   individual needs, would I consider that to be

13   unnecessary?    No.    The concern here is that you said

14   within the GNETS program.    And the GNETS program, as

15   indicated in finding 3, is failing to provide the

16   services that it's using to justify its existence.

17            So, for example, they aren't providing

18   opportunities for equal learning, they aren't

19   providing opportunities for learning with peers, et

20   cetera.

21       Q.    Is it your opinion that the GNETS, as you

22   just described it, is not providing a free and public

1   education to the students in that program?

2            MS. TUCKER:  Object to form.

3            THE WITNESS:  I'm not -- I did not look at

4   the application of FAPE in the context of the GNETS

5   program.  What I can tell you is the GNETS centers

6   and school-based sites are not even considered

7   schools.  They're considered entities.

8            And so when asking whether or not students

9   within the GNETS program are having an effective

10  education, or whether or not they're unnecessarily

11  segregated, it's very difficult to say that they are

12  not.

13  BY MR. BELINFANTE:

14       Q.    What is the basis of -- you said they're

15  not considered schools.  Can you explain that?

16       A.    Yes, that's also in here.

17       Q.    Okay.  Why don't we look for that at

18  lunch, too.

19       A.    Okay.  They're considered entities.

20       Q.    If a school fails to deliver effective

21  behavioral and therapeutic supports, does that school

22  also fail to provide a free and public education?

1          MS. TUCKER:  Object to form.

2          THE WITNESS:  Can you say that again?

3     BY MR. BELINFANTE:

4        Q.    Sure.  If a school fails to deliver

5     effective behavioral and therapeutic supports, would

6     that school also deprive students of a free and

7     public education?

8          MS. TUCKER:  The same objection.

9          THE WITNESS:  I -- I don't understand the

10    question.

11    BY MR. BELINFANTE:

12       Q.    You're familiar with the phrase free and

13    public education?

14       A.    Free and appropriate public.

15       Q.    Appropriate, thank you.

16       A.    Yes, I am.

17       Q.    This is why you said FAPE, and I should

18    have just stuck to FAPE.

19       A.    It's easier.

20       Q.    If a school -- is providing effective

21    behavioral and therapeutic supports a necessary

22    element of providing a FAPE?

1        A.    I can't speak to whether or not what I've

2    talked about in the report relates to FAPE.

3        Q.    I'm not asking you about the report.  I'm

4    asking you about your opinion, generally.  Is your

5    opinion generally that if a school district fails to

6    provide effective behavior and therapeutic supports,

7    it cannot deliver a FAPE?

8            MS. TUCKER:  Object to form.

9            THE WITNESS:  I am just not sure how to

10   answer that right now, sitting here.

11   BY MR. BELINFANTE:

12       Q.    Do you find that providing effective

13   behavior and therapeutic supports is a necessary

14   element of a FAPE?

15           MS. TUCKER:  The same objection.

16           THE WITNESS:  If you were saying school,

17   schooling experience, or something of that nature, I

18   can probably go where you're going.  But I don't know

19   when you're asking what constitutes a free and

20   appropriate public education, as it relates to what I

21   reviewed within this case?  I don't -- I can't.

22   BY MR. BELINFANTE:



1        Q.    Yeah, and I think that's where we're

2    disconnecting.  I'm not asking about the report.

3        A.    Okay.

4        Q.    I'm asking -- yeah, in your professional

5    opinion, if a school is not providing effective

6    behavior and therapeutic supports, could it provide a

7    free and appropriate public education?

8              MS. TUCKER:  Object to form.

9              THE WITNESS:  Free and appropriate public

10   education.  I'm thinking.

11   BY MR. BELINFANTE:

12       Q.    Sure.

13       A.    Can we come back to that?

14       Q.    Could you provide me an answer now, and

15   then we can come back to it, and you can correct the

16   answer later?

17       A.    Sure.

18       Q.    And I'm sorry that I have to do that.

19   That's just kind of standard.

20       A.    No problem, no problem.

21       Q.    Yeah.

22       A.    Again, in the context of being an



1   educator, the provision of a free and appropriate

2   public education is ever-changing, given what is --

3   in terms of how you would define a schooling

4   experience for a child.

5           And so children are allowed to have a free

6   and appropriate public education.  Children are

7   allowed to have -- should be allowed to have access

8   to schooling, should be allowed to have opportunities

9   to learn, regardless of whether or not they have

10  disabilities.  They should be able to engage in

11  schooling environments and experiences in which their

12  behavior-related disability does not result in

13  exclusion from those experiences.

14          So that's what I would say about that.

15      Q.    And in order to achieve what you just

16  described, is it your professional opinion that that

17  student would need effective behavior and therapeutic

18  supports in the school system, or delivered to them

19  in their school?

20      A.    It depends on the student.

21      Q.    If a school district -- and again, I

22  realize this is hypothetical, and I'm asking in your

1    professional opinion, unrelated -- you know, not

2    what's in the report.

3         A.    Unrelated to --

4         Q.    Right.

5         A.    Right.

6         Q.    Not what's in the report.  In your

7    professional opinion, if a school district offered no

8    behavior and therapeutic supports, no PBIS, no MTSS,

9    no school counselor, no wraparound services,

10   literally nothing, like just reading, writing,

11   arithmetic, period, would that school district be

12   providing a free and appropriate public education, or

13   FAPE, to all of its students?

14              MS. TUCKER:  Object to form.

15              THE WITNESS:  The context of that question

16   is so broad, I can't even hypothetically go there.

17   There's so many elements to education that I just --

18   I'm sorry.

19   BY MR. BELINFANTE:

20        Q.    Totally fair.  Let me ask this.  In order

21   to examine whether a school district is providing a

22   fair and appropriate -- or free and appropriate -- a

1    FAPE public education, does one necessarily have to

2    look at the behavioral health and therapeutic

3    services that are provided?

4                MS. TUCKER:  Object to form.

5                THE WITNESS:  I don't know.

6    BY MR. BELINFANTE:

7        Q.    In order to prevent unnecessary

8    segregation, is it your professional opinion that one

9    has to look at the services, behavioral health -- or

10   excuse me, behavioral and therapeutic services

11   provided in a school?

12       A.    Repeat that, please?

13       Q.    Sure.  If one is to consider whether a

14   student is undergoing unnecessary segregation, does

15   the question turn on the types of services offered

16   within the school -- unnecessary segregation based on

17   their -- I want to use the phrase you used --

18   behavioral disability, is that correct?

19       A.    Emotional.

20       Q.    Emotional and behavioral health

21   disability.

22       A.    Thank you.



1         Q.    If a student with emotional and behavioral

2    health disability, in order to determine whether a

3    student with emotional and behavioral health

4    disability is being unnecessarily segregated, do you

5    have to consider the services provided in the school?

6         A.    Yes.

7         Q.    Okay.  In order to determine if that same

8    student is receiving a FAPE, do you have to look at

9    the services provided in the school?

10              MS. TUCKER:  Object to form.

11              THE WITNESS:  I don't know.  I think if

12   you want me to look at FAPE and apply FAPE to -- in

13   my opinion, and as it relates to the work I'm doing

14   here, then I need to see that and look at it.  I

15   just -- I don't know what else to--

16   BY MR. BELINFANTE:

17        Q.    Because it's individualized, or is it --

18   like, why would you need to -- what would you need to

19   look at to determine if services are a factor you

20   would consider in determining what constitutes a

21   FAPE?

22        A.    Because I need to know specifically what

1    that definition is, and what it is that you're

2    referencing when you talk about FAPE, and how that

3    relates as an educator in the field, and what that

4    looks like.

5        Q.    Are you familiar with the definition of

6    FAPE in the IDEA?

7        A.    Familiar.

8        Q.    If we applied that definition, does the

9    question of whether a student is receiving a FAPE

10   turn on what services are being provided in that

11   school district?

12             MS. TUCKER:  Object to form.

13             THE WITNESS:  You keep asking the same

14   question.

15   BY MR. BELINFANTE:

16       Q.    Well, you said before you didn't know

17   where I was going with FAPE, so I'm now saying, let's

18   apply the IDEA's definition of FAPE.

19       A.    Do you have a copy of that here that I

20   could look at?

21       Q.    I can get it.

22       A.    Okay.  That would help.



1      Q.    We'll both have homework at lunch.  We'll

2  come back to that, then.

3      A.    Okay.

4      Q.    All right.  In your work across the

5  country, do other states have services similar to

6  GNETS, where some students are provided education in

7  separate facilities based on their emotional and

8  behavioral disability?

9      A.    I'm just breathing for a minute, taking an

10  in-seat break.  I don't know if that's a thing, but

11  we're making it a thing.

12         MS. TUCKER:  Josh, I don't know if it's a

13  good time for you to take a break at some point soon.

14  It's almost 11:00.  If we want to -- I know you have

15  a question pending, but just to order lunch.

16         MR. BELINFANTE:  Yeah, let me do this and

17  then I've got, like, one other thing, and we can

18  order lunch after that.

19         THE WITNESS:  Okay.  Would you ask again?

20         MR. BELINFANTE:  Sure.

21  BY MR. BELINFANTE:

22      Q.    In your work with other states, have you

1    seen programs in education where students with

2    emotional, behavioral disabilities receive education

3    services in separate facilities?

4         A.    Like the GNETS program?

5         Q.    Just separate facilities.

6         A.    Separate facilities.  In my work in other

7    states related to education, the system of education,

8    I've not seen other systems of segregation at the

9    scale and magnitude of what I've seen in the State of

10   Georgia.

11        Q.    Okay.  You added the scale and magnitude

12   piece.  I'm literally just asking about, have you

13   seen other states use separate facilities from a

14   zoned school to provide education services to

15   students with emotional and behavior disabilities?

16        A.    I've been in a lot of schools, and so I'm

17   going through the thinking on that.

18              I don't recall any specific place in which

19   I went that was a wholly segregated environment,

20   separate from the schooling experience, in other

21   states.

22        Q.    Are you familiar with the May Institute in

1    Massachusetts?

2        A.    Yes.

3        Q.    Are you aware that they run schools for

4    students with autism?

5        A.    Yes.

6        Q.    And that they are separate facilities?

7        A.    Separate from what?

8        Q.    Separate from a zoned school, they're

9    independent freestanding facilities?

10       A.    I don't know.

11       Q.    If the May Institute or anyone else were

12   operating freestanding facilities just for students

13   with autism or traumatic brain injuries, would that,

14   in every case, constitute unnecessary segregation?

15       A.    No.

16       Q.    This was that last train of questions, so

17   we can break for lunch -- or order lunch.

18             Are you familiar with the phrase

19   reasonable accommodation as it relates to the ADA?

20             MS. TUCKER:  Object to form.

21             THE WITNESS:  If you're asking me to

22   define what reasonable accommodation is, no.

1    BY MR. BELINFANTE:

2         Q.    Not yet.

3         A.    No.

4         Q.    Okay.  Is it your opinion that the

5    recommendations you make in your report, beginning on

6    page 160, are reasonable accommodations or are

7    reasonable -- let me ask that, and I'll ask the next

8    one.

9         A.    Sure.

10        Q.    Is it your opinion that the

11   recommendations you make beginning on page 160 to 167

12   of your report constitute reasonable accommodations

13   for students with emotional/behavior disabilities?

14        A.    Yes.

15             MS. TUCKER:  Object to form.

16   BY MR. BELINFANTE:

17        Q.    What goes into what constitutes the

18   reasonableness of reasonable accommodation?  What

19   factors do you consider?

20             MS. TUCKER:  Object to form.

21             THE WITNESS:  Again, you're -- it feels

22   like you're applying legal terminology, and asking me



1    to apply that in this situation and --

2    BY MR. BELINFANTE:

3         Q.    If I may interrupt, only because I want to

4    -- I'm not doing that.  I believe you just told me

5    that you believe that the recommendations you provide

6    are reasonable.

7         A.    Yes.

8         Q.    And my question is, in your opinion --

9         A.    Okay.

10         Q.    -- to make that conclusion, what factors

11    go into the conclusion that it's reasonable?

12         A.    Gotcha.

13         Q.    I'm not asking you to opine on the law.

14         A.    Okay.  Thank you.

15         Q.    Yes.  What factors go into your conclusion

16    that the recommendations are reasonable?

17         A.    It is -- the recommendations are

18    reasonable based on my extensive experience in

19    implementing statewide initiatives in and with the

20    support of the state education agencies across the

21    U.S.

22              I'm very knowledgeable about what it takes

1    to change an educational system.  And my life's work

2    has been committed to doing just that, and supporting

3    educational systems.  Therefore, from my personal

4    experience, I feel very clear on the reasonableness

5    of the asks in the recommendations I've made in the

6    report.

7          Q.    Does cost -- is cost a factor in

8    determining whether the recommendations are

9    reasonable?

10          A.    In a general sense?  Yes.

11          Q.    Is workforce availability a factor?

12          A.    Always.

13          Q.    Did you conduct a workforce study for the

14    State of Georgia?

15          A.    I did not conduct a workforce study,

16    although I certainly did look at the number of

17    educators that were available in the GNETS program

18    and their certification, et cetera.

19          Q.    Did you conduct a study of how many

20    physical therapists there are in the State of

21    Georgia, and where?

22          A.    I did not conduct a study, but I did

1    review documents that shared that information.

2         Q.    How about speech therapy?

3         A.    The same.

4         Q.    What documents did you look at, do you

5    recall?

6         A.    Yes.

7         Q.    Are they listed on Appendix E?

8         A.    Yes.

9         Q.    Did you look at -- did they include the

10   number of psychologists in the State of Georgia?

11        A.    Yes.

12        Q.    Psychiatrists as well?

13        A.    Yes.

14        Q.    And social workers?

15        A.    Yes.

16        Q.    And your conclusion is that there is a

17   sufficient number of those professionals scattered

18   across the state to provide -- to implement your

19   recommendations in every school district in Georgia?

20        A.    Multiple parts to that question.  Is there

21   a sufficient number?  There's not a sufficient number

22   of support service personnel certified in the State

1    of Georgia, or in any state, for that matter.  That's

2    a challenge in education right now, what -- so that's

3    part one.

4             Part two was whether or not -- can you say

5    part two again?

6         Q.    I think you answered my question.  I don't

7    think it was two parts.  I think it was, was there

8    enough to implement in every school district across

9    the State of Georgia.  And I think you answered my

10   question.

11        A.    I did not.

12        Q.    You did not answer it?

13        A.    No.

14        Q.    So then go ahead.

15        A.    I think you were asking, is there enough

16   to implement the recommendations in my report as they

17   are now.

18        Q.    In every school district in Georgia,

19   correct.

20        A.    The recommendations in the report are

21   similar to recommendations made in other states, and

22   have effectively been implemented with the same --

1    I'll say with similar educational staffing shortages.

2        Q.    Which states?

3        A.    Elements of the recommendation in various

4    forms in all states throughout the U.S., but in

5    particular, those I mentioned earlier.

6        Q.    Which -- the ones you've worked with?

7        A.    The 20 plus states.

8        Q.    20 or so?

9        A.    Yes.

10       Q.    So it's your contention that the State of

11   Mississippi has fully implemented MTSS in every

12   school district in the state?

13            MS. TUCKER:  Object to form.

14            THE WITNESS:  Not what I said.

15   BY MR. BELINFANTE:

16       Q.    Well, then what did you say?

17       A.    I said that various states -- many states

18   across the U.S. implemented elements of my

19   recommendations with current staffing shortages that

20   are part of the educational system.

21       Q.    Are you aware of any state that has

22   implemented all of your recommendations in every

1    school district in those states?

2         A.    You asked that earlier.  I can't remember

3    what I said earlier.

4         Q.    Well, I'm trying to determine, because

5    you're asking the court to mandate at least five

6    recommended actions to flow through to every school

7    district in the State of Georgia.  I'm asking to

8    determine if any state, to your knowledge, has ever

9    done that.

10            MS. TUCKER:  Object to form.

11            THE WITNESS:  I'm not asking that.  What

12   I'm asking is that the state establish a vision,

13   guidance, and support along a full continuum of

14   services for students with behavior-related

15   disabilities in the State of Georgia.

16            That is to include things such as

17   effective social and emotional behavior supports,

18   effective teaching and learning processes, effective

19   school climate, effective resources and support,

20   entitled students with disabilities such as students

21   without disabilities receive.

22   BY MR. BELINFANTE:



1        Q.      And those recommendations are reflected in

2    your report beginning on page 160 and ending on page

3    167?

4        A.      That is correct.

5        Q.      And again -- okay, I'll leave it at that.

6            MR. BELINFANTE:  You want to break for

7    determining lunch?  Is that what we're doing?

8            MS. TUCKER:  I think so.  And just a

9    break, in general, because we've been going for,

10   like, and hour.  Is it an okay time for you?

11           MR. BELINFANTE:  Yeah, totally fine.

12           THE VIDEOGRAPHER:  Off the record at

13   11:06.

14           (Recess.)

15           THE VIDEOGRAPHER:  On the record at 11:30.

16   BY MR. BELINFANTE:

17       Q.      Dr. McCart, I'm going to -- you've

18   recently written a book called -- with others, called

19   Build Equity, Join Justice:  A Paradigm for Social

20   Belonging; is that right?

21       A.      Yes, I've written a book.  That's not

22   quite the title, but, yes.



1      Q.    And that was with -- is it Dr. Sailor and

2   also -- is it Dr. Kelly?

3      A.    Wade Kelly.

4      Q.    All right.  I'm going to show you what

5   we'll mark as --

6            (Discussion held.)

7            MR. BELINFANTE:  I'll show you what we'll

8   mark as Exhibit 3.

9                  (McCart Exhibit No. 3 was identified

10                  for the record.)

11           MR. BELINFANTE:  I've got extras if you

12   all want.

13   BY MR. BELINFANTE:

14      Q.    This is an article from today.ku.edu.

15   Have you seen this before?

16      A.    Let me see.  Yes.  Yes.

17      Q.    Okay.  If you turn to the second page --

18   well, let me ask this first.  The recommendations

19   that you make in this report and the recommended

20   actions, are they consistent with the recommendations

21   in the book Build Equity, Join Justice?

22      A.    No.



1      Q.      What's the difference?

2      A.      The -- a multitude of differences.

3      Q.      Are you recommending in your report an

4   equity-based MTSS approach in Georgia?

5      A.      I'm recommending a system of support that

6   provides vision, guidance, and leadership from the

7   state to LEAs, to schools, to support students with

8   disabilities.  That system of support can be called

9   MTSS, but can be called other things.

10     Q.      Is the MTSS that you're recommending

11  specifically on page 164, which uses the phrase

12  "within MTSS," an equity-based MTSS?

13     A.      Where are you?

14     Q.      We can start on page 163, "Recommended

15  action:  Develop state capacity to provide guidance

16  for implementation of MTSS through direction, policy,

17  and technical assistance for districts and schools

18  throughout the state."

19     A.      Yes.

20     Q.      Page 164, "Recommended action:  Develop

21  state capacity to serve as technical support for

22  district implementation of social, emotional,

1    behavioral, and mental practices within MTSS."

2        A.    Mental health practices within MTSS, yes.

3        Q.    Page 165, "Recommended action:  Develop

4    state capacity to serve as technical support for

5    district scaling of evidence-based implementation

6    actions to support equity-based MTSS embedded within

7    social, emotional, behavioral, and mental health."

8            Do you see that?

9        A.    I do.

10       Q.    Page 165 again, "Recommended action:

11   Develop state capacity to serve as technical support

12   for district implementation of evidence-based

13   practices to support equity-based MTSS within

14   embedded social, emotional, behavioral, and mental

15   health."

16           Do you see that?

17       A.    I do.  You skipped one.

18       Q.    I did because it didn't use the phrase

19   MTSS.

20       A.    Gotcha.

21       Q.    So on page 2 of 4 of this article, when it

22   describes, at the last paragraph, "The book outlines

1    strategies for ensuring that implementation of

2    equity-based MTSS in schools is done with equity as

3    the driving force for the measure of success."

4              Is that an accurate statement of what your

5    book, Build Equity, Join Justice, outlines?

6              MS. TUCKER:   I just want to correct.   It

7    says, "and the measure of success."

8              MR. BELINFANTE:   Sorry.

9              THE WITNESS:   This book outlines

10   strategies for ensuring that implementation of

11   equity-based MTSS is done in schools -- I'm sorry,

12   MTSS in schools is done with equity as the driving

13   force and the measure of success.

14   BY MR. BELINFANTE:

15        Q.    And you're recommending equity-based MTSS

16   for the State of Georgia, correct?

17        A.    Yes.

18        Q.    And so looking at your quote in the first

19   full paragraph of the article, it says, "The book

20   hopes to inspire a deeper thinking and a fundamental

21   redesign in the way we, as educators, understand and

22   support students and structure our schools."

1          Do you see that?

2     A.     No.

3     Q.     Sorry, first full paragraph beginning with

4     the quote, "The book hopes," on page 2, the same

5     page.

6     A.     I need one more -- say that again.  Okay,

7     "The book hopes."

8     Q.     Yeah.

9     A.     I'm with you.

10     Q.     Is that an accurate quote of yours?

11     That's my only question.

12     A.     That is an accurate quote of mine, "The

13     book hopes to inspire a deeper thinking and

14     fundamental redesign in the way we, as educators,

15     understand and support students and the structure of

16     our schools."

17     Q.     Now, we were talking earlier, and you said

18     that the recommendations you have in your report in

19     this case, beginning, again, on page 163, in terms of

20     the recommended actions, are commonplace across the

21     country.

22          This article says, on page 2, starting in

1    that last paragraph, it says -- the part we've

2    already talked about, "The book outlines strategies

3    for ensuring that implementation of equity-based MTSS

4    in schools is done with equity as the driving force

5    and measure of success?"

6              It then goes on to say, "This is, in part,

7    a response to the prevalence of an educational

8    systems that routinely segregate based on placing

9    into separate classrooms or schools, those students

10   who learn or behave differently from the dominant

11   culture."

12             Do you see that?

13   A.    Yes, I see that.

14   Q.    I realize those aren't your words, but do

15   you agree with that second sentence?

16   A.    I've forgotten the start and end of your

17   question.  So is the question now -- just so I

18   understand, are you asking me, do I agree with the

19   sentence that starts at the bottom of page 2 and goes

20   on to page 3?

21   Q.    Yes.

22   A.    So you're -- this is, in part, a response

1    to the prevalence of educational systems that -- that

2    sentence?

3         Q.    Yes.

4         A.    Do I agree with that statement?

5         Q.    Yes.

6         A.    In part, yes.  The book was in response to

7    a system that -- yes.

8         Q.    So you believe there is a prevalence of

9    educational systems in the United States that

10   routinely segregate by placing into separate

11   classrooms or schools, those students who learn or

12   behave differently from the dominant culture?

13        A.    No.

14        Q.    So then what do you agree with in that

15   second sentence?

16        A.    I thought you were asking -- this is, in

17   part -- the production of this book, the writing of

18   this book --

19        Q.    Right.

20        A.    -- was in response to, in part, systems

21   that segregate.

22        Q.    Right.  My question really is about the

1    prevalence of educational systems.  Do you believe

2    that there is a prevalence of educational systems

3    that routinely segregate?

4        A.    Over the years?

5        Q.    I'm just -- from what this says.  If the

6    book is in response to that, it presumably -- well,

7    let me ask this.  Is the book to address -- it's to

8    help schools implement equity-based MTSS now,

9    correct?

10       A.    You're saying -- you're asking me now, is

11   Build Equity, Join Justice about helping schools

12   build equity-based MTSS?

13       Q.    Today, yes.

14       A.    Today?  That is one very small part of

15   this book.

16       Q.    Okay.

17       A.    My other book is all about it.

18       Q.    Okay.  In page 3, second full paragraph,

19   the sentence begins, "In the book, the authors argue

20   that a paradigm shift is needed to address the

21   inequities embedded in many aspects of the

22   educational system."



1          Do you see that?

2     A.    Yes.

3     Q.    Do you agree with that description of the

4 book?

5     A.    I do agree with that description of the

6 book.  I'll just add that the book has nothing to do

7 with my recommendations that I've made in the report

8 to the State of Georgia.

9     Q.    Your recommendations use the phrase

10 equity-based MTSS.

11     A.    That's correct.

12     Q.    Your book is based on the equity-based

13 MTSS, correct?

14     A.    This book is based on building equity and

15 joining justice around a 10-point paradigm that is

16 separate and distinct from equity-based MTSS, of

17 which a component is included, but is not the primary

18 purpose or intention of the book.

19          So was the word equity-based MTSS used in

20 Build Equity, Join Justice?  Yes.  Was this book

21 utilized as a tool for writing the report?  No.

22     Q.    So equity-based MTSS means one thing for

1    the book, and another thing for your report; is that

2    right?

3        A.    No.

4            MS. TUCKER:  Object to form.

5            THE WITNESS:  I don't -- no.

6    BY MR. BELINFANTE:

7        Q.    They mean the same thing in your book and

8    in the report?

9            MS. TUCKER:  Object to form.

10   BY MR. BELINFANTE:

11       Q.    It's a yes or no.  Do they mean the same

12   thing or not?

13           MS. TUCKER:  Same objection.

14           THE WITNESS:  Can you ask the question

15   again?

16   BY MR. BELINFANTE:

17       Q.    Does equity-based MTSS mean the same thing

18   in your book that we just talked about as it does in

19   your report on the pages we discussed?

20       A.    Not to be difficult, but there are -- MTSS

21   is considered a continuum of support.  And there are

22   gradations along a wide spectrum of educational

1    practice of what equity-based MTSS is and looks like.

2           And so are these the same words?  Yes.

3    Just like I could say teaching in the book and I

4    could say teaching in the report.  And teaching can

5    look and feel very different, because there is a

6    continuum of what those practices look like in

7    reality in the field.

8        Q.    Sure.  So equity-based MTSS could look

9    different in Mississippi, New Hampshire, Vermont,

10   Oregon, Maryland, for example, than it does in

11   Georgia; is that right?

12       A.    Yes.

13       Q.    And would MTSS look different as it would

14   -- in states like that, as it would in Georgia?

15       A.    I didn't understand what you said.

16       Q.    I was asking about equity-based MTSS in

17   the immediate prior question.  So my follow-up

18   question is, does MTSS look different in Mississippi,

19   New Hampshire, Vermont, Oregon, Maryland, for

20   example, than it would in Georgia?

21       A.    I would hope so.

22       Q.    And how does one determine fidelity to

1    MTSS if it varies by state?

2         A.    There's a number of mechanisms for

3    measuring fidelity of implementation of MTSS.  Some

4    of the tools that I mentioned earlier today help

5    measure, among many other tools.

6         Q.    If a court were to say that Georgia is to

7    implement MTSS, what standards would Georgia look to,

8    to determine fidelity?

9              MS. TUCKER:  Object to form.

10   BY MR. BELINFANTE:

11        Q.    Let me withdraw that question and ask

12   another one.  That's probably fair.

13             In terms of your recommended actions, as

14   they relate to Georgia in implementing MTSS, what

15   fidelity standards are you recommending that Georgia

16   adopt to determine if it is complying with your

17   recommended actions?

18        A.    I would have to reference my report.

19   Specifically, I don't believe I mentioned a specific

20   fidelity measure.  Rather, I made a recommendation

21   that the state consider an effective system of

22   support for meeting the needs of students with



1    disabilities who have -- who experience behaviors

2    associated with those disabilities.

3              Certainly if the opportunity -- if there

4    was the desire of the state to implement a fidelity

5    measure, certainly one could be provided.

6         Q.    Where would -- do you agree that in order

7    to implement MTSS effectively, the state has to

8    believe in MTSS?

9         A.    The state needs -- the state needs to

10   believe that having an educational system of support

11   is important for supporting student need, yes.

12        Q.    Do you have any understanding of what the

13   State Department of Education is doing with regards

14   to MTSS?

15        A.    I did not evaluate the efficacy of MTSS or

16   fidelity within the State of Georgia.  Is that what

17   you're asking?

18        Q.    I think you just answered what was

19   probably my third in line.

20        A.    Oh.

21        Q.    So you've done well.  You've saved us

22   time.

1          A.     I always like that.

2          Q.     Now for the part that nobody likes.  You

3     said that we need an effective system of support to

4     meet needs.  How does one determine effective?

5          A.     Efficacy of outcomes as it relates to the

6     students in the GNETS program, as well as other

7     students, are whether or not students have access to

8     educational opportunities as students without

9     disabilities.

10          And they have the opportunity to

11     experience the traditional schooling experience,

12     where effective and appropriate supports are

13     provided, resulting in outcomes for students that are

14     academically, socially, behaviorally sound.  Happy,

15     happy kids.

16          Q.     So the efficacy of educational services

17     turn, at least in part, on the happiness of the

18     child?

19          A.     Certainly you would hope that a child

20     would be happy.

21          Q.     Well, you would certainly hope they are.

22     But if they're not, is that a fault of the school

1    system and the services provided in that school?

2        A.    That's not what I said.

3        Q.    Okay.

4        A.    What I said is that what determines

5    student success is academic, behavioral, social,

6    emotional, and mental health outcomes that are

7    positive for students.

8        Q.    So in order to determine if Georgia is

9    providing appropriate supports, we look at outcomes.

10   Is that what you're stating?

11       A.    Look at many things.  I'm sorry, I

12   interrupted you.

13       Q.    No, but outcomes is one of the things you

14   look at?

15       A.    That is one of the things.

16       Q.    What other than outcomes?

17       A.    The data early in the report shares some

18   of that, but time in general education, and in

19   effective instruction.

20       Q.    I'm listening.

21       A.    Yeah, I'm looking.  Amount and time of

22   involvement and inclusion with general education with

1    peers, amount of time focused on high expectations

2    and access to quality, or at least appropriate

3    environments, such as cafeterias, gymnasiums,

4    after-school activities, specials, all of the, again,

5    traditional elements of a schooling experience.

6         Q.    Is spending 40 percent of the time in a

7    general education environment, is that deemed

8    indicative of effective supports?

9         A.    That depends, absolutely, on each child.

10        Q.    Okay.

11        A.    And their needs.

12        Q.    So in order to determine the efficacy of

13   services, it's an individualized consideration as

14   well?

15             MS. TUCKER:  Object to form.

16             THE WITNESS:  No.

17   BY MR. BELINFANTE:

18        Q.    So is 40 percent good or not?  At one

19   level, it's not.  At one level, it is.  I'm trying to

20   determine when is it an individualized consideration

21   and when is it a generalized consideration?

22        A.    I'm not sure I understand what your

1    question is now.

2         Q.    If a child is spending, on average, 40

3    percent of their time in general education settings,

4    is that indicative of effective services or is it

5    indicative of not effective services?

6         A.    I don't know that child, so it's

7    impossible for me to say.

8         Q.    So you have to look at the individual

9    student?

10        A.    To what?

11        Q.    To determine the efficacy of services.

12        A.    It's more than that.

13        Q.    Okay.

14        A.    That's one variable.

15        Q.    So the time spent in general education is

16   an individual variable.  What are general variables?

17        A.    That's not what I said.  I'm sorry.

18        Q.    Then please clarify what you said.

19        A.    The variables to indicate the

20   effectiveness, is that what you're asking?

21        Q.    Well, I'm specifically asking about the

22   time spent in general education.  I think you had

1    identified that as one of the things you look at when

2    considering efficacy.

3            So my question is, if a child is spending

4    40 percent of their time in general education, is

5    that indicative of an effective program or an

6    ineffective program?

7        A.    That is not -- there's not a correlation

8    between that.

9        Q.    Okay.

10       A.    Because there are a number of variables

11   that determine whether or not an educational

12   placement is effective.

13       Q.    And those variables are individualized in

14   their -- you have to consider how those variables

15   impact the individual child; is that right?

16       A.    Well, whether or not -- one example I gave

17   is the presence of a cafeteria.  I don't think that's

18   an individual determination.  But a student having

19   access to a cafeteria or a library or after-school

20   activities is important for their growth,

21   development, and success.

22       Q.    All right.



1        A.      So those are the kinds of variables that

2    are important from a systemic perspective for student

3    success that can be correlated with time in a quality

4    educational environment.

5        Q.      Are there reasons, though, that a student

6    would not be given access to a cafeteria, and

7    legitimate, non-discriminatory reasons that they

8    would not be provided access there?

9        A.      A hypothetical student?

10       Q.      Sure.

11       A.      Is there a hypothetical student that, for

12   one reason or another, it would be not in their best

13   interest to access a cafeteria?

14       Q.      Correct.

15       A.      That's right.

16       Q.      Okay.

17       A.      That's very different than a student who

18   can't access a cafeteria because it's not there.

19       Q.      Understood.  And would there be legitimate

20   reasons -- similar question, but as opposed to

21   looking at the individual student who has the

22   emotional/behavioral disability, would there be



1   appropriate reasons for the students in the general

2   zoned school, that that child would not be

3   permitted -- that child with emotional/behavioral

4   disability would not be given access to the

5   cafeteria?

6        A.     Again, another hypothetical?

7        Q.     Right. And what I'm really getting at in

8   a probably very obtuse way is, is it legitimate, in

9   your professional opinion, to also consider the

10   students in the general zoned school, and not just

11   the student with the emotional/behavioral disability?

12   Does that make more sense?

13        A.     I'm still not able to answer because of

14   the -- the issue. At first, the question was

15   hypothetical, like, is there ever a circumstance in

16   which there actually is a cafeteria on site, and it

17   would not be in the best interest of a student with

18   disabilities to go into that cafeteria.

19        Q.     Mm-hmm.

20        A.     And that decision is made, and that's

21   fine. I think the follow-up was whether or not -- do

22   you want to take it from there?



1          MR. BELINFANTE:  And I just realized my

2    mic was under the thing.  Have you been able to hear

3    me okay?

4          THE VIDEOGRAPHER:  Yeah, I just turned you

5    up.

6          MR. BELINFANTE:  All right.  I'm putting

7    it back on.  My apologies.

8          THE VIDEOGRAPHER:  No worries.

9    BY MR. BELINFANTE:

10       Q.    Would it be appropriate in determining

11   whether a student has access to a cafeteria to

12   consider students who are not being segregated from

13   that cafeteria, and the safety or needs of those

14   students?

15         MS. TUCKER:  Object to form.

16         THE WITNESS:  Hypothetically, as an

17   educator, it's my goal and hope that we're always

18   attending to the safety and well-being of students.

19   BY MR. BELINFANTE:

20       Q.    So that would be an acceptable

21   consideration?

22       A.    I don't know.



1          Q.    You're familiar, and you cite in your

2    report -- or I don't know if you cite it, but it's

3    referenced in Appendix E -- and I'll make sure I'm

4    using the supplemental.

5              It looks like it's on the third

6    substantive page, an article from Agran, Kurth,

7    Ryndak, et cetera, from 2020 entitled, "Why aren't

8    students with severe disabilities being placed in

9    general education classrooms?"  Do you see that?

10              MS. TUCKER:  Can you say that again?

11              MR. BELINFANTE:  Sure.  It's on the third

12    substantive page.  It's the first article cited

13    beginning with Agran, M.

14              MS. TUCKER:  Okay.

15              MR. BELINFANTE:  I'm looking at the

16    amended one.

17              MS. TUCKER:  Got it, thank you.  I'm good.

18    Thank you.

19    BY MR. BELINFANTE:

20          Q.    I'm going to show you what I believe is

21    that article.  We'll mark it as Exhibit 4.

22                    (McCart Exhibit No. 4 was identified

1              for the record.)

2    BY MR. BELINFANTE:

3        Q.    My question is, on the first paragraph

4    under Keywords, the second sentence says, "According

5    to the recently published U.S. Department of

6    Education (2018) 40th Annual Report to Congress on

7    the Implementation of the IDEA (The Individuals with

8    Disabilities Education Improvement Act),

9    approximately one half of students with intellectual

10   or multiple disabilities spend less than 40% of their

11   time in regular classrooms per day."

12           Do you see that?

13       A.    I do see that.

14       Q.    Okay.  Have you read the U.S. Department

15   of Education's 40th Annual Report to Congress from

16   2018?

17       A.    I do not recall right now.

18       Q.    Any reason to disagree with Agran, et

19   al.'s description of that report, about 50 percent --

20   or one half of students with intellectual and

21   multiple disabilities spend less than 40 percent of

22   their time in regular classrooms per day?



1                    MS. TUCKER:  Object to form.

2                    THE WITNESS:  Can you just ask that

3        another way?

4        BY MR. BELINFANTE:

5            Q.    Sure.  I mean, do you disagree with their

6        description of the report?

7            A.    I do not disagree with their description

8        of that report.

9            Q.    They go on to say, and this is the next

10       sentence, furthermore, to the extent -- or excuse me,

11       "Furthermore, the extent to which students with

12       severe disabilities are provided access to the

13       general education classroom has remained largely

14       stagnant for the last decade."

15                    Understanding this was written in 2020, do

16       you disagree with that statement?

17           A.    I don't disagree with the fact that they

18       wrote that sentence.

19           Q.    Do you disagree with their conclusion in

20       that sentence?

21           A.    I would need to look at the data that they

22       looked at.

1          Q.    It then says, "Nationwide, placement

2    practices for these students continue to remain

3    'distinctly separatist,' and discussions about their

4    inclusion in general education classes often become

5    'highly contentious.'"

6              Do you agreed with their conclusion that

7    placement practices for these students continue to

8    remain distinctly separatist, at least as of 2020?

9          A.    I'm not sure how they're defining

10   distinctly separatist.  But since they put quotations

11   around it, as is the practice, they're likely citing

12   the authors below, Connor and Ferri.  And since I

13   don't know what their definition of that means, I

14   can't speak to that.  If you have that article, I

15   could look.

16         Q.    I don't have that article.  But you do

17   cite this article as something that informed your

18   report, correct?

19         A.    Yes.

20         Q.    Do you agree with their statement that

21   discussions about inclusion in general education

22   classes often become, quote, highly contentious?



1          A.      Again, the same thing I mentioned before.

2     Highly contentious as determined by Connor and Ferri

3     in 2007.  I just -- I don't know how they're defining

4     that.

5          Q.      Is it your experience that it's highly

6     contentious, not using Connor and Ferri's terms, but

7     using your own terms?

8          A.      No.

9          Q.      Is it your experience that providing

10    access to general education classrooms for students

11    with severe disabilities has remained stagnant from

12    roughly 2010 to 2020?

13         A.      Again, I would need -- on that one, I need

14    to look at the data set that they looked at to make

15    that determination.

16         Q.      So sitting here today, you can't tell us

17    if there's been progress made in integrating students

18    with severe disabilities into general education

19    classrooms from 2010 to 2020?

20         A.      I didn't say that.

21         Q.      Is it your opinion that there has been

22    progress, or is it your opinion that it has been

1    stagnant from 2010 to 2020?

2        A.    All right.  So you're asking if students

3    with disabilities --

4        Q.    Severe disabilities.

5        A.    In my opinion, whether or not students

6    with severe disabilities have --

7        Q.    We'll move on.  That's fine.

8        A.    I'll just point out that the student

9    population you're referencing here, students with

10   intellectual and multiple disabilities is a specific

11   population of students.

12       Q.    Okay.

13       A.    Some of which are included in -- some of

14   which have labels that are similar to students in the

15   GNETS program, many of which don't.

16       Q.    But they don't define the terms here.  So

17   how are you confident in what it means here, but

18   you're not confident in what stagnant means or

19   distinctly separatist?

20       A.    Good question.  The distinction is because

21   of the quotation marks, because they're citing

22   somebody specific.  And that means they're



1    referencing another article in which that information

2    is not provided here, whereas the construction of

3    intellectual disabilities and multiple disabilities

4    is commonplace in the field.

5        Q.    And where would one look for those

6    definitions?

7        A.    A number of places.

8        Q.    You don't rely on the Connor and Ferri

9    article, it appears, based on exhibit A -- or excuse

10   me, Appendix E, amended?

11       A.    I -- did I cite that one?

12       Q.    You did not.

13       A.    Then likely no.  Let me turn to the back

14   of this article.  A bit of a rabbit hole.

15       Q.    Would you not agree with me, though, that

16   if, nationwide, students with severe emotional

17   disabilities are spending less time in a general --

18   or spending 40 percent or less time in a general

19   education classroom, that that would speak to the

20   reasonableness of applying a bright line approach?

21       A.    What's a bright line approach?

22       Q.    A per se approach, an all-in approach.



1      A.    I don't know what you mean at all.

2      Q.    A generalized approach.

3      A.    I really don't.  I'm lost.

4      Q.    How much time did you spend in each

5   classroom that you visited, on average?

6      A.    Are we done with this?

7      Q.    We're done with that, yes.

8      A.    Okay.

9      Q.    On average, when you visited a GNETS

10  facility, how much -- or school, how much time did

11  you spend, on average, in the classroom?

12     A.    It varied.  Anywhere from 10 minutes to 90

13  minutes, dependent on the classroom, the

14  circumstances, the site.

15     Q.    Who -- and when you say on the

16  circumstances, who is it -- who created those

17  circumstances?  In other words, was that your

18  decision to stay 10 to 90 minutes, or was that an

19  agreement reached with the school, do you know?

20     A.    It was a mix of variables.  Certainly I

21  had the ability to determine length of stay within

22  the confines of the site visit protocol that was

1    established.  And so I followed that protocol.

2         And then if anything occurred in the

3    environment, like a teacher was needing a moment or a

4    student was needing something, or whatever,

5    contextually, based on my experience, that I thought

6    it was, you know, time to step out and maybe come

7    back later, I would do so.

8         Q.    Okay.  In your review of students who are

9    receiving services through GNETS, did you find anyone

10   who was receiving those services for whom their IEP

11   team did not recommend that they receive services in

12   GNETS?

13        A.    I'm sorry to have to ask you to repeat

14   that.

15        Q.    Sure.  Of the students who you reviewed

16   that received GNETS services, did you see or find an

17   occasion where a student was receiving services

18   through the GNETS Program, and that student was not

19   recommended for GNETS services by their IEP team?

20        A.    I did not review all of the IEPs for every

21   student in the GNETS program, so I cannot speak to

22   that.  If you're asking whether or not the



1   recommendation was made for each IEP that I did

2   review, I cannot recall right now, sitting here.  I'd

3   need to take a look at those to see if there were

4   recommendations made differently by the IEP team.

5        Q.    Do you understand -- is it your

6   understanding that in order for someone to receive

7   services through GNETS, there has to be a

8   recommendation from their IEP team to do so?

9        A.    There is a referral process to GNETS that

10  includes that an IEP determine that that would be an

11  appropriate placement.

12       Q.    Is it your understanding that that

13  determination -- and you may have said this, I'm just

14  asking for the record.  Is it your understanding that

15  that IEP team recommendation is a requirement to

16  receive services through a GNETS program?

17       A.    I believe that it is part of the

18  pre-referral process to -- or the referral process to

19  the GNETS program.  Whether or not it's a

20  requirement, I don't know.

21       Q.    And so I understand that, sitting here

22  today, you can't recall any instance where a student

1    was receiving services through a GNETS program, and

2    that student's IEP did not recommend that they

3    receive GNETS services?

4        A.    I don't recall, one way or another.  I'd

5    have to review the students' IEPs again.

6        Q.    Would that concern you if a student was

7    receiving services in GNETS, and it was not

8    recommended by their IEP team?

9        A.    Yes.

10       Q.    Let's look at page 6 of your report.  It's

11   actually page 7, where you provide a series of

12   definitions.  My specific question is about the

13   definition of unfair, which you define as describing

14   "situations that are not right or fair, according to

15   a set of principles, rules, or standards.  Synonyms

16   of unfair include one-sided, discriminatory, unjust,

17   or inequitable."

18            What are the set of principles, rules, or

19   standards that you applied in reaching the

20   conclusions of your report?

21       A.    Are you asking something about unfair?

22       Q.    Well, yeah, because unfair includes, it's

1    not right or fair according to a set of principles,

2    rules, or standards.  I'm just trying to figure out,

3    when you made a determination that something was

4    unfair, which set of principles, rules, or standards

5    did you apply?

6         A.    Okay, I'm following you now.

7         Q.    Okay.

8         A.    Probably the best way to understand the

9    distinction between unfair and unequal, for example,

10   is unequal would be this group of students over here

11   has a playground, and this group of students does not

12   have a playground.  And from my perspective, that's

13   unequal.  One has something, the other doesn't have

14   something.  And I'm getting to your question.

15         Unfair, from my perspective, would be this

16   group of students has a playground, but this -- and

17   this group of students also has a playground, but

18   that playground is much smaller, of less quality,

19   of -- is in bad shape or is fenced in the middle of a

20   larger playground, as is the case at one site.  And

21   that is unfair because those students are there

22   observing other students playing on a playground in

1    which they have all they need.  That's kind of a

2    working definition of how I distinguish between

3    unequal, unfair.

4              As it relates to what was included in the

5    report, unequal would be -- or equal would be items

6    such -- items, occurrences, events, things,

7    experiences that are typical in general education

8    and/or -- general education, in which students with

9    disabilities also participate.  Whereas, fairness

10   would be whether or not those students have the

11   ability to participate in those experiences.  So I

12   don't know if that got to where you wanted.

13        Q.    Not so much.

14        A.    Okay.

15        Q.    I appreciate it.

16        A.    Let's go again.

17        Q.    It may have shortened some other

18   questions, so I mean, it's fine.

19        A.    Okay.

20        Q.    But I think that the question is probably

21   a bit theoretical anyway, so we can just move on.

22              You brought up playgrounds.  Do you have

1    any understanding of the distinctions between local

2    and state governments as it relates to providing

3    playgrounds?  And by providing, I mean making the

4    decision to use dollars to build playgrounds or

5    update them, repair them, whatever else.

6          A.    I know that it's common in schooling

7    experience for students to have access to playgrounds

8    and gymnasiums, cafeterias, libraries, et cetera.

9          Q.    Right.  But my question is, do you have an

10   understanding as to whether LEAs or state government

11   in Georgia make the decision on where to invest the

12   dollars on playgrounds or gymnasiums, et cetera?

13         A.    I do not, no.

14         Q.    Okay.  Is it your understanding that LEAs

15   and -- let me back up a second.

16               Are you familiar with the term RESA?

17         A.    Yes.

18         Q.    Okay.  Is it your understanding that LEAs

19   and RESAs are legally mandated to apply for GNETS

20   grants?

21               MS. TUCKER:  Object to form.

22               THE WITNESS:  I do not know what they're

```
 1   legally required to do.

 2   BY MR. BELINFANTE:

 3        Q.    Is it your understanding that there is

 4   anything in Georgia that compels LEAs and RESAs to

 5   apply for GNETS grants?

 6        A.    Can you ask that again?

 7        Q.    I think we're fine.  I'll move on.

 8        A.    Okay.

 9        Q.    In your review of students in GNETS, did

10   you find in any case where someone employed by the

11   State Department of Education mandated that a child

12   receive services from GNETS?

13        A.    Are you asking if a state representative

14   of the State Department identified an individual

15   child and mandated that they receive services?

16        Q.    Mm-hmm, through GNETS.

17        A.    I'm not aware of that.

18        Q.    Okay.  The same question, did you find

19   that from an employee of the Department of Community

20   Health?

21        A.    No.

22        Q.    And the same question.  Did you find that
```

1    from an employee of the Department of Behavioral

2    Health and Developmental Disabilities?

3         A.    No.

4         Q.    You cite a series of articles in your

5    report on page 3 to 6.  Do you see that?

6         A.    Yes.  I'm sorry, yes.

7         Q.    No, that's fine.  Let's look at page 4.

8    The first full paragraph starts with, "When students

9    with disabilities are educated outside the general

10   education setting, in separate buildings, wings,

11   rooms, or isolated settings of any kind, they

12   experience a number of adverse outcomes across

13   academic, social, emotional, and behavioral

14   detriments."

15              Do you see that?

16        A.    Mm-hmm.

17        Q.    And you cite the -- is it Ennis?

18        A.    Mm-hmm.

19        Q.    Okay, Ennis and Katsiyannis; is that

20   correct?

21        A.    That's very good.

22        Q.    2017 article for that proposition.

1          MS. TUCKER:  I just want to correct, it

2    was "behavioral determinants."

3          MR. BELINFANTE:  Okay.  Thank you.  What

4    did I say this time?

5          MS. TUCKER:  Detriments.

6    BY MR. BELINFANTE:

7      Q.    If a student is experiencing adverse

8    outcomes across academic, social, emotional, and

9    behavioral determinants, are they being denied a

10   FAPE, in your professional opinion?

11     A.    I don't know how to apply the construct of

12   FAPE to this sentence here.

13     Q.    Okay.  Let me show you what we'll mark as

14   Exhibit 5.

15            (McCart Exhibit No. 5 was identified

16            for the record.)

17   BY MR. BELINFANTE:

18     Q.    Is this the article that you are citing on

19   page 4?

20     A.    In order to answer that question, I'm

21   going to the list of considered documents, Appendix

22   E.

1        Q.      Right.

2        A.      I'm going to the citation that begins --

3    comparing author names, because sometimes they write

4    more than one in a year.  And, yes, it appears that

5    it is.

6        Q.      Okay.

7        A.      Yep, it is.

8        Q.      Okay.  Would you agree with me that this

9    article that you cite for that conclusion is about

10   the IDEA, and not the ADA?

11       A.      I would need to read the article, but IDEA

12   is in the title.

13       Q.      And what the article is talking about is

14   the denial of FAPE, because that's an IDEA concept,

15   correct?  Stop, let me rephrase.

16              The denial of FAPE is an IDEA concept;

17   isn't that right?

18              MS. TUCKER:  Object to form.

19              THE WITNESS:  You're asking, is FAPE

20   included in the IDEA?

21   BY MR. BELINFANTE:

22       Q.      Is it an analysis of IDEA or mandated by

1    the IDEA, yes.

2              MS. TUCKER:  The same objection.

3    BY MR. BELINFANTE:

4        Q.    In other words, if someone were to apply

5    the IDEA, do you look toward, among other things,

6    sure, but do you look towards whether a student is

7    receiving a FAPE?

8              MS. TUCKER:  The same.

9              THE WITNESS:  Again, from an educator

10   perspective, the implementation of FAPE is included

11   as part of IDEA.

12   BY MR. BELINFANTE:

13       Q.    Okay.  On page 306 of this article.  306,

14   sorry, of Exhibit 5.

15       A.    And is it, like, 302 or --

16       Q.    306 of the article itself.

17       A.    306?

18       Q.    Yes.

19       A.    Okay.

20       Q.    Using the article's paginated numbers.  In

21   the second column, the last sentence starts, "School

22   personnel are allowed to exercise professional

1    judgment in addressing performance concerns" --

2        A.    Pause, pause, because I don't want you to

3    read it all before I find it.  Where?

4        Q.    Second column, right there at the bottom.

5        A.    And the sentence starts?

6        Q.    "School personnel."

7        A.    Got it.

8        Q.    "School personnel are allowed to exercise

9    professional judgment in addressing performance

10   concerns by implementing instructional and behavioral

11   interventions without referral for eligibility under

12   IDEA."

13           Do you see that?

14       A.    Yes.

15       Q.    Do you agree with that statement,

16   generally?

17           MS. TUCKER:  Object to form.

18           THE WITNESS:  Are school -- I think, are

19   you asking, are school personnel allowed to implement

20   behavioral and instructional interventions for

21   students without eligibility for IDEA?

22   BY MR. BELINFANTE:



1      Q.    Yes.

2      A.    Yeah.

3      Q.    Okay.  Going back to your report, the next

4   sentence in that first full paragraph after the

5   citation we just discussed, it begins, "Conversely,

6   when" --

7      A.    Page?

8      Q.    Page 4.

9      A.    Okay.

10      Q.    First full paragraph, second sentence.

11   "Conversely, when served in inclusive general

12   education classrooms and environments, students with

13   disabilities show growth in academic outcomes,"

14   citing Kurth and Mastergeorge from 2010.  I know it

15   goes on, but I'm going to ask about Kurth and

16   Mastergeorge first.

17              And I'll show you what we'll mark as

18   Exhibit 6.

19                  (McCart Exhibit No. 6 was identified

20                  for the record.)

21   BY MR. BELINFANTE:

22      Q.    This is the 2010 article cited in your

1    report, correct?

2         A.    I'll have to -- hang on.  Well, I'm not

3    sure, but go ahead and ask your question.

4         Q.    The study that this article talks about,

5    and you can see it on page 147, which is the second

6    page of the article under Method.

7         A.    Mm-hmm.

8         Q.    "Five special education teachers and 15

9    adolescents with autism participated in the study."

10               Do you see that?

11         A.    Yes.

12         Q.    And then it goes on to say, "three school

13    districts were ultimately enrolled in the study,

14    although six districts were contacted.  The districts

15    contacted represent diverse student populations and

16    methods of educating students with autism in Northern

17    California."

18               Do you see that?

19         A.    Yes, I do.

20         Q.    Okay.  So is it your recollection that

21    this article, from which you base that conclusion,

22    cites 15 students in Northern California?

1        A.     I do not know.  I would need to look at

2   the results section.

3        Q.     Okay.  Going back to your report, page 4.

4   The provision about increased social interactions

5   cites the Lyons, Cappadocia, Weiss study from 2011.

6        A.     Uh-huh.

7        Q.     I may need to get -- let me -- I'll move

8   on from that.  I need to get copies of that.

9              Would it surprise you if that study looked

10  at autism only, the Lyons, Cappadocia, and Weiss from

11  2011?

12       A.     No.

13       Q.     In your -- do you have any professional

14  training in statistics?

15       A.     Yes.

16       Q.     Do you consider a study of 15 students in

17  Northern California to be a sufficient sample size to

18  make a statement that students with disabilities show

19  growth in academic outcomes?

20       A.     There are a number of variables that

21  determine whether or not statistical significance can

22  be stated using a variety of measures.  Whether or



1    not the article that you're referencing has

2    statistically significant outcomes, I would need to

3    look.  Certainly it is well-documented in over 30

4    years of literature that students with disabilities

5    have better academic outcomes when in general

6    education.

7          Q.    But, Dr. McCart, you cited Kurth and

8    Mastergeorge, right?

9          A.    That is one article that I cited, yes.

10         Q.    And that's one article about 15 kids with

11   autism in Northern California, correct?

12         A.    I haven't read the article.  If you'd

13   like, I could read the results section and --

14         Q.    Well, I just presumed if you put it in

15   here, you were standing by it, and you would be

16   familiar with it.

17         A.    I am familiar with it.

18         Q.    Then you can answer the question.

19         A.    I can't answer a question --

20         Q.    15 kids in Northern California with

21   autism, correct?

22         A.    I thought we weren't going to interrupt

1    each other.

2        Q.    Continue, I'm sorry.

3        A.    If you would like me to answer the

4    question that you're asking, I need to read the

5    results section.

6        Q.    Do you need to read the results to

7    determine the cohort used?

8        A.    I don't know, because I haven't seen what

9    they've said about who they studied, and what they've

10   done.  So you're asking me to guess.

11       Q.    I'm asking you to explain your report.

12   I'm not asking you to guess anything.

13       A.    I can explain in my report that this

14   article, among others, indicate that students have

15   adverse outcomes across academic, social, emotional,

16   and behavioral determinants.

17       Q.    Jennifer Kurth, does she work with you

18   still at SWIFT?

19       A.    Jennifer Kurth is the chair of the

20   Department of Special Education, but -- chair of the

21   Department of Special Education at the University of

22   Kansas.

1      Q.    Does she work with you professionally?

2      A.    We have worked together, yes.

3      Q.    Did you consult her on your report?

4      A.    No.

5      Q.    Let's go back to your -- what is your

6   training in statistical analysis?

7      A.    I'm a senior researcher at a Research I

8   university in the top rated -- one of the top rated

9   universities in special education.  And that includes

10  a comprehensive and thorough course load and

11  experience in conducting large-scale, systemic

12  reviews, including statistical analyses.

13     Q.    And what is your training that has

14  provided you an opportunity to do that?

15     A.    A doctoral degree.

16     Q.    In statistics?

17     A.    A doctoral degree in special education, in

18  which statistical analyses and statistical courses

19  are part of that process.

20     Q.    Hypothetically, in your experience

21  involving statistics, would a study about 15 students

22  with autism in one area of one state constitute a

1    statistically significant sample?

2        A.    It very well could, yes.

3        Q.    And on what basis could it?

4        A.    Hypothetically, it could be any number of

5    things.

6        Q.    What does statistically significant mean

7    to you?

8        A.    Sitting here, I can't recall the specific

9    definition, because it is deeply complex, and it can

10   include variables, such as different methodologies,

11   different variables, different independent, dependent

12   variables.  It can -- the -- how the sample was

13   selected.  A variety of other elements can determine

14   statistical significance.

15       Q.    Forgive me, because this is probably in

16   your CV, and I just don't know the answer.  Were

17   you -- in 1990, when the ADA passed, where were you

18   at that time in your career?  For all I know, you

19   were in high school.  So, like, don't misunderstand.

20       A.    Yeah, let's go with that.  No, I had

21   children by then.  Let's see where I was in my career

22   in 1990.



1        Q.    It looks like you had graduated, I guess,

2    from the University of Kansas with a bachelor of

3    science.

4        A.    Yes.  And let's see, a few -- a few

5    statements.  I had a bachelor's degree from the

6    University of Kansas as part of the Department of

7    Applied Behavioral Sciences, with an emphasis on

8    human development and family life, with a focus on

9    students who had behavioral disabilities.

10        Q.    That's sufficient.  I don't need to get

11    into all the details.  I honestly was trying to

12    remember, like, if you had graduated college or truly

13    were in high school or something else.  But that's

14    fine.

15        A.    Well, thank you.  I want to add just a

16    little bit more, in that I was working in an

17    organization -- because it's relevant, I think, to

18    what you're saying.  I was working in an organization

19    that supports adults and students who have

20    significant disabilities, with a particular emphasis

21    on students who had a variety of different behavioral

22    disabilities.



1    Q.    Are you aware that the ADA passed in 1990,

2    thereabouts?

3    A.    I don't recall the dates right now.

4    Q.    Do you know if the ADA has been updated

5    since it passed originally?

6    A.    I do not recall --

7        MS. TUCKER:  Object to form.

8    BY MR. BELINFANTE:

9    Q.    And just for the record, are you aware of

10   whether or not Congress has amended the ADA since

11   1990, or its original passage?

12   A.    I don't recall right now.  I know I know

13   these things, but sitting here right now, I can't

14   pull it off the top of my head.

15   Q.    Okay.  Do you know if the IDEA has been

16   amended by Congress since it originally passed?

17       MS. TUCKER:  Object to form.

18       THE WITNESS:  Again, I should know this,

19   and I may know this, but I can't recall dates right

20   now.

21   BY MR. BELINFANTE:

22   Q.    Okay.  Do you recall, sitting here today,

1    if the No Child Left Behind legislation addressed

2    special education?

3        A.    I can say that regarding IDEA, ADA,

4    implementation of No Child Left Behind, as well as a

5    number of other educational policies and practices,

6    that my understanding of those are very much related

7    to implementation of those in the field.

8        Q.    Okay.

9        A.    So although I may not recall, sitting here

10   today, the exact date or time in which a specific

11   policy, or law, or et cetera changed or transpired,

12   or whatever else, I can speak in great depth about

13   what that looks like to be implemented in the field.

14       Q.    Okay.  And I guess, is that also true for

15   the Every Student Succeeds Act, which passed in 2015?

16       A.    That is also true for that.

17       Q.    Okay.

18       A.    That's one place you can look for a

19   definition of MTSS.

20       Q.    Okay.

21            MR. BELINFANTE:  What time do you all want

22   to break for lunch?



1              (Discussion held.)

2              THE VIDEOGRAPHER:  Off the record at

3    12:36.

4              (Whereupon, at 12:36 p.m., the testimony

5    in the above-entitled matter was recessed, to

6    reconvene at 1:15 p.m., this same day.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1                    AFTERNOON SESSION

2                      (1:15 p.m.)

3        EXAMINATION BY COUNSEL FOR DEFENDANT (RESUMED)

4              THE VIDEOGRAPHER:  On the record at 13:15.

5    BY MR. BELINFANTE:

6        Q.    If I could draw your attention -- let me

7    ask this first.  And I think part of it is -- I asked

8    before.  Did you review most students' in GNETS IEP?

9    Let me rephrase.

10             Did you review the IEP of most students in

11   GNETS?  That's probably a clearer way of asking.

12       A.    I reviewed -- out of the almost 3,000

13   students in the GNETS program, I reviewed somewhere

14   between 65 to 100 IEPs.

15       Q.    And you would agree with me, that is not

16   the vast majority of students in the GNETS program,

17   correct?

18       A.    That is not the vast majority of the

19   students in the GNETS program.

20       Q.    Would you agree with me that students in

21   the GNETS program, there are certainly students who

22   are receiving GNETS services who have autism, but

1    there are also students in the GNETS program who do

2    not have autism.  Would you agree with that?

3         A.    Yes.

4         Q.    Okay.  Let's look at page 157 of your

5    report, Exhibit 1.  At the bottom of the page under

6    opinion in finding 3, the last full sentence reads,

7    they are even more concerning when one considers --

8    sorry.  "They are even more concerning when one

9    considers that the placement of most students in the

10   GNETS program is unnecessary."

11             Do you see that?

12        A.    No.  Where are we at?

13        Q.    Page 157, bottom of the page.

14        A.    Oh, yeah, I see it.

15        Q.    Okay.  So if you did not read most IEPs,

16   what was the basis of your conclusion that most

17   students in the GNETS program, the placement there is

18   unnecessary?

19        A.    Given my extensive experience and

20   understanding of students with disabilities,

21   behavior-related disabilities, autism, and other

22   needs, I am aware of the appropriate supports and

1    services that can be put in place in order to support

2    students in an environment in which they have equal

3    -- or fair and equal access to those opportunities.

4              And as I said earlier today, one

5    indication of whether or not segregation is necessary

6    or unnecessary is related to the IEP.  The other is

7    about what services and supports are provided in

8    order to make -- to have successful educational

9    placements for students.

10       Q.    Would you agree with me that if the full

11    panoply of services that you would support are being

12    provided, there are still some students who could --

13    even if they had access to those services, would

14    still need a segregated educational environment?

15       A.    I -- I don't know your definition of

16    "panoply," although that's a fun word.  Just saying.

17       Q.    I've got more fun words.

18       A.    But even if the full array of supports and

19    services were being provided, certainly there are

20    some students, under certain conditions for certain

21    periods of time, that do need placements in which

22    there are smaller numbers of students and away from



1    general education.

2         Q.    And if you could turn to page 159 of your

3    report, the last full paragraph that starts with,

4    "With any student population across the country."

5         A.    159.  And which --

6         Q.    I'm going to ask a question about this

7    last full paragraph that starts, "With any student

8    population across the country."

9         A.    Mm-hmm.

10        Q.    Certainly feel free to get there.  My

11   question is going to be about the sentence that

12   starts, "There are a small number of the nearly 1,000

13   students I observed who had very serious and extreme

14   behaviors that require highly specialized teaching

15   and behavioral support."  But I didn't know if you

16   wanted -- I can ask the question now.

17        A.    Are you -- so you're saying with any

18   student -- I'm saying with any student population

19   across the country, there are a small number of

20   students who have very serious extreme behaviors that

21   require well trained, highly specialized teaching and

22   behavior support, including carefully planned

1    schedules of interaction with others in order for

2    them to experience success.

3        Q.    My question is about the sentence after

4    the one after that.

5        A.    Okay.

6        Q.    Which is, "There are a small number of the

7    1,000 students I observed who have very serious and

8    extreme behaviors that require highly specialized

9    teaching and behavioral support."

10            MS. TUCKER:   I just want to jump in, it

11   was "nearly 1,000 students."

12   BY MR. BELINFANTE:

13       Q.    Nearly 1,000 students.

14       A.    Yes.  And it says the same is true in the

15   GNETS program, that there are a small number of

16   students who require highly specialized teaching and

17   behavior support.

18       Q.    And that's based on your observations from

19   10 to 90 minutes of students; is that correct?

20       A.    It's based on my observation of students.

21   It's based on my examination of individual student

22   records, including IEPs.  It's based on my review of



1    -- year over year of student documentation regarding

2    support and need.  It's based on my review of parent

3    documentation, incident reports, among other

4    documents.

5           It's also based on the fact that I've

6    spent an extensive period of time working with

7    students with a full range of behavior needs, but in

8    particular, with students who have very significant,

9    challenging behavior.  Therefore, I am adept at

10   identifying student need in as small a window as ten

11   minutes to up to, in the case of these observations,

12   90 minutes.

13        Q.    So do you have any -- can you point to

14   any -- because there's none cited.  Can you point to

15   any peer-reviewed articles that would say you can

16   observe what a child needs in ten minutes of

17   observation?

18        A.    I can -- well, I don't accept the premise

19   of what you're asking.

20        Q.    You just told me you could observe someone

21   within ten minutes and make a decision as to what

22   they needed.



1          A.    Based on the observations that I did, my

2    extensive experience in the field, my deep

3    understanding of students who have significant

4    behavioral needs, as well as the documents I

5    reviewed, the depositions I reviewed, and all of the

6    other supporting information, I feel very comfortable

7    in making the statement that I made here.

8          Q.    And my question is, can you point to me

9    any peer-reviewed article where someone says, you can

10   determine, based on watching someone for ten minutes,

11   what their needs are, and their appropriate needs are

12   in terms of services and therapeutic supports?

13         A.    There are thousands of peer-reviewed

14   articles.  And if you would like me to look for one

15   that talks about the length of observation time, it

16   varies over -- there's all kinds of indicators of

17   what are appropriate regarding classroom

18   observations.  You can take within a ten-minute time

19   period, sir, by way -- are you with me?

20         Q.    I'm listening.

21         A.    By way of example, within a ten-minute

22   time period in a given classroom, particularly if

1    there's a small number of students in the classroom,

2    you can observe levels of engagement of the students

3    in the classroom, numbers of problem behaviors,

4    communication styles, teaching interaction, response

5    to teaching interaction, et cetera.

6         Q.    And from that ten minutes -- well, first

7    off, can you point to me any article cited in

8    Appendix E, amended, that says what you just

9    described?

10        A.    Says what?

11        Q.    That you could observe in ten minutes what

12   someone's appropriate services would need to be?

13   Because this is what you relied on for your report.

14   So can you show me anything that's cited in here that

15   says, within ten minutes, you could make that

16   determination?

17        A.    I would have to look.

18        Q.    Okay.

19        A.    Let me do so.  I don't know if I included

20   classroom observation peer-reviewed articles.

21             It will take me a minute to read all of

22   the articles I've listed here, to determine whether

1    or not I included one that talked about the amount of

2    time it takes to assess a classroom environment.

3         Q.    If an IEP team member spent ten minutes

4    with a student, would you find that to be sufficient

5    time to make a recommendation?

6         A.    To make a recommendation on what?

7         Q.    As to whether that student needed -- what

8    types of services and supports would be appropriate

9    for that student?

10        A.    So the question again is?

11        Q.    If an IEP team -- if the members of an IEP

12   team spent ten minutes with a student, would you feel

13   confident in their recommendation for that student,

14   that they could be educated in a general education

15   setting or a separate education setting?

16        A.    No.

17        Q.    And you would agree with me that in the

18   ten minutes you observed a child, you don't have

19   access in that ten minutes to their medical file,

20   correct?

21        A.    No.

22        Q.    Could you turn to page 167 of your report?

1          A.      Am I done looking for peer-reviewed --

2          Q.      We can come back to it.  That's fine.

3          A.      Where are we?

4          Q.      I'm sorry, page 167.

5          A.      Okay.  Mm-hmm.

6          Q.      In the paragraph under Conclusion, midway

7     through, there is a sentence that starts, "Year after

8     year."

9          A.      Yes.

10         Q.      Okay.  "Year after year, the state has

11    encouraged and perpetuated this idea by dedicating

12    over $60 million to the GNETS program (most of which

13    are state funds), despite its gross lack of

14    educational opportunities, adequate resources, and

15    appropriate supports."

16              Do you see that?

17         A.      I do see that.

18         Q.      Okay.  How has the state encouraged the

19    idea, which I believe is -- I should have probably

20    gone the sentence above.  It says, "the GNETS program

21    is based upon the idea that segregating mass amounts

22    of students with behavior-related disabilities is

1    necessary in order to offer them intensive social,

2    emotional, and behavioral therapeutic services and

3    supports."

4              It then continues to the sentence that I

5    read a moment ago.  "Year after year, the state has

6    encouraged or perpetuated this idea by dedicating

7    over $60 million to the GNETS program (most of which

8    are state funds), despite its gross lack of

9    educational opportunities, adequate resources, and

10   appropriate supports."

11             How has the state's appropriation of funds

12   perpetuated an idea?

13             MS. TUCKER:  Object to form.

14   BY MR. BELINFANTE:

15        Q.    Or how has the state's appropriation of

16   funds perpetuated the idea that you describe on page

17   167 of your report?

18        A.    By dedicating over $60 million to it.

19        Q.    How has that perpetuated an idea?

20        A.    By supporting a system of systemic

21   segregation for multiple students in the GNETS

22   program year after year after year, and continuing to



1    allocate 60 million or more funds to that.  That is

2    perpetuating an ineffective system.

3         Q.    Does the state require local education

4    agencies to apply for GNETS grants?

5         A.    I don't know.

6         Q.    So if you don't know, then how do you

7    blame the state for perpetuating a system if you

8    don't know that the LEAs are the ones that are

9    applying for the grants?

10              MS. TUCKER:  Object to form.

11              THE WITNESS:  I don't know what you're

12   asking.  Can you try --

13   BY MR. BELINFANTE:

14        Q.    Well, you said that the state perpetuates

15   a system.

16        A.    By funding it.

17        Q.    By funding it.  My question is -- and so

18   then I asked, do the local education agencies have to

19   accept the funding?  Your answer is, I don't know,

20   correct?

21        A.    I don't know what you're asking.

22        Q.    I'm asking, do the LEAs have to accept any

1    of the $60 million appropriated by the Georgia

2    General Assembly for the GNETS services?

3         A.    I do not know.

4         Q.    So then how do you know or opine that the

5    state has encouraged and perpetuated an idea that you

6    described?

7         A.    Because of what I've already said.

8    There's a program in the state, across the state,

9    over 24 regions within the state, in which over $60

10   million or more has been continually committed to

11   that program year after year.  That's how.

12        Q.    Is the state mandating the program?

13        A.    I don't know.

14        Q.    Do you know if there's federal funds that

15   are also going to GNETS?

16        A.    I do not know.

17        Q.    Well, it says, "most of which are state

18   funds."  So you don't know if there's any federal

19   dollars going to the GNETS program?

20        A.    I do not know.

21        Q.    Isn't it true that this is a cause for

22   you, integration of students?



1        A.     This is a cause for me?

2        Q.     Yes.

3        A.     What do you mean?

4        Q.     I mean, you just said earlier it's your

5    life's work.  Page 167 says it's your "fervent belief

6    and expert opinion that these students do not need to

7    be segregated to be effectively served."

8              MS. TUCKER:  Where is that?

9              MR. BELINFANTE:  Page 167, two sentences

10   after -- or one sentence after what I just said.

11             THE WITNESS:  Are you asking a question

12   about cause, or are you asking a question about --

13   BY MR. BELINFANTE:

14       Q.     You say it's your fervent belief.  Why

15   don't you tell me what you mean by fervent belief.

16       A.     It's my fervent belief and expert opinion

17   that these students -- and I'm referencing students

18   currently in the GNETS program -- do not need to be

19   segregated to be effectively served.  The vast

20   majority of them can and should be served in

21   integrated settings with appropriate services and

22   support, where they are more likely to experience

1  social, emotional, behavioral, and academic success.

2          What I'm referencing here is the fact that

3  I went on over 70 site visits, hundreds of

4  classrooms, over 18 months of time, observing nearly

5  a thousand students.  And based on my expert opinion,

6  I do not believe that these particular students need

7  segregation en masse across the state.

8     Q.    And of that -- that is based -- okay, I

9  think I've asked that question.

10         Let me ask you to turn to page 157.  The

11  top of the page, first full paragraph, last sentence.

12  "It is clear that the State of Georgia contributes to

13  this hopelessness by maintaining the GNETS program in

14  its current form and failing to provide opportunities

15  for these students to succeed in their home schools."

16         Do you see that?

17     A.    I do see that.

18     Q.    Okay.  What is the State of Georgia doing

19  to maintain -- let me back up.

20         What is the State of Georgia Department of

21  Education doing to maintain the GNETS program in its

22  current form?



1          A.     That sentence comes at the end of a

2   section on hopelessness, in which I highlight some of

3   the most devastating experiences of involvement with

4   students that I've seen over the course of my career,

5   including students crying and begging to leave

6   classrooms.

7          And many of these students have been in

8   this program for more than five, six, seven years,

9   year after year after year, which is what I

10  referenced at the end of the report.  The State

11  Department of Education is supposed to provide a

12  vision, guidance, professional learning, support,

13  teaching, effective practices for LEAs and schools

14  across the state.

15         It is not intended to support a systemic

16  system of segregation for students with

17  behavior-related disabilities in programs that aren't

18  even schools.  Page 20.

19         Q.     What is the Department of Education

20  specifically doing to maintain the GNETS program in

21  its current form?  Can you point to me a specific

22  action?



Case 1:16-cv-03088-ELR    Document 431-2    Filed 11/07/23    Page 158 of 377

1      A.      All of the things I just said.

2      Q.      You said it's supposed to --

3      A.      They are funding a -- oh, I'm sorry, go

4   ahead.

5      Q.      No, no, go ahead.

6      A.      They are funding a program that supports

7   systemic segregation across the state, 24 regions

8   across the whole state.

9      Q.      If I told you that the United States

10   Department of Education funds are also going to

11   GNETS, is the United States Department of Education

12   also responsible for what you describe as unnecessary

13   segregation?

14      A.      I don't know about that.

15      Q.      I'm asking you to presume that the United

16   States Department of Education funds are going to

17   GNETS.  If that presumption is true, is the United

18   States Department of Education causing unnecessary

19   segregation in the State of Georgia by funding the

20   program?

21      A.      I don't really feel comfortable speaking

22   hypothetically about what the United States

1    Department of Education is doing or not doing.  I'm

2    not --

3        Q.    I'm sorry you feel uncomfortable.  I'm

4    asking you to answer the question.

5        A.    I don't know.

6        Q.    You don't know.

7        A.    Hmm-mm.

8        Q.    So if the United States Department of

9    Education funds the program, you don't know.  If the

10   Department of Education, as you described, funds the

11   program, it is committing unnecessary segregation.

12           MS. TUCKER:  Object to form.

13   BY MR. BELINFANTE:

14       Q.    What's the difference?

15       A.    I was asked to evaluate the system of

16   support in the State of Georgia, and that's what I've

17   done.  And that's what I've looked at.

18       Q.    I understand.  That's not what I'm asking.

19   I'm asking -- you said the Department of Education is

20   funding.  Putting aside any disagreements on that,

21   you said, by funding the program, the DOE is leading

22   to systemic segregation.

1        A.      I did not say that.

2        Q.      Can you read back what she said about five

3  minutes ago?

4                (Reporter read back as requested.)

5  BY MR. BELINFANTE:

6        Q.      So given that the specific thing that the

7  Georgia DOE is doing, according to you, is funding a

8  program.  My question, and it is a hypothetical, is I

9  would like you to presume that there are federal

10  United States Department of Education dollars flowing

11  through to the GNETS programs through -- or to LEAs

12  who choose to apply for grants.

13                If that's true, is the United States

14  Department of Education also funding a system of

15  systemic segregation, in your opinion?

16                MS. TUCKER:  Object to form.

17                THE WITNESS:  You said earlier, what are

18  the ways in which the state is perpetuating this

19  environment.  And I said --

20  BY MR. BELINFANTE:

21        Q.      I said specifically the Department of

22  Education, which may be different.



1        A.      GaDOE.

2        Q.      Yes, yes.

3        A.      How is GaDOE --

4        Q.      Yes.

5        A.      The Georgia State Department of

6    Education --

7        Q.      Yes.

8        A.      -- perpetuating this.

9        Q.      Yes.

10       A.      And I said that the state is to provide a

11   vision, guidance, leadership, professional learning,

12   all of these array of things, rather than funding a

13   program that perpetuates systemic segregation.

14       Q.      Okay.  Putting aside differences in your

15   previous answer, what you've just described are

16   things that the Department of Education is not doing.

17   I'm asking, what is the affirmative thing that the

18   Department of Education in Georgia is doing to cause

19   the harms that you describe in your report?

20              MS. TUCKER:  Object to form.

21              THE WITNESS:  Maybe the easiest way to

22   answer that is to look at the recommendations to see

1   what would be an effective pathway for the State of

2   Georgia to -- the Georgia State Department of

3   Education to follow, in terms of creating a guidance,

4   vision, policy, direction towards educational

5   environments that provide a continuum of support.

6   BY MR. BELINFANTE:

7        Q.    We will get to that.  My question, though,

8   is about your statement on page 157 that "the State

9   of Georgia contributes to this hopelessness by

10  maintaining the GNETS program in its current form."

11           What is the Department of Education in

12  Georgia doing to maintain the GNETS program in its

13  current form?  Other than not doing the series of

14  things that you recommend, what is it affirmatively

15  doing?

16           MS. TUCKER:  Object to form.

17           THE WITNESS:  I believe that the State of

18  Georgia is not providing effective vision, guidance,

19  support, professional learning, and resources to

20  provide students with disabilities an appropriate,

21  fair, and equal education along a continuum of

22  support.



1    BY MR. BELINFANTE:

2        Q.    What is the Department of Community Health

3    doing affirmatively to cause unnecessary segregation

4    in Georgia education?

5        A.    I did not -- I don't know.

6        Q.    How about -- go ahead, sorry.

7        A.    But that's one.  What I said previously,

8    that's one of many things that I feel the State

9    Department of Education in Georgia is doing that

10   helps perpetuate a system that is not effective, but

11   go ahead.

12       Q.    What would it cost the State of Georgia,

13   in your opinion, to provide sufficient or appropriate

14   supports for all students currently receiving

15   services through the GNETS program?

16       A.    I did not do any sort of cost analysis,

17   just to make sure that I'm restating that.

18       Q.    Right.

19       A.    But based on my experience in implementing

20   across the U.S. -- different states across the U.S.,

21   the implementation of my recommendations would cost

22   the state no more money than what's already being

1    allocated to the services of students with

2    disabilities, behavior-related disabilities.

3        Q.    And the money you're talking about being

4    allocated is the appropriation to the GNETS program?

5        A.    I'm talking about the funding that's

6    allocated for students with disabilities within the

7    state, wherever that source is.

8        Q.    Did you ever look at a Georgia

9    appropriations document -- or I'm sorry,

10   appropriations act of the Georgia General Assembly.

11       A.    I do not recall.  I don't think so, but I

12   could have.

13       Q.    I didn't see it in Appendix E.  So

14   similarly, do you know how much Georgia spends, as

15   you just described, on providing care and treatment

16   for students -- for persons with behavioral and

17   emotional disabilities?

18       A.    In the GNETS program?

19       Q.    At all.  Didn't you just say that you were

20   looking broadly at everything?

21           MS. TUCKER:  Object to form.

22   BY MR. BELINFANTE:



1          Q.     So let's back up, because I think -- how

2    much would it cost, do you know, to provide the types

3    of supports and services to students -- and I mean

4    actual services, not just MTSS training, actual

5    services -- to students that would be appropriate, in

6    your opinion, in Georgia?

7          A.     Based on my experience in implementing in

8    a number of other states, the costs of implementing

9    the kinds of recommendations that I'm suggesting here

10   is no more than what is currently being spent in

11   special education dollars within the state.

12         Q.     And so by --

13         A.     I have not done a specific cost analysis.

14         Q.     So including in appropriate supports, are

15   you including group therapy?

16         A.     Umm.

17         Q.     I'm trying to determine what services you

18   think schools need to provide in order to avoid, as

19   you call it, placement in the GNETS program.  What

20   are the specific services that a school needs to

21   provide?

22         A.     So what is, like, a full array of services

1   that might be provided to any student with a

2   behavior-related disability?

3        Q.     That would be appropriate, yes.

4        A.     In the world?  I mean, in the U.S. or --

5        Q.     Yeah, what would be appropriate?  Because

6   I understand appropriate means, like, look, we would

7   all love to have, for example, individual therapy.

8   But that's not necessarily appropriate for the --

9        A.     That's not appropriate.

10       Q.     Right.  So I'm not asking you for shoot to

11  the moon and name every service eligible.  But your

12  criticism -- one of your criticisms is that Georgia

13  is not providing -- whatever Georgia is, we won't

14  argue that point on this question.  That Georgia is

15  not providing sufficient services to students in

16  schools to avoid them receiving services in GNETS.

17  Is that fair?

18             MS. TUCKER:  Object to form.

19             THE WITNESS:  I'm specifically, as far as

20  my report, which is what you just said not to do, but

21  I am doing, talking about the State Department of

22  Education.



1    BY MR. BELINFANTE:

2         Q.    Okay.

3         A.    In Georgia, GaDOE.

4         Q.    Okay.

5         A.    That's what I'm referencing.

6         Q.    So you're -- and sorry to interrupt.

7         A.    All of my stuff is GaDOE.

8         Q.    No DCH Community --

9         A.    That's correct.

10        Q.    No Department of Behavioral Health.

11        A.    I'm talking about GaDOE.

12        Q.    Got it, okay.

13        A.    That's my expertise.  That's where the

14   state education agency is, the scope of my review, in

15   this case.

16        Q.    Got it.

17        A.    So we start there.

18        Q.    So we start there.  Okay.  What is your

19   understanding of the supports and services that the

20   Georgia Department of Education provides to students

21   with emotional/behavioral disabilities in general

22   zoned schools?



1      A.      As I referenced earlier today, as a

2  general rule, students with disabilities should be

3  afforded the same opportunities that their

4  non-disabled peers have, to include things such as

5  appropriate and effective teaching and learning

6  aligned with standards, to include effective content

7  mapping and lesson planning for learning content,

8  effective, appropriate typical social, emotional

9  learning strategies and supports, among other

10  evidence-based practices and effective practices

11  commonplace in schooling today.

12      Q.      Okay.

13      A.      This is not the Cadillac, this is

14  commonplace.

15      Q.      Can you turn to page 8 of your report?

16  I'll do what I should have done a long time ago,

17  which is actually point to your report.

18      A.      What?

19      Q.      I'm doing what you told me to do a long

20  time ago, which is point to your report.

21      A.      That helps.

22      Q.      Yeah, so my question is going to be about

1    service provision separation, question number 6 -- or

2    criteria number 6.

3         A.    On page 8?

4         Q.    Yes.  This is what I'm asking about.  "Do

5    certain groups of students in the GNETS program

6    access different support services personnel" --

7    sorry.

8         A.    You're good.

9         Q.    "-- access different support services

10   personnel than their peers, either with or without

11   IEPs (e.g., speech, physical therapy, occupational

12   therapy, counseling, or other mental health supports

13   available within the general education setting)."

14              All right.  So my question is, of those

15   services identified, what is your understanding of

16   the Georgia Department of Education's role in

17   providing or contracting for those services?

18        A.    You're asking about the speech, physical

19   therapy part of this question?

20        Q.    I'm asking all of the services you

21   identify in 6.  It's more of a theoretical than a

22   specific.  Like, of these services --



1        A.    So theoretically --

2        Q.    -- support services -- of support

3    services, which ones are provided by the Georgia

4    Department of Education or persons with whom the

5    Georgia Department of Education contracts with?

6              MS. TUCKER:  Object to form.

7              THE WITNESS:  I'm trying to figure out how

8    to answer the question.  Can you ask it in another

9    way?

10   BY MR. BELINFANTE:

11       Q.    I'm trying to go back to your conclusion

12   that the State Department of Education perpetuates

13   GNETS in its current form or perpetuates an idea

14   about students with emotional and behavioral

15   disabilities.  And so what I'm trying to determine

16   is, you've identified that there are certain services

17   -- support services that some students need to avoid

18   unnecessary segregation.

19             My question is, of those support services,

20   what is your understanding about what the Georgia

21   Department of Education does, in terms of providing

22   those or contracting with providers to provide them,

1  which you can probably guess where I'm going, as

2  opposed to what an LEA does in determining what

3  support services are available in that school?

4         MS. TUCKER:  Object to form.

5         THE WITNESS:  Yeah, I'm not trying to

6  exhaust you.  And this is complicated.  And so the

7  first part of the idea that you mentioned, I don't

8  know that I agree with what you said there.  I'm just

9  really listening to the questions intently.  And this

10 is my profession.  And so I'm hung up on the details.

11        And I think what you're asking is, does

12 the state provide these services?  And essentially,

13 what you've done is you've turned to page 8, where

14 there's a list of services, and said, does the state

15 provide these?

16        And this is in a table that talks about

17 service provision as an important mechanism in

18 providing supports to students with disabilities.

19 And so any state in their effort to support students

20 with disabilities would be likely to offer avenues to

21 speech, physical therapy, occupational therapy,

22 counseling, and other mental health supports



1    available.  That is common in a continuum of services

2    for students with disabilities.

3    BY MR. BELINFANTE:

4        Q.    Is it your opinion, as reflected in this

5    report, that the state is not providing a sufficient

6    number of support services as identified in number 6

7    on page 8?

8        A.    My opinion is that the State Department

9    is -- the State Department of Education in Georgia is

10   unnecessarily segregating students en masse, and

11   providing unfair and unequal educational

12   opportunities.  And the state is perpetuating a

13   system that does not -- that's unnecessary, nor does

14   it justify the services that it purports to provide.

15       Q.    Is it your professional opinion that the

16   State of Georgia Department of Education provides an

17   insufficient number of support services to students

18   with behavioral and educational disabilities?

19       A.    Are you reading something?

20       Q.    Support services, but that's it.

21       A.    You're reading number 6 with -- you just

22   inserted "State Department"?

1        Q.    No, I just pulled the phrase support

2    services.  My question is, is it your opinion, as

3    reflected in your report, that the State of Georgia

4    Department of Education provides an insufficient

5    number of support services, an insufficient quantity

6    of support services to students who are receiving --

7    to students with emotional or behavioral

8    disabilities?

9        A.    That is not reflected in my report.

10       Q.    Okay.  Is it your professional opinion

11   that the State of Georgia is providing insufficient

12   quality of support services to students with

13   emotional and behavioral disabilities?

14       A.    In my professional opinion, the State

15   Department is supporting a program that is neither

16   fair nor equal to students without disabilities, nor

17   appropriate for students with disabilities who have

18   behavior-related needs.

19       Q.    Is the State Department of Education

20   providing insufficient quality, in terms of the

21   support services that are provided to students with

22   emotional or behavioral disabilities?



1      A.      Insomuch as it's utilizing -- as it

2  relates to the GNETS program, yes.

3      Q.      My question, though, is about -- okay, so

4  do you have an opinion about support services being

5  offered in general zoned schools?

6      A.      For students with disabilities?

7      Q.      Yes.

8      A.      That are outside the GNETS program?

9      Q.      Yes.

10     A.      No.

11     Q.      Can you --

12     A.      Let me clarify that a little.  Actually,

13  that's not the case.  Because I toured and observed a

14  number of general education schools that had programs

15  for students with disabilities who were not in GNETS,

16  I was able to see and observe students participating

17  in supports and services that were vastly different

18  than students in the GNETS program.

19          For example, in one site, I saw students

20  receiving speech therapy services in their general

21  education environment.  In another example, I saw

22  students receiving mental health supports and

1    services in the -- in the general education

2    environment.

3              And those same supports and services were

4    not being provided in the GNETS program that was in

5    closest proximity to that general education

6    environment.

7        Q.    What is your understanding of what the

8    Georgia Department of Education affirmatively did to

9    cause that differential in service between the

10   general zoned school and the GNETS program?

11       A.    What did the State Department of Education

12   in Georgia do to perpetuate the differences in

13   services between Gen Ed and -- Gen Ed and students

14   with disabilities.

15       Q.    I'm talking about the specific example you

16   gave, where a student received speech therapy and

17   another student received mental health services in a

18   general education school, but not in the GNETS

19   program.  What did the Georgia Department of

20   Education do to cause that distinction?

21       A.    The Georgia State Department of Education,

22   from my perspective, failed to provide guidance for



1   implementation of a full array of supports for

2   students with behavior-related disabilities,

3   including policy and technical assistance for

4   districts and schools, or for districts and the GNETS

5   program within those.

6              The state failed to provide effective

7   social, emotional, and behavior supports,

8   professional learning, technical assistance,

9   guidance, and vision for students in the GNETS

10  program.

11             The state failed to provide guidance,

12  vision, policy, technical support for the GNETS

13  program, in which learning was assigned with state

14  standards and alternate assessment standards for

15  students with behavior-related disabilities.

16             Therefore, students in the GNETS program

17  have less opportunities for academic engagement, and

18  less opportunities for effective social, emotional,

19  behavioral, and mental health supports, and less

20  opportunities to have educators that are certified or

21  have experience, expertise, or understanding of what

22  it means to support students with behavior-related



1    disabilities.

2            In my opinion, the State Department of

3    Education for Georgia failed to provide a coherent

4    system of social, emotional, and behavioral, mental

5    health supports for students who are currently

6    receiving services, and who have received services

7    over the last many years regarding effective common

8    educational practices and services.

9            And then lastly, the state failed to

10   provide leadership, teaching recommendations,

11   professional support, learning and understanding to

12   educators in the GNETS program on how to be effective

13   at supporting the students who have had the most

14   significant and complex needs.

15       Q.    Does that complete your answer?

16       A.    For now, among other things.

17       Q.    Do you need -- is there more?

18       A.    Yeah, there's more.

19       Q.    Okay, keep going.

20       A.    No, that's all right.  I'll stop for now.

21       Q.    Well, I'm trying to understand your --

22   what the Georgia Department of Education did.

1      A.    I just listed a lot.  Do you want more?

2      Q.    Right.  Well, I mean, I'm trying to

3  understand the breadth of your opinion.

4      A.    Okay.

5      Q.    If you're going to read the report, then

6  we can move on.  But let me ask this, then.

7      A.    Well, I don't need to read the report, but

8  I can talk about each of those recommendations

9  underneath.  There's a variety of strategies and

10  steps that I recommend for the State Department to do

11  in order to change, you know, what's occurring right

12  now.

13      Q.    We'll get to that, I promise.

14      A.    Okay.

15      Q.    If we don't, it's on me.

16      A.    All right.  Fair enough.

17      Q.    One of the things you just said is that

18  the state is not providing effective social,

19  behavioral, or emotional supports.  Did I hear you

20  correctly on that?

21      A.    To students within the GNETS program.

22      Q.    Do you know what it -- what would it cost

1    to provide what you're deeming effective social,

2    behavior, and emotional supports in Georgia to those

3    students?

4         A.    It would cost no more than what's already

5    being funded within the state.

6         Q.    And what is the basis of that opinion,

7    your experience in other states; is that correct?

8         A.    My experience in implementation of social,

9    emotional, and behavior support for students across

10   the U.S.

11        Q.    Would you agree with me that rates of

12   service provision vary across states?

13        A.    Yes.

14        Q.    And when we talk about effective -- last

15   question, and then we'll do that, because that's a

16   great idea.

17             When we talk about effective social

18   behavior, and emotional supports, those are -- what

19   we're talking about are actual services, correct?

20   Something that a student receives, whether it's in

21   the form of therapy or counseling, or whatnot.  We

22   are talking about actual services, right?



1          MS. TUCKER:  Object to form.

2          THE WITNESS:  No, we're talking about,

3    again -- and this is a broad concept, so a continuum

4    of support.  And that can mean, for example,

5    proactive teaching of -- for one example, proactive

6    teaching of school-wide expectations.  That's a

7    behavioral strategy applied to a number of students.

8          It's -- there might be small group

9    instruction that occurs within the course of a

10   typical school day.  There may be restorative

11   circles.  There may be peer-to-peer instruction.

12   There may be a varied and wide ranging mechanism by

13   which services and supports are provided to students

14   within the system of schooling.

15   BY MR. BELINFANTE:

16       Q.   Okay.  So at least included within that

17   could be some of the supports, as I described it --

18       A.   Certainly.

19       Q.   -- where we have to contract with a

20   professional provider to provide therapy or speech

21   counseling, et cetera.

22       A.   I answered your question before you

1    finished it, so I'm sorry about that.  And it is not

2    certainly, because the contracting part.  Some

3    schools and agencies provide those types of supports

4    with educators that are hired within the system.

5         Q.    Okay.  I think we're saying the same

6    thing.  And a bathroom break is --

7         A.    A bathroom break is a good idea, but I

8    don't know if we're saying the same thing.  But a

9    bathroom is a good idea.

10             THE VIDEOGRAPHER:  Off the record at

11    14:08.

12             (Recess.)

13             THE VIDEOGRAPHER:  On the record at 14:34.

14    BY MR. BELINFANTE:

15         Q.    All right.  Dr. McCart, I would you to

16    turn -- I promised you we'd get there -- to page 163.

17    I'm going to ask a series of questions about the

18    recommended actions in your report.

19             My first question, actually, though, I

20    should have said go to page 162.  You have two

21    recommendations for the State of Georgia there in

22    bold.  And am I understanding correctly that your

```
1   opinion is to achieve these two recommendations, the

2   State Department of Education would implement the

3   recommended actions on page 163 to 167?

4        A.    I think it's broader than that.  The first

5   eliminates statewide systemic segregation.  The

6   second being to provide fair and equal access to

7   educational opportunities are the overarching

8   recommendations in the report.  Some ways in which

9   you could achieve that are included in the actions --

10  the five actions that you see after that.

11       Q.    Okay.  One of the things I did not see in

12  the recommended actions was to defund or stop sending

13  -- or stop the GNETS grants program.  In your --

14  based on your report, what would be the role for the

15  GNETS grants to achieve the goals you set forth on

16  page 162?

17       A.    The role of the GNETS grants -- are you

18  getting at, how might -- what are you getting at?

19       Q.    Yeah, I mean, if right now the Georgia

20  General Assembly appropriates approximately -- I'll

21  use the number in your report, 60 million for a GNETS

22  grants program.  In order to achieve the goals you
```



1    describe on page 162, would they continue to fund the

2    GNETS grants program or would the GNETS grant program

3    and the GNETS program go away?

4         A.    I make no recommendation about funding

5    regarding the GNETS program.  That is really between

6    the state and entities involved at the state.  I

7    provide recommendations in how the state might go

8    about implementing a system of support that is not

9    segregated, and provides fair and equal access to

10   educational opportunities.

11        Q.    Is it possible that the state achieve the

12   goals you articulate on page 162 in bold, while at

13   the same time there are separate, freestanding GNETS

14   facilities in existence?

15        A.    You're saying, is it possible to achieve

16   goal 1 and 2, and have separate, freestanding GNETS

17   center-based --

18        Q.    Yes.

19        A.    The current GNETS center-based facilities

20   do not provide fair and equal access to educational

21   opportunities, nor -- and they are segregated.  So

22   it's really related to both.



1      Q.    I see one -- and tell me if I'm wrong.   I

2   see the providing fair and equal access to

3   educational opportunities is almost more qualitative;

4   that the services -- the criticisms you have of the

5   GNETS program are the services being provided there

6   are not effective, among other things.

7           What I guess I'm really trying to get to

8   is, is it possible to eliminate systemic segregation

9   and still have schools that provide education for

10  emotionally/behavior disabled students in a separate,

11  freestanding environment?

12          MS. TUCKER:  Object to form.

13          THE WITNESS:  Yeah, I'm not accepting the

14  premise of what you just said.  Is it possible to

15  have a segregated program for students with

16  behavior-related disabilities, and still not have

17  statewide systemic segregation, and have fair and

18  equal access?  Yes, as long as it is related

19  specifically to effective learning environments that

20  are matched to student need that are in line with

21  practices that are common in the field now.

22  BY MR. BELINFANTE:



1          Q.      Let's look at recommendation action --

2     I'll call it 1.  It's the one on page 163.  It says

3     that -- it looks like the third sentence, "Georgia

4     DOE should invest in local capacity through regional

5     and district structures in support of MTSS

6     implementation."

7                  Do you see that?

8          A.      Yes.

9          Q.      What did you mean by invest in local

10    capacity?

11         A.      In order to effectively support any

12    student, you need state capacity and LEA capacity,

13    school capacity.  And that relies on a number of

14    variables, including teaching expertise, policy

15    implementation, among other things.

16         Q.      Do you --

17         A.      The GaDOE in the recommendations should

18    build their capacity, in order to be able to build

19    local capacity in support of students with

20    behavior-related disabilities.

21         Q.      Does that mean hire more individuals?  Is

22    that how you would build the capacity?

1       A.     No.

2       Q.     Okay.   You could train the existing

3  individuals?

4       A.     Yes.

5       Q.     Is it --

6       A.     I don't know what individuals you're

7  talking about, but theoretically, can you train

8  people to be more effective educators?   Certainly.

9       Q.     Is it your opinion that the Department of

10  Education has sufficient staff to implement your

11  recommended actions identified on pages 163 to 167 of

12  your report?

13       A.     Having worked with a number of state

14  Departments of Education, the answer is, yes, because

15  there's a reliance on systems that are established

16  already at the State Department to be able to

17  implement these recommendations.   That decision lies

18  within the State Department itself, how to do so.

19       Q.     Your first recommended action is to

20  "Develop state capacity to provide guidance for

21  implementation of MTSS through direction, policy, and

22  technical assistance for districts and schools

1    throughout the state."

2            Can you describe for me the difference

3    between MTSS and PBIS, and how the two fit together,

4    if they do?

5        A.    Mm-hmm.  One place to find that is in the

6    definitions.

7        Q.    Right.

8        A.    So if we look on page 6, you'll see that

9    MTSS "is a framework with a tiered infrastructure

10   that uses data to help match academic and

11   social-emotional behavior assessment and instruction

12   resources to each and every student's needs.  In this

13   tiered, data-informed framework, educators work to

14   ensure that the majority of students respond to core

15   instruction.  Students who need additional support

16   for enrichment or remediation are identified by the

17   data and provided that support with measured focused

18   intensity."

19           Right below that, you see the definition

20   of PBIS, which is an evidence-based, tiered system of

21   report -- I'm sorry, "tiered system supporting

22   students' behavioral, academic, social, emotional,



1   and mental health.  When implemented with fidelity,

2   PBIS improves social, emotional competence, academic

3   success, and school climate.  It also improves

4   teacher health and well-being."

5             That's the technical definitions of MTSS

6   and PBIS.  In reality, PBIS is the behavioral aspect

7   of a tiered system of support available in the

8   school, also connected to social, emotional learning

9   and mental health.

10            In the past, the terminology around MTSS

11  has been related to academic core content, and has in

12  recent years, expanded to encompass PBIS, restorative

13  practice, and a multitude of other evidence-based

14  practices within tiers of support.

15            That's why sometimes you'll hear me say

16  MTSS, meaning multi-tiered system of support, but

17  I'll also say a system of support.  It's really the

18  same thing.  What is the system by which we, in the

19  education system, are delivering our educational

20  supports and resources to students.

21      Q.    All right.  You said, in recent years,

22  MTSS has expanded from focusing on academic core



1    content to their content, behavioral, social, et

2    cetera.  Can you put a finer point on that, like, the

3    last five years, ten years, eight years?

4        A.    A long history to MTSS regarding when the

5    emergence of strategies entered in at various levels.

6    In terms of year, I can't recall, sitting here right

7    now, but it's been well more than ten years.

8        Q.    Okay.  Has it been -- do you know if MTSS

9    was expanded prior to 1990 in the way you talk about,

10   or would it be after 1990 when folks started looking

11   at it more broadly?

12       A.    I do not recall, off the top of my head.

13       Q.    Okay.  Is it fair to say that you and

14   Dr. Sailor and other folks at SWIFT have been on the

15   vanguard of expanding MTSS into these other areas?

16       A.    Speaking for myself, and not Dr. Sailor

17   and not for all the people at the SWIFT Education

18   Center.

19       Q.    That's fair.

20       A.    Certainly I have been an important

21   mechanism in implementation of tiered systems of

22   support across school districts in the United States,



1    as have -- as has been one of the missions of the

2    SWIFT Education Center.

3        Q.    And that's part of the $24.5 million grant

4    that it received from the United States Department of

5    Education Office of Special Education, was to do

6    that, expand implementation of MTSS; is that right?

7        A.    The $24.5 million grant that was received

8    from the United States Department of Education Office

9    of Special Education in 2012 was about providing

10   effective services for students with disabilities who

11   had -- were receiving -- who -- for students who had

12   disabilities.  Leave it there.

13       Q.    And --

14       A.    One strategy -- one strategy that we

15   employed, among many others, was the implementation

16   of a tiered system of support.

17       Q.    Okay.  If the state -- well, let me ask

18   this.  Are there metrics to determine whether the

19   state has -- let me back up even further.

20            If the state were to adopt your

21   recommendation -- recommended action on page 163, the

22   first one, are there metrics to determine whether it



1  has complied with your recommended action?  And if

2  so, what are those metrics?

3            MS. TUCKER:  Object to form.

4            THE WITNESS:  I've found in my

5  professional experience -- and again, this is

6  probably a distinction between our businesses -- that

7  compliance is not what we focus on.  We focus -- I

8  focus on the development of state capacity, in order

9  to implement effective strategies for what they want

10 to do.

11           Now, if you're asking, is there a specific

12 tool in which states can assess whether or not they

13 feel they are making progress on their desired goals

14 and outcomes, there are.

15 BY MR. BELINFANTE:

16     Q.    How would -- bear with me in this

17 hypothetical for a moment.

18     A.    Okay.

19     Q.    But if you're asked to make a

20 determination whether because someone's appointed you

21 a court monitor, or a consultant for the state, or

22 for the DOJ, how would you -- what tool would you use



1    to determine whether or not -- because, again, I'm

2    asking from the perspective of the state.  If the

3    state were to say, we want to do this, this makes

4    sense.  How does the state know when it has

5    successfully adopted recommended action 1?

6          A.    Recommended action 1, theoretically, a

7    state would decide, based on the information that

8    they have before them, what is the direction and

9    vision for where we want to go with this work?  And

10   they may say, we want to implement a tiered system

11   within our state, or we already have a tiered system

12   within our state.  We want to beef it up, we want to

13   do more, we want to allow more student access.

14   Whatever that is.

15          That is built into an initial guiding

16   document that the state develops and drafts, that

17   then becomes a vision for how that work is carried

18   out within the state through a state implementation

19   team.  And then a state -- I'll just leave it at

20   state implementation team for now.

21          Q.    Okay.  When you write on page 163, the

22   last paragraph -- not full paragraph, beginning with



1    "Georgia DOE should disseminate."

2        A.      Mm-hmm.

3        Q.      "Georgia DOE should disseminate inclusive

4    policy structures and practices for the purpose of

5    building strong relationships furthering equity-based

6    inclusive education."

7            Now, probably as an occupational hazard, I

8    see a bunch of words in there that I can't readily

9    define.  So from a standpoint of where could a state

10   look for a model to do that, that you would opine

11   would satisfy kind of recommended action 1?

12       A.      There are a number of -- let me think a

13   second more.

14       Q.      Mm-hmm.

15       A.      I can talk about what are common

16   indicators of inclusive policy structures and

17   practices that are commonplace in the field that

18   could be adopted, were the State Department

19   interested in providing more inclusive services,

20   along with a full continuum of support for students

21   with behavior-related disabilities.

22            And those kinds of things would be



1  non-categorical service delivery, a full array of

2  service options -- service and support options for

3  students with behavior-related disabilities that do

4  not require placement in a separate, segregated

5  facility in order to receive those services.

6         It would be the utilization of general and

7  specialized educators in support of having received

8  training from the State Department of Education

9  around how to provide effective teaching and learning

10 processes for students with behavior-related

11 disabilities across a continuum of support, among

12 others.  I'll stop there for now.

13    Q.    In terms of non-categorical service

14 delivery, can you tell me what you mean by that?

15    A.    Yeah, I referenced it a bit in the report,

16 in finding 2, on page -- I'm close.  Oh, my goodness,

17 I'm sorry.

18    Q.    No, take your time.

19    A.    It's because everybody's watching.

20         I'm pretty sure I'm close.  Could I have

21 one more minute?

22    Q.    Sure.



1      A.     And then I'll give up.

2             Okay, page 36.  I feel a sense of

3   accomplishment.  Am I done?  Before I read that, let

4   me know what you think.

5      Q.     Well, you can see the amount of ink I

6   dedicated.

7      A.     Yeah, I saw that.  I'm very impressed for

8   some reason.

9             Okay.  So when you talk about non- --

10  you're referencing the question I asked about

11  categorical service delivery.

12     Q.     Correct.

13     A.     And in general, this -- these few

14  paragraphs reference what happens when medical

15  diagnoses are used as a mechanism for providing --

16  for providing academic or behavioral supports.  And

17  I'll just read a little bit, and you can stop me

18  whenever, but "In order to qualify for special

19  education, a student must have a diagnosis from a

20  licensed psychologist or medical doctor."

21     Q.     Right.

22     A.     "This diagnosis provides educators with

1    some sense of the characteristics a student with that

2    diagnosis might present.  For example, a student with

3    autism may have difficulty with social interactions,"

4    et cetera.  "A student with Tourette's Syndrome may

5    have uncontrolled vocalizations," et cetera.

6           The provision of -- if you read further

7    down, "Students with disabilities, just like their

8    general education counterparts, need the full array

9    of educational supports and services to be

10    successful.  Students with behavior-related

11    disabilities need universal screening, progress

12    learning, effective supports."

13           So to provide a system of services that

14    are categorical, meaning you have this disability, so

15    you should have this, is categorical thinking.  And

16    the recommendation is that you understand the full

17    array of student need within your state, and you

18    provide a continuum of support across that student

19    need, rather than relying on a categorical label for

20    defining.

21        Q.    Got it.  Okay.  And I think I recall, and

22    I may be mixing it up with some of the other stuff I



1    read, but I think one of the articles you cited talks

2    about this division within academia between those who

3    approach this issue from a medical perspective, i.e.

4    you have autism, here's the range of supports.  And

5    those -- I forget the phrase used, or the term you

6    used to approach it.  I think you said

7    non-categorically, and they used a different one.

8        A.    Mm-hmm.

9        Q.    Is that accurate, that there is a kind of

10   split within the profession on how to approach these

11   issues?

12       A.    I think it would be more of an evolution

13   over time, that a long time ago, back in the '50s,

14   '60s, '70s, providing services based on a medical

15   diagnosis would be more commonplace than what you see

16   today.

17       Q.    Okay.  That looks like Lanterman's article

18   on moving the needle.  Is it your opinion, then, that

19   disability is a construct?

20       A.    Is it my opinion that disability is a

21   construct?

22       Q.    Mm-hmm.



1      A.      What do you mean by construct?

2      Q.      I mean, would you agree with this

3  statement which, "Disability is a construct that is

4  interpreted through many conceptual models"?  Or do

5  you need more context to answer that?

6      A.      For sure.

7      Q.      Okay.

8      A.      You knew that was coming.

9      Q.      I did once you agreed to the first part.

10  We'll go back to the recommendations on 163.

11              In terms of MTSS as you recommended, as I

12  understand it, the state develops the capacity to

13  provide training, but MTSS itself, the multi-tiered

14  system, is actually implemented at the school level;

15  is that correct?

16      A.      It's implemented across the entire

17  educational system.  So it's sometimes called whole

18  system engagement, at other times, it's called

19  cascading levels of influence.  It's about how do you

20  structure an educational system, such that it's

21  providing for students what they need?  And --

22      Q.      Okay.



1      A.      -- that reaches the whole system.

2      Q.      Okay.  Is it fair to say that -- well, how

3  long do you think it would take the state to develop

4  state capacity to provide guidance for implementation

5  of MTSS through direction, policy, and technical

6  assistance for districts and schools throughout the

7  state?

8      A.      It would depend on what they already had

9  in place regarding their systems of support for

10 students already, who are in the general education

11 system.

12     Q.      Do you have an opinion on what supports

13 are in place for students in the general education

14 system in Georgia?

15     A.      Yes.

16     Q.      Okay.  So given that understanding, how

17 long do you think it would take the State Department

18 of Education to implement recommended action number

19 1?

20     A.      As a general rule, when states begin

21 implementation of an effort to refine or adjust their

22 system of support, there is usually an investment of

1    approximately a year in understanding the vision,

2    direction, and desired destination of the State

3    Department, and how it would lead.

4            And then second to that -- so that first

5    year is really about that.  The second year is really

6    focused more on what is it that we have within the

7    state -- we call it resource mapping.  What do we

8    have within the state already that could help with

9    the implementation of a system that does not

10   unnecessarily segregate students or provide unfair,

11   unequal educational opportunities.  So that typically

12   happens in the second year.

13           The third year is really laying out a

14   pathway for how the state provides vision, guidance,

15   direction, and professional learning, and actually

16   begins implementing a system in which things are

17   different.

18       Q.    What if a school -- what if the State

19   Department of Education develops the capacity to

20   provide this training, et cetera, but an LEA says, we

21   don't want to do it.  Do you have an opinion on what

22   the state could do at that point?  And by state, I



1    mean the State Department of Education in Georgia.

2         A.    If an LEA says, we don't want to provide a

3    system of support that includes students with

4    disabilities?

5         Q.    No, if the State Department of Education

6    adopts an MTSS strategy that you would say is to

7    fidelity, and says, we're going to provide training

8    to you, LEAs, you know, on how to do that.  And an

9    LEA says, we think we've got it covered, we're not

10   interested.  Not because of any animus toward

11   disabled students, but just they have a different

12   vision, let's say.  What is your understanding of

13   what the Georgia Department of Education could do in

14   that circumstance?

15        A.    It is not uncommon within states to have

16   LEAs to -- deeply consider what direction the State

17   Department is putting forth.  Part of building the

18   state capacity around implementation of an effective

19   system of support that meets the needs of students

20   currently in the GNETS program is to provide training

21   to the State Department, in order to be able to know

22   how to work with LEAs who may have concerns or a



1  different vision, and help supporting them.  That's

2  the technical assistance part of this work.  So I was

3  talking about the years.  That would be part of the

4  year 3 --

5       Q.    Okay.

6       A.    -- effort.

7       Q.    Would adopting an MTSS approach, like you

8  suggest in recommended action 1, require the Georgia

9  Department of Education to adopt a particular

10  school-based curriculum?

11      A.    No.  And I want to clarify, because I used

12  the phrase MTSS, because that is what is used in a

13  number of places, that whether or not it's called

14  MTSS is not important.  It is a coherent, full system

15  of support.  A way in which services are delivered

16  throughout the state.

17      Q.    Okay.  Let's look at recommended -- what

18  I'll refer to, just because I'm doing it

19  chronologically, as recommended action number 2, page

20  164.  "Develop state capacity to serve as technical

21  support for district implementation of social,

22  emotional, behavioral, and mental health practices



1   with MTSS."

2           What would constitute technical support

3   for district implementation?

4       A.    Most states see their role as providing a

5   level of vision, guidance, and technical support or

6   technical assistance, meaning expertise or guidance

7   on how to implement current effective educational

8   practices.  In this particular case, it would be

9   that, and it would also apply, then, to students

10  currently in the GNETS program and their educators.

11      Q.    Okay.

12      A.    Teachers or staff.

13      Q.    And how would a third party measure the

14  efficacy of the state's efforts in providing

15  technical support to districts?

16      A.    There's a number of tools that offer

17  feedback and support to states on setting up systems

18  of coaching across the state, systems of technical

19  assistance and support, professional learning across

20  the state.  If the state were interested in this,

21  there would be a variety of options for how that

22  might occur.



1      Q.    So is it fair to say, there is not one

2  measure of efficacy in looking at how the technical

3  support is being prepared and provided?

4      A.    At the State Department?

5      Q.    Yes.

6      A.    There are a number.

7      Q.    Okay.  Neither recommended action 1 nor

8  recommended action 2, if implemented, would

9  immediately remove a student from the GNETS program,

10 correct?

11     A.    That's a difficult question, because,

12 again, the actions you see noted on page 163 are

13 directly tied to the broader recommendations on page

14 162 that talk about eliminating the statewide system

15 of segregation of students with behavior-related

16 disabilities in the GNETS program, and providing fair

17 and equal access to educational opportunities for

18 students with behavior-related disabilities.

19          If the state were to engage in action 1 or

20 2, there may be more immediate opportunities for

21 students who are unnecessarily placed in a systemic

22 system of segregation to have access to fair and

1    equal educational opportunities that are matched to

2    their need.

3        Q.    I mean, I guess my question is, a lot of

4    the report, a bulk of the report certainly goes to

5    and provides criticisms of the GNETS program.  And

6    frankly, as I was reading it, I was expected when I

7    got to the recommended action to be, do something in

8    the GNETS program, right?  Evaluate students,

9    something.  And what we have is an adoption of MTSS

10   at the Georgia DOE level and provide expertise there.

11            So my question is, did any of the

12   recommended actions call for, you know, an immediate

13   evaluation of students in the GNETS program by the

14   Georgia Department of Education?

15            MS. TUCKER:  Object to form.

16            THE WITNESS:  I've done a comprehensive

17   evaluation of the GNETS program right here.  And

18   based on that evaluation, what I think would help to

19   make the situation better for the students that I

20   observed are the recommended actions that you see

21   here.

22   BY MR. BELINFANTE:



1          Q.     Would you agree with me that -- and I'm

2     not criticizing the proposed efficacy of these

3     programs.  But the recommended actions you're talking

4     about do take -- I think we talked about at least one

5     to three years to fully implement; is that right?

6          A.     Or longer.

7          Q.     Or longer.

8          A.     Mm-hmm.

9          Q.     Let's look at the recommended action --

10    the second one, because I think I understand the

11    first -- sorry, let me get you to a page number.  I

12    skipped one, sorry.

13         A.     No problem.

14         Q.     164, the second one there.  "Develop state

15    capacity to serve as technical support for

16    district-focused learning aligned with high

17    expectations and standards-based" --

18         A.     That's the third.

19         Q.     -- "learning for students."

20                Does the IEP team consider whether a

21    student is learning at the level of the

22    standard-based learning of that grade or year?



1        A.      Mm-hmm.

2                MS. TUCKER:  I'm going to just object to

3    form.  And also, it's "students with behavior-related

4    disabilities."  Sorry.

5                MR. BELINFANTE:  No, no.

6                MS. TUCKER:  Just correcting for the

7    record.

8                MR. BELINFANTE:  No, you need to.

9                MS. TUCKER:  Yeah.

10                MR. BELINFANTE:  And I need to learn to

11   read better.

12                THE WITNESS:  And we're talking about the

13   recommended action that starts with, "Develop state

14   capacity to serve as technical support for

15   district-focused learning aligned with high

16   expectations and standards-based learning"?

17   BY MR. BELINFANTE:

18        Q.    Yes.

19        A.    And "for students with behavior-related

20   disabilities."

21                And your question is, if I'm

22   understanding, is there -- does an IEP team ever

1    consider whether or not students are performing

2    related to standards?

3         Q.    Yes.

4         A.    Yes.

5         Q.    Okay.  And do they make their

6    recommendations in order to -- with the goal in mind,

7    that the student will perform on standard-based

8    learning?  In other words, what is the IEP team

9    trying to solve for that student, as it relates to

10   the standards that you're discussing on page 164 and

11   165?

12        A.    Again, I'll speak hypothetically here,

13   because that's what we're talking about --

14        Q.    Sure.

15        A.    -- is, would you hope that an IEP team

16   would be helping students to learn the ways in which

17   general education students learn aligned with state

18   standards, or alternate state standards for students

19   with disabilities?  Yes.

20        Q.    Okay.  And in your experience, having

21   served on an IEP team, and also just your experience

22   generally, if an IEP team fails to do that, are there



1    potential legal consequences that you're aware of for

2    that IEP team or that district?

3            MS. TUCKER:  Object to form.

4            THE WITNESS:  I don't know what legal

5    actions apply.

6    BY MR. BELINFANTE:

7        Q.    Okay.  In that same paragraph, page 164,

8    you talk about, midway through, "Georgia DOE can also

9    serve as a source of technical support, providing

10   professional learning and resources on how to employ

11   effective and current universal screening and analyze

12   progress monitoring data for students."

13           Do you see that?

14       A.    I sure do.

15       Q.    Okay.  Did you review data collected by

16   the Georgia Department of Education as part of your

17   report in this case?

18       A.    Yes, extensively.

19       Q.    Do you have an opinion as to whether the

20   Georgia Department of Education collects sufficient

21   data in order to provide effective supports or to --

22   let me start over.

1        A.      Sure.

2        Q.      Did you form an opinion as to whether the

3   Georgia Department of Education collects sufficient

4   data to allow LEAs and RESAs to provide sufficient

5   reports -- supports, not reports -- to students with

6   emotional and behavioral disabilities?

7        A.      I sincerely do not want to ask you to

8   repeat that question.

9        Q.      Let me ask it in a really simple way.  And

10  then if we can go from there.

11       A.      There we go.

12       Q.      What I'm trying to determine is, is there

13  more data -- is it your opinion that Georgia

14  Department of Education should be collecting more

15  data than it is currently collecting?

16       A.      I have reviewed a lot of data from the

17  Georgia Department of Education, but I have not

18  reviewed all the data.  Therefore, I cannot answer

19  that question.

20       Q.      All right.  And in order to determine

21  whether the local school districts are employing

22  effective and current universal screening, what



1    specific data should the Georgia Department of

2    Education being collecting?

3        A.    It is common in education for educational

4    systems to understand and utilize universal screeners

5    and progress monitoring data in a variety of

6    different forms.  It's -- for lack of a better way of

7    saying it right now, it's a lot of data on how to

8    determine student progress.

9        Q.    And sitting here today, because you

10   haven't looked at the full universe of data, you

11   can't decide if the Georgia Department of Education

12   is collecting sufficient data to do that.  Did I

13   understand that from earlier?

14       A.    Correct.

15       Q.    Is there a place that the Georgia

16   Department of Education could look to, to determine

17   what is the appropriate criteria of data that it

18   should be examining in order to implement your

19   recommended action number 3?

20       A.    Yes, but not to conflate that with

21   progress monitoring and universal screening data,

22   which is related to student progress.



1      Q.      Okay.

2      A.      There are certainly mechanisms, and the

3   state does already collect these, regarding

4   assessments and alternate assessment outcome data,

5   which is related to recommendation number 3.

6      Q.      Okay.  I think I understand.  Let's go to

7   recommended action number 4 on page 165.  Let's see.

8           In the section under the bold, you list

9   five recommended actions.

10     A.      Mm-hmm.

11     Q.      One is "effective and clear data use."

12  That's letter (c).

13     A.      Mm-hmm.

14     Q.      Is there -- how would one measure the

15  efficacy of their data use in this context?

16     A.      You might remember, or you might not, a

17  little bit ago, I discussed this process of whole

18  system engagement, where I talked about a design or

19  vision for MTSS, or a system of support at the state.

20  And then talked about how the district and the system

21  would work together.

22           That's the second one around state,

1   district, school teaming coaching structures.

2   Effective use of data across those systems.  And then

3   establishment of priorities.  And you remember, I

4   might have mentioned resource -- or I did mention

5   resource mapping and matching earlier.

6           Effective use of data, as indicated, is

7   part of a whole system.  There are a number of tools

8   that talk about how to either make data informed

9   decisions or data-based decisions or evidence-based

10  decisions.  And how to use data in a timely fashion,

11  where you have -- you don't have too much or you

12  don't have too little, so that you can make decisions

13  not only about individual student progress, but

14  progress of schools, progress of LEAs, and progress

15  of the state in their capacity to be able to

16  effectively utilize data.

17      Q.    Okay.  In the bold section up there, it

18  says, "Develop state capacity to serve as technical

19  support for district-scaling of evidence-based

20  implementation actions to support equity-based MTSS

21  with embedded social, emotional, behavioral, and

22  mental health."



1              What did you mean by embedded in that

2    context?

3        A.    What I mentioned earlier about how MTSS,

4    PBIS, and social, emotional learning are a subset of

5    a broader umbrella called the MTSS, or system of

6    support.

7        Q.    Okay.  All right.  Let's go to the next

8    recommended action, page 165, "Develop state capacity

9    to serve as technical support for district

10   implementation of evidence-based practices to support

11   equity-based MTSS with embedded social, emotional,

12   behavioral, and mental health."

13             The first sentence under that reads,

14   "Central to effective statewide reform is a large

15   scale investment in building state, district, and

16   school leadership, and leadership teaming

17   structures."

18             Do you see that?

19       A.    Mm-hmm.

20       Q.    Okay.  Do I take from this that you deem

21   your recommended actions to constitute a reform of

22   the Georgia Department of Education?



1          MS. TUCKER:  Object to form.

2          THE WITNESS:  Reform is probably -- I'm

3   not sure what to say about whether or not it is

4   reform.  I mean, reform could be something very small

5   or something very large.

6          In this particular case, I am referencing

7   statewide adjustments to the GNETS program, in order

8   to reduce, eliminate -- I'm sorry, eliminate

9   unnecessary segregation and lack of access to fair

10  and equal educational opportunities.

11  BY MR. BELINFANTE:

12      Q.    And that -- central to that would be

13  large-scale investment in building state, school

14  district, and school leadership teaming structures,

15  correct?

16      A.    Yes.

17      Q.    Okay.  You saw this one coming.  Can you

18  tell me what you mean by large-scale investment?

19      A.    Yeah.

20      Q.    And quantify that in the best way you can.

21      A.    Yes.  Investment, in this context, means a

22  commitment to a vision of implementation focused on



1    building capacity at the state, district, and

2    leader -- school levels around leadership and

3    leadership teaming structures.

4              This is a high leverage practice that

5    utilizes people that are already in the system, or

6    may already be in the system, to implement effective

7    strategies.  And in this case, would help support

8    students in the GNETS program having different

9    options, rather than segregation.

10    Q.    And is there a role for the current

11    educators providing services in GNETS classrooms to

12    do that?

13    A.    My personal belief is that -- I'll say

14    this.  Because of the context, a number of educators

15    struggle within the GNETS program, because of its

16    institutional, like, nature, and its segregation away

17    from general education population.

18              I think that many educators within the

19    GNETS program, if they were in an enabling context

20    that was not segregated, and were provided with

21    appropriate professional learning resources and

22    support, aligned with a vision in the state that did



1    not uphold the current system of segregation, that

2    those educators would be effective in providing

3    supports to students who are currently served in the

4    program in a different way.

5        Q.    Could current -- and I think this may be

6    what you just said.  But could current GNETS

7    instructors, educators, through training, provide

8    education -- an education that would satisfy your two

9    recommendations on page 162?

10       A.    Certainly educators within the GNETS

11   program, if given a different context environment,

12   and appropriate professional learning and support,

13   could provide effective supports to students in

14   general education settings within the state.

15       Q.    So does that mean that a person who is now

16   teaching in a GNETS classroom would be teaching in a

17   general zoned classroom?

18       A.    It depends.

19       Q.    Would that be required in order to satisfy

20   the two --

21       A.    No.

22       Q.    -- recommendations?



1        A.      I'm sorry.

2        Q.      Yeah, I think the answer may be the same.

3    But that would be required for the two

4    recommendations on page 162?

5        A.      No.

6        Q.      Okay.  If you could turn to page 161, the

7    last sentence of the first paragraph, not full

8    paragraph, but the last paragraph reads, "My hope is

9    that educators within the GNETS program will embrace

10   the recommendations and see themselves as part of a

11   movement toward better support for themselves,

12   professionally, and better outcomes for students with

13   behavior-related disabilities."

14           Do you see that?

15       A.      I do.

16       Q.      What did you mean by a movement?

17       A.      The -- all the things we've just been

18   discussing regarding providing supports and services

19   to students within -- currently served within the

20   GNETS program, to be served in a system that is not

21   segregated and provides fair and equal access to

22   those students.



1    Q.    In terms of equal access, what specific

2    education services and support did you find were

3    offered, other than -- I think we talked about, in

4    one example, the speech therapy.  In another example,

5    there was mental health counseling.  What specific

6    services and supports did you find were offered to

7    students in general zoned schools, but not GNETS?

8    A.    That is really all of finding 2.

9    Q.    Okay.

10    A.    Would you like to go there?

11    Q.    I will.  And I think I probably will in a

12    little bit longer, because I think there is a lot in

13    there that I'm not talking about.  So for example,

14    I'm not talking about gymnasiums, I'm not talking

15    about the status of the air conditioning thing that I

16    saw in finding 2.

17        What I'm -- that question that I just

18    asked was more specific to things -- yes, you

19    discussed them in finding 2, but it's a narrower

20    question, if that makes sense.

21    A.    Okay.  So you're not talking about unfair,

22    unequal, and harmful facilities?



1       Q.    I'm not.

2       A.    Okay.

3       Q.    I'm not.  I'm talking about the services

4    and supports.  But I think we probably -- we may have

5    covered that earlier today, unless --

6       A.    I can look.

7       Q.    Sure.

8       A.    You're also not referencing the

9    distinctions between the interior of the buildings.

10       Q.    No, nothing involving physical plans.

11       A.    Okay.  Okay, the same with conditions of

12    classrooms, then.  You're not referencing that.

13       Q.    No.

14       A.    If it was the morning, I could say all of

15    these things off the top of my head.  But right now,

16    I'm going to flip pages.  Also, not the restrooms,

17    you're not referencing.

18       Q.    No, nothing physical.

19       A.    I gotcha.

20       Q.    It's really just the -- you know, in zoned

21    schools, there was speech therapy, and in GNETS,

22    there was not.  That kind of service.



1      A.      Mm-hmm.  In zoned or home schools, there

2  were gymnasiums.  In many GNETS programs, there were

3  not, or they were inferior.  The same with

4  playgrounds.  The same with other outdoor common

5  spaces, for example, at high schools or middle

6  schools.

7              In zoned or home schools or general

8  education environments, there were grade level

9  appropriate resources for students in general

10 education, including those who had disabilities.

11 There were --

12     Q.    I'm sorry, when you say disabilities, you

13 mean behavioral/emotional disabilities?

14     A.    I mean students who receive -- who have

15 disabilities that are not in the GNETS program.

16     Q.    Right.  But because you corrected me on

17 this earlier.  We're not talking about, like, a

18 student with a physical disability, for example,

19 like, may be confined to a wheelchair, or something,

20 versus what we've been talking about, the

21 emotional/behavioral health disability?

22     A.    I was correcting how you said the word,



1    but --

2        Q.    Okay.

3        A.    What I'm actually talking about right now

4    is -- or how you said the words, the sequence of the

5    words.

6        Q.    Okay.

7        A.    But what I'm talking about here is

8    students who have disabilities, have IEPs, may have

9    behavior-related disabilities, accessing general

10   education or in the general education environment,

11   but still receiving special education services, as

12   compared to -- or as -- for purposes of this question

13   to students who are receiving services in the GNETS

14   program with behavior-related disabilities.

15       Q.    Got it.  Okay.

16       A.    So I mentioned grade appropriate

17   resources, the standards-based content, rather than

18   child-like -- young child preschool-like materials

19   for students who were not in preschool, but rather in

20   high school.

21            So they had -- in general education

22   environments, they had standards-based learning,

1    rather than functional curriculum.  They had lesson

2    planning aligned with standards-based instruction on

3    grade level and appropriate for student age.  They

4    had content mapping, knowing when they were going to

5    teach what throughout the course of the year.  That

6    was not in place in GNETS program sites.  There was a

7    lack of learning content and resources in GNETS

8    programs.

9             Therefore, I think your question was

10   related to what was in general education sites that

11   wasn't in GNETS programs, in general, and a lack of

12   learning content and resources.

13            There was the use -- overuse and reliance

14   on online instruction in place of certified educators

15   in GNETS, as opposed to in general education.  You'll

16   have to forgive me.  I think I'm switching back and

17   forth to what has and doesn't have, but it's in the

18   report.

19        Q.    I'm following you.

20        A.    Okay.  Then the general education

21   environments had what is typical scheduling, master

22   schedules from students across the spectrum, that was

1    in place.  And I can go on, but I'm just wondering if

2    I could hear the question one more time.  I want to

3    make sure I'm not wandering.

4        Q.    Sure.  What I'm trying to determine is,

5    what are the specific services that are offered --

6    that you conclude are offered in general zoned

7    schools versus in a GNETS program.

8        A.    Okay.

9        Q.    And I'm not talking about, again, the

10   comparative physical plan.  That was the piece I'm

11   excluding.

12       A.    Okay, so we're still on the same page.

13       Q.    Yeah.

14       A.    So additionally, in general education

15   sites, there is regular access to specials,

16   connections and exploratory classes.  That is not the

17   case in GNETS sites.  Transportation within the GNETS

18   program is segregated or different from what you find

19   if you were going to a home school.

20            And I can continue going on and on, if you

21   would like, including poor school climate and

22   culture --



1        Q.    Let me ask it this way.  If there is a

2    service that you're opining is available in a general

3    zoned school, but not in a GNETS school, I would find

4    it in the report; is that right?

5        A.    Yes.

6        Q.    Okay.  I mean, you've given --

7        A.    I stopped at page 129, and it goes on for

8    a while.  And I would encourage -- I just don't want

9    to keep reading this out loud, but it goes from 129

10   to, I believe, page 157.

11       Q.    And you can tell by the amount of ink that

12   is on the pages, I have read it.

13       A.    I see that.  Again, I know, thank you.

14   Just thank you for that, I'm just going to say.  But

15   on that note, I need to have a little break, if this

16   is an okay time.

17            MR. BELINFANTE:  I think it's a good time.

18            THE VIDEOGRAPHER:  Off the record at

19   15:40.

20            (Recess.)

21            THE VIDEOGRAPHER:  On the record at 15:57.

22   BY MR. BELINFANTE:



1        Q.    Dr. McCart, I'm going to show you what

2   we'll mark as Exhibit 7, which is the GNETS rule --

3   what I'll call the GNETS rule, and is included in

4   amended Appendix E.

5                    (McCart Exhibit No. 7 was identified

6                     for the record.)

7   BY MR. BELINFANTE:

8        Q.    So I'm going to presume you have seen this

9   before.  Is that accurate?

10       A.    I have seen the GNETS rule.  This looks a

11  little different, but --

12       Q.    The formatting is probably different.

13       A.    Yes.

14       Q.    Okay.  My question is, is there any -- is

15  it your opinion that there is anything in the GNETS

16  rule that is, per se, discriminatory?  That's not a

17  good question.

18            Is there anything in the GNETS rule that

19  you find automatically causes unnecessary

20  segregation?

21                    MS. TUCKER:  Object to form.

22                    THE WITNESS:  Can you repeat the question?

1   BY MR. BELINFANTE:

2       Q.    Sure.  Is there anything in the text of

3   the GNETS rule that you opine or understand causes

4   unnecessary segregation?

5       A.    I can't draw the line between words in a

6   rule and unnecessary segregation.  There are

7   certainly concerns when looking at the rule.

8       Q.    Okay.  Could you identify for me what your

9   concerns with the rule are?

10      A.    And maybe what I meant to say is, concerns

11   in implementation, and how it plays out within the

12   GNETS program.

13          So, for example, on the bottom of page 3

14   of the GNETS rule, sub -- section (4), sub (c), it

15   says, "The GNETS continuum of services by

16   environment," and then it proceeds to list one, two,

17   three, four, five, six possible service provision

18   and/or placement options for students who are in the

19   GNETS program.

20          And based on my multi-year review, I was

21   surprised at the number of students served in --

22   solely in GNETS centers for the school day, like one

1    through five were skipped.

2          Q.    And what is your understanding of who

3    decides where those students are going to receive

4    services as in 1 through 6?  Is it at the LEA level

5    or the state DOE level?

6               MS. TUCKER:  Object to form.

7               THE WITNESS:  As I stated earlier in the

8    day, if an IEP team is meeting regarding supports and

9    services for a student who has a behavior-related

10   disability, they can only offer what's available.

11              So for example, if in North Fannin,

12   Georgia, the only option available is a center, then

13   any student in that region that is referred to the

14   GNETS program has to attend a center, as opposed to

15   any of the other options that are listed as part of

16   this rule.

17   BY MR. BELINFANTE:

18         Q.    And --

19         A.    Therefore, unnecessarily segregated.

20         Q.    Okay.  And they're unnecessarily

21   segregated because the service is only provided in

22   the GNETS facility?  Is that what I understand you to

1    say?

2         A.    In the segregated GNETS center-based

3    facility, yes, the ones that are separate and

4    distinction from any relationship or connection to

5    the general education sites.

6         Q.    Okay.  Let's take your example of North

7    Fannin County.  If in North Fannin County School

8    District, there are four students who qualify with

9    emotional/behavioral disability, is it your opinion

10   that that school district can partner with other

11   school districts in the area, and provide services in

12   order to achieve economies of scale, even if that

13   means providing education services in a segregated

14   environment?

15        A.    I don't know what you're asking.

16        Q.    Okay.  So let's say -- you're familiar

17   with RESAs.  We talked about that.

18        A.    Yes.

19        Q.    And in a RESA, school districts can work

20   across geographic boundaries, in terms of county

21   school districts, et cetera, to pool resources and

22   provide services; is that right?



1          A.     I don't know about providing resources,

2   but I understand where you're going.

3          Q.     Okay.  Do you have -- have you, in your

4   report, looked at -- and I may have asked this

5   before, and I apologize.

6          A.     That's okay.

7          Q.     How LEAs -- what is the authority of an

8   LEA to raise funds independent of any state

9   appropriations?

10          MS. TUCKER:  Object to form.

11   BY MR. BELINFANTE:

12          Q.     And by raise funds, I mean taxing, not

13   bake sales.

14          A.     I -- did you ask if I opined on that?

15          Q.     Do you have an understanding of whether or

16   how LEAs can raise tax revenue to obtain resources,

17   independent of what the state may provide through

18   appropriations?

19          MS. TUCKER:  The same objection.

20          THE WITNESS:  No, it was not in the scope

21   of my review of this case.

22   BY MR. BELINFANTE:



1      Q.    If a school district -- let's take North

2  Fannin again, within the entire district -- I realize

3  this is a hypothetical --

4      A.    Yeah.

5      Q.    -- has three students with an

6  emotional/behavioral disability scattered.  One's in

7  lower school, one is in what I'll call middle school,

8  and then one is in upper school, high school.  How

9  would that school district address the needs of those

10 students in an economically feasible manner?

11 Feasible understanding being subjective.

12     A.    Sure.

13     Q.    But I think you see where I'm going.

14     A.    I do.  And the easiest answer to that is

15 by following the recommendations that I put on --

16 starting on page 160, because those recommendations

17 lead to a system of support in which efficiencies are

18 created, service provision is appropriate based on

19 the student need, and support students with

20 disabilities, including those with behavior-related

21 disabilities without the need to unnecessarily

22 segregate those students based on geography.



1        Q.    You mentioned one of your concerns with

2    the GNETS rule was on page 3, which is rule (4)(c).

3    Do you have any others that you're concerned with, in

4    terms of the GNETS rule itself?

5              MS. TUCKER:  Object to form.

6              THE WITNESS:  I would need to review this

7    in greater depth than you likely want -- you likely

8    want me to right now, to determine whether or not I

9    have any other concern regarding this rule.

10    BY MR. BELINFANTE:

11        Q.    Let me ask this.  If you had concerns with

12    the rule as written, would it be reflected in your

13    report?

14        A.    It may or may not be reflected in the

15    report.

16        Q.    Okay.

17        A.    It's only reflected insomuch as it relates

18    to my findings and recommendations.

19        Q.    Okay.  Let's put that aside, then.  Let's

20    look at page 41 -- not 41.  Page 41 -- okay, in the

21    back of the report --

22        A.    I just want to add one more time that I'm

1    not exactly sure if this is the same.  So Exhibit 7.

2         Q.    Okay.

3         A.    Only to just check that.

4         Q.    Okay.  And we can do that, because I think

5    you identify the reg, based on Georgia Department of

6    Education's website.  So it does look different.

7         A.    Yes.  And I think this is from Westlaw,

8    Yeah.

9         Q.    If you could turn to Appendix A of your

10   report, the data tables and graphs.

11        A.    Mm-hmm.  Oh, I said mm-hmm, but I'm not

12   there.

13        Q.    That's okay.

14        A.    Yes.

15        Q.    Okay.  This is -- the work that's

16   reflected here was done by one of your colleagues; is

17   that correct?

18        A.    This is my work.  I had support from my

19   colleague, Jeong Choi, as noted in the beginning of

20   the report.

21        Q.    Got it.  If we can look at figure B.

22        A.    Figure B in the report, I'm guessing?

1          Q.     I'm sorry.

2          A.     Which is --

3          Q.     Yeah, which goes back -- it refers to

4     that.

5          A.     Yeah.

6          Q.     Yeah.  And that's on page 14 of the

7     report.

8          A.     Correct.

9          Q.     Okay.  You would agree with me, and I

10    think the report says this, that the overall number

11    of students who are receiving services through GNETS

12    has declined from school year '15 to '16 to school

13    year '21 to '22, correct?

14         A.     I speak to that directly in the report on

15    page 15.  "Even though total placement numbers" in

16    the GNETS program "indicate a decline in student

17    population in the GNETS program, the percentage of

18    new students admitted to the GNETS program has

19    remained steady.  New student admission comprised

20    over 21% of the total GNETS program student

21    population in school year 2016-'17, and remained near

22    20% for the school year 2021-'22, as indicated in



1    Figure D."

2         Q.    Okay.

3         A.    The sum of that being the -- although the

4    overall numbers of students in the program are

5    reducing, the number of students being admitted are

6    still hundreds a year.

7         Q.    Did you consider, in looking at this data,

8    if the numbers were reducing because students are

9    graduating, or because students are returning to

10   their zoned schools, or a combination?

11        A.    There are no -- yes, I did consider that.

12        Q.    Okay.  And what did you find to be the

13   leading cause of the total number of students in

14   GNETS declining by almost half, not quite?  Almost

15   half is lawyer math for 4400 to 2995.

16        A.    Four minus two.  That's half.

17        Q.    I had to correct myself before you did it

18   for me.

19        A.    Yeah.

20        Q.    But my question is, and I'll repeat it.

21   Were you able to make a determination as to what

22   number graduated versus what number returned to their

1    zoned schools?

2        A.    There's much more to the picture than

3    that, as you might expect, in that indicators such as

4    numbers of referrals to the program may have

5    decreased.  Students being expelled or leaving the

6    program, but not graduating may have occurred.  An

7    increase in district or regional area ability to

8    provide supports to students with behavioral related

9    disabilities without use of the GNETS program.  So

10   there are a number of reasons, including concerns

11   with the quality of the program and the outcomes

12   experienced by students in the program.

13       Q.    Okay.

14       A.    Why those numbers have decreased.  Again,

15   what is of concern is the number of students still

16   being admitted each year.

17       Q.    And does your report -- and I may have

18   just missed it, but does your report actually explain

19   or provide an opinion as to why the number has

20   decreased?  And by the number, I mean total students

21   receiving GNETS services.

22       A.    Beyond what I've just stated, I'm not sure

1   that's --

2        Q.    Let's look at Figure D on page 16.

3        A.    Mm-hmm.

4        Q.    Figure D is what you're referring to as

5   new students being placed in GNETS; is that correct?

6        A.    New student placement in the GNETS program

7   by grade from '15-'16 to '21-'22.

8        Q.    Okay.  And here, would you agree with me

9   that the trend is downward from school year '16 to

10  '17 to school year '21-'22?

11       A.    In total student enrollment?

12       Q.    Yes.

13       A.    Yes.

14       Q.    Total new students, I'm sorry, being

15  admitted.

16       A.    Oh, no.

17       Q.    Okay.

18       A.    The percentage of students being admitted

19  to the program each year remains the same.

20       Q.    I'm sorry, but I'm looking at Figure D,

21  which is just the raw numbers.  I'm not trying to be

22  tricky.  I'm just trying to make sure I understand

1    the graphic.

2              It looks to me -- and am I reading this

3    correctly, that in school year '16 to '17, there were

4    898 new admittants to GNETS?

5        A.    Mm-hmm.

6        Q.    And so in school year '21 to '22, there

7    were 576?

8        A.    Yes.  So if the question is, is 898 higher

9    than the number 576, the answer is yes.  When you

10   look at the proportion, because there are different

11   data sets.  When you look at the proportion of

12   students, new students enrolled, that's what is

13   remaining constant at 20 percent.

14       Q.    Okay.

15       A.    Again, making the point of hundreds of

16   students being admitted each year.

17       Q.    Does your report contain any analysis or

18   opinion as to why the overall number of new students

19   has declined from -- and declined consistently from

20   school year '16 to '17 to school year '21 to '22?

21       A.    I'm just going to reference what I said

22   earlier to the question you asked, which was similar

1    or the same.

2        Q.    Okay.  And when you talk about the

3    percentage remaining the same, is that reflected in

4    one of the figures?  The percentage of new student

5    admits to overall student population?

6        A.    That is at the bottom of page 15.

7        Q.    Okay.

8        A.    It's actually -- that paragraph is

9    actually under Figure C, which talks about the number

10   of students -- proportion of students that are in

11   center-based sites versus school-based sites.

12            But what you're asking about is Figure D,

13   and the language you see at the bottom is what I

14   already read, which is the total placement numbers of

15   students, students placed in the program indicate a

16   decline in the student population, that the

17   percentage is still concerning, in that there are

18   hundreds of students each year still being admitted

19   to the GNETS program.

20            So we would look at whether or not, based

21   on the number of students in the program, is the

22   proportionate number of new admittants decreasing at

1   the same rate as the number of students in the

2   program.

3        Q.    Why would you look at that as opposed to

4   the overall population within the program?

5        A.    Because there's a disproportionate impact

6   on students who enter the program and remain over

7   multiple years.  So you want -- so for example, if in

8   '21-'22, a new student is admitted to the program,

9   and that student's a kindergartner, they could be --

10  data would indicate that there's a likelihood that

11  that student would remain in the GNETS program for

12  many, many years.

13       Q.    I guess -- and this is why lawyers

14  shouldn't play statistician for sure.  But where I'm

15  getting confused on that is, if the overall number is

16  declining and people are coming in, it would seem to

17  me, based on that -- and the number of people who are

18  coming in is also declining, that people are cycling

19  in and out, it would suggest to me that they are

20  moving in and out, or they're not staying.  Because

21  if they were staying, the overall number would stay

22  the same, given that there is, as you say, hundreds



1    of people coming in every year.

2         A.    Hundreds of children.

3         Q.    Yeah.  So how am I misunderstanding

4    your --

5         A.    I think maybe -- I know you looked at this

6    already, but maybe Figure E and F would be more

7    helpful in understanding that.  I think the

8    misunderstanding is coming -- related to in and out.

9         Q.    Okay.

10        A.    So when you look, for example, at Figure

11   E, you see what's highlighted here, second graders in

12   '15-'16, year after year, 35 percent of those

13   students remained in the GNETS program for multiple

14   years.

15        Q.    Okay.

16        A.    So given the length of time students

17   remain in the program once admitted, there's a

18   disproportionate negative impact on the students who

19   enter the program at a younger age.

20        Q.    Okay.

21        A.    That's what this graph references.

22        Q.    Okay.

1      A.      And the same with the next graph.  So a

2  student can just -- the data indicates that students

3  can be there for many years.

4      Q.      And so just to --

5      A.      And are.

6      Q.      Just so I'm understanding the graphic,

7  let's take Figure E.  In school year '15, there were

8  247 students admitted in the second grade for the

9  GNETS program.  And by school year '21-'22, of that

10  247, 88 remained.

11      A.      Yes.

12      Q.      Am I reading that correctly?

13      A.      You are reading that correctly.

14      Q.      Okay.  Is there anywhere I could go to

15  look at national data for -- comparative national

16  data to what I'm seeing in Tables B, C, D, E, and F?

17      A.      B, C, D, E, and F.

18      Q.      In other words -- let me back up a second,

19  because I'm looking at this in a vacuum as it relates

20  to Georgia.

21      A.      Right.

22      Q.      If I were to look at how -- let's just

1    pick on a state, Alabama, because they're next door,

2    Alabama's special education.  And if I wanted to

3    track, you know, students who were in a special

4    education classroom and students who are not, is

5    there a place I could go to try to find that type of

6    information?

7         A.    The uniqueness of the situation in Georgia

8    is the fact -- and why you're seeing it a bit in a

9    vacuum, as you said, is because it is a systemic,

10   statewide issue.  And so there aren't comparative

11   national data, because this is a statewide system of

12   segregation.

13        Q.    Is it -- okay.  Is Georgia the only state

14   you're aware of that has freestanding -- public

15   freestanding schools for students with

16   emotional/behavioral disabilities?

17        A.    The State of Georgia does not have

18   freestanding schools for students with

19   behavior-related disabilities.  They have entities.

20        Q.    What's the difference between a school and

21   an entity?

22        A.    An entity is what the -- I don't know.

1  It's what it's called.  Let me -- it's on page 20.

2  Let me take a look.

3      Q.    Sure.

4      A.    Starting at the full paragraph number 2,

5  it states, "unlike traditional special education

6  programs that operate within home schools, districts,

7  and sites within the GNETS program" -- "the sites

8  within the GNETS program are organized into a

9  regional GNETS program, and are viewed as special

10  entities, not schools."

11      Q.    What's the authority for that sentence?

12      A.    I would need to look again.  You had asked

13  before the break if it was in my report, and I found

14  it in my report.  But I would have to check the

15  documents again to see where that was located.

16      Q.    Okay.  Putting aside the phraseology, are

17  there other states that have freestanding buildings

18  for students with emotional and behavioral

19  disabilities, public -- in the context of public

20  education?

21      A.    I was not asked to look at that as part of

22  this analysis.  I was asked to specifically look at



1    the State of Georgia.

2        Q.    Okay.

3        A.    So whether or not there's the existence of

4    a freestanding school for students with

5    behavior-related disabilities, in and of itself, I

6    can't speak --

7        Q.    I guess -- I mean, because a lot of times

8    today, you've told us, fairly or unfairly, but based

9    on your experience and your years of service and

10   looking at different states, et cetera, in all of

11   that experience, understanding it's not what you were

12   to look for in this report.  But are there other

13   states that offer freestanding buildings where

14   students who have a diagnosis of an emotional or

15   behavioral disability receive an education, separate

16   from a generalized school?

17       A.    Certainly if you think about -- oh, with

18   emotional and behavioral disorder.  Certainly in

19   other states, there are environments in which

20   students who have behavior-related disabilities might

21   attend school that have segregated environments.

22            The distinction between that and this,

1  between that example and the GNETS program is the

2  systemic nature.  And when you look, for example, at

3  the map and how many places and how many sites, just

4  referencing the ones I went to, the 70 sites that I

5  went to, the 26 centers -- 27 centers that I went to,

6  GNETS centers, the 36 school sites I went to, 33

7  counties, across a year-and-a-half time, that sheer

8  number is what is at issue here.

9             There's 24 different regional programs of

10  segregation across the state, which is different

11  than, is there a school somewhere in one of the

12  states that provides services to kids who have

13  behavior-related disabilities that is segregated.

14        Q.    Well, isn't it better that the student

15  receive services closer to home?  So if you're

16  looking at a freestanding building, take the State of

17  Wyoming, I think you mentioned earlier.  If Wyoming

18  only had one versus Georgia that has several, where

19  folks can remain close to home, isn't that better and

20  less discriminatory?

21             MS. TUCKER:  Object to form.

22             THE WITNESS:  Students in the State of



1  Georgia that I observed were in segregated

2  environments that were very far from their homes.

3  BY MR. BELINFANTE:

4      Q.    They would be further from their homes in

5  most cases, however, if there was only one location,

6  isn't that right?

7      A.    You mean like in North Fannin?

8      Q.    Sure.  No, I mean, if like there was only

9  one GNETS facility in Atlanta, and so if an IEP team

10 said, you need to go to a GNETS facility, and the kid

11 lives in Savannah, or the kid lives in North Fannin

12 or Albany, take your pick.  I mean, clearly, that

13 would be more segregating than breaking it out into

14 the 26 regions.

15     A.    All of this is hypothetical.  And again,

16 it's referencing the statewide systemic nature of

17 segregation.  What would be better is if an IEP team

18 would be able to offer the full array of supports and

19 services that did not require unnecessary segregation

20 and lack of access to fair and equal educational

21 opportunities.

22     Q.    What's the difference between fair and

1    equal educational opportunities and fair and

2    appropriate public education?

3              MS. TUCKER:  Object to form.

4              THE WITNESS:  I think I need you to

5    restate that.

6    BY MR. BELINFANTE:

7        Q.    What's the difference between fair and

8    equal educational opportunities and fair and

9    appropriate public education, or FAPE?

10             MS. TUCKER:  The same objection.

11             THE WITNESS:  I don't know, at this point

12   in time, that I can articulate that.  Right now,

13   right here.

14   BY MR. BELINFANTE:

15       Q.    Okay.  Could I ask you to go back to page

16   8 of your report.  And sorry I'm skipping around.

17   The good news is that means I'm actually finishing.

18       A.    Yeah.  I mean, take your time.

19       Q.    Right.

20       A.    Page, I'm sorry, 8 you said?

21       Q.    Page 8.

22       A.    Mm-hmm.

1      Q.    The question I have is about the chart or

2   Table 1 that begins on page 8, and continues on page

3   9.  But equally, the Table 2 that's there and Table 3

4   on page 11.  Is this a chart or a criteria that you

5   developed, is it one that you borrowed from

6   peer-reviewed studies or whatnot?

7      A.    It is tables that I developed based on

8   well-documented indicators of segregated or

9   institutional environments within the field of

10  special education.

11     Q.    Okay.  Understanding that the articles

12  that are cited, or at least most of them, I won't say

13  all of them, because I know there's, like, news

14  articles and so on.  But the field of special

15  education articles that are cited in Appendix --

16  amended Appendix E, would I find -- is there an

17  article that points to these factors, or is it just

18  based on your collection of the various articles that

19  are out there?

20     A.    It's -- you would find in the appendix

21  some articles -- a number of articles that speak to

22  the indicators you see in Table 1, 2, and 3 in

1    different forms and formats.

2         Q.    Okay.

3         A.    Also, I've used my experience, having

4    worked in classroom environments, institutional

5    settings, community living organizations, and

6    students with behavior-related disabilities over the

7    course of my professional career.

8         Q.    Can you look at page 9 of your report?

9    One of the things you look to is number 15.  "Are

10   there spaces in which students in the GNETS program

11   are placed in time out or otherwise isolated based on

12   their behavior?"

13        A.    Yes.

14        Q.    Is it your experience that there are

15   places in general zoned schools where students may be

16   placed in time out or otherwise isolated based on

17   their behavior?

18        A.    No.

19        Q.    You've never seen a zoned school where

20   students are placed in time out or otherwise isolated

21   because of their behavior?

22        A.    Not in the manner in which I'm referencing

1    in this report.

2        Q.    Okay.

3        A.    If you're asking, have I ever worked in a

4    preschool where a teacher had a student -- a

5    two-year-old sit down for a few minutes, yes.  That's

6    not what we're talking about here.

7        Q.    Okay.

8        A.    Here, we're talking about widespread

9    isolation rooms.  I know you looked at the pictures.

10       Q.    Yeah.

11       A.    And saw them.

12       Q.    Okay.  Let's go back to page 162.  And the

13   first full paragraph there under that formula, if you

14   will?

15       A.    Graphic.

16       Q.    Graphic, yeah.

17       A.    Formula, yes, thanks.

18       Q.    Three or four sentences down.  Or

19   actually, I'll just start with the second full

20   sentence.  "This guidance includes statewide mapping

21   of what currently works within the state and the use

22   of current national evidence-based practices for

1   large scale implementation.  Such effective practices

2   include, but are not limited to, standards-based

3   learning, MTSS, PBIS, social-emotional learning,

4   restorative practices, and readily available mental

5   health supports."

6          Do you see that?

7     A.    Yes.

8     Q.    What do you mean by restorative practices?

9     A.    I believe I defined that also on page 6.

10  Let me take a quick look.  I may not have.

11         No, I did not.

12         So restorative practices is a mechanism --

13  let me say, a set of practices implemented with

14  evidence behind them to support students in restoring

15  relationships with other students or adults in their

16  life.

17         This can include, for example, restorative

18  circles or teaching ways in which, if something has

19  happened between a student and another student, they

20  are able to work through that together, and restore

21  their relationship.  It's a very oversimplified

22  definition of it, but that's the basic idea.



1       Q.      That's okay.  If you got more specific,

2    I'd probably -- no, not fall asleep.  You'd probably

3    lose me.

4              What type of qualifications would someone

5    need to provide restorative practices?

6       A.      They would need -- depending on what kind

7    of support they were providing, they would need

8    professional development and learning, maybe some

9    coaching on that.  Those trainings can -- or

10   professional development sessions can last anywhere

11   from six hours to several days, depending on the type

12   of -- or level or intensity of practices that are

13   being utilized.

14      Q.      Could someone without formal training in

15   psychology -- and by that, I mean at least a degree

16   in psychology or a licensed psychologist.  Could they

17   provide effective restorative practices?

18      A.      Absolutely.

19      Q.      Okay.  In that same sentence, right after

20   restorative practices, one of the effective practices

21   you identify are "readily available mental health

22   supports."  How do you quantify whether mental health

1    supports are readily available?

2         A.    In many of the documents, parents who were

3    not able to receive mental health services or

4    supports through the GNETS program accessed mental

5    health resources and supports in their community,

6    separate from their child's learning environment.

7    That's what I'm referencing.  There's mental health

8    agencies and resources across the State of Georgia.

9         Q.    Are you familiar with the term Community

10   Service Board as it relates to Georgia?

11        A.    I don't think so.

12        Q.    Okay.  Let's --

13        A.    I may have seen a document.

14        Q.    Sure.

15        A.    I don't recall right now.

16        Q.    Let's take a hypothetical student with

17   emotional/behavioral disability.  Let's presume that

18   student's IEP says they need mental health services.

19   The student receives mental health services paid for

20   by Medicaid, but outside the school setting.  If they

21   receive it outside the school setting, is it your

22   professional opinion that that leads to unnecessary



1    segregation in the school?

2        A.    I don't see those as related.

3        Q.    Okay.  Then I think I misunderstood what

4    you were talking about a moment ago, when I asked

5    about how do you quantify or determine what is

6    readily mental health support?

7        A.    I was giving an example of what I saw in

8    some of the documents in which mental health services

9    were not provided in the GNETS program, and which

10   parents sought out mental health services in their

11   community.  So that's what I meant by readily

12   available.

13       Q.    Okay.  So is it your opinion that Georgia,

14   putting aside -- well, is it your opinion that

15   students should be receiving mental health services

16   in schools and not outside of the school?

17           MS. TUCKER:  Object to form.

18   BY MR. BELINFANTE:

19       Q.    If such mental health services would be

20   appropriate to their needs?

21           MS. TUCKER:  The same objection.

22           THE WITNESS:  It is my opinion that



1    students have -- that have behavioral needs based on

2    their disability, that might include the need for

3    mental health supports, should be included in their

4    schooling experience, in order for them to be

5    successful.

6    BY MR. BELINFANTE:

7        Q.    And I'm sorry, I may have misunderstood

8    what you said.  You mean the mental health supports

9    should be included in their schooling experience?

10       A.    Yes.

11       Q.    Okay.

12       A.    When a student has a behavior-related

13   disability, if part of the supports and services that

14   they need to be successful in school is mental health

15   support -- and again, remember, earlier, we talked

16   about how there's a continuum of service provision

17   around mental health supports as well, that they

18   should be able to receive those services and supports

19   in connection with their schooling or learning

20   experience.

21       Q.    Okay.  The same paragraph, right at the

22   end there -- well, I guess not right at the end.  The

1   last set of three sentences.  It begins, "Central to

2   the success of this work is the implementation of

3   effective practices within enabling contexts.

4   Enabling contexts exist in environments where

5   students are not segregated and have fair and equal

6   access to educational opportunities.  This approach

7   will result in significant improvement (including

8   social, academic, behavioral, psychological) in

9   outcomes for the thousands of students currently

10  served in the GNETS program."

11          Do you see that?

12      A.    I do.

13      Q.    So if the state were to adopt your

14  recommended actions on the following pages, is this

15  paragraph saying that that would not work as long as

16  students are in a GNETS program?

17      A.    No.

18          MS. TUCKER:  Object to form.

19  BY MR. BELINFANTE:

20      Q.    What do you mean, then, that it has to

21  happen in an environment where students are not

22  segregated and have fair and equal access to



1    educational opportunities?

2        A.    If you look above at the formula we talked

3    about earlier, that sentence is referencing the

4    formula which talks -- and this is about -- the

5    formula is about national -- years and years of

6    national data on implementation -- systems level

7    implementation of educational and other initiatives.

8            That formula suggests if you put into

9    place effective practices, like we've talked about

10   today, that continuum of supports, and you have

11   effective implementation, we've also talked about

12   that today, like teacher efficacy and fidelity of

13   those effective practices, and you have a context

14   that is enabling to that, meaning that context

15   supports and promotes effective implementation,

16   supports and promotes effective practices, that those

17   three variables are key in resulting in socially

18   significant outcomes in this case for students in the

19   GNETS program.

20           When referencing not segregated, you could

21   say not unnecessarily segregated as part of a

22   statewide systemic system, because that's not an



1    enabling context.  Does that make sense?

2         Q.    I think so.  And I'm going to ask a

3    question, because what I'm struggling with is, it

4    seems like a chicken and egg problem.  In other

5    words, you could do these things, have effective

6    practice, effective implementation, but if there's

7    still students in the GNETS program, will it reach

8    them?  Or does what you're describing apply only in

9    the zoned school to prevent children from having

10   their IEP team recommend GNETS services?  Does that

11   make sense?

12        A.    I understand -- what I understand is that

13   -- or what I think I understand is that whether or

14   not a student is in a segregated setting is not the

15   only determinant of an enabling context.

16             And in the case of the GNETS program, its

17   large-scale systemic segregation, as you said

18   earlier, over 24 regional programs across the state,

19   that systemic part of this equation is what's

20   problematic.  That's what makes it not an enabling

21   condition.

22        Q.    And I should have asked this to start.  It

1    is your opinion that the GNETS program is not an

2    enabling context, correct?

3         A.    Correct.

4         Q.    As you describe it.  Okay.  So for those

5    students in the GNETS program, which you say is not

6    an enabling context, how does this formula reach

7    them, if an enabling context is critical to achieving

8    the socially significant outcomes?

9         A.    An enabling context would offer a system

10   of support that included an array of services that

11   were not based on placement -- putting students in a

12   place as an intervention.  Rather, building a system

13   of support in which students had access to the

14   resources they needed in order to be successful,

15   particularly for students who have behavior-related

16   disabilities.

17        Q.    Okay.

18        A.    It is not -- I'll stop there.

19        Q.    You have described systemic adoption of

20   MTSS as transformational; is that right?

21        A.    Where are you referencing?

22        Q.    I've cheated.  I've read articles and

1    books, so -- do you believe that --

2         A.    Very studious.

3         Q.    Yeah.  Do you believe that if Georgia were

4    to adopt the recommended actions you identify on page

5    163 to 167, it would be transforminal --

6              MS. TUCKER:  Object to form.

7              THE WITNESS:  Transformative?

8    BY MR. BELINFANTE:

9         Q.    Thank you.  I should have taken you up on

10   the offer of Coca-Cola, yeah.

11        A.    Okay.  I think the recommendations

12   included in the report, based upon my experience in

13   implementing these types of supports and services in

14   SEAs in other states, would be an effective way for

15   the state to consider how they might provide services

16   for students with behavior-related disabilities that

17   did not result in unnecessary or inappropriate

18   segregation, and a failure to provide effective

19   educational resources and supports.

20             MS. TUCKER:  I just want to pause.  I did

21   object to that one.  It's not on the record.

22             MR. BELINFANTE:  No objection to the

1    objection.  I'm not saying I agree with the

2    objection.

3              MS. TUCKER:  I understand.

4    BY MR. BELINFANTE:

5        Q.    For the states that you have worked in and

6    have done that, is it your conclusion that there is

7    no unnecessary segregation of students with

8    emotional/behavioral disabilities in those states?

9              And let me clarify it.  By states, I mean

10   the SEA, the Department of Education, not like if you

11   did work for a district in the state.

12       A.    It's an impossible question to answer.

13   You've asked if -- it's -- the magnitude is so great

14   on that question, I can't -- I don't know how to

15   respond.

16       Q.    Okay.  Have you worked with the California

17   Department of Education or school districts within

18   California, or both?

19       A.    Both.

20       Q.    Let me show you what we'll mark as Exhibit

21   8, which is an article, I believe, of yours, as well

22   as others, from 2022.



```
 1                    (McCart Exhibit No. 8 was identified

 2                    for the record.)

 3    BY MR. BELINFANTE:

 4         Q.    Are you familiar with this article?

 5         A.    Yes.

 6         Q.    My questions, at least right now, are

 7    truly just factual, and I want to understand what

 8    California did.  And I'm looking at page 515, using

 9    the pages of the article.

10         A.    Mm-hmm.

11         Q.    It says, in the first paragraph, "In late

12    2015, the California legislature appropriated $10

13    million to be directed to a competition restricted to

14    one or more (in collaboration) with the state's 58

15    County Offices of Education to undertake a four-year

16    statewide scale up of MTSS with a whole child

17    perspective across all grade levels, Assembly Bill

18    104."

19                    Do you see that?

20         A.    Yes.

21         Q.    Are the California County Offices of

22    Education the LEAs in California?
```



1        A.      No.

2        Q.      Okay, what are they?

3        A.      They're county offices.

4        Q.      Okay.  Is an LEA in California, do they

5    extend beyond individual counties?

6        A.      I --

7        Q.      Let me ask it this way.  In Georgia, we

8    have school districts, right?

9        A.      Mm-hmm.

10       Q.      Is a school district the equivalent of a

11   County Office of Education in California?

12       A.      No.

13       Q.      What's the difference?

14       A.      One is a county office of education, maybe

15   similar to a RESA.  I have not looked at that, but

16   just for some sort of context.

17       Q.      Okay.

18       A.      A county office that might provide

19   resources and supports to local education agencies

20   within the state.

21       Q.      Got it, okay.  So a county office of

22   education could be, for example -- you were in Fulton

1    County, Georgia?

2        A.    (Nodding head.)

3        Q.    And in Fulton County, we have the county

4    government, Fulton County Board of Commissions, and

5    then the Fulton County Board of Education, which are

6    just different government agencies.

7        A.    Uh-huh.

8        Q.    Or just presume they are.  But in terms of

9    what you're talking about in the County Offices of

10   Education in California, are they under a county

11   board of education or are they under a county

12   government, like, you know, board of commissioners,

13   so to speak?

14       A.    I would have to look at that.

15       Q.    Okay.

16       A.    I don't recall right now.

17       Q.    Do you know how much of the $10 million --

18   or how many county boards of education received any

19   of the $10 million?

20       A.    No.

21       Q.    The effort -- continuing in the same

22   article, "the effort had the potential to reach more

1    than 1,000 school districts and more than 10,000

2    schools."  Is that effort the one -- the 2015 effort?

3        A.    I'm assuming so from the -- yes, from the

4    article.

5        Q.    Okay.  And then it says, "In 2016, the

6    Governor's budget added $20 million more to the

7    effort.  And in 2018, the legislature appropriated an

8    additional $15 million to the scale-up the project,

9    bringing the total appropriation at that time to $45

10   million and extending the timeline to 2023."

11            To your knowledge, how many school

12   districts in California have scaled-up MTSS, as is

13   described in this paragraph?

14       A.    What I can say is that we were responsible

15   for the implementation of MTSS across every single

16   region within the states through --

17       Q.    I'm sorry to interrupt.  You said within

18   the states?

19       A.    State.  Sorry, state.  Within the state.

20       Q.    Got it.

21       A.    And local education agencies within those

22   regions took up various degrees of implementation of

1    MTSS.

2          Q.    Okay.

3          A.    There was a statewide effort.

4          Q.    But not all LEAs took up all levels of

5    MTSS?

6          A.    No.  I don't know.

7          Q.    Okay.  Could you turn to page 517 of the

8    article.  In the second paragraph, under

9    Implementation Issues, it starts, "At present, MTSS

10   in the US, and to a lesser extent internationally, is

11   clearly in its ascendancy.  In configuration with

12   Universal Design for Learning, it affords schools the

13   opportunity to subsume interrelated services under

14   one overarching umbrella framework."  And I'm

15   skipping the citations.

16          My question is about the next one -- the

17   next sentence.  "That said, however, recent research

18   indicates that the process of installing and

19   implementing MTSS to a criterion of full

20   implementation is proving to be a very difficult

21   undertaking, one that requires extensive professional

22   learning and intensive TA, particularly directed at



1    the local education agency capacity to support the

2    effort at the level of the schools."

3          Do you see that?

4    A.    I do.

5    Q.    This was written in 2022.  Any reason that

6    that conclusion has changed, as you sit here today?

7    A.    No.

8    Q.    What is intensive TA?

9    A.    It's providing professional learning

10   support and coaching, as we've been talking about

11   today, to local education agencies to provide

12   effective supports to schools.

13   Q.    I'm sorry, what does just TA stand for?

14   A.    Technical assistance.

15   Q.    Got it.

16   A.    Helping.  Helping.

17   Q.    Okay.  The study goes on to say, "A study

18   of schools that received intensive TA to install MTSS

19   found only 11% of schools secured a fidelity of full

20   implementation score that exceeded the criterion of

21   80% within four years."

22          Do you see that?



1        A.      I do.

2        Q.      Any reason to disagree with that

3    conclusion today?

4        A.      Any reason to disagree with that

5    conclusion today.

6        Q.      Let me ask another question.  Have you

7    seen a study that has updated those numbers since

8    2022, when this was published?

9        A.      This references a Hicks et al. article

10   that was published in 2017 -- 2017.  I think I might

11   be an author on it as well.  So I might be

12   confounding the issue here, but I don't think there's

13   any reason to disagree with the sentence that is

14   here.

15       Q.      Okay.  Any reason to believe that what you

16   describe here would not be the case in Georgia?

17       A.      You're asking me to pick up the words from

18   this report, or this article and what you've just

19   said, and apply that to the State of Georgia?

20       Q.      I'm asking -- yeah, I'll phrase it this

21   way.  Any reason to believe that the process of

22   installing and implementing MTSS to a criterion of



1   full implementation would be something other than

2   very difficult in the State of Georgia?

3        A.    I don't know --

4        Q.    Okay.

5        A.    -- whether or not that would be very

6   difficult.  As I've outlined in the recommendations,

7   it requires a commitment, and I can't remember the

8   exact wording, but an investment.  That was the word.

9   Investment of -- and a belief that MTSS is an

10  effective strategy for providing supports.  And then

11  having the state outline the vision and guidance for

12  that implementation across the state.

13       Q.    Okay.  I understand.

14       A.    That journey for Georgia is unique to

15  Georgia.

16       Q.    But is there any reason to believe -- I

17  understand it's unique to Georgia, but is there any

18  reason to believe that it would be any easier to

19  fully implement MTSS at the LEA level in Georgia than

20  Mr. Choi, and perhaps you as well, in this 2019

21  article -- I don't know if you were part of the et

22  al. -- concluded.



 1                MS. TUCKER:  Object to form.

 2                THE WITNESS:  Can you say that again?

 3    BY MR. BELINFANTE:

 4        Q.    Sure.  And I got lost in citing the

 5    article.

 6        A.    Go ahead.

 7        Q.    Is there any reason to believe that the

 8    conclusions that were found in that 2019 Choi

 9    article, that it would be easier to implement and

10    install MTSS to a full criterion in Georgia than was

11    the experience in that article?

12        A.    From an SEA perspective?

13        Q.    From an LEA perspective.  Because

14    ultimately, it's the LEAs that are implementing this,

15    correct?

16        A.    This is a statewide effort of

17    implementation, statewide scale-up of MTSS.  And I

18    believe this is a reference to how LEAs responded to

19    the statewide direction, guidance, and vision for

20    implementing MTSS.

21        Q.    Okay.

22        A.    And so how -- the sheer magnitude of the

1    State of California and the number of students, the

2    number of districts, the number of regions, the

3    number of counties, the number of schools certainly

4    contribute to the complexity of implementation like a

5    State of California.  How that would play out in

6    Georgia is yet to be seen.

7        Q.    Okay.  Again, this is truly a factual

8    question.  Page 522 of the article talks about

9    schools participating in the CAMTSS and SWIFT-FIA.

10       A.    Show me where you're at.

11       Q.    The bottom, where it says, "Participants."

12       A.    522?

13       Q.    522.  Is that where the appropriations

14   that we talked about that are discussed on page 515

15   of the article --

16       A.    No.

17       Q.    Something totally different?

18       A.    What this -- you're talking about the --

19   well, I interrupted you.  Why don't you go ahead and

20   ask your --

21       Q.    I think you answered the question.  I was

22   trying to understand if there was a link between the

1    two.

2        A.    The dollars and the FIA?

3        Q.    Correct.

4        A.    Okay, there is no linkage there.

5        Q.    Okay.

6        A.    The FIA is an example, you asked earlier,

7    of a fidelity measure for implementation of a system

8    of support.  And the FIA is another one of those.

9        Q.    Okay.  Got it.  We can put that one away.

10   Let me show you what we'll mark as Exhibit 9.

11              (McCart Exhibit No. 9 was identified

12              for the record.)

13   BY MR. BELINFANTE:

14       Q.    And this is an older article, one from

15   2014, you wrote with -- is it Dr. Sailor?

16       A.    Yes.

17       Q.    Okay, with Dr. Sailor.

18       A.    Mm-hmm.

19       Q.    My question is about -- this is right at

20   the time, I believe -- at or around the time that

21   SWIFT received the $24.5 million grant?

22       A.    Two years after.

1        Q.    Two years after?

2        A.    Mm-hmm.

3        Q.    And it was at that time, in the first

4   paragraph, you note that "federal data sources

5   indicate percentages of students served" --

6        A.    Hang on.

7        Q.    Sure.

8        A.    Where are we at?

9        Q.    First paragraph under the

10  Kleinhammer-Tramill, Burrello, and Sailor quote.

11       A.    Uh-huh.  I'm with you, "Federal data

12  sources" --

13       Q.    -- "increased percentages of students

14  served under the Individuals With Disabilities

15  Education Improvement Act (IDEA) 80% or more of the

16  time in the general education classroom, but most of

17  the variance is associated with students who require

18  fewer support needs, while remaining dismal for those

19  with more needs," citing McLeskey and others' article

20  in 2012.

21       A.    Yes.

22       Q.    Has that distinction remained today in

1    2023, where there's greater variance with students

2    who require fewer supports and -- from those who have

3    more needs?

4        A.    Variance of what kind of supports?

5        Q.    Variance in -- for two different

6    populations, right?  The students who require fewer

7    supports, and those who have more needs.  As I

8    understand your description of the federal data,

9    students who are spending 80 percent or more time in

10   general education, if they have fewer needs, that

11   number has varied.

12           But students who have, in the words of the

13   article, more needs, that number had remained low or

14   dismal.  My question is, has that changed since 2012,

15   based on -- and I'm citing 2012, because that's the

16   article cited.

17       A.    Mm-hmm.  This citation is from James

18   McLeskey and others, and how they describe students

19   with more or less needs.  And again, not to be

20   challenging, but rather just for clarity, how you

21   determine student need is varied, based on the source

22   of data that they're utilizing to make this decision.



1              So it's hard for me to say whether or not

2    the fact that was stated in 2012 by James McLeskey is

3    the same today.

4         Q.    Okay.

5         A.    Without knowing a little bit more.

6         Q.    Okay.  If I wanted to find data on that,

7    because I know we've talked about, there was a report

8    to Congress from U.S. DOE Special -- Office of

9    Special Education.  Where would I look to find that

10   most recent data?

11        A.    You could find that data in likely some of

12   the documents considered here.

13        Q.    Okay.

14        A.    In the list of materials.  I can't recall

15   the name.  Again, if it was morning, maybe I could.

16        Q.    Okay.

17              MR. BELINFANTE:  All right.  Why don't we

18   do this.  If we could take another ten-minute break.

19   This is my -- I can start to close things up, which

20   does not mean expect only 15 minutes left.

21              THE VIDEOGRAPHER:  Off the record at

22   17:07.

 1              (Recess.)

 2              THE VIDEOGRAPHER:  On the record at 17:22.

 3    BY MR. BELINFANTE:

 4        Q.    Dr. McCart, I'm going to show you another

 5    one of your articles from 2020, which we'll mark as

 6    Exhibit 10.

 7                    (McCart Exhibit No. 10 was identified

 8                    for the record.)

 9    BY MR. BELINFANTE:

10        Q.    Do you recall this article?

11        A.    Yes.

12        Q.    Okay.  In the abstract, the first couple

13    sentences say, "Inclusive educational practices are

14    rooted in a body of research indicating that when

15    students in need of support through special education

16    are meaningfully included in schools, academic and

17    social outcomes improve for all students.  To realize

18    this promise of better outcomes, traditional schools

19    with separate classrooms and even schools designated

20    to exclusively serve various learner subgroups (e.g.,

21    students identified for special education) will

22    require reorganized systems, structures, and

1    resources."

2            Do you see that?

3      A.    Yes.

4      Q.    Any reason why that would not apply to the

5    State of Georgia?

6            MS. TUCKER:  Object to form.

7            THE WITNESS:  As a researcher, it's

8    difficult to pick up words that were written a while

9    ago, and apply them to a separate context.

10   BY MR. BELINFANTE:

11     Q.    You're articulating here a general rule,

12   though, that better outcomes -- to achieve better

13   outcomes, "schools designated to exclusively serve

14   various learner subgroups (e.g., students identified

15   for special education) will require reorganized

16   systems, structures, and resources."  That's what

17   you're applying as a general rule, correct?

18           MS. TUCKER:  Object to form.

19           THE WITNESS:  What is written here is a

20   sentence to introduce the concept of the -- what

21   occurs in the article.  To take a sentence written

22   many years ago, and just apply it wherever, however,

1    is not something I feel comfortable doing.  But if

2    you want to ask something more specifically.

3    BY MR. BELINFANTE:

4        Q.    Do you believe that in order to increase

5    better outcomes in Georgia, "schools designated to

6    exclusively serve various learner subgroups (e.g.,

7    students identified for special education) will

8    require reorganized systems, structures, and

9    resources"?

10       A.    I believe that the GNETS program, which is

11   currently operating as a segregated program, will

12   need to implement the recommendations that I have in

13   the report, which include implementations of more

14   effective systems, structures, and resources, yes.

15       Q.    And it will require not a reorganization

16   of existing systems; is that right?

17       A.    What -- again, you're asking me to pull a

18   word out of an article written many years ago before

19   I was even involved in this case.  And so again,

20   would there be any reorganization that might occur as

21   determined by the state, based on my recommendations?

22   That would be entirely up to the state.



1        Q.    Did you write the abstract?

2        A.    I do not recall.

3        Q.    Okay.  Do you approve the abstract or do

4    you know if it's written by the journal?

5        A.    The abstract, in almost all cases in

6    education, is written by the authors.

7        Q.    By the authors, okay.  So you stand behind

8    at least, then, the statement that we've talked about

9    and read now a couple times?

10        A.    As it relates to this article.

11        Q.    As it relates to the article?  Okay.  As

12    you sit here today, any reason to believe this

13    statement that you have articulated would not apply

14    to the State of Georgia?

15        A.    I can't apply this to the State of

16    Georgia.

17        Q.    On the next page, page 9 of the article,

18    one, two, three -- the third full paragraph, the last

19    sentence starts, "Further, despite a long history of

20    federal lawsuits, Supreme Court decisions, and U.S.

21    Department of Education policy imperatives and a

22    preponderance of research evidence challenging the

1    utility of segregated places, widespread categorical

2    segregation of students identified for special

3    education continues to this day."

4              Do you see that?

5        A.    I was behind you in finding it.  Where did

6    it start?

7        Q.    I'm sorry.  "Further," and the word

8    "further" is all the way on the right, in the third

9    full paragraph.  It's the last sentence.

10       A.    Okay, sorry.  I can read it now.

11       Q.    Just let me know when you're done.

12       A.    Okay, I've read it.

13       Q.    Do you believe that was accurate as of

14   2020?

15       A.    This cites a report from the National

16   Center of Education Statistics in 2017.

17       Q.    Mm-hmm.

18       A.    So.

19       Q.    But it's in your 2020 article.

20       A.    Yeah, the publication process takes a

21   while.

22       Q.    Sure.

1          A.      And you can cite different time periods,

2    but the statement that is above is related to the

3    2017 reference.

4          Q.      All right.  Continuing to the next

5    paragraph, the first two sentences read, "Recent data

6    suggest some progress is evident in providing greater

7    access to a general education curriculum for students

8    considered to have high incidence or 'mild and/or

9    moderate' disabilities," skipping the citation.

10   "However, for students considered to have low

11   incidence, or 'severe' disabilities, few

12   opportunities exist to learn from the general

13   education curriculum alongside non-disabled peers,"

14   citing a Kurth article from 2014 and the NCES article

15   -- or study from 2017.

16              Do you see that?

17         A.      I do.

18         Q.      Okay.  And that was accurate at the time

19   that this was submitted for publication?

20         A.      Yes.

21         Q.      Okay.  Starting on page 10.

22         A.      I'm going to -- let me pause for a second.

1    Q.    Sure.

2    A.    I don't want my tiredness to have me short

3    cut my reflection on the question you asked.  And I

4    think you asked whether or not that statement was

5    true as it was stated and referenced in 2017.

6    Q.    Well, I said at the time of publication --

7    or at the time that it was submitted to publication.

8    A.    I think there are elements of that

9    statement that are true.  Meaning that -- and let me

10   clarify.  Meaning that the relevance of high

11   incidence and/or mild or moderate disabilities, as

12   compared to low incidence or more significant

13   disabilities, sometimes there are distinctions made

14   in how those students are provided supports in

15   general education curriculum.  And in that way, this

16   statement is correct.

17   Q.    Are you aware of any reports that further

18   update the findings of Kurth, Morningstar, and

19   Kozleski from 2014, or the NCES from 2017?

20   A.    I would have to look.

21   Q.    Okay.  Could we turn to page 10?  Have you

22   concluded --



1      A.      Mm-hmm.

2      Q.      Okay.  The first sentence on page 10

3  reads, "Much of the somewhat contentious discourse

4  around least restrictive environment has been linked

5  to the term 'inclusion.'"

6              Do you see that?

7      A.      Yes.

8      Q.      What did you mean by contentious

9  discourse?

10      A.      Although typically it is difficult to

11  identify who might have said what in any given

12  article, I can absolutely affirm that my colleague,

13  Dr. Sailor, made this statement.  And I'm not sure

14  what he meant about the contentious discourse.

15      Q.      Okay.  But your name is on here with it,

16  correct?

17      A.      Yes, it is.

18      Q.      So presumably, you would agree with that;

19  is that right?

20      A.      No.

21      Q.      You don't agree with the statement --

22              MS. TUCKER:  Object to form.

1   BY MR. BELINFANTE:

2        Q.      -- in the first sentence on page 10?

3        A.      What I said was, I don't know what he

4   meant by the contentious discourse statement, and as

5   it relates to inclusion, which is what I thought you

6   were asking me.

7        Q.      That's fair.

8        A.      Okay.

9        Q.      Do you agree with the statement that "Much

10  of the somewhat contentious discourse around least

11  restrictive environment has been linked to the term

12  'inclusion'"?

13       A.      Since I'm not sure what he means by

14  contentious discourse, I can't say that I agree with

15  this statement.

16       Q.      Dr. McCart, do you normally put out

17  journal articles with your name, where you disagree

18  with statements in the journal?

19       A.      No.

20       Q.      The last sentence, first paragraph says,

21  "The inclusion movement, while making progress with

22  students labeled as having mild or moderate



1    disabilities, has been largely unsuccessful with

2    students labeled as having 'severe' disabilities."

3            Do you see that?

4        A.    No, I didn't see where you were.

5        Q.    Last sentence, the same paragraph, the

6    first paragraph on page 10.

7        A.    Did you say it started "with these

8    approaches"?

9        Q.    "The inclusion movement."

10       A.    I need help.

11            MS. TUCKER:  Can I point it out to her?

12            MR. BELINFANTE:  Of course.

13            MS. TUCKER:  That's where I did that.

14            THE WITNESS:  Yes.

15    BY MR. BELINFANTE:

16       Q.    Is it a fair reading that in 2020 -- at or

17    around the time of 2020, when this was submitted for

18    publication, the inclusion movement had been largely

19    unsuccessful for students labeled as having severe

20    disabilities?

21       A.    "The inclusion movement, while making

22    progress with students labeled as having mild or



1  moderate disabilities, has been largely unsuccessful

2  with students labeled as having 'severe'

3  disabilities."

4         If you're asking me, do I agree with the

5  fact that Kurth, who cited that, has that belief, I

6  do.

7     Q.    Do you have that belief, or did you in

8  2020 when this was published?

9     A.    That students with more significant

10  disabilities have had more difficulties regarding

11  being included?

12     Q.    At or around the time that you submitted

13  this article for publication, did you agree with the

14  statement that the inclusion movement, while making

15  progress with students labeled as having mild or

16  moderate disabilities, has been largely unsuccessful

17  with students labeled as having severe disabilities?

18     A.    Forgive my pausing, as we are near the end

19  of the day.  And the preparation and writing of this

20  article occurred likely in 2018.  And you're asking

21  me, back at that time, if I felt or agreed with this

22  perspective.  And it's a lot to remember and a lot to



1    recall, so that's the pause here.

2           When you publish an article with

3    coauthors, there's a bit of a negotiation around the

4    language that occurs.  And so it would be difficult

5    for me to suggest that the inclusion movement, per

6    se, has been largely unsuccessful.  Certainly there

7    is more work to be done, so that students could

8    access general education curriculum.  How that

9    relates to the GNETS case, I'm not sure.

10      Q.    Has the inclusion movement been largely

11    unsuccessful for students labeled as having severe

12    disabilities?

13      A.    I just answered that.

14      Q.    You said it has been largely -- you can't

15    say it's been largely unsuccessful overall, or you

16    didn't have the limitation about students with severe

17    disabilities.  So my question is about, has the

18    inclusion movement been largely unsuccessful for

19    students labeled as having severe disabilities?

20      A.    I think how I might rephrase that is, the

21    inclusion movement, in general, has been difficult

22    for students having disabilities, including those



1    with severe disabilities.

2         Q.    Okay.  Do you consider yourself part of

3    the inclusion movement?

4         A.    No.

5         Q.    When you said in your report that you want

6    teachers -- and this is on page 161, that your hope

7    that "educators within the GNETS program will embrace

8    the recommendations and see themselves as part of a

9    movement toward better support themselves

10   professionally and better outcomes for students with

11   behavior-related disabilities."  Do you consider

12   them -- are you hoping that they will see themselves

13   as part of the inclusion movement?

14        A.    No.

15        Q.    What is the inclusion movement as defined

16   in your article from 2020 with coauthors Choi and

17   Sailor?

18        A.    I would have to look and see what, again,

19   they're referencing.  But they're referencing a Kurth

20   article in 2014.  I can say that what I'm referencing

21   in the GNETS report related to students in the GNETS

22   program is not about an inclusion movement.



1         Q.    Page 11 of the same article, the second

2    full paragraph beginning, "We argue."  "We argue that

3    the time has come, through the advent of

4    whole-school, equity-based inclusive MTSS, to replace

5    the medical model construct of disability with a

6    human capability construct that reflects the

7    significant contribution of the learning ecology to

8    individual students' response to instruction."

9              Do you see that?

10        A.    Yes.

11        Q.    Is that like what we were talking about

12   before, in terms of having -- where someone has a

13   particular diagnosis, i.e., autism, and then they get

14   a panoply or a series of services based on that

15   diagnosis?  Is that what that's referencing here?

16        A.    In part.

17        Q.    Okay.

18        A.    It's larger than that, but you're in the

19   same zone.

20        Q.    All right.  Is it your professional

21   opinion that Georgia local education agencies employ

22   a medical model construct of disability?



1        A.     No.

2        Q.     I wish I could -- what was the phrase we

3   used --

4               THE VIDEOGRAPHER:  I don't want to

5   interrupt your flow, sorry.  Could you raise your mic

6   a little bit?

7               MR. BELINFANTE:  It would be helpful if I

8   put it on, right?  Thank you.

9               THE VIDEOGRAPHER:  Thank you.

10  BY MR. BELINFANTE:

11       Q.     Do you recall the phrase that that was

12  that we talked about?

13              MS. TUCKER:  Object to form.

14  BY MR. BELINFANTE:

15       Q.     Categorical service delivery.  Is that it?

16       A.     Non-categorical service.

17       Q.     Non-categorical service delivery.  Is it

18  your professional opinion that Georgia employs --

19  Georgia's LEAs provide a categorical service delivery

20  system?

21       A.     No.

22       Q.     Is it your opinion that Georgia LEAs

1   employ a human capability construct that reflects the

2   significant contribution of the learning ecology to

3   individual students' response to instruction?

4        A.    You're making a lot of leaps from an

5   article, and again, published in 2020, written

6   several years before about what kind of services and

7   supports are in place in the State of Georgia.  And

8   I'm having trouble trying to, again, draw the line

9   between what you're asking.

10       Q.    Did Georgia IEP teams, in your review of

11  them, tend to employ what I'll refer to as the

12  medical model, as described here on page 11, or as we

13  talked about earlier, the -- I'll get there --

14  categorical service delivery model?

15       A.    IEP teams -- based on the IEP -- IEPs that

16  I reviewed, employed a variety of interventions and

17  supports, some of which may be more closely aligned

18  with a medical model, some which may be more closely

19  aligned with a human capability construct.

20       Q.    Okay.  So there's variety within the IEP

21  team -- or IEP reports you reviewed, is that fair?

22       A.    Yes.



1      Q.      So that would, then, lean to indicate that

2  the Georgia Department of Education is not dictating

3  the model that the IEP team should use, correct?

4          MS. TUCKER:  Object to form.

5          THE WITNESS:  No.

6  BY MR. BELINFANTE:

7      Q.      Well, if there's variety, then what is the

8  Georgia Department of Education doing to cause either

9  an IEP team to adopt either a medical construct or a

10  human capability construct?

11      A.      That leads back to the issue we discussed

12  earlier about systemic segregation.  And when a

13  systemic model of segregation is in place, the use of

14  categorical service delivery is more likely to be

15  prevalent.

16          So by supporting -- perpetuating funding

17  the GNETS program, as I have seen it and evaluated it

18  in my report, that is how the state is implementing

19  categorical service delivery options.

20      Q.      But it's really not implementing it if

21  some of the IEP teams are adopting something very

22  counter to that, correct?

1      A.      IEP teams can only implement what is

2    available.

3      Q.      And so if the Department of Education were

4    imposing systemic segregation, how are teams -- IEP

5    teams adopting a human capability construct approach?

6            MS. TUCKER:   Object to form.

7            THE WITNESS:   An IEP team can look at an

8    individual student and implement a strategy that is

9    focused on human capabilities.

10           For example, an IEP team might say, the

11    student who has autism needs support in order to be

12    able to communicate.  The IEP team all agrees.  It's

13    a human capability approach to establishing a goal or

14    an intervention for a student who has a

15    behavior-related disability.

16           The ability to implement that depends on

17    the context, the proximity, and the opportunity of

18    that student to be able to access that system of

19    communication.  And, for example, in the GNETS

20    program, again, which is unnecessarily systemically

21    segregating, there are no effective communication

22    systems in place for students with behavior-related



1    disabilities, for students with autism in all of the

2    sites that I went to.

3              So an IEP team can say, hey, it would be a

4    good idea for us to put a communication system in

5    place to help this student.  Everybody agrees.  The

6    only place the student can go is GNETS, because

7    that's all we've got.  So they send the kid to

8    GNETS -- the child to GNETS.  And the system can't be

9    implemented because there's no communication system.

10         Q.    How would an IEP team recommend GNETS if

11   there's not the service that they're recommending

12   there?  Are you saying that they send them to GNETS,

13   but there's not the service there.  So if they've

14   identified the service, and they recommend placement

15   in GNETS, putting aside placement if that's the right

16   term, but -- and the service isn't there, hasn't the

17   IEP team failed to identify the service and recommend

18   placement that achieves that service?

19              MS. TUCKER:  Object to form.

20              THE WITNESS:  You're asking me to state

21   whether or not an IEP team has failed because the

22   large-scale segregation system that's in place within



1    the state does not offer and provide effective

2    individualized strategies, consistent with what's

3    available to students with disabilities in general

4    education environments.

5    BY MR. BELINFANTE:

6        Q.    No.  Because if that's what I was asking,

7    then they would have the service available in the

8    general education environment.  You keep saying

9    large-scale systemic discrimination, and I still

10   can't identify what the IEP team is doing based on a

11   decision or an affirmative act of the Georgia

12   Department of Education.

13           So we first talked about the hypothetical

14   where the student has autism, and needs speech or

15   communication services.  They're referred to GNETS.

16   You stated that GNETS does not have communication

17   services for students with autism.  Am I right so

18   far?

19       A.    Mm-hmm.

20           MS. TUCKER:  Object to form.

21           THE WITNESS:  Oh.

22   BY MR. BELINFANTE:



1          Q.     So an IEP team that recommended that

2    student with autism to GNETS for communications

3    services would not be recommending a placement that

4    provides a FAPE for that student, would they?

5               MS. TUCKER:   Same objection.

6               THE WITNESS:   I'm not sure you're

7    understanding the construct of what a large-scale

8    systemic system of segregation can do to service

9    provision within a state.

10              And so an IEP team may meet and make a

11   decision in the hopes that a communication strategy

12   or program could be put in place for a student with

13   autism.

14              But in reality, that system is not put in

15   place, and that's, again, because it is not an

16   enabling context.   It's not fair and appropriate.

17   There aren't the same resources, supports,

18   interventions that are in place in general education

19   environments, even for students with disabilities --

20   behavior-related disabilities in those environments.

21   BY MR. BELINFANTE:

22          Q.     Is it your understanding and opinion that

1    a student in Georgia can get services in their

2    general education -- or general zoned school, and the

3    IEP team recommends them to GNETS anyway?

4        A.    I don't know why that would be the case.

5        Q.    And -- well, okay.  I don't, either, so I

6    guess we're in agreement there.

7        A.    Are we?

8        Q.    I think so.

9        A.    I don't.

10        Q.    Well, then tell me why an IEP team would

11    come to a conclusion that an autistic student needs

12    communication services, the zoned school offers

13    communication services, and the IEP team recommends

14    the student for GNETS.

15        A.    The GNETS program purports that it

16    provides behavioral and therapeutic supports and

17    services for students who have behavior-related

18    disabilities.  The IEP team, like, it's supposed to

19    be the service provision mechanism for students who

20    have behavior-related disabilities.

21            So the IEP team might make the assumption

22    that the GNETS program, given their behavioral

1    therapeutic system of support, could provide a system

2    of communication as indicated as part of the

3    student's IEP, when, in fact, in reality, those

4    services and supports are not occurring.

5        Q.    Isn't the responsibility of the IEP team

6    to look at the reality and not make assumptions?

7            MS. TUCKER:  Object to form.

8    BY MR. BELINFANTE:

9        Q.    In order to make sure that a student is

10   provided with a FAPE?

11       A.    I don't know.  I don't know what you're

12   asking, I should say.

13       Q.    Well, you said the IEP team assumes that

14   something will be provided at GNETS.  My question is,

15   shouldn't they be making -- not assuming things, but

16   base it on what you've referred to as the reality?

17       A.    You're asking, should the IEP team go or

18   something?

19       Q.    I'm saying should the IEP team make its

20   decisions based on assumptions or based on what

21   you're describing as the reality of GNETS?

22       A.    The IEP team is making their decisions

1    based on what they have been told by the state as

2    being provided as part of the system of education.

3        Q.    Okay.  Show me in Appendix E, amended,

4    where the state has told the IEP team anything about

5    GNETS.

6            MS. TUCKER:  Object to form.

7    BY MR. BELINFANTE:

8        Q.    Where has the state told an IEP team about

9    GNETS?

10           MS. TUCKER:  The same objection.

11           THE WITNESS:  I'm looking at the GNETS

12   rule, page 4.  Your copy is Exhibit 7.

13   BY MR. BELINFANTE:

14       Q.    Sure.

15       A.    That talks about the SEA shall.  "The SEA

16   shall:" -- looking under 5, Duties and

17   Responsibilities.  "The SEA shall:" (A), looking at

18   number iii, "Monitor GNETS to ensure compliance with

19   federal and state policies, procedures, rules, and

20   the delivery of appropriate instructional and

21   therapeutic services."

22           That's one place, from my perspective,

1    that I believe it states that.

2        Q.    This is the document where you believe

3    that the state is communicating to IEP teams that

4    they need to send someone to GNETS?

5        A.    No.

6        Q.    Okay, that was my question.

7        A.    You asked what -- could I point to one

8    document in which the state made a recommendation

9    about whether or not IEPs -- the IEP team should or

10   could be involved.

11       Q.    And your answer is (5)(a)(iii) that begins

12   with "Monitor"?

13       A.    "The SEA shall:  Monitor GNETS to ensure

14   compliance with federal and state policies,

15   procedures, rules, and the delivery of appropriate

16   instructional and therapeutic services" as it relates

17   to students within the GNETS program who have

18   behavior-related disabilities.  That's one place.

19       Q.    Where is the others?  I mean, did you see

20   an email where the state said, this person needs to

21   go to GNETS?  Did you see an IEP file where the state

22   DOE said, this person needs to go to GNETS, anything



1     like that?

2          A.    You're asking if I saw any documents that

3     discussed whether or not students should go to the

4     GNETS program?

5          Q.    From the State Department of Education to

6     an IEP team.

7          A.    I do not recall right now.  I would have

8     to review the documents again to answer that.

9          Q.    And you agree with me that the rule on

10    page 3, paragraph (4)(a) says, "The IEP team must

11    determine that GNETS services are necessary for

12    students to receive FAPE"?

13             MS. TUCKER:  Object to form.

14    BY MR. BELINFANTE:

15         Q.    Do you see that?

16         A.    No, I don't know where you are.

17         Q.    Page 3, paragraph (4)(a), first sentence.

18             MS. TUCKER:  On page 3.

19             THE WITNESS:  Page 3, (4)(a).  Mm-hmm.

20    BY MR. BELINFANTE:

21         Q.    Okay?

22         A.    Yes, I see where you are at.

1       Q.    So the IEP team is -- in order to have

2   GNETS services, the IEP team has to determine "that

3   GNETS services are necessary for the student to

4   receive FAPE."  Do you see that?

5       A.    Mm-hmm.  Yes, I do see that.

6       Q.    So if an IEP team determines that -- and I

7   realize I'm now asking you a different question than

8   I just did -- and the state says, no, you can't send

9   that child to GNETS, the state would be disagreeing

10   with the IEP team on what is necessary to receive

11   FAPE.  Isn't that correct?

12       A.    If you go two bullets down, "The GNETS

13   continuum of services."

14       Q.    Mm-hmm.

15       A.    Established by the state talks about the

16   types of services available within the GNETS program

17   for IEP teams to consider when thinking about

18   placement in the GNETS program for student IEP teams.

19       Q.    What is the basis of your statement that

20   the GNETS continuum of services is, quote, provided

21   by the state?

22       MS. TUCKER:  Object to form.

1              THE WITNESS:  Can you ask the question

2      again?

3      BY MR. BELINFANTE:

4          Q.    Sure.  What is the basis of your statement

5      made just a moment ago that GNETS "continuum of

6      services" is provided by the state?

7          A.    That the title of this document, Title

8      160.  Rules of the Georgia Department of Education,

9      Chapter 160-4-7, Special Education.  That is my --

10     that's why I have that perspective.

11         Q.    Okay.  We talked earlier about your book

12     and that of others.  Actually, before we get there,

13     what is the National Center on Inclusion Toward

14     Rightful Presence?

15         A.    Sir?

16         Q.    Yes.

17         A.    How much time is left?

18         Q.    I'm not sure.

19         A.    Can we ask?

20             THE VIDEOGRAPHER:  About -- at 18:24,

21     you'll be at seven -- seven hours.

22     BY MR. BELINFANTE:

1      Q.    It's about 24 minutes left.

2      A.    24 minutes left?

3            MR. BELINFANTE:  Is that correct?

4            THE VIDEOGRAPHER:  Yes.

5            MR. BELINFANTE:  All right.

6            THE WITNESS:  Okay.

7   BY MR. BELINFANTE:

8      Q.    Are you familiar with the National Center

9   on Inclusion Toward Rightful Presence?

10     A.    I am.

11     Q.    Is there any recommendation in your report

12  that is coming from, or consistent with the National

13  Center on Inclusion Toward Rightful Presence?

14     A.    I see you're looking at a document.  Are

15  you referencing that document?

16     Q.    No, I'm asking right now if there's any --

17  I haven't yet, so I'm just asking right now, is there

18  anything in your report that stems from the National

19  Center on Inclusion Toward Rightful Presence?

20     A.    No.

21     Q.    Okay.  Let's talk about your book, Build

22  Equity, Join Justice.  If we can mark this Exhibit

1    11.

2                    (McCart Exhibit No. 11 was identified

3                    for the record.)

4              THE WITNESS:  I'm not finding --

5              MS. TUCKER:  We'll worry about that later.

6    BY MR. BELINFANTE:

7       Q.    What don't we try to do here, just for the

8    ease of record, is put the cover page, and then there

9    will be specific pages behind.  So there's not a

10   question about the source of the document.  And I've

11   got a copy of it with me if we need to check it,

12   but --

13      A.    You've got a copy of the book?

14      Q.    Yes.  I hope you get royalties from the

15   articles, too.  Page 1, which is in this Exhibit

16   Number 11.

17      A.    Mm-hmm.

18      Q.    Talks about, at the beginning of the book,

19   "There is confusion, there is sadness, and there is a

20   restlessness.  Mental health services are being

21   stretched to the limit as our country, grappling with

22   economic instability, political unrest, and a violent

1    scourge of deadly school shootings, searches for the

2    answers.  Within this storm of uncertainty, and in

3    direct response to it, we call for sweeping systems

4    change in education."

5            Do you see that?

6    A.    I do.

7    Q.    This book was published when?  I need to

8    look.  Here it is.

9    A.    And tabbed.

10   Q.    This book was published, copyright 2023,

11   so this year.  Does that sound right?

12   A.    Yes.

13   Q.    So is that statement still true?

14   A.    Yes.

15   Q.    That mental health services are being

16   stretched -- I'm sorry, you said yes?

17   A.    Yes.

18   Q.    Okay, perfect.  Then I don't have to keep

19   going.

20           Also true, then, that our system of

21   education is strained, our teachers and school

22   leaders are exhausted.

1         A.     Yes.

2         Q.     Let's look at page 71 of the book, which

3    we'll mark as Exhibit 12.

4         A.     Are we done with this one?

5         Q.     Yes.  And some of these do not get the

6    page printed on them, but again, if we want to check

7    it, the book's here.

8                (McCart Exhibit No. 12 was identified

9                for the record.)

10   BY MR. BELINFANTE:

11        Q.     My question here, because this is 2023, is

12   in the third full paragraph.  It begins with the

13   sentence, "To be clear, putting MTSS in place in a

14   school is not easy."

15               Do you see that?

16        A.     I do.

17        Q.     Do you still agree with that statement,

18   sitting here today?

19        A.     Yes.

20        Q.     The last sentence of that paragraph reads,

21   "This system differs so substantially from

22   traditional models of school that it requires

1   organizing and adopting new practices, which means it

2   takes time to install and implement with measurable

3   fidelity."

4           Do you see that?

5       A.    I do see that.

6       Q.    Agree with that, sitting here today?

7       A.    Yes.  To be clear, when it says, "This

8   system," it may or may not -- may or may not be

9   referencing just MTSS.  I would need to see the other

10  parts of this to know for sure what it's referencing.

11      Q.    Well, that whole paragraph only talks

12  about MTSS, right?

13      A.    Yes, but this whole book talks about a lot

14  more.  And I don't know if this sentence is about the

15  book or if it's about MTSS.

16      Q.    What would help you answer that question?

17      A.    The book.

18      Q.    Unfortunately, as you know, we're running

19  short on time for that.  Let's look at page 110 of

20  the book, which we'll mark as Exhibit 13.

21              (McCart Exhibit No. 13 was identified

22              for the record.)



1    BY MR. BELINFANTE:

2        Q.    Page 110 is in the Chapter 5, Leading With

3    Equity.  The first full paragraph beginning, "Popular

4    feel-good stories about 'principal heroes' who turn

5    around struggling schools in a year do a great

6    disservice to educators.  The reality is that an

7    average school transformation process requires five

8    to seven years to complete," citing Fullan from 2001.

9            What is the transformation process you're

10   talking about there, do you know?

11       A.    I'm not sure what Fullan is referencing,

12   but my guess -- and I shouldn't guess, but it is just

13   a guess, that he is referencing transformation in

14   California schools.  That can mean anything from

15   implementation of PBIS strategies in broad measure

16   within a school.  It can mean implementation of MTSS.

17   It might mean implementation of a new curriculum.

18   Any educational initiative.

19       Q.    Okay.  Did you look at the rates of

20   principal turnover in Georgia as part of your

21   analysis?

22       A.    For general education --



1        Q.    Yes.

2        A.    -- schools?

3        Q.    Yes.

4        A.    No.

5        Q.    Okay.  In the context of your book, Build

6   Equity, Join Justice, the phrase "equity leader"

7   appears.

8        A.    Mm-hmm.

9        Q.    What is an equity leader?

10       A.    I would need the book to articulate that

11  at this time of day.

12       Q.    Okay.  Fair enough.

13       A.    Just to be honest.

14       Q.    I appreciate the honesty.

15       A.    I'm sorry.

16       Q.    That's fair.  Let me go ahead and mark

17  this anyway, Exhibit 14.

18                  (McCart Exhibit No. 14 was identified

19                   for the record.)

20  BY MR. BELINFANTE:

21       Q.    I think we have just looked at 110.  This

22  is page 111.  And the first full paragraph starts,

1   "The list of topics to be addressed as an equity

2   leader is long, and these ways of thinking and being

3   require a great deal of work to make equity happen."

4           Is it your recommendations in your report,

5   do they require equity leaders as described here on

6   page 111?

7        A.    No.

8        Q.    Okay.  It continues, "Based on our work

9   with leaders from varied backgrounds all over the

10  United States, equity leaders who embrace MTSS for

11  development of the structural elements of the school

12  are able to give their attention to the important

13  relational factors that are at the heart of an equity

14  ecosystem."

15          Do you see that?

16       A.    Did you start with, "Based on our work"?

17       Q.    I did, yes, ma'am.

18       A.    Yes, I see that.

19       Q.    Okay.  Is your report recommending MTSS

20  for development of the structural elements of the

21  school?

22       A.    My -- you're asking is my report?



1          Q.     Yes.

2          A.     My report is recommending building state

3   capacity regarding guidance, vision, and

4   implementation for -- implementation of MTSS or a

5   system of support.

6          Q.     What is the vision that you're

7   recommending the State Department of Education adopt?

8          A.     That vision is included -- if you'll allow

9   me a moment.

10         Q.     Sure, take your time.

11         A.     My vision is located in two places.  One,

12  if you look at page 160, where we talk about -- or

13  161, where we talk about -- where I talk about the --

14  I'm sorry, 162, the elimination of statewide systemic

15  segregation of students with behavior-related

16  disabilities for the GNETS program, and the provision

17  of fair and equal access to educational opportunities

18  for students with behavior-related disabilities.

19  That's part of the vision that I would hope that the

20  state would consider.

21               Beyond that, the rest of the vision I

22  would hope that they would consider is included in



1   the five recommendations and the conclusion of the

2   report that -- and where I state, I believe in the

3   educators in the State of Georgia, and I believe that

4   these educators can and will refine practices to

5   support students with behavior-related disabilities

6   who have been marginalized for far too long through

7   systems of segregation and unfair and unequal

8   educational opportunities.  It is my hope that the

9   state adopts a vision with guidance from these

10  actions to do those things.

11      Q.    Looking at your amended Appendix E,

12  Exhibit Number 2.

13      A.    I didn't hear you.

14      Q.    I'm sorry, looking at your amended Exhibit

15  E, Exhibit 2.

16      A.    I think I'm missing -- that might be one I

17  lost track of here in the pile.

18            MS. TUCKER:  Are you okay with her looking

19  at mine?

20            MR. BELINFANTE:  Sure, that's totally

21  fine.  Yeah, thank you, by the way.

22  BY MR. BELINFANTE:



1    Q.    Did you find in any of the deposition

2    transcripts that you've identified here where a state

3    official testified that they support systemic

4    segregation of students with behavior-related

5    disabilities?

6    A.    I can't recall --

7    Q.    Okay.

8    A.    -- what I read in thousands of words of

9    transcripts of depositions.

10    Q.    That would kind of stick out, though,

11    wouldn't it, if a state official said, I support

12    statewide systemic segregation of students with

13    behavior-related disabilities?

14    A.    I don't know.

15    Q.    Okay.  Did you find any state official

16    testifying that they opposed providing fair and equal

17    access to educational opportunities for students with

18    behavioral-related disabilities?

19    A.    I don't recall --

20    Q.    So --

21    A.    -- at this time.

22    Q.    Is it your testimony that the State of

1    Georgia currently has a vision that supports

2    statewide systemic segregation of students with

3    behavior-related disabilities?

4        A.    That they have a vision?

5        Q.    Yes.

6        A.    Of statewide systemic segregation?

7        Q.    Yes.   That they have adopted a vision of

8    statewide systemic segregation of students with

9    behavior-related disabilities.

10            MS. TUCKER:   Object to form.

11            THE WITNESS:   The state has a system of

12   statewide segregation with unfair and unequal

13   educational opportunities that is unnecessary and

14   inappropriate for students with behavior-related

15   disabilities, and does not provide the services that

16   it purports to provide.   So it's not a vision.   It's

17   actuality.

18   BY MR. BELINFANTE:

19       Q.    Is it your testimony that that's

20   intentional?

21            MS. TUCKER:   Object to form.

22            THE WITNESS:   I cannot speak to the

1  intentionality of what any person is doing.  It

2  certainly does exist.

3  BY MR. BELINFANTE:

4       Q.    I'm going to show you what we'll mark as

5  Exhibit 15, which is a screenshot from the SWIFT

6  Education Center.

7                 (McCart Exhibit No. 15 was identified

8                 for the record.)

9  BY MR. BELINFANTE:

10      Q.    On your bio, you can see it says,

11  "Unwavering.  Radical.  Mama."

12      A.    Mm-hmm.

13      Q.    Are those your words?

14      A.    Yes.

15            MR. BELINFANTE:  If you will give me five

16  minutes to wrap up.  How much time do I have?  Like,

17  three minutes?

18            THE VIDEOGRAPHER:  Off the record at

19  18:15.

20            (Recess.)

21            THE VIDEOGRAPHER:  Back on the record at

22  18:26.

1    BY MR. BELINFANTE:

2          Q.    All right.  We're back on the record.

3                Dr. McCart, I'm not going to ask you any

4    further questions unless the United States has

5    questions for you.  I will, however, as I did with

6    Dr. Putnam, suspend the deposition pending any -- if

7    you were to file a report in response to Dr. Wiley.

8    And I realize the Department of Justice disagrees

9    with me on this, but we may ask the court for an

10   opportunity to revisit for all of nine minutes your

11   testimony.  And we would do so virtually.

12               MS. TUCKER:  The United States has no

13   questions for Dr. McCart at this time.  But we also

14   do object to holding this deposition open, and want

15   to make sure that's on the record.

16               MR. BELINFANTE:  Sure.  And expert

17   discovery closes October 31, now, based on the

18   amended report?

19               All right.  We can go off the record.

20               MS. TUCKER:  And Dr. McCart would like to

21   read and sign the transcript.

22               MR. BELINFANTE:  Absolutely.  Okay.  And

1    on the record, thank you, Dr. McCart, for your time

2    today, and previous times that we've rescheduled.

3    I'm sorry you got sick as well.  So I'm glad we were

4    able to do this.

5              THE WITNESS:  Thank you.  Me, too.

6              THE VIDEOGRAPHER:  Thank you.  And off the

7    record at 18:27.

8              (Whereupon, at 6:27 p.m., the instant

9    deposition ceased.)

10

11

12

13

14

15

16

17

18

19

20

21

22

CERTIFICATE OF REPORTER

UNITED STATES OF AMERICA  ) ss:

DISTRICT OF COLUMBIA        )

I, Desirae S. Jura, RPR, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically to the best of my ability and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any parties to this case and have no interest, financial or otherwise, in its outcome.

*Desirae Jura*

Notary Public in and for

The District of Columbia



My commission expires:  1/31/2025

Notice Date: 10/27/2023

Deposition Date: 10/24/2023

Deponent: Amy McCart, Ph.D.

Case Name: United States of America v. State of Georgia

Page:Line          Now Reads          Should Read

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

20___, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES:

## WORD INDEX

**< $ >**
**$10** 262:*12* 264:*17, 19*
**$15** 265:*8*
**$20** 265:*6*
**$24.5** 189:*3, 7* 272:*21*
**$45** 265:*9*
**$60** 150:*12* 151:*7, 18* 153:*1, 9*

**< 1 >**
**1** 4:*10* 12:*11, 12* 16:*12, 14* 142:*5* 182:*16* 184:*2* 191:*5, 6* 192:*11* 198:*19* 201:*8* 203:*7, 19* 227:*4* 248:*2, 22* 305:*15*
**1,000** 144:*12* 145:*7, 11, 13* 265:*1*
**1/31/2025** 319:*22*
**1:15** 140:*6* 141:*2*
**1:16-cv-03088-ELR** 1:*7*
**10** 6:*8* 117:*12, 18* 145:*19* 276:*6, 7* 281:*21* 282:*21* 283:2 284:2 285:6
**10,000** 265:*1*
**10:02** 39:*8*
**100** 35:8, *9, 12* 141:*14*
**104** 262:*18*
**108** 25:*11*
**10-point** 97:*15*
**11** 6:*11* 248:*4* 267:*19* 289:*1* 291:*12* 305:*1, 2,*
*16*
**11:00** 78:*14*
**11:06** 88:*13*
**11:30** 88:*15*
**110** 5:*8* 6:*15* 26:*4* 308:*19* 309:*2* 310:*21*
**111** 6:*17* 310:*22* 311:*6*
**12** 4:*11* 6:*13* 307:*3, 8*
**12:36** 140:*3, 4*
**126** 5:*12*
**129** 224:*7, 9*
**13** 6:*15* 308:*20, 21*
**13:15** 141:*4*
**130** 5:*16*
**14** 4:*14* 6:*17* 233:*6* 310:*17, 18*
**14:08** 180:*11*
**14:34** 180:*13*
**141** 4:*6*
**147** 131:*5*
**14th** 3:*7*
**15** 6:*19* 131:*8, 22* 132:*16* 133:*10, 20* 135:*21* 233:*12, 15* 238:*6* 241:*7* 249:*9* 275:*20* 316:*5, 7*
**15:40** 224:*19*
**15:57** 224:*21*
**150** 1:*18* 7:*7*
**15-'16** 236:*7* 240:*12*
**157** 142:*4, 13* 155:*10* 161:*8* 224:*10*
**159** 144:*2, 5*
**16** 233:*12* 236:*2, 9* 237:*3, 20*

**160** 50:*1* 81:*6, 11* 88:2 230:*16* 303:*8* 312:*12*
**160-4-7** 303:*9*
**160-4-7-.15** 5:*17*
**161** 217:*6* 288:*6* 312:*13*
**162** 180:*20* 181:*16* 182:*1, 12* 203:*14* 216:*9* 217:*4* 250:*12* 312:*14*
**163** 50:*3* 51:*18* 90:*14* 93:*19* 180:*16* 181:*3* 184:2 185:*11* 189:*21* 191:*21* 197:*10* 203:*12* 260:*5*
**164** 90:*11, 20* 201:*20* 205:*14* 207:*10* 208:*7*
**165** 91:*3, 10* 207:*11* 211:*7* 213:*8*
**167** 81:*11* 88:*3* 149:*22* 150:*4* 151:*17* 154:*5, 9* 181:*3* 185:*11* 260:*5*
**17** 236:*10* 237:*3, 20*
**17:07** 275:*22*
**17:22** 276:*2*
**18** 155:*4*
**18:15** 316:*19*
**18:24** 303:*20*
**18:26** 316:*22*
**18:27** 318:*7*
**1990** 136:*17, 22* 138:*1, 11* 188:*9, 10*

**< 2 >**

**2** 4:*12* 13:*16, 17* 14:*6, 7* 25:*8* 33:*8, 21* 35:*22* 91:*21* 93:*4, 22* 94:*19* 182:*16* 193:*16* 201:*19* 203:*8, 20* 218:*8, 16, 19* 243:*4* 248:*3, 22* 313:*12, 15*
**20** 38:*8* 44:*8, 20, 22* 86:*7, 8* 156:*18* 233:*22* 237:*13* 243:*1*
**20002** 7:*8*
**2001** 309:*8*
**2007** 114:*3*
**2010** 114:*12, 19* 115:*1* 130:*14, 22*
**2011** 132:*5, 11*
**2012** 189:*9* 273:*20* 274:*14, 15* 275:*2*
**2014** 272:*15* 281:*14* 282:*19* 288:*20*
**2015** 139:*15* 262:*12* 265:*2*
**2016** 18:*8* 265:*5*
**2016-'17** 233:*21*
**2017** 125:*22* 268:*10* 280:*16* 281:*3, 15* 282:*5, 19*
**2018** 48:*9* 111:*6, 16* 265:*7* 286:*20*
**2019** 269:*20* 270:*8*
**202** 2:*15*
**2020** 48:*9* 110:*7* 112:*15* 113:*8* 114:*12, 19* 115:*1* 276:*5* 280:*14, 19*

285:*16, 17*  286:*8*
288:*16*  291:*5*
**2021-'22**  233:*22*
**2022**  6:*3*  261:*22*
267:*5*  268:*8*
**2023**  1:*11, 20*
265:*10*  274:*1*
306:*10*  307:*11*
**20530**  2:*14*
**209**  34:*9*
**21**  233:*13, 20*
237:*6, 20*
**21-'22**  236:*7, 10*
239:*8*  241:*9*
**22**  233:*13*  237:*6,*
*20*
**225**  5:*19*
**24**  1:*11, 20*
153:*9*  157:*7*
245:*9*  258:*18*
304:*1, 2*
**247**  241:*8, 10*
**24th**  7:*5*
**26**  245:*5*  246:*14*
**262**  6:*6*
**27**  245:*5*
**272**  6:*7*
**276**  6:*10*
**289**  34:*9*
**289606**  34:*7, 10*
**2995**  234:*15*

**< 3 >**
**3**  4:*15*  68:*15*
89:*8, 9*  94:*20*
96:*18*  125:*5*
142:*6*  201:*4*
210:*19*  211:*5*
226:*13*  231:*2*
248:*3, 22*  301:*10,*
*17, 18, 19*
**3,000**  40:*4*
141:*12*

**30**  133:*3*
**302**  128:*15*
**30318**  3:*8*
**305**  6:*12*
**305-3488**  2:*15*
**306**  128:*13, 16, 17*
**307**  6:*14*
**308**  6:*16*
**31**  317:*17*
**310**  6:*18*
**316**  6:*19*
**33**  245:*6*
**35**  240:*12*
**36**  26:*21, 22*
28:*4*  194:*2*  245:*6*
**381**  33:*19*
**382**  33:*17, 19*

**< 4 >**
**4**  2:*12*  5:*3*
91:*21*  110:*21, 22*
125:*7*  126:*19*
130:*8*  132:*3*
211:*7*  226:*14*
299:*12*
**4)(a**  301:*10, 17,*
*19*
**4)(c**  231:*2*
**40**  104:*6, 18*
105:*2*  106:*4*
111:*10, 21*  116:*18*
**40th**  111:*6, 15*
**41**  231:*20*
**4400**  234:*15*

**< 5 >**
**5**  5:*9*  126:*14, 15*
128:*14*  299:*16*
309:*2*
**5)(a)(iii**  300:*11*
**50**  111:*19*
**500**  3:*7*
**50s**  196:*13*

**515**  262:*8*  271:*14*
**517**  266:*7*
**522**  271:*8, 12, 13*
**576**  237:*7, 9*
**58**  262:*14*

**< 6 >**
**6**  5:*13*  50:*18, 20*
51:*21*  120:*10*
125:*5*  130:*18, 19*
168:*1, 2, 21*
171:*6, 21*  186:*8*
227:*4*  251:*9*
**6:27**  318:*8*
**60**  152:*1*  181:*21*
**60s**  196:*14*
**65**  35:*4, 9*  141:*14*
**678**  3:*9*
**68**  34:*17*

**< 7 >**
**7**  5:*17*  27:*15*
120:*11*  225:*2, 5*
232:*1*  299:*12*
**70**  27:*15*  155:*3*
245:*4*
**701-9381**  3:*9*
**70s**  196:*14*
**71**  6:*13*  307:*2*

**< 8 >**
**8**  6:*3*  167:*15*
168:*3*  170:*13*
171:*7*  247:*16, 20,*
*21*  248:*2*  261:*21*
262:*1*
**80**  267:*21*
273:*15*  274:*9*
**88**  241:*10*
**89**  4:*17*
**898**  237:*4, 8*

**< 9 >**

**9**  4:*4*  6:*7*  248:*3*
249:*8*  272:*10, 11*
279:*17*
**9:14**  1:*19*  7:*5*
**9:54**  39:*6*
**90**  117:*12, 18*
145:*19*  146:*12*
**950**  2:*13*

**< A >**
**a.m**  1:*19*  7:*5*
**ability**  57:*16*
117:*21*  122:*11*
235:*7*  293:*16*
319:*10*
**able**  28:*9*  57:*7*
73:*10*  108:*13*
109:*2*  173:*16*
184:*18*  185:*16*
200:*21*  212:*15*
234:*21*  246:*18*
251:*20*  253:*3*
255:*18*  293:*12,*
*18*  311:*12*  318:*4*
**above-entitled**
1:*14*  140:*5*
**absolutely**  33:*4*
47:*18*  104:*9*
252:*18*  283:*12*
317:*22*
**abstract**  276:*12*
279:*1, 3, 5*
**academia**  196:*2*
**academic**  24:*16*
103:*5*  125:*13*
126:*8*  130:*13*
132:*19*  133:*5*
134:*15*  155:*1*
175:*17*  186:*10,*
*22*  187:*2, 11, 22*
194:*16*  256:*8*
276:*16*
**academically**
102:*14*

**accept** 67:*20*
146:*18* 152:*19*, *22*
**acceptable** 109:*20*
**accepting** 183:*13*
**access** 20:*22*
21:*14* 24:7 25:*9*,
*18*, *20* 26:*5* 73:7
102:7 104:2
106:*19* 107:*6*, *8*,
*13*, *18* 108:4
109:*11* 112:*12*
114:*10* 123:7
143:*3*, *13* 149:*19*
168:*6*, *9* 181:*6*
182:*9*, *20* 183:2,
*18* 191:*13*
203:*17*, *22* 214:*9*
217:*21* 218:*1*
223:*15* 246:*20*
256:*6*, *22* 259:*13*
281:7 287:*8*
293:*18* 312:*17*
314:*17*
**accessed** 253:*4*
**accessing** 221:*9*
**accommodation**
80:*19*, *22* 81:*18*
**accommodations**
81:*6*, *12*
**accomplishment**
194:*3*
**accurate** 10:*10*
92:4 93:*10*, *12*
196:*9* 225:*9*
280:*13* 281:*18*
**achieve** 73:*15*
181:*1*, *9*, *15*, *22*
182:*11*, *15*
228:*12* 277:*12*
**achieves** 294:*18*
**achieving** 259:7
**Act** 5:*11* 39:*18*
60:*3*, 7 65:*13*
111:*8* 139:*15*

163:*10* 273:*15*
295:*11*
**Action** 1:*6* 90:*15*,
*20* 91:*3*, *10*
156:*22* 184:*1*
185:*19* 189:*21*
190:*1* 191:*5*, *6*
192:*11* 198:*18*
201:*8*, *19* 203:*7*,
*8*, *19* 204:7
205:*9* 206:*13*
210:*19* 211:7
213:*8*
**actions** 50:*3*, *5*, *6*,
*11* 51:*17* 87:*6*
89:*20* 91:*6*
93:*20* 100:*13*, *17*
180:*18* 181:*3*, *9*,
*10*, *12* 185:*11*
203:*12* 204:*12*,
*20* 205:*3* 208:*5*
211:*9* 212:*20*
213:*21* 256:*14*
260:*4* 313:*10*
**Activities** 5:*9*
104:*4* 106:*20*
**actual** 164:*4*
178:*19*, *22*
**actuality** 315:*17*
**ADA** 65:*3* 80:*19*
127:*10* 136:*17*
138:*1*, *4*, *10* 139:*3*
**adaptations** 57:*5*
**add** 30:*16* 43:*11*
97:*6* 137:*15*
231:*22*
**added** 79:*11*
265:*6*
**addition** 24:*13*
**additional** 11:*18*
24:*8* 43:*14* 57:*5*
186:*15* 265:*8*
**Additionally** 24:7
46:*6* 223:*14*

**address** 41:7, *9*
96:7, *20* 230:*9*
**addressed** 139:*1*
311:*1*
**addressing** 129:*1*,
*9*
**adept** 146:*9*
**adequate** 150:*14*
151:*9*
**adjust** 198:*21*
**adjustments**
214:7
**administer** 9:*1*
**administers** 40:*15*
**administrator**
55:*4*, *9*
**admission** 233:*19*
**admits** 238:*5*
**admittants** 237:*4*
238:*22*
**admitted** 233:*18*
234:*5* 235:*16*
236:*15*, *18*
237:*16* 238:*18*
239:*8* 240:*17*
241:*8*
**Adolescents** 5:*14*
131:*9*
**adopt** 100:*16*
189:*20* 201:*9*
256:*13* 260:*4*
292:*9* 312:7
**adopted** 191:*5*
192:*18* 315:7
**adopting** 201:7
292:*21* 293:*5*
308:*1*
**adoption** 204:*9*
259:*19*
**adopts** 200:*6*
313:*9*
**adults** 137:*19*
251:*15*
**advent** 289:*3*

**adverse** 125:*12*
126:7 134:*15*
**advised** 29:*3*
49:*6* 50:*13*
**Advocacy** 15:*9*
**affiliations** 29:*14*
**affirm** 283:*12*
**affirmative**
160:*17* 295:*11*
**affirmatively**
161:*14* 162:*3*
174:*8*
**afforded** 167:*3*
**affords** 266:*12*
**Afternoon** 4:*6*
141:*1*
**after-school**
104:*4* 106:*19*
**Age** 5:*15* 222:*3*
240:*19*
**agencies** 38:7
62:*1* 82:*20*
152:*4*, *18* 180:*3*
253:*8* 263:*19*
264:*6* 265:*21*
267:*11* 289:*21*
**agency** 166:*14*
267:*1*
**ago** 11:*14* 151:*5*
159:*3* 167:*16*, *20*
196:*13* 211:*17*
254:*4* 277:*9*, *22*
278:*18* 303:*5*
**Agran** 110:*6*, *13*
111:*18*
**agree** 44:*11*
94:*15*, *18* 95:*4*,
*14* 97:*3*, *5* 101:*6*
113:*20* 116:*15*
127:*8* 129:*15*
141:*15*, *20* 142:2
143:*10* 149:*17*
170:*8* 178:*11*
197:2 205:*1*

233:*9*  236:*8*
261:*1*  283:*18*, *21*
284:*9*, *14*  286:*4*,
*13*  301:*9*  307:*17*
308:*6*
**agreeable**  10:*3*
11:*2*, *9*
**agreed**  9:*14*, *18*
113:*6*  197:*9*
286:*21*
**agreement**
117:*19*  297:*6*
**agrees**  293:*12*
294:*5*
**ahead**  12:*10*
25:*7*  30:*7*  85:*14*
131:*3*  157:*4*, *5*
162:*6*, *11*  270:*6*
271:*19*  310:*16*
**aims**  36:*16*
**air**  218:*15*
**al**  268:*9*  269:*22*
**al.'s**  111:*19*
**Alabama**  242:*1*
**Alabama's**  242:*2*
**Albany**  246:*12*
**aligned**  26:*15*
167:*6*  205:*16*
206:*15*  207:*17*
215:*22*  222:*2*
291:*17*, *19*
**Alignment**  6:*7*
**all-in**  116:*22*
**allocate**  152:*1*
**allocated**  163:*1*, *4*,
*6*
**allow**  37:*17*
191:*13*  209:*4*
312:*8*
**allowed**  9:*13*
26:*5*  73:*5*, *7*, *8*
128:*22*  129:*8*, *19*
**ALLOY**  3:*6*
**alongside**  281:*13*

**alternate**  26:*2*
175:*14*  207:*18*
211:*4*
**alternative**  58:*16*
66:*19*
**amended**  13:*16*,
*18*, *20*, *21*  14:*18*
33:*8*  35:*22*
110:*16*  116:*10*
138:*10*, *16*  148:*8*
225:*4*  248:*16*
299:*3*  313:*11*, *14*
317:*18*
**AMERICA**  1:*5*
7:*3*  319:*3*
**Americans**  39:*17*
60:*3*, *7*  65:*13*
**Amount**  103:*21*
104:*1*  149:*1*
194:*5*  224:*11*
**amounts**  150:*21*
**AMY**  1:*12*  4:*3*,
*11*, *13*  7:*6*  9:*3*, *11*
**analyses**  135:*12*,
*18*
**analysis**  42:*21*
43:*2*, *7*  127:*22*
135:*6*  162:*16*
164:*13*  237:*17*
243:*22*  309:*21*
**analyze**  208:*11*
**and/or**  122:*8*
226:*18*  281:*8*
282:*11*
**ANDREA**  3:*14*
8:*13*
**Angeles**  15:*21*
**animus**  200:*10*
**Annual**  111:*6*, *15*
**answer**  10:*14*, *16*
11:*1*  20:*12*  23:*5*
37:*15*, *19*  44:*5*
45:*3*  46:*21*  52:*9*
71:*10*  72:*14*, *16*

85:*12*  108:*13*
126:*20*  133:*18*,
*19*  134:*3*  136:*16*
152:*19*  158:*4*
160:*15*, *22*  169:*8*
176:*15*  185:*14*
197:*5*  209:*18*
217:*2*  230:*14*
237:*9*  261:*12*
300:*11*  301:*8*
308:*16*
**answered**  43:*6*
85:*6*, *9*  101:*18*
179:*22*  271:*21*
287:*13*
**answering**  25:*13*
**answers**  10:*17*
306:*2*
**anyway**  122:*21*
297:*3*  310:*17*
**apart**  65:*20*
**apologies**  109:*7*
**apologize**  33:*7*
229:*5*
**APPEARANCES**
2:*1*  3:*1*
**APPEARING**
3:*13*
**appears**  116:*9*
127:*4*  310:*7*
**Appendix**  4:*12*
13:*5*, *7*, *16*  14:*18*
27:*7*  35:*22*  84:*7*
110:*3*  116:*10*
126:*21*  148:*8*
163:*13*  225:*4*
232:*9*  248:*15*, *16*,
*20*  299:*3*  313:*11*
**application**  69:*4*
**applied**  53:*8*, *19*
77:*8*  120:*19*
137:*7*  179:*7*
**applies**  60:*11*

**apply**  20:*5*
76:*12*  77:*18*
82:*1*  121:*5*
123:*19*  124:*5*
126:*11*  128:*4*
152:*4*  159:*12*
202:*9*  208:*5*
258:*8*  268:*19*
277:*4*, *9*, *22*
279:*13*, *15*
**applying**  51:*21*
81:*22*  116:*20*
152:*9*  277:*17*
**appointed**  190:*20*
**appreciate**
122:*15*  310:*14*
**approach**  90:*4*
116:*20*, *21*, *22*
117:*2*  196:*3*, *6*,
*10*  201:*7*  256:*6*
293:*5*, *13*
**approaches**  285:*8*
**appropriate**  19:*4*,
*15*, *17*  25:*18*
37:*7*, *10*, *22*  38:*4*,
*9*  60:*6*, *16*  61:*3*,
*7*  70:*14*, *15*
71:*20*  72:*7*, *9*
73:*1*, *6*  74:*12*, *22*
102:*12*  103:*9*
104:*2*  108:*1*
109:*10*  119:*11*
142:*22*  147:*11*,
*17*  148:*12*  149:*8*
150:*15*  151:*10*
154:*21*  161:*20*
162:*13*  164:*5*, *14*
165:*3*, *5*, *6*, *8*, *9*
167:*5*, *8*  172:*17*
210:*17*  215:*21*
216:*12*  220:*9*
221:*16*  222:*3*
230:*18*  247:*2*, *9*

254:*20*  296:*16*
299:*20*  300:*15*

**appropriated**
153:*1*  262:*12*
265:*7*

**appropriately**
20:*9*  21:*3*

**appropriates**
181:*20*

**appropriation**
42:*17, 18*  151:*11,*
*15*  163:*4*  265:*9*

**appropriations**
163:*9, 10*  229:*9,*
*18*  271:*13*

**approve**  279:*3*

**approximately**
44:*8*  111:*9*
181:*20*  199:*1*

**APRIL**  3:*22*  7:*9*

**area**  28:*8*
135:*22*  228:*11*
235:*7*

**areas**  188:*15*

**argue**  96:*19*
165:*14*  289:*2*

**arithmetic**  74:*11*

**array**  37:*6*
38:*11*  66:*16*
67:*1*  143:*18*
160:*12*  164:*22*
175:*1*  193:*1*
195:*8, 17*  246:*18*
259:*10*

**arrive**  50:*21*

**Article**  4:*15*  5:*3,*
*9, 13*  6:*4, 7, 8*
89:*14*  91:*21*
92:*19*  93:*22*
110:*6, 12, 21*
113:*14, 16, 17*
116:*1, 9, 14*
125:*22*  126:*18*
127:*9, 11, 13*

128:*13, 16*
130:*22*  131:*4, 6,*
*21*  133:*1, 9, 10,*
*12*  134:*14*  147:*9*
148:*7*  196:*17*
248:*17*  261:*21*
262:*4, 9*  264:*22*
265:*4*  266:*8*
268:*9, 18*  269:*21*
270:*5, 9, 11*
271:*8, 15*  272:*14*
273:*19*  274:*13,*
*16*  276:*10*
277:*21*  278:*18*
279:*10, 11, 17*
280:*19*  281:*14*
283:*12*  286:*13,*
*20*  287:*2*  288:*16,*
*20*  289:*1*  291:*5*

**articles**  125:*4*
146:*15*  147:*14*
148:*20, 22*  196:*1*
248:*11, 14, 15, 18,*
*21*  259:*22*  276:*5*
284:*17*  305:*15*

**article's**  128:*20*

**articulate**  182:*12*
247:*12*  310:*10*

**articulated**
279:*13*

**articulating**
277:*11*

**ascendancy**
266:*11*

**aside**  158:*20*
160:*14*  231:*19*
243:*16*  254:*14*
294:*15*

**asked**  18:*14*
23:*6*  36:*6*  43:*1*
54:*9*  65:*6*  87:*2*
141:*7*  152:*18*
155:*9*  158:*15*
190:*19*  194:*10*

218:*18*  229:*4*
237:*22*  243:*12,*
*21, 22*  254:*4*
258:*22*  261:*13*
272:*6*  282:*3, 4*
300:*7*

**asking**  11:*9, 21*
19:*12, 17*  20:*13*
22:*22*  38:*1*
60:*19, 20*  63:*9*
65:*10, 11*  66:*7*
68:*1*  69:*8*  71:*3,*
*4, 19*  72:*2, 4*
73:*22*  77:*13*
79:*12*  80:*21*
81:*22*  82:*13*
85:*15*  87:*5, 7, 11,*
*12*  94:*18*  95:*16*
96:*10*  99:*16*
101:*17*  105:*20,*
*21*  115:*2*  118:*22*
119:*14*  120:*21*
124:*13*  127:*19*
129:*19*  134:*4, 10,*
*11, 12*  141:*11*
146:*19*  152:*12,*
*21, 22*  154:*11, 12*
157:*15*  158:*4, 18,*
*19*  160:*17*
165:*10*  168:*4, 18,*
*20*  170:*11*
190:*11*  191:*2*
228:*15*  238:*12*
250:*3*  268:*17, 20*
278:*17*  284:*6*
286:*4, 20*  291:*9*
294:*20*  295:*6*
298:*12, 17*  301:*2*
302:*7*  304:*16, 17*
311:*22*

**asks**  83:*5*

**asleep**  252:*2*

**aspect**  187:*6*

**aspects**  96:*21*

**Assembly**  153:*2*
163:*10*  181:*20*
262:*17*

**assess**  42:*15*
45:*12*  46:*14*
149:*2*  190:*12*

**assessing**  45:*18*

**assessment**  24:*11*
26:*2*  175:*14*
186:*11*  211:*4*

**assessments**  22:*4*
46:*7*  211:*4*

**assigned**  31:*8*
175:*13*

**assistance**  90:*17*
175:*3, 8*  185:*22*
198:*6*  201:*2*
202:*6, 19*  267:*14*

**associated**  22:*6*
29:*11*  101:*2*
273:*17*

**association**  7:*10,*
*11*

**assumes**  298:*13*

**assuming**  265:*3*
298:*15*

**assumption**
297:*21*

**assumptions**
28:*16*  298:*6, 20*

**ATLANTA**  1:*3*
3:*8*  246:*9*

**attached**  13:*4*
47:*1*

**attend**  227:*14*
244:*21*

**attending**  109:*18*

**attention**  141:*6*
311:*12*

**attorneys**  7:*13*
8:*10*

**Attorney's**  1:*18*

**author**  127:*3*
268:*11*

**authority** 64:*1, 5, 6, 11, 19* 229:7 243:*11*
**authors** 96:*19* 113:*12* 279:6, 7
**Autism** 5:*15* 80:*4, 13* 131:*9, 16* 132:*10* 133:*11, 21* 135:22 141:22 142:2, *21* 195:*3* 196:*4* 289:*13* 293:*11* 294:*1* 295:*14, 17* 296:2, *13*
**autistic** 20:7 297:*11*
**automatically** 225:*19*
**availability** 62:5 83:*11*
**available** 26:*17* 57:7, *20* 61:*15, 20* 62:*14* 83:*17* 168:*13* 170:*3* 171:*1* 187:7 224:2 227:*10, 12* 251:*4* 252:*21* 253:*1* 254:*12* 293:2 295:*3, 7* 302:*16*
**Avenue** 2:*13*
**avenues** 170:*20*
**average** 105:2 117:5, *9, 11* 309:7
**avoid** 164:*18* 165:*16* 169:*17*
**awarded** 30:*11* 31:*6*
**aware** 80:*3* 86:*21* 124:*17* 138:*1, 9* 142:22 208:*1* 242:*14*

282:*17*

**< B >**
**bachelor** 137:2
**bachelor's** 137:*5*
**back** 47:*6, 8* 50:*16* 59:*18* 60:22 72:*13, 15* 78:2 109:7 116:*13* 118:7 123:*15* 130:*3* 132:3 135:5 150:2 155:*19* 159:2, *4* 164:*1* 169:*11* 189:*19* 196:*13* 197:*10* 222:*16* 231:*21* 233:3 241:*18* 247:*15* 250:*12* 286:*21* 292:*11* 316:*21* 317:2
**backgrounds** 311:9
**bad** 19:*9* 121:*19*
**bake** 229:*13*
**base** 20:*4* 131:*21* 298:*16*
**Based** 4:*16* 16:*17* 19:*19, 21* 20:*10* 38:7, *16, 20* 62:*19, 21* 66:6 68:*11* 75:*16* 78:7 82:*18* 94:8 97:*12, 14* 116:*9* 118:5 145:*18, 20, 21, 22* 146:2, *5* 147:*1, 10* 150:*21* 155:5, *8* 162:*19* 164:7 181:*14* 191:7 196:*14* 204:*18* 226:*20* 230:*18, 22* 232:5 238:*20* 239:*17*

244:*8* 248:*7, 18* 249:*11, 16* 255:*1* 259:*11* 260:*12* 274:*15, 21* 278:*21* 289:*14* 291:*15* 295:*10* 298:*20* 299:*1* 311:*8, 16* 317:*17*
**basic** 10:*1* 24:*14* 251:*22*
**basis** 69:*14* 136:*3* 142:*16* 178:6 302:*19* 303:4
**Bates** 33:*16*
**bathroom** 180:*6, 7, 9*
**bear** 190:*16*
**beef** 191:*12*
**begging** 156:*5*
**beginning** 7:*14* 50:*1* 51:*18* 65:5 81:*5, 11* 88:2 93:*3, 19* 110:*13* 191:22 232:*19* 289:2 305:*18* 309:3
**begins** 96:*19* 127:2 130:*5* 199:*16* 248:2 256:*1* 300:*11* 307:*12*
**behalf** 2:*3* 3:*3* 8:*18, 20* 15:*1, 4* 16:*13* 17:*20*
**behave** 94:*10* 95:*12*
**behavior** 22:*1, 3, 4, 6, 17, 20* 23:*18, 19* 24:*11* 71:6, *13* 72:6 73:*17* 74:*8* 79:*15* 87:*17* 144:22 145:*17* 146:7, *9*

175:7 178:2, *9, 18* 186:*11* 249:*12, 17, 21*
**behavioral** 21:7, *21* 24:*17* 56:*9, 11* 64:*18* 69:*21* 70:*5, 21* 75:*2, 9, 10, 18, 20* 76:*1, 3* 78:*8* 79:2 91:*1, 7, 14* 103:5 125:*1, 13* 126:*2, 9* 129:*10, 20* 134:*16* 137:7, *9, 21* 144:*15* 145:9 147:*4* 151:2 155:*1* 163:*16* 166:*10* 169:*14* 171:*18* 172:7, *13, 22* 175:*19* 176:*4* 177:*19* 179:7 186:22 187:6 188:*1* 194:*16* 201:22 209:6 212:*21* 213:*12* 235:8 243:*18* 244:*15, 18* 255:*1* 256:*8* 297:*16, 22*
**behavioral/emotio nal** 220:*13*
**behaviorally** 102:*14*
**behavioral-related** 314:*18*
**behavior-related** 18:*19, 21* 19:2 20:*16* 24:*1* 25:*19* 37:*5, 8* 61:*16* 73:*12* 87:*14* 142:*21* 150:22 156:*17* 163:2 165:2 172:*18* 175:2, *15, 22* 183:*16* 184:*20* 192:*21*



193:*3, 10*  195:*10*
203:*15, 18*  206:*3,
19*  217:*13*  221:*9,
14*  227:9  230:20
242:19  244:5, 20
245:13  249:6
255:12  259:*15*
260:*16*  288:*11*
293:*15, 22*
296:20  297:*17,
20*  300:*18*
312:*15, 18*  313:5
314:*4, 13*  315:*3,
9, 14*

**behaviors**  101:*1*
144:*14, 20*  145:8
148:*3*

**belief**  154:5, *14,
15, 16*  215:13
269:9  286:5, 7

**believe**  13:5, *16*
15:17  19:*14*
21:*3*  22:22  27:7
66:*15*  82:4, 5
95:8  96:*1*
100:*19*  101:*8, 10*
110:20  119:*17*
150:*19*  155:6
161:17  224:*10*
251:9  260:*1, 3*
261:*21*  268:*15,
21*  269:*16, 18*
270:7, *18*  272:20
278:4, *10*  279:12
280:*13*  300:*1, 2*
313:*2, 3*

**BELINFANTE**
3:*4, 6*  4:*4*  7:17
9:7, *10, 19*  12:*14,
19, 22*  14:*11, 15*
19:*13*  21:*1*  39:*3,
9*  44:2  52:*3*
53:6  54:*19*
60:*12, 21*  61:10

63:*10*  65:*1, 8*
67:*13*  68:*3*
69:*13*  70:*3, 11*
71:*11, 22*  72:11
74:*19*  75:6
76:*16*  77:*15*
78:*16, 20, 21*
81:*1, 16*  82:2
86:*15*  87:22
88:*6, 11, 16*  89:7,
*11, 13*  92:8, *14*
98:*6, 10, 16*
100:*10*  104:*17*
109:*1, 6, 9, 19*
110:*11, 15, 19*
111:2  112:*4*
124:2  126:*3, 6,
17*  127:*21*  128:*3,
12*  129:22
130:*21*  138:*8, 21*
139:*21*  141:5
145:*12*  151:*14*
152:*13*  154:*9, 13*
158:*13*  159:5, *20*
161:*6*  162:*1*
163:*22*  166:*1*
169:*10*  171:*3*
179:*15*  180:*14*
183:22  190:*15*
204:22  206:5, *8,
10, 17*  208:6
214:*11*  224:*17,
22*  225:7  226:*1*
227:*17*  229:*11,
22*  231:*10*  246:*3*
247:*6, 14*  254:*18*
255:6  256:*19*
260:8, *22*  261:*4*
262:*3*  270:*3*
272:*13*  275:*17*
276:*3, 9*  277:*10*
278:*3*  284:*1*
285:*12, 15*  290:*7,
10, 14*  292:6

295:*5, 22*  296:*21*
298:*8*  299:*7, 13*
301:*14, 20*  303:*3,
22*  304:*3, 5, 7*
305:6  307:*10*
309:*1*  310:*20*
313:*20, 22*
315:*18*  316:*3, 9,
15*  317:*1, 16, 22*

**Belonging**  6:*12*
88:*20*

**benefit**  21:*10*

**BERRY**  2:9

**best**  24:2  35:9
107:*12*  108:*17*
121:8  214:*20*
319:*10*

**better**  133:5
204:*19*  206:*11*
210:6  217:*11, 12*
245:*14, 19*
246:*17*  276:*18*
277:*12*  278:5
288:*9, 10*

**Beyond**  235:22
263:5  312:*21*

**big**  37:*12*

**Bill**  262:*17*

**bills**  17:7

**bio**  316:*10*

**biography**  47:*1*

**bit**  116:*14*
122:*21*  137:*16*
193:*15*  194:*17*
211:*17*  218:*12*
242:8  275:5
287:*3*  290:6

**blame**  152:7

**Board**  253:*10*
264:*4, 5, 11, 12*

**boards**  264:*18*

**body**  276:*14*

**bold**  180:22
182:*12*  211:8
212:*17*

**book**  51:*3*  88:*18,
21*  89:*21*  91:22
92:5, *9, 19*  93:*4,
7, 13*  94:2  95:*6,
17, 18*  96:*6, 7, 15,
17, 19*  97:*4, 6, 12,
14, 18, 20*  98:*1, 7,
18*  99:*3*  303:*11*
304:*21*  305:*13,
18*  306:*7, 10*
307:2  308:*13, 15,
17, 20*  310:5, *10*

**books**  260:*1*

**book's**  307:7

**borrowed**  248:5

**bottom**  27:*12, 15*
94:*19*  129:*4*
142:*5, 13*  226:*13*
238:*6, 13*  271:*11*

**boundaries**
228:*20*

**brain**  80:*13*

**breadth**  177:*3*

**break**  10:*20*
11:2  22:*18*
37:*14*  39:*3*
59:*15*  78:*10, 13*
80:*17*  88:*6, 9*
139:22  180:*6, 7*
224:*15*  243:*13*
275:*18*

**breaking**  246:*13*

**breathing**  78:*9*

**bright**  116:*20, 21*

**bringing**  265:9

**broad**  74:*16*
179:*3*  309:*15*

**broader**  67:*1*
181:*4*  203:*13*
213:5

broadly 163:*20* 188:*11*
brought 15:*8* 58:*19* 122:22
Broward 15:*18*
budget 265:6
Build 6:*11, 13, 15, 17* 88:*19* 89:*21* 92:5 96:*11, 12* 97:*20* 123:*4* 184:*18, 22* 304:*21* 310:5
building 55:*4* 97:*14* 192:5 200:*17* 213:*15* 214:*13* 215:*1* 245:*16* 259:*12* 312:2
buildings 125:*10* 219:9 243:*17* 244:*13*
built 20:22 191:*15*
bulk 204:*4*
bullets 302:*12*
bunch 192:8
Burrello 273:*10*
businesses 190:6

< C >
Cadillac 167:*13*
cafeteria 106:*17, 19* 107:6, *13, 18* 108:5, *16, 18* 109:*11, 13*
cafeterias 104:*3* 123:8
California 49:*14* 131:*17, 22* 132:*17* 133:*11, 20* 261:*16, 18* 262:8, *12, 21, 22* 263:*4, 11* 264:*10*

265:*12* 271:*1, 5* 309:*14*
call 14:*11* 15:7 164:*19* 184:2 199:7 204:*12* 225:*3* 230:7 306:*3*
called 1:*13* 44:*1* 48:*13* 57:*21* 88:*18* 90:8, *9* 197:*17, 18* 201:*13* 213:5 243:*1*
camera 7:9
Campbell 15:*15* 16:7
CAMTSS 271:9
capabilities 293:9
capability 289:6 291:*1, 19* 292:*10* 293:5, *13*
capacity 90:*15, 21* 91:*4, 11* 184:*4, 10, 12, 13, 18, 19, 22* 185:*20* 190:8 197:*12* 198:*4* 199:*19* 200:*18* 201:*20* 205:*15* 206:*14* 212:*15, 18* 213:8 215:*1* 267:*1* 312:*3*
Cappadocia 132:5, *10*
care 163:*15*
career 136:*18, 21* 156:*4* 249:7
carefully 144:22
Carolina 49:*14*
carried 191:*17*
CARTER 3:22 7:*10*
cascading 197:*19*

Case 5:*12* 14:*19* 15:*13* 17:*13* 18:5, *10* 21:8 28:20 29:*17* 36:7, *10* 39:20 47:*12, 16, 22* 48:*11* 57:*19* 58:*18* 61:*12* 66:*1, 4* 71:*21* 80:*14* 93:*19* 121:20 124:*10* 146:*11* 166:*15* 173:*13* 202:8 208:*17* 214:6 215:7 223:*17* 229:21 257:*18* 258:*16* 268:*16* 278:*19* 287:9 297:*4* 319:*13*
cases 40:9 246:5 279:5
catch 11:6
categorical 194:*11* 195:*14, 15, 19* 280:*1* 290:*15, 19* 291:*14* 292:*14, 19*
cause 153:*21* 154:*1, 12* 160:*18* 162:*3* 174:9, *20* 234:*13* 292:8
caused 66:*14*
causes 67:7 225:*19* 226:*3*
causing 157:*18*
ceased 318:9
Center 6:*19* 17:*18, 22* 18:*1* 46:*10* 188:*18* 189:2 227:*12, 14* 280:*16* 303:*13* 304:8, *13, 19* 316:6

center-based 62:*11, 13* 182:*17, 19* 228:2 238:*11*
centers 69:5 226:22 245:5, *6*
Central 213:*14* 214:*12* 256:*1*
certain 21:9 143:*20* 168:5 169:*16*
certainly 10:7 33:*4* 51:*13* 52:9 83:*16* 101:*3, 5* 102:*19, 21* 117:*20* 133:*3* 141:*21* 143:*19* 144:*10* 179:*18* 180:2 185:*8* 188:*20* 204:*4* 211:2 216:*10* 226:7 244:*17, 18* 271:*3* 287:6 316:2
CERTIFICATE 319:*1*
certification 83:*18*
certified 21:*18* 24:6 84:22 175:*20* 222:*14*
certify 319:7
cetera 20:*3* 27:*18* 53:5 55:*13* 68:*20* 83:*18* 110:7 123:8, *12* 139:*11* 148:5 179:*21* 188:2 195:*4, 5* 199:20 228:*21* 244:*10*
chair 134:*19, 20*
challenge 57:*11* 58:*11, 14, 15, 19*

85:2

**challenges** 21:7

**challenging** 146:9 274:20 279:22

**change** 83:1 177:11 306:4

**changed** 139:11 267:6 274:14

**CHANTEL** 3:19 8:19

**Chapter** 303:9 309:2

**characteristics** 195:1

**charged** 57:1

**chart** 27:18 33:12, 15 35:5 248:1, 4

**Charter** 48:15 49:4

**cheated** 259:22

**check** 232:3 243:14 305:11 307:6

**CHEVRIER** 3:15 8:11

**chicken** 258:4

**Child** 5:9 65:19 66:2 73:4 102:18, 19 104:9 105:2, 6 106:3, 15 108:2, 3 124:11, 15 139:1, 4 146:16 149:18 221:18 262:16 294:8 302:9

**child-like** 221:18

**children** 73:5, 6 136:21 240:2 258:9

**child's** 253:6

**Choi** 232:19 269:20 270:8 288:16

**choose** 35:11, 12 159:12

**chronologically** 201:19

**circles** 179:11 251:18

**circumstance** 108:15 200:14

**circumstances** 20:18 21:2 117:14, 16, 17

**citation** 127:2 130:5 274:17 281:9

**citations** 266:15

**cite** 110:1, 2 113:17 116:11 125:4, 17 127:9 281:1

**cited** 110:12 130:22 133:7, 9 146:14 148:7, 14 196:1 248:12, 15 274:16 286:5

**cites** 131:22 132:5 280:15

**citing** 113:11 115:21 126:18 130:14 270:4 273:19 274:15 281:14 309:8

**Civil** 1:6 2:11 9:13

**claims** 65:3

**CLAIRE** 3:15 8:11

**clarify** 12:21 16:5 30:6, 7 54:6 105:18 173:12 201:11 261:9 282:10

**clarity** 274:20

**class** 22:12

**classes** 113:4, 22 223:16

**Classroom** 5:7 46:7, 9 112:13 116:19 117:5, 11, 13 147:17, 22 148:1, 3, 20 149:2 216:16, 17 242:4 249:4 273:16

**Classrooms** 5:5 21:12 62:9 94:9 95:11 110:9 111:11, 22 114:10, 19 130:12 155:4 156:6 215:11 219:12 276:19

**clear** 29:2 83:4 155:12 211:11 307:13 308:7

**clearer** 141:11

**clearly** 246:12 266:11

**climate** 87:19 187:3 223:21

**close** 193:16, 20 245:19 275:19

**closely** 291:17, 18

**closer** 245:15

**closes** 317:17

**closest** 174:5

**coaching** 202:18 212:1 252:9 267:10

**coauthors** 287:3 288:16

**Coca-Cola** 260:10

**code** 27:16

**coherent** 176:3 201:14

**cohort** 134:7

**collaboration** 262:14

**colleague** 232:19 283:12

**colleagues** 232:16

**collect** 211:3

**collected** 17:2 208:15

**collecting** 209:14, 15 210:2, 12

**collection** 248:18

**collects** 208:20 209:3

**college** 137:12

**color** 27:14

**Columbia** 1:17 319:4, 19

**column** 128:21 129:4

**combination** 234:10

**come** 10:15 47:6, 8 59:18 72:13, 15 78:2 118:6 150:2 289:3 297:11

**comes** 156:1

**comfortable** 147:6 157:21 278:1

**coming** 62:8 197:8 214:17 239:16, 18 240:1, 8 304:12

**commission** 319:22

**commissioners** 264:12

**Commissions** 264:4

**commitment** 214:22 269:7

**committed** 83:2 153:10

**committing** 158:11

**common** 24:*6*
43:*20* 53:*2*
123:*6* 171:*1*
176:*7* 183:*21*
192:*15* 210:*3*
220:*4*
**commonplace**
50:*12, 13, 14*
51:*18* 93:*20*
116:*4* 167:*11, 14*
192:*17* 196:*15*
**communicate**
31:*10, 13* 293:*12*
**communicating**
300:*3*
**communication**
148:*4* 293:*19, 21*
294:*4, 9* 295:*15,
16* 296:*11*
297:*12, 13* 298:*2*
**communications**
296:*2*
**Community** 56:*5*
64:*10* 124:*19*
162:*2* 166:*8*
249:*5* 253:*5, 9*
254:*11*
**companion** 15:*6,
7*
**comparative**
223:*10* 241:*15*
242:*10*
**compared** 221:*12*
282:*12*
**comparing** 127:*3*
**compels** 124:*4*
**competence** 187:*2*
**competition**
30:*10* 31:*1*
262:*13*
**compilation** 11:*17*
**compiling** 42:*20*
**complaint** 36:*10,
18*

**complete** 22:*3*
176:*15* 309:*8*
**complex** 20:*14*
136:*9* 176:*14*
**complexity** 271:*4*
**compliance** 190:7
299:*18* 300:*14*
**complicated**
170:*6*
**complied** 190:*1*
**complies** 39:*17*
**complying** 100:*16*
**component** 97:*17*
**comprehensive**
135:*10* 204:*16*
**comprised** 233:*19*
**concept** 60:*10*
127:*14, 16* 179:*3*
277:*20*
**conceptual** 197:*4*
**concern** 57:*16, 18*
68:*13* 120:6
231:9 235:*15*
**concerned** 231:*3*
**concerning** 142:7,
8 238:*17*
**concerns** 32:*10*
129:*1, 10* 200:*22*
226:*7, 9, 10*
231:*1, 11* 235:*10*
**conclude** 223:*6*
**concluded** 269:*22*
282:*22*
**conclusion** 63:*16*
82:*10, 11, 15*
84:*16* 112:*19*
113:*6* 127:*9*
131:*21* 142:*16*
150:*6* 169:*11*
261:*6* 267:*6*
268:*3, 5* 297:*11*
313:*1*
**conclusions**

120:*20* 270:*8*
**condition** 258:*21*
**conditioning**
218:*15*
**conditions** 143:*20*
219:*11*
**conduct** 35:*19*
83:*13, 15, 19, 22*
**conducting**
135:*11*
**confident** 115:*17,
18* 149:*13*
**configuration**
266:*11*
**confined** 220:*19*
**confines** 117:*22*
**confirm** 27:*8*
**conflate** 210:*20*
**confounding**
268:*12*
**confuse** 65:*9*
**confused** 239:*15*
**confusing** 11:*4, 7*
**confusion** 305:*19*
**Congress** 111:*6,
15* 138:*10, 16*
275:*8*
**connected** 28:*6*
187:*8*
**connection** 228:*4*
255:*19*
**connections**
223:*16*
**Connor** 113:*12*
114:*2, 6* 116:*8*
**consequences**
63:*17* 208:*1*
**consider** 61:*4*
68:*12* 75:*13*
76:*5, 20* 81:*19*
100:*21* 106:*14*
108:*9* 109:*12*
132:*16* 200:*16*
205:*20* 207:*1*

234:*7, 11* 260:*15*
288:*2, 11* 302:*17*
312:*20, 22*
**consideration**
104:*13, 20, 21*
109:*21*
**Considered** 4:*12*
13:*8, 14* 28:*6*
36:*1* 69:*6, 7, 15,
19* 98:*21* 126:*21*
275:*12* 281:*8, 10*
**considering** 106:*2*
**considers** 142:7, 9
**consistent** 89:*20*
295:*2* 304:*12*
**consistently**
237:*19*
**constant** 237:*13*
**constitute** 80:*14*
81:*12* 135:*22*
202:*2* 213:*21*
**constitutes** 65:*17*
68:*8* 71:*19*
76:*20* 81:*17*
**Constitution** 2:*12*
**construct** 126:*11*
196:*19, 21* 197:*1,
3* 289:*5, 6, 22*
291:*1, 19* 292:*9,
10* 293:*5* 296:*7*
**construction**
116:*2*
**consult** 135:*3*
**consultant** 48:*10*
190:*21*
**consulting** 28:*21*
29:*7, 11*
**contacted** 17:*9*
18:*8* 28:*19*
29:*16, 18* 131:*14,
15*
**contain** 237:*17*
**content** 26:*14, 17*
167:*6, 7* 187:*11*

188:*1*  221:*17*
222:*4, 7, 12*
**contention**  86:*10*
**contentious**  113:*5,
22*  114:*2, 6*
283:*3, 8, 14*
284:*4, 10, 14*
**context**  20:*1*
21:*6*  37:*11*
38:*16*  60:*17*
69:*4*  72:*22*
74:*15*  197:*5*
211:*15*  213:*2*
214:*21*  215:*14,
19*  216:*11*
243:*19*  257:*13,
14*  258:*1, 15*
259:*2, 6, 7, 9*
263:*16*  277:*9*
293:*17*  296:*16*
310:*5*
**contexts**  256:*3, 4*
**contextually**
118:*5*
**continually**
153:*10*
**continue**  113:*2, 7*
134:*2*  182:*1*
223:*20*
**Continued**  3:*1*
**continues**  151:*4*
248:*2*  280:*3*
311:*8*
**continuing**
151:*22*  264:*21*
281:*4*
**continuum**  38:*13*
87:*13*  98:*21*
99:*6*  161:*5, 21*
171:*1*  179:*3*
192:*20*  193:*11*
195:*18*  226:*15*
255:*16*  257:*10*
302:*13, 20*  303:*5*

**contract**  16:*17,
19, 22*  179:*19*
**contracting**
168:*17*  169:*22*
180:*2*
**contracts**  169:*5*
**contribute**  271:*4*
**contributes**
155:*12*  161:*9*
**contribution**
289:*7*  291:*2*
**conversation**  10:*9*
**conversations**
11:*22*  32:*5*
**Conversely**  130:*5,
11*
**copies**  132:*8*
**copy**  77:*19*
299:*12*  305:*11, 13*
**copyright**  306:*10*
**copy's**  27:*13*
**core**  51:*8*  52:*20*
186:*14*  187:*11, 22*
**corporate**  8:*20*
**correct**  13:*5*
17:*16*  27:*20*
30:*5*  36:*2, 11*
39:*14, 20*  40:*12,
13*  43:*7, 8*  44:*12*
46:*20*  47:*14*
50:*19*  51:*12*
52:*18*  61:*18*
62:*20*  63:*1*  66:*3*
72:*15*  75:*18*
85:*19*  88:*4*  92:*6,
16*  96:*9*  97:*11,
13*  107:*14*
113:*18*  125:*20*
126:*1*  127:*15*
131:*1*  133:*11, 21*
141:*17*  145:*19*
149:*20*  152:*20*
166:*9*  178:*7, 19*
194:*12*  197:*15*

203:*10*  210:*14*
214:*15*  232:*17*
233:*8, 13*  234:*17*
236:*5*  259:*2, 3*
270:*15*  272:*3*
277:*17*  282:*16*
283:*16*  292:*3, 22*
302:*11*  304:*3*
319:*8*
**corrected**  220:*16*
**correcting**  206:*6*
220:*22*
**correctly**  49:*10*
177:*20*  180:*22*
237:*3*  241:*12, 13*
**correlated**  107:*3*
**correlation**  106:*7*
**cost**  42:*21, 22*
43:*2, 3, 4, 7*  83:*7*
162:*12, 16, 21*
164:*2, 13*  177:*22*
178:*4*
**costs**  164:*8*
**counsel**  1:*14*  4:*2*
9:*6*  141:*3*  319:*12*
**counseling**
168:*12*  170:*22*
178:*21*  179:*21*
218:*5*
**counselor**  74:*9*
**counter**  292:*22*
**counterparts**
195:*8*
**counties**  245:*7*
263:*5*  271:*3*
**country**  51:*10*
52:*17*  53:*8, 19*
78:*5*  93:*21*
144:*4, 8, 19*
305:*21*
**County**  15:*18*
228:*7, 20*  262:*15,
21*  263:*3, 11, 14,*

*18, 21*  264:*1, 3, 4,
5, 9, 10, 11, 18*
**couple**  12:*3*
276:*12*  279:*9*
**course**  51:*2*
135:*10*  156:*4*
179:*9*  222:*5*
249:*7*  285:*12*
**courses**  135:*18*
**COURT**  1:*1*
7:*10*  9:*1*  10:*6,
10*  47:*10*  48:*6*
87:*5*  100:*6*
190:*21*  279:*20*
317:*9*
**cover**  305:*8*
**covered**  200:*9*
219:*5*
**created**  117:*16*
230:*18*
**creating**  161:*3*
**credentials**  24:*5*
**crisis**  22:*5*  24:*12*
**criteria**  168:*2*
210:*17*  248:*4*
**criterion**  266:*19*
267:*20*  268:*22*
270:*10*
**critical**  259:*7*
**criticism**  67:*12,
21, 22*  68:*5*
165:*12*
**criticisms**  67:*5,
14*  165:*12*  183:*4*
204:*5*
**criticizing**  205:*2*
**crying**  156:*5*
**culture**  94:*11*
95:*12*  223:*22*
**current**  57:*2*
86:*19*  155:*14, 22*
156:*21*  161:*10,
13*  169:*13*
182:*19*  202:*7*

208:*11* 209:*22*
215:*10* 216:*1, 5,
6* 250:*22*
**currently** 66:*11*
154:*18* 162:*14*
164:*10* 176:*5*
200:*20* 202:*10*
209:*15* 216:*3*
217:*19* 250:*21*
256:*9* 278:*11*
315:*1*
**curriculum** 25:*21*
201:*10* 222:*1*
281:*7, 13* 282:*15*
287:*8* 309:*17*
**cut** 282:*3*
**CV** 47:*1, 8, 17*
136:*16*
**cycling** 239:*18*

**< D >**
**DANIELLE** 3:*17*
8:*17*
**data** 45:*4, 5, 21*
46:*1, 21* 50:*7*
53:*3* 103:*17*
112:*21* 114:*14*
186:*10, 17*
208:*12, 15, 21*
209:*4, 13, 15, 16,
18* 210:*1, 5, 7, 10,
12, 17, 21* 211:*4,
11, 15* 212:*2, 6, 8,
10, 16* 232:*10*
234:*7* 237:*11*
239:*10* 241:*2, 15,
16* 242:*11* 257:*6*
273:*4, 11* 274:*8,
22* 275:*6, 10, 11*
281:*5*
**database** 45:*17*
**data-based** 212:*9*
**data-informed**

186:*13*
**date** 7:*4* 139:*10*
**dates** 138:*3, 19*
**day** 111:*11, 22*
140:*6* 179:*10*
226:*22* 227:*8*
280:*3* 286:*19*
310:*11*
**days** 252:*11*
**DC** 1:*19* 2:*14*
7:*8* 49:*21*
**DCH** 166:*8*
**deadly** 306:*1*
**deal** 311:*3*
**decade** 112:*14*
**decide** 39:*1*
191:*7* 210:*11*
**decides** 38:*16, 19*
227:*3*
**decision** 39:*2*
41:*21* 57:*14, 16*
58:*13* 61:*13*
66:*20* 108:*20*
117:*18* 123:*4, 11*
146:*21* 185:*17*
274:*22* 295:*11*
296:*11*
**decisions** 53:*3*
58:*17* 212:*9, 10,
12* 279:*20*
298:*20, 22*
**Declaration** 4:*10*
16:*15*
**decline** 233:*16*
238:*16*
**declined** 233:*12*
237:*19*
**declining** 234:*14*
239:*16, 18*
**decreased** 235:*5,
14, 20*
**decreasing** 238:*22*
**dedicated** 194:*6*

**dedicating**
150:*11* 151:*6, 18*
**deem** 213:*20*
**deemed** 104:*7*
**deeming** 178:*1*
**deep** 147:*2*
**deeper** 92:*20*
93:*13*
**deeply** 136:*9*
200:*16*
**Defendant** 1:*9,
14* 3:*3* 4:*3* 9:*6,
11* 141:*3*
**define** 37:*10*
50:*18, 20* 52:*17*
67:*9* 73:*3* 80:*22*
115:*16* 120:*13*
192:*9*
**defined** 251:*9*
288:*15*
**defining** 113:*9*
114:*3* 195:*20*
**definition** 50:*22*
51:*1, 7, 12, 21*
52:*14* 53:*7, 18*
66:*6* 77:*1, 5, 8,
18* 113:*13*
120:*13* 122:*2*
136:*9* 139:*19*
143:*15* 186:*19*
251:*22*
**definitions** 51:*8,
9, 22* 52:*21* 53:*2*
116:*6* 120:*12*
186:*6* 187:*5*
**defund** 181:*12*
**degree** 50:*9*
135:*15, 17* 137:*5*
252:*15*
**degrees** 265:*22*
**Delaware** 49:*19*
**deliver** 69:*20*
70:*4* 71:*7*

**delivered** 73:*18*
201:*15*
**delivering** 187:*19*
**delivery** 193:*1,
14* 194:*11*
290:*15, 17, 19*
291:*14* 292:*14,
19* 299:*20* 300:*15*
**denial** 127:*14, 16*
**denied** 126:*9*
**DEPARTMENT**
2:*10* 7:*7* 11:*20,
22* 12:*6* 14:*19*
17:*16, 20* 28:*15,
19* 29:*7, 12, 17,
22* 30:*4, 8, 13, 14*
31:*5, 14* 32:*1, 9*
36:*9* 49:*7* 55:*22*
56:*4, 5, 9, 11*
61:*22* 63:*22*
64:*5, 10, 18*
101:*13* 111:*5, 14*
124:*11, 14, 19*
125:*1* 134:*20, 21*
137:*6* 155:*20*
156:*11, 19*
157:*10, 11, 16, 18*
158:*1, 8, 10, 19*
159:*10, 14, 21*
160:*5, 16, 18*
161:*2, 11* 162:*2,
9* 165:*21* 166:*10,
20* 168:*16* 169:*4,
5, 12, 21* 171:*8, 9,
16, 22* 172:*4, 15,
19* 174:*8, 11, 19,
21* 176:*2, 22*
177:*10* 181:*2*
185:*9, 16, 18*
189:*4, 8* 192:*18*
193:*8* 198:*17*
199:*3, 19* 200:*1,
5, 13, 17, 21*
201:*9* 203:*4*

204:*14*  208:*16*, *20*  209:*3*, *14*, *17*  210:*1*, *11*, *16*  213:22  232:5  261:*10*, *17*  279:*21*  292:2, 8  293:*3*  295:*12*  301:5  303:8  312:7  317:8
**Departments**  185:*14*
**depend**  198:8
**dependent**  117:*13*  136:*11*
**depending**  252:6, *11*
**depends**  73:*20*  104:9  216:*18*  293:16
**deposed**  9:*21*
**Deposition**  1:*12*  7:6  9:*10*, *17*  11:*12*, *13*, *16*  12:2, 7  314:*1*  317:6, *14*  318:9
**depositions**  147:5  314:9
**deprive**  70:6
**depth**  139:*12*  231:7
**describe**  151:*16*  157:*12*  160:*19*  182:*1*  186:2  259:4  268:*16*  274:*18*
**described**  68:*22*  73:*16*  148:9  153:6  158:*10*  160:*15*  163:*15*  179:*17*  259:*19*  265:*13*  291:*12*  311:5
**describes**  91:22

**describing**  26:*13*  120:*13*  258:8  298:*21*
**description**  97:*3*, *5*  111:*19*  112:*6*, *7*  274:8
**design**  211:*18*  266:*12*
**designated**  276:*19*  277:*13*  278:5
**Desirae**  1:*16*, *21*  7:*11*  319:5
**desire**  101:4
**desired**  190:*13*  199:2
**despite**  150:*13*  151:8  279:*19*
**destination**  199:2
**detail**  40:8
**details**  137:*11*  170:*10*
**determinant**  258:*15*
**determinants**  126:2, 9  134:*16*
**determination**  106:*18*  114:*15*  119:*13*  121:*3*  148:*16*  190:*20*  234:*21*
**determine**  28:*13*  76:2, 7, *19*  87:*4*, 8  99:22  100:*8*, *16*  102:*4*  103:8  104:*12*, *20*  105:*11*  106:*11*  117:*21*  119:*10*  132:*21*  134:7  136:*13*  147:*10*  148:22  164:*17*  169:*15*  189:*18*, *22*  191:*1*  209:*12*, *20*  210:*8*, *16*

223:4  231:8  254:5  274:*21*  301:*11*  302:2
**determined**  61:*17*, *20*  114:2  278:*21*
**determines**  103:4  302:6
**determining**  60:*15*  61:6  76:*20*  83:8  88:7  109:*10*  170:2
**detriments**  125:*14*  126:5
**devastating**  156:*3*
**Develop**  90:*15*, *20*  91:*3*, *11*  185:20  198:*3*  201:20  205:*14*  206:*13*  212:*18*  213:8
**developed**  248:5, 7
**development**  30:*17*  106:*21*  137:8  190:8  252:8, *10*  311:*11*, 20
**Developmental**  64:*19*  125:2
**developments**  14:*17*
**develops**  191:*16*  197:*12*  199:*19*
**diagnoses**  194:*15*
**diagnosis**  194:*19*, 22  195:2  196:*15*  244:*14*  289:*13*, 15
**dictating**  292:2
**Diego**  49:*19*
**difference**  90:*1*  158:*14*  186:2  242:20  246:22  247:7  263:*13*

**differences**  90:2  160:*14*  174:*12*
**different**  27:*16*  41:9  44:*12*  46:9  49:4  51:*11*  52:*16*  99:5, 9, *13*, *18*  107:*17*  136:*10*, *11*  137:*21*  159:22  162:*20*  168:6, 9  173:*17*  196:7  199:*17*  200:*11*  201:*1*  210:6  215:8  216:*4*, *11*  223:*18*  225:*11*, *12*  232:6  237:*10*  244:*10*  245:9, *10*  249:*1*  264:6  271:*17*  274:5  281:*1*  302:7
**differential**  174:9
**differently**  52:*18*  65:*21*  94:*10*  95:*12*  119:*4*
**differs**  307:*21*
**difficult**  17:4  69:*11*  98:*20*  203:*11*  266:*20*  269:2, 6  277:8  283:*10*  287:*4*, *21*
**difficulties**  286:*10*
**difficulty**  195:*3*
**direct**  17:*18*  306:*3*
**directed**  262:*13*  266:22
**direction**  1:*22*  90:*16*  161:*4*  185:*21*  191:8  198:5  199:2, *15*  200:*16*  270:*19*
**directly**  40:7, *11*  203:*13*  233:*14*

**Disabilities** 5:*4, 11* 18:*18, 19, 21* 19:2 20:*16* 21:8 23:*3* 24:*1* 25:*19, 20* 26:*3, 9* 37:*5, 8* 38:*13, 17, 22* 39:*18* 55:*3, 4* 60:*3, 7* 61:*16* 64:*19* 65:*13, 22* 66:*17* 73:*10* 79:2, *15* 81:*13* 87:*15, 20, 21* 90:*8* 101:*1, 2* 102:9 108:*18* 110:8 111:*8, 10, 21* 112:*12* 114:*11, 18* 115:*3, 4, 6, 10* 116:*3, 17* 122:9 125:*2, 9* 130:*13* 132:*18* 133:*4* 137:*9, 20, 22* 142:*20, 21* 150:22 156:*17* 161:*20* 163:2, *6, 17* 166:*21* 167:2 169:*15* 170:*18, 20* 171:2, *18* 172:8, *13, 16, 17, 22* 173:*6, 15* 174:*14* 175:2, *15* 176:*1* 183:*16* 184:*20* 189:*10, 12* 192:*21* 193:*3, 11* 195:7, *11* 200:*4* 203:*16, 18* 206:*4, 20* 207:*19* 209:*6* 217:*13* 220:*10, 12, 13, 15* 221:8, *9, 14* 230:*20, 21* 235:9 242:*16, 19* 243:*19* 244:*5, 20* 245:*13* 249:*6* 259:*16* 260:*16*

261:*8* 273:*14* 281:*9, 11* 282:*11, 13* 285:*1, 2, 20* 286:*1, 3, 10, 16, 17* 287:*12, 17, 19, 22* 288:*1, 11* 294:*1* 295:*3* 296:*19, 20* 297:*18, 20* 300:*18* 312:*16, 18* 313:*5* 314:*5, 13, 18* 315:*3, 9, 15*
**Disability** 4:*17* 73:*12* 75:*18, 21* 76:*2, 4* 78:*8* 107:*22* 108:*4, 11* 165:2 195:*14* 196:*19, 20* 197:*3* 220:*18, 21* 227:*10* 228:*9* 230:*6* 244:*15* 253:*17* 255:2, *13* 289:*5, 22* 293:*15*
**disabled** 183:*10* 200:*11*
**disagree** 111:*18* 112:*5, 7, 16, 17, 19* 268:2, *4, 13* 284:*17*
**disagreeing** 302:9
**disagreements** 158:*20*
**disagrees** 317:8
**Disclosure** 4:*10*
**disconnecting** 72:2
**discourse** 283:*3, 9, 14* 284:*4, 10, 14*
**discovery** 9:*12* 317:*17*
**discrimination** 295:9

**discriminatory** 120:*16* 225:*16* 245:*20*
**discuss** 25:9
**discussed** 98:*19* 130:*5* 211:*17* 218:*19* 271:*14* 292:*11* 301:*3*
**discussing** 207:*10* 217:*18*
**Discussion** 89:*6* 140:*1*
**discussions** 113:*3, 21*
**dismal** 273:*18* 274:*14*
**disorder** 244:*18*
**disorders** 22:*20* 23:*18, 19*
**disproportionate** 239:*5* 240:*18*
**dissatisfied** 57:9 58:*3, 9, 13*
**disseminate** 192:*1, 3*
**disservice** 309:*6*
**distinct** 97:*16*
**distinction** 115:*20* 121:9 174:*20* 190:*6* 228:*4* 244:*22* 273:*22*
**distinctions** 123:*1* 219:9 282:*13*
**distinctly** 113:*3, 8, 10* 115:*19*
**distinguish** 122:2
**DISTRICT** 1:*1, 2, 17* 24:*15* 29:*4* 40:*18* 44:*16* 46:*18* 48:*19* 63:*15, 18* 71:*5* 73:*21* 74:*7, 11, 21* 77:*11* 84:*19*

85:*8, 18* 86:*12* 87:*1, 7* 90:*22* 91:*5, 12* 184:*5* 201:*21* 202:*3* 208:2 211:*20* 212:*1* 213:*9, 15* 214:*14* 215:*1* 228:*8, 10* 230:*1, 2, 9* 235:*7* 261:*11* 263:*10* 319:*4, 19*
**district-focused** 205:*16* 206:*15*
**districts** 90:*17* 131:*13, 14* 175:*4* 185:*22* 188:*22* 198:*6* 202:*15* 209:*21* 228:*11, 19, 21* 243:*6* 261:*17* 263:*8* 265:*1, 12* 271:*2*
**district-scaling** 212:*19*
**disturbed** 22:*17*
**diverse** 131:*15*
**divided** 49:*3*
**DIVISION** 1:*3* 2:*11* 196:*2*
**doc** 34:*20*
**doctor** 194:*20*
**doctoral** 135:*15, 17*
**document** 14:*5* 33:*16* 34:*5, 7, 13* 35:*15, 21* 163:*9* 191:*16* 253:*13* 300:*2, 8* 303:*7* 304:*14, 15* 305:*10*
**documentation** 146:*1, 3*
**documents** 11:*15* 33:*1* 35:*16, 18* 42:*4, 15* 51:*6* 57:*17* 58:*7* 84:*1,*

*4* 126:*21* 146:*4*
147:*4* 243:*15*
253:2 254:*8*
275:*12* 301:2, *8*
**DOE** 158:*21*
159:7 184:*4*
192:*1, 3* 204:*10*
208:*8* 227:*5*
275:8 300:*22*
**doing** 11:*5*
25:*12* 26:*22*
49:*10* 76:*13*
82:*4* 83:2 88:7
101:*13* 155:*18,
21* 156:*20* 158:*1*
159:7 160:*16, 18*
161:*12, 13, 15*
162:3, *9* 165:*21*
167:*19* 201:*18*
278:*1* 292:*8*
295:*10* 316:*1*
**DOJ** 190:*22*
**dollars** 123:*4, 12*
153:*19* 159:*10*
164:*11* 272:2
**dominant** 94:*10*
95:*12*
**door** 242:*1*
**downward** 236:*9*
**Dr** 4:*11* 7:6 9:*8,
11, 20* 14:*16, 22*
15:*3, 20* 39:*10*
88:*17* 89:*1, 2*
133:7 180:*15*
188:*14, 16* 225:*1*
272:*15, 17* 276:*4*
283:*13* 284:*16*
317:*3, 6, 7, 13, 20*
318:*1*
**drafts** 191:*16*
**draw** 141:*6*
226:*5* 291:*8*
**driving** 92:*3, 12*

94:*4*
**due** 57:*21* 58:*4, 5*
**duly** 1:*15* 9:*4*
**Duties** 299:*16*

**< E >**
**e.g** 168:*11*
276:*20* 277:*14*
278:*6*
**earlier** 24:*9*
29:*21* 30:*3* 86:*5*
87:*2, 3* 93:*17*
100:*4* 143:*4*
154:*4* 159:*17*
167:*1* 210:*13*
212:*5* 213:*3*
219:*5* 220:*17*
227:*7* 237:*22*
245:*17* 255:*15*
257:*3* 258:*18*
272:*6* 291:*13*
292:*12* 303:*11*
**early** 103:*17*
**ease** 305:*8*
**easier** 12:*19*
70:*19* 269:*18*
270:*9*
**easiest** 160:*21*
230:*14*
**easy** 307:*14*
**ecology** 289:7
291:*2*
**economic** 305:*22*
**economically**
230:*10*
**economies** 228:*12*
**ecosystem** 311:*14*
**Ed** 174:*13*
**educated** 20:*7, 9*
125:*9* 149:*14*
**educating** 66:*3*
131:*16*
**Education** 4:*17*
5:*5, 11, 13* 6:*10,*

*19* 17:*16, 21*
18:*1* 20:*8* 21:*12,
19* 22:*12* 23:*2*
26:*12, 19* 27:*22*
28:*2, 7, 10, 11*
29:*8, 13, 18, 22*
30:*4, 8, 9, 14, 15*
31:*2, 3, 5, 14*
32:*1, 9* 38:*7*
40:*22* 41:*5* 42:*7*
48:*15* 49:*7*
52:*15* 53:*14*
55:*6, 7, 22* 60:*11,
17* 62:*1* 63:*22*
64:*6* 66:*11* 69:*1,
10, 22* 70:*7, 13*
71:*20* 72:*7, 10*
73:*2, 6* 74:*12, 17*
75:*1* 78:*6* 79:*1,
2, 7, 14* 82:*20*
85:*2* 101:*13*
103:*18, 22* 104:*7*
105:*3, 15, 22*
106:*4* 110:*9*
111:*6, 8* 112:*13*
113:*4, 21* 114:*10,
18* 116:*19* 122:*7,
8* 124:*11* 125:*10*
130:*12* 131:*8*
133:*6* 134:*20, 21*
135:*9, 17* 139:*2*
144:*1* 149:*14, 15*
152:*3, 18* 155:*21*
156:*11, 19*
157:*10, 11, 16, 18*
158:*1, 9, 10, 19*
159:*10, 14, 22*
160:*6, 16, 18*
161:*3, 11, 21*
162:*4, 9* 164:*11*
165:*22* 166:*14,
20* 168:*13* 169:*4,
5, 12, 21* 171:*9,
16* 172:*4, 19*

173:*14, 21* 174:*1,
5, 8, 11, 18, 20, 21*
176:3, *22* 181:*2*
183:*9* 185:*10, 14*
187:*19* 188:*17*
189:*2, 5, 8, 9*
192:*6* 193:*8*
194:*19* 195:*8*
198:*10, 13, 18*
199:*19* 200:*1, 5,
13* 201:*9* 204:*14*
207:*17* 208:*16,
20* 209:*3, 14, 17*
210:2, *3, 11, 16*
213:*22* 215:*17*
216:*8, 14* 218:*2*
220:*8, 10* 221:*10,
11, 21* 222:*10, 15,
20* 223:*14* 228:*5,
13* 242:2, *4*
243:*5, 20* 244:*15*
247:2, *9* 248:*10,
15* 261:*10, 17*
262:*15, 22*
263:*11, 14, 19, 22*
264:*5, 10, 11, 18*
265:*21* 267:*1, 11*
273:*15, 16*
274:*10* 275:*9*
276:*15, 21*
277:*15* 278:*7*
279:*6, 21* 280:*3,
16* 281:*7, 13*
282:*15* 287:*8*
289:*21* 292:2, *8*
293:*3* 295:*4, 8,
12* 296:*18* 297:*2*
299:*2* 301:*5*
303:*8, 9* 306:*4,
21* 309:*22* 312:*7*
316:*6*
**Educational** 5:*16,
18* 6:*8* 19:*1, 6*
20:*17* 21:*4* 24:*4*

25:*10*   37:*4*
41:*13*   53:*1*
56:*17*   61:*21*
83:*1, 3*   86:*1, 20*
94:*7*   95:*1, 9*
96:*1, 2, 22*   98:*22*
101:*10*   102:*8, 16*
106:*11*   107:*4*
139:*5*   143:*8, 14*
150:*14*   151:*9*
161:*4*   171:*11, 18*
176:*8*   181:*7*
182:*10, 20*   183:*3*
187:*19*   195:*9*
197:*17, 20*
199:*11*   202:*7*
203:*17*   204:*1*
210:*3*   214:*10*
246:*20*   247:*1, 8*
256:*6*   257:*1, 7*
260:*19*   276:*13*
309:*18*   312:*17*
313:*8*   314:*17*
315:*13*

**Education's**
111:*15*   168:*16*
232:*6*

**educator** 23:*1*
30:*17*   36:*7, 19*
40:*22*   41:*4*
51:*14*   52:*8*   55:*1,*
*10, 11*   58:*12*
73:*1*   77:*3*
109:*17*   128:*9*

**educators** 21:*14,*
*17, 18*   22:*11*
24:*2, 6, 8, 10*
25:*17*   41:*16*
42:*11*   51:*10*
52:*10*   83:*17*
92:*21*   93:*14*
175:*20*   176:*12*
180:*4*   185:*8*
186:*13*   193:*7*

194:*22*   202:*10*
215:*11, 14, 18*
216:*2, 7, 10*
217:*9*   222:*14*
288:*7*   309:*6*
313:*3, 4*

**educator's** 57:*12*
**effective** 20:*2*
21:*21*   22:*2, 3, 5*
23:*22*   24:*3, 12,*
*21*   25:*1, 3*   26:*9*
30:*17*   31:*3*
38:*11*   53:*3*   69:*9,*
*20*   70:*5, 20*   71:*6,*
*12*   72:*5*   73:*17*
87:*17, 18, 19*
100:*21*   102:*3, 4,*
*12*   103:*19*   104:*8*
105:*4, 5*   106:*5,*
*12*   156:*13*   161:*1,*
*18*   162:*10*   167:*5,*
*6, 8, 10*   175:*6, 18*
176:*7, 12*   177:*18*
178:*1, 14, 17*
183:*6, 19*   185:*8*
189:*10*   190:*9*
193:*9*   195:*12*
200:*18*   202:*7*
208:*11, 21*
209:*22*   211:*11*
212:*2, 6*   213:*14*
215:*6*   216:*2, 13*
251:*1*   252:*17, 20*
256:*3*   257:*9, 11,*
*13, 15, 16*   258:*5,*
*6*   260:*14, 18*
267:*12*   269:*10*
278:*14*   293:*21*
295:*1*

**effectively** 46:*5*
85:*22*   101:*7*
154:*7, 19*   184:*11*
212:*16*

**effectiveness**
105:*20*
**efficacy** 46:*4, 14*
50:*8*   101:*15*
102:*5, 16*   104:*12*
105:*11*   106:*2*
202:*14*   203:*2*
205:*2*   211:*15*
257:*12*
**efficiencies**
230:*17*
**effort** 170:*19*
198:*21*   201:*6*
264:*21, 22*   265:*2,*
*7*   266:*3*   267:*2*
270:*16*
**efforts** 202:*14*
**egg** 258:*4*
**eight** 29:*19*   188:*3*
**either** 20:*7*
54:*13*   168:*10*
212:*8*   292:*8, 9*
297:*5*
**element** 45:*11*
70:*22*   71:*14*
**elements** 74:*17*
86:*3, 18*   104:*5*
136:*13*   282:*8*
311:*11, 20*
**eligibility** 129:*11,*
*21*
**eligible** 165:*11*
**eliminate** 37:*2*
67:*2*   183:*8*   214:*8*
**eliminates** 181:*5*
**eliminating**
203:*14*
**elimination**
312:*14*
**Elliott** 15:*20*
**email** 300:*20*
**embedded** 91:*6,*
*14*   96:*21*   212:*21*
213:*1, 11*

**embrace** 217:*9*
288:*7*   311:*10*
**emergence** 188:*5*
**emotional** 22:*20*
23:*17*   24:*17*
46:*15*   75:*19, 20*
76:*1, 3*   78:*7*
79:*2, 15*   87:*17*
90:*22*   91:*7, 14*
103:*6*   116:*16*
125:*13*   126:*8*
134:*15*   151:*2*
155:*1*   163:*17*
167:*8*   169:*14*
172:*7, 13, 22*
175:*7, 18*   176:*4*
177:*19*   178:*2, 9,*
*18*   186:*22*   187:*2,*
*8*   201:*22*   209:*6*
212:*21*   213:*4, 11*
243:*18*   244:*14, 18*
**emotional/behavio
r** 81:*13*
**emotional/behavio
ral** 107:*22*   108:*3,*
*11*   166:*21*
220:*21*   228:*9*
230:*6*   242:*16*
253:*17*   261:*8*
**emotionally** 22:*16*
**emotionally/behavi
or** 183:*10*
**emphasis** 137:*7,*
*20*
**employ** 208:*10*
289:*21*   291:*1, 11*
**employed** 124:*10*
189:*15*   291:*16*
319:*12*
**employee** 124:*19*
125:*1*
**employees** 42:*8*
55:*22*   56:*4, 11*

**employing** 209:*21*
**employs** 290:*18*
**en** 18:*20* 155:*7*
171:*10*
**enabling** 215:*19*
256:*3, 4* 257:*14*
258:*1, 15, 20*
259:*2, 6, 7, 9*
296:*16*
**encompass** 187:*12*
**encourage** 224:*8*
**encouraged**
150:*11, 18* 151:*6*
153:*5*
**engage** 73:*10*
203:*19*
**engagement**
148:2 175:*17*
197:*18* 211:*18*
**Ennis** 125:*17, 19*
**enrichment**
186:*16*
**enrolled** 131:*13*
237:*12*
**enrollment**
236:*11*
**ensure** 186:*14*
299:*18* 300:*13*
**ensuring** 92:*1, 10*
94:*3*
**enter** 239:*6*
240:*19*
**entered** 188:*5*
**entire** 197:*16*
230:*2*
**entirely** 278:*22*
**entirety** 61:*20*
**entities** 69:7, *19*
182:6 242:*19*
243:*10*
**entitled** 87:*20*
110:7
**entity** 242:*21, 22*

**environment**
21:*13* 60:6, *10,
16* 61:2, *5, 7, 14*
66:*12* 79:*19*
104:7 107:4
118:*3* 143:2, *14*
149:2 159:*19*
173:*21* 174:2, *6*
183:*11* 216:*11*
221:*10* 226:*16*
228:*14* 253:*6*
256:*21* 283:*4*
284:*11* 295:*8*
**environments**
21:*10* 26:*5*
73:*11* 104:*3*
130:*12* 161:*5*
183:*19* 220:*8*
221:*22* 222:*21*
244:*19, 21* 246:2
248:*9* 249:*4*
256:*4* 295:*4*
296:*19, 20*
**equal** 18:22 37:*4*
68:*18* 122:*5*
143:2, *3* 161:*21*
172:*16* 181:6
182:9, *20* 183:2,
*18* 203:*17* 204:*1*
214:*10* 217:*21*
218:*1* 246:*20*
247:*1, 8* 256:*5,
22* 312:*17* 314:*16*
**equally** 20:*21*
248:*3*
**equation** 258:*19*
**Equity** 6:*11, 13,
15, 17* 88:*19*
89:*21* 92:2, *5, 12*
94:*4* 96:*11*
97:*14, 20* 304:*22*
309:*3* 310:6, *9*
311:*1, 3, 5, 10, 13*

**equity-based**
90:*4, 12* 91:6, *13*
92:2, *11, 15* 94:*3*
96:8, *12* 97:*10,
12, 16, 19, 22*
98:*17* 99:*1, 8, 16*
192:5 212:*20*
213:*11* 289:*4*
**equivalent** 263:*10*
**ESQ** 2:*4, 5, 6, 7,
8* 3:*4, 5, 15*
**essentially** 52:*21*
170:*12*
**establish** 87:*12*
**established** 20:22
118:*1* 185:*15*
302:*15*
**establishing**
293:*13*
**establishment**
212:*3*
**ET** 1:*19* 20:*3*
27:*17* 53:*4, 5*
55:*13* 68:*19*
83:*18* 110:7
111:*18* 123:*8, 12*
139:*11* 148:*5*
179:*21* 188:*1*
195:*4, 5* 199:*20*
228:*21* 244:*10*
268:*9* 269:*21*
**evaluate** 64:2
101:*15* 158:*15*
204:8
**evaluated** 292:*17*
**evaluation** 11:*15*
35:*20* 45:*13*
204:*13, 17, 18*
**events** 122:*6*
**ever-changing**
73:*2*
**Everybody** 294:*5*
**everybody's**
193:*19*

**evidence** 251:*14*
279:22
**evidence-based**
38:*11* 91:*5, 12*
167:*10* 186:*20*
187:*13* 212:9, *19*
213:*10* 250:22
**evident** 281:6
**evolution** 196:*12*
**exact** 57:*15*
139:*10* 269:*8*
**exactly** 23:6
35:*3* 232:*1*
**examination** 1:*13*
4:2 9:6 141:*3*
145:*21*
**examine** 74:*21*
**examined** 9:*5*
34:22
**Examining** 5:6
210:*18*
**example** 20:6
22:*1* 24:*10* 26:*3*
45:*10, 14, 16*
48:*20* 53:2 55:*5*
57:*19* 59:8 62:6
68:*17* 99:*10, 20*
106:*16* 121:9
147:*21* 165:7
173:*19, 21*
174:*15* 179:*4, 5*
195:2 218:*4, 13*
220:5, *18* 226:*13*
227:*11* 228:6
239:7 240:*10*
245:*1, 2* 251:*17*
254:7 263:22
272:6 293:*10, 19*
**examples** 40:7
**exceeded** 267:*20*
**Excerpt** 6:*11, 13,
15, 17*
**excluding** 223:*11*
**exclusion** 73:*13*



**exclusively**
276:*20*  277:*13*
278:*6*
**excuse**  19:*8*  44:*4*
75:*10*  112:*10*
116:*9*
**exercise**  128:*22*
129:*8*
**exhaust**  170:*6*
**exhausted**  306:*22*
**EXHIBIT**  4:*9*
5:*2*  6:*2*  12:*11*,
*12, 15*  13:*5, 13,
16, 17*  14:*6, 7*
33:*8, 9*  35:*22*
89:*8, 9*  110:*21*,
*22*  116:*9*  126:*14,
15*  128:*14*
130:*18, 19*  142:*5*
225:*2, 5*  232:*1*
261:*20*  262:*1*
272:*10, 11*  276:*6,
7*  299:*12*  304:*22*
305:*2, 15*  307:*3,
8*  308:*20, 21*
310:*17, 18*
313:*12, 14, 15*
316:*5, 7*
**exist**  256:*4*
281:*12*  316:*2*
**existence**  19:*7, 8*
68:*16*  182:*14*
244:*3*
**existing**  185:*2*
278:*16*
**expand**  189:*6*
**expanded**  187:*12,
22*  188:*9*
**expanding**  188:*15*
**expect**  235:*3*
275:*20*
**expectations**  24:*3*
104:*1*  179:*6*

205:*17*  206:*16*
**expected**  204:*6*
**expelled**  235:*5*
**experience**  25:*19*
38:*7, 21*  54:*22*
71:*17*  73:*4*
79:*20*  82:*18*
83:*4*  101:*1*
102:*11*  104:*5*
114:*5, 9*  118:*5*
123:*7*  125:*12*
135:*11, 20*
142:*19*  145:*2*
147:*2*  154:*22*
162:*19*  164:*7*
175:*21*  178:*7, 8*
190:*5*  207:*20, 21*
244:*9, 11*  249:*3,
14*  255:*4, 9, 20*
260:*12*  270:*11*
**experienced**
235:*12*
**experiences**
73:*11, 13*  122:*7,
11*  156:*3*
**experiencing**
126:*7*
**Expert**  4:*10, 14*
15:*12*  16:*13*
18:*5, 9*  32:*7*
47:*9*  48:*10*
154:*6, 16*  155:*5*
317:*16*
**expertise**  166:*13*
175:*21*  184:*14*
202:*6*  204:*10*
**Experts**  4:*15*
**expires**  319:*22*
**explain**  69:*15*
134:*11, 13*  235:*18*
**exploratory**
223:*16*
**exposure**  21:*11*
**express**  57:*16*

**expressed**  32:*9*
57:*18*
**extend**  263:*5*
**extending**  265:*10*
**extensive**  25:*12*
82:*18*  142:*19*
146:*6*  147:*2*
266:*21*
**extensively**
208:*18*
**extent**  112:*10, 11*
266:*10*
**external**  46:*3*
**extra**  27:*13*
**extras**  89:*11*
**extreme**  144:*13,
20*  145:*8*

**< F >**
**facilities**  27:*20*
78:*7*  79:*3, 5, 6,
13*  80:*6, 9, 12*
182:*14, 19*  218:*22*
**facility**  66:*13*
68:*7*  117:*10*
193:*5*  227:*22*
228:*3*  246:*9, 10*
**fact**  112:*17*
146:*5*  155:*2*
242:*8*  275:*2*
286:*5*  298:*3*
**factor**  76:*19*
83:*7, 11*
**Factors**  5:*8*  27:*1*
60:*15*  61:*6, 12*
81:*19*  82:*10, 15*
248:*17*  311:*13*
**factual**  262:*7*
271:*7*
**fail**  69:*22*
**failed**  174:*22*
175:*6, 11*  176:*3,
9*  294:*17, 21*

**failing**  68:*15*
155:*14*
**fails**  69:*20*  70:*4*
71:*5*  207:*22*
**failure**  260:*18*
**fair**  18:*22*  35:*21*
37:*3*  74:*20, 22*
100:*12*  120:*14*
121:*1*  143:*3*
161:*21*  165:*17*
172:*16*  177:*16*
181:*6*  182:*9, 20*
183:*2, 17*  188:*13,
19*  198:*2*  203:*1,
16, 22*  214:*9*
217:*21*  246:*20,
22*  247:*1, 7, 8*
256:*5, 22*  284:*7*
285:*16*  291:*21*
296:*16*  310:*12,
16*  312:*17*  314:*16*
**fairly**  244:*8*
**fairness**  122:*9*
**fall**  252:*2*
**familiar**  15:*6, 7,
15, 19, 20*  16:*1*
32:*12*  53:*11, 13*
54:*1, 2, 10, 13, 14*
57:*21*  60:*2, 5, 9*
65:*2, 11, 14*
70:*12*  77:*5, 7*
79:*22*  80:*18*
110:*1*  123:*16*
133:*16, 17*
228:*16*  253:*9*
262:*4*  304:*8*
**familiarity**  54:*2, 7*
**family**  137:*8*
**Fannin**  227:*11*
228:*7*  230:*2*
246:*7, 11*
**FAPE**  53:*14, 19*
69:*4*  70:*17, 18,
22*  71:*2, 7, 14*

74:*13*  75:*1*  76:*8*, *12*, *21*  77:*2*, *6*, *9*, *17*, *18*  126:*10*, *12*  127:*14*, *16*, *19*  128:*7*, *10*  247:*9*  296:*4*  298:*10*  301:*12*  302:*4*, *11*
**far**  165:*19*  246:*2*  295:*18*  313:*6*
**fashion**  28:*7*  212:*10*
**fault**  102:*22*
**feasible**  230:*10*, *11*
**features**  51:*8*  52:*20*
**Federal**  9:*13*  31:*6*  51:*6*  52:*14*  153:*14*, *18*  159:*9*  273:*4*, *11*  274:*8*  279:*20*  299:*19*  300:*14*
**feedback**  202:*17*
**feel**  11:*7*  33:*5*  83:*4*  99:*5*  144:*10*  147:*6*  149:*12*  157:*21*  158:*3*  162:*8*  190:*13*  194:*2*  278:*1*
**feel-good**  309:*4*
**feeling**  14:*9*
**feels**  81:*21*
**felt**  286:*21*
**fenced**  121:*19*
**Ferri**  113:*12*  114:*2*  116:*8*
**Ferri's**  114:*6*
**fervent**  154:*5*, *14*, *15*, *16*
**fewer**  273:*18*  274:*2*, *6*, *10*
**FIA**  272:*2*, *6*, *8*

**fidelity**  46:*1*, *3*, *4*, *8*, *13*, *19*  99:*22*  100:*3*, *8*, *15*, *20*  101:*4*, *16*  187:*1*  200:*7*  257:*12*  267:*19*  272:*7*  308:*3*
**field**  26:*12*  60:*11*  77:*3*  99:*7*  116:*4*  139:*7*, *13*  147:*2*  183:*21*  192:*17*  248:*9*, *14*
**figure**  121:*2*  169:*7*  232:*21*, *22*  234:*1*  236:*2*, *4*, *20*  238:*9*, *12*  240:*6*, *10*  241:*7*
**figures**  238:*4*
**file**  33:*18*, *19*, *22*  34:*20*  35:*6*  149:*19*  300:*21*  317:*7*
**filed**  14:*22*  15:*3*  58:*4*
**files**  28:*12*
**financial**  319:*13*
**Find**  5:*9*  27:*4*  45:*5*, *6*, *7*, *20*  47:*2*, *18*  59:*10*, *12*  64:*14*  71:*12*  118:*9*, *16*  124:*10*, *18*, *22*  129:*3*  149:*4*  186:*5*  218:*2*, *6*  223:*18*  224:*3*  225:*19*  234:*12*  242:*5*  248:*16*, *20*  275:*6*, *9*, *11*  314:*1*, *15*
**finding**  25:*8*  68:*15*  142:*6*  193:*16*  218:*8*, *16*, *19*  280:*5*  305:*4*
**findings**  231:*18*  282:*18*

**fine**  12:*20*  88:*11*  108:*21*  115:*7*  122:*18*  124:*7*  125:*7*  137:*14*  150:*2*  313:*21*
**finer**  188:*2*
**finished**  180:*1*
**finishing**  247:*17*
**fired**  40:*19*  41:*1*, *5*, *11*, *17*  42:*3*, *11*
**first**  22:*19*  34:*5*, *7*  37:*16*  89:*18*  92:*18*  93:*3*  108:*14*  110:*12*  111:*3*  125:*8*  130:*4*, *10*, *16*  141:*7*  148:*6*  155:*11*  170:*7*  180:*19*  181:*4*  185:*19*  189:*22*  197:*9*  199:*4*  205:*11*  213:*13*  217:*7*  250:*13*  262:*11*  273:*3*, *9*  276:*12*  281:*5*  283:*2*  284:*2*, *20*  285:*6*  295:*13*  301:*17*  309:*3*  310:*22*
**fit**  186:*3*
**Five**  50:*3*, *5*  87:*5*  131:*8*  156:*8*  159:*2*  181:*10*  188:*3*  211:*9*  226:*17*  227:*1*  309:*7*  313:*1*  316:*15*
**flip**  219:*16*
**Florida**  15:*16*  46:*12*, *13*
**flow**  87:*6*  290:*5*
**flowing**  159:*10*
**focus**  137:*8*  190:*7*, *8*

**focused**  104:*1*  186:*17*  199:*6*  214:*22*  293:*9*
**focusing**  187:*22*
**folks**  188:*10*, *14*  245:*19*
**follow**  10:*2*  161:*3*
**followed**  118:*1*
**following**  121:*6*  222:*19*  230:*15*  256:*14*
**follows**  9:*5*
**follow-up**  99:*17*  108:*21*
**force**  92:*3*, *13*  94:*4*
**foregoing**  319:*6*, *7*
**forget**  68:*4*  196:*5*
**forgive**  32:*22*  136:*15*  222:*16*  286:*18*
**forgotten**  94:*16*
**form**  9:*15*  19:*10*  20:*11*  28:*6*  38:*5*  43:*18*  51:*2*  52:*2*, *19*  54:*18*  60:*8*, *18*  61:*9*  63:*7*  64:*22*  65:*4*  67:*10*  69:*2*  70:*1*  71:*8*  72:*8*  74:*14*  75:*4*  76:*10*  77:*12*  80:*20*  81:*15*, *20*  86:*13*  87:*10*  98:*4*, *9*  100:*9*  104:*15*  109:*15*  112:*1*  123:*21*  127:*18*  129:*17*  138:*7*, *17*  151:*13*  152:*10*  155:*14*, *22*  156:*21*  158:*12*  159:*16*  160:*20*  161:*10*, *13*, *16*  163:*21*  165:*18*

169:6, 13   170:4
178:21   179:1
183:12   190:3
204:15   206:3
208:3   209:2
214:1   225:21
227:6   229:10
231:5   245:21
247:3   254:17
256:18   260:6
270:1   277:6, 18
283:22   290:13
292:4   293:6
294:19   295:20
298:7   299:6
301:13   302:22
315:10, 21
**formal**  39:13
252:14
**formats**  249:1
**formatting**  225:12
**formed**  54:17
**forms**  86:4
210:6   249:1
**formula**  250:13,
17  257:2, 4, 5, 8
259:6
**forth**  181:15
200:17   222:17
**found**  21:8
57:17   190:4
243:13   267:19
270:8
**four**  226:17
228:8   234:16
250:18   267:21
**four-year**  262:15
**framework**  45:15
186:9, 13  266:14
**frankly**  204:6
**free**  11:7  33:5
53:13   68:22
69:22   70:6, 12,
14  71:19   72:7, 9

73:1, 5   74:12, 22
144:10
**freestanding**
67:17   68:8   80:9,
12  182:13, 16
183:11   242:14,
15, 18  243:17
244:4, 13  245:16
**frequently**  11:6
**friendly**  65:6, 7
**full**  66:16   87:13
92:19   93:3
96:18   125:8
130:4, 10  142:6
143:10, 18  144:3,
7  146:7  155:11
164:22   175:1
191:22   192:20
193:1   195:8, 16
201:14   210:10
217:7   243:4
246:18   250:13,
19  266:19
267:19   269:1
270:10   279:18
280:9   289:2
307:12   309:3
310:22
**Fullan**  309:8, 11
**fully**  52:10
86:11   205:5
269:19
**Fulton**  263:22
264:3, 4, 5
**fun**  143:16, 17
**functional**  22:4
24:10   25:21
26:7   222:1
**fund**  182:1
**fundamental**
92:20   93:14
**funded**  31:15
178:5

**funding**  17:19
29:22   30:9, 10,
17, 19   31:2, 3, 9
43:14   152:16, 17,
19  157:3, 6, 19
158:20, 21  159:7,
14  160:12  163:5
182:4  292:16
**funds**  150:13
151:8, 11, 16
152:1  153:14, 18
157:10, 16  158:9,
10  229:8, 12
**further**  189:19
195:6  246:4
279:19  280:7, 8
282:17  317:4
**furthering**  192:5
**furthermore**
112:10, 11

**< G >**
**GaDOE**  160:1, 3
166:3, 7, 11
184:17
**GARDNER**  2:7
8:5
**Gen**  174:13
**General**  5:5
20:8   21:12, 19
22:12   23:2   24:2,
14  25:17   26:19
27:22   28:1, 7, 10,
11  38:10   39:11
40:22   41:4, 13
42:7   55:7, 10
66:3, 10, 11
83:10   88:9
103:18, 22  104:7
105:3, 15, 16, 22
106:4  108:1, 10
110:9  112:13
113:4, 21  114:10,
18  116:17, 18

122:7, 8   125:9
130:11   133:5
144:1   149:14
153:2   163:10
166:21   167:2
168:13   173:5, 14,
20  174:1, 5, 10,
18  181:20  193:6
194:13   195:8
198:10, 13, 20
207:17   215:17
216:14, 17  218:7
220:7, 9  221:9,
10, 21  222:10, 11,
15, 20  223:6, 14
224:2   228:5
249:15   273:16
274:10   277:11,
17  281:7, 12
282:15   287:8, 21
295:3, 8  296:18
297:2  309:22
**generalized**
104:21   117:2
244:16
**Generally**  36:13,
16  60:2  71:4, 5
129:16  207:22
**geographic**
228:20
**geography**  230:22
**GEORGIA**  1:2, 8
3:8, 15, 16, 17, 18,
19  5:17  7:4, 18,
20  8:16, 18, 20
9:12  15:8, 9
17:1  18:18, 19,
21  23:4  26:16
28:3, 21  29:3, 7,
12, 18  32:6, 10,
13, 16  37:3, 6, 9,
22  38:2  39:17
40:15, 19  41:1, 6,
14, 17  42:3, 12,

22  50:7  55:6, 8,
19  56:1, 7, 12
58:3, 18  63:22
64:4, 5, 18  67:5,
15, 21  68:6
79:10  83:14, 21
84:10, 19  85:1, 9,
18  87:7, 15  90:4
92:16  97:8
99:11, 14, 20
100:6, 7, 14, 15
101:16  103:8
123:11  124:4
153:1  155:12, 18,
20  157:19
158:16  159:7
160:5, 18  161:2,
9, 12, 18  162:4, 9,
12  163:8, 10, 14
164:6  165:12, 13,
14  166:3, 20
168:16  169:3, 5,
20  171:9, 16
172:3, 11  174:8,
12, 19, 21  176:3,
22  178:2  180:21
181:19  184:3
192:1, 3  198:14
200:1, 13  201:8
204:10, 14  208:8,
16, 20  209:3, 13,
17  210:1, 11, 15
213:22  227:12
232:5  241:20
242:7, 13, 17
244:1  245:18
246:1  253:8, 10
254:13  260:3
263:7  264:1
268:16, 19  269:2,
14, 15, 17, 19
270:10  271:6
277:5  278:5
279:14, 16

289:21  290:18,
22  291:7, 10
292:2, 8  295:11
297:1  303:8
309:20  313:3
315:1
**Georgia's**  42:17
64:10  290:19
**getting**  108:7
121:14  181:18
239:15
**GILLESPIE**  2:5
8:1
**give**  21:6  49:14
59:10, 19  194:1
311:12  316:15
**given**  18:22  54:1,
7  67:12  73:2
107:6  108:4
142:19  147:22
159:6  198:16
216:11  224:6
239:22  240:16
283:11  297:22
**giving**  254:7
**glad**  318:3
**GNET000381**
33:17
**GNETS**  5:19
15:8  18:22  19:3,
5, 8, 9, 15, 16
27:20  28:1, 4, 8,
9  37:3, 5  38:18
40:15  41:16
42:2, 9, 11  55:8,
9  57:19  58:4, 10
62:8, 9  63:12
66:13  67:6, 17
68:7, 14, 21  69:4,
5, 9  78:6  79:4
83:17  102:6
115:15  117:9
118:9, 12, 16, 18,
19, 21  119:7, 9,

16, 19  120:1, 3, 7
123:19  124:5, 9,
12, 16  141:8, 11,
13, 16, 19, 21, 22
142:1, 10, 17
145:15  150:12,
20  151:7, 21
152:4  153:2, 15,
19  154:18
155:13, 21
156:20  157:11,
17  159:11
161:10, 12
162:15  163:4, 18
164:19  165:16
168:5  169:13
173:2, 8, 15, 18
174:4, 10, 18
175:4, 9, 12, 16
176:12  177:21
181:13, 15, 17, 21
182:2, 3, 5, 13, 16,
19  183:5  200:20
202:10  203:9, 16
204:5, 8, 13, 17
214:7  215:8, 11,
15, 19  216:6, 10,
16  217:9, 20
218:7  219:21
220:2, 15  221:13
222:6, 7, 11, 15
223:7, 17  224:3
225:2, 3, 10, 15,
18  226:3, 12, 14,
15, 19, 22  227:14,
22  228:2  231:2,
4  233:11, 16, 17,
18, 20  234:14
235:9, 21  236:5,
6  237:4  238:19
239:11  240:13
241:9  243:7, 8, 9
245:1, 6  246:9,
10  249:10  253:4

254:9  256:10, 16
257:19  258:7, 10,
16  259:1, 5
278:10  287:9
288:7, 21  292:17
293:19  294:6, 8,
10, 12, 15  295:15,
16  296:2  297:3,
14, 15, 22  298:14,
21  299:5, 9, 11,
18  300:4, 13, 17,
21, 22  301:4, 11
302:2, 3, 9, 12, 16,
18, 20  303:5
312:16
**go**  12:10  25:7
30:7  34:4  59:13
60:15  61:6, 12
63:20  67:17
68:7  71:18
74:16  82:11, 15
85:14  108:18
112:9  122:16
131:3  135:5
136:20  157:3, 5
162:6, 11  169:11
180:20  182:3, 7
191:9  197:10
209:10, 11  211:6
213:7  218:10
223:1  241:14
242:5  246:10
247:15  250:12
270:6  271:19
294:6  298:17
300:21, 22  301:3
302:12  310:16
317:19
**goal**  109:17
182:16  207:6
293:13
**Goals**  5:14
181:15, 22
182:12  190:13

**goes** 58:*16* 81:*17* 94:6, *19* 130:*15* 131:*12* 204:4 224:7, *9* 233:3 267:*17*

**going** 9:*15* 11:4 22:*18* 30:6 50:2 64:*14* 71:*18* 77:*17* 79:*17* 88:9, *17* 89:4 110:20 126:*21* 127:2 130:3, *15* 132:3 133:22 144:6, *11* 153:*15*, *19* 157:*10*, *16* 167:22 170:*1* 176:*19* 177:5 180:*17* 200:7 206:2 219:*16* 222:4 223:*19*, 20 224:*14* 225:*1*, 8 227:3 229:2 230:*13* 237:*21* 258:2 276:4 281:22 306:*19* 316:*4* 317:*3*

**Good** 9:8, *9* 23:5 78:*13* 104:*18* 110:*17* 115:20 125:*21* 168:8 180:7, *9* 224:*17* 225:*17* 247:*17* 294:4

**goodness** 193:*16*

**Gotcha** 82:*12* 91:20 219:*19*

**government** 123:*10* 264:*4*, *6*, *12*

**governments** 123:2

**Governor's** 265:*6*

**gradations** 98:22

**grade** 22:*12* 23:*1* 25:*16*, *18*, 20 205:22 220:8 221:*16* 222:3 236:7 241:*8* 262:*17*

**graders** 240:*11*

**graduated** 137:*1*, *12* 234:22

**graduating** 234:*9* 235:6

**grant** 29:22 30:*5*, *12* 31:*6*, *15* 182:2 189:*3*, 7 272:*21*

**grants** 17:*19* 31:*16*, *19*, 20 123:20 124:5 152:*4*, *9* 159:*12* 181:*13*, *15*, *17*, 22 182:2

**graph** 240:*21* 241:*1*

**graphic** 237:*1* 241:*6* 250:*15*, *16*

**graphs** 232:*10*

**grappling** 305:*21*

**great** 11:*11* 23:7 139:*12* 178:*16* 261:*13* 309:5 311:*3*

**greater** 231:7 274:*1* 281:6

**gross** 150:*13* 151:8

**group** 121:*10*, *11*, *16*, *17* 164:*15* 179:8

**groups** 15:*10* 168:5

**growth** 106:20 130:*13* 132:*19*

**guess** 35:9 134:*10*, *12* 137:*1*

139:*14* 170:*1* 183:7 204:*3* 239:*13* 244:7 255:22 297:6 309:*12*, *13*

**guessing** 232:22

**guests** 7:*16*

**guidance** 61:22 66:2*1* 87:*13* 90:*6*, *15* 156:*12* 160:*11* 161:*3*, *18* 174:22 175:*9*, *11* 185:20 198:*4* 199:*14* 202:*5*, *6* 250:20 269:*11* 270:*19* 312:*3* 313:*9*

**Guide** 4:*15*

**guiding** 191:*15*

**gymnasiums** 104:*3* 123:*8*, *12* 218:*14* 220:2

**< H >**

**half** 111:*9*, *20* 234:*14*, *15*, *16*

**HAMILTON** 3:*14* 8:*13*

**Hampshire** 49:*13* 99:*9*, *19*

**handed** 14:*2*, *3*, *6*

**hang** 131:2 273:6

**happen** 256:2*1* 311:*3*

**happened** 14:*17* 251:*19*

**happening** 62:2*1*

**happens** 194:*14* 199:*12*

**happiness** 102:*17*

**happy** 12:*18* 102:*14*, *15*, *20*

**hard** 275:*1*

**harmful** 218:22

**harms** 160:*19*

**hazard** 192:7

**head** 138:*14* 188:*12* 219:*15* 264:*2*

**health** 24:*17* 56:*5*, *10*, *11* 64:*10*, *18* 75:*2*, *9*, *20* 76:*2*, *3* 91:*2*, *7*, *15* 103:6 124:20 125:2 162:2 166:*10* 168:*12* 170:22 173:22 174:*17* 175:*19* 176:5 187:*1*, *4*, *9* 201:*22* 212:22 213:*12* 218:5 220:2*1* 251:5 252:2*1*, *22* 253:*3*, *5*, *7*, *18*, *19* 254:*6*, *8*, *10*, *15*, *19* 255:*3*, *8*, *14*, *17* 305:20 306:*15*

**hear** 109:2 177:*19* 187:*15* 223:2 313:*13*

**hearing** 57:22 58:5

**heart** 311:*13*

**held** 1:*17* 89:6 140:*1*

**help** 77:22 96:8 100:*4* 186:*10* 199:*8* 201:*1* 204:*18* 215:7 285:*10* 294:5 308:*16*

**helpful** 240:7 290:7

**helping** 96:*11* 207:*16* 267:*16*

helps 162:*10*
167:*21*
HERNANDEZ
3:*17* 8:*17*, *18*
heroes 309:*4*
hey 294:*3*
Hicks 268:*9*
high 24:2 104:*1*
136:*19* 137:*13*
205:*16* 206:*15*
215:*4* 220:*5*
221:*20* 230:*8*
281:*8* 282:*10*
higher 237:*8*
highlight 156:*2*
highlighted
240:*11*
highly 21:*14*, *16*
22:*11* 113:5, 22
114:2, *5* 144:*14*,
*21* 145:8, *16*
hire 184:*21*
hired 40:*18* 41:*1*,
*5*, *11*, *17* 42:*3*, *11*
180:*4*
history 188:*4*
279:*19*
Hmm-mm 158:7
holding 317:*14*
hole 116:*14*
home 58:*16*, *20*
59:5 155:*15*
220:*1*, 7 223:*19*
243:6 245:*15*, *19*
homes 246:2, *4*
homework 78:*1*
honest 310:*13*
honestly 137:*11*
honesty 310:*14*
hope 99:*21*
102:*19*, *21*
109:*17* 207:*15*
217:*8* 288:6

305:*14* 312:*19*,
22 313:*8*
hopelessness
155:*13* 156:2
161:*9*
hopes 92:*20*
93:*4*, *7*, *13* 296:*11*
hoping 288:*12*
hour 88:*10*
hours 12:9 17:*5*
252:*11* 303:*21*
huh-uh 10:*15*
human 137:*8*
289:*6* 291:*1*, *19*
292:*10* 293:*5*, *9*,
*13*
hundreds 155:*3*
234:6 237:*15*
238:*18* 239:*22*
240:2
hung 170:*10*
hypothetical
63:*19* 73:22
107:9, *11* 108:*6*,
*15* 159:8 190:*17*
230:3 246:*15*
253:*16* 295:*13*
hypothetically
63:*13* 74:*16*
109:*16* 135:*20*
136:*4* 157:*22*
207:*12*

< I >
i.e 196:*3* 289:*13*
Idaho 49:*20*
IDEA 53:*11*
54:2, *7*, *10*, *14*, *17*
58:*11* 63:6 77:6
111:7 127:*10*, *11*,
*14*, *16*, *20*, *22*
128:*1*, *5*, *11*
129:*12*, *21*
138:*15* 139:*3*

150:*11*, *19*, *21*
151:6, *12*, *16*, *19*
153:5 169:*13*
170:7 178:*16*
180:7, *9* 251:22
273:*15* 294:*4*
IDEA's 77:*18*
identified 12:*12*
13:*8* 14:7 27:*1*
50:*4* 52:*1* 89:*9*
106:*1* 110:22
124:*14* 126:*15*
130:*19* 168:*15*
169:*16* 171:*6*
185:*11* 186:*16*
225:5 262:*1*
272:*11* 276:7, *21*
277:*14* 278:7
280:2 294:*14*
305:2 307:*8*
308:*21* 310:*18*
314:2 316:7
identify 7:*13*
8:*10* 24:*21*
168:*21* 226:8
232:5 252:*21*
260:4 283:*11*
294:*17* 295:*10*
identifying 146:*10*
IEP 33:*17*, *19*, 22
34:*19* 35:*10*, *14*
54:*3*, *5*, *16*, *21*
55:*1*, *2*, 9, *15*, *18*
56:*1*, 5, *6*, *12*, *15*,
*16*, *21* 57:*1*, 6, *9*,
*14* 61:*1*, *4*, *17*
62:*3*, 6, *11*, *18*, *21*
63:*3*, *11*, *16* 64:*1*,
6, *11*, *20* 66:*1*, 7,
9, *14*, *19* 67:*6*, *16*
68:*6*, *10* 118:*10*,
*19* 119:*1*, *4*, 8, *10*,
*15* 120:2, *8*
141:8, *10* 143:*6*

149:*3*, *11* 205:*20*
206:22 207:*8*, *15*,
*21*, *22* 208:2
227:8 246:9, *17*
253:*18* 258:*10*
291:*10*, *15*, 20, *21*
292:*3*, 9, *21*
293:*1*, *4*, *7*, *10*, *12*
294:*3*, *10*, *17*, *21*
295:*10* 296:*1*, *10*
297:*3*, *10*, *13*, *18*,
*21* 298:*3*, *5*, *13*,
*17*, *19*, *22* 299:*4*,
*8* 300:*3*, *9*, *21*
301:*6*, *10* 302:*1*,
*2*, 6, *10*, *17*, *18*
IEPs 34:*22* 35:*4*,
*11* 40:*12* 42:*6*
118:*20* 120:*5*
141:*14* 142:*15*
145:*22* 168:*11*
221:8 291:*15*
300:*9*
iii 299:*18*
immediate 99:*17*
203:*20* 204:*12*
immediately
203:*9*
Impact 5:*15*
106:*15* 239:*5*
240:*18*
imperatives
279:*21*
implement 38:*3*
43:*15*, *17* 84:*18*
85:*8*, *16* 96:*8*
100:*7* 101:*4*, *7*
129:*19* 181:*2*
185:*10*, *17* 190:*9*
191:*10* 198:*18*
202:7 205:*5*
210:*18* 215:*6*
269:*19* 270:*9*

278:*12* 293:*1, 8, 16* 308:*2*
**implementation**
43:*22* 45:*10, 11*
46:*8* 90:*16, 22*
91:*5, 12* 92:*1, 10*
94:*3* 100:*3*
111:*7* 128:*10*
139:*4, 7* 162:*21*
175:*1* 178:*8*
184:*6, 15* 185:*21*
188:*21* 189:*6, 15*
191:*18, 20* 198:*4, 21* 199:*9* 200:*18*
201:*21* 202:*3*
212:*20* 213:*10*
214:*22* 226:*11*
251:*1* 256:*2*
257:*6, 7, 11, 15*
258:*6* 265:*15, 22*
266:*9, 20* 267:*20*
269:*1, 12* 270:*17*
271:*4* 272:*7*
309:*15, 16, 17*
312:*4*
**implementations**
278:*13*
**implemented**
44:*6, 15, 18, 21*
45:*1* 46:*5, 19*
50:*4, 10* 85:*22*
86:*11, 18, 22*
139:*13* 187:*1*
197:*14, 16* 203:*8*
251:*13* 294:*9*
**implementing**
31:*19* 44:*10*
82:*19* 100:*14*
129:*10* 162:*19*
164:*7, 8* 182:*8*
199:*16* 260:*13*
266:*19* 268:*22*
270:*14, 20*
292:*18, 20*

**important** 20:*19, 21* 101:*11*
106:*20* 107:*2*
170:*17* 188:*20*
201:*14* 311:*12*
**importantly** 10:*5*
**imposing** 293:*4*
**impossible** 105:*7*
261:*12*
**impressed** 194:*7*
**improve** 276:*17*
**Improvement**
111:*8* 256:*7*
273:*15*
**improves** 187:*2, 3*
**inappropriate**
25:*16* 260:*17*
315:*14*
**incidence** 281:*8, 11* 282:*11, 12*
**incident** 42:*5*
146:*3*
**include** 24:*9*
25:*4* 51:*20* 84:*9*
87:*16* 120:*16*
136:*10* 167:*4, 6*
251:*2, 17* 255:*2*
278:*13*
**included** 42:*4*
51:*3, 4, 5* 97:*17*
115:*13* 122:*4*
127:*20* 128:*10*
148:*19* 149:*1*
179:*16* 181:*9*
225:*3* 255:*3, 9*
259:*10* 260:*12*
276:*16* 286:*11*
312:*8, 22*
**includes** 25:*4*
51:*7* 119:*10*
120:*22* 135:*9*
200:*3* 250:*20*
**including** 19:*22*
135:*12* 144:*22*

145:*22* 156:*5*
164:*14, 15* 175:*3*
184:*14* 220:*10*
223:*21* 230:*20*
235:*10* 256:*7*
287:*22*
**inclusion** 103:*22*
113:*4, 21* 283:*5*
284:*5, 12, 21*
285:*9, 18, 21*
286:*14* 287:*5, 10, 18, 21* 288:*3, 13, 15, 22* 303:*13*
304:*9, 13, 19*
**Inclusive** 6:*10*
48:*14* 130:*11*
192:*3, 6, 16, 19*
276:*13* 289:*4*
**increase** 235:*7*
278:*4*
**increased** 132:*4*
273:*13*
**independent** 12:*1*
80:*9* 136:*11*
229:*8, 17*
**indicate** 105:*19*
134:*14* 233:*16*
238:*15* 239:*10*
273:*5* 292:*1*
**indicated** 62:*9*
66:*15* 68:*15*
212:*6* 233:*22*
298:*2*
**indicates** 27:*16*
241:*2* 266:*18*
**indicating** 276:*14*
**indication** 143:*5*
**indicative** 104:*8*
105:*4, 5* 106:*5*
**indicators** 147:*16*
192:*16* 235:*3*
248:*8, 22*
**Individual** 5:*13*
19:*19* 20:*4, 10,*

20 23:*8, 11, 14, 15* 28:*12* 32:*12*
35:*9* 39:*22* 40:*2, 8* 48:*19, 21*
56:*16* 62:*19, 22*
68:*12* 105:*8, 16*
106:*15, 18*
107:*21* 124:*14*
145:*21* 165:*7*
212:*13* 263:*5*
289:*8* 291:*3*
293:*8*
**individualized**
22:*5* 76:*17*
104:*13, 20*
106:*13* 295:*2*
**individually** 16:*19*
**Individuals** 5:*10*
24:*13* 111:*7*
184:*21* 185:*3, 6*
273:*14*
**ineffective** 106:*6*
152:*2*
**inequitable**
120:*17*
**inequities** 96:*21*
**inferior** 220:*3*
**influence** 197:*19*
**inform** 41:*20, 21*
42:*1*
**information** 17:*2*
84:*1* 116:*1*
147:*6* 191:*7*
242:*6*
**informed** 113:*17*
212:*8*
**infrastructure**
186:*9*
**initial** 191:*15*
**initiative** 309:*18*
**initiatives** 82:*19*
257:*7*
**injuries** 80:*13*

**ink** 194:*5* 224:*11*
**in-seat** 78:*10*
**inserted** 171:*22*
**Insomuch** 173:*1*
231:*17*
**inspire** 92:*20*
93:*13*
**instability** 305:*22*
**install** 267:*18*
270:*10* 308:*2*
**installing** 266:*18*
268:*22*
**instance** 119:*22*
**instant** 318:*8*
**Institute** 79:*22*
80:*11*
**institutional**
215:*16* 248:*9*
249:*4*
**instruction**
103:*19* 179:*9, 11*
186:*11, 15* 222:*2,*
*14* 289:*8* 291:*3*
**instructional**
129:*10, 20*
299:*20* 300:*16*
**instructors** 216:*7*
**instrument** 46:*13*
**insufficient**
171:*17* 172:*4, 5,*
*11, 20*
**integrated** 154:*21*
**integrating**
114:*17*
**integration**
153:*22*
**intellectual** 111:*9,*
*20* 115:*10* 116:*3*
**intended** 156:*15*
**intensity** 186:*18*
252:*12*
**intensive** 151:*1*
266:*22* 267:*8, 18*

**intention** 97:*18*
**intentional** 315:*20*
**intentionality**
316:*1*
**intently** 170:*9*
**interaction** 145:*1*
148:*4, 5*
**interactions** 25:*4*
132:*4* 195:*3*
**interchangeably**
49:*8*
**Interest** 47:*13*
48:*11* 107:*13*
108:*17* 319:*13*
**interested** 192:*19*
200:*10* 202:*20*
**interior** 219:*9*
**internationally**
266:*10*
**interpreted** 197:*4*
**interrelated**
266:*13*
**interrupt** 82:*3*
133:*22* 166:*6*
265:*17* 290:*5*
**interrupted**
103:*12* 271:*19*
**intervention** 22:*3,*
*6* 24:*11, 12*
45:*14* 259:*12*
293:*14*
**interventions**
22:*1* 129:*11, 20*
291:*16* 296:*18*
**introduce** 12:*10*
13:*15* 277:*20*
**inverse** 25:*15*
**invest** 123:*11*
184:*4, 9*
**investment**
198:*22* 213:*15*
214:*13, 18, 21*
269:*8, 9*
**invoice** 17:*6*

**involved** 47:*12*
182:*6* 278:*19*
300:*10*
**involvement**
103:*22* 156:*3*
**involving** 47:*13*
135:*21* 219:*10*
**isolated** 125:*11*
249:*11, 16, 20*
**isolation** 250:*9*
**issue** 12:*21*
23:*10* 108:*14*
196:*3* 242:*10*
245:*8* 268:*12*
292:*11*
**Issues** 6:*4* 18:*17*
196:*11* 266:*9*
**items** 122:*5, 6*
**its** 68:*16* 74:*13*
138:*11* 150:*13*
151:*8* 155:*14, 21*
156:*21* 161:*10,*
*12* 169:*13*
215:*15, 16*
258:*16* 266:*11*
298:*19* 319:*14*

**< J >**
**James** 274:*17*
275:*2*
**JAVIER** 3:*16*
8:*15*
**jbelinfante@robbi**
**nsfirm.com** 3:*10*
**Jennifer** 134:*17,*
*19*
**Jeong** 232:*19*
**JESSICA** 2:*9*
**JOHNSON** 3:*5*
7:*19*
**Join** 6:*11, 14, 16,*
*18* 88:*19* 89:*21*
92:*5* 96:*11*

97:*20* 304:*22*
310:*6*
**joining** 97:*15*
**JOSH** 3:*4* 7:*17*
78:*12*
**Journal** 6:*3*
279:*4* 284:*17, 18*
**journey** 269:*14*
**judge** 37:*21*
**judgment** 14:*20*
129:*1, 9*
**judicial** 36:*5, 15*
38:*1*
**Judy** 15:*20*
**jump** 145:*10*
**Jura** 1:*16, 21*
7:*11* 319:*5*
**JUSTICE** 2:*10*
6:*11, 14, 16, 18*
7:*7* 11:*20, 22*
12:*6* 28:*15, 20*
29:*17* 88:*19*
89:*21* 92:*5*
96:*11* 97:*15, 20*
304:*22* 310:*6*
317:*8*
**Justice's** 14:*20*
**justify** 68:*16*
171:*14*

**< K >**
**K-12** 48:*14* 49:*1*
**Kansas** 16:*20, 21*
17:*19* 46:*1, 7, 10*
134:*22* 137:*2, 6*
**Katie** 32:*13*
**Katsiyannis**
125:*19*
**keep** 30:*6* 77:*13*
176:*19* 224:*9*
295:*8* 306:*18*
**KELLY** 2:*7* 8:*5*
89:*2, 3*

**Kelly.Gardner@us**
**doj.gov** 2:*19*
**kept** 45:*17*
**key** 257:*17*
**Keywords** 111:*4*
**kid** 246:*10, 11*
294:*7*
**kids** 20:*7* 102:*15*
133:*10, 20* 245:*12*
**Kim** 16:*6*
**Kimberly** 32:*15*
**Kimm** 15:*15*
16:*7*
**K-I-M-M** 16:*7*
**kind** 10:*1, 17*
35:*18* 39:*10*
72:*19* 122:*1*
125:*11* 192:*11*
196:*9* 219:*22*
252:*6* 274:*4*
291:*6* 314:*10*
**kindergartner**
239:*9*
**kinds** 107:*1*
147:*16* 164:*9*
192:*22*
**Kleinhammer-**
**Tramill** 273:*10*
**knew** 197:*8*
**know** 11:*6* 13:*13*
14:*16* 16:*6, 8, 10*
17:*12* 18:*4*
19:*11* 29:*15*
31:*19* 32:*4, 18*
33:*3, 14* 41:*8*
42:*13, 19* 45:*6*
50:*8* 52:*4, 5*
53:*9, 20* 54:*5*
56:*2, 8, 13* 61:*1,*
*8* 63:*17* 64:*8*
71:*18* 74:*1* 75:*5*
76:*11, 15, 22*
77:*16* 78:*10, 12,*
*14* 80:*10* 105:*6*

109:*22* 110:*2*
113:*13* 114:*3*
117:*1, 19* 118:*6*
119:*20* 122:*12*
123:*6, 22* 126:*11*
130:*14* 132:*1*
134:*8* 136:*16, 18*
138:*4, 12, 15, 18,*
*19* 143:*15*
144:*15* 148:*19*
152:*5, 6, 8, 11, 19,*
*21* 153:*3, 4, 13,*
*14, 16, 18, 20*
157:*14* 158:*5, 6,*
*9* 162:*5* 163:*14*
164:*2* 170:*8*
177:*11, 22* 180:*8*
185:*6* 188:*8*
191:*4* 194:*4*
200:*8, 21* 204:*12*
208:*4* 219:*20*
224:*13* 228:*15*
229:*1* 240:*5*
242:*3, 22* 247:*11*
248:*13* 250:*9*
261:*14* 264:*12,*
*17* 266:*6* 269:*3,*
*21* 275:*7* 279:*4*
280:*11* 284:*3*
297:*4* 298:*11*
301:*16* 308:*10,*
*14, 18* 309:*10*
314:*14*
**knowing** 222:*4*
275:*5*
**knowledge** 29:*10*
55:*21* 56:*3, 10*
87:*8* 265:*11*
**knowledgeable**
82:*22*
**Kozleski** 282:*19*
**KU** 4:*15*
**Kurth** 110:*6*
130:*14, 15* 133:*7*

134:*17, 19*
281:*14* 282:*18*
286:*5* 288:*19*

**< L >**
**label** 33:*17*
195:*19*
**labeled** 33:*17*
284:*22* 285:*2, 19,*
*22* 286:*2, 15, 17*
287:*11, 19*
**labeling** 35:*4*
**labels** 115:*14*
**lack** 150:*13*
151:*8* 210:*6*
214:*9* 222:*7, 11*
246:*20*
**language** 238:*13*
287:*4*
**Lanterman's**
196:*17*
**large** 23:*11* 35:*3*
213:*14* 214:*5*
251:*1*
**largely** 112:*13*
285:*1, 18* 286:*1,*
*16* 287:*6, 10, 14,*
*15, 18*
**larger** 121:*20*
289:*18*
**large-scale** 23:*3,*
*10* 52:*11* 135:*11*
214:*13, 18*
258:*17* 294:*22*
295:*9* 296:*7*
**lastly** 176:*9*
**late** 262:*11*
**LAURA** 2:*8* 8:*7*
**Law** 5:*12* 52:*15*
82:*13* 139:*11*
**lawsuit** 13:*2*
15:*8* 17:*10*
18:*15, 16* 36:*5,*

*14, 17*
**lawsuits** 279:*20*
**lawyer** 234:*15*
**Lawyers** 47:*13*
48:*10* 239:*13*
**laying** 199:*13*
**LEA** 170:*2*
184:*12* 199:*20*
200:*2, 9* 227:*4*
229:*8* 263:*4*
269:*19* 270:*13*
**lead** 199:*3*
230:*17*
**leader** 215:*2*
310:*6, 9* 311:*2*
**leaders** 306:*22*
311:*5, 9, 10*
**Leadership** 6:*3*
61:*22* 90:*6*
160:*11* 176:*10*
213:*16* 214:*14*
215:*2, 3*
**leading** 158:*21*
234:*13* 309:*2*
**leads** 253:*22*
292:*11*
**lean** 292:*1*
**leaps** 291:*4*
**learn** 20:*1* 73:*9*
94:*10* 95:*11*
206:*10* 207:*16,*
*17* 281:*12*
**Learner** 5:*7*
276:*20* 277:*14*
278:*6*
**learning** 19:*22*
21:*11, 22* 24:*3*
26:*5, 10, 16*
46:*15* 57:*4* 61:*5*
66:*22* 68:*18, 19*
87:*18* 156:*12*
160:*11* 161:*19*
167:*5, 7, 9* 175:*8,*
*13* 176:*11*

183:*19*  187:*8*
193:*9*  195:*12*
199:*15*  202:*19*
205:*16, 19, 21, 22*
206:*15, 16*  207:*8*
208:*10*  213:*4*
215:*21*  216:*12*
221:*22*  222:*7, 12*
251:*3*  252:*8*
253:*6*  255:*19*
266:*12, 22*  267:*9*
289:*7*  291:*2*
**LEAs**  90:*7*
123:*10, 14, 18*
124:*4*  152:*8, 22*
156:*13*  159:*11*
200:*8, 16, 22*
209:*4*  212:*14*
229:*7, 16*  262:*22*
266:*4*  270:*14, 18*
290:*19, 22*
**leave**  67:*7*  88:*5*
156:*5*  189:*12*
191:*19*
**leaving**  235:*5*
**Left**  139:*1, 4*
275:*20*  303:*17*
304:*1, 2*
**legal**  39:*13*
60:*14*  81:*22*
208:*1, 4*
**legalese**  38:*2*
**legalities**  39:*19*
**legally**  123:*19*
124:*1*
**legislation**  139:*1*
**legislature**
262:*12*  265:*7*
**legislature's**  42:*18*
**legitimate**  107:*7,*
*19*  108:*8*
**length**  117:*21*
147:*15*  240:*16*
**lesser**  266:*10*

**lesson**  26:*11*
167:*7*  222:*1*
**letter**  211:*12*
**level**  25:*20*  44:*6*
45:*19*  50:*8, 12*
52:*12*  104:*19*
197:*14*  202:*5*
204:*10*  205:*21*
220:*8*  222:*3*
227:*4, 5*  252:*12*
257:*6*  267:*2*
269:*19*
**levels**  44:*18*  45:*2,*
*19*  57:*2*  148:*2*
188:*5*  197:*19*
215:*2*  262:*17*
266:*4*
**leverage**  215:*4*
**libraries**  123:*8*
**library**  106:*19*
**licensed**  194:*20*
252:*16*
**lies**  185:*17*
**life**  137:*8*  251:*16*
**life's**  83:*1*  154:*5*
**likelihood**  239:*10*
**likes**  102:*2*
**LILL**  2:*6*  8:*3*
17:*11, 12*  18:*2, 8*
**limit**  37:*1*  305:*21*
**limitation**  287:*16*
**limited**  21:*9*
251:*2*
**line**  101:*19*
116:*20, 21*
183:*20*  226:*5*
291:*8*
**link**  271:*22*
**linkage**  272:*4*
**linked**  283:*4*
284:*11*
**list**  35:*18*  126:*21*
170:*14*  211:*8*

226:*16*  275:*14*
311:*1*
**listed**  35:*22*  84:*7*
148:*22*  177:*1*
227:*15*
**listening**  103:*20*
147:*20*  170:*9*
**literally**  74:*10*
79:*12*
**literature**  133:*4*
**little**  21:*6*  27:*13*
49:*4*  137:*16*
173:*12*  194:*17*
211:*17*  212:*12*
218:*12*  224:*15*
225:*11*  275:*5*
290:*6*
**LITTLEFIELD**
3:*6*
**lives**  246:*11*
**living**  249:*5*
**LLC**  3:*6*
**load**  135:*10*
**local**  40:*18, 22*
62:*1*  63:*15, 17*
123:*1*  152:*3, 18*
184:*4, 9, 19*
209:*21*  263:*19*
265:*21*  267:*1, 11*
289:*21*
**located**  28:*4*
45:*17*  46:*9*  55:*6,*
*8*  243:*15*  312:*11*
**location**  62:*11, 13*
67:*18*  246:*5*
**long**  11:*14*  17:*3*
167:*16, 19*
183:*18*  188:*4*
196:*13*  198:*3, 17*
256:*15*  279:*19*
311:*2*  313:*6*
**longer**  205:*6, 7*
218:*12*

**look**  25:*6*  26:*22*
27:*12, 14, 19*
28:*2*  33:*8*  35:*11,*
*13*  36:*19*  38:*1, 4*
46:*7*  47:*17*  48:*5*
50:*7*  59:*15, 21*
61:*2*  64:*2*  69:*3,*
*17*  75:*2, 9*  76:*8,*
*12, 14, 19*  77:*20*
83:*16*  84:*4, 9*
99:*5, 6, 8, 13, 18*
100:*7*  103:*9, 11,*
*14*  105:*8*  106:*1*
112:*21*  113:*15*
114:*14*  116:*5*
119:*3*  120:*10*
125:*7*  128:*5, 6*
132:*1*  133:*3*
139:*18*  142:*4*
147:*14*  148:*17*
160:*22*  163:*8*
165:*6*  184:*1*
186:*8*  192:*10*
201:*17*  205:*9*
210:*16*  219:*6*
231:*20*  232:*6, 21*
236:*2*  237:*10, 11*
238:*20*  239:*3*
240:*10*  241:*15,*
*22*  243:*2, 12, 21,*
*22*  244:*12*  245:*2*
249:*8, 9*  251:*10*
257:*2*  264:*14*
275:*9*  282:*20*
288:*18*  293:*7*
298:*6*  306:*8*
307:*2*  308:*19*
309:*19*  312:*12*
**looked**  112:*22*
114:*14*  132:*9*
158:*17*  210:*10*
229:*4*  240:*5*
250:*9*  263:*15*
310:*21*

looking 23:*14*
32:22 46:*21*
48:2 62:*18*
92:*18* 103:*21*
107:*21* 110:*15*
150:*1* 163:*20*
188:*10* 203:*2*
226:7 234:7
236:*20* 241:*19*
244:*10* 245:*16*
262:8 299:*11, 16,
17* 304:*14*
313:*11, 14, 18*
looks 13:*19* 77:4
99:*1* 110:5
137:*1* 139:*13*
184:*3* 196:*17*
225:*10* 237:2
Los 15:*21*
lose 252:*3*
lost 117:*3* 270:*4*
313:*17*
lot 32:22 33:*1, 3*
79:*16* 177:*1*
204:*3* 209:*16*
210:7 218:*12*
244:7 286:22
291:*4* 308:*13*
loud 224:*9*
Louisiana 49:*21*
love 165:7
low 274:*13*
281:*10* 282:*12*
lower 230:7
lunch 59:*15*
69:*18* 78:*1, 15,
18* 80:*17* 88:7
139:22
Lyons 132:*5, 10*

< M >
ma'am 311:*17*

magnitude 35:*20*
79:*9, 11* 261:*13*
270:22
maintain 155:*19,
21* 156:*20* 161:*12*
maintaining
155:*13* 161:*10*
majority 27:*20*
141:*16, 18*
154:*20* 186:*14*
making 36:*1*
56:22 61:*13*
66:*19* 78:*11*
123:*3* 147:7
190:*13* 237:*15*
284:*21* 285:*21*
286:*14* 291:*4*
298:*15, 22*
Mama 316:*11*
mandate 87:*5*
mandated 123:*19*
124:*11, 15* 127:22
mandating 153:*12*
manner 230:*10*
249:22
map 245:*3*
mapping 26:*14*
167:7 199:7
212:5 222:*4*
250:20
marginalized
313:*6*
mark 12:*11, 14*
13:*15, 17* 14:*5*
89:*5, 8* 110:*21*
126:*13* 130:*17*
225:2 261:*20*
272:*10* 276:*5*
304:22 307:*3*
308:*20* 310:*16*
316:*4*
marks 115:*21*
Maryland 49:*14*

99:*10, 19*
mass 150:*21*
Massachusetts
80:*1*
masse 18:*20*
155:7 171:*10*
master 26:*4*
42:6 222:*21*
Mastergeorge
130:*14, 16* 133:*8*
match 35:*5*
186:*10*
matched 183:*20*
204:*1*
matching 212:*5*
Materials 4:*12*
13:7, 8, *13*
221:*18* 275:*14*
math 234:*15*
matter 1:*14* 7:*3*
16:*13* 85:*1* 140:*5*
MATTHEW 2:*5*
8:*1*
Matthew.Gillespie
@usdoj.gov 2:*17*
McCART 1:*12*
4:*3, 9, 11, 13* 5:*2*
6:*2* 7:6 9:*3, 8,
11, 20* 12:*12*
14:7, *16* 39:*10*
88:*17* 89:*9*
110:22 126:*15*
130:*19* 133:7
180:*15* 225:*1, 5*
262:*1* 272:*11*
276:*4, 7* 284:*16*
305:*2* 307:*8*
308:*21* 310:*18*
316:7 317:*3, 13,
20* 318:*1*
McLeskey 273:*19*
274:*18* 275:*2*
mean 32:*19*
42:*17* 49:*6*

56:*19* 59:*6* 63:*6*
67:*14* 98:7, *11,
17* 112:*5* 117:*1*
122:*18* 123:*3*
136:*6* 154:*3, 4,
15* 164:*3* 165:*4*
177:*2* 179:*4*
181:*19* 184:*9, 21*
193:*14* 197:*1, 2*
200:*1* 204:*3*
213:*1* 214:*4, 18*
216:*15* 217:*16*
220:*13, 14* 224:*6*
229:*12* 235:*20*
244:7 246:*7, 8,
12* 247:*18* 251:*8*
252:*15* 255:*8*
256:*20* 261:*9*
275:*20* 283:*8*
300:*19* 309:*14,
16, 17*
Meaning 32:*17*
58:*18* 187:*16*
195:*14* 202:*6*
257:*14* 282:*9, 10*
meaningful 26:*6*
meaningfully
276:*16*
means 97:22
113:*13* 115:*17,
18, 22* 165:*6*
175:22 214:*21*
228:*13* 247:*17*
284:*13* 308:*1*
meant 226:*10*
254:*11* 283:*14*
284:*4*
measurable 308:*2*
measure 92:*3, 7,
13* 94:*5* 100:*5,
20* 101:*5* 202:*13*
203:2 211:*14*
272:7 309:*15*
measured 186:*17*

**measures** 46:*4* 132:22

**measuring** 100:*3*

**mechanism** 170:*17* 179:*12* 188:*21* 194:*15* 251:*12* 297:*19*

**mechanisms** 100:2 211:2

**Medicaid** 253:*20*

**medical** 149:*19* 194:*14, 20* 196:*3, 14* 289:*5, 22* 291:*12, 18* 292:*9*

**meet** 19:*5* 61:*15* 102:*4* 296:*10*

**meeting** 11:*19* 100:22 227:*8*

**meets** 200:*19*

**MELANIE** 3:*5* 7:*19*

**member** 55:*15, 18* 149:*3*

**members** 54:*16, 21* 55:21 56:*3, 5, 6, 10* 149:*11*

**mental** 24:*17* 91:*1, 2, 7, 14* 103:6 168:*12* 170:22 173:22 174:*17* 175:*19* 176:*4* 187:*1, 9* 201:22 212:22 213:*12* 218:*5* 251:*4* 252:*21, 22* 253:*3, 4, 7, 18, 19* 254:*6, 8, 10, 15, 19* 255:*3, 8, 14, 17* 305:*20* 306:*15*

**mention** 212:*4*

**mentioned** 24:*5, 9* 29:*21* 30:*3* 31:*4* 86:*5* 100:*4, 19* 114:*1* 170:7

**met** 32:*17, 18*

**Method** 131:*6*

**methodologies** 136:*10*

**methods** 131:*16*

**metrics** 189:*18, 22* 190:*2*

**mic** 109:*2* 290:*5*

**MICHELLE** 2:*4* 7:*21* 9:*14*

**Michelle.Tucker@ usdoj.gov** 2:*16*

**middle** 36:*22* 121:*19* 220:*5* 230:*7*

**midway** 150:*6* 208:*8*

**mild** 281:*8* 282:*11* 284:*22* 285:*22* 286:*15*

**million** 150:*12* 151:*7, 18* 152:*1* 153:*1, 10* 181:*21* 189:*3, 7* 262:*13* 264:*17, 19* 265:*6, 8, 10* 272:*21*

**mind** 11:*11* 25:*6* 49:*15* 207:6

**mine** 93:*12* 313:*19*

**minus** 234:*16*

**minute** 25:*6* 53:*15* 59:*10, 19, 21* 78:*9* 148:*21* 193:*21*

**minutes** 59:*12* 117:*12, 13, 18* 145:*19* 146:*11, 12, 16, 21* 147:*10* 148:*6, 11, 15* 149:*3, 12, 18, 19*

**159**:*3* 250:*5* 275:20 304:*1, 2* 316:*16, 17* 317:*10*

**missed** 235:*18*

**missing** 25:*11* 313:*16*

**missions** 189:*1*

**Mississippi** 49:*13* 86:*11* 99:*9, 18*

**misunderstand** 136:*19*

**misunderstanding** 240:*3, 8*

**misunderstood** 254:*3* 255:*7*

**mix** 117:*20*

**mixing** 195:*22*

**mjohnson@robbin sfirm.com** 3:*11*

**Mm-hmm** 25:*2* 27:*5* 31:*21* 33:*10* 34:*3, 11, 17* 54:*8* 62:*16* 108:*19* 124:*16* 125:*16, 18* 131:7 144:*9* 150:*5* 186:*5* 192:*2, 14* 196:*8, 22* 205:*8* 206:*1* 211:*10, 13* 213:*19* 220:*1* 232:*11* 236:*3* 237:*5* 247:*22* 262:*10* 263:*9* 272:*18* 273:*2* 274:*17* 280:*17* 283:*1* 295:*19* 301:*19* 302:*5, 14* 305:*17* 310:*8* 316:*12*

**model** 192:*10* 289:*5, 22* 291:*12, 14, 18* 292:*3, 13*

**models** 197:*4* 307:22

**moderate** 281:*9* 282:*11* 284:22 286:*1, 16*

**modifications** 57:*5*

**moment** 49:*15* 118:*3* 151:*5* 190:*17* 254:*4* 303:*5* 312:*9*

**money** 162:*22* 163:*3*

**monitor** 48:*6* 190:*21* 299:*18* 300:*12, 13*

**monitoring** 57:*1* 208:*12* 210:*5, 21*

**months** 155:*4*

**moon** 165:*11*

**morning** 9:*8, 9* 219:*14* 275:*15*

**Morningstar** 282:*18*

**motion** 14:*20*

**move** 53:*4* 115:7 122:*21* 124:7 132:*7* 177:*6*

**moved** 65:*19*

**movement** 217:*11, 16* 284:*21* 285:*9, 18, 21* 286:*14* 287:*5, 10, 18, 21* 288:*3, 9, 13, 15, 22*

**moving** 196:*18* 239:*20*

**MTSS** 22:*2* 43:*17* 44:*1, 6, 12, 14, 15, 18, 21* 45:*1, 2, 11* 46:*4, 19* 50:*16, 18* 51:*6, 8, 12, 15, 20* 52:*9, 11, 18, 21* 74:*8* 86:*11* 90:*4, 9, 10, 12, 16* 91:*1,*

2, 6, *13, 19* 92:*2,*
*11, 12, 15* 94:*3*
96:*8, 12* 97:*10,*
*13, 16, 19, 22*
98:*17, 20* 99:*1, 8,*
*13, 16, 18* 100:*1,*
*3, 7, 14* 101:*7, 8,*
*14, 15* 139:*19*
164:*4* 184:*5*
185:*21* 186:*3, 9*
187:*5, 10, 16, 22*
188:*4, 8, 15*
189:*6* 197:*11, 13*
198:*5* 200:*6*
201:*7, 12, 14*
202:*1* 204:*9*
211:*19* 212:*20*
213:*3, 5, 11*
251:*3* 259:*20*
262:*16* 265:*12,*
*15* 266:*1, 5, 9, 19*
267:*18* 268:*22*
269:*9, 19* 270:*10,*
*17, 20* 289:*4*
307:*13* 308:*9, 12,*
*15* 309:*16*
311:*10, 19* 312:*4*
**MULLEN** 3:*19*
**Multiple** 84:*20*
111:*10, 21*
115:*10* 116:*3*
151:*21* 239:*7*
240:*13*
**Multi-Tiered** 6:*5*
187:*16* 197:*13*
**multitude** 20:*15*
25:*14* 90:*2*
187:*13*
**multi-year** 226:*20*

**< N >**
**N.E** 1:*18*
**name** 7:*9* 16:*6*
17:*22* 22:*9*

26:*17* 32:*19*
34:*20* 44:*8*
47:*16, 22* 48:*11,*
*18* 165:*11*
275:*15* 283:*15*
284:*17*
**named** 32:*12*
**names** 59:*2*
127:*3*
**narrower** 218:*19*
**nation** 50:*14, 15*
51:*19*
**national** 30:*10*
31:*1* 241:*15*
242:*11* 250:22
257:*5, 6* 280:*15*
303:*13* 304:*8, 12,*
*18*
**Nationwide** 113:*1*
116:*16*
**natural** 10:*8*
**nature** 71:*17*
215:*16* 245:2
246:*16*
**NCES** 281:*14*
282:*19*
**near** 28:*5*
233:*21* 286:*18*
**nearly** 40:*4*
144:*12* 145:*11,*
*13* 155:*4*
**necessarily** 75:*1*
165:*8*
**necessary** 19:*5*
70:*21* 71:*13*
143:*5* 151:*1*
301:*11* 302:*3, 10*
**need** 23:2, *13*
24:*7, 13, 21* 33:*7*
35:*19* 57:*3, 6*
67:2 73:*17*
76:*14, 18, 22*
93:6 101:*11*
102:*3* 112:*21*

114:*13* 119:*3*
122:*1* 127:*11*
132:*1, 7, 8* 133:*2*
134:*4, 6* 137:*10*
143:*14, 21* 146:*2,*
*10* 148:*12* 154:*6,*
*18* 155:6 164:*18*
169:*17* 176:*17*
177:7 183:*20*
184:*12* 186:*15*
195:*8, 11, 17, 19*
197:*5, 21* 204:2
206:*8, 10* 224:*15*
230:*19, 21* 231:6
243:*12* 246:*10*
247:*4* 252:*5, 6, 7*
253:*18* 255:*2, 14*
274:*21* 276:*15*
278:*12* 285:*10*
300:*4* 305:*11*
306:*7* 308:*9*
310:*10*
**needed** 96:*20*
146:22 149:*7*
259:*14*
**needing** 118:*3, 4*
**needle** 196:*18*
**needs** 19:6, *19*
20:*3, 17, 20*
21:*15* 24:*1*
26:*10* 38:*17*
61:*3, 8, 16* 62:*19*
68:*12* 100:22
101:*9* 102:*4*
104:*11* 109:*13*
142:22 146:*7, 16*
147:*4, 11* 164:*20*
172:*18* 176:*14*
186:*12* 200:*19*
230:9 254:*20*
255:*1* 273:*18, 19*
274:*3, 7, 10, 13,*
*19* 293:*11*

295:*14* 297:*11*
300:*20, 22*
**negative** 240:*18*
**negotiation** 287:*3*
**neither** 172:*15*
203:7 319:*12*
**Network** 5:*17*
**never** 249:*19*
**New** 47:*13*
48:*10, 14* 49:*3,*
*13, 19* 99:*9, 19*
233:*18, 19* 236:*5,*
*6, 14* 237:*4, 12,*
*18* 238:*4, 22*
239:*8* 308:*1*
309:*17*
**news** 247:*17*
248:*13*
**nine** 317:*10*
**Nodding** 264:2
**noise** 21:*13*
**non** 194:*9*
**non-categorical**
193:*1, 13* 290:*16,*
*17*
**non-categorically**
196:7
**non-disabled**
167:*4* 281:*13*
**non-**
**discriminatory**
107:7
**normally** 284:*16*
**North** 49:*14*
227:*11* 228:*6, 7*
230:*1* 246:*7, 11*
**Northeast** 7:7
**NORTHERN** 1:*2*
131:*16, 22*
132:*17* 133:*11, 20*
**Notary** 1:*16* 9:*4*
319:*18*
**note** 224:*15*

273:*4*
**notebook** 47:*19*
**noted** 203:*12*
232:*19*
**notice** 1:*15*
**noticing** 7:*15*
**number** 12:*9*
34:*15* 35:*3* 42:*4*
44:*5* 83:*16*
84:*10*, *17*, *21*
100:*2* 106:*10*
116:*7* 125:*12*
132:*20* 136:*4*
139:*5* 144:*12*, *19*
145:*6*, *15* 148:*1*
164:*8* 168:*1*, *2*
171:*6*, *17*, *21*
172:*5* 173:*14*
179:*7* 181:*21*
184:*13* 185:*13*
192:*12* 198:*18*
201:*13*, *19*
202:*16* 203:*6*
205:*11* 210:*19*
211:*5*, *7* 212:*7*
215:*14* 226:*21*
233:*10* 234:*5*, *13*,
*22* 235:*10*, *15*, *19*,
*20* 237:*9*, *18*
238:*9*, *21*, *22*
239:*1*, *15*, *17*, *21*
243:*4* 245:*8*
248:*21* 249:*9*
271:*1*, *2*, *3*
274:*11*, *13*
299:*18* 305:*16*
313:*12*
**numbers** 21:*9*
128:*20* 143:*22*
148:*3* 233:*15*
234:*4*, *8* 235:*4*,
*14* 236:*21*
238:*14* 268:*7*

**NW** 2:*13* 3:*7*

**< O >**
**oath** 9:*1*
**Object** 19:*10*
20:*11* 38:*5*
43:*18* 52:*2*, *19*
54:*18* 60:*8*, *18*
61:*9* 63:*7* 64:*22*
65:*4* 67:*10* 69:*2*
70:*1* 71:*8* 72:*8*
74:*14* 75:*4*
76:*10* 77:*12*
80:*20* 81:*15*, *20*
86:*13* 87:*10*
98:*4*, *9* 100:*9*
104:*15* 109:*15*
112:*1* 123:*21*
127:*18* 129:*17*
138:*7*, *17* 151:*13*
152:*10* 158:*12*
159:*16* 160:*20*
161:*16* 163:*21*
165:*18* 169:*6*
170:*4* 179:*1*
183:*12* 190:*3*
204:*15* 206:*2*
208:*3* 214:*1*
225:*21* 227:*6*
229:*10* 231:*5*
245:*21* 247:*3*
254:*17* 256:*18*
260:*6*, *21* 270:*1*
277:*6*, *18* 283:*22*
290:*13* 292:*4*
293:*6* 294:*19*
295:*20* 298:*7*
299:*6* 301:*13*
302:*22* 315:*10*,
*21* 317:*14*
**objection** 67:*19*
70:*8* 71:*15*
98:*13* 128:*2*
229:*19* 247:*10*

254:*21* 260:*22*
261:*1*, *2* 296:*5*
299:*10*
**objections** 9:*14*
**observation**
145:*20* 146:*17*
147:*15* 148:*20*
**observations**
145:*18* 146:*11*
147:*1*, *18*
**observe** 146:*16*,
*20* 148:*2*, *11*
173:*16*
**observed** 25:*11*
40:*6*, *11* 144:*13*
145:*7* 149:*18*
173:*13* 204:*20*
246:*1*
**observing** 121:*22*
155:*4*
**obtain** 229:*16*
**obtuse** 108:*8*
**obviously** 18:*11*
**occasion** 118:*17*
**occupational**
168:*11* 170:*21*
192:*7*
**occur** 202:*22*
278:*20*
**occurred** 59:*3*
118:*2* 235:*6*
286:*20*
**occurrences** 122:*6*
**occurring** 177:*11*
298:*4*
**occurs** 179:*9*
277:*21* 287:*4*
**OCTOBER** 1:*11*,
*19* 7:*4* 317:*17*
**offer** 40:*3*, *4*
43:*2* 57:*7* 59:*20*
66:*16* 151:*1*
170:*20* 202:*16*
227:*10* 244:*13*

246:*18* 259:*9*
260:*10* 295:*1*
**offered** 74:*7*
75:*15* 173:*5*
218:*3*, *6* 223:*5*, *6*
**offering** 57:*4*
**offers** 297:*12*
**Office** 1:*18* 15:*9*
30:*9*, *15* 31:*2*
189:*5*, *8* 263:*11*,
*14*, *18*, *21* 275:*8*
**officer** 31:*8*, *9*, *15*,
*18* 32:*2*, *5* 319:*5*
**offices** 1:*17*
262:*15*, *21* 263:*3*
264:*9*
**official** 314:*3*, *11*,
*15*
**officials** 31:*4*
**Oh** 17:*4* 34:*17*
101:*20* 142:*14*
157:*3* 193:*16*
232:*11* 236:*16*
244:*17* 295:*21*
**Okay** 9:*20* 10:*4*,
*11*, *12*, *18* 11:*11*,
*21* 13:*1*, *4*, *21*
14:*5* 15:*18* 16:*3*,
*11* 17:*1*, *9*, *12*, *15*,
*22* 18:*11* 22:*8*,
*21* 23:*8*, *12*, *21*
26:*22* 27:*14*
29:*6*, *16* 30:*8*, *18*
31:*11* 32:*21*
34:*18* 35:*7*
36:*13* 38:*6*
39:*16*, *21* 40:*2*
41:*15* 42:*10*, *20*
43:*9* 44:*3* 45:*7*
47:*12*, *20* 48:*4*, *8*,
*9*, *12*, *14*, *22* 49:*9*,
*22* 51:*10* 52:*6*
53:*18*, *21* 54:*1*,
*16* 56:*3*, *14* 58:*8*

59:*17*, *20*  60:*13*, *15*  62:*17*  63:*3*, *14*  65:*17*  69:*17*, *19*  72:3  76:7  77:22  78:*3*, *19*  79:*11*  81:*4*  82:*9*, *14*  88:*5*, *10*  89:*17*  93:*6*  96:*16*, *18*  103:*3*  104:*10*  105:*13*  106:*9*  107:*16*  109:*3*  110:*14*  111:*14*  115:*12*  117:*8*  118:*8*  121:6, 7  122:*14*, *19*  123:*14*, *18*  124:*8*, *18*  125:*19*  126:*3*, *13*  127:*6*, *8*  128:*13*, *19*  130:*3*, *9*  131:*20*  132:*3*  138:*15*, *22*  139:*8*, *14*, *17*, *20*  142:*4*, *15*  145:*5*  148:*18*  150:*5*, *10*, *18*  155:*8*, *18*  160:*14*  166:*2*, *4*, *12*, *18*  167:*12*  172:*10*  173:*3*  176:*19*  177:*4*, *14*  179:*16*  180:*5*  181:*11*  185:*2*  188:*8*, *13*  189:*17*  190:*18*  191:*21*  194:*2*, *9*  195:*21*  196:*17*  197:*7*, *22*  198:*2*, *16*  201:*5*, *17*  202:*11*  203:*7*  207:*5*, *20*  208:*7*, *15*  211:*1*, *6*  212:*17*  213:*7*, *20*  214:*17*  217:*6*  218:*9*, *21*  219:*2*, *11*  221:*2*, *6*, *15*  222:*20*  223:*8*, *12*

224:6, *16*  225:*14*  226:*8*  227:*20*  228:6, *16*  229:*3*, *6*  231:*16*, *19*, *20*  232:*2*, *4*, *13*, *15*  233:*9*  234:*2*, *12*  235:*13*  236:*8*, *17*  237:*14*  238:*2*, *7*  240:*9*, *15*, *20*, *22*  241:*14*  242:*13*  243:*16*  244:2  247:*15*  248:*11*  249:2  250:*2*, *7*, *12*  252:*1*, *19*  253:*12*  254:*3*, *13*  255:*11*, *21*  259:*4*, *17*  260:*11*  261:*16*  263:*2*, *4*, *17*, *21*  264:*15*  265:*5*  266:*2*, *7*  267:*17*  268:*15*  269:*4*, *13*  270:*21*  271:*7*  272:*4*, *5*, *9*, *17*  275:*4*, *6*, *13*, *16*  276:*12*  279:*3*, *7*, *11*  280:*10*, *12*  281:*18*, *21*  282:*21*  283:*2*, *15*  284:*8*  288:*2*  289:*17*  291:*20*  297:*5*  299:*3*  300:*6*  301:*21*  303:*11*  304:*6*, *21*  306:*18*  309:*19*  310:*5*, *12*  311:*8*, *19*  313:*18*  314:*7*, *15*  317:*22*

**Oklahoma**  49:*20*
**older**  272:*14*
**once**  17:2  197:9  240:*17*
**ones**  43:*21*  86:*6*  152:8  169:*3*

228:3  245:*4*
**One's**  230:*6*
**one-sided**  120:*16*
**online**  222:*14*
**open**  317:*14*
**operate**  243:*6*
**operating**  80:*12*  278:*11*
**operator**  7:*9*
**opine**  82:*13*  153:*4*  192:*10*  226:*3*
**opined**  229:*14*
**opining**  39:*16*  224:2
**opinion**  19:7  22:*14*  40:*3*, *4*, *14*  41:*21*  51:*19*  61:*11*  66:*13*  68:*5*, *21*  71:*4*, *5*  72:*5*  73:*16*  74:*1*, *7*  75:*8*  76:*13*  81:*4*, *10*  82:*8*  108:*9*  114:*21*, *22*  115:*5*  126:*10*  142:*6*  154:*6*, *16*  155:*5*  159:*15*  162:*13*  164:*6*  171:*4*, *8*, *15*  172:*2*, *10*, *14*  173:*4*  176:*2*  177:*3*  178:*6*  181:*1*  185:*9*  196:*18*, *20*  198:*12*  199:*21*  208:*19*  209:*2*, *13*  225:*15*  228:*9*  235:*19*  237:*18*  253:22  254:*13*, *14*, *22*  259:*1*  289:*21*  290:*18*, *22*  296:*22*
**opportunities**  19:*1*  21:*11*

25:*10*  37:*4*  68:*18*, *19*  73:*8*  102:*8*  143:*3*  150:*14*  151:*9*  155:*14*  167:*3*  171:*12*  175:*17*, *18*, *20*  181:*7*  182:*10*, *21*  183:*3*  199:*11*  203:*17*, *20*  204:*1*  214:*10*  246:*21*  247:*1*, *8*  256:*6*  257:*1*  281:*12*  312:*17*  313:*8*  314:*17*  315:*13*
**opportunity**  57:*14*  101:*3*  102:*10*  135:*14*  266:*13*  293:*17*  317:*10*
**opposed**  10:*17*  107:*20*  170:2  222:*15*  227:*14*  239:*3*  314:*16*
**opt**  45:*18*
**option**  59:7  62:*10*  227:*12*
**options**  57:*20*  193:2  202:*21*  215:9  226:*18*  227:*15*  292:*19*
**order**  22:*15*  23:*2*  35:*19*  36:*5*, *15*  37:*21*  38:*1*, *3*  43:*14*  73:*15*  74:*20*  75:7  76:*2*, *7*  78:*15*, *18*  80:*17*  101:*6*  103:*8*  104:*12*  119:*6*  126:*20*  143:*1*, *8*  145:*1*  151:*1*  164:*18*  177:*11*  181:*22*  184:*11*, *18*  190:*8*

193:*5* 194:*18* 200:*21* 207:*6* 208:*21* 209:*20* 210:*18* 214:7 216:*19* 228:*12* 255:*4* 259:*14* 278:*4* 293:*11* 298:*9* 302:*1*
**Oregon** 45:*18* 49:*13* 99:*10*, *19*
**organization** 137:*17*, *18*
**organizations** 249:*5*
**organized** 52:*22* 243:*8*
**organizing** 308:*1*
**original** 138:*11*
**originally** 138:*5*, *16*
**Orleans** 48:*14* 49:*3*
**OT/PT** 55:*13*
**outcome** 211:*4* 319:*14*
**Outcomes** 5:*8* 102:*5*, *13* 103:*6*, *9*, *13*, *16* 125:*12* 126:*8* 130:*13* 132:*19* 133:*2*, *5* 134:*15* 190:*14* 217:*12* 235:*11* 256:*9* 257:*18* 259:*8* 276:*17*, *18* 277:*12*, *13* 278:*5* 288:*10*
**outdoor** 220:*4*
**outline** 269:*11*
**outlined** 51:*7* 269:*6*
**outlines** 91:*22* 92:*5*, *9* 94:*2*

**Outside** 17:*1* 125:*9* 173:*8* 253:*20*, *21* 254:*16*
**outstanding** 10:*22*
**overall** 233:*10* 234:*4* 237:*18* 238:*5* 239:*4*, *15*, *21* 287:*15*
**overarching** 181:*7* 266:*14*
**override** 64:*1*, *6*, *11*, *20*
**oversimplified** 251:*21*
**overuse** 222:*13*
**Owens** 32:*13*

**< P >**
**p.m** 140:*4*, *6* 141:*2* 318:*8*
**Page** 4:*6*, *9* 5:*2* 6:*2*, *13*, *15*, *17* 16:*12* 25:*10* 26:*4* 27:*14* 33:*15* 34:*4*, *6*, *7* 50:*1*, *18*, *20* 51:*18*, *21* 81:*6*, *11* 88:*2* 89:*17* 90:*11*, *14*, *20* 91:*3*, *10*, *21* 93:*4*, *5*, *19*, *22* 94:*19*, *20* 96:*18* 110:*6*, *12* 120:*10*, *11* 125:*5*, *7* 126:*19* 128:*13* 130:7, *8* 131:*5*, *6* 132:*3* 142:*4*, *5*, *13* 144:*2* 149:*22* 150:*4* 151:*16* 154:*5*, *9* 155:*10*, *11* 156:*18* 161:*8* 167:*15* 168:*3* 170:*13* 171:*7* 180:*16*, *20* 181:*3*,

*16* 182:*1*, *12* 184:*2* 186:*8* 189:*21* 191:*21* 193:*16* 194:*2* 201:*19* 203:*12*, *13* 205:*11* 207:*10* 208:*7* 211:*7* 213:*8* 216:*9* 217:*4*, *6* 223:*12* 224:*7*, *10* 226:*13* 230:*16* 231:*2*, *20* 233:*6*, *15* 236:*2* 238:*6* 243:*1* 247:*15*, *20*, *21* 248:*2*, *4* 249:*8* 250:*12* 251:*9* 260:*4* 262:*8* 266:*7* 271:*8*, *14* 279:*17* 281:*21* 282:*21* 283:*2* 284:*2* 285:*6* 288:*6* 289:*1* 291:*12* 299:*12* 301:*10*, *17*, *18*, *19* 305:*8*, *15* 307:*2*, *6* 308:*19* 309:*2* 310:*22* 311:*6* 312:*12*
**pages** 33:*11* 60:*1* 98:*19* 185:*11* 219:*16* 224:*12* 256:*14* 262:*9* 305:*9*
**paginated** 128:*20*
**paid** 253:*19*
**panoply** 143:*11*, *16* 289:*14*
**Paradigm** 6:*12* 88:*19* 96:*20* 97:*15*
**paragraph** 16:*14* 91:*22* 92:*19* 93:*3* 94:*1* 96:*18*

111:*3* 125:*8* 130:*4*, *10* 144:*3*, *7* 150:*6* 155:*11* 191:*22* 208:*7* 217:*7*, *8* 238:*8* 243:*4* 250:*13* 255:*21* 256:*15* 262:*11* 265:*13* 266:*8* 273:*4*, *9* 279:*18* 280:*9* 281:*5* 284:*20* 285:*5*, *6* 289:*2* 301:*10*, *17* 307:*12*, *20* 308:*11* 309:*3* 310:*22*
**paragraphs** 194:*14*
**Paralegal** 2:*9*
**parent** 42:*5* 55:*3* 56:*14* 57:*9*, *13*, *18* 58:*9*, *13*, *18* 146:*2*
**parents** 58:*2* 253:*2* 254:*10*
**part** 20:*19* 28:*8*, *9*, *10*, *11* 30:*12* 43:*5* 58:*5* 68:*1*, *5* 85:*3*, *4*, *5* 86:*20* 94:*1*, *6*, *22* 95:*6*, *17*, *20* 96:*14* 102:*2*, *17* 119:*17* 128:*11* 135:*19* 137:*6* 141:*7* 168:*19* 170:*7* 180:*2* 189:*3* 197:*9* 200:*17* 201:*2*, *3* 208:*16* 212:*7* 217:*10* 227:*15* 243:*21* 255:*13* 257:*21* 258:*19* 269:*21* 288:*2*, *8*, *13* 289:*16* 298:*2*

299:2  309:20
312:19
**partial**  14:20
**Participants**
271:11
**participate**  57:8
122:9, 11
**participated**
131:9
**participating**
173:16  271:9
**particular**  48:20,
21  86:5  137:20
146:8  155:6
201:9  202:8
214:6  289:13
**particularly**
20:16  43:21
147:22  259:15
266:22
**parties**  7:14
319:13
**partner**  228:10
**parts**  67:11
84:20  85:7
308:10
**party**  7:15
202:13
**passage**  138:11
**passed**  136:17
138:1, 5, 16
139:15
**pathway**  161:1
199:14
**Paul**  47:14
48:11, 16
**Pause**  129:2
260:20  281:22
287:1
**pausing**  53:15
286:18
**PBIS**  45:10, 12
74:8  186:3, 20
187:2, 6, 12

213:4  251:3
309:15
**peer-reviewed**
146:15  147:9, 13
148:20  150:1
248:6
**peers**  65:20  66:3
68:19  104:1
167:4  168:10
281:13
**peer-to-peer**
179:11
**pending**  78:15
317:6
**Pennsylvania**
2:13
**people**  29:15
33:1  185:8
188:17  215:5
239:16, 17, 18
240:1
**percent**  104:6, 18
105:3  106:4
111:19, 21
116:18  237:13
240:12  274:9
**percentage**  44:5
233:17  236:18
238:3, 4, 17
**percentages**
273:5, 13
**perfect**  306:18
**perform**  207:7
**performance**
129:1, 9
**performing**  207:1
**period**  74:11
146:6  147:19, 22
**periods**  143:21
281:1
**permitted**  108:3
**perpetuate**
162:10  174:12

**perpetuated**
150:11  151:6, 12,
16, 19  153:5
**perpetuates**
152:14  160:13
169:12, 13
**perpetuating**
152:2, 7  159:18
160:8  171:12
292:16
**person**  216:15
300:20, 22  316:1
**personal**  83:3
215:13
**personally**  49:6
**personnel**  84:22
128:22  129:6, 8,
19  168:6, 10
**persons**  30:13
163:16  169:4
**perspective**  37:1
57:13  60:14
107:2  121:12, 15
128:10  174:22
191:2  196:3
262:17  270:12,
13  286:22
299:22  303:10
**Ph.D**  1:13  4:3
9:3
**phrase**  23:16
65:12, 14  70:12
75:17  80:18
90:11  91:18
97:9  172:1
196:5  201:12
268:20  290:2, 11
310:6
**phraseology**
243:16
**physical**  83:20
168:11, 18
170:21  219:10,
18  220:18  223:10

**pick**  242:1
246:12  268:17
277:8
**PICO**  3:16  8:15
**picture**  235:2
**pictures**  250:9
**piece**  79:12
223:10
**pile**  313:17
**place**  23:7  26:11
45:13, 20, 22
62:3, 4  79:18
139:18  143:1
186:5  198:9, 13
210:15  222:6, 14
223:1  242:5
257:9  259:12
291:7  292:13
293:22  294:5, 6,
22  296:12, 15, 18
299:22  300:18
307:13
**place-based**  38:14
**Placed**  5:4  110:8
203:21  236:5
238:15  249:11,
16, 20
**Placement**  5:7
19:3  58:10
106:12  113:1, 7
119:11  142:9, 17
164:19  193:4
226:18  233:15
236:6  238:14
259:11  294:14,
15, 18  296:3
302:18
**placements**  143:9,
21
**places**  46:16
116:7  201:13
245:3  249:15
280:1  312:11

**placing** 94:*8* 95:*10*

**Plaintiff** 1:*6* 2:*3*

**Plan** 5:*13* 22:7 56:*16* 223:*10*

**planned** 144:*22*

**planning** 167:7 222:2

**plans** 22:*3, 6* 24:*12* 26:*11* 56:*22* 219:*10*

**play** 239:*14* 271:*5*

**playground** 121:*11, 12, 16, 17, 18, 20, 22*

**playgrounds** 122:*22* 123:*3, 4, 7, 12* 220:*4*

**playing** 121:*22*

**plays** 226:*11*

**please** 7:*13* 8:*10* 9:*1* 11:7 34:*15* 49:*11* 75:*12* 105:*18*

**plus** 86:7

**point** 33:*14* 59:*8* 78:*13* 115:*8* 146:*13, 14* 147:*8* 148:7 156:*21* 165:*14* 167:*17, 20* 188:*2* 199:*22* 237:*15* 247:*11* 285:*11* 300:7

**points** 248:*17*

**policies** 139:*5* 299:*19* 300:*14*

**policy** 19:*9* 90:*16* 139:*11* 161:*4* 175:*3, 12* 184:*14* 185:*21* 192:*4, 16* 198:*5* 279:*21*

**political** 305:*22*

**pool** 31:*9* 228:*21*

**poor** 223:*21*

**Popular** 309:*3*

**population** 115:*9, 11* 144:*4, 8, 18* 215:*17* 233:*17, 21* 238:*5, 16* 239:*4*

**populations** 20:*5* 131:*15* 274:*6*

**position** 62:*12*

**positive** 22:*1* 25:*4* 103:7

**possible** 51:*13* 52:7 182:*11, 15* 183:*8, 14* 226:*17*

**potential** 208:*1* 264:*22*

**practical** 54:*22*

**practice** 43:*13, 20* 99:*1* 113:*11* 187:*13* 215:*4* 258:*6*

**practices** 22:2 24:*4, 21, 22* 25:*1, 3* 38:*12* 41:*13* 91:*1, 2, 13* 99:*6* 113:*2, 7* 139:*5* 156:*13* 167:*10* 176:*8* 183:*21* 187:*14* 192:*4, 17* 201:*22* 202:*8* 213:*10* 250:*22* 251:*1, 4, 8, 12, 13* 252:*5, 12, 17, 20* 256:*3* 257:*9, 13, 16* 276:*13* 308:*1* 313:*4*

**PRATS** 3:*16* 8:*15*

**prefer** 14:*12*

**premise** 67:*21* 146:*18* 183:*14*

**Preparation** 4:*13* 11:*19* 286:*19*

**prepare** 11:*12, 13* 12:*1, 2, 6*

**prepared** 13:2 203:*3*

**preparing** 17:*3, 9* 28:*16* 35:*1*

**preponderance** 279:*22*

**pre-referral** 119:*18*

**preschool** 221:*19* 250:*4*

**preschool-like** 221:*18*

**presence** 106:*17* 303:*14* 304:*9, 13, 19*

**PRESENT** 3:*21* 16:*13* 195:*2* 266:*9*

**presumably** 96:*6* 283:*18*

**presume** 12:*15* 157:*15* 159:*9* 225:*8* 253:*17* 264:*8*

**presumed** 133:*14*

**presuming** 12:*15*

**presumption** 157:*17*

**presumptions** 28:*16*

**pretty** 44:*12* 193:*20*

**prevalence** 94:7 95:*1, 8* 96:*1, 2*

**prevalent** 292:*15*

**prevent** 22:*15* 23:*2, 9, 13* 75:7 258:*9*

**previous** 160:*15* 318:*2*

**previously** 9:*14* 24:*5* 162:7

**primary** 97:*17*

**principal** 55:*5* 309:*4, 20*

**principles** 120:*15, 18* 121:*1, 4*

**printed** 307:*6*

**prior** 17:*12* 28:*19* 29:*16* 99:*17* 188:*9*

**priorities** 212:*3*

**privilege** 9:*15*

**proactive** 179:*5*

**probably** 12:*9* 22:*19* 35:*8* 71:*18* 100:*12* 101:*19* 108:*8* 121:*8* 122:*20* 136:*15* 141:*11* 150:*19* 170:*1* 190:*6* 192:7 214:*2* 218:*11* 219:*4* 225:*12* 252:*2*

**problem** 10:*14* 19:*8* 72:*20* 148:*3* 205:*13* 258:*4*

**problematic** 258:*20*

**Procedure** 9:*13*

**procedures** 299:*19* 300:*15*

**proceeding** 7:*15*

**proceedings** 1:*20* 319:*6, 8, 9*

**proceeds** 226:*16*

**process** 19:*22* 42:*17, 18* 57:*22* 58:*4, 5* 119:*9, 18* 135:*19* 211:*17* 266:*18* 268:*21* 280:*20* 309:*7, 9*

**processes** 21:22
87:18 193:10
**production** 95:17
**profession** 170:10
196:10
**professional**
66:22 72:4
73:16 74:1, 7
75:8 108:9
126:10 128:22
129:9 132:13
156:12 160:11
161:19 171:15
172:10, 14 175:8
176:11 179:20
190:5 199:15
202:19 208:10
215:21 216:12
249:7 252:8, 10
253:22 266:21
267:9 289:20
290:18
**professionally**
135:1 217:12
288:10
**professionals**
84:17
**program** 18:22
19:3, 4, 5, 9, 15
28:4 37:3, 5
38:18 40:5, 15
41:16 42:2 55:7,
8 57:19 58:10
62:8 68:14 69:1,
5, 9 79:4 83:17
102:6 106:5, 6
115:15 118:18,
21 119:16, 19
120:1 141:13, 16,
19, 21 142:1, 10,
17 145:15
150:12, 20 151:7,
22 153:8, 11, 12,
19 154:18

155:13, 21 156:8,
20 157:6, 20
158:9, 11, 21
159:8 160:13
161:10, 12
162:15 163:4, 18
164:19 168:5
172:15 173:2, 8,
18 174:4, 10, 19
175:5, 10, 13, 16
176:12 177:21
181:13, 22 182:2,
3, 5 183:5, 15
200:20 202:10
203:9, 16 204:5,
8, 13, 17 214:7
215:8, 15, 19
216:4, 11 217:9,
20 220:15
221:14 222:6
223:7, 18 226:12,
19 227:14
233:16, 17, 18, 20
234:4 235:4, 6, 9,
11, 12 236:6, 19
238:15, 19, 21
239:2, 4, 6, 8, 11
240:13, 17, 19
241:9 243:7, 8, 9
245:1 249:10
253:4 254:9
256:10, 16
257:19 258:7, 16
259:1, 5 278:10,
11 288:7, 22
292:17 293:20
296:12 297:15,
22 300:17 301:4
302:16, 18 312:16
**programs** 24:11
28:1, 2 79:1
156:17 159:11
173:14 205:3
220:2 222:8, 11

243:6 245:9
258:18
**progress** 57:2
114:17, 22
190:13 195:11
208:12 210:5, 8,
21, 22 212:13, 14
281:6 284:21
285:22 286:15
**project** 31:8, 9,
12, 14, 18 32:2, 5
265:8
**Promise** 6:9
177:13 276:18
**promised** 180:16
**promotes** 257:15,
16
**proportion**
237:10, 11 238:10
**proportionate**
238:22
**proposed** 205:2
**proposition**
125:22
**protocol** 117:22
118:1
**provide** 24:16
26:15 37:3, 6, 22
38:3 42:21
46:10 51:21
52:22 68:15
69:22 71:6 72:6,
14 79:14 82:5
84:18 90:15
120:11 155:14
156:11 160:10
161:5, 20 162:13
164:2, 18, 21
169:22 170:12,
15 171:14
174:22 175:6, 11
176:3, 10 178:1
179:20 180:3
181:6 182:7, 20

183:9 185:20
193:9 195:13, 18
197:13 198:4
199:10, 20 200:2,
7, 20 204:10
208:21 209:4
216:7, 13 228:11,
22 229:17 235:8,
19 252:5, 17
260:15, 18
263:18 267:11
290:19 295:1
298:1 315:15, 16
**provided** 14:18
20:2 24:15
28:20 29:6, 11
35:14, 17, 18
38:15 75:3, 11
76:5, 9 77:10
78:6 101:5
102:13 103:1
107:8 112:12
116:2 135:14
143:7, 12, 19
165:1 169:3
172:21 174:4
179:13 183:5
186:17 203:3
215:20 227:21
254:9 282:14
298:10, 14 299:2
302:20 303:6
**provider** 179:20
**providers** 55:13
169:22
**provides** 29:22
30:4, 9 38:11
90:6 166:20
171:16 172:4
182:9 194:22
199:14 204:5
217:21 245:12
296:4 297:16

providing 18:5
38:9 40:14 57:3
66:21 68:17, 19,
22 70:20, 22
71:12 72:5
74:12, 21 103:9
114:9 123:2, 3
161:18 163:15
165:13, 15
168:17 169:21
170:18 171:5, 11
172:11, 20
177:18 183:2
189:9 192:19
194:15, 16
196:14 197:21
202:4, 14 203:16
208:9 215:11
216:2 217:18
228:13 229:1
252:7 267:9
269:10 281:6
314:16
proving 266:20
provision 55:12
73:1 132:4
168:1 170:17
178:12 195:6
226:17 230:18
255:16 296:9
297:19 312:16
proximity 174:5
293:17
Psychiatrists
84:12
psychological
256:8
psychologist
194:20 252:16
psychologists
84:10
psychology
252:15, 16

Public 1:16 9:4
47:13 48:10
53:14 68:22
69:22 70:7, 13,
14 71:20 72:7, 9
73:2, 6 74:12
75:1 242:14
243:19 247:2, 9
319:18
publication
280:20 281:19
282:6, 7 285:18
286:13
publish 287:2
published 111:5
268:8, 10 286:8
291:5 306:7, 10
pull 138:14
278:17
pulled 172:1
purports 171:14
297:15 315:16
purpose 97:18
192:4
purposeful 26:6
purposes 9:12
50:19 221:12
pursuant 1:15
31:20 54:17
put 62:4, 12
113:10 133:14
143:1 188:2
230:15 231:19
257:8 272:9
284:16 290:8
294:4 296:12, 14
305:8
Putnam 317:6
Putnam's 15:3
putting 109:6
158:20 160:14
200:17 243:16
254:14 259:11

294:15 307:13

< Q >
qualifications
28:13 252:4
qualify 194:18
228:8
qualitative 183:3
quality 104:2
107:3 121:18
172:12, 20 235:11
quantify 214:20
252:22 254:5
quantity 172:5
question 9:15
10:21, 22 11:1, 7
17:4 18:13
20:13 23:1, 6
25:13 27:22
37:12 41:10
44:22 46:22
70:10 74:15
75:15 77:9, 14
78:15 82:8
84:20 85:6, 10
93:11 94:17
95:22 98:14
99:17, 18 100:11
105:1 106:3
107:20 108:14
111:3 115:20
120:12 121:14
122:20 123:9
124:18, 22
126:20 131:3
133:18, 19 134:4
144:6, 11, 16
145:3 147:8
149:10 152:17
154:11, 12 155:9
158:4 159:8
161:7 165:14
167:22 168:1, 14,
19 169:8, 19

172:2 173:3
178:15 179:22
180:19 194:10
203:11 204:3, 11
206:21 209:8, 19
218:17, 20
221:12 222:9
223:2 225:14, 17,
22 234:20 237:8,
22 248:1 258:3
261:12, 14
266:16 268:6
271:8, 21 272:19
274:14 282:3
287:17 298:14
300:6 302:7
303:1 305:10
307:11 308:16
questions 11:5
16:3 39:11 43:1,
10 47:7 64:15
65:6 80:16
122:18 170:9
180:17 262:6
317:4, 5, 13
quick 251:10
quite 88:22
234:14
quo 67:16
quotation 115:21
quotations 113:10
quote 92:18
93:4, 10, 12
113:22 273:10
302:20

< R >
rabbit 116:14
Radical 316:11
raise 229:8, 12,
16 290:5
random 35:12
range 146:7

196:*4*

**ranging** 179:*12*

**rate** 239:*1*

**rated** 135:*8*

**rates** 178:*11*
309:*19*

**raw** 236:*21*

**reach** 258:7
259:*6* 264:*22*

**reached** 18:2, *4*
117:*19*

**reaches** 198:*1*

**reaching** 120:*19*

**read** 14:*19, 22*
15:*3, 12* 35:5
36:*10* 40:*11*
58:*17* 111:*14*
127:*11* 129:*3*
133:*12, 13* 134:*4,
6* 142:*15* 148:*21*
151:*5* 159:2, *4*
177:*5, 7* 194:*3,
17* 195:*6* 196:*1*
206:*11* 224:*12*
238:*14* 259:*22*
279:*9* 280:*10, 12*
281:*5* 314:*8*
317:*21*

**readily** 192:*8*
251:*4* 252:*21*
253:*1* 254:6, *11*

**reading** 74:*10*
171:*19, 21* 204:*6*
224:*9* 237:*2*
241:*12, 13* 285:*16*

**reads** 142:*6*
213:*13* 217:*8*
283:*3* 307:*20*

**reality** 58:*14*
99:*7* 187:*6*
296:*14* 298:*3, 6,
16, 21* 309:*6*

**Realize** 6:*9*
73:*22* 94:*14*

230:2  276:*17*
302:7  317:*8*

**realized** 109:*1*

**really** 37:*12*
95:*22* 108:*7*
117:*3* 157:*21*
170:*9* 182:5, *22*
183:*7* 187:*17*
199:*5, 13* 209:*9*
218:*8* 219:*20*
292:*20*

**reason** 107:*12*
111:*18* 194:*8*
267:*5* 268:2, *4,
13, 15, 21* 269:*16,
18* 270:7  277:*4*
279:*12*

**reasonable** 80:*19,
22* 81:6, *7, 12, 18*
82:*6, 11, 16, 18*
83:*9*

**reasonableness**
81:*18* 83:*4*
116:*20*

**reasons** 107:*5, 7,
20* 108:*1* 235:*10*

**recall** 12:*8*
29:*20* 32:3, *14*
34:*22* 41:*18*
47:*16* 48:*1, 13,
19* 53:*22* 58:*6*
79:*18* 84:*5*
111:*17* 119:2, *22*
120:*4* 136:*8*
138:*3, 6, 12, 19,
22* 139:*9* 163:*11*
188:6, *12* 195:*21*
253:*15* 264:*16*
275:*14* 276:*10*
279:2  287:*1*
290:*11* 301:*7*
314:6, *19*

**receive** 56:*17*
63:4, *12* 67:*6*

79:2  87:*21*
118:*11* 119:6, *16*
120:*3* 124:*12, 15*
193:*5* 220:*14*
227:*3* 244:*15*
245:*15* 253:3, *21*
255:*18* 301:*12*
302:*4, 10*

**received** 118:*16*
174:*16, 17* 176:*6*
189:*4, 7* 193:*7*
264:*18* 267:*18*
272:*21*

**receives** 17:*19*
66:*12* 178:*20*
253:*19*

**receiving** 55:*11*
76:*8* 77:*9* 118:*9,
10, 17* 120:*1, 7*
128:*7* 141:*22*
162:*14* 165:*16*
172:*6* 173:*20, 22*
176:*6* 189:*11*
221:*11, 13*
233:*11* 235:*21*
254:*15*

**Recess** 39:*7*
88:*14* 180:*12*
224:*20* 276:*1*
316:*20*

**recessed** 140:*5*

**recollection** 32:*8*
131:*20*

**recommend**
118:*11* 120:*2*
161:*14* 177:*10*
258:*10* 294:*10,
14, 17*

**recommendation**
37:*1* 56:*15*
57:*10* 58:*4, 9, 11*
62:*13* 63:*4, 5*
64:*1, 7, 12, 20*
66:*8, 10* 86:*3*

100:*20* 119:*1, 8,
15* 149:*5, 6, 13*
182:*4* 184:*1*
189:*21* 195:*16*
211:*5* 300:*8*
304:*11*

**recommendations**
36:*8* 38:*20*
42:*22* 43:*3, 12*
49:*22* 51:*16*
56:*22* 57:*3*
66:*22* 81:*5, 11*
82:*5, 16, 17* 83:*5,
8* 84:*19* 85:*16,
20, 21* 86:*19, 22*
88:*1* 89:*18, 20*
93:*18* 97:*7, 9*
119:*4* 160:*22*
162:*21* 164:*9*
176:*10* 177:*8*
180:*21* 181:*1, 8*
182:*7* 184:*17*
185:*17* 197:*10*
203:*13* 207:*6*
216:*9, 22* 217:*4,
10* 230:*15, 16*
231:*18* 260:*11*
269:*6* 278:*12, 21*
288:*8* 311:*4*
313:*1*

**recommended**
50:*2, 5, 11* 51:*17*
63:*11* 66:*2* 87:*6*
89:*19* 90:*14, 20*
91:*3, 10* 93:*20*
100:*13, 17*
118:*19* 120:*8*
180:*18* 181:*3, 12*
185:*11, 19*
189:*21* 190:*1*
191:*5, 6* 192:*11*
197:*11* 198:*18*
201:*8, 17, 19*
203:*7, 8* 204:*7,*

12, 20  205:3, 9
206:13  210:19
211:7, 9  213:8,
21  256:14  260:4
296:1
**recommending**
43:4  90:3, 5, 10
92:15  100:15
294:11  296:3
311:19  312:2, 7
**recommends**
67:6, 17  68:6, 11
297:3, 13
**reconvene** 140:6
**record**  7:3  10:11
12:13  14:8
34:19  39:5, 8
88:12, 15  89:10
111:1  119:14
126:16  130:20
138:9  140:2
141:4  180:10, 13
206:7  224:18, 21
225:6  260:21
262:2  272:12
275:21  276:2, 8
305:3, 8  307:9
308:22  310:19
316:8, 18, 21
317:2, 15, 19
318:1, 7  319:8
**recorded**  7:6
**Records**  34:14
35:10  42:7
145:22
**redesign**  92:21
93:14
**reduce**  214:8
**reduced**  319:10
**reducing**  234:5, 8
**refer**  50:2
201:18  291:11
**reference**  48:16,
21  50:6  100:18

194:14  237:21
270:18  281:3
**referenced**  25:5
42:8  59:7  110:3
156:10  167:1
193:15  282:5
**references**  47:7
240:21  268:9
**referencing**  50:11
53:9  77:2  115:9
116:1  133:1
154:17  155:2
166:5  194:10
214:6  219:8, 12,
17  245:4  246:16
249:22  253:7
257:3, 20  259:21
288:19, 20
289:15  304:15
308:9, 10  309:11,
13
**referral**  119:9, 18
129:11
**referrals**  235:4
**referred**  227:13
295:15  298:16
**referring**  34:8
236:4
**refers**  233:3
**refine**  198:21
313:4
**reflected**  17:6
88:1  171:4
172:3, 9  231:12,
14, 17  232:16
238:3
**reflection**  282:3
**reflects**  289:6
291:1
**reform**  213:14,
21  214:2, 4
**reg**  232:5
**regarding**  31:12
43:3  46:1  57:4

61:13  139:3
146:1  147:17
176:7  182:5
188:4  198:9
211:3  217:18
227:8  231:9
286:10  312:3
**regardless**  31:7
73:9
**regards**  101:13
**region**  62:11
227:13  265:16
**regional**  184:4
235:7  243:9
245:9  258:18
**regions**  153:9
157:7  246:14
265:22  271:2
**regular**  111:11,
22  223:15
**regulations**  52:15
60:7
**rejected**  63:16
**relate**  100:14
**related**  55:12
57:5  61:14  79:7
139:6  143:6
182:22  183:18
187:11  207:2
210:22  211:5
222:10  235:8
240:8  254:2
281:2  288:21
319:12
**relates**  61:12
65:3, 12  71:2, 20
76:13  77:3
80:19  102:5
122:4  123:2
173:2  207:9
231:17  241:19
253:10  279:10,
11  284:5  287:9

300:16
**relational**  311:13
**Relations**  5:6
**relationship**
228:4  251:21
**relationships**
192:5  251:15
**relevance**  282:10
**relevant**  137:17
**reliance**  185:15
222:13
**relied**  148:13
**relies**  184:13
**rely**  116:8
**relying**  195:19
**remain**  113:2, 8
239:6, 11  240:17
245:19
**remained**  112:13
114:11  233:19,
21  240:13
241:10  273:22
274:13
**remaining**  237:13
238:3  273:18
**remains**  236:19
**remediation**
186:16
**remedies**  57:11
**remedy**  36:4, 15
**remember**  36:21
59:1, 2  87:2
137:12  211:16
212:3  255:15
269:7  286:22
**remote**  7:16  8:10
**REMOTELY**
3:13
**remove**  203:9
**reorganization**
278:15, 20
**reorganized**
276:22  277:15

278:8
**repair** 123:5
**repeat** 7:16
56:19 75:12
118:13 209:8
225:22 234:20
**repeats** 27:17
**repetitive** 64:15
**rephrase** 11:8
29:1 127:15
141:9 287:20
**replace** 289:4
**Report** 4:14
11:17, 19 12:2,
11 13:1, 4, 9, 14
14:10, 22 15:3
16:12 17:3, 10
18:5 25:5 27:4
28:17 35:1 36:1,
20 39:11, 21
40:8 41:7 42:20
47:2 50:1, 18, 19,
20 51:18 65:16
66:15 71:2, 3
72:2 74:2, 6
81:5, 12 83:6
85:16, 20 88:2
89:19 90:3
93:18 97:7, 21
98:1, 8, 19 99:4
100:18 103:17
110:2 111:6, 15,
19 112:6, 8
113:18 120:10,
20 122:5 125:5
130:3 131:1
132:3 134:11, 13
135:3 142:5
144:3 148:13
149:22 151:17
156:10 160:19
165:20 167:15,
17, 20 171:5
172:3, 9 177:5, 7

180:18 181:8, 14,
21 185:12
186:21 193:15
204:4 208:17
222:18 224:4
229:4 231:13, 15,
21 232:10, 20, 22
233:7, 10, 14
235:17, 18
237:17 243:13,
14 244:12
247:16 249:8
250:1 260:12
268:18 275:7
278:13 280:15
288:5, 21 292:18
304:11, 18 311:4,
19, 22 312:2
313:2 317:7, 18
**reporter** 7:11
9:1 10:6, 10
159:4 319:1
**reports** 15:12
42:5 146:3
209:5 282:17
291:21
**represent** 7:14
131:15
**representative**
124:13
**representatives**
8:21
**representing** 7:18,
20
**request** 10:21
**requested** 159:4
**require** 43:14
144:14, 21 145:8,
16 152:3 193:4
201:8 246:19
273:17 274:2, 6
276:22 277:15
278:8, 15 311:3, 5

**required** 124:1
216:19 217:3
**requirement**
119:15, 20
**requires** 266:21
269:7 307:22
309:7
**RESA** 123:16
228:19 263:15
**RESAs** 123:19
124:4 209:4
228:17
**rescheduled** 12:3
318:2
**Research** 4:17
135:7 266:17
276:14 279:22
**researcher** 135:7
277:7
**reserved** 9:16
**Reshaping** 6:8
**resource** 199:7
212:4, 5
**resources** 25:17,
18 26:17 43:14
46:16 87:19
150:14 151:9
161:19 186:12
187:20 208:10
215:21 220:9
221:17 222:7, 12
228:21 229:1, 16
253:5, 8 259:14
260:19 263:19
277:1, 16 278:9,
14 296:17
**respond** 24:1
186:14 261:15
**responded** 270:18
**response** 94:7, 22
95:6, 20 96:6
148:4 289:8
291:3 306:3
317:7

**Responsibilities**
299:17
**responsibility**
298:5
**responsible**
157:12 265:14
**rest** 312:21
**restate** 56:19
247:5
**restating** 162:17
**restlessness**
305:20
**restorative** 22:2
179:10 187:12
251:4, 8, 12, 17
252:5, 17, 20
**restore** 251:20
**restoring** 251:14
**restricted** 262:13
**restrictive** 60:6,
10, 16 61:2, 7, 14
283:4 284:11
**restroom** 37:15
**restrooms** 219:16
**result** 58:19
73:12 256:7
260:17
**resulting** 11:16
102:13 257:17
**results** 132:2
133:13 134:5, 6
**RESUMED** 141:3
**retained** 16:12
**returned** 234:22
**returning** 234:9
**revenue** 229:16
**review** 11:15, 18
26:20 28:12
35:19 40:9
41:20 42:1, 14
45:4 84:1 118:8,
20 119:2 120:5
124:9 141:8, 10
145:22 146:2

166:*14* 208:*15* 226:20 229:*21* 231:6 291:*10* 301:8

**reviewed** 35:*14, 15* 51:6 58:7 71:*21* 118:*15* 141:*12, 13* 147:5 209:*16, 18* 291:*16, 21*

**reviews** 135:*12*

**revisit** 317:*10*

**RF** 34:*13*

**right** 10:*13* 13:*10* 18:2 25:7 27:*11, 19* 34:2 36:*21* 39:*18, 22* 40:*1* 41:*18* 42:*14* 48:*15* 49:2, 5 50:*17* 53:22 59:22 68:4 71:*10* 74:*4, 5* 78:4 85:2 88:20 89:*4* 95:*19, 22* 98:2 99:*11* 106:*15, 22* 107:*15* 108:7 109:6 111:*17* 115:2 119:2 120:*14* 121:*1* 123:9 127:*1, 17* 129:*4* 133:8 138:*3, 12, 13, 19* 162:*18* 165:*10* 168:*14* 176:20 177:2, *11, 16* 178:22 180:*15* 181:*19* 186:7, *19* 187:*21* 188:6 189:6 194:*21* 204:8, *17* 205:5 209:20 210:7 213:7 219:*15* 220:*16* 221:*3*

224:*4* 228:22 231:8 241:*21* 246:6 247:*12, 13, 19* 252:*19* 253:*15* 255:*21, 22* 259:20 262:6 263:8 264:*16* 272:*19* 274:6 275:*17* 278:*16* 280:8 281:*4* 283:*19* 289:20 290:8 294:*15* 295:*17* 301:7 304:*5, 16, 17* 306:*11* 308:*12* 317:2, *19*

**Rightful** 303:*14* 304:*9, 13, 19*

**Rights** 2:*11* 57:*11*

**risk** 19:*3*

**ROBBINS** 3:6

**role** 19:*15* 38:9 168:*16* 181:*14, 17* 202:4 215:*10*

**rooms** 125:*11* 250:9

**rooted** 276:*14*

**roughly** 18:*4* 44:*3, 4* 114:*12*

**routinely** 94:8 95:*10* 96:3

**royalties** 305:*14*

**RPR** 1:*21* 319:5

**rule** 62:9 167:2 198:20 225:2, *3, 10, 16, 18* 226:*3, 6, 7, 9, 14* 227:*16* 231:2, *4, 9, 12* 277:*11, 17* 299:*12* 301:9

**Rules** 9:*13* 10:*1* 120:*15, 18* 121:2,

*4* 299:*19* 300:*15* 303:8

**run** 37:*15* 80:*3*

**running** 49:*15* 308:*18*

**Ryndak** 110:7

**< S >**

**sadness** 305:*19*

**safety** 109:*13, 18*

**Sailor** 89:*1* 188:*14, 16* 272:*15, 17* 273:*10* 283:*13* 288:*17*

**sales** 229:*13*

**sample** 132:*17* 136:*1, 12*

**San** 49:*19*

**satisfy** 192:*11* 216:8, *19*

**Savannah** 246:*11*

**saved** 101:*21*

**saw** 34:*19* 173:*19, 21* 194:7 214:*17* 218:*16* 250:*11* 254:7 301:2

**saying** 71:*16* 77:*17* 96:*10* 137:*18* 143:*16* 144:*17, 18* 180:5, *8* 182:*15* 210:7 256:*15* 261:*1* 294:*12* 295:8 298:*19*

**says** 16:*11* 38:*3* 92:7, *19* 93:22 94:*1* 96:5 111:*4* 113:*1* 145:*14* 147:9 148:8, *10, 15* 150:20 153:*17* 154:5 184:2 199:*20*

200:2, 7, 9 212:*18* 226:*15* 233:*10* 253:*18* 262:*11* 265:5 271:*11* 284:20 301:*10* 302:8 308:7 316:*10*

**Scale** 6:*4* 35:20 79:*9, 11* 213:*15* 228:*12* 251:*1* 262:*16*

**scaled-up** 265:*12*

**scale-up** 265:8 270:*17*

**scaling** 91:5

**scattered** 84:*17* 230:6

**schedules** 26:*4* 42:6 145:*1* 222:22

**scheduling** 222:*21*

**School** 6:*3, 12* 28:8 29:*3, 4* 40:*18* 41:*1, 4* 44:*16* 45:*1* 46:*18* 48:*15, 18, 19, 21* 63:*15, 18* 66:*12* 67:8 69:20, *21* 70:*4, 6, 20* 71:5, *16* 72:5 73:*18, 19, 21* 74:7, *9, 11, 21* 75:*11, 16* 76:5, *9* 77:*11* 79:*14* 80:8 84:*19* 85:8, *18* 86:*12* 87:*1, 6, 19* 102:22 103:*1* 108:2, *10* 117:*10, 19* 128:*21* 129:*6, 8, 18, 19* 131:*12* 136:*19* 137:*13* 164:20 170:*3* 174:*10, 18* 179:*10* 184:*13*

187:*3, 8*  188:22  197:*14*  199:*18*  209:21  212:1  213:*16*  214:*13, 14*  215:2  221:20  223:19, 21  224:*3*  226:22  228:7, *10, 11, 19, 21*  230:*1, 7, 8, 9*  233:*12, 21, 22*  236:9, *10*  237:*3, 6, 20*  241:*7, 9*  242:*20*  244:*4, 16, 21*  245:6, *11*  249:19  253:20, 21  254:*1, 16*  255:14  258:9  261:*17*  263:*8, 10*  265:*1, 11*  297:2, *12*  306:*1, 21*  307:*14, 22*  309:7, *16*  311:*11, 21*

**school-aged** 65:*20*

**school-based** 28:5  69:6  201:*10*  238:*11*

**schooling** 71:*17*  73:*3, 8, 11*  79:20  102:*11*  104:5  123:6  167:*11*  179:*14*  255:*4, 9, 19*

**Schools** 4:*16*  26:*19*  27:3  44:*19*  45:*18*  46:*3*  69:7, *15*  79:*16*  80:*3*  90:7, *17*  92:2, *11, 12, 22*  93:*16*  94:4, 9  95:11  96:8, *11*  155:*15*  156:*13, 18*  164:*18*  165:*16*  166:22  173:5, *14*  175:4  180:*3*  183:9

185:22  198:6  212:*14*  218:7  219:*21*  220:*1, 5, 6, 7*  223:7  234:*10*  235:*1*  242:*15, 18*  243:*6, 10*  249:*15*  254:*16*  265:2  266:*12*  267:2, *12, 18, 19*  271:*3, 9*  276:*16, 18, 19*  277:*13*  278:5  309:*5, 14*  310:2

**Schoolwide** 45:*13*

**school-wide** 179:*6*

**science** 137:*3*

**Sciences** 137:*7*

**scope** 36:*20*  166:*14*  229:*20*

**score** 267:*20*

**scourge** 306:*1*

**screeners** 210:*4*

**screening** 195:*11*  208:*11*  209:22  210:*21*

**screenshot** 316:*5*

**se** 19:*9*  116:22  225:*16*  287:6

**SEA** 43:*13*  49:7  50:*12*  261:*10*  270:*12*  299:*15, 17*  300:*13*

**searches** 306:*1*

**SEAs** 43:*17*  260:*14*

**second** 43:*5*  50:*17*  60:22  68:*1*  89:*17*  94:*15*  95:*15*  96:*18*  111:*4*  123:*15*  128:*21*  129:*4*  130:*10*  131:*5*  181:6  192:*13*  199:*4, 5,*

*12*  205:*10, 14*  211:22  240:*11*  241:8, *18*  250:*19*  266:8  281:22  289:*1*

**section** 132:2  133:*13*  134:*5*  156:2  211:8  212:*17*  226:*14*

**secured** 267:*19*

**see** 12:*20*  16:*15*  18:*9*  27:*16*  33:*19*  35:*15*  36:*16*  47:4, *22*  48:*9*  58:2  59:*15*  76:*14*  89:*16*  91:*8, 16*  93:*1*  94:*12, 13*  97:*1*  110:*9*  111:*12, 13*  118:*16*  119:*3*  125:5, *15*  129:*13*  131:*5, 10, 18*  136:*21*  137:*4*  142:*11, 14*  150:*16, 17*  155:*16, 17*  160:22  163:*13*  173:*16*  181:*10, 11*  183:*1, 2*  184:7  186:*8, 19*  192:8  194:5  196:*15*  202:4  203:*12*  204:*20*  208:*13*  211:7  213:*18*  217:*10, 14*  224:*13*  230:*13*  238:*13*  240:*11*  243:*15*  248:22  251:6  254:2  256:*11*  262:*19*  267:*3, 22*  277:2  280:4  281:*16*  283:6  285:*3, 4*  288:8,

*12, 18*  289:*9*  300:*19, 21*  301:*15, 22*  302:*4, 5*  304:*14*  306:5  307:*15*  308:*4, 5, 9*  311:*15, 18*  316:*10*

**seeing** 241:*16*  242:8

**seeking** 36:4, *14*  44:*17*

**seen** 79:*1, 8, 9, 13*  89:*15*  134:8  156:*4*  225:8, *10*  249:19  253:*13*  268:7  271:6  292:*17*

**segregate** 19:*18*  94:8  95:*10, 21*  96:*3*  199:*10*  230:22

**segregated** 18:*20*  20:*9*  21:*4*  68:*11*  69:*11*  76:*4*  79:*19*  109:*12*  143:*14*  154:7, *19*  182:*9, 21*  183:*15*  193:*4*  215:*20*  217:*21*  223:*18*  227:*19, 21*  228:2, *13*  244:*21*  245:*13*  246:*1*  248:8  256:5, *22*  257:*20, 21*  258:*14*  278:*11*  280:*1*

**segregating** 150:*21*  171:*10*  246:*13*  293:*21*

**segregation** 22:*16*  23:*3, 10, 14*  37:2  65:*3, 12, 15, 18*  66:*6, 8, 14, 18*  67:*3, 8, 18*  68:*9*

75:8, *14*, *16*   79:8
80:*14*   143:5
151:*21*   155:7
156:*16*   157:7, *13*,
*19*   158:*11*, *22*
159:*15*   160:*13*
162:*3*   169:*18*
181:5   183:8, *17*
203:*15*, *22*   214:9
215:9, *16*   216:*1*
225:20   226:4, *6*
242:*12*   245:*10*
246:*17*, *19*   254:*1*
258:*17*   260:*18*
261:7   280:2
292:*12*, *13*   293:4
294:22   296:8
312:*15*   313:7
314:*4*, *12*   315:2,
*6*, *8*, *12*
**selected**   136:*13*
**self-assessments**
46:2
**send**   294:7, *12*
300:*4*   302:8
**sending**   181:*12*
**senior**   135:7
**sense**   62:*15*
83:*10*   108:*12*
191:*4*   194:2
195:*1*   218:*20*
258:*1*, *11*
**sent**   17:7
**sentence**   94:*15*,
*19*   95:2, *15*
96:*19*   111:*4*
112:*10*, *18*, *20*
126:*12*   128:*21*
129:5   130:*4*, *10*
142:6   144:*11*
145:*3*   150:7, *20*
151:*4*   154:*10*
155:*11*   156:*1*
184:*3*   213:*13*

217:7   243:*11*
250:*20*   252:*19*
257:*3*   266:*17*
268:*13*   277:20,
*21*   279:*19*   280:9
283:2   284:2, *20*
285:5   301:*17*
307:*13*, *20*   308:*14*
**sentences**   154:9
250:*18*   256:*1*
276:*13*   281:5
**separate**   66:*13*
68:7   78:7   79:*3*,
*5*, *6*, *13*, *20*   80:*6*,
*7*, *8*   94:9   95:*10*
97:*16*   125:*10*
149:*15*   182:*13*,
*16*   183:*10*   193:4
228:*3*   244:*15*
253:6   276:*19*
277:9
**separated**   66:2
**separation**   168:*1*
**separatist**   113:*3*,
*8*, *10*   115:*19*
**sequence**   221:*4*
**series**   64:*15*
120:*11*   125:4
161:*13*   180:*17*
289:*14*
**serious**   144:*13*,
*20*   145:7
**serve**   18:9   56:*12*
90:*21*   91:*4*, *11*
201:20   205:*15*
206:*14*   208:9
212:*18*   213:9
276:20   277:*13*
278:6
**served**   21:4   40:5
48:*4*, *6*, *9*   130:*11*
154:7, *19*, *20*
207:*21*   216:*3*
217:*19*, *20*

226:*21*   256:*10*
273:5, *14*
**service**   42:8
55:*12*   58:*10*
84:22   165:*11*
168:*1*   170:*17*
174:*9*   178:*12*
193:*1*, *2*, *13*
194:*11*   219:22
224:2   226:*17*
227:*21*   230:*18*
244:9   253:*10*
255:*16*   290:*15*,
*16*, *17*, *19*   291:*14*
292:*14*, *19*
294:*11*, *13*, *14*, *16*,
*17*, *18*   295:7
296:8   297:*19*
**service-based**
38:*14*
**Services**   5:*14*
19:*4*   28:*21*   29:7,
*12*   53:*1*   56:*18*
58:*4*   61:*15*, *19*
63:5, *12*   66:*12*,
*17*   67:2, 7   68:*16*
74:9   75:*3*, *9*, *10*,
*15*   76:5, *9*, *19*
77:*10*   78:5   79:*3*,
*14*   87:*14*   102:*16*
103:*1*   104:*13*
105:*4*, *5*, *11*
118:9, *10*, *11*, *16*,
*17*, *19*   119:7, *16*
120:*1*, *3*, *7*
124:*12*, *15*
141:22   143:*1*, 7,
*11*, *13*, *19*   147:*12*
148:*12*   149:8
151:2   153:2
154:*21*   162:*15*
163:*1*   164:*3*, *4*, *5*,
*17*, *20*, *22*   165:*15*,
*16*   166:*19*   168:6,

9, *15*, *17*, *20*, *22*
169:2, *3*, *16*, *17*,
*19*   170:*3*, *12*, *14*
171:*1*, *6*, *14*, *17*,
*20*   172:2, *5*, *6*, *12*,
*21*   173:*4*, *17*, *20*
174:*1*, *3*, *13*, *17*
176:6, *8*   178:*19*,
*22*   179:*13*   183:*4*,
*5*   189:*10*   192:*19*
193:*5*   195:9, *13*
196:*14*   201:*15*
215:*11*   217:*18*
218:2, *6*   219:*3*
221:*11*, *13*   223:5
226:*15*   227:*4*, *9*
228:*11*, *13*, *22*
233:*11*   235:*21*
245:*12*, *15*
246:*19*   253:*3*, *18*,
*19*   254:*8*, *10*, *15*,
*19*   255:*13*, *18*
258:*10*   259:*10*
260:*13*, *15*
266:*13*   289:*14*
291:6   295:*15*, *17*
296:*3*   297:*1*, *12*,
*13*, *17*   298:*4*
299:*21*   300:*16*
301:*11*   302:2, *3*,
*13*, *16*, *20*   303:6
305:*20*   306:*15*
315:*15*
**Session**   4:6   141:*1*
**sessions**   252:*10*
**SET**   45:*13*
65:20   114:*14*
120:*15*, *18*   121:*1*,
*4*   181:*15*   251:*13*
256:*1*
**sets**   237:*11*
**Setting**   5:*16*
20:8, *9*   21:4
40:22   41:5

68:*11*  125:*10*  149:*15*  168:*13*  202:*17*  253:*20*, *21*  258:*14*

**settings**  66:*3*  105:*3*  125:*11*  154:*21*  216:*14*  249:*5*

**seven**  156:*8*  303:*21*  309:*8*

**Severe**  5:*4*  110:*8*  112:*12*  114:*11*, *18*  115:*4*, *6*  116:*16*  281:*11*  285:*2*, *19*  286:*2*, *17*  287:*11*, *16*, *19*  288:*1*

**shape**  121:*19*

**shared**  62:*1*  84:*1*

**shares**  103:*17*

**sheer**  245:*7*  270:*22*

**shift**  96:*20*

**shoot**  165:*10*

**shootings**  306:*1*

**short**  282:*2*  308:*19*

**shortages**  86:*1*, *19*

**shortened**  122:*17*

**shorter**  37:*19*

**show**  13:*17*  89:*4*, *7*  110:*20*  126:*13*  130:*13*, *17*  132:*18*  148:*14*  225:*1*  261:*20*  271:*10*  272:*10*  276:*4*  299:*3*  316:*4*

**siblings**  65:*20*

**sick**  318:*3*

**sign**  317:*21*

**significance**  132:*21*  136:*14*

**significant**  21:*7*  133:*2*  136:*1*, *6*  137:*20*  146:*8*  147:*3*  176:*14*  256:*7*  257:*18*  259:*8*  282:*12*  286:*9*  289:*7*  291:*2*

**similar**  78:*5*  85:*21*  86:*1*  107:*20*  115:*14*  237:*22*  263:*15*

**similarly**  163:*14*

**simple**  209:*9*

**sincerely**  209:*7*

**single**  46:*18*  265:*15*

**Sir**  16:*5*  147:*19*  303:*15*

**sit**  55:*9*  250:*5*  267:*6*  279:*12*

**site**  11:*14*  25:*12*  27:*10*, *15*  108:*16*  117:*14*, *22*  121:*20*  155:*3*  173:*19*

**sites**  27:*16*, *17*  28:*5*, *7*  69:*6*  222:*6*, *10*  223:*15*, *17*  228:*5*  238:*11*  243:*7*  245:*3*, *4*, *6*  294:*2*

**sitting**  45:*3*  46:*17*  58:*6*  67:*4*, *15*  71:*10*  114:*16*  119:*2*, *21*  136:*8*  138:*13*, *22*  139:*9*  188:*6*  210:*9*  307:*18*  308:*6*

**situation**  58:*14*  82:*1*  204:*19*  242:*7*

**situations**  120:*14*

**six**  131:*14*  156:*8*  226:*17*  252:*11*

**sixth**  22:*12*  23:*1*

**size**  132:*17*

**skip**  34:*4*  47:*4*

**skipped**  91:*17*  205:*12*  227:*1*

**skipping**  247:*16*  266:*15*  281:*9*

**small**  21:*10*  96:*14*  144:*12*, *19*  145:*6*, *15*  146:*10*  148:*1*  179:*8*  214:*4*

**smaller**  121:*18*  143:22

**Smith**  32:*15*

**social**  24:*17*  46:*15*  84:*14*  87:*17*  88:*19*  90:22  91:*7*, *14*  103:*5*  125:*13*  126:*8*  132:*4*  134:*15*  151:*1*  155:*1*  167:*8*  175:*7*, *18*  176:*4*  177:*18*  178:*1*, *8*, *17*  186:*22*  187:*2*, *8*  188:*1*  195:*3*  201:*21*  212:*21*  213:*4*, *11*  256:*8*  276:*17*

**social-emotional**  186:*11*  251:*3*

**socially**  102:*14*  257:*17*  259:*8*

**solely**  226:*22*

**solve**  207:*9*

**somebody**  115:22

**someone's**  148:*12*  190:*20*

**somewhat**  283:*3*  284:*10*

**soon**  78:*13*

**sorry**  19:*12*  30:*2*, *22*  64:*14*  66:*9*  72:*18*  74:*18*  92:8, *11*  93:*3*  103:*11*  105:*17*  118:*13*  125:*6*  128:*14*  134:*2*  142:*8*  150:*4*  157:*3*  158:*3*  162:*6*  163:*9*  166:*6*  168:*7*  180:*1*  186:*21*  193:*17*  205:*11*, *12*  206:*4*  214:*8*  217:*1*  220:*12*  233:*1*  236:*14*, *20*  247:*16*, *20*  255:*7*  265:*17*, *19*  267:*13*  280:*7*, *10*  290:*5*  306:*16*  310:*15*  312:*14*  313:*14*  318:*3*

**sort**  55:*11*  62:*12*  162:*16*  263:*16*

**sought**  254:*10*

**sound**  15:*19*  102:*14*  306:*11*

**source**  30:*17*  163:*7*  208:*9*  274:*21*  305:*10*

**sources**  30:*19*  45:8  50:8  273:*4*, *12*

**Southern**  46:*13*

**spaces**  220:*5*  249:*10*

**spare**  48:*2*

**speak**  29:*14*  36:*6*, *8*, *9*  38:*6*  44:*7*  52:*10*, *11*  54:22  57:*12*  71:*1*  113:*14*  116:*19*  118:*21*  139:*12*  207:*12*

233:*14* 244:*6*
248:*21* 264:*13*
315:*22*
**speaking** 58:*12*
157:*21* 188:*16*
**special** 21:*19*
24:*8, 9* 25:*17*
29:*18* 30:*9, 15*
31:*2* 36:*7* 55:*6,
10* 131:*8* 134:*20,
21* 135:*9, 17*
139:*2* 164:*11*
189:*5, 9* 194:*18*
221:*11* 242:*2, 3*
243:*5, 9* 248:*10,
14* 275:*8, 9*
276:*15, 21*
277:*15* 278:*7*
280:*2* 303:*9*
**Specialist** 2:*9*
**specialized** 21:*14,
16* 22:*11* 144:*14,
21* 145:*8, 16*
193:*7*
**specials** 104:*4*
223:*15*
**specific** 12:*8*
40:*8* 43:*9* 45:*9*
79:*18* 100:*19*
115:*10, 22*
120:*12* 136:*8*
139:*10* 156:*21*
159:*6* 164:*13, 20*
168:*22* 174:*15*
190:*11* 210:*1*
218:*1, 5, 18*
223:*5* 252:*1*
305:*9*
**specifically** 11:*21*
15:*18* 19:*16*
25:*6, 10* 38:*12*
39:*11* 40:*5*
41:*14* 50:*2*
76:*22* 90:*11*

100:*19* 105:*21*
156:*20* 159:*21*
165:*19* 183:*19*
243:*22* 278:*2*
**specifics** 41:*18*
59:*11*
**spectrum** 98:*22*
222:*22*
**speech** 55:*13*
84:*2* 168:*11, 18*
170:*21* 173:*20*
174:*16* 179:*20*
218:*4* 219:*21*
295:*14*
**spend** 17:*3*
111:*10, 21* 117:*4,
11*
**spending** 104:*6*
105:*2* 106:*3*
116:*17, 18* 274:*9*
**spends** 163:*14*
**spent** 12:*5*
105:*15, 22* 146:*6*
149:*3, 12* 164:*10*
**split** 196:*10*
**Square** 2:*12*
**ss** 319:*3*
**STACEY** 3:*18*
8:*19*
**staff** 62:*7*
185:*10* 202:*12*
**staffing** 42:*6*
86:*1, 19*
**stagnant** 112:*14*
114:*11* 115:*1, 18*
**stand** 267:*13*
279:*7*
**standard** 26:*12*
43:*12, 16, 20*
53:*7, 10, 18* 72:*19*
**standard-based**
205:*22* 207:*7*
**standards** 26:*2,
15* 100:*7, 15*

120:*15, 19* 121:*2,
4* 167:*6* 175:*14*
207:*2, 10, 18*
**standards-based**
21:*20* 25:*22*
205:*17* 206:*16*
221:*17, 22* 222:*2*
251:*2*
**standing** 133:*15*
**standpoint** 192:*9*
**Stars** 6:*7*
**start** 23:*7* 30:*2*
39:*10* 41:*21*
90:*14* 94:*16*
166:*17, 18*
208:*22* 250:*19*
258:*22* 275:*19*
280:*6* 311:*16*
**started** 11:*14*
188:*10* 285:*7*
**starting** 61:*21*
93:*22* 230:*16*
243:*4* 281:*21*
**starts** 94:*19*
125:*8* 128:*21*
129:*5* 144:*3, 7,
12* 150:*7* 206:*13*
266:*9* 279:*19*
310:*22*
**STATE** 1:*8* 3:*15,
16, 17, 18, 19* 7:*4,
18, 20* 8:*16, 18,
20* 9:*11* 15:*1*
18:*18, 19, 21*
23:*4* 24:*15*
26:*16* 28:*2, 21*
29:*12* 32:*5, 10,
13, 16* 35:*1* 37:*2,
6, 8, 21* 38:*2, 7, 9,
16, 19* 39:*17*
40:*15, 19* 41:*1, 5,
14, 17* 42:*3, 16,
18, 22* 44:*6, 16*
46:*18, 19* 47:*21*

49:*6, 20* 50:*7*
51:*5* 52:*12, 15,
17* 55:*6, 8, 19, 22*
56:*1, 5* 58:*3, 17*
61:*22* 63:*22*
64:*4, 5, 10, 18*
66:*21* 67:*5, 15,
21* 68:*6* 79:*9*
82:*20* 83:*14, 20*
84:*10, 18, 22*
85:*1, 9* 86:*10, 12,
21* 87:*7, 8, 12, 15*
90:*7, 15, 18, 21*
91:*4, 11* 92:*16*
97:*8* 100:*1, 21*
101:*4, 7, 9, 13, 16*
123:*2, 10* 124:*11,
13, 14* 135:*22*
150:*10, 13, 18*
151:*5, 8* 152:*3, 7,
14* 153:*5, 8, 9, 12,
17* 155:*7, 12, 18,
20* 156:*10, 14*
157:*7, 8, 19*
158:*16* 159:*18*
160:*5, 10* 161:*1,
2, 8, 17* 162:*8, 12,
22* 163:*7* 164:*11*
165:*21* 166:*14*
169:*12* 170:*12,
14, 19* 171:*5, 8, 9,
12, 16, 22* 172:*3,
11, 14, 19* 174:*11,
21* 175:*6, 11, 13*
176:*2, 9* 177:*10,
18* 178:*5* 180:*21*
181:*2* 182:*6, 7,
11* 184:*12*
185:*13, 16, 18, 20*
186:*1* 189:*17, 19,
20* 190:*8, 21*
191:*2, 3, 4, 7, 11,
12, 16, 18, 19, 20*
192:*9, 18* 193:*8*

195:*17* 197:*12* 198:*3, 4, 7, 17* 199:2, *7, 8, 14, 18, 22* 200:*1, 5, 16, 18, 21* 201:*16, 20* 202:*18, 20* 203:*4, 19* 205:*14* 206:*13* 207:*17, 18* 211:*3, 19, 22* 212:*15, 18* 213:*8, 15* 214:*13* 215:*1, 22* 216:*14* 227:5 229:*8, 17* 242:*1, 13, 17* 244:*1* 245:*10, 16, 22* 250:*21* 253:8 256:*13* 258:*18* 260:*15* 261:*11* 263:*20* 265:*19* 268:*19* 269:*2, 11, 12* 271:*1, 5* 277:5 278:*21, 22* 279:*14, 15* 291:7 292:*18* 294:*20* 295:*1* 296:*9* 299:*1, 4, 8, 19* 300:*3, 8, 14, 20, 21* 301:*5* 302:*8, 9, 15, 21* 303:*6* 312:*2, 7, 20* 313:*2, 3, 9* 314:*2, 11, 15, 22* 315:*11*

**stated** 25:*15* 48:*1* 132:22 227:7 235:22 275:2 282:5 295:*16*

**statement** 92:*4* 95:4 112:*16* 113:*20* 129:*15* 132:*18* 147:7 161:8 197:*3* 279:*8, 13* 281:2 282:*4, 9, 16*

283:*13, 21* 284:*4, 9, 15* 286:*14* 302:*19* 303:*4* 306:*13* 307:*17*

**statements** 137:5 284:*18*

**STATES** 1:*1, 5, 18* 3:*14* 7:*3, 22* 8:*2, 4, 6, 8, 12, 14* 15:*4* 16:*14* 17:*7, 16* 29:22 30:*4, 14* 31:*5* 32:*1, 9* 35:2 36:*4, 14* 38:*8, 22* 39:*1* 43:*13, 17, 21* 44:*3, 4, 7, 14, 18, 19, 20, 21, 22* 45:2 49:5 50:*4, 10, 13* 52:*16* 78:*5, 22* 79:*7, 13, 21* 85:*21* 86:*2, 4, 7, 17* 87:*1* 95:*9* 99:*14* 157:*9, 11, 16, 18, 22* 158:8 159:*10, 13* 162:*20* 164:8 178:*7, 12* 188:22 189:*4, 8* 190:*12* 198:*20* 200:*15* 202:*4, 17* 243:*5, 17* 244:*10, 13, 19* 245:*12* 260:*14* 261:*5, 8, 9* 265:*16, 18* 300:*1* 311:*10* 317:*4, 12* 319:*3*

**state's** 151:*11, 15* 202:*14* 262:*14*

**Statewide** 6:*4* 82:*19* 181:5 183:*17* 203:*14* 213:*14* 214:7 242:*10, 11* 246:*16* 250:*20*

257:22 262:*16* 266:*3* 270:*16, 17, 19* 312:*14* 314:*12* 315:*2, 6, 8, 12*

**stating** 103:*10*

**statistical** 132:*21* 135:*6, 12, 18* 136:*14*

**statistically** 133:2 136:*1, 6*

**statistician** 239:*14*

**statistics** 132:*14* 135:*16, 21* 280:*16*

**status** 67:*16* 218:*15*

**stay** 117:*18, 21* 239:*21*

**staying** 239:*20, 21*

**steady** 233:*19*

**stems** 304:*18*

**stenographically** 319:*9*

**Stenotype** 1:*21*

**step** 118:*6*

**steps** 177:*10*

**stick** 314:*10*

**stimuli** 21:*13*

**stop** 10:*9* 127:*15* 176:*20* 181:*12, 13* 193:*12* 194:*17* 259:*18*

**stopped** 224:7

**stories** 309:*4*

**storm** 306:2

**strained** 306:*21*

**strategies** 20:2 50:9 92:*1, 10* 94:2 167:*9* 177:*9* 188:5 190:*9* 215:7 295:2 309:*15*

**strategy** 179:7 189:*14* 200:6

269:*10* 293:8 296:*11*

**Street** 1:*18* 3:*7* 7:*7*

**stretched** 305:*21* 306:*16*

**strong** 192:5

**structural** 311:*11, 20*

**structure** 92:22 93:*15* 197:*20*

**structured** 21:*11*

**structures** 42:*6* 184:5 192:*4, 16* 212:*1* 213:*17* 214:*14* 215:*3* 276:22 277:*16* 278:*8, 14*

**struggle** 215:*15*

**struggling** 258:*3* 309:*5*

**stuck** 70:*18*

**student** 19:*20* 20:*5, 10* 21:*2, 3* 23:*14, 15* 33:*17, 19, 21* 34:*13, 19* 35:*10* 38:*17* 39:22 40:*9* 42:7 55:*2, 3, 5, 7, 11* 56:*16, 17* 57:*3, 6* 58:*16, 20* 59:*2* 61:*3, 5, 8* 62:*7, 20, 22* 63:*4, 12* 66:*10, 20* 67:*17* 68:7 73:*17, 20* 75:*14* 76:*1, 3, 8* 77:9 101:*11* 103:5 105:*9* 106:*18* 107:*2, 5, 9, 11, 17, 21* 108:*11, 17* 109:*11* 115:8 118:*4, 17, 18, 21* 119:22 120:6

126:7  128:6
131:*15*  139:*15*
144:*4, 7, 18*
145:*21*  146:*1, 10*
149:*4, 7, 9, 12, 13*
165:*1*  174:*16, 17*
178:*20*  183:*20*
184:*12*  191:*13*
194:*19*  195:*1, 2, 4, 17, 18*  203:*9*
205:*21*  207:*7, 9*
210:*8, 22*  212:*13*
220:*18*  222:*3*
227:*9, 13*  230:*19*
233:*16, 19, 20*
236:*6, 11*  238:*4, 5, 16*  239:*8, 11*
241:*2*  245:*14*
250:*4*  251:*19*
253:*16, 19*
255:*12*  258:*14*
274:*21*  293:*8, 11, 14, 18*  294:*5, 6*
295:*14*  296:*2, 4, 12*  297:*1, 11, 14*
298:*9*  302:*3, 18*
**Students**  5:*3*
18:*17, 20*  19:*2, 18*  20:*1, 6, 15, 20, 22*  21:*6, 9*  22:*16, 20*  23:*3, 22*
25:*18*  26:*3, 5, 9*
37:*4, 7*  38:*12, 17, 22*  40:*2, 5, 11*
53:*4*  56:*6, 22*
57:*2, 7*  61:*15*
65:*21*  66:*17*
69:*1, 8*  70:*6*
74:*13*  78:*6*  79:*1, 15*  80:*4, 12*
81:*13*  87:*14, 20*
90:*7*  92:*22*
93:*15*  94:*9*
95:*11*  100:*22*

102:*6, 7, 8, 13*
103:*7*  108:*1, 10*
109:*12, 14, 18*
110:*8*  111:*9, 20*
112:*11*  113:2, 7
114:*10, 17*  115:*2, 5, 9, 11, 14*
116:*16*  118:*8, 15*
120:*5*  121:*10, 11, 16, 17, 21, 22*
122:*8, 10*  123:*7*
124:*9*  125:*8*
129:*21*  130:*12*
131:*16, 22*
132:*16, 18*  133:*4*
134:*14*  135:*21*
137:*9, 19, 21*
141:*8, 10, 13, 16, 19, 20, 21*  142:*1, 9, 17, 20*  143:2, *9, 12, 20, 22*  144:*13, 20*  145:*7, 11, 13, 16, 19, 20*  146:*7, 8*  147:*3*  148:*1, 2*
150:*22*  151:*21*
153:*22*  154:*6, 17*
155:*5, 6, 15*
156:*4, 5, 7, 16*
161:*20*  162:*14*
163:*1, 6, 16*
164:*3, 5*  165:*15*
166:*20*  167:*2*
168:*5*  169:*14, 17*
170:*18, 19*  171:*2, 10, 17*  172:*6, 7, 12, 16, 17, 21*
173:*6, 15, 16, 18, 19, 22*  174:*13*
175:*2, 9, 15, 16, 22*  176:*5, 13*
177:*21*  178:*3, 9*
179:*7, 13*  183:*10, 15*  184:*19*
186:*14, 15, 22*

187:*20*  189:*10, 11*  192:*20*  193:*3, 10*  195:*7, 10*
197:*21*  198:*10, 13*  199:*10*  200:*3, 11, 19*  202:*9*
203:*15, 18, 21*
204:*8, 13, 19*
205:*19*  206:*3, 19*
207:*1, 16, 17, 18*
208:*12*  209:*5*
215:*8*  216:*3, 13*
217:*12, 19, 22*
218:*7*  220:*9, 14*
221:*8, 13, 19*
222:*22*  226:*18, 21*  227:*3*  228:*8*
230:*5, 10, 19, 22*
233:*11, 18*  234:*4, 5, 8, 9, 13*  235:*5, 8, 12, 15, 20*
236:*5, 14, 18*
237:*12, 16, 18*
238:*10, 15, 18, 21*
239:*1, 6*  240:*13, 16, 18*  241:*2, 8*
242:*3, 4, 15, 18*
243:*18*  244:*4, 14, 20*  245:*22*  249:*6, 10, 15, 20*  251:*14, 15*  254:*15*  255:*1*
256:*5, 9, 16, 21*
257:*18*  258:*7*
259:*5, 11, 13, 15*
260:*16*  261:*7*
271:*1*  273:*5, 13, 17*  274:*1, 6, 9, 12, 18*  276:*15, 17, 21*
277:*14*  278:*7*
280:*2*  281:*7, 10*
282:*14*  284:*22*
285:*2, 19, 22*
286:*2, 9, 15, 17*
287:*7, 11, 16, 19,*

22  288:*10, 21*
289:*8*  291:*3*
293:*22*  294:*1*
295:*3, 17*  296:*19*
297:*17, 19*
300:*17*  301:*3, 12*
312:*15, 18*  313:*5*
314:*4, 12, 17*
315:*2, 8, 14*
**student's**  120:*2*
186:*12*  239:*9*
253:*18*  298:*3*
**studied**  134:*9*
**studies**  248:*6*
**studious**  260:*2*
**study**  83:*13, 15, 19, 22*  131:*4, 9, 13*  132:*5, 9, 16*
135:*21*  267:*17*
268:*7*  281:*15*
**stuff**  166:*7*
195:*22*
**styles**  26:*10*
148:*4*
**sub**  226:*14*
**SUBER-DRAKE**
3:*18*  8:*19*
**subgroups**
276:*20*  277:*14*
278:*6*
**subjective**  230:*11*
**submitted**  15:*13*
281:*19*  282:*7*
285:*17*  286:*12*
**subset**  213:*4*
**substantially**
307:*21*
**substantive**  110:*6, 12*
**subsume**  266:*13*
**succeed**  11:*5*
20:*17*  155:*15*
**Succeeds**  139:*15*

**success** 92:*3, 7, 13* 94:*5* 103:*5* 106:*21* 107:*3* 145:*2* 155:*1* 187:*3* 256:*2*
**successful** 62:*7* 143:*8* 195:*10* 255:*5, 14* 259:*14*
**successfully** 191:*5*
**sufficient** 84:*17, 21* 132:*17* 137:*10* 149:*4* 162:*13* 165:*15* 171:*5* 185:*10* 208:*20* 209:*3, 4* 210:*12*
**suggest** 201:*8* 239:*19* 281:*6* 287:*5*
**suggesting** 164:*9*
**suggestions** 57:*4*
**suggests** 257:*8*
**sum** 234:*3*
**summary** 14:*20*
**superintendent** 40:*18*
**supervision** 319:*11*
**supplemental** 110:*4*
**Support** 5:*18* 6:*6* 20:*21* 21:*15* 24:*14, 16* 38:*10, 13* 43:*22* 44:*10, 11* 45:*19* 46:*2, 5, 11* 51:*9* 52:*12, 22* 53:*4* 62:*2* 66:*16* 82:*20* 84:*22* 87:*13, 19* 90:*5, 7, 8, 21* 91:*4, 6, 11, 13* 92:*22* 93:*15* 98:*21* 100:*22* 101:*10* 102:*3*

143:*1, 11* 144:*15, 22* 145:*9, 17* 146:*2* 154:*22* 156:*12, 15* 158:*16* 161:*5, 19, 22* 168:*6, 9* 169:*2, 17, 19* 170:*3, 19* 171:*6, 17, 20* 172:*1, 5, 6, 12, 21* 173:*4* 175:*12, 22* 176:*11* 178:*9* 179:*4* 182:*8* 184:*5, 11, 19* 186:*15, 17* 187:*7, 14, 16, 17* 188:*22* 189:*16* 192:*20* 193:*2, 7, 11* 195:*18* 198:*9, 22* 200:*3, 19* 201:*15, 21* 202:*2, 5, 15, 17, 19* 203:*3* 205:*15* 206:*14* 208:*9* 211:*19* 212:*19, 20* 213:*6, 9, 10* 215:*7, 22* 216:*12* 217:*11* 218:*2* 230:*17, 19* 232:*18* 251:*14* 252:*7* 254:*6* 255:*15* 259:*10, 13* 267:*1, 10* 272:*8* 273:*18* 276:*15* 288:*9* 293:*11* 298:*1* 312:*5* 313:*5* 314:*3, 11*
**supporting** 20:*3* 38:*22* 83:*2* 101:*11* 147:*6* 151:*20* 172:*15* 176:*13* 186:*21* 201:*1* 292:*16*

**supports** 19:*4* 20:*2* 21:*21* 22:*2* 23:*22* 24:*18* 37:*7, 10, 22* 38:*4, 10, 15* 57:*6* 61:*15, 19* 62:*4* 67:*1* 69:*21* 70:*5, 21* 71:*6, 13* 72:*6* 73:*18* 74:*8* 87:*17* 102:*12* 103:*9* 104:*8* 137:*19* 142:*22* 143:*7, 18* 147:*12* 149:*8* 150:*15* 151:*3, 10* 157:*6* 162:*14* 164:*3, 14* 166:*19* 167:*9* 168:*12* 170:*18, 22* 173:*17, 22* 174:*3* 175:*1, 7, 19* 176:*5* 177:*19* 178:*2, 18* 179:*13, 17* 180:*3* 187:*20* 194:*16* 195:*9, 12* 196:*4* 198:*12* 208:*21* 209:*5* 216:*3, 13* 217:*18* 218:*6* 219:*4* 227:*8* 235:*8* 246:*18* 251:*5* 252:*22* 253:*1, 4, 5* 255:*3, 8, 13, 17, 18* 257:*10, 15, 16* 260:*13, 19* 263:*19* 267:*12* 269:*10* 274:*2, 4, 7* 282:*14* 291:*7, 17* 296:*17* 297:*16* 298:*4* 315:*1*
**supposed** 61:*1* 156:*11* 157:*2* 297:*18*
**Supreme** 279:*20*

**sure** 10:*3, 5* 11:*3* 16:*9* 22:*10, 13* 23:*5, 6* 25:*3* 29:*2* 30:*3, 21* 31:*18* 34:*21* 37:*13, 18, 20* 41:*3* 43:*6* 47:*18* 49:*16* 53:*16* 54:*13* 56:*20* 59:*9* 63:*8, 20* 70:*4* 71:*9* 72:*12, 17* 75:*13* 78:*20* 81:*9* 99:*8* 104:*22* 107:*10* 110:*3, 11* 112:*5* 113:*9* 118:*15* 128:*6* 131:*3* 162:*17* 193:*20, 22* 197:*6* 207:*14* 208:*14* 209:*1* 214:*3* 219:*7* 223:*3, 4* 226:*2* 230:*12* 232:*1* 235:*22* 236:*22* 239:*14* 243:*3* 246:*8* 253:*14* 270:*4* 273:*7* 280:*22* 282:*1* 283:*13* 284:*13* 287:*9* 296:*6* 298:*9* 299:*14* 303:*4, 18* 308:*10* 309:*11* 312:*10* 313:*20* 317:*15, 16*
**surprise** 132:*9*
**surprised** 226:*21*
**suspend** 317:*6*
**sweeping** 306:*3*
**SWIFT** 6:*19* 18:*1* 29:*10, 11, 15* 30:*1, 5* 134:*18* 188:*14, 17* 189:*2* 272:*21* 316:*5*

**SWIFT-FIA**
271:*9*
**switching** 222:*16*
**sworn** 1:*15* 9:*4*
**Syndrome** 195:*4*
**Synonyms** 120:*15*
**System** 6:*5*
20:*21* 23:*11*
38:*10* 42:*11*
43:22 44:*10, 11*
45:*13* 46:5 51:*8*
52:*12, 21, 22*
61:*21* 62:2
66:*16* 73:*18*
79:7 83:*1* 86:*20*
90:5, *8* 95:7
96:22 100:*21*
101:*10* 102:*3*
103:*1* 151:*20*
152:2, *7, 15*
156:*16* 158:*15*
159:*14* 162:*10*
171:*13* 176:*4*
179:*14* 180:*4*
182:8 186:*20, 21*
187:7, *16, 17, 18,
19* 189:*16*
191:*10, 11*
195:*13* 197:*14,
17, 18, 20* 198:*1,
11, 14, 22* 199:*9,
16* 200:*3, 19*
201:*14* 203:*14,
22* 211:*18, 19, 20*
212:7 213:*5*
215:5, *6* 216:*1*
217:20 230:*17*
242:*11* 257:22
259:9, *12* 272:7
290:20 293:*18*
294:4, *8, 9, 22*
296:8, *14* 298:*1*
299:2 306:*20*

307:*21* 308:8
312:5 315:*11*
**systemic** 23:*10*
37:2 107:2
135:*11* 151:20
156:*15* 157:7
158:22 159:*15*
160:*13* 181:5
183:8, *17* 203:*21*
242:9 245:2
246:*16* 257:22
258:*17, 19*
259:*19* 292:*12,
13* 293:4 295:9
296:8 312:*14*
314:*3, 12* 315:2,
*6, 8*
**systemically**
23:*15* 293:20
**Systems** 6:*9*
24:*14, 16* 46:2, *8*
79:8 83:*3* 94:8
95:*1, 9, 20* 96:*1,
2* 185:*15* 188:*21*
198:9 202:*17, 18*
210:*4* 212:2
257:6 276:22
277:*16* 278:8, *14,
16* 293:22 306:*3*
313:7

**< T >**
**TA** 266:22
267:8, *13, 18*
**tabbed** 306:*9*
**table** 27:*10, 12,
15* 170:*16* 248:2,
*3, 22*
**tables** 232:*10*
241:16 248:7
**take** 10:*20* 11:*1*
37:*14* 39:*3*
59:*20* 78:*13*
108:22 119:*3*

147:*18* 148:*21*
193:*18* 198:*3, 17*
205:4 213:*20*
228:6 230:*1*
241:7 243:2
245:16 246:*12*
247:*18* 251:*10*
253:16 275:*18*
277:21 312:*10*
**taken** 1:*20* 7:6
9:*11* 47:*19, 20*
260:9 319:*6, 9*
**takes** 82:22
149:2 280:*20*
308:2
**talk** 10:7, *8*
25:*11* 59:*11*
77:2 177:8
178:*14, 17* 188:*9*
192:15 194:*9*
203:*14* 208:8
212:8 238:2
304:*21* 312:*12, 13*
**talked** 32:*18*
71:2 94:2 98:*18*
149:*1* 205:*4*
211:*18, 20* 218:*3*
228:17 255:*15*
257:2, *9, 11*
271:*14* 275:7
279:8 290:*12*
291:13 295:*13*
303:*11*
**talking** 39:*19*
93:*17* 127:*13*
163:3, *5* 165:*21*
166:11 174:*15*
178:*19, 22* 179:2
185:7 201:*3*
205:3 206:*12*
207:13 218:*13,
14, 21* 219:*3*
220:*17, 20* 221:*3,
7* 223:9 250:*6, 8*

254:4 264:*9*
267:10 271:*18*
289:*11* 309:*10*
**talks** 131:*4*
147:15 170:*16*
196:*1* 238:*9*
257:4 271:*8*
299:15 302:*15*
305:18 308:*11, 13*
**tax** 229:*16*
**taxing** 229:*12*
**TAYLOE** 2:*8*
8:7
**teach** 26:9 222:*5*
**teacher** 22:*11*
23:2, *9, 11, 13*
41:*11* 118:*3*
187:4 250:*4*
257:12
**Teachers** 21:*18,
19* 22:*10* 26:*1,
12* 28:12 42:2
131:8 202:*12*
288:6 306:*21*
**teaching** 19:22
21:*21, 22* 24:*3,
12* 25:*1, 3* 26:*3,
15* 41:*16* 87:*18*
99:*3, 4* 144:*14,
21* 145:*9, 16*
148:4, *5* 156:*13*
167:5 176:*10*
179:5, *6* 184:*14*
193:9 216:*16*
251:18
**Team** 6:*19*
34:*19* 54:*3, 5, 16,
21* 55:2, *9, 14, 16,
18* 56:*1, 6, 15, 21*
57:*1, 6* 61:*1, 4,
17* 62:*3, 6, 11, 18*
63:*3, 11, 16* 64:*1,
6, 11, 20* 66:2, *7,
9, 14, 19* 67:6, *17*

68:*6*, *11*  118:*11*, *19*  119:*4*, *8*, *15*  120:*8*  149:*3*, *11*, *12*  191:*19*, *20*  205:20  206:22  207:*8*, *15*, *21*, *22*  208:2  227:*8*  246:*9*, *17*  258:*10*  291:*21*  292:*3*, *9*  293:*7*, *10*, *12*  294:*3*, *10*, *17*, *21*  295:*10*  296:*1*, *10*  297:*3*, *10*, *13*, *18*, *21*  298:*5*, *13*, *17*, *19*, *22*  299:*4*, *8*  300:*9*  301:*6*, *10*  302:*1*, *2*, *6*, *10*

**teaming**  212:*1*  213:*16*  214:*14*  215:*3*

**teams**  56:*12*  291:*10*, *15*  292:*21*  293:*1*, *4*, *5*  300:*3*  302:*17*, *18*

**team's**  57:*10*

**technical**  90:*17*, *21*  91:*4*, *11*  175:*3*, *8*, *12*  185:22  187:*5*  198:*5*  201:2, *20*  202:2, *5*, *6*, *15*, *18*  203:2  205:*15*  206:*14*  208:9  212:*18*  213:9  267:*14*

**tell**  13:*18*  18:*3*  46:*17*  49:*11*  69:5  114:*16*  154:*15*  183:*1*  193:*14*  214:*18*  224:*11*  297:*10*

**ten**  12:*9*  146:*10*, *16*, *21*  147:*10*

148:*6*, *11*, *15*  149:*3*, *12*, *18*, *19*  188:*3*, *7*

**tend**  291:*11*

**ten-minute**  147:*18*, *21*  275:*18*

**term**  53:*13*  54:*3*  60:*5*  65:*2*  123:*16*  196:*5*  253:9  283:*5*  284:*11*  294:*16*

**terminology**  81:22  187:*10*

**terms**  36:*8*  38:*8*  53:*10*  56:*21*  62:2  73:3  93:*19*  100:*13*  114:*6*, *7*  115:*16*  147:*12*  161:*3*  169:*21*  172:*20*  188:*6*  193:*13*  197:*11*  218:*1*  228:*20*  231:*4*  264:*8*  289:*12*

**testified**  9:*5*  47:*9*  314:*3*

**testifying**  16:*4*, *11*  314:*16*

**testimony**  12:*7*  16:*13*  43:*16*, *19*  140:*4*  314:22  315:*19*  317:*11*

**text**  226:*2*

**Thank**  8:*9*, *22*  33:*6*  39:*4*  70:*15*  75:22  82:*14*  110:*17*, *18*  126:*3*  137:*15*  224:*13*, *14*  260:9  290:*8*, *9*  313:*21*  318:*1*, *5*, *6*

**thanks**  250:*17*

**theoretical**  122:*21*  168:*21*

**theoretically**  169:*1*  185:*7*  191:*6*

**Therapeutic**  5:*18*  69:*21*  70:*5*, *21*  71:*6*, *13*  72:*6*  73:*17*  74:*8*  75:*2*, *10*  147:*12*  151:*2*  297:*16*  298:*1*  299:*21*  300:*16*

**therapists**  83:*20*

**therapy**  84:*2*  164:*15*  165:*7*  168:*11*, *12*, *19*  170:*21*  173:*20*  174:*16*  178:*21*  179:*20*  218:*4*  219:*21*

**thereabouts**  138:*2*

**thing**  10:*8*  43:*11*  78:*10*, *11*, *17*  97:22  98:*1*, *7*, *12*, *17*  109:2  114:*1*  159:*6*  160:*17*  180:*6*, *8*  187:*18*  218:*15*

**things**  10:*14*  14:*17*  24:*20*  87:*16*  90:*9*  103:*11*, *13*, *15*  106:*1*  122:*6*  128:*5*  136:*5*  138:*13*  157:*1*  160:*12*, *16*  161:*14*  162:*8*  167:*4*  176:*16*  177:*17*  181:*11*  183:*6*  184:*15*  192:22  199:*16*  217:*17*  218:*18*  219:*15*  249:9  258:*5*  275:*19*  298:*15*  313:*10*

**think**  12:*5*  23:*8*  24:*20*  25:*5*, *15*  43:*1*, *6*, *10*, *11*  47:*19*  54:*9*  57:*15*  65:*5*  72:*1*  76:*11*  85:*6*, *7*, *9*, *15*  88:*8*  101:*18*  105:22  106:*17*  108:*21*  122:*20*  124:*7*  129:*18*  137:*17*  141:*7*  155:*9*  163:*11*  164:*1*, *18*  170:*11*  180:*5*  181:*4*  192:*12*  194:*4*  195:*21*  196:*1*, *6*, *12*  198:*3*, *17*  200:*9*  204:*18*  205:*4*, *10*  211:*6*  215:*18*  216:*5*  217:*2*  218:*3*, *11*, *12*  219:*4*  222:*9*, *16*  224:*17*  230:*13*  232:*4*, *7*  233:*10*  240:*5*, *7*  244:*17*  245:*17*  247:*4*  253:*11*  254:*3*  258:2, *13*  260:*11*  268:*10*, *12*  271:*21*  282:*4*, *8*  287:*20*  297:*8*  310:*21*  313:*16*

**thinking**  37:*14*  72:*10*  79:*17*  92:*20*  93:*13*  195:*15*  302:*17*  311:*2*

**third**  33:*15*  101:*19*  110:*5*, *11*  184:*3*  199:*13*  202:*13*  205:*18*  279:*18*  280:*8*  307:*12*

thirds 33:*16*
thorough 135:*10*
thought 54:*11*
  62:*6* 95:*16*
  118:*5* 133:*22*
  284:*5*
thousand 40:*6*
  155:*5*
thousands 11:*15*
  40:*6, 10* 147:*13*
  256:*9* 314:*8*
three 45:*12*
  67:*11* 131:*12*
  205:*5* 226:*17*
  230:*5* 250:*18*
  256:*1* 257:*17*
  279:*18* 316:*17*
threw 36:*15*
tied 203:*13*
tiered 24:*16*
  45:*14* 46:*2, 8, 13*
  186:*9, 13, 20, 21*
  187:*7* 188:*21*
  189:*16* 191:*10, 11*
tiers 44:*15*
  45:*19* 53:*3*
  187:*14*
time 7:*5* 9:*16*
  11:*14* 12:*5*
  21:*12* 39:*6* 42:*8*
  48:*2* 67:*5, 16*
  68:*5* 78:*13*
  88:*10* 101:*22*
  103:*18, 21* 104:*1,*
  *6* 105:*3, 15, 22*
  106:*4* 107:*3*
  111:*11, 22*
  116:*17, 18* 117:*4,*
  *10* 118:*6* 126:*4*
  136:*18* 139:*10,*
  *21* 143:*21* 146:*6*
  147:*15, 18, 22*
  149:*2, 5* 155:*4*
  167:*16, 20*

182:*13* 193:*18*
  196:*13* 223:*2*
  224:*16, 17*
  231:*22* 240:*16*
  245:*7* 247:*12, 18*
  249:*11, 16, 20*
  265:*9* 272:*20*
  273:*3, 16* 274:*9*
  281:*1, 18* 282:*6,*
  *7* 285:*17* 286:*12,*
  *21* 289:*3* 303:*17*
  308:*2, 19* 310:*11*
  312:*10* 314:*21*
  316:*16* 317:*13*
  318:*1*
timeline 265:*10*
timely 22:*4*
  212:*10*
times 12:*3* 34:*19*
  197:*18* 244:*7*
  279:*9* 318:*2*
tiredness 282:*2*
title 88:*22*
  127:*12* 303:*7*
today 11:*19*
  16:*4, 11* 43:*19*
  45:*4* 46:*17* 67:*4,*
  *16* 96:*13, 14*
  100:*4* 114:*16*
  119:*22* 138:*22*
  139:*10* 143:*4*
  167:*1, 11* 196:*16*
  210:*9* 219:*5*
  244:*8* 257:*10, 12*
  267:*6, 11* 268:*3,*
  *5* 273:*22* 275:*3*
  279:*12* 307:*18*
  308:*6* 318:*2*
today.ku.edu
  89:*14*
Today's 7:*4*
  11:*12, 13* 12:*2*

told 82:*4* 146:*20*
  157:*9* 167:*19*
  244:*8* 299:*1, 4, 8*
tool 97:*21*
  190:*12, 22*
tools 45:*12, 16*
  46:*16* 100:*4, 5*
  202:*16* 212:*7*
top 135:*8*
  138:*14* 155:*11*
  188:*12* 219:*15*
topic 51:*4* 57:*13*
topics 311:*1*
total 233:*15, 20*
  234:*13* 235:*20*
  236:*11, 14*
  238:*14* 265:*9*
totally 12:*20*
  33:*2* 74:*20*
  88:*11* 271:*17*
  313:*20*
tour 28:*9*
toured 173:*13*
Tourette's 195:*4*
touring 28:*7, 11*
TP.One 7:*10, 12*
track 242:*3*
  313:*17*
traditional
  102:*11* 104:*5*
  243:*5* 276:*18*
  307:*22*
train 80:*16*
  185:*2, 7*
trained 21:*14, 16*
  22:*11* 144:*21*
training 21:*17*
  22:*14* 23:*12*
  28:*13* 39:*13*
  132:*14* 135:*6, 13*
  164:*4* 193:*8*
  197:*13* 199:*20*
  200:*7, 20* 216:*7*

252:*14*
trainings 252:*9*
transcribed 1:*21*
transcript 10:*16*
  317:*21* 319:*7*
transcripts 11:*16*
  314:*2, 9*
transformation
  309:*7, 9, 13*
transformational
  259:*20*
Transformative
  260:*7*
transforminal
  260:*5*
Transforming
  4:*16*
transpired 139:*11*
Transportation
  223:*17*
traumatic 80:*13*
travel 17:*1*
traveled 17:*2*
treated 65:*21*
treatment 163:*15*
trend 236:*9*
trial 9:*16* 10:*16*
trick 13:*11*
tricky 236:*22*
trouble 291:*8*
true 139:*14, 16*
  145:*14* 153:*21*
  157:*17* 159:*13*
  282:*5, 9* 306:*13,*
  *20* 319:*7*
truly 137:*12*
  262:*7* 271:*7*
try 10:*2, 7, 8*
  11:*4* 152:*12*
  242:*5* 305:*7*
trying 13:*11*
  25:*5* 36:*9* 38:*3*
  65:*9* 87:*4*
  104:*19* 121:*2*

137:*11*  164:*17*
169:*7, 11, 15*
170:*5*  176:*21*
177:*2*  183:*7*
207:*9*  209:*12*
223:*4*  236:*21, 22*
271:*22*  291:*8*
**TUCKER**  2:*4*
7:*21*  9:*18*  12:*17*
14:*13*  19:*10*
20:*11*  38:*5*
43:*18*  52:2, *19*
54:*18*  60:*8, 18*
61:*9*  63:*7*  64:*22*
65:*4*  67:*10, 19*
69:*2*  70:*1, 8*
71:*8, 15*  72:*8*
74:*14*  75:*4*
76:*10*  77:*12*
78:*12*  80:*20*
81:*15, 20*  86:*13*
87:*10*  88:*8*  92:*6*
98:*4, 9, 13*  100:*9*
104:*15*  109:*15*
110:*10, 14, 17*
112:*1*  123:*21*
126:*1, 5*  127:*18*
128:*2, 8*  129:*17*
138:*7, 17*  145:*10*
151:*13*  152:*10*
154:*8*  158:*12*
159:*16*  160:*20*
161:*16*  163:*21*
165:*18*  169:*6*
170:*4*  179:*1*
183:*12*  190:*3*
204:*15*  206:*2, 6,*
*9*  208:*3*  214:*1*
225:*21*  227:*6*
229:*10, 19*  231:*5*
245:*21*  247:*3, 10*
254:*17, 21*
256:*18*  260:*6, 20*
261:*3*  270:*1*

277:*6, 18*  283:*22*
285:*11, 13*
290:*13*  292:*4*
293:*6*  294:*19*
295:*20*  296:*5*
298:*7*  299:*6, 10*
301:*13, 18*
302:*22*  305:*5*
313:*18*  315:*10,*
*21*  317:*12, 20*
**TUESDAY**  1:*11,*
*19*
**turn**  27:*7*  75:*15*
77:*10*  89:*17*
102:*17*  116:*13*
144:*2*  149:*22*
155:*10*  167:*15*
180:*16*  217:*6*
232:*9*  266:*7*
282:*21*  309:*4*
**turned**  109:*4*
170:*13*
**turning**  13:*10*
25:*8*
**turnover**  309:*20*
**two**  33:*15*  43:*1*
85:*4, 5, 7*  154:*9*
180:*20*  181:*1*
186:*3*  216:*8, 20*
217:*3*  226:*16*
234:*16*  272:*1, 22*
273:*1*  274:*5*
279:*18*  281:*5*
302:*12*  312:*11*
**two-thirds**  34:*12*
**two-year-old**
250:*5*
**type**  22:*14*  23:*12*
42:*21*  242:*5*
252:*4, 11*
**types**  75:*15*
149:*8*  164:*2*
180:*3*  260:*13*
302:*16*

**typewriting**
319:*11*
**typical**  24:*4*
55:*1*  122:*7*
167:*8*  179:*10*
222:*21*
**typically**  55:*2*
199:*11*  283:*10*

< U >
**U.S**  2:*10*  7:*7*
38:*8*  82:*21*  86:*4,*
*18*  111:*5, 14*
162:*20*  165:*4*
178:*10*  275:*8*
279:*20*
**uh-huh**  10:*15*
132:*6*  264:*7*
273:*11*
**ultimately**  131:*13*
270:*14*
**umbrella**  213:*5*
266:*14*
**Umm**  164:*16*
**uncertainty**  306:*2*
**uncomfortable**
158:*3*
**uncommon**
200:*15*
**uncontrolled**
195:*5*
**undergoing**  75:*14*
**underneath**  177:*9*
**understand**  11:*8*
20:*19*  24:2, *10,*
*14*  26:*1*  33:*2*
36:*3, 13*  41:*13*
44:*17*  52:*10*
67:*14*  70:*9*
92:*21*  93:*15*
94:*18*  99:*15*
104:*22*  119:*5, 21*
121:*8*  158:*18*
165:*6*  176:*21*

177:*3*  195:*16*
197:*12*  205:*10*
210:*4, 13*  211:*6*
226:*3*  227:*22*
229:*2*  236:*22*
258:*12, 13*  261:*3*
262:*7*  269:*13, 17*
271:*22*  274:*8*
**understanding**
12:*3*  21:*20, 22*
26:*8*  40:*17, 21*
41:*3, 8, 10, 12, 15*
42:*2, 10, 16*
51:*14*  52:*8*
54:*20*  56:*15, 21*
57:*2, 10*  58:*8*
63:*6, 21*  64:*4, 9,*
*17*  67:*4*  101:*12*
112:*15*  119:*6, 12,*
*14*  123:*1, 10, 14,*
*18*  124:*3*  139:*6*
142:*20*  147:*3*
166:*19*  168:*15*
169:*20*  174:*7*
175:*21*  176:*11*
180:*22*  198:*16*
199:*1*  200:*12*
206:*22*  227:*2*
229:*15*  230:*11*
240:*7*  241:*6*
244:*11*  248:*11*
296:*7, 22*
**Understood**  64:*3*
107:*19*
**undertake**  262:*15*
**undertaking**
266:*21*
**unequal**  25:*9*
121:*9, 10, 13*
122:*3, 5*  171:*11*
199:*11*  218:*22*
313:*7*  315:*12*
**unfair**  25:*9*
120:*13, 16, 21, 22*

121:*4, 9, 15, 21*
122:*3*  171:*11*
199:*10*  218:*21*
313:*7*  315:*12*
**unfairly**  244:*8*
**Unfortunately**
308:*18*
**unique**  269:*14, 17*
**uniqueness**  242:7
**UNITED**  1:*1, 5,*
*17*  3:*14*  7:*3, 22*
8:*2, 3, 5, 7, 12, 14*
15:*4*  16:*14*  17:*7,*
*15*  29:*21*  30:*4,*
*14*  31:*5, 22*  32:*9*
35:*2*  36:*4, 14*
39:*1*  43:*13, 17*
44:*19*  95:*9*
157:*9, 11, 15, 17,*
*22*  158:*8*  159:*10,*
*13*  188:*22*  189:*4,*
*8*  311:*10*  317:*4,*
*12*  319:*3*
**universal**  195:*11*
208:*11*  209:*22*
210:*4, 21*  266:*12*
**universe**  210:*10*
**universities**  17:*20*
135:*9*
**University**  16:*20,*
*21*  17:*18*  31:*7*
45:*17, 22*  46:*6,*
*10, 12*  134:*21*
135:*8*  137:*2, 6*
**unjust**  120:*16*
**unnecessarily**
69:*10*  76:*4*
171:*10*  199:*10*
203:*21*  227:*19,*
*20*  230:*21*
257:*21*  293:*20*
**unnecessary**
22:*16*  23:*13*
65:*2, 12, 15, 17*

66:*5, 8, 14, 18*
67:*3, 8, 18*  68:*8,*
*13*  75:*7, 14, 16*
80:*14*  142:*10, 18*
143:*6*  157:*12, 18*
158:*11*  162:*3*
169:*18*  171:*13*
214:*9*  225:*19*
226:*4, 6*  246:*19*
253:*22*  260:*17*
261:*7*  315:*13*
**unrelated**  74:*1, 3*
**unrest**  305:*22*
**unsatisfied**  57:*14*
**unsuccessful**
285:*1, 19*  286:*1,*
*16*  287:*6, 11, 15,*
*18*
**Unwavering**
316:*11*
**update**  123:*5*
282:*18*
**updated**  138:*4*
268:*7*
**uphold**  216:*1*
**upper**  230:*8*
**US0306845**  34:*13,*
*16*
**use**  9:*16*  12:*18,*
*19*  14:*10, 12, 14*
49:*7*  67:*22*
75:*17*  79:*13*
91:*18*  97:*9*
123:*4*  181:*21*
190:*22*  211:*11,*
*15*  212:*2, 6, 10*
222:*13*  235:*9*
250:*21*  292:*3, 13*
**uses**  90:*11*
186:*10*
**usually**  198:*22*
**utility**  280:*1*
**utilization**  193:*6*

**utilize**  46:*3*
210:*4*  212:*16*
**utilized**  45:*12*
46:*14*  62:*3*
97:*21*  252:*13*
**utilizes**  215:*5*
**utilizing**  173:*1*
274:*22*

**< V >**
**vacuum**  241:*19*
242:*9*
**vanguard**  188:*15*
**variable**  105:*14,*
*16*
**variables**  19:*21*
20:*15*  24:*8*
105:*16, 19*
106:*10, 13, 14*
107:*1*  117:*20*
132:*20*  136:*10,*
*11, 12*  184:*14*
257:*17*
**variance**  273:*17*
274:*1, 4, 5*
**varied**  51:*11, 14,*
*22*  52:*8*  117:*12*
179:*12*  274:*11,*
*21*  311:*9*
**varies**  100:*1*
147:*16*
**variety**  19:*21*
21:*7*  45:*8*  51:*11*
132:*22*  136:*13*
137:*21*  177:*9*
202:*21*  210:*5*
291:*16, 20*  292:*7*
**various**  86:*3, 17*
188:*5*  248:*18*
265:*22*  276:*20*
277:*14*  278:*6*
**vary**  178:*12*
**varying**  26:*10*

**vast**  141:*16, 18*
154:*19*
**vastly**  173:*17*
**Vermont**  49:*13*
99:*9, 19*
**version**  51:*3, 5*
**versions**  52:*14, 16*
**versus**  7:*4*
220:*20*  223:*7*
234:*22*  238:*11*
245:*18*
**VICTORIA**  2:*6*
8:*3*
**Victoria.Lill@usd**
**oj.gov**  2:*18*
**video**  7:*5*
**Videographer**
3:*22*  7:*2*  8:*9, 22*
39:*5, 8*  88:*12, 15*
109:*4, 8*  140:*2*
141:*4*  180:*10, 13*
224:*18, 21*
275:*21*  276:*2*
290:*4, 9*  303:*20*
304:*4*  316:*18, 21*
318:*6*
**Videotaped**  1:*12*
**viewed**  243:*9*
**violent**  305:*22*
**virtually**  317:*11*
**vision**  61:*21*
66:*22*  87:*12*
90:*6*  156:*12*
160:*11*  161:*4, 18*
175:*9, 12*  191:*9,*
*17*  199:*1, 14*
200:*12*  201:*1*
202:*5*  211:*19*
214:*22*  215:*22*
269:*11*  270:*19*
312:*3, 6, 8, 11, 19,*
*21*  313:*9*  315:*1,*
*4, 7, 16*

**visit** 27:*10*, *15*
117:22
**visited** 117:5, *9*
**visits** 11:*14*
25:12 155:3
**vocalizations**
195:5

**< W >**
**Wade** 89:*3*
**wandering** 223:*3*
**want** 10:2, *20*
14:*13* 16:5
22:19 23:16
37:15, *17* 67:20
75:17 76:*12*
78:*14* 82:*3* 88:6
89:*12* 92:6
108:22 126:*1*
129:2 137:*15*
139:*21* 145:*10*
177:*1* 190:9
191:*3*, *9*, *10*, *12*,
*13* 199:21 200:2
201:*11* 209:7
223:2 224:8
231:7, *8*, 22
239:7 260:*20*
262:7 278:2
282:2 288:5
290:*4* 307:6
317:*14*
**wanted** 24:*19*
122:12 144:*16*
242:2 275:6
**Washington** 1:*19*
2:*14* 7:*8* 49:*21*
**watching** 147:*10*
193:*19*
**WATSON** 3:*14*
8:*13*
**way** 25:*13* 33:16
34:*12* 37:*18*
43:*13* 45:16

54:*14* 56:20
59:*11*, *13* 92:21
93:*14* 108:8
112:*3* 120:*4*
121:8 141:*11*
147:*19*, *21*
160:*21* 169:9
188:9 201:*15*
209:9 210:6
214:*20* 216:*4*
224:*1* 260:*14*
263:7 268:*21*
280:8 282:*15*
313:*21*
**ways** 25:*14* 26:9
159:*18* 181:8
207:*16* 251:*18*
311:2
**website** 232:6
**Weiss** 47:*14*
48:*11*, *16* 132:5,
*10*
**well** 10:*16* 15:6
28:*4* 35:*12* 43:6
46:*3* 50:*16*
55:*14* 77:*16*
84:*12* 86:*16*
87:*4* 89:*18* 96:6
101:*21* 102:6, *21*
104:*14* 105:*21*
106:*16* 120:22
131:2 133:*14*
136:2 137:*15*
139:*4* 144:*21*
146:*18* 147:*4*
148:6 152:*14*
153:*17* 176:*21*
177:2, *7* 188:7
189:*17* 194:5
198:2 245:*14*
254:*14* 255:*17*,
*22* 261:*21*
268:*11* 269:*20*
271:*19* 282:6

292:7 297:*5*, *10*
298:*13* 308:*11*
318:3
**well-being** 109:*18*
187:4
**well-documented**
133:*3* 248:8
**went** 25:*12*
27:17 34:*18*
52:17 58:*20*
59:5 79:*19*
155:3 245:*4*, *5*, *6*
294:2
**we're** 34:6 72:*1*
78:*11* 88:7
109:*17* 117:7
124:7 178:*19*
179:2 180:*5*, *8*
200:7, *9* 206:*12*
207:*13* 220:*17*
223:*12* 250:6, *8*
297:6 308:*18*
317:2
**Westlaw** 232:7
**we've** 8:*17*, *19*
88:9 94:*1* 200:9
217:*17* 220:*20*
257:9, *11* 267:*10*
275:7 279:8
294:7 318:2
**whatnot** 178:*21*
248:6
**wheelchair**
220:*19*
**whole-school**
289:*4*
**wholly** 79:*19*
**wide** 98:22
179:*12*
**widespread** 250:8
280:*1*
**Wiley** 317:7
**Wiley's** 14:22

**willing** 18:*9*
**window** 146:*10*
**wing** 28:8
**wings** 125:*10*
**Wisconsin** 49:*19*
**wish** 290:2
**withdraw** 100:*11*
**witness** 1:*13*, *15*
4:2 12:*18* 14:9
18:*10* 19:*11*
20:*13* 32:7 38:6
39:4 43:*19*
52:20 60:9, *19*
63:8 65:5 67:*11*,
*20* 69:*3* 70:2, *9*
71:9, *16* 72:9
74:*15* 75:5
76:11 77:*13*
78:*19* 80:21
81:21 86:14
87:*11* 92:9 98:*5*,
*14* 104:*16*
109:*16* 112:2
123:22 127:*19*
128:9 129:*18*
138:*18* 152:*11*
154:*11* 159:*17*
160:*21* 161:*17*
165:*19* 169:7
170:*5* 179:2
183:*13* 190:*4*
204:*16* 206:*12*
208:4 214:2
225:22 227:7
229:*20* 231:6
245:22 247:*4*, *11*
254:22 260:7
270:2 277:7, *19*
285:*14* 292:5
293:7 294:*20*
295:21 296:6
299:*11* 301:*19*
303:*1* 304:6

305:*4*  315:*11, 22*
318:*5*
**witnesses**  10:*14*
**wondering**  223:*1*
**word**  57:*15*
67:*22*  97:*19*
143:*16*  220:*22*
269:*8*  278:*18*
280:*7*
**wording**  269:*8*
**words**  18:*15, 16*
20:*6*  36:*3*  52:*16*
94:*14*  99:*2*
117:*17*  128:*4*
143:*17*  192:*8*
207:*8*  221:*4, 5*
226:*5*  241:*18*
258:*5*  268:*17*
274:*12*  277:*8*
314:*8*  316:*13*
**work**  16:*1*  17:*13,
15, 20*  30:*13*
31:*15, 19, 22*
76:*13*  78:*4, 22*
79:*6*  83:*1*
134:*17*  135:*1*
154:*5*  186:*13*
191:*9, 17*  200:*22*
201:*2*  211:*21*
228:*19*  232:*15,
18*  251:*20*  256:*2,
15*  261:*11*  287:*7*
311:*3, 8, 16*
**worked**  21:*5*
31:*4*  38:*21*
43:*21*  44:*7, 9, 14,
21*  49:*12*  86:*6*
135:*2*  185:*13*
249:*4*  250:*3*
261:*5, 16*
**workers**  84:*14*
**workforce**  83:*11,
13, 15*

**working**  30:*12*
31:*1, 20*  122:*2*
137:*16, 18*  146:*6*
**works**  41:*4*
250:*21*
**world**  165:*4*
**worries**  109:*8*
**worry**  305:*5*
**wrap**  316:*16*
**wraparound**  74:*9*
**Write**  4:*15*
127:*3*  191:*21*
279:*1*
**writing**  74:*10*
95:*17*  97:*21*
286:*19*
**written**  88:*18, 21*
112:*15*  231:*12*
267:*5*  277:*8, 19,
21*  278:*18*  279:*4,
6*  291:*5*
**wrong**  183:*1*
**wrote**  51:*4*
112:*18*  272:*15*
**Wyoming**  49:*17*
245:*17*

**< Y >**
**Yeah**  8:*17*  12:*17*
16:*8*  23:*20*
30:*22*  34:*17*
47:*20*  49:*12*
64:*16*  67:*11*
72:*1, 4, 21*  78:*16*
88:*11*  93:*8*
103:*21*  109:*4*
120:*22*  130:*2*
136:*20*  142:*14*
165:*5*  167:*22*
170:*5*  176:*18*
181:*19*  183:*13*
193:*15*  194:*7*
206:*9*  214:*19*
217:*2*  223:*13*

230:*4*  232:*8*
233:*3, 5, 6*
234:*19*  240:*3*
247:*18*  250:*10,
16*  260:*3, 10*
268:*20*  280:*20*
313:*21*
**year**  127:*4*
146:*1*  150:*7, 8,
10*  151:*5, 22*
153:*11*  156:*9*
188:*6*  199:*1, 5,
12, 13*  201:*4*
205:*22*  222:*5*
233:*12, 13, 21, 22*
234:*6*  235:*16*
236:*9, 10, 19*
237:*3, 6, 16, 20*
238:*18*  240:*1, 12*
241:*7, 9*  306:*11*
309:*5*
**year-and-a-half**
245:*7*
**years**  21:*5*  29:*19*
51:*2*  96:*4*  133:*4*
156:*8*  176:*7*
187:*12, 21*  188:*3,
7*  201:*3*  205:*5*
239:*7, 12*  240:*14*
241:*3*  244:*9*
257:*5*  267:*21*
272:*22*  273:*1*
277:*22*  278:*18*
291:*6*  309:*8*
**Yep**  127:*7*
**York**  47:*13*
48:*10*  49:*19*
**young**  221:*18*
**younger**  240:*19*

**< Z >**
**zone**  289:*19*
**zoned**  40:*22*
41:*4*  66:*12*  67:*8*

79:*14*  80:*8*
108:*2, 10*  166:*22*
173:*5*  174:*10*
216:*17*  218:*7*
219:*20*  220:*1, 7*
223:*6*  224:*3*
234:*10*  235:*1*
249:*15, 19*  258:*9*
297:*2, 12*
**ZOOM**  3:*13*