IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

     *Plaintiff*,

v.

STATE OF GEORGIA,

     *Defendant*.

CIVIL ACTION

NO. 1:16-CV-03088-ELR

DEFENDANT STATE OF GEORGIA'S BRIEF IN OPPOSITION TO
UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

Introduction .................................................................................................1

Background ..................................................................................................2

   I.   DOJ's Allegations at Summary Judgment ....................................2

   II.   State Agencies, Local Agencies, and GNETS ...............................4

   III.   Responses to Specific Sections of DOJ's Brief............................7

      A. Responding to the "GNETS Program Overview" Section (p. 3–4). ..........7

      B. Responding to the "State's Service Delivery System"
         Section (p. 4–6). ...........................................................................9

      C. Responding to the "GNETS Rule" Section (p. 6–8). .............................11

      D. Responding to the "Direction from State-Employed GNETS
         Program Personnel" Section (p. 8-16)........................................14

      E. Responding to the "GNETS Program Funding" Section (p. 16–21). ......18

Legal Standard ..........................................................................................21

Argument....................................................................................................21

   I.   The DOJ Rule must be interpreted consistent with the ADA. .....................22

   II.   The State does not "provide" special-education services as required to
       establish liability under the text of the ADA. ..................................28

   III.   The State does not "administer" GNETS using the four-factor test
       articulated in the Court's prior Order...........................................30

Conclusion .................................................................................................35

## INTRODUCTION

The United States Department of Justice ("DOJ") seeks partial summary judgment based on a term found only in its own regulation and not the Americans with Disabilities Act of 1990 (the "ADA"). Specifically, DOJ asserts that, for purposes of what it calls the "integration mandate" promulgated at 28 C.F.R. § 35.130(d) (the "DOJ Rule"), the State of Georgia—and more specifically the State Departments of Education ("GaDOE"), Community Health ("DCH"), and Behavioral Health and Developmental Disabilities ("DBHDD")—"administers" the Georgia Network for Educational and Therapeutic Supports (the "GNETS Program"). But its argument runs headlong into dispositive legal and factual realities that preclude summary judgment.

*First*, the DOJ Rule's use of the word "administer" must be interpreted consistent with Title II of the ADA and impose liability only on those who provide services or otherwise make decisions which cause discrimination. Any interpretation broader than that would impermissibly expand and alter Title II's statutory reach.

For its part, DOJ's Brief in Support of its Motion for Partial Summary Judgment (the "DOJ Brief") define the term "administer." See 28 C.F.R. § 35.130(d). This results in DOJ's erroneous request that this Court enter judgment as a matter of law based on a term that DOJ as moving party does not even attempt to define. This is impermissible as a matter of general civil procedure and federalism.

*Second*, to achieve its desired result of creating liability in the absence of statutory or regulatory text, DOJ's Brief frequently mischaracterizes the facts adduced during discovery, and at the very least, DOJ ignores the standard of review applicable at summary judgment. See Fed. R. Civ. P. 56(a) (requiring facts to be construed in favor of the non-moving party).

*Third*, the State does not administer the GNETS Program under either the appropriate textual interpretation of "administer" or the framework the Court previously identified at the pleading stage.

## BACKGROUND

### I.    DOJ's Allegations at Summary Judgment

DOJ's Motion is limited in scope. It seeks only a determination that the State "administers" the GNETS Program by "ask[ing] this Court to rule, as a matter of law that the State *administers the GNETS Program* within the meaning of Title II and is thus subject to Title II's integration mandate." [ECF 395-1 at 2 (emphasis added)]. This limitation is applied throughout DOJ's Brief (and, indeed, this lawsuit).[1] Thus,

---

[1] See [ECF 395-1 at 2 (describing DOJ's twin causes of action as the alleged "unecessar[y] segregate[ion] of students with behavior-related disabilities in the GNETS Program, and … relegating the *students in the GNETS program* to inferior educational opportunities"); at 3 (asking for a ruling that the "State administers *the GNETS Program*") (emphasis added); at 6 ("the State regulates *GNETS Program* operations"); at 23–24 (alleging that "undisputed facts show that the State administers *the GNETS Program*") (emphasis added)].

concerns about other, separate programs overseen by DCH or DBHDD are not at issue.[2]

It is also relevant that DOJ's Motion is based solely on the DOJ Rule. [ECF 395-1 at 2, 3, 23, 24]. Of course, that's because the word "administer" appears only in the DOJ Rule and not the text of Title II of the ADA. See 42 U.S.C. §§ 12131–34. Indeed, DOJ's Brief barely cites to the statute. The significance of this distinction is discussed below. See infra § I.A.

DOJ's Motion is also limited by the fact that it cites no authority and offers no succinct definition of what it means to "administer" a program within the context of the DOJ Rule. It is true that DOJ's Brief refers to this Court's Order on the Motion to Dismiss (the "MTD Order"). [ECF 61 at 8–13]. But the Court's Order does not adopt a definition of the word "administers" either; as discussed below, it instead considers certain factors based on DOJ's allegations at the motion to dismiss stage of this litigation. Id. These limitations focus the issues before the Court to the viability and meaning of the DOJ Rule and the GNETS Program. Nothing else is presented by DOJ's Motion.

---

[2] Footnote 5 of DOJ's Brief may attempt to expand the gaze of the Motion to include such programs, but no programs other than GNETS are identified in DOJ's Brief or the Motion. See [ECF 395-1 at 3 n.5.] The State reserves the right to respond if DOJ raises new arguments in its reply brief.

## II.    State Agencies, Local Agencies, and GNETS

As set forth in the State's Brief in Support of its Motion for Summary Judgment (the "State's Brief"), which is fully incorporated into this responsive brief, DOJ's lawsuit identifies three State agencies: GaDOE, DCH, and DBHDD. [ECF 429-1 at 5–6]. GaDOE is the State Educational Agency ("SEA") for purposes of the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1401(32). It is governed by the State School Superintendent (an independent and elected constitutional officer) and the State Board of Education. O.C.G.A. §§ 20-2-34 (State School Superintendent), 20-2-1 (State Board). Among other duties, GaDOE is charged with adopting the "criteria used to determine eligibility of students for state funded special education programs." Id. § 152(a). GaDOE is also authorized to provide grants to regional educational service agencies ("RESAs") and local school districts for the provision of special education services.[3] O.C.G.A. § 20-2-152(c)(1).

DBHDD focuses on "state programs for mental health, developmental disabilities, and addictive diseases." O.C.G.A. § 37-1-20(1). It does *not* have responsibility for "all individuals who receive public services for mental health." [Fitzgerald Dep. 49:16–21]. To provide access to some of Georgia's uninsured and Medicaid beneficiaries, DBHDD frequently contracts with government and private

---

[3] RESAs are "not state agencies." O.C.G.A. § 20-2-270(f); see also N. Georgia Reg'l Educ. Serv. Agency v. Weaver, 272 Ga. 289, 291 (2000).

providers of behavioral health services, including CSBs. [Id. at 217:23–218:1]. An example is the Apex Program, a DBHDD initiative through which it contracts with providers that have partnered with local schools to offer some in-school behavioral health services. [Id. at 62:23–63:5].

DCH is the State Medicaid agency. See O.C.G.A. § 49-4-142. It acts as an "insurance and regulatory body" for various healthcare providers throughout the State. [Fitzgerald Dep. 64:20–65:1.]

The State's Brief also explains GaDOE's limitations in creating and implementing education policy in a state, like Georgia, where the State Constitution expressly delegates "exclusive" responsibility to local agencies (e.g., school boards) to govern local schools. See Gwinnett Cty. Sch. Dist. v. Cox, 289 Ga. 265 (2011).[4] Consistent with the State Constitution, the Georgia Code requires local schools (and not the State of Georgia), either directly or through RESAs, to "*provide special education programs* for all eligible students with special needs who are residents of

---

[4] The MTD Order addresses the Cox decision by finding—at the preliminary stage of the litigation—that the GNETS Program is a "special school" that is directly administered by the State of Georgia. [ECF 61 at 10]. DOJ does not advance that argument now, and if it were to do so in a reply brief, the State reserves the right to respond. Nevertheless, the GNETS Program is *not* a State operated "special school" like the Atlanta Area School for the Deaf, the Georgia School for the Deaf, or the Georgia School for the Blind. See https://www.gadoe.org/Curriculum-Instruction-and-Assessment/State-Schools/Pages/default.aspx. See also O.C.G.A. § 20-2-302 (identifying the "state schools for the deaf and blind").

their local school systems" or RESAs. O.C.G.A. § 20-2-152(b) (emphasis added).
DOJ's Brief does not address this statute and instead focuses on State appropriations
and its misreading of the GNETS Rule. Ga. Comp. R. and Regs. 160-4-7-.15.

GNETS services are funded by a *voluntary* grant program comprised of State
and federal (United States Department of Education ("USDOE")) funds
appropriated by the General Assembly. In Fiscal Year 2024, State funds represented
82% of the total appropriation of $65,427,745. [ECF 429-25, -26 at 105–06]. LEAs
who chose to apply for and receive GNETS Grants are given broad discretion on
where they can provide services, ranging from fully integrated to wholly separate
settings. Ga. Comp. R. & Regs. 160-4-7-.15(4)(c); [Owen Dep. 155:13–20;
Cleveland Dep. at 114:11–14]. LEAs are also constitutionally authorized to impose
property to taxes to raise revenue—for special education or any other authorized
purpose—independent of state appropriations. See Ga. Const. art. VIII, § 6, ¶ I.

The State does not staff and cannot control the individuals who administer or
teach students receiving services through the GNETS Programs. Personnel decisions
are made solely by the LEAs, which (1) employ, pay, hire and fire, and oversee
GNETS Directors who report to the LEAs/RESAs;[5] (2) do not consult with GaDOE

---

[5] [Cleveland Dep. at 147:5–14; Livingston Dep. at 11:16–20, 277:8–14; Braddock
Dep. at 77: 16–20; Newsome Dep. at 52:15–53:23; Holifield Dep. at 332:16–19;
Gilchrist Dep. at 19:10–18, 256:4–6; Cole Dep. at 24:5–13; Ngeve Dep. at 23:9–
11]; [Newsome Dep. at 107:2–111:2; Livingston Dep. at 277:8–12; 278:1–12;

before making staffing, hiring, and firing decisions;[6] (3) conduct performance evaluations of GNETS Directors or their staff;[7] and (4) determine the use and layout of facilities and provide transportation to and from these facilities.[8] These facts are ignored by and directly contradict the conclusions in DOJ's Brief. This is made apparent by addressing each factual section of DOJ's Brief.

### III. Responses to Specific Sections of DOJ's Brief

### A. Responding to the "GNETS Program Overview" Section (p. 3–4).

DOJ provides its overview of the GNETS Program on pages 3–4 of its Brief. It begins by claiming that "GNETS is a program developed and funded by the State of Georgia." [ECF 395-1 at 3]. This misses the mark for several reasons. *First*, the State has not "developed" the GNETS Program. Only one statute refers to the GNETS Program and not by name. O.C.G.A. § 20-2-270.1(c). The statute, substantively ignored in DOJ's Brief, imposes no obligation on GaDOE or any other

---

Futch Dep. at 349:8–14; Owen Dep. at 155:13–20; Gilchrist Dep. at 254:14–255:5]; [Livingston Dep. at 278:10–12; Newsome Dep. at 111:24–112:4; Holifield Dep. at 332:12–15; 147:6–18; Ngeve Dep. at 128:3–131:18, 280:18–281:5; Cleveland Dep. at 146:14–23; Low Dep. at 195:16–17; Ackerman Dep. at 85:4–7].

[6] [Newsome Dep. at 107:2–111:2; Livingston Dep. at 277:8–12; 278:1–12; Futch Dep. at 349:8–14; Owen Dep. at 155:13–20; Gilchrist Dep. at 254:14–255:5].

[7] [Livingston Dep. at 277:19–25; Holifield Dep. at 333:4–12; Cleveland Dep. at 146:24–147:1].

[8] [Ackerman Dep. at 95:18–20, 139:12–24; Newsome Dep. at 84:17–22, 85:2–6, 236:20–237:3; Futch Dep. at 167:9–18; Livingston Dep. at 153:4–11; Ngeve Dep. at 139:2–5].

State agency. Instead, the limited operative language imposes duties on RESAs only. O.C.G.A. § 20-2-270.1(a). This is consistent with the GNETS Rule, which is discussed in detail below.

*Second*, while State funds do make up a portion of the revenue available for GNETS Grants, the mix of available funds includes a blend of state, local, *and* USDOE federal tax dollars. [Id.; see also DOJ Ex. 91 at GA00054567.002]. Indeed, in Fiscal Year 2024, federal funds made up 17% of GNETS grant funds. [ECF 429-25, -26 at 105–06]. The federal funds are not automatic—USDOE provides them only if it concludes that Georgia complies with the Individuals with Disabilities in Education Act (the "IDEA").[9] [Id.; see also 20 U.S.C. § 1412 (conditioning state grants on the USDOE's confirmation that a state complies with the IDEA). Indeed, the federal Secretary of Education is statutorily charged with "monitor[ing]" a state's use of IDEA funds, which is not dissimilar from the role DOJ claims the State occupies here. 20 U.S.C. § 1416(a)(1).

*Third*, DOJ asserts—incorrectly—that the "24 regional programs" that provide GNETS services are "answerable to the State." [ECF 395-1 at 4]. DOJ bases

---

[9] See "Exhibit 1" to Defendant's Statement of Additional Material Facts filed contemporaneously herewith, available at: https://www2.ed.gov/fund/data/award/idea/2023partb/ga-2023b-letter.enclosures.pdf.

this legal conclusion on the State's responses to DOJ's Requests for Admissions.[10] None of the cited Requests for Admissions asks, and correspondingly, none of the State's responses state that any—much less all—of the 24 regional programs are "answerable" to the State. [ECF 395-33 at 3-5.] Indeed, DOJ's discovery requests do not even contain the word "answerable." And as discussed further below, the State's compliance power over these entities is severely circumscribed by Georgia law. See infra § I.C.

**B. Responding to the "State's Service Delivery System" Section (p. 4–6).**

Despite the fact that DOJ's Motion addresses only the GNETS Program, DOJ's Brief dedicates two pages to the services provided by other State agencies to some Georgians with behavioral health diagnoses. [ECF 395-1 at 4–6]. It starts by claiming that the State Constitution and the GNETS Rule as establishing GaDOE's role in special education. [Id. at 4-5]. But the State Constitution does not mention special education. Ga. Const. art. 8, § 1. If anything, Georgia law (that DOJ does not address) limits GaDOE's role. For example, the GNETS Rule limits GaDOE's authority with regards to the GNETS Program. Ga. Comp. R. & Regs. 160-4-7-.15(5)(a); see also infra §§ I.B–I.C. The very provision cited by DOJ's Brief defines GaDOE and explains that it is "charged with the fiscal and administrative management of *certain* aspects of K-12 public education." [ECF 395-1 at 5 n.5

---

[10] DOJ attaches the responses as "Exhibit 1" to DOJ Brief.

– 9 –

(citing Ga. Comp. R. & Regs. 160-4-7-.15(1)(c) (emphasis added)]. This is a far cry from mandating that GaDOE administers the GNETS Program.

DOJ's discussion of DCH and DBHDD is similarly unsupported. While it cites O.C.G.A. § 49-5-220(a)(6) for the idea that those agencies administer and fund "additional programs, services, and activities for students with disabilities," DOJ's Brief does not challenge or identify those services, and the cited portion of the statute merely describes the General Assembly's broad intent instead of any specific division of specific duties and responsibilities. [ECF 395-1 at 5 n.10 (citing O.C.G.A. § 49-5-220(a)(6))].

As with its treatment of DOE's authority, DOJ Brief's recitation of purported facts ignores key limitations on DBHDD's authority as well. For example, former DBHDD Commissioner Judy Fitzgerald testified that DBHDD does not have responsibility for all Georgians with diagnoses of mental health conditions. [Fitzgerald Dep. 49:16–21]. And DOJ does not identify any student receiving services through the GNETS Programs that qualifies for services DBHDD actually administers. While DOJ's Brief mentions the Apex Program—a Medicaid funded partnership between local behavioral health providers and local schools—DOJ's Motion and cited evidence is about the GNETS Program alone. In short, the section of DOJ's Brief broadly discussing the "State's Service Delivery System" is based on false foundations, and it is irrelevant to the extent that it addresses anything outside

of the GNETS Program.

### C. Responding to the "GNETS Rule" Section (p. 6–8).

When it comes to the GNETS Rule, DOJ improperly makes several legal conclusions disguised as facts. See Taylor v. Polhill, 964 F.3d 975, 981 (11th Cir. 2020) (deciding "legal conclusions masquerading as facts" will not overcome summary judgment). Even its legal analysis ignores the plain text of the GNETS Rule, which is a critical factor in how a Georgia court would decide the scope and reach of GaDOE's authority. See Premier Health Care Investments, LLC v. UHS of Anchor, L.P., 310 Ga. 32, 56 (2020) (deciding agency regulations that exceed agency authority are void); New Cingular Wireless PCS, LLC v. Georgia Dep't of Revenue, 303 Ga. 468, 472 (2018) (interpreting regulations based on actual text).

An examination of the text of the GNETS Rule reveals that the Rule is, in fact, fatal to DOJ's lawsuit and Motion. It imposes limited duties only on GaDOE and does not mention DCH or DBHDD. For GaDOE, the GNETS Rule provides only that it must receive and disburse the GNETS Grants; and also "[a]dminister the *grant funds*" by (1) developing "rules and procedures regulating the operation of the *GNETS grant*;" (2) notifying fiscal agents of the grant allocation and approve the budget as part of the grant process; and (3) monitoring compliance of the LEAs' and RESAs' uses of the grants. Ga. Comp. R. & Regs. 160-4-7-.15(5)(a)(1) (emphasis added). None of these provisions authorize affirmative acts of control, and they are

a requirement of the IDEA. 20 U.S.C. § 1407(a). Indeed, they are the same obligations that Congress imposed on the USDOE, meaning that DOJ's theory would also implicate USDOE as likewise discriminating against individuals with disabilities. See 20 U.S.C. § 1416 (establishing USDOE's monitoring responsibilities, including the implementation of a "performance plan that evaluates that State's efforts to implement" the IDEA); see also 34 C.F.R. § 105.20 (stating that USDOE "shall *administer* programs and activities in the *most integrated setting appropriate* to the needs of qualified individuals with handicaps.") (emphasis added). Perhaps most critically for this lawsuit, the GNETS Rule does not empower the State to decide where the "GNETS continuum of services" may be provided as between a fully integrated and wholly separate facility and classroom. Ga. Comp. R. & Regs. 160-4-7-.15(4)(c). Thus, GaDOE lacks authority to punish LEAs and RESAs for using GNETS Grants for separate facilities. Id. Indeed, if GaDOE is to withhold funds from an LEA, it must employ the legal process to do so. O.C.G.A. § 20-2-243.

DOJ's Brief ignores that, in comparison to GaDOE's limited role, the GNETS Rule imposes significant obligations on the LEAs. These include: (1) "ensur[ing]" that students are educated in the least restrictive environment; (2) convening IEP Teams that make recommendations to refer a student for GNETS services; (3) monitoring students' IEPs; (4) providing training to teachers who teach disabled

children; (5) collaborating with community behavioral health service providers; and (6) allocating supports and resources to GNETS Programs. Ga. Comp. R. & Regs. 160-4-7-.15(5)(b). Taken together, this authority and the record evidence demonstrate that local officials decide *whether* to seek GNETS Grants, for *whom* GNETS services are appropriate, *when* it is appropriate for a student to return to the general education setting, *where* to provide GNETS services (e.g., an integrated or separate environment), and *by whom* those services are provided. Thus, the text of the GNETS Rule is consistent with the limitations imposed on GaDOE by the Georgia Constitution and statutes governing special education. Ga. Const. art. VIII, § 5, ¶ II; O.C.G.A. §§ 20-2-152, O.C.G.A. § 20-2-270.1.

Despite this plain regulatory text, DOJ attempts to transform the GNETS Rule into something it is not by misciting or misstating evidence. *First*, DOJ claims that the GNETS Rule "binds" the GNETS Programs, citing only to the State's response to a Request for Admission that said merely that the State revised the Rule most recently in 2017. [ECF 395-1 at 6 n.14 (citing to DOJ Ex. 1 ("Admit that the State has periodically revised the GNETS Rule, most recently in 2017."))]. Not only did the State object to the use of the RFA to conclude that the State "administers" the GNETS Program, the RFA cannot be reasonably read as inquiring about the legal effect of the GNETS Rule. [Id.].

*Second*, contrary to DOJ's Brief, the State does not "establish[] … the learning

– 13 –

environments where GNETS Program services may be delivered." As shown, the text of the GNETS Rule (which provides the only source of authority for DOJ's allegation) expressly reserves that decision to the LEAs. Ga. Comp. R. & Regs. 160-4-7-.15(b)(10) and (4)(c).

*Third*, the fact that the GNETS Rule requires LEAs and RESAs to provide data and collaborate with GaDOE does not establish factual administration under any reasonable definition of the word. Id. 160-4-7-.15(5)(b) and (5)(c). The receipt of data is not controlling a program or mandating how the data is used. In addition, collaboration does not equal compulsion. See Oxford Dictionary of English (3d Ed. 2010) (defining "collaborate" as "work[ing] jointly"); Webster's New Collegiate Dictionary (1st Ed. 1977) (same). Finally, the State collects this data only because it is required by *the IDEA* to do so. See 20 U.S.C.A. § 1418(a).

### D. Responding to the "Direction from State-Employed GNETS Program Personnel" Section (p. 8-16).

DOJ next claims that GaDOE employees direct GNETS Program administrators and staff. [Doc. 395-1 at 8–16]. It bases this allegation largely on the (1) Project Management Plan (the "PMP"); (2) the GNETS Strategic Plan and Self-Assessment (the "Strategic Plan"); (3) "Other State-Created Documents;" (4) data directives; and (5) an email between two individuals that DOJ asserts evidences State-based "direction." [Id.] DOJ's characterization is wrong and largely irrelevant.

DOJ's description of the PMP is incomplete at best and wrong at worst. [Id.

at 8-9]. The cited deposition testimony refers to an email between two individuals that speaks of an a hope to identify a short-term goal and not the implementation of anything. [Id. at 8 n.22 (citing DOJ Ex., K, Keith Dep.)]. The other documents cited by DOJ are similarly aspirational. [Id. at 8–9, n.22 and n.23 (citing DOJ Ex. 16 at GA00061974 and DOJ Ex. 17 at GA00198520)]. Further, DOJ's Brief describes "program administration" as something done by the GNETS Programs and not GaDOE. [Id. at 8.].

The same is true of the evidence DOJ cites about the Strategic Plan. [Id. at 9–13]. One document identifies the participants who helped create the Strategic Plan, the majority of whom (11 of 17) are local officials. [Id. at 9 n.24 (citing DOJ Ex. 18 at GA00362006)]. The other documents identify no role for GaDOE (or any other State agency). [Id. (citing DOJ Ex. 18 at GA00362008–09)]. Other cited pages do not, as DOJ claims, support DOJ's characterization that the GNETS Programs must take steps based on the Strategic Plan in order to "solicit and spend State funds." [Id. at 11 (citing DOJ Ex. 18 at GA00362011–20)].

Similarly, DOJ's discussion of GaDOE personnel's visits to GNETS Programs acknowledges the non-binding and advisory nature of such efforts, describing GaDOE's role of "review[ing] the evidence … determin[ing] the [GNETS] programs' final ratings …, and provid[ing] feedback …, including steps the regional GNETS programs *should* [not must] take in the future." [ECF 395-1 at 13 (emphasis

added)].

Put simply, the actual documents cited by DOJ fall well short of DOJ's description of them. None demonstrate GaDOE's authority to compel action by the GNETS Programs or create or enforce consequences for failing to meet guideposts in the Strategic Plan.

DOJ's description of "Other State-Created Documents" is equally unavailing. [ECF 395-1 at 13-15]. The first is a "Consideration of Services Form," which DOJ does not (and cannot) claim are binding or mandatory. [Id. at n.39 (citing Exs. 30-47)]. More importantly, the forms are irrelevant to DOJ's Motion, as it does not challenge the entry criteria as inherently discriminatory or relevant to IEP Team recommendations to refer students for GNETS Program services. An examination of the cited documents reveals that one is an email from a DOE official asking for input from a regional GNETS employee, and another is a regional GNETS employee recruiting other GNETS employees to participate in planning sessions—hardly evidence of administration or control. [ECF 395-1 at 14 n.42 (citing Exs. 54 and 55).] The documents' discussion of the GNETS Operations Manual is equally unavailing, as they describe the document as providing mere "guidance," dated, not followed, and not updated despite discussions to do so.[11] [Id.]

---

[11] The cited portion of Clara Keith's deposition described her internal duties with DOE and not any interactions or monitoring of LEAs or RESAs. [ECF 395-1 at 14

DOJ's discussion of "data directives" fares no better. It cites to emails in which some State officials are seeking information from GNETS Program Directors. [ECF 395-1 at 14 n.43]. These communications do not exhibit control, and instead show GaDOE's efforts to comply with USDOE demands under the IDEA. See 20 U.S.C.A. § 1418(a).

DOJ also cites to review of IEP files. [ECF 395-1 at 14-15]. The cited correspondence does not explain why GaDOE requested the information, and the deposition testimony of Vicki Cleveland makes clear that the State did not explain the purpose of the information to GNETS Program Directors. [Id. at 15, n.44]. Thus, any GNETS Directors' testimony would be speculative and unable to support DOJ's mischaracterization that the IEP file review was done to "assess compliance with State-imposed operating standards," potentially used for DOE sanction against an LEA or RESA. [Id.]

Finally, DOJ wrongly claims, based on four emails, that DOE employees "provide general and day-to-day direction to the GNETS program." [ECF 395-1 at 15–16]. Two emails are from the same person and ask about the 2017 revisions to the GNETS Rule; these are questions about the operation of the Georgia Administrative Procedure Act and not the administration of GNETS Programs. [Id.

---

n. 42 (citing DOJ Ex. K).]

(citing DOJ Exs. 67–68)]. The third email involves a GNETS official informing the State of a local decision; it is not a request for permission or authority to make the change. [Id. (citing DOJ Ex. 69)]. This leaves only one email where a GNETS Director seeks advice, but there is no indication that GaDOE staff response was binding, authoritative, or even implemented. [Id. (citing DOJ Ex. 73)]. In light of the over 5.5 million pages of documents produced, one email hardly establishes that GaDOE "provides … day-to-day direction," much less that it "administers" the GNETS Program.

### E. Responding to the "GNETS Program Funding" Section (p. 16–21).

State appropriations represent the final factual predicate DOJ relies upon for partial summary judgment. DOJ's descriptions of the evidence—considering State appropriations and GNETS Grants—are irrelevant or incorrect, and they do not show "administration" under any circumstance. The consideration of State appropriations is considered above and not rehashed here. See supra § III.A

The discussion of the "funding formula" is irrelevant to questions of administration for several reasons. [ECF 395-1 at 17–18.] *First*, the funding formula is only used to determine the maximum amount of a voluntary GNETS grant that an LEA may seek. It does not demonstrate anything mandatory or controlling. *Second*, DOJ does not link the funding formula to any aspect of the administration of the GNETS Program, much less any alleged discrimination. *Third*, LEAs and RESAs

– 18 –

have discretion under the law to decide *how* to spend the GNETS grant funds, which speaks to administration far more than anything else. *Finally*, as discussed below, this funding formula and regulatory structure is not dissimilar to the one employed by the USDOE when calculating IDEA grant funds.

Similarly, DOJ's consideration of State funding for contracts that benefit the GNETS Program is immaterial. [ECF 395-1 at 17-18 n.52, 20–21]. The cited information addressed voluntary State grant funding for programs that was not apparently unique to the GNETS Program and/or voluntary GNETS Grants. In addition, DOJ lacks evidence to support its claim that State contracts or grants "cover … a significant portion of the purported therapeutic services provided by various regional GNETS programs" without consideration of the individual GNETS Programs' budgets. [Id. at 20]. Indeed, DOJ's Brief cites $1.3 million provided by "the State" to the GNETS Program in Fiscal Year 2019, but it does not explain how the amount of funding supports its claim that it represents a "significant portion," or why that would matter. Moreover, the documents cited do not demonstrate any State control over the use of the grants, and they frequently show GNETS Programs' seeking funds *after* costs have been incurred. [See, e.g., id. at 20 n.61].

This analysis is not changed by DOJ's claim that the State "provides regional GNETS programs with direction as to when and how the programs should administer" services funded by something other than GNETS Grants. [ECF 395-1 at

21]. Indeed, the documents do not demonstrate any control exercised by GaDOE at all. [Id. at 21 n.63 (citing Exs. 87–90, 94–97).] Nor does the deposition testimony.

DOJ Brief also discusses the "GNETS Grant Application Process," and its analysis is equally from what the actual evidence. [ECF 395-1 at 18–19]. For example, DOJ asserts that the State "requires regional GNETS programs to apply annually for GNETS Program funding." [Id. at 18]. To the extent this statement suggests that the State requires LEAs to apply for GNETS funds, it is flat wrong.[12] Neither the GNETS grant application forms, nor the cited deposition testimony, nor the other documents cited in DOJ's Brief support the idea that anyone must seek GNETS grant funding. [Id. at 18–19].

This review of DOJ's recitation of the evidence makes several facts clear. First, DOJ's description of the evidence is frequently inconsistent with the evidence itself. Second, the evidence cited does not demonstrate any actual State control of decisions made by LEAs, RESAs, or IEP Teams. Third, no evidence shows that the State dictates how GNETS Grants are spent, particularly in terms of the environment—integrated or otherwise—where GNETS Program services are provided. As shown below, this absence of evidence warrants denying DOJ's Motion and deciding that the State does not "administer" the GNETS Program under any

---

[12] The State explained this in its response to RFA No. 24, cited in DOJ's Brief. [ECF 395-1 at 18 n.55 (citing DOJ Ex. 1).]

reasonable definition. At the very least, there is a question of fact.

## LEGAL STANDARD

Summary judgment is warranted when there are no "genuine dispute[s] as to any material fact" and the defendant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Defendants (as movants) bear the burden of making this showing, which they may satisfy by demonstrating there "is an absence of evidence" to support an element of Plaintiffs' claims. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Evidence and "factual inferences [are viewed] in the light most favorable" to Plaintiffs (as non-movants). Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). Once Defendants satisfy this initial requirement, the burden shifts to the Plaintiffs to show the existence of a dispute of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## ARGUMENT

In addition to the reasons cited in the State's Motion for Summary Judgment [ECF 429-1 at 17-19], DOJ is not entitled to partial summary judgment on its claim that the State "administers" the GNETS Program. *First*, DOJ's Motion is based on the DOJ Rule, which is invalid to the extent that it focuses on something other than the actual provision of services. *Second*, the record evidence demonstrates that the State does not "administer" the GNETS Program as defined by the DOJ Rule because it neither provides GNETS services nor controls the decisions that led to the

injuries DOJ alleges in this case, *i.e.*, where GNETS-funded services are provided or the quality of services they receive.

## I.    The DOJ Rule must be interpreted consistent with the ADA.

DOJ's Motion asks this Court to decide a single issue: whether the State "administers" the GNETS Program. Yet, the word "administers" is found nowhere in the ADA itself. It appears only in the DOJ Rule, which does not define the term. 28 C.F.R. § 35.130(d). This is significant, because Congress imposed liability under Title II of the ADA not for the "administration" of services, but instead only for the discriminatory "provision" of public services or programs. The first questions the Court must decide, therefore, are what the term "administer" means, and whether that meaning is consistent with the text of the ADA.

In a "heads we win, tails you lose" approach, DOJ's Brief fails to provide a definition of "administer," despite asking this Court to declare, as a matter of law, that the State "administers" the GNETS Program. It should be axiomatic that a party cannot obtain summary judgment based on a term that it refuses to define, as the moving party has not demonstrated it is entitled to summary judgment as a matter of law. Put differently, DOJ cannot reasonably argue that the State "administers" the GNETS Program when does not or cannot tell the Court what "administers" means.

This fact alone should preclude summary judgment.[13]

Nevertheless, standard methods of textual interpretation make clear that the DOJ Rule can only apply to those who actually "provide," or "supply [and] make available," the challenged "services, programs, or activities[.]" Any other interpretation would improperly expand the DOJ Rule beyond the scope authorized by the ADA.

"It is a basic tenet that 'regulations, in order to be valid, must be consistent with the statute under which they are promulgated.'" Decker v. Nw. Envtl. Def. Ctr., 568 U.S. 597, 609 (2013) (citing United States v. Larionoff, 431 U.S. 864, 873(1977)); see also Dixon v. United States, 381 U.S. 68, 73(1965); Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue, 297 U.S. 129, 134 (1936); Legal Envtl. Assistance Found., Inc. v. U.S. E.P.A., 118 F.3d 1467, 1473 (11th Cir. 1997). In other words, a regulation may not create liability where a statute does not. Consequently, if the DOJ Rule would render a state liable for something other than providing

---

[13] In its own motion for summary judgment, the State argues it is entitled to summary judgment on the question of administration. It is for several reasons as discussed in this Brief. First, the question under Title II is not whether the State "administers" services, but whether it "provides" them. It is clear that the State does not "provide" GNETS Program services, as the LEAs are constitutionally, statutorily, and regulatorily charged with that obligation. In addition, the LEAs make the dispositive choices.

services, it is invalid.[14]

Here, the DOJ Rule—which provides the basis for DOJ's Motion—was promulgated pursuant to DOJ's regulatory authority under the ADA. 42 U.S.C § 12134(a). The operative provision of Title II of the ADA is one sentence: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities *of a public entity*, or be subjected to discrimination *by any such entity*." 42 U.S.C. § 12132 (emphasis added). The statute defines a "qualified individual with a disability" as someone who is otherwise eligible for "the received of services or the participation in programs or activities *provided by a public entity*." Id. § 12131(2). Reading these two provisions together—as the Court is required to do—it is clear that ADA liability only attaches to the entity which is "provid[ing]" the "services, programs, or activities." See United States v. Atl. Rsch. Corp., 551 U.S. 128, 135 (2007) ("Statutes must 'be read as a whole.'"). The DOJ Rule, meanwhile, does not address the "provision" of services, but also purports to regulate their "administration." 28 C.F.R. § 35.130(d).

The ADA does not define the phrase "provided by," nor does the DOJ Rule

---

[14] This is an open question, as the Court did not consider the validity of The DOJ Rule in Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 592 (1999) ("We recite these regulations with the caveat that we do not here determine their validity.").

define the term "administer." Under Eleventh Circuit precedent, the lack of a definition does not necessarily render a phrase ambiguous. <u>Catalyst Pharm., Inc. v. Becerra</u>, 14 F.4th 1299, 1307 (11th Cir. 2021), <u>cert. dismissed sub nom.</u> <u>Jacobus Pharm. Co. v. Catalyst Pharm.</u>, 142 S. Ct. 2904 (2022). Instead, courts must first "exhaust all the 'traditional tools' of construction[.]" <u>Kisor v. Wilkie</u>, 139 S. Ct. 2400, 2415 (2019). To do so, the Court must "'interpret words that are not defined in a statute with their ordinary and plain meaning because we assume that Congress uses words in a statute as they are commonly understood.'" <u>Becerra</u>, 14 F.4th at 1307 (citing <u>Polycarpe v. E&S Landscaping Serv., Inc.</u>, 616 F.3d 1217, 1223 (11th Cir. 2010) (defining various terms in the Fair Labor Standards Act using everyday dictionaries)). Courts also must employ the rules of grammar to interpret statutory text. <u>Nielsen v. Preap</u>, 139 S. Ct. 954, 965 (2019) (citation omitted).

Applying these mandatory methods of textual construction demonstrates that the DOJ Rule's use of the term "administer" applies only to those who "provide" the relevant services, programs, or activities. This is based on the statutory inclusion of the word "provide," and what dictionaries say the word means. More specifically, when addressing the potential liability for public entities, the ADA uses the term "provide," which Merriam-Webster defines as "to supply or make available." <u>Provide</u>, Merriam-Webster's Dictionary (11th Ed. 2014). DOJ Rule, however, uses the word "administer," which, has two potential definitions: either (1) to "manage or

supervise the execution, use, or conduct of," *e.g.*, to "administer a trust fund," or (2) "to provide or apply," *e.g.*, "administer justice" or "administer punishment." Administer, id.

Basing liability on the first definition (e.g., management or oversight) would drastically and improperly expand the ADA's reach to defendants who have no direct connection to the challenged decisions at issue. Such judicial lawmaking would not only be barred by cases like Decker, it is also wholly inconsistent with the Olmstead decision. There, Justice Kennedy's controlling concurrence requires courts must proceed cautiously when applying Title II's statutory mandate against states: "We must be cautious when we seek to infer specific rules limiting States' choices when Congress has used only general language in the controlling statute."[15] Olmstead, 527 U.S. 581, 615 (Kennedy, J., concurring). Indeed, as the Fourth Circuit said, Title II "cannot be read to impose strict liability on public entities that neither caused plaintiffs to be excluded nor discriminated against them." Bacon v. City of Richmond, Va., 475 F.3d 633, 638 (4th Cir. 2007).

Because Title II only imposes liability on those who are actually responsible for providing a discriminatory service (in this case, the unjustified isolation), courts

---

[15] As recognized by the Fifth Circuit, Justice Kennedy's concurring opinion sets for the controlling decision for the Olmstead decision. See Mississippi, 82 F.4th at 394 n.11 (citing Marks v. United States, 430 U.S. 188, 193(1977)).

must therefore interpret the term "administer" as requiring a causal connection between the provided service and the alleged discrimination. See Decker, 568 U.S. at 609. In other words, it would not be enough to argue that a public entity "administers" a program in some general sense. In order to be consistent with Title II of the ADA, a plaintiff must demonstrate that the public entity is the one which actually did the discriminating. The second definition of "administer" is fully consistent with this approach and, like the plain text of the ADA, would impose responsibilities only on those who actually give the relevant services. In the Olmstead context, this means the plaintiff must prove that the defendant entity is one that chose *where* the services were provided or *where* the students received them. See Bacon, 475 F.3d at 638) (to succeed on a Title II claim, the plaintiff "must prove that some action attributable to the [State] *caused* [students] to be excluded") (emphasis added).[16]

---

[16] Similarly, the regulatory basis for DOJ'S disparate treatment claim prohibits "a public entity, in *providing* any aid, benefit or service" from "*deny[ing]*" equal opportunity to participate in the service, "*afford[ing]*" an individual an unequal opportunity to participate in the service, "*provid[ing]*" them with a less effective opportunity, or "*limit[ing]*" their enjoyment of the service. 28 C.F.R. § 35.130(b)(1)(i)–(iii), (vii) (emphasis added). Thus, like an Olmstead claim, a public entity is only liable under a disparate treatment theory if it is the entity that is responsible for actually providing the relevant service or otherwise discriminating against the individual at issue. But while the *principles* may be the same, the facts necessary to establish liability under these various provisions depend on the specific discrimination alleged. Therefore, contrary to DOJ's assertions in n.5 of its brief, the facts necessary to establish "administer" under an

In a decision cited approvingly in the MTD Order, another court in this district accepted the necessity of causation in Title II claims when it articulated four principles courts must consider in determining whether an entity "administered" a government program:

> First, and most directly, the Court looks to whether the public entity *made decisions that led to segregation.* Second, funding a program alone is not administration. Third, a state's statutory structure informs whether the state administers the program. Fourth, the state need not have made the direct decisions that led to the discrimination, as using criteria that leads to discrimination sufficiently forms a *causal* connection. Last, the level of control the public entity has informs whether a plaintiff has shown a *causal* connection.

447 F. Supp. 3d 1311, 1321 (N.D. Ga. 2020) (emphasis added). These principles represent guideposts to assist the Court in answering the central question posed by Title II and, by extension, the DOJ Rule: did *this* public entity discriminate against *this* plaintiff?

## II. The State does not "provide" special-education services as required to establish liability under the text of the ADA.

With those principles in mind, the answer to that question in this case is clearly, "No." The students at issue in this case were not discriminated against *by the State* because the State does not make the decisions that are challenged here, namely,

---

Olmstead claim are *not* the same as those required to establish culpability for a disparate-treatment claim.

where GNETS-funded services are provided and where individual students receive them. Those decisions are made by the LEAs and IEPs, respectively.

As the Georgia Supreme Court has articulated, "[t]he constitutional history of Georgia could not be more clear that, as to general K–12 public education, local boards of education have the *exclusive* authority to fulfill one of the 'primary obligation[s] of the State of Georgia,' namely, 'the *provision* of an adequate public education for the citizens." Cox, 289 Ga. at 266 (emphasis added).

Consistent with that constitutional framework—and like the ADA itself—the Georgia Code uses the word "provides" when it comes to the division of responsibilities for special education. While the State sets "eligibility criteria" for special-education programs,[17] O.C.G.A. § 20-2-152(b) explains that LEA's "*shall*, subject to any limitations specified in this Code section, *provide* special education programs for all eligible students with special needs who are residents of their local school systems," including by "establishing and maintaining such educational facilities and employing such professional workers as are needed by these students[.]" Id. § 152(b) (emphasis added). Thus, consistent with the "clear" constitutional framework providing for local education agencies to have the "exclusive authority" over education, O.C.G.A. § 20-2-152 divides responsibility

---

[17] Notably, DOJ's Motion does not challenge or rely on the eligibility criteria for GNETS services.

for eligibility and *provision* of services between the State and LEAs, respectively. <u>Cox</u>, 289 Ga. at 266.[18] Likewise, Georgia's education regulations place responsibility for the *provision* of GNETS services squarely on the shoulders of local agencies.

## III. The State does not "administer" GNETS using the four-factor test articulated in the Court's prior Order.

Notwithstanding the textual limitations of "administer" discussed above, DOJ's Motion must also be denied even if the Court used the same four-factor test it employed based upon the deferential motion to dismiss standard. [ECF 61]. In its MTD Order, the Court identified four factors to consider when deciding what "administers" means: (1) "establishing criteria for implementation of the program in local school districts;" (2) funding; (3) "promulgating regulations to carry out program;" and (4) "overseeing the operations and implementation of the program." [ECF 61 at 8–9]. The evidence at summary judgment does not show that the State "administers" the GNETS Program even if these considerations were applied.

The first and third factors are simply irrelevant to this case. While the State

---

[18] DOJ claims in its motion that the *State* "is responsible for *providing* mental health and therapeutic educational services to students with disabilities, including GNETS services, directly or through contractual or other educational arrangements." [ECF 395-1 at 3 n.5 (emphasis added); <u>see also</u> <u>id.</u> at 24 (same)]. But Georgia law explicitly contradicts that assertion, as Georgia law states clearly that "local school systems"—not the State—"shall … *provide* special education programs for all eligible students with special needs[.]" O.C.G.A. § 20-2-152(b).

sets eligibility criteria for students to receive GNETS services and promulgated the GNETS Rule, it bears repeating that DOJ Motion challenged neither the GNETS Rule itself nor the GNETS Rule's criteria for admission into GNETS.

To the extent that the third factor is relevant, it plainly imposes the obligation for administering the GNETS Program (whatever that means) on the LEAs and RESAs. For example, nothing in the GNETS Rule prevents GNETS-funded services from being provided in integrated settings, nor does anything in the GNETS Rule require the creation of separate schools. To the contrary, the Rule expressly states that GNETS-funded services may be delivered in a "continuum of services" that includes "services provided in the general education setting[.]" Ga. Comp. R. & Regs. 160-4-7-.15(4)(c).

Similarly, the GNETS Rules imposes on LEAs and RESAs the responsibility for "ensur[ing] that FAPE is delivered to students recommended for GNETS services *in the least restrictive environment*," however, is placed squarely in the hands of the LEAs, not the State. The LEAs must also:

- "to the maximum extent possible, collaborate with community service providers to deliver mental health services and/or family support in students' Zoned schools." Id. (5)(b).

- "ensure that a continuum of alternative placements is available" for special-education students, including "instruction in regular classes," and they must "make provision supplementary services … to be provided in conjunction with regular class placement;" and

- "ensure that each child with a disability has the supplementary aids and

services determined by the child's IEP Team to be appropriate and necessary for the child to participate in nonacademic settings."

Ga. Comp. R. & Regs. 160-4-7-.07 (emphasis added). And the student's IEP team is responsible for "consider[ing] the various setting[s] in which GNETS services may be provided and determine[ing] whether individual student is likely to receive FAPE in each environment, *beginning with the least restrictive setting*." Id. (emphasis added). Thus, the State did not make any of the decisions that led to the alleged discrimination here: namely, where GNETS Program services are provided.

On the issue of funding, the Court has previously accepted that, standing alone, the appropriation of State (and federal) funds is not determinative of ADA liability. [ECF 61 at 13–14]. The Court denied the State's motion to dismiss on that ground, however, because it decided that DOJ had "alleged far more" than funding. [Id.]. But those allegations no longer sufficient at summary judgment, and the Fourth Circuit's analysis in Bacon applies even more strongly now. 475 F.3d at 638. The State's issuance of *voluntary* grants is not evidence of "administration" or control of the GNETS Program. The State does not compel the LEAs or RESAs to utilize the GNETS Program or seek GNETS Grants. Nor are LEAs or RESA's limited to GNETS Grants when providing special education services. Ga. Const. art. VIII, § 6, ¶ I.

Indeed, if the Court were to adopt DOJ's theory, then it would be implicitly finding that USDOE is also liable for violating federal anti-discrimination laws like

the Rehabilitation Act of 1973, which (like the ADA) prohibits discrimination on the basis of disability and is interpreted under the same standards as the ADA. 29 U.S.C. § 701 et seq.; J.S., III by & through J.S. Jr. v. Houston Cty. Bd. of Educ., 877 F.3d 979, 985 (11th Cir. 2017) (applying the "same standards" to claims of discrimination under the ADA and the Rehabilitation Act).

Pursuant to its obligations under the Rehabilitation Act, USDOE issued regulations which govern its own conduct in providing services and programs. And using almost identical language to the DOJ Rule, USDOE's own Rehabilitation Act regulations state that "[t]he Department shall *administer* programs and activities in the most integrated setting appropriate to the needs of qualified individuals with handicaps." 34 C.F.R. § 105.20; compare 28 C.F.R. § 35.130(d). Thus, the same standards that apply to the State under the DOJ Rule likewise apply to USDOE under its Rehabilitation Act regulations.

And an examination of the facts demonstrates that USDOE and the State are almost indistinguishable in their positions. Like the GNETS Grant appropriations, the federal government (acting through the USDOE) makes special-education grants available to states pursuant to the IDEA. 20 U.S.C § 1411(a)(1). Like the State of Georgia, the USDOE uses a funding formula to determine the maximum amount of each grant. 20 U.S.C § 1411(a)(2). Acting pursuant to this authority, the USDOE provided IDEA grants to Georgia, which are used in the appropriations for GNETS

Grants.[19] And, like the provision of the GNETS Rule, the federal Secretary of Education shall "monitor implementation" of the IDEA, including IDEA grants and exercise "oversight of the exercise of general supervision by the States." 20 U.S.C. § 1416(a)(1). USDOE has therefore not only provided funds to GNETS, but also— like DOJ alleges about the State here—has responsibility for "monitoring" the GNETS Program. Thus, because the USDOE provides funds that are utilized by GNETS Programs, and because the USDOE has oversight obligations, it too would be liable under the Rehabilitation Act.

*Finally*, on the fourth factor, the State does not have the unilateral authority to compel or control LEAs or RESAs. The State cannot hire or fire GNETS Program staff. See supra at 6–7. And any attempts by the State to withhold funds is not plenary or final; it is subject to challenge and review by the LEAs in state courts. See O.C.G.A. § 20-2-243. The State must notify the local board of its decision, hold a hearing, after which the local board has "the right to obtain judicial review of the decisions … by filing an appeal in the superior court of the county of the local unit affected." Id. And importantly, state law clearly states that "[n]o funds shall be withheld until all appeals are exhausted." Id. As the Eleventh Circuit said in

---

[19] See "Exhibit 1" to Defendant's Statement of Additional Material Facts filed contemporaneously herewith, available at: https://www2.ed.gov/fund/data/award/idea/2023partb/ga-2023b-letter.enclosures.pdf.

<u>Jacobson v. Florida Sec'y of State</u>, the fact that the State "must resort to judicial process if the [LEAs] fail to perform their duties underscores [its] lack of authority over them." 974 F.3d 1236, 1253 (11th Cir. 2020). Not only does this vitiate the traceability needed for Article III standing, but it also further emphasizes that the State does not exercise the control over LEAs necessary to "administer" GNETS-funded services in any way that is relevant to DOJ'S claims in this case.[20]

## CONCLUSION

For the reasons stated above, the State of Georgia respectfully requests that the Court deny DOJ's motion for partial summary judgment.

Respectfully submitted, this 13th day of November, 2022.

<table>
<tr><td></td><td></td><td>/s/ Josh Belinfante</td><td></td></tr>
<tr><td>Christopher M. Carr</td><td>112505</td><td>Josh Belinfante</td><td>047399</td></tr>
<tr><td>  Attorney General</td><td></td><td>Melanie Johnson</td><td>466759</td></tr>
<tr><td>Bryan Webb</td><td>743580</td><td>Edward A. Bedard</td><td>926148</td></tr>
<tr><td>  Deputy Attorney General</td><td></td><td>Danielle Hernandez</td><td>736830</td></tr>
<tr><td>Russell D. Willard</td><td>760280</td><td>Javier Pico Prats</td><td>664717</td></tr>
<tr><td>  Sr. Assistant Attorney General</td><td></td><td>Anna Edmondson</td><td>289667</td></tr>
<tr><td>Susan R. Haynes</td><td>901269</td><td>ROBBINS ALLOY BELINFANTE</td><td></td></tr>
<tr><td>  Assistant Attorney General</td><td></td><td>  LITTLEFIELD, LLC</td><td></td></tr>
<tr><td>Office of the Attorney General</td><td></td><td>500 14th St. NW</td><td></td></tr>
<tr><td>40 Capitol Square, SW</td><td></td><td>Atlanta, GA 30318</td><td></td></tr>
</table>

---

[20] Likewise, offering "direction," "advice," and "collaborating" to create new standards does not mean that the State is responsible for all aspects of the local agencies' provision of services because it doesn't demonstrate the agency relationship necessary to establish causation here. [See, e.g., ECF 395-1 8–15, 30–32]. Even if such actions could hypothetically constitute administration, DOJ has not identified how any of the supposed direction, advice, or collaboration with the State led to the injuries it complains of here.

– 35 –

Atlanta, Georgia 30334

T: (678) 701-9381
F: (404) 856-3255
E: jbelinfante@robbinsfirm.com
   mjohnson@robbinsfirm.com
   ebedard@robbinsfirm.com
   dhernandez@robbinsfirm.com
   jpicoprats@robbinsfirm.com
   aedmondson@robbinsfirm.com

Alexa R. Ross          614986
AlexaRossLaw, LLC
2657 Danfroth Lane
Decatur, Georgia 30033
E: alexarross@icloud.com

*Special Assistant Attorneys General*

*Attorneys for Defendant*
*State of Georgia*

## LOCAL RULE 7.1(D) CERTIFICATION

I certify that this State of Georgia's Brief in Support of Its Motion for Summary Judgment has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1. Specifically, this document has been prepared using 14-pt Times New Roman font and type.

*/s/ Josh Belinfante*
Josh Belinfante