IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | CIVIL ACTION |
| v. | NO. 1:16-CV-03088-ELR |
| STATE OF GEORGIA, | |
| *Defendant*. | |

**DEFENDANT STATE OF GEORGIA'S
STATEMENT OF ADDITIONAL MATERIAL FACTS**

**I.    Additional Material Facts Regarding Georgia Department of
Education**

1.    The Georgia Department of Education ("GaDOE") is the State Educational

Agency for purposes of the IDEA. See 20 U.S.C. § 1401(32).

2.    Code Sections 20-2-34 and 20-2-1 provide that GaDOE is administered by

the State School Superintendent and the State Board of Education. O.C.G.A.

§§ 20-2-34 (State School Superintendent), 20-2-1 (State Board of

Education).

3.    Code Section 20-2-152 provides that GaDOE is charged with, among other

duties, adopting the "criteria used to determine eligibility of students for

state funded special education programs." O.C.G.A. §20-2-152(a).

4.    The text of the Georgia State Constitution does not mention special

education. Ga. Const. art. 8, § 1.

## II.    Additional Material Facts Regarding Georgia Department of Behavioral Health and Developmental Disabilities

5.    The Georgia Department of Behavioral Health and Developmental

Disabilities (DBHDD) focuses on "state programs for mental health,

developmental disabilities, and addictive diseases." O.C.G.A. § 37-1-20(1);

Deposition of Frank Berry at 89:12-19.

6.    DBHDD frequently contracts with government and private providers of

behavioral health services, including Community Service Boards (CSBs), to

provide some behavioral health services to some of Georgia's uninsured and

Medicaid beneficiaries. Deposition of Judy Fitzgerald at 217:23-218:1.

7.    DBHDD does not have responsibility for "all individuals who receive public

services for mental health." Deposition of Judy Fitzgerald at 49:16-21.

8.    DBHDD does not deliver direct services or care, but instead it contracts with

its network of providers and CSBs to fund the delivery of services and care.

Deposition of Frank Berry at 147:14-148:8; 167:16-18; 90:19-91:5;

Deposition of Judy Fitzgerald at 217:17-20.

9.    An example is the Apex Program, a DBHDD initiative through which it

contracts with providers that have partnered with local schools to offer some

in-school behavioral health services. Deposition of Judy Fitzgerald at 62:23–63:5.

10.  Not all children in the State of Georgia are the financial responsibility of DBHDD. Deposition of Judy Fitzgerald at 154:8-9.

11.  DBHDD is only responsible for uninsured children that do not have any other coverage, and they have a limited amount of funding to support those children. Deposition of Frank Berry at 91:6-20; Judy Fitzgerald at 53:24-54:3; 231: 9-11.

12.  DBHDD plays a limited role in ensuring that mental health services are readily available to children across the State of Georgia in their own communities because their funding supports only uninsured children. Deposition of Frank Berry at 184:13-20.

13.  DBHDD does not have any role in providing behavioral health services to GNETS Programs. Deposition of Frank Berry at 185:14-18; Judy Fitzgerald at 66:19-67:7; 119: 9-11.

14.  According to Dr. Stephanie Pearson, the Clinical Director of the Office of Children, Young Adults and Families ("OCYF") for DBHDD, there is no direct relationship between DBHDD and GNETS. Deposition of Stephanie Pearson at 52:10-20; 53:9-18; Deposition of Wendy Tiegreen at 31:2-23.

15. Neither Dr. Pearson nor Dante McKay, OCYF's Director, have any ongoing responsibilities with respect to GNETS and do not work with GNETS Program directors. Deposition of Stephanie Pearson at 73:11-18; Deposition of Dante McKay at 49:8-14.

16. To Dr. Pearson's knowledge, no employee within OCYF provides training or technical assistance to GNETS staff. Deposition of Stephanie Pearson at 78:14-16.

17. Further, as Clinical Director of OCYF, Dr. Pearson does not receive data or documents relating to enrollment in GNETS, or to the length of placement in GNETS. Deposition of Stephanie Pearson at 83:17-23.

18. Dr. Pearson does not receive data or documents relating to the availability, utilization, or the quality of behavioral health services to students enrolled in GNETS. Deposition of Stephanie Pearson at 83:24-84:10.

19. Dr. Pearson does not receive data or documents relating to staffing at GNETS or to coordination between GNETS Programs and community service providers in Georgia. Deposition of Stephanie Pearson at 84:11-17.

20. The text of the GNETS Rule does not mention DBHDD. See generally, Ga Comp. R. & Regs. 160-4-7-.15.

III.    **Additional Material Facts Regarding the Georgia Department of Community Health**

21.    The Georgia Department of Community Health (DCH) is the State Medicaid agency. See O.C.G.A. § 49-4-142.

22.    It acts as an "insurance and regulatory body" for various healthcare providers throughout the State. Fitzgerald Dep. 64:20–65:1.

23.    DCH's involvement with GNETS is minimal to none as staff at DCH do not have duties or responsibilities with respect to the GNETS program. Deposition of Brian Dowd at 166:4-11; 168:13-20.

24.    The text of the GNETS Rule does not mention DCH. See generally, Ga Comp. R. & Regs. 160-4-7-.15.

IV.    **Additional Material Facts Regarding System of Care**

25.    The Georgia General Assembly has "declare[d] its intention and desire to: (6) Develop a coordinated system of care so that children and adolescents with a severe emotional disturbance and their families will receive appropriate educational, nonresidential and residential mental health services, and support services, as prescribed in an individualized plan." O.C.G.A. § 49-5-220(a).

26.    The General Assembly has not passed a law requiring implementation of a system of care.

27.  The Geogia General Assembly further stated that it "intends that" DBHDD

have the primary responsibility for planning, developing, and implementing

any system of care. O.C.G.A. § 49-5-220(b).

28.  The General Assembly has not passed a law requiring DBHDD have the

primary responsibility for any system of care in Georgia.

## V.     Additional Material Facts Regarding the Provision of Educational Services in Georgia- Georgia is a Local Control State

29.  The Georgia Constitution delegates the "management and control" of each

school system to a locally-elected board of education. Ga. Const. art. VIII, §

5, ¶ II.

30.  The Supreme Court of Georgia has said, "the fundamental principle of

exclusive local control of general primary and secondary ("K–12") public

education" applies. Gwinnett Cty. Sch. Dist. v. Cox, 289 Ga. 265, 266

(2011).

31.  The IDEA refers to these local boards as "local educational agencies" or

"LEAs." 20 USC § 1401(19); see also, Ga Comp. R. & Regs. 160-4-7-.15(1)

(defining LEA for purposes of the GNETS Rule).

32.  Code Section 20-2-152 provides that LEAs, either directly or through

RESAs, "provide special education programs for all eligible students with

special needs who are residents of their local school systems" or RESAs.

O.C.G.A. § 20-2-152(b).

33.    Code Section 20-2-152 provides statutory authority for state funded, but

locally operated, special-education programs like GNETS.

34.    Code Section 20-2-152 further provides that the State shall set "eligibility

criteria" for such programs, but that "local school systems shall … provide

special education programs for all eligible students with special needs,"

including by "establishing and maintaining such educational facilities and

employing such professional workers as are needed by these students[.]"

O.C.G.A. § 20-2-152(b).

35.    GaDOE recognizes this principal of local authority. See, e.g., Deposition of

Wina Low at 150:7–17 (GaDOE reinforces expectations and provides

supports to local agencies regarding their GNETS reintegration rates); Id. at

167:13–168:2 (GaDOE provides guidance in areas like transition, academic

achievement, and assistive technology but does not have the authority to

issue mandates); Id. at 85:17–18; Deposition of Garry McGiboney at 48:18–

49:7 (GaDOE cannot require public schools to offer mental health services

but it can encourage and facilitate same).

36.    GaDOE encourages schools to offer mental health services as a method of

increasing access to such services but it cannot require schools to do so.

Deposition of Garry McGiboney at 48:18–49:7.

37.     It also encourages schools to work with CSBs to enhance access to mental
        health in schools. Deposition of Garry McGiboney at 39:19–23; 41:2–18.

38.     Code Section 20-2-152 provides that GaDOE is authorized to provide grants
        to regional educational service agencies ("RESAs") and local school districts
        for the provision of special education services. See O.C.G.A. § 20-2-
        152(c)(1).

39.     Code Section 20-2-270 provides that RESAs are "not state agencies."
        O.C.G.A. § 20-2-270(f).

40.     Only one statute refers to the GNETS Program and not by name. O.C.G.A. §
        20-2-270.1(c).

41.     The text of O.C.G.A. § 20-2-270.1 imposes no obligation on GaDOE or any
        other State agency.

42.     The only operative language imposes duties on RESAs. O.C.G.A. § 20-2-
        270.1(a).

**VI.    Additional Material Facts Regarding the IEP Process**

43.     Federal law provides that a child's individualized education program ("IEP")
        is based on the individual needs of the particular child. See 20 U.S.C. §
        1414(d)(1)(A).

44.     State and federal statutes provide that a child's IEP team is responsible for
        determining the setting from the continuum of services required by IDEA in

which the child is to receive education and related services. Ga Comp. R. & Regs. 160-4-7-.15(4);  Ga. Comp. R. & Regs. 160-4-7-.07; 34 C.F.R. § 300.115; Deposition of Garry McGiboney at 75:5-10.

45.   This decision is based on the goals and individual needs of the child and the least restrictive environment ("LRE") in which they can reach those goals. Ga. Comp. R. & Regs. 160-4-7-.07; Deposition of Garry McGiboney at 75:11-14; Deposition of Wina Low at 165:10–166:7.

46.   The child's IEP team determines whether the child should be recommended to receive education and related services through the GNETS Program. Deposition of Garry McGiboney at 27:14–28:3.

47.   LEAs are empowered with the discretion to offer GNETS services in settings ranging from fully integrated ("in the general education setting") to wholly separate ("in a facility dedicated to GNETS"). Ga. Comp. R. & Regs. 160-4-7-.15(4)(c).

48.   LEAs are charged with ensuring that GNETS services are provided the least restrictive environment for the student to obtain a free appropriate public education ("FAPE"). Ga. Comp. R. & Regs. 160-4-7-.15(5)(b)(1).

49.   On August 1, 2016, USDOE released a "Dear Colleague" letter ("USDOE Letter") stating that, "when a child with a disability experiences behavioral challenges, including those that result in suspensions or other exclusionary

disciplinary measures, appropriate behavioral supports may be necessary to ensure that the child receives FAPE." USDOE Letter at 6. The USDOE Letter is attached to Defendant's Statement of Undisputed Material Facts as Exhibit V.

50.    The USDOE Letter further states that "[a] determination of whether there is a denial of FAPE is a fact based determination, to be made on a case by case basis." Ex. V at 9.

51.    The USDOE Letter provides that "[a] determination of whether there is a denial of placement in the LRE is also a fact based determination." Ex. V at 10.

52.    The USDOE Letter states that "[t]herefore, a failure to provide appropriate behavioral supports (because they are not offered or because teachers and other staff are not adequately trained to implement such supports) that results in the child not receiving a meaningful educational benefit may constitute a denial of FAPE." Ex. V at 12.

53.    Once a student begins receiving GNETS services, the LEA is charged with "monitor[ing]" the student's IEP to "determine students' progress and access to services in a lesser restrictive environment." Ga. Comp. R. & Regs 160-4-7-.15(5)(b)(8).

54. The kinds of behavioral health services that should be provided to students with emotional and behavioral disabilities depends on the student's IEP. Deposition of Garry McGiboney at 167:6–168:7.

55. An IEP team is made up of the classroom teacher, special education director, the student, the parent, other related service providers, LEA representatives, sometimes a building administrator, and any other invited related service provider or stakeholder that has a role in supporting the student. Deposition of Samuel Clemons at 327:13-17; Deposition of Brooke Cole at 401:2-9; Deposition of Derrick Gilchrist at 257:15-22. See also 20 U.S.C. § 1414(d)(1)(B) (listing members of IEP team).

56. When a student is being considered for receiving services through the GNETS Program, staff from the GNETS Program being considered attends as well. Deposition of Celest Ngeve at 206:2-13.

57. The State has no role on an IEP team. Deposition of Haley Livingston at 278:22-279:7; Deposition of Cassandra Holifield at 333:13-20; Deposition of Samuel Clemons at 327:18-22; Deposition of Brooke Cole at 401:2-9; Deposition of Derrick Gilchrist at 257:23-258:9; Deposition of Patricia Wolf at 277: 24-278:2; Deposition of Whitney Braddock at 232:6-12; see also 20 U.S.C. § 1414(d)(1)(B).

58.    Parents are always involved in IEP team decisions. Deposition of Haley

Livingston at 102:13-22.

59.    Federal law provides that a parent can request a meeting at any time and

such request must be granted. See 20 USC 1414.

60.    A parent can unilaterally decline GNETS services. Deposition of Talithia

Newsome at 196:24-197:1.

61.    In some instances, parents have requested for their child to spend their entire

academic career in GNETS. Deposition of Wina Low at 155:24–156:4.

62.    No GNETS Director testified that they were aware of any instance in which

the State compelled a GNETS Program to make a particular decision

regarding a student's placement. See e.g., Deposition of Derrick Gilchrist at

258:10-13.

63.    No GNETS Director testified that the State has encouraged their program to

keep a student in GNETS when the IEP recommended otherwise. See e.g.,

Deposition of Derrick Gilchrist at 258:14-16; Deposition of Whitney

Braddock at 232:23- 233:1.

64.    The length of time a student receives services through GNETS is dependent

on what is in the student's IEP and how quickly the student reaches the goals

identified in the IEP. Deposition of Clara Keith Brown at 23:24-24:3;

Deposition of Samuel Clemons at 329:20-1.

65. Exit criteria are developed by the IEP team. Wolf Dep. 81: 14-16. The IEP team determines the student's IEP goals and goals they need to meet in order to exit the GNETS Program. Deposition of Patricia Wolf at 81: 7-13; Deposition of David Ackerman at 234: 10-21.

66. Student reintegration into general education from a GNETS Program is entirely reliant on the student's individualized IEP. Deposition of Samuel Clemons at 327:5-12.

### VII.   Additional Material Facts Regarding GNETS

67. The GNETS Rule provides GaDOE must receive and disburse the GNETS grants; and also "[a]dminister the grant funds" by specific acts of (1) developing "rules and procedures regulating the operation of the GNETS grant;" (2) notify fiscal agents of the grant allocation and approve the budget as part of the grant process; and (3) monitoring compliance. Ga. Comp. R. & Regs. 160-4-7-.15(5)(a)(1).

68. These grant obligations are a requirement of IDEA. 20 U.S.C. § 1407(a).

69. 20 U.S.C. § 1416(a)(1)(A) imposes these same grant obligations on the United States Department of Education.

70. The GNETS Rules describes the LEAs as responsible for (1) "ensur[ing]" that students are educated in the least restrictive environment; (2) convening IEP Teams that make recommendations to refer a student for GNETS

services; (3) monitoring students' IEPs; (4) providing training to teachers who teach disabled children; (5) collaborating with community behavioral health service providers; and (6) allocating supports and resources to GNETS Programs. Ga. Comp. R. & Regs. 160-4-7-.15(5)(b).

71. There is no text in the GNETS Rule explicitly dictating a location where services must be provided.

72. The text of the GNETS Rule expressly reserves the decision of establishing the learning environments where GNETS Program services may be delivered to the LEAs. Ga. Comp. R. & Regs. 160-4-7-.15(b)(10) and (4)(c).

73. The GNETS Rule does not empower the State to decide where the "GNETS continuum of services" may be provided as between a fully integrated and wholly separate facility and classroom. Ga. Comp. R. & Regs. 160-4-7-.15(4)(c).

74. The evidence shows that it is the LEA or RESA that determine the setting in which to provide services through the GNETS Program. Decisions on whether to operate as a school-based site or self-contained facility are local decisions. Deposition of Shaun Owen at 155:13-20.

75. The fiscal agent is responsible for the fiscal management and budgeting of GNETS funding. Ga Comp. R. & Regs. 160-4-7-.15(1)(b); see, e.g., Deposition of Patricia Wolf at 61:17-20 (role of GNETS of Oconee's fiscal

agent is to provide oversight in terms of budgets, and fiscal and personnel issues.)

76. No LEA or RESA has testified that they are incentivized by GaDOE to provide GNETS services in settings other than the general education setting.

77. GNETS Program decisions are made at the local level. Decisions to close programs or locations are local decisions. Deposition of Vickie Cleveland at 114:11-14.

78. Which counties a program will serve is a local decision. Deposition of Lisa Futch at 115:15-23; Deposition of Haley Livingston at 113:6-114:6.

79. Policies and procedures for GNETS Programs are made and changed at the local level. Deposition of Haley Livingston at 60:9-61:7.

80. Curriculum decisions are locally made decisions and GNETS Programs follow the curriculum of their local district. Deposition of Lisa Futch at 237:12-238:4; Deposition of Cassandra Holifield at 30:20-31:17; Deposition of Wina Low at 63:15–64:14.

81. Thus, every Program does something different for their curriculum. Deposition of Lakesha Stevenson at 137:17-20.

82. GNETS Directors are employees of the LEA/RESA and report to supervisors employed by the LEA/RESA. Deposition of Talithia Newsome at 52:15-53:23; Deposition of Haley Livingston at 11:16-20; 277:8-10;

Deposition of Cassandra Holifield at 332:16-19; Deposition of Derrick

Gilchrist at 256:4-6; 19:10-18; Deposition of Brooke Cole at 24:5-13;

Deposition of Celest Ngeve at 23:9-11.

83. GNETS Program Directors' salaries are paid by either the LEA or RESA,

depending on who the fiscal agent is. Deposition of Vickie Cleveland at

147:5-10; Deposition of Haley Livingston at 277:13-14; Deposition of

Whitney Braddock at 77: 16-20.

84. Similarly, all GNETS Program staffing and hiring decisions are determined

and handled by the county. Deposition of Talithia Newsome at 107:2-111:2;

Deposition of Haley Livingston at 277:8-12; 278:1-12; Deposition of Lisa

Futch at 349:8-14; Deposition of Shaun Owen at 155:13-20; Deposition of

Derrick Gilchrist at 254:14-255:5.

85. The State has no role in the Programs' staffing and hiring decisions.

Deposition of Haley Livingston at 278:10-12; Deposition of Talithia

Newsome at 111:24-112:4; Deposition of Cassandra Holifield at 332:12-15;

147:6-18; Deposition of Celest Ngeve at 280:18-281:5.

86. Each fiscal agent has its own process for how it hires staff and the State is

not consulted before a director is selected. Deposition of Vickie Cleveland at

146:14-23; Deposition of Celest Ngeve at 128:3-131:18.

87.    GaDOE has no involvement or control over who is hired in GNETS

        Programs. Deposition of Wina Low at 195:16-17; Deposition of David

        Ackerman at 85:4-7.

88.    No GNETS Program has staff employed by GaDOE. Deposition of Vickie

        Cleveland at 147:11-14.

89.    The State of Georgia does not conduct performance evaluations of GNETS

        Directors or their staff. Deposition of Haley Livingston at 277:19-25;

        Deposition of Cassandra Holifield at 333:4-12.

90.    Nor does the GNETS Program Manager evaluate GNETS Directors.

        Deposition of Vickie Cleveland at 146:24-147:1.

91.    GNETS students belong to their home school's LEA. Deposition of Amber

        McCollum at 67:3-6; Deposition of Garry McGiboney at 178:9–13.

92.    Facility maintenance and concerns are handled by the county. Deposition of

        Talithia Newsome at 71:25-73:11; Deposition of Lisa Futch at 238:5-15;

        Deposition of Cassandra Holifield at 286:15-24; Deposition of David

        Ackerman at 90:1-3; Deposition of Whitney Braddock at 230:17-21. Indeed,

        GNETS facilities are county-owned buildings. Deposition of Cassandra

        Holifield at 286:15-24.

93.    Facility layout and use is determined by the school. Deposition of David

        Ackerman at 95: 18-20; 139: 12-24.

94.    Bus service is determined, provided, and paid for by the LEA/RESA.

Deposition of Talithia Newsome at 84:17-22; 85:2-6; 236:20-237:3;

Deposition of Lisa Futch at 167:9-18; Deposition of Haley Livingston at

153:4-11; Deposition of Celest Ngeve at 139:2-5; Deposition of David

Ackerman at 19-21.

95.    Bus concerns are, therefore, brought to the county. Deposition of Talithia

Newsome at 86:12-87:17.

96.    Restraint policies are approved by the local authority, not GaDOE.

Deposition of Lisa Futch at 353:9-18.

97.    GNETS Programs who wish to collaborate with CSBs do so at the local

level. For example, South Metro GNETS contracts directly with View Point

Health for two clinicians to provide behavioral health services at South

Metro GNETS. Deposition of Jennifer Hibbard at 74:24-75:14; 76:4-13.

98.    Federal law requires states, including Georgia, to collect certain data. See 20

U.S.C.A. § 1418(a).

99.    Plaintiff's proffered expert, Dr. Amy McCart, acknowledges that there can

be "appropriate" reasons to "segregate students." Deposition of Amy McCart

at 19:14-18; 21:5-15; 145:14-17; 183:13-21.

100.   Dr. McCart also acknowledges that, even if students with emotional or

behavioral disabilities were provided with "the full array of supports and

services," some would need to be educated away from the general education setting. Deposition of Amy McCart at 143:18-144:1.

101.  Plaintiff's other proffered expert, Dr. Bob Putnam, concedes that some students may be afforded "with appropriate services at the appropriate intensity" and still need to "receive educational services … in a separate or segregated setting." Putnam Dep. 63:9-16.

### VIII.  Additional Material Facts Regarding the Strategic Plan and GNETS Program Documents

102.  The Strategic Plan was created by a collaboration of the GNETS Program Manager and GNETS Directors. Deposition of Clara Keith Brown at 177:11-178:6.

103.  The ultimate decision as to the content of the Strategic Plan was a collaborative decision of the GNETS Program Manager and GNETS Directors. Cleveland Dep. 205:21–206:411.

104.  The Strategic Plan is used by Programs to continue to reevaluate and self-assess their Programs, make changes as needed, and decide on their priorities for the upcoming year based on the needs identified by the assessment. See generally, Defendant's Statement of Undisputed Material Facts, Ex. U at GA00362005-23; Deposition of Shaun Owen at 194:11-15.

105.  The GNETS Program Manager and GNETS Program Specialist do not receive each Program's Strategic Plan; they receive mid-year and end of year

summaries when the regional Program's grant application is uploaded to the

GaDOE portal. Deposition of Vickie Cleveland at 208:9-21; Deposition of

Lakesha Stevenson at 150:23-151:8.

106. The Programs rate themselves; GaDOE does not provide a rating.

Deposition of Vickie Cleveland at 207:4-10; Deposition of Lakesha

Stevenson at 151:9-21.

107. To the extent a Program is not meeting the goals laid out in the Strategic

Plan, the State does not take any action beyond providing feedback and

suggestions to the Programs for ways they can improve. Deposition of

Vickie Cleveland 218:13–220:2; Deposition of Lakesha Stevenson at

153:11–154:10, 158:21–160:7.

108. At least one GNETS Program Director testified she completes the Strategic

Plan self-assessment but does not turn it in. Deposition of Whitney

Braddock at 210:12-18.

109. The GNETS Program Manager and GNETS Program Specialist do not

provide feedback after a location visit. Deposition of Vickie Cleveland at

183:7-20; Deposition of Lakesha Stevenson at 194:13-19.

110. The GNETS Program Manager looks at the Programs' Strategic Plan self-

assessments for what the Programs have done, what information and

artifacts they have presented, and may provide feedback. Deposition of Vickie Cleveland at 185:1-4; 214:20-24.

111.    The Strategic Plan is not tied to anything, including the receipt of any funding. Deposition of Lakesha Stevenson at 154:9-10; 160:1-2.

112.    A Program can still be funded by the grant even if the goals in the Strategic Plan are not met. Deposition of Vickie Cleveland at 219:9-12.

113.    The consideration for services forms were developed by a committee which included various GNETS Directors. Wolf Dep. 171:6-16; 185:4-186:2.

114.    Specifically, the GNETS Directors themselves created the "Consideration of Services" packet, "Request for GNETS consultation" document, and "Guidance and Planning Document for Student Integration from GNETS" document that they share and use for guidance. Deposition of Talithia Newsome at 150:13-151:10; 180:16-22; Deposition of Cassandra Holifield at 279:8-18; Deposition of Vickie Cleveland at 124:23-125:10; 141:19-142:22; 128:18-21; Wolf Dep. at 185:4-186:2.

115.    The GNETS Program Manager agreed to the final versions in conjunction with the rest of the committee, as the forms themselves were formally approved by the Committee, not by the GNETS Program Manager. Wolf Dep. 185:23-187:5.

116. There is no requirement by GaDOE to use these documents. Deposition of Talithia Newsome at 150:13-151:10; 180:16-22; Deposition of Cassandra Holifield at 279:8-18.

117. Similarly, there is no requirement by GaDOE to use the "Guiding Questions for Consideration of GNETS Services" document or the GNETS Operations Manual which are also guidance documents. Deposition of Cassandra Holifield at 252:9-14; Deposition of Talithia Newsome at 162:13-17.

118. In fact, GaDOE does not require use of any specific documents related to consideration of services. Deposition of Vickie Cleveland at 128:4-129:15.

## IX.    Additional Material Facts Regarding the Roles of GNETS Program Manager and GNETS Program Specialist

119. When the role that ultimately became the GNETS Program Manager was created, Clara Keith Brown wanted to make sure the person hired knew the State did not control or administer GNETS; that the GNETS Programs were independent of GaDOE in that they have their own directors who did not report to anyone at GaDOE; and that GaDOE has a State Board rule that GaDOE provides implementation guidance on. Deposition of Clara Keith Brown at 85:16-25.

120. The GNETS Program Manager and Specialist are not there for day-to-day implementation of the program. Deposition of Vickie Cleveland at 169:18-22.

121.   They do not provide consultation regarding improvement to the GNETS
       Programs. Deposition of Lakesha Stevenson at 48:23-49:1.

122.   Nor do they provide recommendations regarding appropriateness of GNETS
       Programs' therapeutic interventions or classroom instruction. Deposition of
       Lakesha Stevenson at 113:2-5; 112:2-5.

123.   They do not provide recommended changes or feedback on reintegration
       data because the decisions are local and the Program Manager cannot make
       decisions or recommendations for what IEP teams are going to recommend
       for their students. Deposition of Vickie Cleveland at 136:12-137:14.

124.   They do not look at compliance with Functional Behavior Assessment
       (FBA) or Behavior Improvement Plan (BIP) requirements. Deposition of
       Vickie Cleveland at 172:18-25.

## X.    Additional Material Facts Regarding GNETS Funding

125.   LEAs who choose to apply for and receive GNETS grants are given broad
       discretion on where they can provide services, ranging from fully integrated
       to wholly separate settings. Ga. Comp. R. & Regs. 160-4-7-.15(4)(c);
       Deposition of Shaun Owen at 155:13–20; Deposition of Vickie Cleveland at
       114:11–14.

126.   The State must receive approval from the United States Department of
       Education for its use of IDEA discretionary funds on the GNETS Program.

30(b)(6) Deposition of Rusk Roam at 28:12-29:15; 30:15-31:5. <u>See also</u>, July 1, 2023 letter from United States Department of Education to Richard Woods "approv[ing] Georgia's application for Federal fiscal year (FFY) 2023 funds under Part B of the Individuals with Disabilities Education Act (IDEA Part B)" and explaining the bases of the approval. The letter is attached hereto as **Exhibit 1**.

127. Indeed, the federal Secretary of Education is statutorily charged with "monitor[ing]" a state's use of IDEA funds. 20 U.S.C. § 1416(a)(1).

128. LEAs help fund the GNETS Program. <u>See</u> Plaintiff's Ex. 91 at GA00054567.002.

129. In addition, local funds are contributed from LEAs in the form of in-kind services. Deposition of Derrick Gilchrist at 255:6-256:3; Deposition of Lisa Futch at 237:12-238:20.

130. Many staff positions are funded by the county. Deposition of Talithia Newsome at 115:16-117:2; 118:20-22; 123:6-127:7; Deposition of Cassandra Holifield at 55:8-11; 133:21-23.

131. GNETS Programs must get budget approval from their fiscal agents. Deposition of Cassandra Holifield at 105:24-106:6.

132. Some RESAs prepare and handle their respective GNETS Programs' budgets. <u>See, e.g.,</u> Deposition of Haley Livingston at 118:9-10; 199:25-

200:4; 229:12-18 (explaining Harrell Learning Center's RESA prepares its budget).

133.  The fiscal agent is responsible for the fiscal management and budgeting of GNETS funding. Ga Comp. R. & Regs. 160-4-7-.15(1)(b); see, e.g., Deposition of Patricia Wolf at 61:17-20 (role of GNETS of Oconee's fiscal agent is to provide oversight in terms of budgets, and fiscal and personnel issues.)

134.  GaDOE is a flowthrough agency for state and federal funds to the fiscal agent, either the LEA or RESA as the case may be. Deposition of Shaun Owen at 154:22-23.

135.  The RESA/LEA is a flowthrough for state and federal funds to the individual GNETS Programs. Deposition of Haley Livingston at 75:18-25; Deposition of Cassandra Holifield at 49:18-50:4; 50:11-12.

136.  The fiscal agent receives funds from GaDOE and has the responsibility for appropriately accounting for the expenditure of those funds. Deposition of Clara Keith Brown at 31:2-6.

137.  The funding for GNETS is held for reimbursement after the GNETS programs have made certain expenditures. Deposition of Geronald Bell at 34:19-22.

138.  The GNETS Program submits requests or purchase orders to the fiscal agent for approval and to receive payment. Deposition of Cassandra Holifield at 50:16-51:13.

139.  In Fiscal Year 2024, State funds represented 82% of the total appropriation of $65,427,745. Defendant's Statement of Undisputed Material Facts, Ex. S at 105–06.

140.  GNETS grant funding is driven by enrollment. Deposition of Vickie Cleveland at 266:14-17.

141.  The GNETS population is consistently trending down. Deposition of Vickie Cleveland at 88:13-19.

142.  The GNETS grant has accordingly trended down each year. See generally, Defendant's Statement of Undisputed Material Facts, Exhibits K through T.

143.  Grants are not mandatory. There is no evidence that LEAs and RESAs are required to apply for the GNETS grant.

144.  The grant application requirements and assurances are the same for all programs. Deposition of Vickie Cleveland at 250:24-251:6; 251:12-14.

145.  The grant does not include language that provides for termination if noncompliance by the GNETS Program is found. Deposition of Vickie Cleveland at 255:16-21.

146.  Scores such as the GAA and GAA 2.0 do not impact funding. Deposition of Vickie Cleveland at 266:14-17.

147.  The fiscal agent and regional GNETS Program enter into assurances for the therapeutic services grant. See, Plaintiff's Ex. 120; Deposition of Lakesha Stevenson at 145:4-12; 144:17-20.

148.  There are no assurances between the GNETS Programs and GaDOE. Deposition of Lakesha Stevenson at 145:13-15.

149.  Grants to GNETS Programs are awarded to the fiscal agents as the Grant Recipient, not the GNETS Programs. See Plaintiff's Exs. 114-116.

150.  Eleven programs receive the need-based therapeutic grant. Deposition of Vickie Cleveland at 105:3-5.

151.  The LEAs are reimbursed by the therapeutic services subgrant for funds the LEAs used on the social worker position. Plaintiff's Ex. 116.

152.  The therapeutic services grant is a subgrant. Deposition of Vickie Cleveland at 150:8-11.

153.  The fiscal agent decides to enter into an agreement with a provider, reviews the provider agreement, and "make[s] any adjustments that [the fiscal agent] deemed (sic) to be necessary. Including statements related to the contractors (sic) liability for this service." Plaintiff's Ex. 118.

154. The GNETS Program Specialist completes a year end summary of social worker logs submitted for the therapeutic services grant, including things such as the average number of students who receive support and the most common types of support received. Deposition of Lakesha Stevenson at 70:2-17.

155. Neither she nor the GNETS Program Manager take any action or make any suggestions based on the summary. Deposition of Lakesha Stevenson at 70:9-17.

## XI.    Additional Material Facts Regarding Facility Conditions Assessment

156. Code Section 20-2-16(c) provides that "the Board is authorized to inspect any public school building and, if such building is found to be dangerous to the lives or health of the pupils, to notify the county or independent board of education in writing of the unsafe or unhealthful conditions revealed, including in the notification specific suggestions for the correction of such unsafe or unhealthful conditions."

157. The 2016 letter from the State Board of Education sent to the county superintendents for the nine impacted facilities described them as "unsafe and unhealthful." Plaintiff's Ex. 100 at GA01486055.

158. The State Board of Education wrote to the impacted county superintendents that it was "suggesting that you remedy this deficiency by collaborating with

key stakeholders" to relocate children to a different facility. Plaintiff's Ex.

100 at GA01486055.

Respectfully submitted this 13th day of November, 2023.

Christopher M. Carr
*Attorney General*
Georgia Bar No. 112505
Bryan K. Webb
*Deputy Attorney General*
Georgia Bar No. 743580
Russell D. Willard
*Senior Assistant Attorney General*
Georgia Bar No. 760280
Susan R. Haynes
*Assistant Attorney General*
Georgia Bar No. 901269
Office of the Attorney General 40
Capitol Square, S.W. Atlanta, Georgia
30334 Telephone: (404) 656-3357

*/s/ Josh Belinfante*
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Melanie Johnson
Georgia Bar No. 466756
mjohnson@robbinsfirm.com
Edward Bedard
Georgia Bar No. 926148
ebedard@robbinsfirm.com
Danielle Hernandez
Georgia Bar No. 736830
dhernandez@robbinsfirm.com
Javier Pico Prats
Georgia Bar No. 664717
jpicoprats@robbinsfirm.com
Anna Edmondson
Georgia Bar No. 289667
aedmondson@robbinsfirm.com
**Robbins Alloy Belinfante Littlefield LLC**
500 14th Street NW
Atlanta, GA 30318
Telephone: (678) 701-9381
Facsimile: (404) 856-3255

Alexa R. Ross
Georgia Bar No. 614986
alexarross@icloud.com
**AlexaRossLaw, LLC**
2657 Danforth Lane
Decatur, Georgia 30033

Special Assistant Attorneys General

*Attorneys for Defendant*