**In the Matter Of:**

UNITED STATES vs STATE OF GEORGIA

1:16-cv-03088-ELR

---

**ANDREW WILEY, PH.D.**

*October 30, 2023*

---



800.211.DEPO (3376)
EsquireSolutions.com

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION

3

   UNITED STATES OF AMERICA,           Civil Action No.
4                                       1:16-cv-03088-ELR
              Plaintiff,
5
           vs.
6
   STATE OF GEORGIA,
7
              Defendant.
8  ~~~~~~~~~~~~~~~~~~~~~

9

10            Video Recorded Deposition of:

11                 ANDREW WILEY, Ph.D.

12

13             Monday, October 30, 2023

14                   8:59 a.m.

15

16                     Jones Day
                  901 Lakeside Avenue
17              Cleveland, Ohio 44114

18

19     Reported By:  Sarah R. Drown, RDR, CRR

20

21

22

23

24

25



1                    APPEARANCES OF COUNSEL

2

3        On behalf of the Plaintiff:

4            MATTHEW K. GILLESPIE, ESQ.
             CRYSTAL ADAMS, ESQ.
             CLAIRE CHEVRIER, ESQ. (Via Zoom)
5            FRANCES COHEN, ESQ. (Via Zoom)
             ANDREA HAMILTON WATSON, ESQ. (Via Zoom)
6            VICTORIA LILL, ESQ. (Via Zoom)
             JESSICA POLANSKY, ESQ. (Via Zoom)
7            LAURA TAYLOE, ESQ. (Via Zoom)
             MICHELLE L. TUCKER, ESQ. (Via Zoom)
8            U.S. DEPARTMENT OF JUSTICE
             950 Pennsylvania Ave., NW
9            Suite 7273 NWB
             Washington, D.C. 20530-0001
10           202.803.1302
             Matthew.gillespie2@usdoj.gov
11           Crystal.adams@usdoj.gov
             Claire.chevrier@usdoj.gov
12           Frances.cohen2@usdoj.gov
             Andrea.watson2@usdoj.gov
13           Victoria.lill@usdoj.gov
             Jessica.polansky@usdoj.gov
14           Laura.tayloe@usdoj.gov
             Michelle.tucker@usdoj.gov
15

16

         On behalf of the Defendant:
17
             MELANIE JOHNSON, ESQ.
18           ANNA EDMONDSON, ESQ.
             ROBBINS ALLOY BELINFANTE LITTLEFIELD LLC
19           500 14th Street, Northwest
             Atlanta, Georgia 30318
20           678.701.3258
             Mjohnson@robbinsfirm.com
21           Aedmondson@robbinsfirm.com

22

     ALSO PRESENT:
23
         STACEY SUBER-DRAKE, ESQ. (Via Zoom)
24       GEORGIA DEPARTMENT OF EDUCATION

25       BRIAN MCCOLLUM, VIDEOGRAPHER



1                    INDEX OF EXAMINATION

2

3   WITNESS:   ANDREW WILEY, Ph.D.

4   EXAMINATION                                        PAGE
    By Mr. Gillespie                                       5
5
                            -  -  -
6
    PLAINTIFF'S
7   EXHIBIT              DESCRIPTION               PAGE

8   Ex. 979          Errata to Rebuttal Expert      100

9                     Report of Andrew Wiley, Ph.D.

10

11  Ex. 980          8/23/2023 Interview Notes       123

12

13  Ex. 981          8/24/2023 GNETS Interview       147

14                   Notes

15

16  Ex. 982          8/25/2023 Interview Notes       150

17

18  Ex. 983          Response to U.S. Department     211

19                   of Justice Expert Reports of

20                   Dr. Amy McCart and Dr. Robert

21                   Putnam, Rebuttal Expert Report

22                   Prepared by Andrew Wiley, Ph.D.,

23                   September 1, 2023

24

25  Ex. 984          The Washington Post article     376



1    titled "No, special education

2    does not treat disability

3    like a disease and is not

4    'obsessed' with forcing

5    students to conform."

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1    VIDEO RECORDED DEPOSITION OF ANDREW WILEY, Ph.D.

2                Monday, October 30, 2023

3

4                    THE VIDEOGRAPHER:  We're on the

5              record, 8:59.

6                   You may swear in the witness.

7                        - - - - -

8                    ANDREW WILEY, Ph.D., of lawful age,

9              called for examination, as provided by

10             the Federal Rules of Civil Procedure,

11             being by me first duly sworn, as

12             hereinafter certified, deposed and said

13             as follows:

14          EXAMINATION OF ANDREW WILEY, Ph.D.

15        BY MR. GILLESPIE:

16        Q.     Good morning, Dr. Wiley.

17        A.     Good morning.

18        Q.     Would you please state your name for

19       the record.

20        A.     My name is Andrew Wiley.

21                  MR. GILLESPIE:  Counsel, can we

22            agree to reserve all objections other than

23            form or privilege for this deposition?

24                  MS. JOHNSON:  Yes.

25                  MR. GILLESPIE:  Thank you.



1    Q.      All right.  Dr. Wiley, are you aware

2    that you are being deposed today in the matter

3    of the United States of America versus the state

4    of Georgia?

5    A.      Yes.

6    Q.      Okay.  Any reason you cannot give full

7    and accurate testimony today?

8    A.      No.

9    Q.      Have you ever been deposed before?

10   A.      I have not.

11   Q.      You've just been placed under oath by

12   our stenographer.  Are you aware of what that

13   means generally?

14   A.      Yes.

15   Q.      Okay.  And you know that means that

16   you're obligated to tell the truth today and

17   that it's the same as though you were testifying

18   in court?

19   A.      Sure.  Yes.

20   Q.      There are a couple things that are

21   different from a regular conversation today,

22   with conducting a deposition, and I want to go

23   over just some ground rules that we'll both try

24   to abide by if we can.

25   A.      Okay.



1    Q.      One is that, as you know, we have

2    Sarah here who's going to be transcribing

3    everything we both say today.  One thing that

4    makes her life more difficult is if we interrupt

5    each other.

6    A.      Okay.

7    Q.      That often happens when you're

8    anticipating what it is that I'm about to ask.

9    Or, you know, it could happen with me with your

10   answer.  We're just going to try not to

11   interrupt each other today to make Sarah's life

12   a little bit easier.  Okay?

13   A.      Sounds good.

14   Q.      Another thing with the transcription

15   is being sure that you verbalize your answers.

16   If I ask a yes or no question, you go "uh-huh"

17   or "uh-uh," I understand what you mean, but it

18   doesn't -- it's not clear in the record.  And so

19   I'll just ask you to verbalize your answer as a

20   yes or no.  It's not me trying to be rude, it's

21   just me trying to make sure that we're clear

22   about what the answer is.

23         Does that make sense?

24   A.      Yes.

25   Q.      If at any point you don't understand



 1   what I'm asking -- I try to ask good questions,
 2   sometimes I succeed, sometimes I don't.  If you
 3   don't understand what I'm asking, please feel
 4   free to ask for clarification.  If you answer
 5   the question I'm going to assume you understood
 6   what I asked.
 7       A.      Okay.
 8       Q.      Does that make sense?
 9       A.      Yes.
10       Q.      And, finally, I'll ask that you
11   provide me with full and accurate answers.  And
12   a bunch of attorneys have different ways of
13   describing what that means.  The example I use
14   is if I ask you what you had for breakfast this
15   morning and you say eggs but you also had a
16   waffle and orange juice, the full and complete
17   answer is to say I had eggs, waffle, and orange
18   juice.
19              Does that make sense?
20       A.      Yes.
21       Q.      And, Dr. Wiley, if at any time you
22   need to take a break for whatever reason -- I
23   try to break about every hour or so, but if you
24   need a break before then for any reason, just
25   let me know and that won't be a problem.  The



1  only exception is if I have a pending question,

2  I've asked a question, I'm waiting for an

3  answer, I'll ask you to go ahead and answer that

4  question before we take a break.

5           Any questions for me before we dive

6  into it?

7     A.      No, I don't think so.

8     Q.      Great.  Thank you.

9           Dr. Wiley, did you do anything to

10  prepare for today's deposition?

11    A.      Well, I wrote the report and I did

12  meet with the lawyers, Melanie and Ed and Josh.

13  We just talked about general expectations.

14    Q.      And I don't want to get into any

15  conversations that happened, --

16    A.      That's fine.

17    Q.      -- but I appreciate that.

18           So you said you met with attorneys for

19  the state.  Do you know approximately how long

20  you met with them for?

21    A.      Probably an hour and a half.

22    Q.      Okay.  Did you review any documents in

23  preparation for this deposition?

24    A.      No.  We didn't have documents out to

25  review.  We just had a conversation.



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    10

1    Q.       Have you discussed this deposition
2  with anyone else?
3    A.       I have not.
4    Q.       Okay.  Have you done anything else to
5  prepare for this deposition?
6    A.       I reread materials, both my own report
7  and the expert reports for the DOJ.
8    Q.       So would those be the expert reports
9  of Dr. McCart and Dr. Putnam?
10   A.       Yes.
11   Q.       Did you read anything else?
12   A.       No.
13   Q.       Dr. Wiley, have you ever been an
14  expert in litigation before?
15   A.       I have not.
16   Q.       Are you currently serving as an expert
17  in any other matters?
18   A.       No.
19   Q.       Have you ever testified in a legal
20  proceeding of any kind?
21   A.       No.
22   Q.       In addition to your academic duties
23  with Kent State, do you provide any type of
24  consulting services?
25   A.       I have done professional development



 1   in a couple different ways.  You know, I

 2   sometimes provide professional development to

 3   school districts in Northeast Ohio.

 4          I also provide some online

 5   professional development that isn't officially

 6   part of Kent State.  It's our office of

 7   continuing development.  So I have a couple of

 8   workshops that I provide online, and I provide

 9   those pretty regularly.

10          Sometimes I have students at Kent

11   State who take those and sometimes I have

12   students -- or people who are teachers or

13   principals who participate in that.

14   Q.     Is there anything else?  Any other

15   type of consulting that you do?

16   A.     I don't think so currently.

17   Q.     And when you talk about professional

18   development, do you mind telling me a little bit

19   more about that?  What does that entail and what

20   does that mean exactly?

21   A.     Sure.  So it's usually around a

22   specific topic.  For example, when I recently

23   went to a school district, I met with all of

24   their grade level teachers, K through 12, and we

25   talked about classroom management.



1              It was under the title of class-wide

2    positive behavior support.  How to do it, how to

3    implement it, that kind of stuff.  Strategies.

4              I also -- one of my online workshops

5    is about classroom management as well.

6      Q.      You said you met with all grade level

7    teachers, K through 12.  So that's not just

8    special education?

9      A.      That Kenston one was special education

10   and general education.

11     Q.      Okay.

12     A.      In that case.

13     Q.      And is that typically the case?  Or

14   how is it usually?

15     A.      It depends.  There are spaces between

16   when I provide professional development.  So

17   I've also done it where it's just special

18   education teachers, but more recently it would

19   be both general and in special ed.

20     Q.      And how often do you do these

21   professional development trainings?

22     A.      If you're counting the online workshop

23   that I do through the office of continuing

24   development, I do that at least two or three

25   times a year.  The others are more spaced out.



1   It really depends.  Some have seen my online

2   workshops, that would be the case of the most

3   recent one, and they've asked me to come and do

4   similar things in person.

5      Q.      And are these usually one-off events,

6   or are they week long?  How does that work?

7      A.      Typically one-off.  I mean, -- so the

8   workshops are provided over a period of time,

9   like a semester.  So students complete, you

10  know, different parts of the professional

11  development.

12     Q.      Okay.  And is this through the

13  university or otherwise?

14     A.      So some that I do on my own are not

15  through the university.  And then the ones --

16  there is a Kent State office, that's the office

17  of continuing education and professional

18  development.  And so technically that is

19  connected to Kent State.  And I am paid through

20  Kent State for that.

21     Q.      And for the ones that are not through

22  Kent State, is that through an entity, or is

23  that just you individually?

24     A.      That would be just me.  And I've done

25  it with other faculty as well.



1    Q.      Okay.  Other than in this case, have

2    you consulted with or provided any services for

3    the state of Georgia?

4    A.      No.

5    Q.      Okay.  Have you provided any other

6    reports to the state of Georgia?

7    A.      No.

8    Q.      Than the one that is provided in this

9    case, the United States versus the state of

10   Georgia.

11   A.      No other reports for Georgia.

12   Q.      In the last five years or so have you

13   spent any time consulting with state departments

14   of education?

15   A.      I have not.  I mean, -- let me flesh

16   that out just a little bit.

17           I have done some work, for example,

18   with education pathways.  So what that is is a

19   pathway for training teachers who go to two-year

20   colleges and then to transfer to four-year

21   colleges.

22           Ohio, like many other places, has a

23   shortage of all teachers, and especially special

24   ed teachers.  So over the past couple of years

25   we've been working on different approaches.



1              So technically that is involved by not

2       the state Department of Education, but also the

3       Department of Higher Education.

4              I've also done some things where I've

5       worked with Department of Education, working on

6       innovations and teacher education.

7              So I would say in a way we're doing it

8       mostly through Kent State, but we're also

9       providing consultation to these state department

10      in Ohio on how to come up with innovative models

11      and things like that.

12      Q.      Can you tell me a bit about that?  So

13      when you say that you've -- and I don't mean to

14      be rude here, I'm just trying to make sure I

15      track with what you've said.

16      A.      Sure.

17      Q.      On innovations on teacher education,

18      what sort of work are you doing with the state

19      on that?

20      A.      Yeah.  So, I mean, an example

21      previously would be that I worked with -- it was

22      called the Ohio Deans Compact.  And we were

23      working on dual license, general ed and special

24      ed teacher education.  There are multiple

25      universities that would come to together.



 1            That was the one where we also had The

 2    CEEDAR Center from the University of Florida

 3    support our work in trying to create dual

 4    license programs.

 5            And so that would be an innovation, in

 6    the sense that mostly in Ohio you have special

 7    ed licensure, general ed licensure broken down

 8    by age bands.  So an innovation would be to have

 9    a dual licensure.

10            I'll say for that -- for Kent State

11    there were a few places that were able to do

12    that successfully.  We weren't able to do that

13    successfully, but we created some special

14    education minors that our general ed teachers

15    take at Kent State to try to give them some

16    competencies that will help them work with kids

17    with IEPs, if that makes sense.

18    Q.      And so if I'm hearing you correctly,

19    and correct me if I'm not, you've consulted with

20    the state on developing programs to help get

21    teachers credentialed and ready to begin

22    teaching in the state of Ohio; is that right?

23    A.      That's correct, yeah.  So it would be,

24    you know, preservice teachers.

25    Q.      Okay.



1    A.      So it was most university-based

2   teacher education programs.

3    Q.      And what exactly was your involvement

4   in --

5    A.      So I was one of --

6    Q.      -- this?

7    A.      -- several faculty, and we would meet

8   with -- in this case we were working with what's

9   middle childhood education.  That was new for me

10   when I moved to Ohio.  A lot of other states

11   break down like K through 6, maybe 7 through 12.

12          Middle childhood education is four

13   through ninth grade.  And so we had middle

14   childhood faculty at Kent State and we had some

15   special ed faculty.

16          And we would meet and we were trying

17   to develop a -- it was an interesting time

18   because there was a lot of pressure on

19   universities to stay within four years for our

20   students.  So we tried to come up with a dual

21   license program that would allow them to get

22   middle childhood credential licensure and also

23   special ed, which is K through 12 in Ohio.

24          Does that make sense?

25          So there were special ed faculty.



1   There were middle childhood faculty who would

2   attend these meetings in Columbus.  But we would

3   also do our work.

4          We were caught between the rock and

5   the hard place of that four year constraint.  So

6   that's why we weren't able to complete a four

7   year two license program that we thought was

8   rigorous enough for preparing both special ed

9   and middle childhood teachers.

10  Q.     And what was the time frame for your

11  involvement in this?

12  A.     Oh, if you're going to ask me for

13  exact years, I would have to take --

14  Q.     Just in general.

15  A.     -- a look.

16         I mean, it was over about three years.

17         And I think that took place maybe,

18  jeez, six, seven, eight years ago.

19         Now, we did revisit it within Kent

20  State.  That wasn't with the state.  We sort of

21  on our own got back together and said all right,

22  let's look and see if things have changed.  But

23  from that there was sort of a mutual agreement

24  that we weren't ready to create blended

25  programs.



1    Q.      And you also earlier referenced

2    education pathways.  Is that the same thing as

3    what we're talking about?

4    A.      That's completely different.

5    Q.      Okay.

6    A.      So the state looked for people.

7            The other thing that I've done with

8    the state is Ohio has something called TAG

9    courses.  This is Transfer Assurance guarantees

10   [sic].  And there are four that are in education

11   currently.  One of them is the special ed course

12   intro to exceptionalities.  So for years --

13   several years I served as a TAG reviewer.

14           So if a university created one of

15   these courses, they would submit it to the

16   state.  And there were reviewers who had

17   expertise who would look at it and say yes, this

18   is -- to use a technical term, up to snuff.  You

19   know, we had learning outcomes that they were

20   supposed to address.

21           As part of my work this -- this new

22   grant that I wasn't part of getting -- but they

23   had money for universities and two-year colleges

24   to work together to try to work on education

25   pathways.

1          And education pathways, again, we have

2     them in other, like, business, and I can't

3     remember all of the different ones.

4     Education -- they didn't have them in many

5     places.  There were a few places.

6          So I worked with a faculty from

7     Bowling Green, another four year, and a faculty

8     from Tri-C, which is Cuyahoga Community College

9     here in Cleveland.  And what we were doing was

10    try to come up with different models for how

11    that might look if we were to create two-year

12    degrees that could then transfer.

13         And to address, you know, both the

14    shortage of teachers -- this was broader than

15    special ed, but also a big focus, and rightfully

16    so, is diversifying our teacher workforce.  And

17    so that was -- we also thought this is a way to

18    do that.

19         And also concern about making this

20    more affordable for students who would like to

21    become a licensed teacher.

22         So that is different work in many

23    ways.

24         I did have folks at Kent State who

25    work on these education pathways who were kind



1   of listening in as I did that work.  Again, we

2   were able to come up with something that we

3   didn't think was the greatest in the world, but

4   as we speak they're still looking at it and

5   saying are we going to make this sort of an

6   official -- it was a one-year program that

7   students could take at community colleges that

8   all public -- 13 public universities would

9   accept and sort of bring students on to those

10  four-year teacher ed programs.

11          It's not done yet.  We've gotten some

12  good feedback, but we're still waiting to see if

13  the state sort of makes that official.

14          Does that make sense?

15    Q.      It does.

16          And so if I'm hearing you correctly --

17  so educational [sic] pathways also has to do

18  with teacher credentialing --

19    A.      Correct.

20    Q.      -- in the area?

21    A.      Yes.

22    Q.      Like the other consulting work that

23  you were referencing?

24    A.      That's right.

25    Q.      And is it ongoing?



1      A.      It is ongoing.

2      Q.      Okay.

3      A.      So my official work with that is over,

4   but the three of us continue to, you know, meet

5   with the state folks and consult with them.

6           And, you know, you have to bring

7   people on board and make everybody feel like

8   what we put together makes sense.  So that's

9   sort of where that is.

10          I think there's leadership support for

11  it, but -- I don't know.  I mean, I have worked

12  a little bit in other states, but I think Ohio

13  in particular, you really have to get consensus.

14  There's not a lot of top down change.  So these

15  universities and two-year colleges have to say

16  yes, we would like to do that.

17     Q.      And when was the bulk of your work

18  with education pathways?

19     A.      I would say over the last two and a

20  half or three years.  Again, I can give you

21  exact timelines later if you need it.

22     Q.      No.  That's fine.

23          You said you've done some other work

24  with other states.  What's that?

25     A.      Well, I'm really talking about when



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    23

 1   I've been, for example, a student in Virginia
 2   and a teacher.
 3      Q.      Okay.
 4      A.      So less so about how that process --
 5      Q.      Sure.
 6      A.      -- of consulting works than my
 7   experience as a teacher.
 8              And also when I was in Massachusetts
 9   as a postdoctoral research associate.
10      Q.      Understood.
11              So other than teacher credentialing
12   with the state of Ohio through education
13   pathways and the other consulting that we
14   discussed, have you consulted with any other
15   state departments of education?
16      A.      No other state departments of
17   education.
18      Q.      Okay.  And we discussed the
19   professional development you provided.  Have you
20   provided any other consultation services for
21   school districts?
22      A.      I don't think so.  I would not say in
23   a formal sense.  I haven't provided, you know,
24   consultation.  I have interactions with
25   different school districts around our, you know,



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    24

1   preservice teacher prep, but no.

2      Q.      Sure.

3      A.      I'd say no.

4      Q.      When was the last time you were in a K

5   through 12 school working hands-on with

6   teachers?

7      A.      That one when I was in Kenston would

8   be an example.  That was the special ed and

9   general ed.  And it wasn't the beginning of last

10  year, but the year before that.

11            When I was teaching field

12  experience --

13     Q.      I'm sorry.  Just really quick.

14     A.      Yes.

15     Q.      You're referring to professional

16  development?

17     A.      I am referring to --

18     Q.      Okay.

19     A.      -- professional development.

20     Q.      Great.

21     A.      And so that's since I was in the

22  schools and talking to teachers about their

23  experiences.

24            I also -- when I was teaching field

25  experience, which we're required in Ohio to have



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              25

1   100 hours of our students in schools -- I'm not

2   teaching that now, but I would meet with

3   principals and teachers about our field

4   experience students.  And so those would be some

5   of the last times that I was in schools.

6     Q.      Okay.  And when was that?

7     A.      You're going to have to -- I'm going

8   to have to pull up --

9     Q.      Just --

10    A.      Yeah.

11    Q.      -- generally.

12    A.      Five or six years ago.

13    Q.      Okay.

14    A.      I want to say.

15            So our faculty, you know, we divide

16  the labor in different ways depending on what

17  years it would be, but ...

18    Q.      And would you be -- would you be in

19  the school when school was in session

20  advising --

21    A.      It was --

22    Q.      -- teachers?

23    A.      -- during that time, because that's

24  when our field experience was.

25            The other thing that we were doing is



1   I had constant communication with our

2   supervising teachers for field experience.  So

3   good or bad I would hear from them about, you

4   know, what's going on.

5            We also sought a lot of feedback from

6   them in terms of how our field students are

7   doing, things that they would like for them to

8   do while they were in their field experiences.

9            So some of that contact was more by

10  email, but there were also times, especially

11  with district leadership, where I would actually

12  be in schools or in school districts talking

13  about what we're trying to accomplish with our

14  students and making sure that it worked well.

15  You know, they have to volunteer to do it.  So

16  we had to keep our school districts happy.

17    Q.      Absolutely.

18    A.      Which usually is a win-win, you know.

19    Q.      Yeah.

20            Just very briefly, Dr. Wiley.  I'm

21  noticing a little bit that you are anticipating

22  my questions.  Just --

23    A.      I apologize.

24    Q.      You're totally fine.  I just want to

25  make Sarah's life easy.



1            COURT REPORTER:  If you could slow

2       down a little --

3            THE WITNESS:  I will.  I can do

4       that, too.

5            MR. GILLESPIE:  Yeah.  You're doing

6       great.

7            THE WITNESS:  Sorry.

8    Q.      So, Dr. Wiley, you referred to

9    supervising teachers.  So I'm just -- from the

10   outside looking in, could you kind of describe

11   what the structure was for this teacher --

12   A.      Sure.

13   Q.      -- professional development work you

14   were talking about?

15   A.      Yes.  When I say supervising a teacher

16   in the context of field experience, I'm talking

17   about the teachers who were actually working in

18   the school buildings.

19   Q.      Okay.

20   A.      And they're the ones who would

21   supervise -- that's why we say supervising

22   teacher -- our students who are preservice

23   teachers who are getting their field experience

24   hours.

25   Q.      Thank you.  I appreciate that.



1              When was the last time you taught in a

2    K through 12 classroom?

3        A.      My last experience would have been as

4    a behavior specialist.  So if the question is

5    when was I last employed as a special educator,

6    it would have been when I was at Fairfax County

7    in Virginia as a behavior specialist.

8        Q.      Have you ever consulted on PBIS

9    implementation?

10       A.      I have, yes.

11       Q.      And when was that?

12       A.      That also would have been mostly

13   during my time in Virginia.  But again, when

14   I am doing my workshops now on behavior

15   management, classroom management, we do focus on

16   that PBIS framework, those principles and

17   practices of PBIS.  That is very much sort of

18   current with the way that people talk and think

19   about behavior support in schools.

20       Q.      I use the word "consulted," but I

21   guess maybe a more accurate descriptor for what

22   you've done, is that professional development

23   work?  Correct?

24       A.      That would be correct.

25       Q.      Okay.



1    A.      Yes.  Yes.

2    Q.      And so I'll ask with MTSS

3    implementation.  Have you also provided

4    professional development on MTSS implementation?

5    A.      So consultation -- I think maybe the

6    way you're thinking about consultation, not so

7    much.  I have done professional development.

8           In addition to the classroom

9    management, I created a workshop that different

10   faculty will teach.  This is one of the online

11   continuing development that was on response to

12   intervention.  We started that -- which is part

13   of MTSS.  Right.  The behavior side is positive

14   behavior support.  Response to intervention is

15   the academic side.

16          And so that, again, isn't consultation

17   or professional development, but the idea is

18   that -- you know, again, we get students at Kent

19   State.  We also get people who are principals or

20   teachers at different schools who want to learn

21   about how that's done, you know.

22          And then the other online workshop

23   that I've done that also falls within that MTSS

24   framework would be supplemental and intensive

25   math instruction.  So it's specific to, you



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              30

 1   know, what is supplemental and intensive.

 2           And the supplemental really

 3   corresponds to tier two in the academic part of

 4   MTSS, and intensive instruction would be

 5   tier three, intensive instruction.

 6     Q.     Okay.

 7     A.     So ...

 8     Q.     And so you provide workshops on RTI

 9   and tier three --

10     A.     Correct.

11     Q.     -- MTSS?

12     A.     Yes.

13     Q.     Okay.

14     A.     Workshops.  Uh-huh.

15     Q.     How often do you do that?

16     A.     Again, I offer the one on math

17   typically two times a year.

18           And then RTI, again, I'm sort of

19   training with other faculty who want to also

20   offer that one.  But I usually do that one once

21   or twice a year typically.

22     Q.     Okay.  And who's the audience

23   typically for those workshops?

24     A.     It is geared towards students and it

25   is geared towards working professionals.



 1    Q.      And we're talking about a couple

 2   different classes of -- classes.  Categories of

 3   students.  Kent State students is what you're

 4   referring?

 5    A.      Kent State students.

 6    Q.      Okay.

 7    A.      It is open and there have been a

 8   couple of times where, you know, we've had

 9   students from other universities because it's

10   online and it's accessible.  Graduate students

11   and undergraduate students.

12    Q.      Okay.

13    A.      So all of those workshops have kind of

14   graduate designations and undergraduate.

15    Q.      And is that the same for the PBIS

16   professional development that you've taught?

17    A.      So, yeah, I'm calling it classroom

18   management and that is the focus.  But we do,

19   again, put classroom management in that broader

20   context of school-wide, positive behavior

21   support.

22            And there actually is a part of that

23   training that also focuses on intensive support

24   for kids who don't respond to class-wide

25   strategies.

1    Q.       And how often do you do the classroom
2  management training?
3    A.       Yeah, that would be the one I
4  mentioned before.  And so typically two or three
5  times a year; that online workshop.
6    Q.       So when you say you mentioned it
7  before, I just want to make sure I have this
8  year.  Is the RTI and the classroom management,
9  are those --
10   A.       They're separate.
11   Q.       -- one -- they're separate?
12   A.       They're separate, yeah.
13   Q.       Okay.
14   A.       RTI has its own 3 credit professional
15  development --
16   Q.       Okay.
17   A.       -- workshop and the classroom
18  management its own.
19           And also the math is just a separate
20  one.  We found that there was a lot of interest
21  in --
22   Q.       Okay.
23   A.       -- how do we help kids who are
24  struggling in math.
25   Q.       And you provide each of those a couple

1  times a year?

2    A.      Yes.

3    Q.      Okay.

4    A.      That's correct.

5    Q.      Thank you --

6    A.      Sure.

7    Q.      -- for bearing with me --

8    A.      Yes.

9    Q.      -- on that.

10          Dr. Wiley, have you ever consulted on

11  the adequacy on an educational environment?

12    A.      I would probably need that clarified.

13    Q.      Sure.

14          Have you ever advised an LEA or any

15  sort of educating entity about whether they were

16  providing adequate supports and services in a

17  particular environment?

18          MS. JOHNSON:  Object to form.

19          You can answer.

20          THE WITNESS:  Okay.

21    A.      I think that what would most closely

22  fit with what you're describing was my work for

23  three years as a behavior specialist.

24          So a lot of what I did as a behavior

25  specialist is I would meet with teachers, I



1    would meet with different support folks, and I

2    did observe in classrooms and would talk about

3    things like, you know, the behavior supports

4    that were, were not in place.  So I did that for

5    several years.

6              That was at a time when functional

7    behavior assessment was a brand new requirement

8    of the law.

9              So I did both consulting around

10   functional behavior assessment, where you're

11   looking at those conditions, right, and saying

12   okay, what's (unintelligible)  behavior, what

13   are the consequences that follow behaviors, so

14   that we can try to develop a hypothesis about

15   why this student's exhibiting a behavior.

16             So I think it's part of that work.  I

17   was absolutely with a school team evaluating the

18   conditions around a student and talking about

19   whether or not there were things that we could

20   change in order to provide better support to the

21   student, if that makes sense.

22   Q.       When was the time period for that

23   work?

24   A.       '90 -- the late '90s.

25   Q.       So --



1    A.        Yeah.  When I worked as a behavior

2    specialist.  It's also when I worked as an

3    autism resource teacher, because that work would

4    have been similar.  Right.  So I had a caseload

5    of students.  All had IEPs for autism spectrum

6    disorder.  And I would do some one-on-one work

7    with the students.

8              But mostly, because that was sort of a

9    consultative role, like a resource -- autism

10   resource meetings.  I had lots of different

11   schools and lots of different students.  I met

12   with the teachers quite a bit, talked about

13   things that I saw, gave them suggestion for

14   strategies to support them.

15             And really -- my work as an autism

16   resource specialist, I did a lot of work around

17   behavior, and that's where Fairfax County

18   created I think four total behavior specialists

19   for the county.

20             If you're familiar -- it's a very

21   large county.  I had one section of it with

22   multiple high schools.  And so I would meet with

23   teachers, observe, help them conduct functional

24   behavior assessments, help them develop behavior

25   intervention plans.



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              36

1           But all as a part of that you would

2    evaluate what was going on with the student in

3    whatever context they were in.

4    Q.      So since that time, in the late '90s

5    in Fairfax County, have you done any sort of

6    consultation or analysis of the adequacy of an

7    education environment?

8    A.      I have not been --

9               MS. JOHNSON:  Object to form.

10              You're fine.  Go ahead.

11   Q.      You can answer the question.

12   A.      Yeah.  Well, the only other example

13   that I would provide would be when I was at the

14   University of Massachusetts.  That was a center

15   for social development and education run by Gary

16   Siperstein.

17          And he occasionally got contracts to

18   consult with various schools about various

19   things.  And he received a request to evaluate a

20   program that was for what we're calling here

21   kids with behavior-related disabilities.

22          And in that capacity I worked with

23   Gary and we did a program evaluation where we

24   interviewed staff, we observed, reviewed

25   records.  We did a lot of things and generated a

1   report that said here's where we see strengths,

2   here's where we see weaknesses, and this is our

3   advice in terms of how to improve your program.

4           Does that make sense?

5   Q.      It does.

6   A.      That definitely was consultative while

7   I was at U Mass, Boston.

8   Q.      And what entity was it that you were

9   evaluating?

10  A.      I will have to get -- it was part of

11  that collaborative system.  And so they had

12  various names of collaboratives around the

13  state.  Again, I could find that if you need it,

14  the exact name.

15          It was one of the schools within the

16  collaborative.  You know, this was the model

17  that Massachusetts -- I think they still use,

18  because I did take a peek as I was writing my

19  report, where they have special schools for kids

20  with behavior-related disabilities and it was

21  one of those.

22          It's not jumping into my brain, I'm

23  sorry, but I could find it later if you want.

24  Q.      No.  That's totally fine.

25          So, Dr. Wiley, fair to say in the last



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    38

1   15 years or so, though, you haven't conducted

2   sort of a third-party analysis of the adequacy

3   of an educational environment?

4                 MS. JOHNSON:  Object --

5   A.      I --

6                 MS. JOHNSON:  -- to form.

7           Go ahead.

8   A.      Yeah.  I mean, again, it depends on

9   exactly what you're saying.  But I think when

10  you're saying that direct consultative work to

11  do an in depth evaluation, yeah, that's probably

12  accurate, yes.

13  Q.      Have you provided any sort of

14  consultative services or third-party evaluation

15  of therapeutic or mental health supports and

16  services provide by an LEA?

17                MS. JOHNSON:  Object to form.

18  A.      And if you can specify more -- so now

19  are you talking about -- when you say

20  therapeutic services, you're not talking about

21  things like functional behavior assessment or

22  those kinds of practices, you're talking more

23  about mental health services --

24  Q.      Correct.

25  A.      -- specifically?



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    39

1      Q.      Yes.

2      A.      No, I have not.

3      Q.      Okay.  Is there anything that we

4   haven't discussed so far about the consultation

5   work that you have or haven't done?

6      A.      I don't think so.

7      Q.      Okay.  Would it be fair to say, then,

8   Dr. Wiley, that your expertise, for purposes of

9   your report, today is based on your experience

10  as an academic?

11     A.      I think, you know, like I said in my

12  report, my experience is based on my knowledge

13  about the research in the field.

14          It's also based on, you know, my

15  experience in K-12 schools.  And it's also based

16  on my professional reasoning as a special

17  educator who has worked quite a bit with kids

18  with behavior-related disabilities.

19          Am I getting what you're asking?

20     Q.      I think so, yeah.

21     A.      Okay.

22     Q.      No, absolutely.

23     A.      Okay.

24     Q.      And the purposes of these questions is

25  just for me to get an understanding of --



1    A.      Sure.

2    Q.      -- how you approached this.

3    A.      Absolutely.

4    Q.      When you say your experience from K

5    through 12 schools, are you talking back to your

6    experience back before -- back in the '90s, in,

7    like, Fairfax County and the like?  Is that the

8    experience that you're referring to?

9    A.      Yeah.  I mean, when you're talking

10   about my school-based experience, yeah.  That's

11   mostly what I'm talking about.

12   Q.      Okay.  And is it fair to say that your

13   expertise for purposes of your report today

14   relates to the status of academic research

15   regarding the educational placement of students

16   with behavior-related disabilities?

17           MS. JOHNSON:  Object to form.

18   A.      I would say that's true, but when you

19   say "academic research," the research that I'm

20   talking about is research that takes place in

21   schools.  So it's more of an applied research.

22           I think that that even confuses my own

23   students, where they say "What is this

24   research?"

25           They just go into a lab in the



1    university, but the research that I'm talking

2    about and the conferences that I go to and, you

3    know, the conferences that we host, are all

4    people who are doing research in the schools.

5        Q.      I appreciate that clarification.

6            So fair to say, then, with that

7    caveat, your expertise for purposes of your

8    report today relates to the status of research

9    regarding the educational placement of students

10   with behavior-related disabilities?

11           MS. JOHNSON:  Object to form.

12       A.      That's part of my expertise, --

13       Q.      Okay.

14       A.      -- yes.

15       Q.      What other -- what part am I missing

16   or not appreciating there?

17       A.      Well, -- oh, no.  Sure.  I mean,

18   again, I'm talking about my experience as --

19       Q.      Okay.

20       A.      -- a special educator.

21           My experience directly consulting, all

22   of those things together, but part of it is my

23   understanding of academic research or applied

24   research in the field.

25       Q.      And not to belabor the point, when you



1  say your experience directly consulting, that's

2  the professional development work that we've

3  talked through already, correct?

4      A.      Yes.

5      Q.      Okay.  Dr. Wiley, what's your

6  understanding of what this case is about?

7      A.      My understanding of what this case is

8  about is that the Department of Justice has said

9  that the state of Georgia is unnecessarily

10  segregating students with behavior-related

11  disabilities through their GNETS program.

12     Q.      And what is that understanding based

13  on?

14     A.      My understanding is based on reading

15  the materials.  I'm not going to get the

16  legalese correct, but the letter of findings,

17  the complaint letter.

18             Also the motions that were filed by

19  the DOJ and also state of Georgia.  And also the

20  expert reports by Dr. Putnam and Dr. McCart.

21     Q.      And what is your understanding of what

22  the United States is seeking in this case?

23     A.      I -- I -- I think I've read the

24  recommendations by the experts.  I haven't been

25  completely clear about exactly what the DOJ --



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    43

1  | I'll be honest, but I think that what they would
2  | like is for the state of Georgia to change the
3  | services that they provide, such that those
4  | students can be appropriately and effectively
5  | served in general education environments.
6  |           That's probably summing things up.
7  | But my understanding is that sort of gets to the
8  | core of what the DOJ thinks would be -- what
9  | they think is needed.
10 |   Q.      In forming your opinions, Doctor, was
11 | it your belief that the United States is seeking
12 | to discontinue the GNETS program?
13 |           MS. JOHNSON:  Object to form.
14 |   Q.      You can answer.
15 |           MS. JOHNSON:  You can answer.
16 |   A.      Okay.  I think -- I'm making sure I
17 | get this right.
18 |           I think that I was getting sort of
19 | mixed sense of that, particularly from the
20 | expert reports, where it seemed like they were
21 | saying that programs like GNETS, which they
22 | called segregated, are sort of inherently
23 | harmful.  But then there was a lot of
24 | qualification with we're talking about the
25 | majority of students.

1              So I think that because they're these

2    sort of qualifying phrases that were used, and

3    in the DOJ materials that I read, I would say

4    that I don't think that that's the purpose, is

5    to discontinue GNETS.  Or discontinue the

6    provision of, you know, the full continuum of

7    placements.

8              It could be, although I would have to

9    ask the DOJ folks, that they think that they

10   shouldn't be doing it through GNETS, they should

11   be doing it another way.  But, to be honest, I

12   wasn't clear about what they're seeking to

13   happen in regards to GNETS specifically.

14   Q.        In forming your opinions, was it your

15   belief that the United States is seeking to

16   place students currently in GNETS in general

17   education classrooms without supports or

18   services all or nearly all the time?

19              MS. JOHNSON:  Object to form.

20   A.        Well, you said "without services or

21   supports," but I think that that is the claim,

22   is that if you provided services and supports,

23   these students could be served in general

24   education.

25              So it's not my understanding that the



1  DOJ or the experts were saying place students

2  without services or supports.

3      Q.      Thank you for that clarification.

4              In forming your opinions, Dr. Wiley,

5  was it your belief that placement in GNETS is a

6  last resort, limited to students who could not

7  be successful in more integrated environments?

8              MS. JOHNSON:   Object to form.

9      A.      I wouldn't use the term "last resort."

10 The continuum includes even additional

11 placements, like residential, hospital,

12 homebound.  So when I think about it in terms of

13 that required continuum of placements -- and

14 last resort, again, I think has sort of a

15 connotation that may influence the way that

16 people think about it.

17             I think that GNETS and similar

18 programs around the country would be viewed as

19 an option for providing, you know, more

20 intensive and more structured services for

21 students through the IEP team saying, you know,

22 this student needs that level of programming.

23     Q.      Thank you, Doctor.

24             Dr. Wiley, before we get into kind of

25 the meat of this here, I want to make sure that



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    46

 1  when we use some of the acronyms and, you know,

 2  language --

 3     A.      Sure.

 4     Q.      -- with which we're familiar that

 5  we're talking about the same things.

 6            And so when you refer to general

 7  education settings, can you tell me what that

 8  means?

 9     A.      General education settings, when it

10  refers --

11            THE WITNESS:  -- and, by the way,

12       Sarah, am I going slow enough?  I never

13       checked.  Slower?

14            COURT REPORTER:  Your speed hasn't

15       come down.

16            THE WITNESS:  Okay.  I apologize.

17       I'm going to work on that.

18     A.      General education settings refers to

19  places where students with disabilities and

20  students with disabilities -- without

21  disabilities are taught.

22            So we're typically talking about

23  general education classrooms, but we might be

24  talking about other settings within a school;

25  cafeterias, gyms, and those kinds of things may



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              47

1  be referred to as general education settings.

2          But primarily when I'm thinking about

3  it, I'm primarily thinking about general ed

4  classrooms.

5  Q.      Okay.  And so in your report when you

6  refer to placement in general education or

7  general education settings, are you thinking

8  general education classrooms?  Is that what

9  you're referencing?

10  A.      Yes.

11  Q.      Okay.

12  A.      Typically.

13         And I want to also say that, you know,

14  I think that even though there may not be a lot

15  of clarity in the reports, I think that there's

16  a notion -- because people will also talk about

17  zone schools, which is sort of a Georgia term,

18  but it's the idea that students could be in

19  self-contained classrooms but in general ed

20  buildings.  Right.

21         But when I think of general education

22  settings, I am thinking about not necessarily

23  self-contained classrooms, even if they're in

24  their neighborhood schools, I'm talking about,

25  again, places where students with and without



1   disabilities are taught together.

2       Q.      And could that be inclusive of a

3   general education classroom with and without

4   students with disabilities, where there are

5   supports and services for the students with

6   disabilities?

7       A.      Yeah.  I mean, if you're talking about

8   general education classrooms, students with and

9   without disabilities.  And it could be where

10  some of those services and supports are

11  provided --

12      Q.      Okay.

13      A.      -- in the general education classroom.

14      Q.      So, Dr. Wiley, when I refer to the

15  ADA, what do you understand me to be referring

16  to?

17      A.      Americans with Disabilities Act.

18      Q.      When I refer to the IDEA, what do you

19  understand that to be?

20      A.      Individuals with Disabilities

21  Education Act.

22      Q.      If I use ED, students with EBD or

23  behavior-related disability, do you agree that

24  those are roughly synonymous?

25      A.      Yeah.  ED, emotional disturbance,



 1  which is the federal term.  Usually in research

 2  we use emotional, behavior disorders.

 3            I will say that in this case

 4  behavior-related disabilities is not a typical

 5  term that's used in the field, but I understand

 6  it to relate -- and I think that if we use EBD

 7  kind of interchangeably it's okay, but these are

 8  kids who exhibit emotional, behavioral

 9  difficulties.  Yeah.

10     Q.      Thank you.  I appreciate that.

11            FAPE.  What do you understand that to

12  refer to?

13     A.      Free and Appropriate Public Education.

14     Q.      IEP.

15     A.      Individualized Education Program.

16     Q.      If I refer to FBA.

17     A.      Functional behavior assessment.

18     Q.      BIP.

19     A.      Behavior intervention plan.

20     Q.      If I refer to GNETS or the GNETS

21  program.

22     A.      Yeah.  That's the Georgia Network of

23  Educational Therapeutic services.  I hope I got

24  that.  I've been using the shorthand with that

25  one, and that's not one that I've used for



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    50

1  decades.  So ...

2      Q.      If I refer to regional GNETS programs,

3  you understand those as being --

4      A.      Yes, --

5      Q.      -- part of the 24 --

6      A.      -- the 24 regions.  Yes.  Yes.

7      Q.      And, finally, LEA?

8      A.      Local Education Agency.

9      Q.      Great.  I appreciate that and helping

10  to make the record clear there.

11          In your report, Doctor, you also refer

12  to specialized placements in specialized

13  settings or separate schools or separate

14  placements at different points.  Are these terms

15  synonymous?

16      A.      They are.  Yes.

17      Q.      Okay.

18      A.      I would say.  I mean, they refer to --

19  and, again, I think probably for clarity I

20  should have just stuck with the language that's

21  in IDEA.

22          That's interesting.

23      Q.      It might be the train.

24      A.      Sounds like horses.

25          Self-contained classrooms in separate



 1   schools, but yes.

 2      Q.       Okay.  And so -- and those terms all

 3   refer to --

 4      A.       Specialized, separate, yes.

 5   Self-contained.  Yeah.

 6      Q.       Self-contained and separate --

 7      A.       Yes.

 8      Q.       -- schools.  Okay.  Great.

 9               Do you consider these terms to be the

10   same as segregated placement?

11      A.       I think that they match in terms of

12   their official definition, but, like I said in

13   my report, I think segregated has connotations

14   that don't help us think more clearly about what

15   these placements are.  That's my opinion.

16      Q.       And for -- sorry.  Let me withdraw

17   that.

18               Would you say that GNETS then

19   qualifies as a specialized setting under your

20   definition?

21      A.       Yeah.  And my understanding is that

22   there are separate schools but they're also

23   self-contained classrooms.  But I think the

24   GNETS mostly oversees those kinds of separate or

25   special placements.



1    Q.      And I think you anticipated my next

2    question.

3            Do you draw -- no, that's great.

4            Do you draw a distinction between the

5    GNETS centers and the GNETS school-based sites

6    as to whether they qualify as a specialized

7    setting?

8    A.      They both would be considered

9    specialized settings.

10   Q.      Okay.  Which of these terms that we've

11   discussed, or another term, applies to a

12   separate classroom in a general education school

13   where students spend portions of their day?

14   A.      Which of these terms?

15   Q.      Yeah.

16   A.      I think, if we're trying to keep the

17   conversation clear, then typically those are

18   referred to as self-contained classrooms.

19   Q.      Okay.  And that would be the case even

20   if students aren't there for the entirety of the

21   school day?

22   A.      Clarify that for me.  So it would

23   apply, self-contained classrooms, even if they

24   weren't -- say it one more time.  I'm sorry.

25   Q.      If they weren't there for the entirety



1   of the school day.  If --

2   A.       Yeah, --

3   Q.       -- students --

4   A.       -- they would be considered

5   self-contained classrooms.

6           Again, there are distinctions that are

7   made in the data that are reported to IDEA in

8   terms of percent of time spent in general

9   education.  Right.  I think we're probably all

10  familiar with the 80 percent or above, and then

11  there's, you know, between.

12          So in that sense they're sometimes

13  referred to -- if it's 80 percent or above in

14  general education classrooms, that's called full

15  inclusion in the law.  Then there's partial

16  inclusion, and then -- so students may be in

17  self-contained classrooms or they may be in

18  resource rooms, but usually those distinctions

19  are made based on the amount of time that

20  students spend in those particular classrooms.

21          It's tricky because it's not -- it's

22  very individualized and it's not, you know, one

23  placement sort of package for every student.

24  Q.       Do you consider alternative schools to

25  be specialized settings?

1              MS. JOHNSON:  Object to form.

2     Q.      You can answer.

3     A.      Okay.  Yeah, the alternative schools

4  terms also gets confusing, because I know that

5  there are schools that serve entirely students

6  with disabilities.

7              I know that there are alternative

8  schools for kids who are at risk for dropping

9  out, kids who have discipline problems, academic

10 problems.

11             So alternative schools I like to think

12 about -- and sometimes those alternative schools

13 do serve kids with IEPs.  So that again kind of

14 blurs a little bit, but I would consider that to

15 be a separate school or a special school that's

16 meant to serve the needs of kids who were not

17 successful in general education.  If that makes

18 sense.

19    Q.      And so I guess -- I'm trying to make

20 sure that when -- in your report when you talk

21 about specialized settings and separate schools,

22 would you include alternative schools within

23 those -- within those --

24    A.      What I would say --

25    Q.      -- (unintelligible) terms?



1    A.       Yeah.  What I would say is that in the

2    special education research, for example, there

3    sometimes is overlap.  When people are talking

4    about alternative schools, they can be sometimes

5    schools --

6    Q.       Okay.

7    A.       -- that fit into these other

8    categories.

9             In terms of GNETS I am mostly talking

10   about schools that serve specifically students

11   with disabilities.

12   Q.       So just to make sure I'm

13   understanding, they can be, but aren't

14   necessarily the same as what you call the

15   specialized setting?

16   A.       For the -- like a special education

17   specialized setting.

18   Q.       Okay.

19   A.       It's tricky because there's sort of a

20   Venn diagram.  There's a bit of an overlap.  But

21   mostly I'm talking about schools that are

22   separate from general education schools.

23   Q.       And so the Venn diagram, I guess, --

24   let me withdraw that.

25             Let me switch gears a bit.



1              Dr. Wiley, I want to be sure you and I
2    are on the same page today when we talk about
3    appropriate and inappropriate in the context of
4    educational placements.
5        A.      Okay.
6        Q.      And so, Dr. Wiley, would you agree
7    that not all separate placements -- and I'll use
8    these terms interchangeably that we just
9    discussed -- are inherently appropriate for
10   students with the emotional and behavioral
11   disabilities?
12       A.      I would say that no placement is
13   inherently appropriate.  It's placement that is
14   meant to be the best place where you can
15   implement the IEP, and that's the appropriate
16   part of it.
17       Q.      And when you say that no placement is
18   inherently appropriate, why is that?
19       A.      Because it's not the place, it's the
20   individualized education program that the
21   student -- that determines appropriateness.
22              Now, I think, as I said in my report,
23   you know, we have the continuum of alternative
24   placements because what we're supposed to do is
25   determine what that IEP is.  And that's the --



1  you know, how we sort of operationalize the free

2  and appropriate public education part of.

3         And then we determine what placement

4  would be most appropriate for implementing that

5  particular IEP.  Yeah, that IEP.

6         So I think you can't really -- and I

7  think I talked about this.  I was citing someone

8  who knows more than I do about a lot of this

9  stuff.  But that least restrictive appropriate

10  environment.  So the two things are definitely

11  related.

12    Q.     And would you agree that a setting can

13  be separate without being specialized?

14              MS. JOHNSON:  Object to form.

15    A.     A placement can be separate without

16  being specialized.  You'll just have to unpack

17  that a little bit more for me.  What do you mean

18  without being specialized?

19    Q.     Well, let me try it this way.

20         So in your expert opinion what

21  features must a separate placement have in order

22  to be considered as potentially appropriate for

23  students with EBD?

24    A.     So the appropriate thing still applies

25  where you have an individualized education



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    58

1   program of services and supports.  That IEP has

2   to be implemented in that setting in order for

3   it to be considered appropriate.

4          What's special about the special

5   placements is that it may have allowances for

6   the implementing aspects of that student's

7   program that are not in another setting.

8          So I think another thing I talked

9   about in the report is that general education

10  has some inherent limitations of implementation,

11  and that's why we have the continuum of

12  alternative placements, so that we have other

13  ways.

14         I'm going on.  I could probably talk

15  more specifically to what you asked, but you

16  just tell me if you want me to try again.

17  Q.      No.  I think --

18  A.      Okay.

19  Q.      I think we're generally on the same

20  page, but what I'm -- what I would hope -- what

21  I'm hoping to learn from you, Doctor, is, what

22  are some of the very basic components an

23  educational placement would need to have to

24  potentially be appropriate --

25  A.      Okay.



1    Q.      -- as a specialized setting for

2    students with EBD?

3    A.      Okay.  So not any educational

4    environment but a specialized setting.

5    Q.      Correct.

6    A.      Yeah.  And, again, it's driven largely

7    by the IEP.

8         But some of the things that I think

9    you're talking about would be highly structured

10   behavioral support.  I think it would be

11   intensive academic instruction, because a lot of

12   these kids have significant learning problems

13   and academic achievement deficits.  Those things

14   can be provided in a lot of different ways.

15        Again, I have experience working in a

16   school specifically for kids with EBD.  So we

17   had school-wide -- actually, PBIS was pretty new

18   at that time, too, but we did have school-wide

19   behavior programs, like the level system and

20   positive reinforcement through, like, point

21   sheets.

22        So those are just examples of the

23   kinds of things that might constitute a

24   structured organized kind of behavior support

25   program.  Then it can be individualized from

1  there, depending on what the needs of the

2  particular student are in the specialized

3  setting.  And it's the same thing with the

4  academic instruction.

5          Driven by the IEP.  It has to target

6  specifically what are the individual needs of

7  that particular student.

8  Q.     In -- so, Dr. Wiley, as I understand

9  what you're saying, the specific supports and

10  services of the environment will be tailored to

11  the students that are in the environment, but

12  there are also some general attributes that you

13  would expect a specialized setting like this to

14  have when serving students with EBD.  And the

15  two that you identified, I think, were highly

16  structured behavioral support and intensive

17  academic instruction.

18          Is there anything else?

19          MS. JOHNSON:  Object to form.

20  A.     Well, yeah, there can be some other

21  things.  There can be things like social skills

22  instruction.  There can be things like

23  communication with the family.

24          There can be, you know -- there are

25  a lot of sort of -- I didn't touch on these

ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              61

1   a lot in the report, but relational kinds of

2   approaches where you try to build relationships

3   with the students that you're working with.

4           So I think to cover all of those

5   things -- and I do think that in some of the

6   research that I covered there were some of these

7   aspects that I'm talking about, like the highly

8   structured behavior management and the

9   appropriately intensive academic instruction, to

10  meet those needs.

11          I'm being pretty general, but I hope

12  I'm getting at some of the things that you're

13  talking about that you would expect to see or

14  would typically see in a special program.

15          And I think we're being broad, where

16  we're saying a self-contained classroom and also

17  a special school.

18   Q.     That's right.

19          And I think, to the extent this is

20  helpful, you know, what I'm trying to talk about

21  here is what sort of capacity would you expect a

22  setting to have to be specialized versus maybe

23  the specifics which you're saying track along

24  with the student's IEP.

25   A.     Sure.

1    Q.      So I guess, you know, is there

2    anything else when it comes to a settings

3    capacity to educate students with emotional,

4    behavioral disabilities that you would expect to

5    see?

6    A.      Right.

7            MS. JOHNSON:  Object to form.

8    A.      Yes.  In the capacity to deliver those

9    services that I'm talking about kind of

10   generally, because we're out of the context of

11   an individual student, but I think that it is

12   right to say that these are the things that you

13   would expect to see, structured -- behavioral

14   supports structured.

15           And that's broad.  Right.  That can

16   include, like, instruction and replacement

17   behaviors and social skills and the capacity to

18   deliver that.  And that's looking at the

19   environment, looking at the people who are

20   delivering it, making sure that they have the

21   resources that they need in order to deliver it.

22           So, yeah, again, when I say in the

23   report -- and I know, you know, we've talked a

24   little bit about -- places -- the place that

25   facilitates.  Right.  It's not place by itself



1  that makes all of these things happen, whether
2  we're talking about general education, we're
3  talking about a special placement.
4          I'm going fast again.  I can tell.  I
5  apologize.
6   Q.     Thank you, Doctor.
7          Would you agree that you would also
8  expect these settings, in addition to this
9  capacity, to have certified -- appropriately
10 certified staff?
11         MS. JOHNSON:  Object to form.
12  A.     I would expect that the teachers would
13 be licensed teachers.
14         I do think that they have to have
15 access to related services providers, as
16 indicated in students IEPs, and, ideally,
17 certified administration; leadership,
18 principals.
19         Yeah, I think certification training
20 is important.  I know that this has been a
21 challenge in general ed and special ed, making
22 sure, you know, we have enough of those folks to
23 meet the needs of these kids.  But yes.
24  Q.     And would you also -- in order for a
25 separate placement to be considered



1   appropriately specialized, would you also agree

2   that they would have to implement, let's say,

3   IEPs with fidelity?

4          MS. JOHNSON:  Object to form.

5   A.     Yes.  Appropriateness, as we

6   understand it in the profession, means that

7   we're implementing the individualized education

8   program as well as we can.

9   Q.     And so in order to be an appropriate

10  setting, would the -- would the setting also

11  have to implement a student's BIP with fidelity?

12         MS. JOHNSON:  Object to form.

13  A.     Yeah.  Regardless of the setting.  If

14  the determination was that the student needed an

15  FBA based BIP, then they would have to implement

16  it to be able to say that that student is

17  receiving their IEP.

18  Q.     Are there any baseline therapeutic and

19  mental health services and supports that you

20  would expect to see in any specialized setting

21  for students with behavior-related disabilities?

22         MS. JOHNSON:  Object to form.

23  A.     Baseline's kind of a broad term.  I

24  know that I'm sort of pulling things out, you

25  know, really quickly, but I would expect to see



1  individualized behavior supports and academic

2  instruction in any setting for me to determine

3  whether or not it's appropriate.  But that's

4  also true in a special setting.

5             Again, a special setting provides the

6  conditions where these things are more readily

7  done.  But whether you're in general ed or a

8  special setting, to say that the student is, you

9  know, having their needs met, then the IEP has

10  to be implemented.

11             Did I get that one, or did I miss that

12  one?  I want to make sure I'm answering your

13  question.

14     Q.     Let me -- I think so, but I want to

15  make sure as well that -- in order for a setting

16  to be appropriate, a separate setting to be

17  appropriate for students with behavior-related

18  disabilities, would you agree that they would

19  have to be able to implement the students' BIPs

20  with fidelity?

21             MS. JOHNSON:  Object to form.

22     A.     If the student has a BIP, then that

23  would be correct.

24     Q.     And you would expect most students who

25  are in a specialized setting because of a



 1   behavior-related disability to have a BIP,

 2   correct?

 3              MS. JOHNSON:   Object to form.

 4   A.        When you say BIP, I think that -- you

 5   know, one of the tricky parts here is that there

 6   is BIP as it's understood in the law since 1997.

 7   You have functional behavior assessment,

 8   behavior intervention plan.

 9              I would expect that student to have

10   behavior supports that are appropriate to their

11   need and, again, similar to like I'm describing

12   in my own experience.

13              And also in some of the research where

14   they've talked about positive behavior support

15   in special schools that you would have what's

16   called tier one.  And in a special school that

17   might be a highly structured behavior program.

18              But then you might have students who

19   need something more.  So that could be an

20   individualized behavior intervention plan or

21   individualized behavior interventions.

22              If they have one formally as part of

23   their IEP, then wherever that student is you

24   would expect that BIP to be implemented.

25              So I just want to make sure that we're



ANDREW WILEY, PH.D.                              October 30, 2023
UNITED STATES vs STATE OF GEORGIA                           67

1  clear that there is sort of this, you know,

2  formal legal version.  And it's one of the

3  challenges, I think, of implementation, is, you

4  know, when do we have to have a functional

5  behavior assessment, behavior intervention plan.

6         We need to make sure for kids with EBD

7  that they're receiving the appropriate type and

8  intensity of behavior intervention that they

9  need in order to be -- to make appropriate

10  progress.

11  Q.     And you would expect a specialized

12  setting to have the capacity to do -- to provide

13  exactly those -- that level of services and

14  supports, correct?

15         MS. JOHNSON:  Object to form.

16  A.     I would expect, yes.

17  Q.     Okay.  And there are some things even

18  more basic that we haven't discussed here that

19  you would expect a specialized setting to have

20  in order to be appropriate for students, right,

21  such as a habitable building, correct?

22         MS. JOHNSON:  Object to form.

23  A.     And I know that this was part of the

24  reports.  I'm a little weary of going here too

25  much.  You're probably not going to make me.

1          But I would expect in any school,

2      general ed, special school, any school, that

3      there would be sort of basic levels of safety

4      and cleanliness.  But that's as deep as I go

5      when it comes to understanding, like, what

6      constitutes a -- go ahead.

7      Q.      I'm speaking generally here to get an

8      understanding of the -- again, the --

9      A.      Yeah.

10     Q.      -- baseline for a setting --

11     A.      It --

12     Q.      -- to be appropriate for students.

13     A.      Yeah.  Your question is would you

14     expect a school to be habitable.  I would say

15     yes.

16     Q.      Okay.  And without the -- again, this

17     baseline of services and teacher certifications

18     and all of these things that we've just

19     discussed, the setting would be inappropriate

20     for the education of students with

21     behavior-related disabilities, correct?

22              MS. JOHNSON:  Object to form.

23     A.      Wherever these students are taught,

24     they need teachers who are trained and ideally

25     certified.  You know, again I don't want to go



1   to, like, the biggest problems that we have in

2   the field, but there are emergency certified

3   teachers in both general education and special

4   education who end up working with students with

5   EBD.

6           So in that sense I would say yes, we

7   need to have people who can implement IEPs and

8   we need to think about how we make that happen,

9   whether it's in, you know, special settings.

10  And to the extent that it's possible and

11  appropriate in other settings as well.

12  Q.      But without this capacity to serve

13  these students, would you agree that the setting

14  would be inappropriate for students with

15  behavior-related disabilities?

16          MS. JOHNSON:   Object to form.

17  A.      I guess what I'm stuck on is, like,

18  setting.  Right.  Where you're saying, like, I'm

19  making a judgment that the place itself is

20  inappropriate.  And I think that, again, it's

21  not the place, it's the services that are

22  provided.

23          So if you're asking me, like, does

24  that make the setting inappropriate, I mean, no.

25  I think that a setting like a special school is



1   appropriate and required, you know, but we want

2   to make sure that wherever we're providing IEPs

3   that, you know, that we're able to do that.

4        Q.     So to make sure I'm understanding you,

5   to make sure that I'm understanding what you're

6   telling me, Doctor, you're distinguishing

7   between the physical location, and then the

8   services and everything else that are being

9   provided within that location?

10       A.     Yeah.  And I think when you use the

11  term -- did I go too fast?

12              When you use the term setting, I'm

13  thinking about the physical place, and that's

14  throwing me a little bit.

15       Q.     Okay.

16       A.     So I think that what I want to say is

17  you know, if you mean these are baseline for a

18  program to be appropriate.  Right.

19       Q.     Sure.  So --

20       A.     Go ahead.

21       Q.     If I can, let me ask that question,

22  then.

23              So without these -- these -- this

24  basic capacity that we've discussed, the program

25  would be inappropriate to serve students with



1 | behavior-related disabilities, correct?

2 |           MS. JOHNSON:  Object to form.

3 |  A.       And now we're talking about an

4 | individualized education program.  And the

5 | placement is meant to be the last decision, the

6 | LRE, and that placement and the program that

7 | occurs there has to be able to implement the

8 | IEP.

9 |           And, again, this is where we say

10 | independent of setting if general education

11 | can't implement those services, then it's not

12 | appropriate.

13 |           And then we would expect that a more

14 | intensive specialized program would have the

15 | capacity to implement the IEP as written.

16 |           So in that sense I say yes, the

17 | program has to implement the IEP.

18 |  Q.       It has to be able to implement the

19 | IEP --

20 |  A.       Correct.

21 |  Q.       -- in order to be appropriate to have

22 | students?

23 |  A.       Yeah.  IEP and appropriate, when we

24 | say Free and Appropriate Public Education, are

25 | linked.



1    Q.      So what would you call a separate

2    setting that lacked this capacity to serve

3    students and to fulfill their IEPs?

4               MS. JOHNSON:  Object to form.

5    Q.      Is there a term you would use for

6    that?

7               MS. JOHNSON:  Object to form.

8    A.      Is there a term I would use for --

9    Q.      Would you consider that to be

10   segregation?

11              MS. JOHNSON:  Object to form.

12   A.      Well, I think one of the distinctions

13   that I try to make at the beginning of my

14   report -- and because people are very focused on

15   the physical aspects of what we're calling

16   integration and segregation -- is that

17   instructional inclusion is the most important

18   part of special education.

19              And so I think that students can be

20   segregated in that sense when they're placed in

21   general education programs.

22              If they're there and the general

23   education is not able to provide the intensive

24   supports that the student needs, then I would

25   consider that instructionally segregated.



1         Again, I've given my reasons why I'm
2    not a fan of that term exactly, but I would use
3    excluded.  You know, we use inclusion and
4    exclusion.
5         To be included in any setting it has
6    to be able to provide the individualized
7    supports that are defined in that individualized
8    education program.  General ed can't do that
9    with every kid with behavior-related
10   disabilities.  I think we see that pretty
11   consistently in the research and over time.
12    Q.     And I guess, Doctor, what I'm getting
13   at is -- I want to get an understanding of how
14   you classify a setting that students with
15   disabilities are placed in that's separate from
16   general education when that setting lacks the
17   capacity to fulfill that student's IEP.
18             MS. JOHNSON:  Object --
19    Q.     What would you consider that to be?
20             MS. JOHNSON:  Object to form.
21    A.     And, again, because -- I'm not going
22   to speak to, like, what I know about the
23   capacity of, you know, specific programs --
24    Q.     I'm just asking generally.
25    A.     -- in Georgia.  But what I would say



1   is that it's a -- yeah.  I mean, on an

2   individual student level, we would say --

3   because if you think about special schools, you

4   may have students who you implement their IEP in

5   a special school and then there's more to the

6   continuum.  Right.

7           And there are students who may have to

8   then -- we say, well, you know, we're not able

9   to appropriately serve this student, and they

10  might be placed in a residential setting or a

11  hospital.  Right.

12          So in that sense we can say this

13  setting is not appropriate because we're not

14  able to implement an IEP to the extent that it

15  meets the needs of this individual student.

16          So what I would say on an individual

17  basis is if it's not able to implement the IEP,

18  then it's not the LRE for that student.  That

19  may be residential, may be a hospital setting,

20  may be homebound.

21          Is that getting close to where you're

22  talking about?

23  Q.      You're saying that if a program's

24  unable to meet the needs of a student, then they

25  need to be in a more restrictive --



1    A.      They may.  It may be that they're

2    unable to implement the IEP because the

3    student's needs are such that you can't provide

4    the intensity that a residential setting, for

5    example, might.

6    Q.      What if the program could provide the

7    level of services that the student needs but for

8    whatever reason does not?

9           MS. JOHNSON:  Object to form.

10   A.      I mean, I would have to consider

11   reasons that they don't.

12          But I think the IEP is the important

13   thing and that we need to focus on implementing

14   that IEP.  And, again, the IEP is thought of

15   first, and then the placement where it's most

16   likely to be implemented appropriately and

17   effectively is selected.

18          And it's not just the place.  Yes, it

19   is the program that is most able to implement

20   that IEP.

21   Q.      So you've talked a bit about the

22   baseline features you would expect to see for a

23   setting to be specialized and to be adequate to

24   serve or appropriate to serve students with

25   disabilities.  Now I want to talk about the



ANDREW WILEY, PH.D.                                      October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    76

1   inverse.

2      A.      Okay.

3      Q.      Are there some things you agree would

4   make a separate setting categorically

5   inappropriate even if it's otherwise

6   specialized?

7                MS. JOHNSON:  Object to form.

8      A.      Yeah.  I mean, -- categorically.  So

9   you mean, like, not just individual students?

10     Q.      Categorically.

11     A.      I mean, -- so I think what you're

12  getting at is that you have to have a program

13  that implements research-based services and

14  programs, things that the student needs and in

15  terms of addressing whatever the full range of

16  needs is for that student.

17                And, I mean, I would have to have

18  whatever setting it is -- or the program has to

19  have the capacity to implement those.  And that

20  would mean resources and it would mean the

21  training and it would mean, you know, all of

22  those kinds of things that are required to

23  implement the IEP specific to the individual

24  student.

25     Q.      And again this goes back to, again,



1  the universe of what we were saying earlier.  If

2  a program doesn't have the capacity to fulfill

3  the student's IEPs with fidelity, then that

4  makes it inappropriate, correct, for the

5  students?

6      A.      For the student, yeah.

7      Q.      Okay.

8      A.      And it could be for a variety of

9  reasons.

10     Q.      Would you agree that a setting that

11 lacked appropriately qualified staff would be

12 categorically inappropriate?

13             MS. JOHNSON:  Object to form.

14     A.      You have to have the capacity to

15 implement the IEP and you have to have people

16 who have the training to be able to do that.

17 Teachers and in some cases related service, you

18 know, as required in IDEA.

19     Q.      So would you agree that a setting that

20 provided no therapeutic and mental health

21 supports and services would be categorically

22 inappropriate for the mass -- for the vast

23 majority of high-need students with

24 behavior-related disabilities?

25             MS. JOHNSON:  Object to form.



1  A.      Again you're saying no therapeutic

2  supports, mental health services because -- it's

3  going to vary by individual.  I'll just say it

4  could still be appropriate if it's not providing

5  something that a student doesn't need.

6          And, you know, I think one of the

7  tricky parts about this case in trying to figure

8  it out is, you know, when we say, like, what is

9  the appropriate therapeutic services and

10 supports, that's a highly individualized

11 decision.  And even beyond that --

12 Q.      And -- I'm sorry.  I don't want to --

13 A.      Oh, that's fine.

14 Q.      I don't want to be rude, Doctor, but

15 I -- we're going to talk about the case and

16 we're --

17 A.      Okay.

18 Q.      -- going to have plenty of time for

19 that, but I'm just -- I'm still trying to get an

20 understanding --

21 A.      In general.

22 Q.      -- in general and --

23 A.      Right.

24 Q.      -- in the abstract.

25 A.      Right.

```
1    Q.       So if there's a separate setting that

2  doesn't have -- that doesn't provide any

3  therapeutic or mental health supports and

4  services, would you agree that that is

5  categorically inappropriate for the vast

6  majority of high-need students with

7  behavior-related disabilities?

8              MS. JOHNSON:  Object to form.

9    A.       So if you're asking me that they

10 provide zero, like literally none, and I'm

11 lumping in, and tell me if this is

12 appropriate -- therapeutic services would mean

13 like special education services, functional

14 behavior assessment, behavior (unintelligible)

15 plans, everything --

16             COURT REPORTER:  I'm sorry.

17             THE WITNESS:  Oh.  Oh.

18             COURT REPORTER:  You lost --

19             THE WITNESS:  Yeah.  Yeah.

20             COURT REPORTER:  -- me.

21   A.       I'll just say that when you say mental

22 health supports and then therapeutic services,

23 again, it's a little bit of an unusual term for

24 special education, but that refers to

25 educationally therapeutic.  Is that right?
```



1          So they're providing no specialized

2     education, behavior management.  Zero.  Right.

3          But I think the reason why the

4     question trips me up a little bit is it seems to

5     imply that we know what sort of a baseline is of

6     the exact level of therapeutic services that one

7     of these programs should have.

8          And I don't think that's what we have

9     from the research that we have so far, is to be

10    able to say here's what it looks like.  We can

11    go in --

12    Q.     And the baseline is what the students

13    need, right?  That's what we've been talking

14    about.  The baseline that a setting would need

15    is whatever is needed to meet the needs of the

16    individual --

17    A.     Of the --

18    Q.     -- students there?

19    A.     -- individual students that it serves.

20    Okay.

21    Q.     But we're talking about -- so my

22    question's talking about separate settings.

23    Right.

24          So in order to meet the LRE,

25    presumably the student would have some level of



 1   a need, right, beyond zero.

 2           And so, again, my question is, would

 3   you agree that a program that offered no

 4   therapeutic or mental health supports and

 5   services would be categorically inappropriate

 6   for the vast majority of high-need students with

 7   behavior-related disabilities?

 8           MS. JOHNSON:  Object to form.

 9   A.      Well, if you're saying zero, then I

10   would go beyond the vast majority.  I don't know

11   of a setting like that where it's zero.  In that

12   case you're not providing special education at

13   all.  And so under those exact conditions, I

14   would say yeah, that would be inappropriate.

15   Q.      And if a separate program didn't

16   provide individualized services, would that also

17   be inappropriate for the vast majority of

18   students with behavior-related disability?

19           MS. JOHNSON:  Object to form.

20   A.      I mean, again, not to dance around it,

21   but what the individualized services are -- and

22   what I was trying to say a little bit earlier is

23   what's typical from research and also my

24   experience in a special school is that you have

25   some programmatic things, I'll call it that, and

 1   some individualized things.

 2           And so for some needs the programmatic

 3   aspects of a special school may be enough to

 4   meet the student's needs, but if there are

 5   individual needs beyond that, then I would say

 6   yes, the program to be appropriate has to meet

 7   those individual needs in addition.

 8           But it's going to vary.  Right.  You

 9   do have some kids, for example, who need less

10   support in reading and more support in math.

11           And, by the way, this cuts across

12   settings again.

13           You may have a student who needs more

14   support in terms of a particular behavior and

15   less in another, in which case you're going to

16   have some things that are programmatic about a

17   special school and that are not necessarily in

18   place in general ed that can meet those needs

19   and then beyond that.

20           And I think the place to look for

21   a lot of this -- again, I know this is the

22   applied research part -- is on that research on

23   behavior support in special schools, where

24   they'll talk about how a lot of times these

25   special schools tier one is not the same as --



1  so tiers I hope everybody's familiar with.  We

2  didn't go over that term.

3          So, again -- I hope I answered the

4  question.  If you need to ask it again, I can --

5  I can, but that's what I mean by I'm trying to

6  clarify exactly what we mean about can the

7  program meet individual needs.  Any program has

8  to meet the I -- the needs as determined on the

9  IEP.

10  Q.      No, I think you did answer my

11  question.  And I'm going to let us take a break

12  here in just a second, but I just have a couple

13  of quick follow ups.

14          So, Dr. Wiley, would you agree that

15  sometimes a setting can be so deficient that you

16  don't need to do an analysis of a student's

17  individual characteristics to determine it to be

18  inappropriate?

19          MS. JOHNSON:  Object to form.

20  A.      I mean, I think for me to just say

21  categorically this is not an appropriate program

22  it would be -- have to be.

23          I mean, the zero that you talked about

24  does nothing that I would consider to be the

25  best available evidence for supports for kids



1    with EBD under those circumstances.

2              And, again, I would apply that to any

3    setting.  General education, if it's doing

4    zero -- and I think that's one of the challenges

5    of inclusion, is that that happens quite often.

6              And it's not just because teachers

7    aren't trained or that they're not motivated to

8    help these kids.  In fact, the opposite.

9    Motivation is almost always there with teachers.

10   Teachers are generally really good people.

11             But it can be very difficult to

12   implement the kinds of individualized supports

13   that students with EB need.  Some yes.  Some no.

14   That's why we have, you know, the continuum of

15   alternative placements.

16             Is that okay?  Did I get that one?  I

17   want to make sure.

18                  THE WITNESS:  Am I slowing down?

19                  COURT REPORTER:  No.

20                  THE WITNESS:  Poor Sarah.  She's

21        never going to want to work with me again.

22                  MR. GILLESPIE:  I'm going to give

23        Sarah a break here in just a second.

24                  THE WITNESS:  Okay.

25                  MR. GILLESPIE:  Dr. Wiley, when you



1      say -- actually, you know what, let me, --

2      let me -- let's pause here.  Let's take a

3      quick break, if that works for you.

4              THE WITNESS:  That works for me.

5      Thank you.

6              THE VIDEOGRAPHER:  All right.

7      Standby.

8          Off the record, 10:13.

9              - - - - -

10         (A recess was taken.)

11             - - - - -

12   (A discussion was held off the record.)

13             - - - - -

14             THE VIDEOGRAPHER:  Well, let's

15     just --

16             THE WITNESS:  Oh.  Go ahead.

17             THE VIDEOGRAPHER:  -- get on the

18     record.  10:27.

19         Go ahead.

20             THE WITNESS:  You had asked if I

21     had written any other reports, and I

22     actually have written a report for the

23     advocate -- Georgia advocate group.  I'm

24     sorry.  I'm not going to get the names

25     right.  But there's another case.



ANDREW WILEY, PH.D.                                October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              86

1    BY MR. GILLESPIE:

2    Q.      And you provided that report on behalf

3    of the state of Georgia?

4    A.      Yes.

5    Q.      And is that report substantially

6    similar to your report in this case?

7    A.      It has --

8              MS. JOHNSON:  Object to form.

9    A.      -- similarities and -- oh.

10             MS. JOHNSON:  You're fine.

11             Go ahead.

12   A.      It has similarities and some

13   differences.

14   Q.      Okay.  Is it -- are your conclusions

15   the same in both cases?

16             MS. JOHNSON:  Object to form.

17   A.      Yes.

18   Q.      Thank you for the clarification.

19   A.      Uh-huh.

20             THE WITNESS:  Oh, am I on camera or

21       not?  Can you see me?

22             MS. JOHNSON:  You are.

23             THE WITNESS:  Okay.  It's weird

24       that I can't see myself.  It's just

25       throwing me off.  I'm good.



1    Q.      Dr. Wiley, in our last conversation

2    you used a phrase I want to ask you about.

3            You referenced the best available

4    evidence for supports for kids with EBD.

5            And I just wanted to ask you first, I

6    guess, what do you consider to be the best --

7    the practices that represent the best available

8    evidence for supports for kids with EBD?

9    A.      So that -- I mean, that's a big

10   question.  I think a lot of them get touched on

11   in both the expert reports and in my report.

12           They're ones that I refer to as

13   promising practices.  And in my report I do

14   describe best available evidence, which is sort

15   of acknowledging that research on kids with EBD

16   has important limitations to consider.

17           However, when you say okay, you know,

18   what are the most effective practices, I think

19   it would includes things like positive behavior

20   support, which would be school-wide positive

21   behavior support, whether you're talking about

22   general education or a special school.  It would

23   be class-wide.

24           And, again, within these things there

25   are a lot of practices.  So you have to tell me



1   how much you want me to break it down.

2           But then individualized behavior

3   support or intensive behavior support, which can

4   include things like a function -- FBA based --

5   functional-based interventions.

6           There is -- promising practices

7   include things like social skills instruction,

8   intensive academic instruction.  So, I mean,

9   there are a number of them.  Yes.

10  Q.      Sure.  And so -- we're going to talk a

11  bit more about your conclusions around the

12  research later on, but, --

13  A.      Okay.

14  Q.      -- I guess, just generally speaking,

15  you agree that educators are -- should enact

16  practices even if the research behind them is

17  imperfect, correct?

18          MS. JOHNSON:  Object to form.

19  Q.      Or maybe -- let me rephrase that.

20  A.      Okay.

21  Q.      That educators are sometimes required

22  to enact practices even if the research behind

23  them isn't perfect.

24          MS. JOHNSON:  Object to form.

25  A.      Do you mean required by law?



1    Q.     No.  I mean to effectively serve the

2    students.  Their students.

3              MS. JOHNSON:  Object to form.

4    A.     And because you're talking about

5    imperfect evidence, unfortunately that's a

6    continuum as well.

7              There are some, and an example that I

8    would give, and I talked about in my report,

9    would be like universal design for learning,

10   which is widely known.

11             In terms of imperfection, that one, I

12   would say, has very little evidence to support

13   it.  And so what I'm saying is that if you're

14   saying what's going to produce positive outcomes

15   for the kids, then there are some that are so

16   imperfect that I would say this is not likely to

17   work.  And then some that you would say yeah.

18             And then the other important thing is

19   there are degrees of intensity of

20   implementation.  So a lot of the things that we

21   know in special ed are based on applied behavior

22   analysis -- I'm sorry.  I'm going fast, and I

23   meant to slow down.  Based on behavior

24   principles like positive reinforcement.

25             I think Dr. Putnam, for example,



1   mentions praise.  And that is a recommended

2   practice that you would say hey, it's good for

3   you to acknowledge kids for appropriate

4   behavior.

5            And so I would say yes, these are

6   practices that, if you can implement them, are

7   ones that could serve many kids with EBD well.

8   Q.       And that's a great clarification.

9            So, Doctor, maybe to -- tell me if I'm

10  paraphrasing you correctly, but is it correct

11  that educators should follow the practices

12  reflected in the best available evidence to them

13  even if the research is itself imperfect?

14           MS. JOHNSON:  Object to form.

15  A.       Yes.  In the absence of very strong

16  evidence.  Then we have to pay attention to

17  what's best.

18           And you saw, you know, like, the What

19  Works Clearinghouse is very much structured that

20  way.  It has tiers of evident support.

21           And we would say yeah, it's a

22  promising practice, we would love for it to

23  have, you know, better support.  But that should

24  probably guide what we do because it's the best

25  available evidence.  Understanding that because



```
 1  there are limitations to the evidence it may or
 2  may not have the outcomes that we're hoping for.
 3  It's complex stuff.  Right.
 4              It's not like doing, you know,
 5  something -- and I think initially -- I don't
 6  use this in my report, but when you talk about
 7  providing supports for people with other
 8  disabilities, sometimes they're very concrete
 9  and straightforward.  Right.
10              Like, I use the example -- I may not
11  say this in my report -- like a wheelchair ramp.
12  We could say well, you know how to put that in
13  place.  And for many people who use wheelchairs.
14              All I wanted to point out in my report
15  and what I want to make sure is clear is that we
16  do want to follow the best available evidence
17  with these understandings that there are
18  limitations that we need to consider.
19   Q.      I appreciate that.  Thank you.
20              I'm going to switch gears a little
21  bit, Dr. Wiley.
22   A.      Sure.
23   Q.      I'm going to start talking about this
24  case in particular.
25   A.      Okay.
```



ANDREW WILEY, PH.D.                                October 30, 2023
UNITED STATES vs STATE OF GEORGIA                           92

1    Q.      When were you first contacted about

2    providing expert opinion testimony in this

3    matter?

4    A.      It was this past summer.  I don't know

5    that I have the date.  But ...

6              THE WITNESS:  Was it June?  I

7        think.

8              MS. JOHNSON:  I can't help you.

9    Q.      It's all you, Doctor.

10   A.      I learned that.

11   Q.      That's fine.  I won't hold you to the

12   specific date.

13   A.      It was around June.  I can find the

14   exact date of the email --

15   Q.      No.

16   A.      -- at some point.

17   Q.      That's great.

18              And what is your understanding of --

19   so let me caveat this.  I don't want to hear

20   about any conversations you've had with any

21   attorneys for the state.

22   A.      Okay.

23   Q.      But what is your understanding of how

24   you were identified as a potential expert?

25   A.      My understanding is that they -- you



 1   know, I don't know that I know the exact

 2   process, but I think that there were some

 3   experts that they had had communication with and

 4   sometimes they got recommendations from other

 5   experts.

 6          We didn't go very far into that, but I

 7   think that there was probably some looking at my

 8   curriculum vitae and, you know, my position

 9   and -- like, on our faculty websites we have

10   things like here are my areas of focus and

11   interest.

12          I think mostly what we talked about is

13   that they had identified, but I don't think I

14   asked them to unpack specifically the criteria

15   that they used.  I think there was some mention

16   of other experts in the field that they had

17   spoken to.

18   Q.     And what were you told that you would

19   be doing in this case?

20   A.     I was told that I would be writing a

21   rebuttal report of the experts of the Department

22   of Justice.  A timeline was given about when

23   those reports were expected.

24          I had some personal stuff happen, and

25   so that --



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    94

1    Q.      Understood.

2    A.        -- timeline changed, but essentially

3  they said within this timeline here's the

4  report, here are the other materials.  We want

5  you to review, and then offer your expert

6  opinion, rebuttal opinion.

7    Q.      Were you told to focus on any

8  particular aspect of the reports or just a

9  rebuttal to the reports generally?

10            MS. JOHNSON:  Object to form.

11   A.      I -- my understanding was that I

12  really was mostly going to be focused on what

13  was said in the expert reports and rebutting the

14  claims and findings of the rebuttal report.

15   Q.      Okay.

16   A.      Reports.  Two.  Yeah.

17   Q.      Were you provided any information

18  about the GNETS program?

19   A.      I was provided access to materials.

20  And in some of those -- some of the information

21  I got about it was from the expert reports and

22  also from some of the other DOJ materials, but I

23  was also able to go to, like, the Georgia

24  Department of Ed websites, read the operating

25  manual, that kind of thing.



1    Q.      Sure.

2    A.      So I was, you know, directed to what

3    the focus of the case was.  And some of it,

4    those materials, were available to me, and some

5    I went and sort of located.

6            I don't think I located anything

7    unique.  I think the things that I looked at

8    were in the materials that were made available

9    to me.

10   Q.      Dr. Wiley, you're being compensated

11   for your work in this case, correct?

12   A.      That is correct.

13   Q.      And do you know how much you've been

14   compensated for your work in this case to dated?

15   A.      I'm being compensated $200 per hour.

16   Q.      And do you know total how much you've

17   been compensated for your work today?

18   A.      Well, I've submitted invoices for my

19   work since June.  I don't know what the total

20   is.  And all of that hasn't been processed yet.

21   So I haven't actually gotten any money.

22   Q.      Do you have an estimate?

23   A.      I think that for the number of hours

24   that I've worked on this case, it's somewhere

25   around 20,000.



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                               96

1    Q.      Okay.  And is that directly to you, or
2    is it through the university?
3    A.      It's to me.
4    Q.      Okay.
5    A.      I've been hired independent of the
6    university.
7    Q.      Did you consult with anyone, again
8    other than counsel for the state of Georgia,
9    about your work in this case?
10            MS. JOHNSON:  Object to form.
11    A.      This case is somewhat well known in
12    special ed, when it first came up that a case
13    was being brought under the ADA.  So I've spoken
14    to a few people informally.
15            When you say "consult," I don't think
16    that that's the case.  I was told that I could,
17    you know, get people to help collect data and do
18    all kinds of other things, that was an option,
19    but I didn't.  I did these things on my own.
20    Q.      And you said it's well known in your
21    field, this case.
22            What did you know about this case
23    before you started?
24    A.      Well, -- so I belong to a listserv
25    called SPEDPro, and this is where people



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                  97

1   share -- well, they share job openings.  There's
2   some practical -- it's like any listserv.
3           But then sometimes people will --
4   "Hey, here's an interesting, you know, news
5   story."  And I remember that happening seven
6   years ago, or whenever the case first came, and
7   people were like "Well, this is interesting."
8   So, you know, how do you reconcile ADA with
9   IDEA.
10          I know that there was a publication by
11  a couple of folks that I know, Robin Inez
12  [phonetic] -- and I think it's cited in
13  Dr. McCart's report -- and then Thomas Catanias
14  [phonetic], where they wrote about the GNETS
15  case.  So because I read the journals, I had
16  read a little bit about that there.
17          I think a lot of my scholarship kind
18  of touches on things that are important to
19  consider in this case.  So I wasn't putting it
20  in the specific context of this case, but these
21  are things that are not unique to Georgia.
22  We're always talking about how do you
23  appropriately serve kids with EBD and what does
24  the continuum of alternative placements have to
25  do it.



1    Q.      And you -- I think you answered this

2    question, but I just want to be sure.

3            Did you have any graduate assistants

4    or anyone else assist you with putting together

5    your report?

6    A.      I did not have graduate assistants

7    help with this report.

8    Q.      Or anyone else?

9    A.      No.

10   Q.      Okay.  Did you discuss your work on

11   this case with anyone other than counsel for the

12   state?

13   A.      Discuss this case?  After --

14   Q.      Your work on this case.

15   A.      Yeah.  Again, some conversational

16   stuff.  Not in great depth.

17           Once the report was done, it was my

18   understanding that it was okay for me to talk

19   about my report, and I did talk to some people

20   about that.  I just said, you know, here's how I

21   approached it.  But it was very conversational.

22   These are people that I typically am doing some

23   research with in various things.

24   Q.      Colleagues --

25   A.      (Unintelligible) my circles.




ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              99

```
 1      Q.      Colleagues in the field?
 2      A.      Colleagues in the field.  That's
 3    correct.
 4      Q.      Is it your understanding that you will
 5    be performing any additional work for the state
 6    of Georgia?
 7      A.      On this case?
 8      Q.      Yes.
 9      A.      I -- my understanding is that if this
10    were to go to trial, I might testify in court.
11    I think that's basically my understanding of
12    after the deposition.
13      Q.      And outside of this case do you
14    anticipate having any other work for the state
15    of Georgia?
16      A.      With the other case being brought by
17    the advocates, it's pretty much the same thing.
18    I'll be doing a deposition there.  Yeah.
19      Q.      But there's not something else you're
20    doing for the state of Georgia that we haven't
21    touched on?
22      A.      No.
23      Q.      Okay.
24      A.      No.
25              MR. GILLESPIE:  All right.  Can we
```



1        mark this one as Exhibit 979?

2                    - - - - -

3            (Deposition Exhibit 979, Errata to

4            Rebuttal Expert Report of Andrew Wiley,

5            Ph.D., was marked for identification

6            purposes.)

7                    - - - - -

8    Q.       All right.  Dr. Wiley, I -- or Sarah

9    has handed you what has now been marked as

10   Exhibit 979.

11           Do you recognize this?

12   A.       Yes.

13   Q.       Is this a copy of an errata to your

14   report identifying your considered materials?

15   A.       Yes.

16   Q.       And is this a comprehensive list of

17   everything you reviewed and considered in

18   forming your opinions in your report?

19             MS. JOHNSON:  Object to form.

20             MR. GILLESPIE:  What's the

21        objection?

22             MS. JOHNSON:  The report speaks for

23        itself and there's other -- the report

24        includes other items than on this list.

25   Q.       You can answer the question, Doctor.



1    A.      Yes.  I think what's here in the
2  errata is accurate.
3    Q.      And the inverse of that question.  Did
4  you review or consider anything in forming your
5  opinions for this matter that's not on this
6  list?
7    A.      No.
8    Q.      Who put this list together?
9    A.      I did.  And I got some help from
10  Melanie with errata.  We had to correct some
11  references and we had to update some of these
12  things.  I'm a first timer, so I think I had
13  forgotten a couple of things that really
14  belonged on this list.
15    Q.      And how did you -- how did you keep
16  track of what you reviewed or considered in
17  putting together your report?
18    A.      Keep track of?
19    Q.      Do you have like a file of your things
20  for -- as part of your review in GNETS?
21    A.      I have a folder, yes, with materials
22  for the case.  And I collected some of the
23  literature that I cited and PDFs.  So yeah.  If
24  that's what you mean, yeah.
25    Q.      Absolutely.



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    102

1          So how did you determine what it is

2     you reviewed as part of your evaluation?

3        A.     I determined it by staying very close

4     to what the experts were stating about the case

5     and saying using these materials, what is my

6     evaluation of their findings and their claims

7     and conclusions.  So everything was guided by

8     rebutting those two expert reports very

9     specifically.  I understood that to be my job.

10       Q.     And when you say staying very close to

11    what the experts were saying in their reports,

12    what do you mean by that?

13       A.     What I mean is that when they made a

14    claim or made a conclusion, I evaluated the

15    conclusion.  And then I used what I needed from

16    these things to rebut those conclusions, as I

17    did --

18       Q.     Okay.

19       A.     -- in my report.

20       Q.     Thank you.  That's helpful.

21             Did you ask for any documents as part

22    of your evaluation?

23       A.     I asked -- I think that a lot of the

24    documents were sort of given to me upfront in

25    zip files.



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                   103

1            I think there were a couple things --
2   the one that I did have trouble with was an
3   upcoming training on functional behavior
4   assessment.  I didn't end up referring to it, I
5   don't think, but it had gotten mentioned in one
6   of my conversations with one or more of the DOE,
7   Georgia DOE folks, and I was curious to see what
8   that training was going to be.  I think that
9   training is ongoing this year.
10    Q.      Okay.  So there were the materials
11  that were provided to you upfront in the zip
12  files you referenced.
13            You also mentioned you looked at a
14  couple of things up online, just on the Georgia
15  DOE website, correct?
16    A.      Correct.  GNETS and the PBIS website,
17  yeah.
18    Q.      Okay.  Was there anything outside of
19  those two categories that you -- and the
20  training you just referenced that you asked to
21  see?
22    A.      I do not think so.  Hold on.
23            I want to make sure.  I don't think
24  so.  I think that's all of them.  If I remember
25  something later, I'll bring it up.



1   Q.      Please.

2           Can you tell me more about this PBIS

3   training that you said that's ongoing?  What is

4   that about?

5   A.      I believe it was when I was talking to

6   Wina Low.  And it was a training focused on

7   functional behavior assessment.  And I think it

8   was being provided by faculty from one or two

9   Georgia universities.  And I think it hadn't

10  happened yet, but I was just interested in, you

11  know, what that actually was.

12          So I saw materials that I think showed

13  maybe an outline of the topics that they would

14  cover in a general schedule for when those

15  trainings would be offered.

16  Q.      And was that being -- who was

17  providing that training?

18  A.      I think it was being organized and

19  maybe sponsored through the Department of

20  Education.  I'm not sure of that, but -- and,

21  again, I can't remember the exact faculty

22  members' names.

23          I know that Georgia works with

24  Dr. George at USF.  I don't think she was

25  involved in this, if I'm remembering correctly.



1   I obviously didn't make heavy reference to this

2   specific training in my report, so I'm trying to

3   remember.

4       Q.      Maybe a better question is what's the

5   connection to GNETS?  Was it meant to be a

6   training for teachers of the GNETS program, or

7   what's the connection to GNETS?  Why did you

8   want to see it?

9       A.      So what I learned in my conversations

10  is that these trainings are offered to teachers

11  in general ed, special ed, GNETS, everywhere.

12          If I'm recalling correctly, they

13  receive the same invitations that other

14  schools -- so I think they're invited to attend

15  this training.

16      Q.      Thank you.  I appreciate that.

17          You also reviewed the 2014 GNETS

18  operating manual; is that right?

19      A.      Yes.

20      Q.      And why was that something that you

21  wanted to look at?

22      A.      The specific thing that I was looking

23  at is -- I think there was something in

24  Dr. McCart's report that said that the way

25  that -- and I don't know if she was being




1   general or speaking to Georgia, but she was

2   saying that the way that these students were

3   being referred to GNETS is they were being

4   labeled and placed.

5           So the idea was, you know, we pick the

6   label and then we have a program, which is

7   against the law, you know, procedurally and

8   substantively.

9           So the one thing that I focused on in

10  particular in that was how they described how

11  students were referred to GNETS.  And I wanted

12  to see if their materials -- if it was

13  consistent with the way I understand the correct

14  way that students were referred.

15          It was not label based.  They pointed

16  out that the students they serve tend to have

17  the characteristics of kids with emotional,

18  behavior disorders, but they also serve kids

19  with autism spectrum disorders and OHI, which

20  would probably mostly be ADHD.

21          So I was looking at it to see if what

22  was conveyed in that manual was what Dr. McCart

23  was saying was occurring.

24  Q.      Thank you.  That's helpful.

25          You also reviewed to Georgia DOE PBIS



1   website, correct?

2      A.      Yes.

3      Q.      And why was it you looked at that?

4      A.      I was looking for information on, you

5   know, their implementation.  They actually have

6   some things that I think are common across

7   states, but -- also happens in Ohio, where they

8   recognize different schools for different levels

9   of implementation.

10          So I was trying to get the most up to

11  date information on implementation of PBIS,

12  which -- I think you see in those expert reports

13  and you see some in mine, you know,

14  implementation tends to happen in stages,

15  because PBIS is very complex and there's sort of

16  initial and then emerging, and -- I'm not going

17  to remember the exact.

18          So one of the things that I was

19  looking at was, you know, what was more up to

20  date in terms of what percentage of schools were

21  implementing PBIS.  I can't remember if I

22  actually put that exact number.

23          Part of my point was compared to

24  national data on a lot of states, I would argue

25  that Georgia's a bit ahead of the curve in terms



1   of implementing PBIS.  And I just wanted to make

2   sure that I was, you know, reflecting what

3   Georgia was presenting as their data.

4       Q.      I understand.

5       A.      There may have been other things, and

6   I think of them, I'll say, but I think that was

7   one of the big reasons why I looked at that PBIS

8   website.

9       Q.      Understood.  Thank you.

10          It also says here you reviewed the

11  state of Georgia's memorandum of law in support

12  of its motion to dismiss; is that correct?

13      A.      Yes.

14      Q.      And why did you look at that?

15      A.      Well, I wanted to understand sort of

16  the legal cases that were being made.  I will

17  admit that when I'm reviewing that stuff, I get

18  lost a little bit in the legalese part.

19          But as I was looking at the expert

20  reports, I was looking at things that were also

21  stated in those DOJ materials.

22          And also -- I mean, so the only thing

23  that I think I really touched on was -- from my

24  level of expertise, IDEA and that in the law.

25  And so I read those things to have an



1 │ understanding of, to the extent that I could,

2 │ the legal arguments.

3 │       Those things didn't become a major

4 │ part of my report because my report was really

5 │ focused on Dr. Putnam and Dr. McCart.

6 │   Q.    Understood.

7 │       And I'm assuming it's the same thing

8 │ with your review of the Court's order.

9 │   A.    Yes.

10 │   Q.    Okay.  When you refer to the state of

11 │ Georgia -- sorry.  I want to go back just a

12 │ second to the PBIS.

13 │       When you refer to the state of Georgia

14 │ being ahead of curve in PBIS implementation, can

15 │ you explain to me what you mean by that?

16 │   A.    Sure.  And so, again, you can access

17 │ state data from some states and not from others.

18 │ Georgia is saying here's what we've implemented.

19 │       And so the other complexity that I

20 │ think Dr. Putnam touched on is not only do you

21 │ have stages of implementation but you have these

22 │ tiers.  Right.

23 │       Tier one is that school-wide

24 │ expectations and all that stuff.

25 │       Tier two would be for kids that are on



1  the fence, having some difficulty.

2            And tier three.

3            So when I say "ahead of the curve,"

4  I'm comparing to the national data that is in

5  the report -- or the paper by Dr. Sugai and

6  Dr. Horner, I believe, where the actual PBIS is

7  one of the big clearinghouses for saying how's

8  implementation going.

9            And so in that paper, the report shows

10 that about a quarter of schools nationwide --

11 and they don't break out state data, but they do

12 say some states it's fewer than 50 schools and

13 some ...

14            And so when I say that, I say that

15 it's ahead of the curve in terms of that

16 25 percent.

17            The next part of that, and it is

18 important, is that in that paper by Sugai and

19 Horner, they then talk about levels of -- or

20 fidelity of implementation.  Right.  Of those

21 one out of four schools, how many have -- and I

22 don't remember the exact numbers, but it's a

23 smaller fraction that will say not only are we

24 doing it, we're doing it well.

25            And then as you get to those more



ANDREW WILEY, PH.D.                          October 30, 2023
UNITED STATES vs STATE OF GEORGIA                      111

1  specialized tiers, you know, more complex tiers,

2  tier two, tier three, that number shrinks quite

3  a bit.

4           But I think that the data that I

5  looked at in PBIS was mostly focused probably

6  just on tier one.  Have they, you know, started

7  to implement.  And in that sense it was above

8  25 percent.

9           I -- yeah.  Yep.  That's it.

10    Q.     Okay.  Thank you.

11           You also reviewed the depositions of

12  Jason Byars, Wina Low, Brooke Cole, and

13  Dr. Cassandra Holifield, correct?

14    A.     I did.

15    Q.     Were there any others that you

16  reviewed?

17    A.     Depositions?

18    Q.     Yes.

19    A.     Well, since my report I have looked at

20  the depositions of Dr. Putnam and Dr. McCart,

21  although neither in great detail.  I've kind

22  of --

23    Q.     Okay.

24    A.     -- skimmed both of those, but that was

25  after I wrote the report.



1            Yeah, I looked at those because I

2    think they were referenced in some of the expert

3    reports and I think they spoke to, again, some

4    of the things about the processes between

5    referral and, you know, what was happening in

6    GNETS and what was happening in zone schools.

7            I don't think I heavily cited any of

8    those depositions.  I didn't find anything that

9    I thought really was necessary for the rebuttal

10   opinion that I was writing.

11   Q.      Why -- how are those four individuals

12   identified?

13   A.      I know that Wina Low, Brooke Cole, and

14   Cassandra Holifield had -- at least one or two

15   of them had previous connections to GNETS and

16   experience in leadership in GNETS and also

17   current leadership in PBIS.

18           I'm trying to remember, and I don't

19   know that I can.  Again I'll have to think about

20   it, why it was that Jason was one that I

21   asked -- or one that I looked at.  I'll have to

22   think about that.

23           But I think that those were the things

24   that I was trying to get some more context

25   about; referral and services that are provided



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    113

1   in zone schools.

2           Probably some things about training as

3   well.  I think talking to Wina Low I just wanted

4   to, you know, find out some things that she

5   would say about that.

6   Q.      Maybe a better question would be who

7   identified these four people as -- or who

8   identified these four depositions as items for

9   you to consider?

10  A.       I think that I identified those in

11  talking with the lawyers and saying can you help

12  me think about who would help me get some more

13  context for A, B, and C.  And then it was sort

14  of a back and forth.

15          I mean, I do think that a tricky part

16  for me, and I don't know if this is normal, is

17  that I had a pretty compressed time frame to

18  write my report.

19          So for some of the things, because

20  it's a lot of materials, I would say hey, I'm

21  interested in this.  What are things that I

22  might look at.  And it was a conversation.  It

23  was really my decision, but they would say, you

24  know, this person may have talked about this and

25  this and this.  So if that makes sense.



ANDREW WILEY, PH.D.                                October 30, 2023
UNITED STATES vs STATE OF GEORGIA                            114

1      Q.      And so you identified topics, and then

2   you were helped to find people who would speak

3   to those topics?

4      A.      That's right --

5      Q.      Okay.

6      A.      -- basically.

7      Q.      Thank you.

8              And who is Jason Byars?

9      A.      See, that's the one I'm not going to

10   remember; Jason's background.  I think I could

11   tell you about Wina and Brooke and Cassandra --

12   Dr. Holifield.

13     Q.      Do you know if --

14     A.      I would have to look.  I don't have it

15   in my brain.

16     Q.      Do you know if Mr. Byars has ever

17   worked in a GNETS program?

18     A.      I do not know --

19     Q.      Okay.

20     A.      -- but based on my -- I don't know.

21     Q.      And you also spoke -- you also spoke

22   with several individuals as part of your

23   evaluation, correct?

24     A.      I did.

25     Q.      And with whom did you speak?



1      A.      I spoke with Wina Low, Brooke Cole,

2   Cassandra Holifield.  And I feel like there was

3   one other person and I'm not going to remember

4   her name.

5      Q.      Would that be Jeannie Morris?

6      A.      I think so.  I think so.  Yes.

7   Because I do refer to those conversations in my

8   report.  Thank you.

9      Q.      Was there anyone else that you spoke

10   to?

11      A.      From Georgia DOE --

12      Q.      Well, let's say --

13      A.      No.  No.  No.  Go ahead.  Ask your

14   question.

15      Q.      Yeah.

16           Did you speak to anyone else as part

17   your evaluation in this case?

18      A.      No.

19      Q.      Okay.  How were those four individuals

20   identified as people with whom you would speak

21   as part of your evaluation?

22      A.      It is similar to the depositions.  I

23   had topics that I wanted to get some more

24   context and talk to some people who actually had

25   worked in these programs.



ANDREW WILEY, PH.D.                          October 30, 2023
UNITED STATES vs STATE OF GEORGIA                       116

1            And so based on that -- I think,
2   again, it was -- it might have been the same
3   conversation, where I was saying these would be
4   people in our compressed time frame that
5   at least if I could have a phone conversation.
6   And so I had those topics in my mind and I
7   talked to them about those topics.
8      Q.      And so other than those four
9   individuals, you didn't discuss GNETS with
10  anyone else, correct?
11     A.      I do not think so, no.
12     Q.      Okay.  Or at least not that you
13  considered in forming your report, correct?
14     A.      That's correct.  Yes.
15     Q.      Did you -- no.  We covered that one.
16            If you had more time, was there other
17  material that you would have liked to have
18  considered in putting together your opinions in
19  this case?
20     A.      I think that when I read the expert
21  reports and understood it to be my task, to
22  evaluate the conclusions and claims, that I
23  don't think that in order to do that I needed to
24  review much more than I did or any more.  I
25  think that I was able to rebut the claims and



1  the findings with the materials that I reviewed.

2      Q.      At any point did you travel to the

3  state of Georgia as part of your work in this

4  case?

5      A.      I did not.

6      Q.      So you didn't conduct any observations

7  as part of your evaluation, correct?

8      A.      I did not, no.

9      Q.      So did you consider anything in

10  drafting your report that we have not discussed

11  and that's not listed in the errata?

12     A.      No.  I think -- I think that's

13  accurate and comprehensive.

14     Q.      You didn't review any other documents?

15     A.      No.

16     Q.      You didn't review any other analyses?

17     A.      What do you mean by "analyses"?

18     Q.      Like data analyses, for example.

19     A.      No.  No.

20     Q.      Were you told anything that informed

21  your opinions that may not be reflected

22  separately in a document?  And by that I mean,

23  for example, something you were told over the

24  phone.

25     A.      No.



1           And I just want to clarify with -- you

2    know, the data analyses.  When I hear that in my

3    world and I'm thinking about it, I might be

4    talking about things like state provided data.

5           If you meant to include research as

6    data analyses, I just want to say that in order

7    to provide the research part of my rebuttal, my

8    strategy was to look mostly at research

9    syntheses.

10          So going study by study is a pretty

11   inefficient way to characterize the research.

12   So that was something that was a decision where

13   I could have gone study by study, but that

14   becomes -- you know.

15          So it's a very normal practice in

16   special ed research and other social sciences,

17   education, that people synthesize based on

18   certain criteria.  Here's what we know about X,

19   Y, or Z.

20          So my point being did I include

21   literally everything that's ever been published

22   about all of these topics?  No.  But my strategy

23   was -- and not only syntheses, but also ones

24   that are most directly relevant to kids with

25   behavior-related disabilities and/or providing



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                            119

1   services in general education or providing

2   services in separate schools.

3      Q.      I appreciate that clarification.  But,

4   no, I was focused on data related to GNETS --

5      A.      Got it.

6      Q.      -- or the state of Georgia.

7              And the answer [sic] is, did you

8   review any data --

9      A.      I didn't.

10     Q.      -- related to the state of Georgia?

11     A.      No.  I don't think things that made it

12  into my report -- so I just want to make sure

13  I'm answering your question accurately.

14     Q.      Please.

15     A.      For example, when I was looking at

16  GNETS, there might have been some information

17  about -- and this may not have been GNETS, but,

18  like, changes in enrollment over time.  That

19  might have been referred to in maybe the report,

20  so I may be confusing myself.

21             Where at the time that I think this

22  case was first brought, GNETS enrollment was X,

23  like 5,000, 6,000, and now it's 2,000.  I'm just

24  telling you that because it didn't become a part

25  of my report but I may have seen those things



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                   120

1    either in the expert reports or in some of the

2    materials that I reviewed.

3        Q.      Understood.  Thank you.

4                THE WITNESS:  That was too fast.

5        I'm sorry.

6        Q.      All right.  So your errata references

7    you spoke with employees of the Georgia

8    Department of Education.  That would be Ms. Wina

9    Low, correct?

10       A.      Correct.

11       Q.      Was there anyone else from the Georgia

12   Department of Education?

13       A.      Brooke Cole, Dr. Holifield, and

14   Jeannie Morris.

15       Q.      Okay.  Thank you.

16               What is -- let's start with Ms. Low.

17   What's Ms. Low's title?  Do you recall?

18       A.      I believe she's the director of

19   special education.  You're going to quiz me on

20   these, and I may not get them all right.  So ...

21               Or she may be a super -- I don't even

22   know if instructor of special education -- she

23   may be a state superintendent.  I -- I

24   apologize.

25               Again, if I had a moment, I could look



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                               121

1    through and refresh my understanding.

2       Q.      No.  You're -- I'm just trying to get

3    an understanding of your recollection, with the

4    understanding that sometimes recollection's

5    imperfect.

6            How did you communicate with Ms. Low?

7       A.      By -- by phone.

8       Q.      How many times?

9       A.      Wait.  It may have been -- and I'm

10   going to get this mixed up.  I think there may

11   have been a Teams for a couple and it may be

12   phone.

13      Q.      Okay.

14      A.      But it was either virtual or

15   phone call.

16      Q.      How many times did you speak with

17   Ms. Low?

18      A.      One time.

19      Q.      And who attended that -- I'm sorry.

20           Did you say this one was a phone call

21   or a Teams chat?

22      A.      See, I'm not going to be able to

23   remember which is which.

24      Q.      This discussion -- who attended this

25   discussion?



1    A.      I think Melanie was there for that

2    discussion.  And she can't help me, but I think

3    that's it.

4    Q.      Okay.  And who led the discussion?

5    A.      I did.

6    Q.      Okay.  And was there an agenda or an

7    outline that you went through?

8    A.      There were topics that I had in mind

9    that I wanted to talk about.  And that's pretty

10   much -- and then I kind of let it go where they

11   wanted to fill in things that I may not have

12   known about based on, you know, my prompts or my

13   conversations.

14   Q.      And did you put that together?

15   A.      I did.

16   Q.      Okay.  Did this outline of topics

17   differ from person to person you spoke with?

18   A.      There were definite overlaps.  There

19   were similar topics that I wanted more context

20   about.

21           And again very generally speaking, it

22   would have been some of the things related to

23   services provided in general ed and special ed

24   or in GNETS.  Also things related to training.

25   And then some questions about the referral



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                               123

1   process.

2      Q.      Thank you.

3              MR. GILLESPIE:  Can we mark this as

4         980?

5                    - - - - -

6         (Deposition Exhibit 980, 8/23/2023

7         Interview Notes, was marked for

8         identification purposes.)

9                    - - - - -

10     Q.      Dr. Wiley, do you recognize this

11  document?

12     A.      Yes.

13     Q.      And what is this?

14     A.      Some notes from my interview.

15     Q.      And was this interview dated August 23

16  of this year?

17     A.      Yes.

18     Q.      Okay.  And who authored this document?

19     A.      I did.

20     Q.      And how was this created?

21     A.      You know, I wrote down initially some

22  of the things that I wanted to talk about.

23  Whether or not that's going to be obvious to a

24  person, an outsider reading it, probably not.

25              And then as I talked about things, I



1  would fill things in.  Now, there may have been

2  things that I initially thought I wanted to talk

3  about, but then it came up in a different part

4  of the conversation.

5          Your question is -- if you want to say

6  how is it organized, it's not very.  This is my

7  brain kind of going through things that I wanted

8  to talk more about.

9          Some of -- the 1, 2, and 3, I think it

10 was my intention to go kind of in an order, but

11 that order may have sort of fallen apart.

12         So there are a few topics that I threw

13 down first, and then had the conversation and

14 then took some notes.

15   Q.      Okay.  Thank you.

16         And I'll just throw out there I'm glad

17 it's not my notes that we're going through

18 because --

19   A.      Right.

20   Q.      -- it would be the same story.

21         How long did you speak with Ms. Low?

22   A.      My recollection would have been about

23 an hour and a half.

24   Q.      Okay.

25   A.      Maybe a little bit more.



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                125

1    Q.       And are these the only notes from that
2    conversation?
3    A.       Yes.
4    Q.       Okay.  For these interviews is it fair
5    to say that you wrote down the information that
6    you thought was most relevant to your review?
7    A.       Most relevant to the questions that I
8    had and the topics where I wanted to get some
9    more context.
10   Q.       And I think you answered this, but if
11   you see on the -- just on the first page even,
12   but it continues through.  You have "second" at
13   the top, and then "first" further down and -- is
14   that what you were saying before about having a
15   rough order that you wanted to discuss things?
16   A.       Right.
17   Q.       Okay.
18   A.       And I don't know that I stuck to that.
19   Q.       Were these notes taken
20   contemporaneously with your discussion with
21   Ms. Low?
22   A.       That is correct.
23           Yes.  I'm sorry.  I got to do yes and
24   no.  I'm trying to remember all of my tips and
25   I'm not doing it.



1    Q.      That's fine, too.

2            So many of the questions that I see on

3    here seem not to have notes for the answers to

4    them.  Is that because they weren't answered or

5    another reason?

6    A.      They may have been answered or not.  I

7    can't tell you for sure if that's why you don't

8    see additional notes.  There were some things

9    that I think I knew where I wanted to include in

10   my report and I put things directly into my

11   report.  Probably not contemporaneously, but

12   immediately after I stopped talking, I went and

13   said okay.

14           You know, that was where I wanted to

15   see if I could get more context from people

16   working in Georgia.

17   Q.      And on this first page here there are

18   some questions and words that are bolded.  Is

19   there any significance to that?

20   A.      I tried to remember what my brain was

21   doing as I thought that that was kind of an

22   interesting question and one that applies to all

23   states, but I can't tell you.  I'm sort of

24   speculating about what the method was to my

25   madness here.



1    Q.      There are a couple of font changes

2    throughout the document, too.

3            My question is just were there things

4    taken from other sources or --

5    A.      No.  That's all accidental.

6    Q.      Okay.  So in the middle of the first

7    page you have the number "1," "2" there.

8            1 begins "With SW-PBIS."

9            Do you see that?

10   A.      Uh-huh.

11   Q.      And these two points, were these notes

12   from something Ms. Low said?

13   A.      No.  I think those were things that I

14   put in as topics because they were what I

15   understood to be conclusions of the experts and

16   I wanted to remember that that was my focus.

17   Right.

18           So when I was asking questions about

19   specific to Georgia, how does that relate to the

20   idea that virtually all students -- you know,

21   you can see what they say.  But yeah.

22   Q.      Okay.  So this is your paraphrase of

23   what you understood the United States experts'

24   to be saying?

25   A.      It's a shorthand, --



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                               128

1    Q.       Okay.

2    A.       -- yeah.  Just to remind myself.

3    Q.       Thank you.

4             And SW-PBIS is "school-wide" --

5    A.       School-wide -- uh-huh.  Yep.  Yes.

6    Q.       On the second page -- there aren't too

7    many questions here.  Just a couple.

8             Under "second" you have "GNETS

9    programs," and then "What do parents say about

10   GNETS?  Anecdotal or data."

11            Do you see that?

12   A.       Yes.

13   Q.       What did you ask here?

14   A.       Now, I think that this is one that I

15   ended up asking Dr. Holifield, because I can't

16   remember -- it was either that -- I can't

17   remember what Ms. Low's experience was with

18   GNETS and whether I thought that she had the

19   most recent or maybe the most years where she

20   could answer that question.

21            So I think it was a topic that I

22   was -- have in my report, right, when I talk

23   about who makes decisions about placement and,

24   you know, what their impressions are.

25            So this one I may have put here, but I



ANDREW WILEY, PH.D.                                October 30, 2023
UNITED STATES vs STATE OF GEORGIA                          129

1   may not have asked.

2       Q.       Okay.

3       A.       But I am interested to hear what

4   people who have worked in this program actually

5   say about experience with the parents.  And then

6   if they had data.  But that would be kind of

7   surprising.

8            I don't know many school programs that

9   have really good reliable data about school

10  contacts or even feedback.  I mean, schools

11  sometimes do that from parents.  Right.  They

12  want to know do they like things.

13           But that's my recollection about --

14  that was a possible topic, but I may not --

15      Q.       Sure.

16      A.       I may have decided not to ask Ms. Low

17  about it.

18      Q.       In just the next line you talk about

19  the strategic plan.  Same question.  Do you

20  recall what question you asked there?

21      A.       Strategic plan.  Oh, okay.  So that

22  comes from -- the strategic plan.  That might

23  have been -- I think I might have sort of

24  cross-hatched my report and the things I was

25  focusing on with that strategic plan that is



1    part of -- it's on the GNETS website, I believe.

2      Q.      Okay.

3      A.      You all know what I'm referring to.

4    They have a strategic plan.  It's like a

5    self-assessment checklist.  And so I think I

6    looked at that when I was thinking about what I

7    wanted to talk about.

8      Q.      But you don't recall if you -- if

9    Ms. Low told you anything about this?

10     A.      I don't think so.

11     Q.      Okay.

12     A.      And it could have been because I saw

13   that and I understood it to be a self-assessment

14   that they might have actually collected data,

15   maybe annually, that would speak to that

16   particular topic.

17             But I think I must have decided in

18   talking to Ms. Low -- or is it Dr. Low?  I feel

19   bad if I'm not -- that she wasn't the best

20   person to ask.

21     Q.      Okay.  A little bit further down under

22   "third," a couple lines, --

23     A.      Okay.

24     Q.      -- there's a line that begins

25   "Social/emotional skills."

1            Do you see that?

2    A.      Yeah.  Oh.  Social -- yeah,

3    social/emotional skills.

4    Q.      It says "All programs use social

5    skills; psychologists, school counselors, social

6    workers, individual therapeutic; to the best of

7    my knowledge, SEL curriculum, not sure if it was

8    being implemented; character education."

9            Do you see that?

10   A.      Yes.

11   Q.      And do you recall what you asked here?

12   A.      Do I recall what?  I'm sorry.

13   Q.      What you asked there.

14   A.      I think that I asked about the

15   implementation of social skills programs.

16           What I can't remember from my notes

17   right here is if I was asking about GNETS, zone

18   schools, or both.  But I think it was about

19   GNETS and she was saying -- social skills,

20   psychologists, school counselors helped with

21   social skills.

22           So I think she was saying that it was

23   her experience that social and emotional

24   programming was provided in GNETS.

25           And then the character education, the



ANDREW WILEY, PH.D.                                October 30, 2023
UNITED STATES vs STATE OF GEORGIA                           132

1  SEL curriculum, what I'm confused about here is
2  that she may have been talking about in the zone
3  schools.  Like there may be a curriculum that --
4  some of the zone schools, but I'm not sure.
5      Q.     Okay.  So this answer may have applied
6  to some combination of zone schools and GNETS?
7      A.     Yeah.  And I apologize.  It's just the
8  nature of my notes.
9      Q.     Let's see here.
10              Did you have an understanding that all
11  regional GNETS programs utilize psychologists?
12      A.     Is it my current understanding?
13      Q.     At the time -- at the time you put
14  together your report.
15      A.     You know, I later saw -- so I don't
16  even know if I should talk about it, but I saw
17  that in another -- in the other case an expert
18  talked about how many psychologists are GNETS.
19              But the answer for this, when I put
20  together my report, I did not know how many
21  psychologists served GNETS programs.
22      Q.     And what's your understanding now?
23      A.     My understanding now is that they may
24  have psychologists that serve more than one
25  GNETS program, but I can't off the top of my



1  head characterize that exact --

2  Q.      Sure.

3  A.      -- proportion.

4  Q.      By the time you put together your

5  report in this case, was it your understanding

6  that all regional GNETS programs utilized school

7  counselors?

8  A.      Now, I think from my conversation

9  there was involvement of school counselors, but

10  again, I can't tell you exactly how that was

11  configured.

12          There are times and places where you

13  could have one counselor and one psychologist

14  per program, but I also don't think it's

15  unusual, especially given some shortages

16  depending on where you are, that psychologists

17  might serve, for example, more than one program

18  or a school counselor.

19  Q.      Thank you.

20          And with the -- specifically with the

21  language in here, "to the best of my knowledge,

22  SEL curriculum, not sure if it was being

23  implemented," would that have been --

24  A.      That was her quote.

25  Q.      Thank you.



1    A.      Yeah.

2    Q.      Okay.

3    A.      And I think she was speaking as a

4  person who wasn't currently either in the zone

5  schools or the GNETS.  I'm sorry.  I can't

6  figure out which one that applied to.

7          But the character education as I

8  recall it, and I don't recall it well because it

9  didn't go into my report, is something that

10  maybe some Georgia schools were doing.  Some

11  sort of school-wide character education, but I'm

12  not -- I'm not certain.

13   Q.      So I'm just looking at the next line

14  and just the -- you have there "seclusion and

15  restraint?"

16          And my question is, what were you told

17  about the use of seclusion and restraint in the

18  GNETS program?

19   A.      So I focus more as mindset because I

20  had seen that in the expert reports, I believe.

21  It also came up in the conversation that this

22  was the crisis intervention training that most

23  GNETS programs use.

24          I don't -- I'm not familiar with it.

25  I am familiar with Mandt and CPI.  Those are the



1   two that I've had the most experience with.  But

2   I think I did ask.

3           But the purpose of a crisis

4   intervention is to minimize the use of restraint

5   and minimize the use of seclusion.

6           In my professional experience that was

7   a big focus of what I did.  Because when I

8   worked at the special school for kids with EBD,

9   I was a crisis resource teacher and our goal was

10  to get better and better at deescalating kids

11  without the use of seclusion and restraint.

12          But I don't think when I talked to

13  Ms. Low we talked directly about seclusion and

14  restraint.  We just talked about mindset as a

15  program for crisis intervention.

16  Q.      Okay.  Thank you.

17          So I'm going to skip down two

18  paragraphs.  It begins "Computer-based

19  instruction."  But I actually want to ask about

20  the line "kids are almost always behind

21  reading."

22          Do you see that?

23  A.      Yes.

24  Q.      What were you told related to that?

25  A.      I think that we were -- it was a



1   question that I had because in the report it

2   talked about what the perception of the expert

3   was that there was an overreliance on

4   computer-based instruction.  So I wanted to talk

5   to somebody about that.

6          And I think that that comment did come

7   from Ms. Low, and it was that these kids that

8   they were serving in these programs were almost

9   always behind in their ability to read.  So they

10  were, you know, grade levels behind, which is

11  very typical of kids with EBD, and that the

12  computer-based instruction wasn't the only

13  instruction.

14          But there are a number of

15  research-based, computer-based programs -- I

16  didn't look at exactly what they were using --

17  that can be used for kids that do have reading

18  difficulties.  Read 180 is one for high school

19  kids that just jumps to mind.

20          But anyway.  Does that make sense?

21   Q.     Yes, that does.

22   A.     Okay.

23   Q.     Thank you.

24          So I think relatedly, going on to the

25  next line, you wrote "hard to special ed teacher



ANDREW WILEY, PH.D.                           October 30, 2023
UNITED STATES vs STATE OF GEORGIA                        137

1  to become qualified - computer-assisted as

2  co-teaching."

3          And I was wondering what you were told

4  related to that.

5     A.     My goodness.  I -- here's what I

6  think.  And I'm interpreting my own notes.  If

7  it didn't make it into my report, I apologize.

8          But I think that what they were

9  talking about was there may have been GNETS

10  programs in high schools, so these would not

11  have been separate schools, where they were

12  trying to help kids struggling academically.

13  And they may not have always had one-to-one

14  special ed, and so computer-assisted instruction

15  was used to supplement regular instruction.

16          Highly speculative.  I'm not sure what

17  I meant there.  I apologize.

18     Q.     No.

19          Dr. Wiley, were you ever told that

20  computer-assisted learning was used when there

21  weren't qualified staff available?

22     A.     I was not told that.

23     Q.     Okay.  Would that concern you, if that

24  was a practice?

25     A.     That --



1              MS. JOHNSON:  Object to form.

2      A.      Okay.  The way that computer-assisted

3  instruction, which, again, I want to emphasize

4  people who don't know the research super well

5  might say "Oh, that's terrible."  And you could

6  characterize it as oh, we just send these kids

7  to computers.

8              It varies in how the format is and how

9  much is delivered through the computer and how

10  much is delivered in other ways.

11              I think in another conversation, it

12  was with Dr. Holifield, where she said it's a

13  mischaracterization to say that these kids were

14  just receiving computer-based instruction.

15              In your hypothetical where you say if

16  they were just receiving computer-based

17  instruction, I can't think of one of these

18  programs where that's the way it's supposed to

19  be.

20      Q.      And again -- so switching from

21  specifically talking about GNETS to just into a

22  hypothetical.  If a program was using

23  computer-assisted learning for subjects where

24  they didn't have qualified teaching staff

25  available, would that cause you concern as an



1   expert in this field?

2              MS. JOHNSON:  Object to form.

3   A.      If that were happening, I mean, the

4   devil still might be in the details, but

5   generally I would say that needs to be looked at

6   more closely to understand exactly what's going

7   on.

8   Q.      The next little line there is "School

9   districts that would be upset."

10             Do you have a recollection of what

11  that's referring to?

12  A.      I'm embarrassed to say this is what my

13  brain looks like when you open it up.

14             I don't know the context of that.

15  Sorry.

16  Q.      Let me see if I can truncate this a

17  little bit.

18             Let's go to the last page here.

19  A.      Okay.

20  Q.      And there's a font change here at the

21  very end after "first," and my question is, were

22  these -- to your recollection, is this still

23  notes from your conversation with Ms. Low?  That

24  last section there.

25  A.      I want to make sure I get this right.

1           I think there are two things here, and

2     it could be that the first things I either

3     paraphrased or copied, possibly from the

4     strategic plan, but I'm guessing a little bit.

5           And then I think that where it starts

6     saying "Schools did have behavior specialists,"

7     that might have been what Ms. Low said to me.

8           Does that make sense?

9           So where it goes from "properly

10    evaluating --

11    Q.      Yeah.

12    A.      -- or reevaluating students',"

13    "applying entrance and exit standards,"

14    "redirecting the state's" -- I'm sorry.

15    "Redirecting the state's resources."

16          But then I think when it says "Schools

17    did have behavior specialist; had to have

18    functional behavior assessment/behavior

19    intervention plan for one year," I believe that

20    that is what I was told by Ms. Low.

21          And, again, I am not 100 percent

22    certain.

23    Q.      Okay.

24    A.      And it's probably because I copied and

25    pasted something with different font, and then I



ANDREW WILEY, PH.D.                                October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              141

1    continued typing my notes beneath that --

2    Q.      Sure.

3    A.      -- and it just had the same font.

4              MR. GILLESPIE:  I think now is a

5       good time for another break, if that works

6       for you all.

7              THE WITNESS:  Sure.

8              THE VIDEOGRAPHER:  Off the record,

9       11:22.

10              - - - - -

11         (A recess was taken.)

12              - - - - -

13              THE VIDEOGRAPHER:  We're back on

14       the record, 11:35.

15    BY MR. GILLESPIE:

16    Q.      Dr. Wiley, just one or two more

17    questions with regard to your notes from

18    Ms. Low.

19    A.      Okay.

20    Q.      Again looking at that section after

21    "first" where it says "properly evaluating or

22    reevaluating students' service needs and whether

23    those needs can be met in general education

24    classes or schools."

25              Do you remember if Ms. Low told you



ANDREW WILEY, PH.D.                                October 30, 2023
UNITED STATES vs STATE OF GEORGIA                            142

1  anything related to that?

2     A.      I don't recall in that conversation

3  whether Ms. Low said anything about that.  The

4  only thing that I would relate could have been

5  where she said they had to have a functional

6  behavior assessment, behavior intervention plan

7  for one year.  So that might have related to --

8     Q.      Okay.

9     A.      Yeah.

10    Q.      No, I didn't mean to interrupt you.

11 I'm sorry.

12    A.      No, that's okay.

13    Q.      Okay.  You can set that aside if you

14 would like.

15    A.      Okay.

16    Q.      I'm done with that one.

17            Are you aware that the Georgia

18 Department of Education employs a GNETS program

19 manager?

20    A.      Am I aware -- say it one more time.

21    Q.      Sure.

22            Are you aware that the Georgia

23 Department of Education employs a GNETS program

24 manager?

25    A.      That's not a detail that stuck in my



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              143

1  head, but I assume that they must or you

2  wouldn't bring it up.  If I lost track of titles

3  and things, that might have been it.

4     Q.    Do you know who Vickie Cleveland is?

5     A.    I know that name is familiar, but no,

6  I don't know.

7     Q.    Do you know who LaKesha Stevenson is?

8     A.    No.

9     Q.    Sean Owen?

10    A.    Again, I might have seen these names

11  listed --

12    Q.    Sure.

13    A.    -- as, you know, part of the

14  depositions maybe, but no.

15    Q.    But sitting here today, you don't

16  recall who these individuals are.

17          And Matt Jones.  Is that -- do you

18  know who that is?

19    A.    I don't.

20    Q.    Okay.  And you said you spoke with --

21  actually, let me rephrase that.

22          You also said that Dr. Cassandra

23  Holifield, Brooke Cole, and Jeannie Morris were

24  all with the Georgia Department of Education as

25  well?



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                  144

1    A.      Yes.

2    Q.      And what were their roles?

3    A.      I think Jeannie Morris was either

4  student wellness or PBIS.  Or they may have

5  combined those two things recently.  So she's

6  the director of that.

7           Dr. Holifield might have been the

8  director of special education.

9           I -- I'm not going to remember.  I

10  remember that -- all of these folks when I

11  talked about people who had some experience with

12  GNETS.  Again, if I'm remembering correctly,

13  it's all of those people except for maybe Wina

14  Low.  She might even have had some experience.

15          But I don't remember their titles

16  right offhand.  I would have to look at my --

17   Q.      And, again --

18   A.      -- materials.

19   Q.      -- the people you spoke with and the

20  depositions you reviewed, you didn't identify

21  those individuals by, for example, title and say

22  I want to speak to this person, correct?

23   A.      No.  By topic.  And, again, I did get

24  a little bit of help consulting with the lawyers

25  about, you know, here are the things that I

1   would like some additional context, given my

2   limited time and, you know, being able to speak

3   to a few people who have some knowledge about

4   these topics.

5   Q.      And --

6   A.      And we identified those people

7   together.

8   Q.      And for any of these individuals were

9   you the one that said I want to talk to this

10  person specifically?

11  A.      I made the decision, yeah, based on

12  talking about the topics that I was interested

13  in and then given some more information about

14  some of these different people.  And those are

15  people that I selected based on the topics.

16  Q.      And based on the information that was

17  given to you about what these people knew or

18  didn't know?

19  A.      Yeah.  Yeah.

20          MS. JOHNSON:  Object to form.

21  Q.      And -- okay.  Thank you.

22          So let's start with Dr. Cassandra

23  Holifield.  How did you communicate with her?

24  A.      It was -- again I can't figure out

25  which.  Phone call or Teams.



1    Q.      So maybe I'll -- for all four of these

2    individuals, was it either a phone call or a

3    Teams call?

4    A.      Yes.

5    Q.      Okay.  And for Dr. Holifield, how long

6    did you speak with her?

7    A.      I didn't note the exact amount of

8    time, but I think all of those conversations

9    were between an hour and a half and two hours.

10   Q.      Okay.  Did who attended these

11   discussions vary from call to call?

12   A.      I think it was always just the

13   individual, and then Melanie was with me on all

14   of them.  Again, I don't know why I think there

15   might have been one other person from -- but I

16   think it was just the three of us, yeah.

17   Q.      And did you lead the discussion for

18   each of these calls?

19   A.      I did.

20   Q.      Okay.  And was it like this?  Based on

21   some notes that you put together --

22   A.      Yeah.

23   Q.      -- about what you wanted to discuss.

24   A.      That's correct, yes.

25   Q.      Did anyone else take notes during



1   these calls?

2      A.       I don't think so.

3      Q.       Okay.

4      A.       I mean, I'm not sure what the people I

5   was talking to might have done.  It didn't

6   appear they were taking notes.  Or if they were

7   on the phone, I wouldn't have been able to know.

8               MR. GILLESPIE:  981.

9               - - - - -

10          (Deposition Exhibit 981, 8/24/2023 GNETS

11          Interview Notes, was marked for

12          identification purposes.)

13              - - - - -

14     Q.       This will be shorter, I promise.

15     A.       That's fine.

16     Q.       Dr. Wiley, do you recognize that?

17   This document.

18     A.       Yes.

19     Q.       And what is this?

20     A.       These are my notes from my

21   conversation with Dr. Cassandra Holifield.

22     Q.       And was that conversation on August 24

23   of this year?

24     A.       That's correct.

25     Q.       And you took these notes, correct?



ANDREW WILEY, PH.D.                          October 30, 2023
UNITED STATES vs STATE OF GEORGIA                        148

```
 1      A.      Yes.

 2      Q.      And again the -- these were taken

 3    contemporaneously with that discussion?

 4      A.      Yes.

 5      Q.      I think I just have one question for

 6    this one.

 7              So on this first page here, about a

 8    third of the way down, there's the line that

 9    begins "Behavior specialist."

10              It goes "behavior specialist; behavior

11    interventionist; a lot had BCBA, RBT; different

12    background; some level of certification, most

13    but not all."

14              Do you see that?

15      A.      Yes.

16      Q.      And if you want to, you can take a

17    look or you could take my word for it.  That

18    same language is included in the second to last

19    line in your notes from your call with Ms. Low.

20      A.      Okay.

21      Q.      And so my question is just why is

22    that?

23      A.      Okay.

24              MS. JOHNSON:  I'm sorry.  Which

25        line?
```



1              MR. GILLESPIE:  It's the second to

2      last.

3              THE WITNESS:  Yeah, I see it.

4              MR. GILLESPIE:  On the third page.

5      Well, I guess the fourth to last line, but

6      second group -- second to last grouping.

7      A.      So I think that probably what happened

8   there was I had this conversation first and I

9   may have copied it here as something that I

10   wanted to make sure to talk about.

11   Q.      Follow up on.

12   A.      Whether or not I did, I'm not sure.

13   Q.      Okay.  And there are a couple other

14   areas, I'll represent to you, in this

15   Exhibit 981 where some of the same language

16   seems to appear in both this and Ms. Low's.

17   Would that be the same thing?

18   A.      I think that's -- yeah.

19   Q.      Okay.

20   A.      That's my recollection.

21   Q.      That's it for that one.  I told you it

22   would be easy.

23              MR. GILLESPIE:  Let's do ...

24              982, please.

25                  - - - - -



```
 1              (Deposition Exhibit 982, 8/25/2023

 2              Interview Notes, was marked for

 3              identification purposes.)

 4                   - - - - -

 5     Q.      Dr. Wiley, do you recognize this?

 6     A.      Yes.

 7     Q.      And what is Exhibit 982?

 8     A.      These are my notes, personal notes,

 9   from my -- when I had contemporaneous speaking

10   with Jeannie Morris.  Yeah.  This was a school

11   climate whole school [sic] reports -- supports.

12              I think she was director of what maybe

13   once was PBS -- PBIS, but I think they've

14   combined it with school climate.

15              These are my notes.

16     Q.      And you spoke with Jeannie Morris on

17   August 25 --

18     A.      Yes.

19     Q.      -- of this year, correct?

20     A.      That's right.

21     Q.      All right.  So just another couple

22   questions here.

23              On this first page, about two-thirds

24   of the way down, the line beginning "Schools

25   invited," do you see that?
```



ANDREW WILEY, PH.D.                                      October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    151

1      A.      Yes.

2      Q.      And then later on you say "invited to

3    use SWIS," and I think that's referring to

4    school-wide PBIS, but is that something else?

5      A.      SWIS is a school-wide information

6    system.

7      Q.      Okay.

8      A.      So it's a data collection --

9      Q.      Ah.

10     A.      -- that's often used with PBIS.  I

11   know that some Georgia schools use it.

12     Q.      On the next line there's language

13   "feasibility, legal issues."

14             What is that referring to?

15     A.      I think it's referring to -- so I

16   believe that Georgia had something related to

17   PBIS and/or school climate where they were

18   encouraging schools to report some data.

19             And what Jeannie Morris was saying

20   here was that they got some pushback from the

21   principals thinking we're sharing data that

22   could be confidential.

23             So they were worried that -- and I

24   don't know the details of it, but she was saying

25   one of the reasons why they didn't get

1    consistent collection and reporting of that SWIS

2    data was the principals were worried about.

3              And the feasibility may have been that

4    some of them pushed back on whether they could

5    collect this data, whether it was feasible.

6    Q.       Why did you ask about SWIS?

7    A.       I think that at that time I --

8    certainly part of the conversation here was,

9    again, data about PBIS implementation, but I was

10   also curious whether or not they had data on

11   outcomes related to PBIS implementation.

12             So I think that that was what I was

13   looking for, was whether or not they had any way

14   to say hey, not only are we doing PBIS, but here

15   are the outcomes that we're seeing based on

16   implementation of PBIS.

17             That's my memory of why that came up.

18   Q.       And do you recall if they had that

19   capability?

20   A.       And I think that's why she said that

21   they don't have it, because there was some

22   pushback at the school level in terms of

23   collecting and reporting these data.  That's my

24   memory of that.

25   Q.       On page 2 of those notes, so on the



1    flip side.  It's two-sided.

2              You have the bolded question "What do

3    you think it would take to scale up FBA/BIPs

4    across the state?"

5              Do you see that?

6    A.       Yes.

7    Q.       Did you ask that question?

8    A.       I'm going to try to remember.

9              And I really think it was Ms. Low who

10   first brought up the upcoming FBA tier three

11   training.  And, again, I might have thought that

12   I wanted to ask her this.

13             I do remember that we had some

14   discussions about the challenges and, you know,

15   barriers to implementation, but I obviously

16   didn't include many of my notes related to that.

17             I remember as I had this conversation

18   that it was pretty consistent with at least some

19   of the research that I reviewed related to

20   difficulties implementing tier one, two, three

21   of PBIS, but I can't say that I remember or

22   there's anything in my notes that indicates ...

23   Q.       And you don't have a specific

24   recollection of what --

25   A.       Yeah.  For FBA, BIP, no.  I feel like



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              154

1    maybe we got a little bit more into it when we

2    talked about tier two, but ...

3              No.

4    Q.        Okay.  And I'm sorry.  Again just to

5    make sure that the record's clear and I'm able

6    to --

7    A.        Yeah.

8    Q.        You don't have a specific recollection

9    of what either Ms. Morris or Ms. Low said in

10   response to that question?

11   A.        I don't think so.  I think -- now, I'm

12   going to say something, but I'm not sure it was

13   in this conversation or if -- what I was

14   remembering, but I think one of the people that

15   I spoke to about functional behavior assessment,

16   whether or not it's in my notes or in my report,

17   was that there were some schools -- I got to be

18   careful because it might have been just PBIS

19   generally.

20             One of the challenges is if you have a

21   school where discipline problems are very low

22   and then there's a perception that this isn't

23   really us, this is something for schools that

24   have lots of trouble.  Really anecdotal.

25             And, again, I don't remember if that



1   was in relation to we don't need functional

2   behavior assessment or we don't need positive

3   behavior support.

4           Does that make sense?

5           But I'm really guessing.  And it's not

6   something I think is here in these notes and I

7   don't think I said anything about that.

8           I did speak about, again, challenges

9   for implementation, but I don't know that I

10  spoke about that specific conversation.

11          I can clarify if you need me to.

12  Q.     I think I'm just ...

13          So you made the statement one of the

14  challenges is if a school has a low level of

15  discipline problems.

16  A.     I just made that statement.  Right?

17  Q.     Yeah.

18          So I'm just trying to understand what

19  you -- this is something for schools that have

20  lots of trouble.

21          You're saying that there's this

22  perception with schools that don't have a lot of

23  students with behavior-related issues that use

24  of FBAs and BIPs are reserved for --

25  A.     And if I were forced to choose, I

 1   would say that was probably more about PBIS

 2   generally than FBA.

 3          And I do remember -- so not only when

 4   I was with Fairfax County was I part of the team

 5   of people that train people in functional

 6   behavior assessment -- I sound like I'm

 7   bragging, but I kind of -- the emerging

 8   initiative of PBIS I kind of discovered.  And I

 9   started talking to people.

10          And I remember even back then there

11   was this same kind of issue, where if you had a

12   very low number of discipline problems people

13   might say "Why do I have to do all of these

14   things?"

15          Now I want to be careful, to say that

16   I don't recall -- I feel like I had that

17   conversation, but I don't have it in my notes

18   and I can't remember if I talked about that

19   specifically.

20          But everybody in PBIS will talk about

21   commitment and buy in, and that is one of the

22   issues with commitment and buy in from the

23   research, that there has to be a perception that

24   this is a need for our school.

25   Q.      Thank you, Doctor.



1            And I don't mean to be rude, but we

2    are interrupting each other just a little bit.

3    So thank you.  I appreciate that.

4            Do you remember whether there was

5    pushback regarding PBIS data from specific

6    schools or LEAs or what the issue there was?

7                    MS. JOHNSON:  Object to form.

8      A.      She did not identify any specific

9    schools.

10     Q.      Okay.  Let's look at the bottom of

11   page 2 here of these notes.

12            Do you see the line "GNETS - FBA

13   eventually over time"?

14     A.      Yes.

15     Q.      Do you recall what that means?

16     A.      I just said in our break that --

17   lesson learned.  Next time I take these kind of

18   notes, for my sake and for people who are

19   looking at them -- so I apologize for that.  Let

20   me see.

21            I don't remember what the context of

22   that phrase is or what it means here.  I'm

23   sorry.

24     Q.      No.  Thank you for -- thank you for

25   letting me know.



1             Looking at the next line there.

2    There's the line "GNETS have done something

3    wrong."

4             Do you know what that means?

5    A.      I think near the end of the

6    conversation Jeannie Morris, who I can't

7    remember how many years she had with GNETS, she

8    was expressing that she felt really bad that in

9    the suit there was the sense that, you know,

10   GNETS was this terrible place.  And so I might

11   have just been typing some notes.

12            It was more of her personal feelings

13   that there was a lot of bad feeling among GNETS

14   personnel and -- past and present, that they

15   felt like they were being unfairly

16   characterized.  That's what I recall that phrase

17   referring to, some of her last comments.

18   Q.      And then your final line there,

19   "Reduction in number of GNETS."

20            Do you recall what that referred to?

21   A.      I think that she might have mentioned

22   that since the 2016 lawsuit enrollment in GNETS

23   had declined.

24            And, again, it didn't make it in my

25   report, but I remember looking at something, it



1   might have been one of the expert reports, where

2   they showed the breakdown by disability and by

3   year, and I think she just mentioned that.

4       Q.      Sure.

5       A.      She's kind of saying hey, we're

6   already reducing our numbers in GNETS.  It was

7   her statement.  I think.

8       Q.      So we've gone through your notes with

9   Ms. Low, Dr. Holifield, and Ms. Morris, but you

10  also spoke with Ms. Brooke Cole, correct?

11      A.      Yes.

12      Q.      And what's -- do you recall what

13  Ms. Cole's title is?

14      A.      I'm sorry.  I don't.  I would have

15  look at my notes.

16      Q.      Would you have spoken with Ms. Cole at

17  approximately the same time that you spoke --

18      A.      Probably near that same time.  I think

19  scheduling was a little tricky with a couple of

20  them.  So there might have been one that was

21  like a week after, a week before.  I don't

22  remember.

23      Q.      And --

24      A.      It's on my Outlook calendar.  I could

25  find it, but ...



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                               160

1    Q.      Is there a reason why you don't have

2    notes for Ms. Cole?

3    A.      I am not sure.  I can't remember -- if

4    she was last, it might have been that I was kind

5    of comfortable with the kinds of things that I

6    was asking about and didn't have to prompt

7    myself.  But I am not sure why I don't.  I don't

8    have an answer for why I don't have those notes.

9    Q.      Do you recall what you discussed?

10   A.      Similar things, I think.  And I do

11   think Brooke Cole also had some previous

12   experience.

13         She might have been current.  Is that

14   true?  I can't remember.  I'm sorry.  If I look

15   through my notes again, I could get some answers

16   for you.

17   Q.      Do you recall anything that she told

18   you specifically that informed your opinions in

19   this case?

20   A.      I don't think.  If she did, then I

21   would have put it in a footnote about --

22   something that was said to me in my report.

23   Q.      So for these conversations that you

24   had, Dr. Wiley, did you take any steps to verify

25   any of the representations that were made?



1              MS. JOHNSON:  Object to form.

2      A.        Verify any of the representations that

3   were made.  I mean, that's pretty general.

4              Again, because when I -- and I know

5   that this may be, like, a section that you're

6   getting into later, but I know that in the

7   expert reports there were some things said about

8   what was and what was not happening in GNETS and

9   what was and was not happening in the zone

10   schools.  We can talk about that later.

11             But in order to rebut the claims that

12   were being made about, you know, these kids

13   could be included, I don't -- I -- I didn't have

14   to look at those things super closely in order

15   to make those judgments.

16             And my other concern with it was, you

17   know, when I compare some of the things that

18   were said in my conversations to some of the

19   findings, for example, in Dr. McCart's report, I

20   mean, my impression was that the way that she

21   characterized GNETS and came to her conclusions

22   was pretty subjective.

23             And I didn't see a clear method for

24   how she made sure that the information she was

25   collecting and compiling was objective and not



1    based on sort of her prior conceptions about

2    separate schools like GNETS.  Same thing with

3    the records review.

4            And, now, there are ways to structure

5    an observation to come up with clear categories

6    of occurring or not occurring or things related

7    to, you know, documents and records, but I

8    didn't see that method used.

9            So in that sense, you know, no, I

10   didn't have the opportunity to corroborate these

11   things.  I was kind of saying, you know, there

12   are people who work in these programs who have

13   said that's not accurate.

14           So it does to me, in my opinion, call

15   in question the accuracy of everything that

16   Dr. McCart, for example, put in her findings.

17   Q.      And what does?

18   A.      Talking to the folks.  And also her

19   method.

20   Q.      And do you -- well, we can hold off on

21   that.

22           But, Dr. Wiley, earlier you said "I

23   don't have to look at those things super closely

24   in order to make those judgments."

25           I just want to get an understanding of



1    what "those things" are.

2      A.       Rebutting the claims that I listed

3    that I rebutted from the expert reports.

4            So an example would be we now know how

5    to include the vast majority of kids with

6    behavior-related disabilities.  That's, in my

7    opinion, not correct and not consistent with

8    knowledge in the field.

9            So that would be an example of, you

10   know, that doesn't require me to specifically

11   look at -- to do the observations and the

12   extensive records reviews that over years I

13   think, in my understanding, Dr. Putnam and

14   Dr. McCart did.

15           Tell me if you need that clarified,

16   because I can say it again.

17     Q.       No.  Thank you.  I appreciate that.

18           Are you familiar with the term

19   "community service board"?

20     A.       Not very familiar.  So I think no.

21     Q.       Did you communicate with any staff of

22   the Department of Behavioral Health and

23   Developmental Disabilities?

24     A.       I did not.

25     Q.       Did you communicate with Heather



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              164

1    George about the GNETS program at all?

2       A.     I did not.

3       Q.     Are you familiar with the

4    Interconnected Systems Framework, or ISF?

5       A.     I am generally familiar and I am

6    familiar with a recent randomized control trial.

7    I know that it's something where they're trying

8    to bring essentially wraparound together with

9    PBIS.

10          So I know a little bit about it.

11   Again, I would describe wraparound and the

12   framework as a promising practice, but we

13   haven't solved all the problems and we don't

14   know if that makes it possible to include the

15   vast majority of kids with behavior

16   disabilities.  Behavior related.

17      Q.     And you didn't specifically consider

18   any version of the ISF manual in preparing your

19   rebuttal report, correct?

20      A.     A specific version of the manual.  I

21   did not.

22      Q.     Did you consider any version of the

23   manual in considering your report?

24      A.     The ISF manual?

25      Q.     Yes.



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                               165

1    A.      No.

2    Q.      Okay.

3    A.      I did have a section where I

4  responded -- and I know that Dr. Putnam in

5  particular spent a lot of time.  He gave some

6  examples of, you know, wraparound research.

7          And I think, again, it's promising,

8  but we're not at a point where we know how to do

9  it.  And we also don't know how well that serves

10 kids with behavior-related disabilities in

11 general ed in particular.

12         I'm hopeful.  You know, I think -- I

13 hope I made that clear.  I hope we're able to

14 develop that and solve all the implementation

15 problems.  But I don't think it's right to say

16 that wraparound is ready for prime time.

17   Q.      Are you aware whether Georgia offers a

18 high fidelity wraparound intervention for

19 children with behavior-related disabilities?

20   A.      I am not aware.

21         And I will say that wraparound is not

22 my heavy sort of area of focus and expertise.  I

23 did read in the reports about some of the

24 community health and some of the things that

25 are -- have been started and are being used to



1  some degree, but I can't really characterize

2  what exactly is in place, how it's accessed, how

3  well it's being implemented.

4          I was a little better able to look at

5  things like PBIS implementation.  So yeah.

6    Q.    Sure.  That's helpful.  Thank you.

7          Do you know whether the state of

8  Georgia's done any research relating to

9  educational outcomes for children receiving high

10  fidelity wraparound intervention?

11    A.    I don't think I'm aware.  I do think

12  that I saw mention of some grants, which I don't

13  know if they're research grants or

14  implementation grants, related to, you know,

15  community mental health.

16    Q.    Are you aware whether Georgia

17  encourages the use of PBIS -- of the PBIS

18  framework in its school?

19    A.    I am aware.  And my opinion is yes,

20  they do encourage it.

21    Q.    Are you aware whether the state of

22  Georgia has a PBIS strategic plan?

23          MS. JOHNSON:  Object to form.

24    A.    I am not aware.  I don't recall seeing

25  it on the website, but ...



1            I think that they do, but I'm not sure

2      exactly where I saw that.

3      Q.      Are you aware of whether the state of

4      Georgia has endorsed a system of care approach

5      to coordinating its programs and services for

6      children with behavior-related disabilities?

7                MS. JOHNSON:  Object to form.

8      A.      I am not aware.  I think that that was

9      mentioned, again, in the report.  And without

10     looking at Dr. Putnam's report I think that

11     there is endorsement of a system of care, but

12     that's just -- I may not be remembering

13     correctly.

14     Q.      Are you aware of whether the state of

15     Georgia offers intensive family intervention

16     services for children with behavior-related

17     disabilities?

18                MS. JOHNSON:  Object to form.

19     A.      I am not aware of if or how they

20     provide that.

21     Q.      And do you know whether the state of

22     Georgia has endorsed that service as effective

23     for children who may be at risk for restrictive

24     placement?

25                MS. JOHNSON:  Object to form.



1    A.      If Georgia has?

2    Q.      Yes.

3    A.      No, I'm not aware.

4    Q.      So we discussed that you've seen

5    Dr. McCart's -- actually, let me go back really

6    quick.

7            Do -- are you familiar with the term

8    "system of care"?

9    A.      Only from reading these reports.

10           Again, my focus is much more on

11   school-based.  I know enough about related

12   services and wraparound from my, you know, my

13   training.  But -- when it gets into community

14   services, I will say that that's not as much my

15   area of expertise.

16   Q.      And just so that I have an

17   understanding, if I ask you to define what a

18   system of care is, would that be something

19   outside of your area of expertise?

20   A.      Yeah, that term specifically.  I think

21   if you used the term "wraparound" -- and what I

22   just don't know is how much those two things

23   relate to each other.

24           But wraparound is the idea that, you

25   know, you wrap around the child services of



1  various kinds to address their needs.

2           I think system of care might relate to

3  that, but I'm not sure.

4    Q.      Thank you.

5           So earlier, Doctor, you told me that

6  you reviewed the transcripts for Dr. McCart and

7  Dr. Putnam in their depositions.

8           Have you reviewed anything else

9  related to this matter since completing your

10 report?

11   A.      I have not.  And again I want to

12 emphasize that I didn't read thoroughly their

13 depositions, but I looked at some parts of it.

14   Q.      And I'm guessing -- is there anything

15 from your view of either of those that changes

16 your opinions in your report?

17   A.      No.

18   Q.      No.

19          So, Dr. Wiley, before we dive into the

20 specifics of your report, I just -- I want to

21 begin by getting clarification of what opinions

22 that I understand you're not giving in this

23 case.

24          So, Dr. Wiley, you offer no expert

25 opinions on whether any students in the GNETS



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                   170

1   program could or should be appropriately served

2   in a general education environment, correct?

3       A.      On any individual students?

4       Q.      Correct.

5       A.      No.  And I don't think the other

6   experts did either.  If I'm right, but -- yeah.

7       Q.      And I'm just asking here --

8       A.      Yes.

9       Q.      -- to get an understanding --

10      A.      No, that's right.  That's right.  No

11  individual students.

12      Q.      What you are and are not saying.

13      A.      Yes.  Good.

14      Q.      You also offer no expert opinions on

15  the sufficiency of the provided mental health

16  and therapeutic services to meet the needs of

17  the students in the GNETS program, correct?

18      A.      Individual students or students

19  overall?

20      Q.      Either.

21      A.      Either.  No, I'm not.

22      Q.      You're not offering any opinions of

23  Georgia's implementation of PBIS, correct?

24              MS. JOHNSON:  Object to form.

25      A.      Well, I think that I did, you know,



1  look at their level of implementation and sort

2  of characterize it compared to other states, you

3  know, around the country.

4          I did look at some of their training

5  materials and their website where they're trying

6  to support schools and help them.

7          So in that sense I do think that I --

8  I looked at that in forming my opinion.  Yeah.

9    Q.     But I guess my question is, are you

10  offering expert opinions in this case about

11  Georgia's implementation of PBIS?

12   A.     So opinion about whether or not

13  they're doing it all, doing it well enough,

14  doing it as much as you would --

15   Q.     Yeah.

16   A.     -- I mean those kinds of things?

17   Q.     Exactly.

18   A.     I mean, in that sense that I think I'm

19  giving an opinion, and that opinion is that they

20  are implementing PBIS.

21          You know, one of the challenges here

22  is knowing what's possible and whether or not,

23  you know, Georgia's doing what you would expect

24  a state to do in terms of supporting PBIS.

25          My opinion is that they're pretty much



1   middle of the road in terms of doing that, if

2   that makes sense.  So I think that they're doing

3   many of the right things, they're providing

4   training.  I think that they're recognizing

5   schools that are doing it.  I think recently,

6   again, ongoing this year they're providing

7   training in tier three.

8           So implementing -- the trick for me is

9   implementing PBIS is a pretty complex matter,

10  and I think that I have evidence that they're

11  doing many of the things that you would expect

12  to do.

13          But I did not focus my report on going

14  into schools implementing PBIS and providing,

15  like, sort of that fine-grained analysis of

16  exactly how well it's going.

17          Now, the data that they collect, not

18  all of them, are those fidelity data, and that's

19  one way we get a look at how well are schools

20  implementing PBIS.

21          And I did compare -- I did say when we

22  look at national data from the national Center

23  on PBIS it's a very small percentage of schools

24  that we can say from data are implementing these

25  things with fidelity.



1          So comparing Georgia to that and

2    providing that kind of opinion.

3          And I think the other thing that I've

4    tried to say in my report and I want to say

5    here, and maybe it will come up again, is that

6    one of the challenges of implementing PBIS is

7    it's a framework.  It's not a curriculum or a

8    program that has step one, step two, step three.

9          And so I think even when you use those

10   tiered fidelity inventories, they look like

11   that.  Do you have a team?  Do they meet?  Do

12   they identify interventions?

13         And, by the way, I'm very respectful

14   of the work in PBIS, but I think it's a

15   implementation -- one of the reasons why we

16   don't see better implementation is we don't have

17   specific ways to really evaluate implementation

18   of PBIS.

19         I didn't mean to go on there, but I

20   also don't want to say I'm not giving any

21   opinion, but I'm giving the opinion that I feel

22   like I have enough information to give an

23   opinion.

24   Q.      And I want to make sure I understand,

25   too.



1          So the opinion that you're giving on

2    Georgia's implementation of PBIS is the extent

3    to which schools in the state of Georgia have

4    implemented some tier of PBIS, correct?

5      A.      Right.  That's what the state reports.

6      Q.      And that's based only on the state

7    data on the PBIS website that you looked at,

8    correct?

9      A.      Yes.  Yes, that's correct.

10     Q.      And so your opinion on PBIS is just

11   measuring the state reported data of its own

12   implementation compared to data available to you

13   from other states?

14     A.      Yeah.  And that's a universal thing,

15   though, for states to complete their own tiered

16   fidelity inventories.  So it's not that outside

17   people come in and say okay, we're going to look

18   at you.  The way that it works -- and it's good,

19   it's just not perfect --

20     Q.      Sure.

21     A.      -- for them to fill it out themselves.

22     Q.      I want to make sure -- no, you're

23   great.

24          I just want to make sure that I'm

25   getting this exactly right, that the extent of



1 | your opinion on Georgia's implementation of PBIS
2 | is just measuring that state reported data --
3 | actually, let me withdraw that.
4 |         Comparing that state reported data
5 | from Georgia to other states.  That's -- that's
6 | your opinion on Georgia's implementation of
7 | PBIS, correct?
8 | A.       Yeah.  If my opinion is to
9 | characterize their implementation, it's that.
10 |         And then the other thing that's kind
11 | of hard to get throughout my report is it's hard
12 | to give an opinion on a level of implementation
13 | when implementation is not really clearly
14 | defined in the field yet.  That's my opinion.
15 |         And so you're right.  I mean, I would
16 | have to rely on whatever self-report data that
17 | they have.  I didn't go into schools and use
18 | the -- and, by the way, that's one of them, you
19 | know, the fidelity instrument.
20 |         But relying on what they've said.
21 | They're in a very similar place.  And in some
22 | ways at that tier one level of implementation
23 | above that 24 percent that's reported for all
24 | states.
25 |         And the other part of my opinion is to



1   say implementation is more challenging than I

2   think the experts are saying.  And so it's not

3   like hey, we just don't provide enough training,

4   we don't have the motivation, it's that these

5   frameworks are very complex, difficult to

6   sustain.  I think they're good, you know.

7            One of the things I wrote about in my

8   report is in a lot of ways they've made more

9   progress than other things, but it's still we

10  have to be realistic about where we are in terms

11  of what we know about implementing PBIS.

12   Q.      Understood.  Thank you.

13           Dr. Wiley, you're not offering any

14  expert opinions on the sufficiency of the scope

15  or quality of mental health and therapeutic

16  services available to students in the GNETS

17  program, correct?

18   A.      Certainly not individual students.

19  And then also no about -- about whether or not

20  the scope and quality is sufficient.

21   Q.      And you're not offering any expert

22  opinions on the sufficiency of the scope or

23  quality of services and supports provided in

24  general education settings in Georgia, correct?

25   A.      That is correct.  I'm not providing



1    that opinion, but I am providing an opinion

2    about the claims by the experts that we now know

3    how to do that and schools could do it if they

4    just did it.

5       Q.       Understood.

6       A.       Does that make sense?

7       Q.       Yeah.

8               You're also not offering opinions on

9    the scope or quality of community mental health

10   and therapeutic services in the state of

11   Georgia, correct?

12      A.       That's correct.

13      Q.       And you're not offering any expert

14   opinions on whether any aspect of the education

15   that students in the GNETS program receive is or

16   is not inferior to that of students in general

17   education schools in the state of Georgia,

18   correct?

19      A.       So you're saying I'm not offering an

20   opinion about what's actually happening within

21   GNETS schools?

22      Q.       On whether any aspect of the education

23   that students receive -- students in the GNETS

24   program receive is or is not inferior to that of

25   students in general education settings in the



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                   178

1    state of Georgia.

2              MS. JOHNSON:   Object to form.

3      A.      Well, I'm not, but I also am concerned

4    about, again, the use of "inferior" outside of

5    the individualized context of an IEP.  You know,

6    what you mean by "inferior."

7              Especially when we say hey, these --

8    they should have an equal educational

9    experience.  I understand what we mean when we

10   say that, but in some ways it's different.

11   Special education is meant to be individualized

12   and different from what all kids, you know, get.

13             So I don't know that I'm going in and

14   saying in this particular kid's case the

15   educational experience is inferior to these kids

16   in another place.

17             But I am trying to comment on how we

18   ought to be thinking about that.  And I think

19   rebutting some of the conclusions -- again,

20   partly based on the fact that I don't think the

21   experts brought up individual kids and talked

22   about their individual experiences either.

23             And then the methodology that might

24   have sort of helped that, the observation and

25   the records review, strikes me as nonsystematic.



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              179

1  And it's kind of like these are my conclusions,
2  but it's not clear to me how they looked and how
3  they reviewed records.
4        And it's similar to reviewing a
5  manuscript, which I know Dr. Putnam and
6  Dr. McCart and I -- you know, we review research
7  studies.  You look at the method and we say are
8  these conclusions.
9        So that was a little bit of the hat
10 that I had on when I said, you know, have they
11 provided a student that I can look at and also
12 have their methods accurately characterize what
13 is and is not happening in GNETS and what is or
14 is not happening in the general ed schools.  I
15 feel like we don't have that is my opinion.  We
16 don't have that information to look at.
17 Q.       But you didn't conduct any individual
18 or systematic review of educational settings in
19 Georgia for appropriateness of educational
20 services, correct?
21 A.       I didn't.  I don't think anybody else
22 did either.
23 Q.       And you're not offering any expert
24 opinions on the methodology used by either of
25 the United States' experts in this case, are



1  you?

2    A.      I am offering my opinion here in this

3  deposition.  I am not sure if I made comments

4  about the approach used in my report.  I can't

5  recall.

6            I think that the one comment that I

7  made in my report is that they didn't identify

8  individual kids who they say -- who you would

9  say exemplify the unnecessary segregation.

10           Does that make sense?

11   Q.      It does.

12   A.      So I'm saying, you know, to do that,

13  you really would have had to have done, in my

14  opinion, something different.  Yeah.

15   Q.      And you're not offering any expert

16  opinions in this case on whether any students in

17  the GNETS program could be equally or better

18  served in a more integrated environment,

19  correct?

20   A.      I am offering an opinion based on

21  research about when somebody says a bunch of --

22  so if I'm talking about the kids in general,

23  like the population, right, that's sort of my

24  opinion, is saying when they say kids with

25  behavior-related disabilities could be served in



1  general ed with these particular settings,

2  that's the big part of my section where I say

3  well, hold on.  You know, is this really the

4  consensus of the field?  How much do we actually

5  know?  Sorry.

6     Q.     And -- no.  No.  Dr. Wiley, --

7     A.     I interrupted you again.  I apologize.

8     Q.     -- I appreciate what you're saying,

9  and I promise you we're going to spend most of

10 our time today talking about what opinions you

11 are giving, but --

12    A.     Okay.

13    Q.     -- I just -- you know, before we get

14 into that, I want to have some clarity on the

15 areas where you're not providing an expert

16 opinion.

17    A.     Okay.

18    Q.     And so just here I want to clarify

19 you're not offering any expert opinions on

20 whether any students in the GNETS program could

21 be equally or better served in a more integrated

22 environment, correct?

23    A.     Any individual students.  No, I'm not.

24 Is that okay, for me to clarify it that way?

25    Q.     Yeah.



ANDREW WILEY, PH.D.                                      October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    182

1    A.      Okay.

2    Q.      But then I'm going to ask any group of

3  students.

4    A.      Kids with behavior-related

5  disabilities I think I am offering an opinion.

6            But I think what you're getting at --

7  I don't mean to be -- I'm sorry.

8    Q.      No.

9    A.      You're saying that I didn't go in and

10  look at the program to say are there kids here

11  that could be in general ed if they just did X,

12  Y, or Z.

13    Q.      Right.

14    A.      That, I think, is accurate.

15            But I think when we're talking about

16  the population of kids and when we've looked at

17  them systematically through research, that's the

18  opinion that I'm offering.

19    Q.      But nothing relating to Georgia

20  specifically or GNETS specifically, --

21    A.      A specific --

22    Q.      -- correct?

23    A.      -- school or a specific student,

24  that's correct.

25    Q.      Or even statewide.



ANDREW WILEY, PH.D.                              October 30, 2023
UNITED STATES vs STATE OF GEORGIA                         183

```
 1    A.       Right.

 2    Q.       Yeah.  Thank you.

 3             As I understand your report, at least

 4    sections II through V, your purpose was to

 5    correct what you saw to be misunderstandings on

 6    the literature around placements interventions

 7    generally, correct?

 8    A.       Yes.

 9    Q.       And in so doing, you provide a defense

10    for having separate placements generally,

11    correct?

12    A.       Yes.

13    Q.       But, again, you're not offering expert

14    opinions on the GNETS program itself, correct?

15    A.       Well, GNETS program being a program

16    that offers separate schools on the continuum of

17    alternative placements.  Just in that sense,

18    yes.

19    Q.       Okay.  Thank you.

20             When I pause, I'm just trying to see

21    if I can --

22    A.       No.

23    Q.       -- truncate things --

24    A.       No.

25    Q.       -- a bit.
```



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              184

1            You didn't conduct any analyses of
2    claims data for children receiving behavioral
3    health services through Georgia Medicaid,
4    correct?
5      A.      I did not.
6      Q.      And you're not offering any opinions
7    in this case on that topic, correct?
8      A.      Again, the only connection, I would
9    say, is what we know from research about
10   wraparound services and what I view as a
11   promising practice.  And I try to say, you know,
12   when you're looking at what can and should be
13   done, this is what research has shown us so far.
14   That's all.
15     Q.      Understood.  Thank you.
16             You don't purport to contest
17   Dr. Putnam's Medicaid utilization data analyses,
18   correct?
19     A.      I am not rebutting his data.
20     Q.      And you're not offering any opinions
21   in this case as to whether the GNETS program in
22   particular unnecessarily segregates students
23   with behavior-related disabilities from
24   nondisabled peers, correct?
25     A.      Say it one more time.



1    Q.      Yeah.  Absolutely.

2    A.      I don't mean to put the qualifiers on

3  it, because I think I'm offering an opinion, but

4  I want to make sure I answer your question.

5    Q.      So you're not offering any opinions in

6  this case as to whether the GNETS program in

7  particular unnecessarily segregates students

8  with behavior-related disabilities from

9  nondisabled peers, correct?

10    A.      So the two things that I want to say

11  are I am providing, I think, the criteria for

12  how you would have to make that determination,

13  both in terms of the requirements of IDEA and

14  also what we know from research.

15        And then, also, when you say programs,

16  it is true that I did not have the opportunity

17  to, you know, spend multiple days in those

18  programs.  But I want to be careful of that one,

19  too, because I think there are multiple

20  different programs, and my assumption is there

21  is some variation in the kids that they're

22  serving and also, you know, the services that

23  they're providing.

24        But I think that if you're saying did

25  I go and look at individual kids in GNETS



1   programs or individual GNETS programs, I didn't,

2   but it's my opinion that I didn't have to to

3   rebut the claim, right, that there are thousands

4   of kids who are unnecessarily segregated.

5          Does that make sense?

6   Q.      Yes.

7   A.      Okay.

8   Q.      And I track you with that.

9   A.      Okay.

10  Q.      But, Dr. Wiley, I just want to make

11  sure that I have clarity on this.

12  A.      Yes.

13  Q.      You aren't offering expert -- an

14  expert opinion in this case as to whether the

15  GNETS program statewide, or any particular GNETS

16  program, unnecessarily segregates students with

17  disabilities, correct?

18  A.      I am not offering that opinion and I

19  don't think anybody gathered the information

20  that would allow us to make that determination.

21  Q.      Understood.  Thank you.

22  A.      So, yeah.

23  Q.      It's your expert opinion, Dr. Wiley,

24  that some students are best served in separate

25  educational settings, correct?



1    A.      That is correct.

2    Q.      And, broadly speaking, -- well,

3    actually, let me think if I want to shortcut

4    this a little bit.

5           Yeah.   So what categories of students,

6    just again very generally, do you believe should

7    be served in separate educational settings?

8    A.      It isn't categories of students, it is

9    based on their individual needs and their

10   individual education program.

11          So I know that that's, you know, what

12   the law says, but there's a substantive, you

13   know, kind of reason for that.  And there are

14   some kids who have special -- or

15   disability-related needs that require a level of

16   intensity of programming that really can only be

17   provided effectively and appropriately in a

18   specialized setting.

19          So it's not that there are categories

20   of kids.   There's a determination, and I think

21   it's one of the really important things about

22   IDEA, that's made by the people who know the

23   student best.  And you -- so there are

24   categories.

25          I do think that I did mention



1  somewhere in my report that there are -- of the

2  13 eligibility categories in IDEA, there are

3  some students that tend to be served more often

4  in separate placements.  And that's a general

5  reflection of the characteristics of those

6  students and the difficulties that they

7  typically ...

8           So when you look at it and you say oh,

9  students with more severe disabilities may be

10 served more often self-contained, it's logical

11 in the sense that those students tend to have

12 very intensive and specialized needs.

13   Q.      And maybe I was inartful in my use of

14 the word "category."

15   A.      Okay.  No.  No.  That's okay.

16   Q.      You would agree that separate settings

17 should be reserved for students who would not

18 otherwise be successful in more integrated

19 settings, correct?

20   A.      That's what the law requires, and I

21 fully support that.  I think that we have to try

22 to provide supports in the -- in a more

23 inclusive setting or with students without --

24 without disabilities.

25           But then an IEP team needs to make a



1   determination about whether or not progress is

2   satisfactory, right, under those circumstances.

3           So if you're asking me if that -- I

4   believe in that logic or that ethic, absolutely.

5   I think that unfortunately we've pressed for

6   inclusion without really thinking very

7   carefully.

8           It's easy to measure how many kids are

9   physically in a general ed class.  Whether or

10  not they're making appropriate progress is much

11  tougher to determine, but I think it should be

12  first in our mind when we think about what's

13  appropriate for kids with disabilities.

14    Q.      And it's not your opinion, Doctor,

15  that separate placements are inherently superior

16  to integrated placements, correct?

17    A.      They are not inherently superior, but

18  they are logistically superior for some

19  individualized interventions and supports.

20    Q.      What do you mean by "logistically

21  superior"?

22    A.      So when I talked about the limitations

23  of general education, for example, that have to

24  do with the use of space, social constraints,

25  the fact that you have large groups versus small



1   groups, there are things about large group

2   general education, including, you know, what

3   activities are prioritized, that can run counter

4   to implementing the kind of individualized

5   interventions for some kids.

6           And then there are -- on the opposite

7   end, in a special school it allows you to

8   provide potentially, you know, smaller groups,

9   environments that are more appropriate for the

10  activities, materials.  You know, focus of

11  instruction.

12          So those are general things.  And I

13  think I have a section where I sort of talk

14  about why is placement important.  Why can't we

15  do anything anywhere, right, in education or

16  special education.

17          And that's what -- I would say your

18  initial question is, is there something

19  inherently superior about special placements.

20  Just like any profession that has

21  specialization, either in environments or tools

22  or whatever, that's the advantage.  It's not

23  that it's inherent.

24          And I really made that point because

25  people will say that.  "Oh, it's inherently



 1  better to be in general education."  Well,

 2  that's not true either.  It doesn't matter

 3  what's actually done.

 4        But some placements are configured

 5  such that it's more likely -- you're more able

 6  to provide intensive supports for some kids.

 7  Q.      So maybe this gets at what I think

 8  you're telling me.  Would you agree that, all

 9  other factors being equal, students with

10  disabilities -- and, actually, let me preference

11  this by saying I want to talk separately from

12  your understanding of what the legal

13  requirements are --

14  A.      Okay.

15  Q.      -- and your opinions an as expert in

16  this field.

17  A.      Okay.

18  Q.      So with that caveat, would you agree

19  that all things, all other factors being equal,

20  students with disabilities should be placed in

21  the most integrated environment suited to meet

22  their needs?

23  A.      The "all factors being equal" is a

24  little confusing.

25        I think on an individual basis



1    students absolutely -- like, there should be a
2    weight to having students taught with their
3    nondisabled peers.  There should not be an
4    unnecessary teaching in a -- less inclusive
5    settings.
6      Q.      Okay.  Thank you.
7      A.      Not necessarily just a legal matter,
8    but I do think that if we can provide
9    appropriate IEPs to kids in more inclusive
10   settings, then we should do that.
11          And for many kids we can't, and that's
12   reflected in placement data, including for kids
13   with behavior-related disabilities.  But for
14   some kids it's not appropriate and the IEP team
15   is the one that knows the kid; the -- what's
16   going on in general ed, what's going on in the
17   continuum placements, and what would be the most
18   appropriate level of inclusion.
19          If you want to -- I'm trying to take
20   it out of the legal LRE kind of thing.
21     Q.      Sure.
22          And, Doctor, you said there should not
23   be unnecessary teaching in less inclusive
24   settings.  And we're going to talk about what
25   unnecessary means later, but my question is just



1  why is that.

2    A.      I think that because -- I use the

3  historical example that there was a time when

4  kids with disabilities were sort of

5  automatically taught in self-contained

6  classrooms or in special schools.  Right.

7          And then -- I think that there is

8  value to having kids being taught and having

9  opportunities to interact with kids who don't

10 have disabilities.  There's value.

11         I think there's moral value, and I

12 think that there at times, although, again,

13 people don't tend to get into the details, which

14 are important, there are potential educational

15 values.

16         However, the reality is that there are

17 some kids where teaching them in those settings

18 would undercut their ability to make -- to learn

19 and to make progress.

20         So I hope that that answers it.

21         So I really do think that the law

22 makes sense from an ethical perspective.  And

23 the way that I think about it is that

24 presumptive rights.  I'm sorry to bring it into

25 IDEA and the law, but there is weight to we



1   shouldn't unnecessarily or haphazardly or

2   randomly separate kids for educational purposes

3   when we don't have to.

4      Q.      Thank you.  No, that does answer --

5      A.      Okay.

6      Q.      But if I understand you correctly,

7   it's your position that for some minority, or

8   maybe I should say number of students with

9   emotional and behavioral disabilities, separate

10  placements may be better suited to meet those

11  students' needs, correct?

12     A.      That is correct.

13     Q.      But even there would you generally

14  agree that students with disabilities should be

15  able to access general education settings and

16  peers to the greatest extent possible consistent

17  with their needs?

18     A.      "To the greatest extent possible" is

19  an important qualifier, and also to the greatest

20  extent appropriate.  I know that -- and it's

21  great because we have this continuum -- when we

22  think of a continuum of --

23     Q.      I'm sorry.

24     A.      You go ahead.

25     Q.      I just want to -- was that a yes at



1  the beginning, to the question?  Because I want

2  to make sure, before we get to that, --

3    A.      To the greatest extent possible, yes.

4    Q.      Okay.  Thank you.

5    A.      But I would say -- can I just --

6    Q.      Yes, please.

7    A.      To the greatest extent appropriate and

8  possible.

9    Q.      Yes.  Okay.

10    A.      There are students who, because of the

11  nature of their disabilities, even, you know,

12  being in the same, let's say cafeteria, and I've

13  worked with many of these students, can be very

14  challenging for the student.  And it can be very

15  challenging because it may disrupt or -- you

16  know, there are a lot of things that can happen.

17  And so we have to look at that.

18        You know, we can't just say we believe

19  that it would be great if all kids ate in the

20  cafeteria together, just to give you an example.

21  It's an individualized determination.  So

22  appropriate on an individual basis, yes.

23    Q.      Thank you.

24        I'm going to do a couple questions,

25  and then we'll break for lunch, if that works.



1   A couple.  A lawyer's couple.

2            So kind of operating from those same

3   caveats about appropriateness and possibility,

4   should students with disabilities have the

5   opportunity to participate in specific classes

6   with nondisabled peers if they're able to and

7   would benefit from doing so?

8            MS. JOHNSON:  Object to form.

9   A.      If they're able to and they would

10  benefit from doing so.  Yes.

11  Q.      Should students with disabilities have

12  the opportunity to participate in electives with

13  nondisabled peers if they are able to and would

14  benefit from doing so?

15  A.      If --

16           MS. JOHNSON:  Object to form.

17  A.      Okay.  If they're able to and if they

18  would benefit from it.

19           And another thing that we don't often

20  mention here --

21  Q.      I'm sorry.  I want to get the --

22  A.      Go ahead.

23  Q.      I want to get the yes or no --

24  A.      Yeah.

25  Q.      -- before the explanation.



 1    A.      This is the professor -- you said it's
 2  lawyer time.  This is a professor --
 3    Q.      Yes.
 4    A.      -- talking too much.  My fault.
 5  Go ahead.
 6    Q.      No.  No.
 7          So I want to hear your explanation,
 8  but --
 9    A.      Okay.
10    Q.      But, again, should students with
11  disabilities have the opportunity to participate
12  in electives with nondisabled peers if they're
13  able to and would benefit from doing so?
14          MS. JOHNSON:  Object to form.
15    A.      I would say yes.  And the only thing I
16  was going to add is if they want to.  Sometimes
17  we forget when we're sort of toggling over this
18  is that kids have experiences and perceptions.
19          And I don't know that I mentioned this
20  research, but there's some kids who really like
21  their special classrooms and their special
22  schools.  And so it's important to not only say
23  can they and will they benefit, but also --
24  which could be wrapped up in benefit.  Do they
25  find it emotionally beneficial.  Let's say it



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              198

```
 1   like that.
 2      Q.      Thank you.
 3      A.      Yeah.
 4      Q.      I appreciate that.  And I'm not trying
 5   to cut off your explanation.
 6      A.      No.  No.
 7      Q.      I just want --
 8      A.      That's fine.
 9      Q.      -- to make sure I get the answer
10   first.
11      A.      Please do.  If you don't cut me off, I
12   won't know when to stop.
13      Q.      Should students with disabilities have
14   the opportunity to eat in the cafeteria, for
15   example, with nondisabled peers if they're able
16   to and would benefits from doing so?
17      A.      If they're able to and they would
18   benefit.  Yes.
19      Q.      Thank you.
20              And should students with disabilities
21   have the opportunity to participate in
22   extracurricular activities with nondisabled
23   peers if they are able to and would benefit from
24   doing so?
25      A.      Yes, and they would want to.  Correct.
```



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                               199

1    Q.      Thank you.

2            Do you agree that the availability of

3    appropriate services and supports can in some

4    cases determine whether a student with

5    disabilities is able to be served in the most

6    integrated environment appropriate to their

7    needs?

8            MS. JOHNSON:   Object to form.

9    A.      Can in some cases.   That's -- in some

10   case is the individualized part for sure.

11   Q.      So, for example, if there are

12   insufficient community-based services with a

13   general education school, could an IEP team

14   determine that a child must go to a more

15   restrictive setting due to that lack of

16   services?

17           MS. JOHNSON:   Object to form.

18   A.      There are requirements for an IEP team

19   to develop that IEP, and that happens first.

20   And there are things like related services, for

21   example, that can be include in that.   And

22   then -- ask your question one more time, Matt.

23   I'm sorry.

24   Q.      No.   No.   You're fine.

25           Could the lack of availability of



1  supports and services result in an IEP team

2  placing a student in a more restrictive setting?

3    A.      Legally?

4            MS. JOHNSON:  Object to form.

5    Q.      Not legally, just your experience --

6    A.      Okay.

7    Q.      -- as an expert?

8    A.      No, that's not the way it's supposed

9  to work.  So, you know, the IEP is supposed to

10  address all of the students' needs, not based on

11  their disability.  Right.

12           And there has to be a judgment

13  about -- by the IEP team about which services

14  are required to identify which of the priority

15  needs.  And then to decide what is the

16  educational placement.

17           And I think that same determination

18  would have to be made related to participation

19  in things like specials and extracurricular

20  activities.  The IEP team is the one that would

21  make that determination.  Sometimes with the

22  input from the child, but certainly from the

23  parents.  Go ahead.

24    Q.      No.  No.  I'm trying to understand.

25           If an IEP team determines that a



1  student has a need for some support or service

2  that is not available at that school or

3  location, could that not result in the student

4  being placed in a more restrictive setting?

5            MS. JOHNSON:   Object to form.

6   A.      Again I think -- it might depend to

7  some degree on the service that you're talking

8  about.  I also think that you're getting into

9  some areas that have to do with the law.

10           My practitioner, kind of my person

11  type understanding of the law is that if the IEP

12  team identifies that a service is needed, then

13  it has to be provided.

14           Now, there are some services that are

15  going to be best provided for a variety of

16  reasons in a more specialized setting.

17           But -- let me take a really mundane

18  example where we say oh, you know, we have a

19  student who has a visual impairment and they

20  need Braille or books on tape.  A school cannot

21  say "Books on tape, we don't have them here.

22  You have to go to the school for the blind."  In

23  that sense that -- that's true.

24           But the reason why I'm saying that is

25  that the detail is important about what service



1   it is to understand, how to think about your

2   question.

3      Q.      But, I guess, looking at the

4   practicality if there's -- if there is no

5   alternative in the general education setting,

6   would you agree, then, that the IEP team's

7   choice is really limited as to whether to keep a

8   student in a general education setting or

9   sending them to a more restrictive setting?

10                MS. JOHNSON:   Object to form.

11     A.      I'm only having difficulty out of a

12   very specific context.

13           That is one of the reasons why, for

14   example, a special school -- let me use the

15   example of, you know, where I taught.

16           We had our own specials.  We had our

17   on music.  We had our own PE.  And they were

18   trained -- special educators were also provided

19   PE.  In that sense we did draw kids from, right,

20   on the continuum, and it was an optimal way to

21   provide those services to those kids.  So that

22   is part of what happens.  Right.

23           You know, and if you even use an

24   example that may be more directly related to the

25   case -- and, again, you may get into more



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                   203

1  specifics about -- but if you need people who
2  function as a behavior specialist, and right now
3  if it's tough to get enough for the specialized
4  programs in GNETS, you can imagine how we're
5  going to have one per every general ed school
6  that's out there.  Right.  I'm just using a
7  very ...
8           But my point is that you have to
9  implement the IEP.  You can't -- there are
10  certain things that you can't just say that
11  doesn't exist.  It is true that the limit is --
12  it's not the sky's the limit, right, because the
13  legal concept -- however, the school's able to
14  say we have a continuum of ways to deliver those
15  services.  And one may be the special settings.
16           That's everywhere.  Right.  That's
17  every state and that's part of the law.
18    Q.     You said that they have to implement
19  the IEP.  Right.
20           But what I'm saying is that if the
21  capacity of the general ed setting is limited in
22  how much it can implement from students' IEPs,
23  could that not result in students being placed
24  in more restrictive settings?
25                MS. JOHNSON:  Object to form.



1    A.      And I think you're describing exactly

2   what's required of -- for LRE, which is we will

3   try to implement the services and supports that

4   the student needs, but if it's not something

5   that can be implemented in general ed, we have

6   this continuum of options.

7    Q.      And I think maybe the daylight between

8   what I'm asking and what you're saying is it's

9   not about just what can be implemented but what

10  is actually implemented by the less restrictive

11  environment, correct?

12   A.      It's not just what can be --

13   Q.      So, for example let's say that there's

14  a student who their IEP determines they need

15  one-on-one aide.

16   A.      Okay.

17   Q.      And for whatever reason the general

18  education requirement cannot or does not provide

19  that.  Could that not result in the IEP placing

20  that student in a more restrictive setting than

21  that student needs if that more restrictive

22  setting has a one-on-one aide?

23   A.      Uh-huh.  That example's okay, and I do

24  think that there aren't many schools that that

25  would be considered acceptable.  They would say



1   you can provide an aide in a general ed

2   classroom.

3              To me what's more challenging, just

4   because we've got this sort of broad category,

5   is -- let's say it's an individualized behavior

6   plan, and we say okay, this has to be

7   implemented in a least restrictive setting and

8   we can't consider a more restrictive setting.

9              Now, that capacity of general ed --

10  that's the term that you're using for a lot of

11  the things that I put in the report -- can be

12  limited.  You can have people that don't have

13  the training.  It can be just hard to implement

14  it with 30 other kids.

15             You know, the other thing about

16  behavior intervention plans is -- I think

17  there's a misconception that you just give it to

18  them and things are solved.  Right.  Usually

19  these kids have lifelong developmental

20  disabilities that require continuous problem

21  solving.

22             So that example to me is just the one

23  that I would want to consider in giving my

24  answer.  Okay.  We do want to say that we need

25  to provide the student some interventions.



1          But what can general ed implement?
2    It's not unlimited.  And so it may be that we
3    have to consider a more specialized setting that
4    has more capacity or the conditions that make
5    implementation possible, appropriate, and
6    effective.
7          And the appropriate also has to do
8    with the student's dignity.  And I did mention
9    and you're aware, but, you know, we do have to
10   consider the impact on other kids as well,
11   right, when we say is this an appropriate
12   setting.
13          So I get the aide example.  To me I
14   would think that a school would have a much
15   harder time saying we only have aides in this
16   special school.
17          But if we were to say oh, this kid
18   needs individualized behavior supports,
19   sometimes that's going to work out in general ed
20   but sometimes it's not.  And it's not because
21   they're saying, you know, we don't want to give
22   this, it's -- only intervention plans are over
23   there, it's just what that individual student
24   needs may not -- general ed may not have the
25   capacity to provide it.



1    Q.       I guess would you agree that the

2   capacity of a general ed setting to provide

3   supports and services for students with

4   disabilities could impact whether or not certain

5   students with disabilities are able to be

6   successfully educated in that general education

7   setting?

8    A.       I think I agree with what you're

9   saying.  I'm just putting it in the context of

10   this is the decision-making process.

11    Q.       I hear you.

12    A.       Can we serve this kid in general ed or

13   do we need to consider.  And first you have to

14   figure out what do they need, and then make a

15   determination of, you know, where those services

16   most -- are best provided.

17    Q.       All right.  Before we break, I have

18   just a couple of -- I said this before.

19    A.       That's all right.

20    Q.       I have a couple of questions, but

21   these should be easy.  I think.

22    A.       Okay.

23    Q.       And bear with me.

24             But, Dr. Wiley, you don't endorse the

25   use of facilities for students with disabilities



ANDREW WILEY, PH.D.                                  October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              208

 1  that are of inferior condition to those used by
 2  general education students, correct?
 3              MS. JOHNSON:  Object to form.
 4    A.      Are you talking about, like, physical
 5  conditions?
 6    Q.      Yes.
 7    A.      Again, I would expect any school to
 8  have some basic safety, cleanliness, that kind
 9  of stuff, yeah.
10    Q.      But -- sorry.  My question is slightly
11  different than that.
12              You don't support -- you don't endorse
13  the use of facilities for students with
14  disabilities that are inferior to the quality of
15  facilities used by general education students,
16  correct?
17              MS. JOHNSON:  Object to form.
18    A.      I don't mean to treat it like a trap.
19  It's not.  But my point is that I endorse the
20  use of special schools and I think those special
21  schools should have clean, safe facilities.
22              But I would never say oh, we got to
23  put all of these kids in general ed because
24  their facilities are better than their
25  facilities.



1              The condition of the facilities

2    matter.  I am absolutely saying that.  But I'm

3    careful because I feel like you're saying oh, if

4    the conditions of these schools are inferior,

5    then all kids then have to go to the school with

6    the better facility.  To me, fix that school.

7              So you may not have meant it that way,

8    but I just want to make sure I'm giving my

9    opinion as accurately as I can.

10   Q.        And I appreciate --

11   A.        Yeah.

12   Q.        -- that.

13   A.        Okay.

14   Q.        I really intend for these to be some

15   of the easiest questions of the day.  So that's

16   where I'm approaching --

17   A.        Uh-oh.  I'm just kidding.

18   Q.        So you don't endorse the use of --

19   and, again, there's not an implication here that

20   I'm trying to make in this question to other

21   ramifications.

22   A.        Okay.

23   Q.        I'm just -- at face value you don't

24   endorse the use of under or unqualified

25   instructional or behavioral staff for students



1  with disabilities, correct?

2  A.      I don't --

3              MS. JOHNSON:  Object to form.

4  A.      -- endorse that.  Unfortunately

5  underqualified is, again, you know -- but, no, I

6  think that they should be trained to provide the

7  services that the kids require.

8  Q.      And you don't endorse unnecessarily

9  restricting the access of students with

10 disabilities to educational resources, programs,

11 or activities enjoyed by general education

12 peers, correct?

13 A.      I do not endorse unnecessarily.  Yes.

14 Q.      All right.

15             MR. GILLESPIE:  That's a good time

16     to stop.

17             THE WITNESS:  All right.

18     Thank you.

19             THE VIDEOGRAPHER:  Okay.  Off the

20     record, 12:44.

21             - - - - -

22     (A recess was taken.)

23             - - - - -

24             THE VIDEOGRAPHER:  On the record,

25     1:31.



1              MR. GILLESPIE:  Thank you.

2        All right.

3              - - - - -

4          (Deposition Exhibit 983, Response to

5          U.S. Department of Justice Expert

6          Reports of Dr. Amy McCart and Dr. Robert

7          Putnam, Rebuttal Expert Report Prepared

8          by Andrew Wiley, Ph.D., September 1,

9          2023, was marked for identification

10         purposes.)

11              - - - - -

12    BY MR. GILLESPIE:

13    Q.      Dr. Wiley, I'm going to hand you

14  what's been marked as Exhibit 983.

15    A.      Okay.

16    Q.      Do you recognize that?

17    A.      Yes.

18    Q.      And is that your expert report, your

19  rebuttal report, for this matter?

20    A.      It is, yes.

21    Q.      Dr. Wiley, let's start at the

22  beginning.  That's the best place.

23    A.      Right.

24    Q.      Page 2.

25              And here I'm going on to page 3.  You



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                  212

1   identified eight quotes -- excuse me -- taken

2   from the reports of Drs. Putnam and McCart,

3   correct?

4      A.      Yes.

5      Q.      And how were these quotes in

6   particular identified?

7      A.      I think that they were what I viewed

8   as sort of the primary claims or the most

9   consequential claims or conclusions of the

10  experts and I wanted to include them.

11           I think I -- my effort was to rebut

12  these claims in particular.  I may have gone a

13  little bit around them a bit, but that's what

14  they are.  They're all meant to be -- and the

15  way that I thought about these quotes is I sort

16  of rephrased first, and then I took direct

17  quotes that I think captured what I thought were

18  the main conclusions of the experts.

19     Q.      When you say you rephrased or reframed

20  first --

21     A.      Just thought about it in my head.

22  Like what are the core.  And then I think these

23  quotes reflect the main things that I wanted to

24  rebut.

25     Q.      Okay.  So you cut through a couple of



1   my questions right off the bat.

2      A.      Oh.  I'm sorry.  Or you're welcome.

3      Q.      No.  That's a good thing.

4           So we're going to dive down into

5   everything in more detail, but let's just start

6   by talking through some of these quotes if we

7   can.

8      A.      Okay.

9      Q.      So we'll start with the first one.

10          So you wrote the vast majority of --

11  or you quoted Dr. McCart, who wrote "The vast

12  majority of students in the GNETS program can

13  and should be served in integrated settings with

14  appropriate services and supports, where they

15  are more likely to experience social, emotional,

16  behavioral, and academic success."

17          Did I read that correctly?

18     A.      Yes.

19     Q.      And I just want to be sure I

20  understand.  Your critique applied to GNETS

21  specifically -- or I'll just ask.

22          You're not disagreeing with

23  Dr. McCart's conclusions as to GNETS

24  specifically, correct?

25               MS. JOHNSON:  Object to form.

1    A.       Because the students in the GNETS

2    program were not sort of individually described,

3    then my rebuttal applies to what I think she's

4    saying about the GNETS program being students

5    with behavior-related disabilities.

6            So I think my rebuttal applies to the

7    GNETS program based on what Dr. McCart did or

8    didn't provide.  But it's also more generally to

9    students with behavior-related disabilities.

10   Q.       So your rebuttal applies to -- well,

11   let me keep focus on -- your rebuttal to this

12   quote applies to GNETS, insofar as it applies to

13   students with behavior-related disabilities

14   generally, and those are some of the students

15   that are in GNETS.  Is that an accurate --

16   A.       Correct.

17   Q.       -- paraphrase?

18   A.       Yes.

19   Q.       So in the next quote you wrote -- or

20   you quoted Dr. Putnam, who wrote "Researchers,

21   service providers, and educators have coalesced

22   around a core set of interventions -- including

23   functional behavior assessments and behavioral

24   intervention plans, wraparound services, family

25   and community support, and individual and group



1    therapy -- that are effective in supporting

2    students with behavior-related disabilities in

3    more integrated settings."

4            I just wanted to ask what are the

5    interventions that you would identify as being

6    effective in supporting students with

7    behavior-related disabilities?

8    A.        I think that what I'm rebutting here

9    is that I understood the statement to mean that

10   these services -- again, he didn't use the term

11   "vast majority."

12           But I think because I identified the

13   practices that Dr. Putnam names here as

14   promising practices, I would say that means two

15   things.

16           One is when we implement them well,

17   they can serve many, but not all, students with

18   behavior-related disabilities.

19           And then what I add to Dr. Putnam's

20   list in terms of -- in some ways functional

21   behavior assessment and behavior intervention

22   plans, that's pretty specific.

23           Wraparound services is a model.  You

24   know, so like PBIS, it's more like a

25   conceptional framework than it is one practice,



1    right.

2              Family and community support to me is

3    pretty broad.

4              And I understood and I think

5    Dr. Putnam made -- individual and group therapy.

6    He mentioned things like social skills

7    instruction.  He might have mentioned things

8    like cognitive behavior therapy.  This is

9    another one where it depends specifically about

10   on what you're talking about.

11             And, again, what I tried to say in my

12   report is that the evidence, again, it's

13   promising.  So it's mixed.  And also we

14   shouldn't assume that they're going to be

15   effective in the vast majority of cases.

16             So when I was looking at research on

17   these practices, especially ones that are meant

18   to make integrated settings effective for kids

19   with behavior-related disabilities, I was

20   looking at limitations of evidence and

21   limitations of implementation.

22             These I would agree with being

23   promising practices.

24   Q.     Okay.  And so if I understand this

25   correctly, there are two aspects to what you're



```
 1   disagreeing with here.

 2             One is you'd rather characterize these

 3   as promising practices because the research is

 4   imperfect or incomplete; is that right?

 5     A.      Yeah.  I think that that's fair.

 6             And so, like, in this specific

 7   statement what I'm trying to say is a

 8   categorical statement that they're effective in

 9   supporting students with behavior-related

10   disabilities requires some context.

11             And that context is that not only is

12   it incomplete in terms of both effectiveness and

13   implementation, but in some cases we can see

14   that, you know, even the best research we have,

15   it's not always effective.

16     Q.      And that's part two, right, --

17     A.      Yeah.

18     Q.      -- is that you want to highlight that

19   these services aren't effective for everyone

20   100 percent of the time, --

21     A.      All the time, --

22     Q.      -- correct?

23     A.      -- yeah.  That's right.

24     Q.      Okay.

25     A.      That's right.
```



1    Q.       But you're not saying that you don't

2    think that these are helpful tools or that they

3    can't be used in a way that helps to serve

4    students with behavior-related disabilities; is

5    that right?

6    A.       So I would speak to, first, functional

7    behavior assessment and behavior interventions,

8    because I'm more familiar with that and that's

9    more specific.  In which case I would say yes,

10   that can be helpful for many kids in different

11   settings.

12            Wraparound services.  Again, that's

13   kind of a broad term, but there are services

14   that can be provided in the community that can

15   help.

16            Family and community support to me is

17   too broad to respond to.

18            And I really focused on -- individual

19   and group therapy, I used the example of social

20   skills intervention.  It's one that's mentioned

21   both in the context of the case and the expert

22   reports.

23            But there are others.  Right.  So

24   there are ones that are packaged, like curricula

25   essentially, including some cognitive behavioral



ANDREW WILEY, PH.D.                              October 30, 2023
UNITED STATES vs STATE OF GEORGIA                          219

1   therapy.  And then there are some that are more

2   just like a model, like social skills

3   instruction.

4            So these are ones that I think, based

5   on the best available evidence, we would suggest

6   schools ought to start with.

7     Q.     Okay.  Thank you.  That's really

8   helpful.

9            All right.  Just going to the next

10  quote.  Dr. Putnam wrote "The vast majority of

11  students with behavior-related disabilities,

12  including students at serious risk of

13  restrictive educational placement, can be served

14  effectively in general education schools within

15  their communities."

16           And, Dr. Wiley, you agree that some

17  students with behavior-related disabilities can

18  be served successfully in general education

19  settings, correct?

20    A.     Some students with behavior related --

21  yes.

22    Q.     And I'm assuming you disagree with the

23  characterization of the vast majority.  Is that

24  right?

25    A.     Well, -- and Dr. Putnam here gets more



1   specific and talks about students at serious

2   risk of restrictive --

3      Q.      I'm so sorry.

4      A.      Yeah.  Yeah.

5      Q.      I just -- like I said before, I want

6   to hear the context of your answer, --

7      A.      Okay.

8      Q.      -- but first I want to focus on the

9   direct answer to my question first.

10      A.      So ask it one more time.

11      Q.      You're fine.

12              So my question is, am I correct that

13   you disagree with the characterization of "the

14   vast majority"?

15      A.      Yes, on two counts.

16              One is that it sounds like they're

17   saying -- I mean, it's not a very specific

18   number.

19              And, again, it's the wrong way to

20   think about special education, because we're

21   individual by individual.  And so nobody ever

22   clarifies at an individual or just a

23   conceptional level what does "vast majority"

24   mean.  And so in that sense I think I was trying

25   to point out that there are problems with this



1   kind of statement.

2    Q.      So you don't disagree necessarily with

3   the conclusion that -- you disagree with a

4   process followed to get to that conclusion,

5   correct?

6             MS. JOHNSON:  Object to form.

7    A.      If the conclusion -- if I'm cutting

8   out the context of the middle phrasing.  "The

9   vast majority of students with behavior-related

10  disabilities can be served effectively in

11  general ed."  I disagree with that, and I don't

12  think we have good evidence that that's true.

13            To be honest, I think we're struggling

14  with the kids that are currently placed in

15  general education.  I mean, there's work to be

16  done there to better support them.

17            So if it were just to be that and just

18  to say of all of the kids with behavior-related

19  disabilities, that's a statement that I would

20  say is not supported by our best available

21  evidence.

22            If you put an actual number on it, it

23  would still make it weird.  But, I mean, like,

24  what does vast majority mean.  But I -- even if

25  I just let that slide, no, I don't think that



 1  that's an accurate characterization of where we

 2  are.

 3      Q.      What if it just said "majority"?

 4  Would you have the same objections?

 5      A.      Again, it's just a weird comment

 6  because we're looking at kid by kid.

 7              I will say it this way.  I am all in

 8  favor of trying to make general education more

 9  responsive to kids with behavior-related

10  disabilities, but we can't put the cart before

11  the horse.  We need to figure out how to do that

12  before we talk about the majority or what

13  percentage could be served in general ed

14  environments.

15      Q.      So --

16      A.      Schools.

17      Q.      -- when you say that you're in favor

18  of trying to make general education more

19  responsive to kids with behavior-related

20  disabilities, can you tell me, what do you mean

21  by that?

22      A.      I mean, it would be great if we knew

23  how to provide more promising practices in

24  general education than we do now.

25              So I'm all for solving the



1  implementation problems.  I'm all for -- if

2  there's mixed evidence about the effectiveness

3  of something like functional behavior

4  assessment, well, let's figure out how to make

5  it better and make it more effective for more

6  kids.  I think that when you focus on individual

7  kids and you focus first on their services, many

8  of the other things will come.  Right.

9          So there is a presumption in the law,

10  and I think it's right, that kids will be, to

11  the extent appropriate, served in general ed.

12          The way that we get there is by

13  figuring out how to do it first.  Figuring out

14  what schools needs, what are the conditions

15  required in order for them to implement them,

16  and then we can talk about how many kids can be

17  appropriately included in general ed.

18    Q.      Thank you.  That's helpful.

19    A.      Okay.

20    Q.      We'll put a pin on that for now.

21    A.      All right.

22    Q.      And I want to move to the next quote

23  here.

24          All right.  The next quote was from

25  Dr. Putnam.  "The consensus among professionals



ANDREW WILEY, PH.D.                                October 30, 2023
UNITED STATES vs STATE OF GEORGIA                           224

1   who work with students with behavior-related

2   disabilities -- including myself -- is that in

3   most cases they can be served in integrated

4   settings in their home schools and attend class

5   with general education students, provided they

6   receive the proper supports."

7           Now, Dr. Wiley, you agree that some

8   students with behavior-related disabilities can

9   be served in integrated settings in their home

10  schools and attend class with general education

11  students provided they receive proper supports,

12  correct?

13    A.      Yes.

14    Q.      And so again is your concern with this

15  statement the use of the word "most"?

16    A.      That's part of it.

17          The other concern with a statement

18  like this is -- and I don't -- I don't know

19  Latin.  I don't know if this is the right term.

20  But it's sort of tonological where it says they

21  can be served appropriately in general ed if

22  they receive proper services.

23          And, you know -- so proper becomes by

24  definition they achieve FAPE and meaningful

25  progress based on their services.



1              So I think the way that I would unpack

2    that a little bit is also at the proper

3    supports, because then we need to identify

4    practices that we know are generally effective

5    with most students with behavior-related

6    disabilities and we know how to implement them

7    in general education.  And my rebuttal is that I

8    disagree that that's a consensus.

9    Q.      Dr. Wiley, do you agree that ...

10             If I'm understanding you correctly,

11   part of your objection here is that -- are what

12   you understand to be statements that are saying

13   that these supports and services can and will

14   work in general education settings for students

15   with behavior-related disabilities, and you

16   disagree with that, correct?

17   A.      Well, I think I just disagree because

18   the specifics aren't provided.  If you're asking

19   me whether I think that it's possible in some

20   cases to implement these practices in such a way

21   that they're effective for some kids with

22   behavior-related disabilities, yes, I think that

23   we know enough to say that's possible.

24             But we also, especially at the

25   individualized planning process, have to be



1    mindful that there are limitations.

2          And so when a student -- when an IEP

3    team determines that a separate placement is

4    most appropriate, it's not because they're

5    disregarding what we know and what we already

6    know how to do.  Those are real limitations.

7    Q.      But, to your point, Dr. Wiley, what

8    you should look at first is the individual

9    student's IEP to determine what they need before

10   you figure out placement?  That's your position,

11   correct?

12   A.      That is correct.

13   Q.      Okay.

14   A.      And if it helps, the example that we

15   used earlier in our conversation was behavior

16   intervention plans.  And so you say to yourself

17   can behavior intervention plans effectively

18   support a student with behavior-related

19   disabilities.

20          Well, that's true, but it all will

21   depend on the nature of the student's

22   difficulties, the complexity of the behavior

23   plan, and also the various constraints of that

24   particular general ed classroom.

25          And so I think when you don't specify



1   certain terms and you don't qualify, that this

2   statement is not accurate.  And that's kind of

3   what I'm trying to rebut, is that there -- there

4   needs to be more context and more specificity

5   about what we're talking about.

6        Q.       But would you agree that if a

7   student's IEP, inclusive of any particular BIP,

8   does not require any set of supports or services

9   that can only be effectively given in a

10  separate -- or specialized environment that that

11  student should remain in a more integrated

12  environment?

13       A.       If they can be appropriately taught

14  with services and supports, that's the general

15  language of the law, right, then yes.  That's

16  what the law requires, and also I think that

17  that's a good thing.

18            Now, judgments have to be made about,

19  you know, which services and supports to

20  provide.  They need to be made about how much

21  progress does this student have to make.  And I

22  think that that really comes down to an IEP team

23  looking at that student and knowing individually

24  that student in the context in which they're

25  trying to provide the IEP.



1    Q.        Thank you.

2    A.        It's -- a lot of it depends.  And I

3    know that it's -- it runs counter to sort of

4    categorical statements, but I think it's the

5    nature of special education, that there's a lot

6    of if -- you know, it depends on sort of

7    contextual things to consider.  Even when you're

8    just trying to say what is the consensus of the

9    field.  I think more people would say well, it's

10   not quite that clear-cut.

11   Q.        Thank you.

12   A.        Uh-huh.

13   Q.        I'm going to skip the quote that

14   begins with "The GNETS program."

15   A.        Okay.

16   Q.        Go to the beginning of the top of

17   page 3.  The quote there reads "The therapeutic

18   services and supports that help students remain

19   in more integrated educational settings are well

20   established, as are the frameworks for

21   implementing and sustaining those services at

22   the system level."

23            And based on our conversation, Doctor,

24   my understanding is your disagreement here is

25   based on your understanding of the status and

1   strength of the research at this point in time.

2   Correct?

3       A.      Yeah.  And in this specific case --

4   again, when you talk about frameworks -- and an

5   example, you could talk about the ISF.  I can't

6   remember the one because I'm not -- but let's do

7   PBIS because we've been talking about it.

8           There's a lot to break down in there

9   in terms of there's tier one, there's tier two,

10  there's tier three.  Really where I would

11  probably quibble most with this and what I'm

12  trying to say is in the implementing and

13  sustaining.

14          I think that there is good research

15  that many, but not all, kids can be helped with

16  a really well implemented three tiered system of

17  multitiered systems of support.  I think most of

18  the problems here fall in the implementation and

19  sustaining of those services.

20          And I think that, again, it's

21  promising.  I hope more work is done.  But I

22  think that the field's -- and I say this --

23  enthusiasm has gotten a little bit ahead of the

24  problems involved with implementing it.

25          You know, what is the level of



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                  230

 1   training required.  How many specialized

 2   personnel do you need to have involved.  What

 3   resources do you need.  I mean, there's a lot

 4   that goes into it in order to get to that point.

 5           And there is research, including the

 6   national PBIS data, that says implementation is

 7   not quite where we want it to be.  And

 8   particularly at tier two and tier three, which

 9   is where we're mostly focused when we're talking

10   about kids with behavior-related disabilities.

11           So -- I just realized I'm talking too

12   fast.

13           Implementing and sustaining would be

14   part of what I would highlight from that, where

15   I would say do we really have solid knowledge

16   where tomorrow we could go out, put these things

17   in place if we just had a little bit of training

18   and a little bit of motivation.

19           And I disagree with that statement.

20   Q.      Okay.  Thank you.  That's helpful.

21           Moving on to the next quote.

22   Dr. Putnam wrote "The unnecessary segregation of

23   students with disabilities leads to serious

24   problems that are well documented in the

25   research literature."



1          And am I correct that by listing this

2    statement, you are preemptively disputing

3    whether segregation's unnecessary?  Is that the

4    disagreement?

5       A.      Well, what I would disagree with there

6    is first, you know, I don't like the word

7    "segregation."  But I think what's being said

8    here is that teaching students in separate

9    environments leads to serious problems that are

10   well documented in the research literature.

11          Again, I think Dr. Putnam only cites

12   one study of six self-contained classrooms here

13   as the well established, and I don't think that

14   that's great.

15          I focus more on the placement

16   research, which you saw in my report, which says

17   hey, we can compare these outcomes between kids

18   more in general ed and more in -- more separate

19   placements.  And that research is inconclusive

20   and really flawed.

21          I think under certain circumstances

22   students served in separate schools can do way

23   better than they would do in a general ed

24   school.  And we have to figure out how to

25   provide IEPs that are as effective as possible



1   across the whole continuum, from general ed to

2   special ed.

3       Q.      So is it your opinion that the --

4   well, actually, I'm going to break this down

5   into a couple of different steps here.

6       A.      Sure.

7       Q.      So do you agree that unnecessary

8   segregation of students with disabilities leads

9   to serious problems for the students?

10              MS. JOHNSON:  Object to form.

11      A.      Again I don't know what is meant by

12  "unnecessary."

13      Q.      I -- I'm sorry.

14      A.      It's okay.

15      Q.      I want to cut off because I -- I'm

16  just asking you, you know, like, related to

17  this, but mostly separate from this now.

18      A.      Okay.

19      Q.      Not reading -- trying to read

20  Dr. Putnam's mind.

21      A.      Okay.

22      Q.      I'm asking you, Dr. Wiley, the expert.

23              Do you agree that unnecessary

24  segregation of students with disabilities leads

25  to serious problems?

```
 1      A.       Well, --
 2               MS. JOHNSON:   Object to form.
 3      A.       So if students are placed in separate
 4   settings when they really shouldn't be, I don't
 5   know the research that shows what problems those
 6   actually lead to.  And I don't think Dr. Putnam
 7   cites anything to say, first of all, -- so what
 8   would be required in the research would be to
 9   identify here kids are placed.  Let's look at
10   them individually and let's make the case that,
11   oh, this kid clearly could have been served in
12   general education.
13               And then you have to say all right.
14   So what outcomes do they experience when this
15   occurs.
16               There is sort of a parallel thing
17   around special ed.  I mean, there is concern
18   about unnecessarily placing kids in special ed.
19   Probably don't want to go there because that's a
20   whole big -- maybe we will later.  I don't know.
21               But it also -- that also depends on
22   what's happening in that separate placement.  I
23   mean -- so, in special ed, if special ed is
24   considered to be uniformly sort of a helpful
25   thing, then most people don't go, you know, "Oh,
```



1  we got to keep kids out of there under all

2  circumstances."

3         I would say the same thing would

4  happen with special schools.  You know, we want

5  to say special schools, it's a good thing.  It

6  doesn't lead to serious bad outcomes if the

7  students are receiving some sort of beneficial

8  service.

9  Q.     Again I appreciate that context, but I

10  really want to focus in on whether or not you

11  agree that unnecessary segregation -- and, you

12  know, we can go back to our conversation earlier

13  if a student could be as or more successful in

14  an inclusive or integrated general ed setting.

15         But do you agree that the unnecessary

16  segregation of students with disabilities leads

17  to serious problems for that student or could

18  lead to serious problems for that student?

19            MS. JOHNSON:  Object to form.

20  A.     Yeah, and I'm really not being

21  difficult, but it depends.  I think of the

22  example of the school that I worked at.  If

23  there was a student who came to my school, they

24  probably would do really well, given the

25  services that we provided them.



1          So -- but let me take the terms at

2     their face value and say this kid should have

3     been taught in general ed.  It was unnecessary

4     that they were placed in a special setting.

5          I will speculate that it would lead

6     to -- it could lead to serious problems.  How

7     about that?  I agree with that.  It could.

8          But, again, I disagree with the

9     statement, because I think it's not clear about

10    what is meant by a necessary segregation.  And I

11    don't -- and, again, usually I would say if

12    somebody's making a statement like this that

13    they would provide the research that shows here

14    are the outcomes that we have documented.  It

15    says well -- does it say -- yeah, "well

16    documented."

17         And I would say where have we

18    identified the kids who were unnecessarily

19    placed and what are the problems that we've

20    documented.  That's all.

21    Q.     Thank you.

22    A.     Uh-huh.

23    Q.     Moving on to the next quote.

24         Dr. McCart wrote that "The GNETS

25    program unnecessarily segregates students with



1   behavior-related disabilities, provides them

2   unfair and unequal educational opportunities,

3   and causes them harm (in many case

4   irreparable)."

5          And again am I understanding your

6   disagreement to be more as it applies to

7   specialized settings generally?

8   A.      That's a big part of it.

9          I did read the findings of

10  Dr. McCart's report.  And the thing that I also

11  question, although I didn't get real far into it

12  in the report, is that she created some tables

13  indicating her definitions of segregated.  I

14  don't know where they came from.

15          And usually when we're saying hey,

16  let's evaluate something, you need to have a

17  reliable and valid measure of that thing.  So

18  I'm like -- in my mind it doesn't -- it's not a

19  reliable and valid way to document what is or is

20  not happening anywhere.

21          And then she provides her conclusions

22  that to me -- because I don't know how she got

23  there, I don't know that it's right to say that

24  the GNETS program provides unfair and unequal

25  opportunities and causes them harm.  I think

1  that she's stating something that she doesn't

2  provide enough support for.

3     Q.      Thank you.

4            All right.  Now looking at this next

5  section here, also on page 3.

6     A.      Okay.

7     Q.      You provide summaries of the five

8  major opinions of your report, correct?

9     A.      Uh-huh.

10    Q.      And what was your process for

11  identifying these five focus areas of your

12  report?

13    A.      Well, reading the reports and reading

14  the claims that were made -- and a lot of them,

15  again, have been made by sometimes very

16  prominent people in special education -- so

17  a lot of my scholarship is around inclusion in

18  kids with emotional, behavioral disorders.

19            And so when I read what the claims

20  were, I sort of laid out what I thought were the

21  most important ways to rebut what those

22  conclusions were.

23            And so the first one -- even though,

24  you know, my expertise is not specifically the

25  law, you know, I was trying to understand from

1   my training in IDEA what -- how to reconcile

2   that with the requirements of the ADA.  So that

3   was the first section.

4          And I think it's important because

5   unnecessary segregation inevitably relates to,

6   from an IDEA perspective, how are decisions made

7   about the LRE for an individual student.

8          So, as -- I thought about what was

9   being said, what was being included.  That was

10  my first section.

11         Do you want me to walk through all of

12  them, or?

13   Q.     Well, you know what, we were about to

14  do that.

15   A.     Okay.

16   Q.     So let's do it step-by-step.  And you

17  just very helpfully began talking about the

18  first section.  So let's start there.

19         And, Dr. Wiley, you're not a licensed

20  attorney, correct?

21   A.     That's correct.

22   Q.     And you have no formal legal training?

23   A.     That is correct.

24   Q.     And are you familiar outside of this

25  with the Americans with Disabilities Act?



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              239

1    A.        At a very introductory level.  In our

2  introduction to exceptionalities course, for

3  example, most of the textbooks have a chapter

4  that's -- has ADA and 504.

5          Because from a historical perspective

6  it's import to understand all of these different

7  laws.  And then of course IDEA gets sort of the

8  heaviest treatment because it's the one that we

9  think about as applying to special education

10  most directly.

11    Q.        But you don't purport to be an

12  expert --

13    A.        No.

14    Q.        -- in the legal application of the

15  ADA, correct?

16    A.        Of the ADA, no.

17    Q.        And in section I of your report, you

18  provide your analysis as to how the requirements

19  of the ADA and IDEA should be understood,

20  correct?

21    A.        Uh-huh.  As I understand them, yeah.

22  And I think my understanding of IDEA is deeper.

23  Again, I don't claim to be a special ed law

24  expert, but all of our preservice teachers have

25  to be trained in the requirements of IDEA; what

1   they are, why they are what they are.

2          And so in that sense I think I know

3   more about IDEA than I do about ADA.

4   Q.     If I reference Olmstead in the context

5   of the ADA, do you know what that means?

6   A.     I know that -- I know that from

7   reading the materials -- and I hadn't studied

8   Olmstead, but my understanding is it was a case

9   that said something about people with

10  disabilities should be integrated, to the extent

11  appropriate, if that's what they want.

12         So I think it was a ruling.  I don't

13  know what the legal terms are.  But basically it

14  said in community services and programs and

15  things like that, they should be provided in the

16  most integrated setting appropriate basically.

17         That is Olmstead, right?  Did I get it

18  sort of right?

19  Q.     The questions only go one way

20  unfortunately.

21  A.     Got it.  Got it.

22  Q.     So, Dr. Wiley, I'm actually going to

23  direct your attention to the top of the next

24  page.  And you can orient yourself if you want.

25  I'm talking about bullet II of your summaries.



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              241

1    A.      Page 4?

2    Q.      Yeah.

3    A.      Okay.

4    Q.      At the top of page 4.

5    A.      Got it.

6    Q.      And just the line here you include

7    that says "DOJ's experts did not examine

8    individual students' needs."

9            Do you see that?

10   A.      Yes.

11   Q.      What is this statement based on?

12   A.      The fact that I didn't see examples of

13   individual students who the DOJ was claiming

14   could be served in general ed environments.

15   Q.      Are you aware if either expert for the

16   United States reviewed and considered student

17   specific records?

18   A.      I saw that there was review of

19   records.  I think that was reported as part of

20   the method for both of those experts.

21   Q.      But you didn't take a look at what

22   records were reviewed to see what the scope of

23   the evaluation was, correct?

24   A.      I didn't.  I looked at the conclusions

25   based on those reviews, and I didn't see where



1   the experts use those reviews to say here are

2   example of students that we're talking about.

3     Q.      This first sentence in paragraph III,

4   also on page 4, you wrote that "Research does

5   not show that inclusion (placement in general

6   education) is categorically more beneficial than

7   placement in specialized settings (e.g.,

8   self-contained classrooms, separate school) for

9   students with behavior-related disabilities."

10          Did I read that correctly?

11    A.      Yes.

12    Q.      Would you agree that research does

13  support placement of students in the least

14  restrictive environment?

15    A.      Which is not always general education.

16          And that's an interesting -- because

17  the least restrictive environment -- you know,

18  the problem is the placement research.  And so,

19  actually, I don't know that research would tell

20  us that the placement -- least restrictive

21  environment.  That's more like a principle of

22  IDEA that has very good reasons for it.

23          I'm answering honestly, because I

24  can't think of the research that would say --

25  the research that would say placement in LRE is



ANDREW WILEY, PH.D.                                October 30, 2023
UNITED STATES vs STATE OF GEORGIA                            243

1   more beneficial.  Or is beneficial.

2         That's your question, right?

3   Placement in the LRE is beneficial than not

4   placement in the LRE maybe.  Okay.

5   Q.      Thank you.

6         Paragraph V on the same --

7   A.      Yes.  Yes.

8   Q.      You wrote "Separate placements" --

9   again referring to self-contained classrooms and

10  separate schools -- "can be more appropriate and

11  effective than general education for some

12  students with behavior-related disabilities."

13        And my question here, with this

14  conclusion here and then further on, do you

15  purport to speak for a consensus of special

16  education professionals?

17  A.      This is a funny question, because we

18  don't have, like, a poll, but I think that --

19  the way that I would characterize it is to say

20  the mainstream of special education research

21  would agree with that statement.  And I don't

22  have the survey that says that.

23        What I would say is that there's a

24  vocal, but not the mainstream of special

25  education, that argues that separate schools can



ANDREW WILEY, PH.D.                          October 30, 2023
UNITED STATES vs STATE OF GEORGIA                        244

 1  be done away with that we can appropriately

 2  serve.

 3          And there usually is the qualifier

 4  like there is in, for example, Dr. McCart's

 5  report.  I'm not saying all, but the vast

 6  majority.

 7          My opinion is that what I have written

 8  there would be the consensus of mainstream

 9  research in special education.

10  Q.      Dr. Wiley, let's go to page 14, if we

11  could.

12  A.      14?

13  Q.      Yes, please.

14          Let me know when you're there, please.

15  A.      Yes, I'm there.

16  Q.      So the first sentence below the table,

17  you wrote that "IDEA's LRE requirement is

18  essential because there was a time when many

19  students with disabilities were unnecessarily

20  taught in separate settings when they could be

21  appropriately taught part or full time with

22  their nondisabled peers."

23          Did I read that correctly?

24  A.      Yes.

25  Q.      And here your point is that the LRE



1  requirement was essential because it was

2  problematic that many students with disabilities

3  were being unnecessarily taught in separate

4  settings when they could be appropriately taught

5  part or full time --

6     A.     Right.

7     Q.     -- with nondisabled peers, correct?

8     A.     Yes.

9     Q.     Okay.

10     A.     That we should make that decision

11  individually, rather than just saying all kids

12  are taught in one place.

13     Q.     And why was that problematic?

14     A.     Well, there were a couple things that

15  were problematic before IDEA.

16          And one that's kind of interesting is,

17  you know, people think of the continuum of

18  alternative placement as being a basis for

19  exclusion, but the continuum allowed us to

20  respond to individual kids.

21          So, for example, I take a state like

22  Massachusetts, which since the 1950s, and we

23  would consider it progressive in those days, had

24  special schools for kids with EBD.

25          And often if you had a student who



1  could not succeed in general education, their

2  only other choice was the special school

3  20 miles down the highway, or whatever it is.

4          The continuum allows you to make

5  determinations about how can we provide, first

6  of all, a free and appropriate public education,

7  but to not separate kids from students without

8  disabilities any more than might be necessary.

9          And so -- I think we talked a little

10  bit about this before.  I agree with the

11  presumptive right to be taught with students

12  with disabilities, but I also agree that it can

13  be overridden when the student's interest and

14  their IEP require it.

15  Q.      And if this same practice of students

16  with disabilities being unnecessarily taught in

17  separate settings were occurring today, it would

18  be similarly problematic --

19  A.      Right.

20  Q.      -- for the same reasons, correct?

21  A.      Right.

22  Q.      Okay.  Same page.  We're going to go

23  to the bottom, the second to last sentence.

24  A.      Okay.

25  Q.      It begins with "This deceleration."



1    A.      Yeah.

2    Q.      And you wrote that "This deceleration

3  in general education placement may reflect the

4  reality that general education does not have

5  unlimited capacity to appropriately include all

6  or the vast majority of students with

7  disabilities," particularly with those --

8  "particularly those with the most complex and

9  intensive needs."

10          Did I read that correctly?

11   A.      Yes.

12   Q.      And is this statement meant to apply

13 to all students with disabilities?

14   A.      Yes, because the research that I'm

15 citing applied to all kids with disabilities.

16          And this is a potential way of

17 interpreting the initial steep increase of kids

18 being placed 80 percent or more of the time in

19 general ed, and then the fact that it's tapered

20 off since.

21          And so that's my -- and you're correct

22 that that does not specify kids with

23 behavior-related disabilities, but it would

24 include them.

25          So this Williamson, et al. was focused



1   on all kids with disabilities.

2       Q.      Would that include physical and

3   mobility-related disabilities?

4       A.      I believe so.

5       Q.      Okay.

6       A.      I would have to look at it closely,

7   but yes, I think so.

8       Q.      Is it your belief that the vast

9   majority of students with disabilities cannot be

10  educated in general education settings?

11      A.      The vast majority of students with

12  disabilities cannot be.

13          No.  That's not my belief.  But I

14  think that we answer that question -- again,

15  it's just unavoidable that we do it kid by kid.

16          And, you know, we've made progress.

17  And I would say that the increase in inclusion

18  reflects that we have identified and we've

19  overcome some implementation barriers where we

20  can appropriately teach kids in general

21  education.

22          But not completely.  And, again, the

23  vast majority thing just throws me off because

24  I'm not thinking about these kids as one lump

25  population.  It's -- we have to think about



1   these kids individually, kid by kid, like the

2   way that an IEP team does.

3       Q.     Now, in here you wrote about "the

4   reality that general education does not have

5   unlimited capacity."

6             And, Doctor, would you agree that

7   additional or better allocated resources can

8   expand a general education's environment

9   capacity to include students with disabilities?

10            MS. JOHNSON:   Object to form.

11      A.     I think it's possible to implement

12  practices that could make general education more

13  responsive to some kids with behavior-related

14  disabilities.

15      Q.     Which you said earlier you're in favor

16  of, correct?

17      A.     I am in favor of that.

18            Again, you know, we've got this sort

19  of really important but broad statement that

20  with, you know, appropriate services -- that we

21  don't remove kids from general ed without first

22  providing them appropriate services and

23  supports.  But that's been tough to figure out

24  in general.

25            We've made progress, but we're not all



1  the way there.  And it's also a determination

2  that I think has to be made on an individual

3  basis, to say what are appropriate services and

4  supports for this student.  And then the IEP

5  team has to make a difficult judgment and say

6  for this student they may need a more special

7  placement in order to more appropriately provide

8  their IEP.

9     Q.      But you agree that the first step is

10 or should be to try implementations of supports

11 and services in a general education setting,

12 correct?

13    A.      I think that general logic applies.  I

14 do think that it's possible in some cases that

15 you know enough about -- like, so, an IEP team

16 is not sort of beholding mindlessly to that

17 process.  Meaning they may know wow, this

18 student has -- clearly has really significant

19 needs.  And so they can make a determination.

20         So it's not that you have to spend X

21 amount of time testing out whether or not

22 general ed will work necessarily.  But that

23 logic does generally apply, where you say hey,

24 here's some reasonable things we could try to do

25 to appropriately serve this kid in general ed,



1   and then if it doesn't ...

2          But what I'm trying to explain is

3   that -- and this is part of the logic of, for

4   example, response to intervention, which really

5   began as a special ed eligibility process.

6   Right.

7          So kids with academic problems.  Let's

8   make sure we, you know, make instruction good

9   for everybody.  Then let's provide them with

10  some supplemental services.

11         But from the beginning the researchers

12  in RTI and also the law makers have sent dear

13  colleague letters that said you can't, you know,

14  force people to sort of mindlessly go through

15  the process of first we're going to try A, then

16  B.  The IEP team can make that determination.

17         But the logic of saying let's make

18  general ed as responsive as possible, I think

19  that's correct.  I mean, that's sort of what

20  we're after.

21         But an IEP team could, all I'm saying,

22  is could legitimately say but for this student,

23  we've made a judgment based on their needs that

24  we can go right to a self-contained classroom or

25  a different ...



1    Q.      But you would expect those to be rare,

2    correct?

3              MS. JOHNSON:   Object to form.

4    A.      I don't -- I don't know.

5    Q.      Okay.

6    A.      I mean, it's going to depend really on

7    the school where the student is at and a lot of

8    different factors.  So I can't -- I don't know

9    that I would feel good saying it's rare, common

10   or -- sorry.

11   Q.      No.

12             Is that because you're not aware of

13   research related to that?

14   A.      Again, the most -- the closest thing

15   would be response to intervention, which is not

16   necessarily focused on -- where they've tested

17   this concept where, you know, the decision

18   driver is let's implement effective practices

19   and then make a determination after that based

20   on the -- that's where the response comes from,

21   right, response to intervention.  And so

22   response becomes sort of the measurement.

23             And so, Matthew, to your question, I'm

24   not aware of research specifically that has sort

25   of quantified that or made that, you know,

1   really clear.

2    Q.      Thank you.

3            Dr. Wiley, let's turn to page 16,

4   please.

5    A.      Okay.

6    Q.      Which is your table 2.

7    A.      All right.

8    Q.      My first question is --

9            MS. ADAMS:  Sorry, Matthew.  I'm

10      just going to interrupt for a second.

11      It sounds like from some folks who are

12      on the Zoom that it's a little bit hard to

13      hear you right now.

14            THE WITNESS:  Oh.  I'm sorry.

15            MS. ADAMS:  I don't know if

16      anything is different with the microphone.

17            - - - - -

18   (A discussion was held off the record.)

19            - - - - -

20            THE VIDEOGRAPHER:  That is active.

21      Do you want to go off the record and check

22      the settings?

23            MR. GILLESPIE:  I think let's try

24      this, and if there's still an issue, we'll

25      pause.



ANDREW WILEY, PH.D.                         October 30, 2023
UNITED STATES vs STATE OF GEORGIA                       254

1    BY MR. GILLESPIE:

2    Q.      All right.  First question.  Who

3    created this table?

4    A.      This is data that's reported to

5    Congress by IDEA.  So it's the Office of Special

6    Education Programs, I believe.  This is an IDEA

7    data table taken directly from a federal data

8    website.

9    Q.      And do you know how -- sorry.

10          You said this came from IDEA.  And

11   when you say that, to what are you referring?

12   A.      So there are annual reports to

13   Congress on IDEA data.  So special education

14   data.  And there are a variety of things and

15   they include, like, how many kids were served

16   and where they were served and those kinds of

17   things.

18          And this is one of the tables that

19   breaks out emotional disturbance.

20          There are one or two-year more recent

21   tables, but COVID was so odd that I went with

22   2019.

23          And I also will say, I would have to

24   confirm this, but these numbers don't tend to

25   radically change year to year.  So ...



ANDREW WILEY, PH.D.                              October 30, 2023
UNITED STATES vs STATE OF GEORGIA                            255

1    Q.      Do you know how this data's collected?

2    A.      The states are required to report it.

3  I don't know the nuts and bolts of it exactly,

4  but all states are required to report how many

5  kids are identified, under what categories, and

6  some other things.  Exit, like graduation, data.

7  There are a number of things that are collected

8  for IDEA every year.

9    Q.      And you didn't take any steps to

10 independently validate any of this data,

11 correct?

12   A.      I did not.  I'm assuming that this

13 federal data would be accurate.  But it

14 certainly could have errors in it that I'm not

15 aware of.

16   Q.      Do you know what constitutes a

17 separate school under this chart?

18   A.      I think that a separate school --

19 uh-oh.  Is that someone --

20   Q.      Yeah, we're good.  You're good.

21   A.      Okay.  You can see these categories.

22 80 percent or more of the school day in regular

23 class, 40 to 79 percent, and then less than 40.

24          And I think a separate school would be

25 entirely separate from general education.  So



ANDREW WILEY, PH.D.                         October 30, 2023
UNITED STATES vs STATE OF GEORGIA                        256

1   essentially zero percent in a general ed school.

2       Q.      And is that your assumption from

3   looking at this, or did you see that somewhere?

4       A.      That's my understanding --

5       Q.      Okay.

6       A.      -- yeah.  There may be definitions,

7   but I'm pretty sure -- I've done some research

8   around these IDEA data, and I'm pretty familiar.

9   So I think I'm right, but ...

10      Q.      Is GNETS considered a separate school

11  for purposes of this data, or -- do you know?

12      A.      I would assume that because these are

13  kids with IEP they're being reported with the

14  other state data.  And I know that GNETS is some

15  separate schools, also has some self-contained

16  classrooms.

17              So my guess would be in Georgia the

18  GNETS, for example, that are in the

19  self-contained classrooms could be under less

20  than 40 percent of the day.

21              But, yes, my assumption would be that

22  the GNETS students are in separate schools for a

23  GNETS program would be in that 9.9 percent.

24  That's my assumption.

25      Q.      And when you say GNETS students in a



ANDREW WILEY, PH.D.                        October 30, 2023
UNITED STATES vs STATE OF GEORGIA                      257

```
 1   self-contained classroom, can you expand for me
 2   what your understanding of -- what that looks
 3   like?
 4     A.      Well -- are we good?  In a -- I don't
 5   know why I thought -- self-contained would fit
 6   sort of conceptually but also numerically in
 7   that less than 40 percent of the school day.
 8           So typically if you have a student who
 9   is a self-contained classroom, they're pretty
10   likely to fall somewhere between that 1 to
11   40 percent of their day they're taught in some
12   sort of general education setting.
13     Q.      Would you expect a self-contained
14   classroom to be part of a general education
15   building?
16     A.      Not necessarily every building has
17   self-contained classrooms.  You know, the
18   example of Ohio is we have things that are
19   called -- they refer to them as units, but there
20   are autism units, and there may be one or more
21   self-contained classrooms that primarily serve
22   kids with autism in a general ed school.
23           There also are ones that are related
24   to kids with emotional, behavioral disorders.
25           I think what I'm describing for Ohio
```



1    is pretty typical around the country, but I'm

2    saying based on the way that I understand how

3    self-contained classrooms usually are.

4           Not every school will have

5    self-contained classrooms.  That's pretty

6    typical.  Often they're, you know, in this

7    school but in not in another school.

8    Q.      Are students in a self-contained

9    classroom typically able to interact at all with

10   general education peers?

11   A.      It depends on the self-contained

12   classroom.  Again, that less than 40 percent

13   suggests that at least for some of those

14   students served in those self-contained there

15   are some time spent in general education

16   classrooms or settings.

17   Q.      And stepping back for a second.

18          What is a situation in which a student

19   would be more appropriately served in a

20   completely separate school compared to a

21   self-contained classroom?

22   A.      Well, can I use examples?

23   Q.      Please.

24   A.      You know, for my work in Fairfax

25   County, there were public schools that were



1   schools for kids with emotional, behavior

2   disorders all over the county.  And most of them

3   were separate schools, but some of them also had

4   these sort of self-contained classrooms.

5          And when students had, for example,

6   behavior and/or academic problems that were not

7   responsive to the services provided in that

8   service delivery model, they would often come to

9   the program where I worked.

10         The program where I worked in some

11   ways was an attempt to provide within Fairfax

12   County the level of service that's often

13   provided in, like, private day schools.  But

14   Fairfax County decided that they wanted to try

15   to do it, I would argue, quite successfully.

16         So a lot of those kids who were having

17   lots of behavioral incidents, lots of

18   difficulties, not doing well academically, would

19   come to Olde Creek, and they would -- most of

20   them did -- made much better progress.

21   Q.     And -- I apologize if I'm missing it.

22         What is it that would make it so a

23   student would have to be placed in a separate --

24   completely separate school as opposed to a

25   self-contained classroom within a larger general



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                  260

1   education setting?

2      A.      Yeah.  So I think that it would be

3   that if they weren't making satisfactory

4   progress in the self-contained classroom.

5      Q.      Thank you.

6              Turning back to table 2.

7      A.      Yes.

8      Q.      From this table, in your review of the

9   material underlying this table, are you able to

10  discern the categories of supports and services

11  provided to students in any of these settings?

12     A.      That is not included in this table.

13  And I'm trying to think if anything -- and, you

14  know, this is one of the things that -- when

15  I've written about instructional inclusion, it's

16  very -- in some ways it's really easy to collect

17  data that says where are the kids.  Right.  Are

18  they in general ed.

19             Understanding what services and

20  supports there I think would be great to know,

21  but it's much more difficult to figure out a way

22  to collect those data and then report them.

23             But it doesn't -- it doesn't -- this

24  table will not tell you what services and

25  supports are provided.



1    Q.        And, similarly, from this table you're

2    not able to discern the quality of supports and

3    services provided to students in any of these

4    settings, correct?

5    A.        Not from this table, no.

6    Q.        Do you know, are GNETS program sites

7    considered schools under Georgia law?

8              MS. JOHNSON:   Object to form.

9    A.        I -- my understanding of what I read

10   about GNETS, from what I remember, is that they

11   are considered schools.

12   Q.        So I will represent to you that

13   regional GNETS program sites are specifically

14   excluded from the state's definition of a

15   school.

16   A.        Okay.

17   Q.        And so knowing that, can you say with

18   certainty how students placed in GNETS are

19   reflected in this data?

20   A.        Well, what I can say with 99 percent

21   certainty is that if they have IEPs, then it

22   should be required that the state of Georgia is

23   reporting their placement.

24             So my assumption is -- and, again,

25   kids with IEPs are served in different places in



1   different states, but I would assume that that

2   would -- how they would be reported with their

3   IEPs.

4           Did I dive into exactly how Georgia is

5   reporting these required federal data, no, but I

6   think I could assume that that's what they would

7   be reported under.

8   Q.      Dr. Wiley, let's turn to page 19,

9   please.

10          I'm looking at the first full

11  paragraph under the "CAP" title, subheading.

12  You wrote, the last sentence -- last two

13  sentences there, "Students are referred to GNETS

14  through the IEP process, as required by IDEA.

15  If an IEP team determines that a student with a

16  behavior-related disability has not benefited

17  educationally in a less specialized placement,

18  placement in a GNETS program can be considered.

19          Dr. Wiley, what were these

20  statements -- actually, let me rephrase that.

21          Were these statements based off of

22  your review of the things listed in the

23  considered materials?

24  A.      The manual would be one where -- I

25  believe that's where I read the description of



1  the procedures for referral to GNETS.  And it

2  also came up in my conversations with some of

3  the Georgia Department of Ed staff.

4     Q.     And -- but you did not evaluate the

5  supports and services offered by Georgia's

6  general education requirements, correct?

7     A.     For individual students, no, I didn't.

8     Q.     Or collectively.

9     A.     Or collectively.  That's correct.

10    Q.     And you can't speak to what

11 alternative placements are actually available to

12 students with disabilities in the state of

13 Georgia, correct?

14    A.     Do you mean other kinds of special

15 schools besides GNETS?  When you say

16 "alternative," I'm just trying to --

17    Q.     Yeah.  Referring to the -- again to

18 the continuum that you're talking about --

19    A.     Yeah.

20    Q.     -- in this section.

21    A.     Yeah.

22    Q.     You can't speak to what other options

23 there are in the continuum in the state of

24 Georgia, correct?

25    A.     I can't except that, as you saw in the



1  regulations for IDEA, that schools are required

2  to offer general ed, resource rooms,

3  self-contained special schools.

4          Based on that, you're right, I haven't

5  gone in and double-checked that, but it would be

6  surprising to me if they didn't have something

7  like that.

8   Q.     But even within what's provided within

9  the IDEA, what that actually looks like in

10 practice can vary quite a bit from state to

11 state and even district to district, correct?

12  A.     It varies, but not as much as some

13 people might think.  And that's one of the

14 interesting things about this case to me, is

15 that -- I think that people have looked at

16 Georgia like these are really unusual things

17 going on.

18          I think you'll probably talk about the

19 next paragraph where I try to provide examples

20 of it may not be identical to GNETS, but there

21 are a lot of ways that different states provide

22 the continuum of placements or services.

23          But -- okay.  So if you're saying do I

24 know whether it's like other states, I don't

25 know that.  I would be surprised if it was much



 1  different.

 2   Q.     Are there students placed in GNETS

 3  without FBAs beforehand?

 4          MS. JOHNSON:  Object to form.

 5   A.     I don't know.  I don't know.  And I

 6  didn't look at individual students in order to

 7  rebut the claims that I laid out at the

 8  beginning.

 9          I am not sure where the experts

10  reported that that is the case or to what extent

11  it is the case.

12          I would also say the tough part about

13  functional behavior assessment is that it is

14  required by IDEA, but under a really narrow set

15  of circumstances.  And there are people in my

16  field who say it's too bad that -- you know.

17          But I -- again, just like I said, an

18  IEP team may not have to make a decision based

19  on checking a rigid number of boxes.

20          They may be able to say well, here's

21  what we did, these were the services we

22  provided, but it's the determination of the IEP

23  team that a more specialized placement is

24  needed.

25          The short answer is, though, that I



ANDREW WILEY, PH.D.                          October 30, 2023
UNITED STATES vs STATE OF GEORGIA                        266

1  did not look at individual files to say how many

2  do and how many don't.  I have no idea.

3      Q.      Thank you.

4              Let's go to the next page, please.

5      A.      Okay.

6      Q.      Page 20.

7              I'm looking at the bottom.  The second

8  to last sentence you wrote "Full inclusion

9  proponents believe that FAPE can be provided in

10 general education to all or very nearly all

11 students with disabilities, regardless of their

12 special education needs."

13             And when you use "general education"

14 here, what do you mean by that?

15     A.      I think primarily I would be referring

16 to general education classrooms, because full

17 inclusion proponents, and I didn't cite them

18 here, but people who make this argument are

19 saying that we could teach all of these kids in

20 general ed, or very nearly all.

21             Some people give a little bit of

22 qualification.  I think I use the example later,

23 but the SWIFT Center, which is, you know, maybe,

24 I don't know, a funded center.  Their motto is

25 "All means All."



1           So I think that what they're saying is

2    that all students can be taught in general

3    education classrooms.

4       Q.      And do you understand that to mean

5    general education classrooms with or without

6    supports?

7       A.      I think that that -- the full

8    inclusion proponents are saying with supports.

9       Q.      Okay.

10      A.      That they -- that that FAPE can be

11   provided.

12      Q.      Dr. Wiley, out of curiosity, why are

13   you addressing what full inclusion proponents

14   believe in your rebuttal report?

15      A.      I think because the experts tried to

16   characterize certain statements as the consensus

17   of the field.

18           I also think that in particular

19   Dr. McCart, I think, probably -- again, I can't

20   characterize her, she would have to do it the

21   way she would, but I think that she does -- some

22   of her publications suggest that she believes

23   that all kids could be -- all, or very nearly

24   all.

25           So I was trying to give it a context



1   in the field, that there are people who think

2   with the right services and supports all, or

3   very nearly all, but I would argue that even

4   though there have been full inclusion advocates

5   since the '80s at least, and earlier really, the

6   consensus of the field is that we don't know how

7   to do that.  Ethically or effectively.

8       Q.      And so am I correct, then, in

9   understanding that this isn't in response to

10  anything in either of the United States' expert

11  reports, but rather you trying to lay out what

12  your understanding of the status of opinions in

13  the field are?

14      A.      It may not have worked perfectly, but

15  I think I was trying to rebut the whole notion

16  of there's a consensus.

17      Q.      Okay.

18      A.      And to understand that there are

19  different views.  And one of those views is full

20  inclusion.

21      Q.      Okay.  Let's go to the next page,

22  please.

23      A.      Okay.

24      Q.      The first line you wrote "For as long

25  as full inclusion proponents have called for the



1   elimination of the LRE and CAP, special

2   education researchers, leaders, and advocates

3   have, in turn, criticized and questioned the

4   feasibility, wisdom, and ethicality of full

5   inclusion."

6          And again same question.  Is this in

7   response to anything in either report?

8   A.      It's in response to the idea that

9   there's a consensus that the vast majority of

10  kids with behavior-related disabilities could be

11  served in general education.

12         And I'm trying to give an example of

13  highly cited research that spans a long period

14  of time that has said this full inclusion is not

15  supported by the evidence.

16  Q.      But was there anything in either --

17  well, okay.  Thank you.

18  A.      Yeah, I didn't say it, and I probably

19  could say, you know, when Dr. McCart or Putnam

20  says the consensus of the field.  I didn't make

21  that clear, but that is what I'm trying to

22  rebut.

23  Q.      All right.  Let's go to the next

24  sentence after the string cite there.

25  A.      Sure.



ANDREW WILEY, PH.D.                                October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              270

1    Q.      You wrote "Critics of full inclusion
2    highlight the lack of evidence that all or very
3    nearly all students with disabilities can be
4    effectively and appropriately taught in general
5    education environments."
6            Again are you saying that the evidence
7    does not support that all or nearly all students
8    with disabilities generally can be educated in
9    general education environments?
10   A.      That's correct.
11   Q.      Okay.  Now, if I can, turning back to
12   table 2 on page 16.
13   A.      Sure.
14   Q.      The table here that you cite shows
15   that nationally, just with students with
16   emotional and behavioral disabilities, over
17   80 percent are educated in general education
18   some or all of the time, correct?
19   A.      What page is that on?  I can't believe
20   I can't find my own table.
21   Q.      16.  16.
22   A.      Thank you.  16.
23           I was like "Is it before this or
24   after?"  I really should know.
25           Okay.  So this may be a confusion of



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                  271

```
 1   the table, but when you say 80 percent of
 2   students with --
 3      Q.      Well, -- so I'm --
 4      A.      Go ahead.
 5      Q.      -- just looking at inside the regular
 6   class.
 7      A.      Yeah.
 8      Q.      You look at all states, and the three
 9   numbers there.
10           Over 80 percent are in general
11   education or regular classes some or all of the
12   time, correct?
13      A.      So let me clarify that what that
14   column means is this is the percentage of kids
15   with emotional disturbance who are taught
16   80 percent or more of the day in regular
17   education.  So the 80 percent doesn't refer to
18   the kids.
19      Q.      Yeah.
20      A.      Right.
21      Q.      I'm with --
22      A.      Okay.
23      Q.      -- you, actually.
24      A.      Okay.
25      Q.      But I'm actually -- I'm adding the
```



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              272

```
 1    first three columns.
 2       A.      Okay.
 3       Q.      That show that some percentage of the
 4    day, some it's less than --
 5       A.      Oh, okay.  I see what you're --
 6       Q.      Right.
 7       A.      Yeah.  Yeah.  Yeah.
 8       Q.      So it's confusing because 80 percent
 9    shows up two different ways.
10       A.      Yeah.
11       Q.      But I'm saying if you look at all of
12    the state's data, this shows that over
13    80 percent are educated in general -- this is
14    just students with behavior -- with emotional
15    disturbance.
16       A.      Correct.
17       Q.      Over 80 percent are educated across
18    the country in general education settings some
19    or all of the time, correct?
20       A.      Right.
21       Q.      And so I'm trying to reconcile this
22    with your statement on page 21.
23       A.      That there isn't evidence that they
24    can be.
25       Q.      That there isn't evidence that they
```



1   can be educated in general education

2   environments.

3     A.     Well, you're right that it's

4   80 percent, but there's still 12.3 percent, plus

5   whatever the other percentages are, who are not

6   served in general ed.  So this is where the

7   fuzzy terms get difficult.  If we're talking

8   about all, this wouldn't provide support for

9   that.  What is vast majority.  If it's

10  80 percent.

11          Now, I mean, the other thing that's

12  really important if, you know, you're thinking

13  about placement and, you know, how to use the

14  continuum of alternative placement is that, like

15  you said earlier, this doesn't say anything

16  about the services that are provided, either in

17  a separate setting or general education.

18          And so the fact that 80 percent are in

19  general education does not mean that they're all

20  being appropriately and effectively served.  Or

21  as appropriately and effectively as they can be.

22    Q.     Is it your opinion that there should

23  be fewer students with ED being served in

24  regular classes some or all of the time?

25    A.     My opinion is that we should focus



1  first on what is appropriate instruction at the

2  individual level.  And that if we -- the more

3  that we can provide those in general ed, that's

4  great, but we shouldn't include kids or fuss

5  with these numbers until we know, like, here are

6  the ways that we can deliver this type of

7  support to the student with this level of need

8  or this type of need.  And my general argument

9  is that we don't know that.

10              So when we say there isn't evidence

11  that we can effectively serve these kids, you

12  know, there are other indicators we can use

13  about these services.  And they include things

14  like involvement with the juvenile justice

15  system, dropout, failing classes.

16              If we're just looking at placement,

17  you know, we might go "Yay, we've done a great

18  job," but when we look at those outcomes we say

19  maybe we've lost focus on appropriate intensive

20  services and that's going to be the most

21  important thing.

22              That's my opinion and my perspective.

23  I'm not saying they should be more or less, I'm

24  saying that we should do more to ensure that

25  kids with EBD who need special education are



1    identified and get the appropriate services to

2    their individual needs as we can.

3        Q.       But if I understood you correctly,

4    what you were saying a few moments ago with

5    relation to this table 2 is that you can't tell

6    from this whether students who are in regular

7    classrooms some or all of the time are being

8    appropriately served in --

9        A.       Not in this table.  That's right.

10       Q.       But you also can't tell for students

11   in separates schools; is that correct?

12       A.       I can't tell for either one.

13       Q.       Okay.

14       A.       This is just how many are served in

15   these particular settings.  That's right.

16       Q.       When you use this term in this

17   sentence that we discussed back on 21 --

18       A.       Okay.

19       Q.       When you use the term critics of full

20   inclusion, do you include yourself in that

21   group?

22       A.       Yes.

23               The "full" is the critical qualifier.

24   I am not a critic of inclusion, appropriate

25   responsible inclusion.



1          I'm probably talking too quietly.  I'm
2    worried.
3               MS. ADAMS:  We haven't gotten
4       any --
5               THE WITNESS:  Oh, good.  So we're
6       all right.  Thanks.
7    Q.      In your opinion is there a difference
8    between educating students so that they have
9    interactions with general education peers in
10   educating students in general education
11   environments?
12   A.      I just --
13              MS. JOHNSON:  Object to form.
14   A.      -- might need that one unpacked a
15   little bit.
16   Q.      I'm just trying to see is there a
17   distinction between educating students in a way
18   that they are able to interact with general
19   education peers either -- you know, that could
20   be the cafeteria.  It could be extracurriculars.
21   It could be whatever.  Is that the same thing as
22   educating students in general education
23   environments to you?
24              MS. JOHNSON:  Object to form.
25   A.      So you're asking me if I make a



ANDREW WILEY, PH.D.                                October 30, 2023
UNITED STATES vs STATE OF GEORGIA                            277

1  distinction between educating students when they

2  interact with nondisabled peers and -- what was

3  the second part?  I'm sorry.

4     Q.     No.  I'm trying to figure out if there

5  is a distinction.

6     A.     Okay.

7     Q.     You know, if -- would you consider --

8  a self-contained classroom where students are

9  able to interact with nondisabled peers, would

10 that transition out to a general education

11 setting in your mind?  Is that still a

12 specialized setting that allows for interaction

13 with nondisabled peers?  Where does that fit for

14 you?

15    A.     If I'm understanding your question

16 correctly, it's on that continuum.  Right.  So

17 self-contained would be the 40 percent or less

18 in general ed.

19           You know, I think that, again, if --

20 we're very thoughtful about nondisabled peers

21 and how, you know, interactions with nondisabled

22 peers can for some students enhance their

23 educational outcomes, their educational

24 experience.  That's great.

25           I'm always wary of the assumption that



1   people think that we just put them together and

2   magically things happens.  And that's not the

3   case.  That's not the nature of disabilities.

4          But I also want to emphasize here

5   that, again, from my experience, but also from

6   some of the research that I cited, that the

7   social experience of being in a special school

8   can be remarkable.

9          And what I'm weary of is -- I do agree

10  with the presumption, and for all the reasons

11  that we've sort of discussed so far, but I also

12  am weary of this argument that somehow because

13  kids with disabilities only interact with

14  each other that that's going to be inherently

15  harmful.  It's not intentional.  But in a way to

16  me it can devalue the kids with the disabilities

17  themselves.

18          And I have examples, not just from

19  when I was a teacher.  I didn't include my

20  paraprofessional experience.  I worked in a

21  special school in Alameda, California.  And it

22  was a incredible place and these kids became

23  great friends with each other.  They made great

24  progress.

25          All I'm saying is that it's a mistake



 1  to think, one, that you can just put them
 2  together and things will happen.
 3          And, two, that, you know, that's there
 4  end-all and be-all, most important thing of the
 5  educational experience of students with
 6  disabilities, if that makes sense.  Okay.
 7  Q.      I follow you.
 8          So let's go to the next paragraph, if
 9  we can.  We're still on page 21.
10  A.      Okay.
11  Q.      And I'm going to start halfway through
12  that first sentence.  You wrote "full inclusion
13  advocates underestimate the academic,
14  behavioral, and social problems exhibited by
15  many students with disabilities, particularly
16  students with behavior-related disabilities."
17          And I don't see that there's a
18  citation to this statement.
19          Is this your personal opinion of full
20  inclusion advocates generally?
21  A.      It is my opinion.  And in my
22  scholarship I've cited examples of that.  I
23  didn't do that here.  I'll be honest that I
24  didn't cite some of those examples.  It was sort
25  of a part of me that was trying to be polite in



 1  this context.

 2          And not that it's -- you know, again,

 3  there are legitimate wide opinions in the field.

 4  I'm not says it so shameful.

 5          But I think what you will see

 6  consistently -- in some of the things that I've

 7  written I've talked about this, is that when you

 8  advocate and say yeah, we can do this with all

 9  kids, there tends to be a way of describing

10  those kids that doesn't acknowledge how diverse

11  they can be, how, you know, intensive their

12  problems can be.

13          But you're right.  I didn't cite those

14  examples here, but I could.  I could, if anybody

15  needed them at some point, give you some

16  examples of what I'm talking about.

17          And, by the way, that's not just full

18  inclusion advocates, just so that you have the

19  full context.  There are examples.

20          For example, when response to

21  intervention was sort of the big thing that was

22  emerging, and there were people who said look,

23  we can do response to intervention, we don't

24  need special ed anymore.

25          And when those folks said, they tend



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              281

 1  to talk about oh, these kids with, you know,

 2  academic problems, they're not so tough, we just

 3  need to make a few tweaks.

 4          So that's my point.  For some kids a

 5  few tweaks can absolutely get you there.  But

 6  when we look at who these kids actually are, the

 7  whole population of kids with behavior-related

 8  disabilities, some of them have really complex

 9  and intensive needs.

10          And so I thought that was important

11  because there were a few things in the report

12  that to me reflected that, you know these kids

13  are -- if you just listen to their

14  communication, for example, they would be fine.

15  And the truth is they're more complicated than

16  that overall.

17  Q.      So is this statement in response to

18  anything in particular in either of the

19  United States' experts reports?

20  A.      Yeah.  Again, in response to, I think,

21  statements made by Dr. McCart in particular

22  where she said sometimes they do this just to

23  regulate their emotions and they need a few

24  minutes of quiet time.

25          So, again, I didn't tie it into that



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    282

1  directly, but that was one of the things that I

2  was responding to.

3          But it also links to the previous

4  section, which is why do we have to make these

5  decisions on an individualized basis rather than

6  saying the vast majority.

7          And it's because -- it's not that

8  every kid with behavior-related disability is

9  like another kid with a behavior -- right.

10 There's a lot of diversity.

11         And so I wanted to include the

12 research that says if we're going to respond to

13 these kids appropriately and give them access to

14 education in a meaningful way, we really have to

15 consider this diversity and when their needs get

16 really pretty complex.

17 Q.      But to that point, for some students

18 with behavior-related disabilities, at some

19 times could a few minutes of quiet time be what

20 they need to reregulate?

21 A.      I think that that may be true, but

22 just saying that is really all you need to do.

23         And I don't think -- it's one of the

24 few specific things that I remember Dr. McCart

25 mentioning, and to me it really mischaracterizes



ANDREW WILEY, PH.D.                          October 30, 2023
UNITED STATES vs STATE OF GEORGIA                        283

1  the intensity of the problems that we're talking
2  about.
3           So strictly it's true.  I just think
4  that in order to understand this case, it's
5  important to consider these kids in more depth
6  than that.
7     Q.      Do you believe that Dr. McCart in her
8  role as an expert in this case is an advocate of
9  full inclusion?
10    A.      I would say that based on her writings
11 and based on the SWIFT Center that she works
12 for, to me that's what would be full inclusion.
13          I think one example would be, and I
14 don't cite it here, but there's a publication by
15 Wayne Sailor and Dr. McCart called the Stars in
16 Alignment where they're talking about MTSS and
17 how we're basically on the cusp of making full
18 inclusion a reality.
19          And there are some people who think
20 that, who think that MTSS can make general
21 education appropriate for all kids, regardless
22 of their needs.
23          So that's my opinion.  Dr. McCart may
24 say no, I'm not an advocate.
25          One of the challenges is that



ANDREW WILEY, PH.D.                                      October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    284

1   difference between are you saying all kids.

2   Well, Dr. McCart makes exceptions.  She says no,

3   the vast majority.  There are some kids who are

4   going to need special placements.  At least

5   that's how I understand her report.

6          But if you're asking me in my view, I

7   think that her perspective reflects that full

8   inclusion perspective.

9   Q.     And so when you're talking about full

10  inclusion proponents and advocates and

11  responding to what you understand some of their

12  positions to be in your report, are you

13  intending to respond to some of Dr. McCart's and

14  others outside writing within your report?

15  A.     I am not.

16          MS. JOHNSON:  Object to form.

17  A.     I am trying to respond to Dr. McCart's

18  statements and conclusions in her report.  Some

19  of them are very much consistent with other full

20  inclusion outside of here.  That's sort of what

21  I'm -- I mean, that's what I'm answering your

22  question with.  I was really trying to rebut the

23  claims and the arguments, but -- does that make

24  sense?

25          I would think -- I would say that some



1    of the arguments that are made in here are

2    reflective of the consensus of full inclusion

3    folks in the field.

4      Q.      Understood.

5                MR. GILLESPIE:  We've been going

6          for about another hour, hour 10.  Do you

7          want to take another break?

8                THE VIDEOGRAPHER:  Okay.  Off the

9          record, 2:45.

10                   - - - - -

11              (A recess was taken.)

12                   - - - - -

13                THE VIDEOGRAPHER:  We're back on

14          the record, 3:00.

15     BY MR. GILLESPIE:

16      Q.      All right.  Dr. Wiley, we are still on

17    page 21.

18      A.      Okay.

19      Q.      And we're moving on to section II.

20              In that bottom paragraph there, I'm

21    talking about the end of that first sentence,

22    where you refer to individualized educational

23    programming required to address students with

24    behavior-related disabilities needs.

25              And what I wanted to understand is



1   what do you mean by saying "individualized

2   educational programming required to address

3   those needs"?

4       A.      So in that sentence I'm referring to

5   IEPs, but the emphasis on individualized, that

6   we have to look at the types of special

7   educational needs that each of these students

8   have and also the intensity of those needs and

9   make sure that we address them.

10      Q.      And so you're just referring to the

11   IEP itself here?  Like the document?

12      A.      I would say that I intend that to be

13   linked to the IEP conceptually and as a practice

14   that we have to think about the diversity of

15   needs, the intensity of needs, and we need to

16   make sure that we provide individualized

17   programming that addresses those needs.

18      Q.      And I guess when you say

19   "individualized programming" there, I'm just --

20   I'm trying to make sure I have a clear

21   understanding of what you mean by that.

22      A.      I think I mean both just as a broad

23   concept that they need individualized

24   educational programming, but it's okay if it

25   also refers to IEPs specifically as part of

1   special education.

2          I think I intended this mostly just as

3   an introductory sentence.  I don't know that I

4   was trying to express anything earth shaking.

5      Q.     I know.  I understand.

6      A.     But, no, that's fine.

7      Q.     I just want to make sure, because, you

8   know, when you say "individualized

9   programming" -- I mean are there -- are you

10  thinking of categories of supports and services

11  or what can that entail?

12     A.     Everything that would go into an IEP I

13  think is the way to think about it.  The

14  services and supports that you provide to a

15  student that address the educational needs of

16  the student.

17         And in that sense, you know, the other

18  part of the order is important in the law, not

19  just because it's a law, but conceptionally, is

20  that we first identify exactly the individual

21  characteristics or needs of the student, then we

22  identify the services and supports, and then we

23  identify placement.

24         So it could be academic interventions.

25  It could be social, emotional, behavioral



 1    interventions.  That's what I'm referring to.

 2    The things that would be reflected on an IEP to

 3    address the needs of the individual student.

 4        Q.      Okay.  Thank you.

 5                The next page, please.  That middle

 6    paragraph.  The one full paragraph.

 7        A.      Okay.

 8        Q.      And in the middle you say "For

 9    example, for students with emotional and

10    behavioral disorders (EBD); estimates of the

11    actual prevalence of EBDs in the school-aged

12    population based on epidemiological studies

13    indicate that between 3 percent and 6 percent of

14    children and youth have EBDs severe enough to

15    warrant intervention."

16                And my question's actually really

17    simple.  What do you mean by "warrant

18    intervention"?

19        A.      What I mean is that -- and when you

20    talk about -- emotional and behavioral disorders

21    are challenging to conceptualize, because they

22    include both the behaviors and the emotions

23    which are unusual, but then they also have some,

24    in order for it to be a disorder, functional

25    impairment.



1          So does it impair my ability to make

2    friends, hold a job, I'm talking children and

3    adults, you know, learn.  All of these different

4    things.

5          And so the estimates in these

6    epidemiological studies are based on that idea.

7    Like who are the kids that have unusual emotions

8    and behaviors that also impair them in some life

9    area.

10         So those estimates sort of reflect out

11   of the whole population, somewhere between 3 and

12   6 percent -- some will say that's a conservative

13   estimate, too, but require some kind of

14   intervention, would warrant intervention in

15   school, possibly special education.  Could be

16   mental health but not special education.

17         So it's a pretty broad -- but that's

18   kind of how you in epidemiological studies --

19   like if you're identifying the flu in a study,

20   we know how to do that.

21         An emotional, behavioral disorder is

22   behaviors that are outside of the norm and

23   emotions and they impair you in some area of

24   functioning.  Without both of those things, you

25   don't really have an emotional, behavioral



ANDREW WILEY, PH.D.                                  October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              290

 1  disorder.

 2    Q.      And so are you using intervention

 3  synonymously with supports and services?

 4    A.      Yeah.  And I don't mean it to be just

 5  necessarily special education, but that would be

 6  the way in which this is studies.

 7         So there are people for a long time

 8  who have noticed that we have really low

 9  identification for kids under the category of

10  emotional disturbance.  But we have evidence

11  from research that there are probably many more

12  kids.

13         Now, some of those kids almost

14  certainly are served under other categories;

15  learning disabilities, OHI, you know, different

16  things.

17         So -- but, nonetheless, there is some

18  good evidence that a lot of these kids aren't

19  officially getting services of any kind, which

20  is also, I think, important to remember when we

21  think about inclusion in general education, is

22  it's not just the kids that we've identified and

23  are giving services, but in some places there

24  can be a lot of really needy kids in general ed

25  classrooms who haven't been identified.



1    Q.        And -- thank you for that

2    clarification.

3    A.        Uh-huh.

4    Q.        This analysis that you're referring to

5    here, it was not of students with EBD in the

6    state of Georgia, correct?

7    A.        This particular thing that I cite or

8    my analysis?  You mean, like, Forness and

9    Kauffman & Landrum?

10   Q.        Yeah.  Either way.  It doesn't apply

11   to the state of Georgia, correct?

12   A.        Yeah, it doesn't refer to the

13   prevalence of EBD specific to Georgia.  Most of

14   these are national studies.  And there may be

15   even a few from other countries, but mostly the

16   United States, I think.

17   Q.        Okay.  Thank you.

18             Let's go to the next page, please.

19   A.        Okay.

20   Q.        We're going to look at the footnote

21   there, and I'm going to start after Dr. McCart's

22   quote.

23             You wrote "Again, because the

24   individual characteristics and needs of students

25   vary significantly, the apparent success of a

 1 | few students with behavior-related disabilities
 2 | does not mean that integrated provision of
 3 | supports will work for the 'vast majority' of
 4 | these students.  Individual differences must be
 5 | taken into account, as required by IDEA and
 6 | sound special education practice."
 7 |         Now, it's not your position that
 8 | experts in your field can't ever generalize
 9 | about student populations based on a review of a
10 | sampling of students, correct?
11 |         MS. JOHNSON:  Object to form.
12 |  A.     I'm going to try to answer, and you're
13 | going to tell me if I understood your question
14 | correctly.
15 |         You know, we do say things, for
16 | example, about generally effective practices for
17 | students with EBD.  And in that sense that's
18 | kind of a generalization.  Right.
19 |         We say hey, here's a practice that
20 | this research suggests may be effective with
21 | kids with EBD.  But.
22 |         I think there's always an
23 | understanding that kids with EBD, like any
24 | disability category, is very diverse.  So we
25 | always do it sort of with an asterisk that



1  says -- you know, and I think you see it in some

2  of the more recent position papers on the state

3  of the field, which I cite in different places,

4  that we've made progress helping many kids with

5  EBD, but a lot of times there's that caveat that

6  when we're talking about the kids with the most

7  intensive, we still got things that we need to

8  figure out.

9           Does that answer your question?

10   Q.      I think so.

11   A.      Okay.

12   Q.      But let me paraphrase to make sure I'm

13  understanding correctly.

14   A.      Okay.

15   Q.      You don't object to making, drawing

16  conclusions about student populations generally,

17  as long as you account for the fact that there

18  will be exceptions and individualized

19  assessments being made --

20   A.      Yeah.

21   Q.      -- to recognize those; is that

22  accurate?

23   A.      That is accurate in this context.  I'm

24  mentioning it because Dr. McCart points to an

25  example of at least one student -- one student,



ANDREW WILEY, PH.D.                                  October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              294

1   yeah, and just to be careful that because one

2   student appears to be successful, that that's

3   not a strong argument that we can now meet the

4   needs of all kids.  That sort of was my only

5   point.  I would not generalize for one student.

6       Q.      Thank you.

7               Are you aware that Dr. McCart reviewed

8   dozens of student records in forming her

9   opinions in this case?

10      A.      I am aware of that, but it's not clear

11  to me in her report exactly how she reviewed the

12  reports or how she came to her conclusions.

13      Q.      And are you aware that Dr. McCart

14  conducted 70 site visits to GNETS programs?

15      A.      I am over a period of time that -- my

16  question, again if I'm putting my manuscript

17  reviewer hat on would be how did you structure

18  those interviews, did you use any kind of

19  standardized observation instrument, and did the

20  number of days over 70 sites really justify your

21  ability to draw conclusions.

22              And I think a thing that I would say

23  as a manuscript reviewer -- and I don't know if

24  this works for everybody.  I would say you're

25  really being overly confident in the validity



1 | and the reliability of your findings.  You have

2 | to be able to justify that.

3 |         I think in a case where we're trying

4 | to understand what's happening in these GNETS

5 | programs and what's happening in these -- in

6 | zone schools, that some level of rigor would

7 | have been better, to say I can draw, you know,

8 | any kind of -- I can put any kind of confidence

9 | in her findings.

10 | Q.      Would you agree that somebody that's

11 | reviewed individual student records, conducted

12 | on site observations, that has observed students

13 | live would be in a better position to opine on

14 | the needs of a student population?

15 |              MS. JOHNSON:  Object to form.

16 | A.      And you're talking about in this

17 | specific example, not McCart observing in

18 | general but --

19 | Q.      I'm talking generally.

20 | A.      That literal question, that direct

21 | question.

22 | Q.      That direct question.

23 | A.      Not if they're using biased methods to

24 | collect that information.  And we are sometimes

25 | not aware that we're being biased in what we're



1  paying attention and not paying attention to and

2  that's why use of a standardized at least

3  procedure, if not instrument -- and there are

4  a lot of observation protocols that are

5  available -- would to me make me better able to

6  respond to her findings.

7           So if you go in with a conclusion in

8  mind, and I'm not saying that but I'm just

9  saying if, then I would not put more confidence

10 in those findings, I would question them.

11   Q.     So let's address that parameter you've

12 put there.

13   A.     Yeah.

14   Q.     So assuming somebody's doing an

15 evaluation in good faith, would you agree that

16 somebody who's done those things, who's looked

17 at individual student records, gone on site,

18 conducted live observations, would be in the

19 position to make observations about the student

20 population that was reviewed and observed?

21           MS. JOHNSON:  Object to form.

22   A.     And I want to be clear.  I am not

23 questioning at all Dr. McCart's motives when I

24 say this.  A lot of times the bias and

25 observation is not intentional at all.



ANDREW WILEY, PH.D.                        October 30, 2023
UNITED STATES vs STATE OF GEORGIA                      297

```
 1           There are advantages, if your goal is
 2   to accurately characterize something, to going
 3   and observing and doing all of these things, but
 4   if you're not careful about how you do it, your
 5   conclusions could be much less reliable than
 6   someone who I spoke to and said here's what we
 7   do every year.
 8           That would have added as well, is to
 9   kind of triangulate some of her records reviews
10   and observations with GA -- Georgia Department
11   of Ed staff, right, to say here's what I found.
12   Can you give me more context for this?
13           And they might have said "Oh, well,
14   here's some records that show ..."
15           So it's tough.  You know, if your goal
16   is to provide accurate information, to me it
17   depends on how you do it whether or not you
18   would be better able to characterize what's
19   happening, who the students are, and those kinds
20   of things.  Right.
21           You said in good faith, and I'm just
22   going to replace that with using sound methods,
23   and then I would say yes.
24   Q.       Okay.
25   A.       Using sound methods, then I would say
```



```
 1    they're in a better position to say what's

 2    happening.

 3       Q.      You said a couple times now that --

 4    you know, about objections to methodology.

 5              If you were reviewing the

 6    United States' experts reports as though it were

 7    a manuscript, is that the standard that you kind

 8    of apply to the --

 9       A.      Only the methods.

10       Q.      -- United States' experts reports?

11       A.      And I didn't literally do that, but

12    I'm giving you an analogy where I would say

13    okay, you did these things, you drew these

14    conclusions and you interpreted this way.  I

15    would say now we need to be mindful of the

16    limitations of what you did.

17              And I would be -- for me, if I had

18    used methods that I felt were shaky, I would

19    qualify them quite a bit and say I only went for

20    this number of days.  Or it may be that I didn't

21    observe something in the record that could have

22    been there.

23              That's sort of what I'm saying.  I'm

24    not saying I reviewed their entire report that

25    way.  I took the conclusions and claims, and I
```



1    did my best to rebut them using the sources that

2    I talked about.

3        Q.       And so -- I'm sorry.  I just want to

4    make sure that I'm understanding what you're

5    telling me.

6        A.       Yeah.

7        Q.       You're saying that you applied the

8    standard that you had applied to an academic

9    manuscript to the United States experts'

10   reports -- to the United States' experts

11   methodology in putting together their reports;

12   correct?

13       A.       I -- and I would have expected --

14   maybe not even what would be stringent enough to

15   pass peer review, but I would have expected

16   something more structured and, you know, more

17   based on something from standards in the field.

18            You know, Dr. McCart's table was

19   interesting, but I didn't understand how she

20   applied it.  She just gave sort of different

21   definitions and examples to her of what would be

22   segregation.

23            And then -- so I think that when you

24   say that, I would say I get it.  I wouldn't

25   expect them to have all of the resources and

ANDREW WILEY, PH.D.                                October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              300

1  time to do it at the highest level of, like,

2  peer-reviewed research, but I would expect that

3  there would have been more transparency in the

4  process and more checks on those findings.

5      Q.      Do you think in putting together your

6  report that your methodology was consistent with

7  standards in the field?

8      A.      My -- my -- well, -- so if I used the

9  method if this was to be compared to research,

10  it would be a synthesis of research around a

11  particular problem.

12             And I think that what I did in terms

13  of identifying literature that was relevant to

14  the analysis -- again, maybe not quite to peer

15  reviewed, but I think I had a process whereby I

16  tried to identify research that synthesized

17  everything.  Right.

18             So if I used syntheses in literature

19  reviews, it's not oh, I've cherry-picked a study

20  here or there that I thought oh, yeah, this one

21  really supports my case.

22             I was looking at here are the people

23  who have synthesized research on a particular

24  intervention or and inclusion and I'm basically

25  reporting these are the things that they



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              301

1   actually found.

2            Does that make sense?

3   Q.      It does.

4   A.      So I did make an effort to not have my

5   bias in it.  Bias, I also mean error.  So there

6   may be someone who would look at these things

7   and say hey, I would have emphasized this more

8   or that more.  That's possible.  There can be

9   different interpretations.

10  Q.      So if your report was intended to be a

11  synthesis of research, then what role do the

12  interviews and your review of the records we

13  talked about before play into that process?

14  A.      Yeah.  So the materials that I

15  reviewed and the conversations and things like

16  that were meant to bring together both what we

17  know from research and also specific contextual

18  information for this particular case.

19            So I didn't want it to be, you know,

20  purely academic.  So I did include some things

21  that were based on conversations that were based

22  on my review of the materials.

23            You know, when you're saying that,

24  maybe it's my mistake for using the manuscript

25  example because it puts a little bit, you know,



1   too much focus on that, but as far as the way I

2   reviewed the literature as part of, not my

3   entire, rebuttal report was -- it was made with

4   effort to be objective about what the research

5   says.

6      Q.      And if you were to opine on the GNETS

7   program specifically, what methodology would you

8   use to conduct a thorough evaluation?

9      A.      And this would be similar to, you

10  know, my experience with program evaluation.

11  And I can give you that example.  Now, this was

12  one program within a Massachusetts collective,

13  but --

14     Q.      You're talking about back when you

15  were --

16     A.      Yes.

17     Q.      -- a graduate student?

18     A.      Right.  And I haven't pulled the name

19  of the school yet.

20             Observations, records reviews,

21  interviews with faculty.  And we had

22  instruments, because this was a research

23  instrument -- institution for systematic reviews

24  of records and observation tools that allowed us

25  to focus on particular things and state upfront



1  here's what we were looking for.

2         So we were trying to give the

3  leadership, and also the faculty there, as

4  accurate of a picture of what we saw going on

5  with our program and make recommendations for

6  how they might improve.

7         So program evaluation includes some of

8  the things.  And I get it, there are decisions

9  that have to be made in limited periods of time,

10  but that's what I would suggest would have added

11  more credibility to some of the conclusions.

12  Q.      And how large was that program in

13  Massachusetts?

14  A.      That was one school.  So I -- you

15  know, I can only ballpark.  30 to 40 students.

16  Q.      And what was your process with -- so

17  you said, again, that your report is about --

18  mostly about being a synthesis of the research,

19  and so what was your process, then, for

20  synthesizing the research?

21  A.      Oh.  Well, I looked at specific claims

22  about, you know, just, for example, you know, we

23  now know that X, Y, and Z are effective and can

24  be implemented in general ed.  Like those kinds

25  of -- and then I said well, what is the actual



1   case of the research that you take something

2   like functional behavior assessment.

3            And my focus was on searching for meta

4   analyses and literature reviews that were as

5   current as possible that also focused, if I

6   could, primarily on kids with behavior-related

7   disabilities and also, to the extent that I

8   could, there were, like, three of the syntheses

9   that were focused on functional behavior

10  assessment in general ed settings.

11           So I'm trying to evaluate very

12  specifically that claim that we could, for

13  example, implement tier three or functional

14  behavior assessment in general ed.

15           And I think that the experts were

16  saying this is the consensus of the field and

17  research shows, and I found something different.

18           So I would use -- I knew some of the

19  research, but I would use key searches.  I would

20  also look at things that cited a particular

21  reviews or reviews that it cited.

22           I used some of the process that we

23  used to try to make sure we don't miss

24  particular -- and in this case because it was

25  hard to go study by study, I was mostly focused



1    on published syntheses of bodies of research.

2    Q.      And did you look for counter examples

3    as part of your syntheses?

4    A.      Yeah.  I mean, -- so when you're

5    looking at things that cite a particular review,

6    you look at it and you see if there appears to

7    be another review that might have, you know,

8    found a different conclusion.

9           You also look at things that it cites.

10          And you will find, because of the

11   nature of the complexity of these things that

12   they're studying, they'll cite a previous review

13   that maybe found something slightly different

14   and they'll say okay, we're going to update that

15   review.  They may change the parameters of the

16   review.  For example, some reviews of functional

17   behavior assessments are in any setting and some

18   are well, we wanted to look at, you know, in

19   general education settings.

20          So that was the process that I used.

21          You know, again, there may be a

22   reviewer who would say, you know, maybe you

23   should look at X, Y, and Z, but I think that I

24   did a pretty good job finding the most directly

25   relevant literature.



ANDREW WILEY, PH.D.                                      October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    306

1            I'm giving the examples of section IV,

2    I want to say, where I was looking at, you know,

3    what do we know about making general ed

4    appropriate and effective for students with

5    behavior-related disabilities.

6       Q.       But you would agree that the

7    evaluation you conducted would not have been

8    consistent with standards in your field if you

9    were opining specifically on the sufficiency of

10   the GNETS program, correct?

11      A.       What I think I did here was

12   appropriate for a rebuttal report of specific

13   claims.

14            If my task was to go and evaluate a

15   program, then I would have used a different set

16   of methods.  Some of them would have been

17   similar to, for example, Dr. McCart.  And I know

18   Dr. Putnam also visited some.

19            But I would have used a more

20   structured transparent approach.  That's all I'm

21   saying.

22      Q.       Understood.  Thank you.

23            Let's go to page 25, please.

24      A.       Yes.

25               THE WITNESS:  Does it matter that



 1      that came on?

 2               THE VIDEOGRAPHER:  It's okay.

 3               THE WITNESS:  Okay.

 4   Q.      So I'm looking at the bottom

 5   paragraph.

 6   A.      Okay.

 7   Q.      You wrote "The best available evidence

 8   suggests that the most effective way to address

 9   the learning difficulties of students with EBD

10   is through intensive academic instruction.

11   Intensive academic instruction is instruction

12   that is delivered in small groups using

13   specialized curricula (which, because students

14   with EBD are below grade level, includes

15   off-grade-level content)."

16               Did I read that correctly?

17   A.      Yes.

18   Q.      And you don't know whether or not

19   GNETS actually does this, correct?

20               MS. JOHNSON:  Object to form.

21   A.      I don't know.  I didn't see any

22   information that would tell me, you know,

23   whether or not or whether some programs are and

24   some programs aren't.

25   Q.      Okay.  Again I'm trying to truncate a



```
 1   little bit.
 2      A.      Oh, that's okay.
 3      Q.      Let's go to page 28, please.
 4      A.      28?
 5      Q.      Yes.
 6      A.      Okay.
 7      Q.      I'm looking at that first paragraph,
 8   and I'm actually going to start with the first
 9   sentence.  You wrote "Similar to students with
10   EBD, students with ASD" -- autism spectrum
11   disorder -- "may need to learn functional skills
12   that are not part of the standard curriculum,
13   but nonetheless relevant for maximizing the
14   success and independence of the individual
15   student in current and future environments."
16           But you agree a functional curriculum
17   shouldn't replace an academic curriculum,
18   correct?
19      A.      That's correct.  And so currently in
20   the field -- and I think what's true in Georgia
21   and pretty much every other state is you have
22   the state standards, and then you have modified
23   standards.  I think Dr. McCart mentions those.
24   And those can be functional and also parallel
25   the academic curriculum.
```



1          There is a requirement and idea that

2   kids access the general ed curriculum, and this

3   is one of the ways that we do it with kids who

4   also may need some functional instruction.

5          I'll just say that that's what the law

6   says, that's what some folks in research will

7   say, is that there's value in making sure

8   there's a connection.

9          And then there are some, and I may

10  have cited some of them somewhere, who have said

11  that we've got to be careful not to take this

12  exercise to a ridiculous point.  Meaning that

13  yes, to the extent that's appropriate for the

14  individual student, they should be learning the

15  general academic curriculum.

16          But we also have what we call an

17  individual curriculum, which is this student may

18  need to learn very functional skills.

19          And whether or not we make it look

20  like it's the general ed curriculum or not, it's

21  that they need to learn these things in order to

22  maximum their independence.

23   Q.       Thank you.

24          I'm going to skip a sentence and then

25  go to where you wrote "The goal of special



1  education and FAPE for every student is enabling

2  successful participation in the community after

3  graduating from school."

4         How do you enable a student to

5  successfully participate in the community after

6  graduating from school if they're never exposed

7  to peers without disabilities?

8  A.     What is successful participation in

9  the community is going to differ for different

10  kids.  And all of us, really.  Right.  So when

11  we all graduate, we all do different things and

12  we have to be prepared in different ways.

13         I'll say that, you know, there are a

14  set of skills, academic, adaptive, behavior that

15  increase your options when you graduate from

16  school.  This is true also with kids with

17  behavior-related disabilities.

18         Kids who graduate and they've never

19  learned, you know, how to -- you know, control

20  their behavior, I'll just say that sort of

21  generally, may have much more limited options in

22  terms of employment and things like that.

23         So the focus is not so much -- and

24  school really for all kids is kind of off

25  Broadway in terms of society.  And then society



1   is Broadway.  And you can have lots of different

2   things that kids do.

3           But the focus on free and appropriate

4   publication education first, what does this

5   student need to need -- learn, what's going to

6   benefit the most now and in the future is going

7   to differ.

8           And I don't think that being around

9   kids with disabilities is going to be by itself,

10  and I don't think many people are saying that,

11  but is going to make the turning point for now

12  I'm ready.

13          If you're around people who don't have

14  disabilities but you don't learn critical

15  skills, you're not prepared for maximizing your

16  independence and options.

17  Q.      I just want to clarify.  Did you mean

18  being around kids without disabilities there at

19  the --

20  A.      Yeah.  Did I say something different?

21  Q.      You said with, but --

22  A.      I apologize.

23  Q.      No.

24          Let's go to page 28, please.

25          Page 28, please.



1    A.      I think I'm on 28.

2    Q.      Oh, we are on 28.  Oh, my gosh.  Look

3  at me.  I lost track.  Right page.  Bottom of

4  the page.

5          At the very end you say "Typically,

6  appropriate programming for students with

7  behavior-related disabilities will include," and

8  you list seven different items.

9    A.      Yeah.  A direct quote from the

10  publication.  Yep.

11    Q.      Is this whole section a direct quote

12  from that --

13    A.      Yeah.

14    Q.      -- Mitchell, et al.?

15    A.      I think it's page 71 of Mitchell,

16  et al., which is one of the state of the field

17  papers.

18    Q.      Okay.  And you agree that these seven

19  items are appropriate programming for students

20  with behavior-related disabilities?

21    A.      Typically.  Yeah.  In different

22  versions and different levels of intensity.

23  That's important to note, too, because if we're

24  going to, for some kids with behavior-related

25  disabilities, teach them in general ed



 1   classrooms, then this has to be able to bend to

 2   some degree.

 3           Does that make sense?

 4   Q.      Absolutely.

 5   A.      So, you know, there are things that

 6   are the most structured and the most intensive.

 7   And then general ed it might be sort of a

 8   variation of that.  And some kids will succeed

 9   with that and some kids won't.  Yeah.

10   Q.      Thank you.

11           Let's discuss each of them kind of one

12   at a time if we can.

13   A.      Sure.

14   Q.      Let's start with number 1.  Or, no,

15   let's say letter A.

16           "Systematic delivery and application

17   of interventions coupled with data-based

18   decision-making about impact and effect."

19           Let's just start with what does this

20   mean?

21   A.      All right.  How did I lose this?  What

22   page is this on?

23   Q.      Oh.  It's the bottom of 28 going on to

24   29.

25   A.      Thank you.  Oh, okay.



1    Q.      Yeah.

2    A.      "Systematic delivery and application

3   of interventions coupled with data-based

4   decision-making about impact and effect."

5           So systematic with delivery.  Again,

6   there can be variability in degree of

7   systematicity.  I think that's a word.

8           But that it's done goal oriented in a

9   planned way.  Again, you may have a behavior

10   intervention plan that's appropriate for one

11   student that has some sort of general ideas

12   about what to do.

13           But then systematic means it's goal

14   directed and that we're going to measure

15   progress towards that goal.

16    Q.      And what about data-based

17   decision-making?  What does -- what does that

18   entail?

19    A.      So there are, again, degrees of

20   intensity and structure, but it's the idea that

21   we won't just intervene and hope but that we'll

22   actually collect some data and say oh, sure

23   enough this student is making progress.

24           Now, there are, you know, kinds of

25   data that you might collect that aren't



 1   extremely systematic.  You may just say hey,

 2   this student's having difficulties once in a

 3   while.  Let's just make a note whenever they

 4   have this kind of difficulty and then look at

 5   whether or not it's decreasing.

 6          Two, more systematic, including some

 7   packaged kinds of database.  So in intensive

 8   academic intervention you might use a

 9   curriculum-based measure and you might

10   administer it once every week and you might even

11   graph it, right, and say okay, is the student's

12   learning increasing.

13          So the notion that it's planned and

14   goal oriented would be, I think, the systematic

15   part.  And to me that allows for real systematic

16   versus a little bit more.

17          And the data is that you collect some

18   data that's appropriate given the nature of the

19   intervention.

20   Q.      And so would you expect, then, that

21   there would be either improvement or that there

22   would be, for lack of a better word, redesign of

23   the interventions?

24          MS. JOHNSON:  Object to form.

25   Q.      With data-based decision-making.



1    A.      Right.  So that's the idea, is that

2   you don't just collect data for fun, that you

3   actually say well, hold on a second, if the

4   student isn't making progress, maybe we need to

5   adjust the intervention or the support.

6           The other thing to keep in mind with

7   that is that, again, when you talk about -- and

8   this is -- I didn't include this in my report,

9   so I don't know if I'm allowed to say, I happen

10  to be on the National Center on Intensive

11  Intervention.

12          We've done PBIS quite a bit and, you

13  know, they talk about myths of intensive

14  intervention, and one of them is that you do

15  this and the kid gets better and that's sort of

16  the end of the story.  Unfortunately, because

17  disabilities are lifelong typically and

18  developmental, you may have ups and downs,

19  right, with some students.

20          I just wanted to make sure I say that.

21  You adjust the intervention based on that.  But

22  understanding that, and I don't think many

23  people think this, you just do this and then

24  they're going to be, you know, great from here

25  on out.

1              Is that okay?

2    Q.        Thank you.

3    A.        I'm going too fast, too.

4              Slow down.  Okay.

5    Q.        All right.  Let's go to B.  "Ongoing

6    monitoring of academic and behavioral

7    performance."

8              Is this kind of along the same lines

9    that we've been discussing?

10   A.        Yes.

11   Q.        Okay.  And again, not to belabor the

12   point, but you would expect educators to adjust

13   what they're doing if the student's not showing

14   improvements --

15   A.        That's correct.

16   Q.        -- over a sufficient period of time?

17   A.        That's a component of data-based

18   decision-making.  Yeah.

19   Q.        All right.  C.  "Provision of

20   substantial opportunity to practice newly

21   learned skills across relevant settings.

22             What does this mean?

23   A.        So if you, you know, provide some sort

24   of instruction or prompting for a new skill, and

25   we can apply this to both behavior and



1  academics, is that they have opportunities to

2  demonstrate that skill and receive some feedback

3  in an academic instruction in a highly

4  structured, for example, is a more structured

5  version, but a program.

6          Usually you're providing, the term we

7  use is, like, opportunities to respond.  So the

8  student, you know, completes a problem or a

9  question and the teacher provides some practice.

10         And then in academics we also try to

11 program for transfer.  So you've learned this

12 reading skill or math skill and now you apply

13 it.

14         And behavior.  You know, you've

15 learned a new way to deal with, you know,

16 getting upset, and you prompt the student in

17 the -- during the day or across their settings

18 or activities.  And so they have opportunities

19 to practice it and they also receive some sort

20 of effective feedback.

21    Q.     And I think that's the next part of my

22 question.  What does "across relevant settings"

23 mean?

24    A.     Across relevant settings -- again I

25 quoted someone here, but relevant to the



1  behavioral skill or the academic.  Right.

2          So let me see if I can come up with

3  another one.

4          You know, you learn a skill where if

5  someone cuts in front of you in line, that

6  you'll say "Excuse me."  You know, "You cut in

7  front of me in line."

8          So it would be in that setting where

9  you're in lines.  Right.

10         So I think that what this speaks to is

11 it's not just teaching the skill in isolation,

12 but also making sure that you support it in

13 relevant settings where you're hoping the

14 student will demonstrate it.

15   Q.      And that could be outside of the

16 specialized setting.  Assuming that some of this

17 is being --

18   A.      It could be --

19   Q.      -- implemented --

20   A.      -- inside of it.  It could be outside

21 of it.  It depends on the student.  And -- but

22 opportunities to practice is an important

23 component.

24   Q.      All right.  D is "intervention

25 programs and practices matched with type and



1   intensity of the problem."

2          Could you --

3   A.      That's kind of the general -- that's a

4   kind of a general statement, but...

5          Yeah.  And, I mean, this would really

6   fit with an IEP.  Right.  I mean, that you've

7   identified the specific student problems that

8   you're trying to address.  You provide them with

9   the appropriate type of intervention for that

10  problem and at an appropriate level of

11  intensity.

12  Q.      And maybe I can narrow this down just

13  a little bit for you.

14         What does it mean to be matched with

15  type and intensity?

16  A.      So with type, you know, the law

17  requires that to the extent practicable we use

18  research.  So I would say research-based

19  intervention that addresses the particular type.

20         So a problem that addresses a problem

21  of social skills.  A problem that addresses, you

22  know, some sort of interfering behavior or an

23  academic problem.

24         This is a broad statement that makes

25  a lot of sense, but it's essentially you're not

1   giving an intervention that doesn't target

2   specifically that problem that the student is

3   exhibiting.

4           And intensity.  That -- so that's a

5   nice one to talk about.  Again, in terms of the

6   National Center on Intensive Intervention,

7   because they actually talk about intensification

8   strategies.

9           Where I'm thinking about this right

10  now is in terms of academics, but specifically

11  what's talked about is you can reduce group

12  size.  That's one way to intensify academic

13  instruction.  You can give the student more

14  opportunities to respond.  Sometimes that comes

15  with -- you know, you can make instruction even

16  more explicit, with more modeling and more

17  practices.

18          So there are several dimensions when

19  we talk about intensity that apply to both --

20  I'll just use academic and behavioral for now.

21          Frequency of reinforcement might be

22  one for behavior.  So it's a number of different

23  variables that we look at when we talk about

24  what is the intensity of this intervention.

25          When I'm doing classroom management



1    and I'm talking about individualized strategies,

2    I'll say there are some individual things you

3    could do that are not really that much work or

4    that intensive but they may solve the problem.

5            And from an efficiency point of view

6    we may do that, right, and say oh, if I just

7    move this seat, oh, the problem is solved,

8    rather than doing something really complicated.

9            And at the same time you can be much

10   more structured.  Frequent duration.  Those all

11   dimensions that apply to intensity.

12     Q.      Thank you.

13     A.      Yes.

14     Q.      I'm going to skip E, actually, and go

15   to F.  "Planning that specifically addressed

16   transfer of skills across settings and

17   maintenance of effect over time."

18           Would transfer of skills across

19   settings be kind of like we were discussing

20   before under --

21     A.      Relevant --

22     Q.      Yeah.

23     A.      You're right.

24     Q.      And then maintenance of effect

25   overtime.  Could you explain that one to me?



1    A.       So it's always a goal of intervention

2    that the effects are sustained.  Right.

3            So -- and, actually, it's something

4    that I didn't touch on a lot in the functional

5    behavior assessment literature, but maintenance

6    is usually a part of this research.

7            Like there will be a single subject

8    design and you'll implement an intervention over

9    two, three weeks.  And then you'll go back a

10   month later and say did they maintain this

11   change.

12           That's always a goal.  So both

13   generalization and maintenance of the new thing

14   that you've taught.  It's a hard thing to do,

15   though.  I mean, behavior is very responsive to

16   the immediate circumstances.  So depending.

17           You know, so there are different

18   things that we recommend in research that will

19   promote maintenance, but it's one of the things

20   we have to consider.  Yeah.

21   Q.       And that's why you should

22   continuously -- you.  Let me be more precise.

23           That's why educators should be

24   continuously evaluating --

25   A.       That's right.

1   Q.      -- whether or not --

2   A.      That's right.

3   Q.      -- something's working --

4   A.      That's right.

5   Q.      -- or continuing to work?

6   A.      That's right.

7   Q.      Okay.

8   A.      Yeah.

9   Q.      And G.  "Understanding long-term

10  intervention may be required."

11          Is that kind of along the same lines

12  that --

13  A.      I said earlier.  Yeah.

14          It's important to understand,

15  particularly with kids with the most complex

16  problems, that it isn't usually a one shot.  You

17  know, these kids require -- and I've worked with

18  them, a lot of people have.  But they require

19  a lot of support.  Sometimes it's lifelong, even

20  into adulthood.

21  Q.      So am I correct understanding, these

22  seven items that we just went through reflect

23  the types of programming that would, in your

24  opinion, be appropriate for students with EBD?

25  A.       I think that these are -- how do I

1  keep doing this.

2          I think that they weren't even really

3  synthesizing research, but it was sort of a

4  synthesis of practice to say that these are the

5  hallmarks of effective programming.

6          I don't think that they were saying

7  that you have to have all of them or to what

8  degree of intensity.  But these are the kinds of

9  things that -- this was the state of the field

10 paper, is kind of what we know.

11   Q.     I want to be clear.  I'm not asking

12 for your perception of what the authors of

13 this --

14   A.     Yeah.

15   Q.     -- thought.  Your perception --

16   A.     My perception, yeah.

17   Q.     -- is that -- okay.  Is --

18   A.     Yes.

19   Q.     Please.  I'm sorry.  Did you just say

20 yes?

21   A.     Yeah.  I'm sorry.  Do you want to

22 restate the question and make sure it's clear on

23 the record?  Okay.

24   Q.     I think -- I think we're clear.

25 Thank you.



1            Do these types of -- does this list
2    also reflect the types of programming that
3    would, in your opinion, be appropriate for
4    students in the GNETS program?
5    A.        These would be some of the ones that I
6    would look at.
7    Q.        And you would agree that these are
8    appropriate steps to -- for educational bodies
9    to consider and implement as appropriate?
10   A.        In any setting.  I would say for kids
11   with EBD.  And then it depends on what -- how
12   systematic intensive it needs to be.  And then
13   setting might need to be considered.
14   Q.        Assuming -- assuming that these seven
15   categories of programming are not present in the
16   GNETS program or in the state of Georgia, am I
17   correct that you would support the adoption of
18   this type of programming?
19            MS. JOHNSON:  Object to form.
20   A.        Yeah.  I mean, I'm going to answer it
21   because I feel bad that I keep putting
22   qualifiers.
23            It would depend somewhat on the
24   program and the kids that they're serving, but
25   these are some of things -- and I also don't



1  want to say that because I included this as an

2  example in my report that it's the only place

3  where you could look for a summary of, you know,

4  hallmarks of effective programming for kids with

5  EBD.

6         But yes, these are some of the things

7  that I would use to look at and evaluate, again,

8  any setting, whether you're serving a kid in

9  general or at a special setting.  Yeah.

10  Q.      Dr. Wiley, in your work today do

11  you -- are you ever on students' IEP teams?

12  A.      I am not.

13  Q.      Have you ever been on a student's IEP

14  team?

15  A.      Yes, I have.

16  Q.      When was the last time you were on a

17  student's IEP team?

18  A.      It probably would have been when I

19  was -- before I started my doctoral program.

20  When I was working in schools.

21  Q.      Okay.

22  A.      It's pretty unusual for a researcher

23  to be placed on an IEP team.

24  Q.      Do you ...

25         Do you ever review IEPs as part of



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              328

1  your work?

2    A.      Well, I have some doctoral students

3  who that's part of their dissertation research.

4  And so we have redacted IEPs that they've looked

5  at and evaluated for quality.

6          The student that I'm thinking about

7  right now has identified -- like I was talking

8  about, records review forms.  There are a number

9  of forms that have been used in research to

10 objectively evaluate IEP components and things

11 like that.

12         And the only other thing I would add

13 is that in some of our classes we use -- now,

14 these are not classes I teach, but our faculty

15 all work together.

16         We have an IEP class where they're

17 actually looking at real life IEPs to try to

18 understand procedural and substantive components

19 of IEPs.

20   Q.      In those settings you're reviewing to

21 IEPs for educational purposes or research

22 purposes, correct?

23   A.      Educating the preservice teachers.

24 That would be the class example.

25         And then for research the student I'm



1  thinking of specifically is interested in kids

2  who are deaf or hard of hearing, and she's

3  designing her dissertation to be an evaluation

4  of IEPs for kids who are deaf or hard of

5  hearing.

6     Q.      And I guess my next question is have

7  you in the last 10, 15 years reviewed a

8  student's IEP for sufficiency or fidelity of

9  implementation or anything along those lines?

10    A.      I have not.

11    Q.      Okay.

12              MR. GILLESPIE:  I forget when we

13        dropped off last time.  Are we about an

14        hour in?

15              MS. ADAMS:  Yeah.

16              MR. GILLESPIE:  Yeah.  Let's take a

17        break.

18              THE WITNESS:  All right.

19              THE VIDEOGRAPHER:  All right.  Off

20        the record, 3:44.

21                   - - - - -

22          (A recess was taken.)

23                   - - - - -

24              THE VIDEOGRAPHER:  On the record,

25        4:00.



ANDREW WILEY, PH.D.                          October 30, 2023
UNITED STATES vs STATE OF GEORGIA                         330

1      BY MR. GILLESPIE:

2      Q.      All right.  Dr. Wiley, we left off on

3    page 29 of your report.

4      A.      Yes.

5      Q.      We're now on section III.

6      A.      Okay.

7      Q.      And am I correct in understanding that

8    this section is generally intended to highlight

9    limitations in the research supporting

10   integrated placement?

11     A.      Yeah.  And I think that I was

12   rebutting I think the statement -- a statement

13   that was made by the experts, both Dr. McCart

14   and Dr. Putnam, that research shows that

15   inclusion -- kids achieve better outcomes in

16   inclusion.  Yeah.

17     Q.      Would you agree that experience in the

18   field can also be informative as to the efficacy

19   or reliability of practices?

20     A.      I think experience in the field with a

21   grain of salt.  Yeah, that is possible.  I mean,

22   we always have to be careful with antidotes

23   where people will say I did this practice and it

24   works really well.

25             Unfortunately in education there are



ANDREW WILEY, PH.D.                                October 30, 2023
UNITED STATES vs STATE OF GEORGIA                            331

1   a lot of practices that are, you know, highly

2   questionable that people use and say oh, it

3   works.

4           But then also -- I think the anecdote

5   would be a concern and I think that until we

6   rigorously evaluate a practice, then we should

7   be careful with saying it's effective or not.

8   Q.      Are there times when research lags

9   behind practice?

10  A.      When research lags behind practice.

11  That's a great question.

12          I'd have to think about that one.  I

13  can't think of examples specific that I would

14  point to.

15  Q.      But as we discussed earlier, educators

16  and clinicians may have to -- may have a

17  practical need to rely on practices with

18  imperfect support of the research, correct?

19  A.      That is true.

20  Q.      Okay.  I'm just going to start with,

21  actually, the title that you have for section

22  III here.

23  A.      Okay.

24  Q.      It says "Research does not demonstrate

25  that inclusion is more beneficial than other



1   replacement options."

2            And it's not your opinion that

3   inclusion needs to be more beneficial to be

4   preferred to separate environments, correct?

5            MS. JOHNSON:   Object to form.

6   A.      I think in the individualized

7   decision-making it does.  We have to be able to

8   say that an IEP that -- is appropriate for the

9   student where it's best implemented.

10           And beneficial is a broad term.  Most

11   of this research looks at a number of academic,

12   social, behavioral.  Some of the research also

13   looks at the impact on other kids, both positive

14   and negative.

15   Q.      But you would agree that if in an

16   inclusive setting was equally beneficial to a

17   separate setting, than the inclusive setting

18   would be preferred, correct?

19   A.      I think in that hypothetical that

20   would be true.  And that's also consistent with

21   the law.

22   Q.      Okay.

23   A.      Now, I'm also assuming there that

24   they're not -- like barely beneficial.  Then we

25   would have to rethink that.



1    Q.      Let's go to the bottom of page 32,
2    please.
3    A.      32.
4    Q.      I'm looking at that last sentence that
5    actually will go on to 33.
6    A.      Okay.
7    Q.      You wrote that "The idea that the
8    individual characteristics of students with
9    disabilities are essential when considering
10   placement outcomes is conceptionally consistent
11   with the individualized process described
12   earlier for determining the LRE as required by
13   IDEA."
14           Did I read that correctly?
15   A.      Yes.
16   Q.      Once in a specialized setting, what
17   sort of process should there be to evaluate if
18   the placement is successful?
19   A.      It's the same for an IEP regardless of
20   where it's implemented.  There has to be
21   progress monitoring.  I think that it would have
22   to be at least progress monitoring once per
23   quarter, but it would depend on also the nature
24   of the IEP goals that you're measuring.  So the
25   student would have to make progress.  And I'll

1    use the language that is meaningful based on the

2    student circumstances.

3       Q.      Same page, 33.  We're going to go to

4    the last full paragraph.

5       A.      Okay.

6       Q.      At the beginning you wrote "Second,

7    placement research is conceptionally flawed

8    because this research gives insufficient

9    attention to the actual practices used in

10   different educational environments, i.e., what

11   instruction and services were providing in the

12   different placements being compared."

13          Am I correct in understanding that it

14   is your opinion that opining on the

15   appropriateness of a placement without

16   consideration of the actual practices of that

17   practice is inappropriate?

18      A.      I'm saying that research that doesn't

19   consider the actual practices is not appropriate

20   and can't be interpreted.

21      Q.      Is it also true in other context, that

22   it would be inappropriate to opine on the

23   appropriateness of a placement without

24   considering actual practices?

25                MS. JOHNSON:  Object to form.



1    A.       Yeah.   I mean, so appropriateness for

2    the individual student would require you to

3    think about the individual needs of that student

4    and the services that are applied -- are

5    provided through an individualized education

6    program.

7    Q.       So you would have to consider what

8    services are actually being provided beyond just

9    what you're being told would be provided,

10   correct?

11   A.       Yeah.   Yes.

12   Q.       Okay.   Let's go to page 34.   The next

13   page.

14           The paragraph with the bolded

15   "Inclusive Placement" language.   Just the first

16   sentence there.   You wrote "Teaching students

17   with behavior-related disabilities in inclusive

18   placements can be associated with negative

19   outcomes that must be considered."

20           Isn't it true that teaching students

21   with behavior-related disabilities in separation

22   placements can be associated with negative

23   outcomes?

24                MS. JOHNSON:   Object to form.

25                MR. GILLESPIE:   What's the



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                 336

1      objection?

2              MS. JOHNSON:  Negative outcomes.

3              MR. GILLESPIE:  It's Dr. Wiley's

4      language.

5      A.      You're talking about separate

6  placements, and I think I'm talking about

7  inclusive placements here.

8      Q.      Correct.

9      A.      I think that, again, talking about the

10  outcomes of a place without talking about the

11  services doesn't make a lot of sense.

12              So when you say isn't it true that

13  separate placement can be associated with

14  negative outcomes, well, in any case, you know,

15  any placement can be associated with negative

16  outcomes if the student's individual needs are

17  not being addressed.  Right.

18              And so the example here, what I'm

19  saying, if you include students in general ed

20  and they're not provided with the type and

21  intensity of supports and interventions that

22  they need, then negative outcomes can ensue.

23      Q.      And I guess I'm asking -- that's true

24  regardless of whether it's an inclusive or --

25      A.      Correct.



1    Q.      -- a separate placement, correct?

2    A.      Yeah.

3    Q.      Okay.  Let's go to page 35, the next

4  page.

5    A.      Okay.

6    Q.      Paragraph "Negative academic

7  outcomes."

8         Now, there at the beginning you wrote

9  "Placement in general education has not produced

10  positive learning outcomes for many students

11  with disabilities.  Despite the upward trend of

12  students with disabilities taught in general

13  education, students with behavior related and

14  other disabilities persistently exhibit

15  unacceptably low academic achievement."

16         Do students with EBD not exhibit

17  unacceptably low academic achievement in

18  separate settings?

19    A.      Some do and some don't.  Right.

20    Q.      And that's also true for students with

21  disabilities taught in general education,

22  correct?

23    A.      That is true.  And so I want to say a

24  couple things really quickly here.  Oh, I did

25  cite Gilmour, et al.  That would be a good



1  example of a recent meta-analysis where they

2  combined a lot of research on grade level of

3  kids with disabilities that had some breaking

4  out of kids with behavior disabilities.

5          And so in general what we're saying is

6  independent of placement, we ought to be

7  concerned about the academic achievement of kids

8  with EBD.

9          The other asterisk that I have to put

10  on this is when people say, like, so what should

11  we expect?  What would be acceptably low?  And I

12  think it would be wrong to say that we would

13  expect every kid with a behavior-related

14  disability to be on grade level.  Okay.

15          But really what's baked into this part

16  and the research that I'm citing is that we

17  could do better if we made sure to provide these

18  kids with best available evidence, academic

19  instruction.  And mostly that's intensive

20  instruction.

21          Does that make sense?

22          So I am trying to respond to, you

23  know, your statement can negative outcomes be --

24  and maybe I'm not saying it right.

25          Can separate placements be associated



1   with negative outcomes.  Is that where we

2   started?  I'm sorry.

3      Q.      So -- no.  No.  You're -- actually,

4   here you're talking about -- you know, the

5   language you used --

6      A.      Right.

7      Q.      -- of unacceptably low academic

8   achievement.

9      A.      Yes.  Yes.  Okay.

10     Q.      And --

11     A.      Does that occur in special placements?

12     Q.      That's -- yeah.

13     A.      It can.

14     Q.      This statement that you have here

15  applies to both students in general education

16  and students in separate placements, correct?

17     A.      It can apply, yes.

18     Q.      Okay.  In the studies that you cite in

19  this paragraph of your report, do you know if

20  they account for whether students in general

21  education were receiving appropriate timely

22  supports and services?

23     A.      So the research that I'm citing here,

24  again, is a meta-analysis or a synthesis.  I

25  don't know that first -- I know you're not



```
 1    saying this.  You're saying services.
 2            I'm not sure that settings was used as
 3    a moderator variable to look at differences in
 4    academic achievement.  I would have to look at
 5    that again.
 6            I don't think that in this synthesis
 7    they were looking at the services that were
 8    provided.
 9            And one of the things that I would
10    underline here, because I didn't see much in
11    Dr. McCart and Dr. Putnam's reports about
12    intensive academic instruction.  I think there
13    was mention of things, like, being exposed to
14    the general curriculum and universal design for
15    learning.
16            When we talk about -- it's really
17    important that we are clear about -- oh, I'm
18    sorry -- what are appropriate academic supports
19    if we were to look at this meta-analysis.
20            And, again, the best available
21    evidence we have is that, first of all,
22    universal design for learning is popular, but we
23    do not have research to suggest that it will
24    meet these kids' needs in general ed or
25    anywhere.
```



1              And that we also need to be clear

2      about what does work for accelerating the

3      academic achievement of kids with

4      behavior-related disabilities.

5              So you're right.  I don't think that's

6      in there, but I would say it's really important

7      to be clear about what those services ought to

8      be.

9      Q.       Understood.

10             Let's go to page 37, please.

11             I won't read the whole thing, but in

12     this footnote you reference speaking with

13     Dr. Holifield and Ms. Cole and Ms. Morris about

14     parents' feelings about GNETS.

15             And my question is, did you ask to

16     speak with anyone who felt differently about the

17     GNETS program?

18     A.       In that conversation or at all?

19             Just at all.

20     Q.       At all.

21     A.       I did not ask to speak to anybody who

22     felt differently.  Again, I had topics in mind

23     for these conversations and I didn't have any

24     presumptions about what they would say.  I had

25     those terrible notes with my topics, and I think



1   I made note of what I was told bye these

2   different people.

3       Q.      I think we covered this, but it would

4   have been this morning.

5               Did you ask to speak with anyone that

6   you didn't get to speak with?

7       A.      No.

8       Q.      Okay.

9       A.      I had no request denied, if that's

10  what you're describing, --

11      Q.      Yes.

12      A.      -- I'd like to talk to.

13              Yes, that's true.

14      Q.      Did you ask if there were some parents

15  who felt differently than what you describe

16  here?

17      A.      I did not ask that question, and I

18  didn't know that that would be a realistic ask,

19  to be able to speak to parents and also to be

20  able to -- I mean, I'm saying that now, but --

21  you know, when I think about it, but I think it

22  didn't occur to me because I didn't know that

23  that might be something that I would be able to

24  do in my capacity as an expert witness.

25              So instead I talked to some folks that



1   have worked in GNETS.

2      Q.       You're not purporting to be -- to

3   provide expert testimony on what parents do or

4   do not feel about the GNETS program, correct?

5      A.       I am not, but can I say one other

6   thing?  I know I'm doing this and I'm -- you

7   know, it was interesting to me to read the ADA

8   language about whether or not students with

9   behavior-related disabilities would object to

10  being placed in general education.  Right.  I

11  sort of got that right.

12          And I think it's interesting because

13  what that means within a school-aged kid with

14  disabilities in the IEP process -- I'm not

15  saying that there are -- like, the IEP process

16  is not -- is always perfect.  So I'm not using

17  that as a perfect proxy for parents expressing

18  what they wanted.

19          But they are required to be part of

20  the IEP process, including the placement

21  decision, and I just wondered -- I'm not going

22  to say anything that's a conclusion about that

23  except how does that work when you say what is

24  the preference of the student when you have this

25  IEP process where the parent is supposed to have

1    input into the IEP and the placement decision.

2              So that's not talking to the parent.

3    So I know that's way off topic, but I want to

4    say it out loud because it is a thought that

5    occurred to me as I was looking at the case and

6    the expert reports.

7    Q.        Dr. Wiley, would it concern you to

8    learn that there are parents who have gone so

9    far as to move out of the state of Georgia to

10   keep their kids from being placed in the GNETS

11   program?

12   A.        In a hypothetical it would concern me.

13   I would want to know some more of the details,

14   of exactly what went on that that happened.

15             But I think that any time people are

16   that unhappy with any educational program that

17   we're off the track.  Right.

18   Q.        Would it concern you to learn that

19   there are other parents who have moved out of

20   the state of Georgia after seeing how their

21   child was treated after being placed in a

22   regional GNETS program?

23             MS. JOHNSON:  Object to form.

24   A.        And again it's a hypothetical.  I

25   think that it -- that would concern me.

1           And the other thing that I want to

2   say, I'm sorry, is that my focus would be on how

3   do we make sure that that program is better,

4   better resourced and supported to do work that

5   parents would be happy with.

6           That's all hypothetical.  I don't know

7   what actually happened in any of those cases.

8   Q.      Let's go to section IV of your report,

9   which begins on page 38.

10  A.      Okay.

11  Q.      But just generally speaking, in this

12  section of your report, am I correct in

13  understanding that your overall critique is that

14  the United States' experts did an insufficient

15  job acknowledging limitations in the research

16  around the supports and services you discuss?

17  A.      I would say that in their statements

18  and conclusions, yes, they didn't do a

19  sufficient job looking at limitations.

20  Q.      And these limitations that you

21  acknowledge in this section apply regardless of

22  setting, correct?

23  A.      Well, some of the research that I

24  reviewed was specific to general education,

25  because that's the specific claim, is that we



ANDREW WILEY, PH.D.                          October 30, 2023
UNITED STATES vs STATE OF GEORGIA                        346

1   now know what's effective when we implement it

2   in general education.

3           In some cases I talked about generally

4   effective practices or promising practices that

5   would be independent of setting.

6           But I did have a particular attention

7   on, for example, functional behavior assessment

8   implemented in general education settings.  I

9   think I reviewed three recent meta analyses.

10  Q.      So let's go to page 39.

11  A.      Okay.

12  Q.      I am looking at that bottom paragraph.

13  A.      Okay.

14  Q.      Sir, the first sentence you wrote "The

15  claim that we now know how to appropriately and

16  effectively include the 'vast majority' of

17  students with behavior-related disabilities in

18  general education environments is inconsistent

19  with current gaps in and weaknesses of the

20  relevant research."

21          Again, based on the data that you

22  cited in table 2, is it your professional

23  opinion that the vast majority of students with

24  behavior-related disabilities are being

25  inappropriately educated in general ed



1   classrooms some or all of the time?

2      A.       We have the indirect evidence that I

3   think I referred to earlier that -- the outcomes

4   we talked just now about, academic, but also

5   post school outcomes, which would suggest that

6   we probably ought to be doing better.

7              And the fact that 80 percent of these

8   kids are in general ed but they still have high

9   dropout rates, high arrest rates, mental health

10  problems after they graduate, difficulty being

11  employed, I didn't cite that research, but of

12  all the kids with disabilities, it's kids with

13  behavior-related disabilities that appear to be

14  at the highest risk for those outcomes.

15             Now, for me to draw very specific

16  conclusions about where are they being

17  appropriately served and where are they not,

18  that's tough, but we have to be able to say what

19  do we know about appropriately, effective

20  serving these kids and what do we know about

21  whether or not general education, for example,

22  is implementing it when we're talking about the

23  question of including the vast majority of

24  students with behavior-related disabilities.

25     Q.       Does the research in the field show



1  that academic outcomes are superior in separate

2  settings?

3    A.     The -- again that goes to the

4  placement research.  And what I said sort of at

5  the beginning of the next section is we can't

6  use the placement research to say something

7  about general ed and we can't say it to say

8  something about separate placements, because of

9  the flaws in how those studies are designed and

10  also the fact that they don't consider

11  individual characteristics and the practices

12  that are actually implemented.

13    Q.     So is it fair to say that no, the

14  research does not show that academics --

15  academic outcomes are superior in separate

16  settings?

17            MS. JOHNSON:  Object to form.

18    A.     It doesn't show that they're superior

19  or inferior.

20    Q.     Fair.

21    A.     Okay.

22    Q.     Let's look at the next sentence.  You

23  wrote "The consensus of the field is that more

24  research is needed to understand how best to

25  serve students with behavior-related



 1   disabilities, particularly those with the most

 2   intensive needs."

 3          In light of this need for more --

 4   actually, let me withdraw that.

 5          You know what, actually, I think we

 6   covered this earlier.

 7   A.     Okay.

 8   Q.     We're going to skip that.

 9          Let's go to page 41, please.

10   A.     Okay.

11   Q.     And the first full paragraph with the

12   bolded "Limitations of services."

13   A.     Okay.

14   Q.     Your first sentence was "Placing the

15   'vast majority' of students with

16   behavior-related disabilities in general

17   education cannot be done ethically and

18   responsibly without addressing the limitations I

19   discuss below."

20          Is it your opinion that placing the

21   vast majority of students with behavior-related

22   disabilities in separate settings can be done

23   ethically and responsibly without addressing the

24   limitations in your report?

25   A.     Oh, that's an interesting phrasing.



1   Let me -- let me make sure I get my head around

2   it.

3           Placing students in separate settings.

4   You're asking me whether I can think that that

5   can be done ethically and responsibly without

6   addressing the limitations I discussed below?

7     Q.      You make this -- you have this

8   conclusion, this summary statement here --

9     A.      At the beginning of this discussion.

10    Q.      Yeah.  And I'm trying to say are you

11  drawing a distinction between the applicability

12  of this conclusion to separate settings.

13          Can students be placed, the vast

14  majority of students with behavior-related

15  disabilities, be placed in separate settings

16  ethically and responsibly without addressing

17  those limitations?

18    A.      So the first thing I would say is that

19  I was responding to the expert reports stating

20  this, that we are now ready and able to teach

21  these students in general ed.  So that was

22  primarily my focus.

23          And then I would say in terms of, you

24  know, ethically and responsibly educating,

25  right, independent of placement, students with

1  behavior-related disabilities requires us to

2  push what we know about effective practices and

3  how to implement them.

4          Just like in the law, I think the

5  setting is sort of the next question.  I think

6  that we have a responsibility, it's an ethical

7  responsibility and a professional

8  responsibility, to try to provide the most

9  effective special education that we can to these

10  students.

11          I think that there are instances

12  that -- we have examples that I cite in the next

13  section -- where they have been taught

14  responsibly and ethically.  And so we know that

15  it can be done.

16          I also think that's true of general

17  education.  I think the important additional

18  factor when we say both of those things, it's

19  possible under some circumstances to

20  responsibly, and, you know, in both general and

21  separate placements.  It depends on the

22  individual student and what they need.

23  Q.      But in both settings in order to

24  ethically and responsibly place the students

25  with behavior-related disabilities in those



1  settings, you would need to address the

2  limitations that you outline in this section,

3  correct.

4     A.      I think that we have to address the

5  limitations of providing special education

6  that's appropriate and effective, regardless of

7  setting.

8          And, yes, I'm not letting special

9  placements off the hook in that sense.  I used

10 an analogy at some point of, you know, placement

11 and thinking about medicine and outpatient

12 versus emergency rooms.  Right.  And I think

13 that across all of those medical settings we

14 want to make sure that we're using the best

15 available treatments.  Right.

16    Q.      Sure.

17    A.      And it's the same thing.  But we also

18 understand that there are going to be some

19 patients and some treatments that are going to

20 be most effectively delivered in a particular

21 setting.

22          So it's hard to disentangle all of

23 these things, which I think, you know, you

24 understand generally my perspective on that.

25 But I do think that we have a responsibility to



1  try to figure out how to maximize the

2  appropriateness of effectiveness of services

3  across all settings.

4     Q.     Is it your position that while the

5  research is still in development that the

6  default should be that students with

7  behavior-related disabilities are being served

8  in separate settings or specialized settings?

9     A.     Default, no.  I think that decision

10 needs to be made on an individual basis.

11    Q.     Let's go -- let's jump ahead a little

12 bit --

13    A.     Okay.

14    Q.     -- to 53.

15    A.     All righty.

16    Q.     Oh, actually, you know what.  We're

17 going to do 51 first.

18    A.     Okay.

19    Q.     Yeah.

20           All right.  At the bottom of page 51,

21 the last sentence that goes on to 52, you wrote

22 "A major barrier to tier three implementation is

23 the failure to specify, validate, and

24 disseminate the necessary and sufficient

25 technologies (training, guidance, materials)



1    required for high-quality implementation of

2    FBA-based interventions under typical classroom

3    conditions."

4              Did I read that right?

5    A.      Yes.

6    Q.      And you would agree that failure to

7    provide training would be a major barrier to

8    successful implementation of tier three PBIS,

9    correct?

10   A.      And I'm just making sure that I say --

11   this is tier three, again, independent of

12   setting.

13             Yes.  Training is one of the critical

14   components of implementation.

15   Q.      And, likewise, guidance is a critical

16   component of --

17   A.      Yes.

18   Q.      -- implementation of tier three of

19   PBIS, correct?

20   A.      Tools, materials, training.  What I

21   collectively refer to as the technology of

22   implementation.

23   Q.      And would you agree that receiving

24   quality training with fidelity is critical to

25   enable school personnel to develop effective



1  FBAs?

2    A.      So you're saying that the training has

3  fidelity or you're saying training to implement

4  with fidelity?

5    Q.      Let's say both.

6    A.      All right.  Yeah.  It's a great one

7  that you bring up, because people -- obviously

8  we have a national technical assistance center.

9  We have all kinds of different aspects of

10  training.

11          But training is a challenge itself.

12  Right.  Figuring out what's the right amount,

13  who delivers it, what's the format.

14          So when I say we need to sort of field

15  test training -- I think that people do

16  wonderful work, by the way, you know, in these

17  things, but we don't really -- we can't really

18  demonstrate what is sufficient training, what is

19  adequate training, what are all of the elements

20  that are required for it to ...

21          And, by the way, this is an in-service

22  and preservice.  I think in this case there's

23  been a lot of discussion about can Georgia

24  train, you know.

25          But I also think preservice has to be



1   looked at very closely.  I think that if our

2   goal is to -- is high quality or high fidelity

3   implementation, we have to do many, many

4   different things in how we train, for example,

5   general education teachers, if they're going to

6   play a role.  We need to make changes to teacher

7   education and how functional behavior assessment

8   is trained.

9         And then, you know, the other part of

10  it is to say yes, functional behavior assessment

11  in tier three, recognizing that training isn't

12  the only barrier.

13        So my point throughout the report has

14  been there are implementation barriers that are

15  related to setting, and that's why we have the

16  continuum of alternative placements.  Or one of

17  the reasons.

18        Does that make sense?

19   Q.      That does.  Thank you.

20   A.      And if you don't read anything else,

21  this paper by Pogrow is a really interesting

22  one.  And it's about education reform and what

23  it really takes.  Anyway.

24   Q.      I appreciate the recommendation.

25   A.      I apologize.



1    Q.      No.

2            Let's go to page 59, please.

3    A.      Okay.

4    Q.      Let's look at that full paragraph

5    there in the middle.

6            We discussed some of this already.  So

7    you wrote "There is nothing about the

8    requirements of IDEA and the existence of the

9    continuum of alternative placements that

10   prevents or impedes efforts to reform general

11   education to be more appropriate and effective

12   for students with behavior-related

13   disabilities."

14           And this is what we were talking about

15   earlier today that you're in support of,

16   correct?

17   A.      I'm in favor of the continuum of

18   alternative placement as currently required.  Is

19   that what you mean?

20   Q.      Well, actually, I was looking at the

21   reforming general education to be more

22   appropriate and effective for students with

23   behavior-related disabilities.

24   A.      Am I in favor of that?  Is that what

25   you're asking?



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              358

1    Q.      Yes.

2    A.      The answer is yes.  Yes.

3    Q.      Okay.

4    A.      I mean, my focus is special education

5   wherever it's delivered.

6    Q.      And then the next sentence says "To

7   the extent that such efforts are successful,

8   responsible inclusion of more students with

9   behavior-related disabilities will follow."

10          And so you're saying if that capacity

11  is built and that competency is built in general

12  education, that will naturally result in more

13  inclusion; is that correct?

14   A.      And I use the term "responsible

15  inclusion" very deliberately there, which means

16  that it's placement where their needs are

17  addressed.

18   Q.      That's a situation where I want to

19  make sure I get the answer before the

20  explanation.

21   A.      Oh.  Do it again.  I'm sorry.

22   Q.      No, you're good.

23          And so I just want to make sure that

24  I'm correct, that you're saying that if the --

25  if the capacity and the competency is built in



1    general education, that the natural result will

2    be that there's more inclusion of students with

3    disabilities?

4              MS. JOHNSON:  Object to form.

5    A.       I mean, I'm not being difficult, but

6    I'm just saying that we've already seen

7    increased inclusion of kids with ED.  That was

8    the Williamson study from before.

9              So when I say responsible inclusion, I

10   mean they're going to -- the capacity -- and so

11   the capacity is really what you're describing,

12   which is do they have the capacity to deliver

13   with fidelity the kinds of services appropriate

14   to the individual kids.

15             So in that sense I would say yes, if

16   those -- that's what I think is the correct way

17   of thinking about improving general education

18   and promoting responsible inclusion.

19   Q.       Thank you.

20   A.       Sure.

21   Q.       Let's go to section V, which is the

22   next -- begins on the next page.

23   A.       Okay.

24   Q.       And earlier you said that it's not

25   your opinion that separate placements are



1  inherently superior to more integrated

2  placements, correct?

3    A.      Correct.  In terms of student

4  outcomes, yes.

5    Q.      And is it fair to say that your

6  opinion in this section is summarizing academic

7  research that you believe supports the use of

8  separate placements for some students some of

9  the time?

10   A.      I'm also rebutting the claims.

11   Q.      Sorry.  Is that a "yes" first?

12   A.      Yes.  I think it's a yes.  Sorry.  I

13  got to get better at that.  My apologies.

14          Say it again.

15   Q.      So am I correct that your opinion in

16  this section is summarizing the research that

17  you believe supports the use of separate

18  placements for some students some of the time?

19   A.      Yes.  Probably not all of it, but what

20  I thought was key research to demonstrate the

21  point.

22   Q.      Even for the students that you think

23  can be served in separate placements or should

24  be served in separate placements, would you

25  agree that whether a separate placement is



1   preferable to a more integrated placement would

2   depend on if the student is receiving the

3   quality and scope of supports and services they

4   need?

5       A.      Yeah.  To me job number one is

6   providing the services that the kids need.

7       Q.      Wherever it is?

8       A.      Wherever it is.

9               And then, you know, if the IEP team

10  determines that specialized placement is

11  required to implement that IEP.

12              But always -- and I say this somewhere

13  where I soapbox, and I apologize, but I think

14  that we've sort of forgotten to make that job

15  number one.

16      Q.      At various points in your report you

17  refer to students in GNETS as the students with

18  the most complex and extensive needs, with the

19  most intensive needs, with the most intensive

20  behavior problem -- or problem behaviors, and

21  with the most severe impairments.  Is that

22  generally consistent with your understanding?

23              MS. JOHNSON:  Object to form.

24      A.      So when I'm referring to students with

25  the most complex needs that -- I think that that

1  would likely apply to students who are served in
2  GNETS, yeah.  I mean, I would speculate that
3  that's true.
4          The only -- that -- I would expect
5  that there would be some correspondence between
6  specialization of setting and intensity of need
7  and complexity of need when kids are not able to
8  be appropriately served in general.  That's
9  often the factor.  Right.
10          I'm only giving you that look that I
11  have something else to say because there can be
12  variability geographically essentially.
13          Some of my early research in
14  Massachusetts looked at context and that
15  sometimes you had kids with much more intensive
16  needs, let's say, for example, in low income
17  districts.
18          And -- anyway.  So I'm just going to
19  add that bit of a context, that there can be
20  some variation, but I would expect to be
21  generally their correspondence between
22  specialization of placement and intensity of
23  needs.
24  Q.      Thank you.
25  A.      Yeah.



```
 1      Q.      I'm going to take you to page 63.

 2      A.      63?

 3      Q.      Yes.

 4      A.      Okay.

 5      Q.      I'm going to jump around a little bit,

 6   so bear with me.  Okay?

 7      A.      Sure.

 8      Q.      So in the bolded paragraph, --

 9      A.      Okay.

10      Q.      -- the first sentence, you wrote

11   "Research on separate schools for students with

12   behavior-related disabilities is somewhat

13   limited," and then I'm going to take you to the

14   next page first.

15      A.      Okay.

16      Q.      The bottom of that first incomplete

17   paragraph.

18      A.      64?

19      Q.      Yes.

20      A.      Okay.

21      Q.      You wrote "more rigorous research on

22   separate schools is also necessary."

23              Do you see that?

24      A.      Uh-uh.  Which -- I'm sorry.  Which

25   paragraph?
```



ANDREW WILEY, PH.D.                          October 30, 2023
UNITED STATES vs STATE OF GEORGIA                        364

1    Q.      This is the first paragraph.

2    A.      Oh.

3    Q.      Last clause there.

4    A.      Right.

5    Q.      Okay.  And then on page 59, if we can

6    go back.

7    A.      Okay.

8    Q.      In the middle of the paragraph we were

9    talking earlier, you wrote "It is irresponsible

10   and unethical to insist that all or nearly all

11   students with behavior-related disabilities" can

12   "be placed in general education before

13   limitations of evidence and implementation have

14   been satisfactorily addressed."

15           Did I read that right?

16   A.      Uh-huh.

17   Q.      So, Dr. Wiley, in your opinion why do

18   the limitations and the evidence and

19   implementation need to be satisfactorily

20   addressed before students are placed in

21   inclusive environments but does not seem to be

22   the case for placing students in separate

23   environments?

24           MS. JOHNSON:  Object to form.

25   A.      Yeah, the limitations have to be



 1  addressed.  That's how the field make progress;

 2  limitations of evidence.  We need more research

 3  and better research in general.  Implementation.

 4  So when we identify effective practices,

 5  figuring out how to implement them.

 6          But I first started that -- I get

 7  what, you know, kind of you're saying -- by

 8  saying that if somebody were to kind of swoop in

 9  and say hey, you know, we know enough, it's

10  time -- and this is a little bit how I

11  interpreted some of the conclusions in the

12  expert reports.  We know what to do.  Let's go

13  ahead and do it.  That that on its own would be

14  unethical.

15          I think there's an ethical duty in

16  separate schools to conduct more rigorous

17  research to understand how to implement

18  effective programs for those kids as well.

19          So in a sense I'm saying for both that

20  is an equal concern.  You know, but right now,

21  given the limitations and the gaps that we need

22  to fill, we need to have all of the options

23  available to us on an individualized basis.

24          I would never make a categorical

25  statement about which percentage, for example,



ANDREW WILEY, PH.D.                                October 30, 2023
UNITED STATES vs STATE OF GEORGIA                            366

1   what we mean by "nearly all" or "vast majority."

2   I think that that's unethical.  I think we have

3   to go student by student and we have to

4   recognize, like, here are the limitations.

5            We have to sort of operate within

6   reality when we make individualized decisions

7   about placement for kids with behavior-related

8   disabilities.

9   Q.      So is it fair to say that it's your

10  position, then, that we shouldn't eliminate

11  separate placements from the CAP.  Correct?

12  A.      That's correct.

13  Q.      You're not saying that there's more

14  support for separate placements or better

15  support for separate placements than more

16  inclusive placements, correct?

17  A.      I am not saying that.  That whole

18  section of the research on placement is sort of

19  my -- what I'm saying I understand the research

20  to be.

21  Q.      You're not giving it an expert opinion

22  that one or the other is preferable, correct?

23  A.      About the research.  I think I was

24  responding to the expert claim that we now know.

25  And I think it was stated in various forms.  So



 1  that was my response to the claim by the experts
 2  that there's a consensus or that research has
 3  documented those different statements.
 4    Q.      Okay.
 5    A.      Yeah.
 6    Q.      But, again, I guess just to make sure
 7  that I'm clear, your -- your position is in
 8  favor of keeping those separate placements as an
 9  option?
10    A.      A continuum, yes.
11    Q.      Okay.  Thanks for bearing with me on
12  that.
13    A.      No.  That's okay.
14          And, you know, when I brought up best
15  available evidence, it was to say that, you
16  know, there is -- the other reality is that we
17  are making these decisions without perfect
18  knowledge or perfectly developed practices.
19          But across settings, again, I think we
20  should be putting to close those gaps and to
21  make sure that we are able to be responsive to
22  all of the individuals needs of this really
23  vulnerable population.
24    Q.      Let's -- I'm getting really close to
25  the end here.



```
 1    A.      Oh, that's okay.  I'm not pushing you.

 2    Q.      We can go longer if you want,

 3  Dr. Wiley.

 4              MR. GILLESPIE:  Let's take -- let's

 5      take a quick break here --

 6              THE WITNESS:  All right.

 7              MR. GILLESPIE:  -- and wrap up.

 8              THE VIDEOGRAPHER:  Off the record,

 9      4:40.

10              - - - - -

11          (A recess was taken.)

12              - - - - -

13              THE VIDEOGRAPHER:  On the record,

14      4:52.

15    BY MR. GILLESPIE:

16    Q.      So, Dr. Wiley, we talked about this a

17  little bit earlier today, but generally

18  speaking, how important is it for students with

19  behavior-related disabilities who are in

20  separate placements to be reevaluated regularly

21  for more integrated placement?

22    A.      That should be part of the process.

23              And I think -- I'm not sure whether

24  it's in regulations or it's just considered like

25  a best practice, is -- like an annual
```

 1  reevaluation.

 2          I don't know that the exact components

 3  of that are spelled out somewhere.  They may be.

 4  I think that there are a few guides out there

 5  for how to do that, yeah.

 6    Q.     And would it concern you if that was

 7  not happening within a separate placement?

 8    A.     If that wasn't happening, I would say

 9  it should be.

10    Q.     Earlier today we talked about

11  self-contained classrooms a bit, and I just had

12  a quick follow up on that.

13    A.     Okay.

14    Q.     Are there any services and supports

15  that cannot be offered in a self-contained

16  classroom but could be offered in a separate

17  school?

18    A.     Supports that cannot be offered in

19  self-contained but could be offered in a

20  separate school.

21          Well, I think that -- again I'm just

22  going to use my examples.  You know, I was in a

23  Center program in Fairfax County that I think I

24  said in my -- was attached to an elementary

25  school.  And we had many special spaces.



1              One of them was our own gym.  One was

2    our own music and art room.

3              We also had a room that I often worked

4    in as a crisis resource teacher.  We called it

5    the get room, which stood for get everything

6    together.  And so when kids were in crisis, I

7    would sometimes provide support to the

8    classrooms.

9              So those are some of the kinds of

10   things that you would see at separate schools in

11   terms of special facilities and configurations

12   that you would not necessarily have in a

13   self-contained classroom.

14   Q.      And -- sorry.  In that example you're

15   referring to having your own gym and other

16   facilities like that?

17   A.      Yeah.  Dedicated spaces for various

18   things.  That one classroom in a general ed

19   school, you may or may not have access to those

20   things.  So I think there are some things about

21   separate schools that enable some things above

22   and beyond a self-contained classroom.

23   Q.      Is there anything else?

24   A.      You said services and supports.

25              I think at different levels of



1   intensity, I think, that there may be

2   differences between self-contained.

3            You know, let me give the example of a

4   student who may need frequent crisis support.

5   You know, they may engage in, you know, loud or

6   potentially really aggressive behavior.  And

7   that may be both not really dignifying for the

8   students themselves but also potentially

9   disruptive in a school.

10           So I don't know if I'm giving a good

11  example.  You're making me pull them out of my

12  head.  But that may be different in a special

13  school versus a self-contained classroom.

14   Q.      But, I guess, -- I want to have an

15  understanding.

16           Is there anything that a separate

17  school can provide that a self-contained

18  classroom could not offer?  And I hear your

19  point on facilities, but I'm just --

20   A.      Yeah.

21   Q.      Is there anything else that --

22   A.      And I think that you're talking about

23  services when you say "provide."

24   Q.      That's right.

25   A.      And I think that, again, when we



1  talked about what would be hallmarks of

2  effective programming for behavior-related

3  disabilities, you may be better able to apply

4  them at a level of structure across all settings

5  and also a level of intensity across all

6  settings in a separate school.

7           And, you know, we talked about this as

8  well.  In that continuum when we think about a

9  special school or a separate school, that having

10  that option for some kids who need it can almost

11  prevent them from even more restrictive

12  settings.

13           So when I talked about that old 1950s

14  example, when you take apart that continuum and

15  you really only have general ed, and then, you

16  know, let's say residential, you've lost the

17  whole notion of continuum of inclusion really.

18           And being in a separate school that's

19  not a residential facility can be thought of as

20  being more inclusive than a hospital or

21  residential facility.

22           You're probably familiar, but I just

23  want to make sure I say that out loud.  Yeah.

24  Q.      Thank you.

25           Dr. Wiley, did -- you didn't review



1   any materials related to GNETS funding, correct?

2      A.      Only some of the things that were in

3   the reports, which I think were some summaries

4   of those things.  I think I saw some numbers in

5   terms of annual budgets, but it wasn't obviously

6   a major part of my rebuttal.

7      Q.      Okay.  And earlier today we talked a

8   bit about separate placements, and I want to

9   make sure I'm -- we talked a lot about separate

10  placement.  That didn't really narrow it down.

11     A.      Right.

12     Q.      About whether or not unnecessary

13  placement and separate placements could be

14  harmful to students.  And I want to make sure

15  I'm clear on this.

16          Is it your testimony today that in no

17  circumstances can separation from peers in an

18  education setting be harmful to result in

19  adverse consequences for students?

20     A.      I think there is a possibility -- and

21  let me give an example.

22          I don't think I cited the research,

23  but there's some research that hasn't been

24  updated, and it was about let's give the example

25  of self-concept of kids with disabilities in



1  kids who were taught -- provided those services

2  mostly in general education.

3           I think mostly in the research I'm

4  talking about it would be self-contained

5  classrooms, for example.

6           And there were some kids who felt

7  stigmatized by having to leave the classroom to

8  go to their resource room or self-contained.

9           And then there were some kids who were

10  quite the opposite.  They felt stigmatized

11  struggling to read in a general ed classroom.

12           So the harm of teaching students in

13  separate placements, that might be an example

14  where for some kids it's possible that they

15  might have a negative self-concept or experience

16  stigma from being placed.

17           So I will say that, yeah, I could

18  imagine circumstances.

19           But the other thing that I would say

20  is with any decision, whether it's inclusion or

21  self-contained classroom or separate placement,

22  there probably may be some downsides and

23  potential negatives.

24           But we also may need to look at it

25  more holistically and say yeah, it's unfortunate



ANDREW WILEY, PH.D.                                                October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                              375

1   that the student -- my example -- may feel

2   stigmatized by being in a separate school, but

3   considering all the other problems that we have

4   to address, it's almost like thinking about it

5   is going to sound like a side effect.  Right.

6           So you take a medication, you know

7   there's side effects, but overall -- that also

8   applies to inclusion.

9           Sometimes we say hey, there are some

10  downsides to being in general education, but

11  maybe the net positive determined by the IEP

12  team we say that's okay.

13          And I think you were asking some of

14  that a little bit earlier.  Like do we have to

15  have -- do we have to focus on the best outcome

16  or can we balance between.  Yeah, there's a

17  little give and take to a particular setting.

18          Again, I believe in the idea that

19  that's for the IEP team to determine.  And I

20  think that they ought to be helped to think

21  about all of these things.  Right.  And to the

22  extent they have research that can inform their

23  judgment or professional expertise or all

24  different kinds of sources.

25          But I hope that that helps.



1          So I wouldn't say that there's no

2    possible downside to being placed in a separate

3    classroom or school.

4      Q.      Thank you.  That is helpful.

5      A.      Yes.

6              MR. GILLESPIE:  What number are we

7        at?

8              COURT REPORTER:  984.

9              MR. GILLESPIE:  984.  Let's do it.

10             - - - - -

11         (Deposition Exhibit 984, The Washington

12         Post article titled "No, special

13         education does not treat disability like

14         a disease and is not 'obsessed' with

15         forcing students to conform," was marked

16         for identification purposes.)

17             - - - - -

18     Q.      Dr. Wiley, do you recognize this one?

19     A.      Yes.

20     Q.      What's that?

21             What's Exhibit 984?

22     A.      I do.  This was a response to --

23    letter to the editor in The Washington Post.

24     Q.      And you authored the portion that's

25    under your by-line, correct?



```
 1      A.      I did with Dimitris and Jim, yeah.

 2      Q.      Okay.  I'm just going to direct your

 3   attention to one really small part, actually.

 4      A.      Okay.

 5      Q.      I don't have a lot of questions about

 6   this.

 7              But on the second page, the very

 8   bottom.

 9      A.      Okay.

10      Q.      Last sentence.  You wrote "Pointing

11   out instances of special education practiced

12   badly is one thing; condemning the whole

13   endeavor is quite another;" --

14      A.      Okay.

15      Q.      -- is that right?

16      A.      I didn't find it.  I'm sorry.  Did you

17   say it was the last paragraph of the second

18   page?

19      Q.      Yeah.  It's the very last line of the

20   second page.

21      A.      Oh.  That's makes it easier.

22      Q.      Yeah.

23      A.      Okay.

24      Q.      So "Pointing out instances of special

25   education practiced badly is one thing;
```



1   condemning the whole endeavor is quite another."

2   A.      Okay.

3   Q.      You wrote that?

4   A.      Yes.

5   Q.      And --

6   A.      With my co-authors, yeah.

7   Q.      Okay.  What do you mean by "special

8   education practiced badly"?

9   A.      I think that it just means that

10  students are provided or not provided services

11  and supports that they need.

12          And, you know, the point would be --

13  you can apply it to any profession.  Law.  We

14  won't do that one.  Medicine.  Where you can

15  say, you know, there are instances where people

16  practice these things madly.

17          And so I would say that's, you know,

18  any time that an individualized education

19  program is not implemented well.

20  Q.      Have you witnessed special education

21  practiced badly?

22  A.      I think that I have in my entire --

23  from being a practitioner to also being a

24  researcher.

25  Q.      And, you know, I'm not asking for



1  names or anything like that.

2     A.      Right.

3     Q.      But in what context would you say

4  you've been exposed to special education

5  practiced badly?

6     A.      So the examples that immediately jump

7  to mind are when I was -- actually, it was when

8  I was transitioning from being an autism

9  resource teacher to a behavior specialist.

10          And part of why I became a behavior

11  specialist is I was working on a very

12  high-profile case of a young lady with autism.

13  And the mother was quite vocal, and had been for

14  years, that she didn't think her child was

15  receiving appropriate special ed services.

16          Now, in that case I'm not focusing on

17  that student, but there were times when I went

18  to work with that teacher and that school team

19  and meet with a parent where I would look at --

20  this is just one very specific example -- kids

21  with more severe disabilities in a

22  self-contained classroom and they spent

23  inordinate amounts of times looking at

24  magazines.

25          And I thought to myself that's an



1   example of where that's not a great use of their

2   time.  So very concretely that's just one

3   specific example.

4           If I sat here and thought for a while,

5   I could probably -- in and that role as a

6   behavior specialist and resource teacher, I was

7   in a little bit of a unique position.

8           But why I think I was pretty good at

9   that point was I didn't come in there judging

10  everybody.  I always saw it as problems to be

11  solved.

12  Q.      And, you know, this may be obvious,

13  but in that particular example, what would you

14  say was bad about that practice?

15  A.      Well, in the times -- and again I have

16  to be careful because I was critical of methods

17  earlier.  I was sort of their intermittently.

18  So I developed a perception that there was a lot

19  of time being spent.  I was just saying -- you

20  know, I didn't put on my vitae my

21  preprofessional -- I think I mentioned one thing

22  earlier.

23          But my mom was a speech therapist at a

24  center for kids with severe disabilities, and

25  what I remember about my times there is that it



1  was just everything was happening all the time.

2  It was an energetic place that had a lot of --

3  and when I saw that, I would say to myself that

4  just looks like too much sitting around and

5  doing nothing.

6           Does that make sense?  Did I answer

7  your question?

8     Q.      Yes.

9     A.      Okay.

10    Q.      I think you did.

11           Is special education practiced badly a

12  concern in your field?

13    A.      It -- yes.  Special education

14  practiced badly is a concern.

15    Q.      Why?

16    A.      It's a concern, because -- I mean, I'm

17  thinking about there are some sort of systematic

18  observations.

19           So when I speak from, like, the

20  research part, I think there's examples where

21  people have observed or done observational

22  studies where it would be like this.  Right.

23  Where you would say these kids are not getting

24  the kind of individualized supports that they

25  need.



1             If you gave me time, I would come up

2    with some examples.

3             But some of the ones that influenced

4    me early on were like Naomi Zigmond, University

5    of Pittsburgh.  And she would go to blue ribbon

6    inclusion schools and she would observe kids

7    with learning disabilities included in general

8    ed classrooms and they weren't getting the

9    special support that they really needed.

10            So there are examples of that, where

11   we say, you know, there is a concern that

12   special education may not always be practiced as

13   well as it can be and we should make that a

14   goal.

15            More recently, in my scholarship,

16   where I've talked about multitiered system

17   support, which I am a proponent of, and, again,

18   I say it's a promising practice, I worry that it

19   takes our focus off of special education.

20            Making general ed better is good for a

21   number of reasons, but -- you know, so I'm

22   talking about myself, but I think there are

23   others who would say, you know, we need to get

24   ourselves back on job number one, which is

25   making sure that special ed is practiced more



1   uniformly in more places effectively and well.

2       Q.      And what effects would you say special

3   education practiced badly can have on students?

4       A.      Yeah.  I mean, -- so I think, broadly

5   put, then kids fail to achieve their maximum

6   potential.  So all the things that I talk about,

7   you know, why participation and instruction and

8   the benefits of learning are so important in

9   education is it gives you choices.  It gives you

10  independence.

11          That's going to vary a little bit from

12  individual to individual.  I think it is

13  important to consider what that means for

14  students, especially in special education, and

15  their circumstances.

16          But essentially you -- you fail to

17  maximize their learning and the benefits of

18  learning.

19      Q.      So, Dr. Wiley, what I want to do next

20  is I want to quickly run through a list of

21  factors, and the question's going to be the same

22  for each.

23      A.      Okay.

24      Q.      In your opinion-- the question is, in

25  your opinion, is this an indicator of special



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              384

```
 1   education practiced badly.
 2     A.      Okay.
 3     Q.      And my hope is to start briefly with
 4   yes or no, and then we can break down a little
 5   bit more afterwards.
 6     A.      Okay.
 7     Q.      Okay.  So is -- in your opinion is the
 8   use of corporal punishment an indicator of
 9   special education practiced badly?
10     A.      Yes.
11     Q.      Is -- in your opinion is seclusion of
12   students an indicator of special education
13   practiced badly?
14             MS. JOHNSON:  Object to form.
15     Q.      You can answer.
16     A.      I'm going to -- I'm sorry.  I can't
17   get that in a yes or a no, because I think that
18   the focus in the field is greatly reducing, if
19   not eliminating, the use of seclusion.
20             But I think that done appropriately
21   that it can be a part of effective special
22   education for some students.
23     Q.      In your opinion is the use of physical
24   restraints as a punishment an indicator of
25   special education practiced badly?
```



1    A.    As a punishment, yes.

2    Q.    In your opinion is -- are poorly

3   maintained facilities an indicator of special

4   education practiced badly?

5              MS. JOHNSON:  Object to form.

6    A.    I have a hard time speaking to that

7   one because, again, I think any school should

8   have basic cleanliness and safetiness.  I don't

9   know how that attaches to special education

10  directly.  That's why I'm pausing with that one.

11   Q.    If I said if it is an indicator of

12  education practiced badly.

13   A.    It could be education.

14        Could be an example of building

15  maintenance practiced badly.  I don't know.

16   Q.    In your opinion are -- is

17  overutilization of computer-based learning an

18  indicator of special education practiced badly?

19              MS. JOHNSON:  Object to form.

20   A.    If -- yeah.  I mean, if you're -- I

21  mean, you're sort of -- baked it in there.  I

22  mean, if it's being overused, then I would

23  assume it's not being used effectively.

24   Q.    Is the removal -- in your opinion is

25  the removal of learning materials as a



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              386

1    punishment special education practiced badly?

2      A.      As a punishment?  I would have to look

3    at that one more closely.  I need more context.

4      Q.      In your opinion is a failure to

5    provide behavioral supports identified in a

6    student's IEP an example of special education

7    practiced badly?

8      A.      You have to provide the supports that

9    are identified in the IEP.

10     Q.      Is that a yes, then?

11     A.      So, yes, if you're not implementing

12   the IEP, then ...

13     Q.      Is the failure to individualize or

14   update a student's IEP an example of special

15   education practiced badly?

16             MS. JOHNSON:  Object to form.

17     A.      A failure to individualize or update.

18             So individualize -- it should be based

19   on the individual needs of the student.

20             Update.  You want to clarify that for

21   me?  Like a three-year evaluation?  What do you

22   mean by "update"?

23     Q.      Just periodically update in accordance

24   with the needs of the student.

25     A.      Yeah.  So if the needs of the student

1    changes, such that the IEP changes, then you

2    have to update it.

3        Q.       Is the failure to provide FBAs or BIPs

4    for students with serious behavior-related

5    disabilities an example of special education

6    practiced badly?

7        A.       Not necessarily.

8        Q.       Okay.  Is the failure to have FBAs

9    conducted by qualified personnel an example of

10   special education practiced badly?

11       A.       People who know how to do functional

12   behavior assessments should be the ones that are

13   conducting FBAs and developing BIPs.

14       Q.       Is the failure to base FBAs on

15   appropriate data an example of special education

16   practiced badly?

17       A.       Yeah.  I mean, the functional behavior

18   assessment has to be based on reliable and valid

19   data.

20       Q.       Is the failure to train teachers and

21   other staff who work with students with

22   behavior-related disabilities on effective

23   strategies based on a student's BIP an example

24   of special education practiced badly?

25               MS. JOHNSON:  Object to form.



```
 1    A.      So I think that implementing a BIP
 2   badly would be an example of.
 3    Q.      And so a failure to implement a BIP
 4   with fidelity would be an example of special
 5   education practiced badly?
 6    A.      It would be, yep.  An example of
 7   implementing the BIP badly.
 8           And I also put that -- because there's
 9   an assumption in MTSS that kids who don't have
10   an IEP and who are not receiving special
11   education could get an FBA or a BIP.
12    Q.      So you answered a slightly different
13   question.  You said it's an example of
14   implementing the BIP badly.
15    A.      Right.
16    Q.      But would you also agree that's an
17   example of --
18    A.      Yeah, --
19    Q.      -- special education --
20    A.      -- part of their --
21    Q.      -- practiced badly?
22    A.      Yeah.  Yeah.  I would say that.
23    Q.      Thank you.
24           Would you say the failure to evaluate
25   the fidelity of BIP implementation is an example
```



ANDREW WILEY, PH.D.                                      October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    389

1  | of special education practiced badly?
2  |    A.      It's a good idea to evaluate
3  | implementation, you know, for a BIP to work and
4  | also to make sense of whether the student does
5  | or does not make progress.  It's important to
6  | know whether or not the BIP was being
7  | implemented.
8  |    Q.      Okay.
9  |    A.      And I think that would be fidelity.
10 |            And it's -- so I don't mean to take
11 | you off task, but, you know, when I was a
12 | behavior specialist and -- I worked with schools
13 | to develop BIPs, and then I would consult with
14 | them on implementing it.
15 |            And then I would come back and we
16 | would look at progress monitoring data.  The
17 | first question was always are we implementing
18 | the behavior intervention plan.
19 |            Because if they weren't or they were
20 | doing it inconsistently, then it's hard to know
21 | well, was the lack of progress because it was
22 | the wrong BIP or was it because it wasn't
23 | implemented consistently.
24 |            So I think evaluating -- and there are
25 | a lot of different ways to do that, by the way.



ANDREW WILEY, PH.D.                                October 30, 2023
UNITED STATES vs STATE OF GEORGIA                            390

1   I don't want to also make the assumption that

2   you would have to use, like, tiered fidelity.

3   That's more like at a school level, tier three.

4          But you want to have a way -- you want

5   to have a way, it could even just be a

6   checklist, to be able to say are we implementing

7   the BIP.

8      Q.     In your opinion is a lack of certified

9   behavioral or therapeutic staff or students with

10  serious behavior-related disabilities an example

11  of special education practiced badly?

12     A.     So break out for me the staff you're

13  talking about.

14     Q.     Behavioral or therapeutic staff.

15     A.     Are you talking about, like,

16  board-certified behavior analysts?

17     Q.     That would be an example, yes.

18     A.     Registered behavior technicians,

19  school psychologists, --

20     Q.     Exactly.

21     A.     -- counselors, special ed teachers.

22     Q.     It could be inclusive of any of those.

23     A.     Oh, okay.  You have to have people who

24  have expertise.  I think that that's not really

25  well-defined in the field.



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                             391

1            And certainly one of the challenges

2    for implementation is ensuring there's

3    sufficient behavioral expertise to maximize

4    implementation.  Yeah.

5       Q.        And, similarly, would you agree that a

6    lack of certified instructional staff would be

7    an example of special education practiced badly?

8       A.        Yeah.  You want to have people who are

9    sufficiently trained to provide special

10   education.  I would say that's a challenge not

11   only we're dealing with in general, but for kids

12   with behavior-related disabilities.  It's a

13   particularly pronounced problem everywhere.

14      Q.        Would you say a lack of differentiated

15   instruction based on ability and targeted needs

16   is an example of a special education practiced

17   badly?

18      A.        Differentiated instruction is not a

19   research-based practice.

20      Q.        Okay.

21      A.        It has many meanings to many different

22   people.  I think it's better to talk about

23   tiered instruction of increasing intensity.  And

24   so we want to make sure that students are

25   receiving instruction at a sufficient intensity



 1  for their academic needs.

 2    Q.      I'm getting to the end here.  I

 3  promise.

 4    A.      That's fine.

 5            You said differentiated instruction.

 6  Did you say one other thing?  I just want to

 7  make sure I ...

 8    Q.      Based on ability and targeted needs.

 9    A.      Oh, ability and targeted needs, yeah.

10  Targeted needs, yeah.

11    Q.      Would you say that a categorical lack

12  of access to curricula for art, music, PE, or

13  other electives is an example of special

14  education practiced badly?

15    A.      So students don't have access to PE or

16  to art or to music.  I'm not quite sure exactly

17  what that means.

18            And it's funny because it's in an area

19  of special ed that I wish we had more research

20  on.  I know it doesn't all have to relate to

21  research, but, you know, how do we support kids

22  with disabilities in music and art and things

23  like that.

24            I mean, I think that kids should have

25  art and PE and music in the elementary grades.



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                  393

1   I think when you get older, then -- like I'm

2   thinking about high schoolers.  It really

3   depends what they do.  Right.  Band or graphic

4   arts or -- anyway.

5       Q.      And you said that you think that kids

6   should have access to art and PE and music in

7   the elementary grades.  Is that true regardless

8   of whether or not the student has disabilities?

9       A.      Yeah.  I mean, you're relating it to

10  special education in an interesting way.  So if

11  you're saying should students have -- with

12  disabilities have access to art and music and

13  PE -- but I also, because I'm not an expert in

14  those areas, I imagine that those could take a

15  number of different forms.

16      Q.      Sure.

17      A.      And may even need to be specialized in

18  a way for kids with more intensive needs.

19              But go ahead.  Sorry.

20      Q.      Thank you.

21              Dr. Wiley, would exclusion from

22  extracurricular activities -- categorical

23  exclusion from extracurricular activities be an

24  example of special education practiced badly?

25      A.      Yeah, I don't think you can exclude



1   kids from extracurricular activities because

2   they have a disability.

3          Now, you may have other individualized

4   reasons for looking at that, but I'm pretty sure

5   that that's explicitly addressed in IDEA;

6   extracurricular activities.

7   Q.      Would reduced instruction time to

8   accommodate long bus rides to and from school be

9   an example of special education practiced badly?

10  A.      Reducing instruction time so that

11  students have less instruction because of a -- I

12  think that would need a close look.

13         Again I'm not sure.  I probably have

14  to look at a specific context.  But I don't

15  think that that would be -- you know, so when

16  I'm talking about practice of special education,

17  I want to make sure that kids have sufficient

18  instruction.  Right.  In that sense if that's

19  somehow being unnecessarily constrained, then

20  that would not be good.

21  Q.      It would be concerning?

22  A.      It would be concerning, yeah.  Require

23  a closer look to understand the context.

24  Q.      And, to round us off, would a failure

25  to coordinate with external providers of



1 | community-based behavioral health services for
2 | students with behavior-related disabilities be
3 | an example of special education practiced badly?
4 |   A.       So I think that this goes to related
5 | services.  And if students need related services
6 | in order to benefit from special education, then
7 | that's what's required in special education
8 | practice.
9 |            In terms of wraparound services,
10 | again, I think that that's been a model that's
11 | been in the field for a long time.  It's existed
12 | in children's mental health.  I think right now
13 | we're just getting to the point of figuring out
14 | how to do wraparound services really
15 | effectively.
16 |            So I'm hemming and hawing on that one
17 | just because I think that absolutely if there's
18 | a related service that's identified in the IEP
19 | that's definitely part of special education.
20 |            I think the PBIS wraparound thing is
21 | new and evolving, and I hope it continues to
22 | grow and becomes clearer how we can implement
23 | those.
24 |   Q.       Thank you.
25 |   A.       Yeah.



1    Q.      I want to touch base really quick on

2    the discussion around seclusion.

3    A.      Okay.

4    Q.      Dr. Wiley, how would you define

5    appropriate use of seclusion of students with

6    disabilities?

7    A.      Well, I know that in Ohio, for

8    example, there are laws and regulations

9    regarding the use of seclusion, and I think

10   a lot of those present important guardrails for

11   the safe use of restraint, the safe use of

12   seclusion.

13   Q.      Do you know whether the state of

14   Georgia has any laws around the use of

15   seclusion?

16   A.      I would assume that it has some

17   regulations around the use of -- and I think in

18   most states, but I don't have this as part of my

19   report, they tend to be more regulated than

20   outright banned.

21           I know that in my experience we had a

22   seclusion room and we took data on restraints

23   and seclusion, and a consistent goal of our

24   crisis intervention was to reduce both.  Reduce

25   the use of restraint, reduce the use of



1    seclusion and the time in either.  Right.  And

2    we did that in my time in that role.  It was an

3    explicit goal.

4              And -- but, however, there were times

5    when -- and I think everybody acknowledges this.

6    It's not restrained as punishment, but safe

7    restraint in order to keep the child safe or the

8    student safe and other people safe that could be

9    used.  And seclusion could also be used in that

10   way as well, as a safe way to protect the

11   student.

12             So the -- some of the things when you

13   say what would be appropriate use, the door

14   should not lock on its own.  You should be able

15   to always view the student.  So the seclusion

16   rooms I've seen, you have a way of seeing what's

17   going on with the student.  You should never

18   leave the student.  You know, like leave the

19   room, the seclusion room.

20             So if you're talking about those kinds

21   of things, there are guardrails around the safe

22   use of seclusion.

23             In the field I think there's agreement

24   that we want to reduce that as much as possible,

25   but it's not clear that we could say hey, it's



1  possible to educate every student with

2  behavior-related disabilities without ever using

3  restraint or every using seclusion.  That's just

4  not the reality of some of these kids that we

5  work with.  But we want to do it safely and

6  ethically and according to professional

7  guidelines.

8      Q.      And, in your opinion, would it be

9  appropriate to seclude students for

10  disability-related behaviors?

11     A.      So disability-related behaviors.

12  There is a legal mechanism for that, right,

13  manifestation, determination where we say was

14  the behavior a manifestation of that student's

15  disability.

16          I think that's an interesting one to

17  bring up, because when you talk about kids with

18  emotional, behavioral disorders, sort of parsing

19  out.

20          So let me take a -- if it's seclusion

21  for a disability-related behavior that is not

22  harmful to the student or to others, then that

23  would be inappropriate.

24          Does that make sense?

25     Q.      How would you determine whether or not



1  seclusion of a student with behavior-related

2  disabilities is appropriate?

3      A.      Is the student making progress.  I

4  mean, I think all the other indicators that we

5  use to say is the behavior decreasing.  Is the

6  student able to participate in instruction more.

7          I know that in my experience that was

8  done as well.  But I'll give you the one example

9  of our 25 students in the special school.  There

10  was one student who actually had a tumor in his

11  brain that later was -- after I left was

12  surgically removed.  Some of his behaviors were

13  aggressive and at times violent, and they really

14  were in some ways beyond his control.

15          So my point is this, that we needed to

16  use seclusion probably more than any other kid

17  with, you know, in that program.  More than we

18  would have expected to or wanted to.

19          So there's that asterisk of saying we

20  would want to see that overall that student is

21  making progress behaviorally, reducing those

22  problem behaviors and those kinds of things.  So

23  data would be the thing that would tell us.

24          Understanding that there may be some

25  kids who it is not a straight arrow.  Right.



1  It's like we're using seclusion as part of --

2  that's the other part, too.  It has to be part

3  of a comprehensive program.  If you're using

4  just restraint and seclusion without any kind of

5  positive reinforcement or other kinds of

6  positive programming, that's not acceptable and

7  that would be bad practice.

8      Q.      And to make sure I'm understanding.

9  To paraphrase you again, you're saying that

10  seclusion without showing improvement as part of

11  the programming for the child would be

12  inappropriate?

13      A.      You would need to revisit and say --

14  and so my focus in the time that I was at my

15  school and I was in crisis resource, again, we

16  kept that data and it was something that we

17  reviewed.

18          And what was neat about my experience

19  at that school was we did make changes that were

20  able to reduce seclusion and restraint

21  dramatically.  So it should be a focus of

22  programming, both individual, but also in --

23  overall in the school.

24          So, yeah, if you were using seclusion,

25  you should also be thinking about what are the



1  other things we need to address upstream from

2  this behavior in order to make it less likely

3  that they become so aggressive or, you know,

4  violent, to the point where they could be a harm

5  to themselves or to others.

6           Is that making sense?

7    Q.       That does.  Thank you.

8           MR. GILLESPIE:  Crystal, do you

9       have anything?

10           I'll pass the witness.

11           MS. JOHNSON:  I do not have any

12       questions for you.  I think we can go --

13           MR. GILLESPIE:  I can think up some

14       others if you want.

15           We can go off the record.

16           THE VIDEOGRAPHER:  Off the record,

17       5:25.

18                - - - - -

19    (A discussion was held off the record.)

20                - - - - -

21           THE VIDEOGRAPHER:  We're back on

22       the record, 5:26.

23           MR. GILLESPIE:  Just to note that

24       we'll want to order a copy of the

25       transcript.



1          MS. JOHNSON:  And Dr. Wiley will

2      read and sign.

3          COURT REPORTER:  Do you want a

4      copy?

5          MS. JOHNSON:  Please.  Yes.  E-tran

6      is fine.

7          THE VIDEOGRAPHER:  Off the record,

8      5:26.

9              - - - - -

10   (Deposition concluded at 5:26 p.m.)

11              - - - - -

12          SIGNATURE:

13      The Deponent will read and sign the

14      transcript of said deposition.

15              - - - - -

16

17

18

19

20

21

22

23

24

25



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                403

1                    REPORTER CERTIFICATE

2

3    The State of Ohio,      )

4                            )        SS:

5    County of Cuyahoga.     )

6

7              I, Sarah R. Drown, a Registered
     Diplomate Reporter, Certified Realtime Reporter,
8    and Notary Public within and for the State of
     Ohio, duly commissioned and qualified, do hereby
9    certify that the within named witness, ANDREW
     WILEY, Ph.D., was by me first duly sworn to
10   testify the truth, the whole truth and nothing
     but the truth in the cause aforesaid; that the
11   testimony then given by the above-referenced
     witness was by me reduced to stenotypy in the
12   presence of said witness; afterwards
     transcribed, and that the foregoing is a true
13   and correct transcription of the testimony so
     given by the above-referenced witness.

14
               I do further certify that this
15   deposition was taken at the time and place in
     the foregoing caption specified and was
16   completed without adjournment.  I do further
     certify that I am not a relative, counsel or
17   attorney for either party, or otherwise
     interested in the event of this action.

18
               HEREBY, I attest to and certify the
19   aforementioned on this 13th day of November,
     2023.

20

21

22

23                  

24                  Sarah R. Drown, RDR, CRR
                    Notary Public, State of Ohio
25                  Commission expiration:  04-22-27

ANDREW WILEY, PH.D.                                October 30, 2023
UNITED STATES vs STATE OF GEORGIA                             404

1                    DEPOSITION ERRATA SHEET

2

3    Our Assignment No. J10416168

4    Case Caption: UNITED STATES OF AMERICA vs. STATE OF

5    GEORGIA

6

7         DECLARATION UNDER PENALTY OF PERJURY

8

9         I declare under penalty of perjury that I have

10   read the entire transcript of my deposition taken

11   in the above-captioned matter or the same has been

12   read to me, and the same is true and accurate, save

13   and except for changes and/or corrections, if any,

14   as indicated by me on the DEPOSITION ERRATA SHEET

15   hereof, with the understanding that I offer these

16   changes as if still under oath.

17

18   Signed on the _____ day of _____, 2023.

19

20   _____

21   ANDREW WILEY, Ph.D.

22

23

24

25



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              405

```
 1                      DEPOSITION ERRATA SHEET

 2     Page No._____Line No._____Change to:_____

 3     _____

 4     Reason for change:_____

 5     Page No._____Line No._____Change to:_____

 6     _____

 7     Reason for change:_____

 8     Page No._____Line No._____Change to:_____

 9     _____

10     Reason for change:_____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change:_____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change:_____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for change:_____

23

24     SIGNATURE:_____DATE:_____

25               ANDREW WILEY, Ph.D.
```



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                  406

1                    DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____DATE:_____

25              ANDREW WILEY, Ph.D.



**Exhibits**

10416168 An
drew.Wiley,
Ph.D..
EXHIBIT979
  3:8
  100:1,3,
  10
10416168 An
drew.Wiley,
Ph.D..
EXHIBIT980
  3:11
  123:6
10416168 An
drew.Wiley,
Ph.D..
EXHIBIT981
  3:13
  147:10
  149:15
10416168 An
drew.Wiley,
Ph.D..
EXHIBIT982
  3:16
  150:1,7
10416168 An
drew.Wiley,
Ph.D..
EXHIBIT983
  3:18
  211:4,14
10416168 An
drew.Wiley,
Ph.D..
EXHIBIT984
  3:25
  376:11,21

**$**

$200
  95:15

**1**

1
  124:9
  127:7,8
  211:8
  257:10
  313:14
10
  285:6
  329:7
100
  25:1
  140:21
  217:20
10:13
  85:8
10:27
  85:18
11:22
  141:9
11:35
  141:14
12
  11:24
  12:7
  17:11,23
  24:5  28:2
  40:5
12.3
  273:4
12:44
  210:20
13
  21:8

188:2
14
  244:10,12
15
  38:1
  329:7
16
  253:3
  270:12,
  21,22
180
  136:18
19
  262:8
1950s
  245:22
  372:13
1997
  66:6
1:31
  210:25

**2**

2
  124:9
  127:7
  152:25
  157:11
  211:24
  253:6
  260:6
  270:12
  275:5
  346:22
2,000
  119:23
20
  246:3
  266:6

20,000
  95:25
2014
  105:17
2016
  158:22
2019
  254:22
2023
  5:2  211:9
21
  272:22
  275:17
  279:9
  285:17
23
  123:15
24
  50:5,6
  147:22
  175:23
25
  110:16
  111:8
  150:17
  306:23
  399:9
28
  308:3,4
  311:24,25
  312:1,2
  313:23
29
  313:24
  330:3
2:45
  285:9

**3**

3

32:14
  124:9
  211:25
  228:17
  237:5
  288:13
  289:11
30
  5:2
  205:14
  303:15
32
  333:1,3
33
  333:5
  334:3
34
  335:12
35
  337:3
37
  341:10
38
  345:9
39
  346:10
3:00
  285:14
3:44
  329:20

**4**

4
  241:1,4
  242:4
40
  255:23
  256:20
  257:7,11
  258:12



277:17
303:15

**41**
349:9

**4:00**
329:25

**4:40**
368:9

**4:52**
368:14

_____

**5**

**5,000**
119:23

**50**
110:12

**504**
239:4

**51**
353:17,20

**52**
353:21

**53**
353:14

**59**
357:2
364:5

**5:25**
401:17

**5:26**
401:22
402:8,10

_____

**6**

**6**
17:11
288:13
289:12

**6,000**
119:23

**63**
363:1,2

**64**
363:18

_____

**7**

**7**
17:11

**70**
294:14,20

**71**
312:15

**79**
255:23

_____

**8**

**8/23/2023**
123:6

**8/24/2023**
147:10

**8/25/2023**
150:1

**80**
53:10,13
247:18
255:22
270:17
271:1,10,
16,17
272:8,13,
17 273:4,
10,18
347:7

**80s**
268:5

**8:59**

5:5

_____

**9**

**9.9**
256:23

**90**
34:24

**90s**
34:24
36:4 40:6

**979**
100:1,3,
10

**980**
123:4,6

**981**
147:8,10
149:15

**982**
149:24
150:1,7

**983**
211:4,14

**984**
376:8,9,
11,21

**99**
261:20

_____

**A**

**abide**
6:24

**ability**
136:9
193:18
289:1
294:21
391:15

392:8,9

**absence**
90:15

**absolutely**
26:17
34:17
39:22
40:3
101:25
185:1
189:4
192:1
209:2
281:5
313:4
395:17

**abstract**
78:24

**academic**
10:22
29:15
30:3
39:10
40:14,19
41:23
54:9
59:11,13
60:4,17
61:9 65:1
88:8
213:16
251:7
259:6
279:13
281:2
287:24
299:8
301:20
307:10,11
308:17,25
309:15
310:14
315:8
317:6
318:3

319:1
320:23
321:12,20
332:11
337:6,15,
17 338:7,
18 339:7
340:4,12,
18 341:3
347:4
348:1,15
360:6
392:1

**academically**
137:12
259:18

**academics**
318:1,10
321:10
348:14

**accelerating**
341:2

**accept**
21:9

**acceptable**
204:25
400:6

**acceptably**
338:11

**access**
63:15
94:19
109:16
194:15
210:9
282:13
309:2
370:19
392:12,15
393:6,12

**accessed**



166:2

**accessible**
31:10

**accidental**
127:5

**accommodate**
394:8

**accomplish**
26:13

**accordance**
386:23

**account**
292:5
293:17
339:20

**accuracy**
162:15

**accurate**
6:7 8:11
28:21
38:12
101:2
117:13
162:13
182:14
214:15
222:1
227:2
255:13
293:22,23
297:16
303:4

**accurately**
119:13
179:12
209:9
297:2

**achieve**
224:24
330:15
383:5

**achievement**
59:13
337:15,17
338:7
339:8
340:4
341:3

**acknowledge**
90:3
280:10
345:21

**acknowledges**
397:5

**acknowledging**
87:15
345:15

**acronyms**
46:1

**Act**
48:17,21
238:25

**active**
253:20

**activities**
190:3,10
198:22
200:20
210:11
318:18
393:22,23
394:1,6

**actual**
110:6
221:22
288:11
303:25
334:9,16,
19,24

**ADA**
48:15
96:13

97:8
238:2
239:4,15,
16,19
240:3,5
343:7

**ADAMS**
253:9,15
276:3
329:15

**adaptive**
310:14

**add**
197:16
215:19
328:12
362:19

**added**
297:8
303:10

**adding**
271:25

**addition**
10:22
29:8 63:8
82:7

**additional**
45:10
99:5
126:8
145:1
249:7
351:17

**address**
19:20
20:13
169:1
200:10
285:23
286:2,9
287:15
288:3
296:11

307:8
320:8
352:1,4
375:4
401:1

**addressed**
322:15
336:17
358:17
364:14,20
365:1
394:5

**addresses**
286:17
320:19,
20,21

**addressing**
76:15
267:13
349:18,23
350:6,16

**adequacy**
33:11
36:6 38:2

**adequate**
33:16
75:23
355:19

**ADHD**
106:20

**adjust**
316:5,21
317:12

**administer**
315:10

**administration**
63:17

**admit**
108:17

**adoption**
326:17

**adulthood**
324:20

**adults**
289:3

**advantage**
190:22

**advantages**
297:1

**adverse**
373:19

**advice**
37:3

**advised**
33:14

**advising**
25:20

**advocate**
85:23
280:8
283:8,24

**advocates**
99:17
268:4
269:2
279:13,20
280:18
284:10

**affordable**
20:20

**age**
5:8 16:8

**Agency**
50:8

**agenda**
122:6

**aggressive**
371:6
399:13
401:3

**agree**



5:22
48:23
56:6
57:12
63:7 64:1
65:18
69:13
76:3
77:10,19
79:4 81:3
83:14
88:15
188:16
191:8,18
194:14
199:2
202:6
207:1,8
216:22
219:16
224:7
225:9
227:6
232:7,23
234:11,15
235:7
242:12
243:21
246:10,12
249:6
250:9
278:9
295:10
296:15
306:6
308:16
312:18
326:7
330:17
332:15
354:6,23
360:25
388:16
391:5

**agreement**
18:23

397:23

**ahead**
9:3 36:10
38:7 68:6
70:20
85:16,19
86:11
107:25
109:14
110:3,15
115:13
194:24
196:22
197:5
200:23
229:23
271:4
353:11
365:13
393:19

**aide**
204:15,22
205:1
206:13

**aides**
206:15

**Alameda**
278:21

**Alignment**
283:16

**allocated**
249:7

**allowances**
58:5

**allowed**
245:19
302:24
316:9

**alternative**
53:24
54:3,7,
11,12,22
55:4

56:23
58:12
84:15
97:24
183:17
202:5
245:18
263:11,16
273:14
356:16
357:9,18

**America**
6:3

**Americans**
48:17
238:25

**amount**
53:19
146:7
250:21
355:12

**amounts**
379:23

**Amy**
211:6

**analogy**
298:12
352:10

**analyses**
117:16,
17,18
118:2,6
184:1,17
304:4
346:9

**analysis**
36:6 38:2
83:16
89:22
172:15
239:18
291:4,8
300:14

**analysts**
390:16

**and/or**
118:25
151:17
259:6

**Andrew**
5:1,8,14,
20 100:4
211:8

**anecdotal**
128:10
154:24

**anecdote**
331:4

**annual**
254:12
368:25
373:5

**annually**
130:15

**answering**
65:12
119:13
242:23
284:21

**answers**
7:15 8:11
126:3
160:15
193:20

**anticipate**
99:14

**anticipated**
52:1

**anticipating**
7:8 26:21

**antidotes**
330:22

**anymore**

280:24

**apologies**
360:13

**apologize**
26:23
46:16
63:5
120:24
132:7
137:7,17
157:19
181:7
259:21
311:22
356:25
361:13

**apparent**
291:25

**appears**
294:2
305:6

**applicability**
350:11

**application**
239:14
313:16
314:2

**applied**
40:21
41:23
82:22
89:21
132:5
134:6
213:20
247:15
299:7,8,
20 335:4

**applies**
52:11
57:24
126:22



214:3,6,
10,12
236:6
250:13
339:15
375:8

**apply**
52:23
84:2
247:12
250:23
291:10
298:8
317:25
318:12
321:19
322:11
339:17
345:21
362:1
372:3
378:13

**applying**
140:13
239:9

**appreciating**
41:16

**approach**
167:4
180:4
306:20

**approached**
40:2
98:21

**approaches**
14:25
61:2

**approaching**
209:16

**appropriately**
43:4  61:9

63:9  64:1
74:9
75:16
77:11
97:23
170:1
187:17
223:17
224:21
227:13
244:1,21
245:4
247:5
248:20
250:7,25
258:19
270:4
273:20,21
275:8
282:13
346:15
347:17,19
362:8
384:20

**appropriateness**
56:21
64:5
179:19
196:3
334:15,23
335:1
353:2

**approximately**
9:19
159:17

**area**
21:20
165:22
168:15,19
289:9,23
392:18

**areas**
93:10

149:14
181:15
201:9
237:11
393:14

**argue**
107:24
259:15
268:3

**argues**
243:25

**argument**
266:18
274:8
278:12
294:3

**arguments**
109:2
284:23
285:1

**arrest**
347:9

**arrow**
399:25

**art**
370:2
392:12,
16,22,25
393:6,12

**article**
376:12

**arts**
393:4

**ASD**
308:10

**aspect**
94:8
177:14,22

**aspects**
58:6  61:7
72:15

82:3
216:25
355:9

**assessment**
34:7,10
38:21
49:17
66:7  67:5
79:14
103:4
104:7
142:6
154:15
155:2
156:6
215:21
218:7
223:4
265:13
304:2,10,
14 323:5
346:7
356:7,10
387:18

**assessment/
behavior**
140:18

**assessments**
35:24
214:23
293:19
305:17
387:12

**assist**
98:4

**assistance**
355:8

**assistants**
98:3,6

**associate**
23:9

**assume**
8:5  143:1

216:14
256:12
262:1,6
385:23
396:16

**assuming**
109:7
219:22
255:12
296:14
319:16
326:14
332:23

**assumption**
185:20
256:2,21,
24 261:24
277:25
388:9
390:1

**Assurance**
19:9

**asterisk**
292:25
338:9
399:19

**ate**
195:19

**attached**
369:24

**attaches**
385:9

**attempt**
259:11

**attend**
18:2
105:14
224:4,10

**attended**
121:19,24
146:10



**attention**
  90:16
  240:23
  296:1
  334:9
  346:6
  377:3

**attorney**
  238:20

**attorneys**
  8:12 9:18
  92:21

**attributes**
  60:12

**audience**
  30:22

**August**
  123:15
  147:22
  150:17

**authored**
  123:18
  376:24

**authors**
  325:12

**autism**
  35:3,5,9,
  15 106:19
  257:20,22
  308:10
  379:8,12

**automatically**
  193:5

**availability**
  199:2,25

**aware**
  6:1,12
  142:17,
  20,22
  165:17,20

  166:11,
  16,19,21,
  24 167:3,
  8,14,19
  168:3
  206:9
  241:15
  252:12,24
  255:15
  294:7,10,
  13 295:25

---

**B**

---

**back**
  18:21
  40:5,6
  76:25
  109:11
  113:14
  141:13
  152:4
  156:10
  168:5
  234:12
  258:17
  260:6
  270:11
  275:17
  285:13
  302:14
  323:9
  364:6
  382:24
  389:15
  401:21

**background**
  114:10
  148:12

**bad**
  26:3
  130:19
  158:8,13
  234:6
  265:16

  326:21
  380:14
  400:7

**badly**
  377:12,25
  378:8,21
  379:5
  381:11,14
  383:3
  384:1,9,
  13,25
  385:4,12,
  15,18
  386:1,7,
  15 387:6,
  10,16,24
  388:2,5,
  7,14,21
  389:1
  390:11
  391:7,17
  392:14
  393:24
  394:9
  395:3

**baked**
  338:15
  385:21

**balance**
  375:16

**ballpark**
  303:15

**Band**
  393:3

**bands**
  16:8

**banned**
  396:20

**barely**
  332:24

**barrier**
  353:22
  354:7

  356:12

**barriers**
  153:15
  248:19
  356:14

**base**
  387:14
  396:1

**based**
  39:9,12,
  14,15
  42:12,14
  53:19
  64:15
  88:4
  89:21,23
  106:15
  114:20
  116:1
  118:17
  122:12
  145:11,
  15,16
  146:20
  152:15
  162:1
  174:6
  178:20
  180:20
  187:9
  200:10
  214:7
  219:4
  224:25
  228:23,25
  241:11,25
  251:23
  252:19
  258:2
  262:21
  264:4
  265:18
  283:10,11
  288:12
  289:6

  292:9
  299:17
  301:21
  316:21
  334:1
  346:21
  386:18
  387:18,23
  391:15
  392:8

**baseline**
  64:18
  68:10,17
  70:17
  75:22
  80:5,12,
  14

**Baseline's**
  64:23

**basic**
  58:22
  67:18
  68:3
  70:24
  208:8
  385:8

**basically**
  99:11
  114:6
  240:13,16
  283:17
  300:24

**basis**
  74:17
  191:25
  195:22
  245:18
  250:3
  282:5
  353:10
  365:23

**bat**
  213:1



**BCBA**
148:11

**be-all**
279:4

**bear**
207:23
363:6

**bearing**
33:7
367:11

**began**
238:17
251:5

**begin**
16:21
169:21

**beginning**
24:9
72:13
150:24
195:1
211:22
228:16
251:11
265:8
334:6
337:8
348:5
350:9

**begins**
127:8
130:24
135:18
148:9
228:14
246:25
345:9
359:22

**behalf**
86:2

**behavior**
12:2
28:4,7,

14,19
29:13,14
31:20
33:23,24
34:3,7,
10,12,15
35:1,17,
18,24
38:21
49:2,17,
19 59:19,
24 61:8
65:1
66:7,8,
10,14,17,
20,21
67:5,8
79:14
80:2
82:14,23
87:19,21
88:2,3
89:21,23
90:4
103:3
104:7
106:18
140:6,17,
18 142:6
148:9,10
154:15
155:2,3
156:6
164:15,16
203:2
205:5,16
206:18
214:23
215:21
216:8
218:7
219:20
223:3
226:15,
17,22
259:1,6
265:13

272:14
282:9
304:2,9,
14 305:17
310:14,20
314:9
317:25
318:14
320:22
321:22
323:5,15
337:13
338:4
346:7
356:7,10
361:20
371:6
379:9,10
380:6
387:12,17
389:12,18
390:16,18
398:14,21
399:5
401:2

**behavior-related**
36:21
37:20
39:18
40:16
41:10
42:10
48:23
49:4
64:21
65:17
66:1
68:21
69:15
71:1 73:9
77:24
79:7
81:7,18
118:25
155:23

163:6
165:10,19
167:6,16
180:25
182:4
184:23
185:8
192:13
214:5,9,
13 215:2,
7,18
216:19
217:9
218:4
219:11,17
221:9,18
222:9,19
224:1,8
225:5,15,
22 226:18
230:10
236:1
242:9
243:12
247:23
249:13
262:16
269:10
279:16
281:7
282:8,18
285:24
292:1
304:6
306:5
310:17
312:7,20,
24
335:17,21
338:13
341:4
343:9
346:17,24
347:13,24
348:25
349:16,21
350:14

351:1,25
353:7
357:12,23
358:9
363:12
364:11
366:7
368:19
372:2
387:4,22
390:10
391:12
395:2
398:2
399:1

**behavioral**
49:8
56:10
59:10
60:16
62:4,13
163:22
184:2
194:9
209:25
213:16
214:23
218:25
237:18
257:24
259:17
270:16
279:14
287:25
288:10,20
289:21,25
317:6
319:1
321:20
332:12
386:5
390:9,14
391:3
395:1
398:18



behaviorally
399:21

behaviors
34:13
62:17
288:22
289:8,22
361:20
398:10,11
399:12,22

beholding
250:16

belabor
41:25
317:11

belief
43:11
44:15
45:5
248:8,13

believes
267:22

belong
96:24

belonged
101:14

bend
313:1

beneath
141:1

beneficial
197:25
234:7
242:6
243:1,3
331:25
332:3,10,
16,24

benefit
196:7,10,
14,18

197:13,
23,24
198:18,23
311:6
395:6

benefited
262:16

benefits
198:16
383:8,17

bias
296:24
301:5

biased
295:23,25

big
20:15
87:9
108:7
110:7
135:7
181:2
233:20
236:8
280:21

biggest
69:1

BIP
49:18
64:11,15
65:22
66:1,4,6,
24 153:25
227:7
387:23
388:1,3,
7,11,14,
25 389:3,
6,22
390:7

BIPS
65:19
155:24

387:3,13
389:13

bit
7:12
11:18
14:16
15:12
22:12
26:21
35:12
39:17
54:14
55:20,25
57:17
62:24
70:14
75:21
79:23
80:4
81:22
88:11
91:21
97:16
107:25
108:18
111:3
124:25
130:21
139:17
140:4
144:24
154:1
157:2
164:10
179:9
183:25
187:4
212:13
225:2
229:23
230:17,18
246:10
253:12
264:10
266:21
276:15

298:19
301:25
308:1
315:16
316:12
320:13
353:12
362:19
363:5
365:10
368:17
369:11
373:8
375:14
380:7
383:11
384:5

blended
18:24

blind
201:22

blue
382:5

blurs
54:14

board
22:7
163:19

board-
certified
390:16

bodies
305:1
326:8

bolded
126:18
153:2
335:14
349:12
363:8

bolts
255:3

books
201:20,21

Boston
37:7

bottom
157:10
246:23
266:7
285:20
307:4
312:3
313:23
333:1
346:12
353:20
363:16
377:8

Bowling
20:7

boxes
265:19

bragging
156:7

Braille
201:20

brain
37:22
114:15
124:7
126:20
139:13
399:11

brand
34:7

break
8:22,23,
24 9:4
17:11
83:11
84:23
85:3 88:1
110:11
141:5



157:16
195:25
207:17
229:8
232:4
285:7
329:17
368:5
384:4
390:12

**breakdown**
159:2

**breakfast**
8:14

**breaking**
338:3

**breaks**
254:19

**briefly**
26:20
384:3

**bring**
21:9 22:6
103:25
143:2
164:8
193:24
301:16
355:7
398:17

**broad**
61:15
62:15
64:23
205:4
216:3
218:13,17
249:19
286:22
289:17
320:24
332:10

**broader**

20:14
31:19

**broadly**
187:2
383:4

**Broadway**
310:25
311:1

**broken**
16:7

**Brooke**
111:12
112:13
114:11
115:1
120:13
143:23
159:10
160:11

**brought**
96:13
99:16
119:22
153:10
178:21
367:14

**budgets**
373:5

**build**
61:2

**building**
67:21
257:15,16
385:14

**buildings**
27:18
47:20

**built**
358:11,25

**bulk**
22:17

**bullet**
240:25

**bunch**
8:12
180:21

**bus**
394:8

**business**
20:2

**buy**
156:21,22

**by-line**
376:25

**Byars**
111:12
114:8,16

**bye**
342:1

——————————

——————————
        C
——————————

**cafeteria**
195:12,20
198:14
276:20

**cafeterias**
46:25

**calendar**
159:24

**California**
278:21

**call**
55:14
72:1
81:25
121:15,20
145:25
146:2,3,
11 148:19
162:14
309:16

**called**
5:9 15:22
19:8
43:22
53:14
66:16
96:25
257:19
268:25
283:15
370:4

**calling**
31:17
36:20
72:15

**calls**
146:18
147:1

**camera**
86:20

**CAP**
262:11
269:1
366:11

**capability**
152:19

**capacity**
36:22
61:21
62:3,8,17
63:9
67:12
69:12
70:24
71:15
72:2
73:17,23
76:19
77:2,14
203:21
205:9
206:4,25
207:2
247:5

249:5,9
342:24
358:10,25
359:10,
11,12

**captured**
212:17

**care**
167:4,11
168:8,18
169:2

**careful**
154:18
156:15
185:18
209:3
294:1
297:4
309:11
330:22
331:7
380:16

**carefully**
189:7

**cart**
222:10

**case**
12:12,13
13:2
14:1,9
17:8
42:6,7,22
49:3
52:19
78:7,15
81:12
82:15
85:25
86:6
91:24
93:19
95:3,11,
14,24
96:9,11,



12,16,21,
22 97:6,
15,19,20
98:11,13,
14 99:7,
13,16
101:22
102:4
115:17
116:19
117:4
119:22
132:17
133:5
160:19
169:23
171:10
178:14
179:25
180:16
184:7,21
185:6
186:14
199:10
202:25
218:9,21
229:3
233:10
236:3
240:8
264:14
265:10,11
278:3
283:4,8
294:9
295:3
300:21
301:18
304:1,24
336:14
344:5
355:22
364:22
379:12,16

caseload
35:4

cases
77:17
86:15
108:16
199:4,9
216:15
217:13
224:3
225:20
250:14
345:7
346:3

Cassandra
111:13
112:14
114:11
115:2
143:22
145:22
147:21

Catanias
97:13

categorical
217:8
228:4
365:24
392:11
393:22

categorically
76:4,8,10
77:12,21
79:5 81:5
83:21
242:6

categories
31:2 55:8
103:19
162:5
187:5,8,
19,24
188:2
255:5,21
260:10

287:10
290:14
326:15

category
188:14
205:4
290:9
292:24

caught
18:4

caveat
41:7
92:19
191:18
293:5

caveats
196:3

CEEDAR
16:2

center
16:2
36:14
172:22
266:23,24
283:11
316:10
321:6
355:8
369:23
380:24

centers
52:5

certainty
261:18,21

certification
63:19
148:12

certifications
68:17

certified
5:12
63:9,10,
17 68:25
69:2
390:8
391:6

challenge
63:21
355:11
391:10

challenges
67:3 84:4
153:14
154:20
155:8,14
171:21
173:6
283:25
391:1

challenging
176:1
195:14,15
205:3
288:21

change
22:14
34:20
43:2
139:20
254:25
305:15
323:11

changed
18:22
94:2

chapter
239:3

character
131:8,25
134:7,11

characteristics

83:17
106:17
188:5
287:21
291:24
333:8
348:11

characterization
219:23
220:13
222:1

characterize
118:11
133:1
138:6
166:1
171:2
175:9
179:12
217:2
243:19
267:16,20
297:2,18

characterized
158:16
161:21

chart
255:17

chat
121:21

check
253:21

checked
46:13

checking
265:19

checklist
130:5
390:6



**checks**
300:4

**cherry-picked**
300:19

**child**
168:25
199:14
200:22
344:21
379:14
397:7
400:11

**childhood**
17:9,12,
14,22
18:1,9

**children**
165:19
166:9
167:6,16,
23 184:2
288:14
289:2

**children's**
395:12

**choice**
202:7
246:2

**choices**
383:9

**choose**
155:25

**circles**
98:25

**circumstances**
84:1
189:2
231:21
234:2
265:15

323:16
334:2
351:19
373:17
374:18
383:15

**citation**
279:18

**cite**
266:17
269:24
270:14
279:24
280:13
283:14
291:7
293:3
305:5,12
337:25
339:18
347:11
351:12

**cited**
97:12
101:23
112:7
269:13
278:6
279:22
304:20,21
309:10
346:22
373:22

**cites**
231:11
233:7
305:9

**citing**
57:7
247:15
338:16
339:23

**Civil**
5:10

**claim**
44:21
102:14
186:3
239:23
304:12
345:25
346:15
366:24
367:1

**claiming**
241:13

**claims**
94:14
102:6
116:22,25
161:11
163:2
177:2
184:2
212:8,9,
12
237:14,19
265:7
284:23
298:25
303:21
306:13
360:10

**clarification**
8:4 41:5
45:3
86:18
90:8
119:3
169:21
291:2

**clarified**
33:12
163:15

**clarifies**
220:22

**clarify**

52:22
83:6
118:1
155:11
181:18,24
271:13
311:17
386:20

**clarity**
47:15
50:19
181:14
186:11

**class**
189:9
224:4,10
255:23
271:6
328:16,24

**class-wide**
12:1
31:24
87:23

**classes**
31:2
141:24
196:5
271:11
273:24
274:15
328:13,14

**classify**
73:14

**classroom**
11:25
12:5
28:2,15
29:8
31:17,19
32:1,8,17
48:3,13
52:12
61:16
205:2

226:24
251:24
257:1,9,
14 258:9,
12,21
259:25
260:4
277:8
321:25
354:2
369:16
370:13,
18,22
371:13,18
374:7,11,
21 376:3
379:22

**classrooms**
34:2
44:17
46:23
47:4,8,
19,23
48:8
50:25
51:23
52:18,23
53:5,14,
17,20
193:6
197:21
231:12
242:8
243:9
256:16,19
257:17,21
258:3,5,
16 259:4
266:16
267:3,5
275:7
290:25
313:1
347:1
369:11
370:8



374:5
382:8

**clause**
364:3

**clean**
208:21

**cleanliness**
68:4
208:8
385:8

**clear**
7:18,21
42:25
44:12
50:10
52:17
67:1
91:15
154:5
161:23
162:5
165:13
179:2
235:9
253:1
269:21
286:20
294:10
296:22
325:11,
22,24
340:17
341:1,7
367:7
373:15
397:25

**clear-cut**
228:10

**clearer**
395:22

**Clearinghouse**
90:19

**clearinghouses**
110:7

**Cleveland**
20:9
143:4

**climate**
150:11,14
151:17

**clinicians**
331:16

**close**
74:21
102:3,10
367:20,24
394:12

**closely**
33:21
139:6
161:14
162:23
248:6
356:1
386:3

**closer**
394:23

**closest**
252:14

**co-authors**
378:6

**co-teaching**
137:2

**coalesced**
214:21

**cognitive**
216:8
218:25

**Cole**
111:12
112:13
115:1

120:13
143:23
159:10,16
160:2,11
341:13

**Cole's**
159:13

**collaborative**
37:11,16

**collaboratives**
37:12

**colleague**
251:13

**Colleagues**
98:24
99:1,2

**collect**
96:17
152:5
172:17
260:16,22
295:24
314:22,25
315:17
316:2

**collected**
101:22
130:14
255:1,7

**collecting**
152:23
161:25

**collection**
151:8
152:1

**collective**
302:12

**collectively**
263:8,9

354:21

**College**
20:8

**colleges**
14:20,21
19:23
21:7
22:15

**Columbus**
18:2

**column**
271:14

**columns**
272:1

**combination**
132:6

**combined**
144:5
150:14
338:2

**comfortable**
160:5

**comment**
136:6
178:17
180:6
222:5

**comments**
158:17
180:3

**commitment**
156:21,22

**common**
107:6
252:9

**communicate**
121:6
145:23
163:21,25

**communication**
26:1
60:23
93:3
281:14

**communities**
219:15

**community**
20:8 21:7
163:19
165:24
166:15
168:13
177:9
214:25
216:2
218:14,16
240:14
310:2,5,9

**community-based**
199:12
395:1

**Compact**
15:22

**compare**
161:17
172:21
231:17

**compared**
107:23
171:2
174:12
258:20
300:9
334:12

**comparing**
110:4
173:1
175:4

**compensated**
95:10,14,



15,17

competencies
16:16

competency
358:11,25

compiling
161:25

complaint
42:17

complete
8:16 13:9
18:6
174:15

completely
19:4
42:25
248:22
258:20
259:24

completes
318:8

completing
169:9

complex
91:3
107:15
111:1
172:9
176:5
247:8
281:8
282:16
324:15
361:18,25

complexity
109:19
226:22
305:11
362:7

complicated
281:15

322:8

component
317:17
319:23
354:16

components
58:22
328:10,18
354:14
369:2

comprehensive
100:16
117:13
400:3

compressed
113:17
116:4

computer
138:9

computer-assisted
137:1,14,
20 138:2,
23

computer-based
135:18
136:4,12,
15
138:14,16
385:17

computers
138:7

concept
203:13
252:17
286:23

conceptional
215:25
220:23

conceptionally
287:19
333:10
334:7

conceptions
162:1

conceptualize
288:21

conceptually
257:6
286:13

concern
20:19
137:23
138:25
161:16
224:14,17
233:17
331:5
344:7,12,
18,25
365:20
369:6
381:12,
14,16
382:11

concerned
178:3
338:7

concluded
402:10

conclusion
102:14,15
221:3,4,7
243:14
296:7
305:8
343:22
350:8,12

conclusions

86:14
88:11
102:7,16
116:22
127:15
161:21
178:19
179:1,8
212:9,18
213:23
236:21
237:22
241:24
284:18
293:16
294:12,21
297:5
298:14,25
303:11
345:18
347:16
365:11

concrete
91:8

concretely
380:2

condemning
377:12
378:1

condition
208:1
209:1

conditions
34:11,18
65:6
81:13
206:4
208:5
209:4
223:14
354:3

conduct
35:23
117:6

179:17
184:1
302:8
365:16

conducted
38:1
294:14
295:11
296:18
306:7
387:9

conducting
6:22
387:13

conferences
41:2,3

confidence
295:8
296:9

confident
294:25

confidential
151:22

configurations
370:11

configured
133:11
191:4

confirm
254:24

conform
376:15

confused
132:1

confuses
40:22

confusing
54:4
119:20



191:24
272:8

**confusion**
270:25

**Congress**
254:5,13

**connected**
13:19

**connection**
105:5,7
184:8
309:8

**connections**
112:15

**connotation**
45:15

**connotations**
51:13

**consensus**
22:13
181:4
223:25
225:8
228:8
243:15
244:8
267:16
268:6,16
269:9,20
285:2
304:16
348:23
367:2

**consequences**
34:13
373:19

**consequential**
212:9

**conservative**
289:12

**consideration**
334:16

**considered**
52:8 53:4
57:22
58:3
63:25
100:14,17
101:16
116:13,18
204:25
233:24
241:16
256:10
261:7,11
262:18,23
326:13
335:19
368:24

**consistent**
106:13
152:1
153:18
163:7
194:16
284:19
300:6
306:8
332:20
333:10
361:22
396:23

**consistently**
73:11
280:6
389:23

**constant**
26:1

**constitute**

59:23

**constitutes**
68:6
255:16

**constrained**
394:19

**constraint**
18:5

**constraints**
189:24
226:23

**consult**
22:5
36:18
96:7,15
389:13

**consultation**
15:9
23:20,24
29:5,6,16
36:6 39:4

**consultative**
35:9 37:6
38:10,14

**consulted**
14:2
16:19
23:14
28:8,20
33:10

**consulting**
10:24
11:15
14:13
21:22
23:6,13
34:9
41:21
42:1
144:24

**contact**
26:9

**contacted**
92:1

**contacts**
129:10

**contemporaneous**
150:9

**contemporaneously**
125:20
126:11
148:3

**content**
307:15

**contest**
184:16

**context**
27:16
31:20
36:3 56:3
62:10
97:20
112:24
113:13
115:24
122:19
125:9
126:15
139:14
145:1
157:21
178:5
202:12
207:9
217:10,11
218:21
220:6
221:8
227:4,24
234:9
240:4
267:25

280:1,19
293:23
297:12
334:21
362:14,19
379:3
386:3
394:14,23

**contextual**
228:7
301:17

**continue**
22:4

**continued**
141:1

**continues**
125:12
395:21

**continuing**
11:7
12:23
13:17
29:11
324:5

**continuous**
205:20

**continuously**
323:22,24

**continuum**
44:6
45:10,13
56:23
58:11
74:6
84:14
89:6
97:24
183:16
192:17
194:21,22
202:20
203:14



204:6
232:1
245:17,19
246:4
263:18,23
264:22
273:14
277:16
356:16
357:9,17
367:10
372:8,14,
17

**contracts**
36:17

**control**
164:6
310:19
399:14

**conversatio
n**
6:21 9:25
52:17
87:1
113:22
116:3,5
124:4,13
125:2
133:8
134:21
138:11
139:23
142:2
147:21,22
149:8
152:8
153:17
154:13
155:10
156:17
158:6
226:15
228:23
234:12
341:18

**conversatio
nal**
98:15,21

**conversatio
ns**
9:15
92:20
103:6
105:9
115:7
122:13
146:8
160:23
161:18
263:2
301:15,21
341:23

**conveyed**
106:22

**coordinate**
394:25

**coordinatin
g**
167:5

**copied**
140:3,24
149:9

**copy**
100:13
401:24
402:4

**core**
43:8
212:22
214:22

**corporal**
384:8

**correct**
16:19,23
21:19
28:23,24
30:10
33:4

38:24
42:3,16
59:5
65:23
66:2
67:14,21
68:21
71:1,20
77:4
88:17
90:10
95:11,12
99:3
101:10
103:15,16
106:13
107:1
108:12
111:13
114:23
116:10,
13,14
117:7
120:9,10
125:22
144:22
146:24
147:24,25
150:19
159:10
163:7
164:19
170:2,4,
17,23
174:4,8,9
175:7
176:17,
24,25
177:11,
12,18
179:20
180:19
181:22
182:22,24
183:5,7,
11,14
184:4,7,

18,24
185:9
186:17,25
187:1
188:19
189:16
194:11,12
198:25
204:11
208:2,16
210:1,12
212:3
213:24
214:16
217:22
219:19
220:12
221:5
224:12
225:16
226:11,12
229:2
231:1
237:8
238:20,
21,23
239:15,20
241:23
245:7
246:20
247:21
249:16
250:12
251:19
252:2
255:11
261:4
263:6,9,
13,24
264:11
268:8
270:10,18
271:12
272:16,19
275:11
291:6,11
292:10

299:12
306:10
307:19
308:18,19
317:15
324:21
326:17
328:22
330:7
331:18
332:4,18
334:13
335:10
336:8,25
337:1,22
339:16
343:4
345:12,22
352:3
354:9,19
357:16
358:13,24
359:16
360:2,3,
15
366:11,
12,16,22
373:1
376:25

**correctly**
16:18
21:16
90:10
104:25
105:12
144:12
167:13
194:6
213:17
216:25
225:10
242:10
244:23
247:10
275:3
277:16



292:14
293:13
307:16
333:14

**corresponde
nce**
362:5,21

**corresponds**
30:3

**corroborate**
162:10

**counsel**
5:21 96:8
98:11

**counselor**
133:13,18

**counselors**
131:5,20
133:7,9
390:21

**counter**
190:3
228:3
305:2

**counting**
12:22

**countries**
291:15

**country**
45:18
171:3
258:1
272:18

**counts**
220:15

**county**
28:6
35:17,19,
21 36:5
40:7
156:4

258:25
259:2,12,
14 369:23

**couple**
6:20
11:1,7
14:24
31:1,8
32:25
83:12
97:11
101:13
103:1,14
121:11
127:1
128:7
130:22
149:13
150:21
159:19
195:24
196:1
207:18,20
212:25
232:5
245:14
298:3
337:24

**coupled**
313:17
314:3

**courses**
19:9,15

**court**
6:18 27:1
46:14
79:16,18,
20 84:19
99:10
376:8
402:3

**Court's**
109:8

**cover**

61:4
104:14

**covered**
61:6
116:15
342:3
349:6

**COVID**
254:21

**CPI**
134:25

**create**
16:3
18:24
20:11

**created**
16:13
19:14
29:9
35:18
123:20
236:12
254:3

**credential**
17:22

**credentiale
d**
16:21

**credentiali
ng**
21:18
23:11

**credibility**
303:11

**credit**
32:14

**Creek**
259:19

**crisis**
134:22
135:3,9,

15 370:4,
6 371:4
396:24
400:15

**criteria**
93:14
118:18
185:11

**critic**
275:24

**critical**
275:23
311:14
354:13,
15,24
380:16

**criticized**
269:3

**critics**
270:1
275:19

**critique**
213:20
345:13

**cross-
hatched**
129:24

**Crystal**
401:8

**curiosity**
267:12

**curious**
103:7
152:10

**current**
28:18
112:17
132:12
160:13
304:5
308:15
346:19

**curricula**
218:24
307:13
392:12

**curriculum**
93:8
131:7
132:1,3
133:22
173:7
308:12,
16,17,25
309:2,15,
17,20
340:14

**curriculum-
based**
315:9

**curve**
107:25
109:14
110:3,15

**cusp**
283:17

**cut**
198:5,11
212:25
232:15
319:6

**cuts**
82:11
319:5

**cutting**
221:7

**Cuyahoga**
20:8

D

**dance**
81:20



data
    53:7
    96:17
    107:24
    108:3
    109:17
    110:4,11
    111:4
    117:18
    118:2,4,6
    119:4,8
    128:10
    129:6,9
    130:14
    151:8,18,
    21 152:2,
    5,9,10,23
    157:5
    172:17,
    18,22,24
    174:7,11,
    12 175:2,
    4,16
    184:2,17,
    19 192:12
    230:6
    254:4,7,
    13,14
    255:6,10,
    13 256:8,
    11,14
    260:17,22
    261:19
    262:5
    272:12
    314:22,25
    315:17,18
    316:2
    346:21
    387:15,19
    389:16
    396:22
    399:23
    400:16

data's
    255:1

data-based
    313:17
    314:3,16
    315:25
    317:17

database
    315:7

date
    92:5,12,
    14
    107:11,20

dated
    95:14
    123:15

day
    52:13,21
    53:1
    209:15
    255:22
    256:20
    257:7,11
    259:13
    271:16
    272:4
    318:17

daylight
    204:7

days
    185:17
    245:23
    294:20
    298:20

deaf
    329:2,4

deal
    318:15

dealing
    391:11

Deans
    15:22

dear
    251:12

decades
    50:1

deceleratio
n
    246:25
    247:2

decide
    200:15

decided
    129:16
    130:17
    259:14

decision
    71:5
    78:11
    113:23
    118:12
    145:11
    245:10
    252:17
    265:18
    343:21
    344:1
    353:9
    374:20

decision-
making
    207:10
    313:18
    314:4,17
    315:25
    317:18
    332:7

decisions
    128:23
    238:6
    282:5
    303:8
    366:6
    367:17

declined
    158:23

decreasing

315:5
    399:5

Dedicated
    370:17

deep
    68:4

deeper
    239:22

deescalatin
g
    135:10

default
    353:6,9

defense
    183:9

deficient
    83:15

deficits
    59:13

define
    168:17
    396:4

defined
    73:7
    175:14

definite
    122:18

definition
    51:12,20
    224:24
    261:14

definitions
    236:13
    256:6
    299:21

degree
    166:1
    201:7
    313:2
    314:6

325:8

degrees
    20:12
    89:19
    314:19

deliberatel
y
    358:15

deliver
    62:8,18,
    21 203:14
    274:6
    359:12

delivered
    138:9,10
    307:12
    352:20
    358:5

delivering
    62:20

delivers
    355:13

delivery
    259:8
    313:16
    314:2,5

demonstrate
    318:2
    319:14
    331:24
    355:18
    360:20

denied
    342:9

department
    15:2,3,5,
    9 42:8
    93:21
    94:24
    104:19
    120:8,12
    142:18,23



143:24
163:22
211:5
263:3
297:10

departments
14:13
23:15,16

depend
201:6
226:21
252:6
326:23
333:23
361:2

depending
25:16
60:1
133:16
323:16

depends
12:15
13:1 38:8
216:9
228:2,6
233:21
234:21
258:11
297:17
319:21
326:11
351:21
393:3

Deponent
402:13

deposed
5:12 6:2,
9

deposition
5:1,23
6:22
9:10,23
10:1,5
99:12,18

100:3
123:6
147:10
150:1
180:3
211:4
376:11
402:10,14

depositions
111:11,
17,20
112:8
113:8
115:22
143:14
144:20
169:7,13

depth
38:11
98:16
283:5

describe
27:10
87:14
164:11
342:15

describing
8:13
33:22
66:11
204:1
257:25
280:9
342:10
359:11

description
262:25

descriptor
28:21

design
89:9
323:8
340:14,22

designation
s
31:14

designed
348:9

designing
329:3

detail
111:21
142:25
201:25
213:5

details
139:4
151:24
193:13
344:13

determinati
on
64:14
185:12
186:20
187:20
189:1
195:21
200:17,21
207:15
250:1,19
251:16
252:19
265:22
398:13

determinati
ons
246:5

determine
56:25
57:3 65:2
83:17
102:1
189:11
199:4,14
226:9
375:19

398:25

determined
83:8
102:3
375:11

determines
56:21
200:25
204:14
226:3
262:15
361:10

determining
333:12

devalue
278:16

develop
17:17
34:14
35:24
165:14
199:19
354:25
389:13

developed
367:18
380:18

developing
16:20
387:13

development
10:25
11:2,5,7,
18 12:16,
21,24
13:11,18
23:19
24:16,19
27:13
28:22
29:4,7,
11,17
31:16

32:15
36:15
42:2
353:5

development
al
163:23
205:19
316:18

devil
139:4

diagram
55:20,23

differ
122:17
310:9
311:7

difference
276:7
284:1

differences
86:13
292:4
340:3
371:2

differentia
ted
391:14,18
392:5

differently
341:16,22
342:15

difficult
7:4 84:11
176:5
234:21
250:5
260:21
273:7
359:5

difficultie
s



49:9
136:18
153:20
188:6
226:22
259:18
307:9
315:2

**difficulty**
110:1
202:11
315:4
347:10

**dignifying**
371:7

**dignity**
206:8

**dimensions**
321:18
322:11

**Dimitris**
377:1

**direct**
38:10
212:16
220:9
240:23
295:20,22
312:9,11
377:2

**directed**
95:2
314:14

**directly**
41:21
42:1 96:1
118:24
126:10
135:13
202:24
239:10
254:7
282:1

305:24
385:10

**director**
120:18
144:6,8
150:12

**disabilitie
s**
36:21
37:20
39:18
40:16
41:10
42:11
46:19,20,
21 48:1,
4,6,9,17,
20 49:4
54:6
55:11
56:11
62:4
64:21
65:18
68:21
69:15
71:1
73:10,15
75:25
77:24
79:7 81:7
91:8
118:25
163:6,23
164:16
165:10,19
167:6,17
180:25
182:5
184:23
185:8
186:17
188:9,24
189:13
191:10,20
192:13

193:4,10
194:9,14
195:11
196:4,11
197:11
198:13,20
199:5
205:20
207:4,5,
25 208:14
210:1,10
214:5,9,
13 215:2,
7,18
216:19
217:10
218:4
219:11,17
221:10,19
222:10,20
224:2,8
225:6,15,
22 226:19
230:10,23
232:8,24
234:16
236:1
238:25
240:10
242:9
243:12
244:19
245:2
246:8,12,
16 247:7,
13,15,23
248:1,3,
9,12
249:9,14
263:12
266:11
269:10
270:3,8,
16 278:3,
13,16
279:6,15,
16 281:8

282:18
285:24
290:15
292:1
304:7
306:5
310:7,17
311:9,14,
18 312:7,
20,25
316:17
333:9
335:17,21
337:11,
12,14,21
338:3,4
341:4
343:9,14
346:17,24
347:12,
13,24
349:1,16,
22 350:15
351:1,25
353:7
357:13,23
358:9
359:3
363:12
364:11
366:8
368:19
372:3
373:25
379:21
380:24
382:7
387:5,22
390:10
391:12
392:22
393:8,12
395:2
396:6
398:2
399:2

**disability**
48:23
66:1
81:18
159:2
200:11
262:16
282:8
292:24
338:14
376:13
394:2
398:15

**disability-
related**
187:15
398:10,
11,21

**disagree**
219:22
220:13
221:2,3,
11 225:8,
16,17
230:19
231:5
235:8

**disagreeing**
213:22
217:1

**disagreemen
t**
228:24
231:4
236:6

**discern**
260:10
261:2

**discipline**
54:9
154:21
155:15
156:12



discontinue
    43:12
    44:5

discovered
    156:8

discuss
    98:10,13
    116:9
    125:15
    146:23
    313:11
    345:16
    349:19

discussed
    10:1
    23:14,18
    39:4
    52:11
    56:9
    67:18
    68:19
    70:24
    117:10
    160:9
    168:4
    275:17
    278:11
    331:15
    350:6
    357:6

discussing
    317:9
    322:19

discussion
    85:12
    121:24,25
    122:2,4
    125:20
    146:17
    148:3
    253:18
    350:9
    355:23
    396:2

401:19

discussions
    146:11
    153:14

disease
    376:14

disentangle
    352:22

dismiss
    108:12

disorder
    35:6
    288:24
    289:21
    290:1
    308:11

disorders
    49:2
    106:18,19
    237:18
    257:24
    259:2
    288:10,20
    398:18

disputing
    231:2

disregarding
    226:5

disrupt
    195:15

disruptive
    371:9

disseminate
    353:24

dissertation
    328:3
    329:3

distinction
    52:4

276:17
    277:1,5
    350:11

distinctions
    53:6,18
    72:12

distinguishing
    70:6

district
    11:23
    26:11
    264:11

districts
    11:3
    23:21,25
    26:12,16
    139:9
    362:17

disturbance
    48:25
    254:19
    271:15
    272:15
    290:10

dive
    9:5
    169:19
    213:4
    262:4

diverse
    280:10
    292:24

diversifying
    20:16

diversity
    282:10,15
    286:14

divide
    25:15

Doctor
    43:10
    45:23
    50:11
    58:21
    63:6  70:6
    73:12
    78:14
    90:9  92:9
    100:25
    156:25
    169:5
    189:14
    192:22
    228:23
    249:6

doctoral
    327:19
    328:2

document
    117:22
    123:11,18
    127:2
    147:17
    236:19
    286:11

documented
    230:24
    231:10
    235:14,
    16,20
    367:3

documents
    9:22,24
    102:21,24
    117:14
    162:7

DOE
    103:6,7,
    15  106:25
    115:11

DOJ
    10:7
    42:19,25

43:8
    44:3,9
    45:1
    94:22
    108:21
    241:13

DOJ's
    241:7

door
    397:13

double-
checked
    264:5

downs
    316:18

downside
    376:2

downsides
    374:22
    375:10

dozens
    294:8

drafting
    117:10

dramatically
    400:21

draw
    52:3,4
    202:19
    294:21
    295:7
    347:15

drawing
    293:15
    350:11

drew
    298:13

driven
    59:6  60:5



**driver**
  252:18

**dropout**
  274:15
  347:9

**dropped**
  329:13

**dropping**
  54:8

**Drs**
  212:2

**dual**
  15:23
  16:3,9
  17:20

**due**
  199:15

**duly**
  5:11

**duration**
  322:10

**duties**
  10:22

**duty**
  365:15

———————————

——————— **E** ———————

———————————

**E-TRAN**
  402:5

**e.g**
  242:7

**earlier**
  19:1 77:1
  81:22
  162:22
  169:5
  226:15
  234:12
  249:15

  268:5
  273:15
  324:13
  331:15
  333:12
  347:3
  349:6
  357:15
  359:24
  364:9
  368:17
  369:10
  373:7
  375:14
  380:17,22

**early**
  362:13
  382:4

**earth**
  287:4

**easier**
  7:12
  377:21

**easiest**
  209:15

**easy**
  26:25
  149:22
  189:8
  207:21
  260:16

**eat**
  198:14

**EB**
  84:13

**EBD**
  48:22
  49:6
  57:23
  59:2,16
  60:14
  67:6 69:5
  84:1

  87:4,8,15
  90:7
  97:23
  135:8
  136:11
  245:24
  274:25
  288:10
  291:5,13
  292:17,
  21,23
  293:5
  307:9,14
  308:10
  324:24
  326:11
  327:5
  337:16
  338:8

**EBDS**
  288:11,14

**ed**
  9:12
  12:19
  14:24
  15:23,24
  16:7,14
  17:15,23,
  25 18:8
  19:11
  20:15
  21:10
  24:8,9
  47:3,19
  48:22,25
  63:21
  65:7 68:2
  73:8
  82:18
  89:21
  94:24
  96:12
  105:11
  118:16
  122:23
  136:25

  137:14
  165:11
  179:14
  181:1
  182:11
  189:9
  192:16
  203:5,21
  204:5
  205:1,9
  206:1,19,
  24 207:2,
  12 208:23
  221:11
  222:13
  223:11,17
  224:21
  226:24
  231:18,23
  232:1,2
  233:17,
  18,23
  234:14
  235:3
  239:23
  241:14
  247:19
  249:21
  250:22,25
  251:5,18
  256:1
  257:22
  260:18
  263:3
  264:2
  266:20
  273:6,23
  274:3
  277:18
  280:24
  290:24
  297:11
  303:24
  304:10,14
  306:3
  309:2,20
  312:25

  313:7
  336:19
  340:24
  346:25
  347:8
  348:7
  350:21
  359:7
  370:18
  372:15
  374:11
  379:15
  382:8,20,
  25 390:21
  392:19

**editor**
  376:23

**educate**
  62:3
  398:1

**educated**
  207:6
  248:10
  270:8,17
  272:13,17
  273:1
  346:25

**educating**
  33:15
  276:8,10,
  17,22
  277:1
  328:23
  350:24

**education**
  12:8,9,
  10,18
  13:17
  14:14,18
  15:2,3,5,
  6,17,24
  16:14
  17:2,9,12
  19:2,10,

24 20:1,
4,25
22:18
23:12,15,
17 36:7,
15 43:5
44:17,24
46:7,9,
18,23
47:1,6,7,
8,21
48:3,8,
13,21
49:13,15
50:8
52:12
53:9,14
54:17
55:2,16,
22 56:20
57:2,25
58:9 63:2
64:7
68:20
69:3,4
71:4,10,
24 72:18,
21,23
73:8,16
79:13,24
80:2
81:12
84:3
87:22
104:20
118:17
119:1
120:8,12,
19,22
131:8,25
134:7,11
141:23
142:18,23
143:24
144:8
170:2
176:24

177:14,
17,22,25
178:11
187:10
189:23
190:2,15,
16 191:1
194:15
199:13
202:5,8
204:18
207:6
208:2,15
210:11
219:14,18
220:20
221:15
222:8,18,
24 224:5,
10 225:7,
14 228:5
233:12
237:16
239:9
242:6,15
243:11,
16,20,25
244:9
246:1,6
247:3,4
248:10,21
249:4,12
250:11
254:6,13
255:25
257:12,14
258:10,15
260:1
263:6
266:10,
12,13,16
267:3,5
269:2,11
270:5,9,
17
271:11,17
272:18

273:1,17,
19 274:25
276:9,10,
19,22
277:10
282:14
283:21
287:1
289:15,16
290:5,21
292:6
305:19
310:1
311:4
330:25
335:5
337:9,13,
21
339:15,21
343:10
345:24
346:2,8,
18 347:21
349:17
351:9,17
352:5
356:5,7,
22
357:11,21
358:4,12
359:1,17
364:12
373:18
374:2
375:10
376:13
377:11,25
378:8,18,
20 379:4
381:11,13
382:12,19
383:3,9,
14 384:1,
9,12,22,
25 385:4,
9,12,13,
18 386:1,

6,15
387:5,10,
15,24
388:5,11,
19 389:1
390:11
391:7,10,
16 392:14
393:10,24
394:9,16
395:3,6,
7,19

**education's**
249:8

**educational**
21:17
33:11
38:3
40:15
41:9
49:23
56:4
58:23
59:3
166:9
178:8,15
179:18,19
186:25
187:7
193:14
194:2
200:16
210:10
219:13
228:19
236:2
277:23
279:5
285:22
286:2,7,
24 287:15
326:8
328:21
334:10
344:16

**educational
ly**
79:25
262:17

**educator**
28:5
39:17
41:20

**educators**
88:15,21
90:11
202:18
214:21
317:12
323:23
331:15

**effect**
313:18
314:4
322:17,24
375:5

**effective**
87:18
167:22
206:6
215:1,6
216:15,18
217:8,15,
19 223:5
225:4,21
231:25
243:11
252:18
292:16,20
303:23
306:4
307:8
318:20
325:5
327:4
331:7
346:1,4
347:19
351:2,9
352:6



354:25
357:11,22
365:4,18
372:2
384:21
387:22

**effectively**
43:4
75:17
89:1
187:17
219:14
221:10
226:17
227:9
268:7
270:4
273:20,21
274:11
346:16
352:20
383:1
385:23
395:15

**effectiveness**
217:12
223:2
353:2

**effects**
323:2
375:7
383:2

**efficacy**
330:18

**efficiency**
322:5

**effort**
212:11
301:4
302:4

**efforts**
357:10
358:7

**eggs**
8:15,17

**electives**
196:12
197:12
392:13

**elementary**
369:24
392:25
393:7

**elements**
355:19

**eligibility**
188:2
251:5

**eliminate**
366:10

**eliminating**
384:19

**elimination**
269:1

**email**
26:10
92:14

**embarrassed**
139:12

**emergency**
69:2
352:12

**emerging**
107:16
156:7
280:22

**emotional**
48:25
49:2,8
56:10
62:3
106:17
131:23
194:9

213:15
237:18
254:19
257:24
259:1
270:16
271:15
272:14
287:25
288:9,20
289:21,25
290:10
398:18

**emotionally**
197:25

**emotions**
281:23
288:22
289:7,23

**emphasis**
286:5

**emphasize**
138:3
169:12
278:4

**emphasized**
301:7

**employed**
28:5
347:11

**employees**
120:7

**employment**
310:22

**employs**
142:18,23

**enable**
310:4
354:25
370:21

**enabling**
310:1

**enact**
88:15,22

**encourage**
166:20

**encourages**
166:17

**encouraging**
151:18

**end**
69:4
103:4
139:21
158:5
190:7
285:21
312:5
316:16
367:25
392:2

**end-all**
279:4

**endeavor**
377:13
378:1

**ended**
128:15

**endorse**
207:24
208:12,19
209:18,24
210:4,8,
13

**endorsed**
167:4,22

**endorsement**
167:11

**energetic**
381:2

**engage**
371:5

**enhance**

277:22

**enjoyed**
210:11

**enrollment**
119:18,22
158:22

**ensue**
336:22

**ensure**
274:24

**ensuring**
391:2

**entail**
11:19
287:11
314:18

**enthusiasm**
229:23

**entire**
298:24
302:3
378:22

**entirety**
52:20,25

**entity**
13:22
33:15
37:8

**entrance**
140:13

**environment**
33:11,17
36:7 38:3
57:10
59:4
60:10,11
62:19
170:2
180:18
181:22
191:21



199:6
204:11
227:10,12
242:14,
17,21
249:8

environment
s
43:5 45:7
190:9,21
222:14
231:9
241:14
270:5,9
273:2
276:11,23
308:15
332:4
334:10
346:18
364:21,23

epidemiolog
ical
288:12
289:6,18

equal
178:8
191:9,19,
23 365:20

equally
180:17
181:21
332:16

errata
100:3,13
101:2,10
117:11
120:6

error
301:5

errors
255:14

essential

244:18
245:1
333:9

essentially
94:2
164:8
218:25
256:1
320:25
362:12
383:16

established
228:20
231:13

estimate
95:22
289:13

estimates
288:10
289:5,10

et al
247:25
312:14,16
337:25

ethic
189:4

ethical
193:22
351:6
365:15

ethicality
269:4

ethically
268:7
349:17,23
350:5,16,
24
351:14,24
398:6

evaluate
36:2,19
116:22

173:17
236:16
263:4
304:11
306:14
327:7
328:10
331:6
333:17
388:24
389:2

evaluated
102:14
328:5

evaluating
34:17
37:9
140:10
141:21
323:24
389:24

evaluation
36:23
38:11,14
102:2,6,
22 114:23
115:17,21
117:7
241:23
296:15
302:8,10
303:7
306:7
329:3
386:21

events
13:5

eventually
157:13

everybody's
83:1

evidence
83:25
87:4,8,14

89:5,12
90:12,16,
25 91:1,
16 172:10
216:12,20
219:5
221:12,21
223:2
269:15
270:2,6
272:23,25
274:10
290:10,18
307:7
338:18
340:21
347:2
364:13,18
365:2
367:15

evident
90:20

evolving
395:21

exact
18:13
22:21
37:14
80:6
81:13
92:14
93:1
104:21
107:17,22
110:22
133:1
146:7
369:2

examination
5:9,14

examine
241:7

example's
204:23

examples
59:22
165:6
241:12
258:22
264:19
278:18
279:22,24
280:14,
16,19
299:21
305:2
306:1
331:13
351:12
369:22
379:6
381:20
382:2,10

exception
9:1

exceptional
ities
19:12
239:2

exceptions
284:2
293:18

exclude
393:25

excluded
73:3
261:14

exclusion
73:4
245:19
393:21,23

excuse
212:1
319:6

exemplify
180:9



exercise
  309:12

exhibit
  49:8
  100:1,3,
  10 123:6
  147:10
  149:15
  150:1,7
  211:4,14
  337:14,16
  376:11,21

exhibited
  279:14

exhibiting
  34:15
  321:3

exist
  203:11

existed
  395:11

existence
  357:8

exit
  140:13
  255:6

expand
  249:8
  257:1

expect
  60:13
  61:13,21
  62:4,13
  63:8,12
  64:20,25
  65:24
  66:9,24
  67:11,16,
  19 68:1,
  14 71:13
  75:22
  171:23
  172:11

208:7
252:1
257:13
299:25
300:2
315:20
317:12
338:11,13
362:4,20

expectation
s
  9:13
  109:24

expected
  93:23
  299:13,15
  399:18

experience
  23:7
  24:12,25
  25:4,24
  26:2
  27:16,23
  28:3
  39:9,12,
  15 40:4,
  6,8,10
  41:18,21
  42:1
  59:15
  66:12
  81:24
  112:16
  128:17
  129:5
  131:23
  135:1,6
  144:11,14
  160:12
  178:9,15
  200:5
  213:15
  233:14
  277:24
  278:5,7,

20 279:5
302:10
330:17,20
374:15
396:21
399:7
400:18

experiences
  24:23
  26:8
  178:22
  197:18

expert
  10:7,8,
  14,16
  42:20
  43:20
  57:20
  87:11
  92:2,24
  94:5,13,
  21 100:4
  102:8
  107:12
  108:19
  112:2
  116:20
  120:1
  132:17
  134:20
  136:2
  139:1
  159:1
  161:7
  163:3
  169:24
  170:14
  171:10
  176:14,21
  177:13
  179:23
  180:15
  181:15,19
  183:13
  186:13,
  14,23

191:15
200:7
211:5,7,
18 218:21
232:22
239:12,24
241:15
268:10
283:8
342:24
343:3
344:6
350:19
365:12
366:21,24
393:13

expertise
  19:17
  39:8
  40:13
  41:7,12
  108:24
  165:22
  168:15,19
  237:24
  375:23
  390:24
  391:3

experts
  42:24
  45:1
  93:3,5,
  16,21
  102:4,11
  127:15
  170:6
  176:2
  177:2
  178:21
  179:25
  212:10,18
  241:7,20
  242:1
  265:9
  267:15
  281:19

292:8
298:6,10
299:10
304:15
330:13
345:14
367:1

experts'
  127:23
  299:9

explain
  109:15
  251:2
  322:25

explanation
  196:25
  197:7
  198:5
  358:20

explicit
  321:16
  397:3

explicitly
  394:5

exposed
  310:6
  340:13
  379:4

express
  287:4

expressing
  158:8
  343:17

extensive
  163:12
  361:18

extent
  61:19
  69:10
  74:14
  109:1
  174:2,25



194:16,
18,20
195:3,7
223:11
240:10
265:10
304:7
309:13
320:17
358:7
375:22

**external**
394:25

**extracurric
ular**
198:22
200:19
393:22,23
394:1,6

**extracurric
ulars**
276:20

**extremely**
315:1

————————
            **F**
————————

**face**
209:23
235:2

**facilitates**
62:25

**facilities**
207:25
208:13,
15,21,24,
25 209:1
370:11,16
371:19
385:3

**facility**
209:6
372:19,21

**fact**
84:8
178:20
189:25
241:12
247:19
273:18
293:17
347:7
348:10

**factor**
351:18
362:9

**factors**
191:9,19,
23 252:8
383:21

**faculty**
13:25
17:7,14,
15,25
18:1
20:6,7
25:15
29:10
30:19
93:9
104:8,21
302:21
303:3
328:14

**fail**
383:5,16

**failing**
274:15

**failure**
353:23
354:6
386:4,13,
17 387:3,
8,14,20
388:3,24
394:24

**fair**
37:25
39:7
40:12
41:6
125:4
217:5
348:13,20
360:5
366:9

**Fairfax**
28:6
35:17
36:5 40:7
156:4
258:24
259:11,14
369:23

**faith**
296:15
297:21

**fall**
229:18
257:10

**fallen**
124:11

**falls**
29:23

**familiar**
35:20
46:4
53:10
83:1
134:24,25
143:5
163:18,20
164:3,5,6
168:7
218:8
238:24
256:8
372:22

**family**
60:23

167:15
214:24
216:2
218:16

**fan**
73:2

**FAPE**
49:11
224:24
266:9
267:10
310:1

**fast**
63:4
70:11
89:22
120:4
230:12
317:3

**fault**
197:4

**favor**
222:8,17
249:15,17
357:17,24
367:8

**FBA**
49:16
64:15
88:4
153:10,25
156:2
157:12
388:11

**FBA-BASED**
354:2

**FBA/BIPS**
153:3

**FBAS**
155:24
265:3
355:1
387:3,8,

13,14

**feasibility**
151:13
152:3
269:4

**feasible**
152:5

**features**
57:21
75:22

**federal**
5:10 49:1
254:7
255:13
262:5

**feedback**
21:12
26:5
129:10
318:2,20

**feel**
8:3 22:7
115:2
130:18
153:25
156:16
173:21
179:15
209:3
252:9
326:21
343:4
375:1

**feeling**
158:13

**feelings**
158:12
341:14

**felt**
158:8,15
298:18
341:16,22
342:15



374:6,10

**fence**
  110:1

**fewer**
  110:12
  273:23

**fidelity**
  64:3,11
  65:20
  77:3
  110:20
  165:18
  166:10
  172:18,25
  173:10
  174:16
  175:19
  329:8
  354:24
  355:3,4
  356:2
  359:13
  388:4,25
  389:9
  390:2

**field**
  24:11,24
  25:3,24
  26:2,6,8
  27:16,23
  39:13
  41:24
  49:5 69:2
  93:16
  96:21
  99:1,2
  139:1
  163:8
  175:14
  181:4
  191:16
  228:9
  265:16
  267:17
  268:1,6,

13 269:20
  280:3
  285:3
  292:8
  293:3
  299:17
  300:7
  304:16
  306:8
  308:20
  312:16
  325:9
  330:18,20
  347:25
  348:23
  355:14
  365:1
  381:12
  384:18
  390:25
  395:11
  397:23

**field's**
  229:22

**figure**
  78:7
  134:6
  145:24
  207:14
  222:11
  223:4
  226:10
  231:24
  249:23
  260:21
  277:4
  293:8
  353:1

**figuring**
  223:13
  355:12
  365:5
  395:13

**file**
  101:19

**filed**
  42:18

**files**
  102:25
  103:12
  266:1

**fill**
  122:11
  124:1
  174:21
  365:22

**final**
  158:18

**finally**
  8:10 50:7

**find**
  37:13,23
  92:13
  112:8
  113:4
  114:2
  159:25
  197:25
  270:20
  305:10
  377:16

**finding**
  305:24

**findings**
  42:16
  94:14
  102:6
  117:1
  161:19
  162:16
  236:9
  295:1,9
  296:6,10
  300:4

**fine**
  9:16
  22:22
  26:24

36:10
  37:24
  78:13
  86:10
  92:11
  126:1
  147:15
  198:8
  199:24
  220:11
  281:14
  287:6
  392:4
  402:6

**fine-
grained**
  172:15

**fit**
  33:22
  55:7
  257:5
  277:13
  320:6

**fix**
  209:6

**flawed**
  231:20
  334:7

**flaws**
  348:9

**flesh**
  14:15

**flip**
  153:1

**Florida**
  16:2

**flu**
  289:19

**focus**
  20:15
  28:15
  31:18

75:13
  93:10
  94:7 95:3
  127:16
  134:19
  135:7
  165:22
  168:10
  172:13
  190:10
  214:11
  220:8
  223:6,7
  231:15
  234:10
  237:11
  273:25
  274:19
  302:1,25
  304:3
  310:23
  311:3
  345:2
  350:22
  358:4
  375:15
  382:19
  384:18
  400:14,21

**focused**
  72:14
  94:12
  104:6
  106:9
  109:5
  111:5
  119:4
  218:18
  230:9
  247:25
  252:16
  304:5,9,
  25

**focuses**
  31:23



**focusing**
129:25
379:16

**folder**
101:21

**folks**
20:24
22:5 34:1
44:9
63:22
97:11
103:7
144:10
162:18
253:11
280:25
285:3
309:6
342:25

**follow**
34:13
83:13
90:11
91:16
149:11
279:7
358:9
369:12

**font**
127:1
139:20
140:25
141:3

**footnote**
160:21
291:20
341:12

**force**
251:14

**forced**
155:25

**forcing**
376:15

**forget**
197:17
329:12

**forgotten**
101:13
361:14

**form**
5:23
33:18
36:9
38:6,17
40:17
41:11
43:13
44:19
45:8 54:1
57:14
60:19
62:7
63:11
64:4,12,
22 65:21
66:3
67:15,22
68:22
69:16
71:2
72:4,7,11
73:20
75:9 76:7
77:13,25
79:8
81:8,19
83:19
86:8,16
88:18,24
89:3
90:14
94:10
96:10
100:19
138:1
139:2
145:20
157:7
161:1

166:23
167:7,18,
25 170:24
178:2
196:8,16
197:14
199:8,17
200:4
201:5
202:10
203:25
208:3,17
210:3
213:25
221:6
232:10
233:2
234:19
249:10
252:3
261:8
265:4
276:13,24
284:16
292:11
295:15
296:21
307:20
315:24
326:19
332:5
334:25
335:24
344:23
348:17
359:4
361:23
364:24
384:14
385:5,19
386:16
387:25

**formal**
23:23
67:2
238:22

**formally**
66:22

**format**
138:8
355:13

**forming**
43:10
44:14
45:4
100:18
101:4
116:13
171:8
294:8

**forms**
328:8,9
366:25
393:15

**Forness**
291:8

**found**
32:20
297:11
301:1
304:17
305:8,13

**four-year**
14:20
21:10

**fourth**
149:5

**fraction**
110:23

**frame**
18:10
113:17
116:4

**framework**
28:16
29:24
164:4,12
166:18

173:7
215:25

**frameworks**
176:5
228:20
229:4

**free**
8:4 49:13
57:1
71:24
246:6
311:3

**Frequency**
321:21

**frequent**
322:10
371:4

**friends**
278:23
289:2

**front**
319:5,7

**fulfill**
72:3
73:17
77:2

**full**
6:6 8:11,
16 44:6
53:14
76:15
244:21
245:5
262:10
266:8,16
267:7,13
268:4,19,
25 269:4,
14 270:1
275:19,23
279:12,19
280:17,19
283:9,12,



17 284:7,
9,19
285:2
288:6
334:4
349:11
357:4

**fully**
188:21

**fun**
316:2

**function**
88:4
203:2

**functional**
34:6,10
35:23
38:21
49:17
66:7 67:4
79:13
103:3
104:7
140:18
142:5
154:15
155:1
156:5
214:23
215:20
218:6
223:3
265:13
288:24
304:2,9,
13 305:16
308:11,
16,24
309:4,18
323:4
346:7
356:7,10
387:11,17

**functional-
based**
88:5

**functioning**
289:24

**funded**
266:24

**funding**
373:1

**funny**
243:17
392:18

**fuss**
274:4

**future**
308:15
311:6

**fuzzy**
273:7

———————

**G**

———————

**GA**
297:10

**gaps**
346:19
365:21
367:20

**Gary**
36:15,23

**gathered**
186:19

**gave**
35:13
165:5
299:20
382:1

**geared**
30:24,25

**gears**

55:25
91:20

**general**
9:13
12:10,19
15:23
16:7,14
18:14
24:9 43:5
44:16,23
46:6,9,
18,23
47:1,3,6,
7,8,19,21
48:3,8,13
52:12
53:8,14
54:17
55:22
58:9
60:12
61:11
63:2,21
65:7 68:2
69:3
71:10
72:21,22
73:8,16
78:21,22
82:18
84:3
87:22
104:14
105:11
106:1
119:1
122:23
141:23
161:3
165:11
170:2
176:24
177:16,25
179:14
180:22
181:1

182:11
188:4
189:9,23
190:2,12
191:1
192:16
194:15
199:13
202:5,8
203:5,21
204:5,17
205:1,9
206:1,19,
24 207:2,
6,12
208:2,15,
23 210:11
219:14,18
221:11,15
222:8,13,
18,24
223:11,17
224:5,10,
21 225:7,
14 226:24
227:14
231:18,23
232:1
233:12
234:14
235:3
241:14
242:5,15
243:11
246:1
247:3,4,
19
248:10,20
249:4,8,
12,21,24
250:11,
13,22,25
251:18
255:25
256:1
257:12,
14,22

258:10,15
259:25
260:18
263:6
264:2
266:10,
13,16,20
267:2,5
269:11
270:4,9,
17 271:10
272:13,18
273:1,6,
17,19
274:3,8
276:9,10,
18,22
277:10,18
283:20
290:21,24
295:18
303:24
304:10,14
305:19
306:3
309:2,15,
20 312:25
313:7
314:11
320:3,4
327:9
336:19
337:9,12,
21 338:5
339:15,20
340:14,24
343:10
345:24
346:2,8,
18,25
347:8,21
348:7
349:16
350:21
351:16,20
356:5
357:10,21



358:11
359:1,17
362:8
364:12
365:3
370:18
372:15
374:2,11
375:10
382:7,20
391:11

generalizat
ion
292:18
323:13

generalize
292:8
294:5

generally
6:13
25:11
58:19
62:10
68:7
73:24
84:10
88:14
94:9
122:21
139:5
154:19
156:2
164:5
183:7,10
187:6
194:13
214:8,14
225:4
236:7
250:23
270:8
279:20
292:16
293:16
295:19

310:21
330:8
345:11
346:3
352:24
361:22
362:21
368:17

generated
36:25

geographica
lly
362:12

George
104:24
164:1

Georgia
6:4 14:3,
6,10,11
42:9,19
43:2
47:17
49:22
73:25
85:23
86:3
94:23
96:8
97:21
99:6,15,
20 103:7,
14 104:9,
23 106:1,
25 108:3
109:11,
13,18
115:11
117:3
119:6,10
120:7,11
126:16
127:19
134:10
142:17,22
143:24

151:11,16
165:17
166:16,22
167:4,15,
22 168:1
173:1
174:3
175:5
176:24
177:11,17
178:1
179:19
182:19
184:3
256:17
261:7,22
262:4
263:3,13,
24 264:16
291:6,11,
13 297:10
308:20
326:16
344:9,20
355:23
396:14

Georgia's
107:25
108:11
166:8
170:23
171:11,23
174:2
175:1,6
263:5

GILLESPIE
5:15,21,
25 27:5
84:22,25
86:1
99:25
100:20
123:3
141:4,15
147:8
149:1,4,

23 210:15
211:1,12
253:23
254:1
285:5,15
329:12,16
330:1
335:25
336:3
368:4,7,
15 376:6,
9 401:8,
13,23

Gilmour
337:25

give
6:6 16:15
22:20
84:22
89:8
173:22
175:12
195:20
205:17
206:21
266:21
267:25
269:12
280:15
282:13
297:12
302:11
303:2
321:13
371:3
373:21,24
375:17
399:8

giving
169:22
171:19
173:20,21
174:1
181:11
205:23

209:8
290:23
298:12
306:1
321:1
362:10
366:21
371:10

glad
124:16

GNETS
42:11
43:12,21
44:5,10,
13,16
45:5,17
49:20
50:2
51:18,24
52:5 55:9
94:18
97:14
101:20
103:16
105:5,6,
7,11,17
106:3,11
112:6,15,
16 114:17
116:9
119:4,16,
17,22
122:24
128:8,10,
18 130:1
131:17,
19,24
132:6,11,
18,21,25
133:6
134:5,18,
23 137:9
138:21
142:18,23
144:12
147:10



157:12
158:2,7,
10,13,19,
22 159:6
161:8,21
162:2
164:1
169:25
170:17
176:16
177:15,
21,23
179:13
180:17
181:20
182:20
183:14,15
184:21
185:6,25
186:1,15
203:4
213:12,
20,23
214:1,4,
7,12,15
228:14
235:24
236:24
256:10,
14,18,22,
23,25
261:6,10,
13,18
262:13,18
263:1,15
264:20
265:2
294:14
295:4
302:6
306:10
307:19
326:4,16
341:14,17
343:1,4
344:10,22
361:17

362:2
373:1

goal
135:9
297:1,15
309:25
314:8,13,
15 315:14
323:1,12
356:2
382:14
396:23
397:3

goals
333:24

good
5:16,17
7:13 8:1
21:12
26:3
84:10
86:25
90:2
129:9
141:5
170:13
174:18
176:6
210:15
213:3
221:12
227:17
229:14
234:5
242:22
251:8
252:9
255:20
257:4
276:5
290:18
296:15
297:21
305:24
337:25

358:22
371:10
380:8
382:20
389:2
394:20

goodness
137:5

gosh
312:2

grade
11:24
12:6
17:13
136:10
307:14
338:2,14

grades
392:25
393:7

graduate
31:10,14
98:3,6
302:17
310:11,
15,18
347:10

graduating
310:3,6

graduation
255:6

grain
330:21

grant
19:22

grants
166:12,
13,14

graph
315:11

graphic

393:3

great
9:8 24:20
27:6 50:9
51:8 52:3
90:8
92:17
98:16
111:21
174:23
194:21
195:19
222:22
231:14
260:20
274:4,17
277:24
278:23
316:24
331:11
355:6
380:1

greatest
21:3
194:16,
18,19
195:3,7

greatly
384:18

Green
20:7

ground
6:23

group
85:23
149:6
182:2
190:1
214:25
216:5
218:19
275:21
321:11

grouping
149:6

groups
189:25
190:1,8
307:12

grow
395:22

guarantees
19:9

guardrails
396:10
397:21

guess
28:21
54:19
55:23
62:1
69:17
73:12
87:6
88:14
149:5
171:9
202:3
207:1
256:17
286:18
329:6
336:23
367:6
371:14

guessing
140:4
155:5
169:14

guidance
353:25
354:15

guide
90:24

guided
102:7



guidelines
    398:7

guides
    369:4

gym
    370:1,15

gyms
    46:25

―――――――――――

        H

habitable
    67:21
    68:14

half
    9:21
    22:20
    124:23
    146:9

halfway
    279:11

hallmarks
    325:5
    327:4
    372:1

hand
    211:13

handed
    100:9

hands-on
    24:5

haphazardly
    194:1

happen
    7:9  44:13
    63:1 69:8
    93:24
    107:14
    195:16
    234:4
    279:2

316:9

happened
    9:15
    104:10
    149:7
    344:14
    345:7

happening
    97:5
    112:5,6
    139:3
    161:8,9
    177:20
    179:13,14
    233:22
    236:20
    295:4,5
    297:19
    298:2
    369:7,8
    381:1

happy
    26:16
    345:5

hard
    18:5
    136:25
    175:11
    205:13
    253:12
    304:25
    323:14
    329:2,4
    352:22
    385:6
    389:20

harder
    206:15

harm
    236:3,25
    374:12
    401:4

harmful
    43:23

278:15
    373:14,18
    398:22

hat
    179:9
    294:17

hawing
    395:16

head
    133:1
    143:1
    212:21
    350:1
    371:12

health
    38:15,23
    64:19
    77:20
    78:2
    79:3,22
    81:4
    163:22
    165:24
    166:15
    170:15
    176:15
    177:9
    184:3
    289:16
    347:9
    395:1,12

hear
    26:3
    92:19
    118:2
    129:3
    197:7
    207:11
    220:6
    253:13
    371:18

hearing
    16:18
    21:16

329:2,5

Heather
    163:25

heaviest
    239:8

heavily
    112:7

heavy
    105:1
    165:22

held
    85:12
    253:18
    401:19

helped
    114:2
    131:20
    178:24
    229:15
    375:20

helpful
    61:20
    102:20
    106:24
    166:6
    218:2,10
    219:8
    223:18
    230:20
    233:24
    376:4

helpfully
    238:17

helping
    50:9
    293:4

helps
    218:3
    226:14
    375:25

hemming
    395:16

hereinafter
    5:12

hey
    90:2 97:4
    113:20
    152:14
    159:5
    176:3
    178:7
    231:17
    236:15
    250:23
    292:19
    301:7
    315:1
    365:9
    375:9
    397:25

high
    35:22
    136:18
    137:10
    165:18
    166:9
    347:8,9
    356:2
    393:2

high-need
    77:23
    79:6 81:6

high-
profile
    379:12

high-
quality
    354:1

Higher
    15:3

highest
    300:1
    347:14

highlight
    217:18



230:14
270:2
330:8

**highly**
59:9
60:15
61:7
66:17
78:10
137:16
269:13
318:3
331:1

**highway**
246:3

**hired**
96:5

**historical**
193:3
239:5

**hold**
92:11
103:22
162:20
181:3
289:2
316:3

**Holifield**
111:13
112:14
114:12
115:2
120:13
128:15
138:12
143:23
144:7
145:23
146:5
147:21
159:9
341:13

**holistically**
374:25

**home**
224:4,9

**homebound**
45:12
74:20

**honest**
43:1
44:11
221:13
279:23

**honestly**
242:23

**hook**
352:9

**hope**
49:23
58:20
61:11
83:1,3
165:13
193:20
229:21
314:21
375:25
384:3
395:21

**hopeful**
165:12

**hoping**
58:21
91:2
319:13

**Horner**
110:6,19

**horse**
222:11

**horses**
50:24

**hospital**
45:11
74:11,19
372:20

**host**
41:3

**hour**
8:23  9:21
95:15
124:23
146:9
285:6
329:14

**hours**
25:1
27:24
95:23
146:9

**how's**
110:7

**hypothesis**
34:14

**hypothetical**
138:15,22
332:19
344:12,24
345:6

─────────────

**I**

─────────────

**i.e.**
334:10

**idea**
29:17
47:18
48:18
50:21
53:7
77:18
97:9
106:5
108:24

127:20
168:24
185:13
187:22
188:2
193:25
238:1,6
239:7,19,
22,25
240:3
242:22
245:15
254:5,6,
10,13
255:8
256:8
262:14
264:1,9
265:14
266:2
269:8
289:6
292:5
309:1
314:20
316:1
333:7,13
357:8
375:18
389:2
394:5

**IDEA's**
244:17

**ideally**
63:16
68:24

**ideas**
314:11

**identical**
264:20

**identification**
100:5
123:8

147:12
150:3
211:9
290:9
376:16

**identified**
60:15
92:24
93:13
112:12
113:7,8,
10  114:1
115:20
145:6
212:1,6
215:12
235:18
248:18
255:5
275:1
290:22,25
320:7
328:7
386:5,9
395:18

**identifies**
201:12

**identify**
144:20
157:8
173:12
180:7
200:14
215:5
225:3
233:9
287:20,
22,23
300:16
365:4

**identifying**
100:14
237:11
289:19
300:13



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA              Index: IEP..implementing

**IEP**
  45:21
  49:14
  56:15,25
  57:5 58:1
  59:7 60:5
  61:24
  64:17
  65:9
  66:23
  71:8,15,
  17,19,23
  73:17
  74:4,14,
  17 75:2,
  12,14,20
  76:23
  77:15
  83:9
  178:5
  188:25
  192:14
  199:13,
  18,19
  200:1,9,
  13,20,25
  201:11
  202:6
  203:9,19
  204:14,19
  226:2,9
  227:7,22,
  25 246:14
  249:2
  250:4,8,
  15
  251:16,21
  256:13
  262:14,15
  265:18,22
  286:11,13
  287:12
  288:2
  320:6
  327:11,
  13,17,23
  328:10,16

  329:8
  332:8
  333:19,24
  343:14,
  15,20,25
  344:1
  361:9,11
  375:11,19
  386:6,9,
  12,14
  387:1
  388:10
  395:18

**IEPS**
  16:17
  35:5
  54:13
  63:16
  64:3 69:7
  70:2 72:3
  77:3
  192:9
  203:22
  231:25
  261:21,25
  262:3
  286:5,25
  327:25
  328:4,17,
  19,21
  329:4

**II**
  183:4
  240:25
  285:19

**III**
  242:3
  330:5
  331:22

**imagine**
  203:4
  374:18
  393:14

**immediately**

  126:12
  379:6

**impact**
  206:10
  207:4
  313:18
  314:4
  332:13

**impair**
  289:1,8,
  23

**impairment**
  201:19
  288:25

**impairments**
  361:21

**impedes**
  357:10

**imperfect**
  88:17
  89:5,16
  90:13
  121:5
  217:4
  331:18

**imperfectio
n**
  89:11

**implement**
  12:3
  56:15
  64:2,11,
  15 65:19
  69:7
  71:7,11,
  15,17,18
  74:4,14,
  17 75:2,
  19 76:19,
  23 77:15
  84:12
  90:6
  111:7

  203:9,18,
  22 204:3
  205:13
  206:1
  215:16
  223:15
  225:6,20
  249:11
  252:18
  304:13
  323:8
  326:9
  346:1
  351:3
  355:3
  361:11
  365:5,17
  388:3
  395:22

**implementat
ion**
  28:9
  29:3,4
  58:10
  67:3
  89:20
  107:5,9,
  11,14
  109:14,21
  110:8,20
  131:15
  152:9,11,
  16 153:15
  155:9
  165:14
  166:5,14
  170:23
  171:1,11
  173:15,
  16,17
  174:2,12
  175:1,6,
  9,12,13,
  22 176:1
  206:5
  216:21

  217:13
  223:1
  229:18
  230:6
  248:19
  329:9
  353:22
  354:1,8,
  14,18,22
  356:3,14
  364:13,19
  365:3
  388:25
  389:3
  391:2,4

**implementat
ions**
  250:10

**implemented**
  58:2
  65:10
  66:24
  75:16
  109:18
  131:8
  133:23
  166:3
  174:4
  204:5,9,
  10 205:7
  229:16
  303:24
  319:19
  332:9
  333:20
  346:8
  348:12
  378:19
  389:7,23

**implementin
g**
  57:4 58:6
  64:7
  75:13
  107:21



108:1
153:20
171:20
172:8,9,
14,20,24
173:6
176:11
190:4
228:21
229:12,24
230:13
347:22
386:11
388:1,7,
14
389:14,17
390:6

implements
76:13

implication
209:19

imply
80:5

import
239:6

important
63:20
72:17
75:12
87:16
89:18
97:18
110:18
187:21
190:14
193:14
194:19
197:22
201:25
237:21
238:4
249:19
273:12
274:21

279:4
281:10
283:5
287:18
290:20
312:23
319:22
324:14
340:17
341:6
351:17
368:18
383:8,13
389:5
396:10

impression
161:20

impressions
128:24

improve
37:3
303:6

improvement
315:21
400:10

improvement
s
317:14

improving
359:17

in-service
355:21

inappropria
te
56:3
68:19
69:14,20,
24 70:25
76:5
77:4,12,
22 79:5
81:5,14,
17 83:18

334:17,22
398:23
400:12

inappropria
tely
346:25

inartful
188:13

incidents
259:17

include
54:22
62:16
88:4,7
118:5,20
126:9
153:16
163:5
164:14
199:21
212:10
241:6
247:5,24
248:2
249:9
254:15
274:4,13
275:20
278:19
282:11
288:22
301:20
312:7
316:8
336:19
346:16

included
73:5
148:18
161:13
223:17
238:9
260:12
327:1

382:7

includes
45:10
87:19
100:24
303:7
307:14

including
190:2
192:12
214:22
218:25
219:12
224:2
230:5
315:6
343:20
347:23

inclusion
53:15,16
72:17
73:3 84:5
189:6
192:18
237:17
242:5
248:17
260:15
266:8,17
267:8,13
268:4,20,
25 269:5,
14 270:1
275:20,
24,25
279:12,20
280:18
283:9,12,
18 284:8,
10,20
285:2
290:21
300:24
330:15,16
331:25

332:3
358:8,13,
15 359:2,
7,9,18
372:17
374:20
375:8
382:6

inclusive
48:2
188:23
192:4,9,
23 227:7
234:14
332:16,17
335:15,17
336:7,24
364:21
366:16
372:20
390:22

income
362:16

incomplete
217:4,12
363:16

inconclusiv
e
231:19

inconsisten
t
346:18

inconsisten
tly
389:20

increase
247:17
248:17
310:15

increased
359:7

increasing
315:12



391:23

incredible
  278:22

independenc
e
  308:14
  309:22
  311:16
  383:10

independent
  71:10
  96:5
  338:6
  346:5
  350:25
  354:11

independentl
y
  255:10

indicating
  236:13

indicator
  383:25
  384:8,12,
  24 385:3,
  11,18

indicators
  274:12
  399:4

indirect
  347:2

individual
  60:6
  62:11
  74:2,15,
  16 76:9,
  23 78:3
  80:16,19
  82:5,7
  83:7,17
  131:6
  146:13
  170:3,11,

18 176:18
178:21,22
179:17
180:8
181:23
185:25
186:1
187:9,10
191:25
195:22
206:23
214:25
216:5
218:18
220:21,22
223:6
226:8
238:7
241:8,13
245:20
250:2
263:7
265:6
266:1
274:2
275:2
287:20
288:3
291:24
292:4
295:11
296:17
308:14
309:14,17
322:2
333:8
335:2,3
336:16
348:11
351:22
353:10
359:14
383:12
386:19
400:22

individuali
ze
  386:13,
  17,18

individuali
zed
  49:15
  53:22
  56:20
  57:25
  59:25
  64:7 65:1
  66:20,21
  71:4
  73:6,7
  78:10
  81:16,21
  82:1
  84:12
  88:2
  178:5,11
  189:19
  190:4
  195:21
  199:10
  205:5
  206:18
  225:25
  282:5
  285:22
  286:1,5,
  16,19,23
  287:8
  293:18
  322:1
  332:6
  333:11
  335:5
  365:23
  366:6
  378:18
  381:24
  394:3

individuall
y
  13:23

214:2
227:23
233:10
245:11
249:1

individuals
  48:20
  112:11
  114:22
  115:19
  116:9
  143:16
  144:21
  145:8
  146:2
  367:22

inefficient
  118:11

inevitably
  238:5

Inez
  97:11

inferior
  177:16,24
  178:4,6,
  15 208:1,
  14 209:4
  348:19

influence
  45:15

influenced
  382:3

inform
  375:22

informally
  96:14

information
  94:17,20
  107:4,11
  119:16
  125:5
  145:13,16

151:5
161:24
173:22
179:16
186:19
295:24
297:16
301:18
307:22

informative
  330:18

informed
  117:20
  160:18

inherent
  58:10
  190:23

inherently
  43:22
  56:9,13,
  18
  189:15,17
  190:19,25
  278:14
  360:1

initial
  107:16
  190:18
  247:17

initially
  91:5
  123:21
  124:2

initiative
  156:8

innovation
  16:5,8

innovations
  15:6,17

innovative
  15:10



inordinate
  379:23

input
  200:22
  344:1

inside
  271:5
  319:20

insist
  364:10

instances
  351:11
  377:11,24
  378:15

institution
  302:23

instruction
  29:25
  30:4,5
  59:11
  60:4,17,
  22 61:9
  62:16
  65:2
  88:7,8
  135:19
  136:4,12,
  13
  137:14,15
  138:3,14,
  17 190:11
  216:7
  219:3
  251:8
  274:1
  307:10,11
  309:4
  317:24
  318:3
  321:13,15
  334:11
  338:19,20
  340:12
  383:7

391:15,
18,23,25
392:5
394:7,10,
11,18
399:6

instructional
  72:17
  209:25
  260:15
  391:6

instructionally
  72:25

instructor
  120:22

instrument
  175:19
  294:19
  296:3
  302:23

instruments
  302:22

insufficient
  199:12
  334:8
  345:14

integrated
  45:7
  180:18
  181:21
  188:18
  189:16
  191:21
  199:6
  213:13
  215:3
  216:18
  224:3,9
  227:11
  228:19
  234:14

240:10,16
292:2
330:10
360:1
361:1
368:21

integration
  72:16

intend
  209:14
  286:12

intended
  287:2
  301:10
  330:8

intending
  284:13

intensification
  321:7

intensify
  321:12

intensity
  67:8 75:4
  89:19
  187:16
  283:1
  286:8,15
  312:22
  314:20
  320:1,11,
  15 321:4,
  19,24
  322:11
  325:8
  336:21
  362:6,22
  371:1
  372:5
  391:23,25

intensive
  29:24
  30:1,4,5

31:23
45:20
59:11
60:16
61:9
71:14
72:23
88:3,8
167:15
188:12
191:6
247:9
274:19
280:11
281:9
293:7
307:10,11
313:6
315:7
316:10,13
321:6
322:4
326:12
338:19
340:12
349:2
361:19
362:15
393:18

intention
  124:10

intentional
  278:15
  296:25

interact
  193:9
  258:9
  276:18
  277:2,9
  278:13

interaction
  277:12

interactions

23:24
276:9
277:21

interchangeably
  49:7 56:8

Interconnected
  164:4

interest
  32:20
  93:11
  246:13

interested
  104:10
  113:21
  129:3
  145:12
  329:1

interesting
  17:17
  50:22
  97:4,7
  126:22
  242:16
  245:16
  264:14
  299:19
  343:7,12
  349:25
  356:21
  393:10
  398:16

interfering
  320:22

intermittently
  380:17

interpretations
  301:9

interpreted
  298:14



334:20
365:11

**interpretin
g**
137:6
247:17

**interrupt**
7:4,11
142:10
253:10

**interrupted**
181:7

**interruptin
g**
157:2

**intervene**
314:21

**interventio
n**
29:12,14
35:25
49:19
66:8,20
67:5,8
134:22
135:4,15
140:19
142:6
165:18
166:10
167:15
205:16
206:22
214:24
215:21
218:20
226:16,17
251:4
252:15,21
280:21,23
288:15,18
289:14
290:2
300:24

314:10
315:8,19
316:5,11,
14,21
319:24
320:9,19
321:1,6,
24 323:1,
8 324:10
389:18
396:24

**interventio
nist**
148:11

**interventio
ns**
66:21
88:5
173:12
183:6
189:19
190:5
205:25
214:22
215:5
218:7
287:24
288:1
313:17
314:3
315:23
336:21
354:2

**interview**
123:7,14,
15 147:11
150:2

**interviewed**
36:24

**interviews**
125:4
294:18
301:12
302:21

**intro**
19:12

**introductio
n**
239:2

**introductor
y**
239:1
287:3

**inventories**
173:10
174:16

**inverse**
76:1
101:3

**invitations**
105:13

**invited**
105:14
150:25
151:2

**invoices**
95:18

**involved**
15:1
104:25
229:24
230:2

**involvement**
17:3
18:11
133:9
274:14

**irreparable**
236:4

**irresponsib
le**
364:9

**ISF**
164:4,18,
24 229:5

**isolation**
319:11

**issue**
156:11
157:6
253:24

**issues**
151:13
155:23
156:22

**items**
100:24
113:8
312:8,19
324:22

**IV**
306:1
345:8

─────────

─────────
        **J**
─────────

**Jason**
111:12
112:20
114:8

**Jason's**
114:10

**Jeannie**
115:5
120:14
143:23
144:3
150:10,16
151:19
158:6

**jeez**
18:18

**Jim**
377:1

**job**
97:1
102:9

274:18
289:2
305:24
345:15,19
361:5,14
382:24

**JOHNSON**
5:24
33:18
36:9
38:4,6,17
40:17
41:11
43:13,15
44:19
45:8 54:1
57:14
60:19
62:7
63:11
64:4,12,
22 65:21
66:3
67:15,22
68:22
69:16
71:2
72:4,7,11
73:18,20
75:9 76:7
77:13,25
79:8
81:8,19
83:19
86:8,10,
16,22
88:18,24
89:3
90:14
92:8
94:10
96:10
100:19,22
138:1
139:2
145:20



148:24
157:7
161:1
166:23
167:7,18,
25 170:24
178:2
196:8,16
197:14
199:8,17
200:4
201:5
202:10
203:25
208:3,17
210:3
213:25
221:6
232:10
233:2
234:19
249:10
252:3
261:8
265:4
276:13,24
284:16
292:11
295:15
296:21
307:20
315:24
326:19
332:5
334:25
335:24
336:2
344:23
348:17
359:4
361:23
364:24
384:14
385:5,19
386:16
387:25
401:11

402:1,5

**Jones**
143:17

**Josh**
9:12

**journals**
97:15

**judging**
380:9

**judgment**
69:19
200:12
250:5
251:23
375:23

**judgments**
161:15
162:24
227:18

**juice**
8:16,18

**jump**
353:11
363:5
379:6

**jumping**
37:22

**jumps**
136:19

**June**
92:6,13
95:19

**justice**
42:8
93:22
211:5
274:14

**justify**
294:20
295:2

**juvenile**
274:14

_____

**K**
_____

**K-12**
39:15

**Kauffman**
291:9

**keeping**
367:8

**Kenston**
12:9 24:7

**Kent**
10:23
11:6,10
13:16,19,
20,22
15:8
16:10,15
17:14
18:19
20:24
29:18
31:3,5

**key**
304:19
360:20

**kid**
73:9
192:15
206:17
207:12
222:6
233:11
235:2
248:15
249:1
250:25
282:8,9
316:15
327:8
338:13

343:13
399:16

**kid's**
178:14

**kidding**
209:17

**kids**
16:16
31:24
32:23
36:21
37:19
39:17
49:8
54:8,9,
13,16
59:12,16
63:23
67:6 82:9
83:25
84:8
87:4,8,15
89:15
90:3,7
97:23
106:17,18
109:25
118:24
135:8,10,
20 136:7,
11,17,19
137:12
138:6,13
161:12
163:5
164:15
165:10
178:12,
15,21
180:8,22,
24 182:4,
10,16
185:21,25
186:4
187:14,20

189:8,13
190:5
191:6
192:9,11,
12,14
193:4,8,
9,17
194:2
195:19
197:18,20
202:19,21
205:14,19
206:10
208:23
209:5
210:7
216:18
218:10
221:14,18
222:9,19
223:6,7,
10,16
225:21
229:15
230:10
231:17
233:9,18
234:1
235:18
237:18
245:11,
20,24
246:7
247:15,
17,22
248:1,20,
24 249:1,
13,21
251:7
254:15
255:5
256:13
257:22,24
259:1,16
260:17
261:25
266:19



267:23
269:10
271:14,18
274:4,11,
25
278:13,
16,22
280:9,10
281:1,4,
6,7,12
282:13
283:5,21
284:1,3
289:7
290:9,12,
13,18,22,
24
292:21,23
293:4,6
294:4
304:6
309:2,3
310:10,
16,18,24
311:2,9,
18 312:24
313:8,9
324:15,17
326:10,24
327:4
329:1,4
330:15
332:13
338:3,4,
7,18
341:3
344:10
347:8,12,
20 359:7,
14 361:6
362:7,15
365:18
366:7
370:6
372:10
373:25
374:1,6,

9,14
379:20
380:24
381:23
382:6
383:5
388:9
391:11
392:21,24
393:5,18
394:1,17
398:4,17
399:25

**kids'**
340:24

**kind**
10:20
12:3
20:25
27:10
31:13
45:24
49:7
54:13
59:24
62:9
64:23
94:25
97:17
111:21
122:10
124:7,10
126:21
129:6
156:7,8,
11 157:17
159:5
160:4
162:11
173:2
175:10
179:1
187:13
190:4
192:20
196:2

201:10
208:8
218:13
221:1
227:2
245:16
289:13,18
290:19
292:18
294:18
295:8
297:9
298:7
310:24
313:11
315:4
317:8
320:3,4
322:19
324:11
325:10
365:7,8
381:24
400:4

**kinds**
38:22
46:25
51:24
59:23
61:1
76:22
84:12
96:18
160:5
169:1
171:16
254:16
263:14
297:19
303:24
314:24
315:7
325:8
355:9
359:13
370:9

375:24
397:20
399:22
400:5

**knew**
126:9
145:17
222:22
304:18

**knowing**
171:22
227:23
261:17

**knowledge**
39:12
131:7
133:21
145:3
163:8
230:15
367:18

————————

————————
L

**lab**
40:25
**label**
106:6,15
**labeled**
106:4
**labor**
25:16
**lack**
199:15,25
270:2
315:22
389:21
390:8
391:6,14
392:11
**lacked**
72:2

77:11

**lacks**
73:16
**lady**
379:12
**lags**
331:8,10
**laid**
237:20
265:7
**Lakesha**
143:7
**Landrum**
291:9
**language**
46:2
50:20
133:21
148:18
149:15
151:12
227:15
334:1
335:15
336:4
339:5
343:8
**large**
35:21
189:25
190:1
303:12
**largely**
59:6
**larger**
259:25
**late**
34:24
36:4
**Latin**
224:19



law
  34:8
  53:15
  66:6
  88:25
  106:7
  108:11,24
  187:12
  188:20
  193:21,25
  201:9,11
  203:17
  223:9
  227:15,16
  237:25
  239:23
  251:12
  261:7
  287:18,19
  309:5
  320:16
  332:21
  351:4
  378:13

lawful
  5:8

laws
  239:7
  396:8,14

lawsuit
  158:22

lawyer
  197:2

lawyer's
  196:1

lawyers
  9:12
  113:11
  144:24

lay
  268:11

LEA
  33:14

  38:16
  50:7

lead
  146:17
  233:6
  234:6,18
  235:5,6

leaders
  269:2

leadership
  22:10
  26:11
  63:17
  112:16,17
  303:3

leads
  230:23
  231:9
  232:8,24
  234:16

learn
  29:20
  58:21
  193:18
  289:3
  308:11
  309:18,21
  311:5,14
  319:4
  344:8,18

learned
  92:10
  105:9
  157:17
  310:19
  317:21
  318:11,15

learning
  19:19
  59:12
  89:9
  137:20
  138:23
  290:15

  307:9
  309:14
  315:12
  337:10
  340:15,22
  382:7
  383:8,17,
  18
  385:17,25

LEAS
  157:6

leave
  374:7
  397:18

led
  122:4

left
  330:2
  399:11

legal
  10:19
  67:2
  108:16
  109:2
  151:13
  191:12
  192:7,20
  203:13
  238:22
  239:14
  240:13
  398:12

legalese
  42:16
  108:18

legally
  200:3,5

legitimate
  280:3

legitimatel
y
  251:22

lesson
  157:17

letter
  42:16,17
  313:15
  376:23

letters
  251:13

letting
  157:25
  352:8

level
  11:24
  12:6
  45:22
  59:19
  67:13
  74:2 75:7
  80:6,25
  108:24
  148:12
  152:22
  155:14
  171:1
  175:12,22
  187:15
  192:18
  220:23
  228:22
  229:25
  239:1
  259:12
  274:2,7
  295:6
  300:1
  307:14
  320:10
  338:2,14
  372:4,5
  390:3

levels
  68:3
  107:8
  110:19

  136:10
  312:22
  370:25

license
  15:23
  16:4
  17:21
  18:7

licensed
  20:21
  63:13
  238:19

licensure
  16:7,9
  17:22

life
  7:4,11
  26:25
  289:8
  328:17

lifelong
  205:19
  316:17
  324:19

light
  349:3

likewise
  354:15

limit
  203:11,12

limitations
  58:10
  87:16
  91:1,18
  189:22
  216:20,21
  226:1,6
  298:16
  330:9
  345:15,
  19,20
  349:12,
  18,24



350:6,17
352:2,5
364:13,
18,25
365:2,21
366:4

**limited**
45:6
145:2
202:7
203:21
205:12
303:9
310:21
363:13

**lines**
130:22
317:8
319:9
324:11
329:9

**linked**
71:25
286:13

**links**
282:3

**list**
100:16,24
101:6,8,
14 215:20
312:8
326:1
383:20

**listed**
117:11
143:11
163:2
262:22

**listen**
281:13

**listening**
21:1

**listing**
231:1

**listserv**
96:24
97:2

**literal**
295:20

**literally**
79:10
118:21
298:11

**literature**
101:23
183:6
230:25
231:10
300:13,18
302:2
304:4
305:25
323:5

**litigation**
10:14

**live**
295:13
296:18

**Local**
50:8

**located**
95:5,6

**location**
70:7,9
201:3

**lock**
397:14

**logic**
189:4
250:13,23
251:3,17

**logical**
188:10

**logisticall
y**
189:18,20

**long**
9:19 13:6
124:21
146:5
268:24
269:13
290:7
293:17
394:8
395:11

**long-term**
324:9

**longer**
368:2

**looked**
19:6 95:7
103:13
107:3
108:7
111:5,19
112:1,21
130:6
139:5
169:13
171:8
174:7
179:2
182:16
241:24
264:15
296:16
303:21
328:4
356:1
362:14

**lose**
313:21

**lost**
79:18
108:18
143:2

274:19
312:3
372:16

**lot**
17:10,18
22:14
26:5
32:20
33:24
35:16
36:25
43:23
47:14
57:8
59:11,14
60:25
61:1
82:21,24
87:10,25
89:20
97:17
102:23
107:24
113:20
148:11
155:22
158:13
165:5
176:8
195:16
205:10
228:2,5
229:8
230:3
237:14,17
252:7
259:16
264:21
282:10
290:18,24
293:5
296:4,24
320:25
323:4
324:18,19
331:1

336:11
338:2
355:23
373:9
377:5
380:18
381:2
389:25
396:10

**lots**
35:10,11
154:24
155:20
259:17
311:1

**loud**
344:4
371:5
372:23

**love**
90:22

**low**
104:6
111:12
112:13
113:3
115:1
120:9,16
121:6,17
124:21
125:21
127:12
129:16
130:9,18
135:13
136:7
139:23
140:7,20
141:18,25
142:3
144:14
148:19
153:9
154:9,21
155:14



156:12
159:9
290:8
337:15,17
338:11
339:7
362:16

Low's
120:17
128:17
149:16

LRE
71:6
74:18
80:24
192:20
204:2
238:7
242:25
243:3,4
244:17,25
269:1
333:12

lump
248:24

lumping
79:11

lunch
195:25

—————————

M

—————————

made
53:7,19
95:8
102:13,14
108:16
119:11
145:11
155:13,16
160:25
161:3,12,
24 165:13
176:8

180:3,7
187:22
190:24
200:18
216:5
227:18,20
237:14,15
238:6
248:16
249:25
250:2
251:23
252:25
259:20
278:23
281:21
285:1
293:4,19
302:3
303:9
330:13
338:17
342:1
353:10

madly
378:16

madness
126:25

magazines
379:24

magically
278:2

main
212:18,23

mainstream
243:20,24
244:8

maintain
323:10

maintained
385:3

maintenance
322:17,24

323:5,13,
19 385:15

major
109:3
237:8
353:22
354:7
373:6

majority
43:25
77:23
79:6
81:6,10,
17 163:5
164:15
213:10,12
215:11
216:15
219:10,23
220:14,23
221:9,24
222:3,12
244:6
247:6
248:9,11,
23 269:9
273:9
282:6
284:3
292:3
346:16,23
347:23
349:15,21
350:14
366:1

make
7:11,21,
23 8:8,19
15:14
17:24
21:5,14
22:7
26:25
32:7 37:4
45:25

50:10
54:19
55:12
65:12,15
66:25
67:6,9,25
69:8,24
70:2,4,5
72:13
76:4
84:17
91:15
103:23
105:1
108:1
119:12
136:20
137:7
139:25
140:8
149:10
154:5
155:4
158:24
161:15
162:24
173:24
174:22,24
177:6
180:10
185:4,12
186:5,10,
20 188:25
193:18,19
195:2
198:9
200:21
206:4
207:14
209:8,20
216:18
221:23
222:8,18
223:4,5
227:21
233:10
245:10

246:4
249:12
250:5,19
251:8,16,
17 252:19
259:22
265:18
266:18
269:20
276:25
281:3
282:4
283:20
284:23
286:9,16,
20 287:7
289:1
293:12
296:5,19
299:4
301:2,4
303:5
304:23
309:19
311:11
313:3
315:3
316:20
321:15
325:22
333:25
336:11
338:21
345:3
350:1,7
352:14
356:6,18
358:19,23
361:14
365:1,24
366:6
367:6,21
372:23
373:9,14
381:6
382:13
389:4,5



390:1
391:24
392:7
394:17
398:24
400:8,19
401:2

**makers**
251:12

**makes**
7:4 16:17
21:13
22:8
34:21
54:17
63:1 77:4
113:25
128:23
164:14
172:2
193:22
279:6
284:2
320:24
377:21

**making**
20:19
26:14
43:16
62:20
63:21
69:19
189:10
235:12
260:3
283:17
293:15
306:3
309:7
314:23
316:4
319:12
354:10
367:17
371:11

382:20,25
399:3,21
401:6

**management**
11:25
12:5
28:15
29:9
31:18,19
32:2,8,18
61:8 80:2
321:25

**manager**
142:19,24

**Mandt**
134:25

**manifestati
on**
398:13,14

**manual**
94:25
105:18
106:22
164:18,
20,23,24
262:24

**manuscript**
179:5
294:16,23
298:7
299:9
301:24

**mark**
100:1
123:3

**marked**
100:5,9
123:7
147:11
150:2
211:9,14
376:15

**mass**
37:7
77:22

**Massachuset
ts**
23:8
36:14
37:17
245:22
302:12
303:13
362:14

**match**
51:11

**matched**
319:25
320:14

**material**
116:17
260:9

**materials**
10:6
42:15
44:3
94:4,19,
22 95:4,8
100:14
101:21
102:5
103:10
104:12
106:12
108:21
113:20
117:1
120:2
144:18
171:5
190:10
240:7
262:23
301:14,22
353:25
354:20

373:1
385:25

**math**
29:25
30:16
32:19,24
82:10
318:12

**Matt**
143:17
199:22

**matter**
6:2 92:3
101:5
169:9
172:9
191:2
192:7
209:2
211:19
306:25

**matters**
10:17

**Matthew**
252:23
253:9

**maximize**
353:1
383:17
391:3

**maximizing**
308:13
311:15

**maximum**
309:22
383:5

**Mccart**
10:9
42:20
106:22
109:5
111:20
162:16

163:14
169:6
179:6
211:6
212:2
213:11
214:7
235:24
267:19
269:19
281:21
282:24
283:7,15,
23 284:2
293:24
294:7,13
295:17
306:17
308:23
330:13
340:11

**Mccart's**
97:13
105:24
161:19
168:5
213:23
236:10
244:4
284:13,17
291:21
296:23
299:18

**Meaning**
250:17
309:12

**meaningful**
224:24
282:14
334:1

**meanings**
391:21

**means**
6:13,15



8:13 46:8
64:6
157:15,22
158:4
192:25
215:14
240:5
266:25
271:14
314:13
343:13
358:15
378:9
383:13
392:17

**meant**
54:16
56:14
71:5
89:23
105:5
118:5
137:17
178:11
209:7
212:14
216:17
232:11
235:10
247:12
301:16

**measure**
189:8
236:17
314:14
315:9

**measurement**
252:22

**measuring**
174:11
175:2
333:24

**meat**
45:25

**mechanism**
398:12

**Medicaid**
184:3,17

**medical**
352:13

**medication**
375:6

**medicine**
352:11
378:14

**meet**
9:12
17:7,16
22:4 25:2
33:25
34:1
35:22
61:10
63:23
74:24
80:15,24
82:4,6,18
83:7,8
170:16
173:11
191:21
194:10
294:3
340:24
379:19

**meetings**
18:2
35:10

**meets**
74:15

**Melanie**
9:12
101:10
122:1
146:13

**members'**
104:22

**memorandum**
108:11

**memory**
152:17,24

**mental**
38:15,23
64:19
77:20
78:2
79:3,21
81:4
166:15
170:15
176:15
177:9
289:16
347:9
395:12

**mention**
93:15
166:12
187:25
196:20
206:8
340:13

**mentioned**
32:4,6
103:5,13
158:21
159:3
167:9
197:19
216:6,7
218:20
380:21

**mentioning**
282:25
293:24

**mentions**
90:1
308:23

**met**
9:18,20
11:23

12:6
35:11
65:9
141:23

**meta**
304:3
346:9

**meta-
analysis**
338:1
339:24
340:19

**method**
126:24
161:23
162:8,19
179:7
241:20
300:9

**methodology**
178:23
179:24
298:4
299:11
300:6
302:7

**methods**
179:12
295:23
297:22,25
298:9,18
306:16
380:16

**microphone**
253:16

**middle**
17:9,12,
13,22
18:1,9
127:6
172:1
221:8
288:5,8
357:5

364:8

**miles**
246:3

**mind**
11:18
116:6
122:8
136:19
189:12
232:20
236:18
277:11
296:8
316:6
341:22
379:7

**mindful**
226:1
298:15

**mindlessly**
250:16
251:14

**mindset**
134:19
135:14

**mine**
107:13

**minimize**
135:4,5

**minority**
194:7

**minors**
16:14

**minutes**
281:24
282:19

**mischaracte
rization**
138:13

**mischaracte
rizes**



282:25

misconcepti
on
    205:17

missing
    41:15
    259:21

mistake
    278:25
    301:24

misundersta
ndings
    183:5

Mitchell
    312:14,15

mixed
    43:19
    121:10
    216:13
    223:2

mobility-
related
    248:3

model
    37:16
    215:23
    219:2
    259:8
    395:10

modeling
    321:16

models
    15:10
    20:10

moderator
    340:3

modified
    308:22

mom
    380:23

moment
    120:25

moments
    275:4

Monday
    5:2

money
    19:23
    95:21

monitoring
    317:6
    333:21,22
    389:16

month
    323:10

moral
    193:11

morning
    5:16,17
    8:15
    342:4

Morris
    115:5
    120:14
    143:23
    144:3
    150:10,16
    151:19
    154:9
    158:6
    159:9
    341:13

mother
    379:13

motion
    108:12

motions
    42:18

motivated
    84:7

motivation

84:9
    176:4
    230:18

motives
    296:23

motto
    266:24

move
    223:22
    322:7
    344:9

moved
    17:10
    344:19

moving
    230:21
    235:23
    285:19

MTSS
    29:2,4,
    13,23
    30:4,11
    283:16,20
    388:9

multiple
    15:24
    35:22
    185:17,19

multitiered
    229:17
    382:16

mundane
    201:17

music
    202:17
    370:2
    392:12,
    16,22,25
    393:6,12

mutual
    18:23

myths
    316:13

———————
        N
———————

names
    37:12
    85:24
    104:22
    143:10
    215:13
    379:1

Naomi
    382:4

narrow
    265:14
    320:12
    373:10

national
    107:24
    110:4
    172:22
    230:6
    291:14
    316:10
    321:6
    355:8

nationally
    270:15

nationwide
    110:10

natural
    359:1

naturally
    358:12

nature
    132:8
    195:11
    226:21
    228:5
    278:3
    305:11

315:18
    333:23

neat
    400:18

necessarily
    47:22
    55:14
    82:17
    192:7
    221:2
    250:22
    252:16
    257:16
    290:5
    370:12
    387:7

needed
    43:9
    64:14
    80:15
    102:15
    116:23
    201:12
    265:24
    280:15
    348:24
    382:9
    399:15

needy
    290:24

negative
    332:14
    335:18,22
    336:2,14,
    15,22
    337:6
    338:23
    339:1
    374:15

negatives
    374:23

neighborhoo
d
    47:24



ANDREW WILEY, PH.D.
UNITED STATES vs STATE OF GEORGIA

October 30, 2023
Index: net..observation

net
  375:11
Network
  49:22
newly
  317:20
news
  97:4
nice
  321:5
ninth
  17:13
nondisabled
  184:24
  185:9
  192:3
  196:6,13
  197:12
  198:15,22
  244:22
  245:7
  277:2,9,
  13,20,21
nonetheless
  290:17
  308:13
nonsystemat
ic
  178:25
norm
  289:22
normal
  113:16
  118:15
Northeast
  11:3
note
  146:7
  312:23
  315:3
  342:1

401:23
notes
  123:7,14
  124:14,17
  125:1,19
  126:3,8
  127:11
  131:16
  132:8
  137:6
  139:23
  141:1,17
  146:21,25
  147:6,11,
  20,25
  148:19
  150:2,8,
  15 152:25
  153:16,22
  154:16
  155:6
  156:17
  157:11,18
  158:11
  159:8,15
  160:2,8,
  15 341:25
noticed
  290:8
noticing
  26:21
notion
  47:16
  268:15
  315:13
  372:17
number
  88:9
  95:23
  107:22
  111:2
  127:7
  136:14
  156:12

158:19
  194:8
  220:18
  221:22
  255:7
  265:19
  294:20
  298:20
  313:14
  321:22
  328:8
  332:11
  361:5,15
  376:6
  382:21,24
  393:15
numbers
  110:22
  159:6
  254:24
  271:9
  274:5
  373:4
numerically
  257:6
nuts
  255:3

———————

O

———————

oath
  6:11
object
  33:18
  36:9
  38:4,17
  40:17
  41:11
  43:13
  44:19
  45:8 54:1
  57:14
  60:19
  62:7

63:11
  64:4,12,
  22 65:21
  66:3
  67:15,22
  68:22
  69:16
  71:2
  72:4,7,11
  73:18,20
  75:9 76:7
  77:13,25
  79:8
  81:8,19
  83:19
  86:8,16
  88:18,24
  89:3
  90:14
  94:10
  96:10
  100:19
  138:1
  139:2
  145:20
  157:7
  161:1
  166:23
  167:7,18,
  25 170:24
  178:2
  196:8,16
  197:14
  199:8,17
  200:4
  201:5
  202:10
  203:25
  208:3,17
  210:3
  213:25
  221:6
  232:10
  233:2
  234:19
  249:10
  252:3

261:8
  265:4
  276:13,24
  284:16
  292:11
  293:15
  295:15
  296:21
  307:20
  315:24
  326:19
  332:5
  334:25
  335:24
  343:9
  344:23
  348:17
  359:4
  361:23
  364:24
  384:14
  385:5,19
  386:16
  387:25
objection
  100:21
  225:11
  336:1
objections
  5:22
  222:4
  298:4
objective
  161:25
  302:4
objectively
  328:10
obligated
  6:16
observation
  162:5
  178:24
  294:19
  296:4,25



302:24

**observational**
381:21

**observations**
117:6
163:11
295:12
296:18,19
297:10
302:20
381:18

**observe**
34:2
35:23
298:21
382:6

**observed**
36:24
295:12
296:20
381:21

**observing**
295:17
297:3

**obsessed**
376:14

**obvious**
123:23
380:12

**occasionally**
36:17

**occur**
339:11
342:22

**occurred**
344:5

**occurring**
106:23
162:6

246:17

**occurs**
71:7
233:15

**October**
5:2

**odd**
254:21

**off-grade-level**
307:15

**offer**
30:16,20
94:5
169:24
170:14
264:2
371:18

**offered**
81:3
104:15
105:10
263:5
369:15,
16,18,19

**offering**
170:22
171:10
176:13,21
177:8,13,
19 179:23
180:2,15,
20 181:19
182:5,18
183:13
184:6,20
185:3,5
186:13,18

**offers**
165:17
167:15
183:16

**offhand**
144:16

**office**
11:6
12:23
13:16
254:5

**official**
21:6,13
22:3
51:12

**officially**
11:5
290:19

**OHI**
106:19
290:15

**Ohio**
11:3
14:22
15:10,22
16:6,22
17:10,23
19:8
22:12
23:12
24:25
107:7
257:18,25
396:7

**Olde**
259:19

**older**
393:1

**Olmstead**
240:4,8,
17

**one-off**
13:5,7

**one-on-one**
35:6
204:15,22

**one-to-one**
137:13

**one-year**
21:6

**ongoing**
21:25
22:1
103:9
104:3
172:6
317:5

**online**
11:4,8
12:4,22
13:1
29:10,22
31:10
32:5
103:14

**open**
31:7
139:13

**openings**
97:1

**operate**
366:5

**operating**
94:24
105:18
196:2

**operationalize**
57:1

**opine**
295:13
302:6
334:22

**opining**
306:9
334:14

**opinion**
51:15

57:20
92:2 94:6
112:10
162:14
163:7
166:19
171:8,12,
19,25
173:2,21,
23 174:1,
10 175:1,
6,8,12,
14,25
177:1,20
179:15
180:2,14,
20,24
181:16
182:5,18
185:3
186:2,14,
18,23
189:14
209:9
232:3
244:7
273:22,25
274:22
276:7
279:19,21
283:23
324:24
326:3
332:2
334:14
346:23
349:20
359:25
360:6,15
364:17
366:21
383:25
384:7,11,
23 385:2,
16,24
386:4
390:8



398:8

opinion--
383:24

opinions
43:10
44:14
45:4
100:18
101:5
116:18
117:21
160:18
169:16,
21,25
170:14,22
171:10
176:14,22
177:8,14
179:24
180:16
181:10,19
183:14
184:6,20
185:5
191:15
237:8
268:12
280:3
294:9

opportunities
193:9
236:2,25
318:1,7,
18 319:22
321:14

opportunity
162:10
185:16
196:5,12
197:11
198:14,21
317:20

opposed

259:24

opposite
84:8
190:6
374:10

optimal
202:20

option
45:19
96:18
367:9
372:10

options
204:6
263:22
310:15,21
311:16
332:1
365:22

orange
8:16,17

order
34:20
57:21
58:2
62:21
63:24
64:9
65:15
67:9,20
71:21
80:24
109:8
116:23
118:6
124:10,11
125:15
161:11,14
162:24
223:15
230:4
250:7
265:6
283:4

287:18
288:24
309:21
351:23
395:6
397:7
401:2,24

organized
59:24
104:18
124:6

orient
240:24

oriented
314:8
315:14

outcome
375:15

outcomes
19:19
89:14
91:2
152:11,15
166:9
231:17
233:14
234:6
235:14
274:18
277:23
330:15
333:10
335:19,23
336:2,10,
14,16,22
337:7,10
338:23
339:1
347:3,5,
14 348:1,
15 360:4

outline
104:13
122:7,16

352:2

Outlook
159:24

outpatient
352:11

outright
396:20

outsider
123:24

overcome
248:19

overlap
55:3,20

overlaps
122:18

overly
294:25

overreliance
136:3

overridden
246:13

oversees
51:24

overtime
322:25

overused
385:22

overutilization
385:17

Owen
143:9

─────────

P

─────────

p.m.
402:10

package
53:23

packaged
218:24
315:7

paid
13:19

paper
110:5,9,
18 325:10
356:21

papers
293:2
312:17

paragraph
242:3
243:6
262:11
264:19
279:8
285:20
288:6
307:5
308:7
334:4
335:14
337:6
339:19
346:12
349:11
357:4
363:8,17,
25 364:1,
8 377:17

paragraphs
135:18

parallel
233:16
308:24

parameter
296:11

parameters
305:15



paraphrase
  127:22
  214:17
  293:12
  400:9

paraphrased
  140:3

paraphrasing
  90:10

paraprofessional
  278:20

parent
  343:25
  344:2
  379:19

parents
  128:9
  129:5,11
  200:23
  342:14,19
  343:3,17
  344:8,19
  345:5

parents'
  341:14

parsing
  398:18

part
  11:6
  19:21,22
  29:12
  30:3
  31:22
  34:16
  36:1
  37:10
  41:12,15,
  22  50:5
  56:16
  57:2
  66:22

67:23
72:18
82:22
101:20
102:2,21
107:23
108:18
109:4
110:17
113:15
114:22
115:16,21
117:3,7
118:7
119:24
124:3
130:1
143:13
152:8
156:4
175:25
181:2
199:10
202:22
203:17
217:16
224:16
225:11
230:14
236:8
241:19
244:21
245:5
251:3
257:14
265:12
277:3
279:25
286:25
287:18
302:2
305:3
308:12
315:15
318:21
323:6
327:25

328:3
338:15
343:19
356:9
368:22
373:6
377:3
379:10
381:20
384:21
388:20
395:19
396:18
400:1,2,
10

partial
  53:15

participate
  11:13
  196:5,12
  197:11
  198:21
  310:5
  399:6

participation
  200:18
  310:2,8
  383:7

partly
  178:20

parts
  13:10
  66:5  78:7
  169:13

pass
  299:15
  401:10

past
  14:24
  92:4
  158:14

pasted

140:25

pathway
  14:19

pathways
  14:18
  19:2,25
  20:1,25
  21:17
  22:18
  23:13

patients
  352:19

pause
  85:2
  183:20
  253:25

pausing
  385:10

pay
  90:16

paying
  296:1

PBIS
  28:8,16,
  17  31:15
  59:17
  103:16
  104:2
  106:25
  107:11,
  15,21
  108:1,7
  109:12,14
  110:6
  111:5
  112:17
  144:4
  150:13
  151:4,10,
  17  152:9,
  11,14,16
  153:21
  154:18

156:1,8,
20  157:5
164:9
166:5,17,
22  170:23
171:11,
20,24
172:9,14,
20,23
173:6,14,
18  174:2,
4,7,10
175:1,7
176:11
215:24
229:7
230:6
316:12
354:8,19
395:20

PBS
  150:13

PDFS
  101:23

PE
  202:17,19
  392:12,
  15,25
  393:6,13

peek
  37:18

peer
  299:15
  300:14

peer-
reviewed
  300:2

peers
  184:24
  185:9
  192:3
  194:16
  196:6,13
  197:12



198:15,23
210:12
244:22
245:7
258:10
276:9,19
277:2,9,
13,20,22
310:7
373:17

**pending**
9:1

**people**
11:12
19:6 22:7
28:18
29:19
41:4
45:16
47:16
55:3
62:19
69:7
72:14
77:15
84:10
91:7,13
96:14,17,
25 97:3,7
98:19,22
113:7
114:2
115:20,24
116:4
118:17
126:15
129:4
138:4
144:11,
13,19
145:3,6,
14,15,17
147:4
154:14
156:5,9,
12 157:18

162:12
174:17
187:22
190:25
193:13
203:1
205:12
228:9
233:25
237:16
240:9
245:17
251:14
264:13,15
265:15
266:18,21
268:1
278:1
280:22
283:19
290:7
300:22
311:10,13
316:23
324:18
330:23
331:2
338:10
342:2
344:15
355:7,15
378:15
381:21
387:11
390:23
391:8,22
397:8

**percent**
53:8,10,
13 110:16
111:8
140:21
175:23
217:20
247:18
255:22,23

256:1,20,
23 257:7,
11 258:12
261:20
270:17
271:1,10,
16,17
272:8,13,
17 273:4,
10,18
277:17
288:13
289:12
347:7

**percentage**
107:20
172:23
222:13
271:14
272:3
365:25

**percentages**
273:5

**perception**
136:2
154:22
155:22
156:23
325:12,
15,16
380:18

**perceptions**
197:18

**perfect**
88:23
174:19
343:16,17
367:17

**perfectly**
268:14
367:18

**performance**
317:7

**performing**
99:5

**period**
13:8
34:22
269:13
294:15
317:16

**periodicall
y**
386:23

**periods**
303:9

**persistentl
y**
337:14

**person**
13:4
113:24
115:3
122:17
123:24
130:20
134:4
144:22
145:10
146:15
201:10

**personal**
93:24
150:8
158:12
279:19

**personnel**
158:14
230:2
354:25
387:9

**perspective**
193:22
238:6
239:5
274:22

284:7,8
352:24

**Ph.d.**
5:1,8,14
100:5
211:8

**phone**
116:5
117:24
121:7,12,
15,20
145:25
146:2
147:7

**phonetic**
97:12,14

**phrase**
87:2
157:22
158:16

**phrases**
44:2

**phrasing**
221:8
349:25

**physical**
70:7,13
72:15
208:4
248:2
384:23

**physically**
189:9

**pick**
106:5

**picture**
303:4

**pin**
223:20

**Pittsburgh**
382:5



place
  18:5,17
  34:4
  40:20
  44:16
  45:1
  56:14,19
  62:24,25
  69:19,21
  70:13
  75:18
  82:18,20
  91:13
  158:10
  166:2
  175:21
  178:16
  211:22
  230:17
  245:12
  278:22
  327:2
  336:10
  351:24
  381:2

placement
  40:15
  41:9 45:5
  47:6
  51:10
  53:23
  56:12,13,
  17 57:3,
  15,21
  58:23
  63:3,25
  71:5,6
  75:15
  128:23
  167:24
  190:14
  192:12
  200:16
  219:13
  226:3,10
  231:15

233:22
242:5,7,
13,18,20,
25 243:3,
4 245:18
247:3
250:7
261:23
262:17,18
265:23
273:13,14
274:16
287:23
330:10
333:10,18
334:7,15,
23 335:15
336:13,15
337:1,9
338:6
343:20
344:1
348:4,6
350:25
352:10
357:18
358:16
360:25
361:1,10
362:22
366:7,18
368:21
369:7
373:10,13
374:21

placements
  44:7
  45:11,13
  50:12,14
  51:15,25
  56:4,7,24
  58:5,12
  84:15
  97:24
  183:6,10,
  17 188:4

189:15,16
190:19
191:4
192:17
194:10
231:19
243:8
263:11
264:22
284:4
334:12
335:18,22
336:6,7
338:25
339:11,16
348:8
351:21
352:9
356:16
357:9
359:25
360:2,8,
18,23,24
366:11,
14,15,16
367:8
368:20
373:8,13
374:13

places
  14:22
  16:11
  20:5
  46:19
  47:25
  62:24
  133:12
  261:25
  290:23
  293:3
  383:1

placing
  200:2
  204:19
  233:18
  349:14,20

350:3
364:22

plan
  49:19
  66:8,20
  67:5
  129:19,
  21,22,25
  130:4
  140:4,19
  142:6
  166:22
  205:6
  226:23
  314:10
  389:18

planned
  314:9
  315:13

planning
  225:25
  322:15

plans
  35:25
  79:15
  205:16
  206:22
  214:24
  215:22
  226:16,17

play
  301:13
  356:6

plenty
  78:18

Pogrow
  356:21

point
  7:25
  41:25
  59:20
  91:14
  92:16

107:23
117:2
118:20
165:8
190:24
203:8
208:19
220:25
226:7
229:1
230:4
244:25
280:15
281:4
282:17
294:5
309:12
311:11
317:12
322:5
331:14
352:10
356:13
360:21
371:19
378:12
380:9
395:13
399:15
401:4

pointed
  106:15

Pointing
  377:10,24

points
  50:14
  127:11
  293:24
  361:16

polite
  279:25

poll
  243:18

Poor



84:20

**poorly**
385:2

**popular**
340:22

**population**
180:23
182:16
248:25
281:7
288:12
289:11
295:14
296:20
367:23

**populations**
292:9
293:16

**portion**
376:24

**portions**
52:13

**position**
93:8
194:7
226:10
292:7
293:2
295:13
296:19
298:1
353:4
366:10
367:7
380:7

**positions**
284:12

**positive**
12:2
29:13
31:20
59:20
66:14

87:19,20
89:14,24
155:2
332:13
337:10
375:11
400:5,6

**possibility**
196:3
373:20

**possibly**
140:3
289:15

**post**
347:5
376:12,23

**postdoctoral**
23:9

**potential**
92:24
193:14
247:16
374:23
383:6

**potentially**
57:22
58:24
190:8
371:6,8

**practicable**
320:17

**practical**
97:2
331:17

**practicality**
202:4

**practice**
90:2,22
118:15
137:24

164:12
184:11
215:25
246:15
264:10
286:13
292:6,19
317:20
318:9,19
319:22
325:4
330:23
331:6,9,
10 334:17
368:25
378:16
380:14
382:18
391:19
394:16
395:8
400:7

**practiced**
377:11,25
378:8,21
379:5
381:11,14
382:12,25
383:3
384:1,9,
13,25
385:4,12,
15,18
386:1,7,
15 387:6,
10,16,24
388:5,21
389:1
390:11
391:7,16
392:14
393:24
394:9
395:3

**practices**
28:17

38:12
87:7,13,
18,25
88:6,16,
22 90:6,
11
215:13,14
216:17,23
217:3
222:23
225:4,20
249:12
252:18
292:16
319:25
321:17
330:19
331:1,17
334:9,16,
19,24
346:4
348:11
351:2
365:4
367:18

**practitioner**
201:10
378:23

**praise**
90:1

**precise**
323:22

**preemptively**
231:2

**preferable**
361:1
366:22

**preference**
191:10
343:24

**preferred**
332:4,18

**prep**
24:1

**preparation**
9:23

**prepare**
9:10 10:5

**prepared**
211:7
310:12
311:15

**preparing**
18:8
164:18

**preprofessional**
380:21

**present**
158:14
326:15
396:10

**presenting**
108:3

**preservice**
16:24
24:1
27:22
239:24
328:23
355:22,25

**pressed**
189:5

**pressure**
17:18

**presumption**
223:9
278:10

**presumptions**
341:24

**presumptive**
193:24



246:11

**pretty**
11:9
59:17
61:11
73:10
99:17
113:17
118:10
122:9
153:18
161:3,22
171:25
172:9
215:22
216:3
256:7,8
257:9
258:1,5
282:16
289:17
305:24
308:21
327:22
380:8
394:4

**prevalence**
288:11
291:13

**prevent**
372:11

**prevents**
357:10

**previous**
112:15
160:11
282:3
305:12

**previously**
15:21

**primarily**
47:2,3
257:21
266:15

304:6
350:22

**primary**
212:8

**prime**
165:16

**principals**
11:13
25:3
29:19
63:18
151:21
152:2

**principle**
242:21

**principles**
28:16
89:24

**prior**
162:1

**prioritized**
190:3

**priority**
200:14

**private**
259:13

**privilege**
5:23

**problem**
8:25
205:20
242:18
300:11
318:8
320:1,10,
20,21,23
321:2
322:4,7
361:20
391:13
399:22

**problematic**
245:2,13,
15  246:18

**problems**
54:9,10
59:12
69:1
154:21
155:15
156:12
164:13
165:15
220:25
223:1
229:18,24
230:24
231:9
232:9,25
233:5
234:17,18
235:6,19
251:7
259:6
279:14
280:12
281:2
283:1
320:7
324:16
347:10
375:3
380:10

**procedural**
328:18

**procedurall
y**
106:7

**procedure**
5:10
296:3

**procedures**
263:1

**proceeding**
10:20

**process**
23:4  93:2
123:1
207:10
221:4
225:25
237:10
250:17
251:5,15
262:14
300:4,15
301:13
303:16,19
304:22
305:20
333:11,17
343:14,
15,20,25
368:22

**processed**
95:20

**processes**
112:4

**produce**
89:14

**produced**
337:9

**profession**
64:6
190:20
378:13

**professiona
l**
10:25
11:2,5,17
12:16,21
13:10,17
23:19
24:15,19
27:13
28:22
29:4,7,17
31:16
32:14

39:16
42:2
135:6
346:22
351:7
375:23
398:6

**professiona
ls**
30:25
223:25
243:16

**professor**
197:1,2

**program**
17:21
18:7  21:6
36:20,23
37:3
42:11
43:12
49:15,21
56:20
58:1,7
59:25
61:14
64:8
66:17
70:18,24
71:4,6,
14,17
73:8
75:6,19
76:12,18
77:2
81:3,15
82:6
83:7,21
94:18
105:6
106:6
114:17
129:4
132:25
133:14,17



134:18
135:15
138:22
142:18,23
164:1
170:1,17
173:8
176:17
177:15,24
180:17
181:20
182:10
183:14,15
184:21
185:6
186:15,16
187:10
213:12
214:2,4,7
228:14
235:25
236:24
256:23
259:9,10
261:6,13
262:18
302:7,10,
12 303:5,
7,12
306:10,15
318:5,11
326:4,16,
24 327:19
335:6
341:17
343:4
344:11,
16,22
345:3
369:23
378:19
399:17
400:3

**program's**
74:23

**programmatic**
81:25
82:2,16

**programming**
45:22
131:24
187:16
285:23
286:2,17,
19,24
287:9
312:6,19
324:23
325:5
326:2,15,
18 327:4
372:2
400:6,11,
22

**programs**
16:4,20
17:2
18:25
21:10
43:21
45:18
50:2
59:19
72:21
73:23
76:14
80:7
115:25
128:9
129:8
131:4,15
132:11,21
133:6
134:23
136:8,15
137:10
138:18
162:12
167:5
185:15,

18,20
186:1
203:4
210:10
240:14
254:6
294:14
295:5
307:23,24
319:25
365:18

**progress**
67:10
176:9
189:1,10
193:19
224:25
227:21
248:16
249:25
259:20
260:4
278:24
293:4
314:15,23
316:4
333:21,
22,25
365:1
389:5,16,
21 399:3,
21

**progressive**
245:23

**prominent**
237:16

**promise**
147:14
181:9
392:3

**promising**
87:13
88:6
90:22

164:12
165:7
184:11
215:14
216:13,23
217:3
222:23
229:21
346:4
382:18

**promote**
323:19

**promoting**
359:18

**prompt**
160:6
318:16

**prompting**
317:24

**prompts**
122:12

**pronounced**
391:13

**proper**
224:6,11,
22,23
225:2

**properly**
140:9
141:21

**proponent**
382:17

**proponents**
266:9,17
267:8,13
268:25
284:10

**proportion**
133:3

**protect**
397:10

**protocols**
296:4

**provide**
8:11
10:23
11:2,4,8
12:16
30:8
32:25
34:20
36:13
38:16
43:3
67:12
72:23
73:6
75:3,6
79:2,10
81:16
118:7
167:20
176:3
183:9
188:22
190:8
191:6
192:8
202:21
204:18
205:1,25
206:25
207:2
210:6
214:8
222:23
227:20,25
231:25
235:13
237:2,7
239:18
246:5
250:7
251:9
259:11
264:19,21
273:8



274:3
286:16
287:14
297:16
317:23
320:8
338:17
343:3
351:8
354:7
370:7
371:17,23
386:5,8
387:3
391:9

provided
5:9 13:8
14:2,5,8
23:19,20,
23 29:3
38:13
44:22
48:11
59:14
69:22
70:9
77:20
86:2
94:17,19
103:11
104:8
112:25
118:4
122:23
131:24
170:15
176:23
179:11
187:17
201:13,15
202:18
207:16
218:14
224:5,11
225:18
234:25

240:15
259:7,13
260:11,25
261:3
264:8
265:22
266:9
267:11
273:16
335:5,8,9
336:20
340:8
374:1
378:10

providers
63:15
214:21
394:25

providing
15:9
33:16
45:19
70:2 78:4
80:1
81:12
91:7 92:2
104:17
118:25
119:1
172:3,6,
14 173:2
176:25
177:1
181:15
185:11,23
249:22
318:6
334:11
352:5
361:6

provision
44:6
292:2
317:19

proxy
343:17

psychologis
t
133:13

psychologis
ts
131:5,20
132:11,
18,21,24
133:16
390:19

public
21:8
49:13
57:2
71:24
246:6
258:25

publication
97:10
283:14
311:4
312:10

publication
s
267:22

published
118:21
305:1

pull
25:8
371:11

pulled
302:18

pulling
64:24

punishment
384:8,24
385:1
386:1,2
397:6

purely
301:20

purport
184:16
239:11
243:15

purporting
343:2

purpose
44:4
135:3
183:4

purposes
39:8,24
40:13
41:7
100:6
123:8
147:12
150:3
194:2
211:10
256:11
328:21,22
376:16

push
351:2

pushback
151:20
152:22
157:5

pushed
152:4

pushing
368:1

put
22:8
31:19
91:12
101:8
107:22
122:14
126:10

127:14
128:25
132:13,19
133:4
146:21
160:21
162:16
185:2
205:11
208:23
221:22
222:10
223:20
230:16
278:1
279:1
295:8
296:9,12
338:9
380:20
383:5
388:8

Putnam
10:9
42:20
89:25
109:5,20
111:20
163:13
165:4
169:7
179:5
211:7
212:2
214:20
215:13
216:5
219:10,25
223:25
230:22
231:11
233:6
269:19
306:18
330:14



Putnam's
167:10
184:17
215:19
232:20
340:11

puts
301:25

putting
97:19
98:4
101:17
116:18
207:9
294:16
299:11
300:5
326:21
367:20

———————

**Q**

———————

qualificati
on
43:24
266:22

qualified
77:11
137:1,21
138:24
387:9

qualifier
194:19
244:3
275:23

qualifiers
185:2
326:22

qualifies
51:19

qualify
52:6
227:1

298:19

qualifying
44:2

quality
176:15,
20,23
177:9
208:14
261:2
328:5
354:24
356:2
361:3

quantified
252:25

quarter
110:10
333:23

question
7:16  8:5
9:1,2,4
28:4
36:11
52:2
65:13
68:13
70:21
80:4  81:2
83:4,11
87:10
98:2
100:25
101:3
105:4
113:6
115:14
119:13
124:5
126:22
127:3
128:20
129:19,20
134:16
136:1

139:21
148:5,21
153:2,7
154:10
162:15
171:9
185:4
190:18
192:25
195:1
199:22
202:2
208:10
209:20
220:9,12
236:11
243:2,13,
17 248:14
252:23
253:8
254:2
269:6
277:15
284:22
292:13
293:9
294:16
295:20,
21,22
296:10
318:9,22
325:22
329:6
331:11
341:15
342:17
347:23
351:5
381:7
383:24
388:13
389:17

question's
80:22
288:16
383:21

questionabl
e
331:2

questioned
269:3

questioning
296:23

questions
8:1  9:5
26:22
39:24
122:25
125:7
126:2,18
127:18
128:7
141:17
150:22
195:24
207:20
209:15
213:1
240:19
377:5
401:12

quibble
229:11

quick
24:13
83:13
85:3
168:6
368:5
369:12
396:1

quickly
64:25
337:24
383:20

quiet
281:24
282:19

quietly

276:1

quiz
120:19

quote
133:24
214:12,19
219:10
223:22,24
228:13,17
230:21
235:23
291:22
312:9,11

quoted
213:11
214:20
318:25

quotes
212:1,5,
15,17,23
213:6

———————

**R**

———————

radically
254:25

ramificati
ons
209:21

ramp
91:11

randomized
164:6

randomly
194:2

range
76:15

rare
252:1,9

rates
347:9



**RBT**
148:11

**read**
10:11
42:23
44:3
94:24
97:15,16
108:25
116:20
136:9,18
165:23
169:12
213:17
232:19
236:9
237:19
242:10
244:23
247:10
261:9
262:25
307:16
333:14
341:11
343:7
354:4
356:20
364:15
374:11
402:2,13

**readily**
65:6

**reading**
42:14
82:10
123:24
135:21
136:17
168:9
232:19
237:13
240:7
318:12

**reads**
228:17

**ready**
16:21
18:24
165:16
311:12
350:20

**real**
226:6
236:11
315:15
328:17

**realistic**
176:10
342:18

**reality**
193:16
247:4
249:4
283:18
366:6
367:16
398:4

**realized**
230:11

**reason**
6:6 8:22,
24 75:8
80:3
126:5
160:1
187:13
201:24
204:17

**reasonable**
250:24

**reasoning**
39:16

**reasons**
73:1
75:11
77:9

108:7
151:25
173:15
201:16
202:13
242:22
246:20
278:10
356:17
382:21
394:4

**rebut**
102:16
116:25
161:11
186:3
212:11,24
227:3
237:21
265:7
268:15
269:22
284:22
299:1

**rebuttal**
93:21
94:6,9,14
100:4
112:9
118:7
164:19
211:7,19
214:3,6,
10,11
225:7
267:14
302:3
306:12
373:6

**rebutted**
163:3

**rebutting**
94:13
102:8
163:2

178:19
184:19
215:8
330:12
360:10

**recall**
120:17
129:20
130:8
131:11,12
134:8
142:2
143:16
152:18
156:16
157:15
158:16,20
159:12
160:9,17
166:24
180:5

**recalling**
105:12

**receive**
105:13
177:15,
23,24
224:6,11,
22 318:2,
19

**received**
36:19

**receiving**
64:17
67:7
138:14,16
166:9
184:2
234:7
339:21
354:23
361:2
379:15
388:10

391:25

**recent**
13:3
128:19
164:6
254:20
293:2
338:1
346:9

**recently**
11:22
12:18
144:5
172:5
382:15

**recess**
85:10
141:11
210:22
285:11
329:22
368:11

**recognize**
100:11
107:8
123:10
147:16
150:5
211:16
293:21
366:4
376:18

**recognizing**
172:4
356:11

**recollectio
n**
121:3
124:22
129:13
139:10,22
149:20
153:24
154:8



recollectio
n's
   121:4

recommend
   323:18

recommendat
ion
   356:24

recommendat
ions
   42:24
   93:4
   303:5

recommended
   90:1

reconcile
   97:8
   238:1
   272:21

record
   5:5,19
   7:18
   50:10
   85:8,12,
   18 141:8,
   14
   210:20,24
   253:18,21
   285:9,14
   298:21
   325:23
   329:20,24
   368:8,13
   401:15,
   16,19,22
   402:7

record's
   154:5

RECORDED
   5:1

records
   36:25
   162:3,7

163:12
178:25
179:3
241:17,
19,22
294:8
295:11
296:17
297:9,14
301:12
302:20,24
328:8

redacted
   328:4

redesign
   315:22

redirecting
   140:14,15

reduce
   321:11
   396:24,25
   397:24
   400:20

reduced
   394:7

reducing
   159:6
   384:18
   394:10
   399:21

Reduction
   158:19

reevaluated
   368:20

reevaluatin
g
   140:12
   141:22

reevaluatio
n
   369:1

refer
   46:6 47:6
   48:14,18
   49:12,16,
   20 50:2,
   11,18
   51:3
   87:12
   109:10,13
   115:7
   257:19
   271:17
   285:22
   291:12
   354:21
   361:17

reference
   105:1
   240:4
   341:12

referenced
   19:1 87:3
   103:12,20
   112:2

references
   101:11
   120:6

referencing
   21:23
   47:9

referral
   112:5,25
   122:25
   263:1

referred
   27:8 47:1
   52:18
   53:13
   106:3,11,
   14 119:19
   158:20
   262:13
   347:3

referring
   24:15,17
   31:4 40:8
   48:15
   103:4
   130:3
   139:11
   151:3,14,
   15 158:17
   243:9
   254:11
   263:17
   266:15
   286:4,10
   288:1
   291:4
   361:24
   370:15

refers
   46:10,18
   79:24
   286:25

reflect
   212:23
   247:3
   289:10
   324:22
   326:2

reflected
   90:12
   117:21
   192:12
   261:19
   281:12
   288:2

reflecting
   108:2

reflection
   188:5

reflective
   285:2

reflects
   248:18
   284:7

reform
   356:22
   357:10

reforming
   357:21

reframed
   212:19

refresh
   121:1

regard
   141:17

regional
   50:2
   132:11
   133:6
   261:13
   344:22

regions
   50:6

Registered
   390:18

regular
   6:21
   137:15
   255:22
   271:5,11,
   16 273:24
   275:6

regularly
   11:9
   368:20

regulate
   281:23

regulated
   396:19

regulations
   264:1
   368:24
   396:8,17

reinforceme
nt



59:20
89:24
321:21
400:5

**relate**
49:6
127:19
142:4
168:23
169:2
392:20

**related**
57:11
63:15
77:17
119:4,10
122:22,24
135:24
137:4
142:1,7
151:16
152:11
153:16,19
162:6
164:16
166:14
168:11
169:9
199:20
200:18
202:24
219:20
232:16
252:13
257:23
337:13
356:15
373:1
395:4,5,
18

**relatedly**
136:24

**relates**
40:14
41:8

238:5

**relating**
166:8
182:19
393:9

**relation**
155:1
275:5

**relational**
61:1

**relationshi
ps**
61:2

**relevant**
118:24
125:6,7
300:13
305:25
308:13
317:21
318:22,
24,25
319:13
322:21
346:20

**reliability**
295:1
330:19

**reliable**
129:9
236:17,19
297:5
387:18

**rely**
175:16
331:17

**relying**
175:20

**remain**
227:11
228:18

**remarkable**
278:8

**remember**
20:3 97:5
103:24
104:21
105:3
107:17,21
110:22
112:18
114:10
115:3
121:23
125:24
126:20
127:16
128:16,17
131:16
141:25
144:9,10,
15 153:8,
13,17,21
154:25
156:3,10,
18 157:4,
21 158:7,
25 159:22
160:3,14
229:6
261:10
282:24
290:20
380:25

**remembering**
104:25
144:12
154:14
167:12

**remind**
128:2

**removal**
385:24,25

**remove**
249:21

**removed**
399:12

**rephrase**
88:19
143:21
262:20

**rephrased**
212:16,19

**replace**
297:22
308:17

**replacement**
62:16
332:1

**report**
9:11 10:6
37:1,19
39:9,12
40:13
41:8 47:5
50:11
51:13
54:20
56:22
58:9 61:1
62:23
72:14
85:22
86:2,5,6
87:11,13
89:8
91:6,11,
14 93:21
94:4,14
97:13
98:5,7,
17,19
100:4,14,
18,22,23
101:17
102:19
105:2,24
109:4
110:5,9

111:19,25
113:18
115:8
116:13
117:10
119:12,
19,25
126:10,11
128:22
129:24
132:14,20
133:5
134:9
136:1
137:7
151:18
154:16
158:25
160:22
161:19
164:19,23
167:9,10
169:10,
16,20
172:13
173:4
175:11
176:8
180:4,7
183:3
188:1
205:11
211:7,18,
19 216:12
231:16
236:10,12
237:8,12
239:17
244:5
255:2,4
260:22
267:14
269:7
281:11
284:5,12,
14,18
294:11



298:24
300:6
301:10
302:3
303:17
306:12
316:8
327:2
330:3
339:19
345:8,12
349:24
356:13
361:16
396:19

**reported**
53:7
174:11
175:2,4,
23 241:19
254:4
256:13
262:2,7
265:10

**REPORTER**
27:1
46:14
79:16,18,
20 84:19
376:8
402:3

**reporting**
152:1,23
261:23
262:5
300:25

**reports**
10:7,8
14:6,11
42:20
43:20
47:15
67:24
85:21
87:11

93:23
94:8,9,
13,16,21
102:8,11
107:12
108:20
112:3
116:21
120:1
134:20
150:11
159:1
161:7
163:3
165:23
168:9
174:5
211:6
212:2
218:22
237:13
254:12
268:11
281:19
294:12
298:6,10
299:10,11
340:11
344:6
350:19
365:12
373:3

**represent**
87:7
149:14
261:12

**representat
ions**
160:25
161:2

**request**
36:19
342:9

**require**
163:10

187:15
205:20
210:7
227:8
246:14
289:13
324:17,18
335:2
394:22

**required**
24:25
45:13
70:1
76:22
77:18
88:21,25
200:14
204:2
223:15
230:1
233:8
255:2,4
261:22
262:5,14
264:1
265:14
285:23
286:2
292:5
324:10
333:12
343:19
354:1
355:20
357:18
361:11
395:7

**requirement**
34:7
204:18
244:17
245:1
309:1

**requirement
s**

185:13
191:13
199:18
238:2
239:18,25
263:6
357:8

**requires**
188:20
217:10
227:16
320:17
351:1

**reread**
10:6

**reregulate**
282:20

**research**
23:9
39:13
40:14,19,
20,21,24
41:1,4,8,
23,24
49:1 55:2
61:6
66:13
73:11
80:9
81:23
82:22
87:15
88:12,16,
22 90:13
98:23
118:5,7,
8,11,16
138:4
153:19
156:23
165:6
166:8,13
179:6
180:21
182:17

184:9,13
185:14
197:20
216:16
217:3,14
229:1,14
230:5,25
231:10,
16,19
233:5,8
235:13
242:4,12,
18,19,24,
25 243:20
244:9
247:14
252:13,24
256:7
269:13
278:6
282:12
290:11
292:20
300:2,9,
10,16,23
301:11,17
302:4,22
303:18,20
304:1,17,
19 305:1
309:6
320:18
323:6,18
325:3
328:3,9,
21,25
330:9,14
331:8,10,
18,24
332:11,12
334:7,8,
18 338:2,
16 339:23
340:23
345:15,23
346:20
347:11,25



348:4,6,
14,24
353:5
360:7,16,
20  362:13
363:11,21
365:2,3,
17
366:18,
19,23
367:2
373:22,23
374:3
375:22
381:20
392:19,21

**research-
based**
76:13
136:15
320:18
391:19

**researcher**
327:22
378:24

**researchers**
214:20
251:11
269:2

**reserve**
5:22

**reserved**
155:24
188:17

**residential**
45:11
74:10,19
75:4
372:16,
19,21

**resort**
45:6,9,14

**resource**

35:3,9,
10,16
53:18
135:9
264:2
370:4
374:8
379:9
380:6
400:15

**resourced**
345:4

**resources**
62:21
76:20
140:15
210:10
230:3
249:7
299:25

**respectful**
173:13

**respond**
31:24
218:17
245:20
282:12
284:13,17
296:6
318:7
321:14
338:22

**responded**
165:4

**responding**
282:2
284:11
350:19
366:24

**response**
29:11,14
154:10
211:4
251:4

252:15,
20,21,22
268:9
269:7,8
280:20,23
281:17,20
367:1
376:22

**responsibil
ity**
351:6,7,8
352:25

**responsible**
275:25
358:8,14
359:9,18

**responsibly**
349:18,23
350:5,16,
24
351:14,
20,24

**responsive**
222:9,19
249:13
251:18
259:7
323:15
367:21

**restate**
325:22

**restrained**
397:6

**restraint**
134:15,17
135:4,11,
14
396:11,25
397:7
398:3
400:4,20

**restraints**
384:24

396:22

**restricting**
210:9

**restrictive**
57:9
74:25
167:23
199:15
200:2
201:4
202:9
203:24
204:10,
20,21
205:7,8
219:13
220:2
242:14,
17,20
372:11

**result**
200:1
201:3
203:23
204:19
358:12
359:1
373:18

**rethink**
332:25

**review**
9:22,25
94:5
101:4,20
109:8
116:24
117:14,16
119:8
125:6
162:3
178:25
179:6,18
241:18
260:8

262:22
292:9
299:15
301:12,22
305:5,7,
12,15,16
327:25
328:8
372:25

**reviewed**
36:24
100:17
101:16
102:2
105:17
106:25
108:10
111:11,16
117:1
120:2
144:20
153:19
169:6,8
179:3
241:16,22
294:7,11
295:11
296:20
298:24
300:15
301:15
302:2
329:7
345:24
346:9
400:17

**reviewer**
19:13
294:17,23
305:22

**reviewers**
19:16

**reviewing**
108:17
179:4



298:5
328:20

**reviews**
163:12
241:25
242:1
297:9
300:19
302:20,23
304:4,21
305:16

**revisit**
18:19
400:13

**ribbon**
382:5

**rides**
394:8

**ridiculous**
309:12

**rightfully**
20:15

**rights**
193:24

**righty**
353:15

**rigid**
265:19

**rigor**
295:6

**rigorous**
18:8
363:21
365:16

**rigorously**
331:6

**risk**
54:8
167:23
219:12
220:2

347:14

**road**
172:1

**Robert**
211:6

**Robin**
97:11

**rock**
18:4

**role**
35:9
283:8
301:11
356:6
380:5
397:2

**roles**
144:2

**room**
370:2,3,5
374:8
396:22
397:19

**rooms**
53:18
264:2
352:12
397:16

**rough**
125:15

**roughly**
48:24

**round**
394:24

**RTI**
30:8,18
32:8,14
251:12

**rude**
7:20
15:14

78:14
157:1

**rules**
5:10  6:23

**ruling**
240:12

**run**
36:15
190:3
383:20

**runs**
228:3

————————

**S**

————————

**safe**
208:21
396:11
397:6,7,
8,10,21

**safely**
398:5

**safetiness**
385:8

**safety**
68:3
208:8

**Sailor**
283:15

**sake**
157:18

**salt**
330:21

**sampling**
292:10

**Sarah**
7:2  46:12
84:20,23
100:8

**Sarah's**

7:11
26:25

**sat**
380:4

**satisfactor
ily**
364:14,19

**satisfactor
y**
189:2
260:3

**scale**
153:3

**schedule**
104:14

**scheduling**
159:19

**scholarship**
97:17
237:17
279:22
382:15

**school**
11:3,23
23:21,25
24:5
25:19
26:12,16
27:18
34:17
46:24
52:12,21
53:1
54:15
59:16
61:17
66:16
68:1,2,14
69:25
74:5
81:24
82:3,17
87:22

129:8,9
131:5,20
133:6,9,
18 135:8
136:18
139:8
150:10,
11,14
151:17
152:22
154:21
155:14
156:24
166:18
182:23
190:7
199:13
201:2,20,
22 202:14
203:5
206:14,16
208:7
209:5,6
231:24
234:22,23
242:8
246:2
252:7
255:17,
18,22,24
256:1,10
257:7,22
258:4,7,
20 259:24
261:15
278:7,21
289:15
302:19
303:14
310:3,6,
16,24
347:5
354:25
369:17,
20,25
370:19
371:9,13,



17 372:6,
9,18
375:2
376:3
379:18
385:7
390:3,19
394:8
399:9
400:15,
19,23

**school's**
203:13

**school-aged**
288:11
343:13

**school-based**
40:10
52:5
168:11

**school-wide**
31:20
59:17,18
87:20
109:23
128:4,5
134:11
151:4,5

**schoolers**
393:2

**schools**
24:22
25:1,5
26:12
28:19
29:20
35:11,22
36:18
37:15,19
39:15
40:5,21
41:4
47:17,24

50:13
51:1,8,22
53:24
54:3,5,8,
11,12,21,
22 55:4,
5,10,21,
22 66:15
74:3
82:23,25
105:14
107:8,20
110:10,
12,21
112:6
113:1
119:2
129:10
131:18
132:3,4,6
134:5,10
137:10,11
140:6,16
141:24
150:24
151:11,18
154:17,23
155:19,22
157:6,9
161:10
162:2
171:6
172:5,14,
19,23
174:3
175:17
177:3,17,
21 179:14
183:16
193:6
197:22
204:24
208:20,21
209:4
219:6,14
222:16
223:14

224:4,10
231:22
234:4,5
243:10,25
245:24
256:15,22
258:25
259:1,3,
13 261:7,
11 263:15
264:1,3
275:11
295:6
327:20
363:11,22
365:16
370:10,21
382:6
389:12

**sciences**
118:16

**scope**
176:14,
20,22
177:9
241:22
361:3

**Sean**
143:9

**searches**
304:19

**searching**
304:3

**seat**
322:7

**seclude**
398:9

**seclusion**
134:14,17
135:5,11,
13
384:11,19
396:2,5,

9,12,15,
22,23
397:1,9,
15,19,22
398:3,20
399:1,16
400:1,4,
10,20,24

**section**
35:21
139:24
141:20
161:5
165:3
181:2
190:13
237:5
238:3,10,
18 239:17
263:20
282:4
285:19
306:1
312:11
330:5,8
331:21
345:8,12,
21 348:5
351:13
352:2
359:21
360:6,16
366:18

**sections**
183:4

**seeking**
42:22
43:11
44:12,15

**segregated**
43:22
51:10,13
72:20,25
186:4
236:13

**segregates**
184:22
185:7
186:16
235:25

**segregating**
42:10

**segregation**
72:10,16
180:9
230:22
231:7
232:8,24
234:11,16
235:10
238:5
299:22

**segregation's**
231:3

**SEL**
131:7
132:1
133:22

**selected**
75:17
145:15

**self-assessment**
130:5,13

**self-concept**
373:25
374:15

**self-contained**
47:19,23
50:25
51:5,6,23
52:18,23
53:5,17
61:16
188:10



193:5
231:12
242:8
243:9
251:24
256:15,19
257:1,5,
9,13,17,
21 258:3,
5,8,11,
14,21
259:4,25
260:4
264:3
277:8,17
369:11,
15,19
370:13,22
371:2,13,
17 374:4,
8,21
379:22

**self-report**
175:16

**semester**
13:9

**send**
138:6

**sending**
202:9

**sense**
7:23 8:8,
19 16:6,
17 17:24
21:14
22:8
23:23
34:21
37:4
43:19
53:12
54:18
69:6
71:16

72:20
74:12
111:7
113:25
136:20
140:8
155:4
158:9
162:9
171:7,18
172:2
177:6
180:10
183:17
186:5
188:11
193:22
201:23
202:19
220:24
240:2
279:6
284:24
287:17
292:17
301:2
313:3
320:25
336:11
338:21
352:9
356:18
359:15
365:19
381:6
389:4
394:18
398:24
401:6

**sentence**
242:3
244:16
246:23
262:12
266:8
269:24

275:17
279:12
285:21
286:4
287:3
308:9
309:24
333:4
335:16
346:14
348:22
349:14
353:21
358:6
363:10
377:10

**sentences**
262:13

**separate**
32:10,11,
12,19
50:13,25
51:4,6,
22,24
52:12
54:15,21
55:22
56:7
57:13,15,
21 63:25
65:16
72:1
73:15
76:4 79:1
80:22
81:15
119:2
137:11
162:2
183:10,16
186:24
187:7
188:4,16
189:15
194:2,9
226:3

227:10
231:8,18,
22 232:17
233:3,22
242:8
243:8,10,
25 244:20
245:3
246:7,17
255:17,
18,24,25
256:10,
15,22
258:20
259:3,23,
24 273:17
332:4,17
336:5,13
337:1,18
338:25
339:16
348:1,8,
15 349:22
350:3,12,
15 351:21
353:8
359:25
360:8,17,
23,24,25
363:11,22
364:22
365:16
366:11,
14,15
367:8
368:20
369:7,16,
20
370:10,21
371:16
372:6,9,
18 373:8,
9,13
374:13,21
375:2
376:2

**separately**
117:22
191:11

**separates**
275:11

**separation**
335:21
373:17

**September**
211:8

**serve**
54:5,13,
16 55:10
69:12
70:25
72:2 74:9
75:24
89:1 90:7
97:23
106:16,18
132:24
133:17
207:12
215:17
218:3
244:2
250:25
257:21
274:11
348:25

**served**
19:13
43:5
44:23
132:21
170:1
180:18,25
181:21
186:24
187:7
188:3,10
199:5
213:13
219:13,18



221:10
222:13
223:11
224:3,9,
21 231:22
233:11
241:14
254:15,16
258:14,19
261:25
269:11
273:6,20,
23 275:8,
14 290:14
347:17
353:7
360:23,24
362:1,8

**serves**
80:19
165:9

**service**
77:17
141:22
163:19
167:22
201:1,7,
12,25
214:21
234:8
259:8,12
395:18

**services**
10:24
14:2
23:20
33:16
38:14,16,
20,23
43:3
44:18,20,
22 45:2,
20 48:5,
10 49:23
58:1

60:10
62:9
63:15
64:19
67:13
68:17
69:21
70:8
71:11
75:7
76:13
77:21
78:2,9
79:4,12,
13,22
80:6
81:5,16,
21 112:25
119:1,2
122:23
167:5,16
168:12,
14,25
170:16
176:16,23
177:10
179:20
184:3,10
185:22
199:3,12,
16,20
200:1,13
201:14
202:21
203:15
204:3
207:3,15
210:7
213:14
214:24
215:10,23
217:19
218:12,13
223:7
224:22,25
225:13
227:8,14,

19
228:18,21
229:19
234:25
240:14
249:20,22
250:3,11
251:10
259:7
260:10,
19,24
261:3
263:5
264:22
265:21
268:2
273:16
274:13,20
275:1
287:10,
14,22
290:3,19,
23 334:11
335:4,8
336:11
339:22
340:1,7
341:7
345:16
349:12
353:2
359:13
361:3,6
369:14
370:24
371:23
374:1
378:10
379:15
395:1,5,
9,14

**serving**
10:16
60:14
136:8
185:22

326:24
327:8
347:20

**session**
25:19

**set**
142:13
214:22
227:8
265:14
306:15
310:14

**setting**
51:19
52:7
55:15,17
57:12
58:2,7
59:1,4
60:3,13
61:22
64:10,13,
20 65:2,
4,5,8,15,
16,25
67:12,19
68:10,19
69:13,18,
24,25
70:12
71:10
72:2
73:5,14,
16 74:10,
13,19
75:4,23
76:4,18
77:10,19
79:1
80:14
81:11
83:15
84:3
187:18
188:23

199:15
200:2
201:4,16
202:5,8,9
203:21
204:20,22
205:7,8
206:3,12
207:2,7
234:14
235:4
240:16
250:11
257:12
260:1
273:17
277:11,12
305:17
319:8,16
326:10,13
327:8,9
332:16,17
333:16
345:22
346:5
351:5
352:7,21
354:12
356:15
362:6
373:18
375:17

**settings**
46:7,9,
18,24
47:1,7,22
50:13
52:9
53:25
54:21
62:2 63:8
69:9,11
80:22
82:12
176:24
177:25



179:18
181:1
186:25
187:7
188:16,19
192:5,10,
24 193:17
194:15
203:15,24
213:13
215:3
216:18
218:11
219:19
224:4,9
225:14
228:19
233:4
236:7
242:7
244:20
245:4
246:17
248:10
253:22
258:16
260:11
261:4
272:18
275:15
304:10
305:19
317:21
318:17,
22,24
319:13
322:16,19
328:20
337:18
340:2
346:8
348:2,16
349:22
350:3,12,
15 351:23
352:1,13
353:3,8

367:19
372:4,6,
12

**severe**
188:9
288:14
361:21
379:21
380:24

**shaking**
287:4

**shaky**
298:18

**shameful**
280:4

**share**
97:1

**sharing**
151:21

**sheets**
59:21

**short**
265:25

**shortage**
14:23
20:14

**shortages**
133:15

**shortcut**
187:3

**shorter**
147:14

**shorthand**
49:24
127:25

**shot**
324:16

**show**
242:5
272:3

297:14
347:25
348:14,18

**showed**
104:12
159:2

**showing**
317:13
400:10

**shown**
184:13

**shows**
110:9
233:5
235:13
270:14
272:9,12
304:17
330:14

**shrinks**
111:2

**sic**
19:10
21:17
119:7
150:11

**side**
29:13,15
153:1
375:5,7

**sign**
402:2,13

**SIGNATURE**
402:12

**significanc
e**
126:19

**significant**
59:12
250:18

**significant
ly**
291:25

**similar**
13:4 35:4
45:17
66:11
86:6
115:22
122:19
160:10
175:21
179:4
302:9
306:17
308:9

**similaritie
s**
86:9,12

**similarly**
246:18
261:1
391:5

**simple**
288:17

**single**
323:7

**Siperstein**
36:16

**Sir**
346:14

**site**
294:14
295:12
296:17

**sites**
52:5
261:6,13
294:20

**sitting**
143:15
381:4

**situation**
258:18
358:18

**size**
321:12

**skill**
317:24
318:2,12
319:1,4,
11

**skills**
60:21
62:17
88:7
130:25
131:3,5,
15,19,21
216:6
218:20
219:2
308:11
309:18
310:14
311:15
317:21
320:21
322:16,18

**skimmed**
111:24

**skip**
135:17
228:13
309:24
322:14
349:8

**sky's**
203:12

**slide**
221:25

**slightly**
208:10
305:13
388:12



ANDREW WILEY, PH.D.
UNITED STATES vs STATE OF GEORGIA

October 30, 2023
Index: slow..special

slow
 27:1
 46:12
 89:23
 317:4

Slower
 46:13

slowing
 84:18

small
 172:23
 189:25
 307:12
 377:3

smaller
 110:23
 190:8

snuff
 19:18

soapbox
 361:13

social
 36:15
 60:21
 62:17
 88:7
 118:16
 131:2,4,
 5,15,19,
 21,23
 189:24
 213:15
 216:6
 218:19
 219:2
 278:7
 279:14
 287:25
 320:21
 332:12

social/
emotional
 130:25

131:3

society
 310:25

solid
 230:15

solve
 165:14
 322:4

solved
 164:13
 205:18
 322:7
 380:11

solving
 205:21
 222:25

somebody's
 235:12
 296:14

something's
 324:3

sort
 15:18
 18:20,23
 21:5,9,13
 22:9
 28:17
 30:18
 33:15
 35:8 36:5
 38:2,13
 43:7,18,
 22 44:2
 45:14
 47:17
 53:23
 55:19
 57:1
 60:25
 61:21
 64:24
 67:1 68:3
 80:5

87:14
95:5
102:24
107:15
108:15
113:13
124:11
126:23
129:23
134:11
162:1
165:22
171:1
172:15
178:24
180:23
190:13
193:4
197:17
205:4
212:8,15
214:2
224:20
228:3,6
233:16,24
234:7
237:20
239:7
240:18
249:18
250:16
251:14,19
252:22,24
257:6,12
259:4
278:11
279:24
280:21
284:20
289:10
292:25
294:4
298:23
299:20
310:20
313:7
314:11

316:15
317:23
318:19
320:22
325:3
333:17
343:11
348:4
351:5
355:14
361:14
366:5,18
380:17
381:17
385:21
398:18

sought
 26:5

sound
 156:6
 292:6
 297:22,25
 375:5

sounds
 7:13
 50:24
 220:16
 253:11

sources
 127:4
 299:1
 375:24

space
 189:24

spaced
 12:25

spaces
 12:15
 369:25
 370:17

spans
 269:13

speak
 21:4
 73:22
 114:2,25
 115:16,20
 121:16
 124:21
 130:15
 144:22
 145:2
 146:6
 155:8
 218:6
 243:15
 263:10,22
 341:16,21
 342:5,6,
 19 381:19

speaking
 68:7
 88:14
 106:1
 122:21
 134:3
 150:9
 187:2
 341:12
 345:11
 368:18
 385:6

speaks
 100:22
 319:10

special
 12:8,9,
 17,19
 14:23
 15:23
 16:6,13
 17:15,23,
 25 18:8
 19:11
 20:15
 24:8 28:5
 37:19



39:16
41:20
51:25
54:15
55:2,16
58:4
61:14,17
63:3,21
65:4,5,8
66:15,16
68:2
69:3,9,25
72:18
74:3,5
79:13,24
81:12,24
82:3,17,
23,25
87:22
89:21
96:12
105:11
118:16
120:19,22
122:23
135:8
136:25
137:14
144:8
178:11
187:14
190:7,16,
19 193:6
197:21
202:14,18
203:15
206:16
208:20
220:20
228:5
232:2
233:17,
18,23
234:4,5
235:4
237:16
239:9,23

243:15,
20,24
244:9
245:24
246:2
250:6
251:5
254:5,13
263:14
264:3
266:12
269:1
274:25
278:7,21
280:24
284:4
286:6
287:1
289:15,16
290:5
292:6
309:25
327:9
339:11
351:9
352:5,8
358:4
369:25
370:11
371:12
372:9
376:12
377:11,24
378:7,20
379:4,15
381:11,13
382:9,12,
19,25
383:2,14,
25 384:9,
12,21,25
385:3,9,
18 386:1,
6,14
387:5,10,
15,24
388:4,10,

19 389:1
390:11,21
391:7,9,
16
392:13,19
393:10,24
394:9,16
395:3,6,
7,19
399:9

specialist
28:4,7
33:23,25
35:2,16
140:17
148:9,10
203:2
379:9,11
380:6
389:12

specialists
35:18
140:6

specializat
ion
190:21
362:6,22

specialized
50:12
51:4,19
52:6,9
53:25
54:21
55:15,17
57:13,16,
18 59:1,4
60:2,13
61:22
64:1,20
65:25
67:11,19
71:14
75:23
76:6 80:1
111:1

187:18
188:12
201:16
203:3
206:3
227:10
230:1
236:7
242:7
262:17
265:23
277:12
307:13
319:16
333:16
353:8
361:10
393:17

specials
200:19
202:16

specific
11:22
29:25
60:9
73:23
76:23
92:12
97:20
105:2,22
127:19
153:23
154:8
155:10
157:5,8
164:20
173:17
182:21,23
196:5
202:12
215:22
217:6
218:9
220:1,17
229:3
241:17

282:24
291:13
295:17
301:17
303:21
306:12
320:7
331:13
345:24,25
347:15
379:20
380:3
394:14

specificall
y
38:25
44:13
55:10
58:15
59:16
60:6
93:14
102:9
133:20
138:21
145:10
156:19
160:18
163:10
164:17
168:20
182:20
213:21,24
216:9
237:24
252:24
261:13
286:25
302:7
304:12
306:9
321:2,10
322:15
329:1

specificity
227:4



specifics
  61:23
  169:20
  203:1
  225:18

spectrum
  35:5
  106:19
  308:10

speculate
  235:5
  362:2

speculating
  126:24

speculative
  137:16

SPEDPRO
  96:25

speech
  380:23

speed
  46:14

spelled
  369:3

spend
  52:13
  53:20
  181:9
  185:17
  250:20

spent
  14:13
  53:8
  165:5
  258:15
  379:22
  380:19

spoke
  112:3
  114:21
  115:1,9
  120:7

122:17
143:20
144:19
150:16
154:15
155:10
159:10,17
297:6

spoken
  93:17
  96:13
  159:16

sponsored
  104:19

staff
  36:24
  63:10
  77:11
  137:21
  138:24
  163:21
  209:25
  263:3
  297:11
  387:21
  390:9,12,
  14 391:6

stages
  107:14
  109:21

standard
  298:7
  299:8
  308:12

standardize
d
  294:19
  296:2

standards
  140:13
  299:17
  300:7
  306:8
  308:22,23

Standby
  85:7

Stars
  283:15

start
  91:23
  120:16
  145:22
  211:21
  213:5,9
  219:6
  238:18
  279:11
  291:21
  308:8
  313:14,19
  331:20
  384:3

started
  29:12
  96:23
  111:6
  156:9
  165:25
  327:19
  339:2
  365:6

starts
  140:5

state
  5:18 6:3
  9:19
  10:23
  11:6,11
  13:16,19,
  20,22
  14:3,6,9,
  13 15:2,
  8,9,18
  16:10,15,
  20,22
  17:14
  18:20
  19:6,8,16

20:24
21:13
22:5
23:12,15,
16 29:19
31:3,5
37:13
42:9,19
43:2 86:3
92:21
96:8
98:12
99:5,14,
20 108:11
109:10,
13,17
110:11
117:3
118:4
119:6,10
120:23
153:4
166:7,21
167:3,14,
21 171:24
174:3,5,
6,11
175:2,4
177:10,17
178:1
203:17
245:21
256:14
261:22
263:12,23
264:10,11
291:6,11
293:2
302:25
308:21,22
312:16
325:9
326:16
344:9,20
396:13

state's

140:14,15
261:14
272:12

stated
  108:21
  366:25

statement
  155:13,16
  159:7
  215:9
  217:7,8
  221:1,19
  224:15,17
  227:2
  230:19
  231:2
  235:9,12
  241:11
  243:21
  247:12
  249:19
  272:22
  279:18
  281:17
  320:4,24
  330:12
  338:23
  339:14
  350:8
  365:25

statements
  225:12
  228:4
  262:20,21
  267:16
  281:21
  284:18
  345:17
  367:3

states
  6:3 14:9
  17:10
  22:12,24
  42:22
  43:11



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA              Index: States'..student

44:15
107:7,24
109:17
110:12
126:23
127:23
171:2
174:13,15
175:5,24
241:16
255:2,4
262:1
264:21,24
271:8
291:16
299:9
396:18

States'
179:25
268:10
281:19
298:6,10
299:10
345:14

statewide
182:25
186:15

stating
102:4
237:1
350:19

status
40:14
41:8
228:25
268:12

stay
17:19

staying
102:3,10

steep
247:17

stenographe
r
6:12

step
173:8
250:9

step-by-
step
238:16

stepping
258:17

steps
160:24
232:5
255:9
326:8

Stevenson
143:7

stigma
374:16

stigmatized
374:7,10
375:2

stood
370:5

stop
198:12
210:16

stopped
126:12

story
97:5
124:20
316:16

straight
399:25

straightfor
ward
91:9

strategic

129:19,
21,22,25
130:4
140:4
166:22

strategies
12:3
31:25
35:14
321:8
322:1
387:23

strategy
118:8,22

strength
229:1

strengths
37:1

strictly
283:3

strikes
178:25

string
269:24

stringent
299:14

strong
90:15
294:3

structure
27:11
162:4
294:17
314:20
372:4

structured
45:20
59:9,24
60:16
61:8
62:13,14
66:17

90:19
299:16
306:20
313:6
318:4
322:10

struggling
32:24
137:12
221:13
374:11

stuck
50:20
69:17
125:18
142:25

student
23:1
34:18,21
36:2
45:22
53:23
56:21
60:2,7
62:11
64:14,16
65:8,22
66:9,23
72:24
74:2,9,
15,18,24
75:7
76:14,16,
24 77:6
78:5
80:25
82:13
144:4
179:11
182:23
187:23
195:14
199:4
200:2
201:1,3,

19 202:8
204:4,14,
20,21
205:25
206:23
226:2,18
227:11,
21,23,24
234:13,
17,18,23
238:7
241:16
245:25
250:4,6,
18 251:22
252:7
257:8
258:18
259:23
262:15
274:7
287:15,
16,21
288:3
292:9
293:16,25
294:2,5,8
295:11,14
296:17,19
302:17
308:15
309:14,17
310:1,4
311:5
314:11,23
316:4
318:8,16
319:14,21
320:7
321:2,13
328:6,25
332:9
333:25
334:2
335:2,3
343:24
351:22



360:3
361:2
366:3
371:4
375:1
379:17
386:19,
24,25
389:4
393:8
397:8,11,
15,17,18
398:1,22
399:1,3,
6,10,20

**student's**
34:15
58:6
61:24
64:11
73:17
75:3 77:3
82:4
83:16
206:8
226:9,21
227:7
246:13
315:2,11
317:13
327:13,17
329:8
336:16
386:6,14
387:23
398:14

**students**
11:10,12
13:9
17:20
20:20
21:7,9
25:1,4
26:6,14
27:22
29:18

30:24
31:3,5,9,
10,11
35:5,7,11
40:15,23
41:9
42:10
43:4,25
44:16,23
45:1,6,21
46:19,20
47:18,25
48:4,5,8,
22 52:13,
20 53:3,
16,20
54:5
55:10
56:10
57:23
59:2
60:11,14
61:3 62:3
63:16
64:21
65:17,24
66:18
67:20
68:12,20,
23 69:4,
13,14
70:25
71:22
72:3,19
73:14
74:4,7
75:24
76:9
77:5,23
79:6
80:12,18,
19 81:6,
18 84:13
89:2
106:2,11,
14,16
127:20

155:23
169:25
170:3,11,
17,18
176:16,18
177:15,
16,23,25
180:16
181:20,23
182:3
184:22
185:7
186:16,24
187:5,8
188:3,6,
9,11,17,
23 191:9,
20 192:1,
2 194:8,
14
195:10,13
196:4,11
197:10
198:13,20
203:23
207:3,5,
25 208:2,
13,15
209:25
210:9
213:12
214:1,4,
9,13,14
215:2,6,
17 217:9
218:4
219:11,
12,17,20
220:1
221:9
224:1,5,
8,11
225:5,14
228:18
230:23
231:8,22
232:8,9,

24 233:3
234:7,16
235:25
241:13
242:2,9,
13 243:12
244:19
245:2
246:7,11,
15 247:6,
13 248:9,
11 249:9
256:22,25
258:8,14
259:5
260:11
261:3,18
262:13
263:7,12
265:2,6
266:11
267:2
270:3,7,
15 271:2
272:14
273:23
275:6,10
276:8,10,
17,22
277:1,8,
22 279:5,
15,16
282:17
285:23
286:7
288:9
291:5,24
292:1,4,
10,17
295:12
297:19
303:15
306:4
307:9,13
308:9,10
312:6,19
316:19

324:24
326:4
328:2
333:8
335:16,20
336:19
337:10,
12,13,16,
20
339:15,
16,20
343:8
346:17,23
347:24
348:25
349:15,21
350:3,13,
14,21,25
351:10,24
353:6
357:12,22
358:8
359:2
360:8,18,
22
361:17,24
362:1
363:11
364:11,
20,22
368:18
371:8
373:14,19
374:12
376:15
378:10
383:3,14
384:12,22
387:4,21
390:9
391:24
392:15
393:11
394:11
395:2,5
396:5
398:9



399:9

students'
  65:19
  140:12
  141:22
  194:11
  200:10
  203:22
  241:8
  327:11

studied
  240:7

studies
  179:7
  288:12
  289:6,18
  290:6
  291:14
  339:18
  348:9
  381:22

study
  118:10,13
  231:12
  289:19
  300:19
  304:25
  359:8

studying
  305:12

stuff
  12:3 57:9
  91:3
  93:24
  98:16
  108:17
  109:24
  208:9

subheading
  262:11

subject
  323:7

subjective
  161:22

subjects
  138:23

submit
  19:15

submitted
  95:18

substantial
  317:20

substantially
  86:5

substantive
  187:12
  328:18

substantively
  106:8

succeed
  8:2 246:1
  313:8

success
  213:16
  291:25
  308:14

successful
  45:7
  54:17
  188:18
  234:13
  294:2
  310:2,8
  333:18
  354:8
  358:7

successfully
  16:12,13
  207:6
  219:18
  259:15

310:5

sufficiency
  170:15
  176:14,22
  306:9
  329:8

sufficient
  176:20
  317:16
  345:19
  353:24
  355:18
  391:3,25
  394:17

sufficiently
  391:9

Sugai
  110:5,18

suggest
  219:5
  267:22
  303:10
  340:23
  347:5

suggestion
  35:13

suggests
  258:13
  292:20
  307:8

suit
  158:9

suited
  191:21
  194:10

summaries
  237:7
  240:25
  373:3

summarizing
  360:6,16

summary
  327:3
  350:8

summer
  92:4

summing
  43:6

super
  120:21
  138:4
  161:14
  162:23

superintendent
  120:23

superior
  189:15,
  17,18,21
  190:19
  348:1,15,
  18 360:1

supervise
  27:21

supervising
  26:2
  27:9,15,
  21

supplement
  137:15

supplemental
  29:24
  30:1,2
  251:10

support
  12:2 16:3
  22:10
  28:19
  29:14
  31:21,23
  34:1,20
  35:14

59:10,24
  60:16
  66:14
  82:10,14,
  23 87:20,
  21 88:3
  89:12
  90:20,23
  108:11
  155:3
  171:6
  188:21
  201:1
  208:12
  214:25
  216:2
  218:16
  221:16
  226:18
  229:17
  237:2
  242:13
  270:7
  273:8
  274:7
  316:5
  319:12
  324:19
  326:17
  331:18
  357:15
  366:14,15
  370:7
  371:4
  382:9,17
  392:21

supported
  221:20
  269:15
  345:4

supporting
  171:24
  215:1,6
  217:9
  330:9



supports
  33:16
  34:3
  38:15
  44:17,21,
  22 45:2
  48:5,10
  58:1 60:9
  62:14
  64:19
  65:1
  66:10
  67:14
  72:24
  73:7
  77:21
  78:2,10
  79:3,22
  81:4
  83:25
  84:12
  87:4,8
  91:7
  150:11
  176:23
  188:22
  189:19
  191:6
  199:3
  200:1
  204:3
  206:18
  207:3
  213:14
  224:6,11
  225:3,13
  227:8,14,
  19 228:18
  249:23
  250:4,10
  260:10,
  20,25
  261:2
  263:5
  267:6,8
  268:2
  287:10,

  14,22
  290:3
  292:3
  300:21
  336:21
  339:22
  340:18
  345:16
  360:7,17
  361:3
  369:14,18
  370:24
  378:11
  381:24
  386:5,8

supposed
  19:20
  56:24
  138:18
  200:8,9
  343:25

surgically
  399:12

surprised
  264:25

surprising
  129:7
  264:6

survey
  243:22

sustain
  176:6

sustained
  323:2

sustaining
  228:21
  229:13,19
  230:13

SW-PBIS
  127:8
  128:4

swear

  5:6

SWIFT
  266:23
  283:11

SWIS
  151:3,5
  152:1,6

switch
  55:25
  91:20

switching
  138:20

swoop
  365:8

sworn
  5:11

synonymous
  48:24
  50:15

synonymous
ly
  290:3

syntheses
  118:9,23
  300:18
  304:8
  305:1,3

synthesis
  300:10
  301:11
  303:18
  325:4
  339:24
  340:6

synthesize
  118:17

synthesized
  300:16,23

synthesizin
g
  303:20

  325:3

system
  37:11
  59:19
  151:6
  167:4,11
  168:8,18
  169:2
  228:22
  229:16
  274:15
  382:16

systematic
  179:18
  302:23
  313:16
  314:2,5,
  13 315:1,
  6,14,15
  326:12
  381:17

systematica
lly
  182:17

systematici
ty
  314:7

systems
  164:4
  229:17

_____

         T
_____

table
  244:16
  253:6
  254:3,7
  260:6,8,
  9,12,24
  261:1,5
  270:12,
  14,20
  271:1
  275:5,9

  299:18
  346:22

tables
  236:12
  254:18,21

TAG
  19:8,13

tailored
  60:10

takes
  40:20
  356:23
  382:19

taking
  147:6

talk
  11:17
  28:18
  34:2
  47:16
  54:20
  56:2
  58:14
  61:20
  75:25
  78:15
  82:24
  88:10
  91:6
  98:18,19
  110:19
  115:24
  122:9
  123:22
  124:2,8
  128:22
  129:18
  130:7
  132:16
  136:4
  145:9
  149:10
  156:20
  161:10



190:13
191:11
192:24
222:12
223:16
229:4,5
264:18
281:1
288:20
316:7,13
321:5,7,
19,23
340:16
342:12
383:6
391:22
398:17

**talked**
9:13
11:25
35:12
42:3  57:7
58:8
62:23
66:14
75:21
83:23
89:8
93:12
113:24
116:7
123:25
132:18
135:12,
13,14
136:4
144:11
154:2
156:18
178:21
189:22
246:9
280:7
299:2
301:13
321:11

342:25
346:3
347:4
368:16
369:10
372:1,7,
13 373:7,
9 382:16

**talking**
19:3
22:25
24:22
26:12
27:14,16
31:1
34:18
38:19,20,
22 40:5,
9,11,20
41:1,18
43:24
46:5,22,
24 47:24
48:7
55:3,9,21
59:9
61:7,13
62:9
63:2,3
71:3
74:22
80:13,21,
22 87:21
89:4
91:23
97:22
104:5
113:3,11
118:4
126:12
130:18
132:2
137:9
138:21
145:12
147:5

156:9
162:18
180:22
181:10
182:15
197:4
201:7
208:4
213:6
216:10
227:5
229:7
230:9,11
238:17
240:25
242:2
263:18
273:7
276:1
280:16
283:1,16
284:9
285:21
289:2
293:6
295:16,19
302:14
322:1
328:7
336:5,6,
9,10
339:4
344:2
347:22
357:14
364:9
371:22
374:4
382:22
390:13,15
394:16
397:20

**talks**
220:1

**tape**
201:20,21

**tapered**
247:19

**target**
60:5
321:1

**targeted**
391:15
392:8,9,
10

**task**
116:21
306:14
389:11

**taught**
28:1
31:16
46:21
48:1
68:23
192:2
193:5,8
202:15
227:13
235:3
244:20,21
245:3,4,
12
246:11,16
257:11
267:2
270:4
271:15
323:14
337:12,21
351:13
374:1

**teach**
29:10
248:20
266:19
312:25
328:14
350:20

**teacher**

15:6,17,
24  17:2
20:16,21
21:10,18
23:2,7,11
24:1
27:11,15,
22  35:3
68:17
135:9
136:25
278:19
318:9
356:6
370:4
379:9,18
380:6

**teachers**
11:12,24
12:7,18
14:19,23,
24  16:14,
21,24
18:9
20:14
24:6,22
25:3,22
26:2
27:9,17,
23  29:20
33:25
35:12,23
63:12,13
68:24
69:3
77:17
84:6,9,10
105:6,10
239:24
328:23
356:5
387:20
390:21

**teaching**
16:22
24:11,24



25:2
138:24
192:4,23
193:17
231:8
319:11
335:16,20
374:12

**team**
34:17
45:21
156:4
173:11
188:25
192:14
199:13,18
200:1,13,
20,25
201:12
226:3
227:22
249:2
250:5,15
251:16,21
262:15
265:18,23
327:14,
17,23
361:9
375:12,19
379:18

**team's**
202:6

**teams**
121:11,21
145:25
146:3
327:11

**technical**
19:18
355:8

**technically**
13:18
15:1

**technicians**
390:18

**technologie
s**
353:25

**technology**
354:21

**telling**
11:18
70:6
119:24
191:8
299:5

**tend**
106:16
188:3,11
193:13
254:24
280:25
396:19

**term**
19:18
45:9
47:17
49:1,5
52:11
64:23
70:11,12
72:5,8
73:2
79:23
83:2
163:18
168:7,20,
21 205:10
215:10
218:13
224:19
275:16,19
318:6
332:10
358:14

**terms**
26:6 37:3

45:12
50:14
51:2,9,11
52:10,14
53:8
54:4,25
55:9 56:8
76:15
82:14
89:11
107:20,25
110:15
152:22
171:24
172:1
176:10
185:13
215:20
217:12
227:1
229:9
235:1
240:13
273:7
300:12
310:22,25
321:5,10
350:23
360:3
370:11
373:5
395:9

**terrible**
138:5
158:10
341:25

**test**
355:15

**tested**
252:16

**testified**
10:19

**testify**
99:10

**testifying**
6:17

**testimony**
6:7 92:2
343:3
373:16

**testing**
250:21

**textbooks**
239:3

**therapeutic**
38:15,20
49:23
64:18
77:20
78:1,9
79:3,12,
22,25
80:6 81:4
131:6
170:16
176:15
177:10
228:17
390:9,14

**therapist**
380:23

**therapy**
215:1
216:5,8
218:19
219:1

**thing**
7:3,14
19:2,7
25:25
57:24
58:8 60:3
75:13
89:18
94:25
99:17
105:22
106:9

108:22
109:7
142:4
149:17
162:2
173:3
174:14
175:10
192:20
196:19
197:15
205:15
213:3
227:17
233:16,25
234:3,5
236:10,17
248:23
252:14
273:11
274:21
276:21
279:4
280:21
291:7
294:22
316:6
323:13,14
328:12
341:11
343:6
345:1
350:18
352:17
374:19
377:12,25
380:21
392:6
395:20
399:23

**things**
6:20 13:4
15:4,11
18:22
26:7
34:3,19



ANDREW WILEY, PH.D.
UNITED STATES vs STATE OF GEORGIA

October 30, 2023
Index: thinking..tiers

35:13
36:19,25
38:21
41:22
43:6
46:5,25
57:10
59:8,13,
23 60:21,
22 61:5,
12 62:12
63:1
64:24
65:6
67:17
68:18
76:3,14,
22 81:25
82:1,16
87:19,24
88:4,7
89:20
93:10
95:7
96:18,19
97:18,21
98:23
101:12,
13,19
102:16
103:1,14
107:6,18
108:5,20,
25 109:3
112:4,23
113:2,4,
19,21
118:4
119:11,25
122:11,
22,24
123:22,25
124:1,2,7
125:15
126:8,10
127:3,13
129:12,24

140:1,2
143:3
144:5,25
156:14
160:5,10
161:7,14,
17 162:6,
11,23
163:1
165:24
166:5
168:22
171:16
172:3,11,
25 176:7,
9 183:23
185:10
187:21
190:1,12
191:19
195:16
199:20
200:19
203:10
205:11,18
212:23
215:15
216:6,7
223:8
228:7
230:16
240:15
245:14
250:24
254:14,17
255:6,7
257:18
260:14
262:22
264:14,16
274:13
278:2
279:2
280:6
281:11
282:1,24
288:2

289:4,24
290:16
292:15
293:7
296:16
297:3,20
298:13
300:25
301:6,15,
20 302:25
303:8
304:20
305:5,9,
11 309:21
310:11,22
311:2
313:5
322:2
323:18,19
325:9
326:25
327:6
328:10
337:24
340:9,13
351:18
352:23
355:17
356:4
370:10,
18,20,21
373:2,4
375:21
378:16
383:6
392:22
397:12,21
399:22
401:1

**thinking**
29:6
47:2,3,7,
22 70:13
118:3
130:6
151:21

178:18
189:6
248:24
273:12
287:10
321:9
328:6
329:1
352:11
359:17
375:4
381:17
393:2
400:25

**thinks**
43:8

**third-party**
38:2,14

**Thomas**
97:13

**thought**
18:7
20:17
75:14
112:9
124:2
125:6
126:21
128:18
153:11
212:15,
17,21
237:20
238:8
257:5
281:10
300:20
325:15
344:4
360:20
372:19
379:25
380:4

**thoughtful**

277:20

**thousands**
186:3

**three-year**
386:21

**threw**
124:12

**throw**
124:16

**throwing**
70:14
86:25

**throws**
248:23

**tie**
281:25

**tier**
30:3,5,9
66:16
82:25
109:23,25
110:2
111:2,6
153:10,20
154:2
172:7
174:4
175:22
229:9,10
230:8
304:13
353:22
354:8,11,
18 356:11
390:3

**tiered**
173:10
174:15
229:16
390:2
391:23

**tiers**



83:1
90:20
109:22
111:1

time
 8:21 13:8
 14:13
 17:17
 18:10
 24:4
 25:23
 28:1,13
 34:6,22
 36:4
 44:18
 52:24
 53:8,19
 59:18
 73:11
 78:18
 113:17
 116:4,16
 119:18,21
 121:18
 132:13
 133:4
 141:5
 142:20
 145:2
 146:8
 152:7
 157:13,17
 159:17,18
 165:5,16
 181:10
 184:25
 193:3
 197:2
 199:22
 206:15
 210:15
 217:20,21
 220:10
 229:1
 244:18,21
 245:5

247:18
250:21
258:15
269:14
270:18
271:12
272:19
273:24
275:7
281:24
282:19
290:7
294:15
300:1
303:9
313:12
317:16
322:9,17
327:16
329:13
344:15
347:1
360:9,18
365:10
378:18
380:2,19
381:1
382:1
385:6
394:7,10
395:11
397:1,2
400:14

timeline
 93:22
 94:2,3

timelines
 22:21

timely
 339:21

timer
 101:12

times
 12:25

25:5
26:10
30:17
31:8 32:5
33:1
82:24
121:8,16
133:12
193:12
282:19
293:5
296:24
298:3
331:8
379:17,23
380:15,25
397:4
399:13

tips
 125:24

title
 12:1
 120:17
 144:21
 159:13
 262:11
 331:21

titled
 376:12

titles
 143:2
 144:15

today
 6:2,7,16,
 21 7:3,11
 39:9
 40:13
 41:8 56:2
 95:17
 143:15
 181:10
 246:17
 327:10
 357:15

368:17
369:10
373:7,16

today's
 9:10

toggling
 197:17

told
 93:18,20
 94:7
 96:16
 117:20,23
 130:9
 134:16
 135:24
 137:3,19,
 22 140:20
 141:25
 149:21
 160:17
 169:5
 335:9
 342:1

tomorrow
 230:16

tonological
 224:20

tools
 190:21
 218:2
 302:24
 354:20

top
 22:14
 125:13
 132:25
 228:16
 240:23
 241:4

topic
 11:22
 128:21
 129:14

130:16
144:23
184:7
344:3

topics
 104:13
 114:1,3
 115:23
 116:6,7
 118:22
 122:8,16,
 19 124:12
 125:8
 127:14
 145:4,12,
 15
 341:22,25

total
 35:18
 95:16,19

totally
 26:24
 37:24

touch
 60:25
 323:4
 396:1

touched
 87:10
 99:21
 108:23
 109:20

touches
 97:18

tough
 203:3
 249:23
 265:12
 281:2
 297:15
 347:18

tougher
 189:11



track
  15:15
  61:23
  101:16,18
  143:2
  186:8
  312:3
  344:17

train
  50:23
  156:5
  355:24
  356:4
  387:20

trained
  68:24
  84:7
  202:18
  210:6
  239:25
  356:8
  391:9

training
  14:19
  30:19
  31:23
  32:2
  63:19
  76:16
  77:16
  103:3,8,
  9,20
  104:3,6,
  17 105:2,
  6,15
  113:2
  122:24
  134:22
  153:11
  168:13
  171:4
  172:4,7
  176:3
  205:13
  230:1,17

238:1,22
353:25
354:7,13,
20,24
355:2,3,
10,11,15,
18,19
356:11

trainings
  12:21
  104:15
  105:10

transcribing
  7:2

transcript
  401:25
  402:14

transcription
  7:14

transcripts
  169:6

transfer
  14:20
  19:9
  20:12
  318:11
  322:16,18

transition
  277:10

transitioning
  379:8

transparency
  300:3

transparent
  306:20

trap
  208:18

travel
  117:2

treat
  208:18
  376:13

treated
  344:21

treatment
  239:8

treatments
  352:15,19

trend
  337:11

Tri-c
  20:8

trial
  99:10
  164:6

triangulate
  297:9

trick
  172:8

tricky
  53:21
  55:19
  66:5 78:7
  113:15
  159:19

trips
  80:4

trouble
  103:2
  154:24
  155:20

true
  40:18
  65:4
  160:14
  185:16
  191:2
  201:23

203:11
221:12
226:20
282:21
283:3
308:20
310:16
331:19
332:20
334:21
335:20
336:12,23
337:20,23
342:13
351:16
362:3
393:7

truncate
  139:16
  183:23
  307:25

truth
  6:16
  281:15

tumor
  399:10

turn
  253:3
  262:8
  269:3

turning
  260:6
  270:11
  311:11

tweaks
  281:3,5

two-sided
  153:1

two-thirds
  150:23

two-year
  14:19
  19:23

20:11
22:15
254:20

type
  10:23
  11:15
  67:7
  201:11
  274:6,8
  319:25
  320:9,15,
  16,19
  326:18
  336:20

types
  286:6
  324:23
  326:1,2

typical
  49:4
  81:23
  136:11
  258:1,6
  354:2

typically
  12:13
  13:7
  30:17,21,
  23  32:4
  46:22
  47:12
  52:17
  61:14
  98:22
  188:7
  257:8
  258:9
  312:5,21
  316:17

typing
  141:1
  158:11



**U**

**U.S.**
  211:5

**uh-huh**
  7:16
  30:14
  86:19
  127:10
  128:5
  204:23
  228:12
  235:22
  237:9
  239:21
  291:3
  364:16

**uh-oh**
  209:17
  255:19

**uh-uh**
  7:17
  363:24

**unable**
  74:24
  75:2

**unacceptably**
  337:15,17
  339:7

**unavoidable**
  248:15

**undercut**
  193:18

**underestimate**
  279:13

**undergraduate**
  31:11,14

underline
  340:10

**underlying**
  260:9

**underqualified**
  210:5

**understand**
  7:17,25
  8:3
  48:15,19
  49:5,11
  50:3 60:8
  64:6
  106:13
  108:4,15
  139:6
  155:18
  169:22
  173:24
  178:9
  183:3
  194:6
  200:24
  202:1
  213:20
  216:24
  225:12
  237:25
  239:6,21
  258:2
  267:4
  268:18
  283:4
  284:5,11
  285:25
  287:5
  295:4
  299:19
  324:14
  328:18
  348:24
  352:18,24
  365:17
  366:19

394:23

**understanding**
  39:25
  41:23
  42:6,7,
  12,14,21
  43:7
  44:25
  51:21
  55:13
  68:5,8
  70:4,5
  73:13
  78:20
  90:25
  92:18,23,
  25 94:11
  98:18
  99:4,9,11
  109:1
  121:1,3,4
  132:10,
  12,22,23
  133:5
  162:25
  163:13
  168:17
  170:9
  191:12
  201:11
  225:10
  228:24,25
  236:5
  239:22
  240:8
  256:4
  257:2
  260:19
  261:9
  268:9,12
  277:15
  286:21
  292:23
  293:13
  299:4

316:22
  324:9,21
  330:7
  334:13
  345:13
  361:22
  371:15
  399:24
  400:8

**understandings**
  91:17

**understood**
  8:5 23:10
  66:6 94:1
  102:9
  108:9
  109:6
  116:21
  120:3
  127:15,23
  130:13
  176:12
  177:5
  184:15
  186:21
  215:9
  216:4
  239:19
  275:3
  285:4
  292:13
  306:22
  341:9

**unequal**
  236:2,24

**unethical**
  364:10
  365:14
  366:2

**unfair**
  236:2,24

**unfairly**
  158:15

unfortunate
  374:25

**unhappy**
  344:16

**uniformly**
  233:24
  383:1

**unintelligible**
  34:12
  54:25
  79:14
  98:25

**unique**
  95:7
  97:21
  380:7

**United**
  6:3 14:9
  42:22
  43:11
  44:15
  127:23
  179:25
  241:16
  268:10
  281:19
  291:16
  298:6,10
  299:9,10
  345:14

**units**
  257:19,20

**universal**
  89:9
  174:14
  340:14,22

**universe**
  77:1

**universities**
  15:25
  17:19



19:23
21:8
22:15
31:9
104:9

university
13:13,15
16:2
19:14
36:14
41:1
96:2,6
382:4

university-
based
17:1

unlimited
206:2
247:5
249:5

unnecessari
ly
42:9
184:22
185:7
186:4,16
194:1
210:8,13
233:18
235:18,25
244:19
245:3
246:16
394:19

unnecessary
180:9
192:4,23,
25 230:22
231:3
232:7,12,
23
234:11,15
235:3
238:5

373:12

unpack
57:16
93:14
225:1

unpacked
276:14

unqualified
209:24

unusual
79:23
133:15
264:16
288:23
289:7
327:22

upcoming
103:3
153:10

update
101:11
305:14
386:14,
17,20,22,
23 387:2

updated
373:24

upfront
102:24
103:11
302:25

ups
83:13
316:18

upset
139:9
318:16

upstream
401:1

upward
337:11

USF
104:24

utilization
184:17

utilize
132:11

utilized
133:6

───────────

V

───────────

valid
236:17,19
387:18

validate
255:10
353:23

validity
294:25

values
193:15

variability
314:6
362:12

variable
340:3

variables
321:23

variation
185:21
313:8
362:20

varies
138:8
264:12

variety
77:8
201:15
254:14

vary

78:3 82:8
146:11
264:10
291:25
383:11

vast
77:22
79:5
81:6,10,
17 163:5
164:15
213:10,11
215:11
216:15
219:10,23
220:14,23
221:9,24
244:5
247:6
248:8,11,
23 269:9
273:9
282:6
284:3
292:3
346:16,23
347:23
349:15,21
350:13
366:1

Venn
55:20,23

verbalize
7:15,19

verify
160:24
161:2

version
67:2
164:18,
20,22
318:5

versions
312:22

versus
6:3 14:9
61:22
189:25
315:16
352:12
371:13

Vickie
143:4

VIDEO
5:1

view
169:15
184:10
284:6
322:5
397:15

viewed
45:18
212:7

views
268:19

violent
399:13
401:4

Virginia
23:1
28:7,13

virtual
121:14

virtually
127:20

visited
306:18

visits
294:14

visual
201:19

vitae
93:8
380:20



vocal
  243:24
  379:13

volunteer
  26:15

vulnerable
  367:23

_____

    W

waffle
  8:16,17

Wait
  121:9

waiting
  9:2 21:12

walk
  238:11

wanted
  87:5
  91:14
  105:21
  106:11
  108:1,15
  113:3
  115:23
  122:9,11,
  19 123:22
  124:2,7
  125:8,15
  126:9,14
  127:16
  130:7
  136:4
  146:23
  149:10
  153:12
  212:10,23
  215:4
  259:14
  282:11
  285:25
  305:18

316:20
343:18
399:18

warrant
  288:15,17
  289:14

wary
  277:25

Washington
  376:11,23

Wayne
  283:15

ways
  8:12 11:1
  20:23
  25:16
  58:13
  59:14
  138:10
  162:4
  173:17
  175:22
  176:8
  178:10
  203:14
  215:20
  237:21
  259:11
  260:16
  264:21
  272:9
  274:6
  309:3
  310:12
  389:25
  399:14

weaknesses
  37:2
  346:19

weary
  67:24
  278:9,12

website

103:15,16
107:1
108:8
130:1
166:25
171:5
174:7
254:8

websites
  93:9
  94:24

week
  13:6
  159:21
  315:10

weeks
  323:9

weight
  192:2
  193:25

weird
  86:23
  221:23
  222:5

well-
defined
  390:25

wellness
  144:4

wheelchair
  91:11

wheelchairs
  91:13

wide
  280:3

widely
  89:10

Wiley
  5:1,8,14,
  16,20 6:1
  8:21 9:9

10:13
26:20
27:8
33:10
37:25
39:8 42:5
45:4,24
48:14
56:1,6
60:8
83:14
84:25
87:1
91:21
95:10
100:4,8
123:10
137:19
141:16
147:16
150:5
160:24
162:22
169:19,24
176:13
181:6
186:10,23
207:24
211:8,13,
21 219:16
224:7
225:9
226:7
232:22
238:19
240:22
244:10
253:3
262:8,19
267:12
285:16
327:10
330:2
344:7
364:17
368:3,16
372:25

376:18
383:19
393:21
396:4
402:1

Wiley's
  336:3

Williamson
  247:25
  359:8

win-win
  26:18

Wina
  104:6
  111:12
  112:13
  113:3
  114:11
  115:1
  120:8
  144:13

wisdom
  269:4

withdraw
  51:16
  55:24
  175:3
  349:4

witnessed
  378:20

wondered
  343:21

wonderful
  355:16

wondering
  137:3

word
  28:20
  148:17
  188:14
  224:15
  231:6



314:7
315:22

**words**
126:18

**work**
13:6
14:17
15:18
16:3,16
18:3
19:21,24
20:22,25
21:1,22
22:3,17,
23  27:13
28:23
33:22
34:16,23
35:3,6,
15,16
38:10
39:5  42:2
46:17
84:21
89:17
95:11,14,
17,19
96:9
98:10,14
99:5,14
117:3
162:12
173:14
200:9
206:19
221:15
224:1
225:14
229:21
250:22
258:24
292:3
322:3
324:5
327:10
328:1,15

341:2
343:23
345:4
355:16
379:18
387:21
389:3
398:5

**worked**
15:5,21
20:6
22:11
26:14
35:1,2
36:22
39:17
95:24
114:17
115:25
129:4
135:8
195:13
234:22
259:9,10
268:14
278:20
324:17
343:1
370:3
389:12

**workers**
131:6

**workforce**
20:16

**working**
14:25
15:5,23
17:8  24:5
27:17
30:25
59:15
61:3  69:4
126:16
324:3
327:20

379:11

**works**
23:6
85:3,4
90:19
104:23
141:5
174:18
195:25
283:11
294:24
330:24
331:3

**workshop**
12:22
29:9,22
32:5,17

**workshops**
11:8  12:4
13:2,8
28:14
30:8,14,
23  31:13

**world**
21:3
118:3

**worried**
151:23
152:2
276:2

**worry**
382:18

**wow**
250:17

**wrap**
168:25
368:7

**wraparound**
164:8,11
165:6,16,
18,21
166:10
168:12,

21,24
184:10
214:24
215:23
218:12
395:9,14,
20

**wrapped**
197:24

**write**
113:18

**writing**
37:18
93:20
112:10
284:14

**writings**
283:10

**written**
71:15
85:21,22
244:7
260:15
280:7

**wrong**
158:3
220:19
338:12
389:22

**wrote**
9:11
97:14
111:25
123:21
125:5
136:25
176:7
213:10,11
214:19,20
219:10
230:22
235:24
242:4
243:8

244:17
247:2
249:3
262:12
266:8
268:24
270:1
279:12
291:23
307:7
308:9
309:25
333:7
334:6
335:16
337:8
346:14
348:23
353:21
357:7
363:10,21
364:9
377:10
378:3

_____

**Y**

**Yay**
274:17

**year**
12:25
18:5,7
20:7
24:10
30:17,21
32:5,8
33:1
103:9
123:16
140:19
142:7
147:23
150:19
159:3
172:6



254:25
255:8
297:7

**years**
14:12,24
17:19
18:13,16,
18 19:12,
13 22:20
25:12,17
33:23
34:5 38:1
97:6
128:19
158:7
163:12
329:7
379:14

**young**
379:12

**youth**
288:14

———————
**Z**
———————

**Zigmond**
382:4

**zip**
102:25
103:11

**zone**
47:17
112:6
113:1
131:17
132:2,4,6
134:4
161:9
295:6

**Zoom**
253:12

