**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:16-cv-03088- |
| | ) | ELR |
| STATE OF GEORGIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF UNITED STATES' OPPOSITION TO**
**DEFENDANT STATE OF GEORGIA'S MOTION TO EXCLUDE**
**EXPERT TESTIMONY OF ROBERT F. PUTNAM, PH.D.**

The United States brought this litigation to vindicate the rights of thousands

of public-school students with behavior-related disabilities in, or at risk of entering,

the Georgia Network for Educational and Therapeutic Support Program ("GNETS"

or "GNETS Program") because of the State's failure to serve them in more

integrated educational settings as required under Title II of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.* The United States has

amassed substantial evidence in support of its claims, including the expert opinions

of Robert F. Putnam, Ph.D. relating to, among other things, the key therapeutic

services and supports that could help divert children with behavior-related

disabilities from unnecessary placement in the GNETS Program and the State's failure to provide those services consistently or in sufficient amounts or intensity to many students who need them. The State of Georgia ("the State") now seeks to exclude this valuable testimony in its entirety—a position wholly out of step with the Eleventh Circuit's application of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

Because the State's Motion to Exclude the Expert Testimony of Dr. Putnam ("Motion") rests on fatal errors of fact and law, it should be denied. The State argues that Dr. Putnam's opinions are not relevant or reliable because he "offers no discernible methodology" and because his opinions lack a sufficient basis beyond his own experience. ECF No. 428 at 2-3. But the State ignores almost entirely the extensive research, data analysis, interviews, site visits, and documentary support upon which Dr. Putnam relied in forming his opinions and that anchored his well-established methodology. The full weight of that evidence, coupled with Dr. Putnam's decades of experience providing, researching, and consulting on inclusive services for children with behavior-related disabilities, easily satisfies the flexible standard for reliable expert testimony that Federal Rule of Evidence 702

("FRE 702") establishes, particularly in a non-jury case such as this one.  *United States v. Brown*, 415 F.3d 1257, 1268-69 (11th Cir. 2005).  Moreover, there can be no question that Dr. Putnam's testimony, which squarely addresses an element of the United States' *prima facie* case, will assist the Court in understanding the evidence and determining the facts in issue.

Instead of meaningfully engaging with Dr. Putnam's expert opinions as proffered, the State harps on what Dr. Putnam did not—and need not—do: conduct "a workforce or cost study" or make individualized determinations for a statistically significant sample of children in, or at risk of entering, the GNETS Program.  The State's belief that Dr. Putnam's expert testimony is irrelevant and unreliable without those components reflects a basic misunderstanding of the burden shifting framework in *Olmstead* litigation and, in any event, does not provide a sufficient basis for excluding his opinions.  The State's criticisms, however misguided, concerning the bases and sources of Dr. Putnam's expert opinions go to their weight rather than their admissibility.  As *Daubert* makes clear, "[v]igorous cross-examination, presentation of contrary evidence, and

3

careful instruction on the burden proof" are the appropriate means of attacking admissible evidence.  509 U.S. at 596.

## I.    Background

The United States will prove at trial that the State of Georgia unnecessarily segregates thousands of public-school students with behavior-related disabilities in the GNETS Program, unlawfully separating them from their general education peers and denying them equal educational opportunities.  *See* United States' Compl. at ¶ 1 (ECF No. 1).  Under Title II of the ADA, the State is required to provide the therapeutic services and supports it offers to students with behavior-related disabilities in integrated educational settings when (a) the students are appropriate for community-based services, (b) they do not oppose receiving such services, and (c) such services can be reasonably accommodated.  *Olmstead v. L.C.*, 527 U.S. 591, 607 (1998). *See* 42 U.S.C. § 12132.

As part of its evidence related to (c) above (reasonable modifications), the United States intends to offer the testimony of Dr. Robert Putnam, a licensed psychologist and Doctoral-level Board-Certified Behavior Analyst with over 50 years of experience working with and on behalf of children with behavior-related

disabilities at risk of restrictive educational or residential placement.  Dr. Putnam is a national authority on integrating school- and community-based behavioral health services through multi-tiered systems of support ("MTSS").  He has authored numerous peer-reviewed articles on the topics of MTSS, Positive Behavioral Intervention and Supports ("PBIS"), and supporting students with behavior-related disabilities in integrated educational settings.  In his capacity as Executive Vice President of the May Institute, Dr. Putnam has provided consultation to states and school districts across the country regarding their implementation of evidence-based therapeutic services and supports that can prevent restrictive educational placements.  Expert Report of Robert Putnam ("Putnam Report") at 1-4 (ECF No. 428-1).  Dr. Putnam's qualifications are described in full in Appendix A to his expert report.

Applying his professional training and decades of experience in the fields of behavioral psychology, applied behavior analysis, special education, and behavioral interventions, Dr. Putnam has rendered six key opinions: (1) that children with behavior-related disabilities who are at risk of restrictive educational placements can be served, with limited exceptions, in general education schools

5

within their communities; (2) that the therapeutic services that help students remain in more integrated educational settings, and the frameworks for implementing those services system-wide, are well-established; (3) that Georgia has adopted key services and supports that could help prevent unnecessary placement in the GNETS Program; (4) that Georgia has failed to provide those services and supports in sufficient amount or intensity to students who need them; (5) that this failure results in students unnecessarily being placed in the GNETS Program and puts other students at serious risk of such placement; and (6) that the State could decrease its reliance on the GNETS Program by making reasonable modifications to its existing behavioral health service system.  Putnam Report at 1.

In support of these opinions, Dr. Putnam relied not only on his training and decades of experience, but also on extensive scholarly research regarding inclusive behavioral health services, site visits to over two dozens public schools in Georgia, interviews of school staff and administrators, testimony by key State officials and community-based service providers, publicly available documents concerning Georgia's behavioral health system of care, and his analysis of voluminous information produced by the State in this litigation including data and documents

relating to the provision of Medicaid-reimbursable behavioral health services to children in or at risk of entering the GNETS Program. Putnam Report at 6. Dr. Putnam attached to his report a complete list of the materials he considered— totaling over 500 entries—in forming his expert opinions. Putnam Report at Appendix B.

As Dr. Putnam testified in his deposition by the State, the methodology that he used to guide his assessments in this litigation is hardly novel. He has used the same well-established methodology—recommending reasonable modifications based on a combination of site visits, interviews of educational staff and administrators, review of relevant scholarly research, and analysis of relevant documents and data—for over 40 years in conducting program evaluations, including at the state level. Deposition of Robert Putnam ("Putnam Dep.") at 99:9-18 (ECF No. 428-2).

## II.    Legal Standard

To determine whether proffered expert testimony is admissible under FRE 702, courts apply a three-part test that considers: (1) whether the expert is qualified to competently testify as to the matters they intend to address; (2) whether the

expert's methodology is sufficiently reliable under *Daubert*; and (3) whether the expert's testimony will assist the factfinder in understanding the evidence or determining a fact in issue. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). As the Supreme Court emphasized in *Daubert*, the inquiry under FRE 702 is "a flexible one." 509 U.S. at 594. The specific factors listed in *Daubert*, where the expert testimony at issue concerned the chemical structure and effects of a prescription drug marketed to the public, may or may not be pertinent "depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co., Ltd. V. Carmichel*, 526 U.S. 137, 150 (1999). Where the expert is addressing issues of "soft science," courts may look beyond the *Daubert* factors and consider the expert's "knowledge, skill, experience, training, or education." *Id.* at 149. The flexible standard under FRE 702 is "even more relaxed" in the bench trial context because "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for [herself]." *Brown*, 415 F.3d 1268-69.

As the 11th Circuit has emphasized, "a district court's exercise of its gatekeeping responsibilities must not 'supplant the adversary system or the role of

the jury.'" *Frazier*, 387 F.3d at 1272 (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999)). *See United States v. Ebron*, 683 F.3d 105, 139 (5th Cir. 2012) ("The trial court's role as a gatekeeper under *Daubert* is not intended to serve as a replacement for the adversary system.").  Rather, as *Daubert* makes clear, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden proof" are the appropriate means of attacking admissible evidence.  509 U.S. at 596.

## III.    Dr. Putnam's Opinions Are Admissible

Dr. Robert Putnam has rendered expert opinions on a central issue in this litigation—whether the State can make reasonable modifications to its behavioral health service system to prevent unnecessary placements in the GNETS Program. Consistent with his approach to conducting program evaluations in other states, Dr. Putnam formed those opinions based not only on his professional training, skill, and experience but also on a rigorous review of scholarly research and extensive information relating to the State's system of care and its provision—or lack thereof—of therapeutic services and supports to students with behavior-related disabilities who are in, or are at risk of entering, the GNETS Program.  Applying

the flexible standard under FRE 702 and *Daubert*, Dr. Putnam's expert testimony is both relevant and reliable.  The Court should reject the State's arguments to the contrary, which have no legal basis and disregard the substantial evidence and well-established methodology upon which Dr. Putnam relied in forming his opinions.

### a. Dr. Putnam's Expert Opinions Will Aid the Court in Evaluating Whether Georgia Can Reasonably Modify its Service System to Prevent Unnecessary Segregation in the GNETS Program.

Dr. Putnam's expert opinions concerning how the State could reasonably accommodate students with behavior-related disabilities in more integrated educational settings go to an element of the United States' *prima facie* case.  527 U.S. at 607 (1998). *See* 42 U.S.C. § 12132.  Dr. Putnam is eminently qualified to assist the Court in evaluating that issue, *see* Putnam Report at 1-4 & Appendix A, and the State does not suggest otherwise in its Motion.  Instead, the State argues that Dr. Putnam's expert opinions are irrelevant because he did not "analyze any individual student for what would constitute appropriate services" and did not "account for present realities in Georgia" by conducting a workforce study or a cost analysis in connection with his proposed reasonable modifications.  ECF No.

428 at 11.  But the State fails to engage with Dr. Putnam's opinions as proffered or grasp how they will be helpful to the Court in understanding the United States' reasonable modification argument.

In his expert report, Dr. Putnam identified a core set of evidence-based interventions—including Functional Behavior Assessments and Behavior Intervention Plans, Wraparound Services, Individual and Group Counseling, and Family and Community Supports (collectively, the "Core Services")—that help students with behavior-related disabilities remain in more integrated educational settings.  Putnam Report at 6-16.  He drew not only on his experience providing and implementing these services successfully, but also on scholarly research demonstrating their effectiveness.  *Id.* at 6-16.  This testimony concerning matters "beyond the understanding of the average lay person" will be helpful to the Court. *See Frazier*, 387 F.3d at 1262.  It serves as a predicate for Dr. Putnam's overarching conclusion that the State could reasonably reduce its reliance on the GNETS Program by expanding the same Core Services, which already exist in Georgia.  Putnam Report at 5, 54-55.  For example, Dr. Putnam's finding that the State could serve more students in integrated educational settings by expanding its

existing Wraparound Service—Intensive Customized Care Coordination (IC3)—
builds on his analysis of published studies showing that Wraparound Services,
when provided with fidelity, are effective in reducing disciplinary actions for
students with behavior-related disabilities.[1]  Putnam Report at 10.

The connection between Dr. Putnam's recommended reasonable
modifications and the research he brought to bear in support of his opinions was
apparently lost on the State, as its Motion fails even to acknowledge Dr. Putnam's
literature review.  Instead, the State seeks to bar his highly relevant testimony
based on something that Dr. Putnam did not and need not do: "analyze any
individual student for what constitutes appropriate services based on the unique
needs of the student."  ECF No. 428 at 11.  That argument distorts the clear focus
of Dr. Putnam's opinion, which is to establish the effectiveness of the Core
Services in supporting students with behavior-related disabilities in general
education settings.  At most, the State's contention that Dr. Putnam's testimony

---

[1] *See*, *e.g.*, Jonathan R. Olson, et al., *Systematic Review and Meta-analysis:
Effectiveness of Wraparound Care Coordination for Children and Adolescents*, 60
J. American Academy Child & Adolescent Psychiatry, 1353-1366, (Issue 11,
2021) (attached as Exhibit 1).

would be even more helpful to the Court if it also incorporated individualized

analysis of appropriateness goes to the weight of his testimony and not its

admissibility.

Relatedly, the State's fixation on Dr. Putnam's use of the term "standard of

care" is a red herring.  ECF No. 428 at 2.  At no point in his expert report does Dr.

Putnam suggest that the State is violating Title II of the ADA because it fails to

provide a "certain level of benefits to individuals with disabilities" or satisfy any

specific "standard of care" as discussed in *Olmstead*.  527 U.S. at 603.  Rather, Dr.

Putnam uses the term "standard of care" for a separate purpose: to describe a set of

behavioral health interventions whose effectiveness is demonstrated in the

literature and that Georgia has already adopted.  Putnam Report at 6-13.  He found

that students who need the Core Services to remain in their general education

schools and avoid placement in the GNETS Program rarely receive them, either at

all or in sufficient amounts or intensity.  *Id.* at 42-54.  That is precisely the kind of

discriminatory result that Title II and *Olmstead* seek to prevent.  42 U.S.C. §

12132; 28 C.F.R. §§ 35.130(d), 35.130(b)(7)(i); *Olmstead*, 527 U.S. at 599-600,

607.  The State's confusion about what Dr. Putnam has opined on should not

13

prevent the Court from hearing his credible testimony on issues central to this litigation.

The State's final challenge to the relevance of Dr. Putnam's opinions—namely, that Dr. Putnam's proposed reasonable modifications are "impossible" and therefore irrelevant because he did not conduct a detailed cost analysis or a workforce study—suffers from the same flawed reasoning.[2]  ECF No. 428 at 11-

---

[2] The State's suggestion that the United States must prove, as part of its *prima facie* case, the cost of implementing the United States' recommended reasonable modifications and how the State could overcome potential workforce obstacles reveals a basic misunderstanding of the burden shifting framework in *Olmstead* litigation.  As courts have made clear, an *Olmstead* plaintiff's initial burden of identifying a reasonable modification is not a "heavy one" and consists only of "articulating a reasonable accommodation."  *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003) (citing *Burkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)) (once the plaintiff suggests "the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits . . . she has made out a prima facie showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant");; *Frederick L. v. Dept. of Pub. Welfare*, 364 F.3d 487, 492 n.4 (3d Cir. 2004).  If a public entity chooses to assert its affirmative defense, it has the burden of establishing that the requested relief would fundamentally alter the nature of its services, programs, or activities.  *Olmstead*, 527 U.S. at 603-06.

Since *Olmstead*, courts have commonly found that plaintiffs satisfied the reasonable modification element of their *prima facie* burden by showing that a plausible accommodation is available, without the need to establish what it would

12.  That the State believes that Dr. Putnam's opinions would be more persuasive if supported by a workforce study or cost analysis does not mean that those opinions are unhelpful to the Court as rendered.  To the contrary, Dr. Putnam's well-grounded testimony regarding the reasonable steps the State could take to reduce its reliance on the GNETS Program—including expanding existing therapeutic services and supports and improving coordination across the State's child-serving agencies and community partners—is highly relevant.  Dr. Putnam drew on his decades of experience consulting with states and large school districts on the implementation of inclusive services as well as a far-reaching review of documents, data, deposition testimony, and other information relating to Georgia's

---

cost to implement the accommodation.  *See, e.g.*, *Disability Advocates, Inc. v. Paterson*, 653 F. Supp. 2d 184, 192 (E.D.N.Y. 2009); *Henrietta D.*, 331 F.3d at 280-81; *Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 298 (D. Conn. 2008) *Radaszewski v. Maram*, 383 F.3d 599, 611-12 (7th Cir. 2004).

By contrast, the State points to no legal authority supporting its position that the United States, through expert testimony or otherwise, is required to present evidence in its case-in-chief about the cost of making the asserted reasonable modifications or any barriers to implementation, such as workforce shortages. Under the framework devised in *Olmstead*, that burden rests squarely on the State. 527 U.S. at 603-06. *Frederick L.*, 364 F.3d at 492, n.4; *Henrietta D.*, 331 F.3d at 280-81.

existing system of care and the resources available to the State to support the

necessary remedial measures.  Putnam Report at 1-6.  The State ignores the full

weight of this evidence, attacking Dr. Putnam's opinions based on what the State

thinks they should be instead of what those opinions are.

> **b. Dr. Putnam Used a Well-Established Methodology to Reach Reliable Opinions Based on an Extensive Review of Relevant Data, Documents, and Other Information as Well as His Experience and Professional Training.**

Dr. Putnam formed his expert opinions in this litigation based on a wide

range of information—including documents, data, scholarly research, interviews,

site visits, and sworn testimony—relating to, among other things, the State's

behavioral health system of care for children, the State's provision (or lack thereof)

of therapeutic services and supports to students entering the GNETS program, and

the reasonable steps the State could take to serve more students in integrated

educational settings.  In doing so, he deployed the same clearly articulated

methodology that he has used with success in conducting numerous program

evaluations over decades.  Dr. Putnam's testimony also reflects his extensive

"knowledge, skill, experience, training, [and] education" in the fields of behavioral

psychology and his experience working directly with states and school systems to

implement more inclusive practices.  *See Kumho*, 526 U.S. at 147.  That testimony is both well-supported and reliable, particularly when viewed through the lens of the Eleventh Circuit's relaxed standard for expert testimony in a non-jury-trial case.  *Brown*, 415 F.3d 1268-69.

Without regard to the relevant legal standard, the State argues that Dr. Putnam's testimony is "too unreliable to be considered in this case" because he "employed little to no methodology in reaching his conclusions" and because he relied solely on his experience.  ECF No. 248 at 13, 15-16.  Like its unfounded attack on the relevance of Dr. Putnam's expert opinions, the State's reliability argument rests on a distorted reading of Dr. Putnam's testimony that fails to account almost entirely for the evidence that he marshalled in support of his opinions.

The State first seeks to "cast[] doubt on the reliability of Dr. Putnam's findings" regarding Georgia's demonstrated failure to provide Medicaid-reimbursable therapeutic services and supports, at all or in sufficient quantities, to students who enter the GNETS Program.  ECF No. 428 at 13; Putnam Report at 42-54.  Anchoring those findings are Dr. Putnam's review and analysis of

17

voluminous data produced by the State in discovery showing the Medicaid-billable services that students in GNETS in School Year 2020 ("SY2020") and School Year 2022 ("SY2022") received from 2017 to 2022. Putnam Report at 42. Based on that analysis, Dr. Putnam concluded that, although the vast majority of GNETS students are enrolled in Medicaid or PeachCare for Kids, many of those students— including over one-third of students in GNETS in SY2020 and over one-quarter of students in GNETS in SY2022—did not receive *any* Medicaid services during the five-year period. Putnam Report at 43. Dr. Putnam further concluded that the therapeutic Medicaid services students did receive were often provided in small amounts or to just a tiny fraction of students. *Id.*

For example, just nine percent (223) of the nearly 2,400 Medicaid-enrolled students in GNETS in SY2022 received Intensive Customized Care Coordination (IC3) at any point between 2017 and 2022, even though the State designed this service for children with intensive behavioral health needs who may be at serious risk of restrictive placement. *Id.* at 33, 43-44. Of those students who received IC3 in any amount during the five-year period, far fewer received it in the 180 days or 365 days immediately preceding their admission to the GNETS Program, when

18

this critical service might have helped them remain in a more integrated educational setting. *Id*. at 45-48. Dr. Putnam traced this pattern of service underutilization across the SY2020 and SY2022 GNETS cohorts and across key therapeutic interventions, ultimately finding that many students in GNETS have not received the Medicaid-reimbursable services and supports—either at all or in sufficient quantities or intensity—that could help them avoid placement in the GNETS Program. *Id.* at 43-52.

In its Motion, the State does not even attempt to engage with the facts and analysis that inform Dr. Putnam's opinion regarding the severe lack of therapeutic services for students entering the GNETS Program. The State instead stands up a "straw man," knocks it down, and asks the Court to bar Dr. Putnam's reliable and largely unrebutted testimony on that basis. Specifically, the State suggests Dr. Putnam failed to use "a standardized method to reduce or eliminate bias and subjectivity" or a statistically significant sample when reviewing information about seven students who were enrolled in GNETS between 2020 and 2022. ECF No. 428 at 13-14. But the State fundamentally misunderstands the function of that review, which was not to draw generalizable conclusions based on a representative

sample but solely to illustrate his findings from his data analysis.  Putnam Dep. at 257:19-259:4.

As Dr. Putnam explained in his expert report, he "pulled the records"[3] of seven students at random "[i]n order to better see how [the] lack of services impacts students who were admitted to GNETS."  Putnam Report at 52.  Consistent with that limited purpose, Dr. Putnam first noted that two of the seven students were enrolled in Medicaid or PeachCare for Kids but received *no* Medicaid services during the five-year period under review.  Dr. Putnam's testimony highlights the experiences of two students whose records he reviewed, including one—"Tyler," a Latino 7th grader who entered GNETS in SY2020 and remained enrolled through SY2022—who did not receive any therapeutic Medicaid services prior to his admission to GNETS.  Putnam Report at 52-53.  These vignettes add color to Dr. Putnam's testimony, shifting the focus to the

---

[3] Dr. Putnam did not review full educational or medical records in connection with these seven children.  Instead, he reviewed information obtained from the State relating to each child's age, gender, race/ethnicity, primary behavioral health diagnosis, date(s) of admission to the GNETS Program, enrollment in Medicaid or PeachCare for Kids, and the Medicaid services they received from 2017 to 2022.

children and families whose civil rights are at stake in this litigation.  But they do not form the primary basis of any of Dr. Putnam's expert opinions, including about whether students receive the Core Services in sufficient quantity and intensity before entering the GNETS Program.  By centering this part of its reliability argument around Dr. Putnam's illustrative case reviews while ignoring entirely the extensive data analysis, documents, and other evidence upon which he relies, the State obscures the record and does nothing to discredit Dr. Putnam's testimony or underlying methodology.

The State's next attack on the reliability of Dr. Putnam's testimony suggests, again despite all evidence to the contrary, that he offers no basis beyond his training, skills, and experience in opining on what constitutes "appropriate services" for students with behavior-related disabilities who are at risk of restrictive educational placement.  ECF No. 428 at 14-16.  As discussed above in response to the State's relevance argument, *see supra* at 10-16, Dr. Putnam brings to bear a wealth of scholarly research to bolster his opinions concerning the effectiveness of the Core Services in helping students—even those with severe behavior-related disabilities—remain in integrated educational settings.  Putnam

21

Report at 6-13.  How Dr. Putnam measures "effectiveness" in meeting the needs of

students with such disabilities likewise is deeply rooted in the academic literature,

as reflected in his written testimony.  *Id.*  Increased academic performance,

decreased office discipline referrals, and enhanced social-emotional status are not

outcome measures that Dr. Putnam conjured up, as the State would have this Court

believe.[4]  ECF No. 428 at 14.  Those same measures are prioritized in the academic

literature on multi-tiered systems of support, which Dr. Putnam himself has

worked to develop over decades.[5]  Putnam Report at 6-10, 16-20.

    Dr. Putnam's well-supported expert opinions bear no resemblance to the

"conclusory statements devoid of factual or analytical support" that this Court

---

[4] The State's argument is particularly perplexing given that DBHDD relies on the same outcome measures in the Georgia Apex Program, which seeks "a reduction of children and youth in Georgia with unmet mental health needs, fewer discipline referrals, and increased academic performance among the children and youth who receive this school-based mental health service."  APEX Contract FY2020, ABH000004, US0013064, at 23 (attached as Exhibit 2).

[5] *See*, *e.g.*, Mark D. Weist, et al., *A randomized controlled trial on the interconnected systems framework for school mental health and PBIS: Focus on proximal variables and school discipline*, 94 J. School Psychology 49-65 (2022) (attached as Exhibit 3).

excluded in *Scheinfeld v. LM Gen. Ins. Co.*, 472 F. Supp. 3d 1329 (N.D. Ga. 2020). In that case, the Court found that the defendant's expert, though qualified to opine on the cause and duration of mold damage to the plaintiffs' property, failed to provide any explanation for why he reached his conclusions beyond invoking the "universal scientific method" and his own experience. *Id.* at 1339-40 (internal quotation marks omitted). Here, by contrast and as detailed above, Dr. Putnam anchors his expert testimony not only with his training, knowledge, experience, but also extensive data, documents, testimony, scholarly research, and other qualitative information obtained in discovery or from public sources.[6] While the sources upon which Dr. Putnam relied in support of his opinions may have escaped the State's attention, they are not mysterious: Dr. Putnam catalogues them meticulously in the

---

[6] The Eleventh Circuit's decision in *Frazier*—the only other legal authority that the State advances in support of its reliability argument—is inapposite for the same reasons. In that case, the defendant sought to offer the expert testimony of a forensic investigator about a sexual assault. 387 F.3d at 1252. The expert testified that his opinion was based on "his experience" and a reference text, but "never explained how his own experience, or the texts he mentioned, supported his [specific] opinion." *Id.* at 1265. The expert even conceded that he "was not familiar with any scientific literature" on the topic. *Id.* at 1253. The Court held that his testimony was unreliable because he "offered precious little in the way of a reliable foundation or basis for his opinion." *Id.* at 1265.

body of his expert report and the attached list of materials considered.  Putnam Report at Appendix B.

In a final effort to suppress Dr. Putnam's relevant and reliable testimony, the State seizes on stray remarks by Dr. Putnam during his deposition that it contends reveal his "complete lack of knowledge or fundamental misunderstanding" of aspects of Georgia's state government and education system.[7]  ECF No. 428 at 16-17.  But some of those aspects—whether the Georgia Department of Education is authorized to hire or fire school principals, for example—have little bearing on Dr. Putnam's expert opinions.  In other places, the State's characterization of Dr. Putnam's testimony is at best uncharitable and arguably misleading.

When asked by counsel for the State whether "there is anything that [the Geogia Department of Behavioral Health and Developmental Disabilities] can do to require [a] provider to participate on an [Apex] team," Dr. Putnam responded, "I'm not sure they could require that, but they could influence it."  Putnam Dep. at

---

[7] The State makes no effort to substantiate its assertions concerning Dr. Putnam's "lack of knowledge or fundamental misunderstanding" of relevant aspects of Georgia's state government based on anything in his carefully considered written testimony.

180:25-181:7.  That answer hardly indicates "a complete lack of knowledge or fundamental misunderstanding" of how the State operates the Georgia Apex Program.  Indeed, in response to the immediately preceding question Dr. Putnam confirmed his understanding—entirely accurate—that participation in the Apex Program is voluntary for community-based behavioral health service providers. Putnam Dep. at 180:16-23.

In any event, this is precisely the kind of argument that *Daubert* makes clear should be advanced through vigorous cross-examination and presentation of contrary evidence, rather than by seeking to exclude the expert's testimony altogether.  509 U.S. at 596.

## IV.    Conclusion

For the above reasons, the United States respectfully requests that the Court deny the State's Motion to Exclude the Testimony of Dr. Robert Putnam.  ECF No. 428.

Dated:  November 21, 2023

Respectfully submitted:

RYAN K. BUCHANAN
United States Attorney
Northern District of Georgia

/s/Aileen Bell Hughes
AILEEN BELL HUGHES
GA Bar Number: 375505
Assistant United States Attorney
United States Department of Justice
Richard B. Russell Federal Building
75 Ted Turner Dr. SW
Suite 600
Atlanta, GA 30303-3309
(404) 581.6000
aileen.bell.hughes@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

SHAHEENA A. SIMONS
Chief
Educational Opportunities Section

KELLY GARDNER
Deputy Chief
Educational Opportunities Section

ANDREA HAMILTON WATSON
Special Litigation Counsel

CRYSTAL ADAMS
CLAIRE CHEVRIER
FRANCES COHEN
MATTHEW GILLESPIE
PATRICK HOLKINS
VICTORIA M. LILL
JESSICA POLANSKY
LAURA C. TAYLOE
MICHELLE L. TUCKER
Trial Attorneys
United States Department of Justice
Civil Rights Division

/s/ Patrick Holkins
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 598-3076
Patrick.Holkins@usdoj.gov

25

## **L.R. 7.1(D) CERTIFICATION**

I certify that this Joint Status Report has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C). Specifically, this brief has been prepared using 14-pt Times New Roman Font.


/s/ *Patrick Holkins*
Patrick Holkins

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day filed the foregoing document with the

Clerk of Court using the CM/ECF system, which automatically sent counsel of

record e-mail notification of such filing.

This 21st Day of November, 2023


/s/ *Patrick Holkins*
Patrick Holkins