# Exhibit C

Response to U.S. Department of Justice Expert Reports
of Dr. Amy McCart & Dr. Robert Putnam

Rebuttal Expert Report

Prepared by Andrew Wiley, Ph.D.

September 1, 2023



## Executive Summary

I have been asked to provide a rebuttal expert opinion and report regarding specific claims and opinions of the U.S. Department of Justice ("DOJ")'s experts, Dr. Amy McCart and Dr. Robert Putnam, regarding the Georgia Network for Educational and Therapeutic Supports ("GNETS"). In this report, I assess their claims and opinions, including:

- "The vast majority of students in the GNETS Program can and should be served in integrated settings with appropriate services and supports, where they are more likely to experience social, emotional, behavioral, and academic success." (McCart, pp. 159, 167).

- "Researchers, service providers, and educators have coalesced around a core set of interventions—including Functional Behavior Assessments and Behavioral Intervention Plans, Wraparound Services, Family and Community Support, and Individual and Group Therapy—that are effective in supporting students with behavior-related disabilities in more integrated settings." (Putnam, p. 6)

- "The vast majority of students with behavior-related disabilities, including students at serious risk of restrictive educational placement, can be served effectively in general education schools within their communities." (Putnam, p. 1).

- "[T]he consensus among professionals who work with [students with behavior-related disabilities]—including myself—is that in most cases they can be served in integrated settings in their home schools and attend class with general education students, provided they receive the proper supports." (Putnam, p. 14).

- "The GNETS Program segregates, separates, and isolates students with behavior-related disabilities in multiple and compounding ways." (McCart, p. 1).

2

- "The therapeutic services and supports that help students remain in more integrated educational settings are well established, as are the frameworks for implementing and sustaining those services at the system level." (Putnam, p. 1).

- "The unnecessary segregation of students with disabilities leads to serious problems that are well documented in the research literature." (Putnam, p. 13).

- "[T]he GNETS Program unnecessarily segregates students with behavior-related disabilities, provides them unfair and unequal educational opportunities, and causes them harm (in many cases irreparable)." (McCart, p. 3).

My rebuttal to these claims is organized into five sections. Summary statements for each section are presented below:

I.  To determine whether one is "unnecessarily segregated" under the Americans with Disabilities Act (ADA), one must also consider the detailed and complete framework for determining proper placement designed by the Individuals with Disabilities Education Act (IDEA), which includes relevant stakeholders like parents, teachers, etc. (i.e., those who know the children and their individual education needs best are tasked by federal law with determining the most appropriate individualized educational program for the individual student). Because DOJ's experts do not consider IDEA's processes and their effect on decisions related to a child's placement in their analysis, their assertions of "unnecessary segregation" of students is unsubstantiated.

II. The generalized statement that the "vast majority" of students with behavior-related disabilities can be effectively taught in general education discounts or underestimates the diversity, complexity, and severity of the educational difficulties experienced by

3

these students. DOJ's experts did not examine individual students' needs or explain how individual differences ought to influence programming and placement decisions (i.e., who are the "vast majority," who are not?)

**III.** Research does not show that inclusion (placement in general education) is categorically more beneficial than placement in specialized settings (e.g., self-contained classroom, separate school) for students with behavior-related disabilities. To the contrary, placement in general education can be associated with negative outcomes.

**IV.** Educational services and supports intended to make general education appropriate and effective for students with behavior-related disabilities have substantial limitations related to both evidence and implementation in schools that are not addressed in the DOJ reports. These limitations cast doubt on whether these practices (e.g., multi-tiered systems of support) will allow the "vast majority" of students with behavior-related disabilities to "succeed" in general education or prevent placement in separate settings.

**V.** Separate placements (self-contained classrooms, separate schools) can be more appropriate and effective than general education for some students with behavior-related disabilities.

My opinions in this report are based on the following:

- The reports of Drs. Amy McCart and Robert Putnam produced by the Department of Justice in this litigation;

- The "Findings Letter" from the Department of Justice;

4

- A review of relevant research and professional literature in special education and related disciplines;
- My training and expertise in special education research and practice for students with behavior-related disabilities;
- Professional reasoning grounded in my experience working with and supporting students with behavior-related disabilities and their teachers in schools; and
- Conversations with Georgia Department of Education staff and current and former GNETS directors.

### Introduction

My name is Dr. Andrew Wiley. My curriculum vita is appended to this report and it includes a list of all publications I authored in the last 10 years. During the last 4 years, I have not testified as an expert at trial or by deposition. My compensation in this case is $200/hour.

I am an associate professor of special education at Kent State University. I received my Ph.D. from the University of Virginia, one of the top ranked special education doctoral programs in the country. I was a postdoctoral research associate with the Center for Social Development and Education (CSDE) at the University of Massachusetts Boston. I directed a federally funded research project examining differences in the identification and characteristics of students with emotional and behavioral disorders and their progress over time. During my time at CSDE, I also conducted a comprehensive program evaluation of a special school for students with behavior-related disabilities administered by one of 24 educational collaboratives which supports districts statewide to serve students who have not been successful in general education environments.

I have been employed as faculty in special education at Kent State for 15 years. I teach graduate and undergraduate courses. I have mentored special education doctoral students and

5

directed dissertations, and I have engaged in service at the university, state, and national levels. I have published and presented research and analyses of critical issues related to serving students with disabilities, focusing on inclusion and its limitations, evidence-based practices, and students with emotional and behavioral disorders. All my work at Kent State University and collaboration with other experts around the country is grounded in dispassionate examination of research in special education and related fields. One of my aims in my work is bringing advocacy in special education in line with what we know and do not know from research to ensure thoughtful and fair treatment of students with disabilities in education.

A focus of my work at Kent State has been improving how we prepare special educators to use generally effective "high leverage" practices in their teaching. With grant support, my colleagues and I collaborated with staff from the national CEEDAR Center at the University of Florida to enhance not only our special educator preparation program, but also how we collaborate with other teacher preparation programs within Kent State and at other schools. In conjunction with this work, my colleagues and I secured additional funds to provide innovative in-service training in classroom and behavior management to schools in northeast Ohio.

I am also a member of the executive committee for the Badar Kauffman Conference on Contemporary Issues in Special Education Research. This is an annual conference that draws emerging and established leaders in special education research from across the United States and other countries as well. The focus of the conference is innovative approaches to special education research and improving methodological rigor and quality. In 2024, the conference will partner with the Council for Exceptional Children's Division for Emotional and Behavioral Health and Kent State University to host a leadership summit in Florence, Italy, with an emphasis on international issues and perspectives in special education research.

6

Before I joined Kent State, I held several professional special education positions. I was a Crisis Resource Teacher at Olde Creek Center in Virginia, a public-school educational program for students grades K-6 with the most intensive behavior-related disabilities in Fairfax County. The center was connected to but separate from a regular elementary school. In my role, I consulted with classroom teachers regarding class-wide and individualized behavioral interventions and supports. I provided crisis support to students and staff as needed. My work at Olde Creek was extremely fulfilling. The staff at Olde Creek Center worked with students who were not successful in self-contained classrooms in regular schools. With the intensive services and supports we were able to provide, our students experienced success and a feeling of belonging often for the first time since they started attending school.

I also worked as an Autism Resource Teacher in Fairfax County, serving a caseload of 15-20 students from kindergarten through high school. Most of my students were partly or fully included in general education, and I consulted with teachers and other school staff to support students' individualized educational programs. Next, I worked as a Behavior Specialist to provide consultative support for students exhibiting challenging behavior grades PK – 12, in both general education settings and specialized placements. I trained school staff to develop, implement, and evaluate functional behavior assessment-based behavior intervention plans. I also conducted regional, district, and school trainings related to school-wide and class-wide positive behavior interventions and support.

In short, my career has been dedicated to improving special education for students with disabilities, their families, and schools.

7

## Rebuttal

### I. The Meaning of "Unnecessary Segregation" of Students with Disabilities in Education

The Department of Justice claims that the State of Georgia discriminates against thousands of students with behavior-related disabilities in schools by "unnecessarily segregating" them in a separate and unequal program known as GNETS. The claim is based on Title II of the Americans with Disabilities Act (ADA) which states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The Individuals with Disabilities Education Act also addresses discrimination against students with disabilities in schools, with important differences.

Preventing discrimination against students with disabilities in education requires understanding of the meaning of "participation in" and "benefiting from" as applied specifically to education. Participation in education means participation in *instruction* that optimizes *learning* (learning is the primary benefit conferred by participating in instruction). As a service, the purpose of education is to provide instruction that enables students to learn the knowledge and skills that they need to maximize their long-term independence, choices, and ability to pursue a fulfilling and happy life.

Thus – as I discuss in this section – exclusion from education in the placement context means exclusion from the place where the child can receive the instruction necessary to optimize their learning. Access to education has a qualitatively different meaning than access to other services, programs, and activities. Whereas the ADA generally prohibits discrimination against individuals, IDEA provides a detailed and specific framework for identifying the appropriate placement of individuals to ensure access to individualized educational programming. In my

8

opinion, a claim of "unnecessary segregation" in schools under the ADA is flawed and incomplete without closer consideration of the detailed framework for individualized placement decisions provided by IDEA and the reasons why that framework is in place.

**Free and Appropriate Education in the Least Restrictive Environment.** Before the passage of the IDEA, students with disabilities were excluded from participating in and benefiting from education in two ways. First, many students with disabilities were prohibited from attending school at all. Second, many students with disabilities were allowed to attend school but, while physically present, they did not receive the specialized instruction that addressed their special (atypical) educational needs. That is, many students with disabilities were *instructionally excluded* even when they were *physically included* in general education environments (a problem that still occurs today, as I discuss later in this report). IDEA recognizes that access to education means *access to instruction that benefits the individual student* first and foremost; the place of instruction is an important but secondary consideration. Note that for other services, programs, and activities, and for some individuals with disabilities, physical access to a place may be the most important concern; for example, access to a building like a library, museum, or recreation center. This is not the case for education.

IDEA addresses discriminatory *instructional exclusion* in education by requiring schools to provide all students with disabilities a free and appropriate education in the least restrictive environment. Because the purpose of education is teaching and learning, the provision of a *free and appropriate public education* (FAPE) is the primary concern or obligation of IDEA. Providing FAPE in the *least restrictive environment* (LRE) is a related but secondary obligation (Yell & Prince, 2022). According to the U.S. Department of Education's Office for Civil Rights, "the 'appropriate' component [of FAPE] means that this education must be designed to meet the

individual educational needs of the student as determined by appropriate evaluation and placement procedures." (*Frequently Asked Questions on Disability Discrimination*; see additional discussion on page 7 about uses of the term "appropriate" in IDEA).

Before IDEA, parents had few rights and were typically excluded from making decisions about the education of their children. IDEA requires all special education decisions (e.g., FAPE, LRE, etc.) to be made by a school-based team that includes the parents or guardians as full and equal team members. Many parental rights are enumerated in IDEA (Yell et al., 2020). Parents must be notified of procedural safeguards at least once per year. Understandable language is required throughout the special education process, so that parents understand their rights, assessment results, available services, and their child's progress. Parents must provide informed written consent before schools can conduct an initial evaluation to determine eligibility, provide special education and related services for the first time, or conduct a reevaluation. Parents may object to any aspect of the special education process, including identification, evaluation, educational programming, and placement. Parents may request a due process hearing to resolve disputes with school districts (Yell et al., 2020).

Determining FAPE first requires comprehensive evaluation and assessment of the unique special educational needs of the individual student.[1] Once those unique needs have been identified, FAPE is operationalized as an *individualized* educational program (IEP) of specially designed instruction and related services that address those needs. *After* FAPE has been established as an IEP, the IEP team decides what the LRE is for each individual student – that is,

---

[1] On page 36 of her report, Dr. McCart incorrectly characterizes the IEP process as "diagnosis and placement." Placement based on disability category violates the substantive and procedural requirements of IDEA. IDEA was deliberately crafted *not* to allow placement based on diagnosis. Dr. McCart incorrectly states that "to qualify for special education, a student must have a diagnosis from a licensed psychologist or medical doctor." Finally, my review of GNETS materials and conversations with current and former GNETS staff confirm that placement in GNETS is not based on disability label; it is based on the needs of the individual student.

where the student's IEP can be most appropriately and effectively delivered. The order in which these requirements are addressed is critical. The IEP that addresses the unique needs of the individual student is developed *first*. *After* the IEP is developed, the school-based team identifies the LRE that is most appropriate for the individual student and his or her IEP (Bateman & Linden, 2006). The LRE requirement is defined as follows:

> "...to the maximum extent appropriate, children with disabilities, including children in
> public or private institutions or other care facilities, are educated with children who are
> not disabled, and that special classes, separate schooling, or other removal of children
> with disabilities from the regular educational environment occurs only when the nature or
> severity of the disability is such that education in regular classes with the use of
> supplementary aids and services cannot be achieved satisfactorily (IDEA, 20 U.S.C. §
> 1412)."

The LRE requirement of IDEA includes two parts. The first part "details the presumptive right of all students with disabilities to be educated with students who are not disabled" (Yell & Prince, 2022). The second part identifies the conditions under which the presumption all students are to be educated in general education settings can be overridden. The presumption can be overridden if FAPE (defined by the IEP) cannot be satisfactorily achieved in general education with supplementary aids and services. To make clearer IDEA's two-part definition of LRE, Yell and Prince (2022) suggest that the term should be least restrictive *appropriate* environment, emphasizing the relationship between FAPE and LRE, as well as the individualized nature of the decision. Critically, the determination of whether a particular placement is necessary or unnecessary for an individual student is made by the IEP team alone, not by others who do not know the individual student or the services they require.

11

**Meanings of "Appropriate" in IDEA.** The term "appropriate" is used multiple times in IDEA and sometimes seems to lack clear definition. From a practitioner perspective, "appropriate" means that the individual educational needs of the student are addressed and met. For the IEP team, the appropriateness of educating students with disabilities alongside their non-disabled peers is dependent on whether the student's individual educational needs are or are not met through supplementary aids and services provided in the general education classroom. A student's needs are "met" when progress monitoring shows adequate progress toward IEP goals. Progress toward IEP goals means that the student is benefiting from their IEP. Lack of progress means they are not.

Table 1 presents the specific procedural requirements for determining LRE. Many of these requirements reflect the presumptive right to be educated with students who are not disabled. At the same time, these requirements specify the conditions under which placement other than general education can be considered[2] (e.g., placement must be based on the IEP and its terms; consideration of any potential harmful effects on the student or quality of services; whether placement in the regular classroom will significantly impede the learning of classmates).

Table 1.

*LRE Placement Requirements*

| LRE Requirement | Regulation |
|---|---|
| The placement decision is made by a group of people, including the parent(s) or legal guardian(s), who are knowledgeable about the student, understand the meaning of their evaluation data, and know the | §300.116(a)(1) |

---

[2] In my conversations with Dr. Cassandra Holifield, former director of North Metro GNETS, and Ms. Brooke Cole, current director of Elam Alexander Academy, I confirmed that referral to GNETS occurred through the IEP process. The IEP team considered and documented services and supports that were provided to the student in a less restrictive environment prior to such a referral, consistent with the LRE requirements of IDEA.

| | |
|---|---|
| placement options. This is often the IEP team. | §300.116(a)(2) |
| The placement team must determine the appropriate placement for a student on at least an annual basis. | §300.116(b)(2) |
| A student's placement must be based on his or her IEP and in accordance with its terms. | §300.116(c) & §300.116(b)(3) |
| Unless a student's IEP necessitates another placement, the student should be educated in the same school they would attend is they were not disabled and should be educated as close to home as possible. | §300.116(a)(2) |
| The LRE mandate governs selection of the appropriate placement. The LRE placement must allow a student to be educated with nondisabled children to the maximum extent appropriate. | §300.114(a)(2) |
| The placement team must first consider if the provision of supplementary aids and services will permit placement of a student in the regular education environment, rather than the more restrictive environments in which the student may otherwise be placed. | §300.116(d) |
| When selecting the LRE, the placement team must consider any potential harmful effects on the student or the quality of services they need. | §300.324(a)(2)(i) |
| Whether placement in the regular classroom, even with appropriate behavioral interventions, will significantly impair the learning of classmates. | §300.116(e) |
| A student with a disability may not be removed from education in age-appropriate regular classrooms solely because of needed modifications in the general education curriculum. | §300.115(a) |
| Each school district must ensure that a continuum of alternative placements is available to meet the needs of students with disabilities for special education and related services. | §300.115(b)(1) |
| The continuum must include (a) instruction in regular classes, (b) special classes, (c) special schools, (d) home instruction, and | |

13

| | |
|---|---|
| (e) instruction in residential facilities and hospitals. | §300.115(b)(2) |
| School districts must make provision for supplementary services, such as resource room or itinerant instruction, to be provided in conformity with regular class placement. | |

Yell & Prince, 2022

**Importance of the Least Restrictive Environment Requirement.** IDEA's LRE requirement is essential because there was a time when many students with disabilities were unnecessarily taught in separate settings when they could be appropriately taught part or full time with their non-disabled peers (Gerber, 2017; Kauffman et al., 2016). Before IDEA, the "default" educational placement for many students with disabilities was a separate classroom or school. LRE addresses this by establishing a presumptive right of students with disabilities to be taught alongside students without disabilities to the greatest extent appropriate. As a result, the percentage of students with disabilities placed in general education has risen steadily over time. Williamson and colleagues (2020) examined national data and found that, from 1990 to 2015, the percentage of students with disabilities placed 80% or more of the school day in general education increased from 34% to 64%. Notably, the increase in general education placements was steepest from 1990 to 2007 (an increase of 93%) and slowed considerably from 2007 to 2015 (an increase of 9%; Williamson et al., 2020). This deceleration in general education placement may reflect the reality that general education does not have unlimited capacity to appropriately include all or the vast majority of students with disabilities, particularly those with the most complex and intensive needs. For many of these students, alternatives to placement in general education are necessary to ensure FAPE (Kauffman et al., 2023).

14

**Continuum of Alternative Placements.** To allow school teams to identify the LRE appropriate for the individual student, IDEA requires local education agencies to offer a full *continuum of alternative placements*, or CAP. The CAP must include (a) instruction in regular classes, (b) special classes, (c) special schools, (d) home instruction, and (e) instruction in residential facilities and hospitals (see Table 1.) The FAPE, LRE, and CAP are all essential and interrelated. The requirements of IDEA (individualized determination of the least restrictive appropriate environment by a school-based team) are grounded in the reality (acknowledged by the DOJ) that for some students, FAPE cannot be satisfactorily achieved in general education environments, and for some students, a special class, school, or another specialized environment will be needed (Yell & Prince, 2022). Without the CAP, many students with disabilities will be denied FAPE, which is the principal focus of IDEA and the central purpose of education as a service, program, or activity.

While the percentage of students with disabilities served in general education has increased, many are served in alternative placements selected from the full CAP required by IDEA. Placement patterns vary across disability categories, reflecting cross-categorical differences in the nature and intensity of needs and the specialized services necessary to meet them. For example, students with emotional and behavioral disorders ("emotional disturbance") are taught in separate schools at a higher percentage than students in some other disability categories, reflecting the more intensive educational difficulties experienced by these students (discussed in the next section of this report). In 2019, the national percentage of students with emotional and behavioral disorders taught 80% or more of the time in general education was 50.2%, while 12.3% were taught in separate schools (see Table 2). By comparison, the percentage of students with emotional and behavioral disorders in Georgia taught 80% or more

15

of the time in general education was 52%, with 9.9% taught in separate schools. Georgia,

therefore, operates above the national average in educating children with emotional and

behavioral disorders in general education settings.

Table 2.

**Percentage of students ages 5 (school age) through 21 served under IDEA, Part B, who were reported under the category of *emotional disturbance*, by educational environment and State: Fall 2019**

| State | Inside the regular class[a] | | | Separate school[c] | Residential facility[e] | Homebound/ hospital[d] | Correctional facilities[e] | Parentally placed in private schools[f] |
| | 80% or more of the day[b] | 40% through 79% of the day | Less than 40% of the day | | | | | |
|---|---|---|---|---|---|---|---|---|
| All States | 50.2 | 17.1 | 16.9 | 12.3 | 1.1 | 1.0 | 1.0 | 0.4 |
| Alabama | 70.1 | 8.9 | 7.0 | 6.3 | 6.2 | 1.5 | 0.1 | 0.0 |
| Alaska | 50.1 | 22.7 | 15.6 | 7.7 | 1.2 | 0.0 | 2.7 | 0.0 |
| Arizona | 44.4 | 14.7 | 19.3 | 18.8 | 0.8 | 0.6 | 1.3 | 0.1 |
| Arkansas | 34.8 | 33.5 | 16.7 | 5.5 | 5.6 | 3.5 | 0.4 | 0.1 |
| BIE schools | 71.8 | 16.4 | 8.4 | 0.3 | 2.4 | 0.7 | 0.0 | — |
| California | 36.9 | 18.8 | 25.2 | 15.3 | 1.4 | 0.8 | 1.4 | 0.1 |
| Colorado | 59.2 | 16.9 | 10.3 | 11.2 | 0.7 | 0.7 | 0.9 | 0.2 |
| Connecticut | 41.8 | 13.0 | 11.7 | 29.4 | 1.2 | 1.5 | 1.3 | 0.1 |
| Delaware | 39.6 | 14.4 | 26.6 | 15.7 | 0.7 | 1.7 | 1.2 | 0.0 |
| District of Columbia | 43.1 | 17.5 | 20.3 | 16.6 | 1.9 | 0.0 | 0.2 | 0.4 |
| Florida | 44.6 | 10.1 | 30.4 | 9.3 | 0.3 | 0.7 | 4.0 | 0.6 |
| Georgia | 52.0 | 19.1 | 17.2 | 9.9 | 1.0 | 0.7 | 0.1 | # |
| Hawaii | 40.4 | 30.2 | 22.2 | 3.2 | 0.8 | 1.5 | 0.7 | 0.9 |
| Idaho | 57.1 | 22.0 | 10.5 | 7.4 | 0.0 | 0.1 | 3.0 | 0.0 |
| Illinois | 34.6 | 19.6 | 14.4 | 30.0 | 0.8 | 0.5 | # | 0.2 |
| Indiana | 61.8 | 12.9 | 14.4 | 3.7 | 1.4 | 3.3 | 1.1 | 1.4 |
| Iowa | — | — | — | — | — | — | — | — |
| Kansas | 52.2 | 19.7 | 12.6 | 12.8 | 0.5 | 0.5 | 1.5 | 0.2 |
| Kentucky | 56.3 | 19.4 | 14.7 | 3.2 | 1.9 | 3.7 | 0.8 | # |
| Louisiana | 53.9 | 22.4 | 18.8 | 2.1 | 0.8 | 1.7 | 0.4 | 0.0 |
| Maine | 44.3 | 24.0 | 18.4 | 10.9 | 1.6 | 0.3 | 0.4 | 0.1 |
| Maryland | 51.1 | 11.7 | 16.6 | 18.5 | # | 0.5 | 1.5 | 0.1 |
| Massachusetts | 51.4 | 10.0 | 16.2 | 20.2 | 1.0 | 0.3 | 0.4 | 0.5 |
| Michigan | 57.3 | 16.3 | 13.2 | 9.1 | 0.7 | 0.3 | 2.8 | 0.3 |
| Minnesota | 53.1 | 23.4 | 12.4 | 10.0 | 0.1 | 0.3 | 0.3 | 0.3 |
| Mississippi | 75.4 | 10.8 | 5.1 | 5.0 | 1.4 | 2.2 | # | # |
| Missouri | 44.2 | 30.1 | 11.3 | 10.7 | # | 2.2 | 1.1 | 0.4 |
| Montana | 50.4 | 27.5 | 14.0 | 5.4 | 1.2 | 0.9 | 0.2 | 0.3 |
| Nebraska | 68.2 | 12.4 | 9.3 | 8.3 | 0.7 | 0.4 | 0.3 | 0.5 |
| Nevada | 44.4 | 21.6 | 26.7 | 5.3 | 0.1 | 0.6 | 1.3 | 0.0 |
| New Hampshire | 61.4 | 17.9 | 10.6 | 8.8 | 1.2 | # | 0.0 | 0.1 |

16

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| New Jersey | 32.4 | 23.5 | 16.1 | 24.1 | 1.5 | 1.7 | 0.4 | 0.3 |
| New Mexico | 43.0 | 25.1 | 30.8 | 0.3 | 0.4 | 0.0 | 0.5 | 0.0 |
| New York | 33.4 | 12.2 | 30.3 | 16.4 | 2.8 | 1.2 | 1.2 | 2.6 |

**Percentage of students ages 5 (school age) through 21 served under IDEA, Part B, who were reported under the category of *emotional disturbance*, by educational environment and State: Fall 2019—Continued**

| State | Inside the regular class[a] | | | Separate school[c] | Residential facility[e] | Homebound/ hospital[d] | Correctional facilities[e] | Parentally placed in private schools[f] |
|---|---|---|---|---|---|---|---|---|
| | 80% or more of the day[b] | 40% through 79% of the day | Less than 40% of the day | | | | | |
| North Carolina | 53.5 | 24.1 | 16.9 | 2.6 | 0.2 | 1.9 | 0.7 | 0.0 |
| North Dakota | 64.8 | 16.1 | 11.9 | 2.8 | 3.5 | 0.4 | 0.1 | 0.2 |
| Ohio | 42.5 | 15.6 | 19.9 | 16.4 | 1.4 | 2.1 | 0.9 | 1.1 |
| Oklahoma | 60.7 | 22.4 | 11.4 | 0.3 | 2.2 | 2.1 | 1.0 | 0.0 |
| Oregon | 58.7 | 15.4 | 15.9 | 7.2 | # | 1.4 | 1.2 | 0.3 |
| Pennsylvania | 48.1 | 21.4 | 12.1 | 16.1 | 1.4 | 0.3 | 0.5 | 0.1 |
| Puerto Rico | 63.7 | 10.9 | 17.8 | 1.2 | 0.0 | 2.2 | 0.0 | 4.1 |
| Rhode Island | 43.2 | 9.3 | 18.5 | 24.9 | 2.7 | 0.2 | 0.2 | 0.2 |
| South Carolina | 40.5 | 24.3 | 26.5 | 2.0 | 0.8 | 3.7 | 2.3 | # |
| South Dakota | 69.5 | 15.8 | 10.7 | 1.1 | 1.8 | 0.2 | 0.5 | 0.4 |
| Tennessee | 61.6 | 14.3 | 15.6 | 5.5 | 1.3 | 1.2 | 0.5 | 0.1 |
| Texas | 71.2 | 13.6 | 13.1 | 0.8 | 0.1 | 0.7 | 0.5 | # |
| Utah | 52.7 | 22.6 | 21.0 | 2.5 | 0.5 | 0.5 | 0.4 | 0.0 |
| Vermont | 60.6 | 8.2 | 8.0 | 18.1 | 4.1 | 0.1 | 0.1 | 0.8 |
| Virginia | 53.7 | 16.8 | 6.9 | 16.5 | 2.4 | 2.9 | 0.6 | 0.2 |
| Washington | 46.8 | 26.5 | 18.6 | 6.0 | 0.8 | 0.1 | 1.0 | 0.2 |
| West Virginia | 45.2 | 33.2 | 11.0 | 0.5 | 2.3 | 4.1 | 3.6 | 0.1 |
| Wisconsin | — | — | — | — | — | — | — | — |
| Wyoming | 56.0 | 20.7 | 10.7 | 3.9 | 7.8 | 0.7 | 0.2 | 0.0 |

**DOJ Acknowledges Exceptions to Placement in General Education.** By stating that the "vast majority" of students with behavior-related disabilities (but not all) can be appropriately educated in general education, the DOJ concedes that *some* students with behavior-related disabilities need separate or special placements. Dr. McCart states in her report that "there [is] a small number of students that I believe require individualized, quiet learning environments with low levels of interactions with others" (p. 67). Dr. McCart also says that "some students …have very serious, extreme behaviors that require well-trained, highly

specialized teaching and behavior support" and that "some students need to be taught in smaller learning environments away from their peers at certain times and under certain conditions" (p. 67). Especially confusing is Dr. McCart's statement that "…while the nature of special education is such that it requires attention to each individual student and their learning process —and certain students may need quieter environments, close adult supervision, fewer individuals near them, or other intensive interventions—those are not rationales for a segregated placement decision." In my opinion, because McCart does not explain the difference between "quieter environments" with "close adult supervision [and] fewer individuals near them" and "segregated placement," her statement is self-contradicting and incoherent.

The DOJ does not make clear how exceptions to the "vast majority" should be determined. Also unclear is how the specialized placements (self-contained classrooms, separate schools) that McCart herself acknowledges some students with behavior-related disabilities need should be provided, and whether and how the current approach to offering CAP should change. In light of the DOJ's interpretations of Title II of ADA, questions remain as to how DOJ or its experts believe "segregated" (non-integrated) placement can be provided in a way that both complies with FAPE and does not discriminate (per their interpretation of ADA requirements) against students with behavior-related disabilities.

The DOJ acknowledges the responsibility of local education agencies to meet the requirements of IDEA but provides few details on how or whether the DOJ's findings and recommendations can be effectively implemented alongside the procedural and substantive requirements of IDEA. For example, who will determine whether a "segregated" placement is necessary, and how will this determination be made? DOJ's experts do not identify any individual students whom they contend could be educated in a general education setting but are

18

currently being educated in a more restrictive placement. Nor do they provide any data or identify any methodology they used to identify who the "vast majority" of students would be that are able to be educated in a general-education setting.

**CAP and the Georgia Network of Educational and Therapeutic Supports.** In Georgia, the Georgia Network of Educational and Therapeutic Supports (GNETS) plays a role in meeting the IDEA requirement to offer a CAP for students with disabilities. According to the GNETS manual, GNETS is "comprised of 24 programs [in 24 regions] that support the local school districts' continuum of services for students with disabilities, ages 3-21" (p. 1). Students are referred to GNETS through the IEP process as required by IDEA. If an IEP team determines that a student with a behavior-related disability has not benefited educationally in a less specialized placement, placement in a GNETS program can be considered.

Many states have similar models or approaches for providing specialized services and placements to students with disabilities who need them. For example, Massachusetts operates a statewide network of public educational service agencies (24 educational collaboratives) to help school districts provide special education services and placements to students with severe and complex learning, behavioral, and emotional needs (Massachusetts Organization of Educational Collaboratives, or MOEC). In Ohio, school districts are supported by a network of Educational Service Centers across 51 regions. Educational Service Centers provide a variety of services, including schools and other programs for students with behavior-related disabilities. Colorado's Office of Facility Schools is one of three offices under the Exceptional Student Services Unit of the Colorado Department of Education. Students with behavior-related disabilities from 80 school districts receive services in Facility Schools. Approximately 6,000 students per year are placed in Facility Schools in Colorado. A last example is Arizona's Emotional Disabilities

Public/Private Program (ED-P). Like Georgia's GNETS program, and consistent with the requirements of IDEA, students with behavior-related disabilities are placed in an ED-P school only if "appropriate services cannot be provided in traditional resource and self-contained classrooms" (Arizona Department of Education, ED-P Program).

**Criticism of IDEA, LRE, and CAP.** Because the LRE and CAP requirements are essential to ensuring the right of students with disabilities to FAPE, the LRE and CAP requirements have not changed since the passage of IDEA nearly 50 years ago (Yell & Prince, 2022). Nonetheless, the LRE and CAP requirements have been continuously criticized, primarily by proponents of *full inclusion.* The term "full inclusion" refers to the placement of all or very nearly all students with disabilities in general education environments. Full inclusion advocates view placement in general education as a moral imperative and the most important issue in educating students with disabilities. Thus, placements other than general education are called "segregated," associating the CAP with the evils of racial segregation despite the completely unrelated premises of racial segregation and the CAP. Racial segregation is premised on the racist belief that people of different races should be separated. The CAP is premised on the need for education to be responsive to the full range of special educational needs. We don't say that first grade classrooms are segregated from fifth grade classrooms, or that elementary schools are segregated from high schools, because we recognize the educational relevance of separating classrooms and schools by age. Nowhere in IDEA is the term "segregated" used to describe specialized placement options. Full inclusion proponents believe that FAPE can be provided in general education to all or very nearly all students with disabilities, regardless of their special education needs. Thus, the LRE and CAP requirements are viewed as unnecessary and even immoral.

For as long as <u>full</u> inclusion proponents have called for the elimination of the LRE and CAP, special education researchers, leaders, and advocates have, in turn, criticized and questioned the feasibility, wisdom, and ethicality of <u>full</u> inclusion (e.g., Braaten et al., 1988; Brigham et al., 2016; Fuchs & Fuchs, 1994; Gilmour, 2018; Kauffman, 1995; Kauffman et al., 2016; Kauffman et al., 2020; Kavale, 2002; Kavale & Forness, 2000; MacMillan et al., 1996; Mesibov & Shea, 1996; Zigmond et al., 2009). Critics of full inclusion highlight the lack of evidence that all or very nearly all students with disabilities can be effectively and appropriately taught in general education environments. Despite enthusiasm for recently developed models, practices, and frameworks for making general education more responsive to the needs of students with disabilities (which I discuss later in this report), the lack of evidence for the feasibility and effectiveness of *full* inclusion remains.

In addition to overestimating the capacity of general education to appropriately include all or the vast majority of students with disabilities, full inclusion advocates underestimate the academic, behavioral, and social problems exhibited by many students with disabilities, particularly students with behavior-related disabilities. I turn to this in the next section.

## II. Diverse Educational Needs of Students with Behavior-Related Disabilities

Assessing the claim that the "vast majority" of students with behavior-related disabilities can be appropriately served in general education environments requires an accurate appraisal of the educational needs of students with behavior-related disabilities and the individualized educational programming required to address those needs. DOJ's experts argue that most students with behavior-related disabilities in Georgia do not need self-contained classrooms or separate schools without providing information or data related to the educational needs of those students. Dr. McCart states several times in her report that there is a "small number" of students

served in GNETS who have "very serious and extreme behaviors that require highly specialized teaching and behavioral support…in learning environments away from their peers at times," but does not explain how she differentiated these students from the other "vast majority" of students. In my opinion, Dr. McCart also oversimplifies and to a degree minimizes the difficulties experienced by students with behavior-related disabilities – for example, when she suggests that most challenging behavior is a form of self-regulation, self-stimulation, or communication. This does not reflect a complete and accurate picture of the characteristics and needs of students with behavior-related disabilities.

While their special education needs are diverse, students with behavior-related disabilities who are found eligible for special education tend to be those who exhibit the most severe learning and behavior problems. To understand why this is so, we first need to know these students are generally underidentified for special education services. For example, for students with emotional and behavioral disorders (EBD), estimates of the actual prevalence of EBDs in the school-aged population based on epidemiological studies indicate that between 3% and 6% of children and youth have EBDs severe enough to warrant intervention (Forness et al., 2012; Kauffman & Landrum, 2018). Yet only one half of a percent (0.5%) of students are identified under the EBD category. So, only a fraction of students who have EBD actually qualify for services. This means that the students with EBD who *do* qualify for services are those with the most severe impairments in functioning (Siperstein et al., 2011).

It is also important to understand that the characteristics of students identified by schools as EBD may vary significantly from one school or district to the next. In schools or districts with high overall rates of problem behavior, students with EBD must exhibit more severe problems to "stand out" and be identified for services. The opposite is true in schools with low overall rates

22

of student problem behavior. Thus, students with EBD found eligible for IEPs in one school district may be much more impaired than students with EBD found eligible in another school district (Siperstein et al., 2011; Wiley et al., 2008; Wiley et al., 2010). This variability *within* the population of students identified as EBD must be considered when examining differences in placement patterns and educational outcomes.[3]

### Characteristics of Students with Emotional and Behavioral Disorders

**Challenging Behavior.** A hallmark of emotional and behavioral disorders (EBD) is challenging behavior. Special education researchers use a dimensional approach (externalizing behavior, internalizing behavior) to define challenging behavior. Students with EBD may exhibit externalizing behavior, internalizing behavior, or both, at a frequency, intensity, and duration that impairs their functioning in school and in other areas of their lives. *Externalizing behavior* is behavior that is directed outward toward the environment. Externalizing behaviors include disruptive behaviors like yelling or getting out of their seats or disturbing peers; verbal and/or physical aggression like cursing or fighting; destruction of property; not following directions and excessively arguing, complaining, or throwing tantrums; stealing and lying to others; and frequently violating classroom and school rules (Kauffman & Landrum, 2018; Walker & Gresham, 2014). Importantly, some students with EBD may exhibit relatively long periods of acceptable behavior and then suddenly display intense disruptive or aggressive behavior (Gresham et al., 1996). Students with EBD who exhibit high levels of externalizing behavior are

---

[3] On page 114 of her report, Dr. McCart says that the examples she saw of GNETS students successfully engaged in general education settings "...provided important evidence that the integrated provision of supports and services for students with behavior-related disabilities is possible. For example, I observed a student in the North Metro GNETS at Centennial High School participate in a general education writing class with limited involvement from the para pro (i.e., a teacher aide)." Again, because the individual characteristics and needs of students vary significantly, the apparent success of a few students with behavior-related disabilities does not mean that integrated provision of supports will work for the "vast majority" of these students. Individual differences must be taken into account, as required by IDEA and sound special education practice.

at risk for a range of negative educational and adult outcomes, such as low academic
achievement, school dropout, involvement with the justice system, lower rates of employment,
interpersonal difficulties in adulthood, and so on (Heward et al., 2022).

*Internalizing behavior* is problem behavior (as well as thoughts and feelings) that is
directed inward, or toward oneself. Internalizing behaviors include social withdrawal, anxiety,
depression, and self-harm (Dart et al., 2019). Internalizing behaviors are extremely
developmentally significant, as they predict many negative outcomes including school and social
failure, chronic mental health problems in adulthood, and self-harm and suicidality (Adrian et al.,
2019).

Modifying environmental conditions (antecedents or "triggers," consequences)
surrounding the behavior of students with EBD is one important component of effective school
programming for these students. However, disordered behavior is not just a function of
environmental factors; it is also a function of individual differences that are characteristic of
students with EBD. These differences include difficulties with social information processing
(Dodge et al., 2013), expressive and receptive communication (Chow & Wehby, 2018; Hollo et
al., 2014), negative emotionality (Mikolajewski et al., 2013); distress intolerance (Daughters et
al., 2009); and emotion dysregulation (Aldao et al., 2010). In addition, students with EBD often
exhibit significant attention deficits and/or hyperactivity; it is estimated that around 6 in 10
children and youth with EBD also have ADHD (Centers for Disease Control & Prevention,
2020a). Students with EBD experience other problems related to their challenging behavior.
These problems include rejection by peers, affiliation with peers with challenging behavior,
coercive interactions and relationships with teachers and peers, and involvement in bullying as
both instigator and victim (Chen et al., 2015; Farmer et al., 2016).

24

**Learning Difficulties.** The term "behavior-related disabilities" does not capture the reality that students with EBD typically experience significant learning difficulties across subjects (reading, math, writing, social studies, science). The mean IQ of students with EBD falls in the low/low average range (Kauffman & Landrum, 2018). Students with EBD exhibit high rates of comorbid learning disabilities (Cristofani et al., 2023; Mattison, 2015; Mattison et al., 2002). In addition to the language and attention difficulties mentioned previously, students with EBD also have deficits in academic processing speed that negatively impact their learning (Benner et al., 2008). As a result, students with EBD are on average 1 to 4 years behind academically compared to their non-disabled peers (e.g., Gilmour et al., 2018; Reid et al., 2004; Siperstein et al., 2011; Trout et al., 2003; Wagner et al., 2005). Grade-level general education instruction, even with accommodations and supports, is often neither appropriate nor effective to overcome the learning difficulties of students with disabilities (D. Fuchs et al., 2023; L. S. Fuchs et al., 2015; Gilmour, 2018).

The best available evidence suggests that the most effective way to address the learning difficulties of students with EBD is through intensive academic instruction (D. Fuchs et al., 2014; Maggin et al., 2016; Vaughn et al., 2010). Intensive academic instruction is instruction that is delivered in small groups using specialized curricula (which, because students with EBD are below grade level, includes off-grade-level content). Instruction is modified (intensified) as necessary[4] (D. Fuchs et al., 2014; see also the What Works Clearinghouse[5] practice guides *Assisting Students Struggling with Reading; Assisting Students Struggling with Mathematics;*

---

[4] As I discuss later in this report, there are several barriers to implementing supplemental and intensive instruction in general education, and several advantages to delivering this instruction in special settings.

[5] The What Works Clearinghouse was established over 20 years ago by the Institute for Educational Sciences at the U.S. Department of Education. The purpose of the What Works Clearinghouse is to disseminate trustworthy information about research-validated practices in education, including special education.

*Providing Reading Interventions for Students in Grades 4-9*

https://ies.ed.gov/ncee/wwc/practiceguides).

In many cases, students with EBD also need to learn skills outside the general academic curriculum that their non-disabled peers have already mastered. These skills include self-monitoring and self-regulation, goal setting, interacting positively with teachers and peers, and so on. Students with EBD may also need to learn skills to transition successfully from school to postsecondary education, employment, and independent living (Rowe et al., 2021). These skills are often not included in the standard curriculum but are nonetheless critical for maximizing the success of students with EBD in school and adulthood. The IEP team decides what, in addition to academic content, each individual student with EBD should learn based on their unique circumstances. In other words, students with EBD often require an individualized curriculum in addition to the standard academic curriculum (Kauffman & Landrum, 2018).

**Characteristics of Students with Autism Spectrum Disorder.** Autism spectrum disorder (ASD) is a neurodevelopmental disorder affecting verbal and nonverbal communication and social interaction. Other characteristics include repetitive behavior, insistence on sameness or resistance to change, and unusual responses to sensory stimuli (Heward et al., 2022). As a spectrum disorder, there is great variability in the types and degree of impairment experienced by students with ASD. Cognitive functioning varies. Estimates indicate that 42% of children with ASD have average to above average IQs, while 33% have cognitive functioning similar to children with intellectual disabilities (Center for Disease Control & Prevention, 2020b). The special educational needs of students with ASD can vary greatly from one individual student to the next.

**Challenging Behavior.** Some students with ASD exhibit challenging behavior in the form of disruption, aggression toward others, destruction of property, or self-harm (Matson et al., 2009; Heward et al., 2022). Challenging behavior can be exacerbated by deficits in executive functioning, including self-regulation, selective attention, cognitive and behavioral flexibility, working memory, and response inhibition (Montgomery et al., 2012). Again, while it is important to identify environmental factors that occasion the occurrence of challenging behavior by students with ASD, the reasons why students with ASD exhibit challenging behavior are complex and related not only to environmental factors, but also to individual characteristics associated with ASD. Consequently, addressing the complex interplay between environmental and individual factors can present significant challenges for designing and implementing effective school-based behavioral interventions and supports. Progress typically requires highly structured educational programs and settings that can support and sustain those programs (Mesibov & Shea, 1996).

**Academic Deficits.** Because ASD is a spectrum disorder, the cognitive functioning of students with ASD varies widely. The academic achievement of students with ASD correlates with overall severity of ASD-related impairment, working memory and processing speed, and IQ (Keen et al., 2016). Students with ASD may experience difficulties in academic areas such as reading comprehension (Brown et al., 2013), written expression (Finnegan & Acardo, 2017), and mathematics (Tonizzi & Usai, 2023). These difficulties can be addressed by highly structured explicit instruction, strategy instruction, computer-mediated instruction, and other specially designed teaching approaches. Also, students with ASD with comorbid intellectual disabilities typically require highly structured teaching employing systematic and explicit instructional techniques (e.g., modeling, prompting, time delay, feedback, small group/one-to-one) and a

27

focus on functional academic skills (e.g., math and reading used in functional contexts; Horn et al., 2023; King et al., 2016).

Similar to students with EBD, students with ASD may need to learn functional skills that are not part of the standard curriculum, but nonetheless relevant for maximizing the success and independence of the individual student in current and future environments (Ayres et al., 2011). Modified standards from the general academic curriculum can be functional for some individual students with ASD, but not in every case. The goal of special education and FAPE for every student is enabling successful participation in the community after graduating from school. To achieve this goal, some students need to learn adaptive skills related to self-care, independent living, postsecondary education, employment, and related areas that most non-disabled students learn without explicit instruction. IEP teams must determine the most appropriate environment in which to deliver the IEP for each individual student with ASD. As Kauffman, Travers, and Badar (2020) observed, general education may not always be the environment that "facilitates advancement toward a vision of the student's future, ensures relevant curriculum is taught using the most effective instruction, and [protects] the privacy and dignity of the student" (p. 31).

**Diversity of Needs Requires a Continuum of Placement Options.** Overall, to provide an appropriate education to students with behavior-related disabilities, school teams must develop IEPs that are responsive to a complex array of environmental and individual factors for each individual child. Supports and interventions implemented in general education may be insufficient, infeasible, or unsustainable in a number of cases (Farmer, 2013; Maggin et al., 2016). Much depends on the intensity of programming required for the individual student. Typically, appropriate programming for students with behavior-related disabilities will include "(a) systematic delivery and application of interventions coupled with data-based decision-

making about impact and effect; (b) ongoing monitoring of academic and behavioral

performance; (c) provision of substantial opportunity to practice newly learned skills across

relevant settings; (d) intervention programs and practices matched with type and intensity of the

problem; (e) consideration for a multifaceted treatment approach (f) planning that specifically

addressed transfer of skills across settings and maintenance of effect over time; and (g)

understanding that long-term intervention may be required" (Mitchell et al., 2019, p. 71). Again,

delivering this programming effectively requires consideration of the setting that will best enable

implementation at the level of intensity and structure required by the individual student.

### III. Research Does Not Demonstrate that Inclusion is More Beneficial than Other Placement Options

The idea that the "vast majority" of students with behavior-related disabilities can be

appropriately and effectively served in general education environments rests, in part, on the

claim – frequently voiced by advocates of full inclusion - that decades of research show that

students with disabilities taught in inclusive placements achieve better outcomes than students

with disabilities taught in separate classrooms or schools. This claim is false. I explain why

below.

**Research Comparing Inclusive vs. Specialized Placement.** Since the 1960s, hundreds

of studies have been conducted examining the relationship between placement (inclusive

placement, specialized placement) and the academic, social, and behavioral outcomes of students

with disabilities (Cook & Cook, 2020). In turn, dozens of narrative and quantitative research

reviews have attempted to synthesize these studies to try to determine whether one type of

placement is more beneficial or effective than the other for students with disabilities.

For example, Carlberg and Kavale (1980) synthesized 50 studies comparing outcomes for

students with disabilities taught in general education to students with disabilities taught in special

29

classes. They found that students with mild intellectual disabilities performed better in general education placements, while special classes were found to be "significantly superior to regular classes" for students with learning disabilities and EBD. Since the 1980s, many more research studies and research reviews have been published (Dalgaard et al., 2022). The findings of this research have been inconsistent, with some favoring inclusive placement, others finding no difference, and some favoring specialized placement. Thus, the position of full inclusion advocates that inclusive placement is best is inconsistent with current research findings.[6]

**Methodological Flaws of Placement Research.** The first and most important reason why we know that research *does not* demonstrate that inclusion in general education is more beneficial for students with disabilities than special classrooms or schools is because of the methodological flaws that are pervasive in placement research. The most serious flaw in placement research is *selection bias.* Selection bias occurs when study participants are not randomly assigned to one condition or another (for example, inclusive or special placement). When assignment to groups is not random, there may be pre-existing differences between groups that influence outcomes for each group (Cook & Cook, 2020; Dalgaard et al., 2022; Gilmour, 2018; Zigmond, 2003).

Imagine a study comparing treatment outcomes for patients admitted to intensive care units with patients treated in outpatient settings. The likely finding would be that patients treated in outpatient settings would display better treatment outcomes than patients admitted to intensive care. Is this because outpatient settings are more effective than intensive care settings? No. A

---

[6] On page 5 of her report, Dr. McCart states that "…students with disabilities who learn in inclusive environments experience a powerful positive effect on their academic achievement and social-emotional well-being, as well as improvement in behavior." As I explain in this section, this is an inaccurate characterization of the relevant research and does not reflect the consensus of the field.

much more likely explanation is that the illnesses or injuries experienced by patients admitted to intensive care were more serious than patients treated in outpatient settings, and that these initial differences explain in large part differences in treatment outcomes. Pre-existing differences between groups are a *confounding variable* that undermines the validity of research findings. An additional challenge in non-experimental research (including propensity score matching[1]) is that confounding variables may not be observable, accounted for, or adequately measured in the research (e.g., motivation, resources and supports at home; Daalgard et al., 2022). As Gilmour (2018) noted:

> "Even in studies that account for students' prior levels of academic achievement, the researchers may not have captured all . . . aspects of a student . . . that can influence both the setting in which he is placed and his future outcomes. A student's educational placement is an IEP team decision and may be based on a host of factors not included in the administrative data sets to which researchers typically have access . . . [which] makes estimating the true causal effect of [general class placement] on student outcomes nearly impossible" (p. 12)

Because it would be unethical and illegal to randomly assign students with disabilities to different placements, the findings of existing placement research (whether one placement is more beneficial than another) can best be described as weak and inconclusive.

In a recent systematic review, Daalgard and colleagues (2022) initially identified 94 studies comparing the academic, behavioral, and social outcomes of students with disabilities served in inclusive versus special placements. Of these studies, 79 were judged to be at "critically high risk" of bias (error) due to significant methodological flaws (primarily selection bias). The remaining 15 studies that were included in the synthesis were non-experimental, did

31

not employ random assignment, and were deemed to be at "serious risk" of bias. Keeping in mind the substantial methodological problems of the 15 studies, the researchers concluded that "the effects of placing children with special needs in grades K-12 in inclusive educational settings are inconsistent" (Daalgard et al., 2022, p. 3). The researchers further concluded that their findings "point to the need for an individual assessment of the specific child's educational and psychosocial needs rather than a one-size-fits-all approach to placement in special education" (p. 4). Many others have highlighted critical methodological limitations that make conclusions about the effectiveness of inclusion extremely tentative at best, misleading at worst (Cook & Cook, 2020; Dalgaard et al., 2022; Gilmour, 2018; Lindsey, 2007; Zigmond, 2003).

**Conceptual Flaws of Placement Research.** In addition to methodological flaws, research comparing the effectiveness of inclusive to specialized placements is conceptually flawed. Focusing exclusively on the location of instruction to the exclusion of other variables makes little sense. First, placement research rarely focuses on *individual characteristics* of students with disabilities and their relationship to variability in outcomes across placements (Daalgard et al., 2022; Lindsey, 2007; Zigmond, 2003). It is likely that there are interactions between the academic, social, and behavioral characteristics of students with disabilities and the positive or negative outcomes associated with different educational placements. That is, the most important question may not be what placement is most beneficial, but *for whom* different placements are most beneficial – a question that is rarely addressed in placement research. Even with methodologically strong research, we would have to look not just at group differences (students served in inclusive versus separate environments), but individual non-responders, i.e., individual students who do not respond positively to inclusion even if other students do. The idea that the *individual characteristics* of students with disabilities are essential when considering

32

placement outcomes is conceptually consistent with the individualized process described earlier for determining the LRE as required by IDEA.

For example, 41 experts in educating students with ASD were asked what characteristics of students with ASD were most likely to predict successful outcomes in inclusive settings. These experts identified low levels of challenging behavior, following teacher directions and classroom rules, interacting appropriately with peers, seeking teacher help appropriately, and the ability to complete academic work independently (Heward, 2011). As I discuss in the next section, research-based practices can be used to teach these skills to students with ASD, but there are limitations to these practices that must be considered.

The individual characteristics of students with EBD are also important. Compared to students with EBD served in separate settings, students with EBD placed by IEP teams in more inclusive placements typically are those that *already* display stronger academic skills, higher cognitive abilities, better self-control, less aggression, more appropriate interactions with peers, and fewer family-related risk factors (Kauffman et al., 1987; Meadows et al., 1994; Nickerson & Brosof, 2003; Stoutjesdijk et al., 2012).

Second, placement research is conceptually flawed because this research gives insufficient attention to the actual *practices* used in different educational environments, i.e., *what* instruction and services were provided in the different placements being compared. Studies comparing placement outcomes rarely provide these critical details (Daalgard et al., 2022; Zigmond, 2003). Place by itself is not an educational program, although it is treated as such by some researchers and full inclusion advocates. Without information about the practices used, research on the effectiveness of one place or another is difficult if not impossible to interpret, and no valid conclusions can be drawn, statements to the contrary notwithstanding.

33

The failure to detail what actually happens instructionally in different educational placements is not only conceptually flawed, it also contributes to more general problems caused by prioritizing the *place* of instruction over the *quality*, *appropriateness*, and *effectiveness* of instruction (Kauffman & Badar, 2016). For example, the emphasis on place of instruction runs counter to IDEA which requires determination of FAPE (effective individualized educational programming) *before* determination of the LRE (the best place to deliver the IEP to the student; Yell & Prince, 2022). Another consequence of putting place ahead of instruction is insufficient acknowledgment of the negative outcomes currently experienced by many students with behavior-related disabilities in inclusive settings and the need to address the shortcomings and failures of inclusion.

**Inclusive Placement and Negative Outcomes.** Teaching students with behavior-related disabilities in inclusive placements can be associated with negative outcomes that must be considered. To be clear, research does not show that negative outcomes occur in every case; many students with behavior-related disabilities can be appropriately and effectively taught in general education settings. Regardless, it is critical to note the potential downsides and negative outcomes of inclusion if we are to provide an individualized FAPE to all students with behavior-related disabilities.

I acknowledge here the services and supports that the DOJ argues can be readily implemented in general education to appropriately and effectively serve students with behavior-related disabilities. I address in detail the flaws in that argument in the next section (Section IV). I note here that despite decades of research, dissemination, and training to increase implementation of tiered interventions and supports in general education, actual implementation is low and uneven (Balu et al., 2015; Berkeley et al., 2020; Sugai & Horner, 2020). Evidence and

34

experience so far do not support the claim that these interventions and supports can make general education effective and appropriate for the "vast majority" of students with behavior-related disabilities (Wiley et al., 2022).

**Negative Academic Outcomes.** Placement in general education has not produced positive learning outcomes for many students with disabilities. Despite the upward trend of students with disabilities taught in general education (Williamson et al., 2020), students with behavior-related and other disabilities persistently exhibit unacceptably low academic achievement. No amount of intervention or support can make general education instruction appropriate and effective for all or nearly all students with disabilities (Gilmour, 2018; L. Fuchs et al., 2015). According to results from the 2019 National Assessment of Educational Progress (NAEP), 70% of 4th graders with disabilities performed below a basic level in reading; for 8th graders, 63% performed below basic in reading. For math in the same year, 83% of 4th graders and 91% of 8th graders with disabilities performed below basic (Nation's Report Card, 2022). In their meta-analysis of 23 studies examining the reading achievement gap for students with disabilities, Gilmour and colleagues (2019) found that students with high-incidence disabilities (learning disabilities, EBD, other health impairments) were approximately four years behind their non-disabled peers.

**Negative Social and Behavioral Outcomes.** Similarly, increased inclusion in general education has not addressed the social and behavioral problems of many students with behavior-related disabilities. Students with EBD often experience rejection by non-disabled peers (e.g., Lansford et al., 2010; Mrug et al., 2012, Zweers et al., 2021). Severe episodes of disruptive or aggressive behavior can interfere with the social inclusion of students with behavior-related disabilities (McGuire & Meadan, 2022). While the hope has been that students with ASD will

35

benefit socially from inclusion in general education settings, research indicates that many

students with ASD develop few friendships and are often at the periphery of peer social networks

in general education (Kasari et al., 2011; Petrina et al., 2014). Because intervention and supports

in general education cannot meet the needs of all or nearly all students with behavior-related

disabilities, many continue to display high levels of challenging behaviors that place them at

high risk for academic and social failure. For example, adolescents with EBD are twice as likely

to be suspended or expelled than their non-disabled peers and are three times as likely to be

arrested (Lipscomb et al., 2017).

Finally, several studies demonstrate that, in some cases, students who exhibit disruptive

behavior can have a negative impact on the learning of non-disabled peers (Gilmour, 2018). For

example, Fletcher (2010) analyzed nationally representative longitudinal data and found that, for

kindergartners, having a classmate with emotional or behavioral problems had a modest but

statistically significant negative impact on reading and math achievement of non-disabled

students. Gottfried (2014) also examined a nationally representative data set and found that, for

elementary students, a greater number of classmates with EBD was associated with non-disabled

students exhibiting higher levels of externalizing and internalizing behaviors, less self-control,

and poorer interpersonal skills (Gottfried, 2014). To be clear, findings such as these do not mean

that students with behavior-related disabilities should never be taught in general education

settings. Rather, this research underscores the importance of making individualized decisions

that account for potential negative effects on the learning of non-disabled peers, per the LRE

requirements of IDEA (see Table 1).

**Negative and Positive Parent Perceptions of Inclusive Placements.** Because

parents/guardians are key decision-makers in the development of the IEP, it is critical to consider

36

whether the "vast majority" of parents would or would not object to placement in general education settings for their children with behavior-related disabilities. Research on parent perceptions of or attitudes toward inclusive placements reveals variability in what parents think of different placements, what their priorities are for their children, and their perceptions about whether inclusion in general education would or would not be beneficial for their child (Garrick Duhaney & Salend, 2000; Gliona et al., 2005; Kauffman et al., 2022).[7] Thus, restricting the continuum of placement options would run counter to the wishes of many parents, and it would run counter to IDEA's aim of ensuring the right of every student with a disability to an *individualized* FAPE in the LRE.

To summarize, research on placement is inconclusive and <u>does not show</u> that students with behavior-related disabilities taught in general education achieve better academic, behavioral, or social outcomes than students with behavior-related disabilities taught in specialized settings (e.g., self-contained classrooms, separate schools). Enthusiasm for full inclusion (placing the vast majority of students with disabilities in general education) has obscured the negative outcomes that can occur for some students with behavior-related disabilities when taught in general education settings (Brigham et al., 2016). Enthusiasm for full inclusion has also led to biased (erroneous) and overly optimistic thinking about current efforts to make general education more effective and inclusive for students with behavior-related disabilities. I address those practices and their limitations next.

---

[7] Cassandra Holifield, Brooke Cole, and Jeannie Morris all reported to me that there were many parents who expressed relief when their child was placed in a GNETS program. Some parents were glad to know that GNETS staff were trained and focused on supporting students with behavior-related disabilities, and that they (the parents) would not receive frequent calls from school about their child's behavior problems.

### IV. Limitations of Services and Supports Implemented in General Education

The claim that the "vast majority" of students with behavior-related disabilities can be appropriately and effectively served in general education settings with the right therapies, supports, and services does not account for significant limitations of these therapies, supports, and services. These limitations include those related to evidence of effectiveness (i.e., the probability that certain that a practice or accommodation will work) and problems of implementation (i.e., the likelihood schools can and will implement a practice).

I begin with a brief overview of issues related to *evidence of effectiveness* (i.e., evidence-based practices) and *implementation* of practices in schools. Next, I examine evidence and implementation limitations of practices, frameworks, and reforms intended to make general education appropriate and effective for students with behavior-related disabilities, including those discussed by the DOJ experts.

**Evidence of Effectiveness.** Appropriate inclusion of students with behavior-related disabilities requires the identification of practices that will effectively meet special educational needs in general education environments. In special education, *evidence-based practices* are practices that have been validated by studies that use appropriate research designs (experimental, quasi-experimental) and that meet quality standards (i.e., the study is methodologically sound; Cook & Cook, 2011; Cook & Odom, 2013; Odom et al., 2005). Whether a practice is deemed evidence-based also depends on the *number* of high-quality studies that support the effectiveness of the practice (i.e., replication of findings across multiple studies). To summarize, "for a practice to be considered evidence-based it must be supported by multiple, high-quality, experimental or quasi-experimental studies demonstrating that the practice has a meaningful impact on…[student] outcomes" (Cook & Odom, p. 136). In addition, *external validity* (whether

38

study findings generalize to settings, populations, or conditions different from the original study) must be assessed and considered (Rumrill et al., 2020).

The emphasis on using research to discern generally effective from generally ineffective practices in special education has been a positive development in the field. However, conducting and interpreting the necessary research is easier said than done. Research in special education is complex, challenging, and time consuming, particularly when the aim is to meet the rigorous standards of research quality required to designate a practice "evidence based." Consequently, while many advances have been made in our knowledge about "what works" in special education, for whom, and under what conditions, a great deal of uncertainty remains. The recent push for *open science* in special education research is in response to recognition that certain questionable practices in special education research could undermine trustworthiness of findings (Cook et al., 2018). Thus, the responsible practice of special education in any environment requires acknowledgment and understanding of gaps and uncertainties in special education research (Slocum et al., 2012). Finally, even when the evidence for a particular practice is relatively strong, no practice will work every time or for every student (Cook & Odom, 2013).

The claim that we now know how to appropriately and effectively include the "vast majority" of students with behavior-related disabilities in general education environments is inconsistent with current gaps in and weaknesses of the relevant research. The consensus of the field is that more research is needed to understand how best to serve students with behavior-related disabilities, particularly those with the most intensive needs (Chen et al., 2021; Lewis et al., 2017; Maggin et al., 2016). Lloyd and colleagues (2019) summarize the state of current understanding when they point out that while progress has been made in identifying effective practices for many students with behavior-related disabilities, "there has been less progress in

39

identifying intervention approaches for the most intensive problem behaviors, which tend to have more complex etiologies and require more comprehensive intervention approaches" (p. 88).

**Implementation.** Identifying generally effective practices is the first step. Implementing these practices in typical classrooms and schools is the critical second step. A "typical" classroom or school is one that does not have unusual resources or support from grants or researchers to implement a particular practice. Additionally, practices must not only be implemented, but they must be implemented *reasonably well*, as they were designed and implemented in the studies that demonstrated their general effectiveness (this is referred to as *fidelity of implementation*). Elements of fidelity include adherence (correctly following steps for implementation), quality of delivery (skillful and enthusiastic implementation by adequately trained staff), exposure/duration (the practice is used frequently/long enough to achieve desired outcome), and student engagement (active participation/engagement of students; Dane & Schneider, 1998; Gresham et al., 1993; O'Donnell, 2008).

In many cases, the challenges of implementing generally effective practices with fidelity for students with behavior-related disabilities remain largely unsolved (Lloyd et al., 2019), particularly in general education settings (Brigham et al., 2016; McKenna et al., 2019; Soares et al., 2022). Referred to as the research-to-practice gap, the challenges of disseminating, implementing, and scaling up practices in schools are widely recognized in special education research and practice.

A common impediment to implementation is the failure of researchers to provide all the technology (materials, measures, tools, scaffolded support) necessary for successful implementation, as I discuss below (Pogrow, 1996; Wiley et al., 2022). Finally, while conditions differ from one school to the next, the realities of teacher shortages and turnover, stressful work

environments, high overall rates of discipline problems (recall that many students with EBD are general education students not identified for services), low morale, inadequate pre-service teacher training, lack of resources, and other difficult circumstances unquestionably interfere with implementation of promising practices in schools (Fuchs & Fuchs, 2017; Gilmour, 2018; Lemons et al., 2016). The reality of these challenges cannot be dismissed or downplayed when considering whether the "vast majority" of students with behavior-related disabilities can now be successfully included in general education settings.

**Limitations of Services, Supports, and Frameworks in General Education.** Placing the "vast majority" of students with behavior-related disabilities in general education cannot be done ethically and responsibly without addressing the limitations I discuss below. I begin with a brief overview of multi-tiered systems of support, or MTSS, which is a "framework" for reforming general education and implementing practices that are ostensibly evidence based. Next, I highlight evidence and implementation gaps related to providing effective academic interventions to students with behavior-related disabilities in general education. Finally, I call attention to limitations of school-wide positive behavior interventions and support (SW-PBIS) and Wraparound services.

It should be noted that several of the practices I discuss (intensive academic instruction, SW-PBIS (including Tier 2 and Tier 3), and wraparound services) are *promising* practices that, in my opinion, should continue to be developed with a focus on strengthening the evidence base and better addressing problems of implementation. I point out limitations not for the purpose of dismissing the promise and potential of these practices, but rather to demonstrate that these limitations call into question the overly optimistic claim that *we are now ready and able* to effectively teach the "vast majority" of students with behavior-related disabilities in general

41

education. This claim is not supported by the best available evidence. The additional practices I briefly overview at the end of this section are *unproven* practices irresponsibly advocated by some advocates of full inclusion.

In the discussion that follows, I weigh known limitations against the following specific assumptions for each practice:

- *The evidence for this practice is sufficient to conclude that it is generally effective and highly likely to meet the needs of the vast majority of students with behavior-related disabilities in general education settings;*

- *In most cases, schools can and will implement this practice in general education settings with fidelity under typical circumstances; and*

- *This practice obviates the need for specialized placements for the vast majority of students with behavior-related disabilities.*

**Limitations of Promising Practices**

**Multi-Tiered Systems of Support.** Multi-tiered systems of support (MTSS) is not a specific practice. It is a "framework" for providing increasingly intensive academic and/or behavioral support to students in schools. Originally, there were two distinct frameworks, one for academics (response to intervention, or RTI; Fletcher & Vaughn, 2009; Fuchs & Fuchs, 2006) and one for behavior (SW-PBIS). MTSS is the merging or combination of the two frameworks (Burns et al., 2016; Lane et al., 2020; McIntosh & Goodman, 2016; Sugai & Horner, 2009). The framework emphasizes improving systems at the schoolwide, classwide, and individual levels to support students.

Because MTSS is conceptualized as a flexible schoolwide framework, not a rigid or prescriptive program or curriculum (Barnes & Harlacher, 2008; McIntosh & Goodman, 2016),

MTSS implementation varies in both research and practice. However, all MTSS models or frameworks have in common certain essential principles and components. These include multiple "tiers" of increasingly intensive supports and interventions matched to the intensity of student need; implementation of evidence-based or research-principled practices in each tier; and assessment systems to support data-based decision making (i.e., screening, progress monitoring). Data-based decision making is primarily focused on determining which students need more intensive academic or behavioral support and delivering supports in each tier effectively.

Enthusiasm for MTSS is strong; acknowledgment and examination of its limitations is insufficient (Fuchs & Fuchs, 2017; Kauffman, 2021; Wiley et al., 2022). Next, I discuss limitations of evidence and implementation in relation to academic interventions (including MTSS for academic learning) and behavior interventions (MTSS for behavior, i.e., SW-PBIS) intended to enable students with behavior-related disabilities to succeed in general education.[8]

### Limitations of Academic Interventions in General Education

*Evidence Limitations.* There are significant gaps in research examining effective academic interventions provided to students with behavior-related disabilities in general education settings. For example, McKenna and colleagues (2019) conducted a "mega-analysis" of academic intervention research for students with EBD. A "mega-analysis" is a review or synthesis of previous research reviews. McKenna et al. located and synthesized a total of 17 research reviews focused on academic interventions for students with EBD (i.e., interventions to

---

[8] The SWIFT (Schoolwide Integrated Framework) Center promotes the idea that MTSS can make general education fully inclusive (appropriate and effective) for all students with disabilities (one of SWIFT's key principles is "all means all.") However, according to my search, only one published study (Choi et al., 2020) has examined the effect of SWIFT MTSS on students with disabilities. The study found better math outcomes for students with disabilities but no effect on reading. The study did not randomly select or assign schools, and students with disabilities were not disaggregated (participants were "all students with IEPs.") Considering the funding and visibility of the SWIFT Center and the claims that they make about "transforming" education, this is a rather prominent example of enthusiasm outpacing evidence.

improve achievement in reading, math, writing, and science). Together, the 17 research reviews included a total of 181 studies, of which only eight (4.4%) were conducted in general education settings. None of the four studies met What Works Clearinghouse (WWC) research quality indicators. Simply put, "there is insufficient academic intervention research that is applicable to the instruction of students with [EBD] in general education classrooms" (McKenna et al., p. 602). Similarly, in a review of interventions for students with ASD in inclusive settings, the authors found zero studies that both met research quality indicators and addressed academic achievement (Watkins et al., 2019).

Examining evidence for effectiveness of academic interventions *independent of setting* (general education, self-contained classroom, separate school) reveals several practices that can best be described as promising. They are promising but not evidence-based because across 17 reviews and 181 studies, adherence to research quality standards was either variable or unreported. Promising practices include specially designed reading instruction (Benner et al., 2010; Burke et al., 2015; McKenna et al., 2017; Rivera et al., 2006); self-regulated strategy development for writing (Ennis et al., 2014; Losinski et al., 2015; Sreckovic et al., 2014); peer-mediated academic interventions (Ryan et al., 2004; Spencer, 2006); math interventions (Hodge et al., 2006; Mulcahy et al., 2014; Mulcahy et al., 2016 Ralston et al., 2014; Templeton et al., 2008); and interventions to support learning in science (Therrien et al., 2014). As noted above, 96% of the research on these academic interventions and supports has been conducted in non-general education settings (McKenna et al., 2019).

Also promising is research examining supplemental and intensive academic instruction delivered within an MTSS framework. MTSS for academics includes three tiers of increasingly intensive academic instruction – Tier 1 core instruction (all students), Tier 2 supplemental

instruction (some struggling students), and Tier 3 intensive instruction (a few students with severe and persistent academic deficits). Fuchs & Fuchs, 2006; see also the What Works Clearinghouse practice guides *Assisting Students Struggling with Reading; Assisting Students Struggling with Mathematics; Providing Reading Interventions for Students in Grades 4-9* *https://ies.ed.gov/ncee/wwc/practiceguides*).

The best available evidence suggests that data-driven Tier 2 supplemental and Tier 3 intensive academic instruction can increase academic achievement of students with severe academic deficits (Jung et al., 2018), including (potentially) students with EBD (Chen et al., 2021; Maggin et al., 2016). As described earlier, Tier 2 and Tier 3 academic interventions are typically delivered in small groups or one-to-one, using specialized curricula, focusing intensively on teaching off-grade-level and/or grade-level concepts and skills that students failed to learn under typical instructional conditions (D. Fuchs et al., 2014; L. Fuchs et al., 2015). Note once again that the best available evidence does *not* support large-group, standards-based general education instruction with accommodations for students with severe learning problems (Fuchs et al., 2010; L. Fuchs et al., 2015).

*Implementation Limitations.* MTSS for academics (RTI) has proven to be very challenging for schools to implement with fidelity (Balu et al., 2015; Fuchs & Fuchs, 2017). This is especially true for general education classrooms. Many of the implementation limitations cannot be overcome with more training and technical assistance. The appeal of frameworks like MTSS for academics (as opposed to highly structured programs or curricula) is their flexibility, but flexibility can also contribute to uncertainty and confusion that impede implementation (D. Fuchs et al., 2012; Fuchs & Fuchs, 2016; Wiley et al., 2022). Currently, the challenges of

implementing effective academic interventions and supports in general education for many students with behavior-related disabilities remain unsolved (Gilmour et al., 2018).

### Limitations of School-Wide Positive Behavior Interventions and Support

*Evidence Limitations.* SW-PBIS is MTSS for preventing and addressing problem behavior in schools (Horner & Sugai, 2010; Sugai & Horner, 2006). The first tier – Tier 1 – involves the implementation of *universal* school-wide practices supporting *all* students to try to prevent most problem behaviors before they start. These practices include establishing, teaching, and reinforcing positive behavioral expectations across all school settings and for all students. Tier 1 also requires team-based support, universal screening for early identification of problem behavior, and data-based decision making to optimize implementation and outcomes (McIntosh et al., 2010). Tier 2 is for students who, despite high-quality implementation of Tier 1, exhibit emerging problem behavior that places them at risk for severe and chronic problem behavior (Bruhn et al., 2014). Tier 3 is the most intensive tier for students who have not responded sufficiently well to Tier 1 and Tier 2. Tier 3 is intended to provide individualized, data-driven behavioral interventions and supports based on functional behavior assessment and/or functional analysis (Maggin et al., 2016; Wehby & Kern, 2014).

Research on *schoolwide* PBIS has focused on schools implementing Tier 1, or Tier 1 along with Tier 2 and/or Tier 3 (research focusing on Tier 2 and Tier 3 specifically is discussed below). This research, while inconsistent for some outcomes, has found mostly promising results with small to medium positive effects across several outcomes and student populations (e.g., Lee et al., 2020; Gage et al., 2018; Simonsen et al., 2022). Some evidence, then, suggests that SW-PBIS is likely to produce positive outcomes for many—but not all—students. On the other hand, and contrary to claims made by some advocates and academics, there is little evidence that SW-

46

PBIS increases the capacity of general education such that the placement of students with behavior-related disabilities in specialized settings becomes significantly reduced or rendered unnecessary.

*Implementation Limitations.* Implementation of SW-PBIS is not yet universal. According to recent data from the National Center on Positive Interventions and Supports, approximately 26.8% (just over $1/4^{th}$) of schools in the United States are implementing SW-PBIS (Sugai & Horner, 2020). SW-PBIS implementation varies widely between states, with five states implementing in fewer than 50 schools. According to PBIS state coordinators,[9] 27 states had 25% of their schools implementing PBIS, while 15 states had 40%. (Sugai & Horner, 2020).

In addition to implementation limitations, there are also unresolved challenges related to *sustaining* SW-PBIS over time (Fox et al., 2022). For example, in a study examining 5,331 schools implementing SW-PBIS, 58% of schools had abandoned SW-PBIS by the end of five years ("abandonment" was defined as falling below 70% implementation fidelity, meaning the school was no longer fully implementing SW-PBIS; McIntosh et al., 2016). In another study by McIntosh and colleagues (2018), 33% of schools abandoned SW-PBIS within five years. Challenges related to implementation and sustainability raise serious questions about the viability of SW-PBIS for making general education appropriate and effective for all or nearly all students with behavior-related disabilities (Wiley et al., 2022).

Barriers to SW-PBIS implementation are numerous (e.g., Fox et al., 2022; Kittelman et al., 2019; McIntosh et al., 2016). As mentioned previously, the implementation of a *framework* like SW-PBIS, with multiple interrelated components and features, is inherently more complex

---

[9] PBIS state coordinators oversee statewide efforts to implement PBIS with support from partners at the National Center on Positive Behavior Interventions and Support. The center partner for Georgia is Dr. Heather George, a national leader in PBIS and a professor at the University of South Florida.

that implementing a singular or discrete practice (Wiley et al., 2022). Also, while an advantage of frameworks is that they can be more flexibly implemented than a highly prescriptive program or practice; the tradeoff is less clear guidance and direction for practitioners, with greater likelihood of undesirable variability in implementation and outcomes (Pogrow, 1996; Wiley et al., 2022).

**Limitations of Evidence and Implementation: Tier 2 PBIS Practices.** Tier 2 is *targeted* PBIS for students who do not respond adequately to Tier 1 universal PBIS. Schools vary in how they measure "inadequate response," with some schools using progress monitoring, teacher nominations, or other methods (Bruhn & McDaniel, 2021). Tier 2 PBIS practices target students who display early or initial signs of social or behavior problems. Cho Blair and colleagues (2020) conducted a meta-analysis of 26 single-case design research studies examining the effectiveness of Tier 2 practices implemented within a SW-PBIS multi-tiered framework. Of the 26 studies, 16 did not meet the What Works Clearinghouse research quality standards. Six studies met the standards with reservations, and just four studies met the standards with reservations. These findings were consistent with previous reviews (e.g., Bruhn et al., 2014).

Similar to previous reviews of Tier 2 PBIS practices (e.g., Bruhn et al., 2014; Mitchell et al., 2011), most of the studies reviewed by Cho Blair and colleagues (2020) focused on Check In/Check Out (CICO), a program that includes a) morning check in with an adult at the school; b) a daily behavior report card; c) regular teacher feedback; d) afternoon check-out with a review of the daily behavior report card, and d) contingent reward provided at home based on daily behavior report card. The reviewers noted that while a medium positive effect of CICO was calculated, the low research quality reduces confidence in the findings (Blair et al., 2020).

Another review of Tier 2 CICO found that five of 13 studies met the Council for Exceptional Children (CEC) research quality indicators (Mitchell et al., 2017). CICO met one of two sets of evidence-based practice criteria set forth by CEC; however, the studies included just 43 students, mostly elementary aged and male, raising cautions about the external validity of the findings. Other Tier 2 interventions less frequently examined in the Tier 2 literature include social skills instruction, self-monitoring, and group contingencies (Bruhn et al., 2020). Gresham (2015) examined multiple research syntheses and determined that social skills instruction could be expected to benefit approximately 65% of students with EBD.

Again, data from the National Center for Positive Behavior Interventions and Supports indicate that across the country, a small percentage of schools (<5%) report implementing Tier 2 PBIS with fidelity (Sugai & Horner, 2020). One reason for low implementation is the flexible and non-prescriptive nature of Tier 2.[10] Leaving too much for schools to decide on their own may lead to confusion, inconsistency, and lack of fidelity (Kauffman, 2021; Pogrow, 1996; Wiley et al., 2022). Additional reasons for low implementation of Tier 2 are the same as those discussed below for Tier 3.

**Limitations of Evidence and Implementation: Tier 3 PBIS Practices.** In the SW-PBIS framework, students who do not respond to Tier 2 targeted PBIS receive Tier 3 intensive PBIS. To provide intensive Tier 3 PBIS, school teams typically conduct a functional behavior assessment (FBA) to identify conditions associated with the occurrence of the individual student's problem behavior. Using direct (e.g., observation) and indirect (e.g., interview, rating scale) methods, the conditions that precede problem behavior (e.g., setting events, antecedents)

---

[10] For example, in the Tier 2 section of the widely used *Tiered Fidelity Inventory* tool for measuring implementation, one item states that "the Tier 2 team has multiple ongoing behavior support interventions with documented evidence of effectiveness." Schools interpret general guidance like this in different ways. Other items are similarly unspecific.

and follow problem behavior (consequences) are identified to form hypotheses about the purpose or function of the problem behavior, i.e., to obtain desirable consequences, to escape/avoid undesirable consequences. An individualized behavior intervention plan is then developed based on the FBA with the goal of changing conditions surrounding the problem behavior and teaching the student positive behaviors (Sugai et al., 2000).

Like Tier 1 PBIS and Tier 2 PBIS, the best available evidence indicates that FBA-based behavior intervention is a promising and potentially effective practice for students with behavior-related disabilities, but there are gaps and weaknesses to consider (Gage et al., 2012; McKenna et al., 2021). For example, the What Works Clearinghouse intervention report (*Functional Behavior Assessment-based Interventions* https://ies.ed.gov/ncee/wwc/Intervention/1241) determined that FBA-based intervention is a promising practice with potentially positive effects on the problem behavior of students with or at risk for EBD. However, this assessment was based on eight single-case design studies that included a total of just 21 students in K-12 with or at risk for EBD. Also, across these eight studies, 68% of the behavioral outcomes measured were positive, with no effect for the remaining 32%. Thus, evidence for the effectiveness and external validity (generalizability) of FBA-based intervention has limitations that must be recognized.

There are gaps and weaknesses in the research on FBA-based interventions implemented in general education settings specifically. Scott and Alter (2017) reviewed nine studies of FBA-based interventions for students with EBD in general education settings. They found inconsistency across studies in how the FBA-intervention process was defined, suggesting a lack of consensus even among researchers. They stated that even though FBA "has been around for 20 years, the exact procedures are not established and continue to be widely variable and often confused" (p. 92). Implementation was variable as was measurement of fidelity of

implementation, which is necessary to interpret possible causal links between FBA-based interventions and outcomes. These and other problems (e.g., inadequate focus on context) lead Scott and Alter to conclude that FBA-based intervention was not an evidence-based intervention; rather, FBA-based intervention is a promising practice that requires further research and development to realize its potential.

Walker and colleagues (2018) reviewed 27 single-case research studies (total of 45 participants with various disabilities) and found overall positive effects of FBA-based intervention in inclusive settings. However, methodologically flawed studies were included in the review. The authors stated that "because including studies with weaker quality involves combining different levels of evidence and increases risk of bias, results…should be interpreted with caution" (p. 213). Finally, Lloyd and colleagues (2019) reviewed 34 single-case research studies of FBA-based intervention implemented in general education classroom. Less than half of the 70 participants were identified as having disabilities; students with behavior-related disabilities were not disaggregated from other participants. While generally positive results were found, none of the studies met CEC research quality indicators resulting in a designation of "insufficient evidence" (Lloyd et al., 2019). Overall, the evidence for the effectiveness of FBA-based interventions is promising but limited, especially for students with behavior-related disabilities in general education settings.

Implementation of FBA-based interventions as Tier 3 of a SW-PBIS framework has proven to be challenging. Nationally, compared to Tier 1 and Tier 2 implementation, the smallest percentage of schools report that they are implementing Tier 3 with fidelity (Sugai & Horner, 2020). A major barrier to Tier 3 implementation is the failure to specify, validate, and disseminate the necessary and sufficient technologies (training, guidance, materials) required for

51

high-quality implementation of FBA-based interventions under typical classroom conditions (Pogrow, 1996; Wiley et al., 2022).

Importantly, we cannot assume that low levels of implementation are solely or even primarily related to lack of training or lack of motivation. We must acknowledge more fundamental limitations and problems of "goodness of fit" between interventions, settings, and students that no amount of training or motivation cannot solve. The complexity and difficulty of the individualized behavior intervention plan, the severity of problems exhibited by the student, and the inherent constraints of different settings are all critical implementation factors that are beyond training or motivation. The constraints of general education classrooms include competing classroom demands, low levels of predictability and structure, large numbers of students, and greater difficulty controlling conditions that occasion and maintain problem behavior (Scott & Alter, 2017). The problems of implementing Tier 2 and Tier 3 PBIS in general education are very similar to the problems identified previously herein for Tier 2 and Tier 3 academic intervention (Kauffman et al., 2016).

In any case, school personnel often lack even basic pre-service or in-service training in key underlying principles and practices of FBA-based intervention (Gable et al., 2014; Trump et al., 2018). In most studies of FBA-based intervention, school personnel receive significant support and guidance from researchers not typically available in most schools (e.g., Gage et al., 2012). One proposed solution is to increase access to behavioral expertise in schools, i.e., professionals trained in FBA-based interventions who can support school personnel. However, the availability and quality of behavioral expertise varies between schools, districts, and states (Sugai & Horner, 2020), a situation that is exacerbated by workforce shortages in school mental health and related professions (Goforth et al., 2021; Zabek et al., 2023). In other words, it may be

impossible in many or most cases to obtain the conditions necessary for sustained, high-quality implementation of FBA-based interventions in general education settings. Given all these barriers and the fundamental limitations discussed earlier, poor school-based implementation of FBA-based interventions is not surprising.

**Evidence and Implementation Limitations of Wraparound Services.** Wraparound is a process for planning, coordinating, and implementing community and school services for children and youth with complex behavioral health needs (Schurer Coldiron et al., 2017; Eber et al., 1997). Like SW-PBIS, Wraparound is a flexible, team-based process or framework for increasing access to interventions and supports to improve various school, home, and community outcomes (Yu et al., 2020). Based on a review of relevant research, Wraparound was determined to be a "promising practice" by the Prevention Services Clearinghouse established by the Administration for Children and Families within the U.S. Department of Health and Human Services (National Wraparound Initiative, 2022). There is limited evidence on the impact of Wraparound on individual placements.

To examine the relationship between access to behavioral health services and special education placement, I compared federal IDEA placement data (see Table 2) to data on the provision of mental health services to children and youth. I used the most recent *Mental Health America* report that summarizes and analyzes national mental health data provided by the Substance Abuse and Mental Health Association and the Centers for Disease Control (Reinert et al., 2022). The *State of Mental Health in America* combines several indicators and ranks states according to their effectiveness at addressing mental health issues for children/youth and adults. Table 3 presents the 13 states ranked highest for access to mental health services for children and youth and the 13 states ranked lowest. Alongside each state I provide the percentage of students

with EBD placed in separate schools. For the 13 states with the highest rankings for mental health services for children and youth, the mean percentage of students with EBD placed in separate schools was 16.9%. For the 13 states with the lowest rankings, the mean placement of students with EBD in separate schools was 5.9%, almost three times lower. Looking at state level data, it does not appear that better access to mental health services for children and youth is associated with fewer students with EBD served in separate schools. In fact, the opposite seems to be true. As access to mental healthcare increases, more students are recognized as needing education in a separate setting. States with stronger youth mental health may also value special schools as a necessary part of a continuum of supports for students with behavior-related disabilities.

Table 3.

| State/Ranking [a] | % Students w/EBD – Separate School |
|---|---|
| 1. District of Columbia | 16.6 |
| 2. Delaware | 15.7 |
| 3. Wisconsin | NR |
| 4. Pennsylvania | 16.1 |
| 5. Massachusetts | 20.2 |
| 6. New Jersey | 24.1 |
| 7. New Hampshire | 8.8 |
| 8. Connecticut | 29.4 |
| 9. Nevada | 5.3 |
| 10. Oklahoma | 0.3 |
| 11. Colorado | 11.2 |
| 12. Rhode Island | 24.9 |
| 13. Illinois | 30.0 |
|  | $M$=16.9 |
|  |  |
| 39. Montana | 5.4 |
| 40. Washington | 6.0 |
| 41. Tennessee | 5.5 |
| 42. Louisiana | 2.1 |
| 43. Hawaii | 3.2 |
| 44. Arkansas | 5.5 |
| 45. West Virginia | 0.5 |

| | | |
|---|---|---|
| 46. Texas | 0.8 | |
| 47. Idaho | 7.4 | |
| 48. Virginia | 16.5 | |
| 49. Nebraska | 8.3 | |
| 50. Kansas | 12.8 | |
| 51. Oregon | 7.2 | |
| | *M*=5.9 | |

**Limitations of Unproven Practices.** Here I briefly comment on unproven practices that are frequently advocated by supporters of full inclusion. "Unproven" means that empirical support for the effectiveness of the practice is weak at best.

*General Education Instruction with Accommodations.*[11] There is little evidence to support the belief that exposure to grade-level instruction and the putative high expectations of the general education classroom improves the academic achievement of students with behavior-related disabilities (e.g., D. Fuchs et al., 2023; L. Fuchs et al., 2015; Gilmour et al., 2018). It is important to note here that most students with behavior-related disabilities are referred for special education evaluation because they were not successful academically in general education (Gilmour, 2018). As discussed previously, the best available evidence supports small group supplemental and intensive instruction using evidence-based intervention programs often targeting off grade-level content (D. Fuchs et al., 2023; Fuchs et al., 2015). General education grade-level instruction with accommodations (e.g., universal design for learning) often does not meet the needs of students with behavior-related disabilities.

---

[11] Dr. Putnam states that "students who are removed from the general education setting for significant periods have less exposure to the general education academic curriculum"...and placement outside of general education "reduce[s] the pace of academic...skill acquisition" (p. 13). See also footnote 13, below.

*Observational Learning.*[12] The popular belief that being with and observing non-disabled peers will improve the behavior of students with behavior-related disabilities is based on flawed understanding of how observational learning does and does not work (Hallenbeck & Kauffman, 1995). If observational learning in general education was as powerful and straightforward as we would hope, all students would observe and imitate the best-behaved students in the classroom. The reality is that the "contagion effect" (students with problem behavior observing, imitating, and reinforcing one another) can occur in any setting (Hendrickx et al., 2016; Laninga-Wijnen et al., 2018). An antidote to the contagion effect is effective, group-focused behavior management, which can be implemented in specialized settings with specially trained personnel (Farmer et al., 2018; Franklin-Gillette et al., 2023).

*Universal Design for Learning*[13]. Universal design for learning (UDL) is a framework for making general education curriculum and instruction accessible to all students (Meyer et al., 2014; Nelson, 2021). Despite its popularity and advocacy for its use in schools, evidence for the effectiveness of UDL is weak (Capp, 2017; Murphy, 2021; Ok et al., 2017). A recent meta-analysis of UDL (King-Sears et al., 2023) found some potentially positive effects, but there were serious problems with the research that was synthesized (lack of clear definitions of UDL, wide range of learning outcomes, poorly described participants). Lack of clarity about what UDL is and the heterogeneity of UDL studies (practices, populations, outcomes) make it difficult to draw any firm conclusions about UDL's effectiveness (Anastasiou et al., under review; Ewe & Galvin, 2023).

---

[12] On page 13 of the DOJ's complaint, it says that students with behavior-related disabilities will benefit from "opportunities to learn, observe, and be influenced by their non-disabled peers."

[13] Dr. McCart, p. 164, "This standards-based instruction combined with improvements in core instruction using high-interest materials and the principles of **universal design for learning** will increase student interest in learning….and will create long term success for students with behavior-related disabilities."

*Co-Teaching.*[14] Co-teaching (general education and special education teachers delivering instruction together) has long been promoted and used to make general education effective for students with behavior-related and other disabilities. Yet research to date does not provide sufficient evidence that co-teaching is effective for students with disabilities (Cook et al., 2017; Iacono et al., 2021; King-Sears et al., 2021). King-Sears and colleagues (2021) conducted a meta-analysis of co-teaching studies that examined differences in academic achievement between students co-taught in general education and students taught by special education teachers in resource rooms or self-contained classrooms. They found small to medium positive effects for co-teaching. However, the studies reviewed reflect the same limitations as those examining the effects of placement. Specifically, problems with selection bias were not adequately addressed, and the specific practices used under different conditions (and whether they were implemented with fidelity) were not described in detail in most of the studies.

*Matching Instruction to Learning Styles.*[15] One of the most popular ways to try to teach students with diverse learning needs is to match instruction to students' learning styles (e.g., visual, auditory, kinesthetic). The research on learning styles (or modality-based instruction) is extensive and conclusive – learning styles do not exist, and matching instruction to learning styles does not increase student achievement (Brown, 2023; Landrum & McDuffie, 2010; Pashler et al., 2008). Like other unproven practices, learning styles instruction not only fails to meet the needs of students with behavior-related disabilities, it takes time and attention away from instruction that is more likely to be effective.

---

[14] Dr. Putnam states that co-teaching is a "proven practice" that, combined with other practices, can reduce placement outside of general education.

[15] Dr. McCart says that "...students with disabilities have all types and manners of **learning styles**..." (p. 36).

*Restorative Practices*[16]. Restorative practices have been developed as an alternative to other forms of school discipline (e.g., suspension). Like PBIS and UDL, restorative practices are not packaged as a program or curriculum. A variety of practices like conflict resolution, restorative conferences, peer mediation, etc. are used to address behavioral incidents in school. Zakzeski and Rutherford (2021) conducted a systematic review of 67 restorative practice studies. They found that only four of these studies compared treatment and control groups, and only one met research quality standards. This one study found no positive effect of restorative practices on disciplinary outcomes.

Claiming that placement in specialized settings (self-contained classrooms, separate schools) is "unnecessary" or can be prevented for the vast majority of students with behavior-related disabilities rests on an assumption that we know *now* how to readily and reliably make general education appropriate and effective for these students. This assumption is overly optimistic and ignores the limitations of evidence and implementation I have reviewed in this section. The uncertainty that remains about appropriately and effectively including students with behavior-related disabilities in general education underscores the importance of IDEA and the individualized decision-making process it requires. The IEP team (including parents/guardians) knows the student, the special education services they need, and the setting where those services can best be implemented. The *individualized educational program* and the *individualized* decision-making process are the mechanisms that protect the right of students with behavior-related disabilities to FAPE in the LRE.

---

[16] Dr. McCart states that "…for students with behavior-related disabilities to be successful, they need proactive and positive behavioral strategies, social-emotional learning, restorative practices, trauma-informed care, measured mental health support, multi-tiered systems of support inclusive of positive behavioral interventions, and support to include functional behavioral assessments, behavior intervention plans, and individualized crisis intervention plans.

Enthusiasm for full inclusion has distracted from the problems that remain to be solved to optimize special education for students with behavior-related disabilities across the continuum of alternative placements, from general education to special schools. A particularly dangerous full inclusion argument, in my view, is that we can and should eliminate placement options other than general education to advance the transformation of general education into fully inclusive education. In the full-inclusionist view, it is the existence of specialized placements ("if you build it, they will come") – not gaps in research or practical limitations – that allows "unnecessary segregation" to continue.

But advocacy for full inclusion has put the cart before the horse. *There is nothing about the requirements of IDEA and the existence of the continuum of alternative placements that prevents or impedes efforts to reform general education to be more appropriate and effective for students with behavior-related disabilities.* To the extent that such efforts are successful, responsible inclusion of more students with behavior-related disabilities will follow. It is irresponsible and unethical to insist that all or nearly all students with behavior-related disabilities be placed in general education *before* limitations of evidence and implementation have been satisfactorily addressed.[17] Given current realities and uncertainty, we must protect the *individualized* nature of special education, including individualized placement decisions.

There are many ways that the full inclusion movement in K-12 education parallels the deinstitutionalization movement of the mid- to late 20th century (Kauffman et al., 2021). While benefitting many individuals with mental illness and other disabilities who could be

---

[17] This is a longstanding full inclusion argument, built on multiple incorrect assumptions. Dr. McCart says "…by investing millions of dollars and untold resources in segregated settings, the State of Georgia implicitly encourages schools and their IEP teams to remove students with behavior-related disabilities from the general education environment—in other words, *if you build it, they will come.* But these referrals and the segregation that they promote are unnecessary. The vast majority of students in the GNETS Program can and should be served in integrated settings with appropriate services and supports, where they are more likely to experience social, emotional, behavioral, and academic success."

appropriately served in community-based programs, deinstitutionalization also failed hundreds of thousands of individuals with the most severe impairments and the fewest resources to attain the care they needed (Talbott, 2004). Many individuals with the most severe impairments and fewest resources ended up in prison or homeless (Davis et al. 2012). Deinstitutionalization advocates overestimated the capacity of community-based mental health services to meet the needs of individuals with the most severe impairments, with disastrous outcomes for many. Deinstitutionalization advocates also incorrectly believed that because some hospitals and residential facilities provided poor care and services, *all* such facilities were harmful and should be significantly reduced or eliminated. A similar flawed logic underlies the claim that the vast majority of students with behavior-related disabilities are "unnecessarily segregated" and that separate settings are inherently or generally harmful. I address this misconception next.

### V. Separate Can Be Better – Specialized Placements and Positive Outcomes

The claim that specialized settings (self-contained classrooms, separate schools) are necessarily or in most cases harmful or unbeneficial to students with behavior-related disabilities is incorrect and based on biased interpretation of relevant research.[18] To rebut this claim, I first briefly explain why specialized placement is necessary to provide FAPE to some students with behavior-related disabilities. Next, I overview evidence and research demonstrating that positive educational outcomes for students with behavior-related disabilities can be achieved in specialized settings.

**Can Any IEP Be Implemented Effectively in Any Environment?** Full inclusion advocates believe, without evidence, that all individualized services and supports can be

---

[18] Dr. Putnam cites Causton-Theoharis et al. (2011) as evidence that separate settings are harmful. This was an observational study of just six self-contained classrooms. In my opinion, drawing generalized conclusions about the harms of separate settings from just six self-contained classrooms is unwarranted.

appropriately and effectively provided in one place – general education. This belief does not reflect rational thinking about relationships between setting and the educational activities that are to occur in that setting. Educational environments are not limitlessly flexible and adaptable. Experience, wisdom, and judgment tell us that different educational settings offer different allowances and constraints for different instructional activities (Kauffman et al., 2005). These allowances and constraints include those that are physical (noise, distractions, room size, space, furniture, equipment, safety), programmatic (structure, predictability, purpose), professional (authority, roles, responsibilities, activities), social (class size, peers, teachers, interactions, stigma, structure, support), and practical (feasibility, efficiency, optimal implementation). Thus, a full continuum of placement options is necessary for IEP teams to select the setting in which a student's IEP can be delivered most appropriately and effectively (Yell & Prince, 2022).

Under ideal circumstances, specialized settings would be viewed and understood for what they are - essential and valuable - and treated as such. Unfortunately, in a climate of misguided full inclusion advocacy, specialized placements have been misunderstood, misrepresented (e.g., "segregated"), devalued, and too often neglected in research, practice, and policy. Ultimately, this neglect and hostility does a disservice to students with behavior-related disabilities who need specialized placements. Especially harmful is the idea of diverting resources *away* from programs in specialized settings that serve students with the most intensive needs; doing so all but guarantees decreased quality of service delivery and outcomes in these programs. Such thinking is grounded in the flawed full inclusion argument I critiqued earlier, i.e., the existence of specialized placements prevents general education from becoming fully inclusive, not limitations of evidence and feasibility.

61

Correcting public misconceptions about specialized placements and CAP is long overdue. Next, I refute the misconception that there is no evidence that specialized placements produce positive outcomes for students with behavior-related disabilities.

**Specialized Placement and Positive Outcomes.** As discussed previously, research comparing inclusive versus specialized placements is methodologically flawed and inconclusive (Cook & Cook, 2020; Daalgard et al., 2022; Gilmour, 2018; Zigmond, 2003). Placement research is also conceptually flawed because the focus is on the place of instruction, rather than what is done instructionally in those places (Zigmond, 2003). Thus, placement research cannot tell us whether services delivered in specialized settings are beneficial and for which students. Fortunately, there are other sources of evidence that demonstrate that specialized placements can and do benefit many students with behavior-related disabilities.

**Evidence from Intervention Research.** The conclusion that students with behavior-related disabilities do not achieve positive outcomes in specialized settings (self-contained classrooms, separate schools) is refuted by research on effective academic, behavioral, and social interventions for students with behavior-related disabilities. Hundreds of studies conducted in specialized settings demonstrate that positive outcomes can be achieved in those settings. As with intervention research conducted in any setting, methodological limitations must be acknowledged, but this research demonstrates that it is clearly wrong to say that students with behavior-related disabilities do not attain positive outcomes in specialized settings.

For example, in the "mega-analysis" of academic interventions for students with EBD previously discussed (McKenna et al., 2019), the authors identified 17 research reviews that included 173 studies conducted in specialized settings. Positive academic outcomes were observed in reading, math, writing, and science. Gersib and Mason (2023) conducted a meta-

analysis of behavior interventions for elementary-aged students with EBD in self-contained settings. They synthesized 15 studies and found positive effects for "the use of a highly structured class-wide behavior system, consistently emphasizing positive strategies, and focusing on building healthy relationships for students with EBD between the student, teacher, and peers" (p. 280). Gage and colleagues (2012) analyzed 69 studies examining the effectiveness of function-based interventions for students with EBD. Of those studies, 25 were conducted in separate settings. Function-based interventions were found to be modestly more effective in separate settings compared to general education. Reviews of school-based intervention research (academic, behavioral, social) for students with ASD also include many studies conducted in specialized settings with generally positive outcomes (e.g., de Bruin et al., 2019; Carr et al., 2014; Machalicek et al., 2007; Plavnick et al., 2015).

**Evidence from Research on Separate Schools.** Research on separate schools for students with behavior-related disabilities is somewhat limited. This is in part because conducting research in separate schools can be challenging. It is also likely because full inclusion advocacy has decreased interest in or incentives for understanding and improving special education provided in separate schools. Nonetheless, research and analyses of separate schools do exist, and they provide evidence that special schools can effectively meet the needs of students with behavior-related disabilities.

Literature reviews have identified practices that are effective in separate schools for students with behavior-related disabilities. For example, Flowers and colleagues (2011) identified the following nine effective practices that can be implemented in separate schools: 1) low student to teacher ratio; 2) highly structured classroom with behavioral classroom management; 3) positive methods to increase appropriate behavior; 4) school-based adult

mentor; 5) functional behavior assessment; 6) social skills instruction; 7) effective academic instruction;[19] 8) parent involvement; 9) positive behavioral interventions and supports (p. 491). They reviewed 39 studies published between 1970 and 2010 and found uneven use of these effective practices in separate schools, indicating a need to better support separate school programs (Flowers et al., 2011; Kumm et al., 2020). The methodological quality of the studies was generally low; more rigorous research on separate schools is also necessary.

Research has focused on implementing SW-PBIS in separate schools (Grasley-Boy et al., 2021; McDaniel et al., 2018; Simonsen & Sugai, 2013). Several case studies have demonstrated that SW-PBIS (one or more of the three tiers) can be implemented in separate schools and improve student outcomes (e.g., Farkas et al., Minkos et al., 2023; Simonsen et al., 2010). Ballard and Bender (2022) reviewed 68 studies examining social, emotional, and behavioral interventions implemented in separate schools (e.g., SW-PBIS, group contingencies, Check In/Check Out, self-management). While the methodological quality was not assessed, most of the studies (71%) found positive outcomes across several measures (e.g., externalizing behavior, office referrals, attendance, substance use, on-task behavior).

**Case Studies of Separate Schools.** In the early 2000s, the Alternative Schools Project conducted five-year in-depth case studies of three exemplary alternative (separate) educational programs for students with behavior-related disabilities (Quinn & Poirier, 2006). Exemplary alternative programs were identified by positive student outcomes, such as improved attendance, improved motivation and self-concept, and parental satisfaction, decreased involvement with police, and more students meeting IEP goals.

---

[19] In my conversation with Dr. Cassandra Holifield, she told me that the DOJ reports present a skewed and incomplete picture of academic instruction in some GNETS programs. For example, while she acknowledges that some programs make use of computer-mediated instruction, she said that this is "blended" with other instructional modalities, including small group instruction, one-to-one instruction, and project-based learning.

The first alternative program served 84 K-12 students in a single building referred from 40 surrounding school districts. Positive outcomes for this program had increased over the seven years before the Alternative Schools Project began. The second alternative program included nine non-profit centers that served 750 students, most identified as EBD. The program operated under the 12 principles of Re-Ed (Hobbs, 1983) and was recognized by the United States Department of Education and Health and Human Services as outstanding based on student outcomes. The third alternative program was operated by a county Department of Alternative Education and included 141 sites (including separate schools) and served 8,759 K-12 students. The program had recently been accredited and senior exit surveys found that 94% of graduates believed the program improved their lives; 91% described their teachers as "great;" 90% agreed that their teachers helped them improve their social skills; and 56% said they enjoyed school more since attending the program.

Project researchers randomly selected 11 school sites from the three programs for their study. Various quantitative and qualitative measures were administered to students, staff, and parents. All three programs were rated highly in the categories of administrative support, behavior support, classroom management, school and work-based learning, and screening and referral. Similarly, all three programs were found to have high percentages of implementation of generally effective practices (instruction, mentoring, program outcomes tracking, whole school discipline, etc.). Measures of school climate were positive for both teachers and students. Teachers viewed their colleagues positively and exhibited high morale. Large percentages of students reported that they liked their school (65%), classes (70%), principal (72%), and teachers (78%). Qualitative findings were also positive across areas such as student-teacher relationships, responsiveness to students and individual differences, student choice, classroom management

65

and discipline, high expectations, flexibility, student-teacher ratios, cultural competence, and parental involvement (Quinn & Poirier, 2006).

While these are non-experimental case studies, they demonstrate quite clearly by example that separate schools are not in all cases harmful, stigmatizing, negative places for students with behavior-related disabilities.[20] Along with the other research reviewed in this section, we see that specialized placements like self-contained classrooms and separate schools can provide benefits that are unattainable in general education for at least some students with behavior-related disabilities.

**Is Placement in Specialized Placements Influenced by Race?** Finally, Dr. McCart raises the issue of the disproportionate placement of Black students in GNETS, suggesting that race is a factor in placement decisions (p. 156). The best available evidence does not conclude that special education placement is influenced by race. Recently, Morgan and colleagues (2023) analyzed two independent and nationally representative longitudinal data sets from elementary schools in the United States. Before controlling for confounding factors, ethnicity was associated with higher likelihood of placement outside of the general education classroom. However, when the researchers statistically controlled for other explanatory student factors (e.g., academic achievement, behavior problems), the association between ethnicity and placement was non-significant (Morgan et al., 2023). This research suggests that educationally relevant student characteristics – not ethnicity – influence placement decisions, consistent with the requirements of IDEA. Cooc (2022) analyzed 10 years of data from a large district and also found that racial disparities in general education placement were explained by disparities in academic achievement.

---

[20] These case studies, representative of many special schools that serve students with behavior-related disabilities, provide a stark contrast to Dr. McCart's negative and, in my opinion, highly subjective characterizations of GNETS.

**Conclusion**

In my opinion, the DOJ's experts' reports and opinions are critically undermined because they rest upon the following incorrect or flawed assumptions:

1. Discrimination against students with behavior-related disabilities can be determined through the general prohibitions of Title II of the ADA without thorough application of the more detailed anti-discrimination framework of IDEA;

2. Discrimination against students with behavior-related disabilities can be established without accounting for the characteristics and needs of individual students and the great variability within this population;

3. Research shows that placement in general education is more beneficial for students with behavior-related disabilities than placement in specialized settings;

4. Therapeutic services and supports can be implemented in integrated settings that will make general education appropriate and effective for the vast majority of students with behavior-related disabilities; and

5. Research shows that placement in specialized settings is harmful and never or very rarely beneficial.

## References

Adrian, M., McCauley, E., Berk, M. S., Asarnow, J. R., Korslund, K., Avina, C., ... & Linehan, M. M. (2019). Predictors and moderators of recurring self-harm in adolescents participating in a comparative treatment trial of psychological interventions. *Journal of Child Psychology and Psychiatry*, *60*(10), 1123-1132.

Aldao, A., Nolen-Hoeksema, S., & Schweizer, S. (2010). Emotion-regulation strategies across psychopathology: A meta-analytic review. *Clinical Psychology Review*, *30*(2), 217-237.

Anastasiou, D., Gage, N. A., Wiley, A. L., & Kauffman, J. M. (under review). Is UDL appropriate for ALL students with disabilities? *Remedial & Special Education.*

Ayres, K. M., Lowrey, K. A., Douglas, K. H., & Sievers, C. (2011). I can identify Saturn but I can't brush my teeth: What happens when the curricular focus for students with severe disabilities shifts. *Education and Training in Autism and Developmental Disabilities*, 11-21.

Ballard, S. C., & Bender, S. L. (2022). A systematic review of social, emotional, and behavioral interventions and outcomes for students in alternative education. *Preventing School Failure: Alternative Education for Children and Youth*, *66*(2), 136-149.

Bateman, B. D., & Linden, M. A. (2006). *Better IEPs: How to Develop Legally Correct and Educationally Useful Programs*. Verona, WI: IEP Resources. *Attainment Co*.

Benner, G. J., Allor, J. H., & Mooney, P. (2008). An investigation of the academic processing speed of students with emotional and behavioral disorders served in public school settings. *Education and Treatment of Children*, *31*(3), 307-332.

Braaten, S., Kauffman, J. M., Braaten, B., Polsgrove, L., & Nelson, C. M. (1988). The regular education initiative: Patent medicine for behavioral disorders. *Exceptional Children*, *55*(1), 21-27.

Brigham, F. J., Ahn, S. Y., Stride, A. N., & McKenna, J. W. (2016). FAPE-accompli:
Misapplication of the principles of inclusion and students with EBD. In *General and special
education inclusion in an age of change: Impact on students with disabilities* (pp. 31–47).
Bingley: Emerald Publishing Limited.

Brown, H. M., Oram-Cardy, J., & Johnson, A. (2013). A meta-analysis of the reading
comprehension skills of individuals on the autism spectrum. *Journal of Autism and
Developmental Disorders, 43,* 932-955.

Brown, S. B. (2023, April). The persistence of matching teaching and learning styles: A review
of the ubiquity of this neuromyth, predictors of its endorsement, and recommendations to end it.
In *Frontiers in Education* (Vol. 8, p. 1147498.

Bruhn, A. L., Lane, K. L., & Hirsch, S. E. (2014). A review of tier 2 interventions conducted
within multitiered models of behavioral prevention. *Journal of Emotional and Behavioral
Disorders, 22*(3), 171-189.

Bruhn, A. L., & McDaniel, S. C. (2021). Tier 2: Critical issues in systems, practices, and
data. *Journal of Emotional and Behavioral Disorders, 29*(1), 34-43.

Capp, M. J. (2017). The effectiveness of universal design for learning: A meta-analysis of
literature between 2013 and 2016. *International Journal of Inclusive Education, 21,* 791–807

Carlberg, C., & Kavale, K. (1980). The efficacy of special versus regular class placement for
exceptional children: A meta-analysis. *The Journal of Special Education, 14*(3), 295-309.

Centers for Disease Control and Prevention (2020a). Data and statistics about ADHD. Retrieved
from https://www.cdc.gov/ncbddd/adhd/data.html#print

Centers for Disease Control and Prevention (2020b). Data and statistics on autism spectrum
disorder. Retrieved from https://www.cdc.gov/ncbddd/autism/data.html

Chow, J. C., & Wehby, J. H. (2018). Associations between language and problem behavior: A systematic review and correlational meta-analysis. *Educational Psychology Review*, *30*, 61-82.

Cooc, N. (2022). Disparities in general education inclusion for students of color with disabilities: Understanding when and why. *Journal of School Psychology*, *90*, 43-59.

Cook, B. G., & Cook, L. (2020). An examination of highly cited research on inclusion. *On Educational Inclusion: Meanings, History, Issues and International Perspectives*, 130-159.

Cook, B. G., Lloyd, J. W., Mellor, D., Nosek, B. A., & Therrien, W. J. (2018). Promoting open science to increase the trustworthiness of evidence in special education. *Exceptional Children*, *85*(1), 104-118.

Cook, B. G., & Odom, S. L. (2013). Evidence-based practices and implementation science in special education. *Exceptional Children*, *79*(2), 135-144.

Cook, S. C., McDuffie-Landrum, K. A., Oshita, L., & Cook, B. G. (2017). Co-teaching for students with disabilities: A critical and updated analysis of the empirical literature. In *Handbook of Special Education* (2nd ed.). (pp. 233-248). Routledge.

Cristofani, P., Di Lieto, M. C., Casalini, C., Pecini, C., Baroncini, M., Pessina, O., ... & Milone, A. (2023). Specific learning disabilities and emotional-behavioral difficulties: Phenotypes and role of the cognitive profile. *Journal of Clinical Medicine*, *12*(5), 1882.

Dalgaard, N. T., Bondebjerg, A., Viinholt, B. C., & Filges, T. (2022). The effects of inclusion on academic achievement, socioemotional development, and wellbeing of children with special educational needs. *Campbell Systematic Reviews*, *18*(4), e1291.

Dart, E. H., Arora, P. G., Collins, T. A., & Doll, B. (2019). Progress monitoring measures for internalizing symptoms: A systematic review of the peer-reviewed literature. *School Mental Health*, *11*, 265-275.

Davis, L., Fulginiti, A., Kriegel, L., & Brekke, J. S. (2012). Deinstitutionalization? Where have all the people gone?. *Current Psychiatry Reports, 14*, 259-269.

Dodge, K. A., Lansford, J. E., Burks, V. S., Bates, J. E., Pettit, G. S., Fontaine, R., & Price, J. M. (2003). Peer rejection and social information-processing factors in the development of aggressive behavior problems in children. *Child Development, 74*(2), 374-393.

Eber, L., Nelson, C. M., & Miles, P. (1997). School-based wraparound for students with emotional and behavioral challenges. *Exceptional Children, 63*(4), 539-555.

Ewe, L. P., & Galvin, T. (2023). Universal design for learning across formal school structures in Europe—A systematic review. *Education Sciences, 13*(9), 867.

Farkas, M. S., Simonsen, B., Migdole, S., Donovan, M. E., Clemens, K., & Cicchese, V. (2012). Schoolwide positive behavior support in an alternative school setting: An evaluation of fidelity, outcomes, and social validity of Tier I implementation. *Journal of Emotional and Behavioral Disorders*, 20, 275–288.

Farmer, T. W. (2013). When universal approaches and prevention services are not enough: The importance of understanding the stigmatization of special education for students with EBD a response to Kauffman and Badar. *Behavioral Disorders, 39*(1), 32-42.

Farmer, T. W., Dawes, M., Hamm, J. V., Lee, D., Mehtaji, M., Hoffman, A. S., & Brooks, D. S. (2018). Classroom social dynamics management: Why the invisible hand of the teacher matters for special education. *Remedial and Special Education, 39*(3), 177–192.

Farmer, T. W., Sutherland, K. S., Talbott, E., Brooks, D. S., Norwalk, K., & Huneke, M. (2016). Special educators as intervention specialists: Dynamic systems and the complexity of intensifying intervention for students with emotional and behavioral disorders. *Journal of Emotional and Behavioral Disorders, 24*(3), 173-186.

Finnegan, E., & Accardo, A. L. (2018). Written expression in individuals with autism spectrum disorder: A meta-analysis. *Journal of Autism and Developmental Disorders*, *48*, 868-882.

Flower, A., McDaniel, S. C., & Jolivette, K. (2011). A literature review of research quality and effective practices in alternative education settings. *Education and treatment of children*, 489-510.

Forness, S. R., Freeman, S. F., Paparella, T., Kauffman, J. M., & Walker, H. M. (2012). Special education implications of point and cumulative prevalence for children with emotional or behavioral disorders. *Journal of Emotional and Behavioral Disorders*, *20*(1), 4-18.

Fox, R. A., Leif, E. S., Moore, D. W., Furlonger, B., Anderson, A., & Sharma, U. (2022). A systematic review of the facilitators and barriers to the sustained implementation of school-wide positive behavioral interventions and supports. *Education and Treatment of Children*, *45*(1), 105-126.

Fuchs, D., & Fuchs, L. S. (1994). Inclusive schools movement and the radicalization of special education reform. *Exceptional Children*, *60*(4), 294-309.

Fuchs, D., & Fuchs, L: S. (2017). Critique of the national evaluation of response to intervention: A case for simpler frameworks. *Exceptional Children*, *83*(3), 255-268.

Fuchs, D., Fuchs, L. S., & Vaughn, S. (2014). What is intensive instruction and why is it important?. *Teaching Exceptional Children*, *46*(4), 13-18.

Fuchs, D., Mirowitz, H. C., & Gilbert, J. K. (2023). Exploring the truth of Michael Yudin's claim: The more time students with disabilities spend in general classrooms, the better they do academically. *Journal of Disability Policy Studies*, *33*(4), 236-252.

Fuchs, L. S., Fuchs, D., Compton, D. L., Wehby, J., Schumacher, R. F., Gersten, R., & Jordan,

N. C. (2015). Inclusion versus specialized intervention for very-low performing students: What does access mean in an era of academic challenge? *Exceptional Children, 81*, 134-157.

Franklin-Gillette, S., DuPaul, G. J., Fu, Q., & Fogt, J. (2023). Peer influence in a school for youth with emotional and behavioral disorders. *Journal of Emotional and Behavioral Disorders, 31*(1), 3-13.

Gable, R. A., Park, K. L., & Scott, T. M. (2014). Functional behavioral assessment and students at risk for or with emotional disabilities: Current issues and considerations. *Education and Treatment of Children*, 111-135.

Gage, N. A., Lewis, T. J., & Stichter, J. P. (2012). Functional behavioral assessment-based interventions for students with or at risk for emotional and/or behavioral disorders in school: A hierarchical linear modeling meta-analysis. *Behavioral Disorders, 37*(2), 55-77.

Gerber, M. M. (2017). A history of special education. In *Handbook of Special Education* (pp. 3-15). Routledge.

Gilmour, A. F. (2018). Has inclusion gone too far? Weighing its effects on students with disabilities, their peers, and teachers. *Education Next, 18*(4), 8-17.

Gilmour, A. F., Fuchs, D., & Wehby, J. H. (2019). Are students with disabilities accessing the curriculum? A meta-analysis of the reading achievement gap between students with and without disabilities. *Exceptional Children, 85*(3), 329-346.

Goforth, A. N., Farmer, R. L., Kim, S. Y., Naser, S. C., Lockwood, A. B., & Affrunti, N. W. (2021). Status of school psychology in 2020: Part 1, demographics of the NASP membership survey. *NASP Research Reports, 5*(2), 1-17.

Grasley-Boy, N. M., Reichow, B., van Dijk, W., & Gage, N. (2021). A systematic review of tier 1 PBIS implementation in alternative education settings. *Behavioral Disorders, 46*(4), 199-213.

Gresham, F. M., MacMillan, D. L., & Bocian, K. (1996). "Behavioral earthquakes:" Low

frequency, salient behavioral events that differentiate students at-risk for behavioral

disorders. *Behavioral Disorders*, *21*(4), 277-292.

Hallenbeck, B. A., & Kauffman, J. M. (1995). How does observational learning affect the

behavior of students with emotional or behavioral disorders? A review of research. *The Journal

of Special Education*, *29*(1), 45-71.

Hendrickx, M. M. H. G., Mainhard, M. T., Boor-Klip, H. J., Cillessen, A. H. M., & Brekelmans,

M. (2016). Social dynamics in the classroom: Teacher support and conflict and the peer ecology.

*Teaching and Teacher Education*, 53, 30–40.

Heward, W. L., Alber-Morgan, S. R., & Konrad, M. (2021). *Exceptional Children: An

Introduction to Special Education* (12th ed.). Pearson.

Hobbs, N. (1983). Project Re-ED: From demonstration project to nationwide program. *Peabody

Journal of Education*, *60*(3), 8-24.

Hollo, A., Wehby, J. H., & Oliver, R. M. (2014). Unidentified language deficits in children with

emotional and behavioral disorders: A meta-analysis. *Exceptional Children*, *80*(2), 169-186.

Horn, A. L., Roitsch, J., & Murphy, K. A. (2023). Constant time delay to teach reading to

students with intellectual disability and autism: A review. *International Journal of

Developmental Disabilities*, *69*(2), 123-133.

Iacono, T., Landry, O., Garcia-Melgar, A., Spong, J., Hyett, N., Bagley, K., & McKinstry, C.

(2021). A systematized review of co-teaching efficacy in enhancing inclusive education for

students with disability. *International Journal of Inclusive Education*, 1-15.

Kauffman, J. M., Ahrbeck, B., Anastasiou, D., Badar, J., Felder, M., & Hallenbeck, B. A. (2021). Special education policy prospects: Lessons from social policies past. *Exceptionality*, *29*(1), 16-28.

Kauffman, J. M., Anastasiou, D., Badar, J., Travers, J. C., & Wiley, A. L. (2016). Inclusive education moving forward. In *General and Special Education Inclusion in an Age of Change: Roles of Professionals Involved* (Vol. 32, pp. 153-178). Emerald Group Publishing Limited.

Kauffman, J. M., & Badar, J. (2016). It's instruction over place—not the other way around!. *Phi Delta Kappan*, *98*(4), 55-59.

Kauffman, J. M., Burke, M. D., & Anastasiou, D. (2023). Hard LRE choices in the era of inclusion: Rights and their implications. *Journal of Disability Policy Studies*, *34*(1), 61-72.

Kauffman, J. M., Cullinan, D., & Epstein, M. (1987). Characteristics of students placed in special programs for the seriously emotionally disturbed. *Behavioral Disorders*, *12*, 175-184.

Kauffman, J. M., & Hallahan, D. P. (1995). *The Illusion of Full Inclusion: A Comprehensive Critique of a Current Special Education Bandwagon*. PRO-ED, Inc., 8700 Shoal Creek Blvd., Austin, TX 78757-6897.

Kauffman, J. M., & Landrum, T. J. (2018). *Characteristics of Emotional and Behavioral Disorders in Children and Youth* (11th ed.). Upper Saddle River, NJ: Prentice Hall.

Kauffman, J. M., Landrum, T. J., Mock, D. R., Sayeski, B., & Sayeski, K. L. (2005). Diverse knowledge and skills require a diversity of instructional groups: A position statement. *Remedial and Special Education*, *26*(1), 2-6.

Kauffman, J. M., Travers, J. C., & Badar, J. (2020). Why some students with severe disabilities are not placed in general education. *Research and Practice for Persons with Severe Disabilities*, *45*(1), 28-33.

Kavale, K. A. (2002). Mainstreaming to full inclusion: From orthogenesis to pathogenesis of an idea. *International Journal of Disability, Development, and Education, 49*(2), 201-214.

Kavale, K. A., & Forness, S. R. (2000). History, rhetoric, and reality: Analysis of the inclusion debate. *Remedial and Special Education, 21*(5), 279–296.

Keen, D., Webster, A., & Ridley, G. (2016). How well are children with autism spectrum disorder doing academically at school? An overview of the literature. *Autism, 20*(3), 276-294.

King, S. A., Lemons, C. J., & Davidson, K. A. (2016). Math interventions for students with autism spectrum disorder: A best-evidence synthesis. *Exceptional Children, 82*(4), 443-462.

King-Sears, M. E., Stefanidis, A., Berkeley, S., & Strogilos, V. (2021). Does co-teaching improve academic achievement for students with disabilities? A meta-analysis. *Educational Research Review, 34*, 100405.

King-Sears M. E., Stefanidis, A., Evmenova, A. S., Raom K., Mergen, R. L., Owen, L. S., & Strimel, M.M. (2023). Achievement of learners receiving UDL instruction: A meta-analysis. *Teaching and Teacher Education, 122*, 1-15.

Kittelman, A., McIntosh, K., & Hoselton, R. (2019). Adoption of PBIS within school districts. *Journal of School Psychology, 76*, 159-167.

Kumm, S., Wilkinson, S., & McDaniel, S. (2020). Alternative education settings in the United States. *Intervention in School and Clinic, 56*(2), 123-126.

Landrum, T. J., & McDuffie, K. A. (2010). Learning styles in the age of differentiated instruction. *Exceptionality, 18*(1), 6-17.

Laninga-Wijnen, L., Harakeh, Z., Dijkstra, J. K., Veenstra, R., & Vollebergh, W. (2018). Aggressive and prosocial peer norms: Change, stability, and associations with adolescent aggressive and prosocial behavior development. *Journal of Early Adolescence, 38*(2), 178–203.

Lansford, J. E., Malone, P. S., Dodge, K. A., Pettit, G. S., & Bates, J. E. (2010). Developmental cascades of peer rejection, social information processing biases, and aggression during middle childhood. *Development and Psychopathology, 22*(3), 593-602.

Lindsay, G. (2007). Educational psychology and the effectiveness of inclusive education/mainstreaming. *British Journal of Educational Psychology, 77*(1), 1-24.

Lloyd, B. P., Bruhn, A. L., Sutherland, K. S., & Bradshaw, C. P. (2019). Progress and priorities in research to improve outcomes for students with or at risk for emotional and behavioral disorders. *Behavioral Disorders, 44*(2), 85-96.

Machalicek, W., O'Reilly, M. F., Beretvas, N., Sigafoos, J., & Lancioni, G. E. (2007). A review of interventions to reduce challenging behavior in school settings for students with autism spectrum disorders. *Research in Autism Spectrum Disorders, 1*(3), 229-246.

MacMillan, D. L., Gresham, F. M., & Forness, S. R. (1996). Full inclusion: An empirical perspective. *Behavioral Disorders, 21*(2), 145-159.

Maggin, D. M., Wehby, J. H., Farmer, T. W., & Brooks, D. S. (2016). Intensive interventions for students with emotional and behavioral disorders: Issues, theory, and future directions. *Journal of Emotional and Behavioral Disorders, 24*(3), 127-137.

Matson, J. L., & Nebel-Schwalm, M. (2007). Assessing challenging behaviors in children with autism spectrum disorders: A review. *Research in Developmental Disabilities, 28*(6), 567-579.

Mattison, R. E. (2015). Comparison of students with emotional and/or behavioral disorders as classified by their school districts. *Behavioral Disorders, 40*(3), 196-209.

Mattison, R. E., Hooper, S. R., & Glassberg, L. A. (2002). Three-year course of learning disorders in special education students classified as behavioral disorder. *Journal of the American Academy of Child & Adolescent Psychiatry, 41*(12), 1454-1461.

McDaniel, S. C., Wilkinson, S., & Simonsen, B. (2018). Positive behavioral interventions and supports in alternative educational placements. In *Emerging Research and Issues in Behavioral Disabilities* (pp. 113-130). Emerald Publishing Limited.

McIntosh, K., & Goodman, S. (2016). *Integrated multi-tiered systems of support: Blending RTI and PBIS*. Guilford Publications.

McIntosh, K., Mercer, S. H., Nese, R. N. T., Strickland-Cohen, M. K., & Hoselton, R. (2016). Predictors of sustained implementation of school-wide positive behavioral interventions and supports. *Journal of Positive Behavior Interventions, 18*(4), 209–218.

McKenna, J. W., Solis, M., Brigham, F., & Adamson, R. (2019). The responsible inclusion of students receiving special education services for emotional disturbance: Unraveling the practice to research gap. *Behavior Modification, 43*(4), 587-611.

Meadows, N. B., Neel, R. S., Scott, C. M., & Parker, G. (1994). Academic performance, social competence, and mainstream accommodations: A look at mainstreamed and nonmainstreamed students with serious behavioral disorders. *Behavioral Disorders, 19*(3), 170-180.

Mesibov, G. B., & Shea, V. (1996). Full inclusion and students with autism. *Journal of Autism and Developmental Disorders, 26*, 337-346.

Meyer, A., Rose, D. H., & Gordon, D. (2014). *Universal Design for Learning: Theory and practice*. CAST.

Mikolajewski, A. J., Allan, N. P., Hart, S. A., Lonigan, C. J., & Taylor, J. (2013). Negative affect shares genetic and environmental influences with symptoms of childhood internalizing and externalizing disorders. *Journal of Abnormal Child Psychology, 41*(3), 411-423.

Minkos, M. L., Winter, E. L., & Trudel, S. M. (2023). Adaptation of universal behavioral supports within an alternative education setting. *The Journal of Special Education, 57*(2), 118-128.

Mitchell, B. S., Adamson, R., & McKenna, J. W. (2017). Curbing our enthusiasm: An analysis of the check-in/check-out literature using the Council for Exceptional Children's evidence-based practice standards. *Behavior Modification, 41*(3), 343-367.

Mitchell, B. S., Kern, L., & Conroy, M. A. (2019). Supporting students with emotional or behavioral disorders: State of the field. *Behavioral Disorders, 44*(2), 70-84.

Montgomery, J. M., Stoesz, B. M., & McCrimmon, A. W. (2012). Emotional intelligence, theory of mind, and executive functions as predictors of social outcomes in young adults with Asperger syndrome. *Focus on Autism and Other Developmental Disabilities, 28,* 4-13.

Morgan, P. L., Woods, A. D., Wang, Y., Farkas, G., Hillemeier, M. M., & Mitchell, C. (2023). Which students with disabilities are placed primarily outside of US elementary school general education classrooms?. *Journal of Learning Disabilities, 56*(3), 180-192.

Mrug, S., Molina, B. S., Hoza, B., Gerdes, A. C., Hinshaw, S. P., Hechtman, L., & Arnold, L. E. (2012). Peer rejection and friendships in children with attention-deficit/hyperactivity disorder: Contributions to long-term outcomes. *Journal of Abnormal Child Psychology, 40,* 1013-1026.

Murphy, M. P. A. (2021). Belief without evidence? A policy research note on Universal Design for Learning. *Policy Futures in Education, 19*(1), 7–12.

Nation's Report Card (2022). Available at www.nationsreportcard.gov

National Wraparound Initiative. (2022). Wraparound's inclusion in the Prevention Services Clearinghouse: How was the rating determined and what does it mean? Portland, OR: National Wraparound Initiative.

Nelson, J. R., Benner, G. J., Lane, K., & Smith, B. W. (2004). Academic achievement of K-12 students with emotional and behavioral disorders. *Exceptional Children, 71*(1), 59-73.

Nelson, L. L. (2021). *Design and deliver: Planning and teaching using universal design for learning* (2nd ed.). Brookes.

Nickerson, A. B., & Brosof, A. M. (2003). Identifying skills and behaviors for successful inclusion of students with emotional or behavioral disorders. *Behavioral Disorders, 28*(4), 401-409.

Odom, S. L., Hall, L. J., Morin, K. L., Kraemer, B. R., Hume, K. A., McIntyre, N. S., ... & DaWalt, L. (2021). Educational interventions for children and youth with autism: A 40-year perspective. *Journal of Autism and Developmental Disorders*, 1-16.

Ok, M. W., Rao, K., Bryant, B. R., & McDougall, D. (2017). Universal design for learning in pre-K to grade 12 classrooms: A systematic review of research. *Exceptionality, 25*(2), 116-138.

Oliver, R. M., & Reschly, D. J. (2007). Effective classroom management: Teacher preparation and professional development. TQ Connection Issue Paper. *National Comprehensive Center for Teacher Quality*.

Pashler, H., McDaniel, M., Rohrer, D., & Bjork, R. (2008). Learning styles: Concepts and evidence. *Psychological Science in the Public Interest, 9*(3), 105-119.

Plavnick, J. B., Marchand-Martella, N. E., Martella, R. C., Thompson, J. L., & Wood, A. L. (2015). A review of explicit and systematic scripted instructional programs for students with autism spectrum disorder. *Review Journal of Autism and Developmental Disorders, 2*, 55-66.

Pogrow, S. (1996). Reforming the wannabe reformers. *Phi Delta Kappan, 77*(10), 656.

Quinn, M., & Poirier, J. M. (2006). *Study of effective alternative education programs: Final grant report.* Washington, DC: American Institutes for Research.

Reid, R., Gonzalez, J. E., Nordness, P. D., Trout, A., & Epstein, M. H. (2004). A meta-analysis of the academic status of students with emotional/behavioral disturbance. *The Journal of Special Education, 38*(3), 130-143.

Reinert, M, Fritze, D. & Nguyen, T. (October 2022). "The State of Mental Health in America 2023" Mental Health America, Alexandria VA.

Rose, C. A., & Espelage, D. L. (2012). Risk and protective factors associated with the bullying involvement of students with emotional and behavioral disorders. *Behavioral Disorders, 37*(3), 133-148.

Rowe, D. A., Mazzotti, V. L., Fowler, C. H., Test, D. W., Mitchell, V. J., Clark, K. A., ... & Dean, C. (2021). Updating the secondary transition research base: Evidence-and research-based practices in functional skills. *Career Development and Transition for Exceptional Individuals, 44*(1), 28-46.

Schmitt, J., & deCourcy, K. (2022). The pandemic has exacerbated a long-standing national shortage of teachers. *Economic Policy Institute*.

Schurer Coldiron, J., Bruns, E. J., & Quick, H. (2017). A comprehensive review of wraparound care coordination research, 1986–2014. *Journal of Child and Family Studies, 26*(5), 1245-1265.

Scott, T. M., & Alter, P. J. (2017). Examining the case for functional behavior assessment as an evidence-based practice for students with emotional and behavioral disorders in general education classrooms. *Preventing School Failure: Alternative Education for Children and Youth, 61*(1), 80-93.

Simonsen, B., & Sugai, G. (2013). PBIS in alternative education settings: Positive support for youth with high-risk behavior. *Education and Treatment of Children*, 3-14.

81

Siperstein, G. N., Wiley, A. L., & Forness, S. R. (2011). School context and the academic and behavioral progress of students with emotional disturbance. *Behavioral Disorders, 36*(3), 172-184.

Stoutjesdijk, R., Scholte, E. M., & Swaab, H. (2012). Special needs characteristics of children with emotional and behavioral disorders that affect inclusion in regular education. *Journal of Emotional and Behavioral Disorders, 20*(2), 92-104.

Sugai, G., & Horner, R. H. (2020). Sustaining and scaling positive behavioral interventions and supports: Implementation drivers, outcomes, and considerations. *Exceptional Children, 86*(2), 120-136.

Sugai, G., Lewis-Palmer, T., & Hagan-Burke, S. (2000). Overview of the functional behavioral assessment process. *Exceptionality, 8*(3), 149-160.

Talbott, J. A. (2004). Deinstitutionalization: Avoiding the disasters of the past. *Psychiatric Services, 55*(10), 1112-1115.

Tonizzi, I., & Usai, M. C. (2023). Math abilities in autism spectrum disorder: A meta-analysis. *Research in Developmental Disabilities, 139*, 104559.

Trout, A. L., Nordness, P. D., Pierce, C. D., & Epstein, M. H. (2003). Research on the academic status of children with emotional and behavioral disorders: A review of the literature from 1961 to 2000. *Journal of Emotional and Behavioral Disorders, 11*(4), 198-210.

Vaughn, S., Denton, C. A., & Fletcher, J. M. (2010). Why intensive interventions are necessary for students with severe reading difficulties. *Psychology in the Schools, 47*(5), 432-444.

Wagner, M., Kutash, K., Duchnowski, A. J., Epstein, M. H., & Sumi, W. C. (2005). The children and youth we serve: A national picture of the characteristics of students with emotional

disturbances receiving special education. *Journal of Emotional and Behavioral Disorders*, *13*(2), 79-96.

Walker, H. M., & Gresham, F. M. (Eds.). (2013). *Handbook of Evidence-Based Practices for Emotional and Behavioral Disorders: Applications in schools*. Guilford Publications.

Walker, V. L., Chung, Y. C., & Bonnet, L. K. (2018). Function-based intervention in inclusive school settings: A meta-analysis. *Journal of Positive Behavior Interventions*, *20*(4), 203-216.

Wiley, A. L., Harker, B., & McCollum, T. (2022). Veil of tiers or happy tiers? Multitiered systems of support. In *Revitalizing Special Education* (pp. 121-141). Emerald Publishing Limited

Wiley, A. L., Siperstein, G. N., Bountress, K. E., Forness, S. R., & Brigham, F. J. (2008). School context and the academic achievement of students with emotional disturbance. *Behavioral Disorders*, *33*(4), 198-210.

Wiley, A. L., Siperstein, G. N., Forness, S. R., & Brigham, F. J. (2010). School context and the problem behavior and social skills of students with emotional disturbance. *Journal of Child and Family Studies*, *19*, 451-461.

Williamson, P., Hoppey, D., McLeskey, J., Bergmann, E., & Moore, H. (2020). Trends in LRE placement rates over the past 25 years. *The Journal of Special Education*, *53*(4), 236-244.

Yell, M. L., Collins, J., Kumpiene, G., & Bateman, D. (2020). The individualized education program: Procedural and substantive requirements. *Teaching Exceptional Children, 52*(5), 304-318.

Yell, M. L., & Prince, A. T. (2022). Why the continuum of alternative placements is essential. In *Revitalizing Special Education* (pp. 59-78). Emerald Publishing Limited.

Yu, R., Haddock, A., & Womack, T. (2020). Integrating supports for students with wraparound. *Contemporary School Psychology*, 1-9.

Zabek, F., Lyons, M. D., Alwani, N., Taylor, J. V., Brown-Meredith, E., Cruz, M. A., & Southall, V. H. (2023). Roles and functions of school mental health professionals within comprehensive school mental health systems. *School Mental Health, 15*(1), 1-18.

Zakszeski, B., & Rutherford, L. (2021). Mind the gap: A systematic review of research on restorative practices in schools. *School Psychology Review, 50*(2-3), 371-387.

Zigmond, N., Kloo, A., & Volonino, V. (2009). What, where, and how? Special education in the climate of full inclusion. *Exceptionality, 17*(4), 189-204.

Wiley Vita 1

## CURRICULUM VITAE

**Andrew L. Wiley, Ph.D.**
Kent State University Special Education Program
School of Lifespan Development and Educational Sciences
College and Graduate School of Education, Health, and Human Services
405 White Hall; Kent, OH 44242-0001
Office Phone: 330.672.0581; Office Fax: 330.672.2512; E-mail: awiley5@kent.edu

### Education

| | | |
|---|---|---|
| 2008 | Ph.D., Special Education | University of Virginia<br>Charlottesville, VA |
| 1996 | M.T., Special Education | University of Virginia<br>Charlottesville, VA |
| 1991 | B.A., English and Religious Studies | University of Virginia<br>Charlottesville, VA |

### Professional Experience

**Higher Education**

| | |
|---|---|
| 2014-Present | Associate Professor. Special Education, Kent State University. |
| 2008-2014 | Assistant Professor, Special Education, Kent State University. |
| 2005-2008 | Senior Research Associate. Center for Social Development and Education, University of Massachusetts, Boston, Massachusetts. |
| 2005 | Instructor. Graduate College of Education, University of Massachusetts, Boston, Massachusetts. |
| 2001-2005 | Instructor. Curry School of Education, University of Virginia, Charlottesville, Virginia |
| 2004-2005 | Teaching Assistant. Assessment Techniques for Exceptional Individuals; Field Project. University of Virginia, Charlottesville, Virginia |
| 2003-2004 | University Supervisor of graduate-level student teachers at the University of Virginia, Charlottesville, Virginia. |
| 2002 | Instructor. George Mason University, Fairfax, Virginia. |

**Pre-K-12**

| | |
|---|---|
| 1999-2003 | Behavior Specialist (K-12) Fairfax County Public Schools, Fairfax, Virginia. |
| 1998-1999 | Autism Resource Teacher. Fairfax County Public Schools, Fairfax, Virginia. |
| 1996-1998 | Specialist/ Crisis Resource Teacher at intensive self-contained program for children grades K-6 with emotional and behavioral disorders, Olde Creek Center, Fairfax, Virginia. |

Wiley Vita 2

## Publications

### Journals (Refereed)

Lockwood, A., **Wiley, A. L.,** & Cowan, R. (in press). Special educator teacher training in norm-referenced assessment: An analysis of syllabi. *Special Education Research, Policy, and Practice.*

Burke, M. D., Kauffman, J. M., & **Wiley, A. L.** (in press). Introduction to the special issue: What is the purpose of special education? *Exceptionality.*

Anastasiou, D., Burke, M. D., **Wiley, A.L.,** & Kauffman, J. M. (in press). Special education's telos: A tripartite approach. *Exceptionality.*

Kauffman, J. M., Anastasiou, D., Burke, M. D., Felder, M., Hornby, G., Lopes, J., & **Wiley, A. L.** (in press). Adventures in naming: Why words matter for EBD and special education *Journal of Emotional and Behavioral Disorders.*

Kauffman, J. M., Anastasiou, D., Hornby, G., Lopes, J., Burke, M. D., Felder, M., ... & **Wiley, A.** (2022). Imagining and reimagining the future of special and inclusive education. *Education Sciences, 12*(12), 903.

Kauffman, J. M., Badar, J., **Wiley, A. L.,** Anastasiou, D., & Koran, J. (2022). Uncertainty in education: Policy implications. *Journal of Education*. Advance online publications.

Kauffman, J. M., **Wiley, A. L.,** Travers, J. C., Badar, J., & Anastasiou, D. (2021). *Endrew* and FAPE: Concepts and implications for particular groups of students. *Behavior Modification, 45*(1), 177-198.

Librea-Carden, M. R., Mulvey, B. K., Borgerding, L. A., **Wiley, A. L.,** & Ferdous, T. (2021). 'Science is accessible for everyone': Preservice special education teachers' nature of science perceptions and instructional practices. *International Journal of Science Education*, 1-20.

**Wiley, A. L.,** Brigham, F. J., Kauffman, J. M., & Bogan, J. (2013). Disproportionate poverty, conservatism, and the disproportionate identification of minority students with EBD. *Education and Treatment of Children, 36,* 29-50.

**Wiley, A. L.,** Kauffman, J. M., & Plageman, K. (2013). Conservatism and the under-identification of students with emotional and behavioral disorders in special education. *Exceptionality, 22,* 237-251.

Cimera, R. E., Burgess, S., & **Wiley, A. L.** (2013). Does providing transition services early enable students with ASD to achieve better vocational outcomes as adults? *Research and Practice for Persons with Severe Disabilities, 38,* 88-93.

**Wiley, A. L.,** & Siperstein, G. N. (2011). Seeing red, feeling blue: The impact of state political leaning on state identification rates for emotional disturbance. *Behavioral Disorders, 36,* 195-207.

Siperstein, G. N., **Wiley, A. L.,** & Forness, S. R. (2011). School context and the academic and behavioral progress of students with emotional disturbance. *Behavioral Disorders, 36,* 172-184.

**Wiley, A. L.,** Siperstein, G. N., Forness, S. R., & Brigham, F. J. (2010). School context and the problem behavior and social skills of students with emotional disturbance. *Journal of Child and Family Studies, 19,* 451-461.

**Wiley, A. L.,** Siperstein, G. N., Bountress, K. E., Forness, S. R., & Brigham, F. J. (2008). School context and the academic achievement of students with emotional disturbance. *Behavioral Disorders, 33,* 198-210.

Kauffman, J. M., & Wiley, A. L. (2005). How the President's Commission on Excellence in Special Education devalues special education. *Learning Disabilities: A Multidisciplinary Journal, 13,* 3-6.

Brigham, F. J., Gustashaw, W. E., **Wiley, A. L.,** & Brigham, M. (2004). Research in the wake of the No Child Left Behind Act: Why the controversies will continue and some suggestions for controversial research. *Behavioral Disorders, 29,* 300-310.

## Journals (Refereed) Under Review

Anastasiou, D., Gage, N. A., **Wiley, A. L.,** & Kauffman, J. K. (under review). Is UDL appropriate for ALL students with disabilities? *Remedial & Special Education.*

Unal, N. U., Barber, B. R., & **Wiley, A. L.** (under review). Teachers' acceptability of reading interventions: Examining the *Reading Intervention Rating Profile. Assessment for Effective Intervention.*

## Books/Book Chapters

**Wiley, A. L.,** David, D., & Harker, B. (2023). Multi-tiered systems of support as special education reform: A critical appraisal. In J. M. Kauffman, D. P. Hallahan, & P. C. Pullen (eds.) *Handbook of Special Education* (3rd ed.)

**Wiley, A. L.,** Harker, B., & McCollum, T. (2022). Veil of tiers or happy tiers? Revitalizing special education in an age of multi-tiered systems of support. In J. M. Kauffman, ed. *Revitalizing Special Education: Revolution, Devolution, Evolution.*

Stevenson, N. A. & **Wiley, A. L.** (2021). Survey research in special education: Methods and mechanics. In, B. Hottt, R. Brigham, & C. Peltier, *Research Methods in Special Education,* SLACK Publishing LTD, Thorofore, NJ.

Barber, B. R., & **Wiley, A. L.** (2020). General education environments and the inclusion of students with high-incidence disabilities. J. Kauffman & J. Badar (Eds.), *On Educational Inclusion.* Oxfordshire, UK: Routledge Publishing.

Kauffman, J. M., Badar, J., & **Wiley, A. L.** (2018). RtI controversies and solutions. In P. C. Pullen & M. M. Kennedy (Eds.), *Handbook of Response to Intervention and Multi-Tiered Systems of Support.* New York: Routledge.

Anastasiou, D., Morgan, P.L., Farkas, G., & **Wiley, A. L.** (2017). Minority disproportionate representation in special education: Politics and evidence, issues and implications. In J. M. Kauffman, D. P. Hallahan, and P. C. Pullen (Eds.) *Handbook of Special Education* (2nd ed.).

Kauffman, J. M., Anastasiou, D., Badar, J., Travers, J. C., & **Wiley, A.** L. (2016). Inclusive education moving forward. In J. P. Bakken & F. E. Obiakor, (Eds.), *Advances in special education, Vol. 32—General and Special Education in an Age of Change: Roles of Professionals Involved* (pp. 153-177). Bingley, UK: Emerald.

**Wiley, A. L.** (2015). Place values: What moral psychology can tell us about the full inclusion debate in special education. In B. Bateman, J. Lloyd, & M. Tankersley, (Eds.). *Enduring Issues in Special Education: Personal Perspectives.*

Kauffman, J. M., **Wiley, A. L.,** Hirsch, S., Bantz, J., & Barber, B. R. (2014). Special education today in the United States. In A. Rotatori, J. Bakken, S. Burkhardt, F. Obiakor, & U. Sharma (Eds.). *Special Education: An International Perspective.*

**Wiley, A. L.,** & Siperstein, G. N. (2014). Social and emotional learning for students

with disabilities. *The Handbook of Social and Emotional Learning* (2nd ed.).

Landrum, T. J., **Wiley, A. L.**, Tankersley, M., & Kauffman, J. M. (2014). Is EBD "special," and is "special education" an appropriate response? In P. Garner, J. M. Kauffman, & J. G. Elliott (Eds.), *Handbook of Emotional and Behavioral Difficulties* (2nd ed.). London: Sage.

**Wiley, A. L.**, Tankersley, M., & Simms, A. (2012). Teachers' causal attributions for student problem behavior: Implications for school-based behavioral interventions and research. In B. G. Cook, M. Tankersley, & T. J. Landrum (Eds.), Classroom behavior, contexts, and interventions (*Advances in Learning and Behavioral Disabilities, 25,* 279-300). Bingley, UK: Emerald Publishing Group.

Fitzgerald, S. M., Rumrill, P. D., & **Wiley, A. L.** (2010). Measurement and statistics in special education research. In P. D. Rumrill, B. G. Cook, & A. L. Wiley, *Research in Special Education* (2nd edition). Springfield, IL: Charles C. Thomas.

Rumrill, P. D., Cook, B. G., & **Wiley, A. L.** (2010). *Research in special education* (2nd edition). Springfield, IL: Charles C. Thomas.

Jablonski, B. R., Potts, E., & **Wiley, A. L.** (December, 2008). Providing access to assessment: How IEP teams should make decisions about accommodations. *CEC Today.*

Edgemon, E. A., **Wiley, A. L.**, Jablonski, B. R., & Lloyd, J. W. (2006). Conducting integrative reviews of special education research: Overview and case study. *Advances in Learning and Behavioral Disabilities, 19,* 257-284.

**Wiley, A. L.** (2004). [Review of the book *Creating safe schools for all children*]. *American School Board Journal, 191(5),* 49-50.

## Conference Papers

Unal, N. U., Barber, B. R., & Wiley, A. L. (2016). Treatment acceptability in special education: Measures, models, and considerations for intervention planning. Annual meeting of the Council for Exceptional Children, St. Louis, MO.

Unal, N. U., Barber, B. R., & Wiley, A. L. (2015). Research on treatment acceptability: Implications for improving educational practices and outcomes for students with EBD. Annual Teacher Educators for Children with Behavioral Disorders (TECBD) conference. Tempe, AZ.

## Grant Activity

*Better Together: Advancing the Quality and Pace of Scientific Research in Special Education through Open Science.* Spencer Conference Grant. ($50,000). Spring, 2019, Co-Principal Investigator. (Not Funded).

*Improving Teacher Self-Efficacy and Evidence-Based Classroom Practices through a Hybrid Learning Framework.* United States Department of Education, Office of Innovation and Improvement's Supporting Effective Educator Development ($2,151,233) Spring, 2018, Co-Principal Investigator.

(Not funded)

*Project SUPPORT-ECM: School-University Partnership to Promote Ongoing and Reciprocal Training in Effective Classroom Management.*(2016-2017). Ohio Dean's Compact for Exceptional Children.

Grant Role: Project Expert

Total Award: $78,717

*CEEDAR Center Intensive Technical Assistance Grant.* (2015-2016). United States Department of Education.
Grant Role: Co-Principal Investigator.
Total Award: $200,000.
*Project ASTUTE: Improving Instruction for All Students through Unified Teacher Education.* (2013-2015). Ohio Dean's Compact for Exceptional Children.
Grant Role: Principal Investigator.
Total Award: $214,000.
*Teachers' Causal Attributions for Student Problem Behavior: Implications for Timely and Effective School-Based Intervention.* (2013-2014). College of EHHS Internal Seed Grant. Role: Director.
Total Award: $5,000 (not selected)
*Implementing and Sustaining Kent State University's Undergraduate Program for Preparing Highly Qualified Special Education Teachers.* (2011-2012). Ohio Department of Education. Role: Co-Director.
Total Award: $99,571
*Kent State University's Redesigned Program for Preparing Highly Qualified Special Education Teachers.* (2010-2011). Ohio Department of Education. Role: Co-Director.
Total Award: $99,879.
*Project OMEGA: Ohio Middle-Level Exceptional and General Education Alignment Proposal.* Ohio Department of Education. Role: Co-Director. Total Requested: $99,000 (Not funded).
*Administrator Perspectives on Implementing Evidence-Based Special Education Practices.* Kent State University, Research and Graduate Studies. (2010).
Total Award: $1,530.
*Inclusive Practices Specialist Program.* U.S. Department of Education, OSERS, Professional Development. Role: Principal Investigator. (2008-2013).
Total Requested: $500,000 (Not funded)
*What ED Means in Different School Contexts: Implications for Served and Unserved Populations.* U.S. Department of Education, OSERS, Division of Research to Practice.
Role: Co-Principal Investigator (2005-2008).
Total Award: $558,000

## Presentations

### National (Refereed)

Anastasiou, D., Hallenbeck, B., Pullen, P., Slocum, T., Travers, J., Truckenmiller, A., & **Wiley, A. L.** (March, 2023). *The telos of special education.* Badar-Kauffman Conference on Contemporary Issues in Special Education Research. Kent, OH.

Kauffman, J. M., Cooper, J. Landrum, Sallese, M. R., Travers, J. C., Vannest, K. J., & **Wiley, A. L.** (March, 2022). *Panel: Revitalizing Special Education.* Badar-Kauffman Conference on Contemporary Issues in Special Education Research. Kent, OH.

**Wiley, A. L.** (April 2019). *Using special education teacher preparation to close the research-to-practice gap: Do we know what we are doing?.* Badar-Kauffman Conference on Contemporary Issues in Special Education Research. Kent, OH.

Brigham, F. J., & **Wiley, A.L.** (October 2017). *Enhancement or individualization? Reconsidering a tradition adrift.* 41st Annual TECBD Conference, Tempe, AZ.

Anastasiou, D., & **Wiley, A. L.** (April 2017). *Social determinants of interstate prevalence rates of emotional disturbance.* Annual Meeting of the Council for Exceptional Children, Boston, MA.

Unuol, N., Barber, B., & **Wiley, A. L.** (October 2015). *Research on treatment acceptability: Implications for improving educational practices and outcomes for students with EBD.* 39th Annual TECBD Conference, Tempe, AZ.

**Wiley, A. L.,** Bedesem, P., & Simms, A. (October 2015). *Advancing teacher education for children with behavioral disorders: Four radical reforms.* 39th Annual TECBD Conference, Tempe, AZ.

Webb, J., **Wiley, A.,** Ringold, S., & Unluol, N. (2014). *What does research tell us about poverty? A special education perspective.* Annual Meeting of the Council for Exceptional Children, Philadelphia, PA.

**Wiley, A. L.,** & Simms, A. (2013). *Teachers' causal attributions and intervention preferences for student problem behavior: An empirical investigation.* International Conference of the Council for Children with Behavioral Disorders, Chicago, IL.

**Wiley, A. L.,** & Brigham, F. J. (October 2012). *Poverty, politics, and the disproportionate identification of minority students as emotionally disturbed.* The 36th Annual TECBD Conference, Tempe, AZ.

Tankersley, M. T., **Wiley, A. L.,** & Simms, A. (October 2011). *Causal attributions for EBDs and their implications for special education: Building a research agenda together.* Richard E. Shores Research Strand, The 35th Annual TECBD Conference, Tempe, AZ.

**Wiley, A. L.,** Simms, A., & Siperstein, G. N. (October 2011). *Seeing red, feeling blue: State political leaning and underidentification of EBD.* The 35th Annual TECBD Conference, Tempe, AZ.

**Wiley, A. L.,** Siperstein, G. N., & Forness, S. R. (October 2011). *Academic and behavioral progress of students with ED served in low income versus high income schools.* The 35th Annual TECBD Conference, Tempe, AZ.

**Wiley, A. L.,** Siperstein, G. N., Forness, S. R., Brigham, F. J., & Bountress, K. E. (April, 2008). *School context and the characteristics of students at-risk and identified as emotionally disturbed.* Annual meeting of the Council for Exceptional Children, Boston, MA.

Jablonski, B. R., Potts, E. A., & **Wiley, A. L.** (April, 2008). *Providing access to assessment: How teachers should make decisions about accommodations.* Annual meeting of the Council for Exceptional Children, Boston, MA.

**Wiley, A. L.** (April, 2008). Discussant. *Truancy and transition: Promoting school completion and successful exit strategies.* Annual meeting of the Council for Exceptional Children, Boston, MA.

**Wiley, A. L.,** Siperstein, G. N., Brigham, F. J., Forness, S. R., & Bountress, K. E. (November, 2007). *Relationships between school characteristics and the academic/ behavioral characteristics of school-identified students with ED.* Robert B. Rutherford Memorial TECBD Conference on Severe Behavior Disorders of Children and Youth, Tempe, AZ.

**International Invited**

**Wiley, A. L.** (2021). *Classroom Management: Positive, Proactive Strategies and Practices:* Brilliant Footsteps International Academy, Sokoto State, Nigeria.

**Wiley, A. L.**, & Unuol, N. (2013). *Teaching Students with Learning Problems in General Education Classrooms.* Kent State Koleji Elementary School Program. Istanbul, Turkey.

**Wiley, A. L.**, & Unuol, N. (2013). *Helping Young Children with Developmental Delays.* Kent State Koleji Early Childhood Educator Program. Istanbul, Turkey.

**Wiley, A. L.**, & Unuol, N. (2013). *How Parents Can Support School Success.* Kent State Koleji, Istanbul, Turkey.

## Professional

**Wiley, A. L.** (2021) *Classwide Positive Behavior Interventions & Supports: Making it Work for Teachers & Students.* All K-12 teachers, Kenston Local Public Schools, OH.

**Wiley, A. L.**, & Tankersley, M. (November, 2011). *Academic and behavioral strategies for inclusion.* Stow/Munroe Falls Public Schools, OH.

Tankersley, M., & **Wiley, A. L.** (November, 2010). *FBAs & BIPs: From data collection to implementation.* Stow/Munroe Falls Public Schools, OH.

Tankersley, M., & **Wiley, A. L.** (May, 2010). *Providing effective instruction to diverse learners.* Stow/Munroe Falls Public Schools, OH.

**Wiley, A. L.** (January, 2007). *Powerful practices: Rising to the challenge of challenging student behavior.* Brockton Public Schools, MA.

**Wiley, A. L.** (November, 2006). *Competing behavior pathways: A model for behavioral assessment and intervention.* Eldon B. Keith Center, Brockton, MA.

**Wiley, A. L.** (October, 2006). *Increasing student achievement: Effective instruction for exceptional learners.* Welcoming School, Lynn, MA.

**Wiley, A. L.**, & Brigham, F. J. (November, 2004). *Aggressive behavior in schools: Prevention, assessment, and intervention.* Lorman Education Services, Roanoke, VA.

**Wiley, A. L.**, & Schwaery, C. (2001-2003). *School-wide positive behavior support.* Fairfax County Public Schools, VA.

**Wiley, A. L.**, & Wilkerson, T. N. (2001-2003). *Functional behavior assessment and behavior intervention plans: Who, what, why, and how.* Fairfax County Public Schools, VA.

**Wiley, A. L.** (2001). *Reducing problem behavior through functional communication training.* FCPS Academy, Fairfax, VA.

## Teaching

### Courses Taught
*Contemporary Issues in Special Education (Doctoral, Masters)*
*Discourse and Dialogue in Disability Studies (Doctoral)*
*Research Applications in Special Education (Masters)*
*Single Subject Research Methods (Doctoral, Masters)*
*Learning Theories (Doctoral, Masters)*
*Inclusive Practices (Undergraduate/Graduate)*
*Applied Behavior Analysis II: Applications (Undergraduate/Graduate)*
*Curriculum Methods Mild/Moderate Disabilities (Undergraduate/Graduate)*
*Curriculum Methods Special Education (Undergraduate/Graduate)*
*Supplemental & Intensive Instruction for Students with Mathematical Difficulties (Undergraduate/Graduate)*

*Characteristics, Mild/Moderate Disabilities (Undergraduate/Graduate)*
*Introduction to Exceptionalities (Undergraduate/Graduate)*
*Family & Professional Collaboration (Undergraduate/Graduate)*
*Destination Kent State/First Year Experience Course (Undergraduate)*
*Classroom Management: Meeting All Learners' Behavioral Needs (Professional Workshop)*
*Response to Intervention: A Promising Practice for Struggling Learners (Professional Workshop)*
*Behavior Management (University of Virginia)*
*Teaching Exceptional Children (University of Virginia)*
*Inclusion, K-12 (University of Massachusetts Boston)*
*Classroom Management and Applied Behavior Analysis (George Mason University)*

## Academic Advising

**Undergraduate Program Faculty Adviser**
Mild to Intensive Dual License Major/Concentration, 2019-present
Mild to Moderate Special Education Minor, 2018-present
Summer Undergraduate Research Experience Faculty Mentor (Mikayla Bell, Summer 2023)
**Master's Program Faculty Adviser**
Mild to Moderate Master's Degree Program, 2008 – 2019
**Dissertation Director**
Stacia Kaschak (August, 2021)
> Title: *Improving Postsecondary Success for Youth with Emotional Disturbance:*
> *The Impact of Student-Level and Transition Programming Variables on Postsecondary*
> *Education and Postschool Employment*

**Dissertation Co-Director**
Rebecca DeNelsky (March, 2023)
> Title: *A Survey of Teacher Perceptions and Implementation of Credit Recovery for*
> *Students with or At-Risk for Disabilities*

Jennifer Webb (June, 2020)
> Title: *Seeing the Forest for the Trees: A Metasynthesis of Qualitative Research*
> *on Response to Intervention*

Neslihan Unluol Unal (May, 2018)
> Title: *Examination of a Rating Scale to Assess Teachers' Treatment*
> *Acceptability of Reading Interventions for Struggling Readers in Elementary Schools*

Abdulkarim Hussain Alhossein (May, 2014)
> Title: *Perspectives of King Saud University Faculty Members Toward*
> *Accommodations for Students with ADHD*

Andrea Simms (August, 2013)
> Topic: *Relationships between Teachers' Causal Attributions for Student Problem*
> *Behavior and Treatment Acceptability*

Abdulrahman Abaoud (August, 2013)
> Topic: *Saudi Elementary School Teachers' Attitudes Toward and Willingness to*
> *Teach Students with ADHD*

Brian Friedt (May, 2012)
> Topic: *Identifying Evidence-Based Practices in Special Education Using Meta-*
> *Analysis and Research Quality Indicators*

**Doctoral Adviser**
Marwh Allhibiy (Ph.D.)
Dylan David (Ph.D.)
BeckyAnn Harker (Ph.D.)
Gretchen Jessel (Ed.D.)
Stacia Kaschak (Ph.D.)

**Doctoral Co-Adviser**
Jena Greenwald (Ed.D.)
Jennifer Miller (Ed.D.)
Laura Cope (Ed.D.)
Jennifer Webb (Ph.D.)
Abdulkarim Hussain Alhossein (Ph.D.)
Rebecca Barrett (Ph.D.)
Abdulrahman Abaoud (Ph.D.)
Andrea Simms (Ph.D.)
David Leitch (Ph.D.)
Brian Friedt (Ph.D.)

**Dissertation Committees**
Melissa Rotman-Nelson (Special Education)
Sarah Bauer (Ph.D., School Psychology)
Hani Alanazi (Ph.D., Special Education)
Mila Rosa Librea-Carden (Ph.D., Science Education)
Rajlakshmi Ghosh (Ph.D., Science Education)

**Graduate Faculty Representative (Dissertation Defense)**
Rachael Muster (Spring, 2021)
Dissertation: *Resilience as a Predictor of Non-Medicinal Use of Prescription Drugs Among College Students*
Janeen Kotsch (Spring, 2021)
Dissertation: *Exploring Students' Experiences of Concept-Based Learning in an Asynchronous Online Pharmacology Course: An Interpretive Study*
Deborah Layman (Fall, 2020)
Dissertation: *The Effect of Guided Goal Setting on the Motivation and Achievement of Eighth Grade Students in an International Baccalaureate Middle Years Program: A      Pilot Study*
Nancy Benincasa (Summer, 2020)
Dissertation: *Ascension to the Superintendency: How Female Administrators Perceive the Attainability and Desirability of the Role*
Jeannine Taylor (Spring, 2020)
Dissertation: *A Hermeneutic Inquiry of Counselors' Experiences in the Use of Pictorial Narratives*
Dale Hirsch (Summer, 2017)
Dissertation: *Dissociation between Declarative and Procedural Mechanisms in Long-Term Memory.*
Perkins Pringle (Summer, 2016)
Dissertation: *Educational Change: The Development of a Creativity Encouraging Pedagogical Framework for a Standards-Based Middle School Environment*

Peggy Slavik (Fall, 2015).
Dissertation: *Students' Attitudes toward Mathematics in a Spreadsheet-Based Learning Environment*

## Doctoral Level Comprehensive Examinations

| | |
|---|---|
| Fall, 2022 | Hani Alanazi (Special Education) |
| Summer, 2021 | Emily Bennett (School Psychology) |
| Spring, 2021 | Melissa Rotman-Nelson (Special Education) |
| Fall, 2020 | Angela Capuzello (School Psychology) |
| Summer, 2017 | Jennifer Gonda (Special Education) |
| Fall, 2016 | Rebecca Barrett (Special Education) |
| Summer, 2015 | Jennifer Webb (Special Education) |
| Spring, 2015 | Neslihan Unluol Unal (Special Education) |
| Fall, 2014 | Seth Ringold (Special Education) |
| Spring, 2013 | Abdulkarim Hussain Alhossein (Special Education) |
| Fall, 2012 | Abdulrahman Abaoud (Special Education) |
| Fall, 2012 | Erin Pope (School Psychology) |
| Summer, 2012 | Andrew Simms (Special Education) |
| Fall, 2011 | David Leitch (Special Education |
| Fall, 2011 | Stacia Kaschak (Special Education) |
| Spring, 2010 | Brian Friedt (Special Education) |
| Fall, 2009 | Nicole Stark (School Psychology) |

## Masters Thesis Committees (Special Education)

Summer, 2022  Hatice Nur Akasu
Thesis topic: *Early Childhood Inclusive Practices/Interventions in Turkey and the United States: A Scoping Review*
Fall, 2010  Virginia Habig (Special Education)
Thesis topic: *Inferential Thinking of Elementary-Aged Students with Disabilities*

## Service

### Program & School

| | |
|---|---|
| 2023 | Development of new Master of Arts in Teaching (Special Education) |
| 2019 | Development of new Mild to Intensive Dual License concentration |
| 2018 | Development of new Mild to Moderate Special Education Minor |
| 2019 – | Coordinator, Mild to Intensive Dual License Undergraduate Concentration (Program) |
| 2017 – | Scholarship Committee/Reviewer, Special Education (Program) |
| 2014-2019 | Coordinator, Mild/Moderate Undergraduate/Graduate Concentration (Program) |
| 2009-2012 | Coordinator, Mild/Moderate Concentration (Program) |
| 2013 | Chair, Special Education Search Committee (Program) |
| 2008-2012 | Faculty Mentor, Student Council for Exceptional Children, Kent State University (Program) |
| 2011 | Co-Chair, Special Education Search Committee (Program) |
| 2009 | Faculty Member, Special Education Search Committee (Program) |
| 2019- | Faculty Advisory Committee (School) |
| 2018-2019 | LDES Curriculum Committee (School) |

2014-2016     Faculty Advisory Committee (School)
2009-2011     Faculty Advisory Committee, LDES (School)

**College & University**
2021-          Faculty Adviser University Budget Committee (University)
2020-2021     Development of new Ed.D. in Interprofessional Leadership (College, Program)
2020           College Honors & Awards Committee (College)
2019-          College Advisory Committee (College)
2010-2011     Teacher Education Coordinator (College)
2010-2011     Undergraduate Program Coordinator (College)

**State & Profession**
2022-2023     Educational Degree Pathways Development Consultant (Community College to
                 Four-Year Teacher Licensure Pathways) (State)
2022 – 2023   Ohio Guaranteed Transfer Pathways Panel (State)
2018 – 2022   Transfer Assurance Guarantee Reviewer (State)
2018 – 2020   Team Kent (Kent City Schools & Kent State Teacher Education) (Profession)

**National**
2023           Co-Editor, Special Issue of *Exceptionality*
2017-          Executive Committee, annual Badar Kauffman Conference on Contemporary
                 Issues in Special Education Research
2017-          Conference Proposal Reviewer, Badar Kauffman Conference on Contemporary
                 Issues in Special Education
2016-          Editorial Board, *Journal of International Special Needs Education*
2009-          Reviewer/Editorial Associate: *Exceptional Children;*
                 *Behavioral Disorders; Behavior Modification; Remedial and Special*
                 *Education; Exceptionality; Teaching Exceptional Children; Journal of*
                 *International Special Needs Education; Journal of Articles in Support*
                 *of the Null Hypothesis; Early Childhood Research Quarterly;*
                 *Educational Research; Journal of Applied School Psychology;*
                 *Education Research International*
2004-2005     Assistant Editor, *Behavioral Disorders*
2003-2005     President, Student Chapter of the Council for Exceptional Children,
                 University of Virginia

**Awards/ Honors**
2017 – Outstanding Author Contribution, Advances in Special Education (Emerald)
2012—Early Career Publication Award, CEC Division for Research
2010—Kent State University Advisement Excellence Award
2003-2004 Walter Labrecque Corbin Scholarship
1996—Samuel Marx Scholarship (Faculty nomination for academic excellence)