# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

UNITED STATES OF AMERICA,

    PLAINTIFF,

    *v.*

STATE OF GEORGIA,

    DEFENDANT.

Civil Action No.

1:16-cv-03088-ELR

## PLAINTIFF UNITED STATES' OPPOSITION
## TO DEFENDANT STATE OF GEORGIA'S MOTION TO
## EXCLUDE EXPERT TESTIMONY OF AMY MCCART, Ph.D.

## I.    INTRODUCTION

The United States brought this litigation in 2016 to vindicate the rights of thousands of public-school students with behavior-related disabilities in, or at risk of entering, the Georgia Network for Educational and Therapeutic Support Program ("GNETS" or "GNETS Program")—an educational program administered by Defendant State of Georgia ("State") that segregates students and deprives them of equal educational opportunities in violation of Title II of the Americans with Disabilities Act ("ADA"). The United States has amassed substantial evidence in support of its claims, including the expert opinions of Amy McCart, Ph.D., which address the ways in which the GNETS Program unnecessarily segregates, separates, and isolates students with behavior-related disabilities and provides those same students with unfair and unequal educational

opportunities. The State now seeks to exclude this highly relevant testimony in its entirety—a position wholly out-of-step with the 11th Circuit's application of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Because the State's Motion to Exclude the Expert Testimony of Dr. McCart ("Motion") rests on fatal errors of fact and law, it should be denied.

In pressing its Motion, the State challenges Dr. McCart's testimony on relevance, helpfulness, and reliability grounds.[1] The State's assertion of irrelevance with respect to Dr. McCart's review and opinions—which address the extent to which the GNETS Program unnecessarily segregates and provides unequal educational opportunities to students with behavior-related disabilities—defies reason and is premised upon a misapplication of the law and inaccurate or incomplete recitation of the facts. Further, instead of meaningfully engaging with Dr. McCart's relevant and reliable expert opinions as disclosed, the State asserts that Dr. McCart's opinions are not helpful based on what Dr. McCart did not and need not do to render those opinions (e.g., conducting "a cost or workforce study" (ECF 432-2 ("Def. Mem.") at 17) and opining on topics unrelated to her evaluation, such as "the State appropriations process," (*id.* at 10); "how LEAs can independently raise revenue" (*id.*); and "if implementation of her recommendations in Georgia will be difficult" (*id.* at 21)).  The State's belief that Dr. McCart's

---

[1] The State does not challenge Dr. McCart's qualifications as an expert.

expert testimony is inadmissible without those components reflects a fundamental misunderstanding of the burden shifting framework in *Olmstead* litigation and the requirements for expert testimony to be admissible under *Daubert* and its progeny. Similarly, the State's attacks on Dr. McCart's methodology, which involved her review of vast quantities of information from a variety of sources, ignores the prevailing law on admissibility of expert opinions in social sciences, including as applied by this Court. Finally, even if this Court were inclined to accept the State's criticisms of Dr. McCart's expert opinions, those criticisms should go to the weight accorded those opinions rather than their admissibility.

## II.    BACKGROUND

Title II of the ADA prohibits the State of Georgia from discriminating against students with disabilities, including by "exclud[ing] [them] from participation in, or [denying] [them] the benefits of" the State's education services. 42 U.S.C. § 12132. In addition, if the State provides therapeutic services and supports to students with behavior-related disabilities through the GNETS Program, the ADA's integration mandate requires that the State do so in the most integrated setting appropriate to their needs. The Court in *Olmstead* elaborates, applying a three-prong test that requires the State to educate students with disabilities in integrated educational settings when (a) the students may be appropriately served in the community, (b) they do not oppose receiving such

services in the community, and (c) such services can be reasonably accommodated. *Olmstead v. L.C.*, 527 U.S. 591, 607 (1998). *See also* 28 C.F.R. § 35.130.

The United States will prove at trial that the State unnecessarily segregates thousands of public-school students with behavior-related disabilities in the GNETS Program and denies them equal educational opportunities in violation of Title II. As part of its trial presentation related to (a) and (c) above, the United States intends to offer the testimony of Dr. Amy McCart. Dr. McCart's extensive expertise on both the research around, and practicalities of, serving students with behavior-related disabilities spans decades and has impacted countless students throughout the country. Dr. McCart holds a professorship with The University of Kansas and is a senior researcher within the Life Span Institute at The University of Kansas. For nearly a decade, she has co-directed the Schoolwide Integrated Framework for Transformation (SWIFT) Education Center—a national pre-k-12 research and technical assistance center designed to improve outcomes for students with disabilities, particularly those with the most extensive need for support. (ECF 431-1 ("McCart Rep.") at 220.) In this role, Dr. McCart has worked extensively with over 20 different state education agencies on issues relating to statewide

implementation of systems of supports for students with disabilities, among other things. (ECF 431-2 ("McCart Dep." at 38:6-8).)[2]

Dr. McCart is also a prolific researcher and published author on topics related to behavior management, multi-tiered systems of supports ("MTSS"), positive behavior supports, and the effective inclusion of students with disabilities. McCart Rep. at 220-54. She is or has been a principal investigator for funded research on these topics for both state and local education agencies in Oregon, California, New York, Wyoming, Idaho, Washington, Oklahoma, Louisiana, Mississippi, North Carolina, and many other states. McCart Rep. at 248-54. Dr. McCart's expertise thus includes not only decades of research on issues relating to supporting students with behavior-related disabilities, but also extensive experience working with education agencies to meet those students' day-to-day needs. As Dr. McCart wrote in her report, "my life's work is focused on students with disabilities being served in general education environments, in their neighborhood schools, and close to family and friends."[3] McCart Rep. at 3.

---

[2] Page references to Dr. McCart's Deposition and Dr. McCart's Report are to the page numbers reflected in the transcript and report, respectively.

[3] The State's brief includes a number of misleading and inaccurate assertions that warrant clarification. For example, the State accuses Dr. McCart of being a "self-described 'radical.'" (Def. Mem. at 5.) The State lobs this *ad hominem* by cherry picking language from a page on the SWIFT Education Center website intended to introduce visitors to the SWIFT Center's researchers using

As part of her assessment of the GNETS Program, Dr. McCart undertook an

exhaustive, thorough evaluation:

> I conducted a multi-year, multi-site examination of the GNETS
> Program using a comprehensive qualitative and quantitative
> methodology that included observation, record review, and interview
> analysis. As part of my examination, I conducted 70 site visits to 27
> center-based GNETS Program sites and 36 school-based GNETS
> Program sites across the State, reviewed thousands of relevant records
> produced by the State as well as the 24 regional GNETS programs,
> and attended (or reviewed testimony from) the depositions of
> numerous regional GNETS program directors.

McCart Rep. at 1; *see also, id.* at 12. Dr. McCart's extensive record review

involved thousands of records, including numerous student Individualized

Education Plans ("IEPs")[4] and incident reports. McCart Rep. App'x. E. In addition,

---

photographs and short, punchy language. The actual quote was: "Unwavering.
Radical. Mama." McCart Dep. at 316:4-14. Similarly, in footnote four of the
State's brief, the State misquotes Dr. McCart's report by omitting key language
*without* acknowledging the omission. Dr. McCart's report actually reads that she
hoped educators in the GNETS Program would "see themselves as part of a
movement **toward better support for themselves professionally and better
outcomes for students with behavior-related disabilities**." McCart Rep. at 161
(omitted language in bold).

    [4] Throughout its briefing, the State incorrectly asserts that the IEPs reviewed
by Dr. McCart were "selected by the DOJ" and that Dr. McCart testified to that
effect. *See, e.g.,* (Def. Mem. at 6). Dr. McCart actually testified that she "reviewed
every IEP that was provided. Every document you see here [in Appendix E], I
reviewed." McCart Dep. at 35:14-15. As Appendix E to her report confirms, Dr.
McCart reviewed all IEPs that were produced by regional GNETS programs in the
course of discovery, without limitation. The IEPs requested were, in turn, a
systematic and random sampling based on the first letter of the students' last names

Dr. McCart observed nearly 1000 students in GNETS classrooms over the course of her many site visits, spending between 10 and 90 minutes in each classroom she visited, under a protocol approved by the Court. McCart Dep. at 117:9-14.

Based on this comprehensive review, Dr. McCart opined that:

1. The GNETS Program segregates, separates, and isolates students with behavior-related disabilities in multiple and compounding ways.
2. The GNETS Program provides unfair and unequal educational opportunities for students with behavior-related disabilities.
3. The GNETS Program's systemic segregation of students with behavior-related disabilities in the State of Georgia is unnecessary and fails to deliver effective behavioral and therapeutic supports.

McCart Rep. at 1. Dr. McCart supported her opinions with myriad specific examples and illustrations detailed throughout her 167-page analysis, including: data analyses showing that approximately twice as many students in the GNETS Program are placed in isolated GNETS Centers as are placed in (still segregated) school-based sites (McCart Rep. at 14-15); examples of students in the GNETS Program being denied access to water (*id.* at 41-43); examples of the prevalent use of isolation and physical restraints as punishment in the GNETS Program (*id.* at 51-63); examples of the State's use of dilapidated and inferior facilities for students at GNETS Program sites (*id.* at 68-106); and descriptions of the lack of qualified behavioral and therapeutic staff and resources (*id.* at 137-40), to name but a few.

---

and the students' grade ranges (i.e., elementary, middle, high). *See, e.g.,* (ECF 108 Att. A at 16).

Dr. McCart also provided a series of recommendations "based on [her] extensive experience in statewide educational reforms focused on equity-based inclusive education using a multi-tiered system of support (MTSS)." *Id.* at 160. These recommendations, "rooted in established evidence of efficacy and specifically matched to the needs of students served within the GNETS Program," "are not about throwing out all aspects of Georgia's system or starting over with a blank slate; rather the recommendations focus on using existing tools to develop a more effective system of support." *Id.* at 161.

## III.   LEGAL STANDARD

To determine whether proffered expert testimony is admissible under Federal Rule of Evidence ("FRE") 702, courts apply a three-part test that considers: (1) whether the expert is qualified to competently testify as to the matters they intend to address (the "qualifications" prong); (2) whether the expert's methodology is sufficiently reliable under *Daubert* (the "reliability" prong); and (3) whether the expert's testimony will assist the factfinder in understanding the evidence or determining a fact in issue (the "helpfulness" prong). *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). As the Supreme Court emphasized in *Daubert*, the inquiry under FRE 702 is "a flexible one." 509 U.S. at 594. The specific factors listed in *Daubert* may or may not be pertinent "depending on the nature of the issue, the expert's particular expertise, and the subject of his

testimony." *Kumho Tire Co., Ltd. v. Carmichel*, 526 U.S. 137, 150 (1999). Where the expert is addressing issues of "soft science," courts may look beyond the *Daubert* factors and consider the expert's "knowledge, skill, experience, training, or education." *Id.* at 147 (quoting FRE 702). In the context of a bench trial, the flexible standard under FRE 702 is "even more relaxed" because "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for [herself]." *Alabama State Conference for the NAACP v. Alabama*, No. 2:16-cv-731-WKW, 2020 WL 579385, at *1 (M.D. Ala. 2020) (citing *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005)).

As courts in the Eleventh Circuit have repeatedly emphasized, "[t]he trial court's role as a gatekeeper under *Daubert* is not intended to supplant the adversary system or the role of the [trier of fact]." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (internal citations omitted). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden proof" are the appropriate means of attacking admissible evidence. *Daubert*, 509 U.S. at 596. Additionally, summary judgment is not conducive to *Daubert* challenges, as "the summary judgment process does not conform well to the discipline that *Daubert* imposes, [and] the *Daubert* regime should be employed only with great care and circumspection at the summary judgment stage." *DL v. D.C.*, 109 F. Supp. 3d 12, 28 (D.D.C. 2015) (quoting

*Cortes–Irizarry v. Corporacion Insular de Seguros*, 111 F.3d 184, 188 (1st

Cir.1997)).

## IV.    ARGUMENT

Dr. McCart's expert opinions in this case, which go to the heart of issues

central to this litigation, are well supported by her years of years of experience and

research in the field of special education and a comprehensive review of a wide

variety of information about the GNETS Program. As a result, her opinions are

relevant, helpful, and admissible expert testimony under the applicable standards

of the Federal Rules of Evidence. The Court should therefore reject the State's

Motion.

> ### A.    Dr. McCart's Opinion Regarding the Insufficiency of Services Provided by the GNETS Program Is Relevant and Should Not Be Excluded.

The State contends that Dr. McCart's testimony that students in the GNETS

Program receive insufficient services is irrelevant and should be excluded.

Contrary to this contention, whether the State is providing the quality and scope of

services needed to appropriately serve students with behavior-related disabilities

and prevent their unnecessary segregation and denial of equal educational

opportunities is clearly relevant to this action. The State's argument that, under

*Olmstead*, it is improper for Dr. McCart to offer testimony on the insufficiency in

quality and scope of services provided by the State, is a red herring: Dr. McCart's

report spells out, over 167 pages, a variety of ways in which students in the

GNETS Program are discriminated against on the basis of their disability. Not only

does her report detail the gross lack of mental health and therapeutic educational

services and supports needed by these students (*see, e.g.*, McCart Rep. 140-53), but

it also details the myriad ways in which students with disabilities in the GNETS

Program experience inequality as compared to students in general education. For

example, her report documents how students in the GNETS Program are often

forced to enter school through separate entrances from their general education

peers (McCart Rep. at 22-35), are largely required to attend school in separate

buildings inferior to general education school buildings (McCart Rep. at 69-106),

and are denied access to extracurricular activities, art, music, and/or physical

education (McCart Rep. at 124-26).

The State's suggestion that this evidence is irrelevant to the United States'

claims of discrimination under the ADA reflects a fundamental misunderstanding

of the law. Testimony of this nature does not seek to install a "standard of care," or

mandate the creation of new programs, but instead relates to whether the State of

Georgia is discriminating against students with disabilities in the GNETS Program,

particularly as compared to its treatment of students without disabilities.

Furthermore, no evidence in the record or cited by the State suggests the United

States is seeking to require the State to create programs where none exist.

**B.    Dr. McCart's Testimony that the State Can Take Reasonable Steps to Prevent the Unnecessary Segregation of Students in GNETS and their Denial of Equal Educational Opportunities Is Both Relevant and Helpful.**

Dr. McCart's testimony regarding the steps reasonably available to the State to prevent unnecessary segregation and inequality of educational opportunity among students with behavior-related disabilities is both relevant and helpful, and this Court should be entrusted to weigh Dr. McCart's testimony appropriately. The State asserts that Dr. McCart's testimony regarding the recommendations outlined in her report is irrelevant because she did not conduct a cost or workforce analysis. (*See* Def. Mem. at 4, 17, 21-22.) However, cost is not—in and of itself—dispositive when assessing whether a modification is reasonable under the ADA. *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1183 (10th Cir. 2003) ("If every alteration in a program or service that required the outlay of funds were tantamount to a fundamental alteration, the ADA's integration mandate would be hollow indeed."); *Frederick L. v. Dep't of Pub. Welfare of Pa.*, 364 F.3d 487, 495 (3rd Cir. 2004). Indeed, reasonable modifications may include the expansion of services and reallocation of resources. *See Arc of Wash. State Inc.* v. *Braddock*, 427 F.3d 615, 621 (9th Cir. 2005) (stating that expansion of a State's Medicaid waiver program could be a reasonable modification required by the ADA); *Disability Advocates, Inc. v. Paterson*, 653 F. Supp. 2d 184, 269 (E.D.N.Y. 2009) ("[A] state must make efforts to comply with the integration mandate in order to show that the

specific relief requested would be too costly."); Ga. Comp. R. & Regs. 160-4-7-

.15(2)(a) (defining "GNETS" as "a service available within the continuum of

supports…").[5] Regardless, it is not the United States' burden to disprove a defense

of either undue burden or fundamental alteration at this stage.[6] Once the United

States has proven that the State could implement reasonable modifications:

> …[t]he burden of proof then shifts to the defendant, who must
> establish that the requested relief would require an unduly
> burdensome or fundamental alteration of state policy in light of its
> economic resources and its obligations to other mentally ill persons in
> the institutional setting.

*Frederick L. v. Dep't of Pub. Welfare of Com. of Pennsylvania*, 364 F.3d 487, 492

n.4 (3d Cir. 2004). Notably, despite its protestations, the State has proffered no

admissible evidence of its own on either cost or workforce analyses.[7]

---

[5] The State's application of *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072 (11th
Cir. 2007), is inapposite. While reasonableness is indeed determined "case-by-
case," nothing in *Bircoll* or any other decision cited by the State suggests
reasonableness can only be determined on an individual, rather than systemic,
level. *Id.* at 1086; *see also United States v. Florida*, No. 12-cv-60460, 2023 WL
4546188, at *54-*55 (S.D. Fla. July 14, 2023) (holding expanding services to
Statewide programs was reasonable under Title II of the ADA).

[6] The State failed to plead fundamental alteration, which is an affirmative
defense, in its Answer to the United States' Complaint. *See* ECF No. 91 at 2-4
(asserting eleven affirmative defenses, none of which mentions fundamental
alteration).

[7] On November 7, 2023—well after the close of fact and expert discovery—
the State attempted to proffer previously-undisclosed testimony regarding cost
through Dante McKay, a state agency employee. (ECF 428-4.) For the reasons set

Dr. McCart's extensive experience working with state and local education agencies to implement multi-tiered systems of supports and facilitate the educational inclusion of students with disabilities across the country makes her perspective on the reasonableness of her recommendations, and the steps the State can take to implement them, all the more helpful to the trier of fact. *See, e.g.,* McCart Dep. 162:19-163:2 ("[B]ased on my experience in implementing across the U.S. – different states across the U.S., the implementation of my recommendations would cost the state no more money than what's already being allocated to the services of students with disabilities, behavior-related disabilities.").[8] That Georgia is not exactly like any other state in the nation, and that implementation of Dr. McCart's recommendations will necessitate some differences from implementation of similar systems in other states, does nothing to negate either the State's liability or the reasonableness of the modifications available to it, but are again factors for the Court to consider as it sees fit. *Guinn v. Norfolk S. Ry. Co.*, 441 F. Supp. 3d

---

forth in the United States' Motion to Exclude the Declaration of Dante McKay (ECF 439), the proffered testimony is inadmissible and should be excluded.

[8] Throughout its brief, the State asserts or implies, without support, that Dr. McCart cannot testify as to how her experience relates to her recommendations for the State of Georgia. While the State elected to spend little time exploring that aspect of Dr. McCart's qualifications in its deposition, Dr. McCart can and will testify to her experience, and its relation to her evaluation and recommendations, at trial.

1319, 1327 (N.D. Ga. 2020) ("[T]he gatekeeping function of the Court should not preclude expert testimony rooted in professional experience which the jury can properly weigh and evaluate with the benefit of effective cross examination by the opposing party.").

### C. Dr. McCart's Expertise and Opinions Rooted in Extensive Review of the GNETS Program Will Be Uniquely Helpful to the Trier of Fact.

As discussed above, Dr. McCart's extensive experience in the field of special education, including in working with states and local school districts to implement the sort of recommendations she makes in her report, renders her perspective uniquely helpful to the trier of fact in this case. Under the helpfulness standard for expert testimony, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004). Special education, particularly for students with behavior-related disabilities, clearly meets this standard as it implicates a thorough understanding of educational pedagogy, research, and practices generally, as well as behavioral analysis, behavior management, and effective practices related to such analysis and management. Dr. McCart's decades of experience conducting research and working with state and local education agencies to implement systems of support will provide necessary professional insight to the Court on the functioning and effect of the GNETs Program's practices.

15

The State's attempts to attack the helpfulness of Dr. McCart's testimony do not align with the facts. First, the State's unsupported and vague contention that Dr. McCart "does not know what the [Georgia Department of Education] is doing in this space," (Def. Mem. at 24), is undermined by the sheer scope of Dr. McCart's evaluation of the GNETS Program and the practical circumstances in which students placed in regional GNETS programs find themselves. Over the course of 70 site visits, including observations of nearly 1,000 students in GNETS, and her review of thousands of documents produced in this litigation (including deposition transcripts of Georgia Department of Education officials), Dr. McCart obtained a thorough understanding of what supports and services are (and are not) being provided to students placed in GNETS and what effect, if any, "what the [Georgia DOE] is doing in this space" has on the education and well-being of students placed in GNETS. That Dr. McCart's testimony on this score is uncomfortable to the State does not render it unhelpful to the trier of fact.

Second, the State does not explain why Dr. McCart's knowledge of "the hiring or firing of local education officials by the DOE" is relevant to her expert testimony. (Def. Mem. at 24.) Nor could it be. Because Dr. McCart does not opine on whether the State administers the GNETS Program, her knowledge of the information cited by the State is beside the point. Further, as shown in the United

States' Motion for Partial Summary Judgment (ECF 395), the issue of State

administration is sufficiently addressed through other record evidence.

### D.    Dr. McCart's Review of the GNETS Program Was Thorough, Reliable, and Consistent with Practices in the Field.[9]

In devising her methodology for evaluating the GNETS Program, Dr.

McCart drew on her extensive experience as an academic and researcher in the

field of special education and as a consultant for dozens of state and local

education agencies throughout the United States. Using, among other things, a

series of tables that she "developed specifically for the evaluation of the GNETS

Program based upon [her] experience with special education, segregation, and

institutionalization[,]" and that included "well-documented indicators of

segregated or institutional environments within the field of special education" as a

guide, Dr. McCart undertook the comprehensive, multi-year review of the GNETS

Program described above. McCart Rep. at 7. This review involved Dr. McCart's

consideration of a broad range of information, including in-person observations of

regional GNETS programs and students, deposition transcripts of State officials

and GNETS personnel, student records, and the prevailing research in the field of

special education, among other things. Contrary to the State's assertions, this

---

[9] The majority of the State's arguments attacking Dr. McCart's methodology are outside of the State's 25-page limit. *See* L.R. 7.1(D), (F), NDGa. Despite this, and out of an abundance of caution, the United States responds in full here.

review reflects a level of diligence well beyond what is required for admissibility under FRE 702. Indeed, when asked what methodology he would use to conduct a thorough evaluation of GNETS, the State's own rebuttal expert described a methodology nearly identical to Dr. McCart's. *See* Ex. 1 at 302:6-303:1 ("Wiley Dep.") (describing methodology he would use to conduct a thorough evaluation of GNETS as including "[o]bservations, records review, interviews with faculty…instruments…for systemic reviews of records and observation tools that allowed us to focus on particular things and state upfront here's what we're looking for.").

The State's attacks on Dr. McCart's analysis and methodology are misplaced and unfounded, as Dr. McCart's approach to the creation of her expert report reflects the standard of practice in the field of special education tailored to the unique circumstances of evaluating a statewide program like GNETS. "[T]he review and analysis of a body of information…is *itself* a generally accepted approach in the social science field. Such a process is especially appropriate where, as here, the subject matter is complex and not susceptible to resolution by any single mode of analysis." *Coal. for Equity & Excellence in Maryland Higher Educ. v. Maryland Higher Educ. Comm'n*, 295 F. Supp. 3d 540, 554 (D. Md. 2017) (internal citation omitted; emphasis in original). The reliability of an expert's opinion should be considered in light of the expert's background, particularly when

the nature of the subject matter "preclude[s] ideal experimental conditions and controls." *Id.* (citing *U.S. v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006)). For obvious reasons, an evaluation of the GNETS Program, and the needs of the students within it, "preclude[s] ideal experimental conditions and controls." Therefore, "other indicia of reliability are considered under *Daubert*, including professional experience, education, training, and observations." *Simmons*, 470 F.3d at 1123 (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002)); *see also Kumho Tire Co.*, 526 U.S. at 152 ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."). Dr. McCart's experience, education, training, and observations,[10] none of which are challenged by the State, all support the reliability of her review and ultimate opinions.

---

[10] The State oddly frames Dr. McCart's in-classroom observations in terms of the minimum amount of time she spent in any given classroom. *See* (Def. Mem. at 6). As she explained to the State in her deposition, however, Dr. McCart spent "anywhere from 10 minutes to 90 minutes," in each classroom she observed. McCart Dep. 117:9-14; *see also* McCart Rep. at 159 ("Over the course of 70 GNETS Program site visits and my three-year long review of the GNETS Program, I spent countless hours carefully observing nearly 1,000 students within the Program. In particular, I spent significant time in classrooms observing student behavior and engagement with educators and peers."). In addition, Dr. McCart identified the kinds of assessments she can make in even ten minutes. *Id*. 147:8-148:5 (observation of levels of engagement, problem behaviors, communication styles, teaching interaction, response to teaching interaction, et cetera).

Other courts' analyses support this conclusion. For example, the district court in *Coalition for Equity and Excellence in Maryland Higher Education* considered the admissibility of expert testimony in similar circumstances. There, a duo of experts on the subject of higher education desegregation offered testimony to assist the district court in fashioning remedies after plaintiffs prosecuted claims under Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause. *Coal. for Equity & Excellence in Maryland Higher Educ.*, 295 F. Supp. 3d at 550. The court rejected defendants' arguments to exclude plaintiffs' experts' testimony, holding:

> In fulfilling its gatekeeping obligations, a court determines only whether the underlying methodology is valid, not whether the expert's conclusions are correct. *TFWS, Inc. v. Schaefer*, 325 F.3d 234, 240 (4th Cir. 2003). [The experts'] opinions satisfy this test. In developing their remedial proposal, [the experts] reviewed facts and data from a wide range of sources. They analyzed those facts and data using principles and methods generally accepted in the relevant fields, including social science, higher education desegregation, and quantitative and qualitative analysis. And they otherwise drew on "specialized knowledge" gained through their professional experience, education, and training. *See* Fed. R. Evid. 702(a).
>
> For these reasons, the court will admit the challenged expert report and testimony.

*Coal. for Equity & Excellence in Maryland Higher Educ.*, 295 F. Supp. 3d at 556-57. The same reasoning holds true here: Dr. McCart "reviewed facts and data from a wide range of sources," "analyzed those facts and data using principles and methods generally accepted" in the fields of special education and quantitative and

qualitative analysis, and otherwise drew on her "specialized knowledge gained through [her] professional experience, education, and training." *Id.* As a result, Dr. McCart's "method of analyzing this complex body of information through varied sources is a generally accepted approach in the field of social sciences and is thus sound methodology." *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2020 WL 13561791, at *5 (N.D. Ga. Dec. 4, 2020); *accord.* Wiley Dep. at 306:6-18 ("If my task was to go and evaluate a program, then I would have used a different set of methods. Some of them would have been similar to, for example, Dr. McCart.").[11] At trial, Dr. McCart will be able to testify further as to how her experience, education, and training informed both her processes and conclusions.

The State's other attacks on Dr. McCart's methodology are similarly unavailing. As discussed above, the State's assertion that Dr. McCart reviewed student IEPs "hand-picked by the DOJ" (Def. Mem. at 27), is false. *See supra* p. 6 n. 4. Moreover, a review of records need not be statistically valid to be admissible and helpful to a trier of fact, as "[s]tatistical models are simply not the only method for making general inferences from specific data." *Braggs v. Dunn*, 317 F.R.D. 634, 646 (M.D. Ala. 2016). Nor is it relevant whether Dr. McCart used the

---

[11] The State's rebuttal expert, Dr. Andrew Wiley, disclosed no opinions on the sufficiency of Dr. McCart's methodology in his report, and is thus precluded from offering any such opinion here or at trial. *See* Fed. R. Civ. P. 26(a)(2)(B)(i).

"unjustified isolation" language from *Olmstead* in her report, as the State objects.
Whether or not an expert uses a "catchphrase from case law" is irrelevant to the
admissibility of her opinions as long as the opinions offered are helpful to the
Court in making those legal determinations. *Id.* at 649-50. As with any legal issue,
it will ultimately be the Court's role to decide how Dr. McCart's expert opinions
relate to the applicable law. *See id.*; *see also Burkhart v. Washington Metro. Area
Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes
equipped with a 'legal expert,' called a judge …").

Next, the State's contention that Dr. McCart's methodology is opaque tracks
poorly with the extensive level of detail contained within her report. Over the span
of more than 160 pages, Dr. McCart describes with painstaking detail what she
observed and how her observations informed her opinions. For example, in support
of her opinion that "the GNETS Program segregates, separates, and isolates
students with behavior-related disabilities in multiple and compounding ways,"
(McCart Rep. at 1), Dr. McCart includes over 70 pictures providing examples of
ways in which the GNETS Program discriminates against students with
disabilities, multiple excerpts from student records and staff materials that support
her observations, and dozens of pages of analysis, inclusive of numerous examples
of concerning incidents in the 47 pages addressing that opinion. McCart Rep. at
20-67. Far from being "devoid of factual or analytical support," (Def. Mem. at 27

(*quoting Scheinfeld v. LM Gen. Ins. Co.*, 472 F. Supp. 3d. 1329 (N.D. Ga. 2020)),

Dr. McCart's report and testimony is replete with support drawn from her

comprehensive review.

Finally, the State's argument that Dr. McCart's analysis is deficient because

it is insufficiently individualized goes to the weight of her testimony rather than its

admissibility. This argument is also irrevocably undermined by the State's own

rebuttal expert, Dr. Andrew Wiley, who repeatedly testified that educational

placements can, in fact, be *categorically* inappropriate to meet students' needs:

> Q.    Are there some things you agree would make a separate setting
> categorically inappropriate even if it's otherwise specialized?
>        MS. JOHNSON:    Object to form.
> A.    Yeah. I mean, -- categorically. So you mean, like, not just
> individual students?
> Q.    Categorically.
> A.    I mean, -- so I think what you're getting at is that you have to
> have a program that implements research-based services and
> programs, things that the student needs and in terms of addressing
> whatever the full range of needs is for that student.
>        And, I mean, I would have to have whatever setting it is – or
> the program has to have the capacity to implement those. And that
> would mean resources and it would mean the training and it would
> mean, you know, all of those kinds of things that are required to
> implement the IEP specific to the individual student.

Wiley Dep. at 76:3-24. Dr. Wiley's testimony describes precisely the kind of

relevant, helpful, and reliable testimony that Dr. McCart outlines in her report and

that she will provide at trial: expert testimony on the ways in which the GNETS

Program categorically fails to meet its students' needs in violation of the ADA.

## V.    CONCLUSION

When Dr. McCart offers her expert testimony at trial, it will be based not only on her review of (and contributions to) academic literature in the field and her years of practical experience working with state and local education agencies to serve students with disabilities, but also on her incredibly methodical, thorough, and comprehensive review of the GNETS Program. Dr. McCart's testimony will address many of the core issues in this litigation, including the extent to which students in the GNETS Program are segregated and provided with unequal educational opportunities, the inappropriateness of that segregation, and the steps the State can take to serve students in more integrated environments.  For the reasons set forth herein, the State of Georgia has offered no valid grounds, in law or in fact, to exclude any portion of Dr. McCart's testimony. As a result, the United States respectfully requests that the Court deny the State's motion in its entirety.

Dated:  November 21, 2023


Respectfully submitted:

RYAN K. BUCHANAN
United States Attorney
Northern District of Georgia

/s/Aileen Bell Hughes
AILEEN BELL HUGHES
GA Bar Number: 375505
Assistant United States Attorney
United States Department of Justice
Richard B. Russell Federal Building
75 Ted Turner Dr. SW
Suite 600
Atlanta, GA 30303-3309
(404) 581.6000
aileen.bell.hughes@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

SHAHEENA A. SIMONS
Chief
Educational Opportunities Section

KELLY GARDNER WOMACK
Deputy Chief
Educational Opportunities Section

ANDREA HAMILTON WATSON
Special Litigation Counsel

CRYSTAL ADAMS
CLAIRE CHEVRIER
FRANCES COHEN
MATTHEW GILLESPIE
PATRICK HOLKINS
VICTORIA M. LILL
JESSICA POLANSKY
LAURA C. TAYLOE
MICHELLE L. TUCKER
Trial Attorneys
United States Department of Justice
Civil Rights Division

*/s/ Matthew Gillespie*
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-4092
Matthew.Gillespie2@usdoj.gov

## **L.R. 7.1(D) CERTIFICATION**

I certify that this Joint Status Report has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C). Specifically, this brief has been prepared using 14-pt Times New Roman Font.


/s/ *Matthew Gillespie*
MATTHEW GILLESPIE

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day filed the foregoing document with the

Clerk of Court using the CM/ECF system, which automatically sent counsel of

record e-mail notification of such filing.

This 21st day of November, 2023

/s/ *Matthew Gillespie*
MATTHEW GILLESPIE