# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 1:16-cv-03088-ELR |
| STATE OF GEORGIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## UNITED STATES' REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

1

Plaintiff United States of America ("United States") respectfully submits this Reply Brief in Further Support of its Motion for Partial Summary Judgment.

## **INTRODUCTION**

At the heart of the United States' Complaint in this case are the allegations, summarized and quoted in this Court's prior opinion, that "[e]ven though mental health and therapeutic educational services and supports can be provided in integrated general education classrooms, the State, including GaDOE [Georgia Department of Education], has selected to plan, fund, administer, license, manage and oversee those services almost exclusively in segregated GNETs centers and classrooms."  461 F. Supp. 3d 1315, 1322 (N.D. Ga. 2020).  This decision by the State violates Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C § 12132 *et seq.*, and its implementing regulation, 28 C.F.R. § 35.130(d), which provides that "a public entity shall *administer* services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d) (emphasis added).

In a motion to dismiss filed at the pleadings stage of this litigation, the State of Georgia ("State") asserted that "to plead a Title II claim, [the United States] must allege that the State 'administers' public services in a discriminatory or unequal manner."  ECF No. 47-1 at 10 (quoting 28 C.F.R. § 35.130).  The State then argued

1

that "[t]he [United States'] Complaint fails to state an ADA claim, because . . . the State does not administer the GNETS program." *Id.* at 10-11.  Confronted with overwhelming record evidence demonstrating that it does—in fact—supply the GNETS Program with "practical management and direction," the State now abandons its prior position that this Court should apply the plain meaning of the term "administer" in determining whether the State administers the GNETS Program, *see id.* at 11, and instead contends that because the term "administer" appears only in the Title II implementing regulation and not in the ADA itself, that previously-asserted plain meaning is invalid.  Def. Mem. at 22.  The proper question, the State argues, is not whether the State administers the GNETS Program but whether it "provides" GNETS services.  *Id.* at 23.  The State further argues that even if the proper question is whether the State administers the GNETS Program, the record evidence requires this Court to answer that question in the negative.  These arguments are without merit.

## **ARGUMENT**

### I.    A PUBLIC ENTITY THAT "ADMINISTERS" SERVICES, PROGRAMS, AND ACTIVITIES IN A DISCRIMINATORY MANNER CAN BE HELD LIABLE UNDER TITLE II OF THE ADA.

Despite its prior acknowledgement that 28 C.F.R. § 35.130 governs the United States' claim that the State has violated Title II's integration mandate, as

2

well as its insistence that "administer" should be construed in accordance with its

plain meaning as "'manage and be responsible for the running of'" and "'practical

management and direction,'" ECF 47-1 at 10-12, the State now contends that

"administer" can only be construed to mean "provide."  Def. Mem. at 23-25 &

n.13.  The State further contends that because it does not directly "provide"

GNETS services, it cannot be held liable under the ADA for discrimination arising

from the operation of the GNETS Program.[1]  *See id.* at 28-30.  These contentions

lack merit.

The State does not identify a single ADA case supporting its theory that the

Title II regulation's use of the word "administer" is invalid because that word does

not appear in the ADA itself.  Instead, it relies on a handful of inapposite cases that

---

[1] The State also argues that the United States' Motion for Partial Summary Judgment should be denied because the United States failed to define the term "administer" in its brief.  *See* Def. Mem. at 22.  The State's argument mischaracterizes the record.  Because this Court considered the State's administration of the GNETS Program twice at the pleadings stage, the United States adopted the framework for administration outlined in this Court's decisions denying the State's Motion to Dismiss and Motion for Judgment on the Pleadings. While the United States asserted in its brief that the evidence gathered in discovery confirms the factual accuracy of the allegations this Court found sufficient to establish the State's administration, it also made clear that the record evidence similarly establishes the State's administration of GNETS using the plain meaning definitions of "administer" advanced by the State in its Motion to Dismiss.  *See* U.S. Mem. at 25-27 & n.65.

it contends establish that "regulations, in order to be valid, must be consistent with the statute under which they are promulgated."  Def. Mem. at 23 (internal quotation marks omitted).  The State's assertion that ADA liability attaches only to the entity directly providing the relevant services, programs, or activities is inconsistent with the well-established principle that a state can be held liable under the ADA even when it has contracted out provision of the challenged services, programs, or activities.  *See*, *e.g.*, *Price v. Shibinette*, No. 21-cv-25, 2021 WL 5397864, at *9-10 (D.N.H. Nov. 18, 2021) (a state cannot avoid liability under the integration mandate by "contracting out to private entities their obligation to provide services in compliance with the ADA"); *Disability Advocs., Inc. v. Paterson*, 598 F. Supp. 2d 289, 316-19 (E.D.N.Y. 2009) ("The State cannot evade its obligation to comply with the ADA by using private entities to deliver . . . services."); *see also Conn. Office of Prot. & Advoc. for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 276-77 (D. Conn. 2010); *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 286-87, 293 (E.D.N.Y. 2008); *cf.* 28 C.F.R. § 35.130(b)(1), (3) (public entities may not discriminate "directly or through contractual . . . or other arrangements").

        For the reasons stated, this Court need not—and should not—construe the term "administer" to mean "provide."  Doing so would give public entities license

to willfully violate Title II by outsourcing discriminatory practices to contractors—a result Congress clearly did not intend when passing the ADA.

## II.    THE UNDISPUTED FACTUAL RECORD SATISFIES THE STANDARD FOR STATE CONTROL AND ADMINISTRATION PREVIOUSLY OUTLINED BY THIS COURT.

Contrary to the State's arguments, the undisputed evidence establishes that the State administers the GNETS Program within the meaning of Title II of the ADA.  In assessing the State's contention—at the pleadings stage—that it does not administer the GNETS Program, this Court closely examined the United States' allegations, the arguments outlined in the parties' briefs, the text of the ADA and its implementing regulation, and relevant caselaw before concluding that "it appears that the State is authorized, and does in fact exercise, some level of control over state-funded programs such as the GNETS program." 461 F. Supp. 3d at 1321. State law, as this Court noted, requires the State to "adopt" both "'classification criteria for each area of special education to be served on a state-wide basis' and 'the criteria used to determine eligibility of students for state funded special education programs.' Ga. Code Ann. § 20-2-152(a)."  461 F. Supp. 3d at 1321. Because the United States had specifically alleged that "[GaDOE] oversees GNETS by establishing criteria for the implementation of the program in local school districts, by disbursing federal and state funds to support the program, by

5

promulgating regulations to carry out the program, and by overseeing the operations and implementation of the program throughout the state," this Court found the allegations in the Complaint adequate to survive the State's motion to dismiss and motion for judgment on the pleadings. *Id.* at 1320-21; *see also* ECF No. 94 at 8-11 (denying the State's motion for judgment on the pleadings and finding allegations in the Complaint that the State "plans, funds, administers, licenses, manages and oversees the GNETS Program," sets student eligibility criteria for GNETS services and designates State employees to oversee the Program, determines which mental health and therapeutic educational services and supports will be provided (and by whom and where), and determines how it will allocate and manage State and federal funds earmarked for such services sufficient to demonstrate at the pleadings stage "that actions within the State's control, not solely local measures, cause the alleged discrimination").

The United States' Motion for Partial Summary Judgment ("U.S. Mot.") and its Memorandum in Support ("U.S. Mem.") set forth the extensive undisputed evidence obtained in discovery, which shows the absence of any material issue of fact regarding the allegations that this Court found sufficient to demonstrate State control and administration at the pleadings stage. That evidence confirms that: (1) the State of Georgia exercises substantial control over GNETS Program operations

6

through the State GNETS Rule, which binds each of the 24 regional GNETS programs, dictates the duties and responsibilities the State has imposed on each of the entities assigned a role in the Program, and sets student eligibility criteria, among other things (U.S. Mem. at 6-7, 27-28); (2) the State of Georgia develops, directs, and assesses regional GNETS programs' compliance with GNETS Program operating standards using the GNETS Strategic Plan self-assessment and review process and other State-created documents—including the Consideration of Services forms that guide regional GNETS programs' consideration of students for services[2] (U.S. Mem. at 9-14, 29-32); (3) the State of Georgia directs regional GNETS programs on a host of day-to-day matters involving student eligibility and service delivery (U.S. Mem. at 15-16, 32); (4) the State of Georgia funds the vast majority of GNETS Program expenses through the State GNETS grant, particularly expenses related to the therapeutic aspects of the Program, and controls the information and assurances regional GNETS programs, their fiscal

---

[2] The State contends that these "forms are irrelevant to [the United States'] Motion, as it does not challenge the entry criteria as inherently discriminatory or relevant to IEP Team recommendations to refer students for GNETS Program services." Def. Mem. at 16. Because the United States seeks partial summary judgment only as to the State's administration of the GNETS Program, the United States need not establish at this stage that any entry criteria included in the forms are discriminatory or relevant to IEP team recommendations.

agents, and local education agencies must provide in order to receive that grant funding (U.S. Mem. at 16-19, 33-34); and (5) the State of Georgia provides funding separate from the GNETS grant for other services for regional GNETS programs and, in so doing, plays a substantial role in determining the purported therapeutic services that particular programs may offer, the staff providing those services, and other available services and supports like academic and behavioral assessments (U.S. Mem. at 20-21, 34).

Nothing in the State's opposition brief seriously challenges these facts. Most critically, the State does not dispute that it has promulgated the GNETS Rule, which was revised and reissued during the pendency of this lawsuit and which codifies the State's control over the GNETS Program's structure, operations, and funding. *See* ECF No. 434-1 at ¶ 16. Not only does the GNETS Rule explicitly set the student eligibility criteria for GNETS, it also requires the State Board of Education—in concert with GaDOE—to monitor GNETS to ensure compliance with Federal and State policies, procedures, rules and the delivery of appropriate instructional and therapeutic services. *See* Ga. Comp. R. & Regs 160-4-7-.15(5)(a). In the service of such monitoring, the State employs a full-time GNETS Program Manager and GNETS Program Specialist who are exclusively dedicated to overseeing the State's responsibilities related to the

GNETS Program.  *See* ECF No. 434-1 at ¶ 33.[3]  The State also has an

overarching strategic plan for GNETS, which it periodically revises, that

addresses all areas of Program operations and binds regional GNETS programs.

*See id.* at ¶¶ 49, 52, 53; *see also* Ga. Comp. R. & Regs 160-4-7-.15(5)(c)(2)-(3).

Using a State-created framework, the regional programs must conduct twice-

annual assessments of their compliance and submit to strategic plan reviews

conducted by the State.  *See* ECF No. 434-1 at ¶¶ 62-76.[4]

---

[3] Although the State objects to the United States' assertion that "GaDOE
employs both a GNETS Program Manager and GNETS Program Specialist who
oversee the State's responsibilities related to the GNETS Program," it provides no
citations to evidence refuting this factual assertion as required by Local Rule
56.1(B)(2)(a)(2).  *See* ECF No. 434-1 at ¶ 33.  Accordingly, the factual assertion
remains undisputed.

[4] The State provides no evidence sufficient to refute the extensive evidence
the United States gathered in discovery demonstrating that regional GNETS
programs are required to comply with the Strategic Plan and participate in the
Strategic Plan self-assessment and review process.  This Court should dispense
with the State's bald assertion that this evidence is immaterial to the issue of the
State's control and administration of the GNETS Program, as it plainly
demonstrates the practical management and direction that the State provides to
regional GNETS programs.  *See*, *e.g.*, ECF No. 434-1 at ¶¶ 62-76.  To the extent
the State attempts to refute evidence showing that regional GNETS programs must
comply with the Strategic Plan by citing evidence that "a Program can still be
funded by the grant even if the goals in the Strategic Plan are not met," and that
"the State does not take any action beyond providing feedback and suggestions"
when a regional program is not meeting Strategic Plan goals, *see*, *e.g.*, ECF No.
434-1 at ¶¶ 62-64, its efforts are futile.  That the State chooses to fund a regional
program even when the Strategic Plan goals are not met says a great deal about its
poor oversight over the GNETS Program, but nothing of its authority to withhold

The State advances several arguments intended to convince this Court that the State does not control and administer the GNETS Program, despite the evidence outlined in the United States' Motion for Partial Summary Judgment. None are persuasive.  While the State emphasizes that local entities' participation in the State's GNETS grant program is entirely "voluntary," this does not diminish the United States' showing of State control and administration.  Def. Mem. at 6, 32.  The State controls not only the structure of the GNETS Program—which participating entities inherit—but also the operating standards and other requirements to which those entities are held.  Accordingly, however voluntary the decision to participate, once that decision is made, a participating entity is subject to the State's substantial authority over the GNETS Program in the myriad ways described in the United States' Motion for Partial Summary Judgment.

Although the State asserts that "LEAs who cho[o]se to apply for and receive GNETS Grants are given broad discretion on where they can provide services, ranging from fully integrated to wholly separate settings" (Def. Mem. at 6), this

_____

funding.  The State does, in fact, possess such authority.  As a former State Board of Education member testified, the State has exercised its authority to put a pause on regional GNETS programs' funding when those programs fail to comply with their responsibilities.  *See* Deposition of Larry Winter 19:7-20:6, 158:3-159:11, 166:5-168:8 (attached hereto as Exhibit 1).

argument is unavailing.  The GNETS Rule specifies the environments in which

GNETS services may be delivered, which range from "the general education

setting in the student's Zoned School or other public school" at one end of the

spectrum to a full school day in "a facility dedicated to GNETS" at the other end of

the spectrum.  Ga. Comp. R. & Regs 160-4-7-.15(4)(c).  While regional GNETS

programs theoretically have the ability to deliver GNETS services across this full

range of environments, the State has adopted a funding formula for regional

GNETS programs that does not include, as a factor in determining funding, the

number of students for whom a regional GNETS program provides "consultative"

services in the general education setting—that is, GNETS services directly to a

student or that student's teacher or paraprofessional in the general education

setting.  *See* GA00347596 (attached hereto as Exhibit 2); Deposition of Cassandra

Holifield ("Holifield Dep.") 276:19-281:9 (attached hereto as Exhibit 3);

Deposition of Whitney Braddock 69:2-12 (attached hereto as Exhibit 4).  In other

words, regional GNETS programs receive State funding only for students that they

serve in segregated settings, not students they serve in general education settings.

    The State's failure to supply regional GNETS programs with funding to

provide services in general education environments deprives the programs of the

financial resources necessary to retain sufficient staff to support students who can

11

be served in integrated educational environments while also supporting students who remain in segregated GNETS environments.  *See* Ex. 2; Ex. 3, Holifield Dep. 277:9-281:9.  As one regional GNETS director explained, "[Y]ou're robbing Peter to pay Paul.  If you have the most significant kids in the program because of their mental health and behavioral challenges, but then we're also wanting to provide those services to the kids in the [least restrictive environment] so we won't have recidivism, them coming back and getting those teachers trained, you can't [d]o both with the same person effectively."  Ex. 3, Holifield Dep. 280:1-281:9.  Not surprisingly, testimony from regional GNETS directors indicates that regional programs provide consultative services in the general education environment infrequently.  *See*, *e.g.*, Deposition of Talithia Newsome 202:13-207:13 (attached hereto as Exhibit 5); Deposition of Celest Ngeve 25:9-28:15 (attached hereto as Exhibit 6); Deposition of Patricia Wolf Dep. 77:15-22, 182:3-7 (attached hereto as Exhibit 7).  In light of these facts, this Court should reject the State's contention that it has no hand in the location where GNETS services are provided.[5]

---

[5] The State's argument that it has no hand in the location where GNETS services are provided is also belied by record evidence establishing the State's role in approving the facilities where regional GNETS programs are permitted to provide services.  *See* U.S. Mot. Ex. 1, Def. Resp. to RFA Nos. 81, 87, 89, 90; *id.* Exs. 100, 102-105; *id.* Ex. O, W. Jones Dep. 189:4-190:6, 193:1-194:25; *id.* Ex. K, Keith Dep. 226:16-229:22, 230:14-232:18; *id.* Ex. Y, Rowland Dep. 80:21-82:2,

Also unavailing is the State's argument that it does not control or administer the GNETS Program because "[t]he State does not staff and cannot control the individuals who administer or teach students receiving services through the GNETS Programs." Def. Mem. at 6. As noted above, the State employs a full-time GNETS Program Manager and GNETS Program Specialist who oversee the State's responsibilities with respect to the GNETS Program and play a significant role in the State's administration of the Program. Further, even though the personnel who staff the regional GNETS programs are employed by LEAs or Regional Education Service Agencies ("RESAs") affiliated with each regional GNETS program, the State indirectly influences staffing at regional GNETS programs through the assurances that GaDOE requires each fiscal agent, regional GNETS program itself, and participating school district's superintendent and special education director to sign. *See, e.g.*, U.S. Mot. Ex. 91. It is immaterial that the State does not directly hire, employ, evaluate, or fire personnel assigned to regional GNETS programs. The State nonetheless holds regional GNETS program staff accountable through the GNETS Strategic Plan self-assessment and review

_____

83:5-88:1, 94:4-96:13, 111:21-116:9, 145:7-146:20; *see also id.* Ex. R, Braddock Dep. 219:21-220:23, 221:17-222:2, 222:15-22, 225:10-226:6.

process, as well as the wide range of program data it requires regional GNETS

programs to report.  *See* U.S. Mem. at 8-13, 14-15, 29-32.

In those instances where it supplies additional therapeutic services grant

money to regional GNETS programs—a circumstance affecting nearly half of all

regional programs[6]—the State is more directly involved in staffing.  There, the

State establishes the approved staffing agencies and/or professional qualifications

that regional GNETS programs receiving therapeutic grants must use when hiring

grant-funded therapeutic staff.  *See* U.S. Mot. Exs. 118, 120, 126-128; *id.* Ex. K,

Keith Dep. 140:8-143:5, 153:7-155:6; *id.* Ex. W, Neal Dep. 80:6-83:8; *id.* Ex. Q,

Wolf Dep. 141:6-144:2, 144:19-145:19, 147:13-149:2.  The State has even

supplied regional GNETS programs with draft job responsibilities for particular

positions, which regional GNETS programs have subsequently used to formulate

job descriptions.  *See* U.S. Mot. Ex. 128; *id.* Ex. Q, Wolf Dep. 147:13-149:2.

Finally, although the State asserts that regional GNETS program fiscal

agents "have discretion under the law to decide *how* to spend the GNETS grant

funds," Def. Mem. at 19 (emphasis in original), undisputed evidence shows that

the State cabins that discretion.  Each year, regional GNETS programs must submit

---

[6] ECF No. 430-1 at ¶ 355.

their budgets to GaDOE in connection with their applications for GNETS grant funds and have those budgets approved.  See U.S. Mot. Ex. 7; id. Ex. A, Cleveland Dep. 158:24-159:10, 159:20-161:5, 208:9-210:4; id. Ex. S, Gilchrist Dep. 245:6-16; id. Ex. T, Holifield Dep. 104:10-106:18; id. Ex. J, McCollum Dep. 107:4-109:8; 214:9-22; id. Ex. C, Stevenson Dep. 149:4-150:5.  In addition, the assurances that GaDOE requires regional GNETS programs, their fiscal agents, and local education agencies to provide in order to receive those funds impose additional limitations on the entities' use of the funds.  For example, the assurances require that "[f]unds will not be spent for any purpose not included in the approved [fiscal year] GNETS budget," "GNETS Program budget amendments will be submitted when expenditures in a function category exceed 125% of the approved amount," and "[p]rior to expending state or federal GNETS grant funds to purchase any equipment that (1) has a useful life of two or more years and (2) would be purchased with $1,000 or more of state grant funds or $5,000 or more in federal grant funds, the GNETS Program shall submit a purchase request to GaDOE for approval" See, e.g., Pl. Mot. Ex. 91 at GA00054563-GA00054566.

For the reasons set forth above, the undisputed facts confirm rather than dispel the State's control and administration of the GNETS Program.

## III.  THE STATE CONTROLS THE BROADER BEHAVIORAL HEALTH SERVICE DELIVERY SYSTEM OF WHICH GNETS IS A COMPONENT.

The State argues that the United States "does not challenge or identify [the] services" that are administered by other State agencies, such as the Department of Behavioral Health and Developmental Disabilities ("DBHDD") and the Department of Community Health ("DCH"), or "identify any student receiving services through the GNETS Programs that qualifies for services DBHDD actually administers." Def. Mem. at 10. These arguments reveal a significant blind spot in the State's understanding of the United States' claims: the State, through its constituent agencies GaDOE, DBHDD, and DCH, administers a *service delivery system* that unnecessarily segregates students with behavior-related disabilities from their peers and deprives them of equal educational opportunities. It is through this service delivery system that students in, or at risk of placement in, the GNETS Program should be receiving the mental health and therapeutic educational services and supports that they are entitled to under the ADA.

The State's contention that the United States has not challenged or identified the role of DBHDD and DCH—or the services that they provide—in connection with the State's role in administering the GNETS Program is unfounded. When this lawsuit was filed, the United States alleged, among other things, that DBHDD

16

"is responsible for many of the supports and services that are needed by students with disabilities placed in GNETS" and that "[m]any mental health and therapeutic educational services and supports, including services and supports provided through the GNETS Program, are reimbursable through the EPSDT program that is administered by DCH."  ECF No. 1 at ¶¶ 27, 28.

The factual record now fully supports these allegations, as detailed in the United States' Motion for Partial Summary Judgment.  *See* U.S. Mem. at 4-6, 24-25.  In particular, the State is required to develop "a coordinated system of care so that children and adolescents with emotional disturbance and their families will receive appropriate educational, nonresidential and residential mental health services."  Ga. Code Ann. § 49-5-220(a)(6).  The State discharges this obligation by providing a variety of services and supports that are planned, administered, and funded by State agencies, including DBHDD, DCH, and GaDOE.  As Georgia's designated state authority for behavioral health services, DBHDD oversees and administers policies, programs, and services for people with mental illness, including—through the Office of Children, Young Adults and Families—children with behavior-related disabilities.  Ga. Code Ann. § 37-1-20; *see also* Ga. Code Ann. § 37-1-21; U.S. Mot. Ex. E, Deposition of Frank Berry ("Berry Dep.") 165:11-166:13, 184:21-25; *id.* Ex. F, Deposition of Judith Fitzgerald ("J. Fitzgerald

17

Dep.") 52:21-53:19; 62:2-16.  In that capacity, DBHDD plays a vital role in

making behavioral health services accessible to children across Georgia in their

own communities, including children in, or at risk of being placed in, GNETS.

Further, many mental health and therapeutic educational services and supports are

reimbursable through the State's Medicaid and PeachCare for Kids programs,

which are administered by DCH.  *See generally* U.S. Mot. Ex. 9 (PeachCare for

Kids website); *id.* Ex. E, Berry Dep. 164:18-166:13.

     The school-based behavioral health services provided through the Georgia

APEX Program illustrate the kind of services that DBHDD funds and

administers—though DBHDD precludes students in GNETS standalone facilities

from receiving those services.  *See* Pl. Mot. Ex. 10; *id.* Ex. F, J. Fitzgerald Dep.

62:17-63:8; *id.* Ex. G, Deposition of Lisa Futch 303:17-305:5; *id.* Ex. H,

Deposition of Dante McKay 158:2-16.

     In short, the State operates a delivery system that, although it specifically

offers and covers services and supports intended for children with emotional and

behavioral disabilities, overwhelmingly fails to deliver such services to students in

the GNETS Program in integrated settings appropriate to their needs.

# **CONCLUSION**

For the reasons set forth above and the reasons outlined in the United States' Motion for Partial Summary Judgment and Memorandum in Support, the United States respectfully requests that this Court grant its Motion for Partial Summary Judgment.

Dated: November 27, 2023

Respectfully submitted:

RYAN K. BUCHANAN
*United States Attorney*
Northern District of Georgia

*/s/ Aileen Bell Hughes*
AILEEN BELL HUGHES
GA Bar Number: 375505
Assistant United States Attorney
United States Department of Justice
Richard B. Russell Federal Building
75 Ted Turner Dr. SW, Suite 600
Atlanta, GA 30303-3309
(404) 581.6000
aileen.bell.hughes@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General

SHAHEENA A. SIMONS
Chief

KELLY GARDNER WOMACK
Deputy Chief

ANDREA HAMILTON WATSON
Special Litigation Counsel

CRYSTAL ADAMS
CLAIRE D. CHEVRIER
FRANCES S. COHEN
MATTHEW GILLESPIE
PATRICK HOLKINS
VICTORIA M. LILL
JESSICA POLANSKY
LAURA C. TAYLOE
MICHELLE L. TUCKER

19

Trial Attorneys
Educational Opportunities Section

*/s/Kelly Gardner Womack*
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-4092
kelly.gardner@usdoj.gov

## **L.R. 7.1(D) CERTIFICATION**

I certify that this Statement of Undisputed Material Facts has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C). Specifically, this brief has been prepared using 14-pt Times New Roman Font.

/s/ *Kelly Gardner Womack*
KELLY GARDNER WOMACK

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day filed the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sent counsel of record e-mail notification of such filing.

This 27th day of November, 2023.


/s/ *Kelly Gardner Womack*
KELLY GARDNER WOMACK