IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | CIVIL ACTION |
| v. | NO. 1:16-CV-03088-ELR |
| STATE OF GEORGIA, | |
| *Defendant*. | |

**PLAINTIFF UNITED STATES' RESPONSES TO DEFENDANT STATE OF GEORGIA'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Rule 56.1(B) of the Civil Local Rules of Practice for the United States District Court for the Northern District of Georgia, Plaintiff the United States of America hereby submits its Responses to Defendant State of Georgia's Statement of Additional Material Facts:

## I. Additional Material Facts Regarding Georgia Department of Education

1. The Georgia Department of Education ("GaDOE") is the State Educational Agency for purposes of the IDEA. See 20 U.S.C. § 1401(32).

    **RESPONSE:** Objection. The fact asserted should not be considered for purposes of the motion for partial summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B). Further, the fact asserted is not material to the pending motion for partial

summary judgment.  Finally, the fact asserted is inconsistent with the definitions contained in the GNETS Rule, according to which "State Education Agency (SEA)" is "[t]he term used in federal laws and regulations for the state education authority which in Georgia is the Georgia State Board of Education (SBOE)."  Ga. Comp. R. & Regs. 160-4-7-.15(1)(g).  The definitions in the GNETS Rule separately define GaDOE as "the state agency charged with the fiscal and administrative management of certain aspects of K-12 public education" whose "management is subject to supervision and oversight by the State Board of Education."  Ga. Comp. R. & Regs. 160-4-7-.15(1)(c).

2.    Code Sections 20-2-34 and 20-2-1 provide that GaDOE is administered by the State School Superintendent and the State Board of Education. O.C.G.A. §§ 20-2-34 (State School Superintendent), 20-2-1 (State Board of Education).

**RESPONSE:**  Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).  The fact is denied in that neither of the Code Sections cited use the word "administer."

3.    Code Section 20-2-152 provides that GaDOE is charged with, among other duties, adopting the "criteria used to determine eligibility of students for state funded special education programs." O.C.G.A. §20-2-152(a).

**RESPONSE:** The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).

4.    The text of the Georgia State Constitution does not mention special education. Ga. Const. art. 8, § 1.

**RESPONSE:** Objection.  The fact asserted is not material to the pending motion for partial summary judgment.  Nor does the cited evidence establish the fact asserted.

## II.    Additional Material Facts Regarding Georgia Department of Behavioral Health and Developmental Disabilities

5.    The Georgia Department of Behavioral Health and Developmental Disabilities (DBHDD) focuses on "state programs for mental health, developmental disabilities, and addictive diseases." O.C.G.A. § 37-1-20(1); Deposition of Frank Berry at 89:12-19.

**RESPONSE:**  Denied in part.  The cited excerpt of the Berry deposition transcript does not support the fact asserted.  In the cited excerpt, Berry describes DBHDD's mission as "leading an accountable and effective continuum of care to support Georgians with behavioral challenges and intellectual and developmental disabilities in a dynamic health care environment."  *See* Deposition of Frank Berry at 89:12-19.  The Court may consider the remainder of this evidence for purposes of the summary

judgment motion.

6.   DBHDD frequently contracts with government and private providers of

behavioral health services, including Community Service Boards (CSBs), to

provide some behavioral health services to some of Georgia's uninsured and

Medicaid beneficiaries. Deposition of Judy Fitzgerald at 217:23-218:1.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

7.   DBHDD does <u>not</u> have responsibility for "all individuals who receive public

services for mental health." Deposition of Judy Fitzgerald at 49:16-21.

**RESPONSE:**  Denied.  The statement is a quote from a section of the

deposition of former Commissioner Judy Fitzgerald, and the State relies on it

to imply that DBHDD does not have *any type* of responsibility for "all

individuals who receive public services for mental health."  The statement

does not support that implication for several reasons.  First, it inaccurately

blends the question and the answer, which appear as follows:

> **Q.**  Does DBHDD have responsibility for all individuals in the State of
> Georgia who receive public services for mental health, developmental
> disabilities, and substance abuse disorder?
>
> **A.**  No. We have responsibilities for the ones that we administer.
> Fitzgerald Dep. 49:16-21. (emphasis added).

Further, the quote is from a portion of the deposition that discussed one type

of responsibility, "budgetary responsibility", and the Commissioner's

response is properly understood as referring to budgetary responsibility.
Fitzgerald Dep. 48:11-49:16.  Finally, the Commissioner testified at her
deposition that DBHDD and DCH together coordinate in developing service
manuals describing all public services for mental health in Georgia.
Fitzgerald Dep. 50:21-51:21.  The dividing line for budgetary responsibility is
primarily the type of insurance an individual has, with DBHDD assuming
budgetary responsibility for uninsured individuals.  Fitzgerald Dep. 53:5-
54:8.  Former Commissioner Frank Berry testified to the same effect at his
deposition.  Berry Dep. 146:13-148:8.

8.    DBHDD does not deliver direct services or care, but instead it contracts with
its network of providers and CSBs to fund the delivery of services and care.
Deposition of Frank Berry at 147:14-148:8; 167:16-18; 90:19-91:5;
Deposition of Judy Fitzgerald at 217:17-20.

**RESPONSE:**  Undisputed in part.  DBHDD does not provide direct
services or care but provides such services under contract with its network
of providers and community service boards.  Denied in part as to the State's
mischaracterization of the cited evidence.  The United States disputes that
DBHDD does not "deliver" direct services or care, on the basis that the term
"deliver" is vague and ambiguous in light of DBHDD's funding and
certification of service providers, including the Community Service Boards
("CSBs").

9.  An example is the Apex Program, a DBHDD initiative through which it contracts with providers that have partnered with local schools to offer some in-school behavioral health services. Deposition of Judy Fitzgerald at 62:23–63:5.

    **RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

10. Not all children in the State of Georgia are the financial responsibility of DBHDD. Deposition of Judy Fitzgerald at 154:8-9.

    **RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

11. DBHDD is only responsible for uninsured children that do not have any other coverage, and they have a limited amount of funding to support those children. Deposition of Frank Berry at 91:6-20; Judy Fitzgerald at 53:24-54:3; 231: 9-11.

    **RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

12. DBHDD plays a limited role in ensuring that mental health services are readily available to children across the State of Georgia in their own communities because their funding supports only uninsured children. Deposition of Frank Berry at 184:13-20.

**RESPONSE:**  Denied.  As Georgia's designated state authority for behavioral health services, DBHDD is responsible for overseeing and administering policies, programs, and services for people with mental illness, including—through the Office of Children, Young Adults and Families—children with behavior-related disabilities.  Ga. Code Ann. § 37-1-20; *see also* Ga. Code Ann. § 37-1-21; Ex. E, Deposition of Frank Berry ("Berry Dep.") 165:11-166:13, 184:21-25; Ex. F, Deposition of Judith Fitzgerald ("J. Fitzgerald Dep.") 52:21-53:19; 62:2-16.   In that capacity, DBHDD plays an important role in ensuring that behavioral health services are accessible to children across Georgia in their own communities, including children enrolled in Medicaid or PeachCare for Kids for whom the Georgia Department of Community Health ("DCH") rather than DBHDD is the primary payor of their publicly funded behavioral health services.  Among other things, DBHDD designs and defines the publicly funded behavioral health services that are available to children and their families in Georgia; funds, oversees, and administers the Georgia Apex Program, through which the State seeks to deliver behavioral health services in certain school settings; contracts with the Georgia State University's Center of Excellence to advance the development of effective behavioral health services for children, specifically including Intensive Customized Care Coordination ("IC3");

– 9 –

and helps to lead the State's efforts to implement its System of Care Plan, which acknowledges that "[a]ccess to an array of community-based services and supports is a core component of any functional behavioral health care system." Deposition of Wendy Tiegreen ("Tiegreen Dep.") 52:12-19; Deposition of Ann DiGirolamo ("DiGirolamo Dep.") 16:16-17:16, 82:24-83:3, 92:16-21; J. Fitzgerald Dep. 62:2-63:9; 134:3-20; 2020 Georgia System of Care Plan; APEX Contract FY2020, ABH000004, US0013064 (ECF No. 438-2).

13. DBHDD does not have any role in providing behavioral health services to GNETS Programs. Deposition of Frank Berry at 185:14-18; Judy Fitzgerald at 66:19-67:7; 119: 9-11.

**RESPONSE:** Denied. As Georgia's designated state authority for behavioral health services, DBHDD could have a larger role in providing behavioral health services to regional GNETS programs, but chooses not to. For example, DBHDD prohibits students that attend regional GNETS centers from receiving Apex services at the centers, regardless of whether those students are otherwise eligible for Apex services. *See* Ex. 10 (*APEX 3.0 Frequently Asked Questions*, https://dbhdd.georgia.gov/be-supported/mental-health-children-young-adults-and-families/apex-3-faqs ("In which types of schools can Apex services be implemented?") (last visited Oct. 18, 2023)). Dante McKay testified that DBHDD's current approach regarding "the

– 10

availability of Apex services" to GNETS schools is: "If a school . . . is served

by the Apex program and the school has a GNETS classroom or classroom

setting . . . then the . . . approach would be that those services would be

available to those GNETS-specific students, along with the general

population." March 9, 2023 McKay Dep. 103:2-15 (attached as Exhibit E to

Plaintiff's Motion to Exclude the Declaration of Dante McKay). For

example, Lisa Oosterveen, Deputy Director of Aspire Community Service

Board, testified that she provided behavioral health services to students who

attended a GNETS classroom. *See* Oosterveen Dep. 23:3-13, 45:19-25,

47:24-49:2.

14.    According to Dr. Stephanie Pearson, the Clinical Director of the Office of

Children, Young Adults and Families ("OCYF") for DBHDD, there is no

direct relationship between DBHDD and GNETS. Deposition of Stephanie

Pearson at 52:10-20; 53:9-18; Deposition of Wendy Tiegreen at 31:2-23.

**RESPONSE:** Undisputed. The Court may consider this evidence for

purposes of the summary judgment motion.

15.  Neither Dr. Pearson nor Dante McKay, OCYF's Director, have any ongoing

responsibilities with respect to GNETS and do not work with GNETS

Program directors. Deposition of Stephanie Pearson at 73:11-18; Deposition

of Dante McKay at 49:8-14.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

16.  To Dr. Pearson's knowledge, no employee within OCYF provides training or

technical assistance to GNETS staff. Deposition of Stephanie Pearson at

78:14-16.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

17.  Further, as Clinical Director of OCYF, Dr. Pearson does not receive data or

documents relating to enrollment in GNETS, or to the length of placement in

GNETS. Deposition of Stephanie Pearson at 83:17-23.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

18.  Dr. Pearson does not receive data or documents relating to the availability,

utilization, or the quality of behavioral health services to students enrolled in

GNETS. Deposition of Stephanie Pearson at 83:24-84:10.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

– 12

19.    Dr. Pearson does not receive data or documents relating to staffing at

GNETS or to coordination between GNETS Programs and community

service providers in Georgia. Deposition of Stephanie Pearson at 84:11-17.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

20.    The text of the GNETS Rule does not mention DBHDD. <u>See generally</u>, Ga

Comp. R. & Regs. 160-4-7-.15.

**RESPONSE:** Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

III.    **Additional Material Facts Regarding the Georgia Department of Community Health**

21.    The Georgia Department of Community Health (DCH) is the State Medicaid agency. See O.C.G.A. § 49-4-142.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

22.    It acts as an "insurance and regulatory body" for various healthcare providers throughout the State. Fitzgerald Dep. 64:20–65:1.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

23.    DCH's involvement with GNETS is minimal to none as staff at DCH do not have duties or responsibilities with respect to the GNETS program. Deposition of Brian Dowd at 166:4-11; 168:13-20.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

24.    The text of the GNETS Rule does not mention DCH. See generally, Ga Comp. R. & Regs. 160-4-7-.15.

**RESPONSE:** Undisputed.

IV.    **Additional Material Facts Regarding System of Care**

25.    The Georgia General Assembly has "declare[d] its intention and desire to:

(6) Develop a coordinated system of care so that children and adolescents

– 14

with a severe emotional disturbance and their families will receive

appropriate educational, nonresidential and residential mental health

services, and support services, as prescribed in an individualized plan."

O.C.G.A. § 49-5-220(a).

**RESPONSE:**

Undisputed.  The Court may consider this evidence for purposes of the

summary judgment motion.

26.  The General Assembly has not passed a law requiring implementation of a

system of care.

**RESPONSE:**  Denied. O.C.G.A. § 49-5-220(a), quoted by the State

above in Paragraph 25, refers to the opening section of a statute, § 49-5-

220 *et seq.*, which declares the intention and desire of legislature.  The

remaining sections are mandatory, including regarding the

implementation of the System of Care plan and to prepare a plan for a

system of care that: "shall be put into implementation by July 1, 1991."

O.C.G.A. § 49-5-223(d).

27. The Geogia General Assembly further stated that it "intends that" DBHDD have the primary responsibility for planning, developing, and implementing any system of care. O.C.G.A. § 49-5-220(b).

**RESPONSE:** Undisputed. The Court may consider this evidence for purposes of the summary judgment motion.

28. The General Assembly has not passed a law requiring DBHDD have the primary responsibility for any system of care in Georgia.

**RESPONSE:** Denied. O.C.G.A. § 49-5-220(a), quoted by the State above in Paragraph 25, refers to the opening section of a statute, § 49-5-220 *et seq.*, which declares the "inten[tion]" of the General Assembly that DBHDD have the primary responsibility for "planning, developing, and implementing" the system of care. O.C.G.A. § 49-5-220(b). The remaining sections of the statute are mandatory, including regarding DBHDD's role in the implementation of the System of Care plan, collection of data, and provision of annual reporting concerning the population of children and adolescents "with a severe emotional disturbance." O.C.G.A. § 49-5-220(a); *see* O.C.G.A. § 49-5-220 *et seq.* Moreover, DBHDD has defined itself as "the state agency responsible for the administration, coordination, planning, regulation and monitoring of all components of the state public behavioral health and intellectual and developmental disability systems." Georgia FY

2020/2021 Community Mental Health Services Block Grant Plan at 22

(Exhibit 10, January 27, 2022 Deposition of Dante McKay).

## V. Additional Material Facts Regarding the Provision of Educational Services in Georgia- Georgia is a Local Control State

29. The Georgia Constitution delegates the "management and control" of each

school system to a locally-elected board of education. Ga. Const. art. VIII, §

5, ¶ II.

**RESPONSE:** Objection.  The fact asserted should not be considered for

purposes of the motion for summary judgment because it is improperly

stated as a legal conclusion in violation of Local Rule 56.1(B).  Also, this

fact is denied in as much as the word "delegates" is not present anywhere in

Ga. Const. art. VIII, § 5, ¶ II.

30. The Supreme Court of Georgia has said, "the fundamental principle of

exclusive local control of general primary and secondary ("K–12") public

education" applies. Gwinnett Cty. Sch. Dist. v. Cox, 289 Ga. 265, 266

(2011).

**RESPONSE:** Objection.  The fact asserted should not be considered for

purposes of the motion for summary judgment because it is improperly stated

as a legal conclusion in violation of Local Rule 56.1(B).

31. The IDEA refers to these local boards as "local educational agencies" or

"LEAs." 20 USC § 1401(19); see also, Ga Comp. R. & Regs. 160-4-7-.15(1)

(defining LEA for purposes of the GNETS Rule).

**RESPONSE:** Undisputed. The Court may consider this evidence for purposes of the summary judgment motion.

32. Code Section 20-2-152 provides that LEAs, either directly or through RESAs, "provide special education programs for all eligible students with special needs who are residents of their local school systems" or RESAs. O.C.G.A. § 20-2-152(b).

**RESPONSE:** Objection. The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B). Furthermore, this statement mischaracterizes O.C.G.A. § 20-2-152(b) which states, in full, "Local school systems shall, subject to any limitations specified in this Code section, provide special education programs for all eligible students with special needs who are residents of their local school systems, either by establishing and maintaining such educational facilities and employing such professional workers as are needed by these students or by contracting with other local school systems, regional educational service agencies, or other qualified public or private institutions for such services."

33.   Code Section 20-2-152 provides statutory authority for state funded, but locally operated, special-education programs like GNETS.

**RESPONSE:**  Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).  Denied as incomplete inasmuch as Code Section 20-2-152 also outlines the many obligations of the State in operating special education programs like GNETS.  Code Section 20-2-152(c)(1) states: "(c)(1) The State Board of Education shall provide for the funding which has been approved by the General Assembly for this purpose for special education programs for students with disabling conditions which are either of such low incidence or of such severity that it is unfeasible or impractical to provide needed educational services through programs offered by local school systems. The state board may provide such educational services with funds specifically approved by the General Assembly for this purpose by:

(A) Providing grants directly to regional educational service agencies for provision of services;

(B) Either directly contracting with or making grants to or authorizing local units of administration to contract with or make grants to suitable private or public institutions, inside or outside this state, for the provision of such services; provided, however, that the educational and related services of the

– 19

child must be provided by professionals, such as teachers, school psychologists, speech therapists, physical and occupational therapists, and audiologists who meet the certification or licensing standards of their profession in the state in which the institution is located;

(C) Authorizing local units of administration to contract with suitable public agencies and departments, including institutions in which eligible children are confined and out-patient centers serving eligible children, inside and outside this state, for the provision of such services;

(D) Entering into reciprocal agreements with other states or political subdivisions thereof for the provision of such services; or

(E) Operating the Georgia School for the Deaf, the Georgia Academy for the Blind, the Atlanta Area School for the Deaf, and other special schools as approved by the General Assembly.

(2) The state board may promulgate rules, regulations, and standards and establish the terms and conditions governing the provision of state aid provided for this purpose by the General Assembly under this subsection and perform any and all acts necessary or proper to carry out the provisions, intent, and purpose of this subsection."

34.    Code Section 20-2-152 further provides that the State shall set "eligibility criteria" for such programs, but that "local school systems shall … provide special education programs for all eligible students with special needs,"

including by "establishing and maintaining such educational facilities and employing such professional workers as are needed by these students[.]" O.C.G.A. § 20-2-152(b).

**RESPONSE:** Objection. The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B). Also, the fact is denied as incomplete as the quotes are partial and misleading. Section 10-2-152(b) states in full: "Local school systems shall, subject to any limitations specified in this Code section, provide special education programs for all eligible students with special needs who are residents of their local school systems, either by establishing and maintaining such educational facilities and employing such professional workers as are needed by these students or by contracting with other local school systems, regional educational service agencies, or other qualified public or private institutions for such services." Importantly, the State left out of its quote the language "subject to any limitations specified in this Code Section." Code Section 10-2-152(c)(1), which is quoted in full at our response to 33, above, outlines some of those limitations, including by delineating all the State's obligations to provide for special education services in Georgia.

35.  GaDOE recognizes this principal of local authority. See, e.g., Deposition of Wina Low at 150:7–17 (GaDOE reinforces expectations and provides

supports to local agencies regarding their GNETS reintegration rates); Id. at

167:13–168:2 (GaDOE provides guidance in areas like transition, academic

achievement, and assistive technology but does not have the authority to

issue mandates); Id. at 85:17–18; Deposition of Garry McGiboney at 48:18–

49:7 (GaDOE cannot require public schools to offer mental health services

but it can encourage and facilitate same).

**RESPONSE:** Objection.  The fact asserted should not be considered for

purposes of the motion for summary judgment because it is improperly

stated as a legal conclusion in violation of Local Rule 56.1(B).  The

statement appears to rely on and further assert an impermissible legal

conclusion initially raised in paragraph 30.

36.  GaDOE encourages schools to offer mental health services as a method of

increasing access to such services but it cannot require schools to do so.

Deposition of Garry McGiboney at 48:18–49:7.

**RESPONSE:** Denied.  GaDOE can and does require schools to offer

mental health services to students.  Through the GNETS Rule, GaDOE

does not encourage, but rather requires that a number of therapeutic

services be provided in schools, which would include mental health

services.  GNETS Rule at 160-4-7-.15(2)(d).  For example, GaDOE

requires that "GNETS will be staffed to meet the needs of a unique

population of students requiring intensive individualized supports,

including providing appropriate therapeutic services identified in the

IEP." 160-4-7-.15(d).  It further requires that "GNETS staff will

collaborate with professionals from a variety of agencies to enhance

students' social, emotional, behavioral and academic development based

on their IEPs."  GNETS Rule 160-4-7-.15(2)(e).  The GNETS Rule

further states that GaDOE, as the SEA, "shall monitor GNETS to ensure .

. . the delivery of appropriate instructional and therapeutic services."  *Id.*

at (5)(a)(2)(iii).

37. It also encourages schools to work with CSBs to enhance access to mental health in schools. Deposition of Garry McGiboney at 39:19–23; 41:2–18.

    **RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

38. Code Section 20-2-152 provides that GaDOE is authorized to provide grants to regional educational service agencies ("RESAs") and local school districts for the provision of special education services. See O.C.G.A. § 20-2-152(c)(1).

    **RESPONSE:** Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).

39. Code Section 20-2-270 provides that RESAs are "not state agencies." O.C.G.A. § 20-2-270(f).

    **RESPONSE:** Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).

40. Only one statute refers to the GNETS Program and not by name. O.C.G.A. § 20-2-270.1(c).

    **RESPONSE:** Objection.  The fact asserted is not material to the pending motion for summary judgment and should not be considered for purposes of the motion because it is improperly stated as a legal conclusion in violation

– 24

of Local Rule 56.1(B).

41. The text of O.C.G.A. § 20-2-270.1 imposes no obligation on GaDOE or any other State agency.

    **RESPONSE:** Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).

42. The only operative language imposes duties on RESAs. O.C.G.A. § 20-2-270.1(a).

    **RESPONSE:** Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).

**VI.    Additional Material Facts Regarding the IEP Process**

43. Federal law provides that a child's individualized education program ("IEP") is based on the individual needs of the particular child. See 20 U.S.C. § 1414(d)(1)(A).

    **RESPONSE:**  Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).

44. State and federal statutes provide that a child's IEP team is responsible for determining the setting from the continuum of services required by IDEA in

which the child is to receive education and related services. Ga Comp. R. &

Regs. 160-4-7-.15(4);  Ga. Comp. R. & Regs. 160-4-7-.07; 34 C.F.R. §

300.115; Deposition of Garry McGiboney at 75:5-10.

**RESPONSE:**  Objection.  The fact asserted should not be considered for

purposes of the motion for summary judgment because it is improperly

stated as a legal conclusion in violation of Local Rule 56.1(B).

45.    This decision is based on the goals and individual needs of the child and the

least restrictive environment ("LRE") in which they can reach those goals.

Ga. Comp. R. & Regs. 160-4-7-.07; Deposition of Garry McGiboney at

75:11-14; Deposition of Wina Low at 165:10–166:7.

**RESPONSE:**  Objection.  The fact asserted should not be considered for

purposes of the motion for summary judgment because it is improperly

stated as a legal conclusion in violation of Local Rule 56.1(B).

46.    The child's IEP team determines whether the child should be recommended

to receive education and related services through the GNETS Program.

Deposition of Garry McGiboney at 27:14–28:3.

**RESPONSE:**  Denied as incomplete.  GaDOE also has a role in determining

when a child may be recommended to receive education and related services

through the GNETS Program.  The GNETS Rule sets forth the eligibility

criteria by which IEP Teams are bound when considering a referral to the

GNETS Program.  *See* Ga. Comp. R. & Regs. 160-4-7-.15(3)(c).

47.    LEAs are empowered with the discretion to offer GNETS services in settings ranging from fully integrated ("in the general education setting") to wholly separate ("in a facility dedicated to GNETS"). Ga. Comp. R. & Regs. 160-4-7-.15(4)(c).

**RESPONSE:**  Denied in that this statement mischaracterizes the cited evidence.  The GNETS Rule does not support nor use terminology stating that the LEAs are, in any way, "empowered."  Nor does it use the words "fully integrated" or "wholly separate."  The GNETS Rule at 160-4-7-.15(4)(c) reads as follows and speaks for itself: "(c) The GNETS continuum of services by environment may be delivered as follows:  1. Services provided in the general education setting in the student's Zoned School or other public school.  2. Services provided in the student's Zoned School or other public school setting by way of a "pull out" from the general education setting for part of the school day.  3. Services provided in the student's Zoned School or other public school for part of the school day in a setting dedicated to GNETS.  4. Services provided in the student's Zoned School or other public school for the full school day, in a setting dedicated to GNETS. 5. Services provided in a facility dedicated to GNETS for part of the school day.  6. Services provided in a facility dedicated to GNETS for the full school day."

48.   LEAs are charged with ensuring that GNETS services are provided the least

restrictive environment for the student to obtain a free appropriate public

education ("FAPE"). Ga. Comp. R. & Regs. 160-4-7-.15(5)(b)(1).

**RESPONSE:**  Denied as incomplete.  The SEA also has a role to play in

ensuring that students receive FAPE in the LRE.  The IDEA makes clear

that SEAs must take steps to "ensure" that LEAs are properly implementing

IDEA requirements, including LRE.   20 U.S.C. § 1414(a).  The GNETS

Rule also states that "[t]he SEA shall [m]onitor GNETS to ensure

compliance with Federal and state policies, procedures, rules, and the

delivery of appropriate instructional and therapeutic services."  Ga. Comp.

R. & Regs. 160-4-7-.15(5)(a)(2)(iii).

49.   On August 1, 2016, USDOE released a "Dear Colleague" letter ("USDOE

Letter") stating that, "when a child with a disability experiences behavioral

challenges, including those that result in suspensions or other exclusionary

disciplinary measures, appropriate behavioral supports may be necessary to ensure that the child receives FAPE." USDOE Letter at 6. The USDOE Letter is attached to Defendant's Statement of Undisputed Material Facts as Exhibit V.

**RESPONSE:** Undisputed that the United States Department of Education released a "Dear Colleague" letter on August 1, 2016. The Court may consider this evidence for purposes of the summary judgment motion. That Dear Colleague letter speaks for itself and this asserted fact is otherwise denied as incomplete. The quote cited by the State begins with the word "however" and is immediately preceded by the following language: "Research shows that school-wide, small group, and individual behavioral supports that use proactive and preventative approaches, address the underlying cause of behavior, and reinforce positive behaviors are associated with increases in academic engagement, academic achievement, and fewer suspensions and dropouts. In short, children are more likely to achieve when they are directly taught predictable and contextually relevant school and classroom routines and expectations, acknowledged clearly and consistently for displaying positive by parents for a meeting to review their child's IEP. Public agencies are required under the statute and these final regulations to be responsive to parental requests for such reviews." There is a footnote attached to this content that cites as sources of support two

separate articles co-authored by the United States' expert, Dr. Robert Putnam.

50.     The USDOE Letter further states that "[a] determination of whether there is a denial of FAPE is a fact based determination, to be made on a case by case basis." Ex. V at 9.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

51.     The USDOE Letter provides that "[a] determination of whether there is a denial of placement in the LRE is also a fact based determination." Ex. V at 10.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

52.     The USDOE Letter states that "[t]herefore, a failure to provide appropriate behavioral supports (because they are not offered or because teachers and other staff are not adequately trained to implement such supports) that results in the child not receiving a meaningful educational benefit may constitute a denial of FAPE." Ex. V at 12.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

53.     Once a student begins receiving GNETS services, the LEA is charged with "monitor[ing]" the student's IEP to "determine students' progress and access

to services in a lesser restrictive environment." Ga. Comp. R. & Regs 160-4-7-.15(5)(b)(8).

**RESPONSE:**   Denied as incomplete.  The SEA also has a role in monitoring IEPs of students in the GNETS Program.  The GNETS Rule states that "[t]he SEA shall [m]onitor GNETS to ensure compliance with Federal and state policies, procedures, rules, and the delivery of appropriate instructional and therapeutic services."  Ga. Comp. R. & Regs. 160-4-7-.15(5)(a)(2)(iii).  GaDOE has previously required that GNETS directors conduct an IEP file review for every student in the GNETS Program and produce certain information about the students to the State.  Cole Dep. 369:1-20.  To facilitate this process, GaDOE requested specific information and later provided a form with a drop-down menu.  *See* GA05243260; *see e.g.*, GA05250025.  The form requires information related to each student's disability, placement history, behavior interventions, history of restraint and seclusion, and the regional GNETS program's compliance with the entrance criteria outlined in the GNETS rules, among other information.  *See e.g.*, GA05250025; Cole Dep. 369:1-15; Cleveland Dep. 199:7-202:20.

54. The kinds of behavioral health services that should be provided to students with emotional and behavioral disabilities depends on the student's IEP. Deposition of Garry McGiboney at 167:6–168:7.

    **RESPONSE:** Denied. This statement mischaracterizes the cited evidence. Dr. McGiboney was asked "[i]n your opinion as a psychologist focused on student mental health, what kinds of behavioral health services should be provided to students with emotional and behavioral disabilities in GNETS?" He answered, "Depends on what they need." McGiboney Dep. 167:6-10. He elaborated, stating that the kinds of services students in GNETS would need "would depend on what the IEP calls for," and he thought students in GNETS had IEPs that "require a high level of need." Mr. McGiboney clarified that he "couldn't fully answer" the question because he has "not worked in a GNETS." McGiboney Dep. 167:6-23.

55. An IEP team is made up of the classroom teacher, special education director, the student, the parent, other related service providers, LEA representatives, sometimes a building administrator, and any other invited related service provider or stakeholder that has a role in supporting the student. Deposition of Samuel Clemons at 327:13-17; Deposition of Brooke Cole at 401:2-9; Deposition of Derrick Gilchrist at 257:15-22. See also 20 U.S.C. § 1414(d)(1)(B) (listing members of IEP team).

**RESPONSE:** Denied.  In each of the three depositions cited, the makeup of the IEP Team was described differently and in a way that varies from requirements laid out in the IDEA.  It is undisputed that the IDEA, as cited by the State, clearly lays out the makeup of an IEP Team as being composed of: "(i) the parents of a child with a disability; (ii) not less than 1 regular education teacher of such child (if the child is, or may be, participating in the regular education environment); (iii) not less than one special education teacher, or where appropriate, not less than 1 special education provider of such child; (iv) a representative of the local educational agency who-- (I) is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities; (II) is knowledgeable about the general education curriculum; and (III) is knowledgeable about the availability of resources of the local educational agency; (v) an individual who can interpret the instructional implications of evaluation results . . . ; (vi) at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate; and (vii) whenever appropriate, the child with a disability."

56.   When a student is being considered for receiving services through the GNETS Program, staff from the GNETS Program being considered attends

as well.  Deposition of Celest Ngeve at 206:2-13.

**RESPONSE:**  Denied as incomplete.  Ms. Ngeve testified that when a

student is being considered for services at Rutland Academy GNETS, Ms.

Ngeve, her coordinator, and "the potential caseload manager for that

student" participate in "all IEP meetings where consideration of GNETS

services is being discussed."  Deposition of Celest Ngeve at 201:16-22,

202:5-17, 204:16-205:2, 205:16-206:13.

57.    The State has no role on an IEP team. Deposition of Haley Livingston at

278:22-279:7; Deposition of Cassandra Holifield at 333:13-20; Deposition

of Samuel Clemons at 327:18-22; Deposition of Brooke Cole at 401:2-9;

Deposition of Derrick Gilchrist at 257:23-258:9; Deposition of Patricia Wolf

at 277: 24-278:2; Deposition of Whitney Braddock at 232:6-12; see also 20

U.S.C. § 1414(d)(1)(B).

**RESPONSE:**  Denied.  GNETS Director Lisa Futch testified that she was

aware of an instance where then-State Director of Special Education Zelphine

Smith-Dixon was present as a member of an IEP Team.  Deposition of Lisa

Futch 349:24-350:14.  In addition, GNETS Director Brooke Cole testified

that, in some cases, a representative from the Georgia Department of

Education will "set the parameters" and "facilitate the IEP" meeting.

Deposition of Brooke Cole 401:10-402:1.

58.    Parents are always involved in IEP team decisions. Deposition of Haley Livingston at 102:13-22.

**RESPONSE:**  Denied.  Parents are, by law, members of the IEP Team.  *See* 20 U.S.C. § 1414(d)(1)(B).  However, the United States has uncovered myriad evidence that, as IEP Team members, the parents of students placed in the GNETS Program felt they were not involved in IEP Team decisions that result in their child being placed in – or remaining in – the GNETS Program. Their wishes that their child be served in a more integrated setting were not reflected in IEP Team decisions.  Parents submitted complaints—both formal and informal—opposing their children's educational placements in the GNETS Program and expressly seeking community educational placements. On at least one occasion the State's GNETS Director directly received an informal complaint via email in which a parent expressly requested a community educational placement.  *See, e.g.*, GA05202437.  Some parents filed due process complaints with the State to demand community educational placements for their children.  *See, e.g.*, GA05199933, GA05200951, GA05199710, GA05200962.  Some of the due process complaints expressly alleged that the initial GNETS Program placement decisions for their children were made unilaterally, despite parents' objections and explicit requests that their children remain in community educational placements.  *See, e.g.*, GA05201028; GA05200951.  Multiple IEPs produced by regional GNETS

– 35 –

programs memorialized parents expressing the desire that their children return to community educational placements.  *See, e.g.*, US0151559 at US0151673; US0184588 at US0184594; *see also* McCart Rep. at 154. Parents have contacted the United States to express their opposition to their students' GNETS Program placements and desire for their children to attend community educational placements.  *See, e.g.*, US0012047; US0012763; US0011494; US0011511; US0011549 and US0011550.  When parents raised concerns about the GNETS Program during IEP meetings, parents were often told that the GNETS Program was the only option for their children.  *See, e.g.*, McCart Dep. 56:14-57:20.  Some parents lamented that they only initially agreed to their children being placed in the GNETS Program, rather than lodging an explicit complaint about the segregated placement at the outset, because they felt "bullied" by the educational placement process that led to their children's GNETS Program placements.  *See, e.g.*, US0011522. Some parents shared that they believe more parents are not actively fighting GNETS Program placements and seeking community educational placements because they do not "know there is something better" or have "given up" advocating.  *See, e.g.*, US0011538.

59.   Federal law provides that a parent can request a meeting at any time and such request must be granted. <u>See</u> 20 USC 1414.

**RESPONSE:**  Objection.  The fact asserted should not be considered

for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).

60.   A parent can unilaterally decline GNETS services. Deposition of Talithia Newsome at 196:24-197:1.

**RESPONSE:**  Denied.  This statement mischaracterizes the cited evidence.  In response to the question, "Can a parent or guardian unilaterally decline GNETS services," Ms. Newsome testified that "a parent can decline any – yes."  Ms. Newsome did not testify that a parent can "unilaterally" decline GNETS services.  In fact, the United States has uncovered myriad evidence that some parents of students placed in the GNETS Program believe their children were placed in GNETS unilaterally, despite the parents' own objections and explicit requests that their children remain in community educational placements.  *See, e.g.*, GA05201028; GA05200951.  Parents have contacted the United States to express their opposition to their students' GNETS Program placements and desire for their children to attend community educational placements.  *See, e.g.*, US0012047; US0012763; US0011494; US0011511; US0011549 and US0011550.  When parents raised concerns about the GNETS Program during IEP meetings, parents were often told that the GNETS Program was the only option for their

children.  *See, e.g.*, McCart Dep. 56:14-57:20.  Some parents lamented that they only initially agreed to their children being placed in the GNETS Program, rather than lodging an explicit complaint about the segregated placement at the outset, because they felt "bullied" by the educational placement process that led to their children's GNETS Program placements.  *See, e.g.*, US0011522.  Some parents shared that they believe more parents are not actively fighting GNETS Program placements and seeking community educational placements because they do not "know there is something better" or have "given up" advocating.  *See, e.g.*, US0011538.

61.    In some instances, parents have requested for their child to spend their entire academic career in GNETS. Deposition of Wina Low at 155:24–156:4.

**RESPONSE:**  Denied as incomplete.  Wina Low testified that she has known of some students who have spent their entire academic career at GNETS and that "parents have requested that as well."  Low Dep. 155:24-156:4.  She suggested that these requests stem from parents' frustration and that parents whose children are in GNETS are "less likely [to] receive so many phone calls" from school about their children.  Low Dep. 155:24-156:10.  Although some parents may request that their children remain in GNETS, Ms. Low acknowledged that GNETS "wasn't intended to be a place to stay forever."  Low Dep. 154:20-156:4.

62.   No GNETS Director testified that they were aware of any instance in which the State compelled a GNETS Program to make a particular decision regarding a student's placement. <u>See e.g.</u>, Deposition of Derrick Gilchrist at 258:10-13.

**RESPONSE:**  Denied.  Brooke Cole, Director of Elam Alexander GNETS Academy, testified that the State's GNETS Program Manager concluded that students on the Georgia Alternate Assessment were inappropriate for Elam Alexander and could be served in their home school systems.  *See* GA00322208; Deposition of Brooke Cole 108:3-110:3, 111:9-18.  As a result, Elam Alexander began removing such students from its program and reintegrating them into their home school systems.  *See* GA00322208; Deposition of Brooke Cole 98:18-22, 107:6-19, 112:22-113:3.

63.   No GNETS Director testified that the State has encouraged their program to keep a student in GNETS when the IEP recommended otherwise. <u>See e.g.</u>, Deposition of Derrick Gilchrist at 258:14-16; Deposition of Whitney Braddock at 232:23- 233:1.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

64.   The length of time a student receives services through GNETS is dependent on what is in the student's IEP and how quickly the student reaches the goals identified in the IEP. Deposition of Clara Keith Brown at 23:24-24:3;

Deposition of Samuel Clemons at 329:20-1.

**RESPONSE:**  Denied as incomplete.  Because the GNETS Program is intended to provide students with therapeutic services and supports that will enable them to return to their home schools, the length of time a student remains in GNETS also depends on the nature of the therapeutic services and supports available to that student.  *See*, *e.g.*, GA00481564; GA00481478; Deposition of Clara Keith 26:5-27:24, 81:8-82:3, 86:10-87:8; Deposition of Celest Ngeve 55:18-56:1; Deposition of Wina Low 154:20-155:23.  The lack of adequate therapeutic services and supports across GNETS is therefore a factor in a student's length of stay in the Program.  *See*, *e.g.*, GA00197223 at GA00197227 (noting that because "many of the GNETS programs are operating below the expected clinical staff ratio for therapeutic services[,] . . . [s]ome of the programs are . . . challenged in providing the recommended amount of therapeutic supports to facilitate optimal turn around in students' behaviors"); Deposition of Clara Keith 132:10-139:20.

65.    Exit criteria are developed by the IEP team. Wolf Dep. 81: 14-16. The IEP

team determines the student's IEP goals and goals they need to meet in order

to exit the GNETS Program. Deposition of Patricia Wolf at 81: 7-13;

Deposition of David Ackerman at 234: 10-21.

**RESPONSE:**  Denied as incomplete.  In addition to IEP teams determining

individual student goals, students in the GNETS program may be required

to meet general exit criteria that apply to all students.  *See*, *e.g.*, Deposition

of Talithia Newsome 214:19-224:5; Deposition of Patricia Wolf 81:20-

82:14.  For example, Patricia Wolf testified that one such "exit criteria that

appl[ies] across the board to all GNETS of Oconee students" is that a

student remain on the "green level" (i.e., displaying positive behavior) 80

percent of the time before transitioning back to their home school.

Deposition of Patricia Wolf 81:20-82:14; *see also generally* Deposition of

Talithia Newsome 214:19-224:5 (discussing similar level system and its

relation to student exit).  Subject to this additional context, the Court may

consider the evidence for purposes of the motion for summary judgment.

66.    Student reintegration into general education from a GNETS Program is

entirely reliant on the student's individualized IEP. Deposition of Samuel

Clemons at 327:5-12.

**RESPONSE:**  Denied.  Student reintegration into general education

from a GNETS Program may occur for a number of reasons, including

reasons related to an individual student's IEP.  Student reintegration

may also occur for other reasons.  For example, numerous GAA students

were reintegrated into general education after the GNETS Program

Manager determined that GNETS was an inappropriate setting for GAA

students and such students could be served by their home school

systems.  *See* Deposition of Brooke Cole 98:18-22, 107:6-19, 108:3-

110:3, 111:9-18, 112:22-113:3.

## VII.   Additional Material Facts Regarding GNETS

67.    The GNETS Rule provides GaDOE must receive and disburse the GNETS

grants; and also "[a]dminister the grant funds" by specific acts of (1)

developing "rules and procedures regulating the operation of the GNETS

grant;" (2) notify fiscal agents of the grant allocation and approve the budget

as part of the grant process; and (3) monitoring compliance. Ga. Comp. R. &

Regs. 160-4-7-.15(5)(a)(1).

**RESPONSE:** Objection.   The cited evidence does not support the fact

asserted.   The GNETS Rule states that the "SEA"—which it defines as the

Georgia State Board of Education, not GaDOE—"shall . . . [r]eceive and

disburse funds appropriated by the Georgia General Assembly to support

GNETS services," "[a]dminister the grant funds . . . in collaboration with the

GaDOE" by "[d]evelop[ing] rules and procedures regulating the operation of

the GNETS grant," "[n]otify[ing] the fiscal agents regarding each fiscal year's

allocation and approv[ing] GNETS services budgets," and "[m]onitor[ing] GNETS to ensure compliance with Federal and state policies, procedures, rules, and the delivery of appropriate instructional and therapeutic services." Ga. Comp. R. & Regs. 160-4-7-.15(5)(a).

68.  These grant obligations are a requirement of IDEA. 20 U.S.C. § 1407(a).

**RESPONSE:** Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).

69.  20 U.S.C. § 1416(a)(1)(A) imposes these same grant obligations on the United States Department of Education.

**RESPONSE:** Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).

70.  The GNETS Rules describes the LEAs as responsible for (1) "ensur[ing]" that students are educated in the least restrictive environment; (2) convening IEP Teams that make recommendations to refer a student for GNETS

services; (3) monitoring students' IEPs; (4) providing training to teachers who teach disabled children; (5) collaborating with community behavioral health service providers; and (6) allocating supports and resources to GNETS Programs. Ga. Comp. R. & Regs. 160-4-7-.15(5)(b).

**RESPONSE:** Denied as incomplete. The GNETS Rule states that LEAs shall, among many other things, (1) "ensure that FAPE is delivered to students recommended for GNETS services in the least restrictive environment (LRE)"; (2) "[c]onvene IEP Team meetings as required by State Board of Education Rule 160-4-7-.06"; (3) "[m]onitor student IEP goals annually to determine students' progress and access to services in a lesser restrictive environment"; (4) "[p]rovide ongoing professional learning opportunities and best practices for teachers to support students who exhibit social, emotional and/or behavioral challenges"; (5) "[c]ollaborate with community service providers to deliver mental health services and/or family support in students' Zoned schools"; and (6) "[a]llocate supports and resources, which may include in-kind services to GNETS to facilitate flexible models of service delivery and best practices for equitable educational support as appropriate." Ga. Comp. R. & Regs. 160-4-7-.15(5)(b).

71. There is no text in the GNETS Rule explicitly dictating a location where services must be provided.

**RESPONSE:** Objection.  The fact asserted is not supported by any citation to evidence, as required by Local Rule 56.1(B)(1).

72. The text of the GNETS Rule expressly reserves the decision of establishing the learning environments where GNETS Program services may be delivered to the LEAs. Ga. Comp. R. & Regs. 160-4-7-.15(b)(10) and (4)(c).

**RESPONSE:** Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).

73. The GNETS Rule does not empower the State to decide where the "GNETS continuum of services" may be provided as between a fully integrated and wholly separate facility and classroom. Ga. Comp. R. & Regs. 160-4-7-.15(4)(c).

**RESPONSE:** Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).

74. The evidence shows that it is the LEA or RESA that determine the setting in which to provide services through the GNETS Program. Decisions on whether to operate as a school-based site or self-contained facility are local decisions. Deposition of Shaun Owen at 155:13-20.

**RESPONSE:**  Denied as incomplete.  Although the LEA or RESA may determine whether to operate a regional GNETS program within a school-

based site or in a self-contained facility, decisions about the location where

a regional GNETS program provides GNETS services are not exclusively

local decisions.  *See* Ex. 1, Def. Resp. to RFA Nos. 81, 87, 89, 90; Exs. 100,

102-105; Deposition of Sonia Shaun Owen 155:13-20; Deposition of

William "Matt" Jones Dep. 189:4-190:6, 193:1-194:25; Deposition of Clara

Keith Dep. 226:16-229:22, 230:14-232:18; Deposition of Michael Rowland

Dep. 80:21-82:2, 83:5-88:1, 94:4-96:13, 111:21-116:9, 145:7-146:20; *see*

*also* Deposition of Whitney Braddock Dep. 219:21-220:23, 221:17-222:2,

222:15-22, 225:10-226:6.  For example, the director of GNETS of Oconee

testified that if her regional GNETS program were to move from an

exclusively school-based program to a center-based program, "it would

have to be approved by the Department of Education and Facilities."

Deposition of Patricia Wolf 60:7-17; *see also* GA00343802; Deposition of

Patricia Wolf 56:20-60:17.

75.    The fiscal agent is responsible for the fiscal management and budgeting of

GNETS funding. Ga Comp. R. & Regs. 160-4-7-.15(1)(b); see, e.g.,

Deposition of Patricia Wolf at 61:17-20 (role of GNETS of Oconee's fiscal

agent is to provide oversight in terms of budgets, and fiscal and personnel issues.)

**RESPONSE:** Denied as incomplete. Regional GNETS programs must also submit their program budgets to GaDOE and have those budgets approved by GaDOE. GNETS Rule at ¶ (5)(a) (GNETS Rule charges SEA with approving program budgets); *see also* Ex. 1, Def. Resp. to RFA No. 25; Deposition of Cassandra Holifield 104:10-106:18; Deposition of Amber McCollum 107:4-109:8; 214:9-15.

76. No LEA or RESA has testified that they are incentivized by GaDOE to provide GNETS services in settings other than the general education setting.

**RESPONSE:** Objection. The fact asserted is not supported by any citation to evidence, as required by Local Rule 56.1(B)(1). Nonetheless the fact asserted is denied. The GNETS Program funding formula does not include, as a factor in determining funding, the number of students for whom a regional GNETS program provides consultative services in the general education setting-that is, services directly to a student or that student's teacher or paraprofessional in the general education setting. *See* Deposition of Cassandra Holifield 277:9-281:9; Deposition of Whitney Braddock 69:2-12. Regional GNETS programs' failure to receive funding for GNETS services provided in general education environments (i.e., consultative services) presents numerous difficulties, including a lack of funds to ensure regional

GNETS programs have enough staff both to serve the students with

significant needs in GNETS environments and to push into the general

education environment to deliver consultative services.  *See* GA00347596;

Deposition of Cassandra Holifield 277:9-281:9

77. GNETS Program decisions are made at the local level. Decisions to close

programs or locations are local decisions. Deposition of Vickie Cleveland at

114:11-14.

**RESPONSE:**  Objection.  The cited evidence pertains only to a regional

GNETS program's decision to move from a center-based structure to a

school-based structure and does not support the assertion that GNETS

Program decisions, writ broadly, are made at the local level.  The cited

evidence regarding decisions to close programs or locations being local

decisions may be considered for purposes of the motion for summary

judgment, with the qualification that decisions to close programs or

locations are not *exclusively* local decisions.  *See* Ex. 1, Def. Resp. to RFA

Nos. 81, 87, 89, 90; Exs. 100, 102-105; Deposition of Sonia Shaun Owen

155:13-20; Deposition of William "Matt" Jones 189:4-190:6, 193:1-

194:25; Deposition of Clara Keith 226:16-229:22, 230:14-232:18;

Deposition of Michael Rowland 80:21-82:2, 83:5-88:1, 94:4-96:13, 111:21-

116:9, 145:7-146:20; *see also* Deposition of Whitney Braddock 219:21-

220:23, 221:17-222:2, 222:15-22, 225:10-226:6.  For example, the director

of GNETS of Oconee testified that her regional GNETS program transitioned from center-based to an exclusively school-based program after "[t]he Department of Education in Georgia basically told us that we would have to move out of the facility" and "[t]here was not another facility for us to move into, so the board decided that we should be spread out."  Deposition of Patricia Wolf 51:13-24; *see also id.* 51:13-52:11, 54:25-55:23.

78.    Which counties a program will serve is a local decision. Deposition of Lisa Futch at 115:15-23; Deposition of Haley Livingston at 113:6-114:6.

**RESPONSE:**  Denied.  GaDOE officials have participated in the decision whether a regional GNETS program may serve students in particular counties.  See, e.g., Ex. 68 (Oconee GNETS Direction inquiring of GaDOE whether Elam Alexander Academy "can . . . serve Jasper County Students even though Jasper County falls under GNETS of Oconee catchment" and GaDOE responding "Jasper county is in the catchment area for the Oconee GNETS program, thus, students will need to receive services in their service area by the Oconee Program or in their local school district. Another concern would be the distance the Jasper county students would need to travel to receive services at Elam."); Deposition of Patricia Wolf 216:2-217:15.

79.    Policies and procedures for GNETS Programs are made and changed at the

local level. Deposition of Haley Livingston at 60:9-61:7.

**RESPONSE:** Objection. The cited evidence does not support the fact asserted. The cited deposition testimony pertains to a single regional GNETS program. *See* Deposition of Haley Livingston 60:9-61:7. As Ms. Livingston made clear: "I didn't want to give the impression that I'm changing any kind of policies. I just change procedures within my building when I was speaking on that earlier. So just anything that needs to be changed in the way we do things in my building. So I guess that's more a procedure-type thing than policy, and I wanted to clarify that." Deposition of Haley Livingston 60:14-61:7. Nothing in the cited testimony indicates that the policies and procedures Ms. Livingston discussed include policies and procedures spanning multiple regional GNETS programs. *See* Deposition of Haley Livingston 60:9-61:7.

80. Curriculum decisions are locally made decisions and GNETS Programs follow the curriculum of their local district. Deposition of Lisa Futch at 237:12-238:4; Deposition of Cassandra Holifield at 30:20-31:17; Deposition of Wina Low at 63:15–64:14.

**RESPONSE:** Denied. While some aspects of the curriculum at regional GNETS programs may reflect local decisions, the State mandates certain curricular interventions across regional GNETS programs. For example, regional GNETS programs are required to use i-Ready—a supplemental

curriculum—and to do so for a particular number of minutes each week.

*See*, *e.g.*, Deposition of Celest Ngeve 33:4-23, 253:1-15, 345:14-25.

81. Thus, every Program does something different for their curriculum.

Deposition of Lakesha Stevenson at 137:17-20.

**RESPONSE:**  Denied.  While some aspects of the curriculum at regional GNETS programs may different from program to program, the State mandates certain curricular interventions across regional GNETS programs. For example, regional GNETS programs are required to use i-Ready—a supplemental curriculum—and to do so for a particular number of minutes each week.  *See, e.g.*, Deposition of Celest Ngeve 33:4-23, 253:1-15, 345:14-25.

82. GNETS Directors are employees of the LEA/RESA and report to supervisors employed by the LEA/RESA. Deposition of Talithia Newsome at 52:15-53:23; Deposition of Haley Livingston at 11:16-20; 277:8-10;

Deposition of Cassandra Holifield at 332:16-19; Deposition of Derrick
Gilchrist at 256:4-6; 19:10-18; Deposition of Brooke Cole at 24:5-13;
Deposition of Celest Ngeve at 23:9-11.

**RESPONSE:** Undisputed in part. The Court may consider this evidence
for purposes of the summary judgment motion, except to the extent the
evidence is read to preclude additional informal lines of reporting. Two
regional GNETS program directors also identified the current GNETS
Program Manager and GNETS Program Specialist as individuals to whom
they report. *See* Deposition of Brooke Cole 25:6-2113, 26:8-15; Deposition
of Talithia Newsome 54:25-55:8.

83. GNETS Program Directors' salaries are paid by either the LEA or RESA,
depending on who the fiscal agent is. Deposition of Vickie Cleveland at
147:5-10; Deposition of Haley Livingston at 277:13-14; Deposition of
Whitney Braddock at 77: 16-20.

**RESPONSE:** Undisputed in part. The Court may consider this evidence
for purposes of the summary judgment motion, except to the extent the
cited evidence is read to suggest that the funds originate with the LEA or
RESA.  GNETS Program Directors' salaries are funded with monies
from the GNETS State grant. *See*, *e.g.*, Exs. 96, 107-108; Deposition of
Samuel Clemons 149:24-150:6; Deposition of Brooke Cole 174:7-19,
181:5-23; Deposition of Cassandra Holifield 50:5-51:13, 104:10-20,

114;1-6; Deposition of Celest Ngeve 266:11-16, 273:15-274:1;

Deposition of Patricia Wolf Dep. 104:18-20.

84.   Similarly, all GNETS Program staffing and hiring decisions are determined

and handled by the county. Deposition of Talithia Newsome at 107:2-111:2;

Deposition of Haley Livingston at 277:8-12; 278:1-12; Deposition of Lisa

Futch at 349:8-14; Deposition of Shaun Owen at 155:13-20; Deposition of

Derrick Gilchrist at 254:14-255:5.

**RESPONSE:**  Denied as inaccurate and incomplete.  The State provides

regional GNETS programs with the Georgia Professional Standards

Commission guidelines that outline the minimum requirements for

personnel being hired into particular positions (i.e., teachers, counselors,

social workers, paraprofessionals).  *See* Deposition of Talithia Newsome

111:24-114:7.  In addition, the State establishes the approved staffing

agencies and/or professional qualifications that regional GNETS programs

receiving therapeutic grants must use when hiring therapeutic staff.   *See*

Exs. 118, 120, 126-128; Deposition of Clara Keith 140:8-143:5, 153:7-

155:6; Deposition of Jacqueline Neal 80:6-83:8; Deposition of Patricia

Wolf 141:6-144:2, 144:19-145:19, 147:13-149:2.  In some instances, the

State has played an even more substantial role, drafting job responsibilities

for particular positions that regional GNETS programs have used to

formulate job descriptions.  *See* Ex. 128; Deposition of Patricia Wolf

147:13-149:2.

85.    The State has no role in the Programs' staffing and hiring decisions.

Deposition of Haley Livingston at 278:10-12; Deposition of Talithia

Newsome at 111:24-112:4; Deposition of Cassandra Holifield at 332:12-15;

147:6-18; Deposition of Celest Ngeve at 280:18-281:5.

**RESPONSE:**  Denied as inaccurate and incomplete.  The State provides

regional GNETS programs with the Georgia Professional Standards

Commission guidelines that outline the minimum requirements for

personnel being hired into particular positions (i.e., teachers, counselors,

social workers, paraprofessionals).  *See* Deposition of Talithia Newsome

111:24-114:7.  In addition, the State establishes the approved staffing

agencies and/or professional qualifications that regional GNETS programs

receiving therapeutic grants must use when hiring therapeutic staff.  *See*

Exs. 118, 120, 126-128; Deposition of Clara Keith 140:8-143:5, 153:7-

155:6; Deposition of Jacqueline Neal 80:6-83:8; Deposition of Patricia

Wolf 141:6-144:2, 144:19-145:19, 147:13-149:2.  In some instances, the

State has played an even more substantial role, drafting job responsibilities

for particular positions that regional GNETS programs have used to

formulate job descriptions.  *See* Ex. 128; Deposition of Patricia Wolf

147:13-149:2.

86.    Each fiscal agent has its own process for how it hires staff and the State is

not consulted before a director is selected. Deposition of Vickie Cleveland at 146:14-23; Deposition of Celest Ngeve at 128:3-131:18.

**RESPONSE:**  Denied.  The cited evidence does not support the fact asserted.  Celest Ngeve's deposition testimony does not address director selection at all.  *See* Deposition of Celest Ngeve 128:3-131:18.  Vickie Cleveland's deposition testimony establishes that each fiscal agent has a process for how they hire their staff, that *she* does not participate in interviews of regional GNETS program directors, and that *she* is not consulted before a regional GNETS program director is selected.  *See* Deposition of Vickie Cleveland 146:14-23.  Ms. Cleveland testified that she did not know who else participated in such interviews.  See Deposition of Vickie Cleveland 146:14-20.

87.   GaDOE has no involvement or control over who is hired in GNETS

Programs. Deposition of Wina Low at 195:16-17; Deposition of David

Ackerman at 85:4-7.

**RESPONSE:**  Denied as inaccurate and incomplete.  The State

provides regional GNETS programs with the Georgia Professional

Standards Commission guidelines that outline the minimum

requirements for personnel being hired into particular positions (i.e.,

teachers, counselors, social workers, paraprofessionals).  *See*

Deposition of Talithia Newsome 111:24-114:7. In addition, the State

establishes the approved staffing agencies and/or professional

qualifications that regional GNETS programs receiving therapeutic

grants must use when hiring therapeutic staff.   *See* Exs. 118, 120,

126-128; Deposition of Clara Keith 140:8-143:5, 153:7-155:6;

Deposition of Jacqueline Neal 80:6-83:8; Deposition of Patricia Wolf

141:6-144:2, 144:19-145:19, 147:13-149:2.  In some instances, the

State has played an even more substantial role, drafting job

responsibilities for particular positions that regional GNETS programs

have used to formulate job descriptions.  *See* Ex. 128; Deposition of

Patricia Wolf 147:13-149:2.

88.   No GNETS Program has staff employed by GaDOE. Deposition of Vickie

Cleveland at 147:11-14.

**RESPONSE:** Undisputed. The Court may consider this evidence for purposes of the summary judgment motion.

89. The State of Georgia does not conduct performance evaluations of GNETS Directors or their staff. Deposition of Haley Livingston at 277:19-25; Deposition of Cassandra Holifield at 333:4-12.

**RESPONSE:** Undisputed in part. The Court may consider this evidence for purposes of the summary judgment motion, except to the extent the cited evidence is read to suggest that the State does not conduct evaluations of the regional GNETS programs themselves through the GNETS Strategic Plan. *See*, *e.g.*, Ex. 18 at GA00362009-GA00362010; Exs. 7, 15, 24-25; Deposition of Whitney Braddock 208:6-209:17, 210:5-14; Deposition of Samuel Clemons 250:12-251:9, 254:7-255:20; Deposition of Vickie Cleveland 158:24-159:10, 166:11-167:10, 210:5-18, 217:20-219:8, 230:16– 231:14; Deposition of Brooke Cole 387:17-388:2, 390:22-391:25; Deposition of Lisa Futch 93:20-95:18; Deposition of Derrick Gilchrist 246:4-247:6; Deposition of Cassandra Holifield 198:19-199:23, 200:15-202:4; Deposition of Clara Keith 90:22-91:6, 178:20-180:22, 181:7-183:22; Deposition of Haley Livingston 68:12-70:12, 80:25-81:17; Deposition of Jacqueline Neal 23:21-24:13; Deposition of Celest Ngeve 288:3-289:16, 290:19-291:18, 304:8-305:22; Deposition of Lakesha Stevenson 46:10-23, 49:9-51:6.

90.    Nor does the GNETS Program Manager evaluate GNETS Directors.

Deposition of Vickie Cleveland at 146:24-147:1.

**RESPONSE:** Undisputed in part.   The Court may consider this evidence for

purposes of the summary judgment motion, except to the extent the cited

evidence is read to suggest that the State does not conduct evaluations of the

regional GNETS programs themselves through the GNETS Strategic Plan.

*See*, *e.g.*, Ex. 18 at GA00362009-GA00362010; Exs. 7, 15, 24-25; Deposition

of Whitney Braddock 208:6-209:17, 210:5-14; Deposition of Samuel Clemons

250:12-251:9, 254:7-255:20; Deposition of Vickie Cleveland 158:24-159:10,

166:11-167:10, 210:5-18, 217:20-219:8, 230:16– 231:14; Deposition of

Brooke Cole 387:17-388:2, 390:22-391:25; Deposition of Lisa Futch 93:20-

95:18; Deposition of Derrick Gilchrist 246:4-247:6; Deposition of Cassandra

Holifield 198:19-199: 23, 200:15-202:4; Deposition of Clara Keith 90:22-

91:6, 178:20-180:22, 181:7-183:22; Deposition of Haley Livingston 68:12-

70:12, 80:25-81:17; Deposition of Jacqueline Neal 23:21-24:13; Deposition of

Celest Ngeve 288:3-289:16, 290:19-291:18, 304:8-305:22; Deposition of

Lakesha Stevenson 46:10-23, 49:9-51:6.

91.    GNETS students belong to their home school's LEA. Deposition of Amber

McCollum at 67:3-6; Deposition of Garry McGiboney at 178:9–13.

**RESPONSE:** Denied.  The cited evidence does not support the fact

asserted.  In particular, none of the cited testimony discusses GNETS

students' "home school."

92.  Facility maintenance and concerns are handled by the county. Deposition of

Talithia Newsome at 71:25-73:11; Deposition of Lisa Futch at 238:5-15;

Deposition of Cassandra Holifield at 286:15-24; Deposition of David

Ackerman at 90:1-3; Deposition of Whitney Braddock at 230:17-21. Indeed,

GNETS facilities are county-owned buildings. Deposition of Cassandra

Holifield at 286:15-24.

**RESPONSE:**  Denied.  The cited evidence does not support the factual

assertion that *all* GNETS facilities are county-owned buildings.  The cited

evidence establishes only that "general education facilities where North

Metro GNETS houses classrooms" are "owned by the LEAs."  Deposition of

Cassandra Holifield 286:15-24.  The Court may consider the evidence

specific to North Metro GNETS for purposes of the motion for summary

judgment.  The Court may also consider the evidence that facility

maintenance and concerns are handled by county school systems, except to

the extent such evidence is read to suggest that the State plays no role in

facility maintenance and concerns.  *See* Ex. 1, Def. Resp. to RFA Nos. 69, 81,

87, 89, 90; Exs. 99-105; Deposition of James "Ted" Beck Dep. 135:11-

136:15, 139:12-141:19; Deposition of William "Matt" Jones 189:4-190:6,

193:1-194:25; Deposition of Clara Keith 226:16-229:22, 230:14-232:18;

Deposition of Michael Rowland 47:16-50:19, 78:7-79:20, 80:21-82:2, 83:5-

88:1, 94:4-96:13, 111:21-116:9, 145:7-146:20, 160:6-161:6; *see also*

Deposition of Whitney Braddock 219:21-220:23, 221:17-222:2, 222:15-22,

225:10-226:6.

93.    Facility layout and use is determined by the school. Deposition of David

Ackerman at 95: 18-20; 139: 12-24.

**RESPONSE:**

Denied.  The cited evidence does not support the fact asserted, which is

vague as to the particular facility and school to which it refers.

94.    Bus service is determined, provided, and paid for by the LEA/RESA.
Deposition of Talithia Newsome at 84:17-22; 85:2-6; 236:20-237:3;
Deposition of Lisa Futch at 167:9-18; Deposition of Haley Livingston at
153:4-11; Deposition of Celest Ngeve at 139:2-5; Deposition of David
Ackerman at 19-21.

**RESPONSE:**  Denied in part.  The cited deposition testimony of David
Ackerman does not support the fact asserted.  The fact asserted is
otherwise undisputed to the extent the term "[b]us service" refers to
bussing students in the GNETS Program to and from their assigned
regional GNETS programs.  Subject to this qualification, the Court may
consider this evidence for purposes of the summary judgment motion.

95.    Bus concerns are, therefore, brought to the county. Deposition of Talithia
Newsome at 86:12-87:17.

**RESPONSE:**  Denied.  The cited evidence does not support the fact
asserted, particularly to the extent the asserted fact is read to apply
broadly to all regional GNETS programs.

96.    Restraint policies are approved by the local authority, not GaDOE.
Deposition of Lisa Futch at 353:9-18.

**RESPONSE:**  Denied.  The cited evidence does not support the
fact asserted, particularly to the extent the asserted fact is read to
apply broadly to all regional GNETS programs.

97.   GNETS Programs who wish to collaborate with CSBs do so at the local

level. For example, South Metro GNETS contracts directly with View Point

Health for two clinicians to provide behavioral health services at South

Metro GNETS. Deposition of Jennifer Hibbard at 74:24-75:14; 76:4-13.

**RESPONSE:**  Denied.  The cited evidence does not support the fact asserted.

In particular, the cited evidence does not establish that all regional GNETS

programs that wish to collaborate with CSBs do so at the local level, as it

pertains only to a single regional GNETS program.  It is undisputed that

South Metro GNETS contracts directly with View Point Health for two

clinicians to provide behavioral health services at South Metro GNETS.  The

Court may consider this evidence regarding South Metro's contract with

View Point Health for purposes of the motion for summary judgment.

98.   Federal law requires states, including Georgia, to collect certain data. See 20

U.S.C.A. § 1418(a).

**RESPONSE:**  Objection.  The fact asserted should not be considered for

purposes of the motion for summary judgment because it is improperly stated

as a legal conclusion in violation of Local Rule 56.1(B).

99.   Plaintiff's proffered expert, Dr. Amy McCart, acknowledges that there can

be "appropriate" reasons to "segregate students." Deposition of Amy McCart

at 19:14-18; 21:5-15; 145:14-17; 183:13-21.

**RESPONSE:** Denied.  The statement mischaracterizes the cited evidence or the cited evidence does not support the fact asserted.  During her deposition, Dr. McCart was asked "do you believe that there is an appropriate role for a program like GNETS, ever?" and she responded "No, not for GNETS, specifically.  If you're asking me whether or not it's appropriate to ever segregate students, yes."  Deposition of Amy McCart 19:14-18.  Dr. McCart later elaborated, saying "I have worked for many, many years, just to give you a little context, with students with a variety of very significant behavioral challenges and disabilities.  And what I found to be the case is in very limited numbers, there are certain students who benefit from small environments that have very structured learning opportunities, and exposure to time in general education classrooms, that have less noise or stimuli in that environment, and that have access to highly trained specialized educators who can support their needs."  Deposition of Amy McCart at 21:2-15.  Dr. McCart explained "there are a small number of students who require highly specialized teaching and behavior support."  Deposition of Amy McCart 144:2-145:17.  Dr. McCart also said "[i]s it possible to have a segregated program for students with behavior-related disabilities, and still not have statewide systemic segregation, and have fair and equal access?  Yes, as long as it is related specifically to effective learning environments that are matched to student need that are in line with

practices that are common in the field now."  Deposition of Amy McCart 182:11-183:21.

100.  Dr. McCart also acknowledges that, even if students with emotional or behavioral disabilities were provided with "the full array of supports and

services," some would need to be educated away from the general education setting. Deposition of Amy McCart at 143:18-144:1.

**RESPONSE:** Denied. The statement mischaracterizes the cited evidence or the cited evidence does not support the fact asserted. Dr. McCart stated, "[E]ven if the full array of supports and services were being provided, certainly there are some students, under certain conditions for certain periods of time, that do need placements in which there are smaller numbers of students and away from general education." Deposition of Amy McCart 142:4-144:1.

101. Plaintiff's other proffered expert, Dr. Bob Putnam, concedes that some students may be afforded "with appropriate services at the appropriate intensity" and still need to "receive educational services ... in a separate or segregated setting." Putnam Dep. 63:9-16.

**RESPONSE:** Undisputed.

**VIII. Additional Material Facts Regarding the Strategic Plan and GNETS Program Documents**

102. The Strategic Plan was created by a collaboration of the GNETS Program Manager and GNETS Directors. Deposition of Clara Keith Brown at 177:11-178:6.

**RESPONSE:** Denied as incomplete. The Strategic Plan was created as a collaboration between the GNETS Program Manager; a committee of

regional GNETS Directors; and various State personnel, including other

personnel from GaDOE and personnel from DBHDD.  *See* Ex. 1, Def. Resp.

to RFA No. 129; Ex. 18 at GA00362006, GA00362008; Ex. 19 at

GA00221994, GA00221996; Deposition of Whitney Braddock 206:10-

207:2; Deposition of Vickie Cleveland 204:21-205:12; Deposition of Clara

Keith 67:17-19, 94:20-95:6, 109:3-14, 177:8-178:6.

103.  The ultimate decision as to the content of the Strategic Plan was a

collaborative decision of the GNETS Program Manager and GNETS

Directors. Cleveland Dep. 205:21–206:411.

**RESPONSE:**  Denied as incomplete.  Clara Keith Brown testified

that final decision making regarding the Strategic Plan involved

State personnel -- specifically the GNETS Program Manager,

Debbie Gay from GaDOE, and Clara Keith from DBHDD -- as well

as the GNETS Directors on the Strategic Planning Committee.

Deposition of Clara Keith 177:8-178:6.

104.  The Strategic Plan is used by Programs to continue to reevaluate and self-

assess their Programs, make changes as needed, and decide on their

priorities for the upcoming year based on the needs identified by the

assessment. <u>See generally</u>, Defendant's Statement of Undisputed Material

Facts, Ex. U at GA00362005-23; Deposition of Shaun Owen at 194:11-15.

**RESPONSE:**  Denied as incomplete.  The regional GNETS programs use the

Strategic Plan for several purposes, including, but not limited to, the purposes listed in the cited testimony of Shaun Owen.  Ex. 18 at GA00362009; *see generally* GA00362005-23.  For example, another purpose set forth in the Strategic Plan is "to determine the need for professional learning and resources to drive improvement."  Ex. 18 at GA00362009.

105.  The GNETS Program Manager and GNETS Program Specialist do not receive each Program's Strategic Plan; they receive mid-year and end of year

summaries when the regional Program's grant application is uploaded to the GaDOE portal. Deposition of Vickie Cleveland at 208:9-21; Deposition of Lakesha Stevenson at 150:23-151:8.

**RESPONSE:**  Denied as incomplete. The State has modified the manner through which Strategic Plan data is collected and assessed on several occasions, which is not reflected in the cited testimony.  According to the Strategic Plan, "[a]t the end and/or beginning of each school year, all GNETS directors will be responsible for sharing the self-assessment ratings, improvement summaries, and the top 3 priority areas with key stakeholders (e.g., GaDOE, fiscal agents, parent groups, and advocates). GaDOE and the fiscal agents will use the improvement summary form and the action plan to provide GNETS directors with the necessary technical assistance and resources needed to make improvement in the top 3 priority areas." Ex. 18 at GA00362010.  Starting in 2022, GaDOE consolidated the strategic plan self-assessment submissions with the GNETS grant application process for regional GNETS programs. Deposition of Brooke Cole 389:22-390:10; 395:9-15; Deposition of Lakesha Stevenson 149:4-151:8. *See also* Deposition of Vickie Cleveland 206:25-207:19; 226:15-227:7.

106.  The Programs rate themselves; GaDOE does not provide a rating. Deposition of Vickie Cleveland at 207:4-10; Deposition of Lakesha

Stevenson at 151:9-21.

**RESPONSE:**  Denied as incomplete.  The State has modified the manner through which Strategic Plan data is collected and assessed on several occasions.  In the past, this feedback has included each regional GNETS program's final ratings on the various GNETS Strategic Plan components, as well as other action steps each regional GNETS program should take in the future. *See* Ex. 18 at GA00362008-GA00362010; Exs. 15, 29; Deposition of Samuel Clemons 250:24-251:9, 253:7-254:2; Deposition of Cassandra Holifield 201:21-202:4; Deposition of Celest Ngeve 295:16-297:7; Deposition of Lakesha Stevenson 46:10-23, 49:20-24.  The Strategic Plan itself says "[t]he GaDOE-GNETS program manager/program specialist will complete the rating section with GNETS teams in the spring of each school year and review supporting evidence to validate ratings." Ex. 18 at GA00362008.  More recently, GaDOE has moved away from providing the regional GNETS programs with numerical scores, and instead provides "feedback on implementation based on the rubric rating"—that is ratings of "operational," "emerging," or "not evident." *See, e.g.*, Deposition of Vickie Cleveland 230:16– 231:14.

107. To the extent a Program is not meeting the goals laid out in the Strategic Plan, the State does not take any action beyond providing feedback and suggestions to the Programs for ways they can improve. Deposition of

Vickie Cleveland 218:13–220:2; Deposition of Lakesha Stevenson at 153:11–154:10, 158:21–160:7.

**RESPONSE:** Denied. According to a former member of the State Board of Education, the State has the authority—and has exercised its authority—to put a pause on regional GNETS programs' funding when those programs fail to comply with their responsibilities. Deposition of Larry Winter Dep. 19:7-20:6, 158:3-159:11, 166:5-168:8.

108. At least one GNETS Program Director testified she completes the Strategic Plan self-assessment but does not turn it in. Deposition of Whitney Braddock at 210:12-18.

**RESPONSE:** Denied as incomplete.

109. The GNETS Program Manager and GNETS Program Specialist do not provide feedback after a location visit. Deposition of Vickie Cleveland at 183:7-20; Deposition of Lakesha Stevenson at 194:13-19.

**RESPONSE:** Denied. Historically, the GNETS Program Manager and GNETS Program Specialist have provided feedback after visits to GNETS facilities as part of the "strategic plan review." Those post-visit discussions occurred either on site or virtually. See Ex. 18 at GA00362010; Exs. 15, 24-25; Deposition of Whitney Braddock 208:6-209:17, 210:5-14; Deposition of Samuel Clemons 250:8-251:9, 254:7-255:20; Deposition of Brooke Cole 387:17-388:2, 390:22-391:23;

Deposition of Derrick Gilchrist 246:4-247:6; Deposition of Cassandra Holifield 198:19-199:23, 200:15-201:3; Deposition of Clara Keith 178:20-180:22, 181:7-183:22; Deposition of Haley Livingston 68:12-70:12, 80:25-81:17; Deposition of Celest Ngeve 288:3-289:12, 290:19-291:518, 304:8-305:22; Deposition of Lakesha Stevenson 46:10-23, 49:9-51:6.

110. The GNETS Program Manager looks at the Programs' Strategic Plan self-assessments for what the Programs have done, what information and

artifacts they have presented, and may provide feedback. Deposition of

Vickie Cleveland at 185:1-4; 214:20-24.

**RESPONSE:** Denied as incomplete.  Historically, feedback was an

important part of the strategic plan review process and was provided

alongside the discussion of action steps that each regional GNETS program

could take in the future regarding implementation.  *See* Ex. 7; Ex. 18 at

GA00362008-GA00362010; Deposition of Samuel Clemons 250:24-251:9;

Deposition of Vickie Cleveland 158:24-159:10, 166:11-167:10, 210:5-18,

217:20-219:8; Deposition of Lisa Futch 94:15-95:18; Deposition of

Cassandra Holifield 200:15-202:4; Deposition of Jacqueline Neal 23:21-

24:13.

111.  The Strategic Plan is not tied to anything, including the receipt of any

funding. Deposition of Lakesha Stevenson at 154:9-10; 160:1-2.

**RESPONSE:** Denied.  The phrase "is not tied to anything" is vague

and ambiguous.  The Strategic Plan is a mandatory self-assessment

and review process required by the State; regional programs cannot

opt out.  Deposition of Celest Ngeve 285:14-286:7; Deposition of

Derrick Gilchrist 243:16-25; Deposition of Haley Livingston 69:17-

70:12.  Among other things, the State currently requires GNETS

programs to submit components of the Strategic Plan as part of their

grant application.  *See* Deposition of Brooke Cole 389:22-390:10;

395:9-15; Deposition of Lakesha Stevenson 149:4-151:8.

112. A Program can still be funded by the grant even if the goals in the Strategic

Plan are not met. Deposition of Vickie Cleveland at 219:9-12.

**RESPONSE:** Undisputed in part. Although a program can still be funded

by the grant even if the goals in the Strategic Plan are not let, a program

may also have its funding paused. *See* Deposition of Larry Winter 166:5-

168:8. Subject to this qualification, the Court may consider this evidence

for purposes of the summary judgment motion.

113. The consideration for services forms were developed by a committee which

included various GNETS Directors. Wolf Dep. 171:6-16; 185:4-186:2.

**RESPONSE:** Denied as incomplete. GaDOE oversaw the committee of

GNETS directors involved in developing the Consideration of Services

packet and Request for GNETS consultation document. See Exs. 32, 40-

43, 48-53; Deposition of Patricia Wolf 187:6-205:15; *see generally*

Deposition of Brooke Cole 97:1-98:14; Deposition of Derrick Gilchrist

228:5-233:6; Deposition of Celest Ngeve 192:13-193:6, 201:16-202:17,

207:1-6, 220:6-24, 236:14-237:21.

114. Specifically, the GNETS Directors themselves created the "Consideration of

Services" packet, "Request for GNETS consultation" document, and

"Guidance and Planning Document for Student Integration from GNETS"

document that they share and use for guidance. Deposition of Talithia

Newsome at 150:13-151:10; 180:16-22; Deposition of Cassandra Holifield

at 279:8-18; Deposition of Vickie Cleveland at 124:23-125:10; 141:19-

142:22; 128:18-21; Wolf Dep. at 185:4-186:2.

**RESPONSE:** Denied as incomplete.  The GNETS Program Manager, who

assembled the committee to develop the first drafts of the Consideration of

Services Forms, directed the committee to ensure that the forms were aligned

to the State's GNETS Rule, reviewed the Forms, determined the process for

obtaining feedback on the Forms from other stakeholders, and approved the

final versions of the Forms.  Exs. 40, 43, 48-49, 51-53; Deposition of Patricia

Wolf 185:4-189:18, 190:8-205:15.

115.   The GNETS Program Manager agreed to the final versions in conjunction

with the rest of the committee, as the forms themselves were formally

approved by the Committee, not by the GNETS Program Manager. Wolf

Dep. 185:23-187:5.

**RESPONSE:** Objection.  The cited evidence does not establish that the

forms themselves were formally approved by the Committee and merely

agreed to by the GNETS Program Manager.  To the contrary, the GNETS

Program Manager "directed the committee to ensure that the forms were

aligned to the State's GNETS Rule, reviewed the Forms, determined the

process for obtaining feedback on the Forms from other stakeholders, and

approved the final versions of the Forms."  Exs. 40, 43, 48-49, 51-53;

Deposition of Patricia Wolf 185:4-189:18, 190:8-205:15.

116.  There is no requirement by GaDOE to use these documents. Deposition of
      Talithia Newsome at 150:13-151:10; 180:16-22; Deposition of Cassandra
      Holifield at 279:8-18.

      **RESPONSE:**  Denied.  The cited evidence does not support the fact
      asserted.  The deposition testimony provided by Cassandra Holifield
      confirms GaDOE's expectation that regional GNETS programs follow the
      protocol set forth in the "Request for GNETS consultation" document.
      Indeed, the testimony references an email in which the GNETS Program
      manager writes that "[t]he GNETS continuation of services flow chart
      provides guidance on consult services.  There is a request for consultation
      form in the packet.  NM [North Metro GNETS] should follow this
      protocol."  Deposition of Cassandra Holifield 276:19-277:2, 279:8-
      280:17; *see also* GA00347596.  More broadly, the referenced documents
      are consistently used across GNETS programs and understood to be
      requirements by regional GNETS program directors.  *See*, *e.g.*, Exs. 30-
      39; Deposition of Whitney Braddock 101:21-102:24, 103:15-104:3,
      107:11-110:10; Deposition of Samuel Clemons 51:21-52:6, 61:20-62:19;
      Deposition of Lisa Futch 313:2-314:23, 316:2-317:12, 350:23-352:6;
      Deposition of Derrick Gilchrist 228:5-233:6; Deposition of Jacqueline
      Neal 128:10-130:11; Deposition of Celest Ngeve 191:18-193:24, 195:21-
      198:5, 201:16-204:15, 220:11-222:9, 235:13-238:1, 313:25-316:22;

Deposition of Patricia Wolf 170:19-175:22.

117.  Similarly, there is no requirement by GaDOE to use the "Guiding Questions
      for Consideration of GNETS Services" document or the GNETS Operations
      Manual which are also guidance documents. Deposition of Cassandra
      Holifield at 252:9-14; Deposition of Talithia Newsome at 162:13-17.

      **RESPONSE:**  Denied.  The cited evidence does not support the fact asserted.
      Although Talithia Newsome testified that she was under no requirement to use
      the Guiding Questions for Considerations of GNETS, she acknowledged that
      the questions appearing on the form reflect mandatory eligibility criteria for
      placement in GNETS outlined in the GNETS State Rule.  *See* Deposition of
      Talithia Newsome 159:12-21, 162:13-174:23.  Cassandra Holified testified that
      the GNETS Operations manual "was basically a guidance document that came
      from the DOE on how to fill out some of the reports, like you pulled up today,
      about the data management tool, The State Board Rule, and like how to code
      different things in the different meetings."  Deposition of Cassandra Holifield
      252:9-14.  Nothing in her testimony, however, indicates that regional GNETS
      programs had authority to fill out reports, the data management tool, or the
      relevant coding in ways inconsistent with the Operations Manual.  *See id.*
      Similarly, the testimony does not establish that regional GNETS programs
      could depart from the Operations Manual's guidelines regarding compliance
      with the GNETS State Board Rule.  *See id.*

118.  In fact, GaDOE does not require use of any specific documents related to consideration of services. Deposition of Vickie Cleveland at 128:4-129:15.

**RESPONSE:**   Denied.   The Consideration of Services packet is consistently used across GNETS programs and understood to be a requirement by regional GNETS program directors. *See*, *e.g.*, Exs. 30-39; Deposition of Whitney Braddock 101:21-102:24, 103:15-104:3, 107:11-110:10; Deposition of Samuel Clemons 51:21-52:6, 61:20-62:19; Deposition of Lisa Futch 313:2-314:23, 316:2-317:12, 350:23-352:6; Deposition of Derrick Gilchrist 228:5-233:6; Deposition of Jacqueline Neal Dep. 128:10-130:11; Deposition of Celest Ngeve 191:18-193:24, 195:21-198:5, 201:16-204:15, 220:11-222:9, 235:13-238:1, 313:25-316:22; Deposition of Patricia Wolf 170:19-175:22.

### IX.   Additional Material Facts Regarding the Roles of GNETS Program Manager and GNETS Program Specialist

119.  When the role that ultimately became the GNETS Program Manager was created, Clara Keith Brown wanted to make sure the person hired knew the State did not control or administer GNETS; that the GNETS Programs were independent of GaDOE in that they have their own directors who did not report to anyone at GaDOE; and that GaDOE has a State Board rule that GaDOE provides implementation guidance on. Deposition of Clara Keith

Brown at 85:16-25.

**RESPONSE:** Denied as incomplete.  The testimony cited in paragraph 331 is one among several statements made by Clara Keith Brown regarding information that she sought from candidates during the GNETS Program Manager interview process.  For example, in response to the question that elicited the cited testimony ("What is the State's role in implementing the GNETS program"), Ms. Keith Brown also stated that she wanted the candidate to know that "while you're not supervising the directors directly, the State has a Board of Education rule and GNETS have to abide by that rule."  Deposition of Clara Keith 85:9-86:6.

120.  The GNETS Program Manager and Specialist are not there for day-to-day implementation of the program. Deposition of Vickie Cleveland at 169:18-22.

**RESPONSE:** Denied.  The State mischaracterizes the cited evidence. Ms. Cleveland was asked the following question: "What steps are taken by GaDOE if a regional GNETS program is not complying with the Board rule?"  Deposition of Vickie Cleveland 169:12-14.  The question was not directed specifically at whether the GNETS Program Manager and Specialist are present for day-to-day implementation of the program. Further, in response to this question, Ms. Cleveland responded: "I have not – I'm trying to think. I cannot think of any examples of where I have

seen noncompliance with the Board rule.  I don't – again, we're not there for *every* day-to-day implementation of the program, but for what I do look at, I have not seen any noncompliance that I can recall specific to the Board rule." Deposition of Vickie Cleveland 169:15-22 (emphasis added). Ms. Cleveland only disavows that she is not present for "every" aspect of the day-to-day implementation of the program, not that she is never involved with day-to-day implementation of the program.  Finally, the record evidence offers numerous examples where the GNETS Program Manager and Program Specialist have been involved in matters related to the day-to-day implementation of the program.  *See, e.g.*, ECF No. 395, Exs. 67-72; Deposition of Lisa Futch 118:10-122:17, 241:17-245:6, 245:25-248:23; Deposition of Haley Livingston 233:22-239:22; *see also* Exs. 73-86; Deposition of Whitney Braddock 116:11-12, 116:21, 117:13-118:9; Deposition of Samuel Clemons 220:19-225:20; Deposition of Brooke Cole 33:6-11, 34:5-21, 108:3-12, 108:21-111:11, 115:14-117:5, 120:11-121:19; Deposition of Derrick Gilchrist 58:16-59:4, 59:23-64:15, 209:3-17, 210:1-211:14; Deposition of Celest Ngeve 231:11-233:25, 247:24-248:17; Deposition of Lakesha Stevenson Dep. 175:23-176:10, 177:16-180:17; Deposition of Patricia Wolf 213:21-215:20, 216:2-217:15.

121. They do not provide consultation regarding improvement to the GNETS Programs. Deposition of Lakesha Stevenson at 48:23-49:1.

**RESPONSE:** Denied. The cited testimony is incomplete in that it comes from Ms. Stevenson's testimony about her job responsibilities related to GaDOE's consultation to regional GNETS programs to "improve the GNETS Strategic Plan." Ex. 421, Deposition of Lakesha Stevenson 46:10-23, 47:19-49:1. However, the strategic plan itself states that regional GNETS programs and GaDOE also use the document "to determine the need for professional learning and resources to drive improvement," which could reasonably be understood as improvement to the program. *See* Ex. 18 at GA00362009. Further, in several instances, statewide GNETS personnel have provided consultation and direction to the regional GNETS programs regarding ways that they can improve their program operations. *See, e.g.*, Exs. 67-73; Deposition of Lisa Futch 241:17-245:6, 245:25-248:23; Deposition of Haley Livingston 233:22239:22; *see also* Exs. 73-86; Deposition of Whitney Braddock 116:11-12, 116:21, 117:13-118:9; Deposition of Samuel Clemons 220:19-225:20; Deposition of Brooke Cole 33:6-11, 34:5-21, 108:3-12, 108:21-111:11, 115:14-117:5, 120:11-121:19; Deposition of Lisa Futch 118:10-122:17; Deposition of Derrick Gilchrist 58:16-59:4, 59:23-64:15, 209:3-17,

210:1-211:14; Deposition of Celest Ngeve 231:11-233:25, 247:24-248:17; Deposition of Lakesha Stevenson 175:23-176:10, 177:16-180:17; Deposition of Patricia Wolf 213:21-215:20, 216:2-217:15.

122. Nor do they provide recommendations regarding appropriateness of GNETS Programs' therapeutic interventions or classroom instruction. Deposition of Lakesha Stevenson at 113:2-5; 112:2-5.

**RESPONSE:** Denied. The statement mischaracterizes the cited evidence. The GNETS Program Manager provides recommendations to regional GNETS Programs regarding matters related to the appropriateness of therapeutic interventions and classroom instruction. *See, e.g.*, Exs. 77, 81-83, Deposition of Lisa Futch 241:17-245:8, 245:25-248:23; Deposition of Brooke Cole 33:6-34:21, 108:3-12, 108:21-111:11, 115:14-121:19.

123. They do not provide recommended changes or feedback on reintegration data because the decisions are local and the Program Manager cannot make decisions or recommendations for what IEP teams are going to recommend for their students. Deposition of Vickie Cleveland at 136:12-137:14.

**RESPONSE:** Denied. The statement mischaracterizes the cited evidence. Cleveland testified that she reviews the regional GNETS programs' reintegration data as part of their grant application submissions and discusses the data with GNETS Directors during their strategic plan reviews. Deposition of Vickie Cleveland 133:21-136:5. Although

– 82 –

Cleveland testified that she has not recommended changes specific to the student reintegration data, she expressly states that she provides feedback to the GNETS Directors regarding this data.  Deposition of Vickie Cleveland 136:12-137:14.

124.  They do not look at compliance with Functional Behavior Assessment (FBA) or Behavior Improvement Plan (BIP) requirements. Deposition of Vickie Cleveland at 172:18-25.

**RESPONSE:**  Denied.  As part of the IEP File Review process in or around November 2020, the State created a GaDOE Student Information Checklist that required GNETS Directors to submit information to GaDOE about individual GNETS students, including whether the student has an FBA or BIP prior to entering GNETS and their most current FBA and BIP dates.  Ex. 387; Deposition of Vickie Cleveland 194:3-20; 198:4-203:22.  In addition, the State oversees the implementation of the Strategic Plan, which includes a "Behavioral Support and Therapeutic Services" component that requires, among other things, that GNETS Directors implement interventions and practices that include the use of FBAs and BIPs.  *See* ECF No. 395, Ex. 18 at GA00362012.

## X.    Additional Material Facts Regarding GNETS Funding

125.  LEAs who choose to apply for and receive GNETS grants are given broad

discretion on where they can provide services, ranging from fully integrated to wholly separate settings. Ga. Comp. R. & Regs. 160-4-7-.15(4)(c); Deposition of Shaun Owen at 155:13–20; Deposition of Vickie Cleveland at 114:11–14.

**RESPONSE:**  Denied as incomplete.  The GNETS Program funding formula does not include, as a factor in determining funding, the number of students for whom a regional GNETS program provides consultative services in the general education setting—that is, services directly to a student or that student's teacher or paraprofessional in the general education setting.  *See* Deposition of Cassandra Holifield 277:9-281:9; Deposition of Whitney Braddock 69:2-12.  Regional GNETS programs' failure to receive funding for GNETS services provided in general education environments (i.e., consultative services) presents numerous difficulties, including a lack of funds to ensure regional GNETS programs have enough staff both to serve the students with significant needs in GNETS environments and to push into the general education environment to deliver consultative services, and thus influences regional programs' decision regarding where to offer services.  *See* GA00347596; Deposition of Cassandra Holifield 277:9-281:9.

126.  The State must receive approval from the United States Department of Education for its use of IDEA discretionary funds on the GNETS Program.

30(b)(6) Deposition of Rusk Roam at 28:12-29:15; 30:15-31:5. See also,
July 1, 2023 letter from United States Department of Education to Richard
Woods "approv[ing] Georgia's application for Federal fiscal year (FFY)
2023 funds under Part B of the Individuals with Disabilities Education Act
(IDEA Part B)" and explaining the bases of the approval. The letter is
attached hereto as **Exhibit 1**.

**RESPONSE:** Objection.  The cited evidence does not support the fact
asserted.  Although Rusk Roam testified that "the State has to submit an
application to US [Department of] Ed[ucation], and in this application I
believe it details out how we will spend those discretionary funds," he later
acknowledged "I do not take part in the application process."  30(b)(6)
Deposition of Rusk Roam at 28:12-29:6.  Nowhere does Mr. Roam testify
that the State must receive approval from the United States Department of
Education for its use of discretionary IDEA funds *on the GNETS Program*.
*See generally id.* at 28:12-29:15; 30:15-31:5.  Similarly, the letter from the
United States Department of Education approving Georgia's FY 2023
application for Part B IDEA funds does not mention the GNETS Program,
nor does it contain a copy of the State's application or any other information
sufficient to determine whether the application specifically mentions the
GNETS Program.  *See* Def. Statement of Additional Material Facts Ex. 1.

127.  Indeed, the federal Secretary of Education is statutorily charged with

"monitor[ing]" a state's use of IDEA funds. 20 U.S.C. § 1416(a)(1).

**RESPONSE:** Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).

128.  LEAs help fund the GNETS Program. See Plaintiff's Ex. 91 at GA00054567.002.

**RESPONSE:** Denied to the extent the State asserts that all LEAs help fund the GNETS Program.  One GNETS director testified, for example, that from approximately 2010 to 2022, her regional GNETS program had not received any local funds to support staff positions. *See* GA00794101; Deposition of Patricia Wolf Dep. 133:1-11, 134:13-137:17.

129.  In addition, local funds are contributed from LEAs in the form of in-kind services. Deposition of Derrick Gilchrist at 255:6-256:3; Deposition of Lisa Futch at 237:12-238:20.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of summary judgment.

130.  Many staff positions are funded by the county. Deposition of Talithia Newsome at 115:16-117:2; 118:20-22; 123:6-127:7; Deposition of Cassandra Holifield at 55:8-11; 133:21-23.

**RESPONSE:**  Denied.  The cited evidence does not support the fact asserted.

Ms. Newsome testified that the LEA "serves as the flowthrough" for position

funding (Deposition of Talithia Newsome 117:2), and even assuming the

LEAs fund the positions identified, many of the service providers are not

"staff" but rather provide in-kind services such as nursing, training, or IT

support.  Dr. Holifield's testimony as cited does not support what they cite it

for.  The States cites it to suggest that that there were "probably around a

hundred, 150"  "teachers and paras" within the GNETS Program funded by

LEAs.  Deposition of Cassandra Holifield at 55:8-11.  However, this cannot

be true as just prior to this statement, Dr. Holifield testified that there "were

probably about 90" staff members on payroll at North Metro regional GNETS

Program. The second passage cited from Dr. Holifield's deposition does not

involve a discussion of personnel or funding at all.  Other directors testified

that few, if any, of their staff were funded by the LEAs they serve.  *E.g.*,

Deposition of Whitney Braddock 83:4-24, 204:25-205:10 (listing the subset

of LEAs that contribute funds to offset costs for a few staff members).

131.    GNETS Programs must get budget approval from their fiscal agents.

Deposition of Cassandra Holifield at 105:24-106:6.

**RESPONSE:**  Denied as incomplete to the extent the State suggests that

fiscal agents and regional GNETS programs have exclusive control over how

to spend the GNETS grant funds.  Indeed, Dr. Holifield further testified that

regional GNETS program budgets must get reviewed and approved by State

personnel at GaDOE.  Deposition of Cassandra Holifield 105:24-106:18.  In

addition, some expenditures require approval by the State even after the funds

have been turned over to the fiscal agent.  *See, e.g.*, Deposition of Whitney

Braddock 25:25-26:11 (certain program purchases need approval through

GaDOE); Deposition of Amber McCollum 206:20-209:7 (State denied

regional GNETS program and LEA authority to use program funds to make

purchase designed to help get GNETS students into the community).

132.  Some RESAs prepare and handle their respective GNETS Programs'

budgets. See, e.g., Deposition of Haley Livingston at 118:9-10; 199:25-

200:4; 229:12-18 (explaining Harrell Learning Center's RESA prepares its budget).

**RESPONSE:** Undisputed that at least one regional GNETS program director testified that someone at the RESA that serves as the program's fiscal agent handles the program's budget. The Court may consider this evidence for purposes of the summary judgment motion.

133. The fiscal agent is responsible for the fiscal management and budgeting of GNETS funding. Ga Comp. R. & Regs. 160-4-7-.15(1)(b); <u>see, e.g.</u>, Deposition of Patricia Wolf at 61:17-20 (role of GNETS of Oconee's fiscal agent is to provide oversight in terms of budgets, and fiscal and personnel issues.)

**RESPONSE:** Denied as incomplete. Regional GNETS programs must also submit their program budgets to GaDOE and have those budgets approved by GaDOE. Ga Comp. R. & Regs. 160-4-7-.15(5)(a) (GNETS Rule charges SEA with approving program budgets); *see also* Ex. 1, Def. Resp. to RFA No. 25; Deposition of Cassandra Holifield 104:10-106:18; Deposition of Amber McCollum 107:4-109:8; 214:9-15.

134. GaDOE is a flowthrough agency for state and federal funds to the fiscal agent, either the LEA or RESA as the case may be. Deposition of Shaun Owen at 154:22-23.

**RESPONSE:** Denied as incomplete. As an initial matter, it is unclear

what is meant by the term "flowthrough agency" and what significance
that term has with respect to the United States' claims.  The cited
sentence has been plucked from a more fulsome response to a question
asking the Deputy Superintendent of Federal Programs for the Georgia
Department of Education to identify any part of the GNETS Program
that was being done effectively, in accordance with the GNETS Rule.
Even in stating that "it's just very difficult to answer your question"
and suggesting that the department does not evaluate the effectiveness
of the GNETS Program, Ms. Owen testified that the Department has
"end-of-the-year data regarding student achievement" and that there are
"certain components that GNETS have to fulfill relative to the grant."
Deposition of Shaun Owen 154:7-155:20.

135. The RESA/LEA is a flowthrough for state and federal funds to the individual
GNETS Programs. Deposition of Haley Livingston at 75:18-25; Deposition
of Cassandra Holifield at 49:18-50:4; 50:11-12.

**RESPONSE:**  Denied.  As an initial matter, it is unclear what is meant by
the term "flowthrough" and what significance that term has with respect to
the United States' claims.  It is undisputed that LEAs and RESAs serve as
fiscal agents for the regional GNETS programs.  *See* Livingston Dep. at
75:18-25 ("our Georgia and federal funds come through [the RESA]");
Deposition of Cassandra Holifield 49:20-50:4 (fiscal agent "oversee[s] all of

our funding that flows from the State and the federal level" and "maintain[s] all of the funding and make sure that it's spent the way it's supposed to be spent").

136. The fiscal agent receives funds from GaDOE and has the responsibility for appropriately accounting for the expenditure of those funds. Deposition of Clara Keith Brown at 31:2-6.

**RESPONSE:** Denied as incomplete. Regional GNETS programs must also submit their program budgets to GaDOE and have those budgets approved by GaDOE. GNETS Rule at ¶ (5)(a) (GNETS Rule charges SEA with approving program budgets); *see also* Ex. 1, Def. Resp. to RFA No. 25; Deposition of Cassandra Holifield 104:10-106:18; Deposition of Amber McCollum 107:4-109:8; 214:9-15.

137. The funding for GNETS is held for reimbursement after the GNETS programs have made certain expenditures. Deposition of Geronald Bell at 34:19-22.

**RESPONSE:** Denied as incomplete to the extent the State suggests that fiscal agents and regional GNETS programs have exclusive control over how to spend the GNETS grant funds. While it is undisputed that the fiscal agents manage the grant funds for the regional GNETS programs, each regional GNETS program must have its budget approved by the State. GNETS Rule at ¶ (5)(a) (GNETS Rule charges SEA with

– 91 –

approving program budgets); *see also* Ex. 1, Def. Resp. to RFA No. 25;
Deposition of Cassandra Holifield 104:10-106:18; Deposition of Amber
McCollum 107:4-109:8; 214:9-15.  Some expenditures require approval
by the State even after the funds have been turned over to the fiscal
agent.  *See*, *e.g.*, Deposition of Whitney Braddock Dep. at 25:25-26:11
(certain program purchases need approval through GaDOE); Deposition
of Amber McCollum 206:20-209:7 (State denied regional GNETS
program and LEA authority to use program funds to make purchase
designed to help get GNETS students into the community).

138.   The GNETS Program submits requests or purchase orders to the fiscal agent for approval and to receive payment. Deposition of Cassandra Holifield at 50:16-51:13.

**RESPONSE:**  Denied as incomplete to the extent the State suggests that fiscal agents and regional GNETS programs have exclusive control over how to spend the GNETS grant funds.  While it is undisputed that the fiscal agents manage the grant funds for the regional GNETS programs, each regional GNETS program must have its budget approved by the State. GNETS Rule at ¶ (5)(a) (GNETS Rule charges SEA with approving program budgets); *see also* Ex. 1, Def. Resp. to RFA No. 25; Deposition of Cassandra Holifield 104:10-106:18; McCollum Dep. 107:4-109:8; 214:9-15.  Some expenditures require approval by the State even after the funds have been turned over to the fiscal agent.  *See, e.g.*, Braddock Dep. at 25:25-26:11 (certain program purchases need approval through GaDOE); McCollum Dep. at 206:20-209:7 (State denied regional GNETS program and LEA authority to use program funds to make purchase designed to help get GNETS students into the community).

139.   In Fiscal Year 2024, State funds represented 82% of the total appropriation of $65,427,745. Defendant's Statement of Undisputed Material Facts, Ex. S at 105–06.

**RESPONSE:**  Undisputed that page 108 of Ex. S shows that the amount

listed as "Total State Funds" for the GNETS Program in Fiscal Year 2024

constitutes 82.7% of the amount listed as "Total Public Funds" for the

GNETS Program in Fiscal Year 2024.

140. GNETS grant funding is driven by enrollment. Deposition of Vickie

Cleveland at 266:14-17.

**RESPONSE:** Denied as incomplete.  GNETS grant funding, in

accordance with the State's GNETS funding formula, is driven by

the weighted student count and T&E earnings.  *E.g.*, Deposition of

Geronald Bell 140:6-141:13.

141. The GNETS population is consistently trending down. Deposition of Vickie

Cleveland at 88:13-19.

**RESPONSE:** Denied as incomplete.  While it is undisputed that total

number of students in the GNETS Program has declined in the period

between school year 2015 and school year 2022, *See* the number of

students in some regional GNETS programs has increased.  McCart Report

at 14, and Figure B.

142. The GNETS grant has accordingly trended down each year. See generally,

Defendant's Statement of Undisputed Material Facts, Exhibits K through T.

**RESPONSE:** Denied.  The cited evidence does not support the fact asserted.

The State portion of the initial appropriations for the GNETS Program

increased between at least FY2016 and FY2017, between FY2021 and

– 94 –

FY2022, and between FY2022 and FY2023.  In addition, there were increases between the initial and amended appropriations for at least FY2016, FY2018, FY2021, and FY2022.  Last, there were increases in the portions of the GNETS Program funding that came from the federal discretionary IDEA funding from FY2015 to FY2016, FY2017 to FY2018, and FY2019 to FY2020.  As a result, there were increases in total appropriations for the GNETS Program from FY2015 to FY2016, from FY2016 to FY2017, from FY2017 to FY2018, from FY2019 to FY2020, from FY2021 to FY2022, and from FY2022 to FY2023.  *See* United States Statement of Material Facts 117. *citing* H.B. 76, 153rd Gen. Assemb., Reg. Sess. (see p. 93 at 134.100) (Ga. 2015); H.B. 751, 153rd Gen. Assemb., Reg. Sess. (see p. 54 at 24.9) (Ga. 2016); H.B. 44, 154th Gen. Assemb., Reg. Sess. (see p. 96 at 142.100) (Ga. 2017); H.B. 684, 154th Gen. Assemb., Reg. Sess. (see p. 50 at 24.10) (Ga. 2018); H.B. 31, 155th Gen. Assemb., Reg. Sess. (see p. 100 at 146.100) (Ga. 2019); H.B. 793, 155th Gen. Assemb., Reg. Sess. (see p. 63 at 24.9) (Ga. 2020); H.B. 81, 156th Gen. Assemb., Reg. Sess. (see p. 80 at 142.100) (Ga. 2021); H.B. 911, 156th Gen. Assemb., Reg. Sess. (see p. 65 at 24.8) (Ga. 2022); H.B. 19, 157th Gen. Assemb., Reg. Sess. (see p. 105 at 151.100) (Ga. 2023).

143.   Grants are not mandatory. There is no evidence that LEAs and RESAs are

       required to apply for the GNETS grant.

       **RESPONSE:**  Undisputed.  The Court may consider this evidence for

       purposes of the summary judgment motion.

144.   The grant application requirements and assurances are the same for all

       programs. Deposition of Vickie Cleveland at 250:24-251:6; 251:12-14.

       **RESPONSE:**  Undisputed.  The Court may consider this evidence for

       purposes of the summary judgment motion.

145.   The grant does not include language that provides for termination if

       noncompliance by the GNETS Program is found. Deposition of Vickie

       Cleveland at 255:16-21.

       **RESPONSE:**  Denied in part.  When asked whether the grant

       included language that provides for termination of funding on the

       grounds of noncompliance, Cleveland testified "not that I'm aware

       of," but did not conclusively state "no."  Deposition of Vickie

       Cleveland 255:16-21.  However, according to a former member of the

       State Board of Education, the State has the authority—and has

       exercised its authority—to put a pause on regional GNETS programs'

       funding when those programs fail to comply with their

       responsibilities.  Deposition of Larry Winter 166:5-168:8.

146.    Scores such as the GAA and GAA 2.0 do not impact funding. Deposition of

Vickie Cleveland at 266:14-17.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

147.    The fiscal agent and regional GNETS Program enter into assurances for the

therapeutic services grant. See, Plaintiff's Ex. 120; Deposition of Lakesha

Stevenson at 145:4-12; 144:17-20.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for

purposes of the motion for summary judgment.

148.    There are no assurances between the GNETS Programs and GaDOE.

Deposition of Lakesha Stevenson at 145:13-15.

**RESPONSE:**  Denied.  Ms. Stevenson acknowledged that there are

assurances between the regional GNETS programs and GaDOE

built into the grant application.  Deposition of Lakesha Stevenson

145:13-20.  In addition, the regional GNETS programs provide

assurances to GaDOE in connection with additional grant funds for

therapeutic services.  Exs. 118, 120, 126-128; Deposition of Brooke

Cole 278:7-280:14; Deposition of Clara Keith 140:8-143:5, 153:7-

155:6; Deposition of Jacqueline Neal 80:6-83:8; Deposition of

Patricia Wolf 141:6-144:2, 144:19-145:19, 147:13-149:2.  Finally,

Letters of Assurance are also included when regional GNETS

programs seek approval from GaDOE to move to another site. Ex.

105; Deposition of Michael Rowland 111:21-116:9.

149. Grants to GNETS Programs are awarded to the fiscal agents as the Grant

Recipient, not the GNETS Programs. See Plaintiff's Exs. 114-116.

**RESPONSE:** Undisputed. The Court may consider this evidence for

purposes of summary judgment.

150. Eleven programs receive the need-based therapeutic grant. Deposition of

Vickie Cleveland at 105:3-5.

**RESPONSE:** Denied as incomplete. The number of programs

receiving the reimbursement from their fiscal agent for therapeutic

services through the therapeutic grant has varied by year. For example,

in FY20 (8/1/19-8/31/20), the funding went to the fiscal agent for 11

GNETS programs. Ex. 116. However, in FY18, funding went to the

fiscal agents for 10 programs. *See* Ex. 124

151. The LEAs are reimbursed by the therapeutic services subgrant for funds the

LEAs used on the social worker position. Plaintiff's Ex. 116.

**RESPONSE:** Denied as incomplete.

152. The therapeutic services grant is a subgrant. Deposition of Vickie Cleveland

at 150:8-11.

**RESPONSE:** Denied. Through their fiscal agents, regional GNETS

programs that receive grant funds for such therapeutic services must

provide the State with various assurances, including that they will procure the therapeutic staff providing such services through a staffing agency approved by GaDOE. Exs. 118, 120, 126; Deposition of Clara Keith 140:8-143:5, 153:7-155:6; Deposition of Jacqueline Neal 80:6-83:8.

153. The fiscal agent decides to enter into an agreement with a provider, reviews the provider agreement, and "make[s] any adjustments that [the fiscal agent] deemed (sic) to be necessary. Including statements related to the contractors (sic) liability for this service." Plaintiff's Ex. 118.

**RESPONSE:** Denied as inaccurate and incomplete. The cited evidence states that the fiscal agent may "decide[] to enter into an agreement with a *GaDOE approved* provider." Plaintiff's Ex. 118 (emphasis added). "The fiscal agent may receive a reimbursement from GaDOE for the provision of clinical therapeutic related services only when entering into an agreement with a GaDOE approved provider." *Id.*

154.  The GNETS Program Specialist completes a year end summary of social

worker logs submitted for the therapeutic services grant, including things

such as the average number of students who receive support and the most

common types of support received. Deposition of Lakesha Stevenson at

70:2-17.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

155.  Neither she nor the GNETS Program Manager take any action or make any

suggestions based on the summary. Deposition of Lakesha Stevenson at

70:9-17.

**RESPONSE:**  Denied as incomplete.  Vickie Cleveland testified that she

may have "follow up conversations" with the regional GNETS program if

questions arise related to the logs.  *See* Deposition of Vickie Cleveland

107:22-108:25.  However, the documents utilized by the State during the

grant approval process require that monitoring by GaDOE take place

following the dispensation of grant funding; this step is required with or

without regard to Stevenson's summary. *See* Deposition of Larry Winter

175:23-177:3.

## XI.  Additional Material Facts Regarding Facility Conditions Assessment

156.  Code Section 20-2-16(c) provides that "the Board is authorized to inspect

any public school building and, if such building is found to be dangerous to the lives or health of the pupils, to notify the county or independent board of education in writing of the unsafe or unhealthful conditions revealed, including in the notification specific suggestions for the correction of such unsafe or unhealthful conditions."

**RESPONSE:** Denied as inaccurate. Georgia Code Section 20-2-16(c) provides that "the state board is authorized to inspect any public school building and, if such building is found to be dangerous to the lives or health of the pupils, to notify the county or independent board of education in writing of the unsafe or unhealthful conditions revealed, including in the notification specific suggestions for the correction of such unsafe or unhealthful conditions."

157. The 2016 letter from the State Board of Education sent to the county superintendents for the nine impacted facilities described them as "unsafe and unhealthful." Plaintiff's Ex. 100 at GA01486055.

**RESPONSE:** Denied as inaccurate and incomplete. The cited letter is written to the chairman of a county board of education, not a county superintendent. *See* Plaintiff's Ex. 100 at GA01486055. The letter describes one of the nine impacted facilities as "a facility where children cannot continue to be served." Plaintiff's Ex. 100 at GA01486055. It subsequently notes that the State Board of Education has "found unsafe

– 101

and unhealthful conditions" at the facility.  *Id.*

158.    The State Board of Education wrote to the impacted county superintendents

that it was "suggesting that you remedy this deficiency by collaborating with

key stakeholders" to relocate children to a different facility. Plaintiff's Ex. 100 at GA01486055.

**RESPONSE:** Denied as inaccurate and incomplete. The cited letter is written to the chairman of a county board of education, not a county superintendent. In the letter, the State Board of Education writes that it is "suggesting that you remedy this deficiency by collaborating with key stakeholders, including your local school superintendent, GNETS director, RESA director (if appropriate), and your local board attorney." Plaintiff's Ex. 100 at GA01486055. In the letter's immediately preceding paragraph, the State Board of education writes that the facility at issue "has been identified as a facility where children cannot continue to be served. Therefore, students receiving services at this facility must immediately be transitioned out of this site before the beginning of the school year." *Id.*

Dated: November 27, 2023

RYAN K. BUCHANAN
*United States Attorney*
Northern District of Georgia

*/s/ Aileen Bell Hughes*
AILEEN BELL HUGHES
GA Bar Number: 375505
Assistant United States Attorney
United States Department of Justice
Richard B. Russell Federal Building
75 Ted Turner Dr. SW, Suite 600
Atlanta, GA 30303-3309
(404) 581.6000
aileen.bell.hughes@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General

SHAHEENA A. SIMONS
Chief

KELLY GARDNER WOMACK
Deputy Chief

ANDREA HAMILTON
WATSON
Special Litigation Counsel

CRYSTAL ADAMS
CLAIRE D. CHEVRIER
FRANCES S. COHEN
MATTHEW GILLESPIE
PATRICK HOLKINS
VICTORIA M. LILL
JESSICA POLANSKY
LAURA C. TAYLOE
MICHELLE L. TUCKER
Trial Attorneys
Educational Opportunities Section

*/s/ Kelly Gardner Womack*
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
kelly.gardner@usdoj.gov

*Attorneys for the United States*

– 104

## **L.R. 7.1(D) CERTIFICATION**

I certify that this Statement of Undisputed Material Facts has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C). Specifically, this brief has been prepared using 14-pt Times New Roman Font.

*/s/ Kelly Gardner Womack*
KELLY GARDNER WOMACK

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day filed the foregoing document with the

Clerk of Court using the CM/ECF system, which automatically sent counsel of

record e-mail notification of such filing.

This 27th day of November, 2023.


/s/ *Kelly Gardner Womack*
KELLY GARDNER WOMACK