# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:16-cv-03088- |
| | ) | ELR |
| STATE OF GEORGIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF UNITED STATES' OPPOSITION TO DEFENDANT STATE OF GEORGIA'S MOTION FOR SUMMARY JUDGMENT

Plaintiff United States of America ("United States") respectfully submits this Opposition to Defendant State of Georgia's ("State") Motion for Summary Judgment ("Motion" or "Def. Mot.") and its Memorandum in Support ("Def. Mem.") (ECF Nos. 429, 429-1).

## INTRODUCTION

Reviving legal arguments that this Court has already considered and rejected at the pleadings stage, the State asserts that the United States lacks Article III standing on several grounds.[1]   These arguments reflect a fundamental misunderstanding of the United States' authority to bring this action on behalf of the

---

[1] *See* ECF No. 61 at 21-23; ECF No. 94 at 7-13.

thousands of students with behavior-related disabilities in—or at risk of placement in—the State's Georgia Network for Educational and Therapeutic Support Program ("GNETS Program" or "GNETS") and should be rejected.

The State's remaining arguments challenging the viability of the "unnecessary segregation" and "unequal educational opportunities" claims that the United States presses under Title II ("Title II") of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and its implementing regulation, 28 C.F.R. § 35.130, should likewise fail. These arguments ignore the factual record and in many instances misconstrue the applicable law. For these reasons, the Court should deny the State's Motion in its entirety, and this case should proceed to trial.

## LEGAL BACKGROUND

Under Title II of the ADA and its implementing regulation, states and other public entities are prohibited from discriminating against students with disabilities by "exclud[ing] [them] from participation in, or [denying] [them] the benefits of" the State's education services. 42 U.S.C. § 12132; 28 C.F.R. § 35.101. In *Olmstead v. L.C.*, the Supreme Court ruled that the unjustified segregation of individuals with disabilities by public entities constitutes unlawful discrimination under Title II. *See* 527 U.S. 581, 582 (1999). Under *Olmstead*, public entities are required to provide community-based services when: (a) such services are appropriate to the needs of the individual; (b) the individuals affected do not

oppose community-based treatment; and (c) community-based services "can be reasonably accommodated, taking into account the resources available to the entity and the needs of other persons with disabilities." *Id.* at 607; *see J.S., III v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979 (11th Cir. 2017) (applying *Olmstead* in the education context). This mandate applies to individuals who are at serious risk of unnecessary segregation. *See Steimel v. Wernert*, 823 F.3d 902, 913-14 (7th Cir. 2016).

## **ARGUMENT**

## I.    **THE UNITED STATES HAS CONSTITUTIONAL STANDING TO ASSERT ITS CLAIM ALLEGING TITLE II VIOLATIONS.**

To establish Article III standing,[2] the United States must show "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). As this Court has already ruled,[3] the United States has met this burden. This Court should therefore deny the State's request for summary judgment on standing grounds.

---

[2] As the State acknowledges, the question of statutory standing was decided in favor of the United States by the Eleventh Circuit. *See* Def. Mem. at 10, n.12.

[3] This Court previously held that the United States had Article III standing to pursue its claims after rejecting the State's arguments on traceability and redressability. ECF No. 94 at 13. The State now challenges the United States' standing on all three prongs.

## A. The United States has Established an Injury-in-Fact.

The State wrongly asserts that the United States cannot make the requisite showing of an injury-in-fact because it has "failed to produce evidence that any individual student has suffered a concrete injury-in-fact." Def. Mem. at 11. The State further asserts that neither students in GNETS nor students at serious risk of placement in GNETS have suffered injuries that are "real" and "concrete," as opposed to "abstract." Def. Mem. at 12. These assertions are meritless.

This suit was brought not by individual students, but by the United States, which has suffered an "injury to its sovereignty arising from violation of its laws" sufficient to satisfy Article III standards. *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000); *see also, e.g.*, *United States v. Raines*, 362 U.S. 17, 27 (1960). The United States therefore need not show that affected students have *also* suffered an injury in fact.

Even if the United States *were* required to establish that the affected children here suffered an Article III injury, the State conflates its broader argument that the United States has failed to present individualized evidence—addressed below, *see infra* at II.B.2—with the standard for establishing Article III standing.[4]

---

[4] The State's reliance on inapposite cases—for example, *qui tam* actions and actions involving receivers—to assert that DOJ's "standing is dependent on the standing of the individual whom they are representing" is unavailing. *See* Def. Mem. 12 n.14, citing *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 768 (2000) (a *qui tam* action "present[ing] the question whether a private

As the State acknowledges at the outset, the United States has authority under Title II to sue on behalf of aggrieved students. *See* Def. Mem. at 11. While the United States is not required to make individualized findings as to the thousands of students in the GNETS Program,[5] it has, in fact, developed evidence of concrete injuries experienced by students—both individually and collectively—as a result of the State's actions. *See infra* at 14-19.[6]

Although the State contends that the United States cannot satisfy the requirements for standing because the at-risk population is "unidentifiable" and

---

individual may bring suit in federal court on behalf of the United States against a State (or state agency) under the False Claims Act"); *Reneker v. Offill*, No. CIV.A.3:08-CV-1294-D, 2009 WL 3365616, at *2-*3 (N.D. Tex. Oct. 20, 2009) (receiver can only bring suit on behalf of entities it represents); *Clearview Imaging, LLC v. Progressive Am. Ins. Co.*, No. 8:19-CV-1299-T-35CPT, 2020 WL 11563551, at *1-*2 (M.D. Fla. Sept. 23, 2020) (assignee instructed to file brief addressing standing issue); *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 191-97 (5th Cir. 2015) (healthcare providers may sue derivatively to enforce ERISA plan beneficiary's claim). The State offers no analysis or argument beyond the asserted similarity.

[5] The State also takes issue with the fact that the United States "has not cited to any individual student who suffered discrimination." Def. Mem. at 12 (citing *United States v. Florida (Florida III)*, 2023 WL 4546188, at *40 (S.D. Fla. July 14, 2023)). Notably, *Florida III* sets forth the court's ruling on the evidence presented *at trial*, and the State has offered no caselaw in support of a requirement that such evidence must be presented at the summary judgment stage.

[6] The State's assertion that claims cannot be "abstract" poses no obstacle in this case. *See* Def. Mem. at 12, *citing Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020) (relating to claims that debt collectors' letters were misleading, in the absence of a claim that anyone was misled). Unlike the theoretical harm from receiving a potentially misleading letter, the harms to the thousands of students in the GNETS Program currently being segregated and denied equal educational opportunities are very much "real" and "concrete," "not abstract." *See id*.

"abstract," Def. Mem. at 12-13, this contention is unfounded.  Indeed, the United

States's expert, Dr. Robert Putnam, has identified a number of behavioral and

diagnostic characteristics that in his experience and expert opinion create a serious

risk of placement in GNETS.  *See* Expert Report of Dr. Putnam at 14.  That the State

has not attempted to identify students who are at risk of being placed in GNETS does

not render those students unknowable.  The State has data about school discipline,

the provision of Apex and Medicaid services, and the children sent to GNETS—all

of which provide a basis for identifying the at-risk population.  In fact, Dr. Putnam's

analyses of the services that students received in the 180- and 365-days prior to their

admission to GNETS came from the State's own data set.  *Id*. at Part VII.  The State

is more than able to utilize that data to identify the characteristics of students sent to

GNETS and their risk factors.[7]

---

[7] The State incorrectly asserts that the United States does not have standing to bring
claims on behalf of children at risk of entering GNETS "because it has not produced
any evidence identifying any children who are at 'certainly impending' risk of being
referred for GNETS services . . . ."  Def. Mem. at 13 n.15 (quoting *Clapper v.
Amnesty Int'l USA*, 568 U.S. 398 (2013)).  Even assuming the necessity of showing
Article III injury to the at-risk children, however, the injury-in-fact is the denial of
necessary behavioral health services resulting in a serious risk of unnecessary
segregation.  The United States' at-risk claim thus satisfies all of the requirements
for standing, including an injury-in-fact, because it alleges (1) an actual injury from
a present denial of services, (2) caused by the State, (3) that would be redressed if
the State's actions were enjoined. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555,
560 (1992) (to satisfy the "injury in fact" requirement for standing, a plaintiff must
identify an injury that is "actual or imminent, not conjectural or hypothetical").

**B. The Injury to Students with Disabilities Alleged by the United States and Supported by Evidence Is Traceable to, and Redressable by, the State of Georgia.**

Whether the injuries to students in the GNETS Program are traceable to, or redressable by, the State (*see* Def. Mem. at 13, citing *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020)) is inextricably linked to the State's control and administration of the GNETS Program—an issue addressed at length in the United States' pending motion for partial summary judgment. *See* ECF Nos. 395, 395-1, 434, 442. For the same reasons the United States has established that the State administers the GNETS Program, *see infra* Section II(A), the United States has also established that the State has the authority to remedy the injuries students with disabilities have suffered as a result of the State's violation. *See* ECF No. 94 at 11-12 (finding the State's reliance on *Jacobson* "misguided" because, in light of the allegations relating to the State's administration of the GNETS Program, "any decision by the Court addressing these acts would be redressable by a judgment against the State").

Although the State contends—yet again—that the harm the United States alleges is "the result of the independent action of some third party not before the court," Def. Mem. at 13 (quoting *Jacobson*, 974 F.3d at 1253),[8] this Court has

---

[8] The State also cites *Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1186 (N.D. Ga. 2022) (citing *Jacobson*, 974 F.3d at 1269), and *Lewis v. Governor of*

already rejected that argument applying the very standard urged by the State: "[T]he Court finds fault with Defendant's characterization that local officials are solely responsible for any discriminatory acts within the administration of the GNETS system." ECF No. 94 at 8. As this Court noted, the allegations in the United States' Complaint support the conclusion that "actions within the State's control, not solely local measures, cause the alleged discrimination." *Id*. at 11.[9]

While the State argues that local education agencies ("LEAs") and Regional Education Service Agencies ("RESAs") are responsible for any discriminatory actions because "LEAs make the decisions about where GNETS funds are spent and where GNETS-funded services are provided," Def. Mem. at 14, its argument is meritless. The State does not, and cannot, rebut the evidence showing that it shapes regional GNETS programs' decisions about where to provide GNETS services and how to spend GNETS funds. *See* Ex. JJ, Bell Dep. 144:18-145:11, 166:23-167:20, 185:20-187:19; Ex. I, Holifield Dep. 277:9-281:9; Ex. Y, McCollum Dep. 139:19-

_____

*Alabama*, 944 F.3d 1287, 1301 (11th Cir. 2019). Nothing in either case compels the conclusion that the harm the United States alleges is independently caused by third parties.

[9] For this reason, the State's reliance on *Bacon v. City of Richmond, Va.*, 475 F.3d 633, 638 (4th Cir. 2007), Def. Mem. at 16 n.26, is unavailing. In *Bacon*, the court ruled that liability could not be imposed on a funding entity with "[n]o operational control over [the relevant] services or activities." 475 F.3d at 640. Contrary to the State's strained reasoning, the fact that the State chooses to dedicate some of its discretionary federal funding to the GNETS Program does not make the U.S. Department of Education liable for the discriminatory use of its funds.

140:13; Ex. J, Braddock Dep. 69:2-8; *see also* ECF No. 442 at 8, 14-15. The State is disingenuous in suggesting that its influence over these decisions is immaterial because no entity is *required* to apply for GNETS funding: "[C]ourts may consider 'arguments "firmly rooted in the basic laws of economics"' to determine the 'likely reaction of third parties.'" *United States v. Florida*, 2023 WL 4546188, at *12 (July 14, 2023) (citations omitted).[10] In practice, few LEAs decline the benefits that flow from the State's funding. As a practical matter they cannot choose between integrated and separate placements offering specialized services, but instead must recommend that students with behavior-related disabilities be referred to the only setting where such services are available: a segregated GNETS placement.[11] For these reasons, the United States has adequately established at the summary judgment stage that its claims are traceable to and redressable by the State.

---

[10] Similarly, the suggestion that an injunction against the State with respect to funding would not remedy the violation because "LEAs are constitutionally authorized to levy taxes for school revenue," Def. Mem. at 16 n.26, ignores reality.

[11] The State's remaining arguments for lack of standing based on *Jacobson* also fail. The State claims that *Jacobson* stands for the proposition that "traceability and redressability are not satisfied where (as here) a state must obtain judicial relief to compel the conduct of local government actors." Def. Mem. at 16, citing *Jacobson*, 974 F.3d at 1253, and O.C.G.A. § 20-2-243. To the extent § 20-2-243 applies outside of the context of quality basic education funding, it merely provides a process for an appeal from a determination made by the State Board of Education. To the extent the State also suggests that the United States is seeking to have the federal courts "rewrite state laws or compel state parties to promulgate a regulation," Def. Mem. at 14 (citing *Jacobson*, 974 F.3d at 1255, 1257, and *Badaracco v. Comm'r*, 464 U.S. 386, 398 (1984)), its suggestion is baseless.

## II.   THE STATE IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE UNITED STATES' *OLMSTEAD* CLAIM.

The State asserts that the United States' *Olmstead* claim fails as a matter of law because the United States cannot establish that the State administers the GNETS Program, cite evidence sufficient to prove the three prima facie elements of an *Olmstead* claim, or defend the viability of the at-risk portion of its *Olmstead* claim. For the reasons that follow, the record reflects a genuine issue of material fact as to each of the elements of the United States' *Olmstead* claim.  The State's request for summary judgment should therefore be denied.

### A.   The Undisputed Evidence Demonstrates that the State of Georgia Administers the GNETS Program.

As discussed at length in the United States' memoranda in support of its Motion for Partial Summary Judgment (ECF Nos. 395-1, 442), the undisputed evidence obtained in discovery shows the absence of any material issue of fact regarding the allegations that this Court found sufficient to demonstrate State control and administration at the pleadings stage.  For the reasons set forth in the United States' Reply, the State's arguments purporting to explain why it does not administer the GNETS Program lack merit and certainly do not establish, as a matter of law, the complete absence of evidence sufficient to support a finding that the State administers the GNETS Program.

## B. **The Evidence Gathered by the United States Raises a Genuine Issue of Material Fact Regarding the Appropriateness of Community Educational Placements.**

As described in detail below, the  United States has adduced substantial evidence demonstrating the appropriateness of community educational placements for students in, or at risk of entering, the GNETS Program.  That evidence is more than sufficient to create issues of material fact precluding summary judgment.

> 1. *The State incorrectly asserts that a treating physician must determine that a student can be placed appropriately in a community educational setting.*

The State asserts that the United States must show a "responsible, treating physician" determined that individual students could be appropriately served in community educational placements.  Def. Mem. at 20 (quotations omitted).  This argument mischaracterizes *Olmstead's* "appropriateness" element and repackages claims that this Court has considered and properly rejected.[12]

Title II's integration mandate does not refer to treating professionals; it simply requires services to be administered "in the most integrated setting appropriate to the needs of" the individual. 28 C.F.R. § 35.130(d).  Nothing in the regulation purports to require evidence from a treating professional.  Nor have courts imposed such

---

[12] The State previously asserted that only a *state* treating physician could make an assessment about the appropriateness of a community placement—an argument that this Court wholly rejected.  *See* ECF No. 53 at 8-9; ECF No. 61 at 14-16.

limits on evidence of appropriateness. *See* Order on Mot. to Dismiss at 15-16 (ECF No. 61) (crediting the United States' experts' findings that "students with behavior-related disabilities who are placed in segregated settings in the GNETS Program would benefit from the general education setting" and holding that the United States met its burden at the pleadings stage); *see also Disability Advoc., Inc. v. Paterson (DAI)*, 653 F. Supp. 2d 184, 258-59 (E.D.N.Y. 2009) ("The court does not read *Olmstead* as creating a requirement that a plaintiff alleging discrimination under the ADA must present evidence that he or she has been assessed by a 'treatment provider' and found eligible to be served in a more integrated setting.")*.*

To the contrary, courts have found that there are multiple ways apart from opinions from treatment professionals to demonstrate those in segregated placements can be appropriately served in community settings. *See e.g., Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 612–13 (7th Cir. 2004) (plaintiff's allegations that he had lived and received services at home for years demonstrated appropriateness); *DAI*, 653 F. Supp. at 245-46 (evidence that individuals with similar disabilities were living and receiving services in integrated settings demonstrated appropriateness), vacated on other grounds sub nom; *see also Z.S. v. Durham Cnty.*, No. 1:21-CV-663, 2022 WL 673649, at *4 (M.D.N.C. Mar. 7, 2022).

The State's emphasis on determinations by a "treating physician" is especially misplaced given the facts of this case. As the State acknowledges, the decision to place students in the GNETS Program is made by an Individualized Education Program ("IEP") Team,[13] not a treating physician. *See* Def. Mem. at 26-28; Ga. Comp. R. & Regs. § 160-4-7-.15(3)(a). Moreover, the GNETS Rule directs that students' IEP Teams determine when they are ready for a less restrictive setting.[14] Ga. Comp. R. & Regs. § 160-4-7-.15(2)(f). It defies logic that only a "treating physician" could decide whether it is appropriate to place a student in a community educational setting, as the State contends, when a team comprised of educators, parents, and a GNETS program official typically makes that determination. The State makes no effort to reconcile its argument with the reality of the GNETS placement process, instead trying to fit a square peg into a round hole.

---

[13] IEP Teams are comprised of parents, teachers, other relevant individuals, and the child where appropriate. 20 U.S.C. § 1414(d)(1)(B). In addition, the GNETS Rule requires that at any IEP Team meeting at which a GNETS Program placement will be considered, "[t]he IEP meeting will include a GNETS director or his/her designee." Ga. Comp. R. & Regs. § 160-4-7-.15(3)(b).

[14] Despite this directive, IEP file reviews and the State's own assessment of IEP file reviews demonstrate and acknowledge that regional GNETS programs often fail to create exit criteria for students and end up retaining students for extended periods of time. *See e.g.,* GA05250459, GA05249762, GA05250869, GA05256666.

> **2. The United States does not need to present evidence of individualized assessments to establish the "appropriateness" element.**

The State next suggests, incorrectly, that to satisfy *Olmstead's* "appropriateness" prong, the United States must provide individualized evidence regarding each student's needs. *See* Def. Mem. at 22-23. The case law makes clear that *Olmstead* plaintiffs bear no such burden.  In *Disability Advocates, Inc. v. Paterson*, the court held that the plaintiff was "not required to show that each of its constituents had been deemed eligible for supported housing by a treatment provider[.]" 653 F. Supp. 2d at 258.  Instead, the court credited "persuasive evidence from a variety of sources" that plaintiff's constituents could receive services in the community.  *Id.* at 259.  That evidence included assessments by plaintiff's experts' that "virtually all" constituents could be served in community settings.  *Id.* at 257-59.  Courts' acceptance of this approach is logical.  Requiring a plaintiff to procure an individualized assessment of each segregated individual—and individuals at serious risk of segregation—to bring a successful *Olmstead* claim would effectively foreclose *Olmstead* relief for large-scale discrimination, shielding the worst offenders from accountability.

Here, the United States has gathered significant evidence of appropriateness through a variety of sources, including but not limited to its experts.[15]  Based on an analysis that included substantial review of student records, extensive site visits, and classroom observations of nearly 1,000 students in GNETS, Dr. Amy McCart concluded that the vast majority of students in the GNETS Program could be served in community educational placements with appropriate therapeutic supports and services.[16]  McCart Dep. 145:6-146:12; McCart Rep. 12, 167.  The Court should disregard the State's attempt to minimize the scope of Dr. McCart's review by

---

[15] This evidence includes documentation from treating physicians, IEPs that memorialize parents' disagreements with the IEP Team decision for their child to enter or remain in the GNETS Program, documentation from parents asserting that their children could and should attend school in community educational placements and from students themselves, due process complaints seeking community educational placements,[15] and evidence that students succeeded in community educational placements once parents successfully demanded the students leave the GNETS Program.  *See*, *e.g.,* US0306845, US0012687 and US0012763, US0011665; GA05202437, GA05199933, GA05200951, GA05199710, GA05200962, US0184588 at at US0184594.

    Evidence produced by the State in discovery further establishes that the State itself believes that entire populations of students—specifically students with intellectual disabilities who are on the Georgia Alternate Assessment track—may be categorically inappropriate for GNETS and better served in community educational placements. *See* GA00338963; Ex. K, Cole Dep. 115:19-119:17.

[16] Dr. McCart also concluded that students outside of Georgia with similar emotional and behavioral disabilities thrive in community educational settings across the country with the appropriate services and supports.  McCart Rep. 159.

suggesting that her opinions are based solely on a paper review of IEPs, which misconstrues the record.[17]

### 3. The GNETS Program is an inappropriate setting in its present form.

Finally, the assessment of whether a community educational placement is appropriate necessarily involves comparisons with, and assumptions about, the segregated setting in which the population is currently being served. The United States has uncovered ample evidence raising concerns about the appropriateness of placement in GNETS Program settings. McCart Rep. at 158. Dr. McCart's report details the gross lack of mental health and therapeutic educational services and supports available to students in the GNETS Program, as well as the many ways in which students with disabilities in the GNETS Program experience inequality

---

[17] While Dr. Putnam did not directly opine on appropriateness, his findings further support the conclusion that many students in, and at serious risk of placement in, the GNETS Program would be appropriately served in general education settings. Dr. Putnam's decades of experience and knowledge of the literature support his opinions that children with behavioral-related disabilities who are at risk of restrictive educational placements can be served, with limited exceptions, in general education schools within their communities, and that there are therapeutic services that can help students remain in more integrated education settings. *See* Putnam Rep. 14. Further, Dr. Putnam reviewed data that enabled him to opine that many students who ultimately were sent to GNETS did not receive Medicaid-reimbursable intensive therapeutic services before they entered GNETS, but they might otherwise have been able to remain in general education settings if provided the appropriate services and supports." Putnam Rep. at 42-43.[17] As with Dr. McCart, the State seeks to exclude Dr. Putnam's conclusions while at the same time ignoring almost entirely the substantial evidence he marshalled in support of those conclusions. *See* Putnam Dep. 5, 73-74, 258-59; Pl.'s Opp. to Mot. to Exclude Putnam Testimony, ECF No. 438.

relative to students in general education.  Ultimately, Dr. McCart concludes that "[t]he GNETS Program, as presently structured, is an inappropriate and unjust program for students with behavior-related disabilities[.]" McCart Rep. at 158.

**C. The Evidence Gathered by the United States Raises a Genuine Issue of Material Fact Regarding Non-Opposition to Community Educational Placements.**

The State next seeks summary judgment on the ground that the United States cannot satisfy the second element of its *Olmstead* claim: non-opposition to community educational placements.[18]  Again, the record amply demonstrates that issues of material fact exist regarding parent non-opposition.[19]

    *1. Parents Have Expressly Requested That Their Children be Educated in the Community.*

If individuals in segregated settings or their parents explicitly express interest in the individual moving to a community placement, they clearly do not oppose the community placement they are seeking.  *See, e.g.*, *Olmstead*, 527 U.S. at 602-03 (plaintiffs did not oppose a community placement).  However, express declarations are not the bar for determining whether individuals in segregated settings do not

---

[18] For purposes of this brief, the United States will refer to a minor student's education decision maker as their parent. *See* 34 C.F.R. § 300.30(a)(3).

[19] The State claims that "DOJ has provided no evidence indicating that an individual referred by that student's IEP Team for GNETS services seeks community placement." Def. Mem. at 23. Even though the United States obtained such evidence, the United States does not need to present evidence of non-opposition for students *referred* to GNETS to satisfy the non-opposition element. *See, e.g.*, *United States v. Florida.*, 12-CV-60460, 2023 WL 4546188, at *46-47 (S.D. Fla. July 14, 2023).

oppose a community placement.  Evidence that individuals *likely* would not oppose community services if provided adequate, individualized information about community services also indicates non-opposition to community-based services. *See, e.g.*, *DAI*, 653 F. Supp. 2d at 260-67.  Further, the absence of an explicit preference concerning community placement does not create an inference that the individual opposes community placement.  *See* 28 C.F.R. § 35.130(d), (e)(1); *Messier v. Southbury Training School*, 562 F. Supp. 2d 294, 337 ("[D]efendants cannot establish compliance with the integration mandate by showing that class members never requested community placement."); *DAI*, 653 F. Supp. 2d at 260-67.

The United States has adduced more than enough evidence to demonstrate genuine issues of material fact exist as to parental non-opposition to community placements.  Numerous parents have submitted complaints—both formal and informal—opposing their children's educational placements in the GNETS Program and expressly seeking community educational placements.[20]  On at least one occasion, a parent submitted an informal complaint via email to the State's GNETS Director expressly requesting a community educational placement.  *See*

---

[20] In addition to submitting complaints to the State, parents also submitted informal written complaints to the United States.  These complaints also reflect parents' opposition to GNETS Program placements and their desire for their children to attend community educational placements.  *See, e.g.*, US0012047; US0012763; US0011494; US0011511; US0011549 and US0011550.

GA05202437.  Other parents have taken more extreme measures, including filing due process complaints with the State to demand community educational placements for their children.    *See, e.g.*, GA05199933, GA05200951, GA05199710, GA05200962.  A number of those due process complaints also expressly alleged that the initial GNETS Program placement decisions were made unilaterally, despite parents' objections and explicit requests that their children remain in community educational placements.  *See, e.g.*, GA05201028; GA05200951.

In addition to parent complaints, multiple IEPs produced by regional GNETS programs memorialize parents' desire for their children return to community educational placements.    *See, e.g.*, US0151559 at US0151673, US0184588 at US0184594; *see also* McCart Rep. at 154 ("Countless records indicated the hopelessness felt on the part of parents when their child was referred for placement in the GNETS Program.  Even in documents, there was a palpable feeling of sadness from parents expressing a feeling of hopelessness when they were denied a community placement for their child.").

### 2. *Many Parents Have Not Been Provided a Meaningful, Informed Choice About Their Children's GNETS Placement.*

While people with disabilities or their parents may knowingly decline community services, *see Olmstead*, 527 U.S. at 602, states must offer appropriate services to people, consistent with their preferences, and provide sufficient individualized information and opportunities in order to allow them to make an

informed choice concerning whether to remain in—or, for those facing admission, whether to enter—a segregated setting. *See Kenneth R. v. Hassan*, 293 F.R.D. 254, 270 n.6 (D.N.H. 2013) ("[T]he *meaningful* exercise of a preference will be possible only *if* an adequate array of community services are available . . . ."); *see also Florida*, 2023 WL 4546188, at *47, 51; *Messier*, 562 F. Supp. 2d at 337-39, 340-42; *DAI*, 653 F. Supp. 2d at 260-67). As such, a state cannot refuse to offer or fail to provide adequate community-based services—especially when those services could reasonably be provided in a community setting—and then claim those receiving necessary services in segregated placements are not seeking and are therefore opposed to community placements.

In the present case, there is ample evidence of parents being denied any alternative to the GNETS Program and being provided false or inaccurate information about what the GNETS Program offers, effectively removing their ability to make an informed decision. On numerous occasions, when parents raised concerns about the GNETS Program during IEP meetings, they were told that the GNETS Program was the only option for their children. *See, e.g.*, Ex. G, McCart Dep. 56:14-57:20; US0011522.

Additionally, some parents have lamented that they initially agreed to their children being placed in the GNETS Program, rather than lodging an explicit objection to the segregated placement, only because they felt "bullied" by the

process that led to their children's GNETS Program placements. *See, e.g.*, US0011522. Some parents shared that they believe more parents are not actively fighting GNETS Program placements and seeking community educational placements because they do not "know there is something better" or because they have "given up" on advocating for themselves and their children. *See, e.g.*, US0011538.[21]

### D. **The Undisputed Evidence Establishes that Reasonable Modifications Are Available to the State to Remedy Its Ongoing Title II Violations.**

The State argues that it is entitled to summary judgment because the United States has failed to develop evidence identifying *not only* the modifications it seeks, *but also* the cost of implementing those modifications and the additional workforce capacity that may be required. Def. Mem. at 3, 24-27. This argument has no legal basis and reflects a fundamental misreading of Title II and *Olmstead*. This Court should reject it.

> *1. The United States has articulated a "plausible accommodation" as required to prove its Olmstead Claim.*

To prevail under Title II of the ADA, plaintiffs must articulate a reasonable modification. *Frederick L. v. Dep't of Pub. Welfare*, 364 F.3d 487, 492 n.4 (3d Cir.

---

[21] Further, the United States maintains its allegations that the State of Georgia fails to provide real community educational placement alternatives in which required therapeutic supports and services are provided for students with emotional and behavioral disabilities. *See* United States Compl. at 3-4, 9-11, 14 (ECF No. 1).

2004) (plaintiff has burden of "articulating a reasonable accommodation" that would allow institutionalized persons with disabilities to avoid unnecessary institutionalization); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003) (quoting *Burkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)) (once the plaintiff suggests "the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits . . . she has made out a prima facie showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant"). If the public entity chooses to assert its affirmative defense, it has the burden of establishing that the requested relief would fundamentally alter the nature of its services, programs, or activities.[22] *Olmstead*, 527 U.S. at 603-06; *Frederick L.*, 364 F.3d at 492 n.4; *Henrietta D.*, 331 F.3d at 280-81.

Here, the United States has identified the reasonable modifications it seeks and adduced overwhelming evidence—including expert opinion, sworn deposition testimony by key State officials, and State-produced documents—showing the reasonableness of those modifications within the context of Georgia's service

---

[22] The State failed to plead fundamental alteration, which is an affirmative defense, in its Answer to the United States' Complaint. *See* ECF No. 91 at 2-4 (asserting eleven affirmative defenses, none of which mentions fundamental alteration).

system.[23]  Putnam Report at 20-32, 54-64; Ex. G, McCart Dep. at 162:12-163:7;

United States Compl. at ¶¶ 52-61 (ECF No. 1).  Specifically, the United States

seeks an expansion of the key integrated therapeutic services and supports that help

students with behavior-related disabilities avoid restrictive educational placements

and which the State already offers, but fails to provide in sufficient amount and

intensity or consistent with its own standards.  Putnam Report at 23-29, 32-54, 54-

55.  The State acknowledges that those services and supports are effective and

seeks to expand them to communities across Georgia.[24]  It could do so in a cost-

---

[23] The State again asserts, incorrectly, that the United States' proposed reasonable modifications seek to impose a "standard of care" or require a certain "level of benefits."  D. Mem. at 26.  As the United States explained in its opposition to the State's Motion to Exclude the Expert Testimony of Dr. Putnam, ECF No. 438 at 13, this is a red herring.  The United States has alleged and will prove at trial that the State unnecessarily segregates in the GNETS Program students who are appropriate for integrated therapeutic services and supports in their home schools but who rarely receive them, either at all or in sufficient amounts or intensity.  Putnam Report at 42-54; McCart Report at 158-60; United States' Compl. at ¶¶ 44-46, 56 (ECF No. 1).  That is precisely the kind of discriminatory result that Title II and *Olmstead* seek to prevent.  42 U.S.C. § 12132; 28 C.F.R. §§ 35.130(d), 35.130(b)(7)(i); *Olmstead*, 527 U.S. at 599-600, 607.

[24] *See*, *e.g.*, APEX Contract FY2020, ABH000004, US0013064, at 22 (stating, in connection with the State's effort to expand access to school-based behavioral services across Georgia, that "mental health interventions are effective and can significantly improve academic performance scores"); PBIS, GaDOE, at https://www.gadoe.org/Curriculum-Instruction-and-Assessment/Special-Education-Services/Pages/Positive-Behavioral-Interventions-and-Support.aspx (last accessed Nov. 24, 2023) (acknowledging that PBIS is "proven to reduce disciplinary incidents, increase a school's sense of safety, and support improved academic outcomes"); Georgia CMHS Block Grant Application FY 2020-2021, Ex. 10, Dante McKay Deposition, January 27, 2022, at 172 ("[T]he ability to keep youth in their

effective manner by leveraging the substantial resources available through Medicaid and by reallocating funds from the GNETS Program.[25]  Putnam Report at 20-32, 58-60.  The United States' other proposed modifications—providing robust training and technical assistance for educational and therapeutic staff and improving coordination and data-sharing across the State's child-serving agencies and community partners—are aligned with the State's current priorities, as set forth in its System of Care Plan and elsewhere.[26]  Putnam Report at 62-63.

---

communities and to improve their functioning is directly related to the types of services and supports made available to them and their families."); Deposition of Dante McKay, ("McKay Dep."), at 131:22-132:24 (testifying that the State's Medicaid-reimbursable services for children with behavior-related disabilities, specifically including IC3, are "important to helping DBHDD achieve its goal of maintaining youth in their homes, schools and communities."); McKay Dep. at 186:9-16 (testifying that the State's goal is to expand the Apex program into "all public schools in the State of Georgia").

[25] Indeed, as far back as 2010, the State acknowledged that "there is no assurance that GNETS is a cost-effective placement for providing these services."  Georgia Department of Audits and Accounts Performance Audit Operations, GNETS, at 13, http://www.gahsc.org/nm/2010/educational%20and%20therapeutic%20support%20-%20gnets%5B1%5D.pdf  (last accessed Nov. 28, 2023).  By the State's own estimate, it would cost less to serve students in their local schools than in GNETS. *Id.* at 22.  A recent State-coordinated analysis of the funding framework for Georgia's behavioral health system further illustrates that serving more students in integrated educational settings through the State's Medicaid program, in lieu of placement in the GNETS Program, would generate cost-savings for the State.  Mindworks Georgia, "Our Funding Framework for Children: Understanding How We Measure Spending Across Georgia's Behavioral Health System of Care," at 28-32, https://mindworksga.org/download/funding-framework-report/ (last accessed Nov. 24, 2023).

[26] *See, e.g.*, Georgia System of Care Plan 2020, Exhibit 947, page 11, Monica Johnson Deposition ("Johnson Dep."), March 2, 2023 (acknowledging that effective

As applicable case law makes clear, this showing is more than adequate to suggest "the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Henrietta D.*, 331 F.3d at 280 (quoting *Burkowski*, 63 F.3d at 138). *See, e.g.*, *DAI*, 653 F. Supp. 2d at 192 (finding that adding permanent supported housing units was a reasonable modification for purposes of plaintiff's prima facie showing); *United Spinal Ass'n v. Bd. of Elections in New York*, 882 F. Supp. 2d 615, 626-27 (S.D.N.Y. 2012), *aff'd sub nom. Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189 (2d Cir. 2014) (granting plaintiff's motion for summary judgment and finding that plaintiff's proposed modifications—including broad changes to policies and procedures to ensure polling-site accessibility for persons with physical disabilities—were reasonable); *Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 298 (D. Conn. 2008) (holding that requiring the state to assess class members for community placement was a reasonable modification); *Radaszewski v. Maram*, 383 F.3d 599, 611-12 (7th Cir. 2004) (stating that expanding existing

---

coordination between State agencies and key stakeholders is "at the heart of the State's [System of Care] approach"); FY 23 Ga. DBHDD Provider Manual for Community Behavioral Health Providers (January 1, 2023) at 377-396 (setting forth the community service requirements, including relating to professional staff training and qualifications, for approved community behavioral health service providers); McKay Dep. at 88:9-93:9 (testifying about the State's existing efforts to train community behavioral health service providers on evidence-based practices); 30(b)(6) Hill Dep. at 34:11-35:6 (testifying about the State's efforts to train educational and therapeutic staff on PBIS).

private duty nursing service limit under waiver program was a reasonable modification); *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1284 (M.D. Fla. 2010) (stating that expanding existing waiver slots to prevent the plaintiff's unnecessary institutionalization was a reasonable modification). Plaintiffs in these cases and others have not been required to describe, as part of their *prima facie* burden, exactly how much it would cost to implement the modifications sought or what additional workforce capacity the modifications might require. *See Olmstead,* 527 U.S. at 606-07*;DAI*, 653 F. Supp. 2d at 192; *Henrietta D.*, 331 F.3d at 280-81; *United Spinal Ass'n*, 882 F. Supp. 2d at 626; *Messier*, 562 F. Supp. 2d at 298; *Radaszewski*, 383 F.3d at 611-12; *Haddad*, 784 F. Supp. 2d at 1284.

2. *The United States does not need to present additional evidence relating to cost and workforce capacity to satisfy its reasonable modification burden.*

Against the weight of prior authority, the State argues that to satisfy the reasonable modification element it is not enough for the United States to articulate a plausible accommodation. According to the State, the United States must also specify the cost of implementing its recommended reasonable modifications and how the State could overcome potential workforce obstacles. D. Mem. at 3, 24-27. The State's argument rests on a distorted reading of *Olmstead*—specifically, a footnote in Justice Ginsburg's opinion that describes the "undue hardship" inquiry under Title II and its implementing regulations. *Id.* at 25 (citing *Olmstead*, 527

U.S. at 606 n.16). While "the nature and cost of the accommodation" and the "composition and structure of [the public entity's] workforce" may be relevant to this "case-by-case analysis," nothing in the cited authority suggests that *plaintiffs* must address those factors in their case-in-chief.[27] To the contrary, both here and elsewhere, *Olmstead* makes clear that it is *the public entity's* burden to prove, as an affirmative defense, that the asserted modifications would fundamentally alter its services, programs, or activities. *Olmstead*, 527 U.S. at 606-07 and n.16 (identifying "the State" as the entity that has the burden of proving undue hardship under the reasonable modification regulation).[28]

---

[27] *Bircoll*, upon which the State relies in its Motion, only confirms that under Title II of the ADA the public entity bears the burden of proving a fundamental alteration. *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1082-83 (11th Cir. 2007). The Eleventh Circuit's observation that "what is reasonable must be decided case-by-case based on numerous factors" in no way alters the burden shifting framework established in *Olmstead*. *Id.* at 1085-86. And contrary to the State's suggestion, the United States' asserted reasonable modifications are particularized to and deeply rooted in Georgia's unique system of care. *See supra* at 21-26.

[28] In asking the United States to prescribe the specific costs and programmatic changes necessary to achieve compliance with the ADA, the State disrupts the ADA's careful balance between ensuring non-discrimination and preserving the public entity's control over its programs. By design, the ADA gives public entities the latitude and flexibility they legitimately require in the administration of their programs and services. *Tennessee v. Lane*, 541 U.S. 509, 532 (2004) ("As Title II's implementing regulations make clear, the reasonable modification requirement can be satisfied in a number of ways."). The United States has suggested several viable approaches the State could use to implement the requested modifications to its service system for students with behavior-related disabilities, including re-allocation of funds from the GNETS Program and maximization of the State's Medicaid program. *See* Putnam Report at 54-64 . The State can choose, for example, not to

## E. The United States Has Established a Viable *Olmstead* Claim for Students At Serious Risk of Placement in GNETS.

Finally, the State seeks summary judgment on the grounds that the United States lacks a viable *Olmstead* claim as it pertains to students who are at serious risk of placement in the GNETS Program.  The United States has brought this case on behalf of the students currently in GNETS, as well as those students with behavioral health disabilities who are at serious risk of placement in GNETS.  As in other *Olmstead* cases brought on behalf of individuals at serious risk of unnecessary segregation, these children are at serious risk of placement in GNETS because of the State's failure to provide them with adequate or effective integrated mental health and therapeutic educational services and supports.

In a footnote, the State asserts that at-risk claims are not cognizable under the ADA.  Def. Mem. at 19 n.29.  The State cites just one case in support, *United States v. Mississippi*, 82 F.4th 387, 391-98 (5th Cir. 2023), failing to acknowledge that *six* other Circuit Courts of Appeal have reached the opposite conclusion.  As those Circuits have found, an *Olmstead* claim lies where a state deprives qualified individuals with disabilities of services that are critical to maintaining their health and well being thereby creating a serious risk that the individuals will be

maximize federal Medicaid contributions, so long as it still effectively implements the necessary reasonable modifications.  The State's own strategic decisions naturally will dictate the total cost of the reforms and the additional workforce capacity needed, if any.

unnecessarily forced to seek care in a segregated setting.  *See Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 461 (6th Cir. 2020); *Steimel v. Wernert*, 823 F.3d 902, 911-12 (7th Cir. 2016); *Davis v. Shah*, 821 F.3d 231, 263-64 (2d Cir. 2016); *Pashby v. Delia*, 709 F.3d 307, 321-22 (4th Cir. 2013); *M.R. v. Dreyfus*, 663 F.3d 1100, 1116-17 (9th Cir. 2011), *amended by* 697 F.3d 706 (9th Cir. 2012); *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181-82 (10th Cir. 2003); *see also Radaszewski v. Maram*, 383 F.3d 599, 608, 614-615 (7th Cir. 2004).  As the Tenth Circuit reasoned, the integration mandate "would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation." *Fisher*, 335 F.3d at 1181.  The most recent district court in this Circuit to opine on this issue found similarly.  *United States v. Florida*, No. 12-cv-60460, 2023 WL 4546188, at *6, *36, *65 (S.D. Fla. July 14, 2023) (holding that Title II forbids States from placing individuals with disabilities at serious risk of unnecessary segregation and finding after trial that Florida had violated the statute by, *inter alia*, placing certain children at such risk).

### III.   SUMMARY JUDGMENT SHOULD BE DENIED AS TO THE UNITED STATES' UNEQUAL EDUCATIONAL OPPORTUNITY CLAIM.

The State argues that the United States' unequal educational opportunity claim fails because the United States cannot provide evidence of discriminatory intent and because the claim imposes a specific "standard of care" for the provision

of services under Title II and is barred by the Individuals with Disabilities Education Act ("IDEA"). These arguments rest on the State's misapplication of legal precedent and its attempts to impose legal standards not required under the ADA. Accordingly, the Court should reject the State's arguments.

### A. The United States is not Required to Prove Discriminatory Intent as an Element of its Unequal Educational Opportunity Claim.

Despite the State's arguments to the contrary, there is no requirement that the United States prove intent, let alone "animus," Def. Mem. at 27-28) in order to establish that Georgia is providing students with behavioral disabilities unequal educational opportunities. The implementing regulation for Title II states:

> A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:
>
> (i)   *That have the effect of* subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or]
>
> (ii)  That have the purpose *or effect of* defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[.]

28 C.F.R. § 35.130(b)(3) (emphasis added). A prohibition on behavior that *has the effect of* subjecting a person to discrimination clearly does not require a showing of discriminatory intent. *See, e.g.*, *Helen L. v. DiDario*, 45 F.3d 325, 335 (3d Cir. 1995).

The circumstances cited by the State where courts have imposed an intentional discrimination standard to bring a Title II claim do not apply here. For example, a showing of intentional discrimination may be required of plaintiffs seeking monetary

damages, but the United States is not seeking this form of relief.  *See Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019); *see also Frazier v. Kelley*, 460 F. Supp. 3d 799, 844 (E.D. Ark. 2020).[29]

For the reasons stated, the United States' unequal educational opportunity claim does not require a showing of discriminatory intent.  To the extent the State's motion for summary judgment asserts otherwise, the motion should be denied.

### B. The United States' Claim Does Not Impose a Specific Standard or Quantity of Care.

The State also contends that "to the extent that the unequal education claim is premised on a theory that the State doesn't provide … 'ideal' services to achieve the 'best' outcomes, [the] claim fails" because "[t]he ADA does not mandate a specific 'standard' or 'quantity' of care."  Def. Mem. at 28.  The United States' unequal

---

[29] Further, Defendant cites an unreported 2012 opinion, *Wilf v. Bd. Of Regents of the Univ. Sys. of Georgia*, but the *Wilf* court itself acknowledged that in cases such as that of the plaintiff before it, "a failure-to-make-reasonable-accommodations claim requires no animus and occurs when a covered entity breaches its affirmative duty to reasonably accommodate the known physical or mental limitations of an otherwise qualified person."  No. 1:09-cv-01877-rlv-ggb, 2012 WL 12888680, at *17 (N.D. Ga. Oct. 15, 2012), *aff'd on other grounds*, 544 F. App'x 906 (11th Cir. 2013).  2012 WL 12888680, at *17.  The court's remark that "[d]isparate treatment involves discriminatory intent" (*id.*) is not relevant to the discrimination alleged in this case.  Similarly, Defendant also cites a Sixth Circuit opinion for the proposition that "'[p]roof of discriminatory motive is critical' in disparate treatment claims."  Def. Mem. at 28, citing *Knox Cty., Tennessee v. M.Q.*, 62 F.4th 978, 1000 (6th Cir. 2023).  This cited language is inapposite.

education claim is not about seeking "ideal" educational opportunities. On the contrary, the core issue underlying the United States' claim is whether the educational opportunities provided to students in the GNETS Program are equitable relative to those provided to students in general education settings—and, in some instances, the issue is whether the educational opportunities are provided *at all*. In over nearly 90 pages of her expert report, Dr. McCart outlines a variety of ways in which students in the GNETS Program receive unequal educational opportunities on the basis of their disability. McCart Rep. at 68-157. The United States' claims arising from these deficiencies do not concern "ideal services" or "best outcomes" but instead the discrimination against students with disabilities in the GNETS Program that the deficiencies occasion.

### C. The United States' Unequal Educational Opportunity Claim Is Not Barred by the IDEA.

Returning again to arguments that this Court considered and rejected in denying its motion to dismiss, the State asserts that the United States lacks authority to bring an unequal education claim because it is "an IDEA claim disguised in the ADA's clothing." Def. Mem. at 31. The Court should reject this misguided assertion, as it did at the motion to dismiss stage.

First, the IDEA is not the only statute that can or should address education of students with disabilities. In *Fry*, the Supreme Court made clear that Title II of the ADA covers children with disabilities in public schools. *Fry v. Napoleon Cmty.*

*Sch.*, 580 U.S. 154, 159-60 (2017).  As the Court explained, "the IDEA guarantees individually tailored educational services, while Title II and § 504 promise[s] non-discriminatory access to public institutions for people with disabilities of all ages. That is not to deny some overlap in coverage:  The same conduct might violate all three statutes."  *Id.* at 155-56.

Second, the IDEA's administrative remedies are available only to parents and children, LEAs, SEAs, or state agencies directly responsible for providing a child a Free Appropriate Public Education; they do not apply to the United States.  *See* 20 U.S.C. §§ 1415(b)(6)-(7), (c), (e)-(g), and (l).  Therefore, the United States has no ability or obligation to exhaust under the IDEA before exercising its independent authority to enforce other statutes, including the ADA.  Nor does the State proffer any authority to the contrary.

Even assuming the United States could pursue remedies under the IDEA and were required to exhaust, the gravamen of its unequal education claim is not the denial of "individually tailored educational services," Def. Mem. at 29, but instead "systematic discriminatory practices which result in unlawful stigmatization, deprivation of advantages that come from integrated learning environments, denial of access to public institutions, and unjustified segregation and discrimination of children who are in the GNETS program."  ECF No. 61 at 19; *see* Def. Mem at 31. In light of this, the claim would not be barred under the IDEA.  *See Fry*, 580 U.S.

154, 158 (holding that "exhaustion is not necessary when the gravamen of the plaintiff's suit is something other than the denial of the IDEA's core guarantee— what the Act calls a 'free appropriate public education.'").  Indeed, courts have recognized that a claim brought under the ADA may implicate concepts relevant to the IDEA while remaining a valid ADA claim.  *See Doe v. Dallas Ind. Sch. Dist.*, 941 F.3d 224, 227 (5th Cir. 2019); *see J.S.*, 877 F.3d at 986-87.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court deny the State's Motion for Summary Judgment in its entirety.

Dated: November 28, 2023

Respectfully submitted:

RYAN K. BUCHANAN                          KRISTEN CLARKE
*United States Attorney*                       Assistant Attorney General
Northern District of Georgia

/s/ *Aileen Bell Hughes*                        SHAHEENA A. SIMONS
AILEEN BELL HUGHES                        Chief
GA Bar Number: 375505
Assistant United States Attorney            KELLY GARDNER WOMACK
United States Department of Justice         Deputy Chief
Richard B. Russell Federal Building
75 Ted Turner Dr. SW, Suite 600           ANDREA HAMILTON WATSON
Atlanta, GA 30303-3309                      Special Litigation Counsel
(404) 581.6000
aileen.bell.hughes@usdoj.gov              CRYSTAL ADAMS
                                                          CLAIRE D. CHEVRIER
                                                          FRANCES S. COHEN

MATTHEW GILLESPIE
PATRICK HOLKINS
VICTORIA M. LILL
JESSICA POLANSKY
LAURA C. TAYLOE
MICHELLE L. TUCKER
Trial Attorneys
Educational Opportunities Section

*/s/Kelly Gardner Womack*
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-4092
kelly.gardner@usdoj.gov

## **L.R. 7.1(D) CERTIFICATION**

I certify that this Document has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C). Specifically, this brief has been prepared using 14-pt Times New Roman Font.


/s/ *Kelly Gardner Womack*
KELLY GARDNER WOMACK

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have this day filed the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sent counsel of record e-mail notification of such filing.

This 28th day of November, 2023.


<u>/s/ *Kelly Gardner Womack*</u>
KELLY GARDNER WOMACK