IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

STATE OF GEORGIA,

    *Defendant*.

CIVIL ACTION

NO. 1:16-CV-03088-ELR

## PLAINTIFF UNITED STATE'S RESPONSES TO DEFENDANT STATE OF GEORGIA'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Rule 56.1(B) of the Civil Local Rules of Practice for the United States District Court for the Northern District of Georgia, Plaintiff the United States of America hereby submits its Responses to Defendant State of Georgia's Statement of Undisputed Material Facts (ECF No. 430-1):

## I.     Defendant State of Georgia

### A. Georgia Department of Education

1.     The Georgia Department of Education (GaDOE) is the state agency charged with the fiscal and administrative management of certain aspects of K-12 public education in the State of Georgia, including the implementation of federal

and state mandates. *See* Ga Comp. R. & Regs. 160-4-7-.15, which is attached hereto as Exhibit A.

   **RESPONSE:** Undisputed. The Court may consider this evidence for purposes of the summary judgment motion.

   2.    It is the State Educational Agency for purposes of the IDEA. *See* 20 U.S.C. § 1401(32).

   **RESPONSE:** Objection. The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B). In addition, the State's use of the term "it" in this statement is vague and ambiguous.

   3.    Code Sections 20-2-34 and 20-2-1 provide that GaDOE is administered by the State School Superintendent and the State Board of Education. O.C.G.A. §§ 20-2-34 (State School Superintendent), 20-2-1 (State Board of Education).

   **RESPONSE:** Objection. The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B). The fact is denied in that neither of the Code Sections cited use the word "administer."

   4.    To date, there are over 2,200 schools in 181 school districts in this State. *See* AskDOE, *Schools and Districts* <u>available at</u>

https://www.gadoe.org/External-Affairs-and-Policy/AskDOE/Pages/Schools-and-

Districts.aspx#:~:text=There%20are%20currently%20181%20school,in%20the%2

0state%20of%20Georgia and attached hereto as Exhibit B.

**RESPONSE:** Undisputed. The Court may consider this evidence for

purposes of the summary judgment motion.

5.     Code Section 20-2-152 provides that GaDOE is charged with, among

other duties, adopting the "criteria used to determine eligibility of students for state

funded special education programs." O.C.G.A. §20-2-152(a).

**RESPONSE:** Objection. The fact asserted should not be considered for

purposes of the motion for summary judgment because it is improperly stated as a

legal conclusion in violation of Local Rule 56.1(B).

6.     Code Section 20-2-152 further provides that GaDOE is also

authorized to provide grants to regional educational service agencies ("RESAs")

and local school districts for the provision of special education services. *See*

O.C.G.A. § 20-2-152(c)(1).

**RESPONSE:** Objection. The fact asserted should not be considered for

purposes of the motion for summary judgment because it is improperly stated as a

legal conclusion in violation of Local Rule 56.1(B).

7.     Code Section 20-2-270 provides that RESAs are "not state agencies."

O.C.G.A. § 20-2-270(f).

**RESPONSE:** Objection. The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).

8.     Pursuant to statutory authority, GaDOE promulgated Rule 160-4-7-.15 (the "GNETS Rule") creating the Georgia Network for Educational and Therapeutic Support (GNETS) Program. *See* Ex. A.

**RESPONSE:** Undisputed. The Court may consider this evidence for purposes of the summary judgment motion.

## B. Georgia Department of Behavioral Health and Developmental Disabilities

9.     The Georgia Department of Behavioral Health and Developmental Disabilities (DBHDD) focuses on "state programs for mental health, developmental disabilities, and addictive diseases." O.C.G.A. § 37-1-20(1); Deposition of Frank Berry at 89:12-19.

**RESPONSE:** Denied in part. The cited excerpt of the Berry deposition transcript does not support the fact asserted. In the cited excerpt, Berry describes DBHDD's mission as "leading an accountable and effective continuum of care to support Georgians with behavioral challenges and intellectual and developmental disabilities in a dynamic health care environment." *See* Deposition of Frank Berry ("Berry Dep.") at 89:12-19 (attached hereto as Exhibit A). The Court may consider the remainder of this evidence for purposes of the summary judgment motion.

4

10.    It does <u>not</u> have responsibility for "all individuals who receive public services for mental health." Deposition of Judy Fitzgerald at 49:16-21.

**RESPONSE:** Denied.  The statement is a quote from a section of the deposition of former Commissioner Judy Fitzgerald, and the State relies on it to imply that DBHDD does not have *any type* of responsibility for "all individuals who receive public services for mental health."  The statement does not support that implication for several reasons.  First, it inaccurately blends the question and the answer, which appear as follows:

> **Q.** Does DBHDD have responsibility for all individuals in the State of Georgia who receive public services for mental health, developmental disabilities, and substance abuse disorder?
>
> **A.** No. We have responsibilities for the ones that we administer.

Deposition of Judith Fitzgerald ("J. Fitgerald Dep.") 49:16-21 (emphasis added) (attached hereto as Exhibit B).

11.    Further, the quote is from a portion of the deposition that discussed one type of responsibility, "budgetary responsibility", and the Commissioner's response is properly understood as referring to budgetary responsibility.  Ex. B, Fitzgerald Dep. 48:11-49:16.  Finally, the Commissioner testified at her deposition that DBHDD and DCH together coordinate in developing service manuals describing all public services for mental health in Georgia.  Ex. B, Fitzgerald Dep. 50:21-51:21.  The dividing line for budgetary responsibility is

5

primarily the type of insurance an individual has, with DBHDD assuming

budgetary responsibility for uninsured individuals.  Ex. B, Fitzgerald Dep. 53:5-

54:8.  Former Commissioner Frank Berry testified to the same effect at his

deposition.  Ex. A, Berry Dep. 146:13-148:8.DBHDD does not deliver direct

services or care, but instead it contracts with its network of providers and

community service boards ("CSBs") to fund the delivery of services and care.

Deposition of Frank Berry at 147:14-148:8; 167:16-18; 90:19-91:5; Deposition of

Judy Fitzgerald at 217:17-20.

**RESPONSE**:  Denied.  As reflected on its public website, DBHDD provides

direct care services, including operating five hospitals offering inpatient adult

mental health and forensic services.  GA DBHDD, Hospital Services,

https://dbhdd.georgia.gov/be-caring (last visited Nov. 27, 2023) (attached hereto as

Exhibit 1).  DBHDD provides other services through its contracts with provider

organizations, including the Community Service Boards ("CSBs").

12.     DBHDD frequently contracts with government and private

providers of behavioral health services, including CSBs, to provide some

behavioral health services to some of Georgia's uninsured Medicaid

beneficiaries. Deposition of Judy Fitzgerald at 217:23-218:1.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for

 purposes of the summary judgment motion.

13.    DBHDD contracts for the delivery of services and care for
individuals with serious and persistent mental illness and for youth with serious
emotional disturbances. Deposition of Judy Fitzgerald at 52: 21-25.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for
purposes of the summary judgment motion.

14.    Not all children in the State of Georgia are the financial responsibility
of DBHDD. Deposition of Judy Fitzgerald at 154:8-9.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for
purposes of the summary judgment motion.

15.    DBHDD is only responsible for uninsured children that do not have
any other coverage, and they have a limited amount of funding to support those
children. Deposition of Frank Berry at 91:6-20; Judy Fitzgerald at 53:24-54:3; 231:
9-11.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for
purposes of the summary judgment motion.

16.    DBHDD plays a limited role in ensuring that mental health services
are readily available to children across the State of Georgia in their own
communities because their funding supports only uninsured children. Deposition of
Frank Berry at 184:13-20.

**RESPONSE:**  Denied.  As Georgia's designated state authority for

7

behavioral health services, DBHDD is responsible for overseeing and administering policies, programs, and services for people with mental illness, including—through the Office of Children, Young Adults and Families— children with behavior-related disabilities.  Ga. Code Ann. § 37-1-20; *see also* Ga. Code Ann. § 37-1-21; Ex. A, Berry Dep. 165:11-166:13, 184:21-25; Ex. B, J. Fitzgerald Dep. 52:21-53:19; 62:2-16.   In that capacity, DBHDD plays an important role in ensuring that behavioral health services are accessible to children across Georgia in their own communities, including children enrolled in Medicaid or PeachCare for Kids for whom the Georgia Department of Community Health ("DCH") rather than DBHDD is the primary payor of their publicly funded behavioral health services.  Among other things, DBHDD designs and defines the publicly funded behavioral health services that are available to children and their families in Georgia; funds, oversees, and administers the Georgia Apex Program, through which the State seeks to deliver behavioral health services in certain school settings; contracts with the Georgia State University's Center of Excellence to advance the development of effective behavioral health services for children, specifically including Intensive Customized Care Coordination ("IC3"); and helps to lead the State's efforts to implement its System of Care Plan, which acknowledges that "[a]ccess to an array of community-based services and supports is a core component of any functional behavioral

health care system." Deposition of Wendy Tiegreen ("Tiegreen Dep.")

52:12-19 (attached hereto as Exhibit C); Deposition of Ann DiGirolamo

("DiGirolamo Dep.") 16:16-17:16, 82:24-83:3, 92:16-21 (attached hereto as

Exhibit D); J. Fitzgerald Dep. 62:2-63:9; 134:3-20; 2020 Georgia System of

Care Plan; APEX Contract FY2020, ABH000004, US0013064 (ECF No.

438-2).

17.    DBHDD does not have any role in providing behavioral health

services to GNETS Programs. Deposition of Frank Berry at 185:14-18; Judy

Fitzgerald at 66:19-67:7; 119: 9-11.

**RESPONSE:**  Denied.  As Georgia's designated state authority for

behavioral health services, DBHDD could have a larger role in providing behavioral

health services to regional GNETS programs, but chooses not to.  For example,

DBHDD prohibits students that attend regional GNETS centers from receiving

Apex services at the centers, regardless of whether those students are otherwise

eligible for Apex services.  *See APEX 3.0 Frequently Asked Questions*,

https://dbhdd.georgia.gov/be-supported/mental-health-children-young-adults-and-

families/apex-3-faqs ("In which types of schools can Apex services be

implemented?") (last visited Oct. 18, 2023) (ECF No. 395-44).  Dante McKay

testified that DBHDD's current approach regarding "the availability of Apex

services" to GNETS schools is: "If a school . . . is served by the Apex program and

the school has a GNETS classroom or classroom setting . . . then the . . . approach

would be that those services would be available to those GNETS-specific students,

along with the general population."  March 9, 2023 30(b)(6) Deposition of Dante

McKay ("McKay Dep.") Dep. 103:2-15 (attached hereto as Exhibit E).  For

example, Lisa Oosterveen, Deputy Director of Aspire Community Service Board,

testified that she provided behavioral health services to students who attended a

GNETS classroom.  *See* Deposition of Lisa Oosterveen ("Oosterveen Dep.") 23:3-

13, 45:19-25, 47:24-49:2 (attached hereto as Exhibit F).

18.     According to Dr. Stephanie Pearson, the Clinical Director of the Office

of Children, Young Adults and Families ("OCYF") for DBHDD, there is no direct

relationship between DBHDD and GNETS. Deposition of Stephanie Pearson at

52:10-20; 53:9-18; Deposition of Wendy Tiegreen at 31:2-23.

**RESPONSE:** Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

19.     Neither Dr. Pearson nor Dante McKay, OCYF's Director, have any

ongoing responsibilities with respect to GNETS and do not work with GNETS

Program directors. Deposition of Stephanie Pearson at 73:11-18; Deposition of

Dante McKay at 49:8-14.

**RESPONSE:** Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

20.     To Dr. Pearson's knowledge, no employee within OCYF provides

training or technical assistance to GNETS staff. Deposition of Stephanie Pearson at 78:14-16.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

21.     Further, as Clinical Director of OCYF, Dr. Pearson does not receive data or documents relating to enrollment in GNETS, or to the length of placement in GNETS. Deposition of Stephanie Pearson at 83:17-23.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

22.     Dr. Pearson does not receive data or documents relating to the availability, utilization, or the quality of behavioral health services to students enrolled in GNETS. Deposition of Stephanie Pearson at 83:24-84:10.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

23.     Dr. Pearson does not receive data or documents relating to staffing at GNETS or to coordination between GNETS Programs and community service providers in Georgia. Deposition of Stephanie Pearson at 84:11-17.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

### C. Georgia Department of Community Health

24.    Code Section 49-4-142 provides that the Geogia Department of Community Health (DCH) is the State's designee for purposes of Medicaid. *See* O.C.G.A. § 49-4-142.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

25.    It acts as an "insurance and regulatory body" for various health care providers throughout the State. Judy Fitzgerald at 64:20-65:1.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

26.    DCH is charged with support of other agencies as an insurance company. Deposition of Frank Berry at 173:15-20.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

27.    DCH is not a service provider; and Medicaid is an insurance plan, rather than a service delivery plan. Deposition of Frank Berry at 173:15-20.

**RESPONSE:**  Denied.  Medicaid is a partnership jointly funded by the federal government and the states, and administered by the states, according to federal requirements to assist states in providing medical care to eligible people. The Kaiser Family Foundation: The Kaiser Commission on Medicaid and the Uninsured, "5 Key Questions About Medicaid and Its Role in State/Federal

12

Budgets and Health Reform," https://www.kff.org/wp-content/uploads/2013/01/8139-02.pdf (last accessed November 27, 2023) (attached hereto as Exhibit 2). DCH is the State's Medicaid authority. O.C.G.A. § 49-4-142; Ex. C, Tiegreen Dep. 21:16-22:7. In that capacity, DCH designs and defines the behavioral health services that it administers in collaboration with DBHDD and contracts with private Care Management Organizations to deliver services to enrolled members, including children. Ex. B, J. Fitzgerald Dep. 51:5-52:3, Ex. C, Tiegreen Dep. 45:7-13, 52:12-53:8; Georgia Department of Community Health, Medicaid Managed Care, https://dch.georgia.gov/medicaid-managed-care (last accessed Nov. 27, 2023) (attached hereto as Exhibit 3). In accordance with federal regulations, DCH developed a Quality Strategy "to continually monitor, assess, and improve the timeliness and delivery of quality healthcare" to Medicaid and PeachCare for Kids members served through its managed care and fee-for-service programs. DCH's Quality Strategy provides "the framework to accomplish DCH's mission of providing Georgians with access to affordable, quality healthcare through effective planning, purchasing, and oversight." Georgia Department of Community Health 2021-2023 Quality Strategy, *available at* https://dch.georgia.gov/medicaid-quality-reporting at 4 (last accessed Nov. 20, 2023) (attached hereto as Exhibit 4).

28.    DCH's involvement with GNETS is minimal to none as staff at DCH do not have duties or responsibilities with respect to the GNETS program.

Deposition of Brian Dowd at 166:4-11; 168:13-20.

**RESPONSE:** Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

## II.    The Department of Justice and its Proffered Experts

29.    The Department of Justice (the "Department's") allegations are "the

first challenge" of the ADA to the provision of individualized services and supports

in the education setting. *See*, Press Release, U.S. Dep't of Justice, Justice

Department Sues Georgia for Unnecessarily Segregating Students with Disabilities

(August 23, 2016), underline available at https://www.justice.gov/opa/pr/justice-department-

sues-georgia-unnecessarily-segregating-students-disabilities and attached hereto as

Exhibit C ("The Lawsuit is the First Challenge to a State-Run School System for

Segregating Students with Disabilities").

**RESPONSE:** Objection.  The fact asserted is not material to the pending

motion for summary judgment and is inadmissible. The United States objects to

the statements in Paragraph 29 as inadmissible: a press release of the United States

is irrelevant to the merits of the underlying suit as it neither has any tendency to

make a fact more or less probable than it would be without it and is of no

consequence in determining the action. Fed. R. Evid. 401. In addition, the United

States' allegations in this case are not a "challenge of the ADA." Subject to the

above objections, it is undisputed that this action is the Department's "first

14

challenge to a state-run school system for segregating students with disabilities."

### A. Dr. Amy McCart

30.    Dr. Amy McCart is a self-described "radical." Deposition of Amy McCart at 316:10-14, Ex. 15.

**RESPONSE:** Objection.  The fact asserted is not material to the pending motion for summary judgment and is inadmissible. Whether Dr. McCart has described herself as "radical" in contexts dramatically different from those at issue in this case is irrelevant to the merits of the underlying suit as it neither has any tendency to make a fact more or less probable than it would be without it and is of no consequence in determining the action. Fed. R. Evid. 401. In addition, such evidence is inadmissible as any probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, and wasting time. Fed. R. Evid. 403. Finally, Exhibit 15 to Dr. McCart's deposition is inadmissible hearsay. Fed. R. Evid. 802.

31.    The Department reached out to Dr. McCart to potentially testify months before it filed suit against the State of Georgia. Deposition of Amy McCart at 18:8-14.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

32.    Dr. McCart has never testified as an expert in court. Deposition of

Amy McCart at 47:9-11.

**RESPONSE:** Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

33.    Dr. McCart has never served as a court monitor. Deposition of Amy

McCart at 48:6-7.

**RESPONSE:** Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

34.    Dr. McCart offers three conclusions in her expert report: (1)

 (2)

and (3)

Expert Report of

Amy McCart at 1, attached hereto as Exhibit E.

**RESPONSE:** Denied as incomplete. Dr. McCart's report speaks for itself and

contains a number of conclusions, including those quoted in Paragraph 34.

35.    Dr. McCart's opinions are based only on the policies of the Georgia

Department of Education; she did not consider any policies, acts, or programs of

the Departments of Community Health or Behavioral Health and Developmental

Disabilities. Deposition of Amy McCart at 165:19-22; 166:7-15.

**RESPONSE:** Denied. The statement mischaracterizes the cited evidence. Dr. McCart's opinions are based on a wide variety of sources, including in-person observations, facility site visits, review of thousands of records, relevant academic literature, and her extensive experience in the field of special education. Defendant's Statement of Undisputed Material Facts ("SOMF") Ex. E, Report of Amy McCart, Ph.D. ("McCart Rep.") at 1, 11-12 (ECF No. 430-2).

36.     Despite the report's expressed concerns with the GNETS Program, Dr. McCart has never spoken to anyone at the United States Department of Education (USDOE) about the State of Georgia. Deposition of Amy McCart at 32:4-11.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

37.     USDOE enforces the IDEA. 20 U.S.C. § 1416.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

38.     Federal funds from USDOE make up a portion of the GNETS budget. *See generally*, General Appropriations Act FY2024, attached hereto as Exhibit S.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

39.     Dr. McCart offers two recommendations in her report: ██████████

17



Ex. E at 162.

**RESPONSE:** Denied as incomplete. Dr. McCart's report speaks for itself and

contains a number of conclusions, including those quoted in Paragraph 39.

40.     Dr. McCart further offers specific action needed to carry out her

proposed recommendations. Ex. E at 162. First, ███████████████

███████████████████████████████████████

███████████████████████████████

███████████████ Ex. E at 163.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes

of the summary judgment motion**.**

41.     Second, ███████████████████████████

████████████████████████████████

███████████████ Ex. E at 164.

**RESPONSE:** Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion**.**

42.     Third, ███████████████████████████

████████████████████████████████████████████

██████████████████████████████ Ex. E at 164.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

43.    Fourth, ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ Ex. E at 165.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

44.    Fifth, ████████████████████████████████

████████████████████████████████████████████

████████████████████████████ Ex. E at 165.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

45.    Dr. McCart claims ████████████ ████████████████

████████████████████████████████████████████

████████████████████████ Ex. E at 12.

**RESPONSE:** Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

46.    According to Dr. McCart, this methodology included 70 site visits to 27 center-based GNETS Program sites and 36 school-based GNETS Program sites. Ex. E at 12.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

47.    At the site visits Dr. McCart claims to have ███████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████ Ex. E at 12.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

48.    Dr. McCart did not review the files of any individual Georgia teachers to determine their qualifications and training as part of her methodology. Deposition of Amy McCart at 28:11-14.

**RESPONSE:** Denied. The statement mischaracterizes the cited evidence. The testimony cited in Paragraph 48 only stands for the proposition that "in touring the general education part," Dr. McCart did not "review files of individual teachers to determine their qualifications and training." Deposition of

Amy McCart, Ph.D. ("McCart Dep.") Dep. 28:11-14 (attached hereto as Exhibit G). Dr. McCart did, however, review records reflecting teacher qualifications. McCart Rep. Appx. E.

49.    Dr. McCart's recommendations are based on her observations of GNETS program classrooms which varied from "10 minutes to 90 minutes." Deposition of Amy McCart at 117:9-14.

**RESPONSE:**  Denied as incomplete. Dr. McCart's opinions are based on a wide variety of sources, including in-person observations, facility site visits, review of thousands of records, relevant academic literature, and her extensive experience in the field of special education. McCart Rep. at 1, 11-12.

50.    Dr. McCart would not be confident in the recommendation of an IEP team that spent just ten minutes with a student. Deposition of Amy McCart at 149:11-16.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

51.    Dr. McCart used a series of self-authored questions as shown in the tables on pages 8-11 of her report ███████████████████ ██ Ex. E at 12; 8-11.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

52.    Dr. McCart herself "developed" the tables identified on pages 8-11 of

her report, and while the report cites no authority for the construct, she testified

that it was based on what she described (but did not identify) as "well-documented

indicators of segregated or institutional environments within the field of special

education." Ex. E at 8-11; Deposition of Amy McCart at 248:7-10.

**RESPONSE:** Undisputed in part. Dr. McCart authored the tables identified

on pages 8-11 of her report based on her extensive experience in and knowledge of

relevant research in the field of special education. Dr. McCart testified these tables

were developed "based on well-documented indicators of segregated or

institutional environments within the field of special education." McCart Rep. at 7.

The Court may consider this particular evidence for purposes of the summary

judgment motion, but all other statements in Paragraph 52 are denied as

mischaracterizations of the cited evidence.

53.    Dr. McCart also claims to have reviewed thousands of records

including IEPs, incident reports, handbooks, programmatic reporting, and other

documents related to program operations. Ex. E at 12.

**RESPONSE:** Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

54.    She attended or reviewed depositions of various fact witnesses and

lastly, ████████████████████████████████████████████████

███████ Ex. E at 12.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

55.    While Dr. McCart repeatedly opined that what constitutes "appropriate services" for students with emotional or behavioral disabilities is an individualized analysis, and while she claims that the "vast majority" of students in GNETS could be educated in their zoned school in a general setting classroom, she concedes that she did not review IEPs of the "vast majority" of GNETS students. Deposition of Amy McCart at 141:12-19.

**RESPONSE:**  Undisputed in part. Dr. McCart did conclude, *inter alia*, that "[t]he vast majority of students in the GNETS Program can and should be served in integrated settings with appropriate services and supports, where they are more likely to experience social, emotional, behavioral, and academic success." McCart Rep. at 159. Dr. McCart also testified that she estimated herself to have reviewed between 65 and 100 individual students' IEPs. All other statements in Paragraph 55 are denied as mischaracterizations of the cited evidence.

56.    At her deposition, Dr. McCart testified she reviewed "[s]omewhere between 65 and 100 student IEP records" that were provided to her by the Department of Justice. Deposition of Amy McCart at 34:22-35:15.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

23

57.    The IEPs reviewed by Dr. McCart "employed a variety of interventions and supports, some of which may be more closely aligned with the medical model, some of which may be more aligned with a human capability construct." Deposition of Amy McCart at 291:15-19.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

58.    Documents not listed on Appendix E to her report, as amended, were not considered when making the report. Deposition of Amy McCart at 35:21-36:2.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

59.    While Dr. McCart claims that her opinion is about the "nearly 3,000 students that are served in the [GNETS] program," she acknowledges that she observed about a "thousand" or so students along with the 65-100 IEPs she reviewed. Deposition of Amy McCart at 40:3-9; 34:22-35:15.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

60.    Dr. McCart, who does not hold a degree in statistical analysis, opined that a study considering 15 students with autism in northern California could be statistically significant, but she did not say that it necessarily was. Deposition of Amy McCart at 135:20-136:2, Ex. 6; Ex. E at 4.

24

**RESPONSE:**  Denied. The statement mischaracterizes the cited evidence. The cited testimony was only that "a study [of] about 15 students with autism in one area of one state" could, under some circumstances, "constitute a statistically significant sample." Ex. G, McCart Dep. 135:20-136:5. In addition, while Dr. McCart's PhD is in special education, she testified that obtaining that degree included "statistical analyses and statistical courses," in addition to her experience "conducting large-scale, systemic reviews, including statistical analyses" as a senior researcher. Ex. G, McCart Dep. 135:5-19.

61.    She has never provided any consulting services to the State of Georgia, including GaDOE, nor has she previously advised any Georgia school district or school. Deposition of Amy McCart at 28:19-29:9.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

62.    Dr. McCart testified that she provided consulting services to state departments of education in Mississippi, New Hampshire, Vermont, Oregon, Maryland, North Carolina, California, Wyoming, Delaware, Wisconsin, New York, Oklahoma, Idaho, Washington, Washington, DC, and Louisiana, and she claims to have advised others but could not identify them. Deposition of Amy McCart at 49:12-21.

**RESPONSE:** Undisputed in part. Dr. McCart testified she provided

consulting services to state departments of education in the states identified

in Paragraph 62. This fact is denied in part for improperly asserting that she

"could not" identify others. Ex. G, McCart Dep. 49:19-21 (listing states,

"among others" without any follow-up from questioning counsel).

63.    Dr. McCart could not identify whether states she consulted with have

implemented her recommendations, or with the degree of efficacy, but she claimed

that her "recommended actions … are commonplace" at unidentified state

departments of education. Deposition of Amy McCart at 50:6-12.

**RESPONSE:**  Undisputed in part. It is undisputed that Dr. McCart testified

her recommended actions are "commonplace." All other statements in paragraph 63

are denied, including that Dr. McCart "could not identify whether states she

consulted with have implemented her recommendations, or with the degree of

efficacy…" Dr. McCart testified that she "would have to look at data sources to

know whether or not the level or efficacy of how those strategies, and to what

degree might have been implemented in other states." Ex. G, McCart Dep. 50:7-10.

64.    Dr. McCart testified that it was "impossible … to answer" a question

asking her to opine whether, in the states where she has consulted the state

education agency, "unnecessary segregation of students with emotional/behavioral

disabilities" occurred. Deposition of Amy McCart at 261:5-15.

**RESPONSE:** Denied. The statement mischaracterizes the cited evidence and

is incomplete. The State asked Dr. McCart: "For the states that you have worked in

and have done that, is it your conclusion that there is no unnecessary segregation of students with emotional/behavioral disabilities in those states? And let me clarify it. By states, I mean the SEA, the Department of Education, not like if you did work for a district in the state." Ex. G, McCart Dep. 261:5-11. Dr. McCart's full answer was: "It's an impossible question to answer. You've asked if – it's -- the magnitude is so great on that question, I can't -- I don't know how to respond." Ex. G, McCart Dep. 261:12-15. The State did not seek to clarify thereafter. Thus, the cited testimony only stands for the proposition that Dr. McCart was not offering "conclusions" that there is "no unnecessary segregation" in the numerous states she has worked with.

65.    Dr. McCart could not articulate the expectations of how her recommendations would flow through or be implemented by local school districts; instead, she often spoke broadly of a "vision, guidance, and support along a full continuum of services" being offered by the Georgia Department of Education. Deposition of Amy McCart at 87:11-15; 161:17-22.

**RESPONSE:**  Undisputed in part. It is undisputed that Dr. McCart testified that she recommended the state "establish a vision, guidance, and support along a full continuum of services for students with behavior-related disabilities in the State of Georgia." Ex. G, McCart Dep. 87:11-15. The remainder of Paragraph 65 is denied. In her report, Dr. McCart explicitly outlines her recommendations for the State of Georgia and how they should be implemented. McCart Rep. at 160-67.

66.     Dr. McCart opined that her recommendations are to explain "how the state might go about implementing a system of support that is not segregated, and provides fair and equal access to educational opportunities." Deposition of Amy McCart at 182:7-10.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

67.     Dr. McCart recommends that the State Department of Education adopt her "vision." Deposition of Amy McCart at 312:11-20.

**RESPONSE:** Denied. The statement mischaracterizes the cited evidence. Nowhere in her report did Dr. McCart describe her recommendations as her "vision." The testimony cited by the State shows that it was the State that asked Dr. McCart "What is your vision that you're recommending the State Department of Education adopt?" Ex. G, McCart Dep. 312:6-7. As the State asserts in Paragraph 65, at various times throughout her deposition, Dr. McCart did speak to her recommendation that *the State* adopt a "vision" for its provision of services. *See, e.g.,* Ex. G, McCart Dep. 191:6-20.

68.     Her "vision" is for the "elimination" of what she contends is Georgia's "statewide systemic segregation of students with behavior related disabilities for the GNETS program, and the provision of fair and equal access to educational opportunities for students with behavior-related disabilities." Deposition of Amy

McCart at 312:14-20.

**RESPONSE:** Undisputed in part. It is undisputed that Dr. McCart's recommendations include the "elimination of statewide systemic segregation of students with behavior-related disabilities for the GNETS program, and the provision of fair and equal access to educational opportunities for students with behavior-related disabilities." Ex. G, McCart Dep. at 312:14-20. This statement is denied as to Paragraph 68's characterization of Dr. McCart's recommendations as a "vision." *See supra* Paragraph 67.

69.    Her "vision" that she seeks to impose on the State Department of Education includes the adoption of her recommendations. Deposition of Amy McCart at 312:21-313:10.

**RESPONSE:** Undisputed in part. Denied as to Paragraph 69's characterization of Dr. McCart's recommendations as a "vision" that she seeks to impose. *See supra* Paragraph 67.

70.    In an article published by Dr. McCart and others at the SWIFT Center in 2020, Dr. McCart, citing a 2017 U.S. Department of Education study, wrote that "despite a long history of federal lawsuits, Supreme Court decisions, and U.S. Department of Education policy imperatives and a preponderance of research evidence challenging the utility of segregated places, widespread categorical segregation of students identified for special education continues to this day." Deposition of Amy McCart at 279:17-280:12, Ex. 10.

**RESPONSE:** Undisputed. The Court may consider this evidence for purposes of the summary judgment motion.

71.    In the same article, Dr. McCart and her co-authors write and cite 2014 and 2017 articles for the conclusion that "some progress is evident in providing greater access to general education curriculum for students considered to have high incidence or 'mild and/or moderate' disabilities, … However, for students considered to have low incidence, or 'severe' disabilities, few opportunities exist to learn from the general education curriculum alongside non-disabled peers." Deposition of Amy McCart at 281:5-13, Ex. 10.

**RESPONSE:** Undisputed. The Court may consider this evidence for purposes of the summary judgment motion.

72.    Dr. McCart opined that the "inclusion movement, in general, has been difficult for students having disabilities, including those with severe disabilities." Deposition of Amy McCart at 287:20-288:1.

**RESPONSE:** Denied as incomplete. The cited testimony omits key context: namely, that Dr. McCart made the statement in the context of discussing whether the "inclusion movement" has been "largely unsuccessful for students labeled as having severe disabilities." Ex. G, McCart Dep. 287:17-19.

73.    This conclusion is supported by the updated version of the 2017 study, the United States Department of Education's "44th Annual Report to Congress on

the Implementation of the Individuals with Disabilities Education Act, 2022." *See*

*generally*, 44th Annual Report to Congress on the Implementation of the

Individuals with Disabilities Education Act, 2022 available at

https://sites.ed.gov/idea/files/44th-arc-for-idea.pdf.

**RESPONSE:** Denied. The United States objects to the admissibility of this

unauthenticated exhibit under Fed. R. Evid. 802 and 901. The United States also

objects to Paragraph 73 as immaterial to the underlying suit: the State of Georgia

has provided no information on how the cited report relates to the GNETS Program,

including how students in the GNETS Program (which is specifically excluded from

the State's definition of a "school" under State law) are reflected in the report, how

other states' data and categorizations relate to that of the State of Georgia, and the

accuracy of any of the representations made therein.

74.    Exhibit 64 of the 44th Annual Report shows that every state reporting

data provides a separate school setting for students, and that the percentage of

Georgia students with emotional disturbances that are served in separate schools is

in the middle of the pack. Id. at 150-51, attached hereto as Exhibit F.

**RESPONSE:** Denied. The United States objects to the admissibility of this

unauthenticated exhibit under Fed. R. Evid. 802 and 901. The United States also

objects to Paragraph 74 as immaterial to the underlying suit: the State of Georgia

has provided no information on how the cited report and exhibit relate to the

GNETS Program, including how students in the GNETS Program (which is

specifically excluded from the State's definition of a "school" under State law) are reflected in the report, how other states' data and categorizations relate to that of the State of Georgia, and the accuracy of any of the representations made therein.

75.    And, several of the States where Dr. McCart provided consulting services have a significantly higher percentage of students with emotional disturbances being educated in separate schools. *See* Ex. F.

**RESPONSE:** Denied. The United States objects to the admissibility of this unauthenticated exhibit under Fed. R. Evid. 802 and 901. The United States also objects to the report cited in Paragraph 75 as immaterial to the underlying suit: the State of Georgia has provided no information on how the cited report relates to the GNETS Program, including how students in the GNETS Program (which is specifically excluded from the State's definition of a "school" under State law) are reflected in the report, how other states' data and categorizations relate to that of the State of Georgia, and the accuracy of any of the representations made therein.

76.    Dr. McCart testified could not identify specific indicators that demonstrate the efficacy of a "system of support" to meet individual student needs; instead, she identified various undefined factors like "access to [the same] educational opportunities as students without disabilities … the opportunity to experience the traditional schooling experience … outcomes for students that are academically, socially, behaviorally sound.  Happy, happy kids." Deposition of

Amy McCart at 102:2-15.

**RESPONSE:** Denied. The statement mischaracterizes the cited evidence and is incomplete. In addition to the quoted testimony in Paragraph 76, Dr. McCart testified that "what determines student success is academic, behavioral, social, emotional, and mental health outcomes that are positive for students." McCart Dep. 103:4-7. She further testified that the State should also look to "[a]mount of time of involvement and inclusion with general education with peers, amount of time focused on high expectations and access to quality, or at least appropriate environments, such as cafeterias, gymnasiums, after-school activities, specials, all of the, again, traditional elements of a schooling experience." Ex. G, McCart Dep. 103:21-104:5. These, she testified, "are the kinds of variables that are important from a systemic perspective for student success that can be correlated with time in a quality educational environment." Ex. G, McCart Dep. at 107:1-4.

77.    Dr. McCart offered her belief that the recommended actions articulated in her report would "help to make the situation better for the students that [she] observed" in GNETS classrooms. Deposition of Amy McCart at 204:16-21.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

78.    Dr. McCart acknowledged, however, that it could take more than three years to implement her recommendations. Deposition of Amy McCart at 205:1-7.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

79.    Along with some colleagues from the SWIFT Center, Dr. McCart has written that "[i]nclusive educational practices" lead to overall better student outcomes, that "traditional schools with separate classrooms and even schools designated to exclusively serve various learner subgroups (e.g., students identified for special education) will require <u>reorganized systems, structures, and resources</u>." Deposition of Amy McCart at 276:12-277:3, Ex. 10 (emphasis added.)

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

80.    Dr. McCart's report states that Georgia must ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ Ex. E at 165; Deposition of Amy McCart at 214:12-215:9.

**RESPONSE:** Denied.  This statement mischaracterizes the cited evidence and is incomplete.  The report states: "Central to effective statewide reform is large scale investment in building State, school district, and school leadership and leadership teaming structures."  McCart Rep. at 165.  *See also* Ex. G, McCart Dep. 213:7-17.

81.    Dr. McCart does know the full universe of student data that the State Department of Education already collects, nor could she testify that Georgia's

efforts to collect the data she recommends is sufficient. Deposition of Amy McCart at 209:12-19; 210; 10-14.

**RESPONSE:** Denied. The statement mischaracterizes the cited evidence and is incomplete. It is undisputed that Dr. McCart testified that she could not opine on whether the Georgia Department of Education collects sufficient data "to determine whether the local school districts are employing effective and current universal screening[.]" McCart Dep. 209:20-210:14. All other assertions are denied. The State's cited testimony does not support the State's contention that Dr. McCart "knows the full universe of student data that the State Department of Education already collects," (though it seems likely that the State unintentionally omitted the word "not" from its assertion). Dr. McCart testified that she "reviewed a lot of data from the Georgia Department of Education, but [she] ha[s] not reviewed all the data." Ex. G, McCart Dep. 209:16-18.

82.    Dr. McCart acknowledges that, at least in a "general sense," cost is a factor in determining whether recommendations to address students with disability-related behaviors are reasonable. Deposition of Amy McCart at 83:7-10.

**RESPONSE:** Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).  The United States further objects to the extent that the State is erroneously alleging that a showing on cost is part of the United States' prima facie burden.

83.     Dr. McCart's report does not contain a cost analysis, and she did not perform one. *See generally*, Ex. E; Deposition of Amy McCart at 43:6-8; 162:12-17.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

84.     Dr. McCart agrees that workforce availability is "always" a factor in determining what is reasonable. Deposition of Amy McCart at 83:11-12.

**RESPONSE:** Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).  The United States further objects to the extent that the State is erroneously alleging that a show of workforce availability is part of the United States' prima facie burden.

85.     Dr. McCart did not perform a workforce study for the State of Georgia. Deposition of Amy McCart at 83:13-15.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

86.     Dr. McCart's report does not opine that the "State of Georgia Department of Education provides an insufficient number of support services, an insufficient *quantity* of support services to students who are receiving – to students with emotional or behavioral disabilities." Deposition of Amy McCart at 172:1-9

(emphasis added).

**RESPONSE:** Undisputed in part. It is undisputed that Dr. McCart's report does not opine on, for example, the number of different categories of support services the Georgia Department of Education provides to students with emotional and behavioral disabilities. All other assertions in Paragraph 86 are denied. Throughout her report, Dr. McCart identifies numerous instances where the State provided insufficient services to students with behavior-related disabilities in the GNETS Program. *See, e.g.,* McCart Rep. at 136-153, 160.

87.     Dr. McCart articulated her opinion that the "State Department of Education [is] providing insufficient *quality*, in terms of support services that are provided to students with emotional or behavioral disabilities … as it relates to the GNETS program." Deposition of Amy McCart at 172:19-2 (emphasis added).

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

88.     Dr. McCart also opined that the State Department of Education "failed to provide effective social, emotional, and behavioral supports, professional learning, technical assistance, guidance, and vision for students in the GNETS program." Deposition of Amy McCart at 175:6-10.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

89.    She further states GaDOE "failed to provide a coherent system of social, emotional, and behavioral, mental health supports for students who are currently receiving services, and who have received services over the last many years regarding effective common educational practices and services." Deposition of Amy McCart at 176:2-8; 177:17-21.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

90.    Despite repeatedly—in her report and deposition testimony—opining that there is a role for segregated settings in education, Dr. McCart revealed her wholly contrary opinion: "It is my opinion that students have – that have behavioral needs based on their disability, that might include the need for mental health supports, should be included in their schooling experience in order for them to be successful." Deposition of Amy McCart at 254:22-255:5.

**RESPONSE:** Denied. The statement mischaracterizes the cited evidence and is incomplete. The State omits from its citation the prompting question, which clarifies the scope of Dr. McCart's response. The State asked Dr. McCart if it was her opinion that "students should be receiving mental health services in schools and not outside of the school…[i]f such mental health services would be appropriate to their needs?" Ex. G, McCart Dep. 254:13-20. In context, therefore, Dr. McCart's response was to affirm that students with behavior-related

disabilities should receive mental health services in their school environment.

91.    Dr. McCart's opinion is that "mental health supports should be included in [students with emotional or behavioral disabilities'] schooling experience." Deposition of Amy McCart at 255:7-10.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

### B. Dr. Robert Putnam

92.    The Department's other proffered expert, Dr. Robert Putnam, opined that "Georgia can make reasonable modifications to its service system to enable such students to remain in their home schools and prevent their unnecessary placement in GNETS facilities." Expert Report of Robert Putnam at 54, attached hereto as Exhibit G.

**RESPONSE:** Undisputed to the extent "such students" refers to "children who manifest significant behavior needs while attending public schools in Georgia." and "frequently do not receive appropriate services and supports in their home schools before being placed in GNETS facilities." Def. SOMF Ex. G, Expert Report of Robert Putnam, Ph.D., L.P., LABA, BCBA-D ("Putnam Rep.") at 54 (ECF No. 429-8).  The Court may consider this evidence for purposes of the summary judgment motion."

93.    Dr. Putnam offered four ways for "Georgia" to achieve his

recommendation: "(1) expanding its existing programs to ensure timely access to individualized planning, services, and supports as appropriate, including intensive behavioral health services for students at serious risk of restrictive educational placement; (2) ensuring that those services are provided consistent with established standards relating to service intensity, early identification and intervention, and PBIS; (3) ensuring that school administrators and teachers receive ongoing, effective training and mentoring on inclusionary practices and services for students with behavior-related disabilities; and (4) improving coordination through its existing System of Care, including data collection and information exchange between and by the relevant child-serving State agencies and other relevant stakeholders." Ex. G at 54.

**RESPONSE:** Undisputed. The Court may consider this evidence for purposes of the summary judgment motion.

94.    When considering whether a service is effective, Dr. Putnam acknowledged that cost is "obviously" a factor. Deposition of Robert Putnam Ph.D., L.P., LABA, BCBA-D ("Putnam Dep.") at 71:20-25 (attached hereto as Exhibit H).

**RESPONSE:** Undisputed. The Court may consider this evidence for purposes of the summary judgment motion.

95.    Despite this, his analysis is completely void of any cost report or other

fiscal analysis of his policy recommendations. Deposition of Robert Putnam at

97:6-10; 88:8-12; 97:6-10; 215:11-16; 282:11-22.

**RESPONSE:** Denied.  The statement mischaracterizes the cited evidence.

Dr. Putnam testified that in his experience, schools can often provide more effective

services in community settings at less cost.  Ex. H, Putnam Dep. 71:2-7.

96.    Similarly, though he acknowledged the importance of a sufficient

number of professionals to provide the services he recommends, Dr. Putnam did

not consider Georgia's workforce shortage of mental health professionals when

making the recommendations in his report. Deposition of Robert Putnam at 97:6-

10; 215:11-16; 282:11-22; 137:2-6.

**RESPONSE:** Denied.  The cited evidence does not support the fact asserted.

The cited testimony does not address the importance of having enough professionals

to provide services, nor does it address whether Dr. Putnam considered any possible

workforce shortage of mental health professionals in Georgia.

97.    Nor did Dr. Putnam conduct his own workforce analysis to determine

whether Georgia had sufficient workforce for expanding services. Deposition of

Robert Putnam at 110:10-111:8.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

98.    Dr. Putnam based his cost-savings recommendations for Georgia on

his experience in one school district in Massachusetts. Deposition of Robert Putnam at 38:9-43:25; 82:11-25.

**RESPONSE:** Denied.  The statement mischaracterizes the cited evidence. In the cited testimony, Dr. Putnam testified about his experience working with other urban and rural school districts, and further testified about the cost savings that the State could achieve by expanding its utilization of Medicaid services.  As Dr. Putnam noted in his report, if the State utilized Medicaid funds, "Georgia could expand the amount of therapeutic Medicaid services it provides, reach significantly more students with behavior-related disabilities, and use federal funds to cover more than 65% of the cost." Putnam Rep. at 58, and generally Part VIII § I; *see also* Federal Medical Assistance Percentage (FMAP) for Medicaid and Multiplier, KFF, *available at*

https://www.kff.org/medicaid/state-indicator/federal-matching-rate-andmultiplier/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D, *last visited* June 11, 2023 (attached hereto as Exhibit 4). *See* Holt et al., *Paths Toward Sustainable State and County Systems of Care*, 48 J. Behavioral Health Services Research 531-35 (2021).

## III.    The Delivery of Educational Services in the State of Georgia

### A. Georgia is a Local Control State

99.    The Georgia Constitution delegates the "management and control" of

each school system to a locally-elected board of education. Ga. Const. art. VIII, § 5, ¶ II.

**RESPONSE:**  Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).  Also, this fact is denied in as much as the word "delegates" is not present anywhere in Ga. Const. art. VIII, § 5, ¶ II.

100.   The IDEA refers to these local boards as "local educational agencies" or "LEAs." 20 USC § 1401(19); *see also*, Ga Comp. R. & Regs. 160-4-7-.15(1) (defining LEA for purposes of the GNETS Rule).

**RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

101.   Code Section 20-2-152 provides that LEAs, either directly or through RESAs, "provide special education programs for all eligible students with special needs who are residents of their local school systems" or RESAs. O.C.G.A. § 20-2-152(b).

**RESPONSE:**  Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).  Furthermore, this statement mischaracterizes O.C.G.A. § 20-2-152(b) which states, in full, "Local school systems shall, subject to any limitations specified in this Code section, provide

special education programs for all eligible students with special needs who are
residents of their local school systems, either by establishing and maintaining such
educational facilities and employing such professional workers as are needed by
these students or by contracting with other local school systems, regional
educational service agencies, or other qualified public or private institutions for such
services."

102.   Code Section 20-2-152 provides statutory authority for state funded,
but locally operated, special-education programs like GNETS.

**RESPONSE:**  Objection.  The fact asserted should not be considered for
purposes of the motion for summary judgment because it is improperly stated as a
legal conclusion in violation of Local Rule 56.1(B).  Denied as incomplete
inasmuch as Code Section 20-2-152 also outlines the many obligations of the
State in operating special education programs like GNETS.  Code Section 20-2-
152(c)(1) states: "(c)(1) The State Board of Education shall provide for the
funding which has been approved by the General Assembly for this purpose for
special education programs for students with disabling conditions which are
either of such low incidence or of such severity that it is unfeasible or impractical
to provide needed educational services through programs offered by local school
systems. The state board may provide such educational services with funds
specifically approved by the General Assembly for this purpose by:
(A) Providing grants directly to regional educational service agencies for

provision of services;

(B) Either directly contracting with or making grants to or authorizing local units of administration to contract with or make grants to suitable private or public institutions, inside or outside this state, for the provision of such services; provided, however, that the educational and related services of the child must be provided by professionals, such as teachers, school psychologists, speech therapists, physical and occupational therapists, and audiologists who meet the certification or licensing standards of their profession in the state in which the institution is located;

(C) Authorizing local units of administration to contract with suitable public agencies and departments, including institutions in which eligible children are confined and out-patient centers serving eligible children, inside and outside this state, for the provision of such services;

(D) Entering into reciprocal agreements with other states or political subdivisions thereof for the provision of such services; or

(E) Operating the Georgia School for the Deaf, the Georgia Academy for the Blind, the Atlanta Area School for the Deaf, and other special schools as approved by the General Assembly.

(2) The state board may promulgate rules, regulations, and standards and establish the terms and conditions governing the provision of state aid provided for this purpose by the General Assembly under this subsection and perform any and all

acts necessary or proper to carry out the provisions, intent, and purpose of this subsection."

103.   Code Section 20-2-152 further provides that the State shall set "eligibility criteria" for such programs, but that "local school systems shall … provide special education programs for all eligible students with special needs," including by "establishing and maintaining such educational facilities and employing such professional workers as are needed by these students[.]" O.C.G.A. § 20-2-152(b).

**RESPONSE:** Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).  Also, the fact is denied as incomplete as the quotes are partial and misleading.  Section 10-2-152(b) states in full:  "Local school systems shall, subject to any limitations specified in this Code section, provide special education programs for all eligible students with special needs who are residents of their local school systems, either by establishing and maintaining such educational facilities and employing such professional workers as are needed by these students or by contracting with other local school systems, regional educational service agencies, or other qualified public or private institutions for such services."  Importantly, the State left out of its quote the language "subject to any limitations specified in this Code Section."  Code Section

10-2-152(c)(1), which is quoted in full at our response to 33, above, outlines some of those limitations, including by delineating all the State's obligations to provide for special education services in Georgia.

104.    The Supreme Court of Georgia has said, "the fundamental principle of exclusive local control of general primary and secondary ("K–12") public education" applies. Gwinnett Cty. Sch. Dist. v. Cox, 289 Ga. 265, 266 (2011).

**RESPONSE:**  Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).

105.    GaDOE recognizes this principal of local authority. *See, e.g.*, Deposition of Wina Low at 150:7–17 (GaDOE reinforces expectations and provides supports to local agencies regarding their GNETS reintegration rates); Id. at 167:13–168:2 (GaDOE provides guidance in areas like transition, academic achievement, and assistive technology but does not have the authority to issue mandates); Id. at 85:17–18; Deposition of Garry McGiboney at 48:18–49:7 (GaDOE cannot require public schools to offer mental health services but it can encourage and facilitate same).

**RESPONSE:**  Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).  The statement appears to rely on and further assert an impermissible legal conclusion initially raised in paragraph

104.

106.   GaDOE encourages schools to offer mental health services as a method of increasing access to such services but it cannot require schools to do so. Deposition of Garry McGiboney at 48:18–49:7.

**RESPONSE:**  Denied.  GaDOE can and does require schools to offer mental health services to students.  Through the GNETS Rule, GaDOE does not encourage, but rather requires that a number of therapeutic services be provided in schools, which would include mental health services.  GNETS Rule at 160-4-7-.15(2)(d). For example, GaDOE requires that "GNETS will be staffed to meet the needs of a unique population of students requiring intensive individualized supports, including providing appropriate therapeutic services identified in the IEP."  160-4-7-.15(d).  It further requires that "GNETS staff will collaborate with professionals from a variety of agencies to enhance students' social, emotional, behavioral and academic development based on their IEPs."  GNETS Rule 160-4-7-.15(2)(e).  The GNETS Rule further states that GaDOE, as the SEA, "shall monitor GNETS to ensure . . . the delivery of appropriate instructional and therapeutic services."  *Id.* at (5)(a)(2)(iii).

107.   It also encourages schools to work with CSBs to enhance access to mental health in schools. Deposition of Garry McGiboney at 39:19–23; 41:2–18.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

## B. The IEP Process

108.   Federal law provides that a child's individualized education program ("IEP") is based on the individual needs of the particular child. *See* 20 U.S.C. § 1414(d)(1)(A).

**RESPONSE:**  Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).

109.   State and federal statutes provide that a child's IEP team is responsible for determining the setting from the continuum of services required by IDEA in which the child is to receive education and related services. Ga Comp. R. & Regs. 160-4-7-.15(4);  Ga. Comp. R. & Regs. 160-4-7-.07; 34 C.F.R. § 300.115; Deposition of Garry McGiboney at 75:5-10.

**RESPONSE:**  Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).

110.   This decision is based on the goals and individual needs of the child and the least restrictive environment ("LRE") in which they can reach those goals. Ga. Comp. R. & Regs. 160-4-7-.07; Deposition of Garry McGiboney at 75:11-14; Deposition of Wina Low at 165:10–166:7.

**RESPONSE:**  Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a

legal conclusion in violation of Local Rule 56.1(B).

111.    The child's IEP team determines whether the child should be recommended to receive education and related services through the GNETS Program. Deposition of Garry McGiboney at 27:14–28:3.

**RESPONSE:**  Denied as incomplete.  GaDOE also has a role in determining when a child may be recommended to receive education and related services through the GNETS Program.  The GNETS Rule sets forth the eligibility criteria by which IEP Teams are bound when considering a referral to the GNETS Program. *See* Ga. Comp. R. & Regs. 160-4-7-.15(3)(c).

112.    LEAs are empowered with the discretion to offer GNETS services in settings ranging from fully integrated ("in the general education setting") to wholly separate ("in a facility dedicated to GNETS"). Ga. Comp. R. & Regs. 160-4-7-.15(4)(c).

**RESPONSE:**  Denied in that this statement mischaracterizes the cited evidence.  The GNETS Rule does not support nor use terminology stating that the LEAs are, in any way, "empowered."  Nor does it use the words "fully integrated" or "wholly separate."  The GNETS Rule at 160-4-7-.15(4)(c) reads as follows and speaks for itself: "(c) The GNETS continuum of services by environment may be delivered as follows:  1. Services provided in the general education setting in the student's Zoned School or other public school.  2. Services provided in the student's Zoned School or other public school setting by way of a "pull out" from the general

education setting for part of the school day.  3. Services provided in the student's

Zoned School or other public school for part of the school day in a setting dedicated

to GNETS.  4. Services provided in the student's Zoned School or other public

school for the full school day, in a setting dedicated to GNETS.  5. Services

provided in a facility dedicated to GNETS for part of the school day.  6. Services

provided in a facility dedicated to GNETS for the full school day."  Further, the

GNETS Program funding formula does not include, as a factor in determining

funding, the number of students for whom a regional GNETS program provides

consultative services in the general education setting—that is, services directly to a

student or that student's teacher or paraprofessional in the general education setting.

*See* Deposition of Cassandra Holifield ("Holifield Dep.") 277:9-281:9 (attached

hereto as Exhibit I); Deposition of Whitney Braddock ("Braddock Dep.") 69:2-12

(attached hereto as Exhibit J).  Regional GNETS programs' failure to receive

funding for GNETS services provided in general education environments (i.e.,

consultative services) presents numerous difficulties, including a lack of funds to

ensure regional GNETS programs have enough staff both to serve the students with

significant needs in GNETS environments and to push into the general education

environment to deliver consultative services, and this affects programs' discretion

regarding where to offer GNETS services.  *See* GA00347596 (attached hereto as

Exhibit 5); Ex. I, Holifield Dep. 277:9-281:9

113.   LEAs are charged with ensuring that GNETS services are provided the least restrictive environment for the student to obtain a free appropriate public education ("FAPE"). Ga. Comp. R. & Regs. 160-4-7-.15(5)(b)(1).

**RESPONSE:** Denied as incomplete.  The SEA also has a role to play in ensuring that students receive FAPE in the LRE.  The IDEA makes clear that SEAs must take steps to "ensure" that LEAs are properly implementing IDEA requirements, including LRE.   20 U.S.C. § 1414(a).  The GNETS Rule also states that "[t]he SEA shall [m]onitor GNETS to ensure compliance with Federal and state policies, procedures, rules, and the delivery of appropriate instructional and therapeutic services."  Ga. Comp. R. & Regs. 160-4-7- .15(5)(a)(2)(iii).

114.   On August 1, 2016, USDOE released a "Dear Colleague" letter ("USDOE Letter") stating that, "when a child with a disability experiences behavioral challenges, including those that result in suspensions or other exclusionary disciplinary measures, appropriate behavioral supports may be necessary to ensure that the child receives FAPE." USDOE Letter at 6. The USDOE Letter is attached hereto as Exhibit V.

**RESPONSE:**  Undisputed that the United States Department of Education released a "Dear Colleague" letter on August 1, 2016. The Court may consider this evidence for purposes of the summary judgment motion.

That Dear Colleague letter speaks for itself and this asserted fact is otherwise denied as incomplete.  The quote cited by the State begins with the word "however" and is immediately preceded by the following language: "Research shows that school-wide, small group, and individual behavioral supports that use proactive and preventative approaches, address the underlying cause of behavior, and reinforce positive behaviors are associated with increases in academic engagement, academic  achievement, and fewer suspensions and dropouts.  In short, children are more likely to achieve when they are directly taught predictable and contextually relevant school and classroom  routines and expectations, acknowledged clearly and consistently for displaying positive by parents for a meeting to review their child's IEP. Public agencies are required under the statute and these final regulations to be responsive to parental requests for such reviews."  There is a footnote attached to this content that cites as sources of support two separate articles co-authored by the United States' expert, Dr. Robert Putnam.

115.   The USDOE Letter further states that "[a] determination of whether there is a denial of FAPE is a fact based determination, to be made on a case by case basis." Ex. V at 9.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

116.   The USDOE Letter provides that "[a] determination of whether there

is a denial of placement in the LRE is also a fact based determination." Ex. V at 10.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

117.   The USDOE Letter states that "[t]herefore, a failure to provide appropriate behavioral supports (because they are not offered or because teachers and other staff are not adequately trained to implement such supports) that results in the child not receiving a meaningful educational benefit may constitute a denial of FAPE." Ex. V at 12.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

118.   Once a student begins receiving GNETS services, the LEA is charged with "monitor[ing]" the student's IEP to "determine students' progress and access to services in a lesser restrictive environment." Ga. Comp. R. & Regs 160-4-7-.15(5)(b)(8).

**RESPONSE:** Denied as incomplete.  The SEA also has a role in monitoring IEPs of students in the GNETS Program.  The GNETS Rule states that "[t]he SEA shall [m]onitor GNETS to ensure compliance with Federal and state policies, procedures, rules, and the delivery of appropriate instructional and therapeutic services."  Ga. Comp. R. & Regs. 160-4-7-.15(5)(a)(2)(iii).  GaDOE has previously required that GNETS directors conduct an IEP file review for every student in the

GNETS Program and produce certain information about the students to the State. Cole Dep. 369:1-20.  To facilitate this process, GaDOE requested specific information and later provided a form with a drop-down menu.  *See* GA05243260 (attached hereto as Exhibit 6); *see e.g.*, GA05250025 (attached hereto as Exhibit 7). The form requires information related to each student's disability, placement history, behavior interventions, history of restraint and seclusion, and the regional GNETS program's compliance with the entrance criteria outlined in the GNETS rules, among other information.  *See e.g.*, Ex. 7 (GA05250025); Deposition of Brooke Cole ("Cole Dep.") 369:1-15 (attached hereto as Exhibit K); Deposition of Vickie Cleveland ("Cleveland Dep.") 199:7-202:20 (attached hereto as Exhibit L).

119.   Whether a child can be appropriately served in the general education setting depends on the individual. Deposition of Garry McGiboney at 223:22–224:3.

**RESPONSE:**  Denied as incomplete.  Whether a child can be appropriately served in the general education setting also depends on the services available in that setting.  Dr. McGiboney testified that "local school system[s] could be incentivized to bring the student home" "[i]f they understood more of mental health issues, and perhaps that could in the long run influence the IEP."  Deposition of Garry McGiboney ("McGiboney Dep.") 223:7-223:25 (attached hereto as Exhibit M).  Dr. McCart also stated that "[f]actors as it relates to this case that go into making a decision regarding the least restrictive environment are related to what are the

available supports and services to meet students' needs who have behavior-related

disabilities." Ex. G, McCart Dep. 61:12-16.  She further testified that "[t]he

supports and services that are available are determined by the entirety of the

educational system, starting with the vision, guidance, and leadership at the State

Department of Education., then shared with the local education agencies, in terms

of, again, that system of support that is in place.  That is then utilized by an IEP

team about what supports can be put into place because of their availability."  Ex.

G, McCart Dep. 61:19-62:5.

120.    Dr. McCart has never been a member of an IEP team in the State of

Georgia. Deposition of Amy McCart at 55:18-20.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

121.    Dr. McCart agrees that IEPs are based on the needs of individual

students. Deposition of Amy McCart at 62:18-63:2.

**RESPONSE:**  Denied as incomplete.  IEPs, while based on the needs of an

individual student, are, in practice, also based on the services that are available to

the student.  Dr. McCart testified that "[f]actors as it relates to this case that go into

making a decision regarding the least restrictive environment are related to what are

the available supports and services to meet students' needs who have behavior-

related disabilities." Ex. G, McCart Dep. 61:6-16.  She went on to say that "[t]he

supports and services that are available are determined by the entirety of the

educational system, starting with the vision, guidance, and leadership at the State

Department of Education., then shared with the local education agencies, in terms

of, again, that system of support that is in place.  That is then utilized by an IEP

team about what supports can be put into place because of their availability."  Ex.

G, McCart Dep. 61:6-62:14.

122.  The national consideration of whether a student spends "40 percent of

the time in a general education environment" is not "indicative of effective

supports," because, according to Dr. McCart, considerations of efficacy "depend[],

absolutely on each child … and their needs." Deposition of Amy McCart at 104:6-

11; 106:3-12.

**RESPONSE:** Denied as inaccurate and incomplete.  The statement

mischaracterizes the cited evidence. Dr. McCart never referred to or acknowledged

a "national consideration of whether a student spends '40 percent of the time in a

general education environment.'"  Further, the State has omitted relevant testimony

from Dr. McCart indicating that considerations of efficacy depend on more than

merely the child's needs: "Q:  If a child is spending, on average, 40 percent of their

time in general education settings, is that indicative of effective services or is it

indicative of not effective services?  A:  I don't know that child, so it's impossible

for me to say.  Q:  So you have to look at the individual student?  A:  To what?  Q:

To determine the efficacy of services.  A.  It's more than that.  Q:  Okay.  A.  That's

one variable."  Ex. G, McCart Dep. 103:8-105:14.  Dr. McCart went on to say that

"there are a number of variables that determine whether or not an educational placement is effective."  Ex. G, McCart Dep. 105:2-106:12.

123.   Dr. McCart acknowledges that there can be "appropriate" reasons to "segregate students." Deposition of Amy McCart at 19:14-18; 21:5-15; 145:14-17; 183:13-21.

**RESPONSE:**  Denied.  The statement mischaracterizes the cited evidence or the cited evidence does not support the fact asserted.  During her deposition, Dr. McCart was asked "do you believe that there is an appropriate role for a program like GNETS, ever?" and she responded "No, not for GNETS, specifically.  If you're asking me whether or not it's appropriate to ever segregate students, yes."  Ex. G, McCart Dep. 19:14-18.  Dr. McCart later elaborated, saying "I have worked for many, many years, just to give you a little context, with students with a variety of very significant behavioral challenges and disabilities.  And what I found to be the case is in very limited numbers, there are certain students who benefit from small environments that have very structured learning opportunities, and exposure to time in general education classrooms, that have less noise or stimuli in that environment, and that have access to highly trained specialized educators who can support their needs."  Ex. G, McCart Dep. 21:2-15.  Dr. McCart explained "there are a small number of students who require highly specialized teaching and behavior support."  Ex. G, McCart Dep. 144:2-145:17.  Dr. McCart also said "[i]s it possible to have a segregated program for students with behavior-related disabilities, and still not have

statewide systemic segregation, and have fair and equal access?  Yes, as long as it is related specifically to effective learning environments that are matched to student need that are in line with practices that are common in the field now."  Ex. G, McCart Dep. 182:11-183:21.

124.   Dr. McCart also acknowledges that, even if students with emotional or behavioral disabilities were provided with "the full array of supports and services," some would need to be educated away from the general education setting. Deposition of Amy McCart at 143:18-144:1.

**RESPONSE:**  Denied.  The statement mischaracterizes the cited evidence or the cited evidence does not support the fact asserted.  Dr. McCart stated, "[E]ven if the full array of supports and services were being provided, certainly there are some students, under certain conditions for certain periods of time, that do need placements in which there are smaller numbers of students and away from general education." Ex. G, McCart Dep. 142:4-144:1.

125.   Dr. McCart did not articulate a consistent definition of "unnecessary segregation."  At one point, she defined the phrase as being "moved away from his or her school-aged peers or siblings, set apart from, or treated differently than students without disabilities." Deposition of Amy McCart at 65:17-22.

**RESPONSE:** Denied.  The cited evidence does not support the fact asserted. Dr. McCart was asked in various ways about what constitutes unnecessary

segregation, and she provided responses that were appropriate taking into account the framing of each question.  *See* Ex. G, McCart Dep. 65-68.

126.    At another, she says that if an IEP team recommends a segregated setting it does not result in "unnecessary segregation." Deposition of Amy McCart at 68:10-16; *see also* Deposition of Amy McCart at 80:11-15.

**RESPONSE:**  Denied.  This statement mischaracterizes the cited evidence. In the cited testimony, Dr. McCart was asked if "it is [her] opinion that every time an IEP team in the State of Georgia recommends that a student to go a GNETS facility that is separate and freestanding, that that constitutes unnecessary segregation?"  She responded: "[i]f you were to say that any – if an IEP team recommends a segregated setting, based on the individual needs, would I consider that to be unnecessary?  No.  The concern here is that you said within the GNETS program.  And the GNETS program, as indicated in finding 3, is failing to provide the services that it's using to justify its existence."  Ex. G, McCart Dep. 68:4-69:16. She then responded "no" when asked "if the May Institute or anyone else were operating free standing facilities just for students with autism or traumatic, would that, in every case, constitute unnecessary segregation." Ex. G, McCart Dep. 80:11-81:15.

127.    Dr. McCart equated discrimination in education as being denied a free and appropriate public education ("FAPE"). Deposition of Amy McCart at 73:5-13.

**RESPONSE:**  Denied.  This statement mischaracterizes the cited evidence.

Dr. McCart does not use the word discrimination in the testimony cited.  The State

asked Dr. McCart "if a school is not providing effective behavior and therapeutic

supports, could it provide a free and appropriate public education?"  She replied that

"in the context of being an educator, the provision of a free and appropriate public

education is ever-changing, given what is – in terms of how you would define a

schooling experience for a child.  And so children are allowed to have a free and

appropriate public education.  Children are allowed to have – should be allowed to

have opportunities to learn, regardless of whether or not they have disabilities.

They should be able to engage in schooling environments and experiences in which

their behavior-related disability does not result in exclusion from those experiences.

So that's what I would say about that."  Ex. G, McCart Dep. 72:4-73-14.

128.   Dr. McCart frequently used the phrase "fair and appropriate public

education" in her deposition, but she could not articulate the difference between it

and a "free and appropriate public education" or FAPE. Deposition of Amy McCart

at 247:11-13.

**RESPONSE:**  Denied.  The cited evidence does not support the fact asserted.

Dr. McCart never once used the phrase "fair and appropriate public education" in

her deposition.  Dr. McCart was asked "[w]hat's the difference between fair and

equal educational opportunities and fair and appropriate public education, or

FAPE?"  Ex. G, McCart Dep. 247:7-9.  She responded "I don't know, at this point

in time, that I can articulate that."  Ex. G, McCart Dep. 247:11-13.  She was

undoubtedly confused because, in asking this question, the State wrongly declared

that FAPE stands for "fair and appropriate public education" when it stands for

"free and appropriate public education."  Throughout the deposition, the State

asserted myriad incorrect definitions of FAPE, at once point asking Dr. McCart

whether she is "familiar with the term free and public education, or FAPE?"  Ex. G,

McCart Dep. 53:13-14.  The State used the incorrect phrase three additional times

until Dr. McCart corrected counsel, noting that it is "free and appropriate public"

education.  Ex. G, McCart Dep. 69:22; 70:6-7, 12-14; *see also* Ex. G, McCart Dep.

68:21-69:22 (counsel referring to "a free and public education"); McCart Dep.

74:20-75:3 (counsel referring to "fair and appropriate – or free and appropriate – a

FAPE public education . . .").

129.   The kinds of behavioral health services that should be provided to

students with emotional and behavioral disabilities depends on the student's IEP.

Deposition of Garry McGiboney at 167:6–168:7.

**RESPONSE:**  Denied.  This statement mischaracterizes the cited evidence.

Dr. McGiboney was asked "[i]n your opinion as a psychologist focused on student

mental health, what kinds of behavioral health services should be provided to

students with emotional and behavioral disabilities in GNETS?"  He answered,

"Depends on what they need."  Ex. M, McGiboney Dep. 167:6-10.  He elaborated,

stating that the kinds of services students in GNETS would need "would depend on

what the IEP calls for," and he thought students in GNETS had IEPs that "require a

high level of need." Mr. McGiboney clarified that he "couldn't fully answer" the question because he has "not worked in a GNETS." Ex. M, McGiboney Dep. 167:6-23.

130.   An IEP team is made up of the classroom teacher, special education director, the student, the parent, other related service providers, LEA representatives, sometimes a building administrator, and any other invited related service provider or stakeholder that has a role in supporting the student. Deposition of Samuel Clemons at 327:13-17; Deposition of Brooke Cole at 401:2-9; Deposition of Derrick Gilchrist at 257:15-22. *See also* 20 U.S.C. § 1414(d)(1)(B) (listing members of IEP team).

**RESPONSE:** Denied. In each of the three depositions cited, the makeup of the IEP Team was described differently and in a way that varies from requirements laid out in the IDEA. It is undisputed that the IDEA, as cited by the State, clearly lays out the makeup of an IEP Team as being composed of: "(i) the parents of a child with a disability; (ii) not less than 1 regular education teacher of such child (if the child is, or may be, participating in the regular education environment); (iii) not less than one special education teacher, or where appropriate, not less than 1 special education provider of such child; (iv) a representative of the local educational agency who-- (I) is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities; (II) is

knowledgeable about the general education curriculum; and (III) is knowledgeable about the availability of resources of the local educational agency; (v) an individual who can interpret the instructional implications of evaluation results . . . ; (vi) at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate; and (vii) whenever appropriate, the child with a disability."

131.   When a student is being considered for receiving services through the GNETS Program, staff from the GNETS Program being considered attends as well. Deposition of Celest Ngeve ("Ngeve Dep.") at 206:2-13.

**RESPONSE:**  Denied as incomplete.  Ms. Ngeve testified that when a student is being considered for services at Rutland Academy GNETS, Ms. Ngeve, her coordinator, and "the potential caseload manager for that student" participate in "all IEP meetings where consideration of GNETS services is being discussed."  Ngeve Dep. at 201:16-22, 202:5-17, 204:16-205:2, 205:16-206:13 (attached hereto as Exhibit N).

132.   Dr. McCart does not know if employees of the Georgia Departments of Education, Community Health, and Behavioral Health and Developmental Disabilities serve on IEP teams. Deposition of Amy McCart at 55:21-56:13.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

133.   She does not know if the Georgia Departments of Education, Community Health, or Behavioral Health and Developmental Disabilities can override the recommendations of an IEP team. Deposition of Amy McCart at 64:9-21.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

134.   The State has no role on an IEP team. Deposition of Haley Livingston at 278:22-279:7; Deposition of Cassandra Holifield at 333:13-20; Deposition of Samuel Clemons at 327:18-22; Deposition of Brooke Cole at 401:2-9; Deposition of Derrick Gilchrist at 257:23-258:9; Deposition of Patricia Wolf at 277: 24-278:2; Deposition of Whitney Braddock at 232:6-12; *see also* 20 U.S.C. § 1414(d)(1)(B).

**RESPONSE:**  Denied.  GNETS Director Lisa Futch testified that she was aware of an instance where then-State Director of Special Education Zelphine Smith-Dixon was present as a member of an IEP Team.  Deposition of Lisa Futch ("Futch Dep.") 349:24-350:14 (attached hereto as Exhibit O).  In addition, GNETS Director Brooke Cole testified that, in some cases, a representative from the Georgia Department of Education will "set the parameters" and "facilitate the IEP" meeting.  Ex. K, Cole Dep. 401:10-402:1.

135.   Parents are always involved in IEP team decisions. Deposition of Haley Livingston at 102:13-22.

**RESPONSE:** Denied.  Parents are, by law, members of the IEP Team.  *See* 20 U.S.C. § 1414(d)(1)(B).  However, the United States has uncovered substantial evidence that the parents of students placed in the GNETS Program do not oppose—and in fact often expressly seek—community educational placements. Parents and guardians have complained—formally and informally—about their children's educational placements in the GNETS Program and have expressly sought community educational placements instead.  *See, e.g.*, GA05202437 (attached hereto as Exhibit 8); US0012047 (attached hereto as Exhibit 9); US0012763 (attached hereto as Exhibit 10); US0011494 (attached hereto as Exhibit 11); US0011511 (attached hereto as Exhibit 12); US0011549 (attached hereto as Exhibit 13); US0011550 (attached hereto as Exhibit 14).  Some parents have filed due process complaints with the State to demand community educational placements for their children.  *See, e.g.*, GA05199933 (attached hereto as Exhibit 15); GA05200951 (attached hereto as Exhibit 16); GA05199710 (attached hereto as Exhibit 17); GA05200962 (attached hereto as Exhibit 18).  A number of these due process complaints expressly alleged that students' initial GNETS Program placement decisions were made unilaterally, despite parents' objections and explicit requests that their children remain in community educational placements.  *See, e.g.*, GA05201028 (attached hereto as Exhibit 19); Ex. 16 (GA05200951).  IEPs produced by regional GNETS programs also memorialize parents' desire for their children return to community educational placements.  *See, e.g.*, US0151559 at

US0151673 (attached hereto as Exhibit 20); US0184588 at US0184594 (attached hereto as Exhibit 21); *see also* McCart Rep. at 154. Oftentimes, when parents have raised concerns about the GNETS Program during IEP meetings, they have been told that the GNETS Program is the only option for their children. *See, e.g.*, McCart Dep. 56:14-57:20. Some parents have lamented that they only initially agreed to their children being placed in the GNETS Program, rather than lodging an explicit complaint about the segregated placement at the outset, because they felt "bullied" by the educational placement process that led to their children's GNETS Program placements. *See, e.g.*, US0011522 (attached hereto as Exhibit 22). Others have shared that they believe more parents are not actively fighting GNETS Program placements and seeking community educational placements because they do not "know there is something better" or have "given up" advocating. *See, e.g.*, US0011538 (attached hereto as Exhibit 23).

136.    Federal law provides that a parent can request a meeting at any time and such request must be granted. *See* 20 USC 1414.

**RESPONSE:** Objection. The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B). Further, the term "meeting," as used in this sentence, is vague and ambiguous, and the statement mischaracterizes the cited evidence.

137.    A parent can unilaterally decline GNETS services. Deposition of

Talithia Newsome at 196:24-197:1.

**RESPONSE:** Denied. This statement mischaracterizes the cited evidence. In response to the question, "Can a parent or guardian unilaterally decline GNETS services," Ms. Newsome testified that "a parent can decline any – yes." Ms. Newsome did not testify that a parent can "unilaterally" decline GNETS services. In fact, the United States has uncovered myriad evidence that some parents of students placed in the GNETS Program believe their children were placed in GNETS unilaterally, despite the parents' own objections and explicit requests that their children remain in community educational placements. *See, e.g.*, Ex. 19, GA05201028; Ex. 16, GA05200951. Parents have contacted the United States to express their opposition to their students' GNETS Program placements and desire for their children to attend community educational placements. *See, e.g.*, Ex. 9, US0012047; Ex. 10, US0012763; Ex. 11, US0011494; Ex. 12, US0011511; Ex. 13, US0011549; Ex. 14, US0011550. When parents raised concerns about the GNETS Program during IEP meetings, parents were often told that the GNETS Program was the only option for their children. *See, e.g.*, Ex. G, McCart Dep. 56:14-57:20. Some parents lamented that they only initially agreed to their children being placed in the GNETS Program, rather than lodging an explicit complaint about the segregated placement at the outset, because they felt "bullied" by the educational placement process that led to

their children's GNETS Program placements. *See, e.g.*, Ex. 22, US0011522.

Some parents shared that they believe more parents are not actively fighting

GNETS Program placements and seeking community educational

placements because they do not "know there is something better" or have

"given up" advocating. *See, e.g.*, Ex. 23, US0011538.

138.   The Department has not produced any evidence that any individual

student opposes receiving services in a GNETS Program school-based location or

center.

**RESPONSE:** Denied.  The United States has uncovered substantial evidence

that the parents of students placed in the GNETS Program do not oppose—and in

fact often expressly seek—community educational placements.   Parents and

guardians have complained—formally and informally—about their children's

educational placements in the GNETS Program and have expressly sought

community educational placements instead.  *See, e.g.*, Ex. 8, GA05202437; Ex. 9,

US0012047; Ex. 10, US0012763; Ex. 11, US0011494; Ex. 12, US0011511; Ex. 13,

US0011549; Ex. 14, US0011550.  Some parents have filed due process complaints

with the State to demand community educational placements for their children.  *See,*

*e.g.*, Ex. 15, GA05199933; Ex. 16, GA05200951; Ex. 17, GA05199710; Ex. 18,

GA05200962.  A number of these due process complaints expressly alleged that

students' initial GNETS Program placement decisions were made unilaterally,

despite parents' objections and explicit requests that their children remain in

community educational placements.  *See, e.g.*, Ex. 19, GA05201028; Ex. 16, GA05200951.  IEPs produced by regional GNETS programs also memorialize parents' desire for their children return to community educational placements.  *See, e.g.*, Ex. 20, US0151559 at US0151673; Ex. 21, US0184588 at US0184594; *see also* McCart Rep. at 154.  Oftentimes, when parents have raised concerns about the GNETS Program during IEP meetings, they have been told that the GNETS Program is the only option for their children.  *See, e.g.*, Ex. G, McCart Dep. 56:14-57:20.  Some parents have lamented that they only initially agreed to their children being placed in the GNETS Program, rather than lodging an explicit complaint about the segregated placement at the outset, because they felt "bullied" by the educational placement process that led to their children's GNETS Program placements.  *See, e.g.*, Ex. 22, US0011522.  Others have shared that they believe more parents are not actively fighting GNETS Program placements and seeking community educational placements because they do not "know there is something better" or have "given up" advocating.  *See, e.g.*, Ex. 23, US0011538.

139.   In contrast, in some instances, parents have requested for their child to spend their entire academic career in GNETS. Deposition of Wina Low at 155:24–156:4.

**RESPONSE:**  Denied as incomplete.  Wina Low testified that she has known of some students who have spent their entire academic career at GNETS and that "parents have requested that as well."  Deposition of Wina Low ("Low

Dep.") 155:24-156:4 (attached hereto as Exhibit P).  She suggested that these requests stem from parents' frustration and that parents whose children are in GNETS are "less likely [to] receive so many phone calls" from school about their children.  Ex. P, Low Dep. 155:24-156:10.  Although some parents may request that their children remain in GNETS, Ms. Low acknowledged that GNETS "wasn't intended to be a place to stay forever."  Ex. P, Low Dep. 154:20-156:4.

140.   No GNETS Director testified that they were aware of any instance in which the State compelled a GNETS Program to make a particular decision regarding a student's placement. *See e.g.*, Deposition of Derrick Gilchrist at 258:10-13.

**RESPONSE:**  Denied.  Brooke Cole, Director of Elam Alexander GNETS Academy, testified that the State's GNETS Program Manager concluded that students on the Georgia Alternate Assessment were inappropriate for Elam Alexander and could be served in their home school systems.  *See* GA00322208 (attached hereto as Exhibit 24); Ex. K, Cole Dep. 108:3-110:3, 111:9-18.  As a result, Elam Alexander began removing such students from its program and reintegrating them into their home school systems.  *See* Ex. 24, GA00322208; Ex. K, Cole Dep. 98:18-22, 107:6-19, 112:22-113:3.

141.   No GNETS Director testified that the State has encouraged their program to keep a student in GNETS when the IEP recommended otherwise. *See*

*e.g.*, Deposition of Derrick Gilchrist at 258:14-16; Deposition of Whitney

Braddock at 232:23- 233:1.

**RESPONSE:** Undisputed.  The Court may consider this evidence

for purposes of the summary judgment motion.

142.   As reflected by the absence of such information in her report and her

deposition testimony, Dr. McCart is not aware of any individual for whom a State

employee—from GaDOE, DCH, or DBHDD—mandated a particular student

receive GNETS services. Deposition of Amy McCart at 124:13-125:3; *see*

*generally* Ex. E.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

143.   The length of time a student receives services through GNETS is

dependent on what is in the student's IEP and how quickly the student reaches the

goals identified in the IEP. Deposition of Clara Keith Brown at 23:24-24:3;

Deposition of Samuel Clemons at 329:20-1.

**RESPONSE:** Denied as incomplete.  Because the GNETS Program is

intended to provide students with therapeutic services and supports that will

enable them to return to their home schools, the length of time a student remains

in GNETS also depends on the nature of the therapeutic services and supports

available to that student.  *See*, *e.g.*, GA00481564 (attached hereto as Exhibit 25);

GA00481478 (attached hereto as Exhibit 26); Deposition of Clara Keith 26:5-27:24, 81:8-82:3, 86:10-87:8; Deposition of Celest Ngeve 55:18-56:1; Deposition of Wina Low 154:20-155:23.  The lack of adequate therapeutic services and supports across GNETS is therefore a factor in a student's length of stay in the Program.  *See*, *e.g.*, GA00197223 at GA00197227 (noting that because "many of the GNETS programs are operating below the expected clinical staff ratio for therapeutic services[,] . . . [s]ome of the programs are . . . challenged in providing the recommended amount of therapeutic supports to facilitate optimal turn around in students' behaviors") (attached hereto as Exhibit 27); Deposition of Clara Keith Brown ("Keith Dep.") 132:10-139:20 (attached hereto as Exhibit Q).

144.   Exit criteria are developed by the IEP team. Wolf Dep. 81: 14-16. The IEP team determines the student's IEP goals and goals they need to meet in order to exit the GNETS Program. Deposition of Patricia Wolf at 81:7-13; Deposition of David Ackerman at 234: 10-21.

**RESPONSE:** Denied as incomplete.  In addition to IEP teams determining individual student goals, students in the GNETS program may be required to meet general exit criteria that apply to all students.  *See*, *e.g.*, Deposition of Talithia Newsome ("Newsome Dep.") 214:19-224:5 (attached hereto as Exhibit R); Deposition of Patricia Wolf ("Wolf Dep.") 81:20-82:14 (attached hereto as Exhibit S).  For example, Patricia Wolf testified that one such "exit criteria that appl[ies] across the board to all GNETS of Oconee students" is that a student

remain on the "green level" (i.e., displaying positive behavior) 80 percent of the time before transitioning back to their home school.  Ex. S, Wolf Dep. 81:20-82:14; *see also generally* Ex. R, Newsome Dep. 214:19-224:5 (discussing similar level system and its relation to student exit).  Subject to this additional context, the Court may consider the evidence for purposes of the motion for summary judgment.

145.   Student reintegration into general education from a GNETS Program is entirely reliant on the student's individualized IEP. Deposition of Samuel Clemons at 327:5-12.

**RESPONSE:** Denied.  Student reintegration into general education from a GNETS Program may occur for a number of reasons, including reasons related to an individual student's IEP.  Student reintegration may also occur for other reasons.  For example, numerous GAA students were reintegrated into general education after the GNETS Program Manager determined that GNETS was an inappropriate setting for GAA students and such students could be served by their home school systems.  *See* Ex. K, Cole Dep. 98:18-22, 107:6-19, 108:3-110:3, 111:9-18, 112:22-113:3.

146.   The Department has offered no evidence that any individual student has been wrongly placed in a GNETS Program by the student's IEP team.

**RESPONSE:**  Objection.  The fact asserted is not supported by any

citation to evidence, as required by Local Rule 56.1(B)(1).

147.    Indeed, Dr. McCart could not recall—and her report does not identify—any student receiving GNETS services who was not recommended for the GNETS Program by his or her IEP. Deposition of Amy McCart at 119:21-120:5.

> **RESPONSE:**  Undisputed. The Court may consider this evidence for purposes of the summary judgment motion.

148.    There is no evidence that any single student would be better educated in a less restrictive setting than that of a GNETS school-based location or center.

> **RESPONSE:**  Objection.  The fact asserted is not supported by any citation to evidence, as required by Local Rule 56.1(B)(1).

149.    The Department has not produced any evidence demonstrating any individual student would not be in the GNETS Program had they received any particular service in a general education setting.

> **RESPONSE:** Denied. The United States has produced myriad evidence that had students received appropriate therapeutic supports and services in the general education setting they could have avoided a GNETS Program placement. *See e.g.*, Ex. 15, GA05199933; Ex. 18, GA05200962; McCart Rep. at 163-164; Putnam Rep. at 14, 42-58. The State has also produced evidence acknowledging that students often enter the GNETS Program without documentation that they have had a

Functional Behavioral Assessment and/or Behavior Intervention Plan as the GNETS Rule requires, which could be used to establish whether a student is receiving appropriate therapeutic services and supports that enable them to remain in a general education setting. *see* Ga. Comp. R. & Regs. § 160-4-7-.15(3)(c)(2).

150.   The Department has not produced evidence of even one identified student who currently receives services through the GNETS Program but could be served in a more integrated setting if provided with appropriate services and supports.

**RESPONSE:** Denied. As part of her examination, Dr. McCart conducted 70 site visits, reviewed thousands of relevant records, and observed nearly a thousand students in the GNETS Program.  McCart Rep. at 7, 165.  It is Dr. McCart's expert opinion that the "vast majority of students in the GNETS Program can and should be served in integrated settings with appropriate services and supports[.]" McCart Rep. at 167, *see* Ex. G, McCart Dep. 39:10-40:2-9. The State itself has also acknowledged that students with intellectual disabilities who currently receive services in the GNETS Program could be served in a more integrated setting if provided with appropriate services and supports. *See, e.g.*, GA00338963 (attached hereto as Exhibit 28); Ex. K, Cole Dep. 115:14-119:17.

151.   The Department has not produced any evidence demonstrating that a student's IEP team would recommend placement in the general education setting if only the student could receive specialized services there.

**RESPONSE:** Objection. The fact asserted is not supported by any citation to evidence, as required by Local Rule 56.1(B)(1).

152. Evidence has not identified a single student for whom an observing, treating clinician has opined that general education is the most appropriate setting for their needs.

**RESPONSE:** Objection. The fact asserted is not supported by any citation to evidence, as required by Local Rule 56.1(B)(1).

153. The Department has failed to produce any evidence that demonstrates non-opposition of any single student or parent to a community-based setting.

**RESPONSE:** Denied. The United States has uncovered substantial evidence that the parents of students placed in the GNETS Program do not oppose—and in fact often expressly seek—community educational placements. Parents and guardians have complained—formally and informally—about their children's educational placements in the GNETS Program and have expressly sought community educational placements instead. *See, e.g.*, Ex. 8, GA05202437; Ex. 9, US0012047; Ex. 10, US0012763; Ex. 11, US0011494; Ex. 12, US0011511; Ex. 13, US0011549; Ex. 14, US0011550. Some parents have filed due process complaints with the State to demand community educational placements for their children. *See, e.g.*, Ex. 15, GA05199933; Ex. 16, GA05200951; Ex. 17, GA05199710; Ex. 18, GA05200962. A number of these due process complaints expressly alleged that

students' initial GNETS Program placement decisions were made unilaterally, despite parents' objections and explicit requests that their children remain in community educational placements. *See, e.g.*, Ex. 19, GA05201028; Ex. 16, GA05200951. IEPs produced by regional GNETS programs also memorialize parents' desire for their children return to community educational placements. *See, e.g.*, Ex. 20, US0151559 at US0151673; Ex. 21, US0184588 at US0184594; *see also* McCart Rep. at 154. Oftentimes, when parents have raised concerns about the GNETS Program during IEP meetings, they have been told that the GNETS Program is the only option for their children. *See, e.g.*, Ex. G, McCart Dep. 56:14-57:20. Some parents have lamented that they only initially agreed to their children being placed in the GNETS Program, rather than lodging an explicit complaint about the segregated placement at the outset, because they felt "bullied" by the educational placement process that led to their children's GNETS Program placements. *See, e.g.*, Ex. 22, US0011522. Others have shared that they believe more parents are not actively fighting GNETS Program placements and seeking community educational placements because they do not "know there is something better" or have "given up" advocating. *See, e.g.*, Ex. 23, US0011538.

154. Dr. McCart's report contains information demonstrating that overall new student recommendations to the GNETS Program declined from 898 in school year 16-17 to 576 in school year 21-22. Ex. E at 16, Figure D.

**RESPONSE:** Denied. The statement mischaracterizes the cited evidence.

Figure D in Dr. McCart's report reflects the number of new student placements in the GNETS Program, not the number of new student "recommendations." McCart Rep. at 22, Figure D. Further, the number of new student placements has not declined consistently from school year 16-17 to school year 21-22. *Id*. For example, the number of new student placements increased from 798 students in school year 17-18 to 852 students in school year 18-19. *Id*. In addition, while there was a decrease in new student placements to 383 students in school year 20-21—a school year largely impacted by COVID-19—in school year 21-22, the number of new student placements increased to 576 students. *Id*.

155.   Similarly, the report shows that the total population of students in the GNETS Program has declined from 4,492 in school year 15-16 to 2,925 in school year 21-22. Ex. E at 16, Figure D.

**RESPONSE:** Undisputed. The Court may consider this evidence for purposes of the summary judgment motion.

156.   Despite the significant decline in IEP teams' referrals of new students to the GNETS program, Dr. McCart expressed concern with GNETS enrollment data as the "number of students still being admitted each year." Deposition of Amy McCart at 235:14-16.

**RESPONSE:** Denied. The statement mischaracterizes the cited evidence. There is no evidence and no testimony about a "significant decline in IEP teams' referrals of new students to the GNETS [P]rogram," and the data speaks for itself

with respect to variations in the numbers of new student placements.  It undisputed that in the context of clarifying the various possible reasons for the decline in overall GNETS Program enrollment numbers (Ex. G, McCart Dep. at 232:21-235:1), Dr. McCart testified that "what is of concern is the number of students still being admitted each year."  Ex. G, McCart Dep. 235:2-16.  Dr. McCart also expressed concern that the proportion of new student placements is "remaining constant at 20 percent."  Ex. G, McCart Dep. 236:2-239:2; *see* McCart Rep. at 15.

157.   Although Dr. McCart testified that the "concern" was new student enrollment in GNETS, Deposition of Amy McCart at 235:14-16, she later testified that another issue is how long students remain in the program. Deposition of Amy McCart at 240:16-19.

**RESPONSE:** Denied.  The statement mischaracterizes the cited evidence as to the content covered in paragraph 156 and the testimony cited in Dr. McCart's deposition.  This statement is also denied to the extent this statement suggests there is inconsistency in having more than one concern about the data relating to student enrollment numbers in the GNETS Program.  It is undisputed that Dr. McCart is concerned about the length of stay of many students once placed in the GNETS Program.  *See e.g.*, Ex. G, McCart Dep. 236:4-237:13, 238:2-241:3.

158.   But Dr. McCart's report shows that, of the 4,492 students receiving GNETS services in school year 15-16, only 527 (11.73%) were still receiving GNETS services in school year 21-22. Ex. E at 16, Figure E.

**RESPONSE:**  Denied. The statement mischaracterizes the cited evidence. As explained in Dr. McCart's report (McCart Report at 16-17 and Figure E) and testimony (Ex. G, McCart Dep. 236:2--241:13), the table reflects the number of students remaining in the GNETS Program disaggregated by the grade of the student in the initial year, SY15-16.  Thus, only students in grades pre-K through sixth grade in SY15-16 would be expected to still be enrolled in school by the last year in the table, SY21-22.  Among those cohorts, between 17.44% and 35.63% of students are still in the GNETS Program for *at least* their seventh year.  McCart Report at 16 and Figure E.  Among the older cohorts, the numbers of students remaining in the GNETS Program declines markedly after the point at which students should have reached graduation or non-mandatory attendance.  *Id*.  (Figure F presents comparable data for students who were placed in the GNETS Program in SY16-17; between 30.49% and 45.65% of K-5 students in these cohorts were still in the GNETS Program for their sixth year.  McCart Report at 16-17 and Figure F.)  In addition, those students no longer in the GNETS Program–from any cohort–have not necessarily returned to school in general education settings, for a variety of reasons, including having been expelled or having left the GNETS Program without graduating.  Ex. G, McCart Dep. at 232:21-235:2-12.

159.   While Dr. McCart devotes a significant amount of weight to her recommendation that Georgia adopt her "vision," she could not recall whether the

information she reviewed for her report contained a statement where a state official "testified that they support systemic segregation of students with behavior-related disabilities." Deposition of Amy McCart at 314:1-6.

**RESPONSE:** Denied.  The statement mischaracterizes the cited evidence: Dr. McCart recommended that the State develop its own vision for serving students with behavioral disabilities in an inclusive way, not adopt "her" vision.  *See* Ex. G, McCart Dep. 270:7-20 (recommending that the SEA offer "statewide direction, guidance, and vision for implementing MTSS."); 312:2-5 (recommending "building state capacity regarding guidance, vision, and implementation [of] MTSS or a system of support.").  When asked what vision she was recommending that GaDOE adopt, she referenced the vision she hoped the State would consider, with guidance from her recommendations.  *Id*. at 312:6-313:10.  It is undisputed that, when asked if she found, in the deposition transcripts she had reviewed, any testimony by a state official "that they support systemic segregation of students with behavior-related disabilities," she testified that she could not recall what she had read in thousands of words of transcripts of depositions.  *Id*. at 314:1-9.

This statement is also denied as incomplete.  When asked whether the "State of Georgia currently has a vision that supports statewide systemic segregation of students with behavior-related disabilities," Dr. McCart testified that the State had adopted such a vision, and, when pressed, she testified that "it's not a vision. It's

actuality." *Id*. at 314:25-315:17.

160.    The Department has not identified any reasonable accommodation needed by an individual student.

**RESPONSE:** Objection.  The fact asserted is not material to the pending motion for summary judgment.  The asserted fact is also denied.  The United States has identified a number of reasonable accommodations needed by students in the GNETS Program, including, but not limited to, appropriate FBAs completed by properly trained personnel, individualized BIPs implemented with fidelity, access to appropriately certified personnel and standards-based curricula, and access to a full range of educational services in a setting that is not segregated from the students' peers with and without disabilities.

### C. Implementation of PBIS and MTSS in Georgia Public Schools

161.    Positive behavioral interventions and support (PBIS) is a three-tiered framework in which schools operate to make sure that behavior and expectations are set and taught. Deposition of Jason Byars at 43:3-9.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

162.    PBIS addresses problematic and challenging behaviors. O.C.G.A. § 20-2-741; Deposition of Jason Byars at 45:15-47:8.

**RESPONSE:** Denied. The statement mischaracterizes the cited evidence.

There is a difference between PBIS "addressing" and being "useful for decreasing" "challenging" behaviors. Further, Mr. Byars did not characterize the "challenging" behaviors as "problematic." "Q: Would you agree that PBIS is useful for decreasing challenging behaviors for students with disabilities? A: Yes, I would agree with that statement." Deposition of Jason Byars ("Byars Dep.") 47:5-10 (attached hereto as Exhibit T).

163.   PBIS is an example of a multitiered system of support (MTSS). Deposition of Jason Byars at 117:3-13.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

164.   Code Section 20-2-741 provides that local school districts are only "encouraged" and not required to implement PBIS. O.C.G.A. § 20-2-741(b). Thus, schools' implementation of PBIS is voluntary in Georgia. Deposition of Garry McGiboney at 160:2–20.

**RESPONSE:**  Undisputed to the extent the State's usage of the term "schools" does not include regional GNETS programs.  Subject to this qualification, the Court may consider this evidence for purposes of the motion for summary judgment.

165.   According to former GaDOE employee Garry McGiboney, voluntary implementation is an essential component of effective PBIS. Deposition of Garry

McGiboney at 160:2–20.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

166.   According to former GaDOE employee Jason Byars, local buy-in of school administrators, specifically including the district superintendent, is essential for effective implementation of PBIS. Deposition of Jason Byars at 133:15-23; 134:12-16.

**RESPONSE:** Undisputed. The Court may consider this evidence for purposes of the summary judgment motion.

167.   According to Byars, GaDOE's previous PBIS program manager, it "all begins with the principal." Deposition of Jason Byars at 52:1-5; 26:10-14.

**RESPONSE:** Undisputed to the extent that the State's use of the term "it" is referencing PBIS and does not conflict with the fact asserted in Paragraph 166.

168.   The Department's proffered expert, Dr. Robert Putnam, agreed that PBIS must be implemented at the local level - by local districts and schools. Deposition of Robert Putnam at 190:3-8.

**RESPONSE:** Denied. The statement mischaracterizes the cited evidence, which actually says: "Q: Sure. In other words, if the state Department of Education says we're going to implement PBS, it doesn't end there. In order for it to reach the students, there has to be some implementation by districts and schools; correct? A: correct."  Ex. H, Putnam Dep. 190:3-8.

169.    Dr. McCart "did not evaluate the efficacy of MTSS or fidelity [to MTSS standards] within the State of Georgia." Deposition of Amy McCart at 100:12-17.

**RESPONSE:**  Denied in part.  The cited evidence does not support the fact asserted. However, it is undisputed that Dr. McCart testifies to this fact later in her deposition.  Ex. G, McCart Dep. 101:12-17.  Accordingly, the Court may consider this evidence for purposes of the summary judgment motion.

170.    GaDOE supports and endorses PBIS and has done so since 2006 or 2007. Deposition of Jason Byars at 47:1-3; 56: 16-18; 209:11-13; 30(b)(6) Deposition of Justin Hill at 28:2-25.

**RESPONSE:** Undisputed.   The Court may consider this evidence for purposes of the summary judgment motion.  However, the United States observes that some of the cited evidence (specifically Ex. T, Byars Dep. 47:1-3, 209:11-13) does not support the fact asserted.

171.    GaDOE works diligently to expand PBIS to as many schools as possible. Deposition of Garry McGiboney at 34:12–21.

**RESPONSE:**  Denied. The statement mischaracterizes the cited evidence. Dr. McGiboney was testifying to his work while he was an employee of GaDOE, not to its ongoing, present efforts. Additionally, his testimony offers an opinion, not a fact.

172.    For example, GaDOE supports school districts in PBIS implementation by committing resources including personnel, salaries, web services, trainings, travel, and a budget for PBIS. Deposition of Jason Byars at 58:10-20; 30(b)(6) Deposition of Justin Hill at 34:11-35:6.

**RESPONSE:**  Undisputed. The Court may consider this evidence for purposes of the summary judgment motion.

173.    To date, approximately 60% of school districts and at least 1,400 schools in Georgia have implemented PBIS. Deposition of Garry McGiboney 34:12–21; 30(b)(6) Deposition of Justin Hill at 35:17-24.

**RESPONSE:** Denied. The statement mischaracterizes the cited evidence. At least 1,400 schools in Georgia have implemented Tier I of the PBIS framework. 30(b)(6) Deposition of Justin Hill ("30(b)(6) Hill Dep.") 37:4-25 (attached hereto as Exhibit U).

174.    There are schools in Georgia that have fully implemented PBIS at every tier. Deposition of Garry McGiboney at 153:20–22.

**RESPONSE:** Denied. Dr. McGiboney's testimony directly contradicts more recent testimony regarding the current status of the rollout of Tier III training and the implementation of all three tiers in Georgia schools. Ex. U, 30(b)(6) Hill Dep. 37:4-25; Ex. T, Byars Dep. 157:17-158:4, 188:3-9; 208:25-209:10.

175.    Full implementation of PBIS, however, is challenging in part because of teacher and staff turnover that is common in the education field. If there is

significant staff turnover, the school may have to go back to a previous implementation phase while the new staff members are trained and caught up. Thus, it is unsurprising that there are GNETS Programs that have not yet fully implemented PBIS. Deposition of Garry McGiboney at 163:25–164:20.

**RESPONSE:** The United States objects to the statements in Paragraph 175 as improper opinion testimony that was not disclosed as required under Federal Rule of Civil Procedure 26(a)(2).   The Court should disregard this evidence for purposes of summary judgment.

176.   Less than 30,000 public schools nationwide have implemented PBIS thus far. Deposition of Robert Putnam at 160:20-161:7, Ex. 7.

**RESPONSE:**  Denied. The statement mischaracterizes the cited evidence. Dr. Putnam's actual quote is: "A: Through the National Technical Assistance Center, there's probably about a little less than 30,000 schools, but that doesn't count many other schools that are doing [PBIS]. It just basically counts the schools that the National Technical Assistance Center providers have some involvement." Ex. H, Putnam Dep. 159: 14-23.

177.   Dr. McCart did not consider the rates of principal turnover in Georgia's generally zoned schools. Deposition of Amy McCart at 309:19-310:4.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

178.    She describes the education system, including mental health services, as "stretched to the limit." Deposition of Amy McCart at 305:18-307:1, Ex. 11.

**RESPONSE:**  Denied.  The statement mischaracterizes the cited evidence. In the cited testimony, Dr. McCart made two statements: the first was to affirm a quote from her book that, inter alia, "[m]ental health services are being stretched to the limit as our country, grappling with economic instability, political unrest, and a violent scourge of deadly school shootings, searches for the answers…" Ex. G, McCart Dep. 305:18-306:17.  The second was to agree with the State's premise that "our system of education is strained, our teachers and school leaders are exhausted." Ex. G, McCart Dep. 306:20-307:1.  In neither instance did Dr. McCart describe the education system as a whole, including mental health services, as "stretched to the limit."

179.    Although the Department's proffered expert, Dr. Putnam, contended that Georgia could do more to provide PBIS training, he did not review any training document created or used by the Georgia Department of Education. Deposition of Robert Putnam at 245:5-16.

**RESPONSE:** Denied. The cited evidence does not support the fact asserted. In the cited testimony, Dr. Putnam acknowledged not having reviewed "the training […] that GaDOE provided to their PBIS teams." He did not testify that he did not review any training documents created or used by the Georgia Department of Education. Dr. Putnam's Materials Considered list, attached to his expert report at

Appendix B, includes a number of training-related documents.

180.   Dr. McCart describes implementing her MTSS recommendation is "not easy." Deposition of Amy McCart at 307:11-19, Ex. 12.

**RESPONSE:**  Denied. The statement mischaracterizes the cited evidence and is incomplete. Dr. McCart did indeed affirm a quote from her recent book that stated, *inter alia*, "…putting MTSS in place in a school is not easy." Ex. G, McCart Dep. 307:11-19, Ex. 12. However, Dr. McCart was not asked, and therefore did not opine, on the applicability of this statement to any of the specific recommendations she made for the State of Georgia in her Report.

181.   During her deposition testimony, Dr. McCart opined that it would take the state three years to implement MTSS as she recommends in four of her five recommended actions. Deposition of Amy McCart at 198:16-199:17; Ex. E at 163-167.

**RESPONSE:** Denied. The statement mischaracterizes the cited evidence. Dr. McCart testified that "as a general rule," implementation of her first recommendation can be broken down into three, year-long categories of implementation. Ex. G, McCart Dep. 198:16-199:17.

182.   Dr. McCart's report does not identify a state that has implemented MTSS at every school (as she recommends), nor could she identify such a state during her deposition. Deposition of Amy McCart at 44:3-45:4; 46:17-22; *see generally*, Ex. E.

**RESPONSE:** Undisputed in part. It is undisputed that Dr. McCart's report does not "identify a state that has implemented MTSS at every school." The remainder of the assertions in Paragraph 182 are denied. Dr. McCart explicitly stated that, while she had insufficient data to identify a state that has "implemented MTSS at every school within [the] state, all levels of MTSS" (Ex. G, McCart Dep. 44:22-45:4), she could do so if she had adequate data. Ex. G, McCart Dep. 45:3-46:22.

183.   At one point, Dr. McCart claims that, to serve children with disabilities, educators need only "the typical educational credentials that … are common for certified teachers." Deposition of Amy McCart at 23:22-24:6.

**RESPONSE:** Denied.  The statement mischaracterizes the cited evidence and is incomplete. In the context of a question about what a hypothetical sixth grade general education teacher would need to prevent unnecessary segregation of an individual student (Ex. G, McCart Dep. 22:22-23:7, 23:12-14), Dr. McCart identified: "effective supports for students with disabilities," "general educators who understand high expectations, effective teaching, and learning practice," "[a]ll of the typical educational credentials that I previously mentioned are common for certified educators," "access to special educators that have the additional variables that I mentioned earlier, which include special educators that understand, for example, functional behavior assessment, behavior intervention programs, crisis intervention plans, and effective teaching," and "those individuals would need to

understand basic general systems of support provided through the state and the district, such as tiered systems of support that provide academic, behavioral, social, emotional, and mental health supports." Ex. G, McCart Dep. 23:22-24:18.

184.   Yet, she continues to state that general education teachers need "access [to] special educators" with additional training, as well as an understanding of what she describes as "basic general systems of support provided through the state and the district such as tiered systems of support that provide academic, behavioral, social, emotional, and mental health supports." Deposition of Amy McCart at 24:7-18.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

185.   As confirmed through her deposition testimony, Dr. McCart's report recommends that Georgia adopt an "equity-based MTSS." Deposition of Amy McCart at 92:15-17.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

186.   Dr. McCart has described her book on equity-based MTSS, Build Equity, Join Justice, as being written with the hope "to inspire deeper thinking and fundamental redesign in the way we, as educators, understand and support students and the structure of our schools." Deposition of Amy McCart at 93:10-16, Ex. 3.

**RESPONSE:** Objection.  The fact asserted is not material to the pending motion for summary judgment.

187.  Dr. McCart opined that her recommended equity-based MTSS is highly variable and should "look different" in each state that attempts to adopt it. Deposition of Amy McCart at 99:8-21.

**RESPONSE:** Undisputed in part.  It is undisputed that Dr. McCart testified that "equity-based MTSS could look different" in Georgia compared to other states. Ex. G, McCart Dep. 99:8-21. The remainder of Paragraph 187 mischaracterizes the cited evidence.

188.  Dr. McCart's report does not identify or recommend a fidelity standard to allow Georgia policymakers to know if they are implementing or training her type of equity-based MTSS with fidelity. Deposition of Amy McCart at 100:11-101:5; *see generally*, Ex. E.

**RESPONSE:** Denied. Dr. McCart's report refers to a number of recommendations, resources, and desired outcomes, each of which may be monitored for efficacy and fidelity of implementation. *See generally* McCart Rep. at 160-67.

189.  Dr. McCart has written and confirmed her continued belief in the conclusion that "recent research indicates that the process of installing and implementing MTSS to a criterion of full implementation is proving to be a very

difficult undertaking, one that requires extensive professional learning and intensive [technical assistance], particularly directed at the local education agencies to support the effort at the level of the schools." Deposition of Amy McCart at 266:16-267:7, Ex. 8.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

190.   Dr. McCart does not know if "full implementation" of MTSS as she recommends would be something other than "very difficult in the State of Georgia." Deposition of Amy McCart at 268:20; 269:3.

**RESPONSE:** Denied. The statement mischaracterizes the cited evidence. Dr. McCart testified that her recommendations require "investment" by the State, a factor not within Dr. McCart's immediate control. Ex. G, McCart Dep. 269:3-12; *see, e.g.* McCart Rep. at 165-66 (discussing necessity of state investment in leadership teaming structures, developing positive cultures, creating an educator support system, and engaging families, caregivers, and community partners).

191.   In California, which contracted for $45 million with Dr. McCart's SWIFT Center to implement MTSS, the "local education agencies within those regions took up various degrees of implementation of MTSS." Deposition of Amy McCart at 265:21-266:1, Ex. 8.

**RESPONSE:** Objection. The fact asserted is not material to the pending motion for summary judgment and is inadmissible. The statements in Paragraph 191

are irrelevant to the merits of the underlying suit as they neither have any tendency

to make a fact more or less probable than it would be without it and are of no

consequence in determining the action. Fed. R. Evid. 401. In addition, such

evidence is inadmissible as any probative value is substantially outweighed by the

danger of unfair prejudice, confusing the issues, and wasting time. Fed. R. Evid.

403. Finally, Exhibit 8 to Dr. McCart's deposition is inadmissible hearsay. Fed. R.

Evid. 802.

## IV.    The Delivery of Mental Health Services in the State of Georgia

### A. System of Care

192.    The Georgia General Assembly has "declare[d] its intention and desire

to: (6) Develop a coordinated system of care so that children and adolescents with

a severe emotional disturbance and their families will receive appropriate

educational, nonresidential and residential mental health services, and support

services, as prescribed in an individualized plan." O.C.G.A. § 49-5-220(a).

**RESPONSE:** Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

193.    The General Assembly has not passed a law requiring implementation

of a system of care.

**RESPONSE:** Denied. O.C.G.A. § 49-5-220(a), quoted by the State above in

Paragraph 192, refers to the opening section of a statute, § 49-5-220 *et seq.*, which

declares the intention and desire of legislature.  The remaining sections are

mandatory, including regarding the implementation of the System of Care plan and

to prepare a plan for a system of care that: "shall be put into implementation by July

1, 1991."  O.C.G.A. § 49-5-223(d).

194.    The Geogia General Assembly further stated that it "intends that"

DBHDD have the primary responsibility for planning, developing, and

implementing any system of care. O.C.G.A. § 49-5-220(b).

**RESPONSE:** Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

195.    The General Assembly has not passed a law requiring DBHDD have

the primary responsibility for any system of care in Georgia.

**RESPONSE:** Denied.  O.C.G.A. § 49-5-220(a), quoted by the State above in

Paragraph 25, refers to the opening section of a statute, § 49-5-220 *et seq.*, which

declares the "inten[tion]" of the General Assembly that DBHDD have the primary

responsibility for "planning, developing, and implementing" the system of care.

O.C.G.A. § 49-5-220(b).  The remaining sections of the statute are mandatory,

including regarding DBHDD's role in the implementation of the System of Care

plan, collection of data, and provision of annual reporting concerning the population

of children and adolescents "with a severe emotional disturbance."  O.C.G.A. § 49-

5-220(a); *see* O.C.G.A. § 49-5-220 *et seq.*  Moreover, DBHDD has defined itself as

"the state agency responsible for the administration, coordination, planning,

regulation and monitoring of all components of the state public behavioral health

and intellectual and developmental disability systems."  Georgia FY 2020/2021

Community Mental Health Services Block Grant Plan at 22 (Exhibit 10, January 27,

2022 Deposition of Dante McKay) (attached hereto as Exhibit 29).

196.   System of Care is not a service, but is an approach to care. Deposition

of Judy Fitzgerald at 73:20-74:6; 220:23-24.

**RESPONSE:**  Denied.  The "Coordinated system of care" means "a

comprehensive array of mental health and other necessary services organized into a

coordinated network to meet the multiple and changing needs of severely

emotionally disturbed children and adolescents." O.G.C.A. §49-5-221.

197.   System of Care is a comprehensive wraparound providing a variety of

services to children to support them in their communities. Deposition of Frank

Berry at 47:5-11.

**RESPONSE:** Denied.  The "Coordinated system of care" means "a

comprehensive array of mental health and other necessary services organized into a

coordinated network to meet the multiple and changing needs of severely

emotionally disturbed children and adolescents." O.G.C.A. §49-5-221.

198.   Services offered by entities such as CSBs play a role in a community's

system of care. Deposition of Frank Berry at 48:20-49:9.

**RESPONSE:** Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

## B. The Apex Program

199.   The Georgia Apex Program (Apex) is a school-based mental health program designed to build infrastructure and increase access to mental health services for school-aged youth by placing mental health providers in school settings to deliver therapeutic support. *See* Georgia Apex Program Annual Evaluation Results July 2021-June 2022 at GA05558502, attached hereto as Exhibit H.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

200.   Apex is a DBHDD initiative, and Apex Program services are reimbursed with a mixture of funds from DBHDD and DCH. Deposition of Judy Fitzgerald at 62:23-63:5.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

201.   The Apex program provides funding for CSBs to provide infrastructure including staffing to build a school-based mental health partnership. Deposition of Frank Berry at 115:22-25; Deposition of Marnie Braswell at 87:15-20.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

202.   Apex is a programmatic framework through which certain unbundled services are made available within public schools. *See* Affidavit of Dante McKay at ¶ 3, attached hereto as Exhibit I.

**RESPONSE:** Denied. The cited evidence does not support the fact asserted. As the United States argued in its Motion to Exclude (ECF No. 439-1), the Declaration of Dante McKay that the State submitted in support of its Motion for Summary Judgment is improper and should be excluded for the following reasons. First, Mr. McKay opines about a cost estimate for modifying the State's school-based mental health Apex program, yet the United States has not found the cost estimate or any basis for it in the State's discovery productions, and the State has declined to clarify whether it previously produced the estimate or any basis for it pursuant to this Court's scheduling orders. Second, the Declaration's principal purpose is to express opinion testimony not previously disclosed in accordance with this Court's scheduling orders. And third, Mr. McKay opines about the challenges of expanding the Apex program without explaining the basis, sources, or methods underlying his opinions. The United States has been prejudiced by each of the lapses, particularly at this late stage when it is not able to test Mr. McKay's opinions through further depositions or discovery.

203.   It does not produce any new services that are not already available as part of DBHDD's core service package. Deposition of Dante McKay at 55:10-15; Deposition of Marnie Braswell at 53:10-17.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

204.   Qualified providers of behavioral health services can become eligible for Medicaid reimbursement for certain behavioral health services offered to school age children and youth. Ex. I at ¶ 4.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

205.   As an example, individual counseling is a behavioral health service which is available through Apex. Deposition of Dante McKay at 55:16-20; Deposition of Marnie Braswell at 48:25-49:9.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

206.   Currently, 735 public schools have partnered with Apex program providers. Ex. I at ¶ 5.

**RESPONSE:** Denied.  According to the Apex Program Annual Evaluation Results Report, during the 2021-2022 school year, 738 schools in Georgia were involved in the Apex Program. Def. Mot. Ex. H at GA05558511.

207.   As of June 2022, 704 schools report "engaged partnerships," defined to be schools submitting three or more months of reported data. Def. Mot. Ex. H at GA05558511; Deposition of Garry McGiboney at 47:11–18.

**RESPONSE:** Denied.  According to the Apex Program Annual Evaluation Results Report, during the 2021-2022 school year, 704 schools in Georgia reported "engaged partnerships," meaning the schools submitted three or more months of reported data.  Def. Mot. Ex. H at GA05558511.

208.   To be an eligible Apex program provider, the contracting entity must satisfy regulatory criteria and have the written support of a local school system. Ex. I at ¶ 4; Deposition of Dante McKay at 144:9-21.

**RESPONSE:** Denied.  The McKay deposition does not support the fact asserted.  According to the DBHDD Provider Manual for Community Behavioral Health Providers, Apex is a partnership between community-based behavioral health providers and local school districts.  FY 23 Provider Manual for Community Behavioral Health Providers, page 56 (January 1, 2023) (attached hereto as Exhibit 30).  Apex "[p]roviders must obtain and maintain commitment by the school leadership to support school based behavioral health services . . . ."  Ex. 30, FY 23 Provider Manual for Community Behavioral Health Providers, page 58 (January 1, 2023); State of Georgia DBHDD Contract with Advantage Behavioral Health Systems, US0013064 at US0013086 (attached hereto as Exhibit 31).  The United States also objects to the McKay Declaration for the reasons set forth in its Motion to Exclude.  ECF No. 439.

209.   DBHDD encourages schools to take advantage of Apex services. Deposition of Garry McGiboney at 47:11–18.

**RESPONSE:** Denied as incomplete. This statement fails to acknowledge that Apex is not available in all schools. Dr. McGiboney's testimony also includes a discussion of GA00557687 in which he shares that schools were not asking for Apex because they were unaware of the program. Ex. M, McGiboney Dep. 196:19-198:5; *see also* GA00557687 (attached hereto as Exhibit 32). Testimony from CSB employees revealed that Apex is unable to expand into more schools without adequate support, funding, and approval from DBHDD. Deposition of Fabio van der Merwe ("van der Merwe Dep.") 28:5-17; 29:18-30:1, 46:6-47:9 (attached hereto as Exhibit V); Deposition of Janel Allen Dep. ("Allen Dep.") 22:17-23:3 (attached hereto as Exhibit W). Apex services are also explicitly not provided in "private charter schools, GNETS standalone facilities, private schools, or homeschooled/cyber public schools."  ECF No. 395-44.

210.    Whether a student enrolled in a GNETS program is eligible for Apex services is a decision made between community providers and the local school district. Deposition of Dante McKay at 139:2-20.

**RESPONSE:** Denied.  DBHDD prohibits students that attend regional GNETS centers from receiving Apex services at the centers, regardless of whether those students are otherwise eligible for Apex services.  *See APEX 3.0 Frequently Asked Questions*, https://dbhdd.georgia.gov/be-supported/mental-health-children-young-adults-and-families/apex-3-faqs ("In which types of schools can Apex

services be implemented?") (last visited Oct. 18, 2023) (ECF No. 395-44).

Community service provider staff have testified that they would like to serve more

students that they believe should receive Apex services, but DBHDD has denied

some providers' applications to serve those students. *See, e.g.*, Ex. W, Allen Dep.

78:25-79:8, 84:19-85:9, 86:24-90:8, 91:14-94:19.

211.    DBHDD does not direct a school to become a part of the Apex

program. Deposition of Dante McKay at 139:6-8.

**RESPONSE:** Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

212.    DBHDD and DCH issue provider care manuals for the behavioral

health services DBHDD contracts for and that are Medicaid reimbursable by DCH.

Deposition of Judy Fitzgerald at 50:7-11; Deposition of Frank Berry at 164:18-

166:13.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for

 purposes of the summary judgment motion.

213.    The manual contains a service guideline about the Apex Program.

Deposition of Dante McKay at 50:6-11.

**RESPONSE:** Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

214.    The Department's proffered expert, Dr. Robert Putnam, had no

criticisms of the types of services or intensity of services made available in the

Apex program. Deposition of Robert Putnam at 185:16-186:13.

**RESPONSE:** Denied.  The statement mischaracterizes the stated evidence.

Dr. Putnam testified that "the constellation of services" in the DBHDD Provider

Manual for Community Behavioral Health Providers are sufficient for students with

behavior-related disabilities.  Ex. H, Putnam Dep. 185:16-186:5.  Dr. Putnam

testified that where the Manual specifies standards for the intensity of services, the

standards for intensity were sufficient.  Ex. H, Putnam Dep. 185:16-186:13.

215.   The Apex program model does not align with the GNETS program

model because the model of Apex is to serve all three tiers, which are: prevention,

at risk, and intensive services. Deposition of Dante McKay at 141:1-20.

RESPONSE: Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

216.   GNETS students mostly fit in Tier 3, while some may potentially fit in

Tier 2, which the Apex model is not funded to serve. Deposition of Dante McKay

at 141:5-21.

**RESPONSE:** Denied.  This statement misquotes the testimony of Mr.

McKay.  In fact, Mr. McKay testified as follows: "My understanding of the GNETS

population is that they could possibly fit in Tier 2 but most likely they're going to fit

in Tier 3.  Apex is not funded to just serve Tier 3 settings.  Again, the model is --

because students churn between the various tiers, from prevention, to maybe at risk,

back to prevention.  They may have a crisis which is Tier 3, and then they go back to prevention.  So the model is to serve all three tiers.

217.   Standalone GNETS program models do not align with the Apex program. Deposition of Dante McKay at 142:4-5.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

218.   Apex providers would not be equipped to handle the entirety of a GNETS center and provide behavioral health services to everyone in it. Deposition of Judy Fitzgerald at 200:15-201:2.

**RESPONSE:** Denied.  Commissioner Fitzgerald testified that she did not know enough to comment on whether there are any structural impediments to a collaboration between a standalone GNETS program and the Apex program or other issues relating to GNETS.  Ex. B, Fitzgerald Dep. 200:1-10, 201.  Speculating as to possible elements of a conflict, the Commissioner testified that elements of the GNETS program would not cause conflict so much as capacity challenges: "In an Apex environment a limited portion of the students in that school are in need of and seek mental health services.  It's not every youth in school.  The provider would not be equipped to handle the entirety of the school and provide behavioral health services o everyone in the school."  Ex. B, Fitzgerald Dep. 200:11-201:9.

219.   Accordingly, Apex services are not provided in GNETS centers. *See*

Apex 3.0 Frequently Asked Questions, *In which types of schools can Apex services*

*be implemented?* available at https://dbhdd.georgia.gov/be-supported/mental-health-children-young-adults-and-families/apex-3-faqs and attached hereto as Exhibit J.

**RESPONSE:** Undisputed insofar as Apex services are not provided in GNETS Centers.  The term "accordingly" vaguely suggests a causal connection. The United States denies that capacity concerns are the sole reason that Apex services are not provided in GNETS facilities.

220.   GNETS centers are not the only exclusion from Apex services, as Apex services also cannot be provided in homeschooled/cyber public schools, private charter schools, or private schools. *See* Ex. J.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion**.**

221.   DBHDD did not create the three-tier model utilized by Apex; it adopted it, as the three-tier model is generally accepted practice within the field. Deposition of Dante McKay at 142:6-16; 149:21-150:10.

**RESPONSE:** Objection.  The fact asserted is not material to the pending motion for summary judgment.

222.   In the Georgia Apex Program Annual Evaluation Results July 2021 – June 2022, Apex providers reported comparatively little problems with Medicaid payors and, instead, complained most about private pay insurance that is not

regulated by DBHDD, DCH, or GaDOE. *See* Ex. H at GA05558524.

**RESPONSE:** Objection.  The fact asserted is not material to the pending

motion for summary judgment.

223.    The Report also showed that Apex providers were also challenged by

school districts who hired their own employees and clinicians, which demonstrates

that the same services can be provided in the school setting even if not part of an

Apex collaboration. *See* Ex. H at GA05558572.

**RESPONSE:** Objection.  The fact asserted is not material to the pending

motion for summary judgment, and this statement improperly calls for an inference.

Defendant has put forth no evidence that particular services can be provided any

specific setting.

224.    Apex expansion is most challenged by workforce issues. Deposition

of Garry McGiboney at 47:11–18; 187:1–7; 200:16–21.

**RESPONSE:** Denied.  This statement mischaracterizes Dr. McGiboney's

testimony.  Apex has been unable to expand for multiple reasons, including the

State's failure to prioritize Apex services or to provide sufficient funding.  *See, e.g.*,

January 27, 2022 Deposition of Dante McKay ("1/27/22 McKay Dep.") 38:20-

41:14 (describing cuts to Children and Adolescent Mental Health budget) (attached

hereto as Exhibit X); *id*. at 42:8-16 (testifying about cuts to the Apex budget);

GA00051873 (same) (attached hereto as Exhibit 33). CSB employee testimony

establishes that Apex is unable to expand into more schools without adequate

support, funding, and approval from DBHDD. Ex. V, van der Merwe Dep. 28:5-17;

29:18-30:1, 46:6-47:9; Ex. W, Allen Dep. 22:17-23:3, 78:25-79:8, 84:19-85:9,

86:24-90:8, 91:14-94:19.

225.  Indeed, the Georgia Apex Program Annual Evaluation Results July
2021 – June 2022 revealed that providers identified workforce shortages as the
primary barrier to expanding the program. *See* Ex. H at GA05558542.

**RESPONSE:** Denied.  The document states that Apex providers reported
"access to qualified staff" most frequently as a barrier to parents' general access to
behavioral health services in the community.

226.  Dante McKay, OCYF Director, confirms that cost and workforce
shortages are the material impediments to Apex expansion to every public school.
Ex. I at ¶ 6.

**RESPONSE:** Objection.  The McKay Declaration, ECF 428-4, is
inadmissible for the reasons set forth in the United States' Motion to Exclude.  ECF
No. 439.

227.  Apex is also challenged by transportation and the location of schools
and providers. Deposition of Garry McGiboney at 187:1–7.

**RESPONSE:** Denied.  The cited evidence does not support the fact asserted.
When asked "how Apex actually gets providers into schools," Dr. McGiboney
testified that he was "not certain" and that "[i]t's a complex process for two reasons:
One is because of the workforce shortage, and the other is transportation and
location of the schools and the provider."  Ex. M, McGiboney Dep. 187:1-7.  Dr.
McGiboney stated that DBHDD "has direct responsibility over the Apex program"

and that DBHDD "make[s] all the selections of the providers and [DBHDD]
select[s] the schools."  Ex. M, McGiboney Dep. 187:1-19.

228.   Workforce shortages in the area of mental health has been a challenge
in Georgia for decades. Deposition of Garry McGiboney at 225:21–226:1; 46:7–
20.

**RESPONSE:** Denied.  The statement mischaracterizes the cited evidence.
Mr. McGiboney testified that access to mental health services has been a challenge
in Georgia; however, Defendant has proffered no additional evidence in support.

229.   There is a significant, ongoing, and well-documented workforce
shortage of mental health professionals and educators in the State of Georgia.
Deposition of Lisa Futch at 348:14-18; 115:24-116:25, 305:12-22; Deposition of
Cassandra Holifield at 293:3-7; Deposition of Garry McGiboney at 187:1–7;
209:4–10.

**RESPONSE:** Denied.  The statement mischaracterizes the cited evidence.
Dr. Holifield testified to a teacher shortage at a particular time that she was trying to
recruit teachers to GNETS, and Mr. McGiboney and Ms. Futch testified to shortages
of mental health professionals; however, Defendant has proffered no additional
evidence in support of this statement.

230.   There is a shortage of psychiatrists, clinical psychologists, licensed
professional counselors, psychiatric social workers, and any field that touches on
mental health. Deposition of Garry McGiboney at 46:7–20.

**RESPONSE:** Denied.  The statement mischaracterizes the cited evidence. Mr. McGiboney testified that access to mental health services has been a challenge in Georgia; however, Defendant has proffered no additional evidence in support.

231.   The Department's proffered expert, Dr. Putnam, agreed that it is possible that schools could not receive services from Apex providers because of workforce shortages. Deposition of Robert Putnam at 215:11-16.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

232.   An informal cost estimate conducted by DBHDD estimates that it would cost $313.5 million, with an estimated attributed cost to the State of Georgia of more than $219.5 million, to include Apex at all 2,308 of the public schools in Georgia at a 1:50 therapist to student ratio. Ex. I at ¶¶ 7-8.

**RESPONSE:** Objection.  The McKay Declaration, ECF 428-4, is inadmissible for the reasons set forth in the United States Motion to Exclude.  ECF No. 439.

233.   Such expansion would require the General Assembly to appropriate an additional $219.5 million to DBHDD; federal funds would not supplement this amount. Ex. I at ¶ 8.

**RESPONSE:** Objection.  The McKay Declaration, ECF 428-4, is inadmissible for the reasons set forth in the United States Motion to Exclude.  ECF

No. 439.

234.    This estimate contemplates a gradual expansion with full implementation by fiscal year 2032. Ex. I at ¶ 10.

**RESPONSE:** Objection.  The McKay Declaration, ECF 428-4, is inadmissible for the reasons set forth in the United States Motion to Exclude.  ECF No. 439.

235.    This estimate is subject to workforce availability in all 2,308 public schools. Ex. I at ¶ 11.

**RESPONSE:** Objection.  The McKay Declaration, ECF 428-4, is inadmissible for the reasons set forth in the United States Motion to Exclude.  ECF No. 439.

236.    Dr. Putnam suggested that the Apex program was also limited by the number of funds provided to it (Deposition of Robert Putnam at 215:17-24), but he performed no kind of cost analysis for any of his recommendations. Deposition of Robert Putnam at 97:6-10; 282:11-22.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

## V.    The Georgia Network for Educational and Therapeutic Supports

237.    The Georgia Network for Educational and Therapeutic Supports ("GNETS") is a network of 24 programs throughout the State that "provides comprehensive educational and therapeutic support services to students who exhibit intense social, emotional and/or behavioral challenges with a severity, frequency or duration such that the provision of education and related services in the general education environment has not enabled him or her to benefit educationally based on the IEP." Ga Comp. R. & Regs. 160-4-7-.15.

**RESPONSE:**  Undisputed to the extent the cited evidence speaks to the purpose of the GNETS Program.  The Court may consider the evidence with that limitation for purposes of the motion for summary judgment.  However, the cited evidence does not establish that the GNETS Program actually provides comprehensive educational and therapeutic support services.  Indeed, there are many ways in which the GNETS Program fails to provide such support services.  *See*, *e.g.*, McCart Rep. at 136-153.

238.    It is a service administered by the LEAs and "available within the continuum of supports for LEAs to consider when determining the least restrictive environment" for a student's IEP. Ga. Comp. R. & Regs. 160-4-7-.15(2)(a); *see also* 20 U.S.C. §§ 1401(14), 1414(d)(1)(A) (defining IEP).

**RESPONSE:**  Objection.  The cited evidence does not establish that

GNETS is a service administered by the LEAs.  The Court may, however, consider the cited evidence for purposes of the motion for summary judgment insofar as it establishes that the GNETS Rule states that GNETS "is a service available within the continuum of supports for LEAs to consider when determining the least restrictive environment for students with disabilities, ages 5-21." Ga. Comp. R. & Regs. 160-4-7-.15(2)(a).

239.  GNETS services are provided to students who have been referred to the GNETS Program by his or her IEP team. Ga Comp. R. & Regs. 160-4-7-.15; Deposition of Clara Keith Brown at 20:25-21:7; Deposition of David Ackerman at 82:16-21.

**RESPONSE:**  Undisputed.  The Court may consider the cited evidence for purposes of the motion for summary judgment.

240.  The GNETS Rule lays out certain eligibility criteria which students must meet in order to be eligible for services paid for by GNETS grant funds. Ga Comp. R. & Regs. 160-4-7-.15.

**RESPONSE:**  Undisputed.  The Court may consider the cited evidence for purposes of the motion for summary judgment.

241.  The regional GNETS Programs may serve, and typically do serve, more than one school district. Deposition of Garry McGiboney at 74:14-17.

**RESPONSE:**  Undisputed.  The Court may consider the cited evidence

for purposes of the motion for summary judgment.

242.    Each regional Program has either a local educational agency ("LEA") or regional educational service agency ("RESA ") that acts as its fiscal agent. Ga Comp. R. & Regs. 160-4-7-.15(1)(d)-(e).

**RESPONSE:**  Objection.  The provisions of the GNETS Rule cited do not support the fact asserted.  It is undisputed, however, that each regional GNETS program has either an LEA or RESA that acts as its fiscal agent.  Ga Comp. R. & Regs. 160-4-7-.15(1)(b).  The Court may consider this evidence with the proper citation for purposes of the motion for summary judgment.

243.    The fiscal agent is responsible for the fiscal management and budgeting of GNETS funding. Ga Comp. R. & Regs. 160-4-7-.15(1)(b); *see, e.g.*, Deposition of Patricia Wolf at 61:17-20 (role of GNETS of Oconee's fiscal agent is to provide oversight in terms of budgets, and fiscal and personnel issues.)

**RESPONSE:** Denied as incomplete.  Regional GNETS programs must also submit their program budgets to GaDOE and have those budgets approved by GaDOE.  Ga Comp. R. & Regs. 160-4-7-.15(5)(a) (charging SEA with approving program budgets); *see also* Ex. 1, Def. Resp. to RFA No. 25; Ex. I, Holifield Dep. 104:10-106:18; Deposition of Amber McCollum ("McCollum Dep.") 107:4-109:8; 214:9-15 (attached hereto as Exhibit Y).

244.    The goal of the GNETS Program is the same as the goal for each child in their individualized IEP, which all look different. Deposition of Garry

McGiboney at 75:3-76:4.

**RESPONSE:** Objection. The cited evidence does not support the fact asserted. In general, the goal of the GNETS Program is "to support students with social, emotional and/or behavioral challenges." Ga Comp. R. & Regs. 160-4-7-.15(2)(b).

245. According to the GNETS Rule, services provided through the GNETS Program aim to support students with social, emotional and/or behavioral challenges that may include but are not limited to, significant, aggressive, self-destructive, atypical, and withdrawal behaviors. Ga Comp. R. & Regs. 160-4-7-.15.

**RESPONSE:** Undisputed. The Court may consider the cited evidence for purposes of the motion for summary judgment.

246. Based on her interpretation of the title of GNETS Rule, Dr. McCart explained her belief that "GNETS continuum of services [is] established by the state," and that it is "provided by state." Deposition of Amy McCart at 302:12-303:10.

**RESPONSE:** Denied as incomplete. The cited testimony confuses Dr. McCart's testimony with the State's own language. In response to a question from the State, Dr. McCart testified to her understanding that the "GNETS continuum of services," as that phrase is used in Ga. Comp. R. & Regs. 160-4-7-.15(4)(c), was

"[e]stablished by the state…"  McCart Dep. 302:15 (emphasis added). The State

then inaccurately attempted to construe that testimony as Dr. McCart testifying that

the language was "provided" by the State.  Ex. G, McCart Dep. 302:19-21 ("What is

the basis of your statement that the GNETS continuum of services is, quote,

provided by the state?").  In this context, it makes sense that Dr. McCart understood

the question to be: what is your basis for believing the "GNETS continuum of

services," as outlined in a state regulation, was determined by the State?  To which

Dr. McCart reasonably answered that, because the regulation was a regulation of the

Georgia Department of Education, that was her basis for understanding the

"GNETS continuum of services" was established, provided, or determined by the

State as distinct from whether the identified services were provided by the State.

Ex. G, McCart Dep. 302:19-303:10.

247.   Dr. McCart claims she is not providing an opinion on whether the

State of Georgia "administers" the GNETS program. Deposition of Amy McCart at

40:14-16.

**RESPONSE:**  Undisputed.  The Court may consider the cited evidence for

purposes of the motion for summary judgment.

248.   Code Section 20-2-152(c)(1)(E) provides for the operation of "special

schools" by the State of Georgia, specifically, the Georgia School for the Deaf, the

Georgia Academy for the Blind, and the Atlanta Area School for the Deaf. GNETS

is not a special school.

**RESPONSE:** Objection.  The fact asserted should not be considered for purposes of the motion for summary judgment because it is improperly stated as a legal conclusion in violation of Local Rule 56.1(B).  In addition, the cited evidence does not support the fact asserted.

249.  The therapeutic services provided in GNETS are need-based for each child as determined by the IEP team; they look differently for every child and in every program. Deposition of Vickie Cleveland at 81:8-18; Deposition of Wina Low at 158:21–159:6.

**RESPONSE:** Denied.  After conducting an extensive examination of the GNETS Program that included a review of records (including individual student records and the depositions of GNETS and State agency personnel), site visits of 70 GNETS facilities, and observations of countless classrooms and approximately 1,000 students in the GNETS Program, Dr. Amy McCart, Ph.D. concluded that the GNETS Program demonstrated a lack of the therapeutic services and supports that its students need.  McCart Rep. at 137-140, 149-151. This included a "lack of certified behavioral and therapeutic staff," "a lack of understanding of the myriad tools, resources, and support available to help students," and "a universal absence of trauma-informed practices, restorative practices, or effective behavioral practices," among other things. *See id.* at 137-140, 149-151.

250.  There is no text in the GNETS Rule explicitly dictating a location

where services must be provided.

**RESPONSE:** Objection.  The fact asserted is not supported by any

citation to evidence, as required by Local Rule 56.1(B)(1).

251.   During her deposition, Dr. McCart could not identify anything in the

text of the GNETS rule that causes "unnecessary segregation." Deposition of Amy

McCart at 226:2-7.

**RESPONSE:**  Denied.  The statement mischaracterizes the cited evidence

and is incomplete.  In the cited testimony, Dr. McCart did not testify that she could

not identify anything in the GNETS Rule that causes "unnecessary segregation."  To

the contrary, Dr. McCart stated that "[t]here are certainly concerns when looking at

the rule," particularly with regard to "implementation, and how it plays out within

the GNETS [P]rogram."  Ex. G, McCart Dep. 226:2-227:1. It is undisputed,

however, that Dr. McCart does not opine on the legal sufficiency or effect of the

contents of the GNETS Rule.

252.   During her deposition, Dr. McCart explained her recommendations as:

"[1] to limit or eliminate systemic segregation across the State of Georgia within

the GNETS program, [2] to provide fair and equal educational opportunities for

students with behavior-related disabilities in the GNETS program, and [3] to have

the State of Georgia provide an array of appropriate supports for students with

behavior-related disabilities in the State of Georgia." Deposition of Amy McCart at

37:1-9 (brackets and emphasis added).

**RESPONSE:** Denied. The statement mischaracterizes the cited evidence. As the State's preceding question makes clear, the quoted language was provided in the context of Dr. McCart's understanding of what the United States is "seeking in this lawsuit," or the United States' "aims of the lawsuit," not her recommendations as described in her Report. Ex. G, McCart Dep. 36:13-37:9.

253. Dr. McCart provides many, and sometimes inconsistent, definitions of "appropriate supports." For example, she describes them as "in general a system of support that provides an array of effective evidence-based practices for – specifically for students who have disabilities that are along a continuum of support, not place-based, but rather service-based. And those supports are provided in context, based on what the state decides on student – students with disabilities needs within the GNETS program." Deposition of Amy McCart at 38:9-18.

**RESPONSE:** Objection. The cited evidence does not support the fact asserted, as nothing in Dr. McCart's cited testimony illustrates that she provides "many, and sometimes inconsistent, definitions of 'appropriate supports.'"

254. Despite her significant criticisms of the GNETS program implemented by LEAs and RESAs, Dr. McCart acknowledged that the "what the state does – decides to do is up to [it] … what [the State] decide[s] to do is [its] decision." Deposition of Amy McCart at 38:19-39:2.

**RESPONSE:** Objection. The fact asserted is not material to the pending

motion for summary judgment and is inadmissible.  The United States objects to the

statements in Paragraph 254 as inadmissible: the testimony is irrelevant under FRE

401 as it neither has any tendency to make a fact more or less probable than it would

be without it and is of no consequence in determining the action.  It is also

impermissible legal opinion testimony.  The question that prompted the quoted

testimony was: "If a judge is to order that the State of Georgia provide appropriate

supports, what does that look like in a judicial order?  I'm not asking you to get into

legalese, but, like, if the State of Georgia is trying to implement an order that says,

provide appropriate supports, what does that look like?" Ex. G, McCart Dep. 37:21-

38:4.  The United States preserved its objection to the form of the question,

impermissibly called for a legal conclusion by asking Dr. McCart to make a

judgment about the contents of a potential a judicial order in this case.  *See* Ex. G,

McCart Dep. 38:5. Because Dr. McCart is not a lawyer, the testimony is outside of

the scope of her expertise and thus inadmissible.

255.   The evidence shows that it is the LEA or RESA that determine the

setting in which to provide services through the GNETS Program. Decisions on

whether to operate as a school-based site or self-contained facility are local

decisions. Deposition of Shaun Owen at 155:13-20.

**RESPONSE:** Denied.  The statement mischaracterizes the cited evidence.

When asked whether Ms. Owen had seen "the GNETS programs operating the way

that they are supposed to be operating according to the rules," Ms. Owen testified

that "There's certain components that GNETS have to fulfill . . . but beyond that, . . . the day-to-day operations, who they're going to hire, what students are in, you know, their GNETS program, if they're gonna run it as a – you know, as a school or a site based, every bit of that falls in . . . it's all GNETS, so local control." Deposition of Sonia Shaun Owen ("Owen Dep.") 154:1-155:20 (attached hereto as Exhibit Z).  In addition, although the LEA or RESA may determine whether to operate a regional GNETS program within a school-based site or in a self-contained facility, the State has played a role in these decisions—even requiring some programs to move facilities.  *See* Ex. 1, Def. Resp. to RFA Nos. 81, 87, 89, 90; Exs. 100, 102-105; Ex. Z, Owen Dep. 155:13-20; Deposition of William "Matt" Jones Dep. ("W. Jones Dep.") 189:4-190:6, 193:1-194:25 (attached hereto as Exhibit AA); Ex. Q, Keith Dep. 226:16-229:22, 230:14-232:18; Deposition of Michael Rowland ("Rowland Dep.") Dep. 80:21-82:2, 83:5-88:1, 94:4-96:13, 111:21-116:9, 145:7-146:20 (attached hereto as Exhibit BB); *see also* Ex. J, Braddock Dep. 219:21-220:23, 221:17-222:2, 222:15-22, 225:10-226:6.  For example, the director of GNETS of Oconee testified that if her regional GNETS program were to move from an exclusively school-based program to a center-based program, "it would have to be approved by the Department of Education and Facilities."  Ex. S, Wolf Dep. 60:7-17; *see also* GA00343802 (attached hereto as Exhibit 34); Ex. S, Wolf Dep.  56:20-60:17.

256.   And, IEP teams determine the setting – whether in general education, a separate facility, or somewhere else—in which a specific child should receive services through the GNETS Program. Ga Comp. R. & Regs. 160-4-7-.15(4).

**RESPONSE:**  Undisputed, except to the extent that the evidence is construed to mean that all IEP teams have the same range of settings to select from when determining where a child should receive services through the GNETS Program. For example, an IEP team within the Rutland Academy catchment area would not have had the option of determining that a student should be placed in a school-based GNETS program location because Rutland Academy consisted of a single separate facility and the only option for GNETS placement would be a GNETS center.  *See* Ex. N, Ngeve Dep. 45:8-20.  Subject to the foregoing qualification, the Court may consider this evidence for purposes of the summary judgment motion.

257.   Dr. McCart's underlying theory is that IEP teams refer students to GNETS programs because they conclude it is the only option available. Deposition of Amy McCart at 62:6-14.

**RESPONSE:**  Denied.  The statement mischaracterizes the cited evidence and is incomplete.  The cited testimony was in response to a question about whether a student's least restrictive environment is determined by the IEP team. Ex. G, McCart Dep. 61:6-18.  Dr. McCart's response highlighted that "[t]he supports and services available are determined by the entirety of the educational system, starting with the vision, guidance, and leadership of the State Department of Education, then

shared with local education agencies, in terms of, again, that system of support that is in place.  That is then utilized by an IEP team about what supports can be put into place because of their availability." Ex. G, McCart Dep. 61:19-62:5.  Dr. McCart then discussed, explicitly as an example, how an IEP team may feel forced to make recommendations for GNETS placements because of a lack of alternative options.  *See* Ex. G, McCart Dep. 62:6-14.  Dr. McCart did not at any point state that this example was her "underlying theory."  *See* Ex. G, McCart Dep. 61:6-62:14.

258.   No LEA or RESA has testified that they are incentivized by GaDOE to provide GNETS services in settings other than the general education setting.

**RESPONSE:** Objection.  The fact asserted is not supported by any citation to evidence, as required by Local Rule 56.1(B)(1).  Nonetheless the fact asserted is denied.  The GNETS Program funding formula does not include, as a factor in determining funding, the number of students for whom a regional GNETS program provides consultative services in the general education setting- that is, services directly to a student or that student's teacher or paraprofessional in the general education setting.  *See* Ex. I, Holifield Dep. 277:9-281:9; Ex. J, Braddock Dep. 69:2-12.  Regional GNETS programs' failure to receive funding for GNETS services provided in general education environments (i.e., consultative services) presents numerous difficulties, including a lack of funds to ensure regional GNETS programs have enough staff both to serve the students with significant needs in GNETS environments and to push into the

general education environment to deliver consultative services.  *See* Ex. 5,
GA00347596; Ex. I, Holifield Dep. 277:9-281:9

259.   GNETS Program decisions are made at the local level. Decisions to
close programs or locations are local decisions. Deposition of Vickie Cleveland at
114:11-14.

**RESPONSE:** Denied. The cited evidence pertains only to a regional
GNETS program's decision to move from a center-based structure to a school-
based structure and does not support the assertion that GNETS Program
decisions, writ broadly, are made at the local level.  In addition, the State plays a
role in decisions to close programs or locations.  *See* ECF No. 395-33, Def.
Resp. to RFA Nos. 81, 87, 89, 90; ECF Nos. 395-135, 395-137 to -140; Ex. Z,
Owen Dep. 155:13-20; Ex. AA, W. Jones Dep. 189:4-190:6, 193:1-194:25; Ex.
Q, Keith Dep. 226:16-229:22, 230:14-232:18; Ex. BB, Rowland Dep. 80:21-
82:2, 83:5-88:1, 94:4-96:13, 111:21-116:9, 145:7-146:20; *see also* Ex. J,
Braddock Dep. 219:21-220:23, 221:17-222:2, 222:15-22, 225:10-226:6.  For
example, the director of GNETS of Oconee testified that her regional GNETS
program transitioned from center-based to an exclusively school-based program
after "[t]he Department of Education in Georgia basically told us that we would
have to move out of the facility" and "[t]here was not another facility for us to
move into, so the board decided that we should be spread out."  Ex. S, Wolf
Dep. 51:13-24; *see also id.* 51:13-52:11, 54:25-55:23.

260.   Which counties a program will serve is a local decision. Deposition of Lisa Futch at 115:15-23; Deposition of Haley Livingston at 113:6-114:6.

**RESPONSE:** Denied.  GaDOE officials have participated in the decision whether a regional GNETS program may serve students in particular counties. See, e.g., ECF No, 395-102 (Oconee GNETS Direction inquiring of GaDOE whether Elam Alexander Academy "can . . . serve Jasper County Students even though Jasper County falls under GNETS of Oconee catchment" and GaDOE responding "Jasper county is in the catchment area for the Oconee GNETS program, thus, students will need to receive services in their service area by the Oconee Program or in their local school district. Another concern would be the distance the Jasper county students would need to travel to receive services at Elam."); Ex. S, Wolf Dep. 216:2-217:15.

261.   Policies and procedures for GNETS Programs are made and changed at the local level. Deposition of Haley Livingston at 60:9-61:7.

**RESPONSE:**  Denied.  The cited evidence does not support the fact asserted.  The cited deposition testimony pertains to a single regional GNETS program.  *See* Deposition of Haley Livingston ("Livingston Dep.") 60:9-61:7 (attached hereto as Exhibit CC).  As Ms. Livingston made clear: "I didn't want to give the impression that I'm changing any kind of policies.  I just change procedures within my building when I was speaking on that earlier.  So just

anything that needs to be changed in the way we do things in my building.  So I guess that's more a procedure-type thing than policy, and I wanted to clarify that."  Ex. CC, Livingston Dep. 60:14-61:7.  Nothing in the cited testimony indicates that the policies and procedures Ms. Livingston discussed include policies and procedures spanning multiple regional GNETS programs.  *See* Ex. CC, Livingston Dep. 60:9-61:7.

262.  Students receiving GNETS services are taught the Georgia performance standards. Ex. L, Cleveland Dep. at 81:8-13.

**RESPONSE:**  Denied.  Following a comprehensive review of the GNETS Program that included classroom observations in 70 regional GNETS program facilities, Dr. Amy McCart concluded that the GNETS Program—unlike general education settings—was characterized by a functional rather than standards-based curriculum. *See* McCart Rep. at 1, 108, 110-114.  Dr. McCart also found an absence of standards-based instruction.  *See id.* at 114-115.

263.  But curriculum decisions are locally made decisions and GNETS Programs follow the curriculum of their local district. Deposition of Lisa Futch at 237:12-238:4; Deposition of Cassandra Holifield at 30:20-31:17; Deposition of Wina Low at 63:15–64:14.

**RESPONSE:**  Denied.  While some aspects of the curriculum at regional

GNETS programs may reflect local decisions, the State mandates certain curricular interventions across regional GNETS programs.  For example, regional GNETS programs are required to use i-Ready—a supplemental curriculum—and to do so for a particular number of minutes each week.  *See*, *e.g.*, Ex. N, Deposition of Celest Ngeve 33:4-23, 253:1-15, 345:14-25.

264.    Thus, every Program does something different for their curriculum. Deposition of Lakesha Stevenson at 137:17-20.

**RESPONSE:**  Denied.  While some aspects of the curriculum at regional GNETS programs may different from program to program, the State mandates certain curricular interventions across regional GNETS programs.  For example, regional GNETS programs are required to use i-Ready—a supplemental curriculum—and to do so for a particular number of minutes each week.  *See, e.g.*, Ex. N, Deposition of Celest Ngeve 33:4-23, 253:1-15, 345:14-25.

265.    Dr. McCart's testimony identified several services (excluding physical plant concerns) that she claims are available in zoned schools but not in the GNETS program, including: (1) grade appropriate resources like standards-based content; (2) standards-based learning instead of functional curriculum; (3) content-mapping; (4) less online instruction; (5) specials, connections, and exploratory classes; and (6) integrated transportation. Deposition of Amy McCart at 221:15-223:19.

**RESPONSE:**  Denied.  The statement mischaracterizes the cited evidence

and is incomplete. Initially, as the State's own question recognized, Dr. McCart had previously identified at least two other specific categories of services and supports that were provided in general education settings but lacking in regional GNETS program sites: speech therapy and mental health services.  Ex. G, McCart Dep. 218:1-7.  Further, in addition to those deficiencies identified in Paragraph 265, Dr. McCart also identified, among other things: general education settings had "typical scheduling, master schedules from students across the spectrum" that regional GNETS programs did not (Ex. G, McCart Dep. 222:20-22); regional GNETS programs had poor school climate and culture due to police and security presence, troubling signage, corporal punishment, and more (Ex. G, McCart Dep. 223:20-22; McCart Rep. at 128-36); regional GNETS programs lacked behavioral or therapeutic support, due to a lack of certified behavioral and therapeutic staff, a lack of Positive Behavioral Interventions and Support implementation, ineffective interaction patterns, and more (McCart Rep. at 136-54); and regional GNETS programs had an institutional culture of hopelessness (McCart Rep. at 154-57).

266.   GNETS Directors are employees of the LEA/RESA and report to supervisors employed by the LEA/RESA. Deposition of Talithia Newsome at 52:15-53:23; Deposition of Haley Livingston at 11:16-20; 277:8-10; Deposition of Cassandra Holifield at 332:16-19; Deposition of Derrick Gilchrist at 256:4-6; 19:10-18; Deposition of Brooke Cole at 24:5-13; Deposition of Celest Ngeve at 23:9-11.

**RESPONSE:** Undisputed in part. The Court may consider this evidence for purposes of the summary judgment motion, except to the extent the evidence is read to preclude additional informal lines of reporting. Two regional GNETS program directors also identified the current GNETS Program Manager and GNETS Program Specialist as individuals to whom they report. *See* Ex. K, Deposition of Brooke Cole 25:6-2113, 26:8-15; Ex. R, Deposition of Talithia Newsome 54:25-55:8.

267. GNETS Program Directors' salaries are paid by either the LEA or RESA, depending on who the fiscal agent is. Deposition of Vickie Cleveland at 147:5-10; Deposition of Haley Livingston at 277:13-14; Deposition of Whitney Braddock at 77: 16-20.

**RESPONSE:** Undisputed in part. The Court may consider this evidence for purposes of the summary judgment motion, except to the extent the cited evidence is read to suggest that the funds originate with the LEA or RESA. GNETS Program Directors' salaries are funded with monies from the GNETS State grant. *See*, *e.g.*, ECF Nos. 395-130, 395-131, 395-142, 395-143; Deposition of Samuel Clemons ("Clemons Dep.") 149:24-150:6 (attached hereto as Exhibit DD); Ex. K, Deposition of Brooke Cole 174:7-19, 181:5-23; Ex. I, Deposition of Cassandra Holifield 50:5-51:13, 104:10-20, 114;1-6; Ex. N, Deposition of Celest Ngeve 266:11-16, 273:15-274:1; Ex. S, Deposition of Patricia Wolf Dep. 104:18-20.

268.    Similarly, all GNETS Program staffing and hiring decisions are determined and handled by the county. Deposition of Talithia Newsome at 107:2-111:2; Deposition of Haley Livingston at 277:8-12; 278:1-12; Deposition of Lisa Futch at 349:8-14; Deposition of Shaun Owen at 155:13-20; Deposition of Derrick Gilchrist ("Gilchrist Dep.") at 254:14-255:5 (attached hereto as Exhibit EE).

**RESPONSE:**  Denied as inaccurate and incomplete.  The State provides regional GNETS programs with the Georgia Professional Standards Commission guidelines that outline the minimum requirements for personnel being hired into particular positions (i.e., teachers, counselors, social workers, paraprofessionals). *See* Ex. R, Deposition of Talithia Newsome 111:24-114:7.  In addition, the State establishes the approved staffing agencies and/or professional qualifications that regional GNETS programs receiving therapeutic grants must use when hiring therapeutic staff.   *See* ECF Nos. 395-153, 395-155, 396-161 to -163; Ex. Q, Deposition of Clara Keith 140:8-143:5, 153:7-155:6; Deposition of Jacqueline Neal ("Neal Dep.") 80:6-83:8 (attached hereto as Exhibit FF); Ex. S, Deposition of Patricia Wolf 141:6-144:2, 144:19-145:19, 147:13-149:2.  In some instances, the State has played an even more substantial role, drafting job responsibilities for particular positions that regional GNETS programs have used to formulate job descriptions.  *See* ECF No. 395-163; Ex. S, Deposition of Patricia Wolf 147:13-149:2.

269.   The State has no role in the Programs' staffing and hiring decisions.

Deposition of Haley Livingston at 278:10-12; Deposition of Talithia Newsome at 111:24-112:4; Deposition of Cassandra Holifield at 332:12-15; 147:6-18; Deposition of Celest Ngeve at 280:18-281:5.

**RESPONSE:** Denied as inaccurate and incomplete. The State provides regional GNETS programs with the Georgia Professional Standards Commission guidelines that outline the minimum requirements for personnel being hired into particular positions (i.e., teachers, counselors, social workers, paraprofessionals). *See* Ex. R, Deposition of Talithia Newsome 111:24-114:7. In addition, the State establishes the approved staffing agencies and/or professional qualifications that regional GNETS programs receiving therapeutic grants must use when hiring therapeutic staff. *See* ECF Nos. 395-153, 395-155, 396-161 to -163; Ex. Q, Deposition of Clara Keith 140:8-143:5, 153:7-155:6; Ex. FF, Deposition of Jacqueline Neal 80:6-83:8; Ex. S, Deposition of Patricia Wolf 141:6-144:2, 144:19-145:19, 147:13-149:2. In some instances, the State has played an even more substantial role, drafting job responsibilities for particular positions that regional GNETS programs have used to formulate job descriptions. *See* ECF No. 395-163; Ex. S, Deposition of Patricia Wolf 147:13-149:2.

270. Each fiscal agent has its own process for how it hires staff and the State is not consulted before a director is selected. Deposition of Vickie Cleveland

at 146:14-23; Deposition of Celest Ngeve at 128:3-131:18.

**RESPONSE:** Denied.  The cited evidence does not support the fact asserted.  Celest Ngeve's deposition testimony does not address director selection at all.  *See* Ex. N, Deposition of Celest Ngeve 128:3-131:18.  Vickie Cleveland's deposition testimony establishes that each fiscal agent has a process for how they hire their staff, that *she* does not participate in interviews of regional GNETS program directors, and that *she* is not consulted before a regional GNETS program director is selected.  *See* Ex. L, Deposition of Vickie Cleveland 146:14-23.  Ms. Cleveland testified that she did not know who else participated in such interviews.  *See* Ex. L, Deposition of Vickie Cleveland 146:14-20.

271.    GaDOE has no involvement or control over who is hired in GNETS Programs. Deposition of Wina Low at 195:16-17; Deposition of David Ackerman ("Ackerman Dep.") at 85:4-7 (attached hereto as Exhibit GG).

**RESPONSE:** Denied as inaccurate and incomplete.  The State provides regional GNETS programs with the Georgia Professional Standards Commission guidelines that outline the minimum requirements for personnel being hired into particular positions (i.e., teachers, counselors, social workers, paraprofessionals).  *See* Ex. R, Deposition of Talithia Newsome 111:24-114:7. In addition, the State establishes the approved staffing agencies and/or professional qualifications that regional GNETS programs receiving therapeutic grants must use when hiring therapeutic staff.   *See* ECF Nos. 395-153, 395-155, 396-161 to -163; Ex. Q,

Deposition of Clara Keith 140:8-143:5, 153:7-155:6; Ex. FF, Deposition of Jacqueline Neal 80:6-83:8; Ex. S, Deposition of Patricia Wolf 141:6-144:2, 144:19-145:19, 147:13-149:2.  In some instances, the State has played an even more substantial role, drafting job responsibilities for particular positions that regional GNETS programs have used to formulate job descriptions.  *See* ECF No. 395-163; Ex. S, Deposition of Patricia Wolf 147:13-149:2.

272.   Dr. McCart does not have an understanding about how local school district superintendents or teachers are hired or fired in Georgia. Deposition of Amy McCart at 40:21-41:15.

**RESPONSE:**  Objection.  The fact asserted is not material to the pending motion for summary judgment.

273.   She could not recall how GNETS teachers are hired or fired, and her report says nothing about it. Ex. G, Deposition of Amy McCart at 41:15-42:15; *see generally*, Ex. E.

**RESPONSE:**  Objection.  The fact asserted is not material to the pending motion for summary judgment.

274.   No GNETS Program has staff employed by GaDOE. Deposition of Vickie Cleveland at 147:11-14.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

275. The State of Georgia does not conduct performance evaluations of GNETS Directors or their staff. Deposition of Haley Livingston at 277:19-25; Deposition of Cassandra Holifield at 333:4-12.

**RESPONSE:** Undisputed in part.   The Court may consider this evidence for purposes of the summary judgment motion, except to the extent the cited evidence is read to suggest that the State does not conduct evaluations of the regional GNETS programs themselves through the GNETS Strategic Plan. *See*, *e.g.*, ECF No. 395-52 at GA00362009-GA00362010; ECF Nos. 395-39, 395-49, 495-58, 395-59; Ex. J, Deposition of Whitney Braddock 208:6-209:17, 210:5-14; Ex. DD, Deposition of Samuel Clemons 250:12-251:9, 254:7-255:20; Ex. L, Deposition of Vickie Cleveland 158:24-159:10, 166:11-167:10, 210:5-18, 217:20-219:8, 230:16– 231:14; Ex. K, Deposition of Brooke Cole 387:17-388:2, 390:22-391:25; Ex. O, Deposition of Lisa Futch 93:20-95:18; Ex. EE, Deposition of Derrick Gilchrist 246:4-247:6; Ex. I, Deposition of Cassandra Holifield 198:19-199:23, 200:15-202:4; Ex. Q, Deposition of Clara Keith 90:22-91:6, 178:20-180:22, 181:7-183:22; Ex. C, Deposition of Haley Livingston 68:12-70:12, 80:25-81:17; Ex. FF, Deposition of Jacqueline Neal 23:21-24:13; Ex. N, Deposition of Celest Ngeve 288:3-289:16, 290:19-291:18, 304:8-305:22; Deposition of Lakesha Stevenson ("Stevenson Dep.") 46:10-23, 49:9-51:6 (attached hereto as Exhibit HH).

276. Nor does the GNETS Program Manager evaluate GNETS Directors.

Deposition of Vickie Cleveland at 146:24-147:1.

**RESPONSE:** Undisputed in part. The Court may consider this evidence for purposes of the summary judgment motion, except to the extent the cited evidence is read to suggest that the State does not conduct evaluations of the regional GNETS programs themselves through the GNETS Strategic Plan. *See*, *e.g.*, ECF No. 395-52 at GA00362009-GA00362010; ECF Nos. 395-39, 395-49, 495-58, 395-59; Ex. J, Deposition of Whitney Braddock 208:6-209:17, 210:5-14; Ex. DD, Deposition of Samuel Clemons 250:12-251:9, 254:7-255:20; Ex. L, Deposition of Vickie Cleveland 158:24-159:10, 166:11-167:10, 210:5-18, 217:20-219:8, 230:16– 231:14; Ex. K, Deposition of Brooke Cole 387:17-388:2, 390:22-391:25; Ex. O, Deposition of Lisa Futch 93:20-95:18; Ex. EE, Deposition of Derrick Gilchrist 246:4-247:6; Ex. I, Deposition of Cassandra Holifield 198:19-199: 23, 200:15-202:4; Ex. Q, Deposition of Clara Keith 90:22-91:6, 178:20-180:22, 181:7-183:22; Ex. CC, Deposition of Haley Livingston 68:12-70:12, 80:25-81:17; EX. FF, Deposition of Jacqueline Neal 23:21-24:13; Ex. N, Deposition of Celest Ngeve 288:3-289:16, 290:19-291:18, 304:8-305:22; Ex. HH, Deposition of Lakesha Stevenson 46:10-23, 49:9-51:6.

277. GNETS students belong to their home school's LEA. Deposition of Amber McCollum at 67:3-6; Deposition of Garry McGiboney at 178:9–13.

**RESPONSE:** Denied. The cited evidence does not support the fact

asserted.  In particular, none of the cited testimony discusses GNETS students'

"home school."

278.  Facility maintenance and concerns are handled by the county.

Deposition of Talithia Newsome at 71:25-73:11; Deposition of Lisa Futch at

238:5- 15; Deposition of Cassandra Holifield at 286:15-24; Deposition of David

Ackerman at 90:1-3; Deposition of Whitney Braddock at 230:17-21. Indeed,

GNETS facilities are county-owned buildings. Deposition of Cassandra Holifield

at 286:15-24.

**RESPONSE:**  Denied.  The cited evidence does not support the factual

assertion that *all* GNETS facilities are county-owned buildings.  The cited evidence

establishes only that "general education facilities where North Metro GNETS

houses classrooms" are "owned by the LEAs."  Ex. I, Deposition of Cassandra

Holifield 286:15-24.  The Court may consider the evidence specific to North Metro

GNETS for purposes of the motion for summary judgment.  The Court may also

consider the evidence that facility maintenance and concerns are handled by county

school systems, except to the extent such evidence is read to suggest that the State

plays no role in facility maintenance and concerns.  *See* ECF No. 395-33, Def.

Resp. to RFA Nos. 69, 81, 87, 89, 90; ECF Nos. 395-134 to -140; Deposition of

James "Ted" Beck Dep. ("Beck Dep.") 135:11-136:15, 139:12-141:19 (attached

hereto as Exhibit II); Ex. AA, Deposition of William "Matt" Jones 189:4-190:6,

193:1-194:25; Ex. Q, Deposition of Clara Keith 226:16-229:22, 230:14-232:18; Ex.

BB, Deposition of Michael Rowland 47:16-50:19, 78:7-79:20, 80:21-82:2, 83:5-88:1, 94:4-96:13, 111:21-116:9, 145:7-146:20, 160:6-161:6; *see also* Ex. J, Deposition of Whitney Braddock 219:21-220:23, 221:17-222:2, 222:15-22, 225:10-226:6.

279.    Dr. McCart does not know who—whether LEAs or the State government—makes decisions on where to invest dollars on playgrounds, gymnasiums, and the like. Deposition of Amy McCart at 123:9-13.

**RESPONSE:**  Objection.  The fact asserted is not material to the pending motion for summary judgment.

280.    Facility layout and use is determined by the school. Deposition of David Ackerman at 95: 18-20; 139: 12-24.

**RESPONSE:**  Denied.  The cited evidence does not support the fact asserted, which is vague as to the particular facility and school to which it refers.

281.    Bus service is determined, provided, and paid for by the LEA/RESA. Deposition of Talithia Newsome at 84:17-22; 85:2-6; 236:20-237:3; Deposition of Lisa Futch at 167:9-18; Deposition of Haley Livingston at 153:4-11; Deposition of Celest Ngeve at 139:2-5; Deposition of David Ackerman at 19-21.

**RESPONSE:**  Denied in part.  The cited deposition testimony of David

Ackerman does not support the fact asserted.  The fact asserted is otherwise undisputed to the extent the term "[b]us service" refers to bussing students in the GNETS Program to and from their assigned regional GNETS programs.  Subject to this qualification, the Court may consider this evidence for purposes of the summary judgment motion.

282.   Bus concerns are, therefore, brought to the county. Deposition of Talithia Newsome at 86:12-87:17.

**RESPONSE:**  Denied.  The cited evidence does not support the fact asserted, particularly to the extent the asserted fact is read to apply broadly to all regional GNETS programs.

283.   Restraint policies are approved by the local authority, not GaDOE. Deposition of Lisa Futch at 353:9-18.

**RESPONSE:**  Denied.  The cited evidence does not support the fact asserted, particularly to the extent the asserted fact is read to apply broadly to all regional GNETS programs.

284.   The GNETS Rule requires the Board of Education to "Administer the grant funds by performing the following in collaboration with the GaDOE: Monitor GNETS to ensure compliance with Federal and state policies, procedure, rules, and the delivery of appropriate instructional and therapeutic services." Ga Comp. R. & Regs. 160-4-7-.15.

**RESPONSE:**  Undisputed that the GNETS Rule requires the Georgia State

Board of Education to "Administer the grant funds by performing the following in collaboration with the GaDOE: . . . (iii) Monitor GNETS to ensure compliance with Federal and state policies, procedures, rules, and the delivery of appropriate instructional and therapeutic services." Ga Comp. R. & Regs. § 160-4-7-.15(5)(a)(2).  The Court may consider this evidence for purposes of the summary judgment motion.

285.   This is done through GaDOE's cross-functional monitoring by its Results-Driven Accountability Unit, through the strategic plan review, and through

the budgeting division when budgets are submitted by the fiscal agents. Deposition of Vickie Cleveland at 166:12-167:16; Deposition of Shaun Owen at 154:1-155:9.

**RESPONSE:** Undisputed. The Court may consider this evidence for purposes of the motion for summary judgment.

286. As GaDOE does with all LEAs and students, the Results-Driven Accountability Unit has district liaisons that conduct monitoring of LEAs' compliance through cross functional monitoring visits in which they pull student folders and, in so doing, always pull two GNETS student folders. Deposition of Lakesha Stevenson at 61:1-13; Deposition of Shaun Owen at 155:1-3; Deposition of Vickie Cleveland at 44:13-19; 45:1-8; 166:16-19.

**RESPONSE:** Objection. The cited evidence does not speak to GaDOE's use of cross functional monitoring visits with all LEAs and students. For purposes of the motion for summary judgment, the Court may consider evidence that the Results-Driven Accountability Unit has district liaisons that conduct monitoring through cross functional monitoring visits and, in so, doing, pull two GNETS student folders.

287. While the State may "monitor" the LEAs' compliance with state and federal law in this manner, the State has no direct enforcement authority over the LEAs. Code Section 20-2-243 provides that the only enforcement mechanism the State has is the ability to seek to withhold state funds from LEAs, a process which

is subject to judicial review before any withholding action can be taken. O.C.G.A.

§ 20-2-243.

**RESPONSE:** Objection. The fact asserted should not be considered for

purposes of the motion for summary judgment because it is improperly stated as a

legal conclusion in violation of Local Rule 56.1(B).

288. GNETS Directors have created documents such as the "Consideration

of Services" packet, "Request for GNETS consultation" document, and "Guidance

and Planning Document for Student Integration from GNETS" document that they

share and use for guidance. Deposition of Talithia Newsome at 150:13-151:10;

180:16-22; Deposition of Cassandra Holifield at 279:8-18; Deposition of Vickie

Cleveland at 124:23-125:10; 141:19-142:22; 128:18-21.

**RESPONSE:** Denied as incomplete. The GNETS Program Manager, who

assembled the committee to develop the first drafts of the Consideration of Services

Forms, directed the committee to ensure that the forms were aligned to the State's

GNETS Rule, reviewed the Forms, determined the process for obtaining feedback

on the Forms from other stakeholders, and approved the final versions of the Forms.

ECF Nos. 395-74, 395-77, 395-82, 395-83, 395-85 to -87; Ex. S, Deposition of

Patricia Wolf 185:4-189:18, 190:8-205:15.

289. There is no requirement by GaDOE to use these documents.

Deposition of Talithia Newsome at 150:13-151:10; 180:16-22; Deposition of

Cassandra Holifield at 279:8-18.

**RESPONSE:** Denied. The cited evidence does not support the fact asserted. The deposition testimony provided by Cassandra Holifield confirms GaDOE's expectation that regional GNETS programs follow the protocol set forth in the "Request for GNETS consultation" document. Indeed, the testimony references an email in which the GNETS Program manager writes that "[t]he GNETS continuation of services flow chart provides guidance on consult services. There is a request for consultation form in the packet. NM [North Metro GNETS] should follow this protocol." Ex. I, Deposition of Cassandra Holifield 276:19-277:2, 279:8-280:17; *see also* Ex. 5, GA00347596. More broadly, the referenced documents are consistently used across GNETS programs and understood to be requirements by regional GNETS program directors. *See*, *e.g.*, ECF Nos. 395-64 to -73; Ex. J, Deposition of Whitney Braddock 101:21-102:24, 103:15-104:3, 107:11-110:10; Ex. DD, Deposition of Samuel Clemons 51:21-52:6, 61:20-62:19; Ex. O, Deposition of Lisa Futch 313:2-314:23, 316:2-317:12, 350:23-352:6; Ex. EE, Deposition of Derrick Gilchrist 228:5-233:6; Ex. FF, Deposition of Jacqueline Neal 128:10-130:11; Ex. N, Deposition of Celest Ngeve 191:18-193:24, 195:21-198:5, 201:16-204:15, 220:11-222:9, 235:13-238:1, 313:25-316:22; Ex. S, Deposition of Patricia Wolf 170:19-175:22.

290.   Similarly, there is no requirement by GaDOE to use the "Guiding Questions for Consideration of GNETS Services" document or the GNETS

Operations Manual which are also guidance documents. Deposition of Cassandra Holifield at 252:9-14; Deposition of Talithia Newsome at 162:13-17.

**RESPONSE:** Denied. The cited evidence does not support the fact asserted. Although Talithia Newsome testified that she was under no requirement to use the Guiding Questions for Considerations of GNETS, she acknowledged that the questions appearing on the form reflect mandatory eligibility criteria for placement in GNETS outlined in the GNETS State Rule. *See* Ex. R, Deposition of Talithia Newsome 159:12-21, 162:13-174:23. Cassandra Holified testified that the GNETS Operations manual "was basically a guidance document that came from the DOE on how to fill out some of the reports, like you pulled up today, about the data management tool, The State Board Rule, and like how to code different things in the different meetings." Ex. I, Deposition of Cassandra Holifield 252:9-14. Nothing in her testimony, however, indicates that regional GNETS programs had authority to fill out reports, the data management tool, or the relevant coding in ways inconsistent with the Operations Manual. *See id.* Similarly, the testimony does not establish that regional GNETS programs could depart from the Operations Manual's guidelines regarding compliance with the GNETS State Board Rule. *See id.*

291. In fact, GaDOE does not require use of any specific documents related to consideration of services. Deposition of Vickie Cleveland at 128:4-129:15.

**RESPONSE:** Denied. The Consideration of Services packet is consistently

used across GNETS programs and understood to be a requirement by regional

GNETS program directors. *See*, *e.g.*, ECF Nos. 395-64 to -73; Ex. J, Deposition

of Whitney Braddock 101:21-102:24, 103:15-104:3, 107:11-110:10; Ex. DD,

Deposition of Samuel Clemons 51:21-52:6, 61:20-62:19; Ex. O, Deposition of

Lisa Futch 313:2-314:23, 316:2-317:12, 350:23-352:6; Ex. EE, Deposition of

Derrick Gilchrist 228:5-233:6; Ex. FF, Deposition of Jacqueline Neal Dep.

128:10-130:11; Ex. N, Deposition of Celest Ngeve 191:18-193:24, 195:21-198:5,

201:16-204:15, 220:11-222:9, 235:13-238:1, 313:25-316:22; Ex. S, Deposition of

Patricia Wolf 170:19-175:22.

292.    GaDOE provides guidance to regional GNETS Programs in areas

such as transition, academic achievement, and reintegration. Deposition of Wina

Low at 167:13–168:2; 150:7–17.

**RESPONSE:**  Objection. The cited deposition testimony of Wina Low

does not establish that GaDOE provides guidance to regional GNETS programs

in the area of reintegration.  Instead, Ms. Low testified regarding the things

GaDOE could do to increase the rate at which students in GNETS reintegrate

into their home schools.  *See* Ex. P, Low Dep. 149:19-150:17.  Ms. Low

testified that GaDOE could "continue to reinforce the expectations and try to

provide supports in place.  Preventive measures, especially."  Ex. P, Low Dep.

150:7-17.  These preventive measures include "[a]dditional professional

learning in behavior management, functional behavior assessment, behavior

146

intervention plans." Ex. P, Low Dep. 150:18-22.  Ms. Low also testified that the "number one" thing GaDOE could do to increase the rate of reintegration "is offering a full continuum in all of our schools."  Ex. P, Low Dep. 149:23-150:6.

293.   Because GaDOE does not mandate Programs' adherence to the guidance, compliance with the guidance is the concern of the local agencies who run the GNETS Programs. Deposition of Wina Low at 167:13–168:2; 150:7–17.

**RESPONSE:**  Objection.  The cited evidence does not speak to the issue of compliance and thus does not support the fact asserted.

294.   Similarly, because GaDOE does not supervise the Programs' academic programming, it does not have authority to take steps in response to issues such as, for example, low Milestone scores other than to provide tools and direction to materials such as iReady. Deposition of Wina Low at 185:11–20.

**RESPONSE:**  Objection.  The cited evidence does not support the assertion that GaDOE does not have authority to take steps in response to low Milestone scores other than to provide tools and direction to materials such as iReady.

295.   GNETS Programs who wish to collaborate with CSBs do so at the local level. For example, South Metro GNETS contracts directly with View Point Health for two clinicians to provide behavioral health services at South Metro GNETS. Deposition of Jennifer Hibbard at 74:24-75:14; 76:4-13.

**RESPONSE:** Denied.  The cited evidence does not support the fact asserted. In particular, the cited evidence does not establish that all regional GNETS programs that wish to collaborate with CSBs do so at the local level, as it pertains only to a single regional GNETS program.  It is undisputed that South Metro GNETS contracts directly with View Point Health for two clinicians to provide behavioral health services at South Metro GNETS.  The Court may consider this evidence regarding South Metro's contract with View Point Health for purposes of the motion for summary judgment.

296.   Dr. McCart's report asserts that ████████████████████

████████████████████████████████████████

██████████ Ex. E at 162 (emphasis in original).

**RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of the motion for summary judgment.

297.   Dr. McCart testified that GNETS is not an "enabling context." Deposition of Amy McCart at 258:16-259:3.[3]

**RESPONSE:**  Undisputed that Dr. McCart testified that GNETS is not currently an "enabling context," but denied to the extent that the State attributes other views to Dr. McCart not contained in her testimony— including that GNETS must be abolished for her recommendations to work. Dr. McCart testified that the large-scale systemic segregation present across

the GNETS Program and the lack of a system of support in which students

have access to the resources they need currently prevents the Program from

being an enabling context.  *See* Ex. G, McCart Dep. 258:2-259:16.  Subject

to those qualifications, the Court may consider this evidence for purposes of

the motion for summary judgment.

### A. GNETS Funding

298.   Each year, the General Assembly appropriates money for the GNETS

Programs' use via a grant process. *See generally*, General Appropriations Acts

FY2019 through FY2024, attached hereto as Exhibits K through T; Deposition of

Derrick Gilchrist at 255:6-256:3.

**RESPONSE:**  Denied to the extent the statement varies from the cited

evidence.  It is undisputed, however, that each year the General Assembly

appropriates money to the Georgia Department of Education that is designated for

the GNETS Program, and that each year the Georgia Department of Education

allocates the funds to regional GNETS programs, through their fiscal agents, by

applying its spreadsheet formula using the weighted student count and personnel

T&E earnings submitted by the programs in their annual grant applications.  *See,*

*e.g.*, Deposition of Geronald Bell ("Bell Dep.") 140:2-141:13, 166:23-167:20

(attached hereto as Exhibit JJ).

299.   The total allocation to GNETS Programs is made up of state and

federal dollars. Deposition of Haley Livingston at 199:13-17; Deposition of

Cassandra Holifield at 266:13-17; Deposition of Derrick Gilchrist at 255:6-256:3;

---

[3] This means her recommendations would not work within the GNETS Program, meaning it needs to be abolished for her plans to work.

Deposition of Celest Ngeve at 281:6-9; Deposition of Patricia Wolf at 62: 4-6; *see generally*, Exs. K through T.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the motion for summary judgment.

300.   In Fiscal Year 2024, federal funds flowing through USDOE represented 17% of the total appropriation of $65,427,745 for the GNETS budget. *See* Ex. S.

**RESPONSE:**  Undisputed that page 108 of Ex. S shows that the amount listed as "Total Federal Funds" for the GNETS Program in Fiscal Year 2024 constitutes 17.3% of the amount listed as "Total Public Funds" for the GNETS Program in Fiscal Year 2024.  The Court may consider this evidence for purposes of the motion for summary judgment.

301.   In Fiscal Year 2024, State funds represented 82% of the total appropriation of $65,427,745 for the GNETS budget. *See* Ex. S.

**RESPONSE:**  Undisputed that page 108 of Ex. S shows that the amount listed as "Total State Funds" for the GNETS Program in Fiscal Year 2024 constitutes 82.7% of the amount listed as "Total Public Funds" for the GNETS Program in Fiscal Year 2024.

302.    GNETS grant funding is driven by enrollment. Deposition of Vickie

Cleveland at 266:14-17.

**RESPONSE:** Denied as incomplete. GNETS grant funding, in accordance with the State's GNETS funding formula, is driven by the weighted student count and T&E earnings. *E.g.*, Ex. JJ, Bell Dep. at 140:6-141:13.

303. The GNETS population is consistently trending down. Deposition of Vickie Cleveland at 88:13-19.

**RESPONSE:** Denied as incomplete. While it is undisputed that total number of students in the GNETS Program has declined in the period between school year 2015 and school year 2022, *See* the number of students in some regional GNETS programs has increased. McCart Rep. at 14, and Figure B.

304. The GNETS grant has accordingly trended down each year. *See generally*, Exhibits Exs. K through T.

**RESPONSE:** Denied. The cited evidence does not support the fact asserted. The State portion of the initial appropriations for the GNETS Program increased between at least FY2016 and FY2017, between FY2021 and FY2022, and between FY2022 and FY2023. In addition, there were increases between the initial and amended appropriations for at least FY2016, FY2018, FY2021, and FY2022. Last, there were increases in the portions of the GNETS Program funding that came from the federal discretionary IDEA funding from FY2015 to FY2016, FY2017 to FY2018, and FY2019 to FY2020. As a result, there were increases in total appropriations for the GNETS Program from FY2015 to FY2016, from FY2016 to

FY2017, from FY2017 to FY2018, from FY2019 to FY2020, from FY2021 to FY2022, and from FY2022 to FY2023. *See* H.B. 76, 153rd Gen. Assemb., Reg. Sess. (see p. 93 at 134.100) (Ga. 2015); H.B. 751, 153rd Gen. Assemb., Reg. Sess. (see p. 54 at 24.9) (Ga. 2016); H.B. 44, 154th Gen. Assemb., Reg. Sess. (see p. 96 at 142.100) (Ga. 2017); H.B. 684, 154th Gen. Assemb., Reg. Sess. (see p. 50 at 24.10) (Ga. 2018); H.B. 31, 155th Gen. Assemb., Reg. Sess. (see p. 100 at 146.100) (Ga. 2019); H.B. 793, 155th Gen. Assemb., Reg. Sess. (see p. 63 at 24.9) (Ga. 2020); H.B. 81, 156th Gen. Assemb., Reg. Sess. (see p. 80 at 142.100) (Ga. 2021); H.B. 911, 156th Gen. Assemb., Reg. Sess. (see p. 65 at 24.8) (Ga. 2022); H.B. 19, 157th Gen. Assemb., Reg. Sess. (see p. 105 at 151.100) (Ga. 2023).

305.   In addition, local funds are contributed from LEAs in the form of in-kind services. Deposition of Derrick Gilchrist at 255:6-256:3; Deposition of Lisa Futch at 237:12-238:20.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of summary judgment.

306.   Many staff positions are funded by the county. Deposition of Talithia Newsome at 115:16-117:2; 118:20-22; 123:6-127:7; Deposition of Cassandra Holifield at 55:8-11; 133:21-23.

**RESPONSE:**  Denied.  The cited evidence does not support the fact asserted. Ms. Newsome testified that the LEA "serves as the flowthrough" for position funding (Ex. R, Newsome Dep. 117:2), and even assuming the LEAs fund the

positions identified, many of the service providers are not "staff" but rather provide

in-kind services such as nursing, training, or IT support.  Dr. Holifield's cited

testimony also does not support the fact asserted.  Although Dr. Holified testified

that there were "probably around a hundred, 150"  "teachers and paras" within the

North Metro GNETS Program funded by LEAs, Ex. I, Holifield Dep. at 55:8-11,

she testified that there were only "about 90" staff members on payroll at that

program. The second passage cited from her testimony does not involve a

discussion of personnel or funding at all.  Further, other directors testified that few,

if any, of their staff are funded by the LEAs they serve.  *E.g.*, Ex. J, Deposition of

Whitney Braddock 83:4-24, 204:25-205:10 (listing the subset of LEAs that

contribute funds to offset costs for a few staff members).

307.    Others are funded by the State grant. Deposition of Talithia Newsome
at 118:16-19; 119:1-4.

**RESPONSE:**  Denied as incomplete.  While the cited testimony refers

primarily to administrators and service providers, Ms. Newsome testified that most

of the teaching positions and other personnel at her  regional GNETS program are

also funded by the state grant.  Ex. R, Newsome Dep. at 128:11-131:1.

308.    Dr. McCart has no knowledge of the State appropriations process.
Deposition of Amy McCart at 42:16-19.

**RESPONSE:**  Objection.  The fact asserted is not material to the pending

motion for summary judgment.  The statement is also denied as incomplete; Dr.

McCart reviewed the Georgia Department of Education's report on funding for the

GNETS Program, as directed in HB911 (*see* McCart Rep. App. E, citing

GA05242582) and is therefore familiar with the amounts dedicated to the GNETS

and the other topics covered by the report, even if not the appropriations process.

309.   Nor does Dr. McCart know how LEAs can raise revenue

independent from State appropriations. Deposition of Amy McCart at 229:14-21.

**RESPONSE:** Objection.  The fact asserted is not material to the pending

motion for summary judgment.

310.   Dr. McCart does not know if LEAs must accept or apply for GNETS

grants, nor does she know if GaDOE mandates the program. Deposition of Amy

McCart at 152:22-153:13.

**RESPONSE:** Objection.  The fact asserted is not material to the pending

motion for summary judgment.

311.   Grants are not mandatory. There is no evidence that LEAs and RESAs

are required to apply for the GNETS grant.

**RESPONSE:** Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

312.   Despite having never read an appropriations act enacted by the

General Assembly, Dr. McCart identifies only the State's appropriation of State and

federal dollars to fund GNETS grants as ████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████ Ex. E at 167; Deposition of Amy McCart at 151:15-18; 157:6-8.

**RESPONSE:** Objection. The fact asserted is not material to the pending

motion for summary judgment and the cited evidence does not support the fact

asserted. Dr. McCart reviewed the Georgia Department of Education's report on

funding for the GNETS Program referenced in HB911, and she is familiar with the

funding structure in place for the GNETS Program. *See* McCart Rep. App. E, citing

GA05242582. The quotes included in this response are also not present in the cited

evidence but instead appear on page 158 of Dr. McCart's report. It undisputed that

Dr. McCart offered funding as an example of the State's role in remedying the

issues she identified with the GNETS Program, but the United States denies that

that was the only basis for her recommendations to ensure that students with

behavior-related disabilities receive services in an integrated environment. *See*, *e.g.*,

Ex. G, McCart Dep. at 160:14-161:22 ("Q: … what you've just described are things

that the Department of Education is not doing. I'm asking, what is the affirmative

thing that the Department of Education in Georgia is doing to cause the harms that

you describe in your report?" and "Q: … Other than not doing the series of things

that you recommend, what is [the State] affirmatively doing?"). It is undisputed that

Dr. McCart is concerned that the continuing existence of the GNETS Program

perpetuates "the idea that segregating mass amounts of students with behavior-

related disabilities is necessary in order to offer them intensive social, emotional, and behavioral therapeutic services and supports." McCart Rep. at 167.

313.   Although Dr. McCart claims that the State "perpetuates" alleged systemic segregation in the GNETS program by providing funds for GNETS grants (and, she did not understand the funding to be grant-based or discretionary), she did not "feel comfortable" applying the same standard to the United States Department of Education when asked to presume that some of its federal funds are used to provide GNETS grants. Deposition of Amy McCart at 157:15-158:7.

**RESPONSE:**  Objection.  The fact asserted is not material to the pending motion for summary judgment.  Dr. McCart appropriately testified that she was not comfortable responding to the question about the legal consequences of federal funding being dedicated to the GNETS Program.  *See* Ex. G, McCart Dep. 157:9-158:7.

314.   GaDOE is a flowthrough agency for state and federal funds to the fiscal agent, either the LEA or RESA as the case may be. Deposition of Shaun Owen at 154:22-23.

**RESPONSE:**  Denied as incomplete.  As an initial matter, it is unclear what is meant by the term "flowthrough agency" and what significance that term has with respect to the United States' claims.  It is undisputed that GaDOE allocates federal and state funds to regional GNETS programs via their fiscal agents.

315.   The RESA/LEA is a flowthrough for state and federal funds to the individual GNETS Programs. Deposition of Haley Livingston at 75:18-25; Deposition of Cassandra Holifield at 49:18-50:4; 50:11-12.

**RESPONSE:**  Denied.  As an initial matter, it is unclear what is meant by the term "flowthrough" and what significance that term has with respect to the United States' claims.  It is undisputed that LEAs and RESAs serve as fiscal agents for the regional GNETS programs.  *See* Ex. CC, Livingston Dep. at 75:18-25 ("our Georgia and federal funds come through [the RESA]"); Ex. I, Holifield Dep. at 49:20-50:4 (fiscal agent "oversee[s] all of our funding that flows from the State and the federal level" and "maintain[s] all of the funding and make sure that it's spent the way it's supposed to be spent").

316.   The fiscal agent receives funds from GaDOE and has the responsibility for appropriately accounting for the expenditure of those funds. Deposition of Clara Keith Brown at 31:2-6.

**RESPONSE:**  Denied as incomplete.  Regional GNETS programs must also submit their program budgets to GaDOE and have those budgets approved by GaDOE.  Ga Comp. R. & Regs. § 160-4-7-.15(5)(a) (GNETS Rule charges SEA with approving program budgets); *see also* ECF No. 395-33, Def. Resp. to RFA No. 25; Ex. I, Holifield Dep. 104:10-106:18; Ex. Y, McCollum Dep. 107:4-109:8; 214:9-15.

317.   Dr. McCart explained during her deposition that she makes "no

recommendation about funding regarding the GNETS program." Deposition of
Amy McCart at 182:4-5.

**RESPONSE:** Denied as incomplete. Dr. McCart had earlier testified that
her recommendations are "standard for [State Education Agency] practice across the
United States, and in no way require additional resources or funding in order to
implement." Ex. G, McCart Dep. at 43:6-15. Dr. McCart continued, that based on
her experience, "the implementation of [her] recommendations would cost the state
no more money than what's already being allocated to the services of students with
disabilities, behavior-related disabilities." Ex. G, McCart Dep. at 162:12-163:2.

318.   She, instead, acknowledged that such decisions are "really between
the state and the entities involved at the state." Deposition of Amy McCart at
182:4-6.

**RESPONSE:** Objection. The fact asserted is not material to the pending
motion for summary judgment.

319.   There are fiscal assurances signed between the GNETS Programs
their respective RESAs/LEAs as the fiscal agents for the GNETS Programs.
Deposition of Lakesha Stevenson at 145:4-12; 144:17-20.

**RESPONSE:** Denied as incomplete. The regional GNETS programs must
provide GaDOE with assurances as part of the grant application process. *See* ECF
No, 395-125 at GA00054563-GA00054566; *see* ECF No. 395-170 at GA00321621-

GA00321628.  In addition, the regional GNETS programs provide assurances to GaDOE in connection with additional grant funds for therapeutic services.  ECF Nos. 395-153, 395-155, 395-161 to -163; Ex. K, Cole Dep. 278:7-280:14; Ex. Q, Keith Dep. 140:8-143:5, 153:7-155:6; Ex. FF, Neal Dep. 80:6-83:8; Ex. S, Wolf Dep. 141:6-144:2, 144:19-145:19, 147:13-149:2.

320.   There are no assurances between the GNETS Programs and GaDOE. Deposition of Lakesha Stevenson at 145:13-15.

**RESPONSE:** Denied.  Ms. Stevenson acknowledged that there are assurances between the regional GNETS programs and GaDOE built into the grant application.  Deposition of Lakesha Stevenson 145:13-20.  In addition, the regional GNETS programs provide assurances to GaDOE in connection with additional grant funds for therapeutic services.  ECF Nos. 395-153, 395-155, 395-161 to -163; Ex. K, Deposition of Brooke Cole 278:7-280:14; Ex. Q, Deposition of Clara Keith 140:8-143:5, 153:7-155:6; Ex. FF, Deposition of Jacqueline Neal 80:6-83:8; Ex. S, Deposition of Patricia Wolf 141:6-144:2, 144:19-145:19, 147:13-149:2.  Finally, Letters of Assurance are also included when regional GNETS programs seek approval from GaDOE to move to another site. ECF No,. 395-140; Ex. BB, Deposition of Michael Rowland 111:21-116:9.

321.   The funding for GNETS is held for reimbursement after the GNETS programs have made certain expenditures. Deposition of Geronald Bell at 34:19-22.

**RESPONSE:**  Denied as incomplete to the extent the State suggests that fiscal agents and regional GNETS programs have exclusive control over how to spend the GNETS grant funds.  While it is undisputed that the fiscal agents manage the grant funds for the regional GNETS programs, each regional GNETS program must have its budget approved by the State.  Ga Comp. R. & Regs. § 160-4-7-.15(5)(a) (GNETS Rule charges SEA with approving program budgets); *see also* ECF No. 395-33, Def. Resp. to RFA No. 25; Ex. I, Deposition of Cassandra Holifield 104:10-106:18; Ex. Y, Deposition of Amber McCollum 107:4-109:8; 214:9-15.  Some expenditures require approval by the State even after the funds have been turned over to the fiscal agent.  *See*, *e.g.*, Ex. J, Deposition of Whitney Braddock Dep. at 25:25-26:11 (certain program purchases need approval through GaDOE); Ex. Y, Deposition of Amber McCollum 206:20-209:7 (State denied regional GNETS program and LEA authority to use program funds to make purchase designed to help get GNETS students into the community).

322.  The GNETS Program submits requests or purchase orders to the fiscal agent for approval and to receive payment. Deposition of Cassandra Holifield at 50:16-51:13.

**RESPONSE:**  Denied as incomplete to the extent the State suggests that fiscal agents and regional GNETS programs have exclusive control over how to spend the GNETS grant funds.  While it is undisputed that the fiscal agents manage the grant funds for the regional GNETS programs, each regional GNETS program

must have its budget approved by the State.  Ga Comp. R. & Regs. § 160-4-7-.15(5)(a) (GNETS Rule charges SEA with approving program budgets); *see also* ECF No. 395-33, Def. Resp. to RFA No. 25; Ex. I, Holifield Dep. 104:10-106:18; Ex. Y, McCollum Dep. 107:4-109:8; 214:9-15.  Some expenditures require approval by the State even after the funds have been turned over to the fiscal agent.  *See, e.g.*, Ex. J, Braddock Dep. at 25:25-26:11 (certain program purchases need approval through GaDOE); Ex. Y, McCollum Dep. at 206:20-209:7 (State denied regional GNETS program and LEA authority to use program funds to make purchase designed to help get GNETS students into the community).

323.    GNETS Programs must get budget approval from their fiscal agents. Deposition of Cassandra Holifield at 105:24-106:6.

**RESPONSE:**  Denied as incomplete to the extent the State suggests that fiscal agents and regional GNETS programs have exclusive control over how to spend the GNETS grant funds.  Indeed, Dr. Holifield further testified that regional GNETS program budgets must get reviewed and approved by State personnel at GaDOE.  Ex. I, Holifield Dep. at 105:24-106:18.  In addition, some expenditures require approval by the State even after the funds have been turned over to the fiscal agent.  *See, e.g.*, Ex. J, Braddock Dep. at 25:25-26:11 (certain program purchases need approval through GaDOE); Ex. Y, McCollum Dep. at 206:20-209:7 (State denied regional GNETS program and LEA authority to use program funds to make purchase designed to help get GNETS students into the community).

324.    Some RESAs prepare and handle their respective GNETS Programs' budgets. *See, e.g.,* Deposition of Haley Livingston at 118:9-10; 199:25-200:4; 229:12-18 (explaining Harrell Learning Center's RESA prepares its budget).

**RESPONSE:**  Undisputed that at least one regional GNETS program director testified that someone at the RESA that serves as the program's fiscal agent handles the program's budget.  The Court may consider this evidence for purposes of the summary judgment motion.

325.    To receive GNETS grant funds, GNETS Programs submit a grant application. Deposition of Celest Ngeve at 263:16-264:24.

**RESPONSE:** Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

326.    In reviewing the grant application, the GNETS Program Manager simply makes sure the various components are complete. Deposition of Lakesha Stevenson at 128:2-5.

**RESPONSE:**  Denied.  The cited testimony does not speak to the role of the GNETS Program Manager with respect to the GNETS grant application.

327.    The grant application requirements and assurances are the same for all programs. Deposition of Vickie Cleveland at 250:24-251:6; 251:12-14.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

328.   The grant does not include language that provides for termination if noncompliance by the GNETS Program is found. Deposition of Vickie Cleveland at 255:16-21.

**RESPONSE:** Denied in part.  When asked whether the grant included language that provides for termination of funding on the grounds of noncompliance, Cleveland testified "not that I'm aware of," but did not conclusively state "no."  Ex. L, Cleveland Dep. at 255:16-21.  However, according to a former member of the State Board of Education, the State has the authority—and has exercised its authority—to put a pause on regional GNETS programs' funding when those programs fail to comply with their responsibilities.  Ex. KK, Winter Dep. 166:5-168:8.

329.   Scores such as the GAA and GAA 2.0 do not impact funding. Deposition of Vickie Cleveland at 266:14-17.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

## B. GNETS Program Manager and GNETS Program Specialist

330.   The GNETS Program Manager and GNETS Program Specialist roles fall under the purview of the Federal Programs Division of GaDOE. Deposition of Shaun Owen at 28:21-25.

**RESPONSE:**  Denied as incomplete.  The GNETS Program Manager and GNETS Program Specialist roles currently fall under the Division of Special

Education Services and Supports within GaDOE's Office of Federal Programs. *See* ECF No. 395-46; Ex. P, Low Dep. 30:16-35:25; Ex. Z, Owen Dep. 30:14-31:7, 33:21-34:12.

331.    When the role that ultimately became the GNETS Program Manager was created, Clara Keith Brown wanted to make sure the person hired knew the State did not control or administer GNETS; that the GNETS Programs were independent of GaDOE in that they have their own directors who did not report to anyone at GaDOE; and that GaDOE has a State Board rule that GaDOE provides implementation guidance on. Deposition of Clara Keith Brown at 85:16-25.

**RESPONSE:** Denied as incomplete.  The testimony cited in paragraph 331 is one among several statements made by Clara Keith Brown regarding information that she sought from candidates during the GNETS Program Manager interview process.  For example, in response to the question that elicited the cited testimony ("What is the State's role in implementing the GNETS program"), Ms. Keith Brown also stated that she wanted the candidate to know that "while you're not supervising the directors directly, the State has a Board of Education rule and GNETS have to abide by that rule."  Ex. Q, Deposition of Clara Keith 85:9-86:6.

332.    Today, the role of the GNETS Program Manager is to provide technical assistance to the 24 programs; to work with the budget division in looking at allocations for GNETS funding and allocating funds to the GNETS

programs; to work with the budget division within special education to review budgets; strategic plan technical assistance; training on the Board rule; and professional learning and technical assistance as needed for GNETS Directors. Deposition of Vickie Cleveland at 36:12-37:1; 50:14-16.

**RESPONSE:** Denied as incomplete. The GNETS Program Manager position includes, but is not limited to, the duties and responsibilities described in the cited testimony from Vickie Cleveland's deposition. *See* Exs. 375-376; Ex. L, Cleveland Dep. 36:12-37:14; 38:19-42:14, 44:6-47:16, 47:17-50:16.

333. The GNETS Program Manager provides trainings to GNETS Directors, not to GNETS teachers. Deposition of Vickie Cleveland at 176:18-22.

**RESPONSE:** Undisputed in part. The Court may consider this evidence for purposes of the summary judgment motion. However, consistent with the GNETS Program Manager's testimony that directly follows, some content provided during trainings to GNETS Directors is intended to be brought back by the GNETS Directors and delivered to their teachers and staff. Ex. L, Cleveland Dep. 176:23-177:4; 178:10-179:10.

334. The GNETS Program Manager and Specialist are not there for day-to-day implementation of the program. Deposition of Vickie Cleveland at 169:18-22.

**RESPONSE:** Denied. The State mischaracterizes the cited evidence. Ms. Cleveland was asked the following question: "What steps are taken by GaDOE if a regional GNETS program is not complying with the Board rule?" Ex. L, Deposition

of Vickie Cleveland 169:12-14. The question was not directed specifically at whether the GNETS Program Manager and Specialist are present for day-to-day implementation of the program. Further, in response to this question, Ms. Cleveland responded: "I have not – I'm trying to think. I cannot think of any examples of where I have seen noncompliance with the Board rule. I don't – again, we're not there for *every* day-to-day implementation of the program, but for what I do look at, I have not seen any noncompliance that I can recall specific to the Board rule." Ex. L, Deposition of Vickie Cleveland 169:15-22 (emphasis added). Ms. Cleveland only disavows that she is not present for "every" aspect of the day-to-day implementation of the program, not that she is never involved with day-to-day implementation of the program. Finally, the record evidence offers numerous examples where the GNETS Program Manager and Program Specialist have been involved in matters related to the day-to-day implementation of the program. *See, e.g.*, ECF Nos. 395-101 to -106; Ex. O, Deposition of Lisa Futch 118:10-122:17, 241:17-245:6, 245:25-248:23; Ex. CC, Deposition of Haley Livingston 233:22-239:22; *see also* ECF Nos. 395-107 to -120; Ex. J, Deposition of Whitney Braddock 116:11-12, 116:21, 117:13-118:9; Ex. DD, Deposition of Samuel Clemons 220:19-225:20; Ex. K, Deposition of Brooke Cole 33:6-11, 34:5-21, 108:3-12, 108:21-111:11, 115:14-117:5, 120:11-121:19; Ex. EE, Deposition of Derrick Gilchrist 58:16-59:4, 59:23-64:15, 209:3-17, 210:1-211:14; Ex. N, Deposition of Celest Ngeve 231:11-233:25, 247:24-248:17; Ex. HH, Deposition of Lakesha Stevenson

Dep. 175:23-176:10, 177:16-180:17; Ex. S, Deposition of Patricia Wolf 213:21-

215:20, 216:2-217:15.

335.    They do not provide consultation regarding improvement to the

GNETS Programs. Deposition of Lakesha Stevenson at 48:23-49:1.

**RESPONSE:**  Denied.  The cited testimony is incomplete in that it comes

from Ms. Stevenson's testimony about her job responsibilities related to GaDOE's

consultation to regional GNETS programs to "improve the GNETS Strategic Plan."

ECF No. 395-49; Ex. HH, Deposition of Lakesha Stevenson 46:10-23, 47:19-49:1.

However, the strategic plan itself states that regional GNETS programs and GaDOE

also use the document "to determine the need for professional learning and

resources to drive improvement," which could reasonably be understood as

improvement to the program. *See* ECF No. 395-52 at GA00362009.  Further, in

several instances, statewide GNETS personnel have provided consultation and

direction to the regional GNETS programs regarding ways that they can improve

their program operations.  *See, e.g.,*   ECF Nos. 395-101 to -107; Ex. O, Deposition

of Lisa Futch 241:17-245:6, 245:25-248:23; Ex. I, Deposition of Haley Livingston

233:22239:22; *see also* ECF Nos. 395-107 to -120; Ex. J, Deposition of Whitney

Braddock 116:11-12, 116:21, 117:13-118:9; Ex. DD, Deposition of Samuel

Clemons 220:19-225:20; Ex. K, Deposition of Brooke Cole 33:6-11, 34:5-21,

108:3-12, 108:21-111:11, 115:14-117:5, 120:11-121:19; Ex. O, Deposition of Lisa

Futch 118:10-122:17; Ex. EE, Deposition of Derrick Gilchrist 58:16-59:4, 59:23-

64:15, 209:3-17, 210:1-211:14; Ex. N, Deposition of Celest Ngeve 231:11-233:25,

247:24-248:17; Ex. HH, Deposition of Lakesha Stevenson 175:23-176:10, 177:16-

180:17; Ex. S, Deposition of Patricia Wolf 213:21-215:20, 216:2-217:15.

336.   Nor do they provide recommendations regarding appropriateness of

GNETS Programs' therapeutic interventions or classroom instruction. Deposition

of Lakesha Stevenson at 113:2-5; 112:2-5.

**RESPONSE:**  Denied.  The statement mischaracterizes the cited evidence.

The GNETS Program Manager provides recommendations to regional GNETS

Programs regarding matters related to the appropriateness of therapeutic

interventions and classroom instruction.  *See, e.g.*, ECF Nos. 395-111, 395-115 to -

117; Ex. O, Deposition of Lisa Futch 241:17-245:8, 245:25-248:23; Ex. K,

Deposition of Brooke Cole 33:6-34:21, 108:3-12, 108:21-111:11, 115:14-121:19.

337.   They do not provide recommended changes or feedback on

reintegration data because the decisions are local and the Program Manager cannot

make decisions or recommendations for what IEP teams are going to recommend

for their students. Deposition of Vickie Cleveland at 136:12-137:14.

**RESPONSE:**  Denied.  The statement mischaracterizes the cited evidence.

Cleveland testified that she reviews the regional GNETS programs' reintegration

data as part of their grant application submissions and discusses the data with

GNETS Directors during their strategic plan reviews. Ex. L, Deposition of Vickie

Cleveland 133:21-136:5.  Although Cleveland testified that she has not

recommended changes specific to the student reintegration data, she expressly states that she provides feedback to the GNETS Directors regarding this data.  Ex. L, Deposition of Vickie Cleveland 136:12-137:14.

338.   They do not look at compliance with Functional Behavior Assessment (FBA) or Behavior Improvement Plan (BIP) requirements. Deposition of Vickie Cleveland at 172:18-25.

**RESPONSE:**  Denied.  As part of the IEP File Review process in or around November 2020, the State created a GaDOE Student Information Checklist that required GNETS Directors to submit information to GaDOE about individual GNETS students, including whether the student has an FBA or BIP prior to entering GNETS and their most current FBA and BIP dates.  ECF No. 395-91; Ex. L, Deposition of Vickie Cleveland 194:3-20; 198:4-203:22.  In addition, the State oversees the implementation of the Strategic Plan, which includes a "Behavioral Support and Therapeutic Services" component that requires, among other things, that GNETS Directors implement interventions and practices that include the use of FBAs and BIPs.  *See* ECF No. 395-52 at GA00362012.

### C. GNETS Strategic Plan

339.   The Strategic Plan was created by a collaboration of the GNETS Program Manager and GNETS Directors. Deposition of Clara Keith Brown at 177:11-178:6.

**RESPONSE:** Denied as incomplete. The Strategic Plan was created as a collaboration between the GNETS Program Manager; a committee of regional GNETS Directors; and various State personnel, including other personnel from GaDOE and personnel from DBHDD. *See* ECF No. 395-33, Def. Resp. to RFA No. 129; ECF No. 395-52 at GA00362006, GA00362008; ECF No. 395-53 at GA00221994, GA00221996; Ex. J, Deposition of Whitney Braddock 206:10-207:2; Ex. L, Deposition of Vickie Cleveland 204:21-205:12; Ex. Q, Deposition of Clara Keith 67:17-19, 94:20-95:6, 109:3-14, 177:8-178:6.

340.  The ultimate decision as to the content of the Strategic Plan was a collaborative decision of the GNETS Program Manager and GNETS Directors. Deposition of Clara Keith Brown at 177:11-178:6.

**RESPONSE:** Denied as incomplete. Clara Keith Brown testified that final decision making regarding the Strategic Plan involved State personnel -- specifically the GNETS Program Manager, Debbie Gay from GaDOE, and Clara Keith Brown from DBHDD -- as well as the GNETS Directors on the Strategic Planning Committee. Ex. Q, Keith Dep. 177:8-178:6.

341.  The Strategic Plan is a six-part plan that the GNETS Programs complete every year. Deposition of Shaun Owen at 193:4-15.

**RESPONSE:** Undisputed. The Court may consider this evidence for purposes of the summary judgment motion. The United States notes that the 2016 version of the Strategic Plan had seven focus areas, but the "Program Leadership"

and "Program Accountability" sections were combined to create what is now the

"Program Leadership and Accountability" section. *See* ECF No. 395-52 at

GA00362005, GA00362008; ECF No 395-53 at GA00221993, GA00221997; Ex.

R, Braddock Dep. 206:10-207:11; Ex. A, Cleveland Dep. 204:21-206:1; Ex. C,

Stevenson Dep. 48:8-22.

342.    The six parts are: Program Leadership and Accountability; Behavior

Support and Therapeutic Services; Instructional and Academic Support; Program

Funding and Fiscal Management; Integration of Services and Capacity Building;

and Facilities Management and Safety. *See* GNETS Strategic Plan at GA00362005,

attached hereto as Exhibit U.

**RESPONSE:**    Undisputed.  The Court may consider this evidence for

purposes of the summary judgment motion.

343.    Each Program provides evidence of whether the Program is

operational, emergent, or nonexistent as to each of the six areas of the plan. Ex. U

at GA00362010; Deposition of Shaun Owen at 193:4-15.

**RESPONSE:**    Denied.  This statement mischaracterizes some of the cited

evidence.  According to the  Strategic Plan self-assessment, the regional GNETS

program rates the status of implementation of the Strategic Plan's action items and

activities in each of the six focus areas using the following three ratings:

operational, emerging, and not evident.  ECF No. 395-52 at GA00362010.

344.    The Strategic Plan is used by Programs to continue to reevaluate and self-assess their Programs, make changes as needed, and decide on their priorities for the upcoming year based on the needs identified by the assessment. *See generally*, Ex. U at GA00362005-23; Deposition of Shaun Owen at 194:11-15.

**RESPONSE:**  Denied as incomplete.  The regional GNETS programs use the Strategic Plan for several purposes, including, but not limited to, the purposes listed in the cited testimony of Shaun Owen.  ECF No. 395-52 at GA00362009; *see generally* ECF No. 395-52.  For example, another purpose set forth in the Strategic Plan is "to determine the need for professional learning and resources to drive improvement."  ECF No. 395-52 at GA00362009.

345.    The GNETS Program Manager and GNETS Program Specialist do not receive each Program's Strategic Plan; they receive mid-year and end of year summaries when the regional Program's grant application is uploaded to the GaDOE portal. Deposition of Vickie Cleveland at 208:9-21; Deposition of Lakesha Stevenson at 150:23-151:8.

**RESPONSE:** Denied as incomplete. The State has modified the manner through which Strategic Plan data is collected and assessed on several occasions, which is not reflected in the cited testimony.  According to the Strategic Plan, "[a]t the end and/or beginning of each school year, all GNETS directors will be responsible for sharing the self-assessment ratings, improvement summaries, and the top 3 priority areas with key stakeholders (e.g., GaDOE, fiscal agents, parent

groups, and advocates). GaDOE and the fiscal agents will use the improvement summary form and the action plan to provide GNETS directors with the necessary technical assistance and resources needed to make improvement in the top 3 priority areas." ECF No. 395-52 at GA00362010. Starting in 2022, GaDOE consolidated the strategic plan self-assessment submissions with the GNETS grant application process for regional GNETS programs. Ex. K, Deposition of Brooke Cole 389:22-390:10; 395:9-15; Ex. HH, Deposition of Lakesha Stevenson 149:4-151:8. *See also* Ex. L, Deposition of Vickie Cleveland 206:25-207:19; 226:15-227:7.

346. The Programs rate themselves; GaDOE does not provide a rating. Deposition of Vickie Cleveland at 207:4-10; Deposition of Lakesha Stevenson at 151:9-21.

**RESPONSE:** Denied as incomplete. The State has modified the manner through which Strategic Plan data is collected and assessed on several occasions. In the past, this feedback has included each regional GNETS program's final ratings on the various GNETS Strategic Plan components, as well as other action steps each regional GNETS program should take in the future. *See* ECF No. 395-52 at GA00362008-GA00362010; ECF Nos. 395-49, 395-63; Ex. DD, Deposition of Samuel Clemons 250:24-251:9, 253:7-254:2; Ex. I, Deposition of Cassandra Holifield 201:21-202:4; Ex. I, Deposition of Celest Ngeve 295:16-297:7; Ex. HH, Deposition of Lakesha Stevenson 46:10-23, 49:20-24. The Strategic Plan itself says "[t]he GaDOE-GNETS program manager/program specialist will complete the

174

rating section with GNETS teams in the spring of each school year and review supporting evidence to validate ratings." ECF No. 395-52 at GA00362008. More recently, GaDOE has moved away from providing the regional GNETS programs with numerical scores, and instead provides "feedback on implementation based on the rubric rating"—that is ratings of "operational," "emerging," or "not evident." *See, e.g.*, Ex. L, Deposition of Vickie Cleveland 230:16– 231:14.

347. Implementation of Strategic Plan goals is monitored through the Programs' own ratings. Deposition of Vickie Cleveland at 215:8-14; *see generally*, Ex. U at GA00362005-23.

**RESPONSE:** Denied as incomplete. In addition to monitoring the Program's own ratings, GaDOE "will complete the rating section with GNETS teams in the spring of each school year and review supporting evidence to validate ratings" and "will use the improvement summary form and action plan to provide GNETS directors with the necessary technical assistance and resources needed to make improvement in the top 3 priority areas." ECF No. 395-52 at GA00362008, GA00362010; *see, e.g.*, ECF No. 395-62; Ex. CC, Livingston Dep. 81:6-17; Ex. HH, Stevenson Dep. 160:22-163:2.

348. If a Program does not meet a goal, the GNETS Program Manager typically has follow up conversations about what the Program is doing to get implementation in place. Deposition of Vickie Cleveland at 217:20-218:1.

**RESPONSE:** Denied as incomplete. The term "follow up conversations" is

vague and does not adequately describe the nature of communications that may occur between GaDOE and the regional GNETS program if a goal is not met. These "follow-up conversations" about unmet goals often occurred as part of the more formal "strategic plan reviews" conducted by the GNETS Program Manager and/or the Program Specialist.  Ex. L, Cleveland Dep. 166:11-167:10, 219:3-8.

349.   The GNETS Program Manager and GNETS Program Specialist conduct visits to GNETS locations as part of the Strategic Plan process to observe academic instruction and programming and as an opportunity for programs to share information. Deposition of Vickie Cleveland at 179:23-180:9.

**RESPONSE:**  Denied as incomplete.  In addition to the activities listed, when GaDOE conducted site visits, the GNETS Program Manager and the Program Specialist evaluated the regional GNETS programs' self-assessment, reviewed artifacts, asked questions, toured facilities, and provided feedback. *See* ECF No. 395-52 at GA00362008-GA00362010; ECF Nos. 395-49, 395-58, 395-59; Ex. J, Braddock Dep. 208:6-209:17; Ex. DD, Clemons Dep. 250:8-254:3, 254:7-255:20; Ex. K, Cole Dep. 387:17-388:2, 390:22-391:25; Ex. EE, Gilchrist Dep. 246:4-247:6; Ex. I, Holifield Dep. 198:19-199:23, 200:15-201:3; Ex. Q, Keith Dep. 178:20-180:22, 181:7-183:22; Ex. CC, Livingston Dep. 68:12-70:12, 80:25-81:17; Ex. N, Ngeve Dep. 288:3-289:12, 290:19-291:18, 304:8-305:22; Ex. HH, Stevenson Dep. 46:10-23, 49:9-51:6.

350.    The GNETS Program Manager and GNETS Program Specialist do not provide feedback after a location visit. Deposition of Vickie Cleveland at 183:7-20; Deposition of Lakesha Stevenson at 194:13-19.

**RESPONSE:**  Denied.  Historically, the GNETS Program Manager and GNETS Program Specialist have provided feedback after visits to GNETS facilities as part of the "strategic plan review."  Those post-visit discussions occurred either on site or virtually.  See ECF No. 395-52 at GA00362010; ECF Nos. 395-49, 395-58, 395-59; Ex. J, Deposition of Whitney Braddock 208:6-209:17, 210:5-14; Ex. DD, Deposition of Samuel Clemons 250:8-251:9, 254:7-255:20; Ex. K, Deposition of Brooke Cole 387:17-388:2, 390:22-391:23; Ex. EE, Deposition of Derrick Gilchrist 246:4-247:6; Ex. I, Deposition of Cassandra Holifield 198:19-199:23, 200:15-201:3; Ex. Q, Deposition of Clara Keith 178:20-180:22, 181:7-183:22; Ex. CC, Deposition of Haley Livingston 68:12-70:12, 80:25-81:17; Ex. N, Deposition of Celest Ngeve 288:3-289:12, 290:19-291:518, 304:8-305:22; Ex. HH, Deposition of Lakesha Stevenson 46:10-23, 49:9-51:6.

351.    The GNETS Program Manager looks at the Programs' Strategic Plan self-assessments for what the Programs have done, what information and artifacts they have presented, and may provide feedback. Deposition of Vickie Cleveland at 185:1-4; 214:20-24.

**RESPONSE:**  Denied as incomplete.  Historically, feedback was an important part of the strategic plan review process and was provided alongside the

discussion of action steps that each regional GNETS program could take in the future regarding implementation. *See* ECF No. 395-39; ECF No. 395-52 at GA00362008-GA00362010; Ex. DD, Deposition of Samuel Clemons 250:24-251:9; Ex. L, Deposition of Vickie Cleveland 158:24-159:10, 166:11-167:10, 210:5-18, 217:20-219:8; Ex. O, Deposition of Lisa Futch 94:15-95:18; Ex. I, Deposition of Cassandra Holifield 200:15-202:4; Ex. FF, Deposition of Jacqueline Neal 23:21-24:13.

352.   The Strategic Plan is not tied to anything, including the receipt of any funding. Deposition of Lakesha Stevenson at 154:9-10; 160:1-2.

**RESPONSE:**  Denied.  The phrase "is not tied to anything" is vague and ambiguous.  The Strategic Plan is a mandatory self-assessment and review process required by the State; regional programs cannot opt out.  Ex. N, Deposition of Celest Ngeve 285:14-286:7; Ex. EE, Deposition of Derrick Gilchrist 243:16-25; Ex. CC, Deposition of Haley Livingston 69:17-70:12.  Among other things, the State currently requires GNETS programs to submit components of the Strategic Plan as part of their grant application.  *See* Ex. K, Deposition of Brooke Cole 389:22-390:10; 395:9-15; Ex. HH, Deposition of Lakesha Stevenson 149:4-151:8.

353.   A Program can still be funded by the grant even if the goals in the Strategic Plan are not met. Deposition of Vickie Cleveland at 219:9-12.

**RESPONSE:**  Undisputed in part.  Although a program can still be funded by the grant even if the goals in the Strategic Plan are not let, a program may also have

its funding paused by the State.  *See* Ex. KK, Deposition of Larry Winter 166:5-168:8.  Subject to this qualification, the Court may consider this evidence for purposes of the summary judgment motion.

### D. Therapeutic Services Grant

354.    The therapeutic services grant is a grant based off of a needs assessment conducted to identify and assist GNETS locations that have greater need and less funding so that they can provide additional therapeutic supports. Deposition of Shaun Owen at 93:11-24.

**RESPONSE:**  Undisputed.  The Court may consider this evidence for purposes of the summary judgment motion.

355.    Eleven programs receive the need-based therapeutic grant. Deposition of Vickie Cleveland at 105:3-5.

**RESPONSE:**  Denied as incomplete.  The number of programs receiving the reimbursement from their fiscal agent for therapeutic services through the therapeutic grant has varied by year.   For example, in FY20 (8/1/19-8/31/20), the funding went to the fiscal agent for 11 GNETS programs.  ECF No. 395-151. However, in FY18, funding went to the fiscal agents for 10 programs.  *See* ECF No. 395-159**.**

356.    Those programs submit monthly logs and then the GNETS Program Specialist pulls a report showing what therapeutic services are provided.

Deposition of Vickie Cleveland at 105:3-17; 107:22-25.

**RESPONSE:** Undisputed. The Court may consider this evidence for purposes of the summary judgment motion.

357. In the reports, the GNETS Program Manager looks to see if therapists are using evidence-based interventions and that they are documenting what they are doing with students in providing the interventions. Deposition of Vickie Cleveland at 105:3-17; 107:22-25.

**RESPONSE:** Undisputed. The Court may consider this evidence for purposes of the summary judgment motion.

358. There are no separate assurances for the therapeutic services grant; it is a subgrant. Deposition of Vickie Cleveland at 150:8-11.

**RESPONSE:** Denied. Through their fiscal agents, regional GNETS programs that receive grant funds for such therapeutic services must provide the State with various assurances, including that they will procure the therapeutic staff providing such services through a staffing agency approved by GaDOE. ECF Nos. 395-153, 395-155, 395-161; Ex. Q, Deposition of Clara Keith 140:8-143:5, 153:7-155:6; Ex. FF, Deposition of Jacqueline Neal 80:6-83:8.

359. The GNETS Program Specialist completes a year end summary of social worker logs submitted for the therapeutic services grant, including things such as the average number of students who receive support and the most common types of support received. Deposition of Lakesha Stevenson at 70:2-17.

**RESPONSE:** Undisputed. The Court may consider this evidence for purposes of the summary judgment motion.

360.   Neither she nor the GNETS Program Manager take any action or make any suggestions based on the summary. Deposition of Lakesha Stevenson at 70:9-17.

**RESPONSE:** Denied as incomplete. Vickie Cleveland testified that she may have "follow up conversations" with the regional GNETS program if questions arise related to the logs. *See* Ex. L, Deposition of Vickie Cleveland 107:22-108:25. However, the documents utilized by the State during the grant approval process require that monitoring by GaDOE take place following the dispensation of grant funding; this step is required with or without regard to Stevenson's summary. *See* Ex. KK, Deposition of Larry Winter 175:23-177:3.

Dated: November 28, 2023

RYAN K. BUCHANAN
*United States Attorney*
Northern District of Georgia

/s/ *Aileen Bell Hughes*
AILEEN BELL HUGHES
GA Bar Number: 375505
Assistant United States Attorney
United States Department of Justice
Richard B. Russell Federal Building
75 Ted Turner Dr. SW, Suite 600
Atlanta, GA 30303-3309
(404) 581.6000
aileen.bell.hughes@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General

SHAHEENA A. SIMONS
Chief

KELLY GARDNER WOMACK
Deputy Chief

ANDREA HAMILTON
WATSON
Special Litigation Counsel

CRYSTAL ADAMS
CLAIRE D. CHEVRIER
FRANCES S. COHEN
MATTHEW GILLESPIE
PATRICK HOLKINS
VICTORIA M. LILL
JESSICA POLANSKY
LAURA C. TAYLOE
MICHELLE L. TUCKER
Trial Attorneys
Educational Opportunities Section

/s/*Kelly Gardner Womack*
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
kelly.gardner@usdoj.gov
*Attorneys for the United States*

182

## **L.R. 7.1(D) CERTIFICATION**

I certify that this Document has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C). Specifically, this brief has been prepared using 14-pt Times New Roman Font.

/s/ *Kelly Gardner Womack*
KELLY GARDNER WOMACK

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day filed the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sent counsel of record e-mail notification of such filing.

This 28th day of November, 2023.


/s/ *Kelly Gardner Womack*
KELLY GARDNER WOMACK