# EXHIBIT H



# Transcript of **Robert F. Putnam**

Thursday, September 7, 2023

*United States of America v. State of Georgia*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 133069

```
 1   spend, do you think, preparing for today?
 2        A.    Oh.  Today?  Well, probably since I
 3   prepared the report.
 4        Q.    Okay.
 5        A.    Yeah.
 6        Q.    All right.  And you are testifying
 7   today pursuant to an agreement between the United
 8   States Department of Justice and the May Institute;
 9   is that correct?
10        A.    That's correct.
11        Q.    Okay.  Let's go ahead and introduce
12   as Exhibit 1 the -- your report.  We've got a copy,
13   and you can use your copy or use ours, it doesn't
14   matter.
15        A.    Okay, thank you.
16        Q.    It may make sense just to use yours.
17        A.    Okay.
18        Q.    To be sure the pagination is the
19   same.
20                    (Exhibit 1 was marked for
21                    identification.)
22        Q.    Doctor, I realize I just handed you
23   a lot of paper, but that does appear to be your
24   report; correct?
25        A.    From what I see on the first page;
```

1  right.
2      Q.   We'll be spending a lot of time with
3  it today, so you can always tell me if something is
4  wrong.
5           How long did it take you to write the
6  actual report, from the time you sat down to begin
7  writing, not talking about the visits to Georgia
8  and that kind of thing, but in terms of writing the
9  report, how long do you think that took you?
10     A.   I would guess about six weeks.
11     Q.   Six weeks?
12     A.   Yeah.
13     Q.   And you said a moment ago that
14 somebody had reached out to you.  Do you recall who
15 reached out to you to about providing your service
16 for this lawsuit?
17     A.   I believe it was attorney Laura
18 Tayloe.
19     Q.   Do you recall roughly when that was?
20     A.   Probably February of last year.
21     Q.   Okay.  Do you recall if you were
22 asked to make any presumptions in terms of your
23 report?
24           ATTORNEY HOLKINS:  Object to form.
25           THE WITNESS:  No.

```
 1                     ATTORNEY HOLKINS:  Object to form.
 2                     THE WITNESS:  To go back to that
 3           article, probably most of the work I've
 4           done is looking at cost-effectiveness in
 5           terms of that.  My experience is schools
 6           oftentimes can provide more effective
 7           services, some cases at less cost.
 8      BY ATTORNEY BELINFANTE:
 9           Q.     So cost, does that mean that cost is
10      a component of determining what is an effective
11      service?
12           A.     Let's go back in terms of
13      effectiveness; right.  I defined effectiveness as
14      improvements in ODR, which is reductions in
15      social-emotional, which is -- so there are metrics.
16      And we've done a lot of research looking at PBS
17      that shows that schools actually can reduce costs
18      in terms of what they do and effectively serve
19      students in general settings.
20           Q.     But my question is a bit more
21      targeted than that.  In terms of what is an
22      effective service for a student, do you consider
23      cost or do you not?
24                     ATTORNEY HOLKINS:  Object to form.
25                     THE WITNESS:  Obviously.
```

```
 1       BY ATTORNEY BELINFANTE:
 2            Q.    Don't panic.  The nice thing is,
 3    Dr. Putnam, you put your opinions at the start of
 4    your report, so it lets me go there and ask a bunch
 5    of questions.  It alleviates the need for me to do
 6    it later.
 7            Let me go back to page 1.  I'm still on
 8    that sentence that's the third paragraph of the
 9    report.  "Georgia can decrease its reliance on
10    GNETS' program by making reasonable changes to its
11    service system."
12            What did you mean by "reasonable changes"?
13            A.    That from my perspective, and we're
14    talking about reasonable changes, are things
15    clearly within their power in terms of being able
16    to do that -- so, for example, part of that is
17    expanding the rest of that paragraph, expanding
18    existing therapeutic services and supports by
19    improving coordination and data collection across
20    state child-serving agencies and community partners
21    and providing robust training and technical
22    assistance.
23            So those are what I considered to be
24    reasonable changes.
25            Q.    Okay.
```



```
 1                    ATTORNEY COHEN:  I'm just going to
 2          caution the witness to slow down because
 3          the court reporter is genius but not
 4          supernaturally powered.  She's close.
 5     BY ATTORNEY BELINFANTE:
 6          Q.     In terms of making that
 7     determination that Georgia could make reasonable
 8     changes, did you perform any kind of cost analysis
 9     for your report?
10          A.     No.
11          Q.     Is it possible that Georgia can
12     make -- and using your language here -- that
13     Georgia could make all the reasonable changes in
14     the world that you prescribe, but that an IEP team
15     still refers a child for services in a segregated
16     education setting?
17                    ATTORNEY HOLKINS:  Object to form.
18                    THE WITNESS:  Well, I think you
19          have to talk about IEP teams in context.
20          So I'm suggesting that they could expand
21          Apex, right, and if an Apex provider was
22          sitting on an IEP team that they could
23          come to a different conclusion.  I'm
24          suggesting that they expand PBS.
25                    And so if somebody had training
```

```
 1                experience in PBS, the IEP team could
 2                come to a different conclusion.
 3                     My 40 years of experience has been
 4                here is an IEP team that basically
 5                suggests a restrictive placement.  And
 6                the school district brings me in to say
 7                can you influence the IEP team to come up
 8                with a less restrictive program.
 9                     So my 40 years experience
10                indicates the IEP teams operate within
11                the context of what -- where they are.
12                And that if they, in fact have other
13                supports, other services that are
14                provided to them that many cases they
15                come to a different conclusion relative
16                to restrictive...
17        BY ATTORNEY BELINFANTE:
18             Q.     Many cases but not all; correct?
19             A.     Correct.
20             Q.     All right.  Let's go to page 4 of
21     your report, Exhibit 1.
22             A.     Yes.
23             Q.     In the part that you described here
24     as part 2, the methodology, did anyone review the
25     methodology that you used here in kind of a peer
```

1   of Community Health and Department of Behavioral
2   Health and Developmental Disabilities?
3                   ATTORNEY HOLKINS:  Object to form.
4                   THE WITNESS:  What are you asking?
5       BY ATTORNEY BELINFANTE:
6           Q.    I can ask it differently.
7           To your knowledge, is the Department of
8   Community Health or the Department of Behavioral
9   Health and Disabilities doing anything to prevent
10  LEAs from adopting MTSS?
11                  ATTORNEY HOLKINS:  Object to form.
12                  THE WITNESS:  No.
13      BY ATTORNEY BELINFANTE:
14          Q.    Do you know roughly how many schools
15  in the United States have adopted PBIS or what
16  percentage?
17          A.    Through the National Technical
18  Assistance Center, there's probably about a little
19  less than 30,000 schools, but that doesn't count
20  many other schools that are doing PBS.  It just
21  basically counts the schools that the National
22  Technical Assistance Center providers have some
23  involvement.
24          Q.    And would the other schools be
25  private, or they are just not involved with the

1  disabilities within the Medicaid system outside of
2  Apex?
3         A.    Well, clearly that the constellation
4  of services that are in the DBHD provider manual
5  are all services that could be provided outside of
6  Apex.
7         Q.    Okay.  Did you have an opinion as to
8  whether the services that are identified in the
9  provider manual, the DBHD provider manual, did you
10 form an opinion as to whether those services were
11 insufficient in the State of Georgia?
12               ATTORNEY HOLKINS:  Object to form.
13               THE WITNESS:  Can you repeat that
14         question.
15    BY ATTORNEY BELINFANTE:
16         Q.    Sure.  Did you form an opinion as to
17 whether the services identified in the DBHDD
18 provider manual for students with
19 behavioral-related disabilities are sufficient?  In
20 other words, is there a service that DBHDD is not
21 providing that it should be providing?  Did you
22 form an opinion as to that?
23               ATTORNEY HOLKINS:  Object to form.
24               THE WITNESS:  You're talking about
25         service or the intensity?

```
 1      BY ATTORNEY BELINFANTE:
 2           Q.     Service.
 3           A.     I think the constellation of
 4   services that are dollars provider manual are
 5   sufficient.
 6           Q.     In terms of the intensity, did you
 7   form an opinion based upon the provider manual
 8   whether what is documented dollars provider manual
 9   is sufficient?
10                      ATTORNEY HOLKINS:  Object to form.
11                      THE WITNESS:  Where there is
12              specification of standards?  I thought
13              they were sufficient.
14      BY ATTORNEY BELINFANTE:
15           Q.     Okay.  Did you review any individual
16   child's -- never mind.  I know where that's going
17   to come up.
18           Specifically what services does the Georgia
19   Department of Education fund and administer for
20   students with behavioral-related disabilities?
21                      ATTORNEY HOLKINS:  Object to form.
22           Q.     Let me phrase it this way:  In your
23   report, did you make a conclusion or in your report
24   did you conclude that the Georgia Department of
25   Education funds and administers a range of services
```

```
 1            understand.  You're asking to confirm
 2        which footnote is on which pages?
 3                ATTORNEY BELINFANTE:  Correct.
 4                ATTORNEY HOLKINS:  The first
 5        footnote on page 22 is footnote 38.
 6                THE WITNESS:  In the GNETS
 7        section?
 8                ATTORNEY HOLKINS:  Yes.
 9   BY ATTORNEY BELINFANTE:
10        Q.     What I'm looking for is basically
11   the authority or the citations you have for the
12   GNETS is exclusively footnote 39 through 44, the
13   GNETS section, II.  Is that right?
14        A.     I believe so.
15        Q.     Okay.  And each of those citations
16   is to the GNETS rule; correct?
17        A.     Correct.
18        Q.     Let me show you what we've marked as
19   Exhibit 10.
20                   (Exhibit 10 was marked for
21                identification.)
22        Q.     This is the GNETS rule that you
23   considered, Doctor.  Poorly phrased.  That was a
24   question.
25        Is this the GNETS rule that you considered,
```

```
 1   Doctor?
 2          A.      I believe so.
 3          Q.      All right.
 4                  ATTORNEY COHEN:  I'm sorry.  What
 5       number is it?
 6                  THE WITNESS:  The one I have is in
 7       a different format.
 8   BY ATTORNEY BELINFANTE:
 9          Q.      Let's look at in this document
10   page 3.
11          A.      Can I take a little bit of time to
12   look at this before?  I haven't seen this in a
13   while.
14          Q.      Sure.
15                         (Pause)
16          A.      Thank you very much.
17          Q.      Looking at page 3 of that document,
18   Paragraph 4(c) of the rule, the first sentence
19   says, "The IEP team must determine that GNETS
20   services are necessary for the student to receive
21   FAPE."
22          Do you see that?
23          A.      4(c)?
24          Q.      4(a).
25          A.      Okay.
```

```
 1              question.
 2        BY ATTORNEY BELINFANTE:
 3              Q.      Sure.  Having now looked at the rule
 4    and specifically 4(a) --
 5              A.      4(a), okay.  We're back to 4(a)?
 6              Q.      Yes.
 7              A.      Okay.
 8              Q.      Is it your understanding that the
 9    Department of Behavioral Health and Developmental
10    Disability plays any role in referring a student
11    for GNETS services?
12                     ATTORNEY HOLKINS:  Same objection.
13                     THE WITNESS:  Not that I'm aware
14              of.
15        BY ATTORNEY BELINFANTE:
16              Q.      Looking again at 4(a), is it your
17    understanding that the Department of Community
18    Health plays any role in referring students for
19    GNETS services?
20                     ATTORNEY HOLKINS:  Same objection.
21                     THE WITNESS:  Well, the only --
22              let's back up a little bit.  In my
23              report, I suggest that DBHDD and DCH
24              could provide Medicaid-available services
25              or services through Apex that in my
```

1                experience would influence the IEP team

2                making a referral to GNETS.

3       BY ATTORNEY BELINFANTE:

4            Q.    But it would influence the IEP team,

5   but it would not -- would not be determinative of

6   the IEP team's recommendation; correct?

7                      ATTORNEY HOLKINS:   Object to form.

8                      THE WITNESS:   I don't know what

9                you mean by "determinative."

10      BY ATTORNEY BELINFANTE:

11           Q.    What did you mean by "could

12  influence"?

13           A.    Well, I think if there was an Apex

14  clinician sitting on that IEP team and a staff

15  person that's trained in PBS setting, that IEP

16  team, that they may come to a different

17  determination in terms of whether the student

18  should, you know, need GNETS.

19           Q.    But it's still the IEP team's

20  decision, correct, not DBHDD's or DCH's?

21           A.    That's correct.   But my experience

22  in doing this for 40 years is whoever sits at that

23  meeting, you know, in terms of their roles makes a

24  difference in terms of the IEP team coming up with

25  a decision.