EXHIBIT J

In the Matter Of:

UNITED STATES vs STATE OF GEORGIA

1:16-cv-03088-ELR

---

## WHITNEY BRADDOCK

*July 18, 2022*

---



800.211.DEPO (3376)
EsquireSolutions.com

1           She handles the filings for staff, and she

2     handles -- she keeps and files student files that are

3     no longer at either site.

4         Q.   Where are student files -- so students that

5     are still in the program, their files are at each

6     site?

7         A.   Correct.

8         Q.   She keeps the ones after the students have

9     transitioned out or withdrawn or whatever?

10        A.   Yes.

11        Q.   I understood everything except you mentioned

12    requisitions and PO system.  Can you explain what that

13    means.

14        A.   So when staff -- or at each site if they need

15    items to be purchased, they let me know.  I then will

16    approve them.  I send them to Tara Hendrix, the program

17    evaluator.  She enters them into a purchase order

18    system.

19           And then at RESA here there is a person in

20    charge of purchasing, and he does the ordering.  And

21    then she also handles the billing for that and making

22    sure that those bills get paid.

23        Q.   So the PO system is run by the RESA?

24        A.   Yes.

25        Q.   And are there certain purchases that need to



1  be approved even above the RESA?

2      A.   Well, they would be depending on like how much

3  they would be, and then some things need to have

4  approval through the Georgia DOE.

5      Q.   What kinds of things are those?

6      A.   There's a price point that would have to be

7  approved.  I couldn't -- I don't know.  I can't report

8  to what it is.

9      Q.   Okay.  But it has more to do with how much it

10  costs than what kind of purchases?

11      A.   I believe, yes.

12      Q.   Okay.  And you said you had interactions with

13  the special education directors of each LEA.  Is there

14  anybody else -- well, let's start with them.

15          What kinds of interactions -- what kinds of

16  communications do you have with those special education

17  directors?

18      A.   We meet monthly through what used to be

19  Southeast GLRS.  I think they're still our Southeast

20  GLRS, but it's a District 14 group meeting.

21          And, I mean, we talk about students, problems

22  that they may have, their needs that they have that

23  they may need us to work with for them.  We talk about

24  IEPs, and if I need to attend a meeting.  We may talk

25  about money if we need them to supplement anything.



1  Cedarwood for ten years.

2     Q.   And when you talk about students served for

3  your funding, does that include consultative services

4  or just the students enrolled in one of the sites?

5     A.   Just students enrolled in one of the sites.

6     Q.   Does funding for consultative services through

7  some other way or do you --

8     A.   No.

9     Q.   Okay.  So funding is exclusively based on the

10 student count on the three-year waiting enrollment you

11 talked about?

12    A.   Yes.

13    Q.   So you've known of students to remain at

14 Cedarwood for ten years.  And you said earlier you

15 don't track an aggregate length of stay.  Do you review

16 length of stay periodically for students?

17    A.   No.

18    Q.   Have you had students leave Cedarwood and then

19 come back?

20    A.   Yes.

21    Q.   And for purposes of counting, would they be

22 counted -- is it counted by admission or by student?

23    A.   By student.  They would only be counted

24 once.

25    Q.   Okay.  Does that happen sometimes within the



1    A.    The ones that I can see are.  I need to move

2  it over to the right.  There we go.  Yes, all of them

3  are.

4    Q.    Is there something different about the funding

5  for Cody Brannon?

6    A.    We are reimbursed from Bulloch County Schools

7  for Cody.  But he is our employee, so we pay him and

8  then they reimburse us for his -- we invoice them for

9  his pay and benefits.

10   Q.    Why is that?

11   A.    The classroom in Bulloch County in Statesboro

12 that has the students with intellectual disabilities

13 and autism, we didn't have a class for them in the

14 past, and they needed -- they had some students with

15 severe behavioral problems that fit into that category

16 and they needed us to serve them.

17        And because it was in addition to what I

18 really had funding for, it was actually decided before

19 I became the director.  So it's just something that's

20 been carried on and we've continued with that

21 classroom.

22   Q.    So that was negotiated directly with Bulloch

23 County that they wanted this extra classroom served?

24   A.    Yes.

25   Q.    And we would refund the teacher for it?



1      A.   We go for without contact mostly.

2      Q.   And when is contact -- when does contact

3   happen?

4      A.   If a student that -- it would be a young

5   student that contact would be used.  We know that they

6   run or they're pushing against someone.  Someone may

7   hold their hand to walk somewhere with them.  We really

8   try not to use any contact.

9      Q.   Do you keep a record of times where it's

10  necessary?

11     A.   If we use a full restraint.

12     Q.   What's a full restraint?

13     A.   If a student has been aggressive or is being

14  aggressive towards someone and a staff has to use the

15  Mind Set techniques to restrain them.

16     Q.   But that's the only -- so if there was someone

17  guiding somebody by the elbow or something like that or

18  holding them by the hand, that wouldn't be recorded.

19  Only the full restraint?

20     A.   Correct.

21     Q.   Okay.  Now I want to talk a little bit about

22  the admissions process or enrollment process to

23  Cedarwood.

24          Can you describe the process.  And you've

25  referenced parts of it before, but describe the process



 1   for which students come to receive services at

 2   Cedarwood.

 3        A.   In general, a student would be in special ed

 4   and having behavioral, severe behavioral issues, in

 5   that setting we like to go in and do consultation

 6   first, if possible.

 7        If not, if things are more than -- have really

 8   escalated to a certain degree that the special ed

 9   director says, you know, we really need to have a

10   meeting, so we will work with a special ed director and

11   the specialty ed staff for the LEA to have a meeting on

12   the student and then the IEP committee decides

13   placement.

14        Q.   And what is your role in that process?

15        A.   I am -- I know what's going on.  I don't

16   attend those meetings unless someone has asked me to.

17        I will look over students' paperwork.  We

18   ensure that students have a behavioral intervention

19   plan that's current and it's been followed, that -- we

20   like to try to be sure everything has been tried at the

21   school before students then are met on for GNETS.

22        But even sometimes in the meeting we may come

23   with something and the IEP team decides not to send the

24   student to Cedarwood.

25        Q.   Do you come up with something at the meeting



1   that has not been tried yet?

2       A.   Yeah.

3       Q.   You said at the beginning that you don't

4   attend the meetings unless someone asks me.  Does that

5   generally include the IEP meetings?

6       A.   Yes, the psych coordinators are the

7   administrators that go do annual review meetings and

8   other IEP meetings.

9       Q.   So site coordinators.  Are they your designees

10  in that process?

11      A.   Yes.

12      Q.   And is that true for the admissions IEP

13  meetings and other IEP meetings?

14      A.   Yes.

15      Q.   Okay.  At what point in the process you

16  described is the preferred packet prepared?

17      A.   Usually when a special ed director either gets

18  in touch with me or gets in touch with the psych

19  coordinator, then we ask them to give us some

20  information on the student by filling that out and

21  sending us the information that they have on the

22  student prior to the IEP meeting.

23      Q.   Okay.  Is there a step in where -- so you

24  described you try to make sure everything has been

25  tried at the school.  Is that step you described,



1  making sure it's been tried, done on the basis of the

2  referral packet?

3      A.   Yes.

4      Q.   Okay.  And then if it passes that sort of

5  screening stage, then would it advance to the step of

6  an IEP meeting?

7      A.   Yes.

8      Q.   So you mentioned that you want to make sure

9  they have a current IEP and that it's been followed.

10  Do you check to see whether there is an FBA?

11      A.   We do, yes.

12      Q.   Is it required?

13      A.   It is part of that, yes.  We don't have a

14  specific FBA that has to be done.  But, yeah, some type

15  of functional behavioral assessment needed to be

16  done.

17      Q.   I'm not sure I understood that.  So are there

18  different kinds of FBAs?

19      A.   There's different processes in an FBA or to

20  carry out an FBA.

21      Q.   So you're saying some FBA has to be done but

22  it could be different for different students?

23      A.   Yes.

24      Q.   And is there a requirement there be progress

25  monitoring data on the IEP implementation?



 1  we already did.

 2      Q.   Do you understand that to mean you already did

 3  it because they were required before or you already did

 4  that even though it wasn't part of the rule?

 5      A.   Just because it was best practices.

 6      Q.   So as far as you can remember, the addition

 7  for the FBA to be done prior was the only thing that

 8  changed in your practice with the amendment of the

 9  rule?

10      A.   That was -- yes.

11      Q.   Are you familiar with the -- I've been calling

12  it a referral packet, but I think it has a different

13  name.  The student information -- student information

14  packet?

15      A.   Yes.

16      Q.   And are you familiar with the flow chart, the

17  GNETS flow chart?

18      A.   Yes.

19      Q.   And the guiding questions?

20      A.   Yes.

21      Q.   Do those documents together with the GNETS

22  rule, do they form the basis for the enrollment

23  determinations that you make for students referred for

24  services at Cedarwood?

25      A.   Those along within the IEP committee team



1   meeting.

2       Q.   Okay.  Are there other documents that are used

3   in the referral process?

4       A.   No.

5       Q.   So are the criteria set forth in the documents

6   we just discussed, the information packet, the GNETS

7   rules along with the guidance and the flow chart and

8   the guiding questions, are those sort of the criteria

9   that govern the enrollment decisions?

10      A.   They are guidelines.

11      Q.   All of them?

12      A.   Well, the GNETS rule is actually the major

13  guideline.  The others are just -- well, the GNETS rule

14  is the rule and these are just guidelines to help

15  follow in the process.

16      Q.   So the information packet, the flow chart, and

17  the guiding questions are guidelines to help in the

18  process?

19      A.   Yes.

20      Q.   Have you received any guidance on what the

21  word intense means with respect to the rule requiring

22  intense social emotional behavioral challenges?

23      A.   No.

24      Q.   Have you received any guidance about how to

25  assess the severity, frequency, or duration of the



1  challenges referred to in the rule?

2      A.    No specific guidance, no.

3      Q.    Have you received general guidance?

4      A.    No.

5      Q.    How about guidance about how to assess the

6  services and supports provided in the general education

7  settings?

8      A.    No.

9      Q.    And who reviews the sufficiency of the

10 services that have been provided at the student's home

11 school?

12     A.    The Cedarwood coordinator and the special ed

13 director would have conversations about it.

14     Q.    And does the coordinator report to you or does

15 the coordinator make a determination themselves?

16     A.    In most parts the coordinator and I have

17 conversations about it.

18     Q.    And then what happens after the

19 conversations?

20     A.    Then they -- we might -- the coordinator

21 themselves or I would talk to the special ed director

22 and then they would -- it would still have a meeting,

23 an IEP meeting, for the committee to make the

24 decision.

25     Q.    So you and the coordinator would together come



1   to a decision about whether you think that enough had

2   been done and convey that to the special director?

3       A.   Yes.  We would look at, to be sure, that

4   everything has been done according to the rule, that we

5   have everything there that we need, and the information

6   that we need.

7       Q.   And then you let the special ed director know

8   that the packet was, like, complete basically and then

9   the IEP meeting would be convened?

10      A.   Yes.

11      Q.   And you would not attend that part, correct?

12  The coordinator would attend that meeting?

13      A.   Right, usually.  I'm not where I can't, but I

14  generally do not.

15      Q.   And so has a student ever referred to

16  Cedarwood been denied enrollment because he or she had

17  not received sufficient support at the home school?

18      A.   I don't know.

19      Q.   Do you have a sense of how many referrals are

20  expected and how many are denied?

21      A.   Well, we don't -- we wouldn't -- when you say

22  denied, that makes it sound like someone is saying no,

23  we can't even have a meeting on this.

24           We may say you need to do this or that, you

25  know.  You don't have an FBA to back up your behavior



1    Q.   How often would you say these kinds of

2  nonemergent but nonstandard admissions happen?

3    A.   Very seldom.

4    Q.   Does anybody in the Georgia Department of

5  Education have a role to play in these decisions, these

6  admissions or enrollment decisions?

7    A.   No.

8    Q.   Do they have a role in transferring records

9  from school to school or program to program?

10   A.   No.

11   Q.   I'm going to mark as Exhibit 253 (sic) a

12 document from the State GA00013594.

13        MS. HERNANDEZ:  I did have one question for

14 you, Laura.  It cut out.  You said, "Does anyone from

15 the blank participate in."  It was your last question

16 and I didn't hear it, if either you or the court

17 reporter can read that back.

18        MS. TAYLOE:  Georgia Department of

19 Education.

20        MS. HERNANDEZ:  Gotcha.  Okay.  Thank you.

21        (Plaintiff Exhibit 254 marked.)

22 BY MS. TAYLOE:

23   Q.   Okay.  And I'm giving you control,

24 Ms. Braddock.

25   A.   Okay.  You would think by now I would have



 1 | figured out how to do it.
 2 |     Q.    I'm the same pre-tech generation you are, so
 3 | no judgment from me.  I think if you scroll the control
 4 | bar on the right, it works better.
 5 |     A.    The problem is when I get all the way on the
 6 | right to scroll, I can't see what's on the left and
 7 | then have to get back down there.  So is this -- okay,
 8 | here we go.
 9 |     Q.    There might be a way to fit it to screen, too,
10 | if it's not all on one screen for you.
11 |     A.    Let me try.  There we go.  Okay.  All right.
12 | What's your question?
13 |     Q.    Do you recognize this document?
14 |     A.    Yes, I do.
15 |     Q.    Can you -- for the record, it involves an
16 | email exchange between Whitney Braddock and Vicky
17 | Cleveland.
18 |         And your message to Vicky is, "I sent a
19 | request for a student transfer in i-Ready in the portal
20 | earlier this week.  I was just double-checking to be
21 | sure that you knew the request was there.  I have
22 | teachers asking about the student."
23 |         Is that accurate what it says?
24 |     A.    Yes, it is.
25 |     Q.    Can you explain what was happening here?



1    A.    Okay.  A student was a move-in from another

2  GNETS to our program.  And we used the i-Ready program

3  for reading and math remediation.

4         And if a student was at another GNETS and they

5  were using i-Ready, when they moved to us so that they

6  don't -- so the continuity of using this program, the

7  DOE actually has the ability to transfer students from

8  one GNETS to another within this program, the i-Ready

9  program.

10    Q.    Okay.  What did you mean teachers asking about

11  the student?

12    A.    Well, I had teachers wanting to know when the

13  student can start using i-Ready because he hadn't been

14  transferred into our i-Ready program yet.

15    Q.    So he was already in Cedarwood classes --

16    A.    Yes.

17    Q.    -- but not able to access --

18    A.    i-Ready.  I'm sorry, I'm talking over you.

19    Q.    And is that the only circumstances in which

20  the Department of Education would get involved in a

21  transfer to access records?

22    A.    Yeah, for the i-Ready records.  Yes.

23    Q.    How many new students would you say are

24  enrolled in Cedarwood on average each year?

25    A.    It really depends on the year.  It changed and



1   the record.  Okay.  Have there been any other state or

2   federal funds like COVID-related monies or special

3   education-related funds?

4       A.   Yes.  Last year we got some COVID money for

5   nursing-type supplies and things and then some money

6   for counseling services.

7       Q.   But that was only last year.  It's not renewed

8   this year?

9       A.   It has not been renewed this year, no.  Well,

10  no, I'm sorry.  Yes, there is a separate counseling

11  grant that is coming from the Georgia Department of

12  Education that was renewed this year.  Yes.

13           I also get -- I'm sorry -- I also get money

14  that I didn't think about for Dr. Mullis, our

15  counselor.  We receive a separate DOE grant for his

16  salary, but I cover his benefits.

17      Q.   And is the DOE grant for Mr. Mullis, that is

18  recurring?

19      A.   It has been, yes, for three or four years.

20      Q.   But the other one, the counseling grant from

21  Georgia Department of Education, do you understand that

22  to be a one-time only like COVID?

23      A.   I believe that it's for three years.  I'm not

24  completely certain.

25      Q.   And then any other kind of funding?  Do you



1    get any kind of support or donations from LEA, from

2    staff, from community partners, or families?

3        A.   I get, like we already talked about, the

4    salary and benefits for Cody Brannen.  And then Appling

5    County Schools gives me $10,000 a year to offset the

6    cost of a paraprofessional.

7             Jeff Davis County Schools gives me $10,000 a

8    year to offset the cost for a paraprofessional.  And

9    Evans County Schools gives me $5,000 a year to help

10   with a cost for a paraprofessional.

11            Tattnall County Schools provides a one-on-one

12   paraprofessional for one of their students that is in

13   his IEP that he needs an individualized

14   paraprofessional, so they provide that parapro.

15       Q.   Do they actually provide the parapro or

16   provide the funding for the parapro?

17       A.   They actually provide the parapro.

18       Q.   Okay.  And those amounts, is that LEA decides

19   or signs an agreement or is it based on some kind of

20   formula for how many students they have?

21       A.   I don't know how the number came up.  It's

22   just been something that kind of was grandfathered in

23   and continued.  I've asked them each year, you know,

24   are you going to be able to continue to do this.  And

25   they do and they have but...



1    Q.    What is S-W-I-S?

2    A.    That's SWIS.  We don't use that.

3    Q.    Okay.  Is it the school-wide information

4  system?

5    A.    Yes.  That is a system that some GNETS and

6  some school systems use for conduct citations or to

7  track conduct and what is known as write-ups.

8    Q.    Okay.

9    A.    We do that through educator's handbook.

10    Q.    And then I want to talk a little bit about the

11  strategic plan and the self-assessment reviews.  Are

12  you familiar with the GNETS strategic plan?

13    A.    Yes, I am.

14    Q.    How would you describe what that plan is?

15    A.    It's a plan that covers -- it used to be seven

16  areas.  I think it's now six areas -- to basically keep

17  us on track where we look at it and grade ourselves and

18  collect data to make sure we're doing the things we

19  need to do.

20    Q.    And who wrote the plan?

21    A.    I believe the plan was written by some folks

22  at the Georgia Department of Education and different

23  GNETS directors.  We're on a committee.

24    Q.    When was it first written?

25    A.    I don't know for certain, but it was when



1  Nakeba was the program manager at the Georgia

2  Department of Education.

3       Q.   And were you involved in that committee

4  process?

5       A.   I was not on one of the committees for the

6  initial one.  I was on a committee when we had some

7  discussions about what to combine and what to cut out

8  to make it a little more streamlined.

9       Q.   Was that in connection with it used to be

10  seven areas now it's six?

11       A.   Part of it, yes.

12       Q.   So what was the -- what were the areas that

13  were combined and streamlined?

14       A.   I'm not certain.  Off the top of my head, I

15  don't know.  If I had it in front of me, I could tell

16  you.

17       Q.   What was the timeline, you would say, that

18  your participation on this level, you know, this part

19  of the process was?

20       A.   We probably worked on it for a few months, had

21  a couple of meetings.

22       Q.   And how long ago was that?

23       A.   Prior to COVID.  So when we look at things and

24  I can track it like that, so it may have been 2018 and

25  it could have been 2017.



1    Q.   Is that around the time the GNETS rule was

2  being revised?  Do you remember in working on the

3  strategic plan, was it in connection with the GNETS

4  rule?

5    A.   I believe the rule had already been done.

6    Q.   Okay.  And what is the -- so you said it was

7  designed to keep you on track.  How does it work?  What

8  does the plan ask for GNETS or GNETS directors to do?

9    A.   We collect data and evidence for each of the

10  areas and the subareas.  It requires GNETS directors

11  to --

12    Q.   What do you do with the data and evidence?

13    A.   I've got it on a file on my computer.

14    Q.   Oh, no.

15    A.   We present it to our staff so they understand

16  some of the task that they need to do and provide for

17  us.

18         Oh, I completely lost her.  My screen is gone.

19         THE VIDEOGRAPHER:  We're off the record at

20  4:52.

21         (Recess.)

22         THE VIDEOGRAPHER:  We are back on the record

23  at 4:53.

24  BY MS. TAYLOE:

25    Q.   Okay.  You were starting to tell us that the



1    process involves collecting data and evidence for each

2    of the areas.

3        A.    Right.  And part of that is ensuring that our

4    staff knows what our goals are and turns in the things

5    they need to turn in and they are staying on track in

6    providing that information.

7        Q.    And by what -- and what standard do you

8    measure whether you're meeting the goals and achieving

9    the objectives outlined?

10       A.    So each one has the standard listed and then

11   you write yourself as a -- well, as a 01 or 2, but I

12   think changed that now.

13            Part of the change was that it's emerging or

14   operational or nonexistent.  And so that's how those

15   are then marked based on the way that each of the

16   subareas are listed.  You know, there's a lot to it in

17   each different section.

18       Q.    And are directors given guidance as to what

19   counts as emergent or operational?

20       A.    In the beginning rollout of it, yes, we

21   were.

22       Q.    But not since then?

23       A.    When it was adjusted and changed a little bit,

24   then yes.  But not to the same extent as at the

25   beginning of the rollout.



1    Q.    Okay.  And what is your understanding about
2    how this information is used when you turn in your
3    self-assessments?

4    A.    I don't know how it's used.

5    Q.    Do you ever get feedback after you've turned
6    it in?

7    A.    In the beginning when it was first rolled out,
8    it was done where someone from the DOE came around to
9    each GNETS and looked at all of the stuff that you had
10   and rated each area.

11         But then beyond that, now they don't -- the
12   DOE is not doing that.  We rate ourselves and I've not
13   turned it in.  It's just something that we now just
14   use.

15   Q.    So, I'm sorry, you're not doing or you're
16   doing it but not reporting it?

17   A.    I'm doing it but not reporting it.

18   Q.    Okay.  And do you recall filling out or
19   writing some narrative responses in response to the
20   documents subpoena where you just described maybe why
21   some information was not available?

22   A.    Yes.

23   Q.    Do you remember saying that you had not done
24   the strategic plan for FY20 and FY21 because you were
25   not scheduled for review?



1    Q.    Okay.  One other question I wanted to revisit

2   is, is time in GNETS, like number of years a student

3   has spent in the GNETS, is that something that was

4   considered as part of the strategic plan?

5    A.    No.

6    Q.    That was not a target they wanted to reduce as

7   part of the tracking the progress of the programs?

8    A.    No.

9    Q.    Was there any request that you track exit

10   rates?

11    A.    I don't think so.

12    Q.    But if you did still track exit rates, either

13   for that or for some other purpose, could that mask

14   that some students were coming and going while others

15   were staying for a long time?

16    A.    Could that do what?  I'm sorry.

17    Q.    Like an exit rate might not look alarming but

18   it would not reveal if some students were coming and

19   going where others were staying for a long time?

20    A.    I don't think that we keep that data.

21    Q.    Okay.  All right.  I want to talk a little bit

22   more about the facility closures that we talked about

23   earlier.  I don't know that you had dates but -- okay.

24   So the Baxley site in Appling County was closed; is

25   that correct?



1    A.   Yes.

2    Q.   Do you remember what the facility's report

3    said about that facility?

4    A.   I don't remember.

5    Q.   Did you ever see the facility's report

6    itself?

7    A.   I did, yes.

8    Q.   Do you recall it mentioning the building had

9    been built in 1954 with no apparent renovations?

10   A.   I don't remember any of the content.

11   Q.   Okay.  Do you remember that it was one of the

12   first facilities closed by the Department of Education

13   even while the assessments were going on?

14   A.   No.  I don't recall that being what

15   happened.

16   Q.   What do you recall?

17   A.   I recall that an email or a phone call was

18   sent out that we were to be on a virtual meeting, all

19   GNETS directors, and that -- or maybe it was just an

20   email and a phone conference.

21        But it was announced which GNETS facilities

22   would be closed.  And I remember my heart racing and

23   trying to figure out what we were going to do.

24   Q.   Oh, because you learned on that call that --

25   A.   On that call at that point in time everyone at



800.211.DEPO (3376)
EsquireSolutions.com

 1  the same time.

 2      Q.    And what did you do with the students from the

 3  Baxley site?

 4      A.    The students from the Baxley site were then

 5  going to be bussed to the Lyons site.  And the Lyons

 6  site was moving to the current building that we're

 7  in.

 8      Q.    And what were these assessment reports for the

 9  Statesboro and Lyons sites?

10      A.    I know the Lyons site was closed.  I don't

11  really remember the content of it.  And I know that

12  there were recommendations for the Statesboro site, but

13  it was not closed.  I received the reports.

14      Q.    And do you remember what the basis for the

15  closures were?

16      A.    I don't remember the basis.

17      Q.    Okay.  And for the ones that weren't closed,

18  what was -- what happened?

19      A.    For the ones that --

20      Q.    That were not closed.  What did the Department

21  of Education tell you about the ones that were not

22  closed?

23      A.    That would have been our Statesboro site, and

24  they gave recommendations for it to be upgraded and

25  things that needed to be done, which was then why



 1  Bulloch County applied for that GNETS facilities grant
 2  and redid the building.
 3       Q.   Do you remember were you involved in that
 4  process?
 5       A.   I was involved in the renovation of the
 6  building, yes.  We talked about that earlier.
 7       Q.   Okay.  So after the grant had been awarded,
 8  you were involved in how to spend the money but not in
 9  the part before that?
10       A.   Actually, the application for the grant, the
11  special ed director of Bulloch County schools did the
12  application for the grant.  And she asked me questions
13  and I provided her with some information, but she did
14  the bulk of the work on that.
15       Q.   And during the period of the renovations, did
16  students have to move to a temporary site for some
17  period?
18       A.   Yes.
19       Q.   Where did they move?
20       A.   They moved to another school in Bulloch County
21  called Portal Middle High School, and we were given
22  rooms in that school.
23       Q.   I'm going to introduce now as Exhibit 259 a
24  document from the State, GA00337565.
25            (Plaintiff Exhibit 259 marked.)



 1   what parents or teachers or other students report about

 2   these students when they're at these schools.

 3        Q.   Did the GNETS students, in fact, attend the

 4   Portal schools for that semester?

 5        A.   Yes.

 6        Q.   Was there any issue with them being dangerous

 7   during that time?

 8        A.   There was some behavior issues, but there was

 9   no issues with them being dangerous.

10        Q.   Were your staff able to provide the services

11   in the Portal schools?

12        A.   Yes.

13        Q.   And then who decided that that placement would

14   be temporary?

15        A.   The Bulloch County superintendent.

16        Q.   And why -- is that a man or woman?

17        A.   A man.  Charles Wilson is his name.

18        Q.   Why did he get to decide that?

19        A.   Well, Bulloch County Schools applied for the

20   facilities grant, and Bulloch County schools made --

21   put in other local funding to redo the building.

22             And in doing that, he needed a place -- Portal

23   Middle High had the rooms for us to move to but then

24   the money was being spent to upgrade the building.  So

25   then when the building was completed, then we moved



 1  back into it.

 2      Q.   Were you aware that the facility's grant

 3  application had a provision that the grant recipients

 4  had to promise that the GNETS program would stay in the

 5  facility for ten years?

 6      A.   Yes.

 7      Q.   Was that ever discussed with you?

 8      A.   No, not really.  I don't recall having a

 9  discussion with anyone about it that I can think of.

10      Q.   And are you aware of the amounts of money that

11  were spent on the renovation?

12      A.   I do not know the exact price of it.  I'm not

13  certain of what it was.

14      Q.   I'm going to mark as Exhibit 260 document

15  GA04103131 and let you have control of it.

16  Ms. Braddock.

17      A.   Okay.

18           (Plaintiff Exhibit 260 marked.)

19           (Witness reviewing document.)

20           THE WITNESS:  Okay.

21  BY MS. TAYLOE:

22      Q.   So I'm going to state for the record this is

23  an email from Troy Brown to Pat Schofill copying Scott

24  Wilson dated April 11, 2019.

25           And do you see that the award amount -- well,

