EXHIBIT Q

1                 IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                       ATLANTA DIVISION

3

4   UNITED STATES OF AMERICA,
                              )CIVIL ACTION
5           Plaintiff,        )NO. 1:16-cv-03088-ELR
                              )
6   vs.                       )
                              )
7   STATE OF GEORGIA,         )
                              )
8           Defendants.       )
                              )
9   - - - - - - - - - - - - - - - )

10

11              VIDEOTAPE DEPOSITION OF

12                 CLARA KEITH BROWN

13

14         Tuesday, June 7, 2022, 9:18 a.m., EST

15

16

17

18

19         HELD AT:

20         Robbins Alloy Belinfante Littlefield LLC
           500 14th Street, N.W.
21         Atlanta, Georgia  30318

22   -----------------------------------------------

23

24         WANDA L. ROBINSON, CRR, CCR, No. B-1973
         Certified Shorthand Reporter/Notary Public

25



800.211.DEPO (3376)
EsquireSolutions.com

1       Q    And when you say program director for the

2   GNETS program, who was Ms. Rahming's employer?

3       A    She was the Georgia -- she was an employee

4   of the Georgia Department of Education.

5       Q    You note in this email, you say:  "I think

6   it is important for the GNETS to understand the goal

7   of the GNETS program is to transition students back

8   to their LRE and as much as possible, in the general

9   education program."

10           Have I read that correctly?

11      A    Yes, you read it correctly.

12      Q    What is LRE?

13      A    LRE is least restrictive environment.

14      Q    And what does that mean?

15      A    Least restrictive environment.  That

16  wherever possible the student is in the general

17  education classroom with his or her peers, with

18  support services in that classroom, depending on the

19  needs of the students.  It may -- they may need

20  different services depending on what you identified

21  in the IEP.

22           THE VIDEOGRAPHER:  Can we take a quick

23      break.

24           We're off the record at 9:44 a.m.

25           (A recess was taken.)



1          THE VIDEOGRAPHER:  We're back on the

2      record at 9:49 a.m.

3  BY MS. GARDNER:

4      Q    Ms. Keith Brown, before we went off the

5  record we were talking about least restrictive

6  environment, right?

7      A    Yes.

8      Q    Am I correct in understanding from your

9  response that the baseline for least restrictive

10  environment is the general education classroom?

11      A    Yes.

12      Q    And the further a student is moved away

13  from the general education classroom, the more the

14  restrictive the environment is considered?

15      A    Yes.

16      Q    Here in your email you say:  "The goal of

17  the GNETS program is to transition students back to

18  their LRE and as much as possible, in the general

19  education program," right?

20      A    Correct.

21      Q    When you say "as much as possible," "the

22  general education program," are you identifying the

23  general education program as the ideal?

24      A    Yes.

25      Q    And would you agree that the GNETS program



 1       A    Yes.

 2       Q    And what does that refer to?

 3       A    So that would have been Nakeba's project,

 4  and she would have been updating me on data

 5  collection.  I don't recall the specific data

 6  collection that she's referring here, but that would

 7  have been Nakeba's responsibility.

 8       Q    Okay.  So the data collection progress was

 9  a project of Ms. Rahming's?

10       A    Yes.

11       Q    And in this meeting she would have just

12  been providing you with updates on how that project

13  was coming along?

14       A    Correct.  And I would have been providing

15  her my guidance on who she needed to talk to to make

16  that happen, if she needed my help.

17       Q    Now, the strategic plan that's mentioned

18  here, whose project was that?

19       A    That would have been Nakeba's project.

20       Q    And what was then your role in the

21  strategic plan?

22       A    I would -- I'm sorry.

23            I would have been there to provide

24  guidance, answer questions that I had knowledge

25  about, give -- an example would be if the State



CLARA KEITH BROWN                                    June 07, 2022
UNITED STATES vs STATE OF GEORGIA                            81

```
 1        A    No.
 2             MS. GARDNER:  I am handing the court
 3        reporter a document that I would like to have
 4        marked as Plaintiff's Exhibit 63.
 5             (WHEREUPON, Plaintiff's Exhibit-63 was
 6         marked for identification.)
 7   BY MS. GARDNER:
 8        Q    The court reporter has handed you
 9   Plaintiff's Exhibit 63.  This is an email from you
10   to an email address that appears to be Debbie Gay's,
11   with the subject "Interview Questions."
12             And the first page of this is
13   Bates-stamped GA00481478.
14        A    Yes.
15        Q    Am I correct that this was in fact sent to
16   Debbie Gay?
17        A    Yes.
18        Q    You sent this email on October 6, 2015?
19        A    Yes.
20        Q    There is one attachment to this email, a
21   Word document with the title "Interview Questions
22   GNETS Position."
23             Is that right?
24        A    Yes.
25        Q    Is the GNETS position that the attachment
```



 1 title references the one that Ms. Rahming was hired

 2 to fill?

 3      A    Yes.

 4      Q    So I believe you said earlier you were

 5 involved in developing the interview questions for

 6 the hiring of that position?

 7      A    Yes.

 8      Q    And am I correct that in this email you

 9 are forwarding that list of interview questions to

10 Ms. Gay?

11      A    Correct.

12      Q    If you will turn to the attachment, the

13 first page of which is Bates-stamped GA00481479.

14           The second question down you say:

15 "Describe your experiences with accessing the status

16 of a program, documenting results, recommending

17 changes, and improvement based on research and

18 evaluation data."

19           Do you see that?

20      A    Yes.

21      Q    That was one of the interview questions

22 for Ms. Rahming's position?

23      A    Yes.

24      Q    Why did you include this question in the

25 set of questions for the interview?



1  determined that GNETS needed any professional

2  learning in the rule or any component or aspect of

3  the rule, to provide that leadership to ensure that

4  it happened.

5      Q    Any other ways in which you understood the

6  GNETS director was to provide general supervision of

7  the State's GNETS program?

8      A    Not any specific things, no.

9      Q    Moving to the next question, you include

10 "What is the State's role in implementing the GNETS

11 program?"

12          Do you see that?

13     A    Yes.

14     Q    What were you looking for from interview

15 candidates in response to this question?

16     A    I wanted to make sure that the person we

17 hired for this position knew that the State did not

18 control or administer the GNETS; that the GNETS were

19 independent of the Georgia Department of Education

20 in the sense that they have the directors.  Their

21 directors did not report to anyone at the Georgia

22 Department of Education, but that the Georgia

23 Department of Education did have a State Board of

24 Education rule and it did have guidance on how to

25 implement that rule.



1              And I thought that it would be very

2    important for the person to have done their research

3    on that model and to understand that while you're

4    not supervising the directors directly, the State

5    has a Board of Education rule and GNETS have to

6    abide by that rule.

7         Q    Moving down to the last question on this

8    page, and you include -- it says, "Share your

9    thoughts on the relationship between instruction and

10   therapeutic support."

11             Do you see that?

12        A    Yes.

13        Q    What were you looking for from interview

14   candidates in response to this prompt?

15        A    It was my goal that this is where we would

16   learn candidates' experience with a continuum of

17   support, a multitiered system of support, because if

18   they understood that students receiving the

19   therapeutic support as -- included in their IEP,

20   that they would be -- "they" being the students --

21   would be successful in their learning.  And if

22   teachers understood the connection between

23   therapeutic support and instruction, then we would

24   have a system where students would get the support

25   that they need and the instruction would, would -- a



1  student would then be successful.

2      Q    So is it fair to say that in terms of a

3  sufficient answer to this question that you viewed

4  there being a relationship between instruction and

5  therapeutic support such that therapeutic support

6  was a prerequisite, if you will, to students within

7  the GNETS program receiving effective instruction?

8      A    Yes.

9      Q    Turning to Page 2 of -- and the second

10  question down on that page, you include the

11  question:  "What qualities do you think a manager

12  implementing a large-scale program with political,

13  local school/school district, state (and perhaps

14  national) interest should possess?"

15          Do you see that?

16      A    Yes.

17      Q    What did you hope to learn by adding this

18  question?

19      A    I wanted just the person's thinking and

20  understanding what an individual would have to know,

21  what competencies that person would have to have in

22  order to be successful in implementing a large-scale

23  program.

24      Q    Am I correct in understanding that you

25  viewed the GNETS education program specialist as a



1   meetings as opposed to statewide meetings.

2          If there were any professional learning

3   that was recommended for all GNETS directors, either

4   recommended for GNETS directors or recommended as a

5   Train The Trainer model, then that person would need

6   to secure the delivery of that professional

7   learning.  That person would need to then actually

8   go on-site to ensure that the intended professional

9   learning is exactly what happened.

10      Q    So the GNETS education program specialist

11  may have needed to travel on-site for purposes of

12  providing training?  Is that one of the sort of

13  purposes of travel in this particular position?

14      A    Yes.

15      Q    And then I think you also mentioned in

16  situations where the education program specialist

17  may not have been providing the training themselves,

18  they might be on-site to ensure that the training

19  delivered was actually what was supposed to be

20  delivered?

21      A    Yes.

22      Q    Did the GNETS education program specialist

23  travel on-site to assess programs in any way?

24      A    Yes.

25      Q    And sort of what was the nature of the



1  assessment that the education program specialist

2  might travel to GNETS programs for?

3      A    The GNETS were required to complete the

4  strategic plan.  There is an assessment partner.  So

5  the GNETS person would have gone on-site to have a

6  discussion about that rating.

7      Q    And when the GNETS education program

8  specialist went on-site to have a discussion about

9  that rating, was the education program specialist

10 looking at anything to determine whether that rating

11 was accurate?

12     A    I hesitate because I did not see any data,

13 for example, that the -- that the specialist would

14 have -- that Nakeba in this particular case would

15 have pulled, but -- so I can't say for certain that

16 that is exactly what happened.

17     Q    Okay.  Was there any out-of-state travel

18 required for or contemplated for the education

19 program specialist?

20     A    I don't recall.

21          MS. GARDNER:  I'm handing the court

22     reporter what I would like to request be marked

23     as Plaintiff's Exhibit 64.

24          (WHEREUPON, Plaintiff's Exhibit-64 was

25       marked for identification.)



1  question is both."  Is that correct?

2      A    Yes.

3      Q    Then you go on to say:  "The position is a

4  newly funded position but expectation is this

5  position will provide direct leadership and indirect

6  supervision to the GNETS.  Some of the operations

7  details are still left to be worked out, thus the

8  reason we stressed the person filling this position

9  will need to be flexible."

10     A    Yes.

11     Q    In what ways was the expectation that the

12 position would provide direct leadership to the

13 GNETS?

14     A    Direct leadership for implementing or

15 adhering to the State Board of Education GNETS rule,

16 and following the guidance that was developed for

17 that rule.

18     Q    Any other ways?

19     A    That's my best answer.

20     Q    In what ways was the expectation that the

21 position would provide indirect supervision to the

22 GNETS?

23     A    Yes.  Indirect because GNETS directors did

24 not report to anyone at the Georgia Department of

25 Education, but the State Board of Education rule



1  following the guidance as outlined in the manual, as

2  well as working on the strategic plan and evaluating

3  each, each director evaluating the services that

4  were provided through GNETS, this person would have

5  -- Nakeba would have been directly responsible for

6  that.

7          THE VIDEOGRAPHER:  I'm sorry, we need to

8      take another break.

9          Off the record at 12:05 p.m.)

10         (A recess was taken.)

11         THE VIDEOGRAPHER:  We're back on the

12     record at 12:09 p.m.

13 BY MS. GARDNER:

14     Q   We were discussing the email that Ms.

15 Rahming sent to you after interviewing with the

16 Georgia Department of Education for the position

17 that she was ultimately hired into.

18         Ms. Rahming includes in her email a third

19 question that she remembered after her interview.

20         Do you see that?

21     A   Yes.

22     Q   And that question is:  "What are your

23 short and long-term expectations of the hired

24 candidate?"

25     A   Yes.



1   provided her contact information for the GNETS as

2   well.

3       Q    The strategic plan that you mentioned was

4   one of Ms. Rahming's projects.  Had that been

5   started at the time that you were assisting Ms.

6   Rahming in sort of getting her bearings within the

7   Department of Education?

8       A    Yes.

9       Q    Who started that prior to Ms. Rahming

10  arriving?

11      A    She would have started that.

12      Q    She would have started that when she

13  arrived?

14      A    Yes.

15      Q    In discussing the calendar invitation we

16  looked at earlier for the meeting between you and

17  Ms. Rahming that outlined the four areas in which

18  Ms. Rahming was providing updates to you, do you

19  recall that?

20      A    Yes.

21      Q    And you can look back if you would like.

22           One of the things listed was an outline

23  for service delivery model.  Do you recall that?

24      A    Yes, I do.

25      Q    What is a service delivery model?



1  therapeutic services were being provided in regional

2  units' programs?

3       A    I did not know that.

4            MS. GARDNER:  I'd like to ask the court

5       reporter to mark this document as Plaintiff's

6       Exhibit 71.

7            (WHEREUPON, Plaintiff's Exhibit-71 was

8        marked for identification.)

9  BY MS. GARDNER:

10      Q    The court reporter has handed you what is

11 marked as Plaintiff's Exhibit 71.  This is an email

12 from Nakeba Rahming to you dated June 24, 2016.  The

13 subject is "Therapeutic Supports."

14           The first page of the email is

15 Bates-stamped GA00197223.

16           This is an email that you received from

17 Ms. Rahming?

18      A    Yes.

19      Q    And am I correct if you look at the very

20 first page, in the Attachments field, this email

21 included two attachments?

22      A    Yes.

23      Q    If you turn to the first attachment, which

24 has the Bates No. ending in 7224, do you see that?

25      A    Yes.



1      Q    What is the heading at the top of this

2  document?

3      A    "Reviews for clinical staff within a

4  therapeutic setting to serve students."

5      Q    Were you involved in preparing this

6  document?

7      A    I don't recall specifically being involved

8  in preparing this document.

9      Q    But you received this document from Ms.

10  Rahming in the context of this email?

11      A    Yes, I did.

12      Q    Am I correct that in this email Ms.

13  Rahming is asking -- is saying she will call to

14  discuss feedback on these documents?

15      A    Yes.

16      Q    If you look at the first paragraph of this

17  document, it says:  "In an effort to validate the

18  decisions around GNETS provision of therapeutic

19  services for students, a comprehensive review of

20  other identified therapeutic schools were

21  researched."

22           Do you see that?

23      A    Yes.

24      Q    Then further down in that paragraph, it

25  says:  "The programs reviewed and the makeup of



1  their clinical staff serve as a basis to compare the

2  makeup of the clinical staff at each of the 24 GNETS

3  programs."

4          Do you see that?

5     A    Yes.

6     Q    This first paragraph goes on to say:

7  "Based on this comparison, it was determined whether

8  or not identified GNETS programs were staffed to

9  provide therapeutic/behavioral service to students

10 with significant Emotional/Behavioral needs like

11 other therapeutic programs."

12         Do you see that?

13    A    Yes.

14    Q    So this is a document that Ms. Rahming is

15 providing to you for feedback, and it has to do with

16 the review of clinical staff at regional GNETS

17 programs and whether those programs are staffed to

18 provide therapeutic and behavioral services to

19 students?

20    A    Yes.

21    Q    The bottom portion of this document

22 identifies three schools outside of Georgia that

23 have therapeutic components; is that right?

24    A    Yes.

25    Q    And for each of these schools it lists the



1   number of students served in the school, right?

2        A    Yes.

3        Q    And it also lists the number of clinical

4   staff in the school?

5        A    Yes.

6        Q    In each section it provides a breakdown of

7   those clinical staff in terms of the kinds of

8   clinical staff at the school?

9        A    Yes.

10       Q    And do I understand correctly from this

11  document that this information was used as a

12  reference point for comparing the makeup of clinical

13  staff at each of the 24 regional GNETS programs?

14       A    According to what's written here, yes.

15       Q    Do you have any reason to think that

16  what's written here is not accurate?

17       A    No.

18       Q    Just under the first paragraph in this

19  first attachment, it says:  "Information was

20  triangulated from the GNETS Grant Applications,

21  GNETS Directors Interviews and other Therapeutic

22  programs."

23            What do you understand that to mean?

24       A    I'm not sure I understand your question.

25       Q    I'm trying to understand what that means.



1              And you received this document.  You

2    worked with Ms. Rahming.  So I'm asking, did you

3    have any understanding when you received this as to

4    what was being communicated here?

5         A    She was looking at the data that she

6    listed below, looking at the ratio, therapeutic

7    services and staff provided at GNETS.  She talked to

8    GNETS directors, and she looked at other therapeutic

9    programs and pulled all of that information

10   together.

11        Q    Okay.  At bottom of this document it says:

12   "Please see the attached document with an overview

13   of clinical staff serving each GNETS program for the

14   2015-2016 school year."

15             Do you see that?

16        A    Yes.

17        Q    So if you could turn to the second

18   attachment, and the first page of that is Bates No.

19   GA 00197225.

20             What is the heading at the top of this

21   document?

22        A    "Analysis of clinical staff available to

23   provide direct therapeutic/behavior support to

24   students in GNETS programs."

25        Q    Can you walk me through what this document



1  shows?

2      A    The Fiscal Agent, the Site, the Clinical

3  Staff, the LEA Funded clinical staff, Contracted

4  Clinical Staff, total number of students served, the

5  ratio of staff to student, Clinical Support,

6  Directors Interviews as of 6/16/2016.

7      Q    And those are the headings for every

8  column that move from left to right in the document

9  on the first page?

10     A    Yes.

11     Q    This document identifies in the site

12 column each of the 24 regional GNETS programs; is

13 that right?

14     A    23.  Maybe -- I want to make sure.

15          Yes, yes.

16     Q    And when you say yes, yes, did you count?

17     A    There's 24.  I did.

18     Q    And for each of the 24 regional GNETS

19 programs, this chart contains information that falls

20 into those categories of the columns that you read a

21 few moments ago?

22     A    Yes.

23     Q    Some of the rows on this document are

24 highlighted in a very dark shade as compared to

25 others.  Do you see that?



 1        A    Yes.

 2        Q    What is the significance of that shading?

 3        A    I don't recall.

 4        Q    Are each of the GNETS programs that are

 5   shaded in the darkest color have the text "very

 6   concerning" in the column that's titled, "Clinical

 7   Support."

 8        A    Yes.

 9        Q    And the information in the Clinical

10   Support column, is this a qualitative assessment

11   about the clinical staff at a particular regional

12   GNETS program based on the total number of students

13   served and the ratio of clinical staff to students

14   that's contained in this chart?

15        A    I'm not sure if that was the reason it was

16   labeled "concerning" or "very concerning."  I don't

17   have that knowledge.

18        Q    If you turn to the second page of this

19   document, am I correct there's a legend at the

20   bottom on the right-hand side, has the heading

21   "GNETS Programs?"

22             Do you see that?

23        A    Yes.

24        Q    Is this the legend that explains when

25   programs were rated very concerning?



1      A     This is an explanation of the ratings.

2      Q     Okay.  If you turn to the very last page

3   of that attachment, the text on the right half of

4   the document, is this basically a summary narrative

5   of the take-aways of this analysis of clinical staff

6   at regional GNETS programs?

7      A     Yes.

8      Q     In that summary, am I correct that it

9   says, "Compared to other therapeutic models, many of

10  the GNETS programs are operating below the expected

11  student clinical staff ratio for therapeutic

12  services"?

13     A     Yes.

14     Q     Moving down to the second paragraph below,

15  it says:  "Digging deeper, some of the expected

16  clinical services are being provided by

17  non-credentialed personnel trained by GNETS and/or

18  credentialed in another without formal training or

19  certification to deliver counseling services."

20     A     Yes.

21     Q     And then in the middle of the last

22  paragraph, it notes that "the major reason for using

23  non-credentialed and under qualified staff are that

24  it is most cost effective or it is all the program

25  can afford due to budget limitations"?



1        A    Yes.

2             MS. GARDNER:   I'd like to have the court

3        reporter mark this document as Plaintiff's

4        Exhibit 72.

5             (WHEREUPON, Plaintiff's Exhibit-72 was

6         marked for identification.)

7   BY MS. GARDNER:

8        Q    You've been handed Plaintiff's Exhibit 72.

9   This is an email from Nakeba Rahming to you dated

10  July 13, 2017.  The subject is "FY18 Therapeutic

11  Staff Assurance."

12            And this email has the Bates stamp

13  GA00198908.

14            This is an email that you received from

15  Ms. Rahming?

16       A    Yes.

17       Q    And in it she says to you:  "Please review

18  and let me know your thoughts.  We can work on edits

19  tomorrow."

20       A    Yes.

21       Q    Ms. Rahming attaches a document to this

22  email that -- at least the file name document

23  appearing on the email page is FY18 Therapeutic

24  Staff Assurances?

25       A    Yes.



1     Q    Correct?  Okay.

2          If you take a look at the attachment,

3  which is Bates-stamped GA00198909; when Ms. Rahming

4  says that you can work on edits tomorrow, she's

5  referring to edits to this attachment?

6     A    Yes.

7     Q    What was the purpose of this form?

8     A    The purpose of this form was to get

9  assurances from the fiscal agent that funds provided

10  through the GNETS grant would be used for the

11  purposes of providing and/or enhancing therapeutic

12  support services at GNETS.

13     Q    So this was a document that would be

14  signed if a GNETS, a regional GNETS program were

15  receiving funds for a service agreement with the

16  provider of clinical services to students?

17     A    Say that again.

18     Q    Yeah.  I'm just clarifying to make sure I

19  understand, this was a document that a regional

20  GNETS program would sign if they were receiving

21  funds for a service agreement basically with a

22  provider of clinical services to GNETS students?

23     A    No.  This is a form that the fiscal agent

24  would sign to assure the Georgia Department of

25  Education that those funds would be used to provide



1  or enhance educational and therapeutic supports at

2  the GNETS.

3      Q    Okay.  So this form would be signed by the

4  fiscal agent?

5      A    Correct.

6      Q    This form would also be signed by the

7  GNETS director?

8      A    Yes.

9      Q    And the form was in connection with funds

10 provided to ensure that -- this says temporary

11 therapeutic services.  Am I understanding that

12 right?

13     A    Yes, you are.

14     Q    If you look on the document, in the text

15 that appears in connection with No. 1 -- these are

16 the list of assurances that are being given in this

17 document, right?

18          There's an enumerated list of six of them?

19     A    Yes.

20     Q    And the first one says, "The fiscal agent

21 will enter no a temporary staffing service agreement

22 with a state approved therapeutic staffing service

23 provider for the current school year"?

24     A    Yes.

25     Q    So one of the assurances that was required



1  to be provided was that the fiscal agent entered

2  into a temporary staffing service agreement with a

3  therapeutic staffing service provider that was state

4  approved?

5       A    Yes.

6       Q    And when this says state approved, is that

7  approval by the Georgia Department of Education?

8       A    To my knowledge, no, I do not think the

9  Georgia Department of Education had a list of

10 approved therapeutic staffing services.

11      Q    Who decided whether a therapeutic staffing

12 service was state approved?

13      A    I don't know the answer to that.

14      Q    Moving down, another of the assurances was

15 that the GNETS director would provide data to the

16 Georgia Department of Education with, quote,

17 "caseloads, social-emotional progress monitoring

18 data, and fidelity of therapeutic sessions provided

19 by the contracted therapeutic professional."

20      A    No. 4, yes.

21      Q    No. 5?

22      A    Yes.

23      Q    Did you provide Ms. Rahming with any

24 feedback on this document?

25      A    I don't recall.



1          MS. GARDNER:  I'm going to hand the court

2      reporter what I would like to be marked as

3      Plaintiff's Exhibit 74.

4          (WHEREUPON, Plaintiff's Exhibit-74 was

5       marked for identification.)

6  BY MS. GARDNER:

7      Q    The court reporter has handed you

8  Plaintiff's Exhibit 74.  This is an email from

9  Nakeba Rahming to you dated August 22nd, 2017.  The

10  subject is "Please provide feedback."

11          The Bates-stamp on this document is

12  GA00198949.

13          This is an email that Ms. Rahming sent to

14  you?

15      A    Yes.

16      Q    Keeping with our discussion about clinical

17  staff and regional GNETS programs, the first sort of

18  set of text with hashmarks in front of them, if you

19  see that, says:  "The GADOE has identified gaps in

20  clinical staff (i.e., certified or licensed social

21  workers and psychologists) to provide intensive

22  individualized therapeutic to students served by

23  GNETS."

24          Do you see that?

25      A    Yes.



1    Q    And then just beneath that, it says:

2    "Based on this information, GaDOE has approved

3    therapeutic staffing agencies to contract with GNETS

4    fiscal agents to fill these identified gaps."

5         Do you see that?

6    A    Yes.

7    Q    We discussed earlier in the context of the

8    assurances that we looked at that there were

9    therapeutic staffing agencies that had to be

10   approved.  Do you recall that?

11   A    Yes.

12   Q    And am I correct in understanding from

13   this particular document that it says that GaDOE has

14   approved those therapeutic staffing agencies?

15   A    Yes.

16   Q    The bottom of this email, it notes two

17   options for fiscal agents to consider.

18        Do you see that?

19   A    Yes.

20   Q    The first one says, "The fiscal agent may

21   receive a reimbursement from GaDOE for provision of

22   clinical therapeutic related services only when

23   entering into an agreement with a GaDOE approved

24   provider."

25   A    Yes.



CLARA KEITH BROWN                                      June 07, 2022
UNITED STATES vs STATE OF GEORGIA                              155

1    Q    So again in the assurances that we looked

2  at, the reimbursement for therapeutic services only

3  applied in the event the physical agent entered into

4  an agreement with the provider that the Georgia

5  Department of Education had approved?

6    A    Correct.

7    Q    There's a second option here that says:

8  "The fiscal agent may determine how therapeutic

9  services such as skills-based interventions would be

10  provided by non-certified personnel as well as

11  clinical therapeutic related services for intensive

12  students by licensed/certified personnel without a

13  reimbursement from GaDOE."

14         What did you understand that option to

15  mean?

16    A    I, I don't -- I don't know other than if

17  the fiscal agent was going to use its local funding

18  to pay for the services.

19    Q    When you say local funding to pay for

20  service, so for -- you mentioned many of the fiscal

21  agents are RESAs.  You're saying a RESA's own

22  budget?

23    A    No, I'm not saying a RESA's own budget.

24  I'm saying the fiscal agent may have local funds

25  that they could use to provide these services.



1      Q      Did anyone else review or provide feedback

2   on the Strategic Plan & Self-assessment Guide?

3      A      I'm not certain.  She may have asked staff

4   in the Special Education Division to review it.  But

5   I don't know.  She may have asked GNETS as well, but

6   I can't specifically recall if that is a yes or a

7   no.

8      Q      Okay.  What did you understand the process

9   by which the content of this document was developed

10  to be?

11     A      I believe a group of GNETS directors were

12  a part of the development of the strategic plan.  I

13  know there were other key personnel in the Special

14  Education Department, specifically Debbie Gay.

15  There may have been other staff persons.

16            And I know that information from GNETS

17  program director -- GNETS directors, as well as

18  other information that Nakeba may have known, would

19  have got into the content of this strategic plan.

20     Q      Did Ms. Rahming ultimately make the call

21  on sort of what finally would be included in this

22  Strategic Plan & Self-Assessment Guide?

23     A      I think it was a collaborative decision

24  between -- I was a part of the decision-making.

25  Debbie Gay would have been part of the



1  decision-making, Nakeba, and if I'm not mistaken, I

2  think the Strategic Planning Committee of the GNETS

3  group would have been a part of the final

4  decision-making as well.

5          So it would have been a collaborative

6  decision.

7      Q    So I want to walk through this draft of

8  the Strategic Plan & Self-assessment Guide.

9          This is -- or is this a version of

10  strategic plan that Mr. Winter referred to as a

11  coaching tool in the email that we previously looked

12  at?

13      A    Yes.

14      Q    And am I correct in understanding that the

15  Strategic Plan & Self-assessment Guide is broken up

16  into sort of six primary sections?

17      A    This draft has seven sections.

18      Q    Does it have seven sections?

19      A    Yes.

20      Q    Oh.  The last one is facilities.  Okay.

21          So there are seven primary sections that

22  the Strategic Plan & Self-Assessment Guide is broken

23  up into?

24      A    Yes.

25      Q    At least this draft?



```
 1         A    Correct.
 2         Q    And then within each of the sections of
 3  the Strategic Plan & Self-Assessment Guide there is
 4  an identified goal related to that section; is that
 5  right?
 6         A    Correct.
 7         Q    And then beneath the goal there are
 8  enumerated action items related to that goal?
 9         A    Correct.
10         Q    And then this strategic plan identifies
11  the frequency with which those action items should
12  be done?
13         A    Correct.
14         Q    It also identifies the person responsible
15  for those action items?
16         A    Correct.
17         Q    It contains a column that's titled,
18  "Activities."  What is that for?
19         A    It is a list of the activities expected to
20  happen as a result of the action items.
21         Q    Okay.  And what about Measure/
22  Documentation?  What is that?
23         A    It is the documentation that would need to
24  be provided to document that the activities action
25  items goals, goals were met.
```



 1      Q    And when you say would need to be

 2   provided, provided to who?

 3      A    If -- actually, the GNETS would have

 4   needed to make sure that they maintained that

 5   documentation and provide it to Nakeba if she

 6   requested that information.

 7      Q    The strategic plan also identifies the

 8   resources that are needed for the enumerated action

 9   items?

10      A    Yes.

11      Q    And then on the far right there is a

12   section that's titled "Rating Scale," right?

13      A    Correct.

14      Q    And is this a rating as to whether the

15   action item has been met?

16      A    Yes.

17      Q    For each item that's rated, there are

18   three potential ratings offered in the strategic

19   plan?  Is that correct?

20      A    Yes.

21      Q    And what are those ratings?

22      A    Not evident, emerging, and operational.

23      Q    And am I correct that the legend that

24   tells you what evident, emerging and operational

25   means appears on the very first page of the



1  Strategic Plan & Self-assessment Guide?

2       A    You are correct.

3       Q    How would programs be rated in the areas

4  identified by this Strategic Plan & Self-assessment

5  Guide?

6       A    How would programs --

7       Q    How would regional GNETS programs be rated

8  in the areas identified by this Strategic Plan &

9  Self-Assessment Guide?

10      A    I'm not sure I understand your question.

11      Q    So we just went through the way that the

12  Strategic Plan & Self-Assessment Guide is

13  structured, and you told me that there is a rating

14  scale for every action item that is included in the

15  strategic plan, right?

16      A    Correct.

17      Q    Am I correct in understanding that this

18  rating was a rating of a regional GNETS programs

19  implementation of action items?

20      A    It is a rating of -- it's a

21  self-assessment rating of each GNETS, and they would

22  rate the scale according to the evidence that they

23  were able to provide.

24      Q    So the ratings that appear in the

25  Strategic Plan & Self-Assessment Guide are



1  self-assessments by the regional GNETS programs of

2  themselves?

3      A    It is a -- it is a self-assessment guide.

4      Q    Okay.  Were the ratings that regional

5  GNETS programs assigned to themselves initially the

6  final ratings?

7      A    It is my understanding that Nakeba would

8  have reviewed the ratings -- self-assessment guide

9  for each GNETS, and then would have looked for the

10  evidence that supported that rating at the GNETS,

11  and they would have had a discussion about the

12  rating and they would have come to an agreement on

13  the accuracy of the rating.

14     Q    So regional GNETS programs would begin by

15  rating themselves on the self-assessment?  That's

16  the first step?

17     A    Correct.

18     Q    And then Ms. Rahming would review the

19  ratings using a self-assessment guide to look for

20  evidence supporting those ratings for each regional

21  GNETS programs?  That was kind of a second step?

22     A    Correct.  Under the resources that were

23  needed to show the justification for the rating.

24     Q    Okay.  And when Ms. Rahming did that, did

25  she look for the evidence supporting the rating



1   while on-site with regional GNETS programs?

2       A    Yes.

3       Q    And then you said while she was on-site

4   that she would have had discussions with the

5   regional GNETS programs about their ratings in light

6   of the evidence that she reviewed related to those

7   ratings?

8       A    I cannot say for certain that it was

9   on-site with every -- I'm sorry -- GNETS director

10  because it could have been at a GNETS meeting, and

11  the GNETS director brought their evidence with them.

12           So there could have been a number of ways

13  that she would have reviewed the data supporting the

14  justification for the rating that a GNETS would have

15  assigned their GNETS.

16      Q    Okay.  But whether her review occurred

17  on-site or elsewhere, she would have reviewed the

18  regional GNETS program's initial self-assessment

19  rating to look for evidence supporting that rating,

20  and then had a discussion with the regional GNETS

21  program about that?

22      A    Correct.

23      Q    Were the ratings for each regional GNETS

24  program, the sort of final ratings for each regional

25  GNETS program, maintained somewhere?



1    Q    There are four facilities listed on that

2  attachment?

3         Are there four facilities listed on that

4  attachment?

5    A    Yes.

6    Q    And that attachment, just for the record,

7  appears the placeholder with the Bates-stamp

8  GA00196898.

9         MS. HERNANDEZ:  Is that the page I'm

10       missing?  I just want to make sure.

11         MS. GARDNER:  Yeah.  This will be

12       Plaintiff's Exhibit 90.

13         (WHEREUPON, Plaintiff's Exhibit-90 was

14        marked for identification.)

15  BY MS. GARDNER:

16    Q    You are being handed what's marked as

17  Plaintiff's Exhibit 90.  This is an email from

18  Nakeba Rahming to you.  The subject is "try it."

19         The email was sent on July 11, 2016, and

20  is Bates-stamped GA00197241.

21         This is an email that Ms. Rahming sent to

22  you attaching a document titled, "GNETS Exit

23  Strategy Plan - for Priority sites."

24         Is that correct?

25    A    Yes.



1      Q     And if you turn to the page beginning with

2  Bates Stamp GA00197242, is this that attached

3  document that's a GNETS exit strategy plan?

4      A     Yes.

5      Q     If you look on the first page of that

6  strategy plan, the third bulleted point down, in the

7  second sentence in that paragraph, it says:  "Nine

8  sites that were identified by GaDOE's initial

9  assessment were prioritized for validation and a

10  more in-depth condition assessment by the

11  contractor."

12          Do you see that?

13      A     Yes.

14      Q     And then if you turn to Page 2, the third

15  bullet point down, "What will be the message and how

16  will it be delivered?"

17          Am I correct this bullet point references

18  a final assessment of priority sites that yielded

19  nine priority sites that GaDOE has concluded can no

20  longer provide instructional and therapeutic

21  services in the current sites?

22      A     Yes.

23      Q     So is it fair to say that after the

24  facilities reviews of GNETS facilities were

25  conducted, that there were nine sites where the



1  Georgia Department of Education concluded that those

2  sites could not continue serving GNETS students?

3          MS. HERNANDEZ:  Objection.

4      A    Yes.

5      Q    And to be clear, when I say cannot

6  continue serving GNETS students, could not continue

7  serving GNETS students in the facilities that they

8  -- in those nine facilities?

9      A    The final assessment of priority sites

10  yielded nine propriety sites that GaDOE has

11  concluded can no longer provide instructional and

12  therapeutic sites in the current site.

13     Q    And immediately beneath that, it says:

14  "Therefore, GaDOE will issue a mandatory exit plan

15  for all students referring services in any of the

16  nine priority sites."  Right?

17     A    Yes.

18     Q    And what did that mean, that the Georgia

19  Department of Education would issue a mandatory exit

20  plan for all students receiving services in any of

21  those nine sites?

22     A    It meant that the GaDOE would issue a --

23  that the GNETS site create an exit strategy and

24  submit that exit strategy.

25     Q    So basically the Georgia Department of



1  Education was requiring that students be moved out

2  of those nine facilities into some other facility?

3      A    They were requiring that that facility --

4  those nine facilities could no longer provide

5  services at those facilities.

6      Q    Right.  And so would that necessitate

7  moving students from those facilities to somewhere

8  -- to somewhere else?

9          MS. HERNANDEZ:  Objection.

10     A    If there were students there, it would

11 mean that the exit strategy would have to have a

12 component where a discussion about the students' IEP

13 and where services for that student would be

14 provided.

15     Q    And this document was the strategy for

16 supporting -- and on the first page it says:

17 "Supporting schools, LEAs and GNETS when the

18 leadership team at GaDOE determines that the

19 facility should no longer be considered a site to

20 support the instructional and therapeutic needs of

21 students."  That's what this document was?

22     A    Yes.

23          MS. GARDNER:  Can we take a break, short

24     one.

25          THE VIDEOGRAPHER:  Off the record at 5:27



CLARA KEITH BROWN                                    June 07, 2022
UNITED STATES vs STATE OF GEORGIA                            230

```
 1      p.m.
 2            (A recess was taken.)
 3            THE VIDEOGRAPHER:  We're back on the
 4      record at 5:40 p.m.
 5  BY MS. GARDNER:
 6      Q    Ms. Keith Brown, we have been talking
 7  about the GNETS facility review process.
 8            MS. GARDNER:  And I would like to have the
 9      court reporter mark this document as
10      Plaintiff's Exhibit 91.
11            (WHEREUPON, Plaintiff's Exhibit-91 was
12       marked for identification.)
13  BY MS. GARDNER:
14      Q    The court reporter has handed you
15  Plaintiff's Exhibit 91.  This is an email from
16  Stacey Suber-Drake to Nakeba Rahming and you, sent
17  on July 25th, 2016.
18            The subject line is "Forward:  Scanned
19  from a Xerox Multifunction Printer."
20            The Bates-stamp on the cover of this email
21  is GA01486054.
22            You received this email from Stacey
23  Suber-Drake?
24      A    Yes.
25      Q    And this email contains an attachment that
```



 1 │ does is a PDF titled "Burwell Program."

 2 │         Do you see that?

 3 │    A    Yes.

 4 │    Q    What is the document that's attached to

 5 │ this email?

 6 │    A    I don't understand your question.

 7 │    Q    What is the document that Stacey

 8 │ Suber-Drake was forwarding to you in this email?

 9 │    A    It is a document on Georgia State Board of

10 │ Education letterhead, sent to Dr. Pope.

11 │    Q    And Dr. Pope is the chair of the

12 │ Carrollton Board of Education?

13 │    A    Correct.

14 │    Q    This letter is sent by Michael P. Royal,

15 │ who is the chairman of the State Board of Education?

16 │    A    Yes.

17 │    Q    And in this letter Mr. Royal says, in the

18 │ first paragraph, about halfway down:  "423 Alabama

19 │ Street, Carrollton, GA 30117-3002, has been

20 │ identified as a facility where children cannot

21 │ continue to be served.  Therefore, students

22 │ referring services at this facility must immediately

23 │ be transitioned out of this site before the

24 │ beginning of the school year."

25 │         Is that an accurate reading?



1      A    Yes.

2      Q    So this is a letter from the State Board

3  of Education notifying the Carrollton Board of

4  Education they have one of the nine facilities that

5  we discussed that students were required to be moved

6  out of?

7      A    Yes.

8      Q    Did other letters like this go out

9  regarding the other nine facilities that GNETS

10  students were required to be moved out of?

11      A    I believe that is accurate.

12      Q    And was the language in those letters

13  substantially the same as the language appearing

14  here, with the exception of those parts that

15  reference the specific address of the facility,

16  addressee, that sort of thing?

17      A    I would assume the language would be the

18  same, yes.

19          MS. GARDNER:  I'm going to ask this be

20      marked as Plaintiff's Exhibit 92.

21          (WHEREUPON, Exhibit-92 was marked for

22       identification.)

23  BY MS. GARDNER:

24      Q    The court reporter has handed you what is

25  marked as Plaintiff's Exhibit 92.

