EXHIBIT BB

# In the Matter Of:

## UNITED STATES vs STATE OF GEORGIA

NO. 1:16-cv-03088-ELR

---

# MICHAEL D. ROWLAND

*June 09, 2022*

---



800.211.DEPO (3376)
EsquireSolutions.com

1          All right.  Get to the substance.

2          Are you familiar with the GNETS strategic

3   plan?

4     A    I'm not familiar with it, no.  I know it

5   exists, but I haven't looked at it, never -- I

6   didn't have a role to play in creating it.

7     Q    Does the Department of Education have a

8   role to play in it?

9     A    Again, I just -- I don't have any specific

10  knowledge of -- other than the fact that I know that

11  was, as I was transitioning out of my role as a

12  director into a field position and then ultimately

13  retiring, I know that was something that was being

14  worked on, but -- and I had heard reference to it,

15  but I didn't have any direct involvement in, in it.

16    Q    Okay.  Then are you familiar with the

17  Facilities Conditions Assessment Project?

18    A    Yes.

19    Q    Could you describe to me generally what

20  that entailed?

21    A    Okay.  So I was the director when the

22  Governor's Office put the $14 million into the

23  budget for, for GNETS facilities.  And it was --

24  when the budget was passed, my boss, who was the CFO

25  at the time, came down and said, okay, I don't know



1  where this money came from or what we're supposed to

2  do with it but you got to figure it out.

3         Okay.  And, look, it's okay.  I mean

4  that's -- so one of the things -- and this was, this

5  was me.

6         We do -- before we give out money to

7  school systems, we require them to create a needs --

8  to hire an architect and do a needs assessment.

9  Well, I don't care whether they hire them or not.

10  The architect will do it for free but you got to

11  have an architect to do a needs assessment for the

12  things that are going in your plan.

13         We had -- and these numbers might not be

14  exactly right, but they are from my memory.  There

15  were 46 different locations, based on a list I was

16  given from the program staff, that said, here's

17  where all these kids are located.  These are

18  addresses.

19         And some of them are at schools that in a

20  Local Facility Plan, some of them are at -- well,

21  let me -- again, in my world it's easy to use school

22  and facilities interchangeably, but they are really

23  different.  Some of these students were at

24  facilities, in the facility plan.  Some of these

25  students might have been in facilities that were not



1  in a facility plan, and some were in phased-out

2  facilities, and some were in -- so, so, it just

3  occurred to me the first thing we needed was a needs

4  assessment.

5         So I asked for permission to use a portion

6  of that 14 million to engage an architectural firm

7  that would conduct these needs assessments.  And I

8  got that permission.  I went through the selection

9  process, and we hired a firm.

10        And in that summer -- you'd have to tell

11 me the year.  If you tell me the year, I'd say

12 you're right because I don't remember the years.

13 But in the summer of that year the firm that we

14 hired did what we would call a non-destructive site

15 evaluation of each facility, each one of those

16 facilities that was on the list, provided to us by

17 the program staff.

18        They had two or three teams; divided the

19 State up into quandrants.  You know, one team went

20 here, one team went there.  And that function went

21 on all summer.

22        As a kick-off to that, we made a -- we

23 made the decision to -- myself and -- I know I was

24 involved.  Some of the program staff at GNETS was

25 involved in this.  And then representatives from --



1  the team from the architectural firm that we hired,

2  they put together a -- they were going to do --

3  again, if I remember correctly, they were going to

4  do these site visits in about -- in clusters, based

5  on where they were located, just for efficiency.

6          And so we created kind of a test case of

7  three or four sites that we would go look at

8  together.  They would do their work.  We would be

9  there watching it, looking at it, giving feedback,

10  say look at this, don't -- make sure you look at

11  that.  They would say we can't look at this but we

12  can look at that.

13          And that became sort of a baseline from

14  what the teams would do moving forward, to visit the

15  remaining sites, and that function went on during

16  the summer.

17          And in some time in the mid to late July

18  time frame, I think we got a draft report from, from

19  the architect.

20      Q    Thank you very much for that overview.

21          I want to back up to a few things you

22  said.

23          You said you received a list of 46

24  locations from program staff.  Could you tell me who

25  program staff are?



1        the hard copy document that was actually marked

2        included the printed attachments.

3            So if you all have your copies that you

4        received when we first marked it, it also has

5        the copies of as attachments.

6            (Discussion ensued off the record.)

7            MS. TAYLOE:  I am going to give the court

8        reporter a document produced from the State

9        labeled GA00279624 and ask that be introduced

10        as Plaintiff's Exhibit 118.

11            (WHEREUPON, Plaintiff's Exhibit-118 was

12        marked for identification.)

13   BY MS. TAYLOE:

14        Q    Are you familiar with this document?

15        A    Yes.

16        Q    This is an email from you to Ted Beck,

17   dated May 31st, 2016.

18            In the second paragraph you indicate that

19   you and Nakeba accompanied two teams from -- that

20   was 2WR, the architectural firm?

21        A    Yes.

22        Q    So were these the pilot visits you talked

23   about before?

24        A    Yes.

25        Q    Where it says:  "The purpose of the trips



1  was to work through expectations and get a baseline

2  of GaDOE's expectations."

3          Can you tell me what those expectations

4  were?

5      A    I don't think we knew until we went on the

6  visit, honestly.  But what I remember about the

7  exercise was that 2WR would go and conduct the visit

8  per some standards that were, that were available

9  for facility condition assessments based on

10 architect's stuff, and that what we were really

11 doing was just witnessing what they were doing to,

12 to understand -- to agree they were on the right

13 track.

14         I don't have any memory of saying don't do

15 this or do that, although that very well could have

16 happened.  It was more of a -- they wanted us, you

17 come watch what we're doing.  If you see anything

18 that you think we shouldn't be doing or should be

19 doing, you know, just give us the feedback.

20         That's my memory.

21     Q    And where you said, "I think we will glean

22 the kind of information that will inform our

23 decisions moving forward," what was that in

24 reference to?

25     A    I have no idea.  I don't know.  I think



1  it's exactly what I -- I don't know what decisions

2  there were to be made moving forward, but if there

3  were decisions to be made moving forward, this

4  facilities condition assessment was necessary to

5  inform those decisions.

6          Now, obviously, we know one of those

7  decisions was to inform future applicants for the

8  grant but short of -- I mean that was the purpose of

9  the exercise, was to create a basis for these

10 centers, or programs, whichever it turned out to be,

11 to be able to make an application.

12     Q   So one of the purposes would have been to

13 be able to notify the facility superintendent or

14 owner of the kinds of deficiencies they might be

15 eligible to request grants to repair?

16     A   Yes.

17     Q   Thank you.  And they might -- they might

18 have been used for something else, but that may or

19 may not have been known at the time?

20     A   Yes.

21         MS. TAYLOE:  I'm going to give the court

22     reporter a document produced by the State

23     GA00197246 and ask it be identified as

24     Plaintiff's Exhibit 119.

25         (WHEREUPON, Plaintiff's Exhibit-119 was



1          marked for identification.)

2    BY MS. TAYLOE:

3          Q    Are you familiar with this document?

4               (Witness reviews exhibit.)

5          A    Yes.

6          Q    Okay.  Who is Sarah Morris?

7          A    Sarah worked, and still does, in the

8    Facilities Department.

9               I don't -- at the time -- she was with us

10   and she left and she came back.  So what I'm

11   stumbling over is I'm not really sure what role she

12   was in at the time, but I do know that -- I think by

13   this point, you know, I was giving this information

14   back to Pat Schofill, who was our director, and

15   Sarah had some role to play on the funding side.

16              She was our grants administrator in the

17   early -- at some point, and she left the department

18   and we hired her back as a grants administrator.  So

19   she may have had -- her role may have been in the

20   process of getting the money out to school districts

21   when -- or the entities that manage the GNETS

22   programs that were doing the work when the time

23   came.

24         Q    Okay.  And she said she's attaching the

25   list, GNETS list, ranked by the GaDOE Facilities



1  team.

2      A    Yes.

3      Q    Is that -- which set of consultants is

4  that?  Or who is the GaDOE Facilities team?

5      A    That's the field consultants that I

6  referenced earlier.

7      Q    Okay.  And the scale she's referencing

8  there is the same one to five scale we talked about

9  before, where one is critical and five is new or

10 like new?

11     A    Correct.

12     Q    Then she talked about a formula for

13 obtaining a ranking.  Can you tell me what that is

14 in reference to?

15     A    Not by memory, no.  I mean I -- so much

16 this -- you know, I want to be clear.  Nothing would

17 make me happier than to tell you everything you're

18 asking me with perfect fidelity.  There was so much

19 -- and so much of this now I'm begin -- I see -- we

20 were doing kind of make up -- just do it as you

21 figure out and try to do the best thing.

22          And so I am confident we used some formula

23 to get to that ranking.  Whether it was an averaging

24 or a formula on a spreadsheet or -- but if you

25 showed it to me, I'd say I remember that.  But



1  without that, I just -- I don't remember what that

2  formula looked like.

3        Q     Okay.  I think I can -- I think I can find

4  one to address that.

5              MS. TAYLOE:  I'm going to ask Ms. Lill to

6        screen share the attached facilities report,

7        which is GA00197248.

8              Do we need to mark that as an exhibit?

9  BY MS. TAYLOE:

10       Q     Mr. Rowland, you have been granted control

11 of that.  So if you want to scroll up and down on

12 that, you can.

13             Have you seen this document before?

14       A     Yes.

15       Q     Can you describe it, please?

16       A     So the heading of the document is "GNETS

17 Facilities Not Active In Local Facility Plans."

18             So I mean this appears to me to be a list

19 of the GNETS programs that we couldn't find evidence

20 were housed in facilities that were in local

21 facility plans.

22             The cells highlighted in red, based on my

23 memory, was those locations that had a facility

24 condition assessment score of .4 or lower -- well,

25 lower than .4.  Because .4 is not in red.



1    Q    And what would be the consequence of

2   having a facility score of lower than .4?

3    A    Well, so I do -- let me say this about the

4   score.  Given the decimal that I'm seeing -- I think

5   this is the score that came out of the facility

6   condition assessments done by 2WR.

7          So, again, my memory is part of what we

8   have asked them to do in this process was to see if

9   they could boil this down to a facility condition

10  assessment ratio where the closer that ratio got to

11  zero, the more deficient, let's say, the building,

12  the facility would be, and the clearer it got to

13  one, the better it was.

14          And so based on this, my memory is this

15  was a spreadsheet we created -- not the list of

16  spaces but the score coming from their condition

17  report.

18          And, again, at this point in the process,

19  I don't think I knew the answer to what does -- what

20  happens to a facility that has a condition

21  assessment lower than .4, other than to say these

22  aren't very good.  And then that, that begets the

23  question, all right, what happens next.

24          I think that's where we were in the

25  process at that point.



1      Q    And you said before you believed that some
2  facilities were encouraged to consider options based
3  on those scores, consider remedial actions based on
4  the scores?
5      A    Yes.
6      Q    Okay.  But is it not your understanding,
7  looking at this document, that these ones marked in
8  red were the ones that were closed by the State?
9      A    Well --
10          MR. PICO PRATS:  And objection for -- I
11      think it's misrepresenting what he said in
12      connection to the State closing.
13  BY MS. TAYLOE:
14      Q    Did you understand these facilities closed
15  after the results were shared with them?
16      A    I'm looking at the list to see, and it --
17  again, I wish I could tell you I remember what every
18  action was, but what I know is we shared this
19  information with the Board, State Board.
20          A letter went out to these facilities from
21  the State Board chairman, and it is my belief, my
22  memory, that in most cases, if not all, that these
23  programs made different arrangements for these kids.
24          There's a, there's a meaning to the word
25  "closed" that I'm not comfortable with, if that



1   helps you understand my -- and I don't mean to be

2   vague.  I just, you know -- the purpose of the

3   exercise to me was to say, you know, guys, look,

4   we've been through this process, nobody's out to

5   hurt anybody.  We're trying to do things, what's

6   best for kids, and this has been -- this is the

7   situation.

8           And it is true that not many

9   superintendents liked to get phone calls from the

10  Department or letters from the State Board chair,

11  but -- so I know they wanted to try to do better,

12  and I think in most, if not all, of these cases they

13  did.

14      Q    So maybe am I using the word "closed" has

15  been confusing because it has different connotations

16  and facilities than I was thinking of it.

17          Would you say after -- would you say these

18  nine facilities relocated their students after --

19  the ones that were marked in red relocated their

20  students after getting those reports?

21      A    Yes, I think that's fair to say.

22          MS. TAYLOE:  I would like to refer to what

23      was previously introduced as Plaintiff's

24      Exhibit No. 91.

25          I'm afraid I don't have a copy for you,



 1        because...

 2              (WHEREUPON, Plaintiff's Exhibit-91 was

 3         previously marked for identification.)

 4              MS. TAYLOE:  It's GA01486054.

 5              (Witness reviews exhibit.)

 6   BY MS. TAYLOE:

 7        Q    Have you had a chance to familiarize

 8   yourself with this document?

 9        A    Yes.

10        Q    Okay.  This is an email from Stacey

11   Suber-Drake to Nakeba Rahming and Clara Keith, dated

12   July 25th, 2016.  And it attaches a letter from the

13   Georgia State Board of Education signed by Michael

14   Royal, chairman of the State Board of Education.

15              Is that correct?

16        A    That's correct.

17        Q    Do you see at the end of the first

18   paragraph, where it says:  "Therefore, students

19   receiving services at this facility must immediately

20   be transitioned out of the site before beginning --

21   "before the beginning of the school year."

22        A    Yes.

23        Q    Is that consistent with your understanding

24   of the steps that were taken after the facilities

25   conditions assessment was completed?



1    A    Yes.

2    Q    It says:  "We're directing staff to assist

3  you and provide guidance throughout this process so

4  it may provide the best educational opportunities

5  for all students in a safe and positive

6  environment."

7         You see where it says that?

8    A    Yes.

9    Q    Were -- which staff was directed to assist

10 and provide guidance to the -- the people these

11 letters were directed to?

12   A    The facility services staff.  Myself and

13 potentially field consultants that served those --

14 that area.

15   Q    And would you say, was that assistance in

16 the form of the GNETS grant or in terms of

17 relocating, or both, or something else?

18   A    At this time, in relation to the letter,

19 it was with relocating.

20         What we required of the GNETS programs was

21 when you find a suitable location, when you find a

22 location that you propose as suitable, you contact

23 me and I go look at it, and I say yes or no.

24   Q    And did you also help them find facilities

25 that had available instructional units that they



1  BY MS. TAYLOE:

2      Q    Are you okay going a few more?

3      A    Absolutely.

4      Q    I want to talk a little bit about the

5  facilities remediation plan next that came after the

6  facilities condition assessment.  Is that correct?

7      A    Yes.

8      Q    Can you tell me -- just give me an

9  overview what the facilities remediation plan was?

10     A    Yeah, I had really forgotten about that.

11          Again, what I remember was that -- and I

12 wish I could tell you that we started this process

13 knowing how it would -- this was, this was really

14 like building an airplane while you fly.

15          And so at some point as a team -- and

16 there was -- I don't want to mislead you I was

17 making these decisions in a vacuum.  I was obviously

18 working with either Pat Schofill, maybe our

19 facilities consultants, Clara, Nakeba, and Stacey

20 and all these people to think about.

21          So we have this report now that says -- it

22 kind of had layers.  Layer one -- the first, most

23 immediate thing was we found these facilities that

24 were -- that needed immediate -- that needed

25 immediate attention, needed to be attended to



1  immediately.  And that took place.

2          Then we had a report that said here's a

3  condition of the facilities that remain, and when we

4  release the application for funding, you should be

5  applying for needs that have been identified in the,

6  in the plan -- or in the facility condition

7  assessments.

8          Understand that in the facilities world,

9  $14 million is not a lot of money.  So intuitively

10 we knew it wasn't enough money to meet all the needs

11 that had been identified in the condition

12 assessments, but we took the position as a

13 department that that didn't absolve the programs

14 from developing plans to remediate those needs.

15         Again, very much in keeping with the K-12

16 focus on you have a Local Facility Plan.  You can't

17 get to everything in it in one year, we know that,

18 but that doesn't mean you shouldn't be -- you

19 shouldn't be planning to meet those needs.

20         So, so -- so part of the requirement was

21 now that we've done this work, you can't just say,

22 well, we want to apply for the money, so we're off

23 the hook.  No.  You have a report and it shows

24 deficiencies -- needs, not deficiencies.  It shows

25 needs.  We want to know how you're going to address



MICHAEL D. ROWLAND                                June 09, 2022
UNITED STATES vs STATE OF GEORGIA                           96

1  those needs.

2      Q    So would it be fair to say that the

3  options available to facilities after receiving the

4  facilities condition assessment report included

5  relocating the students or submitting a plan to make

6  corrections, addressing needs with or without state

7  grant funds?

8      A    Yes.

9      Q    And if the facility operators chose not to

10 continue to serve the students in that facility,

11 were they required to provide you with an exit

12 strategy?

13     A    Yes.

14     Q    And what would that exit strategy entail?

15     A    It would be different for every situation.

16 Again, I think what our -- it's really hard to

17 remember the thinking at the moment, but based on

18 the way I know myself, what I would -- what I think

19 we were looking for is, look, you give us -- one of

20 the things I want to make sure you understand.  This

21 is an awful lot of work, and at some point I thought

22 it was all my work to do.  By me, I mean the

23 Department.

24          So what I wanted to do is give this work

25 back to the people at the ground floor who ought to



 1 │ would be not?

 2 │     A    Yeah.  I mean -- they would -- you might

 3 │ remove an air filter cover, for example, and inspect

 4 │ the air filter to see if it had been changed.

 5 │         There was some ductwork probably that you

 6 │ could get to and see without necessarily having to

 7 │ go behind a wall or into a ceiling, depending on

 8 │ some of them may have been exposed.

 9 │         But other than knowing the --

10 │ theoretically, they could determine what year the

11 │ HVAC system had been installed.

12 │     Q    How about lead in the water?

13 │     A    No, no -- no.

14 │     Q    Or radon or any other kind of exposure

15 │ like that?

16 │     A    No.

17 │     Q    Okay.  Are those known to be -- with the

18 │ exception of ventilation, are the things I listed

19 │ known to be more common in older buildings?

20 │     A    Yes.

21 │         MS. TAYLOE:  I'm going to introduce a

22 │     document from the State GA00198597, and ask it

23 │     be marked as Plaintiff's Exhibit No. 123.

24 │         I'm sorry, that one has been already been

25 │     marked as Plaintiff's Exhibit 88.  I'm sorry.



1              (WHEREUPON, Plaintiff's Exhibit-88 was

2         previously marked for identification.

3              MS. TAYLOE:  I apologize.

4              (Witness reviews exhibit.)

5    A    Okay.

6    Q    This is an email from you dated March

7    30th, 2017 to a number of email recipients.

8              Can you identify the recipients by

9    category?

10   A    Obviously, it went to -- I think what I'm

11   looking at is GNETS directors and superintendents.

12   Q    And can you -- it says you're asking for a

13   letter of assurance for the facilities grant

14   application process.

15             Can you describe the role of the letter of

16   assurance?

17   A    Again, if you, if you put one in front of

18   me, I can certainly remember what it looked like,

19   but I think the intent was instead of creating this

20   methodology where the State would say here's what

21   you have to do, and we're going to come by and

22   visually inspect it, there was a methodology of

23   creating a list of things that these people, as the

24   fiscal agent and head of the school system, people

25   with authority, would have to attest to that you had



1  done these things.

2           And I do not remember what was on the

3  list.  And if I saw it, I might have a different

4  opinion about what its intent was but that's

5  typically what you use a letter of assurance for.

6  Instead of me saying you did it, I want you to say

7  you did it.

8      Q    Okay.  I think this is a different one,

9  because this is in advance of the --

10     A    Was this the one saying they intended to

11 apply or not apply?

12     Q    Yes.

13     A    Okay.  Well, again, if you show it to me,

14 I might have a different answer.  But I think --

15 there were two things -- so that sets up two

16 thoughts in my mind:  One was we were trying to find

17 out who's going to apply and who's not.  And perhaps

18 that's what this -- that's this letter was about.

19          But I think later on, and as part of the

20 application, there was a letter of assurance, too.

21 Although I might be misremembering that.

22     Q    All right.  I'm going to -- I don't have

23 copies but we can -- it will help you to see the

24 document?

25     A    Yeah.



```
 1      Q    So you have it attached to your.

 2      A    Okay.  I got it.

 3      Q    00198599.

 4           MS. TAYLOE:  If you can pull it up so

 5      counsel can see it.

 6      A    Yeah.  So I think this is -- this is

 7  pretty much what I remembered.

 8           I mean the letter of assurance had, had --

 9  the first thing it wanted to know was, you know, if

10  you return this, you're telling us you intend to

11  make an application for these funds, and if you

12  intend to make an application to these funds, you

13  attest to these eight things.

14           That you need to either understand, will

15  do, comply.  This is where, you know, you understand

16  that it's a competitive award, so you could, you

17  could not get anything.  You understand you have to

18  comply with all the State and federal laws and State

19  Board rules and guidelines that go along with it.

20           The grant is a reimbursement grant.  So

21  everybody knew that up front.  If you don't think

22  you have the money up front to pull off the project,

23  don't apply.

24           You agree -- one of the issues we ran into

25  is, okay, if we give you this money and you
```



1 refurbish this facility, what's the requirement for

2 how long you're going to stay in it.  So that period

3 was established, that 10 years.

4            And these other things that are listed

5 there.

6     Q    The 10-year one was the one I wanted to

7 ask you about.

8     A    Okay.

9     Q    Because I understand like fiscally it

10 makes sense you wouldn't want to invest a lot of

11 money and then have the building abandoned the next

12 year.  I understand that's the intent behind it.

13           Were you aware of any concerns by

14 superintendents or programs that they couldn't be

15 sure they would be in there for 10 more years, or

16 that it restricted their flexibility in any way?

17     A    Well, what we tried to do was, was cover

18 that in that sixth point by saying in the event it

19 becomes necessary to move a GNETS program from the

20 facility from which the grant was expended, you just

21 have to get prior approval from the Department.

22           I don't think -- I mean certainly

23 everybody understood that, that -- you know, there's

24 a lot of uncertainty in education when it comes to

25 facilities, particularly as programs evolve.



1          So I think we tried to leave -- I wouldn't

2   really call it an out, but at least leave the

3   applicant with the understanding that, look, if you

4   in good faith take the money, if you in good faith

5   do the work, if you in good faith plan to stay there

6   for 10 years, and three years in something happens

7   that requires -- you think necessitates a move, just

8   get with us and let's work through it.  We'll work

9   through it somehow.

10       Q    Did you have any ideas or discussions

11  about what would account for viability?  Or

12  viability is a different letter.  I'm sorry.

13          Becomes necessary, what would qualify as

14  necessary to move a GNETS program?

15       A    I'm sure we did.  I don't remember what

16  those specific conversations were, but I can tell

17  you in my own mind, from my own experience, but...

18       Q    What would you think those would be?

19       A    Well, I mean most --

20          MR. PICO PRATS:  Objection, as far as it

21       causes him to speculate about it.

22          MS. TAYLOE:  He just said he could say

23       from his own experience.

24          MR. PICO PRATS:  You can answer.

25       A    Well, I mean if GNETS operates the way



MICHAEL D. ROWLAND                                    June 09, 2022
UNITED STATES vs STATE OF GEORGIA                              145

1  going into these facilities wasn't with an eye for

2  do the spaces meet program needs, because I didn't

3  really understand the nature of the program needs

4  relative to the technical experience -- I mean

5  technical requirements, delivered instruction to

6  those kids.

7        Q    What were your main take-aways from the

8  facility conditions assessments when they were

9  completed about the conditions at GNETS facilities?

10       A    It was very similar to what we find

11 statewide.  There were some school districts and

12 some entities that were providing quality facilities

13 for those students, and there were some school

14 districts and facilities that were not, and

15 everything in between.

16       Q    Were there any kind of things that were

17 more commonly issues at GNETS facilities?

18       A    I think in general the idea that -- I

19 don't know how -- it's dangerous to quantify because

20 many sounds like a lot, and I don't know what the

21 numbers are.

22            But what I do know is that, that in some

23 cases students were housed in facilities that had

24 been phased out of facility plans for a long time,

25 and where it appeared school districts just hadn't



1  put the kind of resources into those facilities that

2  they might.

3       Q    And -- let me back up little bit.

4            Did you agree with the recommendation to

5  close --

6            MS. TAYLOE:   I'm sorry.

7       Q    Did you agree with the recommendation to

8  relocate the students from the nine facilities in

9  the summer of 2016?

10      A    Yes.

11      Q    Did you think there were other facilities

12  that it might also have been beneficial to relocate

13  students from?

14      A    I don't remember one particularly, for

15  example, that I felt like we missed, especially

16  given the fact that we were offering a grant for

17  facility improvement.

18           So there's not one that stands out, I

19  think is what I'm trying to say, other than the nine

20  that were identified in that report.

21      Q    Do you remember one of your field

22  consultants saying that they were haunted by the

23  gross inadequacies -- inadequacies that they saw?

24      A    If you say they said it, they said it.

25           I don't remember that specifically, but if



1  that we discussed earlier?

2        A    Yes.

3        Q    So you sent this to Emily and Clara

4  attaching the RFQ; is that correct?

5        A    That is correct.

6             MS. TAYLOE:  Then I would like to look at

7        the next -- the attachment ending 6913.

8             So that would be GA00196913, and identify

9        that as Exhibit 129, please.

10            We'll mark it as a separate one.

11            (WHEREUPON, Plaintiff's Exhibit-129 was

12         marked for identification.)

13            MS. TAYLOE:  It's marked as an attachment

14       but it's not in one document.

15            (Witness reviews exhibit.)

16       A    Okay.

17       Q    Do you see on -- do you see on Page 2, in

18  Item No. 1, where it says, "The Georgia Department

19  of Education, and local school districts, operate 48

20  GNETS locations throughout the state of Georgia"?

21       A    Yes.

22       Q    And that they "are in need of various

23  repairs and upgrades to meet the needs of students

24  in the GNETS program."

25       A    Yes.



1       Q    Okay.  So that was -- that reflects the

2  entity with which the contractor, the architects

3  entered into the contract?

4            The owner being GSFIC working on behalf of

5  Georgia Department of Education?

6       A    That's correct.

7            MS. TAYLOE:  Now I'd like to ask for

8       document 04089630 to be marked as Exhibit 130.

9            (WHEREUPON, Defendant's Exhibit-130 was

10        marked for identification.)

11           (Witness reviews exhibit.)

12      A    Okay.

13      Q    This is an email from you to Pat Schofill,

14  dated January 8th -- wait a minute.

15           MS. TAYLOE:  I'm sorry, that was the wrong

16      document.

17           We're going to be looking at GA04089636.

18           (Witness reviews exhibit.)

19           MS. TAYLOE:  Can we go off the record for

20      a second.

21           THE VIDEOGRAPHER:  Off the record at 3:24

22      p.m.

23           (Discussion ensued off the record.)

24           THE VIDEOGRAPHER:  Back on the record at

25      3:24 p.m.

