# EXHIBIT 30



**Georgia Department of Behavioral Health & Developmental Disabilities**

# PROVIDER MANUAL

## FOR

# COMMUNITY BEHAVIORAL HEALTH PROVIDERS

## FOR

## THE DEPARTMENT OF BEHAVIORAL HEALTH & DEVELOPMENTAL DISABILITIES

### FISCAL YEAR 2023

#### QUARTER 3

**Effective Dates: January 1, 2023 through March 31, 2023**

(*Posted: December 1, 2022*)

This FY 2023 Provider Manual is designed as an addendum to your contract/agreement with DBHDD to provide structure for supporting and serving individuals residing in the state of Georgia. DBHDD publishes its expectations, requirements, and standards for community Behavioral Health providers via policies and the Community Behavioral Health Provider Manual. The Community Behavioral Health Provider Manual is updated quarterly throughout each state fiscal year and is posted one month prior to the effective date. Community Behavioral Health Provider Manuals from previous fiscal years and quarters are archived on DBHDD's website at: http://dbhdd.georgia.gov/provider-manuals-archive.

# DEPARTMENT OF BEHAVIORAL HEALTH & DEVELOPMENTAL DISABILITIES

## FY 2023 COMMUNITY BEHAVIORAL HEALTH PROVIDER MANUAL

# TABLE OF CONTENTS

*When accessing this manual electronically, use your mouse to left click on the part or section you would like to access, and you will be quickly linked to the corresponding page.  If you see a red arrow ( ► ), please check the* <u>*Summary of Changes Table*</u> *for details.*

**PART I -  Eligibility, Service Definitions and Service Requirements**

► **Section I:** Eligibility of Individuals Served

**Section II:**  Orientation to Service Authorization

**Section III:** Service Definitions

**Section IV:** Practitioner Detail

**Section V**: Service Code Modifier Descriptions


**PART II  -  Community Service Requirements for BH Providers**

**Section I:** Policies and Procedures

► **Section II:** Staffing Requirements

► **Section III:** Documentation Requirements


**PART III -  General Policies and Procedures**

**All policies are now posted in DBHDD PolicyStat located at http://gadbhdd.policystat.com**


 **PART IV -  Appendices**

► **Appendix A:** Glossary of Terms

**Appendix B:** Valid Authorization Diagnoses

**Appendix C:** Valid Claims Diagnoses

**Appendix D:** Certified Alcohol and Drug Counselor - Trainee Supervision Form

**Appendix  E**: COVID-19 Public Health Emergency: DBHDD Communications to Providers

# DEPARTMENT OF BEHAVIORAL HEALTH & DEVELOPMENTAL DISABILITIES

## FY 2023 COMMUNITY BEHAVIORAL HEALTH PROVIDER MANUAL

## DETAILED TABLE OF CONTENTS

*When accessing this manual electronically, use your mouse to left click on the part or section you would like to access, and you will be quickly linked to the corresponding page. After using a hyperlink, return to the Detailed TOC by hitting the Alt+Left Arrow keys (Note: You must first use a hyperlink in the Detailed TOC to move to a section of the manual in order for Alt+Left Arrow keys to return you to the Detailed TOC).*

**TITLE PAGE**

**SUMMARY OF CHANGES TABLE**

**PART I -  Eligibility, Service Definitions and Service Requirements**

### Section I: Eligibility of Individuals Served

### Section II:  Orientation to Service Authorization

### Section III: Service Definitions

#### Child and Adolescent Non-Intensive Outpatient Services

| | |
|---|---|
| Behavioral Health Assessment | Group Outpatient Services – Group Training |
| Behavioral Health Clinical Consultation | Individual Counseling |
| Community Support | Interactive Complexity |
| Community Transition Planning | Medication Administration |
| Crisis Intervention | Nursing Assessment and Health Services |
| Diagnostic Assessment | Pharmacy and Lab |
| Family Outpatient Services – Family Counseling | Psychiatric Treatment |
| Family Outpatient Services – Family Training | Psychological Testing |
| Group Outpatient Services – Group Counseling | Service Plan Development |

#### Child and Adolescent Specialty Services

| | |
|---|---|
| Apex Program | Intensive Customized Care Coord. - Flexible Supports |
| Clubhouse Services | Intensive Family Intervention |
| Community Based Inpatient Psychiatric | Mobile Crisis |
| Coordinated Specialty Care for First Episode Psychosis | Parent Peer Support – Group |
| Crisis Stabilization Unit Services | Parent Peer Support -- Individual |
| Crisis Stabilization Unit Services – ASD | Structured Residential Supports |
| High Utilizer Management | Substance Abuse Intensive Outpatient Program |
| Integrated Supported Employment & Education | Youth Peer Support – Group |
| Intensive Customized Care Coordination | Youth Peer Support – Individual |

#### Adult Non-Intensive Outpatient Services

| | |
|---|---|
| Addictive Disease Support Services | Group Outpatient Services – Group Training |
| Behavioral Health Assessment | Individual Counseling |
| Behavioral Health Clinical Consultation | Interactive Complexity |
| Case Management | Medication Administration |
| Community Transition Planning | Nursing Assessment and Health Services |
| Crisis Intervention | Pharmacy and Lab |
| Diagnostic Assessment | Psychiatric Treatment |
| Family Outpatient Services – Family Counseling | Psychological Testing |
| Family Outpatient Services – Family Training | Psychosocial Rehabilitation – Individual |
| Group Outpatient Services – Group Counseling | Service Plan Development |

**Adult Specialty Services**

Addiction Recovery Support Center - Services
AD Peer Support Program
AD Peer Support Services – Individual
Ambulatory Substance Abuse Detoxification
Assertive Community Treatment
Assisted Outpatient Treatment Program
Community Based Inpatient Psychiatric
Community Support Team
Community Transition Peer Support
Coordinated Specialty Care for First Episode Psychosis
Co-Responder Program
Crisis Respite Apartments
Crisis Service Center
Crisis Stabilization Unit Services
Crisis Stabilization Unit Services – Co-Occurring I/DD
Specialized Capacity
Forensic Peer Mentor – Peer Support
Georgia Housing Voucher Program
High Utilizer Management
Housing Supplements
Housing Support
Intensive Case Management
Medication Assisted Treatment
MH Peer Support Program
MH Peer Support Services – Individual

Mobile Crisis
Opioid Maintenance Treatment
Peer Support, Wellness & Respite Center – Respite
Peer Support Wellness and Respite Center – Warm Line
Peer Support Whole Health & Wellness – Group
Peer Support Whole Health & Wellness – Individual
Psychosocial Rehabilitation – Program
Residential: Community Residential Rehabilitation I
Residential: Community Residential Rehabilitation III
Residential: Community Residential Rehabilitation IV
Residential: Independent AD Residential Services
Residential: Independent MH Residential Services
Residential: Intensive AD Residential Services
Residential: Semi-Independent AD Residential Services
Residential Substance Detoxification
Substance Abuse Intensive Outpatient Program
Supported Employment
Task Oriented Rehabilitation Services (TORS)
Temporary Observation Services
Treatment Court – AD
Treatment Court – MH
Women's Tx & Recovery Services – Outpatient Services
Women's Tx & Recovery Services – Residential Tx
Women's Tx & Recovery Services – Transitional Housing

**Section IV: Table A - Practitioner Detail – Service x Practitioner**

**Table B - Ordering Practitioner Guidelines**

**Section V: Service Code Modifier Descriptions**

**PART II - Community Service Requirements for BH Providers**

**Section I: Policies and Procedures**

**Section II: Staffing Requirements**

Approved BH Practitioners Table

**Section III: Documentation Requirements**

**PART III - General Policies and Procedures**

All policies are now posted in DBHDD PolicyStat located at **http://gadbhdd.policystat.com**

**PART IV - Appendices**

**Appendix A:** Glossary of Terms

**Appendix B:** Valid Authorization Diagnoses

**Appendix C:** Valid Claims Diagnoses

**Appendix D:** Certified Alcohol and Drug Counselor-Trainee Supervision Form

**Appendix E:** COVID-19 Public Health Emergency: DBHDD Communications to Providers

# SUMMARY OF CHANGES TABLE

## UPDATED FOR JANUARY 1, 2023 EFFECTIVE DATE (POSTED DECEMBER 1, 2022)

As a courtesy for Providers, this Summary of Changes is designed to guide the review of new and revised content contained in this updated version of the Provider Manual. The responsibility for thorough review of the Provider Manual content remains with the Provider.

| Item # | Topic | Location | Summary of Changes |
|---|---|---|---|
| 1. | Crisis Intervention (C&A and Adult) | Part I, Section III. Service Definitions | In the Code Detail section, the "add-on each additional 30 mins" language was inadvertently missing from Practitioner Level 1, In-Clinic. It is now added. |
| 2. | Assisted Outpatient Treatment Program | Part I, Section III. Service Definitions | A new service is added. |
| 3. | Co-Responder Program | Part I, Section III. Service Definitions | A new service is added. |
| 4. | CRR I | Part I, Section III. Service Definitions | Significant refinements to the entire Service Definition, and reorganization/clarification of previous content. |
| 5. | CRR III | Part I, Section III. Service Definitions | Significant refinements to the entire Service Definition, and reorganization/clarification of previous content. |
| 6. | Approved BH Practitioners Table | Part I, Section II. Staffing Requirements, Approved BH Practitioners Table | CPS-Parent and CPS-Youth were inadvertently missing from the table. They are now added. |
| 7. | Documentation Requirements | Part II, Section III. Documentation Requirements, 1. Overview of Documentation | Reorganization and clarification of requirements for paper versus electronic records, as follows:<br><br>A.   Documentation/information in the medical record: Reorganized and clarified requirements.<br><br>E.   Added a new section: "Special Requirements for Paper versus Electronic Health Records/Medical Records." In the section: "For providers using Electronic Health Records (EHRs)/ Electronic Medical Records (EMRs)" added a new item d. |
| 8. | Documentation Requirements: DC-0 to 5 language | Part II, Section III. Documentation Requirements, 3. Diagnosis | New item F. Describes a tool and method that can assist practitioners in diagnosing children ages 4 through 5 years. |

| 9. | Aggregated Claims | Part II, Section III: Documentation Requirements, 8. Progress Notes, C. Progress note documentation must address and adhere to the following: xii. Location of Intervention | New item # 4:<br><br>**Claims** - In situations where multiple practitioners of the same U-level deliver a service (or services) for which the same procedure code and modifier(s) would be billed, *but service delivery occurs at two different times*, the time would need to be aggregated into one claim. If a different Place of Service code were applicable for each practitioner, only one should be selected and used on the aggregated claim. |
| 10. | Glossary | Part IV, Appendices, Appendix A: Glossary of Terms | A definition of the DC 0-5™ Manual is added. |

**ALL POLICIES ARE POSTED IN DBHDD POLICYSTAT LOCATED AT http://gadbhdd.policystat.com**

Details are provided in the policy titled Access to DBHDD Policies for Community Providers, 04-100.

The DBHDD PolicyStat INDEX helps to identify policies applicable for Community Providers.

The New and Updated policies are listed below. For 90 days after the date of revision, users can see the track changes version of a policy by scrolling to 'New and Recently Revised Policies' on the PolicyStat Home Page.

Questions or issues related to policy and service delivery should be directed to your Provider Relations team: https://dbhddapps.dbhdd.ga.gov/PIMS/Default.aspx

Questions related to the Georgia Collaborative ASO functions such as those listed below can be directed to GACollaborativePR@beaconhealthoptions.com

- Provider Enrollment
- ASO Quality Reviews
- Behavioral Health Registrations, Authorizations, and Billing for State Funded Services

| Item# | Topic | Location | Summary of Changes |
|-------|-------|----------|--------------------|
| 1. | Suicide Prevention, Screening, Brief Intervention and Monitoring, 01-118 | Part III General Policies and Procedures | REVISED: https://gadbhdd.policystat.com/policy/12323466/latest |
| 2. | Suicide Prevention, Screening, Brief Intervention and Monitoring for Tier 2 and Tier 2+ Providers, 01-126 | Part III General Policies and Procedures | REVISED: https://gadbhdd.policystat.com/policy/12324504/latest |



**Georgia Department of Behavioral Health and Developmental Disabilities**

**January 1, 2023**

# PART I

# *Eligibility, Service Definitions and Service Requirements*

### Provider Manual for
### Community Behavioral Health Providers

### Fiscal Year 2023

# SECTION I

## ELIGIBILITY OF INDIVIDUALS SERVED
## DBHDD CRITERIA FOR MENTAL HEALTH AND ADDICTIVE DISEASE-SERVICES

| A. ACCESS |
| --- |

**ADULT**

**CHILD & ADOLESCENT**

Many adults/youth/families approach the state service delivery system looking for help. Not everyone who seeks assistance is in need of mental health or addictive disease services. In order to efficiently and expeditiously address the needs of those seeking assistance, a quick assessment of the presenting circumstances is warranted. A brief screening/assessment should be initiated by all community-based service providers on all individuals who present for services or who are referred by the Georgia Crisis and Access Line (GCAL) for an evaluation. For the purposes of this definition, a brief screening/assessment refers to a rapid determination of an adult/youth's need for services and whether there are sufficient indications of a mental illness and/or substance related disorder to warrant further evaluation and admission to services.

1. If the adult/youth does not have sufficient indications of a mental illness and/or substance related disorder, or if the individual does not appear to meet this eligibility criteria for services, then an appropriate referral to other services or agencies is provided.
2. If the adult/youth does appear to have a mental illness and/or substance related disorder, and does appear to meet eligibility criteria, then the individual may either begin in Non-Intensive Outpatient services or may enroll in clinically appropriate intensive and/or specialized recovery/treatment services determined as a part of a more comprehensive assessment process.

## B. CORE CUSTOMER CLASSIFICATION AND ELIGIBILITY DETERMINATION

Eligibility for an individual is verified through the ASO system. The provider submits individual registration details on behalf of an individual. When it is determined that the individual qualifies for one of the DBHDD fund sources, then subsequent authorization can be requested.

In the event that an individual presents for service and the agency is unable to ascertain identifying information, the individual may be engaged in some limited service without this identifying information, temporarily, with the expectation that the agency is working with the individual to acquire that information for continued enrollment. This individual would be registered in the SHORT-TERM/IMMEDIATE registration category which will allow the agency up to seven (7) days of eligibility for the individual without additional unique identifying information. The following are potential services when utilizing this eligibility category and requesting authorization:

| | | |
| --- | --- | --- |
| Community-based Inpatient Psychiatric/ Detoxification | Psychological Testing | Medication Administration |
| Residential Detoxification | Diagnostic Assessment | Community Support |
| Crisis Stabilization Unit | Interactive Complexity | Psychosocial Rehabilitation-Individual |
| Crisis Service Center | Crisis Intervention | Case Management |
| Temporary Observation | Psychiatric Treatment | Addictive Diseases Support Services |
| Behavioral Health Assessment/Service Plan Dev | Nursing Assessment and Care | Individual Outpatient |
| Peer Support (Individual and Whole Health) | Family Outpatient | Group Outpatient |

| CHILD & ADOLESCENT | ADULT |
|---|---|
| There are four (4) variables for consideration to determine whether a youth qualifies as eligible for child and adolescent mental health and addictive disease services. | There are four (4) variables for consideration to determine whether an individual qualifies as eligible for adult mental health and addictive disease services. |
| 1. **Age:** A youth must be under the age of 18 years old. Youth aged 18-21 years (children still in high school or when it is otherwise developmentally/clinically indicated) may be served to assist with transitioning to adult services.<br>2. **Diagnostic Evaluation:** The DBHDD system utilizes the Diagnostic and Statistical Manual of Mental Disorders (DSM) classification system to identify, evaluate and classify a youth's type, severity, frequency, duration and recurrence of symptoms. The diagnostic evaluation must yield information that supports an emotional disturbance and/or substance related diagnosis (or diagnostic impression). The diagnostic evaluation must be documented adequately to support the diagnosis.<br>3. **Functional/Risk Assessment:** Information gathered to evaluate a child/adolescent's ability to function and cope on a day-to-day basis comprises the functional/risk assessment. This includes youth and family resource utilization and the youth's role performance, social and behavioral skills, cognitive skills, communication skills, personal strengths and adaptive skills, needs and risks as related to an emotional disturbance, substance related disorder or co-occurring disorder. The functional/risk assessment must yield information that supports a behavioral health diagnosis (or diagnostic impression) in accordance with the DSM.<br>4. **Financial Eligibility:** Please see Payment by Individuals for Community Behavioral Health Services, 01-107. | 1. **Age:** An individual must be over the age of 18 years old, to include the older adult population 65+ years old. Individuals under age 18 may be served in adult services if they are emancipated minors under Georgia Law, and if adult services are otherwise clinically/developmentally indicated.<br>2. **Diagnostic Evaluation:** The DBHDD system utilizes the Diagnostic and Statistical Manual of Mental Disorders (DSM) classification system to identify, evaluate and classify an individual's type, severity, frequency, duration and recurrence of symptoms. The diagnostic evaluation must yield information that supports a psychiatric disorder and/or substance related diagnosis (or diagnostic impression). The diagnostic evaluation must be documented adequately to support the diagnostic impression/diagnosis.<br>3. **Functional/Risk Assessment:** Information gathered to evaluate an individual's ability to function and cope on a day-to-day basis comprises the functional/risk assessment. This includes the individual's resource utilization, role performance, social and behavioral skills, cognitive skills, communication skills, independent living skills, personal strengths and adaptive skills, needs and risks as related to a psychiatric disorder, substance related disorder or co-occurring disorder. The functional/risk assessment must yield information that supports a behavioral health diagnosis (or diagnostic impression) in accordance with the DSM.<br>4. **Financial Eligibility:** Please see Payment by Individuals for Community Behavioral Health Services, 01-107. |

## C. PRIORITY FOR SERVICES

| CHILD & ADOLESCENT | ADULT |
|---|---|
| The following youth are priority for services:<br>1. The first priority group for services is Youth:<br>Who are at risk of out-of-home placements; and<br>Who are currently in a psychiatric facility or a community-based crisis residential service including a crisis stabilization unit.<br><br>2. The second priority group for services is:<br>Youth with a history of one or more hospital admissions for psychiatric/substance use disorder reasons within the past 3 years;<br>Youth with a history of one or more crisis stabilization unit admissions within the past 3 years; | The following individuals are the priority for ongoing support services:<br>1. The first priority group for services is individuals currently in a state operated psychiatric facility (including forensic individuals), state funded/paid inpatient services, a crisis stabilization unit or crisis residential program.<br><br>2. The second priority group for services is<br>Individuals with a history of one or more hospital admissions for psychiatric/substance use disorder reasons within the past 3 years;<br>Individuals with a history of one or more crisis stabilization unit admissions within the past 3 years;<br>Individuals with a history of enrollment on an Assertive Community Treatment team within the past 3 years; |

Youth with a history of enrollment on an Intensive Family Intervention team within the past 3 years;

Youth with court orders to receive services;

Youth under the correctional community supervision with mental illness or substance use disorder or dependence;

Youth released from secure custody (county/city jails, state YDCs/RYDCs, diversion programs, forensic inpatient units) with mental illness or substance use disorder or dependence;

Pregnant youth;

Youth who are homeless; or,

IV drug users.

The timeliness for providing these services is set within the agency's contract/agreement with the DBHDD.

Individuals with court orders to receive services (especially related to restoring competency);

Individuals under the correctional community supervision with mental illness or substance use disorder or dependence;

Individuals released from secure custody (county/city jails, state prisons, diversion programs, forensic inpatient units) with mental illness or substance use disorder or dependence;

Individuals aging out of out of home placements or who are transitioning from intensive C&A services, for whom adult services are clinically and developmentally appropriate;

Pregnant women;

Individuals who are homeless; or,

IV drug users.

The timeliness for providing these services is set within the agency's contract/agreement with the DBHDD.

[1] Specific to AD Women's Services. Providers shall give preference to admission to services as follows: 1) Pregnant women who are using drugs by means of intravenous injection; 2) Pregnant women who have substance use disorders, but who are not using drugs by means of intravenous injection; 3) Non-pregnant women who are using drugs by means of intravenous injection; and then 4) All others.

## D. SERVICES AUTHORIZATION

Services are authorized based on individualized need considered alongside service design. In many cases, the electronic ASO system provides for an automated process to request services and to receive authorization based upon clinical and demographic information provided to the ASO. Periodically, a provider will be asked to provide additional supporting information to the ASO, e.g., an Individualized Recovery Plan (IRP).

While most services identified in this manual will require an authorization from the ASO via provider batch submission or via the ASO Connect system, some services will require immediate authorization via the ASO/GCAL. Those services have specific requirements identified in the Reporting and Billing Requirements section of the unique service guideline.

# E. APPROVED DIAGNOSES

Please reference the table in Appendix B of this document for approved authorization diagnoses. The diagnoses listed in Appendix B are ICD-10 diagnosis which are organized here into Mental Health (MH) and Substance Use (SU) categories. Services that are uniquely identified as being MH only or SU only on the chart in Part 1, Section II of this manual will require a diagnosis which is within that category of condition. (e.g., Alcohol Intoxication with Use Disorder [F10.229] would be an acceptable diagnosis for receiving Ambulatory Detox [SU]).

An individual diagnosed with a Neurocognitive Disorder must have a documented history of a qualifying behavioral health diagnosis that pre-dates the Neurocognitive Disorder and any associated psychiatric symptoms and/or substance use. Individuals with a Neurocognitive Disorder must demonstrate a cognitive ability to participate in, and benefit from the behavioral health service(s) in which they are enrolled. Individuals who have historically received treatment for a qualifying behavioral health diagnosis and may now be showing signs of a Neurocognitive Disorder such as Dementia or Alzheimer's Disease should remain included in treatment until such time as the individual is no longer capable of active participation in treatment services and supports.

**Diagnosis Exceptions:** Several diagnostic codes may have an **E** identified. This indicates that the DBHDD does not cover this diagnosis code, but that in certain circumstances, that there may be an exception to this rule. In this event, the ASO would do a review of such things as a recent physical examination, unique provider skill specialties, proposed IRPs, etc. to determine whether or not authorization will be granted.

Appendix B only includes ICD-10 diagnosis codes that correspond with an applicable DSM V code. As noted in Part II of this manual, providers should use DSM V to diagnose individuals and report the ICD-10 code accordingly. Note that, due to the adjustment of diagnoses between DSM IV and DSM V, not all ICD-9 codes will have a valid match to an ICD-10 code. Providers should use the DSM V as the initial source to determine the appropriate ICD-10 codes for authorization requests.

*NOTE: The presence of co-occurring mental illnesses/emotional disturbances, substance related disorders and/or developmental disabilities is not uncommon and typically results in a more complicated clinical presentation. Individuals diagnosed with the excluded mental disorders listed may receive services **ONLY** when these disorders co-occur with a qualifying mental illness or substance related disorder. The qualifying mental illness or substance related disorder must be the presenting problem and the focus of service, and the individual must meet the functional criteria listed above.*

# SECTION II

## ORIENTATION TO SERVICE AUTHORIZATION

### FY2023 Behavioral Health Levels of Service

Specifically related to DBHDD authorization through its ASO vendor, services are organized into a set of categories which are defined by Level of Care, then Type of Care, which then define a subset of services.

## FY2023 Behavioral Health Services

### Level of Service: Inpatient & Higher Level of Care (HLOC)

| Level of Service | Type of Service | Type of Care Code | Type of Care Description | Service Class Code | Service Groups Available | Service Description | Initial Auth Max Auth Length | Initial Auth Max Units Auth'd | Concurrent Auth Max Auth Length | Concurrent Auth Max Units Auth'd | Max Daily Units | Place of Service |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Inpt | MH, MHSU | BEH | Behavioral | IPF | 20102 | Community Based Inpatient (Psych) | varies | varies | varies | varies | 1 | 21, 51 |
| Inpt | SU | DETOX | Detox | IPF | 20102 | Community Based Inpatient (Detox) | varies | varies | varies | varies | 1 | 21, 51 |
| Inpt | MH, MHSU | BEH | Behavioral | CUA | 20101 | Crisis Stabilization - Adult | 10 | 10 | varies | varies | 1 | 11, 52, 53, 55, 56, 99 |
| Inpt | SU | DETOX | Detox | CUA | 20101 | Crisis Stabilization - Adult | 10 | 10 | varies | varies | 1 | 11, 52, 53, 55, 56, 99 |
| Inpt | MH, MHSU | BEH | Behavioral | CUC | 20101 | Crisis Stabilization - C&A | 10 | 10 | varies | varies | 1 | 11, 52, 53, 55, 56, 99 |
| Inpt | SU | DETOX | Detox | CUC | 20101 | Crisis Stabilization - C&A | 10 | 10 | varies | varies | 1 | 11, 52, 53, 55, 56, 99 |
| Inpt | DD | BEH | Behavioral | CAU | 20110 | Crisis Stabilization - C&A ASD | 30 | 30 | varies | varies | 1 | 11, 52, 53, 55, 56, 99 |
| Inpt | MH | BEH | Behavioral | PRT | 20506 | PRTF | 30 | 30 | 30 | 30 | 1 | 56 |
| Inpt | SU | DETOX | Detox | IDF | 21101 | Residential Detox | 20 | 20 | varies | varies | 1 | 11, 12, 53, 99 |

### Level of Service: Outpatient

| Level of Service | Type of Service | Type of Care Code | Type of Care Description | Service Class Code | Service Groups Available | Service Description | Initial Auth Max Auth Length | Initial Auth Max Units Auth'd | Concurrent Auth Max Auth Length | Concurrent Auth Max Units Auth'd | Max Daily Units | Place of Service |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Outpt | MH, MHSU | ACT | ACT | ACT | 20601 | Assertive Community Treatment | 90 | 240 | 90 | 240 | 60 | 11, 12, 53, 99 |
| | | | | CT1 | 21202 | Community Transition Planning | 90 | 50 | 90 | 50 | 12 | 11, 12, 53, 99 |

| Level of Service | Type of Service | Type of Care Code | Type of Care Description | Service Class Code | Service Groups Available | Service Description | Initial Auth | | Concurrent Auth | | Max Daily Units | Place of Service |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Max Auth Length | Max Units Auth'd | Max Auth Length | Max Units Auth'd | | |
| Outpt | SU | AMBDTX | AMBULATORY DETOX | OPD | 21102 | Ambulatory Detox | 14 | 32 | varies | varies | 24 | 11, 12, 53, 99 |
| | | | | BHA | 10101 | BH Assmt & Service Plan Development | 14 | 32 | varies | varies | 24 | 11, 12, 53, 99 |
| | | | | DAS | 10103 | Diagnostic Assessment | 14 | 2 | varies | varies | 2 | 11, 12, 53, 99 |
| | | | | CAO | 10104 | Interactive Complexity | 14 | 22 | varies | varies | 4 | 11, 12, 53, 99 |
| | | | | PEM | 10120 | Psychiatric Treatment - (E&M) | 14 | 40 | varies | varies | 2 | 11, 12, 53, 99 |
| | | | | ADS | 10152 | Addictive Disease Support Services | 14 | 24 | varies | varies | 16 | 11, 12, 53, 99 |
| | | | | TIN | 10160 | Individual Outpatient Services | 14 | 8 | varies | varies | 1 | 11, 12, 53, 99 |
| | | | | GRP | 10170 | Group Outpatient Services | 14 | 80 | varies | varies | 4 | 11, 12, 53, 99 |
| | | | | FAM | 10180 | Family Outpatient Services | 14 | 32 | varies | varies | 16 | 11, 12, 53, 99 |
| Outpt | MH, SU, MHSU | CS | CRISIS SERVICES | CSC | 20103 | Crisis Service Center | 20 | 7 | 20 | 7 | 1 | 11, 52, 53, 55, 56, 99 |
| | | | | UHB | 20105 | Temporary Observation | 20 | 7 | 20 | 7 | 1 | 11, 52, 53, 55, 56, 99 |
| | | | | BHA | 10101 | BH Assmt & Service Plan Development | 20 | 32 | 20 | 32 | 24 | 11, 12, 53, 99 |
| | | | | DAS | 10103 | Diagnostic Assessment | 20 | 2 | 20 | 2 | 2 | 11, 12, 53, 99 |
| | | | | CAO | 10104 | Interactive Complexity | 20 | 22 | 20 | 22 | 4 | 11, 12, 53, 99 |
| | | | | CIN | 10110 | Crisis Intervention | 20 | 80 | 20 | 80 | 8 | 11, 12, 53, 99 |
| | | | | PEM | 10120 | Psychiatric Treatment - (E&M) | 20 | 40 | 20 | 40 | 2 | 11, 12, 53, 99 |
| | | | | NRS | 10131 | Nursing Services | 20 | 80 | 20 | 80 | 5 | 11, 12, 53, 99 |
| | | | | MED | 10140 | Medication Administration | 20 | 24 | 20 | 24 | 1 | 11, 12, 53, 99 |
| | | | | CSI | 10150 | Community Support - Individual | 20 | 32 | 20 | 32 | 32 | 11, 12, 53, 99 |
| | | | | PSR | 10151 | Psychosocial Rehabilitation - Individual | 20 | 32 | 20 | 32 | 8 | 11, 12, 53, 99 |
| | | | | ADS | 10152 | Addictive Disease Support Services | 20 | 24 | 20 | 24 | 16 | 11, 12, 53, 99 |
| | | | | TIN | 10160 | Individual Outpatient Services | 20 | 14 | 20 | 14 | 1 | 11, 12, 53, 99 |
| | | | | GRP | 10170 | Group Outpatient Services | 20 | 80 | 20 | 80 | 4 | 11, 12, 53, 99 |
| | | | | FAM | 10180 | Family Outpatient Services | 20 | 20 | 20 | 20 | 4 | 11, 12, 53, 99 |
| | | | | CMS | 21302 | Case Management | 20 | 84 | 20 | 84 | 12 | 11, 12, 53, 99 |
| | | | | PSI | 20306 | Peer Support - Adult - Individual | 20 | 80 | 20 | 80 | 8 | 11, 12, 53, 99 |
| | | | | CT1 | 21202 | Community Transition Planning | 20 | 80 | 20 | 80 | 8 | 11, 12, 53, 99 |
| Outpt | MH | CST | CST | CST | 20605 | Community Support Team | 90 | 240 | 90 | 240 | 60 | 11, 12, 53, 99 |
| | | | | CT1 | 21202 | Community Transition Planning | 90 | 50 | 90 | 50 | 12 | 11, 12, 53, 99 |

| Level of Service | Type of Service | Type of Care Code | Type of Care Description | Service Class Code | Service Groups Available | Service Description | Initial Auth | | Concurrent Auth | | Max Daily Units | Place of Service |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Max Auth Length | Max Units Auth'd | Max Auth Length | Max Units Auth'd | | |
| Output | MH | CA | Crisis Apartment | APT | 20104 | Crisis Respite Apartment | 30 | 30 | 14 | 14 | 1 | 11, 12, 14, 53, 55, 56, 99 |
| Output | MH, SU | IR | Residential Services (Independent) | IRS | 20501 | Residential Services (Independent) | 90 | 90 | 90 | 90 | 1 | 11, 12, 14, 53, 55, 56, 99 |
| Output | MH | SIM | Residential Services (CRR Level 3) | SRS | 20502 | Residential Services (CRR Level 3) | 90 | 90 | 90 | 90 | 1 | 11, 12, 14, 53, 55, 56, 99 |
| Output | SU | SIM | Residential Services (Semi-Independent) | SRS | 20502 | Residential Services (Semi-Independent) | 90 | 90 | 90 | 90 | 1 | 11, 12, 14, 53, 55, 56, 99 |
| Output | MH | INR | Residential Services (CRR Level 1) | INT | 20503 | Residential Services (CRR Level 1) | 90 | 90 | 90 | 90 | 1 | 11, 12, 14, 53, 55, 56, 99 |
| Output | SU | INR | Residential Services (Intensive) | INT | 20503 | Residential Services (Intensive) | 90 | 90 | 90 | 90 | 1 | 11, 12, 14, 53, 55, 56, 99 |
| Output | MH | CR4 | Community Residential Rehab 4 | CL4 | 20514 | Community Residential Rehabilitation 4 | 90 | 13 | 180 | 26 | 8 | 11, 12, 14, 53, 55, 56, 99 |
| Output | MH, SU | SRC | Structured Residential - C&A | STR | 20510 | Structured Residential - C&A | 180 | 180 | 180 | 180 | 1 | 11, 12, 14, 53, 55, 56, 99 |
| Output | MH | ICM | ICM | ICM | 21301 | Intensive Case Management | 90 | 104 | 90 | 104 | 24 | 11, 12, 53, 99 |
| | | | | PSR | 10151 | Psychosocial Rehabilitation - Individual | 90 | 104 | 90 | 104 | 48 | 11, 12, 53, 99 |
| | | | | CT1 | 21202 | Community Transition Planning | 90 | 100 | 90 | 100 | 12 | 11, 12, 53, 99 |
| Output | MH | ICCC | Intensive Customized Care Coordination | IC3 | 21303 | Intensive Customized Care Coordination | 90 | 3 | 90 | 3 | 1/mo | 11, 12, 53, 99 |
| | | | | BAS | 32101 | Behavioral Assistance | 90 | 24 | 90 | 24 | 16 | 11, 12, 53, 99 |
| | | | | CLC | 32102 | Clinical Consultative Services | 90 | 12 | 90 | 12 | 8 | 11, 12, 53, 99 |
| | | | | EXP | 32103 | Expressive Clinical Services | 90 | 24 | 90 | 24 | 16 | 11, 12, 53, 99 |
| | | | | CGD | 32104 | Customized Goods and Services | 90 | see guidelines | 90 | see guidelines | see guidelines | 11, 12, 53, 99 |
| | | | | RPT | 32105 | Respite Services | 90 | 24 | 90 | 24 | 24 | 11, 12, 53, 99 |
| | | | | TSP | 32106 | Transportation Services | 90 | 12 | 90 | 12 | 4 | 11, 12, 53, 99 |
| Output | MH | IFI | Intensive Family Intervention | IFI | 20602 | Intensive Family Intervention | 90 | 288 | 90 | 288 | 48 | 11, 12, 53, 99 |
| | | | | CT1 | 21202 | Community Transition Planning | 90 | 50 | 90 | 50 | 12 | 11, 12, 53, 99 |
| Output | SU | SAIOPA | SAIOP - Adult | IOA | 20606 | SAIOP - Adult | 180 | 320 | 180 | 320 | 5 | 11, 12, 53, 99 |
| | | | | BHA | 10101 | BH Assmt & Service Plan Development | 180 | 32 | 180 | 32 | 24 | 11, 12, 53, 99 |
| | | | | DAS | 10103 | Diagnostic Assessment | 180 | 4 | 180 | 4 | 2 | 11, 12, 53, 99 |
| | | | | CAO | 10104 | Interactive Complexity | 180 | 48 | 180 | 48 | 4 | 11, 12, 53, 99 |
| | | | | PEM | 10120 | Psychiatric Treatment - (E&M) | 180 | 12 | 180 | 12 | 2 | 11, 12, 53, 99 |
| | | | | NRS | 10131 | Nursing Services | 180 | 48 | 180 | 48 | 16 | 11, 12, 53, 99 |
| | | | | MED | 10140 | Medication Administration | 180 | 6 | 180 | 6 | 1 | 11, 12, 53, 99 |
| | | | | CT1 | 21202 | Community Transition Planning | 180 | 50 | 180 | 50 | 12 | 11, 12, 53, 99 |

| Level of Service | Type of Service | Type of Care Code | Type of Care Description | Service Class Code | Service Groups Available | Service Description | Initial Auth | | Concurrent Auth | | Max Daily Units | Place of Service |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Max Auth Length | Max Units Auth'd | Max Auth Length | Max Units Auth'd | | |
| Output | SU | SAIOPC | SAIOP - C&A | IOC | 20607 | SAIOP - C&A | 180 | 320 | 180 | 320 | 5 | 11, 12, 53, 99 |
| | | | | BHA | 10101 | BH Assmt & Service Plan Development | 180 | 32 | 180 | 32 | 24 | 11, 12, 53, 99 |
| | | | | DAS | 10103 | Diagnostic Assessment | 180 | 4 | 180 | 4 | 2 | 11, 12, 53, 99 |
| | | | | CAO | 10104 | Interactive Complexity | 180 | 48 | 180 | 48 | 4 | 11, 12, 53, 99 |
| | | | | PEM | 10120 | Psychiatric Treatment - (E&M) | 180 | 12 | 180 | 12 | 2 | 11, 12, 53, 99 |
| | | | | NRS | 10131 | Nursing Services | 180 | 48 | 180 | 48 | 16 | 11, 12, 53, 99 |
| | | | | CT1 | 21202 | Community Transition Planning | 180 | 50 | 180 | 50 | 12 | 11, 12, 53, 99 |
| Output | MH, SU, MHSU | NIO | Non-Intensive Outpatient | BHA | 10101 | BH Assmt & Service Plan Development | 90 | 32 | 275 | 64 | 24 | 11, 12, 53, 99 |
| | | | | TES | 10105 | Psychological Testing | 90 | 10 | 275 | 10 | 5 | 11, 12, 53, 99 |
| | | | | DAS | 10103 | Diagnostic Assessment | 90 | 2 | 275 | 4 | 2 | 11, 12, 53, 99 |
| | | | | CAO | 10104 | Interactive Complexity | 90 | 24 | 275 | 96 | 4 | 11, 12, 53, 99 |
| | | | | CIN | 10110 | Crisis Intervention | 90 | 20 | 275 | 96 | 16 | 11, 12, 53, 99 |
| | | | | PEM | 10120 | Psychiatric Treatment - (E&M) | 90 | 12 | 275 | 48 | 2 | 11, 12, 53, 99 |
| | | | | NRS | 10131 | Nursing Services | 90 | 12 | 275 | 120 | 16 | 11, 12, 53, 99 |
| | | | | MED | 10140 | Medication Administration | 90 | 6 | 275 | 120 | 1 | 11, 12, 53, 99 |
| | | | | CSI | 10150 | Community Support - Individual | 90 | 68 | 275 | 160 | 48 | 11, 12, 53, 99 |
| | | | | PSR | 10151 | Psychosocial Rehabilitation - Individual | 90 | 52 | 275 | 160 | 48 | 11, 12, 53, 99 |
| | | | | ADS | 10152 | Addictive Disease Support Services | 90 | 100 | 275 | 600 | 48 | 11, 12, 53, 99 |
| | | | | TIN | 10160 | Individual Outpatient Services | 90 | 8 | 275 | 48 | 2 | 11, 12, 53, 99 |
| | | | | GRP | 10170 | Group Outpatient Services | 90 | 480 | 275 | 400 | 20 | 11, 12, 53, 99 |
| | | | | FAM | 10180 | Family Outpatient Services | 90 | 32 | 275 | 120 | 16 | 11, 12, 53, 99 |
| | | | | CT1 | 21202 | Community Transition Planning | 90 | 24 | 275 | 48 | 24 | 11, 12, 53, 99 |
| | | | | CMS | 21302 | Case Management | 90 | 68 | 275 | 160 | 24 | 11, 12, 53, 99 |
| | | | | PSI | 20306 | Peer Support - Adult - Individual | 90 | 72 | 275 | 312 | 48 | 11, 12, 53, 99 |
| | | | | PSW | 20302 | Peer Support Whole Health & Wellness | 90 | 72 | 275 | 312 | 6 | 11, 12, 53, 99 |
| | | | | YPI | 20308 | Youth Peer Support - Individual | 90 | 72 | 275 | 312 | 24 | 11, 12, 53, 99 |
| | | | | YPG | 20309 | Youth Peer Support - Group | 90 | 162 | 275 | 486 | 5 | 11, 12, 53, 99 |
| | | | | PPI | 20310 | Parent Peer Support - Individual | 90 | 72 | 275 | 312 | 24 | 11, 12, 53, 99 |
| | | | | PPG | 20311 | Parent Peer Support - Group | 90 | 162 | 275 | 486 | 5 | 11, 12, 53, 99 |

| Level of Service | Type of Service | Type of Care Code | Type of Care Description | Service Class Code | Service Groups Available | Service Description | Initial Auth Max Auth Length | Initial Auth Max Units Auth/d | Concurrent Auth Max Auth Length | Concurrent Auth Max Units Auth/d | Max Daily Units | Place of Service |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Output | SU | OM | Medication Assisted Treatment (MAT) | MDM | 21001 | Opioid Maintenance | 90 | 80 | 365 | 150 | 1 | 11, 12, 53, 99 |
| | | | | BHA | 10101 | BH Assmt & Service Plan Development | 90 | 24 | 365 | 24 | 12 | 11, 12, 53, 99 |
| | | | | DAS | 10103 | Diagnostic Assessment | 90 | 2 | 365 | 4 | 2 | 11, 12, 53, 99 |
| | | | | CAO | 10104 | Interactive Complexity | 90 | 24 | 365 | 96 | 4 | 11, 12, 53, 99 |
| | | | | CIN | 10110 | Crisis Intervention | 90 | 20 | 365 | 96 | 16 | 11, 12, 53, 99 |
| | | | | PEM | 10120 | Psychiatric Treatment - (E&M) | 90 | 6 | 365 | 6 | 1 | 11, 12, 53, 99 |
| | | | | NRS | 10131 | Nursing Services | 90 | 24 | 365 | 96 | 4 | 11, 12, 53, 99 |
| | | | | MED | 10140 | Medication Administration | 90 | 80 | 365 | 150 | 1 | 11, 12, 53, 99 |
| | | | | ADS | 10152 | Addictive Disease Support Services | 90 | 100 | 365 | 96 | 4 | 11, 12, 53, 99 |
| | | | | TIN | 10160 | Individual Outpatient Services | 90 | 12 | 365 | 36 | 1 | 11, 12, 53, 99 |
| | | | | GRP | 10170 | Group Outpatient Services | 90 | 180 | 365 | 730 | 4 | 11, 12, 53, 99 |
| | | | | FAM | 10180 | Family Outpatient Services | 90 | 48 | 365 | 48 | 4 | 11, 12, 53, 99 |
| | | | | PSI | 20306 | Peer Support – Adult - Individual | 90 | 48 | 365 | 48 | 4 | 11, 12, 53, 99 |
| Output | MH, SU, MHSU | PSP | Peer Support Program | PSI | 20306 | Peer Support - Adult - Individual | 180 | 520 | 180 | 520 | 48 | 11, 12, 53, 99 |
| | | | | PSP | 20307 | Peer Support – Adult - Group | 180 | 650 | 180 | 650 | 5 | 11, 12, 53, 99 |
| | | | | PSW | 20302 | Peer Support Whole Health & Wellness | 180 | 400 | 180 | 400 | 6 | 11, 12, 53, 99 |
| Output | MH, SU, MHSU | PSC | C&A Peer Supports | YPI | 20308 | Youth Peer Support - Individual | 90 | 72 | 275 | 312 | 24 | 11, 12, 53, 99 |
| | | | | YPG | 20309 | Youth Peer Support - Group | 90 | 162 | 275 | 486 | 5 | 11, 12, 53, 99 |
| | | | | PPI | 20310 | Parent Peer Support - Individual | 90 | 72 | 275 | 312 | 24 | 11, 12, 53, 99 |
| | | | | PPG | 20311 | Parent Peer Support - Group | 90 | 162 | 275 | 486 | 5 | 11, 12, 53, 99 |
| Output | MH | PRP | Psychosocial Rehab Program | PSR | 10151 | Psychosocial Rehabilitation - Individual | 180 | 104 | 180 | 104 | 48 | 11, 12, 53, 99 |
| | | | | PRE | 20908 | Psychosocial Rehabilitation - Group | 180 | 300 | 180 | 300 | 20 | 11, 12, 53, 99 |
| Output | MH | SE | Supported Employment | SE8 | 20401 | Supported Employment | 90 | 3 | 90 | 3 | 1 | 11, 12, 18, 53, 99 |
| | | | | TOR | 20402 | Task Oriented Rehabilitation | 90 | 150 | 90 | 150 | 8 | 11, 12, 53, 99 |
| Output | SU | TCSAD | Treatment Court - AD | BHA | 10101 | BH Assmt & Service Plan Development | 365 | 32 | 365 | 32 | 24 | 11, 12, 53, 99 |
| | | | | DAS | 10103 | Diagnostic Assessment | 365 | 5 | 365 | 5 | 2 | 11, 12, 53, 99 |
| | | | | CAO | 10104 | Interactive Complexity | 365 | 2 | 365 | 2 | 2 | 11, 12, 53, 99 |
| | | | | CIN | 10110 | Crisis Intervention | 365 | 48 | 365 | 48 | 4 | 11, 12, 53, 99 |
| | | | | PEM | 10120 | Psychiatric Treatment - (E&M) | 365 | 24 | 365 | 24 | 2 | 11, 12, 53, 99 |
| | | | | NRS | 10131 | Nursing Services | 365 | 60 | 365 | 60 | 16 | 11, 12, 53, 99 |
| | | | | MED | 10140 | Medication Administration | 365 | 60 | 365 | 60 | 1 | 11, 12, 53, 99 |
| | | | | ADS | 10152 | Addictive Disease Support Services | 365 | 300 | 365 | 300 | 48 | 11, 12, 53, 99 |
| | | | | TIN | 10160 | Individual Outpatient Services | 365 | 24 | 365 | 24 | 2 | 11, 12, 53, 99 |
| | | | | GRP | 10170 | Group Outpatient Services | 365 | 200 | 365 | 200 | 20 | 11, 12, 53, 99 |
| | | | | FAM | 10180 | Family Outpatient Services | 365 | 60 | 365 | 60 | 16 | 11, 12, 53, 99 |
| | | | | CT1 | 21202 | Community Transition Planning | 365 | 24 | 365 | 24 | 24 | 11, 12, 53, 99 |
| | | | | PSI | 20306 | Peer Support - Adult - Individual | 365 | 312 | 365 | 312 | 48 | 11, 12, 53, 99 |
| | | | | PSW | 20302 | Peer Support Whole Health & Wellness | 365 | 312 | 365 | 312 | 6 | 11, 12, 53, 99 |

| Level of Service | Type of Service | Type of Care Code | Type of Care Description | Service Class Code | Service Groups Available | Service Description | Initial Auth Max Auth Length | Initial Auth Max Units Auth'd | Concurrent Auth Max Auth Length | Concurrent Auth Max Units Auth'd | Max Daily Units | Place of Service |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Output | MH | TCS | Treatment Court - MH | BHA | 10101 | BH Assmt & Service Plan Development | 365 | 32 | 365 | 32 | 24 | 11, 12, 53, 99 |
| | | | | DAS | 10103 | Diagnostic Assessment | 365 | 5 | 365 | 5 | 2 | 11, 12, 53, 99 |
| | | | | CAO | 10104 | Interactive Complexity | 365 | 2 | 365 | 2 | 2 | 11, 12, 53, 99 |
| | | | | CIN | 10110 | Crisis Intervention | 365 | 48 | 365 | 48 | 4 | 11, 12, 53, 99 |
| | | | | PEM | 10120 | Psychiatric Treatment - (E&M) | 365 | 24 | 365 | 24 | 2 | 11, 12, 53, 99 |
| | | | | NRS | 10131 | Nursing Services | 365 | 60 | 365 | 60 | 16 | 11, 12, 53, 99 |
| | | | | MED | 10140 | Medication Administration | 365 | 60 | 365 | 60 | 1 | 11, 12, 53, 99 |
| | | | | PSR | 10151 | Psychosocial Rehabilitation - Individual | 365 | 80 | 365 | 80 | 48 | 11, 12, 53, 99 |
| | | | | TIN | 10160 | Individual Outpatient Services | 365 | 24 | 365 | 24 | 2 | 11, 12, 53, 99 |
| | | | | GRP | 10170 | Group Outpatient Services | 365 | 200 | 365 | 200 | 20 | 11, 12, 53, 99 |
| | | | | FAM | 10180 | Family Outpatient Services | 365 | 60 | 365 | 60 | 16 | 11, 12, 53, 99 |
| | | | | CT1 | 21202 | Community Transition Planning | 365 | 24 | 365 | 24 | 24 | 11, 12, 53, 99 |
| | | | | CMS | 21302 | Case Management | 365 | 80 | 365 | 80 | 24 | 11, 12, 53, 99 |
| | | | | PSI | 20306 | Peer Support - Adult - Individual | 365 | 312 | 365 | 312 | 48 | 11, 12, 53, 99 |
| | | | | PSW | 20302 | Peer Support Whole Health & Wellness | 365 | 312 | 365 | 312 | 6 | 11, 12, 53, 99 |
| Output | SU | WTRSO | WTRS - Outpatient | BHA | 10101 | BH Assmt & Service Plan Development | 180 | 32 | 180 | 32 | 24 | 11, 12, 53, 99 |
| | | | | DAS | 10103 | Diagnostic Assessment | 180 | 4 | 180 | 4 | 2 | 11, 12, 53, 99 |
| | | | | CAO | 10104 | Interactive Complexity | 180 | 48 | 180 | 48 | 4 | 11, 12, 53, 99 |
| | | | | PEM | 10120 | Psychiatric Treatment - (E&M) | 180 | 12 | 180 | 12 | 2 | 11, 12, 53, 99 |
| | | | | NRS | 10131 | Nursing Services | 180 | 48 | 180 | 48 | 16 | 11, 12, 53, 99 |
| | | | | ADS | 10152 | Addictive Disease Support Services | 180 | 200 | 180 | 200 | 48 | 11, 12, 53, 99 |
| | | | | TIN | 10160 | Individual Outpatient Services | 180 | 36 | 180 | 36 | 1 | 11, 12, 53, 99 |
| | | | | GRP | 10170 | Group Outpatient Services | 180 | 1,170 | 180 | 1,170 | 20 | 11, 12, 53, 99 |
| | | | | FAM | 10180 | Family Outpatient Services | 180 | 100 | 180 | 100 | 8 | 11, 12, 53, 99 |
| | | | | WTT | 20517 | WTRS - Transitional Bed | 180 | 180 | 180 | 180 | 1 | 11, 12, 14, 53, 55, 56, 99 |
| | | | | PSI | 20306 | Peer Support - Adult - Individual | 180 | 156 | 180 | 156 | 48 | 11, 12, 53, 99 |
| | | | | PSW | 20302 | Peer Support Whole Health & Wellness | 180 | 156 | 180 | 156 | 6 | 11, 12, 53, 99 |
| Output | SU | WTRSR | WTRS - Residential | BHA | 10101 | BH Assmt & Service Plan Development | 180 | 32 | 180 | 32 | 24 | 11, 12, 53, 99 |
| | | | | DAS | 10103 | Diagnostic Assessment | 180 | 4 | 180 | 4 | 2 | 11, 12, 53, 99 |
| | | | | CAO | 10104 | Interactive Complexity | 180 | 48 | 180 | 48 | 4 | 11, 12, 53, 99 |
| | | | | PEM | 10120 | Psychiatric Treatment - (E&M) | 180 | 24 | 180 | 24 | 2 | 11, 12, 53, 99 |
| | | | | NRS | 10131 | Nursing Services | 180 | 48 | 180 | 48 | 16 | 11, 12, 53, 99 |
| | | | | MED | 10140 | Medication Administration | 180 | 40 | 180 | 40 | 1 | 11, 12, 53, 99 |
| | | | | WTR | 20516 | WTRS - Residential | 180 | 180 | 180 | 180 | 1 | 11, 12, 14, 53, 55, 56, 99 |
| | | | | WTT | 20517 | WTRS - Transitional Bed | 180 | 180 | 180 | 180 | 1 | 11, 12, 14, 53, 55, 56, 99 |

| Level of Service | Type of Service | Type of Care Code | Type of Care Description | Service Class Code | Service Groups Available | Service Description | Initial Auth | | | Concurrent Auth | | | Max Daily Units | Place of Service |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Max Auth Length | Max Units Auth'd | Max Auth Length | Max Units Auth'd | Max Daily Units | | | |
| BFHV | HV | HV | Georgia Housing Voucher[1] | GHV | 20515 | Housing Voucher | See note[1] | See note[1] | See note[1] | See note[1] | See note[1] | Place of Service: See note[1] | See note[1] |
| Output | MH, SU, MHSU | HSUP | GHV Housing Supports | CMS | 21302 | Case Management | 180 | 140 | 180 | 140 | 24 | 11, 12, 53, 99 |
| | | | | PSI | 20306 | Peer Support – Adult - Individual | 180 | 520 | 180 | 520 | 48 | 11, 12, 53, 99 |
| | | | | PSR | 10151 | Psychosocial Rehabilitation - Individual | 180 | 300 | 180 | 300 | 48 | 11, 12, 53, 99 |
| | | | | ADS | 10152 | Addictive Disease Support Services | 180 | 100 | 180 | 100 | 48 | 11, 12, 53, 99 |
| | | | | CIN | 10110 | Crisis Intervention | 180 | 64 | 180 | 64 | 16 | 11, 12, 53, 99 |
| | | | | CT1 | 21202 | Community Transition Planning | 180 | 32 | 180 | 32 | 24 | 11, 12, 53, 99 |
| | | | | CL4 | 20514 | Community Residential Rehabilitation 4 | 180 | 36 | 180 | 36 | 8 | 11, 12, 53, 99 |

1 Georgia Housing Voucher authorizations are entered by DBHDD staff.

**SECTION III**
**SERVICE DEFINITIONS**

## Child and Adolescent Non-Intensive Outpatient Services

### Behavioral Health Assessment

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MH Assessment by a non-Physician | Practitioner Level 2, In-Clinic | H0031 | U2 | U6 | | | $38.97 | Practitioner Level 2, Out-of-Clinic | H0031 | U2 | U7 | | | $46.76 |
| | Practitioner Level 3, In-Clinic | H0031 | U3 | U6 | | | $30.01 | Practitioner Level 3, Out-of-Clinic | H0031 | U3 | U7 | | | $36.68 |
| | Practitioner Level 4, In-Clinic | H0031 | U4 | U6 | | | $20.30 | Practitioner Level 4, Out-of-Clinic | H0031 | U4 | U7 | | | $24.36 |
| | Practitioner Level 5, In-Clinic | H0031 | U5 | U6 | | | $15.13 | Practitioner Level 5, Out-of-Clinic | H0031 | U5 | U7 | | | $18.15 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | H0031 | GT | U2 | | | $38.97 | Practitioner Level 4, Via interactive audio and video telecommunication systems | H0031 | GT | U4 | | | $20.30 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | H0031 | GT | U3 | | | $30.01 | Practitioner Level 5, Via interactive audio and video telecommunication systems | H0031 | GT | U5 | | | $15.13 |
| | Utilization Criteria | TBD | | | | | | | | | | | | |

| Unit Value | 15 minutes |
|---|---|
| Service Definition | The Behavioral Health Assessment process consists of a face-to-face comprehensive clinical assessment with the individual, which must include the youth's perspective as a full partner and should include family/responsible caregiver(s) and others significant in the youth's life as well as other involved agencies/treatment providers.

The purpose of the Behavioral Health Assessment process is to gather all information needed in to determine the youth's problems, symptoms, strengths, needs, abilities, resources and preferences, to develop a social (extent of natural supports and community integration) and medical history, to determine functional level and degree of ability versus disability, if necessary, to assess trauma history and status, and to engage with collateral contacts for other assessment information. An age-sensitive suicide risk assessment shall also be completed. The information gathered should support the determination of a differential diagnosis and assist in screening for/ruling-out potential co-occurring disorders.

As indicated, information from medical, nursing, school, nutritional, etc. staff should serve as the basis for the comprehensive assessment and the resulting IRP. |
| Admission Criteria | 1.  A known or suspected mental illness or substance-related disorder; and
2.  Initial screening/intake information indicates a need for further assessment. |
| Continuing Stay Criteria | The youth's situation/functioning has changed in such a way that previous assessments are outdated. |
| Discharge Criteria | 1.  An adequate continuing care plan has been established; **and one or more of the following:**
2.  Individual has withdrawn or been discharged from service; **or**
3.  Individual no longer demonstrates need for additional assessment. |
| Service Accessibility | To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include: |

## Behavioral Health Assessment

|  |  |
|---|---|
| | • the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individuals language versus use of interpreters; and/or |
| | • the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service. |
| | Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual/family must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. |
| Required Components | 1. Any diagnosis given to an individual must come from persons identified in O.C.G.A Practice Acts as qualified to provide a diagnosis. These practitioners include a licensed clinical social worker, licensed psychologist, licensed marriage and family therapist, licensed professional counselor, a physician or a PA or APRN (NP and CNS-PMH) working in conjunction with a physician with an approved job description or protocol. |
| | 2. The behavioral health assessment process must include a face-to-face comprehensive clinical assessment with the youth. Beyond this face-to-face assessment, additional collateral information gathered from the youth, from family members/caregivers, significant others, other involved agencies/treatment providers, and any other relevant individuals may be collected telephonically. |
| | 3. An initial Behavioral Health Assessment is required within the first 30 days of service with ongoing assessments completed as demanded by changes with an individual. |
| Staffing Requirements | 1. Practitioner scope of practice is often defined in law and/or regulation. As such, while U4 and U5 practitioners are supporting partners in the assessment process, certain aspects of assessment must be completed by practitioners licensed or certified to do so. |
| | 2. As indicated, medical, nursing, peer, school, nutritional, etc. staff can provide information from the individual, records, and various multi-disciplinary resources to complete the comprehensive nature of the assessment. Time spent gathering this information may be billed as long as the detailed documentation justifies the time and need for capturing said information. |
| | 3. Addictions counselors/SUD-certified practitioners may deliver this service when: |
| | a. A presenting individual has a known or suspected substance use disorder (including those with known/suspected co-occurring MH/SUD diagnoses); and/or |
| | b. The service is delivered at a location wherein it can be expected that all individuals presenting have a substance use disorder (including those with known/suspected co-occurring MH/SUD diagnoses); |
| | AND |
| | c. If, during the course of service delivery, there is evidence of either a singular MH condition (i.e. without a co-occurring SUD), or a co-occurring MH condition that rises to a certain level of acuity/complexity (e.g. psychosis, symptoms of major depression, etc.), then additional assessment should be coordinated with a partnering U1-U3 level practitioner who can provide necessary supporting assessment interventions. |
| Documentation Requirements | 1. In addition to any specific assessment documents resulting from the delivery of this service, there must be a Progress Note in the individual's medical record that supports each claim submitted for this service, in accordance with Part II – Community Service Requirements for BH Providers, Section III – Documentation Requirements, 8. Progress Notes of this manual. |
| Billing & Reporting Requirements | 2. A provider may submit an authorization request and subsequent claim for BHA for an individual who may have been erroneously referred for assessment and, upon the results of that assessment, it is determined that the person does not meet eligibility as defined in this manual. |
| | 3. When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |

# Behavioral Health Clinical Consultation

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Interprofessional Telephone Consultation | Practitioner Level 1 | 99446 | U1 | | | | $38.81 | Practitioner Level 2 | 99446 | U2 | | | | $25.98 |
| Unit Value | 15 minutes | | | | | | | Utilization Criteria | TBD | | | | | |

**Service Definition**

This service includes an inter-professional telephone consultation between physicians (practitioner level 1) and/or physician extenders (practitioner level 2) in which the physician/extender with the enrolled DBHDD agency provides or receives specialty expertise opinion and/or treatment advice to/from another treating physician/extender regarding an individual who is enrolled receiving DBHDD services/supports. The physician/extender colleagues collaboratively confer to:

• Request/receive a clinical/medical opinion related to the behavioral health condition; and/or

• Assist the behavioral health/medical provider with diagnosing; and/or

• Support/manage the diagnosis and/or management of an individual's presenting condition without the need for the individual's face-to-face contact with the other practitioner; and/or

• Consult about alternatives to medication, medication combined with psychosocial treatments and potential results of medication usage; and/or

• Identify and plan for additional services; and/or

• Coordinate or revise a treatment plan; and/or

• Understand the complexities of co-occurring medical conditions on the individual's behavioral health recovery plan (e.g. kidney failure, diabetes, high blood pressure, etc.); and/or

• Reviewing the individual's progress for the purposes of collaborative treatment outcomes.

**Admission Criteria**

1. Individual must meet the Admission Criteria elements as defined in the Psychiatric Treatment definition herein; and
2. Individual must be a registered recipient of DBHDD services (in the Georgia Collaborative ASO system); and
3. Individual must have a condition or presentation of symptoms that require the advice, opinion, and/or coordination with a supporting physician/extender.

**Continuing Stay Criteria**

1. Individual continues to meet the admission criteria; or
2. Individual exhibits acute disabling conditions of sufficient severity to bring about a significant impairment in day-to-day functioning; or
3. Individual continues to present symptoms that are likely to respond to pharmacological interventions; or
4. Individual continues to demonstrate symptoms that are likely to respond or are responding to medical interventions; or
5. Individual continues to require management of pharmacological treatment in order to maintain symptom remission.

**Discharge Criteria**

Individual no longer meets criteria defined in the admission criteria above.

**Clinical Exclusions**

Individuals are inappropriate for medical consultation when the physician/extender needs more information than can be provided telephonically by the health provider.

**Required Components**

1. A consultation request from a physician/extender seeking the specialty opinion or guidance of a physician/extender while treating an individual with a co-morbid medical condition; and
2. This service may be utilized at various points in the individual's course of treatment and recovery; however, each intervention is intended to be a discrete time-limited service that stabilizes the individual and moves him/her to the appropriate course of treatment/level of care.

**Staffing Requirements**

1. The practitioner must be employed by a DBHDD enrolled Tier I or Tier I agency.
2. Practitioners able to provide consultation are those who are recognized as levels 1-2 practitioners in the Service X Practitioner Table A included herein; and
3. The practitioner must devote full attention to the individual served and cannot provide services to other individuals during the time identified in the medical record and in the related claim/encounter/submission.

## Behavioral Health Clinical Consultation

| | |
|---|---|
| Clinical Operations | 1. When the treating physician or other qualified health providers asks for a consultation, the consultant should establish the urgency of the consultation (e.g., emergency, routine, within 24 hours).<br>2. When engaging in a consultation, the practitioner should be prepared to provide:<br>  a. Individual demographics;<br>  b. Date and results of initial or most recent behavioral health evaluation;<br>  c. Diagnosis and/or presenting behavioral health condition(s);<br>  d. Prescribed medications; and<br>  e. Supporting health providers' name and contact information.<br>3. The consultant providing medical guidance and advice should have the following credentials and skillset:<br>  a. Licensed and in good standing with the Georgia Composite Medical Board;<br>  b. Ability to recognize and categorize symptoms;<br>  c. Ability to assess medication effects and drug-to-drug interactions;<br>  d. Ability to initiate transfers to medical services; and<br>  e. Ability to assist with disposition planning.<br>4. The advice and/or guidance of the consultant should be considered during treatment/recovery and discharge planning, and clearly documented in the individual's medical record. |
| Service Accessibility | 1. Services are available 24-hours/day, 7 days per week, and offered by telephone; and<br>2. Demographic information collected shall include a preliminary determination of hearing status to determine referral to DBHDD Office of Deaf Services. |
| Documentation Requirements | 1. Requests between the practitioners (or their representatives) may be written or verbal. Either type of request shall be documented in the individual's medical record and noted as an administrative note (i.e. no charge).<br>2. In addition to all elements defined in this provider manual for the documentation of an encounter, for this service additional elements required are as follows:<br>  a. The DBHDD enrolled agency physician/extender who requests a consultation from an external provider should clearly document:<br>    i. The External Physician/Extender name and specialty practice area; and<br>    ii. A justification of signs, symptoms, or other co-morbid health interactions that reflect why the consultation was requested; and<br>    iii. Advice, guidance, and/or result of the consulting behavioral health provider consultation.<br>  b. When a practitioner external to the DBHDD enrolled agency requests a consultation from the DBHDD enrolled agency physician/extender, the practitioner should clearly document the following:<br>    i. The External Physician/Extender name and specialty practice area; and<br>    ii. The requesting reason for the consultation, medical advice and/or guidance provided to the healthcare provider; and<br>    iii. Any collaborative outcome/plan which will impact the overall IRP. |
| Billing & Reporting Requirements | 1. The only practitioners who can bill this service are Physicians and Physician Extenders who work for a Tier I or Tier II provider who is approved to deliver Physician Assessment services through the DBHDD.<br>2. The DBHDD enrolled provider must consult with an *external* Physician/Extender (e.g., emergency department, primary care, etc.). In other words, billing for internal consultations are not permitted through this code. |

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|

## Community Support

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|

## Community Support

| | Practitioner Level | | | | Value |
|---|---|---|---|---|---|
| Community Support | Practitioner Level 4, In-Clinic | H2015 | U4 | U6 | $20.30 |
| | Practitioner Level 5, In-Clinic | H2015 | U5 | U6 | $15.13 |
| | Practitioner Level 4, Out-of-Clinic | H2015 | U4 | U7 | $24.36 |
| | Practitioner Level 5, Out-of-Clinic | H2015 | U5 | U7 | $18.15 |
| | Practitioner Level 4, Via interactive audio and video telecommunication systems | H2015 | GT | U4 | $20.30 |

| Practitioner Level | | | | | Value |
|---|---|---|---|---|---|
| Practitioner Level 4, In-Clinic, Collateral Contact | H2015 | UK | U4 | U6 | $20.30 |
| Practitioner Level 5, In-Clinic, Collateral Contact | H2015 | UK | U5 | U6 | $15.13 |
| Practitioner Level 4, Out-of-Clinic, Collateral Contact | H2015 | UK | U4 | U7 | $24.36 |
| Practitioner Level 5, Out-of-Clinic, Collateral Contact | H2015 | UK | U5 | U7 | $18.15 |
| Practitioner Level 5, Via interactive audio and video telecommunication systems | H2015 | GT | U5 | | $15.13 |

| Unit Value | Utilization Criteria |
|---|---|
| 15 minutes | TBD |

**Service Definition**

Community Support services consist of rehabilitative, environmental support and resources coordination considered essential to assist a youth/family in gaining access to necessary services and in creating environments that promote resiliency and support the emotional and functional growth and development of the youth. The service activities of Community Support include:

1. Assistance to the youth and family/responsible caregivers in the facilitation and coordination of the Individual Resiliency Plan (IRP) including providing skills support in the youth/family's self-articulation of personal goals and objectives;
2. Planning in a proactive manner to assist the youth/family in managing or preventing crisis situations;
3. Individualized interventions, which shall have as objectives:

   a. Identification, with the youth, of strengths which may aid him/her in achieving resilience, as well as barriers that impede the development of skills necessary for age-appropriate functioning in school, with peers, and with family;

   b. Support to facilitate enhanced natural and age-appropriate supports (including support/assistance with defining what wellness means to the youth in order to assist them with resiliency-based goal setting and attainment);

   c. Assistance in the development of interpersonal, community coping and functional skills (including adaptation to home, school and healthy social environments);

   d. Encouraging the development and eventual succession of natural supports in living, learning, working, other social environments;

   e. Assistance in the acquisition of skills for the youth to self-recognize emotional triggers and to self-manage behaviors related to the youth's identified emotional disturbance;

   f. Assistance with personal development, school development, school performance, work performance, and functioning in social and family environment through teaching skills/strategies to ameliorate the effect of behavioral health symptoms;

   g. Assistance in enhancing social and coping skills that ameliorate life stresses resulting from the youth's emotional disturbance;

   h. Service and resource coordination to assist the youth and family in gaining access to necessary rehabilitative, medical, social and other services and supports;

   i. Assistance to youth and other supporting natural resources with illness understanding and self-management;

   j. Any necessary monitoring and follow-up to determine if the services accessed have adequately met the youth's needs;

   k. Identification, with the youth/family, of risk indicators related to substance related disorder relapse, and strategies to prevent relapse.

This service is provided to youth in order to promote stability and build towards age-appropriate functioning in their daily environment. Stability is measured by a decreased number of hospitalizations, by decreased frequency and duration of crisis episodes and by increased and/or stable participation in school and community activities. Supports based on the youth's needs are used to promote resiliency while understanding the effects of the emotional disturbance and/or substance use

## Community Support

disorder and to promote functioning at an age-appropriate level. The Community Support staff will serve as the primary coordinator of behavioral health services and will provide linkage to community, general entitlements; and psychiatric, substance use disorder, medical services, crisis prevention and intervention services.

**Admission Criteria**

1. Individual must meet target population criteria as indicated above; **and one or more of the following:**
2. Individual may need assistance with developing, maintaining, or enhancing social supports or other community coping skills; **or**
3. Individual may need assistance with daily living skills including coordination to gain access to necessary rehabilitative and medical services.

**Continuing Stay Criteria**

1. Individual continues to meet admission criteria; **and**
2. Individual demonstrates documented progress or maintenance of community skills relative to goals identified in the Individualized Resiliency Plan.

**Discharge Criteria**

1. An adequate continuing care plan has been established; **and one or more of the following:**
2. Goals of Individualized Resiliency Plan have been substantially met; **or**
3. Individual/family requests discharge and the individual is not imminently in danger of harm to self or others; **or**
4. Transfer to another service is warranted by change in the individual's condition.

**Service Exclusions**

1. Intensive Family Intervention may be provided concurrently during transition between these services for support and continuity of care for a maximum of four units of CSI per month. If services are provided concurrently, CSI should not be duplication of IFI services. This service must be adequately justified in the Individualized Resiliency Plan.
2. Assistance to the youth and family/responsible caregivers in the facilitation and coordination of the Individual Resiliency Plan (IRP) including providing skills support in the youth/family's self-articulation of personal goals and objectives can be billed as CSI; however, the actual plan development must be billed and provided in accordance with the service guideline for Service Plan Development.
3. The billable activities of Community Support do not include:
   a. Transportation.
   b. Observation/Monitoring.
   c. Tutoring/Homework Completion.
   d. Diversionary Activities (i.e., activities/time for which a therapeutic intervention tied to a goal on the individual's recovery/resiliency plan (IRP) is not occurring).

**Clinical Exclusions**

1. There is a significant lack of community coping skills such that a more intensive service is needed.
2. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a co-occurring Behavioral Health condition: Developmental Disability, Autism, Neurocognitive Disorder, Traumatic Brain Injury.

**Required Components**

1. Community Support services must include a variety of interventions in order to assist the individual in developing:
   a. Symptom self-monitoring and self-management of symptoms.
   b. Strategies and supportive interventions for avoiding out-of-home placement for youth and building stronger family support skills and knowledge of the youth or youth's strengths and limitations.
   c. Relapse prevention strategies and plans.
2. Community Support services focus on building and maintaining a therapeutic relationship with the youth and facilitating treatment and resiliency goals.
3. Contact must be made with youth receiving Community Support services a minimum of twice each month. At least one of these contacts must be face-to-face and the second may be either face-to-face or telephone contact (denoted by the UK modifier) depending on the youth's support needs and documented preferences of the family.
4. At least 50% of CSI service units must be delivered face-to-face with the identified youth receiving the service and at least 80% of all face-to-face service units must be delivered in non-clinic settings over the authorization period (these units are specific to single individual records and are not aggregate across an agency/program or multiple payers).
5. In the absence of the required monthly face-to-face contact **and** if at least two unsuccessful attempts to make face-to-face contact have been tried and documented, the provider may bill for a maximum of two telephone contacts in that specified month (denoted by the UK modifier).
6. Unsuccessful attempts to make contact with the individual are not billable.
7. When the primary focus of Community Support services for youth is medication maintenance, the following allowances apply:

## Community Support

| | |
|---|---|
| Staffing Requirements | a. These youths are not counted in the offsite service requirement or the individual-to-staff ratio; and |
| | b. These youths are not counted in the monthly face-to-face contact requirement; however, face-to-face contact is required every 3 months and monthly calls are an allowed billable service. |
| | Community Support practitioners may have the recommended individual-to-staff ratio of 30 individuals per staff member and must maintain a maximum ratio of 50 individuals per staff member. Youth who receive only medication maintenance are not counted in the staff ratio calculation. |
| Clinical Operations | 1. Community Support services provided to youth must include coordination with family and significant others and with other systems of care (such as the school system, etc.) juvenile justice system, and child welfare and child protective services when appropriate to treatment and educational needs. This coordination with other child-serving entities is an essential component of Community Support and can be billed for up to 70 percent of the contacts when directly related to the support and enhancement of the youth's resilience. When this type of intervention is delivered, it shall be designated with a UK modifier. |
| | 2. The organization must have a Community Support Organizational Plan that addresses the following: |
| | a. Description of the particular rehabilitation, resiliency and natural support development models utilized, types of intervention practiced, and typical daily schedule for staff. |
| | b. Description of the staffing pattern and how staff are deployed to assure that the required staff-to-individual ratios are maintained, including how unplanned staff absences, illnesses, or emergencies are accommodated, how case mix is managed, access, etc. |
| | c. Description of the hours of operations as related to access and availability to the youth served; and |
| | d. Description of how the plan for services is modified or adjusted to meet the needs specified in every Individualized Resiliency Plan. |
| | 3. Utilization (frequency and intensity) of CSI should be directly related to the CANS and to the other functional elements of the youth's assessment. |
| | 4. When clinical/functional needs are great, there should be complementary therapeutic services by licensed/credential professionals paired with the provision of CSI (individual, group, family, etc.). |
| Service Accessibility | 1. Specific to the "Medication Maintenance Track," individuals who require more than 4 contacts per quarter for two consecutive quarters (as based upon clinical need) are expected to be re-evaluated with the CANS for enhanced access to CSI and/or other services. The designation of the CSI "medication maintenance track" should be lifted and exceptions stated above in A.10. are no longer applied. |
| | 2. To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include: |
| | • the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or |
| | • the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service. |
| | Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual/family must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. |
| Billing & Reporting Requirements | 1. When a billable collateral contact is provided, the H2015UK reporting mechanism shall be utilized. A collateral contact is classified as any contact that is not face-to-face with the individual. |
| | 2. When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|

## Community Transition Planning

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|

## Community Transition Planning

| | | | | |
|---|---|---|---|---|
| Community Transition Planning | Community Transition Planning (State Hospital) | T2038 | ZH | $20.92 |
| | Community Transition Planning (Crisis Stabilization Unit) | T2038 | ZC | $20.92 |
| | Community Transition Planning (PRTF) | T2038 | ZP | $20.92 |
| | Community Transition Planning (Jail / Youth Detention Center) | T2038 | ZJ | $20.92 |
| | Community Transition Planning (Other) | T2038 | ZO | $20.92 |

| | |
|---|---|
| Unit Value | 15 minutes |
| Utilization Criteria | Available to those currently in qualifying facilities who meet the DBHDD Eligibility Definition |
| Service Definition | Community Transition Planning (CTP) is a service provided by Tier 1, Tier II and IFI providers to address the care, service, and support needs of youth to ensure a coordinated plan of transition from a qualifying facility to the community. Each episode of CTP must include contact with the individual, family, or caregiver with a minimum of one (1) face-to-face or telephonic contact with the individual prior to release from a facility. Additional Transition Planning activities include educating the individual, family, and/or caregiver on service options offered by the chosen primary service agency, participating in facility treatment team meetings to develop a transition plan.<br><br>In partnership between other community service providers and the hospital/facility staff, the community service agency maintains responsibility for carrying out transitional activities either by the individual's chosen primary service coordinator or by the service coordinator's designated Community Transition Liaison. CTP may also be used for Community Support staff. ACT team members and Certified Peer Specialists who work with the individual in the community or will work with the individual in the future to maintain or establish contact with the individual.<br><br>CTP consists of the following interventions to ensure the youth, family, and/or caregiver transitions successfully from the facility to their local community:<br>1. Establishing a connection or reconnection with the youth/parent/caregiver through supportive contacts while in the qualifying facility. By engaging with the youth, this helps to develop and strengthen a relationship.<br>2. Educating the youth/parent/caregiver about local community resources and service options available to meet their needs upon transition into the community. This allows the youth/parent/caregiver to make self-directed, informed choices on service options to best meet their needs;<br>3. Participating in qualifying facility team meetings especially in person centered planning for those in an out-of-home treatment facility, to share hospital and community information related to estimated length of stay, present problems related to admission, discharge/release criteria, progress toward recovery goals, personal strengths, available supports and assets, medical condition, medication issues, and community-based service needs;<br>4. Linking the youth with community services including visits between the youth and the Community Support staff, or IFI team members who will be working with the youth/parent/caregiver in the community to improve the likelihood of the youth accepting services and working toward change.<br>5. Conducting any screenings or necessary assessments to engage the youth and refer them to appropriate services. |
| Admission Criteria | Individual who meets DBHDD Eligibility while in one of the following qualifying facilities:<br>1. State Operated Hospital,<br>2. Crisis Stabilization Unit (CSU),<br>3. Psychiatric Residential Treatment Facility (PRTF),<br>4. Jail/Youth Development Center (YDC), or<br>5. Other (ex: Community Psychiatric Hospital). |
| Continuing Stay Criteria | Same as above. |

## Community Transition Planning

| | |
|---|---|
| Discharge Criteria | 1. Individual/family requests discharge; or<br>2. Individual no longer meets DBHDD Eligibility; or<br>3. Individual is discharged from a qualifying facility. |
| Clinical Exclusions | Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a co-occurring Behavioral Health condition: Developmental Disability, Autism, Neurocognitive Disorder, Traumatic Brain Injury. |
| Required Components | Prior to Release from a Qualifying Facility: When an individual is admitted to a Qualifying Facility, a community transition plan in partnership with the facility is required. Evidence of planning shall be recorded, and a copy of the Plan shall be included in both the youth's hospital and community record. |
| Clinical Operations | 1. Because individuals receiving CTP may be in settings in which there are needs for immediate engagement, yet there is restricted access to the setting, the initial IRP for an individual may be more generic (i.e., less individualized) at the onset of treatment/support.<br>    A. The allowance for "generic" content of the IRP shall not extend beyond three (3) months.<br>    B. It is expected that the IRP be individualized and recovery-oriented after the team becomes engaged with the individual and comes to know the individual.<br>2. IFI providers may provide this service to those youth who are working towards transition into the community (as defined in the CTP guideline) and are expected to receive services from the IFI team. Please refer to the CTP Guideline for the detail.<br>3. Community Transition Planning activities may include:<br>    a. Telephone and Face-to-face contacts with youth/family/caregiver;<br>    b. Participating in youth's clinical staffing(s) prior to their discharge from the facility;<br>    c. Applications for resources and services prior to discharge from the facility, including:<br>        i. Healthcare;<br>        ii. Entitlements for which they are eligible;<br>        iii. Education;<br>        iv. Consumer Support Services;<br>        v. Applicable waivers, i.e., PRTF, and/or Intellectual and/or Developmental Disabilities (I/DD); and<br>        vi. Obtaining legal documentation/identification(s). |
| Service Accessibility | 1. This service must be available 7 days a week (if the qualifying facility discharges or releases 7 days a week).<br>2. This service may be delivered via telemedicine technology or via telephone conferencing. |
| Billing & Reporting Requirements | 1. The modifier on Procedure Code indicates setting from which the individual is transitioning.<br>2. There must be a minimum of one face-to-face or telephone contact with the youth prior to release from hospital or qualifying facility in order to bill for this service. |
| Documentation Requirements | 1. A documented Community Transition Plan for all individuals.<br>2. Documentation of all face-to-face and telephone contacts and a description of progress with Community Transition Plan implementation and outcomes. |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Practitioner Level 1, In-Clinic | H2011 | U1 | U6 | | | $58.21 |
| Practitioner Level 2, In-Clinic | H2011 | U2 | U6 | | | $38.97 |
| Practitioner Level 3, In-Clinic | H2011 | U3 | U6 | | | $30.01 |
| Practitioner Level 4, In-Clinic | H2011 | U4 | U6 | | | $20.30 |
| Practitioner Level 5, In-Clinic | H2011 | U5 | U6 | | | $15.13 |

## Crisis Intervention

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Crisis Intervention | Practitioner Level 1, Out-of-Clinic | H2011 | U1 | U7 | | | $74.09 |
| | Practitioner Level 2, Out-of-Clinic | H2011 | U2 | U7 | | | $46.76 |
| | Practitioner Level 3, Out-of-Clinic | H2011 | U3 | U7 | | | $36.68 |
| | Practitioner Level 4, Out-of-Clinic | H2011 | U4 | U7 | | | $24.36 |
| | Practitioner Level 5, Out-of-Clinic | H2011 | U5 | U7 | | | $18.15 |

## Crisis Intervention

| Service | Code | Mod | Mod | Rate | Service | Code | Mod | Mod | Rate |
|---|---|---|---|---|---|---|---|---|---|
| Practitioner Level 1, Via interactive audio and video telecommunication systems | H2011 | GT | U1 | $58.21 | Practitioner Level 1, Via interactive audio and video telecommunication systems | H2011 | GT | U4 | $20.30 |
| Practitioner Level 2, Via interactive audio and video telecommunication systems | H2011 | GT | U2 | $38.97 | Practitioner Level 2, Via interactive audio and video telecommunication systems | H2011 | GT | U5 | $15.13 |
| Practitioner Level 3, Via interactive audio and video telecommunication systems | H2011 | GT | U3 | $30.01 | | | | | |
| Practitioner Level 1, In-Clinic, first 60 minutes (base code) | 90839 | U1 | U6 | $232.84 | Practitioner Level 1, In-Clinic, add-on each additional 30 mins. | 90840 | U1 | U6 | $116.42 |
| Practitioner Level 2, In-Clinic, first 60 minutes (base code) | 90839 | U2 | U6 | $155.88 | Practitioner Level 2, In-Clinic, add-on each additional 30 mins. | 90840 | U2 | U6 | $77.94 |
| Practitioner Level 3, In-Clinic, first 60 minutes (base code) | 90839 | U3 | U6 | $120.04 | Practitioner Level 3, In-Clinic, add-on each additional 30 mins. | 90840 | U3 | U6 | $60.02 |
| Practitioner Level 1, In-Clinic, first 60 minutes (base code) | 90839 | U1 | U6 | $296.36 | Practitioner Level 1, Out-of-Clinic, add-on each additional 30 mins. | 90840 | U1 | U7 | $148.18 |
| Practitioner Level 2, In-Clinic, first 60 minutes (base code) | 90839 | U2 | U6 | $187.04 | Practitioner Level 2, Out-of-Clinic, add-on each additional 30 mins. | 90840 | U2 | U7 | $93.52 |
| Practitioner Level 3, In-Clinic, first 60 minutes (base code) | 90839 | U3 | U6 | $146.72 | Practitioner Level 3, Out-of-Clinic, add-on each additional 30 mins. | 90840 | U3 | U7 | $73.36 |
| Practitioner Level 1, Via interactive audio and video telecommunication systems | 90839 | GT | U1 | $232.84 | Practitioner Level 1, Via interactive audio and video telecommunication systems, add-on each additional 30 mins | 90840 | GT | U1 | $116.42 |
| Practitioner Level 2, Via interactive audio and video telecommunication systems | 90839 | GT | U2 | $155.88 | Practitioner Level 2, Via interactive audio and video telecommunication systems, add-on each additional 30 mins | 90840 | GT | U2 | $77.94 |
| Practitioner Level 3, Via interactive audio and video telecommunication systems | 90839 | GT | U3 | $120.04 | Practitioner Level 3, Via interactive audio and video telecommunication systems, add-on each additional 30 mins | 90840 | GT | U3 | $60.02 |

Psychotherapy for Crisis

**Unit Value**

| | Unit Value | Maximum Daily Units* | |
|---|---|---|---|
| Crisis Intervention | 15 minutes | Crisis Intervention | 16 units |
| Psychotherapy for Crisis | 1 encounter | Psychotherapy for Crisis, base code | 2 encounters |
| | | Psychotherapy for Crisis, add-ons | 4 encounters |

**Utilization Criteria**

TBD

## Crisis Intervention

| | |
|---|---|
| Service Definition | Services directed toward the support of a child who is experiencing an abrupt and substantial change in behavior which is usually associated with a precipitating situation and which is in the direction of severe impairment of functioning or a marked increase in personal distress. Crisis Intervention is designed to prevent out of home placement or hospitalization. Often, a crisis exists at such time as a child and/or his or her family/responsible caregiver(s) decide to seek help and/or the individual, family/responsible caregiver(s), or practitioner identifies the situation as a crisis. Crisis services are time-limited and present-focused in order to address the immediate crisis and develop appropriate links to alternate services. Services may involve the youth and his/her family/responsible caregiver(s) and/or significant other, as well as other service providers.

The current family-owned safety plan, if existing, should be utilized to help manage the crisis. Interventions provided should honor and be respectful of the child and family's wishes/choices by following the plan as closely as possible in line with appropriate clinical judgment. Plans/advanced directives developed during the Assessment/IRP process should be reviewed and updated (or developed if the individual is a new individual) as part of this service to help prevent or manage future crisis situations.

Some examples of interventions that may be used to de-escalate a crisis situation could include: a situational assessment; active listening and empathic responses to help relieve emotional distress; effective verbal and behavioral responses to warning signs of crisis related behavior; assistance to, and involvement/participation of the individual (to the extent he or she is capable) in active problem solving planning and interventions; facilitation of access to a myriad of crisis stabilization and other services deemed necessary to effectively manage the crisis; mobilization of natural support systems; and other crisis interventions as appropriate to the individual and issues to be addressed. |
| Admission Criteria | 1. Treatment at a lower intensity has been attempted or given serious consideration; **and #2 and/or #3 are met:**<br>2. Youth has a known or suspected mental health diagnosis or substance related disorder; or<br>3. Youth is at risk of harm to self, others and/or property. Risk may range from mild to imminent; **and one or both of the following:**<br>  a. Youth has insufficient or severely limited resources or skills necessary to cope with the immediate crisis; or<br>  b. Youth demonstrates lack of judgment and/or impulse control and/or cognitive/perceptual abilities. |
| Continuing Stay Criteria | This service may be utilized at various points in the youth's course of treatment and recovery; however, each intervention is intended to be a discrete time-limited service that stabilizes the individual and moves him/her to the appropriate level of care. |
| Discharge Criteria | 1. Youth no longer meets continued stay guidelines; and<br>2. Crisis situation is resolved, and an adequate continuing care plan has been established. |
| Clinical Exclusions | Severity of clinical issues precludes provision of services at this level of care. |
| Clinical Operations | In any review of clinical appropriateness of this service, the mix of services offered to the individual is important. The use of crisis units will be looked at by the Administrative Services Organization in combination with other supporting services. For example, if an individual present in crisis and the crisis is alleviated within an hour but ongoing support continues, it is expected that 4 units of crisis will be billed and then some supporting service such as individual counseling will be utilized to support the individual during that interval of service. |
| Staffing Requirements | 1. 90839 and 90840 are only utilized when the content of the service delivered is Crisis Psychotherapy. Therefore, the only practitioners who can do this are those who are recognized as practitioners for Individual Counseling in the Service X Practitioner Table A. included herein.<br>2. The practitioner who will bill 90839 (and 90840 if time is necessary) must devote full attention to the individual served and cannot provide services to other individuals during the time identified in the medical record and in the related claim/encounter/submission. |

# Crisis Intervention

| | |
|---|---|
| Service Accessibility | 1. All crisis service response times for this service must be within 2 hours of the individual or other constituent contact to the provider agency. |
| | 2. Services are available 24-hours/ day, 7 days per week, and may be offered by telephone and/or face-to-face in most settings (e.g. home, school, community, clinic etc.). |
| | 3. Demographic information collected shall include a preliminary determination of hearing status to determine referral to DBHDD Office of Deaf Services. |
| | 4. To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include: |
| |     • the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or |
| |     • the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service. |
| | Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual/family must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. |
| Additional Medicaid Requirements | The daily maximum within a CSU for Crisis Intervention is 8 units/day. |
| Billing & Reporting Requirements | 1. Any use of a telephonic intervention must be coded/reported with a U6 modifier as the person providing the telephonic intervention is not expending the additional agency resources in order to be in the community where the person is located during the crisis. |
| | 2. Any use beyond 16 units will not be denied but will trigger an immediate retrospective review. |
| | 3. Psychotherapy for Crisis (90839, 90840) may be billed if the following criteria are met: |
| |     a. The nature of the crisis intervention is urgent assessment and history of a crisis situation, assessment of mental status, and disposition and is paired with psychotherapy, mobilization of resources to defuse the crisis and restore safety and the provision of psychotherapeutic interventions to minimize trauma; and |
| |     b. The practitioner meets the definition to provide therapy in the Georgia Practice Acts; and |
| |     c. The presenting situation is life-threatening and requires immediate attention to an individual who is experiencing high distress. |
| | 4. Other payers may limit who can provide 90839 and 90840 and therefore a providing agency must adhere to those third-party payers' policies regarding billing practitioners. |
| | 5. The 90839 code is utilized when the time of service ranges between 45-74 minutes and may only be utilized once in a single day. Anything less than 45 minutes can be provided either through an Individual Counseling code or through the H2011 code above (whichever best reflects the content of the intervention). |
| | 6. Add-on Time Specificity: |
| |     a. If additional time above the base 74 minutes is provided and the additional time spent is greater than 23 minutes, an additional encounter of 90840 may be billed. |
| |     b. If the additional time spent (above base code) is 45 minutes or greater, a second unit of 90840 may be billed. |
| |     c. If the additional time spent (above base code) is 83 minutes or greater, a third unit of 90840 may be billed. |
| |     d. If the additional time spent (above base code) is 113 minutes or greater, a fourth unit of 90840 may be billed. |
| | 7. 90839 and 90840 cannot be submitted by the same practitioner in the same day as H2011 above. |
| | 8. 90839 and 90840 cannot be provided/submitted for billing in the same day as 90791, 90792, 90833, or 90836. |
| | 9. Appropriate add-on codes must be submitted on the same claim as the paired base code. |
| | 10. When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |

## Diagnostic Assessment

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Psychiatric Diagnostic Evaluation (no medical service) | Practitioner Level 2, In-Clinic | 90791 | U2 | U6 | | | $116.90 |
| | Practitioner Level 2, Out-of-Clinic | 90791 | U2 | U7 | | | $140.28 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 90791 | GT | U2 | | | $116.90 |
| | Practitioner Level 1, In-Clinic | 90792 | U1 | U6 | | | $174.63 |
| | Practitioner Level 1, Out-of-Clinic | 90792 | U1 | U7 | | | $222.26 |
| | Practitioner Level 1, Via interactive audio and video telecommunication systems | 90792 | GT | U1 | | | $174.63 |
| | Practitioner Level 3, In-Clinic | 90791 | U3 | U6 | | | $90.03 |
| | Practitioner Level 3, Out-of-Clinic | 90791 | U3 | U7 | | | $110.04 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems* | 90791 | GT | U3 | | | $90.03 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 90792 | GT | U2 | | | $116.90 |
| | Practitioner Level 2, In-Clinic | 90792 | U2 | U6 | | | $116.90 |
| | Practitioner Level 2, Out-of-Clinic | 90792 | U2 | U7 | | | $140.28 |

| | | |
|---|---|---|
| Unit Value | 1 encounter | |
| Maximum Daily Units* | 1 unit per procedure code | 2 unit per procedure code |
| Utilization Criteria | TBD | |

**Service Definition**

Psychiatric diagnostic interview examination includes a history; mental status exam; evaluation and assessment of physiological phenomena (including co-morbidity between behavioral and physical health care issues); psychiatric diagnostic evaluation (including assessing for co-occurring disorders and the development of a differential diagnosis); screening and/or assessment of any withdrawal symptoms for youth with substance related diagnoses; assessment of the appropriateness of initiating or continuing services; and a disposition. These are completed by face-to-face evaluation of the youth (which may include the use of telemedicine) and may include communication with family and other sources and the ordering and medical interpretation of laboratory or other medical diagnostic studies.

**Admission Criteria**

1. Youth has a known or suspected mental illness or a substance-related disorder and has recently entered the service system; or
2. Youth is in need of annual assessment and re-authorization of service array; or
3. Youth has need of an assessment due to a change in clinical/functional status.

**Continuing Stay Criteria**

Youth's situation/functioning has changed in such a way that previous assessments are outdated.

**Discharge Criteria**

1. An adequate continuing care plan has been established; **and one or more of the following:**
2. Individual has withdrawn or been discharged from service; **or**
3. Individual no longer demonstrates need for continued diagnostic assessment.

**Required Components**

1. When providing diagnostic services to individuals who are deaf, deaf-blind, or hard of hearing, diagnosticians shall demonstrate training, supervision, and/or consultation with a qualified professional as approved by DBHDD Deaf Services.

**Staffing Requirements**

The only U3 practitioners who can provide Diagnostic Assessment are an LCSW, LMFT, or LPC.

**Service Accessibility**

1. This service may be provided via telemedicine to any individual/family who consents to this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference.

## Diagnostic Assessment

| | |
|---|---|
| Billing and Reporting Requirements | 2. 90791 is used when an initial evaluation is provided by a non-physician.<br>3. 90792 is used when an initial evaluation is provided by a physician, PA, or APRN. This 90792 intervention content would include all general behavioral health assessment as well as Medical assessment/Physical exam beyond mental status as appropriate.<br>4. If a Medicaid claim for this service denies for a Procedure-to-Procedure edit, a modifier (59) can be added to the claim and resubmitted to the MMIS for payment. |
| Additional Medicaid Requirements | The daily maximum for Diagnostic Assessment (Psychiatric Diagnostic Interview) for a youth is 2 units. Two units should be utilized only if it is necessary in a complex diagnostic case for the diagnostician to call in a physician for an assessment to corroborate or verify the correct diagnosis. |

## Family Outpatient Services: Family Counseling

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Family – BH counseling/therapy (w/o client present) | Practitioner Level 2, In-Clinic | H0004 | HS | U2 | U6 | | $38.97 | Practitioner Level 2, Out-of-Clinic | H0004 | HS | U2 | U7 | | $46.76 |
| | Practitioner Level 3, In-Clinic | H0004 | HS | U3 | U6 | | $30.01 | Practitioner Level 3, Out-of-Clinic | H0004 | HS | U3 | U7 | | $36.68 |
| | Practitioner Level 4, In-Clinic | H0004 | HS | U4 | U6 | | $20.30 | Practitioner Level 4, Out-of-Clinic | H0004 | HS | U4 | U7 | | $24.36 |
| | Practitioner Level 5, In-Clinic | H0004 | HS | U5 | U6 | | $15.13 | Practitioner Level 5, Out-of-Clinic | H0004 | HS | U5 | U7 | | $18.15 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | H0004 | GT | HS | U2 | | $38.97 | Practitioner Level 4, Via interactive audio and video telecommunication systems | H0004 | GT | HS | U4 | | $20.30 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | H0004 | GT | HS | U3 | | $30.01 | Practitioner Level 5, Via interactive audio and video telecommunication systems | H0004 | GT | HS | U5 | | $15.13 |
| Family – BH counseling/therapy (with client present) | Practitioner Level 2, In-Clinic | H0004 | HR | U2 | U6 | | $38.97 | Practitioner Level 2, Out-of-Clinic | H0004 | HR | U2 | U7 | | $46.76 |
| | Practitioner Level 3, In-Clinic | H0004 | HR | U3 | U6 | | $30.01 | Practitioner Level 3, Out-of-Clinic | H0004 | HR | U3 | U7 | | $36.68 |
| | Practitioner Level 4, In-Clinic | H0004 | HR | U4 | U6 | | $20.30 | Practitioner Level 4, Out-of-Clinic | H0004 | HR | U4 | U7 | | $24.36 |
| | Practitioner Level 5, In-Clinic | H0004 | HR | U5 | U6 | | $15.13 | Practitioner Level 5, Out-of-Clinic | H0004 | HR | U5 | U7 | | $18.15 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | H0004 | GT | HR | U2 | | $38.97 | Practitioner Level 4, Via interactive audio and video telecommunication systems | H0004 | GT | HR | U4 | | $20.30 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | H0004 | GT | HR | U3 | | $30.01 | Practitioner Level 5, Via interactive audio and video telecommunication systems | H0004 | GT | HR | U5 | | $15.13 |
| Family Psycho-therapy w/o the patient present (appropriate license required) | Practitioner Level 2, In-Clinic | 90846 | U2 | U6 | | | $38.97 | Practitioner Level 2, Out-of-Clinic | 90846 | U2 | U7 | | | $46.76 |
| | Practitioner Level 3, In-Clinic | 90846 | U3 | U6 | | | $30.01 | Practitioner Level 3, Out-of-Clinic | 90846 | U3 | U7 | | | $36.68 |
| | Practitioner Level 4, In-Clinic | 90846 | U4 | U6 | | | $20.30 | Practitioner Level 4, Out-of-Clinic | 90846 | U4 | U7 | | | $24.36 |
| | Practitioner Level 5, In-Clinic | 90846 | U5 | U6 | | | $15.13 | Practitioner Level 5, Out-of-Clinic | 90846 | U5 | U7 | | | $18.15 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 90846 | GT | U2 | | | $38.97 | Practitioner Level 4, Via interactive audio and video telecommunication systems | 90846 | GT | U4 | | | $20.30 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | 90846 | GT | U3 | | | $30.01 | Practitioner Level 5, Via interactive audio and video telecommunication systems | 90846 | GT | U5 | | | $15.13 |

## Family Outpatient Services: Family Counseling

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Conjoint Family Psycho-therapy w/ the patient presents a portion or the entire session (appropriate license required) | Practitioner Level 2, In-Clinic | 90847 | U2 | U6 | $38.97 | Practitioner Level 2, Out-of-Clinic | 90847 | U2 | U7 | $46.76 |
| | Practitioner Level 3, In-Clinic | 90847 | U3 | U6 | $30.01 | Practitioner Level 3, Out-of-Clinic | 90847 | U3 | U7 | $36.68 |
| | Practitioner Level 4, In-Clinic | 90847 | U4 | U6 | $20.30 | Practitioner Level 4, Out-of-Clinic | 90847 | U4 | U7 | $24.36 |
| | Practitioner Level 5, In-Clinic | 90847 | U5 | U6 | $15.13 | Practitioner Level 5, Out-of-Clinic | 90847 | U5 | U7 | $18.15 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 90847 | GT | U2 | $38.97 | Practitioner Level 4, Via interactive audio and video telecommunication systems | 90847 | GT | U4 | $20.30 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | 90847 | GT | U3 | $30.01 | Practitioner Level 5, Via interactive audio and video telecommunication systems | 90847 | GT | U5 | $15.13 |
| Unit Value | 15 minutes | | | | | Utilization Criteria | TBD | | | |

**Service Definition**

A therapeutic intervention or counseling service shown to be successful with identified family populations, diagnoses and service needs. Services are directed toward achievement of specific goals defined by the individual youth and by the parent(s)/responsible caregiver(s) and specified in the Individualized Resiliency Plan. The focus of family counseling is the family or subsystems within the family, e.g., the parental couple. The service is always provided for the benefit of the individual and may or may not include the individual's participation as indicated by the CPT code.

Family counseling provides systematic interactions between the identified individual, staff and the individual's family unit. This may include specific clinical interventions/activities to enhance development, enhancement or maintenance of functioning of the identified individual/family unit. This may include specific clinical interventions/activities to enhance family roles; relationships, communication and functioning that promote the structure of the individual/family unit. Specific goals/issues to be addressed though these services may include the restoration, development, enhancement or maintenance of:

1. Cognitive processing skills;
2. Healthy coping mechanisms;
3. Adaptive behaviors and skills;
4. Interpersonal skills;
5. Family roles and relationships; and
6. The family's understanding of the person's mental illness and substance-related disorders and methods of intervention, interaction and mutual support the family can use to assist their family member therapeutic goals.

Best practices such as Multi-Systemic Family Therapy, Multidimensional Family Therapy, Behavioral Family Therapy, Functional Family Therapy or others appropriate for the family and issues to be addressed should be utilized in the provision of this service.

**Admission Criteria**

1. Individual must have an emotional disturbance and/or substance-related disorder diagnosis that is at least destabilizing (markedly interferes with the ability to carry out activities of daily living or places others in danger) or distressing (causes mental anguish or suffering); **and**
2. Individual's level of functioning does not preclude the provision of services in an outpatient milieu; **and**
3. Individual's assessment indicates needs that may be supported by a therapeutic intervention shown to be successful with identified family populations and individual's diagnoses.

**Continuing Stay Criteria**

1. Individual continues to meet Admission Criteria as articulated above; **and**
2. Progress notes document progress relative to goals identified in the Individualized Resiliency Plan, but all treatment/support goals have not yet been achieved.

# Family Outpatient Services: Family Counseling

**Discharge Criteria**
1. An adequate continuing care plan has been established; **and one or more of the following:**
2. Goals of the Individualized Resiliency Plan have been substantially met; **or**
3. Individual/family requests discharge and individual is not in imminent danger of harm to self or others; **or**
4. Transfer to another service is warranted by change in individual's condition; **or**
5. Individual requires more intensive services.

**Service Exclusions**
1. Intensive Family Intervention.
2. The absence of empirical evidence for conversion therapy prohibits the use of this intervention and it is not reimbursed by DBHDD.

**Clinical Exclusions**
1. This service is not intended to supplant other services such as IID/IDD Personal and Family Support or any day services where the individual may more appropriately receive these services with staff in various community settings.
2. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a qualifying psychiatric condition/substance use disorder co-occurring with one of the following diagnoses: Intellectual/Developmental Disabilities, Autism, Neurocognitive Disorder, and Traumatic Brain Injury.

**Required Components**
1. The treatment/service orientation, modality, and goals must be specified and agreed upon by the youth/family/caregiver.
2. The Individualized Resiliency Plan for the individual includes goals and objectives specific to the family for whom the service is being provided.

**Clinical Operations**
Models of best practice delivery may include (as clinically appropriate) Multidimensional Family Therapy, Behavioral Family Therapy, Functional Family Therapy, and others as appropriate the family and issues to be addressed.

**Service Accessibility**
1. Services may not exceed 16 Billable units (combined Family Counseling and Family Therapy) in a single day. If clinical need indicates this level of intensity, other services may need to be considered for authorization.
2. To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:
   • the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or
   • the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.

   Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual/family must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference.

**Documentation Requirements**
1. If there are multiple family members in the Family Counseling session who are enrolled individuals for whom the focus of treatment is related to goals on their IRP, we recommend the following:
   a. Document the family session in the charts of each individual for whom the treatment is related to a specific goal on the individual's IRP.
   b. Charge the Family Counseling session units to **one** of the served individuals.
   c. Indicate "NC" (No Charge) on the documentation for the other individual(s) in the family session and have the note reflect that the charges for the session are assigned to another family member in the session.

**Billing & Reporting Requirements**
1. If a Medicaid claim for this service denies for a Procedure-to-Procedure edit, a modifier (59) can be added to the claim and resubmitted to the MMIS for payment.
2. When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission.

# Family Outpatient Services: Family Training

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | |

# Family Outpatient Services: Family Training

| | Service | Code | Mod | Mod | Mod | Rate |
|---|---|---|---|---|---|---|
| Family Skills Training and Development | Practitioner Level 4, In-Clinic, w/o client present | H2014 | HS | U4 | U6 | $20.30 |
| | Practitioner Level 5, In-Clinic, w/o client present | H2014 | HS | U5 | U6 | $15.13 |
| | Practitioner Level 4, Out-of-Clinic, w/o client present | H2014 | HS | U4 | U7 | $24.36 |
| | Practitioner Level 5, Out-of-Clinic, w/o client present | H2014 | HS | U5 | U7 | $18.15 |
| | Practitioner Level 4, Via interactive audio and video telecommunication systems, w/o client present | H2014 | GT | HS | U4 | 20.30 |
| | Practitioner Level 5, Via interactive audio and video telecommunication systems, w/o client present | H2014 | GT | HS | U5 | 15.13 |
| | Practitioner Level 4, In-Clinic, w/ client present | H2014 | HR | U4 | U6 | $20.30 |
| | Practitioner Level 5, In-Clinic, w/ client present | H2014 | HR | U5 | U6 | $15.13 |
| | Practitioner Level 4, Out-of-Clinic, w/ client present | H2014 | HR | U4 | U7 | $24.36 |
| | Practitioner Level 5, Out-of-Clinic, w/ client present | H2014 | HR | U5 | U7 | $18.15 |
| | Practitioner Level 4, Via interactive audio and video telecommunication systems, w/ client present | H2014 | GT | HR | U4 | $20.30 |
| | Practitioner Level 5, Via interactive audio and video telecommunication systems, w/ client present | H2014 | GT | HR | U5 | 15.13 |

| Unit Value | 15 minutes |
|---|---|
| Utilization Criteria | TBD |

**Service Definition**

A therapeutic interaction shown to be successful with identified family populations, diagnoses and service needs, provided by qualified staff. Services are directed toward achievement of specific goals defined by the individual youth and by the parent(s)/responsible caregiver(s) and specified in the Individualized Resiliency Plan (note: although interventions may involve the family, the focus or primary beneficiary of intervention must always be the individual).

Family training provides systematic interactions between the identified individual, staff and the individual's family members directed toward the restoration, development, enhancement or maintenance of functioning of the identified individual/family unit. This may include support of the family, as well as training and specific activities to enhance family roles; relationships, communication and functioning that promote the resiliency of the individual/family unit.

Specific goals/issues to be addressed through these services may include the restoration, development, enhancement or maintenance of:
1. Illness and medication self-management knowledge and skills (e.g., symptom management, behavioral management, relapse prevention skills, knowledge of medications and side effects, and motivational/skill development in taking medication as prescribed/helping a family member to take medication as prescribed);
2. Problem solving and practicing functional support;
3. Healthy coping mechanisms;
4. Adaptive behaviors and skills;
5. Interpersonal skills;
6. Daily living skills;
7. Resource access and management skills; and
8. The family's understanding of mental illness and substance related disorders, the steps necessary to facilitate recovery/resiliency, and methods of intervention, interaction and mutual support the family can use to assist their family member.

**Admission Criteria**

1. Individual must have an emotional disturbance and/or substance-related disorder diagnosis that is at least destabilizing (markedly interferes with the ability to carry out activities of daily living or places others in danger) or distressing (causes mental anguish or suffering); and
2. Individual's level of functioning does not preclude the provision of services in an outpatient setting; and
3. Individual's assessment indicates needs that may be supported by a therapeutic intervention shown to be successful with identified family populations and individual's diagnoses.

## Family Outpatient Services: Family Training

| | | |
|---|---|---|
| Continuing Stay Criteria | 1. | Individual continues to meet Admission Criteria as articulated above; **and** |
| | 2. | Progress notes document progress relative to goals identified in the IRP, but all treatment/support goals have not yet been achieved. |
| Discharge Criteria | 1. | An adequate continuing care plan has been established; **and one or more of the following:** |
| | 2. | Goals of the Individualized Resiliency Plan have been substantially met; **or** |
| | 3. | Individual/family requests discharge and individual is not in imminent danger of harm to self or others; **or** |
| | 4. | Transfer to another service is warranted by change in individual's condition; **or** |
| | 5. | Individual requires more intensive services. |
| Service Exclusions | 1. | Designated Crisis Stabilization Unit services and Intensive Family Intervention. |
| | 2. | This service is not intended to supplant other services such as Personal and Family Support or any day services where the individual may more appropriately receive these services with staff in various community settings. |
| Clinical Exclusions | | Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition/substance use disorder co-occurring with one of the following diagnoses: Intellectual/Developmental Disabilities, Autism, Neurocognitive Disorder, and Traumatic Brain Injury. |
| Required Components | 1. | The treatment orientation, modality and goals must be specified and agreed upon by the youth/family/caregiver. |
| | 2. | The Individualized Resiliency Plan for the individual includes goals and objectives specific to the youth and family for whom the service is being provided. |
| | 1. | Services may not exceed 16 Billable units (combined Family Counseling and Family Therapy) in a single day. If clinical need indicates this level of intensity, other services may need to be considered for authorization. |
| | 2. | Family Training may **not** be provided in an Institution for Mental Diseases (IMD, e.g., state or private psychiatric hospital, psychiatric residential treatment facility or Crisis Stabilization Unit with greater than 16 beds), jail, youth development center (YDC) or prison system. |
| | 3. | This service may not be provided and billed for youth who are involuntarily detained in Regional Youth Detention Centers (RYDCs) awaiting criminal proceedings, penal dispositions, or other involuntary detainment proceedings. Any exception to this requires supporting documentation from the DJJ partners. The provider holds the risk for assuring the youth's eligibility. |
| Service Accessibility | 4. | To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include: |
| | | • the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or |
| | | • the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service. |
| | | Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual/family must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. |
| Documentation Requirements | 1. | If there are multiple family members in the Family Training session who are enrolled individuals for whom the focus of treatment in the group is related to goals on their IRP, we recommend the following: |
| | | a.   Document the family session in the charts of each individual for whom the treatment is related to a specific goal on the individual's IRP. |
| | | b.   Charge the Family Training session units to **one** of the individuals. |
| | | c.   Indicate "NC" (No Charge) on the documentation for the other individual(s) in the family session and have the note reflect that the charges for the session are assigned to another family member in the session. |

## Group Outpatient Services: Group Counseling

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Group – Behavioral health counseling and therapy | Practitioner Level 2, In-Clinic | H0004 | HQ | U2 | U6 | | $8.50 |
| | Practitioner Level 3, In-Clinic | H0004 | HQ | U3 | U6 | | $6.60 |
| | Practitioner Level 4, In-Clinic | H0004 | HQ | U4 | U6 | | $4.43 |
| | Practitioner Level 5, In-Clinic | H0004 | HQ | U5 | U6 | | $3.30 |
| | Practitioner Level 2, Out-of-Clinic | H0004 | HQ | U2 | U7 | | $10.39 |
| | Practitioner Level 3, Out-of-Clinic | H0004 | HQ | U3 | U7 | | $8.25 |
| | Practitioner Level 4, Out-of-Clinic | H0004 | HQ | U4 | U7 | | $5.41 |
| | Practitioner Level 5, Out-of-Clinic | H0004 | HQ | U5 | U7 | | $4.03 |
| | Practitioner Level 2, In-Clinic; Multi-family group, w/ client present | H0004 | HQ | HR | U2 | U6 | $8.50 |
| | Practitioner Level 3, In-Clinic; Multi-family group, w/ client present | H0004 | HQ | HR | U3 | U6 | $6.60 |
| | Practitioner Level 4, In-Clinic; Multi-family group, w/ client present | H0004 | HQ | HR | U4 | U6 | $4.43 |
| | Practitioner Level 5, In-Clinic; Multi-family group, w/ client present | H0004 | HQ | HR | U5 | U6 | $3.30 |
| Group Psycho-therapy other than of a multiple family group (appropriate license required) | Practitioner Level 2, In-Clinic | 90853 | U2 | U6 | | | $8.50 |
| | Practitioner Level 3, In-Clinic | 90853 | U3 | U6 | | | $6.60 |
| | Practitioner Level 4, In-Clinic | 90853 | U4 | U6 | | | $4.43 |
| | Practitioner Level 5, In-Clinic | 90853 | U5 | U6 | | | $3.30 |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Practitioner Level 2, Out-of-Clinic, Multi-family group, with client present | H0004 | HQ | HR | U2 | U7 | $10.39 |
| Practitioner Level 3, Out-of-Clinic, Multi-family group, with client present | H0004 | HQ | HR | U3 | U7 | $8.25 |
| Practitioner Level 4, Out-of-Clinic, Multi-family group, with client present | H0004 | HQ | HR | U4 | U7 | $5.41 |
| Practitioner Level 5, Out-of-Clinic, Multi-family group, with client present | H0004 | HQ | HR | U5 | U7 | $4.03 |
| Practitioner Level 2, In-Clinic, Multi-family group, without client present | H0004 | HQ | HS | U2 | U6 | $8.50 |
| Practitioner Level 3, In-Clinic, Multi-family group, without client present | H0004 | HQ | HS | U3 | U6 | $6.60 |
| Practitioner Level 4, In-Clinic, Multi-family group, without client present | H0004 | HQ | HS | U4 | U6 | $4.43 |
| Practitioner Level 5, In-Clinic, Multi-family group, without client present | H0004 | HQ | HS | U5 | U6 | $3.30 |
| Practitioner Level 2, In-Clinic, Multi-family group, without client present | H0004 | HQ | HS | U2 | U7 | $10.39 |
| Practitioner Level 3, Out-of-Clinic, Multi-family group, without client present | H0004 | HQ | HS | U3 | U7 | $8.25 |
| Practitioner Level 4, Out-of-Clinic, Multi-family group, without client present | H0004 | HQ | HS | U4 | U7 | $5.41 |
| Practitioner Level 5, Out-of-Clinic, Multi-family group, without client present | H0004 | HQ | HS | U5 | U7 | $4.03 |
| Practitioner Level 2, Out-of-Clinic | 90853 | U2 | U7 | | | $10.39 |
| Practitioner Level 3, Out-of-Clinic | 90853 | U3 | U7 | | | $8.25 |
| Practitioner Level 4, Out-of-Clinic | 90853 | U4 | U7 | | | $5.41 |
| Practitioner Level 5, Out-of-Clinic | 90853 | U5 | U7 | | | $4.03 |

## Group Outpatient Services: Group Counseling

| | Utilization Criteria | TBD |
|---|---|---|
| Unit Value | 15 minutes | |

**Service Definition**

A therapeutic intervention or counseling service shown to be successful with identified populations, diagnoses and service needs. Services are directed toward achievement of specific goals defined by the youth and by the parent(s)/responsible caregiver(s) and specified in the Individualized Resiliency Plan. Services may address goals/issues such as promoting resiliency, and the restoration, development, enhancement or maintenance of:
1. Cognitive skills;
2. Healthy coping mechanisms;
3. Adaptive behaviors and skills;
4. Interpersonal skills;
5. Identifying and resolving personal, social, intrapersonal and interpersonal concerns.

**Admission Criteria**
1. Youth must have an emotional disturbance/substance-related disorder diagnosis that is at least destabilizing (markedly interferes with the ability to carry out activities of daily living or places others in danger) or distressing (causes mental anguish or suffering); **and**
2. The youth's level of functioning does not preclude the provision of services in an outpatient milieu; **and**
3. The individual's resiliency goal/s that are to be addressed by this service must be conducive to response by a group milieu.

**Continuing Stay Criteria**
1. Youth continues to meet admission criteria; **and**
2. Youth demonstrates documented progress relative to goals identified in the Individualized Resiliency Plan, but goals have not yet been achieved.

**Discharge Criteria**
1. An adequate continuing care plan has been established; **and one or more of the following:**
2. Goals of the Individualized Resiliency Plan have been substantially met; **or**
3. Youth and family requests discharge and the youth is not in imminent danger of harm to self or others; **or**
4. Transfer to another service/level of care is warranted by change in youth's condition; **or**
5. Youth requires more intensive services.

**Service Exclusions**
1. See Required Components, Item 2, below.
2. The absence of empirical evidence for conversion therapy prohibits the use of this intervention and it is not reimbursed by DBHDD.

**Clinical Exclusions**
1. Severity of behavioral health issue precludes provision of services.
2. Severity of cognitive impairment precludes provision of services in this level of care.
3. There is a lack of social support systems such that a more intensive level of service is needed.
4. This service is not intended to supplant other services such as IID/IDD Personal and Family Support or any day services where the individual may more appropriately receive these services with staff in various community settings.

**Required Components**
1. The treatment orientation, modality and goals must be specified and agreed upon by the youth/family/caregiver. If there are disparate goals between the youth and family, this is addressed clinically as part of the resiliency-building plans and interventions.
2. When billed concurrently with IFI services, this service must be curriculum based and/or targeted to a very specific clinical issue (e.g. incest survivor groups, perpetrator groups, sexual abuse survivor groups).

**Staffing Requirements**

Maximum face-to-face ratio cannot be more than 10 individuals to 1 direct service staff based on average group attendance.

**Clinical Operations**
1. The membership of a multiple family group (H0004 HQ) consists of multiple family units such as a group of two or more parent(s) from different families either with (HR) or without (HS) participation of their child/children.
2. Practitioners and supervisors of those providing this service are expected to maintain knowledge and skills regarding group practice such as selecting appropriate participants for a particular group, working with the group to establish necessary group norms and goals, and understanding and managing group dynamics and processes.

**Billing & Reporting Requirements**
1. When using 90853, and the intervention meets the definition of Interactive Complexity, the 90785 code will be submitted with the 90853 base code.
2. If a Medicaid claim for this service denies for a Procedure-to-Procedure edit, a modifier (59) can be added to the claim and resubmitted to the MMIS for payment.

## Group Outpatient Services: Group Training

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Group Skills Training & Development | Practitioner Level 4, In-Clinic | H2014 | HQ | U4 | U6 | | $4.43 |
| | Practitioner Level 5, In-Clinic | H2014 | HQ | U5 | U6 | | $3.30 |
| | Practitioner Level 4, Out-of-Clinic | H2014 | HQ | U4 | U7 | | $5.41 |
| | Practitioner Level 5, Out-of-Clinic | H2014 | HQ | U5 | U7 | | $4.03 |
| | Practitioner Level 4, In-Clinic, w/ client present | H2014 | HQ | HR | U4 | U6 | $4.43 |
| | Practitioner Level 5, In-Clinic, w/ client present | H2014 | HQ | HR | U5 | U6 | $3.30 |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Practitioner Level 4, Out-of-Clinic, w/ client present | H2014 | HQ | HR | U4 | U7 | $5.41 |
| Practitioner Level 5, Out-of-Clinic, w/ client present | H2014 | HQ | HR | U5 | U7 | $4.03 |
| Practitioner Level 4, In-Clinic, w/o client present | H2014 | HQ | HS | U4 | U6 | $4.43 |
| Practitioner Level 5, In-Clinic, w/o client present | H2014 | HQ | HS | U5 | U6 | $3.30 |
| Practitioner Level 4, Out-of-Clinic, w/o client present | H2014 | HQ | HS | U4 | U7 | $5.41 |
| Practitioner Level 5, Out-of-Clinic, w/o client present | H2014 | HQ | HS | U5 | U7 | $4.03 |

**Unit Value:** 15 minutes

**Utilization Criteria** — TBD

**Service Definition**

A therapeutic interaction shown to be successful with identified populations, diagnoses and service needs. Services are directed toward achievement of specific goals defined by the youth and by the parent(s)/responsible caregiver(s) and specified in the Individualized Resiliency Plan. Services may address goals/issues such as promoting resiliency, and the restoration, development, enhancement, or maintenance of:

1. Illness and medication self-management knowledge and skills (e.g., symptom management, behavioral management, relapse prevention skills, knowledge of medications and side effects, and motivational/skill development in taking medication as prescribed);
2. Problem solving skills;
3. Healthy coping mechanisms;
4. Adaptive skills;
5. Interpersonal skills;
6. Daily living skills;
7. Resource management skills;
8. Knowledge regarding emotional disturbance, substance related disorders and other relevant topics that assist in meeting the youth's and family's needs; and skills necessary to access and build community resources and natural support systems.

**Admission Criteria**

1. Youth must have an emotional disturbance/substance-related disorder diagnosis that is at least destabilizing (markedly interferes with the ability to carry out activities of daily living or places others in danger) or distressing (causes mental anguish or suffering); **and**
2. The youth's level of functioning does not preclude the provision of services in an outpatient milieu; **and**
3. The individual's resiliency goal/s that are to be addressed by this service must be conducive to response by a group milieu.

**Continuing Stay Criteria**

1. Youth continues to meet admission criteria; **and**
2. Youth demonstrates documented progress relative to goals identified in the Individualized Resiliency Plan, but goals have not yet been achieved.

**Discharge Criteria**

1. An adequate continuing care plan has been established; **and one or more of the following:**
2. Goals of the Individualized Resiliency Plan have been substantially met; **or**
3. Youth and family requests discharge and the youth is not in imminent danger of harm to self or others; **or**
4. Transfer to another service/level of care is warranted by change in youth's condition; **or**
5. Youth requires more intensive services.

## Group Outpatient Services: Group Training

| | |
|---|---|
| Service Exclusions | When billed concurrently with IFI services, this service must be curriculum based and/or targeted to a very specific clinical issue (e.g. incest survivor groups, perpetrator groups, sexual abuse survivor groups). |
| Clinical Exclusions | 1. Severity of behavioral health issue precludes provision of services.<br>2. Severity of cognitive impairment precludes provision of services in this level of care.<br>3. There is a lack of social support systems such that a more intensive level of service is needed.<br>4. This service is not intended to supplant other services such as IID/IDD Personal and Family Support or any day services where the individual may more appropriately receive these services with staff in various community settings.<br>5. Youth with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition overlaying the behavioral health diagnosis: Intellectual/Developmental Disabilities, Autism, Neurocognitive Disorder, and Traumatic Brain Injury. |
| Required Components | The functional goals addressed through this service must be specified and agreed upon by the youth/family/caregiver. If there are disparate goals between the youth and family, this is addressed clinically as part of the resiliency building plans and interventions. |
| Staffing Requirements | Maximum face-to-face ratio cannot be more than 10 individuals to 1 direct service staff based on average group attendance. |
| Clinical Operations | 1. Out-of-clinic group skills training is allowable and clinically valuable for some individuals; therefore, this option should be explored to the benefit of the individual. In this event, staff must be able to assess and address the individual needs and progress of each individual consistently throughout the intervention/activity (e.g. in an example of teaching 2-3 individuals to access public transportation in the community, group training may be given to help each individual individually to understand the bus schedule in a way that makes sense to them, to address questions/concerns each may have about how to use the bus, perhaps to spend time riding the bus with the individuals and assisting each to understand and become comfortable with riding the bus in accordance with *individual* goals, etc.)<br>2. The membership of a multiple family Group Training session (H2014 HQ) consists of multiple family units such as a group of two or more parent(s) from different families either with (HR) or without (HS) participation of their child/children. |
| Billing & Reporting Requirements | 1. Out-of-clinic group skills training is denoted by the U7 modifier. |

## Individual Counseling

| Transaction Code | | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|
| Individual Psychotherapy, insight oriented, behavior-modifying and/or supportive face-to-face w/ patient and/or family member | 30 minutes | Practitioner Level 2, In-Clinic | 90832 | U2 | U6 | | | $64.95 |
| | | Practitioner Level 3, In-Clinic | 90832 | U3 | U6 | | | $50.02 |
| | | Practitioner Level 4, In-Clinic | 90832 | U4 | U6 | | | $33.83 |
| | | Practitioner Level 5, In-Clinic | 90832 | U5 | U6 | | | $25.21 |
| | | Practitioner Level 2, Via interactive audio and video telecommunication systems | 90832 | GT | U2 | | | $64.95 |
| | | Practitioner Level 3, Via interactive audio and video telecommunication systems | 90832 | GT | U3 | | | $50.02 |
| | | Practitioner Level 2, Out-of-Clinic | 90832 | U2 | U7 | | | $77.93 |
| | | Practitioner Level 3, Out-of-Clinic | 90832 | U3 | U7 | | | $61.13 |
| | | Practitioner Level 4, Out-of-Clinic | 90832 | U4 | U7 | | | $40.59 |
| | | Practitioner Level 5, Out-of-Clinic | 90832 | U5 | U7 | | | $30.25 |
| | | Practitioner Level 4, Via interactive audio and video telecommunication systems | 90832 | GT | U4 | | | $33.83 |
| | | Practitioner Level 5, Via interactive audio and video telecommunication systems | 90832 | GT | U5 | | | $25.21 |
| | 45 minutes | Practitioner Level 2, In-Clinic | 90834 | U2 | U6 | | | $116.90 |
| | | Practitioner Level 3, In-Clinic | 90834 | U3 | U6 | | | $90.03 |
| | | Practitioner Level 4, In-Clinic | 90834 | U4 | U6 | | | $60.89 |
| | | Practitioner Level 2, Out-of-Clinic | 90834 | U2 | U7 | | | $140.28 |
| | | Practitioner Level 3, Out-of-Clinic | 90834 | U3 | U7 | | | $110.04 |
| | | Practitioner Level 4, Out-of-Clinic | 90834 | U4 | U7 | | | $73.07 |

## Individual Counseling

| | Description (In-Clinic) | Code | Mod | Mod | Rate | Description (Out-of-Clinic) | Code | Mod | Mod | Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | Practitioner Level 5, In-Clinic | 90834 | U5 | U6 | $45.38 | Practitioner Level 5, Out-of-Clinic | 90834 | U5 | U7 | $54.46 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 90834 | GT | U2 | $116.90 | Practitioner Level 4, Via interactive audio and video telecommunication systems | 90834 | GT | U4 | $60.89 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | 90834 | GT | U3 | $90.03 | Practitioner Level 5, Via interactive audio and video telecommunication systems | 90834 | GT | U5 | $45.38 |
| ~60 minutes | Practitioner Level 2, In-Clinic | 90837 | U2 | U6 | $155.87 | Practitioner Level 2, Out-of-Clinic | 90837 | U2 | U7 | $187.04 |
| | Practitioner Level 3, In-Clinic | 90837 | U3 | U6 | $120.04 | Practitioner Level 3, Out-of-Clinic | 90837 | U3 | U7 | $146.71 |
| | Practitioner Level 4, In-Clinic | 90837 | U4 | U6 | $81.18 | Practitioner Level 4, Out-of-Clinic | 90837 | U4 | U7 | $97.42 |
| | Practitioner Level 5, In-Clinic | 90837 | U5 | U6 | $60.51 | Practitioner Level 5, Out-of-Clinic | 90837 | U5 | U7 | $72.61 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 90837 | GT | U2 | $155.87 | Practitioner Level 4, Via interactive audio and video telecommunication systems | 90837 | GT | U4 | $81.18 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | 90837 | GT | U3 | $120.04 | Practitioner Level 5, Via interactive audio and video telecommunication systems | 90837 | GT | U5 | $60.51 |
| Psycho-therapy Add-on with patient and/or family in conjunction with E&M (~30 minutes) | Practitioner Level 1, In-Clinic | 90833 | U1 | U6 | $97.02 | Practitioner Level 1, Out-of-Clinic | 90833 | U1 | U7 | $123.48 |
| | Practitioner Level 2, In-Clinic | 90833 | U2 | U6 | $64.95 | Practitioner Level 2, Out-of-Clinic | 90833 | U2 | U7 | $77.93 |
| | Practitioner Level 1 | 90833 | GT | U1 | $97.02 | Practitioner Level 2 | 90833 | GT | U2 | $64.95 |
| (~45 minutes) | Practitioner Level 1, In-Clinic | 90836 | U1 | U6 | $174.63 | Practitioner Level 1, Out-of-Clinic | 90836 | U1 | U7 | $226.26 |
| | Practitioner Level 2, In-Clinic | 90836 | U2 | U6 | $116.90 | Practitioner Level 2, Out-of-Clinic | 90836 | U2 | U7 | $140.28 |
| | Practitioner Level 1 | 90836 | GT | U1 | $174.63 | Practitioner Level 2 | 90836 | GT | U2 | $116.90 |

**Utilization Criteria:** TBD

**Unit Value:** 1 encounter (Note: Time-in/Time-out is required in the documentation as it justifies which code above is billed)

**Service Definition:**

A therapeutic intervention or counseling service shown to be successful with identified youth populations, diagnoses and service needs, provided by a qualified clinician. Techniques employed involve the principles, methods and procedures of counseling that assist the youth in identifying and resolving personal, social, vocational, intrapersonal and interpersonal concerns. Individual counseling may include face-to-face in or out-of-clinic time with family members as long as the individual is present for part of the session and the focus is on the individual. Services are directed toward achievement of specific goals defined by the youth and by the parent(s)/responsible caregiver(s) and specified in the Individualized Resiliency Plan. These services address goals/issues such as promoting resiliency, and the restoration, development, enhancement or maintenance of:

1. The illness/emotional disturbance and medication self-management knowledge and skills (e.g., symptom management, behavioral management, relapse prevention skills, knowledge of medications and side effects, and motivational/skill development in taking medication as prescribed);
2. Problem solving and cognitive skills;
3. Healthy coping mechanisms;
4. Adaptive behaviors and skills;
5. Interpersonal skills; and
6. Knowledge regarding the emotional disturbance, substance related disorders and other relevant topics that assist in meeting the youth's needs.

## Individual Counseling

| | |
|---|---|
| Admission Criteria | 7. Best/evidence-based practice modalities may include (as clinically appropriate): Motivational Interviewing/Enhancement Therapy, Cognitive Behavioral Therapy, Behavioral Modification, Behavioral Management, Rational Behavioral Therapy, Dialectical Behavioral Therapy, Interactive Play Therapy, and others as appropriate to the individual and clinical issues to be addressed.<br>1. Youth must have an emotional disturbance/substance-related disorder diagnosis that is at least destabilizing (markedly interferes with the ability to carry out activities of daily living or places others in danger) or distressing (causes mental anguish or suffering); **and**<br>2. The youth's level of functioning does not preclude the provision of services in an outpatient milieu. |
| Continuing Stay Criteria | 1. Individual continues to meet admission criteria; **and**<br>2. Individual demonstrates documented progress relative to goals identified in the Individualized Resiliency Plan, but goals have not yet been achieved. |
| Discharge Criteria | 1. Adequate continuing care plan has been established; **and one or more of the following:**<br>2. Goals of the Individualized Resiliency Plan have been substantially met; **or**<br>3. Individual/family requests discharge and individual is not in imminent danger of harm to self or others; **or**<br>4. Transfer to another service is warranted by change in individual's condition; **or**<br>5. Individual requires a service approach which supports less or more intensive need. |
| Service Exclusions | Designated Crisis Stabilization Unit services and Intensive Family Intervention.<br>The absence of empirical evidence for conversion therapy prohibits the use of this intervention and it is not reimbursed by DBHDD. |
| Clinical Exclusions | 1. Severity of behavioral health disturbance precludes provision of services.<br>2. Severity of cognitive impairment precludes provision of services in this level of care.<br>3. There is a lack of social support systems such that a more intensive level of service is needed.<br>4. There is no outlook for improvement with this particular service.<br>5. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a behavioral health condition overlaying the diagnosis: Intellectual/Developmental Disabilities, Autism, Neurocognitive Disorder and Traumatic Brain Injury. |
| Required Components | The treatment orientation, modality and goals must be specified and agreed upon by the youth/family/caregiver. |
| Clinical Operations | 1. Practitioners and supervisors of those providing this service are expected to maintain knowledge and skills regarding current research trends in best/evidence-based counseling practices.<br>2. 90833 and 90836 are utilized with E/M CPT Codes as an add-on for psychotherapy and may not be billed individually. |
| Service Accessibility | 1. To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:<br>• the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or<br>• the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.<br>Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual/family must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should <u>not</u> be driven by the practitioner's/agency's convenience or preference.<br>2. Additionally, telemedicine may be utilized for 90833 and 90836 when the service is combined with CPT E&M codes and delivered by a medical practitioner (Level U1 and U2). |

## Individual Counseling

| Transaction | Detail |
|---|---|
| Billing & Reporting Requirements | 1. When 90833 or 90836 are provided with an E/M code, these are submitted together to encounter/claims system.<br>2. 90833 is used for any intervention which is 16-37 minutes in length.<br>3. 90836 is used for any intervention which is 38-52 minutes in length.<br>4. 90837 is used for any intervention which is greater than 53 minutes.<br>5. If a Medicaid claim for this service denies for a Procedure-to-Procedure edit, a modifier (59) can be added to the claim and resubmitted to the MMIS for payment with two exceptions: If the billable base code is either 90833 or 90836 and is denied for Procedure-to-Procedure edit, then a (25) modifier should be added to the claim resubmission.<br>6. Appropriate add-on codes must be submitted on the same claim as the paired base code.<br>When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |
| Documentation Requirements | 1. When 90833 or 90836 are provided with an E/M code, they are recorded on the same intervention note but the distinct services must be separately identifiable.<br>2. When 90833 or 90836 are provided with an E/M code, the psychotherapy intervention must include time in/time out in order to justify which code is being utilized (each code shall have time recorded for the two increments of service as if they were distinct and separate services). Time associated with activities used to meet criteria for the E/M service is not included in the time used for reporting the psychotherapy service. |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Interactive complexity (List separately in addition to the code for primary procedure) | 90785 | | | | | $0.00 |

**Unit Value:** 1 Encounter

## Interactive Complexity

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Interactive complexity (List separately in addition to the code for primary procedure) | 90785 | TG | | | | $0.00 |

**Utilization Criteria:** 4 units

| Transaction Code | Interactive Complexity |
|---|---|
| Service Definition | Interactive Complexity is not a direct service but functions as a modifier to Psychiatric Treatment, Diagnostic Assessment, Individual Therapy, and Group Counseling. This modifier is used when:<br>1. Communication with the individual/participant is complicated perhaps related to (e.g., high anxiety, high reactivity, repeated questions, or disagreement and therefore delivery of care is challenging).<br>2. Caregiver emotions/behaviors complicate the implementation of the IRP.<br>3. Evidence/disclosure of a sentinel event and mandated report to a third party (e.g., abuse or neglect with report to state agency) with initiation of discussion of the sentinel event and/or report with the individual and supporters.<br>4. Use of play equipment, physical devices, interpreter or translator to overcome significant language barriers (when individual served is not fluent in same language as practitioner, or when the individual has not developed or has lost expressive/receptive communication skills necessary for interactive participation in the intervention). |
| Admission Criteria | |
| Continuing Stay Criteria | These elements are defined in the specific companion service to which this modifier is anchored to in reporting/claims submission. |
| Discharge Criteria | |

## Interactive Complexity

| | |
|---|---|
| **Clinical Exclusions** | |
| **Documentation Requirements** | 1. When this code is submitted, there must be:<br>  a. Record of base service delivery code/s **AND** the Interactive Complexity code on the single note; and<br>  b. Evidence within the multi-code service note which indicates the specific category of complexity (from the list of items 1-4 in the definition above) utilized during the intervention.<br>2. The interactive complexity component relates only to the increased work intensity of the psychotherapy service but *does not* change the time for the psychotherapy service. |
| **Billing & Reporting Requirements** | 1. This service may only be reported/billed in conjunction with one of the following codes: 90791, 90792, 90832, 90834, 90837, 90853, and with the following codes only when paired with 90833 or 90836: 99201, 99211, 99202, 99212, 99203, 99213, 99204, 99214, 99205, 99215.<br>2. This Service Code paired with the TG modifier is only used when the complexity type from the Service Definition above is categorized under Item 4 **AND** an interpreter or translator is used during the intervention. So, if play equipment is the only complex intervention utilized, then TG is not utilized.<br>3. Interactive Complexity is utilized as a modifier and therefore is not required in an order or in an Individualized Recovery/Resiliency Plan. |

## Medication Administration

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Comprehensive Medication Services | Practitioner Level 2, In-Clinic | H2010 | U2 | U6 | | | $33.40 | Practitioner Level 2, Out-of-Clinic | H2010 | U2 | U7 | | | $42.51 |
| | Practitioner Level 3, In-Clinic | H2010 | U3 | U6 | | | $25.39 | Practitioner Level 3, Out-of-Clinic | H2010 | U3 | U7 | | | $33.01 |
| | Practitioner Level 4, In-Clinic | H2010 | U4 | U6 | | | $17.40 | Practitioner Level 4, Out-of-Clinic | H2010 | U4 | U7 | | | $22.14 |
| | Practitioner Level 5, In-Clinic | H2010 | U5 | U6 | | | $12.97 | | | | | | | |
| Therapeutic, prophylactic or diagnostic injection | Practitioner Level 2, In-Clinic | 96372 | U2 | U6 | | | $33.40 | Practitioner Level 2, Out-of-Clinic | 96372 | U2 | U7 | | | $42.51 |
| | Practitioner Level 3, In-Clinic | 96372 | U3 | U6 | | | $25.39 | Practitioner Level 3, Out-of-Clinic | 96372 | U3 | U7 | | | $33.01 |
| | Practitioner Level 4, In-Clinic | 96372 | U4 | U6 | | | $17.40 | Practitioner Level 4, Out-of-Clinic | 96372 | U4 | U7 | | | $22.14 |
| Alcohol, and/or drug services, methadone administration and/or service | Practitioner Level 2, In-Clinic | H0020 | U2 | U6 | | | $33.40 | Practitioner Level 4, In-Clinic | H0020 | U4 | U6 | | | $17.40 |
| | Practitioner Level 3, In-Clinic | H0020 | U3 | U6 | | | $25.39 | | | | | | | |
| Unit Value | 1 Encounter | | | | | | | | | | | | | |
| Service Definition | As reimbursed through this service, medication administration includes the act of introducing a drug (any chemical substance that, when absorbed into the body of a living organism, alters normal bodily function) into the body of another person by any number of routes including, but not limited to the following: oral, nasal, inhalant, intramuscular injection, intravenous, topical, suppository or intraocular. Medication administration requires a written service order for Medication Administration and a written order for the medication and the administration of the medication that complies with guidelines in Part II, Section 1, Subsection 6 - Medication of the Provider Manual. The order for and administration of medication must be completed by members of the medical staff pursuant to the Medical Practice Act of 2009, Subsection 43-34-23 Delegation of Authority to Nurse and Physician Assistant and must be administered by licensed or credentialed* medical personnel under the supervision of a | | | | | | | | | | | | | |
| | Utilization Criteria | TBD | | | | | | | | | | | | |

## Medication Administration

physician or registered nurse in accordance with O.C.G.A. This service does **not** cover the supervision of self-administration of medications (See Clinical Exclusions below).

The service must include:

1. An assessment, by the licensed or credentialed medical personnel administering the medication, of the youth's physical, psychological and behavioral status in order to make a recommendation regarding whether to continue the medication and/or its means of administration, and whether to refer the youth to the physician for a medication review.

2. Education to the youth and/or family/responsible caregiver(s), by appropriate licensed medical personnel, on the proper administration and monitoring of prescribed medication in accordance with the youth's resiliency plan.

For individuals who need opioid maintenance, the Opioid Maintenance Type of Care should be requested.

| | |
|---|---|
| Admission Criteria | 1. Youth presents symptoms that are likely to respond to pharmacological interventions; and<br>2. Youth has been prescribed medications as a part of the treatment/service array; and<br>3. Youth/family/responsible caregiver is unable to self-administer/administer prescribed medication because:<br>   a. Although the youth is willing to take the prescribed medication, it is an injectable form and must be administered by licensed medical personnel; **or**<br>   b. Although youth is willing to take the prescribed medication, it is a Class A controlled substance which must be stored and dispensed by medical personnel in accordance with state law; **or**<br>   c. Administration by licensed/credentialed medical personnel is necessary because an assessment of the youth's physical, psychological and behavioral status is required in order to make a determination regarding whether to continue the medication and/or its means of administration and/or whether to refer the youth to the physician for a medication review.<br>   d. Due to the family/caregiver's lack of capacity there is no responsible party to manage/supervise self-administration of medication (refer youth/family for CSI and/or Family or Group Training in order to teach these skills). |
| Continuing Stay Criteria | Youth continues to meet admission criteria. |
| Discharge Criteria | 1. Youth no longer needs medication; **or**<br>2. Youth/Family/Caregiver is able to self-administer, administer, or supervise self-administration medication; **and**<br>3. Adequate continuing care plan has been established. |
| Service Exclusions | 1. Medication administered as part of Ambulatory Detoxification is billed as "Ambulatory Detoxification" and is not billed via this set of codes.<br>2. Must not be billed in the same day as Nursing Assessment.<br>3. For individuals who need opioid maintenance, the Opioid Maintenance service should be requested. |
| Clinical Exclusions | This service does **not** cover the supervision of self-administration of medications. Self-administration of medications can be done by anyone physically and mentally capable of taking or administering medications to himself/herself. Youth with mental health issues, or developmental disabilities are very often capable of self-administration of medications even if supervision by others is needed in order to adequately or safely manage self-administration of medication and other activities of daily living. |
| Required Components | 1. There must be a written service order for Medication Administration and a written order for the medication and the administration of the medication that complies with guidelines in Part II, Section 1, Subsection 6 - Medication of the Provider Manual. The order for and administration of medication must be completed by members of the medical staff pursuant to the Medical Practice Act of 2009, Subsection 43-34-23 Delegation of Authority to Nurse and Physician Assistant. The order must be in the youth's chart. Telephone orders are acceptable provided they are co-signed by the appropriate members of the medical staff in accordance with DBHDD requirements.<br>2. Documentation must support that the individual is being trained in the risks and benefits of the medications being administered and that symptoms are being monitored by the staff member administering the medication.<br>3. Documentation must support the medical necessity of administration by licensed/credentialed medical personnel rather than by the youth, family or caregiver. |

# Medication Administration

| | |
|---|---|
| | 4. Documentation must support that the youth **AND** family/caregiver is being trained in the principles of self-administration of medication and supervision of self-administration or that the youth/family/caregiver is physically or mentally unable to self-administer/administer. This documentation will be subject to scrutiny by the Administrative Services Organization in reauthorizing services in this category.<br>5. This service does **not** include the supervision of self-administration of medication. |
| Staffing Requirements | Qualified Medication Aides working in a Community Living Arrangement (CLA) may administer medication only in a CLA. |
| Clinical Operations | 1. Medication administration may not be billed for the provision of single or multiple doses of medication that an individual has the ability to self-administer, either independently or with supervision by a caregiver, either in a clinic or a community setting. In a group home setting, for example, medications may be managed by the house parents or residential care staff and kept locked up for safety reasons. Staff may hand out medication to the residents, but this does not constitute administration of medication for the purposes of this definition and, like other watchful oversight and monitoring functions, are not reimbursable treatment services.<br>2. If individual/family requires training in skills needed in order to learn to manage his/her own medications and their safe self-administration and/or supervision of self-administration, this skills training service can be provided via the Community Support or Family/Group Training services in accordance with the person's individualized recovery/resiliency plan.<br>3. Agency employees working in residential settings such as group homes, are not eligible for CSI or Family/Group Training in the supervision of medication self-administration by youth in their care. |
| Service Accessibility | 1. Medication Administration may not be provided in an Institution for Mental Diseases (IMD, e.g., state or private psychiatric hospital, psychiatric residential treatment facility or Crisis Stabilization Unit with greater than 16 beds), jail, youth development center (YDC) or prison system.<br>2. This service may not be provided and billed for youth who are involuntarily detained in Regional Youth Detention Centers (RYDCs) awaiting criminal proceedings, penal dispositions, or other involuntary detainment proceedings. Any exception to this requires supporting documentation from the DJJ partners. The provider holds the risk for assuring the youth's eligibility. |
| Billing & Reporting Requirements | 1. If a Medicaid claim for this service denies for a Procedure-to-Procedure edit, a modifier (59) can be added to the claim and resubmitted to the MMIS for payment.<br>2. When Opioid Maintenance type of care is required for an individual, then the authorization and billing parameters set forth in Part I, Section II govern units and initial/concurrent authorization. |

# Nursing Assessment and Health Services

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Nursing Assessment/ Evaluation | Practitioner Level 2, In-Clinic | T1001 | U2 | U6 | | | $38.97 |
| | Practitioner Level 3, In-Clinic | T1001 | U3 | U6 | | | $30.01 |
| | Practitioner Level 4, In-Clinic | T1001 | U4 | U6 | | | $20.30 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | T1001 | GT | U2 | | | $38.97 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | T1001 | GT | U3 | | | $30.01 |
| RN Services, up to 15 minutes | Practitioner Level 2, In-Clinic | T1002 | U2 | U6 | | | $38.97 |
| | Practitioner Level 3, In-Clinic | T1002 | U3 | U6 | | | $30.01 |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Practitioner Level 2, Out-of-Clinic | T1001 | U2 | U7 | | | $46.76 |
| Practitioner Level 3, Out-of-Clinic | T1001 | U3 | U7 | | | $36.68 |
| Practitioner Level 4, Out-of-Clinic | T1001 | U4 | U7 | | | $24.36 |
| Practitioner Level 4, Via interactive audio and video telecommunication systems | T1001 | GT | U4 | | | $20.30 |
| | | | | | | |
| Practitioner Level 2, Out-of-Clinic | T1002 | U2 | U7 | | | $46.76 |
| Practitioner Level 3, Out-of-Clinic | T1002 | U3 | U7 | | | $36.68 |

# Nursing Assessment and Health Services

| Service | Practitioner Level | Code | Mod | Mod | Unit Value |
|---|---|---|---|---|---|
| LPN Services, up to 15 minutes | Practitioner Level 2, Via interactive audio and video telecommunication systems | T1002 | GT | U2 | $38.97 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | T1002 | GT | U3 | $30.01 |
| | Practitioner Level 4, In-Clinic | T1003 | U4 | U6 | $20.30 |
| | Practitioner Level 4, Out-of-Clinic | T1003 | U4 | U7 | $24.36 |
| Health Behavior Assessment or Re-assessment (e.g. health-focused clinical interview, behavioral observations, clinical decision making) | Practitioner Level 2, In-Clinic | 96156 | U2 | U6 | $38.97 |
| | Practitioner Level 2, Out-of-Clinic | 96156 | U2 | U7 | $62.35 |
| | Practitioner Level 3, In-Clinic | 96156 | U3 | U6 | $30.01 |
| | Practitioner Level 3, Out-of-Clinic | 96156 | U3 | U7 | $48.91 |
| | Practitioner Level 4, In-Clinic | 96156 | U4 | U6 | $20.30 |
| | Practitioner Level 4, Out-of-Clinic | 96156 | U4 | U7 | $32.48 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 96156 | GT | U2 | $38.97 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | 96156 | GT | U3 | $30.01 |
| | Practitioner Level 4, Via interactive audio and video telecommunication systems | 96156 | GT | U4 | $20.30 |

**Unit Value:** 15 minutes for T codes, 1 encounter for CPT code 96156

**Utilization Criteria:** TBD

**Service Definition:**

1. This service requires face-to-face contact with the youth/family/caregiver to monitor, evaluate, assess, and/or carry out orders of appropriate medical staff pursuant to the Medical Practice Act of 2009, Subsection 43-34-23 Delegation of Authority to Nurse and Physician Assistant regarding the psychological and/or physical problems and general wellness of the youth. It includes:

   a. Providing nursing assessments and interventions to observe, monitor and care for the physical, nutritional, behavioral health and related psychosocial issues, problems or crises manifested in the course of the youth's treatment;

   b. Assessing and monitoring the youth's response to medication(s) to determine the need to continue medication and/or to determine the need to refer the youth for a medication review;

   c. Assessing and monitoring a youth's medical and other health issues that are either directly related to the mental health or substance related disorder, or to the treatment of the condition (e.g., diabetes, cardiac and/or blood pressure issues, substance withdrawal symptoms, weight gain and fluid retention, seizures, etc.);

   d. Consulting with the youth's family/caregiver about medical, nutritional and other health issues related to the individual's mental health or substance related issues;

   e. Educating the youth and family/responsible caregiver(s) on medications and potential medication side effects (especially those which may adversely affect health such as weight gain or loss, blood pressure changes, cardiac abnormalities, development of diabetes or seizures, etc.);

   f. Consulting with the youth and family/caregiver (s) about the various aspects of informed consent (when prescribing occurs/APRN);

   g. Training for self-administration of medication;

   h. Venipuncture required to monitor and assess mental health, substance disorders or directly related conditions, and to monitor side effects of psychotropic medications, as ordered by appropriate members of the medical staff; and

   i. Providing assessment, testing, and referral for infectious diseases.

**Admission Criteria:**

1. Youth presents with symptoms that are likely to respond to medical/nursing interventions; or
2. Youth has been prescribed medications as a part of the treatment/service array or has a confounding medical condition.

**Continuing Stay Criteria:**

1. Youth continues to demonstrate symptoms that are likely to respond to or are responding to medical interventions; or
2. Youth exhibits acute disabling conditions of sufficient severity to bring about a significant impairment in day-to-day functioning; or

## Nursing Assessment and Health Services

| | |
|---|---|
| Discharge Criteria | 3. Youth demonstrates progress relative to medical/medication goals identified in the Individualized Resiliency Plan, but goals have not yet been achieved.<br><br>1. An adequate continuing care plan has been established; **and one or more of the following:**<br>2. Youth no longer demonstrates symptoms that are likely to respond to or are responding to medical/nursing interventions; **or**<br>3. Goals of the Individualized Resiliency Plan have been substantially met; **or**<br>4. Youth/family requests discharge and youth is not in imminent danger of harm to self or others. |
| Service Exclusions | Medication Administration, Opioid Maintenance. |
| Clinical Exclusions | Routine nursing activities that are included as a part of ambulatory detoxification and medication administration/methadone administration. |
| Required Components | 1. Nutritional assessments indicated by a youth's confounding health issues might be billed under this code (96150, 96151). No more than 8 units specific to nutritional assessments can be billed for an individual within a year. This specific assessment must be provided by a Registered Nurse or by a Licensed Dietician (LD).<br>2. This service does **not** include the supervision of self-administration of medication.<br>3. Each nursing contact should document the checking of vital signs (Temperature, Pulse, Blood Pressure, Respiratory Rate, and weight, if medically indicated and if related to behavioral health symptom or behavioral health medication side effect) in accordance with general psychiatric nursing practice. |
| Clinical Operations | 1. Venipuncture billed via this service must include documentation that includes cannula size utilized, insertion site, number of attempts, location, and individual tolerance of procedure.<br>2. All nursing procedures must include relevant individual-centered, family-oriented education regarding the procedure. |
| Service Accessibility | To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:<br><br>• the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or<br>• the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.<br><br>Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual/family must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should <u>not</u> be driven by the practitioner's/agency's convenience or preference. |
| Billing & Reporting Requirements | 1. If a Medicaid claim for this service denies for a Procedure-to-Procedure edit, a modifier (59) can be added to the claim and resubmitted to the MMIS for payment.<br>2. When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |

## Pharmacy and Lab

| | |
|---|---|
| Service Definition | Pharmacy & Lab Services include operating/purchasing services to order, package, and distribute prescription medications. It includes provision of assistance to access indigent medication programs, sample medication programs and payment for necessary medications when no other fund source is available. This service provides for appropriate lab work, such as drug screens and medication levels, to be performed. This service ensures that necessary medication/lab services are not withheld/delayed based on inability to pay. |
| Admission Criteria | Individual has been assessed by a prescribing professional to need a psychotropic, anti-cholinergic, substance use disorder-specific, or anti-convulsant (as related to behavioral health issue) medication and/or lab work required for persons entering services, and/or monitoring medication levels. |

## Pharmacy and Lab

| Continuing Stay Criteria | Individual continues to meet the admission criteria as determined by the prescribing professional. |
|---|---|
| Discharge Criteria | 1. Individual no longer demonstrates symptoms that are likely to respond to or are responding to pharmacologic interventions; **or** 2. Individual requests discharge and individual is not imminently dangerous or under court order for this intervention. |
| Required Components | 1. Service must be provided by a licensed pharmacy or through contract with a licensed pharmacy. 2. Agency must participate in any pharmaceutical rebate programs or pharmacy assistance programs that promote individual access in obtaining medication. 3. Providers shall refer all individuals who have an inability to pay for medications or services to the local county offices of the Division of Family and Children Services for the purposes of determining Medicaid eligibility. |
| Additional Medicaid Requirements | Not a DBHDD Medicaid service. Medicaid recipients may access the general Medicaid pharmacy program as prescribed by the Department of Community Health. |

## Psychiatric Treatment

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| E/M New Patient – 15 – 29 minutes | Practitioner Level 1, In-Clinic | 99202 | U1 | U6 | | | 97.00 | Practitioner Level 2, In-Clinic | 99202 | U2 | U6 | | | 64.95 |
| | Practitioner Level 1, Out-of-Clinic | 99202 | U1 | U7 | | | 123.50 | Practitioner Level 2, Out-of-Clinic | 99202 | U2 | U7 | | | 77.95 |
| | Practitioner Level 1 | 99202 | GT | U1 | | | 97.00 | Practitioner Level 2 | 99202 | GT | U2 | | | 64.95 |
| 30 – 44 minutes | Practitioner Level 1, In-Clinic | 99203 | U1 | U6 | | | 155.20 | Practitioner Level 2, In-Clinic | 99203 | U2 | U6 | | | 103.92 |
| | Practitioner Level 1, Out-of-Clinic | 99203 | U1 | U7 | | | 197.60 | Practitioner Level 2, Out-of-Clinic | 99203 | U2 | U7 | | | 124.72 |
| | Practitioner Level 1 | 99203 | GT | U1 | | | 155.20 | Practitioner Level 2 | 99203 | GT | U2 | | | 103.92 |
| 45 – 59 minutes | Practitioner Level 1, In-Clinic | 99204 | U1 | U6 | | | 213.40 | Practitioner Level 2, In-Clinic | 99204 | U2 | U6 | | | 142.89 |
| | Practitioner Level 1, Out-of-Clinic | 99204 | U1 | U7 | | | 271.70 | Practitioner Level 2, Out-of-Clinic | 99204 | U2 | U7 | | | 171.49 |
| | Practitioner Level 1 | 99204 | GT | U1 | | | 213.40 | Practitioner Level 2 | 99204 | GT | U2 | | | 142.89 |
| 60 – 74 minutes | Practitioner Level 1, In-Clinic | 99205 | U1 | U6 | | | 271.60 | Practitioner Level 2, In-Clinic | 99205 | U2 | U6 | | | 181.86 |
| | Practitioner Level 1, Out-of-Clinic | 99205 | U1 | U7 | | | 345.80 | Practitioner Level 2, Out-of-Clinic | 99205 | U2 | U7 | | | 218.26 |
| | Practitioner Level 1 | 99205 | GT | U1 | | | 271.60 | Practitioner Level 2 | 99205 | GT | U2 | | | 181.86 |
| E/M Established Patient – ~ 5 minutes | Practitioner Level 1, In-Clinic | 99211 | U1 | U6 | | | 19.40 | Practitioner Level 2, In-Clinic | 99211 | U2 | U6 | | | 12.99 |
| | Practitioner Level 1, Out-of-Clinic | 99211 | U1 | U7 | | | 24.70 | Practitioner Level 2, Out-of-Clinic | 99211 | U2 | U7 | | | 15.59 |
| | Practitioner Level 1 | 99211 | GT | U1 | | | 19.40 | Practitioner Level 2 | 99211 | GT | U2 | | | 12.99 |
| 10 - 19 minutes | Practitioner Level 1, In-Clinic | 99212 | U1 | U6 | | | 58.20 | Practitioner Level 2, In-Clinic | 99212 | U2 | U6 | | | 38.97 |
| | Practitioner Level 1, Out-of-Clinic | 99212 | U1 | U7 | | | 74.10 | Practitioner Level 2, Out-of-Clinic | 99212 | U2 | U7 | | | 46.77 |
| | Practitioner Level 1 | 99212 | GT | U1 | | | 58.20 | Practitioner Level 2 | 99212 | GT | U2 | | | 38.97 |
| 20 - 29 minutes | Practitioner Level 1, In-Clinic | 99213 | U1 | U6 | | | 97.00 | Practitioner Level 2, In-Clinic | 99213 | U2 | U6 | | | 64.95 |
| | Practitioner Level 1, Out-of-Clinic | 99213 | U1 | U7 | | | 123.50 | Practitioner Level 2, Out-of-Clinic | 99213 | U2 | U7 | | | 77.95 |
| | Practitioner Level 1 | 99213 | GT | U1 | | | 97.00 | Practitioner Level 2 | 99213 | GT | U2 | | | 64.95 |
| 30 - 39 minutes | Practitioner Level 1, In-Clinic | 99214 | U1 | U6 | | | 135.80 | Practitioner Level 2, In-Clinic | 99214 | U2 | U6 | | | 90.93 |
| | Practitioner Level 1, Out-of-Clinic | 99214 | U1 | U7 | | | 172.90 | Practitioner Level 2, Out-of-Clinic | 99214 | U2 | U7 | | | 109.13 |

# Psychiatric Treatment

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Practitioner Level 1 | 99214 | GT | U1 | 135.80 | Practitioner Level 2 | 99214 | GT | U2 | 90.93 |
| Practitioner Level 1, In-Clinic | 99215 | U1 | U6 | 194.00 | Practitioner Level 2, In-Clinic | 99215 | U2 | U6 | 129.90 |
| Practitioner Level 1, Out-of-Clinic | 99215 | U1 | U7 | 247.00 | Practitioner Level 2, Out-of-Clinic | 99215 | U2 | U7 | 155.90 |
| Practitioner Level 1 | 99215 | GT | U1 | 194.00 | Practitioner Level 2 | 99215 | GT | U2 | 129.90 |

40 – 54 minutes

| Section | Content |
|---|---|
| Unit Value | 1 encounter (Note: Time-in/Time-out is required in the documentation as it justifies which code above is billed) |
| | Utilization Criteria: TBD |
| Service Definition | The provision of specialized medical and/or psychiatric services that include, but are not limited to: <br> a. Psychotherapeutic services with medical evaluation and management including evaluation and assessment of physiological phenomena (including co-morbidity between behavioral and physical health care issues); <br> b. Assessment and monitoring of an individual's status in relation to treatment with medication; <br> c. Assessment of the appropriateness of initiating or continuing services. <br><br> Youth must receive appropriate medical interventions as prescribed and provided by members of the medical staff pursuant to the Medical Practice Act of 2009, Subsection 43-34-23 Delegation of Authority to Nurse and Physician Assistant that shall support the individualized goals of recovery as identified by the individual and their parent/guardians and their Individualized Recovery Plan (within the parameters of the youth/family's informed consent). <br><br> Note: For the purposes of this manual, Psychiatric Treatment is sometimes referred to as "physician assessment" or "physician assessment and care." |
| Admission Criteria | 1. Individual is determined to be in need of psychotherapy services and has confounding medical issues which interact with behavioral health diagnosis, requiring medical oversight; or <br> 2. Individual has been prescribed medications as a part of the treatment array. |
| Continuing Stay Criteria | 1. Individual continues to meet the admission criteria; or <br> 2. Individual exhibits acute disabling conditions of sufficient severity to bring about a significant impairment in day-to-day functioning; or <br> 3. Individual continues to present symptoms that are likely to respond to pharmacological interventions; or <br> 4. Individual continues to demonstrate symptoms that are likely to respond or are responding to medical interventions; or <br> 5. Individual continues to require management of pharmacological treatment in order to maintain symptom remission. |
| Discharge Criteria | 1. An adequate continuing care plan has been established; and one or more of the following: <br> 2. Individual has withdrawn or been discharged from service; or <br> 3. Individual no longer demonstrates symptoms that need pharmacological interventions. |
| Service Exclusions | 1. Not offered in conjunction with ACT. <br> 2. Supervision time is not billable. <br> 3. Time spent on documentation is not billable. |
| Clinical Exclusions | Services defined as a part of ACT. |
| Required Components | When providing psychiatric services to individuals who are deaf, deaf-blind, and/or hard of hearing, psychiatrists shall demonstrate training, supervision, or consultation with a qualified professional as approved by DBHDD Office of Deaf Services. |
| Clinical Operations | 1. In accordance with recovery philosophy, it is expected that individuals will be treated as full partners in the treatment regimen/services planned and received. As such, it is expected that practitioners will fully discuss treatment options with individuals and allow for individual choice when possible. Discussion of treatment options should include a full disclosure of the pros and cons of each option (e.g., full disclosure of medication/treatment regimen potential side effects, potential adverse reactions - including potential adverse reaction from not taking medication as prescribed and expected benefits). If such full discussion/disclosure is not possible or advisable according to the clinical judgment of the practitioner, this should be documented in the individual's chart (including the specific information that was not discussed and a compelling rationale for lack of discussion/disclosure). |

## Psychiatric Treatment

2. Assistive tools, technologies, worksheets, etc. can be used by the served individual to facilitate communication about treatment, symptoms, improvements, etc. with the treating practitioner. If this work falls into the scope of Interactive Complexity, it is noted in accordance with that definition.
3. This service may be provided with Individual Counseling codes 90833 and 90836, but the two services must be separately identifiable.
4. For purposes of this definition, a "new patient" is an individual who has not received an E/M code service from that agency within the past three (3) years. If an individual has engaged with the agency and has been seen a non-physician for a BH Assessment, they are still considered a "new patient" until after the first E/M service is completed.

**Service Accessibility:** This service may be provided via telemedicine to any individual/family who consents to this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference.

**Additional Medicaid Requirements:**
1. The daily maximum within a CSU for E/M is 1 unit/day.
2. Even if a physician also has his/her own Medicaid number, the physician providing behavioral health treatment and care through this code should bill via the approved provider agency's Medicaid number through the Medicaid Category of Service (COS) 440.

**Billing & Reporting Requirements:**
1. Within this service group, a second unit with a U1 modifier may be used in the event that a Telemedicine Psychiatric Treatment unit is provided and it indicates a need for a face-to-face assessment (e.g. 99213GTU1 is billed and it is clinically indicated that a face-to-face by an on-site physician needs to immediately follow based upon clinical indicators during the first intervention, then 99213U1, can also be billed in the same day).
2. Within this service group, there is an allowance for when a U2 practitioner conducts an intervention and, because of clinical indicators presenting during this intervention, a U1 practitioner needs to provide another unit due to the concern of the U2 supervisee (e.g., Physician's Assistant provides and bills 90805U2U6 and because of concerns, requests U1 intervention following his/her billing of U2 intervention). The use of this practice should be rare and will be subject to additional utilization review scrutiny.
3. These E/M codes are based upon Time (even though recent CPT guidance allows the option of using **either** Medical Decision Making **or** Time). The Georgia Medicaid State Plan is priced on time increments and therefore time will remain the basis of justification for the selection of codes above for the near term.
4. If a Medicaid claim for this service denies for a Procedure-to-Procedure edit, a modifier (25) can be added to the claim and resubmitted to the MMIS for payment.
5. Despite recent CPT guidance, this service may not be billed for all time spent on an individual's case in a single day (i.e. pre- and post-appointment work that is not direct individual assessment and/or care), because this indirect time is already included in the service rate.

## Psychological Testing: Psychological Testing – Psycho-diagnostic assessment of emotionality, intellectual abilities, personality and psycho-pathology

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Psychological testing evaluation services by physician or other qualified health care professional, including integration of patient data, interpretation of standardized test results and clinical data, clinical decision making, treatment planning and report and interactive feedback to the patient, family member(s) or caregiver(s), when performed; first hour | Practitioner Level 2, In-Clinic | 96130 | U2 | U6 | | | $155.87 | Practitioner Level 2, Out-of-Clinic | 96130 | U2 | U7 | | | $187.04 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 96130 | GT | U2 | | | 155.87 | | | | | | | |
| Each additional hour (List separately in addition to code for primary procedure) | Practitioner Level 2, In-Clinic | 96131 | U2 | U6 | | | $155.87 | Practitioner Level 2, Out-of-Clinic | 96131 | U2 | U7 | | | $187.04 |

## Psychological Testing: Psychological Testing – Psycho-diagnostic assessment of emotionality, intellectual abilities, personality and psycho-pathology

| Service | Setting | Code | Mod | Mod | Rate | Setting | Code | Mod | Mod | Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| Psychological or neuropsychological test administration and scoring by physician or other qualified health care professional, any method, first 30 minutes | Practitioner Level 2, Via interactive audio and video telecommunication systems | 96131 | GT | U2 | 155.87 | | | | | $93.52 |
| | Practitioner Level 2, In-Clinic | 96136 | U2 | U6 | $77.94 | Practitioner Level 2, Out-of-Clinic | 96136 | U2 | U7 | $93.52 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 96136 | GT | U2 | $77.94 | | | | | |
| Each additional 30 minutes (List separately in addition to code for primary procedure) | Practitioner Level 2, In-Clinic | 96137 | U2 | U6 | $77.94 | Practitioner Level 2, Out-of-Clinic | 96137 | U2 | U7 | $93.52 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 96137 | GT | U2 | $77.94 | | | | | |
| Psychological or neuropsychological test administration and scoring by technician, any method, first 30 minutes | Practitioner Level 3, In-Clinic | 96138 | U3 | U6 | $60.02 | Practitioner Level 4, In-Clinic | 96138 | U4 | U6 | $40.59 |
| | Practitioner Level 3, Out-of-Clinic | 96138 | U3 | U7 | $73.36 | Practitioner Level 4, Out-of-Clinic | 96138 | U4 | U7 | $48.71 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | 96138 | GT | U3 | $60.02 | Practitioner Level 4, Via interactive audio and video telecommunication systems | 96138 | GT | U4 | $40.59 |
| Each additional 30 minutes (List separately in addition to code for primary procedure-96138) | Practitioner Level 3, In-Clinic | 96139 | U3 | U6 | $60.02 | Practitioner Level 4, In-Clinic | 96139 | U4 | U6 | $40.59 |
| | Practitioner Level 3, Out-of-Clinic | 96139 | U3 | U7 | $73.36 | Practitioner Level 4, Out-of-Clinic | 96139 | U4 | U7 | $48.71 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | 96139 | GT | U3 | $60.02 | Practitioner Level 4, Via interactive audio and video telecommunication systems | 96139 | GT | U4 | $40.59 |

**Unit Value:** 1 hour or 30 minutes

**Utilization Criteria:** TBD

**Service Definition:** Psychological testing consists of a face-to-face assessment of emotional functioning, personality, cognitive functioning (e.g., thinking, attention, memory) or intellectual abilities using an objective and standardized tool that has uniform procedures for administration and scoring and utilizes normative data upon which interpretation of results is based.

Psychological tests are only administered and interpreted by those who are properly trained in their selection and application. The practitioner administering the test ensures that the testing environment does not interfere with the performance of the examinee and ensures that the environment affords adequate protections of privacy and confidentiality.

This service covers both the face-to-face administration of the test instrument(s) by a qualified examiner as well as the time spent by a psychologist or physician (with the proper education and training) interpreting the test results and preparing a written report in accordance with CPT procedural guidance.

**Admission Criteria:**
1. A known or suspected mental illness or substance-related disorder; and
2. Initial screening/intake information indicates a need for additional undetermined supports and recovery/resiliency planning; and
3. Individual meets DBHDD eligibility.

## Psychological Testing: Psycho-diagnostic assessment of emotionality, intellectual abilities, personality and psycho-pathology

| | |
|---|---|
| Continuing Stay Criteria | The Individual's situation/functioning has changed in such a way that previous assessments are outdated. |
| Discharge Criteria | Each intervention is intended to be a discrete time-limited service that modifies treatment/support goals or is indicated due to change in illness/disorder. |
| Staffing Requirements | The term "psychologist" is defined in the Approved Behavioral Health Practitioners table in Section II of this manual (Reference § 43-39-1 and § 43-39-7). |
| Required Components | 1. There may be no more than 10 combined hours of the codes above provided to one individual within an authorization. 2. When providing psychological testing to individuals who are deaf, deaf-blind, or hard of hearing, practitioner shall demonstrate training, supervision, and/or consultation with a qualified professional as approved by DBHDD Office of Deaf Services. |
| Clinical Operations | The individual (and caregiver/responsible family members etc. as appropriate) must actively participate in the assessment processes. |
| Documentation Requirements | In addition to the authorization produced through this service, documentation of clinical assessment findings from this service should also be completed and placed in the individual's chart. |
| Service Accessibility | To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:<br>• the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or<br>• the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.<br>Telemedicine may only be utilized when delivering this service on an individual for whom English is not their first language. The individual/family must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. |
| Billing & Reporting Requirements | 1. Each unique code cannot be billed more than 5 units on a single day. 2. Add-on codes shall be provided on the same day as the associated base code). 3. Scoring may occur and be billed on a different day than the evaluation and testing procedures (and related codes). 4. If a Medicaid claim for this service denies for a Procedure-to-Procedure edit, a modifier (59) can be added to the claim and resubmitted to the MMIS for payment. 5. When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |

| Code | Code Detail | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| H0032 | Practitioner Level 2, Out-of-Clinic | U2 | U7 | | | $46.76 |
| H0032 | Practitioner Level 3, Out-of-Clinic | U3 | U7 | | | $36.68 |
| H0032 | Practitioner Level 4, Out-of-Clinic | U4 | U7 | | | $24.36 |
| H0032 | Practitioner Level 5, Out-of-Clinic | U5 | U7 | | | $18.15 |
| H0032 | Practitioner Level 4, Via interactive audio and video telecommunication systems | GT | U4 | | | 20.30 |

## Service Plan Development

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Service Plan Development | Practitioner Level 2, In-Clinic | H0032 | U2 | U6 | | | $38.97 |
| | Practitioner Level 3, In-Clinic | H0032 | U3 | U6 | | | $30.01 |
| | Practitioner Level 4, In-Clinic | H0032 | U4 | U6 | | | $20.30 |
| | Practitioner Level 5, In-Clinic | H0032 | U5 | U6 | | | $15.13 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | H0032 | GT | U2 | | | 38.97 |

# Service Plan Development

| | Practitioner Level 3, Via interactive audio and video telecommunication systems | H0032 | GT | U3 | 30.01 | Practitioner Level 5, Via interactive audio and video telecommunication systems | H0032 | GT | U5 | 15.13 |
|---|---|---|---|---|---|---|---|---|---|---|
| Unit Value | 15 minutes | | | | | | | | | TBD |

**Utilization Criteria**

**Service Definition**

Youth/Families access this service when it has been determined through an initial screening that the youth has mental health or substance use disorder concerns. The Individualized Recovery/Resiliency Plan (IRP) results from the Diagnostic and Behavioral Health Assessments and is required within the first 30 days of service, with ongoing plans completed as demanded by individual need and/or by service policy.

Information from a comprehensive assessment should ultimately be used to develop, together with the youth and/or caretakers an IRP that supports resilience and that is based on goals identified by the individual with parent(s)/responsible caregiver(s) involvement. As indicated, medical, nursing, peer, school, nutritional, etc. staff should provide information from records, and various multi-disciplinary assessments for the development of the IRP.

The cornerstone component of the youth IRP involves a discussion with the child/adolescent and parent(s)/responsible caregiver(s) regarding what resiliency means to them personally (e.g., the youth having more friends, improvement of behavioral health symptoms, staying in school, improved family relationships etc.), and the development of goals (i.e. outcomes) and objectives that are defined by and meaningful to the youth based upon the individual's articulation of their recovery hopes. Concurrent with the development of the IRP, an individualized safety plan should also be developed, with the individual youth and parent(s)/responsible caregiver(s) guiding the process through the free expression of their wishes and through their assessment of the components developed for the safety plan as being realistic for them. The entire process should involve the youth as a full partner and should focus on service and resiliency goals/outcomes as identified by the youth and his/her family as well as collateral agencies/treatment providers/relevant individuals.

Recovery/Resiliency planning shall set forth the course of care by:
- Prioritizing problems and needs;
- Stating goals which will honor achievement of stated hopes, choice, preferences and desired outcomes of the youth/family;
- Assuring goals/objectives are related to the assessment;
- Defining goals/objectives that are individualized, specific, and measurable with achievable timeframes;
- Defining discharge criteria and desired changes in levels of functioning and quality of life to objectively measure progress;
- Transition planning at onset of service delivery;
- Selecting services and interventions of the right duration, intensity, and frequency to best accomplish these objectives;
- Assuring there is a goal/objective that is consistent with the service intent; and
- Identifying qualified staff who are responsible and designated for the provision of services.

**Admission Criteria**

1. A known or suspected mental illness or substance-related disorder; **and**
2. Initial screening/intake information indicates a need for additional undetermined supports and recovery/resiliency planning; **and**
3. Youth meets DBHDD eligibility.

**Continuing Stay Criteria**

The youth's situation/functioning has changed in such a way that previous assessments are outdated.

**Discharge Criteria**

Each intervention is intended to be a discrete time-limited service that modifies treatment/support goals or is indicated due to change in illness/disorder.

**Required Components**

1. The service plan must include elements articulated in the Community Requirements chapter in this Provider Manual.
2. As indicated, medical, nursing, peer, school, nutritional, etc. staff can provide information from the youth and family, records, and various multi-disciplinary resources needed to complete the service plan. Time spent gathering this information may be billed as long as the detailed documentation justifies the time and need for capturing said information.

## Service Plan Development

| | |
|---|---|
| | 1. The individual (and caregiver/responsible family members etc. as appropriate) should actively participate in planning processes. |
| | 2. The Individualized Resiliency Plan should be directed by the individual's/family's personal resiliency goals as defined by them. |
| | 3. Safety/crisis planning should be directed by the youth/family and their needs/wishes to the extent possible and clinically appropriate. Plans should not contain elements/components that are not agreeable to, meaningful for, or realistic for the youth/family and that the youth/family is therefore not likely to follow through with. |
| Clinical Operations | 4. Detailed guidelines for recovery/resiliency planning are contained in the "Community Requirements" in this Provider Manual and must be adhered to. |
| | 5. For youth at or above age 17 who may need long-term behavioral health supports, plan elements should include transitional elements related to post-primary education, adult services, employment (supported or otherwise), and other transitional approaches to adulthood. |
| | 6. Individualized Recovery/Resiliency Plans (or portions of the plan) must be reassessed as needed, in accordance with changing needs, circumstances, and responses of the youth and family/caregiver (see content regarding the IRP in Part II of this manual). For any change in medical, behavioral, cognitive, and/or physical status of the youth that potentially impacts goals, objectives and/or interventions in the plan, or that would necessitate the addition of new goals, objectives and/or interventions, Service Plan Development would be used to support the youth and family/caregiver in revisiting their goals and objectives. |
| Service Accessibility | To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include: |
| | • the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or |
| | • the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service. |
| | Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual/family must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. |
| Billing & Reporting Requirements | When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |

# CHILD and ADOLESCENT SPECIALTY SERVICES

## Apex Program (Georgia Apex Program)

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | See Billing & Reporting Requirements section below for services billing detail. | | | | | | | | | | | | | |
| Service Definition | The Georgia Apex Program is a DBHDD-funded partnership between community-based behavioral health providers and local school districts. The program utilizes a school-based behavioral health framework to increase access to behavioral health services among school-aged youth (Pre-K through 12th grade) throughout the state. The Program provides preventive interventions and adjunct support for the provision of DBHDD services in designated public school settings. Apex Program Goals: 1. Prevention and early detection of child and adolescent behavioral health needs; 2. Increase statewide access to behavioral health services for children and adolescents; and | | | | | | | | | | | | | |

# Apex Program (Georgia Apex Program)

3. Encourage sustainable coordination between Georgia's community behavioral health providers and their local schools/school districts.

The Apex Program helps to support program development, relationship building, and embedding providers in schools, and aligns with other types of school-based behavioral health support programs such as Positive Behavioral Interventions and Supports. The Program utilizes a Multi-Tiered System of Support (MTSS) framework for delivering services to students, and while providers implement services across all three tiers, they prioritize delivering services to youth represented in MTSS Tier III.

- MTSS Tier I interventions promote universal prevention benefiting the entire school.
- MTSS Tier II refers to targeted early interventions for at-risk students with emerging behavioral health needs.
- MTSS Tier III refers to individualized intervention for students identified as living with a behavioral health diagnosis.

Within these tiers, providers may implement preventative community outreach and educational activities related to behavioral health (MTSS Tier I), as well as facilitate the provision of early intervention services for youth and families with risk factors for/early indications of emerging behavioral health challenges (MTSS Tier II). In addition to prevention and early intervention, Apex offers adjunct supports for the provision of DBHDD services (named below) to youth with an established behavioral health need (MTSS Tier III). Such supports are based on individual need, and could include (but are not limited to) the coordination of DBHDD services with school and community services/supports, and financial assistance to help offset the costs of an approved provider's staff time for non-billable activities such as travel, meeting and conference attendance, trainings, individual teacher-based needs assessment/education/skill building regarding behavioral health conditions and classroom interventions, and other related activities.

Specific allowable DBHDD behavioral health services (see the Service Definition/Requirements for each service listed below in this Provider Manual):
1. Behavioral Health Assessment;
2. Diagnostic Assessment;
3. Service Plan Development;
4. Crisis Intervention;
5. Individual Counseling;
6. Group Counseling/Training;
7. Family Counseling/Training;
8. Community Support;
9. Psychiatric Treatment;
10. Medication Administration; and
11. Nursing Assessment and Health Services

| | |
|---|---|
| Admission Criteria | 1. Youth must be enrolled in a designated public school setting; and<br>2. Youth must meet the Core Customer criteria for child and adolescent services in the DBHDD's Provider Manual for Community Based Behavioral Health Providers, Part I, Section I; and<br>3. The youth's level of functioning does not preclude the provision of services in an outpatient milieu. |
| Continuing Stay Criteria | 1. Youth continues to meet admission criteria; and<br>2. Youth demonstrates documented progress relative to goals identified in their Individualized Recovery Plan, but goals have either not yet been achieved, or new service needs have been identified. |
| Discharge Criteria | 1. Youth no longer meets admission criteria; or<br>2. Goals of the Individualized Recovery Plan have been substantially met; or<br>3. Youth or their parent/legal guardian requests that the youth no longer participate in the Apex Program and/or associated DBHDD behavioral health services; or<br>4. Transfer to another service is warranted due to a change in the youth's condition and/or needs. |

# Apex Program (Georgia Apex Program)

| | | |
|---|---|---|
| Clinical Exclusions | 1. | Severity of cognitive impairment precludes provision of services. |
| | 2. | Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a behavioral health condition overlaying the diagnosis: Intellectual/Developmental Disabilities, Autism, Neurocognitive Disorder and Traumatic Brain Injury. |
| Required Components | 1. | The Apex Program may only be implemented in designated public school settings. |
| | 2. | The Apex Program is administered by approved DBHDD service providers (DBHDD Provider Tiers 1 and 2). |
| | 3. | DBHDD services provided via the Apex Program must utilize evidence-informed practices (where these exist). |
| | 4. | DBHDD services provided via the Apex Program must adhere to all DBHDD service definitions and requirements for each service provided. |
| | 5. | Each Apex Program provider must have an established referral process, which is documented in the Provider's internal Policies and Procedures. |
| | 6. | The Apex Program must be offered year-round, including during the summer. |
| | 7. | Providers must obtain and maintain commitment by the school leadership to support school based behavioral health services (e.g., designated space for treatment and confidential file storage, communication plan for parents and teachers to announce and coordinate the implementation of services, evidence that student support professionals support the new service and will collaborate with the mental health professional(s) assigned to their school, etc.). |
| | 8. | Providers must coordinate any needed treatment with the student, their family and teacher, and other resources, as indicated (e.g. probation officer, student support teams and response to intervention teams, natural supports, physician, school student support professionals including professional school counselors, school psychologists, school social workers, school nurses, or Local Interagency Planning Teams [LIPTs]). |
| Staffing Requirements | 1. | One FTE Apex Program Coordinator; |
| | 2. | Provider must adhere to the Staffing Requirements section of the Service Definition/Requirements for the specific DBHDD service being provided, as well as to all other staffing/professional requirements found elsewhere in the DBHDD's Provider Manual for Community Based Behavioral Health Providers; |
| | 3. | Supervisees/trainees must work alongside a practitioner who is independently licensed while inside the school. |
| Program Accessibility | 1. | The Program encourages access to behavioral health services for youth and families who may otherwise not become engaged due to externalities such as transportation challenges, parental work schedules, etc. In addition, this program is offered in a school-based setting in order to identify and engage with youth in a familiar environment where they spend much of their time. |
| | 2. | DBHDD behavioral health services may be provided via telemedicine as may be allowable per the Service Definition/Requirements for each particular service. |
| Documentation Requirements | 1. | Provider must adhere to the Documentation Requirements section of the Service Definition/Requirements for the specific DBHDD service being provided, as well as to Part II, Section III of the DBHDD's Provider Manual for Community Based Behavioral Health Providers. |
| | 2. | For services provided/activities engaged in as part of the Apex Program, but which are not defined DBHDD behavioral health services (e.g. travel, conference attendance, meetings with school/community stakeholders, etc.), provider must meet the documentation requirements established through the Georgia State COE evaluation process, as well as DBHDD's monthly progress report process. |
| Billing & Reporting Requirements | 1. | DBHDD service provision, billing, and reporting must adhere to all DBHDD and Georgia Collaborative ASO requirements. |
| | 2. | Provider must submit a monthly invoice, and invoice justification/supporting documentation (as needed) to their designated DBHDD contract manager. |
| | 3. | Providers are required to maximize utilization of alternative funding streams, including third party payers (e.g., Medicaid, private insurance, etc.), public targeted and competitive grants, and private foundation funds. |
| | 4. | To promote program sustainability, a target threshold of sixty percent (60%) billable direct-service time per clinical staff member has been established, and providers should make a good faith effort to reach this target as quickly and efficiently as possible. However, during the first contract-term of service provision, staff are required to meet a minimum threshold of forty percent (40%) billable time. |
| | 5. | Apex may also provide up to 60 days of reimbursement for DBHDD services delivered by Tier 2 providers who cannot bill DBHDD state-funds for uninsured individuals served. |
| | 6. | Outpatient services that are identified in the service definition above may be authorized and billed in accordance with Part I, Section II of this manual via the Non-intensive Outpatient Services Type of Care. |

## Clubhouse Services (Release TBD)

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

## Community Based Inpatient Psychiatric and Substance Detoxification

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Psychiatric Health Facility Service, Per Diem | | H2013 | | | | | | | | | | | | |

| | | |
|---|---|---|
| **Unit Value** | Per Diem | CA-LOCUS Level 6 |
| | | **Utilization Criteria** |

**Service Definition:** A short-term stay in a licensed and accredited community-based hospital for the treatment or rehabilitation of a psychiatric and/or substance related disorder. Services are of short duration and provide treatment for an acute psychiatric or behavioral episode. For clinically appropriate transitional age youth, this service may also include Medically Managed Inpatient Detoxification at ASAM Level 4-WM.

**Admission Criteria:** For youth defined as the target population for the DBHDD contract, the Inpatient Psychiatric hospital will accept referrals for admission solely from DBHDD and its designated ASO agents: Behavioral Health Link (BHL) or Beacon Health Options (BHO). This service will utilize the DBHDD-required board monitoring system, providing regularly updated information to ensure appropriate utilization of inpatient beds. Admissions are for a:
1. Youth with a mental disorder/serious emotional disturbance, who presents a substantial risk or harm to himself/herself or others, as manifested by recent overt acts or recent expressed threats of major suicidal, homicidal or high-risk behaviors as a result of the mental disorder/serious emotional disturbance which present a probability of physical injury to himself/herself or others; **OR**
2. Youth with a mental disorder/serious emotional disturbance who is so unable to care for his/her own physical health and safety as to create an imminently life-endangering crisis.

**Continuing Stay Criteria:**
1. Youth continues to meet admission criteria; and
2. Youth's withdrawal signs and symptoms are not sufficiently resolved to the extent that they can be safely managed in less intensive services.

**Discharge Criteria:**
1. An adequate continuing care plan has been established; and one or more of the following:
2. Youth no longer meets admission and continued stay criteria; or
3. Family requests discharge and youth is not imminently dangerous to self or others; or
4. Transfer to another service/level of care is warranted by change in the individual's condition; or
5. Individual requires services not available in this level of care.

**Service Exclusions:** This service may not be provided simultaneously to any other service in the service array excepting short-term access to services that provide continuity of care or support planning for discharge from this service.

**Clinical Exclusions:** Youths with any of the following unless there is clearly documented evidence of an acute psychiatric/substance use disorder episode overlaying the diagnosis: Autism, Intellectual/Developmental Disabilities, Neurocognitive Disorder; or Traumatic Brain Injury.

**Required Components:**
1. If providing withdrawal management services, the program must be licensed by DCH/HFR under the Rules and Regulations for Drug Abuse Treatment Programs, 290-4-2 OR is licensed as a hospital/specialty hospital.
2. A physician's order in the individual's record is required to initiate withdrawal management services. Verbal orders or those initiated by a Physician's Assistant or Clinical Nurse Specialist are acceptable provided they are signed by the physician within 24 hours or the next working day.

## Community Based Inpatient Psychiatric and Substance Detoxification

| | |
|---|---|
| Staffing Requirements | Only nursing or other licensed medical staff under supervision of a physician may provide withdrawal management services. |
| Reporting and Billing Requirements | 1. This service requires authorization via the ASO via GCAL Providers will select an individual from the State Contract Bed (SCB) Board. Once they accept them, they will assign the individual to a bed on the inventory status board (via bhIweb). Once an individual is assigned to the inventory status board a tracking number will be generated and the information will be sent from the Georgia Collaborative ASO crisis access team to the Georgia Collaborative ASO care management team for registration/authorization to take place. Once an authorization number is assigned, that number will appear on the beds inventory status board (on bhIweb) and an email will be generated and sent to the designated UM of the SCB facility containing the authorization number.<br>2. Span billing may occur for this service, meaning the start and end date are not the same on a given service claim line. The span dates may cross months (start date and end date on a given service line may begin in one month and end in the next).<br>3. Providers must submit a discharge summary into the provider connect/batch system within 48 hours of discharge. |

## Coordinated Specialty Care for First Episode Psychosis Program (CSC for FEP) (Effective Date January 1, 2023)

| Transaction Code | Code | Code Detail | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| | | **See Billing & Reporting Requirements section below for services billing detail.** | | | | | |

| | |
|---|---|
| Service Definition | Coordinated Specialty Care for the First Episode Psychosis Program (CSC for FEP) is a team-based, time-limited, multi-faceted approach to treating youth and young adults, ages 16-30, experiencing first episode psychosis. The CSC for FEP model's guiding principles include early detection of psychosis; rapid access to specialty care; flexible, accessible, youth-friendly, and welcoming services; recovery-focused interventions; and respect for young adults striving for autonomy and independence. Component interventions include case management, psychotherapy, supported education and employment services, family education and support, and medication management. CSC for FEP emphasizes shared decision making as a means for addressing the unique needs, preferences, and recovery goals of the individuals served. Collaborative treatment planning in CSC for FEP is a respectful and effective means for establishing a positive therapeutic alliance and maintaining engagement with young people and their family members over time. CSC for FEP services are also highly coordinated with primary medical care, with a focus on optimizing overall mental and physical health. As such, the team is multidisciplinary, includes weekly integrated treatment team meetings, and spans the fields of psychiatry, nursing, counseling/psychology, social work, and career planning; additionally, Certified Peer Specialists on the team provide assistance with the development of natural supports, and promoting socialization and community integration. CSC for FEP team members are expected to maintain knowledge and skills according to the current research trends in best practices and evidence-based treatment, including the provision of trauma-informed, culturally competent care, and the use of effective engagement strategies for youth and young adults. The CSC for FEP model emphasizes flexibility, with services delivered in home, community, and youth-friendly and welcoming office settings depending on the participants' needs and preferences. Services are individually tailored to address participants' preferences and goals.<br><br>Based on the needs of the individual, the following services may be provided by qualified CSC for FEP team members and billed under the Non-intensive Outpatient Services Type of Care (see the Service Definition/Requirements for each service listed below in this Provider Manual)*.<br>1. Behavioral Health Assessment;<br>2. Diagnostic Assessment;<br>3. Service Plan Development;<br>4. Crisis Intervention;<br>5. Individual Counseling;<br>6. Group Counseling/Training;<br>7. Family Counseling/Training; |

# Coordinated Specialty Care for First Episode Psychosis Program (CSC for FEP) (Effective Date January 1, 2023)

8.  Case Management (Adult)
9.  Psychosocial Rehabilitation-Individual (Adult)
10. Addictive Disease Support Services (Adult);
11. Community Support (C&A)
12. Peer Support-Individual (Adult MH/AD, C&A Parent/Youth);
13. Psychiatric Treatment;
14. Medication Administration;
15. Nursing Assessment and Health Services;
16. Pharmacy & Lab;
17. Psychological Testing
18. Community Transition Planning

* **In addition to the billable DBHDD services named above**, the DBHDD provides ancillary funding through CSC for FEP provider contracts for education and employment support interventions/activities, which are integral to the CSC for FEP model; and for other non-billable activities as described in the paragraph below.

In delivering the services outlined above, individualized interventions of particular importance to the CSC for FEP model include the following:

1.  Psychoeducation on first episode psychosis, treatment options, and recovery to participants and their families;
2.  Crisis planning, support, and intervention;
3.  Recovery-based goal setting;
4.  Instrumental/skill-building support to participants and their families;
5.  Service and resource coordination, including linkage to medical care;
6.  Psychotherapy and skills training;
7.  Family counseling, education, support, and skills training;
8.  Substance use disorder counseling and interventions;
9.  Peer support; and
10. Support for educational and employment endeavors.

As an adjunct to direct service provision, CSC for FEP teams offer outreach and education activities/events within the community at large in order to identify individuals experiencing a first episode of psychosis, as well as to educate the community about behavioral health conditions, the CSC for FEP program, recovery principles and practice, and accessing the public behavioral health system. Outreach and education efforts are intended to establish a seamless community system of care for youth and young adults with first episode psychosis, and promote the sustainability of the program. The DBHDD provides funding to offset the costs for providers' time spent in these and other non-billable activities such as travel, meetings, trainings and conference attendance, community partner collaboration, and other related activities.

It is anticipated that individuals participating in CSC for FEP will experience a reduction in psychiatric symptoms or the debilitating effects of these symptoms; will show improved educational, occupational, and social functioning; and will require less frequent hospitalization and use of crisis services over time. Most participants remain with CSC for FEP teams for an average of two years; however, all decisions regarding discharge of participants from CSC for FEP programs should be based on clinical considerations.

| Admission Criteria | 1. The target population for Coordinated Specialty Care for First Episode Psychosis is youth and young adults aged 16 – 30 with non-organic psychotic disorders (e.g. schizophrenia, schizophreniform disorder, schizoaffective disorder, delusional disorder) or mood disorders with psychotic symptoms (e.g. bipolar disorder with psychotic symptoms; major depressive disorder with psychotic symptoms) who have had symptoms of psychosis for no longer than 24 months. |
|---|---|

## Coordinated Specialty Care for First Episode Psychosis Program (CSC for FEP) (Effective Date January 1, 2023)

| | |
|---|---|
| | 2. The target population is not to be limited to insurance coverage or lack thereof: individuals who have any kind of third-party insurance, or no insurance, must be served by the provider. |
| | 3. Youth and young adults who fall outside the target age range of 16 – 30, or who have had psychotic symptoms longer than 24 months, may be considered for enrollment in CSC for FEP services on a case-by-case basis, with prior approval from DBHDD. |
| | 4. An individual does not need to have a diagnosis of a psychotic disorder to be evaluated for enrollment in CSC for FEP services.  It is anticipated that for many youth and young adults referred to CSC for FEP teams, they will have had no previous mental health treatment and thus will not have received a diagnosis prior to their evaluation with the CSC for FEP team. |
| Continuing Stay Criteria | Individual demonstrates documented progress relative to goals identified in the Individualized Recovery Plan (IRP), but goals have not yet been achieved, and/or new service needs have been identified. |
| Discharge Criteria | An adequate continuing care plan has been established; and one or more of the following:<br>1. Goals of the IRP have been substantially met;<br>2. Individual/family requests discharge and individual is not in imminent danger of harm to self or others; or<br>3. Transfer to another service is warranted by change in individual's condition and/or needs. |
| Service Exclusions | 1. CSC for FEP is a comprehensive team intervention and most services are excluded, with the exceptions of:<br>  a. Residential or Housing Supports (the CSC for FEP provider shall be in close coordination with the Residential/Housing Support provider such that there is no duplication of services supports/efforts);<br>  b. Substance Abuse Intensive Outpatient Program: If a substance use disorder is identified and documented as a clinical need unable to be met by the CSC for FEP team, and the individual's current treatment progress indicates that provision of CSC for FEP services alone, without an organized SUD program model, is not likely to result in the individual's ability to maintain sobriety, CSC for FEP teams may assist the individual in accessing this service, but must ensure clinical coordination in order to avoid duplication of services. If CSC for FEP and SAIOP are provided by the same agency, the agency may update the existing authorization to include group services to be utilized by the SAIOP program;<br>  c. The following are **not** service exclusions:<br>    i. Individual Counseling and Group/Family Counseling/Training provided outside of the CSC for FEP program when the needs of an individual exceed that which can be provided by the CSC for FEP team. For example, the individual may participate in SA group treatment provided by a Tier 1, Tier 2, or SA-IOP provider upon documentation of the demonstrated need;<br>    ii. Specialized evidence-based practices delivered outside the CSC for FEP program utilizing a treatment modality (e.g. Individual Counseling, Group Counseling, etc.) that would otherwise be provided by a CSC for FEP team member *when* the needs of an individual exceed that which can be provided by the CSC for FEP team (e.g. specialized treatment for PTSD, eating disorders, personality disorders, and/or other specific clinical specialized treatment needs). In this case, the individual's treatment plan must reflect the necessity for participation in such services along with medical record documentation of the unique need and resulting collaboration between service providers to ensure coordination towards goals and to prevent any duplication of services/effort.<br>2. On an individual basis, up to eight (8) weeks of some services may be provided to CSC for FEP participants to facilitate a smooth transition from CSC for FEP to these other community services. A transition plan must be adequately documented in the treatment plan and clinical record. These services are:<br>  a. Case Management/Intensive Case Management.<br>  b. Psychosocial Rehabilitation-Individual/Program<br>  c. AD Support Services<br>  d. Behavioral Health Assessment<br>  e. Service Plan Development<br>  f. Diagnostic Assessment<br>  g. Physician Assessment<br>  h. Individual Counseling |

## Coordinated Specialty Care for First Episode Psychosis Program (CSC for FEP) (Effective Date January 1, 2023)

| | |
|---|---|
| | i. Peer Support |
| Clinical Exclusions | 1. Individuals with severe and profound intellectual/developmental disability are excluded because the severity of cognitive impairment precludes participation in services at this level of care. |
| | 2. Individuals with mild or moderate intellectual/developmental disability are excluded unless there is an identified mental illness that is the foremost consideration for this psychiatric intervention, and the individual is able to benefit from the cognitive behavioral-based program components. |
| | 3. Individuals with medical conditions suspected to be causing the psychotic symptoms are excluded.  [Examples: Neurological conditions including traumatic brain injury; brain tumor; endocrine, metabolic, or autoimmune disorders with central nervous system involvement.] |
| | 4. Individuals whose psychotic symptoms are suspected to be caused by drug or alcohol intoxication or withdrawal are excluded. |
| Required Components | 1. CSC for FEP must include a comprehensive and integrated set of medical and psychosocial services provided in home, community, and office settings by a multidisciplinary team. |
| | 2. The team must provide community-based supportive and recovery-oriented services interwoven with treatment services. |
| | 3. Services and interventions must be individually tailored to the needs, goals, preferences, and strengths of the individual. During the course of CSC for FEP service delivery, the CSC for FEP team will provide the intensity and frequency of service needed for each individual based on individual need and preference. |
| | 4. There is no requirement that every CSC for FEP participant works with every member of the team, as interventions should be tailored to the unique needs and preferences of each participant. |
| | 5. The CSC for FEP team must maintain a small participant-to-clinician ratio, with an expected census of 30 participants at a point-in-time based on a team FTE of approximately 5.0. |
| | 6. The CSC for FEP team is expected to retain a high percentage of enrolled individuals in services with few dropouts. In the event that the CSC for FEP program documents multiple attempts to locate and make contact with an individual and has demonstrated diligent search, after 90 days of unsuccessful attempts the individual may be discharged due to drop out. |
| | 7. The CSC for FEP team must hold weekly team meetings. All CSC for FEP team members are required to attend the meetings.  In the weekly team meeting, each individual must be discussed, even if only briefly. The purpose of the team meetings is to review the clinical status of all individuals in the CSC for FEP program and the outcome of the most recent staff contacts, individuals' progress toward their goals, barriers to progress toward goals, and strategies for eliminating these barriers. |
| | 8. The CSC for FEP team must respond to phone calls from participants and family members 24-hours/365-days, and either directly provide or refer individuals/families to any appropriate crisis services. |
| | 9. The CSC for FEP team should maintain a strong recovery orientation and commitment to hiring individuals with lived experience of mental illness. |
| | 10. CSC for FEP providers must have established procedures/protocols for handling emergency and crisis situations that describe methods that shall be taken by the team in supporting and responding to CSC for FEP-enrolled individuals who require emergency psychiatric admission/hospitalization and/or crisis stabilization. |
| | 11. CSC for FEP providers must have a Coordinated Specialty Care for First Episode Psychosis organizational plan that addresses the following: |
| |     a.  Staffing pattern and how staff are deployed, including how unplanned staff absences, illnesses, and emergencies are accommodated; |
| |     b.  Hours of operation and typical daily schedule for staff; |
| |     c.  Inter-team communication (e.g., e-mail, team staffings, staff safety plan such as check-in protocols, etc.); |
| |     d.  How the team will respond to crises for individuals served (e.g., on-call rotation schedule and protocols, etc.); |
| |     e.  For the individuals whom the CSC for FEP team supports, the CSC for FEP team should be involved in all hospital admissions and hospital discharges whenever possible, and this involvement should be documented in the clinical record. |
| |     f.  Because of the often complex mental health conditions of CSC for FEP-referred individuals and the need to build trust with the referred individuals, comprehensive mental health, addiction, and functional assessments may take up to 60 days. The assessments shall include: Psychiatric History, Mental Status/Diagnosis, Physical Health, Substance Use, Education and Employment, Social Development and Functioning, and Family Structure and Relationships. |

| Coordinated Specialty Care for First Episode Psychosis Program (CSC for FEP) (Effective Date January 1, 2023) | |
| --- | --- |
| | 12. In addition to services provided to individuals enrolled in the program, the CSC for FEP team must provide outreach and education activities/events to the community at large regarding behavioral health conditions, first episode psychosis and the CSC for FEP program, recovery and wellness principles and practice, and information on how to access the public behavioral health system.<br><br>13. CSC for FEP providers must have policies and procedures governing the provision of community outreach and education services, including methods for protecting the safety of staff who engage in these activities. |
| Staffing Requirements | 1. Coordinated Specialty Care team members must include:<br>  a. (1 FT Employee required): One full-time Team Leader who is the clinical and administrative supervisor of the team, and who also functions as a practicing clinician on the team. The Team Leader must be a FT employee and must have one of the following qualifications to be an independently licensed practitioner:<br>    i.  Physician<br>    ii.  Psychologist<br>    iii.  Physician's Assistant<br>    iv.  APRN<br>    v.  RN with a 4-year BSN<br>    vi.  LCSW<br>    vii.  LPC<br>    viii.  LMFT<br>    ix.  One of the following, as long as the practitioner below is under supervision in accordance with O.C.G.A. § 43-10A-11:<br>      • LMSW*<br>      • LAPC*<br>      • LAMFT*<br>      * If the team lead is not independently licensed, then clinical supervision duties should be delegated appropriately in accordance with expectations set forth in O.C.G.A. Practice Acts.<br>  b. (Variable: 25 FTE based on CSC for FEP team census of 30 participants): **a prescriber (a psychiatrist or, under the supervision of a Psychiatrist, an APRN, NP, or PA) who:**<br>    i.  Provides clinical and crisis services to all team participants;<br>    ii.  Works with the team to monitor each individual's clinical and medical status and response to treatment;<br>    iii.  Directs psychopharmacologic and medical treatment for CSC for FEP participants;<br>    iv.  Participates in the CSC for FEP team meetings weekly.<br>  c. (Variable: .15 FTE based on CSC for FEP team census of 30 participants): **one Nurse (RN)** who:<br>    i.  Provides nursing services for all participants, including health and assessments, education on treatment adherence, nutrition, exercise, smoking cessation, and other health and wellness-related topics as needed;<br>    ii.  Works with the team to monitor each individual's overall physical health and wellness, clinical status and response to treatment; and<br>    iii.  Participants in the CSC for FEP team meetings weekly.<br>  d. If the Team Lead is not a **licensed psychologist, LCSW, LPC, LMFT, LMSW, LAPC, or LAMFT**, there must be an additional 0.5 FTE team member who holds one of these licensed credentials or associate licensed credentials (note that associate-level clinicians must be under supervision in accordance with O.C.G.A. § 43-10A-11).<br>  e. (1 FTE required): One full-time **Case Manager** who provides concrete needs assistance to CSC for FEP participants and who participates in the CSC for FEP team meetings weekly. The Case Manager is supervised by the Team Lead.<br>  f. (1 FTE required): One full-time **Education and Employment Specialist** who provides support to CSC for FEP participants on their educational and vocational goals, and who participates in the CSC for FEP team meetings weekly. The Education and Employment Specialist is supervised by the Team Lead.<br>  g. (1 FTE required): One or two **Certified Peer Specialist or Certified Peer Specialist-Youth** who are fully integrated into the team and promote |

## Coordinated Specialty Care for First Episode Psychosis Program (CSC for FEP) (Effective Date January 1, 2023)

| | |
|---|---|
| | individual self-determination and decision-making and provide essential expertise and consultation to the entire team to promote a culture in which each participant's point of view and preferences are recognized, understood, respected and integrated into treatment and community integration activities. CPSs/CPS-Ys participate in the CSC for FEP team meetings weekly and are supervised by the Team Lead.<br><br>h.  (Variable: 0.5 FTE based on CSC for FEP team census of 30 participants): One **fully licensed or associate-level licensed clinician who specializes in family counseling, or a Certified Peer Specialist-Parent (CPS-P)** who provides education, support, and training to family members of CSC for FEP participants. This practitioner bills the Parent Peer Support service (if a CPS-P) or Family Counseling/Training otherwise. The provider is strongly encouraged to utilize the Parent Peer Support service if a CPS-P is available, to meet the recovery needs of the family. This team member participates in the CSC for FEP team meetings weekly and is supervised by the Team Lead. |
| Clinical Operations | 1.  Individuals receiving CSC for FEP do not need to have a qualifying diagnosis prior to the initial evaluation for eligibility for CSC for FEP enrollment. As stated above, it is anticipated that many youth and young adults referred to CSC for FEP teams will have had no previous mental health treatment and thus will not have received a diagnosis prior to their evaluation with the CSC for FEP team.<br>2.  Because CSC for FEP-eligible individuals may be difficult to engage, the initial treatment/recovery plan for an individual may be more generic at the onset of treatment/support. It is expected that the plan be individualized and recovery-oriented after the individual becomes engaged with the team.<br>3.  Because many individuals served may have co-occurring mental health and substance use disorders, the CSC for FEP team may not discontinue services to individuals based solely upon a relapse in their substance use disorder recovery.<br>4.  CSC for FEP teams are expected to participate actively and assertively in transitional planning for the individual, including:<br>   a.  Via in person or, when in-person participation is impractical or not possible, via telephonic or virtual meetings between stakeholders;<br>   b.  The team is expected to coordinate care through a demonstrable plan for timely follow-up on referrals to and from their service, making sure individuals are connected to resources to meet their needs in alignment with their preferences.<br>   c.  The team is responsible for ensuring the individual has access to services and resources such as housing, pharmacy, benefits, a support network, etc. when being discharged from a psychiatric hospital; released from jail; or experiencing an episode of homelessness.<br>   d.  CSC for FEP teams may use the Community Transition Planning service to establish a connection or reconnection to the individual and participate in discharge planning meetings while the individual is in a state operated hospital, crisis stabilization unit/behavioral health crisis center, jail/prison, or other community psychiatric hospital.<br>   e.  When the nature of transition planning meets the scope of definition for either ADSS, CM, CTP, or CSI, that service should be billed in accordance with the particular scope of service defined within this Manual.<br>4.  The CSC for FEP team is required to respond to the crisis needs of CSC for FEP-enrolled individuals, by either directly providing or referring individuals/families to any appropriate crisis services.<br>5.  Treatment and recovery support to the individuals served by the CSC for FEP team is provided in accordance with an individualized recovery plan, to be developed within 30 days of an individual's enrollment with the CSC for FEP team. Reviews of these plans should occur at least every six months and are thorough summaries describing the individual's and team's evaluation of the individual's progress/goal attainment, the effectiveness of the interventions provided, and the individual's satisfaction with services since the last plan review. |
| Service Accessibility | 1.  The CSC for FEP team must respond to phone calls from participants and family members 24-hours/365-days, and either directly provide or refer individuals/families to any appropriate crisis services. Answering devices/services/Georgia Crisis and Access Line do not meet the expectation; CSC for FEP team staff members must provide this phone coverage.<br>2.  The team must be able to rapidly respond to early signs of relapse and symptom recurrence and must have the capability of providing multiple contacts daily to individuals in acute need.<br>3.  There must be documented evidence that service hours of operation include evening, weekend and holiday hours. |
| Documentation Requirements | 1.  Each CSC for FEP program must provide monthly fidelity and outcomes data as defined by the DBHDD.<br>2.  The CSC for FEP must have documentation (e.g., notebook, binder, file, etc,) of treatment team meetings to include:<br>   a.  Date, start time, and end time for the meeting; |

## Coordinated Specialty Care for First Episode Psychosis Program (CSC for FEP) (Effective Date January 1, 2023)

| | |
|---|---|
| Billing & Reporting Requirements | b. Names of team participants involved in staffing (signed/certified by the team leader or team lead designee in the absence of the team leader); <br> c. Initials of all individuals discussed/planned for during staffing; and <br> d. Minimal documentation of content of discussion specific to each individual (1-2 sentences is sufficient). <br> 3. CSC for FEP meeting logs should be retained for a minimum of one (1) year, and in accordance with professional standards and the provider agency's policy. <br> 1. Providers must document services in accordance with the general requirements found in Part II, Section III: Documentation Requirements of this Provider Manual, as well as with the service-specific requirements delineated in this section below. Service provision, billing, and reporting must adhere to all DBHDD and Georgia Collaborative ASO requirements. <br> 2. Non-intensive Outpatient services that are identified in the Service Definition section above should be authorized and billed in accordance with Part I, Section II of this manual via the Non-intensive Outpatient Services Type of Care. Each practitioner must follow the specific service definition for each service they bill under the auspices of the CSC for FEP program. <br> 3. Education and employment support interventions should be billed/invoiced to the provider's DBHDD CSC for FEP contract. <br> 4. The CSC for FEP team can provide and bill for Community Transition Planning as outlined in the guidelines for this service. This includes supporting individuals who are eligible for CSC for FEP and are transitioning from jail/prison. <br> 5. Providers must submit a monthly programmatic and expenditure report and supporting documentation as needed to their designated DBHDD programmatic officer. <br> 6. Providers must maximize use of third-party payers (Medicaid, managed care organizations, private insurance, etc.). |

| Transaction Code | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Behavioral Health; Short-term Residential (Non-Hospital Residential Treatment Program W/o Rm & Board, Per Diem) | H0018 | HA | | | | 209.22 |
| Unit Value | 1 day | | | | | |

## Crisis Stabilization Unit (CSU) Services

| Transaction Code | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Code Detail | Code Detail | | | | | |
| Behavioral Health; Short-term Residential (Non-Hospital Residential Treatment Program W/o Rm & Board, Per Diem); Transition Bed | H0018 | HA | TB | U2 | | Per negotiation |
| Unit Value | 1 day | Utilization Criteria | 1 unit | | | |

| Service Definition |
|---|
| This is a residential alternative to or diversion from inpatient hospitalization, offering psychiatric stabilization and withdrawal management services. The program provides medically monitored residential services for the purpose of providing psychiatric stabilization and/or withdrawal management on a short-term basis. Specific services may include (see Behavioral Health Provider Certification and Operational Requirements for Certified Crisis Stabilization Units (CSUs), 01-325): <br> a. Psychiatric, diagnostic, and medical assessments; <br> b. Crisis assessment, support and intervention; <br> c. Medically Monitored Residential Substance Withdrawal Management (at ASAM Level 3.7-WM); <br> d. Medication administration, management and monitoring; <br> e. Psychiatric/Behavioral Health Treatment; <br> f. Nursing Assessment and Care; <br> g. Brief individual, group and/or family counseling; and <br> h. Linkage to other services as needed. |

## Crisis Stabilization Unit (CSU) Services

| | |
|---|---|
| **Admission Criteria** | 1. Treatment/Services at a lower level of care have been attempted or given serious consideration; **and**<br>2. Child/Youth has a known or suspected illness/disorder in keeping with one of the following target populations:<br>   A child/youth who is experiencing a:<br>    a. Severe situational crisis; or<br>    b. Mental Illness or Severe Emotional Disturbance (SED); or<br>    c. Substance Use Disorder; or<br>    d. Co-Occurring Substance Use Disorder and Mental Illness; or<br>    e. Co-Occurring Mental Illness and Intellectual/Developmental Disability; or<br>    f. Co-Occurring Substance Use Disorder and Intellectual/Developmental Disability; **and**<br>3. Child/Youth is experiencing a severe situational crisis which has significantly compromised safety and/or functioning, **as evidenced by one or more of the following:**<br>    a. Child/Youth presents a substantial risk of harm or risk to self, others, and/or property or is so unable to care for his or her own physical health and safety as to create a life-endangering crisis. Risk may range from mild to imminent; or<br>    b. Child/Youth has insufficient or severely limited resources or skills necessary to cope with the immediate crisis; or<br>    c. Child/youth demonstrates lack of judgment and/or impulse control and/or cognitive/perceptual abilities to manage the crisis; or<br>    d. For withdrawal management services, individual meets diagnostic criteria under the DSM for substance use, exhibiting withdrawal signs, symptoms, behaviors, or functional impairments and can reasonably be expected to respond to withdrawal management treatment. |
| **Continuing Stay Criteria** | This service may be utilized at various points in the child's course of treatment and recovery; however, each intervention is intended to be a discrete time-limited service that stabilizes the individual. These time limits for continued stay are based upon the individual's specific needs. |
| **Discharge Criteria** | 1. Child/Youth no longer meets admission guidelines requirements; **or**<br>2. Crisis situation is resolved and an adequate continuing care plan has been established; **or**<br>3. Child/Youth does not stabilize within the evaluation period and must be transferred to a higher intensity service. |
| **Clinical Exclusions** | 1. Child/Youth is not in crisis.<br>2. Child/Youth does not present a risk of harm to self or others or is able to care for his/her physical health and safety.<br>3. Severity of clinical issues precludes provision of services at this level of intensity. See CSU: Medical Evaluation Guidelines and Exclusion Criteria for Admission to Crisis Stabilization Units, 01-350. |
| **Service Exclusions** | 1. This is a comprehensive service intervention that is not to be provided with any other service(s), except for the Crisis Services Type of Care. |
| **Required Components** | 1. CSUs providing medically monitored short-term residential psychiatric stabilization and/or withdrawal management services shall be designated by DBHDD as both an emergency receiving facility and an evaluation facility and must be surveyed and licensed by the DBHDD.<br>2. In addition to all service qualifications specified in this document, providers of this service must adhere to Behavioral Health Provider Certification and Operational Requirements for Certified Crisis Stabilization Units (CSUs), 01-325.<br>3. Youth occupying transitional beds must receive services from outside the CSU (i.e. community-based services) on a daily basis.<br>4. Services must be provided in a facility designated as an emergency receiving and evaluation facility.<br>5. A CSU must have documented operating agreements and referral mechanisms for psychiatric disorders, substance use disorders, and physical healthcare needs that are beyond the scope of the CSU and that require inpatient treatment. Operating agreements must delineate the type and level of service to be provided by the private or public inpatient hospital or treatment facility. These agreements must specifically address the criteria and procedures for transferring the youth to a designated treatment facility when the CPS is unable to stabilize the youth.<br>6. Crisis Stabilization Units (CSU) must continually monitor the bed-board, regardless of current bed availability, and review, accept or decline individuals who are awaiting disposition on a bed-board, and provide a disposition based on clinical review. It is the expectation that CSU's accept the individual who is most in need.<br>7. CSUs are expected to review, accept or decline at least 90% of all individuals placed on a bed-board over the course of a fiscal year. |

# Crisis Stabilization Unit (CSU) Services

| | |
|---|---|
| | 8. A physician-to-physician consultation is required for all CSU denials that occur when that CSU has an open/available bed. |
| **Staffing Requirements** | 1. A physician or a staff member under the supervision of a physician, practicing within the scope of State law, must provide CSU Services. |
| | 2. All services provided within the CPS must be delivered under the direction of a physician. A physician must conduct an assessment of new admissions, address issues of care, and write orders as required. |
| | 3. A CSU must employ a full time Nursing Administrator who is a Registered Nurse. |
| | 4. A CSU must have a Registered Nurse present at the facility at all times. |
| | 5. If the charge nurse is an APRN, then he/she may not simultaneously serve as the accessible physician during the same shift. |
| | 6. A CSU must have an independently licensed/credentialed practitioner (or a supervised S/T) on staff and available to provide individual, group, and family therapy. |
| | 7. Staff-to-individual served ratios must be established based on the stabilization needs of individuals being served and in accordance with the aforementioned Rules and Regulations. |
| | 8. Functions performed by Physician Assistants, Nurse Practitioners, Clinical Nurse Specialists, Registered Nurses, and Licensed Practical Nurses must be performed within the scope of practice allowed by State law and Professional Practice Acts. |
| | 9. CSUs are strongly encouraged to employ a CPS (Parent or Youth) as part of their regular staffing compliment, and utilize them in early engagement, orientation to services, family support, skills building, IRP development, discharge planning, and aftercare follow-up. |
| **Clinical Operations** | 1. A physician must evaluate a child/youth referred to a CSU within 24 hours of the referral. |
| | 2. A CSU must follow the seclusion and restraint procedures included in the Department's policy: CSU: Use of Seclusion or Restraint in Crisis Stabilization Services, 01-351. |
| | 3. The following restraint practices are prohibited: |
| | a. The use of chemical restraint for any individual. |
| | b. The combined use of seclusion and mechanical, and/or manual restraint. |
| | c. Standing orders for seclusion or any form of restraint. |
| | d. PRN orders for seclusion or any form of restraint. |
| | e. Prone manual or mechanical restraints. |
| | f. Transporting an individual in a prone position while being carried or moved. |
| | g. Use of seclusion or restraint as a part of a Behavior Support Plan (BSP) or an Individual Recovery Plan (IRP). |
| | h. The use of handcuffs for an individual not under the jurisdiction of the criminal justice system. |
| | i. The use of medication as a chemical restraint. |
| | 4. For child/youth with co-occurring diagnoses including Intellectual/Developmental Disabilities, this service must target the symptoms, manifestations, and skills-development related to the identified behavioral health issue. |
| | 5. Child/Youth served in transitional beds may access an array of community-based services in preparation for their transition out of the CSU and are expected to engage in community-based services daily while in a transitional bed. |
| **Additional Medicaid Requirements** | 1. Crisis Stabilization Units with 16 beds or less may bill services to GAMMIS for Medicaid FFS recipients. |
| | 2. Medicaid claims for this service may **not** be billed for any service provided to Medicaid-eligible individuals in CSUs with greater than 16 beds. |
| **Reporting and Billing Requirements** | 1. This service requires authorization via the ASO via GCAL. Providers will select an individual from the State Contract Bed (SCB) Board. Once they accept them, they will assign the individual to a bed on the inventory status board (via bhiweb). Once an individual is assigned to the inventory status board a tracking number will be generated and the information will be sent from the Georgia Collaborative ASO crisis access team to the Georgia Collaborative ASO care management team for registration/authorization to take place. Once an authorization number is assigned, that number will appear on the beds inventory status board (on bhiweb) and an email will be generated and sent to the designated UM of the SCB facility containing the authorization number. |
| | 2. Providers must report information on all individuals served in CSUs no matter the funding source: |

## Crisis Stabilization Unit (CSU) Services

3. The CSU shall submit prior authorization requests for all individuals served (state-funded, Medicaid funded, private pay, other third-party payer, etc.);
4. The CSU shall submit per diem encounters (H0018HAU2 or H0018HATBU2) for all individuals served (state-funded, Medicaid funded, private pay, other third-party payer, etc.);
5. Providers must designate either CSU bed use or transitional bed use in encounter submissions through the presence or absence of the TB modifier. TB represents "Transitional Bed."
6. Unlike all other DBHDD residential services, the start date of a CSU span encounter submission may be in one month and the end date may be in the next. The span of reporting must cover continuous days of service and the number of units must equal the days in the span.
7. Providers must submit a discharge summary into the provider connect/batch system within 72 hours of CSU discharge.

| Documentation Requirements | 1. Individuals receiving services within the CSU shall be reported as a per diem encounter based upon occupancy at 11:59PM. At 11:59PM, each individual reported must have a verifiable physician's order for CSU level of care [or order written by delegation of authority to nurse or physician assistant under protocol as specified in § 43-34-23]. Individuals entering and leaving the CSU on the same day (prior to 11:59PM) will not have a per diem encounter reported.
2. For individuals transferred to transitional beds, the date of transfer must be documented in a progress note and filed in the individual's chart.
3. In addition to documentation requirements set forth in Part II of this manual, the notes for the program must have documentation to support the per diem including admission/discharge time, shift notes, and specific consumer interactions.
4. Daily engagement in community-based services must also be documented in progress notes for those occupying transitional beds. |
|---|---|

## Crisis Stabilization Unit (CSU) Services – Child and Adolescent Autism Spectrum Disorder (ASD)

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASD Crisis Stabilization Unit | TBD | TBD | | | | | | | | | | | | |

# Crisis Stabilization Unit (CSU) Services – Child and Adolescent Autism Spectrum Disorder (ASD)

| | |
|---|---|
| Service Definition | The ASD CSU service is a short-term residential alternative to/diversion from inpatient hospitalization for youth with ASD who present with severe and challenging behaviors that seriously and imminently compromise health, safety, and/or ability to remain in the community. The primary purpose of the ASD-CSU is to provide individualized applied behavior interventions services to decrease the challenging behaviors that place the youth and/or others at serious risk, increase communication skills and adaptive skills to help mitigate the challenging behavior, and increase a caregiver's ability to support the youth in the community. The primary treatment modalities used to achieve these goals are Applied Behavior Analysis and Clinical Behavior Analysis, utilizing trauma-sensitive approaches. Additional supports such as psychiatric stabilization and substance use treatment may be provided as clinically necessary.

Specific services include:
  A.  Crisis-related assessment, including: A diagnostic assessment, functional behavior assessment, adaptive skills assessment, psychiatric assessment, and medical assessment;
  B.  Crisis intervention planning, treatment and support, including: Behavior interventions, adaptive behavior skills treatment/training, and any needed psychiatric treatment for co-occurring behavioral health diagnoses;
  C.  Medication administration, management, and monitoring;
  D.  Nursing assessment and care, including assistance with ADLs as needed;
  E.  Brief individual, group and/or family counseling as needed and appropriate;
  F.  Discharge planning and linkage to other services
  G.  Parent/caregiver training
  H.  Treatment for behavioral health-related comorbidities |
| Admission Criteria | Youth must meet the following criteria in each of the primary categories (I. through IV.) below:

I.  Youth is between the ages of 10 to 14, and has an Autism Spectrum Disorder (ASD) diagnosis made by a professional qualified to render diagnoses under GA law or educational classification. In addition to ASD, the youth may also have co-occurring behavioral health diagnoses and/or intellectual/developmental disabilities that present challenges requiring intervention/stabilization. Increasing severe and challenging behaviors, and the need for adaptive skills acquisition treatment/training must be significant presenting needs.

II.  **Harm**

Child/Youth presents a serious and imminent risk of harm to self or others, so as to create a gravely endangering crisis, **as evidenced by one or more of the following:**
  1.  Indication or report of significant impulsivity and/or physical aggression, with poor judgment and insight, and that is imminently life threatening or gravely endangering to self or others;

**AND/OR**

  2.  There has been at least one episode of severe and highly acute maladaptive behavior. If continued, the behavior would significantly compromise the child's/youth's ability to safely remain in their home/community, and the behavior cannot be managed at a lower level of care.

III.  **Crisis Management/Coping**

Youth must meet **either #1 or 2, in addition to #3 below:**
  1.  Youth demonstrates significant deficits in adaptive skills or significant maladaptive behaviors that interfere with ability to manage the immediate crisis; **or**
  2.  Youth demonstrates lack of judgement, impulse control and/or cognitive/perceptual abilities to manage the crisis; |

## Crisis Stabilization Unit (CSU) Services – Child and Adolescent Autism Spectrum Disorder (ASD)

**AND**

3. Youth displays high acuity maladaptive behaviors which impact their ability to function in significant life domains: family, school, social, or activities of daily living. This impacts child/youth's ability to manage the crisis situation and remain safely in the community or be supported in a lower level of care.

### IV. Distress/Disruption

The youth's current behavior supports the need for the safety and structure of treatment/support provided at a high level of care, as evidenced by **BOTH Items #1 and 2 below:**

1. Less restrictive or intensive levels of treatment/support have been tried or considered, and are not appropriate to meet the individual's needs;

**AND**

2. Response to treatment and/or formal/informal support has not been sufficient to resolve the crisis.

### V. Clinical Need/Level of Care

Needs short-term, involuntary (1013) or voluntary treatment that includes brief crisis intervention and stabilization, **as evidenced by one or more of the following:**

1. Treatment/services at a lower level of care have been attempted and has not been sufficient to meet the youth's needs at this time,

**OR**

2. Treatment/services at a lower level of care have been given serious consideration and deemed not clinically appropriate to meet the youth's needs at this time.

| | |
|---|---|
| **Continuing Stay Criteria** | 1. Individual continues to meet admission criteria as defined above; **and** <br> 2. A behavior support plan related to the maladaptive behavior has been created/updated and implemented, but the behavior has not stabilized to the extent that the youth can safely return to his or her home/community; **and** <br> 3. A higher level of care is not indicated. |
| **Discharge Criteria** | 1. Youth no longer meets admission criteria and an adequate discharge/continuing support/care plan has been established; **and** <br> 2. Youth has achieved behavior goals directly related to the crisis (or behaviors directly related to the crisis have returned to baseline), such that the youth can be safely supported at either a lower level of care or in their natural home/setting. <br> **OR** <br> 3. Youth's legal guardian requests discharge; **or** <br> 4. Youth's behaviors and/or psychiatric symptoms have not stabilized within the crisis stabilization period, and youth must be transferred to a service offering a longer duration of intensive treatment/higher level of care; **or** <br> 5. Youth no longer displays highly acute maladaptive behaviors, however, significant maladaptive behaviors are still present and youth requires additional ongoing behavior intervention and skill acquisition treatment/training prior to being able to safely be supported in the community. |
| **Service Exclusions** | 1. All other Medicaid Community Based Rehabilitation Services and DBHDD State Funded Behavioral Health Core and Specialty services are excluded until the individual has been unconditionally discharged from the CSU (with the exception of the Community Transition Planning service for youth with a co-occurring behavioral health diagnosis and who are enrolled with a behavioral health provider who is authorized to provide the service). <br> 2. All other Medicaid-reimbursable and DBHDD State Funded Intellectual and Developmental Disability services are excluded with the exception of Support Coordination, consultation with established providers of Behavioral Support Services, and training of paid caregivers. |
| **Clinical Exclusions** | 1. Children/youth with a behavioral health diagnosis or IDD diagnosis in the absence of an ASD diagnosis. <br> 2. Children/youth requiring substance use withdrawal management. <br> 3. While many facilities use the following as clinical exclusions, the items below are **not** exclusionary criteria for this service: <br>    a. **Medical Needs:** |

# Crisis Stabilization Unit (CSU) Services – Child and Adolescent Autism Spectrum Disorder (ASD)

| | |
|---|---|
| **Required Components** | I. ADLs: Inability to independently perform ADLs, as defined below, is <u>not</u> an exclusion criterion for this service. A youth's dependence is defined as staff supervision, direction/prompts, and personal assistance. |
| |     1. **Transferring: The extent of a youth's ability to move from one position to another.** |
| |     2. **Feeding: The ability of a youth to feed oneself.** |
| |     3. **Dressing: The ability to select appropriate clothes and put clothes on.** |
| |     4. **Personal hygiene: The ability to bathe and groom oneself and to maintain dental hygiene, hair, and nail care.** |
| |     5. **Continence: The ability to control bladder and bowel function.** |
| |     6. **Toileting: The ability to get to and from the toilet, use it appropriately, and clean oneself.** |
| | b. **Sexual Risk:** Presence of sexually inappropriate behavior is <u>not</u> an exclusionary criterion for this service. |
| | c. **Elopement Risk:** Elopement behavior is <u>not</u> an exclusionary criterion for this service. May have recent or historical episodes of elopement behaviors that have placed the individual at imminent risk to self or others. |
| | 1. CSUs providing medically monitored short-term residential psychiatric/behavioral stabilization services shall be designated by the Department as both an emergency receiving facility and an evaluation facility and must be surveyed and certified by the DBHDD. |
| | 2. In addition to all service qualifications specified in this document, providers of this service must adhere to the DBHDD policy Behavioral Health Provider Certification and Operational Requirements for Certified Crisis Stabilization Units (CSUs), 01-325, and to all other CSU policies except as specifically denoted for this service in policy CSU: Child & Adolescent Autism Spectrum Disorder, 01-353. |
| | 3. Services must be provided in a facility designated as an emergency receiving and evaluation facility. |
| | 4. A CSU must have documented operating agreements and referral mechanisms for Autism Spectrum Disorder, psychiatric disorders, addictive disorders, and physical healthcare needs that are beyond the scope of the CSU and that require inpatient treatment. Operating agreements must delineate the type and level of service to be provided by the private or public inpatient hospital or treatment facility. These agreements must specifically address the criteria and procedures for transferring the youth to a designated treatment facility when the CSU is unable to stabilize the youth. |
| | 5. Crisis Stabilization Units (CSU) must continually monitor the bed-board, regardless of current bed availability, and review, accept or decline individuals who are awaiting disposition on a bed-board, and provide a disposition based on clinical review. It is the expectation that this CSU accepts individuals who meet the criteria above and who are most in need. |
| | 6. CSUs are expected to review, accept or decline at least 90% of all individuals placed on a bed-board over the course of a fiscal year. |
| | 7. A physician–to-physician consult is required for all CSU denials that occur when that CSU has an open/available bed. |
| **Staffing Requirements** | 1. ASD CSU services must be provided by a physician or a physician extender under the supervision of a physician, practicing within the scope of State law. All services provided within the CSU must be delivered under the direction of a physician. A physician must conduct an assessment of new admissions, address issues of care, and write orders as required. |
| | 2. ASD CSU must employ a full-time (FT) Nursing Administrator who is a Registered Nurse. |
| | 3. ASD CSU must always have a Registered Nurse present at the facility and maintain the ratio of 1 nurse to 8 individuals served. A second nurse may be a Licensed Practicing Nurse (LPN). |
| | 4. If the Charge nurse is an APRN, then he/she may not simultaneously serve as the accessible physician during the same shift. |
| | 5. ASD CSU must employ a full-time-equivalent (FTE) Board Certified Behavior Analyst (BCBA), who serves as the lead for all Applied Behavior Analysis (ABA) aspects of treatment. |
| | 6. ASD CSU must employ at least one additional full-time-equivalent (FTE) Board-Certified Behavior Analyst (BCBA) or a Board-Certified Assistant Behavior Analyst (BCaBA), who provides oversight to direct care staff during awake hours (first and second shift, 7 days a week). Functions performed by the BCBA or BCaBA must be performed within the scope of their practice and aligned with their professional standards. A BCaBA must be supervised by the lead BCBA on staff. |
| | 7. Staff-to individual served ratios must be established based on the needs of individuals served and in accordance with rules and regulations. A minimum of one (1) staff member per four (4) individuals served must always be maintained. Direct care staff may consist of a combination of Registered Behavior Technicians (RBT), |

# Crisis Stabilization Unit (CSU) Services – Child and Adolescent Autism Spectrum Disorder (ASD)

8.  Qualified Autism Services Practitioner-Supervisors (QASP-S), Qualified Autism Service Practitioners (QASP), Applied Behavior Analysis Technicians (ABAT), Behavior Intervention Specialists (BIS), and Mental Health Technicians (MHT). Additional clinical staff such as nurses, clinicians and BCBAs can count towards the staffing ratio. Functions performed by an RBT, QASP-S, QASP, or ABAT must be performed within the scope of their practice, and aligned with their professional standards. RBTs must be supervised by either the BCBA or Board Certified Assistant Behavior Analyst (BCaBA) on staff. QASP-Ss, QASPs, and ABATs must be supervised by the BCBA on staff.

9.  Functions performed by Physician Assistants, Nurse Practitioners, Clinical Nurse Specialists, Registered Nurses, and Licensed Practical Nurses must be performed within the scope of practice allowed by State law and Professional Practice Acts.

    ASD CSU must have an independently licensed/credentialed practitioner (or a Supervisee/Trainee) on staff and available to provide individual, group, and family therapy.

**Clinical Operations**

1.  If a child/youth is admitted via a diagnostic impression of ASD, one of the following shall apply:

    a.  If there is parental/caregiver affirmation that an actual diagnosis of ASD exists, documentation of this diagnosis must be confirmed and acquired by the CSU provider within one (1) week of admission; OR

    b.  If an actual diagnosis of ASD cannot be confirmed, the CSU provider must arrange for a full diagnostic workup resulting in a confirmed and documented diagnosis of ASD within two (2) weeks of admission.

    In either case, if a diagnosis of ASD is not confirmed via documentation within the specified timeframe, the provider must immediately begin arranging for transfer of the youth to services that are more appropriate for his or her needs. To facilitate this transfer, the youth should be placed on the non-ASD-specific bed board (if youth still meets CSU level of care) so that other CSUs can determine whether they are able to meet the needs of the youth.

2.  Medical Care

    a.  A physician must evaluate a youth referred to a CSU within 24 hours of the referral.

    b.  A nurse must evaluate each youth upon admission. The nurse shall also perform medication management functions and conduct other assessments/evaluations as needed within their scope of practice.

3.  A CSU must follow the seclusion and restraint procedures included in the Department's policy: CSU: Use of Seclusion or Restraint in Crisis Stabilization Services, 01-351.

4.  The following restraint practices are prohibited:

    a.  The use of chemical restraint for any individual.

    b.  The combined use of seclusion and mechanical, and/or manual restraint.

    c.  Standing orders for seclusion or any form of restraint.

    d.  PRN orders for seclusion or any form of restraint.

    e.  Prone manual or mechanical restraints.

    f.  Transporting an individual in a prone position while being carried or moved.

    g.  Use of seclusion or restraint as a part of a Behavior Support Plan (BSP) or an Individual Recovery Plan (IRP).

    h.  The use of handcuffs for an individual not under the jurisdiction of the criminal justice system.

    i.  The use of medication as a chemical restraint.

5.  Behavior Intervention Services

    a.  A BCBA must begin a functional behavior assessment on each youth within 36 hours of admission to develop the individualized Crisis Intervention Plan and Positive Behavior Support Plan.

    b.  If clinically indicated, an Adaptive behavior assessment can be completed during the initial assessment by the appropriate credentialed provider. The ASD CSU must use an established adaptive behavior assessment such as the Adaptive Behavior Assessment System, 3rd. Ed. (ABAS-3), Vineland Adaptive Behavior Scales, 2nd Ed, Assessment of Functional Living Skills (AFLS), etc.

# Crisis Stabilization Unit (CSU) Services – Child and Adolescent Autism Spectrum Disorder (ASD)

c. As part of the needs assessment, provider must work to identify necessary behavioral health and/or IDD treatments and supports for individuals with co-occurring diagnoses. For youth with co-occurring diagnoses, this service must target the symptoms, maladaptive behaviors, and adaptive behavior deficits related to the co-occurring diagnosis and that are relevant to the crisis event.

d. Positive Behavior Support Plans and behavior-change programs will be conceptually consistent with behavior analytic principles. Treatment implementation, fidelity and progress monitoring will be informed by quantitative data collected on the youth's behaviors while admitted to the ASD CSU.

e. Immediately upon admission, the provider must implement its internal policies and procedures for managing crisis situations, based upon the youth's presenting behaviors and needs.

f. Within 36 hours of admission, an individualized crisis plan must be developed (or updated if one already exists) and implemented for each youth served.

g. Within three (3) days of admission, a provisional Positive Behavior Support Plan must be developed (which is primarily focused on the crisis-related behavior) and implemented.

h. Within five (5) days of admission, a finalized Positive Behavior Support Plan must be fully implemented.

6. Additional Treatment

a. Treatment for Comorbidities - Some youth may come to the ASD CSU with psychiatric, intellectual/developmental, substance use, and/or medical comorbidities. Therefore, the Contractor shall have adequate treatment options, and referral agreements to treat various types of comorbidities, in accordance with DBHDD CSU policy. All treatment shall be administered by appropriately licensed providers.

b. Treatment of Patients with Trauma- Some youth with ASD and related disorders are more prone to experiencing trauma. The ASD CSU shall provide a licensed clinician with experience and competence in trauma focused behavior therapy to provide therapeutic support to these youth. The ASD CSU shall educate and work with the guardian/caregiver, who should be engaged in the program with the youth, to ensure that youth with trauma are discharged to safe environments.

7. In addition to providing trauma-specific treatment interventions to children/youth for whom these are needed, the CSU will utilize trauma sensitive approaches in all aspects of support to children, youth, and families.

8. Education - The ASD CSU will manage the educational needs of the youth in accordance with Georgia law while the youth receives treatment at the ASD CSU.

9. Daily Schedule - No more than 30% of all youth's waking hours (except educational schooling, mealtimes and ADL times) should be spent in milieu activities.

10. Transitioning Youth from the ASD CSU - The ASD CSU will dedicate a staff member whose primary role is to plan the appropriate discharge of the youth from the ASD CSU. This staff will work with the ASD Case Expeditors and other identified  and/or established service providers to, at a minimum, complete the following:

a. Upon admission, provider must begin developing an individualized discharge/transition plan, to include coordination and continuity of post-discharge services and supports. The CSU's case manager must assist each youth and caregiver/family with identifying and accessing needed services/supports post-discharge and must update/coordinate with any existing supporting providers and key stakeholders.

b. Research the available community resources and outpatient providers that meet the youth's and caregiver's/guardian's needs, including financial resources and preferences for location;

c. Discuss the transition options with the guardian/caregiver and youth engaging in the process, as appropriate;

d. Develop a transition plan, clearly outlining the recommended, continued treatment plan and responsibilities of the guardian/caregiver;

e. Perform all tasks related to placing the youth with the outpatient providers;

f. At least one (1) follow-up call within seven (7) days of discharge to ensure needed community support connections have been made, and that the discharge plan is being implemented.

11. Caregiver Training

a. To increase the efficacy of treatment at the unit, the staff of the ASD CSU will provide training for the youth's caregivers, paid and unpaid.

b. The ASD CSU will make accommodations to ensure that caregivers are able to participate in training regardless of their proximity in relation to the ASD CSU.

c. This training shall, at a minimum, result in the following:

## Crisis Stabilization Unit (CSU) Services – Child and Adolescent Autism Spectrum Disorder (ASD)

      i.   Comprehensive knowledge on the child's complete diagnosis;
      ii.   Competence in the behavior plan developed on the unit;
      iii.   Knowledge on how to respond to challenging behaviors;
      iv.   Knowledge on how to prevent challenging behaviors;
      v.   Knowledge on how to advocate for the child's needs; and
      vi.   Knowledge on how to respond and implement the crisis safety plan.

12. A daily activity schedule (per shift) must be posted in the ASD CSU, and available to external reviewers:
   a. A significant portion of the ASD CSUs daily schedule must consist of structured activities and treatment targeted toward reduction of maladaptive behaviors, acquisition of adaptive behaviors, and mitigation of any co-occurring behavioral health symptoms related to the emanating crisis.
   b. These activities should be consistent with each youth's needs as identified in their Positive Behavior Support Plan and Individualized Resiliency Plan.

| Service Accessibility | See Behavioral Health Provider Certification and Operational Requirements for Certified Crisis Stabilization Units (CSU), 01-325. |
| --- | --- |
| Documentation Requirements | 1. Individuals receiving services within the CSU shall be reported as a per diem encounter based upon occupancy at 11:59PM. At 11:59PM, each individual reported must have a verifiable physician's order for CSU level of care [or order written by delegation of authority to nurse or physician assistant under protocol as specified in § 43-34-23]. Individuals entering and leaving the CSU on the same day (prior to 11:59PM) will not have a per diem encounter reported. |

2. In addition to documentation requirements set forth in Part II of this manual, the notes for the program must contain documentation to support the per diem, including admission/discharge time, shift notes, and specific consumer interactions.
3. An individualized daily schedule must be included in each child/youth's clinical record.
4. The Positive Behavior Support Plan (PBSP) provides the primary direction for/management of behavior treatment in the ASD CSU, and must therefore be included as an adjunct to the IRP.
   a. The PBSP must include the following elements:
      i.   Background and Statement of Problem
      ii.   Relevant Medical History/Medical Necessity
      iii.   Functional Behavioral Assessment
      iv.   Operational definitions of each challenging behavior and goal needs
      v.   Measurable goals and objectives
      vi.   Identified replacement behaviors and/or necessary skill acquisition
      vii.   Description of data collection procedures and methods including staff responsible for data collection
      viii.   Specific behavior strategies and methods of interventions for reduction of maladaptive behaviors, methods of treatment, and staff responsible to deliver the treatments
      ix.   Any environmental modifications needed (if applicable)
      x.   Data recording, data analyses, and fidelity/program monitoring
      xi.   Generalization, Maintenance, and fading strategies
      xii.   Staff Training/Caregiver Training
      xiii.   Risks and Benefits
      xiv.   Consent
      xv.   Data Collection Forms/Checklist
      xvi.   Staff Training Record/Roster
   b. For youth who already have an active Positive Behavior Support Plan that was developed by another service provider, the ASD CSU should use interventions from that existing Plan to inform the development of the interventions to be implemented during the crisis stabilization process.
5. All children/youth must have an individualized Crisis Intervention Plan, which includes the following elements:

## Crisis Stabilization Unit (CSU) Services – Child and Adolescent Autism Spectrum Disorder (ASD)

6.
  a. Operational Definition of behaviors
  b. Description of situations in which the challenging behavior typically occurs
  c. Common warning signs and/or precursor behaviors that indicate a crisis is imminent
  d. Identification of staffing needed to carry out crisis curriculum procedures
  e. Identification of equipment necessary
  f. Contact information for additional staff that may be available for assistance
  g. Specific crisis curriculum techniques to use for each challenging behavior
  h. Protocols to access community-based crisis services to include the Georgia Crisis Response System, access emergency room care or law enforcement, if the acute crisis presents a substantial risk of imminent harm to self and others must be included in the crisis intervention plan provided upon discharge
  i. Procedures for debriefing and documentation– A functionally appropriate debriefing should occur.

6. The CSU must have detailed documentation of the interventions that were identified in the Positive Behavior Support Plan, and that these were both attempted and exhausted before initiating crisis interventions.

7. The ASD CSU must maintain documentation of quantitative data, graphs and narrative analysis of behavior change programs, replacement behaviors, skill acquisition, and medication changes related to behavior intervention and the emanating crisis behaviors.

8. The ASD CSU must maintain documentation of fidelity monitoring regarding implementation of the Positive Behavior Support Plan and interventions.

9. The ASD CSU must maintain documentation of behavior support plan and intervention competency training of staff and caregivers.

**Billing & Reporting Requirements**

1. This service requires authorization via the Georgia Collaborative ASO (ASO) via the Georgia Crisis and Access Line. Providers will select an individual from the Referral Board. If they accept an individual, they will assign the individual to a bed on the inventory status board (via bhlweb). Once an individual is assigned to the inventory status board a tracking number will be generated and the information will be sent from the ASO crisis access team to the ASO care management team for registration/authorization to take place. Once an authorization number is assigned, that number will appear on and an email will be generated and sent to the designated UM of the SCB facility containing the authorization number;

2. The CSU must report information on all individuals served in CSUs no matter the funding source;

3. The CSU shall submit prior authorization requests for all individuals served (state-funded, Medicaid funded, private pay, other third party payer, etc.);

4. The CSU shall submit per diem encounters (H0018HAU2 or H0018HATBU2) for all individuals served (state-funded, Medicaid funded, private pay, other third party payer, etc.);

5. Unlike all other DBHDD residential services, the start date of a CSU span encounter submission may be in one month and the end date may be in the next. The span of reporting must cover continuous days of service and the number of units must equal the days in the span;

6. Providers must submit a discharge summary into the provider connect/batch system within 48 hours of CSU discharge.

| | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Code Detail | T1016 | HA | HW | | | |

**Additional Medicaid Requirements**

None

## High Utilizer Management

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| High Utilizer Management | | | | | | | |

# High Utilizer Management

| | |
|---|---|
| Service Definition | The High Utilization Management (HUM) program provides support to individuals who experience challenges and barriers in accessing and remaining enrolled in desired community-based services and supports. Using a data-driven process, the HUM program identifies and provides assertive linkage, referral, and short-term care coordination for individuals with behavioral health challenges who have a demonstrated history of high crisis service utilization. The program offers support, education, and navigation to assist at-risk individuals who could benefit from the removal of barriers to accessing community-based treatment. Utilizing a recovery-oriented approach, HUM services offer care coordination in identifying and gaining access to required services and supports, as well as medical, social, educational, developmental, and other services and supports, regardless of the funding source for the services to which access is sought. The HUM program includes assertive engagement and time-limited follow up to individuals to support and encourage a consistent and ongoing connection with appropriate community resources. Objectives for the programs are to:

a. Determine the factors related to an individual's high utilization of crisis services (e.g., homelessness, inadequate discharge planning, engagement challenges, cultural factors, etc.).
b. Use case management to educate, connect to services, and advocate for the individual.
c. Utilize a person-centered approach to tailor supports to meet the unique needs of the individual served.
d. Reduce the individual's re-admission rate into inpatient settings.
e. Act as a navigator for an individual who has not been able to engage successfully in services beyond a crisis.
f. Reduce the number of people with elevated acute behavioral needs to improve access to care.
g. Elevate identified gaps in resources to regional community collaboratives in order to address these gaps and develop solutions with community partners.

This service supports effective engagement as defined by one or more of the following outcomes:
1. Individual's linkage to the appropriate service(s) and support(s);
2. Completion of an initial evaluation/behavioral health assessment;
3. Completion of a psychiatric evaluation;
4. Authorization for services;
5. Completion of two (2) face-to-face follow up appointments; and/or
6. Individual reports feeling sufficiently supported and connected to desired services. |
| Admission Criteria | Individuals with a primary substance use, mental health, or co-occurring diagnosis who have been admitted to a crisis setting (CSU, BHCC, State contracted Community-Based Inpatient Psychiatric facility, or PRTF) meeting one of the following frequency rates:
1. A 30-day readmission; or
2. Two (2) admissions within a 12-month period;

AND/OR

3. Other crisis utilization indicators, as evidenced by the following:
a. Three (3) mobile crisis dispatches within 90 days or;
b. Four (4) or more mobile crisis dispatches within nine (9) months; or
c. Two (2) or more presentations at an Emergency Department within 90-days; and/or
d. 30 consecutive days or more in a CSU or State contracted Community-Based Inpatient Psychiatric bed. |
| Continuing Stay Criteria | Individual remains disconnected from behavioral health community-based services and supports. |

# High Utilizer Management

## Discharge Criteria

1. Individual has solidified recovery support networks to assist in maintenance of recovery; and
2. Individual reports feeling sufficiently supported and connected to an appropriate level of services and supports.
3. Documented multiple attempts (e.g., a minimum of four attempts over the first two weeks, a minimum of six attempts over the first month, and/or a minimum of eight attempts over a two-month period) to locate and make contact with an individual. The individual may be removed from the caseload due to drop out/unsuccessful engagement after 90-days.

## Service Exclusions

1. This service may not duplicate any discharge planning efforts which are part of the expectation for hospitals, BHOCs, CSUs, and PRTFs.
2. The HUM program is not available to any individual who has an authorization for and is actively engaged in services (as evidenced by face-to-face contact within the past 30-days) with IC3, CME, or IFI.

## Clinical Exclusions

1. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition co-occurring with the diagnosis of:
   a. Intellectual/Developmental Disabilities; and/or
   b. Autism; and/or
   c. Neurocognitive Disorder; and/or
   d. Traumatic Brain Injury.
2. Individual does not present with medical necessity and functional limitations to substantiate eligibility for a behavioral health service.

## Required Components

1. Provider organization must agree to promote HUM activities as an integrated service within the agency's continuum/system of care in order to promote engagement and successful ongoing connection.
2. Each HUM Navigator will have access to, and/or receive a report generated daily of:
   a. Individuals assigned to their agency; and
   b. DBHDD hospital recidivism, specific to the individuals assigned to their agency.
3. HUM Navigators will maintain a short-term, rolling case load of individuals with whom active connection and reconnection services are being coordinated.
4. The HUM program is expected to engage a high percentage of individuals into services with few dropouts. In the event that a HUM Navigator has documented multiple attempts (e.g., a minimum of four attempts over the first two weeks, a minimum of six attempts over the first month, and/or a minimum of eight attempts over a two-month period) to locate and make contact with an individual, and has demonstrated a diligent search, the individual may be removed from the caseload due to drop out/unsuccessful engagement after 90-days.
5. HUM Navigators work as part of the known or developing care coordination team/network.
6. HUM Navigators may use flexible funds up to $500 per HUM program-enrolled individual for the following allowable expenses:
   a. **Transportation** – Round-trip bus or car fare for individuals to attend behavioral health, medical provider, or housing appointments.
   b. **Medication** – One (1) time allowance for direct purchase of [60 to 90-day supply] prescription medication from retail pharmacies other than the provider's pharmacy.
   c. **Personal items** – One (1) time purchase of necessary personal care items (e.g., basic clothing, grooming/hygiene items).
   d. **Food** - Light meal that is engagement-related with HUM navigator; maximum of $8.00 per meal.
   e. **Requisite benefits-related documentation** - Obtaining birth certificate, state identification, etc.

HUM Navigators will use specified leveling in order to prioritize individuals based on the color coding below to identify barrier levels:

**Green** – lowest level – mild barriers. Individual may have had previous service authorizations and/or an established connection to a provider; individual is known to the system, but not continuously and consistently engaging in community services that support stability; individual may have inadequate/inappropriate level of care; and/or individual may have refused services.

## High Utilizer Management

| | |
|---|---|
| **Staffing Requirements** | **Yellow** – mid level – moderate barriers. Individual may or may not have been authorized and/or engaged previously with provider, but is currently neither authorized for services nor connected, individual may have had inadequate/inappropriate level of care; individual may have refused services. Circumstances may include change in payor, financial limitations, location.<br><br>**Red** – highest level – severe barriers. No current or previous authorization; individual may be homeless or have other unsafe/unstable housing, may present with medical complexity and/or co-occurring I/DD, involvement with criminal justice system or DFCS; individual may have inappropriate level of care; may have refused services.<br><br>1. The practitioner who provides this service will be referred to in this definition as a HUM Navigator.<br>2. A full-time HUM Navigator must be hired in accordance with Department determined criteria, and in collaboration with the Department's High Utilization Management Coordinator (HUMC).<br>3. The following practitioners may provide HUM program services:<br>   • Practitioner Level 2: Psychologist, APRN, PA<br>   • Practitioner Level 3: LCSW, LPC, LMFT, RN<br>   • Practitioner Level 4: LMSW; LAPC; LAMFT; Psychologist/LCSW/LPC/LMFT's supervisee/trainee with at least a Bachelor's degree in one of the helping professions such as social work, community counseling, counseling, psychology, or criminology, functioning within the scope of the practice acts of the state; MAC, CAADC, CAC-II, GCADC (II, III); CPS; PP, CPRP or Addiction Counselor Trainee/Counselor in Training with at least a Bachelor's degree in one of the helping professions such as social work, community counseling, counseling, psychology, or criminology<br>   • Practitioner Level 5: CPS; PP; CPRP; or, when an individual served has a co-occurring mental illness and substance use disorder: CAC-I, GCADC-I, or Addiction Counselor Trainee/Counselor in Training with high school diploma/equivalent under supervision of one of the licensed/credentialed professionals above.<br>4. Staff-to-consumer ratio for each HUM navigator shall be maintained at a minimum caseload of one HUM navigator serving 50 individuals (1:50). This is based on a rolling census of eligible individuals identified in the Beacon system and/or by other enrolled providers who may serve as referral sources. Of these individuals, those who become connected to services will be discharged and no longer counted in the ratio. |
| **Clinical Operations** | 1. It is not expected that HUM Navigators participate in or deliver clinical services.<br>2. HUM Navigator service delivery may include (with appropriate consent) coordination with family and significant others and with other systems/supports (e.g., work, school, religious entities, law enforcement, aging agencies, etc.) when appropriate for services and supports.<br>3. HUM Navigators must have the ability to deliver engagement services in various environments, such as inpatient, residential, homes, homeless shelters, or street locations.<br>4. HUM Navigators must incorporate assertive engagement techniques to identify, locate, engage, and retain the most difficult to engage individuals who have a history of cycling in and out of intensive services.<br>5. HUM Navigators must demonstrate the implementation of well thought out engagement strategies, including the use of street and shelter outreach approaches and collateral contacts with family, friends, probation or parole officers.<br>6. Using assertive engagement skills, the HUM Navigator will function to perform and report on the following 30-60-90 Day Activities:<br>  Within 30 days (Rapid Intensive Engagement)<br>   • have had face-to-face contact with individual<br>   • collaborate to identify most urgent needs<br>   • collaborate to identify barriers to access treatment/supports, prioritize services<br>   • report on progress<br>  Within 60 days (Focused Resource Engagement)<br>   • connection to appropriate resources, services (as evidenced by attendance to appointments)<br>   • convening appropriate parties, treatment providers, natural supports, stakeholders to identify and resolve barriers |

## High Utilizer Management

Within 90 days (Active Monitoring Engagement)
- Integration into appropriate level of services, supports and other resources.
- Monitor access and continued engagement in identified services/supports.
- Transition out of HUM program

HUM Navigators must:
1. Use case management strategies to educate and connect to services and advocate for individuals.
2. Utilize a person-centered approach to meet the needs of each unique person.
3. Engage individuals who have not been successfully engaged into services beyond a crisis.
4. Use conventional and unconventional methods of engagement to determine barriers to ongoing community-based care.
5. Use a standardized comprehensive needs assessment tool.

The HUM program must:
1. Use available data to identify and assign a level of priority (see Required Components) to eligible individuals;
2. Utilize methods, materials, settings, and outside resources appropriate to the developmental and cognitive levels, capabilities, age, gender, and culture of participants;
3. Utilize methods, materials, approaches, activities, settings and outside resources appropriate for, and targeted to individuals with Substance Use Disorders and co-occurring mental illness;
4. Elevate identified gaps in resources to the regional community collaboratives/local interagency planning team chairs to address and develop solutions with community partners;
5. Reduce the number of people with elevated acute BH needs to improve access to care;
6. Increase utilization and participation in programming that promotes stability, wellness and recovery; and/or
7. Reduce the re-admission rates of individuals being re-admitted into BHCC, CSU, Private Hospital, PRTF levels of care.

| Service Accessibility | 1. There must be documented evidence that service hours of operation are flexible and include outreach and engagement during evenings and weekends.<br>2. Demographic information collected shall include a preliminary determination of hearing-impairment status to determine the appropriateness of a referral to the Office of Deaf Services.<br>3. HUM Navigators are expected to assertively engage with individuals in settings to include: Hospitals, BHCCs, CSUs, PRTFs, and other community settings.<br>4. Parents/families/legal guardians are considered to be necessary supports for youth served in the HUM service. However, if the individual served is 18 years of age or older, they may choose not to have parents/families engaged. |
|---|---|
| Documentation Requirements | • 30/60/90-day reporting of progress<br>• Date of admission and discharge from HUM program<br>   Discharge Disposition:<br>    • Still receiving services;<br>    • Completed receiving services;<br>    • Refused services;<br>    • Left catchment area;<br>    • Incarcerated; or<br>    • Other dispositions.<br>• Date of first and last HUM Navigator contact<br>• Unique identifier for each individual, which will follow them across multiple engagements<br>• ID of HUM Provider (T1, T2+), perhaps Federal ID #? |

## High Utilizer Management

- Region
- County (where individual intends to reside while receiving services)
- Urban vs. Rural (based on county)
- Initial priority level coming into HUM (Red, Yellow, Green)
- Number and type of Crisis contacts - What factors placed them on the HUM list?
  - ER
  - IP Stay (State contracted beds)
  - BHCC/CSU
  - PRTF
  - Mobile Crisis
- Initial Barriers to engagement in community treatment (select as many as apply):
  - Homelessness
  - Transportation
  - Inadequate DC planning
  - Cultural factors
  - Lack of understanding of value of OP services
  - Unavailability of services in community
  - Lack of knowledge in how to access state services
  - Prior negative experience with community services
  - Other
- List of barriers that were successfully removed by the HUM Navigator/service.

| Billing & Reporting Requirements | 1. Compliance with monthly programmatic reporting as required by the Department's HUM Coordinator.<br>2. Each HUM navigator must submit per unit encounters for all individuals served.<br>3. Post 90-Day Review – The HUM Navigator will provide a monthly programmatic report to DBHDD of the caseload outcomes for individuals served in the HUM program. |
| --- | --- |
| Additional Medicaid Requirements | None. |

## Integrated Supported Employment and Education (SEEd) Program

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| TBD | TBD | | | | | | | | | | | | | |
| Service Definition | The Integrated Supported Employment and Education (SEEd) program supports youth and emerging adults with SED/SMI in obtaining and maintaining employment, and/or enrolling in, attending, and completing an education program (high school/GED, higher education, technical/trade school, etc.). SEEd integrates both employment and educational needs within a single program, and offers supports that enable youth/emerging adults to improve their daily functioning, and work toward achievement of their recovery and employment/education goals. Support is available according to individualized goals and needs in the areas of care coordination, | | | | | | | | | | | | | |

## Integrated Supported Employment and Education (SEEd) Program

| | |
|---|---|
| | assistance with the job and/or school application process, job and/or educational learning skill development, follow-along/on-site mentoring and assistance, and career counseling.<br><br>Enrollment in the SEEd program is based on individual choice. The program utilizes a rapid engagement process to assist individuals with identifying career and/or educational goals, and once identified, with determining the steps required to pursue those goals. As soon as the individual has made some preliminary choices concerning their preferences for a job/career and/or for an educational program/setting, the SEEd program utilizes a rapid application and placement process to help the individual begin the job and/or educational program of their choosing. |
| Admission Criteria | All interested individuals have access to services regardless of educational/employment readiness factors, symptoms, and history of substance use, violent behavior, cognition impairments, treatment adherence, or personal presentation. |
| Continuing Stay Criteria | TBD |
| Discharge Criteria | TBD |
| Service Exclusions | None |
| Clinical Exclusions | None |
| Required Components | 1. **Services begin soon after the person expresses interest.**<br>   a.  Supported Education Component – For individuals who want educational support, the first meaningful education activities occur within 30 days of enrollment into the program. Meaningful education activities could include an exploration of career and educational interests, a tour of a campus, applying for financial aid, or meeting a department leader (among others).<br>   b.  Supported Employment Component – For individuals who want employment support, the first meaningful employment activities occur within 30 days of enrollment into the program. Meaningful employment activities could include exploration of career interests, resume/job skill development, or identifying and applying for potential job opportunities (among others).<br>2. **SEEd services are integrated with other services**, such as any behavioral health treatment/support that individuals may be receiving.<br>   a.  When these other services are rendered by a DBHDD behavioral health or I/DD provider, Supported Education Specialists and Supported Employment Specialists must be part of an integrated treatment team.<br>   b.  When such services are rendered by a non-DBHDD provider, Supported Education and Employment Specialists are expected to advocate for their inclusion in treatment teams/IRP planning conducted by the non-DBHDD provider.<br>   c.  Supported Employment and Supported Education Specialists are also expected to communicate with the Georgia Vocational Rehabilitation Agency (GVRA), the Technical College System of Georgia (TCSG), and other such agencies as applicable to the individual's goals and needs.<br>3. **Individual preferences guide services.** The role of Supported Education and Supported Employment Specialists is to assist the individual to discover and articulate their education and career preferences, and to then provide the services that will help them realize those education/employment goals.<br>4. **Individualized follow-along supports are ongoing.** Follow-along supports are available as long as the individual is actively pursuing their educational/employment goals. The level of support is geared to the individual's needs and may decline over time as they reach their goals. Supports are intended to continue if an individual's educational/employment goals change.<br>5. **Services are community-based.** Education and employment services are provided in a natural community setting the majority of the time.<br>6. **Services are strengths focused and promote hope and recovery.** Services focus on individuals' strengths and building for the future. Inherent in this principle is the idea that recovery and hope for the future is pragmatic and achievable. For the integrated SEEd program, education goals should be linked to employment goals/outcomes to the greatest extent possible, even when individuals are still exploring/have not firmly committed to particular employment/career trajectories. |

## Integrated Supported Employment and Education (SEEd) Program

| Staffing Requirements | 1. All program staff must be trained in an integrated model including both Supported Education and Supported Employment services. |
| Clinical Operations | 1. There is a maximum staff to individuals served ratio of 1:25, with the target ratio being 1:20. |
| Service Accessibility | TBD |
| Documentation Requirements | Provider will participate in all evaluation, quality improvement, training and fidelity monitoring activities and any other mechanism DBHDD chooses to utilize. |
| Billing & Reporting Requirements | TBD |

## Intensive Customized Care Coordination

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Community-based wrap-around services, monthly | Community-based wrap-around services | H2022 | HK | | | | |
| Unit Value | 1 month | | | | | | |
| Initial Authorization | 3 units | | | | | | |
| Authorization Period | 90 days | | 90 days | | | | |
| | Utilization Criteria | | | See Admission Criteria below | | | |
| Service Definition | Intensive Customized Care Coordination is a provider-based High Fidelity Wraparound intervention, as defined by the National Wraparound Initiative, comprised of a team selected by the family/caregiver in which the family and team identify the goals and the appropriate strategies to reach the goals. Intensive Customized Care Coordination assists individuals in identifying and gaining access to required services and supports, as well as medical, social, educational, developmental and other services and supports, regardless of the funding source for the services to which access is sought. Intensive Customized Care Coordination encourages the use of community resources through referral to appropriate traditional and non-traditional providers, paid, unpaid and natural supports. Intensive Customized Care Coordination is a set of interrelated activities for identifying, planning, budgeting, documenting, coordinating, securing, and reviewing the delivery and outcome of appropriate services for individuals through a wraparound approach. Care Coordinators (CC), who deliver this intervention, work in partnership with the individual and their family/caregivers/legal guardian are responsible for assembling the Child and Family Team (CFT), including both professionals and non-professionals who provide individualized supports and whose combined expertise and involvement ensures plans are individualized and person-centered, build upon strengths and capabilities and address individual health and safety issues.

Intensive Customized Care Coordination is differentiated from traditional case management by:
- Coaching and skill building of the individual and parent/caregiver to empower their self-activation and self-management of their personal resiliency, recovery and wellness towards stability and independence.
- The intensity of the coordination: an average of three hours of coordination weekly. | | | | | | |

## Intensive Customized Care Coordination

- The frequency of the coordination: an average of one face-to-face meeting weekly.
- The caseload: an average of ten youth per care coordinator.
- The average service duration: 12 – 18 months.
- Involvement in a partnership with a High Fidelity Wraparound-trained certified parent peer specialist (CPS-P) as a part of the Wrap Team (this CPS-P, while a required partner in the ICCC process, is billed separately as Parent Peer Support in accordance with this manual.
- Development of a Child and Family Team, minimally comprised of the individual, parent/caregiver, and Wrap Team (CC, CPS-P, and one natural support).
- A Child and Family Team Meeting (CFTM), held minimally every 30 days, where all decisions regarding the Individual Recovery Plan are made.

Intensive Customized Care Coordination includes the following components as frequently as necessary:

- Comprehensive youth-guided and family-directed assessment and periodic reassessment of the individual to determine service needs, including activities that focus on needs identification to determine the need for any medical, educational, social, developmental or other services and include activities such as: taking individual history; identifying the needs, strengths, preferences and physical and social environment of the individual, and completing related documentation; gathering information from other sources, such as family members, medical providers, social workers, and educators, if necessary, to form a complete assessment of the individual.

- Development and periodic revision of an individualized recovery plan (IRP), based on the assessment, that specifies the goals of providing care management and the actions to address the medical, social, educational, developmental and other services needed by the individual, including activities that ensure active participation by the individual and others. The IRP will include transition goals and plans. If an individual declines services identified in the IRP, it must be documented.

- Referral and related activities to help the individual obtain needed services/supports, including activities that help link the eligible individual with medical, social, educational, developmental providers, and other programs or services that are capable of providing services to address identified needs and achieve goals in the IRP.

- Monitoring and follow-up activities that are necessary to ensure that the IRP is effectively implemented and adequately addresses the needs of the individual. Monitoring includes direct observation and follow-up to ensure that IRPs have the intended effect and that approaches to address challenging behaviors, medical and health needs, and skill acquisition are coordinated in their approach and anticipated outcome. Monitoring includes reviewing the quality and outcome of services and the ongoing evaluation of the satisfaction of individuals and their families/caregivers/legal guardians with the IRP. These activities may be with the individual, family members, providers, or other entities, and may be conducted as frequently as necessary to help determine: whether services/supports are being furnished in accordance with the individual's IRP, whether the services in the IRP are adequate to meet the needs of the individual; whether there are changes in the needs or status of the individual. If changes have occurred, the individual IRP and service arrangements with providers will be updated to reflect changes.

- Intensive Customized Care Coordination may include contacts and coordination with individuals that are directly related to the identification of the individual's needs and care, for the purposes of assisting individual's access to services, identifying needs and supports to assist the individual in obtaining services, providing Care Coordinators with useful feedback, and alerting Care Coordinators to changes in the individual's needs. Examples of these individuals include, but are not limited to, school personnel, child welfare representatives, juvenile justice staff, primary care physicians, etc.

- Intensive Customized Care Coordination also assists individuals and their families or representatives in making informed decisions about services, supports and providers.

- Partnering with and facilitating involvement of the required CPS-P.

Youth (through age 20) who, based on CANS-Georgia scoring, have:

At least 1 rating of "2" or "3" on the following Child Behavioral/Emotional Needs:
- Psychosis
- Attention/Concentration

| | |
|---|---|
| Admission Criteria | |

## Intensive Customized Care Coordination

- Impulsivity
- Depression
- Anxiety
- Substance Abuse
- Attachment Difficulties
- Anger Control

And

At least 1 rating of "1" on the following Exposure to Potentially Traumatic/Adverse Childhood Experiences:
- Sexual Abuse
- Physical Abuse
- Emotional Abuse
- Neglect
- Witness to Family Violence
- Community Violence
- School Violence
- Disruptions in Caregiving/Attachment Losses

And

At least 1 rating of "2" or "3" on the following Life Functioning Needs:
- Family
- Living Situation
- Social Functioning
- Legal
- Sleep
- Recreational
- School Behavior

And one or more of the following:

1. Individual has shown serious risk of harm in the past one hundred and eighty (180) days, as evidenced by one of the following:
   a. Indication or report of significant and repeated impulsivity and/or physical aggression, with poor judgment and insight, and that is significantly endangering to self or others, OR
   b. Recent pattern of excessive substance use (co-occurring with a mental health diagnoses as indicated in target population definition above) resulting in clearly harmful behaviors with no demonstrated ability of child/adolescent or family to restrict use, OR
   c. Clear and persistent inability, given developmental abilities, to maintain physical safety and/or use environment for safety, OR
   d. Current suicidal or homicidal ideation with clear, expressed intentions and/or current suicidal or homicidal ideation with history of carrying out such behavior.

or

## Intensive Customized Care Coordination

| | |
|---|---|
| | 2. The clinical documentation supports the need for the safety and structure of treatment provided the individual's behavioral health issues are unmanageable as evidenced by: <br>   a. Documented history of multiple admissions to crisis stabilization programs or psychiatric hospitals (in the past 12 months) and individual has not progressed sufficiently or has regressed; and one of the following: <br>     i. Less restrictive or intensive levels of treatment have been tried and were unsuccessful, or are not appropriate to meet the individual's needs; OR <br>     ii. Past response to treatment has been minimal, even when treated at high levels of care for extended periods of time; OR <br>     iii. Symptoms are persistent and functional ability shows no significant improvement despite extended treatment exposure, OR <br>   b. Have experienced two or more placement changes within 24 months due to behavioral health needs in home, home school or GNET, OR <br>   c. Have been treated with two or more psychotropic medications at the same time over a 3-month period by the same or multiple prescribing providers, OR <br>   d. Youth and/or family risk of homelessness within the prior 6 months. <br><br> and <br><br> 3. Individual and/or family has history of attempted, but unsuccessful follow through with elements of a Resiliency/Recovery Plan which has resulted in specific mental, behavioral or emotional behaviors that place the recipient at imminent risk for disruption of current living arrangement including: <br>   a. Lack of follow through taking prescribed medications; <br>   b. Following a crisis plan; or <br>   c. Maintaining family and community-based integration. |
| **Continuing Stay Criteria** | Individual has shown serious risk of harm due to Mental Health, Substance Use, or Co-Occurring issues in the past ninety (90) days, as evidenced by the following: <br> • Some self-mutilation, risk taking or loss of impulse control resulting in danger to self or others, or <br> • Decreased daily functioning due to bizarre behavior, psychomotor agitation, or <br> • Disorientation or memory impairment due to mental health condition that endangers the welfare of self or others, or <br> • Notable impairment in social, interpersonal, occupational, educational functioning that leads to dangerous functioning, or <br> • Inability to maintain adequate nutrition or self-care with no support due to psychiatric condition, or <br> • Side effects of atypical complexity from psychotropic medication or lack of stabilization on psychotropic medication, or <br> • Persistent mood disturbance, with or without psychosis that indicates a risk of harm to self or others, or <br> • Some patterns of substance use resulting in risky or harmful behavior patterns with limited restriction capacity. |
| **Discharge Criteria** | 1. Youth has demonstrated a decrease in admission criteria behaviors over the past ninety (90) days. This decrease is clearly and sufficiently documented in case plans and/or medical records; and <br> 2. An adequate transition plan has been established; and <br> 3. One or more of the following: <br>   a. Goals of Individualized Recovery Plan (IRP) have been substantially met and individual no longer meets continuing stay criteria; or <br>   b. Individual's family requests discharge and the individual is not imminently in danger of harm to self or others; or <br>   c. Transfer to another service is warranted by change in the individual's condition. |

## Intensive Customized Care Coordination

| | |
|---|---|
| **Service Exclusions** | 1. Intensive Customized Care Coordination providers cannot bill the following services while providing Intensive Customized Care Coordination to an individual: <br>   • Behavioral Health Assessment <br>   • Service Plan Development <br>   • Community Support Individual <br>2. While "care coordination" is often considered a managed care product, this service does not function in that manner. This is a direct service benefit to individual and families, provided side-by-side with them in their own homes/communities. The service includes (among other elements) provision of direct coaching, support, and training specific to developing the individual/family skills to self-manage services coordination and, as such, is not solely appropriate as a tool for utilization management. |
| **Clinical Exclusions** | 1. Individuals with the following conditions are excluded from admission because the severity of cognitive impairment precludes provision of services in this level of care: Severe and Profound Intellectual/Developmental Disabilities. <br>2. The following diagnoses are not considered to be a sole diagnosis for this service: <br>   • Rule-Out (R/O) diagnoses <br>   • Personality Disorders <br>3. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence that an additional psychiatric diagnosis is the foremost consideration for psychiatric intervention: <br>   • Conduct Disorder <br>   • Neurocognitive Disorder <br>   • Traumatic Brain Injury <br>4. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence that a psychiatric diagnosis is the foremost consideration for this psychiatric intervention: <br>   • Mild Intellectual/Developmental Disabilities <br>   • Moderate Intellectual/Developmental Disabilities <br>   • Autistic Disorder |
| **Required Components** | 1. Access to parent peer support shall be offered. This access is a required complement to this service. Parent Peer Support is a separate and distinct billable service. <br>2. The family must be contacted within 48 hours of the initial referral. <br>3. The family must be met face-to-face by care coordinator and/or family peer support staff within 72 hours of the initial referral to begin the engagement and assessment processes. <br>4. An initial CFTM must be held within 14 days from the initial enrollment for all individual. <br>5. CFTMs must be held at a minimum of every 30 days to minimally include the parent or legal guardian (or their representative), individual, one natural support and Wrap Team (To accommodate full participation, parent or legal guardian (or their representative), individual and natural support may participate telephonically or through other electronic means). Service providers (behavioral health and medical), child-serving agency personnel (child welfare, juvenile justice, education) and other natural and informal supports should also be a part of the Child and Family Team. <br>6. The CFTM process should be family-driven and youth-guided. <br>7. All ECFTMs must be held within 72 hours of a crisis. <br>8. Direct supervision by the supervisor must occur at least monthly utilizing the supervision tools indicated by the National Wraparound Initiative. <br>9. Group/team case consultation by the supervisor must occur at least twice monthly. <br>10. Provision of direct observation of staff in the field by the supervisor at least monthly. <br>11. Provision of direct observation of staff in the field by Master Trainers/Coaches. |

## Intensive Customized Care Coordination

12. All staff must be trained in High Fidelity Wraparound through the Georgia Center of Excellence for Child and Adolescent Behavioral Health (COE) before providing this service.

13. Ensure that families are utilizing natural supports and low-cost, no-cost options that are sustainable. Provision of crisis response, 24/7/365 to the individual they serve, to include face-to-face response when clinically indicated.

14. The Care Coordinator will average 3 hours of care coordination per week per individual served.

15. The Care Coordinator will average 1 face-to-face per week per individual served.

16. To promote team cohesion, Care Coordinators must have weekly contact with the CPS-P on the ICCC team in support of the individual/family.

17. All coordination will be documented in accordance with the DBHDD Provider Manual for Community Behavioral Health Providers.

18. Providers must participate in the DBHDD Care Management Entity (CME) quality improvement processes.

| Staffing Requirements | Intensive Customized Care Coordination providers will minimally have: |

1. Care Coordinators who can serve at a 10 individual to 1 care coordinator ratio:
    - Care Coordinators must possess a minimum of B.A or B.S. degree in social work, psychology or related field with a minimum of two (2) years clinical intervention experience in serving youth with SED or emerging adults with mental illness. All Bachelor level and unlicensed care coordinators must be supervised at minimum by a licensed mental health professional (e.g., LCSW, LPC, LMFT). Experience can be substituted for education. Ability to create effective relationships with individuals of different cultural beliefs and lifestyles.
    - Effective verbal and written communication skills.
    - Strong interpersonal skills and the ability to work effectively with a wide range of constituencies in a diverse community.
    - Ability to develop and deliver case presentations.
    - Ability to analyze complex information, and to define and solve problems.
    - Ability to work effectively in a team environment.
    - Ability to work in partnership with family service providers with lived experience.

2. Wraparound Supervisor for every six (6) care coordinators:
    - Wraparound Supervisor must possess a minimum of M.A. or M.S. degree in social work, psychology or related field with a minimum of two (2) years clinical intervention experience in serving youth with SED or emerging adults with mental illness. All unlicensed Wraparound Supervisors must be supervised at minimum by an independently licensed mental health practitioner (e.g., LCSW, LPC, LMFT). Education can be substituted for experience. Ability to create effective relationships with individuals of different cultural beliefs and lifestyles.
    - Effective verbal and written communication skills.
    - Strong interpersonal skills and the ability to work effectively with a wide range of constituencies in a diverse community.
    - Ability to develop and deliver case presentations.
    - Ability to analyze complex information, and to define and solve problems.
    - Ability to work effectively in a team environment.

3. A Program Director who is responsible for the overall management of this service. The CME Director oversees the implementation of numerous activities that are critical to CME administration and management including but not limited to supervision of team personnel; model adherence, principles, values, and fidelity; participation and monitoring of continuous quality improvement.

4. A CPS-P assigned for every child/family team:
    - This particular staff support can be declined by the legal guardian; or
    - This particular staff support can be declined for youth who are in DFCS/DJJ custody and for whom there is not a foster parent; or as appropriate, with a reunification plan, this CPS-P can be utilized to facilitate permanency planning and/or to facilitate increasing parental involvement in care coordination processes.

# Intensive Customized Care Coordination

| | |
|---|---|
| Clinical Operations | 1. Providers must adhere to the DBHDD CME Procedures Manual. |
| | 2. Provider must accept all coordination responsibility for the individual and family. |
| | 3. Provider must ensure that all possible resources (services, formal supports, natural supports, etc.) have been exhausted to sustain the individual in a community-based setting prior to institutional care being presented as an option. |
| | 4. Provider must ensure care coordination and tracking of services and dollars spent. |
| | 5. Provider must ensure that all updated action plans or authorization plans are submitted to the authorizer of services per the state guidelines of 7 days after the CFTM. |
| | 6. Provider must have an organizational plan that addresses how the provider will ensure the following: |
| | • Direct supervision by the supervisor must occur at least monthly utilizing the supervision tools indicated by the National Wraparound Initiative. |
| | • Group/team case consultation by the supervisor must occur at least twice monthly. |
| | • Provision of oversight and guidance around the quality and fidelity of Wrap Process by the supervisor. |
| | • Provision of oversight and guidance around the quality and fidelity to family-driven and youth-guided care by the supervisor. |
| | • Ongoing training and support from the Center of Excellence regarding introductory and advanced Wraparound components as identified by CME Staff, COE or DBHDD in maintaining effective statewide implementation. |
| | • Supervisors complete Georgia Document Review Form (see DBHDD CME Manual) with Care Coordinators monthly for each child and family team. |
| | • Provision of crisis response, 24/7/365 to the youth they serve, to include face-to-face response when clinically indicated. |
| Service Accessibility | 1. Providers will be available for meetings at times and days conducive to the families, to include weekends and evenings for Child and Family Team meetings. |
| | 2. Families must be given their choice of family support organizations for parent peer support, where available. If unavailable in their county, the provider of Intensive Customized Care Coordination must provide parent peer support to the family, as the Wrap Team is defined as a care coordinator and a High-Fidelity Wraparound trained certified parent peer specialist (CPS-P). |
| Documentation Requirements | The following must be documented: |
| | 1. Youth/Young Adult and family orientation to the program, to include family and individual expectations. |
| | 2. Wrap Team progress notes are documented for all individual and family interventions and coordination interventions. These notes adhere to the content set forth in the DBHDD Provider Manual for Community Behavioral Health providers. |
| | 3. Evidence that the youth/young adult's needs have been assessed, eligibility established, and needs prioritized. |
| | 4. Evidence of youth/young adult participation, consent and response to support are present. |
| | 5. Evidence that methods used to deliver services and supports to meet the basic needs of individual are in a manner consistent with normal daily living as much as possible. |
| | 6. Evidence of minimal participation in each CFTM as described in Required Components. |
| | 7. Evidence of CFTMs and ECFTMs occurring as described in Required Components. |
| | 8. Documentation of active CPS-P participation in the team process (billed separately from the ICCC service). If this is declined in accordance with Staffing Requirement Item 4 above, the reason for declined CPS-P support is noted in the record. |
| Billing & Reporting Requirements | 1. The provider must report data to the DBHDD or COE as required by the DBHDD CME Quality Improvement Plan or any other data request. |
| | 2. The provider must provide requested data to the DBHDD and/or DCH in their roles as state medical and behavioral health authorities. |
| | 3. The provider must document the provision of direct observation of staff in the field by the supervisor at least monthly. |
| | 4. The provider must document the provision of direct observation of staff in the field by Master Trainers/Coaches. |
| Additional Medicaid Requirements | 1. The Care Coordinator is responsible for seeking service authorization in accordance with the criteria herein through the benefit manager. |

## Intensive Customized Care Coordination: Flexible Supports

| Transaction Code / Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Behavioral Assistance | TBD | | | | | |
| Clinical Consultative | TBD | | | | | |
| Expressive Therapeutic | TBD | | | | | |

| Unit Value | Varied (See below) |
|---|---|

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Customized Goods and Services | TBD | | | | | |
| Respite | TBD | | | | | |

| Maximum Daily Units | Varied (See below) |
|---|---|

**Service Definition**

The ICCC service is based on several mandatory elements which comprise fidelity to the wraparound model. Philosophically, the wraparound approach calls for doing "whatever it takes" to promote health, wellness, and recovery for the youth and family. The "whatever it takes" supports can be reimbursed by the DBHDD through this service guideline or can be accessed through the community and team resources that are developed in partnership with the unique child/family team members. This includes local non-profit resources (which may include a family support organization), church resources, family/friend volunteers, professional resources, and a myriad of other creative solutioning for the child.

ICCC Flexible Supports is an adjunct to ICCC, and is comprised of the following available support: Behavioral Assistance, Customized Goods and Services, Clinical Consultative Services, Expressive Therapeutic Services, and Respite, as defined below:

1. Behavioral Assistance: Provided to support the individual in the community and promote independence in daily activities, as appropriate to the participant's needs and as specified in the plan of care. Services may be rendered in the participant's home or community setting as documented in the plan of care. Services may include, but are not limited to:

    a. Assisting the youth/parent/caregiver in organizing a safe household environment;
    b. Assistance in daily living, such as household tasks related to building self-sufficiency;
    c. Protective oversight and behavioral supervision/redirection; and/or
    d. Providing training and supervision for youth to promote social skills, problem-solving, coping, life skills, and personal wellbeing as identified in the youth's approved Individualized Recovery Plan.

2. Customized Goods and Services: Individualized supports that youth with severe emotional dysregulation or mental illness may need to fully benefit from mental health services. It includes services, equipment, or supplies not otherwise available to the youth/family and that address an identified need in the Individualized Recovery Plan. Customized Goods and Services may include tutoring, parenting skills, homemaker services, structured recreation, therapeutic activities, mentor aid, a utility deposit to stabilize crisis, and environmental modification to enhance safety in a living arrangement.

3. Clinical Consultative Services: Clinical Consultative Services are provided by professional experts in fields such as psychology, social work, counseling, behavior management and/or criminology. These specialized services are provided to youth who have specialized diagnoses/needs which may require an expert to differentiate assessment, treatment, or plans of care. Clinical Consultative Services are services that are not covered by another DBHDD benefit, but which are necessary to improve the participant's independence and inclusion in their community, and to assist unpaid caregivers and/or paid support staff in carrying out Individualized Recovery Plans (IRPs). Services may include assessment, development of a home treatment/support plan, training, technical assistance and support to carry out the plan, monitoring of the participant and other providers in the implementation of the plan, and compensation for participation in the Child and Family Team meetings. Crisis counseling and stabilization, and family or participant counseling may be provided. This service may be delivered in the youth's home, other community home such as foster care, in the school, or in other community settings as described in the IRP to improve consistency across service systems.

4. Expressive Therapeutic Services: An adjunct therapeutic modality to support individualized goals as part of IRP. The aim of creative therapeutic modalities is to help participants find a form of expression beyond words or traditional therapy. They include techniques that can be used for self-expression and personal growth and aid in the healing and therapeutic process. Services may include, but are not limited to the following: Art Behavioral Services, Dance/Movement Behavioral

# Intensive Customized Care Coordination: Flexible Supports

|  | Services, Equine-Assisted Behavioral Services, Horticultural Behavioral Services, Music Behavioral Services, Drama Behavioral Services, Animal Assisted Therapy, etc. |
|---|---|
| 5. | Respite: Respite services provide safe and supportive environments on a short-term basis for youth who are unable to care for themselves because of the absence or need for relief of those persons who normally provide care for the participant. Additionally, Respite Services may be provided for support or relief from the caretaker of the youth. This service reduces the risk of out-of-home placements at a higher level of care. |

| Admission Criteria | 1. Youth shall meet ICCC Admission Criteria and be enrolled in that service; and |
|---|---|
|  | 2. Youth shall have the need for one of these unique ICCC-FS elements identified in his/her IRP (action plan). |

| Continuing Stay Criteria | Youth shall only remain qualified for this service if he/she remains authorized for ICCC. |
|---|---|

| Discharge Criteria | ICCC is no longer authorized for this youth. |
|---|---|

| Service Exclusions | 1. If the youth is authorized for the Money Follows the Person program, and one of these ICCC-FS services is authorized via that plan, then these DBHDD codes named here shall not be billed on behalf of the youth. |
|---|---|
|  | 2. If youth is enrolled in COMP/NOW waiver and receives a similar service via the waiver, then the care coordinator shall determine which mechanism best suits the needs of the youth. |
|  | 3. Youth covered by a Medicaid CMO are not eligible for ICCC Flexible Supports. |
|  | 4. ICCC Flexible Supports that are available via a youth's insurance benefit plan are excluded from coverage herein. |

| Clinical Exclusions | This service is a complement to the ICCC service and is not available as a stand-alone benefit. |
|---|---|

| Required Components | 1. ICCC Flexible Supports are unique billable items which fall into the following categories: |
|---|---|

| Service | Cap detail |
|---|---|
| Behavioral Assistance | 24 hours annually |
| Customized Goods and Services | $1,000 annually |
| Clinical Consultative Services | 12 hours annually |
| Expressive Therapeutic Services | 24 hours annually |
| Respite | 12 per quarter @ $128.00 day or $6,144 year |

All individual/agency providers of ICCC Flexible Support services must meet and/or comply with DCH and DBHDD Policies and Procedures (DCH is applicable for MFP participants only).

2. Customized Goods and Services

   a. In order to utilize Customized Goods and Services, it must be confirmed that either the youth/family does not have the funds to purchase the item or service, or that the item or service is not available through another source. In addition, at least one of the following criteria must be met:

      i. The item or service would decrease the need for other DBHDD or Medicaid services; and/or

      ii. The item or service would promote inclusion in the community; and/or

      iii. The item or service would increase the participant's safety in the home environment.

# Intensive Customized Care Coordination: Flexible Supports

b. The specific Customized Goods and Services must be clearly linked to a participant behavior/skill/resource need that has been documented in the approved IRP prior to purchase or delivery of services.

c. Goods and services purchased under this coverage may not circumvent other restrictions of services, including the prohibition against claiming for the costs of room and board.

d. The care coordinator may provide support to the participant/representative in budgeting and directing goods or services to be purchased that will include the supplier/vendor name and identifying information and the cost of the service/goods.

3. Respite:

a. Respite is available twenty-four (24) hours/seven (7) days a week.

b. Respite Services may be in quarter-hour increments or overnight, and may be provided in-home or out-of-home in the following locations: (1) Participant's home or private place of residence, (2) The private residence of a respite care provider, (3) Foster home/Group home.

**Staffing Requirements**

1. A variety of staff may provide ICCC-FS, in accordance with scope of practice and other requirements below.
2. The ICCC Provider is responsible for assuring that the professional is credentialed/licensed/certified to provide the service offered.
3. The following are staffing requirements specific to certain ICCC Flexible Supports services:
4. Behavioral Assistance

a. Individual providing the service is at least 21 years of age, or if exceptional circumstances exist (for example in rural areas, or the age requirement presents a hardship in a participant being able to access program services) a person 18-20 years of age may provide this service.

b. Individual has current CPR and Basic First Aid certifications;

c. Individual has evidence of annual health examination with signed statement from a physician, nurse practitioner, or physician assistant that the person is free of communicable diseases;

d. Individual has the experience, training, education or skills necessary to meet the participant's needs for Wraparound Services as demonstrated by experience in providing direct assistance to individuals with mental illness to network within a local community or comparable training, education or skills;

e. Individual agrees to or provides required documentation of a criminal records check, prior to providing services;

f. Individual has an understanding of Wraparound Services and strategies for working effectively/communicating clearly with people who have a mental illness and their families/representatives.

g. Individual will adhere to DBHDD provider requirements as specified either through DBHHD contract with the Medicaid enrolled provider or a Letter of Agreement between the Medicaid enrolled provider and DBHDD.

5. Clinical Consultative Services:

a. Professionals delivering Clinical Consultative Services shall meet all applicable licensure and certification requirements, and adhere to Georgia law and the scope of practice definitions of licensure boards; and

b. May be provided by a licensed physician, psychologist, LCSW, LMSW, LPC, LAPC, LMFT, LAMFT, RN, CAC-II, CAADC, MAC, or GCADC-II.

6. Expressive Therapeutic Services:

a. Professionals delivering Clinical Consultative Services shall meet all applicable licensure and certification requirements, and adhere to Georgia law and the scope of practice definitions of licensure boards;

b. May be provided by an LCSW, LMSW, LPC, LAPC, LMFT, LAMFT, RN, psychologist or psychologist supervisee, CAC-I (at least Bachelor's), CAC-II, CAADC, MAC, GCADC-I (at least Bachelor's), GCADC-II, or Addiction Counselor Trainee with at least a Bachelor's degree in a helping profession; and

c. To provide a particular Expressive Therapeutic Service a provider shall have current registration in the applicable Association as follows:

   i. Art Behavioral Services – Current registration in the American Art Therapy Association as a Registered Art Therapist by the Art Therapy Credentials Board or a comparable Association with equivalent requirements;

## Intensive Customized Care Coordination: Flexible Supports

ii. Dance, Movement & Expressive Services – Current registration as a Dance Therapist Registered or an Academy of Dance Therapists Registered in the American Dance Therapy Association or a comparable Association with equivalent requirements;

iii. Equine-Assisted Behavioral Services – Current registration as an EAGALA Certified Mental Health Professional in the Equine Assisted Growth and Learning Association (EAGALA); a North American Handicapped Riding Association (NAHRA) Registered Therapist in NAHRA; or, a comparable Association with equivalent requirements;

iv. Music Behavioral Services – Current registration as a Music Therapist-Board Certified, as described in O.C.G.A. Title 43, by the Board for Music Therapists, Inc. in the American Association for Music Therapy, Inc or a comparable Association with equivalent requirements;

v. Horticultural Behavioral Services – Current registration as a Horticultural Therapist Registered in the American Horticultural Therapy Association, or a comparable Association with equivalent requirements.

vi. Psychodrama/Drama Behavioral Services – Current registration in the National Association for Drama Therapy as a Registered Drama Therapist or a Board Certified Trainer, or a comparable Association with equivalent requirements.

vii. Animal Assisted Therapy – Current Registration as provider of a registered Animal Therapy Team through a regional or national Animal Assisted Therapy organization.

viii. Other therapy – Current registration or certification of the organization surrounding the other therapy being requested.

7. Respite Services:

a. Respite providers must meet/comply with DCH and DBHDD Policies and Procedures (DCH is applicable for MFP waiver participants only).
b. Respite providers must be at least 21 years of age and be a Georgia resident.
c. Respite providers must have a reliable vehicle or an emergency plan for transportation of both the provider and the youth in their care.
d. Respite providers must have a means of reliable telephonic communication.
e. Respite providers must have adequate space for the youth without disrupting the usual sleeping and living arrangements of the family.
f. Respite providers must have a High School diploma or GED.
g. Respite providers and any adults residing in the home must be fingerprinted for and pass a criminal background check.
h. Respite providers and all household members must have an initial medical examination, including TB clearance.
i. Respite providers must not smoke in the home.
j. Respite providers must not provide day care and/or domiciliary care in the home.

**Service Accessibility**

ICCC-FS shall be considered for every youth served via the ICCC service in the Child/Family Team process. The ICCC provider is responsible for identifying these needs and brokering (and, if necessary, paying for) the necessary support through the funds which are reimbursed via the submission of ICCC-FS claims.

**Documentation Requirements**

1. When ICCC-FS is provided, the unique code will be documented in the clinical record with the representation of how much was delivered.
2. If the support provided was a professional service which is to be reimbursed, the note must contain the name and credential of the practitioner who delivered the service and the resulting outcome of the intervention.

**Billing & Reporting Requirements**

1. The ICCC provider shall submit encounters and invoice these ICCC Flexible Support services.
2. The ICCC shall pay sub-contracted purveyors of the supports defined herein.
3. If a service item such as transporting a youth, babysitting, etc. are needed and there is not a volunteered resource, payment can be made by the ICCC provider to the purveyor of that support.
4. **Respite:** For youth supported by the MFP waiver, federal financial participation will not be claimed for the cost of room and board except when provided as part of respite care furnished in a facility approved by the State that is not a private residence.
5. **Customized Good and Services:** A paid invoice or receipt that provides clear evidence of the purchase must be on file in the participant's record to support all goods and services purchased.

## Intensive Customized Care Coordination: Flexible Supports

| Additional Medicaid Requirements | 1. Non-MFP enrolled Medicaid youth may receive these DBHDD state-funded services, as Medicaid does not reimburse these supports (the encounters are submitted to the Georgia Collaborative ASO).<br>2. For youth enrolled in the Medicaid MFP program, these services should be billed directly to DCH. |
| --- | --- |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
| --- | --- | --- | --- | --- | --- | --- |
| Practitioner Level 3, Out-of-Clinic | H0036 | U3 | U7 | | | $41.26 |
| Practitioner Level 4, Out-of-Clinic | H0036 | U4 | U7 | | | $27.06 |
| Practitioner Level 5, Out-of-Clinic | H0036 | U5 | U7 | | | $20.17 |
| Practitioner Level 5, via interactive audio and video telecommunication systems | H0036 | GT | U5 | | | $16.50 |
| Utilization Criteria | TBD | | | | | |

## Intensive Family Intervention

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Intensive Family Intervention | Practitioner Level 3, In-Clinic | H0036 | U3 | U6 | | | $30.01 |
| | Practitioner Level 4, In-Clinic | H0036 | U4 | U6 | | | $22.14 |
| | Practitioner Level 5, In-Clinic | H0036 | U5 | U6 | | | $16.50 |
| | Practitioner Level 3, via interactive audio and video telecommunication systems | H0036 | GT | U3 | | | $30.01 |
| | Practitioner Level 4, via interactive audio and video telecommunication systems | H0036 | GT | U4 | | | $22.14 |
| Unit Value | 15 minutes | | | | | | |

**Service Definition**

A service intended to improve family functioning by clinically stabilizing the living arrangement, promoting reunification or preventing the utilization of out of home therapeutic venues (i.e. psychiatric hospital, psychiatric residential treatment facilities, or residential treatment services) for the identified youth. Services are delivered utilizing a team approach and are provided primarily to youth in their living arrangement and within the family system. Services promote a family-based focus in order to:

- Defuse the current behavioral health crisis, evaluate its nature and intervene to reduce the likelihood of a recurrence;
- Ensure linkages to needed psychiatric, psychological, medical, nursing, educational, and other community resources, including appropriate aftercare upon discharge (i.e. medication, outpatient appointments, etc.); and
- Improve the individual child's/adolescent's ability to self-recognize and self-manage behavioral health issues, as well as the parents'/responsible caregivers' capacity to care for their children.

Services should include crisis intervention, intensive supporting resources management, individual and/or family counseling/training, and other rehabilitative supports to prevent the need for out-of-home placement or other more intensive/restrictive services. Services are based upon a comprehensive, individualized assessment and are directed towards the identified youth and his or her behavioral health needs/strengths and goals as identified in the Individualized Resiliency Plan.

Services shall also include resource coordination/acquisition to achieve the youth's and their family's' goals and aspirations of self-sufficiency, resiliency, permanency, and community integration.

**Admission Criteria**

1. Youth has a diagnosis and duration of symptoms which classify the illness as SED (youth with SED have a diagnosable mental, behavioral, or emotional disorder of sufficient duration to meet DSM diagnostic criteria and results in a functional impairment which substantially interferes with or limits the child's role or functioning in the family, school, or community activities) and/or is diagnosed with a Substance Related Disorder; **and one or more of the following:**
2. Youth has received documented services through other services such as Non-Intensive Outpatient Services and exhausted these less intensive out-patient resources. Treatment at a lower intensity has been attempted or given serious consideration, but the risk factors for out-of-home placement are compelling (see

# Intensive Family Intervention

| | |
|---|---|
| | item G.1. below); The less intensive services previously provided must be documented in the clinical record (even if it via by self-report of the youth and family); **or** |
| | 3. Youth and/or family has insufficient or severely limited resources or skills necessary to cope with an immediate behavioral health crisis; **or** |
| | 4. Youth and/or family behavioral health issues are unmanageable in traditional outpatient treatment and require intensive, coordinated clinical and supportive intervention; **or** |
| | 5. Because of behavioral health issues, the youth is at immediate risk of out-of-home placement; **or** |
| | 6. Because of behavioral health issues, the youth is at immediate risk of legal system intervention or is currently involved with DJJ for behaviors/issues related to SED and/or the Substance-related disorder. |
| Continuing Stay Criteria | Same as above. |
| Discharge Criteria | 1. An adequate continuing care plan has been established; **and one or more of the following:** <br> 2. Youth no longer meets the admission criteria; **or** <br> 3. Goals of the Individualized Resiliency Plan have been substantially met; **or** <br> 4. Individual and family request discharge, and the individual is not imminently dangerous; **or** <br> 5. Transfer to another service is warranted by change in the individual's condition; **or** <br> 6. Individual requires services not available within this service. |
| Service Exclusions | 1. Not offered in conjunction with Individual Counseling, Family Counseling/Training, Crisis Intervention Services, and/or Crisis Stabilization Unit, PRTF, or inpatient hospitalization. <br> 2. Community Support may be used for transition/continuity of care. <br> 3. This service may not be provided to youth who reside in a congregate setting in which the caregivers are paid (such as group homes, or any other living environment that is not comprised of family, guardians, or other more permanent caregivers). A short-term exception would be if the youth were preparing for transition back to a single-family unit, the family member is present during the intervention, and the service is directed to supporting the unification/reunification of the youth and his/her identified family/caregiver and takes place in that home and community. <br> 4. The absence of empirical evidence for conversion therapy prohibits the use of this intervention and it is not reimbursed by DBHDD. <br> 5. The billable activities of IFI **do not** include: <br>    • Transportation; <br>    • Observation/Monitoring; <br>    • Tutoring/Homework Completion; and <br>    • Diversionary Activities (i.e. activities without therapeutic value). |
| Clinical Exclusions | 1. Youth with any of the following unless there is a clearly documented evidence of an acute psychiatric/substance use disorder episode overlaying the diagnosis: Autism Spectrum Disorders including Asperger's Disorder, Intellectual/Developmental Disabilities, Neurocognitive Disorder, or Traumatic Brain Injury. <br> 2. Youth can effectively and safely be treated at a lower intensity of service. This service may not be used in lieu of family preservation and post-adoption services for youth who do not meet the admission criteria for IFI. |
| Required Components | 1. The organization has procedures/protocols for emergency/crisis situations that describe methods for intervention when youth require psychiatric hospitalization. <br> 2. Each IFI provider must have policies and procedures governing the provision of outreach services, including methods for protecting the safety of staff that engage in outreach activities. <br> 3. The organization must have an Intensive Family Intervention Organizational Plan that addresses the description of: <br>    • Particular evidence-based family preservation, resource coordination, crisis intervention and wraparound service models utilized (MST, DBT, MDFT, etc.), types of intervention practiced. The organization must show documentation that each staff member is trained in the model for in-home treatment (i.e., certification, ongoing supervision provided by the training entity, documentation of annual training in the model); |

# Intensive Family Intervention

- The organization must have demonstrable evidence that they are working towards fidelity to the model that they have chosen (via internal Quality Assurance documentation, staff training documentation, etc.). There should not be an eclectic approach to utilizing models. Fidelity to the chosen model is the expectation for each IFI team. If an agency chooses to develop a plan which incorporates more than one evidenced-based model within the organization, there must be a particular evidenced-based model chosen for each IFI team (e.g. an agency administers 3 teams, 2 which will adhere to one model, one to another model). Documentation of training for each staff person on the evidenced-based in-home model they will be utilizing in the provision of services should exist in their personnel files. Some models do not have the stringent staffing requirements that this service requires. The expectation is that staffing patterns in accordance with the specific model used are in compliance with staffing requirements noted in this service definition;
  - Hours of operation, the staff assigned, and types of services provided to individuals, families, parents, and/or guardians;
  - How the plan for services is modified or adjusted to meet the needs specified in each Individualized Resiliency Plan; and

4. At least 60% of service units must be provided face-to-face with youth and their families and 80% of all face-to-face service units must be delivered in non-clinic settings over the authorization period.

5. At least 50% of IFI face-to-face units must include the identified youth. However, when the child is not included in the face-to-face contacts, the focus of the contacts must remain on the child and their goals as identified on their IRP.

6. Documentation of how the team works with the family and other agencies/support systems (such as LIPTs, provider agencies, etc.) to build a clinically oriented transition and discharge plan is required and should be documented in the clinical record of the individual.

7. IFI is an individual intervention and may not be provided or billed for more than 1 youth at the same time (including siblings); however, youth participating in an IFI program may receive group skills training and/or group counseling in keeping with his/her individual recovery plan. Siblings who are each authorized to receive IFI must receive individualized services, but family interventions can be done jointly, with only one bill being submitted to the payer (For example, Sibling 1 and Sibling 2 are being seen for 2 units with the parents. Sibling 1 and Sibling 2 each have the documentation in both records, but only one claim for 2 units of reimbursement may be submitted to the payer source).

8. IFI is intended to be provided to youth/families in their living arrangement. Services provided in school settings are allowable up to 3 hours/week as a general rule and the clinical record shall include documentation of partnership with the school. Exceptions to this 3 hours/week should be documented to include approval by the IFI Team Leader of clinical need (CANS scores, recent discharge from inpatient hospitalization, PRTF, CSU, etc.). The record should indicate why a specific intervention took place in the school during school hours instead of after school in the home or community. Youth receiving this service must never be taken out of the classroom for the convenience of the service provider. IFI should not supplant what schools must provide for support of a child based on the IEP.

| Staffing Requirements | 1. Intensive Family Intervention is provided by a team consisting of the family and the following practitioners: |
| --- | --- |
| | a. One fulltime Team Leader who is licensed (and/or certified as a CAC-II, GCADC-II or -III, CAADC, or MAC if the target population is solely diagnosed with substance related disorders) by the State of Georgia under the Practice Acts and has at least 3 years of experience working with children with severe emotional disturbances. AMFT, LMSW, APC staff do not qualify for this position. The team leader must be actively engaged in the provision of the IFI service in the following manner: |
| |     i. Convene, at least weekly, team meetings that serve as the way to staff a child with the team, perform case reviews, team planning, and to provide for the team supervision and coordination of treatment/supports between and among team members. When a specific plan for a specific youth results from this meeting, there shall be an administrative note made in the youth's clinical record. In addition, there should exist a log of meeting minutes from this weekly team meeting that documents team supervision. There should be two documentation processes for these meetings; one child specific in the clinical record, and the other a log of meeting minutes for each team meeting that summarizes the team supervision process. This supervision and team meeting process is not a separately-billable activity, but the cost is accounted for within the rate methodology and supports the team approach to treatment. Weekly time for group supervision and case review is scheduled and protected. |
| |     ii. Meet at least twice a month with families face-to-face or more often as clinically indicated. |
| |     iii. Provide weekly, individual, clinical supervision to each IFI team member (outside of the weekly team meeting) for all services provided by that member of the IFI team. The individual supervision process is to be one-on-one supervision, documented in a log, with appropriate precautions for individual confidentiality and indicating date/time of supervision, issues addressed, and placed in the personnel file for the identified IFI team staff. |

# Intensive Family Intervention

    iv.  Be dedicated to a single IFI team ("Dedicated" means that the team leader works with only one team at least 32 hours/week [up to 40 hours/week] and is a full-time employee of the agency [not a subcontractor/1099 employee]). The Team Leader is available 24/7 to IFI staff for emergency consultation/supervision.

    b.  Two to three fulltime equivalent paraprofessionals who work under the supervision of the Team Leader.

    c.  The team may also include an additional mental health professional, addiction professional or paraprofessional. The additional staff may be used .25 FTE between 4 teams.

2.  To facilitate access for those families who require it, the specialty IFI providers must have access to psychiatric and psychological services, as provided by a Physician, Psychiatrist or a Licensed Psychologist (via contract or referral agreement). These contracts/agreements must be kept in the agency's administrative files and be available for review.

3.  Practitioners providing this service are expected to maintain knowledge/skills regarding current research trends in best/evidence-based practices. Some examples of best/evidence-based practice are multi-systemic therapy, multidimensional family therapy, dialectic behavioral therapy and others as appropriate to the child, family and issues to be addressed. Their personnel files must indicate documentation of training and/or certification in the evidenced-based model chosen by the organization. There shall be training documentation indicating the evidenced-based in-home practice model each particular staff person will be utilizing in the provision of services.

4.  The IFI Team's family-to-staff ratio must not exceed 12 families for teams with two paraprofessionals, and 16 families for teams with three paraprofessionals (which is the maximum limit which shall not be exceeded at any given time). The staff-to-family ratio takes into consideration evening and weekend hours, needs of special populations, and geographic areas to be covered.

5.  Documentation must demonstrate that at least 2 team members (one of whom must be licensed/credentialed) are providing IFI services in the support of each individual served by the team in each month of service. One of these team members must be appropriately licensed/credentialed to provide the professional counseling and treatment modalities/interventions needed by the individual and must provide these modalities/interventions as clinically appropriate according to the needs of the youth.

6.  It is critical that IFI team members are fully engaged participants in the supports of the served individuals. No more than 50% of staff can be "contracted"/1099 team members. Team members must work for only one IFI organization at a time and cannot be providing this service when they are a member of another team because they cannot be available as directed by families need or for individual crises while providing on-call services for another program.

7.  When a team is newly starting, there may be a period when the team does not have a "critical mass" of individuals to serve. During this time, a short-term waiver may be granted to the agency's team by the DBHDD for the counties served. The waiver request may address the part-time nature of a team leader and the paraprofessionals serving less than individual-load capacity. For example, a team may only start by serving 4-6 families (versus full capacity 12-16 families) and therefore could request to have the team leader serve ½ time and a single paraprofessional. A waiver of this nature will not be granted for any time greater than 6 months. The waiver request to DBHDD must include:

    a.  The agency's plan for building individual capacity (not to exceed 6 months).

    b.  The agency's corresponding plan for building staff capacity which shall be directly correlated to the item above.

    DBHDD has the authority to approve these short-term waivers and must copy BHO on its approval and/or denial of these waiver requests. No extension on these waivers will be granted.

8.  It is understood that there may be periodic turn-over in the Team Leader position; however, the service fails to meet model-integrity in the absence of a licensed/credentialed professional to provide supervision, therapy, oversight of Individualized Recovery/Resiliency Plans, and team coordination. Understanding this scenario, an IFI team who loses a Team Leader must provide the critical functions articulated via one of the following means:

    a.  Documentation that there is a temporary contract for Team Leader who meets the Team Leader qualifications; or

    b.  Documentation that there is another fully licensed/credentialed professional who meets the Team Leader qualifications and is currently on the team providing the Team Leader functions temporarily (this would reduce the team staff to either 2 or 3 members based on the numbers of families served by the team); or

## Intensive Family Intervention

| | |
|---|---|
| | c. Documentation that there is another fully licensed/credentialed professional who meets the Team Leader qualifications and is currently employed by the agency providing the Team Leader functions temporarily (this professional would devote a minimum of 15-20 hours/week to supervision, therapy, oversight of Individualized Recovery/Resiliency Plans, and team coordination); or |
| | d. Documentation that there is an associate-licensed professional who could work full-time dedicated to therapy, oversight of Individualized Recovery/Resiliency Plans, and team coordination with a fully licensed/credentialed professional supporting the team for 5 hours/week for clinical supervision. |
| | For this to be allowed, the agency must be able to provide documentation that recruitment in underway. Aggressive recruitment shall be evidenced by documentation in administrative files of position advertising. In the event that a position cannot be filled within 60 days OR in the event that there is no ability to provide the coverage articulated in this item (B.8.), there shall be notification to the State DBHDD Office and the associated Regional Field Office of the intent to cease billing for the IFI service. |
| | 9. IFI providers may not share contracted team members with other IFI agencies. Staff may not work part-time for one agency and part-time with another agency due to the need for staff availability in accord with the specific needs, requirements, and requests of the families served. Team members must be dedicated to each specific team to ensure intensity, consistency, and continuity for the individuals served. |
| Clinical Operations | 1. In-home services include consultation with the individual, parents, or other caregivers regarding medications, behavior management skills, and dealing with the responses of the individual, other caregivers and family members, and coordinating with other child-serving treatment providers. |
| | 2. Individuals receiving this service must have a qualifying and verified diagnosis present in the medical record prior to the initiation of services. |
| | 3. The Individualized Resiliency Plan must be individualized, strengths-based, and not developed from a template used for other individuals and their families. |
| | 4. IFI must be provided through a team approach (as evidenced in documentation) and flexible services designed to address concrete therapeutic and environmental issues in order to stabilize a situation quickly. Services are family-driven, child focused, and focus on developing resiliency in the child. They are active and rehabilitative, and delivered primarily in the home or other locations in the community. Services are initiated when there is a reasonable likelihood that such services will lead to specific, observable improvements in the individual's functioning (with the family's needs for intensity and time of day as a driver for service delivery). |
| | 5. Service delivery must be preceded by a thorough assessment of the child and the family in order to develop an appropriate and effective IRP. This assessment must be clearly documented in the clinical record. |
| | 6. IFI services provided to children and youth must be coordinated with the family and significant others and with other systems of care such as the school system, the juvenile justice system, and children's protective services when appropriate to treatment and educational needs. |
| | 7. The organization must have policies that govern the provision of services in natural settings and can document that it respects the youth's and/or family's right to privacy and confidentiality when services are provided in these settings. |
| | 8. When a projected discharge date for the service has been set, the youth may begin to receive more intensified Community Support services two weeks prior to IFI discharge for continuity of care purposes only. |
| | 9. When there is a crisis situation identified or there is potential risk of youth harm to self or others, there must be documentation that a licensed/credentialed practitioner is involved in that crisis resolution. |
| | 10. The IFI organization will be expected to develop and demonstrate comprehensive crisis protocols and policies and must adhere to all safety planning criteria as specified below. Safety planning with the family must be evident at the beginning of treatment and must include evidence that safety needs are assessed for all youth and families. The family shall be a full participant in the safety planning, and all crisis stabilization steps will be clearly identified. All parties involved, including community partners, will need to know the plan and who is responsible for supporting its implementation. When aggression is an issue within the family, a written safety plan must be developed and signed by the parents/caregivers, staff, youth, and other agency staff involved in the plan. Safety plans should also include natural supports and should not rely exclusively on professional resources. This plan must be given to the family, other agency staff, the youth, and a copy kept in the individual's record. |

# Intensive Family Intervention

| | 11. | Service delivery should be organized in a way such that there is a high frequency of services delivered at the onset of support and treatment and a tapering off as the youth moves toward discharge. As it applies to the specific youth, this shall be documented in the record. |

| Service Accessibility | | |
|---|---|---|
| | 1. | Services must be available 24 hours a day, 7 days a week, through on-call arrangements with practitioners skilled in crisis intervention. A team response is preferable when a family requires face-to-face crisis intervention. |
| | 2. | Due to the intensity of the service, providers must offer a minimum of 3 contacts per week with the youth/family except during periods where service intensity is being tapered toward the goal of transition to another service or discharge. |
| | 3. | Intensive Family Intervention may **not** be provided in an Institution for Mental Diseases (IMD, e.g. state or private psychiatric hospital, psychiatric residential treatment facility or Crisis Stabilization Unit with greater than 16 beds), jail, youth development center (YDC) or prison system. |
| | 4. | This service may not be provided and billed for youth who are involuntarily detained in Regional Youth Detention Centers (RYDCs) awaiting criminal proceedings, penal dispositions, or other involuntary detainment proceedings. Any exception to this requires supporting documentation from the DJJ partners. The provider holds the risk for assuring the youth's eligibility. |
| | 5. | Services provided for over 6 hours on any given day must be supported with rigorous reasons in the documentation. Anything over 6 hours would need to relate to a crisis situation and the support administrative documentation should spell out the reasons for extended hours and be signed by the Team Leader. |
| | 6. | To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include: |

  • the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or
  • the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.

Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual/family must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should <u>not</u> be driven by the practitioner's/agency's convenience or preference.

| Documentation Requirements | | |
|---|---|---|
| | 1. | If admission criteria #2 is utilized to establish admission, notation of other services provision intensity/failure should be documented in the record (even if it is self-reported by the youth/family). |
| | 2. | As the team, youth, and family work toward discharge, documentation must indicate planning with the youth/family for the supports and treatment needed post-discharge from the IFI service. Referrals to subsequent services should be a part of this documentation. |

| Billing & Reporting Requirements | |
|---|---|
| When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. | |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |

# Mobile Crisis

| Transaction Code | Mobile Crisis Response Service |
|---|---|
| Service Definition | The Mobile Crisis Response Service (MCRS) provides community-based face-to-face rapid response to individuals in an active state of crisis. This service operates 24 hours a day, seven days a week. MCRS offers short-term, behavioral health, intellectual/developmental disability, and/or Autism Spectrum Disorder (ASD) crisis response for individuals in need of crisis assessment, intervention, and referral services within their community. This service is unique in that it provides in-person intervention to persons in their community who may be in crisis. MCRS may be provided in community settings including, but not limited to, homes, residential settings, |

## Mobile Crisis

|  |  |
|---|---|
|  | other treatment/support settings, schools, hospital emergency departments, jails, and social service settings. Interventions include a brief, situational assessment; verbal and or behavioral interventions to de-escalate the crisis; assistance in immediate crisis resolution; mobilization of natural support systems; and referral to alternate services at the appropriate level.<br><br>MCRS includes in-field crisis assessment, crisis de-escalation, rapid assessment of strengths, problems and needs; psychoeducation, brief behavioral support and intervention; and referral to appropriate services and supports. MCRS functions to provide a short-term linkage and referral between persons in crisis and the appropriate/additional behavioral health and/or IDD services and supports, while reducing the rate of hospitalization, incarceration, out of home placement and unnecessary emergency room visits. This service includes post crisis follow-up to ensure linkage with recommended services. |
| Admission Criteria | The service is available to individuals with behavioral health diagnoses and/or intellectual and developmental disabilities, including autism spectrum disorder, aged four (4) years and above who meet the following eligibility criteria:<br>1. The individual is experiencing an acute Behavioral Health, Intellectual/Developmental Disability, ASD, and or Co-occurring crisis (inclusive of two (2) or more of these conditions); and<br>2. The individual and/or family/caregiver lacks the skills necessary to cope with the immediate crisis and there exists no other available, appropriate community supports to meet the needs of the person; and<br>3. The individual needs immediate care, evaluation, stabilization or treatment due to the crisis as evidenced by:<br>  • A substantial risk of harm to self or others by the individual; and/or<br>  • The individual is engaging in behaviors presenting with serious potential legal or safety consequences; or<br>4. Screening provided by the Georgia Crisis and Access Line (GCAL) indicates the presence of a behavioral health, an intellectual/developmental disability, and/or ASD crisis presentation.<br>5. The individual served does not have to be a current or past-enrolled recipient of DBHDD services or supports. |
| Continuing Stay Criteria | N/A |
| Discharge Criteria | 1. The acute presentation of the crisis situation is resolved;<br>2. Appropriate referral(s) and service engagement/s to stabilize the crisis situation are completed;<br>3. Recommendations for ongoing services, supports or linkages have been documented; and<br>4. Post-crisis follow-up has been completed within 1-3 days of crisis contact. |
| Service Exclusions | Individuals in the following settings are excluded from MCRS dispatch; Crisis Stabilization Units (CSU), Behavioral Health Crisis Centers (BHCC), CRR-I, psychiatric hospital (state or private); state prisons; youth detention center; and regional youth detention center. |
| Clinical Exclusions | 1. All persons receiving MCRS must have present indications of a behavioral health disorder, an Intellectual/Developmental Disability and/or ASD.<br>2. MCRS shall not be dispatched for individuals presenting solely with a need for Substance Use Disorder (SUD) intervention.<br>3. MCRS shall not be dispatched in response to a medical emergency. |
| Required Components | 1. A mobile crisis team responder offering any diagnostic impressions must be a person identified in O.C.G.A. Practice Acts as qualified to provide a diagnosis and who possess training and experience in behavioral health and intellectual/developmental disability assessment.<br>2. The licensed clinician on the Mobile Crisis Team is to provide oversight and clinical supervision to the operation of the team and is responsible for ensuring that the appropriate team members are dispatched or are available for consultation based on the clinical data provided by the Georgia Crisis and Access Line (GCAL).<br>3. The Mobile Crisis Team is to:<br>  a. Respond and arrive on site within 59 minutes of the dispatch by GCAL; and.<br>  b. Address the crisis situation to mitigate any risk to the health and safety of the individual and/or others; and<br>  c. Consult with medical professionals, when needed, to assess potential medical causes that might be contributing to the crisis prior to recommending any intensive crisis supports involving behavioral interventions.<br>4. The Mobile Crisis Team members are responsible for completing comprehensive assessment(s) of the current crisis situation. This assessment process shall |

## Mobile Crisis

include interviews with the individual, care providers and/or family members, observation of the current environment, and review of behavior and individual support plans if available. The licensed professional or BCBA on the team is responsible for ensuring that the assessment process is thorough and complete.

5. A crisis plan will be developed to help manage, prevent, or reduce the frequency of future crises occurring. When available, an individual's existing crisis plan should be utilized by the MCRS team when it is appropriate to the presenting situation. When a crisis plan does not exist, MCRS will engage the individual/family/caregivers in a therapeutic plan that fosters a return to pre-crisis level of functioning and connect or reconnect the individual to treatment services and other community resources.

   a. Also, when available and offered by the individual, a Wellness Recovery Action Plan (WRAP) shall be utilized by MCRS to support the individual's preferences.

   b. When available, an individual's behavior support plan shall be utilized by MCRS during the assessment process.

6. All interventions shall be offered in a clinically appropriate manner that respects the preferences of the individual in crisis while recognizing the primary need to maintain safety.

7. Reasonable and relatively simple environmental modifications that do not require continuing programmatic efforts are considered before intensive crisis supports and/or a behavior plan is recommended or implemented.

8. When applicable and accessible, community supports, natural supports, and external helping networks should be utilized for crisis planning to assist in crisis prevention.

9. When the Mobile Crisis Team makes a disposition, the licensed clinician or BCBA communicates all recommendations within 24 hours to all applicable parties (e.g., Provider Agencies Families/Caregivers/ Guardians, Support Coordination Agencies, known Care Coordinators and/or Regional Field Office I&E Teams as applicable).

10. The MCRS shall comply with the current GCAL process for dispatch of mobile crisis, including non-refusal of calls or dispatch.

11. When the Mobile Crisis Team completes services, the licensed clinician or BCBA on the team completes a written summary that shall:

    a. Minimally include:
       • Description of precipitating events
       • Assessment and Interventions provided
       • Diagnosis or diagnostic impressions
       • Response to interventions
       • Crisis plan
       • Recommendations for continued interventions
       • Linkage and Referral for additional supports (if applicable); and

    b. Be completed and documented within a 24-hour period after a disposition has been determined.

12. Within 24 hours of completion of the MCRS intervention a follow-up phone call is made and documented to individuals served or their representative/parent/guardian. Exceptions to this requirement are for persons for whom the mobile crisis intervention results in placement in a hospital, CSU, BHCC, intensive in-home IDD supports, or an IDD crisis home.

13. The MCRS provider must develop policies and procedures consistent with DBHDD policies for referral and engagement with Crisis Stabilization Units (CSUs) Behavioral Health Crisis Centers (BHCCs), Crisis Respite Homes and In-Home IDD Supports; (i.e., staffing, eligibility, service delivery, GCAL interface).

14. Additionally, the MCRS provider must develop policies and procedures that include criteria for determination of the need for higher levels of care, indicators for referral to medical/health services and how staff should access support from healthcare professionals; how the staff will be trained to employ positive behavior supports, trauma informed care, and crisis intervention principles in the delivery of mobile services; and how the safety of staff members is maintained.

15. MCRS will collaborate with the individual's health and support providers to ensure linkage with follow-up post crisis treatment. This may include Core providers, Specialty providers, Detoxification providers, IDD service providers, local physicians, BHCCs/CSUs, and other public and social service agencies (such as DFCS, schools, treatment courts, law enforcement, Care Management Organizations [CMOs], etc.) When the MCRS provider determines during a community-based intervention that an individual is enrolled with a CMO, the CMO will receive notification within 72 hours through an identified inbox and provided basic status

## Mobile Crisis

**Staffing Requirements**

information (name, date of intervention, written summary, final referral and disposition, for the CMO to follow up on treatment services and other community resources for the member.

16. The MCRS must maintain accreditation by the appropriate credentialing body (The Joint Commission, The Commission on Accreditation of Rehabilitation Facilities, The Council on Accreditation).

1. The following training components must be provided during orientation for all new staff:
   - Community-based crisis intervention training and TIP 42 training.
   - Cross training of BH and IDD MCRS staff.
   - DBHDD array of Adult Mental Health, Child and Adolescent Mental Health, Addictive Diseases, Intellectual & Developmental Disabilities crisis services, and community psychiatric hospitals.
   - DBHDD Community Behavioral Health and IDD Provider Manual service definitions.
   - Rapid crisis screening.
   - Dispatch decision tree.
   - Web-based data access and interface with DBHDD information system.

2. The Mobile Crisis Team includes minimally two staff responding:
   a. Of those, one (1) is a Licensed Clinical Social Worker/Licensed Professional Counselor/Licensed Marriage and Family Therapist/ Licensed Psychologist (LCSW/ LPC/LMFT/Licensed Psychologist Ph.D./Psy.D.); and
   b. When the screening indicates that the individual in crisis has IDD, the two-person team must also include a Behavioral Specialist (BS), BCBA, or BCaBA (dispatch of a licensed clinician is always required along with this practitioner).
   c. Additional staff who may be dispatched when a behavioral health need is identified include: paraprofessional/direct support staff, a registered nurse, an additional social worker (MSW), safety officer, and/or a Certified Peer Specialist (CPS, CPS-AD, CPS-Y, and CPS-P)].
   d. In addition, a physician will be available to the MCRS team for consultation, if needed. Other physicians (psychiatric or medical) may consult as necessary.
   e. Each mobile crisis team must include at least one staff member with specialization in ASD; so, when there is a known or suspected indication of ASD, the following team compositions are allowed:
      i. A BCBA or BCBA-D who serves as the lead in a mobile crisis response for individuals with ASD and any second recognized practitioner type named herein; or
      ii. Licensed practitioner (as named in a. above) along with a BCBA, BCaBA or RBT.

3. All team members are required to comply with the Professional Licensing or Certification Requirements and the Reporting of Practice Act Violations, 04-101, including maintaining valid/current license or certification and compliance with all DBHDD training requirements for paraprofessional, licensed or certified staff.

**Service Accessibility**

1. MCRS must be available by staff skilled in crisis intervention 24 hours a day, 7 days a week with emergency response coverage, including psychiatric, medical and nursing consultation services as required.
2. All mobile crisis service response times for arrival at the site of the crisis must be less than 59 minutes of dispatch by the GCAL.
3. Services are available 24-hours a day, 7 days a week, and include face-to-face contact offered in eligible settings (e.g., home/community, school, jail, emergency room).
4. MCRS may not be provided in an Institution for Mental Diseases (IMD, e.g., treatment units for state or private psychiatric hospital, psychiatric residential treatment facility or crisis stabilization program), nursing homes, youth development center (YDC), or State Prisons.
5. Telemedicine is the use of interactive telecommunications equipment that includes, at a minimum, audio and video equipment permitting two-way, real time interactive communication between the patient, and the physician or practitioner at the distant site. Telemedicine is never to be utilized as the primary means of delivery of MCRS services.

## Mobile Crisis

| | |
|---|---|
| Documentation Requirements | 1. Providers must document services in accordance with the specifications for documentation requirements specified in Part II, Section IV of the Provider Manual and in keeping with this section G. Documentation will include the following;<br>• Calls received;<br>• Referring source; individual, agency,<br>• Time of received call,<br>• Specific plan of action to address need;<br>• Composition of responders<br>• Time of arrival on-site<br>• Time of completion of assessment<br>• Description of intervention,<br>• Diagnosis and or diagnostic impressions<br>• Documentation of disposition, linkages provided/appointments made<br>• Behavioral recommendations provided;<br>• Provision of assessment upon Release of Information<br>• Contact information for follow-up<br>• Follow-up contact.<br>2. Each MCRS shall provide monthly outcomes data as defined by the DBHDD. |
| Billing & Reporting Requirements | 1. All other applicable DBHDD reporting requirements must be followed.<br>2. Where there are individuals covered by Georgia CMOs and the specific CMO is identified, the MCRS provider will report the MCRS intervention to the CMO. |

## Parent Peer Support Service - Group

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Peer Support Services | Practitioner Level 4, In-Clinic | H0038 | HQ | HS | U4 | U6 | $17.72 | | Practitioner Level 4, Out-of-Clinic | H0038 | HQ | HS | U4 | U7 | $21.64 |
| | Practitioner Level 5, In-Clinic | H0038 | HQ | HS | U5 | U6 | $13.20 | | Practitioner Level 5, Out-of-Clinic | H0038 | HQ | HS | U5 | U7 | $16.12 |
| Unit Value | 1 hour | | | | Utilization Criteria | | | | TBD | | | | | | |

Service Definition

Parent Peer Support (PPS) is a strength-based rehabilitative service provided to parents/caregivers that is expected to increase the youth/family's capacity to function within their home, school, and community while promoting recovery. These services are rendered by a CPS-P (Certified Peer Support – Parent) who is performing the service within the scope of their knowledge, live d - experience, and education. The service exists within a system of care framework and enables timely response to the needs of all family members across several life domains, incorporating formal and informal supports, and developing realistic intervention strategies that complement the youth's natural environment.

The services are geared toward promoting self-empowerment of the parent, enhancing community living skills, and developing natural supports through the following interventions:
  a.  Through positive relationships with health providers, promoting access and quality services to the youth/family.
  b.  Assisting with identifying other community and individual supports that can be used by the family to achieve their goals and objectives-; these can include friends, relatives, and/or religious affiliations.

## Parent Peer Support Service - Group

c. Assisting the youth and family accessing strength-based behavioral health, social services, educational services and other supports and resources required to assist the family to attain its vision/goals/objectives including:

   i. Helping the family identify natural supports that exist for the family; and
   ii. Working with families to access supports which maintain youth in the least restrictive setting possible; and
   iii. Working with the families to ensure that they have a choice in life aspects, sustained access to an ownership of their IRP and resources developed.

d. In partnership with the multi-disciplinary team, working with the provider community to develop responsive and flexible resources that facilitate community-based interventions and supports that correspond with the needs of the families and their youth.

Interventions are approached from a perspective of lived experience and mutuality, building family recovery, empowerment, and self-efficacy. Interventions are based upon respect and honest dialogue. The unique mutuality of the service allows the sharing of personal experience including modeling family recovery, respect, and support that is respectful of the individualized journey of a family's recovery. Equalized partnership must be established to promote shared decision making while remaining family centered. All aspects of the intervention acknowledge and honor the cultural uniqueness of each family and the many pathways to family recovery.

One of the primary functions of the Parent Peer Support service is to promote family/youth recovery. While the identified youth is the target for services, recovery is approached as a family journey towards self-management and developing the concept of wellness and functioning while actively managing a chronic behavioral health condition, which enable the youth to be supported in wellness within his/her family unit. Families are supported by the CPS and by participating group members in learning to live life beyond the identified behavioral health condition, focusing on identifying and enhancing the strengths of their family unit as supporters of the youth. As a part of this service intervention, a CPS-P will articulate points in their own recovery stories that are relevant to the obstacles faced by the family of consumers of behavioral health services and promote personal responsibility for family recovery as the youth/family define recovery.

The group focuses on building respectful partnerships with families, identifying the needs of the parent/caregiver and helping the parent recognize self-efficacy while building partnership between families, communities and system stakeholders in achieving the desired outcomes. This service provides the training and support necessary to promote engagement and active participation of the family in the supports/treatment/recovery planning process for the youth and assistance with the ongoing implementation and reinforcement of skills learned throughout the treatment/support process. PPS is a supportive relationship between a parent/guardian and a CPS-P that promotes respect, trust, and warmth and empowers the group participants to make choices and decisions to enhance their family recovery.

The following are among the wide range of specific interventions and supports which are expected and allowed in the provision of this service:

a. Facilitating peer support in and among the participating group family members;
b. Assisting families in gaining skills to promote the families' recovery process (e.g., self-advocacy, developing natural supports, etc.);
c. Support family voice and choice by assisting the family in assuming the lead roles in all multi-disciplinary team meetings;
d. Listening to the family's needs and concerns from a peer perspective, and offering suggestions for engagement in planning process;
e. Providing ongoing emotional support, modeling and mentoring during all phases of the planning services/support planning process;
f. Promoting and planning for family and youth recovery, resilience and wellness;
g. Working with the family to identify, articulate and build upon their strengths while addressing their concerns, needs and opportunities;
h. Helping families better understand choices offered by service providers, and assisting with understanding policies, procedures, and regulations that impact the identified youth while living in the community;
i. Ensuring the engagement and active participation of the family and youth in the planning process and guiding families toward taking a pro-active and self-managing role in their youth's treatment;
j. Assisting the family with the acquisition of the skills and knowledge necessary to sustain an awareness of their youth's needs as well as his/her strengths and the development and enhancement of the family's unique problem-solving skills, coping mechanisms, and strategies for the youth's illness/symptom/behavior management;

## Parent Peer Support Service - Group

k. Assisting the parent participants in coordinating with other youth-serving systems, as needed, to achieve the family/youth goals;

l. As needed, assisting communicating family needs to multi-disciplinary team members, while also building the family skills in self-articulating; needs/desires/preferences for treatment and support with the goal of full family-guided, youth-driven self-management;

m. Supporting, modeling, and coaching families to help with their engagement in all health-related processes;

n. Coaching parents in developing systems advocacy skills in order to take a proactive role in their youth's treatment and to obtain information and advocate with all youth-serving systems;

o. Cultivating the parent/guardian's ability to make informed, independent choices including a network for information and support which will include others who have been through similar experiences;

p. Building the family skills, knowledge, and tools related to the identified condition/related symptoms so that the family/youth can assume the role of self-monitoring and self-management; and

q. Assisting the parent participants in understanding:
   i. Various system processes, how these relate to the youth's recovery process, and their valued role (e.g. crisis planning, IRP process);
   ii. What a behavioral health diagnosis means and what a journey to recovery may look like;
   iii. The role of services/prescribed medication in diminishing/managing the symptoms of that condition and increasing resilience and functioning in living with that condition;

r. Empowering the family on behalf of the recipient; providing information regarding the nature, purpose and benefits of all services; providing interventions and support; and providing overall support and education to a caregiver to ensure that he or she is well equipped to support the youth in service transition/upon discharge and have natural supports and be able to navigate service delivery systems;

s. Identifying the importance of Self Care, addressing the need to maintain family whole health and wellness in order to ultimately support the youth with a behavioral health condition;

t. Assisting the family participants in self-advocacy promoting family-guided, youth-driven services and interventions;

u. Drawing upon their own experience, helping the family/youth find and maintain hope as a tool for progress towards recovery; and

v. Assisting youth and families with identifying goals, representing those goals to the collaborative, multi-disciplinary treatment team, and, together, taking specific steps to achieve those goals.

### Admission Criteria

1. PPS is targeted to the parent/guardian of youth/young adults who meet the following criteria:
   a. Individual is 21 or younger; and
   b. Individual has a substance related condition and/or mental illness; and **two or more of the following**:
      i. Individual and his/her family needs peer-based recovery support for the acquisition of skills needed to engage in and maintain youth/family recovery;
      or
      ii. Individual and his/her family need assistance to develop self-advocacy skills to achieve self-management of the youth's behavioral health status; or
      iii. Individual and his/her family need assistance and support to prepare for a successful youth work/school experience; or
      iv. Individual and his/her family need peer modeling to increase responsibilities for youth/family recovery.

2. For the purposes of this service, "family" is defined as the person(s) who live with or provide care to the targeted youth, and may include a parent, guardians, other caregiving relatives, and foster caregivers.

### Continuing Stay Criteria

1. Individual continues to meet admission criteria; **and**
2. Progress notes document parent/guardian progress relative to goals which the youth/family identified in the Individualized Recovery Plan, but treatment/recovery goals have not yet been achieved.

### Discharge Criteria

1. An adequate continuing recovery plan has been established; **and one or more of the following**:
   a. Goals of the Individualized Recovery Plan have been substantially met; or
   b. Individual served/family requests discharge; or
   c. Transfer to another service/level is more clinically appropriate.

## Parent Peer Support Service - Group

| | |
|---|---|
| Service Exclusions | 1. "Family" or "caregiver" does not include individuals who are employed to care for the member (excepting individuals who are identified as a foster parent).<br>2. General support groups which are made available to the public to promote education and advocacy do not qualify as Parent Peer Support.<br>3. If there are siblings of the targeted youth for whom a need is specified, this service is not billable unless there is applicability to the targeted youth/family.<br>4. This unique billable service may not be billed for youth who resides in a congregate setting in which the caregivers are paid in a parental role (such as child caring institutions, or any other living environment that is not comprised of family, guardians, or other more permanent caregivers). A short-term exception would be if the youth were preparing for transition back to a single-family unit, the family member is present during the intervention, and the service is directed to supporting the unification/reunification of the youth and his/her identified family/caregiver and takes place in that home and community. |
| Clinical Exclusions | Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a behavioral health condition overlaying the diagnosis: Developmental Disability, Autism, Neurocognitive Disorder, or Traumatic Brain Injury. |
| Required Components | 1. Individuals participating in the service at any given time must have the opportunity to participate in and make decisions about the person-centered interactions offered by the Certified Peer Specialist(s), while also respecting the group dynamics.<br>2. The operating agency shall have an organizational plan which articulates the following agency protocols:<br>  a. PPS cannot operate in isolation from the rest of the programs/services within the agency or affiliated organization or from other health providers;<br>  b. CPS-Ps providing this service are supported through a network of agency resources (e.g. Supervisors, internal agency 24/7 crisis resources, external crisis resources, etc.) in responding to youth/family crises.<br>3. The CPS-P shall be empowered to convene multidisciplinary team meetings regarding a participating individual's needs and desires as they become known in the group setting.<br>4. The CPS-P must be allowed to participate as an equal practitioner partner with all staff in multidisciplinary team meetings. |
| Staffing Requirements | 1. Services must be provided by a CPS-P;<br>2. Parent Peer Support services are provided in a structured 1:15 CPS to participant ratio;<br>3. A CPS-P must receive ongoing and regular supervision by an independently licensed practitioner to include:<br>  a. Supervisor's availability to provide backup, support, and/or consultation to the CPS-P as needed;<br>  b. The partnership between the Supervisor and CPS-P in collaboratively assessing fidelity to the service definition and addressing implementation successes/challenges; and<br>4. A CPS-P cannot provide this service to his/her own youth and/or family or to an individual with whom he/she is living. |
| Clinical Operations | 1. CPS-Ps who deliver PPS shall be involved in proactive multi-disciplinary planning to assist the youth/family in managing and/or preventing crisis situations;<br>2. PPS is goal-oriented and is provided in accordance with the youth's collaborative and comprehensive IRP. |
| Service Accessibility | 1. PPS may be provided at a service site, in the recipient's home, or in any community setting appropriate for providing the services as specified in the recipient's behavioral health recovery plan; via telephone (although 50% must be provided face to face, telephonic contacts are limited to 50%). |
| Documentation Requirements | 1. CPS-Ps must comply with all required documentation expectations set forth in this manual.<br>2. CPS-Ps must comply with any data collection expectations in support of the program's implementation and evaluation strategy. |

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| | Practitioner Level 4, In-Clinic | H0038 | HS | U4 | U6 | | $20.30 |

## Parent Peer Support Service - Individual

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| | Practitioner Level 5, Out-of-Clinic | H0038 | HS | U5 | U7 | | $18.15 |

## Parent Peer Support Service - Individual

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Peer Support Services | Practitioner Level 5, In-Clinic | H0038 | HS | U5 | U6 | | $15.13 |
| | Practitioner Level 4, Out-of-Clinic | H0038 | HS | U4 | U7 | | $24.36 |
| | Practitioner Level 4, Via interactive audio and video telecommunication systems | H0038 | GT | HS | U4 | U5 | $20.30 |
| | Practitioner Level 5, Via interactive audio and video telecommunication systems | H0038 | GT | HS | U5 | | $15.13 |

| Unit Value | 15 minutes | TBD |
|---|---|---|

**Utilization Criteria**

**Service Definition**

Parent Peer Support (PPS) is a strength-based rehabilitative service provided to parents/caregivers that is expected to increase the youth/family's capacity to function within their home, school, and community while promoting recovery. These services are rendered by a CPS-P (Certified Peer Support – Parent) who is performing the service within the scope of their knowledge, lived experience, and education. The service exists within a system of care framework and enables timely response to the needs of all family members across several life domains, incorporating formal and informal supports, and developing realistic intervention strategies that complement the youth's natural environment.

The services are geared toward promoting self-empowerment of the parent, enhancing community living skills, and developing natural supports through the following interventions:

1. Through positive relationships with health providers, promoting access and quality services to the youth/family.
2. Assisting with identifying other community and individual supports that can be used by the family to achieve their goals and objectives-; these can include friends, relatives, and/or religious affiliations.
3. Assisting the youth and family accessing strength-based behavioral health, social services, educational services and other supports and resources required to assist the family to attain its vision/goals/objectives including:
   a. Helping the family identify natural supports that exist for the family;
   b. Working with families to access supports which maintain youth in the least restrictive setting possible; and
   c. Working with the families to ensure that they have a choice in life aspects, sustained access to an ownership of their IRP and resources developed.
4. In partnership with the multi-disciplinary team, working with the provider community to develop responsive and flexible resources that facilitate community-based interventions and supports that correspond with the needs of the families and their youth.

Interventions are approached from a perspective of lived experience and mutuality, building family recovery, empowerment, and self-efficacy. Interventions are based upon respect and honest dialogue. The unique mutuality of the service allows the sharing of personal experience including modeling family recovery, respect, and support that is respectful of the individualized journey of a family's recovery. Equalized partnership must be established to promote shared decision making while remaining family centered. All aspects of the intervention acknowledge and honor the cultural uniqueness of each family and the many pathways to family recovery.

One of the primary functions of the Parent Peer Support service is to promote family/youth recovery. While the identified youth is the target for services, recovery is approached as a family journey towards self-management and developing the concept of wellness and functioning while actively managing a chronic behavioral health condition, which enable the youth to be supported in wellness within his/her family unit. Families are supported in learning to live life beyond the identified behavioral health condition, focusing on identifying and enhancing the strengths of their family unit as supporters of the youth. As a part of this service intervention, a CPS-P will articulate points in their own recovery stories that are relevant to the obstacles faced by the family of consumers of behavioral health services and promote personal responsibility for family recovery as the youth/family define recovery.

The CPS-P focuses on respectful partnerships with families, identifying the needs of the parent/caregiver and helping the parent recognize self-efficacy while building partnership between families, communities and system stakeholders in achieving the desired outcomes. This service provides the training and support necessary to promote engagement and active participation of the family in the supports/treatment/recovery planning process for the youth and family with assistance with the ongoing

## Parent Peer Support Service - Individual

implementation and reinforcement of skills learned throughout the treatment/support process. PPS is a supportive relationship between a parent/guardian and a CPS-P that promotes respect, trust, and warmth and empowers youth/families to make choices and decisions to enhance their family recovery.

The following are among the wide range of specific interventions and supports which are expected and allowed in the provision of this service:

1. Assisting families in gaining skills to promote the families' recovery process (e.g., self-advocacy, developing natural supports, etc.);
2. Support family voice and choice by assisting the family in assuming the lead roles in all multi-disciplinary team meetings;
3. Listening to the family's needs and concerns from a peer perspective, and offering suggestions for engagement in planning process;
4. Providing ongoing emotional support, modeling and mentoring during all phases of the planning services/support planning process;
5. Promoting and planning for family and youth recovery, resilience and wellness;
6. Working with the family to identify, articulate and build upon their strengths while addressing their concerns, needs and opportunities;
7. Helping families better understand choices offered by service providers, and assisting with understanding policies, procedures, and regulations that impact the identified youth while living in the community;
8. Ensuring the engagement and active participation of the family and youth in the planning process and guiding families toward taking a pro-active and self-managing role in their youth's treatment;
9. Assisting the family with the acquisition of the skills and knowledge necessary to sustain an awareness of their youth's needs as well as his/her strengths and the development and enhancement of the family's unique problem-solving skills, coping mechanisms, and strategies for the youth's illness/symptom/behavior management;
10. Assisting the parent in coordinating with other youth-serving systems, as needed, to achieve the family/youth goals;
11. As needed, assisting communicating family team members, while also building the family skills in self-articulating needs/desires/preferences for treatment and support with the goal of full family-guided, youth-driven self-management;
12. Supporting, modeling, and coaching families to help with their engagement in all health-related processes;
13. Coaching parents in developing systems advocacy skills in order to take a proactive role in their youth's treatment and to obtain information and advocate with all youth-serving systems;
14. Cultivating the parent/guardian's ability to make informed, independent choices including a network for information and support which will include others who have been through similar experiences;
15. Building the family skills, knowledge, and tools related to the identified condition/related symptoms so that the family/youth can assume the role of self-monitoring and self-management;
16. Assisting the family in understanding:
    - Various system processes, how these relate to the youth's recovery process, and their valued role (e.g. crisis planning, IRP process);
    - What a behavioral health diagnosis means and what a journey to recovery may look like; and
    - The role of services/prescribed medication in diminishing/managing the symptoms of that condition and increasing resilience and functioning in living with that condition;
17. Empowering the family on behalf of the recipient; providing information regarding the nature, purpose and benefits of all services; providing interventions and support; and providing overall support and education to a caregiver to ensure that he or she is well equipped to support the youth in service transition/upon discharge and have natural supports and be able to navigate service delivery systems;
18. Identifying the importance of Self Care, addressing the need to maintain family whole health and wellness in order to ultimately support the youth with a behavioral health condition;
19. Assisting the family in self-advocacy promoting family-guided, youth-driven services and interventions;
20. Drawing upon their own experience, helping the family/youth find and maintain hope as a tool for progress towards recovery; and
21. Assisting youth and families with identifying goals, representing those goals to the collaborative, multi-disciplinary treatment team, and, together, taking specific steps to achieve those goals.

# Parent Peer Support Service - Individual

| | |
|---|---|
| Admission Criteria | 1. PPS is targeted to the parent/guardian of youth/young adults who meet the following criteria:<br>  a. Individual is 21 or younger; and<br>  b. Individual has a substance related condition and/or mental illness; and **two or more of the following:**<br>    i. Individual and his/her family needs peer-based recovery support for the acquisition of skills needed to engage in and maintain youth/family recovery;<br>    or<br>    ii. Individual and his/her family need assistance to develop self-advocacy skills to achieve self-management of the youth's behavioral health status; or<br>    iii. Individual and his/her family need assistance and support to prepare for a successful youth work/school experience; or<br>    iv. Individual and his/her family need peer modeling to increase responsibilities for youth/family recovery.<br>2. For the purposes of this service, "family" is defined as the person(s) who live with or provide care to the targeted youth, and may include a parent, guardians, other caregiving relatives, and foster caregivers. |
| Continuing Stay Criteria | 1. Individual continues to meet admission criteria; **and**<br>2. Progress notes document parent/guardian progress relative to goals which the youth/family identified in the Individualized Recovery Plan, but treatment/recovery goals have not yet been achieved. |
| Discharge Criteria | 1. An adequate continuing recovery plan has been established; **and one or more of the following:**<br>  a. Goals of the Individualized Recovery Plan have been substantially met; or<br>  b. Individual served/family requests discharge; or<br>  c. Transfer to another service/level is more clinically appropriate. |
| Service Exclusions | 1. "Family" or "caregiver" does not include individuals who are employed to care for the member (excepting individuals who are identified as a foster parent).<br>2. General support groups which are made available to the public to promote education and advocacy do not qualify as Parent Peer Support.<br>3. If there are siblings of the targeted youth for whom a need is specified, this service is not billable unless there is applicability to the targeted youth/family.<br>4. This unique billable service may not be billed for youth who resides in a congregate setting in which the caregivers are paid in a parental role (such as child caring institutions, or any other living environment that is not comprised of family, guardians, or other more permanent caregivers). A short-term exception would be if the youth were preparing for transition back to a single-family unit, the family member is present during the intervention, and the service is directed to supporting the unification/reunification of the youth and his/her identified family/caregiver and takes place in that home and community. |
| Clinical Exclusions | Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a behavioral health condition overlaying the diagnosis: Developmental Disability, Autism, Neurocognitive Disorder, or Traumatic Brain Injury. |
| Required Components | 1. Individuals participating in the service at any given time must have the opportunity to participate in and make decisions about the person-centered interactions offered by the Certified Peer Specialist(s).<br>2. The operating agency shall have an organizational plan which articulates the following agency protocols:<br>  a. PPS cannot operate in isolation from the rest of the programs/services within the agency or affiliated organization or from other health providers.<br>  b. CPS-Ps providing this service are supported through a myriad of agency resources (e.g., Supervisors, internal agency 24/7 crisis resources, external crisis resources, etc.) in responding to youth/family crises.<br>3. The CPS-P shall be empowered to convene multidisciplinary team meetings regarding a participating individual's needs and desires.<br>4. Contact must be made with the individual receiving PPS services a minimum of twice each month. At least one of these contacts must be face-to-face and the second may be either face-to-face or telephone contact depending on the individual's support needs and documented preferences.<br>5. At least 50% of PPS service units must be delivered face-to-face with the family/youth receiving the service. In the absence of the required monthly face-to-face contact **and** if at least two unsuccessful attempts to make face-to-face contact have been tried and documented, the provider may bill for a maximum of two telephone contacts in that specified month.<br>6. The CPS-P must be allowed to participate as an equal practitioner partner with all staff in multidisciplinary team meetings. |

## Parent Peer Support Service - Individual

**Staffing Requirements**

1. Services must be provided by a CPS-P;
2. Parent Peer Support services are provided in a structured 1:1 CPS to family-served ratio;
3. A CPS-P must receive ongoing and regular supervision by an independently licensed practitioner to include:
   a. Supervisor's availability to provide backup, support, and/or consultation to the CPS-P as needed.
   b. The partnership between the Supervisor and CPS-P in collaboratively assessing fidelity to the service definition and addressing implementation successes/challenges.
4. A CPS-P cannot provide this service to his/her own youth and/or family or to an individual with whom he/she is living; and
5. A CPS-P cannot exceed a caseload of 30 families and shall be defined by the providing agency based upon the clinical and functional needs of the youth/families served.

**Clinical Operations**

1. CPS-Ps who deliver PPS shall be involved in proactive multi-disciplinary planning to assist the youth/family in managing and/or preventing crisis situations.
2. PPS is goal-oriented and is provided in accordance with the youth's collaborative and comprehensive IRP.

**Service Accessibility**

1. PPS may be provided at a service site, in the recipient's home, or in any community setting appropriate for providing the services as specified in the recipient's behavioral health recovery plan; via phone (although 50% must be provided face to face, telephonic contacts are limited to 50%).
2. To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:
   * the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or
   * the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.

   Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual/family must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference.

**Documentation Requirements**

1. CPS-Ps must comply with all required documentation expectations set forth in this manual.
2. CPS-Ps must comply with any data collection expectations in support of the program's implementation and evaluation strategy.

**Billing & Reporting Requirements**

When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission.

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Child Program | H0043 | HA | | | | As negotiated |

## Structured Residential Supports

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Structured Residential | | | | | | | |
| Unit Value | 1 day | | | | | | |
| | Utilization Criteria | | | | | TBD | |

**Service Definition**

Structured Residential Supports (formerly Rehabilitation Supports for Individuals in Residential Alternatives, Levels 1 & 2) are comprehensive rehabilitative services to aid youth in developing daily living skills, interpersonal skills, and behavior management skills; and to enable youth to learn about and manage symptoms; and aggressively improve functioning/behavior due to SED, substance use, and/or co-occurring disorders. This service provides support and assistance to the youth and caregivers to identify, monitor, and manage symptoms; enhance participation in group living and community activities; and, develop positive personal and interpersonal skills and behaviors to meet the youth's developmental needs as impacted by his/her behavioral health issues.

## Structured Residential Supports

Services are delivered to youth according to their specific needs. Individual and group activities and programming must consist of services to develop skills in functional areas that interfere with the ability to live in the community, participate in educational activities; develop or maintain social relationships; or participate in social, interpersonal, recreational or community activities.

Rehabilitative services must be provided in a licensed residential setting with no more than 16 individuals and must include supportive counseling, psychotherapy and adjunctive therapy supervision, and recreational, problem solving, and interpersonal skills development. Residential supports must be staffed 24 hours/day, 7 days/week.

**Admission Criteria**

1. Youth must have symptoms of a SED or a substance related disorder; **and one or more of the following:**
   a. Youth's symptoms/behaviors indicate a need for continuous monitoring and supervision by 24-hour staff to ensure safety; **or**
   b. Youth/family has insufficient or severely limited skills to maintain an adequate level of functioning, specifically identified deficits in daily living and social skills and/or community/family integration; **or**
   c. Youth has adaptive behaviors that significantly strain the family's or current caretaker's ability to adequately respond to the youth's needs; **or**
   d. Youth has a history of unstable housing due to a behavioral health issue or a history of unstable housing which exacerbates a behavioral health condition.

**Continuing Stay Criteria**

Youth continues to meet Admissions Criteria.

**Discharge Criteria**

1. Youth/family requests discharge; or
2. Youth has acquired rehabilitative skills to independently manage his/her own housing; or
3. Transfer to another service is warranted by change in youth's condition.

**Service Exclusions**

Cannot be billed on the same day as Crisis Stabilization Unit.

**Clinical Exclusions**

1. Severity of identified youth issues precludes provision of services in this service.
2. Youth with the following conditions are excluded from admission unless there is clearly documented evidence of psychiatric condition overlaying the diagnosis: Intellectual/Developmental Disabilities, Autism, Neurocognitive Disorder, or Traumatic Brain Injury.
3. Youth is actively using unauthorized drugs or alcohol (which should not indicate a need for discharge, but for a review of need for more intensive services).
4. Youth can effectively and safely be supported with a lower intensity service.

**Required Components**

1. The organization must have an executive director or program director charged with the responsibility for day-to-day management of the organization.
2. If applicable, the organization must be licensed by the Georgia Department of Human Services/CCI or the Department of Community Health/HFR to provide residential services to youth with SED and/or substance use disorder diagnosis. If the agency does not have a license/letter from either the DHS/CCI or DCH/HFR related to operations, there must be enough administrative documentation to support the non-applicability of a license.
3. The residential program must provide a structured and supported living environment 24 hours a day, 7 days a week.
4. Structured Residential Supports must provide at least 5 hours per week of structured programming and/or services.

**Staffing Requirements**

1. Any Level 5 and higher practitioner may provide all Residential Rehabilitation Services.
2. If applicable, facilities must comply with any staffing requirements set forth for mental health and substance abuse facilities by the Department of Community Health, Healthcare Facilities Regulation Division (see Required Components, Item 2 above).
3. An independently licensed practitioner or SUD credentialed practitioner (MAC, CAADC, CAC-II, or GCADC-II or -III) must provide clinical supervision for Residential Support Services. This person is available for emergencies 24 hours/ 7 days a week.
4. The organization that provides direct residential services must have written policies and procedures for selecting and hiring residential and clinical staff in accordance with their applicable license/accreditation/certification.
5. The organization must have a mechanism for ongoing monitoring of staff licensure, certification, or professional registration such as an annual confirmation process concurrent with a performance evaluation that includes repeats of screening checks outlined above.

## Structured Residential Supports

| | |
|---|---|
| Clinical Operations | 1. The organization must have a written description of the Structured Residential Support services it offers that includes, at a minimum, the purpose of the service; the intended population to be served; treatment modalities provided by the service; level of supervision and oversight provided; and typical treatment objectives and expected outcomes.<br>2. Structured Residential Supports assist youth in developing daily living skills that enable them to manage the symptoms and behaviors linked to their psychiatric or substance use disorder diagnosis. Services must be delivered to individuals according to their specific needs. Individual and group activities and programming consists of services geared toward developing skills in functional areas that interfere with the youth's ability to participate in the community, retain school tenure, develop or maintain social relationships, or age-appropriately participate in social, interpersonal, or community activities.<br>3. Structured Residential Supports must include symptom management or supportive counseling; behavioral management; medication education, training and support; support, supervision, and problem-solving skill development; development of community living skills that serve to promote age-appropriate utilization of community-based services; and/or social or recreational skill training to improve communication skills, manage symptoms, and facilitate age-appropriate interpersonal behavior. |
| Add'l Medicaid Requirements | This is not a Medicaid-billable service. |
| Documentation Requirements | 1. The organization must develop and maintain sufficient written documentation to support the Structured Residential Support Services for which billing is made. This documentation, at a minimum, must confirm that the individual for whom billing is requested was a resident of the residential service on the date of service. The youth's record must also include each week's programming/service schedule in order to document the provision of the required amount of service.<br>2. Weekly progress notes must be entered in the youth's record to enable the monitoring of the youth's progress toward meeting treatment and rehabilitation goals and to reflect the Individualized Resiliency Plan implementation. Each note must be signed and dated and must include the professional designation of the individual making the entry.<br>3. Documentation must be legible and concise and include the printed name and the signature of the treating practitioner. The name, title, and credentials of the individual providing the service must reflect the staffing requirements established for the Rehabilitation Service being delivered. |
| Facilities Management | **Applicable to traditional residential settings such as group homes, treatment facilities, etc.**<br>1. Structured Residential Supports may only be provided in facilities that have no more than 16 beds.<br>2. Each residential facility must be arranged and maintained to provide adequate measures for the health, safety, access and well-being of the residents.<br>3. Each residential facility must comply with all relevant fire safety codes.<br>4. All areas of the residential facility must appear clean, safe, appropriately equipped, and furnished for the services delivered.<br>5. The organization must comply with the Americans with Disabilities Act.<br>6. The organization must maintain a written evacuation plan to be used in the case of fire or other disaster. An appropriate written certificate of compliance must be obtained indicating that all applicable fire and safety code requirements have been satisfied. Periodic fire drills must be conducted.<br>7. Evacuation routes must be clearly marked by exit signs.<br>8. The program must be responsible for providing physical facilities that are structurally sound and meet all applicable federal, state, and local regulations for adequacy of construction, safety, sanitation, and health. |
| Billing & Reporting Requirements | Span billing may occur for this service, meaning the start and end date are not the same on a given service claim line); however, spans cannot cross months (e.g. start date and end date must be within the same month). |

## Substance Abuse Intensive Outpatient Program: Adolescent

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | |

| Intensive Outpatient Program | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Child Program, Practitioner Level 3, In-Clinic | H0015 | HA | U3 | U6 | 26.40 | Child Program, Practitioner Level 3, Out-of-Clinic | H0015 | HA | U3 | U7 | 33.00 |
| Child Program, Practitioner Level 4, In-Clinic | H0015 | HA | U4 | U6 | 17.72 | Child Program, Practitioner Level 4, Out-of-Clinic | H0015 | HA | U4 | U7 | 21.64 |
| Child Program, Practitioner Level 5, In-Clinic | H0015 | HA | U5 | U6 | 13.20 | Child Program, Practitioner Level 5, Out-of-Clinic | H0015 | HA | U5 | U7 | 16.12 |

**Unit Value:** 1 hour | TBD

**Utilization Requirements**

**Service Definition**

An outpatient approach to treatment services for adolescents 13 - 17 years old who require structure and support to achieve and sustain recovery, focusing on early recovery skills; including the negative impact of substances, tools for developing support, and relapse prevention skills.

Through the use of a multi-disciplinary team, medical, therapeutic and recovery supports are provided in a coordinated approach to access and treat youth with substance use disorders in scheduled sessions, utilizing the identified components of the service guideline. This service can be delivered during the day or evening hours to enable youth to maintain residence in their community, continue work or thrive in school. The duration of treatment should vary with the severity of the youth's illness and response to treatment based on the individualized treatment plan, utilizing the best/evidenced based practices for the service delivery and support.

**Admission Criteria**

1. A DSM diagnosis of Substance Use Disorder or a Substance Use Disorder with a co-occurring DSM diagnosis of mental illness and/or IDD; **and**
2. Youth meets the age criteria for adolescent treatment; **and**
3. Youth's biomedical conditions are stable or are being concurrently addressed (if applicable) and one or more of the following:
   a. The youth is currently able to maintain behavioral stability for more than a 72-hour period, as evidenced by distractibility, negative emotions, or generalized anxiety; or
   b. There is a likelihood of drinking or drug use without close monitoring and structured support; or
   c. The substance use is incapacitating, destabilizing or causing the youth anguish or distress and the youth demonstrates a pattern or alcohol and/or drug use that has resulted in a significant impairment of interpersonal occupational and/or educational; or
   d. The youth's substance use history after previous treatment indicates that provision of outpatient services alone (without an organized program model) is not likely to result in the youth's ability to maintain sobriety; or
   e. There is a reasonable expectation that the youth can improve demonstrably within 3-6 months; or
   f. The youth is assessed as needing ASAM Level 2 or 3.1; or
   g. The youth has no significant cognitive and/or intellectual impairments that will prevent participation in and benefit from the services offered and has sufficient cognitive capacity to participate in and benefit from the services offered; or
   h. The youth is not actively suicidal or homicidal, and the youth's crisis, and/or inpatient needs (if any) have been met prior to participation in the program.

**Continuing Stay Criteria**

1. The youth's condition continues to meet the admission criteria; **or**
2. Progress notes document progress in reducing use of substances; developing social networks and lifestyle changes; increasing educational, vocational, social and interpersonal skills; understanding substance use disorders; and/or establishing a commitment to a recovery and maintenance program, but the overall goals of the recovery plan have not been met; **or**
3. There is a reasonable expectation that the youth can achieve the goals in the necessary reauthorization time frame; **or**
4. The youth recognizes and understands relapse triggers, but has not developed sufficient coping skills to interrupt or postpone gratification or to change related inadequate impulse control behaviors; **or**
5. Youth's substance seeking behaviors, while diminishing, have not been reduced sufficiently to support function outside of a structure treatment environment.

**Discharge Criteria**

1. An adequate continuing care or discharge plan is established, and linkages are in place; **and one or more of the following:**
   a. Goals of the treatment plan have been substantially met; **or**
   b. Youth's problems have diminished in such a way that they can be managed through less intensive services; **or**

| | |
|---|---|
| | c. Youth recognizes severity of his/her drug/alcohol usage and is beginning to apply skills necessary to maintain recovery by accessing appropriate community supports; **or** |
| | d. Clinical staff determines that youth no longer needs ASAM Level 2 and is now eligible for aftercare and/or transitional services; **OR** |
| 2. | Transfer to a higher level of service is warranted by the following: |
| | a. Change in the youth's condition or nonparticipation; **or** |
| | b. Youth refuses to submit to random drug screens; **or** |
| | c. Youth exhibits symptoms of acute intoxication and/or withdrawal **or** |
| | d. Youth requires services not available at this level; **or** |
| | e. Youth has consistently failed to achieve essential recovery objectives despite revisions to the individualized treatment plan and advice concerning the consequences **or** |
| | f. Youth continues alcohol/drug use to such an extent that no further process is likely to occur. |

| Service Exclusions | 1. Service elements included within SAIOP include counseling, group outpatient services, family outpatient services, and community support. Therefore, it is expected that these services are not generally ordered/authorized/provided outside of SAIOP. Any exception must be clinically justified in the medical record and may be subject to scrutiny by the ASO. Exceptions in offering these services external to SAIOP include scenarios where there are sensitive and targeted clinical issues to be addressed that require a specialized intervention or privacy (e.g., sexual abuse, criminal justice system involvement, etc.). When an exception is clinically justified, services must not duplicate interventions provided by SAIOP. |
|---|---|

| Clinical Exclusions | 1. Youth manifests overt physiological withdrawal symptoms. |
|---|---|
| | 2. Youth with any of the following is clearly documented evidence of a Substance Use Disorder: Autism, Developmental Disabilities, Neurocognitive Disorder, Traumatic Brain Injury. |

| Required Components | 1. This service must be licensed by DCH/HFR under the Rules and Regulations for Drug Abuse Treatment Programs, 290-4-2. |
|---|---|
| | 2. The program provides structured treatment or therapeutic services, utilizing activity schedules as part of its operational method, i.e.., plans or schedules of days or times of day for certain activities. |
| | 3. These services should be scheduled and available at least 3 hours per day, 4 days per week (12 hrs. /week), with no more than 2 consecutive days without service availability for high need youth (ASAM Level 2.1). |
| | 4. The program utilizes methods, materials, settings, and outside resources appropriate to the developmental and cognitive levels, capabilities, age, gender, and culture of participants. |
| | 5. The program utilizes methods, materials, approaches, activities, settings, and outside resources appropriate for and targeted to youths with co-occurring disorders of mental illness and substance use and targeted to youths with co-occurring developmental disabilities and substance use when such youths are referred to the program. |
| | 6. The program will work with the family to develop responsive and flexible recovery resources that facilitate community-based interventions and supports that correspond with the needs of the families and their youth. |
| | 7. Drug screening/toxicology examinations are required in accordance with HFR requirements but are not billable to DBHDD as components of this service benefit. |
| | 8. The program is provided over a period of several weeks or months and often follows withdrawal management or residential services and should be evident in the individual youth records. |
| | 9. This service must operate at an established site approved to bill Medicaid for services. However, limited individual or group activities may take place off-site in natural community settings as is appropriate to each youth's treatment plan. (Narcotics Anonymous (NA) and/or Alcoholics Anonymous (AA) meetings offsite may be considered part of these limited individual or group activities for billing purposes only when time limited and only when the purpose of the activity is introduction of the participating youth to available NA and/or AA services, groups or sponsors. NA and AA meetings occurring during the SA Intensive Outpatient package may not be counted as billable hours for any individual outpatient services, nor may billing related to these meetings be counted beyond the basic introduction of a youth to the NA/AA experience.). |
| | 10. This service may operate in the same building as other services; however, there must be a distinct separation between services in staffing, program description, and physical space during the hours the SA Intensive Outpatient Services is in operation. |

**Staffing Requirements**

11. Adequate space, equipment, furnishings, supplies, and other resources must be provided in order to effectively provide services and so that the program environment is clean and in good repair. Space, equipment, furnishings, supplies, transportation, and other resources for participating youths' use within the Substance Abuse Intensive Outpatient program must not be substantially different from that provided for other uses for similar numbers of youth.

1. The program must be under the clinical supervision of an LCSW, LPC, LMFT, MAC, CAADC, GCADC-II/-III, or CAC-II, who is onsite a minimum of 50% of the hours the service is in operation.

2. Services must be provided by staff who are:
   a. Level 3: LCSW, LPC, LMFT, MAC, CAADC, GCADC-II or -III, or CAC-II.
   b. Level 4: APC, LMSW, LAPC, LAMFT, GCADC-I (with Bachelor's Degree), CAC-I (with Bachelor's Degree), CPS-AD (with Bachelor's Degree), Paraprofessional (with Bachelor's Degree), and Certified Alcohol and Drug Counselor-Trainee/Counselor in Training (with Bachelor's Degree and under supervision).
   c. Level 5: Under the supervision of an LCSW, LPC, or LMFT (for SUD practitioners, an LCSW, LPC, LMFT, MAC, CAADC, GCADC-II/-III, or CAC-II): Paraprofessionals (without Bachelor's Degree), GCADC-I (without Bachelor's Degree), CAC-I (without Bachelor's Degree), CPS-AD (without Bachelor's Degree).

3. Programs must have documentation that there is one Level 4 staff (excluding Certified Alcohol and Drug Counselor-Trainee/Counselor in Training) that is "co-occurring capable." This person's knowledge must go beyond basic understanding and must demonstrate actual staff capabilities in using that knowledge for youth with co-occurring disorders. Personnel documentation should demonstrate that this staff person has received a minimum of 4 hours of training in co-occurring treatment within the past 2 years.

4. There must be at least a Level 4 on-site at all times the service is in operation, regardless of the number of youth participating.

5. The maximum face-to-face ratio cannot be more than 10 youth to 1 direct program staff based on average daily attendance of youth in the program.

6. A physician and/or a Registered Nurse or a Licensed Practical Nurse with appropriate supervision must be available to the program either by a physician and/or nurse employed by the agency, through a contract with a licensed practitioner, or by written referral or affiliation agreement with another agency or agencies that offer such services.
   a. An appropriate member of the medical staff pursuant to the Medical Practice Act of 2009, Subsection 43-34-23 Delegation of Authority to Nurse and Physician Assistant is responsible for substance use disorder and psychiatric consultation, assessment, and care (including but not limited to ordering medications and/or laboratory testing) as needed.
   b. The nurse is responsible for nursing assessments, health screening, medication administration, health education, and other nursing duties as needed.

7. Level 4 staff may be shared with other programs as long as they are available as required for supervision and clinical operations and as long as their time is appropriately allocated to staffing ratios for each program.

**Clinical Operations**

1. It is expected that the C&A Community Transition Planning for less intensive service will begin at the onset of these services. Documentation must demonstrate this planning.

2. A youth may have variable length of stay. The level of care should be determined as a result of the youths' multiple assessments. It is recommended that youth attend at a frequency appropriate to their level of need. Ongoing clinical assessment should be conducted to determine step down in level of care.

3. Each youth should participate in setting individualized goals for themselves and in assessing their own skills and resources related to sobriety, use, and maintaining recovery. Goals are set by exploring strengths and needs in the youth's living, learning, social, and working environments. Provision of services may take place individually or in groups.

4. Each individual youth must be provided assistance in the development/acquisition of needed skills and resources necessary to achieve sobriety and/or reduction in use and maintenance of recovery.

5. The Adolescent Substance Abuse Intensive Outpatient Program must offer a range of skill-building and recovery activities within the program.

6. The Adolescent Substance Abuse Intensive Outpatient Program will include, but are not limited, to the following:
   a. Age appropriate Psycho-educational activities focusing on substance use disorder prevention, the health consequences of substance use disorders, and recovery
   b. Therapeutic group treatment and counseling
   c. Leisure and social skill-building activities without the use of substances
   d. Helping the family identify natural supports for the youth and self-help opportunities for the family

Case 1:16-cv-03088-ELR    Document 448-73    Filed 11/29/23    Page 117 of 627

|  |  |
|---|---|
|  | e. Individual counseling<br>f. Individualized treatment, service, and recovery planning<br>g. Linkage to health care<br>h. Family skills development and engagement<br>i. AD Support Services<br>j. Vocational readiness and support<br>k. Service coordination unless provided through another service provider<br>7. Assessment and reassessment (included in the programmatic model, but billed as discrete services) will include:<br>a. Behavioral Health Assessment<br>b. Psychiatric Treatment<br>c. Nursing Assessment<br>d. Diagnostic Assessment<br>e. Medication Administration<br>8. The program must have an Adolescent Substance Abuse Intensive Outpatient Services Organizational Plan addressing the following:<br>a. The philosophical model of the program and the expected outcomes for program participants (i.e., harm reduction, abstinence, beginning of or maintaining, individually defined recovery, employment readiness, relapse prevention, stabilization and treatment of those with co-occurring disorders).<br>b. The schedule of activities and hours of operations.<br>c. Staffing patterns for the program including access medical and evaluation staff as needed including access medical and evaluation staff as needed.<br>d. How the activities listed above in Items 4 and 5 will be offered and/or made available to those youth who need them, including how that need will be determined.<br>e. How assessments will be conducted.<br>f. How staff will be trained in the administration of substance use disorder services and technologies.<br>g. How staff will be trained in the recognition and treatment of substance use disorders in an adolescent population.<br>h. How staff will be trained in the recognition and treatment of co-occurring disorders of mental illness & substance use pursuant to the best practices.<br>i. How services for youth with co-occurring disorders will be flexible and will include services and activities addressing both mental health and substance use issues of varying intensities and dosages based on the symptoms, presenting problems, functioning, and capabilities of such youth.<br>j. How youth with co-occurring disorders who cannot be served in the regular program activities will be provided and/or referred for time-limited special integrated services that are co-occurring enhanced as reflected in Guiding Principles Regarding Co-occurring Mental Health and Addictive Diseases Disorders, 04-109.<br>k. How services will be coordinated with the substance use array of services including assuring or arranging for appropriate referrals and transitions, and<br>l. How the requirements in these service guidelines will be met. |
| Service Accessibility | 1. The program is to be available at least 4 days per week to allow youth access to support and treatment within the youth's community, school, and family.<br>2. Program hours are to be published and distributed to all individuals served (and updated/redistributed as needed). |
| Documentation Requirements | 1. Every admission and assessment must be documented.<br>2. Daily notes must include time in/time out in order to justify units being utilized.<br>3. Progress notes must include written daily documentation of groups; important occurrences; level of functioning; acquisition of skills necessary for recovery; progress on goals identified in the IRP including acknowledgement of substance use disorder, progress toward recovery, use, reduction and/or abstinence; use of drug screening results by staff; and evaluation of service effectiveness.<br>4. Provider shall only document and bill units in which the youth was actively engaged in services. Meals and breaks must not be included in the reporting of units of service delivered. Should a youth leave the program or receive other services during the range of documented time in/time out for Adolescent SAIOP hours, the absence should be documented.<br>5. Daily attendance of each youth participating in the program must be documented showing the number of hours in attendance for billing purposes.<br>6. Program hours are to be published and updated as needed in the program's administrative record so as to be available to any external reviewers to validate billing and claims. |

FY 23 – 3rd Quarter Provider Manual for Community Behavioral Health Providers (January 1, 2023)<br>Page **116 of 465**

1. The maximum number of units that can be billed a day for SAIOP is 5 units.
2. There are some outpatient services which are required components of SAIOP but because of their frequency of use, are not practical as part of the bundled services. The following are those additional services that are to be billed unbundled as part of the SAIOP program:

| Service | Maximum Authorization | Daily Maximum Billable Units |
|---|---|---|
| Behavioral Health Assessment & Service Plan Development | 32 | 24 |
| Diagnostic Assessment | 4 | 2 |
| Psychiatric Treatment | 12 | 1 |
| Nursing Assessment and Care | 48 | 16 |
| Interactive Complexity (as a modifier to Psychiatric Treatment, Diagnostic Assessment, Individual Counseling, and Group Counseling) | 48 | 4 |
| Community Transition Planning | 50 | 12 |

3. The following services are included in the SAIOP and should not be requested as part of the SAIOP authorization, nor should they be ordered separately outside of the SAIOP authorization except under special circumstances (see Service Exclusions section):
   a. Family Outpatient Services (Counseling & Training)
   b. Group Outpatient Services (Counseling & Training)
   c. Individual Counseling
   d. Community Support

4. Rounding is applied to the person's cumulative hours/day at the Substance Abuse Intensive Outpatient Program (excluding non-programmatic time). The provider shall follow the guidance in the rounding policy included in this Provider Manual, and, specific to this service, the person served must have participated in at least 50% of the hour in order to bill for one unit of this service. For instance, if an individual participates in the program from 9:00 am -1:15 pm excluding a 30-minute break for lunch, his/her participating hours are 3.75 hours. The rounding policy is applied to the .75 hour and the units billed for that day are 4 units. Practitioner type must still be addressed and so these 4 units must be adequately assigned to either a U3, U4 or U5 practitioner type as reflected in the log for that day's activities.

5. Approved providers of this service may submit claims/encounters for the unbundled services listed in the table above, up to the daily maximum amount for each service. Program expectations are that these complementary services follow the content of this Service Guideline as well as the clearly defined service group elements.

6. Services authorized via the SAIOP Type of Care are only billable during the designated programmatic hours. If an individual needs additional service time outside the designated programmatic hours or needs services other than the designated programmatic services, AND the provider is enrolled to provide those services, the services are to be separately ordered and authorized (for example, services through the Non-Intensive Outpatient Type of Care).

Billing & Reporting Requirements

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Practitioner Level 4, Out-of-Clinic | H0038 | HA | HQ | U4 | U7 | $21.64 |
| Practitioner Level 5, Out-of-Clinic | H0038 | HA | HQ | U5 | U7 | $16.12 |

## Youth Peer Support - Group

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Peer Support Services | Practitioner Level 4, In-Clinic | H0038 | HA | HQ | U4 | U6 | $17.72 |
| | Practitioner Level 5, In-Clinic | H0038 | HA | HQ | U5 | U6 | $13.20 |

## Youth Peer Support - Group

| | Utilization Criteria | TBD |
|---|---|---|
| Unit Value | 1 hour | |

**Service Definition**

Youth Peer Support (YPS-G) is a strength-based rehabilitative service provided to youth/young adults that is expected to increase the youth/family's capacity to function within their home, school, and community while promoting recovery. These services are rendered by a CPS-Y (Certified Peer Support – Youth) who is performing the service within the scope of their knowledge, lived-experience, and education. The service exists within a system of care framework and enables timely response to the needs of the youth and all family members across several life domains, incorporating formal and informal supports, and developing realistic intervention strategies that complement the youth/family natural environment.

The services are geared toward promoting self-empowerment of the youth, enhancing community living skills, and developing natural supports through the following interventions:

a. Through positive relationships with health providers, promoting access and quality services to the youth/young adults and family.
b. Assisting with identifying other community and individual supports that can be used by the youth/young adult to achieve their goals and objectives; these can include friends, relatives, and/or religious affiliations.
c. Assisting the youth/young adult and family accessing strength-based behavioral health, social services, educational services and other supports and resources required to assist the family to attain its vision/goals/objectives including:
 i. Helping the youth/young adult identify natural supports that exist for the family; and
 ii. Working with youth/young adults to access supports which maintain youth in the least restrictive setting possible; and
 iii. Working with the youth to ensure that they have a choice in life aspects, sustained access to an ownership of their IRP and resources developed.
d. In partnership with the multi-disciplinary team, working with the provider community to develop responsive and flexible resources that facilitate community-based interventions and supports that correspond with the needs of the youth/young adult and their family.

Interventions are approached from a perspective of lived experience and mutuality, building youth recovery, empowerment, and self-efficacy. Interventions are based upon respect and honest dialogue. The unique mutuality of the service allows the sharing of personal experience including modeling youth recovery, respect, and support that is respectful of the individualized journey of a family's recovery. Equalized partnership must be established to promote shared decision making while remaining family centered. All aspects of the intervention acknowledge and honor the cultural uniqueness of each family and the many pathways to family recovery.

One of the primary functions of the Youth Peer Support service is to promote family/youth recovery. While the identified youth is the target for services, recovery is approached as a family journey towards self-management and developing the concept of wellness and functioning while actively managing a chronic behavioral health condition, which enable the youth to be supported in wellness within his/her family unit. Youth are supported by the CPS-Y and by participating group members in learning to live life beyond the identified behavioral health condition, focusing on identifying and enhancing their individual strengths as well as the strengths of their family unit as supporters of the youth. As a part of this service intervention, a CPS-Y will articulate points in their own recovery stories that are relevant to the obstacles faced by the youth/young adult of consumers of behavioral health services and promote personal responsibility for individual recovery as the youth/family define recovery.

The group focuses on building respectful partnerships with youth/young adult members, identifying the needs, and helping the youth/young adult recognize self-efficacy while building partnership between families, communities and system stakeholders in achieving the desired outcomes. This service provides the training and support necessary to promote engagement and active participation of the youth/young adult in the supports/treatment/recovery planning process for the youth and assistance with the ongoing implementation and reinforcement of skills learned throughout the treatment/support process. YPS is a supportive relationship between a youth/young adult and a CPS-Y that promotes respect, trust, and warmth and empowers the group participants to make choices and decisions to enhance their family recovery.

The following are among the wide range of specific interventions and supports which are expected and allowed in the provision of this service:
a. Facilitating peer support in and among the participating group youth/young adult members;

## Youth Peer Support - Group

b. Assisting youth/young adults in gaining skills to promote their recovery process (e.g., self-advocacy, developing natural supports, etc.);

c. Support youth/young adult voice and choice by assisting the family in assuming the lead roles in all multi-disciplinary team meetings;

d. Listening to the youth/young adults needs and concerns from a peer perspective, and offering suggestions for engagement in planning process;

e. Providing ongoing emotional support, modeling and mentoring during all phases of the planning services/support planning process;

f. Promoting and planning for family and youth recovery, resilience and wellness;

g. Working with the youth/young adult to identify, articulate and build upon their strengths while addressing their concerns, needs and opportunities;

h. Helping youth/young adults better understand choices offered by service providers, and assisting with understanding policies, procedures, and regulations that impact the identified youth while living in the community;

i. Ensuring the engagement and active participation of the family and youth in the planning process and guiding youth/young adult toward taking a pro-active and self-managing role in their treatment;

j. Assisting the youth/young adult with the acquisition of the skills and knowledge necessary to sustain an awareness of their needs as well as his/her strengths and the development and enhancement of the family's unique problem-solving skills, coping mechanisms, and strategies for the youth's illness/symptom/behavior management;

k. Assisting the youth/young adult and family participants in coordinating with other youth-serving systems, as needed, to achieve the youth/family goals;

l. As needed, assisting communicating youth/young adult and family needs to multi-disciplinary team members, while also building the youth/young adult and family skills in self-articulating; needs/desires/preferences for treatment and support with the goal of full family, youth-driven self-management;

m. Supporting, modeling, and coaching youth/young adult to help with their engagement in all health-related processes;

n. Coaching youth/young adults in developing systems advocacy skills in order to take a proactive role in their treatment and to obtain information and advocate with all youth-serving systems;

o. Cultivating the youth/young adult ability to make informed, independent choices including a network for information and support which will include others who have been through similar experiences;

p. Building the youth/young adult skills, knowledge, and tools related to the identified condition/related symptoms so that the youth/family can assume the role of self-monitoring and self-management; and

q. Assisting the youth/young adult participants in understanding:
  i. Various system processes, how these relate to the youth's recovery process, and their valued role (e.g. crisis planning, IRP process);
  ii. What a behavioral health diagnosis means and what a journey to recovery may look like;
  iii. The role of services/prescribed medication in diminishing/managing the symptoms of that condition and increasing resilience and functioning in living with that condition;

r. Empowering the youth/young adult and family on behalf of the recipient; providing information regarding the nature, purpose and benefits of all services; providing interventions and support; and providing overall support and education to the youth/young adult and family to ensure that they are well equipped to support the youth in service transition/upon discharge and have natural supports and be able to navigate service delivery systems;

s. Identifying the importance of Self Care, addressing the need to maintain family whole health and wellness in order to ultimately support the youth with a behavioral health condition;

t. Assisting the participants in self-advocacy promoting family-guided, youth-driven services and interventions;

u. Drawing upon their own experience, helping the youth/family find and maintain hope as a tool for progress towards recovery; and

v. Assisting youth and families with identifying goals, representing those goals to the collaborative, multi-disciplinary treatment team, and, together, taking specific steps to achieve those goals.

1. YPS is targeted to the youth/young adults who meet the following criteria:
  a. Individuals is 20 or younger; **and**
  b. Individual has a substance related condition/challenge and/or mental illness; and **two or more of the following:**
    i. Individual and his/her family needs peer-based recovery support for the acquisition of skills needed to engage in and maintain youth/family recovery; or

| | |
|---|---|
| Admission Criteria | |

## Youth Peer Support - Group

ii. Individual and his/her family need assistance to develop self-advocacy skills to achieve self-management of the youth's behavioral health status; or
iii. Individual and his/her family need assistance and support to prepare for a successful youth work/school experience; or
iv. Individual and his/her need peer modeling to increase responsibilities for youth/family recovery.
2. For the purposes of this service, "family" is defined as the person(s) who live with or provide care to the targeted youth, and may include a parent, guardians, other caregiving relatives, and foster caregivers.

| | |
|---|---|
| **Continuing Stay Criteria** | 1. Individual continues to meet admission criteria; **and**<br>2. Progress notes document parent/guardian progress relative to goals which the youth/family identified in the Individualized Recovery Plan, but treatment/recovery goals have not yet been achieved. |
| **Discharge Criteria** | 1. An adequate continuing recovery plan has been established; **and one or more of the following:**<br>a. Goals of the Individualized Recovery Plan have been substantially met; or<br>b. Individual served/family requests discharge; or<br>c. Transfer to another service/level is more clinically appropriate. |
| **Service Exclusions** | 1. "Family" or "caregiver" does not include individuals who are employed to care for the member (excepting individuals who are identified as a foster parent).<br>2. This unique billable service may not be billed for youth who resides in a congregate setting in which the caregivers are paid in a parental role (such as child caring institutions, or any other living environment that is not comprised of family, guardians, or other more permanent caregivers). A short-term exception would be if the youth were preparing for transition back to a single-family unit, the family member is present during the intervention, and the service is directed to supporting the unification/reunification of the youth and his/her identified family/caregiver and takes place in that home and community.<br>3. General support groups which are made available to the public to promote education and advocacy do not qualify as Parent Peer Support.<br>4. If there are siblings of the targeted youth for whom a need is specified, this service is not billable unless there is applicability to the targeted youth/family. |
| **Clinical Exclusions** | Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a behavioral health condition overlaying the diagnosis: Developmental Disability, Autism, Neurocognitive Disorder, or Traumatic Brain Injury. |
| **Required Components** | 1. Individuals participating in the service at any given time must have the opportunity to participate in and make decisions about the person-centered interactions offered by the Certified Peer Specialist(s), while also respecting the group dynamics.<br>2. The operating agency shall have an organizational plan which articulates the following agency protocols:<br>  a. YPS cannot operate in isolation from the rest of the programs/services within the agency or affiliated organization or from other health providers;<br>  b. CPS-Ys providing this service are supported through a myriad of agency resources (e.g. Supervisors, internal agency 24/7 crisis resources, external crisis resources, etc.) in responding to youth/family crises<br>3. The CPS-Y shall be empowered to convene multidisciplinary team meetings regarding a participating individual's needs and desires as they become known in the group setting.<br>4. The CPS-Y must be allowed to participate as an equal practitioner partner with all staff in multidisciplinary team meetings. |
| **Staffing Requirements** | 1. Direct services must be provided by a CPS-Y;<br>2. Youth Peer Support services are provided in a structured 1:15 CPS to participant ratio;<br>3. A CPS-Y must receive ongoing and regular supervision by an independently licensed practitioner to include:<br>  a. Supervisor's availability to provide backup, support, and/or consultation to the CPS-Y as needed;<br>  b. The partnership between the Supervisor and CPS-Y in collaboratively assessing fidelity to the service definition and addressing implementation successes/challenges;<br>4. When a CPS-P is also providing a service to the parents/guardians of the youth/young adult, these identified CPSs shall coordinate to reinforce various aspects of the youth's IRP.<br>5. A CPS-Y cannot provide this service to his/her own youth and/or family or to an individual with whom he/she is living. |

## Youth Peer Support - Group

| | |
|---|---|
| Clinical Operations | 1. CPS-Ys who deliver YPS shall be involved in proactive multi-disciplinary planning to assist the youth/family in managing and/or preventing crisis situations;<br>2. YPS is goal-oriented and is provided in accordance with the youth's collaborative and comprehensive IRP. |
| Service Accessibility | 1. YPS may be provided at a service site, in the recipient's home, or in any community setting appropriate for providing the services as specified in the recipient's behavioral health recovery plan; via telephone (although 50% must be provided face to face, telephonic contacts are limited to 50%). |
| Documentation Requirements | 1. CPS-Ys must comply with all required documentation expectations set forth in this manual.<br>2. CPS-Ys must comply with any data collection expectations in support of the program's implementation and evaluation strategy. |

## Youth Peer Support - Individual

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Peer Supports | Practitioner Level 4, In-Clinic | H0038 | HA | U4 | U6 | | 20.30 |
| | Practitioner Level 5, In-Clinic | H0038 | HA | U5 | U6 | | 15.13 |
| | Practitioner Level 4, Via interactive audio and video telecommunication systems | H0038 | GT | HA | U4 | | 20.30 |
| | Practitioner Level 4, Out-of-Clinic | H0038 | HA | U4 | U7 | | 24.36 |
| | Practitioner Level 5, Out-of-Clinic | H0038 | HA | U5 | U7 | | 18.15 |
| | Practitioner Level 5, Via interactive audio and video telecommunication systems | H0038 | GT | HA | U5 | | 15.13 |
| Unit Value | 15 minutes | | | | | | |
| Utilization Criteria | TBD | | | | | | |

**Service Definition**

Youth Peer Support-Individual (YPS-I) is a strength-based rehabilitative service provided to youth who are living with a mental health, substance use and/or co-occurring health condition. The one-to-one service rendered by a CPS-Y (Certified Peer Support – Youth) practitioner models recovery by using lived experience as a tool for the service intervention within the scope of their knowledge, skills and education. This service intervention is expected to increase the targeted youth's capacity to function and thrive within their home, school, and communities of choice. The service exists within a full family-guided, youth-driven system of care framework and enables response to the needs of the youth across several life domains, incorporating formal and informal supports, and developing realistic intervention strategies that complement the youth's natural resources and environment.

The services are geared toward promoting self-empowerment of the youth, enhancing community living skills, and developing/enhancing natural supports. The following are among the wide - range of specific interventions and supports which are expected and allowed in the provision of this service:

1. Promoting a service culture of respect, wellness, dignity, and strength, by changing the labels which have emerged in the system and seeing young persons as individuals who can achieve full, rich lives on their own terms;
2. Facilitating the process for the youth in his/her exploration of strengths and supports of wellness/resiliency/recovery and ultimately supporting the youth/family voice and choice in such activities as self-advocating for needs/preferences, assuming the lead roles in multi-disciplinary team meetings; holding accountability for his/her own health/wellness/recovery, etc.;
3. Drawing upon their own experience, helping the family/youth find and maintain hope as a tool for progress towards recovery;
4. Assisting the youth in identifying the tools of wellness/resiliency/recovery available in everyday life;
5. Creating the opportunities and dialogues to explore behavioral health, what wellness is for the specific youth and his/her family, so that the individual can define and articulate wellness and create plans which strengthen their recovery and resilience;
6. Listening to the youth and family's needs and concerns from a peer perspective, and offering suggestions and alternatives for youth engagement in planning and self-direction process;

## Youth Peer Support - Individual

7. Assisting the youth and family with the acquisition of the skills and knowledge necessary to sustain an awareness of their youth's needs as well as his/her strengths and the development and enhancement of the family's unique problem-solving skills, coping mechanisms, and strategies for the youth's illness/symptom/behavior management; and relapse prevention;
8. Building the youth and family skills, knowledge, and tools related to the identified condition/related symptoms/triggers so that the family/youth can assume the role of self-monitoring and self-management;
9. Through positive collaboration and relationships, promoting access and quality services for the youth/family by assisting with accessing strength-based behavioral health/health services, social services, educational services and other supports and resources required to assist the family unit to attain its vision/goals/objectives including:
    a. Creating early access to the messages of recovery and wellness;
    b. Helping the family identify natural supports that exist for the youth;
    c. Working with youth/young adults to access supports which maintain youth in the least restrictive setting possible;
    d. Working with the youth/young adult to ensure that they have choices in life aspects, sustained access to an ownership of their IRP and resources developed;
    e. Working with youth/young adult to provide adequate information to make healthier choices about their use of alcohol and/or other drugs;
    f. Working with the provider community and other practitioners, the CPS-Y promotes the youth to self-advocate to:
        i. Develop responsive and flexible resources that facilitate community-based interventions;
        ii. Create a person-centered, recovery-oriented system of care plan that correspond with the needs of the youth/family;
        iii. Acknowledge the importance of Self Care, addressing the need to maintain whole health and wellness. This should include support in building "recovery capital" (formal and informal community supports);
    g. Assisting with identifying community and individual supports (including friends, relatives, schools, religious affiliations, etc.) that can be used by the youth to achieve his/her goals and objectives;
    h. Assisting the youth and family participants as needed in coordinating with other youth-serving systems (or at a certain age, collaboration and engagement with adult-serving systems) to achieve the family/youth goals;
10. Provide resources and educational materials to help assist youth with understanding services, options, and treatment expectations, as well assistance with developing wellness tools and coping skills, including:
    a. Understanding various system processes, how these relate to the youth's recovery process, and their valued role (e.g. crisis planning, IRP process);
    b. Understanding what a behavioral health diagnosis means and what a journey to recovery may look like;
    c. The role of services/prescribed medication in diminishing/managing the symptoms of that condition and increasing resilience and functioning in living with that condition;
11. Facilitating and creating advocacy, balance, and cohesion on the IRP support team between the youth/family served, professionals (including CPS-Ps who may be supporting the family), and other supporting partners.

Interventions are approached from a perspective of lived experience and mutuality, building the youth's and family's recovery, empowerment, and self-efficacy. Interventions are based upon respect and honest dialogue. The unique mutuality of the service allows the sharing of personal experience including modeling individual/family recovery, respect, and support that is respectful of the individualized journey of a youth's/family's recovery. Equalized partnership must be established to promote shared decision making while remaining youth-driven, family-centered. All aspects of the intervention acknowledge and honor the cultural uniqueness of each youth and family and the many pathways to recovery.

One of the primary functions of the Youth Peer Support service is to promote youth and family recovery. While the identified youth is the target for services, recovery is approached as a family journey towards self-management and developing the concept of wellness and functioning while actively managing a substance use and/or chronic mental health condition, which enable the youth to be supported in wellness within his/her family unit. Youth are supported by the CPS-Y in learning to live life

# Youth Peer Support - Individual

| Section | Content |
|---|---|
| Admission Criteria | beyond the identified behavioral health condition, focusing on identifying and enhancing the strengths of the youth and the family unit. As a part of this service intervention, a CPS-Y will articulate points in their own recovery stories that are relevant to overcoming obstacles faced by the youth-recipient of behavioral health services and promote personal responsibility for recovery as the youth/family define recovery. The CPS-Y focuses on building respectful partnerships with families, identifying the needs of the youth and helping the youth recognize self-efficacy while strengthening good communication within the families and good partnerships with communities and system stakeholders in achieving the desired outcomes. This service provides the training and support necessary to promote engagement and active participation of the youth in the supports/treatment/recovery planning process for the youth and assistance with the ongoing implementation and reinforcement of skills learned throughout the treatment/support process. YPS-I provides interventions which promote supportive relationships between a youth and a CPS-Y that promotes respect, trust, and warmth and empowers the youth to make choices and decisions to enhance their recovery. YPS-I is targeted to a youth who meets the following criteria: 1. Individual is age 20 or younger; and 2. Individual has a substance related condition and/or mental illness; and two or more of the following: a. Individual and his/her family needs peer-based recovery support for the acquisition of skills needed to engage in and maintain youth/family recovery; or b. Individual and his/her family need assistance to develop self-advocacy skills to achieve self-management of the youth's behavioral health status; or c. Individual and his/her family need assistance and support to prepare for a successful youth work/school experience; or d. Individual and his/her family need peer modeling to increase responsibilities for youth/family recovery. |
| Continuing Stay Criteria | 1. Individual continues to meet admission criteria; and 2. Progress notes document youth progress relative to goals which the youth/family identified in the Individualized Recovery Plan, but treatment/recovery goals have not yet been achieved. |
| Discharge | An adequate continuing recovery plan has been established; **and one or more of the following:** 1. Goals of the Individualized Recovery Plan have been substantially met; or 2. Individual served/family requests discharge; or |
| Service Exclusions | None |
| Clinical Exclusions | Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a behavioral health condition overlaying the diagnosis: Developmental Disability, Autism, Neurocognitive Disorder, or Traumatic Brain Injury. |
| Required Components | 1. Youth choice and voice are paramount to this recovery-oriented service but are considered in the context of the youth's age, developmental stage, emerging empowerment, and family dynamics. Younger children will be supported in their articulation of needs/preferences, symptoms, feelings, status, etc. while understanding the guardian's ultimate role in some specific decision-making. 2. CPS-Ys are integral partners as the youth is considering transitions between levels of service, transitions between youth and adult services, and/or is considering a transition out of service. The CPS-Y is not the sole supporter of this work but is a leading partner to supporting the youth's recovery transition. |
| Staffing Requirements | 1. In delivering this service, the CPS-Y role is not interchangeable with traditional staff that works from the perspective of their training and status as licensed/certified behavioral health care providers. The CPEs have unique roles working from the perspective of "having been there." Through their lived experience with mental health or substance use, they lend unique insight into behavioral health and what makes resilience and recovery possible for an individual experiencing one of these chronic conditions. 2. CPEs have an equivalent voice with other professional practitioners and should serve as valued members of any internal or internal/external IRP support teams. 3. Supervision shall extend beyond performance oversight. For CPS-Ys, it is expected that supervision considers conducive, youth-centric environments, recovery-oriented culture, employee development, supportive relationships, etc. 4. Supervisors must attend at least one DBHDD-required Peer Support supervisor training/year. |

## Youth Peer Support - Individual

| Clinical Operations | 1. | The youth is the primary recipient of the Youth Peer Support; however, there is an expectation that the CPS-Y is working as an integral member of the supporting team, specifically supporting the youth in articulating his/her own recovery goals and objectives, working closely with the CPS-P who is identified as a supporter to the youth's family, etc. |
|---|---|---|
| Service Accessibility | 1. | YPS may be provided at a service site, in the recipient's home, or in any community setting appropriate for providing the services as specified in the recipient's behavioral health recovery plan; via phone (although 50% must be provided face to face, telephonic contacts are limited to 50%). |
|  | 2. | To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include: |
|  |  | • the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or |
|  |  | • the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service. |
|  |  | Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual/family must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. |
| Documentation Requirements | 1. | CPS-Ys must comply with all required documentation expectations set forth in this manual. |
|  | 2. | CPS-Ys must comply with any data collection expectations in support of the program's implementation and evaluation strategy. |
| Billing & Reporting Requirements |  | When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |

## ADULT NON-INTENSIVE OUTPATIENT SERVICES

### Addictive Diseases Support Services

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Addictive Diseases Support Services | Practitioner Level 4, In-Clinic | H2015 | HF | U4 | U6 |  | $20.30 |
|  | Practitioner Level 5, In-Clinic | H2015 | HF | U5 | U6 |  | $15.13 |
|  | Practitioner Level 4, In-Clinic | H2015 | HF | UK | U4 | U6 | $20.30 |
|  | Practitioner Level 5, In-Clinic | H2015 | HF | UK | U5 | U6 | $15.13 |
|  | Practitioner Level 4, Via interactive audio and video telecommunication systems | H2015 | GT | HF | U4 | U6 | $20.30 |
| Unit Value | 15 minutes | | | | | | |
| Service Definition | Specific to adults with substance use disorders, Addictive Diseases Support Services (ADSS) consist of individualized 1:1 substance use recovery services and supports which build on the strengths and resilience of the individual and are necessary to assist the person in achieving recovery and wellness goals as identified in the Individualized Recovery Plan. The service activities include: | | | | | | |
|  | 1. Assistance to the person and other identified recovery partners in the facilitation and coordination of the Individual Recovery Plan (IRP) including the use of motivational interviewing and other skills support to promote the person's self-articulation of personal goals and objectives; | | | | | | |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Practitioner Level 4, Out-of-Clinic | H2015 | HF | U4 | U7 |  | $24.36 |
| Practitioner Level 5, Out-of-Clinic | H2015 | HF | U5 | U7 |  | $18.15 |
| Practitioner Level 4, Out-of-Clinic | H2015 | HF | UK | U4 | U7 | $24.36 |
| Practitioner Level 5, Out-of-Clinic | H2015 | HF | UK | U5 | U7 | $18.15 |
| Practitioner Level 5, Via interactive audio and video telecommunication systems | H2015 | GT | HF | U5 | U6 | $15.13 |
| Utilization Criteria | TBD | | | | | |

| | |
|---|---|
| 2. | Relapse Prevention Planning to assist the person in managing and/or preventing crisis and relapse situations with the understanding that when individuals do experience relapse, this support service can help minimize the negative effects through timely re-engagement/intervention and, where appropriate, timely connection to other treatment supports; |
| 3. | Individualized interventions through all phases of recovery (pre-recovery preparation, initiation of recovery, continuing recovery, and relapse) which shall have as objectives: |
| | a. Identification, with the person, of strengths which may aid him/her in achieving and maintaining recovery from the substance use disorder as well as barriers that impede the development of skills necessary for functioning in work, with peers, and with family/friends; |
| | b. Support to facilitate enhanced natural supports (including comprehensive support/assistance in connecting to a recovery community); |
| | c. Assistance in the development of interpersonal, community coping and functional skills (which may include adaptation to home, adaptation to work, adaptation to healthy social environments, learning/practicing skills such as personal financial management, medication self-monitoring, symptom self-monitoring, etc.); |
| | d. Assistance in the skills training for the person to self-recognize emotional triggers and to self-manage behaviors related to the substance use disorder; |
| | e. Assistance with personal development, work performance, and functioning in social and family environments through teaching skills/strategies to reduce the effects of substance use disorder symptoms; |
| | f. Assistance in enhancing social and coping skills that reduce life stresses resulting from the person's substance use disorder; |
| | g. Facilitating removal of barriers and swift entry to necessary supports and resources. Supports/Resources may include but are not limited to medical services, employment, education, etc.; and |
| | h. ADSS focuses on building and maintaining a therapeutic relationship with the individual and monitoring, coordinating, and facilitating treatment and recovery goals. |
| Admission Criteria | 1. Individuals with one of the following:  Substance Use Disorder, Co-Occurring Substance Use Disorder and MH Diagnosis, or Co-Occurring Substance Use Disorder and DD **and**<br>2. Individual may need assistance and access to service(s) targeted to reduce and/or stop the use of any mood altering substances; or<br>3. Individual may need assistance with developing, maintaining, or enhancing social supports or other community coping skills; or<br>4. Individual may need assistance with daily living skills including coordination to gain access to necessary rehabilitative and medical services. |
| Continuing Stay Criteria | 1. Individual continues to meet admission criteria; **and**<br>2. Individual demonstrates documented progress or maintenance of community skills relative to goals identified in the Individualized Recovery Plan. |
| Discharge Criteria | 1. An adequate continuing care plan has been established; **and one or more of the following:**<br>a. Goals of the Individualized Recovery Plan have been substantially met; **or**<br>b. Individual requests discharge and the individual is not in imminent danger of harm to self or others; **or**<br>c. Transfer to another service/level of care is warranted by change in individual's condition; **or**<br>d. Individual requires more intensive services. |
| Clinical Exclusions | 1. The individual's current status precludes his/her ability to understand the information presented and participate in the recovery planning and support/treatment process;<br>2. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a co-occurring Substance Use Disorder: Developmental Disability, Autism, Neurocognitive Disorder, Traumatic Brain Injury. |
| Service Exclusions | 1. ACT and ADSS may be provided concurrently during transition between these services for support and continuity of care for a maximum of four units of ADSS per month. If services are provided concurrently, ADSS should not be duplication of ACT services. This service must be adequately justified in the Individualized Resiliency Plan.<br>2. CM/ICM and ADSS may be authorized/provided at the same time to individuals with co-occurring mental health/substance use disorders, but there is an expectation that one of these services serves as the primary coordination resource for the person. If these services co-occur, there must be documentation of coordination of supports in a way that no duplication occurs. |

| | |
|---|---|
| Required Components | 1. The agency providing this service must be a Tier 1 or Tier 2 provider, an Intensive Outpatient Program (IOP) specialty provider, or a WTRS provider. Contact must be made with the individual receiving ADSS services a minimum of twice each month. At least one of these contacts must be face-to-face and the second may be either face-to-face or telephone contact depending on the individual's support needs and documented preferences.<br>2. At least 50% of ADSS service units must be delivered face-to-face with the identified individual receiving the service. In the absence of the required monthly face-to-face contact **and** if at least two unsuccessful attempts to make face-to-face contact have been tried and documented, the provider may bill for a maximum of two telephone contacts in that specified month.<br>3. ADSS is not a group service and must always be provided on an individualized 1:1 basis. |
| Staffing Requirements | ADSS practitioners have a recommended individual-to-staff caseload ratio of 30 individuals per staff member but must not exceed a maximum caseload ratio of 50 individuals per staff member. |
| Clinical Operations | 1. ADSS may include (with the written permission of the adult individual) coordination with family and significant others and with other systems/supports (e.g., work, religious entities, corrections, aging agencies, etc.) when appropriate for treatment and recovery needs.<br>2. Any necessary monitoring and follow-up to determine if the services and resources accessed have adequately met the person's needs in achieving and sustaining recovery are allowable. Coordination is an essential component of ADSS when directly related to the support and enhancement of the person's recovery.<br>3. The organization must have an ADSS Organizational Plan that addresses the following:<br>  a. Description of the particular rehabilitation, recovery and natural support development models utilized, types of intervention practiced, and typical daily schedule for staff.<br>  b. Description of the staffing pattern and how staff are deployed to assure that the required staff-to-individual ratios are maintained, including how unplanned staff absences, illnesses, or emergencies are accommodated, case mix, access, etc.<br>  c. Description of the hours of operations as related to access and availability to the individuals served; and<br>  d. Description of how the plan for services is modified or adjusted to meet the needs specified in every Individualized Recovery Plan.<br>4. Utilization (frequency and intensity) of ADSS should be directly related to the ANSA and to other functional elements in the assessment. In addition, when clinical/functional needs are great, there should be complementary therapeutic services by licensed/credentialed professionals paired with the provision of ADSS (individual, group, family, etc.). |
| Service Accessibility | To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:<br>• the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or<br>• the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.<br><br>Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should <u>not</u> be driven by the practitioner's/agency's convenience or preference. |
| Billing & Reporting Requirements | 1. Unsuccessful attempts to make contact with the individual are not billable.<br>2. When a billable collateral contact is provided, that is documented as a part of the progress note. A collateral contact is classified as any contact that is not face-to-face with the individual.<br>3. When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |

**Behavioral Health Assessment**

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mental Health Assessment by a non-Physician | Practitioner Level 2, In-Clinic | H0031 | U2 | U6 | | | $38.97 | Practitioner Level 2, Out-of-Clinic | H0031 | U2 | U7 | | | $46.76 |
| | Practitioner Level 3, In-Clinic | H0031 | U3 | U6 | | | $30.01 | Practitioner Level 3, Out-of-Clinic | H0031 | U3 | U7 | | | $36.68 |
| | Practitioner Level 4, In-Clinic | H0031 | U4 | U6 | | | $20.30 | Practitioner Level 4, Out-of-Clinic | H0031 | U4 | U7 | | | $24.36 |
| | Practitioner Level 5, In-Clinic | H0031 | U5 | U6 | | | $15.13 | Practitioner Level 5, Out-of-Clinic | H0031 | U5 | U7 | | | $18.15 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | H0031 | GT | U2 | | | $38.97 | Practitioner Level 4, Via interactive audio and video telecommunication systems | H0031 | GT | U4 | | | $20.30 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | H0031 | GT | U3 | | | $30.01 | Practitioner Level 5, Via interactive audio and video telecommunication systems | H0031 | GT | U5 | | | $15.13 |

| Unit Value | 15 minutes | Utilization Criteria | TBD |
|---|---|---|---|

**Service Definition**

The Behavioral Health Assessment process consists of a face-to-face comprehensive clinical assessment with the individual, which must include the individual's perspective as a full partner, and may also include individual-identified family and/or significant others as well as other involved agencies, treatment providers (including Certified Peer Specialists who have been working with individuals on goal discovery), and other relevant individuals.

The purpose of the assessment process is to gather all information needed to determine the individual's problems, strengths, needs, abilities, resources, and preferences, to develop a social (extent of natural supports and community integration) and medical history, to determine functional level and degree of ability versus disability, and to engage with collateral contacts for other assessment information. A suicide risk assessment shall also be completed. The information gathered should support the determination of a differential diagnosis and assist in screening for/ruling-out potential co-occurring disorders.

As indicated, information from medical, nursing, peer, vocational, nutritional, etc. staff should serve as content basis for the comprehensive assessment and the resulting IRP.

**Admission Criteria**

1. Individual has a known or suspected mental illness or substance-related disorder; **and**
2. Initial screening/intake information indicates a need for further assessment; **and**
3. It is expected that individual meets DBHDD service eligibility.

**Continuing Stay Criteria**

Individual's situation/functioning has changed in such a way that previous assessments are outdated.

**Discharge Criteria**

1. An adequate continuing care plan has been established; **and** one or more of the following:
2. Individual has withdrawn or been discharged from service.

**Service Exclusions**

Assertive Community Treatment

**Required Components**

1. Any diagnosis given to an individual must come from persons identified in O.C.G.A. Practice Acts as qualified to provide a diagnosis.
2. The behavioral health assessment process must include a face-to-face comprehensive clinical assessment with the individual. Beyond this face-to-face assessment, additional collateral information gathered from the individual, from individual-identified family members, significant others, other involved agencies/treatment providers, and any other relevant individuals may be collected telephonically.
3. An initial Behavioral Health Assessment is required within the first 30 days of service with ongoing assessments completed as demanded by changes with an individual.

**Staffing Requirements**

1. Practitioner scope of practice is often defined in law and/or regulation. As such, while U4 and U5 practitioners are supporting partners in the assessment process, certain aspects of assessment must be completed by practitioners licensed or certified to do so.

2. As indicated, medical, nursing, peer, school, nutritional, etc. staff can provide information from the individual, records, and various multi-disciplinary resources to complete the comprehensive nature of the assessment. Time spent gathering this information may be billed as long as the detailed documentation justifies the time and need for capturing said information.

3. Addictions counselors/SUD-certified practitioners may deliver this service when:
   a. A presenting individual has a known or suspected substance use disorder (including those with known/suspected co-occurring MH/SUD diagnoses); and/or
   b. The service is delivered at a location wherein it can be expected that all individuals presenting have a substance use disorder (including those with known/suspected co-occurring MH/SUD diagnoses);

   AND

   c. If, during the course of service delivery, there is evidence of either a singular MH condition (i.e., without a co-occurring SUD), or a co-occurring MH condition that rises to a certain level of acuity/complexity (e.g. psychosis, symptoms of major depression, etc.), then additional assessment should be coordinated with a partnering U1-U3 level practitioner who can provide necessary supporting assessment interventions.

**Service Accessibility**

To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:
- the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or
- the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.

Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference.

**Documentation Requirements**

1. In addition to any specific assessment documents resulting from the delivery of this service, there must be a Progress Note in the individual's medical record that supports each claim submitted for this service, in accordance with Part II – Community Service Requirements for BH Providers, Section III – Documentation Requirements, 8. Progress Notes of this manual.

**Billing & Reporting Requirements**

2. A provider may submit an authorization request and subsequent claim for BHA for an individual who may have been erroneously referred for assessment and, upon the results of that assessment, it is determined that the person does not meet eligibility as defined in this manual.

3. When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission.

## Behavioral Health Clinical Consultation

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Interprofessional Telephone Consultation | Practitioner Level 1 | 99446 | U1 | | | | $38.81 |
| | Practitioner Level 2 | 99446 | U2 | | | | $25.98 |
| Unit Value | 15 minutes | Utilization Criteria | TBD | | | | |

**Service Definition**

This service includes an inter-professional telephone consultation between physicians (practitioner level 1) and/or physician extenders (practitioner level 2) in which the physician/extender with the enrolled DBHDD agency provides or receives specialty expertise opinion and/or treatment advice to/from another treating physician/extender regarding an individual who is enrolled receiving DBHDD services/supports. The physician/extender colleagues collaboratively confer to:
- Request/receive a clinical/medical opinion related to the behavioral health condition; and/or
- Assist the behavioral health/medical provider with diagnosing; and/or

## Behavioral Health Clinical Consultation

| | |
|---|---|
| | • Support/manage the diagnosis and/or management of an individual's presenting condition without the need for the individual's face-to-face contact with the other practitioner; and/or<br>• Consult about alternatives to medication, medication combined with psychosocial treatments and potential results of medication usage; and/or<br>• Identify and plan for additional services; and/or<br>• Coordinate or revise a treatment plan; and/or<br>• Understand the complexities of co-occurring medical conditions on the individual's behavioral health recovery plan (e.g. kidney failure, diabetes, high blood pressure, etc.); and/or<br>• Reviewing the individual's progress for the purposes of collaborative treatment outcomes. |
| Admission Criteria | 1. Individual must meet the Admission Criteria elements as defined in the Psychiatric Treatment definition herein; and<br>2. Individual must be a registered recipient of DBHDD services (in the Georgia Collaborative ASO system); and<br>3. Individual must have a condition or presentation of symptoms that require the advice, opinion, and/or coordination with a supporting physician/extender. |
| Continuing Stay Criteria | 1. Individual continues to meet the admission criteria; or<br>2. Individual exhibits acute disabling conditions of sufficient severity to bring about a significant impairment in day-to-day functioning; or<br>3. Individual continues to present symptoms that are likely to respond to pharmacological interventions; or<br>4. Individual continues to demonstrate symptoms that are likely to respond or are responding to medical interventions; or<br>5. Individual continues to require management of pharmacological treatment in order to maintain symptom remission. |
| Discharge Criteria | Individual no longer meets criteria defined in the Admission Criteria above. |
| Clinical Exclusions | Individuals are inappropriate for medical consultation when the physician/extender needs more information than can be provided telephonically by the health provider. |
| Required Components | 1. A consultation request from a physician/extender seeking the specialty opinion or guidance of a physician/extender while treating an individual with a co-morbid medical condition; and<br>2. This service may be utilized at various points in the individual's course of treatment and recovery; however, each intervention is intended to be a discrete time-limited service that stabilizes the individual and moves him/her to the appropriate course of treatment/level of care. |
| Staffing Requirements | 1. The practitioner must be employed by a DBHDD enrolled Tier I or Tier II agency.<br>2. Practitioners able to provide consultation are those who are recognized as levels 1-2 practitioners in the Service X Practitioner Table A included herein; and<br>3. The practitioner must devote full attention to the individual served and cannot provide services to other individuals during the time identified in the medical record and in the related claim/encounter/submission. |
| Clinical Operations | 1. When the treating physician or other qualified health providers asks for a consultation, the consultant should establish the urgency of the consultation (e.g., emergency, routine, within 24 hours).<br>2. When engaging in a consultation, the practitioner should be prepared to provide:<br>   a. Individual demographics;<br>   b. Date and results of initial or most recent behavioral health evaluation;<br>   c. Diagnosis and/or presenting behavioral health condition(s);<br>   d. Prescribed medications; and<br>   e. Supporting health providers' name and contact information.<br>3. The consultant providing medical guidance and advice should have the following credentials and skillset:<br>   a. Licensed and in good standing with the Georgia Composite Medical Board;<br>   b. Ability to recognize and categorize symptoms;<br>   c. Ability to assess medication effects and drug-to-drug interactions; |

## Behavioral Health Clinical Consultation

|  |  |
|---|---|
| | d. Ability to initiate transfers to medical services; and<br>e. Ability to assist with disposition planning.<br>4. The advice and/or guidance of the consultant should be considered during treatment/recovery and discharge planning, and clearly documented in the individual's medical record. |
| Service Accessibility | 1. Services are available 24-hours/day, 7 days per week, and offered by telephone; and<br>2. Demographic information collected shall include a preliminary determination of hearing status to determine referral to DBHDD Office of Deaf Services. |
| Documentation Requirements | 1. Requests between the practitioners (or their representatives) may be written or verbal. Either type of request shall be documented in the individual's medical record and noted as an administrative note (i.e., no charge).<br>2. In addition to all elements defined in this provider manual for the documentation of an encounter, for this service additional elements required are as follows:<br>a. The DBHDD enrolled agency physician/extender who requests a consultation from an external provider should clearly document:<br>  i. The External Physician/Extender name and specialty practice area; and<br>  ii. A justification of signs, symptoms, or other co-morbid health interactions that reflect why the consultation was requested; and<br>  iii. Advice, guidance, and/or result of the consulting behavioral health provider consultation.<br>b. When a practitioner external to the DBHDD enrolled agency requests a consultation from the DBHDD enrolled agency physician/extender, the practitioner should clearly document the following:<br>  i. The External Physician/Extender name and specialty practice area; and<br>  ii. The requesting reason for the consultation, medical advice and/or guidance provided to the healthcare provider; and<br>  iii. Any collaborative outcome/plan which will impact the overall IRP. |
| Billing & Reporting Requirements | 1. The only practitioners who can bill this service are Physicians and Physician extenders who work for a Tier I or Tier II provider who is approved to deliver Physician Assessment services through the DBHDD.<br>2. The DBHDD enrolled provider must consult with an *external* Physician/Extender (e.g., emergency department, primary care, etc.). In other words, billing for internal consultations are not permitted through this code. |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Practitioner Level 4, In-Clinic | T1016 | U4 | U6 | | | $20.30 |
| Practitioner Level 5, In-Clinic | T1016 | U5 | U6 | | | $15.13 |
| Practitioner Level 4, Out-of-Clinic | T1016 | U4 | U7 | | | $24.36 |
| Practitioner Level 5, Out-of-Clinic | T1016 | U5 | U7 | | | $18.15 |
| Practitioner Level 4, Via interactive audio and video telecommunication systems | T1016 | GT | U4 | | | $20.30 |
| Unit Value | 15 minutes | | | | | |

## Case Management

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Case Management | Practitioner Level 4, In-Clinic, Collateral Contact | T1016 | UK | U4 | U6 | | $20.30 |
| | Practitioner Level 5, In-Clinic, Collateral Contact | T1016 | UK | U5 | U6 | | $15.13 |
| | Practitioner Level 4, Out-of-Clinic, Collateral Contact | T1016 | UK | U4 | U7 | | $24.36 |
| | Practitioner Level 5, Out-of-Clinic, Collateral Contact | T1016 | UK | U5 | U7 | | $18.15 |
| | Practitioner Level 5, Via interactive audio and video telecommunication systems | T1016 | GT | U5 | | | $15.13 |
| Utilization Criteria | 24 units | | | | | | |

# Case Management

| | |
|---|---|
| Service Definition | Case Management services consist of providing environmental support and care coordination considered essential to assist the individual with improving his/her functioning, gaining access to necessary services, and creating an environment that promotes recovery as identified in his/her Individual Recovery Plan (IRP). The focus of interventions includes assisting the individual with: 1) developing natural supports to promote community integration; 2) identifying service needs; 3) referring and linking to services and resources identified through the service planning process; 4) coordinating services identified on the IRP to maximize service integration and minimize service gaps; and 5) ensuring continued adequacy of the IRP to meet his/her ongoing and changing needs.<br><br>The performance outcome expectations for individuals receiving this service include decreased hospitalizations, decreased incarcerations, decreased episodes of homelessness, increased housing stability, increased participation in employment or job-related activities, increased community engagement, and recovery maintenance.<br><br>Case Management Services shall consist of four (4) major components that cover multiple domains that impact one's overall wellness including medical, behavioral, wellness, social, educational, vocational, co-occurring, housing, financial, and other service needs of the individual:<br><br>**Engagement & Needs Identification**<br>The case manager engages the individual in a recovery-based partnership that promotes personal responsibility and provides support, hope, and encouragement. The case manager assists the individual with developing a community-based support network to facilitate community integration and maintain housing stability. Through engagement, the case manager partners with the individual to identify and prioritize housing, service and resource needs to be included in the IRP.<br><br>**Care Coordination**<br>The case manager coordinates care activities and assists the individual as he/she moves between and among services and supports. Care coordination requires information sharing among the individual, his/her Tier 1 or Tier 2 provider, specialty provider(s), residential provider, primary care physician, and other identified supports in order to: 1) ensure that the individual receives a full range of integrated services necessary to support a life in recovery that includes health, home, purpose, and community; 2) ensure that the individual has an adequate and current crisis plan; 3) reduce barriers to accessing services and resources; 4) minimize disruption, fragmentation, and gaps in service; and 5) ensure all parties work collaboratively for the common benefit of the individual.<br><br>**Referral & Linkage**<br>The case manager assists the individual with referral and linkage to services and resources identified on the IRP including housing, social supports, family/natural supports, entitlements (SSI/SSDI, Food Stamps, VA), income, transportation, etc. Referral and linkage activities may include assisting the individual to: 1) locate available resources; 2) make and keep appointments; 3) complete the application process; and 4) make transportation arrangements when needed.<br><br>**Monitoring and Follow-Up**<br>The case manager visits the individual in the community to jointly review progress made toward achievement of IRP goals and to seek input regarding his/her level of satisfaction with treatment and any recommendations for change. The case manager monitors and follows-up with the individual in order to: 1) determine if services are provided in accordance with the IRP; 2) determine if services are adequately and effectively addressing the individual's needs; 3) determine the need for additional or alternative services related to the individual's changing needs or circumstances; and 4) notify the treatment team when monitoring indicates the need for IRP reassessment and update. |
| Admission Criteria | 1. Individual must meet DBHDD eligibility criteria;<br><br>**AND**<br><br>2. Individual has functional impairments that interfere with maintaining their recovery and **needs assistance with one (1) or more of the following areas**:<br>  a.  Navigate and self-manage necessary services;<br>  b.  Maintain personal hygiene; |

## Case Management

c. Meet nutritional needs;
d. Care for personal business affairs;
e. Obtain or maintain medical, legal, and housing services;
f. Recognize and avoid common dangers or hazards to self and possessions;
g. Perform daily living tasks;
h. Obtain or maintain employment at a self-sustaining level or consistently perform homemaker roles (e.g., household meal preparation, washing clothes, budgeting, or childcare tasks and responsibilities);
i. Maintain a safe living situation:

**AND**

3. Individual is engaged in their Recovery Plan but demonstrates difficulty implementing the plan which has led to the exacerbation of problematic symptoms.
Individual **needs assistance with one (1) or more of the following areas** in order to successfully implement their Recovery Plan and maintain their recovery:
a. Taking prescribed medications; or
b. Following a crisis plan; or
c. Maintaining community integration; or
d. Keeping appointments with needed services.

| | |
|---|---|
| **Continuing Stay Criteria** | 1. Individual continues to have a documented need for CM interventions at least twice monthly; and<br>2. Individual continues to meet the admission criteria; or<br>3. Continued difficulty participating in traditional clinic-based services or a community setting at a less intensive level of service/support; or<br>4. Living in substandard housing, homeless, or at imminent risk of becoming homeless due to functional impairments associated with behavioral health issues. |
| **Discharge Criteria** | 1. There has been a planned reduction of units of service delivered and related evidence of the individual sustaining functioning through that reduction plan; and<br>2. Individual has established recovery support networks to assist in maintenance of recovery (such as peer supports, AA, NA, etc.); and<br>3. Individual has demonstrated ownership and engagement with her/his own illness self-management as evidenced by:<br>a. Navigating and self-managing necessary services;<br>b. Maintaining personal hygiene;<br>c. Meeting his/her own nutritional needs;<br>d. Caring for personal business affairs;<br>e. Obtaining or maintaining medical, legal, and housing services;<br>f. Recognizing and avoiding common dangers or hazards to self and possessions;<br>g. Performing daily living tasks;<br>h. Obtaining or maintaining employment at a self-sustaining level or consistently performing homemaker roles (e.g., household meal preparation, washing clothes, budgeting, or childcare tasks and responsibilities); and<br>i. Maintaining a safe living situation. |
| **Service Exclusions** | 1. This service may not duplicate any discharge planning efforts which are part of the expectation for hospitals, Intermediate Care Facilities for Individuals with Intellectual Disabilities (IFC/IID), Institutions for Mental Disease (IMDs), and Psychiatric Residential Treatment Facilities (PRTFs).<br>2. This service is not available to any individual who receives a waiver service via the Department of Community Health. Payment for Intensive Case Management Services under the plan shall not duplicate payments made to public agencies or private entities under other program authorities for this same purpose.<br>3. Individuals with a substance-related disorder are excluded from receiving this service unless there is clearly documented evidence of a psychiatric diagnosis.<br>4. ACT, CST, ICM are service exclusions. Individuals may receive CM and one of these service for a limited period of time to facilitate a smooth transition. |
| **Clinical Exclusions** | Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition co-occurring with the diagnosis of: Intellectual/Developmental Disabilities; and/or Autism; and/or Neurocognitive Disorder; and/or Traumatic Brain Injury. |

## Case Management

**Required Components**

1. Each provider must have policies and procedures related to referral including providing outreach to agencies who may serve the targeted population including but not limited to psychiatric inpatient hospitals, Crisis Stabilization Units, jails, prisons, homeless shelters, etc.
2. For each specific individual, the provider must demonstrate and maintain a time frame from receipt of referral to engagement in services of no more than 5 days.
3. The organization must have policies and procedures for protecting the safety of staff that engage in these community-based service delivery activities.
4. Because of the complex needs of this target population, CM services may only be delivered by a DBHDD designated Tier 1 or Tier 2 Provider.
5. Individuals will be provided assistance with gaining skills and resources necessary to obtain housing of the individual's choice, including completion of the housing need and choice survey (https://dbhddapps.dbhdd.ga.gov/NSH/) upon admission and with the development of a housing goal, which will be minimally updated at each reauthorization.
6. Contact must be made with the individual receiving CM a minimum of two (2) times a month. At least one of the monthly contacts must be face-to-face in non-clinic/community-based setting and the other may be either face-to-face or telephone contact (denoted by the UK modifier) depending on the individual's identified support needs. While the minimum number of contacts is stated above, individual clinical need is always to be met and may require a level of service higher than the established minimum criteria for contact.
7. At least 50% of CM service units must be delivered face-to-face with the identified individual receiving the service and the majority of all face-to-face service units must be delivered in non-clinic settings over the authorization period (these units are specific to single individual records and are not aggregate across an agency/program or multiple payers).
8. The majority of all face-to-face service units must be delivered in non-clinic settings (i.e. any place that is convenient for the individual such as FQHC, place of employment, community space) over the course of the authorization period (these units are specific to single individual consume records and are not aggregate across an agency/program or multiple payers).
9. In the absence of meeting the minimum monthly face-to-face contact **and** if at least two (2) unsuccessful attempts to make face-to-face contact have been tried and documented, the provider may bill for a maximum of one (1) telephone contact in that specified month (denoted by the UK modifier). Billing for collateral contact only may not exceed 30 consecutive days.
10. After four (4) unsuccessful attempts at making face to face contact with an individual, the CM and members of the treatment team will re-evaluate the IRP and utilization of services.
11. In the event that a CM has documented multiple attempts to locate and make contact with an individual and has demonstrated diligent search, after 60 days of unsuccessful attempts the individual may be discharged.
12. Individuals for whom there is a written transition/discharge plan may receive a tapered benefit based upon individualized need as documented in that plan.
13. When the primary focus of CM is on medication maintenance, the following allowances apply:
    a. These individuals are not counted in the off-site service requirement or the individual-to-staff ratio; and
    b. These individuals are not counted in the monthly face-to-face contact requirement; however, a minimum of one (1) face-to-face contact is required every three (3) months; and monthly calls are an allowed billable service.

**Staffing Requirements**

1. Oversight of CM is provided by an independently licensed practitioner.
2. It is recommended that the CM caseload not exceed 50 enrolled individuals.
3. Individuals who receive only medication maintenance are not counted in the staff ratio calculation.
4. A practitioner delivering Case Management should be able to provide skills training when needed by the individual, but the skills training activity must be billed as PSR-I and not Case Management.

**Clinical Operations**

1. CM may include (with the consent of the Adult) coordination with family and significant others and other systems/supports (e.g., work, religious entities, corrections, aging agencies, etc.) when appropriate for treatment and recovery needs.
2. CM providers must have the ability to deliver services in various environments, such as homes, homeless shelters, or street locations. The provider should keep in mind that individuals may prefer to meet staff at a community location other than their homes or other conspicuous locations (e.g. their place of employment), especially if staff drive a vehicle that is clearly marked as a state or agency vehicle, or if staff must identify themselves and their purpose to gain access to the individual in a way that may potentially embarrass the individual or breech the individual's privacy/confidentiality. Staff should be sensitive to and respectful of

## Case Management

3. individuals' privacy/confidentiality rights and preferences in this regard to the greatest extent possible (e.g. if staff must meet with an individual during their work time, if the individual wishes, mutually agree upon a meeting place nearby that is the least conspicuous from the individual's point of view).

3. CM is expected to participate in planning, coordinating, and accessing services and resources when an enrolled individual experience an episode of psychiatric hospitalization, incarceration, and/or homelessness.

4. It is expected that the individual served will receive ongoing physician assessment and treatment as well as other recovery-supporting services. These services may be provided by a Tier 1 or Tier 2 Provider or by an external agency. There shall be documentation during each Authorization Period to demonstrate the team's efforts at consulting and collaborating with the physician and other recovery-supporting services.

5. It is expected that the Case Management practitioner will assist all eligible individuals with the application process to obtain entitlement benefits including SSI/SSDI, Food Stamps, VA, Medicaid, etc. including making appointments, completing applications and related paperwork.

6. The organization must have policies that govern the provision of services in natural settings and can document that the organization respects individuals' rights to privacy and confidentiality when services are provided in these settings.

7. The organization has established procedures/protocols for handling emergency and crisis situations that includes:
   a. Joint development of a crisis plan between the individual, organization, Tier 1 or Tier 2 provider, and other providers where the organization is engaged with the individual to ensure that the plan is complete, current, adequate, and communicated to all appropriate parties; and
   b. An evaluation of the adequacy of the individual's crisis plan and its implementation occurs at periodic intervals including post-crisis events.
      i. While respecting the individual's crisis plan and identified points of first response, the policies should articulate the role of the Tier 1 or Tier 2 provider agency to be the primary responsible provider for providing crisis supports and intervention as clinically necessary.

8. The organization must have an CM Organizational Plan that addresses the following:
   a. Description of the role of a Case Management practitioner during a crisis in partnership with the individual's other service providers either within the agency or with an outside clinical home where the individual receives ongoing physician assessment and treatment, as well as other recovery support services;
   b. Description of the staffing pattern and how staff are deployed to assure that the required staff-to-individual ratios are maintained, including how unplanned staff absences, illnesses, or emergencies are accommodated, case mix, access, etc.;
   c. Description of the hours of operations as related to access and availability to the individuals served;
   d. Description of how the IRP plan constructed, modified and/or adjusted to meet the needs of the individual and to facilitate broad natural and formal support participation; and
   e. Description of how CM agencies engage with other agencies who may serve the target population.

## Service Accessibility

1. There must be documented evidence that service hours of operation include evening, weekend, and holiday hours.

2. "Medication Maintenance Track," individuals who require more than 4 contacts per quarter for two consecutive quarters (as based upon need) are expected to be re-evaluated with the ANSA for enhanced access to CM. The designation of "medication maintenance track" should be lifted and exceptions stated above are no longer allowed.

3. To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:
   • the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or
   • the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.

Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference.

# Case Management

| | |
|---|---|
| Billing & Reporting Requirements | 1. When a billable collateral contact is provided, the UK reporting modifier shall be utilized. A collateral contact is classified as any contact that is not face-to-face with the individual.<br>2. When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |

# Community Transition Planning

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Community Transition Planning | Community Transition Planning (State Hospital) | T2038 | ZH | | | | $20.92 |
| | Community Transition Planning (CSU) | T2038 | ZC | | | | $20.92 |
| | Community Transition Planning (Jail /Prison) | T2038 | ZJ | | | | $20.92 |
| | Community Transition Planning (Other) | T2038 | ZO | | | | $20.92 |

| | |
|---|---|
| Unit Value | 15 minutes |
| Service Definition | Community Transition Planning (CTP) is a service for contracted Tier 1/Tier 2 and ACT providers to address the care, service, and support needs of adults with a mental health and/or substance use disorder to ensure a coordinated plan of transition from a qualifying facility to the community. Each episode of CTP must include contact with the individual and their identified supports with a minimum of one (1) face-to-face or telephonic contact with the individual prior to release from the state hospital/facility. Additional Transition Planning activities include educating the individual and identified supports on service options offered by the chosen primary service agency; participating in state hospital or facility treatment team meetings to develop a transition plan, and making collateral contacts with other agencies and community resources when indicated.<br><br>In partnership between other community service providers and the hospital/facility staff, the community service agency maintains responsibility for carrying out transitional activities either by the individual's chosen primary service coordinator or by the service coordinator's designated Community Transition Liaison. CTP may also be used for Case Management/ICM/AD Support Services staff, ACT/CST team members and CPSs who work with the individual in the community or will work with the individual in the future to maintain or establish contact.<br><br>CTP consists of the following interventions to ensure the person transitions successfully from the facility to their local community:<br>1. Establishing a connection or reconnection with the person through supportive contacts while in the qualifying facility. By engaging with the person, this helps to develop and strengthen a foundation for the therapeutic relationship.<br>2. Educating the person and his/her identified supports about local community resources and service options available to meet their needs upon transition into the community. This allows the person to make self-directed, informed choices on service options that they feel will best meet their needs and increases the likelihood of post-facility engagement.<br>3. Participating in qualifying facility team meetings especially in person centered planning for those in a treatment facility, to share hospital and community information related to estimated length of stay, present problems related to admission, discharge/release criteria, progress toward recovery goals, personal strengths, available supports and assets, medical condition, medication issues, and community treatment needs.<br>4. Linking the adult with community services including visits between the person and the CM/ICM/AD Support Services staff, ACT/CST team members and/or CPSs who will be working with the individual in the community (including visits and telephone contacts between the individual and the community-based providers).<br>5. Conducting any screenings or necessary assessments to engage the individual and refer them to appropriate services. |
| Admission Criteria | Individual who meets DBHDD Eligibility while in one of the following qualifying facilities:<br>1. State Operated Hospital. |

## Community Transition Planning

| | |
|---|---|
| | 2. Crisis Stabilization Unit (CSU).<br>3. Jail/Prison.<br>4. Other (e.g. Residential Detox Facility, Inpatient Substance Use Disorder Treatment, Community Psychiatric Hospital). |
| Continuing Stay Criteria | Same as above. |
| Discharge Criteria | 1. Individual/family requests discharge; or<br>2. Individual no longer meets DBHDD Eligibility; or<br>3. Individual is discharged from a state hospital or qualifying facility |
| Service Exclusions | This service is utilized only when an individual is transitioning from an institutional setting and therefore is not provided concurrent to an ongoing community-based service. |
| Clinical Exclusions | Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a co-occurring Behavioral Health condition: Developmental Disability, Autism, Neurocognitive Disorder, Traumatic Brain Injury. |
| Required Components | Prior to Release from a State Hospital or Qualifying Facility: When an individual is admitted to a State Hospital or Qualifying Facility, a community transition plan in partnership with the facility is required. Evidence of planning shall be recorded, and a copy of the Plan shall be included in both the individual's hospital and community records. |
| Clinical Operations | 1. Because individuals receiving CTP may be in settings in which there are needs for immediate engagement, yet there is restricted access to the setting, the initial IRP for an individual may be more generic (i.e. less individualized) at the onset of treatment/support.<br>  A. The allowance for "generic" content of the IRP shall not extend beyond three (3) months.<br>  B. It is expected that the IRP be individualized and recovery-oriented after the team becomes engaged with the individual and comes to know the individual.<br>2. Community Transition Planning activities shall include:<br>  A. Telephone and Face-to-face contacts with individual and their identified family;<br>  B. Participating in individual's clinical staffing(s) prior to their discharge from the facility;<br>  C. Applications for resources and services prior to discharge from the facility including:<br>    i. Healthcare.<br>    ii. Entitlements (i.e., SSI, SSDI) for which they are eligible.<br>    iii. Self-Help Groups and Peer Supports.<br>    iv. Housing.<br>    v. Employment, Education, Training.<br>    vi. Consumer Support Services.<br>    vii. Obtaining legal documentation/identification(s). |
| Service Accessibility | 1. This service must be available 7 days a week (if the state hospital/qualifying facility discharges or releases 7 days a week).<br>2. This service may be delivered via telemedicine technology or via telephone conferencing. |
| Billing & Reporting Requirements | 1. The modifier on Procedure Code indicates setting from which the individual is transitioning.<br>2. There must be a minimum of one face-to-face or telephone contact with the individual prior to release from hospital or qualifying facility in order to bill for this service. |
| Documentation Requirements | 1. A documented Community Transition Plan for all individuals.<br>2. Documentation of all face-to-face and telephone contacts and a description of progress with Community Transition Plan implementation and outcomes. |

## Crisis Intervention

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Crisis Intervention | Practitioner Level 1, In-Clinic | H2011 | U1 | U6 | | | $58.21 | Practitioner Level 1, Out-of-Clinic | H2011 | U1 | U7 | | | $74.09 |
| | Practitioner Level 2, In-Clinic | H2011 | U2 | U6 | | | $38.97 | Practitioner Level 2, Out-of-Clinic | H2011 | U2 | U7 | | | $46.76 |
| | Practitioner Level 3, In-Clinic | H2011 | U3 | U6 | | | $30.01 | Practitioner Level 3, Out-of-Clinic | H2011 | U3 | U7 | | | $36.68 |
| | Practitioner Level 4, In-Clinic | H2011 | U4 | U6 | | | $20.30 | Practitioner Level 4, Out-of-Clinic | H2011 | U4 | U7 | | | $24.36 |
| | Practitioner Level 5, In-Clinic | H2011 | U5 | U6 | | | $15.13 | Practitioner Level 5, Out-of-Clinic | H2011 | U5 | U7 | | | $18.15 |
| | Practitioner Level 1, Via interactive audio and video telecommunication systems | H2011 | GT | U1 | | | $58.21 | Practitioner Level 4, Via interactive audio and video telecommunication systems | H2011 | GT | U4 | | | $20.30 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | H2011 | GT | U2 | | | $38.97 | Practitioner Level 5, Via interactive audio and video telecommunication systems | H2011 | GT | U5 | | | $15.13 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | H2011 | GT | U3 | | | $30.01 | | | | | | | |
| | Practitioner Level 1, In-Clinic, first 60 minutes (base code) | 90839 | U1 | U6 | | | $232.84 | Practitioner Level 1, Out-of-Clinic, add-on each additional 30 mins. | 90840 | U1 | U7 | | | $116.42 |
| | Practitioner Level 2, In-Clinic, first 60 minutes (base code) | 90839 | U2 | U6 | | | $155.88 | Practitioner Level 2, Out-of-Clinic, add-on each additional 30 mins. | 90840 | U2 | U7 | | | $77.94 |
| | Practitioner Level 3, In-Clinic, first 60 minutes (base code) | 90839 | U3 | U6 | | | $120.04 | Practitioner Level 3, Out-of-Clinic, add-on each additional 30 mins. | 90840 | U3 | U7 | | | $60.02 |
| | Practitioner Level 1, In-Clinic, first 60 minutes (base code) | 90839 | U1 | U6 | | | $296.36 | Practitioner Level 1, Out-of-Clinic, add-on each additional 30 mins. | 90840 | U1 | U7 | | | $148.18 |
| | Practitioner Level 2, In-Clinic, first 60 minutes (base code) | 90839 | U2 | U6 | | | $187.04 | Practitioner Level 2, Out-of-Clinic, add-on each additional 30 mins. | 90840 | U2 | U7 | | | $93.52 |
| | Practitioner Level 3, In-Clinic, first 60 minutes (base code) | 90839 | U3 | U6 | | | $146.72 | Practitioner Level 3, Out-of-Clinic, add-on each additional 30 mins. | 90840 | U3 | U7 | | | $73.36 |
| Psychotherapy for Crisis | Practitioner Level 1, Via interactive audio and video telecommunication systems | 90839 | GT | U1 | | | $232.84 | Practitioner Level 1, Via interactive audio and video telecommunication systems, add-on each additional 30 mins | 90840 | GT | U1 | | | $116.42 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 90839 | GT | U2 | | | $155.88 | Practitioner Level 2, Via interactive audio and video telecommunication systems, add-on each additional 30 mins | 90840 | GT | U2 | | | $77.94 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | 90839 | GT | U3 | | | $120.04 | Practitioner Level 3, Via interactive audio and video telecommunication systems, add-on each additional 30 mins | 90840 | GT | U3 | | | $60.02 |

# Crisis Intervention

| | Crisis Intervention | 15 minutes | | 16 units |
|---|---|---|---|---|
| **Unit Value** | Psychotherapy for Crisis | 1 Encounter | Crisis Intervention: Psychotherapy for Crisis, base code | 2 encounters |
| | | | Psychotherapy for Crisis, add-ons | 4 encounters |
| | | Maximum Daily Units | | |

**Utilization Criteria:** TBD

**Service Definition:**

Crisis Intervention supports the individual who is experiencing an abrupt and substantial change in behavior which is usually associated with a precipitating situation and which is in the direction of severe impairment of functioning or a marked increase in distress. Interventions are designed to prevent out of community placement or hospitalization. Often, a crisis exists at such time as an individual and his/her identified natural resources decide to seek help and/or the individual, identified natural resources, or practitioner identifies the situation as a crisis. Crisis services are time-limited and present-focused to address the immediate crisis and develop appropriate links to alternate services.

The individual's current behavioral health care advanced directive, if existing, should be utilized to manage the crisis. Interventions provided should honor and respect the individual's wishes/choices by following the plan/advanced directive as closely as possible in line with clinical judgment. Plans/advanced directives developed during the Behavioral Health Assessment/IRP process should be reviewed and updated (or developed if the individual is a new consumer) as part of those services to help prevent or manage future crisis situations.

Some examples of interventions that may be used to de-escalate a crisis situation could include: a situational assessment; active listening and empathic responses to help relieve emotional distress; effective verbal and behavioral responses to warning signs of crisis related behavior; assistance to, and involvement/participation of the individual (to the extent he or she is capable) in active problem solving planning and interventions; facilitation of access to a myriad of crisis stabilization and other services deemed necessary to effectively manage the crisis; mobilization of natural support systems; and other crisis interventions as appropriate to the individual and issues to be addressed.

**Admission Criteria:**

1. Treatment at a lower intensity has been attempted or given serious consideration; **and #2 and/or #3 are met:**
2. Individual has a known or suspected mental health diagnosis or Substance Related Disorder; **or**
3. Individual is experiencing severe situational crisis and is at risk of harm to self, others and/or property. Risk ranges from mild to imminent; **and one/both of the following:**
   a. Individual has insufficient or severely limited resources or skills necessary to cope with the immediate crisis; **or**
   b. Individual demonstrates lack of judgment and/or impulse control and/or cognitive/perceptual abilities.

**Continuing Stay Criteria:** This service may be utilized at various points in the individual's course of treatment and recovery; however, each intervention is intended to be a discrete time-limited service that stabilizes the individual and moves him/her to the appropriate level of care.

**Discharge Criteria:**
1. Individual no longer meets continued stay guidelines; and
2. Crisis situation is resolved and an adequate continuing care plan has been established.

**Clinical Exclusions:** Severity of clinical issues precludes provision of services at this level of care.

**Clinical Operations:** In any review of clinical appropriateness of the service, the mix of services offered to the individual is key. Crisis units will be looked at by the Administrative Services Organization in combination with other supporting services. For example, if an individual present in crisis and the crisis is alleviated within an hour but ongoing support continues, it is expected that 4 units of crisis is billed and then some supporting service such as individual counseling will be utilized to support the individual during that interval of service.

**Staffing Requirements:**
1. 90839 and 90840 are only utilized when the content of the service delivered is Crisis Psychotherapy. Therefore, the only practitioners who can do this are those who are recognized as practitioners for Individual Counseling in the Service X Practitioner Table A included herein.

# Crisis Intervention

2. The practitioner who will bill 90839 (and 90840 if time is necessary) must devote full attention to the individual served and cannot provide services to other individuals during the time identified in the medical record and in the related claim/encounter/submission.

## Service Accessibility

1. All crisis service response times for this service must be within 2 hours of the individual or other constituent contact to the provider agency.
2. Services are available 24-hours/day, 7 days/week, and may be offered by telephone and/or face-to-face in most settings (e.g., home, jail, community hospital, clinic etc.).
3. Demographic information collected shall include a preliminary determination of hearing status to determine referral to the Office of Deaf Services.
4. To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:
   - the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or
   - the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.

Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference.

## Additional Medicaid Requirements

The daily maximum within a CSU for Crisis Intervention is 8 units/day.

## Billing & Reporting Requirements

1. Any use of a telephonic intervention must be coded/reported with a U6 modifier as the person providing the telephonic intervention is not expending the additional agency resources in order to be in the community where the person is located during the crisis.
2. Any use beyond 16 units will not be denied but will trigger an immediate retrospective review.
3. Psychotherapy for Crisis (90839, 90840) may be billed if the following criteria are met:
   a. The nature of the crisis intervention is urgent assessment and history of a crisis situation, assessment of mental status, and disposition and is paired with psychotherapy, mobilization of resources to defuse the crisis and restore safety and the provision of psychotherapeutic interventions to minimize trauma; AND
   b. The practitioner meets the definition to provide therapy in the Georgia Practice Acts; AND
   c. The presenting situation is life-threatening and requires immediate attention to an individual who is experiencing high distress.
4. Other payers may limit who can provide 90839 and 90840 and therefore a providing agency must adhere to those third-party payers' policies regarding billing practitioners.
5. The 90839 code is utilized when the time of service ranges between 45-74 minutes and may only be utilized once in a single day. Anything less than 45 minutes can be provided either through an Individual Counseling code or through the H2011 code above (whichever best reflects the content of the intervention).
6. Add-on Time Specificity:
   a. If additional time above the base 74 minutes is provided and the additional time spent is greater than 23 minutes, an additional encounter of 90840 may be billed.
   b. If the additional time spent (above base code) is 45 minutes or greater, a second unit of 90840 may be billed.
   c. If the additional time spent (above base code) is 83 minutes or greater, a third unit of 90840 may be billed.
   d. If the additional time spent (above base code) is 113 minutes or greater, a fourth unit of 90840 may be billed.
7. 90839 and 90840 cannot be submitted by the same practitioner in the same day as H2011 above.
8. 90839 and 90840 cannot be provided/submitted for billing in the same day as 90791, 90792, 90833, or 90836.
9. Appropriate add-on codes must be submitted on the same claim as the paired base code.

## Crisis Intervention

10. When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission.

## Diagnostic Assessment

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Psychiatric Diagnostic Evaluation (no medical service)* | Practitioner Level 2, In-Clinic | 90791 | U2 | U6 | | | $116.90 |
| | Practitioner Level 2, Out-of-Clinic | 90791 | U2 | U7 | | | $140.28 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 90791 | GT | U2 | | | $116.90 |
| Psychiatric Diagnostic Evaluation with medical services | Practitioner Level 1, In-Clinic | 90792 | U1 | U6 | | | $174.63 |
| | Practitioner Level 1, Out-of-Clinic | 90792 | U1 | U7 | | | $222.26 |
| | Practitioner Level 1, Via interactive audio and video telecommunication systems | 90792 | GT | U1 | | | $174.63 |
| | Practitioner Level 3, In-Clinic | 90791 | U3 | U6 | | | $90.03 |
| | Practitioner Level 3, Out-of-Clinic | 90791 | U3 | U7 | | | $110.04 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems* | 90791 | GT | U3 | | | $90.03 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 90792 | GT | U2 | | | $116.90 |
| | Practitioner Level 2, In-Clinic | 90792 | U2 | U6 | | | $116.90 |
| | Practitioner Level 2, Out-of-Clinic | 90792 | U2 | U7 | | | $140.28 |

| Utilization Criteria | | | | | | | |
|---|---|
| Unit Value | 1 encounter | | | | | | TBD |
| Service Definition | Psychiatric diagnostic interview examination includes a history; mental status exam; evaluation and assessment of physiological phenomena (including co-morbidity between behavioral and physical health care issues); psychiatric diagnostic evaluation (including assessing for co-occurring disorders and the development of a differential diagnosis),screening and/or assessment of any withdrawal symptoms for the individual with substance related diagnoses; assessment of the appropriateness of initiating or continuing services; and a disposition. These are completed by face-to-face evaluation of the individual (which may include the use of telemedicine) and may include communication with family and other sources and the ordering and medical interpretation of laboratory or other medical diagnostic studies. |
| Admission Criteria | 1. Individual has a known or suspected mental illness or a substance-related disorder and has recently entered the service system; or<br>2. Individual is in need of annual assessment and re-authorization of service array; or<br>3. Individual has need of an assessment due to a change in clinical/functional status. |
| Continuing Stay Criteria | Individual's situation/functioning has changed in such a way that previous assessments are outdated. |
| Discharge Criteria | 1. An adequate continuing care plan has been established; **and one or more of the following:**<br>a. Individual has withdrawn or been discharged from service; **or**<br>b. Individual no longer demonstrates need for additional assessment. |
| Service Exclusions | Assertive Community Treatment |
| Required Components | 1. When providing diagnostic services to individuals who are deaf, deaf-blind, or hard of hearing, diagnosticians shall demonstrate training, supervision, and/or consultation with a qualified professional as approved by DBHDD Office of Deaf Services. |
| Staffing Requirements | The only U3 practitioners who can provide Diagnostic Assessment are an LCSW, LMFT, or LPC. |

## Diagnostic Assessment

| | |
|---|---|
| Billing and Reporting Requirements | 1. 90791 is used when an initial evaluation is provided by a non-physician.<br>2. 90792 is used when an initial evaluation is provided by a physician, PA, or APRN. This 90792 intervention content would include all general behavioral health assessment as well as medical assessment/physical exam beyond mental status as appropriate.<br>3. If a Medicaid claim for this service denies for a Procedure-to-Procedure edit, a modifier (59) can be added to the claim and resubmitted to the MMIS for payment. |
| Service Accessibility | 1. This service may be provided via telemedicine to any individual who consents to this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. |
| Additional Medicaid Requirements | The daily maximum for Diagnostic Assessment (Psychiatric Diagnostic Interview) for adults is 2 units. Two units should be utilized only if it is necessary in a complex diagnostic case for the principle diagnostician to call in a physician for an assessment of the individual to corroborate or verify the correct diagnosis. |

## Family Outpatient Services: Family Counseling

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Family – BH counseling/therapy (w/o client present) | Practitioner Level 2, In-Clinic | H0004 | HS | U2 | U6 | | $38.97 |
| | Practitioner Level 3, In-Clinic | H0004 | HS | U3 | U6 | | $30.01 |
| | Practitioner Level 4, In-Clinic | H0004 | HS | U4 | U6 | | $20.30 |
| | Practitioner Level 5, In-Clinic | H0004 | HS | U5 | U6 | | $15.13 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | H0004 | GT | HS | U2 | | $38.97 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | H0004 | GT | HS | U3 | | $30.01 |
| Family – BH counseling/therapy (with client present) | Practitioner Level 2, In-Clinic | H0004 | HR | U2 | U6 | | $38.97 |
| | Practitioner Level 3, In-Clinic | H0004 | HR | U3 | U6 | | $30.01 |
| | Practitioner Level 4, In-Clinic | H0004 | HR | U4 | U6 | | $20.30 |
| | Practitioner Level 5, In-Clinic | H0004 | HR | U5 | U6 | | $15.13 |
| | Practitioner Level 4, Via interactive audio and video telecommunication systems | H0004 | GT | HR | U2 | | $38.97 |
| | Practitioner Level 5, Via interactive audio and video telecommunication systems | H0004 | GT | HR | U3 | | $30.01 |
| Family Psycho-therapy w/o the patient present (appropriate license required) | Practitioner Level 2, In-Clinic | 90846 | U2 | U6 | | | $38.97 |
| | Practitioner Level 3, In-Clinic | 90846 | U3 | U6 | | | $30.01 |
| | Practitioner Level 4, In-Clinic | 90846 | U4 | U6 | | | $20.30 |
| | Practitioner Level 5, In-Clinic | 90846 | U5 | U6 | | | $15.13 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 90846 | GT | U2 | | | $38.97 |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Practitioner Level 2, Out-of-Clinic | H0004 | HS | U2 | U7 | | $46.76 |
| Practitioner Level 3, Out-of-Clinic | H0004 | HS | U3 | U7 | | $36.68 |
| Practitioner Level 4, Out-of-Clinic | H0004 | HS | U4 | U7 | | $24.36 |
| Practitioner Level 5, Out-of-Clinic | H0004 | HS | U5 | U7 | | $18.15 |
| Practitioner Level 4, Via interactive audio and video telecommunication systems | H0004 | GT | HS | U4 | | $20.30 |
| Practitioner Level 5, Via interactive audio and video telecommunication systems | H0004 | GT | HS | U5 | | $15.13 |
| Practitioner Level 2, Out-of-Clinic | H0004 | HR | U2 | U7 | | $46.76 |
| Practitioner Level 3, Out-of-Clinic | H0004 | HR | U3 | U7 | | $36.68 |
| Practitioner Level 4, Out-of-Clinic | H0004 | HR | U4 | U7 | | $24.36 |
| Practitioner Level 5, Out-of-Clinic | H0004 | HR | U5 | U7 | | $18.15 |
| Practitioner Level 4, Via interactive audio and video telecommunication systems | H0004 | GT | HR | U4 | | $20.30 |
| Practitioner Level 5, Via interactive audio and video telecommunication systems | H0004 | GT | HR | U5 | | $15.13 |
| Practitioner Level 2, Out-of-Clinic | 90846 | U2 | U7 | | | $46.76 |
| Practitioner Level 3, Out-of-Clinic | 90846 | U3 | U7 | | | $36.68 |
| Practitioner Level 4, Out-of-Clinic | 90846 | U4 | U7 | | | $24.36 |
| Practitioner Level 5, Out-of-Clinic | 90846 | U5 | U7 | | | $18.15 |
| Practitioner Level 4, Via interactive audio and video telecommunication systems | 90846 | GT | U4 | | | $20.30 |

## Family Outpatient Services: Family Counseling

| | Service | Code | Mod | Mod | Unit Value | Service | Code | Mod | Mod | Unit Value |
|---|---|---|---|---|---|---|---|---|---|---|
| Conjoint Family Psycho-therapy w/ the patient presents a portion or the entire session (appropriate license required) | Practitioner Level 3, Via interactive audio and video telecommunication systems | 90846 | GT | U3 | $30.01 | Practitioner Level 3, Via interactive audio and video telecommunication systems | 90846 | GT | U5 | $15.13 |
| | Practitioner Level 2, In-Clinic | 90847 | U2 | U6 | $38.97 | Practitioner Level 2, Out-of-Clinic | 90847 | U2 | U7 | $46.76 |
| | Practitioner Level 3, In-Clinic | 90847 | U3 | U6 | $30.01 | Practitioner Level 3, Out-of-Clinic | 90847 | U3 | U7 | $36.68 |
| | Practitioner Level 4, In-Clinic | 90847 | U4 | U6 | $20.30 | Practitioner Level 4, Out-of-Clinic | 90847 | U4 | U7 | $24.36 |
| | Practitioner Level 5, In-Clinic | 90847 | U5 | U6 | $15.13 | Practitioner Level 5, Out-of-Clinic | 90847 | U5 | U7 | $18.15 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 90847 | GT | U2 | $38.97 | Practitioner Level 4, Via interactive audio and video telecommunication systems | 90847 | GT | U4 | $20.30 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | 90847 | GT | U3 | $30.01 | Practitioner Level 5, Via interactive audio and video telecommunication systems | 90847 | GT | U5 | $15.13 |

| Unit Value | 15 minutes | | TBD |
|---|---|---|---|

**Utilization Criteria**

**Service Definition**

A therapeutic intervention or counseling service shown to be successful with identified family populations, diagnoses and service needs, provided by a qualified clinician or practitioner. Services are directed toward achievement of specific goals defined with/by the individual and targeted to the individual-identified family and specified in the Individualized Recovery Plan. The focus of family counseling is the family or subsystems within the family, e.g. the parental couple. The service is always provided for the benefit of the individual and may or may not include the individual's participation as indicated by the CPT code.

Family counseling provides systematic interactions between the identified individual, staff and the individual's identified family members directed toward the restoration, development, enhancement or maintenance of functioning of the identified individual/family unit. This includes support of the family and specific therapeutic interventions/activities to enhance family roles, relationships, communication and functioning that promote the recovery of the individual. Specific goals/issues to be addressed though these services may include the restoration, development, enhancement or maintenance of:

1. Processing skills;
2. Healthy coping mechanisms;
3. Adaptive behaviors and skills;
4. Interpersonal skills;
5. Family roles and relationships; and
6. The family's understanding of mental illness and substance related disorders, the steps necessary to facilitate recovery, and methods of intervention, interaction and mutual support the family can use to assist their family member.

Best practices such as Multi-Systemic Family Therapy, Multidimensional Family Therapy, Behavioral Family Therapy, Functional Family Therapy or others appropriate for the family and issues to be addressed should be utilized in the provision of this service.

**Admission Criteria**

1. Individual must have a mental illness and/or substance-related disorder diagnosis that is at least destabilizing (markedly interferes with the ability to carry out activities of daily living or places others in danger) or distressing (causes mental anguish or suffering); **and**
2. Individual's level of functioning does not preclude the provision of services in an outpatient milieu; **and**
3. Individual's assessment indicates needs that may be supported by therapeutic intervention shown to be successful with identified family populations and individual's diagnoses.

**Continuing Stay Criteria**

1. Individual continues to meet admission criteria as articulated above; **and**
2. Progress notes document progress relative to goals identified in the Individualized Recovery Plan, but all treatment/support goals have not yet been achieved.

**Discharge Criteria**

1. An adequate continuing care plan has been established; **and one or more of the following:**

# Family Outpatient Services: Family Counseling

|  |  |
|---|---|
|  | 2. Goals of the Individualized Recovery Plan have been substantially met; **or**<br>3. Individual requests discharge and individual is not in imminent danger of harm to self or others; **or**<br>4. Transfer to another service is warranted by change in individual's condition; **or**<br>5. Individual requires more intensive services. |
| Service Exclusions | ACT |
| Clinical Exclusions | 1. Severity of behavioral health impairment precludes provision of services.<br>2. Severity of cognitive impairment precludes provision of services in this level of care.<br>3. There is a lack of social support systems such that a more intensive level of service is needed.<br>4. This service is not intended to supplant other services such as IID/IDD Personal and Family Support or any day services where the individual may more appropriately receive these services with staff in various community settings.<br>5. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition overlaying the diagnosis: Developmental Disability, Autism, Neurocognitive Disorder and Traumatic Brain Injury. |
| Required Components | 1. The treatment/recovery orientation, modality and goals must be specified and agreed upon by the individual.<br>2. Couples counseling is included under this service code if the counseling is directed toward the identified individual and his/her goal attainment as identified in the Individualized Recovery Plan.<br>3. The Individualized Recovery Plan for the individual includes goals and objectives specific to the individual-identified family for whom the service is being provided. |
| Clinical Operations | Models of best practice delivery may include (as clinically appropriate) Multidimensional Family Therapy, Behavioral Family Therapy, Functional Family Therapy, and others as appropriate the family and issues to be addressed. |
| Service Accessibility | 1. Services may not exceed 8 Billable units (combined Family Counseling and Family Therapy) in a single day. If clinical need indicates this level of intensity, other services may need to be considered for authorization.<br>2. To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not the individual's first language. Examples of this include:<br>  • the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or<br>  • the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.<br><br>Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. |
| Documentation Requirements | If there are multiple family members in the Family Counseling session who are enrolled individuals for whom the focus of treatment is related to goals on their IRPs, the following applies:<br>1. Document the family session in the chart of each individual for whom the treatment is related to a specific goal on the individual's IRP.<br>2. Charge the Family Counseling session units to **one** of the individuals.<br>3. Indicate "NC" (No Charge) on the documentation for the other individual(s) in the family session and have the note reflect that the charges for the session are assigned to another family member in the session. |
| Billing & Reporting Requirements | 1. If a Medicaid claim for this service denies for a Procedure-to-Procedure edit, a modifier (59) can be added to the claim and resubmitted to the MMIS for payment.<br>2. When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |

## Family Outpatient Services: Family Training

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Family Skills Training and Development | Practitioner Level 4, In-Clinic, without client present | H2014 | HS | U4 | U6 | | $20.30 | Practitioner Level 4, In-Clinic, with client present | H2014 | HR | U4 | U6 | | $20.30 |
| | Practitioner Level 5, In-Clinic, without client present | H2014 | HS | U5 | U6 | | $15.13 | Practitioner Level 5, In-Clinic, with client present | H2014 | HR | U5 | U6 | | $15.13 |
| | Practitioner Level 4, Out-of-Clinic, without client present | H2014 | HS | U4 | U7 | | $24.36 | Practitioner Level 4, Out-of-Clinic, with client present | H2014 | HR | U4 | U7 | | $24.36 |
| | Practitioner Level 5, Out-of-Clinic, without client present | H2014 | HS | U5 | U7 | | $18.15 | Practitioner Level 5, Out-of-Clinic, with client present | H2014 | HR | U5 | U7 | | $18.15 |
| | Practitioner Level 4, Via interactive audio and video telecommunication systems, without client present | H2014 | GT | HS | U4 | | 20.30 | Practitioner Level 4, Via interactive audio and video telecommunication systems, with client present | H2014 | GT | HR | U4 | | 20.30 |
| | Practitioner Level 5, Via interactive audio and video telecommunication systems, without client present | H2014 | GT | HS | U5 | | 15.13 | Practitioner Level 5, Via interactive audio and video telecommunication systems, with client present | H2014 | GT | HR | U5 | | 15.13 |
| Unit Value | 15 minutes | | | | | | | Utilization Criteria | TBD | | | | | |

**Service Definition**

A therapeutic interaction shown to be successful with identified family populations, diagnoses and service needs. Services are directed toward achievement of specific goals defined by the individual and targeted to the individual-identified family and specified in the Individualized Recovery Plan (note: although interventions may involve the family, the focus or primary beneficiary of intervention must always be the individual). Family training provides systematic interactions between the identified individual, staff and the individual's identified family members directed toward the enhancement or maintenance of functioning of the identified individual/family unit. This may include support of the family, as well as training and specific activities to enhance functioning that promote the recovery of the individual. Specific goals/issues to be addressed though these services may include the restoration, development, enhancement or maintenance of:

1. Illness and medication self-management knowledge and skills (e.g. symptom management, behavioral management, relapse prevention skills, knowledge of medications and side effects, and motivational/skill development in taking medication as prescribed);
2. Problem solving and practicing functional skills;
3. Healthy coping mechanisms;
4. Adaptive behaviors and skills;
5. Interpersonal skills;
6. Daily living skills;
7. Resource access and management skills; **and**
8. The family's understanding of mental illness and substance related disorders, the steps necessary to facilitate recovery, and methods of intervention, interaction and mutual support the family can use to assist their family member.

**Admission Criteria**

1. Individual must have a mental illness and/or substance-related disorder diagnosis that is at least destabilizing (markedly interferes with the ability to carry out activities of daily living or places others in danger) or distressing (causes mental anguish or suffering); **and**
2. Individual's level of functioning does not preclude the provision of services in an outpatient milieu; **and**
3. Individual's assessment indicates needs that may be supported by a therapeutic intervention shown to be successful with identified family populations and diagnoses.

| | |
|---|---|
| Continuing Stay Criteria | 1. Individual continues to meet admission criteria as articulated above; **and**<br>2. Progress notes document progress relative to goals identified in the Individualized Recovery Plan, but all treatment/support goals have not yet been achieved. |
| Discharge Criteria | 1. An adequate continuing care plan has been established; **and one or more of the following:**<br>2. Goals of the Individualized Recovery Plan have been substantially met; **or**<br>3. Individual requests discharge and individual is not in imminent danger of harm to self or others; **or**<br>4. Transfer to another service is warranted by change in individual's condition; **or**<br>5. Individual requires more intensive services. |
| Service Exclusions | ACT |
| Clinical Exclusions | 1. Severity of behavioral health impairment precludes provision of services.<br>2. Severity of cognitive impairment precludes provision of services in this level of care.<br>3. There is a lack of social support systems such that a more intensive level of service is needed.<br>4. There is no outlook for improvement with this particular service.<br>5. This service is not intended to supplant other services such as Personal and Family Support or any day services where the individual may more appropriately receive these services with staff in various community settings.<br>6. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition overlaying the diagnosis: Developmental Disability, Autism, Neurocognitive Disorder and Traumatic Brain Injury. |
| Required Components | 1. The treatment orientation, modality and goals must be specified and agreed upon by the individual.<br>2. The Individualized Recovery Plan for the individual includes goals and objectives specific to the individual-identified family for whom the service is being provided. |
| Service Accessibility | 1. Services may not exceed 8 Billable units (combined Family Counseling and Family Therapy) in a single day. If clinical need indicates this level of intensity, other services may need to be considered for authorization.<br>2. To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:<br>  • the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or<br>  • the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.<br><br>Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should <u>not</u> be driven by the practitioner's/agency's convenience or preference. |
| Documentation Requirements | If there are multiple family members in the Family Training session who are enrolled individuals for whom the focus of treatment in the group is related to goals on their IRPs, the following applies:<br>1. Document the family session in the chart of each individual for whom the treatment/support is related to a specific goal on the individual's IRP.<br>2. Charge the Family Training session units to <u>one</u> of the individuals.<br>3. Indicate "NC" (No Charge) on the documentation for the other individual(s) in the family session and have the note reflect that the charges for the session are assigned to another family member in the session. |
| Billing & Reporting Requirements | When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |

## Group Outpatient Services: Group Counseling

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Group – Behavioral health counseling and therapy | Practitioner Level 2, In-Clinic | H0004 | HQ | U2 | U6 | | $8.50 |
| | Practitioner Level 3, In-Clinic | H0004 | HQ | U3 | U6 | | $6.60 |
| | Practitioner Level 4, In-Clinic | H0004 | HQ | U4 | U6 | | $4.43 |
| | Practitioner Level 5, In-Clinic | H0004 | HQ | U5 | U6 | | $3.30 |
| | Practitioner Level 2, Out-of-Clinic | H0004 | HQ | U2 | U7 | | $10.39 |
| | Practitioner Level 3, Out-of-Clinic | H0004 | HQ | U3 | U7 | | $8.25 |
| | Practitioner Level 4, Out-of-Clinic | H0004 | HQ | U4 | U7 | | $5.41 |
| | Practitioner Level 5, Out-of-Clinic | H0004 | HQ | U5 | U7 | | $4.03 |
| | Practitioner Level 2, In-Clinic, Multi-family group, with client present | H0004 | HQ | HR | U2 | U6 | $8.50 |
| | Practitioner Level 3, In-Clinic, Multi-family group, with client present | H0004 | HQ | HR | U3 | U6 | $6.60 |
| | Practitioner Level 4, In-Clinic, Multi-family group, w/ client present | H0004 | HQ | HR | U4 | U6 | $4.43 |
| | Practitioner Level 5, In-Clinic, Multi-family group, w/ client present | H0004 | HQ | HR | U5 | U6 | $3.30 |
| | Practitioner Level 2, Out-of-Clinic, Multi-family group, w/ client present | H0004 | HQ | HR | U2 | U7 | $10.39 |
| | Practitioner Level 3, Out-of-Clinic, Multi-family group, w/ client present | H0004 | HQ | HR | U3 | U7 | $8.25 |
| | Practitioner Level 4, Out-of-Clinic, Multi-family group, w/ client present | H0004 | HQ | HR | U4 | U7 | $5.41 |
| | Practitioner Level 5, Out-of-Clinic, Multi-family group, w/ client present | H0004 | HQ | HR | U5 | U7 | $4.03 |
| | Practitioner Level 2, In-Clinic, Multi-family group, without client present | H0004 | HQ | HS | U2 | U6 | $8.50 |
| | Practitioner Level 3, In-Clinic, Multi-family group, without client present | H0004 | HQ | HS | U3 | U6 | $6.60 |
| | Practitioner Level 4, In-Clinic, Multi-family group, without client present | H0004 | HQ | HS | U4 | U6 | $4.43 |
| | Practitioner Level 5, In-Clinic, Multi-family group, without client present | H0004 | HQ | HS | U5 | U6 | $3.30 |
| | Practitioner Level 2, Out-of-Clinic, Multi-family group, without client present | H0004 | HQ | HS | U2 | U7 | $10.39 |
| | Practitioner Level 3, Out-of-Clinic, Multi-family group, w/o client | H0004 | HQ | HS | U3 | U7 | $8.25 |
| | Practitioner Level 4, Out-of-Clinic, Multi-family group, w/o client | H0004 | HQ | HS | U4 | U7 | $5.41 |
| | Practitioner Level 5, Out-of-Clinic, Multi-family group, w/o client present | H0004 | HQ | HS | U5 | U7 | $4.03 |
| Group Psycho-therapy other than of a multiple family | Practitioner Level 2, In-Clinic | 90853 | U2 | U6 | | | $8.50 |
| | Practitioner Level 3, In-Clinic | 90853 | U3 | U6 | | | $6.60 |
| | Practitioner Level 4, In-Clinic | 90853 | U4 | U6 | | | $4.43 |
| | Practitioner Level 5, In-Clinic | 90853 | U5 | U6 | | | $3.30 |
| | Practitioner Level 2, Out-of-Clinic | 90853 | U2 | U7 | | | $10.39 |
| | Practitioner Level 3, Out-of-Clinic | 90853 | U3 | U7 | | | $8.25 |
| | Practitioner Level 4, Out-of-Clinic | 90853 | U4 | U7 | | | $5.41 |
| | Practitioner Level 5, Out-of-Clinic | 90853 | U5 | U7 | | | $4.03 |

**group** (appropriate license required)

| | Utilization Criteria | TBD |
|---|---|---|
| **Unit Value** | 15 minutes | |
| **Service Definition** | A therapeutic intervention or counseling service shown to be successful with identified populations, diagnoses and service needs, provided in a group format by a qualified clinician or practitioner. Services are directed toward achievement of specific goals defined by the individual and specified in the Individualized Recovery Plan. Services may address goals/issues such as promoting recovery, and the restoration, development, enhancement or maintenance of:<br>1. Cognitive processing skills;<br>2. Healthy coping mechanisms;<br>3. Adaptive behaviors and skills;<br>4. Interpersonal skills; and<br>5. Identifying and resolving personal, social, intrapersonal and interpersonal concerns. | |
| **Admission Criteria** | 1. Individual must have a mental illness/substance-related disorder diagnosis that is at least destabilizing (markedly interferes with the ability to carry out activities of daily living or places others in danger) or distressing (causes mental anguish or suffering); **and**<br>2. The individual's level of functioning does not preclude the provision of services in an outpatient milieu; **and**<br>3. The individual's recovery goal/s which are to be addressed by this service must be conducive to response by a group milieu. | |
| **Continuing Stay Criteria** | 1. Individual continues to meet admission criteria; **and**<br>2. Individual demonstrates documented progress relative to goals identified in the Individualized Recovery Plan, but treatment goals have not yet been achieved. | |
| **Discharge Criteria** | 1. An adequate continuing care plan has been established; **and one or more of the following:**<br>2. Goals of the Individualized Recovery Plan have been substantially met; **or**<br>3. Individual requests discharge and individual is not in imminent danger of harm to self or others; **or**<br>4. Transfer to another service/level of care is warranted by change in individual's condition; **or**<br>5. Individual requires more intensive services. | |
| **Service Exclusions** | See Required Components, items 2 and 3 below. | |
| **Clinical Exclusions** | 1. Severity of behavioral health impairment precludes provision of services.<br>2. Severity of cognitive impairment precludes provision of services in this level of care.<br>3. There is a lack of social support systems such that a more intensive level of service is needed.<br>4. This service is not intended to supplant other services such as I/DD Waiver Personal and Family Support Services or any day services where the individual may more appropriately receive these services with staff in various community settings.<br>5. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition overlaying the diagnosis: Developmental Disability, Autism, Neurocognitive Disorder and Traumatic Brain Injury. | |
| **Required Components** | 1. The recovery orientation, modality and goals must be specified and agreed upon by the individual.<br>2. Group outpatient services should very rarely be offered in addition to day services such as Psychosocial Rehabilitation. Any exceptions must be clinically justified in the record and may be subject to scrutiny by the Administrative Services organization. Exceptions in offering group outpatient services external to day services include such sensitive and targeted clinical issue groups as incest survivor groups, perpetrator groups, and sexual abuse survivor groups. When an exception is clinically justified, services must not duplicate day services activities.<br>3. When billed concurrently with ACT services, group counseling must be curriculum-based (See ACT Service Guideline for requirements). | |
| **Staffing Requirements** | Maximum face-to-face ratio cannot be more than 10 individuals to 1 direct service staff based on average group attendance. | |

| | |
|---|---|
| Clinical Operations | 1. The membership of a multiple family group (H0004 HQ) consists of multiple family units such as a group of two or more parent(s) from different families either with (HR) or without (HS) participation of their child/children.<br>2. Practitioners and supervisors of those providing this service are expected to maintain knowledge and skills regarding group practice such as selecting appropriate participants for a particular group, working with the group to establish necessary group norms and goals, and understanding and managing group dynamics and processes. |
| Billing & Reporting Requirements | 1. If a Medicaid claim for this service denies for a Procedure-to-Procedure edit, a modifier (59) can be added to the claim and resubmitted to the MMIS for payment. |
| Additional Medicaid Requirements | The daily maximum within a CSU for combined Group Training/Counseling is 4 units/day. |

## Group Outpatient Services: Group Training

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Group Skills Training & Development | Practitioner Level 4, In-Clinic | H2014 | HQ | U4 | U6 | | $4.43 |
| | Practitioner Level 5, In-Clinic | H2014 | HQ | U5 | U6 | | $3.30 |
| | Practitioner Level 4, Out-of-Clinic | H2014 | HQ | U4 | U7 | | $5.41 |
| | Practitioner Level 5, Out-of-Clinic | H2014 | HQ | U5 | U7 | | $4.03 |
| | Practitioner Level 4, In-Clinic, with client present | H2014 | HQ | HR | U4 | U6 | $4.43 |
| | Practitioner Level 5, In-Clinic, with client present | H2014 | HQ | HR | U5 | U6 | $3.30 |
| | Practitioner Level 4, Out-of-Clinic, with client present | H2014 | HQ | HR | U4 | U7 | $5.41 |
| | Practitioner Level 5, Out-of-Clinic, with client present | H2014 | HQ | HR | U5 | U7 | $4.03 |
| | Practitioner Level 4, In-Clinic, without client present | H2014 | HQ | HS | U4 | U6 | $4.43 |
| | Practitioner Level 5, In-Clinic, without client present | H2014 | HQ | HS | U5 | U6 | $3.30 |
| | Practitioner Level 4, Out-of-Clinic, without client present | H2014 | HQ | HS | U4 | U7 | $5.41 |
| | Practitioner Level 5, Out-of-Clinic, without client present | H2014 | HQ | HS | U5 | U7 | $4.03 |
| Unit Value | 15 minutes | Maximum Daily Units | 20 units | | | | |

**Service Definition**

A therapeutic interaction shown to be successful with identified populations, diagnoses and service needs. Services are directed toward achievement of specific goals defined by the individual and specified in the Individualized Resiliency Plan. Services may address goals/issues such as promoting recovery, and the restoration, development, enhancement or maintenance of:

1. Illness and medication self-management knowledge and skills (e.g., symptom management, behavioral management, relapse prevention skills, knowledge of medications and side effects, and motivational/skill development in taking medication as prescribed);
2. Problem solving skills;
3. Healthy coping mechanisms;
4. Adaptive skills;
5. Interpersonal skills;
6. Daily living skills;
7. Resource management skills;
8. Knowledge regarding mental illness, substance related disorders and other relevant topics that assist in meeting the youth's and family's needs; **and**
9. Skills necessary to access and build community resources and natural support systems.

## Group Outpatient Services: Group Training

| | |
|---|---|
| Admission Criteria | 1. Individuals must have a mental illness/substance-related disorder diagnosis that is at least destabilizing (markedly interferes with the ability to carry out activities of daily living or places others in danger) or distressing (causes mental anguish or suffering); **and** <br> 2. The individual's level of functioning does not preclude the provision of services in an outpatient milieu; **and** <br> 3. The individual's resiliency goal/s that are to be addressed by this service must be conducive to response by a group milieu. |
| Continuing Stay Criteria | 1. Individual continues to meet admission criteria; **and** <br> 2. Individual demonstrates documented progress relative to goals identified in the Individualized Recovery Plan, but recovery goals have not yet been achieved. |
| Discharge Criteria | An adequate continuing care plan has been established; **and one or more of the following:** <br> 1. Goals of the Individualized Recovery Plan have been substantially met; **or** <br> 2. Individual requests discharge and the individual is not in imminent danger of harm to self or others; **or** <br> 3. Transfer to another service/level of care is warranted by change in individual's condition; **or** <br> 4. Individual requires more intensive services. |
| Service Exclusions | See also Required Components, item 2. below. |
| Clinical Exclusions | 1. Severity of behavioral health issue precludes provision of services. <br> 2. Severity of cognitive impairment precludes provision of services in this level of care. <br> 3. There is a lack of social support systems such that a more intensive level of service is needed. <br> 4. This service is not intended to supplant other services such as IID/IDD Personal and Family Support or any day services where the individual may more appropriately receive these services with staff in various community settings. <br> 5. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition overlaying the diagnosis: Developmental Disability, Autism, Neurocognitive Disorder, Traumatic Brain Injury. |
| Required Components | 1. The functional goals addressed through this service must be specified and agreed upon by the individual. <br> 2. Group outpatient services should very rarely be offered in addition to day services such as Psychosocial Rehabilitation. Any exceptions must be clinically justified in the record and may be subject to scrutiny by the Administrative Services organization. Exceptions in offering group outpatient services external to day services include such sensitive and targeted clinical issue groups as incest survivor groups, perpetrator groups, and sexual abuse survivor groups. When an exception is clinically justified, services must not duplicate day services activities. |
| Staffing Requirements | Maximum face-to-face ratio cannot be more than 10 individuals to 1 direct service staff based on average group attendance. |
| Clinical Operations | 1. Practitioners providing this service are expected to maintain knowledge and skills regarding group practice such as selecting appropriate participants for a particular group, working with the group to establish necessary group norms and goals, and understanding and managing group dynamics and processes. <br> 2. Out-of-clinic group skills training is allowable and clinically valuable for some individuals; therefore, this option should be explored to the benefit of the individual. In this event, staff must be able to assess and address the individual needs and progress of each individual consistently throughout the intervention/activity (e.g. in an example of teaching 2-3 individuals to access public transportation in the community, group training may be given to help each individual individually to understand the bus schedule in a way that makes sense to them, to address questions/concerns each may have about how to use the bus, perhaps to spend time riding the bus with the individuals and assisting each to understand and become comfortable with riding the bus in accordance with *individual* goals, etc.). |
| Additional Medicaid Requirements | The daily maximum within a CSU for combined Group Training/Counseling is 4 units/day. |

## Individual Counseling

### In-Clinic / Telehealth panel

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Individual Psycho-therapy, insight oriented, behavior-modifying and/or supportive face-to-face w/ patient and/or family member | Practitioner Level 2, In-Clinic | 90832 | U2 | U6 | | | $64.95 |
| | Practitioner Level 3, In-Clinic | 90832 | U3 | U6 | | | $50.02 |
| | Practitioner Level 4, In-Clinic | 90832 | U4 | U6 | | | $33.83 |
| | Practitioner Level 5, In-Clinic | 90832 | U5 | U6 | | | $25.21 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 90832 | GT | U2 | | | $64.95 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | 90832 | GT | U3 | | | $50.02 |
| | Practitioner Level 2, In-Clinic | 90834 | U2 | U6 | | | $116.90 |
| | Practitioner Level 3, In-Clinic | 90834 | U3 | U6 | | | $90.03 |
| | Practitioner Level 4, In-Clinic | 90834 | U4 | U6 | | | $60.89 |
| | Practitioner Level 5, In-Clinic | 90834 | U5 | U6 | | | $45.38 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 90834 | GT | U2 | | | $116.90 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | 90834 | GT | U3 | | | $90.03 |
| | Practitioner Level 2, In-Clinic | 90837 | U2 | U6 | | | $155.87 |
| | Practitioner Level 3, In-Clinic | 90837 | U3 | U6 | | | $120.04 |
| | Practitioner Level 4, In-Clinic | 90837 | U4 | U6 | | | $81.18 |
| | Practitioner Level 5, In-Clinic | 90837 | U5 | U6 | | | $60.51 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 90837 | GT | U2 | | | $155.87 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | 90837 | GT | U3 | | | $120.04 |
| Psycho-therapy Add-on with patient and/or family in conjunction with E&M | Practitioner Level 1, In-Clinic | 90833 | U1 | U6 | | | $97.02 |
| | Practitioner Level 2, In-Clinic | 90833 | U2 | U6 | | | $64.95 |
| | Practitioner Level 1 | 90833 | GT | U1 | | | $97.02 |
| | Practitioner Level 1, In-Clinic | 90836 | U1 | U6 | | | $174.63 |
| | Practitioner Level 2, In-Clinic | 90836 | U2 | U6 | | | $116.90 |
| | Practitioner Level 1 | 90836 | GT | U1 | | | $174.63 |

### Out-of-Clinic / Telehealth panel

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Practitioner Level 2, Out-of-Clinic | 90832 | U2 | U7 | | | $77.93 |
| Practitioner Level 3, Out-of-Clinic | 90832 | U3 | U7 | | | $61.13 |
| Practitioner Level 4, Out-of-Clinic | 90832 | U4 | U7 | | | $40.59 |
| Practitioner Level 5, Out-of-Clinic | 90832 | U5 | U7 | | | $30.25 |
| Practitioner Level 4, Via interactive audio and video telecommunication systems | 90832 | GT | U4 | | | $33.83 |
| Practitioner Level 5, Via interactive audio and video telecommunication systems | 90832 | GT | U5 | | | $25.21 |
| Practitioner Level 2, Out-of-Clinic | 90834 | U2 | U7 | | | $140.28 |
| Practitioner Level 3, Out-of-Clinic | 90834 | U3 | U7 | | | $110.04 |
| Practitioner Level 4, Out-of-Clinic | 90834 | U4 | U7 | | | $73.07 |
| Practitioner Level 5, Out-of-Clinic | 90834 | U5 | U7 | | | $54.46 |
| Practitioner Level 4, Via interactive audio and video telecommunication systems | 90834 | GT | U4 | | | $60.89 |
| Practitioner Level 5, Via interactive audio and video telecommunication systems | 90834 | GT | U5 | | | $45.38 |
| Practitioner Level 2, Out-of-Clinic | 90837 | U2 | U7 | | | $187.04 |
| Practitioner Level 3, Out-of-Clinic | 90837 | U3 | U7 | | | $146.71 |
| Practitioner Level 4, Out-of-Clinic | 90837 | U4 | U7 | | | $97.42 |
| Practitioner Level 5, Out-of-Clinic | 90837 | U5 | U7 | | | $72.61 |
| Practitioner Level 4, Via interactive audio and video telecommunication systems | 90837 | GT | U4 | | | $81.18 |
| Practitioner Level 5, Via interactive audio and video telecommunication systems | 90837 | GT | U5 | | | $60.51 |
| Practitioner Level 1, Out-of-Clinic | 90833 | U1 | U7 | | | $123.48 |
| Practitioner Level 2, Out-of-Clinic | 90833 | U2 | U7 | | | $77.93 |
| Practitioner Level 2 | 90833 | GT | U2 | | | $64.95 |
| Practitioner Level 1, Out-of-Clinic | 90836 | U1 | U7 | | | $226.26 |
| Practitioner Level 2, Out-of-Clinic | 90836 | U2 | U7 | | | $140.28 |
| Practitioner Level 2 | 90836 | GT | U2 | | | $116.90 |

## Individual Counseling

| Unit Value | 1 encounter (Note: Time-in/Time-out is required in the documentation as it justifies which code above is billed) | Utilization Criteria | TBD |
|---|---|---|---|
| Service Definition | A therapeutic intervention or counseling service shown to be successful with identified populations, diagnoses and service needs, provided by a qualified clinician. Techniques employed involve the principles, methods and procedures of counseling that assist the person in identifying and resolving personal, social, vocational, intrapersonal and interpersonal concerns. Individual counseling may include face-to-face in or out-of-clinic time with family members as long as the individual is present for part of the session and the focus is on the individual. Services are directed toward achievement of specific goals defined by the individual and specified in the Individualized Recovery Plan. These services address goals/issues such as promoting recovery, and the restoration, development, enhancement or maintenance of:<br>Illness and medication self-management knowledge and skills (e.g., symptom management, behavioral management, relapse prevention skills, knowledge of medications and side effects, and motivational/skill development in taking medication as prescribed);<br>Problem solving and cognitive skills;<br>Healthy coping mechanisms;<br>Adaptive behaviors and skills;<br>Interpersonal skills; **and**<br>Knowledge regarding mental illness, substance related disorders and other relevant topics that assist in meeting the individual's or the support system's needs.<br>Best/evidence-based practice modalities may include (as clinically appropriate): Motivational Interviewing/Enhancement, Cognitive Behavioral Therapy, Behavioral Modification, Behavioral Management, Rational Behavioral Therapy, Dialectical Behavioral Therapy, and others as appropriate to the individual and clinical issues to be addressed. | | |
| Admission Criteria | Individual must have a mental illness/substance-related disorder diagnosis that is at least destabilizing (markedly interferes with the ability to carry out activities of daily living or places others in danger) or distressing (causes mental anguish or suffering); **and**<br>The individual's level of functioning does not preclude the provision of services in an outpatient milieu. | | |
| Continuing Stay Criteria | Individual continues to meet admission criteria; **and.**<br>Individual demonstrates documented progress relative to goals identified in the Individualized Recovery Plan, but recovery goals have not yet been achieved. | | |
| Discharge Criteria | Adequate continuing care plan has been established; **and one or more of the following:**<br>Goals of the Individualized Recovery Plan have been substantially met; **or**<br>Individual requests discharge and individual is not in imminent danger of harm to self or others; **or**<br>Transfer to another service is warranted by change in individual's condition; **or**<br>Individual requires a service approach that supports less or more intensive need. | | |
| Service Exclusions | ACT and Crisis Stabilization Unit services. | | |
| Clinical Exclusions | Severity of behavioral health impairment precludes provision of services.<br>Severity of cognitive impairment precludes provision of services in this level of care.<br>There is a lack of social support systems such that a more intensive level of service is needed.<br>Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition overlaying the diagnosis: Developmental Disability, Autism, Neurocognitive Disorder and Traumatic Brain Injury. | | |
| Required Components | The recovery orientation, modality and goals must be specified and agreed upon by the individual. | | |
| Clinical Operations | Practitioners and supervisors of those providing this service are expected to maintain knowledge and skills regarding current research trends in best/evidence-based counseling practices.<br>90833 and 90836 are utilized with E/M CPT Codes as an add-on for psychotherapy and may not be billed individually. | | |

## Individual Counseling

| Service Accessibility | 1. To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:<br>  • the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or<br>  • the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.<br><br>Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference.<br><br>2. Additionally, telemedicine may be utilized for 90833 and 90836 when the service is combined with CPT E&M codes and delivered by a medical practitioner (Level U1 and U2). |
| --- | --- |
| Billing and Reporting Requirements | 1. When 90833 or 90836 are provided with an E/M code, these are submitted together to encounter/claims system.<br>2. 90833 is used for any intervention which is 16-37 minutes in length.<br>3. 90836 is used for any intervention which is 38-52 minutes in length.<br>4. 90837 is used for any intervention which is greater than 53 minutes.<br>5. If a Medicaid claim for this service denies for a Procedure-to-Procedure edit, a modifier (59) can be added to the claim and resubmitted to the MMIS for payment with two exceptions: If the billable base code is either 90833 or 90836 and is denied for Procedure-to-Procedure edit, then a (25) modifier should be added to the claim resubmission.<br>6. Appropriate add-on codes must be submitted on the same claim as the paired base code. |
| Documentation Requirements | When 90833 or 90836 are provided with an E/M code, they are recorded on the same intervention note but the distinct services must be separately identifiable.<br>When 90833 or 90836 are provided with an E/M code, the psychotherapy intervention must include time in/time out in order to justify which code is being utilized.<br>Time associated with activities used to meet criteria for the E/M service is not included in the time used for reporting the psychotherapy service. |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
| --- | --- | --- | --- | --- | --- | --- |
| Interactive complexity (List separately in addition to the code for primary procedure) | 90785 | | | | | $0.00 |

## Interactive Complexity

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Interactive Complexity | Interactive complexity (List separately in addition to the code for primary procedure) | 90785 | TG | | | | $0.00 |

| Unit Value | 1 Encounter |
| --- | --- |
| Service Definition | Interactive Complexity is not a direct service but functions as a modifier to Psychiatric Treatment, Diagnostic Assessment, Individual Therapy, and Group Counseling.<br>This modifier is used when:<br>1. Communication with the individual participant/s is complicated perhaps related to, e.g., high anxiety, high reactivity, repeated questions, or disagreement and therefore delivery of care is challenging.<br>2. Caregiver emotions/behaviors complicate the implementation of the IRP.<br>3. Evidence/disclosure of a sentinel event and mandated report to a third party (e.g., abuse or neglect with report to state agency) with initiation of discussion of the sentinel event and/or report with the individual and supporters. |

| | |
|---|---|
| | 4. Use of play equipment, physical devices, interpreter or translator to overcome significant language barriers (when individual served is not fluent in same language as practitioner, or when the individual has not developed or has lost expressive/receptive communication skills necessary for interactive participation in the intervention). |
| Admission Criteria | |
| Continuing Stay Criteria | |
| Discharge Criteria | These elements are defined in the specific companion service to which this modifier is anchored in reporting/claims submission. |
| Clinical Exclusions | |
| Documentation Requirements | 1. When this code is submitted, there must be:<br>  a. Record of base service delivery code/s AND the Interactive Complexity code on the single note; and<br>  b. Evidence within the multi-code service note which indicates the specific category of complexity (from the list of items 1-4 in the definition above) utilized during the intervention.<br>2. The interactive complexity component relates only to the increased work intensity of the psychotherapy service, but *does not change* the time for the psychotherapy service. |
| Reporting and Billing Requirements | 1. This service may only be reported/billed in conjunction with one of the following codes: 90791, 90792, 90832, 90834, 90837, 90853, and with the following codes only when paired with 90833 or 90836: 99201, 99211, 99202, 99212, 99203, 99213, 99204, 99214, 99205, 99215.<br>2. This Service Code paired with the TG modifier is only used when the complexity type from the Service Definition above is categorized under Item 4 **AND** an interpreter or translator is used during the intervention. So, if play equipment is the only complex intervention utilized, then TG is not utilized.<br>3. Interactive Complexity is utilized as a modifier and therefore is not required in an order nor in an Individualized Recovery/Resiliency Plan. |

## Medication Administration

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Comprehensive Medication Services | Practitioner Level 2, In-Clinic | H2010 | U2 | U6 | | | $33.40 |
| | Practitioner Level 3, In-Clinic | H2010 | U3 | U6 | | | $26.39 |
| | Practitioner Level 4, In-Clinic | H2010 | U4 | U6 | | | $17.40 |
| | Practitioner Level 5, In-Clinic | H2010 | U5 | U6 | | | $12.97 |
| Therapeutic, prophylactic or diagnostic injection | Practitioner Level 2, In-Clinic | 96372 | U2 | U6 | | | $33.40 |
| | Practitioner Level 3, In-Clinic | 96372 | U3 | U6 | | | $25.39 |
| | Practitioner Level 4, In-Clinic | 96372 | U4 | U6 | | | $17.40 |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Practitioner Level 2, Out-of-Clinic | H2010 | U2 | U7 | | | $42.51 |
| Practitioner Level 3, Out-of-Clinic | H2010 | U3 | U7 | | | $33.01 |
| Practitioner Level 4, Out-of-Clinic | H2010 | U4 | U7 | | | $22.14 |
| Practitioner Level 2, Out-of-Clinic | 96372 | U2 | U7 | | | $42.51 |
| Practitioner Level 3, Out-of-Clinic | 96372 | U3 | U7 | | | $33.01 |
| Practitioner Level 4, Out-of-Clinic | 96372 | U4 | U7 | | | $22.14 |

| | |
|---|---|
| Alcohol, and/or drug services, methadone administration and/or service (provision of the drug by a licensed program) | |
| Unit Value | 1 encounter |
| Utilization Criteria | For individuals who need opioid maintenance, the Opioid Maintenance service should be requested |
| | 1 encounter |
| Service Definition | As reimbursed through this service, medication administration includes the act of introducing a drug (any chemical substance that, when absorbed into the body of a living organism, alters normal bodily function) into the body of another person by any number of routes including, but not limited to the following: oral, nasal, inhalant, intramuscular injection, intravenous, topical, suppository or intraocular. Medication administration requires a written service order for Medication Administration and a |

written order for the medication and the administration of the medication that complies with guidelines in Part II, Section 1, Subsection 6—Medication of the Provider Manual. The order for and administration of medication must be completed by members of the medical staff pursuant to the Medical Practice Act of 2009, Subsection 43-34-23 Delegation of Authority to Nurse and Physician Assistant and must be administered by licensed or credentialed* medical personnel under the supervision of a physician or registered nurse in accordance with O.C.G.A.

The service must include:
1. An assessment by the licensed/credentialed medical personnel administering the medication of the individual's physical/psychological/behavioral status in order to make recommendations regarding whether to continue medication and/or its means of administration, and whether to refer the individual to the physician for medication review.
2. Education to the individual, by appropriate licensed medical personnel, on the proper administration and monitoring of prescribed medication in accordance with the individual's recovery plan.

| | |
|---|---|
| Admission Criteria | 1. Individual presents symptoms that are likely to respond to pharmacological interventions; and<br>2. Individual has been prescribed medications as a part of the treatment array; and<br>3. Individual/family/responsible caregiver is unable to self-administer/administer prescribed medication because:<br>  a. Although the individual is willing to take the prescribed medication, it is an injectable form and must be administered by licensed medical personnel; **or**<br>  b. Although individual is willing to take the prescribed medication, it is a Class A controlled substance which must be stored and dispensed by medical staff in accordance with state law; **or**<br>  c. Administration by licensed/credentialed medical personnel is necessary because an assessment of the individual's physical, psychological and behavioral status is required in order to make a determination regarding whether to continue the medication and/or its means of administration and/or whether to refer the individual to the physician for a medication review.<br>  d. Due to the family/caregiver's lack of capacity there is no responsible party to manage/supervise self-administration of medication (refer individual /family for CSI and/or Family or Group Training in order to teach these skills). |
| Continuing Stay Criteria | Individual continues to meet admission criteria. |
| Discharge Criteria | 1. Individual no longer needs medication; or<br>2. Individual is able to self-administer medication; **and**<br>3. Adequate continuing care plan has been established. |
| Service Exclusions | 1. Does not include medication given as part of an Ambulatory Detoxification protocol. Medication administered as part of this protocol is billed as Ambulatory Detoxification.<br>2. Must not be billed in the same day as Nursing Assessment.<br>3. Must not be billed while enrolled in ACT except if this Medication Administration service is utilized only for the administration of methadone (for Medicaid recipients).<br>4. May not be billed in conjunction with Intensive Day Treatment (Partial Hospitalization). |
| Clinical Exclusions | This service does **not** cover supervision of self-administration of medications. Self-administration of medications can be done by anyone physically and mentally capable of taking or administering medications to himself/herself. Youth and adults with mental health issues, or developmental disabilities are very often capable of self- administration of medications even if supervision by others is needed in order to adequately or safely manage self-administration of medication and other activities of daily living. |
| Required Components | 1. There must be a written service order for Medication Administration and a written order for the medication and the administration of the medication that complies with guidelines in Part II, Section 1, Subsection 6 - Medication of the Provider Manual. The order for and administration of the medication must be completed by members of the medical staff pursuant to the Medical Practice Act of 2009, Subsection 43-34-23 Delegation of Authority to Nurse and Physician Assistant. The order must be in the individual's chart. Telephone/verbal orders are acceptable provided they are signed by an appropriate member of the medical staff in accordance with DBHDD requirements. |

2. Documentation must support that the individual is being trained in the risks and benefits of the medications being administered and that symptoms are being monitored by the staff member administering the medication.
3. Documentation must support the medical necessity of administration by licensed/credentialed medical personnel rather than by the individual, family or caregiver.
4. Documentation must support that the individual is being trained in the principle of self-administration of medication or that the individual is physically or mentally unable to self-administer. This documentation will be subject to scrutiny by the Administrative Services Organization in reauthorizing services in this category.
5. This service does **not** include the supervision of self-administration of medication.

| Staffing Requirements | Qualified Medication Aides working in a Community Living Arrangement (CLA) may administer medication only in a CLA. |
|---|---|
| Clinical Operations | 1. Medication administration may not be billed for the provision of single or multiple doses of medication that an individual has the ability to self-administer, either independently or with supervision by a caregiver, either in a clinic or a community setting. In a group home/CCI setting, for example, medications may be managed by the house parents or residential care staff and kept locked up for safety reasons. Staff may hand out medication to the residents but this does not constitute administration of medication for the purposes of this definition and, like other watchful oversight and monitoring functions, are not reimbursable treatment services.<br>2. If individual/family requires training in skills needed in order to learn to manage his/her own medications and their safe self-administration and/or supervision of self-administration, this skills training service can be provided via the PSR-I, AD Support Services, or Family/Group Training services in accordance with the person's individualized recovery/resiliency plan. |
| Billing & Reporting Requirements | If a Medicaid claim for this service denies for a Procedure-to-Procedure edit, a modifier (59) can be added to the claim and resubmitted to the MMIS for payment. |
| Additional Medicaid Requirements | As in all other settings, the daily maximum within a CSU for Medication Administration is 1 unit/day. |

## Nursing Assessment and Health Services

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Nursing Assessment/ Evaluation | Practitioner Level 2, In-Clinic | T1001 | U2 | U6 | | | $38.97 |
| | Practitioner Level 3, In-Clinic | T1001 | U3 | U6 | | | $30.01 |
| | Practitioner Level 4, In-Clinic | T1001 | U4 | U6 | | | $20.30 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | T1001 | GT | U2 | | | $38.97 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | T1001 | GT | U3 | | | $30.01 |
| RN Services, up to 15 minutes | Practitioner Level 2, In-Clinic | T1002 | U2 | U6 | | | $38.97 |
| | Practitioner Level 3, In-Clinic | T1002 | U3 | U6 | | | $30.01 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | T1002 | GT | U2 | | | $38.97 |
| | Practitioner Level 4, In-Clinic | T1003 | U4 | U6 | | | $20.30 |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Practitioner Level 2, Out-of-Clinic | T1001 | U2 | U7 | | | $46.76 |
| Practitioner Level 3, Out-of-Clinic | T1001 | U3 | U7 | | | $36.68 |
| Practitioner Level 4, Out-of-Clinic | T1001 | U4 | U7 | | | $24.36 |
| Practitioner Level 4, Via interactive audio and video telecommunication systems | T1001 | GT | U4 | | | $20.30 |
| Practitioner Level 2, Out-of-Clinic | T1002 | U2 | U7 | | | $46.76 |
| Practitioner Level 3, Out-of-Clinic | T1002 | U3 | U7 | | | $36.68 |
| Practitioner Level 3, Via interactive audio and video telecommunication systems | T1002 | GT | U3 | | | $30.01 |
| Practitioner Level 4, Out-of-Clinic | T1003 | U4 | U7 | | | $24.36 |

## Nursing Assessment and Health Services

| LPN Services, up to 15 minutes | Practitioner Level 4, Via interactive audio and video telecommunication systems | T1003 | GT | U4 | $20.30 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Health Behavior Assessment or Re-assessment (e.g., health-focused clinical interview, behavioral observations, clinical decision making) | Practitioner Level 2, In-Clinic | 96156 | U2 | U6 | $38.97 | Practitioner Level 2, Out-of-Clinic | 96156 | U2 | U7 | $62.35 |
| | Practitioner Level 3, In-Clinic | 96156 | U3 | U6 | $30.01 | Practitioner Level 3, Out-of-Clinic | 96156 | U3 | U7 | $48.91 |
| | Practitioner Level 4, In-Clinic | 96156 | U4 | U6 | $20.30 | Practitioner Level 4, Out-of-Clinic | 96156 | U4 | U7 | $32.48 |
| | Practitioner Level 2, Via interactive audio and video telecommunication systems | 96156 | GT | U2 | $38.97 | Practitioner Level 4, Via interactive audio and video telecommunication systems | 96156 | GT | U4 | $20.30 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | 96156 | GT | U3 | $30.01 | | | | | |

| Unit Value | 15 minutes for T codes, 1 encounter for code 96156 | Utilization Criteria | TBD |
|---|---|---|---|

**Service Definition**

This service requires face-to-face contact with the individual to monitor, evaluate, assess, and/or carry out a physician's orders regarding the physical and/or psychological problems of the individual. It includes:

1. Providing nursing assessments and interventions to observe, monitor and care for the physical, nutritional, behavioral health and related psychosocial issues, problems or crises manifested in the course of an individual's treatment;
2. Assessing and monitoring individual's response to medication(s) to determine the need to continue medication and/or to determine the need to refer the individual for a medication review;
3. Assessing and monitoring an individual's medical and other health issues that are either directly related to the mental health or substance related disorder, or to the treatment of the disorder (e.g. diabetes, cardiac and/or blood pressure issues, substance withdrawal symptoms, weight gain and fluid retention, seizures, etc.);
4. Consulting with the individual and individual-identified family and significant other(s) about medical, nutritional and other health issues related to the individual's mental health or substance related issues;
5. Educating the individual and any identified family about potential medication side effects (especially those which may adversely affect health such as weight gain or loss, blood pressure changes, cardiac abnormalities, development of diabetes or seizures, etc.);
6. Consulting with the individual and the individual-identified family and significant other(s) about the various aspects of informed consent (when prescribing occurs);
7. Training for self-administration of medication;
8. Venipuncture required to monitor and assess mental health, substance disorders or directly related conditions, and to monitor side effects of psychotropic medications, as ordered by an appropriate member of the medical staff; and
9. Providing assessment, testing, and referral for infectious diseases.

**Admission Criteria**

1. Individual presents with symptoms that are likely to respond to medical/nursing interventions; or
2. Individual has been prescribed medications as a part of the treatment array or has a confounding medical condition.

**Continuing Stay Criteria**

1. Individual continues to demonstrate symptoms that are likely to respond to or are responding to medical interventions; or
2. Individual exhibits acute disabling conditions of sufficient severity to bring about a significant impairment in day-to-day functioning; or
3. Individual demonstrates progress relative to goals identified in the Individualized Recovery Plan, but recovery goals have not yet been achieved.

**Discharge Criteria**

1. An adequate continuing care plan has been established; **and one or more of the following:**
2. Individual no longer demonstrates symptoms that are likely to respond to or are responding to medical/nursing interventions; **or**
3. Goals of the Individualized Recovery Plan have been substantially met; **or**
4. Individual requests discharge and individual is not in imminent danger of harm to self or others.

## Nursing Assessment and Health Services

| Service Exclusions | ACT, Medication Administration, Opioid Maintenance. |
|---|---|
| Clinical Exclusions | Routine nursing activities that are included as a part of medication administration/methadone administration. |
| Required Components | 1. Nutritional assessments indicated by an individual's confounding health issues may be billed under this code (96150, 96151). No more than 8 units specific to nutritional assessments can be billed for an individual within a year. This specific assessment must be provided by a Registered Nurse or by a Licensed Dietician. <br> 2. This service does **not** include the supervision of self-administration of medication. <br> 3. Each nursing contact should document the checking of vital signs (Temperature, Pulse, Blood Pressure, Respiratory Rate, and weight, if medically indicated or if related to behavioral health symptom or behavioral health medication side effect) in accordance with general psychiatric nursing practice. <br> 4. Nursing assessments will assess health risks, health indicators, and health conditions given that behavioral health conditions, behavioral health medications, and physical health are intertwined. Personal/family history of Diabetes, Hypertension, and Cardiovascular Disease should be explored as well as tobacco use history, substance use history, blood pressure status, and Body Mass Index (BMI). Any sign of major health concerns should yield a medical referral to a primary health care physician/center. |
| Clinical Operations | 1. Venipuncture services must include documentation that includes cannula size, insertion site, number of attempts, location, and individual tolerance of procedure. <br> 2. All nursing procedures must include relevant individual centered education regarding the procedure. |
| Service Accessibility | To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include: <br><br> • the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or <br> • the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service. <br><br> Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. |
| Billing & Reporting Requirements | 1. If a Medicaid claim for this service denies for a Procedure-to-Procedure edit, a modifier (59) can be added to the claim and resubmitted to the MMIS for payment. <br> 2. When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |
| Additional Medicaid Requirements | The daily maximum within a CSU for Nursing Assessment and Health Services is 5 units/day. |

## Pharmacy & Lab

| Service Definition | Pharmacy and Lab Services include operating or purchasing services to order, package, and distribute prescription medications. It includes provision of assistance to individuals to access indigent medication programs, sample medication programs and payment for necessary medications when no other funding source is available. This service provides for appropriate lab work, such as drug screens and medication levels to be performed. This service is to ensure that necessary medication and lab services are not withheld or delayed to individuals based on inability to pay. |
|---|---|
| Admission Criteria | Individual has been assessed by a prescribing professional to need a psychotropic, anti-cholinergic, substance use disorder-specific, or anti-convulsant (as related to behavioral health issue) medication and/or lab work required for persons entering services, and/or monitoring medication levels. |

| | |
|---|---|
| Continuing Stay Criteria | Individual continues to meet the admission criteria as determined by the prescribing professional. |
| Discharge Criteria | 1. Individual no longer demonstrates symptoms that are likely to respond to or are responding to pharmacologic interventions; **or** <br> 2. Individual requests discharge and individual is not imminently dangerous or under court order for this intervention. |
| Required Components | 1. Service must be provided by a licensed pharmacy or through contract with a licensed pharmacy. <br> 2. Agency must participate in any pharmaceutical rebate programs or pharmacy assistance programs that promote individual access in obtaining medication. <br> 3. Providers shall assist individuals who have an inability to pay for medications in accessing the local Division of Family & Children Services or the Social Security Administration to explore options for Medicaid eligibility. |
| Additional Medicaid Requirements | Not a Medicaid Rehabilitation Option "service." Medicaid recipients may access the general Medicaid pharmacy program as defined by the Department of Community Health. |
| Reporting and Billing Requirements | The agency shall adhere to expectations set forth in this contract for reporting related information. |

## Psychiatric Treatment

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| 15 – 29 minutes | Practitioner Level 1, In-Clinic | 99202 | U1 | U6 | | | 97.00 |
| | Practitioner Level 1, Out-of-Clinic | 99202 | U1 | U7 | | | 123.50 |
| | Practitioner Level 1 | 99202 | GT | U1 | | | 97.00 |
| 30 – 44 minutes | Practitioner Level 1, In-Clinic | 99203 | U1 | U6 | | | 155.20 |
| | Practitioner Level 1, Out-of-Clinic | 99203 | U1 | U7 | | | 197.60 |
| | Practitioner Level 1 | 99203 | GT | U1 | | | 155.20 |
| 45 – 59 minutes | Practitioner Level 1, In-Clinic | 99204 | U1 | U6 | | | 213.40 |
| | Practitioner Level 1, Out-of-Clinic | 99204 | U1 | U7 | | | 271.70 |
| | Practitioner Level 1 | 99204 | GT | U1 | | | 213.40 |
| 60 – 74 minutes | Practitioner Level 1, In-Clinic | 99205 | U1 | U6 | | | 271.60 |
| | Practitioner Level 1, Out-of-Clinic | 99205 | U1 | U7 | | | 345.80 |
| | Practitioner Level 1 | 99205 | GT | U1 | | | 271.60 |
| ~ 5 minutes | Practitioner Level 1, In-Clinic | 99211 | U1 | U6 | | | 19.40 |
| | Practitioner Level 1, Out-of-Clinic | 99211 | U1 | U7 | | | 24.70 |
| | Practitioner Level 1 | 99211 | GT | U1 | | | 19.40 |
| 10 – 19 minutes | Practitioner Level 1, In-Clinic | 99212 | U1 | U6 | | | 58.20 |
| | Practitioner Level 1, Out-of-Clinic | 99212 | U1 | U7 | | | 74.10 |
| | Practitioner Level 1 | 99212 | GT | U1 | | | 58.20 |
| 20 – 29 minutes | Practitioner Level 1, In-Clinic | 99213 | U1 | U6 | | | 97.00 |
| | Practitioner Level 1, Out-of-Clinic | 99213 | U1 | U7 | | | 123.50 |
| | Practitioner Level 1 | 99213 | GT | U1 | | | 97.00 |
| 30 – 39 minutes | Practitioner Level 1, In-Clinic | 99214 | U1 | U6 | | | 135.80 |

E/M New Patient corresponds to transaction codes 99202–99205; E/M Established Patient corresponds to 99211–99214.

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Practitioner Level 2, In-Clinic | 99202 | U2 | U6 | | | 64.95 |
| Practitioner Level 2, Out-of-Clinic | 99202 | U2 | U7 | | | 77.95 |
| Practitioner Level 2 | 99202 | GT | U2 | | | 64.95 |
| Practitioner Level 2, In-Clinic | 99203 | U2 | U6 | | | 103.92 |
| Practitioner Level 2, Out-of-Clinic | 99203 | U2 | U7 | | | 124.72 |
| Practitioner Level 2 | 99203 | GT | U2 | | | 103.92 |
| Practitioner Level 2, In-Clinic | 99204 | U2 | U6 | | | 142.89 |
| Practitioner Level 2, Out-of-Clinic | 99204 | U2 | U7 | | | 171.49 |
| Practitioner Level 2 | 99204 | GT | U2 | | | 142.89 |
| Practitioner Level 2, In-Clinic | 99205 | U2 | U6 | | | 181.86 |
| Practitioner Level 2, Out-of-Clinic | 99205 | U2 | U7 | | | 218.26 |
| Practitioner Level 2 | 99205 | GT | U2 | | | 181.86 |
| Practitioner Level 2, In-Clinic | 99211 | U2 | U6 | | | 12.99 |
| Practitioner Level 2, Out-of-Clinic | 99211 | U2 | U7 | | | 15.59 |
| Practitioner Level 2 | 99211 | GT | U2 | | | 12.99 |
| Practitioner Level 2, In-Clinic | 99212 | U2 | U6 | | | 38.97 |
| Practitioner Level 2, Out-of-Clinic | 99212 | U2 | U7 | | | 46.77 |
| Practitioner Level 2 | 99212 | GT | U2 | | | 38.97 |
| Practitioner Level 2, In-Clinic | 99213 | U2 | U6 | | | 64.95 |
| Practitioner Level 2, Out-of-Clinic | 99213 | U2 | U7 | | | 77.95 |
| Practitioner Level 2 | 99213 | GT | U2 | | | 64.95 |
| Practitioner Level 2, In-Clinic | 99214 | U2 | U6 | | | 90.93 |

## Psychiatric Treatment

| | | | | Value | | Value |
|---|---|---|---|---|---|---|
| Practitioner Level 1, Out-of-Clinic (minutes) | 99214 | U1 | U7 | 172.90 | Practitioner Level 2, Out-of-Clinic — 99214 U2 U7 | 109.13 |
| Practitioner Level 1 | 99214 | GT | U1 | 135.80 | Practitioner Level 2 — 99214 GT U2 | 90.93 |
| Practitioner Level 1, In-Clinic (40 – 54 minutes) | 99215 | U1 | U6 | 194.00 | Practitioner Level 2, In-Clinic — 99215 U2 U6 | 129.90 |
| Practitioner Level 1, Out-of-Clinic | 99215 | U1 | U7 | 247.00 | Practitioner Level 2, Out-of-Clinic — 99215 U2 U7 | 155.90 |
| Practitioner Level 1 | 99215 | GT | U1 | 194.00 | Practitioner Level 2 — 99215 GT U2 | 129.90 |

| | |
|---|---|
| **Unit Value** | 1. encounter (Note: Time-in/Time-out is required in the documentation as it justifies which code above is billed) |
| Utilization Criteria | TBD |
| **Service Definition** | The provision of specialized medical and/or psychiatric services that include, but are not limited to:<br>a. Psychotherapeutic services with medical evaluation and management including evaluation and assessment of physiological phenomena (including co-morbidity between behavioral and physical health care issues);<br>b. Assessment and monitoring of an individual's status in relation to treatment with medication;<br>c. Assessment of the appropriateness of initiating or continuing services.<br><br>Individuals must receive appropriate medical interventions as prescribed and provided by appropriate members of the medical staff pursuant to the Medical Practice Act of 2009, Subsection 43-34-23 Delegation of Authority to Nurse and Physician Assistant that shall support the individualized goals of recovery as identified by the individual and their Individualized Recovery Plan (within the parameters of the person's informed consent).<br><br>Note: For the purposes of this manual, Psychiatric Treatment is sometimes referred to as "physician assessment" or "physician assessment and care." |
| **Admission Criteria** | 1. Individual is determined to be in need of psychotherapy services and has confounding medical issues which interact with behavioral health diagnosis, requiring medical oversight; **or**<br>2. Individual has been prescribed medications as a part of the treatment array. |
| **Continuing Stay Criteria** | 1. Individual continues to meet the admission criteria; **or**<br>2. Individual exhibits acute disabling conditions of sufficient severity to bring about a significant impairment in day-to-day functioning; **or**<br>3. Individual continues to present symptoms that are likely to respond to pharmacological interventions; **or**<br>4. Individual continues to demonstrate symptoms that are likely to respond or are responding to medical interventions; **or**<br>5. Individual continues to require management of pharmacological treatment in order to maintain symptom remission. |
| **Discharge Criteria** | 1. An adequate continuing care plan has been established; **and one or more of the following:**<br>2. Individual has withdrawn or been discharged from service; **or**<br>3. Individual no longer demonstrates symptoms that need pharmacological interventions. |
| **Service Exclusions** | 1. Not offered in conjunction with ACT.<br>2. Supervision time is not billable.<br>3. Time spent on documentation is not billable. |
| **Clinical Exclusions** | Services defined as a part of ACT. |
| **Required Components** | When providing psychiatric services to individuals who are deaf, deaf-blind, and/or hard of hearing, psychiatrists shall demonstrate training, supervision, or consultation with a qualified professional as approved by DBHDD Office of Deaf Services. |

## Psychiatric Treatment

**Clinical Operations**

1. In accordance with recovery philosophy, it is expected that individuals will be treated as full partners in the treatment regimen/services planned and received. As such, it is expected that practitioners will fully discuss treatment options with individuals and allow for individual choice when possible. Discussion of treatment options should include a full disclosure of the pros and cons of each option (e.g., full disclosure of medication/treatment regimen potential side effects, potential adverse reactions - including potential adverse reaction from not taking medication as prescribed and expected benefits). If such full discussion/disclosure is not possible or advisable according to the clinical judgment of the practitioner, this should be documented in the individual's chart (including the specific information that was not discussed and a compelling rationale for lack of discussion/disclosure).
2. Assistive tools, technologies, worksheets, etc. can be used by the served individual to facilitate communication about treatment, symptoms, improvements, etc. with the treating practitioner. If this work falls within the scope of Interactive Complexity, it is noted in accordance with that definition.
3. This service may be provided with Individual Counseling codes 90833 and 90836, but the two services must be separately identifiable.
4. For purposes of this definition, a "new patient" is an individual who has not received an E/M code service from that agency within the past three (3) years. If an individual has engaged with the agency and has seen a non-physician for a BH Assessment, they are still considered a "new patient" until after the first E/M service is completed.

**Service Accessibility**

This service may be provided via telemedicine to any individual who consents to this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference.

**Additional Medicaid Requirements**

1. The daily maximum within a CSU for E/M is 1 unit/day.
2. Even if a physician also has his/her own Medicaid number, the physician providing behavioral health treatment and care through this code should bill via the approved provider agency's Medicaid number through the Medicaid Category of Service (COS) 440.

**Billing & Reporting Requirements**

1. Within this service group, a second unit with a U1 modifier may be used in the event that a Telemedicine Psychiatric Treatment unit is provided and it indicates a need for a face-to-face assessment (e.g. 99213GTU1 is billed and it is clinically indicated that a face-to-face by an on-site physician needs to immediately follow based upon clinical indicators during the first intervention; then 99213U1, can also be billed in the same day).
2. Within this service group, there is an allowance for when a U2 practitioner conducts an intervention and, because of clinical indicators presenting during this intervention, a U1 practitioner needs to provide another unit due to the concern of the U2 supervisee (e.g., Physician's Assistant provides and bills 90805U2U6 and because of concerns, requests U1 intervention following his/her billing of U2 intervention). The use of this practice should be rare and will be subject to additional utilization review scrutiny.
3. These E/M codes are based upon Time (even though recent CPT guidance allows the option of using either Medical Decision Making or Time). The Georgia Medicaid State Plan is priced on time increments and therefore time will remain the basis of justification for the selection of codes above for the near term.
4. If a Medicaid claim for this service denies for a Procedure-to-Procedure edit, a modifier (25) can be added to the claim and resubmitted to the MMIS for payment.
5. Despite recent CPT guidance, this service may not be billed for all time spent on an individual's case in a single day (i.e., pre- and post-appointment work that is not direct individual assessment and/or care), because this indirect time is already included in the service rate.

## Psychological Testing: Psychological Testing – Psycho-diagnostic assessment of emotionality, intellectual abilities, personality and psycho-pathology

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Psychological testing evaluation services by physician or other qualified health care professional, including integration of patient data, interpretation of | Practitioner Level 2, In-Clinic | 96130 | U2 | U6 | | | $155.87 | Practitioner Level 2, Out-of-Clinic | 96130 | U2 | U7 | | | $187.04 |

## Psychological Testing: Psychological Testing – Psycho-diagnostic assessment of emotionality, intellectual abilities, personality and psycho-pathology

| Description | Service | Code | Mod | Mod | Rate | Service | Code | Mod | Mod | Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| standardized test results and clinical data, clinical decision making, treatment planning and report and interactive feedback to the patient, family member(s) or caregiver(s), when performed; first hour | Practitioner Level 2, Via interactive audio and video telecommunication systems | 96130 | GT | U2 | 155.87 | | | | | |
| | Practitioner Level 2, In-Clinic | 96131 | U2 | U6 | $155.87 | Practitioner Level 2, Out-of-Clinic | 96131 | U2 | U7 | $187.04 |
| Each additional hour (List separately in addition to code for primary procedure) | Practitioner Level 2, Via interactive audio and video telecommunication systems | 96131 | GT | U2 | 155.87 | | | | | |
| | Practitioner Level 2, In-Clinic | 96136 | U2 | U6 | $77.94 | Practitioner Level 2, Out-of-Clinic | 96136 | U2 | U7 | $93.52 |
| Psychological or neuropsychological test administration and scoring by physician or other qualified health care professional, two or more tests, any method, first 30 minutes | Practitioner Level 2, Via interactive audio and video telecommunication systems | 96136 | GT | U2 | $77.94 | | | | | |
| | Practitioner Level 3, In-Clinic | 96136 | U3 | U6 | $60.02 | Practitioner Level 4, In-Clinic | 96136 | U4 | U6 | $40.59 |
| | Practitioner Level 3, Out-of-Clinic | 96136 | U3 | U7 | $73.36 | Practitioner Level 4, Out-of-Clinic | 96136 | U4 | U7 | $48.71 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | 96136 | GT | U3 | $60.02 | Practitioner Level 4, Via interactive audio and video telecommunication systems | 96136 | GT | U4 | $40.59 |
| | Practitioner Level 2, In-Clinic | 96137 | U2 | U6 | $77.94 | Practitioner Level 2, Out-of-Clinic | 96137 | U2 | U7 | $93.52 |
| Each additional 30 minutes (List separately in addition to code for primary procedure) | Practitioner Level 2, Via interactive audio and video telecommunication systems | 96137 | GT | U2 | $77.94 | | | | | |
| | Practitioner Level 3, In-Clinic | 96137 | U3 | U6 | $60.02 | Practitioner Level 4, In-Clinic | 96137 | U4 | U6 | $40.59 |
| | Practitioner Level 3, Out-of-Clinic | 96137 | U3 | U7 | $73.36 | Practitioner Level 4, Out-of-Clinic | 96137 | U4 | U7 | $48.71 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | 96137 | GT | U3 | $60.02 | Practitioner Level 4, Via interactive audio and video telecommunication systems | 96137 | GT | U4 | $40.59 |
| | Practitioner Level 2, In-Clinic | 96138 | U2 | U6 | $77.94 | Practitioner Level 2, Out-of-Clinic | 96138 | U2 | U7 | $93.52 |
| Psychological or neuropsychological test administration and scoring by technician | Practitioner Level 2, Via interactive audio and video telecommunication systems | 96138 | GT | U2 | $77.94 | | | | | |
| | Practitioner Level 3, In-Clinic | 96138 | U3 | U6 | $60.02 | Practitioner Level 4, In-Clinic | 96138 | U4 | U6 | $40.59 |
| | Practitioner Level 3, Out-of-Clinic | 96138 | U3 | U7 | $73.36 | Practitioner Level 4, Out-of-Clinic | 96138 | U4 | U7 | $48.71 |

## Psychological Testing: Psychological Testing – Psycho-diagnostic assessment of emotionality, intellectual abilities, personality and psycho-pathology

| Description | Code | | | Rate | Description | Code | | | Rate |
|---|---|---|---|---|---|---|---|---|---|
| Each additional 30 minutes (List separately in addition to code for primary procedure) | | | | | | | | | |
| Practitioner Level 3, Via interactive audio and video telecommunication systems | 96138 | GT | U3 | $60.02 | Practitioner Level 4, Via interactive audio and video telecommunication systems | 96138 | GT | U4 | $40.59 |
| Practitioner Level 2, In-Clinic | 96139 | U2 | U6 | $77.94 | Practitioner Level 2, Out-of-Clinic | 96139 | U2 | U7 | $93.52 |
| Practitioner Level 2, Via interactive audio and video telecommunication systems | 96139 | GT | U2 | $77.94 | | | | | |
| Practitioner Level 3, In-Clinic | 96139 | U3 | U6 | $60.02 | Practitioner Level 4, In-Clinic | 96139 | U4 | U6 | $40.59 |
| Practitioner Level 3, Out-of-Clinic | 96139 | U3 | U7 | $73.36 | Practitioner Level 4, Out-Of-Clinic | 96139 | U4 | U7 | $48.71 |
| Practitioner Level 3, Via interactive audio and video telecommunication systems | 96139 | GT | U3 | $60.02 | Practitioner Level 4, Via interactive audio and video telecommunication systems | 9613 | GT | U4 | $40.59 |

| | |
|---|---|
| **Unit Value** | 1 hour or 30 minutes |
| **Utilization Criteria** | TBD |
| **Service Definition** | Psychological testing consists of a face-to-face assessment of emotional functioning, personality, cognitive functioning (e.g., thinking, attention, memory) or intellectual abilities using an objective and standardized tool that has uniform procedures for administration and scoring and utilizes normative data upon which interpretation of results is based. |
| | Psychological tests are only administered and interpreted by those who are properly trained in their selection and application. The practitioner administering the test ensures that the testing environment does not interfere with the performance of the examinee and ensures that the environment affords adequate protections of privacy and confidentiality. |
| | This service covers both the face-to-face administration of the test instrument(s) by a qualified examiner as well as the time spent by a psychologist or physician (with the proper education and training) interpreting the test results and preparing a written report in accordance with CPT procedural guidance. |
| **Admission Criteria** | 1.   A known or suspected mental illness or substance-related disorder; and |
| | 2.   Initial screening/intake information indicates a need for additional undetermined supports and recovery/resiliency planning; and |
| | 3.   Individual meets DBHDD eligibility. |
| **Continuing Stay Criteria** | The individual's situation/functioning has changed in such a way that previous assessments are outdated. |
| **Discharge Criteria** | Each intervention is intended to be a discrete time-limited service that modifies treatment/support goals or is indicated due to change in illness/disorder. |
| **Staffing Requirements** | The term "psychologist" is defined in the Approved Behavioral Health Practitioners table in Section II of this manual (Reference § 43-39-1 and § 43-39-7). |
| **Required Components** | 1.   There may be no more than 10 combined hours of the codes above provided to one individual within an authorization. |
| | 2.   When providing psychological testing to individuals who are deaf, deaf-blind, or hard of hearing, practitioner shall demonstrate training, supervision, and/or consultation with a qualified professional as approved by DBHDD Office of Deaf Services. |
| **Clinical Operations** | The individual (and caregiver/responsible family members etc. as appropriate) must actively participate in the assessment processes. |
| **Documentation Requirements** | In addition to the authorization produced through this service, documentation of clinical assessment findings from this service should also be completed and placed in the individual's chart. |

## Psychological Testing: Psychological Testing – Psycho-diagnostic assessment of emotionality, intellectual abilities, personality and psycho-pathology

| | |
|---|---|
| Service Accessibility | To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:<br>• the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or<br>• the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.<br><br>Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. |
| Billing & Reporting Requirements | 1. Each unique code cannot be billed more than 5 units on a single day.<br>2. Add-on codes shall be provided on the same day as the associated base code).<br>3. Scoring may occur and be billed on a different day than the evaluation and testing procedures (and related codes).<br>4. If a Medicaid claim for this service denies for a Procedure-to-Procedure edit, a modifier (59) can be added to the claim and resubmitted to the MMIS for payment.<br>5. When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |

## Psychosocial Rehabilitation - Individual

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Psychosocial Rehabilitation | Practitioner Level 4, In-Clinic | H2017 | HE | U4 | U6 | | $20.30 |
| | Practitioner Level 5, In-Clinic | H2017 | HE | U5 | U6 | | $15.13 |
| | Practitioner Level 4, Via interactive audio and video telecommunication systems | H2017 | GT | HE | U4 | U6 | $20.30 |
| | Practitioner Level 4, Out-of-Clinic | H2017 | HE | U4 | U7 | | $24.36 |
| | Practitioner Level 5, Out-of-Clinic | H2017 | HE | U5 | U7 | | $18.15 |
| | Practitioner Level 5, Via interactive audio and video telecommunication systems | H2017 | GT | HE | U5 | U6 | $15.13 |

| Unit Value | 15 minutes |
|---|---|
| Utilization Criteria | TBD |

| | |
|---|---|
| Service Definition | Psychosocial Rehabilitation-Individual (PSR-I) services consist of rehabilitative skills building, the personal development of environmental and recovery supports considered essential in improving a person's functioning, learning skills to promote the person's self-access to necessary services and in creating environments that promote recovery and support the emotional and functional improvement of the individual. The service activities of Psychosocial Rehabilitation-Individual include:<br>1. Providing skills support in the person's self-articulation of personal goals and objectives;<br>2. Assisting the person in the development of skills to self-manage or prevent crisis situations;<br>3. Individualized interventions in living, learning, working, other social environments, which shall have as objectives:<br>   a. Identification, with the person, of strengths which may aid him/her in achieving recovery, as well as barriers that impede the development of skills necessary for functioning in work, with peers, and with family/friends;<br>   b. Supporting skills development to build natural supports (including support/assistance with defining what wellness means to the person in order to assist them with recovery-based goal setting and attainment);<br>   c. Assistance in the development of interpersonal, community coping and functional skills (which may include adaptation to home, adaptation to work, adaptation to healthy social environments, learning/practicing skills such as personal financial management, medication self-monitoring, symptom self-monitoring, etc.); |

## Psychosocial Rehabilitation - Individual

d. Assistance in the acquisition of skills for the person to self-recognize emotional triggers and to self-manage behaviors related to the behavioral health issue;

e. Assistance with personal development, work performance, and functioning in social and family environments through teaching skills/strategies to ameliorate the effect of behavioral health symptoms;

f. Assistance in enhancing social and coping skills that ameliorate life stresses resulting from the person's mental illness/substance use disorder;

g. Assist the person in his/her skills in gaining access to necessary rehabilitative, medical, social and other services and supports;

h. Assistance to the person and other supporting natural resources with illness understanding and self-management (including medication self-monitoring); and

i. Identification, with the individual and named natural supporters, of risk indicators related to substance related disorder relapse, and the development of skills and strategies to prevent relapse.

This service is provided in order to promote stability and build towards functioning in the person's daily environment. Stability is measured by a decreased number of hospitalizations, by decreased frequency and duration of crisis episodes and by increased and/or stable participation in community/work activities. Supports based on the person's needs are used to promote recovery while understanding the effects of the mental illness and/or substance use disorder, and to promote functioning.

**Admission Criteria**
1. Individuals with one of the following: Mental Health (MH) Diagnosis, Co-Occurring Substance Use Disorder and MH Diagnosis, or Co-Occurring MH Diagnosis and Developmental Disabilities (DD) **and one or more of the following:**
2. Individual may need assistance with developing, maintaining, or enhancing social supports or other community coping skills; **or**
3. Individual may need assistance with daily living skills including coordination to gain access to necessary rehabilitative and medical services.

**Continuing Stay Criteria**
1. Individual continues to meet admission criteria; **and**
2. Individual demonstrates documented progress or maintenance of community skills relative to goals identified in the Individualized Recovery Plan.

**Discharge Criteria**
1. An adequate continuing care plan has been established; **and one or more of the following:**
2. Goals of the Individualized Recovery Plan have been substantially met; **or**
3. Individual requests discharge and the individual is not in imminent danger of harm to self or others; **or**
4. Transfer to another service/level of care is warranted by change in individual's condition; **or**
5. Individual requires more intensive services.

**Clinical Exclusions**
1. There is a significant lack of community coping skills such that a more intensive service is needed.
2. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a co-occurring Behavioral Health condition: Developmental Disability, Autism, Neurocognitive Disorder, Traumatic Brain Injury.

**Required Components**
1. Psychosocial Rehabilitation-Individual services must include a variety of interventions in order to assist the individual in developing:
   a. Symptom self-monitoring and self-management of symptoms.
   b. Strategies and supportive interventions for avoiding out-of-community treatment for adults and building stronger knowledge of the adult's strengths and limitations.
   c. Relapse prevention strategies and plans.
2. Psychosocial Rehabilitation-Individual services focus on building and maintaining a therapeutic relationship with the individual and facilitating treatment and recovery goals.
3. Contact must be made with the individual receiving PSR-I services a minimum of twice each month.
4. In the absence of the required monthly face-to-face contact **and** if at least two unsuccessful attempts to make face-to-face contact have been tried and documented, the provider may bill for a maximum of two telephone contacts in that specified month.
5. There may be instances where a person has an order and authorization to receive PSR-Group in addition to PSR-I. When the person is in attendance at the PSR-Group program and a staff provides support to the served individual on a one-to-one basis, the PSR Specialty provider may bill this PSR-I code. In this specific circumstance, the PSR group program shall not count for that time within in its hourly claims submission. There must be a PSR-I note which is individualized and indicates the one-to-one nature of the intervention.

## Psychosocial Rehabilitation - Individual

| | |
|---|---|
| | 6. When the primary focus of PSR-I is for medication maintenance, the following allowances apply:<br>  a. These individuals are not counted in the offsite service requirement or the individual-to-staff ratio; and<br>  b. These individuals are not counted in the monthly face-to-face contact requirement; however, face-to-face contact is required every 3 months and monthly calls are an allowed billable service. |
| Staffing Requirements | PSR-I practitioners may have the recommended individual-to-staff ratio of 30 individuals per staff member and must maintain a maximum ratio of 50 individuals per staff member. Individuals who receive only medication maintenance are not counted in the staff ratio calculation. |
| Clinical Operations | 1. The organization must have a Psychosocial Rehabilitation-Individual Organizational Plan that addresses the following:<br>  a. Description of the particular rehabilitation, recovery and natural support development models utilized, types of intervention practiced, and typical daily schedule for staff;<br>  b. Description of the staffing pattern and how staff are deployed to assure that the required staff-to-individual ratios are maintained, including how unplanned staff absences, illnesses, or emergencies are accommodated, case mix, access, etc.;<br>  c. Description of the hours of operations as related to access and availability to the individuals served;<br>  d. Description of how the plan for services is modified or adjusted to meet the needs specified in every Individualized Recovery Plan; and<br>  e. If the service is offered through an agency which provides PSR-Group, then there is a description of how the agency has protocols and accountability procedures to assure that there is no duplication of billing when the person is being supported through the group model.<br>2. Utilization (frequency and intensity) of PSR-I should be directly related to the ANSA and to other functional elements in the assessment. In addition, when clinical/functional needs are great, there should be complementary therapeutic services by licensed/credential professionals paired with the provision of PSR-I (individual, group, family, etc.). |
| Service Accessibility | 1. There must be documented evidence that service hours of operation include evening, weekend, and holiday hours.<br>2. "Medication Maintenance Track," individuals who require more than 4 contacts per quarter for two consecutive quarters (as based upon need) are expected to be re-evaluated with ANSA for enhanced access to PSR-I. The designation of PSR-I "medication maintenance track" should be lifted and exceptions stated above are no longer allowed.<br>3. To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:<br>  • the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or<br>  • the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.<br><br>Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. |
| Billing & Reporting Requirements | 1. Unsuccessful attempts to make contact with the individual are not billable.<br>2. When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| | Practitioner Level 2, In-Clinic | H0032 | U2 | U6 | | | $38.97 |
| | Practitioner Level 2, Out-of-Clinic | H0032 | U2 | U7 | | | $46.76 |

## Service Plan Development

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Service Plan Development | | | | | | | |

## Service Plan Development

| Practitioner | Code | Mod | Mod | Value | | Practitioner | Code | Mod | Mod | Value |
|---|---|---|---|---|---|---|---|---|---|---|
| Practitioner Level 3, In-Clinic | H0032 | U3 | U6 | $30.01 | | Practitioner Level 3, Out-of-Clinic | H0032 | U3 | U7 | $36.68 |
| Practitioner Level 4, In-Clinic | H0032 | U4 | U6 | $20.30 | | Practitioner Level 4, Out-of-Clinic | H0032 | U4 | U7 | $24.36 |
| Practitioner Level 5, In-Clinic | H0032 | U5 | U6 | $15.13 | | Practitioner Level 5, Out-of-Clinic | H0032 | U5 | U7 | $18.15 |
| Practitioner Level 2, Via interactive audio and video telecommunication systems | H0032 | GT | U2 | 38.97 | | Practitioner Level 4, Via interactive audio and video telecommunication systems | H0032 | GT | U4 | 20.30 |
| Practitioner Level 3, Via interactive audio and video telecommunication systems | H0032 | GT | U3 | 30.01 | | Practitioner Level 5, Via interactive audio and video telecommunication systems | H0032 | GT | U5 | 15.13 |
| | | | Utilization Criteria | TBD | | | | | | |

| | |
|---|---|
| **Unit Value\*** | 15 minutes |
| **Service Definition** | Individuals access this service when it has been determined through an assessment that the individual has mental health or substance use disorder concerns. The Individualized Recovery Plan (IRP) results from the Diagnostic and Behavioral Health Assessments and is required within the first 30 days of service, with ongoing plans completed as demanded by individual need or by service policy.

Information from a comprehensive assessment should ultimately be used to develop with the individual an IRP that supports recovery and is based on goals identified by the individual. Friends, family and other natural supports may be included at the discretion and direction of the individual for whom services/supports are being planned. Also, as indicated, medical, nursing, peer support, community support, nutritional staff, etc. should provide information from records, and various multi-disciplinary assessments for the development of the IRP.

The cornerstone component of the IRP involves a discussion with the individual regarding what recovery means to him/her personally (e.g., getting/keeping a job, having more friends/improved relationships, improvement of behavioral health symptoms, etc.), and the development of goals (i.e. outcomes) and objectives that are defined by and meaningful to the individual based upon his/her articulation of their recovery hopes. Concurrent with the development of the IRP, the individual should be offered the opportunity to develop an Advanced Directive for behavioral healthcare with the individual guiding the process through the free expression of their wishes and through his/her assessment of the components developed for the Advanced Directive as being realistic for him/her.

The entire process should involve the individual as a full partner and should focus on service and recovery goals/outcomes as identified by the individual.

Recovery planning shall set forth the course of care by:
1. Prioritizing problems and needs;
2. Stating goals which will honor achievement of stated hopes, choice, preferences and desired outcomes of the individual;
3. Assuring goals/objectives are related to the assessment;
4. Defining goals/objectives that are individualized, specific, and measurable with achievable timeframes;
5. Defining discharge criteria and desired changes in levels of functioning and quality of life to objectively measure progress;
6. Transition planning at onset of service delivery;
7. Selecting services and interventions of the right duration, intensity, and frequency to best accomplish these objectives;
8. Assuring there is a goal/objective that is consistent with the service intent; and
9. Identifying qualified staff who are responsible and designated for the provision of services. |
| **Admission Criteria** | 1. A known or suspected mental illness or substance-related disorder; **and**
2. Initial screening/intake information indicates a need for additional undetermined supports and recovery/resiliency planning; **and**
3. Individual meets DBHDD eligibility. |
| **Continuing Stay Criteria** | The individual's situation/functioning has changed in such a way that previous assessments are outdated. |

## Service Plan Development

| Discharge Criteria | Each intervention is intended to be a discrete time-limited service that modifies treatment/support goals or is indicated due to change in illness/disorder. |
|---|---|
| Service Exclusions | Assertive Community Treatment |
| Required Components | 1. The service plan must include elements articulated in the Documentation Guideline chapter in this Provider Manual.<br>2. As indicated, medical, nursing, peer, school, nutritional, etc. staff can provide information from the individual, records, and various multi-disciplinary resources needed to complete the service plan. Time spent gathering this information may be billed as long as the detailed documentation justifies the time and need for capturing said information. |
| Clinical Operations | 1. The individual (and any other individual-identified natural supports) should actively participate in planning processes.<br>2. The Individualized Recovery Plan should be directed by the individual's personal recovery goals as defined by that individual.<br>3. Advanced Directive/Crisis Planning shall be directed by the individual served and their needs/wishes to the extent possible and clinically appropriate. Plans should not contain elements/components that are not agreeable to, meaningful for, or realistic for the person and that the person is, therefore, not likely to follow through with.<br>4. Guidelines for recovery/resiliency planning are contained in the DBHDD Requirements for Community Providers in this Provider Manual.<br>5. Individualized Recovery Plans (or portions of the plan) must be reassessed as needed, in accordance with changing needs, circumstances, and responses of the individual (see content regarding the IRP in Part II of this manual). For any change in medical, behavioral, cognitive, and/or physical status that potentially impacts goals, objectives and/or interventions in the plan, or that would necessitate the addition of new goals, objectives and/or interventions, Service Plan Development would be used to support the individual in revisiting their goals and objectives. |
| Service Accessibility | To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:<br><br>• the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or<br>• the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.<br><br>Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. |
| Billing & Reporting Requirements | When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |
| Additional Medicaid Requirements | The daily maximum within a CSU for combined Behavioral Health Assessment and Service Plan Development is 24 units/day. |
| Documentation Requirements | 1. The initial authorization/IRP and each subsequent authorization/IRP must be completed within the time-period specified by DBHDD.<br>2. Every record must contain an IRP in accordance with these Service Guidelines and with the DBHDD Requirements contained in this Provider Manual. |

# ADULT SPECIALTY SERVICES

## Addiction Recovery Support Center – Services (Effective January 1, 2023)

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AD Recovery Center | Addiction Recovery Support Service | H2001 | HW | HF | | | | | | | | | | |
| Unit Value | 1 day | | | | | | | Maximum Daily Units | 1 unit | | | | | |

**Service Definition**

An Addiction Recovery Support Center offers a set of non-clinical, peer-led activities that engage, educate and support individuals and families successfully to make life changes necessary to establish, maintain and enhance recovery (health and wellness) from substance use disorders. The recovery activities are community-based services for individuals with a substance use disorder; and consist of activities that promote recovery, self-determination, self-advocacy, well-being, and independence. Activities are individualized, recovery-focused, and based on a relationship that supports a person's ability to promote their own recovery. Activities include social support, linkage to and coordinating among other service providers, eliminating barriers to independence and continued recovery. Activities may occur in the center or in other locations in the community.

Addiction Recovery Support Services are holistic in nature, support people with moving beyond their substance use disorder and toward a life of self-directed recovery. During scheduled hours, Addiction Recovery Support Services may include but are not limited to the following support topics which may occur at a physical location or in the community:

1. Promote self-directed recovery by assisting an individual.
2. Promote trauma informed care and diversity competence, encourage self-direction, and advocate for informed choice.
3. Ongoing exploration of recovery needs;
4. Supporting individuals in achieving personal independence as identified by the individual;
5. Encouraging hope;
6. Supporting the development of life skills such as budgeting and connecting to community resources;
7. Developing and working toward achievement of personal recovery goals;
8. Modeling personal responsibility for recovery;
9. Teaching skills to effectively navigate to the health care delivery system to effectively and efficiently utilize services;
10. Providing recovery check-in's that allow individuals to address challenges or that assist an individual in eliminating barriers to seeking or maintaining recovery, employment, education, or housing;
11. Assisting with accessing and developing natural support systems in the community;
12. Promoting coordination and linkage among similar providers;
13. Coordinating or assistance in crisis interventions and stabilization as needed;
14. Conducting community outreach;
15. Attending and participating in recovery planning team; or,
16. Assisting individuals in the development of empowerment skills through self-advocacy and activities that mitigate discrimination and inspire hope.

**Non-Clinical Services/Activities**

ARSCs provide services/activities that are unique to their specific communities. Therefore, not all ARSCs will provide the same activities, nor will they provide them in the same manner. Below is a list of categories of Addiction Recovery Support Services and other activities that may be provided by each ARSC:

1. **Individual or Group Peer Check-Ins:** This can include individual or group use of recovery capital scale sheets, outcome rating scales/relationship rating scales, or other assessments to assess recovery progress. May also take the form of telephone, text, and email assertive outreach.
2. **Employment Services:** This can include any activity or event that is being provided to increase the likelihood that someone in recovery will be employed.

## Addiction Recovery Support Center – Services (Effective January 1, 2023)

| | |
|---|---|
| | 3. **Social Support Activities:** This includes but is not limited to prosocial and other recreational activities such as hikes, group exercises, game nights, movie showings, yoga, social outings, etc. |
| | 4. **Educational Services:** This section includes any service offered to support the educational development of someone in recovery in scholastic achievement, such as GED Classes, tutoring, applying for student financial aid for college, applying to college, etc. |
| | 5. **Family Support Services:** This includes any service specifically targeted towards families of someone in or seeking recovery. Peers may also participate in this programming with or without their family present. |
| | 6. **Housing Supports:** Any service that provides, or increases the likelihood of someone in recovery finding, safe living conditions. |
| | 7. **Transportation Supports:** Any service that assists individuals in or seeking recovery with transportation to/from supports offered by the ARSC or to other resources, facilities, agencies, or businesses in the community. |
| | 8. **Artistic Recovery Support:** This can include any activity or instruction provided around music, theatre, art, etc. as a supportive outlet for an individual's recovery and empowerment. |
| | 9. **Volunteering Service:** This can be used to track a peer's involvement in volunteering their time to support activities or events conducted by the ARSC. Volunteering and giving back are key theme's in supporting an individual's continued recovery from substance use disorder. |
| | 10. **Recovery Oriented Training/Education:** This includes an individual's participation in trainings provided by the ARSC such as Recovery Messaging Training, Science of Addiction Recovery (SOAR), Recovery Oriented Systems of Care (ROSC), Mental Health First Aid, and other trainings surrounding recovery. |
| **Admission Criteria** | Adults ages 18 or older must meet the following criteria: <br> 1. The individual desires to enter or maintain his/her recovery by reducing the recreational use of alcohol or other drugs, reduce participation in illegal activity, improve health and wellness, increase participation in healthy social supports. <br> 2. The individual does not need to meet the diagnostic criteria for a Substance Use Disorder as defined in the most recent DSM for the purpose of medical necessity but must have a self-reported history of SUD. <br> 3. The individual requests support of an alcohol and drug free environment. <br> 4. The individual can be using Medication Assisted Treatment/Recovery as part of their recovery process and can't be excluded. |
| **Continuing Stay Criteria** | The individual continues to attend and participate. |
| **Discharge Criteria** | 1. The individual indicates a desire to leave the support; <br> 2. The individual fails to follow the guidelines of the ARSC. |
| **Service Exclusions** | 1. The individual exhibits behavior dangerous to staff, self, or others. <br> 2. ARSC staff do not provide clinical services. <br> 3. Drug Abuse Treatment Education Program colocation is prohibited. |
| **Required Components** | 1. Have a primary goal of enhancing the quantity and quality of support available to individuals seeking recovery from substance use disorders; <br> 2. Be grounded in three core principles: a recovery vision, authenticity of voice, and accountability to the recovery community; <br> 3. Promote the strategies of public awareness and education, personal empowerment, and peer based- and other recovery support services. <br> 4. Must have policies and procedures on how to assist individuals who attend activities while actively intoxicated (use of peer support, connection to services if individual is willing, etc.). <br> 5. Must be able to provide referrals to other levels of treatment and support for individuals in or seeking recovery. <br> 6. Must have an advisory board that meets the following requirements: (1) All members are local to the community, (2) More than 50% identify as being in recovery from SUD, (3) must have official board meetings once per month, (4) Must have programmatic decision-making power. <br> 7. Be responsive to the needs of individuals participating in services and be based on local community needs as identified by the individuals participating in the service. <br> 8. An individual that only comes to the ARSC to attend an AA, NA, or other anonymous fellowship meeting can, but is not required to, provide identifiable |

## Addiction Recovery Support Center – Services (Effective January 1, 2023)

information for tracking purposes.

**Staffing Requirements**
1. An Addiction Recovery Support Center has a full-time Director of day to day operations who is an active CPS-AD.
2. Director of day to day operations attends monthly learning collaboratives convened by Georgia Council on Substance Abuse.
3. The number of remaining staff are defined in contracts but are required to be specially trained CPS-AD who have participated in targeted areas of training such as Intentional Peer Support, Science of Addiction and Recovery, CPR/First Aid, P-COMS, and All-Recovery Groups.
4. With department approval, an individual with lived experience may be hired as staff with the performance expectation that the CPS-AD credential will be achieved within the first twelve (12) months of hire.
5. With department approval, inactive CPS-AD may be employed by the Addiction Recovery Support Center with the expectation of achieving "active" status within first twelve (12) months of hire.
6. Additional staff may be allowed if approved by DBHDD and needed to support the operations of the center.
7. All staff without CPS-AD designation must participate in a recovery principles orientation, made up of key components of the CPS-AD training, upon hire.

The ARSC is open a minimum of 40 hours per week and is required to have hours consistent with community need.

**Service Accessibility**
1. An updated weekly schedule that includes hours of operation, groups, and activities should be posted in plain sight for participants and visitors.
2. Addiction Recovery Support Services are available at any point during the open hours.
3. Recovery activities are offered throughout the day in the center and periodically outside the center, in the community.
4. The individual can utilize this service as support while participating in other treatment services.

**Documentation Requirements**
1. Any individual that signs in during the hours of operation will be considered supported as a participant for the day.
2. A list of activities that an individual participates in will be tracked.
3. Sign-in sheets and daily activity attendance will be maintained by the ARSC.

**Billing & Reporting Requirements**
1. Visitors that do not meet admission criteria are not to be included in ASO submissions.
2. Must provide DBHDD with an annual calculation of in-kind support (volunteer time, facility donation, etc.) or fiscal donations through fundraising efforts or community collaborations.
3. Must have a system in place to track unduplicated individuals served for each month.
4. Each month the provider must submit a monthly invoice, programmatic report, and advisory board meeting minutes to DBHDD to determine utilization.
5. Daily encounter/claims will be submitted on a daily basis for any Individuals registered through the ASO.
6. Place of Service Code 99 will be used for all claims/encounter submissions to the ASO.

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| SA Program, Group Setting, Practitioner Level 4, Out-of-Clinic | H0038 | HF | HQ | U4 | U7 | 21.64 |
| SA Program, Group Setting, Practitioner Level 5, Out-of-Clinic | H0038 | HF | HQ | U5 | U7 | 16.12 |
| Utilization Criteria | TBD | | | | | |

## AD Peer Support Program

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| AD Peer Support Services | SA Program, Group Setting, Practitioner Level 4, In-Clinic | H0038 | HF | HQ | U4 | U6 | 17.72 |
| | SA Program, Group Setting, Practitioner Level 5, In-Clinic | H0038 | HF | HQ | U5 | U6 | 13.20 |
| Unit Value | 1 hour | | | | | | |
| Service Definition | This service provides structured activities (in an agency or community-based setting) which promote recovery, self-advocacy, relationship enhancement, self-awareness and values, and self-directed care. Individuals served are introduced to the reality that there are many different pathways to recovery and each individual determines his or her own way. Supports are recovery oriented. This occurs when individuals share the goal of long-term recovery. Individuals served are encouraged | | | | | | |

## AD Peer Support Program

|  |  |
|---|---|
|  | to initiate and lead group activities and each participant identifies his/her own individual goals for recovery. Activities must promote self-directed recovery by honoring the many pathways to recovery, by tapping into each participant's strengths and by helping each to recognize his/her "recovery capital", the reality that each individual has internal and external resources that they can draw upon to keep them well.<br><br>Interventions are approached from a lived experience perspective but also are based upon the Science of Addiction Recovery framework. Supportive interactions include motivational interviewing, recovery planning, resource utilization, strengths identification and development, support in considering theories of change, building recovery empowerment and self-efficacy. There is also advocacy support with the individual to have recovery dialogues with their identified natural and formal supporters. |
| Admission Criteria | 1. Individual must have a substance related issue; and **one or more of the following:**<br> a. Individual needs peer-based recovery support for the acquisition of skills needed to engage in and maintain recovery; or<br> b. Individual needs assistance to develop self-advocacy skills to achieve decreased dependency on formalized treatment systems; or<br> c. Individual needs assistance and support to prepare for a successful work experience; or<br> d. Individual needs peer modeling to increase responsibilities for his /her own recovery. |
| Continuing Stay Criteria | 1. Individual continues to meet admission criteria; **and**<br>2. Progress notes document progress relative to goals identified in the Individualized Recovery Plan, but treatment/recovery goals have not yet been achieved. |
| Discharge Criteria | 1. An adequate continuing care plan has been established; **and one or more of the following:**<br>2. Goals of the Individualized Recovery Plan have been substantially met; **or**<br>3. Individual served/family requests discharge; **or**<br>4. Transfer to another service/level is more clinically appropriate. |
| Service Exclusions | Crisis Stabilization Unit (however, those utilizing transitional beds within a Crisis Stabilization Unit may access this service). |
| Clinical Exclusions | Individuals diagnosed with a mental illness that have no co-occurring Substance-Related Disorder. |
| Required Components | 1. AD Peer Support Program services may operate as a program within a Tier 1 or Tier 2 provider, an Intensive Outpatient Provider (IOP) specialty provider, a WTRS provider or an established peer program.<br>2. AD Peer Support Program services must be operated for no less than 3 days a week, no less than 12 hours/week, no less than 4 hours per day, typically during day, evening and weekend hours. Any agency may offer additional hours on additional days in addition to these minimum requirements (up to the daily max).<br>3. Individuals participating in the service at any given time must have the opportunity to participate in and make decisions about the activities that are conducted or services offered within the AD Peer Support Program, and about the schedule of those activities and services, as well as other operational issues.<br>4. The AD Peer Support Program should operate as an integral part of the agency's scope of services.<br>5. When needed and in collaboration with a participant, the Program Leader may call multidisciplinary team meetings regarding that individual's needs and desires, and a Certified Peer Specialist Addictive Diseases (CPS-AD) providing services for and with an individual must be allowed to participate in multidisciplinary team meetings. |
| Staffing Requirements | 1. The individual leading and managing the day-to-day operations of the program must be a CPS-AD.<br>2. The AD Peer Support Program shall be supervised by an independently licensed practitioner or one (1) of the following addiction credentials: MAC, CAADC, GCADC-II or -III, or CAC-II.<br>3. CPS-AD Program Leader is dedicated to the service at least 20 hours per week.<br>4. The Program Leader and other CPS-Ads AD Peer Support Recovery program may be shared with other programs as long as the Program Leader is present at least 50% of the hours the Peer Recovery program is in operation, and as long as the Program leader and the CPS-AD are available as required for supervision and clinical operations, and as long as they are not counted in individual to staff ratios for 2 different programs operating at the same time. |

## AD Peer Support Program

5. Services must be provided and/or activities led by staff who are CPS-Ads or other individuals under the supervision of a CPS-AD. A specific activity may be led by someone who is not a consumer but is a guest invited by peer leadership.

6. The maximum face-to-face ratio cannot be more than 15 individuals to 1 CPS-AD direct service/program staff, based on the average daily attendance in the past three (3) months of individuals in the program.

7. All CPS-Ads providing this support must have an understanding of recovery principles as defined by the Substance Abuse Mental Health Services Administration and the Recovery Bill of Rights published by Faces and Voices of Recovery, Inc. and must possess the skills and abilities to assist other individuals in their own recovery processes.

### Clinical Operations

1. This service must operate at an established site approved to bill Medicaid for services. However, individuals or group activities may take place offsite in natural community settings as appropriate for the individualized Recovery Plan (IRP) developed by each individual with assistance from the program staff.

2. Individuals receiving AD Peer Support Program services must demonstrate or express a need for recovery assistance.

3. Individuals entering AD Peer Support Program services must have a qualifying diagnosis present in the medical record prior to the initiation of formal clinical services. The diagnosis must be given by persons identified in O.C.G.A. Practice Acts as qualified to provide a diagnosis.

4. This service may operate in the same building as other day services; however, there must be a distinct separation between services in staffing, program description, and physical space during the hours the Peer Recovery program is in operation except as noted above.

5. Adequate space, equipment, furnishings, supplies, and other resources must be provided in order to effectively provide services and so that the program environment is clean and in good repair. Space, equipment, furnishings, supplies transportation, and other resources for individual use within the Peer Recovery program must not be substantially different from space provided for other uses for similar numbers of individuals.

6. Staff of the AD Peer Support Program must be treated as equal to any other staff of the facility or organization and must be provided equivalent opportunities for training (both mandated and offered) and pay and benefits competitive and comparable to the state's peer workforce and based on experience and skill level.

7. When this service is used in conjunction with Psychosocial Rehabilitation or ACT, documentation must demonstrate careful planning to maximize the effectiveness of this service as well as appropriate reduction in service amounts. Utilization of this service in conjunction with these services is subject to review by the Administrative Services Organization.

8. Each individual must be provided the opportunity for peer assistance in the form of recovery coaches and allies and community networking to achieve stated goals.

9. AD Peer Support Programs must offer a range of recovery activities developed and led by consumers, with the recognition of and respect for the fact that there are many pathways to recovery.

10. The program must have an AD Peer Support Program *Organizational Plan* addressing the following:
    a. A Recovery Bill of Rights as developed and promoted by Faces and Voices of Recovery, Inc. This philosophy must be actively incorporated into all services and activities and:
       i. View each individual as the driver of his/her recovery process.
       ii. Promote the value of self-help, peer support, and personal empowerment to foster recovery.
       iii. Promote information about the science of addiction, recovery.
       iv. Promote peer-to-peer training of individual skills, community resources, group and individual advocacy and the concept of "giving back".
       v. Promote the concepts of employment and education to foster self-determination and career advancement.
       vi. Support each individual to embrace SAMHSA's *Recovery Principles* and to utilize community resources and education regarding health, wellness and support from peers to replace the need for clinical treatment services.
       vii. Support each individual to fully participate in communities of their choosing in the environment most supportive of their recovery and that promotes housing of his/her choice and to build and support recovery connections and supports within his/her own community.
       viii. Actively seek ongoing input into program and service content so as to meet each individual's needs and goals and fosters the recovery process.
    b. A description of the particular consumer empowerment models utilized, types of activities offered, and typical daily activities and schedule. If offered, meals must be described as an adjunctive peer relation building activity rather than as a central activity.

## AD Peer Support Program

| | |
|---|---|
| Clinical Operations, continued | c. A description of the staffing pattern plans for staff who have or will have CPS-AD and appropriate addiction counselor credentials, and how staff are deployed to assure that the required staff-to-individual ratios are maintained, including how unplanned staff absences, illnesses, and emergencies are accommodated.<br><br>d. A description of how peer practitioners within the agency are given opportunities to meet with or otherwise receive support from other peers (including CPS-AD) both within and outside the agency.<br><br>e. A description of how individuals are encouraged and supported to seek Georgia certification as CPS-AD through participation in training opportunities and peer or other counseling regarding anxiety following certification.<br><br>f. A description of test-taking skills and strategies, assistance with study skills. Information about training and testing opportunities, opportunities to hear from and interact with peers who are already certified, additional opportunities for peer staff to participate in clinical team meetings at the request of a participant, and the procedure for the Program Leader to request a team meeting.<br><br>g. A description of the hours of operation, the staff assigned, and the types of services and activities provided for and by individuals served, as well as for families, parents, and /or guardians.<br><br>h. A description of the program's decision-making processes, including how participants' direct decision-making about both individual and program-wide activities and about key polices and dispute resolution processes.<br><br>i. A description of how individuals participating in the service at any given time are given the opportunity to participate in and  make decisions about the activities that are conducted or services offered within the Peer Recovery program, about the schedule of those activities and services, and other operational issues.<br><br>j. A description of the space furnishings, materials, supplies, transportation, and other resources available for individuals participating in the Peer Recovery services.<br><br>k. A description of the governing body and /or advisory structures indicating how this body/structure meets requirements for peer leadership and cultural diversity.<br><br>l. A description of how the plan for services and activities is modified or adjusted to meet the needs specified in IRP.<br><br>m. A description of how individual requests for discharge and change in service or service intensity are handled.<br><br>11. Assistive tools, technologies, worksheets, (e.g. SOAR; Recovery Check-Ins; Motivational Interviewing; Cultural Competence, Stigma & Labeling etc.) can be used by the Peer Recovery staff to work with the served individual to improve his/her communication about treatment, symptoms, improvements, etc. with treating behavior health and medical practitioners. |
| Documentation Requirements | 1. Providers must document services in accordance with the specifications for documentation requirements specified in Part II, Section III of the Provider Manual.<br>2. The provider has several alternatives for documenting progress notes:<br>  a.  Weekly progress notes must document the individual's progress relative to functioning and skills related to the person-centered goals identified in his/her IRP. This progress note aligns the weekly Peer Support-Group activities reported against the stated interventions on the individualized recovery plan, and documents progress toward goals. This progress note may be written by any practitioner who provided services over the course of that week; or<br>  b.  If the agency's progress note protocol demands a detailed daily note which documents the progress above, this daily detail note can suffice to demonstrate functioning, skills, and progress related to goals and related to the content of the group intervention; or<br>  c.  If the agency's progress note protocol demands a detailed hourly note which documents the progress above, this daily detail note can suffice to demonstrate functioning, skills, and progress related to goals and related to the content of the group intervention.<br>3.  While billed in increments, the Peer Support Program service is a program model. Daily time in/time out is tracked for while the person is present in the program, but due to time/in out not being required for each intervention, the time in/out may not correlate with the units billed as the time in/out will include breaks taken during the course of the program. However, the units noted on the log should be consistent with the units billed and, if noted, on the weekly progress note. If the units documented are not consistent, the most conservative number of units will be utilized and may result in a billing discrepancy.<br>4.  Rounding is applied to the person's cumulative hours/day at the Peer program (excluding non-programmatic time). The provider shall follow the guidance in the rounding policy included in this Provider Manual and, specific to this service, the person served must have participated in at least 50% of the hour in order to bill |

## AD Peer Support Program

for one unit of this service. For instance, if an individual participates in the program from 9-1:15 excluding a 30-minute break for lunch, his/her participating hours are 3.75 hours. The rounding policy is applied to the .75 hour and the units billed for that day are 4 units. Practitioner type must still be addressed and so that 4 units must be adequately assigned to either a U4 or U5 practitioner type as reflected in the log for that day's activities.

5. A provider shall record units in which the individual was actively engaged in services. Meals and breaks must not be included in the reporting of units of service delivered. Should an individual leave the program or receive other services during the range of documented time in/time out for Peer Support Program hours, the absence should be documented on the log.

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| SA Program, Practitioner Level 4, Out-of-Clinic | H0038 | HF | U4 | U7 | | 24.36 |
| SA Program, Practitioner Level 5, Out-of-Clinic | H0038 | HF | U5 | U7 | | 18.15 |
| Practitioner Level 5, Via interactive audio and video telecommunication systems | H0038 | GT | HF | U5 | | 15.13 |
| Utilization Criteria | TBD | | | | | |

## AD Peer Support Services – Individual

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| AD Peer Support Services | SA Program, Practitioner Level 4, In-Clinic | H0038 | HF | U4 | U6 | | 20.30 |
| | SA Program, Practitioner Level 5, In-Clinic | H0038 | HF | U5 | U6 | | 15.13 |
| | Practitioner Level 4, Via interactive audio and video telecommunication systems | H0038 | GT | HF | U4 | | 20.30 |
| Unit Value | 15 minutes | | | | | | |
| Service Definition | This service provides interventions (in an agency or community-based setting) which promote recovery, self-advocacy, relationship enhancement, self-awareness and values, and self-directed care. Individuals served are introduced to the reality that there are many different pathways to recovery and each individual determines his or her own way. Supports are recovery-oriented and occur when individuals share the goal of long-term recovery. Each participant identifies his/her own individual goals for recovery. Interventions must promote self-directed recovery by honoring the many pathways to recovery, by tapping into each participant's strengths and by helping each to recognize his/her "recovery capital", the reality that each individual has internal and external resources that they can draw upon to keep them well. Interventions are approached from a lived experience perspective but also are based upon the Science of Addiction Recovery framework. Supportive interactions include motivational interviewing, recovery planning, resource utilization, strengths identification and development, support in considering theories of change, building recovery empowerment and self-efficacy. There is also advocacy support with the individual to have recovery dialogues with their identified natural and formal supporters. | | | | | | |
| Admission Criteria | 1. Individual must have a substance related issue; and **one or more of the following:**<br>a. Individual needs peer-based recovery support for the acquisition of skills needed to engage in and maintain recovery; or<br>b. Individual needs assistance to develop self-advocacy skills to achieve decreased dependency on formalized treatment systems; or<br>c. Individual needs assistance and support to prepare for a successful work experience; or<br>d. Individual needs peer modeling to increased responsibilities for his /her own recovery. | | | | | | |
| Continuing Stay Criteria | 1. Individual continues to meet admission criteria; **and**<br>2. Progress notes document progress relative to goals identified in the Individualized Recover Plan, but treatment/recovery goals have not yet been achieved. | | | | | | |
| Discharge Criteria | 1. An adequate continuing care plan has been established; **and one or more of the following:**<br>2. Goals of the Individualized Recovery Plan have been substantially met; **or**<br>3. Individual served/family requests discharge; **or**<br>4. Transfer to another service/level is more clinically appropriate. | | | | | | |
| Service Exclusions | Crisis Stabilization Unit (however, those utilizing transitional beds within a Crisis Stabilization Unit may access this service). | | | | | | |

## AD Peer Support Services – Individual

| | |
|---|---|
| Clinical Exclusions | Individuals diagnosed with a mental illness that have no co-occurring Substance-Related Disorder. |
| Required Components | 1. AD Peer Supports are provided in 1:1 CPS-AD to person-served ratio.<br>2. This service will operate within one of the following administrative structures: as a Tier 1 or Tier 2 provider, an Intensive Outpatient Provider (IOP) specialty provider, a WTRS provider or an established peer program.<br>3. Individuals participating in the service at any given time must have the opportunity to participate in and make decisions about person-centered interactions offered by the CPS-AD.<br>4. AD Peer Support should operate as an integral part of the agency's scope of services.<br>5. When needed and in collaboration with a participant, the Program Leader may call multidisciplinary team meetings regarding that individual's needs and desires, and a Certified Peer Specialist Addictive Diseases (CPS-AD) providing services for and with an individual must be allowed to participate in multidisciplinary team meetings. |
| Staffing Requirements | 1. The providing practitioner is a Georgia-Certified Peer Specialist- Addictive Diseases (CPS-AD).<br>2. The work of the CPS-AD shall be supervised by an independently licensed practitioner or one of the following addiction credentials: MAC, CAADC, CGADC-II or -III, or CAC-II.<br>3. The individual leading and managing the day-to-day operations of the program is a CPS-AD.<br>4. There must be at least 1 CPS-AD on staff who may also serve as the program leader.<br>5. The maximum caseload ratio for CPS-AD cannot be more than 30 individuals to 1 CPS-AD direct service/program staff, based on the average daily attendance in the past three (3) months of individuals in the program.<br>6. All CPS-ADs providing this service must have an understanding of recovery principles as defined by the Substance Abuse Mental Health Services Administration and the Recovery Bill of Rights published by Faces and Voices of Recovery, Inc. and must possess the skills and abilities to assist other individuals in their own recovery processes. |
| Clinical Operations | 1. Individuals receiving AD Peer Support services must demonstrate or express a need for recovery assistance.<br>2. Individuals entering AD Peer Support services must have a qualifying diagnosis present in the medical record prior to the initiation of formal clinical services. The diagnosis must be given by persons identified in O.C.G.A. Practice Acts as qualified to provide a diagnosis.<br>3. If a CPS-AD serves as staff for an AD Peer Support Program and provides AD Peer Support-Individual, the agency has written work plans which establish the CPS-AD's time allocation in a manner that is distinctly attributed to each program.<br>4. CPS-Ads providing this service must be treated as equal to any other staff of the facility or organization and must be provided equivalent opportunities for training (both mandated and offered) and pay and benefits competitive and comparable to the state's peer workforce and based on experience and skill level.<br>5. Individuals should set their own individualized goals each will be assisted and encouraged to identify and utilize his/her existing "recovery capital".<br>6. Each service intervention is provided only in a 1:1 ratio between a CSP-AD and a person-served.<br>7. Each individual must be provided the opportunity for peer assistance in the form of recovery coaches and allies and community networking to achieve stated goals.<br>8. Peer Support services must offer a range of recovery activities developed and led by consumers, with the recognition of and respect for the fact that there are many pathways to recovery.<br>9. The program must have a Peer Support *Organizational Plan* addressing the following:<br>  a. A Recovery Bill of Rights as developed and promoted by Faces and Voices of Recovery, Inc. This philosophy must be actively incorporated into all services and activities and:<br>    i. View each individual as the driver of his/her recovery process.<br>    ii. Promote the value of self-help, peer support, and personal empowerment to foster recovery.<br>    iii. Promote information about the science of addiction, recovery.<br>    iv. Promote peer-to-peer training of individual skills, community resources, group and individual advocacy and the concept of "giving back."<br>    v. Promote the concepts of employment and education to foster self-determination and career advancement. |

## AD Peer Support Services – Individual

| | |
|---|---|
| | vi. Support each individual to embrace SAMHSA's *Recovery Principles* and to utilize community resources and education regarding health, wellness and support from peers to replace the need for clinical treatment services. |
| | vii. Support each individual to fully participate in communities of their choosing in the environment most supportive of their recovery and that promotes housing of his/her choice and to build and support recovery connections and supports within his/her own community. |
| | viii. Actively seek ongoing input into program and service content so as to meet each individual's needs and goals and fosters the recovery process. |
| | b. A description of the particular consumer empowerment models utilized, types of activities offered, and typical daily activities and schedule. If offered, meals must be described as an adjunctive peer relation building activity rather than as a central activity. |
| | c. A description of the staffing pattern plans for staff who have or will have CPS and appropriate credentials, and how staff are deployed to assure that the required staff-to-individual ratios are maintained, including how unplanned staff absences, illnesses, and emergencies are accommodated. |
| | d. A description of how CPS-Ads within the agency are given opportunities to meet with or otherwise receive support from other peers both within and outside the agency. |
| Clinical Operations, continued | e. A description of how individuals are encouraged and supported to seek Georgia certification as CPS-AD through participation in training opportunities and peer or other counseling regarding anxiety following certification. |
| | f. A description of test-taking skills and strategies, assistance with study skills. Information about training and testing opportunities, opportunities to hear from and interact with peers who are already certified, additional opportunities for peer staff to participate in clinical team meetings at the request of a participant, and the procedure for the Program Leader to request a team meeting. |
| | g. A description of the hours of operation, the staff assigned, and the types of services and activities provided for and by individuals served, as well as for families, parents, and/or guardians. |
| | h. A description of the program's decision-making processes, including how participants' direct decision-making about both individual and program-wide activities and about key polices and dispute resolution processes. |
| | i. A description of how individuals participating in the service at any given time are given the opportunity to participate in and make decisions about the activities that are conducted or services offered within the Peer Recovery program, about the schedule of those activities and services, and other operational issues. |
| | j. A description of the materials, supplies, transportation, and other resources available for individuals participating in the Peer Recovery services. |
| | k. A description of the governing body and / or advisory structures indicating how this body/structure meets requirements for peer leadership and cultural diversity. |
| | l. A description of how the plan for services and activities is modified or adjusted to meet the needs specified in IRP. |
| | m. A description of how individual requests for discharge and change in service or service intensity are handled; and |
| | n. Assistive tools, technologies, worksheets, (e.g., SOAR, Recovery Check-Ins, Motivational Interviewing; Cultural Competence, Stigma & Labeling etc.) can be used by the Peer Recovery staff to work with the served individual to improve his/her communication about treatment, symptoms, improvements, etc. with treating behavioral health and medical practitioners. |
| Service Accessibility | To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:<br>• the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or<br>• the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.<br><br>Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. |
| Documentation Requirements | Providers must document services in accordance with the specifications for documentation requirements in Part II, Section III of the Provider Manual. |

## AD Peer Support Services – Individual

| Billing & Reporting Requirements | When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |
| --- | --- |

## Ambulatory Substance Abuse Detoxification

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Alcohol and/or Drug Services; Ambulatory Detoxification | Practitioner Level 2, In-Clinic | H0014 | U2 | U6 | | | 38.97 |
| | Practitioner Level 3, In-Clinic | H0014 | U3 | U6 | | | 30.01 |
| | Practitioner Level 4, In-Clinic | H0014 | U4 | U6 | | | 20.30 |

| Unit Value | 15 minutes | | Utilization Criteria | TBD |
| --- | --- | --- | --- | --- |

| Service Definition | This service is the medical monitoring of the physical process of withdrawal from alcohol or other drugs in an outpatient setting for those individuals with an appropriate level of readiness for behavioral change and level of community/social support. It is indicated when the individual experiences physiological dysfunction during withdrawal, but life or significant bodily functions are not threatened.

This service must reflect ASAM (American Society of Addiction Medication) Levels 1-WM (Ambulatory Without Extended On-Site Monitoring) and 2-WM (Ambulatory with Extended Onsite Monitoring) and focuses on rapid stabilization and entry into the appropriate level of care/treatment based upon the ASAM guidelines placement criteria. These services may be provided in traditional Outpatient, Intensive Outpatient, Day Treatment, Intensive Day Treatment or other ambulatory settings. |
| --- | --- |
| Admission Criteria | Individual has a Substance Related Disorder (ASAM PPC-2, Dimension-1) that is incapacitating, destabilizing or distressing. If the severity is incapacitating, there must be sufficient optimization in other dimensions of the individual's life to provide for safe withdrawal management in an outpatient setting, and individual meets the following three criteria:
1. Individual is experiencing signs and symptoms of withdrawal, or there is evidence (based on history of substance intake, age, gender, previous withdrawal history, present symptoms, physical condition, and/or emotional/behavioral condition) that withdrawal is imminent; and the individual is assessed to be at minimal (Level 1-WM) to moderate (Level 2-WM) risk of severe withdrawal syndrome outside the program setting and can safely be managed at this service level; and
2. Individual has no incapacitating physical or psychiatric complications that would preclude ambulatory detoxification services; and
3. Individual is assessed as likely to complete needed withdrawal management and to enter into continued treatment or self-help recovery as evidenced by:
   a. Individual or support persons clearly understand and are able to follow instructions for care; and
   b. Individual has adequate understanding of and expressed interest to enter into ambulatory detoxification services; or
   c. Individual has adequate support services to ensure commitment to completion of withdrawal management and entry into ongoing treatment or recovery; or
   d. Individual evidences a willingness to accept recommendations for treatment once withdrawal has been managed. |
| Continuing Stay Criteria | Individual's withdrawal signs and symptoms are not sufficiently resolved so that the individual can participate in self-directed recovery or ongoing treatment without the need for further medical or withdrawal management monitoring. |
| Discharge Criteria | 1. Adequate continuing care plan has been established; and one or more of the following:
2. Goals of the Individualized Recovery Plan have been substantially met; or
3. Individual/family requests discharge and individual is not imminently dangerous; or
4. Withdrawal signs and symptoms have failed to respond to treatment and have intensified (as confirmed by higher scores on CIWA-Ar or other comparable standardized scoring system) such that transfer to a more intensive level of withdrawal management service is indicated; or |

## Ambulatory Substance Abuse Detoxification

|  |  |
|---|---|
| | 5. Individual has been unable to complete Level 1-WM/2-WM despite an adequate trial. |
| Service Exclusions | ACT, Nursing and Medication Administration (Medication administered as a part of Ambulatory Detoxification is not billed separately as Medication Administration). |
| Clinical Exclusions | 1. Substance Use Disorder has incapacitated the individual in all aspects of daily living, there is resistance to treatment as in ASAM Dimension 4, relapse potential is high (Dimension 5), and the recovery environment is poor (Dimension 6).<br>2. Concomitant medical condition and/or other behavioral health issues warrant inpatient/residential treatment.<br>3. This service code does not cover withdrawal management treatment for cannabis, amphetamines, cocaine, hallucinogens and phencyclines. |
| Required Components | 1. This service must be licensed by DCH/HFR under the Rules and Regulations for Drug Abuse Treatment Programs, 290-4-2.<br>2. There must be a written service order for Ambulatory Detoxification and must be completed by members of the medical staff pursuant to the Medical Practice Act of 2009, Subsection 43-34-23 Delegation of Authority to Nurse and Physician Assistant and in the individual's record is required to initiate ambulatory detoxification services. Verbal orders or those initiated by other appropriate members of the medical staff are acceptable provided the physician signs them within 24 hours or the next working day. |
| Clinical Operations | 1. The severity of the individual's symptoms, level of supports needed, and the authorization of appropriate medical staff for the service will determine the setting, as well as the amount of nursing and physician supervision necessary during the withdrawal process. The individual may or may not require medication, and 24-hour nursing services are not required. However, there is a contingency plan for "after hours" concerns/emergencies.<br>2. In order for this service to have best practice impact, the Individualized Recovery/Resiliency Plan should consider group and individual counseling and training to fully support recovery. |

## Assertive Community Treatment

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Assertive Community Treatment | Practitioner Level 1, In-Clinic | H0039 | U1 | U6 | | | $32.46 |
| | Practitioner Level 2, In-Clinic | H0039 | U2 | U6 | | | $32.46 |
| | Practitioner Level 3, In-Clinic | H0039 | U3 | U6 | | | $32.46 |
| | Practitioner Level 4, In-Clinic | H0039 | U4 | U6 | | | $32.46 |
| | Practitioner Level 5, In-Clinic | H0039 | U5 | U6 | | | $32.46 |
| | Practitioner Level 3, Group, In-Clinic | H0039 | HQ | U3 | U6 | | $6.60 |
| | Practitioner Level 4, Group, In-Clinic | H0039 | HQ | U4 | U6 | | $4.43 |
| | Practitioner Level 5, Group, In-Clinic | H0039 | HQ | U5 | U6 | | $3.30 |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Practitioner Level 1, Out-of-Clinic | H0039 | U1 | U7 | | | $32.46 |
| Practitioner Level 2, Out-of-Clinic | H0039 | U2 | U7 | | | $32.46 |
| Practitioner Level 3, Out-of-Clinic | H0039 | U3 | U7 | | | $32.46 |
| Practitioner Level 4, Out-of-Clinic | H0039 | U4 | U7 | | | $32.46 |
| Practitioner Level 5, Out-of-Clinic | H0039 | U5 | U7 | | | $32.46 |
| Practitioner Level 3, Group, Out-of-Clinic | H0039 | HQ | U3 | U7 | | $6.60 |
| Practitioner Level 4, Group, Out-of-Clinic | H0039 | HQ | U4 | U7 | | $4.43 |
| Practitioner Level 5, Group, Out-of-Clinic | H0039 | HQ | U5 | U7 | | $3.30 |

## Assertive Community Treatment

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Practitioner Level 1, Via interactive audio and video telecommunication systems | H0039 | GT | U1 | $32.46 | Multidisciplinary Team Meeting | H0039 | HT | $0.00 |
| Practitioner Level 2, Via interactive audio and video telecommunication systems | H0039 | GT | U2 | $32.46 | | | | |

| Unit Value | 15 minutes | | | | | | | TBD |

**Utilization Criteria**

**Service Definition**

ACT is an Evidence Based Practice that is person-centered, recovery-oriented, and a highly intensive community-based service for individuals who have serious and persistent mental illness. The individual's mental illness has significantly impaired his or her functioning in the community. ACT provides a variety of interventions twenty-four (24) hours, seven days a week. The service utilizes a multidisciplinary mental health team from the fields of psychiatry nursing, psychology, social work, substance use disorders, and vocational rehabilitation; additionally, a Certified Peer Specialist is an active member of the ACT Team providing assistance with the development of natural supports, promoting socialization, and the strengthening of community living skills. The ACT Team works as one organizational unit providing community-based interventions that are rehabilitative, intensive, integrated, and stage specific. Services emphasize social inclusiveness though relationship building and the active involvement in assisting individuals to achieve a stable and structured lifestyle. The service providers must develop programmatic goals that clearly articulate the use of best/evidence-based practices for ACT recipients using co-occurring and trauma-informed service delivery and support. Practitioners of this service are expected to maintain knowledge and skills according to the current research trends in best/evidence-based practices. ACT is a unique treatment model in which the majority of mental health services are directly provided internally by the ACT program in the recipient's natural environment. ACT services are individually tailored with each individual to address his/her preferences and identified goals, which are the basis of the Individualized Recovery Plan (IRP). Based on the needs of the individual, services may include (in addition to those services provided by other systems):

1. Assistance to facilitate the individual's active participation in the development of the IRP;
2. Psycho educational and instrumental support to individuals and their identified family;
3. Crisis planning, Wellness Recovery Action Plan (WRAP), assessment, support and intervention;
4. Psychiatric assessment and care; nursing assessment and care; psychosocial and functional assessment which includes identification of strengths, skills, resources and needs;
5. Curriculum-based group treatment;
6. Individualized interventions, which may include:
   a. Identification, with the individual, of barriers that impede the development of skills necessary for independent functioning in the community; as well as existing strengths which may aid the individual in recovery and goal achievement;
   b. Support to facilitate recovery (including emotional/therapeutic support/assistance with defining what recovery means to the individual in order to assist individual with recovery-based goal setting and attainment);
   c. Service and resource coordination to assist the individual with the acquisition and maintenance of recovery capital (i.e. gaining access to necessary internal and external rehabilitative, medical and other services) required for recovery initiation and self-maintenance;
   d. Family counseling/training for individuals and their families (as related to the person's IRP);
   e. Assistance to develop both mental illness and physical health symptom monitoring and illness self-management skills in order to identify and minimize the negative effects of symptoms which interfere with the individual's daily living (may include medication administration and/or observation and assistance with self- medication motivation and skills) and to promote wellness;
   f. Assistance with accessing entitlement benefits and financial management skill development;
   g. Motivational assistance to develop and work on goals related to personal development and school or work performance;
   h. Substance use disorder counseling and intervention (e.g. motivational interviewing, stage-based interventions, refusal skill development, cognitive behavioral therapy, psycho educational approaches, instrumental support such as helping individual relocate away from friends/neighbors who influence drug use, relapse prevention planning and techniques etc.);

## Assertive Community Treatment

| Admission Criteria | i. Individualized, restorative one-to-one psychosocial rehabilitation and skill development, including assistance in the development of interpersonal/social and community coping and functional skills (i.e. adaptation/functioning in home, school and work environments); |
| --- | --- |

j. Psychotherapeutic techniques involving the in-depth exploration and treatment of interpersonal and intrapersonal issues, including trauma issues; and

k. Any necessary monitoring and follow-up to determine if the services accessed have adequately met the individual's needs; and

l. Individuals receiving this intensive level of community support are expected to experience increased community tenure and decreased frequency and/or duration of hospitalization/crisis services. Through individualized, team-based supports, it is expected that individuals will achieve housing stability, decreased symptomatology (or a decrease in the debilitating effects of symptoms), improved social integration and functioning, and increased movement toward self-defined recovery.

1. Individuals with serious and persistent mental illness that seriously impairs the ability to live in the community. **Priority** is given to people recently discharged from an institutional setting with schizophrenia, other psychotic disorders, or bipolar disorder, because these illnesses more often cause long-term psychiatric disability;

**AND**

2. Individuals with significant functional impairments as demonstrated by the need for assistance in 3 or more of the following areas which despite support from a caregiver or behavioral health staff continues to be an area that the individual cannot complete:

a. Maintaining personal hygiene;

b. Meeting nutritional needs;

c. Caring for personal business affairs;

d. Obtaining medical, legal, and housing services;

e. Recognizing and avoiding common dangers or hazards to self and possessions;

f. Persistent or recurrent failure to perform daily living tasks except with significant support or assistance from others such as friends, family, or relatives;

g. Employment at a self-sustaining level or inability to consistently carry out homemaker roles (e.g., household meal preparation, washing clothes, budgeting or childcare tasks and responsibilities);

h. Maintaining a safe living situation (e.g., evicted from housing, or recent loss of housing, or imminent risk of loss of housing);

**AND**

3. Individuals with **two or more of the following issues** that are indicators of continuous high-service needs (i.e. greater than 8 hours of service per month):

a. High use of acute psychiatric hospitals or crisis/emergency services including mobile, in-clinic, Psychiatric Residential Treatment Facility (PRTF) or crisis residential (e.g., 3 or more admissions in a year) or extended hospital or PRTF stay (60 days in the past year) or psychiatric emergency services.

b. Persistent, recurrent, severe, or major symptoms that place the individual at risk of harm to self or others (e.g., command hallucinations, suicidal ideations or gestures, homicidal ideations or gestures, self-harm).

c. Coexisting substance use disorder of significant duration (e.g., greater than 6 months) or co-diagnosis of substance abuse.

d. High risk for or a recent history of criminal justice involvement related to mental illness (e.g., arrest and incarceration).

e. Chronically homeless (e.g., 1 extended episode of homelessness for a year, or 4 episodes of homelessness within 3 years).

f. Residing in an inpatient bed (i.e., state hospital, community hospital, CSU) or in a supervised community residence, but clinically assessed to be able to live in a more independent living situation if intensive services are provided or requiring a residential or institutional placement if more intensive services are not available.

g. Inability to participate in traditional clinic-based services (must provide evidence of multiple agency trials if this is the only requirement met on the list).

## Assertive Community Treatment

**AND**

4. Meets one or more of the criteria below:

   a. Individual is transitioning from a state forensic or adult mental health unit after an extended length of stay and the hospital's treatment team determines that due to the individual's history and/or potential risk if non-compliant with clinic-based community services a period of ACT is clinically necessary prior to transition to less intensive services;

   b. Within the last 180 days, the individual has been incarcerated 2 or more times related to a behavioral health condition; or

   c. Within the last 180 days, individual has been admitted to a psychiatric hospital or crisis stabilization unit 2 or more times.

   d. Past (within 180 days of admission) or current response to other traditional, community-based intensive behavioral health treatment has shown minimal effectiveness/unsuccessful treatment (e.g. Psychosocial Rehabilitation, ICM, etc.). The individual has been unsuccessfully treated in the traditional mental health service system at a level of greater than 8 hours of service per month. The recipient may have experienced chronic homelessness and/or criminal justice involvement; and may have had multiple and/or extended stays in state psychiatric/public hospitals. Admission documentation must include evidence to support this criterion.

| Continuing Stay Criteria | Individual meets two (2) or more of the requirements below: |
|---|---|

Individual meets two (2) or more of the requirements below:

1. Individual has been admitted to an inpatient psychiatric hospital, received services from a temporary observation unit or crisis service center, and/or received in-person crisis intervention services from ACT or Mobile Crisis one or more times in the past six (6) months;

2. Individual has had contact with Police/Criminal Justice System due to behavioral health problems in the past six (6) months;

3. Individual has displayed inability to maintain stable housing in the community due to behavioral health problems (i.e. individual fails to maintain home with safe living conditions such as insect infestation, damaging property, etc.) during the past six (6) months;

4. Individual continues to demonstrate significant functional impairments and/or difficulty developing a natural support system which allows for consistent maintenance of medical, nutritional, financial, and legal responsibilities without incident in the past six (6) months. Examples include, but are not limited to:

   a. **Natural Supports**: Inability to identify, engage, and maintain relationships with friends and/or family support;

   b. **Medical**: Unable to comply with medical recommendations which results in significant health risk (such as inability to identify the need for medical attention, refusal to engage with traditional healthcare systems for medical needs (e.g. PCP appointments, etc.), demonstrated inability to manage medication even with available supports, continued use of alcohol or illicit drugs despite adverse consequences;

   c. **Activities of Daily Living**: Inability to maintain personal hygiene. Persistent or recurrent failure to perform daily living tasks except with significant support or assistance from others such as friends, family, or relatives. Failure to recognize and avoid common dangers or hazards to self and possessions;

   d. **Nutritional/Financial**: Consistent pattern of misuse of benefits such as SNAP, TANF, WIC, etc. such as documented evidence of selling food benefits for money or drugs and creating the frequent condition of lack of nourishment;

   e. **Legal Responsibilities**: Inability to comprehend illegal and legal actions, consistent engagement of high-risk illegal behaviors, or failure to comply with mandated community supervision or court orders.

5. Individual has displayed persistent, recurrent, severe, or major symptoms that place him/her at risk of harm to self or others (e.g. command hallucinations, suicidal ideation or gestures, homicidal ideation or gestures, self-harm) in the past six (6) months.

6. Documented efforts of attempts to transition an individual within the prior 6 months have resulted in unsuccessful engagement in traditional clinic-based behavioral health services and the subsequent need for ACT level intensity of services continues.

| Discharge Criteria | |
|---|---|

1. No individual should be considered for discharge prior to 45 days of consecutive outreach and documentation of attempted contacts (calls, visits to various locations, collateral/informal contacts etc.).

2. An adequate continuing care plan has been established; **and one or more of the following:**

   a. Individual no longer meets admission criteria; **or**

   b. Goals of the Individualized Recovery Plan have been substantially met; **or**

## Assertive Community Treatment

| | |
|---|---|
| | c. Individual requests discharge and is not in imminent danger of harm to self or others; **or** |
| | d. Transfer to another service/level of care is warranted by a change in individual's condition; **or** |
| | e. Individual requires services not available in this level of care. |
| **Service Exclusions** | 1. ACT is a comprehensive team intervention and most services are excluded, with the exceptions of: |
| |    a. Peer Supports; |
| |    b. Residential Supports; |
| |    c. Community Transition Planning (to be utilized as a person is transitioning to/from an inpatient setting, jail, or CSP); |
| |    d. Group Training/Counseling (within parameters listed in Section A); |
| |    e. Supported Employment; |
| |    f. Psychosocial Rehabilitation – Group; |
| |    g. SA Intensive Outpatient (If a substance use disorder is identified and documented as a clinical need unable to be met by the ACT team Substance Abuse counselor, and the individual's current treatment progress indicates that provision of ACT services alone, without an organized SA-program model, is not likely to result in the individual's ability to maintain sobriety ACT teams may assist the individual in accessing this service, but must ensure clinical coordination in order to avoid duplication of services. If ACT and SAIOP are provided by the same agency, the agency may update the existing authorization to include group services to be utilized by the SAIOP program; |
| |    h. Group therapy is not a service exclusion when the needs of an individual exceed that which can be provided by the ACT team, the individual may participate in SA group treatment provided by a Tier 1 or Tier 2 provider or SA-IOP provider upon documentation of the demonstrated need. |
| |    i. Specialized evidence-based practices are not service exclusions (excluded) when the needs of an individual exceed that which can be provided by the ACT team (e.g. specialized treatment for PTSD, eating disorders, personality disorders, and/or other specific clinical specialized treatment needs). In this case, the Individual's recovery plan (IRP) must reflect the necessity for participation in such services along with medical record documentation of the unique need and resulting collaboration between service providers to ensure coordination towards goals and to prevent any duplication of services/effort; and |
| |    j. High Utilization Management. |
| | 2. On an individual basis, up to eight (8) weeks of some services may be provided to ACT consumers to facilitate a smooth transition from ACT to these other community services. A transition plan must be adequately documented in the IRP and clinical record. These services are: |
| |    a. Case Management/Intensive Case Management. |
| |    b. Psychosocial Rehabilitation Individual/Group. |
| |    c. AD Support Services. |
| |    d. Behavioral Health Assessment. |
| |    e. Service Plan Development. |
| |    f. Diagnostic Assessment. |
| |    g. Physician Assessment (specific to engagement only). |
| |    h. Individual Counseling (specific to engagement only). |
| | 3. ACT recipients who also receive a DBHDD Residential Service may not receive ACT-provided skills training which is a part of the "residential" service. The ACT provider shall be in close coordination with the Residential provider such that there is no duplication of services supports/efforts. |
| | 4. Those receiving Medicaid I/DD Waivers who meet the admission criteria above may be considered for this service as long as his/her waiver service plan is not so comprehensive in nature as to be duplicative to the ACT service scope. |
| **Clinical Exclusions** | 1. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition/substance use disorder co-occurring with one of the following diagnoses: Developmental Disability, Autism, Neurocognitive Disorder, Substance-Related Disorder. |
| | 2. Individuals may be excluded if there is evidence that they are unable to participate in the development of their Individual Recovery Plan as a result of significant impairment due to an I/DD diagnosis. |

## Assertive Community Treatment

1. Assertive Community Treatment must include a comprehensive and integrated set of medical and psychosocial services provided in non-office settings 80% of the time by a mobile multidisciplinary team. The team must provide community support services interwoven with treatment and rehabilitative services and regularly scheduled team meetings which will be documented in the served individual's medical record.

2. Ideally, and in accordance with the Dartmouth Assertive Community Treatment Scale (DACTS), the Treatment Team meeting must be held a minimum of 4 times a week with time dedicated to discussion of support to a specific individual, and documentation in the log of the Treatment Team Meetings as indicated in the Documentation Requirements section below. Each individual must be discussed, even if briefly, in each Treatment Team Meeting. The Treatment Team Meetings are to review the status of all individuals and the outcome of the most recent staff contacts, develop a master staff work schedule for the day's activities, and all ACT team members are expected to attend; exception of nonattendance can be made and documented by the Team Leader. The psychiatrist must participate at least one time/week in the ACT team meetings.

3. Each ACT team will identify an Individual Treatment Team (ITT) for each enrolled ACT individual.

4. Individuals will be provided assistance by the ACT team with gaining skills and resources necessary to obtain housing of the individual's choice, including completion of the housing need and choice survey (https://dbhddapps.dbhdd.ga.gov/NSH/) upon admission and with the development of a housing goal, which will be minimally updated at each reauthorization.

5. Services and interventions must be individually tailored to the needs, goals, preferences and assets of the individual with the goals of maximizing independence and recovery as defined by the individual.

6. At least 80% of all service units must involve face-to-face contact with individuals. Eighty percent (80%) or more of face-to-face service units must be provided outside of program offices in locations that are comfortable and convenient for individuals (including the individual's home, based on individual need and preference and clinical appropriateness).

7. During the course of ACT service delivery, the ACT Team will provide the intensity and frequency of service needed for each individual. ACT teams are expected to achieve fidelity with the DACTS Model. To achieve a score of "4" in the Frequency of Contact Measure within DACTS, ACT Teams must provide a median of 3‑3.99 face-to-face contacts per week across a sample of agency's ACT individuals. This measure is calculated by determining the median of the average weekly face-to-face contacts of each individual in the sample. At least one of these monthly contacts must include symptom assessment/management and management of medications.

8. During discharge transition, the number of face-to-face visits per week will be determined based on the person's mental health acuity with the expectation that these individuals participating in ACT transitioning must receive a minimum of 2 face-to-face contacts per month during the documented active transition period.

9. Service may be delivered by a single team member to 2 ACT individuals at the same time if their goals are compatible, however, this cannot be a standard practice. Services cannot be offered to more than 2 individuals at a time (exception: Item A.8.).

10. ACT recipients can receive limited Group Training/Counseling (up to 20 units/week) when a curriculum-based therapeutic group is offered such as Dialectical Behavioral Therapy (DBT), Motivational Enhancement, Integrative Dual Diagnosis Treatment (IDDT), etc. For this to be allowable, the ACT participants must have clinical needs and recovery goals that justify intervention by staff trained in the implementation of the specific curriculum-based therapy.
    a. This group may be offered to no less than 3 individuals and no more than 10 ACT participants at one time.
    b. Only ACT enrolled individuals are permitted to attend these group services.
    c. Acceptable group practitioners are those on the ACT team who meet the practitioner levels as follows:
        i. Practitioner Level 1: Physician/Psychiatrist.
        ii. Practitioner Level 2: Psychologist, CNS-PMH.
        iii. Practitioner Level 3: LCSW, LPC, LMFT, and RN. In addition, and only performing these functions related to the treatment of substance use disorders: MAC, CAADC, GCADC-II or -III, and CAC-II.
        iv. Practitioner Level 4: LMSW, APC, AMFT, and Psychologist/LCSW/LPC/LMFT's supervisee/trainee with at least a Bachelor's Degree in one of the helping professions such as social work, community counseling, counseling, psychology, or criminology, functioning within the scope of the practice acts of the state. In addition, and only performing these functions related to the treatment of substance use disorders: GCADC-I (with

**Required Components**

## Assertive Community Treatment

| | |
|---|---|
| | Bachelor's Degree), CAC-I (with Bachelor's Degree), or Certified Alcohol and Drug Counselor-Trainee (with Bachelor's Degree and under supervision). |

v. Practitioner Level 5: GCADC-I (without Bachelor's Degree), CAC-I (without Bachelor's Degree), or Certified Alcohol and Drug Counselor-Trainee (without Bachelor's Degree and under supervision) (practitioners at this level may only perform these functions related to treatment of substance use disorders).

d. Ideally, 50% of individuals with co-occurring substance use disorders will participate in a substance abuse group at least once per month with their ACT provider. If there are 2 practitioners leading the group who are the same practitioner level (i.e. two U3 practitioners), then each may split the responsibility for documentation and singly sign a note. In this situation, there must be evidence in the note of who was the co-leader of that group to document the compliance expectations for two practitioners.

e. If a group is facilitated by two practitioners who are not the same U-level (i.e. one is a U3 and one is a U4), then these co-leaders may split the responsibility for documenting group progress notes. If the lower-leveled practitioner writes the progress note, the upper level person's practitioner level can be billed if the higher practitioner-leveled person co-signs the note. If the higher-level practitioner writes the note, then he/she shall document the co-leaders participation and can solely sign that note.

**Staffing Requirements**

1. Assertive Community Treatment Team members must include:
   a. (1 FT Employee required) A fulltime Team Leader who is the clinical and administrative supervisor of the team, and also functions as a practicing clinician on the team; this individual must have at least 2 years of documented experience working with adults with a SPMI and one of the following qualifications to be an "independently licensed practitioner." It is expected that the practicing ACT Team Leader provides direct services at least 10 hours per week with the remaining work hours encompassing team-focused activities. The Team Leader must be a FT employee and dedicated to only the ACT team.
      i. Physician
      ii. Psychologist
      iii. Physician's Assistant
      iv. APRN
      v. RN with a 4-year BSN
      vi. LCSW
      vii. LPC
      viii. LMFT
      ix. One of the following as long as the practitioner below is under supervision in accordance with O.C.G.A. § 43-10A-11:
         • LMSW*
         • APC*
         • AMFT*
         * If the team lead is not independently licensed, then clinical supervision duties should be delegated appropriately in accordance with expectations set forth in O.C.G.A. Practice Acts.
   b. (Variable:.2-1.0 FTE required) Depending on individual enrollment, a full or part time Psychiatrist who:
      i. provides clinical and crisis services to all team consumers;
      ii. delivers services in the recipient's natural environment when the individual is unable or unwilling to access a traditional service setting (this allowance is only for psychiatrists. Also, adherence to the 80% of the entire team's services provided in non-office settings requirement above is still maintained);
      iii. works with the team leader to monitor each individual's clinical and medical status and response to treatment; and
      iv. directs psychopharmacologic and medical treatment (at a minimum, must provide monthly medication management for each individual);
      v. must provide a minimum of 14 hours per week of direct support to the ACT team/ACT consumers;
      vi. the psychiatrist must participate in at least one time/week in the ACT team meetings; and

# Assertive Community Treatment

vii. The psychiatrist (including Physician Extender) to ACT individual ratio must not be greater than 1:100. Specifically:

- With 1-50 consumers, the requirement for the ACT team is to employ a Psychiatrist/Physician Extender minimally .35-.5 FTE (14 hrs./wk-20 hrs./wk.) providing support to the team and;
- With 51-65 consumers, the requirement for the ACT team is to employ a Psychiatrist/Physician Extender minimally .36-.65 FTE (14.4 hrs./wk-26 hrs./wk.) providing support to the team and;
- With 66-75 consumers, the requirement for the ACT team is to employ a Psychiatrist/Physician Extender t minimally .47-.75 FTE (18.8 hrs./wk-30 hrs./wk.) providing support to the team; and
- With 76-100 consumers, the requirement for the ACT team is to employ a Psychiatrist/Physician Extender minimally .54 FTE-1 FTE (21.6 hrs. /wk-40 hrs./wk.) providing support to the team.
- Teams utilizing a physician extender (APRN, NP, or PA) for part of the Psychiatrist time outlined above must maintain enough Psychiatrist time (not including physician extenders) to obtain a score of at least 3 on the Psychiatrist staffing item (.40FTE Psychiatrist per 100 consumers). The Psychiatrist's FTE and the physician extender's FTE combined would yield at least a 4 (.70 combined FTE per 100 consumers) on the DACTS. The physician extender's FTE that fulfills this requirement could not also be counted as fulfilling the FTE requirements for the RNs for the team (i.e. no portion of an FTE may be counted twice).
- The ACT Team Psychiatrist would see each new admission to the ACT Team in a face-to-face appointment and would review each case with the physician extender on a monthly basis.
- The physician extender would be expected to participate in ACT team meetings at least once per week as would the supervising Psychiatrist be expected to participate in an ACT team meeting at least once per week.

c. (1-2 Fulltime Employee/s) RN/s who provide nursing services for all individuals, including health and psychiatric assessments, education on adherence to treatment, prevention of medical issues, rehabilitation, nutritional practices and works with the team to monitor each individual's overall physical health and wellness, clinical status and response to treatment

   i. With 1-50 consumers, the requirement for the ACT team is to employ a Registered Nurse minimally .7-1 FTE (28 hrs./wk-40 hrs./wk.) providing support to the team;
   ii. With 51-65 consumers, the requirement for the ACT team is to employ a Registered Nurse minimally .73 FTE-1.3 FTE (29.2 hrs./wk-52 hrs./wk.) providing support to the team;
   iii. With 66-75 consumers, the requirement for the ACT team is to employ a Registered Nurse(s) .93 FTE-1.5 FTE (37.2 hrs./wk-60 hrs./wk.) providing support to the team and; and
   iv. With 76-100 consumers, the requirement for the ACT team is to employ a Registered Nurse (s) 1.3 FTE -2 FTE (52 hrs. /wk-80 hrs. /wk. providing support to the team.

d. An addiction practitioner who holds a CAC-I (or other addiction certification equivalent or higher) and assesses the need for and provides and/or accesses substance use disorder treatment and supports for team consumers.
   i. With 1-50 consumers, the requirement for the ACT team is to employ an addiction practitioner minimally .7-1 FTE (28 hrs./wk-40 hrs./wk.) providing support to the team; and
   ii. With 51-65 consumers, the requirement for the ACT team is to employ an addiction practitioner minimally .73 FTE-1.3 FTE (29.2 hrs./wk-52 hrs./wk.) providing support to the team; and
   iii. With 66- 75 consumers, the requirement for the ACT team is to employ an addiction practitioner .93 FTE-1.5 FTE (37.2 hrs./wk-60 hrs./wk.) providing support to the team; and
   iv. With 76-100 consumers, the requirement for the ACT team is to employ an addiction practitioner 1.3 FTE -2 FTE (52 hrs. /wk-80 hrs. /wk. providing support to the team.

## Assertive Community Treatment

e. (1 FTE employee) A full-time practitioner licensed to provide psychotherapy/counseling under the practice acts or a person with an associate license who is supervised by a fully licensed clinician and provides individual and group support to team consumers (this position is in addition to the Team Leader).

f. (1 FTE) One FTE Certified Peer Specialist who is fully integrated into the team and promotes individual self-determination and decision-making and provides essential expertise and consultation to the entire team to promote a culture in which each individual's point of view and preferences are recognized, understood, respected and integrated into treatment, rehabilitation and community self-help activities. CPSs must be supervised by an independently licensed/credentialed practitioner on the team.

g. (2 FTEs) Two paraprofessional mental health workers who provide rehabilitation and support services under the supervision of a Licensed Clinician. The sum of the FTE counts for the following two bullets must equal at least 2 FTEs.

   i. (1 FTE) One of these staff must be a Vocational Specialist. A Vocational Specialist is a person with a minimum of one-year verifiable training and/or experience in vocational counseling.

   ii. (1 FTE) Other Paraprofessional.

2. It is critical that ACT team members build a sound relationship with and fully engage in supporting the served individuals. To that end, no more than 1/3 of the team can be "contracted"/1099 team members.

3. The ACT team maintains a small consumer-to-clinician ratio, of no more than 10 individuals per staff member. This does not include the psychiatrist, program assistant/s, transportation staff, or administrative personnel. Staff-to-individual ratio takes into consideration evening and weekend hours, needs of special populations, and geographical areas to be served.

4. Documentation must demonstrate that multiple members across disciplines from the ACT team are engaged in the support of individuals served by the team including direct and indirect service delivery for each intervention (excluding the addiction practitioner, if substance related issues have been ruled out).

5. At least one ACT RN must be employed by an ACT team. The RN works with a team at least 32 hours/week (up to 40 hours/week) and is a full-time employee of the agency (not a subcontractor/1099 employee).

**Clinical Operations**

1. Individuals receiving this service must have a qualifying diagnosis present in the medical record prior to the initiation of services.

2. ACT Teams must incorporate assertive engagement techniques to identify, engage, and retain the most difficult to engage individuals which include using street outreach approaches and legal mechanisms such as outpatient commitment and collaboration with parole and probation officers.

3. Because ACT-eligible individuals may be difficult to engage, the initial treatment/recovery plan for an individual may be more generic at the onset of treatment/support. It is expected that the IRP be individualized and recovery-oriented after the team becomes engaged with the individual and comes to know the individual. The allowance for "generic" content of the IRP shall not extend beyond three (3) months.

4. Because many individuals served may have a mental illness and co-occurring substance use disorder, the ACT team may not discontinue services to any individual based solely upon a relapse in his/her substance use disorder recovery.

5. ACT is expected to actively and assertively participate in transitional planning via in person or, when in person participation is impractical, via teleconference meetings between stakeholders. The team is expected to coordinate care through a demonstrable plan for timely follow up on referrals to and from their service, making sure individuals are connected to resources to meet their needs in alignment with their preferences. The team is responsible for ensuring the individual has access to services and resources such as housing, pharmacy, benefits, a support network, etc. when being discharged from a psychiatric hospital; released from jail; or experiencing an episode of homelessness. ACT providers who are a Tier 1 or Tier 2+ Provider may use Community Transition Planning to establish a connection or reconnection to the individual and participate in discharge planning meetings while the individual is in a state operated hospital, crisis stabilization unit, jail/prison, or other community psychiatric hospital.

6. Each ACT provider must have policies and procedures governing the provision of outreach services, including methods for protecting the safety of staff that engage in outreach activities.

7. The organization must have established procedures/protocols for handling emergency and crisis situations that describe methods that shall be taken by the ACT team for supporting and responding to ACT enrolled individuals who require emergency psychiatric admission/hospitalization and/or crisis stabilization.

## Assertive Community Treatment

a. The ACT team is required to respond to the crisis needs of ACT enrolled individuals, both directly and via collaboration with Mobile Crisis Response Service (MCRS). ACT teams will receive a phone call from MCRS when a GCAL call has been received for ACT enrolled consumers in crisis. Upon receipt of the call, the ACT team must:

   i.   Respond to the MCRS call within 15 minutes of receipt; and
   ii.  Engage in discussion w/ MCRS regarding clinical and/or crisis needs and location of individual; and
   iii. Agree upon appropriate intervention/response which shall be provided within 1 hour of completion of call, either in the form of ACT team responding in person, MCRS team responding in person or another agreed upon in-person response.

b. ACT teams are required to respond with face-to-face evaluation and/or intervention to at least 85% of all crisis calls coming through GCAL involving their respective ACT enrolled individuals over the course of fiscal year.

8. The organization must have an Assertive Community Treatment Organizational Plan that addresses the following descriptions:

   a. Particular rehabilitation, recovery and resource coordination models utilized, types of intervention practiced, and typical daily schedule for staff.
   b. Staffing pattern and how staff are deployed to assure that the required staff-to-individual ratios are maintained, including how unplanned staff absences, illnesses, and emergencies are accommodated.
   c. Hours of operation, the staff assigned, and types of services provided to individuals, families, and/or guardians.
   d. How the plan for services is modified or adjusted to meet the needs specified in the Individualized Recovery Plan.
   e. Inter-team communication plan regarding individual support (e.g., e-mail, team staffings, staff safety plan such as check-in protocols etc.).
   f. A physical health management plan.
   g. How the organization will integrate individuals into the community including assisting individuals in preparing for employment.
   h. How the organization (team) will respond to crisis for individuals served.

9. The ACT team is expected to work with informal support systems at least an average of 2 to 4 times a month with or without the individual present to provide support and skill training as necessary to assist the individual in his or her recovery. For individuals who have no identified informal supports, team members should document attempts to engage, identify, or build support networks at least 2 to 4 times per month. Informal supports are defined as persons who are not paid to support the individual (i.e. family, friends, neighbors, church members, etc.). Monthly maximum billing for informal support contacts without an individual being present shall not exceed 4 hours.

10. For the individuals which the ACT team supports, the ACT team must be involved in all hospital admissions and hospital discharges. The agency will be reviewed for fidelity by the standard that the ACT team will be involved with 95% of all hospital admissions and hospital discharges. This is evidenced by documentation in the clinical record.

11. The entire ACT team is responsible for completing the ACT Comprehensive Assessment for newly enrolled individuals. The ACT Comprehensive Assessment results from the information gathered and are used to establish immediate and longer-term service needs with each individual and to set goals and develop the first individualized recovery plan. Because of the complexity of the mental illness and the need to build trust with the served individual, the comprehensive mental health, addiction, and functional assessments may take up to 60 days. Enrolled individuals will be re-assessed at 6-month intervals from date of completion of the comprehensive assessment. It is expected that when a person identifies and allows his/her natural supports to be partners in recovery that they will be fully involved in assessment activities and ACT team documentation will demonstrate this participation. The ACT Comprehensive Assessment shall (at a minimum) include:

   a. Psychiatric History, Mental Status/Diagnosis.
   b. Physical Health.
   c. Substance Use assessment.
   d. Education and Employment.
   e. Social Development and Functioning.
   f. Family Structure and Relationships.

## Assertive Community Treatment

12. Treatment and recovery support to the individual is provided in accordance with a Recovery Plan. Recovery planning shall be in accordance with the following:

   a. The Individual Treatment Team (ITT) is responsible for providing much of the individual's treatment, rehabilitation, and support services and is charged with the development and continued adaptation of the person's recovery plan (along with that person as an active participant). The ITT is a group or combination of three to five ACT staff members who together have a range of clinical and rehabilitation skills and expertise. The ITT members are assigned by the team leader to work collaboratively with an individual and his/her family and/or natural supports in the community by the time of the first recovery/resiliency planning meeting or thirty days after admission. The key members are the primary practitioner and at least one clinical or rehabilitation staff person who shares case coordination and service provision tasks for each individual. ITT members are assigned to take separate service roles with the individual as specified by the individual and the ITT in the IRP.

   b. The Recovery Plan Review is a thorough, written summary describing the individual's and the ITT's evaluation of the individual's progress/goal attainment, the effectiveness of the interventions, and satisfaction with services since the last person-centered IRP.

   c. The Recovery Planning Meeting is a regularly scheduled meeting conducted under the supervision of the team leader and the psychiatric prescriber. The purpose of these meetings is for the staff, as a team, and the individual and his/her family/natural supports, to thoroughly prepare for their work together. The group meets together to present and integrate the information collected through assessment in order to learn as much as possible about the individual's life, his/her experience with mental illness, and the type and effectiveness of the past treatment they have received. The presentations and discussions at these meetings make it possible for all staff to be familiar with each individual and his/her goals and aspirations and for each individual to become familiar with each ITT staff person. The IRP shall be reevaluated and adjusted accordingly (at least quarterly) via the Recovery Planning Meeting prior to each reauthorization of service (Documentation is guided by the general requirements found in Part II, Section III. Documentation Requirements of this manual, and by the specific Documentation Requirements section for this service below.)

13. In order to maintain compliance with the DACTS fidelity model, each ACT team may enroll a maximum of 8 individual admissions per month. Allowing teams to meet and maintain the expectation of an active average daily census of at least 75 individuals.

14. It is expected that 90% or more of the individuals have face to face contact with more than one staff member in a 2-week period.

### Service Accessibility

1. Services must be available by ACT Team staff skilled in crisis intervention 24 hours a day, 7 days a week with emergency response coverage, including psychiatric services. Answering devices/services/Georgia Crisis and Access Line do not meet the expectation of "emergency response".

2. The team must be able to rapidly respond to early signs of relapse and decompensation and must have the capability of providing multiple contacts daily to individuals in acute need.

3. An ACT staff member must provide this on-call coverage.

4. There must be documented evidence that service hours of operation include evening, weekend and holiday hours.

5. Telemedicine is the use of medical information exchanged from one site to another via electronic communications to improve a patient's health. Electronic communication means the use of interactive telecommunications equipment that includes, at a minimum, audio and video equipment permitting two-way, real time interactive communication between the patient, and the physician or practitioner at the distant site. The ACT Physician may use telemedicine to provide this service by using the code above with the GT modifier. Telemedicine is not to be utilized as the primary means of delivery of psychiatric services for ACT consumers and should not exceed 50% of psychiatric contacts.

### Billing & Reporting Requirements

1. ACT teams are expected to submit all requisite information in order to establish eligibility for the initial authorization, and if an individual meets eligibility they receive a 12-month authorization for ACT services. During the first 12-months, consumers receive an automatic-authorization for the first 4 authorizations for ACT services. ACT teams are required to submit information that the ASO system references as a "reauthorization" every 90 days for collection of consumer outcome indicators. This data collection is captured from information submitted by ACT teams during initial and subsequent authorization periods. There is no clinical review taking place during this 90-day data collection process, the 90-day data collection-reauthorization meets the need of data collection only. At these intervals, the use of the term "reauthorization" is merely a data collection process and not a clinical review for eligibility every 90 days ACT teams are expected to submit all requisite information in order to establish continued eligibility for the concurrent review, this reauthorization review for medical necessity time frame is 180 days and begins after the initial 12 months of authorized services and occurs no less than every 6 months thereafter.

2. All submissions for initial authorization must be entered into the ASO system within three days of establishing eligibility for ACT services.

## Assertive Community Treatment

3. ACT teams are expected to submit all initial authorizations for service and all 6-month concurrent authorizations in a timely manner. All continuing stay reauthorization must be submitted in advance of the expiration of the current authorization.

4. All time spent between 2 or more team practitioners discussing a served individual must be reported as H0039HT. While this claim/encounter is reimbursed at $0, it is imperative that these encounters (see Documentation Requirements below) to demonstrate program integrity AND submit the claim/encounter for this so this service can be included in future rate setting.

5. The following elements (at a minimum) shall be documented in the clinical record and shall be accessible to the DBHDD monthly as requested:
   a. Served individual's employment status;
   b. Served individual's residential status (including homelessness);
   c. Served individual's involvement with criminal justice system/s;
   d. Served individual's interactions with crisis support services (including acute psychiatric hospitals, emergency room visits, crisis stabilization program interactions, etc.).

6. ACT may **not** be provided in an Institution for Mental Diseases (IMD, e.g. state or private psychiatric hospital or crisis stabilization program with greater than 16 beds), jail, or prison system.

7. The ACT team can provide and bill for Community Transition Planning as outlined in the Guideline for this service. This includes supporting individuals who are eligible for ACT and are transitioning from jail/prison.

8. When group services are provided via an ACT team to an enrolled ACT-recipient, then the encounter shall be submitted as a part of the ACT type of care defined in the **Orientation to Services** section of Part I, Section 1 of this manual.

9. Each ACT program shall provide monthly outcomes data as defined by the DBHDD.

| Documentation Requirements | 1. Providers must document services in accordance with the general requirements found in Part II, Section III: Documentation Requirements of this Provider Manual, as well as with the service-specific requirements delineated in this section below.

2. All time spent between 2 or more team practitioners discussing a served individual must be documented in the medical record as H0039HT. While this claim/encounter is reimbursed at $0, it is imperative that the team document these encounters to demonstrate program integrity AND submit the claim/encounter for this so this service can be included in future rate setting. HT documentation parameters include:
   a. If the staff interaction is specific to a single individual for 15 minutes, then the H0039HT code shall be billed to that individual (through claims or encounters).
   b. If the staff interaction is for multiple individuals served and is for a minimum single 15-minute unit and:
      i. The majority of time is for a single individual served, then the claim/encounter shall be submitted attached to the individual's name who was the focus of this staffing conversation; or
      ii. The time is spent discussing multiple individuals (with no one individual being the focus of the time), then the team should create a rotation list (see below) in which a different individual would be selected for each of these staffing notes in order to submit claims and account for this staffing time; and
   c. An agency is not required to document every staff-to-staff conversation in the individual's medical record; however, every attempt should be made to accurately document the time spent in staffing or case conferencing for individual consumers. The exceptions (which shall be documented in a medical record) are:
      i. When the staffing conversation modifies an individual's IRP or intervention strategy; and
      ii. When observations are discussed that may lead to treatment or intervention changes, and/or that change the course of treatment.

3. The ACT team must have documentation (e.g., notebook, binder, file, etc.) which contains all H0039HT staffing interactions (which shall become a document for audit purposes, and by which claims/encounters can be revoked-even though there are no funds attached). In addition to the requirements in item #2 of this section (above), a log of staff meetings must be documented as outlined in the Staffing Requirements section of this service guideline (above), item #2. The documentation notebook shall include:
   a. The team's protocol for submission of H0039HT encounters (how the team is accounting for the submissions of H0039HT in accordance with the above); |

## Assertive Community Treatment

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|

b. The protocol for staffing which occur ad hoc (e.g., team member is remote supporting an individual and calls a clinical supervisor for a consult on support, etc.);

c. Date of staffing;

d. Time start/end for the "staffing" interaction;

e. If a regular team meeting, names of team participants involved in staffing (signed/certified by the team leader or team lead designee in the absence of the team leader);

f. If ad hoc staffing note, names of the team participants involved (signed by any one of the team members who is participating);

g. Name all of individuals discussed/planned for during staffing; and

h. Minimal documentation of content of discussion specific to each individual (1-2 sentences is sufficient).

4. If the group location is documented in the note as a community-based setting (despite the absence of an "out-of-clinic" code for group reporting), then it will be counted for reviews/audits as an out-of-clinic service.

5. All expectations set forth in this "Additional Service Components" section shall be documented in the record in a way which demonstrates compliance with the said items.

6. ACT Treatment team meeting logs/staffing logs should be retained for a minimum of one (1) year, and in accordance with professional standards and the provider agency's policy.

## Assisted Outpatient Treatment Program

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| TBD | TBD | TBD | | | | | |
| Service Definition | Assisted Outpatient Treatment (AOT) is the practice of providing court-ordered community-based mental health treatment under a civil commitment to individuals living with serious mental illness if it is determined that they may be a danger to themselves or others.<br><br>AOT facilitates engagement in treatment services and supports that may allow an individual to live independently in the community of their choice while living with a mental health diagnosis or co-occurring substance use disorder. It also helps providers focus their attention to work diligently to keep the enrolled individual engaged in effective treatment, and to support them in reaching their personal recovery goals.<br><br>This Program is a time-limited, multi-faceted treatment model for adults who are court-ordered through a Probate Court petition to enroll in an Assisted Outpatient Treatment Program for required structure and support to achieve and sustain recovery from behavioral health conditions. These services enable individuals served to:<br>• Maintain residence in their community,<br>• Continue to work and go to school,<br>• Stay connected to friends and family life,<br>• Transition to voluntary treatment past court involvement.<br><br>All behavioral health services described in this manual are available to individuals in the AOT Program, subject to clinical necessity and the requirements of the particular service being considered. Intellectual and Developmental Disability services may also be available to individuals in the Program who have a co-occurring intellectual or developmental disability, subject to the eligibility requirements for those services. | | | | | | |

## Assisted Outpatient Treatment Program

| | |
|---|---|
| **Admission Criteria** | An individual can be enrolled in the Assisted Outpatient Treatment Program if:<br>1. A petition has been signed by a probate judge of the county of the individual's residence, **AND**<br>2. AOT service is available in the county the individual resides: **AND**<br>3. The individual meets the following criteria:<br>  a. The person is 18 years of age or older; **and**<br>  b. The person is suffering from a mental health or co-occurring substance use disorder which has been clinically documented by a health care provider licensed to practice in Georgia; **and**<br>  c. There has been a clinical determination by a physician or psychologist that the person is unlikely to survive safely in the community without supervision; and<br>  d. The person has a history of lack of compliance with treatment for his or her mental health or co-occurring substance use disorder, in that at least one of the following is true:<br>    i. The person's mental health or co-occurring substance use disorder has, at least twice within the previous 36 months, been a substantial factor in necessitating hospitalization or the receipt of services in a forensic or other mental health unit of a correctional facility, not including any period during which such person was hospitalized or incarcerated immediately preceding the filing of the petition; or<br>    ii. The person's mental health or co-occurring substance use disorder has resulted in one or more acts of serious and violent behavior toward himself or herself or others or threatens or attempts to cause serious physical injury to himself or herself or others within the preceding 48 months, not including any period in which such person was hospitalized or incarcerated immediately preceding the filing of the petition; **and**<br>  e. The person has been offered an opportunity to participate in a treatment plan by the department, a state mental health facility, a community service board, or a private provider under contract with the department and such person continues to fail to engage in treatment; **and**<br>  f. The person's condition is substantially deteriorating; **and**<br>  g. Participation in the assisted outpatient treatment program would be the least restrictive placement necessary to ensure such person's recovery and stability; **and**<br>  h. In view of the person's treatment history and current behavior, such person is in need of assisted outpatient treatment in order to prevent a relapse or deterioration that would likely result in grave disability or serious harm to himself or others; **and**<br>  i. It is likely that the person may benefit from assisted outpatient treatment. |
| **Continuing Stay Criteria** | An individual may remain in the AOT Program as long as:<br>1. There is a current court-order from the probate court ordering them to remain enrolled; **and**<br>2. The individual's condition continues to meet the admission criteria; **and**<br>3. Progress notes document progress towards goals identified in the IRP (e.g., developing social networks and lifestyle changes, increasing educational, vocational, social and interpersonal skills, meeting court program requirements, and establishing a commitment to a recovery program), but overall goals have not yet been met; **and**<br>4. There is a reasonable expectation that the individual can achieve their IRP goals in the necessary reauthorization timeframe. |
| **Discharge Criteria** | An individual may be discharged from the AOT Program if:<br>1. An adequate continuing care or discharge plan is established, **and**<br>2. Linkages are in place, **and**<br>3. The individual is no longer under court-order to be enrolled. |
| **Service Exclusions** | 1. Individuals who are not under court-order from the probate court to be enrolled in the AOT Program are not eligible.<br>2. When higher intensity services are utilized, documentation must indicate efforts to minimize duplication of services and effectively transition individuals to appropriate services of lower intensity when appropriate. |

## Assisted Outpatient Treatment Program

| Clinical Exclusions | 1. Individuals who do not meet the eligibility requirements for each service for which admission is sought.<br>2. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition co-occurring with one of the following diagnoses: Developmental Disability, Autism, Neurocognitive Disorder, Substance Use Disorder. |
|---|---|
| Required Components | 1. While a court order may have been issued for this program, the provider must assess, determine, and complete an order for the unique services and supports needed by the individual, in keeping with standards set forth in Part II of this manual.<br>2. The program incorporates information from a court ordered evaluation, provider assessments and the individual's personal goals into the treatment planning process and resulting IRP.<br>3. While this is a court-ordered program, all aspects of programmatic and service delivery are subject to the stipulations set forth in the Service Definition for each service delivered, as well as to all requirements in Part II of this manual.<br>4. The program must operate at a site approved to bill DBHDD/Medicaid for services. However, limited individual or group activities may take place off- site in natural community settings as is appropriate to each individual's recovery plan. Program must have in place appropriate accreditation and licenses for all established service sites.<br>5. The program provides individual treatment compliance and status reports as needed prior to and during court staffing/judicial review meetings. Any decrease in engagement levels should be reported to identified court as soon as possible for court review (incidents to be reported to the court include but are not limited to: missed appointments, inappropriate behavior toward staff or other participants, damage to property, non-compliance with provider policies).<br>6. Provider will develop written agreements, partnerships, and memoranda of understanding (MOU) with key justice, mental health and substance use disorder treatment providers, recovery community advocates and support partners, consumer groups on an ongoing basis for the purpose of cooperative wrap around services and for developing sustainable activities.<br>7. In cases where an individual is in an inpatient facility, prior to discharge from the facility, an AOT team member shall engage with the individual and explain the AOT process and program expectations. The individual must have a **written** document with the outpatient appointment date and time and the AOT program expectations (Participant Handbook) upon discharge.<br>8. All individuals enrolled in the AOT Program shall receive a *Participant Handbook and Assisted Outpatient Treatment Enhancement Program Framework* upon enrollment to the AOT program.<br>9. All participants and significant family members (caregivers) shall be given the opportunity and encouraged to complete the *AOT Participant/Family Satisfaction Survey* upon discharge from the AOT program.<br>10. At a minimum, the entire AOT Team shall meet to discuss and status all individuals enrolled in the AOT Program. Other service providers from the agency or community may be invited to supply relevant information on the status of any individual enrolled. |
| Staffing Requirements | The AOT Team will maintain a maximum caseload of 25 participants to allow for frequent contact with the individual. The AOT team, working with the treating psychiatrist and other appropriate staff, monitors the individual's engagement in treatment and observes for behavior changes similar to previous behavior that preceded a psychiatric decompensation.<br><br>Every AOT Team includes the following staff:<br>1. Team Lead Clinician (1 FTE) Duties shall include, but not limited to:<br>  a. Assisting the individual in identifying and resolving personal, social, vocational, intrapersonal, and interpersonal concerns.<br>  b. Providing services (or be responsible for the oversight of service provision) to address goals/issues such as promoting recovery, and the restoration, development, enhancement, or maintenance of:<br>    i. Illness and medication self-management knowledge and skills (e.g., symptom management, behavioral management, relapse prevention skills, knowledge of medications and side effects, and motivational/skill development in taking medication as prescribed);<br>    ii. Problem solving and cognitive skills;<br>    iii. Healthy coping mechanisms;<br>    iv. Adaptive behaviors and skills; |

## Assisted Outpatient Treatment Program

    v.  Interpersonal skills; and

    vi.  Knowledge regarding mental illness, substance related disorders and other relevant topics that assist in meeting the individual's or the support system's needs; and

    vii.  Use best/evidence-based practice modalities which may include (as clinically appropriate): Motivational Interviewing/Enhancement, Cognitive Behavioral Therapy, Behavioral Modification, Behavioral Management, Rational Behavioral Therapy, Dialectical Behavioral Therapy, and others as appropriate to the individual and clinical issues to be addressed.

c.  Conducting a monthly IRP review and, with input from the Team, to determine progress made, barriers to success, and whether the individual continues to meet criteria for court-ordered treatment criteria. Findings should be submitted through the 30-Day Review report.

d.  Submit reports and updates to the court, as requested, or presented at status hearings conducted by the probate judge.

e.  Monitoring each AOT enrolled individual, and determine appropriate actions, when warranted.

f.  Completing identified documentation in a timely manner.

2.  Case Manager (1 FTE) The case manager monitors the individual's stability and ensures that care is provided in the least restrictive setting consistent with the individual's needs. Duties shall include, but not limited to:

a.  Engagement & Needs Identification: The case manager engages the individual in a recovery-based partnership that promotes personal responsibility and provides support, hope, and encouragement. The case manager assists the individual with developing a community-based support network to facilitate community integration and maintain housing stability. Through engagement, the case manager partners with the individual to identify and prioritize housing, service and resource needs to be included in the IRP.

b.  Care Coordination: The case manager coordinates care activities and assists the individual as he/she moves between and among services and supports. Care coordination requires information sharing among the individual, his/her Tier 1 or Tier 2 provider, specialty provider(s), residential provider, primary care physician, and other identified supports in order to:

    i.  Ensure that the individual receives a full range of integrated services necessary to support a life in recovery that includes health, home, purpose, and community;

    ii.  Ensure that the individual has an adequate and current crisis plan;

    iii.  Reduce barriers to accessing services and resources;

    iv.  Minimize disruption, fragmentation, and gaps in service; and

    v.  Ensure all parties work collaboratively for the common benefit of the individual.

c.  Referral & Linkage: The case manager assists the individual with referral and linkage to services and resources identified on the IRP including housing, social supports, family/natural supports, entitlements (SSI/SSDI, Food Stamps, VA), income, transportation, etc. Referral and linkage activities may include assisting the individual to:

    i.  Locate available resources;

    ii.  Make and keep appointments;

    iii.  Complete the application process; and

    iv.  Make transportation arrangements when needed.

d.  Monitoring and Follow-Up: The case manager visits the individual in the community to jointly review progress made toward achievement of IRP goals and to seek input regarding his/her level of satisfaction with treatment and any recommendations for change. The case manager monitors and follows-up with the individual in order to:

    i.  Determine if services are provided in accordance with the IRP;

    ii.  Determine if services are adequately and effectively addressing the individual's needs;

    iii.  Determine the need for additional or alternative services related to the individual's changing needs or circumstances; and

    iv.  Notify the treatment team when monitoring indicates the need for IRP reassessment and update.

## Assisted Outpatient Treatment Program

3. Certified Peer Specialist (1 FTE): The Certified Peer Specialist provides interventions which promote socialization, recovery, wellness, self-advocacy, development of natural supports, and maintenance of community living skills. Duties shall include, but not limited to:
   a. Conduct activities between and among individuals who have common issues and needs, that are individual motivated, initiated and/or managed;
   b. Assist individuals in living as independently as possible;
   c. Promote self-directed recovery by exploring individual purpose beyond the identified mental illness; and
   d. Explore possibilities of recovery by:
      i. Tapping into individual strengths related to illness self-management (including developing skills and resources and using tools related to communicating recovery strengths, communicating health needs/concerns, self-monitoring progress);
      ii. Emphasizing hope and wellness, by helping individuals develop and work toward achievement of specific personal recovery goals (which may include attaining meaningful employment if desired by the individual); and
      iii. Assisting individuals with relapse prevention planning.

**Clinical Operations**

1. An individual may have a variable length of stay. The level of care and length of stay should be determined by individual's multiple assessments and progress toward meeting goals of the IRP. It is recommended that the individuals attend at a frequency appropriate to their level of need. Ongoing clinical assessment should be conducted to determine step down in level of care.
2. Each individual should participate in setting individualized goals for themselves and in assessing their own skills and resources related to recovery. Goals are set by exploring strengths and needs in the individual's living, learning, social, and working environments. Implementation of services may take place individually or in groups.
3. Each individual must be provided assistance in the development/acquisition of needed skills and resources necessary to achieve recovery and/or reduction in use of substances and maintenance of recovery.
4. Court Status Meetings time may be billable as a collateral contact via Case Management with or without the person being served if the following are considered:
   a. If the Court Status Meeting addresses multiple individuals being supported by the Assisted Outpatient Treatment Program, the only time which can be billed is the specific discussion and planning related to the individual being served;
   b. Court Status Meeting time and documentation must comply with the expectations set forth in the unique Case Management (CM) service definition (Assistance to the person and other identified recovery partners in the facilitation and coordination of the Individual Recovery Plan (IRP), identification, with the person, of strengths which may aid him/her in achieving and maintaining recovery from mental health challenges as well as barriers that impede the development of necessary skills, linkage and referral, monitoring and follow-up, etc.). For example, if this service is being billed via CM and the individual served is not participating, the intervention and billing would comply with the Required Components section of the CM service which allow 50% of billable contact to be non-face-to-face.

**Service Accessibility**

1. Service are available during the day and evening hours.
2. Demographic information collected shall include a preliminary determination of hearing status to determine referral to the Office of Deaf Services.
3. To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:
   a. The use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or
   b. The use of an interpreter via Telemedicine to support the practitioner in delivering the identified service. Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. The use of an interpreter via Telemedicine to support the practitioner in delivering the identified service must be documented in the individual's record.

**Documentation Requirements**

1. Entry of required data shall be entered monthly to monitor performance and outcomes as well and approve the amount requested via the monthly invoices.
2. Every admission and assessment must be documented.
3. Agency must adhere to documentation requirements set forth for each unique service delivered in accordance with Part 1 of this Manual.
4. The program will document the following data for the required timelines in the Data Collection Worksheet found at the SharePoint site below:

## Assisted Outpatient Treatment Program

https://gets.sharepoint.com/:x:/r/sites/DBHDDExtranet/JSU/_layouts/15/Doc.aspx?sourcedoc=%7B4A2DA5E0-AA84-4D4F-B4D2-12CC977C72F0%7D&file=AOT%20Data%20Collection%20Worksheet%20-%20Provider%20Temp.xlsx&action=default&mobileredirect=true

   a.  AOT Participant Information (demographic data): Shall be completed within 30 days of enrollment for each participant.

   b.  12 Months Pre-AOT (historical data): All efforts to gather as much data as possible should be sought using connections with sheriff's departments, provider medical records, other ERF records, family, etc. Additional information, other than that used to determine eligibility criteria should be entered as discovered.

   c.  During AOT (ongoing status and significant events): All incident categories listed in the spreadsheet should be entered within 24 hours of the event.

   d.  12 Months Post-AOT (continued monitoring of participant's progress): Significant events should be monitored and recorded within 24 hours of discovery.

   e.  30-Day Review (ongoing reviews): This review must be completed on each enrolled participant no less than every 30 days. Copy of review may be submitted to the partnered probate court upon request of the court.

   f.  Determination of Renewal (request for continued enrollment or discharge): The request for discharge may completed at any time the individual meets discharge criteria but if renewal of the current court-order is warranted, the request shall be completed no less than 45 days prior to current court-order expiration date and submitted to the court no less than 30 days prior to expiration.

   g.  Request for Immediate Court Action/Conference: Shall be completed and submitted to the court when indications of nonengagement increase or a significant incident occurs that warrants court intervention.

5.  Mandatory documentation of weekly team status meetings shall be documented and downloaded to the appropriate Team folder on the SharePoint site above.

| Billing & Reporting Requirements | The individual medical record must include documentation of services described in the Service Operations section.<br>1. Provider is required to complete progress notes for every contact with individual as well as for related collateral contacts.<br>2. Progress notes must adhere to documentation requirements set forth in this manual. |
| --- | --- |
| Additional Medicaid Requirements | Providers should bill DBHDD State Fee-For-Service, Medicaid, or private insurance for behavioral health services rendered. |

## Community Based Inpatient Psychiatric

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Psychiatric Health Facility Service, Per Diem | | H2013 | | | | | Per negotiation | | | | | | | |
| Unit Value | 1 day | | | | | | | Utilization Criteria | | LOCUS Level 6 | | | | |
| Service Definition | A short-term stay in a licensed and accredited community-based hospital for the stabilization of a psychiatric crisis. The service is of short duration and provides treatment for individuals experiencing an acute psychiatric crisis episode due to a new or recurring mental illness, non-compliance with medications, or a combination of these causes. The intent of this service is to provide short-term recovery-oriented treatment and support that increases the functioning of persons with psychiatric disabilities. The service should include tailored interventions based upon the individual's unique needs as identified in their individualized recovery plan, but may also include routinely available interventions provided by a contractor's inpatient program milieu, as clinically indicated. Upon stabilization of the psychiatric crisis, the individual is connected to the appropriate level of care and transitioned back into the community. Specific desired outcomes of this service are: 1) Successful hospital to community transition, 2) Effective collaboration with community service providers and field offices, 3) Effective discharge planning, 4) Linkage and referral to community services, 5) Reduction in hospital readmissions. | | | | | | | | | | | | | |

## Community Based Inpatient Psychiatric

| | |
|---|---|
| Admission Criteria | For individuals defined as the target population for the DBHDD contract, the Inpatient Psychiatric hospital will accept referrals for admission solely from DBHDD and its designated ASO agents: Behavioral Health Link (BHL) or Beacon Health Options (BHO). This service will utilize the DBHDD-required board monitoring system, providing regularly updated information to ensure appropriate utilization of inpatient beds. Admissions are for an:<br>1. Individual with serious mental illness who presents a substantial risk or harm to himself/herself or others, as manifested by recent overt acts or recent expressed threats of major suicidal, homicidal or high-risk behaviors as a result of the mental illness which present a probability of physical injury to himself/herself or others; **OR**<br>2. Individual with serious mental illness is so unable to care for his/her own physical health and safety as to create an imminently life-endangering crisis. |
| Continuing Stay Criteria | 1. Individual meets the following:<br>   a.   Continues to meet admission criteria; and has been assessed to be at risk of major suicidal, homicidal or high-risk behaviors; **and**<br>   b.   Is assessed as requiring continued hospitalization beyond the initial authorization,<br>2. When the individual has received and expended two (2) concurrent authorizations or by the ninth day of admission, the individual must be placed on the state hospital transfer list. |
| Discharge Criteria | At which point the risk and crisis are determined to no longer exist, the individual must be transferred to a lower level of care/discharged with an adequate continuing care plan. Absence of the risk and crisis must be accompanied by one or more of the following:<br>1. Individual no longer meets admission and continued stay criteria; **or**<br>2. Individual requests discharge and individual is not imminently dangerous to self or others; **or**<br>3. Transfer to another service/level of care is warranted by change in the individual's condition; **or**<br>4. Individual requires services not available in this level of care. |
| Service Exclusions | This service may not be provided simultaneously with any other service in the DBHDD behavioral health service array excepting short-term access to services that provide continuity of care or support in planning for discharge from this service. Any individual with a substance use disorder or a substance-induced psychiatric disorder as their primary diagnosis should not be admitted for the purpose of detoxification. |
| Clinical Exclusions | Individuals with any of the following conditions are excluded from admission unless there is clearly documented evidence of a co-occurring acute psychiatric diagnosis: Autism, Developmental Disabilities, Neurocognitive Disorder, or Traumatic Brain Injury. |

## Community Based Inpatient Psychiatric

| | |
|---|---|
| Required Components | Inpatient psychiatric hospitals provide an intense (Locus level VI) level of care in the DBHDD service continuum and must include the following:<br><br>1. Care Environment - The facility must be capable of providing secure care, meaning that individuals may be contained within a locked environment, with capabilities for providing seclusion and/or restraint if necessary. It must be capable of providing involuntary care when required. The facility must provide adequate space, light, ventilation, and privacy. Food services and other personal care needs must be adequately provided.<br>2. Clinical Services - An individualized recovery plan for each individual must be developed within 36 hours of his/her admission. Clinical services must be available 24 hours a day, seven days a week. Psychiatric, nursing, and medical services must be provided on site, at all times. Psychiatric/medical contact will be made on a daily basis. Treatment will be provided on a daily basis, to include individual, group and family therapy, as well as pharmacologic treatment, depending on the individual's needs. Provision of peer support services is a recognized evidence based best practice in behavioral health and is strongly recommended.<br>3. Supportive Services - All necessities of living and well-being must be provided for individuals in psychiatric inpatient settings. Individuals are assisted and/or supported in participating in activities of daily living such as hygiene, grooming, and maintenance of their immediate environment.<br>4. Discharge and Transition Planning - Expected average length of stay for individuals in this service shall not exceed five days. Psychiatric inpatient facilities must provide services to facilitate and support successful transition back into the community. At the time of admission, the coordination of discharge planning begins, in collaboration with the DBHDD contracted community behavioral health service provider in the individual's county of residence. The facility shall deliver care coordination, including linkage and referral, which must include:<br>   a.   Coordination with community behavioral health providers including communication with current behavioral health provider (in accordance with HIPAA allowance for sharing of necessary PHI for the purpose of access to treatment);<br>   b.   Initiating entitlement applications to facilitate access to benefits;<br>   c.   Communicating with DBHDD contracted providers of behavioral health services in order to effectuate successful linkage to services and supports including housing;<br>   d.   Referral to less intense level of care when clinically appropriate;<br>   e.   Provision of 5 days of medication at the time of discharge using a normed formulary (such as the Medicaid Pharmacy formulary) which will increase the individual's access to these medications post-discharge.<br>   f.   Facilities shall communicate with the DBHDD regional field office staff regarding:<br>      i.   Out-of-region placements and/or discharges;<br>      ii.   All homeless individuals admitted, within 24 hours of admission, in order to coordinate access to housing and avoid a shelter discharge.<br>5. Collaboration - In order to support the operation of this service as a component within the array of DBHDD adult mental health services, psychiatric inpatient facilities must participate in DBHDD regional community collaborative meetings for the region in which the facility operates, minimally on a quarterly basis. |
| Staffing Requirements | The facility complies with staffing requirements as set forth by HFR in its "Specialty Hospital" licensing process Rule 111-8-40-.37, Psychiatric and Substance Abuse Services. Each treatment program is under the administrative leadership of a skilled behavioral health clinical staff and is staffed by at least one physician, registered and practical nurses, social workers, psychologists, and direct service staff. Staff members also are trained in the use of interventions and offer an array of therapeutic alternatives including; sensory modulation, art, music, craft, and recreation activities. |

## Community Based Inpatient Psychiatric

| Billing & Reporting Requirements | |
|---|---|
| 1. | This service requires authorization via the ASO via GCAL. Providers will select an individual from the State Contract Bed (SCB) Board. Once they accept them, they will assign the individual to a bed on the inventory status board (via bhIweb). Once an individual is assigned to the inventory status board a tracking number will be generated and the information will be sent from the Georgia Collaborative ASO crisis access team to the Georgia Collaborative ASO care management team for registration/authorization to take place. Once an authorization number is assigned, that number will appear on the beds inventory status board (on bhIweb) and an email will be generated and sent to the designated UM of the SCB facility containing the authorization number. |
| 2. | Span billing may occur for this service, meaning the start and end date are not the same on a given service claim line). The span dates may cross months (start date and end date on a given service line may begin in one month and end in the next). |
| 3. | If the initial authorization period expires and there is documentation that the individual meets medically necessary continuing stay criteria, the individual must be placed on the Transfer-to-a-State-Hospital referral list via the Beacon bed board process as a requirement for reimbursement of any additional authorized days. In the absence of this documentation, service may continue at the expense of the facility. |
| 4. | Providers must submit a discharge summary into the Provider Connect/batch system within 48 hours of discharge. |
| 5. | Submission of supporting documentation is required as part of all billing submissions (examples of supporting documentation include, but are not limited to: Nursing notes, MAR, physician notes, treatment plan, etc.). |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Practitioner Level 3, Out-of-Clinic | H0039 | TN | U3 | U7 | | $36.68 |
| Practitioner Level 4, Out-of-Clinic | H0039 | TN | U4 | U7 | | $24.36 |
| Practitioner Level 5, Out-of-Clinic | H0039 | TN | U5 | U7 | | $18.15 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| Utilization Criteria | TBD | | | | | |

## Community Support Team

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Community Support Team | Practitioner Level 3, In-Clinic | H0039 | TN | U3 | U6 | | $30.01 |
| | Practitioner Level 4, In-Clinic | H0039 | TN | U4 | U6 | | $20.30 |
| | Practitioner Level 5, In-Clinic | H0039 | TN | U5 | U6 | | $15.13 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | H0039 | TN | GT | U3 | | 30.01 |
| | Practitioner Level 4, Via interactive audio and video telecommunication systems | H0039 | TN | GT | U4 | | 20.30 |
| | Practitioner Level 5, Via interactive audio and video telecommunication systems | H0039 | TN | GT | U5 | | 15.13 |

| Unit Value | 15 minutes |
|---|---|
| Service Definition | Community Support Team (CST) is an intensive behavioral health service for individuals with severe mental illness living in rural areas of the State who are discharged from a state or private psychiatric hospital or Psychiatric Residential Treatment Facility (PRTF) after multiple or extended stays or from multiple discharges from crisis stabilization unit(s), or discharged from correctional facilities or other institutional settings, or those leaving institutions who are reluctant to engage in treatment. This service is provided in rural areas, where there is less demand for service, and/or in areas with professional workforce shortages. CST utilizes a mental health team led by a licensed clinician to support individuals in decreasing hospitalizations, incarcerations, emergency room visits, and crisis episodes and increasing community tenure/independent functioning; increasing time working or with social contacts; and increasing personal satisfaction and autonomy. Through active assistance and based on identified, individualized needs, the individual will be engaged in the recovery process. |
| | CST is a restorative/recovery focused intervention to assist individuals with: |
| | 1. Gaining access to necessary services; |

## Community Support Team

2. Managing (including teaching skills to self-manage) their psychiatric and, if indicated, co-occurring substance use disorder and physical diseases;
3. Developing optimal independent community living skills;
4. Achieving a stable living arrangement (independently or supported); and
5. Setting and attaining individual-defined recovery goals.

CST elements and interventions (as medically necessary) include:
1. Comprehensive behavioral health assessment;
2. Nursing services;
3. Symptom assessment/management;
4. Medication management/monitoring;
5. Medication Administration;
6. Linkage to services and resources including rehabilitation/recovery services, medical services, wellness and nutrition supports, general entitlement benefits;
7. Care Coordination;
8. Individual Counseling; and
9. Psychosocial Rehabilitation–Individual for skills training including:
   a. Daily living skills training;
   b. Illness self-management training;
   c. Problem-solving, social, interpersonal, and communication skills training;
10. Harm reduction strategies, relapse prevention skills training, and substance use disorder recovery support;
11. Development of personal support networks;
12. Crisis planning and, if necessary, crisis intervention services; and
13. Consultation and psycho-educational support for the individual and his/her family/natural supporters (if this family interaction is endorsed by the individual served).

| Admission Criteria | 1. Individual with a severe and persistent mental illness that seriously interferes with their ability to live in the community as evidenced by:<br>   a. Transitioning or recently discharged (i.e., within past 6 months) from an institutional setting (hospital, jail/prison, or PRTF) because of psychiatric issue; **or**<br>   b. Frequently admitted to a psychiatric inpatient facility or PRTF (i.e. 3 or more times within past 12 months) for psychiatric stabilization and/or treatment; **or**<br>   c. Chronically homeless with a psychiatric condition, defined as a) continuously homeless for one full year, OR b) having at least four (4) episodes of homelessness within the past three (3) years; **or**<br>   d. Frequently seen in the emergency room for behavioral health needs (i.e. 3 or more times within past 12 months); **or**<br>   e. Having a "forensic status" and the relevant court has found that assertive community services are appropriate,<br>   **AND**<br>2. Individual with significant functional impairments as demonstrated by the **inability to consistently engage in at least two (2) of the following:**<br>   a. Maintaining personal hygiene;<br>   b. Meeting nutritional needs;<br>   c. Caring for personal business affairs;<br>   d. Obtaining medical, legal, and housing services;<br>   e. Recognizing and avoiding common dangers or hazards to self and possessions;<br>   f. Performing daily living tasks except with significant support or assistance from others such as friends, family, or other relatives;<br>   g. Employment at a self-sustaining level or consistently performing homemaker roles (e.g. household meal preparation, washing clothes, budgeting, or childcare tasks and responsibilities);<br>   h. Maintaining a safe living situation (e.g., evicted from housing, or recent loss of housing, or imminent risk of loss of housing);<br>   **AND** |
| --- |

## Community Support Team

**Continuing Stay Criteria**

3. Individual with **one (1) or more of the following** as indicators of continuous high-service needs (i.e., greater than 8 hours of service per month):
   a. High use of acute psychiatric hospitals or crisis/emergency services including mobile, in-clinic or crisis residential (e.g., 3 or more admission per year) or extended hospital or PRTF stay (60 days within the past year) or psychiatric emergency services;
   b. Persistent, recurrent, severe, or major symptoms (e.g., affective, psychotic, suicidal);
   c. Coexisting substance use disorder of significant duration (e.g., greater than 6 months) or co-diagnosis of substance abuse (ASAM Levels I, II.1, II.5, III.3, III.5);
   d. High risk or a history of criminal justice involvement (e.g., arrest and incarceration);
   e. Residing in an inpatient bed or in a supervised community residence, but clinically assessed to be able to live in a more independent living situation if intensive services are provided, or requiring a residential or institutional placement if more intensive services are not available;
   f. Inability to participate in traditional clinic-based services;

   **AND**

4. A lower level of service/support has been tried or considered and found inappropriate at this time.

1. Individual continues to have a documented need for a CST intervention at least four (4) times monthly such as to maintain newly established housing stability (within past 6 months), improved community functioning and/or self-care and illness self-management skills (such as attending scheduled appointments and taking medications as prescribed without significant prompting, using crisis plan as needed, accessing community resources as needed most of the time).

   **AND**

2. Individual continues to meet the admission criteria above; or
3. Individual has continued difficulty participating in traditional clinic-based services or a community setting at a less intensive level of service/supports; **or**
4. Individual is in substandard housing, homeless, or at imminent risk of becoming homeless due to functional impairments associated with behavioral health issues.

**Discharge Criteria**

1. There has been a planned reduction of units of service delivered and related evidence of the individual sustaining functioning through the reduction plan; and
2. An adequate continuing care plan has been established; **and one (1) or more of the following:**
   a. Individual no longer meets admission criteria; **or**
   b. Goals of the Individualized Recovery Plan have been substantially met; **or**
   c. Individual requests discharge and is not in imminent danger of harm to self or others; **or**
   d. Transfer to another service/level of care is warranted by a change in individual's condition; **or**
   e. Individual requires services not available in this level of care.

**Service Exclusions**

1. It is expected that the CST attempt to engage the individual in other rehabilitation and recovery-oriented services such as Housing Supports, Residential Services, group-oriented Peer Supports, group-oriented Psychosocial Rehabilitation, Supported Employment, etc.; however, ACT, Family Counseling, Family Training, Nursing Assessment, ICM and CM are Service Exclusions. Individuals may receive CST and one of these services for a limited period of time to facilitate a smooth transition.
2. SA Intensive Outpatient Program (SAIOP) is generally excluded; however, if a substance use disorder is identified and documented as a clinical need, and the individual's current progress indicates that provision of CST services alone, without an organized SA program model, it is not likely to result in the individual's ability to maintain sobriety, CST may assist the individual in accessing the SAIOP service, but must ensure clinical coordination in order to avoid duplication of specific service interventions.
3. Specialized evidence-based practices are not service exclusions (excluded) when the needs of an individual exceed that which can be provided by the CST team (e.g. specialized treatment for PTSD, eating disorders, personality disorders, and/or other specific clinical specialized treatment needs). In this case, the Individual's Recovery Plan (IRP) must reflect the necessity for participation in such services along with medical record documentation of the unique need and resulting collaboration between service providers to ensure coordination towards goals and to prevent any duplication of services/effort.

**Clinical Exclusions**

1. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of psychiatric condition/substance use disorder co-occurring with one of the following diagnoses: Intellectual/Developmental Disabilities, Autism, Neurocognitive Disorder, Substance-Related Disorder.

## Community Support Team

| | |
|---|---|
| | 2. Individuals may be excluded if there is evidence that they are unable to participate in the development of their Individual Recovery Plan as a result of significant impairment due to an I/DD diagnosis. |
| Required Components | 1. Team meetings must be held a minimum of once a week and time dedicated to discussion of support and service to individuals must be documented in the Treatment Team Meetings log. Each individual must be discussed, even if briefly, at least one time weekly. CST staff members are expected to attend Treatment Team Meetings. |
| | 2. Services and interventions must be individually tailored to the needs, goals, preferences and assets of the individual with the goals of maximizing independence and recovery as defined by the individual. |
| | 3. At least 60% of all service units must involve face-to-face contact with individuals. The majority (51% or greater) of face-to-face service units must be provided outside of program offices in locations that are comfortable and convenient for individuals (including the individual's home, based on individual need and preference and clinical appropriateness). |
| | 4. A minimum of four (4) face-to-face visits must be delivered monthly by the CST. Additional contacts above the monthly minimum may be either face-to-face or telephone collateral contact depending on the individual's support needs and keeping to the expected 60% of units being face-to-face. |
| | 5. CST is expected to retain a high percentage of enrolled individuals in services with few dropouts. In the event that the CST documents multiple attempts to locate and make contact with an individual and has demonstrated diligent search, after 45 days of unsuccessful attempts the individual may be discharged due to drop out. |
| | 6. While the minimum percentage of contacts is stated above, individual clinical need is always to be met and may require a level of service higher than the established minimum criteria for contact. CST teams will provide the clinically required level of service in order to achieve and maintain desired outcomes. |
| | 7. Individuals will be provided assistance by the CST team with gaining skills and resources necessary to obtain housing of the individual's choice, including completion of the housing need and choice survey https://dbhddapps.dbhdd.ga.gov/NSH/ upon admission and with the development of a housing goal, which will be minimally updated at each reauthorization. |
| Staffing Requirements | 1. A CST shall have a minimum of 3.5 team members which must include:<br>a. (1 FTE) A fulltime dedicated Team Leader ("Dedicated" means that the team leader works with only one team at least 32 hours and up to 40 hours/week) who is a licensed clinician (LPC, LCSW, LMFT) and provides clinical and administrative supervision of the team. This individual must have at least four (4) years of documented experience working with adults with a SPMI and is preferably certified/credentialed as a substance use disorder counselor (CAC-I equivalent or higher). The Team Leader is responsible for working with the team to monitor each individual's physical health, clinical status and response to treatment.<br>b. (1 FTE) A fulltime or two half-time (.5 FTE) Certified Peer Specialist (s) who is/are fully integrated into the team and promotes individual self-determination and decision-making and provides essential expertise and consultation into the team to promote a culture in which each individual's point of view and preferences are recognized, understood, respected and integrated into treatment, rehabilitation, medical, and community self-help activities.<br>c. (.5 FTE) A half-time registered nurse (RN). This person will provide nursing care, health evaluation/reevaluation, and medication administration and will make referrals as medically necessary to psychiatric and other medical services. Registered nurses may be clinic based with provision of community-based/ in the home services as needed. Nursing face-to-face time with each individual served by the team is determined based on the IRP, physician assessment, and is delivered at a frequency that is clinically and/or medically indicated.<br>d. (1 FTE) A fulltime Paraprofessional level team member, minimally bachelor's level, preferably with a SUD counselor certification (CAC-I equivalent or higher). |
| | 2. The CST maintains a small individual-to-staff ratio, with a minimum of 10 individuals served per full time staff member (10:1) and a maximum of 20 individuals served per staff member (20:1), yielding a 3-person team's minimum capacity of 30 and a team maximum capacity of 60. The Individual-to-staff ratio range should consider evening and weekend hours, needs of the target population, and geographical areas to be served. |
| Clinical Operations | 1. CST must incorporate assertive engagement techniques to identify, locate, engage, and retain the most difficult to engage individuals who cycle in and out of intensive services. CST must demonstrate the implementation of well thought out engagement strategies to minimize discharges due to drop out including the use |

## Community Support Team

of street and shelter outreach approaches, legal mechanisms such as outpatient commitment (when clinically indicated), and collaboration with family, friends, parole and/or probation officers.

2. CST is expected to gather assessment information from internal or external provider sources on existing individuals in order to identify the individual's strengths, needs, abilities, resources, and preferences. CST Team Lead may complete a comprehensive behavioral health assessment on new individuals as well as ongoing assessments to ensure meeting the individual's changing needs or circumstances. When a comprehensive behavioral health assessment is conducted by the CST Team Lead, it may be billed as CST (see Billing & Reporting Requirements below).

3. CST is expected to actively and assertively participate in transitional planning via in person or, when in person participation is impractical, via teleconference meetings between stakeholders. The team is expected to coordinate care through a demonstrable plan for timely follow up on referrals to and from their service, making sure individuals are connected to resources to meet their needs in alignment with their preferences. The team is responsible for ensuring the individual has access to services and resources such as housing, pharmacy, benefits, a support network, etc. when being discharged from a psychiatric hospital; released from jail; or experiencing an episode of homelessness. CST providers who are a Tier 1 or Tier 2+ Provider may use Community Transition Planning to establish a connection or reconnection to the individual and participate in discharge planning meetings while the individual is in a state operated hospital, crisis stabilization unit, jail/prison, or other community psychiatric hospital.

4. Because CST-eligible individuals may be difficult to engage, the initial treatment/recovery plan for an individual may be more generic at the onset of treatment/support. It is expected that the IRP be individualized and recovery-oriented after the team becomes engaged with the individual and comes to know the individual. The allowance for "generic" content of the IRP shall not extend beyond 90 days.

5. Because of the complexity of the target population, it is expected that the individual served will receive ongoing physician assessment and treatment well as other recovery-supporting services. These services may be provided by Tier 1 or Tier 2 Provider agency or by an external agency. There shall be documentation during each Authorization Period to demonstrate the team's efforts at consulting and collaborating with the physician and other recovery-supporting services.

6. CST will assist all eligible individuals with the application process to obtain entitlement benefits including SSI/SSDI, Food Stamps, VA, Medicaid, etc. including making appointments, completing applications and related paperwork.

7. Because many individuals served may have a mental illness and co-occurring substance use disorder, the CST team may not discontinue services to any individual based solely upon a relapse in his/her substance use disorder recovery.

8. CST must be designed to deliver services in various environments, such as homes, schools, homeless shelters, and street locations. The provider should keep in mind that individuals may prefer to meet staff at community locations other than their homes or other conspicuous locations (e.g. their place of employment or school), especially if staff drive a vehicle that is clearly marked as a state or agency vehicle, or if staff must identify themselves and their purpose to gain access to the individual in a way that may potentially embarrass the individual or breach the individual's privacy/confidentiality. Staff should be sensitive to and respectful of individuals' privacy/confidentiality rights and preferences in this regard to the greatest extent possible (e.g., if staff must meet with an individual during their work hours, mutually agree upon a meeting place nearby that is the least conspicuous from the individual's point of view).

9. The CST Crisis Plan must include a clear comprehensive approach for provision of 24/7 crisis response and emergency management of crisis situations that may occur after regular business hours, on weekends, and on holidays.
   a. The Crisis Plan should demonstrate a supportive linkage and connection between the organization and CST.
   b. A CST will ensure coordination with the Tier 1 or Tier 2 services provider or other clinical home service provider in all aspects of the IRP.
   c. The CST is required to provide follow-up for all CST-enrolled individuals for whom notification is received of a GCAL interaction/referral.

10. The CST agency must have established procedures that support the individual in preventing admission into psychiatric hospitalization/crisis stabilization. There shall be evidence that these procedures are utilized in the support of the individual when a crisis situation occurs.

11. Using the information collected through assessments, the CST staff work in partnership with the individual's Tier 1 or Tier 2 provider, specialty provider, residential provider, primary care physician, and other identified supports to develop a Wellness Recovery Action Plan (WRAP) that meets the medical, behavioral, wellness, social, educational, vocational, co-occurring, housing, financial, and other service needs of the eligible individual.

12. The CST is expected to work with informal support systems (with or without the individual present) to provide support and skill training as necessary to assist the individual in their recovery. For individuals who have no identified informal supports, team members should document attempts to engage, identify, or build support

# Community Support Team

13. networks. Informal supports are defined as persons who are not paid to support the individual (e.g., family, friends, neighbors, church members, etc.). The monthly maximum billing for informal support contacts without an individual present shall not exceed four (4) hours in any month.

The organization must have an CST Organizational Plan that addresses the following:

   a. Particular rehabilitation, recovery and resource coordination models utilized, types of intervention practiced, and typical daily schedule for staff;
   b. Organizational Chart, staffing pattern, and a description of how staff are deployed to assure that the required staff-to-consumer ratios are maintained; including how unplanned staff absences, illnesses, and emergencies are accommodated;
   c. Hours of operation, the staff assigned, and types of services provided to individuals, families, and/or guardians;
   d. How the plan for services is modified or adjusted to meet the needs specified in the Individualized Recovery Plan;
   e. Mechanisms to assure the individual has access to methods of transportation that support their ability engage in treatment, rehabilitation, medical, daily living and community self-help activities. Transportation is not a reimbursed element of this service;
   f. Intra-team communication plan regarding individual support (e.g., e-mail, team staffings, staff safety plan such as check-in protocols etc.);
   g. The team's approach to monitoring an individual's medical and other health issues and to engaging with health entities to support health/wellness; and
   h. How the organization will integrate individuals into the community including assisting individual in preparing for employment.

## Service Accessibility

1. Services must be available 24 hours a day, 7 days a week with emergency response coverage. On-call crisis coverage by CST staff is required for days on which CST services are not regularly scheduled. Answering devices/services do not meet the expectation of "emergency response."

2. There must be documented evidence that service hours of operation include evening, weekend and holiday hours.

3. At the time of provider application, the DBHDD will determine, through its Provider Enrollment process, the current need for a CST team in a given area. Because this service is targeted to rural areas, services may only be provided in counties with less than 150,000 population (per most recent estimates from the U.S. Census Bureau). The provider of this service must operate their CST business from a county which is qualified, in keeping with this population criteria.

4. To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:

   • the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or
   • the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.

   Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference.

## Billing & Reporting Requirements

1. While a comprehensive assessment is clinically recommended to be provided as an integral part of CST, the provision and billing of Behavioral Health Assessment is also allowed by a non-CST practitioner in certain circumstances (such as assessment by a specialty practitioner for trauma, substance use, etc.; person presents in crisis and requires immediate assessment, etc.).

2. CST programs are expected to submit all requisite information in order to establish eligibility for the initial authorization, and if an individual meets eligibility they receive a 12-month authorization for CST services. During the first 12-months consumers receive an automatic-authorization for the first 4 authorizations for CST services. CST providers are required to submit information that the ASO references as a reauthorization every 90-days for collection of consumer outcome indicators. This data collection is captured from information submitted by CST programs during initial and subsequent authorization periods. There is no clinical review taking place during this 90-day data collection process-the 90-day data collection-reauthorization meets the need of data collection only. At these intervals, the use of the term "reauthorization" is merely a data collection process and not a clinical review for eligibility every 90 days. CST programs are expected to submit all requisite information in order to establish continued eligibility for the concurrent review for medical necessity (time frame is every 180 days and begins after the initial 12 months of authorized services).

3. The CST staffing requirements are adjusted according to the rural service delivery area, and the rates that are paid are consistent with the practitioner level and location of service as with other out-of-clinic services.

## Community Support Team

| | |
|---|---|
| 4. | When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |

## Coordinated Specialty Care for First Episode Psychosis Program (CSC for FEP) (Effective Date January 1, 2023)

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **See Billing & Reporting Requirements section below for services billing detail.** | | | | | | | | | | | | | |

**Service Definition**

Coordinated Specialty Care for the First Episode Psychosis Program (CSC for FEP) is a team-based, time-limited, multi-faceted approach to treating youth and young adults, ages 16-30, experiencing first episode psychosis. The CSC for FEP model's guiding principles include early detection of psychosis; rapid access to specialty care; flexible, accessible, youth-friendly, and welcoming services; recovery-focused interventions; and respect for young adults striving for autonomy and independence. Component interventions include case management, psychotherapy, supported education and employment services, family education and support, and medication management. CSC for FEP emphasizes shared decision making as a means for addressing the unique needs, preferences, and recovery goals of the individuals served. Collaborative treatment planning in CSC for FEP is a respectful and effective means for establishing a positive therapeutic alliance and maintaining engagement with young people and their family members over time. CSC for FEP services are also highly coordinated with primary medical care, with a focus on optimizing overall mental and physical health. As such, the team is multidisciplinary, includes weekly integrated treatment team meetings, and spans the fields of psychiatry, nursing, counseling/psychology, social work, and career planning; additionally, Certified Peer Specialists on the team provide assistance with the development of natural supports, and promoting socialization and community integration. CSC for FEP team members are expected to maintain knowledge and skills according to the current research trends in best practices and evidence-based treatment, including the provision of trauma-informed, culturally competent care, and the use of effective engagement strategies for youth and young adults. The CSC for FEP model emphasizes flexibility, with services delivered in home, community, and youth-friendly and welcoming office settings depending on the participants' needs and preferences. Services are individually tailored to address participants' preferences and goals.

Based on the needs of the individual, the following services may be provided by qualified CSC for FEP team members and billed under the Non-Intensive Outpatient Services Type of Care (see the Service Definition/Requirements for each service listed below in this Provider Manual)*:

1. Behavioral Health Assessment;
2. Diagnostic Assessment;
3. Service Plan Development;
4. Crisis Intervention;
5. Individual Counseling;
6. Group Counseling/Training;
7. Family Counseling/Training;
8. Case Management (Adult)
9. Psychosocial Rehabilitation-Individual (Adult)
10. Addictive Disease Support Services (Adult);
11. Community Support (C&A)
12. Peer Support-Individual (Adult MH/AD, C&A Parent/Youth);
13. Psychiatric Treatment;
14. Medication Administration;
15. Nursing Assessment and Health Services;

## Coordinated Specialty Care for First Episode Psychosis Program (CSC for FEP) (Effective Date January 1, 2023)

16. Pharmacy & Lab;
17. Psychological Testing
18. Community Transition Planning

\* **In addition to the billable DBHDD services named above**, the DBHDD provides ancillary funding through CSC for FEP provider contracts for education and employment support interventions/activities, which are integral to the CSC for FEP model; and for other non-billable activities as described in the paragraph below.

In delivering the services outlined above, individualized interventions of particular importance to the CSC for FEP model include the following:

~~11.~~1. Psychoeducation on first episode psychosis, treatment options, and recovery to participants and their families;
~~12.~~2. Crisis planning, support, and intervention;
~~13.~~3. Recovery-based goal setting;
~~14.~~4. Instrumental/skill-building support to participants and their families;
~~15.~~5. Service and resource coordination, including linkage to medical care;
~~16.~~6. Psychotherapy and skills training;
~~17.~~7. Family counseling, education, support, and skills training;
~~18.~~8. Substance use disorder counseling and interventions;
~~19.~~9. Peer support; and
~~20.~~10. Support for educational and employment endeavors.

As an adjunct to direct service provision, CSC for FEP teams offer outreach and education activities/events within the community at large in order to identify individuals experiencing a first episode of psychosis, as well as to educate the community about behavioral health conditions, the CSC for FEP program, recovery principles and practice, and accessing the public behavioral health system. Outreach and education efforts are intended to establish a seamless community system of care for youth and young adults with first episode psychosis, and promote the sustainability of the program. The DBHDD provides funding to offset the costs for providers' time spent in these and other non-billable activities such as travel, meetings, trainings and conference attendance, community partner collaboration, and other related activities.

It is anticipated that individuals participating in CSC for FEP will experience a reduction in psychiatric symptoms or the debilitating effects of these symptoms; will show improved educational, occupational, and social functioning; and will require less frequent hospitalization and use of crisis services over time. Most participants remain with CSC for FEP teams for an average of two years; however, all decisions regarding discharge of participants from CSC for FEP programs should be based on clinical considerations.

| Admission Criteria | 1. The target population for Coordinated Specialty Care for First Episode Psychosis is youth and young adults aged 16 – 30 with non-organic psychotic disorders (e.g. schizophrenia, schizophreniform disorder, schizoaffective disorder, delusional disorder) or mood disorders with psychotic symptoms (e.g. bipolar disorder with psychotic symptoms; major depressive disorder with psychotic symptoms) who have had symptoms of psychosis for no longer than 24 months.<br>2. The target population is not to be limited to insurance coverage or lack thereof; individuals who have any kind of third-party insurance, or no insurance, must be served by the provider.<br>3. Youth and young adults who fall outside the target age range of 16 – 30, or who have had psychotic symptoms longer than 24 months, may be considered for enrollment in CSC for FEP services on a case-by-case basis, with prior approval from DBHDD.<br>4. An individual does not need to have a diagnosis of a psychotic disorder to be evaluated for enrollment in CSC for FEP services. It is anticipated that for many youth and young adults referred to CSC for FEP teams, they will have had no previous mental health treatment and thus will not have received a diagnosis prior to their evaluation with the CSC for FEP team. |
|---|---|
| Continuing Stay Criteria | Individual demonstrates documented progress relative to goals identified in the Individualized Recovery Plan (IRP), but goals have not yet been achieved, and/or new service needs have been identified. |

## Coordinated Specialty Care for First Episode Psychosis Program (CSC for FEP) (Effective Date January 1, 2023)

| | |
|---|---|
| Discharge Criteria | An adequate continuing care plan has been established; and one or more of the following:<br>4.1 Goals of the IRP have been substantially met;<br>5.2 Individual/family requests discharge and individual is not in imminent danger of harm to self or others; or<br>6.3 Transfer to another service is warranted by change in individual's condition and/or needs. |
| Service Exclusions | 1. CSC for FEP is a comprehensive team intervention and most services are excluded, with the exceptions of:<br>　d.a. Residential or Housing Supports (the CSC for FEP provider shall be in close coordination with the Residential/Housing Support provider such that there is no duplication of services supports/efforts);<br>　e.b. Substance Abuse Intensive Outpatient Program: If a substance use disorder is identified and documented as a clinical need unable to be met by the CSC for FEP team, and the individual's current treatment progress indicates that provision of CSC for FEP services alone, without an organized SUD program model, is not likely to result in the individual's ability to maintain sobriety, CSC for FEP teams may assist the individual in accessing this service, but must ensure clinical coordination in order to avoid duplication of services. If CSC for FEP and SAIOP are provided by the same agency, the agency may update the existing authorization to include group services to be utilized by the SAIOP program;<br>　f.c. The following are **not** service exclusions:<br>　　iii.i. Individual Counseling and Group/Family Counseling/Training provided outside of the CSC for FEP program when the needs of an individual exceed that which can be provided by the CSC for FEP team. For example, the individual may participate in SA group treatment provided by a Tier 1, Tier 2, or SA-IOP provider upon documentation of the demonstrated need;<br>　　iv.ii. Specialized evidence-based practices delivered outside the CSC for FEP program utilizing a treatment modality (e.g. Individual Counseling, Group Counseling, etc.) that would otherwise be provided by a CSC for FEP team member *when* the needs of an individual exceed that which can be provided by the CSC for FEP team (e.g. specialized treatment for PTSD, eating disorders, personality disorders, and/or other specific clinical specialized treatment needs). In this case, the individual's treatment plan must reflect the necessity for participation in such services along with medical record documentation of the unique need and resulting collaboration between service providers to ensure coordination towards goals and to prevent any duplication of services/effort.<br>2. On an individual basis, up to eight (8) weeks of some services may be provided to CSC for FEP participants to facilitate a smooth transition from CSC for FEP to these other community services. A transition plan must be adequately documented in the treatment plan and clinical record. These services are:<br>　a. Case Management/Intensive Case Management.<br>　b. Psychosocial Rehabilitation-Individual/Program<br>　c. AD Support Services<br>　d. Behavioral Health Assessment<br>　e. Service Plan Development<br>　f. Diagnostic Assessment<br>　g. Physician Assessment<br>　h. Individual Counseling<br>　i. Peer Support |
| Clinical Exclusions | 5.1 Individuals with severe and profound intellectual/developmental disability are excluded because the severity of cognitive impairment precludes participation in services at this level of care.<br>6.2 Individuals with mild or moderate intellectual/developmental disability are excluded unless there is an identified mental illness that is the foremost consideration for this psychiatric intervention, and the individual is able to benefit from the cognitive behavioral-based program components.<br>7.3 Individuals with medical conditions suspected to be causing the psychotic symptoms are excluded. [Examples: Neurological conditions including traumatic brain injury; brain tumor; endocrine, metabolic, or autoimmune disorders with central nervous system involvement.]<br>8.4 Individuals whose psychotic symptoms are suspected to be caused by drug or alcohol intoxication or withdrawal are excluded. |

## Coordinated Specialty Care for First Episode Psychosis Program (CSC for FEP) (Effective Date January 1, 2023)

| | |
|---|---|
| Required Components | 44.<u>1</u> CSC for FEP must include a comprehensive and integrated set of medical and psychosocial services provided in home, community, and office settings by a multidisciplinary team.<br><br>45.<u>2</u> The team must provide community-based supportive and recovery-oriented services interwoven with treatment services.<br><br>46.<u>3</u> Services and interventions must be individually tailored to the needs, goals, preferences, and strengths of the individual. During the course of CSC for FEP service delivery, the CSC for FEP team will provide the intensity and frequency of service needed for each individual based on individual need and preference.<br><br>47.<u>4</u> There is no requirement that every CSC for FEP participant works with every member of the team, as interventions should be tailored to the unique needs and preferences of each participant.<br><br>48.<u>5</u> The CSC for FEP team must maintain a small participant-to-clinician ratio, with an expected census of 30 participants at a point-in-time based on a team FTE of approximately 5.0.<br><br>49.<u>6</u> The CSC for FEP team is expected to retain a high percentage of enrolled individuals in services with few dropouts. In the event that the CSC for FEP program documents multiple attempts to locate and make contact with an individual and has demonstrated diligent search, after 90 days of unsuccessful attempts the individual may be discharged due to drop out.<br><br>50.<u>7</u> The CSC for FEP team must hold weekly team meetings. All CSC for FEP team members are required to attend the meetings. In the weekly team meeting, each individual must be discussed, even if only briefly. The purpose of the team meetings is to review the clinical status of all individuals in the CSC for FEP program and the outcome of the most recent staff contacts, individuals' progress toward their goals, barriers to progress toward goals, and strategies for eliminating these barriers.<br><br>21.<u>8</u> The CSC for FEP team must respond to phone calls from participants and family members 24-hours/365-days, and either directly provide or refer individuals/families to any appropriate crisis services.<br><br>22.<u>9</u> The CSC for FEP team should maintain a strong recovery orientation and commitment to hiring individuals with lived experience of mental illness.<br><br>23.<u>10</u> CSC for FEP providers must have established procedures/protocols for handling emergency and crisis situations that describe methods that shall be taken by the team in supporting and responding to CSC for FEP-enrolled individuals who require emergency psychiatric admission/hospitalization and/or crisis stabilization.<br><br>24.<u>11</u> CSC for FEP providers must have a Coordinated Specialty Care for First Episode Psychosis organizational plan that addresses the following:<br>  a. Staffing pattern and how staff are deployed, including how unplanned staff absences, illnesses, and emergencies are accommodated;<br>  b. Hours of operation and typical daily schedule for staff;<br>  c. Inter-team communication (e.g., e-mail, team staffing, staff safety plan such as check-in protocols, etc.);<br>  d. How the team will respond to crises for individuals served (e.g., on-call rotation schedule and protocols, etc.);<br>  e. For the individuals whom the CSC for FEP team supports, the CSC for FEP team should be involved in all hospital admissions and hospital discharges whenever possible, and this involvement should be documented in the clinical record.<br>  f. Because of the often complex mental health conditions of CSC for FEP-referred individuals and the need to build trust with the referred individuals, comprehensive mental health, addiction, and functional assessments may take up to 60 days. The assessments shall include: Psychiatric History, Mental Status/Diagnosis, Physical Health, Substance Use, Education and Employment, Social Development and Functioning, and Family Structure and Relationships.<br><br>25.<u>12</u> In addition to services provided to individuals enrolled in the program, the CSC for FEP team must provide outreach and education activities/events to the community at large regarding behavioral health conditions, first episode psychosis and the CSC for FEP program, recovery and wellness principles and practice, and information on how to access the public behavioral health system.<br><br>26.<u>13</u> CSC for FEP providers must have policies and procedures governing the provision of community outreach and education services, including methods for protecting the safety of staff who engage in these activities. |
| Staffing Requirements | 1. Coordinated Specialty Care team members must include:<br>  a. (1 FT Employee required): One full-time Team Leader who is the clinical and administrative supervisor of the team, and who also functions as a practicing clinician on the team. The Team Leader must be a FT employee and must have one of the following qualifications to be an independently licensed practitioner: |

## Coordinated Specialty Care for First Episode Psychosis Program (CSC for FEP) (Effective Date January 1, 2023)

i. Physician
ii. Psychologist
iii. Physician's Assistant
iv. APRN
v. RN with a 4-year BSN
vi. LCSW
vii. LPC
viii. LMFT
ix. One of the following, as long as the practitioner below is under supervision in accordance with O.C.G.A. §43-10A-11:
- LMSW*
- LAPC*
- LAMFT*

*If the team lead is not independently licensed, then clinical supervision duties should be delegated appropriately in accordance with expectations set forth in O.C.G.A. Practice Acts.

b. (Variable: .25 FTE based on CSC for FEP team census of 30 participants) a prescriber (a psychiatrist or, under the supervision of a Psychiatrist, an APRN, NP, or PA) who:

i. Provides clinical and crisis services to all team participants;
ii. Works with the team to monitor each individual's clinical and medical status and response to treatment;
iii. Directs psychopharmacologic and medical treatment for CSC for FEP participants;
iv. Participates in the CSC for FEP team meetings weekly.

c. (Variable: .15 FTE based on CSC for FEP team census of 30 participants) one Nurse (RN) who:

i. Provides nursing services for all participants, including health and assessments, education on treatment adherence, nutrition, exercise, smoking cessation, and other health and wellness-related topics as needed;
ii. Works with the team to monitor each individual's overall physical health and wellness, clinical status and response to treatment; and
iii. Participates in the CSC for FEP team meetings weekly.

d. If the Team Lead is not a licensed psychologist, LCSW, LPC, LMFT, LMSW, LAPC, or LAMFT, there must be an additional 0.5 FTE team member who holds one of these licensed credentials or associate licensed credentials (note that associate-level clinicians must be under supervision in accordance with O.C.G.A. §43-10A-11).

e. (1 FTE required): One full-time Case Manager who provides concrete needs assistance to CSC for FEP participants and who participates in the CSC for FEP team meetings weekly. The Case Manager is supervised by the Team Lead.

f. (1 FTE required): One full-time Education and Employment Specialist who provides support to CSC for FEP participants on their educational and vocational goals, and who participates in the CSC for FEP team meetings weekly. The Education and Employment Specialist is supervised by the Team Lead.

g. (1 FTE required): One or two Certified Peer Specialist or Certified Peer Specialist-Youth who are fully integrated into the team and promote individual self-determination and decision-making and provide essential expertise and consultation to the entire team to promote a culture in which each participant's point of view and preferences are recognized, understood, respected and integrated into treatment and community integration activities. CPSs/CPS-Ys participate in the CSC for FEP team meetings weekly and are supervised by the Team Lead.

h. (Variable: 0.5 FTE based on CSC for FEP team census of 30 participants): One fully licensed or associate-level licensed clinician who specializes in family counseling, or a Certified Peer Specialist-Parent (CPS-P) who provides education, support, and training to family members of CSC for FEP participants. This practitioner bills the Parent Peer Support service (if a CPS-P) or Family Counseling/Training otherwise. The provider is strongly encouraged to utilize the Parent Peer Support service if a CPS-P is available, to meet the recovery needs of the family. This team member participates in the CSC for FEP team meetings weekly and is supervised by the Team Lead.

## Coordinated Specialty Care for First Episode Psychosis Program (CSC for FEP) (Effective Date January 1, 2023)

| | |
|---|---|
| **Clinical Operations** | 1. Individuals receiving CSC for FEP do not need to have a qualifying diagnosis prior to the initial evaluation for eligibility for CSC for FEP enrollment. As stated above, it is anticipated that many youth and young adults referred to CSC for FEP teams will have had no previous mental health treatment and thus will not have received a diagnosis prior to their evaluation with the CSC for FEP team.<br>2. Because CSC for FEP-eligible individuals may be difficult to engage, the initial treatment/recovery plan for an individual may be more generic at the onset of treatment/support. It is expected that the plan be individualized and recovery-oriented after the individual becomes engaged with the team.<br>3. Because many individuals served may have co-occurring mental health and substance use disorders, the CSC for FEP team may not discontinue services to individuals based solely upon a relapse in their substance use disorder recovery.<br>4. CSC for FEP teams are expected to participate actively and assertively in transitional planning for the individual, including:<br>  a. Via in person or, when in-person participation is impractical or not possible, via telephonic or virtual meetings between stakeholders;<br>  b. The team is expected to coordinate care through a demonstrable plan for timely follow-up on referrals to and from their service, making sure individuals are connected to resources to meet their needs in alignment with their preferences.<br>  c. The team is responsible for ensuring the individual has access to services and resources such as housing, pharmacy, benefits, a support network, etc. when being discharged from a psychiatric hospital; released from jail; or experiencing an episode of homelessness.<br>  d. CSC for FEP teams may use the Community Transition Planning service to establish a connection or reconnection to the individual and participate in discharge planning meetings while the individual is in a state operated hospital, crisis stabilization unit/behavioral health crisis center, jail/prison, or other community psychiatric hospital.<br>  e. When the nature of transition planning meets the scope of definition for either ADSS, CM, CTP, or CSI, that service should be billed in accordance with the particular scope of service defined within this Manual.<br>5. The CSC for FEP team is required to respond to the crisis needs of CSC for FEP-enrolled individuals, by either directly providing or referring individuals/families to any appropriate crisis services.<br>6. Treatment and recovery support to the individuals served by the CSC for FEP team is provided in accordance with an individualized recovery plan, to be developed within 30 days of an individual's enrollment with the CSC for FEP team. Reviews of these plans should occur at least every six months and are thorough summaries describing the individual's and team's evaluation of the individual's progress/goal attainment, the effectiveness of the interventions provided, and the individual's satisfaction with services since the last plan review. |
| **Service Accessibility** | 1. The CSC for FEP team must respond to phone calls from participants and family members 24-hours/365-days, and either directly provide or refer individuals/families to any appropriate crisis services. Answering devices/services/Georgia Crisis and Access Line do not meet the expectation; CSC for FEP team staff members must provide this phone coverage.<br>2. The team must be able to rapidly respond to early signs of relapse and symptom recurrence and must have the capability of providing multiple contacts daily to individuals in acute need.<br>3. There must be documented evidence that service hours of operation include evening, weekend and holiday hours. |
| **Documentation Requirements** | 1. Each CSC for FEP program must provide monthly fidelity and outcomes data as defined by the DBHDD.<br>2. The CSC for FEP must have documentation (e.g., notebook, binder, file, etc.) of treatment team meetings to include:<br>  a. Date, start time, and end time for the meeting;<br>  b. Names of team participants involved in staffing (signed/certified by the team leader or team lead designee in the absence of the team leader);<br>  c. Initials of all individuals discussed/planned for during staffing; and<br>  d. Minimal documentation of content of discussion specific to each individual (1-2 sentences is sufficient).<br>3. CSC for FEP meeting logs should be retained for a minimum of one (1) year, and in accordance with professional standards and the provider agency's policy. |
| **Billing & Reporting Requirements** | 2. 1 Providers must document services in accordance with the general requirements found in Part II, Section III: Documentation Requirements of this Provider Manual, as well as with the service-specific requirements delineated in this section below. Service provision, billing, and reporting must adhere to all DBHDD and Georgia Collaborative ASO requirements. |

## Coordinated Specialty Care for First Episode Psychosis Program (CSC for FEP) (Effective Date January 1, 2023)

2. Non-intensive Outpatient services that are identified in the Service Definition section above should be authorized and billed in accordance with Part I, Section II of this manual via the Non-intensive Outpatient Services Type of Care. Each practitioner must follow the specific service definition for each service they bill under the auspices of the CSC for FEP program.
3. Education and employment support interventions should be billed/invoiced to the provider's DBHDD CSC for FEP contract.
4. The CSC for FEP team can provide and bill for Community Transition Planning as outlined in the guidelines for this service. This includes supporting individuals who are eligible for CSC for FEP and are transitioning from jail/prison.
5. Providers must submit a monthly programmatic and expenditure report and supporting documentation as needed to their designated DBHDD programmatic officer.
6. Providers must maximize use of third-party payers (Medicaid, managed care organizations, private insurance, etc.).

## Co-Responder Program

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| TBD | TBD | TBD | | | | | |

**Service Definition**

A Co-Responder Program is established through a partnership between a contracted provider and one or more law enforcement agencies and/or emergency medical services (EMS) entities to utilize the combined expertise of peace officers and behavioral health professionals on emergency calls involving behavioral health crises. The goals of the program are to de-escalate crisis situations and help link individuals with behavioral health concerns to appropriate services. A Co-responder Program consists of the following components:

1. Co-responder Teams: A team established pursuant to a co-responder program, composed of at least one officer team member and one dedicated CSB direct-service practitioner.
2. Co-responder Intervention: The Co-responder Team provides on-scene crisis de-escalation, screening and assessments, and referrals to ongoing treatment by the skilled staff named below.
3. Post-emergency Follow-up Services: The contracted provider covering the area where the crisis occurred will contact the individual within two business days following a behavioral health crisis.
4. Co-responder Protocol Committee: CSBs will establish a "Co-responder Protocol Committee" to work to increase the availability, efficiency, and effectiveness of community response to behavioral health crises. The Committee must consist of law enforcement agencies.

**Admission Criteria**

Individuals experiencing a behavioral health crisis who are the subject of a communication-officer or public-safety dispatch interaction, and who could benefit from behavioral health (BH) services and supports within the community. The individual served does not have to be a current or past-enrolled recipient of DBHDD services or supports.

**Continuing Stay Criteria**

N/A

**Discharge Criteria**

1. The acute presentation of the crisis situation is resolved;
2. Appropriate referral(s) and service engagement(s) to stabilize the crisis situation are completed;
3. Post-crisis follow-up contact has been completed within 2 days of crisis contact; and
4. Recommendations for ongoing services, supports or linkages have been documented.

**Service Exclusions**

Individuals in the following settings are excluded from receiving Co-Responder Program Services: Crisis Stabilization Units (CSU), Behavioral Health Crisis Centers (BHCC), CRR-I, psychiatric hospital (state or private); Residential Detox; Emergency Departments (EDs); state prisons; youth detention center; regional youth detention center, and Psychiatric Residential Treatment Facilities (PRTFs).

## Co-Responder Program

| | |
|---|---|
| Clinical Exclusions | 1. All individuals receiving Co-responder Program services must present with indications of a behavioral health disorder, an Intellectual/Developmental Disability, and/or Substance Use Disorder.<br>2. Co-responder teams shall not respond to non-psychiatric medical emergencies. |
| Required Components | 1. Which programmatic requirements herein are required is contingent on the availability of funding. Variation on any expectations shall be defined in a specific DBHDD contract.<br>   a. Specifically, all Community Service Boards (CSBs) must provide:<br>      i. Follow-up Contact; and<br>      ii. Co-responder Protocol Committees.<br>   b. Additionally, contracted providers may provide:<br>      i. Co-responder Team/s; and<br>      ii. Co-response Intervention.<br>2. Contracted providers implementing a Co-responder Program are required to have documented evidence of the partnership between the local law enforcement partner/s and the contracted provider establishing a co-responder program in their jurisdiction (e.g., co-signed plans, agreements, etc.). The agreement between the law enforcement agency/emergency medical services entity and the contracted provider should articulate, at minimum, the following:<br>   a. If the Co-responder Program partnership is with a Law Enforcement Agency, the following are requirements:<br>      i. The commitment by a law enforcement agency to designate one or more peace officers to participate as officer team members in a co-responder team model;<br>      ii. Based on planned number of teams, the law enforcement agency's commitment to staff the required and named shifts for the co-responder team<br>      iii. That when an emergency call involving an individual's behavioral health crisis is received by a communications officer or public safety agency, and a Mobile Crisis Response Service is not appropriate or available, the communications officer should be encouraged to notify the co-responder team in the jurisdiction where the emergency is located, if practicable, regardless of whether other peace officers are also dispatched;<br>      iv. That the co-responder team will work collaboratively to de-escalate the situation; provided, however, that all final decisions shall be made by the officer team member, or by the officer's superiors.<br>      v. That during a co-responder team's response to a call, the law enforcement officer remains "in charge of the scene"; and<br>      vi. That the officer team member may consider input from the contracted provider team member in determining whether to refer an individual for behavioral health treatment or other community support, or to transport the individual for emergency evaluation in accordance with Code Section 37-3-42 or 37-7-42, rather than making an arrest; **OR**<br>   b. If the Co-responder Program partnership is with an Emergency Medical Services entity, the following are requirements:<br>      i. Based on planned number of teams, the Emergency Medicaid Services entity's commitment to staff the required and named shifts for the co-responder team<br>      ii. That when an emergency call involving an individual's behavioral health crisis is received by a communications officer or public safety agency, and a Mobile Crisis Response Service is not appropriate or available, the communications officer should be encouraged to notify the co-responder team in the jurisdiction where the emergency is located, if practicable, regardless of whether other peace officers are also dispatched;<br>      iii. That the co-responder team will work collaboratively to de-escalate the situation; provided, however, that all final decisions shall be made by the EMT in charge of the deployment.<br>      iv. That during a co-responder team's response to a call, the EMT responder remains "in charge of the scene."<br>   c. Co-responder Teams and Interventions provided by the contracted provider shall comply with the following (which will also be documented in the shared agreement):<br>      i. The contracted providers will make available licensed and credentialed staff based on funding to support the co-responder teams designated shifts |

## Co-Responder Program

ii. The co-responder licensed and/or credentialed staff may participate in-person or virtually via telemedicine or telephone.

iii. The contracted provider team member/s will provide:

1. Brief Screening;
2. Crisis behavioral health support/treatment;
3. Referrals to and engagement with other medical and community supports;
4. If licensed, and as appropriate, the contracted provider team member can issue a 1013/2013 to direct that an individual be taken to an emergency receiving facility for involuntary evaluation.

iv. When an emergency call involving an individual with a behavioral health crisis is received by a law enforcement agency and a co-responder team is dispatched, a contracted provider team member shall either be available to accompany the officer team member in-person, or shall be available for consultation via telephone or telemedicine during the emergency call response

v. Transport the individual for emergency evaluation in accordance with Code Section 37-3-42 or 37-7-42

1. Transport conducted pursuant to this Code section shall occur in government-owned vehicles configured for safe transport based on the individual's condition; provided, however, that the officer team member may authorize alternative transportation by a medical transport company or otherwise if deemed safe to do so based on the individual's condition.

2. In the event that the officer team member transports the individual for emergency evaluation in accordance with Code Section 37-3-42 or 37-7-42 to an emergency receiving facility which is a not a CSU, the officer shall notify the partnering contracted provider, prior to the release of the individual, regarding whether or not the individual is admitted for treatment, to identify and facilitate any necessary follow-up services for such individual to prevent relapse.

3. The Co-responder team will provide known documentation for the individual and contact information for the contracted provider for the emergency receiving facility to contact for clinical continuity at discharge.

vi. If the individual does not reside in the service area for the partnering contracted provider, the Co-responder team will notify a CSB where the individual resides for follow-up care. The Co-responder team will provide documentation regarding the intervention to the corresponding CSB for promoting clinical continuity.

3. Post-emergency Follow-up Services

a. When a co-responder team responds to a behavioral health crisis, the assigned CSB for that service area where the crisis occurred shall contact the individual within two business days following the crisis.

b. If the individual resides in another CSB's service area, the Co-responder teams shall communicate information about the individual to the appropriate community service board.

c. The CSB who is providing the follow-up shall work to identify the types of services needed to support the individual's stability and to locate sources for those services, including peer support, housing, and job placement.

d. If the individual was incarcerated, the CSB may make recommendations for inclusion in a jail release plan.

e. Following the behavioral health crisis, the CSB must provide voluntary outpatient therapy and rehabilitative supports, as needed, to eligible individuals pursuant to Code Section 37-11-9.

4. Co-responder Protocol Committee (for law enforcement agency partnership models only):

a. The CSB will establish a co-responder protocol committee comprised of the law enforcement agencies in their service area. The co-responder protocol committee will work with law enforcement agencies to increase the availability, efficiency, and effectiveness of community responses to behavioral health crises, and to address issues arising from the work of co-responder teams. The co-responder protocol committee may include representatives of other agencies providing crisis responses and behavioral health care in the service area

b. Whether or not an agency chooses to participate in a co-responder team, each law enforcement agency in the service area shall designate an officer to serve on the co-responder protocol committee.

c. Law enforcement agencies shall designate one officer to serve as the primary point of contact for the CSB.

# Co-Responder Program

| | |
|---|---|
| | 5. A law enforcement agency that has not entered into a co-responder partnership with a CSB should be encouraged to designate one peace officer to serve as the primary point of contact with the CSB in their service area. |
| | 6. A law enforcement agency should be encouraged to designate a peace officer who shall serve on the co-responder protocol committee *convened* by the CSB in their service area. |
| **Staffing Requirements** | 1. The agency providing this service shall either be a CSB or another DBHDD-contracted provider for this service program. |
| | 2. **The Co-Responder Team partnered with law enforcement agencies will:** |
| | a. Be comprised of at least one officer team member and one CSB team member; |
| | b. Have designated, by the CSB partner, a sufficient number of practitioners to serve as co-response intervention members to partner with the law enforcement agencies located within the community service board's service area, with on-call availability at all times; |
| | c. Have allowance for the partnered CSB team member to be part of multiple co-responder teams; |
| | d. Designate CSB Team Member/s as co-responder partners: |
| |     i. CSB Team Member/s must be licensed or certified in this state to provide counseling services, or to provide other support services to individuals and their families regarding a behavioral health disorder, and whose responsibilities include participation as a CSB team member on a co-responder team. |
| |     ii. CSB team members shall receive training on the operations, policies, and procedures of the law enforcement agencies with which they partner. |
| | e. Have access to on-call supervision and consultation of fully licensed CSB Team Member/s which must be provided during the operational hours of the multiple co-responder teams. Supervising Licensed CSB Team members can provide clinical consultation either face-to-face, telehealth, or by telephone. |
| | f. Include an Officer Team Member: |
| |     i. A law enforcement agency that has entered a co-responder partnership with a CSB shall designate one or more peace officers to participate as officer team members in a co-responder team. |
| |     ii. A law enforcement agency that has not entered a co-responder partnership with a CSB shall designate one peace officer to serve as the primary point of contact with the community service board. |
| | 3. When Post-emergency Follow-up Services are provided, follow-up contact can be provided by any CSB staff member. |
| | 4. Specific to the Co-responder Protocol Committee: |
| | a. The CSB shall designate a licensed staff member to lead the co-responder protocol committee. |
| | b. Each law enforcement agency in the CSB service area shall designate a peace officer who shall serve on the co-responder protocol committee. |
| | 5. Co-response supports must be available from staff that is skilled to provide on-scene crisis de-escalation, screening and assessments, and referrals to ongoing behavioral health treatment/support. |
| **Service Accessibility** | 1. The Co-response teams do not necessarily have to be available 24 hours a day, 7 days a week. Team access will be defined by contract and by the contracted provider's agreement with the partnering law enforcement agency and/or EMS entity. |
| | 2. Co-response may not be provided in Crisis Stabilization Units (CSU), Behavioral Health Crisis Centers (BHCC), CRR-I, psychiatric hospital (state or private); Residential Detox; state prisons; youth detention center; and regional youth detention center. |
| | 3. The Community Service Board team member shall be available to accompany the officer team member in person or via virtual means or shall be available for consultation via telephone or telemedicine during such emergency call. |
| **Documentation Requirements** | 1. Each CSB shall compile and maintain records of the services provided by co-responder teams which shall include: |
| | a. Crisis call information |
| | b. Community follow-ups |
| | c. Actions taken on behalf of incarcerated individuals |
| | d. Reasonably available outcome data, as determined by the Department. |
| | 2. In the event that the individual served is supported by a co-responder team other than the one in their home county, the team shall notify the CSB where the residence for follow-up care and provide documentation regarding the incident. |

## Co-Responder Program

| Billing & Reporting Requirements | The contracted providers shall report data to the DBHDD in a format developed cooperatively with the contracted providers. |
|---|---|

## Community Transition Peer Supports (Peer Mentor)

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Peer Support Services | Practitioner Level 4, In-Clinic | H0038 | HW | U4 | U6 | | |
| | Practitioner Level 5, In-Clinic | H0038 | HW | U5 | U6 | | |

| Unit Value | 15 minutes |
|---|---|

| | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| | Practitioner Level 4, Out-of-Clinic | H0038 | HW | U4 | U7 | | |
| | Practitioner Level 5, Out-of-Clinic | H0038 | HW | U5 | U7 | | |

| Utilization Criteria | TBD |
|---|---|

**Service Definition**

Community Transition Peer Supports provide interventions that promote recovery, wellness, independence, self-advocacy, and the development of natural supports among individuals transitioning from inpatient to community-based service settings. The goal of the service is to foster a positive and intentionally mutual relationship between a Certified Peer Specialist (CPS) and an individual to support his/her transition to the community and in regaining control over his/her own life and recovery process.

The service begins with a CPS engaging individuals who are currently in an inpatient setting via the use of recovery dialogues (for example, sharing their own recovery story, building hope and exploring possibilities for recovery, and/or tapping into strengths individuals possess which could be used to galvanize the recovery process), and gradually building mutually valued relationships with these individuals. Utilizing their unique lived experience, CPS role model the recovery journey, assist their peers in recognizing, understanding and relating their own recovery stories, support their peers in developing their own recovery goals and self-directed recovery processes, and promote a successful life of meaning and purpose in the community of each individual's choice. As the peer relationship progresses, the CPS supports individuals in preparing for their return to the community and continues to support them during and after discharge.

In order to accomplish the goals of the service, supports such as the following are utilized:
- Sharing one's own recovery story;
- Promoting the individual's self-articulation of his/her own recovery story;
- Demonstrating and modeling recovery principles, self-help strategies, coping techniques, and self-advocacy;
- Supporting effective coping skills development;
- Assisting individuals with:
  a. the articulation of their personal goals;
  b. identifying personal strengths;
  c. identifying potential outcomes, opportunities, and challenges in accomplishing goals;
  d. providing support in meeting goals and objectives;
  e. if desired, the creation and ongoing maintenance of a personal Wellness Recovery Action Plan (WRAP);
  f. identifying and supporting participation in mutual self-help support groups;
  g. the development of problem-solving techniques;
  h. identifying and overcoming their fears (i.e., in preparation for hospital discharge);
  i. motivation and development of job-related skills;
  j. community resource linking and acquisition;
  k. establishing and/or maintaining natural support systems.

Due to the dual nature of the service setting (inpatient initially, then community-based as the individual transitions back to his/her own home and community), there are some interventions which are more germane to one setting or the other, and some interventions which are appropriate in both settings:

For example, in the inpatient setting:

- Establishment of an intentionally mutual relationship;
- Assisting with discharge preparation through shared experience;
- Assisting with community connections through the use of Day-Passes (both on-site and off-site);
- Supporting the individual in setting and keeping goals relevant to the inpatient setting;
- Facilitating or assisting with interactions related to community resource linkage, discharge planning, and recovery dialogues.
- Interact with peers at the regional hospital's treatment/rehab mall;
  a.  General interaction with peers during social periods;
  b.  Facilitate or assist groups on community resource linking, discharge planning, and recovery dialogue (maximum of one group per week).

For example, in the community setting:

- Ongoing building and support of an intentionally mutual relationship;
- Assisting with establishing and/or maintaining natural support systems;
- Assisting with social connections and community linkages.

For example, in both settings:

- Promoting the individual's self-articulation of his/her own recovery story;
- Demonstrating and modeling recovery principles, self-help strategies, coping techniques, and self-advocacy;
- Supporting the development or continuation of a self-directed recovery plan/process;
- Supporting effective coping skills and problem-solving skills development/utilization;
- Support in identifying and overcoming potential recovery barriers (i.e., fears, negative self-talk, stigma);
- Development and refinement of personal goals, and planning for how to achieve them.

CTPS services are targeted to adults who meet the following criteria:
  a.  Individual has a mental illness (and includes individuals with a co-occurring substance use disorder);
  b.  Individual has little or no natural support systems that are actively engaged in encouraging wellness, empowerment, and self-advocacy;
  c.  Individual wants to receive the CTPS service provided by a CPS;
  d.  Individual has received extensive inpatient mental health services as evidenced by a prolonged stay (45 or more consecutive days) and/or frequent inpatient stays/readmissions;
  e.  Individual may or may not currently be receiving forensic services.

| | |
|---|---|
| Admission Criteria | (see above) |
| Continuing Stay Criteria | 1.  Individual continues to meet admission criteria; **and** <br> 2.  Progress notes document progress relative to goals identified in the Individualized Recovery/Resiliency Plan, but treatment/recovery goals have not yet been achieved. |
| Discharge Criteria | 1.  An adequate continuing recovery plan has been established; **and one or more of the following:** <br>   a.  Goals and/or objectives in the Individualized Recovery/Resiliency Plan related to CTPS services have been substantially met; or <br>   b.  Individual requests discharge; or <br>   c.  Transfer to another service/level is more clinically appropriate. |

| Service Exclusions | 1. Individuals covered by a Medicaid Care Management Organization (CMO) are not covered for this DBHDD service benefit. |
|---|---|
| Clinical Exclusions | 1. Individuals diagnosed with a Substance-Related Disorder and no other concurrent mental illness; **or**<br>2. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition co-occurring with one of the following diagnoses: Developmental Disability, Autism, Neurocognitive Disorder, or Traumatic Brain Injury. |
| Required Components | 1. CTPS services are primarily provided in 1:1 CPS to person-served ratio but may include one CTPS-related group per week.<br>2. Individuals participating in the service at any given time must have the opportunity to participate in and make decisions about the person-centered interactions offered by the CPS. |
| Staffing Requirements | 1. The providing practitioner is a Georgia-Certified Peer Specialist (CPS), though at the discretion of the Georgia Mental Health Consumer Network, may be hired conditionally with a time-based expectation that this requirement will be met. |
| Clinical Operations | 1. The providing practitioner delivers all CTPS services under the auspices and supervision of the Georgia Mental Health Consumer Network. |
| Service Accessibility | 1. Service should initially be provided in a DBHDD inpatient setting, then shift to the individual's home and community setting upon discharge (any community setting is appropriate for providing the service so long as the choice of setting is made by the individual receiving the service). For the purposes of this definition, the word "inpatient" is inclusive of DBHDD hospitals and other high acuity supports such as Crisis Stabilization Units (CSUs) and Psychiatric Residential Treatment Facilities (PRTFs).<br>2. If the individual is still admitted to the inpatient setting but is utilizing a day-pass, service may be provided outside of the inpatient setting.<br>3. Service may be provided by telephone (although 50% must be provided face to face, telephonic contacts are limited to 50%).<br>4. A CPS may facilitate no more than one CTPS-related group per week in the inpatient setting. |
| Documentation Requirements | 1. CPSs must comply with any data collection expectations in support of the program's implementation and evaluation strategy. |
| Billing and Reporting Requirements | 1. For this service, the U6 In-Clinic modifier is utilized when the service occurs in a DBHDD inpatient setting, jail, or other institutional setting.<br>2. For this service, the U7 Out-of-Clinic modifier is utilized when the service occurs outside a DBHDD inpatient setting or institution as referenced above. |

## Crisis Respite Apartments

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Crisis Respite Service | Crisis Respite | H0045 | HE | | | | |
| Unit Value | 1 day | | | | Utilization Criteria | | TBD |
| Service Definition | The service offers crisis respite for an individual who needs a supportive environment (1) when transitioning back into the community from a psychiatric inpatient facility, Crisis Stabilization Unit (CSU), or 23-hour observation area; or 2) when preventing an admission or readmission into a psychiatric inpatient facility, CSU, or 23-hour observation area and can be safely served in a voluntary community-based setting. Crisis Respite services include individualized engagement, crisis planning, linkage to behavioral health treatment/supports and other community resources necessary for the individual to safely reside in the community, including transportation assistance when needed to access appropriate services, supports, and levels of care.<br><br>* *Where indicated in contract, the service allows for an Enhanced CRA component. The enhanced CRA provides increased on-site supervision requirements for individuals admitted to the service.* | | | | | | |

# Crisis Respite Apartments

## Admission Criteria

1. Individual with a severe and persistent mental illness that seriously interferes with their ability to live in the community and at least one of the below:
   a. Transitioning or recently discharged from a psychiatric inpatient setting; or
   b. Frequently admitted to a psychiatric inpatient facility or crisis stabilization unit (e.g., three (3) or more admissions within past 12 months or extended hospital stay of 60 days within past 12 months); or
   c. Chronically homeless (e.g., 1 extended episode of homelessness for one year, or four (4) episodes of homelessness with three (3) years; or
   d. Recently released from jail or prison; or
   e. Frequently seen in emergency rooms for behavioral health needs (e.g., three (3) or more visits within past 12 months).
2. Individual is free of medical issues that require daily nursing or physician care;
3. Individual does not demonstrate active substance use;
4. Individual (does not demonstrate danger to self or others) is able to safely remain in an open, community-based placement; and
5. Individual demonstrates need for short-term crisis support which could delay or prevent the need for higher levels of service intensity (such as acute hospitalization); and/or
6. Individual has a circumstance which destabilizes their current living arrangement and the provision of this service would provide short-term crisis relief and support.
7. Individuals discharging from a state hospital, presenting with an approved Notice to Proceed upon admission shall receive priority admission for a vacant CRA opening.

## Continuing Stay Criteria

1. Individual continues to meet admission criteria as defined above;
2. Individual has been assisted with:
   a. Obtaining/applying for vital records;
   b. Submitting appropriate entitlement application;
   c. Documented housing search activities;
   d. Submitted unified referral application; and
   e. Currently documented housing goal.

This service is short-term and transitional in nature, intended to support successful community transition and integration. As such, discharge planning begins upon admission.

## Discharge Criteria

1. Individual requests discharge; or
2. Individual's medical necessity indicates a need for an alternate level of care; or
3. Individual has received two consecutive episodes of care authorization; met the maximum length of stay.

## Service Exclusions

Intensive, Semi-Independent, and Independent Residential Services. Crisis stabilization unit services, community-based in-patient.

## Clinical Exclusions

1. Individuals experiencing a medical crisis are excluded from admission.
2. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition co-occurring with a diagnosis of: Intellectual/Developmental Disabilities; and/or Autism; and/or Neurocognitive Disorder; and/or Traumatic Brain Injury.
3. Danger to self or others.
4. Active substance use as evidenced by positive drug and or alcohol screens.

## Required Components

1. Upon admission into the CRA a housing plan must be in place that identifies the housing option or resource including action steps that will support transition within the maximum length of stay. All providers should develop a contingency plan in case the primary housing plan does not actualize.
2. This service facilitates the provision of community supports that promote an individual's ability to prepare for and transition back into the community, including:
   a. Comprehensive Needs Assessment;
   b. Linkage to appropriate behavioral health treatment and support services;

## Crisis Respite Apartments

   c. Developing an individualized housing support plan, including housing goals, needs, preferences, available resources, barriers, completion of the Housing Choice and Needs Evaluation, etc.;

   d. Interventions that support an individual's ability to prepare and transition back into a community setting; and

   e. Assisting with housing applications and any associated search processes.

3. Each provider must have a defined standardized admission process which is shared with other referring agencies.

4. Providers must facilitate application for birth certificate within 72 hours of admission if needed.

5. Provider must facilitate appointment with a Medicaid Elabability Speaciality (MES) within 72 hours for individuals without income.

6. Provides must facilitate application for a social security card within 72 hours of admission if needed.

7. Provider must ensure documented individualized housing search log, reflective of provision of active housing search assistance, locations (minimum 2 locations per week), applications submitted, denials and corresponding dates.

8. Crisis Respite services must be available daily including evening and weekend hours.

9. Agency must have a 24/7 Staffing Plan that includes on-call coverage with a response time of 30 minutes such that the ability to respond to individuals in crisis is provided.

10. There must be at least one (1) face-to-face contact daily with each individual receiving Crisis Respite service.

11. Any individual enrolled in this service for whom acute stabilization services were necessary (e.g., inpatient hospitalization, crisis stabilization unit, emergency department intervention, BHCC, etc.), the provider must conduct a clinical review of the individual's relevant clinical information (e.g. discharge plan/summary, risk assessments, treatment recommendations, etc.) and modify the individual's IRP as necessary, in accordance with Part II, Section III: Documentation Requirements of this manual, item #5. Individualized Recovery/Resiliency Planning, sub-item E.

12. Enhanced CRA requires a minimum of three (3) face-to-face visits per day by staff – one per shift; morning, afternoon and evening.

13. Crisis Plan development to formulate and implement a crisis response.

14. The provider shall adhere to basic boarding expectations which include:
   a. Provision of clean linens/towels,
   b. Provision of three (3) nutritious meals per day and nutritional snacks,
   c. Access to laundry facilities,
   d. Cleaning, and
   e. Transportation assistance to access services and supports.

15. Individuals receiving SNAP benefit are not required to use their food stamps to meet the provider requirement of provision of three nutritious meals per day.

16. Single person per room but if shared, bedroom must be gender specific with dividing partition or wing wall allowing for privacy. Bedrooms utilized for more than one person shall have a minimum of 60- sq. ft. per individual, a single room shall not be less than 100 sq. ft.

17. Shower/bathing facility shall be provided, not requiring access through another individual's bedroom.

18. To support privacy and confidentiality, programs shall not maintain administrative office space in individuals' living spaces.

19. As a part of the planning for when an individual will move to housing of his/her own choice, the Housing Choice and Needs Evaluation https://dbhddapps.dbhdd.ga.gov/NSH/ must be completed. The only exception to this expectation is when an individual chooses to opt out due to stable housing, personal choice, etc.

20. The Provider is responsible to conduct a self-certification of the Housing Quality Standard (HQS) Inspection twice per year at the beginning of the contract period and six months after the contract start day. The provider must keep a record of the self -certification HQS on file indicating the date and staff responsible for completion. If deficiencies are identified, the provider must correct within 30 days of inspection for routine maintenance issues and within 24 hours if there is an emergency deficiency (such as non-working smoking detectors).

### Staffing Requirements

1. The following practitioners may provide Crisis Respite Services:
   a. Practitioner Level 1: Physician/Psychiatrist (reimbursed at Level 4 rate).
   b. Practitioner Level 2: Psychologist, APRN, PA (reimbursed at Level 4 rate).

## Crisis Respite Apartments

|  |  |
|---|---|
|  | c. Practitioner Level 3: LCSW, LPC, LMFT, RN, MAC, CAADC, GCADC-II or – III, CAC-II (reimbursed at Level 4 rate). <br> d. Practitioner Level 4: LMSW, LAPC, LAMFT, Psychologist/LCSW/LPC/LMFT's supervisee/trainee with at least a Bachelor's degree in one of the helping professions such as social work, community counseling, counseling, psychology, or criminology, functioning within the scope of the practice acts of the state. CPS (with Bachelor's Degree), Paraprofessional (with Bachelor's Degree), CPRP (with Bachelor's Degree), CAC-I (with Bachelor's Degree), GCADC-I (with Bachelor's Degree), or Certified Alcohol and Drug Counselor-Trainee (with Bachelor's Degree and under supervision). <br> e. Practitioner Level 5: CPS (without Bachelor's Degree); Paraprofessional (without Bachelor's Degree); CPRP (without Bachelor's Degree); or, when an individual served is diagnosed with a co-occurring mental illness and substance use disorder: CAC-I (without Bachelor's Degree), GCADC-I (without Bachelor's Degree), or Certified Alcohol and Drug Counselor-Trainee (without Bachelor's Degree and under supervision of one of the licensed/credentialed professionals above). <br> 2. When provided by one of the practitioners cited below, must be under the documented supervision (organizational charts, supervisory notation, etc.) of an independently licensed/credentialed professionals: <br>    a. Certified Peer Specialists. <br>    b. Paraprofessional staff. <br>    c. Certified Psychiatric Rehabilitation Professional. <br>    d. Certified Addiction Counselor-I. <br>    e. Certified Alcohol and Drug Counselor-Trainee. <br> 3. Specific staffing requirements for each service provider are dependent upon how the service is integrated into an existing community-based service array and the providers' proposal for delivering the service. These requirements will be outlined in the provider-specific contracts and annexes. |
| Clinical Operations | 1. Not to exceed up to six (6) Crisis Respite beds located in a single integrated community setting. <br> 2. Crisis Respite is not accessible to individuals by walk-ins and there is no signage identifying the nature of this service. All individuals receiving Crisis Respite Services must come through a referring agency such as a Tier 1 or Tier 2 Provider, hospital, CSU, 23-hour observation area, emergency room, etc. Crisis Respite is not an emergency receiving facility and shall not receive individuals under emergency conditions. Any individual who presents under emergency conditions (1013) should be directed to a local emergency receiving facility. <br> 3. Agency has a Crisis Respite Service Organizational Plan that addresses the following: <br>    a. Description of the staffing pattern and how staff are deployed to assure that the required staff-to-individual ratios are maintained, including how unplanned staff absences, illnesses, or emergencies are accommodated, case mix, access, etc.; <br>    b. Description of the hours of operations as related to access and availability to the individuals served; <br>    c. Description of how the IRP? plan constructed, modified and/or adjusted to meet the needs of the individual and to facilitate broad natural and formal support participation; and <br>    d. Description of how Crisis Respite Service agency engages with other agencies who may serve the target population. <br>    e. Description of protocol to secure the individual's personal items including medications. <br> 4. For the individual connected to a behavioral health provider, the Crisis Respite staff shall engage the behavioral health agency to facilitate crisis resolution while meeting treatment and medication needs during brief respite period. <br> 5. For the individual not connected to a behavioral health provider, the Crisis Respite staff shall engage and link that individual to behavioral health services upon admission. <br> 6. Every individual will be assisted in developing a crisis plan at the time of admission or the individual's existing crisis plan will be reviewed in concert with existing behavioral health provider and updated as needed. <br> 7. To promote privacy, there will be no external signage to indicate the presence of a behavioral health service. <br> 8. Program staff shall introduce concepts of independent living to the individual and promote activities to advance goals of successful, individualized, community-integrated housing. |

## Crisis Respite Apartments

| | |
|---|---|
| Service Accessibility | 1. Referrals must be accepted daily during agency hours of operation, minimally between the hours of 9 am and 5 pm. Providers should communicate an admission decision and move-in date within 3 business days of receiving a referral. When vacancies exist, referrals and admissions must be accepted 7 days per week.<br>2. Each provider is responsible for establishing a system with priority referral sources (hospitals, CSUs, Crisis Service Centers, Temporary Observation units, emergency rooms, Mobile Crisis Team) through which the status of bed availability is accessible to referral sources 24 hours per day. This may be though a website or automated phone greeting.<br>3. The average length of stay shall not exceed two consecutive authorizations of care approved by the ASO.<br>4. This service incorporates linkage to choices for housing which reflect individualized needs, preferences, as well as appropriate and available housing options. |
| Reporting and Billing Requirements | 1. All applicable ASO and DBHDD reporting requirements must be met.<br>2. Span billing may occur for this service, meaning the start and end date are not the same on a given service claim line; however, spans cannot cross months (e.g. start date and end date must be within the same month).<br>3. The provider must submit billing and reporting according to annual contract requirements. |
| Additional Medicaid Requirements | Not a Medicaid-billable service. |

## Crisis Service Center

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| **Crisis Service Center** | Crisis Service Center (CSC) | S9484 | | | | | |
| Unit Value | 1 day (contact) | Utilization Criteria | | | TBD | | |
| Service Definition | A Crisis Service Center (CSC) provides short-term, 24/7, facility-based, walk-in psychiatric/substance related crisis evaluation and brief intervention services to support an individual who is experiencing an abrupt and substantial change in behavior noted by severe impairment of functioning typically associated with a precipitating situation or a marked increase in personal distress. These services also include screening and referral for appropriate outpatient services and community resources for those who are not in crisis but who are seeking access to behavioral health care. Interventions are provided by licensed and unlicensed behavioral health professionals, with supervision of the facility provided by a licensed professional and designed to prevent out of community treatment or hospitalization. Interventions used to de-escalate a crisis situation may include assessment of crisis; active listening and empathic responses to help relieve emotional distress; effective verbal and behavioral responses to warning signs of crisis related behavior; assistance to, and involvement/ participation of the individual (to the extent he/she is capable) in active problem solving, planning, and interventions; referral to appropriate levels of care for adults experiencing crisis situations which may include a crisis stabilization unit or other services deemed necessary to effectively manage the crisis; to mobilize natural support systems; and to arrange transportation when needed to access appropriate levels of care. | | | | | | |
| Admission Criteria | 1. Adult with a suspected or known mental illness diagnosis or substance related disorder; **AND**<br>2. Expressing a need for behavioral healthcare services; **OR**<br>3. Experiencing a severe situational crisis; **OR**<br>4. At risk of harm to self, others, and/or property. Risk may range from mild to imminent; **and at least one of the following;**<br>  a. Individual has insufficient or severely limited resources or skills necessary to cope with the immediate crisis; or<br>  b. Individual demonstrates lack of judgment and/or impulse control and/or cognitive/perceptual abilities which are necessary to cope with immediate crisis. | | | | | | |
| Continuing Stay Criteria | Not applicable, as this service is intended to be a discrete time-limited service that stabilizes the individual and moves them to the appropriate level of care. | | | | | | |

## Crisis Service Center

| | |
|---|---|
| Discharge Criteria | Crisis situation is resolved and/or referral to appropriate service is provided. |
| Service Exclusions | No exclusions. However, if the individual is enrolled in ACT, it is the expectation that the ACT provider serves as the primary crisis response resource. |
| Clinical Exclusions | 1. A stand-alone Crisis Service Center (not co-located with or within a facility that is a Behavioral Health Crisis Center (BHCC)) is not an emergency receiving facility and shall not receive individuals under emergency conditions. Any individual who presents under emergency conditions (1013/213/probate court order) to a stand-alone CSC must be directed to the nearest available emergency receiving facility.<br>2. If a CSC operates as part of a Behavioral Health Crisis Center (BHCC), the CSC (or the associated Temp Observation or CSU service) must accept individuals referred under emergency conditions (1013/213/probate court order) and perform a face-to-face evaluation in order to determine the most appropriate level of care.<br>3. If after face-to-face assessment by licensed staff, it is determined that the severity individual requires services at a different level of care, the CSC will make the necessary referrals and/or arrangements for transfer to an appropriate level of care. |
| Required Components | Crisis Service Center is a facility-based service which is operational 24 hours a day, 7 days a week, offering a safe environment for individuals receiving crisis assessments, stabilization, and referral services using licensed mental health professionals. |
| Staffing Requirements | A.  At a minimum, staff must include:<br>    1.  A fully Licensed Behavioral Health Clinician on site at all times;<br>    2.  A Certified Peer Specialist – coverage may be shared with the temporary observation unit;<br>    3.  A Physician, APRN or PA to provide timely assessment, orders for presenting individuals, and temporary observation (coverage may be shared with a Crisis Service Center or Crisis Stabilization Unit as long as contract requirements for coverage by specific levels of professionals are met); and<br>    4.  A Registered Nurse who is stationed in the Temporary Observation Unit may float to the Crisis Service Center to perform nursing assessments.<br>B.  A DBHDD contract for this service may list additional staffing requirements. In the event of conflicting requirements, provider must adhere to the requirement that is most stringent. |
| Clinical Operations | 1.  All Physicians, Physician Assistants, and Advanced Practice Registered Nurses are under the supervision of a board-eligible Psychiatrist who provides direction, supervision and oversight of program quality.<br>2.  On-Call Physicians, Physician Assistants, or Advanced Practice Registered Nurses may provide services, face-to-face, or via telemedicine.<br>3.  Response time for On-Call Physicians, Physician Assistants, or Advanced Practice Registered Nurses must be within 1 hour of initial contact by CSC staff.<br>4.  Medication must be administered by licensed or credentialed* medical personnel under the supervision of a physician or registered nurse in accordance with O.C.G.A. |
| Service Accessibility | This service is available 7 days a week, 24 hours a day. |
| Reporting and Billing Requirements | Providers must report information on **all** individuals served in CSC no matter the funding source:<br>1.  The CSC shall submit prior authorization requests for all individuals served (state-funded, Medicaid funded, private pay, other third-party payer, etc.);<br>2.  The CSC shall submit per diem encounters (1 per day) for service (S9484) for all individuals served (state-funded, Medicaid funded, private pay, other third-party payer, etc.) even if sub-parts cited in type of care P0015 are billed as a claim to Medicaid or other payer source; and<br>3.  The CSC is allowed a 24-hour window for completion of Orders (up to one (1) calendar day) following the start of services and must document this exception on the Order noting the name of the staff member responsible for obtaining the Order for service.<br>4.  The Crisis Service Center should bill individual discrete services for DBHDD state-funded and Medicaid FFS service recipients. There is a Crisis Services Type of Care available for use by Crisis Service Centers (stand-alone and within a BHCC).<br>5.  The individual services listed below may be billed up to the daily maximum listed for services provided in the Crisis Service Center. Billable services in the Crisis Service Center are as follows: |

## Crisis Service Center

| Service | Max Daily Units |
|---|---|
| Behavioral Health Assessment & Service Plan Development | 12 |
| Psychological Testing | 5 |
| Diagnostic Assessment | 2 |
| Interactive Complexity (as a modifier to Psychiatric Treatment, Diagnostic Assessment, Individual Counseling, and Group Counseling) | 4 |
| Crisis Intervention | 14 |
| Psychiatric Treatment | 2 |
| Nursing Assessment & Care | 14 |
| Medication Administration | 1 |
| Psychosocial Rehabilitation - Individual | 8 |
| Addictive Disease Support Services | 16 |
| Individual Outpatient Services | 1 |
| Family Outpatient Services | 4 |
| Case Management | 12 |
| Peer Support - Individual | 8 |

## Crisis Stabilization Unit (CSU) Services

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Behavioral Health; Short-term Residential (Non-Hospital Residential Treatment Program W/o Rm & Board, Per Diem) | | H0018 | | | | | 209.22 |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Behavioral Health; Short-term Residential (Non-Hospital Residential Treatment Program W/o Rm & Board, Per Diem) | H0018 | TB | U2 | | | Per negotiation |

| Unit Value | 1 day |
|---|---|
| Utilization Criteria | LOCUS Levels 5 and 6 |
| Service Definition | This is a residential alternative to or diversion from inpatient hospitalization, offering psychiatric stabilization and withdrawal management services. The program provides medically monitored residential services for the purpose of providing psychiatric stabilization and substance withdrawal management services on a short-term basis. Services may include (see Behavioral Health Provider Certification and Operational Requirements for Certified Crisis Stabilization Units (CSUs), 01-325): <br> a. Psychiatric, diagnostic, and medical assessments; <br> b. Crisis assessment, support and intervention; <br> c. Medically Monitored Residential Substance Withdrawal Management (at ASAM Level 3.7-WM); |

## Crisis Stabilization Unit (CSU) Services

| | |
|---|---|
| | d. Medication administration, management and monitoring;<br>e. Psychiatric/Behavioral Health Treatment;<br>f. Nursing Assessment and Care;<br>g. Brief individual, group and/or family counseling; and<br>h. Linkage to other services as needed. |
| Admission Criteria | 1. Treatment at a lower level of care has been attempted or given serious consideration; **and**<br>2. Individual has a known or suspected illness/disorder in keeping with one of the following target populations: An adult who is experiencing a:<br>  a. Severe situational crisis; or<br>  b. Mental Illness; or<br>  c. Substance Use Disorder; or<br>  d. Co-Occurring Substance Use Disorder and Mental Illness; or<br>  e. Co-Occurring Mental Illness and Intellectual/Developmental Disability; or<br>  f. Co-occurring Substance Use Disorder and Intellectual/Developmental Disability; **and**<br>3. Individual is experiencing a severe situational crisis which has significantly compromised safety and/or functioning; **as evidenced by one or more of the following:**<br>  a. Individual presents a substantial risk of harm to self, others, and/or property or is so unable to care for his or her own physical health and safety as to create a life-endangering crisis. Risk may range from mild to imminent; or<br>  b. Individual has insufficient or severely limited resources or skills necessary to cope with the immediate crisis; or<br>  c. Individual demonstrates lack of judgment and/or impulse control and/or cognitive/perceptual abilities to manage the crisis; or<br>  d. For withdrawal management services, individual meets diagnostic criteria under the DSM for substance use, exhibiting withdrawal signs, symptoms, behaviors, or functional impairments and can reasonably be expected to respond to withdrawal management treatment. |
| Continuing Stay Criteria | This service may be utilized at various points in the course of treatment and recovery; however, each intervention is intended to be a discrete time-limited service that stabilizes the individual. These time limits for continued stay are based upon the individual's specific needs. |
| Discharge Criteria | 1. Individual no longer meets admission guidelines requirements; **or**<br>2. Crisis situation is resolved and an adequate continuing care plan has been established; **or**<br>3. Individual does not stabilize within the evaluation period and must be transferred to a higher intensity service. |
| Service Exclusions | 1. This is a comprehensive service intervention that is not to be provided with any other service(s), except for the following:<br>  a. Methadone Administration.<br>  b. Crisis Services Type of Care. |
| Clinical Exclusions | 1. Individual is not in crisis.<br>2. Individual does not present a risk of harm to self or others or is able to care for his or her own physical health and safety.<br>3. Severity of clinical issues precludes provision of services at this level of intensity. See CSU: Medical Evaluation Guidelines and Exclusion Criteria for Admission to Crisis Stabilization Units, 01-350. |
| Required Components | 1. Crisis Stabilization Units (CSU) providing medically monitored short-term residential psychiatric stabilization and withdrawal management services shall be designated by DBHDD as both an emergency receiving facility and an evaluation facility and must be surveyed and licensed by the DBHDD.<br>2. In addition to all service qualifications specified in this document, providers of this service must adhere to Behavioral Health Provider Certification and Operational Requirements for Certified Crisis Stabilization Units (CSUs), 01-325.<br>3. Individual referred to a CSU must be evaluated by a physician within 24 hours of the referral.<br>4. Services must be provided in a facility designated as an emergency receiving and evaluation facility. |

## Crisis Stabilization Unit (CSU) Services

5. All services provided within the CSU must be delivered under the direction of a physician. A physician must conduct an assessment of new admissions, address issues of care, and write orders as required.

6. Crisis Stabilization Units (CSU) must continually monitor the bed –board, regardless of current bed availability, and review, accept or decline individuals who are awaiting disposition on a bed-board, and provide a disposition based on clinical review. It is the expectation that CSU's accept the individual who is most in need.

7. CSUs are expected to review, accept or decline at least 90% of all individuals placed on a bed-board over the course of a fiscal year.

8. A physician–to-physician consultation is required for all CSU denials that occur when that CSU has an open/available bed.

### Staffing Requirements

1. Crisis Stabilization Unit (CSU) Services must be provided by a physician or a staff member under the supervision of a physician, practicing within the scope of State law.

2. A CSU must employ a fulltime Nursing Administrator who is a Registered Nurse.

3. A CSU must have a Registered Nurse present at the facility at all times.

4. If the charge nurse is an APRN, then he/she may not simultaneously serve as the accessible physician during the same shift.

5. Staff-to-individual served ratios must be established based on the stabilization needs of individuals being served and in accordance with rules and regulations.

6. Functions performed by Physician Assistants, Nurse Practitioners, Clinical Nurse Specialists, Registered Nurses, and Licensed Practical Nurses must be performed within the scope of practice allowed by State law and Professional Practice Acts.

7. CSUs are encouraged to employ a CPS as part of their regular staffing compliment, and utilize them in early engagement, orientation to services, skills building, WRAP development, discharge planning and aftercare follow-up.

8. A CSU that functions as a component of a Behavioral Health Crisis Center (BHCC) must employ a full-time peer specialist (MH, CPS-AD) during the hours of 8:00 AM to 10:00 PM seven (7) days per week.

### Clinical Operations

1. CSU must have documented operating agreements and referral mechanisms for psychiatric disorders, substance use disorders, and physical healthcare needs that are beyond the scope of the CSU and that require inpatient treatment. Operating agreements must delineate the type and level of service to be provided by the private or public inpatient hospital or treatment facility. These agreements must specifically address the criteria and procedures for transferring an individual to a designated treatment facility when the CSU is unable to stabilize the individual.

2. CSUs must follow the seclusion and restraint procedures included in DBHDD's policy: CSU: Use of Seclusion or Restraint in Crisis Stabilization Services, 01-351.

3. The following restraint practices are prohibited:
   a. The use of chemical restraint for any individual.
   b. The combined use of seclusion and mechanical, and/or manual restraint.
   c. Standing orders for seclusion or any form of restraint.
   d. PRN orders for seclusion or any form of restraint.
   e. Prone manual or mechanical restraints.
   f. Transporting an individual in a prone position while being carried or moved.
   g. Use of seclusion or restraint as a part of a Behavior Support Plan (BSP) or an Individual Recovery Plan (IRP).
   h. The use of handcuffs for an individual not under the jurisdiction of the criminal justice system.
   i. The use of medication as a chemical restraint.

4. For individuals with co-occurring diagnoses including developmental disability/developmental disabilities, this service must target the symptoms, manifestations, and skills-development related to the identified behavioral health issue.

5. Individuals served in transitional beds may access an array of community-based services in preparation for their transition out of the CSU and are expected to engage in community-based services daily while in a transitional bed.

6. Medication must be administered by licensed or credentialed* medical personnel under the supervision of a physician or registered nurse in accordance with O.C.G.A.

## Crisis Stabilization Unit (CSU) Services

| | |
|---|---|
| **Additional Medicaid Requirements** | 1. Crisis Stabilization Units with 16 beds or less may bill services to GAMMIS for Medicaid FFS recipients.<br>2. Medicaid claims for this service may **not** be billed for any service provided to Medicaid-eligible individuals in CSUs with greater than 16 beds. |
| **Billing & Reporting Requirements** | 1. This service requires authorization via the ASO via GCAL. Providers will select an individual from the State Contract Bed (SCB) Board. Once they accept them, they will assign the individual to a bed on the inventory status board (via bhiweb). Once an individual is assigned to the inventory status board a tracking number will be generated and the information will be sent from the Georgia Collaborative ASO crisis access team to the Georgia Collaborative ASO care management team for registration/authorization to take place. Once an authorization number is assigned, that number will appear on the beds inventory status board (on bhiweb) and an email will be generated and sent to the designated UM of the SCB facility containing the authorization number.<br>2. Providers must report information on all individuals served in CSUs no matter the funding source:<br>3. The CSU shall submit prior authorization requests for all individuals served (state-funded, Medicaid funded, private pay, other third-party payer, etc.);<br>4. The CSU shall submit per diem encounters (H0018 or H0018) for all individuals served (state-funded, Medicaid-funded, private pay, other third-party payer, etc.).<br>5. Providers must designate either CSU bed use or transitional bed use in encounter submissions through the presence or absence of the TB modifier. TB represents "Transitional Bed."<br>6. Unlike all other DBHDD residential services, the start date of a CSU span encounter submission may be in one month and the end date may be in the next. The span of reporting must cover continuous days of service and the number of units must equal the days in the span.<br>7. Providers must submit a discharge summary into the provider connect/batch system within 72 hours of CSU discharge. |
| **Documentation Requirements** | 1. Individuals receiving services within the CSU shall be reported as a per diem encounter based upon occupancy at 11:59PM. At 11:59PM, each individual reported must have a verifiable physician's order for CSU level of care [or order written by delegation of authority to nurse or physician assistant under protocol as specified in § 43-34-23]. Individuals entering and leaving the CSU on the same day (prior to 11:59PM) will not have a per diem encounter reported.<br>2. For individuals transferred to transitional beds, the date of transfer must be documented in a progress note and filed in the individual's chart.<br>3. In addition to documentation requirements set forth in Part II of this manual, the notes for the program must have documentation to support the per diem including admission/discharge time, shift notes, and specific consumer interactions.<br>4. Daily engagement in community-based services must also be documented in progress notes for those occupying transitional beds. |

## Crisis Stabilization Unit (CSU) Services

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Behavioral Health; Short-term Residential (Non-Hospital Residential Treatment Program W/o Rm & Board, Per Diem) | | H0018 | | | | | Per negotiation |

| Unit Value | 1 day |
|---|---|
| Service Definition | This service is a short-term residential alternative to, and diversion from inpatient hospitalization (i.e. a mental illness and/or substance use disorder) and Intellectual/Developmental Disability (I/DD) who present with crisis-related psychiatric/substance use disorder symptoms |

## Crisis Stabilization Unit (CSU) Services - Co-Occurring Intellectual & Developmental Disability (I/DD) Specialized Capacity

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Behavioral Health; Short-term Residential (Non-Hospital Residential Treatment Program W/o Rm & Board, Per Diem) | H0018 | TB | U2 | | | Per negotiation |

| Utilization Criteria | LOCUS Levels 5 and 6 |
|---|---|

## Crisis Stabilization Unit (CSU) Services - Co-Occurring Intellectual & Developmental Disability (I/DD) Specialized Capacity

and/or severe and challenging behaviors related to an I/DD. These symptoms and/or behaviors seriously and imminently compromise health, safety, baseline daily functioning, and/or ability to remain in the community. The main goals of this service are:

1. To provide medically monitored residential psychiatric and/or substance use disorder stabilization (e.g., substance withdrawal management services), and/or behavior stabilization (e.g. utilizing individualized applied behavior interventions and other behavior support services), in order to ameliorate the symptoms and/or challenging behaviors that place the individual or others at serious risk;
2. To increase communication skills and adaptive skills to help mitigate crisis-related challenging behaviors; and
3. To increase the caregiver's (if applicable) ability to support the individual in the community.

The CSU must perform crisis-related assessments of each individual served, as clinically indicated. At a minimum, these assessments must include a psychiatric and SUD-related assessment (including a Diagnostic Assessment), and a medical assessment. Additional assessments should be individualized and crisis-related, and may include but are not limited to: Functional behavior assessment, adaptive skills assessment, environmental/situational/needs assessment, adult ANSA-I/DD version, etc.

When indicated by current assessment(s), services may include:
1. Crisis-support and intervention;
2. Medically Monitored Residential Substance Withdrawal Management (at ASAM Level 3.7-WM);
3. Medication administration, management, and monitoring;
4. Psychiatric/Behavioral Health Treatment;
5. Applied Behavior Analysis (ABA) and other crisis-oriented behavior support interventions;
6. Nursing Assessment and Care;
7. Brief individual, group, and/or family counseling; and
8. Formal/natural support training in ABA and/or other behavior support interventions; and
9. Discharge planning and linkage to other services as needed, and follow-up.

| | |
|---|---|
| Admission Criteria | 1. Treatment at a lower level of care has been attempted or given serious consideration;<br>**AND**<br><br>2. Individual is an adult who has a known or suspected illness/disorder in keeping with one or more of the following:<br>  a. Co-Occurring Mental Illness and Intellectual/Developmental Disability; and/or<br>  b. Co-occurring Substance Use Disorder and Intellectual/Developmental Disability;<br>**AND**<br><br>3. The individual is experiencing a severe crisis (situational, psychiatric, and/or substance use-related), which includes an increase in severe and challenging maladaptive behaviors, and/or a lack of sufficient adaptive skills to manage the crisis at the individual's current level of care/support; **and**<br>  a. As a result of the crisis, the individual's safety and/or functioning have been significantly compromised <u>beyond</u> any safety/functional challenges that are typically present at the individual's non-crisis baseline, as evidenced by one or more of the following:<br>    1. Significant impulsivity and/or physical aggression that is imminently life threatening or gravely endangering to self or others; or<br>    2. At least one recent episode of a severe maladaptive behavior. If continued, the nature and severity of the behavior would significantly compromise the individual's ability to safely remain in their home/community; or<br>    3. The individual either displays high acuity maladaptive behavior, or fails to display necessary adaptive skill, which impact the individual's ability to function in significant life domains: family, work, school, social, or activities of daily living. The impact on functioning seriously and imminently compromises the individual's ability to remain safely in the community, or to be supported at a lower level of care; **and** |

# Crisis Stabilization Unit (CSU) Services - Co-Occurring Intellectual & Developmental Disability (I/DD) Specialized Capacity

| | |
|---|---|
| Continuing Stay Criteria | b. The individual requires crisis behavior intervention **and/or** an increased level of support/monitoring (such as a need for additional and/or specialized staff oversight) that cannot be achieved at a lower level of care, or within the standard behavioral health milieu of the Crisis Stabilization Unit. |
| | 1. Individual continues to meet admission criteria as defined above; **and** |
| | 2. If clinically indicated/applicable, a behavior support plan for the crisis-related maladaptive behavior has been created/updated and implemented, but the behavior has not stabilized to the extent that the individual can safely return to his or her home/community; **and** |
| | 3. A higher level of care is not indicated. |
| Discharge Criteria | 1. Individual no longer meets admission criteria and an adequate discharge/continuing support/care plan has been established; **and** |
| | 2. Individual has achieved any applicable crisis-related behavior goals (or behaviors directly related to the crisis have returned to baseline), such that the individual can be safely supported at either a lower level of care or in his/her natural home/setting. |
| | **OR** |
| | 3. For voluntary admissions only, individual's legal guardian (if applicable) requests discharge; |
| | **OR** |
| | 4. Individual's crisis-related severe maladaptive behaviors and/or behavioral health symptoms have not stabilized within the crisis stabilization period, and individual must be transferred to a service offering a longer duration of intensive treatment or a higher level of care. |
| Service Exclusions | 1. This is a comprehensive service intervention that is not to be provided with any other behavioral health service(s), except for the following: |
| | c. Opioid Maintenance Treatment. |
| | d. Crisis Services Type of Care |
| | e. Community Transition Planning. |
| | 2. All other Medicaid-reimbursable and DBHDD State-Funded Intellectual and Developmental Disability services are excluded, with the exceptions of Support Coordination, Intensive Support Coordination, Fiscal Intermediary services, Waiver Supplemental Services, and training of formal and natural supports regarding the behavior support plan (if applicable). |

## Crisis Stabilization Unit (CSU) Services - Co-Occurring Intellectual & Developmental Disability (I/DD) Specialized Capacity

| | |
|---|---|
| Clinical Exclusions | 1. Individual is not in crisis. |
| | 2. Individual does not present a risk of harm to self or others or is able to care for his or her own physical health and safety. |
| | 3. Severity of clinical issues precludes provision of services at this level of intensity. See CSU: Medical Evaluation Guidelines and Exclusion Criteria for Admission to Crisis Stabilization Units, 01-350. |
| | 4. EXCEPTIONS: While some of the following are exclusionary in accordance with standard CSU policy, the items below are **not** exclusionary criteria for this targeted service: |
| |    a. Medical Needs: |
| |       i. ADLs: Inability to independently perform ADLs, as defined below, is **not** an exclusion criterion for this service. An individual's dependence is defined as staff supervision, direction/prompts, and personal assistance. |
| |          1. Transferring: The extent of an individual's ability to move from one position to another. |
| |          2. Feeding: The ability of an individual to feed oneself. |
| |          3. Dressing: The ability to select appropriate clothes and put clothes on. |
| |          4. Personal hygiene: The ability to bathe and groom oneself and to maintain dental hygiene, hair, and nail care. |
| |          5. Continence: The ability to control bladder and bowel function. |
| |          6. Toileting: The ability to get to and from the toilet, use it appropriately, and clean oneself. |
| |    b. Sexual Risk: Presence or history of sexually inappropriate behavior of a non-aggressive (i.e., toward others) nature is **not** an exclusionary criterion for this service. |
| |    c. Elopement Risk: Elopement behavior is **not** an exclusionary criterion for this service. Individual may have recent or historical episodes of elopement behaviors that have placed the individual at imminent risk to self or others. |
| |    d. Physical characteristics alone (e.g., height, weight, etc.) do **not** preclude admission. |
| Required Components | 1. Crisis Stabilization Units (CSU) providing medically monitored short-term residential psychiatric/behavioral stabilization and withdrawal management services shall be designated by DBHDD as both an emergency receiving facility and an evaluation facility and must be surveyed and licensed by the DBHDD. |
| | 2. In addition to all service qualifications specified in this document, providers of this service must adhere to Behavioral Health Provider Certification and Operational Requirements for Certified Crisis Stabilization Units (CSUs), 01-325. |
| | 3. Individual referred to a CSU must be evaluated by a physician within 24 hours of the referral. |
| | 4. Services must be provided in a facility designated as an emergency receiving and evaluation facility. |
| | 5. All services provided within the CSU must be delivered under the direction of a physician. A physician must conduct an assessment of new admissions, address issues of care, and write orders as required. |
| | 6. Crisis Stabilization Units (CSU) must continually monitor the bed-board, regardless of current bed availability, and review, accept or decline individuals who are awaiting disposition on a bed-board, and provide a disposition based on clinical review. It is the expectation that CSU's accept the individual who is most in need. |
| | 7. CSUs are expected to review, accept or decline at least 90% of all individuals placed on a bed-board over the course of a fiscal year. |
| | 8. A physician-to-physician consultation is required for all CSU denials that occur when that CSU has an open/available bed. |
| | 9. Aftercare planning: The CSU must notify the appropriate DBHDD Field Office of an individual's admission within two (2) business days, particularly for individuals who may not have needed services, supports, or living arrangements post-discharge. |
| Staffing Requirements | 1. Crisis Stabilization Unit (CSU) Services must be provided by a physician or a staff member under the supervision of a physician, practicing within the scope of State law. |
| | 2. A CSU must employ a fulltime Nursing Administrator who is a Registered Nurse. |
| | 3. A CSU must have a Registered Nurse present at the facility at all times. |
| | 4. If the charge nurse is an APRN, then he/she may not simultaneously serve as the accessible physician during the same shift. |
| | 5. Staff-to-individual served ratios must be established based on the stabilization needs of individuals being served and in accordance with rules and regulations. |

## Crisis Stabilization Unit (CSU) Services - Co-Occurring Intellectual & Developmental Disability (I/DD) Specialized Capacity

6. Functions performed by Physician Assistants, Nurse Practitioners, Clinical Nurse Specialists, Registered Nurses, and Licensed Practical Nurses must be performed within the scope of practice allowed by State law and Professional Practice Acts.

7. CSUs are encouraged to employ a CPS as part of their regular staffing compliment, and utilize them in early engagement, orientation to services, skills building, WRAP development, discharge planning and aftercare follow-up.

8. A CSU that functions as a component of a Behavioral Health Crisis Center (BHCC) must employ a full-time peer specialist (MH, CPS-AD) during the hours of 8:00 AM to 10:00 PM seven (7) days per week.

9. The Co-Occurring I/DD Specialized Capacity CSU must employ, at a minimum, one half-time-equivalent (FTE) Board Certified Behavior Analyst (BCBA) who serves as the lead for all Applied Behavior Analysis (ABA) aspects of treatment, and provides oversight to direct care staff engaged in ABA or other behavior support interventions. Functions performed by the BCBA may be partially provided via telemedicine, however, all functions must be performed within the scope of their practice and aligned with their professional standards.

10. The Co-Occurring I/DD Specialized Capacity CSU must employ, at a minimum, one full-time-equivalent (FTE) Registered Behavior Technician (RBT) who is directly supervised by the BCBA, and who is responsible for the implementation Applied Behavior Analysis (ABA) aspects of treatment. Functions performed by the RBT must be performed within the scope of their practice and aligned with their professional standards. RBTs may be considered direct care staff for the required staffing ratios defined below.

11. The Co-Occurring I/DD Specialized Capacity CSU must employ other direct care staff who hold credentials such as the Direct Service Professional (DSP) and/or other health service technician designations.

12. The Co-Occurring I/DD Specialized Capacity CSU must maintain the minimum following staffing ratio for its Specialized Capacity beds:
    a. 1-2 individuals served = One (1) direct care staff (as defined above) on all shifts (note: this is a *minimum*; a higher number of direct care staff should be used if acuity of individuals served indicates a safety need).
    b. 3-4 individuals served = Two (2) direct care staff (as defined above) on all shifts (note: this is a *minimum*; a higher number of direct care staff should be used if acuity of individuals served indicates a safety need).
    c. 5-6 individuals served = Three (3) direct care staff (as defined above) on all shifts (note: this is a *minimum*; a higher number of direct care staff should be used if acuity of individuals served indicates a safety need).

**Clinical Operations**

1. CSU must have documented operating agreements and referral mechanisms for psychiatric disorders, substance use disorders, and physical healthcare needs that are beyond the scope of the CSU and that require inpatient treatment. Operating agreements must delineate the type and level of service to be provided by the private or public inpatient hospital or treatment facility. These agreements must specifically address the criteria and procedures for transferring an individual to a designated treatment facility when the CSU is unable to stabilize the individual.

2. CSUs must follow the seclusion and restraint procedures included in the Department's policy: CSU: Use of Seclusion or Restraint in Crisis Stabilization Services, 01-351.

3. The following restraint practices are prohibited:
    a. The use of chemical restraint for any individual.
    b. The combined use of seclusion and mechanical, and/or manual restraint.
    c. Standing orders for seclusion or any form of restraint.
    d. PRN orders for seclusion or any form of restraint.
    e. Prone manual or mechanical restraints.
    f. Transporting an individual in a prone position while being carried or moved.
    g. Use of seclusion or restraint as a part of a Behavior Support Plan (BSP) or an Individual Recovery Plan (IRP).
    h. The use of handcuffs for an individual not under the jurisdiction of the criminal justice system.
    i. The use of medication as a chemical restraint.

4. For individuals with co-occurring diagnoses including behavioral health and developmental disability/developmental disabilities, this service must target the crisis-related symptoms, behaviors, manifestations, and skills-development related to the identified issue.

## Crisis Stabilization Unit (CSU) Services - Co-Occurring Intellectual & Developmental Disability (I/DD) Specialized Capacity

5. Individuals served in transitional beds may access an array of community-based services in preparation for their transition out of the CSU and are expected to engage in community-based services daily while in a transitional bed.

6. Medication must be administered by licensed or credentialed* medical personnel under the supervision of a physician or registered nurse in accordance with O.C.G.A.

7. Immediately upon admission, the CSU must implement its internal policies and procedures for managing crisis situations, based upon the individual's presenting behaviors and needs.

8. Within thirty-six (36) hours of admission, an individualized crisis plan must be developed (or updated, if one already exists) and implemented for each individual served by the CSU's clinical team.
    a. Any needed behavior intervention component of this plan (i.e., ultimately resulting in a Positive Behavior Support Plan) should be added as soon as possible, but at a minimum, must be added in accordance with the timeframes and criteria listed in the Behavior Intervention Services item below.
    b. CSU staff involved in the development and implementation of the individualized crisis plan should ensure ongoing consultation with the BCBA during the BCBA's assessment and planning processes to ensure continuity between the Positive Behavior Support Plan and other components of the crisis plan.

9. Behavior Intervention Services (only applicable to individuals with either a suspected presenting need for behavior intervention services at the time of admission, or who evidence a need at a later point during their stay):
    a. As a component of the overarching individualized crisis plan, a BCBA must begin a functional behavior assessment of each individual within three (3) business days of admission, (or within three (3) business days of evidenced need; if this need was not identified at admission) to develop an individualized Positive Behavior Support Plan that addresses crisis-related behaviors.
    b. If clinically indicated, an adaptive behavior assessment can be completed during the initial assessment by the appropriate credentialed provider. The CSU must use an established adaptive behavior assessment such as the Adaptive Behavior Assessment System, 3rd Ed. (ABAS-3), Vineland Adaptive Behavior Scales, 3rd Ed, etc.
    c. In accordance with a needs assessment, CSU staff must work to identify any behavioral health and/or I/DD treatments and supports that will be needed post-discharge. When post-discharge behavior intervention services are indicated, the BCBA should assist in identifying and contacting an appropriate outpatient provider.
    d. Positive Behavior Support Plans and behavior-change programs will be conceptually consistent with behavior analytic principles. Treatment implementation, fidelity, and progress monitoring will be informed by quantitative data collected on the individual's behaviors while admitted to the CSU.
    e. Within seven (7) business days of admission (or within seven (7) business days of evidenced need; if this need was not identified at admission), a provisional Positive Behavior Support Plan must be developed (which is focused on the crisis-related behavior) and implemented.
    f. Within ten (10) business days of admission (or within ten (10) business days of evidenced need; if this need was not identified at admission), a finalized Positive Behavior Support Plan must be fully implemented.

10. Training for natural and formal support persons (only applicable for individuals who receive behavior intervention services):
    a. The staff of the CSU will provide training for the individual's natural and formal support persons.
    b. The CSU will make accommodations to ensure that natural/formal support persons are able to participate in training regardless of their proximity in relation to the CSU.
    c. This training shall, at a minimum, result in the following basic, introductory-level knowledge and competencies:
        i. Knowledge regarding the individual's complete diagnoses;
        ii. Knowledge regarding the positive behavior support plan developed on the unit;
        iii. Knowledge and competence regarding how to respond to challenging behaviors;
        iv. Knowledge and competence regarding how to prevent challenging behaviors;
        v. Knowledge and competence regarding how to advocate for the individual's needs; and
        vi. Knowledge and competence regarding how to respond and implement the crisis safety plan.

## Crisis Stabilization Unit (CSU) Services - Co-Occurring Intellectual & Developmental Disability (I/DD) Specialized Capacity

| | |
|---|---|
| **Additional Medicaid Requirements** | 1. Crisis Stabilization Units with 16 beds or less may bill services to GAMMIS for Medicaid FFS recipients.<br>2. Medicaid claims for this service may **not** be billed for any service provided to Medicaid-eligible individuals in CSUs with greater than 16 beds. |
| **Billing & Reporting Requirements** | **NOTE: Type of Care Grid adjustments specific to length of stay are TBD.**<br><br>1. This service requires authorization via the ASO via GCAL. Providers will select an individual from the State Contract Bed (SCB) Board. Once they accept them, they will assign the individual to a bed on the inventory status board (via bhlweb). Once an individual is assigned to the inventory status board a tracking number will be generated and the information will be sent from the Georgia Collaborative ASO crisis access team to the Georgia Collaborative ASO care management team for registration/authorization to take place. Once an authorization number is assigned, that number will appear on the beds inventory status board (on bhlweb) and an email will be generated and sent to the designated UM of the SCB facility containing the authorization number.<br>2. Providers must report information on all individuals served in CSUs no matter the funding source.<br>3. The CSU shall submit prior authorization requests for all individuals served (state-funded, Medicaid funded, private pay, other third-party payer, etc.);<br>4. The CSU shall submit per diem encounters (H0018 or H0018) for all individuals served (state-funded, Medicaid-funded, private pay, other third-party payer, etc.).<br>5. Providers must designate either CSU bed use or transitional bed use in encounter submissions through the presence or absence of the TB modifier. TB represents "Transitional Bed."<br>6. Unlike all other DBHDD residential services, the start date of a CSU span encounter submission may be in one month and the end date may be in the next. The span of reporting must cover continuous days of service and the number of units must equal the days in the span.<br>7. Providers must submit a discharge summary into the provider connect/batch system within 72 hours of CSU discharge.<br>8. For tracking purposes, and for these specialized capacity beds only, the CSU shall list the individual's I/DD diagnosis in the first position of the "Diagnosis" section within the Provider Connect Authorization. |
| **Documentation Requirements** | 1. Individuals receiving services within the CSU shall be reported as a per diem encounter based upon occupancy at 11:59PM. At 11:59PM, each individual reported must have a verifiable physician's order for CSU level of care [or order written by delegation of authority to nurse or physician assistant under protocol as specified in §43-34-23]. Individuals entering and leaving the CSU on the same day (prior to 11:59PM) will not have a per diem encounter reported.<br>2. For individuals transferred to transitional beds, the date of transfer must be documented in a progress note and filed in the individual's chart.<br>3. In addition to documentation requirements set forth in Part II of this manual, the notes for the program must have documentation to support the per diem including admission/discharge time, shift notes, and specific consumer interactions.<br>4. Daily engagement in community-based services must also be documented in progress notes for those occupying transitional beds.<br>5. All individuals must have an **individualized crisis intervention plan** which, for individuals needing crisis-related behavior intervention services, addresses the following elements:<br>   a. In the overarching crisis plan:<br>      i. Operational Definition of behaviors (if applicable);<br>      ii. Description of situations in which the challenging behavior typically occurs (if applicable);<br>      iii. Common warning signs and/or precursor behaviors that indicate a crisis is imminent (if applicable);<br>      iv. Identification of staffing needed to carry out crisis curriculum procedures;<br>      v. Identification of equipment necessary;<br>      vi. Contact information for additional staff that may be available for assistance;<br>      vii. Specific crisis curriculum techniques to use for each challenging behavior;<br>      viii. Protocols to access community-based crisis services to include the Georgia Crisis Response System, access emergency room care or law; enforcement, if the acute crisis presents a substantial risk of imminent harm to self and others must be included in the crisis intervention plan provided upon discharge; and<br>      ix. Procedures for debriefing and documentation- A functionally appropriate debriefing should occur. |

## Crisis Stabilization Unit (CSU) Services - Co-Occurring Intellectual & Developmental Disability (I/DD) Specialized Capacity

b. In the Positive Behavior Support Plan (PBSP) component of the crisis plan:

    i. A PBSP provides the primary direction for/management of behavior intervention services in the CSU, and must therefore be included as a major and coordinated component of the overarching individualized crisis intervention plan, and can include the following standard elements:

        1. Background and Statement of Problem
        2. Relevant Medical History/Medical Necessity
        3. Functional Behavioral Assessment
        4. Reinforcer Identification
        5. Baseline Data
        6. Rationale for Current Plan and Procedures
        7. Behavioral Objectives/Behavior Goals
        8. Alterations to Interactions and the Environment
        9. Replacement Behavior Teaching & Skill Acquisition Training
        10. Reinforcement Procedures
        11. Strategies for Decreasing Inappropriate Behaviors
        12. Data Recording/Fidelity Monitoring
        13. Generalization, Maintenance, Fading Strategies
        14. Staff Training/Caregiver Training
        15. Program Monitoring
        16. Risks and Benefits
        17. Consent
        18. Data Collection Forms – Challenging, replacement behavior & skill acquisition
        19. Monitoring Forms/Fidelity Checklists
        20. Staff Training Records/Plan

    ii. For individuals who already have an active Positive Behavior Support Plan that was developed by another service provider, the CSU should use interventions from that existing Plan to inform the development of the interventions to be implemented during the crisis stabilization process.

6. For individuals needing crisis-related behavior intervention services, the CSU must have detailed documentation of the interventions that were identified in the Positive Behavior Support Plan, and that these were both attempted and exhausted before initiating more restrictive interventions.

7. For individuals needing crisis-related behavior intervention services, the CSU must maintain documentation of quantitative data, graphs and narrative analysis of behavior change programs, replacement behaviors, skill acquisition, and medication changes related to behavior intervention and the emanating crisis behaviors.

8. For individuals needing crisis-related behavior intervention services, the CSU must maintain documentation of fidelity monitoring regarding implementation of the Positive Behavior Support Plan and intervention competency training of staff and caregivers.

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Practitioner Level 4, Out-of-Clinic | H0038 | HK | U4 | U7 | | |
| Practitioner Level 5, Out-of-Clinic | H0038 | HK | U5 | U7 | | |
| Utilization Criteria | TBD | | | | | |

### Forensic Peer Mentor - Peer Support

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Peer Support Services | Practitioner Level 4, In-Clinic | H0038 | HK | U4 | U6 | | |
| | Practitioner Level 5, In-Clinic | H0038 | HK | U5 | U6 | | |
| Unit Value | 1 encounter | | | | | | |

| Service Definition | Forensic Peer Mentor – Peer Support is a service intended to promote recovery and wellness, assist with community re-entry/integration efforts, and support a reduction in the likelihood of recidivism among judicially involved individuals with serious mental illnesses and/or co-occurring substance use disorders. Forensic Peer Mentors (FPMs) support individuals in preparing for a life free from judicial involvement, and provides ongoing support during and after release from judicial obligations.

The service is provided through partnership between participating judicial agencies, contracted providers of peer services, and the Georgia Department of Behavioral Health and Developmental Disabilities (DBHDD). The DBHDD contracts with providers of peer services, which employs Forensic Peer Mentors (FPM) to implement the service.

FPMs who deliver the service provide interventions that promote recovery, wellness, independence, self-advocacy, recidivism reduction strategies, and the development of natural supports among individuals involved in the judicial system. The goal of the service is to foster a positive and intentionally mutual relationship between a FPM and a judicially involved person with a behavioral health condition to resolve current, and prevent future involvement in the judicial system. In addition, the FPM assists individuals in regaining control over their own lives and recovery.

FPMs initiate and maintain relationships with associated judicial system agencies and team members to support peers in communicating progress, concerns, and any challenges or barriers to meeting judicial system requirements and expectations.  FPMs attend facility/community trainings and staff meetings, as agreed to through collaboration with judicial agencies, and as outlined in MOU/MOA developed between judicial agency and provider of peer services.

The FPM initiates the service by using a person-centered engagement of peers who are currently involved in, or at increased risk of returning to, the judicial system. Through the use of their own recovery skills, and by initiating recovery dialogues (for example, sharing their own recovery story, exploring possibilities for recovery, building hope and recovery capital, and tapping into individuals' strengths), the FPM assists individuals in galvanizing the recovery process. FPMs utilize their unique lived experience to model the recovery journey, assist their peers in recognizing, understanding, and relating their own recovery stories; support their peers in the development of their own recovery goals and self-directed recovery processes; and promote a successful life of meaning and purpose in the community of each individual's choice.

In order to accomplish the goals of the service, the following trauma-informed, and culturally-competent recovery principles, self-help strategies, and self-advocacy supports are utilized:

•  Exploring the need for:
   a.  Transitional supports/resources (housing, employment, financial, medical, mental health, transportation, food, clothing, state ID or driver's license, childcare, benefits, etc.);
   b.  Development of personal goals and articulating them;
   c.  Discovery of personal strengths and utilizing them to achieve goals;
   d.  Identification of potential outcomes, opportunities, and challenges/barriers in accomplishing goals;
   e.  Linkage to mutual self-help support groups and recovery-related social events, and encouraging participation;
   f.  Recognition of fears (i.e. in preparation for community re-entry, repairing relationships, living in recovery) and strategies for overcoming them;
   g.  Changes in thinking patterns and behaviors that put the individual at risk for further justice system involvement/recidivism; and
   h.  Exploration of individual, cultural, and faith-based connections, beliefs, and values.

•  Development, supporting, and/or modeling of:
   a.  Problem-solving and healthy coping techniques;
   b.  Career/education motivation and related skills;
   c.  Establishing and/or maintaining healthy, natural support systems in community and with family (biological or identified);
   d.  If desired, the creation and ongoing maintenance of a personal Wellness Recovery Action Plan (WRAP); |
|---|---|

e. If desired, the creation and ongoing maintenance of a Whole Health Action Management Plan (WHAM);
f. Plans for community resource linking, acquisition, and transportation to judicial requirements, community mental health, medical services, entitlement agencies, and other identified resources needed to encourage empowerment;
g. System and community navigation and self-management;
h. Skills in reporting to judicial agencies (probation/parole officials, judges, etc.);
i. Recovery, activism, and advocacy aimed at reducing stigma.
j. Appropriate inclusion of individual's personal, cultural, and faith-based beliefs in recovery plan; and
k. Ways to improve quality of life.

| | |
|---|---|
| **Admission Criteria** | FPM services are targeted to adults who meet the following criteria:<br>1. Individual is living with a behavioral condition(s).<br>2. Individual needs assistance in developing natural supports systems that are actively engaged in encouraging wellness, empowerment, and self-advocacy;<br>3. Individual wants to receive the FPM service provided by a FPM;<br>4. Individual may or may not currently be receiving forensic services. |
| **Continuing Stay Criteria** | 1. Individual continues to meet admission criteria; **and**<br>2. Weekly activity notes document progress relative to the individual's treatment/recovery goals, but these goals have not yet been achieved. |
| **Discharge Criteria** | 1. An adequate continuing recovery plan has been established; **and one or more of the following:**<br>a. Goals and/or objectives related to FPM services have been substantially met; or<br>b. Individual requests discharge; or<br>c. Transfer to another service/level is more clinically appropriate. |
| **Service Exclusions** | None |
| **Clinical Exclusions** | 1. Individuals diagnosed with a Substance-Related Disorder and no other concurrent mental illness; **or**<br>2. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a co-occurring behavioral health condition: developmental disability, autism, neurocognitive disorder, or traumatic brain injury. |
| **Required Components** | 1. FPM services are primarily provided in 1:1 CPS-F to person-served ratio and may additionally include FPM facilitated rehabilitative groups.<br>2. Services should be person-centered and driven by the individual.<br>3. Partnered-peer list ratio should be no more than 1:20.<br>4. Peer Supports cannot operate in isolation from the rest of the programs within the facility or affiliated organization. The FPM shall be empowered to convene multidisciplinary team meetings regarding a participating individual's needs and desires, and the Forensic Peer Mentor must be allowed to participate as an equal practitioner partner with all staff in multidisciplinary team meetings. They also have the unique role as an advocate to the individual served, encouraging them to steer goals and objectives in Individualized Recovery Planning.<br>5. Contact must be made with the individual receiving FPM services a *minimum* of twice each month. At least one of these contacts must be face-to-face and the second may be either face-to-face or telephone contact depending on the individual's support needs and documented preferences. |
| **Staffing Requirements** | 1. The providing practitioner is a Georgia-Certified Peer Specialist (CPS-MH or -AD), and has obtained additional certification as a Forensic Peer Mentor. **In addition, the following must be met:**<br>a. The practitioner must have, at time of hire, certification as a Georgia-Certified Peer Specialist (CPS-MH or –AD and<br>b. At the discretion of the hiring provider, qualified CPS practitioners without the FPM-specific certification can be hired upon the condition of obtaining this certification within six (6) months of hire. |
| **Clinical Operations** | The providing practitioner delivers all FPM services under the auspices and supervision of the contracted provider of peer support services. |

| | |
|---|---|
| Service Accessibility | Service can be provided in a GDC, DCS, or other judicial setting, or any community setting that is appropriate for providing the service so long as the choice of setting is made by the individual receiving the service. |
| Documentation Requirements | 1. FPMs must comply with all data collection expectations in support of the program's implementation and evaluation strategy.<br>2. Weekly activity notes, and a Monthly programmatic report. |
| Billing and Reporting Requirements | 1. For this service, the U6 In-Clinic modifier is utilized when the service occurs in a DBHDD facility, CSU, prison, jail, or other institutional setting.<br>2. For this service, the U7 Out-of-Clinic modifier is utilized when the service occurs outside a facility or institution as referenced above. |

## Georgia Housing Voucher Program

| Transaction Code | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Supported Housing | H0044 | RR | | | | Actual cost | Rental Cost | | | | | | |
| Unit Value | | | | | | | Maximum Daily Units | 1 | | | | | |

| | |
|---|---|
| Service Definition | The Georgia Housing Voucher Program (GHVP) assists individuals in attaining safe and affordable housing. The GHVP supports community integration by providing immediate access to a housing subsidy. Supportive Housing includes integrated, permanent housing with tenancy rights, linked with flexible community-based services that are available to support individuals' behavioral health needs and promote stability in the community. The GHVP promotes housing as a foundation of recovery, active engagement, and person centeredness. The GHVP supports informed choice and is based on personal housing needs and preferences. The voucher is tenant-based, which allows individuals to choose an apartment location based on their needs. The program design does not mandate clinical services, however, participation in the GHVP will require engagement with supports that promote the individual's health, safety, and maintenance of housing stability.<br><br>The program consists of:<br>1. The service participant;<br>2. Community-based service providers who provide one or more of the following:<br>   a. Bridge funding<br>   b. "Wellness" case management interventions specific to GHVP participants<br>   c. Housing supports (e.g., assistance with completing GHVP application/paperwork, identifying potential housing options, assisting with housing process, help with landlord communications, assistance with move-in process, providing support for housing stability needs, etc.); and<br>3. The landlord/property owner. |
| Admission Criteria | DBHDD will solicit potential candidates for the GHVP from DBHDD state hospitals, crisis settings (e.g. BHCCs, CSUs, etc.), jails, prisons, hospital ERs, and the population of homeless individuals with mental illnesses. All individuals who meet the admission criteria are eligible. Selection will be based on current residential status, eligibility, availability of other housing placements or programs, income, the need for support services and the desired location's support service capacity, history of employment, criminal background, and daily living skill analysis. All selections are at the sole and absolute discretion of the DBHDD, and the DBHDD reserves the right to prioritize the target population based on need, budget considerations, or any other criteria established by DBHDD.<br><br>1. Criteria:<br>   a. The individual must be at least 18 years of age;<br>   b. The individual must have a psychiatric diagnosis that qualifies as a Serious and Persistent Mental Illness (SPMI), as defined in Georgia Department of Behavioral Health and Developmental Disabilities' Definition of Severe and Persistent Mental Illness, 01-121, and that has been verified in the past 12 months (individuals with a co-occurring SUD diagnosis or developmental disability are also eligible); and |

## Georgia Housing Voucher Program

c. The individual must meet at least one of the following:
   i. Is currently homeless (i.e., in a homeless shelter, living on the street or a place not meant for human habitation), or
   ii. Is living in a DBHDD-funded residential program (e.g., CRR, transitional housing, CRA, CSU/BHCC), and without such placement, would be homeless; **and**

d. In addition, the individual must also meet at least one of the following:
   i. Being served in a state psychiatric hospital (individuals currently receiving treatment in a DBHDD state hospital have automatic access to the GHVP upon referral submitted by a hospital social worker); and/or
   ii. Frequently readmitted to state psychiatric hospitals and/or CSUs/BHCCs three or more times within 12 months; and/or
   iii. Frequently seen in Emergency Rooms for psychiatric needs, three or more times within 12 months; and/or
   iv. Chronically homeless (as defined by the Department of Housing and Urban Development - HUD); and/or
   v. Currently being released from jail/prison (within the last 90 days); and/or
   vi. Forensic status (as defined in Initial Placement and Transfer of Individuals on Secure and Maximum Secure Units, 06-110);

2. At the sole discretion of the DBHDD, an individual who meets at least one of the criteria (1.d.i. through 1.d.vi) above, but not criterion 1.c.i. or 1.c.ii. above may still be considered for admission, depending upon voucher availability and the individual's circumstances.

3. DBHDD shall include any individual who satisfies the eligibility criteria above and who has a co-occurring condition, such as a substance use disorder and/or developmental disability.

4. The individual must have the ability to live on their own, as determined by the referring provider.

5. Household income must not exceed 30% of Area Median Income (AMI), as determined by HUD for the household size in the county of preference.

| | |
|---|---|
| Continuing Stay Criteria | 1. Adherence to individual's lease agreement with the landlord/property owner. <br> 2. Adherence to GHVP regulations and guidelines, including tenant responsibilities. <br> 3. Ongoing participation in wellness case management or housing support services. <br> 4. Ongoing and timely payment of the tenant portion of rent. |
| Discharge Criteria | Individuals may be discharged from the GHVP for the following reasons: <br> 1. Individual no longer wishes to participate in the GHVP. <br> 2. Individual no longer meets expectations set forth in the Continuing Stay Criteria. <br> 3. Individual is transferred to another housing program that provides housing subsidy. |
| Required Components | 1. Housing Need and Choice Survey, Unified Referral & Access to Affordable Housing (Outside of GHVP) <br> a. This DBHDD housing need and choice tool is required with every referral package for use of Housing Choice Voucher (Section 8) resources. The purpose of the tool is to provide the individual with information to make an informed choice and to document that there is a need for Supported Housing. <br> b. Providers wishing to make application for the GHVP on behalf of an individual must comply with the Unified Referral Process (URP) as outlined in Supported Housing Needs and Choice Survey, 01-120. <br> c. Former GHVP participants may reapply based on the guidelines for the URP. <br> d. Individuals who are currently receiving treatment in a state hospital have automatic access to the GHVP upon referral submitted by the hospital social worker. <br> e. The GHVP may collaborate with Public Housing Authorities (PHAs) for use of Housing Choice Voucher (Section 8) resources. Upon renewal of the GHVP voucher, the partnering PHA will renew the voucher under the funds, policies, and procedures of that agency's Section 8 HCV program. <br> f. All individuals initially provided with a GHVP voucher must accept the Section 8 HCV voucher if offered and if eligible under that particular Section 8 HCV program. <br> g. Current Service Provider or any subsequent provider of support services is expected to enroll the tenant or place the tenant on federal housing support programs for which the individual is eligible (i.e., HUD 811, Housing Choice Voucher Program-Section 8). |

# Georgia Housing Voucher Program

2. Determination of the Unit Size for the Household Composition - The GHVP has established subsidy standards that determine the number of bedrooms needed for the household size and composition:

   a. The GHVP will use the following chart in determining the appropriate voucher for a household:

   | Voucher Size | Persons in Household (Minimum – Maximum) |
   |---|---|
   | 1 Bedroom | 1-2 |
   | 2 Bedrooms | 2-4 |
   | 3 Bedrooms | 3-6 |
   | 4 Bedrooms | 4-8 |
   | 5 Bedrooms | 6-10 |

   b. The GHVP does not determine who within a household will share a bedroom/sleeping room.

   c. The following requirements apply when determining the size of the unit:

   i. The subsidy standards must provide for the smallest number of bedrooms needed to house the intended occupants without overcrowding (see table in item a. above);

   ii. The subsidy standards must be consistent with space requirements under the housing quality standard;

   iii. The subsidy standards must be applied consistently for all households of like size and composition;

   d. Any live-in aide (must be if-approved by GHVP for medical reasons) must be counted in determining the household unit size;

   e. A household space consisting of a single individual must be either a zero-bedroom (i.e., a studio or efficiency unit) or one-bedroom unit.; At the DBHDD's full and absolute discretion, approval may be granted for a two-bedroom unit that meets all requirements of the GHVP and that has a rental value less than or equal to the Maximum Rent, if there is a verified lack of one-bedroom rental unit inventory within the individual's desired county of residence.

   f. For households with more than one Head of Household (HOH), GHVP will assign separate bedrooms to individuals in the household under the following circumstances:

   i. A single/unmarried head of household will be assigned a separate bedroom (married spouses will share a bedroom) from any other adults or children who are officially approved to reside in the home and who are included in the household size determination (including live-in aides);

   ii. Two or more children (under age 18) of the same gender will be assigned a shared bedroom, which is separate from the head of household's bedroom;

   iii. Two or more children (under age 18) of different genders will be assigned separate bedrooms from one another, and which are separate from the head of household's bedroom.

   g. In determining household size, the GHVP may grant an exception to its established subsidy standards if the GHVP determines that the exception is justified by the age, gender, health, handicap, relationship of family members, or other personal circumstances. Reasons may include but not limited to:

   i. A need for an additional bedroom for medical equipment;

   ii. A need for a separate bedroom for reasons related to a family members disability, medical, or health condition. The household's request for an exception to the subsidy standards must be in writing. The request must explain the need for justification for a larger family unit, and must include appropriate documentation. Requests based on health-related needs must be accompanied by verification from a licensed professional (e.g., doctor or other health professional). The household's continued need for an additional bedroom due to special medical needs must be re-verified at annual reexamination.

# Georgia Housing Voucher Program

h. In the interest of child welfare, households that include minors (anyone under 18 years of age) must provide legal documentation providing proof of the parental/familiar relationship prior to lease approval by the Regional Field Office, without exception.

3. Income and Rent Determination
   a. Tenant Contribution
      i. For initial leases, all individuals with financial means will be required to contribute 30% of their income toward their living expenses (tenant paid utilities, rent, and initial start-up expenses).
         1) If an individual has no income at the time of program entry, the individual must locate a unit that includes utilities.
         2) For initial/new leases, households may not pay more than thirty-five percent (35%) of their household income toward rent and utilities.
         3) In no case, without prior DBHDD approval, will DBHDD allow the individual to pay more than 40% of their income toward rent and utilities.
      ii. At lease renewal, individuals may pay as much as 40% of their income toward rent and utilities.
   b. The individual is expected to use their own financial resources (e.g. referral to SOAR and/or Supported Employment) to meet the needs of any subsequent costs associated with utilities. Neither the GHVP nor the Bridge program provides financial support for on-going utility assistance.
   c. Rent Determination
      i. If approved for the GHVP, calculations to determine the tenant's portion of the rent will include any additional tenants' income.
      ii. GHVP-5, Rent Determination Payment Standard Income Certification form must be used as part of the initial submission package.
      iii. All household income must be included.
      iv. All adult non-student and non-related members must contribute their pro-rated share of the rent before calculations are made for the GHVP covered individual.
   d. Change in Tenant Income During the Lease Term
      i. When a GHVP-4 (Tenant Information Form) is submitted to notify of a change in payment due to an increase/decrease in income on behalf of the individual during the lease term, supporting income documentation must be submitted with the packet.
      ii. If the individual reports that they are no longer working or receiving income, a separation letter from the employer, statement from the payor source, etc. must be submitted as verification with the packet.
      iii. If the individual reports an increase or decrease in income, at least one of the following is required and must be submitted for verification:
         1) Check stubs,
         2) Letter from the employer,
         3) Letter from the Social Security Administration,
         4) Statement from the payor source.
      iv. Effective Date of Payment Change: When an individual's income changes (increases or decreases) during the lease term, the effective date of the change will be the first day of the following month, not during the same month of the income change.

4. Service Provider Roles, Responsibilities and Conditions of Participation in the GHVP
   a. Provision of Services: As of December 1, 2018, Service Providers who refer and provide supportive services to individuals who meet criteria for the GHVP will minimally provide each GHVP participant a basic level of case management for program compliance, health, safety, and wellness. All individuals newly enrolling, and currently enrolled in the GVHP are expected to engage in support services that promote community integration, coordination of desired services, and housing stability.
      i. Each prospective tenant must have an Individualized Recovery Plan that documents the tenant's desire to live independently, the individual's support service needs, the Current Provider responsible for placing the individual into the community, and the support service provider responsible for on-going supports matched to their needs.
      ii. All individuals enrolled in the GHVP shall receive support for the following:
         1) Screening and housing assessment for an individual's preferences and barriers;

# Georgia Housing Voucher Program

2) Developing an individual housing support plan: Identifying goals, addressing barriers, establishing approaches to meet their goals, including identifying available services/resources;

3) Assisting with housing application, and search and move-in processes;

4) Purchase of initial household furnishing, deposits, household goods for the one-time move-in needs;

5) Developing a housing support crisis plan;

6) Safety and Wellness Checks and Property Unit Inspections;

7) Early intervention to mitigate factors impacting housing stability (e.g. late rent payment, lease violations, tenant/landlord or property owner conflicts);

8) Education on roles, responsibilities, rights of tenant and landlord/property owner;

9) Coaching on relationship-building with landlords/property owners, managers, and neighbors, and assisting in dispute resolution;

10) Linking with community resources to prevent eviction;

11) Assisting individual with his/her housing recertification process;

12) Identification of properties that will accept the GHVP;

13) Primary point of contact for landlords/property owners to trouble shoot problem solving related to damages, repairs, and unresolved maintenance issues.

b. The current Service Provider is responsible for facilitating transition of a tenant from their current residential placement (e.g. hospitals, homelessness, correctional institutions, crisis stabilization units, and residential treatment settings) into an independent community rental unit with full tenancy rights.

c. The Provider must offer housing choice, which is central to the program. Providers will ensure that individuals are offered options consisting of multiple potential locations that meet program and rent standard guidelines. The Service Provider may use resources such as the http://www.georgiahousingsearch.org/ web site, www.gosection8.com; social media outlets, the HUD 811 apartment listing, and other resources that provide information on the availability of affordable housing units.

d. The current Service Provider will explain policies of the program including the requirement to accept other rental assistance programs if offered, reasons for disbarment from the program, and the role of choice in housing options and locations.

e. DBHDD may limit current Service Provider access to the GHVP at its sole and absolute discretion. Only those providers that currently are in good standing with DBHDD, that have a DBHDD contract or LOA for the provision of ACT, CST, ICM, CM, PATH, CRR, and/or that are designated as Core Tier 1 providers may submit referrals to DBHDD. DBHDD may further limit access from time to time to specific providers or a class of providers.

f. No Service Provider that is also a Shelter Plus Care Grantee will be allowed to refer an individual who is homeless to the GHVP unless the federal definition of "homeless" restricts the use of available Shelter Plus Care resources, or the Shelter Plus Care program is fully subscribed and with a wait list.

5. Bridge Funding

a. Bridge Funds are available for one-time initial move-in expenses (as listed on the GHVP-3 Bridge Funding Request Form, up to $2,500.00 per GHVP household. Use of the full $2,500.00 is not required if it is not needed.

b. In order to be reimbursed, the Service Provider must submit purchase receipts that correspond with allowable expenses on the Bridge Funding Request form, and the total of these receipts must equal the total amount stated on the Bridge Funding Request form.

c. $250.00 is approved for the Service Provider fee for GHVP Renewals.

d. One-time Bridge Funding allowance for GHVP Enrollees for eviction-related moving and/or damages to housing:

i. It is recognized that individuals in GHVP are subject to challenges that make them more likely to be subject to experiencing eviction and it is the wish of DBHDD that individuals be able to move successfully or be able to avoid eviction by assisting with the repair of damages, with limitations.

ii. Bridge Funding, up to $1,000 (in addition to the initial $2,500 limit if this has already been expended) will be made available to households in the following circumstances:

1) Households that experience eviction and that are approved for relocation to another housing location under GHVP.

# Georgia Housing Voucher Program

2) Bridge Funding may be utilized to repair any damages inflicted upon the housing for which the household is deemed responsible.

iii. Bridge Service Providers must utilize the GHVP-3 Bridge Funding Request Form and all expenses must be supported with receipts as required in the normal claims process.

e. Bridge Funding Payments for Federal Housing Assistance Programs

i. Bridge Funding will be permitted for individuals who are approved and determined eligible through the Unified Referral Process (URP) for federal housing assistance programs.

f. For new individuals, a one-time initial move in expense is approved (as listed on the GHVP-3 Bridge Funding Request- HUD Federal Assistance Programs Only Form). $3,000 is approved for new applicants (Up to $2,500 for eligible expenses and $500 provider fee).

i. Total Bridge Funding requests exceeding $3,000 must receive DBHDD approval before expending money on the tenant's behalf and must be supported with proposed estimates.

g. For GHVP Transfers to a federal housing assistance program, a one-time initial move in expense is approved (as listed on the GHVP-3 Bridge Funding Request- HUD Federal Assistance Programs Only Form). The Provider will receive a $500.00 fee for completing the GHVP Transfer.

h. Bridge funding on a case-by-case basis may be (at the discretion of DBHDD) used for the following:

i. Abatement of bed bugs

ii. Economic hardship for a utility payment

iii. Moving expense when the landlord/property owner no longer accepts the GHVP and the tenant must move due to no fault of their own.

6. Landlords/Property Owners and the Apartment Unit

a. In no case will the rent paid to landlords/property owners exceed rent for a comparable non-GHVP assisted unit in the same complex.

b. In order for a landlord/property owner to participate and to receive payments, the landlord/property owner must agree to:

i. Participate in direct deposit (EFT) payments through PaySpan. Landlords/property owners may sign up by contacting PaySpan customer service at 1-877-331-7154.

ii. Allow an Annual Housing Quality (HQS) Inspection of any unit for which the landlord/property owner is receiving payment.

iii. Provide IRS Form W-9 and one of the following IRS documents:

1) IRS Form 147C or IRS Form CP575A as verification of Tax ID number, or the submission of a Social Security Card for the landlord/property owner, before a rental payment can be paid or a lease is signed under the GHVP.

c. The tenant is fully responsible for all damages done to the unit.

d. DBHDD will renew an individual's enrollment in the GHVP at its sole and absolute discretion. DBHDD is under no obligation to approve an automatic lease renewal.

7. GHVP Transfers, Portability, Disbarment, and Reapplication

a. The GHVP is portable. A transfer must adhere to the following:

i. Individual must submit a written request to the Service Provider at least 90-days before the end of the current lease;

ii. The regional office will complete the Transfer Request Form and ensure the following:

1) Individual cannot be in arrears on rent and/or utilities;

2) Individual must have clearance from the appropriate authority if individual is involved in any open investigations from a government agency and/or criminal proceedings (e.g., open child protection case, currently on probation/parole, current pending charges);

3) Individual must have the ability to cover moving expenses (GHVP is not financially responsible and Bridge does not cover these expenses);

4) Individual must have a minimum of six months of financial stability, with steady income and ability to manage household budget and expenses; and

# Georgia Housing Voucher Program

   5) Individual must be in compliance with their current lease.

b. Program Disbarment

   i. DBHDD may at its sole and absolute discretion, disbar any individual from future participation in the GHVP if the household violates any of the below program requirements:

      1) Failure to inform the Service Provider/DBHDD of the composition of the household. The Head of Household (HOH) must promptly inform the Service Provider/DBHDD of any change in household composition in the GHVP-funded apartment. Other persons may not be added to the household without prior written approval of the landlord/property owner and the Service Provider/DBHDD.

      2) The GHVP-funded unit may only be used for residence by the DBHDD approved household members. The unit must be the family's only residence.

      3) The tenant may not sublease or let the unit.

      4) The tenant may not assign or transfer the leased unit.

      5) The tenant may not conduct any business activity in the GHVP-funded unit.

      6) The tenant may not use the leased unit for illegal activities.

c. Reapplication

   i. Former GHVP participants may reapply, and if deemed eligible, may be approved for GHVP.

8. Payment Termination

Individuals may have their payment authorization terminated for the reasons outlined below. Payment termination occurs when an individual must leave their approved housing. Therefore, this also occurs in the process of changing housing locations. Termination does not necessarily mean that an individual has been discharged from the program. Additionally, eviction does not guarantee discharge or disbarment from the program.

a. Termination of rental payments may occur under any of the following conditions:

   i. Eviction by the landlord/property owner;

   ii. Any violation of the Lease Addendum or GHVP regulations/ guidelines.

   iii. It is determined that the tenant is no longer occupying the unit or has abandoned the unit.

   iv. Failure to comply with all required components of this service guideline and all applicable GHVP programmatic policies and procedures (see Tenant Responsibility Form).

   v. Tenant changes housing locations.

   vi. Tenant is no longer enrolled in the GHVP.

b. The GHVP may continue to pay for a vacated unit due to a brief hospitalization or minor incarceration on a case-by-case basis, if approved by DBHDD program leadership.

c. Service Provider requirements related to tenant occupancy and payment termination:

   i. If the Service Provider becomes aware that a tenant is no longer occupying the assigned unit, Service Provider will submit form GHVP-8 within 48 hours.

   ii. The current Service Provider and any subsequent provider primarily responsible for support services will be required to notify DBHDD if there is any change to the tenant's residency status.

   iii. The Service Provider will notify the landlord/property owner that the Rental Assistance Payment will end.

9. Master Leasing Agreements (MLAs)

# Georgia Housing Voucher Program

| | |
|---|---|
| | a. Master Leasing Agreements (MLAs) can help create additional housing options for individuals with multiple housing barriers. GHVP allows MLAs in which there is a master lease contract between a Service Provider and a Landlord/Property Owner in order to lease apartment units under the name of the Service Provider and sublease the units directly to individuals in the GHVP.<br><br>i. Service Providers that wish to offer MLAs do not require a separate agreement with DBHDD and must adhere to the following requirements:<br>   1) The sub-lease must be in the individual's name.<br>   2) The individual must maintain all tenancy rights.<br>   3) The tenant must maintain their right to privacy.<br>   4) The rental rate of the sublet unit charged to the tenant may not exceed the market rate of the unit as paid by the Service Provider.<br>   5) No more than 20% of the units in a single building with at least 5 units may be GHVP-funded.<br>   6) The tenant remains responsible for their portion of the rent as well as any damages for which the tenant is responsible.<br>   7) DBHDD is not responsible for the cost of vacant units or any administrative costs associated with master leased units.<br><br>b. In order to ensure a GHVP recipient has the benefit of consumer housing choice, the Service Provider must also identify at least two additional housing options that are not part of an MLA involving the same Service Provider.<br><br>c. Service Providers must provide DBHDD with the lease document executed between the tenant and Service Provider as part of the normal GHVP documentation requirements, AND in addition must submit a copy of the executed agreement between the Service Provider and the landlord/property owner.<br><br>10. Fidelity Monitoring and Program Evaluation<br>  a. Service Providers will participate as requested and deemed appropriate by DBHDD in annual Fidelity Monitoring process.<br>  b. Service Providers shall provide DBHDD with all requested information regarding the agency's participation in the GHVP in order to conduct an assessment of the Service Providers' operation and provision of services as it relates to GHVP and supportive housing services.<br>  c. Service Providers will receive training on this process from DBHDD as well as technical assistance to support the success of Service Providers.<br><br>1. GHVP Forms and Descriptions<br>  a. Current Service Providers must use the GHVP forms provided by the DBHDD's Office of Supported Housing. Any outdated forms may not be accepted and may result in the loss of all or part of the provider fee.<br>  b. For individuals being newly referred to the GHVP, in order for the Regional Field Office to determine program eligibility, the forms below should be completed and submitted by the Service Provider via the NSH Portal:<br>    i. **Individualized Treatment / Recovery Plan.** Each prospective tenant must have an Individualized Recovery Plan that documents the tenant's desire to live independently, the individual's support service needs, the Current Provider responsible for placing the individual into the community, and the support service provider responsible for on-going supports matched to their needs.<br>    ii. **GHVP-14: Declaration of Citizenship Status.** All participants will be required to complete and sign GHVP-14 Declaration of Citizenship Status form with the initial referral. This form is required by the Georgia Security and Immigration Compliance Act to assure that the GHVP and Bridge Funding public benefit goes to those that have a lawful presence in the United States.<br>    iii. **GHVP-20: Release of Information/Consent Form.** This form must be completed by the applicant in order to allow the release of the information they have provided to the Service Provider to DBHDD.<br>    iv. **GHVP-21: Wellness Case Management Acknowledgement Form.** This form must be signed by the individual in acknowledgement of the requirement to receive wellness case management while in the GHVP program.<br>    v. **GHVP-22: Certification of Homelessness** (if applicable). This form is only required if the individual is reporting a history of chronic homelessness to be deemed eligible. It requires documenting episodes of homelessness over time. |

Documentation Requirements

# Georgia Housing Voucher Program

vi. **GHVP-23:** Zero-Income Form (if household has no income). This form is required for individuals being referred who report having zero income. Individuals without income are still eligible for GHVP and are likely to experience additional housing barriers. All zero income individuals should be referred to the SOAR program.

vii. **GHVP-24: Disability Verification Form.** The Disability Verification form must be completed for all applicants by a licensed practitioner to document a diagnosis of Severe and Persistent Mental Illness (SPMI) in order to be eligible for GHVP.

c. For individuals newly enrolling in the GHVP, the forms below should be completed and submitted by the Service Provider:

i. **GHVP 1: The Notice to Proceed** issued by the current Service Provider represents DBHDD's approval of the referral application and authorizes the current Service Provider to assist the individual in their search for affordable housing that meets GHVP standards and requirements. The GHVP-1 is active for one-hundred and twenty (120) days from the notice's date of issuance. After 120 days, the authorization for a voucher will no longer be valid unless the Regional Field Office has received evidence of ongoing housing search efforts from the supporting provider agency and approved an extension. DBHDD and its Regional Field Offices have sole discretion regarding the extension of a GHVP Notice to Proceed.

ii. **GHVP-2: Lease Addendum** is a required form that details DBHDD's responsibilities, the amount that the tenant owes toward rent, the breakout of utilities, unit quality standards and other program requirements. The form must be signed by the owner and the tenant.

iii. **GHVP-3: Bridge Funding Request.** The Bridge Funding Request must be submitted by a Service Provider when submitting claims for eligible expenses made on behalf of individuals serves under the Bridge Funding service. Only those items on the checklist may be purchased with Bridge Funding. Any item not on the list must receive pre-approval by the DBHDD's Regional Transition Coordinator.

iv. **GHVP-4: Tenant Information.** DBHDD will use the information on this form to establish ongoing payments to the property owner, and the amounts to be split between DBHDD and the tenant. Information on this form must be consistent with the same information on GHVP-2, GHVP-5, and W-9. The document must be signed by the current Service Provider and the tenant.

v. **GHVP-5: Rent Determination-Payment Standard Income Determination.** This form automatically calculates the tenant's share of rent and utilities and the amount provided by GHVP. If any program requirement appears stating that the rent standard is greater than program requirements or that the individual is paying more than 40% of their income on rent and utilities, the submission package will not be accepted unless prior approval by the Regional Field Office. Handwritten submissions will not be accepted. GHVP Payment Standards seek to reflect Fair Market Rents (FMRs) as determined by HUD and adapted by the Georgia Department of Community Affairs (DCA) in their administration of the Housing Choice Voucher program. DBHDD also utilizes HUD Small Area FMRs (SAFMRs) for the counties for which DCA does not issue a standard. Standards may also be adapted to reflect those of local Public Housing Authorities.

vi. **GHVP-6: Accessibility Modifications.** Accessibility Modifications made to the housing unit in order to accommodate the physical needs of the tenant is an eligible Bridge Funding expense. All accessibility modifications must first receive DBHDD prior approval before entering into a lease or authorizing or commencing any work. In submitting the request, the current Service Provider must use GHVP-6; attach a description of the scope of work, Property Owner approval of the work scope, and estimates by a licensed contractor. Every effort should be used by the current Service Provider to locate units using http://www.georgiahousingsearch.org/ that are already adapted to the tenant's needs. All Accessibility Modifications must receive prior documented approval using the GHVP-6, Accessibility Modifications form, even if it is the initial Bridge Funding Request and the total request is less than $3,000.00.

vii. **GHVP-7: Notice of Change in Payment/Owner.** At any time when rent changes or property owner information changes this form should be used to document those changes. This form must be used when the lease is renewed even if no changes are made in either rent or property owner. Additional property contact information will assist future communication with the property owners.

viii. **GHVP-8: Notice of Lease Cancellation.** The Notice of Lease Cancellation is used to terminate GHVP subsidy payments on behalf of a tenant/individual served. If any current Service Provider knows that any GHVP tenant is no longer living at a contracted unit, the current Service Provider must submit the Notice of Lease Cancellation form. If known, the reason for the cancellation should be provided.

ix. **GHVP-10: Determining Your Housing Needs.** Current Service Providers are required to document, using GHVP-10 Determining Your Housing Needs, that they inquired about the desires of the individual concerning their living preference, the characteristics of the rental community, the

# Georgia Housing Voucher Program

design of the specific unit. All new placements must submit a GHVP-10. Current Service Provider is required to use GHVP-10, Determining Your Housing Needs, when discussing the tenant's potential housing options.

x. **GHVP-11: Documents and Compliance with GHVP Requirements.** To ensure that the individual will have access to other forms of housing supports, the GHVP program will align its expectations with other mainstream programs (e.g., Shelter Plus Care of Housing Choice Voucher Program). A signed GHVP-11 will be required at lease signing. Although not all of the documents below are required by the GHVP at lease signing, one or more may be required by the landlord/property owner in order execute the lease agreement, or by the GHVP in order to determine household size. Moreover, it is the expectation that if any of the following documents is not already within the individual's possession, the service provider and individual will work to obtain them within 3 months:

   1) Photocopy of the social security card for each household member or a letter from the Immigration and Naturalization Service indicating the social security numbers that have been assigned. SSN Verification letters will also be accepted.
   2) Photocopy of the birth certificate for each household member.
   3) Photocopy of picture identification for the head of household.
   4) Copies of Disability, SSI, or Social Security award letters received by any household member.

xi. **GHVP-12: Mutual Termination of Lease.** Although not a required GHVP form, there may be instances when the tenant and the owner, by mutual consent desire to terminate the lease. This form may be used to document that understanding.

xii. **GHVP-13: Notice of Change in Provider.** At any time after the individual occupies a GHVP supported unit, the current Service Provider is responsible for informing the Regional Field Office within 5 business days that they are no longer providing services. This may occur as a result of the individual no longer accepting services from the current Service Provider or there has been a change to another service provider. In those instances, where there has been a change in a Service Provider, the GHVP-13: Notice of Change in Provider must be submitted to the DBHDD Regional Field Office.

xiii. **GHVP-14: Declaration of Citizenship Status.**

xiv. **GHVP-15: Lease Payment Inquiry.** The current Service Provider or the Regional Office may receive communication from the landlord/property owner that a GHVP is missing or was not received on time. This form should be used and forwarded to the Regional Office if coming from the field to document a need to investigate the missing payment.

xv. **GHVP-16: Tenant Impressions.** At initial lease and any subsequent renewals of a GHVP supported apartment, the current Service Provider is asked to solicit the impressions of the individual on their experience with the GHVP and Bridge Funding Programs. If the individual consents, the current Service Provider should include GHVP-16 with the other submitted documents to the Regional Field Office.

xvi. **GHVP-17: Certification of Need for Live-In Aide.** A GHVP recipient may at initial lease or at any time when circumstances warrant requests an additional bedroom to accommodate a live-in aide. In those instances, the individual must forward to DBHDD a completed Certification of Need by a licensed professional for a medical condition that indicates a direct and verifiable need for an extra bedroom and/or live-in aide.

xvii. **GHVP-18-a: HQS Form 52580-a:** The Service Provider must submit the HQS Form 52580-a indicating successful passage of the HQS inspection for the housing unit.

xviii. **GHVP-18: HQS Inspection Results (Repairs only).** This form must be completed if a Housing Quality Standards inspection fails and the property requires repairs. In those instances, GHVP-18 should be used to document the repairs, the person responsible for making those repairs, the time frame to complete the work, and when a follow-up inspection will be conducted.

xix. **GHVP-19: Acknowledgement of Tenant Responsibilities.** This is a required form to be reviewed with the individual by the Service Provider, completed and signed at initial placement and all subsequent renewals.

2. All Current Providers are required to use the Submission Checklist (New Leases, Renewals, Terminations, Changes in Payments) and Cover Memo when submitting documents to DBHDD for GHVP payments. Service Providers should use the most current version of the GHVP Checklist.

## Georgia Housing Voucher Program

**New Submission Checklist:**

- GHVP 1: Notice to Proceed Form
- GHVP 2: Lease Addendum Form
- GHVP 3: Bridge Funding Request Form
- GHVP 4: Tenant Information Form
- GHVP 5: Rent Determination Payment Standard- Income Certification Form
- GHVP-11: Documents and Compliance with GHVP Requirements
- GHVP 14: Declaration of Citizenship Status Form
- GHVP 16: Tenant Impressions Form
- GHVP-18-a: HQS Form 52580-a, and GHVP-18 (if repairs are required).
- GHVP 19: Acknowledgement of Tenant Responsibilities Form
- GHVP-20: Release of Information/Consent Form
- GHVP-21: Wellness Case Management Form
- GHVP-23: Zero Income Form (required for households with zero income only)
- IRS W-9 Form for the Landlord/Property Owner
- IRS Form 147C or IRS Form CP575A (Required for landlords/property owners that are assigned an Employee Identification Number) or Copy of Social Security Card (Required for private landlords/property owners). Documents are required for new landlords/property owners only.
- Verification of income for all family members (wages- 2 most current pay stubs or letter from employer, TANF, child support, SSI/SSA, VA benefits, Pensions, Statement of financial contribution from family or friends)
- Lease signed by the tenant and the landlord/property owner

The following documents are not required prior to move-in by the GHVP but are required to be collected within 3 months:

- Picture ID for Head of Household
- Social Security Card or SSN Verification Letters for all household members
- Birth Certificate for all household members

**Renewal Submission Checklist:**

- GHVP 2: Lease Addendum
- GHVP 3: Bridge Funding Request Form
- GHVP 4: Tenant Information Form
- GHVP 5: Rent Determination Payment Standard- Income Certification Form
- GHVP 8: Notice of Lease Cancellation (if applicable)
- GHVP 16: Tenant Impressions Form (optional)
- GHVP-18-a: HQS Form 52580-a, and GHVP-18: HQS Inspection Results (if repairs are required).
- GHVP 19: Acknowledgement of Tenant Responsibilities Form
- GHVP-20: Release of Information/Consent Form
- GHVP-21: Wellness Case Management Form
- GHVP-23: Zero Income Form (required for households with zero income only)
- IRS W-9 Form for the Landlord/Property Owner

# Georgia Housing Voucher Program

| | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| | • IRS Form 147C or IRS Form CP575A (Required for landlords/property owners that are assigned an Employee Identification Number) or Copy of Social Security Card (Required for private landlords/property owners). | | | | | | |
| | • Lease signed by the tenant and the landlord/property owner | | | | | | |
| | • Verification of income for all family members (wages- 2 most current pay stubs or letter from employer, TANF, child support, SSI/SSA, VA benefits, Pensions, Statement of financial contribution from family or friends). | | | | | | |
| | If the following documents are already on file, they are not required again for renewal: | | | | | | |
| | • Picture ID for Head of Household | | | | | | |
| | • Social Security Card or SSN Verification Letters for all household members | | | | | | |
| | • Birth Certificate for all household members | | | | | | |
| Billing & Reporting Requirements | 1. Service Providers may bill in accordance with the Service Guidelines as defined in the Behavioral Health Provider Manual for the service in which a GHVP individual is enrolled. | | | | | | |
| | 2. Bridge Funding Reimbursement | | | | | | |
| | a. Submitting Claims: | | | | | | |
| | i. Providers should access the ASO ProviderConnect Portal to submit all bridge claims reimbursements. | | | | | | |
| | ii. Providers should utilize the Bridge Funding Service Claims Submission Quick Reference Guide as a resource for entering claims reimbursements. | | | | | | |
| | iii. ProviderConnect can be accessed by using this link: https://www.valueoptions.com/pc/eProvider/providerLogin.do?client=GACO. | | | | | | |
| | 1) A User ID and Password is required and must be created by the agency's Super User. | | | | | | |
| | b. Claim Requirements | | | | | | |
| | i. Bridge reimbursement requests can only be submitted once there is a signed lease. | | | | | | |
| | ii. Claims submitted must be in accordance with an approved GHVP-3 form for audit and reconciliation purposes. | | | | | | |
| | iii. All claims must be submitted through the ProviderConnect direct claims entry process and cannot be submitted via batch because of the receipt requirement. | | | | | | |
| | c. Receipts | | | | | | |
| | i. Receipts must be from a valid store, vendor, or business and must have the business name, date of payment, and amount paid. | | | | | | |
| | ii. If the receipt is for fees paid to the Provider (e.g., Initial, Renewal fee, etc.) then an invoice style receipt will be sufficient on agency letterhead or other form with the agency name. | | | | | | |
| | iii. If items on the receipt are not an approved reimbursable item, draw a line through the items. | | | | | | |
| | iv. Ensure the amount on the claim matches the amount to be reimbursed from the receipt. | | | | | | |
| | v. Beacon's claims staff will review all submitted receipts. | | | | | | |
| | d. Payments | | | | | | |
| | i. Claims are paid on a weekly basis. The Provider has the option to receive payments via ACH or paper check. | | | | | | |
| | ii. All claims submitted and adjudicated by Beacon's claims staff will be paid with Each Tuesday's check run. | | | | | | |
| | iii. Any claims that have been paid and later it was identified that the expense was outside of the guidelines will require the claim to be reversed and payment recouped. | | | | | | |

# High Utilizer Management

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

# High Utilizer Management

| High Utilizer Management | T1016 | HW |
|---|---|---|

| | |
|---|---|
| Service Definition | The High Utilization Management (HUM) program provides support to individuals who experience challenges and barriers in accessing and remaining enrolled in desired community-based services and supports. Using a data-driven process, the HUM program identifies and provides assertive linkage, referral, and short-term care coordination for individuals with behavioral health challenges who have a demonstrated history of high crisis service utilization. The program offers support, education, and navigation to assist at-risk individuals who could benefit from the removal of barriers to accessing community-based treatment. Utilizing a recovery-oriented approach, HUM services offer care coordination in identifying and gaining access to required services and supports, as well as medical, social, educational, developmental, and other services and supports, regardless of the funding source for the services to which access is sought. The HUM program includes assertive engagement and time-limited follow up to individuals to support and encourage a consistent and ongoing connection with appropriate community resources. Objectives for the programs are to:<br><br>a. Determine the factors related to an individual's high utilization of crisis services (e.g., homelessness, inadequate discharge planning, engagement challenges, cultural factors, etc.).<br>b. Use case management to educate, connect to services, and advocate for the individual.<br>c. Utilize a person-centered approach to tailor supports to meet the unique needs of the individual served.<br>d. Reduce the individual's re-admission rate into inpatient settings.<br>e. Act as a navigator for an individual who has not been able to engage successfully in services beyond a crisis.<br>f. Reduce the number of people with elevated acute behavioral needs to improve access to care.<br>g. Elevate identified gaps in resources to regional community collaboratives in order to address these gaps and develop solutions with community partners.<br><br>This service supports effective engagement as defined by one or more of the following outcomes:<br>1. Individual's linkage to the appropriate service(s) and support(s);<br>2. Completion of an initial evaluation/behavioral health assessment;<br>3. Completion of a psychiatric evaluation;<br>4. Authorization for services;<br>5. Completion of two (2) face-to-face follow up appointments; and/or<br>6. Individual reports feeling sufficiently supported and connected to desired services. |
| Admission Criteria | Adults with a primary substance use, mental health, or co-occurring diagnosis who have been admitted to a crisis setting (CSU, BHCC, State contracted Community-Based Inpatient Psychiatric facility, DBHDD State Hospital, or Residential Detox) meeting one of the following frequency rates:<br>1. A 30-day readmission; or<br>2. Two (2) admissions within a 12-month period;<br>AND/OR<br>3. Other crisis utilization indicators, as evidenced by the following:<br>a. Three (3) mobile crisis dispatches within 90 days or;<br>b. Four (4) or more mobile crisis dispatches within nine (9) months; or<br>c. Two (2) or more presentations at an emergency department within 90-days; and/or<br>d. 30 consecutive days or more in a CSU or State contracted Community-Based Inpatient Psychiatric bed. |
| Continuing Stay Criteria | Individual remains disconnected from behavioral health community-based services and supports. |

# High Utilizer Management

| | |
|---|---|
| **Discharge Criteria** | 1. Individual has solidified recovery support networks to assist in maintenance of recovery; and<br>2. Individual reports feeling sufficiently supported and connected to an appropriate level of services and supports<br>3. Documented multiple attempts (e.g., a minimum of four attempts over the first two weeks, a minimum of six attempts over the first month, and/or a minimum of eight attempts over a two-month period) to locate and make contact with an individual. The individual may be removed from the caseload due to drop out/unsuccessful engagement after 90-days. |
| **Service Exclusions** | 1. This service may not duplicate any discharge planning efforts which are part of the expectation for hospitals, BHOCs, CSUs, and PRTFs.<br>2. The HUM program is available to individuals who have an authorization for ACT, CST, or ICM, and have not been actively engaged in services (as evidenced by not having at least one face-to-face contact within the past 30-days). |
| **Clinical Exclusions** | 1. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition co-occurring with the diagnosis of:<br>  a. Intellectual/Developmental Disabilities; and/or<br>  b. Autism; and/or<br>  c. Neurocognitive Disorder; and/or<br>  d. Traumatic Brain Injury.<br>2. Individual does not present with medical necessity and functional limitations to substantiate eligibility for a behavioral health service. |
| **Required Components** | 1. Provider organization must agree to promote HUM activities as an integrated service within the agency's continuum/system of care in order to promote engagement and successful ongoing connection.<br>2. Each HUM Navigator will have access to, and/or receive a report generated daily of:<br>3. Individuals assigned to their agency; and<br>4. DBHDD hospital recidivism, specific to the individuals assigned to their agency.<br>5. HUM Navigators will maintain a short-term, rolling case load of individuals with whom active connection and reconnection services are being coordinated.<br>6. The HUM program is expected to engage a high percentage of individuals into services with few dropouts. In the event that a HUM Navigator has documented multiple attempts (e.g., a minimum of four attempts over the first two weeks, a minimum of six attempts over the first month, and/or a minimum of eight attempts over a two-month period) to locate and make contact with an individual, and has demonstrated a diligent search, the individual may be removed from the caseload due to drop out/unsuccessful engagement after 90-days.<br>7. HUM Navigators work as part of the known or developing care coordination team/network.<br>8. HUM Navigators may use flexible funds up to $500 per HUM program-enrolled individual for the following allowable expenses:<br>  a. **Transportation** - Round-trip bus or car fare for individuals to attend behavioral health, medical provider, or housing appointments.<br>  b. **Medication** - One (1) time allowance for direct purchase of [60 to 90-day supply] prescription medication from retail pharmacies other than the provider's pharmacy.<br>  c. **Personal items** - One (1) time purchase of necessary personal care items (e.g., basic clothing, grooming/hygiene items).<br>  d. **Food** - Light meal that is engagement-related with HUM navigator; maximum of $8.00 per meal.<br>  e. **Requisite benefits-related documentation** - Obtaining birth certificate, state identification, etc.<br><br>HUM Navigators will use specified leveling in order to prioritize individuals based on the color coding below to identify barrier levels:<br><br>**Green** – lowest level – mild barriers. Individual may have had previous service authorizations and/or an established connection to a provider; individual is known to the system, but not continuously and consistently engaging in community services that support stability; individual may have inadequate/inappropriate level of care; and individual may have refused services. |

# High Utilizer Management

## Staffing Requirements

**Yellow** – mid level – moderate barriers. Individual may or may not have been authorized and/or engaged previously with provider, but is currently neither authorized for services nor connected, individual may have had inadequate/inappropriate level of care; individual may have refused services. Circumstances may include change in payor, financial limitations, location.

**Red** – highest level – severe barriers. No current or previous authorization; individual may be homeless or have other unsafe/unstable housing, may present with medical complexity and/or co-occurring I/DD, involvement with criminal justice system or DFCS; individual may have inappropriate level of care; may have refused services.

1. The practitioner who provides this service will be referred to in this definition as a HUM Navigator.
2. A full-time HUM Navigator must be hired in accordance with Department determined criteria, and in collaboration with the Department's High Utilization Management Coordinator (HUMC).
3. The following practitioners may provide HUM program services:
   - Practitioner Level 2: Psychologist, APRN, PA
   - Practitioner Level 3: LCSW, LPC, LMFT, RN
   - Practitioner Level 4: LMSW, LAPC, LAMFT, Psychologist/LCSW/LPC/LMFT's supervisee/trainee with at least a Bachelor's degree in one of the helping professions such as social work, community counseling, counseling, psychology, or criminology, functioning within the scope of the practice acts of the state; MAC, CAADC, CAC-II, GCADC (II, III); CPS, PP, CPRP or Addiction Counselor Trainee/Counselor in Training with at least a Bachelor's degree in one of the helping professions such as social work, community counseling, counseling, psychology, or criminology.
   - Practitioner Level 5: CPS; PP; CPRP; or, when an individual served has a co-occurring mental illness and substance use disorder: CAC-I, GCADC-I, or Addiction Counselor Trainee/Counselor in Training with high school diploma/equivalent under supervision of one of the licensed/credentialed professionals above.
4. Staff-to-consumer ratio for each HUM navigator shall be maintained at a minimum caseload of one HUM navigator serving 50 individuals (1:50). This is based on a rolling census of eligible individuals identified in the Beacon system and/or by other enrolled providers who may serve as referral sources. Of these individuals, those who become connected to services will be discharged and no longer counted in the ratio.

## Clinical Operations

1. It is not expected that HUM Navigators participate in or deliver clinical services.
2. HUM Navigator service delivery may include (with appropriate consent) coordination with family and significant others and with other systems/supports (e.g., work, school, religious entities, law enforcement, aging agencies, etc.) when appropriate for services and supports.
3. HUM Navigators must have the ability to deliver engagement services in various environments, such as inpatient, residential, homes, homeless shelters, or street locations.
4. HUM Navigators must incorporate assertive engagement techniques to identify, locate, engage, and retain the most difficult to engage individuals who have a history of cycling in and out of intensive services.
5. HUM Navigators must demonstrate the implementation of well thought out engagement strategies, including the use of street and shelter outreach approaches and collateral contacts with family, friends, probation or parole officers.
6. Using assertive engagement skills, the HUM Navigator will function to perform and report on the following 30-60-90 Day Activities:
   <u>Within 30 days</u> (Rapid Intensive Engagement)
   - have had face-to-face contact with individual
   - collaborate to identify most urgent needs
   - collaborate to identify barriers to access treatment/supports, prioritize services
   - report on progress
   <u>Within 60 days</u> (Focused Resource Engagement)

## High Utilizer Management

| | |
|---|---|
| | • connection to appropriate resources, services (as evidenced by attendance to appointments)<br>• convening appropriate parties, treatment providers, natural supports, stakeholders to identify and resolve barriers<br><u>Within 90 days (Active Monitoring Engagement)</u><br>  • Integration into appropriate level of services, supports and other resources.<br>  • Monitor access and continued engagement in identified services/supports.<br>  • Transition out of HUM program<br><br>HUM Navigators must:<br>1. Use case management strategies to educate and connect to services and advocate for individuals.<br>2. Utilize a person-centered approach to meet the needs of each unique person.<br>3. Engage individuals who have not been successfully engaged into services beyond a crisis.<br>4. Use conventional and unconventional methods of engagement to determine barriers to ongoing community-based care.<br>5. Use a standardized comprehensive needs assessment tool.<br><br>The HUM program must:<br>1. Use available data to identify and assign a level of priority (see Required Components) to eligible individuals;<br>2. Utilize methods, materials, settings, and outside resources appropriate to the developmental and cognitive levels, capabilities, age, gender, and culture of participants;<br>3. Utilize methods, materials, approaches, activities, settings and outside resources appropriate for, and targeted to individuals with Substance Use Disorders and co-occurring mental illness;<br>4. Elevate identified gaps in resources to the regional community collaboratives/local interagency planning team chairs to address and develop solutions with community partners;<br>5. Reduce the number of people with elevated acute BH needs to improve access to care;<br>6. Increase utilization and participation in programming that promotes stability, wellness and recovery; and/or<br>7. Reduce the re-admission rates of individuals being re-admitted into BHCC, CSU, State/Private Hospital, PRTF levels of care. |
| Service Accessibility | 1. There must be documented evidence that service hours of operation are flexible and include outreach and engagement during evenings and weekends.<br>2. Demographic information collected shall include a preliminary determination of hearing-impairment status to determine the appropriateness of a referral to Deaf Services.<br>3. HUM Navigators are expected to assertively engage with individuals in settings to include: Hospitals, BHCCs, CSUs, PRTFs, and other community settings. |
| Documentation Requirements | • 30/60/90-day reporting of progress<br>  Date of admission and discharge from HUM program<br>  Discharge Disposition:<br>    • Still receiving services;<br>    • Completed receiving services;<br>    • Refused services;<br>    • Left catchment area;<br>    • Incarcerated; or<br>    • Other dispositions.<br>• Date of first and last HUM Navigator contact<br>• Unique identifier for each individual, which will follow them across multiple engagements |

## High Utilizer Management

- ID of HUM Provider (T1, T2+), perhaps Federal ID #?
- Region
- County (where individual intends to reside while receiving services)
- Urban vs. Rural (based on county)
- Initial priority level coming into HUM (Red, Yellow, Green)
- Number and type of Crisis contacts - What factors placed them on the HUM list?
  - ER
  - IP Stay (State contracted or DBHDD beds)
  - BHCC/CSU
  - Residential Detox
  - PRTF
  - Mobile Crisis
- Initial Barriers to engagement in community treatment (select as many as apply):
  - Homelessness
  - Transportation
  - Inadequate DC planning
  - Cultural factors
  - Lack of understanding of value of OP services
  - Unavailability of services in community
  - Lack of knowledge in how to access state services
  - Prior negative experience with community services
  - Other
- List of barriers that were successfully removed by the HUM Navigator/service.

| Billing & Reporting Requirements | 1. Compliance with monthly programmatic reporting as required by the Department's HUM Coordinator.<br>2. Each HUM navigator must submit per unit encounters for all individuals served.<br>3. Post 90-Day Review - The HUM Navigator will provide a monthly programmatic report to DBHDD of the caseload outcomes for individuals served in the HUM program. |
| Additional Medicaid Requirements | None |

## Housing Supplements

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Housing Supplements | | ROOM1 | | | | | Actual cost | | | | | | | |

Maximum Daily Units: 1

| Unit Value | 1 day |
|---|---|
| Service Definition | This is a rental/housing subsidy that must be justified by a personal consumer budget. This may include a one-time rental payment to prevent eviction/homelessness. |

| | |
|---|---|
| Admission Criteria | 1. Individual meets target population as identified above; **and** <br> 2. Based upon a personal budget, individual has a need for financial support for a living arrangement. |
| Continuing Stay Criteria | 1. Individual continues to meet admission criteria as defined above; **and** <br> 2. Individual has developed a Recovery goal to develop natural supports that promote the family/caregiver-management of these needs. |
| Discharge Criteria | 1. Individual requests discharge; or <br> 2. Individual has acquired natural supports that supplant the need for this service. |
| Clinical Exclusions | Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of psychiatric condition co-occurring with one of the following diagnoses: Developmental Disability, Autism, Neurocognitive Disorder, Traumatic Brain Injury. |
| Documentation Requirements | 1. If the individual supported is sharing rent with another person, then agency may only utilize and report the assistance provided to the served individual (rounded to the nearest dollar). <br> 2. The individual clinical record must have documentation of the actual payment by the agency to the leaser/landlord. A receipt for this payment must also be kept in the clinical record. |

# Housing Support (Effective January 1, 2023)

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Service Definition | The Housing Support program represents a critical component of Permanent Supportive Housing as outlined in the Evidence Based Practices Toolkit from SAMHSA. In its fullness, this program is comprised of recovery supports to sustain permanent housing. The Housing Support program is a required element of the program for all individuals entering the Georgia Housing Voucher Program (GHVP) or renewing their lease under GHVP, as of April 1, 2022. All enrolled individuals are expected to engage in the Housing Support program in order to promote community integration, coordination of desired services, and long-term housing stability. Access to housing is not contingent upon the acceptance of treatment services, in accordance with the Housing First philosophy and approach. <br><br> The Housing Support program is comprised of multiple supports designed to assist individuals living in GHVP-subsidized permanent supportive housing to promote ongoing housing stability. All individuals enrolled in the Housing Support program must receive the following types of support: <br> 1. Assistance with housing search, leasing, and move-in processes; <br> 2. Purchase of initial household furnishing, deposits, household goods for the one-time move-in needs; <br> 3. Safety and wellness checks and housing safety inspections; <br> 4. Developing a Housing Stability Support Plan as an adjunct to an individual's IRP; <br> 5. Early intervention to mitigate factors impacting housing stability (e.g., late rent payment, lease violations, tenant/landlord or property owner conflicts); <br> 6. Education on the roles, responsibilities, and rights of tenant(s) and the landlord/property owner; and <br> 7. Assistance with the annual housing recertification and inspection process. <br><br> All individuals enrolled in the Housing Support program shall receive any of the following supports, according to their needs and preferences: <br> 1. Completion of supportive housing referral and application processes; <br> 2. Landlord engagement, recruitment, and enrollment; <br> 3. Coaching on relationship-building with landlords/property owners, managers, and neighbors, and assisting in dispute resolution; and <br> 4. Linking with community resources to prevent eviction. | | | | | | | | | | | | | |

## Housing Support (Effective January 1, 2023)

This program is provided to adults enrolled in GHVP in order to promote housing stability, wellness, independence, recovery, and community integration. Housing stability is measured by ongoing housing and by decreased number of hospitalizations/ER visits/incarcerations, by decreased frequency and duration of crisis episodes, and by increased and/or stable participation in maintenance of personal housing stability and wellness. Supports based on the individuals' needs are used to promote resiliency while understanding the effects of SPMI and lived trauma. The Housing Support staff will serve as the first point of contact for landlords/property owners for any issues arising with a supportive housing individual, and will provide linkage to community; general entitlements; and psychiatric, substance use disorder, medical services, crisis prevention, and intervention services.

The Housing Support program is comprised of a group of interventions including items 1-8 below as well as elements which are defined herein which are not billable via traditional rehabilitation codes. Supports are based on individual need and could include (but are not limited to) the coordination of DBHDD services with community services/supports and financial assistance to help offset the costs of an approved provider's staff time for non-billable activities such as travel, meeting and conference attendance, trainings, and other related activities.

Specific allowable DBHDD behavioral health services (see the Service Definition/Requirements for each service listed below in this Provider Manual):
1. Case Management (CM)
2. MH and/or SUD Peer Supports (PS)
3. Psychosocial Rehabilitation – Individual (PSR-I)
4. Addictive Disease Support Services (ADSS)
5. Crisis Intervention
6. Community Residential Rehabilitation (CRR-IV)
7. Community Transition Planning (CTP)

| | |
|---|---|
| Admission Criteria | 1. Individual must be 18 or older and have a severe and persistent mental illness (SPMI).<br>2. Individual must be enrolled in the Georgia Housing Voucher Program (GHVP).<br>  o  Includes individuals with a Notice to Proceed for GHVP, meaning those who have received a voucher and are in the housing search process. |
| Continuing Stay Criteria | Individual continues to meet admission criteria. |
| Discharge Criteria | Individual no longer meets admission criteria. |
| Service Exclusions | Behavioral Health Residential Programs are excluded (MH or SUD). |

## Housing Support (Effective January 1, 2023)

**Required Components**

1. The Housing Support program must be provided through a team approach (as evidenced in documentation). It focuses on building and maintaining a positive relationship with the individual, facilitating needed independent living supports, and working toward recovery goals.
2. The Housing Support program must include a variety of interventions in order to assist the individual in developing:
   a. Recovery orientation and skills to work toward their personal recovery goals related to their ability to live independently.
   b. Illness self-monitoring and self-management of symptoms.
   c. Strategies and supportive interventions for developing positive relationships/avoiding conflicts with neighbors and property owner.
   d. Relapse prevention strategies and plans.
3. Required tasks include checking on and documenting the following on a monthly basis:
   a. Individual wellness, need for additional supports or connection to other community resources;
   b. Household wellness, health and safety of the housing unit;
   c. Community integration and relationships with property/neighbors;
   d. Household financial stability.
4. Contact requirements for individuals receiving the Housing Support program:
   a. Contact must be made a minimum of once a week during the first three months of being housed to ensure individuals remain stabilized,
   b. After the first three months of being housed, then contact must be made a minimum of twice each month, one of which must be in the individual's residence/unit and include items 3(a-d).
   c. Half of these contacts must be face-to-face and the other half may be either face-to-face or telephone contact depending on the individual's support needs and documented preferences.
5. At least 50% of HSI service units must be delivered face-to-face with the identified individual receiving the service and at least 80% of all face-to-face service units must be delivered in the individual's home over the authorization period (these units are specific to single individual records and are not aggregate across an agency/program or multiple payers).
6. In the absence of the required monthly face-to-face contact and if at least two unsuccessful attempts to make face-to-face contact have been tried and documented, the provider may bill for a maximum of four telephone contacts in that specified month.
7. Unsuccessful attempts to make contact with the individual are not billable.
8. DBHDD services provided via the Housing Support service must adhere to all DBHDD service definitions and requirements for each service provided.

**Staffing Requirements**

1. Housing Support providers must, at a minimum, have the following positions on staff:
   a. 1 FTE Program Director dedicated (licensed: LCSW, LPC, or LMFT); and
   b. At least 1 FTE Housing Specialist/Case Manager (practitioners who can provide Case Management services as defined in the BH Provider Manual) who is responsible for providing all of the supports described herein.
2. Peer Support is a critical component of recovery. Individuals being served by a Housing Support provider must have access to a CPS-MH that can provide Peer Support services. There must be documented engagement by the staff team with a CPS-MH.
3. Housing Support must maintain a maximum ratio of 25 individuals per staff member; however, a ratio of 20 individuals per staff member is recommended.
4. Provider must adhere to the Staffing Requirements section of the Service Definition/Requirements for the specific DBHDD service being provided, as well as to all other staffing/professional requirements found elsewhere in the DBHDD's Provider Manual for Community Based Behavioral Health Providers.

**Service Accessibility**

1. To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:
   • the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or
   • the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.

## Housing Support (Effective January 1, 2023)

|  |  |
|---|---|
| | Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should <u>not</u> be driven by the practitioner's/agency's convenience or preference. |
| | 2. If any of the individually billed services named herein have more restrictive telemedicine expectations, then those shall supersede item 1 above. |
| Documentation Requirements | 1. There must be an individual record that includes documentation of supports described in this program guideline. |
| | 2. Provider is required to complete a progress note for every housing support intervention on behalf of the individual that does not align with one of the eight services outlined above. |
| | 3. Progress notes must adhere to the documentation requirements set forth in this manual. |
| | 4. A monthly programmatic report is required that will aggregate any generalized activities conducted on behalf of individuals which do not align with the one of the services outlined above. |
| | 5. Housing Support program staff must comply with any data collection expectations in support of the program's implementation and evaluation strategy. |
| | 6. The individual's clinical record contains a Housing Stability Support Plan as an adjunct to the Individualized Recovery Plan, which is no more than 12 months old and which is updated when there is a demand for change in said plan. |

## Housing Support (Effective January 1, 2023)

**Billing & Reporting Requirements**

1. The majority of interventions defined herein are billable through the codes named here:

| Service | Maximum Authorization Units | Daily Maximum Billable Units |
|---|---|---|
| Case Management (CM) | 140 for 6 months | 24 |
| MH and/or SUD Peer Supports (PS) | 520 for 6 months | 48 |
| Psychosocial Rehabilitation – Individual (PSR-I) | 300 for 6 months | 48 |
| Addictive Disease Support Services (ADSS) | 100 for 6 months | 48 |
| Crisis Intervention | 64 for 6 months | 16 |
| Community Support – Individual (CSI) | 100 for 6 months | 48 |
| Community Residential Rehabilitation (CRR-IV) | 36 for 6 months | 8 |
| Community Transition Planning (CTP) | 32 for 6 months | 24 |

2. DBHDD service provision, billing, and reporting must adhere to all DBHDD and Georgia Collaborative ASO requirements.

3. Provider must submit a monthly invoice, invoice justification/supporting documentation (as needed), and a programmatic report to their designated DBHDD contract manager.

4. Providers are required to maximize utilization of alternative funding streams, including third party payers (e.g., Medicaid, private insurance, etc.), public targeted and competitive grants, and private foundation funds.

5. Approved providers of this program may submit claims/encounters for the unbundled services listed in the table above, in accordance with individual need, and up to the daily maximum amount for each service. The overall Housing Support Program must follow the content of this Service Guideline, while any specific services delivered as part of the program but billed separately (i.e., those listed in the table above) must also comply with their specific service guidelines found elsewhere in this Manual.

6. The billable activities of the Housing Support program do not include:
   a. Transportation.
   b. Food.
   c. Expenses covered under Bridge Funding services.
   d. Generalist engagements/interactions with landlords to build capacity, i.e., landlord interactions must be specific to an individual's IRP in order to be billable.

## Intensive Case Management

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Intensive Case Management | Practitioner Level 4, In-Clinic | T1016 | HK | U4 | U6 | | $20.30 |
| | Practitioner Level 5, In-Clinic | T1016 | HK | U5 | U6 | | $15.13 |
| | Practitioner Level 4, Out-of-Clinic | T1016 | HK | U4 | U7 | | $24.36 |
| | Practitioner Level 5, Out-of-Clinic | T1016 | HK | U5 | U7 | | $18.15 |
| | Practitioner Level 4, In-Clinic, Collateral Contact | T1016 | HK | UK | U4 | U6 | $20.30 |
| | Practitioner Level 5, In-Clinic, Collateral Contact | T1016 | HK | UK | U5 | U6 | $15.13 |
| | Practitioner Level 4, Out-of-Clinic, Collateral Contact | T1016 | HK | UK | U4 | U7 | $24.36 |
| | Practitioner Level 5, Out-of-Clinic, Collateral Contact | T1016 | HK | UK | U5 | U7 | $18.15 |

## Intensive Case Management

| | Practitioner Level 4, Via interactive audio and video telecommunication systems | T1016 | GT | HK | U4 | $20.30 | Practitioner Level 5, Via interactive audio and video telecommunication systems | T1016 | GT | HK | U5 | $15.13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unit Value | 15 minutes | | | | | | Utilization Criteria | TBD | | | | |

**Service Definition**

Intensive Case Management consists of providing environmental supports and care coordination considered essential to assist a person with improving his/her functioning, gaining access to necessary services, and creating an environment that promotes recovery as identified in his/her Individual Recovery Plan (IRP). The focus of the interventions includes assisting the individual with: 1) developing natural supports to promote community integration; 2) identifying service needs; 3) referring and linking to services and resources identified through the service planning process; 4) coordinating services identified on the IRP to maximize service integration and minimize service gaps; and 5) ensuring continued adequacy of the IRP to meet his/her ongoing and changing needs.

The performance outcome expectations for individuals receiving this service include decreased hospitalizations, decreased incarcerations, decreased episodes of homelessness, increased housing stability, increased participation in employment activities, and increased community engagement.

Intensive Case Management shall consist of four (4) major components and cover multiple domains that impact one's overall wellness including medical, behavioral, wellness, social, educational, vocational, co-occurring, housing, financial, and other service needs of the individual:

**Engagement & Needs Identification**

The case manager engages the individual in a recovery-based partnership that promotes personal responsibility, and provides support, hope and encouragement. The case manager assists the individual with developing a community-based support network to facilitate community integration and maintain housing stability. Through engagement, the case manager partners with the individual to identify and prioritize housing, service, and resource needs to be included in the IRP.

**Care Coordination**

The case manager coordinates care activities and assist the individual as he/she moves between and among services and supports. Case Coordination requires information sharing among the individual, his/her Tier 1 or Tier 2 provider, specialty provider(s), residential provider, primary care physician, and other identified supports in order to: 1) ensure the individual receives a full range of integrated services necessary to support a life in recovery including health, home, purpose, and community; 2) ensure the individual has an adequate and current crisis plan; 3)reduce barriers to accessing services and resources; 4) minimize disruption, fragmentation, and gaps in service; and 5) ensure all parties work collaboratively for the common benefit of the individual.

**Referral & Linkage**

The case manager assists the individual with referral and linkage to services and resources identified on the IRP including housing, social supports, family/natural supports, entitlements (e.g., SSI/SSDI, Food Stamps, VA), income, transportation, etc. Referral and linkage activities may include assisting the individual to: 1) locate available resources; 2) make and keep appointments; 3) complete intake and application processes and 4) arrange transportation when needed.

**Monitoring & Follow-Up**

The case manager visits the individual in the community to jointly review progress toward achievement of IRP goals and to seek input regarding his/her level of satisfaction with treatment and any recommendations for change. The case manager monitors and follows-up with the individual in order to: 1) determine if services are provided in accordance with the IRP; 2) determine if services are adequately and effectively addressing the individual's needs; 3) determine the need for additional or alternative services related to the individual's changing needs or circumstances; and 4) notify the treatment team when monitoring indicates the need for an IRP reassessment and update.

## Intensive Case Management

| | |
|---|---|
| Admission Criteria | 1. Individual must meet DBHDD eligibility criteria: **AND**<br>2. Individual has a severe and persistent mental illness that seriously interferes with their ability to live in the community and:<br>  a. Transitioning or recently discharged (i.e., within past 6 months) from a psychiatric inpatient setting; or<br>  b. Frequently admitted to a psychiatric inpatient facility (i.e., 3 or more times within past 12 months) or crisis stabilization unit for psychiatric stabilization and/or treatment; or<br>  c. Chronically homeless (i.e., continuously homeless for a year or more, or 4 episodes of homelessness within past 3 years); or<br>  d. Recently released from jail or prison (i.e., within past 6 months); or<br>  e. Frequently seen in the emergency room (i.e., 3 or more times within past 12 months) for behavioral health needs; or<br>  f. Transitioning or have been recently discharged from Assertive Community Treatment services; **AND**<br>3. Individual has significant functional impairments that interfere with integration in the community and **needs assistance in two (2) or more of the following areas** which, despite support from a care giver or behavioral health staff (i.e.CM, AD Support Services) continues to be an area that the individual cannot complete. Needs significant assistance to:<br>  a. Navigate and self-manage necessary services;<br>  b. Maintain personal hygiene;<br>  c. Meet nutritional needs;<br>  d. Care for personal business affairs;<br>  e. Obtain or maintain medical, legal, and housing services;<br>  f. Recognize and avoid common dangers or hazards to self and possessions;<br>  g. Perform daily living tasks;<br>  h. Obtain or maintain employment at a self-sustaining level or consistently perform homemaker roles (e.g., household meal preparation, washing clothes, budgeting, or childcare tasks and responsibilities);<br>  i. Maintain a safe living situation (e.g., evicted from housing, or recent loss of housing, or imminent risk of loss of housing); **AND**<br>4. Individual is engaged in their Recovery Plan but **needs assistance with one (1) or more of the following areas** as an indicator of demonstrated ownership and engagement with his/her own illness self-management:<br>  a. Taking prescribed medications, or<br>  b. Following a crisis plan, or<br>  c. Maintaining community integration, or<br>  d. Keeping appointments with needed services which have resulted in the exhibition of specific behaviors that have led to two or more of the following within the past 18 months:<br>    i. Hospitalization.<br>    ii. Incarceration.<br>    iii. Homelessness, or use of other crisis services (i.e., CSU, ER, etc.). |
| Continuing Stay Criteria | 1. Individual continues to have a documented need for an ICM intervention at least four (4) times monthly.<br>**AND**<br>2. Individual continues to demonstrate significant functional impairment as demonstrated by the need for assistance in **2 or more** of the following areas which, despite support from a caregiver or behavioral health staff continues to be an area that the individual cannot complete. Needs significant assistance to:<br>  a. Access, navigate and/or manage multiple necessary community services.<br>  b. Maintain personal hygiene.<br>  c. Meet nutritional needs.<br>  d. Care for personal business affairs. |

## Intensive Case Management

e. Obtain or maintain medical, legal, and housing services.
f. Recognize and avoid common dangers or hazards to self and possessions.
g. Perform daily living tasks except with significant support or assistance from others such as friends, family, or other relatives.
h. Obtain or maintain employment at a self-sustaining level or inability to consistently carry out homemaker roles (e.g. household meal preparation, washing clothes, budgeting, or childcare tasks and responsibilities).
i. Maintain a safe living situation (e.g., evicted from housing, or recent loss of housing, or imminent risk of loss of housing).
j. Keep appointments with needed services including mental health appointments.
k. Take medications as prescribed.
l. Budgeting money (including prioritizing expenses) to ensure necessary living expenses are maintained.

**AND**

3. **One of the following:**

a. Continued difficulty participating in traditional clinic-based services or a community setting at a less intensive level of service/supports;
b. Substandard housing, homeless, or at imminent risk of becoming homeless due to functional impairments associated with behavioral health issues;
c. Living arrangement through a Georgia Housing Voucher and needs ongoing support to maintain stable housing; and
d. Experienced recent life changing event (Examples include death of significant other or close family member, change in marital status, Involvement with criminal justice system, serious illness or injury of self or close family member, financial issues including loss of job, disability check, etc.) and needs intensive support to prevent the utilization of crisis level services.

| Discharge Criteria | 1. There has been a planned reduction of units of service delivered and related evidence of the individual sustaining functioning through that reduction plan; and |
|---|---|
| | 2. Individual has established recovery support networks to assist in maintenance of recovery (such as peer supports, AA, NA, etc.); and |
| | 3. Individual has demonstrated some ownership and engagement with her/his own illness self-management as evidenced by: |
| | a. Navigating and self-managing necessary services; |
| | b. Maintaining personal hygiene; |
| | c. Meeting his/her own nutritional needs; |
| | d. Caring for personal business affairs; |
| | e. Obtaining or maintaining medical, legal, and housing services; |
| | f. Recognizing and avoiding common dangers or hazards to self and possessions; |
| | g. Performing daily living tasks; |
| | h. Obtaining or maintaining employment at a self-sustaining level or consistently performing homemaker roles (e.g., household meal preparation, washing clothes, budgeting, or childcare tasks and responsibilities); and |
| | i. Maintaining a safe living situation. |

| Service Exclusions | 1. This service may not duplicate any discharge planning efforts which are part of the expectation for hospitals, ICF/IDD, Institutions for Mental Disease (IMDs), and Psychiatric Residential Treatment Facilities (PRTFs) for youth transition population. |
|---|---|
| | 2. This service is not available to any individual who receives a waiver service via the Department of Community Health. Payment for ICM Services under the plan shall not duplicate payments made to public agencies or private entities under other program authorities for this same purpose. |
| | 3. Individuals with a substance-related disorder are excluded from receiving this service unless there is clearly documented evidence of a co-occurring psychiatric diagnosis. |
| | 4. For individuals receiving this service, "Service Plan Development" utilization should be limited and supplanted with this service. |
| | 5. ACT, CST, and CM are Service Exclusions. Individuals may receive ICM and one of these services for a limited period of time to facilitate a smooth transition. |

## Intensive Case Management

| | |
|---|---|
| Clinical Exclusions | Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition co-occurring with the diagnosis of:<br>1. Intellectual/Developmental Disabilities; and/or<br>2. Autism; and/or<br>3. Neurocognitive Disorder; and/or<br>4. Traumatic Brain Injury. |
| Required Components | 1. The ICM service can only be provided by a Tier I or Tier II DBHDD contracted provider.<br>2. Each provider must have policies and procedures related to referral including providing outreach to agencies who may serve the targeted population, including but not limited to psychiatric inpatient hospitals, Crisis Stabilization Units, jails, prisons, homeless shelters, etc.<br>3. Demonstrate and maintain a time frame from receipt of referral to engagement in services with an individual of no more than 5 days.<br>4. The organization must have policies and procedures for protecting the safety of staff that engage in these community-based service delivery activities.<br>5. Individuals will be provided assistance with gaining skills and resources necessary to obtain housing of the individual's choice, including completion of the housing need and choice survey (https://dbhddapps.dbhdd.ga.gov/NSH/) upon admission and with the development of a housing goal, which will be minimally updated at each reauthorization.<br>6. Maintain face-to-face contact with individuals receiving Intensive Case Management services, providing a supportive and practical environment that promotes recovery and maintain adherence to the desired performance outcomes that have been established for individuals receiving ICM services. It is expected that frequency of face-to-face contact is increased when clinically indicated in order to achieve the performance outcomes, and the intensity of service is reflected in the individual's IRP.<br>7. A minimum of 4 face-to-face visits must be delivered on a monthly basis to each consumer. Additional contacts may be either face-to-face or telephone collateral contact depending on the individual's support needs, 60% of total units must be face-to-face contacts with the individual.<br>8. At least 50% of all face-to-face service units must be delivered in non-clinic/community-based settings (i.e., any place that is convenient for the individual such as a FQHC, place of employment, community space) over the authorization period (these units are specific to single individual records and are not aggregate across an agency/program or multiple payers).<br>9. In the absence of monthly face-to-face contacts and if at least two unsuccessful attempts to make face-to-face contact have been tried and documented, the provider may bill for a maximum of 2 telephone contacts in that specified month (denoted by the UK modifier). This may occur for no more than 60 consecutive days.<br>10. After 8 unsuccessful attempts at making face to face contact with an individual, the ICM and members of the treatment/support team will re-evaluate the standing IRP and utilization of services.<br>11. ICM is expected to retain a high percentage of enrolled individuals in services with few dropouts. In the event that an ICM has documented multiple attempts to locate and make contact with an individual and has demonstrated diligent search, after 60 days of unsuccessful attempts the individual may be discharged due to drop out.<br>12. Individuals for whom there is a written transition/discharge plan may receive a tapered benefit based upon individualized need as documented in that plan.<br>13. Team meetings must be held a minimum of once a week and time dedicated to discussion of support and service to individuals must be documented in the Treatment Team Meetings Log. Each individual must be discussed, even if briefly, at least one time monthly. ICM staff members are expected to attend Treatment Team Meetings. |
| Staffing Requirements | 1. The following practitioners may provide ICM services:<br>   a.   Practitioner Level 1: Physician/Psychiatrist (reimbursed at Level 4 rate).<br>   b.   Practitioner Level 2: Psychologist, APRN, PA (reimbursed at Level 4 rate).<br>   c.   Practitioner Level 3: LCSW, LPC, LMFT, RN, or when an individual served is diagnosed with a co-occurring mental illness and substance use disorder: MAC, CAADC, GCADC-II or -III, or CAC-II (reimbursed at Level 4 rate). |

## Intensive Case Management

   d. Practitioner Level 4: LMSW; LAPC; LAMFT; Psychologist/LCSW/LPC/LMFT's supervisee/trainee with at least a Bachelor's degree in one of the helping professions such as social work, community counseling, counseling, psychology, or criminology, functioning within the scope of the practice acts of the state; CPS, Paraprofessional, CPRP, or when an individual served is diagnosed with a co-occurring mental illness and substance use disorder: GCADC-I (with Bachelor's Degree), CAC-I (with Bachelor's Degree), or Certified Alcohol and Drug Counselor-Trainee/Counselor in Training (with Bachelor's Degree and under supervision).

   e. Practitioner Level 5: CPS, Paraprofessional, CPRP, or when an individual served is diagnosed with a co-occurring mental illness and substance use disorder: GCADC-I (without Bachelor's Degree), CAC-I (without Bachelor's Degree), or Certified Alcohol and Drug Counselor-Trainee/Counselor in Training (without Bachelor's Degree and under supervision of one of the licensed/credentialed professionals above).

2. Each ICM provider shall have a minimum of 11 staff members which must include 1 full-time licensed supervisor and 10 full-time case managers. When provided by one of the practitioners cited below, must be under the documented supervision (organizational charts, supervisory notation, etc.) of one of the independently licensed/credentialed professionals above:
   a. Certified Peer Specialists
   b. Paraprofessional staff
   c. Certified Psychiatric Rehabilitation Professional
   d. Certified Addiction Counselor-I or GCADC-I
   e. Certified Alcohol and Drug Counselor-Trainee

3. Oversight of an intensive case manager is provided by an independently licensed practitioner.

4. Staff to consumer ratio for ICM services shall be a maximum caseload of 1:20 quarterly in rural areas and 1:30 in urban areas. Minimum caseloads in rural areas are 1:15 and 1:25 in urban areas. These ratios reflect a maximum team capacity of 200 in rural areas and 300 in urban areas. Urban counties are delineated in the annual **Georgia County Guide with the term "Metropolitan County"**.

**Clinical Operations**

1. ICM may include (with the consent of the Adult) coordination with family and significant others and with other systems/supports (e.g., work, religious entities, corrections, aging agencies, etc.) when appropriate for treatment and recovery needs.

2. ICM providers must have the ability to deliver services in various environments, such as homes, homeless shelters, or street locations. The provider should keep in mind that individuals may prefer to meet staff at a community location other than their homes or other conspicuous locations (e.g. their place of employment), especially if staff drive a vehicle that is clearly marked as a state or agency vehicle, or if staff must identify themselves and their purpose to gain access to the individual in a way that may potentially embarrass the individual or breech the individual's privacy/confidentiality. Staff should be sensitive to and respectful of individuals' privacy/confidentiality rights and preferences in this regard to the greatest extent possible (e.g., if staff must meet with an individual during their work time, if the individual wishes, mutually agree upon a meeting place nearby that is the least conspicuous from the individual's point of view).

3. ICM must incorporate assertive engagement techniques to identify, locate, engage, and retain the most difficult to engage enrolled individuals who cycle in and out of intensive services. ICM must demonstrate the implementation of well thought out engagement strategies to minimize discharges due to drop out including the use of street and shelter outreach approaches and collateral contacts with family, friends, probation or parole officers.

4. ICM is expected to actively and assertively participate in transition planning via in person or, when in person participation is impractical, via teleconference meetings between stakeholders. The team is expected to coordinate care through a demonstrable plan for timely follow up on referrals to and from their service, making sure individuals are connected to resources to meet their needs in alignment with their preferences. The team is responsible for ensuring the individual has access to services and resources such as housing, pharmacy, benefits, a support network, etc. when being discharged from a psychiatric hospital; released from jail; or experiencing an episode of homelessness. An ICM provider who is a Tier 1 or Tier 2+ Provider may use Community Transition Planning to establish a connection or reconnection to the individual and participate in discharge planning meetings while the individual is in a state operated or community psychiatric hospital, crisis stabilization unit, jail/prison.

5. The organization must have policies that govern the provision of services in natural settings and can document that the organization respects individuals' rights to privacy and confidentiality when services are provided in these settings.

6. The organization has established procedures/protocols for handling emergency and crisis situations:

## Intensive Case Management

a. The organization jointly develops the crisis plan in partnership with the individual. The organization is engaged with the individual to ensure that the plan is complete, current, adequate, and communicated to all appropriate parties.

b. There is evaluation of the adequacy of the individual's crisis plan and its implementation at periodic intervals including post-crisis events.

  i. While respecting the individual's crisis plan and identified points of first response, the policies should articulate the role of the Tier 1 or Tier 2 provider agency to be the primary responsible provider for providing crisis supports and intervention as clinically necessary.

  ii. Describe methods for supporting individuals as they transition to and from psychiatric hospitalization/crisis stabilization.

7. The organization must have an ICM Organizational Plan that addresses the following:

a. Description of the role of ICM during a crisis in partnership with the individual, and Tier 1 or Tier 2 provider or other clinical home service provider where the individual receives ongoing physician assessment and treatment as well as other recovery supporting services.

b. Description of the staffing pattern and how staff are deployed to assure that the required staff-to-individual ratios are maintained, including how unplanned staff absences, illnesses, or emergencies are accommodated, case mix, access, etc.

c. Description of the hours of operations as related to access and availability to the individuals served;

d. Description of how the IRP plan constructed, modified and/or adjusted to meet the needs of the individual and to facilitate broad natural and formal support participation; and

e. Description of how ICM agencies engage with other agencies who may serve the target population.

| Service Accessibility | 1. There must be documented evidence that service hours of operation include evening, weekend, and holiday hours.<br>2. To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:<br>  • the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or<br>  • the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.<br><br>Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. |
| --- | --- |
| Billing & Reporting Requirements | 1. When a billable collateral contact is provided, the UK reporting modifier shall be utilized. A collateral contact is classified as any contact that is not face-to-face with the individual.<br>2. When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |

## Medication Assisted Treatment

| Transaction Code | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
| --- | --- | --- | --- | --- | --- | --- |
| Code Detail | See TOC Grid in Part I of this Manual for Services Billing detail. | | | | | |
| Service Definition | Medication Assisted Treatment (MAT) provides specific interventions for reducing and/or eliminating the use of illicit opioids and other drugs of abuse; while developing the individuals social support network and necessary lifestyle changes; psychoeducational skills; pre-vocational skills leading to work activity by reducing substance use as a barrier to employment; social and interpersonal skills; improved family functioning; the understanding of substance use disorders; and the continued commitment to a recovery and maintenance program. MAT is a multi-faceted approach treatment service for adults who require structure and support to achieve and maintain recovery from Opioid Use Disorder. The following elements of this service model include: | | | | | |

## Medication Assisted Treatment

|  |  |
|---|---|
|  | 1. Physician Assessment;<br>2. Nursing Assessment;<br>3. Medication Administration;<br>4. Opioid Maintenance;<br>5. Diagnostic Assessment;<br>6. Individual Counseling;<br>7. Group Outpatient Services (including psycho-educational groups focusing on relapse prevention and recovery);<br>8. Family Outpatient Services;<br>9. Addictive Disease Support Services; and<br>10. Behavioral Health Assessment & Service Planning Development.<br><br>Additionally, the following services maybe provided:<br>1. Crisis Intervention;<br>2. Peer Support. |
| Admission Criteria | 1. Individual has a DSM V diagnosis of Opioid Use Disorder; and<br>2. Individual presents symptoms that are likely to respond to pharmacological interventions; and<br>3. Individual has no incapacitating physical or psychiatric complications that would preclude participation in medication assisted treatment services; and<br>4. Individual is assessed as likely to enter into continued treatment as evidenced by;<br>  a. Individual clearly understands and is able to follow instructions for care; and<br>  b. Individual has adequate understanding of and expressed interest to enter into medication assisted treatment services. |
| Continuing Stay Criteria | Individual continues to meet the criteria for admission. |
| Discharge Criteria | An adequate continuing care or discharge plan is established and linkages are in place; and one or more of the following:<br>1. Goals of the individualized recovery plan have been met; and<br>2. The individual consistently fails to adhere to the program rules and guidelines; or<br>3. Individual requests discharge and the individual is not in imminent danger of harm to self or others; or<br>4. Transfer to another service/level of care is warranted by change in individual's condition. |
| Service Exclusions | 1. Infectious Diseases screenings such as (HIV, TB) are not billed as service interventions which are covered by this service definition. The provision of these screenings is a federally mandated function of the program, but do not qualify as a specific billable service intervention to the DBHDD.<br>2. Take-home medication is not billed as a type of service intervention which is covered by this service definition. The provision of take-home medications is a federally mandated function of the program but does not qualify as a specific billable service intervention to the DBHDD.<br>3. Required lab work and testing for this service are not billable to this service code. |
| Required Components | 1. This service must be licensed by DCH/HFR under the Rules and Regulations for Narcotic Treatment Programs, 111-8-53, and certified with SAMHSA pursuant to 42 CFR Part qualifications.<br>2. The program provides structured treatment and therapeutic services, utilizing activity schedules as part of its operational method, i.e., plans or schedules of days or times of day for certain activities.<br>3. The program must be in operation at least 5 hours per day Monday - Friday and a minimum of 3 hours per day on Saturdays.<br>4. The program utilizes methods, materials, approaches, activities, settings, and outside resources appropriate for and targeted to individuals with co-occurring disorders of mental illness and substance use and targeted to individuals with substance use, co-occurring disorders and developmental disabilities when such individuals are referred to the program.<br>5. The program conducts random drug screening and uses the results of these tests for marking participant's progress toward goals and for service planning. |

## Medication Assisted Treatment

| | |
|---|---|
| | 6. This service must operate at an established site approved by DBHDD, DEA, SAMHSA, and DCH/HFR. |
| | 7. All providers of this service must be in compliance with DCH, DEA, SAMHSA and Georgia Board of Pharmacy rules and guidelines. |
| | 8. The program is required to register each individual in the DBHDD Central Registry and comply fully with all Central Registry requirements. |
| | 9. The program physician shall ensure that each individual voluntarily chooses MAT and that all relevant facts concerning the use of the opioid drug are clearly and adequately explained to the individual, and that each individual provides informed written consent to treatment. |
| | 10. A full medical examination and other tests must be completed by the program within 14 days of admission. |
| **Staffing Requirements** | 1. The program must be under the clinical direction of one of the following independently licensed/certified practitioners: (MAC, CAADC, CAC-II, GCADC-II or -III, LPC, LCSW, LMFT, or CAS with bachelor's degree). |
| | 2. There must be at least one independently licensed/certified practitioner, (CAC-II, CAC-I, GCADC-II or -III, GCADC-I, CAS, MAC, CAADC, LPC, LCSW, or LMFT) on-site at all times the service is in operation, regardless of the number of individuals participating. |
| | 3. Services must be provided by staff who are: |
| |    a.  Level 1: Physicians; |
| |    b.  Level 2: Psychologist, APRN, or PA; [note: Any use of physician extenders does not replace the requirement for physician coverage]; |
| |    c.  Level 3: LPC, LCSW, LMFT, MAC, CAADC, GCADC-II or -III, or CAC-II; |
| |    d.  Level 4: APC, LMSW, GCADC-I (with bachelor's degree), CAC-I (with bachelor's degree), CAS, Certified Alcohol and Drug Counselor-Trainee (with Bachelor's Degree and supervision); |
| |    e.  Level 5: GCADC-I (without Bachelor's Degree), CAC-I (without Bachelor's Degree) under the supervision of one of the following independently licensed/certified practitioners: MAC, CAADC, GCADC-II or -III, CAC-II, LPC, LCSW, or LMFT; |
| | 4. The maximum face-to-face ratio cannot be more than 50 individuals to 1 direct full-time level 3 or 4 direct service care provider. |
| | 5. A physician must be employed by the program and must be available all times a program is open. |
| | 6. When the physician is not present on site, he/she must be available on call for consultation and/or emergency orders. |
| | 7. Programs shall ensure that appropriate nursing care is provided at all times the program is in operation. |
| **Clinical Operations** | 1. It is expected that the transition planning for less intensive service will begin at the onset of these services. Documentation must demonstrate this planning. |
| | 2. An individual may have variable length of stay. The frequency and duration of service shall be determined as a result of the individual's clinical assessments. Ongoing clinical assessment should be conducted to determine changes in the Individual Recovery Plan. |
| | 3. Each individual should participate in setting individualized goals for themselves and in assessing their own skills and resources related to sobriety, use/abuse, and maintaining recovery. Goals are set by exploring strengths and needs in the individual's living, learning, social, and working environments. Implementation of services may take place individually or in groups. |
| | 4. Each individual must be provided assistance in the development/acquisition of needed skills and resources necessary to achieve sobriety and/or reduction in abuse and maintenance of recovery. |
| | 5. The Medication Assisted Treatment program must offer a range of skill-building and recovery activities within the program, as evidenced by weekly schedule and individual progress notes. |
| | 6. The following services must be included in the MAT program. The activities include but are not limited to: |
| |    a.  **Group Outpatient Services:** |
| |       i.  Psycho-educational activities focusing on the disease of addiction, the health consequences of substance use disorders, and recovery; |
| |       ii.  Therapeutic group treatment and counseling; |
| |       iii.  Leisure and social skill-building activities without the use of substances; |
| |       iv.  Linkage to natural supports and self-help opportunities; |
| |    b.  **Individual Outpatient Services:** Individualized counseling and treatment |
| |    c.  **Family Outpatient Services:** Family education and engagement; |
| |    d.  **AD Support Services:** |

# Medication Assisted Treatment

    i.   Pre-vocational readiness and support;

    ii.   Service coordination and engagement unless provided through another service provider; and

    iii.   Linkage to health care.

e.   **Behavioral Health Assessment & Service Plan Development:**

    i.   Assessment and reassessment;

    ii.   Individualized recovery planning; and

    iii.   Service plan development.

f.   **Medication Administration & Opioid Maintenance:**

    i.   There must be a written service order for Medication Administration and a written order for the medication and the administration of the medication that complies with guidelines set forth herein Part II, Section 1, Subsection 6 - Medication.

    ii.   Documentation must support the medical necessity of administration by licensed/credentialed medical personnel rather than by the individual, family or caregiver;

    iii.   Documentation must support that the individual is being trained in the principle of self-administration of medication or that the individual is physically or mentally unable to self-administer. This documentation will be subject to scrutiny by the Administrative Service Organization in reauthorizing services in this category.

g.   **Physician Assessment:**

    i.   Complete and fully document physical exam;

    ii.   Physician assessment and care;

    iii.   Health screening.

h.   **Nursing Assessment:**

This service requires face-to-face contact with the individual to monitor, evaluate, assess, and/or carry out a physician's orders regarding the physical and/or psychological problems of the individual. It includes:

    i.   Providing nursing assessments and interventions to observe, monitor and care for the physical, nutritional, behavioral health and related psychosocial issues, problems or crises manifested in the course of an individual's treatment;

    ii.   Assessing and monitoring individual's response to medication(s) to determine the need to continue medication and/or to determine the need to refer the individual for a medication review;

    iii.   Assessing and monitoring an individual's medical and other health issues that are either directly related to the mental health or substance related disorder, or to the treatment of the disorder (e.g. diabetes, cardiac and/or blood pressure issues, substance withdrawal symptoms, weight gain and fluid retention, seizures, etc.);

    iv.   Consulting with the individual and individual-identified family and significant other(s) about medical, nutritional and other health issues related to the individual's mental health or substance related issues;

    v.   Educating the individual and any identified family about potential medication side effects (especially those which may adversely affect health such as weight gain or loss, blood pressure changes, cardiac abnormalities, development of diabetes or seizures, etc.);

    vi.   Consulting with the individual and the individual-identified family and significant other(s) about the various aspects of informed consent (when prescribing occurs); and

    vii.   Training for self-administration of medication.

7.   In addition to the above required activities within the program, the following must be offered as needed either within the program or through referral to/or affiliation with another agency or practitioner, and may be billed in addition to the billing for MAT:

    a.   AD Support Services– for housing, legal and other issues.

    b.   Individual counseling in exceptional circumstances for traumatic stress and other mental illnesses for which special skills or licenses are required.

8.   The program must have a Medication Assisted Treatment Services Organizational Plan addressing the following:

# Medication Assisted Treatment

a. The philosophical model of the program and the expected outcomes for program participants (i.e., harm reduction, abstinence, beginning of or maintaining individually defined recovery, employment readiness, relapse prevention, stabilization and treatment of those with co-occurring disorders);

b. The schedule of activities and hours of operations;

c. Staffing patterns for the program;

d. The MAT Organizational Plan must address how the activities listed above will be offered and/or made available to those individuals who need them, including how that need will be determined;

e. How assessments will be conducted;

f. How staff will be trained in the administration of substance use disorder services and technologies;

g. How services for individuals with co-occurring disorders will be flexible and will include services and activities addressing both mental health and substance abuse issues of varying intensities and dosages based on, presenting the symptoms, problems, functioning, and capabilities of such individuals;

h. How individuals with co-occurring disorders who cannot be served in the regular program activities will be provided and/or referred for time-limited special integrated services that are co-occurring enhanced;

i. How services will be coordinated with the substance abuse array of services including assuring or arranging for appropriate referrals and transitions;

j. How the requirements in these service guidelines will be met;

k. How services for individuals with HIV will be conducted to ensure the privacy of individuals.

**Service Access**

The program must be in operation at least 5 hours per day Monday– Friday and a minimum of 3 hours per day on Saturdays.

**Additional Medicaid Requirements**

1. Medication Assisted Treatment services are unbundled and billed incrementally per service. As mentioned above MAT allows providers to select all services that will be offered in a MAT setting. Billable services and daily limits within the MAT Package are as follows:

| Service | Initial Authorization Units (90 Days) | Concurrent Authorization Units (365 Days) | Daily Maximum Billable Units |
| --- | --- | --- | --- |
| Behavioral Health Assessment & Service Planning Development | 24 | 150 | 12 |
| Individual Outpatient Services | 12 | 96 | 1 |
| AD Support Services | 100 | 96 | 4 |
| Group Outpatient Services | 180 | 730 | 4 |
| Medication Administration | 80 | 150 | 1 |
| Opioid Maintenance | 80 | 150 | 1 |
| Psychiatric Treatment – (E&M) | 6 | 6 | 1 |
| Nursing Services | 24 | 96 | 4 |
| Diagnostic Assessment | 2 | 4 | 2 |
| Family Outpatient Services | 48 | 48 | 4 |
| Crisis Intervention | 20 | 96 | 16 |
| Peer Support | 48 | 48 | 4 |
| Interactive Complexity (as a modifier to Psychiatric Treatment, Diagnostic Assessment, Individual Counseling, and Group Counseling) | 24 | 96 | 4 |

**Reporting and Billing Requirements**

1. The maximum number of units that can be billed differs depending on the individual service. Please refer to the table below or in the Mental Health and Addictive Disease Orientation to Authorization Packages Section of this manual.

## Medication Assisted Treatment

| | |
|---|---|
| | 2. Approved providers of this service may submit claims/encounters for the unbundled services listed in the package, up to the daily maximum amount for each service. Program expectations are that this model follows the content of this Service Guideline as well as the clearly defined service group elements. |
| | 3. All applicable ASO, Adult Needs and Strength Assessment (ANSA), and DBHDD reporting requirements must be met. |
| | 4. The Opioid Maintenance code is used when there is the administration of methadone. Other federally approved MAT medications that are administered as part of the ordered IRP can be billed under the Medication Administration code (e.g. suboxone). |
| Documentation Requirements | 1. Every admission and assessment must be documented. |
| | 2. The complete and fully documented physical exam must be in the medical record; and |
| | 3. Progress notes must include written daily documentation of important occurrences; level of functioning; acquisition of skills necessary for recovery; progress on goals identified in the IRP including acknowledgement of a substance use disorder, progress toward recovery and use/abuse reduction and/or abstinence; use of drug screening results by staff; and evaluation of service effectiveness. |
| | 4. Daily attendance of each individual participating in the program must be documented showing the number of hours in attendance for billing purposes. |
| | 5. This service may be offered in conjunction with ACT or CSU for a limited time to manage a short-term crisis or to plan for an appropriate clinical continuity plan. |
| | 6. When this service is used in conjunction with ACT or Crisis Residential services, documentation must demonstrate careful planning to maximize the effectiveness of this service as well as an appropriate reduction in service amounts of the service to be discontinued. Utilization of MAT services in conjunction with these services is subject to review by the Administrative Services Organization. |
| | 7. Individuals approved for this service must have a separate CID for DBHDD community services, which is a different ID number than that which is used by the DBHDD Central Registry. |

## MH Peer Support Program

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Peer Support Services | Practitioner Level 4, In-Clinic | H0038 | HQ | U4 | U6 | | $17.72 | Practitioner Level 4, Out-of-Clinic | H0038 | HQ | U4 | U7 | | $21.64 |
| | Practitioner Level 5, In-Clinic | H0038 | HQ | U5 | U6 | | $13.20 | Practitioner Level 5, Out-of-Clinic | H0038 | HQ | U5 | U7 | | $16.12 |
| Unit Value | 1 hour | | | | | | | Utilization Criteria | TBD | | | | | |

| | |
|---|---|
| Service Definition | This service provides structured activities within a peer support center that promote socialization, recovery, wellness, self-advocacy, development of natural supports, and maintenance of community living skills. Activities are provided between and among individuals who have common issues and needs, are consumer motivated, initiated and/or managed, and assist individuals in living as independently as possible. Activities must promote self-directed recovery by exploring individual purpose beyond the identified mental illness, by exploring possibilities of recovery, by tapping into individual strengths related to illness self-management (including developing skills and resources and using tools related to communicating recovery strengths, communicating health needs/concerns, self-monitoring progress), by emphasizing hope and wellness, by helping individuals develop and work toward achievement of specific personal recovery goals (which may include attaining meaningful employment if desired by the individual), and by assisting individuals with relapse prevention planning. A Consumer Peer Support Center may be a stand-alone center or housed as a "program" within a larger agency and must maintain adequate staffing support to enable a safe, structured recovery environment in which individuals can meet and provide mutual support. |
| Admission Criteria | 1. Individual must have a mental health issue which is the focus of the support; **and one or more of the following:** |
| | 2. Individual requires and will benefit from support of peer professionals for the acquisition of skills needed to manage symptoms and utilize community resources; **or** |
| | 3. Individual may need assistance to develop self-advocacy skills to achieve decreased dependency on the mental health system; **or** |
| | 4. Individual may need assistance and support to prepare for a successful work experience; **or** |
| | 5. Individual may need peer modeling to take increased responsibilities for his/her own recovery; **or** |
| | 6. Individual needs peer supports to develop or maintain daily living skills. |

## MH Peer Support Program

| | |
|---|---|
| **Continuing Stay Criteria** | 1. Individual continues to meet admission criteria; **and**<br>2. Progress notes document progress relative to goals identified in the Individualized Recovery/Resiliency Plan, but treatment/recovery goals have not yet been achieved. |
| **Discharge Criteria** | 1. An adequate continuing care plan has been established; **and one or more of the following:**<br>   a. Goals of the Individualized Recovery Plan have been substantially met; **or**<br>   b. Individual/family requests discharge; **or**<br>   c. Transfer to another service/level is more clinically appropriate. |
| **Service Exclusions** | 1. Crisis Stabilization Unit (however, those utilizing transitional beds within a Crisis Stabilization Unit may access this service).<br>2. When whole health and wellness topics are provided within a MH Peer Support program model, this PSWHW code is not utilized as a billable intervention. In this case, the whole health and wellness content is a subcomponent of the MH Peer Support program model. |
| **Clinical Exclusions** | 1. Individuals diagnosed with a substance use disorder and no other concurrent mental illness; **or**<br>2. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition co-occurring with one of the following diagnoses: Developmental Disability, Autism, Neurocognitive Disorder, or Traumatic Brain Injury. |
| **Required Components** | 1. A Peer Supports service may operate as a program within:<br>   a. A freestanding Peer Support Center.<br>   b. A Peer Support Center that is within a clinical service provider.<br>   c. A larger clinical or community human service provider administratively, but with complete programmatic autonomy.<br>2. A Peer Supports service must be operated for no less than 3 days a week, no less than 12 hours a week, no less than 4 hours per day, typically during day, evening and weekend hours. Any agency may offer additional hours on additional days in addition to these minimum requirements.<br>3. The governing board of a freestanding Peer Center must be composed of 75% consumers and represent the cultural diversity of the population of the community being served. The board is encouraged to have either board members or operating relationships with someone with legal and accounting expertise. For programs that are part of a larger organizational structure that is not consumer led and operated, the Peer Supports Program must have an advisory body with the same composition as a freestanding Peer Center's board. The board or advisory committee must have the ability to develop programmatic descriptions and guidelines (consistent with state and federal regulations, accreditation requirements, and sponsoring agency operating policies), review and comment on the Peer Support Program's budgets, review activity offerings, and participate in dispute resolution activities for the program.<br>4. Individuals participating in the service at any given time must have the opportunity to participate in and make decisions about the activities that are conducted or services offered within the Peer Supports program, and about the schedule of those activities and services, as well as other operational issues.<br>5. Regardless of organizational structure, the service must be directed and led by consumers themselves.<br>6. Peer Supports may include meals or other social activities for purpose of building peer relationships, but meals cannot be the central service activity offered (as this is not a medically covered service). The focus of the service must be skill maintenance and enhancement and building individual's capacity to advocate for themselves and other consumers.<br>7. Peer Supports cannot operate in isolation from the rest of the programs within the facility or affiliated organization. The Program Leader must be able to call multidisciplinary team meetings regarding a participating individual's needs and desires, and a Certified Peer Specialist providing services for and with a participating individual must be allowed to participate in multidisciplinary team meetings. |
| **Staffing Requirements** | 1. The individual leading and managing the day-to-day operations of the program, the Program Leader, must be a Georgia-certified Peer Specialist, who is a CPRP or can demonstrate activity toward attainment of the CPRP credential.<br>2. The work of the CPS Program leader is under supervision of a Physician, Psychologist, LCSW, LPC, LMFT, RN, APRN, PA, LMSW, APC, or AMFT.<br>3. The Program Leader must be employed by the sponsoring agency at least 0.5 FTE.<br>4. The Program Leader and Georgia-certified Peer Specialists in the Peer Supports program may be shared with other programs as long as the Program Leader is present at least 75% of the hours the Peer Supports program is in operation, and as long as the Program Leader and the Georgia-certified Peer Specialists are |

## MH Peer Support Program

available as required for supervision and clinical operations, and as long as they are not counted in individual to staff ratios for 2 different programs operating at the same time.

5. Services must be provided and/or activities led by staff who are Georgia-certified Peer Specialists or other consumer paraprofessionals under the supervision of a Georgia-certified Peer Specialist. A specific activity may be led by someone who is not a consumer but is a guest invited by peer leadership.

6. There must be at least 2 Georgia-certified Peer Specialists on staff either in the Peer Supports Program or in a combination of Peer Supports and other programs and services operating within the agency.

7. The maximum face-to-face ratio cannot be more than 30 individuals to 1 Certified Peer Specialist based on average daily attendance in the past three (3) months of individuals in the program.

8. The maximum face-to-face ratio cannot be more than 15 individuals to 1 direct service/program staff, based on the average daily attendance in the past three (3) months of individuals in the program.

9. All staff must have an understanding of recovery and psychosocial rehabilitation principles as defined by the Georgia Consumer Council and psychosocial rehabilitation principles published by USPRA and must possess the skills and ability to assist other individuals in their own recovery processes.

**Clinical Operations**

1. This service must operate at an established site approved to bill Medicaid for services. However, individual or group activities may take place offsite in natural community settings as appropriate for the Individualized Recovery Plan (IRP) developed by each individual with assistance from the Program Staff.

2. Individuals receiving this service must have a qualifying diagnosis present in the medical record prior to the initiation of services. The diagnosis must be given by persons identified in O.C.G.A Practice Acts as qualified to provide a diagnosis.

3. This service may operate in the same building as other day services; however, there must be a distinct separation between services in staffing, program description, and physical space during the hours the Peer Supports program is in operation except as noted above.

4. Adequate space, equipment, furnishings, supplies, and other resources must be provided in order to effectively provide services and so that the program environment is clean and in good repair. Space, equipment, furnishings, supplies, transportation, and other resources for individual use within the Peer Supports program must not be substantially different from space provided for other uses for similar numbers of individuals.

5. Staff of the Peer Supports Program must be treated as equal to any other staff of the facility or organization and must be provided equivalent opportunities for training (both mandated and offered) and pay and benefits competitive and comparable to other staff based on experience and skill level.

6. When this service is used in conjunction with Psychosocial Rehabilitation and ACT, documentation must demonstrate careful planning to maximize the effectiveness of this service as well as appropriate reduction in service amounts. Utilization of this service in conjunction with these services is subject to review by the Administrative Services Organization.

7. Individuals should set their own individualized goals and assess their own skills and resources related to goal attainment.  Goals are set by exploring strengths and needs in the individual's living, learning, social, and working environments. Goal attainment should be supported through a myriad of approaches (e.g. coaching approaches, assistance via technology, etc.).

8. Implementation of services may take place individually or in groups.

9. Each individual must be provided the opportunity for peer assistance in the development and acquisition of needed skills and resources necessary to achieve stated goals.

10. A Peer Supports Program must offer a range of skill-building and recovery activities developed and led by consumers. These activities must include those that will most effectively support achievement of the individual's rehabilitation and recovery goals.

11. The program must have a Peer Supports Organizational Plan addressing the following:

    a. A service philosophy reflecting recovery principles as articulated by the Georgia Consumer Council, August 1, 2001. This philosophy must be actively incorporated into all services and activities and:

        i.   View each individual as the director of his/her rehabilitation and recovery process.
        ii.  Promote the value of self-help, peer support, and personal empowerment to foster recovery.
        iii. Promote information about mental illness and coping skills.
        iv.  Promote peer-to-peer training of individual skills, social skills, community resources, and group and individual advocacy.

## MH Peer Support Program

v. Promote the concepts of employment and education to foster self-determination and career advancement.

vi. Support each individual to "get a life" using community resources to replace the resources of the mental health system no longer needed.

vii. Support each individual to fully integrate into accepting communities in the least intrusive environment that promote housing of his/her choice.

viii. Actively seek ongoing consumer input into program and service content so as to meet each individual's needs and goals and foster the recovery process.

b. A description of the particular consumer empowerment models utilized, types of activities offered, and typical daily activities and schedule. If offered, meals must be described as an adjunctive peer relationship building activity rather than as a central activity.

c. A description of the staffing pattern, plans for staff who have or will have achieved Certified Peer Specialist and CPRP credentials, and how staff are deployed to assure that the required staff-to-individual ratios are maintained, including how unplanned staff absences, illnesses, and emergencies are accommodated.

d. A description of how consumer staff within the agency are given opportunities to meet with or otherwise receive support from other consumers (including Georgia-certified Peer Specialists) both within and outside the agency.

e. A description of how individuals are encouraged and supported to seek Georgia certification as a Peer Specialist through participation in training opportunities and peer or other counseling regarding anxiety following certification.

f. A description of test-taking skills and strategies, assistance with study skills, information about training and testing opportunities, opportunities to hear from and interact with consumers who are already certified, additional opportunities for consumer staff to participate in clinical team meetings at the request of an individual, and the procedure for the Program Leader to request a team meeting.

g. A description of the hours of operation, the staff assigned, and the types of services and activities provided for and by consumers as well as for families, parents, and/or guardians.

h. A description of the program's decision-making processes including how consumers direct decision-making about both individual and program-wide activities and about key policies and dispute resolution processes.

i. A description of how individuals participating in the service at any given time are given the opportunity to participate in and make decisions about the activities that are conducted or services offered within the Peer Supports program, about the schedule of those activities and services, and other operational issues.

j. A description of the space, furnishings, materials, supplies, transportation, and other resources available for individuals participating in the Peer Supports services.

k. A description of the governing body and/or advisory structures indicating how this body/structure meets requirements for consumer leadership and cultural diversity.

l. A description of how the plan for services and activities is modified or adjusted to meet the needs specified in each IRP.

m. A description of how individual requests for discharge and change in services or service intensity are handled.

12. Assistive tools, technologies, worksheets, etc. can be used by the Peer Support staff to work with the served individual to improve his/her communication about treatment, symptoms, improvements, etc. with treating behavioral health and medical practitioners.

### Documentation Requirements

1. Providers must document services in accordance with the specifications for documentation requirements specified in Part II, Section III of the Provider Manual.

2. The provider has several alternatives for documenting progress notes:

a. Weekly progress notes must document the individual's progress relative to functioning and skills related to the person-centered goals identified in his/her IRP. This progress note aligns the weekly Peer Support-Group activities reported against the stated interventions on the individualized recovery plan, and documents progress toward goals. This progress note may be written by any practitioner who provided services over the course of that week; or

b. If the agency's progress note protocol demands a detailed daily note which documents the progress above, this daily detail note can suffice to demonstrate functioning, skills, and progress related to goals and related to the content of the group intervention; or

c. If the agency's progress note protocol demands a detailed hourly note which documents the progress above, this daily detail note can suffice to demonstrate functioning, skills, and progress related to goals and related to the content of the group intervention.

## MH Peer Support Program

3. While billed in increments, the Peer Support service is a program model. Daily time in/time out is tracked for while the person is present in the program, but due to time/in out not being required for each intervention, the time in/out may not correlate with the units billed as the time in/out will include breaks taken during the course of the program. However, the units noted on the log should be consistent with the units billed and, if noted, on the weekly progress note. If the units documented are not consistent, the most conservative number of units will be utilized. Other approaches may result in a billing discrepancy.

4. Rounding is applied to the person's cumulative hours/day at the Peer program (excluding non-programmatic time). The provider shall follow the guidance in the rounding policy included in this Provider Manual, and, specific to this service, the person served must have participated in at least 50% of the hour in order to bill for one unit of this service. For instance, if an individual participates in the program from 9-1:15 excluding a 30-minute break for lunch, his/her participating hours are 3.75 hours. The rounding policy is applied to the .75 hour and the units billed for that day are 4 units. Practitioner type must still be addressed and so that 4 units must be adequately assigned to either a U4 or U5 practitioner type as reflected in the log for that day's activities.

5. A provider shall only record units in which the individual was actively engaged in services. Meals and breaks must not be included in the reporting of units of service delivered. Should an individual leave the program or receive other services during the range of documented time in/time out for Peer Support hours, the absence should be documented on the log.

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Practitioner Level 4, Out-of-Clinic | H0038 | U4 | U7 | | | $24.36 |
| Practitioner Level 5, Out-of-Clinic | H0038 | U5 | U7 | | | $18.15 |
| Practitioner Level 5, Via interactive audio and video telecommunication systems | H0038 | GT | U5 | | | $15.13 |
| Utilization Criteria | TBD | | | | | |

## MH Peer Support Services - Individual

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Peer Support Services | Practitioner Level 4, In-Clinic | H0038 | U4 | U6 | | | $20.30 |
| | Practitioner Level 5, In-Clinic | H0038 | U5 | U6 | | | $15.13 |
| | Practitioner Level 4, Via interactive audio and video telecommunication systems | H0038 | GT | U4 | | | $20.30 |
| Unit Value | 15 minutes | | | | | | |
| Service Definition | This service provides interventions which promote socialization, recovery, wellness, self-advocacy, development of natural supports, and maintenance of community living skills. Activities are provided between and among individuals who have common issues and needs, are individual motivated, initiated and/or managed, and assist individuals in living as independently as possible. Activities must promote self-directed recovery by exploring individual purpose beyond the identified mental illness, by exploring possibilities of recovery, by tapping into individual strengths related to illness self-management (including developing skills and resources and using tools related to communicating recovery strengths, communicating health needs/concerns, self-monitoring progress), by emphasizing hope and wellness, by helping individuals develop and work toward achievement of specific personal recovery goals (which may include attaining meaningful employment if desired by the individual), and by assisting individuals with relapse prevention planning. Peer Supports must be provided by a Certified Peer Specialist. | | | | | | |
| Admission Criteria | 1. Individual must have a mental health issue which is the focus of support; **and one or more of the following:**<br>2. Individual requires and will benefit from support of peer professionals for the acquisition of skills needed to manage symptoms and utilize community resources; **or**<br>3. Individual may need assistance to develop self-advocacy skills to achieve decreased dependency on the mental health system; **or**<br>4. Individual may need assistance and support to prepare for a successful work experience; **or**<br>5. Individual may need peer modeling to take increased responsibilities for his/her own recovery; **or**<br>6. Individual needs peer supports to develop or maintain daily living skills. | | | | | | |
| Continuing Stay Criteria | 1. Individual continues to meet admission criteria; **and**<br>2. Progress notes document progress relative to goals identified in the Individualized Recovery/Resiliency Plan, but treatment/recovery goals have not yet been achieved. | | | | | | |

## MH Peer Support Services - Individual

| | |
|---|---|
| **Discharge Criteria** | 1. An adequate continuing care plan has been established; **and one or more of the following:**<br>2. Goals of the Individualized Recovery Plan have been substantially met; **or**<br>3. Individual/family requests discharge; **or**<br>4. Transfer to another service/level is more clinically appropriate. |
| **Service Exclusions** | Crisis Stabilization Unit (however, those utilizing transitional beds within a Crisis Stabilization Unit may access this service). |
| **Clinical Exclusions** | 1. Individuals diagnosed with a Substance-Related Disorder and no other concurrent mental illness; **or**<br>2. Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition co-occurring with one of the following diagnoses: Developmental Disability, Autism, Neurocognitive Disorder, or Traumatic Brain Injury. |
| **Required Components** | 1. Peer Supports are provided in 1:1 CPS to person-served ratio.<br>2. Individuals participating in the service at any given time must have the opportunity to participate in and make decisions about the person-centered interactions offered by the Certified Peer Specialist(s).<br>3. Peer Supports cannot operate in isolation from the rest of the programs within the facility or affiliated organization. The CPS shall be empowered to convene multidisciplinary team meetings regarding a participating individual's needs and desires, and the Certified Peer Specialist must be allowed to participate as an equal practitioner partner with all staff in multidisciplinary team meetings. He/she also has the unique role as an advocate to the person-served, encouraging that person to steer goals and objectives in Individualized Recovery Planning. |
| **Staffing Requirements** | 1. The providing practitioner is a Georgia-Certified Peer Specialist (CPS).<br>2. The work of the CPS is under supervision of a Physician, Psychologist, LCSW, LPC, LMFT, RN, APRN, PA, LMSW, APC, or AMFT.<br>3. There must be at least 2 Georgia-certified Peer Specialists on staff within an agency either in the Peer Supports Group program or in a combination of Peer Supports-Group, Peer Support-Individual and other programs and services operating within the agency.<br>4. The maximum caseload ratio for CPS to persons-served cannot be more than 1:50.<br>5. All CPSs providing this support must be able to articulate an understanding of recovery as defined by SAMHSA and psychiatric rehabilitation principles published by USPRA and must demonstrate the skills and ability to assist other individuals in their own recovery processes. |
| **Clinical Operations** | 1. Individuals receiving this service must have a qualifying diagnosis present in the medical record prior to the initiation of services. The diagnosis must be given by persons identified in O.C.G.A Practice Acts as qualified to provide a diagnosis.<br>2. If a CPS serves as staff for a Peer Support Program and provides Peer Support-Individual, the agency has written work plans which establish the CPS's time allocation in a manner that is distinctly attributed to each program.<br>3. CPSs providing this service must be treated as equal to any other staff of the facility or organization and must be provided equivalent opportunities for training (both mandated and offered) and pay and benefits competitive and comparable to other staff based on experience and skill level.<br>4. Individuals should set their own individualized goals and assess their own skills and resources related to goal attainment. Goals are set by exploring strengths and needs in the individual's living, learning, social, and working environments. Goal attainment should be supported through a myriad of approaches (e.g. coaching approaches, assistance via technology, etc.).<br>5. Each service intervention is provided only in a 1:1 ratio between a CPS and a person served.<br>6. Each individual must be provided the opportunity for peer assistance in the development and acquisition of needed skills and resources necessary to achieve stated goals.<br>7. The program must have a Peer Supports Organizational Plan addressing the following:<br>   a. A service philosophy reflecting recovery principles as articulated by the Georgia Consumer Council, August 1, 2001. This philosophy must be actively incorporated into all services and activities and:<br>     i.  View each individual as the director of his/her rehabilitation and recovery process.<br>     ii.  Promote the value of self-help, peer support, and personal empowerment to foster recovery.<br>     iii.  Promote information about mental illness and coping skills. |

## MH Peer Support Services - Individual

    iv.   Promote peer-to-peer training of individual skills, social skills, community resources, and group and individual advocacy.

    v.   Promote the concepts of employment and education to foster self-determination and career advancement.

    vi.   Support each individual to "get a life" using community resources to replace the resources of the mental health system no longer needed.

    vii.   Support each individual to fully integrate into accepting communities in the least intrusive environment that promote housing of his/her choice.

    viii.   Actively seek ongoing consumer input into program and service content so as to meet each individual's needs and goals and foster the recovery process.

  b.  A description of the particular consumer empowerment models utilized and types of recovery-support activities offered which are reflective of that model.

  c.  A description of the staffing pattern including how caseloads are evaluated to assure that the required staff-to-individual ratios are maintained, including how unplanned staff absences, illnesses, and emergencies are accommodated.

  d.  A description of how CPSs within the agency are given opportunities to meet with or otherwise receive support from other consumers (including Georgia-Certified Peer Specialists) both within and outside the agency.

  e.  A description of how CPSs are encouraged and supported to seek continuing education and/or other certifications through participation in training opportunities.

  f.  A description of the standard by which CPSs participate in, and, if necessary, request clinical team meetings at the request of an individual.

  g.  A description of the program's decision-making processes, including how individuals direct decision-making about both individual and program-wide activities, and about key policies and dispute resolution processes.

  h.  A description of the governing body and/or advisory structures indicating how this body/structure meets requirements for consumer leadership and cultural diversity.

  i.  A description of how the plan for services and activities is modified or adjusted to meet the needs specified in each IRP.

  j.  A description of how individual requests for discharge and change in services or service intensity are handled.

8.  Assistive tools, technologies, worksheets, etc. can be used by the CPS to work with the served individual to improve his/her communication about treatment, symptoms, improvements, etc. with treating behavioral health and medical practitioners.

| | | | |
|---|---|---|---|
| **Service Accessibility** | To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:<br><br>  •  the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or<br>  •  the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.<br><br>Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should <u>not</u> be driven by the practitioner's/agency's convenience or preference. | | | |
| **Documentation Requirements** | Providers must document services in accordance with the specifications for documentation requirements specified in Part II, Section III of the Provider Manual. | | | |
| **Billing & Reporting Requirements** | When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. | | | |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|

## Mobile Crisis

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|

## Mobile Crisis

| Mobile Crisis Response Service | |
|---|---|
| Service Definition | The Mobile Crisis Response Service (MCRS) provides community-based face-to-face rapid response to individuals in an active state of crisis. This service operates 24 hours a day, seven days a week. MCRS offers short-term, behavioral health, intellectual/developmental disability, and/or Autism Spectrum Disorder (ASD) crisis response for individuals in need of crisis assessment, intervention, and referral services within their community. This service is unique in that it provides in-person intervention to persons in their community who may be in crisis. MCRS may be provided in community settings including, but not limited to homes, residential settings, other treatment/support settings, schools, hospital emergency departments, jails, and social service settings. Interventions include a brief, situational assessment; verbal and or behavioral interventions to de-escalate the crisis; assistance in immediate crisis resolution; mobilization of natural support systems; and referral to alternate services at the appropriate level.<br><br>MCRS includes in-field crisis assessment, crisis de-escalation, rapid assessment of strengths, problems and needs; psychoeducation, brief behavioral support and intervention; and referral to appropriate services and supports. MCRS functions to provide a short-term linkage and referral between persons in crisis and the appropriate/additional behavioral health and/or IDD services and supports, while reducing the rate of hospitalization, incarceration, out of home placement and unnecessary emergency room visits. This service includes post crisis follow-up to ensure linkage with recommended services. |
| Admission Criteria | The service is available to individuals with behavioral health diagnoses and/or intellectual and/or developmental disabilities, including Autism Spectrum Disorder (ASD), aged four (4) years and above who meet the following eligibility criteria:<br>1. The individual is experiencing an acute Behavioral Health, Intellectual/Developmental Disability, ASD, and or Co-occurring crisis (inclusive of two (2) or more of these conditions); and<br>2. The individual and/or family/caregiver lacks the skills necessary to cope with the immediate crisis and there exists no other available, appropriate community supports to meet the needs of the person; and<br>3. The individual needs immediate care, evaluation, stabilization or treatment due to the crisis as evidenced by:<br>  • A substantial risk of harm to self or others by the individual; and/or<br>  • The individual is engaging in behaviors presenting with serious potential legal or safety consequences; or<br>4. Screening provided by the Georgia Crisis and Access Line (GCAL) indicates the presence of a behavioral health, an intellectual/developmental disability, and/or ASD crisis presentation.<br>5. The individual served does not have to be a current or past-enrolled recipient of DBHDD services or supports. |
| Continuing Stay Criteria | N/A |
| Discharge Criteria | 1. The acute presentation of the crisis situation is resolved;<br>2. Appropriate referral(s) and service engagement/s to stabilize the crisis situation are completed;<br>3. Recommendations for ongoing services, supports or linkages have been documented; and<br>4. Post-crisis follow-up has been completed within 1-3 days of crisis contact. |
| Service Exclusions | Individuals in the following settings are excluded from MCRS dispatch; Crisis Stabilization Units (CSU), Behavioral Health Crisis Centers (BHCC), CRR-I, psychiatric hospital (state or private); state prisons; youth detention center; and regional youth detention center. |
| Clinical Exclusions | 1. All persons receiving MCRS must have present indications of a behavioral health disorder, an Intellectual/Developmental Disability and/or ASD.<br>2. MCRS shall not be dispatched for individuals presenting solely with a need for Substance Use Disorder (SUD) intervention.<br>3. MCRS shall not be dispatched in response to a medical emergency. |
| Required Components | 1. A mobile crisis team responder offering any diagnostic impressions must be a person identified in O.C.G.A. Practice Acts as qualified to provide a diagnosis and who possess training and experience in behavioral health and intellectual/developmental disability assessment.<br>2. The Licensed clinician on the Mobile Crisis Team is to provide oversight and clinical supervision to the operation of the team and is responsible for ensuring that the appropriate team members are dispatched or are available for consultation based on the clinical data provided by the Georgia Crisis and Access Line (GCAL). |

**Mobile Crisis**

3. The Mobile Crisis Team is to:
   a. Respond and arrive on site within 59 minutes of the dispatch by GCAL; and.
   b. Address the crisis situation to mitigate any risk to the health and safety of the individual and/or others; and
   c. Consult with medical professionals, when needed, to assess potential medical causes that might be contributing to the crisis prior to recommending any intensive crisis supports involving behavioral interventions.

4. The Mobile Crisis Team members are responsible for completing comprehensive assessment(s) of the current crisis situation. This assessment process shall include interviews with the individual, care providers and/or family members, observation of the current environment, and review of behavior and individual support plans if available. The licensed professional or BCBA on the team is responsible for ensuring that the assessment process is thorough and complete.

5. A crisis plan will be developed to help manage, prevent, or reduce the frequency of future crises occurring. When available, an individual's existing crisis plan should be utilized by the MCRS team when it is appropriate to the presenting situation. When a crisis plan does not exist, MCRS will engage the individual/family/caregivers in a therapeutic plan that fosters a return to pre-crisis level of functioning and connect or reconnect the individual to treatment services and other community resources.
   a. Also, when available and offered by the individual, a Wellness Recovery Action Plan (WRAP) shall be utilized by MCRS to support the individual's preferences.
   b. When available, an individual's behavior support plan shall be utilized by MCRS during the assessment process.

6. All interventions shall be offered in a clinically appropriate manner that respects the preferences of the individual in crisis while recognizing the primary need to maintain safety.

7. Reasonable and relatively simple environmental modifications that do not require continuing programmatic efforts are considered before intensive crisis supports and/or a behavior plan is recommended and implemented.

8. When applicable and accessible, community supports, natural supports, and external helping networks should be utilized for crisis planning to assist in crisis prevention.

9. When the Mobile Crisis Team makes a disposition, the licensed clinician or BCBA communicates all recommendations within 24 hours to all applicable parties (e.g., Provider Agencies Families/Caregivers/ Guardians, Support Coordination Agencies, known Care Coordinators and/or Regional Field Office I&E Teams as applicable).

10. The MCRS shall comply with the current GCAL process for dispatch of mobile crisis, including non-refusal of calls or dispatch.

11. When the Mobile Crisis Team completes services, the licensed clinician or BCBA on the team completes a written summary that shall:
    a. Minimally include:
       • Description of precipitating events
       • Assessment and Interventions provided
       • Diagnosis or diagnostic impressions
       • Response to interventions
       • Crisis plan
       • Recommendations for continued interventions
       • Linkage and Referral for additional supports (if applicable); and
    b. Be completed and documented within a 24-hour period after a disposition has been determined.

12. Within 24 hours of completion of the MCRS intervention a follow-up phone call is made and documented to individuals served or their representative/parent/guardian. Exceptions to this requirement are for persons for whom the mobile crisis intervention results in placement in a hospital, CSU, BHCC, intensive in-home IDD supports, or an IDD crisis home.

13. The MCRS provider must develop policies and procedures consistent with DBHDD policies for referral and engagement with Crisis Stabilization Units (CSUs) Behavioral Health Crisis Centers (BHCCs), Crisis Respite Homes and In-Home I/DD Supports; (i.e., staffing, eligibility, service delivery, GCAL interface).

14. Additionally, the MCRS provider must develop policies and procedures that include criteria for determination of the need for higher levels of care, indicators for

| Mobile Crisis | |
|---|---|
| | referral to medical/health services and how staff should access support from healthcare professionals; how the staff will be trained to employ positive behavior supports, trauma informed care, and crisis intervention principles in the delivery of mobile services; and how the safety of staff members is maintained. |
| | 15. MCRS will collaborate with the individual's health and support providers to ensure linkage with follow-up post crisis treatment. This may include Core providers, Specialty Providers, detoxification providers, I/DD service providers, local physicians, BHCCs/CSUs, and other public and social service agencies (such as DFCS, schools, treatment courts, law enforcement, Care Management Organizations [CMOs], etc.). When the MCRS provider determines during a community-based intervention that an individual is enrolled with a CMO, the CMO will receive notification within 72 hours through an identified inbox and provided basic status information (name, date of intervention, written summary, final referral and disposition, for the CMO to follow up on treatment services and other community resources for the member. |
| | 16. The MCRS must maintain accreditation by the appropriate credentialing body (The Joint Commission, The Commission on Accreditation of Rehabilitation Facilities, The Council on Accreditation). |
| Staffing Requirements | 1. The following training components must be provided during orientation for all new staff:<br>   a. Community-based crisis intervention training and TIP 42 training.<br>   b. Cross training of BH and IDD MCRS staff.<br>   c. DBHDD array of Adult Mental Health, Child and Adolescent Mental Health, Addictive Diseases, Intellectual & Developmental Disabilities crisis services, and community psychiatric hospitals.<br>   d. DBHDD Community Behavioral Health and IDD Provider Manual service definitions.<br>   e. Rapid crisis screening.<br>   f. Dispatch decision tree.<br>   g. Web-based data access and interface with DBHDD information system.<br>2. The Mobile Crisis Team includes minimally two staff responding:<br>   a. Of those, one (1) is a Licensed Clinical Social Worker/Licensed Professional Counselor/Licensed Marriage and Family Therapist/ Licensed Psychologist (LCSW/ LPC/LMFT/Licensed Psychologist Ph.D./Psy.D.); and<br>   b. When the screening indicates that the individual in crisis has I/DD, the two-person team must also include a Behavioral Specialist (BS), BCBA, or BCaBA (dispatch of a licensed clinician is always required along with this practitioner)<br>   c. Additional staff who may be dispatched when a behavioral health need is identified include: paraprofessional/direct support staff, a registered nurse, an additional social worker (MSW), safety officer, and/or a Certified Peer Specialist (CPS, CPS-AD, CPS-Y, and CPS-P)].<br>   d. In addition, a physician will be available to the MCRS team for consultation, if needed. Other physicians (psychiatric or medical) may consult as necessary.<br>   e. Each mobile crisis team must include at least one staff member with specialization in ASD; so, when there is a known or suspected indication of ASD, the following team compositions are allowed:<br>      i. A BCBA or BCBA-D who serves as the lead in a mobile crisis response for individuals with ASD and any second recognized practitioner type named herein; or<br>      ii. Licensed practitioner (as named in a. above) along with a BCBA, BCaBA or RBT.<br>3. All team members are required to comply with the DBHDD Policy, Professional Licensing and Certification Requirements of Practice Act, including maintaining valid/current license or certification and compliance with all DBHDD training requirements for paraprofessional, licensed or certified staff. |

## Mobile Crisis

| Service Accessibility | |
|---|---|
| 1. | MCRS must be available by staff skilled in crisis intervention 24 hours a day, 7 days a week with emergency response coverage, including psychiatric, medical and nursing consultation services as required. |
| 2. | All mobile crisis service response times for arrival at the site of the crisis must be less than 59 minutes of dispatch by the GCAL. |
| 3. | Services are available 24-hours a day, 7 days a week, and include face-to-face contact offered in eligible settings (e.g., home/community, school, jail, emergency room). |
| 4. | MCRS may not be provided in an Institution for Mental Diseases (IMD, e.g., treatment units for state or private psychiatric hospital, psychiatric residential treatment facility or crisis stabilization program), nursing homes, youth development center (YDC), or State Prisons. |
| 5. | Telemedicine is the use of medical information exchanged from one site to another via electronic communications to improve a patient's health. Electronic communication means the use of interactive telecommunications equipment that includes, at a minimum, audio and video equipment permitting two-way, real time interactive communication between the patient, and the physician or practitioner at the distant site. Telemedicine is never to be utilized as the primary means of delivery of MCRS services. |

| Documentation Requirements | |
|---|---|
| 1. | Providers must document services in accordance with the specifications for documentation requirements specified in Part II, Section IV of the Provider Manual and in keeping with this section G. Documentation will include the following: |
| | a.  Calls received; |
| | b.  Referring source; individual, agency, |
| | c.  Time of received call, |
| | d.  Specific plan of action to address need; |
| | e.  Composition of responders |
| | f.  Time of arrival on-site |
| | g.  Time of completion of assessment |
| | h.  Description of intervention, |
| | i.  Diagnosis and or diagnostic impressions |
| | j.  Documentation of disposition, linkages provided/appointments made |
| | k.  Behavioral recommendations provided; |
| | l.  Provision of assessment upon Release of Information |
| | m.  Contact information for follow-up |
| | n.  Follow-up contact. |
| 2. | Each MCRS shall provide monthly outcomes data as defined by the DBHDD. |

| Billing & Reporting Requirements | |
|---|---|
| 1. | All other applicable DBHDD reporting requirements must be followed. |
| 2. | Where there are individuals covered by Georgia CMOs and the specific CMO is identified, the MCRS provider will report the MCRS intervention to the CMO. |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| H0020 | U2 | U6 | | | | 33.40 |

## Opioid Maintenance Treatment

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| | H0020 | U4 | U6 | | | | 17.40 |

## Opioid Maintenance Treatment

| | | | | | | |
|---|---|---|---|---|---|---|
| Alcohol and/or Drug Services; Methadone Administration and/or Service | H0020 | U3 | U6 | 25.39 | | TBD |

| | | |
|---|---|---|
| Unit Value | 1 encounter | Utilization Criteria |
| Service Definition | An organized, usually ambulatory, substance use disorder treatment service for individuals who have an addiction to opiates. The nature of the services provided (such as dosage, level of care, length of service or frequency of visits) is determined by the individual's clinical needs, but such services always includes scheduled psychosocial treatment sessions and medication visits (often occurring on a daily basis) within a structured program. Services function under a defined set of policies and procedures, including admission, discharge and continued service criteria stipulated by state law and regulation and the federal regulations at FDA 21 CFR Part 291. Length of service varies with the severity of the individual's illness, as well as his or her response to and desire to continue treatment. Treatment with methadone or LAAM is designed to address the individual's goal to achieve changes in his or her level of functioning, including elimination of illicit opiate and other alcohol or drug use. To accomplish such change, the Individualized Recovery/Resiliency Plan must address major lifestyle, attitudinal and behavioral issues that have the potential to undermine the goals of recovery. The Individualized Recovery/Resiliency Plan should also include individualized treatment, resource coordination, and personal health education specific to addiction recovery (including education about human immunodeficiency virus [HIV], tuberculosis [TB], and sexually transmitted diseases [STD]). | TBD |
| Admission Criteria | | |
| Continuing Stay Criteria | Must meet criteria established by the Georgia Regulatory body for opioid administration programs (Department of Community Health, Healthcare Facilities Regulation Division) and the Food and Drug Administration's guidelines for this service. | |
| Discharge Criteria | | |
| Required Components | 1. This service must be licensed by DCH/HFR under the Rules and Regulations for Drug Abuse Treatment Programs, 290-4-2.<br>2. Must meet and follow criteria established by the Georgia regulatory body for opioid administration programs (Department of Community Health, Healthcare Facilities Regulation Division) and the Food and Drug Administration's guidelines for this service. | |
| Additional Medicaid Requirements | Tier I and II providers who are approved to bill Medication Administration may bill H0020 for Medicaid recipients who receive this service. | |
| Documentation Requirements | If medically necessary for the individual, the Individualized Recovery/Resiliency Plan should also include individualized treatment, resource coordination, and personal health education specific to substance use disorder recovery (including education about human immunodeficiency virus [HIV], tuberculosis [TB], and sexually transmitted diseases [STD]). | |

## Peer Support, Wellness and Respite Center - Respite

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 |
|---|---|---|---|---|
| Rehabilitation Program | Peer Supported Daily Wellness Activities | H2001 | HW | UJ |
| Unit Value | 1 day | Maximum Daily Units | 1 unit | Maximum Utilization | 7 units |
| Service Definition | Peer Support, Wellness and Respite Center - Respite services are a self-directed, trauma-informed, and recovery-oriented alternative to traditional clinical crisis services; and support peers in seeing crisis as an opportunity for learning and growth. These services are a combination of an overnight stay (up to 7 consecutive nights) with Intentional Peer Support as a key recovery approach during that stay. The PSWRC Respite experience is offered as a safe environment in which an individual can be supported to accomplish the individualized expectations set forth in the proactive interviewing process (cited below). | | | |

## Peer Support, Wellness and Respite Center - Respite

| | |
|---|---|
| Admission Criteria | 1. Individuals with a behavioral health condition who are experiencing an emotional, mental, and/or psychiatric crisis and have previously completed a pre-crisis, proactive interview. A proactive interview is an interactive dialogue between a center peer staff and a peer who may choose this service in the future. The proactive interview is completed when the person is doing well and includes a discussion of the expectations of both parties.<br>2. Individuals must be 18 years or older.<br>3. Individuals must be capable of basic self-care during their stay. |
| Continuing Stay Criteria | The individual continues to articulate a need for the respite up through the 7th night. |
| Discharge Criteria | 1. The individual indicates a desire to leave the support;<br>2. The individual fails to meet the Participation and Respite Guidelines expectations that are mutually agreed upon during the interview process. |
| Service Exclusions | 1. The PSWRC does not provide medical services.<br>2. The PSWRC does not accept individuals who are registered sex offenders.<br>3. The PSWRC does not provide crisis, clinical or case management services. |
| Required Components | 1. For each individual accepted for support, there has been a prerequisite proactive interview completed as noted in the Admission Criteria.<br>2. Each site will have a minimum of 3 bedrooms available for individuals in need of this service.<br>3. Each site will have a gathering room for a group of 8-12 individuals as well as additional space for other groups to coincide.<br>4. Each site will have a plan for operations during disaster crisis plan and conduct fire and disaster drills.<br>5. Freedom to come and go is promoted in order to work, attend school, appointments or other activities.<br>6. The PSWRC is responsible for the provision of:<br>  a. Sheets and towels and cleaning supplies for the individual during his/her time in Respite services.<br>  b. Food for the individual during his/her stay with the expectation that the individual prepares his/her own meals/snacks.<br>  c. A private bedroom with space to store personal belongings; and<br>  d. A bathroom to be shared with center guests. |
| Staffing Requirements | 1. A PSWRC has a full-time Director who is a Certified Peer Specialist.<br>2. The number of remaining staff are defined in contracts but are required to be specially trained Certified Peer Specialists who have participated in targeted areas of training such as Intentional Peer Support, CPR/First Aid, etc. |
| Service Accessibility | 1. This service is operational 24 hours a day, 7 days a week.<br>2. Respite guests are able to access:<br>  a. Daily Peer Support and Wellness activities provided by the Center,<br>  b. A washer & dryer to wash linens and clothing,<br>  c. A kitchen to cook food (food provided by center and prepared by respite guest),<br>  d. On-site computers,<br>  e. A locked box to store medications that individuals bring and self-administer, and<br>  f. Access to community resources and natural supports. |
| Documentation Requirements | Individuals are considered as accessing a day of respite when they are at the PSWRC at 11:59PM. |
| Billing & Reporting Requirements | 1. Place of Service Code 99 will be used for all claims/encounter submissions to the ASO.<br>2. Span billing may occur for this service within a single month, meaning the start and end date are not the same on a given service claim line. |

## Peer Support, Wellness and Respite Center - Daily Wellness

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 |
|---|---|---|---|---|---|---|
| Rehabilitation Program | Peer Supported Daily Wellness Activities | H2001 | HW | | | |
| Unit Value | 1 day | Maximum Daily Units | 1 unit | | | |
| Service Definition | Daily Wellness Activities are holistic in nature, support people with moving beyond their illness and toward a life of self-directed recovery. During scheduled hours, PSWRC Peer Daily Wellness Activities may include but are not limited to the following peer support topics which may occur at the center or in the community: 1. Employment Supports; 2. Basic Finance/Financial Planning; 3. Independent Housing; 4. Wellness; 5. Wellness Recovery Action Plans; 6. Double Trouble in Recovery; 7. Community Resources; 8. Community Outreach and Connections; 9. Meditation/Relaxation; 10. Cooking and Nutrition; 11. Trauma Informed Peer Support; 12. Computer Training; 13. Physical Activities, such as yoga; 14. Writing/Creativity Group (such as lyrical expression, art exploration); and 15. Social Group Activities. | | | | | |
| Admission Criteria | 1. Wellness activities shall be available to respite guests as well as individuals who walk-in and choose to participate. 2. Individuals must be 18 years or older. 3. Individuals must be capable of basic self-care during their stay. | | | | | |
| Continuing Stay Criteria | The individual continues to attend and participate. | | | | | |
| Discharge Criteria | 1. The individual indicates a desire to leave the support; 2. The individual fails to meet the Participation Guidelines. | | | | | |
| Service Exclusions | 1. The PSWRC does not provide medical services. 2. The PSWRC does not accept individuals who are registered sex offenders. 3. The PSWRC does not provide crisis, clinical or case management services. | | | | | |
| Required Components | 1. Walk-in services will be available 7 days a week from 10:00 am to 6:00 pm. 2. During a first encounter, the PSWRC staff provide a tour for individuals to orient the person to the supports available. 3. An individual who is also in respite is not required to participate in the Daily Wellness Activities. | | | | | |
| Staffing Requirements | 1. A PSWRC has a full-time Director who is a Certified Peer Specialist. 2. The number of remaining staff are defined in contracts but are required to be specially trained Certified Peer Specialists who have participated in targeted areas of training such as Intentional Peer Support, CPR/First Aid, etc. (in rural areas, an individual with lived experience may be hired as staff with the performance expectation that the CPS credential will be achieved). | | | | | |
| Service Accessibility | The PSWRC Walk-in Center is available 7 days a week from 10:00 am to 6:00 pm. 1. This recovery support is provided on a drop-in basis promoting immediate availability and engagement. | | | | | |

## Peer Support, Wellness and Respite Center - Daily Wellness

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 |
|---|---|---|---|---|---|
| 2. Structured wellness activities are offered intermittently during these hours of operation.<br>3. Peer support is available at any point during the open hours. | | | | | |
| **Documentation Requirements** 1. Any individual who signs-in between the hours of 10:00 am to 6:00 pm will be considered supported as a participant for that day.<br>2. Sign-in sheets will be maintained by the PSWRC. | | | | | |
| **Billing & Reporting Requirements** 1. Visitors that drop-in who do not self-identify as having lived experience are not to be included as a daily participant.<br>2. Place of Service Code 99 will be used for all claims/encounter submissions to the ASO. | | | | | |

## Peer Support, Wellness and Respite Center - Warm Line

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 |
|---|---|---|---|---|---|---|
| Behavioral Health Hotline Services | Peer Supported Warm Line | H0030 | | | | |
| Unit Value | 1 contact | | | | | |
| | Maximum Daily Units | | 1 unit | | | |
| Service Definition | Warm line services afford individuals access to 24/7 peer support and non-urgent crisis support over the telephone. In addition to peer support, callers can receive information about community and natural supports. Warm transfers of calls can be made to GCAL when appropriate. | | | | | |
| Admission Criteria | Anyone with a behavioral health condition that calls the warm line for the purposes of peer support. | | | | | |
| Staffing Requirements | 1. A PSWRC has a full-time Director who is a Certified Peer Specialist.<br>2. The number of remaining staff that are defined in contracts but are required to be specially trained Certified Peer Specialists who have participated in targeted areas of training such as Intentional Peer Support, CPR/First Aid, etc. (in rural areas, an individual with lived experience may be hired as staff with the performance expectation that the CPS credential will be achieved). | | | | | |
| Service Accessibility | 24 hours, 7 days a week. | | | | | |
| Documentation Requirements | 1. Calls are documented by the PSWRC staff including time of call and CPS who provided support.<br>2. Calls which are not indicated as Peer Support calls (wrong numbers, abandoned calls, etc.) are not documented as Warm-line contacts. | | | | | |
| Billing & Reporting Requirements | 1. If an individual calls more than once per day, he/she is reported as having received one Warm Line support for that day.<br>2. Place of Service Code 99 will be used for all claims/encounter submissions to the ASO. | | | | | |

## Peer Support Whole Health & Wellness - Group

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| | Practitioner Level 4, Group, In-clinic | H0025 | HQ | U4 | U6 | | $4.43 |
| | Practitioner Level 4, Group, Out-of-clinic | H0025 | HQ | U4 | U7 | | $5.41 |

# Peer Support Whole Health & Wellness - Group

**Health and Wellness Supports** (Behavioral Health Prevention Education Service) (Delivery of Services with Target Population to Affect Knowledge, Attitude and/or Behavior)

| | | | | | |
|---|---|---|---|---|---|
| Practitioner Level 5, Group, In-clinic | H0025 | HQ | U5 | U6 | $3.30 |
| Practitioner Level 5, Group, Out-of-clinic | H0025 | HQ | U5 | U7 | $4.03 |

**Unit Value:** 15 minutes

**Utilization Criteria:** TBD

**Service Definition**

**Definition of Service:** This is a group service in which the Whole Health & Wellness Coach (CPS-WH) assists participants with setting personal expectations, introducing health objectives as an approach to accomplishing overall life goals, helping identify personal and meaningful motivation, and health/wellness self-management. The individuals served should be supported by the CPS-WH and the members of the group to be the director of his/her health through identifying incremental and measurable steps/objectives that make sense to the person, considering these successes as a benchmark for future success.

Health engagement and health management for the individual are key objectives of the service. These should be accomplished by facilitating health dialogues; exploring the multiple choices for health engagement; supporting the individual in overcoming fears and anxiety related to engaging with health care providers and procedures; promoting engagement with health practitioners including, at a minimum, participating in an annual physical; assisting the individual in the work of finding a compatible primary physician who is trusted; among other engagement activities.

Another major objective is promoting access to health supports. This is accomplished by using technology to support the individual's goals; providing materials which assist in structuring the individual's path to prevention, healthcare, and wellness; partnering with the person to navigate the health care system; assisting the person in developing his/her own natural support network which will promote that individual's wellness goals; creating solutions with the person to overcome barriers which prevent healthcare engagement (e.g. transportation, food stamps, shelter, medications, safe environments in which to practice healthy choices, etc.); and linking the individual with other health and wellness resources (physical activity, fitness, healthy/nutritional food).

The Whole Health & Wellness Coach (CPS-WH) and supporting nurse also provide the following health skill-building and supports:
1. Share basic health information which is pertinent to the individual's personal health;
2. Promote awareness regarding health indicators;
3. Assist in understanding the idea of whole health and the role of health screening;
4. Support behavior changes for health improvement;
5. Make available wellness tools (e.g., relaxation response, positive imaging, education, wellness toolboxes, daily action plans, stress management, etc.) to support the individual's identified health goals;
6. Provide concrete examples of basic health changes and work with the group members in the selection of incremental health goals;
7. Teach/model/demonstrate skills such as nutrition, physical fitness, healthy lifestyle choices;
8. Promote and offer healthy environments and skills-development to assist in modifying own living environments for wellness;
9. Support group members as they practice creating healthy habits, personal self-care, self-advocacy and health communication (including but not limited to disclosing history, discussing prescribed medications, asking questions in health settings, etc.);
10. Support group members to identify and understand how his/her family history, genetics, etc. contribute to their overall health picture;
11. Support group members in understanding medication and related health concerns; and
12. Promote health skills, considering fitness, healthy choices, nutrition, healthy meal preparation, teaching early warning signs/symptoms which indicate need for health intervention, etc.

## Peer Support Whole Health & Wellness - Group

Specific interventions may also include supporting the individual group members in being able to have conversations with various providers to access health support and treatment and assisting individuals in gaining confidence in asserting their personal health concerns and questions, while also assisting the person in building and maintaining self-management skills. Health should be discussed as a process instead of a destination.

Assistance will be provided to group members to facilitate active participation in the development of Individualized Recovery Plan (IRP) health goals which may include but not be limited to attention to dental health, healthy weight management, cardiac health/hypertension, vision care, substance use disorders (including smoking cessation), vascular health, diabetes, pulmonary, nutrition, sleep disorders, stress management, reproductive health, human sexuality, and other health areas.

These interventions are necessarily collaborative: partnering with health providers and partnering with individuals served in dialogues with other community partners and supporters to reinforce and promote healthy choices. The Whole Health & Wellness Coach (CPS-WH) must also be partnered with the identified supporting nurse and other licensed health practitioners within the organization to access additional health support provided by the organization or to facilitate health referral and access to medical supports external to the organization providing this service.

The interventions are based upon respectful and honest dialogue supported by motivational coaching. The approach is strengths-based: sharing positive perspectives and outcomes about managing one's own health, what health looks like when the person gets there (visioning), assisting a person with re-visioning his/her self-perception (not as "disabled"), assisting the person in recognizing his/her own strengths as a basis for motivation, and identifying capabilities and opportunities upon which to build enhanced health and wellness. The peer-to-peers basis for the service allows the sharing of personal experience, including modeling wellness and mutual respect and support that is also respectful of the individualized process and journey of recovery. This equality partnership between the supported individual and the Whole Health & Wellness Coach (CPS-WH) should serve as a model for the individual as he/she then engages in other health relationships with health services practitioners. As such the identified nurse member of the team is in a supporting role to the Whole Health & Wellness Coach (CPS).

A mind/body/spirit approach is essential to address the person's whole health. Throughout the provision of these services the practitioner addresses and accommodates an individual's unique sense of culture, spirituality, and self-discovery, assisting individuals in understanding shared-decision making, and in building a relationship of mutual trust with health professionals.

| Admission Criteria | 1. Individual must have two co-existing serious health conditions (hypertension, diabetes, obesity, cardiovascular issues, pulmonary issues, etc.), one of which is either a mental health condition or substance use disorder; **and one or more of the following:**<br>2. Individual requires and will benefit from support of Whole Health & Wellness Coaches (CPS-WHs) and from a group model for the acquisition of skills needed to manage health symptoms and utilize/engage community health resources; **or**<br>3. Individual may need assistance to develop self-advocacy skills in meeting health goals, engaging in health activities, utilizing community-health resources, and accessing health systems of care; **or**<br>4. Individual may need peer modeling to take increased responsibilities for his/her own recovery and wellness. |
|---|---|
| Continuing Stay Criteria | 1. Individual continues to meet admission criteria; and<br>2. Progress notes document progress relative to health goals identified in the Individualized Recovery/Resiliency Plan, but treatment/recovery/wellness goals have not yet been achieved. |
| Discharge Criteria | 1. An adequate continuing care plan has been established; **and one or more of the following:**<br>2. Goals of the Individualized Recovery Plan have been substantially met; **or**<br>3. Individual/family requests discharge. |
| Service Exclusions | 1. Individuals receiving Assertive Community Treatment are excluded from this service. (If an ACT team has a Whole Health & Wellness Coach (CPS), then that Whole Health & Wellness Coach (CPS-WH) can provide this intervention but would bill through that team's existing billing mechanisms).<br>2. When whole health and wellness topics are provided within a MH Peer Support program model, this PSWHW code is not utilized as a billable intervention. In this case, the whole health and wellness content is a subcomponent of the MH Peer Support program model. |
| Clinical Exclusions | Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition co-existing with one of the following diagnoses: Intellectual/Developmental Disabilities, Autism, Neurocognitive Disorder, Substance-Related Disorder, or Traumatic Brain Injury. |

## Peer Support Whole Health & Wellness - Group

| Category | Content |
|---|---|
| Required Components | 1. There is documentation available which evidences a minimum monthly team meeting during which the Whole Health & Wellness Coach/s and the agency-designated RN/s convene to:<br>  a. Promote communication strategies;<br>  b. Confer about specific individual health trends;<br>  c. Consult on health-related issues and concerns; and<br>  d. Brainstorm partnered approaches in supporting the person in achieving his/her whole health goals.<br>2. Services and interventions must be individually tailored to the needs, goals, preferences and assets of the individual with the goals of wellness and recovery as defined by the individual.<br>3. At least 60% of all service units must involve face-to-face contact with individuals either through an individual or group Peer Support Whole Health and Wellness modality. The remainder of direct billable service includes telephonic intervention directly with the person or is contact alongside the person to navigate and engage in health and wellness systems/activities (billable as PSWHW-I). |
| Staffing Requirements | 1. This service is delivered in a group service model.<br>2. The following practitioners can provide Peer Supported Whole Health & Wellness-Group:<br>  a. Practitioner Level 3: RN (only when he/she is identified in the agency's organizational chart as being the specific support nurse to the CPS-WH).<br>  b. Practitioner Level 4: Whole Health & Wellness Coach (CPS-WH) with Master's or Bachelor's degree in one of the helping professions such as social work, community counseling, counseling, psychology, or criminology, under the supervision of a licensed independent practitioner.<br>  c. Practitioner Level 5: Whole Health & Wellness Coach (CPS-WH) with high school diploma/equivalent under supervision of one of the licensed/credentialed professionals above.<br>3. Partnering team members must include:<br>  a. A Whole Health & Wellness Coach (CPS-WH) who promotes individual self-determination, whole health goal setting, decision-making and provides essential health coaching and support to promote activities and outcomes specified above.<br>  b. An agency-designated Registered Nurse(s) who provides back-up support to the Whole Health & Wellness Coach (CPS-WH) in the monitoring of each individual's health and providing insight to the Whole Health & Wellness Coach (CPS-WH) as they engage in the health coaching activities described above.<br>  c. There is no more than a 1:12 CPS-to-individual ratio for each facilitated group.<br>  d. The Whole Health & Wellness Coach (CPS-WH) shall be supervised by a licensed independent practitioner (who may also be the RN partner).<br>  e. The Whole Health & Wellness Coach (CPS) is the lead practitioner in the service delivery. The RN will be in a health consultation role to the Whole Health & Wellness Coach (CPS-WH) and the individuals served. The nurse should also be prepared to provide clinical consultation to the Whole Health & Wellness Coach (CPS) if there is an emerging health need; however, the individual is in charge of his/her own health process and this self-direction must be acknowledged throughout the practice of this service.<br>  f. The agency supports and promotes the participation of Whole Health & Wellness Coaches (CPS-WHs) in statewide technical assistance initiatives which enhance the skills and development of the CPS. |
| Clinical Operations | 1. The program shall have an Organizational Plan which will describe the following:<br>  a. How the served individual will access the service;<br>  b. How the preferences of the individual will be supported in accomplishing health goals;<br>  c. Relationship of this service to other resources of the organization;<br>  d. An organizational chart which delineates the relationship between the Whole Health & Wellness Coach (CPS) and the RN;<br>  e. Whole Health & Wellness Coach (CPS-WH) engagement expectations with the individuals served (e.g., planned frequency of contact, telephonic access, etc.).<br>  f. The consultative relationship between the Whole Health & Wellness Coach (CPS) and the RN. |
| Service Accessibility | There is a minimum contact expectation with an individual weekly, either face-to-face (one-on-one or within a group) or telephonically to track progress on the identified health goal. Unsuccessful attempts to make contact shall be documented. |

## Peer Support Whole Health & Wellness - Group

| Documentation Requirements | 1. All applicable Medicaid, ASO, and other DBHDD reporting requirements must be met.<br>2. There is documentation available which demonstrates a minimum monthly team meeting during which the Whole Health & Wellness Coach (CPS-WH) and the agency- designated RN/s convene to discuss items identified in Required Components Item 1 in this definition. |
| --- | --- |

## Peer Support Whole Health & Wellness - Individual

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Health and Wellness Supports (Behavioral Health Prevention Education Service) (Delivery of Services with Target Population to Affect Knowledge, Attitude and/or Behavior) | Practitioner Level 3, In-Clinic | H0025 | U3 | U6 | | | $ 30.01 | Practitioner Level 3, Out-of-Clinic | H0025 | U3 | U7 | | | $ 36.68 |
| | Practitioner Level 4, In-Clinic | H0025 | U4 | U6 | | | $ 20.30 | Practitioner Level 4, Out-of-Clinic | H0025 | U4 | U7 | | | $ 24.36 |
| | Practitioner Level 5, In-Clinic | H0025 | U5 | U6 | | | $ 15.13 | Practitioner Level 5, Out-of-Clinic | H0025 | U5 | U7 | | | $ 18.15 |
| | Practitioner Level 3, Via interactive audio and video telecommunication systems | H0025 | GT | U3 | | | $ 30.01 | Practitioner Level 5, Via interactive audio and video telecommunication systems | H0025 | GT | U5 | | | $ 15.13 |
| | Practitioner Level 4, Via interactive audio and video telecommunication systems | H0025 | GT | U4 | | | $ 20.30 | | | | | | | |

| Unit Value | 15 minutes | | | | | Utilization Criteria | TBD |
| --- | --- | --- | --- | --- | --- | --- | --- |

**Service Definition**

**Definition of Service:** This is a one-to-one service in which the Whole Health & Wellness Coach (CPS-WH) assists the individual with setting his/her personal expectations, introducing health objectives as an approach to accomplishing overall life goals, helping identify personal and meaningful motivation, and health/wellness self-management. The individual served should be supported to be the director of his/her health through identifying incremental and measurable steps/objectives that make sense to the person, considering these successes as a benchmark for future success.

Health engagement and health management for the individual are key objectives of the service. These should be accomplished by facilitating health dialogues; exploring the multiple choices for health engagement; supporting the individual in overcoming fears and anxiety related to engaging with health care providers and procedures; promoting engagement with health practitioners including, at a minimum, participating in an annual physical; assisting the individual in the work of finding a compatible primary physician who is trusted; among other engagement activities.

Another major objective is promoting access to health supports. This is accomplished by using technology to support the individual's goals; providing materials which assist in structuring the individual's path to prevention, healthcare, and wellness; partnering with the person to navigate the health care system; assisting the person in developing his/her own natural support network which will promote that individual's wellness goals; creating solutions with the person to overcome barriers which prevent healthcare engagement (e.g. transportation, food stamps, shelter, medications, safe environments in which to practice healthy choices, etc.); and linking the individual with other health and wellness resources (physical activity, fitness, healthy/nutritional food).

The Whole Health & Wellness Coach (CPS-WH) and supporting nurse also provide the following health skill-building and supports:
1. Share basic health information which is pertinent to the individual's personal health;
2. Promote awareness regarding health indicators;
3. Assist the individual in understanding the idea of whole health and the role of health screening;
4. Support behavior changes for health improvement;

## Peer Support Whole Health & Wellness - Individual

5.  Make available wellness tools (e.g. relaxation response, positive imaging, education, wellness toolboxes, daily action plans, stress management, etc.) to support the individual's identified health goals;

6.  Provide concrete examples of basic health changes and work with the individual in his/her selection of incremental health goals;

7.  Teach/model/demonstrate skills such as nutrition, physical fitness, healthy lifestyle choices;

8.  Promote and offer healthy environments and skills-development to assist the individual in modifying his/her own living environments for wellness;

9.  Support the individual as they practice creating healthy habits, personal self-care, self-advocacy and health communication (including but not limited to disclosing history, discussing prescribed medications, asking questions in health settings, etc.);

10.  Support the individual to identify and understand how his/her family history, genetics, etc. contribute to their overall health picture;

11.  Support the individual in understanding medication and related health concerns; and

12.  Promote health skills, considering fitness, healthy choices, nutrition, healthy meal preparation, teaching early warning signs/symptoms which indicate need for health intervention, etc.

Specific interventions may also include supporting the individual in being able to have conversations with various providers to access health support and treatment and assisting individuals in gaining confidence in asserting their personal health concerns and questions, while also assisting the person in building and maintaining self-management skills. Health should be discussed as a process instead of a destination.

Assistance will be provided to the individual to facilitate his/her active participation in the development of the Individualized Recovery Plan (IRP) health goals which may include but not be limited to attention to dental health, healthy weight management, cardiac health/hypertension, vision care, substance use disorders (including smoking cessation), vascular health, diabetes, pulmonary, nutrition, sleep disorders, stress management, reproductive health, human sexuality, and other health areas.

These interventions are necessarily collaborative: partnering with health providers and partnering with the individual served in dialogues with other community partners and supporters to reinforce and promote healthy choices. The Whole Health & Wellness Coach (CPS-WH) must also be partnered with the identified supporting nurse and other licensed health practitioners within the organization to access additional health support provided by the organization or to facilitate health referral and access to medical supports external to the organization providing this service.

The interventions are based upon respectful and honest dialogue supported by motivational coaching. The approach is strengths-based: sharing positive perspectives and outcomes about managing one's own health, what health looks like when the person gets there (visioning), assisting a person with re-visioning his/her self-perception (not as "disabled"), assisting the person in recognizing his/her own strengths as a basis for motivation, and identifying capabilities and opportunities upon which to build enhanced health and wellness. The peer-to-peer basis for the service allows the sharing of personal experience, including modeling wellness and mutual respect and support that is also respectful of the individualized process and journey of recovery. This equality partnership between the supported individual and the Whole Health & Wellness Coach (CPS-WH) should serve as a model for the individual as he/she then engages in other health relationships with health services practitioners. As such the identified nurse member of the team is in a supporting role to the Whole Health & Wellness Coach (CPS-WH).

A mind/body/spirit approach is essential to address the person's whole health. Throughout the provision of these services the practitioner addresses and accommodates an individual's unique sense of culture, spirituality, and self-discovery, assisting individuals in understanding shared decision making, and in building a relationship of mutual trust with health professionals.

| Admission Criteria | 1.  Individual must have two co-existing serious health conditions (hypertension, diabetes, obesity, cardiovascular issues, pulmonary issues, etc.), one of which is either a mental health condition or substance use disorder; **and one or more of the following:** |
| | 2.  Individual requires and will benefit from support of Whole Health & Wellness Coaches (CPS-WHs) for the acquisition of skills needed to manage health symptoms and utilize/engage community health resources; **or** |
| | 3.  Individual may need assistance to develop self-advocacy skills in meeting health goals, engaging in health activities, utilizing community-health resources, and accessing health systems of care; **or** |
| | 4.  Individual may need peer modeling to take increased responsibilities for his/her own recovery and wellness. |

## Peer Support Whole Health & Wellness - Individual

| | |
|---|---|
| Continuing Stay Criteria | 1. Individual continues to meet admission criteria; and<br>2. Progress notes document progress relative to health goals identified in the Individualized Recovery/Resiliency Plan, but treatment/recovery/wellness goals have not yet been achieved. |
| Discharge Criteria | 1. An adequate continuing care plan has been established; **and one or more of the following:**<br>2. Goals of the Individualized Recovery Plan have been substantially met; **or**<br>3. Individual/family requests discharge. |
| Service Exclusions | Individuals receiving Assertive Community Treatment are excluded from this service. (If an ACT team has a Whole Health & Wellness Coach (CPS-WH), then that Whole Health & Wellness Coach (CPS) can provide this intervention but would bill through that team's existing billing mechanisms). |
| Clinical Exclusions | Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition co-existing with one of the following diagnoses: Intellectual/Developmental Disabilities, Autism, Neurocognitive Disorder, Substance-Related Disorder, or Traumatic Brain Injury. |
| Required Components | 1. There is documentation available which evidences a minimum monthly team meeting during which the Whole Health & Wellness Coach/s and the agency-designated RN/s convene to:<br>  a. Promote communication strategies;<br>  b. Confer about specific individual health trends;<br>  c. Consult on health-related issues and concerns; and<br>  d. Brainstorm partnered approaches in supporting the person in achieving his/her whole health goals.<br>2. Services and interventions must be individually tailored to the needs, goals, preferences and assets of the individual with the goals of wellness and recovery as defined by the individual.<br>3. At least 60% of all service units must involve face-to-face contact with individuals. The remainder of direct billable service includes telephonic intervention directly with the person or is contact alongside the person to navigate and engage in health and wellness systems/activities. |
| Staffing Requirements | 1. This service is delivered in a one-to-one service model by a single practitioner to single individual served.<br>2. The following practitioners can provide Peer Supported Whole Health &Wellness:<br>  a. Practitioner Level 3: RN (only when he/she is identified in the agency's organizational chart as being the specific support nurse to the CPS).<br>  b. Practitioner Level 4: Whole Health & Wellness Coach (CPS-WH) with Master's or Bachelor's degree in one of the helping professions such as social work, community counseling, counseling, psychology, or criminology, under the supervision of a licensed independent practitioner.<br>  c. Practitioner Level 5: Whole Health & Wellness Coach (CPS-WH) with high school diploma/equivalent under supervision of one of the licensed/credentialed professionals above.<br>3. Partnering team members must include:<br>  a. A Whole Health & Wellness Coach (CPS-WH) who promotes individual self-determination, whole health goal setting, decision-making and provides essential health coaching and support to promote activities and outcomes specified above.<br>  b. An agency-designated Registered Nurse/s who provides back-up support to the Whole Health & Wellness Coach (CPS-WH) in the monitoring of each individual's health and providing insight to the Whole Health & Wellness Coach (CPS-WH) as they engage in the health coaching activities described above.<br>  c. There is no more than a 1:30 CPS-to-individual ratio.<br>  d. The Whole Health & Wellness Coach (CPS-WH) shall be supervised by a licensed independent practitioner (who may also be the RN partner).<br>  e. The Whole Health & Wellness Coach (CPS-WH) is the lead practitioner in the service delivery. The RN will be in a health consultation role to the Whole Health & Wellness Coach (CPS-WH) if there is an emerging health need; however, the individual is in charge of his/her own health process and this self-direction must be acknowledged throughout the practice of this service.<br>  f. The agency supports and promotes the participation of Whole Health & Wellness Coaches (CPS-WHs) in statewide technical assistance initiatives which enhance the skills and development of the CPS. |

## Peer Support Whole Health & Wellness - Individual

| | |
|---|---|
| Clinical Operations | The program shall have an Organizational Plan which will describe the following:<br>a. How the served individual will access the service;<br>b. How the preferences of the individual will be supported in accomplishing health goals;<br>c. Relationship of this service to other resources of the organization;<br>d. An organizational chart which delineates the relationship between the Whole Health & Wellness Coach (CPS-WH) and the RN;<br>e. Whole Health & Wellness Coach (CPS-WH) engagement expectations with the individuals served (e.g. planned frequency of contact, telephonic access, etc.);<br>f. The consultative relationship between the Whole Health & Wellness Coach (CPS-WH) and the RN. |
| Service Accessibility | 1. There is a minimum contact expectation with an individual weekly, either face-to-face or telephonically to track progress on the identified health goal. Unsuccessful attempts to make contact shall be documented.<br>2. To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:<br>&bull; the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or<br>&bull; the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.<br><br>Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. |
| Documentation Requirements | 1. All applicable Medicaid, ASO, and other DBHDD reporting requirements must be met.<br>2. There is documentation available which demonstrates a minimum monthly team meeting during which the Whole Health & Wellness Coach (CPS-WHs) and the agency-designated RN/s convene to discuss items identified in Required Components Item 1 in this definition. |
| Billing & Reporting Requirements | The only RN/s who are allowed to bill this service are those who are identified in the agency's organizational chart as being the specific support nurse to the CPS-WH for this wellness service.<br>When Telemedicine technology is utilized for the provision of this service in accordance with the allowance in the Service Accessibility section of this definition, the code cited in the Code Detail above with the appropriate GT modifier shall be utilized in documentation and claims submission. |

| Transaction Code | Code Detail | Code | Mo d 1 | Mo d 2 | Mo d 3 | Mo d 4 | Rate |
|---|---|---|---|---|---|---|---|
| Peer Support Whole Health & Wellness - Individual | Practitioner Level 4, Out-of-Clinic | H2017 | HQ | U4 | U7 | | $21.64 |
| | Practitioner Level 5, Out-of-Clinic | H2017 | HQ | U5 | U7 | | $16.12 |
| Utilization Criteria | TBD | | | | | | |

## Psychosocial Rehabilitation - Program

| Transaction Code | Code Detail | Code | Mo d 1 | Mo d 2 | Mo d 3 | Mo d 4 | Rate |
|---|---|---|---|---|---|---|---|
| Psychosocial Rehabilitation | Practitioner Level 4, In-Clinic | H2017 | HQ | U4 | U6 | | $17.72 |
| | Practitioner Level 5, In-Clinic | H2017 | HQ | U5 | U6 | | $13.20 |
| Unit Value | Unit=1 hour | | | | | | |
| Service Definition | A therapeutic, rehabilitative, skill building and recovery promoting service for individuals to gain the skills necessary to allow them to remain in or return to naturally occurring community settings and activities. Services include, but are not limited to:<br>1. Individual or group skill building activities that focus on the development of skills to be used by individuals in their living, learning, social and working environments;<br>2. Social, problem solving and coping skill development;<br>3. Illness and medication self-management; | | | | | | |

## Psychosocial Rehabilitation - Program

4. Prevocational skills (for example: preparing for the workday; appropriate work attire and personal presentation including hygiene and use of personal effects such as makeup, jewelry, perfume/cologne etc. as appropriate to the work environment; time management; prioritizing tasks; taking direction from supervisors; appropriate use of break times and sick/personal leave; importance of learning and following the policies/rules and procedures of the workplace; workplace safety; problem solving/conflict resolution in the workplace; communication and relationships with coworkers and supervisors; resume and job application development; on-task behavior and task completion skills such as avoiding distraction from work tasks, following a task through to completion, asking for help when needed, making sure deadlines are clarified and adhered to, etc.; learning common work tasks or daily living tasks likely to be utilized in the workplace such as telephone skills, food preparation, organizing/filing, scheduling/participating in/leading meetings, computer skills etc.); and

5. Recreational activities and/or leisure skills which support a goal on the IRP and improve rehabilitation skills necessary for recovery.

The programmatic goals of the service must be clearly articulated by the provider, utilizing a best/evidence-based model for service delivery and support. These best/evidence-based models may include: The Boston University Psychosocial Rehabilitation approach, the Lieberman Model, the International Center for Clubhouse Development approach, or blended models/approaches in accordance with current psychosocial rehabilitation research. Practitioners providing this service are expected to maintain knowledge and skills regarding current research trends in best/evidence-based models and practices for psychosocial rehabilitation.

This service is offered in a group setting. Group activities and interventions should be made directly relevant to the needs, desires and IRP goals of the individual participants (i.e. an additional activity/group should be made available as an alternative to a particular group for those individuals who do not need or wish to be in that group, as clinically appropriate).

| | |
|---|---|
| **Admission Criteria** | 1. Individual must have a behavioral health issue (including those with a co-occurring substance use disorder or IID/IDD) and present a low or no risk of danger to themselves or others; and one or more of the following:<br>2. Individual lacks many functional and essential life skills such as daily living, social skills, vocational/academic skills and/or community/family integration; or<br>3. Individual needs frequent assistance to obtain and use community resources. |
| **Continuing Stay Criteria** | 1. Behavioral health issues that continue to present a low or no imminent risk of danger to themselves or others (or is at risk of moderate to severe symptoms); and one or more of the following:<br>2. Individual improvement in skills in some but not all areas; or<br>3. If services are discontinued there would be an increase in symptoms and decrease in functioning. |
| **Discharge Criteria** | 1. An adequate continuing care plan has been established; **and one or more of the following:**<br>2. Individual has acquired a significant number of needed skills; **or**<br>3. Individual has sufficient knowledge and use of community supports; **or**<br>4. Individual demonstrates ability to act on goals and is self-sufficient or able to use peer supports for attainment of self-sufficiency; **or**<br>5. Individual/family need a different level of care; **or**<br>6. Individual/family requests discharge. |
| **Service Exclusions** | 1. Cannot be offered in conjunction with SA Intensive Outpatient Program Services.<br>2. Service can be offered while enrolled in a Crisis Stabilization Unit in a limited manner when documentation supports this combination as a specific need of the individual. Time and intensity of services in PSR must be at appropriate levels when PSR is provided in conjunction with other services. (This will trigger a review by the Administrative Services Organization). This service cannot be offered in conjunction with Medicaid I/DD Waiver services. |
| **Clinical Exclusions** | 1. Individuals who require one-to-one supervision for protection of self or others.<br>2. Individual has diagnosis of a substance use disorder, Developmental Disability, Autism Spectrum Disorder, or Neurocognitive Disorder without a co-occurring DSM mental health diagnosis. |
| **Required Components** | 1. This service must operate at an established clinic site approved to bill Medicaid for services. However, individual or group activities should take place offsite in natural community settings as is appropriate to the participating individual's Individualized Recovery Plan. |

## Psychosocial Rehabilitation - Program

2. This service may operate in the same building as other day-model services; however, there must be a distinct separation between services in staffing, program description, and physical space during the hours the PSR program is in operation except as described above.

3. Adequate space, equipment, furnishings, supplies and other resources must be provided in order to effectively provide services and so that the program environment is clean and in good repair. Space, equipment, furnishings, supplies, transportation, and other resources for individual use within the PSR program must not be substantially different from that provided for other uses for similar numbers of individuals.

4. The program must be operated for no less than 25 hours/week, typically during day, evening and weekend hrs. No more than 5 hours/day may be billed per individual.

5. A PSR program must operate to assist individuals in attaining, maintaining, and utilizing the skills and resources needed to aid in their own rehabilitation and recovery.

| Staffing Requirements | 1. The program must be under the direct programmatic supervision of a Certified Psychiatric Rehabilitation Practitioner (CPRP), or staff who can demonstrate activity toward attainment of certification (an individual can be working toward attainment of the certification for up to one year under a non-renewable waiver which will be granted by the DBHDD). For purposes of this service "programmatic supervision" consists of the day-to-day oversight of the program as it operates (including elements such as maintaining the required staffing patterns, staff supervision, daily adherence to the program model, etc.). |
|---|---|
| | 2. Additionally, the program must be under the clinical oversight of an independently licensed practitioner (this should include meeting with the programmatic leadership on a regular basis to provide direction and support on whether the individuals in the program are clinically improving, whether the design of the program promotes recovery outcomes, etc.). |
| | 3. There must be a CPRP with a bachelor's degree present at least 80% of all time the service is in operation regardless of the number of individuals participating. |
| | 4. The maximum face-to-face ratio cannot be more than 12 individuals to 1 direct service/program staff (including CPRPS) based on average daily attendance of individuals in the program. |
| | 5. At least one CPRP (or someone demonstrating activity toward attainment of certification) must be onsite face-to-face at all times (either the supervising CPRP or other CPRP staff) while the program operates regardless of the number of individuals participating. All staff are encouraged to seek and obtain the CPRP credential. All staff must have an understanding of recovery and psychosocial rehabilitation principles as defined by USPRA and must possess the skills/ability to assist individuals in their own recovery processes. |
| | 6. Programs must have documentation that there is one staff person that is "co-occurring capable." This person's knowledge must go beyond basic understanding and must demonstrate actual staff capabilities in using that knowledge for individuals with co-occurring disorders. Personnel documentation should demonstrate that this staff person has received a minimum of 4 hours of training in co-occurring treatment within the past 2 years. |
| | 7. If the program does not employ someone who meets the criteria for a MAC, CAADC, GCADC-II or -III, or CAC-II, then the program must have documentation of access to an addictionologist and/or one of the above for consultation on substance use disorders as co-occurring with the identified mental illness. |

| Clinical Operations | 1. Individuals receiving this service must have a qualifying diagnosis present in the medical record prior to the initiation of services. The diagnosis must be given by persons identified in O.C.G.A Practice Acts as qualified to provide a diagnosis. |
|---|---|
| | 2. Rehabilitation services facilitate the development of an individual's skills in the living, learning, social, and working environments, including the ability to make decisions regarding self-care, management of illness, life work, and community participation. The services promote the use of resources to integrate the individual into the community. |
| | 3. Rehabilitation services are individual-driven and are founded on the principles and values of individual choice and active involvement of individuals in their rehabilitation. Through the provision of both formal and informal structures individuals are able to influence and shape service development. |
| | 4. Rehabilitation services must include education on self-management of symptoms, medications and side effects; identification of rehabilitation preferences; setting rehabilitation goals; and skills teaching and development. |
| | 5. All individuals should participate in setting individualized goals for themselves and in assessing their own skills and resources related to goal attainment. Goals are set by exploring strengths and needs in the individual's living, learning, social, and working environments. Implementation of services may take place individually or in groups. |
| | 6. Each individual must be provided assistance in the development and acquisition of needed skills and resources necessary to achieve stated goals. |

## Psychosocial Rehabilitation - Program

7. PSR programs must offer a range of skill-building and recovery activities from which individuals choose those that will most effectively support achievement of the individual's rehabilitation and recovery goals. These activities must be developed based on participating individual's input and stated interests. Some of these activities should be taught or led by consumers themselves as part of their recovery process.

8. A PSR program must be capable of serving individuals with co-occurring disorders of mental illness and substance abuse utilizing integrated methods and approaches that address both disorders at the same time (e.g. groups and occasional individual interventions utilizing approaches to co-occurring disorders such as motivational interviewing/building motivation to reduce or stop substance use, stage based interventions, refusal skill development, cognitive behavioral techniques, psychoeducational approaches, relapse prevention planning and techniques etc.). For those individuals whose substance abuse and dependence makes it difficult to benefit from the PSR program, even with additional or modified methods and approaches, the PSR program must offer co-occurring enhanced services or make appropriate referrals to specialty programs specifically designed for such individuals.

9. The program must have a PSR Organizational Plan addressing the following:
   a. Philosophical principles of the program must be actively incorporated into all services and activities including (adapted from Hughes/Weinstein):
      i. View each individual as the director of his/her rehabilitation process.
      ii. Solicit and incorporate the preferences of the individuals served.
      iii. Believe in the value of self-help and facilitate an empowerment process.
      iv. Share information about mental illness and teach the skills to manage it.
      v. Facilitate the development of recreational pursuits.
      vi. Value the ability of each individual with a mental illness to seek and sustain employment and other meaningful activities in a natural community environment.
      vii. Help each individual to choose, get, and keep a job (or other meaningful daily activity).
      viii. Foster healthy interdependence.
      ix. Be able to facilitate the use of naturally occurring resources to replace the resources of the mental health system.
   b. Services and activities described must include attention to the following:
      i. Engagement with others and with community.
      ii. Encouragement.
      iii. Empowerment.
      iv. Consumer Education and Training.
      v. Family Member Education and Training.
      vi. Assessment.
      vii. Financial Counseling.
      viii. Program Planning.
      ix. Relationship Development.
      x. Teaching.
      xi. Monitoring.
      xii. Enhancement of vocational readiness.
      xiii. Coordination of Services.
      xiv. Accommodations.
      xv. Transportation.
      xvi. Stabilization of Living Situation.
      xvii. Managing Crises.
      xviii. Social Life.
      xix. Career Mobility.

## Psychosocial Rehabilitation - Program

| | |
|---|---|
| | xx. Job Loss.<br>xxi. Vocational Independence.<br>c. A description of the particular rehabilitation models utilized, types of interventions practiced, and typical daily activities and schedule.<br>d. A description of the staffing pattern plans for staff who will achieve CPRP credentials, and how staff are deployed to assure that the required staff-to-individual ratios are maintained, including how unplanned staff absences, illnesses, and emergencies are accommodated.<br>e. A description of how the program will assure that it is co-occurring capable and how it will adjust or make appropriate referrals for individuals needing a co-occurring enhanced PSR program.<br>f. A description of the hours of operation, the staff assigned, and the types of services and activities provided for individuals, families, parents, and/or guardians including how individuals are involved in decision-making about both individual and program-wide activities.<br>g. A description of the daily program model organized around around 50 minutes of direct programmatic intervention per programmatic hour. The 10 remaining minutes in the hour allows supported transition between PSR-Group programs and interventions.<br>h. A description of how the plan for services and activities will be modified or adjusted to meet the needs specified in each IRP.<br>i. A description of services and activities offered for education and support of family members.<br>j. A description of how individual requests for discharge and change in services or service intensity are handled and resolved. |
| Service Access | A PSR program must be open for no less than 25 hours a week, typically during day, evening and weekend hours.  No more than 5 hours per day may be billed per/individual. |
| Billing and Reporting Requirements | Units of service by practitioner level must be aggregated daily before claim submission. |
| Documentation Requirements | 1. Providers must document services in accordance with the specifications for documentation requirements specified in Part II, Section III of the Provider Manual.<br>2. Each hour unit of service provided must be documented within the individual's medical record. Although there is no single prescribed format for documentation (a log may be used), the following elements MUST be included for every unit of service provided:<br>  a. The specific type of intervention must be documented.<br>  b. The date of service must be named.<br>  c. The number of unit(s) of service must be named.<br>  d. The practitioner level providing the service/unit must be named.<br>For example, a group led by a Practitioner Level 4 that lasts 1 hour should be documented as 4 units of H0017U4U6 and the intervention type should be noted (such as "Enhancement of Recovery Readiness" group).<br>3. A weekly log should be present in the record which includes a summary of each day's participation in the programmatic group content.<br>4. The provider has several alternatives for documenting progress notes:<br>  a. Weekly progress notes must document the individual's progress relative to functioning and skills related to the person-centered goals identified in his/her IRP. This progress note aligns the weekly PSR-Group activities reported against the stated interventions on the individualized recovery plan, and documents progress toward goals. This progress note may be written by any practitioner who provided services over the course of that week; or<br>  b. If the agency's progress note protocol demands a detailed daily note which documents the progress above, this daily detail note can suffice to demonstrate functioning, skills, and progress related to goals and related to the content of the group intervention; or<br>  c. If the agency's progress note protocol demands a detailed hourly note which documents the progress above, this daily detail note can suffice to demonstrate functioning, skills, and progress related to goals and related to the content of the group intervention.<br>5. While billed in increments, the PSR-Group service is a program model. Daily time in/time out to the program is tracked for while the person is present in the program, but due to time/in out not being required for each hourly intervention, the time in/out may not correlate with the units billed for the day. However, the units noted on the log should be consistent with the units billed and, if noted, on the weekly progress note. If the units documented are not consistent, the most conservative number of units will be utilized. |

## Psychosocial Rehabilitation - Program

6. A provider shall only record units in which the individual was actively engaged in services. Any time allocated in the programmatic description for meals typically does not include organized programmatic group content and therefore would not be included in the reporting of units of service delivered. Should an individual leave the program or receive other services during the range of documented time in/time out for PSR-Group hours, the absence should be documented on the log.

7. Rounding is applied to the person's cumulative hours/day at the PSR program (excluding non-programmatic time). The provider shall follow the guidance in the rounding policy included in this Provider Manual, and, specific to this service, the person served must have participated in at least 50% of the hour in order to bill for one unit of this service. For instance, if an individual participates in the program from 9-1:15 excluding a 30-minute break for lunch, his/her participating hours are 3.75 hours. The rounding policy is applied to the .75 hour and the units billed for that day are 4 units. Practitioner type must still be addressed and so that 4 units must be adequately assigned to either a U4 or U5 practitioner type as reflected in the log for that day's activities.

8. When this service is used in conjunction with Crisis Stabilization Units, Peer Supports, and ACT (on a limited basis), documentation must demonstrate careful planning to maximize the effectiveness of this service as well as appropriate reduction in service amounts of PSR-group based upon current medical necessity. Utilization of psychosocial rehabilitation in conjunction with these services is subject to additional review by the Administrative Services Organization.

## Residential: Community Residential Rehabilitation I (Intensive / Level 1)

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Behavioral Health; Long-Term Residential, Without Room and Board, Per Diem | Community Residential Rehabilitation Level I | H0043 | R3 | | | | $99.23 |
| Unit Value | 1 day | | Maximum Daily Units | | | 1 | |
| Service Definition | CRR I provides residential rehabilitation services to an individual who require an intensive level of structured support to achieve and enhance their recovery and wellness, increase self-sufficiency and independence, while maintaining community integration. Residential rehabilitation services are individualized goal directed trainings and supports used to restore an individual to the highest level of baseline functioning in the least restrictive and appropriate environment. Services provided include rehabilitative skills building in a variety of areas (such as activities for daily living, health and safety, home and financial management, and personal growth), community integration activities, and rehabilitative supervision. These individualized supportive residential rehabilitative services promote individual initiative, preference, and independence in meeting life choices regarding services and supports, and who provides them; activities that are fully integrated into the community to achieve community-based supports; and staff support and coordination. This level of residential support requires 24/7 on site awake staff. Individuals receiving this level of Community Residential Rehabilitation should experience decreased symptomology (or a decrease in debilitating effects of symptoms), improved social integration and functionality, and increased movement toward self-directed recovery as evidenced by:<br>1. Reduction in hospitalizations;<br>2. Reduction in incarcerations;<br>3. Maintenance of housing stability;<br>4. Participation in education, vocational training or gainful employment, if this is a goal in the Individualized Recovery Plan;<br>5. Participation in activities that promote recovery and community integration such as community meetings and other social and recreational activities. | | | | | | |
| Admission Criteria | Adults aged 18 or older who meet the following criteria: | | | | | | |

## Psychosocial Rehabilitation - Program

1. A primary SPMI diagnosis with functional limitations that severely impair their ability to live in a community-based setting without a high level of residential support and supervision. **AND**

2. There is a need for 24/7 awake staff on site to ensure safety and harm reduction to self and others as evidenced by the following:

   a. Within the past 60 days there is demonstrated evidence of clear and consistent behaviors occurring a minimum of one time per week contributing to risk of harm and safety (i.e. wandering, elopement, poor safety judgment, sleep disturbance resulting in night terror or anxiety, agitation, aggression, poor impulse control, nighttime confusion/disorientation (excluded from 60 day timeframe cited above) that would benefit from 24/7 awake staff support during nighttime hours (SOURCE CITATIONS: Documentation of these behaviors from courts, acute treatment settings (hospitals, CSUs, PRTFs) prison, jails, other residential providers, etc.) **AND**

   b. Significant functional impairment and needs assistance in 3 or more of the following areas: inability to maintain hygiene, meet nutritional needs, care for personal business affairs, avoid common dangers or hazards to self and possessions, failure to perform daily tasks with minimal assistance; inability to carry out homemaker roles. **AND**

   c. Lack the ability to live in an independent setting without intensive residential supports and services, demonstrating a need for assistance to care for self in a safe and sanitary manner as evidenced by 3 or more of the following: need assistance with food and clothing, are unable to maintain hygiene, grooming, nutrition, medical or dental care for primary health care conditions, history of hospitalization or at risk of confinement because of dangerous behavior due to inability to manage illness, lack of medication compliance, experience significant issues such as social isolation, poverty, homelessness, no family support, and substance use/co-occurring disorders **AND**

3. Individuals who utilize this level of service typically have no other viable means of support. **AND**

4. Within the last 180 days attempts at a lower level of residential care have either been considered or tried but have shown little to no effectiveness. **AND**

5. Individuals with two or more of the following indicators of continuous high service needs: high use of psychiatric hospital, CSU; persistent symptoms that place individual at risk of harm to self or others; co existing substance use of significant duration and chronically homelessness. **AND**

6. Priority given to those persons recently discharged from a state psychiatric hospital or CSU diagnosed with schizophrenia, other psychotic disorders, or bipolar disorder and clinically assessed as requiring 24/awake staff support.

### Continuing Stay Criteria

1. Individual continues to meet admission criteria as described above.

2. Individual continues to benefit from and require intensive residential supports, as evidenced by the Comprehensive Needs Assessment, Housing Goal, and Residential Functional Assessment.

### Discharge Criteria

1. Discharge can take place when:

   a. An individual or legal representative/guardian withdraws consent or request discharge from this service (refusal to participate in treatment services is not solely a reason for discharge. The Provider must actively engage the individual in the benefit of treatment compliance, thus allowing the individual to make a personal choice to re-engage in services); **OR**

   b. An individual has achieved his/her goals in the IRP and has appropriate living arrangements that are less restrictive; **OR**

   c. An individual has not achieved his/her goals in the IRP and based on current functioning a higher level of care is recommended.

### Service Exclusions

No other residential services are allowable in conjunction with this service.

### Clinical Exclusions

Individuals with the following conditions are excluded from admission unless there is documented evidence of psychiatric condition: Developmental Disability, Autism, Neurocognitive Disorder, or Traumatic Brain Injury. Individual can be effectively and safely supported without 24/7 awake staff.

## Psychosocial Rehabilitation - Program

| | |
|---|---|
| Required Components | 1. CRR I length of stay is between 12-18 months, and should not typically exceed 18 months. |
| | 2. The agency providing this service must be either CARF or Joint Commission accredited. |
| | 3. Residential setting should not exceed 16 beds for existing providers in operation as of July 1, 2016. |
| | 4. For residential settings/properties approved for service after July 1, 2016, no residential treatment setting shall exceed 4 beds. |
| | 5. The residential program must provide a structured and supported living environment 24 hours a day, 7 days a week with AWAKE staff on-site at all times. |
| | 6. Providers will facilitate Quarterly Team Meetings with the Central Office, Regional Field Office, and individual to report findings of quarterly Residential Functional Assessments, review Housing Goal, and discharge transition plan. Where appropriate, specialty services (such as ACT, CST, ICM, and SE) should also be included in these quarterly meetings. Documentation of this meeting must be entered into the Electronic Medical Record as a non-billable Progress Note. |
| | 7. All involuntary discharges must be approved by the Regional Field Office to ensure that the individual is being discharged to a positive housing setting/environment. |
| | 8. The service site must be licensed by the Georgia HFR as a PCH or CLA facility which can provide support to those with behavioral health concerns. |
| | 9. The Provider and service site must be trained and knowledgeable regarding Protecting the Rights of its individuals as written in the Rules and Regulations set forth by DCH for a PCH or CLA. The home must operate in a manner that respects the personal dignity of the individual. |
| | 10. Each residential site must be arranged and maintained to provide adequate measures for the health, safety, access and well-being of the residents. Each resident facility must comply with all relevant safety codes. |
| | 11. All areas of the residential facility must be clean, safe, appropriately equipped, and furnished for the services delivered. |
| | 12. The facility must comply with the Americans with Disabilities Act. Specifically, the facility must provide access to ground-level units that meet ADA criteria for individuals who have a physical disability. |
| | 13. The facility must maintain a written evacuation plan to be used in the case of fire or other disaster. An appropriate written certification of compliance must be obtained indicating that all applicable fire and safety code requirements have been satisfied. Periodic fire and other safety drills must be conducted. |
| | 14. Evacuation routes must be clearly marked by exit signs. |
| | 15. The program must be responsible for providing physical facilities that are structurally sound and that meet all applicable federal, state, and local regulations for adequacy of construction, safety, sanitation, and health. |
| | 16. The site/facility location is integrated within the community and supports access to the greater community. |
| | 17. Each individual has privacy in their sleeping or living unit. The common areas should be available to residents. |
| | 18. Units have lockable entrance doors, with the individual-served and appropriate staff having keys to doors as needed. |
| | 19. To the best extent possible, individuals sharing units have a choice of roommates. |
| | 20. For sites in which an individual might have an extended length of stay, individuals have the freedom to decorate their sleeping or living units. |
| | 21. Individuals have freedom and support to control their schedules and activities and have access to food any time. |
| | 22. To the best extent possible and with respect to other participants, individuals may have visitors at any time, with the exception of during late night hours and overnight. |
| | 23. As a part of the planning for when an individual will move to housing of his/her own choice, the Housing Choice and Needs Evaluation https://dbhddapps.dbhdd.ga.gov/NSH/ must be completed at admission and annually for every individual, as indicated on their IRP. The only exception to this expectation is when an individual chooses to opt out due to stable housing, personal choice, etc. |
| Staffing Requirements | 1. Residential sites are required to have an on-site residential manager/supervisor. Residential Managers/Supervisors may be persons with at least 2 years' experience providing MH or AD services and at least a high school diploma; however, this person must be directly supervised by a licensed staff member (including LMSW, LMFT, APC, or 4-year RN). |
| | 2. The Residential Manager/Supervisor is required to be on-site at the CRR I site at least 3x/week to provide oversight and supervision to the staff who provide direct daily services and supports. |

## Psychosocial Rehabilitation - Program

3. Persons with high school diplomas, GEDs or higher, who have completed the paraprofessional training required for DBHDD contracted organizations and under the supervision of a Residential Manager may perform residential services.
4. A minimum of at least one (1) awake on-site staff 24/7.
5. Providers should make adjustments for increased staffing as appropriate based on the clinical needs of the individuals within the residential program.

| Clinical Operations | 1. Individuals must be assisted with the below items within the first 7 days of admission and every 90 days until discharge to determine appropriateness for this level of residential support: |
|---|---|

a. A Comprehensive Needs Assessment that includes the below activities:
   i. Applying for and obtaining vital records.
   ii. Submitting appropriate benefit/entitlement applications to assist with the financial demands of independent living.
   iii. Identification of natural supports (i.e. family, friends, and support groups) and ways to strengthen/utilize them while living in the community.
   iv. Linkage to adult mental health and/or substance use disorder services, as well as primary care providers and/or specialty services as applicable. Services can be provided by a Core or Private Psychiatrist and individual choice/preference should always be considered. Individuals served shall not lose this residential support as a result of his/her choice to opt out of other behavioral health support/medical treatment services (unless these services are otherwise required by a federal program/fund source supporting a specific individual).

b. A Housing Goal that clearly states the desire of the individual, identifies available housing opportunities, resources, and supports (i.e. housing types, costs, and locations), and promotes opportunities for continued growth, independence, and community integration.

c. A Primary and Secondary/Contingency Transition Plan that clearly identifies the steps needed to achieve the desired Housing Goal and address any barriers to transition.

d. A Residential Crisis Response Plan that guides the residential provider's response to an individual's crisis episode while receiving residential services that diverts the loss of housing and promotes housing stability. This plan shall be developed in partnership with the individual and offer 24/7 access to a residential services specialist in the event of a crisis.

e. A Residential Functional Assessment

2. CRR I provide a minimum of (5) hours of weekly residential rehabilitation services to an individual who requires an intensive level of structured support to achieve/enhance their recovery and increase self-sufficiency. These services can only be provided by residential staff and must be focused on independent living skills necessary for the individual to live in a lesser structured setting. Examples of Residential Rehabilitative Services include:

a. **Rehabilitative Skill Building** which includes:
   i. Activities for daily living, especially those involving maintaining personal hygiene and proper grooming/dress.
   ii. Health and Safety interventions aimed at assisting individuals with access to behavioral health, substance use, and medical treatment services, as well as continuous engagement and adherence to these services; symptom identification and wellness management that promotes appropriate behaviors and safety in the community, and self-administration of medication.
   iii. Home Management, to include meal planning, preparation, and cooking, laundry, and housekeeping.
   iv. Financial Management that promotes the ability to manage personal finances and entitlements.
   v. Personal Growth that allows an individual to express housing choice and preference, develop better communication and social skills using coping skills and positive peer interactions.

b. **Community Integration Activities** which allow for opportunities to seek employment and work in competitive integrated settings; attend institutions for higher learning; engage in community life; learn the skills necessary to utilize natural supports in the community.

c. **Rehabilitative Supervision** that requires staff to monitor the individual's response to treatment interventions and make adjustments to the IRP as indicated.

3. Services must be delivered to individuals in accordance with their Individualized Recovery Plan.
4. Any individual enrolled in this service for whom acute stabilization services are necessary (e.g.: inpatient hospitalization, crisis stabilization unit, emergency department intervention, BHCC, etc.), the provider must conduct a clinical review of the individual's relevant clinical information (e.g. discharge plan/summary,

## Psychosocial Rehabilitation - Program

|  |  |
|---|---|
| | risk assessments, treatment recommendations, etc.) and modify the individual's IRP as necessary, in accordance with Part II, Section III: Documentation Requirements of this manual, item # 5. Individualized Recovery/Resiliency Planning, sub-item E. |
| 5. | Because DBHDD is committed to providing choices for housing (based on complete information, including the individual's needs, preferences, and the appropriate, available housing options), the residential staff affiliated with this program shall introduce concepts of independent living and promote activities towards the goals of successful, individualized, community-integrated housing during the ongoing residential support provided within this service. |
| 6. | CRR I is a transitional residential setting and is NOT intended to provide a long-term residential placement, nor permanent housing. As such, discharge planning begins upon admission and should reinforce the therapeutic nature of residential supports to ensure individual stability before discharge. |
| 7. | When an individual begins to substantially meet IRP goals and objectives, final transition arrangements to the appropriate level of residential care shall begin within the next 7 to 14 days (ASO reserves the right to authorize transition days accordingly). |
| Service Accessibility | 1. Provider shall have a documented process to receive referrals during normal business hours (i.e. fax number where referrals maybe received).<br>2. Provider must have a documented process to accept individuals for admission during normal business hours/Monday – Friday, 8 am – 6 pm. |
| Documentation Requirements | 1. The organization must develop and maintain sufficient written documentation to support the Residential Service for which billing is made. This documentation, at a minimum, must confirm that the individual for whom billing is requested was a resident of the Residential Service on the date of service.<br>2. The individual's record must also include each week's programming/service schedule in order to document the provision of the required amount of skills training and support activities. Weekly progress notes must be entered in the individual's record to enable the monitoring of the individual's progress toward IRP and recovery goals.<br>3. The record should include health issues and how they are being addressed; appointments for psychiatric and medical care that are scheduled for the consumer; attendance at other treatments such as substance use disorder counseling that staff may be assisting consumer to attend; assistance provided to the consumer to help him or her reach recovery goals; and the consumer's participation in other recovery activities. |
| Billing & Reporting Requirements | 1. Each month, the provider must submit a Monthly Residential Programmatic Report developed by DBHDD.<br>2. All applicable ASO, Encounter Data and DBHDD reporting requirements must be adhered to. |

## Residential: Community Residential Rehabilitation III (Semi-Independent / Level 3)

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Behavioral Health; Long-Term Residential, Without Room and Board, Per Diem | Community Residential Rehabilitation Level III | H0043 | R2 | | | | $46.43 |

| Unit Value | | | | Maximum Daily Units | |
|---|---|---|---|---|---|
| 1 day | | | | 1 | |

| Service Definition |
|---|
| CRR III provides residential rehabilitation services to an individual who require a moderate and periodic level of structured support to achieve and enhance their recovery and wellness, increase self-sufficiency and independence, while maintaining community integration. Residential rehabilitation services are individualized goal directed trainings and supports used to restore an individual to the highest level of baseline functioning in the least restrictive and appropriate environment. Services provided include rehabilitative skills building in a variety of areas (such as activities for daily living, health and safety, home and financial management, and personal growth), community integration activities, and rehabilitative supervision. These individualized supportive residential rehabilitative services promote individual initiative, |

| | |
|---|---|
| | preference, and independence in making life choices regarding services and supports, and who provides them; activities that are fully integrated into the community to achieve community-based supports; and staff support and coordination. |
| | Individuals receiving this level of Community Residential Rehabilitation should experience decreased symptomology (or a decrease in debilitating effects of symptoms), improved social integration and functionality, and increased movement toward self-directed recovery as evidenced by: |
| | 1. Reduction in hospitalizations; |
| | 2. Reduction in incarcerations; |
| | 3. Maintenance of housing stability; |
| | 4. Participation in education, vocational training or gainful employment, if this is a goal in the Individualized Recovery Plan; |
| | 5. Participation in activities that promote recovery and community integration such as community meetings and other social and recreational activities. |
| Admission Criteria | Adults aged 18 or older who meet the following criteria: |
| | 1. A primary SPMI diagnosis with functional limitations that severely impair their ability to live in a community-based setting without a high level of residential support and supervision. Individual does not demonstrate complete independence with the basic self-help skills needed to live independently as their desired housing preference; |
| | **AND** |
| | 2. There is a need for access to 24/7 staff support that is not required to be on site at all times to support and ensure safety and harm reduction to self and others as evidenced by the following: |
| |    a. Significant functional impairment and needs assistance in 2 or more of the following areas: inability to maintain hygiene, meet nutritional needs, care for personal business affairs, avoid common dangers or hazards to self and possessions, failure to perform daily tasks with minimal assistance, inability to carry out homemaker's roles; **and** |
| |    b. Lack the ability to live in an independent setting without residential supports and services, demonstrating a need for assistance to care for self in a safe and sanitary manner as evidenced by 2 or more of the following: need assistance selecting proper clothing, engaging in medical and dental care, following recommendations or primary health condition in a home setting, inability to self-administer medications a prescribed, experiences with significant issues such as social isolation, poverty, homelessness, no family support, substance use/co-occurring disorders; |
| | **AND** |
| | 3. Individuals with two or more of the following indicators of continuous high service needs: high use of hospital, CSU; persistent symptoms that place individual at risk of harm to self or others; co existing substance use of significant duration and chronically homelessness; |
| | **AND** |
| | 4. Priority will be given to individuals who: |
| |    a. Have recently discharged from a state psychiatric hospital or CSU; |
| |    b. Have been diagnosed with schizophrenia, other psychotic disorders, or a bipolar disorder; |
| |    c. Are transitioning from CRR Level I; or |
| |    d. Have been clinically determined to require access to 24/7 staff support, although staff are not necessarily on-site at all times. |
| Continuing Stay Criteria | 1. Individual continues to meet admission criteria as described above; **AND** |
| | 2. Individual continues to benefit from and require moderate residential supports, as evidenced by the Comprehensive Needs Assessment, Housing Goal, and Residential Functional Assessment. |
| Discharge Criteria | Discharge can take place when: |
| | 1. An individual or legal representative/guardian withdraws consent or requests discharge from this service (Refusal to participate in treatment services is not solely a reason for discharge. The Provider must actively engage the individual in the benefit of treatment compliance, thus allowing the individual to make a personal choice to re-engage in services); **OR** |
| | 2. An individual has achieved his/her goals in the IRP and has appropriate living arrangements that are less restrictive; **OR** |
| | 3. An individual has not achieved his/her goals in the IRP, and based on current functioning a higher level of care is recommended. |

| | |
|---|---|
| Service Exclusions | 1. No other residential services are allowable in conjunction with this service.<br>2. Congregate Apartment Settings (unless the location has the proper licensure through HFR). Pairing this residential setting with any housing/rental payment subsidy that is considered long term and permanent is not allowed. |
| Clinical Exclusions | Individuals with the following conditions are excluded from admission unless there is documented evidence of psychiatric condition: Developmental Disability, Autism, Neurocognitive Disorder, or Traumatic Brain Injury. Individual can be effectively and safely supported without 24/7 staff support. |
| Required Components | 1. CRR III length of stay is between 12-18 months, and should not typically exceed 18 months.<br>2. The agency providing this service must be either CARF or Joint Commission accredited.<br>3. Residential setting should not exceed 16 beds for existing providers in operation as of July 1, 2016.<br>4. For residential settings/properties approved for this service after July 1, 2016, no residential treatment setting shall exceed 4 beds.<br>5. The residential program must provide a structured and supported living environment 24 hours a day, 7 days a week, with a minimum of 36 hours of on-site staff.<br>6. Providers will organize a quarterly residential team meeting with the individual to report findings of quarterly Residential Functional Assessments, review Housing Goal, and discharge transition plan. Where appropriate, specialty services (such as ACT, CST, ICM, and SE) should also be included in these quarterly meetings. Documentation of this meeting must be entered into the Electronic Medical Record as a non-billable Progress Note.<br>7. The service site must be licensed by the Georgia HFR as a PCH or CLA facility which can provide support to those with behavioral health concerns, in accordance with those rules and regulations. However, the configuration of some sites may be such that they do not require licensure.<br>8. The Provider and service site must be trained and knowledgeable regarding Protecting the Rights of its individuals as written in the Rules and Regulations set forth by DCH for a PCH or CLA. The home must operate in a manner that respects the personal dignity of the individual.<br>9. Each residential site must be arranged and maintained to provide adequate measures for the health, safety, access and well-being of the residents. Each resident facility must comply with all relevant safety codes.<br>10. All areas of the residential facility must be clean, safe, appropriately equipped, and furnished for the services delivered.<br>11. The facility must comply with the Americans with Disabilities Act. Specifically, the facility must provide access to ground-level units that meet ADA criteria for individuals who have a physical disability.<br>12. The facility must maintain a written evacuation plan to be used in the case of fire or other disaster. An appropriate written certification of compliance must be obtained indicating that all applicable fire and safety code requirements have been satisfied. Periodic fire and other safety drills must be conducted.<br>13. Evacuation routes must be clearly marked by exit signs.<br>14. The program must be responsible for providing physical facilities that are structurally sound and that meet all applicable federal, state, and local regulations for adequacy of construction, safety, sanitation, and health.<br>15. The site/facility location is integrated within the community and supports access to the greater community.<br>16. Each individual has privacy in their sleeping or living unit. The common areas should be available to residents.<br>17. Units have lockable entrance doors, with the individual-served and appropriate staff having keys to doors as needed.<br>18. To the best extent possible, individuals sharing units have a choice of roommates.<br>19. For sites in which an individual might have an extended length of stay, individuals have the freedom to decorate their sleeping or living units.<br>20. Individuals have freedom and support to control their schedules and activities and have access to food any time.<br>21. To the best extent possible and with respect to other participants, individuals may have visitors at any time, with the exception of during late night hours and overnight.<br>22. As a part of the planning for when an individual will move to housing of his/her own choice, the Housing Choice and Needs Evaluation https://dbhddapps.dbhdd.ga.gov/NSH/ must be completed at admission and annually for every individual as indicated on their IRP. The only exception to this expectation is when an individual chooses to opt out due to stable housing, personal choice, etc.<br>23. The site/facility lease must be in the name of the provider, and not in the individual participant's name, to allow for fluidity of individuals that may be served. (NOTE: For the few outliers to this item, DBHDD will work on transitional expectations for other service delivery modalities which can be enacted on or around July 1, 2022). |

| Staffing Requirements | 1. | Residential sites are required to have an on-site residential manager/supervisor. Residential Managers/Supervisors may be persons with at least 2 years' experience providing MH or AD services and at least a high school diploma; however, this person must be directly supervised by a licensed staff member (including LMSW, LMFT, APC, or 4-year RN). |
| | 2. | The Residential Manager/Supervisor is required to be on-site at the CRR I site at least 3x/week to provide oversight and supervision to the staff who provide direct daily services and supports. |
| | 3. | Persons with high school diplomas, GEDs or higher, who have completed the paraprofessional training required for DBHDD contracted organizations and under the supervision of a Residential Manager may perform residential services. |
| | 4. | Provider should make adjustments for increased staffing as appropriate based on the clinical needs of the individuals living with in the residential program. |
| Clinical Operations | 1. | Individuals must be assisted with the below items within the first 7 days of admission and every 90 days to determine appropriateness for this level of residential support: |
| | | a. A Comprehensive Needs Assessment that includes the below activities: |
| | | i. Applying for and obtaining vital records. |
| | | ii. Submitting appropriate benefit/entitlement applications to assist with the financial demands of independent living. |
| | | iii. Identification of natural supports (i.e. family, friends, and support groups) and ways to strengthen/utilize them while living in the community. |
| | | iv. Linkage to adult mental health and/or substance use disorder services, as well as primary care providers and/or specialty services as applicable. Services can be provided by a Core or Private Psychiatrist and individual choice/preference should always be considered. Individuals served shall not lose this residential support as a result of his/her choice to opt out of other behavioral health support/medical treatment services (unless these services are otherwise required by a federal program/fund source supporting a specific individual). |
| | | b. A Housing Goal that clearly states the desire of the individual, identifies available housing opportunities, resources, and supports (i.e. housing types, costs, and locations), and promotes opportunities for continued growth, independence, and community integration. |
| | | c. A Primary and Secondary/Contingency Transition Plan that clearly identifies the steps needed to achieve the desired Housing Goal and address any barriers to transition. |
| | | d. A Residential Crisis Response Plan that guides the residential provider's response to an individual's crisis episode while receiving residential services that diverts the loss of housing and promotes housing stability. This plan shall be developed in partnership with the individual and offer 24/7 access to a residential services specialist in the event of a crisis. |
| | | e. A Residential Functional Assessment. |
| | 2. | CRR III provides a minimum of (3) hours of weekly residential rehabilitation services to an individual who requires an intensive level of structured support to achieve/enhance their recovery and increase self-sufficiency. These services can only be provided by residential staff and must be focused on independent living skills necessary for the individual to live in a lesser structured setting. Examples of Residential Rehabilitative Services include: |
| | | a. Rehabilitative Skill Building which includes: |
| | | i. Activities for daily living, especially those involving maintaining personal hygiene and proper grooming/dress |
| | | ii. Health and Safety interventions aimed at assisting individuals with access to behavioral health, substance use, and medical treatment services, as well as continuous engagement and adherence to these services; symptom identification and wellness management that promotes appropriate behaviors and safety in the community, and self-administration of medication. |
| | | iii. Home Management, to include meal planning, preparation, and cooking; laundry and housekeeping |
| | | iv. Financial Management that promotes the ability to manage personal finances and entitlements |
| | | v. Personal Growth that allows an individual to express housing choice and preference, develop better communication and social skills through the use of coping skills and positive peer interactions |
| | | b. Community Integration Activities which allow for opportunities to seek employment and work in competitive integrated settings; attend institutions for higher learning; engage in community life; learn the skills necessary to utilize natural supports in the community. |
| | | c. Rehabilitative Supervision that requires staff to monitor the individual's response to treatment interventions and make adjustments to the IRP as indicated. |
| | 3. | Services must be delivered to individuals according to their IRP. |

| 4. | Any individual enrolled in this service for whom acute stabilization services are necessary (e.g., inpatient hospitalization, crisis stabilization unit, emergency department intervention, BHCC, etc.), the provider must conduct a clinical review of the individual's relevant clinical information (e.g. discharge plan/summary, risk assessments, treatment recommendations, etc.) and modify the individual's IRP as necessary, in accordance with Part II, Section III: Documentation Requirements of this manual, item #5. Individualized Recovery/Resiliency Planning, sub-item E. |
| 5. | Because DBHDD is committed to providing choices for housing (based on complete information, including the individual's needs, preferences, and the appropriate, available housing options), the residential staff affiliated with this program shall introduce concepts of independent living and promote activities towards the goals of successful, individualized, community-integrated housing during the ongoing residential support provided within this service. |
| 6. | CRR III is a transitional residential setting and is NOT intended to provide a long-term residential placement, nor permanent housing. As such, discharge planning begins upon admission and should reinforce the therapeutic nature of residential supports to ensure individual stability before discharge. |
| 7. | When an individual begins to substantially meet IRP goals and objectives as evidenced by the above discharge readiness activities, final transition arrangements to the appropriate level of residential care shall begin within the next 7 to 14 days (ASO reserves the right to authorize transition days accordingly). |
| **Service Accessibility** | 1. Provider must have a documented process to receive referrals during normal business hours (i.e., fax machine that is available to receive referrals) <br> 2. Providers must have a documented process to accept individuals into service and admission to the residence during normal business hours, Monday – Friday, 8 am – 6 pm. |
| **Documentation Requirements** | 1. The organization must develop and maintain sufficient written documentation to support the Residential Service for which billing is made. This documentation, at a minimum, must confirm that the individual for whom billing is requested was a resident of the Residential Service on the date of service. <br> 2. The individual's record must also include each week's programming/service schedule in order to document the provision of the required amount of skills training and support activities. Weekly progress notes must be entered in the individual's record to enable the monitoring of the individual's progress toward IRP and recovery goals. <br> 3. The record should include health issues and how they are being addressed; appointments for psychiatric and medical care that are scheduled for the consumer; attendance at other treatments such as substance use disorder counseling that staff may be assisting consumer to attend; assistance provided to the consumer to help him or her reach recovery goals; and the consumer's participation in other recovery activities. |
| **Billing & Reporting Requirements** | 1. Each month, the provider must submit a Monthly Residential Programmatic Report developed by DBHDD. <br> 2. All applicable ASO, Encounter Data and DBHDD reporting requirements must be adhered to. |

### Residential: Community Residential Rehabilitation IV

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Community-based Wrap Around Services | Community Living Supports IV | H2021 | UA | | | | $13.96 |

| Unit Value | 15 minutes |
|---|---|

| Code Detail | | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Utilization Criteria | TBD | | | | | | |

| Service Definition | CRR IV provides rehabilitative skills building, acquisition and training activities for daily living, home and personal management, community integration and rehabilitative supervision in scattered site residential locations occupied by the individual in their own residence, even if temporary. The service provides limited short-term assistance for individuals with a serious mental illness in an extreme situational crisis that requires a temporary residential support to maintain and retain stable housing, continue with their recovery, and increase self-sufficiency (such as major depressive episode when an individual is not so critical to warrant hospitalization, but is, for instance, unable to get out of bed without encouragement or unable to muster energy/focus to manage a meal for self). <br><br> This is an intervention that is delivered in order to prevent an extreme crisis that may result in a significant loss of an individual's daily functioning, which could jeopardize their housing due to subsequent destabilization. CRR IV is only utilized until an individual can regain basic management of critical daily self-care. When an |
|---|---|

## Residential: Community Residential Rehabilitation IV

Illness has created a personal circumstance where there is a time-limited demand for personal care. Following a time of decompensation or during a physical health/behavioral health change, this service can be used to:

1. Provide services to an individual who requires personal care in their own home (e.g. assistance with house cleaning, trash removal. medication organization); and
2. Programming should consist of services to restore and develop skills in functional activities; regain or maintain housing and tenancy, supported employment; develop or maintain social relationships.

This service allows for the provision of housing supports, which are interventions that support an individual's ability to prepare for and transition to housing, such as:

1. Developing housing support crisis plan and/or coordinating with the individual to review, update and modify their housing support plan and crisis plans as part of their IRP.
2. Early interventions for behaviors that might jeopardize housing, e.g., late rent payment, lease violations.

The following personal services interventions are applicable:

1. Supporting the individual in reclaiming stable living situation;
2. Monitoring or providing individual assistance with basic daily healthy maintenance activities, meal preparation, and light housekeeping;
3. Limited assistance with bathing, self-grooming and hygiene;
4. Assistance with self-medication, self-administration of medications, medical and health care adherence, symptom identification and management;
5. Assistance for the individual with Meal Planning, Budgeting and Money Management, Laundry, Housekeeping.

**Admission Criteria**

1. Individuals ages 18 and older with a primary SPMI diagnosis with functional limitations that require the temporary need for personal care services not to exceed 30 days, unless the individual meets continuing stay criteria.
2. Individuals who utilize this level of service typically have no other viable means of support, have the inability to live in an independent setting due to an immediate crisis and personal care services has been identified for continued recovery/wellness and housing stability.
3. Individual needs assistance in 3 or more of the following areas: maintain hygiene, meet nutritional needs, care for personal business affairs, avoid common dangers or hazards to self and possessions, failure to perform daily tasks with minimal assistance: inability to carry out homemaker roles.
4. Individuals who are authorized for community-based services such as ACT, ICM, CM, or CST are eligible if the individual meets admission criteria, and if there is documented need for non-duplicative, complementary support to provide community and housing stabilization.

**Continuing Stay Criteria**

1. Individual continues to be in a crisis that require the need for personal care services and continues to demonstrate need for assistance in 3 or more of the following areas: maintain hygiene, meet nutritional needs, care for personal business affairs, avoid common dangers or hazards to self and possessions, failure to perform daily tasks with minimal assistance; inability to carry out homemaker roles.
2. Individual must have a residential functional assessment at minimum at **every 30 days** to determine appropriateness for this level of support.

**Discharge Criteria**

1. Individual can effectively and safely be supported with a more appropriate level of service due to change in individual's level of functioning; and no longer meets admission criteria.
2. Individual or appropriate legal representative, requests discharge.
3. Provider will make significant efforts to reinforce therapeutic and residential supports to ensure client stability before an involuntary discharge occurs.
4. Refusal to participate in treatment services is not solely a reason for discharge. Provider must actively engage individual in the benefit of treatment compliance thus allowing the individual to make a personal choice to re-engage in services.
5. The CRR programs are transitional in nature, intended to support stabilization, promote wellness and recovery and begin to work towards achievement of the individual's longer-term housing goal. As such, discharge planning begins upon admission.

**Clinical Exclusions**

Individuals with the following conditions are excluded from admission unless there is documented evidence of a psychiatric condition: Developmental Disability Autism, Neurocognitive Disorder, or Traumatic Brain Injury.

**Service Exclusions**

1. CRR I, III
2. Agency staff meeting the staffing requirements may deliver CRR IV as a separate and distinct service from any other community-based or authorized Adult Mental Health service.

## Residential: Community Residential Rehabilitation IV

| | |
|---|---|
| **Required Components** | 1. The agency providing this service is CARF or Joint Commission accredited.<br>2. In addition to receiving this service, individuals should be linked to adult mental health and/or substance use disorder services, as applicable, including Core or Private psychiatrist and specialty services; however, individuals served shall not lose this support as a result of his/her choice to opt out of other behavioral health support/treatment services (unless these services are otherwise required by a federal program/fund source supporting a specific individual).<br>3. The organization must have an executive director or program director charged with the responsibility for day-to-day management of the organization.<br>4. There must be a written Residential Crisis Response Plan that guides the residential provider's response to an individual's crisis episode while receiving CRR IV, avoids a loss of housing, and promotes housing stability. This plan shall be developed in partnership with the individual and offer 24/7 access to assigned staff in the event of a crisis.<br>5. This service occurs in the following settings:<br>   a. An individual's permanent housing setting, living in their own individual units with all the tenancy rights therein; or<br>   b. A government-sponsored rental subsidy program (e.g., Shelter Plus Care, Homeless Continuum of Care) providing permanent supportive housing in which than individual lives independently.<br>6. Staff affiliated with this program shall reinforce concepts of independent living and promote activities towards the goals of successful, individualized, community-integrated housing. |
| **Staffing Requirements** | 1. Persons with high school diplomas, GEDs, or higher degrees may provide direct support services under the supervision of a licensed staff member (including LMSW/LCSW, LAPC/LPC, LAMFT/LMFT, or licensed psychologist), or a 4-year RN.<br>2. A staff person must be available 24/7 to respond to emergency calls within one hour.<br>3. A minimum of one (1) staff member per twenty (20) individuals served may not be exceeded. |
| **Clinical Operations** | 1. CRR IV provides residential personal care services to an individual with a minimum of one (1) in-person face-to-face contact with the individual in their home each week to maintain stable housing, continue with their recovery, and increase self-sufficiency.<br>2. The outcomes will focus on:<br>   a. Recovery, housing, employment, and meaningful life in the community;<br>   b. Maintenance of housing stability; and<br>   c. Participation in education, vocational training or gainful employment, if this is a goal in the Individualized Recovery Plan; Participation in activities that promote recovery and community integration. |
| **Billing and Reporting Requirements** | 1. All applicable ASO, ANSA, and other DBHDD reporting requirements must be met.<br>2. Each month, the provider must submit encounter data to the ASO's ProviderConnect system. |
| **Documentation Requirements** | 1. The organization must develop and maintain sufficient written documentation to support the services for which billing is submitted. This documentation, at a minimum, must confirm that the individual for whom billing is requested was enrolled in CRR IV on the billing date and that support services are being provided as required.<br>2. Each note must be signed and dated and must include the professional designation of the individual making the entry.<br>3. Documentation must be legible and concise and include the printed name and the signature of the treating practitioner. The name, title, and credentials of the individual providing the service must reflect the staffing requirements established for Independent AD Residential Services being delivered.<br>4. Providers are required to have a qualifying verified diagnosis present in the individual's case record prior to the initiation of services. |

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|

## Residential: Independent AD Residential Services

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

## Residential: Independent AD Residential Services

| Supported Housing | Addictive Diseases | H0043 | HF | R1 | |
|---|---|---|---|---|---|
| Unit Value | Unit= 1 day | | | | |
| | | | Utilization Criteria | | TBD |

**Service Definition**

AD Independent Residential Services provides recovery housing with a supportive and structured living environment for individuals with a Substance Use Disorder. This is a lower level of care with minimal supervision designed to promote independent living in a recovery environment for individuals who have established and maintained some consistent level of sobriety and does not require 24/7 supervision. Residents continue to maintain basic rehabilitation with focus on early recovery skills that include the negative impact of substances use, tools for developing positive support, and relapse prevention skills.

**Admission Criteria**

Adults aged 18 or older who meet the following criteria:
1. The individual meets the diagnostic criteria for a Substance Use Disorder as defined in the most recent DSM.
2. The individual has sufficient cognitive ability at this time to benefit from admission to the AD Independent Residential program.
3. The individual has demonstrated an ability to participate in or be successful with this level of care as indicated by current recovery efforts.
4. The individual requires support of an AD Independent Residence service that provides an alcohol and drug free environment.
5. The individual benefits from the peer support of fellow residents to maintain ongoing recovery;
6. The individual does not require twenty-four hours a day on-site supervision by clinical staff; and
7. The individual exhibits the skills and strengths necessary to maintain recovery and readapt to independent living in the community while receiving the minimal clinical and peer support provided by the treatment provider.

**Continuing Stay Criteria**

1. The individual continues to meet the criteria of the admission.
2. The individual is making progress but has not yet achieved the goals in the treatment/service plan or new problems have been identified that are appropriately treated in this level of care.
3. A timeline for expected implementation and completion is in place but discharge criteria has not been met.

**Discharge Criteria**

1. The individual has accomplished the goals and objectives of the treatment/service plan. The individual refuses further recovery support/care.
2. The individual will be referred to other appropriate treatment/services which cannot be provided by this level of care.
3. The individual has received maximum benefit from this level of care.
4. The individual's behavior is disruptive to the treatment of others and/or fails to comply with the program rules and therapeutic interventions that have not been successful in resolving the issues.

**Clinical Exclusions**

1. Individuals with the following conditions are excluded from admission unless there is documented evidence of a substance use condition: Developmental Disability, Autism, Neurocognitive Disorder, or Traumatic Brain Injury;
2. The individual exhibits behavior dangerous to staff, self, or others;
3. The individual is experiencing symptoms which appear to require withdrawal management services;
4. The individual meets admission criteria for a higher level of care.

**Required Components**

1. If applicable, the organization must be licensed by the Department of Community Health, Healthcare Facilities Regulation Division.
2. The AD Independent Residential Service provides scheduled visits to assist with residential responsibilities.
3. Services must be provided at a time that accommodates individuals' needs, including evenings and weekends.
4. This service requires a minimum of 1 face-to-face contact with the individual each week.
5. There must be a written comprehensive Behavioral Health and Residential Crisis Response Plan that guides the providers with procedures to follow during and immediately after the crisis, resulting in behavioral and housing stability. Both plans shall be developed in partnership with the individual and allow 24/7 access with the appropriate staff in the event of a crisis.

**Staffing Requirements**

1. Providers shall have a part/full time minimal Level 4 practitioner with at least 3 years of experience working with individuals who have substance use disorders, who is responsible for the day to day operations.
2. Staff should be knowledgeable about substance use and mental health disorders.
3. Providers should have a staff person available 24/7 to respond to emergency calls within one (1) hour.

## Residential: Independent AD Residential Services

| | |
|---|---|
| Clinical Operations | 4. This level of care shall have sufficient staff to ensure that supportive substance use disorder services are available and responsive to the needs of the individual.<br>1. Services shall ensure referrals for individual to individual, group/family counseling and self-help groups.<br>2. The service shall maintain a focus on the development and improvement of the skills necessary for recovery.<br>3. Such services that can also be utilized through Community Resources referrals include but not limited to:<br>  a. Vocational services;<br>  b. Job skills training, and employment readiness training;<br>  c. Educational; and<br>  d. Social skills training.<br>4. Individuals shall engage in aftercare services at least once a week.<br>5. Random individual drug screens as needed. |
| Billing and Reporting Requirements | 1. All applicable ASO, ANSA, and other DBHDD reporting requirements must be met.<br>2. Each month, the provider must submit a Monthly Residential Service Report developed by DBHDD that identifies the actual utilization of independent residential services including amount spent, number of units occupied, and number of individuals served.<br>3. Span billing may occur for this service, meaning the start and end date are not the same on a given service claim line; however, spans cannot cross months (e.g. start date and end date must be within the same month). |
| Documentation Requirements | 1. The organization must develop and maintain sufficient written documentation to support the services for which billing is submitted. This documentation, at a minimum, must confirm that the individual for whom billing is requested was enrolled in the Independent AD Residential Services on the billing date and that residential contact and support services are being provided at least once per week. The individual's record must also include each week's programming/service schedule in order to document the provision of the personal support activities.<br>2. Weekly progress notes must be entered in the individual's record to enable the monitoring of the individual's progress toward recovery goals and to reflect the Individualized Recovery Plan implementation. The individual's record should include health issues or concerns and how they are being addressed, appointments for psychiatric and medical care that are scheduled for the individual, attendance at other treatments such as substance use disorder counseling that staff may be assisting the individual to attend, assistance provided to the individual to help him or her reach recovery goals and the individual's participation in other recovery activities.<br>3. Each note must be signed and dated and must include the professional designation of the individual making the entry.<br>4. Documentation must be legible and concise and must include the printed name and the signature of the treating practitioner. The name, title, and credentials of the individual providing the service must reflect the staffing requirements established for Independent AD Residential Services being delivered.<br>5. Providers are required to have a qualifying verified diagnosis present in the individual's case record prior to the initiation of services. |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Mental Health | H0043 | R1 | | | | |

Unit= 1 day

| Utilization Criteria |
|---|
| TBD |

## Residential: Independent MH Residential Services

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Supported Housing | Mental Health | H0043 | R1 | | | | |
| Unit Value | Unit= 1 day | | | | | | |
| Service Definition | Independent Residential Service (IRS) provides scheduled residential service to an individual who requires a low level of residential structure to maintain stable housing, continue with their recovery, and increase self-sufficiency. This residential placement will reflect individual choice and should be fully integrated in the community in a scattered site individual residence. | | | | | | |

## Residential: Independent MH Residential Services

| Category | Content |
|---|---|
| Admission Criteria | 1. Individual must meet target population as indicated above; **and**<br>2. Individual demonstrates ability to live with minimal supports; **and**<br>3. Individual, states a preference to live independently. |
| Continuing Stay Criteria | Individual continues to benefit from and require minimal community supports. |
| Discharge Criteria | 1. Individual, or appropriate legal representative, no longer desires service, **or**<br>2. Individual no longer meets program and/or housing criteria. |
| Clinical Exclusions | Individuals with the following conditions are excluded from admission unless there is documented evidence of a psychiatric condition: Developmental Disability, Autism, Neurocognitive Disorder, or Traumatic Brain Injury. |
| Required Components | 1. The organization must have an executive director or program director charged with the responsibility for day-to-day management of the organization.<br>2. If applicable, the organization must be licensed by the Department of Community Health, Healthcare Facilities Regulation Division to provide residential services to individuals with a mental illness and/or substance use disorder diagnosis.<br>3. The Independent Residential Service provides scheduled visits to an individual's apartment or home to assist with residential responsibilities.<br>4. Services must be provided at a time that accommodates individuals' needs, which may include during evenings, weekends, and holidays.<br>5. This service requires a minimum of 1 face-to-face contact with the individual in their home each week (see also D. for an exception).<br>6. Independent Residential Services may only be provided within a supportive housing program or within the individual's own apartment or home.<br>7. There must be a written Residential Crisis Response Plan that guides the residential provider's response to an individual's crisis episode while receiving residential services that diverts the loss of housing and promotes housing stability. This plan shall be developed in partnership with the individual and offer 24/7 access to a residential services specialist in the event of a crisis. |
| Staffing Requirements | 1. Residential Managers may be persons with at least 2 years' experience providing MH or AD services and with at least a high school diploma; however, this person must be supervised by a licensed staff member (including LMSW, AMFT, APC or 4-year RN).<br>2. Persons with high school diplomas, GEDs, or higher degrees may provide direct support services under the supervision of a Residential Manager.<br>3. A staff person must be available 24/7 to respond to emergency calls within one hour.<br>4. A minimum of one staff per 35 individuals must not be exceeded. |
| Clinical Operations | 1. The organization must have a written description of the Independent Residential Service offered that includes, at a minimum, the purpose of the service; the intended population to be served; service philosophy/model; level of supervision and oversight provided; and outcome expectations for its residents.<br>2. The focus of service is to view each individual as the director of his/her own recovery; to promote the value of self-help and peer support; to provide information about mental illness and coping skills; to promote social skills, community resources, and individual advocacy; to promote employment and education to foster self-determination and career advancement; to support each individual in using community resources to replace the resources of the mental health system no longer needed; to support each individual to fully integrate into scattered site residential placement or in housing of his or her choice; and to provide necessary support and assistance to the individual that furthers recovery goals, including transportation to appointments and community activities that promote recovery.<br>3. The goal of this service is to fully integrate the individual into an accepting community in the least intrusive environment that promotes housing of his/her choice.<br>4. The outcomes of this service will focus on recovery, housing, employment and meaningful life in the community. These outcomes will be measured based upon:<br>  a.  Reduction in hospitalizations;<br>  b.  Reduction in incarcerations;<br>  c.  Maintenance of housing stability;<br>  d.  Participation in education, vocational training or gainful employment, if this is a goal in the Individualized Recovery plan;<br>  e.  Participation in community meetings and other social and recreational activities; and<br>  f.  Participation in activities that promote recovery and community integration. |

## Residential: Independent MH Residential Services

| | |
|---|---|
| Service Access | In addition to receiving Independent Residential Services, individuals should be linked to adult mental health and/or addictive disease services, as applicable, including Tier 1/Tier 2 or Private psychiatrist and Specialty services; however, individuals served shall not lose this support as a result of his/her choice to opt out of other behavioral health support/treatment services (unless these services are otherwise required by a federal program/fund source supporting a specific individual). |
| Billing and Reporting Requirements | 1. All applicable ASO and other DBHDD reporting requirements must be met.<br>2. Each month, the provider must submit a Monthly Residential Service Report developed by DBHDD that identifies the actual utilization of independent residential services including amount spent, number of units occupied, and number of individuals served.<br>3. Span billing may occur for this service, meaning the start and end date are not the same on a given service claim line; however, spans cannot cross months (e.g., start date and end date must be within the same month). |
| Documentation Requirements | 1. The organization must develop and maintain sufficient written documentation to support the services for which billing is submitted. This documentation, at a minimum, must confirm that the individual for whom billing is requested was enrolled in the Independent Residential Services on the billing date and that residential contact and support services are being provided at least once per week. The individual's record must also include each week's programming/service schedule in order to document the provision of the personal support activities.<br>2. Providers must provide documentation that demonstrates compliance with a minimum of 1 face-to-face contact per week, which includes date and time in/time out.<br>3. Weekly progress notes must be entered in the individual's record to enable the monitoring of the individual's progress toward recovery goals and to reflect the Individualized Recovery Plan implementation. The individual's record should include health issues or concerns and how they are being addressed, appointments for psychiatric and medical care that are scheduled for the individual, attendance at other treatments such as substance use disorder counseling that staff may be assisting the individual to attend, assistance provided to the individual to help him or her reach recovery goals and the individual's participation in other recovery activities.<br>4. Each note must be signed and dated and must include the professional designation of the individual making the entry.<br>5. Documentation must be legible and concise and include the printed name and the signature of the treating practitioner. The name, title, and credentials of the individual providing the service must reflect the staffing requirements established for Independent Residential Services being delivered. |

## Residential: Intensive AD Residential Services

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Supported Housing | Addictive Diseases | H0043 | HF | R3 | | | |
| Unit Value | Unit= 1 day | | | | | | |

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| ANSA: TBD, ASAM Level 3.5 | | | | | | |
| Utilization Criteria | | | | | | |

| | |
|---|---|
| Service Definition | AD Intensive Residential Service (associated with ASAM Level 3.5) provides a planned regimen of 24-hour observation, monitoring, treatment and recovery supports utilizing a multi-disciplinary staff for individuals who require a supportive and structured environment due to a Substance Use Disorder. This Intensive level of Residential Service maintains a basic rehabilitative focus on early recovery skills; including the negative impact of substances, tools for developing support, and relapse prevention skills. |
| Admission Criteria | Adults aged 18 or older who meet the following criteria:<br>1. The individual meets the diagnostic criteria for a Substance Use Disorder as defined in the most recent DSM.<br>2. The individual has sufficient cognitive ability at this time to benefit from admission to a residential treatment program.<br>3. The individual exhibits a pattern of severe substance use/dependency as evidenced by significant impairment in social, family, scholastic or occupational functioning and one or more of the following:<br>a. The individual has not demonstrated an ability to participate in or be successful with less intensive levels of care as indicated by a history of prior treatment followed by rapid or severe relapse or demonstrated an inability to complete outpatient treatment.<br>b. Individual does not have or has not demonstrated the ability to utilize the skills needed to prevent continued use, with imminently dangerous consequences. |

## Residential: Intensive AD Residential Services

| | |
|---|---|
| Continuing Stay Criteria | c. The individual is residing in a dangerous, unstable, or otherwise unsuitable environment which would undermine effective rehabilitation treatment at a lower level of care.<br>d. There is clinical evidence that the individual is not likely to respond to a lower level of care.<br>1. The individual continues to meet the criteria of the admission.<br>2. The individual is making progress but has not yet achieved the goals in the treatment/service plan or new problems have been identified that are appropriately treated with this level of care.<br>3. A timeline for expected implementation and completion is in place but discharge criteria have not been met. |
| Discharge Criteria | 1. The individual has accomplished the goals and objectives of the treatment/service plan; or<br>2. The individual refuses further care; or<br>3. Individual can effectively and safely be transitioned to a lower level of care; or<br>4. The individual will be referred to other appropriate treatment which cannot be provided with this level of care; or<br>5. The individual has received maximum benefit from this level of care; or<br>6. The individual's behavior is disruptive to the treatment of others and/or fails to comply with the program rules and therapeutic interventions that have not been successful in resolving the issues. |
| Clinical Exclusions | 1. Exhibits behavior dangerous to staff, self, or others; or<br>2. The individual is experiencing symptoms which appear to require withdrawal management services.<br>3. The individual meets admission criteria for a lower level of care and can be effectively treated with that level of care.<br>4. Individuals with the following conditions are excluded from admission unless there is documented evidence of psychiatric condition: Developmental Disability, Autism, Neurocognitive Disorder, or Traumatic Brain Injury. |
| Required Components | 1. Facility must be licensed by the Georgia DCH/HFR under the Rules and Regulations for Drug Abuse Treatment Program 290-4-2.<br>2. Individuals receiving services must have a documented verified substance use diagnosis.<br>3. The residential program must provide a structured and supported living environment 24 hours a day, 7 days a week with awake staff on-site at all times.<br>4. Residential programs must offer priority admission as identified in the SAPT Block Grant-Funded Program Requirements. |
| Staffing Requirements | 1. Providers must have a full time Licensed/Certified Director on site whose duties shall include overseeing day to day operations of services.<br>2. Staff facilitating clinical services must be licensed/credential, have cross training in addictive diseases and mental health, working within their scope of practice, and knowledgeable of service interventions.<br>3. There shall be sufficient staff available to all individuals at all times, with a minimum ratio of 10:1.<br>4. One or more staff is trained and experienced in providing case management services.<br>5. The program utilizes a multidisciplinary staff that include a minimum of:<br>   a. Program Director<br>   b. Licensed/Certified Counselors<br>   c. Registered Nurse<br>   d. Paraprofessionals |
| Clinical Operations | 1. The organization must have a written description of the Intensive Residential Service offered that includes, at a minimum, the purpose of the service; the intended population to be served; service philosophy/model, level of supervision and oversight provided; and outcome expectations for its residents.<br>2. Providers are required to provide a structured therapeutic environment designed to facilitate the individual's progress toward recovery from substance use disorders.<br>3. AD Intensive Residential Service must provide a minimum of 20 hours per week, (not including weekend activities) of treatment and recovery support clinical programming relevant to the Individual Recovery Plan. Services must be provided on-site at least five (5) days per week. In addition to the required clinical programs, providers must include treatment activities that strengthens living skills and promotes reintegration into the community. These activities include but are not limited to: |

## Residential: Intensive AD Residential Services

|  |  |
|---|---|
|  | a. Vocational services;<br>b. Job skills training, and employment readiness training;<br>c. Educational; and<br>d. Social skills training.<br>4. The service shall maintain a focus on the development and improvement of the skills necessary for recovery.<br>5. Clinical services which include cognitive, behavioral and other therapies are facilitated through identified treatment interventions.<br>6. Providers shall ensure that the individuals are provided the following;<br>   a. Individual Counseling.<br>   b. Group Counseling (including therapy, psycho-educational, relapse prevention and recovery).<br>   c. Family Counseling/Training (including psycho-education) for Family Members.<br>   d. Access to self-help and 12 step groups.<br>7. At least 50% of the required 20 hours of clinical programming must be group counseling. The remaining hours may be comprised of group training, individual counseling, peer support, etc.<br>8. Providers shall ensure that services are integrated with the activities/services and incorporated in the individual's service plan.<br>9. Services and referrals shall be identified in the Individualized Service Plan.<br>10. Random Individual Drug screens must be provided and documented. |
| Reporting and Billing Requirements | 1. Each month, the provider must submit a Monthly Residential Service Report developed by DBHDD that identifies the actual utilization of intensive residential services including amount spent, number of units occupied, and number of individuals served.<br>2. All applicable ASO, Adult Needs and Strengths Assessment (ANSA) and DBHDD reporting requirements must be met.<br>3. Span billing may occur for this service, meaning the start and end date are not the same on a given service claim line; however, spans cannot cross months (e.g. start date and end date must be within the same month). |
| Documentation Requirements | 1. The organization must develop and maintain sufficient written documentation to support the Intensive AD Residential Service for which billing is made. This documentation, at a minimum, must confirm that the individual for whom billing is requested was a resident of the Intensive Residential Service on the date of service. The individual's record must also include each week's programming/service schedule in order to document the provision of the required amount of skills training and support activities.<br>2. Weekly progress notes must be entered in the individual's record to enable the monitoring of the individual's progress toward IRP and recovery goals.<br>3. The record should include health issues and how they are being addressed; appointments for psychiatric and medical care that are scheduled for the individual; attendance at other treatments such as addictive diseases counseling that staff may be assisting individual to attend; assistance provided to the individual to help him or her reach recovery goals; and the individual's participation in other recovery activities.<br>4. Each note must be signed and dated and must include the professional designation of the individual making the entry.<br>5. Documentation must be legible and concise and include the printed name and the signature of the service provider. The name, title, and credentials of the individual providing the service must reflect the staffing requirements established for the Intensive AD Residential Service being delivered.<br>6. Providers are required to have a qualifying verified diagnosis present in the individual's case record prior to the initiation of services. |

## Residential: Semi-Independent AD Residential Services

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Supported Housing | Addictive Diseases | H0043 | HF | R2 |  |  |  |  |  |  |  |  |  |  |
| Unit Value | Unit = 1 day |  |  |  |  |  |  | Benefit Information | TBD |  |  |  |  |  |

## Residential: Semi-Independent AD Residential Services

| | |
|---|---|
| Service Definition | AD Semi-Independent Residential Services provides or coordinates on-site or off-site treatment services in conjunction with on-site recovery support programming that aligns with a supportive and structured living environment for individuals with a Substance Use Disorder. The residential setting is less restrictive with reduced supervision as individuals begin to strengthen living skills and focus on creating financial, environmental, and social stability to increase the probability of long-term recovery. Residential Care maintains a basic rehabilitation focus on early recovery skills; including the negative impact of substances, tools for developing support, and relapse prevention skills. |
| Admission Criteria | Adults aged 18 or older must meet the following criteria:<br>1. The individual meets the diagnostic criteria for a Substance Use Disorder as defined in the most recent DSM.<br>2. The individual has sufficient cognitive ability at this time to benefit from admission to a residential treatment program.<br>3. The individual exhibits a pattern of significant substance use/dependency as evidenced by significant impairment in social, family, scholastic or occupational functioning **and one or more of the following:**<br>  a. The individual has demonstrated a limited ability to participate in or be successful with less intensive levels of care as indicated by a history or prior treatment. episodes, a demonstrated inability to complete outpatient treatment.<br>  b. Individual has limited recognition of the skills needed to prevent continued use, with imminently dangerous consequences.<br>  c. The individual is residing in a dangerous environment which would undermine effective rehabilitation treatment at a less-intensive level of care.<br>  d. There is clinical evidence that the individual is not likely to respond to a lower level of care. |
| Continuing Stay Criteria | 1. The individual continues to meet admission criteria.<br>2. The individual is making progress but has not yet achieved the goals in the treatment/service plan or new problems have been identified that are appropriately treated with this level of care.<br>3. A timeline for expected implementation and completion is in place but discharge criteria have not been met. |
| Discharge Criteria | 1. The individual has accomplished the goals and objectives of the treatment/service plan; or<br>2. The individual refuses further care; or<br>3. The individual can effectively and safely be transitioned to a lower level of care; or<br>4. The individual will be referred to other appropriate treatment which cannot be provided with this level of care; or<br>5. The individual has received maximum benefit from this level of care; or<br>6. The individual's behavior is disruptive to the treatment of others and/or fails to comply with the program rules and therapeutic interventions that have not been successful in resolving the issues. |
| Clinical Exclusions | 1. Individuals with the following conditions are excluded from admission unless there is documented evidence of psychiatric condition: Developmental Disability, Autism, Neurocognitive Disorder, or Traumatic Brain Injury.<br>2. Exhibits behavior dangerous to staff, self, or others; or<br>3. The individual is experiencing symptoms which appear to require withdrawal management services.<br>4. The individual meets admission criteria for a lower level of care and can be effectively treated with that level of care. |
| Required Components | 1. Facility must be licensed by the Georgia DCH/HFR under the Rules and Regulations for Drug Abuse Treatment Program 290-4-2.<br>2. Individuals receiving services must have a documented verified substance use diagnosis.<br>3. The residential program must provide a structured and supported living environment 24 hours a day, 7 days a week with awake staff on-site at all times. Residential programs must offer priority admission as identified in the SAPT Block Grant-Funded Program Requirements. |
| Staffing Requirements | 1. Providers shall have a fulltime minimal Level 4 practitioner with at least 3 years' experience in addiction support responsible for the day to day operations.<br>2. Clinical staff knowledgeable about substance use and mental health disorders with individuals with co-occurring diagnoses.<br>3. Providers shall have a staff person available 24/7 to respond to emergency calls within one (1) hour<br>4. Providers shall have an experienced staff person and supervised staff to ensure that services are available and responsive to the needs of each individual.<br>5. There should be sufficient staff available to all individuals with a minimum ratio of 1:20. |

## Residential: Semi-Independent AD Residential Services

| | |
|---|---|
| Clinical Operations | 1. The organization must have a written description of the Semi-Independent Residential Service offered that includes, at a minimum, the purpose of the service; the intended population to be served; service philosophy/model, level of supervision and oversight provided; and outcome expectations for its residents.<br>2. Providers are required to provide a structured therapeutic environment designed to facilitate the individual's progress toward recovery from substance use disorders.<br>3. On-site Recovery Services:<br>  a. AD Semi-Independent Residential Services must provide recovery support programming and direct skills training support each week. These activities include:<br>    i. Vocational service;<br>    ii. Job skills training and employment readiness training;<br>    iii. Educational; and<br>    iv. Skills training to include budgeting, shopping, nutritional/meal planning.<br>    v. Personal Support activities such as daily face to face contact with the individual by Residential Service to ensure needs are being met; supportive counseling; crisis intervention as needed; tracking of appointments, assistance with transportation to appointments, shopping, employment, academics, recreational and support activities, and other needed supports as identified in the IRP.<br>    vi. Access to self-help and 12 step groups.<br>  b. The service shall maintain a focus on the development and improvement of the skills necessary for recovery.<br>4. On-site or off-site Treatment Services:<br>  a. AD Semi-Independent Residential Service must coordinate and ensure that individuals enrolled in this service receives a minimum of 12 hours per week of Treatment services as identified in the Individualized Resiliency Plan. Providers may offer the clinical services on site if licensed appropriately and staffing is consistent with required practitioner levels. Conversely, providers may offer the clinical service off site in the agency's outpatient clinic if licensed appropriately and staffing is consistent with required practitioner levels.<br>  b. Clinical services which include cognitive, behavioral and other therapies are facilitated through identified treatment interventions.<br>  c. Providers shall ensure that the individuals are provided the following:<br>    i. Individual Counseling;<br>    ii. Group Counseling (including therapy, psychoeducation, relapse prevention and recovery);<br>    iii. Family Counseling/Training (including psychoeducation) for family members.<br>  d. At least 50% of the required 12 hours of clinical programming must be group counseling. The remaining hours may be comprised of group counseling, individual counseling, peer support, etc.<br>  e. Providers shall ensure that services are integrated with the activities/services and incorporated in the individual's service plan.<br>  f. Services and referrals shall be identified in the Individualized Recovery Plan.<br>  g. Random drug screens as needed must be provided and documented. |
| Reporting and Billing Requirements | 1. Each month, the provider must submit a Monthly Residential Service Report developed by DBHDD that identifies the actual utilization of semi-independent residential services including amount spent, number of units occupied, and number of individuals served.<br>2. Span billing may occur for this service, meaning the start and end date are not the same on a given service claim line; however, spans cannot cross months (e.g. start date and end date must be within the same month).<br>3. All applicable ASO, Adult Needs and Strengths Assessment (ANSA), and DBHDD reporting requirements must be met. |
| Documentation Requirements | 1. The organization must develop and maintain sufficient written documentation to support the AD Semi-Independent Residential Service for which billing is made. This documentation, at a minimum, must confirm that the individual for whom billing is requested was a resident of the AD Semi-Independent Residential Service on the date of service. The individual's record must also include each week's programming/service schedule in order to document the provision of service.<br>2. Weekly progress notes must be entered in the individual's record to enable the monitoring of the individual's progress toward IRP and recovery goals.<br>3. The record should include health issues and how they are being addressed; appointments for psychiatric and medical care that are scheduled for the individual; attendance at other treatments such as mental health counseling that staff may be assisting individual to attend; assistance provided to the individual to help him or |

## Residential: Semi-Independent AD Residential Services

her reach recovery goals; and the individual's participation in other recovery activities.

4. Each note must be signed and dated and must include the professional designation of the individual making the entry.
5. Documentation must be legible and concise and include the printed name and the signature of the service provider. The name, title, and credentials of the individual providing the service must reflect the staffing requirements established for the AD Semi-Independent Residential Service being delivered.
6. Providers are required to have qualifying verified diagnosis present in the individual's record prior to the initiation of services.
7. Progress notes must be entered in the individual's record to enable the monitoring of progress toward recovery goals and to reflect the Individualized Recovery Plan implementation.

## Residential Substance Detoxification

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alcohol and/or Other Drug Services; Sub-acute Detoxification (Residential Addiction Program Outpatient) | | H0012 | | | | | $85.00 | | TBD | | | | | |

| Unit Value | 1 day (per diem) | Utilization Criteria | |
|---|---|---|---|

**Service Definition**

Residential Substance Detoxification is an organized and voluntary service that may be delivered by appropriately trained staff who provide 24-hour per day, 7 days per week supervision, observation and support for individuals during withdrawal management. Residential Withdrawal Management is characterized by its emphasis on medical monitoring and/or on peer/social support and should reflect a range of residential detoxification service intensities from ASAM (American Society of Addiction Medication) Level III.2D to III.7D. These levels provide care for individuals whose intoxication/withdrawal signs and symptoms may only require 24-hour supervision, observation and support by appropriately trained staff with an emphasis on peer/social support that cannot be provided by the individual's natural support system, or that are sufficiently severe enough to require 24-hour medically monitored withdrawal management and support from medical and nursing professionals in a permanent facility with inpatient beds. All programs at these levels rely on established clinical protocols to identify individuals who are in need of medical services beyond the capacity of the facility and to transfer such individuals to more appropriate levels of service.

**Admission Criteria**

Adults/Older Adolescent:

1. Has a substance use disorder with a DSM diagnosis of either 303.00, 291.81, 291.0, 292.89, 292.0; **and**
2. Per (ASAM PPC-2, Dimension-1) is experiencing signs of severe withdrawal, or there is evidence (based on history of substance intake, age, gender, previous withdrawal history, present symptoms, physical condition, and/or emotional/behavioral condition) that severe withdrawal syndrome is imminent; and is assessed as manageable at this level of service; **and**
3. There is strong likelihood that the individual will not complete withdrawal management at another level of service and enter into continued treatment or self-help recovery **as evidenced by one of the following:**
   a. Individual requires medication and has recent history of withdrawal management at a less intensive service level, marked by past and current inability to complete withdrawal management and enter continuing addiction treatment; individual continues to lack skills or supports to complete withdrawal management; **or**
   b. Individual has a recent history of withdrawal management at less intensive levels of service marked by inability to complete withdrawal management or enter into continuing addiction treatment and continues to have insufficient skills to complete withdrawal management; **or**
   c. Individual has co-morbid physical or emotional/behavioral condition that is manageable in a Level III.7-D setting but which increases the clinical severity of the withdrawal and complicates withdrawal management.

## Residential Substance Detoxification

| | |
|---|---|
| Continuing Stay Criteria | Individual's withdrawal signs and symptoms are not sufficiently resolved so that the individual can be managed in a less intensive service. |
| Discharge Criteria | 1. An adequate continuing care plan has been established; and one or more of the following:<br>2. Goals of the Individualized Recovery Plan have been substantially met; or<br>3. Individual requests discharge and individual is not in imminent danger of harm to self or others; or<br>4. Individual's signs and symptoms of withdrawal have failed to respond to treatment and have intensified (as confirmed by higher scores on the CIWA-Ar or other comparable standardized scoring system), such that transfer to a Level 4-WM withdrawal management service is indicated. |
| Service Exclusions | Nursing Assessment and Medication Administration (Medication administered as a part of Residential Detoxification is not to be billed as Medication Administration). |
| Clinical Exclusions | Concomitant medical condition and/or other behavioral health issues warrant inpatient treatment or Crisis Stabilization Unit admission. |
| Required Components | 1. This service must be licensed by DCH/HFR under the Rules and Regulations for Drug Abuse Treatment Programs, 290-4-2.<br>2. A physician's order in the individual's record is required to initiate a withdrawal management regimen.<br>3. Medication administration may be initiated only upon the order of a physician.<br>4. Verbal orders or those initiated by a Physician's Assistant or CNS are acceptable provided they are signed by the physician within 24 hours or the next working day. |
| Staffing Requirements | 1. Services must be provided by a combination of nursing, other licensed medical staff, and other residential support under supervision of a physician.<br>2. In programs that are designed to target older adolescents, staffing patterns must reflect staff expertise in the delivery of services to that age population. In addition, higher staffing ratios would be expected in these programs related to supervision. |
| Additional Medicaid Requirements | 1. For Medicaid recipients, certain individual services may be billed to Medicaid if the individual is receiving this service as a part of a Crisis Stabilization Unit (see CSU service description for billable services).<br>2. For those CSUs that bill Medicaid, the program bed capacity is limited to 16 beds. |
| Billing & Reporting Requirements | Span billing may occur for this service, meaning the start and end date are not the same on a given service claim line; however, spans cannot cross months (e.g. start date and end date must be within the same month). |

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Intensive Outpatient Program | Practitioner Level 3, In-Clinic | H0015 | U3 | U6 | | | 26.40 |
| | Practitioner Level 4, In-Clinic | H0015 | U4 | U6 | | | 17.72 |
| | Practitioner Level 5, In-Clinic | H0015 | U5 | U6 | | | 13.20 |

## Substance Abuse Intensive Outpatient Program

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| Practitioner Level 3, Out-of-Clinic | H0015 | U3 | U7 | | | 33.00 |
| Practitioner Level 4, Out-of-Clinic | H0015 | U4 | U7 | | | 21.64 |
| Practitioner Level 5, Out-of-Clinic | H0015 | U5 | U7 | | | 16.12 |

## Substance Abuse Intensive Outpatient Program

| Unit Value | 1 hour | |
|---|---|---|
| | **Utilization Criteria** | **TBD** |
| Service Definition | An outpatient approach to treatment services for adults eighteen (18) years or older who require structure and support to achieve and sustain recovery, focusing on early recovery skills; including the negative impact of substances, tools for developing support, and relapse prevention skills.<br><br>Through the use of a multi-disciplinary team, medical, therapeutic and recovery supports are provided in a coordinated approach to access and treat individuals with substance use disorders in scheduled sessions, utilizing the identified components of the service guideline. This service can be delivered during the day and evening hours to enable individuals to maintain residence in their community, continue work or go to school. The duration of treatment should vary with the severity of the individual's illness and response to treatment based on the individualized treatment plan, utilizing the best/evidenced based practices for the service delivery and support. | |
| Admission Criteria | 1. A DSM diagnosis of Substance Use Disorder, or a Substance Use Disorder with a co-occurring DSM diagnosis of mental illness and/or IDD; and<br>2. The individual is able to function in a community environment even with impairments in social, medical, family, or work functioning; and<br>3. The individual is sufficiently motivated to participate in treatment; and<br>4. One or more of the following:<br>   a. The substance use is incapacitating, destabilizing or causing the individual anguish or distress and the individual demonstrates a pattern of alcohol and/or<br>      drug use that has resulted in a significant impairment of interpersonal, occupational and/or educational functioning; or<br>   b. The individual's substance use history after previous treatment indicates that provision of outpatient services alone (without an organized program<br>      model) is not likely to result in the individual's ability to maintain sobriety; or<br>   c. There is a reasonable expectation that the individual can improve demonstrably within 3-6 months; or<br>   d. The individual is assessed as needing ASAM Level 2 or 3.1; or<br>   e. The individual has no significant cognitive and/or intellectual impairments that will prevent participation in and benefit from the services offered and has<br>      sufficient cognitive capacity to participate in and benefit from the services offered; or<br>   f. The individual is not actively suicidal or homicidal, and the individual's crisis, and/or inpatient needs (if any) have been met prior to participation in the program. | |
| Continuing Stay Criteria | 1. The individual's condition continues to meet the admission criteria; or<br>2. Progress notes document progress in reducing use of substances; developing social networks and lifestyle changes; increasing educational, vocational, social and<br>   interpersonal skills; understanding addictive disease; and/or establishing a commitment to a recovery and maintenance program, but the overall goals of the<br>   recovery plan have not been met; or<br>3. There is a reasonable expectation that the individual can achieve the goals in the necessary reauthorization time frame. | |
| Discharge Criteria | 1. An adequate continuing care or discharge plan is established, and linkages are in place; **and one or more of the following:**<br>   a. Goals of the treatment plan have been substantially met; or<br>   b. Individual recognizes severity of his/her drug/alcohol usage and is beginning to apply skills necessary to maintain recovery by accessing appropriate<br>      community supports; or<br>   c. Clinical staff determines that individual no longer needs ASAM Level 2 and is now eligible for aftercare and/or transitional services; OR<br>2. Transfer to a higher level of service is warranted by the following:<br>   a. Change in the individual's condition or nonparticipation; or<br>   b. Individual refuses to submit to random drug screens; or<br>   c. Individual exhibits symptoms of acute intoxication and/or withdrawal; or<br>   d. Individual requires services not available at this level; or<br>   e. Individual has consistently failed to achieve essential recovery objectives despite revisions to the individualized treatment plan and advice concerning the<br>      consequences; or<br>   f. Individual continues alcohol/drug use to such an extent that no further process is likely to occur. | |

## Substance Abuse Intensive Outpatient Program

| | |
|---|---|
| Service Exclusions | 1. Services cannot be offered with Psychosocial Rehabilitation Program.<br>2. When offered with ACT, documentation must indicate efforts to minimize duplication of services and effectively transition the individual to the appropriate services.<br>3. This combination of services is subject to review by the Administrative Service Organization (ASO).<br>Service elements included within SAIOP include counseling, group outpatient services, family outpatient services, community support, and peer support programs. Therefore, it is expected that these services are not generally ordered/authorized/provided outside of SAIOP. Any exception must be clinically justified in the medical record and may be subject to scrutiny by the ASO. Exceptions in offering these services external to SAIOP include scenarios where there are sensitive and targeted clinical issues to be addressed that require a specialized intervention or privacy (e.g., sexual abuse, criminal justice system involvement, etc.). When an exception is clinically justified, services must not duplicate interventions provided by SAIOP. |
| Required Components | 1. This service must be licensed by DCH/HFR under the Rules and Regulations for Drug Abuse Treatment Programs, 290-4-2.<br>2. The program provides structured treatment or therapeutic services, utilizing activity schedules as part of its operational method, i.e., plans or schedules of days or times of day for certain activities.<br>3. These services should be scheduled and available at least 5 hours per day, 4 days per week (20 hrs. /week), with no more than 2 consecutive days without service availability for high need individuals (ASAM Level 2.5). For programs that have a lower intensity program Level, it should be at least ASAM Level 2.1 which includes 9 hours of programming per week.<br>4. The program utilizes methods, materials, settings, and outside resources appropriate to the developmental and cognitive levels, capabilities, age, gender, and culture of participants.<br>5. The program utilizes methods, materials, approaches, activities, settings, and outside resources appropriate for and targeted to individuals with co-occurring disorders of mental illness and substance use and targeted to individuals with co-occurring developmental disabilities and substance use when such individuals are referred to the program.<br>6. Drug screening/toxicology examinations are required in accordance with HFR requirements but are not billable to DBHDD as components of this service benefit.<br>   a. Random drug screening occurs and the provider uses the results of these tests for marking participant's progress toward goals and for service planning.<br>7. The program is provided over a period of several weeks or months and often follows withdrawal management or residential services.<br>8. This service must operate at an established site approved to bill Medicaid for services. However, limited individual or group activities may take place off-site in natural community settings as is appropriate to each individual's treatment plan. (Narcotics Anonymous (NA) and/or Alcoholics Anonymous (AA) meetings offsite may be considered part of these limited individual or group activities for billing purposes only when time limited and only when the purpose of the activity is introduction of the participating individual to available NA and/or AA services, groups or sponsors. NA and AA meetings occurring during the SA Intensive Outpatient package may not be counted as billable hours for any individual outpatient services, nor may billing related to these meetings be counted beyond the basic introduction of an individual to the NA/AA experience.).<br>9. This service may operate in the same building as other services; however, there must be a distinct separation between services in staffing, program description, and physical space during the hours the SA Intensive Outpatient Services is in operation.<br>10. Adequate space, equipment, furnishings, supplies, and other resources must be provided in order to effectively provide services and so that the program environment is clean and in good repair. Space, equipment, furnishings, supplies, transportation, and other resources for participating individuals' use within the Substance Abuse Intensive Outpatient program must not be substantially different from that provided for other uses for similar numbers of individuals. |
| Staffing Requirements | 1. The program must be under the clinical supervision of an LCSW, LPC, LMFT, MAC, CAADC, GCADC-II/-III, or CAC-II, who is onsite a minimum of 50% of the hours the service is in operation.<br>2. Services must be provided by staff who are:<br>   a. Level 3: MAC, CAADC, GCADC-II or -III, CAC-II, LCSW, LPC, LMFT<br>   b. Level 4: APC, LMSW, LAPC, LAMFT, GCADC-I (with Bachelor's Degree), CAC-I (with Bachelor's Degree), CPS-AD (with Bachelor's Degree), Paraprofessionals (with Bachelor's Degree) and Certified Alcohol and Drug Counselor-Trainee (with Bachelor's Degree and with supervision).<br>   c. Level 5: Under the supervision of an LCSW, LPC, or LMFT (for SUD practitioners, an LCSW, LPC, LMFT, MAC, CAADC, GCADC-II/-III, or CAC-II): Paraprofessionals (without Bachelor's Degree), GCADC-I (without Bachelor's Degree), CAC-I (without Bachelor's Degree), CPS-AD (without Bachelor's |

## Substance Abuse Intensive Outpatient Program

Degree).

3. Programs must have documentation that there is one Level 4 or above staff (excluding Certified Alcohol and Drug Counselor-Trainees) that is "co-occurring capable." This person's knowledge must go beyond basic understanding and must demonstrate actual staff capabilities in using that knowledge for individuals with co-occurring disorders. Personnel documentation should demonstrate that this staff person has received a minimum of 4 hours of training in co-occurring treatment within the past 2 years.

4. There must be at least a Level 4 or above practitioner on-site at all times the service is in operation, regardless of the number of individuals participating.

5. The maximum face-to-face ratio cannot be more than 12 individuals to 1 direct program staff based on average daily attendance of individuals in the program.

6. The maximum face-to-face ratio cannot be more than 20 individuals to 1 U3 level practitioner based on average daily attendance of individuals in the program.

7. A physician and/or a Registered Nurse or a Licensed Practical Nurse with appropriate supervision must be available to the program either by a physician and/or nurse employed by the agency, through a contract with a licensed practitioner, or by written referral or affiliation agreement with another agency or agencies that offer such services.

   a. An appropriate member of the medical staff pursuant to the Medical Practice Act of 2009, Subsection 43-34-23 Delegation of Authority to Nurse and Physician Assistant is responsible for addiction and psychiatric consultation, assessment, and care (including but not limited to ordering medications and/or laboratory testing) as needed.

   b. The nurse is responsible for nursing assessments, health screening, medication administration, health education, and other nursing duties as needed.

8. LPNs who provide non-nursing SAIOP supports must do so as a Paraprofessional (including completion of the STR for Paraprofessionals) in accordance with item 2c above.

9. Level 3 or 4 staff may be shared with other programs as long as they are available as required for supervision and clinical operations and as long as their time is appropriately allocated to staffing ratios for each program.

1. It is expected that the transition planning for less intensive service will begin at the onset of these services. Documentation must demonstrate this planning.

2. An individual may have variable length of stay. The level of care should be determined as a result of the individuals' multiple assessments. It is recommended that individuals attend at a frequency appropriate to their level of need. Ongoing clinical assessment should be conducted to determine step down in level of care.

   a. Each individual should participate in setting individualized goals for themselves and in assessing their own skills and resources related to sobriety, use, and maintaining recovery. Goals are set by exploring strengths and needs in the individual's living, learning, social, and working environments. Provision of service may take place individually or in groups.

   b. Each individual must be provided assistance in the development/acquisition of needed skills and resources necessary to achieve sobriety and/or reduction in use and maintenance of recovery.

### Clinical Operations

3. The Substance Abuse Intensive Outpatient Program must offer a range of skill-building and recovery activities within the program.

4. The Substance Abuse Intensive Outpatient Program activities will include, but are not limited to, the following:

   a. Psycho-educational activities focusing on the disease of addiction prevention, the health consequences of addiction, and recovery

   b. Therapeutic group treatment and counseling

   c. Leisure and social skill-building activities without the use of substances

   d. Linkage to natural supports and self-help opportunities

   e. Individual counseling

   f. Individualized treatment, service, and recovery planning

   g. Linkage to health care

   h. Family education and engagement

   i. AD Support Services

   j. Vocational readiness and support

   k. Service coordination unless provided through another service provider

## Substance Abuse Intensive Outpatient Program

5. Assessment, reassessment, and medical services (included in the programmatic model, but billed as discrete services) will include:
   a. Behavioral Health Assessment
   b. Psychiatric Treatment
   c. Nursing Assessment
   d. Diagnostic Assessment
   e. Medication Administration
6. The program must have a Substance Abuse Intensive Outpatient Services Organizational Plan addressing the following:
   a. The philosophical model of the program and the expected outcomes for program participants (i.e., harm reduction, abstinence, beginning of or maintaining individually defined recovery, employment readiness, relapse prevention, stabilization and treatment of those with co-occurring disorders).
   b. The schedule of activities and hours of operations.
   c. Staffing patterns for the program including access medical and evaluation staff as needed.
   d. How the activities listed above in Items 4 and 5 will be offered and/or made available to those individuals who need them, including how that need will be determined.
   e. How assessments will be conducted.
   f. How staff will be trained in the administration of addiction services and technologies.
   g. How staff will be trained in the recognition and treatment of co-occurring disorders of mental illness & substance use pursuant to the Georgia Best Practices
   h. How services for individuals with co-occurring disorders will be flexible and will include services and activities addressing both mental health and substance use issues of varying intensities and dosages based on the symptoms, presenting problems, functioning, and capabilities of such individuals.
   i. How individuals with co-occurring disorders who cannot be served in the regular program activities will be provided and/or referred for time-limited special integrated services that are co-occurring enhanced as reflected in Guiding Principles Regarding Co-Occurring Mental Health and Addictive Diseases Disorders, 04-109.
   j. How services will be coordinated with the substance use array of services including assuring or arranging for appropriate referrals and transitions.
   k. How the requirements in these service guidelines will be met.

**Service Accessibility**

1. Service access to the program is offered at least 5 hours per day at least 4 days per week with no more than 2 consecutive days between offered services, and distinguishes between those individuals needing between 9 and 20 hours per week of structured services (ASAM Level 2.1) and those needing 20 hours or more of structured services per week (ASAM Level 2.5 or 3.1) in order to begin recovery and learn skills for recovery maintenance.
2. Program hours are to be published and distributed to all individuals served (and updated/distributed as needed).

## Substance Abuse Intensive Outpatient Program

**Billing & Reporting Requirements**

1. The maximum number of units that can be billed a day for SAIOP is 5 units.

2. There are some outpatient services which are required components of SAIOP but because of their frequency of use, are not practical as part of the bundled services. The following are those additional services that are to be billed unbundled as part of the SAIOP program:

| Service | Maximum Authorization Units | Daily Maximum Billable Units |
|---|---|---|
| Behavioral Health Assessment & Service Plan Development | 32 | 24 |
| Diagnostic Assessment | 4 | 2 |
| Psychiatric Treatment | 12 | 1 |
| Nursing Assessment and Care | 48 | 16 |
| Medication Administration | 8 | 8 |
| Interactive Complexity (as a modifier to Psychiatric Treatment, Diagnostic Assessment, Individual Counseling, and Group Counseling) | 48 | 4 |
| Community Transition Planning | 50 | 12 |

3. The following services are included in the SAIOP and should not be requested as part of the SAIOP authorization, nor should they be ordered separately outside of the SAIOP authorization except under special circumstances (see Service Exclusions section):
   a. Family Outpatient Services (Counseling & Training)
   b. Group Outpatient Services (Counseling & Training)
   c. Individual Counseling
   d. Addictive Disease Support Services
   e. AD Peer Support Program

4. Rounding is applied to the person's cumulative hours/day at the Substance Abuse Intensive Outpatient Program (excluding non-programmatic time). The provider shall follow the guidance in the rounding policy included in this Provider Manual, and, specific to this service, the person served must have participated in at least 50% of the hour in order to bill for one unit of this service. For instance, if an individual participates in the program from 9:00 am -1:15 pm excluding a 30-minute break for lunch, his/her participating hours are 3.75 hours. The rounding policy is applied to the .75 hour and the units billed for that day are 4 units. Practitioner type must still be addressed and so those 4 units must be adequately assigned to either a U3, U4 or U5 practitioner type as reflected in the log for that day's activities.

5. Approved providers of this service may submit claims/encounters for the unbundled services listed in the package, up to the daily maximum amount for each service. Program expectations are that this model follow the content of this Service Guideline as well as the clearly defined service group elements.

6. Services authorized via the SAIOP Type of Care are only billable during the designated programmatic hours. If an individual needs additional service time outside the designated programmatic hours or needs services other than the designated programmatic services, AND the provider is enrolled to provide those services, the services are to be separately ordered and authorized (for example, services through the Non-Intensive Outpatient Type of Care).

## Substance Abuse Intensive Outpatient Program

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| | H2024 | | | | | $410.00 |

| Documentation Requirements | 1. Every admission and assessment must be documented.<br>2. Daily notes must include time in/time out in order to justify units being utilized.<br>3. Progress notes must include written daily documentation of groups, important occurrences; level of functioning; acquisition of skills necessary for recovery; progress on goals identified in the IRP including acknowledgement of addiction, progress toward recovery, use, reduction and/or abstinence; use of drug screening results by staff; and evaluation of service effectiveness.<br>4. Provider shall only document and bill units in which the individual was actively engaged in services. Meals and breaks must not be included in the reporting of units of service delivered. Should an individual leave the program or receive other services during the range of documented time in/time out for SAIOP hours, the absence should be documented.<br>5. Daily attendance of each individual participating in the program must be documented showing the number of hours in attendance for billing purposes.<br>6. Program hours are to be published and updated as needed in the program's administrative record so as to be available to any external reviewers to validate billing and claims.<br>7. This service may be offered in conjunction with ACT or CSU for a limited time to transition individuals from one service to the more appropriate one.<br>8. When this service is used in conjunction with ACT or Crisis Residential services, documentation must demonstrate careful planning to maximize the effectiveness of this service as well as an appropriate reduction in service amounts of the service to be discontinued. Utilization of Substance use Day services in conjunction with these services is subject to review by the Administrative Service Organization (ASO). |

## Supported Employment

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Supported Employment | | TBD | | | | | |
| Unit Value | 1 month – Weekly documentation via daily attendance or weekly time sheet. | | | | | | |

**Utilization Criteria**

| Service Definition | Supported Employment (SE) services are available to eligible individuals, who express a desire and have a goal for competitive employment in their Individual Recovery Plan (IRP); and who, due to the impact and severity of their mental illness have recently lost employment, or been underemployed or unemployed on a frequent or long-term basis. Services include supports to access benefits counseling; identify vocational skills and interests; and develop and implement a job search plan to obtain competitive employment in an integrated community setting that is based on the individual's strengths, preferences, abilities, and needs. In accordance with current best practice, this service emphasizes that a rapid job search be prioritized above traditional prevocational training, work adjustment, or transitional employment services. After suitable employment is attained, services include job coaching to teach job-specific skills/tasks required for job performance and ongoing rehabilitative supports to teach the individual illness self-management, communication and interpersonal skills necessary to successfully retain a particular job. If the individual is terminated or desires a different job, services are provided to assist the individual in redefining vocational and long-term career goals in finding, learning and maintaining new employment aligned with these goals. Employment goals and services are integrated into the Individual Recovery Plan (IRP) and are available until the individual no longer desires or needs Supported Employment Specialty Services to successfully maintain employment. |
| Admission Criteria | 1. Individuals who meet the target population criteria:<br>  a. Indicate an interest in competitive employment;<br>  b. Are unemployed or underemployed due to symptoms associated with chronic and severe mental illness;<br>  c. Have a documented service goal to attain and/or maintain competitive employment; and<br>  d. Are able to actively participate in and benefit from these services.<br>2. Priority is given to individuals who meet the ADA Settlement criteria.<br>3. Individuals receiving this service must have a qualifying diagnosis present in the medical record prior to the initiation of services. The diagnosis must be provided by persons identified in O.C.G.A. Practice Acts as qualified to provide a diagnosis. |

## Supported Employment

| | |
|---|---|
| **Continuing Stay Criteria** | Individual demonstrates documented progress relative to goals identified in the Individualized Recovery Plan for employment, but employment goals have not yet been achieved and significant support for job search and/or employment is still required. |
| **Discharge Criteria** | 1. Goals of the Individualized Recovery Plan related to employment have been substantially met; or<br>2. Individual requests a discharge from this service; or<br>3. Individual does not currently desire competitive employment; or<br>4. If after multiple outreach attempts and attempts to explore and resolve barriers to individual's engagement by Employment Specialist and individual's Behavioral Health Provider consistently made over the course of 90 days, the individual does not engage in services for 90 days; unless the individual is hospitalized or in jail, in which case the provider would be expected to continue contact with the individual, his/her service providers (including Vocational Rehabilitation Counselor), his/her employer and to participate in discharge planning; or<br>5. If after 180 days of steady employment, it has been demonstrated that the individual no longer needs Intensive Supported Employment Specialty Services to maintain employment, and the individual has participated with the Employment Specialist, natural supports and other service providers to create a planned transition from supported employment to extended job supports provided by the individual's natural supports, behavioral health providers (e.g. Psychiatric Rehabilitation-Individual; Peer Support-Individual, etc.) and/or TORS provider. If the individual has or had an open case with the Georgia Vocational Rehabilitation Agency (GVRA)Vocational Rehabilitation (VR) program and received supported employment services paid for in whole or in part by GVRA/VR the extended supports must be provided by the individual's behavioral health provider, which may include, or be the TORS provider. |
| **Clinical Exclusions** | Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition co-occurring with one of the following diagnoses: Developmental Disability, Autism, Neurocognitive Disorder. |
| **Staffing Requirements** | 1. Employment Specialists that do not hold licensure or certification as specified in the Provider Manual must comply with training requirements for paraprofessionals as outlined in the Provider Manual.<br>2. All Employment Specialists and SE Supervisors must complete at least 16 hours of documented training consistent with the IPS-25 model.<br>3. Each SE Provider shall employ a minimum of 1 FTE Employment Specialist.<br>4. All AMH Employment Specialists shall maintain a SE caseload ratio of no greater than 1 FTE Employment Specialist to 20 SE individuals. In accordance with the IPS EBP model, it is required that each AMH Employment Specialist's caseload be 100% comprised only of enrolled persons who meet the adult mental health eligibility criteria for this service. Employment Specialists who deliver TORS to individuals who have been discharged from SE services, should not count these individuals in the SE caseload and must subtract the average number of hours spent delivering TORS from the amount of time dedicated to SE services. For example, if an Employment Specialist works 40 hours a week (1 FTE), provides TORS and Supported Employment services 100% of the time and documents an average of 4 TORS billable hours each week, then 36 hours (90% of 40) would be dedicated to SE services on average each week. The 1:30 SE caseload ratio would be 90% FTE to 18 SE individuals.<br>5. All Employment Specialists must receive regular supervision from a designated SE Supervisor in accordance with the IPS-25 model.<br>6. Each SE Provider shall employ 1 FTE SE Supervisor to be dedicated to a maximum of 10 FTE Employment Specialists. Supervisors responsible for fewer than 10 FTE Employment Specialists may spend a percentage of time on other duties on a prorated basis. For example, a Supervisor responsible for 1 FTE Employment Specialist may spend 90% of time on other duties.<br>7. All SE Supervisors must have a minimum of a bachelor's degree in the social sciences/helping professions and 1-year experience of delivering SE services or certification by a nationally or state recognized evidence-based SE training program. If all the provider's Employment Specialists hold a bachelor's degree or higher in the social sciences/helping professions; or have at least three years' experience in counseling, linking with community resources, special education or instruction, the Bachelor's degree requirement for the SE Supervisor is waived. |
| **Required Components** | 1. All delivery of community-based Adult Mental Health Supported Employment services shall be in accordance with the Individual Placement and Supports (IPS) model of Supported Employment.<br>2. Qualified DBHDD providers of adult mental health Individual Placement and Support (IPS) Supported Employment (SE) are required to be TORS providers.<br>3. The programmatic goals of this service must be clearly articulated by the provider, utilizing evidence-based practices for supported employment services as described in the IPS-25 Fidelity Scale (https://ipsworks.org/). |

## Supported Employment

4. Employment must be in an integrated community setting in which the majority of employees do not have disabilities, and there is no requirement for the applicant to have a disability. The job must pay minimum wage or equivalent to typical earnings/benefits for the job title and be in compliance with all applicable Department of Labor requirements, including compensation, hours, and benefits.

5. If ACT, CST, Non-Intensive Outpatient, PSR-I, Peer Supports other behavioral health and/or vocational rehabilitation services are provided simultaneously, individual record must show evidence of integrated service coordination and effort to avoid duplication of services.

6. A vocational profile, individualized plan of employment and individualized job support plan must be completed according to the individual's strengths and preferences, integrated in the individual's behavioral health service chart; and show evidence of periodic updates. If an individual has an open case with GVRA/VR, all GVRA/VR documentation must be included in the individual's behavioral service record.

7. The initial vocational profile must be completed and the individual or employment specialist on behalf of the individual, must make face-to-face contact with a potential employer, specific to the individual's plan of employment, on average, within the first 30 days of individual's enrollment in SE services and be documented in the progress notes.

1. Individuals receiving this service must have competitive employment as a goal in their IRP. Ninety percent (90%) of Individual medical records must demonstrate integration of behavioral health and employment goals and services. Charts of individuals who have open cases in Vocational Rehabilitation services must document fulfillment of Vocational Rehabilitation meeting, reporting and communication requirements.

2. Supported Employment Specialists must deliver each of the following six service components:

   a. Pre-Placement
      i. Engage individual, and with permission, his/her behavioral health providers and natural supports in an exploratory discussion about the individual's interest in competitive employment and long-term vocational goals. Provide or coordinate access to information about vocational services offered by GVRA/VR; and according to the individual's desires and GVRA/VR guidelines, assist and support the individual in completion and coordination of the GVRA/VR application process and regular follow-up communication with GVRA/VR staff to determine status of application.
      ii. Determine if the individual receives SSI, SSDI or other benefits which might be affected by an increase in income and provide or coordinate access to informational resources about work incentives and benefits counseling. Ensure that the individual and with permission, his/her behavioral health providers and natural supports receive and understand individualized and written information about how new or increased wages will impact the individual's eligibility for and receipt of disability benefits, housing and/or other income-determined services and benefits, as well as how to complete any related and required financial reports.
      iii. Over several sessions, gather information from individual, and with permission, his/her behavioral health providers, Vocational Rehabilitation Counselor, natural supports, former employers, and/or existing records/reports to develop a vocational profile that provides insight to the individual's preferences, experiences, abilities, strengths, supports, resources, limitations and needs. Engage the individual, and if desired, his/her professional and/or natural supports in a discussion about his/her vocational profile to explore, identify and document desirable and suitable job types and work environments. Ensure the Vocational Profile is integrated into the individual's behavioral health service chart.
      iv. Educate individual about the pros and cons of disclosing aspects of his/her disability and discuss at frequent intervals to support and empower the individual to make informed decisions about what, if any details s/he wants communicated to the employer at any point in time.

   b. Service Integration: Provide direct or indirect efforts on behalf of the individual to integrate, coordinate and reduce duplication of the individual's SE service with TORS and other behavioral health and if applicable, Vocational Rehabilitation or other pertinent services, through regular, documented meetings and contact with members of the individual's multidisciplinary treatment team.

   c. Job Development: Cultivate relationships with potential employers in order to explore and develop competitive employment opportunities based on individual's vocational profiles and employment plans for individuals. Competitive employment refers to a job to which anyone can apply, in an integrated community setting in which the majority of employees are not disabled, and which pays minimum wage or more. Relationships are to be based on an understanding of the potential employer's business needs; the services the Employment Specialist is able to provide to the company; and the employment plans of individuals served. Employer contacts should be documented weekly and reviewed regularly by the SE Supervisor according to IPS-25 model.

   D. Job Placement

Clinical Operations

## Supported Employment

i. Develop with the individual, and with permission, his/her behavioral health provider, VR Counselor and/or natural supports an individual plan of employment which includes the type of job and environment being sought, the type of supports the individual wants and clear statements about who will do what by when.

ii. Teach, assist and support the individual to emphasize strengths and minimize consequences (i.e. criminal history, periods of unemployment, etc.) and functional challenges of mental illness in development of resumes, completion of applications and practice for interviews (which may include symptom management and coping skills).

iii. Assist the individual in negotiating a mutually acceptable job offer in a competitive, community-integrated job that meets the individual's vocational goals and includes reasonable accommodations and/or adaptations to ensure the individual's success in the work environment.

iv. Assist the individual, and his/her behavioral health providers, VR Counselor and/or natural supports to identify skills, resources and supports the individual will need to start a new job; and create and implement a plan to attain these things to ensure a successful transition to employment and first days on the job. The plan may include assistance in symptom management, acquiring appropriate work clothes and transportation to work; as well as planning for meals, medication and other activities and supports needed to maintain wellness and stability at the work site. The individual's chart should contain this plan.

v. In the event that the individual desires a different job, quits or is terminated for whatever reason, the vocational profile must be updated and the individual assisted in updating his/her employment plan and resume; finding and applying for another job; and updating his/her job support plan.

e. Job Coaching: Provide intensive one-on-one services designed to teach the individual job-specific skills, tasks, responsibilities and behaviors on or off the job site, according to the individual's disclosure preferences. This may include systematic job analysis, environmental assessment, vocational counseling, training and interventions to help the supported employee learn to perform job tasks to the employer's specifications and be accepted as an employee at the worksite. Provide training, consultation and support to the employer at the individual's request.

f. Follow-Along Supports

i. Work in partnership with the individual and his/her behavioral health providers, Vocational Rehabilitation Counselor and/or natural supports to update and implement an individualized job support plan that maximizes the use of natural supports and prepares the individual and his/her interdisciplinary treatment, rehabilitation and recovery teams for transition to extended job supports provided by behavioral health providers and/or natural supports. Provide and coordinate ongoing task-oriented rehabilitation and job-specific training and support for management of symptoms, crises and over-all job performance necessary for long term success, tenure and stability on the job. Per individual's preferences about disclosure, services may include proactive employment advocacy, supportive counseling, coaching, peer support and ancillary support services, at or away from the job site.

ii. Employment Specialist must make a minimum of 2 face-to-face visits with supported employee at the worksite each month; or 2 face-to-face visits with employee off site and 1 employer contact monthly.

| Reporting and Billing Requirements | 1. A monthly, standardized programmatic report is required by the DBHDD to monitor performance and outcomes as well as approve the amount requested via the MIERs. |
| | 2. SE teams are expected to submit all requisite information in order to establish eligibility for the initial authorization, and if an individual meets eligibility they receive a 180-day authorization for SE services. SE teams are required to submit information that the ASO references as a reauthorization every 90-days for collection of consumer outcome indicators. This data collection is captured from information submitted by SE teams during initial and subsequent authorization periods. There is no clinical review taking place during this 90-day data collection process, the 90-day data collection-reauthorization meets the need of data collection only. At these intervals, the use of the term "reauthorization" is merely a data collection process and not a clinical review for eligibility every 90 days. SE teams are expected to submit all requisite information in order to establish continued eligibility for the concurrent review, and this reauthorization time frame is 180 days. |
| | 3. In order to bill the monthly rate, the provider shall be engaged in supports and planning even when individual is in acute residential, hospital or jail. See discharge criteria #4. |

## Supported Employment

| | |
|---|---|
| | 4. If a provider has no face-to-face contact with the individual during the month, the monthly rate may be billed if the provider has documentation of service integration, job development or active participation in discharge planning if the individual is in acute residential, hospital or jail. See discharge criteria #4.<br>5. Span billing may occur for this service, meaning the start and end date are not the same on a given service claim line; however, spans cannot cross months (e.g. start date and end date must be within the same month).<br>6. DBHDD providers of adult mental health Individual Placement and Support (IPS) Supported Employment (SE) are required to deliver TORS for all Medicaid-eligible persons. |
| Service Accessibility | Employment Specialists are expected to spend at least 65% of scheduled work time delivering services to individuals and employers in the community and must be available during daytime, evening and weekend hours to accommodate the needs of individuals and employers. |
| Documentation Requirements | 1. The individual medical record must include documentation of services described in the Service Operations section.<br>2. Provider is required to complete a progress note for every contact with individual as well as for related collateral.<br>3. Progress notes must adhere to documentation requirements set forth in this manual. |

## Task-Oriented Rehabilitation Services (TORS)

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Task-Oriented Rehabilitation Services | Practitioner Level 4, In-Clinic | H2025 | U4 | U6 | | | $20.30 |
| | Practitioner Level 4, Out-of-Clinic | H2025 | U4 | U7 | | | $24.36 |
| | Practitioner Level 5, In-Clinic | H2025 | U5 | U6 | | | $15.13 |
| | Practitioner Level 5, Out-of-Clinic | H2025 | U5 | U7 | | | $18.15 |
| | | TBD | | | | | |

| Unit Value | 15 minutes |
|---|---|

Utilization Criteria

| Service Definition | Task Oriented Rehabilitation Services (TORS) provide the psychiatric rehabilitation interventions to address the barriers created by psychiatric disability that interfere with an individual's ability to develop or regain a meaningful and valued role, including the ability to successfully pursue and maintain satisfying competitive employment. TORS are delivered concurrently with and after discharge from evidence-based supported employment services (IPS-25; https://ipsworks.org/) in the worksite or community, in accordance with an individual's preferences about disclosure of his/her disability to employers. TORS must be based upon the Individual Recovery Plan (IRP) which identifies a desire and need to acquire the skills, resources and supports the individual needs to self-recognize emotional triggers and to self-manage behaviors related to behavioral health issues that may interfere with employment.<br><br>TORS goals must complement and be closely coordinated with the goals, plans, and activities of supported employment, behavioral health and other services and integrated into the Individualized Recovery Plan (IRP). Interventions may include:<br>1. The use of role-modeling or mentoring of a person working while managing a mental illness;<br>2. Motivational and educational experiences, exercises, methods and tools to help an individual:<br>  a. Develop hope, confidence and motivation related to a meaningful and valued role including employment.<br>  b. Identify, articulate and self-advocate for his/her goals, interests, skills, strengths, needs and preferences;<br>  c. Identify and engage natural supporters to assist in achieving his/her vocational & recovery goals;<br>  d. Identify and develop meaningful roles while living with a mental illness;<br>  e. Identify consequences of increased income, develop and use a plan to manage these consequences in manner that supports the individual's preferences and attainment of recovery, financial and vocational goals; and<br>  f. Use recovery, wellness and symptom management plans, coping skills and strategies to manage mental health needs and challenges that may arise while engaged in vocational activities. |
|---|---|

| Category | Criteria |
|---|---|
| Admission Criteria | Individuals receiving evidence-based supported employment services (IPS-25) are eligible to enroll in TORS and may continue receiving TORS if they are competitively employed at the time of discharge from supported employment services and do not meet discharge criteria.<br>1. Individual must meet DBHDD Eligibility criteria; and<br>  a. Have a goal for competitive employment in his/her Individual Recovery Plan (IRP);<br>  b. Be enrolled in supported employment services; and<br>  c. Need psychiatric rehabilitation services to address the barriers created by their psychiatric disability that interfere with the individual's ability to develop or regain a meaningful and valued role including the ability to successfully pursue and maintain satisfying competitive employment.<br>2. Priority is given to individuals who meet the ADA Settlement criteria;<br>3. Individuals receiving this service must have a qualifying diagnosis present in the medical record prior to the initiation of services. The diagnosis must be provided by persons identified in O.C.G.A. Practice Acts as qualified to provide a diagnosis. |
| Continuing Stay Criteria | 1. Individual demonstrates documented progress relative to identified TORS goals but goals have not yet been achieved, and:<br>  a. Is enrolled in evidence-based supported employment services; or<br>  b. Is competitively employed but no longer needs and therefore has been discharged from evidence-based supported employment services.<br>2. If the individual has no behavioral health providers other than a psychiatrist, the individual may receive extended TORS from his/her supported employment provider if s/he is competitively employed at the time of supported employment discharge and needs these services to maintain his/her goal of competitive employment. |
| Discharge Criteria | 1. Individual no longer has goal to be competitively employed.<br>2. Individual requests discharge from TORS.<br>3. TORS goals in the Individualized Recovery Plan (IRP) have been substantially met; or<br>4. Individual is unemployed and no longer receiving supported employment services; or<br>5. If after 180 days of steady employment, individual has participated with natural supports and service providers in a planned transition from TORS to extended supports by the individual's behavioral health providers (e.g., Case Management; Peer Supports, etc.) and/or natural supports and has demonstrated the ability to continue successful employment without TORS. |
| Service Exclusions | 1. No service exclusions.<br>2. If Supported Employment, ACT, PSR-Individual, Peer Support – Individual, CST, Non-Intensive Outpatient services, or other behavioral health and/or vocational rehabilitation services are provided simultaneously the individual's record must show evidence of integrated service coordination and effort to avoid duplication of services. Note that service integration may not be documented as a TORS billable unit. |
| Clinical Exclusions | Individuals with the following conditions are excluded from admission unless there is clearly documented evidence of a psychiatric condition co-occurring with one of the following diagnoses: Developmental Disabilities, Autism, and Neurocognitive Disorder. |
| Staffing Requirements | 1. The following practitioners will provide TORS in conjunction with current or recent delivery of evidence-based supported employment services:<br>  a. Practitioner Level 3: LPC, LCSW, LMFT; (May provide but must bill at Practitioner Level 4 rate)<br>  b. Practitioner Level 4: LAPC, LMSW, LAMFT, CPS, CPRP, and trained Paraprofessionals with bachelor's degree or higher in the social sciences/helping professions;<br>  c. Practitioner Level 5 – CPS, CPRP and Paraprofessionals.<br>2. TORS staff who do not hold licensure or certification as specified herein must comply with training requirements for paraprofessionals as outlined in Section II of this manual.<br>3. TORS staff who do not have at least 1 year of delivering evidence-based supported employment services, must complete a minimum of 7.5 hours documented hours of training on evidence-based supported employment (IPS) within first 90 days.<br>4. The program must be under the direct programmatic supervision of a LPC, LCSW, LMFT, Physician, Psychologist or CPRP, or staff who can demonstrate activity toward attainment of certification (e.g., current enrollment in CPRP courses/training, etc.). Specific to this program, programmatic supervision consists of the day-to-day oversight of the program as it operates and is demonstrated by monthly supervision sessions and documentation by the Supervisor. This individual must have at least 3 years of documented experience working with adults with SPMI or co-occurring behavioral health conditions. |

| | |
|---|---|
| | 5. Practitioners delivering this service are expected to maintain knowledge/skills regarding current research trends in best/evidence-based practices in recovery and, at a minimum, must maintain at least 5 hours of continuing education in the area of mental health recovery/year. |
| **Required Components** | 1. Qualified DBHDD providers of adult mental health Individual Placement and Support (IPS) Supported Employment (SE) are required to be TORS providers. |
| | 2. TORS providers must provide documentation that the creation of the TORS goals/objectives/interventions involved input from and collaboration with the individual. With permission from the individual, provider will document involvement and collaboration with his/her chosen supporters, including the individual's supported employment, behavioral health and vocational rehabilitation service providers and is based upon knowledge gained from the assessments and service plans of these respective providers, as well as the TORS provider's own assessment process. |
| | 3. As indicated in the IRP, TORS goals and objectives should be based upon and reflect knowledge gained from the comprehensive assessment, as well as collaboration with the individual's BH, supported employment, vocational rehabilitation and any other pertinent service providers. If an individual does not want other providers, vocational rehabilitation, etc. involved in the TORS goals/objectives/interventions in the IRP, the individual's wishes will be respected and input from others will not be included. Documentation of the individual's wishes and coordination (or no coordination) should be included in assessments and progress notes. |
| | 4. The TORS component of the overall IRP must state what the individual, as well as the individual's BH, supported employment, vocational rehabilitation, and any other pertinent service providers will do to implement the plan and show evidence of periodic updates as objectives and goals are achieved. |
| | 5. Development of TORS goals in the IRP must include documented assessment of:<br>   a. Emotional triggers and behaviors related to behavioral health issues that may interfere with employment and ongoing engagement in meaningful and satisfying competitive employment.<br>   b. The skills, resources, and support an individual need to overcome these identified barriers; and<br>   c. The individual's current interests, strengths, skills, resources, and supports that can be used to facilitate his/her achievement of employment goals. |
| | 6. All interventions must increase the individual's ability to manage the symptoms, conditions and consequences associated with his/her mental illness that interfere with his/her ability to pursue and achieve his/her employment goals. |
| | 7. Face to face contacts should be based on the needs of the individual but should not exceed the maximum of 8 units per day. |
| **Clinical/Service Operations** | 1. The programmatic goals of this service must be clearly articulated by the provider, based on best practices for psychiatric rehabilitation as applied to the pursuit of and long-term engagement in meaningful and satisfying competitive employment. |
| | 2. The organization must have a TORS Organization Plan that clearly articulates the programmatic goals of this service and addresses:<br>   a. How the core principles and values of the Psychiatric Rehabilitation Association are utilized to support vocational goals (http://uspra.ipower.com/Board/Governing_Documents/USPRA_CORE_PRINCIPLES2009.pdf);<br>   b. The models and types of psychiatric interventions that will be utilized to support individuals in attainment of vocational goals;<br>   c. How programmatic oversight or guidance by a CPRP will be provided;<br>   d. Protocols to ensure coordination and avoid duplication of services that are provided by the supported employment specialist or other behavioral health and/or vocational rehabilitation providers; and<br>   e. When and how TORS will be provided in conjunction with evidence-based (IPS-25) supported employment services and delivered in a manner that supports and is congruent with fidelity to this model (https://ipsworks.org/). |
| | 3. Individuals should receive TORS from their current or most recent Supported Employment Provider. |
| | 4. TORS must complement and be closely coordinated with the goals, plans and activities of supported employment services and integrated into the Individual Recovery Plan (IRP). |
| **Service Accessibility** | 1. Providers are expected to deliver TORS 100% of the time in the individual's work site or a community setting according to the individual's preferences about disclosure of mental illness to employers, family, and friends and the individual's preferences for preferred location of service delivery. |
| | 2. TORS must be available during daytime, evening and weekend hours to accommodate the needs of the individual served. |
| **Documentation Requirements** | 1. Provider is required to complete a progress note for every TORS contact with the individual. When provided in conjunction with supported employment and/or other behavioral health or vocational rehabilitation services, coordination of services should be evident in documentation as applicable. |
| | 2. Documentation will reflect coordinated service integration as a "no charge". See #2 in Service Exclusions. |
| | 3. All applicable Medicaid, ASO and DBHDD reporting requirements must be met. |

| Additional Medicaid Requirements | 1. TORS cannot be billed for the function of job development; training on job-specific skills or duties; or for any contact with or services provided to an employer.<br>2. TORS cannot be billed for service integration.<br>3. DBHDD providers of adult mental health Individual Placement and Support (IPS) Supported Employment (SE) are required to deliver TORS for all Medicaid-eligible persons. |
|---|---|

## Temporary Observation Services

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Crisis Intervention Mental Health Services | Temporary Observation Services | S9485 | | | | | |
| | | Utilization Criteria | MH Criteria TBD.<br>SUD Criteria: Available to those known or suspected of having ASAM III.7 level of care or lower | | | | |

| Unit Value | 1 Encounter (Admission) |
|---|---|
| Service Definition | Temporary observation is a facility-based program that provides a physically secure and medically safe environment during which an individual in crisis is further assessed, stabilized and referred to the next appropriate level of care (generally within 24 hours). Interventions delivered during temporary observation may include any appropriate outpatient service including but not limited to:<br>1. Psychiatric Treatment,<br>2. Nursing Assessment,<br>3. Medication Administration,<br>4. Crisis Intervention,<br>5. Psychosocial Rehabilitation-Individual,<br>6. Case Management,<br>7. Peer Support-Individual<br><br>Individuals will receive frequent observation, monitoring of objective signs and symptoms of withdrawal, symptom management, discharge and follow-up planning and referral. |
| Admission Criteria | Adult with a psychiatric condition or substance use disorder that has demonstrated via clinical assessment a degree of instability or disability that needs to be monitored, evaluated, and further assessed to determine the most appropriate level of care. This may include either discharge to community-based services or referral for admission to a higher level of care as needed; **Individuals appropriate for temporary observation have demonstrated one or more of the following:**<br>1. Further evaluation is indicated in order to clarify previously incomplete information prior to disposition;<br>2. Further stabilization is indicated prior to disposition;<br>3. There is evidence of an imminent or current psychiatric emergency without clear indication for admission to inpatient or crisis stabilization treatment;<br>4. There are indications that the symptoms are likely to respond to medication, structured environment, or brief withdrawal management resulting in stabilization so that an alternative treatment in a psychiatric inpatient facility or crisis stabilization unit may be initiated;<br>5. Observation and continued care are necessary while awaiting transfer or referral to a higher level of care; and<br>6. There is evidence of a substance withdrawal related crisis, or intoxication, presenting as risk of harm without clear indication for admission to psychiatric inpatient facility or crisis stabilization unit. |

## Temporary Observation Services

| | |
|---|---|
| Discharge Criteria | The individual is considered appropriate for discharge when it has been determined that one of the following is clinically appropriate and arrangements for transfer or aftercare have been completed:<br>1. A higher level of care, such as a crisis stabilization unit or psychiatric inpatient facility; or<br>2. A lower level of care, such as outpatient care; or, less commonly,<br>3. Home with no recommendation for follow-up. |
| Service Exclusions | An individual shall not receive Temporary Observation services while receiving Crisis Stabilization Unit (CSU) services. |
| Clinical Exclusions | 1. The individual can be safely maintained and effectively treated at a less intensive level of care.<br>2. The primary problem is social, economic (i.e., housing, family conflict, etc.), or one of physical health without a concurrent major psychiatric episode meeting the criteria for this level of care.<br>3. Presence of a condition of sufficient severity to require acute psychiatric inpatient, crisis stabilization unit, medical, or surgical care (unless being provided observation and care as described in Item (e) in Admission Criteria section above while awaiting transfer to crisis stabilization unit or inpatient psychiatric facility).<br>4. Admission is being used as an alternative to incarceration and is NOT accompanied by a covered DSM diagnosis of mental illness or substance use disorder.<br>5. Methadone Administration must occur in programs operating under 290-9-12, Narcotic Treatment Programs. |
| Required Components | 1. Temporary Observation is operational 24 hours a day, 7 days a week, offering a brief stay (generally less than 24 hours) in a medically monitored, safe environment for individuals requiring additional assessment and care, using licensed professionals.<br>2. Temporary Observation services are not a stand-alone service. Temporary Observation services must be associated with:<br>  a. A crisis stabilization unit [CSU]; or<br>  b. A 24/7 Crisis Service Center.<br>3. Temporary Observation services may vary in numbers of observation chairs or beds. This will be specified in contracts;<br>4. Temporary Observation services must include service delivery under a physician's order and supervision along with nursing services and medication administration. |
| Staffing Requirements | Staff must include:<br>1. Physician, APRN or PA to provide timely assessment, orders for presenting individuals, and temporary observation (coverage may be shared with a Crisis Service Center or Crisis Stabilization Unit, as long as contract requirements for coverage by specific level of professional are met);<br>2. A Registered Nurse to provide observation and treatment for individuals admitted for Temporary Observation. Note that the RN may float to the Crisis Assessment area, as necessary, but remains the responsible license for the Temporary Observation service;<br>3. A Licensed Practical Nurse or a second Registered Nurse to provide coverage by a licensed professional [and other duties as assigned] when the primary RN floats to the Crisis Service Center area. If the RN floats more than 50% of time during the shift, a second RN should be added for coverage of that shift;<br>4. A properly trained direct care staff member to provide continuous observation and care needs for assigned individuals, minimum of 1 tech per shift; and<br>5. When a physician (who is not a psychiatrist) is the primary individual used for medical oversight, access to a board-eligible psychiatrist for clinical consultation is required. |
| Clinical Operations | 1. Service accessibility is managed and monitored via the GCAL Live Crisis Board. Providers are required to actively monitor and update changes to individuals being referred in or out of Temporary Observation.<br>2. To maintain current and up-to-date information, providers:<br>  a. May select an individual from the GCAL Live Crisis Board, or from another referral source to accept in temporary observation.<br>  b. Once the Provider accepts the individual, they will assign the individual to a temporary observation status on the inventory status board (via bhiweb).<br>  c. Once an individual leaves Temporary Observation, they need to be removed from temporary observation status on the inventory board or transferred to a CSU bed.<br>3. This program, including all physicians, are under the supervision of a board-eligible Psychiatrist who provides direction and oversight of program operation.<br>4. A physician or physician extender (APRN or PA) shall be on call 24-hours/day and shall make rounds seven days/week. The physician is not required to be on site 24-hours/day, however, the physician must respond to staff calls immediately, with delay not to exceed one hour. A physician extender may also be used in an on-call |

## Temporary Observation Services

|  |  |
|---|---|
| | role but must always have access to consult with a physician or psychiatrist. |
| |   a.  Physician/physician extender coverage may include use of telemedicine. |
| |   b.  On Call Physician/Physician Extender response time must be within 60 minutes of initial contact by Temporary Observation staff. |
| | 5.  Medication must be administered by licensed or credentialed* medical personnel under the supervision of a physician or registered nurse in accordance with O.C.G.A. |
| **Additional Medicaid Requirements** | N/A |
| **Service Accessibility** | 1.  Services must be available by required/qualified staff 24 hours a day, 7 days a week with on-call response coverage including psychiatric services.<br>2.  A physician or physician extender delivering Temporary Observation services may utilize telemedicine as a mode of service delivery. |
| **Billing & Reporting Requirements** | 1.  Providers must report all individuals served no matter the funding source (state-funded, Medicaid funded, private pay, other third-party payer, etc.);<br>  a.  The provider shall submit prior authorization requests for all individuals served through the Provider Connect portal or through the batch submission process by selecting the appropriate services through Crisis Service Type of Care.<br>  b.  The provider shall submit a single encounter for each Temporary Observation episode of care (i.e. Admission) for all individuals served.<br>2.  Temporary Observation may bill individual discrete services for non-CMO Medicaid recipients as well as uninsured individuals. There is a Crisis Service type of care available for use by the Temporary Observation provider.<br>3.  The individual services listed below may be billed up to the daily maximum listed for services provided in the Temporary Observations program. Billable services and daily units within the temporary observation are as follows: |

| Service | Max Daily Units |
|---|---|
| Behavioral Health Assessment & Service Plan Development | 12 |
| Diagnostic Assessment | 2 |
| Interactive Complexity (as a modifier to Psychiatric Treatment, Diagnostic Assessment, Individual Counseling, and Group Counseling) | 4 |
| Crisis Intervention | 14 |
| Psychiatric Treatment | 2 |
| Nursing Assessment & Care | 14 |
| Medication Administration | 1 |
| Psychosocial Rehabilitation - Individual | 8 |
| Addictive Disease Support Services | 16 |
| Individual Outpatient Services | 1 |
| Family Outpatient Services | 4 |
| Case Management | 12 |
| Peer Support- Individual | 8 |

4.  Only an active intervention between a Temporary Observation practitioner and a served individual shall be billed as one of the items in the chart above.

## Temporary Observation Services

| | |
|---|---|
| **Documentation Requirements** | 1. Documentation during the period of temporary observation shall be the following:<br>  a. Physician/physician extender order for admission to Temporary Observation;<br>  b. Verbal orders are acceptable if properly documented, as outlined in the Provider Manual (Part II, Section 3)<br>  c. Initial Assessment resulting in working diagnoses / diagnostic impression [including co-occurring diagnoses] and statement of plan for the Temporary Observation stay.<br>  d. Brief Psychiatric History<br>  e. Brief Physical Screening<br>  f. Brief Nursing Assessment<br>  g. RN progress note at least Q shift [Q 12 hours max] to include status, course of treatment, response to treatment and significant events or findings<br>  h. Discharge Order from Physician/physician extender<br>  i. Discharge summary paragraph to include:<br>    i. Care provided and outcome of care<br>    ii. Discharge diagnosis<br>    iii. Disposition / follow-up plan<br>    iv. Condition at discharge<br>2. All individual services for which claims/encounters are submitted must be documented in accordance with requirements as specified in the Provider Manual. |

## Treatment Court Services- Adult Addictive Diseases

| Transaction Code | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TBD | TBD | TBD | TBD | | | TBD | TBD | TBD | TBD | TBD | | | TBD |

| | |
|---|---|
| **Service Definition** | This is a time-limited, multi-faceted treatment model for adults who are enrolled in a Certified Accountability Court Program and require structure and support to achieve and sustain recovery from behavioral health conditions. These services enable individuals served to maintain residence in their community, continue to work and go to school, and be part of their family life. The service model is comprised of the following unique service elements:<br>1. Behavioral Health Assessment & Service Plan Development<br>2. Psychological Testing - (may contract out)<br>3. Diagnostic Assessment<br>4. Interactive Complexity (as a modifier to Psychiatric Treatment, Diagnostic Assessment, Individual Counseling, and Group Counseling)<br>5. Crisis Intervention<br>6. Psychiatric Treatment (E&M)<br>7. Nursing Services<br>8. Medication Administration<br>9. Addictive Disease Support Services<br>10. Individual Outpatient Services<br>11. Group Outpatient Services<br>12. Family Outpatient Services<br>13. Community Transition Planning<br>14. Peer Support - Individual<br>15. Peer Support - Group<br>16. Peer Support Whole Health & Wellness |

## Treatment Court Services- Adult Addictive Diseases

| | 17. Psychosocial Rehabilitation - Individual |
|---|---|
| Admission Criteria | An individual is referred by an Accountability Court and meets the following:<br>1. The individual is assessed as having a DSM diagnosis of a Substance Use Disorder (SUD) that has caused significant functional impairment. Individual may also present with a co-occurring mental health condition or developmental disability; **and**<br>2. The individual's level of risk and support need are assessed using a risk assessment tool supported by the Council of Accountability Court Judges (CACJ), and are found to be appropriately matched to the available level of Accountability Court supervision and program treatment services; **and**<br>3. The individual consents through a written agreement with the court to participate in the Accountability Court program and treatment services; **and**<br>4. The individual signs appropriate confidentiality waivers to allow communication of otherwise HIPAA-protected treatment information between the Accountability Court and treatment provider for the duration of participation in the Accountability Court; **and**<br>5. The individual is able to function in a community environment even with impairments in social, medical, family, or work functioning; **and**<br>6. The individual is sufficiently motivated to participate in treatment planning and recovery work. |
| Continuing Stay Criteria | 1. The individual's condition continues to meet the admission criteria; **and**<br>2. Progress notes document progress towards goals identified in the IRP (e.g. developing social networks and lifestyle changes, increasing educational, vocational, social and interpersonal skills, meeting court program requirements, and establishing a commitment to a recovery program), but overall goals have not yet been met; **and**<br>3. There is a reasonable expectation that the individual can achieve their IRP goals in the necessary reauthorization timeframe; **and**<br>4. The individual is still enrolled with a court program. |
| Discharge Criteria | 1. An adequate continuing care or discharge plan is established, linkages are in place, and one or more of the following:<br>  a.  Goals of the IRP have been substantially met; **or**<br>  b.  Clinical staff determines that the individual no longer needs this LOC; **or**<br>  c.  Individual has completed or been discharged from the court program.<br>2. Individuals discharged from the court program may continue with DBHDD community behavioral health services through a DBHDD-approved provider. |
| Service Exclusions | When offered with services of a higher intensity, documentation must indicate efforts to minimize duplication of services and effectively transition the individuals to the appropriate services. This combination of services is subject to review by the ASO. |
| Clinical Exclusions | Individuals who do not meet the eligibility requirements of each allowable service listed above for which participation is sought. |

## Treatment Court Services- Adult Addictive Diseases

| Required Components | |
|---|---|
| | 1. The program incorporates information from a validated risk and needs assessment (identified by the Council of Accountability Court Judges [CACJ] and the DBHDD) into the individual's treatment planning process and resulting IRP. If the program administers the risk and needs assessment, versus taking receipt of it from a referring Accountability Court, it will be conducted by appropriately trained and credentialed staff. This may be provided through the Behavioral Health Assessment and/or Service Plan Development services. |
| | 2. Program utilizes methods, materials, settings, and outside resources appropriate to the developmental and cognitive levels, capabilities, age, gender, and culture of participants. |
| | 3. Program utilizes methods, materials, approaches, activities, settings, and outside resources appropriate for, and targeted to individuals with a substance use disorder, including those with a co-occurring mental health condition and/or developmental disability. |
| | 4. Program utilizes methods, materials, approaches, activities, and outside resources appropriate for reducing recidivism rates among individuals with moderate to high criminogenic risk and need levels. |
| | 5. Program maintains required staff certification and training standards for evidence-based curricula/practices and provides quality control/model fidelity measures and supervision practices. |
| | 6. The program must operate at a site approved to bill DBHDD/Medicaid for services. However, limited individual or group activities may take place off- site in natural community settings as is appropriate to each individual's recovery plan. Program must have in place appropriate accreditation and licenses for all established service sites. |
| | 7. The program's treatment level and service frequency are based on the individual's clinical need and risk/support need considerations. However, in all cases, the program must offer a minimum of nine (9) hours per week of programming at the initial phase of an individual's treatment. |
| | 8. The program provides individual treatment compliance and status reports prior to court staffing meetings. Any sanctionable offense should be reported to identified court staff as soon as possible, or at least within 24 hours of the incident (sanctionable offenses include but are not limited to missed appointments, inappropriate behavior toward staff or other participants, damage to property, non-compliance with provider policies). |
| | 9. The program works collaboratively with the court to implement evidence-based practices identified by the Georgia Council of Accountability Court Judges (CACJ https://www.gaaccountabilitycourts.org/) and the National Association of Drug Court Professionals (NADCP: Recommended: Best Practice Standards Vol. I and II https://www.ndci.org/resources/publications/standards/). |
| | 10. Provide comprehensive Individual Recovery Plans (IRP) for each enrolled individual, including utilizing applicable adult outpatient services, residential supports and housing, employment supports, trauma informed mental health and substance use disorder treatment, whole health planning and implementation, peer support services, and linkage to other related services required to assist individuals in maintaining the behavioral health recovery and avoiding additional criminal justice involvement. Evidence based practices will guide the IRP and treatment process. |
| | 11. The program will implement at least one evidence-based treatment practice/model(s), using a manualized curriculum, that has shown to be effective in working with the target population, such as: |
| |    a. Cognitive Behavioral Intervention – Substance Abuse |
| |    b. Cognitive Behavioral Treatment (CBT) |
| |    c. Matrix Model |
| |    d. Moral Reconation Therapy |
| |    e. Motivational Interviewing |
| |    f. Seeking Safety |
| |    g. Thinking for a Change |
| |    h. Trauma Recovery and Empowerment Model (TREM) |
| | [NOTE: Not all the services listed in the Service Definition section are aligned with these unique EBPs, and therefore, these EBPs may not be applicable to those particular services. The court and providers will discern any specific applicability via their joint MOU.] |
| | 12. Provider will develop written agreements, partnerships, and memoranda of understanding (MOU) with key justice, mental health and substance abuse treatment providers, recovery community advocates and support partners, consumer groups on an ongoing basis for cooperative wrap-around services and for developing sustainable activities. |

## Treatment Court Services- Adult Addictive Diseases

| | |
|---|---|
| **Staffing Requirements** | 1. Staffing patterns must adhere to the requirements, per service category, for each allowable service listed above.<br>2. Provider shall employ an FTE Treatment Coordinator (50% of salary to be billed to DBHDD and it is recommended that 50% be covered by the Court/CACJ) who:<br>  a. Is a CAC-II (or equivalent), or a licensed clinician; and<br>  b. Attends court staffings/judicial reviews/court sessions; and<br>  c. Carries a minimal case load and/or conducts assessments to ensure billable hours.<br>3. Staff should be appropriately certified and trained on evidence-based practices and curricula.<br>4. For Group therapy: Maximum face-to-face ratio cannot be more than 10 individuals to 1 direct service staff based on average group attendance.<br>5. A physician and/or Registered Nurse or Licensed Practical Nurse with appropriate supervision must be available to the program either through employment by the agency, through a contract with a licensed practitioner, or by written referral or affiliation agreement with another agency or agencies that offer such services. |
| **Clinical Operations** | 1. An individual may have a variable length of stay. The level of care and length of stay should be determined by individual's multiple assessments and progress toward meeting goals of the IRP. It is recommended that the individuals attend at a frequency appropriate to their level of need. Ongoing clinical and risk/need assessment should be conducted to determine step down in level of care.<br>2. Each individual should participate in setting individualized goals for themselves and in assessing their own skills and resources related to recovery. Goals are set by exploring strengths and needs in the individual's living, learning, social, and working environments. Implementation of services may take place individually or in groups.<br>3. Each individual must be provided assistance in the development/acquisition of needed skills and resources necessary to achieve recovery and/or reduction in use of substances and maintenance of recovery.<br>4. Court staffing meeting time may be billable via ADSS with or without the person being present if the following are considered:<br>  a. If the Court Staffing Meeting addresses multiple individuals being supported by the Treatment Court Service, the only time which can be billed is the specific discussion and planning related to the individual being served;<br>  b. The service must comply with the expectations set forth in the unique ADSS service definition (Assistance to the person and other identified recovery partners in the facilitation and coordination of the Individual Recovery Plan (IRP), identification, with the person, of strengths which may aid him/her in achieving and maintaining recovery from addiction issues as well as barriers that impede the development of necessary skills, etc.). For instance, if this staffing event is being billed via ADSS and the individual served is not participating, the intervention and billing would comply with the Required Components section of the ADSS service which allow 50% of billable contact to be non-face-to-face. |
| **Service Accessibility** | 1. Service are available during the day and evening hours.<br>2. Demographic information collected shall include a preliminary determination of hearing status to determine referral to Deaf Services.<br>3. To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:<br>  a. the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or<br>  b. the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service.<br><br>Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. |
| **Documentation Requirements** | 1. Every admission and assessment must be documented.<br>2. Daily notes must include time in/time out in order to justify units being utilized. |

## Treatment Court Services- Adult Addictive Diseases

3. Progress notes must include written daily documentation of groups, important occurrences; level of functioning; acquisition of skills necessary for recovery; progress on goals identified in the IRP, progress toward recovery, substance use, reduction and/or abstinence; use of drug screening results by staff; and evaluation of service effectiveness.
4. Provider shall only document and bill units in which the individual was actively engaged in services. Meals and breaks must not be included in the reporting of units of service delivered.
5. Daily attendance of each individual participating in the program must be documented showing the number of hours in attendance for billing purposes.
6. All services contacts with an individual must be documented.

**Billing & Reporting Requirements**

1. This service is reimbursed on a fee-for-service basis.
2. The following are not billable under this service/program:
   a. Urine drug screens
   b. Travel time
   c. TB skin/RPR tests

| Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|
| TBD | TBD | TBD | TBD | | | TBD |

| | |
|---|---|
| Maximum Daily Units | TBD |
| Re-Authorization | TBD |
| Utilization Criteria | TBD |

## Treatment Court Services- Adult Mental Health

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| TBD | TBD | TBD | TBD | TBD | | | TBD |

| | |
|---|---|
| Unit Value | TBD |
| Initial Authorization | TBD |
| Authorization Period | TBD |

## Treatment Court Services- Adult Mental Health

| | |
|---|---|
| Service Definition | This is a time-limited, multi-faceted treatment model for adults who are enrolled in a Certified Accountability Court Program and require structure and support to achieve and sustain recovery from behavioral health conditions. These services enable individuals served to maintain residence in their community, continue to work and go to school, and be part of their family life. The service model is comprised of the following unique service elements:<br><br>1. Behavioral Health Assessment & Service Plan Development<br>2. Psychological Testing- (may contract out)<br>3. Diagnostic Assessment<br>4. Interactive Complexity (as a modifier to Psychiatric Treatment, Diagnostic Assessment, Individual Counseling, and Group Counseling)<br>5. Crisis Intervention<br>6. Psychiatric Treatment (E&M)<br>7. Nursing Services<br>8. Medication Administration<br>9. Case Management<br>10. Individual Outpatient Services<br>11. Group Outpatient Services<br>12. Family Outpatient Services<br>13. Community Transition Planning<br>14. Peer Support- Individual<br>15. Peer Support - Group<br>16. Peer Support Whole Health & Wellness<br>17. Psychosocial Rehabilitation - Individual |
| Admission Criteria | An individual is referred by an Accountability Court and meets the following:<br><br>1. The individual is assessed as having a DSM psychiatric diagnosis that has caused significant functional impairment. Individual may also present with a co-occurring substance use disorder (SUD) or developmental disability; **and**<br>2. The individual's level of risk and support needs are assessed using a risk assessment tool supported by the Council of Accountability Court Judges (CACJ), and are found to be appropriately matched to the available level of Accountability Court supervision and program treatment services; **and**<br>3. The individual consents through a written agreement with the court to participate in the Accountability Court program and treatment services; **and**<br>4. The individual signs appropriate confidentiality waivers to allow communication of otherwise HIPAA-protected treatment information between the Accountability Court and treatment provider for the duration of participation in the Accountability Court; **and**<br>5. The individual is able to function in a community environment even with impairments in social, medical, family, or work functioning; **and**<br>6. The individual is sufficiently motivated to participate in treatment planning and recovery work. |
| Continuing Stay Criteria | 1. The individual's condition continues to meet the admission criteria; **and**<br>2. Progress notes document progress towards goals identified in the IRP (e.g., developing social networks and lifestyle changes, increasing educational, vocational, social and interpersonal skills, meeting court program requirements, and establishing a commitment to a recovery program), but overall goals have not yet been met; **and**<br>3. There is a reasonable expectation that the individual can achieve their IRP goals in the necessary reauthorization timeframe; **and**<br>4. The individual is still enrolled with a court program. |

## Treatment Court Services- Adult Mental Health

| | |
|---|---|
| **Discharge Criteria** | 1. An adequate continuing care or discharge plan is established, linkages are in place, and one or more of the following:<br>    a. Goals of the IRP have been substantially met; **or**<br>    b. Clinical staff determines that the individual no longer needs this LOC; **or**<br>    c. Individual has completed or been discharged from the court program.<br>2. Individuals discharged from the court program may continue with DBHDD community behavioral health services through a DBHDD-approved provider. |
| **Service Exclusions** | When offered with services with higher intensity, documentation must indicate efforts to minimize duplication of services and effectively transition the individuals to the appropriate services. This combination of services is subject to review of the ASO. |
| **Clinical Exclusions** | Individuals who do not meet the eligibility requirements per service category for each allowable service listed above for which participation is sought. |
| **Required Components** | 1. The program incorporates information from a validated risk and needs assessment (Identified by the Council of Accountability Court Judges [CACJ] and the DBHDD) into the individual's treatment planning process and resulting IRP. If the program administers the risk and needs assessment, versus taking receipt of it from a referring Accountability Court, it will be conducted by appropriately trained and credentialed staff. This may be provided through the Behavioral Health Assessment and/or Service Plan Development services.<br>2. Program utilizes methods, materials, settings, and outside resources appropriate to the developmental and cognitive levels, capabilities, age, gender, and culture of participants.<br>3. Program utilizes methods, materials, approaches, activities, settings, and outside resources appropriate for, and targeted to individuals with a serious mental illness, including those with a co-occurring substance use disorder and/or developmental disability.<br>4. Program utilizes methods, materials, approaches, activities, and outside resources appropriate for reducing recidivism rates among individuals with moderate to high criminogenic risk and need levels.<br>5. Program maintains required staff certification and training standards for evidence-based curricula/practices and provides quality control/model fidelity measures and supervision practices.<br>6. The program must operate at a site approved to bill DBHDD/Medicaid for services. However, limited individual or group activities may take place off- site in natural community settings as is appropriate to each individual's recovery plan. Program must have in place appropriate accreditation and licenses for all established service sites.<br>7. The program's treatment level and service frequency are based on the individual's clinical need and risk/support needs considerations. However, in all cases, the program must offer a minimum of 9 hours per week of programming at the initial phase of an individual's treatment.<br>8. The program provides individual treatment compliance and status reports as needed prior to and during court staffing/judicial review meetings. Any sanctionable offense should be reported to identified court staff as soon as possible, or at least within 24 hours of the incident (sanctionable offenses include but are not limited to missed appointments, inappropriate behavior toward staff or other participants, damage to property, non-compliance with provider policies).<br>9. The program works collaboratively with the court to implement evidence-based practices identified by the Georgia Council of Accountability Court Judges (CACJ; http://www.gaaccountabilitycourts.org/) and the National Association of Drug Court Professionals (NADCP; Recommended: Best Practice Standards Vol. I and II https://www.ndci.org/resources/publications/standards/)<br>10. Provide comprehensive Individual Recovery Plans (IRP) for each enrolled individual, including utilizing applicable adult outpatient services, residential supports and housing, employment supports, trauma informed mental health and substance abuse treatment, whole health planning and implementation, peer support services, and linkage to other related services required to assist individuals in maintaining the behavioral health recovery and avoiding additional criminal justice involvement. Evidence based practices will guide the IRP and treatment process.<br>11. The program will implement at least one evidence-based treatment practice/model(s), using a manualized curriculum, that has shown to be effective in working with the target population, such as:<br>    a. Cognitive Behavioral Intervention – Substance Abuse<br>    b. Cognitive Behavioral Treatment (CBT) |

# Treatment Court Services- Adult Mental Health

    c. Matrix Model
    d. Moral Recognition Therapy
    e. Motivational Interviewing
    f. Seeking Safety
    g. Thinking for a Change
    h. Trauma Recovery and Empowerment Model (TREM)

[NOTE: Not all the services listed in the Service Definition section are aligned with these unique EBPs, and therefore, these EBPs may not be applicable to those particular services. The court and providers will discern any specific applicability via their joint MOU].

12. Provider will develop written agreements, partnerships, and memoranda of understanding (MOU) with key justice, mental health and substance abuse treatment providers, recovery community advocates and support partners, consumer groups on an ongoing basis for the purpose of cooperative wrap around services and for developing sustainable activities.

## Staffing Requirements

1. Staffing patterns must adhere to the requirements for each allowable service listed above.
2. Provider shall employ the following staff exclusively dedicated to the Treatment Court - MH service:
   a. One FTE Treatment Coordinator who:
      i. Is a licensed clinician; and
      ii. Provides all case management/care coordination for participants; and
      iii. Attends court/staffings/judicial reviews/planning sessions; and
      iv. Carries a case load of all Treatment Court - MH participants in need of services (not to exceed the caseload size for any of the unbundled services named above in this service guideline); and
      v. Conducts Behavioral Health Assessments for participants entering services.
   b. One FTE Certified Peer Specialist (with credentials as a Forensic Peer Mentor) who:
      i. Has a certification as Peer Specialist-MH or AD; and
      ii. Is a graduate of Forensic Peer Mentor Training (or completes training within 6 mos. of hire); and
      iii. Provides mentoring and linkage to community resources for participants; and
      iv. Attends court/staffings/judicial reviews/planning sessions; and
      v. Supports participants by modeling a recovery-oriented lifestyle, assisting with building natural supports, and promoting hope; and
      vi. Carries a case load of all Treatment Court - MH participants in need of services.
3. Staff should be appropriately certified and trained on evidence-based practices and curricula.
4. For Group therapy: Maximum face-to-face ratio cannot be more than 10 individuals to 1 direct service staff based on average group attendance.
5. A physician and/or Registered Nurse or Licensed Practical Nurse with appropriate supervision must be available to the program either by employment by the agency, through a contract with a licensed practitioner, or by written referral or affiliation agreement with another agency or agencies that offer such services.

## Clinical Operations

1. An individual may have a variable length of stay. The level of care and length of stay should be determined by individual's multiple assessments and progress toward meeting goals of the IRP. It is recommended that the individuals attend at a frequency appropriate to their level of need. Ongoing clinical and risk/need assessment should be conducted to determine step down in level of care.
2. Each individual should participate in setting individualized goals for themselves and in assessing their own skills and resources related to recovery. Goals are set by exploring strengths and needs in the individual's living, learning, social, and working environments. Implementation of services may take place individually or in groups.
3. Each individual must be provided assistance in the development/acquisition of needed skills and resources necessary to achieve recovery and/or reduction in use of substances and maintenance of recovery.
4. Court staffing meeting time may be billable as a collateral contact via Case Management with or without the person being present if the following are considered:

## Treatment Court Services- Adult Mental Health

| | | |
|---|---|---|
| | a. | If the Court Staffing Meeting addresses multiple individuals being supported by the Treatment Court Service, the only time which can be billed is the specific discussion and planning related to the individual being served; |
| | b. | The service must comply with the expectations set forth in the unique Case Management (CM) service definition (Assistance to the person and other identified recovery partners in the facilitation and coordination of the Individual Recovery Plan (IRP), identification, with the person, of strengths which may aid him/her in achieving and maintaining recovery from mental health challenges as well as barriers that impede the development of necessary skills, linkage and referral, monitoring and follow-up, etc.). For example, if this service is being billed via CM and the individual served is not participating, the intervention and billing would comply with the Required Components section of the CM service which allow 50% of billable contact to be non-face-to-face. |
| Service Accessibility | 1. | Service are available during the day and evening hours. |
| | 2. | Demographic information collected shall include a preliminary determination of hearing status to determine referral to the Office of Deaf Services. |
| | 3. | To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include: |
| | a. | the use of one-to-one service intervention via Telemedicine, connecting the individual to a practitioner who speaks the individual's language versus use of interpreters; and/or |
| | b. | the use of an interpreter via Telemedicine to support the practitioner in delivering the identified service. |
| | | Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language. The individual must consent to the use of this modality. This consent should be documented in the individual's record. The use of telemedicine should not be driven by the practitioner's/agency's convenience or preference. |
| Documentation Requirements | 1. | Submission of a monthly standardized programmatic report is required by the DBHDD to monitor performance and outcomes as well and approve the amount requested via the MIERS. |
| | 2. | Every admission and assessment must be documented. |
| | 3. | Daily notes must include time in/time out in order to justify units being utilized. |
| | 4. | Progress notes must include written daily documentation of groups, important occurrences; level of functioning; acquisition of skills necessary for recovery; progress on goals identified in the IRP, progress toward recovery, substance use, reduction and/or abstinence; use of drug screening results by staff; and evaluation of service effectiveness. |
| | 5. | Provider shall only document units in which the individual was actively engaged in services. Meals and breaks must not be included in the reporting of units of service delivered. |
| | 6. | Daily attendance of each individual participating in the program must be documented showing the number of hours in attendance. |
| | 7. | All service contacts with an individual must be documented. |
| Billing & Reporting Requirements | | The individual medical record must include documentation of services described in the Service Operations section. |
| | 1. | Provider is required to complete progress notes for every contact with individual as well as for related collateral contacts. |
| | 2. | Progress notes must adhere to documentation requirements set forth in this manual. |

# Women's Treatment and Recovery Support (WTRS): Outpatient Services

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Intensive Outpatient | | | | | | | | TBD | | | | | |

See TOC Grid in Part I of this Manual for Services Billing detail.

**Unit Value:** 1 hour

Utilization Criteria

**Service Definition:** WTRS Outpatient Services will provide comprehensive gender specific treatment for addictions. These services will encompass ASAM Level 1 Outpatient services and ASAM Level 2.1 Intensive Outpatient Services. ASAM Level 1 outpatient encompasses organized services that may be delivered in a wide variety of settings. Such services are provided in regularly scheduled sessions and follow a defined set of policies and procedures. ASAM Level 2.1 is an intensive outpatient set of services that maybe offered during the day, before or after work, in the evening or on weekends. Such programs provide essential support and treatment services while allowing the individual to apply his/her newly acquired skills in "real world "environments. The WTRS Outpatient Program assumes an average length of stay in outpatient treatment of 4 to 12 months or based on individual clinical need.

**Admission Criteria:**
Individual must:
1. Have a substance use disorder; and
2. Meet criteria for the DBHDD eligibility (Part I of this manual).
3. These contracted slots are for any woman with no other means to pay for services (Corrections, DFCS, court referred, etc.).
4. **Admissions and Interim Services Policy for Pregnant Consumers:** Federal regulations gives priority admissions to certain populations in the following order: Pregnant injecting drug users, other pregnant drug users, other injecting drug users, and then all other users. All addictions providers are required to adhere to the priority admission policy (including pregnant woman that are actively taking an opiate substitute). In the event a woman is unable to continue her medication regimen, the provider must make the appropriate referral and contact the state office within 48 hours.

**Continuing Stay Criteria:**
1. The individual's condition continues to meet the admission criteria;
2. Documentation reflects continuing progress of the individual's recovery plan within this level of care;
3. There is a reasonable expectation that the individual can achieve the goals in the necessary time frame; and
4. In the event the length of stay needs to be extended, additional documentation is required to be submitted to the DBHDD Women's Treatment Coordinator. All services are individualized and clinical discretion is to be used when evaluating levels of care. The maximum length of stay is twelve (12) months.

**Discharge Criteria:**
1. A discharge/transition plan is completed, linkages are in place, and one or more of the following:
   a. Goals of the IRP have been substantially met; or
   b. If a consumer is involved with DFCS or another referring agency, a discharge staffing should be completed in collaboration with WTRS and other referring organizations before discharge.
2. To discharge an individual before clinically appropriate, a clinical staffing and a discharge summary must be completed, and the following information must be documented.
3. Transfer to a higher level of service is warranted if the individual requires services not available at this level.

**Service Exclusions:** Services cannot be offered with SA Intensive Outpatient Program, Psychosocial Rehabilitation, WTRS residential treatment, and AD Intensive service.

**Clinical Exclusions:**
1. If an individual is actively suicidal or homicidal with a plan and intent.
2. Women should have no cognitive and/ or intellectual impairments which will prevent them from participating in and benefiting from the recommended level of care.
3. Withdrawal Management and impairments needs must be met prior to admission to the program (alternative provider and/ or community resources should be used to serve women with acute treatment needs).
4. Women must be medically stable in order to participate in treatment.

# Women's Treatment and Recovery Support (WTRS): Outpatient Services

| | |
|---|---|
| Required Components | 1. Services must be licensed by DCH/HFR under the Rules and Regulations for Drug Abuse Treatment Program, 290-4-2. |
| | 2. Individuals receiving services must have a substance use disorder present in the medical record prior to initiation of services. The diagnosis must be given by a practitioner identified in O.C.G.A. Practice Acts as qualified to provide a diagnosis. |
| | 3. Each individual should participate in setting individualized goals for themselves. |
| | 4. Services may take place individually or in groups. |
| | 5. Each consumer must be oriented into the program and receive a copy of rules and regulations and client rights. A program handbook is recommended. |
| | 6. IRP reviews must be completed every 60 days and staffing should be conducted involving all necessary participants WTRS Treatment Review Form is recommended. |
| | 7. Use of ASAM is required to determine level of care during each phase of treatment. These levels are to be assessed regularly, must be individualized, and clinical judgment must be used. |
| | 8. All WTRS work providers must provide all services included in the WTRS type of care. |
| | 9. All WTRS work providers must offer the following groups: Addiction Treatment Groups, Relapse Prevention, Trauma Groups, Criminal Addictive Thinking/Irrational Thinking, Anger Management, Co-Occurring Disorders, Life Skills, Family Dynamics and Health Relationships including HIV/AIDS. The recommended curricula for the above groups are: |
| |     a.  The MATRIX with the Women Supplement; |
| |     b.  Helping Women Recover; |
| |     c.  A Woman's Way through the 12 Steps; |
| |     d.  TREM; |
| |     e.  Seeking Safety; |
| |     f.  A New Direction Criminal and Addictive Thinking; |
| |     g.  SAMHSA Anger Management; and |
| |     h.  Matrix Family Component. |
| | 10. The chart below shows the required hours of treatment for each ASAM level. All services are individualized and clinical discretion should be used when evaluating levels of care: |

| ASAM Level of Care | Hours Per Week |
|---|---|
| Level 2.1 | 15 hours |
| Level 1 | up to 8 hours |

| | |
|---|---|
| Staffing Requirements | 1. Program Coordinator Qualifications: |
| |     a.  At least two (2) years of documented work experience in a Gender Specific and/or Addiction Treatment Program. |
| |     b.  Level 4 or higher with co-occurring disorders experience defined in the DBHDD Provider Manual. This person's knowledge must go beyond basic understanding and must demonstrate actual staff capabilities in using knowledge for individuals with co-occurring disorders. Staff person must demonstrate a minimum of 5 hours per year of training in co-occurring treatment. Programs must have documentation that there is at least one (1) Level 4 staff (excluding Paraprofessional, Supervisee/Trainee and Certified Alcohol and Drug Counselor-Trainee) that is co-occurring capable. |
| |     c.  A GCADC-I or CAC-I working towards obtaining a GCADC-II or CAC-II within two years can work in this position. The provider is required to keep documentation of supervision and the anticipated test date. |
| | 2. Program Manager or Lead Counselors Qualifications: |
| |     a.  At least one (1) year of documented work experience in a Gender Specific and/or Addiction Treatment Program. |
| |     b.  Level 4 practitioners, or a GCADC-II/CAC-I with co-occurring disorders experience or higher staff as defined herein. |
| | 3. Programmatic Staff Qualifications: |
| |     a.  All WTRS practitioners with no documented experience should be orientated on the biological and psychosocial dimensions of substance use disorders and trained in evidence-based models and best practices. This orientation should also include "Introduction to Women and Substance Use Disorders" On-line course. This must be completed within the first 90 days of employment. |

## Women's Treatment and Recovery Support (WTRS): Outpatient Services

**Clinical Operations**

b. Level 4 practitioner with co-occurring disorders experience or higher staff as defined in the DBHDD Provider Manual.

c. Non-clinical staff and Level 5 practitioners must be under the supervision of an LCSW, LPC, LMFT, MAC, CAADC, GCADC-II/-III, or CAC-II.

4. WTRS Provider must have at least one program director to oversee residential and outpatient.

5. Each WTRS program must have a distinct separation in staff.

6. The provider must provide assurance that all program staff will have appropriate background checks and credential verifications.

1. The program must be under clinical supervision of an LCSW, LPC, LMFT, MAC, CAADC, GCADC-II/-III, or CAC-II, who is onsite during normal operating hours.

2. All clinical services must be provided by the appropriate practitioner based on the DBHDD practitioner's guide.

3. The program shall conduct random drug screening and use the results of these tests for marking the individual's progress toward goals and for service planning.

4. Addiction treatment/recovery services and programming must demonstrate a primary focus on Group Counseling that consists of Cognitive Behavioral groups (which rearrange patterns of thinking and action that lead to addiction). Group training, such as psychoeducational groups (which teach about substance use disorder and skills development groups, which hone the skills necessary to break free of addictions) may also be offered in combination with group counseling but must not serve as the only group component. At least fifty percent (50%) of groups provided on a weekly based on the ASAM Level of Care must be counseling.

5. Limited individual or group activities may take place off-site in natural community setting as is appropriate to each individual's IRP. (NO Services are to take place at the individual's place of residence unless it is outreach).

6. Recovery Support meetings may not be counted towards hours for any treatment sessions if the session goes beyond the basic introduction to the Recovery Support experience.

7. Hours of operation should be accommodating for individuals who work (i.e. evening/weekend hours).

8. WTRS services may operate in the same building as other services; however, there must be a distinct separation between services, living space and staff.

9. Adequate space, equipment, furnishings, supplies and other resources must be provided in order to effectively provide services and so that the program environment is clean and in good repair.

10. The Department's Evidence Based Practices and curriculums are to be utilized for the target area of treatment. Practitioners providing these services are expected to maintain knowledge and skills regarding current research trends in best evidence-based practices.

11. The program must have a WTRS Services Organizational Plan Addressing the following:

   a. The philosophical model of the program and the expected outcomes for program participants (i.e., harm reduction, abstinence, beginning of or maintaining individually defined recovery, employment readiness, relapse, prevention, stabilization and treatment of those with co-occurring disorder).

   b. The schedule of activities and hours of operations.

   c. Staffing patterns for the program.

   d. How assessments will be conducted.

   e. How the program will support pregnant women that require medication assisted treatment.

   f. How staff will be trained in the administration of addiction services and treatment of co-occurring disorders according to the Georgia Best Practices.

   g. How services for individuals with co-occurring disorders will be flexible and will include services and activities addressing both mental health and addictions.

   h. How individuals with co-occurring disorders who cannot be served in the regular program activities will be provided and/or referred for time-limited special integrated services that are co-occurring enhanced as reflected in Guiding Principles Regarding Co-Occurring Mental Health and Addictive Diseases Disorders, 04-109.

   i. How services will be coordinated with addiction services including assuring or arranging for appropriate referrals and transitions (Including transportation).

12. Staff training and development is required to be addressed by the provider as evidenced by the following:

   a. All WTRS treatment pm staff are required to participate in staff development and ongoing training as required by the community standards, HFR regulations, and national accrediting bodies.

   b. As a part of this already mandated staff development and training, WTRS staff should have at least thirty (30) hours of addiction specific training annually, in accordance with HFR regulations.

## Women's Treatment and Recovery Support (WTRS):  Outpatient Services

c. Licensed and certified staff is required to have at least six (6) hours out of the thirty (30) hours in the area of gender-specific women's addiction modalities and treatment skills.

d. All employees including house parents should complete the SAMHSA's Introduction to Women and Substance Use Disorders On-Line Course within 90 days of employment. To enroll in the Introduction to Women and Substance Use Disorders On-line course go to: https://healtheknowledge.org/ addition modalities and treatment skills.

e. All non-licensed and or non-certified staff that provide services must complete at least 6 hours of gender specific training, annually.

f. All employees including house parents should complete the SAMHSA's Introduction to Women and Substance Use Disorders On-Line Course within 90 days of employment.  To enroll in the Introduction to Women and Substance Use Disorders on-line course go to: http://healtheknowledge.org/.

g. Training can be provided via e-learning or face to face.

h. Each treatment provider is required to train new program staff on the following:
   i. Understanding the WTRS program requirements;
   ii. Understanding Healthcare Facility Regulations (HFR);
   iii. Understanding ASO expectations and requirements;
   iv. Understanding ASAM levels of care; and
   v. Understanding current DFCS policies related to the WTRS program.

| Documentation Requirements | 1. Providers must document services in accordance with the specifications with the specifications for documentation requirements specified in Part II, Section III of the Provider Manual. |
|---|---|
| | 2. It is crucial that individuals be authorized under the WTRS Outpatient type of care in order to assign an appropriate funding source. |
| | a. In addition, new registration must be completed when a previous registration expires; |
| | b. Upon an individual leaving the program or moving to another level of care, a registration update must be completed and an end-date entered in the ASO system. |
| | 3. Every admission and assessment must be documented. |
| | 4. Progress/Group notes must be written daily and signed by the staff that performed the service. |
| | 5. Daily attendance of each individual participating in the program must be documented by evidence of a group sign-in roster. |
| | 6. Clinicians are to sign and date each note with only the correct approved DBHDD credentials based on the practitioners table. The individual that provides the service must complete the note. |
| | 7. Results of Drug Screen must be documented. |
| | 8. All WTRS providers are required to provide a complete biopsychosocial assessment. |
| | 9. The Level of Care will be determined according to the American Society of Addiction Medicine (ASAM) for assessing the severity and intensity of services and the content of the ANSA. The ASAM justification form must be included in consumer's chart. |
| | 10. Provider must complete the WTRS vocational assessment within 30 days of admissions. Assessment must be placed in consumer's medical record. |

## Women's Treatment and Recovery Support (WTRS): Residential Treatment

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Supported Housing | Residential | H0043 | | | | | |

# Women's Treatment and Recovery Support (WTRS): Residential Treatment

| Unit Value | Utilization Criteria | TBD |
|---|---|---|
| 1 day | | TBD |

**Service Definition**

Women's Treatment and Recovery Support Residential Program will provide comprehensive gender specific treatment for addictions. These services will encompass ASAM level 3.1 Clinically Managed Low -Intensity Residential Services and 3.5 Clinically Managed High-Intensity Residential Services level of care and Therapeutic ChildCare. ASAM Level 3.1 programs offer at least 10 hours per week of low-intensity treatment focusing on improving the individual's readiness to change. Services may include individual, group, and family therapy; medication management and medication education, mental health evaluation and treatment; vocational rehabilitation and job placement; and either introductory or remedial life skills workshops. Level 3.1 is a structured recovery residence environment staffed 24 hours a day, which provides sufficient stability to prevent or minimize relapse or continued use. Interpersonal and group living skills generally are promoted through use of community or house meetings of residents and staff. Level 3.5 programs are designed to serve individuals who, because of specific functional limitations, need safe and stable living environments in order to develop and/ or demonstrate sufficient recovery skills so that they do not immediately relapse or continue to use in an imminently dangerous manner upon transfer to a less intensive level of care . This level of care assist individuals who addiction is currently so out of control that they need a 24 hour supportive treatment environment to initate or continue a recovery process that has failed to progress. 3.5 programs provides no less than 25 hours of treatment per week. An on-site safe and adequate living environment is provided for dependent children ages 13 and younger. The provider, may but is not required, to provide an onsite and safe living environment for children 14-17. Therapeutic Child Care provided to ensure the children of the women receive the necessary therapeutic preventions and interventions skills. The provider will comprehensively address wraparound services available on-site or off site, for dependent children 13years of age and younger. WTRS residential services are on-site or provided within walking distance of provider's residential facility.

**Admission Criteria**

1. Individuals must have a substance use disorder, meet the DBHDD eligibility (Part I of this manual), and meets criteria for one of the following:

   a. **TANF and or Child Protective Service Criteria:**
      i. Current TANF Recipients- Individuals with active TANF cash assistance cases.
      ii. Former TANF recipients- Individuals whose TANF assistance was terminated within the previous twelve months due to employment.
      iii. Families at Risk- Individuals with active DFCS child protective cases or referred by Family Support Services.

   **To use a TANF funded slot a referral must come from DFCS. Referral form along with other required documents must be in individual's chart.**

   OR

   b. **Non-TANF Criteria:**
   Individuals determined to be Non-TANF and does not meet the above criteria but do meet the DBHDD eligibility definition may be served in a WTRS program. An individual is determined Non-TANF by the following:
      i. A woman pregnant for the first time.
      ii. A woman has lost parental custody of her children (i.e. is not working on reunification).
      iii. A woman who is not associated with DFCS (TANF or Child Protective Service, meets DBHDD eligibility definition and would benefit from gender specific treatment).
      iv. A woman with no dependent children.

   OR

   c. **SSBG and/or state funded slots**
      i. A woman with dependent children who meet the DBHDD Eligibility definition.

2. Each time an individual is discharged they must meet the admission criteria and follow admission procedure if re-admittance is needed.

3. Federal regulations give priority admissions to certain populations in the following order: Pregnant injecting drug users, other pregnant drug users, other injecting drug users, and all other users. All addictions providers are required to adhere to the priority admission policy (including pregnant women that are actively taking opiate substitute). In the event a woman is unable to continue her medication regimen the provider must make appropriate referrals and contact the state office within 48 hours.

**Continuing Stay Criteria**

1. The individual's condition continues to meet the admission criteria.

2. Documentation reflects continuing progress of the individual's recovery plan within this level of care.

# Women's Treatment and Recovery Support (WTRS): Residential Treatment

3. There is a reasonable expectation that the individual can achieve the goals in the necessary time frame.
4. In the event the length of stay needs to be extended, additional documentation is required to be submitted to the DBHDD Women's Treatment Coordinator. All services are individualized and clinical discretion is to be used when evaluating levels of care. The maximum length of stay is six (6) months.

**Discharge Criteria**

1. Goals of the IRP have been substantially met; and
2. Discharge/ transition plan is completed, and linkages are in place; OR
3. Transfer to a higher level of service is warranted if the individual requires services not available at this level. To discharge an individual before clinically appropriate, a clinical staffing and a discharge summary must be completed with documentation of the clinical justification for the higher level of care.
4. If an individual is involved with DFCS, a discharge staffing should be completed in collaboration with WTRS providers and other referring organization(s) before discharge.

**Service Exclusions**

Services cannot be offered with SA Intensive Outpatient Program, WTRS Outpatient Treatment Service, Psychosocial Rehabilitation, or other residential treatment service.

**Clinical Exclusions**

1. If an individual is actively suicidal or homicidal with a plan and intent.
2. Women should have no cognitive and/ or intellectual impairments which will prevent them from participating in and benefiting from the recommended level of care.
3. Withdrawal Management and impairments needs must be met prior to admission to the program (alternative provider and/ or community resources should be used to serve women with acute treatment needs).
4. Women must be medically stable in order to reside in group living conditions and participate in treatment.

**Required Components**

1. Services must be licensed by DCH/HFR under the Rules and Regulations for Drug Abuse Treatment Program, 290-4-2.
2. Each individual should participate in setting individualized goals for themselves.
3. Services may take place individually or in groups.
4. Each individual must be oriented into the program and receive a copy of rules and regulations and client rights. A program handbook is recommended.
5. IRP reviews must be completed every 30 days and staffing should be conducted involving all necessary participants including Therapeutic Childcare Staff. The WTRS Treatment Review Form is recommended.
6. Use of ASAM is required to determine level of care during each phase of treatment. These levels are assessed regularly and must be individualized, clinical judgment must be used.
7. All WTRS providers must be providing all services included in the WTRS type of care.
8. All WTRS providers must offer the following groups: Addiction Treatment Groups, Relapse Prevention, Trauma Groups, Criminal Addictive Thinking/Irrational Thinking, Anger Management, Co-Occurring Disorders, Life Skills, Family Dynamics and Health Relationships including HIV/AIDS Education.
9. The recommended curriculums for the above groups are:
   a. The MATRIX with the women supplement;
   b. Helping Women Recover;
   c. A Woman's Way Through the 12 Steps;
   d. Beyond Trauma;
   e. TREM;
   f. Seeking Safety;
   g. A New Direction Criminal and Addictive Thinking;
   h. SAMHSA Anger Management; and
   i. Matrix Family Component.
10. Providers are required to maintain a waiting list. All individuals placed on waiting list should be contacted at least twice a month. If the provider has a priority admission on the waiting list. Interim services must be offered and documentation is required monthly to the state office.
11. When a pregnant woman is seeking services, the agency is required to give her preference in admission or on the waiting list. If the provider has insufficient capacity to provide services to any such pregnant woman, the provider is required to refer the pregnant woman to the DBHDD Women's Treatment Coordinator.
12. The provider is required to make interim services available within 48 hours if pregnant woman cannot be admitted because of lack of capacity.

# Women's Treatment and Recovery Support (WTRS): Residential Treatment

13. The program is required to offered interim services at a minimum the following:
    a. Counseling and education about HIV and TB, the risks of needle-sharing, the risks of transmission to sexual partners and infants, and steps that can be taken to ensure that HIV and TB transmission does not occur;
    b. Referral for HIV and TB treatment services, if necessary; and
    c. Counseling pregnant women on the effects of alcohol and other drugs use on the fetus and referrals for prenatal care for pregnant women.

14. The chart below shows the required ASAM content hours:

| ASAM Level of Care | Hours Per Week |
|---|---|
| Level 3.5 | 25 hours |
| Level 3.1 | 10 hours |

| | |
|---|---|
| **Staffing Requirements** | 1. Program Coordinator Qualifications:<br>  a. At least two (2) years of documented work experience in a Gender Specific and/or Addiction Treatment Program.<br>  b. Level 4 or higher with co-occurring disorders experience defined in the DBHDD Provider Manual. This person's knowledge must go beyond basic understanding and must demonstrate actual staff capabilities in using knowledge for individuals with co-occurring disorders. Staff person must demonstrate a minimum of 5 hours per year of training in co-occurring treatment. Programs must have documentation that there is at least one (1) Level 4 staff (excluding Paraprofessional, Supervisee/Trainee and Certified Alcohol and Drug Counselor-Trainee) that is co-occurring capable.<br>  c. A GCADC-I or CAC-I working towards obtaining a GCADC-II or CAC-II within two years can work in this position. The provider is required to keep documentation of supervision and anticipated the test date.<br><br>2. Program Manager or Lead Counselor qualifications:<br>  a. At least one (1) year of documented work experience in a Gender Specific and /or Addiction Treatment Program.<br>  b. Level 4 practitioners or a CAC-I with co-occurring disorders experience or higher staff as defined in the Provider Manual for Community Behavioral Health Providers.<br><br>3. Programmatic Staff Qualifications:<br>  a. All WTRS practitioners with no documented experience should be orientated on the biological and psychosocial dimensions of substance use disorders and trained in evidence-based models and best practices. This orientation should also include "Introduction to Women and Substance Use Disorders" On-line course. This must be completed within the first 90 days of employment.<br>  b. Level 4 practitioner with co-occurring disorders experience or higher staff as defined in the Provider Manual for Community Behavioral Health Providers.<br>  c. Non-clinical staff and Level 5 practitioners must be under the supervision of an onsite LCSW, LPC, LMFT, MAC, CAADC, GCADC-II/-III, or CAC-II.<br><br>4. The WTRS Provider must have at least one program director to oversee residential and outpatient.<br>5. Each WTRS program must have distinct separation in staff.<br>6. The provider must provide assurance that all program staff will have appropriate background checks and credential verifications. |
| **Clinical Operations** | 1. The program must be under clinical supervision of an LCSW, LPC, LMFT, MAC, CAADC, GCADC_II/-III, or CAC-II, who is onsite during normal operating hours.<br>2. All clinical services must be provided by the appropriate practitioner based on the DBHDD practitioner's guide.<br>3. The program shall conduct random drug screening and use the results of these tests for marking the individual's progress toward goals and for service planning.<br>4. Addiction treatment services and programming must demonstrate a primary focus on Group Counseling that consists of Cognitive Behavioral groups (which rearrange patterns of thinking and action that lead to addiction), group training, such as psychoeducational groups which teach about substance use disorders and skills development groups (which hone the skills necessary to break free of addictions) may also be offered in combination with group counseling but must not serve as the only group component. At least fifty percent (50%) of groups provided on a weekly basis on the ASAM Level of Care must be group counseling.<br>5. Limited individual or group activities may take place off-site in natural community setting as is appropriate to each individual's IRP. (NO Services are to take place at the individual's place of residence unless it is outreach).<br>6. Recovery support meetings (such as AA, NA, etc.) may not be counted towards hours for any treatment sessions.<br>7. WTRS services may operate in the same building as other services; however, there must be a distinct separation between services, staff, and living space. |

## Women's Treatment and Recovery Support (WTRS): Residential Treatment

8. Adequate space, equipment, furnishings, supplies and other resources must be provided in order to effectively provide services and so that the program environment is clean and in good repair.

9. The Department's Evidence Based Practices and curriculums are to be utilized for the target areas of treatment. Practitioners providing these services are expected to maintain knowledge and skills regarding current research trends in best evidence-based practices.

10. The program must have a WTRS Services Organizational Plan Addressing the following:

   a. The philosophical model of the program and the expected outcomes for program participants (i.e., harm reduction, abstinence, beginning of or maintaining individually defined recovery, employment readiness, relapse, prevention, stabilization and treatment of those with co-occurring disorder).

   b. The schedule of activities and hours of operations.

   c. Staffing patterns for the program.

   d. How assessments will be conducted.

   e. How the program will support pregnant women that require medication assisted treatment.

   f. How staff will be trained in the administration of addiction services and treatment of co-occurring disorders according to the Georgia Best Practices.

   g. How services for individuals with co-occurring disorders will be flexible and will include services and activities addressing both mental health and addictions.

   h. How individuals with co-occurring disorders who cannot be served in the regular program activities will be provided and/or referred for time-limited special integrated services that are co-occurring enhanced as reflected in Guiding Principles Regarding Co-Occurring Mental Health and Addictive Diseases Disorders, 04-109.

   i. How services will be coordinated with addiction services including assuring or arranging for appropriate referrals and transitions (including transportation).

11. Staff training and development is required to be addressed by the provider as evidenced by the following:

   a. All WTRS treatment providers are required to participate in staff development and ongoing training as required by the community standards, HFR regulations, and national accrediting bodies.

   b. As a part of this already mandated staff development and training, WTRS staff should have at least thirty (30) hours of addiction specific training annually, in accordance with HFR regulations.

   c. Licensed and certified staff is required to have at least six (6) hours out of the thirty (30) hours in the area of gender-specific women's addiction modalities and treatment skills.

   d. All non-licensed and or non-certified staff that provide educational or treatment services must complete at least 6 hours of gender specific training annually.

   e. All employees including house parents should complete the SAMHSA's Introduction to Women and Substance Use Disorders On-Line Course within 90 days of employment. To enroll in the Introduction to Women and Substance Use Disorders on-line course go to: https://www.healtheknowledge.org.

   f. It is recommended that house parents and other support staff have at least 3-6 hours of non-clinical gender specific training annually but provider's discretion can be used.

   g. All training certificates shall be placed in the staff member's file for review.

   h. Training can be provided via e-learning or face to face.

      i. Each provider is required to train new program staff and includes the following:

      ii. Understanding the WTRS program requirements;

      iii. Understanding Healthcare Facility Regulations (HFR);

      iv. Understanding of the prior authorization process; and

      v. Understanding ASAM levels of care.

| Documentation Requirements | 1. Providers must document services in accordance with the specifications for documentation requirements specified in Part II, Section III of the Provider Manual. |
|---|---|
| | 2. It is crucial that individuals be authorized under the WTRS Residential type of care in order to assign an appropriate funding source. |
| | a. In addition, new registration must be completed when a previous registration expires; |

## Women's Treatment and Recovery Support (WTRS): Residential Treatment

b. Upon an individual leaving the program or moving to another level of care, a registration update must be completed and an end-date entered in the ASO system.

3. Every admission and assessment must be documented.
4. Progress/Group notes must be written daily and signed by the staff that performed the service.
5. Daily attendance of each individual participating in the program must be documented by evidence of a group sign in roster.
6. Clinicians are to sign and date each note with only the correct approved DBHDD credentials based on the practitioners table included within this manual. The individual that provides the service must complete the note.
7. Results of Drug Screens must be documented.
8. All WTRS providers are required to complete a biopsychosocial assessment.
9. The Level of Care will be determined according to the American Society of Addiction Medicine (ASAM) 3rd edition for assessing severity and intensity of services and the ANSA. The ASAM justification form must be included in the individual's medical record.
10. The provider must complete the WTRS vocational assessment within 30 days of admissions. Assessment must be placed in the individual's medical record.
11. TANF and Child Protective Service individuals must be referred to DFCS.
12. The following information must be maintained in the individual's chart, including all appropriate signatures:
    a. Substance Use Disorder Assessment Result Form: Substance Use Disorder Assessment Results form must be completed and submitted back to DFCS within 2 weeks from the completion of the assessment (Email or Fax documenting submission to DFCS).
    b. WTRS Referral Form completed by DFCS:
        i. Release of Information Form completed by DFCS.
        ii. Email or fax documenting transmission from DFCS.
    c. Monthly WTRS Compliance Form (Email or Fax documenting submission to DFCS from DFCS).
13. All WTRS providers must submit the WTRS Compliance Form to DFCS within 72 hours for the following:
    a. If individual fails to show for appointments for three consecutive days;
    b. All other major non-compliant issues; and
    c. Email or Fax documenting submission to DFCS.

| Billing & Reporting Requirements | Span billing may occur for this service, meaning the start and end date are not the same on a given service claim line; however, spans cannot cross months (e.g. start date and end date must be within the same month). |
|---|---|

## Women's Treatment and Recovery Services: Transitional Housing

| Transaction Code | Code Detail | Code | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Rate |
|---|---|---|---|---|---|---|---|
| Service Definition | Ready for Work Transitional Housing provide a safe, stable, drug free residence and utilities (power and water) for no more than 6 months to any woman or woman with a child that has successfully completed all recommended treatment/recovery services. The environment should be gender specific and can include dependent children between birth and 18 years old. Transitional Housing is to be a step down in service from Ready for Work residential or outpatient programs; thus, a successful completion of Ready for Work residential, outpatient, or least an ASAM level 2 program is necessary. | | | | | | |
| Admission Criteria | 1. A woman or woman with a child(ren) that has successfully completed all recommended levels of treatment unless approval from Women's Program Coordinator. <br> 2. A woman that has provided evidence of needing a place of residence. <br> 3. A woman that has provided evidence being able to live in a community environment without the assistance of direct care staff. | | | | | | |

# Women's Treatment and Recovery Services: Transitional Housing

| Continuing Stay Criteria | 1. The individual's condition continues to meet the admission criteria.<br>2. Documentation reflects continuing progress of the individual's IRP.<br>3. There is a reasonable expectation that the individual can achieve the goals in the necessary time frame.<br>4. In the event the length of stay needs to be extended additional documentation is required to be submitted to the state DBHDD Women's Treatment Coordinator. All services are individualized and clinical discretion is to be used.<br>5. The maximum length of stay is six (6) months. |
|---|---|
| Discharge Criteria | 1. A discharge / transition plan completed, linkages are in place, and one or more of the following:<br>   a. Goals of the IRP have been substantially met; or<br>      If an individual is involved with DFCS, a discharge staffing should be completed in collaboration with WTRS providers and other referring organizations before discharge.<br>   b. To discharge an individual before clinically appropriate, a clinical staffing must be completed and provide the following information:<br>      i. Documented reason for early discharge; and<br>      ii. An aftercare plan.<br>2. Transfer to a higher level of service is warranted if the individual requires a higher level of supervision. |
| Service Exclusions | Services cannot be offered with Psychosocial Rehabilitation, WTRS residential or other residential treatment service. |
| Clinical Exclusions | 1. If an individual is actively suicidal or homicidal with a plan and intent.<br>2. Women should have no cognitive and/or intellectual impairments which will prevent them from participating in and benefiting from the recommended level of care.<br>3. Withdrawal Management and impairments needs must be met prior to admission to the program (alternative provider and/ or community resources should be used to serve women with acute treatment needs).<br>4. Women must be medically stable in order to reside in an independent living condition and participate in treatment. |
| Required Components | 1. Provider will conduct a residence check twice a month to ensure cleanliness and safety.<br>2. The housing must be in the community away from the primary residential treatment facilities.<br>3. If children are residing with their mother, provider must child proof the home.<br>4. The home must provide a bathroom for every four residents.<br>5. The home must provide a living room and dining area, a kitchen and a bedroom for all residents.<br>6. This is a step-down program. Women living in transitional housing must be independent with support.<br>7. Transportation must be provided for the individuals to attend treatment/support services, this may include public transportation fare, staffing transporting individuals using agency vehicles and/or providing gas for individual's automobile.<br>8. Provider should continue to work with the individual's referral source to ensure consistency of care. |
| Staffing Requirements | **No staffing requirements for this level of care. Follow outpatient staffing requirements when providing aftercare treatment and support services.** |
| Clinical Operations | 1. Transitional Housing Services must provide a schedule for aftercare programming and to ensure stability and consistency for individuals.<br>2. Individual should be in Level 1 outpatient/aftercare. If she does not meet the criteria or the agency does not have a WTRS outpatient program, the individual should have an SA Outpatient.<br>3. Transitional Housing Services may be in the same apartment complex (that is not owned by the provider) as residential services; however, the living quarters must be distinctly different. Preferably (not required) apartments are away from residential services to assist with acclimation back into the community.<br>4. Food and shopping must be completed by individuals; providers should not charge or collect money/EBT cards.<br>5. Medications and medical needs should be the responsibility of the individual. The providers should not hold or dispense medications to individuals in transitional housing. |

## Women's Treatment and Recovery Services: Transitional Housing

6. Transitional Housing must have an organizational plan addressing the following:
   a. Schedule of Activities and Hours;
   b. Policies and Procedures;
   c. House Rules for Consumers; and
   d. Emergency Procedures.
7. Each individual should participate in setting individual goals for themselves and in assessing their own skills and resources related to sobriety.
8. Aftercare services must be provided to all participants in transitional housing unless otherwise approved by the Division.
9. The women living in Transitional Housing should have access to outpatient services. (Please see WTRS Outpatient Admission)
10. Aftercare is defined as the following:
    a. Provide Gender Specific continuing care groups at least once a week for 1 ½ hours.
    b. Provide at least one individual session per month to the individual.
    c. The individual must attend groups at least 3 times per month to be counted.
    d. Connection to support services would include; job, home or school visits, aftercare group, which includes parenting, mental health/developmental disabilities, support group meetings including NA and/ or AA.
    e. Minimum of 2 drug screens per month.
    f. Relapse prevention strategies including: Relapse Prevention, Parenting, Trauma Groups, Anger Management Healthy Relationships including HIV/AIDS education, Criminal Addictive Thinking, Co-Occurring Disorder and, Family Counseling as needed.

**Documentation Requirements**

1. Providers must document services in accordance with the specifications for documentation requirements specified in Part II, Section III of the Provider Manual.
2. Every admission of transitional housing must be documented.
3. Progress/Group notes must be written each time group meets and signed by the practitioner that performed the service.
4. Group attendance of each individual participating in the program must be documented by evidence of a group sign in roster.
5. Clinicians are to sign and date each note with only the correct approved DBHDD credentials based on the practitioners table. The practitioner that provides the service must complete the note.
6. Bi-weekly unit inspection must be documented for transitional housing.
7. Results of Drug Screen must be documented.
8. If individual is a Child Protective Services or TANF referral from DFCS, a Monthly WTRS Compliance Form is required (Email or Fax documenting submission to DFCS from DFCS).
9. If individual is a Child Protective Services or TANF referral from DFCS, the WTRS providers must submit the WTRS Compliance Form to DFCS within 72 hours (Email or Fax documenting submission to DFCS) for the following scenarios:
   a. If individual fails to show for treatment appointments for three consecutive days; and
   b. All other major non-compliance issues.

**Billing & Reporting Requirements**

Span billing may occur for this service, meaning the start and end date are not the same on a given service claim line; however, spans cannot cross months (e.g. start date and end date must be within the same month).

# SECTION IV
## TABLE A:  PRACTITIONER DETAIL

Please see the next page for Practitioner Detail

Specific Service Guidelines include some detail about how practitioners are used in services; however, additional practitioner requirements are listed in Table A and Table B in this section.

TABLE A: Service X Practitioner Table

| Service | Physician | Psychiatrist | Psychologist | PA | APRN-CNS | APRN-NP | APRN CNS-PMH | Pharmacist | LCSW | LPC | LMFT | RN | LMSW | LAPC/APC | LAMFT/AMFT | Psychologist/LCSW/LPC/LMFT's Supervisee/Trainee [1] | LPN | Licensed Dietician | MAC | CAADC | GCADC-III | CAC-II | GCADC-II | CAC-I [2] (with Bachelor's Degree) | CAC-I (without Bachelor's Degree) | GCADC-I [2] (with Bachelor's Degree) | GCADC-I (without Bachelor's Degree) | Certified Alcohol & Drug Counselor Trainee / Counselor in Training [2] (with Bachelor's Degree) | Certified Drug & Alcohol Counselor Trainee / Counselor in Training [4] (without Bachelor's Degree) | Certified Peer Specialist (with Bachelor's Degree) | Certified Peer Specialist (without Bachelor's Degree) | Health-Trained Certified Peer Specialist (with Bachelor's Degree) | Health-Trained Certified Peer Specialist (without Bachelor's Degree) | Certified Peer Specialist-Addictive Disease (with Bachelor's Degree) | Certified Peer Specialist-Addictive Disease (without Bachelor's Degree) | Certified Peer Specialist-Parent (with Bachelor's Degree) | Certified Peer Specialist-Parent (without Bachelor's Degree) | Certified Peer Specialist-Youth (with Bachelor's Degree) | Certified Peer Specialist-Youth (without Bachelor's Degree) | Paraprofessional (with Bachelor's degree) | Paraprofessional (without Bachelor's Degree) | Certified Psychiatric Rehabilitation Professional (with Bachelor's degree) | Certified Psychiatric Rehabilitation Professional (without Bachelor's Degree) | Qualified Medication Assistant [9] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AD Peer Support | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | U4[2,15,20] | U5[15,20] | | | | | | | | | |
| Behavioral Health Assm't | | | U2 | U2 | U2 | U2 | U2 | | U3 | U3 | U3 | U3 | U4 | U4 | U4 | U4 | | U3 | U3[3] | U3[3] | U3[3] | U3[3] | U3[3] | U4[3] | U5[3] | U4[3] | U5[3] | U4[3,18] | U5[3,18] | U4[2,12,18] | U5[12,18] | | | U4[2,3,15,18] | U5[3,15,18] | U4[2,12,18] | U5[12,18] | U4[2,12,18] | U5[12,18] | U4[2,12,18] | U5[12,18] | U4[2,12,18] | U5[12,18] | |
| Case Management | U4 | U4 | U4 | U4 | U4 | U4 | U4 | | U4 | U4 | U4 | U4 | U4 | U4 | U4 | U4 | | | U4 | U4 | U4 | U4 | U4 | U4[3] | U5[5] | U4[3] | U5[5] | U4[3] | U5[5] | U5[5] | U5[5] | | | | | | | | | U4[5] | U5[8] | U5[5] | U5[8] | |
| Community Support | U4 | U4 | U4 | U4 | U4 | U4 | U4 | | U4 | U4 | U4 | U4 | U4 | U4 | U4 | U4 | U5[13] | | U4 | U4 | U4 | U4 | U4 | U4[3] | U5[5] | U4[3] | U5[5] | U4[3] | U5[5] | | | | | | | U4[2,15] | U5[15] | U4[2,15] | U5[15] | U4[5] | U5[8] | U5[5] | U5[8] | |
| ADSS | U4 | U4 | U4 | U4 | U4 | U4 | U4 | | U4 | U4 | U4 | U4 | U4 | U4 | U4 | U4 | U5[13] | | U4 | U4 | U4 | U4 | U4 | U4[3] | U5[5] | U4[3] | U5[5] | U4[3] | U5[5] | U5[5] | U5[5] | | | U4[2,15] | U5[15] | | | | | U4[5] | U5[8] | U5[5] | U5[8] | |
| Community Support Team | | | | | U3 | U3 | U3 | | U3 | U3 | U3 | U3 | U4 | U4 | U4 | U4 | | | U3[3] | U3[3] | U3[3] | U3[3] | U3[3] | U4[3] | U5[5] | U4[3] | U5[5] | U4[3] | U5[5] | U4[5] | U5[5] | | | U4[2,15] | U5[15] | | | | | U4[5] | U5[8] | U4[5] | U5[8] | |
| Community Transition Planning | X | X | X | X | X | X | X | | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | X[5] | X | X[6] | X[7] | X[5] | X[5,7] | X[5,8] | | | | | X[2,15] | X[15] | X[2,15] | X[15] | X[5,7] | X[5,8] | X[5,7] | X[5,8] | |
| Crisis Intervention | U1 | U1 | U2 | U2 | U2 | U2 | U2 | | U3 | U3 | U3 | U3 | U4 | U4 | U4 | U4[16] | | | U3[3] | U3[3] | U3[3] | U3[3] | U3[3] | U4[3] | U5[5] | U4[3] | U5[5] | U4[3] | U5[5] | | | | | | | | | | | U4[5] | U5[8] | U5[5] | U5[8] | |
| Diagnostic Assessment | U1 | U1 | U2 | U2 | U2 | U2 | U2 | | U3 | U3 | U3 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Family Counseling | U2 | U2 | U2 | | | | U2 | | U3 | U3 | U3 | U3 | U4 | U4 | U4 | U4 | | | U3[3] | U3[3] | U3[3] | U3[3] | U3[3] | U4[3] | U5[3] | U4[3] | U5[3] | U4[3] | U5[3] | | | | | | | | | | | | | | | |
| Family Training | U4 | U4 | U4 | U4 | U4 | U4 | U4 | | U4 | U4 | U4 | U4 | U4 | U4 | U4 | U4 | | | U3[3] | U3[3] | U3[3] | U3[3] | U3[3] | U4 | U5[8] | U4 | U5[8] | U4 | U5[8] | U5 | U5[8] | | | U4[2,15] | U5[15] | U4[2,15] | U5[15] | U4[2,15] | U5[15] | U4[2] | U5[8] | U4[2] | U5[8] | |
| Group Counseling | U2 | U2 | U2 | | | | U2 | | U3 | U3 | U3 | U3 | U4 | U4 | U4 | U4 | | | U3[3] | U3[3] | U3[3] | U3[3] | U3[3] | U4[3] | U5[3] | U4[3] | U5[3] | U4[3] | U5[3] | | | | | | | | | | | | | | | |
| Group Training | U4 | U4 | U4 | U4 | U4 | U4 | U4 | | U4 | U4 | U4 | U4 | U4 | U4 | U4 | U4 | | | U3[3] | U3[3] | U3[3] | U3[3] | U3[3] | U4 | U5[8] | U4 | U5[8] | U4 | U5[8] | U5 | U5[8] | | | U4[2,15] | U5[15] | U4[2,15] | U5[15] | U4[2,15] | U5[15] | U4[2] | U5[8] | U4[2] | U5[8] | |
| Individual Counseling | U2 | U2 | U2 | | | | U2 | | U3 | U3 | U3 | U3 | U4 | U4 | U4 | U4 | | | U3[3] | U3[3] | U3[3] | U3[3] | U3[3] | U4[3] | U5[3] | U4[3] | U5[3] | U4[3] | U5[3] | | | | | | | | | | | | | | | |
| Intensive Case Management | U4 | U4 | U4 | U4 | U4 | U4 | U4 | | U4 | U4 | U4 | U4 | U4 | U4 | U4 | U4 | | | U4 | U4 | U4 | U4 | U4 | U4[3] | U5[5] | U4[3] | U5[5] | U4[3] | U5[5] | U5[5] | U5[5] | | | | | | | | | U4[5] | U5[8] | U5[5] | U5[8] | |
| Medication Administration | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| comprehensive Medication services | | | | U2 | U2 | U2 | U2 | U2 | | | | U3 | | | | | U4 | | | | | | | | | | | | | | | | | | | | | | | | | | | U5[9] |
| therapeutic, propylactic, or diagnostic injection | | | | U2 | U2 | U2 | U2 | U2 | | | | U3 | | | | | U4 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Nursing Assm't & Care | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| nursing assm't/evaluation | | | | | U2 | U2 | U2 | | | | | U3 | | | | | U4 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| RN Services | | | | | U2 | U2 | U2 | | | | | U3 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| LPN Services | | | | | | | | | | | | | | | | | U4 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Health/Behavior Assm't | | | | | U2 | U2 | U2 | | | | | U3 | | | | | U4 | U3 | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Psychiatric Treatment | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| individual psychotherapy face to face with medical evaluation and management services | U1 | U1 | | | | | U2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| pharmacological management | U1 | U1 | | U2 | U2 | U2 | U2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Psychological Testing | | | U2 | | | | | | U3[10] | U3[10] | U3[10] | | | | | U4[10,11] | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Service Plan Development | | | U2 | U2 | U2 | U2 | U2 | | U3 | U3 | U3 | U3 | U4 | U4 | U4 | U4 | | U3 | U3[3] | U3[3] | U3[3] | U3[3] | U3[3] | U4[3] | U5[3] | U4[3] | U5[3] | U4[3,18] | U5[3,18] | U4[2,12,18] | U5[12,18] | | | U4[2,3,15,18] | U5[3,15,18] | U4[2,12,18] | U5[12,18] | U4[2,12,18] | U5[12,18] | U4[2,12,18] | U5[12,18] | U4[2,12,18] | U5[12,18] | |
| Intensive Family Intervention | | | U3 | | | | U3 | | U3 | U3 | U3 | U3 | U4 | U4 | U4 | U4 | U5[13] | | U3[3] | U3[3] | U3[3] | U3[3] | U3[3] | U4 | U5[8] | U4 | U5[8] | U4 | U5[8] | | | | | | | U4[2,15] | U5[15] | U4[2,15] | U5[15] | U4[2] | U5[8] | U4[2] | U5[8] | |
| Structured Residential Services | X | X | X | X | X | X | X | | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | X | X | X | X | X | | | | | | | | | | | X | X | X | X | |
| Ambulatory Detoxification | U2 | U2 | | U2 | U2 | U2 | U2 | | | | | U3 | | | | | U4 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ACT | U1 | U1 | U2 | U2 | U2 | U2 | U2 | | U3 | U3 | U3 | U3 | U4 | U4 | U4 | U4 | U5[13] | | U3[3] | U3[3] | U3[3] | U3[3] | U3[3] | U4 | U5[8] | U4 | U5[8] | U4 | U5[8] | U4 | U5[8] | | | U4[2,15] | U5[15] | | | | | U4[2] | U5[8] | U4[2] | U5[8] | |
| Peer Support | | | | | | | | | | | | | U4[20] | U4[20] | U4[20] | U4[20] | | | | | | | | | | | | | | U4[2,12,20] | U5[12,20] | | | | | | | | | U4[2,20] | U5[12,20] | | | |
| Peer Support Whole Health | | | | | | U3[17,20] | U3[17,20] | | | | | U3[17,20] | | | | | | | | | | | | | | | | | | | | U4[2,12,20] | U5[12,20] | | | | | | | | | | | |
| Peer Support-Parent | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | U4[2,15,20] | U5[15,20] | | | | | | | |
| Peer Support-Youth | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | U4[2,15,20] | U5[15,20] | | | | | |
| Psychosocial Rehab-Group | U4 | U4 | U4 | U4 | U4 | U4 | U4 | | U4 | U4 | U4 | U4 | U4 | U4 | U4 | U4 | U5[13] | | U3[3] | U3[3] | U3[3] | U3[3] | U3[3] | U4 | U5[8] | U4 | U5[8] | U4[2] | U5[8] | U4[2] | U5[8] | | | | | | | | | U4[2] | U5[8] | U4[2] | U5[8] | |
| Psychosocial Rehab-Individual | U4 | U4 | U4 | U4 | U4 | U4 | U4 | | U4 | U4 | U4 | U4 | U4 | U4 | U4 | U4 | U5[13] | | U4 | U4 | U4 | U4 | U4 | U4[3] | U5[5] | U4[3] | U5[5] | U4[3] | U5[5] | U5[5] | U5[5] | | | | | | | | | U4[5] | U5[8] | U5[5] | U5[8] | |
| Supported Employment | | | | | | | | | U3 | U3 | U3 | | U4 | U4 | U4 | | | | | | | | | | | | | | | U4[2] | U5 | | | | | | | | | U4[2] | U5 | U4[2] | U5 | |
| SAIOP[19] | | | | | | | | | U3 | U3 | U3 | | U4 | U4 | U4 | | U5[13] | | U3 | U3 | U3 | U3 | U3 | U4 | U5 | U4 | U5 | U4 | U5 | | | | | U4 | U5 | | | | | U4 | U5 | | | |

## Practitioners Table  ey/Superscript Explanation

**Light green shading** denotes services for which telemedicine may be billed only if English is not the person's primary language. **Dar  green shading** denotes services/practitioner types for which telemedicine may be billed for any person (regardless of the person's primary language).  Always reference the actual service guideline of interest for further guidance/clarification.

1    With at least a bachelor's degree in one of the helping professions such as social work, community counseling, counseling, psychology, or criminology, functioning within the scope of the practice acts of the state.

2    With at least a bachelor's degree in one of the helping professions such as social work, community counseling, counseling, psychology, or criminology.

3    Addictions counselors may only perform these functions related to treatment of substance use disorders, including when there is a known or suspected co-occurring disorder.

4    With high school diploma/equivalent.

     Under the documented supervision (organizational charts, supervisory notation, etc.) of one of the licensed/credentialed professionals who may provide this service.

     Modifiers indicate services for which it is required to submit and document "U" levels  an "x" denotes services for which a "U" modifier is not required to submit an encounter.

7    With a Master's/Bachelor's degree in behavioral or social science that is primarily psychological in nature under the supervision of a licensed practitioner.

8    With high school diploma/equivalent under supervision of one of the licensed/credentialed professionals who may provide this service.

9    Working only within a Community Living Arrangement.

10   In conjunction with a psychologist.

11   Excludes LCSW/LPC/LMFT Supervisee/Trainees.

12   Under supervision of a Physician, Psychologist, LCSW, LPC, LMFT, RN, APRN, PA, LMSW, APC, or LAMFT.

13   LPNs who are "paraprofessionals" having completed the STR.

14   Please see the Community Requirements for full titles of practitioners.

1    Under supervision of a Physician, Psychologist, LCSW, LPC, LMFT, RN, APRN, PA, CAC-II, GCADC-II or -III, MAC, or CAADC.

1    Supervisee/Trainers are not able to bill Crisis Psychotherapy codes 90839.

17   While RNs may bill for the Individual modality of the service, they may not bill for the Group modality.

18   Information gathering only – See service guideline

19   Other professional services are billed unbundled as referenced in the service guideline.

20   Telemedicine is allowed only for the "Individual" modality of this service.

See Approved BH Practitioners Table for more detail on the practitioners listed in this table.

**TABLE B:** Physicians[1], Physician's Assistants and APRNs[2] may order any service. Please use the chart below to determine other appropriately licensed practitioner(s) authorized to recommend/order specific services.

| Ordering Practitioner Guidelines | Licensed Psychologist | LPC, LMFT, LCSW |
|---|---|---|
| **Non-Intensive Outpatient Services** | | |
| Addictive Disease Support Services | X | X |
| Behavioral Health Assessment & Service Plan Development | X | X |
| Behavioral Health Clinical Consult | | |
| Case Management (adults only) | X | X |
| Community Support – Individual (youth only) | X | X |
| Community Transition Planning | X | X |
| Crisis Intervention | X | X |
| Diagnostic Assessment | X | X |
| Family Outpatient Services (Counseling & Training) | X | X |
| Group Outpatient Services (Counseling & Training) | X | X |
| Individual Counseling | X | X |
| Medication Administration | | |
| Nursing A/H Services | | |
| Peer Support- Individual[3] | X | X |
| Peer Support Whole Health & Wellness (adults only)[3] | X | X |
| Peer Support – Group - Parent & Youth (youth only)[3] | X | X |
| Psychiatric Treatment | | |
| Psychological Testing | X | X |
| Psychosocial Rehabilitation-Individual (adults only) | X | X |
| **C&A Specialty** | | |
| Community Inpatient / Detoxification | | |
| Crisis Stabilization Program | | |
| Intensive Customized Care Coordination | X | X |
| Intensive Family Intervention | X | X |
| Peer Support- Parent & Youth- Individual & Group[3] | X | X |
| Structured Residential Supports | X | X |
| SA Intensive Outpatient: C&A | | |
| **Adult Specialty** | | |
| Ambulatory Detoxification | | |
| Assertive Community Treatment | | |
| Community Inpatient / Detoxification | | |
| Community Support Team | X | X |
| Crisis Stabilization Unit Services | | |
| Housing Supplements | X | X |
| Intensive Case Management | X | X |
| Opioid Maintenance Treatment | | |
| Peer Support (includes MH/AD Programs & Individual[3]) | X | X |
| Peer Support Whole Health and Wellness[3] | X | X |
| Psychosocial Rehabilitation Program | X | X |
| Residential SA Detoxification | | |
| Respite | X | X |
| Residential Supports | X | X |
| SA Intensive Outpatient: Adult | | |
| Supported Employment/Task Oriented Rehabilitation | X | X |
| Temporary Observation | | |

1 Resident physicians are allowed to order services in accordance with their residency supervision requirements (i.e. they function as a physician for ordering allowance purposes).
2 APRNs include Clinical Nurse Specialists (CNS) and Nurse Practitioners (NP)
3 Peer Support- Individual, PSWHW, Parent Peer Support, and Youth Peer Support are in both the Non-Intensive Outpatient and Specialty groups.

# SECTION V
## Service Code Modifier Descriptions

Certain services in the Service Guidelines contain specific modifiers.  The following is a list of the modifiers included herein and their specific description:

| Modifier | Description and Associated Rules |
|---|---|
| D1 | Utility Deposits* |
| ES | Equipment/Supplies* |
| ET | Emergency Services |
| FG | Food/Grocery* |
| FS | Financial Services* |
| GT | Via Interactive audio/video telecommunication systems |
| HA | Child/Adolescent Program |
| HE | Mental Health Program |
| HF | Substance Abuse Program |
| HH | Integrated mental health/substance abuse program |
| HK | Specialized Mental Health Programs for High-Risk Populations |
| HQ | Group Setting |
| HR | Family/Couple with client present |
| HS | Family/Couple without client present |
| HT | Multidisciplinary team |
| HW | Funded by state mental health agency |
| H1 | Household Furnishings* |
| H2 | Household Goods and Supplies* |
| H9 | Court-ordered |
| M1 | Moving Expenses |
| RR | Rental |
| R1 | Residential Level 1* |
| R2 | Residential Level 2* |
| R3 | Residential Level 3* |
| SE | State and/or federally funded programs/services |
| S1 | Security Deposits* |
| TB | Transitional Bed* |
| TF | Intermediate Level of Care |
| TG | Complex Level of Care |
| TN | Rural |
| TS | Follow-up Service |
| UC | State-defined code, Participant Self-Directed |
| UJ | Services provided at night |
| UK | Collateral Contact |
| U1 | Practitioner Level 1 |
| U2 | Practitioner Level 2 |
| U3 | Practitioner Level 3 |
| U4 | Practitioner Level 4 |
| U5 | Practitioner Level 5 |
| U6 | In-Clinic |

| U7 | Out-of-Clinic* |
| **Modifier** | **Description and Associated Rules** |
| ZC | From CSU* |
| ZH | From State Hospital* |
| ZJ | From Jail / YDC / RYDC* |
| ZO | From Other Institutional Setting* |
| ZP | From PRTF* |

* Represents a state-defined modifier which will is not represented in standard CPT or HCPCS coding.



**Georgia Department of Behavioral Health and Developmental Disabilities**

**January 2023**

D·B·H·D·D

# PART II

# *Community Service Requirements for Behavioral Health Providers*

### Provider Manual for
### Community Behavioral Health Providers

### Fiscal Year 2023

## COMMUNITY SERVICE REQUIREMENTS FOR ALL PROVIDERS
## SECTION I: POLICIES AND PROCEDURES

1. **Guiding Principles**

A. Integration into community: Inclusion and community integration for both the provider and the individuals served is supported and evident.
   i. Individuals have responsibilities in the community such as employment, volunteer activities, church and civic membership and participation, school attendance, and other age-appropriate activities
   ii. The provider has community partnerships that demonstrate input and involvement by:
      1. Advocates;
      2. The person served;
      3. Families; and
      4. Business and community representatives.
   iii. The provider makes known its role, functions and capacities to the community including other organizations as appropriate to its array of services, supports, and treatment as a basis for:
      1. Joint planning efforts;
      2. Continuity in cooperative service delivery, including the educational system;
      3. Provider networking;
      4. Referrals; and
      5. Sub-contracts.
   iv. AD providers who receive SAPTBG funds shall publicize the availability of services and the preference extended to pregnant women through its outreach programs, ongoing public service announcements (radio/television), regular advertisements in local/regional print media, posters placed in targeted areas, and frequent notification of availability of such treatment distributed to the network of community based organizations, health care providers, and social service agencies. [SAPTBG]
   v. Providers receiving SAPTBG grant dollars for treatment/support services for intravenous drug users must encourage the participation of such individuals through a strategy that reasonably can be expected to be an effective but, at a minimum, shall include:
      1. Selecting, training and supervising outreach workers;
      2. Contacting, communicating and following-up with individuals with substance use disorders, their associates, and neighborhood residents, within the constraints of Federal and State confidentiality requirements, including 42 C.F.R. Pt 2;
      3. Promoting awareness among individuals with substance use disorders about the relationship between intravenous drug use and communicable diseases such as HIV, and recommending steps to prevent disease transmission; and
      4. Encouraging entry into treatment. [SAPTBG]
   vi. For agencies who provide any combination of Community Behavioral Health, Psychiatric Residential Treatment Facility (PRTF), and/or Room/Board/Watchful Oversight (RBWO) services, the agency must ensure appropriate distinctions between these programs to include but not limited to physical, financial, administrative, and programmatic separation. Additional guidance may be found in the PRTF Provider Manual.

B. Access to individualized services.
   i. Access to appropriate services, supports, and treatment is available regardless of, Age; Race; National Origin, Ethnicity; Gender; Religion; Social status; Physical disability; Mental disability; Gender identity; Sexual orientation.
   ii. There are no barriers in accessing the services, supports, and treatment offered by the provider, including but not limited to:
      1. Geographic;
      2. Architectural;
      3. Communication:

    a.  Language access is provided to individuals with limited English proficiency or who are sensory impaired;

    b.  All applicable DBHDD policies regarding Limited English Proficiency and Sensory Impairment are followed;

    c.  Individuals who identify as deaf, deaf-blind, or hard of hearing or who are suspected of having a hearing loss are referred to the Office of Deaf Services to receive a Communication Assessment to determine level of communication need for service access as in Provider Procedures for Referral and Reporting of Individuals with Hearing Loss, 15-111.

4. Attitudinal;
5. Procedural;
6. Organizational scheduling or availability; and
7. Services provided in school settings are allowable up to 3 hours/week as a general rule, and the clinical record shall include documentation of partnership with the school.

    a.  When an exception to provide more than 3 hours/week is recommended by the ordering practitioner, it should be documented in the IRP and in a supporting administrative note to include evidence of clinical/access need (challenges with in-home or clinic access, CANS scores, recent discharge from inpatient hospitalization, PRTF, CSU, etc.).

    b.  The DBHDD wants youth to be successful in attaining their educational goals and, so, if a course of service is recommended in the IRP to occur during the youth's educational school day (not before or after school), an administrative note in the record should indicate a plan for minimizing school disruption and why the course of intervention occurs during school hours instead of before/after school, in the home, in clinic, or in other community settings. This documentation is not necessary when there is not a plan for regular school-day services and an unplanned intervention must occur to stabilize a behavioral health situation.

    c.  Youth receiving this service must never be taken out of the classroom for the convenience of the service provider.

    d.  DBHDD services and supports should not supplant but should complement what schools provide for support of a child based on the IEP.

8. Providers that receive SAPTBG funds will treat the family as a unit and admit both women and their children into treatment/support services, if appropriate. Programs must provide, or arrange for the provision of, the following services to pregnant women and women with dependent children, including women who are attempting to regain custody of their children:

    a.  Primary medical care for women, including referral for prenatal care and, while the women are receiving services, childcare;

    b.  Primary pediatric care, including immunization, for their children;

    c.  Gender specific substance abuse treatment and other therapeutic interventions for women, which may address issues of relationships, sexual and physical abuse, parenting, and childcare;

    d.  Therapeutic interventions for children in custody of women in treatment which may address developmental needs, sexual and physical abuse and neglect; and

    e.  Sufficient case management and transportation to ensure access to services. [SAPTBG]

9. Providers that receive SAPTBG funds provide individuals using intravenous drugs access to a treatment program not later than:

    a.  Fourteen (14) days after making the request for admission to a program; or

    b.  One hundred and twenty days after the date of such request, if:

        i.  No such program has the capacity to admit the individual on the date of such request, and

        ii.  Interim services, including referral for prenatal care, are made available to the individual not later than 48 hours after such request. [SAPTBG]

10. Wellness of individuals is facilitated through:

    a.  Advocacy;

    b.  Individual service/treatment practices;

    c.  Education;

    d.  Sensitivity to issues affecting wellness including but not limited to:

        i.  Gender;

      ii.   Culture; and

      iii.  Age.

   e.   Incorporation of wellness goals within the individual plan.

11.   Sensitivity to individual's differences and preferences is evident.

12.   Practices and activities that reduce stigma are implemented.

13.   If services include provision in non-clinic settings, providers must have the ability to deliver services in various environments, such as homes, schools, homeless shelters, or street locations.  Individuals/families may prefer to meet staff at community locations other than their homes or other conspicuous locations (e.g., their school, employer).

14.   The organization must have policies that govern the provision of services in natural settings and can document that it respects youth and/or families' right to privacy and confidentiality.

15.   Staff should be sensitive to and respectful of the individual's privacy/confidentiality rights and preferences to the greatest extent possible (e.g. if staff must meet with an individual during their school/work time, choosing inconspicuous times and locations to promote privacy), especially if staff drive a vehicle that is clearly marked as a state or agency vehicle, or if staff must identify themselves and their purpose to engage with the individual in a way that may potentially embarrass the individual or breech the individual's privacy/confidentiality.

16.   Telemedicine may be used as a means to access individualized service when the Service Guideline allows this practice (See Part I, Section III). Telemedicine is the use of medical information exchanged from one secured site to another via electronic communications to improve a patient's health. Electronic communication means the use of interactive telecommunications equipment that includes, at a minimum, audio and video equipment permitting two-way, real time interactive communication between the patient, and the physician or practitioner at the distant site.

   a.   The telemedicine connection must ensure HIPAA compliance related to Privacy and Security (employing authentication, access controls and encryption to allow for patient/client confidentiality, integrity and availability of their data).

   b.   The following definitions apply:

      i.   Originating Site: Individuals being served via telemedicine may be located at home, schools, other community-based settings, or at more traditional sites.

      ii.  Distance Site: The site where the practitioner providing the professional service is located at the time the service is provided via a telecommunications system.

   c.   All individuals served via telemedicine (DBHDD state-funded and Medicaid FFS) must sign a consent form.  For Medicaid-covered individuals, the Department of Community Health requires that: "The Telemedicine Member Consent Form for each individual is outlined in the Telemedicine Guidance Document and must be utilized." [1] For individuals served using DBHDD state funds, providers may also use the DCH consent form (or create one containing the same basic information/components, as applicable).

   d.   To promote access, providers who are using Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language are exempt from:

      i.   The required percent of community-based services ratios defined in the Service Definitions herein; and

      ii.  The required minimum face-to-face expectations (allowing face-to-face to be via telemedicine).

---

[1] To access the Consent Form: https://www.mmis.georgia.gov/portal/; then click Provider Information > Provider Manuals > Telemedicine Guidance.

**THE FOLLOWING CONTENT WILL REPLACE THE LANGUAGE IN ITEM #16 ABOVE <u>WHEN THE NATIONAL COVID-19 PUBLIC HEALTH EMERGENCY (PHE) ENDS</u>:**

16.  Telemedicine and telephonic interventions may be used as a means to deliver person-centered services, in accordance with the following:

a.  Definitions:

   i.  "Telemedicine" is the use of medical information exchanged from one secured site to another, via electronic communications, to improve a patient's health. Electronic communication means the use of interactive telecommunications equipment that includes, at a minimum, audio and video equipment permitting two-way, real time interactive communication between the patient, and the physician or practitioner at the distant site.

      1.  Originating Site: The site where individuals are being served via telemedicine (i.e. this may be at their homes, in schools, in other community-based settings, or at more traditional service sites).
      2.  Distance Site: The site where the practitioner providing the professional service is located at the time the service is provided via a telecommunications system.

   ii.  "Telephonic" is the use of medical information exchanged between one individual and another, via an audio-only communication exchange made by telephone.

   iii.  "Face-to-Face" (FTF) language is found throughout the BH Provider Manual, and is herein redefined to mean either "in-person" or "via the use of telemedicine technology," based upon the provider's clinical judgment in accordance with the criteria set forth in item "g" below. However, "Face-to-Face" is never inclusive of telephonic intervention.

b.  The telemedicine connection must ensure HIPAA compliance related to Privacy and Security (employing authentication, access controls and encryption to allow for patient/client confidentiality, integrity and availability of their data).

c.  All individuals served via telemedicine (DBHDD state-funded and Medicaid FFS) must sign a consent form, a copy of which must be placed in each individual's health record. For Medicaid-covered individuals, the Department of Community Health requires that: "The Telemedicine Member Consent Form for each individual is outlined in the Telemedicine Guidance Document and must be utilized."[1] For individuals served using DBHDD state funds, providers may either use the DCH consent form, or create one containing the same information/components, as applicable.

d.  All individuals served via telephone (DBHDD state-funded and Medicaid FFS) must also sign a consent form, a copy of which must be placed in each individual's health record. Providers should either create a separate form containing the same applicable information/ components as is utilized in their telemedicine consent form, or may combine the consents into a single form so long as consent to each modality (telemedicine vs. telephonic) is clearly delineated.

e.  Limits regarding telephonic service delivery may exist for certain services. Any such limits can be found in the Service Definition for the specific service in question (see Part I of this manual), and must be adhered to.

f.  Telephonic service delivery must adhere to the 2022 released guidance from the U.S. Department of Health and Human Services, Office for Civil Rights[1].

g.  The use of telemedicine or telephonic service delivery should never be driven by the practitioner's or agency's convenience or preference. Telemedicine and telephonic service delivery should only be deployed based on sound clinical judgement, and with documented consideration of the following:

   i.  The nature and complexity of the service, and of the particular service intervention(s) to be implemented;

   ii.  The individual's needs and preferences;

    iii.   The individual's current clinical presentation and life circumstances (e.g. symptom type and acuity, risk of harm, a significantly stressful and recent life event, etc.);

    iv.   The individual's access to, and comfort with technology;

    v.   The individual's ability to have private and confidential conversations/interactions with the provider;

    vi.   Safety of the individual's home environment or other environment where the individual is receiving services;

    vii.   The potential for viable strategies to address any of the above, as well as any other barriers that may exist.

    viii.   Frequent re-evaluations of telemedicine/telephonic service delivery in consideration of the above, and any other factors that may impact the feasibility of these service delivery modalities.

h.   To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:

   • the use of one-to-one service intervention via Telemedicine, by connecting the individual to a practitioner who speaks the individual's language (i.e. rather than using an interpreter); and/or

   • the use of an interpreter via Telemedicine (i.e. as a third party) to support the practitioner in delivering the identified service to an individual.

i.   Provider agencies must have a written policy that addresses all of the above sub-items listed under item *16. Telemedicine and telephonic interventions.* This policy must address implementation plans/protocols, including internal staff training, documentation in the individual's health record (including the expected frequency of re-evaluations regarding telemedicine/ telephonic modality appropriateness), self-evaluation measures, and internal record review procedures.

1   US Department of Health and Human Services, Office for Civil Rights. (June 13, 2022). Guidance on How the HIPAA Rules Permit Covered Health Care Providers and Health Plans to Use Remote Communication Technologies for Audio-Only Telehealth. https://       .hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-audio-telehealth/inde .html

17.   Interactions with individuals demonstrate respect, careful listening, and are positive and supportive.

## 2.   Required Business Practices and Policies

A.   Program requirements, compliance, and structure:

   i.   Applicable statutory requirements, rules, regulations, licensing, accreditation, and contractual/agreement requirements are evident in organizational policies, procedures and practices. In the event that the above requirements and standards are more stringent than these requirements, providers shall defer to those requirements which are most stringent.

B.   Providers receiving MHBG funds must comply with Public Law 102-321, Section 1912 and applicable code sections at http://www.samhsa.gov/. MHBG Funds cannot be spent to:

   i.   Provide inpatient services;

   ii.   Make cash payments to intended recipients of health services;

   iii.   To purchase or improve land; purchase or construct or permanently improve (other than minor remodeling) any building or other facility; or purchase major medical equipment;

   iv.   To satisfy any requirement for expenditure of non-federal funds as a condition for the receipt of federal funds; and

   v.   To provide financial assistance to any entity other than a public or non-profit private entity.

C.   Providers receiving SATBG funds must comply with 45 CFR 96 Rules and Regulations at http://www.samhsa.gov/. SAPTBG

    i.    The provider shall adhere to companion requirements as published by the Department of Community Health regarding behavioral health services and facilities;

    ii.    The provider shall adhere to supplementary requirements as published by the Administrative Services Organization:

        1.    Organizations must update their contact information on the Georgia Collaborative ASO's website as required:

        2.    For all services, a provider must request a Registration for an individual to whom services/supports will be provided.

        3.    Authorization requests must be submitted for those services identified as requiring such authorization;

        4.    Providers have 48 hours from initial contact to submit Registrations (exceptions being crisis and acute services);

        5.    Providers have 48 hours from initial contact to submit the Authorization (exceptions being crisis and acute services).

        6.    Claims are required to be submitted to the ASO within ninety (90) days from date of service delivery. For those providers who are approved Fee-for-Service providers, delivering named Fee-for-Service services, claims are reimbursed by the DBHDD through the ASO.

    iii.    The provider clearly describes available services, supports, and treatment.

D.    The provider has a description of the services that have been approved by DBHDD and DCH along with the supports, care and treatment provided which includes a description of:

    i.    The population served;

    ii.    How the provider plans to strategically address the needs of those served; and

    iii.    Services available to potential and current individuals.

E.    The provider has internal structures that support good business practices.

    i.    There are clearly stated current policies and procedures for all aspects of the operation of the organization;

    ii.    Policies and corresponding procedures direct the practice of the organization; and

    iii.    Staff is trained in organization policies and procedures.

    iv.    There is a formal code of conduct for the organization to formally communicate moral behavioral standards for the organization's staff and guidelines for ethical decision making.

F.    The provider details the desired expectation of the services, supports, and treatment offered and the outcomes for each of these services.

    i.    The level and intensity of services, supports, and treatment offered is:

        1.    Within the scope of the organization;

        2.    According to benchmarked practices; and

        3.    Timely as required by individual need.

G.    The provider has administrative and clinical structures that are clear and that support individual services.

    i.    Administrative and clinical structures promote unambiguous relationships and responsibilities.

    ii.    The provider bills in accordance with payer policies, and when an individual has questions regarding billing/fees, the provider offers assistance to the individual in understanding the explanation of benefits and/or billing statement.

H.    The program description identifies staff to individual served ratios for each service offered:

    i.    Ratios reflect the needs of individuals served, implementation of behavioral procedures, best practice guidelines and safety considerations.

I.    Policies, procedures and practice describe processes for referral of the individual based on ongoing assessment of individual need:

    i.    Internally to different programs or staff; or

ii.  Externally to services, supports, and treatment not available within the organization including, but not limited to healthcare for:
   1.  Routine assessment such as annual physical examinations;
   2.  Chronic medical issues (Specific to AD providers, if tuberculosis or HIV are identified medical issues, services such as diagnostic testing, counseling, etc. must be made available within the provider or through referrals to other appropriate entities [although these services are not required as a condition of receiving treatment services for substance abuse, and are undertaken voluntarily and with the informed consent of the individual SAPTBG);
   3.  Ongoing psychiatric issues;
   4.  Acute and emergent medical and/or psychiatric needs;
   5.  Diagnostic testing such as psychological testing or labs; and
   6.  Dental services.

J.  In the event that the SAPTBG provider has insufficient capacity to serve any pregnant woman seeking AD treatment, the provider will refer the woman to the DBHDD. SAPTBG

K.  In the event that the SAPTBG provider has insufficient capacity to serve any individual using intravenous drugs who is seeking AD treatment, the provider shall establish a system for reporting unmet demand to the DBHDD.
   i.  The provider, upon reaching 90 percent of service capacity, must notify the DBHDD within seven days.
   ii.  A waiting list shall use a unique patient identifier for each individual using injected drugs who is seeking treatment, including those receiving interim services while awaiting admission to such treatment. The reporting system shall ensure that individuals who cannot be placed in comprehensive treatment within 14 days receive ongoing contact and appropriate interim services while awaiting admission. SAPTBG

L.  Quality Improvement and Risk Management: Quality Improvement Processes and Management of Risk to Individuals, Staff and Others is a Priority.
   i.  There is a well-defined quality improvement plan for assessing and improving organizational quality. The provider is able to demonstrate how:
      1.  Issues are identified;
      2.  Solutions are implemented;
      3.  New or additional issues are identified and managed on an ongoing basis;
      4.  Internal structures minimize risks for individuals and staff;
      5.  Processes used for assessing and improving organizational quality are identified; and
      6.  The quality improvement plan is reviewed/updated at a minimum annually and this review is documented.
   ii.  Indicators of performance are in place for assessing and improving organizational quality. The provider is able to demonstrate:
      1.  The indicators of performance established for each issue:
         a.  The method of routine data collection;
         b.  The method of routine measurement;
         c.  The method of routine evaluation;
         d.  Target goals/expectations for each indicator; and
         e.  Outcome Measurements determined and reviewed for each indicator on a quarterly basis.
      2.  Distribution of Quality Improvement findings on a quarterly basis to:
         a.  Individuals served or their representatives as indicated;
         b.  Organizational staff;
         c.  The governing body; and
         d.  Other stakeholders as determined by the governance authority.
      3.  At least five percent (5%) of records of persons served are reviewed each quarter. Records of individuals who are "at risk" are included. Record reviews must be kept for a period of at least two years.
      4.  Reviews include determinations that:

    a.   The record is organized, complete, accurate, and timely;

    b.   Whether services are based on assessment and need;

    c.   That individuals have choices;

    d.   Documentation of service delivery including individuals' responses to services and progress toward IRP goals;

    e.   Documentation of health service delivery;

    f.   Medication management and delivery, including the use of PRN /OTC medications; and their effectiveness; and

    g.   That approaches implemented for persons with challenging behaviors are addressed as specified in the *Guidelines for Supporting Adults with Challenging Behaviors in Community Settings.* (www.dbhdd.georgia.gov).

5.  Appropriate utilization of human resources is assessed, including but not limited to:

    a.   Competency;

    b.   Qualifications;

    c.   Numbers and type of staff, required based on the services, supports, treatment, and needs of persons served; and

    d.   Staff to individual ratios.

6.  The provider has a governance or advisory board made up of citizens, local business providers, individuals and family members. The Board:

    a.   Meets at least semi-annually;

    b.   Reviews items such as but not limited to:

        i.   Policies;

        ii.   Risk management reports;

        iii.   Budgetary issues; and

        iv.   Provides objective guidance to the organization.

7.  The provider's practice of cultural diversity competency is evident by:

    a.   Staff articulating an understanding of the social, cultural, religious and other needs and differences unique to the individual;

        i.   That such articulation, respect, and inclusion of cultural diversity will include Deaf Culture.

        ii.   Staff honoring these differences and preferences (such as worship or dietary preferences) in the daily services/treatment of the individual; and

        iii.   The inclusion of cultural competency in Quality Improvement processes.

8.  There is a written budget which includes expenses and revenue that serves as a plan for managing resources.  Utilization of fiscal resources is assessed in Quality Improvement processes and/or by the Board of Directors.

9.  Areas of risk to persons served and to the provider are identified based on services, supports, or treatment offered including, but not limited to:

        i.   Incidents:  There is evidence that incidents are reported to the Office of Incident Management as required by:

           a.   Reporting Deaths and Other Incidents in Community Services, 04-106; and

           b.   Investigating Deaths and Other Incidents in Community Services, 04-118.

        ii.   Accidents;

        iii.   Complaints;

        iv.   Grievances;

        v.   Individual rights violations including breaches of confidentiality;

        vi.   There is documented evidence that any restrictive interventions utilized must be reviewed by the provider's Rights Committee;

        vii.   Practices that limit freedom of choice or movement;

        viii.   Medication management; and

        ix.   Infection control preventive measures (specifically, AD providers address tuberculosis and HIV $^{SAPTBG}$). to minimize risk of infectious disease transmission.

10. The provider participates in DBHDD consumer satisfaction and perception of care surveys for all identified populations.  Providers are expected to make their facilities and individuals served accessible to teams who gather the survey responses (e.g., the *Georgia Mental Health Consumer Network)*.

## 3. Consumer Rights

A. Rights and Responsibilities
   i. All individuals are informed about their rights and responsibilities:
      1. At the onset of services, supports, and treatment;
      2. At least annually during services;
      3. Through information that is readily available, well prepared and written/signed (e.g. American Sign Language) using language accessible and understandable to the individual; and
      4. Evidenced by the individual's or legal guardian signature on notification.
   ii. The provider has policies and promotes practices that:
      1. Do not discriminate;
      2. Promote receiving equitable supports from the provider;
      3. Provide services, supports, and treatment in the least restrictive environment;
      4. Emphasize using least restrictive interventions;
      5. Incorporate Clients Rights or Patient's Rights Rules found at, www.dbhdd.ga.gov as applicable to the provider; and
      6. Delineates the rights and responsibilities of persons served.
   iii. In policy and practice, the provider makes it clear that under no circumstances will the following occur:
      1. Threats (overt or implied);
      2. Corporal punishment;
      3. Fear-eliciting procedures;
      4. Abuse or neglect of any kind;
      5. Withholding nutrition or nutritional care;
      6. Withholding of any basic necessity such as clothing, shelter, rest or sleep; or
      7. Withholding services due to hearing status or communication fluency.
   iv. For all community based programs, practices promulgated by DBHDD or the Rules and Regulations for Clients Rights, Chapter 290-4-9 are incorporated into the treatment of individuals served.
   v. For all crisis stabilization units serving adults, children or youth, practices promulgated by DBHDD or the Rules and Regulations for Patients' Rights, Chapter 290-4-6 are incorporated into the treatment of adults, children and youth served in crisis stabilization units.
   vi. For all programs serving individuals with substance use and abuse issues, in addition to practices promulgated by DBHDD or the Rules and Regulations for Clients Rights, Chapter 290-4-9, confidentiality procedures for substance abuse; individual records comply with 42 CFR, Part 2, Confidentiality of Alcohol and Drug Abuse Patient Records, Final Rule (June 9, 1987), or subsequent revisions thereof.

B. Grievances
   i. Grievance, complaint and appeals of internal and external policies and processes are clearly written in language accessible to individuals served and are promulgated and consistent with all applicable DBHDD policies regarding *Complaints and Grievances* regarding community services. Notice of procedures is provided to individuals, staff and other interested parties, and providers maintain records of all complaints and grievances and the resolutions of same.

C. Safety Interventions
   i. Providers must work with each enrolled individual to develop, document, and implement, as needed, a crisis/safety plan.
   ii. Providers must have a process in place to provide after-hours accessibility and have the ability to respond, face-to-face as clinically indicated, to crisis and unsafe situations that occur with enrolled individuals in a timely manner per the contact/agreement with DBHDD. The Georgia Crisis and Access Line (GCAL) are not to be used as the safety plan or after hour's access for enrolled individuals. However, providers may utilize

GCAL in order to gain access to higher levels of care (e.g., Crisis Stabilization Units, other inpatient services, etc.) or facilitate coordination with Georgia Emergency Management Agency services (i.e. 911).

iii. The organization must have established procedures/protocols for handling emergency and crisis situations that describe methods for supporting individuals/youth as they transition to and from psychiatric hospitalization.

iv. In policy, procedures, and practice, the provider makes it clear whether and under what circumstances the following restrictive interventions can be implemented based on the service(s) provided by the provider and licensure requirements. In all cases, federal and state laws and rules are followed and include but are not limited to the following:

1. Use of adaptive supportive devices or medical protective devices;
   a. May be used in any service, support, and treatment environment; and
   b. Use is defined by a physician's order (order not to exceed six calendar months).
   c. Written order to include rationale and instructions for the use of the device.
   d. Authorized in the individual resiliency/recovery plan (IRP).
   e. Are used for medical and/or protective reason (s) and not for behavior control.

2. Time out (used only in co-occurring DD or C&A services):
   a. Under no circumstance is egress restricted;
   b. Time out periods must be brief, not to exceed 15 minutes;
   c. Procedure for time-out utilization incorporated in behavior plan; and
   d. Reason justification and implementation for time out utilization documented.

3. Personal restraint (also known as manual hold or manual restraint): The application of physical force, without the use of any device, for the purpose of restricting the free movement of a person's body;
   a. May be used in all community settings except residential settings licensed as Personal Care Homes;
   b. Circumstances of use must represent an emergency safety intervention of last resort affecting the safety of the individual or of others;
   c. Brief handholding (less than 10 seconds) support for the purpose of providing safe crossing, safety or stabilization does not constitute a personal hold;
   d. If permitted, personal restraint (ten seconds or more), shall not exceed five (5) minutes and this intervention is documented; and
   e. For an individual who is deaf, deaf-blind, or hard of hearing who primarily communicates in sign language, the restraint must allow some movement of hands and fingers for communication access. Hearing assistive technology shall only be removed when it presents an immediate safety issue and shall be returned as soon as the safety issue is resolved.

4. Physical restraint (also known as mechanical restraint): A device attached or adjacent to the individual's body that one cannot easily remove and that restricts freedom of movement or normal access to one's body or body parts.
   a. Prohibited in community settings **except** in community programs designated as crisis stabilization units for adults, children or youth;
   b. Circumstances of use in behavioral health, crisis stabilization units must represent an emergency safety intervention of last resort affecting the safety of the individual or of others;
   c. For an individual who is deaf, deaf-blind, or hard of hearing who primarily communicates in sign language, the restraint must allow some movement of hands and fingers for communication access. Hearing assistive technology shall only be removed when it presents an immediate safety issue and shall be returned as soon as the safety issue is resolved.

5. Seclusion: The involuntary confinement of an individual alone in a room or in any area of a room where the individual is prevented from leaving, regardless of the purpose of the confinement. The practice of "restrictive time-out" (RTO is seclusion and may not be utilized except in compliance with the requirement related to seclusion. The phrase "prevented from leaving" includes not only the use of a locked door, but also the use of physical or verbal control to prevent the individual from leaving.
   a. Seclusion may be used in the community **only** in programs designated as crisis stabilization programs for adults, children or adolescents;
   b. Circumstances of use in behavioral health crisis stabilization programs must represent an emergency safety intervention of last resort affecting the safety of the individual or of others; and

    c.    Is not permitted in developmental disabilities services.

6.    **Chemical restraint may never be used under any circumstance.** Chemical restraint is defined as a medication or drug that is:

    a.    Not a standard treatment for the individual's medical or psychiatric condition;

    b.    Used to control behavior; and

    c.    Used to restrict the individual's freedom of movement.

7.    Examples of chemical restraint are the following:

    a.    The use of over-the-counter medications such as Benadryl for the purpose of decreasing an individual's activity level during regular waking hours; and

    b.    The use of an antipsychotic medication for a person who is not psychotic but simply 'pacing' or mildly agitated.

8.    PRN antipsychotic and mood stabilizer medications for behavior control are not permitted. See Part II, Section 1; Appendix 1 for list of medications.


D.    Confidentiality: The provider maintains a system of information management that protects individual information and that is secure, organized and confidential.

    i.    All individuals determine how their right to confidentiality will be addressed, including but not limited to:

      1.    Who they wish to be informed about their services, supports, and treatment;

      2.    Collateral information. When collateral information is gathered, information about the individual **may not be shared** with the person giving the collateral information unless the individual being served has given specific written consent.

    ii.    The provider has clear policies, procedures, and practices that support secure, organized and confidential management of information, to include electronic individual records if applicable.

    iii.    Maintenance and transfer of both written and spoken information is addressed:

      1.    Personal individual information;

      2.    Billing information; and

      3.    All service related information.

    iv.    The provider has a Confidentiality and HIPAA Privacy policy that clearly addresses state and federal confidentiality laws and regulations. The provider has a Notice of Privacy Practices that gives the individual adequate notice of the provider's policies and practices regarding use and disclosure of their Protected Health Information. The notice must contain mandatory elements required by the Health Insurance Portability and Accountability Act of 1996 (HIPAA, Title II). In addition, the provider must address:

      1.    HIPAA Privacy Rules, as outlined at 45 CFR Parts 160 and 164 are specifically reviewed with staff and individuals;

      2.    Appointment of the Privacy Officer;

      3.    Training to be provided to all staff;

      4.    Posting of the Notice of Privacy Practices in a prominent place;

      5.    Maintenance of the individual's signed acknowledgement of receipt of Privacy Notice in their record.

    v.    A record of all disclosures of Protected Health Information (PHI) must be kept in the medical record, so that the provider can provide an accounting of disclosures to the individual for 6 years from the current date. The record must include:

      1.    Date of disclosure;

      2.    Name of entity or person who received the PHI;

      3.    A brief description of the PHI disclosed;

      4.    A copy of any written request for disclosure; and

      5.    Written authorization from the individual or legal guardian to disclose PHI, where applicable.

    vi.    Confidentiality policies include procedures for substance abuse; individual records comply with 42 CFR Part 2, Confidentiality of Alcohol and Drug Abuse Patient Records.

    vii.    Authorization for release of information is obtained when PHI of an individual is to be released or shared between organizations or with others outside the organization. All applicable DBHDD policies and procedures and HIPAA Privacy Rules (45 CFR parts 160 and 164) related to disclosure and authorization of PHI are followed. Information contained in each release of information must include:

       1.   Specific information to be released or obtained;

       2.   The purpose for the authorization for release of information;

       3.   To whom the information may be released or given;

       4.   The time period that the release authorization remains in effect (reasonable based on the topic of information, generally not to exceed a year); and,

       5.   A statement that authorization may be revoked at any time by the individual, to the extent that the provider has not already acted upon the authorization.

  viii.  Exceptions to use of an authorization for release of information are clear in policy:

       1.   Disclosure may be made if required or permitted by law;

       2.   Disclosure is authorized as a valid exception to the law;

       3.   A valid court order or subpoena are required for behavioral health records;

       4.   A valid court order and subpoena are required for substance use disorder-related records;

       5.   When required to share individual information with the DBHDD or any provider under contract or agreement with the DBHDD for the purpose of meeting obligations to the department; or

       6.   In the case of an emergency treatment situation as determined by the individual's physician, the chief clinical officer can release PHI to the treating physician or psychologist.

  ix.  The provider has written operational procedures consistent with legal and DBHDD requirements governing the retention, maintenance, and purging of records. These procedures must address the following requirements:

       1.   Records must be safely secured, maintained, and retained for a minimum of six (6) years from the date of their creation or the date when last in effect (whichever is later); and

       2.   In the event of a provider closure, adherence to Maintenance of Records for Closed Providers, 04-117 and

       3.   Protocols for the disposal of records after the specified retention period; or in the event of a provider closure, subsequent to the provider's adherence to Maintenance of Records for Closed Providers, 04-117.

  x.  The provider has written policy, protocols and documented practice of how information in the record is transferred when an individual transition to another provider, to include but not be limited to:

       1.   A complete certified copy of the record to the provider who will assume service provision, which includes the individual's PHI and service related information such as current medical orders, medications, and IRP/behavior plans, as deemed necessary for continuity of care and treatment;

       2.   In addition, unused Special Medical Supplies (SMS), funds, personal belongings, burial accounts; and

       3.   The time frames by which transfer of documents and personal belongings will be completed.

E.   Funds Management: The personal funds of an individual are managed by the individual and are protected.

  i.  Policies and clear accountability practices regarding individual valuables and finances comply with all applicable DBHDD policies and Social Security Guide for Organizational and/or Representative Payees regarding management of personal needs spending accounts for individuals served.

  ii.  Providers are encouraged to utilize persons outside the organization to serve as "representative payee" such as, but not limited to:

       1.   Family.

       2.   Other person of significance to the individual.

       3.   Other persons in the community not associated with the provider.

  iii.  The provider is able to demonstrate documented effort to secure a qualified, independent party to manage the individual's valuables and finances when the person served is unable to manage funds and there is no other person in the life of the individual who is able to assist in the management of individual valuables or funds.

  ix.  Individual funds cannot be co-mingled with the provider's funds or other individuals' funds.

F.   Research: The provider policy must state explicitly, in writing, whether or not research is conducted on individuals served by the provider.

    i.   The provider shall follow DBHDD policies surrounding research including, but not limited to <u>Submission, Approval, and Oversight of Research Projects using DBHDD Datasets, 25-102</u> and <u>Research, Protection of Human Subjects, and Institutional Review Board (IRB), 25-101</u>.

    ii.   The provider using unusual medication and investigational experimental drugs shall be considered to be doing research.

       1.   Policies and procedures governing the use of unusual medications and unusual investigational and experimental drugs shall be in place;

       2.   Policies, procedures, and guidelines for research promulgated by the DCH Institutional Review Board shall be followed;

       3.   The research design shall be approved and supervised by a physician;

       4.   Information on the drugs used shall be maintained including:

          a.   Drug dosage forms;

          b.   Dosage range;

          c.   Storage requirements;

          d.   Adverse reactions; and

          e.   Usage and contraindications.

       5.   Pharmacological training about the drug(s) shall be provided to nurses who administer the medications; and

       6.   Drugs utilized shall be properly labeled.

G.   Faith Based Organizations

    i.   Individuals or recipients of services are informed about the following issues relative to faith or denominationally based organizations:

       1.   Its religious character;

       2.   The individual's freedom not to engage in religious activities;

       3.   The individual's right to receive services from an alternative provider;

          a.   The provider shall, within a reasonable time after the date of such objection, refer the individual to an alternative provider.

    ii.   If the provider provides employment that is associated with religious criteria, the individual must be informed.

    iii.   In no case may federal or state funds be used to support any inherently religious activities, such as but not limited to religious instruction or proselytizing.

    iv.   Providers may use space in their facilities to provide services, supports, and treatment without removing religious art, icons, scriptures or other symbols.

    v.   In all cases, rules found at 42 CFR Parts 54, 54a and 45 CFR Parts 96, 260 and 1050 *Charitable Choice Provisions and Regulations: Final Rules* shall apply.

**4.**   **Service Environment: The Service Environment Demonstrates Respect for the Persons Served and is Appropriate to the Services Provided.**

A.   Services are provided in an appropriate environment that is respectful of persons served. The environment is:

    i.   Clean;

    ii.   Age appropriate;

    iii.   Accessible (individuals who need assistance with ambulation shall be provided bedrooms that have access to a ground level exit to the outside or have access to exits with easily negotiable ramps or accessible lifts. The site shall provide at least two (2) exits, remote from each other that are accessible to the individuals served);

    iv.   Individual's rooms are personalized; and

    v.   Adequately lighted, ventilated, and temperature controlled.

B.   Children seventeen (17) and younger may not be served with adults unless the children are residing with their parents or legal guardians in residential programs such as the Ready for Work program.

    i.   Emancipated minors and juveniles who are age 17 years may be served with adults when their life circumstances demonstrate they are more appropriately served in an adult environment.

    ii.   Situations representing exceptions to this Requirement must have written documentation from the DBHDD Regional Field Office. Exceptions must demonstrate that it would be disruptive to the living configuration and relationships to disturb the 'family' make-up of those living together.

C.   There is sufficient space, equipment and privacy to accommodate:
    i.   Accessibility;
    ii.   Safety of persons served and their families or others;
    iii.   Waiting;
    iv.   Telephone use for incoming and outgoing calls that is accessible and maintained in working order for persons served or supported;
       1.   Individuals who are deaf, deaf-blind, or hard of hearing shall have access to telecommunication equipment to communicate with those outside the service location.
    v.   Provision of identified services and supports.

D.   The environment is safe:
    i.   All local and state ordinances are addressed;
       1.   Copies of inspection reports are available;
       2.   Licenses or certificates are current and available as required by the site or the service.

E.   There is evidence of compliance with state and county of residence fire and life safety codes for the following:
    i.   Installation of fire alarm system meets safety code (and is both audio and visual in nature);
    ii.   Each residential setting is required to have carbon monoxide detectors when natural gas, heating oil, or a wood burning fireplace is used.
    iii.   Fire drills are conducted for individuals and staff[2]:
       1.   Once a month at alternating times;
       2.   Once annually for BH administrative or sites open one shift per day;
       3.   Twice a year during sleeping hours if residential services;
       4.   All fire drills shall be documented with staffing involved; and
       5.   DBHDD maintains the right to require an immediate demonstration of a fire drill during any on-site visit.

F.   Policies, plans and procedures are in place that addresses emergency evacuation, relocation preparedness and Disaster Response. Supplies needed for emergency evacuation are maintained in a readily accessible manner, including individuals' information, family contact information and current copies of physician's orders for all individual's medications.
    i.   Plans include detailed information regarding evacuating, transporting, and relocating individuals that coordinate with the local Emergency Management Agency and at a minimum address:
       1.   Medical emergencies;
       2.   Missing persons;
          a.   Georgia's Mattie's Call Act provides for an alert system when an individual with developmental disabilities, dementia, or other cognitive impairment is missing. Law requires residences licensed as Personal Care Homes to notify law enforcement within 30 minutes of discovering a missing individual.
       3.   Natural disasters known to occur, such as tornadoes, snowstorms or floods;
       4.   Power failures;
       5.   Continuity of medical care as required;
       6.   Notifications to families or designees; and

---

[2] Please note: Separate fire drill policies and requirements may exist for agencies/sites that provide services to individuals other than those identified in this Manual. Should the agency or site be regulated by additional policies or accreditation, providers must conform to those that are the most stringent. For example, should a site provide both Behavioral Health and Developmental Disability services, the provider must ensure compliance with both DBHDD Developmental Disabilities standards in addition to meeting the requirements outlined above.

    7. Continuity of Operation Planning to include identifying locations and providing a signed agreement where individuals will be relocated temporarily in case of damage to the site where services are provided (for more information: http://www.georgiadisaster.info/).

    8. CSUs are required to plan for common medically required special diets when planning emergency food supplies.

ii. Emergency preparedness notice and plans are:

    1. Reviewed annually;

    2. Tested at least quarterly for emergencies that occur locally on a less frequent basis such as, but not limited to flood, tornado or hurricane;

    3. Drilled with more frequency if there is a greater potential for the emergency.

G. Providers must comply with federal Public Law 103-227 which requires that smoking not be permitted in any portion of any indoor facility owned, leased, or contracted by the provider and used routinely or regularly for the provision of health care for youth under the age of 18. MHBG, SAPTBG

H. Residential living support service options;

    i. Are integrated and established within residential neighborhoods;

    ii. Are single family units;

    iii. Have space for informal gatherings;

    iv. Have personal space and privacy for persons supported;

    v. Are understood to be the "home" of the person supported or served.

    vi. Providers who serve individuals who are deaf, deaf-blind, or hard of hearing shall have an appropriate visual alert system for front door, bedroom, and bathroom;

    vii. Establish temperature parameters (34 to 40 degrees Fahrenheit) for the safe storage of food.

    viii. Must maintain an emergency water supply to include at least one gallon of water per person per day for 3 days in the event of a disaster;

    ix. Each residence is required to have fire extinguishers on each level of the residence and in the basement, if applicable.

I. Video cameras may be used in common areas of programs that are not personal residences such as Crisis Stabilization Units where visualization of blind areas is necessary for an individual's safety. Cameras **may not be used** in the following instances:

    i. In an individual's personal residence;

    ii. In lieu of staff presence; or

    iii. In the bedroom of individuals.

J. There are policies, procedures, and practices for transportation of persons supported or served in residential services and in programs that require movement of persons served from place to place.

    i. Policies and procedures apply to all vehicles used, including:

        1. Those owned or leased by the provider;

        2. Those owned or leased by subcontractors; and

        3. Use of personal vehicles of staff.

    ii. Policies and procedures include, but are not limited to:

        1. Authenticating licenses of drivers, proof of insurance, and routine vehicle maintenance;

        2. Requirements for evidence of driver training;

        3. Safe transport of persons served;

        4. Requirements for maintaining attendance of person served while in vehicles;

        5. Safe use of lift;

        6. Availability of first aid kits;

        7. Fire suppression equipment; and

        8. Emergency preparedness.

K. Access is promoted at service sites deemed as intake, assessment or crisis programs through:

      i. Clearly labeled exterior signs; and
     ii. Other means of direction to service and support locations as appropriate.

L.    Community services (other than Community Transition Planning) may **not** be provided in an Institution for Mental Diseases (IMD, e.g., state or private psychiatric hospital, psychiatric residential treatment facility or Crisis Stabilization Unit with greater than 16 beds), jail, youth development center (YDC) or prison system.

M.   Services may not be provided and billed for individuals who are involuntarily detained in Regional Youth Detention Centers (RYDCs) awaiting criminal proceedings, penal dispositions, or other involuntary detainment proceedings. Any exception to this requires supporting documentation from the DJJ partners. The provider holds the risk for assuring the youth's eligibility.

## 5.   Infection Control: Practices are Evident in Service Settings.

A.    The provider, at a minimum, has a basic Infection Control Plan that includes the following:
      i. Standard Precautions;
     ii. Hand washing protocols;
    iii. Guidelines for the proper disposal of biohazards, such as needles, lancets, scissors, tweezers, and other sharp instruments; and
    iv. Management of common illness likely to be emergent in the particular service setting.

B.    The provider has effective cleaning and maintenance procedures sufficient to maintain a sanitary and comfortable environment that prevents the development and transmission of infection.

C.    The provider adheres to policies and procedures for controlling and preventing infections in the service setting. Staff is trained and monitored to ensure infection control policies and procedures are followed.

D.    All staff adheres to standard precautions and follows the provider's written policies and procedures in infection control techniques.

E.    The provider's infection control plan is reviewed annually for effectiveness and revision, if necessary.

F.    The provider has available the quantity of bed linens and towels, etc. essential for the proper care of individuals at all times. These items are washed, stored, and transported in a manner that prevents the spread of infection.

G.    Routine laundering of an individual's clothing and personal items is done separately from the belongings of other individuals.

H.    Procedures for the prevention of infestation by insects, rodents or pests shall be maintained and conducted continually to protect the health of individuals served.

I.    The provider ensures that an individual's personal hygiene items, such as toothbrushes, hairbrushes, razors, nail clippers, etc., are maintained separately and in a sanitary condition.

J.    Any pets living in the service setting must be in compliance with local, state, and federal requirements.

## 6.   Medications: Providers having Oversight for Medication or that Administer Medication Follow Federal and State Laws, Rules, Regulations and Best Practice Guidelines.

A.    A copy of the physician (s) order or current prescription dated/signed within the past year is placed in the individual's record for every medication administered or self-administered with supervision. These include:
      i. Regular, on-going medications;
     ii. Controlled substances;
    iii. Over-the-counter medications;

    iv.   PRN (when needed) medications; or
    v.   Discontinuance order.

B.   A valid physician's order must contain:
    i.   The individual's name;
    ii.   The name of the medication;
    iii.   The dose;
    iv.   The route;
    v.   The frequency;
    vi.   Special instructions, if needed; and
    vii.   The physician's signature.
    viii.   A copy of the Medical Office Visit Record with the highlighted physician's medication order may also be kept as documentation.

C.   The order for and administration of medication must be completed by members of the medical staff pursuant to the Medical Practice Act of 2009, Subsection 43-34-23 Delegation of Authority to Nurse and Physician Assistant and must be administered by licensed or credentialed* medical personnel under the supervision of a physician or registered nurse in accordance with O.C.G.A.

D.   The provider has written policies, procedures, and practices for all aspects of medication management including, but not limited to:
    i.   Prescribing: requires the comparison of the physician's medication prescription to the label on the drug container and to the Medication Administration Record (MAR) to ensure they are all the same before each medication is administered or supervised self-administration is done.
    ii.   Ordering: describes the process by which medication orders are filled by a pharmacy.
    iii.   Authenticating orders describes the required time frame for actual or faxed physician's signature on telephone or verbal orders accepted by a licensed nurse.
    iv.   Procuring medication and refills: procuring initial prescription medication and over-the-counter drugs within twenty-four hours of prescription receipt, and refills before twenty-four hours of the exhaustion of current drug supply.
    v.   Labeling: includes the Rights of Medication Administration.
    vi.   Storing:  includes prescribed medications, floor stock drugs, refrigerated drugs, and controlled substances.
    vii.   Security: signing out a dose for an individual, and at a minimum, a daily inventory for controlled medications and floor stock medications; and daily temperature logs for locked, refrigerated medications are required.
    viii.   Storage, inventory, dispensing and labeling of sample medications requires documented accountability of these substances at all stages of possession.
    ix.   Dispensing: Describes the process allowed for pharmacists and/or physicians only. Includes the verification of the individual's medications from other agencies and provides a documentation log with the pharmacist's or physician's signature and date when the drug was verified.
    x.   Supervision of individual self-administration includes all steps in the process from verifying the physician's medication order to documentation and observation of the individual for the medication's effects. Makes clear that staff members may not administer medications unless licensed to do so, and the methods staff members may use to supervise or assist, such as via hand-over-hand technique, when an individual self-administers his/her medications.
    xi.   Administration of medications includes all aspects of the process to be done from verifying the physician's medication order, to who can administer the medications, to documentation and observation of the individual for the medication's effects. Administration of medications may be done only by those who are licensed in this state to do so.
    xii.   Recording: includes the guidelines for documentation of all aspects of medication management. This includes adding and discontinuing medication, charting scheduled and as needed medications, observations regarding the effects of drugs, refused and missing doses, making corrections, and a legend for recording. The legend includes initials, signature, and title of staff member.

xiii. Disposal of discontinued or out-of-date medication includes an environmentally friendly method or disposal by pharmacy.

xiv. Education to the individual and family (as desired by the individual) regarding all medications prescribed and documentation of the education provided in the clinical record.

xv. All PRN or "as needed" medications will be accessible for each individual as per his/her prescriber(s) order(s) and as defined in the individuals' IRP. Additionally, the provider must have written protocols and documented practice that ensures safe and timely accessibility that includes, at a minimum, how medication will be stored, secured or need refrigeration when transported to different programs and home visits.

E.  Organizational policy, procedures and documented practices stipulate that:

i.  Medical conditions are assessed, monitored, and recorded. This includes but is not limited to situations in which:
1. Medication or other ongoing health interventions are required;
2. Chronic or confounding health factors are present;
3. Medication prescribed as part of DBHDD services has research indication necessary surveillance of the emergence of diabetes, hypertension, and/or cardiovascular disease;
4. Allergies or adverse reactions to medications have occurred; or
5. Withdrawal from a substance is an issue.

ii. In homes licensed as Community Living Arrangements (CLA)/Personal Care Homes (PCH), staff may administer medications in accordance with CLA Rules 290-9-37.01 through .25 and PCH Rules 111-8-62.01 through .25.

iii. Only physicians or pharmacists may re-package or dispense medications.
1. This includes the re-packaging of medications into containers such as "day minders" and medications that are sent with the individual when the individual is away from his residence.
2. Note that an individual capable of independent self-administration of medication may be coached in setting up their personal "day minder."

iv. There are safeguards utilized for medications known to have substantial risk or undesirable effects, including but not limited to:
1. Storage;
2. Handling;
3. Ensuring appropriate lab testing or assessment tools accompany the use of the medication; and
4. Obtaining and maintaining copies of appropriate lab testing and assessment tools that accompany the use of the medications prescribed from the individual's physician for the individual's clinical record, or at a minimum, documenting in the clinical record the requests for the copies of these tests and assessments; and follow-up appointments with the individual's physician(s) for any further actions needed.

v.  Education regarding the risks and benefits of the medication is documented and explained in language the individual can understand. Medication education provided by the provider's staff must be documented in the clinical record. Informed consent for the medication is the responsibility of the physician; however, the provider obtains and maintains copies of these informed consent documents, or at a minimum, documents its request for copies of these in the clinical record.

vi. Where medications are self-administered, protocols are defined for training to support individual self-administration of medication.

vii. Staff is educated regarding:
1. Medications taken by individuals, including the benefits and risk;
2. Monitoring and supervision of individual self-administration of medications;
3. The individual's right to refuse medication; and
4. Documentation of medication requirements.

viii. There are protocols for the handling of licit and illicit drugs brought into the service setting. This includes confiscating, reporting, documenting, educating, and appropriate discarding of the substances.

ix. Requirements for safe storage of medication are as required by law includes:
1. Single and double locks,
2. Shift counting of the medications,
3. Individual dose sign-out recording,
4. Documented planned destruction,

     5.   Refrigeration and daily temperature logs with temperature parameters set at 36 to 41 degrees Fahrenheit for the safe storage of medications.

  x.  The provider defines requirements for timely notification to the prescribing professional regarding:
1. Drug reactions;
2. Medication problems;
3. Medication errors; and
4. Refusal of medication by the individual.

  xi.  When the provider allows verbal orders from physicians, those orders will be authenticated:
1. Within 72 hours by fax with the physician's signature on the page (including electronic signature); and
2. The fax must be maintained in the individual's record;

  xii.  There are practices for regular and ongoing physician review of prescribed medications including, but not limited to:
1. Appropriateness of the medication;
2. Documented need for continued use of the medication;
3. Monitoring of the presence of side effects. Individuals on medications likely to cause tardive dyskinesia are monitored at prescribed intervals using an Abnormal Involuntary Movement Scale (AIMS testing);
4. Monitoring of therapeutic blood levels, if required by the medication such as Blood Glucose testing, Dilantin blood levels and Depakote blood levels; such as kidney or liver function tests;
5. Ordering specific monitoring and treatment protocols for diabetic, hypertensive, seizure disorder, and cardiac individuals, especially related to medications prescribed and required vital sign parameters for administration;
6. Writing medication protocols for specific individuals in homes licensed as Community Living Arrangements or Personal Care Homes for identified staff members to administer:
   a. Epinephrine for anaphylactic reaction;
   b. Insulin required for diabetes;
   c. Suppositories for ameliorating serious seizure activity; and
   d. Medications through a nebulizer under conditions described in the Community Living Arrangement Rule 290-9-37-.20 (2).
7. Monitoring of other associated laboratory studies.

  xiii.  For providers that secure their medications from retail pharmacy and/or employ a licensed pharmacist, there is a biennial assessment of agency practice of management of medications **at all sites housing medications.** A licensed pharmacist or licensed registered nurse conducts the assessment. The report shall include, but may not be limited to:
1. A written report of findings, including corrections required;
2. A photocopy of the license of the pharmacist and/or registered nurse; and
3. A statement of attestation from the licensed pharmacist or licensed Registered Nurse that all issues have been corrected.

  xiv.  For providers that conduct any laboratory testing on-site, documented evidence is provided that the provider's Clinical Laboratory Improvement Amendment (CLIA) Waiver is current. Refer to the list of waived tests updated April 15, 2010 on the Centers for Medicaid and Medicare Services website.

F.  The "Eight Rights" for medication administration are defined with detailed guidelines for staff to implement within the organization to verify that right:

  i.  Right person: includes the use of at least two identifiers and verification of the physician's medication order with the label on the prescription drug container and the MAR entry to ensure that all are the same every time before a medication is taken via self-administration or administered by a licensed staff member.

  ii.  Right medication: includes verification of the medication order with the label on the prescription drug container and the MAR entry to verify that all are the same every time before a medication is taken via self-administration or administered by a licensed staff member. The medication is inspected for expiration date. Insulin must be verified with another person prior to administering.

  iii.  Right time: includes the times the provider schedules medications, or the specific physician's instructions related to the drug.

  iv.  Right dose: includes verification of the physician's medication order of dosage amount of the medication; with the label on the prescription drug container and the Medication Administration Record entry to ensure that all

are the same every time before a medication is taken via self-administration or administered by a licensed staff member. The amount of the medication should make sense as to the volume of liquid or number of tablets to be taken.

v.  Right route: includes the method of administration.

vi.  Right position: includes the correct anatomical position; individual should be assisted to assume the correct position for the medication method or route to ensure its proper effect, instillation, and retention.

vii.  Right documentation includes proper methods of the recording on the MAR; and

viii.  Right to refuse medications: includes staff responsibilities to encourage compliance, document the refusal, and report the refusal to the administration, nurse administrator, and physician.

G.  A Medication Administration Record (MAR) is in place for each calendar month that an individual take or receives medication(s):

    i.  Documentation of routine, ongoing medications occur in one discreet portion of the MAR and include but may not be limited to:

        1.  Documentation by calendar month that is sequential according to the days of the month;

        2.  A listing of all medications taken or administered during that month including a full replication of information in the physician's order for each medication:

            a.  Name of the medication;

            b.  Dose as ordered;

            c.  Route as ordered;

            d.  Time of day as ordered; and

            e.  Special instructions accompanying the order, if any, such as but not limited to:

                i.  Must be taken with meals;

                ii.  Must be taken with fruit juice;

                iii.  May not be taken with milk or milk products.

        3.  If the individual is to take or receive the medication more than one time during one calendar day, each time of day must have a corresponding line that permits as many entries as there are days in the month;

        4.  All lines representing days and times preceding the beginning or ending of an order for medications shall be marked through with a single line;

        5.  When a physician discontinues (D/C) a medication order, that discontinuation is reflected by the entry of "D/C" at the date and time representing the discontinuation followed by a mark through of all lines representing days and times that were discontinued.

    ii.  Documentation of medications that are taken or received on a periodic basis, including over the counter medications, occur in a separate discreet portion of the MAR and include but may not be limited to:

        1.  A listing of each medication taken or received on a periodic basis during that month including a full replication of information in the physician's order for each medication:

            a.  Name of the medication;

            b.  Dose as ordered;

            c.  Route as ordered;

            d.  Purpose of the medication;

            e.  Frequency that the medication may be taken:

                i.  The date and time the medication is taken or received is documented for each use.

                ii.  When 'PRN' or 'as needed' medication is used, the PRN medications shall be documented on the same MAR after the routine medications and clearly marked as "PRN" and the effectiveness is documented.

                iii.  Each MAR shall include a legend that clarifies:

                    1.  Identity of authorized staff initials using full signature and title;

                    2.  Reasons that a medication may be not given, is held or otherwise not received by the individual, such as but not limited to:

                      "H" =    Hospital

                      "R" =    Refused

                      "NPO" = Nothing by mouth

                      "HM" =  Home Visit

"DS" =   Day Service

## 7.   Waiver of Requirements

    A.    The provider may not exempt itself from any of these requirements or any portion of the Provider Manual. All requests for waivers of these requirements must be done in accordance with policy: Requests for Waivers of the Standards/Requirements for Mental Health, Developmental Disabilities and Addictive Diseases.

**COMMUNITY SERVICE REQUIREMENTS FOR ALL PROVIDERS**

**SECTION II:  STAFFING REQUIREMENTS**

1. **General Staffing Requirements**

   A.  The professional(s) attached to the organization should have experience in the field of expertise best suited to address the needs of the individual(s) served.

   B.  Providers must ensure an adequate staffing pattern to provide access to services.:
      i.  Please reference the staffing requirements specified for Tier 1 (CCP Standard 10 – Required Staffing, 01-210) and Tier 2 (CMP Standard 8 – Required Staffing, 01-238), and Tier 2+ (CMP+ Standard 8  -- Required Staffing, 01-238a) providers, as appropriate.
      ii. Providers must also reference the Service Guideline(s) of the particular service(s) being provided, and adhere to any additional staffing requirements stated therein.

   C.  Organizational policy and practice demonstrate that appropriate professional staff shall conduct the following services, supports, and treatment, including but not limited to:
      i.   Overseeing the services, supports, and treatment provided to individuals;
      ii.  Supervising the formulation of the individual recovery plan, and delivery of services related to the plan;
      iii. Designing and writing behavior support plans;
      iv.  Implementing assessment, care, and treatment activities as defined in professional practice acts; and
      v.   Supervising programs and services.

   D.  The type and number of professional staff attached to the organization are:
      i.   Properly licensed or credentialed in the professional field as required;
      ii.  Present in numbers to provide adequate supervision to staff;
      iii. Present in numbers to provide services, supports, and treatment to individuals as required; and
      iv.  Knowledgeable, experienced, and skilled in the profession they represent.

   E.  The type and number of all other staff attached to the organization are:
      i.   Properly trained or credentialed in the professional field as required;
      ii.  Present in numbers to provide services, supports, and treatment to individuals as required; and
      iii. Experienced and competent in the services, supports, and treatment they provide.

   F.  A physician with experience in behavioral health must be designated/responsible for directing any medical or psychiatric services, including medically-based SUD withdrawal/management.

   G.  Providers of Specialty Services must maintain support from an independently licensed clinician to provide service review, service monitoring, and assistance in directing an appropriate course of treatment. This individual may be an employee or contracted.

2. **Recruitment and Training**

   A.  Job descriptions are in place for all personnel that include:
      i.   Qualifications for the job;
      ii.  Duties and responsibilities;
      iii. Competencies required;
      iv.  Expectations regarding quality and quantity of work; and

v.    Documentation that the individual staff has reviewed, understands, and is working under a job description specific to the work performed within the organization.

B.    The provider must detail in its policies and procedures, by job classification, the following:
i.    Training required during orientation;
ii.    Training that must be refreshed annually;
iii.    Additional training required for professional level staff; and
iv.    Additional training/recertification (if applicable) required for all other staff.

C.    Direct crisis service professionals receive Deaf Crisis Services Training within 60 (sixty) days of the start of their hire. In addition, all direct crisis service professionals receive refresher training on an annual basis, thereafter. [Training Requests are emailed to DeafServices@dbhdd.ga.gov with "Deaf Crisis Services Training" in the subject line to schedule training].

D.    Unless otherwise indicated in specific service definitions, DBHDD policy, and/or other regulation, in 24-hour or residential settings, all direct care and clinical staff must be trained in Basic Life Support (BLS) and first aid. Training must be both written and hands-on competency-based.

E.    In order to be designated as a "paraprofessional" provider type, staff must comply with training requirements found later in this section, entitled the "Standard Training Requirement for Paraprofessionals."

F.    All staff, direct support volunteers, and direct support consultants shall be trained and show evidence of competence as indicated in the below chart titled **Training Requirements for all Staff, Direct Support Volunteers, and Direct Support Consultants:**

| Training Requirements for all Staff, Direct Support Volunteers, and Direct Support Consultants |
| --- |
| **Orientation requirements are specified for all staff and are provided prior to direct contact with individuals and are as follows:** |
| • The purpose, scope of services, supports, and treatment offered including related policies and procedures; |
| • HIPAA and Confidentiality of individual information, both written and spoken; |
| • Rights and Responsibilities of individuals; |
| • Requirements for recognizing and reporting suspected abuse, neglect, or exploitation of any individual:<br>    o    To the DBHDD;<br>    o    Within the organization;<br>    o    To appropriate regulatory or licensing agencies; and,<br>    o    To law enforcement agencies. |
| **Within the first sixty (60) days from date of hire, all staff having direct contact with individuals shall receive the following training including, but not limited to:** |
| • Person centered values, principles and approaches; |
| • A holistic approach to treatment of the individual; |
| • Medical, physical, behavioral and social needs and characteristics of the persons served; |
| • Human rights and responsibilities (*); |
| • Promoting positive, appropriate and responsive relationships with persons served, their families, and stakeholders; |
| • The utilization of:<br>    o    Communication Skills (*);<br>    o    Crisis intervention techniques to de-escalate challenging and unsafe behaviors (*); and<br>    o    Nationally benchmarked techniques for safe utilization of emergency interventions of last resort (if such techniques<br>    o    are permitted in the purview of the organization). |
| • Ethics, cultural preferences and awareness; |
| • Fire safety (*); |
| • Emergency and disaster plans and procedures (*); |
| • Techniques of Standard Precautions, including: |

| |
|---|
|    o   Preventative measures to minimize risk of HIV;<br>   o   Current information as published by the Centers for Disease Control (CDC); and<br>   o   Approaches to individual education. |
| • Current CPR/AED through the American Heart Association, Health & Safety Institute, or the American Red Cross.<br>   o   All medically licensed staff (nurses, physicians, psychiatrists, dentists, and CNAs) are required to have the Professional Rescuers level of training (Basic Life Support for Healthcare Providers and AED or CPR/AED for the Professional Rescuer).<br>   o   All other staff must have the Lay Rescuers level of training (Heartsaver CPR and AED or CPR/AED).<br>   o   Staff working in CLAs must have Basic Life Support (BLS) level of training.<br>   o   All CPR/AED training, regardless of level, includes both written and hands-on competency training. |
| • First aid and safety training is required for all staff as indicated above with the exception of medically licensed staff (i.e. nurses, physicians, psychiatrists, dentists, and CNAs); |
| • Specific individual medications and their side effects (*); |
| • Services, support, and treatment specific topics appropriate persons served, such as but not limited to:<br>   o   Symptom management;<br>   o   Principles of recovery relative to individuals with mental illness;<br>   o   Principles of recovery relative to individuals with addictive disease;<br>   o   Principles of recovery and resiliency relative to children and youth; and<br>   o   Relapse prevention. |
| **A minimum of 16 hours of training must be completed annually to include the trainings noted by an asterisk (*) above** |

## 3.   Employee Management and Record Keeping

A.   The provider has procedures and practices for verifying licenses, credentials, and the knowledge/experience/skills of staff:
    i.   There is documentation of implementation of these procedures for all staff attached to the organization; and
    ii.   Licenses and credentials are current as required by the field.

B.   The provider has policies, procedures and documentation practices detailing all human resources practices, including but not limited to:
    i.   Processes for determining staff qualifications including license or certification status, training, experience, and competence.
    ii.   Processes for managing personnel information and records including but not limited to:
       1.   Criminal records checks (including process for reporting CRC status change); and
       2.   Driver's license checks.
    iii.   Provisions for and documentation of:
       1.   Timely orientation and development of personnel, including the training topics enumerated above;
       2.   Periodic assessment and development of training needs;
       3.   Development of activities responding to those needs; and
       4.   Annual work performance evaluations.
    iv.   Provisions for sanctioning and removal of staff when:
       1.   Staff are determined to have deficits in required competencies; and
       2.   Staff is accused of abuse, neglect or exploitation.

C.   Regular review and evaluation of the performance of all staff is evident at least annually by managers who are clinically, administratively, and experientially qualified to conduct evaluations.

## 4.   Health and Safety

A.   The organization must have policies and procedures for protecting the health and safety of all staff.

B.    Specific measures to ensure the health and safety of those staff that engage in community-based service delivery activities must be identified.

C.    Must adhere to DBHDD policies regarding staff health and safety, including, but not limited to:
   i.    Accreditation and Standards Compliance Requirements for Providers of Behavioral Health Services, 01-103
   ii.    Criminal History Record Check for DBHDD Network Provider Applicants, 04-104

## 5.  Compliance Management

A.    For any service which a provider has agreed to provide under a contract, Letter of Agreement, or Provider Agreement with DBHDD, the following rules apply:
   i.    The provider shall not enter into a contract or other arrangement with another person or agency for the provision of all or substantially all of any service.
   ii.    The provider may utilize individual independent contractors for aspects of service delivery, if the provider's use of such individual independent contractors does not violate rule (1) of this paragraph or any other applicable law, rule, or regulation, and if such use of individual independent contractors is not otherwise prohibited by DBHDD or by the Department of Community Health. However, the provider must at all times maintain administrative control and clinical direction over all persons who have direct contact with individuals served for the purpose of service delivery, whether those persons are employees, independent contractors, volunteers, or any other person acting on the provider's behalf; and the provider shall not delegate such administrative control or clinical direction to another person or agency through a contract or other arrangement.
   iii.    Any exception to rule (1) or rule (2) of this paragraph must be expressly set forth in the provider's contract, Letter of Agreement, or Provider Agreement with DBHDD.
   iv.    A provider shall not submit a bill or claim for services that have been provided in violation of any rule of this paragraph, regardless of whether those services are funded through Medicaid or through state funds.

B.    Federal law, state law, professional practice acts and in-field certification requirements are followed, including but not limited to:
   i.    Professional or non-professional licenses and qualifications required to provide the services offered. If it is determined that a service requiring licensure or certification by State law is being provided by an unlicensed staff, it is the responsibility of the provider to comply with Professional Licensing or Certification Requirements and the Reporting of Practice Act Violations, 04-101.
   ii.    Laws governing hours of work such as but not limited to the Fair Labor Standards Act.

C.    The status of students, trainees, and individuals working toward licensure must be disclosed to the individuals receiving services from trainees/ interns and signatures/titles of these practitioners must also include indication of that status.

D.    It must be evident that the provider demonstrates administration of personnel policies without discrimination.

## 6. Approved Behavioral Health Practitioners

**The table below outlines the requirements of the approved behavioral health practitioners.** Abbreviations for credentials recognized in the Practitioner Level system are noted below. These approved abbreviations must be on the signature lines in documentation where credentials are required (i.e. orders for services, progress notes, etc.). For those staff members (PP, CPS, S/T, etc.) whose practitioner level is affected by a degree, the degree initials must also be included. For example, if a Paraprofessional is working with an applicable Bachelor of Arts degree, he or she would include "PP, BA" as his or her credentials. For detail on the services each practitioner type can provide, see Practitioner Detail, Table A, Service x Practitioner Table.

| Professional Title & Abbreviation for Signature Line | Minimum Level of Education/Degree / Experience Required | License/ Certification Required | Requires Supervision? | State Code |
|---|---|---|---|---|
| Physician (M.D., D.O., etc.) | Graduate of medical or osteopathic college | Licensed by the Georgia Composite Board of Medical Examiners | No. Additionally, can supervise others | 43-34-20 to 43-34-37 |
| Psychiatrist (M.D., etc.) | Graduate of medical or osteopathic college and a residency in psychiatry approved by the American Board of Psychiatry and Neurology | Licensed by the Georgia Composite Board of Medical Examiners | No. Additionally, can supervise others | 43-34-20 to 43-34-37 |
| Physician's Assistant (PA) | Completion of a physician's assistant training program approved by the Georgia Composite Board of Medical Examiners -- at least 1 year of experience in behavioral healthcare required to supervise CPRP, CPS, or PP staff | Licensed by the Georgia Composite Board of Medical Examiners | Physician delegates functions to PA through Board-approved job description. | 43-34-100 to 43-34-108 |
| Advanced Practice Registered Nurse (APRN): Clinical Nurse Specialist/Psychiatric-Mental Health (CNS-PMH) and Nurse Practitioner (NP) | R.N. and graduation from a post-basic education program for Nurse Practitioners Master's degree or higher in nursing for the CNS/PMH -- Nurse Practitioners must have at least 1 year of experience in behavioral healthcare to supervise CPRP, CPS, or PP staff | Current certification by American Nurses Association, American Nurses Credentialing Center or American Academy of Nurse Practitioners and authorized as an APRN by the Georgia Board of Nursing | Physician delegates advanced practice functions to APRN, CNS-PMH, NP through Board-approved nurse protocol agreements. | 43-26-1 to 43-26-13, 360-32 |
| Licensed Pharmacist (LP) | Graduated and received an undergraduate degree from a college or school of pharmacy; completed a Board-approved internship and passed an examination. | Licensed by the Georgia State Board of Pharmacy | No | 26-4 |
| Registered Nurse (RN) | Georgia Board of Nursing-approved nursing education program -- at least 1 year of experience in behavioral healthcare required to supervise CPRP, CPS, or PP. OR | Licensed by the Georgia Board of Nursing OR | By a physician | 43-26-1 to 46-23-13 |

| Professional Title & Abbreviation for Signature Line | Minimum Level of Education/Degree / Experience Required | License/ Certification Required | Requires Supervision? | State Code |
|---|---|---|---|---|
| | A nursing education program approved by an equivalent board of nursing in a state that is a member of the Enhanced Nursing Licensure Compact (eNLC). | Licensed as an RN in an enhanced nursing licensure Compact state, and possessing an Enhanced Nursing Licensure Compact license granted by the National Council of State Boards of Nursing (NCSBN). Practice must comply with all NCSBN and Georgia Board of Nursing rules and regulations. | | 43-26-60 to 43-26-65 |
| Licensed Practical Nurse (LPN) | Graduation from a nursing education program approved by the Georgia Board of Licensed Practical Nursing. OR Graduation from a nursing education program approved by an equivalent board of nursing in a state that is a member of the Enhanced Nursing Licensure Compact (eNLC). | Licensed by Georgia Board of Licensed Practical Nursing OR Licensed as an LPN in an enhanced nursing licensure Compact state, and possessing an Enhanced Nursing Licensure Compact license granted by the National Council of State Boards of Nursing (NCSBN). Practice must comply with all NCSBN and Georgia Board of Nursing rules and regulations. | By a Physician or RN | 43-26-30 to 43-26-43 43-26-60 to 43-26-65 |
| Licensed Dietician (LD) | - Bachelor's degree or higher with a degree in dietetics, human nutrition, food and nutrition, nutrition education or food systems management. - Satisfactory completion of at least 900 hours of supervised experience in dietetic practice | Licensed by Georgia Board of Licensed Dieticians | No | 43-11A-1 to 43-11A-19 |
| Qualified Medication Aide (QMA) | Completion of a prescribed course conducted by the Georgia Department of Technical and Adult Education and pass examination for qualified medication aides approved by the Georgia Board of Licensed Practical Nursing. | Certified by the Georgia Board of Licensed Practical Nursing | Supervised by RN performing certain medication administration tasks as delegated by RN or LPN. | 43-26-50 to 43-26-60 |
| Psychologist (PhD or PsyD) | Doctoral Degree | Licensed by the Georgia Board of Examiners of Psychologists. | No. Additionally, can supervise others | 43-39-1 to 43-39-20 |

| Professional Title & Abbreviation for Signature Line | Minimum Level of Education/Degree / Experience Required | License/ Certification Required | Requires Supervision? | State Code |
|---|---|---|---|---|
| | | OR<br><br>Licensed to practice Psychology in a Psychology Interjurisdictional Compact (PSYPACT)–participating state, and possessing either an E.Passport or Interjurisdictional Practice Certificate (IPC) granted by the Association of State and Provincial Psychology Licensing Boards (ASPPB). Practice must comply with all ASPPB and Georgia Board of Examiners of Psychologists rules and regulations. | | 43-39-6<br>43-39-7<br>43-39-8<br>43-39-21<br>43-39-22 |
| Licensed Clinical Social Worker (LCSW) | Master's degree in Social Work plus 3 years of supervised full-time work in the practice of social work after the master's degree. | Licensed by the Georgia Composite Board of Professional Counselors, Social Workers, and Marriage and Family Therapists | No. Additionally, can supervise others | 43-10A |
| Licensed Professional Counselor (LPC) | Master's degree | Licensed by the Georgia Composite Board of Professional Counselors, Social Workers, and Marriage and Family Therapists | No. Additionally, can supervise others | 43-10A |
| Licensed Marriage and Family Therapist (LMFT) | Master's degree | Licensed by the Georgia Composite Board of Professional Counselors, Social Workers, and Marriage and Family Therapists | No. Additionally, can supervise others | 43-10A |
| Licensed Master's Social Worker (LMSW) | Master's degree in Social Work | Licensed by the Georgia Composite Board of Professional Counselors, Social Workers, and Marriage and Family Therapists | Works under direction and supervision of an appropriately licensed/credentialed professional. | 43-10A |
| Associate Professional Counselor (May be noted as LAPC and APC) | Master's degree | Licensed by the Georgia Composite Board of Professional Counselors, Social Workers, and Marriage and Family Therapists | Works under direction and supervision of an appropriately | 43-10A |

| Professional Title & Abbreviation for Signature Line | Minimum Level of Education/Degree / Experience Required | License/ Certification Required | Requires Supervision? | State Code |
|---|---|---|---|---|
| | | | licensed/credentialed professional | |
| Associate Marriage and Family Therapist (May be noted as LAMFT and AMFT) | Master's degree | Licensed by the Georgia Composite Board of Professional Counselors, Social Workers, and Marriage and Family Therapists | Works under direction and supervision of an appropriately licensed/credentialed professional | 43-10A |
| Certified Advanced Alcohol and Drug Counselor (CAADC)  Note: ICAADC is an accepted equivalent. | Master's degree or above in human services, with a clinical application. Must meet the legal standards set forth in Georgia Code 43-10A-7. Must meet the certification criteria set forth by the certifying body and maintain certification in good standing. | Certification by the Alcohol and Drug Abuse Certification Board of Georgia (ADACB-GA); International Certification and Reciprocity Consortium /Alcohol and Other Drug Abuse (IC&RC). | Services limited to those practices sanctioned by the certifying board and Georgia Code 43-10A-7 and shall in any event be limited to the provision of chemical dependency treatment. | 43-10A-7 |
| Georgia Certified Alcohol and Drug Counselor Level III (GCADC-III) | Master's degree or above in human services, with a clinical application. Must meet the legal standards set forth in Georgia Code 43-10A-7. Must meet the certification criteria set forth by the certifying body and maintain certification in good standing. | Certification by the Alcohol and Drug Abuse Certification Board of Georgia (ADACB-GA); International Certification and Reciprocity Consortium /Alcohol and Other Drug Abuse (IC&RC). | Services limited to those practices sanctioned by the certifying board and Georgia Code 43-10A-7 and shall in any event be limited to the provision of chemical dependency treatment. | 43-10A-7 |
| Master Addiction Counselor (MAC) through the National Board of Certified Counselors (NBCC) | Master's Degree Documentation of a minimum of 12 semester hours of graduate coursework in the area of OR 500 CE hours specifically in addictions. Must meet the legal standards set forth in Georgia Code 43-10A-7. Must meet the certification criteria set forth by the certifying body and maintain certification in good standing. | Certification by the National Board of Certified Counselors (NBCC) Nationally Certified Counselor (NCC) credential – must be Licensed by the Georgia Composite Board of Professional Counselors, Social Workers, and Marriage and Family Therapists. | Services limited to those practices sanctioned by the certifying board and Georgia Code 43-10A-7 and shall in any event be limited to the provision of chemical dependency treatment. | 43-10A-7 |

| Professional Title & Abbreviation for Signature Line | Minimum Level of Education/Degree / Experience Required | License/ Certification Required | Requires Supervision? | State Code |
|---|---|---|---|---|
| Master Addiction Counselor (MAC) through the National Association of Alcohol and Drug Counselors, (NAADAC) | Master's degree or higher in Substance Use Disorders/Addiction and/or counseling related subjects. Current credential or license as a Substance Use Disorder/Addiction Counselor or Professional Counselor issued by a state or credentialing authority. Must meet the legal standards set forth in Georgia Code 43-10A-7. Must meet the certification criteria set forth by the certifying body and maintain certification in good standing. | Certification by the National Association of Alcohol & Drug Abuse Counselors, the Association for Addiction Professionals. Current credential or license as a Substance Use Disorder/Addiction Counselor or Professional Counselor issued by a state or credentialing authority. | Services limited to those practices sanctioned by the certifying board and Georgia Code 43-10A-7 and shall in any event be limited to the provision of chemical dependency treatment. | 43-10A-7 |
| Georgia Certified Alcohol and Drug Counselor II (GCADC-II)  Note: CADC-II and ICADC-II are accepted equivalents. | Bachelor's degree. Must meet the legal standards set forth in Georgia Code 43-10A-7. Must meet the certification criteria set forth by the certifying body and maintain certification in good standing. | Certification by the Alcohol and Drug Abuse Certification Board of Georgia (ADACB-GA); International Certification and Reciprocity Consortium / Alcohol and Other Drug Abuse (IC&RC). | Services limited to those practices sanctioned by the certifying board and Georgia Code 43-10A-7 and shall in any event be limited to the provision of chemical dependency treatment. | 43-10A-7 |
| Certified Addiction Counselor, Level II (CAC-II) | Bachelor's degree. Must meet the legal standards set forth in Georgia Code 43-10A-7. Must meet the certification criteria set forth by the certifying body and maintain certification in good standing. | Certification by the Georgia Addiction Counselors' Association. | Services limited to those practices sanctioned by the certifying board and Georgia Code 43-10A-7 and shall in any event be limited to the provision of chemical dependency treatment. | 43-10A-7 |
| Georgia Certified Alcohol and Drug Counselor I (GCADC-I)  Note: CADC-I and ICADC-I are accepted equivalents. | GED / high school diploma (state accredited) or higher. Must meet the legal standards set forth in Georgia Code 43-10A-7. Must meet the certification criteria set forth by the certifying body and maintain certification in good standing. | Certification by the Alcohol and Drug Abuse Certification Board of Georgia (ADACB-GA); International Certification and Reciprocity Consortium / Alcohol and Other Drug Abuse (IC&RC). | Services limited to those practices sanctioned by the certifying board and Georgia Code 43-10A-7 and shall in any event be limited to the provision of chemical dependency treatment. | 43-10A-7 |

| Professional Title & Abbreviation for Signature Line | Minimum Level of Education/Degree / Experience Required | License/ Certification Required | Requires Supervision? | State Code |
|---|---|---|---|---|
| Certified Addiction Counselor, Level I (CAC-I) | GED / high school diploma or higher. Must meet the legal standards set forth in Georgia Code 43-10A-7. Must meet the certification criteria set forth by the certifying body and maintain certification in good standing. | Certification by the Georgia Addiction Counselors' Association. | Services limited to those practices sanctioned by the certifying board and Georgia Code 43-10A-7 and shall in any event be limited to the provision of chemical dependency treatment. | 43-10A-7 |
| Certified Alcohol and Drug Counselor – Trainee (CADT-T) | High school diploma/equivalent or higher, and actively pursuing certification as a GCADC. Must meet the legal standards set forth in Georgia Code 43-10A-7. Must meet the criteria set forth by the certifying body and maintain certification trainee status in good standing.<br><br>Completion of Standardized Training Requirement for Paraprofessionals approved by the Georgia Department of Community Health. | Certification by the Alcohol and Drug Abuse Certification Board of Georgia (ADACB-GA); International Certification and Reciprocity Consortium / Alcohol and Other Drug Abuse (IC&RC). | Under supervision of a Certified Clinical Supervisor (CCS), MAC, CAADC, CAC-II, GCADC-II or -III, LPC, LCSW or LMFT who have a minimum of 5 hours of Co-Occurring or Addiction specific continuing education hours per year.<br><br>Services limited to those practices sanctioned by the certifying board and Georgia Code 43-10A-7 and shall in any event be limited to the provision of chemical dependency treatment. | 43-10A-7 |
| Certified Counselor in Training (CCIT) | High school diploma/equivalent or higher, and actively pursuing certification as a CAC. Must meet the legal standards set forth in Georgia Code 43-10A-7. Must meet the criteria set forth by the certifying body and maintain certification trainee status in good standing.<br><br>Completion of Standardized Training Requirement for Paraprofessionals approved by the Georgia Department of Community Health. | Certification by the Georgia Addiction Counselors' Association. | Under supervision of a Certified Clinical Supervisor (CCS), MAC, CAADC, CAC-II, GCADC-II or -III, LPC, LCSW or LMFT who have a minimum of 5 hours of Co-Occurring or Addiction specific continuing education hours per year. | |

| Professional Title & Abbreviation for Signature Line | Minimum Level of Education/Degree / Experience Required | License/ Certification Required | Requires Supervision? | State Code |
|---|---|---|---|---|
| | | | Services limited to those practices sanctioned by the certifying board and Georgia Code 43-10A-7 and shall in any event be limited to the provision of chemical dependency treatment. | |
| Certified Psychiatric Rehabilitation Professional (CPRP) | High school diploma/equivalent, Associates Degree, Bachelor's Degree, Graduate Degree with required experience working in Psychiatric Rehabilitation (varies by level and type of degree) | Certified by the US Psychiatric Rehabilitation Association (USPRA, formerly IASPRS) | Under supervision of an appropriately licensed/credentialed professional | |
| Certified Peer Specialist (CPS) | High school diploma/equivalent | Certification by the DBHDD through the Georgia Mental Health Consumer Network in accordance Training and Certification of Peer Specialists, 01-123. | Services shall be limited to those not requiring licensure but are provided under the supervision of an appropriately licensed/credentialed professional. | |
| Certified Peer Specialist-Addictive Disease (CPS-AD) | High school diploma/equivalent | Certification by the DBHDD through the Georgia Council on Substance Abuse as a CARES (Certified Addiction Recovery Empowerment Specialist) in accordance with Training and Certification of Peer Specialists, 01-123. | Services shall be limited to those not requiring licensure but are provided under the supervision of an appropriately licensed/credentialed professional. | |
| Certified Peer Specialist-Whole Health (CPS-WH) (Whole Health & Wellness Coach) | High school diploma/equivalent | Certification by the DBHDD through the Georgia Mental Health Consumer Network in accordance with Training and Certification of Peer Specialists, 01-123. | Services shall be limited to those not requiring licensure but are provided under the supervision of an appropriately licensed/credentialed professional. | |

| Professional Title & Abbreviation for Signature Line | Minimum Level of Education/Degree / Experience Required | License/ Certification Required | Requires Supervision? | State Code |
|---|---|---|---|---|
| Certified Peer Specialist-Parent (CPS-P) | High school diploma/equivalent | Certification by the DBHDD through the Georgia Parent Support Network in accordance Training and Certification of Peer Specialists, 01-123. | Services shall be limited to those not requiring licensure but are provided under the supervision of an appropriately licensed/credentialed professional. | |
| Certified Peer Specialist-Youth (CSP-Y) | High school diploma/equivalent | Certification by the DBHDD through the Georgia Parent Support Network in accordance Training and Certification of Peer Specialists, 01-123. | Services shall be limited to those not requiring licensure but are provided under the supervision of an appropriately licensed/credentialed professional. | |
| Paraprofessional (PP) | Completion of Standardized Training Requirement for Paraprofessionals approved by the Department of Community Health (includes training provided by the organization and online training outlined below.) | Completion of a minimum of 46 hours of paraprofessional training and successful completion of all written exams and competency-based skills demonstrations. | Under supervision of an appropriately licensed/credentialed professional. | |
| Psychologist / LCSW / LPC / LMFT's supervisee/trainee (S/T) | Must meet the following: <br> 1. Minimum of a bachelor's degree; and <br> 2. Completion of Standardized Training Requirement for Paraprofessionals approved by the Department of Community Health (includes training provided by the organization and online training outlined below); and; one or more of the following: <br> a. Registered toward attaining an associate or full licensure; and/or <br> b. In pursuit of a master's degree that would qualify as a licensed practitioner; and/or | Under supervision in accordance with the GA Composite Board of Professional Counselors, Social Workers, and Marriage and Family Therapists or enrolled in a practicum with an accredited educational Master's degree program which provides supervision as a part of a curriculum which is the foundation toward licensure | Under supervision of a licensed Psychologist/LCSW, LPC, or LMFT in accordance with the GA Composite Board of Professional Counselors, Social Workers, and Marriage and Family Therapists or enrolled in a practicum with an accredited educational Master's degree program which provides supervision as a part of a | 43-10A |

| Professional Title & Abbreviation for Signature Line | Minimum Level of Education/Degree / Experience Required | License/ Certification Required | Requires Supervision? | State Code |
|---|---|---|---|---|
| | c. Not registered, but is acquiring documented supervision toward full licensure<br><br>   i. There shall be a signed attestation by the practitioner and supervisor to be on file with personnel office; and<br><br>   ii. The attestation must include the anticipated and/or actual date, degree earned, licensure type (e.g., Psychologist, LCSW, LMFT, LPC), and anticipated date of licensure examination; and<br><br>   iii. The attestation must be updated on an annual basis. | | curriculum which is the foundation toward licensure | |
| Vocational Rehabilitation Specialist (VS/VS or PP/VS) | Minimum of one-year verifiable vocational rehabilitation experience. | Employed by a provider that is DBHDD approved to provide ACT. | Under supervision of an ACT team leader who is either a physician, psychologist, PA, APRN, RN with a 4-year BSN, LCSW, LPC, or LMFT. | |

7. **Documentation of Supervision for Individuals Working Towards Licensure**

A Psychologist/LCSW/LPC/LMFT supervisee/trainee is defined as an individual with a minimum of a Bachelor's degree, and, effective July 1, 2021, who maintains the supervisee/trainee status for a period of no longer than 108 months, or for a period as may be specified by the Georgia Composite Board of Professional Counselors, Social Workers, and Marriage and Family Therapists for the specific professional type, whichever is shorter. In addition, the individual must meet one or more of the following:

   A. Registered toward attaining an associate or full licensure; and/or

   B. In pursuit of a master's degree that would qualify the student to ultimately qualify as a licensed practitioner (Psychologist, LCSW, LMFT, LPC, LMSW, AMFT, APC); and/or

   C. Not registered but is acquiring documented supervision toward full licensure in accordance with O.C.G.A. 43-10A-3.

These individuals must be under supervision of a licensed Psychologist, LCSW, LPC, or LMFT in accordance with the Georgia Composite Board of Professional Counselors, Social Workers, and Marriage and Family Therapists (hereafter referred to as the GA Composite Board) or enrolled in a practicum with an accredited educational Master's degree program which provides supervision as part of a curriculum which is the foundation toward licensure.

Students and individuals who meet the definition of a Supervisee/Trainee above do not require a co-signature on progress notes unless required by the rules of the GA Composite Board.

In accordance with the GA Composite Board, interns and trainees must work under direction and documented clinical supervision of a licensed professional. Providers will be required to present documentation of supervision of Supervisee/Trainees upon request by DBHDD or the DBHDD's ASO. Supervision must be completed monthly; documentation of supervision for previous month must be in employee file by the 10th day of the following month. For example, April supervision must be recorded by February 10th.

Documentation of supervision is described by O.C.G.A. 43-10A-3 as, "a contemporaneous record of the date, duration, type (individual, paired, or group), and a brief summary of the pertinent activity for each supervision session". More information can be found online at http://sos.ga.gov/index.php/licensing/plb/43/licensure_requirements_for_professional_counselors. Documentation of supervision as defined by O.C.G.A. 43-10A-3 must be present and current in personnel record. The three (3) specialties governed by the GA Composite Board have different supervision requirements for individuals working toward licensure and it is the responsibility of the provider to ensure that the supervision requirements specified by the board for the specialty (professional counseling, social work or marriage and family therapy) for which the individual is working toward licensure are met.

In addition, for Supervisee/Trainees who are either in pursuit of a Master's degree that would qualify the student to ultimately obtain licensure (i.e. as a Psychologist, LCSW, LMFT, LPC, LMSW, AMFT, APC), or who are not registered toward attaining licensure, but acquiring documented supervision toward full licensure in accordance with O.C.G.A. 43-10A-3, the provider will be required to present an attestation signed by both the supervisor and supervisee/trainee which either:

A. Confirms enrollment in a practicum with an accredited educational master's degree program which provides supervision as part of a curriculum which is the foundation toward licensure:
   i. The attestation must include the name of the program the student attends, degree to be earned, and the anticipated/actual graduation date; and
   ii. The attestation must be updated on an annual basis; or

B. Confirms that supervision is being provided towards licensure in accordance with O.C.G.A. 43-10A-3:
   i. The attestation must include graduation date, degree earned, type of licensure being sought (e.g., Psychologist, LCSW, LPC, LMFT) and the anticipated/actual date of licensure examination; and
   ii. The attestation must be updated on an annual basis.

Documentation of Supervisees/Trainees who are receiving on-site supervision in addition to the supervision that they are receiving off-site towards their licensure must include:

A. A copy of the documentation showing supervision towards licensure, and
B. Documentation in compliance with the above-stated requirements.

For example, if a Supervisee/Trainee is working at Provider "A" as a supervisee-trainee and receiving supervision towards their licensure outside of Provider "A", a copy of the documentation showing supervision towards licensure must be held at Provider "A".

8. **Documentation of Supervision of Certified Alcohol and Drug Counselor-Trainees and Certified Counselors in Training**

Certified Alcohol and Drug Counselor-Trainees (CADC-T) and Certified Counselors in Training (CCIT) may provide certain services under Practitioner Levels 4 and 5 as noted in the applicable Service Guidelines. A CADC-T or CCIT may perform counseling as a trainee for a period of up to three (3) years if they meet the requirements in O.C.G.A. 43-10A. This is limited to the provision of chemical dependency treatment under direction and supervision of a clinical supervisor approved by the certification body under which the trainee is seeking certification. Providers should refer to O.C.G.A. 43-10A-3 for the definitions of "direction" and "supervision".

The Certified Alcohol and Drug Counselor - Trainee and Certified Counselor in Training Supervision Form[3] and supporting documentation indicating compliance with the below requirements must be provided for all services provided by a CADC-T or CCIT. The following outlines the definition of supervision and requirements of clinical supervision:

- Supervision means the direct clinical review, for the purpose of training or teaching, by a supervisor of a specialty practitioner's interaction with an individual. It may include, without being limited to, the review of case presentations, audio tapes, video tapes, and direct observation in order to promote the development of the practitioner's clinical skills.
- Monthly Staff Supervision form must be present and current in personnel record. Supervision must be completed monthly; supervision form for previous month must be in employee file by the 10th day of the following month. For example, April supervision must be recorded by February 10th.
- Evidence must be available to show that supervising staff meet qualifications:.
- The following credentials are acceptable for Clinical Supervision: CCS; GCADC-II or -III; CAC-II; MAC, CAADC **or** LPC/ LCSW/LMFT who have a minimum of five (5) hours of Co-Occurring or Addiction-Specific Continuing Education hours per year; certification of attendance/completion must be on file.
- The CADC-T or CCIT must have a certification test date that is within three (3) years of hire as an CADC-T, and;
- The CADC-T or CCIT may not have more than three (3) years of cumulative experience practicing under supervision for the purpose of addiction certification, per GA Rule 43-10A; and
- The CADC-T or CCIT must have a minimum of four (4) hours of documented supervision monthly – this will consist of individual and group supervision.

**The DBHDD has added specificity regarding the supervision of these practitioners due to the volume of practice provided by LCSW/LPC/LMFT's supervisee/trainees and Certified Alcohol and Drug Counselor-Trainees/Certified Counselors in Training. Psychologists in training must adhere to the supervision requirements outlined in the Official Code of Georgia.**

9. **Standard Training Requirement for Paraprofessionals**

---

[3] The Certified Alcohol and Drug Counselor-Trainee Supervision Form can be found in Appendix D of this Manual.

**Overview**

In addition to the training requirements defined in this document, the DBHDD requires that all behavioral health paraprofessionals complete the Standard Training Requirement. These trainings provide useful information necessary to fulfill requirements for delivering DBHDD behavioral health services and supports, while also providing paraprofessionals with access to information that will help them be more effective on the job. Demonstrated mastery of each topic area within the Standard Training Requirement is necessary in order for paraprofessionals to provide both state-funded and Medicaid-reimbursable behavioral health services.

The Standard Training Requirement for Paraprofessionals requires that paraprofessionals complete provider-based training as well as targeted, online trainings. In total, each paraprofessional must complete 46 hours of training (29 hours via online courses and 17 hours provided by the provider). In addition, a set number of training hours must be dedicated to specific subject areas. The number of required training hours is by subject area as outlined below. See chart on following page for additional detail.

| Subject Area | TOTAL Required Hours | Required via Online Courses | Required via Provider-Based Training |
|---|---|---|---|
| Corporate Compliance | 2 | 1 | 1 |
| Cultural Competence | 2 | 2 | 0 |
| Documentation | 5 | 3 | 2 |
| First Aid and CPR | 6 | 0 | 6 |
| Mental Illness – Addictive Disorders | 8 | 8 | 0 |
| Pharmacology & Medication Self-Admin | 2 | 2 | 0 |
| Professional Relationships | 2 | 2 | 0 |
| Recovery Principles | 2 | 2 | 0 |
| Safety/ Crisis De-escalation | 10 | 4 | 6 |
| Explanation of Services | 1 | 0 | 1 |
| Service Coordination | 4 | 3 | 1 |
| Suicide Risk Assessment | 2 | 2 | 0 |
| **Total Required Hours** | **46** | **29** | **17** |

At this time, there is no annual or continued training requirement related to the Standard Training Requirement for Paraprofessionals. However, it should be noted that all providers must comply with all training requirements outlined within this Manual.

**Required Online Courses for Paraprofessionals**

The required online training hours and education component must be completed through the DBHDD provided online courses. Provider agencies have two options to go about accessing the required online courses:

Option 1: DBHDD Online Courses

All behavioral health providers who have an executed contract or agreement with DBHDD have free, 24/7 access to course content at http://georgiamhad training.reliaslearning.com/. For this option, in order to gain initial access to the online courses, providers must designate a Standard Training Requirement (STR) liaison to assign paraprofessionals for the online training. The liaison plays a key role in the successful use of the online curriculum. The liaisons have supervisor rights and can add and delete learners from the system. The liaisons may also assign courses in the Learning Catalog based on the particular need within their organization. Your organization may decide to allow learners to choose their own courses within the required topic areas or to assign learners to complete particular courses that best fit your organization's needs. Providers must ensure that the online courses assigned will meet compliance with the required number of hours per Subject Area (above). Once the paraprofessional has been given a username and password by the provider's liaison, s/he can go online and access the available courses and exams in the learning catalog.

Option 2: Individual Provider Essential/Relias Learning System
DBHDD provider agencies that hold separate contracts with Essential/Relias Learning[4] may request to house Georgia DBHDD-specific courses and related employee records on their own Essential/Relias Learning systems, rather than using the DBHDD online system. To use this option, approval must be given for providers to have access to the DBHDD approved courses that were modified by Georgia DBHDD to reflect Georgia DBHDD policies and procedures. Although the courses may change in the future, the list of courses modified by Georgia DBHDD for this purpose are indicated by an asterisk (*) in Appendix 1.

By notifying DBHDD of their intention to utilize their own Essential/Relias Learning system rather than the DBHDD system, the provider agency is agreeing to the following stipulations:
1.  The provider agency must ask for permission before being allowed access to the DBHDD courses. Access is arranged by UGA's the Carl Vinson Institute of Government (UGA/CVIOG).
2.  The provider agency must let their users (employees) know that their Essential/Relias Learning training records are being held by the provider agency and not by DBHDD.
3.  Because their training records are being held by the provider agency and not by DBHDD, it will take longer to transfer training records between employers as Essential/Relias Learning will be required to transfer records between systems.
4.  It is the provider agency's complete and total responsibility to keep course offerings current as designated in the Provider Manual for Community Behavioral Health Providers, 01-112. Auditing will continue to be conducted based on the requirements specified in the Provider Manual.
The chart in Appendix 1 below displays the courses available within the Standard Training Requirement for Paraprofessionals which may be satisfied via the online training. A total of 29 hours of online training is required to fulfill the training requirement and many subjects offer several courses that can meet the criteria.

Providing Services as a Paraprofessional
The following individuals must complete the Standard Training Requirement in order to provide services as a paraprofessional:
1.  Individuals who are not licensed or do not hold an approved credential, regardless of education level. For example, an individual with a master's in social work but not a license would need to complete the Standard Training Requirement.
2.  Contract employees providing outsourced services who fall within the paraprofessional criterion.

---

[4] Essential/Relias Learning is the vendor who provides the online courses under contract with DBHDD. Though the name of Essential Learning has changed to Relias, the course selection has remained available.

3.  Individuals who have not yet completed the certification process to be Certified Peer Specialists.
4.  Individuals who may be eligible in the future to be licensed or certified but who are not yet licensed or certified.
5.  Individuals who are working towards licensure and meet the qualifications of a Supervisee/Trainee must also complete the Standard Training Requirement.
6.  Individuals providing Psychiatric Residential Treatment Facility services but not staff providing services through foster care, Intensive Community Support Program, and child & adolescent group homes.

Paraprofessional staff members must complete the Standard Training Requirements within the new hire orientation guidelines for their organization but no later than **90 days after hire**. Staff may provide and bill for services during these 90 days. If the Standard Training Requirement is not completed after 90 days, the individual may not bill until the requirement is fulfilled. Any services that are provided outside of the 90-day grace period by an uncertified paraprofessional are subject to recoupment.

If an individual would like to bill a service for which they are not an approved practitioner, that individual may bill as a paraprofessional (providing that a paraprofessional is an approved practitioner). In order to do so s/he must have completed the Standard Training Requirement. When documenting this service, the noted credential of the practitioner must match the practitioner level billed. For example, if an LPN would like to provide Community Support (a service for which an LPN is not an approved practitioner), that individual could bill as a paraprofessional and would therefore need to be in compliance with the Standard Training Requirement. The LPN's credentials would be documented as "LPN and PP" when billing at the paraprofessional rate.

### Documentation for the Standard Training Requirement
Documentation of compliance must be available for each paraprofessional. An orientation agenda/checklist/spreadsheet with the name of the employee, date of topic, training, and number of hours must be available and is <u>required</u> for audit purposes. Proof of course completion must be kept in a personnel file for both provider-based training as well as online training. This may be documented via a training certificate or transcript generated online by Essential/Relias Learning or by the in-person course instructor, and maintained in the personnel file.

Auditors may verify the information provided on the tracking sheet by viewing the training certificates. If this information is not available, services billed by the paraprofessional will be subject to recoupment. The date of hire must also be available for review.

If further questions or clarifications are needed regarding the Standard Training Requirement, please email questions to: <u>DBHDDLearning@dbhdd.ga.gov.</u>

| Subject Area | Courses available to fulfill online training requirement | Online Hours available per Course |
|---|---|---|
| Corporate Compliance (Must complete at least 1 hour of online training) | Corporate Compliance and Ethics | 1 |
| Cultural Competence (Must complete at least 2 hours of online training) | Cultural Issues in Treatment for Paraprofessionals | 2.25 |
| | Cultural Competence | 0.5 |
| | Cultural Responsiveness in Clinical Practice | 1.5 |
| Documentation (Must complete at least 3 hours of online training) | Documentation for Treatment Planning | 2 |
| | Guidelines for Documentation | 1.25 |
| | Reducing Medical and Treatment Errors in Behavioral Health | 2.25 |
| | Integrated Care Treatment Planning | 1 |
| Mental Illness – Addictive Disorders (Must choose at least 8 hours of online training) | Substance Use and the Family for Paraprofessionals | -1.25 |
| | Bipolar and Related Disorders in Youth | 1.5 |
| | Co-Occurring Disorders: An Overview for Paraprofessionals | 1.25 |
| | Overview of Serious Mental Health for Paraprofessionals | 2.25 |
| | Depressive Disorders in Children and Adolescents | 1.75 |
| | Behavioral Health Issues in Older Adults for Paraprofessionals | 1.5 |
| | Introduction to Bipolar and Depressive Disorders in Adults | 1.75 |
| | Evidence-Based Practices in Family Psychoeducation | 1.25 |
| | Supporting Recovery for Individuals with Schizophrenia | 1.25 |
| | Overview of Substance Use Disorders: Part I | 1.25 |
| Pharmacology and Medication Self Admin (Must choose at least 2 hours of online training) | Overview of Psychiatric Medications for Children and Adolescents | 0.75 |
| | Psychiatric Medications: An Overview for Paraprofessionals | 1.5 |
| Professional Relationships (Must complete at least 2 hours of online training) | Boundaries and Dual Relationships for Paraprofessionals | 2.25 |
| | Boundaries | 0.5 |
| | Navigating the Ethics of Dual Relationships for Clinicians | 2 |
| Recovery Principles (Must choose at least 2 hours of online training) | Path to Recovery | 2 |
| | Recovery Principles and Practices in Mental Health Treatment | 1 |
| | Language as a Tool to Combat Stigma | 1 |
| | WRAP One on One | 1.5 |
| Safety/Crisis De-escalation ((Must complete at least 4 hours of online training) | Abuse and Neglect: What to Look for and How to Respond | 1.5 |
| | Incident Reporting | 1 |
| | Crisis Management Basics | 1.5 |
| Service Coordination (Must choose at least 3 hours of online training) | Introduction to Case Management | 1 |
| | Overview of Case to Care Management | 1 |
| | Overview of Supported Employment | 2 |

| | | |
|---|---|---|
| Suicide Risk Assessment (Must choose at least 2 hours of online training) | Suicide Screening for Direct Care | 0.75 |
| | Approaches to Community-Based Suicide Prevention | 1.5 |
| | Best Practices in Suicide Screening and Assessment | 2 |
| | Overview of Adolescent Suicide | 1 |
| | Suicide Specific Interventions and Best Practices | 1.5 |
| Miscellaneous | Client/Patient Rights | 2 |
| **Total Hours of Available Course Content** | | **56** |

## COMMUNITY SERVICE REQUIREMENTS FOR ALL PROVIDERS

## SECTION III: DOCUMENTATION

### 1. OVERVIEW OF DOCUMENTATION

The individual's record is a legal document that is current, comprehensive and includes those persons who are assessed, served, supported, or treated. There are three fundamental components of consumer-related documentation. These include assessment and reassessment; treatment/supports planning; and progress notes. These components are independent and yet must be inter-related in order to create a sound medical record. The documentation guidelines outlined herein do not supersede service-specific requirements. This Provider Manual may list additional requirements and standards which are service-specific; when there is a conflict, providers must defer to those requirements which are most stringent. **All items in this section are DBHDD expectations, however, items using the word "must" indicate requirements for which non-adherence may impact payment or reimbursement via the Administrative Services Organization or other regulatory entities. Items using the word "should," are less likely to impact payment, however, non-adherence will likely impact performance on quality and compliance reviews.**[1]

A. Documentation/information in the medical record:
   i. Must include the practitioner's printed name as listed on his or her practitioner's license;
   ii. Should be Organized, Complete, Current, Meaningful, and Succinct; and
   iii. Is managed in a manner that ensures individual confidentiality and security, while providing access and availability as appropriate.

B. At a minimum, the individual's information:
   i. Must include the name of the individual, precautions, allergies (or no known allergies - NKA) and "volume #x of #y" on the front of the record.  Note that the individual's name, allergies and precautions must also be flagged on the medication administration record;
   ii. Must include the individual's identification and emergency contact information;
   iii. Must include financial and insurance information necessary for adherence to Requirements to Access DBHDD Funds for Child & Adolescent Behavioral Health Services, 01-106;
   iv. Must include the following rights, consent, and legal information:
      1. Consent for service;
      2. Release of information documentation;
      3. Legal documentation establishing guardianship;
      4. Evidence that individual rights and responsibilities are reviewed at the start of services, and at least one time a year thereafter; and
      5. Legal status as it relates to Title 37;
   v. Must include pertinent medical information;
   vi. For individuals who are deaf, deaf-blind, and hard of hearing, communication documentation must include:

1. Communication Assessment Report (CAR) from the Office of Deaf Services (which carries the weight of a Service Order) per Provider Procedures for Referral and Reporting of Individuals with Hearing Loss, 15-111;

2. Action plan for implementing required communication accommodations from the CAR; and

3. Record of communication accommodations provided;

vii.    Must include evidence that the services billed are the services provided;

viii.   Should include any psychiatric or other advanced directive, or documentation that the individual has either denied the existence of a directive or declined to have it included in their medical record;

ix.     Should include records or reports from previous or other current providers;

x.      Should include correspondence related to the individual and their Individualized Recovery Plan;

xi.     The frequency and style of documentation should be appropriate to the frequency and intensity of services, supports, and treatment and in accordance with the Service Guideline;

xii.    Should include documentation of contacts with persons involved in other aspects of the individual's care, including but not limited to internal or external referrals; and

xiii.   There should be a documented process for ongoing communication between staff members working with the same individuals in different programs, activities, schedules or shifts.

C.  Individual records must be maintained onsite (DBHDD approved service locations) for review for a minimum of 90 days following the last date of service or discharge date as identified by the authorization for the individual served[5].

D.  All signatures (and initials, where appropriate) must be original, belonging to the person creating the signature or initials. Signatures (and initials, where appropriate) must be dated by the person signing or initialing to reflect the date on which the signature/initials occurred (e.g., no backdating, no postdating, etc.).

E.  Special Requirements for Paper versus Electronic Health Records/Medical Records

    i.  For providers using paper Health Records/Medical Records:

        1.  All content that is handwritten or typed must be written in black or blue ink (red ink may be used to denote allergies or precautions);

        2.  All content that is handwritten or typed must be readable, decipherable, and easily discernible to all readers;

        3.  Recorded changes – Any corrections or alternations made to existing documentation must be clearly visible. No "white-out" or unreadable cross-outs are allowed. A single line is used to strike an entry, and that strike must be labeled with "error", initialed, and dated. Additionally, if a document contains a Secure Electronic Signature, it must be linked to data in such a manner that if the data is changed the electronic signature is invalidated.

---

[5] For audit purposes, records must be presented within the timeframes indicated in the Georgia Collaborative Provider Handbook; records not submitted within stated timeframes will not be accepted by the auditors for review. Additional information related to audit procedures can be found in this Handbook available online at The Georgia Collaborative ASO website at http://www.georgiacollaborative.com/providers/prv-BH.html.

ii.  **For providers using Electronic Health Records (EHRs)/Electronic Medical Records (EMRs):** Provider EHR/EMR platforms must be configured to allow the DBHDD and its proxies (i.e. the ASO), as well as any other authorized external reviewing entities, <u>full</u> administrative access (view-only) to all components of the EHR/EMR. This access must include:

1.  Ability to validate document creation date, time, and author;
2.  Time stamp of signatures;
3.  Dates, time stamps, and author(s) of any edits, amendments, or late entries;
4.  Ability to view the original content, prior to any editing or amendments, without deletions; and
5.  Dates and time stamps for documents uploaded to the EHR/EMR.

## 2. ASSESSMENT

Individualized services, supports, care and treatment determinations are made on the basis of an assessment of needs with the individual. The individual must be informed of the findings of the assessments in a language he or she can understand.

A.  An initial ANSA/CANS assessment must be completed within the first 30 days of intake into all behavioral health services types, excluding CSC, CSU, and Mobile Crisis Response. Ongoing ANSA/CANS assessments must be completed as demanded by changes with an individual, as needed for reauthorization of services, and upon discharge.

B.  Additional assessments include, but are not limited to, the following:
    i.    Summary of central themes of presenting symptoms/needs and precipitating factors;
    ii.   Individual strengths, needs, abilities, and preferences;
    iii.  Individual's hopes and dreams, or personal life goals;
    iv.   Individual's perception of the issue(s) of concern;
    v.    Prior treatment and rehabilitation services used and outcomes of these services;
    vi.   Preferences for treatment, individual choice and hopes for recovery;
    vii.  A current health status report, medical history, and medical screening;
    viii. Suicide risk assessment;
    ix.   Appropriate diagnostic tools such as impairment indices, psychological testing, or laboratory tests;
    x.    Social and Family history;
    xi.   School records (for school age individuals);
    xii.  Collateral history from family or persons significant to the individual, if available.
    xiii. Review of legal concerns including:
        1.  Advance directives;
        2.  Legal competence;
        3.  Legal involvement of the courts;
        4.  Legal status as it relates to Title 37; and

    5.   Legal status as adjudicated by a court.

xiv.  How needs are to be prioritized and addressed;

xv.  What interventions are needed, when, how quickly, in what services and settings, length of stay, and with what provider(s);

xvi.  The step-down services;

xvii.  Biopsychosocial assessment;

xviii.  Integrated/interpretive summary;

## 3. DIAGNOSIS

A.  A verified diagnosis is defined as a behavioral health diagnosis that has been provided following a face-to-face (to include telemedicine) evaluation by a professional identified in O.C.G.A Practice Acts as qualified to provide a diagnosis. These include a Licensed Psychologist, a Licensed Clinical Social Worker, a Licensed Marriage and Family Therapist, a Licensed Professional Counselor, a Licensed Physician, or a Physician Assistant or APRN (NP and CNS-PMH) working in conjunction with a physician with an approved job description or protocol.

B.  Specific to Non-Intensive Outpatient services, for any individual newly presenting to a provider, a Diagnostic Impression is allowed for 30 days after the initial engagement with the individual in order to initiate timely provision of needed services. The initial engagement is defined as the first encounter with the individual for service. After 30 days, the individual must have a verified diagnosis in order to justify planned services against the diagnostic criteria and to continue services. [NOTE: Specialty Services generally require verified diagnoses prior to admission]. Diagnostic impressions may be provided by practitioners who are permitted by their scope of practice to do so.

C.  The diagnosing professional may rely on assessment information provided by other professionals and collateral informants (as permitted by the individual), but a face-to-face interaction between the diagnosing professional and the individual must also occur (to include telemedicine). A signature by such a person on documentation leading to or supporting a diagnostic impression does not meet this requirement for performing an assessment adequate to support assigning a behavioral health diagnosis.

D.  At a minimum, all diagnoses must be verified annually by one of the previously named qualified practitioners.

E.  When diagnosing individuals who are deaf, deaf-blind, or hard of hearing, the diagnosing professional must demonstrate training, supervision, and/or consultation with a qualified professional as approved by DBHDD Office of Deaf Services.

F.  When diagnosing children who are between the ages of four (4) and five (5) years old, providers may use the DC:0–5™ Manual. After a clinician has appropriately used the tools in the DC:0-5 manual to assess and diagnose a young child, they should use the **Georgia Crosswalk of DC:0-5 Disorders with DSM-5 and ICD-10** found in the Infant and Early Childhood Mental Health Toolkit: Georgia DC:0-5™ Crosswalk and Case Studies guide to map the diagnosis to the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) and/or to the International Statistical Classification of Diseases (ICD-10), which are commonly used classification systems for service billing and reimbursement purposes.

G. Documentation of the initial and annually verified diagnosis(es) must:

    i. Clearly indicate the diagnosis(es);

    ii. Include the following information about the diagnosing practitioner:

        1. The diagnosing practitioner's printed name as listed on their license(s); and

        2. The diagnosing practitioner's credential(s);

    iii. Include the signature of the diagnosing practitioner; and

    iv. Include the date of the diagnosis;

H. Additional Documentation Requirements:

    i. DBHDD providers approved to deliver the Diagnostic Assessment service (regardless of whether the service is actually billed in any individual case) must adhere to the requirements above, as well as to all Diagnostic Assessment Service Guidelines set forth in this Provider Manual, and in addition, must have documentation of:

        1. The factors considered and justification used in determining the diagnosis(es);

        2. The necessary information (including a summary of findings) to support the diagnosis(es);

        3. A face-to-face clinical assessment of the individual provided as part of the diagnostic process (this requirement may be met via the use of telemedicine).

    ii. DBHDD specialty providers who have a diagnosing practitioner on staff who renders diagnoses for individuals served must adhere to the basic requirements above, as well as provide documentation of a face-to-face clinical assessment (telemedicine may be used); but are not required to provide documentation of the factors considered and justification used in determining the diagnosis(es), a summary of findings, or any other supporting documentation related to the diagnosis(es) or diagnostic assessment process.

    iii. DBHDD specialty providers who must obtain diagnoses from external providers (regardless of whether the external provider is a DBHDD provider) must adhere to the basic requirements above; but are not required to provide documentation of a face-to-face clinical assessment, the factors considered and justification used in determining the diagnosis(es), a summary of findings, or any other supporting documentation related to the diagnosis(es) or diagnostic assessment process.

I. Any diagnostic documentation or procedures that do not conform to the above requirements and O.C.G.A. Practice Acts may result in revocation of authorization.

J. While DBHDD generally sets its eligibility and medical necessity criteria and language herein in accordance with the most current version of the DSM, it is also acceptable to utilize an ICD diagnosis as an acceptable diagnosis in the medical record. A list of valid ICD-10 diagnosis codes for claim submission are outlined in Appendix C. Providers will note that there are additional codes that are acceptable for claims, but that are not valid codes for authorization

purposes. This flexibility was included because providers may not know all possible diagnoses at the point in time of authorization. There may be diagnoses being treated that are appropriate for billing that are not on the authorization.

K.  For any diagnoses that are valid for less than one year, an assessment should be completed more often (as indicated in the current DSM). If this requirement is not met due to individual refusal or choice, documentation in the record should reflect this.

## 4. ORDER/RECOMMENDATION FOR COURSE OF TREATMENT[6]

A.  All services must be recommended ("ordered") by a licensed physician or other appropriately licensed practitioner. The practitioner(s) authorized to recommend/order specific services may be found within Part I, Section IV of this Provider Manual.

B.  Orders may exist across multiple authorizations.

C.  The recommendation/order for a course of treatment must specify each service to be provided and shall be reviewed and signed by the appropriately licensed practitioner(s) on or before the initial date of service.

D.  There are two formats that may be used for writing a recommendation/order:
    i.   An individualized recovery/resiliency plan (IRP) which fulfills the required components listed below, can be used as a recommendation/order for the applicable authorization period for services indicated within the plan.
    ii.  A stand-alone recommendation/order in the medical record which fulfills the required components listed below.

E.  Required Components of the recommendation/order include:
    i.   Individual name;
    ii.  All services recommended as a course of treatment/ordered as indicated by Service Description as listed in the current DBHDD Provider Manual (see C. above);
    iii. Signature and credentials[7] of appropriately licensed practitioner(s);
    iv.  Printed or stamped name and credentials of appropriately licensed practitioner(s);
    v.   Date of signature(s). Dates written to indicate the date of a signature must only be dated by the signer; and
    vi.  Duration of the order for the particular service, not to exceed one year from the order date.

---

[6] Note that the following requirements apply only to recommendation/orders for **services** as defined in Part I of this Provider Manual. Requirements regarding orders for medication and procedures can be found in Section I of these Community Service Requirements for All Providers.
[7] See Section II of the Community Service Standards for All Providers for additional information regarding credentials.

F.    Should the recommendation for course of treatment (order) cross multiple pages in a paper record, the provider is responsible for ensuring that it is clear that the additional pages are a continuation of the order. For example, in a 2-page order, page 2 must contain the name of the individual, a page number, and indication that the signature of the practitioner indicates authorization for services as noted on page 1.

G.    Recommendation for course of treatment ("orders") may be made verbally. The required components of the verbal recommendation/order include:

    i.    The provider must have policies and procedures which govern procedures for verbal orders;

    ii.    Recommendations/Orders must be documented in the medical record and must include:

        1.    Individual name;

        2.    All services recommended as a course of treatment/ordered as indicated by official group name as indicated in the current DBHDD Provider Manual;

        3.    Printed or stamped name and credentials of appropriately licensed practitioner(s) recommending service;

        4.    Date of verbal order(s); and

        5.    Printed or stamped name, credentials, original signature, and date signed by the staff member receiving the verbal order. Provider's policy must specify which staff can accept verbal orders for services.

    iii.    Verbal orders must be authenticated by the ordering practitioner's signature within seven (7) calendar days of the issuance of orders. This may be an ink,-facsimile/photocopy, or electronic signature.

    iv.    Faxed/electronic orders signed by the ordering practitioner are acceptable and a preferred alternative to verbal orders. Faxed orders must be dated upon receipt and contain the Required Components (Items 4E, i through vi above).

H.    When more than one physician is involved in an individual's treatment, there should be evidence that an RN or MD has reviewed all relevant information to assure there are no contradictions or inadvertent contraindications within the services and treatment orders or plan.

## 5. INDIVIDUALIZED RECOVERY/RESILIENCY PLANNING

Recovery/Resiliency planning documentation is included in the individual's Individualized Recovery/Resiliency Plan (IRP). *The IRP planning is intended to develop a plan that focuses on the individual's hopes, dreams and vision of a life well-lived.* Every record must contain an IRP in accordance with content set forth in this Manual. The IRP must be reviewed and updated at least annually, and more frequently as may be needed to reflect the individual's evolving needs and goals. This plan sets forth the course of services by integrating the information gathered from the current assessment, status, functioning, and past treatment history into a clinically sound plan.

A.    An individualized resiliency/recovery plan should be developed by the individual with the guidance of an appropriate professional. The individual should direct-decisions that impact their lives.

B.    Others who should assist in the development of the IRP are persons who are:

    i.    Significant in the life of the individual and from whom the individual gives consent for input;

    ii.    Involved in formal or informal support of the individual and from whom the individual gives consent for input; and

iii.   Will deliver the specific services, supports, and treatment identified in the plan.

C.   For individuals with coexisting, complex and confounding needs, cross-disciplinary approaches to planning should be used.

D.   Individualized Recovery/Resiliency Planning should:
   i.   Identify and prioritize the needs of the individual;
   ii.   Be fully explained to the individual using language he or she can understand and agreed to by the individual;
   iii.   Be driven by the individual and focused on outcomes the individual wishes to achieve (based upon assessment of the individual's hopes, dreams, and goals);
   iv.   State goals which will honor achievement of stated hopes, choice, preferences, and desired outcomes of the individual and/or family;
   v.   Be indicative of desired changes in levels of functioning and quality of life (as defined by the individual) to objectively measure progress.
   vi.   Define goals/objectives that are individualized, specific and measurable with achievable timeframes;
   vii.   Include a projected plan to modify or decrease the intensity of services, supports, and treatment as goals are achieved.
   viii.   Documents that may be relevant for incorporation by reference into an individualized plan could include but are not limited to:
      1.   Medical updates as indicated by physician orders or notes;
      2.   Addenda as required when a portion of the plan necessitates reassessment;
      3.   A personal safety/crisis plan which directs in advance the individual's desires/wishes/plans/objectives in the event of a crisis;
      4.   A Wellness Recovery Action Plan (WRAP), which should:
         a.   Be discussed with the individual, and assistance offered in its development should the individual desire it;
         b.   Be completely voluntary and include a written statement to that effect. If the individual declines assistance, this should be documented in a progress note. If assistance is desired by the individual, this should also be documented in a progress note (along with the start and stop time of development activities).
         c.   Be developed with fidelity to WRAP Values and Ethics (www.mentalhealthrecovery.com);
         d.   Belong to the individual, who chooses where it will be kept and with whom it will be shared (Is in the clinical record only if self-directed by the individual for inclusion). If a copy of the WRAP is not to be included in the clinical record, documentation of assistance to the individual with WRAP development and the fact that the individual chose to not include it in their record should be documented in a progress note.
         e.   Be devoid of clinical language (i.e., is in the person's own language);

E.   Individualized plans (or portions of the plan) must be reassessed as needed, in accordance with changing needs, circumstances, and responses of the individual, including but not limited to:
   i.   Any life change that potentially impacts goals, objectives and/or interventions in the plan, or that would necessitate the addition of new goals, objectives and/or interventions;
   ii.   Any change in medical, behavioral, cognitive, and/or physical status that potentially impacts goals, objectives and/or interventions in the plan, or that would necessitate the addition of new goals, objectives and/or interventions;

iii.  When either of the following events occur: (1) The provider refers an individual to an acute level of behavioral health care (e.g. ED for a psychiatric emergency, BHCC, Crisis Stabilization Unit, psychiatric inpatient hospital, PRTF, etc.), or (2) Within seven (7) business days of an individual's discharge from an acute level of behavioral health care service (regardless of whether or not the individual was enrolled with the provider prior to the acute care service episode, or the individual's length of stay in the acute care service), the provider must adhere to the following:

    a.  A licensed (independent or associate-level), or SUD-credentialled (certification level II or above) practitioner must conduct a **clinical review of** the individual's relevant clinical information:

        1.  *For individuals being admitted/readmitted to the provider's services following discharge from an acute level of care*, this clinical review should include a review of the individual's clinical record (if the individual was previously enrolled with the provider), as well as documentation from the acute care provider (e.g. the discharge plan or summary, the treatment plan while in acute care, any risk assessments, the CSSRS, etc.), and any communications with the acute care provider in order to assess and address the individual's current needs, challenges, strengths, progress, possible antecedents to the acute care episode, and post-discharge treatment recommendations.

        2.  *For individuals being referred by the provider to an acute level of care*, this clinical review should include a review of the individual's clinical record (e.g. progress notes, event notes, recent assessments, etc.), as well as communication with other practitioners or informal supports (such as family) involved in the individual's care in order to assess the individual's current needs, challenges, strengths, progress, possible antecedents to the acute care referral, and to develop recommendations for post-acute care services and supports.

    b.  Based upon this clinical review, the practitioner must document their findings and recommendations in the individual's clinical record as an administrative citation, and should also specifically include any recommended modifications/additions to the IRP.

    c. Modifications/additions to the IRP must be made by a practitioner authorized to do so, as soon as possible following the clinical review and resulting recommendations. Justification for any recommendations not adopted should be documented in a progress note. When requested by the individual;

iv.

v.  As required by a specific Service Definition;

vi.  As required by a new or modified Order;

vii.  At least annually; and/or

viii.  When goals are not being met, this should be viewed as an indication that a reassessment is needed.

F.  When services are provided to youth during school hours, the IRP should indicate how the intervention has been coordinated among family system, school, and provider.

G.  Individualized Recovery/Resiliency Planning must:

    i.  Support the individual to develop goals/objectives that are:

        1.  Related to assessment/reassessment;

        2.  Designed to ameliorate, rectify, correct, reduce or make symptoms manageable; and to support and utilize the individual's strengths.

    ii.  Detail interventions which will assist in achieving the outcomes noted in the goals/objectives;

    iii.  Identify services and interventions of the right frequency, intensity and duration to best accomplish plan objectives. The frequency of delivery, the intensity of the service/intervention, and the overall duration of the service/intervention should be based upon what is realistic for the individual and

their circumstances, and what is predicted to be necessary for achieving progress toward defined goals/objectives within the treatment plan's limited timeframe.

1. It is expected that the actual frequency, intensity, and duration of service delivery will closely approximate the levels of service delivery projected in the IRP, and that updates to the plan will be made should the individual's needs change.

   a. Crisis Intervention is an exception to the requirements above, in that: The Individualized Recovery/Resiliency Plan may indicate that the Crisis Intervention service is provided **as needed**. If Crisis Intervention is a part of the services outlined in the IRP, it is expected that an initial and brief Crisis Plan be developed and in place in order to direct the crisis service. The Crisis Plan should conform to standards set forth in this manual.

iv. Identify staff responsible to deliver or provide the specific service, support, and treatment. Identification of staff can be broadly defined such as "physician," "therapist," "paraprofessional," "PSR team," etc.;

v. Assure there is a goal/objective that is consistent with the service intent; and

vi. Document by individual signature and/or, when applicable, guardian signature that the individual served is an active participant in the planning and process of services (to the degree to which that is possible). Subsequent changes to the plan should also document individual and/or guardian signature via dated initials. If gaining signatures or initials (as applicable) is not possible, the record should document the attempt and reason.

## 6. DISCHARGE/TRANSITION PLANNING

A. Discharge/transition planning should:

i. Document transition planning at the onset of service delivery and includes specific objectives to be met prior to decreasing the intensity of service or discharge.

ii. Define discharge criteria which objectively measures progress by aligning with documented goals/objectives, desired changes in levels of functioning, and quality of life;

iii. Define specific step-down service/activity/supports to meet individualized needs;

iv. Be measurable and include anticipated step-down/transition date.

B. Providers of community adult behavioral health services shall participate in the hospital recovery planning team meetings for individuals currently enrolled in or being referred to their community services by a DBHDD-operated or contracted psychiatric inpatient facility. The DBHDD contracted Comprehensive Community Providers (CCP) and/or DBHDD Specialty Providers are held responsible and accountable for the implementation of _Follow-up for Individuals Discharged from the State Hospital, 01-508_.

C. It is the provider's responsibility to discharge individuals in a timely manner once it has been determined they are no longer, or will no longer be receiving services:

i. This includes discharging individuals from the Higher Level of Care (HLOC) services (Community Inpatient, Crisis Stabilization, PRTF, and Residential Detox). When an individual leaves one of these HLOC services, providers are required to submit a discharge record in the Georgia Collaborative ASO system so that a date of discharge, clinical, and discharge information can be collected. Providers shall submit this

documentation within the timeframe defined for the particular service in the DBHDD contract for the service or in this Provider Manual's Service Guidelines.

ii.  For all other community-based services, it is the provider's responsibility to discharge individuals once the individual has left all services and will no longer be returning. An episode of care begins at the point the individual is first enrolled in services and continues for as long as there is a sequence of concurrent authorization requests. Once an individual is no longer receiving any services, the provider shall report a discharge notifying that the person is no longer being served by DBHDD.

iii.  If at any point in time there is an authorization that has expired, and more than 90 days has passed without the provider entering a new request for services or properly discharging the individual, the Georgia Collaborative ASO will automatically generate an administrative discharge record for that individual.

## 7. DISCHARGE SUMMARY

A.  At the time of discharge, a summary should be provided to the individual which indicates:
i.  Strengths, needs, preferences and abilities of the individual;
ii.  Services, supports, and treatment provided; and
iii.  Outcome of the goals and objectives made during the service provision period.
iv.  Necessary plans for referral; and
v.  Service or organization to which the individual was discharged, if applicable.

B.  A summary of the course of services, supports, treatment, the Discharge Summary, must be placed in the record within 30 days of discharge. Documentation must include/adhere to the items in the above section entitled, "Discharge/Transition Planning," and include:
i.  Strengths, needs, preferences and abilities of the individual;
ii.  Services, supports, and treatment provided;
iii.  Outcome of the goals and objectives made during the service provision period;
iv.  Document the reason for ending services;
v.  Living situation at the time of discharge;
vi.  Necessary plans for referral; and
vii.  Service or organization to which the individual was discharged, if applicable.

## 8. PROGRESS NOTES

Progress Note documentation includes the actual implementation and outcome(s) of the designated services in an individual's IRP. There are clear requirements related to the content, components, required characteristics, and format of progress note documentation.

The content in progress note documentation provides all the necessary supporting evidence to justify the need for the services based on medical necessity criteria and support all requirements for billing and adjudication of the service claims. Review of sequential progress notes should provide a snapshot of the individual over a specified time frame.

Note:  This section is applicable to progress notes for all billed services (e.g. face-to-face, telemedicine, collateral, etc.).

A.    Progress note documentation must reflect the following:

   i.    **Linkage** - Clear link between the Individualized Recovery/Resiliency Plan and intervention(s) provided.
   ii.   **Consumer profile** – Description of the current status of the individual.  This may include individual statements, shared information and quotes; observations and description of individual affect; behaviors; symptoms; and level of functioning.
   iii.  **Justification** – Documentation must reflect justification for payment of services provided and utilization of resources as it relates to the service definition and the needs/desires of the individual.
   iv.   **Specific services/intervention/modality provided** – Specific detail of all provided activity(ies) or modality(ies) including date, time, frequency, duration, and location.
   v.    **Consumer response to intervention(s)** – Identification of how and in what manner the service, activity, and modality have impacted the individual; what was the effect; and how was this evidenced.
   vi.   **Consumer's progress** – Identification of the individual's progress (or lack of progress) toward specific goals/objectives.

B.    Progress note documentation should reflect the following:

   i.    **Purpose or goal of the services/intervention/modality** – Clarification of the reasons the individual is participating in the above services, activities, and modalities and the demonstrated value of services.
   ii.   **Monitoring** – Evidence that selected interventions and modalities are occurring and monitored for expected and desired outcomes.
   iii.  **Next steps** – Targeted next steps in services and activities to support progress toward goals/objectives in the IRP.
   iv.   **Reassessment and Adjustment to plan** – Review and acknowledgement as to whether there is a need to modify, amend or update the individualized service/recovery plan and if so, how.
   v.    **Standardized format** – Providers are expected to follow best practices and select a format or create a prescribed narrative that can be used consistently throughout their organization. Specific details regarding actual practice should be described in providers' policies, procedures, training manuals and/or documentation instruction sheets. All formats require a clear link between the progress note, assessment and service and planning data.

C.    Progress note documentation must address and adhere to the following[8].

   i.    **Presence of note** – For any claim or encounter submitted to DBHDD or DCH for these services herein, a note must be present justifying that specific intervention. In addition, other ancillary or non-billable services which are related to the well-being of the individual served must be included in the individual's official medical record.

---

[8] Any electronic records process shall meet all requirements set forth in this document.

ii.     **Service billed** – All progress notes must contain the corresponding HCPCS/CPT code, which must include any designated modifier. When documenting practitioner modifiers, the modifier must indicate the reimbursement level, which may differ from the practitioner level in certain cases. For example, if a RN provides CSI, the RN would include the modifier U4 to indicate the practitioner level even though an RN is generally a level 2 Practitioner.

iii.    **Timeliness** – All activities/services provided are documented (written and filed) within the current individual record within a pre-established time frame set by provider policy not to exceed seven (7) calendar days. Best practice standards require progress notes to be written within 24 hours of the clinical or therapeutic activity. Notes entered retroactively into the record after an event or a shift must be identified as a "late entry".

iv.     **Conciseness and clarity** – Clear language, grammar, syntax, and sentence structure is used to describe the activity and related information.

v.      **Activities dated** – Documentation specifies the date/time of service.

vi.     **Dated entries** – All progress note entries are dated to reflect the date of signature of the individual providing the service (this date may differ from the actual date of service). Dates written to indicate the date of a signature may only be dated by the signer. In electronic records, the date of entry must reflect the date that the secure electronic signature was entered. Back-dating and post-dating are not permitted.

vii.    **Duration of activities** – Documentation of the duration must be noted for all services to include the number of units, times, and dates. For those services in which the unit/rate is based on time (not per contact/encounter), documentation must include time-in and time-out. This requirement applies for both face-to-face and collateral contacts. Residential services are excluded from the daily notation of time-in/time-out and must follow the specific guidelines outlined in each specific residential code. Further instruction related to the Psychosocial Rehabilitation Program and Peer Supports Program services can be found in the respective Service Guidelines.

viii.   **Rounding of Units** –

1.  Time-based: Rounding of units is permitted when a service meeting the service definition is provided in less time than the unit increment requirement. Each provider must have an internal policy regarding rounding of units. Regarding "rounding" of units, a unit may be billed for a service when an activity meets the service definition of the service billed but does not meet the full time/unit requirement. In order to bill a unit of service, at least 50% of the time required per unit must be provided and documented by the "time-in, time-out" documentation. For example, a provider may bill a single 15-minute unit if the service is greater or equal to 8 minutes and less than 23 minutes. If the duration of the service is greater than or equal to 23 minutes and less than 38 minutes, then 2 units may be billed. Providers must document rounding practices in internal policy.

2.  Cost-based: DBHDD has some services which are cost-based reimbursement. In this case, rounding of cents should follow standard mathematical rounding protocols (i.e., 49 and less round down to the dollar amount below, .50 and higher round to the next dollar amount). Provider documentation and policy shall define provider internal controls regarding this expectation.

xii.    **Location of intervention**–

1.  For those services that may be billed as occurring either In-Clinic or Out-of-Clinic, progress notes must reflect the location as either In-Clinic or Out-of-Clinic (unless otherwise noted in Service Guideline).

    a.  If the intervention is In-Clinic, no further specificity is required.

    b.  If an intervention is "Out-of-Clinic," the note must reflect the specific location of the intervention: this indication must be specific enough that it can be generally understood where the service occurred (for example: "…at the individual's home," "…at the grocery store", etc.). Documenting that the service occurred "in the community" is not sufficient to describe the location.

    c.  When services are provided to youth at or during school, documentation must indicate that the intervention is most effective when provided during school hours.

2. Out-of-Clinic Justification and Documentation:

   a. In some cases, an increased rate is allowed for Out-of-Clinic services. When a service is provided Out-of-Clinic and has an established U7 "Out-of-Clinic" modifier associated with it, then generally, that U7 modifier is utilized on the service claim/encounter submission.

   b. While the location of the intervention is required for clinical record documentation as noted above, the use of the U7 modifier is expressly a financial billing mechanism. It allows additional reimbursement related to the loss of productivity which occurs when a practitioner travels from a clinic site to deliver community-based service interventions. "Out-of-Clinic" may only be billed when the following requirements and justifications exist:

      i. Travel by the practitioner is to a non-contiguous location;

      ii. Travel by the practitioner is to a facility not owned, leased, controlled, or named as a service site by the agency who is billing the service (excepting visits to Shelter Plus sites);

      iii. Travel is to a facility owned, leased, or controlled by the agency billing the service, but no more than 6 individuals are being served in the course of that day by a single practitioner in non-group services;

      iv. Travel is to a facility owned, leased, controlled, or named as a service site by the agency, but no more than 24 individuals are being served in groups at that site in the course of a day.

      v. One group and/or six individual sessions *per practitioner* could occur in a single day and be claimed as "Out-of-Clinic" via the use of the U7 modifier. However, if either of these productivity caps is exceeded (i.e. more than one group OR more than six individual sessions), then the "Out-of-Clinic" rate may not be billed. In that case, *none of the services provided at that location by the practitioner for that day qualify for "Out-of-Clinic" billing.*

   c. It should be noted: If volume or infrastructure indicates that a location or site is regularly operating as a service site (e.g. posted on websites as clinic site, the site is a daily point of service for multiple practitioners, etc.) providers may need to do the due diligence of enrolling/licensing it as a site.

   d. If the service does not qualify to be billed as "Out-of-Clinic," or if the U7 modifier utilization criteria above are not met, then the "In-Clinic" rate/modifier (U6) may still be billed.

3. The Place of Service code required on a progress note/claim may not always seem to intuitively align with the In-Clinic and Out-of-Clinic modifier use as defined above. The modifier must always reflect accurate accountability to the requirements above, whereas the Place of Service code is permitted to be generalized and is not used for auditing/accountability purposes.

4. **Claims** - In situations where multiple practitioners of the same U-level deliver a service (or services) for which the same procedure code and modifier(s) would be billed, *but service delivery occurs at two different times*, the time would need to be aggregated into one claim. If a different Place of Service code were applicable for each practitioner, only one should be selected and used on the aggregated claim.

   xiii. **Participation in intervention** – Progress notes should reflect all the participants in the treatment and/or support intervention (individual, family, other natural supports, multi-disciplinary team members, etc.). Progress notes should also reflect the specific interaction that occurred during the reported timeframe, and therefore, not a duplication of another note.

   xiv. **Signature, Printed staff name, qualifications and/or title**[9] – The writer of the documentation is designated by name and credentials/qualifications and when required, degree and title. If an individual is a licensed practitioner, the printed name must be the name listed on his or her practitioner's

---

[9] See Standards for All Behavioral Health Providers, Part II for additional information regarding credentials.

license on all medical record documentation[10]. An original signature is required. The printed name and qualifications and/or title may be recorded using a stamp or typed onto the document. Automated or electronic documentation must include a secure electronic signature[11].

xv.   **Consistency** – Documentation must follow a consistent, uniform format. Should the progress note cross multiple pages in a paper record, the provider is responsible for ensuring that it is clear that the additional pages are a continuation of the progress note. For example, in a 2-page note, page 2 must contain the name of the individual, date of service, a page number, and indication that the signature of the practitioner or paraprofessional is related to the progress note on page 1.

xvi.  **Diversionary and non-billable activities:**

   a.   Providers may not bill for multiple services which are direct interventions with the individual during the same time period. If multiple services are determined to have been billed at the same or overlapping time period, billing for those services are subject to recoupment. Allowable exceptions include an individual receiving a service during the same time period or overlapping time period as:

      1.   A service provided without client present as indicated with the modifier "HS", or
      2.   A collateral contact service as indicated by the modifier "UK"; and
      3.   For example, a provider may bill Individual Counseling with the individual while, simultaneously, CM is being billed for a collateral contact. This is only allowable when at least one of the services do not require that the individual be present and the progress note documents such.

   b.   Non-billable activities are those activities or administrative work that do not fall within the Service Definition. For example, confirming appointments, observation/monitoring, tutoring, transportation, completing paperwork, communication/coordination between practitioners employed by the same agency, and other administrative duties not explicitly allowed within the Service Guidelines are non-billable activities. Billing for non-billable activities is subject to recoupment.

   c.   Billing for services that do not fall within the respective Service Definition is subject to recoupment.

   d.   Diversionary activities are activities/time during which a therapeutic intervention tied to a goal on the IRP is not occurring. Diversionary activities which are billed are subject to recoupment.

## 9.   EVENT NOTES

In addition to progress notes that document the intervention(s), records must also include event notes documenting:

   A.   Issues, situations or events occurring in the life of the individual;

   B.   The individual's response to the issues, situations or events;

   C.   Relationships and interactions with family and friends, if applicable;

---

[10] It is acceptable that the initials can be used for first and middle names. The last name must be spelled out and each of these must correlate with the names on the license. This is an effort to ensure that a connection can be made between the printed/stamped name on the chart entry and a license.

[11] As defined in PART I POLICIES AND PROCEDURES FOR MEDICAID/PEACHCARE FOR KIDS, a Secure Electronic Signature means an electronic or digital signature, symbol, or process associated with a document which is created, transmitted, received, or stored by electronic means which (1) requires the application of a security procedure; (2) capable of verification/authentication; (3) adopted by a party with the intent to be bound or to authenticate a record; (4) signed under penalty of perjury; (5) unique to the person using it; (6) under the sole control of the person using it; and (7) linked to data in such a manner that if the data is changed the electronic signature is invalidated.

D.  Missed appointments including:
    i.   Documentation and result of follow-up (e.g., date of rescheduled appt.),
    ii.  Strategies to avoid future missed appointments.



**Georgia Department of Behavioral
Health and Developmental Disabilities**

**January 2023**

# PART III

# *General Policies and Procedures*

## Provider Manual for Community Behavioral Health Providers

### Fiscal Year 2023

**DBHDD PolicyStat** enables community providers of mental health, developmental disabilities and/or addictive diseases services to have access to all DBHDD policies that are relevant for community services. DBHDD PolicyStat can be accessed online anytime at https://gadbhdd.policystat.com/. By virtue of their contract or agreement with DBHDD, providers are required to comply with DBHDD policies relevant to their contracted services and/or according to the applicability as defined in the policy itself.

Additional information about how to utilize DBHDD PolicyStat is included in the following policy: **ACCESS TO DBHDD POLICIES FOR COMMUNITY PROVIDERS, 04-100** which is posted at https://gadbhdd.policystat.com/.



**Georgia Department of Behavioral Health
and Developmental Disabilities**

**January 2023**

# PART IV

# *Appendices*

### Provider Manual for Community Behavioral Health Providers

### Fiscal Year 2023



**Georgia Department of Behavioral Health and Developmental Disabilities**

**January 2023**

### APPENDIX A:  GLOSSARY OF TERMS

**Administrative Services Organization (ASO)**:  An agency contracted by DBHDD to review provider applications, provide service authorizations, provide agency audits and data collection related to the Behavioral Health and Developmental Disabilities Provider Networks and services.

**Collateral Contact**: Collateral contacts are either 1) communication, on behalf of the individual, with a source of information that is knowledgeable about the individual's situation and serves to support, clarify, expound on, or corroborate information provided by the individual or 2) contacts which are not face-to-face with the individual.  With appropriate releases and permissions from the individual, communication with a collateral contact may be made in person or over the telephone. Collateral contacts include, but are not limited to:

- Family members/close friends/natural supporters;
- Employers;
- School officials;
- Neighbors;
- Landlords;
- Medical professionals;
- Law Enforcement/Community Supervision Officers;
- Other agencies/community resources/treatment providers.

**DC 0-5™ Manual:** A diagnostic classification manual for mental health and developmental disorders of infancy and early childhood. The manual supports clinicians in the diagnosis of these disorders in young children through a systematic and multiaxial approach to diagnosis.

**Diagnostic & Statistical Manual of Mental Disorders**: The American Psychiatric Association's classification and diagnostic tool for behavioral health conditions.  When the term DSM is referenced, it is specifically in reference to the current version of the manual.

**Evidence Based Practice (EBP):** A treatment or supportive approach/practice-protocol that is based upon the application of the best available research evidence for achieving desired consumer outcomes.

**GCAL**: Georgia Crisis and Access Line, an operational branch of the Administrative Services Organization.

**ICD**: International Statistical Classification of Diseases and Related Health Problems, a medical classification list by the World Health Organization (WHO).

**Independently Licensed Clinician/Practitioner**: An individual who by Georgia Code can practice independently without supervision.  These individuals include physicians, psychologists, Licensed Clinical Social Workers, Licensed Professional Counselors, and Licensed Marriage and Family Therapists

**Physician Assessment and Care**: A term that is used in this manual interchangeably with Psychiatric Treatment.

**Place of Service**: Federally defined codes used on electronic transactions to specify the place where service(s) were rendered.

**Telemedicine**: The use of medical information exchanged from one site to another via electronic communications to improve a patient's health. Electronic communication means the use of interactive telecommunications equipment that includes, at a minimum, audio and video equipment permitting two-way, real time interactive communication between the patient, and the physician or practitioner at the distant site.

## APPENDIX B:  VALID AUTHORIZATION DIAGNOSES

The diagnoses listed here are organized into Mental Health (MH) and Substance Use (SU) categories. Services that are uniquely identified as being MH only or SU only will require a diagnosis which is aligned with that discipline (e.g. The diagnoses listed here are organized into Mental Health (MH) and Substance Use (SU) categories. Services that are uniquely identified as being MH only or SU only will require an authorization diagnosis which is within that category of condition (e.g., Alcohol Intoxication with Use Disorder [F10.229] would be an acceptable diagnosis for requesting an authorization for Ambulatory Detox [SU]).

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Schizophrenia Spectrum and Other Psychotic Disorders | F06.0 | Psychotic Disorder Due to Another Medical Condition with Hallucinations | Y | N |
| Schizophrenia Spectrum and Other Psychotic Disorders | F06.1 | Catatonia Associated with Another Mental Disorder (Catatonia Specifier) | Y | N |
| Schizophrenia Spectrum and Other Psychotic Disorders | F06.1 | Catatonic Disorder Due to Another Medical Condition | Y | N |
| Schizophrenia Spectrum and Other Psychotic Disorders | F06.1 | Unspecified Catatonia | Y | N |
| Schizophrenia Spectrum and Other Psychotic Disorders | F06.1 | Catatonia – other | Y | N |
| Schizophrenia Spectrum and Other Psychotic Disorders | F06.2 | Psychotic Disorder Due to Another Medical Condition with Delusions | Y | N |
| Depressive Disorders | F06.31 | Depressive Disorder Due to Another Medical Condition with Depressive Features | Y | N |
| Depressive Disorders | F06.32 | Depressive Disorder Due to Another Medical Condition with Major Depressive-like episode | Y | N |
| Bipolar and Related Disorders | F06.33 | Bipolar and Related Disorder Due to Another Medical Condition with manic features | Y | N |
| Bipolar and Related Disorders | F06.33 | Bipolar and Related Disorder Due to Another Medical Condition with manic or hypomanic-like episode | Y | N |
| Bipolar and Related Disorders | F06.34 | Bipolar and Related Disorder Due to Another Medical Condition with mixed features | Y | N |
| Depressive Disorders | F06.34 | Depressive Disorder Due to Another Medical Condition with Mixed Features | Y | N |
| Depressive Disorders | F06.34 | Mood Disorder Due to Another Medical Condition with mixed features | Y | N |
| Anxiety Disorders | F06.4 | Anxiety Disorder Due to Another Medical Condition | Y | N |
| Obsessive-Compulsive and Related Disorders | F06.8 | Obsessive-Compulsive and Related Disorder Due to Another Medical Condition | E | N |
| Other Mental Disorders | F06.8 | Other Specified Mental Disorder Due to Another Medical Condition | E | N |
| Other Mental Disorders | F06.8 | Obsessive-Compulsive and Related Disorder Due to Another Medical Condition | E | N |
| Personality Disorders | F07.0 | Personality Change Due to Another Medical Condition | Y | N |
| Other Mental Disorders | F09 | Unspecified Mental Disorder Due to Another Medical Condition | E | N |
| Alcohol-Related Disorders | F10.10 | Alcohol Use Disorder- Mild | N | Y |
| Alcohol-Related Disorders | F10.121 | Alcohol Induced Delirium, With mild use disorder | N | Y |
| Alcohol-Related Disorders | F10.129 | Alcohol Intoxication with Use Disorder, Mild | N | Y |
| Alcohol-Related Disorders | F10.130 | Alcohol abuse with withdrawal, uncomplicated | N | Y |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Alcohol-Related Disorders | F10.131 | Alcohol abuse with withdrawal delirium | N | Y |
| Alcohol-Related Disorders | F10.132 | Alcohol abuse with withdrawal with perceptual disturbance | N | Y |
| Alcohol-Related Disorders | F10.139 | Alcohol abuse with withdrawal, unspecified | N | Y |
| Alcohol-Related Disorders | F10.14 | Alcohol - Induced Depressive Disorder, With mild use disorder | N | Y |
| Alcohol-Related Disorders | F10.14 | Alcohol - Induced Bipolar and Related Disorder, With mild use disorder | N | Y |
| Alcohol-Related Disorders | F10.14 | Alcohol-induced Depression/Bipolar/Related Disorder, with mild use | N | Y |
| Alcohol-Related Disorders | F10.159 | Alcohol-Induced Psychotic Disorder, With mild use disorder | N | Y |
| Alcohol-Related Disorders | F10.180 | Alcohol - Induced Anxiety Disorder, With mild use disorder | N | Y |
| Alcohol-Related Disorders | F10.20 | Alcohol Use Disorder - Moderate | N | Y |
| Alcohol-Related Disorders | F10.20 | Alcohol Use Disorder - Severe | N | Y |
| Alcohol-Related Disorders | F10.20 | Alcohol Use Disorder - Moderate/Severe | N | Y |
| Alcohol-Related Disorders | F10.221 | Alcohol Intoxication Delirium, With moderate or severe use disorder | N | Y |
| Alcohol-Related Disorders | F10.229 | Alcohol Intoxication with Use Disorder, Moderate or Severe | N | Y |
| Alcohol-Related Disorders | F10.231 | Alcohol withdrawal delirium | N | Y |
| Alcohol-Related Disorders | F10.232 | Alcohol Withdrawal with Perceptual Disturbances | N | Y |
| Alcohol-Related Disorders | F10.239 | Alcohol Withdrawal without Perceptual Disturbances | N | Y |
| Alcohol-Related Disorders | F10.24 | Alcohol - Induced Depressive Disorder, With moderate or severe use disorder | N | Y |
| Alcohol-Related Disorders | F10.24 | Alcohol - Induced Bipolar and Related Disorder, With moderate or severe use disorder | N | Y |
| Alcohol-Related Disorders | F10.24 | Alcohol-induced Depression/Bipolar/Related Disorder, with moderate or severe use | N | Y |
| Alcohol-Related Disorders | F10.259 | Alcohol-Induced Psychotic Disorder, With moderate or severe use disorder | N | Y |
| Alcohol-Related Disorders | F10.26 | Alcohol induced major neurocognitive disorder, amnestic-confabulatory type, with moderate or severe use disorder | N | Y |
| Alcohol-Related Disorders | F10.27 | Alcohol induced major neurocognitive disorder, Nonamnestic-confabulatory type, with moderate or severe use disorder | N | Y |
| Alcohol-Related Disorders | F10.280 | Alcohol - Induced Anxiety Disorder, With moderate or severe use disorder | N | Y |
| Alcohol-Related Disorders | F10.921 | Alcohol Induced Delirium, Without use disorder | N | Y |
| Alcohol-Related Disorders | F10.929 | Alcohol Intoxication without Use Disorder | N | Y |
| Alcohol-Related Disorders | F10.930 | Alcohol use, unspecified with withdrawal, uncomplicated | N | Y |
| Alcohol-Related Disorders | F10.931 | Alcohol use, unspecified with withdrawal delirium | N | Y |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Alcohol-Related Disorders | F10.932 | Alcohol use, unspecified with withdrawal with perceptual disturbance | N | Y |
| Alcohol-Related Disorders | F10.939 | Alcohol use, unspecified with withdrawal, unspecified | N | Y |
| Alcohol-Related Disorders | F10.94 | Alcohol - Induced Depressive Disorder, Without use disorder | N | Y |
| Alcohol-Related Disorders | F10.94 | Alcohol - Induced Bipolar and Related Disorder, Without use disorder | N | Y |
| Alcohol-Related Disorders | F10.94 | Alcohol-induced Depression/Bipolar/Related Disorder, without use | N | Y |
| Alcohol-Related Disorders | F10.959 | Alcohol-Induced Psychotic Disorder, Without use disorder | N | Y |
| Alcohol-Related Disorders | F10.96 | Alcohol -Induced major neurocognitive disorder, amnestic-confabulatory type, without use disorder | N | Y |
| Alcohol-Related Disorders | F10.97 | Alcohol - Induced major neurocognitive disorder, nonamnestic-confabulatory type, without use disorder | N | Y |
| Alcohol-Related Disorders | F10.980 | Alcohol - Induced Anxiety Disorder, Without use disorder | N | Y |
| Alcohol-Related Disorders | F10.99 | Unspecified Alcohol-Related Disorder | N | Y |
| Opioid-Related Disorders | F11.10 | Opioid Use Disorder - Mild | N | Y |
| Opioid-Related Disorders | F11.13 | Opioid abuse with withdrawal | N | Y |
| Opioid-Related Disorders | F11.121 | Opioid intoxication Delirium, With mild use disorder | N | Y |
| Opioid-Related Disorders | F11.122 | Opioid Intoxication with Perceptual Disturbances, with Use Disorder, Mild | N | Y |
| Opioid-Related Disorders | F11.129 | Opioid Intoxication without Perceptual Disturbances, with Use Disorder, Mild | N | Y |
| Opioid-Related Disorders | F11.14 | Opioid - Induced Depressive Disorder, With mild use disorder | N | Y |
| Opioid-Related Disorders | F11.181 | Opioid- Induced Sexual Dysfunction, With mild use disorder | N | Y |
| Opioid-Related Disorders | F11.188 | Opioid - Induced Anxiety Disorder, With mild use disorder | N | Y |
| Opioid-Related Disorders | F11.20 | Opioid Use Disorder - Moderate | N | Y |
| Opioid-Related Disorders | F11.20 | Opioid Use Disorder - Severe | N | Y |
| Opioid-Related Disorders | F11.20 | Opioid Use Disorder - Moderate/Severe | N | Y |
| Opioid-Related Disorders | F11.221 | Opioid Intoxication Delirium, With moderate or severe use disorder | N | Y |
| Opioid-Related Disorders | F11.222 | Opioid Intoxication with Perceptual Disturbances, with Use Disorder, Moderate or Severe | N | Y |
| Opioid-Related Disorders | F11.229 | Opioid Intoxication without Perceptual Disturbances, with Use Disorder, Moderate or Severe | N | Y |
| Opioid-Related Disorders | F11.23 | Opioid Withdrawal | N | Y |
| Opioid-Related Disorders | F11.24 | Opioid - Induced Depressive Disorder, With moderate or severe use disorder | N | Y |
| Opioid-Related Disorders | F11.281 | Opioid- Induced Sexual Dysfunction, With moderate or severe use disorder | N | Y |
| Opioid-Related Disorders | F11.282 | Opioid-Induced Sleep Disorder, With moderate or severe use disorder | N | Y |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Opioid-Related Disorders | F11.288 | Opioid - Induced Anxiety Disorder, With moderate or severe use disorder | N | Y |
| Opioid-Related Disorders | F11.921 | Opioid Intoxication Delirium, Without use disorder | N | Y |
| Opioid-Related Disorders | F11.921 | Opioid -induced delirium | N | Y |
| Opioid-Related Disorders | F11.921 | Opioid Delirium | N | Y |
| Opioid-Related Disorders | F11.922 | Opioid Intoxication with Perceptual Disturbances, without Use Disorder | N | Y |
| Opioid-Related Disorders | F11.929 | Opioid Intoxication without Perceptual Disturbances, without Use Disorder | N | Y |
| Opioid-Related Disorders | F11.94 | Opioid - Induced Depressive Disorder, Without use disorder | N | Y |
| Opioid-Related Disorders | F11.981 | Opioid- Induced Sexual Dysfunction, Without use disorder | N | Y |
| Opioid-Related Disorders | F11.982 | Opioid-Induced Sleep Disorder, Without use disorder | N | Y |
| Opioid-Related Disorders | F11.988 | Opioid - Induced Anxiety Disorder, Without use disorder | N | Y |
| Opioid-Related Disorders | F11.99 | Unspecified Opioid-Related Disorder | N | Y |
| Cannabis-Related Disorders | F12.10 | Cannabis Use Disorder - Mild | N | Y |
| Cannabis-Related Disorders | F12.121 | Cannabis Intoxication Delirium, With mild use disorder | N | Y |
| Cannabis-Related Disorders | F12.122 | Cannabis Intoxication with Perceptual Disturbances, with Use Disorder, Mild | N | Y |
| Cannabis-Related Disorders | F12.129 | Cannabis Intoxication without Perceptual Disturbances, with Use Disorder, Mild | N | Y |
| Cannabis-Related Disorders | F12.13 | Cannabis abuse with withdrawal | N | Y |
| Cannabis-Related Disorders | F12.159 | Cannabis -Induced Psychotic Disorder, With mild use disorder | N | Y |
| Cannabis-Related Disorders | F12.180 | Cannabis - Induced Anxiety Disorder, With mild use disorder | N | Y |
| Cannabis-Related Disorders | F12.188 | Cannabis-Induced Sleep Disorder, With mild use disorder | N | Y |
| Cannabis-Related Disorders | F12.20 | Cannabis Use Disorder - Moderate | N | Y |
| Cannabis-Related Disorders | F12.20 | Cannabis Use Disorder - Severe | N | Y |
| Cannabis-Related Disorders | F12.20 | Cannabis Use Disorder - Moderate/Severe | N | Y |
| Cannabis-Related Disorders | F12.221 | Cannabis Intoxication Delirium, With moderate or severe use disorder | N | Y |
| Cannabis-Related Disorders | F12.222 | Cannabis Intoxication with Perceptual Disturbances, with Use Disorder, Moderate or Severe | N | Y |
| Cannabis-Related Disorders | F12.229 | Cannabis Intoxication without Perceptual Disturbances, with Use Disorder, Moderate or Severe | N | Y |
| Cannabis-Related Disorders | F12.259 | Cannabis -Induced Psychotic Disorder, With moderate or severe use disorder | N | Y |
| Cannabis-Related Disorders | F12.280 | Cannabis - Induced Anxiety Disorder, With moderate or severe use disorder | N | Y |
| Cannabis-Related Disorders | F12.288 | Cannabis Withdrawal | N | Y |
| Cannabis-Related Disorders | F12.921 | Cannabis Intoxication Delirium, Without use disorder | N | Y |
| Cannabis-Related Disorders | F12.922 | Cannabis Intoxication with Perceptual Disturbances, without Use Disorder | N | Y |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Cannabis-Related Disorders | F12.929 | Cannabis Intoxication without Perceptual Disturbances, without Use Disorder | N | Y |
| Cannabis-Related Disorders | F12.959 | Cannabis -Induced Psychotic Disorder, Without use disorder | N | Y |
| Cannabis-Related Disorders | F12.980 | Cannabis - Induced Anxiety Disorder, Without use disorder | N | Y |
| Cannabis-Related Disorders | F12.988 | Cannabis-Induced Sleep Disorder, Without use disorder | N | Y |
| Cannabis-Related Disorders | F12.99 | Unspecified Cannabis-Related Disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.10 | Sedative, Hypnotic, or Anxiolytic Use Disorder – Mild | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.121 | Sedative, hypnotic, or anxiolytic Intoxication Delirium, With mild use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.129 | Sedative, Hypnotic, or Anxiolytic Intoxication with Use Disorder, Mild | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.130 | Sedative, hypnotic or anxiolytic abuse with withdrawal, uncomplicated | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.131 | Sedative, hypnotic or anxiolytic abuse with withdrawal delirium | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.132 | Sedative, hypnotic or anxiolytic abuse with withdrawal with perceptual disturbance | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.139 | Sedative, hypnotic or anxiolytic abuse with withdrawal, unspecified | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.14 | Sedative, Hypnotic, or Anxiolytic - Induced Bipolar and Related Disorder, With mild use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.14 | Sedative, hypnotic, or anxiolytic - Induced Depressive Disorder, With mild use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.14 | Sedative, Hypnotic, or Anxiolytic - Induced Depressive/Bipolar/Related Disorder, With mild use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.159 | Sedative, hypnotic, or anxiolytic Induced Psychotic Disorder, With mild use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.180 | Sedative, hypnotic, or anxiolytic - Induced Anxiety Disorder, With mild use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.181 | Sedative, Hypnotic, or Anxiolytic- Induced Sexual Dysfunction, With mild use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.20 | Sedative, Hypnotic, or Anxiolytic Use Disorder – Moderate | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.20 | Sedative, Hypnotic, or Anxiolytic Use Disorder – Severe | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.20 | Sedative, Hypnotic, or Anxiolytic Use Disorder - Moderate - Severe | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.221 | Sedative, hypnotic, or anxiolytic Intoxication Delirium, With moderate or severe use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.229 | Sedative, Hypnotic, or Anxiolytic Intoxication with Use Disorder, Moderate or Severe | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.231 | Sedative, hypnotic, or anxiolytic withdrawal delirium | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.232 | Sedative, Hypnotic, or Anxiolytic Withdrawal with Perceptual Disturbances | N | Y |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.239 | Sedative, Hypnotic, or Anxiolytic Withdrawal without Perceptual Disturbances | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.24 | Sedative, Hypnotic, or Anxiolytic - Induced Bipolar and Related Disorder, With moderate or severe use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.24 | Sedative, hypnotic, or anxiolytic - Induced Depressive Disorder, With moderate or severe use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.24 | Sedative, Hypnotic, or Anxiolytic - Induced Depressive/Bipolar/Related Disorder, With moderate or severe use | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.259 | Sedative, hypnotic, or anxiolytic Induced Psychotic Disorder, With moderate or severe use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.27 | Sedative, hypnotic, or anxiolytic -induced major neurocognitive disorder, With moderate or severe use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.280 | Sedative, hypnotic, or anxiolytic - Induced Anxiety Disorder, With moderate or severe use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.281 | Sedative, hypnotic, or Anxiolytic- Induced Sexual Dysfunction, With moderate or severe use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.282 | Sedative, hypnotic, or Anxiolytic-Induced Sleep Disorder, With moderate or severe use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.288 | Sedative, hypnotic, or anxiolytic-induced mild neurocognitive disorder, With moderate or severe use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.921 | Sedative, hypnotic, or anxiolytic Intoxication Delirium, Without use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.921 | Sedative, hypnotic, or anxiolytic -induced delirium | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.921 | Sedative, hypnotic, or anxiolytic delirium | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.929 | Sedative, Hypnotic, or Anxiolytic Intoxication  without Use Disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.94 | Sedative, Hypnotic, or Anxiolytic - Induced Bipolar and Related Disorder, Without use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.94 | Sedative, hypnotic, or anxiolytic - Induced Depressive Disorder, Without use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.94 | Sedative, Hypnotic, or Anxiolytic - Induced Depressive/Bipolar/ Related Disorder, Without use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.959 | Sedative, hypnotic, or anxiolytic Induced Psychotic Disorder, Without use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.97 | Sedative, hypnotic, or anxiolytic-induced major neurocognitive disorder, Without use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.980 | Sedative, hypnotic, or anxiolytic - Induced Anxiety Disorder, Without use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.981 | Sedative, Hypnotic, or Anxiolytic- Induced Sexual Dysfunction, Without use disorder | N | Y |
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.988 | Sedative, hypnotic, or anxiolytic-induced mild neurocognitive disorder, Without use disorder | N | Y |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Sedative-, Hypnotic-, or Anxiolytic-Related Disorders | F13.99 | Unspecified Sedative-, Hypnotic-, or Anxiolytic-Related Disorder | N | Y |
| Stimulant-Related Disorders | F14.10 | Stimulant Use Disorder - Cocaine - Mild | N | Y |
| Stimulant Related Disorders | F14.121 | Cocaine intoxication delirium, With mild use disorder | N | Y |
| Stimulant-Related Disorders | F14.122 | Stimulant Intoxication - Cocaine, With Perceptual Disturbances - With Use Disorder, Mild | N | Y |
| Stimulant-Related Disorders | F14.129 | Stimulant Intoxication - Cocaine, Without Perceptual Disturbances - With Use Disorder, Mild | N | Y |
| Stimulant-Related Disorders | F14.13 | Cocaine abuse, unspecified with withdrawal | N | Y |
| Stimulant Related Disorders | F14.14 | Cocaine - Induced Bipolar and Related Disorder, With mild use disorder | N | Y |
| Stimulant Related Disorders | F14.14 | Cocaine - Induced Depressive Disorder, With mild use disorder | N | Y |
| Stimulant Related Disorders | F14.14 | Cocaine - Induced Depressive/Bipolar/Related Disorder, With mild use disorder | N | Y |
| Stimulant Related Disorders | F14.159 | Cocaine-Induced Psychotic Disorder, With mild use disorder | N | Y |
| Stimulant Related Disorders | F14.180 | Cocaine - Induced Anxiety Disorder, With mild use disorder | N | Y |
| Stimulant Related Disorders | F14.181 | Cocaine - Induced Sexual Dysfunction, With mild use disorder | N | Y |
| Stimulant Related Disorders | F14.188 | Cocaine - Induced Obsessive-Compulsive and Related Disorder, With mild use disorder | N | Y |
| Stimulant-Related Disorders | F14.20 | Stimulant Use Disorder - Cocaine - Moderate | N | Y |
| Stimulant-Related Disorders | F14.20 | Stimulant Use Disorder - Cocaine - Severe | N | Y |
| Stimulant-Related Disorders | F14.20 | Stimulant Use Disorder - Cocaine - Moderate/Severe | N | Y |
| Stimulant Related Disorders | F14.221 | Cocaine Intoxication delirium, With moderate or severe use disorder | N | Y |
| Stimulant-Related Disorders | F14.222 | Stimulant Intoxication - Cocaine, With Perceptual Disturbances - With Use Disorder, Moderate or Severe | N | Y |
| Stimulant-Related Disorders | F14.229 | Stimulant Intoxication - Cocaine, Without Perceptual Disturbances - With Use Disorder, Moderate or Severe | N | Y |
| Stimulant-Related Disorders | F14.23 | Stimulant Withdrawal - Cocaine | N | Y |
| Stimulant Related Disorders | F14.24 | Cocaine - Induced Bipolar and Related Disorder, With moderate or severe use disorder | N | Y |
| Stimulant Related Disorders | F14.24 | Cocaine - Induced Depressive Disorder, With moderate or severe use disorder | N | Y |
| Stimulant Related Disorders | F14.24 | Cocaine - Induced Depressive/Bipolar/Related Disorder, With moderate or severe use | N | Y |
| Stimulant Related Disorders | F14.259 | Cocaine-Induced Psychotic Disorder, With moderate or severe use disorder | N | Y |
| Stimulant Related Disorders | F14.280 | Cocaine - Induced Anxiety Disorder, With moderate or severe use disorder | N | Y |
| Stimulant Related Disorders | F14.281 | Cocaine - Induced Sexual Dysfunction, With moderate or severe use disorder | N | Y |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Stimulant Related Disorders | F14.282 | Cocaine-Induced Sleep Disorder, With moderate or severe use disorder | N | Y |
| Stimulant Related Disorders | F14.288 | Cocaine - Induced Obsessive-Compulsive and Related Disorder, With moderate or severe use disorder | N | Y |
| Stimulant Related Disorders | F14.921 | Cocaine Intoxication Delirium, Without use disorder | N | Y |
| Stimulant-Related Disorders | F14.922 | Stimulant Intoxication - Cocaine, With Perceptual Disturbances - Without Use Disorder | N | Y |
| Stimulant-Related Disorders | F14.929 | Stimulant Intoxication - Cocaine, Without Perceptual Disturbances - Without Use Disorder | N | Y |
| Stimulant-Related Disorders | F14.93 | Cocaine use, unspecified with withdrawal | N | Y |
| Stimulant Related Disorders | F14.94 | Cocaine - Induced Bipolar and Related Disorder, Without use disorder | N | Y |
| Stimulant Related Disorders | F14.94 | Cocaine - Induced Depressive Disorder, Without use disorder | N | Y |
| Stimulant Related Disorders | F14.94 | Cocaine - Induced Depressive/Bipolar/Related Disorder, Without use | N | Y |
| Stimulant Related Disorders | F14.959 | Cocaine-Induced Psychotic Disorder, Without use disorder | N | Y |
| Stimulant Related Disorders | F14.980 | Cocaine - Induced Anxiety Disorder, Without use disorder | N | Y |
| Stimulant Related Disorders | F14.981 | Cocaine - Induced Sexual Dysfunction, Without use disorder | N | Y |
| Stimulant Related Disorders | F14.988 | Cocaine - Induced Obsessive-Compulsive and Related Disorder, Without use disorder | N | Y |
| Stimulant-Related Disorders | F14.99 | Unspecified Stimulant-Related Disorder - Cocaine | N | Y |
| Stimulant-Related Disorders | F15.10 | Stimulant Use Disorder - Amphetamine-type Substance - Mild | N | Y |
| Stimulant-Related Disorders | F15.10 | Stimulant Use Disorder - Other or Unspecified Stimulant – Mild | N | Y |
| Stimulant-Related Disorders | F15.10 | Stimulant Use Disorder - other, mild | N | Y |
| Stimulant Related Disorders | F15.121 | Amphetamine (or other stimulant) Intoxication Delirium, With mild use disorder | N | Y |
| Stimulant-Related Disorders | F15.122 | Stimulant Intoxication - Amphetamine or other stimulant, With Perceptual Disturbances - With Use Disorder, Mild | N | Y |
| Stimulant-Related Disorders | F15.129 | Stimulant Intoxication - Amphetamine or other stimulant, Without Perceptual Disturbances - With Use Disorder, Mild | N | Y |
| Stimulant-Related Disorders | F15.13 | Other stimulant abuse with withdrawal | N | Y |
| Stimulant Related Disorders | F15.14 | Amphetamine (or other stimulant) - Induced Bipolar and Related Disorder, With mild use disorder | N | Y |
| Stimulant Related Disorders | F15.14 | Amphetamine (or other stimulant) - Induced Depressive Disorder, With mild use disorder | N | Y |
| Stimulant Related Disorders | F15.14 | Amphetamine (or other stimulant) - Induced Depressive/Bipolar/Related Disorder, With mild use disorder | N | Y |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Stimulant Related Disorders | F15.159 | Amphetamine (or other stimulant) Induced Psychotic Disorder, With mild use disorder | N | Y |
| Stimulant Related Disorders | F15.180 | Caffeine - Induced Anxiety Disorder, With mild use disorder | N | Y |
| Stimulant Related Disorders | F15.180 | Amphetamine (or other stimulant) - Induced Anxiety Disorder, With mild use disorder | N | Y |
| Stimulant Related Disorders | F15.181 | Amphetamine (or other stimulant) - Induced Sexual Dysfunction, With mild use disorder | N | Y |
| Stimulant Related Disorders | F15.188 | Amphetamine (or other stimulant) - Induced Obsessive-Compulsive and Related Disorder, With mild use disorder | N | Y |
| Stimulant-Related Disorders | F15.20 | Stimulant Use Disorder - Amphetamine-type Substance - Moderate | N | Y |
| Stimulant-Related Disorders | F15.20 | Stimulant Use Disorder - Amphetamine-type Substance - Severe | N | Y |
| Stimulant-Related Disorders | F15.20 | Stimulant Use Disorder - Other or Unspecified Stimulant - Moderate | N | Y |
| Stimulant-Related Disorders | F15.20 | Stimulant Use Disorder - Other or Unspecified Stimulant - Severe | N | Y |
| Stimulant-Related Disorders | F15.20 | Stimulant Use Disorder - other, moderate - severe | N | Y |
| Stimulant Related Disorders | F15.221 | Amphetamine (or other stimulant) intoxication delirium, With moderate or severe use disorder. | N | Y |
| Stimulant-Related Disorders | F15.222 | Stimulant Intoxication - Amphetamine or other stimulant, With Perceptual Disturbances - With Use Disorder, Moderate or Severe | N | Y |
| Stimulant-Related Disorders | F15.229 | Stimulant Intoxication - Amphetamine or other stimulant, Without Perceptual Disturbances - With Use Disorder, Moderate or Severe | N | Y |
| Stimulant-Related Disorders | F15.23 | Stimulant Withdrawal - Amphetamine or Other Stimulant | N | Y |
| Stimulant Related Disorders | F15.24 | Amphetamine (or other stimulant) - Induced Depressive Disorder, With moderate or severe use disorder | N | Y |
| Stimulant Related Disorders | F15.24 | Amphetamine (or other stimulant)-Induced Bipolar and Related Disorder, With moderate or severe use disorder | N | Y |
| Stimulant Related Disorders | F15.24 | Amphetamine (or other stimulant)-Induced Depressive/Bipolar/Related Disorder, With moderate or severe use disorder | N | Y |
| Stimulant Related Disorders | F15.259 | Amphetamine (or other stimulant) Induced Psychotic Disorder, With moderate or severe use disorder | N | Y |
| Stimulant Related Disorders | F15.280 | Caffeine - Induced Anxiety Disorder, With moderate or severe use disorder | N | Y |
| Stimulant Related Disorders | F15.280 | Amphetamine (or other stimulant) - Induced Anxiety Disorder, With moderate or severe use disorder | N | Y |
| Stimulant Related Disorders | F15.281 | Amphetamine (or other stimulant) - Induced Sexual Dysfunction, With moderate or severe use disorder | N | Y |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Stimulant Related Disorders | F15.282 | Caffeine-Induced Sleep Disorder, With moderate or severe use disorder | N | Y |
| Stimulant Related Disorders | F15.282 | Amphetamine (or other stimulant)-Induced Sleep Disorder, With moderate or severe use disorder | N | Y |
| Stimulant Related Disorders | F15.288 | Amphetamine (or other stimulant) - Induced Obsessive-Compulsive and Related Disorder, With moderate or severe use disorder | N | Y |
| Stimulant Related Disorders | F15.921 | Amphetamine (or other stimulant) Intoxication Delirium, Without use disorder | N | Y |
| Stimulant Related Disorders | F15.921 | Amphetamine-type (or other stimulant) -induced delirium | N | Y |
| Stimulant Related Disorders | F15.921 | Amphetamine or Amphetamine-type delirium | N | Y |
| Stimulant-Related Disorders | F15.922 | Stimulant Intoxication - Amphetamine or other stimulant, With Perceptual Disturbances - Without Use Disorder | N | Y |
| Stimulant-Related Disorders | F15.929 | Stimulant Intoxication - Amphetamine or other stimulant, Without Perceptual Disturbances - Without Use Disorder | N | Y |
| Combined Other Substance Disorders | F15.929 | Caffeine Intoxication | N | Y |
| Combined Other Substance Disorders | F15.929 | Stimulant Use Intoxication | N | Y |
| Stimulant Related Disorders | F15.94 | Amphetamine (or other stimulant) - Induced Bipolar and Related Disorder, Without use disorder | N | Y |
| Stimulant Related Disorders | F15.94 | Amphetamine (or other stimulant) - Induced Depressive Disorder, Without use disorder | N | Y |
| Stimulant Related Disorders | F15.94 | Amphetamine (or other stimulant) - Induced Depressive/Bipolar/Related Disorder, Without use disorder | N | Y |
| Stimulant Related Disorders | F15.959 | Amphetamine (or other stimulant) Induced Psychotic Disorder, Without use disorder | N | Y |
| Stimulant Related Disorders | F15.980 | Caffeine - Induced Anxiety Disorder, Without use disorder | N | Y |
| Stimulant Related Disorders | F15.980 | Amphetamine (or other stimulant) - Induced Anxiety Disorder, Without use disorder | N | Y |
| Stimulant Related Disorders | F15.981 | Amphetamine (or other stimulant) - Induced Sexual Dysfunction, Without use disorder | N | Y |
| Stimulant Related Disorders | F15.988 | Amphetamine (or other stimulant) - Induced Obsessive-Compulsive and Related Disorder, Without use disorder | N | Y |
| Combined Other Substance Disorders | F15.99 | Unspecified Caffeine-Related Disorder | N | Y |
| Stimulant-Related Disorders | F15.99 | Unspecified Stimulant-Related Disorder - Amphetamine or Other Stimulant | N | Y |
| Stimulant-Related Disorders | F15.99 | Unspecified Stimulant-Related Disorder | N | Y |
| Hallucinogen-Related Disorders | F16.10 | Other Hallucinogen Use Disorder - Mild | N | Y |
| Hallucinogen-Related Disorders | F16.10 | Other Hallucinogen Use Disorder - Mild | N | Y |
| Hallucinogen-Related Disorders | F16.121 | Other hallucinogen intoxication Delirium, With mild use disorder | N | Y |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Hallucinogen-Related Disorders | F16.121 | Phencyclidine Intoxication Delirium, With mild use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.121 | Phencyclidine/Other Hallucinogen Intoxication Delirium, With mild use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.129 | Other Hallucinogen Intoxication with Use Disorder, Mild | N | Y |
| Hallucinogen-Related Disorders | F16.129 | Phencyclidine Intoxication with Use Disorder, Mild | N | Y |
| Hallucinogen-Related Disorders | F16.129 | Hallucinogen Intoxication - other, mild | N | Y |
| Hallucinogen-Related Disorders | F16.14 | Other Hallucinogen - Induced Bipolar and Related Disorder, With mild use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.14 | Phencyclidine - Induced Bipolar and Related Disorder, With mild use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.14 | Other hallucinogen - Induced Depressive Disorder, With mild use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.14 | Phencyclidine - Induced Depressive Disorder, With mild use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.14 | Phencyclidine/ Other Hallucinogen - Induced Depressive Disorder, With mild use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.159 | Other Hallucinogen-Induced Psychotic Disorder, With mild use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.159 | Phencyclidine-Induced Psychotic Disorder, With mild use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.159 | Phencyclidine/Other Hallucinogen -Induced Psychotic Disorder, With mild use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.180 | Other hallucinogen - Induced Anxiety Disorder, With mild use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.180 | Phencyclidine - Induced Anxiety Disorder, With mild use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.180 | Phencyclidine/Other Hallucinogen - Induced Anxiety Disorder, With mild use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.20 | Other Hallucinogen Use Disorder - Moderate | N | Y |
| Hallucinogen-Related Disorders | F16.20 | Other Hallucinogen Use Disorder - Severe | N | Y |
| Hallucinogen-Related Disorders | F16.20 | Phencyclidine Use Disorder - Moderate | N | Y |
| Hallucinogen-Related Disorders | F16.20 | Phencyclidine Use Disorder - Severe | N | Y |
| Hallucinogen-Related Disorders | F16.20 | Hallucinogen Use Disorder, other, Moderate - Severe | N | Y |
| Hallucinogen-Related Disorders | F16.221 | Other hallucinogen Intoxication Delirium, With moderate or severe use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.221 | Phencyclidine Intoxication Delirium, With moderate or severe use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.221 | Phencyclidine/Other Hallucinogen Intoxication Delirium, With moderate or severe use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.229 | Other Hallucinogen Intoxication with Use Disorder, Moderate or Severe | N | Y |
| Hallucinogen-Related Disorders | F16.229 | Phencyclidine Intoxication with Use Disorder, Moderate or Severe | N | Y |
| Hallucinogen-Related Disorders | F16.229 | Hallucinogen Intoxication - other, moderate - severe | N | Y |
| Hallucinogen-Related Disorders | F16.24 | Other Hallucinogen - Induced Bipolar and Related Disorder, With moderate or severe use disorder | N | Y |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Hallucinogen-Related Disorders | F16.24 | Phencyclidine - Induced Bipolar and Related Disorder, With moderate or severe use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.24 | Other hallucinogen - Induced Depressive Disorder, With moderate or severe use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.24 | Phencyclidine - Induced Depressive Disorder, With moderate or severe use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.24 | Phencyclidine/other Hallucinogen - Induced Depressive Disorder, With moderate or severe use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.259 | Other Hallucinogen-Induced Psychotic Disorder, With moderate or severe use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.259 | Phencyclidine-Induced Psychotic Disorder, With moderate or severe use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.259 | Phencyclidine/Other Hallucinogen-Induced Psychotic Disorder, With moderate or severe use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.280 | Other hallucinogen - Induced Anxiety Disorder, With moderate or severe use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.280 | Phencyclidine - Induced Anxiety Disorder, With moderate or severe use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.280 | Phencyclidine/Other Hallucinogen - Induced Anxiety Disorder, With moderate or severe use disorder | N | Y |
| Hallucinogen Related Disorders | F16.921 | Phencyclidine/Other Hallucinogen Intoxication Delirium, Without use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.921 | Other hallucinogen Intoxication Delirium, Without use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.921 | Phencyclidine Intoxication Delirium, Without use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.929 | Other Hallucinogen Intoxication without Use Disorder | N | Y |
| Hallucinogen-Related Disorders | F16.929 | Phencyclidine Intoxication without Use Disorder | N | Y |
| Hallucinogen-Related Disorders | F16.929 | Hallucinogen Intoxication - other, without Use Disorder | N | Y |
| Hallucinogen Related Disorders | F16.94 | Phencyclidine - Induced Depressive Disorder, Without use disorder | N | Y |
| Hallucinogen Related Disorders | F16.94 | Phencyclidine/Other Hallucinogen - Induced Depressive Disorder, Without use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.94 | Other Hallucinogen - Induced Bipolar and Related Disorder, Without use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.94 | Phencyclidine - Induced Bipolar and Related Disorder, Without use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.94 | Other hallucinogen - Induced Depressive Disorder, Without use disorder | N | Y |
| Hallucinogen Related Disorders | F16.959 | Other Hallucinogen-Induced Psychotic Disorder, Without use disorder | N | Y |
| Hallucinogen Related Disorders | F16.959 | Phencyclidine-Induced Psychotic Disorder, Without use disorder | N | Y |
| Hallucinogen Related Disorders | F16.959 | Phencyclidine/Other Hallucinogen -Induced Psychotic Disorder, Without use disorder | N | Y |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Hallucinogen Related Disorders | F16.980 | Other hallucinogen - Induced Anxiety Disorder, Without use disorder | N | Y |
| Hallucinogen Related Disorders | F16.980 | Phencyclidine - Induced Anxiety Disorder, Without use disorder | N | Y |
| Hallucinogen Related Disorders | F16.980 | Phencyclidine/Other Hallucinogen - Induced Anxiety Disorder, Without use disorder | N | Y |
| Hallucinogen-Related Disorders | F16.983 | Hallucinogen Persisting Perception Disorder | N | Y |
| Hallucinogen-Related Disorders | F16.99 | Unspecified Hallucinogen-Related Disorder | N | Y |
| Hallucinogen-Related Disorders | F16.99 | Unspecified Phencyclidine-Related Disorder | N | Y |
| Hallucinogen-Related Disorders | F16.99 | Unspecified Hallucinogen-Other | N | Y |
| Substance-Related Disorders | F17.208 | Tobacco-Induced Sleep Disorder, With moderate or severe use disorder | N | N |
| Combined Other Substance Disorders | F17.209 | Unspecified Tobacco-Related Disorder | N | N |
| Inhalant Related Disorders | F18.121 | Inhalant Intoxication Delirium, With mild use disorder | N | Y |
| Inhalant-Related Disorders | F18.129 | Inhalant Intoxication with Use Disorder, Mild | N | Y |
| Inhalant Related Disorders | F18.14 | Inhalant - Induced Depressive Disorder, With mild use disorder | N | Y |
| Inhalant Related Disorders | F18.159 | Inhalant-Induced Psychotic Disorder, With mild use disorder | N | Y |
| Inhalant Related Disorders | F18.17 | Inhalant - Induced major neurocognitive disorder, With mild use disorder | N | Y |
| Inhalant Related Disorders | F18.180 | Inhalant - Induced Anxiety Disorder, With mild use disorder | N | Y |
| Inhalant Related Disorders | F18.188 | Inhalant - Induced Mild Neurocognitive Disorder, With mild use disorder | N | Y |
| Inhalant-Related Disorders | F18.20 | Inhalant Use Disorder - Moderate | N | Y |
| Inhalant-Related Disorders | F18.20 | Inhalant Use Disorder - Severe | N | Y |
| Inhalant-Related Disorders | F18.20 | Inhalant Use Disorder - Moderate/Severe | N | Y |
| Inhalant Related Disorders | F18.221 | Inhalant Intoxication Delirium, With moderate or severe use disorder | N | Y |
| Inhalant-Related Disorders | F18.229 | Inhalant Intoxication with Use Disorder, Moderate or Severe | N | Y |
| Inhalant Related Disorders | F18.24 | Inhalant - Induced Depressive Disorder, With moderate or severe use disorder | N | Y |
| Inhalant Related Disorders | F18.259 | Inhalant-Induced Psychotic Disorder, With moderate or severe use disorder | N | Y |
| Inhalant Related Disorders | F18.27 | Inhalant - Induced major neurocognitive disorder, With moderate or severe use disorder | N | Y |
| Inhalant Related Disorders | F18.280 | Inhalant - Induced Anxiety Disorder, With moderate or severe use disorder | N | Y |
| Inhalant Related Disorders | F18.288 | Inhalant - Induced mild neurocognitive disorder, With moderate or severe use disorder | N | Y |
| Inhalant Related Disorders | F18.921 | Inhalant Intoxication Delirium, Without use disorder | N | Y |
| Inhalant-Related Disorders | F18.929 | Inhalant Intoxication without Use Disorder | N | Y |
| Inhalant Related Disorders | F18.94 | Inhalant - Induced Depressive Disorder, Without use disorder | N | Y |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Inhalant Related Disorders | F18.959 | Inhalant-Induced Psychotic Disorder, Without use disorder | N | Y |
| Inhalant Related Disorders | F18.97 | Inhalant -Induced major neurocognitive disorder, Without use disorder | N | Y |
| Inhalant Related Disorders | F18.980 | Inhalant - Induced Anxiety Disorder, Without use disorder | N | Y |
| Inhalant Related Disorders | F18.988 | Inhalant -Induced mild neurocognitive disorder, Without use disorder | N | Y |
| Inhalant-Related Disorders | F18.99 | Unspecified Inhalant-Related Disorder | N | Y |
| Combined Other Substance Disorders | F19.10 | Other (or Unknown) Substance Use Disorder - Mild | N | Y |
| Combined Other Substance Disorders | F19.121 | Other (or unknown) substance Intoxication Delirium, With mild use disorder | N | Y |
| Combined Other Substance Disorders | F19.129 | Other (or Unknown) Substance Intoxication - With Use Disorder, Mild | N | Y |
| Combined Other Substance Disorders | F19.131 | Other psychoactive substance abuse with withdrawal delirium | N | Y |
| Combined Other Substance Disorders | F19.132 | Other psychoactive substance abuse with withdrawal with perceptual disturbance | N | Y |
| Combined Other Substance Disorders | F19.139 | Other psychoactive substance abuse with withdrawal, unspecified | N | Y |
| Combined Other Substance Disorders | F19.14 | Other (or unknown) substance - Induced Bipolar and Related Disorder, With mild use disorder | N | Y |
| Combined Other Substance Disorders | F19.14 | Other (or unknown) substance - Induced Depressive Disorder, With mild use disorder | N | Y |
| Combined Other Substance Disorders | F19.14 | Other (or unknown) substance - Induced Depressive/Bipolar/Related Disorder, With mild use disorder | N | Y |
| Combined Other Substance Disorders | F19.159 | Other (or unknown) substance Induced Psychotic Disorder, With mild use disorder | N | Y |
| Combined Other Substance Disorders | F19.17 | Other (or unknown) substance induced major neurocognitive disorder, With mild use disorder | N | Y |
| Combined Other Substance Disorders | F19.180 | Other (or unknown) substance - Induced Anxiety Disorder, With mild use disorder | N | Y |
| Combined Other Substance Disorders | F19.181 | Other (Or Unknown) Substance Induced Sexual Dysfunction, With mild use disorder | N | Y |
| Combined Other Substance Disorders | F19.188 | Other (or unknown) substance - induced mild neurocognitive disorder, With mild use disorder | N | Y |
| Combined Other Substance Disorders | F19.188 | Other (or unknown) substance- Induced Obsessive-Compulsive and Related Disorder, With mild use disorder | N | Y |
| Combined Other Substance Disorders | F19.188 | Other (or unknown) substance-Induced mild neurocognitive/Obsessive-Compulsive/Related Disorder, With mild use disorder | N | Y |
| Combined Other Substance Disorders | F19.20 | Other (or Unknown) Substance Use Disorder - Moderate | N | Y |
| Combined Other Substance Disorders | F19.20 | Other (or Unknown) Substance Use Disorder - Severe | N | Y |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Combined Other Substance Disorders | F19.20 | Substance Use Disorder, Other (or Unknown) - Moderate - Severe | N | Y |
| Combined Other Substance Disorders | F19.221 | Other (or unknown) substance Induced Delirium, With moderate or severe use disorder | N | Y |
| Combined Other Substance Disorders | F19.229 | Other (or Unknown) Substance Intoxication - With Use Disorder, Moderate or Severe | N | Y |
| Combined Other Substance Disorders | F19.231 | Other (or unknown) substance withdrawal delirium | N | Y |
| Combined Other Substance Disorders | F19.239 | Other (or Unknown) Substance Withdrawal | N | Y |
| Combined Other Substance Disorders | F19.24 | Other (or unknown) substance - Induced Bipolar and Related Disorder, With moderate or severe use disorder | N | Y |
| Combined Other Substance Disorders | F19.24 | Other (or unknown) substance - Induced Depressive Disorder, With moderate or severe use disorder | N | Y |
| Combined Other Substance Disorders | F19.24 | Other (or unknown) substance - Induced Depressive/Bipolar/Related Disorder, With moderate or severe use disorder | N | Y |
| Combined Other Substance Disorders | F19.259 | Other (or unknown) Substance-Induced Psychotic Disorder, With moderate or severe use disorder | N | Y |
| Combined Other Substance Disorders | F19.27 | Other (or unknown) substance - induced major neurocognitive disorder) With moderate or severe use disorder | N | Y |
| Combined Other Substance Disorders | F19.280 | Other (or unknown) substance - Induced Anxiety Disorder, With moderate or severe use disorder | N | Y |
| Combined Other Substance Disorders | F19.281 | Other (or unknown) Substance- Induced Sexual Dysfunction, With moderate or severe use disorder | N | Y |
| Combined Other Substance Disorders | F19.282 | Other (or unknown) Substance-Induced Sleep Disorder, With moderate or severe use disorder | N | Y |
| Combined Other Substance Disorders | F19.288 | Other (or unknown) substance-induced mild neurocognitive disorder, With moderate or severe use disorder | N | Y |
| Combined Other Substance Disorders | F19.288 | Other (or unknown) substance- Induced Obsessive-Compulsive and Related Disorder, With moderate or severe use disorder | N | Y |
| Combined Other Substance Disorders | F19.288 | Other (or unknown) substance- Induced mild neurocognitive/Obsessive-Compulsive/Related Disorder, With moderate or severe use disorder | N | Y |
| Combined Other Substance Disorders | F19.921 | Other (or unknown) substance intoxication Delirium, Without use disorder | N | Y |
| Combined Other Substance Disorders | F19.929 | Other (or Unknown) Substance Intoxication - Without Use Disorder | N | Y |
| Combined Other Substance Disorders | F19.94 | Other (or unknown) substance - Induced Bipolar and Related Disorder, Without use disorder | N | Y |
| Combined Other Substance Disorders | F19.94 | Other (or unknown) substance - Induced Depressive Disorder, Without use disorder | N | Y |
| Combined Other Substance Disorders | F19.94 | Other (or unknown) substance - Induced Depressive/Bipolar/Related Disorder, Without use disorder | N | Y |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Combined Other Substance Disorders | F19.959 | Other (or unknown) substance Induced Psychotic Disorder, Without use disorder | N | Y |
| Combined Other Substance Disorders | F19.97 | Other (or unknown) substance-induced major neurocognitive disorder, Without use disorder | N | Y |
| Combined Other Substance Disorders | F19.980 | Other (or unknown) substance - Induced Anxiety Disorder, Without use disorder | N | Y |
| Combined Other Substance Disorders | F19.981 | Other (or unknown) Substance-Induced Sexual Dysfunction, Without use disorder | N | Y |
| Combined Other Substance Disorders | F19.988 | Other (or unknown) substance mild neurocognitive disorder Without use disorder | N | Y |
| Combined Other Substance Disorders | F19.988 | Other (or unknown) substance- Induced Obsessive-Compulsive and Related Disorder, Without use disorder | N | Y |
| Combined Other Substance Disorders | F19.988 | Other (or unknown) substance- Induced mild neurocognitive/Obsessive-Compulsive/Related Disorder, Without use disorder | N | Y |
| Combined Other Substance Disorders | F19.99 | Unspecified Other (or Unknown) Substance–Related Disorder | N | Y |
| Schizophrenia Spectrum and Other Psychotic Disorders | F20.81 | Schizophreniform Disorder | Y | N |
| Schizophrenia Spectrum and Other Psychotic Disorders | F20.9 | Schizophrenia | Y | N |
| Personality Disorders | F21 | Schizotypal Personality Disorder | Y | N |
| Schizophrenia Spectrum and Other Psychotic Disorders | F21 | Schizotypal (Personality) Disorder | Y | N |
| Schizophrenia Spectrum and Other Psychotic Disorders | F22 | Delusional Disorder | Y | N |
| Schizophrenia Spectrum and Other Psychotic Disorders | F23 | Brief Psychotic Disorder | Y | N |
| Schizophrenia Spectrum and Other Psychotic Disorders | F25.0 | Schizoaffective Disorder Bipolar Type | Y | N |
| Schizophrenia Spectrum and Other Psychotic Disorders | F25.1 | Schizoaffective Disorder Depressive Type | Y | N |
| Schizophrenia Spectrum and Other Psychotic Disorders | F28 | Other Specified Schizophrenia Spectrum and Other Psychotic Disorder | Y | N |
| Schizophrenia Spectrum and Other Psychotic Disorders | F29 | Unspecified Schizophrenia Spectrum and Other Psychotic Disorder | Y | N |
| Bipolar and Related Disorders | F31.0 | Bipolar I Disorder Current or most recent episode hypomanic | Y | N |
| Bipolar and Related Disorders | F31.11 | Bipolar I Disorder Current or most recent episode manic - Mild | Y | N |
| Bipolar and Related Disorders | F31.12 | Bipolar I Disorder Current or most recent episode manic - Moderate | Y | N |
| Bipolar and Related Disorders | F31.13 | Bipolar I Disorder Current or most recent episode manic - Severe | Y | N |
| Bipolar and Related Disorders | F31.2 | Bipolar I Disorder Current or most recent episode manic - with Psychotic Features | Y | N |
| Bipolar and Related Disorders | F31.31 | Bipolar I Disorder Current or most recent episode depressed - Mild | Y | N |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Bipolar and Related Disorders | F31.32 | Bipolar I Disorder Current or most recent episode depressed - Moderate | Y | N |
| Bipolar and Related Disorders | F31.4 | Bipolar I Disorder Current or most recent episode depressed - Severe | Y | N |
| Bipolar and Related Disorders | F31.5 | Bipolar I Disorder Current or most recent episode depressed - with Psychotic Features | Y | N |
| Bipolar and Related Disorders | F31.71 | Bipolar I Disorder Current or most recent episode hypomanic - in partial remission | Y | N |
| Bipolar and Related Disorders | F31.72 | Bipolar I Disorder Current or most recent episode hypomanic - in full remission | Y | N |
| Bipolar and Related Disorders | F31.73 | Bipolar I Disorder Current or most recent episode manic - In Partial Remission | Y | N |
| Bipolar and Related Disorders | F31.74 | Bipolar I Disorder Current or most recent episode manic - In Full Remission | Y | N |
| Bipolar and Related Disorders | F31.75 | Bipolar I Disorder Current or most recent episode depressed - In Partial Remission | Y | N |
| Bipolar and Related Disorders | F31.76 | Bipolar I Disorder Current or most recent episode depressed - In Full Remission | Y | N |
| Bipolar and Related Disorders | F31.81 | Bipolar II Disorder | Y | N |
| Bipolar and Related Disorders | F31.89 | Other Specified Bipolar and Related Disorder | Y | N |
| Bipolar and Related Disorders | F31.9 | Bipolar I Disorder Current or most recent episode hypomanic - unspecified | Y | N |
| Bipolar and Related Disorders | F31.9 | Bipolar I Disorder Current or most recent episode manic - Unspecified | Y | N |
| Bipolar and Related Disorders | F31.9 | Bipolar I Disorder Current or most recent episode depressed - Unspecified | Y | N |
| Bipolar and Related Disorders | F31.9 | Bipolar I Disorder Current or most recent episode unspecified | Y | N |
| Bipolar and Related Disorders | F31.9 | Unspecified Bipolar and Related Disorder | Y | N |
| Bipolar and Related Disorders | F31.9 | Bipolar Disorder - Unspecified | Y | N |
| Depressive Disorders | F32.0 | Major Depressive Disorder, Single Episode -Mild | Y | N |
| Depressive Disorders | F32.1 | Major Depressive Disorder, Single Episode -Moderate | Y | N |
| Depressive Disorders | F32.2 | Major Depressive Disorder, Single Episode -Severe | Y | N |
| Depressive Disorders | F32.3 | Major Depressive Disorder, Single Episode -with Psychotic Features | Y | N |
| Depressive Disorders | F32.4 | Major Depressive Disorder, Single Episode -in Partial Remission | Y | N |
| Depressive Disorders | F32.5 | Major Depressive Disorder, Single Episode -in Full Remission | Y | N |
| Depressive Disorders | F32.8 | Other Specified Depressive Disorder | Y | N |
| Depressive Disorders | F32.9 | Major Depressive Disorder, Single Episode - Unspecified | Y | N |
| Depressive Disorders | F32.9 | Unspecified Depressive Disorder | Y | N |
| Depressive Disorders | F33.0 | Major Depressive Disorder, Recurrent Episode -Mild | Y | N |
| Depressive Disorders | F33.1 | Major Depressive Disorder, Recurrent Episode - Moderate | Y | N |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Depressive Disorders | F33.2 | Major Depressive Disorder, Recurrent Episode - Severe | Y | N |
| Depressive Disorders | F33.3 | Major Depressive Disorder, Recurrent Episode -with Psychotic Features | Y | N |
| Depressive Disorders | F33.41 | Major Depressive Disorder, Recurrent Episode -in Partial Remission | Y | N |
| Depressive Disorders | F33.42 | Major Depressive Disorder, Recurrent Episode -in Full Remission | Y | N |
| Depressive Disorders | F33.9 | Major Depressive Disorder, Recurrent Episode - Unspecified | Y | N |
| Bipolar and Related Disorders | F34.0 | Cyclothymic Disorder | Y | N |
| Depressive Disorders | F34.1 | Persistent Depressive Disorder (Dysthymia) | Y | N |
| Depressive Disorders | F34.8 | Disruptive Mood Dysregulation Disorder | Y | N |
| Anxiety Disorders | F40.00 | Agoraphobia | Y | N |
| Anxiety Disorders | F40.10 | Social Anxiety Disorder (Social Phobia) | Y | N |
| Anxiety Disorders | F40.218 | Specific Phobia - Animal | Y | N |
| Anxiety Disorders | F40.228 | Specific Phobia - Natural Environment | Y | N |
| Anxiety Disorders | F40.230 | Specific Phobia - Fear of Blood | Y | N |
| Anxiety Disorders | F40.231 | Specific Phobia - Fear of Injections and Transfusions | Y | N |
| Anxiety Disorders | F40.232 | Specific Phobia - Fear of Other Medical Care | Y | N |
| Anxiety Disorders | F40.233 | Specific Phobia - Fear of Injury | Y | N |
| Anxiety Disorders | F40.248 | Specific Phobia - Situational | Y | N |
| Anxiety Disorders | F40.298 | Specific Phobia - Other | Y | N |
| Anxiety Disorders | F41.0 | Panic Disorder | Y | N |
| Anxiety Disorders | F41.1 | Generalized Anxiety Disorder | Y | N |
| Anxiety Disorders | F41.8 | Other Specified Anxiety Disorder | Y | N |
| Anxiety Disorders | F41.9 | Unspecified Anxiety Disorder | Y | N |
| Obsessive-Compulsive and Related Disorders | F42 | Hoarding Disorder | Y | N |
| Obsessive-Compulsive and Related Disorders | F42 | Obsessive-Compulsive Disorder | Y | N |
| Obsessive-Compulsive and Related Disorders | F42 | Other Specified Obsessive-Compulsive and Related Disorder | Y | N |
| Obsessive-Compulsive and Related Disorders | F42 | Unspecified Obsessive-Compulsive and Related Disorder | Y | N |
| Personality Disorders | F42 | Obsessive-Compulsive Disorder | Y | N |
| Personality Disorders | F42 | Obsessive-Compulsive Disorder, other | Y | N |
| Trauma- and Stressor-Related Disorders | F43.0 | Acute Stress Disorder | Y | N |
| Trauma- and Stressor-Related Disorders | F43.10 | Posttraumatic Stress Disorder | Y | N |
| Trauma- and Stressor-Related Disorders | F43.20 | Adjustment Disorders - Unspecified | Y | N |
| Trauma- and Stressor-Related Disorders | F43.21 | Adjustment Disorder with depressed mood, Persistent | Y | N |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Trauma- and Stressor-Related Disorders | F43.22 | Adjustment Disorders with Anxiety | Y | N |
| Trauma- and Stressor-Related Disorders | F43.23 | Adjustment Disorders with Mixed Anxiety and Depressed Mood | Y | N |
| Trauma- and Stressor-Related Disorders | F43.24 | Adjustment Disorders with Disturbance of Conduct | Y | N |
| Trauma- and Stressor-Related Disorders | F43.25 | Adjustment Disorders with Mixed Disturbance of Emotions and Conduct | Y | N |
| Trauma- and Stressor-Related Disorders | F43.8 | Other Specified Trauma- and Stressor-Related Disorder | Y | N |
| Trauma- and Stressor-Related Disorders | F43.9 | Unspecified Trauma- and Stressor-Related Disorder | Y | N |
| Dissociative Disorders | F44.0 | Dissociative Amnesia | Y | N |
| Dissociative Disorders | F44.1 | Dissociative Amnesia WITH Dissociative Fugue | Y | N |
| Somatic Symptom and Related Disorders | F44.4 | Conversion Disorder (Functional Neurological Symptom Disorder) with Abnormal Movement | Y | N |
| Somatic Symptom and Related Disorders | F44.4 | Conversion Disorder (Functional Neurological Symptom Disorder) with Speech Symptom | Y | N |
| Somatic Symptom and Related Disorders | F44.4 | Conversion Disorder (Functional Neurological Symptom Disorder) with Swallowing Symptoms | Y | N |
| Somatic Symptom and Related Disorders | F44.4 | Conversion Disorder (Functional Neurological Symptom Disorder) with Weakness or Paralysis | Y | N |
| Somatic Symptom and Related Disorders | F44.4 | Conversion Disorder (Functional Neurological Symptom Disorder) - other physical impairment | Y | N |
| Somatic Symptom and Related Disorders | F44.5 | Conversion Disorder (Functional Neurological Symptom Disorder) with Attacks or Seizures | Y | N |
| Somatic Symptom and Related Disorders | F44.6 | Conversion Disorder (Functional Neurological Symptom Disorder) with Anesthesia or Sensory Loss | Y | N |
| Somatic Symptom and Related Disorders | F44.6 | Conversion Disorder (Functional Neurological Symptom Disorder) with Special Sensory Symptom | Y | N |
| Somatic Symptom and Related Disorders | F44.6 | Conversion Disorder (Functional Neurological Symptom Disorder) - other sensory impairment | Y | N |
| Somatic Symptom and Related Disorders | F44.7 | Conversion Disorder (Functional Neurological Symptom Disorder) with Mixed Symptoms | Y | N |
| Dissociative Disorders | F44.81 | Dissociative Identity Disorder | Y | N |
| Dissociative Disorders | F44.89 | Other Specified Dissociative Disorder | Y | N |
| Dissociative Disorders | F44.9 | Unspecified Dissociative Disorder | Y | N |
| Somatic Symptom and Related Disorders | F45.1 | Somatic Symptom Disorder | Y | N |
| Somatic Symptom and Related Disorders | F45.21 | Illness Anxiety Disorder | Y | N |
| Obsessive-Compulsive and Related Disorders | F45.22 | Body Dysmorphic Disorder | Y | N |
| Somatic Symptom and Related Disorders | F45.8 | Other Specified Somatic Symptom and Related Disorder | Y | N |
| Somatic Symptom and Related Disorders | F45.9 | Unspecified Somatic Symptom and Related Disorder | Y | N |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Dissociative Disorders | F48.1 | Depersonalization/Derealization Disorder | Y | N |
| Feeding and Eating Disorders - Anorexia & Bulimia | F50.01 | Anorexia Nervosa - Restricting Type | E | N |
| Feeding and Eating Disorders - Anorexia & Bulimia | F50.02 | Anorexia Nervosa - Binge-eating/Purging Type | E | N |
| Feeding and Eating Disorders - Anorexia & Bulimia | F50.2 | Bulimia Nervosa | E | N |
| Feeding and Eating Disorders - Binge Eating | F50.8 | Binge-Eating Disorder | E | N |
| Feeding and Eating Disorders - Other | F50.8 | Pica in adults | E | N |
| Feeding and Eating Disorders - Other | F50.8 | Avoidant/Restrictive Food Intake Disorder | E | N |
| Feeding and Eating Disorders - Other | F50.8 | Other Specified Feeding or Eating Disorder | E | N |
| Feeding and Eating Disorders - Other | F50.8 | Feeding / Eating Disorder - other | E | N |
| Feeding and Eating Disorders - Other | F50.9 | Unspecified Feeding or Eating Disorder | E | N |
| Sleep-Wake Disorders | F51.01 | Insomnia Disorder | E | N |
| Sleep-Wake Disorders | F51.11 | Hypersomnolence Disorder | E | N |
| Sleep-Wake Disorders | F51.4 | Non-Rapid Eye Movement Sleep Arousal Disorders - Sleep Terrors | E | N |
| Sleep-Wake Disorders | F51.5 | Nightmare Disorder | E | N |
| Somatic Symptom and Related Disorders | F54 | Psychological Factors Affecting Other Medical Conditions | E | N |
| Personality Disorders | F60.0 | Paranoid Personality Disorder | Y | N |
| Personality Disorders | F60.1 | Schizoid Personality Disorder | Y | N |
| Disruptive, Impulse-Control, and Conduct Disorders | F60.2 | Antisocial Personality Disorder | Y | N |
| Personality Disorders | F60.2 | Antisocial Personality Disorder | Y | N |
| Personality Disorders | F60.3 | Borderline Personality Disorder | Y | N |
| Personality Disorders | F60.4 | Histrionic Personality Disorder | Y | N |
| Personality Disorders | F60.6 | Avoidant Personality Disorder | Y | N |
| Personality Disorders | F60.7 | Dependent Personality Disorder | Y | N |
| Personality Disorders | F60.81 | Narcissistic Personality Disorder | Y | N |
| Personality Disorders | F60.89 | Other Specified Personality Disorder | Y | N |
| Personality Disorders | F60.9 | Unspecified Personality Disorder | Y | N |
| Combined Other Substance Disorders | F63.0 | Gambling Disorder | E | N |
| Disruptive, Impulse-Control, and Conduct Disorders | F63.1 | Pyromania | Y | N |
| Disruptive, Impulse-Control, and Conduct Disorders | F63.2 | Kleptomania | Y | N |
| Obsessive-Compulsive and Related Disorders | F63.3 | Trichotillomania (Hair-Pulling Disorder) | Y | N |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Disruptive, Impulse-Control, and Conduct Disorders | F63.81 | Intermittent Explosive Disorder | Y | N |
| Gender Dysphoria | F64.1 | Gender Dysphoria in Adolescents and Adults | Y | N |
| Gender Dysphoria | F64.8 | Other Specified Gender Dysphoria | Y | N |
| Gender Dysphoria | F64.9 | Unspecified Gender Dysphoria | Y | N |
| Paraphilic Disorders | F65.1 | Transvestic Disorder | E | N |
| Paraphilic Disorders | F65.4 | Pedophilic Disorder | E | N |
| Paraphilic Disorders | F65.52 | Sexual Sadism Disorder | E | N |
| Somatic Symptom and Related Disorders | F68.10 | Factitious Disorder | E | N |
| Intellectual Disabilities | F70 | Intellectual Disability (Intellectual Developmental Disorder) - Mild | N | N |
| Intellectual Disabilities | F71 | Intellectual Disability (Intellectual Developmental Disorder) - Moderate | N | N |
| Intellectual Disabilities | F72 | Intellectual Disability (Intellectual Developmental Disorder) - Severe | N | N |
| Intellectual Disabilities | F73 | Intellectual Disability (Intellectual Developmental Disorder) - Profound | N | N |
| Intellectual Disabilities | F78.A | Other genetic related intellectual disabilities | N | N |
| Intellectual Disabilities | F78.A1 | SYNGAP1-related intellectual disability | N | N |
| Intellectual Disabilities | F78.A9 | Other genetic related intellectual disability | N | N |
| Intellectual Disabilities | F79 | Unspecified Intellectual Disability (Intellectual Developmental Disorder) | N | N |
| Autism Spectrum Disorder | F84.0 | Autism Spectrum Disorder | N | N |
| Intellectual Disabilities | F88 | Global Developmental Delay | N | N |
| Other Neurodevelopmental Disorders | F88 | Other Specified Neurodevelopmental Disorder | N | N |
| Other Neurodevelopmental Disorders | F88 | Intellectual Disabilities, Neurodevelopmental Disorder - other | N | N |
| Other Neurodevelopmental Disorders | F89 | Unspecified Neurodevelopmental Disorder | N | N |
| Trauma- and Stressor-Related Disorders | F90.0 | Attention-Deficit/Hyperactivity Disorder Predominantly inattentive presentation | Y | N |
| Trauma- and Stressor-Related Disorders | F90.1 | Attention-Deficit/Hyperactivity Disorder Predominantly hyperactive/impulsive presentation | Y | N |
| Trauma- and Stressor-Related Disorders | F90.2 | Attention-Deficit/Hyperactivity Disorder Combined Presentation | Y | N |
| Trauma- and Stressor-Related Disorders | F90.8 | Other Specified Attention-Deficit/Hyperactivity Disorder | Y | N |
| Trauma- and Stressor-Related Disorders | F90.9 | Unspecified Attention-Deficit/Hyperactivity Disorder | Y | N |
| Disruptive, Impulse-Control, and Conduct Disorders | F91.1 | Conduct Disorder - Childhood-onset Type | Y | N |
| Disruptive, Impulse-Control, and Conduct Disorders | F91.2 | Conduct Disorder - Adolescent-onset Type | Y | N |
| Disruptive, Impulse-Control, and Conduct Disorders | F91.3 | Oppositional Defiant Disorder | Y | N |

| Diagnostic Category | ICD-10 DX Code | Diagnostic Description ICD-10 | BH MH | BH SU |
|---|---|---|---|---|
| Disruptive, Impulse-Control, and Conduct Disorders | F91.8 | Other Specified Disruptive, Impulse-Control, and Conduct Disorder | Y | N |
| Disruptive, Impulse-Control, and Conduct Disorders | F91.9 | Conduct Disorder - Unspecified Onset | Y | N |
| Disruptive, Impulse-Control, and Conduct Disorders | F91.9 | Unspecified Disruptive, Impulse-Control, and Conduct Disorder | Y | N |
| Disruptive, Impulse-Control, and Conduct Disorders | F91.9 | Disruptive, Impulse-Control, and Conduct Disorders - other | Y | N |
| Anxiety Disorders | F93.0 | Separation Anxiety Disorder | Y | N |
| Disruptive, Impulse-Control, and Conduct Disorders | F94.0 | Selective Mutism | Y | N |
| Trauma- and Stressor-Related Disorders | F94.1 | Reactive Attachment Disorder | Y | N |
| Trauma- and Stressor-Related Disorders | F94.2 | Disinhibited Social Engagement Disorder | Y | N |
| Elimination Disorders | F98.0 | Enuresis | E | N |
| Elimination Disorders | F98.1 | Encopresis | E | N |
| Feeding and Eating Disorders - Other | F98.21 | Rumination Disorder | E | N |
| Feeding and Eating Disorders - Other | F98.3 | Pica in Children | E | N |
| Other Mental Disorders | F99 | Other Specified Mental Disorder | E | N |
| Other Mental Disorders | F99 | Unspecified Mental Disorder | E | N |
| Other Mental Disorders | F99 | Other Specified/Unspecified Mental Disorder | E | N |
| Sleep-Wake Disorders | G47.00 | Unspecified Insomnia Disorder | E | N |
| Sleep-Wake Disorders | G47.09 | Other Specified Insomnia Disorder | E | N |
| Sleep-Wake Disorders | G47.10 | Unspecified Hypersomnolence Disorder | E | N |
| Sleep-Wake Disorders | G47.19 | Other Specified Hypersomnolence Disorder | E | N |
| Sleep-Wake Disorders | G47.20 | Circadian Rhythm Sleep-Wake Disorders - Unspecified Type | E | N |
| Sleep-Wake Disorders | G47.21 | Circadian Rhythm Sleep-Wake Disorders - Delayed Sleep Phase Type | E | N |
| Sleep-Wake Disorders | G47.22 | Circadian Rhythm Sleep-Wake Disorders - Advanced Sleep Phase Type | E | N |
| Sleep-Wake Disorders | G47.23 | Circadian Rhythm Sleep-Wake Disorders - Irregular Sleep-wake Type | E | N |
| Sleep-Wake Disorders | G47.24 | Circadian Rhythm Sleep-Wake Disorders Non-24-hour Sleep-wake Type | E | N |
| Sleep-Wake Disorders | G47.26 | Circadian Rhythm Sleep-Wake Disorders -Shift Work Type | E | N |
| Obsessive-Compulsive and Related Disorders | L98.1 | Excoriation (Skin-Picking) Disorder | Y | N |

## APPENDIX C:  CLAIMS DIAGNOSIS

Specific to the claims that are submitted to the ASO, the following are allowable claims diagnoses. A list of valid ICD-10 diagnosis codes for claim submission are outlined below. Providers will note that there are additional codes that are acceptable for claims that are not valid codes for authorization purposes. This flexibility was included as providers may not know all possible diagnoses at the point in time of authorization. There may be diagnoses being treated that are appropriate for billing that are not on the authorization.

Additionally, this list is not all inclusive of diagnosis descriptions. For instance, F06.1 is listed here as *Catatonic disorder due to known physiological condition*. F06.1 also represents several other descriptions such as *Catatonic Disorder Due to Another Medical Condition*. The provider is allowed to submit claims for the gamut of descriptions associated with that single numerical ICD-CM-10 if it is listed here:

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F983 | Pica of infancy and childhood | Pica of infancy and childhood |
| F630 | Pathological gambling | Pathological gambling |
| F060 | Psychotic disorder w hallucin due to known physiol condition | Psychotic disorder with hallucinations due to known physiological condition |
| F061 | Catatonic disorder due to known physiological condition | Catatonic disorder due to known physiological condition |
| F062 | Psychotic disorder w delusions due to known physiol cond | Psychotic disorder with delusions due to known physiological condition |
| F0630 | Mood disorder due to known physiological condition, unsp | Mood disorder due to known physiological condition, unspecified |
| F0631 | Mood disorder due to known physiol cond w depressv features | Mood disorder due to known physiological condition with depressive features |
| F0632 | Mood disord d/t physiol cond w major depressive-like epsd | Mood disorder due to known physiological condition with major depressive-like episode |
| F0633 | Mood disorder due to known physiol cond w manic features | Mood disorder due to known physiological condition with manic features |
| F0634 | Mood disorder due to known physiol cond w mixed features | Mood disorder due to known physiological condition with mixed features |
| F064 | Anxiety disorder due to known physiological condition | Anxiety disorder due to known physiological condition |
| F070 | Personality change due to known physiological condition | Personality change due to known physiological condition |
| F079 | Unsp personality & behavrl disord due to known physiol cond | Unspecified personality and behavioral disorder due to known physiological condition |
| F09 | Unsp mental disorder due to known physiological condition | Unspecified mental disorder due to known physiological condition |
| F1010 | Alcohol abuse, uncomplicated | Alcohol abuse, uncomplicated |
| F10120 | Alcohol abuse with intoxication, uncomplicated | Alcohol abuse with intoxication, uncomplicated |
| F10121 | Alcohol abuse with intoxication delirium | Alcohol abuse with intoxication delirium |
| F10129 | Alcohol abuse with intoxication, unspecified | Alcohol abuse with intoxication, unspecified |
| F10130 | Alcohol abuse with withdrawal, uncomplicated | Alcohol abuse with withdrawal, uncomplicated |
| F10131 | Alcohol abuse with withdrawal delirium | Alcohol abuse with withdrawal delirium |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F10132 | Alcohol abuse with withdrawal with perceptual disturbance | Alcohol abuse with withdrawal with perceptual disturbance |
| F10139 | Alcohol abuse with withdrawal, unspecified | Alcohol abuse with withdrawal, unspecified |
| F1014 | Alcohol abuse with alcohol-induced mood disorder | Alcohol abuse with alcohol-induced mood disorder |
| F10150 | Alcohol abuse w alcoh-induce psychotic disorder w delusions | Alcohol abuse with alcohol-induced psychotic disorder with delusions |
| F10151 | Alcohol abuse w alcoh-induce psychotic disorder w hallucin | Alcohol abuse with alcohol-induced psychotic disorder with hallucinations |
| F10159 | Alcohol abuse with alcohol-induced psychotic disorder, unsp | Alcohol abuse with alcohol-induced psychotic disorder, unspecified |
| F10180 | Alcohol abuse with alcohol-induced anxiety disorder | Alcohol abuse with alcohol-induced anxiety disorder |
| F10181 | Alcohol abuse with alcohol-induced sexual dysfunction | Alcohol abuse with alcohol-induced sexual dysfunction |
| F10182 | Alcohol abuse with alcohol-induced sleep disorder | Alcohol abuse with alcohol-induced sleep disorder |
| F10188 | Alcohol abuse with other alcohol-induced disorder | Alcohol abuse with other alcohol-induced disorder |
| F1019 | Alcohol abuse with unspecified alcohol-induced disorder | Alcohol abuse with unspecified alcohol-induced disorder |
| F1020 | Alcohol dependence, uncomplicated | Alcohol dependence, uncomplicated |
| F1021 | Alcohol dependence, in remission | Alcohol dependence, in remission |
| F10220 | Alcohol dependence with intoxication, uncomplicated | Alcohol dependence with intoxication, uncomplicated |
| F10221 | Alcohol dependence with intoxication delirium | Alcohol dependence with intoxication delirium |
| F10229 | Alcohol dependence with intoxication, unspecified | Alcohol dependence with intoxication, unspecified |
| F10230 | Alcohol dependence with withdrawal, uncomplicated | Alcohol dependence with withdrawal, uncomplicated |
| F10231 | Alcohol dependence with withdrawal delirium | Alcohol dependence with withdrawal delirium |
| F10232 | Alcohol dependence w withdrawal with perceptual disturbance | Alcohol dependence with withdrawal with perceptual disturbance |
| F10239 | Alcohol dependence with withdrawal, unspecified | Alcohol dependence with withdrawal, unspecified |
| F1024 | Alcohol dependence with alcohol-induced mood disorder | Alcohol dependence with alcohol-induced mood disorder |
| F10250 | Alcohol depend w alcoh-induce psychotic disorder w delusions | Alcohol dependence with alcohol-induced psychotic disorder with delusions |
| F10251 | Alcohol depend w alcoh-induce psychotic disorder w hallucin | Alcohol dependence with alcohol-induced psychotic disorder with hallucinations |
| F10259 | Alcohol dependence w alcoh-induce psychotic disorder, unsp | Alcohol dependence with alcohol-induced psychotic disorder, unspecified |
| F1026 | Alcohol depend w alcoh-induce persisting amnestic disorder | Alcohol dependence with alcohol-induced persisting amnestic disorder |
| F1027 | Alcohol dependence with alcohol-induced persisting dementia | Alcohol dependence with alcohol-induced persisting dementia |
| F10280 | Alcohol dependence with alcohol-induced anxiety disorder | Alcohol dependence with alcohol-induced anxiety disorder |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F10281 | Alcohol dependence with alcohol-induced sexual dysfunction | Alcohol dependence with alcohol-induced sexual dysfunction |
| F10282 | Alcohol dependence with alcohol-induced sleep disorder | Alcohol dependence with alcohol-induced sleep disorder |
| F10288 | Alcohol dependence with other alcohol-induced disorder | Alcohol dependence with other alcohol-induced disorder |
| F1029 | Alcohol dependence with unspecified alcohol-induced disorder | Alcohol dependence with unspecified alcohol-induced disorder |
| F10920 | Alcohol use, unspecified with intoxication, uncomplicated | Alcohol use, unspecified with intoxication, uncomplicated |
| F10921 | Alcohol use, unspecified with intoxication delirium | Alcohol use, unspecified with intoxication delirium |
| F10929 | Alcohol use, unspecified with intoxication, unspecified | Alcohol use, unspecified with intoxication, unspecified |
| F10930 | Alcohol use, unspecified with withdrawal, uncomplicated | Alcohol use, unspecified with withdrawal, uncomplicated |
| F10931 | Alcohol use, unspecified with withdrawal delirium | Alcohol use, unspecified with withdrawal delirium |
| F10932 | Alcohol use, unspecified with withdrawal with perceptual disturbance | Alcohol use, unspecified with withdrawal with perceptual disturbance |
| F10939 | Alcohol use, unspecified with withdrawal, unspecified | Alcohol use, unspecified with withdrawal, unspecified |
| F1094 | Alcohol use, unspecified with alcohol-induced mood disorder | Alcohol use, unspecified with alcohol-induced mood disorder |
| F10950 | Alcohol use, unsp w alcoh-induce psych disorder w delusions | Alcohol use, unspecified with alcohol-induced psychotic disorder with delusions |
| F10951 | Alcohol use, unsp w alcoh-induce psych disorder w hallucin | Alcohol use, unspecified with alcohol-induced psychotic disorder with hallucinations |
| F10959 | Alcohol use, unsp w alcohol-induced psychotic disorder, unsp | Alcohol use, unspecified with alcohol-induced psychotic disorder, unspecified |
| F1096 | Alcohol use, unsp w alcoh-induce persist amnestic disorder | Alcohol use, unspecified with alcohol-induced persisting amnestic disorder |
| F1097 | Alcohol use, unsp with alcohol-induced persisting dementia | Alcohol use, unspecified with alcohol-induced persisting dementia |
| F10980 | Alcohol use, unsp with alcohol-induced anxiety disorder | Alcohol use, unspecified with alcohol-induced anxiety disorder |
| F10981 | Alcohol use, unsp with alcohol-induced sexual dysfunction | Alcohol use, unspecified with alcohol-induced sexual dysfunction |
| F10982 | Alcohol use, unspecified with alcohol-induced sleep disorder | Alcohol use, unspecified with alcohol-induced sleep disorder |
| F10988 | Alcohol use, unspecified with other alcohol-induced disorder | Alcohol use, unspecified with other alcohol-induced disorder |
| F1099 | Alcohol use, unsp with unspecified alcohol-induced disorder | Alcohol use, unspecified with unspecified alcohol-induced disorder |
| F1110 | Opioid abuse, uncomplicated | Opioid abuse, uncomplicated |
| F11120 | Opioid abuse with intoxication, uncomplicated | Opioid abuse with intoxication, uncomplicated |
| F11121 | Opioid abuse with intoxication delirium | Opioid abuse with intoxication delirium |
| F11122 | Opioid abuse with intoxication with perceptual disturbance | Opioid abuse with intoxication with perceptual disturbance |
| F11129 | Opioid abuse with intoxication, unspecified | Opioid abuse with intoxication, unspecified |
| F1113 | Opioid abuse with withdrawal | Opioid abuse with withdrawal |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F1114 | Opioid abuse with opioid-induced mood disorder | Opioid abuse with opioid-induced mood disorder |
| F11150 | Opioid abuse w opioid-induced psychotic disorder w delusions | Opioid abuse with opioid-induced psychotic disorder with delusions |
| F11151 | Opioid abuse w opioid-induced psychotic disorder w hallucin | Opioid abuse with opioid-induced psychotic disorder with hallucinations |
| F11159 | Opioid abuse with opioid-induced psychotic disorder, unsp | Opioid abuse with opioid-induced psychotic disorder, unspecified |
| F11181 | Opioid abuse with opioid-induced sexual dysfunction | Opioid abuse with opioid-induced sexual dysfunction |
| F11182 | Opioid abuse with opioid-induced sleep disorder | Opioid abuse with opioid-induced sleep disorder |
| F11188 | Opioid abuse with other opioid-induced disorder | Opioid abuse with other opioid-induced disorder |
| F1119 | Opioid abuse with unspecified opioid-induced disorder | Opioid abuse with unspecified opioid-induced disorder |
| F1120 | Opioid dependence, uncomplicated | Opioid dependence, uncomplicated |
| F1121 | Opioid dependence, in remission | Opioid dependence, in remission |
| F11220 | Opioid dependence with intoxication, uncomplicated | Opioid dependence with intoxication, uncomplicated |
| F11221 | Opioid dependence with intoxication delirium | Opioid dependence with intoxication delirium |
| F11222 | Opioid dependence w intoxication with perceptual disturbance | Opioid dependence with intoxication with perceptual disturbance |
| F11229 | Opioid dependence with intoxication, unspecified | Opioid dependence with intoxication, unspecified |
| F1123 | Opioid dependence with withdrawal | Opioid dependence with withdrawal |
| F1124 | Opioid dependence with opioid-induced mood disorder | Opioid dependence with opioid-induced mood disorder |
| F11250 | Opioid depend w opioid-induc psychotic disorder w delusions | Opioid dependence with opioid-induced psychotic disorder with delusions |
| F11251 | Opioid depend w opioid-induc psychotic disorder w hallucin | Opioid dependence with opioid-induced psychotic disorder with hallucinations |
| F11259 | Opioid dependence w opioid-induced psychotic disorder, unsp | Opioid dependence with opioid-induced psychotic disorder, unspecified |
| F11281 | Opioid dependence with opioid-induced sexual dysfunction | Opioid dependence with opioid-induced sexual dysfunction |
| F11282 | Opioid dependence with opioid-induced sleep disorder | Opioid dependence with opioid-induced sleep disorder |
| F11288 | Opioid dependence with other opioid-induced disorder | Opioid dependence with other opioid-induced disorder |
| F1129 | Opioid dependence with unspecified opioid-induced disorder | Opioid dependence with unspecified opioid-induced disorder |
| F1190 | Opioid use, unspecified, uncomplicated | Opioid use, unspecified, uncomplicated |
| F11920 | Opioid use, unspecified with intoxication, uncomplicated | Opioid use, unspecified with intoxication, uncomplicated |
| F11921 | Opioid use, unspecified with intoxication delirium | Opioid use, unspecified with intoxication delirium |
| F11922 | Opioid use, unsp w intoxication with perceptual disturbance | Opioid use, unspecified with intoxication with perceptual disturbance |
| F11929 | Opioid use, unspecified with intoxication, unspecified | Opioid use, unspecified with intoxication, unspecified |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F1193 | Opioid use, unspecified with withdrawal | Opioid use, unspecified with withdrawal |
| F1194 | Opioid use, unspecified with opioid-induced mood disorder | Opioid use, unspecified with opioid-induced mood disorder |
| F11950 | Opioid use, unsp w opioid-induc psych disorder w delusions | Opioid use, unspecified with opioid-induced psychotic disorder with delusions |
| F11951 | Opioid use, unsp w opioid-induc psych disorder w hallucin | Opioid use, unspecified with opioid-induced psychotic disorder with hallucinations |
| F11959 | Opioid use, unsp w opioid-induced psychotic disorder, unsp | Opioid use, unspecified with opioid-induced psychotic disorder, unspecified |
| F11981 | Opioid use, unsp with opioid-induced sexual dysfunction | Opioid use, unspecified with opioid-induced sexual dysfunction |
| F11982 | Opioid use, unspecified with opioid-induced sleep disorder | Opioid use, unspecified with opioid-induced sleep disorder |
| F11988 | Opioid use, unspecified with other opioid-induced disorder | Opioid use, unspecified with other opioid-induced disorder |
| F1199 | Opioid use, unsp with unspecified opioid-induced disorder | Opioid use, unspecified with unspecified opioid-induced disorder |
| F1210 | Cannabis abuse, uncomplicated | Cannabis abuse, uncomplicated |
| F12120 | Cannabis abuse with intoxication, uncomplicated | Cannabis abuse with intoxication, uncomplicated |
| F12121 | Cannabis abuse with intoxication delirium | Cannabis abuse with intoxication delirium |
| F12122 | Cannabis abuse with intoxication with perceptual disturbance | Cannabis abuse with intoxication with perceptual disturbance |
| F12129 | Cannabis abuse with intoxication, unspecified | Cannabis abuse with intoxication, unspecified |
| F1213 | Cannabis abuse with withdrawal | Cannabis abuse with withdrawal |
| F12150 | Cannabis abuse with psychotic disorder with delusions | Cannabis abuse with psychotic disorder with delusions |
| F12151 | Cannabis abuse with psychotic disorder with hallucinations | Cannabis abuse with psychotic disorder with hallucinations |
| F12159 | Cannabis abuse with psychotic disorder, unspecified | Cannabis abuse with psychotic disorder, unspecified |
| F12180 | Cannabis abuse with cannabis-induced anxiety disorder | Cannabis abuse with cannabis-induced anxiety disorder |
| F12188 | Cannabis abuse with other cannabis-induced disorder | Cannabis abuse with other cannabis-induced disorder |
| F1219 | Cannabis abuse with unspecified cannabis-induced disorder | Cannabis abuse with unspecified cannabis-induced disorder |
| F1220 | Cannabis dependence, uncomplicated | Cannabis dependence, uncomplicated |
| F1221 | Cannabis dependence, in remission | Cannabis dependence, in remission |
| F12220 | Cannabis dependence with intoxication, uncomplicated | Cannabis dependence with intoxication, uncomplicated |
| F12221 | Cannabis dependence with intoxication delirium | Cannabis dependence with intoxication delirium |
| F12222 | Cannabis dependence w intoxication w perceptual disturbance | Cannabis dependence with intoxication with perceptual disturbance |
| F12229 | Cannabis dependence with intoxication, unspecified | Cannabis dependence with intoxication, unspecified |
| F12250 | Cannabis dependence with psychotic disorder with delusions | Cannabis dependence with psychotic disorder with delusions |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F12251 | Cannabis dependence w psychotic disorder with hallucinations | Cannabis dependence with psychotic disorder with hallucinations |
| F12259 | Cannabis dependence with psychotic disorder, unspecified | Cannabis dependence with psychotic disorder, unspecified |
| F12280 | Cannabis dependence with cannabis-induced anxiety disorder | Cannabis dependence with cannabis-induced anxiety disorder |
| F12288 | Cannabis dependence with other cannabis-induced disorder | Cannabis dependence with other cannabis-induced disorder |
| F1229 | Cannabis dependence with unsp cannabis-induced disorder | Cannabis dependence with unspecified cannabis-induced disorder |
| F1290 | Cannabis use, unspecified, uncomplicated | Cannabis use, unspecified, uncomplicated |
| F12920 | Cannabis use, unspecified with intoxication, uncomplicated | Cannabis use, unspecified with intoxication, uncomplicated |
| F12921 | Cannabis use, unspecified with intoxication delirium | Cannabis use, unspecified with intoxication delirium |
| F12922 | Cannabis use, unsp w intoxication w perceptual disturbance | Cannabis use, unspecified with intoxication with perceptual disturbance |
| F12929 | Cannabis use, unspecified with intoxication, unspecified | Cannabis use, unspecified with intoxication, unspecified |
| F12950 | Cannabis use, unsp with psychotic disorder with delusions | Cannabis use, unspecified with psychotic disorder with delusions |
| F12951 | Cannabis use, unsp w psychotic disorder with hallucinations | Cannabis use, unspecified with psychotic disorder with hallucinations |
| F12959 | Cannabis use, unsp with psychotic disorder, unspecified | Cannabis use, unspecified with psychotic disorder, unspecified |
| F12980 | Cannabis use, unspecified with anxiety disorder | Cannabis use, unspecified with anxiety disorder |
| F12988 | Cannabis use, unsp with other cannabis-induced disorder | Cannabis use, unspecified with other cannabis-induced disorder |
| F1299 | Cannabis use, unsp with unsp cannabis-induced disorder | Cannabis use, unspecified with unspecified cannabis-induced disorder |
| F1310 | Sedative, hypnotic or anxiolytic abuse, uncomplicated | Sedative, hypnotic or anxiolytic abuse, uncomplicated |
| F13120 | Sedatv/hyp/anxiolytc abuse w intoxication, uncomplicated | Sedative, hypnotic or anxiolytic abuse with intoxication, uncomplicated |
| F13121 | Sedatv/hyp/anxiolytc abuse w intoxication delirium | Sedative, hypnotic or anxiolytic abuse with intoxication delirium |
| F13129 | Sedative, hypnotic or anxiolytic abuse w intoxication, unsp | Sedative, hypnotic or anxiolytic abuse with intoxication, unspecified |
| F13130 | Sedative, hypnotic or anxiolytic abuse with withdrawal, uncomplicated | Sedative, hypnotic or anxiolytic abuse with withdrawal, uncomplicated |
| F13131 | Sedative, hypnotic or anxiolytic abuse with withdrawal delirium | Sedative, hypnotic or anxiolytic abuse with withdrawal delirium |
| F13132 | Sedative, hypnotic or anxiolytic abuse with withdrawal with perceptual disturbance | Sedative, hypnotic or anxiolytic abuse with withdrawal with perceptual disturbance |
| F13139 | Sedative, hypnotic or anxiolytic abuse with withdrawal, unspecified | Sedative, hypnotic or anxiolytic abuse with withdrawal, unspecified |
| F1314 | Sedative, hypnotic or anxiolytic abuse w mood disorder | Sedative, hypnotic or anxiolytic abuse with sedative, hypnotic or anxiolytic-induced mood disorder |
| F13150 | Sedatv/hyp/anxiolytc abuse w psychotic disorder w delusions | Sedative, hypnotic or anxiolytic abuse with sedative, hypnotic or anxiolytic-induced psychotic disorder with delusions |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F13151 | Sedatv/hyp/anxiolytc abuse w psychotic disorder w hallucin | Sedative, hypnotic or anxiolytic abuse with sedative, hypnotic or anxiolytic-induced psychotic disorder with hallucinations |
| F13159 | Sedatv/hyp/anxiolytc abuse w psychotic disorder, unsp | Sedative, hypnotic or anxiolytic abuse with sedative, hypnotic or anxiolytic-induced psychotic disorder, unspecified |
| F13180 | Sedative, hypnotic or anxiolytic abuse w anxiety disorder | Sedative, hypnotic or anxiolytic abuse with sedative, hypnotic or anxiolytic-induced anxiety disorder |
| F13181 | Sedative, hypnotic or anxiolytic abuse w sexual dysfunction | Sedative, hypnotic or anxiolytic abuse with sedative, hypnotic or anxiolytic-induced sexual dysfunction |
| F13182 | Sedative, hypnotic or anxiolytic abuse w sleep disorder | Sedative, hypnotic or anxiolytic abuse with sedative, hypnotic or anxiolytic-induced sleep disorder |
| F13188 | Sedative, hypnotic or anxiolytic abuse w oth disorder | Sedative, hypnotic or anxiolytic abuse with other sedative, hypnotic or anxiolytic-induced disorder |
| F1319 | Sedative, hypnotic or anxiolytic abuse w unsp disorder | Sedative, hypnotic or anxiolytic abuse with unspecified sedative, hypnotic or anxiolytic-induced disorder |
| F1320 | Sedative, hypnotic or anxiolytic dependence, uncomplicated | Sedative, hypnotic or anxiolytic dependence, uncomplicated |
| F1321 | Sedative, hypnotic or anxiolytic dependence, in remission | Sedative, hypnotic or anxiolytic dependence, in remission |
| F13220 | Sedatv/hyp/anxiolytc dependence w intoxication, uncomp | Sedative, hypnotic or anxiolytic dependence with intoxication, uncomplicated |
| F13221 | Sedatv/hyp/anxiolytc dependence w intoxication delirium | Sedative, hypnotic or anxiolytic dependence with intoxication delirium |
| F13229 | Sedatv/hyp/anxiolytc dependence w intoxication, unsp | Sedative, hypnotic or anxiolytic dependence with intoxication, unspecified |
| F13230 | Sedatv/hyp/anxiolytc dependence w withdrawal, uncomplicated | Sedative, hypnotic or anxiolytic dependence with withdrawal, uncomplicated |
| F13231 | Sedatv/hyp/anxiolytc dependence w withdrawal delirium | Sedative, hypnotic or anxiolytic dependence with withdrawal delirium |
| F13232 | Sedatv/hyp/anxiolytc depend w w/drawal w perceptual disturb | Sedative, hypnotic or anxiolytic dependence with withdrawal with perceptual disturbance |
| F13239 | Sedatv/hyp/anxiolytc dependence w withdrawal, unsp | Sedative, hypnotic or anxiolytic dependence with withdrawal, unspecified |
| F1324 | Sedative, hypnotic or anxiolytic dependence w mood disorder | Sedative, hypnotic or anxiolytic dependence with sedative, hypnotic or anxiolytic-induced mood disorder |
| F13250 | Sedatv/hyp/anxiolytc depend w psychotic disorder w delusions | Sedative, hypnotic or anxiolytic dependence with sedative, hypnotic or anxiolytic-induced psychotic disorder with delusions |
| F13251 | Sedatv/hyp/anxiolytc depend w psychotic disorder w hallucin | Sedative, hypnotic or anxiolytic dependence with sedative, hypnotic or anxiolytic-induced psychotic disorder with hallucinations |
| F13259 | Sedatv/hyp/anxiolytc dependence w psychotic disorder, unsp | Sedative, hypnotic or anxiolytic dependence with sedative, hypnotic or anxiolytic-induced psychotic disorder, unspecified |
| F1326 | Sedatv/hyp/anxiolytc depend w persisting amnestic disorder | Sedative, hypnotic or anxiolytic dependence with sedative, hypnotic or anxiolytic-induced persisting amnestic disorder |
| F1327 | Sedatv/hyp/anxiolytc dependence w persisting dementia | Sedative, hypnotic or anxiolytic dependence with sedative, hypnotic or anxiolytic-induced persisting dementia |
| F13280 | Sedatv/hyp/anxiolytc dependence w anxiety disorder | Sedative, hypnotic or anxiolytic dependence with sedative, hypnotic or anxiolytic-induced anxiety disorder |
| F13281 | Sedatv/hyp/anxiolytc dependence w sexual dysfunction | Sedative, hypnotic or anxiolytic dependence with sedative, hypnotic or anxiolytic-induced sexual dysfunction |
| F13282 | Sedative, hypnotic or anxiolytic dependence w sleep disorder | Sedative, hypnotic or anxiolytic dependence with sedative, hypnotic or anxiolytic-induced sleep disorder |
| F13288 | Sedative, hypnotic or anxiolytic dependence w oth disorder | Sedative, hypnotic or anxiolytic dependence with other sedative, hypnotic or anxiolytic-induced disorder |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F1329 | Sedative, hypnotic or anxiolytic dependence w unsp disorder | Sedative, hypnotic or anxiolytic dependence with unspecified sedative, hypnotic or anxiolytic-induced disorder |
| F1390 | Sedative, hypnotic, or anxiolytic use, unsp, uncomplicated | Sedative, hypnotic, or anxiolytic use, unspecified, uncomplicated |
| F13920 | Sedatv/hyp/anxiolytc use, unsp w intoxication, uncomplicated | Sedative, hypnotic or anxiolytic use, unspecified with intoxication, uncomplicated |
| F13921 | Sedatv/hyp/anxiolytc use, unsp w intoxication delirium | Sedative, hypnotic or anxiolytic use, unspecified with intoxication delirium |
| F13929 | Sedatv/hyp/anxiolytc use, unsp w intoxication, unsp | Sedative, hypnotic or anxiolytic use, unspecified with intoxication, unspecified |
| F13930 | Sedatv/hyp/anxiolytc use, unsp w withdrawal, uncomplicated | Sedative, hypnotic or anxiolytic use, unspecified with withdrawal, uncomplicated |
| F13931 | Sedatv/hyp/anxiolytc use, unsp w withdrawal delirium | Sedative, hypnotic or anxiolytic use, unspecified with withdrawal delirium |
| F13932 | Sedatv/hyp/anxiolytc use, unsp w w/drawal w perceptl disturb | Sedative, hypnotic or anxiolytic use, unspecified with withdrawal with perceptual disturbances |
| F13939 | Sedatv/hyp/anxiolytc use, unsp w withdrawal, unsp | Sedative, hypnotic or anxiolytic use, unspecified with withdrawal, unspecified |
| F1394 | Sedative, hypnotic or anxiolytic use, unsp w mood disorder | Sedative, hypnotic or anxiolytic use, unspecified with sedative, hypnotic or anxiolytic-induced mood disorder |
| F13950 | Sedatv/hyp/anxiolytc use, unsp w psych disorder w delusions | Sedative, hypnotic or anxiolytic use, unspecified with sedative, hypnotic or anxiolytic-induced psychotic disorder with delusions |
| F13951 | Sedatv/hyp/anxiolytc use, unsp w psych disorder w hallucin | Sedative, hypnotic or anxiolytic use, unspecified with sedative, hypnotic or anxiolytic-induced psychotic disorder with hallucinations |
| F13959 | Sedatv/hyp/anxiolytc use, unsp w psychotic disorder, unsp | Sedative, hypnotic or anxiolytic use, unspecified with sedative, hypnotic or anxiolytic-induced psychotic disorder, unspecified |
| F1396 | Sedatv/hyp/anxiolytc use, unsp w persist amnestic disorder | Sedative, hypnotic or anxiolytic use, unspecified with sedative, hypnotic or anxiolytic-induced persisting amnestic disorder |
| F1397 | Sedatv/hyp/anxiolytc use, unsp w persisting dementia | Sedative, hypnotic or anxiolytic use, unspecified with sedative, hypnotic or anxiolytic-induced persisting dementia |
| F13980 | Sedatv/hyp/anxiolytc use, unsp w anxiety disorder | Sedative, hypnotic or anxiolytic use, unspecified with sedative, hypnotic or anxiolytic-induced anxiety disorder |
| F13981 | Sedatv/hyp/anxiolytc use, unsp w sexual dysfunction | Sedative, hypnotic or anxiolytic use, unspecified with sedative, hypnotic or anxiolytic-induced sexual dysfunction |
| F13982 | Sedative, hypnotic or anxiolytic use, unsp w sleep disorder | Sedative, hypnotic or anxiolytic use, unspecified with sedative, hypnotic or anxiolytic-induced sleep disorder |
| F13988 | Sedative, hypnotic or anxiolytic use, unsp w oth disorder | Sedative, hypnotic or anxiolytic use, unspecified with other sedative, hypnotic or anxiolytic-induced disorder |
| F1399 | Sedative, hypnotic or anxiolytic use, unsp w unsp disorder | Sedative, hypnotic or anxiolytic use, unspecified with unspecified sedative, hypnotic or anxiolytic-induced disorder |
| F1410 | Cocaine abuse, uncomplicated | Cocaine abuse, uncomplicated |
| F14120 | Cocaine abuse with intoxication, uncomplicated | Cocaine abuse with intoxication, uncomplicated |
| F14121 | Cocaine abuse with intoxication with delirium | Cocaine abuse with intoxication with delirium |
| F14122 | Cocaine abuse with intoxication with perceptual disturbance | Cocaine abuse with intoxication with perceptual disturbance |
| F14129 | Cocaine abuse with intoxication, unspecified | Cocaine abuse with intoxication, unspecified |
| F1413 | Cocaine abuse, unspecified with withdrawal | Cocaine abuse, unspecified with withdrawal |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F1414 | Cocaine abuse with cocaine-induced mood disorder | Cocaine abuse with cocaine-induced mood disorder |
| F14150 | Cocaine abuse w cocaine-induc psychotic disorder w delusions | Cocaine abuse with cocaine-induced psychotic disorder with delusions |
| F14151 | Cocaine abuse w cocaine-induc psychotic disorder w hallucin | Cocaine abuse with cocaine-induced psychotic disorder with hallucinations |
| F14159 | Cocaine abuse with cocaine-induced psychotic disorder, unsp | Cocaine abuse with cocaine-induced psychotic disorder, unspecified |
| F14180 | Cocaine abuse with cocaine-induced anxiety disorder | Cocaine abuse with cocaine-induced anxiety disorder |
| F14181 | Cocaine abuse with cocaine-induced sexual dysfunction | Cocaine abuse with cocaine-induced sexual dysfunction |
| F14182 | Cocaine abuse with cocaine-induced sleep disorder | Cocaine abuse with cocaine-induced sleep disorder |
| F14188 | Cocaine abuse with other cocaine-induced disorder | Cocaine abuse with other cocaine-induced disorder |
| F1419 | Cocaine abuse with unspecified cocaine-induced disorder | Cocaine abuse with unspecified cocaine-induced disorder |
| F1420 | Cocaine dependence, uncomplicated | Cocaine dependence, uncomplicated |
| F1421 | Cocaine dependence, in remission | Cocaine dependence, in remission |
| F14220 | Cocaine dependence with intoxication, uncomplicated | Cocaine dependence with intoxication, uncomplicated |
| F14221 | Cocaine dependence with intoxication delirium | Cocaine dependence with intoxication delirium |
| F14222 | Cocaine dependence w intoxication w perceptual disturbance | Cocaine dependence with intoxication with perceptual disturbance |
| F14229 | Cocaine dependence with intoxication, unspecified | Cocaine dependence with intoxication, unspecified |
| F1423 | Cocaine dependence with withdrawal | Cocaine dependence with withdrawal |
| F1424 | Cocaine dependence with cocaine-induced mood disorder | Cocaine dependence with cocaine-induced mood disorder |
| F14250 | Cocaine depend w cocaine-induc psych disorder w delusions | Cocaine dependence with cocaine-induced psychotic disorder with delusions |
| F14251 | Cocaine depend w cocaine-induc psychotic disorder w hallucin | Cocaine dependence with cocaine-induced psychotic disorder with hallucinations |
| F14259 | Cocaine dependence w cocaine-induc psychotic disorder, unsp | Cocaine dependence with cocaine-induced psychotic disorder, unspecified |
| F14280 | Cocaine dependence with cocaine-induced anxiety disorder | Cocaine dependence with cocaine-induced anxiety disorder |
| F14281 | Cocaine dependence with cocaine-induced sexual dysfunction | Cocaine dependence with cocaine-induced sexual dysfunction |
| F14282 | Cocaine dependence with cocaine-induced sleep disorder | Cocaine dependence with cocaine-induced sleep disorder |
| F14288 | Cocaine dependence with other cocaine-induced disorder | Cocaine dependence with other cocaine-induced disorder |
| F1429 | Cocaine dependence with unspecified cocaine-induced disorder | Cocaine dependence with unspecified cocaine-induced disorder |
| F1490 | Cocaine use, unspecified, uncomplicated | Cocaine use, unspecified, uncomplicated |
| F14920 | Cocaine use, unspecified with intoxication, uncomplicated | Cocaine use, unspecified with intoxication, uncomplicated |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F14921 | Cocaine use, unspecified with intoxication delirium | Cocaine use, unspecified with intoxication delirium |
| F14922 | Cocaine use, unsp w intoxication with perceptual disturbance | Cocaine use, unspecified with intoxication with perceptual disturbance |
| F14929 | Cocaine use, unspecified with intoxication, unspecified | Cocaine use, unspecified with intoxication, unspecified |
| F1493 | Cocaine use, unspecified with withdrawal | Cocaine use, unspecified with withdrawal |
| F1494 | Cocaine use, unspecified with cocaine-induced mood disorder | Cocaine use, unspecified with cocaine-induced mood disorder |
| F14950 | Cocaine use, unsp w cocaine-induc psych disorder w delusions | Cocaine use, unspecified with cocaine-induced psychotic disorder with delusions |
| F14951 | Cocaine use, unsp w cocaine-induc psych disorder w hallucin | Cocaine use, unspecified with cocaine-induced psychotic disorder with hallucinations |
| F14959 | Cocaine use, unsp w cocaine-induced psychotic disorder, unsp | Cocaine use, unspecified with cocaine-induced psychotic disorder, unspecified |
| F14980 | Cocaine use, unsp with cocaine-induced anxiety disorder | Cocaine use, unspecified with cocaine-induced anxiety disorder |
| F14981 | Cocaine use, unsp with cocaine-induced sexual dysfunction | Cocaine use, unspecified with cocaine-induced sexual dysfunction |
| F14982 | Cocaine use, unspecified with cocaine-induced sleep disorder | Cocaine use, unspecified with cocaine-induced sleep disorder |
| F14988 | Cocaine use, unspecified with other cocaine-induced disorder | Cocaine use, unspecified with other cocaine-induced disorder |
| F1499 | Cocaine use, unsp with unspecified cocaine-induced disorder | Cocaine use, unspecified with unspecified cocaine-induced disorder |
| F1510 | Other stimulant abuse, uncomplicated | Other stimulant abuse, uncomplicated |
| F15120 | Other stimulant abuse with intoxication, uncomplicated | Other stimulant abuse with intoxication, uncomplicated |
| F15121 | Other stimulant abuse with intoxication delirium | Other stimulant abuse with intoxication delirium |
| F15122 | Oth stimulant abuse w intoxication w perceptual disturbance | Other stimulant abuse with intoxication with perceptual disturbance |
| F15129 | Other stimulant abuse with intoxication, unspecified | Other stimulant abuse with intoxication, unspecified |
| F1513 | Other stimulant abuse with withdrawal | Other stimulant abuse with withdrawal |
| F1514 | Other stimulant abuse with stimulant-induced mood disorder | Other stimulant abuse with stimulant-induced mood disorder |
| F15150 | Oth stimulant abuse w stim-induce psych disorder w delusions | Other stimulant abuse with stimulant-induced psychotic disorder with delusions |
| F15151 | Oth stimulant abuse w stim-induce psych disorder w hallucin | Other stimulant abuse with stimulant-induced psychotic disorder with hallucinations |
| F15159 | Oth stimulant abuse w stim-induce psychotic disorder, unsp | Other stimulant abuse with stimulant-induced psychotic disorder, unspecified |
| F15180 | Oth stimulant abuse with stimulant-induced anxiety disorder | Other stimulant abuse with stimulant-induced anxiety disorder |
| F15181 | Oth stimulant abuse w stimulant-induced sexual dysfunction | Other stimulant abuse with stimulant-induced sexual dysfunction |
| F15182 | Other stimulant abuse with stimulant-induced sleep disorder | Other stimulant abuse with stimulant-induced sleep disorder |
| F15188 | Other stimulant abuse with other stimulant-induced disorder | Other stimulant abuse with other stimulant-induced disorder |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F1519 | Other stimulant abuse with unsp stimulant-induced disorder | Other stimulant abuse with unspecified stimulant-induced disorder |
| F1520 | Other stimulant dependence, uncomplicated | Other stimulant dependence, uncomplicated |
| F1521 | Other stimulant dependence, in remission | Other stimulant dependence, in remission |
| F15220 | Other stimulant dependence with intoxication, uncomplicated | Other stimulant dependence with intoxication, uncomplicated |
| F15221 | Other stimulant dependence with intoxication delirium | Other stimulant dependence with intoxication delirium |
| F15222 | Oth stimulant dependence w intox w perceptual disturbance | Other stimulant dependence with intoxication with perceptual disturbance |
| F15229 | Other stimulant dependence with intoxication, unspecified | Other stimulant dependence with intoxication, unspecified |
| F1523 | Other stimulant dependence with withdrawal | Other stimulant dependence with withdrawal |
| F1524 | Oth stimulant dependence w stimulant-induced mood disorder | Other stimulant dependence with stimulant-induced mood disorder |
| F15250 | Oth stim depend w stim-induce psych disorder w delusions | Other stimulant dependence with stimulant-induced psychotic disorder with delusions |
| F15251 | Oth stimulant depend w stim-induce psych disorder w hallucin | Other stimulant dependence with stimulant-induced psychotic disorder with hallucinations |
| F15259 | Oth stimulant depend w stim-induce psychotic disorder, unsp | Other stimulant dependence with stimulant-induced psychotic disorder, unspecified |
| F15280 | Oth stimulant dependence w stim-induce anxiety disorder | Other stimulant dependence with stimulant-induced anxiety disorder |
| F15281 | Oth stimulant dependence w stim-induce sexual dysfunction | Other stimulant dependence with stimulant-induced sexual dysfunction |
| F15282 | Oth stimulant dependence w stimulant-induced sleep disorder | Other stimulant dependence with stimulant-induced sleep disorder |
| F15288 | Oth stimulant dependence with oth stimulant-induced disorder | Other stimulant dependence with other stimulant-induced disorder |
| F1529 | Oth stimulant dependence w unsp stimulant-induced disorder | Other stimulant dependence with unspecified stimulant-induced disorder |
| F1590 | Other stimulant use, unspecified, uncomplicated | Other stimulant use, unspecified, uncomplicated |
| F15920 | Other stimulant use, unsp with intoxication, uncomplicated | Other stimulant use, unspecified with intoxication, uncomplicated |
| F15921 | Other stimulant use, unspecified with intoxication delirium | Other stimulant use, unspecified with intoxication delirium |
| F15922 | Oth stimulant use, unsp w intox w perceptual disturbance | Other stimulant use, unspecified with intoxication with perceptual disturbance |
| F15929 | Other stimulant use, unsp with intoxication, unspecified | Other stimulant use, unspecified with intoxication, unspecified |
| F1593 | Other stimulant use, unspecified with withdrawal | Other stimulant use, unspecified with withdrawal |
| F1594 | Oth stimulant use, unsp with stimulant-induced mood disorder | Other stimulant use, unspecified with stimulant-induced mood disorder |
| F15950 | Oth stim use, unsp w stim-induce psych disorder w delusions | Other stimulant use, unspecified with stimulant-induced psychotic disorder with delusions |
| F15951 | Oth stim use, unsp w stim-induce psych disorder w hallucin | Other stimulant use, unspecified with stimulant-induced psychotic disorder with hallucinations |
| F15959 | Oth stimulant use, unsp w stim-induce psych disorder, unsp | Other stimulant use, unspecified with stimulant-induced psychotic disorder, unspecified |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F15980 | Oth stimulant use, unsp w stimulant-induced anxiety disorder | Other stimulant use, unspecified with stimulant-induced anxiety disorder |
| F15981 | Oth stimulant use, unsp w stim-induce sexual dysfunction | Other stimulant use, unspecified with stimulant-induced sexual dysfunction |
| F15982 | Oth stimulant use, unsp w stimulant-induced sleep disorder | Other stimulant use, unspecified with stimulant-induced sleep disorder |
| F15988 | Oth stimulant use, unsp with oth stimulant-induced disorder | Other stimulant use, unspecified with other stimulant-induced disorder |
| F1599 | Oth stimulant use, unsp with unsp stimulant-induced disorder | Other stimulant use, unspecified with unspecified stimulant-induced disorder |
| F1610 | Hallucinogen abuse, uncomplicated | Hallucinogen abuse, uncomplicated |
| F16120 | Hallucinogen abuse with intoxication, uncomplicated | Hallucinogen abuse with intoxication, uncomplicated |
| F16121 | Hallucinogen abuse with intoxication with delirium | Hallucinogen abuse with intoxication with delirium |
| F16122 | Hallucinogen abuse w intoxication w perceptual disturbance | Hallucinogen abuse with intoxication with perceptual disturbance |
| F16129 | Hallucinogen abuse with intoxication, unspecified | Hallucinogen abuse with intoxication, unspecified |
| F1614 | Hallucinogen abuse with hallucinogen-induced mood disorder | Hallucinogen abuse with hallucinogen-induced mood disorder |
| F16150 | Hallucinogen abuse w psychotic disorder w delusions | Hallucinogen abuse with hallucinogen-induced psychotic disorder with delusions |
| F16151 | Hallucinogen abuse w psychotic disorder w hallucinations | Hallucinogen abuse with hallucinogen-induced psychotic disorder with hallucinations |
| F16159 | Hallucinogen abuse w psychotic disorder, unsp | Hallucinogen abuse with hallucinogen-induced psychotic disorder, unspecified |
| F16180 | Hallucinogen abuse w hallucinogen-induced anxiety disorder | Hallucinogen abuse with hallucinogen-induced anxiety disorder |
| F16183 | Hallucign abuse w hallucign persisting perception disorder | Hallucinogen abuse with hallucinogen persisting perception disorder (flashbacks) |
| F16188 | Hallucinogen abuse with other hallucinogen-induced disorder | Hallucinogen abuse with other hallucinogen-induced disorder |
| F1619 | Hallucinogen abuse with unsp hallucinogen-induced disorder | Hallucinogen abuse with unspecified hallucinogen-induced disorder |
| F1620 | Hallucinogen dependence, uncomplicated | Hallucinogen dependence, uncomplicated |
| F1621 | Hallucinogen dependence, in remission | Hallucinogen dependence, in remission |
| F16220 | Hallucinogen dependence with intoxication, uncomplicated | Hallucinogen dependence with intoxication, uncomplicated |
| F16221 | Hallucinogen dependence with intoxication with delirium | Hallucinogen dependence with intoxication with delirium |
| F16229 | Hallucinogen dependence with intoxication, unspecified | Hallucinogen dependence with intoxication, unspecified |
| F1624 | Hallucinogen dependence w hallucinogen-induced mood disorder | Hallucinogen dependence with hallucinogen-induced mood disorder |
| F16250 | Hallucinogen dependence w psychotic disorder w delusions | Hallucinogen dependence with hallucinogen-induced psychotic disorder with delusions |
| F16251 | Hallucinogen dependence w psychotic disorder w hallucin | Hallucinogen dependence with hallucinogen-induced psychotic disorder with hallucinations |
| F16259 | Hallucinogen dependence w psychotic disorder, unsp | Hallucinogen dependence with hallucinogen-induced psychotic disorder, unspecified |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F16280 | Hallucinogen dependence w anxiety disorder | Hallucinogen dependence with hallucinogen-induced anxiety disorder |
| F16283 | Hallucign depend w hallucign persisting perception disorder | Hallucinogen dependence with hallucinogen persisting perception disorder (flashbacks) |
| F16288 | Hallucinogen dependence w oth hallucinogen-induced disorder | Hallucinogen dependence with other hallucinogen-induced disorder |
| F1629 | Hallucinogen dependence w unsp hallucinogen-induced disorder | Hallucinogen dependence with unspecified hallucinogen-induced disorder |
| F1690 | Hallucinogen use, unspecified, uncomplicated | Hallucinogen use, unspecified, uncomplicated |
| F16920 | Hallucinogen use, unsp with intoxication, uncomplicated | Hallucinogen use, unspecified with intoxication, uncomplicated |
| F16921 | Hallucinogen use, unsp with intoxication with delirium | Hallucinogen use, unspecified with intoxication with delirium |
| F16929 | Hallucinogen use, unspecified with intoxication, unspecified | Hallucinogen use, unspecified with intoxication, unspecified |
| F1694 | Hallucinogen use, unsp w hallucinogen-induced mood disorder | Hallucinogen use, unspecified with hallucinogen-induced mood disorder |
| F16950 | Hallucinogen use, unsp w psychotic disorder w delusions | Hallucinogen use, unspecified with hallucinogen-induced psychotic disorder with delusions |
| F16951 | Hallucinogen use, unsp w psychotic disorder w hallucinations | Hallucinogen use, unspecified with hallucinogen-induced psychotic disorder with hallucinations |
| F16959 | Hallucinogen use, unsp w psychotic disorder, unsp | Hallucinogen use, unspecified with hallucinogen-induced psychotic disorder, unspecified |
| F16980 | Hallucinogen use, unsp w anxiety disorder | Hallucinogen use, unspecified with hallucinogen-induced anxiety disorder |
| F16983 | Hallucign use, unsp w hallucign persist perception disorder | Hallucinogen use, unspecified with hallucinogen persisting perception disorder (flashbacks) |
| F16988 | Hallucinogen use, unsp w oth hallucinogen-induced disorder | Hallucinogen use, unspecified with other hallucinogen-induced disorder |
| F1699 | Hallucinogen use, unsp w unsp hallucinogen-induced disorder | Hallucinogen use, unspecified with unspecified hallucinogen-induced disorder |
| F1810 | Inhalant abuse, uncomplicated | Inhalant abuse, uncomplicated |
| F18120 | Inhalant abuse with intoxication, uncomplicated | Inhalant abuse with intoxication, uncomplicated |
| F18121 | Inhalant abuse with intoxication delirium | Inhalant abuse with intoxication delirium |
| F18129 | Inhalant abuse with intoxication, unspecified | Inhalant abuse with intoxication, unspecified |
| F1814 | Inhalant abuse with inhalant-induced mood disorder | Inhalant abuse with inhalant-induced mood disorder |
| F18150 | Inhalant abuse w inhalt-induce psych disorder w delusions | Inhalant abuse with inhalant-induced psychotic disorder with delusions |
| F18151 | Inhalant abuse w inhalnt-induce psych disorder w hallucin | Inhalant abuse with inhalant-induced psychotic disorder with hallucinations |
| F18159 | Inhalant abuse w inhalant-induced psychotic disorder, unsp | Inhalant abuse with inhalant-induced psychotic disorder, unspecified |
| F1817 | Inhalant abuse with inhalant-induced dementia | Inhalant abuse with inhalant-induced dementia |
| F18180 | Inhalant abuse with inhalant-induced anxiety disorder | Inhalant abuse with inhalant-induced anxiety disorder |
| F18188 | Inhalant abuse with other inhalant-induced disorder | Inhalant abuse with other inhalant-induced disorder |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F1819 | Inhalant abuse with unspecified inhalant-induced disorder | Inhalant abuse with unspecified inhalant-induced disorder |
| F1820 | Inhalant dependence, uncomplicated | Inhalant dependence, uncomplicated |
| F1821 | Inhalant dependence, in remission | Inhalant dependence, in remission |
| F18220 | Inhalant dependence with intoxication, uncomplicated | Inhalant dependence with intoxication, uncomplicated |
| F18221 | Inhalant dependence with intoxication delirium | Inhalant dependence with intoxication delirium |
| F18229 | Inhalant dependence with intoxication, unspecified | Inhalant dependence with intoxication, unspecified |
| F1824 | Inhalant dependence with inhalant-induced mood disorder | Inhalant dependence with inhalant-induced mood disorder |
| F18250 | Inhalant depend w inhalnt-induce psych disorder w delusions | Inhalant dependence with inhalant-induced psychotic disorder with delusions |
| F18251 | Inhalant depend w inhalnt-induce psych disorder w hallucin | Inhalant dependence with inhalant-induced psychotic disorder with hallucinations |
| F18259 | Inhalant depend w inhalnt-induce psychotic disorder, unsp | Inhalant dependence with inhalant-induced psychotic disorder, unspecified |
| F1827 | Inhalant dependence with inhalant-induced dementia | Inhalant dependence with inhalant-induced dementia |
| F18280 | Inhalant dependence with inhalant-induced anxiety disorder | Inhalant dependence with inhalant-induced anxiety disorder |
| F18288 | Inhalant dependence with other inhalant-induced disorder | Inhalant dependence with other inhalant-induced disorder |
| F1829 | Inhalant dependence with unsp inhalant-induced disorder | Inhalant dependence with unspecified inhalant-induced disorder |
| F1890 | Inhalant use, unspecified, uncomplicated | Inhalant use, unspecified, uncomplicated |
| F18920 | Inhalant use, unspecified with intoxication, uncomplicated | Inhalant use, unspecified with intoxication, uncomplicated |
| F18921 | Inhalant use, unspecified with intoxication with delirium | Inhalant use, unspecified with intoxication with delirium |
| F18929 | Inhalant use, unspecified with intoxication, unspecified | Inhalant use, unspecified with intoxication, unspecified |
| F1894 | Inhalant use, unsp with inhalant-induced mood disorder | Inhalant use, unspecified with inhalant-induced mood disorder |
| F18950 | Inhalant use, unsp w inhalnt-induce psych disord w delusions | Inhalant use, unspecified with inhalant-induced psychotic disorder with delusions |
| F18951 | Inhalant use, unsp w inhalnt-induce psych disord w hallucin | Inhalant use, unspecified with inhalant-induced psychotic disorder with hallucinations |
| F18959 | Inhalant use, unsp w inhalnt-induce psychotic disorder, unsp | Inhalant use, unspecified with inhalant-induced psychotic disorder, unspecified |
| F1897 | Inhalant use, unsp with inhalant-induced persisting dementia | Inhalant use, unspecified with inhalant-induced persisting dementia |
| F18980 | Inhalant use, unsp with inhalant-induced anxiety disorder | Inhalant use, unspecified with inhalant-induced anxiety disorder |
| F18988 | Inhalant use, unsp with other inhalant-induced disorder | Inhalant use, unspecified with other inhalant-induced disorder |
| F1899 | Inhalant use, unsp with unsp inhalant-induced disorder | Inhalant use, unspecified with unspecified inhalant-induced disorder |
| F1910 | Other psychoactive substance abuse, uncomplicated | Other psychoactive substance abuse, uncomplicated |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F19120 | Oth psychoactive substance abuse w intoxication, uncomp | Other psychoactive substance abuse with intoxication, uncomplicated |
| F19121 | Oth psychoactive substance abuse with intoxication delirium | Other psychoactive substance abuse with intoxication delirium |
| F19122 | Oth psychoactv substance abuse w intox w perceptual disturb | Other psychoactive substance abuse with intoxication with perceptual disturbances |
| F19129 | Other psychoactive substance abuse with intoxication, unsp | Other psychoactive substance abuse with intoxication, unspecified |
| F19130 | Other psychoactive substance abuse with withdrawal, uncomplicated | Other psychoactive substance abuse with withdrawal, uncomplicated |
| F19131 | Other psychoactive substance abuse with withdrawal delirium | Other psychoactive substance abuse with withdrawal delirium |
| F19132 | Sedative, hypnotic or anxiolytic abuse with withdrawal with perceptual disturbance | Sedative, hypnotic or anxiolytic abuse with withdrawal with perceptual disturbance |
| F19139 | Sedative, hypnotic or anxiolytic abuse with withdrawal, unspecified | Sedative, hypnotic or anxiolytic abuse with withdrawal, unspecified |
| F1914 | Oth psychoactive substance abuse w mood disorder | Other psychoactive substance abuse with psychoactive substance-induced mood disorder |
| F19150 | Oth psychoactv substance abuse w psych disorder w delusions | Other psychoactive substance abuse with psychoactive substance-induced psychotic disorder with delusions |
| F19151 | Oth psychoactv substance abuse w psych disorder w hallucin | Other psychoactive substance abuse with psychoactive substance-induced psychotic disorder with hallucinations |
| F19159 | Oth psychoactive substance abuse w psychotic disorder, unsp | Other psychoactive substance abuse with psychoactive substance-induced psychotic disorder, unspecified |
| F1916 | Oth psychoactv substance abuse w persist amnestic disorder | Other psychoactive substance abuse with psychoactive substance-induced persisting amnestic disorder |
| F1917 | Oth psychoactive substance abuse w persisting dementia | Other psychoactive substance abuse with psychoactive substance-induced persisting dementia |
| F19180 | Oth psychoactive substance abuse w anxiety disorder | Other psychoactive substance abuse with psychoactive substance-induced anxiety disorder |
| F19181 | Oth psychoactive substance abuse w sexual dysfunction | Other psychoactive substance abuse with psychoactive substance-induced sexual dysfunction |
| F19182 | Oth psychoactive substance abuse w sleep disorder | Other psychoactive substance abuse with psychoactive substance-induced sleep disorder |
| F19188 | Oth psychoactive substance abuse w oth disorder | Other psychoactive substance abuse with other psychoactive substance-induced disorder |
| F1919 | Oth psychoactive substance abuse w unsp disorder | Other psychoactive substance abuse with unspecified psychoactive substance-induced disorder |
| F1920 | Other psychoactive substance dependence, uncomplicated | Other psychoactive substance dependence, uncomplicated |
| F1921 | Other psychoactive substance dependence, in remission | Other psychoactive substance dependence, in remission |
| F19220 | Oth psychoactive substance dependence w intoxication, uncomp | Other psychoactive substance dependence with intoxication, uncomplicated |
| F19221 | Oth psychoactive substance dependence w intox delirium | Other psychoactive substance dependence with intoxication delirium |
| F19222 | Oth psychoactv substance depend w intox w perceptual disturb | Other psychoactive substance dependence with intoxication with perceptual disturbance |
| F19229 | Oth psychoactive substance dependence w intoxication, unsp | Other psychoactive substance dependence with intoxication, unspecified |
| F19230 | Oth psychoactive substance dependence w withdrawal, uncomp | Other psychoactive substance dependence with withdrawal, uncomplicated |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F19231 | Oth psychoactive substance dependence w withdrawal delirium | Other psychoactive substance dependence with withdrawal delirium |
| F19232 | Oth psychoactv sub depend w w/drawal w perceptl disturb | Other psychoactive substance dependence with withdrawal with perceptual disturbance |
| F19239 | Oth psychoactive substance dependence with withdrawal, unsp | Other psychoactive substance dependence with withdrawal, unspecified |
| F1924 | Oth psychoactive substance dependence w mood disorder | Other psychoactive substance dependence with psychoactive substance-induced mood disorder |
| F19250 | Oth psychoactv substance depend w psych disorder w delusions | Other psychoactive substance dependence with psychoactive substance-induced psychotic disorder with delusions |
| F19251 | Oth psychoactv substance depend w psych disorder w hallucin | Other psychoactive substance dependence with psychoactive substance-induced psychotic disorder with hallucinations |
| F19259 | Oth psychoactv substance depend w psychotic disorder, unsp | Other psychoactive substance dependence with psychoactive substance-induced psychotic disorder, unspecified |
| F1926 | Oth psychoactv substance depend w persist amnestic disorder | Other psychoactive substance dependence with psychoactive substance-induced persisting amnestic disorder |
| F1927 | Oth psychoactive substance dependence w persisting dementia | Other psychoactive substance dependence with psychoactive substance-induced persisting dementia |
| F19280 | Oth psychoactive substance dependence w anxiety disorder | Other psychoactive substance dependence with psychoactive substance-induced anxiety disorder |
| F19281 | Oth psychoactive substance dependence w sexual dysfunction | Other psychoactive substance dependence with psychoactive substance-induced sexual dysfunction |
| F19282 | Oth psychoactive substance dependence w sleep disorder | Other psychoactive substance dependence with psychoactive substance-induced sleep disorder |
| F19288 | Oth psychoactive substance dependence w oth disorder | Other psychoactive substance dependence with other psychoactive substance-induced disorder |
| F1929 | Oth psychoactive substance dependence w unsp disorder | Other psychoactive substance dependence with unspecified psychoactive substance-induced disorder |
| F1990 | Other psychoactive substance use, unspecified, uncomplicated | Other psychoactive substance use, unspecified, uncomplicated |
| F19920 | Oth psychoactive substance use, unsp w intoxication, uncomp | Other psychoactive substance use, unspecified with intoxication, uncomplicated |
| F19921 | Oth psychoactive substance use, unsp w intox w delirium | Other psychoactive substance use, unspecified with intoxication with delirium |
| F19922 | Oth psychoactv sub use, unsp w intox w perceptl disturb | Other psychoactive substance use, unspecified with intoxication with perceptual disturbance |
| F19929 | Oth psychoactive substance use, unsp with intoxication, unsp | Other psychoactive substance use, unspecified with intoxication, unspecified |
| F19930 | Oth psychoactive substance use, unsp w withdrawal, uncomp | Other psychoactive substance use, unspecified with withdrawal, uncomplicated |
| F19931 | Oth psychoactive substance use, unsp w withdrawal delirium | Other psychoactive substance use, unspecified with withdrawal delirium |
| F19932 | Oth psychoactv sub use, unsp w w/drawal w perceptl disturb | Other psychoactive substance use, unspecified with withdrawal with perceptual disturbance |
| F19939 | Other psychoactive substance use, unsp with withdrawal, unsp | Other psychoactive substance use, unspecified with withdrawal, unspecified |
| F1994 | Oth psychoactive substance use, unsp w mood disorder | Other psychoactive substance use, unspecified with psychoactive substance-induced mood disorder |
| F19950 | Oth psychoactv sub use, unsp w psych disorder w delusions | Other psychoactive substance use, unspecified with psychoactive substance-induced psychotic disorder with delusions |
| F19951 | Oth psychoactv sub use, unsp w psych disorder w hallucin | Other psychoactive substance use, unspecified with psychoactive substance-induced psychotic disorder with hallucinations |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F19959 | Oth psychoactv substance use, unsp w psych disorder, unsp | Other psychoactive substance use, unspecified with psychoactive substance-induced psychotic disorder, unspecified |
| F1996 | Oth psychoactv sub use, unsp w persist amnestic disorder | Other psychoactive substance use, unspecified with psychoactive substance-induced persisting amnestic disorder |
| F1997 | Oth psychoactive substance use, unsp w persisting dementia | Other psychoactive substance use, unspecified with psychoactive substance-induced persisting dementia |
| F19980 | Oth psychoactive substance use, unsp w anxiety disorder | Other psychoactive substance use, unspecified with psychoactive substance-induced anxiety disorder |
| F19981 | Oth psychoactive substance use, unsp w sexual dysfunction | Other psychoactive substance use, unspecified with psychoactive substance-induced sexual dysfunction |
| F19982 | Oth psychoactive substance use, unsp w sleep disorder | Other psychoactive substance use, unspecified with psychoactive substance-induced sleep disorder |
| F19988 | Oth psychoactive substance use, unsp w oth disorder | Other psychoactive substance use, unspecified with other psychoactive substance-induced disorder |
| F1999 | Oth psychoactive substance use, unsp w unsp disorder | Other psychoactive substance use, unspecified with unspecified psychoactive substance-induced disorder |
| F200 | Paranoid schizophrenia | Paranoid schizophrenia |
| F201 | Disorganized schizophrenia | Disorganized schizophrenia |
| F202 | Catatonic schizophrenia | Catatonic schizophrenia |
| F203 | Undifferentiated schizophrenia | Undifferentiated schizophrenia |
| F205 | Residual schizophrenia | Residual schizophrenia |
| F2081 | Schizophreniform disorder | Schizophreniform disorder |
| F2089 | Other schizophrenia | Other schizophrenia |
| F209 | Schizophrenia, unspecified | Schizophrenia, unspecified |
| F21 | Schizotypal disorder | Schizotypal disorder |
| F22 | Delusional disorders | Delusional disorders |
| F23 | Brief psychotic disorder | Brief psychotic disorder |
| F24 | Shared psychotic disorder | Shared psychotic disorder |
| F250 | Schizoaffective disorder, bipolar type | Schizoaffective disorder, bipolar type |
| F251 | Schizoaffective disorder, depressive type | Schizoaffective disorder, depressive type |
| F258 | Other schizoaffective disorders | Other schizoaffective disorders |
| F259 | Schizoaffective disorder, unspecified | Schizoaffective disorder, unspecified |
| F28 | Oth psych disorder not due to a sub or known physiol cond | Other psychotic disorder not due to a substance or known physiological condition |
| F29 | Unsp psychosis not due to a substance or known physiol cond | Unspecified psychosis not due to a substance or known physiological condition |
| F3010 | Manic episode without psychotic symptoms, unspecified | Manic episode without psychotic symptoms, unspecified |
| F3011 | Manic episode without psychotic symptoms, mild | Manic episode without psychotic symptoms, mild |
| F3012 | Manic episode without psychotic symptoms, moderate | Manic episode without psychotic symptoms, moderate |
| F3013 | Manic episode, severe, without psychotic symptoms | Manic episode, severe, without psychotic symptoms |
| F302 | Manic episode, severe with psychotic symptoms | Manic episode, severe with psychotic symptoms |
| F303 | Manic episode in partial remission | Manic episode in partial remission |
| F304 | Manic episode in full remission | Manic episode in full remission |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F308 | Other manic episodes | Other manic episodes |
| F309 | Manic episode, unspecified | Manic episode, unspecified |
| F310 | Bipolar disorder, current episode hypomanic | Bipolar disorder, current episode hypomanic |
| F3110 | Bipolar disord, crnt episode manic w/o psych features, unsp | Bipolar disorder, current episode manic without psychotic features, unspecified |
| F3111 | Bipolar disord, crnt episode manic w/o psych features, mild | Bipolar disorder, current episode manic without psychotic features, mild |
| F3112 | Bipolar disord, crnt episode manic w/o psych features, mod | Bipolar disorder, current episode manic without psychotic features, moderate |
| F3113 | Bipolar disord, crnt epsd manic w/o psych features, severe | Bipolar disorder, current episode manic without psychotic features, severe |
| F312 | Bipolar disord, crnt episode manic severe w psych features | Bipolar disorder, current episode manic severe with psychotic features |
| F3130 | Bipolar disord, crnt epsd depress, mild or mod severt, unsp | Bipolar disorder, current episode depressed, mild or moderate severity, unspecified |
| F3131 | Bipolar disorder, current episode depressed, mild | Bipolar disorder, current episode depressed, mild |
| F3132 | Bipolar disorder, current episode depressed, moderate | Bipolar disorder, current episode depressed, moderate |
| F314 | Bipolar disord, crnt epsd depress, sev, w/o psych features | Bipolar disorder, current episode depressed, severe, without psychotic features |
| F315 | Bipolar disord, crnt epsd depress, severe, w psych features | Bipolar disorder, current episode depressed, severe, with psychotic features |
| F3160 | Bipolar disorder, current episode mixed, unspecified | Bipolar disorder, current episode mixed, unspecified |
| F3161 | Bipolar disorder, current episode mixed, mild | Bipolar disorder, current episode mixed, mild |
| F3162 | Bipolar disorder, current episode mixed, moderate | Bipolar disorder, current episode mixed, moderate |
| F3163 | Bipolar disord, crnt epsd mixed, severe, w/o psych features | Bipolar disorder, current episode mixed, severe, without psychotic features |
| F3164 | Bipolar disord, crnt episode mixed, severe, w psych features | Bipolar disorder, current episode mixed, severe, with psychotic features |
| F3170 | Bipolar disord, currently in remis, most recent episode unsp | Bipolar disorder, currently in remission, most recent episode unspecified |
| F3171 | Bipolar disord, in partial remis, most recent epsd hypomanic | Bipolar disorder, in partial remission, most recent episode hypomanic |
| F3172 | Bipolar disord, in full remis, most recent episode hypomanic | Bipolar disorder, in full remission, most recent episode hypomanic |
| F3173 | Bipolar disord, in partial remis, most recent episode manic | Bipolar disorder, in partial remission, most recent episode manic |
| F3174 | Bipolar disorder, in full remis, most recent episode manic | Bipolar disorder, in full remission, most recent episode manic |
| F3175 | Bipolar disorder, in partial remis, most recent epsd depress | Bipolar disorder, in partial remission, most recent episode depressed |
| F3176 | Bipolar disorder, in full remis, most recent episode depress | Bipolar disorder, in full remission, most recent episode depressed |
| F3177 | Bipolar disorder, in partial remis, most recent episode mixed | Bipolar disorder, in partial remission, most recent episode mixed |
| F3178 | Bipolar disorder, in full remis, most recent episode mixed | Bipolar disorder, in full remission, most recent episode mixed |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F3181 | Bipolar II disorder | Bipolar II disorder |
| F3189 | Other bipolar disorder | Other bipolar disorder |
| F319 | Bipolar disorder, unspecified | Bipolar disorder, unspecified |
| F320 | Major depressive disorder, single episode, mild | Major depressive disorder, single episode, mild |
| F321 | Major depressive disorder, single episode, moderate | Major depressive disorder, single episode, moderate |
| F322 | Major depressv disord, single epsd, sev w/o psych features | Major depressive disorder, single episode, severe without psychotic features |
| F323 | Major depressv disord, single epsd, severe w psych features | Major depressive disorder, single episode, severe with psychotic features |
| F324 | Major depressv disord, single episode, in partial remis | Major depressive disorder, single episode, in partial remission |
| F325 | Major depressive disorder, single episode, in full remission | Major depressive disorder, single episode, in full remission |
| F328 | Other depressive episodes | Other depressive episodes |
| F329 | Major depressive disorder, single episode, unspecified | Major depressive disorder, single episode, unspecified |
| F330 | Major depressive disorder, recurrent, mild | Major depressive disorder, recurrent, mild |
| F331 | Major depressive disorder, recurrent, moderate | Major depressive disorder, recurrent, moderate |
| F332 | Major depressv disorder, recurrent severe w/o psych features | Major depressive disorder, recurrent severe without psychotic features |
| F333 | Major depressv disorder, recurrent, severe w psych symptoms | Major depressive disorder, recurrent, severe with psychotic symptoms |
| F3340 | Major depressive disorder, recurrent, in remission, unsp | Major depressive disorder, recurrent, in remission, unspecified |
| F3341 | Major depressive disorder, recurrent, in partial remission | Major depressive disorder, recurrent, in partial remission |
| F3342 | Major depressive disorder, recurrent, in full remission | Major depressive disorder, recurrent, in full remission |
| F338 | Other recurrent depressive disorders | Other recurrent depressive disorders |
| F339 | Major depressive disorder, recurrent, unspecified | Major depressive disorder, recurrent, unspecified |
| F340 | Cyclothymic disorder | Cyclothymic disorder |
| F341 | Dysthymic disorder | Dysthymic disorder |
| F348 | Other persistent mood [affective] disorders | Other persistent mood [affective] disorders |
| F349 | Persistent mood [affective] disorder, unspecified | Persistent mood [affective] disorder, unspecified |
| F39 | Unspecified mood [affective] disorder | Unspecified mood [affective] disorder |
| F4000 | Agoraphobia, unspecified | Agoraphobia, unspecified |
| F4001 | Agoraphobia with panic disorder | Agoraphobia with panic disorder |
| F4002 | Agoraphobia without panic disorder | Agoraphobia without panic disorder |
| F4010 | Social phobia, unspecified | Social phobia, unspecified |
| F4011 | Social phobia, generalized | Social phobia, generalized |
| F40210 | Arachnophobia | Arachnophobia |
| F40218 | Other animal type phobia | Other animal type phobia |
| F40220 | Fear of thunderstorms | Fear of thunderstorms |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F40228 | Other natural environment type phobia | Other natural environment type phobia |
| F40230 | Fear of blood | Fear of blood |
| F40231 | Fear of injections and transfusions | Fear of injections and transfusions |
| F40232 | Fear of other medical care | Fear of other medical care |
| F40233 | Fear of injury | Fear of injury |
| F40240 | Claustrophobia | Claustrophobia |
| F40241 | Acrophobia | Acrophobia |
| F40242 | Fear of bridges | Fear of bridges |
| F40243 | Fear of flying | Fear of flying |
| F40248 | Other situational type phobia | Other situational type phobia |
| F40290 | Androphobia | Androphobia |
| F40291 | Gynephobia | Gynephobia |
| F40298 | Other specified phobia | Other specified phobia |
| F408 | Other phobic anxiety disorders | Other phobic anxiety disorders |
| F409 | Phobic anxiety disorder, unspecified | Phobic anxiety disorder, unspecified |
| F410 | Panic disorder without agoraphobia | Panic disorder [episodic paroxysmal anxiety] without agoraphobia |
| F411 | Generalized anxiety disorder | Generalized anxiety disorder |
| F413 | Other mixed anxiety disorders | Other mixed anxiety disorders |
| F418 | Other specified anxiety disorders | Other specified anxiety disorders |
| F419 | Anxiety disorder, unspecified | Anxiety disorder, unspecified |
| F42 | Obsessive-compulsive disorder | Obsessive-compulsive disorder |
| F430 | Acute stress reaction | Acute stress reaction |
| F4310 | Post-traumatic stress disorder, unspecified | Post-traumatic stress disorder, unspecified |
| F4311 | Post-traumatic stress disorder, acute | Post-traumatic stress disorder, acute |
| F4312 | Post-traumatic stress disorder, chronic | Post-traumatic stress disorder, chronic |
| F4320 | Adjustment disorder, unspecified | Adjustment disorder, unspecified |
| F4321 | Adjustment disorder with depressed mood | Adjustment disorder with depressed mood |
| F4322 | Adjustment disorder with anxiety | Adjustment disorder with anxiety |
| F4323 | Adjustment disorder with mixed anxiety and depressed mood | Adjustment disorder with mixed anxiety and depressed mood |
| F4324 | Adjustment disorder with disturbance of conduct | Adjustment disorder with disturbance of conduct |
| F4325 | Adjustment disorder w mixed disturb of emotions and conduct | Adjustment disorder with mixed disturbance of emotions and conduct |
| F4329 | Adjustment disorder with other symptoms | Adjustment disorder with other symptoms |
| F438 | Other reactions to severe stress | Other reactions to severe stress |
| F439 | Reaction to severe stress, unspecified | Reaction to severe stress, unspecified |
| F440 | Dissociative amnesia | Dissociative amnesia |
| F441 | Dissociative fugue | Dissociative fugue |
| F442 | Dissociative stupor | Dissociative stupor |
| F444 | Conversion disorder with motor symptom or deficit | Conversion disorder with motor symptom or deficit |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F445 | Conversion disorder with seizures or convulsions | Conversion disorder with seizures or convulsions |
| F446 | Conversion disorder with sensory symptom or deficit | Conversion disorder with sensory symptom or deficit |
| F447 | Conversion disorder with mixed symptom presentation | Conversion disorder with mixed symptom presentation |
| F4481 | Dissociative identity disorder | Dissociative identity disorder |
| F4489 | Other dissociative and conversion disorders | Other dissociative and conversion disorders |
| F449 | Dissociative and conversion disorder, unspecified | Dissociative and conversion disorder, unspecified |
| F450 | Somatization disorder | Somatization disorder |
| F451 | Undifferentiated somatoform disorder | Undifferentiated somatoform disorder |
| F4520 | Hypochondriacal disorder, unspecified | Hypochondriacal disorder, unspecified |
| F4521 | Hypochondriasis | Hypochondriasis |
| F4522 | Body dysmorphic disorder | Body dysmorphic disorder |
| F4529 | Other hypochondriacal disorders | Other hypochondriacal disorders |
| F4541 | Pain disorder exclusively related to psychological factors | Pain disorder exclusively related to psychological factors |
| F4542 | Pain disorder with related psychological factors | Pain disorder with related psychological factors |
| F458 | Other somatoform disorders | Other somatoform disorders |
| F459 | Somatoform disorder, unspecified | Somatoform disorder, unspecified |
| F481 | Depersonalization-derealization syndrome | Depersonalization-derealization syndrome |
| F482 | Pseudobulbar affect | Pseudobulbar affect |
| F488 | Other specified nonpsychotic mental disorders | Other specified nonpsychotic mental disorders |
| F489 | Nonpsychotic mental disorder, unspecified | Nonpsychotic mental disorder, unspecified |
| F5000 | Anorexia nervosa, unspecified | Anorexia nervosa, unspecified |
| F5001 | Anorexia nervosa, restricting type | Anorexia nervosa, restricting type |
| F5002 | Anorexia nervosa, binge eating/purging type | Anorexia nervosa, binge eating/purging type |
| F502 | Bulimia nervosa | Bulimia nervosa |
| F508 | Other eating disorders | Other eating disorders |
| F509 | Eating disorder, unspecified | Eating disorder, unspecified |
| F53 | Puerperal psychosis | Puerperal psychosis |
| F54 | Psych & behavrl factors assoc w disord or dis classd elswhr | Psychological and behavioral factors associated with disorders or diseases classified elsewhere |
| F600 | Paranoid personality disorder | Paranoid personality disorder |
| F601 | Schizoid personality disorder | Schizoid personality disorder |
| F602 | Antisocial personality disorder | Antisocial personality disorder |
| F603 | Borderline personality disorder | Borderline personality disorder |
| F604 | Histrionic personality disorder | Histrionic personality disorder |
| F605 | Obsessive-compulsive personality disorder | Obsessive-compulsive personality disorder |
| F606 | Avoidant personality disorder | Avoidant personality disorder |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F607 | Dependent personality disorder | Dependent personality disorder |
| F6081 | Narcissistic personality disorder | Narcissistic personality disorder |
| F6089 | Other specific personality disorders | Other specific personality disorders |
| F609 | Personality disorder, unspecified | Personality disorder, unspecified |
| F631 | Pyromania | Pyromania |
| F632 | Kleptomania | Kleptomania |
| F633 | Trichotillomania | Trichotillomania |
| F6381 | Intermittent explosive disorder | Intermittent explosive disorder |
| F6389 | Other impulse disorders | Other impulse disorders |
| F639 | Impulse disorder, unspecified | Impulse disorder, unspecified |
| F641 | Gender identity disorder in adolescence and adulthood | Gender identity disorder in adolescence and adulthood |
| F642 | Gender identity disorder of childhood | Gender identity disorder of childhood |
| F648 | Other gender identity disorders | Other gender identity disorders |
| F649 | Gender identity disorder, unspecified | Gender identity disorder, unspecified |
| F6810 | Factitious disorder, unspecified | Factitious disorder, unspecified |
| F6811 | Factitious disorder w predom psych signs and symptoms | Factitious disorder with predominantly psychological signs and symptoms |
| F6812 | Factitious disorder w predom physical signs and symptoms | Factitious disorder with predominantly physical signs and symptoms |
| F6813 | Factitious disord w comb psych and physcl signs and symptoms | Factitious disorder with combined psychological and physical signs and symptoms |
| F688 | Other specified disorders of adult personality and behavior | Other specified disorders of adult personality and behavior |
| F69 | Unspecified disorder of adult personality and behavior | Unspecified disorder of adult personality and behavior |
| F88 | Other disorders of psychological development | Other disorders of psychological development |
| F89 | Unspecified disorder of psychological development | Unspecified disorder of psychological development |
| F900 | Attn-defct hyperactivity disorder, predom inattentive type | Attention-deficit hyperactivity disorder, predominantly inattentive type |
| F901 | Attn-defct hyperactivity disorder, predom hyperactive type | Attention-deficit hyperactivity disorder, predominantly hyperactive type |
| F902 | Attention-deficit hyperactivity disorder, combined type | Attention-deficit hyperactivity disorder, combined type |
| F908 | Attention-deficit hyperactivity disorder, other type | Attention-deficit hyperactivity disorder, other type |
| F909 | Attention-deficit hyperactivity disorder, unspecified type | Attention-deficit hyperactivity disorder, unspecified type |
| F910 | Conduct disorder confined to family context | Conduct disorder confined to family context |
| F911 | Conduct disorder, childhood-onset type | Conduct disorder, childhood-onset type |
| F912 | Conduct disorder, adolescent-onset type | Conduct disorder, adolescent-onset type |
| F913 | Oppositional defiant disorder | Oppositional defiant disorder |
| F918 | Other conduct disorders | Other conduct disorders |
| F919 | Conduct disorder, unspecified | Conduct disorder, unspecified |
| F930 | Separation anxiety disorder of childhood | Separation anxiety disorder of childhood |

| ICD-CM-10 | Short Description | Long Description |
|---|---|---|
| F938 | Other childhood emotional disorders | Other childhood emotional disorders |
| F939 | Childhood emotional disorder, unspecified | Childhood emotional disorder, unspecified |
| F940 | Selective mutism | Selective mutism |
| F941 | Reactive attachment disorder of childhood | Reactive attachment disorder of childhood |
| F942 | Disinhibited attachment disorder of childhood | Disinhibited attachment disorder of childhood |
| F948 | Other childhood disorders of social functioning | Other childhood disorders of social functioning |
| F949 | Childhood disorder of social functioning, unspecified | Childhood disorder of social functioning, unspecified |
| F980 | Enuresis not due to a substance or known physiol condition | Enuresis not due to a substance or known physiological condition |
| F981 | Encopresis not due to a substance or known physiol condition | Encopresis not due to a substance or known physiological condition |
| F988 | Oth behav/emotn disord w onset usly occur in chldhd and adol | Other specified behavioral and emotional disorders with onset usually occurring in childhood and adolescence |
| F989 | Unsp behav/emotn disord w onst usly occur in chldhd and adol | Unspecified behavioral and emotional disorders with onset usually occurring in childhood and adolescence |
| F99 | Mental disorder, not otherwise specified | Mental disorder, not otherwise specified |

**APPENDIX D: CERTIFIED ALCOHOL AND DRUG COUNSELOR-TRAINEE SUPERVISION FORM**

| | |
|---|---|
| **D·B·H·D·D** | **CERTIFIED ALCOHOL AND DRUG COUNSELOR-TRAINEE / COUNSELOR IN TRAINING SUPERVISION FORM** |
| | _____ Individual_____ Group |

## SECTION A. Employee Information

| Name: | Month of Supervision: |
|---|---|
| **Hire Date as a Certified Alcohol and Drug Counselor-Trainee**: | **Projected Certification Test Date:** (Eligible to test w/in 2 years of hire date) |

## SECTION B.

Check Domain discussed during Supervision and briefly describe (see TAP 21 description):

o      Clinical Evaluation (total monthly hours completed: _____) (accumulative hours completed: ____)

o      Treatment Planning (total monthly hours completed: _____) (accumulative hours completed: ____)

o      Referral (total monthly hours completed: _____) (accumulative hours completed: ____)

o      Service Coordination (total monthly hours completed: _____) (accumulative hours completed: ____)

o      Counseling (total monthly hours completed: _____) (accumulative hours completed: ____)

o      Client, Family and Community Education (total monthly hours completed: _____) (accumulative hours completed: ____)

o      Documentation (total monthly hours completed: _____) (accumulative hours completed: ____)

o      Professional and Ethical Responsibilities (total monthly hours completed: _____) (accumulative hours completed: ____)

Short Term Goals/Action Required: (define expectations – timelines – areas needing improvement)

Training Needs: (progress toward certification, licensure and/or other areas of professional growth)

Training Hours Completed: _____          Next Scheduled Supervision:

## SECTION C. Signatures

| Supervisor's Signature and credentials[12]: | Date: |
|---|---|
| Employee Signature: | Date: |

[12] The following credentials are acceptable for Clinical Supervision and are required to provide proof of credential: CCS; CADC; CCADC; CAC II; MAC or LPC/ LCSW/LMFT who have a minimum of 5 hours of Co-Occurring or Addiction specific Continuing Education hours per year, certification of attendance/completion must be on file.

# APPENDIX E: COVID-19 Public Health Emergency:
## DBHDD Communications to Providers

This Appendix was created to memorialize DBHDD communications to providers regarding service, policy, and procedure modifications that are either allowable (at the provider's discretion) or expected (by the DBHDD) during the COVID-19 Public Health Emergency. The communications contained herein include only those with significant and direct bearing on the content of the Provider Manual for Community Behavioral Health Providers.

The content in this Appendix will be updated periodically during the Public Health Emergency via a "Special Interim Re-Posting" of the Provider Manual and will be labeled as such on the title page. This Appendix will serve as a chronological record of communications and will be added to with each subsequent Special Interim Re-Posting. Although prior content will not be removed, *new* content added to this Appendix in each Special Interim Re-Posting will only reflect communications released during the normal effective dates of this particular Provider Manual.

| | | |
|---|---|---|
| 3/14/2020 | Special Bulletin | Message from Commissioner Fitzgerald related to Coronavirus; DBHDD/DCH guidance for IDD and BH Services |
| 03/14/2020 | Memorandum | Service Allowances due to COVID-19 |
| 03/14/2020 and 3/19/2020 | Guidance | Telemed and Telephonic Coverage |
| 03/17/2020 | Guidance | ACT and CST guidance for COVID-19 |
| 03/17/2020 | Guidance | State Opioid Treatment Authority – COVID-19 |
| 03/18/2020 | Guidance | Apex – COVID-19 |
| 03/18/2020 | Guidance | BHCC/CSU for COVID-19 |
| 03/18/2020 | Guidance | DBHDD Addiction Recovery Support Centers/Peer Wellness and Respite Centers |
| 03/19/2020 | Guidance | COVID 19 Guidance for MCRS |
| 03/20/2020 | Guidance | DBHDD Clubhouse Programs; CYF AD Prevention |
| 03/21/2020 | FAQs | Coronavirus: COVID-19 Provider FAQs |
| 03/25/2020 | Special Bulletin | Deaf Services |
| 03/26/2020 | Special Bulletin | Continuing Education for Professional Counselors, Social Workers, and Marriage and Family Therapists |
| 03/26/2020 | DBHDD Policy (in PolicyStat) | COVID-19 2020: DBHDD Community Behavioral Health Services Policy Modifications – 3/26/2020 (version 1) |
| 03/27/2020 | Guidance | For Regions: All Regions & GHVP Providers - Temporary Measures to Address Tenant Loss of Income during COVID-19 |
| 03/27/2020 | Guidance | For Providers: All Regions & GHVP Providers - Temporary Measures to Address Tenant Loss of Income during COVID-19 |

| 03/30/2020 | Memorandum | COVID-19 Guidance for Supported Employment Providers |
|---|---|---|
| 03/30/2020 | Special Bulletin/ Memo | COVID-19 Emergency - Staff Training Related to CPR and Crisis Intervention |
| 03/31/2020 | Special Bulletin | Billing for Medicaid Telehealth for BH Services, COVID-19 Emergency Staff Training Related to CPR and Crisis Intervention |
| 04/01/2020 | Guidance | DBHDD Take-Homes COVID-19 |
| 04/02/2020 | Special Bulletin | Medication Assisted Treatment Guidance for Take-Home Medication and Telehealth, DBHDD Mental Health Wellness Resources, Telehealth Learning and Consultation (TLC) Tuesdays |
| 04/02/2020 | First release | Summary of COVID-19 Policy Modifications (Table of DBHDD policy revisions with dates) |
| 04/02/2020 | DBHDD Policy (in PolicyStat) | COVID-10: DBHDD Community Behavioral Health Services Policy Modifications – 4/2/2020 (policy version 2) |
| 04/03/2020 | Guidance | DBHDD Guidance for Housing Outreach Coordinators – COVID-19 |
| 04/03/2020 | Guidance | Guidance for Residential Services – COVID-19 |
| 04/03/2020 | FAQs | Coronavirus: COVID-19 Provider FAQs |
| 04/06/2020 | Special Bulletin | Background Check Variance, Georgia COVID-19 Emotional Support Line, 2x2 Series: Daily Self-Care Tips and Support for Health Care and Emergency Response Workers, Telehealth Training and Consultation (TLC) Tuesdays |
| 04/07/2020 | Guidance | Guidance PATH Providers – COVID-19 |
| 04/08/2020 | DBHDD Policy (in PolicyStat) | COVID-10: DBHDD Community Behavioral Health Services Policy Modifications – 4/8/2020 (policy version 3) |
| 04/09/2020 | Guidance | DBHDD Guidance on GHVP Bridge Funding – COVID-19 |
| 04/23/2020 | DBHDD Policy (in PolicyStat) | COVID-10: DBHDD Community Behavioral Health Services Policy Modifications – 4/23/2020 (policy version 4) |
| 04/24/2020 | Special Bulletin | Behavioral Health Telemedicine and Telephonic Guidance, IDD Connects Scheduled Downtime, APPENDIX K Webinar Presentations and Operational Guidance, Background Check Variance |
| 04/24/2020 | Guidance | DBHDD Medication Assisted Treatment Guidance for the COVID-19 Emergency Response |
| 05/11/2020 | Special Bulletin | DBHDD Community Settings: Reopening Recommendations, Appendix K Operational Guidance (IDD providers), Appendix K Webinar Presentations (IDD providers) |
| 05/20/2020 | Special Bulletin | Behavioral Health Community Support Team & Community Support Individual Billing Guidance, Behavioral Health Group Services & Telehealth Allowances, |

|  |  | I/DD Appendix K Webinar & Community Settings Reopening Guidance (I/DD Providers), 2x2 Series: Daily Self Care Tips & Support for Health Care and Emergency Response Workers |
|---|---|---|
| 05/20/2020 | Guidance | Behavioral Health Community Support Team & Community Support Individual Billing Guidance |
| 06/02/2020 | Special Bulletin | BH Provider Manual Revisions due to COVID-19, Change in Fingerprinting Process |
| 07/24/2020 | DBHDD Policy (in PolicyStat) | COVID-19 2020: DBHDD Community Behavioral Health Services Policy Modifications |
| 08/18/2020 | Special Bulletin | Important Announcement: Image Incident Reporting Changes |
| 09/21/2020 | DBHDD Policy (in PolicyStat) | COVID-19 2020: DBHDD Community Behavioral Health Services Policy Modifications |
| 10/01/2020 | Network News | Volume 32: DBHDD COVID-19 2020: DBHDD Community Behavioral Health Services Policy Modifications – 9/21/2020; The Georgia Collaborative ASO Quality Reviews Update |
| 10/06/2020 | Special Bulletin | National Public Health Emergency Extended effective 10/23/2020 for 90 days. |

Special Bulletin                                                                        March 14, 2020

**BE INFORMED**     NETWORK BULLETIN



**D·B·H·D·D**

## A message from Commissioner Fitzgerald related to Coronavirus



DBHDD and you, the provider network, play a vital role as Georgia's behavioral health and IDD Safety Net. Critical services must remain open. State officials are working to sustain services and protect the health and safety of individuals we serve, practitioners, and communities.  We are closely following the evolving guidance from federal and state officials. In this update, we are providing additional guidance and flexibility to support you in the continuity of services.

As Governor Kemp has advised, all providers should use their best professional judgment when required to visit an individual's home. The most up to date information, including guidance for clinicians and those staffing individuals' homes can be found on the **CDC** and **Georgia DPH** websites.

DBHDD will continue to provide updates via the Provider Newsletter: Network News. Should you have questions, please submit them to our Provider Relations team via the **Provider Issue Management System** or submit an email to **DBHDD.Provider@dbhdd.ga.gov**.

**IDD Services**

Yesterday, DCH released a memo that is applicable to NOW and COMP providers, titled COVID-19 Response and HCBS Operations. In the memo, you will note that Case Managers (i.e. Support Coordination Agencies) may continue to use telephonic means to perform client contacts. Support Coordinators should continue to use the IQOMR and make a note when unable to assess a certain question due to the need for visual confirmation. The memo also addresses Adult Day Programs and recommends that this population avoid group settings and practice social distancing. Please review the memo linked below.

State Support Coordinators may use telephonic means to perform client contacts.

> **DCH MEMOCOVID-19 RESPONSE AND HCBS OPERATIONS**

**BH Services**

Effective immediately, DBHDD has removed restrictions on telemedicine services that, until today, had restrictions noted within the service guidelines.  In addition, we are waiving requirements for face to face contacts where the service guidelines note a minimum number or ratio of face to face contacts. Please review the **linked memorandum** for specific allowances. At this time, these allowances will be in place until April 30, 2020.

Many of you have asked questions about fiscal support during the pandemic. We do not have any specific information yet regarding the distribution of any emergency funds. Should this information become available, I assure you we will share it with you as quickly as possible.

Thank you for your continued commitment to Georgia's safety net.
Case 1:16-cv-03088-ELR　　Document 448-73　　Filed 11/29/23　　Page 468 of 627
Commissioner Judy Fitzgerald

## Office of Provider Relations

**Director**
Lynn Copeland

**Senior Provider Relations Manager**
Carole Crowley

**Provider Relations Managers**
Sharon Pyles
Tim Strickland
Lisa Sweat



For Provider Relations inquiries, please contact us at **DBHDD.Provider@dbhdd.ga.gov**

### BE WELL





**Georgia Department of Behavioral Health
& Developmental Disabilities**

Judy Fitzgerald, Commissioner

**D·B·H·D·D**    Office of the Commissioner

MEMORANDUM

TO:        Judy Fitzgerald, Commissioner

FROM:    Community Providers of Behavioral Health and Intellectual and
            Developmental Disabilities Services

DATE:     March 14, 2020

RE:        Service Allowances due to COVID-19


DBHDD and you, the provider network, play a vital role as Georgia's behavioral health
and IDD Safety Net.  Critical services must remain open.  State officials are working to
sustain services and protect the health and safety of individuals we serve, practitioners,
and communities.   We are closely following the evolving guidance from federal and
state officials. In this update, we are providing additional guidance and flexibility to
support you in the continuity of services.

As Governor Kemp has advised, all providers should use their best professional
judgment when required to visit an individual's home.  The most up to date information,
including guidance for clinicians and those staffing individuals' homes can be found on
the CDC and Georgia DPH websites.

DBHDD will continue to provide updates via the Provider Newsletter: Network
News.  Should you have questions, please submit them to our Provider Relations team
via the Provider Issue Management System or submit an email to
DBHDD.Provider@dbhdd.ga.gov.

**IDD Services**

Yesterday, DCH released a memo that is applicable to NOW and COMP providers, titled
COVID-19 Response and HCBS Operations.  In the memo, you will note that Case
Managers (i.e. Support Coordination Agencies) may continue to use telephonic means to
perform client contacts.  Support Coordinators should continue to use the IQOMR and
make a note when unable to assess a certain question due to the need for visual
confirmation. The memo also addresses Adult Day Programs and recommends that this
population avoid group settings and practice social distancing.  Please review the memo
linked below.

State Support Coordinators may use telephonic means to perform client contacts.

**BH Services**

Effective immediately, DBHDD has removed restrictions on telemedicine services that, until today, had restrictions noted within the service guidelines.   In addition, we are waiving requirements for face to face contacts where the service guidelines note a minimum number or ratio of face to face contacts.  Please review the document attached for specific allowances.  At this time, these allowances will be in place until April 30, 2020.

Many of you have asked questions about fiscal support during the pandemic. We do not have any specific information yet regarding the distribution of any emergency funds. Should this information become available, I assure you we will share it with you as quickly as possible. Thank you for your continued commitment to Georgia's safety net.

Attachment:  Behavioral Health Service Allowances, 3/14/2020

**Georgia Department of Behavioral Health & Developmental Disabilities**
Office of the Commissioner
2 Peachtree Street, NW  |  24th Floor  |  Atlanta, Georgia 30303  |  404.463.7946  |  dbhdd.georgia.gov

**D·B·H·D·D**

**Georgia Department of Behavioral Health & Developmental Disabilities**

Judy Fitzgerald, Commissioner

Office of the Commissioner

Attachment 1: Behavioral Health Service Allowances, 3/14/2020

Effective March 14, 2020 and through April 30, 2020, the following allowances for DBHDD Behavioral Health Services are in effect.

**Telemedicine Allowances:**

Currently, the DBHDD Behavioral Health Provider Manual has this clause associated with several services:

*To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language (one-to-one via Telemedicine versus use of interpreters). Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language.*

For the specific services which have this clause, through April 30, 2020, DBHDD will wive the Service Accessibility requirement to allow for individuals to access services via Telemedicine. All other service requirements must be met (practitioner requirements, documentation, consent, adherence to IRP content, etc.), especially content defined in Part II, Section I, 1.B.16.a-c.

DBHDD will also allow Part II, Section I, 1.B.16.d. to be expanded as a part of the waiver above, allowing i. and ii. below to apply to the Telemedicine allowances defined in this guidance through April 30, 2020. Providers can apply the language in green to clearly interpret the allowance as it will be defined during this waiver period:

*To promote access, providers who are using Telemedicine 1) as a tool to provide direct interventions to individuals for whom English is not their first language (one-to-one versus through use of interpreters) or 2) for the waiver period associated with COVID-19 prevention measures are exempt from:*

    *i.   The required percent of community-based services ratios defined in the Service Definitions herein; and*
    *ii.  The required minimum face-to-face expectations (allowing face-to-face to be via telemedicine).*

**Impacted Services:**

Addictive Disease Services and Support
Addictive Diseases Peer Support - IND
Behavioral Health Assessment
Case Management
Community Support Team
Crisis Intervention
Family Counseling
Family Training
Individual Counseling
Intensive Case Management

Intensive Family Intervention
Mental Health Peer Support - IND
Nursing Assessment and Health
Parent Peer Support - IND
Peer Whole Health and Wellness- IND
Psychological Testing
Psychosocial Rehab - IND
Service Plan Development
Treatment Court Services - Adult Addictive Diseases
Youth Peer Support - IND

**In addition to the telemedicine allowances noted above, effective now until April 30, 2020, the following service requirements will be adjusted as noted:**

| Service | Existing DBHDD Provider Manual Requirement | Waiver through April 30, 2020 |
|---|---|---|
| ADSS | 1. The agency providing this service must be a Tier 1 or Tier 2 provider, an Intensive Outpatient Program (IOP) specialty provider, or a WTRS provider. Contact must be made with the individual receiving ADSS services a minimum of twice each month. At least one of these contacts must be face-to-face and the second may be either face-to-face or telephone contact depending on the individual's support needs and documented preferences. | 1. The agency providing this service must be a Tier 1 or Tier 2 provider, an Intensive Outpatient Program (IOP) specialty provider, or a WTRS provider. Contact must be made with the individual receiving ADSS services a minimum of twice each month. |
| | 2. At least 50% of ADSS service units must be delivered face-to-face with the identified individual receiving the service. In the absence of the required monthly face-to-face contact and if at least two unsuccessful attempts to make face-to-face contact | 2. Waived completely |

Georgia Department of Behavioral Health & Developmental Disabilities
Office of the Commissioner
2 Peachtree Street, NW | 24th Floor | Atlanta, Georgia 30303 | 404.463.7946 | dbhdd.georgia.gov

| | | |
|---|---|---|
| | have been tried and documented, the provider may bill for a maximum of two telephone contacts in that specified month. | |
| Assertive Community Treatment | 6. At least 80% of all service units must involve face-to-face contact with individuals. Eighty percent (80%) or more of face-to-face service units must be provided outside of program offices in locations that are comfortable and convenient for individuals (including the individual's home, based on individual need and preference and clinical appropriateness). | 6. Waived completely |
| | 7. During the course of ACT service delivery, the ACT Team will provide the intensity and frequency of service needed for each individual. ACT teams are expected to achieve fidelity with the DACTS Model. To achieve a score of ""4"" in the Frequency of Contact Measure within DACTS, ACT Teams must provide a median of 3-3.99 face-to-face contacts per week across a sample of agency's ACT individuals. This measure is calculated by determining the median of the average weekly face-to-face contacts of each individual in the sample. At least one of these monthly contacts must include symptom assessment/management and management of medications. | 7. During the course of ACT service delivery, the ACT Team will provide the intensity and frequency of service needed for each individual.  ACT Teams must provide a median of 3-3.99 contacts per week across a sample of agency's ACT individuals. This measure is calculated by determining the median of the average weekly contacts of each individual in the sample. At least one of these monthly contacts must include symptom assessment/management and management of medications. |
| | 8. During discharge transition, the number of face-to-face visits per week will be determined based on the person's mental health acuity with the expectation that these individuals participating in ACT transitioning must receive a minimum of 4 face-to-face contacts per month during the documented active transition period. | 8. During discharge transition, the number of contacts per week will be determined based on the person's mental health acuity with the expectation that these individuals participating in ACT transitioning must receive a minimum of 4 contacts per month during the documented active transition period. |
| | 14. It is expected that 90% or more of the individuals have face to face contact with more than one staff member in a 2-week period." | 14. It is expected that 90% or more of the individuals have contact with more than one staff member in a 2-week period." |

Georgia Department of Behavioral Health & Developmental Disabilities
Office of the Commissioner
2 Peachtree Street, NW | 24th Floor | Atlanta, Georgia 30303 | 404.463.7946 | dbhdd.georgia.gov

| Case Management | 6. Contact must be made with the individual receiving CM a minimum of two (2) times a month. At least one of the monthly contacts must be face-to-face in non-clinic/community-based setting and the other may be either face-to-face or telephone contact (denoted by the UK modifier) depending on the individual's identified support needs. While the minimum number of contacts is stated above, individual clinical need is always to be met and may require a level of service higher than the established minimum criteria for contact. | 6. Contact must be made with the individual receiving CM a minimum of two (2) times a month. When the telephone modality is used, it is denoted by the UK modifier. While the minimum number of contacts is stated above, individual clinical/support needs are always to be met and may require a level of service higher than the established minimum criteria for contact. |
|---|---|---|
| | 7. At least 50% of CM service units must be delivered face-to-face with the identified individual receiving the service and the majority of all face-to-face service units must be delivered in non-clinic settings over the authorization period (these units are specific to single individual records and are not aggregate across an agency/program or multiple payers). | 7. At least 50% of CM units must be provided directly to the individual (with the remaining contacts allowed for collateral contacts). |
| | 8. The majority of all face-to-face service units must be delivered in non-clinic settings (i.e. any place that is convenient for the individual such as FQHC, place of employment, community space) over the course of the authorization period (these units are specific to single individual consume records and are not aggregate across an agency/program or multiple payers). | 8. Waived completely. |
| | 9. In the absence of meeting the minimum monthly face-to-face contact and if at least two (2) unsuccessful attempts to make face-to-face contact have been tried and documented, the provider may bill for a maximum of one (1) telephone contact in that specified month (denoted by the UK modifier). Billing for collateral contact only may not exceed 30 consecutive days. | 9. Waived completely. |

Georgia Department of Behavioral Health & Developmental Disabilities
Office of the Commissioner
2 Peachtree Street, NW | 24th Floor | Atlanta, Georgia 30303 | 404.463.7946 | dbhdd.georgia.gov

|  |  |  |
|---|---|---|
|  | 10. After four (4) unsuccessful attempts at making face to face contact with an individual, the CM and members of the treatment team will re-evaluate the IRP and utilization of services. | 10. After four (4) unsuccessful attempts at making contact with an individual, the CM and members of the treatment team will re-evaluate the IRP and utilization of services. |
|  | 13. When the primary focus of CM is on medication maintenance, the following allowances apply: a. These individuals are not counted in the off-site service requirement or the individual-to-staff ratio; and b. These individuals are not counted in the monthly face-to-face contact requirement; however, a minimum of one (1) face-to-face contact is required every three (3) months; and monthly calls are an allowed billable service." | 13. Waived completely. |
| Community Support Individual | 3. Contact must be made with youth receiving Community Support services a minimum of twice each month. At least one of these contacts must be face-to-face and the second may be either face-to-face or telephone contact (denoted by the UK modifier) depending on the youth's support needs and documented preferences of the family.

5. In the absence of the required monthly face-to-face contact and if at least two unsuccessful attempts to make face-to-face contact have been tried and documented, the provider may bill for a maximum of two telephone contacts in that specified month (denoted by the UK modifier). | 3. Contact must be made with youth receiving Community Support services a minimum of twice each month. Contacts must be face-to-face or via telephone contact (denoted by the UK modifier) depending on the youth's support needs.

5. Waived completely |
| Community Support Team | 3. At least 60% of all service units must involve face-to-face contact with individuals. The majority (51% or greater) of face-to-face service units must be provided outside of program offices in locations that are comfortable and convenient for individuals (including the individual's home, based on individual need and preference and clinical appropriateness). | 3. Waived completely. |

Georgia Department of Behavioral Health & Developmental Disabilities
Office of the Commissioner
2 Peachtree Street, NW | 24th Floor | Atlanta, Georgia 30303 | 404.463.7946 | dbhdd.georgia.gov

| | | |
|---|---|---|
| | 4. A minimum of four (4) face-to-face visits must be delivered monthly by the CST. Additional contacts above the monthly minimum may be either face-to-face or telephone collateral contact depending on the individual's support needs and keeping to the expected 60% of units being face-to-face. | 4. A minimum of four (4) contacts must be delivered monthly by the CST. Additional contacts above the monthly minimum may be either face-to-face or telephone collateral contact depending on the individual's support needs. |
| | 1. A CST shall have a minimum of 3.5 team members which must include: c. (.5 FTE) A half-time registered nurse (RN). This person will.... Nursing face-to-face time with each individual served by the team is determined based on the IRP, physician assessment, and is delivered at a frequency that is clinically and/or medically indicated." | 1. A CST shall have a minimum of 3.5 team members which must include: c. (.5 FTE) A half-time registered nurse (RN). This person will.... Nursing contacts with each individual served by the team is determined based on the IRP, physician assessment, and is delivered at a frequency that is clinically and/or medically indicated." |
| Community Transition Planning | Community Transition Planning (CTP) is a service provided by Tier 1, Tier II and IFI providers to address the care, service, and support needs of youth to ensure a coordinated plan of transition from a qualifying facility to the community. Each episode of CTP must include contact with the individual, family, or caregiver with a minimum of one (1) face-to-face contact with the individual prior to release from a facility. | Community Transition Planning (CTP) is a service provided by Tier 1, Tier II and IFI providers to address the care, service, and support needs of youth to ensure a coordinated plan of transition from a qualifying facility to the community. Each episode of CTP must include contact with the individual, family, or caregiver prior to release from a facility. |
| Community Transition Peer Support | 3. Service may be provided by phone (although 50% must be provided face to face, telephonic contacts are limited to 50%). | 3. Service may be provided by phone |
| Psychological Testing | Psychological testing consists of a face-to-face assessment of emotional functioning, personality, cognitive functioning (e.g. thinking, attention, memory) or intellectual abilities using an objective and standardized tool that has uniform procedures for | Psychological testing consists of an assessment of emotional functioning, personality, cognitive functioning (e.g. thinking, attention, memory) or intellectual abilities using an objective and standardized |

Georgia Department of Behavioral Health & Developmental Disabilities
Office of the Commissioner
2 Peachtree Street, NW | 24th Floor | Atlanta, Georgia 30303 | 404.463.7946 | dbhdd.georgia.gov

| | | |
|---|---|---|
| | administration and scoring and utilizes normative data upon which interpretation of results is based....<br><br>This service covers both the face-to-face administration of the test instrument(s) by a qualified examiner as well as the time spent by a psychologist or physician (with the proper education and training) interpreting the test results and preparing a written report in accordance with CPT procedural guidance. | tool that has uniform procedures for administration and scoring and utilizes normative data upon which interpretation of results is based....<br><br>This service covers both the direct administration of the test instrument(s) by a qualified examiner as well as the time spent by a psychologist or physician (with the proper education and training) interpreting the test results and preparing a written report in accordance with CPT procedural guidance. |
| High Utilizer Management | 6. Using assertive engagement skills, the HUM Navigator will function to perform and report on the following 30-60-90 Day Activities:<br>Within 30 days (Rapid Intensive Engagement)<br>• have had face-to-face contact with individual | 6. Using assertive engagement skills, the HUM Navigator will function to perform and report on the following 30-60-90 Day Activities:<br>Within 30 days (Rapid Intensive Engagement)<br>• have had contact with individual |
| Intensive Customized Care Coordination | Intensive Customized Care Coordination is differentiated from traditional case management by:<br>• The frequency of the coordination: an average of one face-to-face meeting weekly.<br><br>15. The Care Coordinator will average 1 face-to-face per week per individual served. | Intensive Customized Care Coordination is differentiated from traditional case management by:<br>• The frequency of the coordination: an average of one meeting with the youth/family weekly.<br><br>15. The Care Coordinator will average 1 contact per week per individual served. |
| Intensive Family Intervention | 4. At least 60% of service units must be provided face-to-face with youth and their families and 80% of all face-to-face service units must be delivered in non-clinic settings over the authorization period. | 4. Therapy intervention can be provided via Telemedicine. Coordination and skills enhancement service components may be provided telephonically. |

| | | |
|---|---|---|
| | ii. Meet at least twice a month with families face-to-face or more often as clinically indicated. | ii. Engage at least twice a month with the families or more often as clinically indicated. |
| Parent Peer Support - Individual | 4. Contact must be made with the individual receiving PPS services a minimum of twice each month. At least one of these contacts must be face-to-face and the second may be either face-to-face or telephone contact depending on the individual's support needs and documented preferences. | 4. Contact must be made with the individual receiving PPS services a minimum of twice each month. |
| | 5. At least 50% of PPS service units must be delivered face-to-face with the family/youth receiving the service. In the absence of the required monthly face-to-face contact and if at least two unsuccessful attempts to make face-to-face contact have been tried and documented, the provider may bill for a maximum of two telephone contacts in that specified month. | 5. Waived completely |
| | Service Accessibility: 2. PPS may be provided at a service site, in the recipient's home, or in any community setting appropriate for providing the services as specified in the recipient's behavioral health recovery plan; via phone (although 50% must be provided face to face, telephonic contacts are limited to 50%). | Service Accessibility: 2. PPS may be provided at a service site, in the recipient's home, or in any community setting appropriate for providing the services as specified in the recipient's behavioral health recovery plan; via phone |
| Youth Peer Support - Individual | 2. YPS may be provided at a service site, in the recipient's home, or in any community setting appropriate for providing the services as specified in the recipient's behavioral health recovery plan; via phone (although 50% must be provided face to face, telephonic contacts are limited to 50%). | 2. YPS may be provided at a service site, in the recipient's home, or in any community setting appropriate for providing the services as specified in the recipient's behavioral health recovery plan; via phone |
| Psychosocial Rehabilitation- Individual | 4. In the absence of the required monthly face-to-face contact and if at least two unsuccessful attempts to make face-to-face contact have been tried and documented, the provider may bill for a maximum of two telephone contacts in that specified month. | 4. Waived completely. |

Georgia Department of Behavioral Health & Developmental Disabilities
Office of the Commissioner
2 Peachtree Street, NW | 24th Floor | Atlanta, Georgia 30303 | 404.463.7946 | dbhdd.georgia.gov

| | | 6. When the primary focus of PSR-I is for medication maintenance, the following allowances apply:<br>a. These individuals are not counted in the offsite service requirement or the individual-to-staff ratio; and<br>b. These individuals are not counted in the monthly face-to-face contact requirement; however, face-to-face contact is required every 3 months and monthly calls are an allowed billable service. | 6. When the primary focus of PSR-I is for medication maintenance, the following allowances applies:<br>a. These individuals are not counted in the offsite service requirement or the individual-to-staff ratio; |
| Peer Support WHW - Individual | REQUIRED COMPONENTS: 3. At least 60% of all service units must involve face-to-face contact with individuals. The remainder of direct billable service includes telephonic intervention directly with the person or is contact alongside the person to navigate and engage in health and wellness systems/activities. | 3. Waived completely. |

Georgia Department of Behavioral Health & Developmental Disabilities
Office of the Commissioner
2 Peachtree Street, NW | 24th Floor | Atlanta, Georgia 30303 | 404.463.7946 | dbhdd.georgia.gov

# Behavioral Health Service Provision

## Telemedicine and Telehealth

Facilitator:
Jennifer Hunt-Manchester

Presenters:
Melissa Sperbeck
Monica Johnson
Wendy Tiegreen
Lynn Copeland

March 20, 2020

**Updated March 18, 2020**

This document provides guidance related to service adjustments made during the COVID-19 crisis.

Telemedicine is the use of medical information exchanged from one secured site to another via electronic communications to improve a patient's health. Electronic communication means the use of interactive telecommunications equipment that includes, at a minimum, audio and video equipment permitting two-way, real time interactive communication between the patient and the practitioner at the distant site. In response to COVID-19, Federal and State authorities are referencing the term "telehealth" which is a broad definition which encompasses phone, text, email, monitoring, and other modalities of interaction as being enabled. Very specifically, DBHDD and DCH are enabling telephonic interventions for services and all references herein qualify that process.

**Telemedicine and Telephonic Allowances:**

On March 14, 2020 the following allowance was provided to the field related to telemedicine:

Currently, the DBHDD Behavioral Health Provider Manual has this clause associated with several services:

*To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language (one-to-one via Telemedicine versus use of interpreters). Telemedicine may only be utilized when delivering this service to an individual for whom English is not their first language.*

For the specific services which have this clause, through April 30, 2020, DBHDD will waive the Service Accessibility requirement to allow for individuals to access services via Telemedicine. All other service requirements must be met (practitioner requirements, documentation, consent, adherence to IRP content, etc.), especially content defined in Part II, Section I, 1.B.16.a-c.

DBHDD will also allow Part II, Section I, 1.B.16.d. to be expanded as a part of the waiver above, allowing i. and ii. below to apply to the Telemedicine allowances defined in this guidance through April 30, 2020. Providers can apply the language in green to clearly interpret the allowance as it will be defined during this waiver period:

*To promote access, providers who are using Telemedicine 1) as a tool to provide direct interventions to individuals for whom English is not their first language (one-to-one versus through use of interpreters) or 2) for the waiver period associated with COVID-19 prevention measures are exempt from:*

    i.   *The required percent of community-based services ratios defined in the Service Definitions herein; and*

    ii.  *The required minimum face-to-face expectations (allowing face-to-face to be via telemedicine).*

**Update as of March 19, 2020:**

With a series of guidance from our federal partners in the past two days and with the DCH Banner Message dated March 17, 2020, DBHDD is able to revise the notice provided to the field on March 14, 2020 and to provide an expansion in the use of the telephone as a tool for the direct provision of service (including modes such as Apple FaceTime, Facebook Messenger video chat, Google Hangouts video, or Skype as implemented and described herein: https://www.hhs.gov/hipaa/for-professionals/special-topics/emergency-preparedness/notification-enforcement-discretion-telehealth/index.html).

All Medicaid providers should review the DCH Banner Message posted on the MMIS website.  DBHDD offers the below information related to the allowance and impact on DBHDD behavioral health services.  The following excerpt from the Banner message provides the rationale for the allowances and requirements noted below.

*The codes that will be billed must be identified as "telehealth services" by utilizing a telehealth **Place of Service (POS)** code or a **telehealth modifier (e.g., GT)**.*

Services listed in Table A have a "GT" modifier code available.  Therefore, these services may be provided with via telemedicine and telephonic methods The GT modifier must be used to denote either service modality.

**TABLE A**

| | |
|---|---|
| Addictive Disease Services and Support | Intensive Case Management |
| Addictive Diseases Peer Support - IND | Intensive Family Intervention |
| Assertive Community Treatment* | Mental Health Peer Support - IND |
| Behavioral Health Assessment | Nursing Assessment and Health* |
| Case Management | Parent Peer Support - IND |
| Community Support Team* | Peer Whole Health and Wellness- IND |
| Crisis Intervention | Psychiatric Treatment |
| Community Support | Psychological Testing |
| Diagnostic Assessment | Psychosocial Rehab - IND |
| Family Counseling | Service Plan Development |
| Family Training | Treatment Court Services - Adult Addictive Diseases |
| Individual Counseling | Youth Peer Support - IND |

*indicates a service-specific requirement related to telemedicine and telehealth, noted in Table C

There are other services that are allowable via telemedicine or telephonic methods noted in Table B. However, these services do not have a GT modifier (in the Provider Manual or IT system). In order to be in compliance with Medicaid requirement noted above, providers must submit the Place of Service (POS) code "02" on **Medicaid claims** to denote the methodology.

At this time, 02 Place of Service code 02 is not activated for DBHDD state-funded claims. Therefore, **state-funded service claims** may be submitted without the Place of Service (POS) code "02".

Table B

| | |
|---|---|
| Assertive Community Treatment* | Psychosocial Rehabilitation – Group (no more than 6 participants) |
| High Utilizer Management | Peer Support Whole Health & Wellness -Group (no more than 6 participants) |
| Intensive Customized Care Coordination | Group Training (no more than 6 participants) |
| Supported Employment | Group Counseling (no more than 6 participants) |
| Task-Oriented Rehabilitation Services | SA Intensive Outpatient Program (no more than 6 participants) |
| Treatment Court Services - Adult AD | Mental Health Peer Support (no more than 6 participants) |
| WTRS Outpatient Services (in accordance with unbundled services named) | Parent Peer Support - Group (no more than 6 participants) |
| | Youth Peer Support – Group (no more than 6 participants) |
| | AD Peer Support Program (no more than 6 participants) |

*indicates a service-specific requirement related to telemedicine and telehealth, noted in Table C

When the telephone or telemedicine is used for the provision of one of these services, the note shall document the use of that modality.

Telemedicine and services provided via telephone must meet requirements noted in the Provider Manual. However, for this time period, DBHDD will allow documentation of verbal consent for telemedicine and telephonic services.

Please note that, for DBHDD services, originating sites may include traditional locations as well as homes, schools, and other community-based settings (see DCH Telehealth Guidance, page 19. This guidance is located on the GAMMIS website. Providers may locate the Telehealth Guidance manual by accessing the following link: www.mmis.georgia.gov. Select the "Provider Information" tab, then select "Provider Manuals." Scroll down to the locate the Telehealth/Telemedicine manual).

For consistency, the provisions below applicable to state funded services mirror DCH requirements noted in their bulletin:

Expansion of the use of telehealth will be supported in the following manner:

1. Allowing telehealth services to be provided during the period of COVID-19 emergency response by the following modalities:
   a. Telephone communication
   b. Use of webcam or other audio and video technology
   c. Video cell phone communication
2. All services must be deemed medically necessary
3. Qualified healthcare providers must continue to comply with state telehealth laws and regulations, including professional licensure, scope of practice, standards of care, patient consent and other payment requirements for Medicaid members.

**In addition to the telemedicine allowances noted above, for effective now until April 30, 2020, the following service requirements will be adjusted as noted in Table 3**

**TABLE C**
**March 19 updates are in red font.**

| Service | Existing DBHDD Provider Manual Requirement | Waiver through April 30, 2020 |
|---|---|---|
| ADSS | 1. The agency providing this service must be a Tier 1 or Tier 2 provider, an Intensive Outpatient Program (IOP) specialty provider, or a WTRS provider. Contact must be made with the individual receiving ADSS services a minimum of twice each month. At least one of these contacts must be face-to-face and the second may be either face-to-face or telephone contact depending on the individual's support needs and documented preferences. | 1. The agency providing this service must be a Tier 1 or Tier 2 provider, an Intensive Outpatient Program (IOP) specialty provider, or a WTRS provider. Contact must be made with the individual receiving ADSS services a minimum of twice each month. |
| | 2. At least 50% of ADSS service units must be delivered face-to-face with the identified individual receiving the service. In the absence of the required monthly face-to-face contact and if at least two unsuccessful attempts to make face-to-face contact have been tried and documented, the provider may bill for a maximum of two telephone contacts in that specified month. | 2. Waived completely |
| Assertive Community Treatment | 6. At least 80% of all service units must involve face-to-face contact with individuals. Eighty percent (80%) or more of face-to-face service units must be provided outside of program offices in locations that are comfortable and convenient for individuals (including the individual's home, | 6. Waived completely |

| | | |
|---|---|---|
| based on individual need and preference and clinical appropriateness). | 7. During the course of ACT service delivery, the ACT Team will provide the intensity and frequency of service needed for each individual. ACT teams are expected to achieve fidelity with the DACTS Model. To achieve a score of ""4"" in the Frequency of Contact Measure within DACTS, ACT Teams must provide a median of 3-3.99 face-to-face contacts per week across a sample of agency's ACT individuals. This measure is calculated by determining the median of the average weekly face-to-face contacts of each individual in the sample. At least one of these monthly contacts must include symptom assessment/management and management of medications. | 7. During the course of ACT service delivery, the ACT Team will provide the intensity and frequency of service needed for each individual. ACT Teams must provide a median of 3-3.99 contacts per week across a sample of agency's ACT individuals. This measure is calculated by determining the median of the average weekly contacts of each individual in the sample. At least one of these monthly contacts must include symptom assessment/management and management of medications. |
| | 8. During discharge transition, the number of face-to-face visits per week will be determined based on the person's mental health acuity with the expectation that these individuals participating in ACT transitioning must receive a minimum of 4 face-to-face contacts per month during the documented active transition period. | 8. During discharge transition, the number of contacts per week will be determined based on the person's mental health acuity with the expectation that these individuals participating in ACT transitioning must receive a minimum of 4 contacts per month during the documented active transition period. |
| | 14. It is expected that 90% or more of the individuals have face to face contact with more than one staff member in a 2-week period." | 14. It is expected that 90% or more of the individuals have contact with more than one staff member in a 2-week period." |
| | <span style="color:red">Special Conditions:</span><br><span style="color:red">1) In order to utilize any telephonic direct intervention, at least to one face-to-face intervention between the ACT team and the individual must occur per week.</span><br><span style="color:red">2) If there is any observation of decline in a person's state of wellness/recovery, the ACT team shall deploy to prevent the potential destabilization of that individual.</span><br><span style="color:red">3) The GT Modifier is only available for U1 and U2 Practitioners; providers should bill using this modifier for these practitioner types. For other practitioner levels, POS 02 must be used for Medicaid claims.</span><br><span style="color:red">4) The multi-disciplinary team may be held through telemedicine or telephonic technology.</span> | |

| Case Management | | |
|---|---|---|
| | 6. Contact must be made with the individual receiving CM a minimum of two (2) times a month. At least one of the monthly contacts must be face-to-face in non-clinic/community-based setting and the other may be either face-to-face or telephone contact (denoted by the UK modifier) depending on the individual's identified support needs. While the minimum number of contacts is stated above, individual clinical need is always to be met and may require a level of service higher than the established minimum criteria for contact. | 6. Contact must be made with the individual receiving CM a minimum of two (2) times a month. When the telephone modality is used, it is denoted by the UK modifier. While the minimum number of contacts is stated above, individual clinical/support needs are always to be met and may require a level of service higher than the established minimum criteria for contact. |
| | 7. At least 50% of CM service units must be delivered face-to-face with the identified individual receiving the service and the majority of all face-to-face service units must be delivered in non-clinic settings over the authorization period (these units are specific to single individual records and are not aggregate across an agency/program or multiple payers). | 7. At least 50% of CM units must be provided directly to the individual (with the remaining contacts allowed for collateral contacts). |
| | 8. The majority of all face-to-face service units must be delivered in non-clinic settings (i.e. any place that is convenient for the individual such as FQHC, place of employment, community space) over the course of the authorization period (these units are specific to single individual consume records and are not aggregate across an agency/program or multiple payers). | 8. Waived completely. |
| | 9. In the absence of meeting the minimum monthly face-to-face contact and if at least two (2) unsuccessful attempts to make face-to-face contact have been tried and documented, the provider may bill for a maximum of one (1) telephone contact in that specified month (denoted by the UK modifier). Billing for collateral contact only may not exceed 30 consecutive days. | 9. Waived completely. |
| | 10. After four (4) unsuccessful attempts at making face to face contact with an individual, the CM and members of the treatment team will re-evaluate the IRP and utilization of services. | 10. After four (4) unsuccessful attempts at making contact with an individual, the CM and members of the treatment team will re-evaluate the IRP and utilization of services. |
| | 13. When the primary focus of CM is on medication maintenance, the following allowances apply:<br>a. These individuals are not counted in the off-site service requirement or the individual-to-staff ratio; and | 13. Waived completely. |

| | | |
|---|---|---|
| | b. These individuals are not counted in the monthly face-to-face contact requirement; however, a minimum of one (1) face-to-face contact is required every three (3) months; and monthly calls are an allowed billable service." | |
| Community Support Individual | 3. Contact must be made with youth receiving Community Support services a minimum of twice each month. At least one of these contacts must be face-to-face and the second may be either face-to-face or telephone contact (denoted by the UK modifier) depending on the youth's support needs and documented preferences of the family.<br><br>5. In the absence of the required monthly face-to-face contact and if at least two unsuccessful attempts to make face-to-face contact have been tried and documented, the provider may bill for a maximum of two telephone contacts in that specified month (denoted by the UK modifier). | 3. Contact must be made with youth receiving Community Support services a minimum of twice each month. Contacts must be face-to-face or via telephone contact (denoted by the UK modifier) depending on the youth's support needs.<br><br>5. Waived completely |
| Community Support Team | 3. At least 60% of all service units must involve face-to-face contact with individuals. The majority (51% or greater) of face-to-face service units must be provided outside of program offices in locations that are comfortable and convenient for individuals (including the individual's home, based on individual need and preference and clinical appropriateness).<br><br>4. A minimum of four (4) face-to-face visits must be delivered monthly by the CST. Additional contacts above the monthly minimum may be either face-to-face or telephone collateral contact depending on the individual's support needs and keeping to the expected 60% of units being face-to-face.<br><br>1. A CST shall have a minimum of 3.5 team members which must include:<br>c. (.5 FTE) A half-time registered nurse (RN). This person will.... Nursing face-to-face time with each individual served by the team is determined based on the IRP, physician assessment, and is delivered at a frequency that is clinically and/or medically indicated."<br><br><span style="color:red">SPECIAL CONDITIONS: If there is any observation of decline in a person's state of wellness/recovery, the CST team shall deploy to prevent the potential destabilization of that individual.</span> | 3. Waived completely.<br><br>4. A minimum of four (4) contacts must be delivered monthly by the CST. Additional contacts above the monthly minimum may be either face-to-face or telephone collateral contact depending on the individual's support needs.<br><br>1. A CST shall have a minimum of 3.5 team members which must include:<br>c. (.5 FTE) A half-time registered nurse (RN). This person will.... Nursing contacts with each individual served by the team is determined based on the IRP, physician assessment, and is delivered at a frequency that is clinically and/or medically indicated." |

| | | |
|---|---|---|
| Community Transition Planning | Community Transition Planning (CTP) is a service provided by Tier 1, Tier II and IFI providers to address the care, service, and support needs of youth to ensure a coordinated plan of transition from a qualifying facility to the community. Each episode of CTP must include contact with the individual, family, or caregiver with a minimum of one (1) face-to-face contact with the individual prior to release from a facility. | Community Transition Planning (CTP) is a service provided by Tier 1, Tier II and IFI providers to address the care, service, and support needs of youth to ensure a coordinated plan of transition from a qualifying facility to the community. Each episode of CTP must include contact with the individual, family, or caregiver prior to release from a facility. |
| Community Transition Peer Support | 3. Service may be provided by phone (although 50% must be provided face to face, telephonic contacts are limited to 50%). | 3. Service may be provided by phone |
| Psychological Testing | Psychological testing consists of a face-to-face assessment of emotional functioning, personality, cognitive functioning (e.g. thinking, attention, memory) or intellectual abilities using an objective and standardized tool that has uniform procedures for administration and scoring and utilizes normative data upon which interpretation of results is based....

This service covers both the face-to-face administration of the test instrument(s) by a qualified examiner as well as the time spent by a psychologist or physician (with the proper education and training) interpreting the test results and preparing a written report in accordance with CPT procedural guidance. | Psychological testing consists of an assessment of emotional functioning, personality, cognitive functioning (e.g. thinking, attention, memory) or intellectual abilities using an objective and standardized tool that has uniform procedures for administration and scoring and utilizes normative data upon which interpretation of results is based....

This service covers both the direct administration of the test instrument(s) by a qualified examiner as well as the time spent by a psychologist or physician (with the proper education and training) interpreting the test results and preparing a written report in accordance with CPT procedural guidance. |
| High Utilizer Management | 6. Using assertive engagement skills, the HUM Navigator will function to perform and report on the following 30-60-90 Day Activities:
Within 30 days (Rapid Intensive Engagement)
• have had face-to-face contact with individual | 6. Using assertive engagement skills, the HUM Navigator will function to perform and report on the following 30-60-90 Day Activities:
Within 30 days (Rapid Intensive Engagement)
• have had contact with individual |
| Intensive Customized Care Coordination | Intensive Customized Care Coordination is differentiated from traditional case management by:
• The frequency of the coordination: an average of one face-to-face meeting weekly.
15. The Care Coordinator will average 1 face-to-face per week per individual served. | Intensive Customized Care Coordination is differentiated from traditional case management by:
• The frequency of the coordination: an average of one meeting with the youth/family weekly.
15. The Care Coordinator will average 1 contact per week per individual served. |
| Intensive Family Intervention | 4. At least 60% of service units must be provided face-to-face with youth and their families and 80% of all face-to-face | 4. Therapy intervention can be provided via Telemedicine. Coordination and skills enhancement service components may be provided telephonically. |

| | | |
|---|---|---|
| | service units must be delivered in non-clinic settings over the authorization period. ii. Meet at least twice a month with families face-to-face or more often as clinically indicated. | ii. Engage at least twice a month with the families or more often as clinically indicated. |
| Parent Peer Support - Individual | 4. Contact must be made with the individual receiving PPS services a minimum of twice each month. At least one of these contacts must be face-to-face and the second may be either face-to-face or telephone contact depending on the individual's support needs and documented preferences. 5. At least 50% of PPS service units must be delivered face-to-face with the family/youth receiving the service. In the absence of the required monthly face-to-face contact and if at least two unsuccessful attempts to make face-to-face contact have been tried and documented, the provider may bill for a maximum of two telephone contacts in that specified month. Service Accessibility: 2. PPS may be provided at a service site, in the recipient's home, or in any community setting appropriate for providing the services as specified in the recipient's behavioral health recovery plan; via phone (although 50% must be provided face to face, telephonic contacts are limited to 50%). | 4. Contact must be made with the individual receiving PPS services a minimum of twice each month. 5. Waived completely Service Accessibility: 2. PPS may be provided at a service site, in the recipient's home, or in any community setting appropriate for providing the services as specified in the recipient's behavioral health recovery plan; via phone |
| Youth Peer Support - Individual | 2. YPS may be provided at a service site, in the recipient's home, or in any community setting appropriate for providing the services as specified in the recipient's behavioral health recovery plan; via phone (although 50% must be provided face to face, telephonic contacts are limited to 50%). | 2. YPS may be provided at a service site, in the recipient's home, or in any community setting appropriate for providing the services as specified in the recipient's behavioral health recovery plan; via phone |
| Psychosocial Rehabilitation- Individual | 4. In the absence of the required monthly face-to-face contact and if at least two unsuccessful attempts to make face-to-face contact have been tried and documented, the provider may bill for a maximum of two telephone contacts in that specified month. 6. When the primary focus of PSR-I is for medication maintenance, the following allowances apply: a. These individuals are not counted in the offsite service requirement or the individual-to-staff ratio; and b. These individuals are not counted in the monthly face-to-face contact requirement; however, face-to-face contact is | 4. Waived completely. 6. When the primary focus of PSR-I is for medication maintenance, the following allowances applies: a. These individuals are not counted in the offsite service requirement or the individual-to-staff ratio; |

| | |
|---|---|
| | required every 3 months and monthly calls are an allowed billable service. |
| Peer Support WHW - Individual | REQUIRED COMPONENTS: 3. At least 60% of all service units must involve face-to-face contact with individuals. The remainder of direct billable service includes telephonic intervention directly with the person or is contact alongside the person to navigate and engage in health and wellness systems/activities. | 3. Waived completely. |
| Intensive Case Management | 6. REQUIRED COMPONENTS: Maintain face-to-face contact with individuals receiving Intensive Case Management services, providing a supportive and practical environment that promotes recovery and maintain adherence to the desired performance outcomes that have been established for individuals receiving ICM services. It is expected that frequency of face-to-face contact is increased when clinically indicated in order to achieve the performance outcomes, and the intensity of service is reflected in the individual's IRP.

7. REQUIRED COMPONENTS: A minimum of 4 face-to-face visits must be delivered on a monthly basis to each consumer. Additional contacts may be either face-to-face or telephone collateral contact depending on the individual's support needs, 60% of total units must be face-to-face contacts with the individual.

8. REQUIRED COMPONENTS: At least 50% of all face-to-face service units must be delivered in non-clinic/community-based settings (i.e., any place that is convenient for the individual such as a FQHC, place of employment, community space) over the authorization period (these units are specific to single individual records and are not aggregate across an agency/program or multiple payers).
9. In the absence of monthly face-to-face contacts and if at least two unsuccessful attempts to make face-to-face contact have been tried and documented, the provider may bill for a maximum of 2 telephone contacts in that specified month (denoted by the UK modifier). This may occur for no more than 60 consecutive days. | 6. REQUIRED COMPONENTS: Maintain engagement with individuals receiving Intensive Case Management services, providing a supportive and practical environment that promotes recovery and maintain adherence to the desired performance outcomes that have been established for individuals receiving ICM services. It is expected that frequency of face-to-face contact is increased when clinically indicated in order to achieve the performance outcomes/mitigate escalating crisis, and the intensity of service is reflected in the individual's IRP but this must at least occur 1x month.

7. REQUIRED COMPONENTS: A minimum of 4 contacts must be delivered on a monthly basis to each consumer. At least one must be face-to-face (or more depending on the individual's support needs).

8-10. Waived Completely. |

| | | |
|---|---|---|
| | 10. After 8 unsuccessful attempts at making face to face contact with an individual, the ICM and members of the treatment/support team will re-evaluate the standing IRP and utilization of services. | |
| Nursing Assessment and Health Services | REQUIRED COMPONENTS 3: Each nursing contact should document the checking of vital signs (Temperature, Pulse, Blood Pressure, Respiratory Rate, and weight, if medically indicated or if related to behavioral health symptom or behavioral health medication side effect) in accordance with general psychiatric nursing practice. | SPECIAL CONDITION: The review of vital signs is a crucial aspect of a health delivery plan for the individuals we support (especially those with significant comorbidities) and, at the same time, DBHDD is open to flexibility. We see our nursing services as key to that whole health delivery so the expectation will be that every other Nursing Assessment service can waive vitals (i.e. 50% of contact would be via telemedicine or telephonic in which a good inquiry related to health status would be expected). If there is a Medication Administration intervention provided by a nurse within your agency, this can also qualify as a documented opportunity to check with the individual on all symptoms, health indicators and vitals, counting as 50% of the Nursing face-to-face contact (which can be noted in that Progress Note). |



**Georgia Department of Behavioral Health
& Developmental Disabilities**

Judy Fitzgerald, Commissioner

**D·B·H·D·D**    Division of Behavioral Health
Office of Adult Mental Health

To:            DBHDD-contracted providers of Assertive Community Treatment (ACT)
               and Community Support Team (CST)

From:          Terri Timberlake, Ph.D., Director
               Office of Adult Mental Health

Date:          March 17, 2020

Re:            COVID 19 guidance for ACT and CST

The current Coronavirus pandemic has sparked heightened health and safety concerns across our state. Our Department is hopeful that each provider is taking the recommended precautions to reasonably support your own wellbeing and that of your staff. Similarly, we expect health and safety measures to be taken to support the needs of individuals enrolled in ACT and CST. This population represents the most vulnerable, high need individuals served by our public behavioral health system. Without necessary support, these individuals face increased risk for crisis. As you are aware, this past weekend Commissioner Fitzgerald released communication addressing use of telemedicine and waiving requirements for face-to-face service delivery contacts where the service guidelines note a minimum number or ratio of face to face contacts through April 30, 2020.  In addition to that allowance, below is guidance specific to ACT and CST service delivery.

 1.       If an ACT or CST enrolled individual is unreachable or refuses telemedicine for a period of 4 consecutive days, an in person, face-to- face therapeutic contact is expected to be attempted. ACT and CST team members making in person contacts should use Centers for Disease Control (CDC) recommended contact precautions for infectious diseases. (Telemedicine is defined as interactive, secure and confidential audio-visual communication between practitioner and client, provided by MDs/NPs/ physician extenders).

2.       Telemedicine contact with ACT or CST enrolled individuals must remain consistent with the service definition, and include documented addressing of individual's needs, and IRP goals.

3.       If there is indication of behavioral health decline/decompensation, including but not limited to behavioral health symptom escalation, behavioral health crisis, or new behavioral health symptoms, there must be a face to face intervention within 24 hours for ACT or CST enrolled individuals.

4.       Interactions with enrolled individuals should include provision of education to clients about COVID19 symptoms and precautions, along with increased support related to virus fear and anxiety.

5.     ACT and CST team meetings must continue be held with all available team members. This may be via a secure virtual portal (i.e., go-to-meeting, zoom or webex).

6.     In advance of any decrease in face-face visits, ACT and CST must work diligently to assist enrolled clients with obtaining sufficient supplies and necessities (i.e., food, medical supplies).

Please be aware that my office will facilitate scheduled annual DACTS fidelity reviews remotely via webex with audio-visual enablement.  We are all in this together, we can choose to be proactive about the precautions that each of us can take and hopeful that the impact of the virus will decline.  The CDC and World Health Organization websites contain information from experts that will help us take sensible steps and support our ability to make health promoting choices. The most up to date information, including guidance for clinicians and those staffing individuals' homes can be found on the Georgia DPH website.  DBHDD will continue to provide updates via the Provider Newsletter: Network News. **Should you have questions, please submit them to our Provider Relations team via the Provider Issue Management System or submit an email to DBHDD.Provider@dbhdd.ga.gov**

We appreciate your continued commitment to the population whom we collectively serve.

cc:     Monica Johnson, Director, Division of Behavioral Health
        Adrian Johnson, Assistant Director, Division of Behavioral Health
        Kimberly Briggs, Assistant Director, Office of Adult Mental Health
        Sarepta Archila, ACT and CST Unit Coordinator



**Georgia Department of Behavioral Health**
**& Developmental Disabilities**

Judy Fitzgerald, Commissioner

**D·B·H·D·D**    Division of Behavioral Health

TO: Opioid Treatment Programs of Georgia

FROM: State Opioid Treatment Authority

March 17, 2020

RE: Guidance for Infection Control and Prevention of COVID-19

**Background**: The Department of Behavioral Health and Developmental Disabilities (DBHDD) Office of Addictive Diseases (OAD) is Georgia's State Opioid Treatment Authority (SOTA). As such, DBHDD's OAD collaborates with other agencies in developing guidelines for establishing and/or closing Medication Assisted Treatment (MAT) Programs operating in Georgia. As the SOTA, DBHDD is also responsible for establishing guidelines for the administration of MAT programs. In this capacity we are concerned with the continuity of care for all individuals currently enrolled in Opioid Treatment Programs in Georgia. Due to the current challenge of addressing COVID-19 in our state, we are providing additional guidance.

**Guidance**: All Opioid Treatment Programs in Georgia should read and follow the attached DBHDD SOTA Policy Disaster Emergency Closure Procedure 01-284 State Opioid Treatment Authority Disaster Emergency Closure, 01-284. In addition, OTP's should follow the suggested guidelines of The Substance Abuse Mental Health Services Administration (SAMHSA) for COVID-19. https://www.samhsa.gov/medication-assisted-treatment/statutes-regulations-guidelines/covid-19-guidance-otp?fbclid=IwAR1yqGWHEnjaQ0XgCkhmkZlFdElLtN4aAJ9vdjciYH6EmssKb6nzRZE1leI

## CLINIC AND PATIENT SAFETY

Opioid Treatment Programs should implement procedures to monitor, recognize and manage patients, staff and visitors to their facility for the prevention of COVID-19.

OTPs should identify patients with signs and symptoms of respiratory infections before they enter the treatment area when possible. Patients with symptoms of a respiratory infection should put on a facemask (i.e., surgical mask) at check-in and keep it on until they leave the facility.

OTPs should encourage patients to inform staff of fever or respiratory symptoms immediately upon arrival at the facility.

OTPs should have patients call ahead to report fever or respiratory symptoms so the staff can be prepared for their arrival or make arrangements for them to appear after dosing hours to mitigate the risk of infecting others.

OTPs should post signs at entrances with instructions to patients with fever or symptoms of respiratory infection to alert staff so that the appropriate precautions can be implemented.

**TAKE-HOME EXCEPTIONS**

OTPs may request blanket exceptions for all stable patients to receive 28 days of take-home medication and up to 14 days of take-home medication for those patients who are less stable but who the OTP believes can safely handle this level of take-home medication. While this is the approved guidance of SAMHSA, they are leaning to the State SOTA to decide with each OTP, the appropriate clinical course of action for take-home medication. Georgia OTPs may submit a request for take-home medication for stable patients to attend OTPs three times per week. This will minimize to potential exposure to COVID-19.

For less stable patients as determined by the OTP, a staggered take-home schedule whereby half the OTP patients will present on Mondays, Wednesdays and Fridays, and the other half of OTP patients present on Tuesdays, Thursdays, and Saturdays, with the remaining days of the week allotted for take-homes is appropriate. These patients should receive no more than two consecutive take-homes at a time. This reduces the clinic's daily census in half and minimizes the potential exposure to COVID-19.

Blanket take-home medication exceptions will be approved for up to two weeks for patients with lab confirmed COVID-19 virus and patients with symptoms of a respiratory viral illness, with or without confirmation via COVID-19 viral testing. At the prescriber's discretion the request may be extended when clinically necessary.

**MEDICATION SUPPLY**

The US Drug Enforcement Agency (DEA) and the SOTA have agreed to collaborate on a case by case basis to ensure that impacted OTPs are not penalized/flagged for ordering more than what seems to be a normal amount of medication to address specific guest dosing needs for patients whose clinic has been impacted by COVID-19. OTPs should contact the SOTA as soon as possible to make the emergency request.

**DBHDD CENTRAL REGISTRY DOSING INFORMATION**

OTPs should, in accordance with the DBHDD SOTA Central Registry Policy, be sure that all patient dosing information is kept updated to facilitate the need for continuation of care. https://gadbhdd.policystat.com/policy/4647463/latest/

**TELEHEALTH SERVICES**

Effective immediately, DBHDD has removed restrictions on telemedicine services that, until today, had restrictions noted within the service guidelines. In addition, we are waiving requirements for face to face contacts where the service guidelines note a minimum number or ratio of face to face contacts. Please review the **linked memorandum** for specific allowances. At this time, these allowances will be in place until April 30, 2020.

Our response to COVID-19 is an ever-changing situation. Please know that as DBHDD receives more information about the needs of our state we will respond accordingly and keep you, our partners, well informed. For questions and further discussion please call 404-416-5225 or email Vonshurii.wrighten@dbhdd.ga.gov



**Georgia Department of Behavioral Health
& Developmental Disabilities**

Judy Fitzgerald, Commissioner

**D·B·H·D·D**   Office of Children, Young Adults & Families

TO:        Georgia Apex Providers

FROM:     Danté McKay, director, Office of Children, Young Adults, and Families

DATE:     March 18, 2020

RE:        Apex service provision during COVID-19 school closures

---

In response to the coronavirus (COVID-19) in Georgia, and Governor Kemp's Public Health State of Emergency guidance to increase efforts related to social distancing, DBHDD is supporting techniques that allow the continuation of services virtually.  The health, safety, and well-being of the individuals we serve, practitioners, and staff, are DBHDD's top priority, and this decision has been made with those in mind.  DBHDD is closely monitoring related developments and will provide additional information and updates in the coming weeks.

With schools closed in response to COVID-19, DBHDD would like to avoid disrupting services for students enrolled in the Georgia Apex Program.  DBHDD will allow the school setting to be waived and expect that youth who have already been identified as Apex program recipients, or those identified as at-risk by that program's teachers, counselors, and/or administrative staff now that they are schooling from home, will be served/engaged.  Any service which would have been provided prior to the COVID-19 response can and should continue to be provided via the DBHDD Services Allowances for COVID-19 memoranda and related FAQs released through the DBHDD.

Please be sure to regularly check the **CDC** and **Georgia DPH** websites for the most up-to-date information about COVID-19, and remember to be vigilant about personal hygiene.

If you have additional questions that relate to COVID-19, please submit them to the provider relations email, DBHDD.Provider@dbhdd.ga.gov, so that they are properly tracked.

Thank you for your dedication and commitment to the people we serve.

Cc:     Monica Johnson, Director, Division of Behavioral Health
          Wendy Tiegreen, Director, Office of Medicaid Coordination
          David Sofferin, Director, Public Affairs
          Lynn Copeland, Director, Provider Relations
          Layla Fitzgerald, Program Manager, OCYF
          Danielle Jones, Program Coordinator, OCYF



**Georgia Department of Behavioral Health & Developmental Disabilities**

Judy Fitzgerald, Commissioner

Office of Crisis Coordination

# Guidance for DBHDD BHCC and CSU units regarding COVID-19

To: Crisis Unit Directors, Agency CEO
From: Debbie Atkins, LPC
Director of the Office of Crisis Coordination

As the safety net providers for crisis services in Georgia, you play a critical role in serving individuals who have very limited options for treatment.  We at DBHDD continue to closely monitor and follow the evolving guidance from both federal and state officials.  As we all embark on new territory of a Public Health Crisis, DBHDD would like to offer the following guidance for our crisis services.

1. Please follow the guidance provided by Georgia DPH and the CDC as it relates to screening individuals. Ask the appropriate questions and take vitals as a routine first step.  If a person is considered as high risk or has developed symptoms, have them tested prior to admission on the unit. Keeping units available to our constituents is very important.

2. If a person is being referred to our system from a hospital via the electronic board, please know that all hospitals have a screening in place. Our medical clearance guidelines continue to be in place. If a person has a slightly elevated temperature and is still within our guidelines, please do not alter them for your unit. The hospital is providing the screens and will not transfer anyone who is at risk.

3. Please remember that our Emergency Departments are filling up quickly with potential cases and with individuals who are fearful they have been exposed. Being diligent in responding quickly and moving individuals from the emergency department will be a great help to our partners.

4. If a person develops symptoms while on the unit, we realize it will mean a stoppage of referrals until testing and stabilization occurs.  Please

consider that once the unit is exposed, stabilization of the individuals will still need to occur. As with other infectious diseases like the flu, stabilize, notify the appropriate authorities to request testing. If it is positive stoppage of admissions will need to happen until proper quarantine and cleaning occurs. If a person is stable enough to quarantine at home, follow proper discharge planning and ensure medication access while they are at home.

5. Lastly, please make sure you communicate any and all issues that will result in limiting your capacity as you are currently contracted. Communicate with your RSA and please copy both Adrian Johnson and Debbie Atkins. As we are monitoring the totality of the crisis system, we will need real time information as to issues that arise.

If you have additional questions that relate to COVID-19 please submit them to the provider relations email so that they are properly tracked. That email is DBHDD.Provider@DBHDD.GA.GOV

CC: Monica Johnson, Adrian Johnson, Terri Timberlake, Dante McKay, Jeff Minor, David Sofferin, Lynn Copeland, Melissa Sperbeck, Emile Risby



**Georgia Department of Behavioral Health & Developmental Disabilities**
Judy Fitzgerald, Commissioner

TO:         Addiction Recovery Support Centers
            Peer Support Wellness and Respite Centers

FROM:       Tony Sanchez, CDAC, CPS-AD, director of DBHDD's Office Recovery
            Transformation

DATE:       March 18, 2020

RE:         Guidance for DBHDD Addiction Recovery Support Centers (ARSC) and
            Peer Support Wellness and Respite Centers (PSWRC) during COVID-19
            epidemic

In response to the coronavirus (COVID-19) in Georgia, and Governor Kemp's Public Health State of Emergency guidance to increase efforts related to social distancing, DBHDD is supporting techniques that allow the continuation of services virtually through our Addiction Recovery Support Centers (ARSC), Peer Support Wellness and Respite Centers (PSWRC).  The health, safety, and well-being of the individuals we serve, and staff are DBHDD's top priority, and this decision has been made with those in mind.  DBHDD is closely monitoring related developments and will provide additional information and updates related to ARSCs and PSWRCs in the coming weeks.

DBHDD has the expectation that all of our providers and their locations are open and able to serve their target populations.  However, we realize that providers may need to adjust how they offer services considering the new guidelines from the federal government to limit all social gatherings to fewer than 10 people.

DBHDD appreciates the connectivity that our many peer centers have created within our communities and would like for our centers to stay connected during this time of need by:[1]

- Virtual recovery meetings
  - Zoom, Go-to-Meeting, Web-ex
- Increased social media presence
  - Testimonial watch parties
  - Regular posts with peer support contact numbers
  - Regular posts with contact numbers for other important community resources such as
    - Food banks, **CDC** and **Georgia DPH**
- Telephonic recovery coaching

Please be sure to regularly check the **CDC** and **Georgia DPH** websites for the most up-to-date information about COVID-19, and remember to be vigilant about personal hygiene.

If you have additional questions that relate to COVID-19, please submit them to the provider relations email, DBHDD.Provider@dbhdd.ga.gov, so that they can properly tracked.

Thank you for all that you do!


[1]The supports provided by these recovery centers/supports are not medical treatment supports, so if there are no transactions of personal health information, these technologies can be used.



**Georgia Department of Behavioral Health
& Developmental Disabilities**

Judy Fitzgerald, Commissioner

**D·B·H·D·D**    Office of Adult Mental Health

To:    DBHDD-contracted providers of Mobile Crisis Response Service (MCRS)

From:  Terri Timberlake, Ph.D., Director
        Office of Adult Mental Health

Date:  March 19, 2020

Re:    COVID 19 guidance for MCRS

The current Coronavirus pandemic has sparked heightened health and safety concerns across our state. Our Department is hopeful that each provider is taking the recommended precautions to reasonably support the wellbeing of your staff. Similarly, we expect health and safety measures to be taken to support the needs of individuals seeking mobile crisis response services.  This is a vulnerable, high need population and without necessary support, these individuals face increased risks.  Below are responses to questions raised that will offer MCRS guidance for use solely for the period of crisis.

Q1: Can MCRS utilize only 1 responder when needing to make face to face contact instead of the required 2?
A1: This is allowed.

Q2: Can MCRS utilize telehealth when responding to jails and ER's? This would often include only audio by phone only to complete the assessments especially in the rural ER's.
A2: This is allowed with documented justification, intervention, recommendation and follow-up.

Q3: For Hospitals, MCRS would screen via phone and ensure that the teams have access to the ER. Some ER's do not want "non-medical" staff to enter right now.
A3: Video is preferred if available. Telephone with audio only is acceptable but should be used as last resort. If phone contact is used, these calls must be tracked via a document that they can be submitted to DBHDD along with follow up.  For provision of MCRS in jails, request a meeting in the visitation area where there is a physical barrier. This will be allowed based on supervisors' decision, documentation, justification, intervention, recommendation and follow-up.

Q4: For provision of MCRS in group homes, if dispatching MCT, can a phone screen be done?

A4: Telephone screening to determine health risk (no symptoms, no confirmed positive COVID19 etc.) use contact precautions, then respond in person. If person is symptomatic, use video (preferred) or phone-audio as last resort.

The Georgia Department of Public Health (DPH) and the Centers for Disease Control and Prevention (CDC) websites contain the most up-to-date information that will help us take sensible steps and support our ability to make health promoting choices. Guidance for clinicians and those providing direct service to individuals can be found on the Georgia DPH website.  DBHDD will continue to provide updates via the Provider Newsletter: Network News. Should you have questions, please submit them to our Provider Relations team via the Provider Issue Management System or submit an email to DBHDD.Provider@dbhdd.ga.gov

Please remember to be vigilant about hygiene practices.

cc:    Jeff Minor, Chief Operating Officer
       Monica Johnson, Director, Division of Behavioral Health
       Ron Wakefield Director, Division of Intellectual & Developmental Disabilities
       Lori Campbell, Assistant Director, Division of Intellectual & Developmental Disabilities
       Adrian Johnson, Assistant Director, Division of Behavioral Health
       Dante` McKay, Director, Office of Children, Young Adults and Families
       Kimberly Briggs, Assistant Director, Office of Adult Mental Health
       Beth Shaw, Director, Office of Transitions
       Debbie Atkins, Director, Office of Crisis Coordination
       David Sofferin, Director, Office of Public Affairs



**Georgia Department of Behavioral Health
& Developmental Disabilities**

Judy Fitzgerald, Commissioner

Division of Behavioral Health

TO:        DBHDD Clubhouse Programs

FROM:    Danté McKay, JD, MPA
              Director - Office of Children, Young Adults & Families

              Jill Mays, MS, LPC
              Director, Office of BH Prevention & Federal Grants

              Cassandra Price, GCADC II, MBA
              Director, Office of Addictive Diseases

DATE:     March 20, 2020

RE:         Guidance for DBHDD Clubhouse Programs; CYF, AD & Prevention


In response to the coronavirus (COVID-19) in Georgia, and Governor Kemp's Public Health State of Emergency guidance to increase efforts related to social distancing, DBHDD is supporting techniques that allow the continuation of services virtually through our DBHDD Clubhouse Programs.  The health, safety, and well-being of the individuals we serve, and staff are DBHDD's top priority, and this decision has been made with those in mind.  DBHDD is closely monitoring related developments and will provide additional information and updates related to Clubhouses in the coming weeks.

DBHDD has the expectation that all providers and their locations are open and able to serve their target populations.  However, we realize that providers may need to adjust how they offer services considering the new guidelines from the federal government to limit all social gatherings to fewer than 10 people.

DBHDD appreciates the connectivity that our many Clubhouses have created within our communities and would like for our Clubhouses to stay connected during this time of need by:[1]

- Virtual recovery, prevention and resiliency support meetings
  - Zoom, Go-to-Meeting, Web-ex
- Increased social media presence
  - Testimonial watch parties
  - Online group activities
  - Regular posts with peer support contact numbers
  - Regular posts with contact numbers for other important community resources such as
    - Food banks, **CDC** and **Georgia**

- Telephonic recovery coaching
- One-on-one sessions

Please be sure to regularly check the **CDC** and **Georgia DPH** websites for the most up-to-date information about COVID-19, and remember to be vigilant about personal hygiene.

If you have additional questions that relate to COVID-19, please submit them to the provider relations email, DBHDD.Provider@dbhdd.ga.gov, so that they can be properly tracked.

Thank you for all that you do!

[1]The supports provided by these Clubhouses are not medical treatment supports, so if there are no transactions of personal health information, these technologies can be used. However, clinical services provided by the CYF clubhouses should follow the DBHDD current telehealth guidance; https://files.constantcontact.com/c2257ded301/3e0220f3-4ccb-4a95-8451-dd05f672b14c.pdf

Cc: Monica Johnson
  Lynn Copeland
  David Sofferin
  Adrian Johnson

 **NOTICE:   Georgia Crisis & Access Line**    (#)

For access to services and immediate crisis help, call the **Georgia Crisis & Access Line (http://www.mygcal.com/)** (GCAL) at **1-800-715-4225**, available 24/7.

# Coronavirus: COVID-19 Provider FAQs

**Due to the recent developments with COVID-19 we have provided answers to the most asked provider questions. If you have a question that you do not see answered below please submit it via PIMS (https://dbhddapps.dbhdd.ga.gov/PIMS/Default.aspx).**

## What are the codes for Billing for tele-medicine or telephonic billing? 

**Please reference the DBHDD Provider Bulletin released on March 19, 2020.**

- ◦ **Table A Services should be submitted with the GT service (ACT is the only exception where U1 and U2 practitioners have the GT modifier, but other practitioner level codes do not)**
- ◦ **Table B Services should consider the following:**
  - ▪ **If there is a UK modifier within that Service Definition defined as applicable to telephonic intervention, then submit the Code with that modifier AND the Place of Service code 02;**

**If there is no UK modifier, submit the service code as normal (considering the telemedicine/telephonic claims as "in-clinic"/U6), only add the 02 code in the Place of Service for the claim submission to MMIS.**

## Should we add the 95 Modifier for CPT codes in order to bill DCH for telemedicine? 

**No. The 95 modifier is not a recognized modifier affiliated with the DBHDD/Medicaid billable behavioral health codes.  The addition of that modifier will yield a denial in the MMIS system.**

## Due to the allowance of the use telemedicine for certain services for precautionary measures, will there be any changes to the reimbursement rates for services? Or will Medicaid observe the Telehealth Site Visit code Q3014GT for Category of Service 44 

There is currently no consideration of additional payment for telemedicine modality used in the provision of Community Behavioral Health Rehabilitation Services program through the Q – code-named above or through other mechanisms (as administrative costs such as telemedicine were considered and included in the reimbursement rate structure).

### How is Telemedicine different from Telehealth/Telephonic service delivery?

Telemedicine is the use of medical information exchanged from one secured site to another via electronic communications to improve a patient's health. Electronic communication means the use of interactive telecommunications equipment that includes, at a minimum, audio and video equipment permitting two-way, real time interactive communication between the patient, and the physician or practitioner at the distant site (defined in the DBHDD Behavioral Health Provider Manual, Glossary).  In response to COVID-19, Federal and State authorities are referencing the term "telehealth" which is a broad definition which encompasses phone, text, email, monitoring, and other modalities of interaction as being enabled.  Very specifically, DBHDD and DCH are enabling some telemedicine and telephonic options in accordance with this **Provider Bulletin. (https://files.constantcontact.com/c2257ded301/3e0220f3-4ccb-4a95-8451-dd05f672b14c.pdf)**

### Will the DBHDD waive requirements of the Secretary of State related to the training requirements for LCSWs, LPCs, and LMFTs in order to provide these services (135-11)?

DBHDD is aware of the State of Georgia Rule and Regulation 135-11-01 and the rules governing Professional Counselors, Social Workers, and Marriage and Family Therapists on the use of a term called "telemental health." "Telemental health" is defined in the regulation as a mode of delivering services via technology-assisted media, such as but not limited to, a telephone, video, internet, a smartphone, tablet, PC desktop system or other electronic means using appropriate encryption technology for electronic health information. TeleMental Health facilitates client self-management and support for clients and includes synchronous interactions and asynchronous store and forward transfers. The regulation requires that any licensee has obtained a minimum of six (6) continuing education hours before providing "telemental health." Additionally, prior to the delivery of supervision via telemental health, the supervisor shall have obtained a minimum of nine (9) hours of continuing education to provide Supervision.

DBHDD heard your concerns regarding the continuing education requirements associated with telemental health and how the state regulations present a hindrance for some licensed staff who are eager to provide supports to individuals using telehealth functionality during this public health emergency. To support our providers and the individuals we serve, DBHDD approached the Georgia Board of Professional Counselors, Social Workers, and Marriage and Family Therapists to seek a waiver of the telemental health

continued education requirements through the duration of the COVID-19 pandemic. More specifically, we sought a waiver of the regulation that requires licensees to obtain at least 6 continuing education hours before providing tele-mental health and the regulation which requires supervisors to obtain at least 9 hours of continuing education before providing supervision.

We recently learned that the Board opted not to waive the requirements. Like you, we are disappointed with the Board's decision. The Board did vote, however, to allow all continuing education courses to be completed online. We urge all providers to abide by the regulations governing licensure. If additional continuing education is needed to deliver services, we request that providers work expeditiously to meet established requirements. Additional information regarding governing regulations can be found at the **Secretary of State's website (https://sos.ga.gov/index.php/licensing/plb/43)**.

### For new or renewed Individualized Recovery Plans, is it still a requirement for signatures?



The DBHDD will allow documentation of verbal agreement for an IRP via phone.  The Progress Note shall clearly indicate that all typical content associated with a face-to-face process of delivering Service Plan Development was met, including the engagement with the individual served as a full partner in that process.

### Can an individual consent to tele-medicine via tele-medicine or phone?



The DBHDD will allow documentation of verbal consent via telemedicine or phone. The required consent as defined in the DBHDD BH Provider Manual is designed and promulgated by the Department of Community Health.  **To access the Consent Form: https://www.mmis.georgia.gov/portal/ (https://www.mmis.georgia.gov/portal/)**; then click Provider Information > Provider Manuals > Telemedicine Guidance.  The documentation of the verbal consent in the progress note should include basic elements from the form in the absence of that signed document.

### Can an individual consent to tele-medicine via email?



The DBHDD will allow documentation of verbal consent via phone.  Email consent would also be acceptable if the consent request is 1) sent through encrypted technology or 2) is generalist enough to transact without concern regarding HIPAA/42 CFR Part 2.  To access the Consent Form: **https://www.mmis.georgia.gov/portal/ (https://www.mmis.georgia.gov/portal/)**; then click Provider Information > Provider Manuals > Telemedicine Guidance.  The documentation of the verbal consent in the progress note should include basic elements from the form in the absence of that signed document.

### Isn't it true that all tele-medicine has to be done from a facility-based distant site?



**DBHDD does not constrict the "distant site" definition to be facility-based. All providers and their associated practitioners MUST be cognizant of HIPAA and 42CFR Part 2 regulation, considering the distant site security as well. Consider that having a Telemedicine session from a non-facility distant site (such as from a personal home with other family members within earshot) would not be permissible. Your agency must still comply with all state and federal laws related to security and confidentiality.**

### Does the DBHDD guidance in the Provider Bulletins apply to the CMOs?

**The DCH Medicaid CMOs are not obligated to follow DBHDD guidance. The DCH and CMOs will set their specific provisions for service access (if any).**

Special Bulletin                                                                                          March 25, 2020



# DBHDD Provides Sign Language Interpreters for Behavioral Health Services

**Greetings from the Office of Deaf Services!**

During this time of concern over COVID-19, the Office of Deaf Services wants to provide information to our provider network about accessing needed American Sign Language (ASL) interpreter supports. Now as always, DBHDD can provide interpreters to DBHDD-authorized providers, at no cost, to make sure that services are accessible to individuals who are deaf or hard of hearing.

Not all ASL interpreters are equally qualified to provide interpreting in behavioral health service settings. The Americans with Disabilities Act regulations require providers to use a "qualified interpreter," defined as "an interpreter who, via a video remote interpreting (VRI) service or an on-site appearance, is able to interpret <u>effectively, accurately, and impartially</u>, both <u>receptively and expressively</u>, using any <u>necessary specialized vocabulary</u>." DBHDD employs and contracts with a number of Qualified Mental Health Interpreters who have been specially trained to facilitate effective communication in ASL for individuals receiving behavioral health services.

**Available In-Person ASL Interpreters**

For individuals who are Deaf/hard of hearing and request sign language interpretation for their appointments, the Office of Deaf Services is still able to send Qualified Mental Health Interpreters to be present at the in-person appointments for the individual. For services that are going to be provided remotely (via telemedicine), a Qualified Mental Health Interpreter can be sent to be present with the clinician; the clinician and interpreter will place the call to the individual by videophone or other video conferencing technology.

**Available Remote /VRI ASL Interpreters**

Alternatively, the Office of Deaf Services is able to provide Qualified Mental Health Interpreter support through Video Remote Interpreting (VRI). The VRI interpreter can connect to the provider location via the phone; the individual receiving services and the interpreter would be able to interact via conferencing software called VSee (see below for more information on this software). This videoconferencing platform is encrypted and can be downloaded at provider locations to a laptop. This will allow the provider site to receive VRI support from the Office of Deaf Services. Additionally, if a service provider wishes to have the ability to see the individual receiving services, there is the capability to have a three-way interaction which would allow such interface.

In light of the recent communication from the U.S. Department of Health and Human Services regarding use of remote communication during the COVID-19 public health emergency, in some cases, providers might be connecting with individuals via a video chat application (for example, Apple FaceTime, Facebook Messenger video chat, Google Hangouts video, or Skype). In those cases, the Office of Deaf Services can also work with providers to coordinate interpreters to participate via those platforms. <u>For these appointments, especially, please provide the Office of Deaf Services as much advance notice as possible, so that the details of the software/application and any technological and privacy questions can be worked out before the appointment.</u>

For DBHDD providers who need sign language interpreters for DBHDD services, please submit the request via the following protocol.

1. If the individual is new to your agency, please follow the notification and referral processes outlined in the DBHDD Policy "**Provider Procedures for Referral and Reporting of Individuals with Hearing Loss, 15-111**." Then proceed to step 2 below.
2. If you have previously served the individual and have already notified DBHDD of the individual, please follow the procedure and guidelines provided in the DBHDD Policy "**Accessibility of Community Behavioral Health Services for Individuals Who are Deaf and Hard of Hearing, 15-114**" (see especially Section C, "Booking An Interpreter"). You will receive a phone call or a follow-up email related to technology needs/preferences, and any questions that you have will be answered. **Please allow as much lead time as possible in the scheduling of these interpreter appointments so that we may address any needs or concerns.**

**VSee**

VSEE is an application that is free to download and use. The contact used is an email address. All of DBHDD's assigned interpreters who will be providing their services through VSee have a DBHDD email address. Once you have contacted the Office of Deaf Services, your interpreter contact email will be provided. For more information on Vsee, see **https://vsee.com/**.

We are very thankful for the work being done by the community provider network during this current crisis. We remain committed to the Deaf and hard of hearing individuals participating in DBHDD services, and want to promote access to these valuable services. If you have any additional questions, please review the DBHDD policies linked in this communication, and feel free to email DBHDD's Office of Deaf Services at **deafservices@dbhdd.ga.gov**.

**Thank you!**

**Kelly Sterling, Director**
**DBHDD Office of Deaf Services**

---

# Office of Provider Relations

**Director**
Lynn Copeland

**Senior Provider Relations Manager**
Carole Crowley

**Provider Relations Managers**
Sharon Pyles
Tim Strickland
Lisa Sweat



For Provider Relations inquiries, please contact us at **DBHDD.Provider@dbhdd.ga.gov**

## BE WELL



Special Bulletin                                                         March 26, 2020



# Continuing Education for Professional Counselors, Social Workers, and Marriage and Family Therapists

DBHDD is aware of the State of Georgia Rule and Regulation 135-11-.01 and the rules governing Professional Counselors, Social Workers, and Marriage and Family Therapists on the use of a term called "telemental health." "Telemental health" is defined in the regulation as a mode of delivering services via technology-assisted media, such as but not limited to, a telephone, video, internet, a smartphone, tablet, PC desktop system or other electronic means using appropriate encryption technology for electronic health information. TeleMental Health facilitates client self-management and support for clients and includes synchronous interactions and asynchronous store and forward transfers. The regulation requires that any licensee has obtained a minimum of six (6) continuing education hours before providing "telemental health." Additionally, prior to the delivery of supervision via telemental health, the supervisor shall have obtained a minimum of nine (9) hours of continuing education to provide Supervision.

DBHDD heard your concerns regarding the continuing education requirements associated with telemental health and how the state regulations present a hindrance for some licensed staff who are eager to provide supports to individuals using telehealth functionality during this public health emergency. To support our providers and the individuals we serve, DBHDD approached the Georgia Board of Professional Counselors, Social Workers, and Marriage and Family Therapists to seek waiver of the telemental health continued education requirements through the duration of the COVID-19 pandemic. More specifically, we sought waiver of the regulation that requires licensees to obtain at least 6 continuing education hours before providing telemental health and the regulation which requires supervisors to obtain at least 9 hours of continuing education before providing supervision.

We recently learned that the Board opted not to waive the requirements. Like you, we are disappointed with the Board's decision. The Board did vote, however, to allow all continuing education courses to be completed online. We urge all providers to abide by the regulations governing licensure. If additional continuing education is needed to deliver services, we request that providers work expeditiously to meet established requirements. Additional information regarding governing regulations can be found at the **Secretary of State's website.**

Thanks for all you do for the individuals and families receiving our services.

*Submitted by:*
**Melissa Sperbeck**
**Director, Division of Performance Management and Quality Improvement**

---

# OFFICE OF HEALTH AND WELLNESS

# COVID 19 Fact Sheet and Health Care Plan

DBHDD's Office of Health and Wellness (OHW) has generated tools intended to offer providers quick (clinical) risk mitigation guidance when facing the impact of the current COVID 19 crisis.  Created were a **COVID 19 fact sheet** and **healthcare plan** intended to

equip and remind providers of recommended actions to decrease the risk of infection and spread.

Additional access to these, and other, OHW tools are available on the **DBHDD website** by hovering over the "**For Providers**" tab and selecting "**Improving Health Outcomes Initiative Collaborative Learning Center**".

Providers electing to utilize the HRST web-based COVID 19 healthcare plan may do so through the established process for accessing all other HRST web-based healthcare plans.

*Submitted by:*
**Dana N. Scott, MSN, RN**
**Director of Office of Health and Wellness**
**DBHDD Division of Developmental Disabilities**

## DBHDD Policy Information

## Background Check Variance

Due to Covid-19, DBHDD understands that some fingerprinting sites have reduced hours or are closed. Therefore, during Georgia's Public Health State of Emergency, the "attestation" process set forth in the DBHDD policies below are in effect as stated therein.

**COVID-19 2020: DBHDD Community Developmental Disability Services Policy Modifications - 3/26/2020**

**COVID-19 2020: DBHDD Community Behavioral Health Services Policy Modifications - 3/26/2020**

## POLICY REVISION

## Payment by Individuals for Community Behavioral Health Services, 01-107

In the above mentioned policy related to state-funded behavioral health services, the provider is required to attempt to verify income using tax returns, pay check stubs, verification of benefits from other federal or state agencies.

For the period of the Public Health Emergency related to COVID-19, DBHDD waives the requirement for income verification to access state funded behavioral health services.

Provider agencies should request attestation of income from individuals served and verify to the best of their ability. If verification is unavailable due to resource constraints related to COVID-19, providers will note this in the record. At the end of the public health emergency, providers will need to verify individuals income status within 90 days.

## Additional Resources

## Substance Abuse and Mental Health Services Administration

The Substance Abuse and Mental Health Services Administration (SAMHSA) recognizes the

challenges posed by the current COVID-19 situation and is providing guidance and resources to assist individuals, providers, communities, and states across the country. You may access SAMHSA's guidance along with resources and information by **clicking here**.

## PPE Use and Conservation - NETEC

The National Emerging Special Pathogen Training and Education Center (NETEC) has created a site on conservation of personal protective equipment (PPE). It has flyers, guides, videos and checklists. Please check this site regularly as additional materials will be added as guidance is updated. You can access this information by **clicking here**.

## Office of Provider Relations

**<u>Director</u>**
Lynn Copeland

**<u>Senior Provider Relations Manager</u>**
Carole Crowley

**<u>Provider Relations Managers</u>**
Sharon Pyles
Tim Strickland
Lisa Sweat



For Provider Relations inquiries, please contact us at **DBHDD.Provider@dbhdd.ga.gov**

## BE WELL





**Georgia Department
of Behavioral Health
& Developmental
Disabilities**

**D·B·H·D·D**

**VERSION 1**


**COVID-19 2020: DBHDD Community Behavioral Health Services
Policy Modifications**


**EFFECTIVE 3/26/2020**

| Current Status: *Old* | PolicyStat ID: *7845537* |
|---|---|

| | | |
|---|---|---|
| | **Creation:** | *3/26/2020* |
| | **Effective:** | *3/26/2020* |
| **Georgia Department of Behavioral Health & Developmental Disabilities** | **Last Reviewed:** | *3/26/2020* |
| | **Last Revision:** | *3/26/2020* |
| | **Next Review:** | *9/22/2020* |
| | Owner: | *Monica Johnson, MA, LPC: Director, Division of Behavioral Health* |
| | Chapter: | *Admin Issues for BH & DD Services* |
| | Sections: | |

# COVID-19 2020: DBHDD Community Behavioral Health Services Policy Modifications -   /2  /2020

## EFFECTIVE IMMEDIATELY

## APPLICABILITY

DBHDD Providers of Community **Behavioral Health** Services

## POLICY

In response to the continued transmission of COVID-19, where necessary new measures are in effect to minimize community spread of the virus, and to assist in the continued delivery of community behavioral health services.

**Modifications** as described in this policy refers to the restriction, enhancement, relaxation, and partial or full suspension of existing policies in PolicyStat, as applicable to the service. This policy includes full details of the alternate requirement(s) or procedures.

The following temporary modifications to the policies listed below are pertinent to community behavioral health services, effective immediately. Please refer to the full policy via the hyperlink, noting the alternate requirements applicable until further notice.

This policy will be updated as necessary. This policy remains in effect until the Governor of the State of Georgia lifts the Emergency Declaration.

1. A ***partial suspension*** of the fingerprinting requirement described in <u>Criminal History Record Check for DBHDD Network Provider Applicants, 04-104</u> as follows:

    a. DBHDD's Provider Network must have each person subject to Policy 04-104 complete the "Network Provider Applicant Attestation," Attachment A to this policy, instead of completing the fingerprint based background check stipulated in Policy 04-104.

    b. Within thirty (30) days of cessation of the Public Health Emergency, all persons who signed the Network Provider Applicant Attestation instead of completing the fingerprint

based background check must complete a fingerprint based background check as required by Policy 04-104. The provider is responsible for sending any person who signed the Network Provider Applicant Attestation for a fingerprint based background check.

c. The provider is also responsible for sending to DBHDD's Criminal History Background Check (CHBC) Section each signed Network Provider Applicant Attestation, while retaining a copy in the applicant's personnel file. The Individual Assessment process set forth in section D of Policy 04-104 does not apply to persons who sign the Network Provider Applicant Attestation.

2. A *partial suspension* of the fingerprinting requirement described in Criminal History Record Check for Individual Provider Applicants, 04-111 is permitted as follows:

a. All applicants who are subject to Policy 04-111 must complete the "Individual Provider Attestation," Attachment B to this policy, instead of completing the fingerprint based background check documented in Policy 04-111.

b. Within thirty (30) days of cessation of the Public Health Emergency, all applicants who signed the Individual Provider Attestation instead of completing the fingerprint based background check must complete a fingerprint based background check as required by Policy 04-111.

c. DBHDD Provider Enrollment is responsible for sending to DBHDD's Criminal History Background Check (CHBC) Section all signed Individual Provider Attestations. The Individual Assessment process set forth in Part D of Policy 04-111 does not apply to applicants who sign the Individual Provider Attestation.

3. A *partial suspension* of the income verification requirements using tax returns, pay check stubs, verification of benefits from other federal or state agencies as stipulated in Sections B.3 and F.2 of Payment by Individuals for Community Behavioral Health Services, 01-107 has been made as follows:

a. For the period of the Public Health Emergency related to COVID-19, DBHDD waives the requirement for income verification to access state funded behavioral health services.

b. Provider agencies are required to request attestation of income from individuals served and verify authenticity to the best of their ability.

i. If verification is unavailable due to resource constraints related to COVID-19, providers are required to note this in the record. At the end of the public health emergency, providers will be required to verify individuals income status within 90 days.

**DBHDD sincerely appreciates your compliance with these measures throughout this Public Health Emergency.**

## Attachments

A - COVID-19 2020 - Attestation of Absence of Barrier Crimes Data.docx
B - COVID-19 2020 - Attestation of Absence of Barrier Crimes Data.docx

## Approval Signatures

| Approver | Date |
| --- | --- |
| Anne Akili, Psy.D.: Director, Policy Management | 3/2 /2020 |
| Monica Johnson, MA, LPC: Director, Division of Behavioral Health | 3/2 /2020 |
| Anne Akili, Psy.D.: Director, Policy Management | 3/2 /2020 |





**Georgia Department of Behavioral Health & Developmental Disabilities**

*Judy Fitzgerald, Commissioner*

**Office of Enterprise Compliance**
*Two Peachtree Street, NW ● 1ˢᵗ Floor ● Atlanta, Georgia 30303-3142 ● Telephone: 404-463-2507 ● Fax: 770-359-5473*

I, _____

      Last Name           First Name           Middle Initial

_____   _____   _____   _____   _____

   Social Security No.     Height    Weight    Eye color   Hair Color

_____   _____   _____

   Date of Birth         Sex           Race

_____

   Street Address         City       State    Zip

attest that I have not been convicted of nor have pending charges for any crime listed on Barrier Record Data (Attachment D of Criminal History Record Check for DBHDD Network Provider Applicants, 04-104, a copy of which has been provided to me).

I also attest that:
1. I am not currently on probation as a First Offender for a crime listed on Barrier Record Data (Attachment D);
2. I am not awaiting final disposition on charges for any crime referenced on the Barrier Record Data (Attachment D);
3. I do not knowingly have an outstanding warrant for any crime referenced on the Barrier Record Data (Attachment D);
4. I do not have a finding of guilty but mentally ill (GBMI) for any crime referenced on the Barrier Record Data (Attachment D);
5. I do not have a finding of guilty with intellectual disability (GWID) for any crime referenced on the Barrier Record Data (Attachment D); and
6. I do not have a finding of not guilty by reason of insanity (NGRI) for any crime referenced on the Barrier Record Data (Attachment D).
7. I do not have any convictions within the last 12 months.

This form serves as a contingency for employment. Within 30 days of the termination of the Public Health State of Emergency, I understand that I will be required to complete a fingerprint based background check and if any information stated hereon is found to be falsified or untrue, I could be deemed ineligible for continued employment by a DBHDD network provider. I also understand that prior to being fingerprinted, if any information stated hereon is discovered to have been falsified or is found to be untrue, I could be deemed ineligible for continued employment.

_____

Signature

_____

Date

2 Peachtree Street, NW ● Atlanta, Georgia 30303 ● 404.657.2252
dbhdd.georgia.gov ● Facebook: Georgia DBHDD ● Twitter: @DBHDD

DBHDD COVID-19:2020 POLICY MODIFICATION        Version 3/26/2020



**Georgia Department of Behavioral Health & Developmental Disabilities**

*Judy Fitzgerald, Commissioner*

**Office of Enterprise Compliance**

*Two Peachtree Street, NW ● 1st Floor   ● Atlanta, Georgia 30303-3142 ● Telephone:  404-463-2507 ● Fax: 770-359-5473*

I, _____

| Last Name | First Name | Middle Initial |

_____

Social Security No.    Height    Weight    Eye color    Hair Color

_____

Date of Birth    Sex    Race

_____

Street Address    City    State    Zip

attest that I have not been convicted of nor have pending charges for any crime listed on Barrier Record Data (Attachment D to DBHDD Policy 04-111, a copy of which has been provided to me).

I also attest that:

1. I am not currently on probation as a First Offender for a crime listed on Barrier Record Data (Attachment D);
2. I am not awaiting final disposition on charges for any crime referenced on the Barrier Record Data (Attachment D);
3. I do not knowingly have an outstanding warrant for any crime referenced on the Barrier Record Data (Attachment D);
4. I do not have a finding of guilty but mentally ill (GBMI) for any crime referenced on the Barrier Record Data (Attachment D);
5. I do not have a finding of guilty with intellectual disability (GWID) for any crime referenced on the Barrier Record Data (Attachment D); and
6. I do not have a finding of not guilty by reason of insanity (NGRI) for any crime referenced on the Barrier Record Data (Attachment D).
7. I do not have any convictions within the last 12 months.

This form serves as a contingency for employment.  Within 30 days of the termination of the Public Health State of Emergency, I understand that I will be required to complete a fingerprint based background check and if any information stated hereon is found to be falsified or untrue, I could be deemed ineligible to be an individual provider.  I also understand that prior to that time if it is discovered that information stated hereon is falsified or found to be untrue, I could be deemed ineligible to be an individual provider.

_____

Signature

_____

Date

2 Peachtree Street, NW ● Atlanta, Georgia 30303 ● 404.657.2252
dbhdd.georgia.gov ● Facebook: Georgia DBHDD ● Twitter: @DBHDD

DBHDD COVID-19: 2020 POLICY MODIFICATION                                              Version 3/26/2020



**Georgia Department of Behavioral Health
& Developmental Disabilities**

Judy Fitzgerald, Commissioner

**D·B·H·D·D**   Division of Behavioral Health

**To**: All Regions and GHVP Providers
**From**: Office of Supportive Housing, DBHDD
**Re**: Temporary Measures to Address Tenant Loss of Income during COVID-19
**Date**: 3/27/2020

In response to the impact of the COVID-19 public health crisis the resultant disruption of local economies throughout the state and country, it is understood that GHVP recipients with employment may experience disruption in their income.

It is our shared mission to ensure the preservation of housing stability for these individuals. As a result we are making emergency accommodations in programmatic policy given the extenuating circumstances of the situation. These changes will remain in effect until further notice.

Individuals who lose their income and thus their ability to pay the tenant portion of the rent should not face termination from the program. Although county courts are not currently processing evictions, we wish to avoid the accumulation of destabilizing debt when the individual is unlikely to be able to resolve it without impacting other vital needs including utilities and food.

In order to fully address the loss of income, ALL individuals that identify a loss of income should be assisted by Providers with application for unemployment supports.

**DBHDD will pay the total rent amount for individuals who lose their income as a result of COVID-19.**

The Regional Field Office must submit a basic online form to the Central Office in order to adjust the payment amount on Beacon. Given the situation, we are not requesting the same level of documentation normally required for individuals with no income.

We are requesting an attestation from the Region that the loss of income has been reasonably verified by the Provider OR by Regional staff. A phone call or email from the employer to confirm is sufficient.

The change in payment amount will remain in effect until after the resolution of the crisis, at which point formal documentation will be required if the individual is to remain without income.

**Clic   here or copy the lin   below:**

https://forms.office.com/Pages/ResponsePage.aspx_id_DaEtURsHlEu_vJ7EBE0VFhWk_gBy4 h_Ft_ruOlz_AdBUNTUxUjRaNUR_S1dMVUxC_z___R1RWSjNOTS_I_CN0PWcu

For any questions regarding this form or policy change, please reach out to the Office of Supportive Housing.



**Georgia Department of Behavioral Health
& Developmental Disabilities**

Judy Fitzgerald, Commissioner

**D·B·H·D·D**    Division of Behavioral Health

**To**: All Regions and GHVP Providers
**From**: Office of Supportive Housing, DBHDD
**Re**: Temporary Measures to Address Tenant Loss of Income during COVID-19
**Date**: 3/27/2020

In response to the impact of the COVID-19 public health crisis the resultant disruption of local economies throughout the state and country, it is understood that GHVP recipients with employment may experience disruption in their income.

It is our shared mission to ensure the preservation of housing stability for these individuals. As a result we are making emergency accommodations in programmatic policy given the extenuating circumstances of the situation. These changes will remain in effect until further notice.

Individuals who lose their income and thus their ability to pay the tenant portion of the rent will not face termination from the GHVP program. Although county courts are not currently processing evictions, we wish to avoid the accumulation of destabilizing debt when the individual is unlikely to be able to resolve it without impacting other vital needs including utilities and food.

In order to fully address the loss of income, ALL individuals that identify a loss of income should be assisted by Providers with application for unemployment supports.

**DBHDD will pay the total rent amount for individuals who lose their income as a result of COVID-19.**

In order to receive this emergency support, Providers must inform the Regional Field Office of the situation and help to verify the loss of income. The Region will submit a basic online form to the Central Office in order to request a temporary adjustment to the payment amount.

Given the situation, we are not requesting the same level of documentation normally required for individuals with no income. We are requiring attestation from the Region that the loss of income has been reasonably verified by the Provider OR by Regional staff. A phone call or email from the employer to confirm is sufficient.

The change in payment amount will remain in effect until after the resolution of the crisis, at which point formal documentation will be required if the individual is to remain without income.

For any questions regarding this form or policy change, please reach out to the Office of Supportive Housing.



**Georgia Department of Behavioral Health
& Developmental Disabilities**

Judy Fitzgerald, Commissioner

**D·B·H·D·D**     Office of Adult Mental Health

## MEMORANDUM

TO:          DBHDD-Contracted Providers of AMH Supported Employment (SE)

FROM:      Terri Timberlake, Ph.D., State Director
                  Office of Adult Mental Health

DATE:      March 30, 2020

RE:          Supported Employment Guidance during COVID-19 Response

The current Coronavirus pandemic has sparked heightened health and safety concerns across our state. DBHDD is hopeful that each provider is taking the recommended precautions to reasonably support the wellbeing of your staff. Similarly, we expect health and safety measures to be taken to support the needs of individuals engaged in supported employment services. As stated in correspondence distributed by Commissioner Judy Fitzgerald, all face-to-face contact requirements outlined in the DBHDD manual for supported employment services have been temporarily waived. Providers now have the flexibility to determine if it is safe to meet with individuals in person for billable services, or provide billable services via phone contact where it is more appropriate. Each region/provider encounters unique circumstances and removing the mandate to provide face-to-face contact allows providers the ability to make decisions that protect their staff and the individuals they serve. The following guidance is being provided to support your delivery of supported employment services.

### Job Development

SE teams may continue to conduct job development in the community on behalf of individuals served, where feasible. Providers also have the option to contact employers via phone, or search for positions available online, to continue to provide job leads to SE-enrolled individuals. Please ensure appropriate documentation.

### Billable Contact with SE-enrolled Individuals

Providers are encouraged to refer to the provider manual for SE-billable services for recommendations. However, SE providers can continue to develop jobs, provide job leads, provide support to working individuals via phone, communicate with employers via phone, assist in submitting applications online, provide feedback on résumé building, conduct mock interviews via phone, among other SE-billable tasks. Many of the services that employment specialists provide can continue to take place over the

phone, through video conferencing, and other means that providers can use to communicate with individuals served.

**Questions and Information**

The Georgia Department of Public Health (DPH) and the Centers for Disease Control and Prevention (CDC) websites contain the most up-to-date information that will help us take sensible steps and support our ability to make health promoting choices. Guidance for clinicians and those providing direct service to individuals can be found at www.dph.georgia.gov.  DBHDD will continue to provide updates via the Provider Newsletter: Network News.  Should you have questions, please submit them to our Provider Relations team via the Provider Issue Management System or submit an email to DBHDD.Provider@dbhdd.ga.gov.

Please remember to be vigilant about hygiene practices.

Thank you for your continued partnership.

Cc:    Monica Johnson, Director, Division of Behavioral Health
       Kimberly Briggs, Assistant Director, Office of Adult Mental Health
       Vernell Jones, Program Manager, Office of Adult Mental Health

**TO:**　　　　DBHDD Community-based Provider Network

**FROM:**　　　Ron Wakefield, Division Director
　　　　　　　Monica Johnson, Division Director

**DATE:**　　　March 30, 2020

**SUBJECT:**　　COVID-19 Emergency - Staff Training Related to CPR and Crisis Intervention

In response to COVID-19 and the guidance of the Centers for Disease Control and Prevention (CDC), DBHDD Learning and many of the vendors with whom you work for training have eliminated certain trainings or the physical components of trainings.  While we recognize the impact this decision has on staff development and readiness, we offer that it has been made with the health, safety and well-being of the individuals we serve, practitioners, and providers as the top priority.  In light of this situation, DBHDD is modifying the current expectations related to certain staff prerequisites:

| Provider Manual for Community Developmental Disability Providers | | |
| --- | --- | --- |
| Citation | Current Language | Modified Language |
| PART II, Section 2 Operational and Clinical Standards for Georgia Crisis Response System (GCRS-DD)F.5.b.iv. | Training Requirements: Training records are to be maintained, which document that all Crisis Response System staff (in-home and out of home) have participated in training…and there is documentation to demonstrate their competence in all crisis protocols and relevant applicable trainings that includes but is not limited to:<br>　b. Mobile team members and intensive support staff are trained in protocols for:<br>　iv. Required crisis intervention curriculum<br>　　• Crisis Prevention Institute (CPI) www.crisisprevention.com<br>　　• Handle with Care Behavior Management System, Inc. www.handlewithcare.com<br>　　• Mindset http://interventionsupportservice.com<br>　　• Safe Crisis Management www.jkmtraining.com<br>　　• Safety- Care (QBS, Inc.) www.qbscompanies.com<br>　v. Cardiopulmonary Resuscitation (CPR) | Training Requirements: Training records are to be maintained, which document that all Crisis Response System staff (in-home and out of home) have participated in training…and there is documentation to demonstrate their competence in all crisis protocols and relevant applicable trainings that includes but is not limited to:<br>　b. Mobile team members and intensive support staff are trained in protocols for:<br>　iv. Completion of a crisis intervention curriculum approved by DBHDD.  The face-to-face or physical certification elements are waived during the declared COVID-19 response and the agency should plan for this type of training to be offered to the staff within 60 days from the official conclusion of the State of Public Health Emergency in Georgia.<br>　v. Completion of an online CPR training (with proficiency |

| | | deferred).  The face-to-face or physical certification elements are waived during the declared COVID-19 response and the agency should plan for this type of training to be offered to the staff within 60 days from the official conclusion of the State of Public Health Emergency in Georgia.* |
|---|---|---|
| Part II, Section 3, Operational and Clinical Standards for Autism Spectrum Disorder Crisis Support Homes, P. 1. C. | Completion of a nationally recognized crisis intervention curriculum approved by DBHDD and taught by a certified trainer in such program as Crisis Prevention Institute (CPI); | Completion of a crisis intervention curriculum approved by DBHDD. The face-to-face or physical certification elements are waived during the declared COVID-19 response and the agency should plan for this type of training to be offered to the staff within 60 days from the official conclusion of the State of Public Health Emergency in Georgia. |

| Provider Manual for Community Behavioral Health Providers | | |
|---|---|---|
| Citation | Current Language | Modified Language |
| Part II, Section II. 2.F. | Within the first sixty (60) days from date of hire, all staff having direct contact with individuals shall receive the following training including, but not limited to:<br><br>The utilization of:<br>• Crisis intervention techniques to de-escalate challenging and unsafe behaviors (*); and<br>• Nationally benchmarked techniques for safe utilization of emergency interventions of last resort (if such techniques are permitted in the purview of the organization).<br>• Current CPR/AED through the American Heart Association, Health & Safety Institute, or the American Red Cross | Within the first sixty (60) days from date of hire, all staff having direct contact with individuals shall receive the following training including, but not limited to:<br><br>The completion of:<br>• A crisis intervention curriculum approved by DBHDD.  The face-to-face or physical elements are waived during the declared COVID-19 response and the agency should plan for this type of training to be offered to the staff within 60 days from the official conclusion of the State of Public Health Emergency in Georgia.<br>• A current online CPR training (with proficiency deferred). The face-to-face/physical certification elements are |

| | | waived during the declared COVID-19 response and the agency should plan for this type of training to be offered within 60 days from the official conclusion of the State of Public Health Emergency in Georgia.* |
| --- | --- | --- |

* The American Heart Association (AHA) has presented guidelines on how to safely train for CPR/First Aid.  If the staff will be working with a vulnerable individual, DBHDD encourages the provider to consider training as defined here in revised AHA guidelines such as providing a mannequin for each student, disinfecting equipment thoroughly and spacing the students in accordance with the CDC guidelines.

With these proposed modifications, we want to direct your attention to the several online crisis intervention and verbal de-escalation courses available through the DBHDD Developmental Disabilities, Behavioral Health, and Paraprofessional Relias Libraries.  The following courses can be accessed through your agency's Relias Supervisor.  If you do not have a Relias Supervisor, have questions, or need assistance, please contact: relias@uga.edu.

**IDD Library:**

Crisis Intervention for Individuals with Developmental Disabilities-
https://ddlibrarydbhdd.training.reliaslearning.com/Learning/Catalog.aspx?CourseCode=REL-IDD-0-CIIDD
Crisis Management-
https://ddlibrarydbhdd.training.reliaslearning.com/Learning/Catalog.aspx?CourseCode=REL-HHS-0-CM-V2
De-escalating Hostile Clients-
https://ddlibrarydbhdd.training.reliaslearning.com/Learning/Catalog.aspx?CourseCode=REL-HHS-0-DHC-V2

**BH Library:**
Deaf Crisis Services- 717656-
https://georgiamhad.training.reliaslearning.com/Learning/Catalog.aspx?CourseCode=717656
Communication Skills and Conflict Management for Paraprofessionals- REL-HHS-0-CSCM-  https://georgiamhad.training.reliaslearning.com/Learning/Catalog.aspx?CourseCode=REL-HHS-0-CSCM
De-escalating Hostile Clients - REL-HHS-0-DHC-V2 -
https://georgiamhad.training.reliaslearning.com/Learning/Catalog.aspx?CourseCode=REL-HHS-0-DHC-V2
Calming Children in Crisis - REL-HHS-CWLA-CCC-  https://GeorgiaMHAD.training.reliaslearning.com/Learning/Catalog.aspx?CourseCode=REL-HHS-CWLA-CCC
Safety/Crisis & De-Escalation- CSH-Safety-004- No Direct Link Crisis Management- REL-HHS-0-CV-V2-
https://georgiamhad.training.reliaslearning.com/Learning/Catalog.aspx?CourseCode=REL-HHS-0-CM-V2
Crisis Management for Paraprofessionals- EL-CRMP-PPBH-GA-
https://GeorgiaMHAD.training.reliaslearning.com/Learning/Catalog.aspx?CourseCode=EL-CRMP-PPBH-GA
Crisis Planning with Families- REL-HHS-0-CPF-V2-
https://GeorgiaMHAD.training.reliaslearning.com/Learning/Catalog.aspx?CourseCode=REL-HHS-0-CPF-V2

**<u>Recovery Library:</u>**

Deaf Crisis Services Training –
820194-  https://gadbhdd.training.reliaslearning.com/Learning/Catalog.aspx?CourseCode=820194

C:     Wendy White Tiegreen, Office of Medicaid Coordination
       Theodore Carter, Jr., Office of Human Resources & Learning

Special Bulletin                                                    March 31, 2020

 

# TWO IMPORTANT ANNOUNCEMENTS AND PUBLIC HEALTH UPDATES

## Billing for Medicaid Telehealth for Behavioral Health Services

In previous guidance, DBHDD has directed providers to utilize the Place of Service (POS) Code "02" to indicate telehealth services when the "GT" modifier is not available for Medicaid claims.

We have been alerted that Medicaid claims for behavioral health services with the POS Code "02" are being denied. DCH is currently working with DXC to correct this issue and expect resolution for new claims submissions beginning this week. Claims submitted for dates of service after March 17, 2020 with this error will be reprocessed.

## COVID-19 Emergency - Staff Training Related to CPR and Crisis Intervention

In response to COVID-19 and the guidance of the Centers for Disease Control and Prevention (CDC), DBHDD Learning and many of the vendors with whom you work for training have eliminated certain trainings or the physical components of trainings. While we recognize the impact this decision has on staff development and readiness, we offer that it has been made with the health, safety and well-being of the individuals we serve, practitioners, and providers as the top priority. In light of this situation, DBHDD is modifying the current expectations related to certain staff prerequisites.

Please review the Provider Guidance Memo by **clicking here.**

## Department of Public Health Announcements

## PPE Resource Request Link and Follow Up

The Resource Request process for Personal Protective Equipment (PPE) assistance was streamlined as we notified you of in the **Provider Relations Special Bulletin** that was distributed on March 24, 2020.

Please understand that the Department of Public Health (DPH) requests to the federal stockpile is not able to be totally fulfilled and supplies are limited. Your request may be partially fulfilled, or requested amounts may be significantly lowered, per supply

availability. Continue to try to source materials through your supply chains.

Below is the link to submit the PPE Resource Request.

<div align="center">

**PPE RESOURCE REQUEST**

</div>

DPH ask that you submit your forms by noon on the following days:

- Saturday for Tuesday deliveries
- Monday for Thursday deliveries
- Wednesday for Saturday deliveries

***For resource request follow up questions, please call the Warehouse at 404-852-0250.***

---

## Healthcare Worker Return to Work Guidance After COVID-19 Illness or Exposure

**Click here** to read guidance from the Department of Public Health (DPH) for assistance when making a decision regarding "returning to work" for healthcare personnel.

---

## Office of Provider Relations



**<u>Director</u>**
Lynn Copeland

**<u>Senior Provider Relations Manager</u>**
Carole Crowley

**<u>Provider Relations Managers</u>**
Sharon Pyles
Tim Strickland
Lisa Sweat

For Provider Relations inquiries, please contact us at **DBHDD.Provider@dbhdd.ga.gov**

## BE WELL





**Georgia Department of Behavioral Health
& Developmental Disabilities**

Judy Fitzgerald, Commissioner

**D·B·H·D·D**    Division of Behavioral Health

TO:    Georgia Medicaid-Enrolled Opioid Treatment Programs

FROM:    Office of Addictive Diseases
Office of Medicaid Coordination

DATE:    April 1, 2020

SUBJECT:    Medication Assisted Treatment Guidance for Take-Home Medication and
Telehealth

**Background**: The Department of Behavioral Health and Developmental Disabilities (DBHDD)
Office of Addictive Diseases (OAD) is Georgia's State Opioid Treatment Authority (SOTA). As
such, DBHDD's OAD collaborates with other agencies in developing guidelines for establishing
and/or closing Medication Assisted Treatment (MAT) Programs operating in Georgia. As the
SOTA, DBHDD is also responsible for establishing guidelines for the administration of MAT
programs. In this capacity we are concerned with the continuity of care for all individuals
currently enrolled in Opioid Treatment Programs in Georgia. Due to the current challenge of
addressing COVID-19 in our state, we are providing additional guidance regarding take-home
medication, telehealth, and billing for medication administration.

**Guidance**: In an effort to maintain patient continuity of care and respond to provider needs
during the COVID-19 response, DBHDD has partnered with the Department of Community
Health (DCH - Georgia's Medicaid authority) to consider special provisions for Opioid
Treatment Programs enrolled to provide the Medication Assisted Treatment Package as defined
by DBHDD in its [Community Behavioral Health Provider Manual](#). For the period of the official
declaration of State of Public Health Emergency in Georgia for COVID-19, *telemedicine/
telephonic* **supervision (video-enabled only) of the individual's self-administration of take-
home medication will be allowed** *to be billed as either Medication Administration or Opioid
Maintenance in accordance with those definitions.* This is only for individuals receiving Opioid
Maintenance treatment and who have been clinically allowed take-home medications due to the
emergency. Documentation must include all checks of physical and mental responses/symptoms
which would generally occur in a face-to-face intervention.

**GENERAL REQUIRED COMPONENTS OF MEDICATION ADMINISTRATION
TAKE-HOME WAIVER:**

1.  There must be a written service order for Medication Administration and a written order for the
    medication and the administration of the medication that complies with guidelines in Part II,
    Section 1, Subsection 6 - Medication of the Provider Manual.

2. The order for and administration of medication must be completed by members of the medical staff pursuant to the Medical Practice Act of 2009, Subsection 43-34-23 Delegation of Authority to Nurse and Physician Assistant.

3. The order must be in the individual's chart. Telephone/verbal orders are acceptable provided they are signed by an appropriate member of the medical staff in accordance with DBHDD requirements.

4. For the period of the official declaration of State of Public Health Emergency in Georgia for COVID-19, documentation must support the medical necessity of administration by licensed/credentialed medical personnel or support the clinically indicated/approved plan for take-home medication (either independently self-administered or with telemedicine/telephonic daily oversight of administration).

5. Documentation must support that the individual served is being trained in the risks and benefits of the medications being administered (or self-administered, if there is a clinically-approved take-home medication plan) and that symptoms are being monitored by the program staff who are either administering the medication, supervising the daily self-administration of take-home medication, or billing for check-ins with the individuals related to their daily self-administration plan.

6. If take-homes are being allowed in accordance with a clinically indicated plan, documentation must support that the individual is being trained in the principle of self-administration of medication or that the individual is physically or mentally unable to self-administer. Opioid Treatment Programs should implement procedures to monitor, recognize and manage patients, staff and visitors to their facility for the prevention of COVID-19.

## TELEMEDICINE/TELEPHONIC PROVISIONS

DBHDD, in concert with the DCH, has released temporary allowances on the provision of services via telemedicine and telephonic modalities. As Medication Assisted Treatment (MAT) is a program service which is comprised of "unbundled," discrete services, this helpful table is included below:

| MAT Discrete Service Interventions | Additional COVID-19 Response Modes of Delivery |
|---|---|
| Physician Assessment | Telemedicine/Telephonic |
| Nursing Assessment | Telemedicine/Telephonic |
| Medication Administration (Supervision of Self-administration) | Telemedicine/Telephonic (video-enabled only) |
| Opioid Maintenance (Supervision of Self-administration) | Telemedicine/Telephonic (video enabled only) |
| Diagnostic Assessment | Telemedicine/Telephonic |
| Individual Counseling | Telemedicine/Telephonic |
| Group Outpatient Services (including psycho-educational groups focusing on relapse prevention and recovery) | Telemedicine/Telephonic (maximum group size = 6) |
| Family Outpatient Services | Telemedicine/Telephonic |
| Addictive Disease Support Services | Telemedicine/Telephonic |
| Behavioral Health Assessment & Service Planning Development | Telemedicine/Telephonic |
| Medication | |

**MODIFIED COMMUNITY BEHAVIORAL HEALTH SERVICE DEFINITION:**

In addition to the General Required Components waiver citations above, please note that there is a temporary adjustment to the DBHDD Community Behavioral Health Provider Manual – MAT requirements noted below (new content represented by red font). These allowances/expectations will be in place until April 30, 2020.

| Service Definition Section | Existing DBHDD Provider Manual Requirement | Waiver through April 30, 2020 |
|---|---|---|
| Required Components | 2. The program provides structured treatment and therapeutic services, utilizing activity schedules as part of its operational method, i.e., plans or schedules of days or times of day for certain activities. | 2. The program provides structured treatment and therapeutic services, utilizing activity schedules as part of its operational method, i.e., plans or schedules of days or times of day for certain activities. These schedules may include use of telemedicine or other telehealth platforms for participants. |
| Required Components, continued | 3. The program must be in operation at least 5 hours per day Monday - Friday and a minimum of 3 hours per day on Saturdays. | 3. During the COVID-19 emergency response period, all required program staff must be accessible, either in-person at the program site or via telemedicine/other telehealth platforms, at least 5 hours per day Monday - Friday and a minimum of 3 hours per day on Saturdays. During a portion of these days/hours, the program site must be fully operational for in-person interventions: At least two days per week, for a minimum of 3 hours on each day (any remaining required hours for a day may be offered via telemedicine). The following information must be provided, in writing, to each individual enrolled in the program: a. Specific days and times when required staff will be physically present at the program site for intervention; b. Specific days and times when required staff will be available via telemedicine/telehealth; c. Clear, detailed information and instructions for accessing telemedicine/other telehealth platforms; d. Alternative contact information for key staff who will serve as points of contact outside of scheduled program operation times; and e. Emergency contact information. |

| | |
|---|---|
| **Required Components, continued** | 5. The program conducts random drug screening and uses the results of these tests for marking participant's progress toward goals and for service planning. | 5. The program conducts random drug screening and uses the results of these tests for marking participant's progress toward goals and for service planning. During the COVID-19 emergency response period, random drug screening may be less frequent. |

| 5. | The program conducts random drug screening and uses the results of these tests for marking participant's progress toward goals and for service planning. | 5. The program conducts random drug screening and uses the results of these tests for marking participant's progress toward goals and for service planning. During the COVID-19 emergency response period, random drug screening may be less frequent. |
|---|---|---|
| 6. | This service must operate at an established site approved by DBHDD, DEA, SAMHSA, and DCH/HFR. | 6. During the COVID-19 response period, this service may be delivered via telemedicine/other telehealth platforms within the parameters outlined in Required Components item #3.<br><br>When delivered in-person, this service must operate from an established site approved by DBHDD, DEA, SAMHSA, and DCH/HFR. |
| 9. | The program physician shall ensure that each individual voluntarily chooses MAT and that all relevant facts concerning the use of the opioid drug are clearly and adequately explained to the individual, and that each individual provides informed written consent to treatment. | 9. The program physician shall ensure that each individual voluntarily chooses MAT and that all relevant facts concerning the use of the opioid drug are clearly and adequately explained to the individual, and that each individual provides informed written or verbal consent to treatment. |
| 10. | A full medical examination and other tests must be completed by the program within 14 days of admission. | 10. A full medical examination and other tests must be completed by the program within 14 days of admission. During the COVID-19 response, this can occur via telemedicine and other telehealth platforms. |
| | | 12. For the period of the COVID-19 emergency, telemedicine-based (i.e. video is required) supervision of self-administration for individuals receiving Opioid Maintenance treatment and who have been allowed take-home medications due to the emergency may be documented and billed as either Medication Administration or Opioid Maintenance in accordance with those definitions, including all checks of physical and mental responses/symptoms which would generally occur in a face-to-face intervention. |
| | | 13. During the COVID-19 emergency response period, documentation must support the medical necessity of administration by licensed/credentialed medical personnel or support the clinically indicated/approved plan for take-home medication (either independently self-administered or with telemedicine/telephonic daily oversight of administration).<br>a. Documentation must support that the individual served is being trained in the |

| | | |
|---|---|---|
| | | risks and benefits of the medications being administered (or self-administered, if there is a clinically-approved take-home medication plan) and that symptoms are being monitored by the program staff who are either administering the medication, supervising the daily self-administration of take-home medication, or billing for check-ins with the individuals related to their daily self-administration plan.<br><br>b. If take-home medications are being allowed in accordance with a clinically indicated plan, documentation must support that the individual is being trained in the principle of self-administration of medication or that the individual is physically or mentally unable to self-administer. |
| **Staffing Requirements** | 2. There must be at least one independently licensed/certified practitioner, (CAC-II, CAC-I, GCADC-II or -III, GCADC-I, CAS, MAC, CAADC, LPC, LCSW, or LMFT) on-site at all times the service is in operation, regardless of the number of individuals participating. | 2. During the COVID-19 emergency response period, there must be at least one independently licensed/certified practitioner, (CAC-II, CAC-I, GCADC-II or -III, GCADC-I, CAS, MAC, CAADC, LPC, LCSW, or LMFT) physically present and accessible during on-site operating days/times, regardless of the number of individuals participating. A practitioner meeting these qualifications must also be accessible via telemedicine/other telehealth platforms at all other times when the service is in remote operation, regardless of the number of individuals participating. |
| | 7. Programs shall ensure that appropriate nursing care is provided at all times the program is in operation. | 7. Programs shall ensure that appropriate nursing care is provided at all times the program is in operation. During the COVID-19 emergency response period, certain nursing services/care may be provided via telemedicine or other telehealth platforms, as clinically appropriate. |
| **Clinical Operations** | f. **Medication Administration & Opioid Maintenance:** | f. **Medication Administration & Opioid Maintenance:**<br><br>iv. During the COVID-19 emergency response period, directly observed and supervised self-administration of take-home MAT medication via telemedicine (i.e. video required) is allowable for individuals who would otherwise require medication administration, if clinically appropriate (i.e. individual is deemed capable of self-administration if given training and if under direct observation/supervision, and is not considered at risk for overdose). The medical necessity of supervised self-administration must be documented in |

| | | |
|---|---|---|
| **Clinical Operations, continued** | | the individual's clinical record prior to implementation of this allowance. |
| | **h. Nursing Assessment:** This service requires face-to-face contact with the individual to monitor, evaluate, assess, and/or carry out a physician's orders regarding the physical and/or psychological problems of the individual... | **h. Nursing Assessment:** This service requires face-to-face contact (during the COVID-19 emergency response period, this may be in-person or via telemedicine/other telehealth platforms, as is clinically feasible and appropriate) with the individual to monitor, evaluate, assess, and/or carry out a physician's orders regarding the physical and/or psychological problems of the individual... |
| **Service Access** | The program must be in operation at least 5 hours per day Monday- Friday and a minimum of 3 hours per day on Saturdays. | During the COVID-19 emergency response period, all required program staff must be accessible, either in-person at the program site or via telemedicine/other telehealth technology, at least 5 hours per day Monday - Friday and a minimum of 3 hours per day on Saturdays. During a portion of this time, the program site must be fully operational for in-person interventions: At least two days per week, for a minimum of 3 hours on each day (any remaining required hours for a day may be offered via telemedicine). |

DBHDD's response to the State of Public Emergency for COVID-19 is continuously adapting based upon the needs of the community, the provider network, and most importantly, the people we mutually serve. Please know that as DBHDD receives more information about the needs of our state we will respond accordingly and keep you, our partners, well informed. For questions and further discussion please call 404-416-5225 or email Vonshurii.wrighten@dbhdd.ga.gov.

Special Bulletin                                                    April 2, 2020

 

# ONE IMPORTANT ANNOUNCEMENT AND TRAINING OPPORTUNITIES

## Medication Assisted Treatment Guidance for Take-Home Medication and Telehealth

The Department of Behavioral Health and Developmental Disabilities (DBHDD) Office of Addictive Diseases (OAD) is Georgia's State Opioid Treatment Authority (SOTA). As such, DBHDD's OAD collaborates with other agencies in developing guidelines for establishing and/or closing Medication Assisted Treatment (MAT) Programs operating in Georgia. As the SOTA, DBHDD is also responsible for establishing guidelines for the administration of MAT programs. In this capacity we are concerned with the continuity of care for all individuals currently enrolled in Opioid Treatment Programs in Georgia. Due to the current challenge of addressing COVID-19 in our state, we are providing additional guidance regarding take-home medication, telehealth, and billing for medication administration.

In an effort to maintain patient continuity of care and respond to provider needs during the COVID-19 response, DBHDD has partnered with the Department of Community Health (DCH - Georgia's Medicaid authority) to consider special provisions for Opioid Treatment Programs enrolled to provide the Medication Assisted Treatment Package as defined by DBHDD in its **Community Behavioral Health Provider Manual.**

Please review the Provider Guidance Memo by **clicking here**

## DBHDD Mental Health Wellness Resources

On behalf of the Department of Behavioral Health and Developmental Disabilities (DBHDD) and the hundreds of thousands of Georgians we serve, we want to thank you for your tireless efforts to provide services during these uncertain and rapidly changing times.  Your work has always been vitally important to our public safety net, but in the last several weeks, you have demonstrated remarkable flexibility and adaptability in the name of making sure that some of Georgia's most vulnerable citizens are still able to receive high-quality care. We are grateful for your commitment and partnership.

We know that you are under great stress and working very hard to meet the needs of the people you serve while navigating a complex health care system. We also know that you have your own health needs – both mental and physical. We want to encourage you not to neglect your health while you are supporting the health of others. DBHDD is committed to supporting you and bolstering your mental strength so that you can keep serving those who need you.

To this end, we are standing up the following Mental Health Wellness resources:

- 2x2: Daily Self-Care Tips and Support for Health Care and Emergency Response

Workers (more information below)

高

available by **clicking here** and **clicking here**

- A warm line staffed by Georgia's peer workforce and individuals certified in Mental Health First Aid to offer support, general information, and wellness tips (coming next week)

We invite you to participate in our **2x2 Series: Daily Self-Care Tips and Support for Health Care and Emergency Response Workers**. These Webex events are designed to provide daily self-care tips and support for health care and emergency response workers. Each session will provide attendees with mental health tips about managing stress, grief, work/life balance, and wellness. The series will be held on weekdays at 2:00 p.m.

**NOTE:** This session will utilize the WebEx webinar online conferencing system. WebEx allows participants to log on to a website from their computer and view the facilitator's information online, while listening to the facilitator through the use of a simultaneous telephone conference call.

**All participants must use the link below to register for the 2x2 series. Additionally, please note that it is strongly encouraged that you join the webinar 10-15 minutes prior to the start time to ensure that you do not experience any connectivity issues. Although all attendees will be muted, the chat box will be functional, and all attendees are encouraged to ask questions and share thoughts through the interactive chat. The facilitator will allot time for Q&A at the end of the presentation.**

Below is the date, time, session title and registration link for the April 3 session:

**April 3, 2020, 2:00 to 2:30 p.m. Conflict and Crisis Management**

If you cannot attend the live session, it will be recorded and available for review on the DBHDD website **here**.

For questions about the webinar, please email **DBHDDLearning@dbhdd.ga.gov**.

We also encourage you to look to trusted resources for managing stress and anxiety amid the COVID-19 crisis, such as these:

**https://www.psychiatry.org/psychiatrists/covid-19-coronavirus**
**https://www.cdc.gov/coronavirus/2019-ncov/prepare/managing-stress-anxiety.html**

As you continue to support Georgians with mental health challenges, substance use disorders, and intellectual and developmental disabilities, please know that we are with you. Thank you for everything you do on behalf of the people we serve.

---

# Telehealth Learning and Consultation (TLC) Tuesdays

TELEHEALTH LEARNING
& CONSULTATION (TLC)
TUESDAYS

9-10 a.m. MT / 10-11 a.m. CT ◀



The Southeast Mental Health Technology Transfer Center (MHTTC) agency, associated with the Substance Abuse and Mental Health Administration (SAMHSA), is offering an online series designed to support providers in utilizing telehealth services. Please join them for Telehealth Learning and Consultation (TLC) Tuesdays, an online series for providers who are new to or unfamiliar with telehealth.

**These will occur from 11 am - 12 pm Eastern Standard Time Tuesday through April.**

During each hour-long session, the Technology Transfer Center (TTC) Network specialists will spend 20 minutes addressing a specific topic, then answer questions submitted by TLC Tuesday registrants. Recordings of the 20-minute presentations, as well as additional resources, will be posted on the **web page** as they become available.

**You must register separately for each TLC Tuesdays session below.** While filling out the registration form, you will prompted to submit any questions you might have. Register by clicking one of the dates below. Certificates of completion will be available.

<div align="center">

**March 31: Telehealth Basics**
**April 7: Telehealth Billing**
**April 14: Telehealth Tools**
**April 21: Telehealth with Children and Adolescents**
**April 28: Telehealth Troubleshooting**

</div>

---

## Office of Provider Relations

**Director**
Lynn Copeland

**Senior Provider Relations Manager**
Carole Crowley

**Provider Relations Managers**
Sharon Pyles
Tim Strickland
Lisa Sweat



For Provider Relations inquiries, please contact us at **DBHDD.Provider@dbhdd.ga.gov**

<div align="center">

### BE WELL

 

</div>

# SUMMARY OF COVID-19 POLICY MODIFICATIONS

**PERIOD COVERED - MARCH 26, 2020 TO APRIL 23, 2020**

This summary of modifications is designed to guide the review of new and revised content published at https://gadbhdd.policystat.com as it relates to each iteration of the **COVID-19 2020: DBHDD Community Behavioral Health Services Policy Modifications** policy. This policy was instated during the COVID-19 coronavirus pandemic, while the State of Georgia declared a Public Health Emergency.

The responsibility for thorough review of the policy content remains with the Provider.

| Policy Date | Policy Item # | Original Policy Impacted by the Modification | Summary of Modification |
|---|---|---|---|
| 3/26/2020 | 1. | Criminal History Record Check for Individual Provider Applicants, 04-111 | Partial suspension of fingerprinting requirements, including a one-page attestation - Attachment A. |
| | 2. | Criminal History Record Check for Individual Provider Applicants, 04-111 | Partial suspension of fingerprinting requirements, including a one-page attestation - Attachment B. |
| | 3. | Payment by Individuals for Community Behavioral Health Services, 01-107 | Partial suspension of the income verification requirements. |
| 4/2/2020 | 1. | Criminal History Record Check for DBHDD Network Provider Applicants, 04-104 | Additional language added to Section 1 items c and d, and new two page Attachment A added. |
| | 2. | Criminal History Record Check for Individual Provider Applicants, 04-111 | Additional language added to Section 2 items c and d, and new two-page Attachment B added. |
| 4/8/2020 | 1. | Recruitment and Application to become a Provider of Behavioral Health Services, 01-111 | Temporary suspension of the site visit requirement for behavioral health provider enrollment, Section 1 items a and b. Notification of the impact of non-attendance at Applicant Forum, Section 1 item c. |
| 4/23/2020 | 2. | Criminal History Record Check for DBHDD Network Provider Applicants, 04-104 | Period of time allowed for fingerprinting increased from 30 days to 60 days. Revised Attachment A. |
| | 3. | ~~Criminal History Record Check for Individual Provider Applicants, 04-111~~ | Removal of this policy reference because it is not applicable to BH providers. |




Georgia Department
of Behavioral Health
& Developmental
Disabilities

**VERSION 2**

**COVID-19 2020: DBHDD Community Behavioral Health Services
Policy Modifications**

**EFFECTIVE 4/2/2020**

| Current Status: *Old* | | PolicyStat ID: *7872870* |
|---|---|---|
| **Georgia Department of Behavioral Health & Developmental Disabilities** | Creation: | *3/26/2020* |
| | Effective: | *4/2/2020* |
| | Last Reviewed: | *4/2/2020* |
| | Last Revision: | *4/2/2020* |
| | Next Review: | *9/29/2020* |
| | Owner: | *Monica Johnson, MA, LPC: Director, Division of Behavioral Health* |
| | Chapter: | *Admin Issues for BH & DD Services* |
| | Sections: | |

# COVID-19 2020: DBHDD Community Behavioral Health Services Policy Modifications - 4/2/2020

## EFFECTIVE IMMEDIATELY

## APPLICABILITY

DBHDD Providers of Community **Behavioral Health** Services

## POLICY

In response to the continued transmission of COVID-19, where necessary new measures are in effect to minimize community spread of the virus, and to assist in the continued delivery of community behavioral health services.

**Modifications** as described in this policy refers to the restriction, enhancement, relaxation, and partial or full suspension of existing policies in PolicyStat, as applicable to the service. This policy includes full details of the alternate requirement(s) or procedures.

The following temporary modifications to the policies listed below are pertinent to community behavioral health services, effective immediately. Please refer to the full policy via the hyperlink, noting the alternate requirements applicable until further notice.

This policy will be updated as necessary. This policy remains in effect until the Governor of the State of Georgia lifts the Emergency Declaration.

1. A ***partial suspension*** of the fingerprinting requirement described in Criminal History Record Check for DBHDD Network Provider Applicants, 04-104 as follows:

   a. DBHDD's Provider Network must have each person subject to Policy 04-104 complete the "Network Provider Applicant Attestation," Attachment A to this policy, instead of completing the fingerprint based background check stipulated in Policy 04-104.

   b. Within thirty (30) days of cessation of the Public Health Emergency, all persons who signed the Network Provider Applicant Attestation instead of completing the fingerprint

based background check must complete a fingerprint based background check as required by Policy 04-104. The provider is responsible for sending any person who signed the Network Provider Applicant Attestation for a fingerprint based background check.

c. The provider is also responsible for sending to DBHDD's Criminal History Background Check (CHBC) section each signed Network Provider Applicant Attestation, while retaining a copy in the applicant's personnel file. The provider must send the signed and dated Attestation to CHBC, and acknowledge receipt of an email from CHBC confirming acceptance of the Attestation, before the applicant begins working. The Individual Assessment process set forth in section D of Policy 04-104 does not apply to persons who sign the Network Provider Applicant Attestation.

d. The Attestation cannot be used by Network Provider Applicants who were fingerprinted for a fingerprint- based background check within 30 days prior to the declaration of the Public Health Emergency.

2. A *partial suspension* of the fingerprinting requirement described in Criminal History Record Check for Individual Provider Applicants, 04-111 is permitted as follows:

a. All applicants who are subject to Policy 04-111 must complete the "Individual Provider Attestation," Attachment B to this policy, instead of completing the fingerprint based background check documented in Policy 04-111.

b. Within thirty (30) days of cessation of the Public Health Emergency, all applicants who signed the Individual Provider Attestation instead of completing the fingerprint based background check must complete a fingerprint based background check as required by Policy 04-111.

c. DBHDD Provider Enrollment is responsible for sending to DBHDD's Criminal History Background Check (CHBC) section all signed Individual Provider Attestations and for acknowledging receipt of an email from CHBC confirming acceptance of the Attestation, before the Individual Provider Applicant can be considered eligible. The Individual Assessment process set forth in Part D of Policy 04-111 does not apply to applicants who sign the Individual Provider Attestation.

d. The Attestation cannot be used by Individual Provider Applicants who were fingerprinted for a fingerprint based background check within 30 days prior to the declaration of the Public Health Emergency.

3. A *partial suspension* of the income verification requirements using tax returns, pay check stubs, verification of benefits from other federal or state agencies as stipulated in Sections B.3 and F.2 of Payment by Individuals for Community Behavioral Health Services, 01-107 has been made as follows:

a. For the period of the Public Health Emergency related to COVID-19, DBHDD waives the requirement for income verification to access state funded behavioral health services.

b. Provider agencies are required to request attestation of income from individuals served and verify authenticity to the best of their ability.

    i. If verification is unavailable due to resource constraints related to COVID-19, providers are required to note this in the record. At the end of the public health

emergency, providers will be required to verify individuals income status within 90 days.

**DBHDD sincerely appreciates your compliance with these measures throughout this Public Health Emergency.**

## Attachments

A - COVID-19 2020 - Attestation of Absence of Barrier Crimes Data & Cover Letter.docx

B - COVID-19 2020 - Attestation of Absence of Barrier Crimes Data & Cover Letter.docx

## Approval Signatures

| Approver | Date |
| --- | --- |
| Anne Akili, Psy.D.: Director, Policy Management | 4/2/2020 |
| Monica Johnson, MA, LPC: Director, Division of Behavioral Health | 4/2/2020 |
| Anne Akili, Psy.D.: Director, Policy Management | 4/2/2020 |



**Georgia Department of Behavioral Health & Developmental Disabilities**

*Judy Fitzgerald, Commissioner*

**Office of Enterprise Compliance**
*Two Peachtree Street, NW ● 1st Floor  ● Atlanta, Georgia 30303-3142 ● Telephone:  404-463-2507 ● Fax: 770-359-5473*

I, _____
        Last Name                        First Name                                Middle Initial

_____    _____    _____    _____    _____
        Social Security No.            Height         Weight          Eye color         Hair Color

_____    _____    _____
        Date of Birth                            Sex                                Race

_____    _____    _____    _____
        Street Address                                    City                    State          Zip

attest that I have not been convicted of nor have pending charges for any crime listed on Barrier Record Data (Attachment D of Criminal History Record Check for DBHDD Network Provider Applicants, 04-104, a copy of which has been provided to me).

I also attest that:
1.  I am not currently on probation as a First Offender for a crime listed on Barrier Record Data (Attachment D);
2.  I am not awaiting final disposition on charges for any crime referenced on the Barrier Record Data (Attachment D);
3.  I do not knowingly have an outstanding warrant for any crime referenced on the Barrier Record Data (Attachment D);
4.  I do not have a finding of guilty but mentally ill (GBMI) for any crime referenced on the Barrier Record Data (Attachment D);
5.  I do not have a finding of guilty with intellectual disability (GWID) for any crime referenced on the Barrier Record Data (Attachment D); and
6.  I do not have a finding of not guilty by reason of insanity (NGRI) for any crime referenced on the Barrier Record Data (Attachment D).
7.  I do not have any convictions within the last 12 months.

This form serves as a contingency for employment.  Within 30 days of the termination of the Public Health State of Emergency, I understand that I will be required to complete a fingerprint based background check and if any information stated hereon is found to be falsified or untrue, I could be deemed ineligible for continued employment by a DBHDD network provider. I also understand that prior to being fingerprinted, if any information stated hereon is discovered to have been falsified or is found to be untrue, I could be deemed ineligible for continued employment.

_____
        Signature

_____
        Date

2 Peachtree Street, NW ● Atlanta, Georgia 30303 ● 404.657.2252
dbhdd.georgia.gov ● Facebook: Georgia DBHDD ● Twitter: @DBHDD

DBHDD COVID-19:2020 POLICY MODIFICATION                                    Version 4/2/2020



**Georgia Department of Behavioral Health & Developmental Disabilities**

*Judy Fitzgerald, Commissioner*

**Office of Enterprise Compliance**

*Two Peachtree Street, NW ● 1st Floor ● Atlanta, Georgia 30303-3142 ● Telephone: 404-463-2507 ● Fax: 770-359-5473*

**TO:**      DBHDD Provider Network

**FROM:**   DBHDD Office of Enterprise Compliance
             Criminal History Background Checks Section

**RE**:      Policy No. 04-104 Attestation

Immediately after a person subject to Policy No. 04-104, as modified during the Public Health State of Emergency, completes the Attestation required under the modified policy, send the Attestation to CHBC by facsimile to (770) 359-1622, or via email at **DBHDD-CRS@DBHDD.GA.GOV.** with this Cover Sheet after completing the information required below:

**Provider Name**              _____

**Name of Direct Contact**     _____

**Contact Phone Number**       _____

**Email address**              _____

If you have questions, please contact our office at 404-463-2507 or 404-232-1641.



**Georgia Department of Behavioral Health & Developmental Disabilities**
*Judy Fitzgerald, Commissioner*

**Office of Enterprise Compliance**
*Two Peachtree Street, NW ● 1st Floor ● Atlanta, Georgia 30303-3142 ● Telephone:  404-463-2507 ● Fax: 770-359-5473*

I, _____

      Last Name            First Name               Middle Initial

_____

    Social Security No.      Height      Weight      Eye color     Hair Color

_____

     Date of Birth          Sex              Race

_____

    Street Address          City         State     Zip

attest that I have not been convicted of nor have pending charges for any crime listed on Barrier Record Data (Attachment D to DBHDD Policy 04-111, a copy of which has been provided to me).

I also attest that:

1. I am not currently on probation as a First Offender for a crime listed on Barrier Record Data (Attachment D);
2. I am not awaiting final disposition on charges for any crime referenced on the Barrier Record Data (Attachment D);
3. I do not knowingly have an outstanding warrant for any crime referenced on the Barrier Record Data (Attachment D);
4. I do not have a finding of guilty but mentally ill (GBMI) for any crime referenced on the Barrier Record Data (Attachment D);
5. I do not have a finding of guilty with intellectual disability (GWID) for any crime referenced on the Barrier Record Data (Attachment D); and
6. I do not have a finding of not guilty by reason of insanity (NGRI) for any crime referenced on the Barrier Record Data (Attachment D).
7. I do not have any convictions within the last 12 months.

This form serves as a contingency for employment.  Within 30 days of the termination of the Public Health State of Emergency, I understand that I will be required to complete a fingerprint based background check and if any information stated hereon is found to be falsified or untrue, I could be deemed ineligible to be an individual provider.  I also understand that prior to that time if it is discovered that information stated hereon is falsified or found to be untrue, I could be deemed ineligible to be an individual provider.

_____

Signature

_____

Date



**Georgia Department of Behavioral Health & Developmental Disabilities**

*Judy Fitzgerald, Commissioner*

**Office of Enterprise Compliance**
*Two Peachtree Street, NW ● 1ˢᵗ Floor  ● Atlanta, Georgia 30303-3142 ● Telephone:  404-463-2507 ● Fax: 770-359-5473*

**TO:**      DBHDD Provider Network

**FROM:**    DBHDD Office of Enterprise Compliance
           Criminal History Background Checks Section

**RE**:      Policy No. 04-104 Attestation

Immediately after a person subject to Policy No. 04-104, as modified during the Public Health State of Emergency, completes the Attestation required under the modified policy, send the Attestation to CHBC by facsimile to (770) 359-1622,  or via email at **DBHDD-CRS@DBHDD.GA.GOV.**  with this Cover Sheet after completing the information required below:

**Provider Name**              _____

**Name of Direct Contact**     _____

**Contact Phone Number**       _____

**Email address**              _____

If have questions, please contact our office at 404-463-2507 or 404-232-1641.



**Georgia Department of Behavioral Health & Developmental Disabilities**

Judy Fitzgerald, Commissioner

**D·B·H·D·D**  Division of Behavioral Health

**To**: All Regions and DBHDD-Contracted Providers with Housing Outreach Coordinators
**From**: Maxwell Ruppersburg, Director, Office of Supportive Housing, DBHDD
**Date:** April 3, 2020
**Re**: Guidance for Housing Outreach Coordinators during COVID-19

In response to the statewide Shelter in Place order and Public Health State of Emergency in Georgia as a result of COVID-19, as well as the increasing pressures placed on the homeless and behavioral health system across the state, DBHDD and the Office of Supportive Housing is authorizing temporary programmatic changes, including guidance for Housing Outreach Coordinators, until further notice.

Currently in effect, all NSH referrals, upon approval, will receive a Notice to Proceed for GHVP and are not being asked to apply first for alternative resources. We are also making additional programmatic accommodations to support individuals during this crisis and those will continue to evolve.

During this time, we know that standard HOC outreach activity must change and adapt as a result of limited access to facilities and the cessation of community meetings. It is critical that HOCs continue to remain active so that we can continue to connect individuals to housing and keep them housed.

In response to this situation, we are asking that HOCs focus their time to support the priorities below.

**Housing Outreach Coordinators** should prioritize the following activities in this period:

1. Assisting with annual lease renewals to keep individuals stably housed.
2. Providing NSH assessment surveys and completion of referrals.
3. Identifying housing opportunities in the community and assist with housing search and leasing.

In addition to the above priorities, please continue with the following:

4. Review completed NSH surveys and close out the referrals, as needed. Follow up with individuals with a completed NSH intake who are not yet connected to services and/or supportive housing.
.   Continue to communicate regularly with your Regional Field Office and the Central Office to relay any questions you have or challenges being experienced.
.   Continue conducting calls and following up with assigned medical and correctional facilities.
7. Provide assistance at outpatient clinics and/or crisis centers to facilitate services for homeless individuals.
8. Participate in COVID-19 related and other learning opportunities via conference calls and webinars.
9. Coordinate resources with the PATH team in your area.
10. Make contact with the local homeless Continuum of Care to stay aware of resources and collaborations in the local area.
11. Make contact with the DCS regional coordinator for coordination of cases for individuals on supervision.

Please continue to exercise personal caution and recommended physical distancing, regular handwashing, and hygiene practices to safeguard the health of yourself and those around you. The work of Housing Outreach Coordinators and the provider network remains critical and ever needed during this time of crisis for so many around the state.

DBHDD Commissioner Judy Fitzgerald has issued a letter of exemption stating that the Governor's Shelter in Place order does not apply to DBHDD essential services which includes Housing Outreach Coordinators. This letter is not required by law but was requested by some providers and can be utilized if needed.

*Please be sure to regularly check the CDC and Georgia DPH websites for the most up-to-date information about COVID-19 and remember to be vigilant about personal hygiene.*

*If you have additional questions that relate to COVID-19 please submit them to the provider relations email so that they are properly tracked. That email is* [DBHDD.Provider@DBHDD.GA.GOV](mailto:DBHDD.Provider@DBHDD.GA.GOV)

We appreciate everything you do

cc:
Monica Johnson, Director, Division of Behavioral Health
Adrian Johnson, Assistant Director, Division of Behavioral Health
Letitia Robinson, Assistant Director, Office of Supportive Housing

**Regional Housing Transition Coordinators Contact Information**

| Region | Name | Email |
|---|---|---|
| 1 | Scarlett Freelin | scarlett.freelin@dbhdd.ga.gov |
| 2 | April Edwards | april.edwards@dbhdd.ga.gov |
| 3 | Jamie  imbrough | jamie.kimbrough@dbhdd.ga.gov |
| 4 | Rachael Holloway | rachael.holloman@dbhdd.ga.gov |
|  | Jeannette Bacon | Jeannette.Bacon@dbhdd.ga.gov |
|  | Sam Page | Sam.Page@dbhdd.ga.gov |

**Housing Outreach Coordinator Contact Information**

| Region | First Name | Last Name | Agency | Email |
|---|---|---|---|---|
| 1 | Anita | Ojeda | Avita | Anita.Ojeda@avitapartners.org |
| 1 | Lee | Greene | Highland Rivers Health | dannygreene@highlandrivers.org |
| 2 | Lena | Mason | Advantage Behavioral Health Systems | lmason@advantagebhs.org |
| 2 | Marsha | Body | River Edge Behavioral Health Center | Mbody@river-edge.org |
| 3 | Cherealla | Lavan | De  alb CSB | clavan@dekcsb.org |
| 3 | Venessa | Bullard-Carr | View Point Health | Venessa.Bullard-Carr@VPHealth.org |
| 4 | Ginger | Eady | Aspire Behavioral Health | geady@albanycsb.org |
| 4 | Jeff | Hall | Legacy | jhall@bhsga.com |
|  | Angie | Wright | CSB of Middle Georgia | adwright@csbmg.com |
|  | Denean | Bonds | Gateway BHS | denean.bonds@gatewaybhs.org |
|  | Janis | Jones | New Horizons Behavioral Health | jjones@nhbh.org |



**Georgia Department of Behavioral Health & Developmental Disabilities**

Judy Fitzgerald, Commissioner

**D·B·H·D·D**    Division of Behavioral Health

To:      DBHDD Contracted providers of Adult Mental Health and Addictive Diseases
             Residential Services
From:   Terri Timberlake, Ph.D., Director, Office of Adult Mental Health
             Cassandra Price, Director, Office of Addictive Diseases
Date:    4/3/2020
Re:     COVID-19 related operational guidance

The current Coronavirus pandemic has sparked heightened health and safety concerns across our state. Our Department is hopeful that each provider is taking the recommended precautions to reasonably support the wellbeing of your staff. Similarly, we expect health and safety measures to be taken to support the needs of individuals in community adult mental health and addictive diseases residential services. The individuals residing in residential services are a vulnerable, high need population and without necessary support, these individuals face increased risks.

The DBHDD has adopted general guidance for all residential facilities as outlined by the National Council for Behavioral Health (see attached) COVID-19 Guidance, please read the entire publication. Providers are strongly encouraged to follow additional guidelines from the Centers for Disease Control (CDC) and the Georgia Department of Public Health (GDPH). Special allowances that were detailed in the DBHDD COVID-19 Provider Relations Special Bulletin dated March 24, 2020 should also be reviewed.  Further, any changes made by providers to residential capacity/ admission standards should be reported to the appropriate DBHDD office immediately and positive cases must be promptly reported through IMAGE system.

The CDC and state health departments have issued guidelines for health care workers who have tested positive or who have been in contact with a COVID-19 positive person, which include less stringent quarantine and return to work criteria for workers in times of shortage. These guidelines should be considered if the program experiences significant staff shortages.

Behavioral health residential facilities/settings should implement the following additional efforts to protect clients and staff in these programs:

1.    Facilities should post educational information from official health sources throughout the building, including signage on how to properly wash your hands, signs and symptoms of early detection and outdoor signage to halt visitors or inform health care workers of access restrictions. Tools can be found on the CDC website.

2.    Individuals should be educated to stay in the residence as much as possible. If they do go out, they should keep a distance of at least 6 feet away from anyone else, including relatives who do

not live in the residence, and avoid touching their faces. Programs should cancel all planned social or recreational outings. Upon returning home, everyone should immediately wash their hands with soap and water for at least 20 seconds or use an alcohol-based hand sanitizer. Cell phones and other frequently handled items should be sanitized daily.

## Visitors

1. Residential settings/facilities should restrict visitation of all nonresidents (visitors and non-essential health care personnel) unless it is deemed necessary to directly support a resident's health and wellness or for certain compassionate care situations, such as young children in residential treatment or end- of-life care. In those cases, visitors should be limited to only a specific room. Facilities are expected to notify potential visitors to defer visitation until further notice through the facilities' websites, door signage, calls to family members, letters, etc. Note: If a state implements actions that exceed CMS requirements, such as a ban on all visitation through a governor's executive order, a facility would not be out of compliance with CMS' requirements.

2. Prior to entering the residence, all visitors should sanitize their hands and should be asked if they have a recent cough, sore throat, shortness of breath, fever or if they recently traveled on an airplane or on a cruise. If the response of any of these questions is "yes", the visitor should not be allowed into the residence.

3. For individuals who enter for compassionate situations meriting exceptions, facilities should require visitors to perform hand hygiene and use personal protective equipment (PPE), such as facemasks and gloves. Decisions about visitation during a compassionate exemption situation should be made on a case-by-case basis, which should include careful screening of the potential visitor for fever or respiratory symptoms or travel by airplane or cruise. Potential visitors with symptoms of a respiratory infection such as fever, cough, shortness of breath or sore throat, or recent airplane or cruise travel should not be permitted to enter the facility at any time, even in end-of-life situations. Visitors who are permitted, must wear a facemask while in the building and restrict their visit to the resident's room or other location(s) designated by the facility. They should also be reminded and monitored to frequently perform hand hygiene.

## Staff

1. Staff should implement active screening and monitoring of residents and staff for fever and respiratory symptoms. Advise employees to check for any signs of illness before reporting to work each day and notify their supervisor if they become ill. Facilities may consider screening staff daily for fever or respiratory symptoms before entering the facility; when doing so, actively take their temperature and document absence of shortness of breath, cough or sore throat. If they are ill, have them put on a facemask and self-isolate at home for 14 days. Staff members should stay home if they are sick. Staff members who have had direct contact with individuals who test positive for COVID-19 or who are designated a person under investigation (PUI) should self-quarantine for 14 days and not come to the residential program and report symptoms to their supervisor. If, after 14 days following the last contact, they have not developed symptoms, they may return to work.

2.  Facilities should identify staff who work at multiple facilities, including agency staff, regional or corporate staff, etc., and actively screen and restrict them appropriately to ensure that they do not place individuals in multiple facilities at risk for COVID-19.

3.  Staff should review and revise how they interact with vendors and receive supplies. Incorporation of CDC contact precautions is necessary to prevent any potential transmission for agency staff when interacting with emergency medical services (EMS) personnel and equipment, food delivery, transporting residents to offsite appointments.  For example, do not have supply vendors transport supplies inside the facility; supplies should be dropped off at a dedicated location and sanitized before entering the facility/residence.

4.  Staff /residential facilities are advised to increase janitorial service at all public access points throughout the facility.

## General Program guidance

1.  To the extent possible, staff should work with clients' health care providers to institute telemedicine appointments

2.  CDC guidance currently recommends suspending all groups and activities with more than 10 people. Communal dining and all group activities with more than 10 people, such as internal and external group activities, should be canceled.

3.  Residential programs should utilize non-face-to-face meeting options, such as phone, video communications, etc., to the extent possible.

5.  In shared bedrooms for individuals who have not developed symptoms, ensure that beds are at least 6 feet apart when possible and require that clients sleep head-to-toe.

6.  Review CDC guidance for Interim Infection Prevention and Control Recommendations for Patients with Confirmed Coronavirus Disease 2019.

7.  Increase the availability and accessibility of alcohol-based hand rubs (ABHR), reinforce strong hand-hygiene practices, tissues, no-touch receptacles for disposal, and facemasks at health care facility entrances, waiting rooms, resident check-ins, etc.

8.  Ensure ABHR is accessible in all resident-care areas including inside and outside resident rooms.

9.  Increase signage for vigilant infection prevention, such as hand hygiene and cough etiquette.

## Accepting New Admissions

It is important for individuals with mental health and substance use conditions to participate in necessary services even during this crisis.  Residential programs should continue accepting new client referrals if able to meet the following conditions:

1.      Have space/capacity to isolate new residents for 14 day,
2.      Have the necessary PPE equipment for staff
3.      People with potential exposure to COVID-19 who are asymptomatic and have not tested positive for the virus should be accepted for admission consistent with your facility's pre-existing admission criteria and protocols.
     a.      Programs should request referring facilities to attest that the client has not had any new symptoms consistent with COVID-19 infections.
4.      For the first 14 days after an individual arrives at the program, they should wear a mask when interacting with others, if masks are available and if possible, they should have their own room.
5.      In the event that a referral is received directly from a hospital, CSU, BHCC admission, the 14-day isolation is not required, if the individual has tested negative for COVID-19 upon discharge.
     a.      A behavioral health residential facility can accept a resident diagnosed with COVID-19 under transmission-based precautions for COVID-19 as long as the facility can follow CDC guidance for transmission-based precautions. If a behavioral health residential facility cannot follow CDC guidance for transmission-based precautions, it must wait until these precaution requirements are discontinued.

## Responding to an Individual Who Develops Symptoms

If an individual in a residential program develops symptoms indicative of a COVID-19 infection, the individual should be isolated in a single room or in the designated isolation room/area if a single room is not available. Exposed roommates should, if possible, also have their own rooms for 14 days and if they remain symptom-free, can then share a room with others. The individual, and others potentially exposed should wear a mask. Meals and medication should be taken in the room. Common bathrooms must be disinfected after each use.

## Program Specific Guidance

### Office of Adult Mental Health -Residential and Crisis Respite Apartments
AMH Intensive Residential
o      Providers must develop a COVID -19 plan based on the general guidance as outlined above and any additional guidance set forth by the CDC, GDPH and DBHDD.
o      These residential facilities must be staff 24 hours a day, 7 days a week, and all residents must be monitored and supported through this crisis.
o      New admissions should be accepted if the provider has the ability to follow CDC  guidelines
o      Providers should continue accepting individuals from state hospitals, CSU, or BHCC. Admission is possible if the provider has more than one bed open. If the provider has only one bed available, they are not required to accept individuals and have the discretion to utilize this bed as an insolation bed if needed for residents presenting with symptoms of COVID 19.
AMH Semi – Independent Residential
o      Providers must develop a COVID plan based on the general guidance as outlined above and any additional guidance set forth by the CDC, GDPH and DBHDD.

o    These residential facilities must be staffed the minimum of 36 hours and all residents must be monitored and supported through this crisis.

o    New admission should be accepted if the provider has the ability to follow the recommended guidelines by the CDC.

Independent Residential

o    Approval is granted for a telephone contact if the once per week face to face in person visit is not permissible.

o    If an enrolled individual is unreachable or refuses telephone contact for a period of 5 days, an in person, face-to- face contact is required.

o    If there is indication of behavioral health decline/decompensation, including but not limited to behavioral health symptom escalation, behavioral health crisis, or new behavioral health symptoms, there must be a face to face intervention within 24 hours for enrolled individuals.

Crisis Respite Apartments

o    Approval is granted for telephone contacts if the required contacts per week face to face in person visit is not permissible.

o    If there is indication of behavioral health decline/decompensation, including but not limited to behavioral health symptom escalation, behavioral health crisis, or new behavioral health symptoms, there must be a face to face intervention within 24 hours for enrolled individuals.

o    Providers must respond to individuals in the case of a crisis call and provide the most appropriate service intervention needed for stabilization.


**Office of Addictive Diseases – Residential and Women's Treatment Residential**

Intensive Residential

o    Providers must develop a COVID 19 plan based on the general guidance as outlined above and any additional guidance set forth by the CDC, DPH and DBHDD.

o    These residential facilities must be staff 24 hours and all residents must be monitored and supported through this crisis.

o    New admission should be accepted if the provider has the ability to follow CDC  guidelines.

Semi – Independent Residential

o    Providers must develop a COVID 19 plan based on the general guidance as outlined above and any additional guidance set forth by the CDC, DPH and DBHDD.

o    A minimum of twelve (12) hours of clinical programming per week that includes but is not limited to therapy, education and relapse prevention.

o    Provision of individual therapy by telephone, group therapy and education in accordance with telehealth guidelines.

o    Self-help can be utilized via internet

o    In addition, services should be provided on-site vs in-clinic if possible, to reduce transportation of individuals.

o    Group modalities must not exceed 10 participants per group.

o    New admissions should be accepted if the provider has the ability to follow the recommended guidelines by the CDC.

Independent Residential

o    Approval is granted for a telephone contact if the once per week face to face in person visit is not permissible.

o      Providers must respond to individuals in the case of a crisis call and provide the most appropriate service intervention needed for stabilization. Services provided by telehealth as outline by DBHDD guidance

o      Self-help groups via internet

Women's Treatment Service Residential
Intensive Residential

o      Providers must develop a COVID plan based on the general guidance as outlined and any additional guidance set forth by the CDC, GDPH and DBHDD.

o      These residential facilities must be staff 24 hours a day, 7 days a week and all residents must be monitored and supported through this crisis.

o      New admissions should be accepted if the provider has the ability to follow CDC  guidelines.

o      Mothers with child(ren) on the unit should identify emergency placement, if needed in the event of implementation of an isolation plan

o      Visitation of child(ren) within the child welfare system has been recommended to cease during this time, however, increase in communication via phone or video conferencing should be allowed.

o      Pregnant women should be supported in making changes in birth plan, if applicable, to comply with identified birthing hospital

Adolescent Intensive Residential
Intensive Residential

o      Providers must develop a COVID 19 plan based on the general guidance as outlined above and any additional guidance set forth by the CDC, GDPH and DBHDD.

o      These residential facilities must be staffed 24 hours a day, 7 days a week and all residents must be monitored and supported through this crisis.

o      New admission should be accepted if the provider has the ability to follow CDC  guidelines.

o      Visitation guidelines above should be followed

**Questions and Information**

The Georgia Department of Public Health (DPH) and the Centers for Disease Control and Prevention (CDC) websites contain the most up-to-date information that will help us take sensible steps and support our ability to make health promoting choices.  Guidance for clinicians and those providing direct service to individuals can be found at www.dph.georgia.gov .  DBHDD will continue to provide updates via the Provider Newsletter: Network News.  Should you have questions, please submit them to our Provider Relations team via the Provider Issue Management System or submit an email to DBHDD.Provider@dbhdd.ga.gov.

Please remember to be vigilant about hygiene practices.

Thank you for your continued partnership.

Cc:    Monica Johnson, Director, Division of Behavioral Health
       Adrian Johnson, Assistant Director, Division of Behavioral Health



**NOTICE:**   **Georgia Crisis & Access Line**                    (#)

For access to services and immediate crisis help, call the **Georgia Crisis & Access Line (http://www.mygcal.com/)** (GCAL) at **1-800-715-4225**, available 24/7.

# Coronavirus: COVID-19 Provider FAQs

**Due to the recent developments with COVID-19 we have provided answers to the most asked provider questions. If you have a question that you do not see answered below please submit it via PIMS (https://dbhddapps.dbhdd.ga.gov/PIMS/Default.aspx).**

**What are the codes for Billing for tele-medicine or telephonic billing?** 

**Should we add the 95 Modifier for CPT codes in order to bill DCH for telemedicine?** 

**Due to the allowance of the use telemedicine for certain services for precautionary measures, will there be any changes to the reimbursement rates for services? Or will Medicaid observe the Telehealth Site Visit code Q3014GT for Category of Service 44** 

**How is Telemedicine different from Telehealth/Telephonic service delivery?** 

**Will the DBHDD waive requirements of the Secretary of State related to the training requirements for LCSWs, LPCs, and LMFTs in order to provide these services (135-11)?** 

**For new or renewed Individualized Recovery Plans, is it still a requirement for signatures?** 

**Can an individual consent to tele-medicine via tele-medicine or phone?** 

**Can an individual consent to tele-medicine via email?** 

**Isn't it true that all tele-medicine has to be done from a facility-based distant site?** 

**Does the DBHDD guidance in the Provider Bulletins apply to the CMOs?** 

**Do we use U6 or U7 modifiers when we bill for GT?** 

The codes that will be billed must be identified as "tele-health services" by utilizing either a telehealth Place of Service (POS) code or a telehealth modifier (e.g., GT). In the DBHDD Guidance dated March 19, 2020 (https://files.constantcontact.com/c2257ded301/3e0220f3-4ccb-4a95-8451-dd05f672b14c.pdf), for services in Table A, a provider would use the designated GT Modifier and bill the appropriate U Code for the particular practitioner level (no use of U6 or U7 as these codes are not currently pro-grammed in the GAMMIS system). For the services in Table B, they would use the POS code.

Please remember that the only service codes that can be billed are those currently identified in the DBHDD Community Behavioral Health Provider Manual (http://dbhdd.org/files/Provider-Manual-BH.pdf). If a provider tries to add any modifier to a base service code which is not identified in the manual, then it will deny.

**Does the GT modifier get added to every claim now when we use telemedicine or telephonic/approved web platforms?** 

No. As specified in the DBHDD Guidance dated March 19, 2020 (https://files.constantcontact.com/c2257ded301/3e0220f3-4ccb-4a95-8451-dd05f672b14c.pdf), for services in Table A, a provider would use the designated GT Modifier and bill the appropriate U Code for the particular practitioner level. For the services in Table B, they would use the POS code.

**The Georgia Board of Professional Counselors, Social Workers and Family Therapists chose not to waive the "Telemental Health" training for licensed practitioners, what does that mean for our behavioral h**

The Georgia DBHDD is aware of the State of Georgia Rule and Regulation 135-11-.01 ing Professional Counselors, Social Workers, and Marriage and Family Therapists called "telemental health." The scope of applicability for that regulation is specific Counselors, Social Workers and Marriage and Family Therapists. No other practiti by DBHDD is required to take this training and therefore, those practitioners can p services as defined in the DBHDD March 19 correspondence. Additionally, if the pr by the Composite Board Rule and Regulation 135-11, they must complete the CEUs a before doing any telemedicine or telephonic service delivery. Once the regulatory Board are fully met by one of those practitioners, then he/she may begin service del

Please see the notice posted by the DBHDD related to this here. (https://c:/Users/wtiegree/Downloads/Coronaviras%20SB%203.26.20_Policy%20 There is also a newly posted meeting announced (https://sos.ga.gov/index.php/lice Secretary of State website for April 3, 2020.

**During the COVID-19 emergency, does DBHDD have a recommendation for getting a newly presenting person's ID and Medicaid ID scanned and uploaded at intake if we are doing BHA via telemedicine or telephone/allowed web platform (Zoom or via email)?**

**For initial intakes where an ID would typically be requested from an individual, the agency has the following alternatives, with the expectation that a physical copy will be made at the time of the next face to face meeting or, if that is not possible, that post-emergency period, this will be gathered for the health record:**

- **For a telemedicine intervention or other allowed visual platforms:**
  - **The person may show his/her ID to the practitioner. The person should show the ID long enough for the agency staff to document the ID#. That ID number should be documented in the record.**
  - **For Medicaid ID, a person's Medicaid eligibility and number can be verified in the GAMMIS portal; however, if the agency staff does not have access to that portal in real-time, the card can be visually shown, number recorded, and then the agency can verify after that intervention through the agency billing office.**
  - **Document that the ID was seen by the staff and note the identifying information in the medical record.**
- **For an audio mode of service delivery:**
  - **The person may tell the intake staff what type of ID he/she has (e.g. State of Georgia Driver's License) and then provide that license number to be documented in the medical record.**
  - **For Medicaid ID, a person's Medicaid eligibility and number can be verified in the GAMMIS portal; however, if the agency staff does not have access to that portal in real-time, the ID number can be read by the presenting person to the intake staff, the number recorded, and then the agency can verify eligibility and billing detail after that intervention through the agency billing office.**
  - **Document that the ID information was requested and document any identifying information in the medical record.**

**In terms of taking a photo of an ID via screenshot, DBHDD does not recommend this as phones/cameras and email have varying degrees of security, and therefore vulnerabilities for data breaches, security risk, identity theft, etc.**

**What happens if any crisis/safety issues arise during the telemedicine/telephonic assessment processes?**

**The Crisis Intervention service has been allowed to be provided via telephone for many years. Just as with a face-to-face crisis intervention, the practitioner should more to a quick situational**

assessment; active listening and empathic responses to help relieve emotional distress; effective verbal and behavioral responses to warning signs of crisis related behavior; assistance to, and involvement/participation of the individual (to the extent he or she is capable) in active problem solving planning and interventions; facilitation of access to a myriad of crisis stabilization and other services deemed necessary to effectively manage the crisis; mobilization of natural support systems; and other crisis interventions as appropriate to the individual and issues to be addressed.

If the individual has family or other natural supporters in the home, request and document verbal consent to engage those individuals in monitoring and supporting the person.  As always, the Mobile Crisis network, Crisis Stabilization Units, Georgia Crisis and Access Line, and emergency responders are options when there is no other clinical alternative; however, we call upon the DBHDD Provider Network to use those resources prudently, using your best skill possible to stabilize the individual remotely to protect that individual from the need to be exposed to face-to-face service in a larger group setting.

When available either through the agency's EHR or through the individual, an individual's existing crisis plan should be utilized by the supporting practitioner when it is appropriate to the presenting situation. When a crisis plan does not exist, the practitioner will engage the individual/family/caregivers in a therapeutic plan that fosters a return to pre-crisis level of functioning and connect or reconnect the individual to treatment services and other community resources. Also, when available and offered by the individual, a Wellness Recovery Action Plan (WRAP) shall be utilized by the practitioner to support the individual's preferences. For individuals with a co-occurring IDD, an individual's behavior support plan shall be referenced during the crisis assessment and intervention process.

Also, depending on which code is used, note that the Crisis Intervention service can be provided between 2-3 hours in a day, so a practitioner can spend an extended time or make multiple calls to an individual in a single day to create an in-home stabilization plan.  Family Training can also be quickly engaged by the same practitioner to work with those individuals on what to monitor.  If there are no in-home family members, consider friends or neighbors who may be supporters to the individual, using Case Management for adults or Community Support for youth to engage those other released parties in a supporting crisis/safety plan.

## Will I be able to come to work during the Governor's shelter in place forth to work?

At this time, we are unable to provide guidance related to the Shelter in Place order mation will be available on the Department of Public Health (DPH) website as this url=https%3A%2F%2Fdph.georgia.gov%2Fnovelcoronavirus&data=02%7C01%7CPa Walden%40dbhdd.ga.gov%7C78b5231281614od0ba5008d7d72f444f%7C512da10d0

Additionally, DBHDD is not able to provide documentation to provider agencies as view the Governor's order once it has been signed to ensure that your agency meets

**Are any employee trainings waived as a result of the COVID-19 crisis?** 

At this time, the only training that has been adjusted to date is for CPR and CPI.  This was distributed in a Provider Relations special bulletin on 3/31/20.  Any future allowances that are made will be communicated via the Provider Relations Special Bulletins.

**We are trying to hire new staff and can't get fingerprinting done. May we waive the fingerprinting for this time?** 

Due to Covid-19, DBHDD understands that some fingerprinting sites have reduced hours or are closed. Therefore, during Georgia's Public Health State of Emergency, the "attestation" process set forth in the DBHDD policy - COVID-19 2020: DBHDD Community Behavioral Health Services Policy Modifications – 3/26/2020 and can be found at the following link to PolicyStat: <u>https://gadbhdd.policystat.com/policy/7845537/latest/ (https://gadbhdd.policystat.com/policy/7845537/latest/)</u>

**Will there be another service adjustment memo based on the Georgia Composite Board decision? How does this impact those that are not licensed? Many of the services identified on the service adjustment memo are provided by non-licensed paraprofessionals.** 

The State of Georgia Rule and Regulation 135-11-.01 and the rules governing Professional Counselors, Social Workers, and Marriage and Family Therapists on the use of a term called "telemental health" are only applicable to Professional Counselors, Social Workers, and Marriage and Family Therapists.  No other practitioner type recognized by DBHDD is required to take this training and therefore, those other practitioners can proceed with delivering services as defined in the DBHDD March 19 correspondence.

    For any of the licensed practitioner noted above that is governed by the Composite Board Rule and Regulation 135-11, they must complete the CEUs as defined by the Board before doing any telemedicine or telephonic service delivery. Once the regulatory expectations of the Board are fully met by one of those practitioners, then they may begin service delivery.  Even though the Board did note vote to waive this requirement completely, they did vote to allow all continuing education courses to be completed online.

**Can agencies code and bill unsuccessful attempts to reach individuals served?** 

There is no provision for "billing" for attempts at engaging individuals in an intervention.  Only interventions directly with the individual (or collateral as indicated in a specific service definition) are billable.

## If an CST RN is not available (on leave/quarantined, etc.), can an outpatient RN (or other RN in the agency) provide services and bill CST? (Or do they bill outpatient?)



The agency should first consult its own CST Organizational Plan which requires the following to be met:

CLINICAL OPERATIONS, Item 13:  The organization must have an CST Organizational Plan that addresses the following:

- ◦ Organizational Chart, staffing pattern, and a description of how staff are deployed to assure that the required staff-to-consumer ratios are maintained; including how unplanned staff absences, illnesses, and emergencies are accommodated;

If the agency relies on another agency nurse to fulfill the role of the CST nurse, then that nurse is acting as a CST staff and should bill under the CST code.  He/she should also be participating as a team member to the best of the agency's ability during this COVID-19 crisis.

## What is the status of RN/LPN services, specifically codes T1002 & T1003 which include education and training, related to special conditions?



DBHDD considers the title Nursing Assessment and Health Services as an umbrella naming convention for all of the Nursing Services included in the BH Provider Manual.  Therefore, the Special Conditions are applicable to this group as a whole.

Special Bulletin  April 6, 2020



# TWO IMPORTANT ANNOUNCEMENTS AND TRAINING OPPORTUNITIES

## Background Check Variance



As stated in a previous special bulletin, due to Covid-19, DBHDD recognized that some fingerprinting sites had reduced hours or were closed. Therefore, during Georgia's Public Health State of Emergency, the "attestation" process set forth in the DBHDD policies below are in effect as stated therein.

**Click here** to access the required **cover letter and attestation** that must be submitted to the DBHDD Office of Enterprise Compliance, Criminal History Background Checks Section  prior to employment. The cover letter and attestation are also available as attachments in the policies noted below.

**COVID-19 2020: DBHDD Community Developmental Disability Services Policy Modifications - 3/26/2020**

**COVID-19 2020: DBHDD Community Behavioral Health Services Policy Modifications - 3/26/2020**



## Georgia COVID-19 Emotional Support Line

The Georgia COVID-19 Emotional Support Line provides 24/7 free and confidential assistance to callers needing emotional support or resources information as a result of the COVID-19 pandemic. The Emotional Support Line is staffed by volunteers, including mental health professionals and others who have received training in crisis counseling.

# Training Opportunities

## 2x2 Series: Daily Self-Care Tips and Support for Health Care and Emergency Response Workers

DBHDD invites you to participate in our **2x2 Series: Daily Self-Care Tips and Support for Health Care and Emergency Response Workers**. These Webex events are designed to provide daily self-care tips and support for health care and emergency response workers. Each session will provide attendees with mental health tips about managing stress, grief, work/life balance, and wellness.

**NOTE:** The sessions will utilize the WebEx webinar online conferencing system. WebEx allows participants to log on to a website from their computer and view the facilitator's information online, while listening to the facilitator through the use of a simultaneous telephone conference call.

All participants must use the links below to register for the 2x2 sessions. Additionally, please note that it is strongly encouraged that you join the webinar 10-15 minutes prior to the start time to ensure that you do not experience any connectivity issues. Although all attendees will be muted, the chat box will be functional, and all attendees are encouraged to ask questions and share thoughts through the interactive chat. The facilitator will allot time for Q&A at the end of the presentation.

Below is the date, time, session title, and registration link for the next four sessions (the password for each session is "2by2"):

**April 7, 2020, 2:00 to 2:30 p.m.: 2X2: Family Wellness Attendee Registration**

**April 8, 2020, 2:00 to 2:30 p.m.: 2X2: Mindfulness Techniques to Manage Stress Attendee Registration**

**April 9, 2020, 2:00 to 2:30 p.m.: 2X2: Creating a Person Centered Self-Care Kit Attendee Registration**

**April 10, 2020: State Holiday**; check out this **live 30-minute** meditation from the Smithsonian Institute at 12:15 p.m.

If you cannot attend the live sessions, each one will be recorded and available for review on the DBHDD website by **clicking here**.

**Questions?** Please email **DBHDDLearning@dbhdd.ga.gov.**

## Teleheath Training and Consultation (TLC) Tuesdays



TELEHEALTH LEARNING & CONSULTATION (TLC) TUESDAYS

9-10 a.m. MT / 10-11 a.m. CT

The Southeast Mental Health Technology Transfer Center (MHTTC) agency, associated with the Substance Abuse and Mental Health Administration (SAMHSA), is offering an online series designed to support providers in utilizing telehealth services. Please join them for Telehealth Learning and Consultation (TLC) Tuesdays, an online series for providers who are new to or unfamiliar with telehealth.

**These will occur from 11 am - 12 pm Eastern Standard Time Tuesday through April.**

During each hour-long session, the Technology Transfer Center (TTC) Network specialists will spend 20 minutes addressing a specific topic, then answer questions submitted by TLC Tuesday registrants. Recordings of the 20-minute presentations, as well as additional resources, will be posted on the **web page** as they become available.

**You must register separately for each TLC Tuesdays session below.** While filling out the registration form, you will prompted to submit any questions you might have. Register by clicking one of the dates below. Certificates of completion will be available.

<div align="center">

**April 7: Telehealth Billing**
**April 14: Telehealth Tools**
**April 21: Telehealth with Children and Adolescents**
**April 28: Telehealth Troubleshooting**

</div>

---

# Office of Provider Relations



**Director**
Lynn Copeland

**Senior Provider Relations Manager**
Carole Crowley

**Provider Relations Managers**
Sharon Pyles
Tim Strickland
Lisa Sweat

For Provider Relations inquiries, please contact us at **DBHDD.Provider@dbhdd.ga.gov**

<div align="center">

## BE WELL

 

</div>



**Georgia Department of Behavioral Health
& Developmental Disabilities**

Judy Fitzgerald, Commissioner

**D·B·H·D·D**    Division of Behavioral Health

**To**: All Regions and DBHDD-Contracted PATH Providers
**From**: Maxwell Ruppersburg, Director, Office of Supportive Housing, DBHDD
**Date**: April 7, 2020
**Re**: Guidance for PATH Teams during COVID-19 Health Crisis

In response to the statewide Shelter in Place order and Public Health State of Emergency in Georgia as a result of COVID-19, as well as the increasing pressures placed on the homeless and behavioral health system across the state, DBHDD and the Office of Supportive Housing is making programmatic accommodations and issuing guidance for PATH Team providers around the state.

During this time, it remains critical that PATH Teams continue to remain active so that vulnerable individuals in need continue to receive services and support. We will continue to adapt and respond to the rapidly changing environment in which we are operating around the state.

Currently in effect, all Supportive Housing Referrals, once approved, will receive a Notice to Proceed for GHVP and are not being asked to apply first for alternative resources. We will continue to do our best to make programmatic accommodations to support our providers and the individuals we serve.

==PATH Teams should follow the below guidance:==
1. Continue serving individuals enrolled in PATH services, utilizing telephonic or virtual communication whenever possible and in-person whenever necessary, using appropriate safeguards.
2. Maintaining outreach efforts while taking necessary efforts to limit risks of exposure.
3. Continue facilitating the NSH assessment and referral process.
4. Regular communication and coordination with local partner agencies and Continuums of Care.
. Ensure all client data and service interaction is accurate, current, and properly reflected in HMIS.
7. Help educate clients and colleagues about best practices for maintaining personal health and safety and for reducing the likelihood of exposure and spread of COVID-19.
8. Utilize the HUD COVID-19 Screening Tool and stay up to date on CDC guidance on COVID-19.
9. Assist individuals who are currently enrolled in PATH or referred by PATH for housing with their Georgia Housing Voucher Program (GHVP) renewals as needed.
10. Coordinate with the DBHDD Regional Field Office for any referrals for individuals that are discharging from the state hospital who are homeless and in need of supportive housing.
11. Coordinate with the Housing Outreach Coordinator for referrals for individuals transitioning from a jail or prison.
12. Continue to maintain compliance with contract deliverables and communicate regularly with the Office of Supportive Housing regarding any identified needs or challenges. We are here to help

This guidance remains in effect until further notice and we will provide further updates as soon as the situation changes.

The Centers for Disease Control and Prevention (CDC) has provided the following interim guidance for homeless services outreach workers based on what is currently known about coronavirus disease 2019 (COVID-19). The CDC is updating this interim guidance as additional information becomes available.

*When COVID-19 is spreading in your community, assign outreach staff who are at <u>higher risk for severe illness</u> to other duties. Advise outreach staff who will be continuing outreach activities on how to protect themselves and their clients from COVID-19 in the course of their normal duties. Instruct staff to:*
- *Greet clients from a distance of 6 feet and explain that you are taking additional precautions to protect yourself and the client from COVID-19.*

- *Screen clients for symptoms consistent with COVID-19 by asking them if they have a fever, new or worsening cough, or shortness of breath.*
  - *If the client has a cough, immediately provide them with a surgical mask to wear.*
  - *If urgent medical attention is necessary, use standard outreach protocols to facilitate access to healthcare.*
- *Continue conversations and provision of information while maintaining 6 feet of distance.*
- *Maintain good hand hygiene by washing your hands with soap and water for at least 20 seconds or using hand sanitizer (with at least 60% alcohol) on a regular basis.*
- *Wear gloves if you need to handle client belongings. Wash your hands or use hand sanitizer (>60% alcohol) before and after wearing gloves.*
- *If at any point you do not feel that you are able to protect yourself or your client from the spread of COVID-19, discontinue the interaction and notify your supervisor. Examples include if the client declines to wear a mask or if you are unable to maintain a distance of 6 feet.*
- *Provide all clients with hygiene products, when available.*
- *Street medicine and healthcare worker outreach staff should review and follow recommendations for healthcare workers.*
- *Review stress and coping resources for yourselves and your clients during this time.*

The work of PATH Teams and the provider network remains critical and ever needed during this time of crisis for so many around the state. Please continue to exercise personal caution and recommended physical distancing and hygiene practices to safeguard the health of yourself and those around you.

DBHDD Commissioner Judy Fitzgerald has issued a letter of exemption explaining the Governor's Shelter in Place order does not apply to DBHDD provider staff. It is not necessary to use this letter under the law.

*Please be sure to regularly check the CDC and Georgia DPH websites for the most up-to-date information about COVID-19 and remember to be vigilant about personal hygiene.*

*If you have additional questions that relate to COVID-19 please submit them to the provider relations email so that they are properly tracked. That email is DBHDD.Provider@DBHDD.GA.GOV*

We appreciate everything you do

**cc**:
Monica Johnson, Director, Division of Behavioral Health, DBHDD
Adrian Johnson, Assistant Director, Division of Behavioral Health, DBHDD
Letitia Robinson, Assistant Director, Office of Supportive Housing, DBHDD
David Whisnant, Division Director, Housing Assistance Division, DCA
Cynthia Patterson, Director, Office of Homeless and Special Needs Housings, DCA

### DBHDD-Contracted Providers of PATH Services:

| DBHDD Region | Provider Agency |
|---|---|
| 1 | Hope Atlanta |
| 2 | Serenity |
| 3 | Community Friendship, Inc. (CFI) |
| 3 | St. Joseph Mercy Care |
| 3 | Hope Atlanta |
| 3 | Grady Hospital |
| 3 | Community Advance Practice Nurses (CAPN) |
| 4 | Legacy Behavioral Health Services |
|  | Chatham Savannah Authority for the Homeless (CSAH) |
|  | New Horizons CSB |



**Georgia Department
of Behavioral Health
& Developmental
Disabilities**

**D·B·H·D·D**

**VERSION 3**

**COVID-19 2020: DBHDD Community Behavioral Health Services
Policy Modifications**

**EFFECTIVE 4/8/2020**

| | |
|---|---|
| **Current Status:** *Old* | **PolicyStat ID:** *7895302* |

| | |
|---|---|
| **Georgia Department of Behavioral Health & Developmental Disabilities** | **Creation:** *3/26/2020* |
| | **Effective:** *4/8/2020* |
| | **Last Reviewed:** *4/8/2020* |
| | **Last Revision:** *4/8/2020* |
| | **Next Review:** *10/5/2020* |
| | **Owner:** *Monica Johnson, MA, LPC: Director, Division of Behavioral Health* |
| | **Chapter:** *Admin Issues for BH & DD Services* |
| | **Sections:** |

# COVID-19 2020: DBHDD Community Behavioral Health Services Policy Modifications - 4/8/2020

## EFFECTIVE IMMEDIATELY

## APPLICABILITY

DBHDD Providers of Community **Behavioral Health** Services

## POLICY

In response to the continued transmission of COVID-19, where necessary new measures are in effect to minimize community spread of the virus, and to assist in the continued delivery of community behavioral health services.

**Modifications** as described in this policy refers to the restriction, enhancement, relaxation, and partial or full suspension of existing policies in PolicyStat, as applicable to the service. This policy includes full details of the alternate requirement(s) or procedures.

The following temporary modifications to the policies listed below are pertinent to community behavioral health services, effective immediately. Please refer to the full policy via the hyperlink, noting the alternate requirements applicable until further notice.

This policy will be updated as necessary. This policy remains in effect until the Governor of the State of Georgia lifts the Emergency Declaration.

1. ***Temporary suspension*** of the site visit requirement for behavioral health provider enrollment, per Recruitment and Application to become a Provider of Behavioral Health Services, 01-111 are permitted as follows:

   a. New Applicants

      i. Site visits are currently suspended for new providers. Applications for new providers will remain in a pending status until site visits resume.

   b. Existing Providers

      i. Site visits for new sites are suspended. Site visits will be waived for existing

DBHDD approved providers applying for services at an existing approved site or a site that is currently licensed by Healthcare Facility Regulation (HFR). Pending applications that require a site visit and do not meet these criteria will remain in pending status until site visits resume.

c. Applicant Forum

   i. Applicants must have attended one of the two most recent BH Provider Enrollment Forums (held August 14, 2019 and December 11, 2019) to be eligible to submit a Letter of Intent (LOI) during this enrollment cycle. LOIs must be submitted to the Georgia Collaborative via email at GA_Enrollment@Beaconhealthoptions.com. LOIs submitted before May 1 or after May 31 will not be accepted or processed. LOIs submitted via USPS mail may experience delays in processing. It is highly recommended to submit LOIs via email.

2. A ***partial suspension*** of the fingerprinting requirement described in Criminal History Record Check for DBHDD Network Provider Applicants, 04-104 as follows:

   a. DBHDD's Provider Network must have each person subject to Policy 04-104 complete the "Network Provider Applicant Attestation," Attachment A to this policy, instead of completing the fingerprint based background check stipulated in Policy 04-104.

   b. Within thirty (30) days of cessation of the Public Health Emergency, all persons who signed the Network Provider Applicant Attestation instead of completing the fingerprint based background check must complete a fingerprint based background check as required by Policy 04-104. The provider is responsible for sending any person who signed the Network Provider Applicant Attestation for a fingerprint based background check.

   c. The provider is also responsible for sending to DBHDD's Criminal History Background Check (CHBC) section each signed Network Provider Applicant Attestation, while retaining a copy in the applicant's personnel file. The provider must send the signed and dated Attestation to CHBC, and acknowledge receipt of an email from CHBC confirming acceptance of the Attestation, before the applicant begins working. The Individual Assessment process set forth in section D of Policy 04-104 does not apply to persons who sign the Network Provider Applicant Attestation.

   d. The Attestation cannot be used by Network Provider Applicants who were fingerprinted for a fingerprint- based background check within 30 days prior to the declaration of the Public Health Emergency.

3. A ***partial suspension*** of the fingerprinting requirement described in Criminal History Record Check for Individual Provider Applicants, 04-111 is permitted as follows:

   a. All applicants who are subject to Policy 04-111 must complete the "Individual Provider Attestation," Attachment B to this policy, instead of completing the fingerprint based background check documented in Policy 04-111.

   b. Within thirty (30) days of cessation of the Public Health Emergency, all applicants who signed the Individual Provider Attestation instead of completing the fingerprint based background check must complete a fingerprint based background check as required by Policy 04-111.

   c. DBHDD Provider Enrollment is responsible for sending to DBHDD's Criminal History

Background Check (CHBC) section all signed Individual Provider Attestations and for acknowledging receipt of an email from CHBC confirming acceptance of the Attestation, before the Individual Provider Applicant can be considered eligible. The Individual Assessment process set forth in Part D of Policy 04-111 does not apply to applicants who sign the Individual Provider Attestation.

d. The Attestation cannot be used by Individual Provider Applicants who were fingerprinted for a fingerprint based background check within 30 days prior to the declaration of the Public Health Emergency.

4. A **partial suspension** of the income verification requirements using tax returns, pay check stubs, verification of benefits from other federal or state agencies as stipulated in Sections B.3 and F.2 of Payment by Individuals for Community Behavioral Health Services, 01-107 has been made as follows:

a. For the period of the Public Health Emergency related to COVID-19, DBHDD waives the requirement for income verification to access state funded behavioral health services.

b. Provider agencies are required to request attestation of income from individuals served and verify authenticity to the best of their ability.

i. If verification is unavailable due to resource constraints related to COVID-19, providers are required to note this in the record. At the end of the public health emergency, providers will be required to verify individuals income status within 90 days.

**DBHDD sincerely appreciates your compliance with these measures throughout this Public Health Emergency.**

## Attachments

A - COVID-19 2020 - Attestation of Absence of Barrier Crimes Data & Cover Letter.docx
B - COVID-19 2020 - Attestation of Absence of Barrier Crimes Data & Cover Letter.docx

## Approval Signatures

| Approver | Date |
|---|---|
| Anne Akili, Psy.D.: Director, Policy Management | 4/8/2020 |
| Monica Johnson, MA, LPC: Director, Division of Behavioral Health | 4/8/2020 |
| Anne Akili, Psy.D.: Director, Policy Management | 4/7/2020 |



**Georgia Department of Behavioral Health & Developmental Disabilities**

*Judy Fitzgerald, Commissioner*

**Office of Enterprise Compliance**

*Two Peachtree Street, NW ● 1st Floor  ● Atlanta, Georgia 30303-3142 ● Telephone:  404-463-2507 ● Fax: 770-359-5473*

I, _____

| Last Name | First Name | Middle Initial |

_____

Social Security No.       Height      Weight       Eye color     Hair Color

_____

Date of Birth             Sex                   Race

_____

Street Address                      City            State        Zip

attest that I have not been convicted of nor have pending charges for any crime listed on Barrier Record Data (Attachment D of Criminal History Record Check for DBHDD Network Provider Applicants, 04-104, a copy of which has been provided to me).

I also attest that:

1.  I am not currently on probation as a First Offender for a crime listed on Barrier Record Data (Attachment D);
2.  I am not awaiting final disposition on charges for any crime referenced on the Barrier Record Data (Attachment D);
3.  I do not knowingly have an outstanding warrant for any crime referenced on the Barrier Record Data (Attachment D);
4.  I do not have a finding of guilty but mentally ill (GBMI) for any crime referenced on the Barrier Record Data (Attachment D);
5.  I do not have a finding of guilty with intellectual disability (GWID) for any crime referenced on the Barrier Record Data (Attachment D); and
6.  I do not have a finding of not guilty by reason of insanity (NGRI) for any crime referenced on the Barrier Record Data (Attachment D).
7.  I do not have any convictions within the last 12 months.

This form serves as a contingency for employment.  Within 30 days of the termination of the Public Health State of Emergency, I understand that I will be required to complete a fingerprint based background check and if any information stated hereon is found to be falsified or untrue, I could be deemed ineligible for continued employment by a DBHDD network provider. I also understand that prior to being fingerprinted, if any information stated hereon is discovered to have been falsified or is found to be untrue, I could be deemed ineligible for continued employment.

_____

Signature

_____

Date

2 Peachtree Street, NW ● Atlanta, Georgia 30303 ● 404.657.2252
dbhdd.georgia.gov ● Facebook: Georgia DBHDD ● Twitter: @DBHDD

DBHDD COVID-19:2020 POLICY MODIFICATION                    Version 4/2/2020



**Georgia Department of Behavioral Health & Developmental Disabilities**

*Judy Fitzgerald, Commissioner*

**Office of Enterprise Compliance**

*Two Peachtree Street, NW ● 1ˢᵗ Floor ● Atlanta, Georgia 30303-3142 ● Telephone: 404-463-2507 ● Fax: 770-359-5473*

**TO:**      DBHDD Provider Network

**FROM:**    DBHDD Office of Enterprise Compliance
            Criminal History Background Checks Section

**RE**:      Policy No. 04-104 Attestation

Immediately after a person subject to Policy No. 04-104, as modified during the Public Health State of Emergency, completes the Attestation required under the modified policy, send the Attestation to CHBC by facsimile to (770) 359-1622, or via email at **DBHDD-CRS@DBHDD.GA.GOV.** with this Cover Sheet after completing the information required below:

**Provider Name**          _____

**Name of Direct Contact**    _____

**Contact Phone Number**    _____

**Email address**          _____

If you have questions, please contact our office at 404-463-2507 or 404-232-1641.



**Georgia Department of Behavioral Health & Developmental Disabilities**

*Judy Fitzgerald, Commissioner*

**Office of Enterprise Compliance**

*Two Peachtree Street, NW ● 1ˢᵗ Floor ● Atlanta, Georgia 30303-3142 ● Telephone: 404-463-2507 ● Fax: 770-359-5473*

I, _____

| Last Name | First Name | Middle Initial |
|---|---|---|

Social Security No.    Height    Weight    Eye color    Hair Color

Date of Birth          Sex                 Race

Street Address                  City          State          Zip

attest that I have not been convicted of nor have pending charges for any crime listed on Barrier Record Data (Attachment D to DBHDD Policy 04-111, a copy of which has been provided to me).

I also attest that:

1. I am not currently on probation as a First Offender for a crime listed on Barrier Record Data (Attachment D);
2. I am not awaiting final disposition on charges for any crime referenced on the Barrier Record Data (Attachment D);
3. I do not knowingly have an outstanding warrant for any crime referenced on the Barrier Record Data (Attachment D);
4. I do not have a finding of guilty but mentally ill (GBMI) for any crime referenced on the Barrier Record Data (Attachment D);
5. I do not have a finding of guilty with intellectual disability (GWID) for any crime referenced on the Barrier Record Data (Attachment D); and
6. I do not have a finding of not guilty by reason of insanity (NGRI) for any crime referenced on the Barrier Record Data (Attachment D).
7. I do not have any convictions within the last 12 months.

This form serves as a contingency for employment. Within 30 days of the termination of the Public Health State of Emergency, I understand that I will be required to complete a fingerprint based background check and if any information stated hereon is found to be falsified or untrue, I could be deemed ineligible to be an individual provider. I also understand that prior to that time if it is discovered that information stated hereon is falsified or found to be untrue, I could be deemed ineligible to be an individual provider.

_____

Signature

_____

Date



**Georgia Department of Behavioral Health & Developmental Disabilities**

*Judy Fitzgerald, Commissioner*

**Office of Enterprise Compliance**

*Two Peachtree Street, NW ● 1ˢᵗ Floor  ● Atlanta, Georgia 30303-3142 ● Telephone:  404-463-2507 ● Fax: 770-359-5473*

**TO:**       DBHDD Provider Network

**FROM:**    DBHDD Office of Enterprise Compliance
             Criminal History Background Checks Section

**RE**:       Policy No. 04-104 Attestation

Immediately after a person subject to Policy No. 04-104, as modified during the Public Health State of Emergency, completes the Attestation required under the modified policy, send the Attestation to CHBC by facsimile to (770) 359-1622,  or via email at **DBHDD-CRS@DBHDD.GA.GOV.**   with this Cover Sheet after completing the information required below:

**Provider Name**            _____

**Name of Direct Contact**    _____

**Contact Phone Number**     _____

**Email address**            _____

If have questions, please contact our office at 404-463-2507 or 404-232-1641.



**Georgia Department of Behavioral Health & Developmental Disabilities**

Judy Fitzgerald, Commissioner

**D·B·H·D·D**   Division of Behavioral Health

**To**: All GHVP Providers
**From**: Maxwell Ruppersburg, Director, Office of Supportive Housing, DBHDD
**Date**: 4/09/2020
**Re**: Emergency Changes to Bridge Funding Policies during COVID-19

In response to the Public Health State of Emergency in Georgia as a result of COVID-19, as well as the increasing pressures placed on the homeless and behavioral health system across the state, DBHDD and the Office of Supportive Housing is making programmatic accommodations for Bridge Funding.

It is our intention to provide additional flexibility to ensure the continued stability and wellbeing of the individuals being served by GHVP. To that end, we are authorizing the use of Bridge Funding to cover short-term emergency/transitional housing in the form of hotel/motel stays, as well as for the payment of monthly utility and food expenses for individuals experiencing a financial impact during COVID-19.

**se of Bridge Funding for Hotel/Motel Stays during Housing Search:**
1. Providers may utilize Bridge Funding to provide individuals with a Notice to Proceed for GHVP with emergency temporary housing through the purchase of a hotel/motel stay.
2. Providers should first pursue the use of Emergency Shelter Grantee hotel/motel vouchers when available in the community.
3. The maximum allowance for Bridge Funding for hotel/motel stays is  1,  00 per household.
4. Providers can submit Bridge Funding claims for hotel/motel stays per normal procedures under the "Other" (T1999-HE-  1) billing code. All receipts should be properly documented.
 . Providers should seek to collaborate within the Region to identify the best possible pricing.

**se of Bridge Funding for Emergency Coverage of   tility Expenses:**
1. Providers may provide emergency coverage of utility expenses for individuals who are currently housed via GHVP and experiencing a harmful financial impact as a result of the COVID-19 crisis.
2. Providers serving individuals without income should seek the assistance of a DBHDD Medical Eligibility Specialist (MES) and SSI/SSDI Outreach, Access, and Recovery (SOAR) Specialist. Contact information for MES/SOAR specialists for all regions is at the bottom of this document.
3. Individuals without employment should receive assistance in applying for unemployment benefits.
4. Providers can submit Bridge Funding claims for utility bill expenses per normal procedures under the "Utility Deposits" (T1999-HE-D1) billing code. All receipts should be properly documented.

**se of Bridge Funding for Emergency Coverage of Food/  rocery Expenses:**
1. Providers may provide emergency coverage of grocery expenses for individuals who are currently housed via GHVP and experiencing a harmful financial impact as a result of the COVID-19 crisis.
2. Providers should seek support from local food banks and assist eligible individuals in applying for SNAP food benefits prior to utilization of Bridge Funding to cover ongoing grocery expenses.
3. Food expenses should follow the maximum monthly allowance schedule below, based on household size. These amounts are based on federal SNAP standards:

| | |
|---|---|
| 1 household member:   194 |  household members:   921 |
| 2 household members:   3 | 7 household members:   1,018 |
| 3 household members:    09 | 8 household members:  1,1  4 |
| 4 household members:    4 | Each additional person:   14 |
|  household members:   7  8 | |

4. Please assist clients with maximizing the use of their budget to meet their long-term needs.

. Providers can submit Bridge Funding claims for ongoing food expenses per normal procedures under the "Food/Grocery" (T1999-HE-FG). All receipts should be properly documented.

**For  uestions about bridge claims**, please contact: GACollaborativePR@beaconhealthoptions.com.

These supports are being extended temporarily as a stop gap measure to ensure the individuals we serve do not experience unnecessary hardship during this crisis. All impacted individuals need to be connected with existing state and federal benefit programs to ensure they can continue to receive available and necessary supports so that their stability can persist after the resolution of this public health crisis.

The policy change providing for Emergency Rental Coverage remains in effect. Providers should ensure individuals are assisted with filing for unemployment benefits if they have lost their employment.

These temporary policy changes remain in effect until further notice and are subject to change.

The work of the provider network remains critical and ever needed during this time of crisis for so many around the state. Please continue to exercise personal caution and recommended physical distancing and hygiene practices to safeguard the health of yourself and those around you.

DBHDD Commissioner Judy Fitzgerald has issued a letter of exemption explaining the Governor's Shelter in Place order does not apply to DBHDD provider staff. It is not necessary to use this letter under the law.

*Please be sure to regularly check the CDC and Georgia DPH websites for the most up-to-date information about COVID-19 and remember to be vigilant about personal hygiene.*

- Unemployment applications can be submitted online here: https://dol.georgia.gov/ or call the local career center to apply by phone.
  - Find the career center locator online here: https://dol.georgia.gov/locations/career-center
- Eligibility for food stamps/SNAP has been expanded during this emergency.
  - Apply for food stamps/Medicaid online here: https://gateway.ga.gov/access/
  - To find food pantries in your area, text FINDFOOD (one word, no space) or COMIDA to 888-97 -2232.

*If you have additional questions that relate to COVID-19 please submit them to the provider relations email so that they are properly tracked. That email is DBHDD.Provider@DBHDD.GA.GOV.*

We appreciate everything you do

**cc**:
Monica Johnson, Director, Division of Behavioral Health, DBHDD
Adrian Johnson, Assistant Director, Division of Behavioral Health, DBHDD
Letitia Robinson, Assistant Director, Office of Supportive Housing, DBHDD
Hetal Patel, Regional Service Administrator, Region 1, DBHDD
Dawn Peel, Regional Service Administrator, Region 2, DBHDD
Gwen Craddieth, Regional Service Administrator, Region 3, DBHDD
Jennifer Dunn, Regional Service Administrator, Region 4, DBHDD
Jos  Lopez, Regional Service Administrator, Region   , DBHDD
Ann Riley, Regional Service Administrator, Region    , DBHDD

*\*MES/SOAR Specialist contact information on next page\**

## MES/SOAR Specialists by DBHDD Region

| Region | Name | Office | Mobile | Email |
|--------|------|--------|--------|-------|
| 1 | Martinita Smiley-Smith | 770-781- 938 | 404- 23- 3 2 | Martinita.smiley-smith@dbhdd.ga.gov |
| 2 | LaTarnesha Martin | 70 -792-728 | 70 -49 -0 | Latarnesha.martin@dbhdd.ga.gov |
| 2 | Michi Smith | 478-44 -30 0 | 404-430-9424 | Michi.smith@dbhdd.ga.gov |
| 3 | Peter Ward | 404-232-1 27 | 404-272-47 8 | Peter.ward@dbhdd.ga.gov |
| 3 | Shekira Davis | 404-  7- 410 | 404- 48-1009 | Shekira.davis@dbhdd.ga.gov |
| 3 | Ivori Cullins-Baker | 404-232-1  4 | 470-3 2-9179 | Ivori.cullins-baker@dbhdd.ga.gov |
| 4 | Corey Stubbs | 229-22 -3984 | 229-379-4934 | Corey.stubbs@dbhdd.ga.gov |
|  | Michele Joseph | 912-303-43 3 | 912-    -081 | Michele.Joseph@dbhdd.ga.gov |
|  | Tandra Dickerson | 70 -  8-2304 | 70 -32 - 42 | Tandra.dickerson@dbhdd.ga.gov |

Darren Willis
Georgia SOAR State Lead
Budget Compliance/Medicaid MGR
404-  7-1  7 Office
404-804-4121 Mobile
Darren.willis@dbhdd.ga.gov

## Regional Service Administrators and Regional Housing Transition Coordinators

| Region | Position | First Name | Last Name | Email |
|--------|----------|------------|-----------|-------|
| 1 | Regional Services Administrator | Hetal | Patel | Hetal.Patel@dbhdd.ga.gov |
| 1 | Housing Transition Coordinator | Scarlett | Freelin | scarlett.freelin@dbhdd.ga.gov |
| 2 | Regional Services Administrator | Dawn | Peel | Dawn.Peel@dbhdd.ga.gov |
| 2 | Housing Transition Coordinator | April | Edwards | april.edwards@dbhdd.ga.gov |
| 3 | Regional Services Administrator | Gwen | Craddieth | Gwen.Craddieth@dbhdd.ga.gov |
| 3 | Housing Transition Coordinator | Jamie | imbrough | jamie.kimbrough@dbhdd.ga.gov |
| 4 | Regional Services Administrator | Jennifer | Dunn | Jennifer.Dunn@dbhdd.ga.gov |
| 4 | Housing Transition Coordinator | Rachael | Holloway | rachael.holloman@dbhdd.ga.gov |
|  | Regional Services Administrator | Jose | Lopez | Jose.Lopez@dbhdd.ga.gov |
|  | Housing Transition Coordinator | Jeannette | Bacon | Jeannette.Bacon@dbhdd.ga.gov |
|  | Regional Services Administrator | Ann | Riley | Ann.riley@dbhdd.ga.gov |
|  | Housing Transition Coordinator | Sam | Page | Sam.Page@dbhdd.ga.gov |



Georgia Department
of Behavioral Health
& Developmental
Disabilities

D·B·H·D·D

**VERSION 4**

**COVID-19 2020: DBHDD Community Behavioral Health Services
Policy Modifications**

**EFFECTIVE 4/23/2020**

| Current Status: *Old* | PolicyStat ID: *7969896* |
|---|---|

| | | |
|---|---|---|
| **Georgia Department of Behavioral Health & Developmental Disabilities** | Creation: | *3/26/2020* |
| | Effective: | *4/23/2020* |
| | Last Reviewed: | *4/23/2020* |
| | Last Revision: | *4/23/2020* |
| | Next Review: | *10/20/2020* |
| | Owner: | *Monica Johnson, MA, LPC, Director, Division of Behavioral Health* |
| | Chapter: | *Admin Issues for BH & DD Services* |
| | Sections: | |

# COVID-19 2020: DBHDD Community Behavioral Health Services Policy Modifications - 4/23/2020

## EFFECTIVE IMMEDIATELY

## APPLICABILITY

DBHDD Providers of Community **Behavioral Health** Services

## POLICY

In response to the continued transmission of COVID-19, where necessary new measures are in effect to minimize community spread of the virus, and to assist in the continued delivery of community behavioral health services.

**Modifications** as described in this policy refers to the restriction, enhancement, relaxation, and partial or full suspension of existing policies in PolicyStat, as applicable to the service. This policy includes full details of the alternate requirement(s) or procedures.

The following temporary modifications to the policies listed below are pertinent to community behavioral health services, effective immediately. Please refer to the full policy via the hyperlink, noting the alternate requirements applicable until further notice.

This policy will be updated as necessary. This policy remains in effect until the Governor of the State of Georgia lifts the Emergency Declaration.

1. ***Temporary suspension*** of the site visit requirement for behavioral health provider enrollment, per Recruitment and Application to become a Provider of Behavioral Health Services, 01-111 are permitted as follows:

    a. New Applicants

        i. Site visits are currently suspended for new providers. Applications for new providers will remain in a pending status until site visits resume.

    b. Existing Providers

        i. Site visits for new sites are suspended. Site visits will be waived for existing

DBHDD approved providers applying for services at an existing approved site or a site that is currently licensed by Healthcare Facility Regulation (HFR). Pending applications that require a site visit and do not meet these criteria will remain in pending status until site visits resume.

c. Applicant Forum

   i. Applicants must have attended one of the two most recent BH Provider Enrollment Forums (held August 14, 2019 and December 11, 2019) to be eligible to submit a Letter of Intent (LOI) during this enrollment cycle. LOIs must be submitted to the Georgia Collaborative via email at GA_Enrollment@Beaconhealthoptions.com. LOIs submitted before May 1 or after May 31 will not be accepted or processed. LOIs submitted via USPS mail may experience delays in processing. It is highly recommended to submit LOIs via email.

2. A **partial suspension** of the fingerprinting requirement described in Criminal History Record Check for DBHDD Network Provider Applicants, 04-104 as follows:

   a. DBHDD's Provider Network must have each person subject to Policy 04-104 complete the "Network Provider Applicant Attestation," **Attachment A** to this policy, instead of completing the fingerprint based background check stipulated in Policy 04-104.

   b. Within sixty (60) days of cessation of the Public Health Emergency, all persons who signed the Network Provider Applicant Attestation instead of completing the fingerprint based background check must complete a fingerprint based background check as required by Policy 04-104. The provider is responsible for sending any person who signed the Network Provider Applicant Attestation for a fingerprint based background check.

   c. The provider is also responsible for sending to DBHDD's Criminal History Background Check (CHBC) section each signed Network Provider Applicant Attestation, while retaining a copy in the applicant's personnel file. The provider must send the signed and dated Attestation to CHBC, and acknowledge receipt of an email from CHBC confirming acceptance of the Attestation, before the applicant begins working. The Individual Assessment process set forth in section D of Policy 04-104 does not apply to persons who sign the Network Provider Applicant Attestation.

   d. The Attestation cannot be used by Network Provider Applicants who were fingerprinted for a fingerprint- based background check within sixty (60) days prior to the declaration of the Public Health Emergency.

3. A **partial suspension** of the income verification requirements using tax returns, pay check stubs, verification of benefits from other federal or state agencies as stipulated in Sections B.3 and F.2 of Payment by Individuals for Community Behavioral Health Services, 01-107 has been made as follows:

   a. For the period of the Public Health Emergency related to COVID-19, DBHDD waives the requirement for income verification to access state funded behavioral health services.

   b. Provider agencies are required to request attestation of income from individuals served and verify authenticity to the best of their ability.

      i. If verification is unavailable due to resource constraints related to COVID-19,

providers are required to note this in the record. At the end of the public health emergency, providers will be required to verify individuals income status within 90 days.

**DBHDD sincerely appreciates your compliance with these measures throughout this Public Health Emergency.**

## Attachments

A - COVID-19 2020 - Attestation of Absence of Barrier Crimes Data & Cover Letter 4/23/2020.docx

## Approval Signatures

| Approver | Date |
|---|---|
| Anne Akili, Psy.D.: Director, Policy Management | 4/23/2020 |
| Monica Johnson, MA, LPC: Director, Division of Behavioral Health | 4/23/2020 |
| Anne Akili, Psy.D.: Director, Policy Management | 4/23/2020 |



**Georgia Department of Behavioral Health & Developmental Disabilities**

*Judy Fitzgerald, Commissioner*

**Office of Enterprise Compliance**
*Two Peachtree Street, NW ● 1ˢᵗ Floor ● Atlanta, Georgia 30303-3142 ● Telephone: 404-463-2507 ● Fax: 770-359-5473*

I, _____
      Last Name           First Name           Middle Initial

_____   _____   _____   _____   _____
   Social Security No.     Height     Weight    Eye color   Hair Color

_____   _____   _____
   Date of Birth         Sex          Race

_____
   Street Address          City      State    Zip

attest that I have not been convicted of nor have pending charges for any crime listed on Barrier Record Data (Attachment D of Criminal History Record Check for DBHDD Network Provider Applicants, 04-104, a copy of which has been provided to me).

I also attest that:
1. I am not currently on probation as a First Offender for a crime listed on Barrier Record Data (Attachment D);
2. I am not awaiting final disposition on charges for any crime referenced on the Barrier Record Data (Attachment D);
3. I do not knowingly have an outstanding warrant for any crime referenced on the Barrier Record Data (Attachment D);
4. I do not have a finding of guilty but mentally ill (GBMI) for any crime referenced on the Barrier Record Data (Attachment D);
5. I do not have a finding of guilty with intellectual disability (GWID) for any crime referenced on the Barrier Record Data (Attachment D); and
6. I do not have a finding of not guilty by reason of insanity (NGRI) for any crime referenced on the Barrier Record Data (Attachment D).
7. I do not have any convictions within the last 12 months.

This form serves as a contingency for employment. Within sixty (60) days of the termination of the Public Health State of Emergency, I understand that I will be required to complete a fingerprint based background check and if any information stated hereon is found to be falsified or untrue, I could be deemed ineligible for continued employment by a DBHDD network provider. I also understand that prior to being fingerprinted, if any information stated hereon is discovered to have been falsified or is found to be untrue, I could be deemed ineligible for continued employment.

_____
   Signature

_____
   Date

2 Peachtree Street, NW ● Atlanta, Georgia 30303 ● 404.657.2252
dbhdd.georgia.gov ● Facebook: Georgia DBHDD ● Twitter: @DBHDD

DBHDD COVID-19:2020 POLICY MODIFICATION                Version 4/23/2020



**Georgia Department of Behavioral Health & Developmental Disabilities**

*Judy Fitzgerald, Commissioner*

**Office of Enterprise Compliance**

*Two Peachtree Street, NW ● 1ˢᵗ Floor ● Atlanta, Georgia 30303-3142 ● Telephone: 404-463-2507 ● Fax: 770-359-5473*

**TO:**      DBHDD Provider Network

**FROM:**   DBHDD Office of Enterprise Compliance
            Criminal History Background Checks Section

**RE**:      Policy No. 04-104 Attestation

Immediately after a person subject to Policy No. 04-104, as modified during the Public Health State of Emergency, completes the Attestation required under the modified policy, send the Attestation to CHBC by facsimile to (770) 359-1622, or via email at **DBHDD-CRS@DBHDD.GA.GOV.** with this Cover Sheet after completing the information required below:

**Provider Name**          _____

**Name of Direct Contact**  _____

**Contact Phone Number**   _____

**Email address**          _____

If you have questions, please contact our office at 404-463-2507 or 404-232-1641.

Special Bulletin                                                April 24, 2020

 

# IMPORTANT ANNOUNCEMENTS

## Behavioral Health Telemedicine and Telephonic Guidance



The **March 19, 2020 DBHDD Telemedicine and Telephonic Guidance** indicates that DBHDD, in partnership with DCH, is allowing the service provision allowances in that guidance through April 30, 2020.

**DBHDD is officially extending the allowances in this Guidance (and any other that references an April 30, 2020 end date) through the end of the public health emergency period, whenever it is declared.**

## IDD CONNECTS Scheduled Downtime

Please note, IDD Connects will be down this **Monday, 4/27/20, from 6:00 pm to 12:00 am**, in order to configure the system for the required Appendix K changes that are now in effect.

## APPENDIX K Webinar Presentations and Operational Guidance

Below are the PowerPoint presentations from the IDD webinars regarding the Appendix K and the Operational Guidance. These presentations are also available on the **DBHDD website** by selecting the **"COVID-19 Guidance, Memos, FAQs & More"** from the homepage.

> **IDD PROVIDER WEBINAR - 4/15/20**

> **SUPPORT COORDINATION WEBINAR - 4/16/20**

> **BILLING PRESENTATION WEBINAR - 4/23/20**

The Operational Guidance can be found on DBHDD PolicyStat by **clicking here**.

## BACKGROUND CHECK VARIANCE



As stated in previous special bulletin, due to Covid-19, DBHDD recognized that some fingerprinting sites had reduced hours or were closed. Therefore, during Georgia's Public Health State of Emergency, the "attestation" process set forth in the DBHDD policies below are in effect as stated therein.

**Please note that the time allowed to complete the required fingerprint based background check, once the Public Health State of Emergency is terminated, has been changed from 30 to 60 days for consistency in policy.**

Click the links to access to the required cover letter and attestation that must be submitted to the DBHDD Office of Enterprise Compliance, Criminal History Background Checks Section prior to employment, for **Individual Providers** or for **Provider Agencies**. These documents are also available in the policies noted below.

**COVID-19 2020: DBHDD Community Developmental Disability Services Policy Modifications - 4/23/2020**

**COVID-19 2020: DBHDD Community Behavioral Health Services Policy Modifications - 4/23/2020**

## Office of Provider Relations

**Director**
Lynn Copeland

**Senior Provider Relations Manager**
Carole Crowley

**Provider Relations Managers**
Sharon Pyles
Tim Strickland
Lisa Sweat



For Provider Relations inquiries, please contact us at **DBHDD.Provider@dbhdd.ga.gov**

## BE WELL





**Georgia Department of Behavioral Health
& Developmental Disabilities**

Judy Fitzgerald, Commissioner

**D·B·H·D·D**    Division of Behavioral Health

TO:            Georgia Medicaid-Enrolled Opioid Treatment Programs

FROM:      Office of Addictive Diseases
                 Office of Medicaid Coordination

DATE:       April 24, 2020

SUBJECT:   Medication Assisted Treatment Guidance for the COVID-19 Emergency Response

**Background**: The Department of Behavioral Health and Developmental Disabilities (DBHDD)
Office of Addictive Diseases (OAD) is Georgia's State Opioid Treatment Authority (SOTA). As
such, DBHDD's OAD collaborates with other agencies in developing guidelines for establishing
and/or closing Medication Assisted Treatment (MAT) Programs operating in Georgia. As the
SOTA, DBHDD is also responsible for establishing guidelines for the administration of MAT
programs. In this capacity we are concerned with the continuity of care for all individuals
currently enrolled in Opioid Treatment Programs in Georgia. Due to the current challenge of
addressing COVID-19 in our state, we are providing additional guidance regarding take-home
medication, telehealth, and billing for medication administration.

**Updated Guidance:**

For Opioid Treatment Providers, DBHDD is offering the following additional clarification for its
network of providers as a follow-up to the March 17, 2020 and April 1, 2020 guidance:

- DBHDD does not reimburse for claims for pharmacy and medication nor its preparation
  or dispensing;
- DBHDD is permitting telemedicine/telephonic supervision (video-enabled only) of the
  individual's self-administration of take-home medication to be billed as either
  Medication Administration or Opioid Maintenance in accordance with those definitions
  in accordance with the April 1, 2020 guidance.  While we realize that many individuals
  do not have a video-enabled phone or a computer to use the video-enabled approved web
  platforms, this is a best-case allowance for the OTP nurse or pharmacist to be able to bill
  for this service while adhering to physical distancing as possible;
- DBHDD is permitting Nursing Assessment to occur via telemedicine, telephonic *(with or
  without video-enabling capability),* and/or web-based approved platforms for
  interaction.  During the COVID-19 emergency response period, this may be in-person or
  via telemedicine/other telehealth platforms, as is clinically feasible and appropriate)
  with the individual to monitor, evaluate, assess, and/or carry out a physician's orders
  regarding the physical and/or psychological problems of the Individual; and
- In March 19, 2020 Guidance, DBHDD outlined that vitals (i.e. in person services) would
  be required for 50% of services billed as Nursing Assessment and Care.  Due to the high
  frequency of contact with individuals served in these specific programs, DBHDD is **not**
  requiring the OTP programs to comply with this provision.  For OTP programs, Nursing
  Assessment and Health can be provided via telehealth, without regard to a ratio of in-
  person visits.

- DBHDD SOTA Guidance for Infection Control and Prevention of COVI-19, which was sent on **March 17, 2020**, remains in effect. In addition, we are asking all provider to report cases of COVID-19 to Georgia Department of Public Health. https://dph.georgia.gov/epidemiology/disease-reporting

Finally, again, except for rare scenarios, the DBHDD does not pay for medication (take-home or otherwise).

**Please join us to discuss this guidance via WebEx on Thursday, April 30, 2020 from @ 10 a. m.** https://globalpage-prod.webex.com/join?surl=https%3A%2F%2Fsignin.webex.com%2Fcollabs%2F%23%2Fmeetings%2Fjoinbynumber%3FTrackID%3D%26hbxref%3D%26goid%3Dattend-meeting&language=en_US Meeting number (access code): 719 782 971

DBHDD's response to the State of Public Emergency for COVID-19 is continuously adapting based upon the needs of the community, the provider network, and most importantly, the people we mutually serve. Please know that as DBHDD receives more information about the needs of our state we will respond accordingly and keep you, our partners, well informed. For questions and further discussion please call 404-416-5225 or email Vonshurii.wrighten@dbhdd.ga.gov.

Special Bulletin                                                    May 11, 2020

 

# ATTENTION I/DD PROVIDERS

## DBHDD COMMUNITY SETTINGS
## Reopening Recommendations

During the temporary COVID-19 Public Health Emergency, I/DD community-based services that are typically provided in group settings have been adversely impacted. The DBHDD provider network has ensured ongoing connection with individuals using various strategies and telehealth options to maintain necessary services.

On May 14, 2020, many provisions of the Georgia statewide shelter in place order will expire. **However, Governor Brian Kemp extended the order that Georgia's citizens who are most vulnerable to COVID-19 continue to shelter in place.** DBHDD recommends that all DBHDD authorized providers of I/DD community access and pre-vocational services abide by this order and recommends that those providers not reopen community services before the shelter in place order for these populations has expired or been lifted. (Currently, the order is set to expire on June 12, 2020.) However, as we approach that date, it is expected that providers will be planning for an eventual reopening of services. The document below offers guidance to assist in planning to keep individuals, provider staff, and families safe.

**Click here to access the document for more information regarding the reopening recommendations.**

Stay tuned for announcements of upcoming webinars to discuss these recommendations with I/DD Providers.

## APPENDIX K
## Operational Guidance



The DBHDD Division of Developmental Disabilities has updated the Appendix K Operational Guidelines. Please visit **DBHDD PolicyStat** for the most current update or you may click the link below.

**COVID-19 2020: DBHDD Community Developmental Disability Services Policy Modifications - 4/30/2020**

## APPENDIX K
## Webinar Presentations

Below are the PowerPoint presentations from the IDD webinars regarding the Appendix K and the Operational Guidance. These presentations were sent out previously in a Special Bulletin on April 24th however, there is one new addition, a presentation that was held with Support

Coordination agencies on May 5th, 2020. Please click below to access these presentations.

**IDD PROVIDER WEBINAR - 4/15/20**

**SUPPORT COORDINATION WEBINAR - 4/16/20**

**BILLING PRESENTATION WEBINAR - 4/23/20**

**SUPPORT COORDINATION WEBINAR - 5/5/20**

## Office of Provider Relations



**Director**
Lynn Copeland

**Senior Provider Relations Manager**
Carole Crowley

**Provider Relations Managers**
Sharon Pyles
Tim Strickland
Lisa Sweat

For Provider Relations inquiries, please contact us at **DBHDD.Provider@dbhdd.ga.gov**

## BE WELL

 

Special Bulletin                                                                May 20, 2020

 

# IMPORTANT ANNOUNCEMENTS

## Behavioral Health Billing Guidance
## Group Services Telehealth Allowances
## I/DD Webinar on Thursday

### BEHAVIORAL HEALTH
### Community Support Team & Community Support
### Individual Billing Guidance

DBHDD has recently been made aware there are billing issues with Community Support Team (CST) and Community Support Individual (CSI) when it is delivered and billed via the telehealth allowance as set forth in DBHDD's communication on March 14 (Revised March 19), 2020. Upon research with our partners at the Department of Community Health (DCH) and the Georgia Collaborative ASO, these are programming anomalies which occurred Fall 2017, but due to limited telemedicine volume, were never discovered until the COVID-19 telehealth allowances were enacted.

The assessment and solution guidance for each service are offered in the memo available by **clicking here**.

### BEHAVIORAL HEALTH
### Group Services & Telehealth Allowances

Based on reflections from the provider network regarding emerging practice experience, effective May 11, 2020, DBHDD will remove the "no more than 6 participants" constriction related to the provision of behavioral health groups conducted via telehealth. DBHDD will allow agencies, along with their clinicians, to consider the service model and targeted participants, exercising their best clinical judgement in designing the ratio of practitioner to individuals served. However, the ratio must comply with the ratio that exists in the current service guidelines within the **DBHDD Community Behavioral Health Provider Manual**.

DBHDD will also now allow for blended group modalities (for instance, some individuals attending group in person and some joining group via Zoom). Again, the practitioner to individuals-served ratio that exists within current service guidelines must be adhered to. Again, this should be considered only when the agency and clinician have given consideration to the participants needs and capacities as well as the subject for the group, tolerance for technology, etc. A graphic representation of this is provided below.



## I/DD APPENDIX K WEBINAR &
## Community Settings Reopening Guidance

The DBHDD Division of I/DD will be hosting a Webex discussion about Appendix K as well as the DBHDD Community Settings Reopening Guidance. This meeting is for DBHDD network providers. Please plan to join this information session.

**Date: Thursday, May 21, 2020**
**Time: 10:00am – 11:30am**

**NOTE:** This session will utilize the Webex webinar online conferencing system. Webex allows participants to log on to a website from their computer, view the facilitators information online, while listening to the facilitator through the use of a simultaneous telephone conference call.

All participants must use the link below to register for the webinar. Additionally, please note that it is strongly encouraged that you join the webinar at least 15 minutes prior to the start time to ensure that you do not experience any connectivity issues. Although all attendees will be muted, the chat box will be functional, and all attendees are encouraged to ask questions and share thoughts through the interactive chat. The facilitator will allot time for Q&A at the end of the presentation.

**Registration is quick and easy online, click here to register.**

Questions? Please email **DBHDDLearning@dbhdd.ga.gov.**

DBHDD invites you to participate in our **2x2 Series: Daily Self-Care Tips and Support for Health Care and Emergency Response Workers**. These WebEx events are designed to provide daily self-care tips and support for health care and emergency response workers. Each session will provide attendees with mental health tips about managing stress, grief, work/life balance, and wellness.

**NOTE:** The sessions will use the WebEx webinar online conference system. WebEx allows participants to log onto a website from their computer and view the facilitator's information online, while listening to the facilitator through the use of a simultaneous telephone conference call.



Below is the date, time, session title and registration link for the next five sessions (the password for each session is "2by2"):

- **May 18, 2020   2:00 to 2:30 p.m.: 2x2 Series:** A Guided Meditation Exercise
- **May 19, 2020   2:00 to 2:30 p.m.: 2x2 Series:** Crafting Your Mental Health
- **May 20, 2020   2:00 to 2:30 p.m.: 2x2 Series:** How to Use Your Personality as a Hint to the Best Self-Care
- **May 21, 2020   2:00 to 2:30 p.m.: 2x2 Series:** Mindfulness Techniques to Manage Stress - Part 2
- **May 22, 2020   2:00 to 2:30 p.m.: 2x2 Series:** Personal Wellness: Prioritize You!

If you cannot attend the live sessions, each one will be recorded and available for review on the DBHDD website: **https://dbhdd.georgia.gov/2x2-series.**

All participants must use the links below to register for the 2x2 sessions. Additionally, please note that it is strongly encouraged that you join the webinar 10-15 minutes prior to the start time to ensure that you do not experience any connectivity issues. Although all attendees will be muted, the chat box will be functional, and all attendees are encouraged to ask questions and share thoughts through the interactive chat. The facilitator will allot time for Q&A at the end of the presentation.

**Questions?** Please email **DBHDDLearning@dbhdd.ga.gov.**

---

## Office of Provider Relations

**Director**
Lynn Copeland

**Senior Provider Relations Manager**
Carole Crowley

**Provider Relations Managers**
Sharon Pyles
Tim Strickland
Lisa Sweat

For Provider Relations inquiries, please contact us at **DBHDD.Provider@dbhdd.ga.gov**

## BE WELL





DBHDD has recently been made aware there are billing issues with Community Support Team and Community Support Individual when it is delivered and billed via the telehealth allowance as set forth in DBHDD's communication on March 14 (Revised March 19), 2020.  Upon research with our partners at DCH and the ASO, these are programming anomalies which occurred Fall 2017, but due to limited telemedicine volume, were never discovered until the COVID-19 telehealth allowances were enacted.

The following assessment and solution guidance for each service are offered below:

**COMMUNITY SUPPORT TEAM:**

Identified Problem:  CST does not have the GT modifier added in the ASO system.  This means when CST has been authorized, the telemedicine modifier is not being sent to GAMMIS on authorizations, creating an inability for the claim to match with an existing authorization.

Identified Solution: For Medicaid claims, DCH has indicated the POS 02 is allowable and programmed for these codes below now, so the provider is able to bill (or resubmit now) for telehealth adding the POS 02 to one of the codes in this chart:

| | | | | |
|---|---|---|---|---|
| **CST** | H0039 | TN | U3 | U6 |
| **CST** | H0039 | TN | U4 | U6 |
| **CST** | H0039 | TN | U5 | U6 |
| **CST** | H0039 | TN | U3 | U7 |
| **CST** | H0039 | TN | U4 | U7 |
| **CST** | H0039 | TN | U5 | U7 |

For state-funded claims, Place of Service (02) is being added to CST in the ASO's Provider Connect system. For state-funded individuals receiving this service, as above, providers must add 02 POS to the claim for reimbursement/reporting.  While this is not active in the ASO system yet, work is underway for that fix with an effective date retroactive to March 2020.

**COMMUNITY SUPPORT INDIVIDUAL:**

<u>Identified Problem:</u>  In the ASO and GAMMIS system, the GT codes were added without the 'U6' modifier.  If the Providers used the programming tables released by DBHDD in Fall 2017, there should be no problem with the claiming (only providers who have used the Behavioral Health Provider Manual coding instead of the official IT Programming coding will likely experience this billing problem).

<u>Identified Solution:</u> Providers will need to bill for CSI provided via telehealth using the GT codes below in yellow:

| | | | | |
|---|---|---|---|---|
| **CSI** | H2015 | U4 | U6 | |
| **CSI** | H2015 | U5 | U6 | |
| **CSI** | H2015 | U4 | U7 | |
| **CSI** | H2015 | U5 | U7 | |
| **CSI** | <mark>H2015</mark> | <mark>GT</mark> | <mark>U4</mark> | |
| **CSI** | <mark>H2015</mark> | <mark>GT</mark> | <mark>U5</mark> | |
| **CSI** | H2015 | UK | U4 | U6 |
| **CSI** | H2015 | UK | U5 | U6 |
| **CSI** | H2015 | UK | U4 | U7 |
| **CSI** | H2015 | UK | U5 | U7 |

 

# IMPORTANT ANNOUNCEMENTS

# Behavioral Health Provider Manual Update to Fingerprinting Process Image

## Provider Manual for Community Behavioral Health Providers

In order to historically document DBHDD communications, policy, and guidance issued to providers during the COVID-19 Public Health Emergency (PHE), the DBHDD will be reposting revisions to certain versions of the **Provider Manual for Community Behavioral Health Providers** that were in effect during the PHE. The revisions will include a new Appendix E at the end of each applicable Provider Manual that catalogs and appends all communications, policy, and guidance issued during the effective dates of the Manual, in chronological order. Currently, two versions of the Provider Manual will be revised:

1. The FY20, Quarter 3 (effective January 1, 2020 through March 31, 2020) Provider Manual will contain all PHE-related content released between March 1st and March 31st.
2. The FY20, Quarter 4 (effective April 1, 2020 through June 30, 2020) Provider Manual will contain all PHE- related content released between March 1st and May 31st (this Manual may again be revised and reposted if new content is released in June).

Given the uncertainty regarding expiration dates of both the PHE itself and of the various federal allowances made under the PHE, the regularly scheduled upcoming FY21, Quarter 1 Provider Manual (effective July 1, 2020 through September 30,2020), which will be posted to the DBHDD website on June 1st, will not contain the PHE-related content.

As the DBHDD continues to engage with state and federal authorities related to the PHE and its related allowances, there will be a revision and reposting of this Provider Manual between June 1st and July 1st if the PHE and its allowances do in fact continue as of July 1 st. Further revisions and repostings may also occur as PHE-related content expires or is added during this Provider Manual's effective dates.

## UPDATE!
## Change in Fingerprinting Process

The Gemalto Cogent, Georgia Application Processing Service for fingerprint background requests, will launch its website redesigned effective June 1, 2020. As a result, there will be a new process when processing the fingerprint background applications for the DBHDD Provider Network. The Provider Network will have to complete a form and cover letter in its

Case 1:16-cv-00088-ER   Document 408-73   Filed 11/29/23   Page 597 of 627

entirety in order to process fingerprint background applications. **Both forms will be mandatory for processing.** Click the link below to access the required documents.

<div align="center">

**GEMALTO FORM & COVER LETTER**

</div>

<div align="center">

## IMAGE
## Browser Compatibility for Data Entry

</div>

Microsoft Internet Explorer is being replaced by Microsoft Edge. We recommend using either Edge or Chrome browsers for data entry in Image. If you use Microsoft Internet Explorer, you may encounter user interface (UI) elements not working as intended, such as issues entered the date and time of an incident. If you run into this issue, please switch browsers and the issue generally resolves. Any other user issues can be sent to **Image.App@dbhdd.ga.gov** and we will do our best to assist you.

<div align="center">

## Office of Provider Relations

</div>

**Director**
Lynn Copeland

**Senior Provider Relations Manager**
Carole Crowley

**Provider Relations Managers**
Sharon Pyles
Tim Strickland
Lisa Sweat



For Provider Relations inquiries, please contact us at **DBHDD.Provider@dbhdd.ga.gov**

<div align="center">

## BE WELL

 

</div>

| Current Status: *Active* | | PolicyStat ID: *8366536* |
|---|---|---|
| | **Creation:** | *3/26/2020* |
| | **Effective:** | *7/24/2020* |
| **Georgia Department of Behavioral Health & Developmental Disabilities** | **Last Reviewed:** | *7/24/2020* |
| | **Last Revision:** | *7/24/2020* |
| | **Next Review:** | *1/20/2021* |
| | Owner: | *Monica Johnson, MA, LPC: Director, Division of Behavioral Health* |
| | Chapter: | *Admin Issues for BH & DD Services* |
| | Sections: | |

# COVID-19 2020: DBHDD Community Behavioral Health Services Policy Modifications - 7/24/2020

## EFFECTIVE IMMEDIATELY

## APPLICABILITY

DBHDD Providers of Community **Behavioral Health** Services

## POLICY

In response to the continued transmission of COVID-19, where necessary new measures are in effect to minimize community spread of the virus, and to assist in the continued delivery of community behavioral health services.

**Modifications** as described in this policy refers to the restriction, enhancement, relaxation, and partial or full suspension of existing policies in PolicyStat, as applicable to the service. This policy includes full details of the alternate requirement(s) or procedures.

The following temporary modifications to the policies listed below are pertinent to community behavioral health services, effective immediately. Please refer to the full policy via the hyperlink, noting the alternate requirements applicable until further notice.

This policy will be updated as necessary. This policy remains in effect until the Governor of the State of Georgia lifts the Emergency Declaration.

1. ***Temporary enhancements*** are made to the requirements stated in <u>CSU: Medical Evaluation Guidelines and Exclusion Criteria for Admission to Crisis Stabilization Units, 01-350</u>

    a. Section A
    A new version of the Medical Evaluation Guidelines & Exclusion Criteria for Persons Referred for Admission to Crisis Stabilization Units (Attachment A). See Item 9 which allows quarantine or isolation as needed to treat COVID positive individuals.

    b. Section D.3
    COVID-19 positive status cannot be the sole reason for denial of care. Additional input and documentation from CSU Medical Director and Leadership is required for a denial.

2. A *temporary enhancement* is made to <u>CSU: Evaluations and Admissions, 01-330</u>:

   a. CSUs refer to the 7/24/2020 version of Attachment A (Exclusionary Criteria) of 01-350, to allow isolation or quarantine as needed to ensure continued access as required of an Emergency Receiving and Evaluating facility.

3. Behavioral Health Providers categorized as Tier 1 or Tier 2 are required to adhere to standards and key performance indicators as outlined in <u>Comprehensive Community Provider (CCP) Standards for Georgia's Tier 1 Behavioral Health Safety Net, 01-200</u> and <u>Community Medicaid Provider (CMP) Standards for Georgia's Tier 2 Behavioral Health Services, 01-230</u>. Due to the impact of the COVID-19 pandemic, DBHDD has delayed the reporting requirements outlined in <u>Process for Reporting Compliance with Standards for Tier 1 Comprehensive Community Providers (CCPs), 01-225</u>, <u>Process for Reporting Compliance with Standards for Tier 2 Community Medicaid Providers (CMPs), 01-249</u>, <u>Process for Reporting Compliance with Standards for Tier 2 Community Medicaid Providers (CMP+), 01-249a</u>, and <u>Standards and Key Performance Indicators for Providers of Community Crisis Services, 01-270</u>. A *temporary relaxation* of the report due dates is permitted as follows:

   a. Tier 1, Tier 2, Tier 2+, and Community Crisis Services
   The reporting due date for the "Performance Monitoring Report" (PMR) has been extended to October 1, 2020. The reporting period will remain the same (July 1, 2019 – June 30, 2020). The PMR portal will open for providers September 1, 2020.

   b. Tier 1
   Activities related to community stakeholder surveys will be delayed and not initiated until the summer.

   c. In the following reporting year the reporting schedule outlined in <u>01-225</u>, <u>01-249</u>, <u>01-249a</u>, and <u>01-270</u> will resume.

4. *Temporary suspension* of the site visit requirement for behavioral health provider enrollment, per <u>Recruitment and Application to become a Provider of Behavioral Health Services, 01-111</u> are permitted as follows:

   a. New Applicants

      i. Site visits are currently suspended for new providers. Applications for new providers will remain in a pending status until site visits resume.

   b. Existing Providers

      i. Site visits for new sites are suspended. Site visits will be waived for existing DBHDD approved providers applying for services at an existing approved site or a site that is currently licensed by Healthcare Facility Regulation (HFR). Pending applications that require a site visit and do not meet these criteria will remain in pending status until site visits resume.

   c. Applicant Forum

      i. Applicants must have attended one of the two most recent BH Provider Enrollment Forums (held August 14, 2019 and December 11, 2019) to be eligible to submit a Letter of Intent (LOI) during this enrollment cycle. LOIs must be submitted to the Georgia Collaborative via email at GA_Enrollment@Beaconhealthoptions.com.

LOIs submitted before May 1 or after May 31 will not be accepted or processed. LOIs submitted via USPS mail may experience delays in processing. It is highly recommended to submit LOIs via email.

5. A *partial suspension* of the fingerprinting requirement described in Criminal History Record Check for DBHDD Network Provider Applicants, 04-104 is permitted as described below **only if fingerprinting services are not available in your area**:

   a. DBHDD's Provider Network must have each person subject to Policy 04-104 complete the "Network Provider Applicant Attestation," **Attachment A** to this policy, instead of completing the fingerprint based background check stipulated in Policy 04-104.

   b. Within sixty (60) days of cessation of the Public Health Emergency, all persons who signed the Network Provider Applicant Attestation instead of completing the fingerprint based background check must complete a fingerprint based background check as required by Policy 04-104. The provider is responsible for sending any person who signed the Network Provider Applicant Attestation for a fingerprint based background check.

   c. The provider is also responsible for sending to DBHDD's Criminal History Background Check (CHBC) section each signed Network Provider Applicant Attestation, while retaining a copy in the applicant's personnel file. The provider must send the signed and dated Attestation to CHBC, and acknowledge receipt of an email from CHBC confirming acceptance of the Attestation, before the applicant begins working. The Individual Assessment process set forth in section D of Policy 04-104 does not apply to persons who sign the Network Provider Applicant Attestation.

   d. The Attestation cannot be used by Network Provider Applicants who were fingerprinted for a fingerprint- based background check within sixty (60) days prior to the declaration of the Public Health Emergency.

6. A *partial suspension* of the income verification requirements using tax returns, pay check stubs, verification of benefits from other federal or state agencies as stipulated in Sections B.3 and F.2 of Payment by Individuals for Community Behavioral Health Services, 01-107 has been made as follows:

   a. For the period of the Public Health Emergency related to COVID-19, DBHDD waives the requirement for income verification to access state funded behavioral health services.

   b. Provider agencies are required to request attestation of income from individuals served and verify authenticity to the best of their ability.

      i. If verification is unavailable due to resource constraints related to COVID-19, providers are required to note this in the record. At the end of the public health emergency, providers will be required to verify individuals income status within 90 days.

   **DBHDD sincerely appreciates your compliance with these measures throughout this Public Health Emergency.**

## Attachments

[A - COVID-19 2020 - Attestation of Absence of Barrier Crimes Data & Cover Letter 4/23/2020.docx](#)

## Approval Signatures

| Approver | Date |
|---|---|
| Anné Akili, Psy.D.: Director, Policy Management | 7/24/2020 |
| Monica Johnson, MA, LPC: Director, Division of Behavioral Health | 7/24/2020 |
| Anné Akili, Psy.D.: Director, Policy Management | 7/24/2020 |





## Georgia Department of Behavioral Health & Developmental Disabilities
*Judy Fitzgerald, Commissioner*

**Office of Enterprise Compliance**
*Two Peachtree Street, NW ● 1ˢᵗ Floor ● Atlanta, Georgia 30303-3142 ● Telephone: 404-463-2507 ● Fax: 770-359-5473*

I, _____

| Last Name | First Name | Middle Initial |
|---|---|---|

_____

| Social Security No. | Height | Weight | Eye color | Hair Color |
|---|---|---|---|---|

_____

| Date of Birth | Sex | Race |
|---|---|---|

_____

| Street Address | City | State | Zip |
|---|---|---|---|

attest that I have not been convicted of nor have pending charges for any crime listed on Barrier Record Data (Attachment D of Criminal History Record Check for DBHDD Network Provider Applicants, 04-104, a copy of which has been provided to me).

I also attest that:

1. I am not currently on probation as a First Offender for a crime listed on Barrier Record Data (Attachment D);
2. I am not awaiting final disposition on charges for any crime referenced on the Barrier Record Data (Attachment D);
3. I do not knowingly have an outstanding warrant for any crime referenced on the Barrier Record Data (Attachment D);
4. I do not have a finding of guilty but mentally ill (GBMI) for any crime referenced on the Barrier Record Data (Attachment D);
5. I do not have a finding of guilty with intellectual disability (GWID) for any crime referenced on the Barrier Record Data (Attachment D); and
6. I do not have a finding of not guilty by reason of insanity (NGRI) for any crime referenced on the Barrier Record Data (Attachment D).
7. I do not have any convictions within the last 12 months.

This form serves as a contingency for employment. Within sixty (60) days of the termination of the Public Health State of Emergency, I understand that I will be required to complete a fingerprint based background check and if any information stated hereon is found to be falsified or untrue, I could be deemed ineligible for continued employment by a DBHDD network provider. I also understand that prior to being fingerprinted, if any information stated hereon is discovered to have been falsified or is found to be untrue, I could be deemed ineligible for continued employment.

_____
Signature

_____
Date

2 Peachtree Street, NW ● Atlanta, Georgia 30303 ● 404.657.2252
dbhdd.georgia.gov ● Facebook: Georgia DBHDD ● Twitter: @DBHDD

DBHDD COVID-19:2020 POLICY MODIFICATION                    Version 4/23/2020



**Georgia Department of Behavioral Health & Developmental Disabilities**

*Judy Fitzgerald, Commissioner*

**Office of Enterprise Compliance**

*Two Peachtree Street, NW ● 1ˢᵗ Floor ● Atlanta, Georgia 30303-3142 ● Telephone: 404-463-2507 ● Fax: 770-359-5473*

**TO:**     DBHDD Provider Network

**FROM:**     DBHDD Office of Enterprise Compliance
Criminal History Background Checks Section

**RE**:     Policy No. 04-104 Attestation

Immediately after a person subject to Policy No. 04-104, as modified during the Public Health State of Emergency, completes the Attestation required under the modified policy, send the Attestation to CHBC by facsimile to (770) 359-1622, or via email at **DBHDD-CRS@DBHDD.GA.GOV.** with this Cover Sheet after completing the information required below:

**Provider Name**     _____

**Name of Direct Contact**     _____

**Contact Phone Number**     _____

**Email address**     _____

If you have questions, please contact our office at 404-463-2507 or 404-232-1641.

Special Bulletin                                                                                    August 18, 2020

  

# IMPORTANT ANNOUNCEMENT
# Image Incident Reporting Changes

## IMAGE
## COVID-19 Incident Reporting Changes

As we continue to navigate working and supporting our individuals during the current pandemic, we recognize that the current way of reporting COVID incidents is untenable. As such, the changes below are being implemented immediately. Hopefully this will help bring some relief to those completing data entry in the system.

**FOR DD RELATED SERVICES:**

Entries in Image for **920 – Exposure** are **ONLY REQUIRED FOR INDIVIDUALS**. Reporting of staff exposures is no longer required.

Entries in Image for **921 – Positive, and 922 – Death ARE STILL REQUIRED** for both staff and individuals.

Entries in Image for **923 – Recovery** will **no longer be required** for individuals or staff at any locations.

|  | 920 Exposed | 921 Positive | 922 Death | 923 Recovery |
|---|---|---|---|---|
| Staff | Not required | REQUIRED | REQUIRED | Not required |
| Individual | REQUIRED | REQUIRED | REQUIRED | Not required |

*DD Providers should continue to work with the DBHDD Office of Health and Wellness staff who will maintain follow-up activities on individuals who test positive until that individual is no longer identified as being positive for COVID 19 or in the event of death, reported as deceased. (Note: Resolution of positive will be based upon CDC Guidelines for designation of COVID 19 negative status.)*

**FOR BH RELATED SERVICES INCLUDING CSU/BHCC:**

Entries in Image for incident types **920 – Exposure and 923 – Recovery** will **no longer be required** for individuals or staff at any locations.

Entries in Image for **921 – Positives and 922 – Deaths ARE STILL REQUIRED** for both staff and individuals.

|  | 920 Exposed | 921 Positive | 922 Death | 923 Recovery |
|---|---|---|---|---|
| Staff | Not required | REQUIRED | REQUIRED | Not required |
| Individual | Not required | REQUIRED | REQUIRED | Not required |

Thank you for your continued support in reporting the incident types as outlined above. If you have any questions, please reach out to us at **dbhddincidents@dbhdd.ga.gov** and we will assist you.

***Submitted by:***
*Jennifer Rybak, Director*
*Office of Incident Management and Compliance*

## Office of Provider Relations

<u>**Director**</u>
Lynn Copeland

<u>**Senior Provider Relations Manager**</u>
Carole Crowley

<u>**Provider Relations Manager**</u>
Sharon Pyles



For Provider Relations inquiries, please contact us at **DBHDD.Provider@dbhdd.ga.gov**

### BE WELL, WEAR A MASK & WASH YOUR HANDS!

 

| Current Status: *Active* | PolicyStat ID: *8618576* |
|---|---|

| | |
|---|---|
| **Creation:** | *3/26/2020* |
| **Effective:** | *9/21/2020* |
| **Last Reviewed:** | *9/21/2020* |
| **Last Revision:** | *9/21/2020* |
| **Next Review:** | *3/20/2021* |
| Owner: | *Monica Johnson, MA, LPC,* *Director, Division of Behavioral* *Health* |
| Chapter: | *Admin Issues for BH & DD* *Services* |
| Sections: | |

Georgia Department of Behavioral Health & Developmental Disabilities

D·B·H·D·D

# COVID-19 2020: DBHDD Community Behavioral Health Services Policy Modifications - 9/21/2020

## EFFECTIVE IMMEDIATELY

## APPLICABILITY

DBHDD Providers of Community **Behavioral Health** Services

## POLICY

In response to the continued transmission of COVID-19, where necessary new measures are in effect to minimize community spread of the virus, and to assist in the continued delivery of community behavioral health services.

**Modifications** as described in this policy refers to the restriction, enhancement, relaxation, and partial or full suspension of existing policies in PolicyStat, as applicable to the service. This policy includes full details of the alternate requirement(s) or procedures.

The following temporary modifications to the policies listed below are pertinent to community behavioral health services, effective immediately. Please refer to the full policy via the hyperlink, noting the alternate requirements applicable until further notice.

This policy will be updated as necessary. This policy remains in effect until the Governor of the State of Georgia lifts the Emergency Declaration.

1. Providers are expected to maintain accreditation as indicated in Accreditation and Standards Compliance Requirements for Providers of Behavioral Health Services, 01-103. It is understood that some accreditation surveys and reviews may be impacted by the COVID-19 Public Health Emergency.  Based on the accrediting body, providers may find that their accreditation reviews are conducted online or with minimal on-site time.  In addition, reviews may be postponed by the accrediting body and an extension offered due to COVID-19.  Should the later occur, DBHDD will honor the extension offered by the accrediting body for a period not to exceed **180 days** following the end of the National Public Health Emergency.  Providers may be asked to provide proof of extension to demonstrate compliance.

2. ***Temporary enhancements*** are made to the requirements stated in [CSU: Medical Evaluation Guidelines and Exclusion Criteria for Admission to Crisis Stabilization Units, 01-350](#)

   a. Section A
   A new version of the Medical Evaluation Guidelines & Exclusion Criteria for Persons Referred for Admission to Crisis Stabilization Units (Attachment A). See Item 9 which allows quarantine or isolation as needed to treat COVID positive individuals.

   b. Section D.3
   COVID-19 positive status cannot be the sole reason for denial of care. Additional input and documentation from CSU Medical Director and Leadership is required for a denial.

3. A ***temporary enhancement*** is made to [CSU: Evaluations and Admissions, 01-330](#):

   a. CSUs refer to the 7/24/2020 version of Attachment A (Exclusionary Criteria) of 01-350, to allow isolation or quarantine as needed to ensure continued access as required of an Emergency Receiving and Evaluating facility.

4. Behavioral Health Providers categorized as Tier 1 or Tier 2 are required to adhere to standards and key performance indicators as outlined in [Comprehensive Community Provider (CCP) Standards for Georgia's Tier 1 Behavioral Health Safety Net, 01-200](#) and [Community Medicaid Provider (CMP) Standards for Georgia's Tier 2 Behavioral Health Services, 01-230](#). Due to the impact of the COVID-19 pandemic, DBHDD has delayed the reporting requirements outlined in [Process for Reporting Compliance with Standards for Tier 1 Comprehensive Community Providers (CCPs), 01-225](#), [Process for Reporting Compliance with Standards for Tier 2 Community Medicaid Providers (CMPs), 01-249](#), [Process for Reporting Compliance with Standards for Tier 2 Community Medicaid Providers (CMP+), 01-249a](#), and [Standards and Key Performance Indicators for Providers of Community Crisis Services, 01-270](#). A ***temporary relaxation*** of the report due dates is permitted as follows:

   a. Tier 1, Tier 2, Tier 2+, and Community Crisis Services
   The reporting due date for the "Performance Monitoring Report" (PMR) has been extended to October 1, 2020. The reporting period will remain the same (July 1, 2019 – June 30, 2020). The PMR portal will open for providers September 1, 2020.

   b. Tier 1
   Activities related to community stakeholder surveys will be delayed and not initiated until the summer.

   c. In the following reporting year the reporting schedule outlined in [01-225](#), [01-249](#), [01-249a](#), and [01-270](#) will resume.

5. ***Temporary suspension*** of the site visit requirement for behavioral health provider enrollment, per [Recruitment and Application to become a Provider of Behavioral Health Services, 01-111](#) are permitted as follows:

   a. New Applicants

      i. Site visits are currently suspended for new providers. Applications for new providers will remain in a pending status until site visits resume.

   b. Existing Providers

      i. Site visits for new sites are suspended. Site visits will be waived for existing DBHDD approved providers applying for services at an existing approved site or a site that is currently licensed by Healthcare Facility Regulation (HFR). Pending applications that require a site visit and do not meet these criteria will remain in pending status until site visits resume.

    c. Applicant Forum

      i. Applicants must have attended one of the two most recent BH Provider Enrollment Forums (held August 14, 2019 and December 11, 2019) to be eligible to submit a Letter of Intent (LOI) during this enrollment cycle. LOIs must be submitted to the Georgia Collaborative via email at GA_Enrollment@Beaconhealthoptions.com. LOIs submitted before May 1 or after May 31 will not be accepted or processed. LOIs submitted via USPS mail may experience delays in processing. It is highly recommended to submit LOIs via email.

6. A ***partial suspension*** of the fingerprinting requirement described in <u>Criminal History Record Check for DBHDD Network Provider Applicants, 04-104</u> is permitted as described below **only if fingerprinting services are not available in your area**:

    a. DBHDD's Provider Network must have each person subject to Policy 04-104 complete the "Network Provider Applicant Attestation," **Attachment A** to this policy, instead of completing the fingerprint based background check stipulated in Policy 04-104.

    b. Within sixty (60) days of cessation of the Public Health Emergency, all persons who signed the Network Provider Applicant Attestation instead of completing the fingerprint based background check must complete a fingerprint based background check as required by Policy 04-104. The provider is responsible for sending any person who signed the Network Provider Applicant Attestation for a fingerprint based background check.

    c. The provider is also responsible for sending to DBHDD's Criminal History Background Check (CHBC) section each signed Network Provider Applicant Attestation, while retaining a copy in the applicant's personnel file. The provider must send the signed and dated Attestation to CHBC, and acknowledge receipt of an email from CHBC confirming acceptance of the Attestation, before the applicant begins working. The Individual Assessment process set forth in section D of Policy 04-104 does not apply to persons who sign the Network Provider Applicant Attestation.

    d. The Attestation cannot be used by Network Provider Applicants who were fingerprinted for a fingerprint- based background check within sixty (60) days prior to the declaration of the Public Health Emergency.

7. A ***partial suspension*** of the income verification requirements using tax returns, pay check stubs, verification of benefits from other federal or state agencies as stipulated in Sections B.3 and F.2 of <u>Payment by Individuals for Community Behavioral Health Services, 01-107</u> has been made as follows:

    a. For the period of the Public Health Emergency related to COVID-19, DBHDD waives the requirement for income verification to access state funded behavioral health services.

    b. Provider agencies are required to request attestation of income from individuals served

and verify authenticity to the best of their ability.

i. If verification is unavailable due to resource constraints related to COVID-19, providers are required to note this in the record. At the end of the public health emergency, providers will be required to verify individuals income status within 90 days.

**DBHDD sincerely appreciates your compliance with these measures throughout this Public Health Emergency.**

## Attachments

A - COVID-19 2020 - Attestation of Absence of Barrier Crimes Data & Cover Letter 4/23/2020.docx

## Approval Signatures

| Approver | Date |
| --- | --- |
| Anné Akili, Psy.D.: Director, Policy Management | 9/21/2020 |
| Monica Johnson, MA, LPC: Director, Division of Behavioral Health | 9/21/2020 |
| Anné Akili, Psy.D.: Director, Policy Management | 9/21/2020 |



**BE CONNECTED** NETWORK NEWS
*"News You Can Use"*

D·B·H·D·D

## Appendix K Attestation Form



### DEADLINE OCTOBER 1, 2020

The deadline for New Options Medicaid Waiver and Comprehensive Supports Medicaid Waiver (NOW/COMP) Providers as well as Representatives for individuals enrolled in the Participant-direction model for the NOW/COMP Medicaid Waiver services to submit their Appendix K Attestation is on Thursday, **October 1, 2020**.

All provider agencies that received a retainer payment for any of the approved services must complete an Attestation Statement indicating compliance with the Centers for Medicare and Medicaid Services (CMS) requirements.

The attestation form is available on the **Department of Community Health website.** Once there, locate the **"Medicaid and Peachcare for Kids"** navigation pane. In that navigation pane click on the **"Provider agencies retainer payment attestation form"** link to access the required form.



In response to the growing need for citizens of Georgia to access behavioral health support and resources during the current health crisis, the Department of Behavioral Health & Developmental Disabilities (DBHDD) in partnership with Behavioral Health Link (BHL) implemented the GA COVID19 emotional support line. This statewide support line is an expansion of the already existing Georgia Crisis and Access Line (GCAL). The Georgia COVID19 Emotional Support Line provides free and confidential assistance to callers needing emotional support, community resources, or referrals to service providers in their communities. The Emotional Support Line is staffed with mental health professionals and others who have received training in crisis counseling.  This crisis is causing people to experience a myriad of emotions and the GA COVID19 Emotional Support Line offers Georgians another option for receiving support in managing their reactions and experiences to the COVID19 crisis.

Thus far, callers have been able to receive non-crisis related assistance in helping them

manage feelings of loneliness and isolation, as well as stress and anxiety. Callers have also been able to access other resources, information and connection to other needed services. The COVID19 Emotional Support Line will operate for the duration of the current crisis.

**Click here** to access additional mental wellness resources and supports.

## DBHDD Policy Information

Since September 1, 2020 DBHDD updated or developed the following policies:

**Corrective Action Plan Management, 13-101**

**COVID-19 2020: DBHDD Community Behavioral Health Services Policy Modifications - 9/21/2020**

**COVID-19 2020: DBHDD Community Developmental Disability Services Policy Modifications - 9/21/2020**

**Provider Manual for Community Behavioral Health Providers, 01-112**

**Provider Manuals for Community Developmental Disability Providers, 02-1201**

**Recruitment and Application to become a Provider of Behavioral Health Services, 01-111**

All current policies can be found on **PolicyStat.**

Please direct all policy-related questions to the Office of Provider Relations via the Provider Issues Management System (PIMS). To submit your questions **click here**.

## Training Announcements

### DBHDD IN-PERSON TRAININGS POSTPONED

In response to the coronavirus (COVID-19) in Georgia, and Governor Kemp's Public Health State of Emergency guidance to cancel or postpone all non-essential travel, DBHDD is postponing **in-person trainings.** The health, safety and well-being of the individuals we serve, practitioners, and staff are DBHDD's top priority, and this decision has been made with those in mind. DBHDD is closely monitoring related developments and will provide additional information and updates related to these events in the coming weeks. Thank you for your interest and event registration, and most importantly, your dedication and commitment to those we serve.

**It's important to note that DBHDD is offering virtual trainings, for information regarding these virtual trainings, click here**.

If you have any questions, please contact **DBHDD.Learning@dbhdd.ga.gov**.

## DBHDD Announcements

### Human Trafficking Intervention Services and Support Hotline

**From the Georgia Office of the Child Advocate:**



As you may be aware, Georgia Cares has previously managed a hotline to provide information to those who might be victims of trafficking, assist law enforcement on the recovery of a victim, and make referrals for victim assistance. **Beginning October 1, 2020**, a new hotline – **1-866-END-HTGA** (or 1-866-363-4842) will now be managed by the Children's Advocacy Centers of Georgia (CACGA) as they assume the role as the statewide provider for human trafficking intervention services and support. If you are aware of youth who have previously been served by Georgia Cares and are concerned they may no longer receive such services, please ensure they are connected with CACGA by calling the hotline number. While the transfer officially occurs on October 1, this line is currently active. This hotline also offers connections to additional resources related to preventing and intervening in trafficking cases.

Referrals to CACGA may result in a further response or intervention from a local Child Advocacy Center (CAC) or the **Receiving Hope Center.**

---

The DBHDD COVID policies **COVID-19 2020: DBHDD Community Behavioral Health Services Policy Modifications - 9/21/2020** and **COVID-19 2020: DBHDD Community Developmental Disability Services Policy Modifications - 9/21/2020** have been updated with an effective date of September 21, 2020.



These policies were updated to address concerns regarding the requirements of maintaining current Provider accreditation during the public health emergency. The following statement was added to both policies:

*Providers are expected to maintain accreditation as indicated in **Accreditation and Compliance Review Requirements for Providers of Developmental Disability Services, 02-703** or **Accreditation and Standards Compliance Requirements for Providers of Behavioral Health Services, 01-103**. It is understood that some accreditation surveys and reviews may be impacted by the COVID-19 Public Health Emergency. Based on the accrediting body, providers may find that their accreditation reviews are conducted online or with minimal on-site time. In addition, reviews may be postponed by the accrediting body and an extension offered due to COVID-19. Should the later occur, DBHDD will honor the extension offered by the accrediting body for a period not to exceed 180 days following the end of the National Public Health Emergency. Providers may be asked to provide proof of extension to demonstrate compliance.*

---

## FRAUD ALERT!
## Department of Justice Impersonators



Attention all DBHDD Providers scammers are falsely claiming to be employees and/or investigators for the Department of Justice (DOJ) in order to obtain personal identifying information. We ask that providers utlize the brochure, **available here**, to increase awareness about this concern.

For more information, please read the article - ***Fraud Alert: Scammers Claiming to be with DOJ, Preying on Elderly.***

---

## The Georgia Recovery

## Project Provides Emotional Support to Georgians During COVID-19



The Georgia Department of Behavioral Health and Developmental Disabilities was awarded a Federal Emergency Management Administration Crisis Counseling Assistance and Training Program (CCP), called the Georgia Recovery Project, to assist Georgians with emotional distress from COVID-19.

The CCP helps individuals and communities in recovering from the effects of natural and human-caused disasters through the provision of community-based outreach and psycho-educational services. Because of social distancing due to the pandemic, this is done through virtual outreach by crisis counselors working in DBHDD's six Regions and staff working on Georgia's COVID-19 Emotional Support Line at 866-399-8938.

Georgia Recovery Project staff provide a "listening ear" for concerned individuals who want to talk about how they've been affected by the pandemic. They also provide psycho-education on stress management, referrals to community-based services for basic needs and direct linkage to crisis services when warranted. The Georgia Recovery Project will run until June 15, 2021. Information about the CCP may be found at **https://www.samhsa.gov/dtac/ccp**.

***Submitted by:***
**Jeannette David, Disaster Mental Health Coordinator**
**Division of Behavioral Health**

## Developmental Disabilities

### Intellectual and Developmental Disabilities Statewide Provider Meeting



The DBHDD Division of Developmental Disabilities will be hosting an IDD Statewide Provider meeting from **9:00 am - 11:30 am on Thursday, November 12, 2020** from. Due to the public health emergency, this meeting will be held remotely via our WebEx platform.

Stay tuned for additional information to be distributed by the Office of Provider Relations via Special Bulletin, which will include the registration link and the meeting agenda.

### DCH and DBHDD Virtual Town Hall Meetings



The Department of Community Health (DCH) and DBHDD are co-hosting a series of virtual town hall meetings for the 2021 Comprehensive Supports (COMP) Medicaid waiver renewal. The DBHDD and DCH will be providing updates on the COMP Medicaid waiver renewal, providing updates on recent waiver amendments, and seeking input from the community and stakeholders. The event is open to the public. Registration is required.

- Monday October 26, 2020 (8:30 am – 9:30 am)
- Tuesday October 27, 2020 (12:00 pm – 1:00 pm)

- Thursday October 29, 2020 (5:30 pm – 6:30 pm)

This meeting will be online via WebEx at the dates and times listed above. You will only need to attend **ONE** session, as they will all include the same information. There will also be time allotted for questions and answers at the end of the town hall.

**Click here** to register for the event.

---

# Behavioral Health

## New Diagnosis Codes Effective 10/1/2020 for Substance Use Disorders

The Georgia Collaborative ASO notified providers on September 21, 2020 of new diagnosis codes that will be implemented on 10/1/2020. These codes were recently released by the Centers for Medicare and Medicaid Services (CMS) and are all **related to substance use disorders.**

Please review the **memorandum** for more information regarding these changes.

---

## ProviderConnect Service Changes Crisis Respite & Community Residential Rehab-Level 4

The Georgia Collaborative ASO notified providers on September 16, 2020 about service changes being made in the ProviderConnect system. They outlined changes being made to the Crisis Respite Apartment service and which was retroactive to 7/1/2020. There was additional information related to the Community Residential Rehabilitation - Level 4 service. **This information was only applicable to those behavioral health providers approved for Crisis Respite or Community Residential Rehab - Level 4**.

Please review the **memorandum** for more information regarding these changes.

---

## Join the Youth Mental Health Awareness Campaign

September was National Suicide Prevention Awareness Month, and what better time to launch our youth mental health awareness campaign "**Free Your Feels**"? Free Your Feels encourages Georgia's young people to explore their real feelings and share them fearlessly. With our children and teens empowered to speak out and express their real feelings, adults and peers tuned in and listening judgment-free, and everyone connected to available resources, we will see a healthier, thriving generation.





Visit the **Free Your Feels website** which will house a collection of resources from different organizations and agencies, and will include ready-to-use editable graphics so you can easily promote and share messaging!

Follow **@free.your.feels** on Instagram, where we will share mental health materials. Share posts on your own account and/or ask people in your networks to follow and help spread the message far and wide!

# Office of Provider Relations

## PIMS CORNER



Welcome to the PIMS Corner! This section highlights the two most popular questions, and their answers, that were submitted to PIMS for the month of August 2020.

Look for this section each month as we will continue to feature one question each from Intellectual and Developmental Disabilities and Behavioral Health Providers.

<u>Behavioral Health Question:</u>

**How do we request coupons for the Adult Needs and Strengths Assessment (ANSA) and the Child and Adolescent Needs and Strengths (CANS) assessment for our agency?**

*Unfortunately, free coupon codes for DBHDD Employees and Contracted Provider Agency Staff to access the online training modules and tests on the Praed Foundation website are **NOT** currently available. If you would like to purchase your own access code or your agency is interested in making a group purchase, email Michelle Fernando **mfernando@chapinhall.org** at Praed Foundation and provide her with the following information:*

- *Jurisdiction (Georgia)*
- *Agency name*
- *Method of payment (check or credit card)*
- *Number of codes needed*

<u>Intellectual and Developmental Disabilities Question:</u>

**Are the same procedure code and modifier used for teleheath services and the retainer payment?**

*On April 23, 2020, DBHDD conducted a webinar for providers that offered technical assistance*

*for billing. Please review the **presentation** as it notes what procedure codes to use when billing for telehealth and Document Adjustment.*

Case 1:16-cv-00088-LAG   Document 444-72   Filed 11/29/23   Page 616 of 627

## JUST A REMINDER...
## Question for your Provider Relations Team?

**The Provider Issues Management System (PIMS)** is your online source to have your questions answered in a consistent, reliable and timely way! In addition to providing a timely response, the information we gather from PIMS will assist DBHDD in trending common concerns, developing FAQs, and informing policy reviews.

PIMS is accessible through the **DBHDD website** by hovering over the **"For Provider"** tab located across the top of the page. When the drop down menu appears, click on "**Questions for your Provider Relations Team**". You can also access the PIMS site directly by using the link below.

> **PROVIDER ISSUES MANAGEMENT SYSTEM**

## IN CASE YOU MISSED IT...
### highlights from previous bulletins

## The Georgia Collaborative ASO
## Quality Reviews Update

The Quality Reviews conducted by the Georgia Collaborative ASO are an important and required aspect of DBHDD's role in the management of the provider network and a valuable tool for providers' monitoring of quality and compliance to DBHDD requirements. Due to COVID-19, DBHDD paused quality reviews in mid-March. The reason for this pause was two-fold; first, to relieve providers of the burden of a quality review while in the midst of a COVID emergency, and second, to comply with social distancing guidance. We have now passed the six month milestone. During this, we have all found new and creative ways to stay connected, accomplish our goals, and provide services and supports to individuals. As we navigate our altered environment, DBHDD, like you, is working to develop customized strategies to coexist with COVID.

DBHDD and the Georgia Collaborative ASO are thoughtfully planning a resumption of quality reviews; these will be conducted remotely for the time being. We, along with our partners at the Georgia Collaborative ASO, have developed a remote review process that we are currently piloting with three providers in order to field test and validate our processes. Once DBHDD has had time to consider and incorporate this valuable feedback from the pilot providers into our remote processes, we will resume quality reviews. Providers, as always, will receive a two week notice, and additional instructions and guidance to help them understand and prepare for the remote process.

The Office of Quality Improvement and Georgia Collaborative ASO hosted training sessions to outline the updated process on September 9, 2020 for both Behavioral Health and Developmental Disabilities Providers. The power point presentations and live recordings for both trainings are available on the Georgia Collaborative ASO website by **clicking here**. Once on the site, scroll down to **"Quality"** and then select either **"Behavioral Health"** or **"Intellectual & Developmental Disabilities"** to view the appropriate documents and recordings.

Thank you,

**Melissa Sperbeck, Director**
**Division of Performance Management & Quality Improvement**
**in partnership with**
**Monica Johnson, Director, Division of Behavioral Health & Ron Wakefield, Director,**
**Division of Developmental Disabilities**

---

The DBHDD policy **Corrective Action Plan Management, 13-101** has been updated and has an effective date of September 1, 2020. The changes are designed to help streamline the process and reduce the burden on providers where possible, while continuing to support the correction of identified issues.



**Highlights of the changes include:**

**Corrective Action Plans (CAP) are only required to be submitted to DBHDD for High or Critical Risk deficiencies.**
- For Low or Moderate Risk deficiencies, providers will be asked to complete an Internal Corrective Action Plan that does not need to be submitted to DBHDD.
- A simple form for the Internal CAP is provided as Attachment A to the revised policy.

**The "Measures of Effectiveness" field has been removed from the CAP form.**
- Although providers won't report this to DBHDD, providers are still required to maintain compliance and sustained correction over time.

**DBHDD may conduct follow-up reviews to verify compliance.**
- This may include requesting records or conducting virtual or on-site visits.
- DBHDD may request a copy of the Internal CAP at any time.

Our hope is that through collaboration with providers during the CAP process, we will be able to assist them in reaching and maintaining compliance. The reduction in required formal CAP responses should allow providers to better allocate resources to fixing the issues identified and effectively implement corrections. The process of reaching an acceptable CAP should take less time, allowing findings to be successfully resolved faster.

As always, providers have a responsibility for correcting all findings and maintaining compliance with applicable policies, regulations, federal and state requirements, accepted standards of care and practice, provider manuals and accreditation bodies, as applicable, regardless off the CAP process. Any questions regarding the CAP process can be directed to **CAP.Request@dbhdd.ga.gov**.

*Submitted by*
**Jennifer Rybak**
**Director, Office of Incident Management and Compliance**
**Division of Accountability and Compliance**

---



## Image COVID-19 Incident Reporting Changes

As we continue to navigate working and supporting our individuals during the current pandemic, we recognize that the current way of reporting COVID incidents is untenable. As such, the changes below are being implemented immediately. Hopefully this will help bring some relief to those completing data entry in the system.

Entries in Image for **920 – Exposure** are **ONLY REQUIRED FOR INDIVIDUALS**. Reporting of staff exposures is no longer required.

Entries in Image for **921 – Positive, and 922 – Death ARE STILL REQUIRED** for both staff and individuals.

Entries in Image for **923 – Recovery** will **no longer be required** for individuals or staff at any locations.

|  | 920 Exposed | 921 Positive | 922 Death | 923 Recovery |
|---|---|---|---|---|
| Staff | Not required | REQUIRED | REQUIRED | Not required |
| Individual | REQUIRED | REQUIRED | REQUIRED | Not required |

*DD Providers should continue to work with the DBHDD Office of Health and Wellness staff who will maintain follow-up activities on individuals who test positive until that individual is no longer identified as being positive for COVID 19 or in the event of death, reported as deceased. (Note: Resolution of positive will be based upon CDC Guidelines for designation of COVID 19 negative status.)*

**FOR BH RELATED SERVICES INCLUDING CSU/BHCC:**

Entries in Image for incident types **920 – Exposure and 923 – Recovery** will **no longer be required** for individuals or staff at any locations.

Entries in Image for **921 – Positives and 922 – Deaths ARE STILL REQUIRED** for both staff and individuals.

|  | 920 Exposed | 921 Positive | 922 Death | 923 Recovery |
|---|---|---|---|---|
| Staff | Not required | REQUIRED | REQUIRED | Not required |
| Individual | Not required | REQUIRED | REQUIRED | Not required |

Thank you for your continued support in reporting the incident types as outlined above. If you have any questions, please reach out to us at **dbhddincidents@dbhdd.ga.gov** and we will assist you.

*Submitted by:*
**Jennifer Rybak**
**Director, Office of Incident Management and Compliance**
**Division of Accountability and Compliance**

# Appendix K Tracking of Retainer Payments & Family Caregiver Hire Options Report

Below is a link to a memo addressing completion of the Appendix K Tracking of Telehealth, Retainer Payments, and Family/Caregiver Options Report" spreadsheet. This memo highlights instructions on how to complete the spreadsheet as well as additional information regarding the Department of Community Health (DCH) attestation requirements.

We ask all providers to read the memo and contact your local regional office if you have any questions.

**Retainer Payments & Family Caregiver Hire OptionsReport Memo**

# Relias Online Libraries



Please be advised the management and coordination of the DBHDD/Relias online libraries, which include the Developmental Disabilities library and the Behavioral Health Paraprofessional and Mental Health Recovery libraries, has transferred from the University of Georgia-Carl Vinson Institute of Government (CVIOG) to the DBHDD Office of Human Resources and Learning.

Any questions, concerns, or recommendations related to Relias access or the transition may be directed to **relias.admin@dbhdd.ga.gov.**

*Submitted by:*
**Theodore Carter, Jr., Senior Director**
**DBHDD Learning**

---

During the month of September, DBHDD held the **2x2 Series: Daily Self-Care Tips and Support for Health Care and Emergency Response Workers**. This series was presented as Webex events and were designed to provide daily self-care tips and support for health care and emergency response workers. Each session provided attendees with mental health tips about managing stress, grief, work/life balance, and wellness.



If you could not attend the live sessions, each one was recorded and is available for review on the DBHDD website: **https://dbhdd.georgia.gov/2x2-series**.

---

## Georgia's Peer2Peer Warm Lines Are Open!



Georgia's Peer2Peer Warm Line plans to continue 24/7 operation through this time. Even where services are able to continue without interruption, there are likely going to be behavioral health service consumers who are at-risk for the Coronavirus who choose not to visit service providers, and the Warm Line is an option for them to stay connected and receive support. Warm Line calls are answered by Georgia Certified Peer Specialists and is funded by DBHDD.

**The Peer2Peer Warm Line toll-free number is 888-945-1414.**

More information can be found by **clicking here**.

---

## Department of Public Health Coronavirus Hotline



With all the concerns surrounding the COVID-19 pandemic the State of Georgia is trying to help ease the minds of residents. Georgia officials have created a new hotline that is available to all residents. Georgians can call **1-844-442-2681** with questions or concerns about the coronavirus.

If you believe that you are experiencing symptoms of COVID-19 or have been exposed to the novel coronavirus, please contact your primary care doctor or an urgent care clinic. Please do

not show up unannounced at an emergency room or health care facility.

For more information, **click here**.

**Senior Provider Relations Manager**
Carole Crowley

**Provider Relations Manager**
Sharon Pyles

For Provider Relations inquiries,
please contact us at
**DBHDD.Provider@dbhdd.ga.gov**.



# BE WELL, WEAR A MASK & WASH YOUR HANDS!

 

Special Bulletin                                    October 6, 2020

  

# HHS Announces Phase 3 Provider Funds Distribution

The U.S. Department of Health and Human Services (HHS), through the Health Resources and Services Administration (HRSA), **announced** $20 billion in new funding for providers on the frontlines of the coronavirus pandemic.

Under this Phase 3 General Distribution allocation, providers that have already received Provider Relief Fund payments will be invited to apply for additional funding that considers financial losses and changes in operating expenses caused by the coronavirus. Previously ineligible providers, such as those who began practicing in 2020 will also be invited to apply, and an expanded group of behavioral health providers confronting the emergence of increased mental health and substance use issues exacerbated by the pandemic will also be eligible for relief payments.

Providers can begin applying for funds on Monday, October 5, 2020.

Providers are encouraged to apply early.

Click **here** to link to the HHS website for additional information and instructions to apply.

## National Public Health Emergency Extended

On October 2, 2020, the Secretary of HHS, Alex Azar, renewed the national public health emergency on Friday with an effective date of Oct 23 for a period of 90 days. The declaration can be seen **here**.

## DPH Update: Georgia Personal Protective Equipment

In March, DPH launched a ReadyOp link to request Personal Protective Equipment (PPE) during the supply shortage. The PPE supply chain has recovered to a point where the big six (gowns, gloves, face shields, coveralls, surgical masks, and hand-sanitizer) are available in stores and through

distributors. Given the change in availability of PPE, the Georgia Emergency Management Agency/Homeland Security (GEMA/HS) and the Georgia Department of Public Health (DPH) have reassessed the PPE support mission of the State's COVID-19 response plan.

Please note, at 11:59 PM on October 15, 2020, DPH will deactivate the Ready Op PPE link and process all requests for emergency resupply of PPE through county EMAs using the State's WebEOC resource request process. Additional information can be found **here**.

DBHDD encourages providers to assess PPE needs routinely and place orders with your suppliers in advance. If an emergency does occur, providers may contact the county Emergency Management Director and he/she will help them with WebEOC.

---

## Office of Provider Relations



**<u>Senior Provider Relations Manager</u>**
Carole Crowley

**<u>Provider Relations Manager</u>**
Sharon Pyles

For Provider Relations inquiries,
please contact us at
**DBHDD.Provider@dbhdd.ga.gov**.

## BE WELL, WEAR A MASK & WASH YOUR HANDS!

 



**Georgia Department of Behavioral Health
& Developmental Disabilities**

Judy Fitzgerald, Commissioner

**D·B·H·D·D**     Division of Behavioral Health

## Memorandum

**To:**          Community Behavioral Health Providers

**From:**      Monica Johnson, Director
                  Division of Behavioral Health

                  Wendy White Tiegreen, Director
                  Office of Medicaid Coordination & Health System Innovation

**Subject:**   Continuation of Telemedicine and Telephonic Service Allowances Post- COVID-19
                  Public Health Emergency (PHE)

**Date:**      August 1, 2022

The purpose of this memorandum is to notify providers of the Georgia Department of Behavioral
Health and Developmental Disabilities' (DBHDD's) upcoming policy changes and related practice
guidance regarding ongoing telemedicine and telephonic service allowances for behavioral health
services following the COVID-19 Public Health Emergency.

Based upon learnings from the standards and practice utilized during the PHE, and practice
reflections from the field and families/individuals served[1], the DBHDD will be expanding its policy
regarding telemedicine/telephonic allowances for outpatient services falling within the purview of
the DBHDD's authority, in order to substantially broaden the potential for telemedicine/telephonic
intervention[2].

Along with these new flexibilities, there will also be some practice expectations that are intended to
ensure the best possible experience related to telehealth practice for the people we serve. These
flexibilities and practice expectations are premised on guidance from the U.S. Substance Abuse and
Mental Health Services Administration[3], and will be published in the upcoming **FY23, Quarter 2
Provider Manual for Community Behavioral Health Providers**, with an <u>effective date
contingent upon federal guidance regarding the termination of the federal COVID-19 Public Health
Emergency (PHE) declaration.</u> The PHE declaration has been extended multiple times over the
past two years, and the DBHDD cannot predict whether there will be any future extensions.
However, we are publishing this telemedicine content so that providers may proactively plan for
service delivery post-PHE, and avoid the potential for future disruptions to their operations due to
uncertainty.  To ensure clarity, consistency, and administrative simplification, we will be focusing
this content in a single designated area of the Provider Manual (Part II). The anticipated language
is noted below and will be included in the revised Provider Manual (FY23, Quarter 2) when it is
published to our website on September 1, 2022.

Thank you for all that you have done and continue to do, and for your continued commitment to
the citizens of Georgia.

Footnotes

1        University of Georgia, Carl Vinson Institute for Government (2021). <u>DBHDD Telehealth Survey Report</u>.

2        This expansion will be contingent upon current and future federal allowances.

3        U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration (2021). <u>Telehealth for the Treatment of Serious Mental Illness and Substance Use Disorders</u>.


c:        Georgia Collaborative ASO

         Brian Dowd, Department of Community Health

         Lynnette Rhodes, Department of Community Health

         Rebecca Dugger, Department of Community Health

**Telemedicine and Telephonic Intervention Requirements for
All Community-Based Behavioral Health Services**

**Provider Manual for Community Behavioral Health Providers**

***The below excerpt will be included in Part II, Section I of the Provider Manual.***

Part II.  Community Service Requirements for Behavioral Health Providers

Section I.  Policies and Procedures

1. Guiding Principles

    B. Access to individualized services.

        ii. There are no barriers in accessing the services, supports, and treatment offered by the provider, including but not limited to:

            16. Telemedicine and telephonic interventions may be used as a means to deliver person-centered services, in accordance with the following:

                a. Definitions:

                    i. "Telemedicine" is the use of medical information exchanged from one secured site to another, via electronic communications, to improve a patient's health. Electronic communication means the use of interactive telecommunications equipment that includes, at a minimum, audio and video equipment permitting two-way, real time interactive communication between the patient, and the physician or practitioner at the distant site.

                        1. Originating Site: The site where individuals are being served via telemedicine (i.e. this may be at their homes, in schools, in other community-based settings, or at more traditional service sites).
                        2. Distance Site: The site where the practitioner providing the professional service is located at the time the service is provided via a telecommunications system.

                    ii. "Telephonic" is the use of medical information exchanged between one individual and another, via an audio-only communication exchange made by telephone.

                    iii. "Face-to-Face" (FTF) language is found throughout the BH Provider Manual, and is herein redefined to mean either "in-person" or "via the use of telemedicine technology," based upon the provider's clinical judgment in accordance with the criteria set forth in item "g" below. However, "Face-to-Face" is never inclusive of telephonic intervention.

                b. The telemedicine connection must ensure HIPAA compliance related to Privacy and Security (employing authentication, access controls and encryption to allow for patient/client confidentiality, integrity and availability of their data).

                c. All individuals served via telemedicine (DBHDD state-funded and Medicaid FFS) must sign a consent form, a copy of which must be placed in each individual's health record. For Medicaid-covered

individuals, the Department of Community Health requires that: "The Telemedicine Member Consent Form for each individual is outlined in the Telemedicine Guidance Document and must be utilized."[1] For individuals served using DBHDD state funds, providers may either use the DCH consent form, or create one containing the same information/components, as applicable.

d.   All individuals served via telephone (DBHDD state-funded and Medicaid FFS) must also sign a consent form, a copy of which must be placed in each individual's health record. Providers should either create a separate form containing the same applicable information/components as is utilized in their telemedicine consent form, or may combine the consents into a single form so long as consent to each modality (telemedicine vs. telephonic) is clearly delineated.

e.   Limits regarding telephonic service delivery may exist for certain services. Any such limits can be found in the Service Definition for the specific service in question (see Part I of this manual), and must be adhered to.

f.   Telephonic service delivery must adhere to the 2022 released guidance from the U.S. Department of Health and Human Services, Office for Civil Rights[1].

g.   The use of telemedicine or telephonic service delivery should never be driven by the practitioner's or agency's convenience or preference. Telemedicine and telephonic service delivery should only be deployed based on sound clinical judgement, and with documented consideration of the following:

   i.     The nature and complexity of the service, and of the particular service intervention(s) to be implemented;
   ii.    The individual's needs and preferences;
   iii.   The individual's current clinical presentation and life circumstances (e.g. symptom type and acuity, risk of harm, a significantly stressful and recent life event, etc.);
   iv.    The individual's access to, and comfort with technology;
   v.     The individual's ability to have private and confidential conversations/interactions with the provider;
   vi.    Safety of the individual's home environment or other environment where the individual is receiving services;
   vii.   The potential for viable strategies to address any of the above, as well as any other barriers that may exist.
   viii.  Frequent re-evaluations of telemedicine/telephonic service delivery in consideration of the above, and any other factors that may impact the feasibility of these service delivery modalities.

h.   To promote access, providers may use Telemedicine as a tool to provide direct interventions to individuals for whom English is not their first language. Examples of this include:

   •   the use of one-to-one service intervention via Telemedicine, by connecting the individual to a practitioner who speaks the individual's language (i.e. rather than using an interpreter); and/or

- the use of an interpreter via Telemedicine (i.e. as a third party) to support the practitioner in delivering the identified service to an individual.

i. Provider agencies must have a written policy that addresses all of the above sub-items listed under item *16. Telemedicine and telephonic interventions.* This policy must address implementation plans/protocols, including internal staff training, documentation in the individual's health record (including the expected frequency of re-evaluations regarding telemedicine/ telephonic modality appropriateness), self-evaluation measures, and internal record review procedures.

Footnotes:

1    US Department of Health and Human Services, Office for Civil Rights. (June 13, 2022). <u>Guidance on How the HIPAA Rules Permit Covered Health Care Providers and Health Plans to Use Remote Communication Technologies for Audio-Only Telehealth</u>. https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-audio-telehealth/index.html