1                UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF GEORGIA

3

United States of America,              No.
4                                      1:16-CV-03088-ELR
      Plaintiff,
5
vs.
6
State of Georgia,
7
      Defendant.
8  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

9

10

11

12            VIDEOTAPED ZOOM DEPOSITION OF

13                 LARRY E. WINTER

14                November 30, 2022

15                   9:01 a.m.

16                 Dalton, Georgia

17

18

19

20

21

22

23        Marcella Daughtry, RPR, RMR

24    Georgia License No. 6595-1471-3597-5424

25        California CSR No. 14315



1                 APPEARANCES OF COUNSEL

2    For the Plaintiff:

3         U.S. DEPARTMENT OF JUSTICE
          MS. LAURA CASSIDY TAYLOE
4         MS. KELLY GARDNER WOMACK
          MS. VICTORIA LILL
5         MS. ANDREA HAMILTON
          MS. RENEE WOHLENHAUS
6         MS. MICHELLE TUCKER
          MS. CRYSTAL ADAMS
7         950 Pennsylvania Avenue, N.W.
          Washington, D.C. 20579
8         202.305.6630
          kelly.gardner@usdoj.gov
9         andrea.hamilton@usdoj.gov
          laura.tayloe@usdoj.gov

10

11   For the Defendant and the Witness:

12        ROBBINS FIRM
          MR. JOSH BELINFANTE
13        MS. MELANIE JOHNSON
          MS. ANNA EDMONDSON
14        MS. DANIELLE HERNANDEZ
          500 14th Street, NW
15        Atlanta, Georgia 30318
          404.856.3252
16        dhernandez@robbinsfirm.com
          melanie.johnson@robbinsfirm.com
17        jbelinfante@robbinsfirm.com

18

     Also Present:

19

          Sandra LeVert
20        Austin King, videographer
          Stacey Suber-Drake

21

22

23      *** ALL PARTICIPANTS APPEARED REMOTELY ***

24

25



1                    INDEX OF EXAMINATION

2    WITNESS:  LARRY E. WINTER

3

4    EXAMINATION                              PAGE

5    BY MS. HAMILTON                            8

6    BY MR. BELINFANTE                        212

7

8

9

10

11

12

13                         *  *  *

14

15

16

17

18

19

20

21

22

23

24

25



```
1                        INDEX TO EXHIBITS

2      EXHIBITS                                              PAGE

3      Exhibit 602       Subpoena to testify                 10

4      Exhibit 603       Bylaws of the State Board of         29
                         Education
5
       Exhibit 604       E-mail chain from Matt Cardoza to    68
6                        Matt Cardoza 10/21/16
                         GA00053761 to 53766
7
       Exhibit 605       E-mail chain from Larry Winter to    70
8                        Matt Jones 5/22/18
                         GA03510889 to 10893
9
       Exhibit 606       E-mail from Larry Winter to          83
10                       Linda Myers 5/11/16
                         GA00279424
11
       Exhibit 607       E-mail chain from Larry Winter       86
12                       to Clara Keith 7/28/16
                         GA01486139 to 141
13
       Exhibit 608       E-mail from Larry Winter to         123
14                       Clara Keith 7/23/16
                         GA00197256
15
       Exhibit 609       E-mail chain from Larry Winter      125
16                       to Mike Royal 4/10/17
                         GA00198610 to 612
17
       Exhibit 610       The Atlantic article: The Separate, 127
18                       Unequal Education of Students With
                         Special Needs
19                       US0003633 to 3650

20     Exhibit 611       E-mail chain from Larry Winter to   143
                         Garry McGiboney 5/11/16
21                       GA00510340 to 341

22     Exhibit 612       E-mail chain from Larry Winter      145
                         to Clara Keith 10/5/16
23                       GA00197817 to 7818

24     Exhibit 613       E-mail chain from Larry Winter      150
                         to Clara Keith 10/13/16
25                       GA01486305 to 306
```



1                    INDEX TO EXHIBITS, CONT'D

2    EXHIBITS                                            PAGE

3    Exhibit 614      June State Board Meeting            160
                      dated 6/13/19
4
     Exhibit 615      Georgia Department of Education     163
5                     Item for State Board of Education
                      Approval - Grant - GNETS state
6                     and Federal Allocations

7    Exhibit 616      Georgia Department of Education     170
                      Item for State Board of Education
8                     Approval - Grant - FY20 GNETS
                      Grant for Supplemental Instruction
9
     Exhibit 617      Georgia Department of Education     173
10                    Item for State Board of Education
                      Approval - Grant - FY20 State
11                    Allocation

12   Exhibit 618      E-mail from Ted Beck to Larry       177
                      Winter 9/28/17
13                    GA04450268 to 50269

14   Exhibit 619      E-mail from Deborah Gay to          179
                      Larry Winter 9/21/16
15                    GA04450250 to 50251

16   Exhibit 620      E-mail from Larry Winter to         185
                      Garry McGiboney 5/14/2018
17                    GA00540344 to 0345

18   Exhibit 621      E-mail from Larry Winter to         189
                      Matt Jones 9/18/15
19                    GA03463431

20   Exhibit 622      E-mail from Larry Winter to         191
                      Matt Jones 12/3/15
21                    GA03464539

22   Exhibit 623      E-mail from Larry Winter to         194
                      Matt Jones 2/16/16
23                    GA03465879

24   Exhibit 624      E-mail chain from Larry Winter      199
                      to Nakeba Rahming 8/29/17
25                    GA00792589 to 2590



1                    INDEX TO EXHIBITS, CONT'D

2    EXHIBITS                                        PAGE

3    Exhibit 625      E-mail chain from Garry McGiboney    205
                      to Larry Winter 2/16/16
4                     GA00506530 to 506531

5

6

7            PREVIOUSLY MARKED AND REFERENCED EXHIBITS

8                              77
                               82
9                              284

10

11                            *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1            THE VIDEOGRAPHER:  Good morning.  We are now

2    on the record.  The time is now 9:01 a.m. on Wednesday,

3    November 30th, 2022.  This begins the videotaped

4    deposition of Larry Winter taken in the matter of the

5    United States of America v. State of Georgia, filed in

6    the United States District Court for the Northern

7    District of Georgia, case number of which is

8    1:16-CV-03088-ELR.

9            The videographer today is Austin King.  The

10   court reporter is Marcie Daughtry.  We are both

11   representing Esquire Deposition Solutions.

12           Counsel, will you please announce your name and

13   whom you represent, after which the court reporter will

14   swear in the witness.

15           MS. HAMILTON:  Andrea Hamilton for the United

16   States.

17           MR. BELINFANTE:  Josh Belinfante for the State

18   of Georgia.

19

20                LARRY E. WINTER,

21   called as a witness herein, having been first duly sworn

22   by the shorthand reporter to speak the truth and nothing

23   but the truth, was examined and testified as follows:

24   >>>

25   >>>



```
1                      EXAMINATION

2    BY MS. HAMILTON:

3        Q    Good morning, Mr. Winter.  How are you doing

4    today?

5        A    Very good.  Good to meet you.

6        Q    Thanks.  Same here.

7             My name again is Andrea Hamilton, and I

8    represent the United States.  I will be taking your

9    deposition today.

10            Would you please state your full name for the

11   record.

12       A    Larry Eugene Winter.

13       Q    I will be asking you a series of questions

14   today, and you are under oath to provide complete and

15   honest answers to those questions.  Do you understand?

16       A    Yes, ma'am.

17       Q    If you do not understand a question that I ask,

18   you should feel free to let me know, and I will try to

19   repeat or rephrase the question.  Okay?

20       A    Yes, ma'am.

21       Q    If you are not sure of an answer or you don't

22   have a complete answer, you must still answer the

23   question to the extent that you can.  Do you understand?

24       A    Yes, ma'am.

25       Q    If you need a break at any point, please tell
```



 1  me or your attorney.  We will let you finish your answer,

 2  if you are in the midst of answering your question, and

 3  then we will discuss when or if to take a break.  Okay?

 4       A   Yes, ma'am.

 5       Q   And then, also, just as a matter of protocol,

 6  we probably will take breaks probably around every hour

 7  and a half or so, and we will take a midday break for

 8  lunch, and we can discuss that when those times arise.

 9  If you need to take a break sooner, don't hesitate to let

10  us know.

11       A   Thank you.

12       Q   We are taking your deposition virtually via

13  Zoom today.  As you can see, the court reporter is

14  recording all that is said here.  Because she can only

15  record our words, please be sure to speak clearly and

16  answer each question with a verbal response as you are

17  doing.

18           Do you understand?

19       A   Yes, ma'am.

20       Q   Also, I want us to avoid talking over each

21  other.  I will try to not interrupt you when you are

22  answering, and I ask that you try to do your best to let

23  me finish my questions before you start to answer.

24           Do you understand?

25       A   Yes, ma'am.



1      Q   Is there any reason that you can think of that

2   you will not be able to answer my questions fully and

3   truthfully?

4      A   None that I know of at this time.

5      Q   If that changes, will you please let me know?

6      A   Yes, ma'am.

7      Q   And then I want to note on the record that

8   United States and the State of Georgia have agreed to

9   have a standing agreement that all objections except as

10  to form and privilege will be reserved until trial.

11        Mr. Winter, as I noted earlier, the exhibits

12  for today's deposition will be shared electronically.  I

13  am going to begin by showing you our first document, and

14  I would like for the court reporter to mark this first

15  document that I am about to share as Plaintiff's Exhibit

16  602.

17        (Plaintiff's Exhibit 602 was marked for

18  identification.)

19     Q   BY MS. HAMILTON:  Please let me know when

20  you're -- when you see the document on the screen,

21  Mr. Winter.

22     A   I can see the subpoena.

23     Q   Okay, great.  I am going to give you control of

24  the document and just give you a moment to review it.

25  And if you just want to scroll through very quickly, let



 1   me know when you are finished, and then we will continue.

 2        A   Why don't you start asking questions, and I can

 3   move the cursor as needed.

 4        Q   This is a subpoena to testify at a deposition

 5   in a civil action, and the subpoena is directed to Larry

 6   Winter; is that correct?

 7        A   Yes.  Although, my address is incorrect.

 8        Q   Okay.  What is the correct address?

 9        A   206 West Crawford -- C-r-a-w-f-o-r-d -- Street,

10   Dalton, 30720.

11        Q   Thank you for correcting that.

12        A   And by agreement, this is taking place via Zoom

13   as opposed to at the Robbins Firm.

14        Q   Yes, that is correct.

15            Have you seen this document before today?

16        A   Yes.

17        Q   Who showed this document to you?

18        A   It was provided by Ms. Johnson.

19        Q   And who is Ms. Johnson?

20        A   She's an attorney that works with Josh

21   Belinfante.

22        Q   And are you represent -- and what law firm is

23   she with?

24        A   I don't know.

25        Q   Okay.  Does the Robbins Firm sound familiar?



 1        A    Probably.  Yes, it is.

 2        Q    Okay.  And are they representing you here today

 3   for the purposes of this deposition?

 4        A    They say they are.  Although, their primary

 5   client, I assume, is the State of Georgia.

 6        Q    Okay.  Okay.  So I just want to make sure that

 7   we're clear on the record.  Is it your understanding that

 8   today you are represented by the Robbins Firm?

 9        A    Yes.

10        Q    Okay.  And are you here today on account of

11   this document?

12        A    Well, I agreed to appear via phone more than a

13   week before I saw the document, so I would say the answer

14   is both and.

15        Q    Okay.  All right.  Do you see at the top of the

16   document -- give me a chance to scroll there -- that the

17   case name is United States versus Georgia?  Do you see

18   that?

19        A    Yes, ma'am.

20        Q    Do you understand that this deposition is being

21   taken in connection with litigation against the State of

22   Georgia relating to the Georgia Network for Educational

23   and Therapeutic Support program?

24        A    Yes, ma'am.

25        Q    Are you aware that this program is commonly



1  referred to as the "GNETS program"?

2       A   Yes, ma'am.

3       Q   So if I use the term "GNETS," will you

4  understand that I am referring to the Georgia Network for

5  Educational and Therapeutic Support program?

6       A   Yes, ma'am.

7       Q   When did you first learn about the GNETS

8  litigation?

9           MR. BELINFANTE:  Object to the form.

10          You can answer, Mr. Winter.

11          THE WITNESS:  I am sure that I learned of it in

12  passing back in 2006 but wasn't reminded of it until

13  within the last week.

14      Q   BY MS. HAMILTON:  How did you learn about it in

15  2006?

16      A   I was a member of the State Board of Education.

17      Q   And as a member of the State Board, how was the

18  litigation brought to your attention?

19      A   It would have been brought to us in an

20  executive session that a suit had been filed.

21      Q   What is your understanding of what this case is

22  about?

23      A   As I understand it, the Department of Justice

24  doesn't like the State of Georgia's local rule control

25  over the GNETS program.



1      Q    And what is your understanding of the case

2   based on?

3      A    I'm not --

4           MR. BELINFANTE:  Object to -- to the extent

5   that the answer calls for Mr. Winter to testify about

6   attorney-client communications.

7           And I would instruct you, Mr. Winter, not to

8   reveal any communications you have had in your role as a

9   board member with any person from the Georgia Department

10  of Law, including outside SAG counsel, which would be

11  folks from our firm, including Ms. Ross as well.

12     Q    BY MS. HAMILTON:  And that's totally fine.  I'm

13  just trying to get a general sense of --

14          MR. BELINFANTE:  Understood.

15     Q    BY MS. HAMILTON:  -- to your knowledge, of how

16  did you learn about it.  Like you mentioned that the --

17  you learned about it likely through executive session,

18  and so just to the extent that you shared what you knew

19  about it, I was trying to get a better sense of how you

20  came to that conclusion.

21     A    Well, that would have been brought to me by the

22  attorneys, so based on the information provided by

23  Mr. Belinfante, I have been instructed not to answer

24  that, and I have not had conversations with any others.

25     Q    Did you review any documents in connection to



 1   the GNETS litigation at the time?
 2        A    No.
 3        Q    And at the time, did you review the GNETS
 4   complaint that was filed in court?
 5        A    No.
 6        Q    Did you review the letter of findings that was
 7   issued to the State of Georgia about the GNETS matter?
 8        A    Not that I recall.
 9        Q    I am going to ask you a few questions about
10   your preparation for the deposition.  Please note that I
11   am not asking you to reveal the substance of any
12   communications that you had with counsel, just the
13   general sense of how you prepared.
14             What did you do to prepare for today's
15   deposition?
16        A    I woke up early, had a great breakfast, and am
17   sitting here enjoying our time together this morning.
18   Beyond that, I had an extremely brief phone call with
19   Ms. Johnson two days ago.
20        Q    And was anyone -- anyone else besides
21   Ms. Johnson present during that meeting?
22        A    No.
23        Q    Have you spoken to anyone else about the
24   deposition?
25        A    Yes.  I mentioned in passing that I was being



 1  deposed, but nothing other than that statement.

 2        Q    And when you say "mentioned in passing," who

 3  did you mention it in passing to?

 4        A    My partner, my secretary, my wife, and current

 5  board member Mike Royal.

 6        Q    Did you review any documents in preparation for

 7  today's deposition?

 8        A    Yes, a document provided by Ms. Johnson.

 9  That's all.

10        Q    Okay.  And what documents did you review?

11        A    I'll let Mr. Belinfante answer that.

12             MR. BELINFANTE:  Yeah, I would -- I would

13  actually object to that on the grounds that it invades

14  attorney work product.

15        Q    BY MS. HAMILTON:  Are there any documents that

16  you independently reviewed, Mr. Winter, apart from what

17  was provided you by counsel?

18        A    Other than the subpoena, no.

19        Q    Did you bring any documents with you today to

20  reference during the deposition?

21        A    No.

22        Q    Have you had -- ever had your deposition taken

23  before?

24        A    Yes.

25        Q    How many times?



1       A    More than 75, less than 100.

2       Q    At a very high level, we don't need to

3  obviously talk about all of them, but what was the

4  general context of the depositions -- the times you've

5  been deposed?

6       A    I am a certified public accountant, a certified

7  fraud examiner, and a certified valuation -- pardon me --

8  analyst.  And I am involved in commercial and sometimes

9  criminal litigation.

10      Q    Have you ever been deposed in connection to

11  your work with the State Board of Education?

12      A    No.  This is the first.

13      Q    I may be using some acronyms today for brevity,

14  and I want to run through a few of those now to ensure

15  that we are on the same page.  If I refer to "Georgia

16  DOE," will you understand that I am referring to the

17  Georgia Department of Education?

18      A    Yes, ma'am.

19      Q    If I refer to the "State Board" or the "SBOE,"

20  will you understand that I am referring to the State

21  Board of Education?

22      A    Yes, ma'am.

23      Q    If I use the acronym "DBHDD," will you

24  understand that I am referring to the Georgia Department

25  of Behavioral Health and Developmental Disabilities?



1        A    Yeah, but only because you just defined it.

2        Q    Okay.

3        A    So I would -- would request that you use the

4   long name for me.

5        Q    Okay.  That is totally fine.

6             Likewise, for the Georgia Department of

7   Community Health, are you familiar with the acronym

8   "DCH"?

9        A    Yes, ma'am.

10       Q    Okay.  So I may alternate between the two of

11   those.

12            If I use the acronym "LEA," will you understand

13   that I am referring to local education agency?

14       A    Yes, ma'am.

15       Q    If I use the acronym "RESA," will you

16   understand that I am referring to Regional Educational

17   Service Agency?

18       A    Yes, ma'am.

19       Q    If I am discussing the term "GNETS centers,"

20   will you understand that when I say "centers," that I'm

21   referring to the stand-alone GNETS locations?

22       A    Yes, ma'am.

23       Q    And then, likewise, if I refer to "GNETS

24   school-based locations," will you understand that I am

25   referring to the GNETS locations that are based in local



 1  general education school settings?

 2      A   Yes, ma'am.

 3      Q   And then maybe the last one for now, if I use

 4  the acronym "EBD," will you understand that I am

 5  referring to emotional and behavioral disabilities?

 6      A   Yes, ma'am.

 7      Q   Okay.  You mentioned that you previously served

 8  on the Georgia State Board of Education; is that correct?

 9      A   Yes, ma'am.

10      Q   Okay.  How long did you serve on the State

11  Board?

12      A   14 years.

13      Q   And what was -- what were the span of years

14  that you served?

15      A   From 2005 to December of 2019.  I understand

16  that my term actually went into the first week of 2020,

17  but I did nothing during that one week.

18      Q   Okay.  When you served on the State Board, what

19  positions did you hold?

20      A   I was either chairman or vice chairman of the

21  budget committee and chaired the audit committee.

22      Q   And what was the time span that you served as

23  chairman or vice chairman of the budget committee?

24      A   To me, they were intermingled, so from 2005 to

25  2019.



1       Q    Okay.  So that entire period you were either
2   chair or vice chair?
3       A    Yes, ma'am.
4       Q    And then, likewise, what was the time span that
5   you served as chair of the audit committee?
6       A    The same.
7       Q    Did you hold any other positions on the State
8   Board?
9       A    Other than member, not that I recall.
10      Q    And did you ever hold the position of chair of
11  the entire board?
12      A    No, ma'am.
13      Q    What district did you represent when you served
14  as a member of the board, State Board?
15      A    It depends.  Initially the 9th congressional
16  district.  After reorganization, the 14th.
17      Q    What area of the state is served by the 9th --
18  well, I should reframe that.
19           What area of the state was served by the 9th
20  district, and how did that differ from the area that was
21  served by the 14th?
22      A    I would describe the 9th as a path across the
23  top of the state and the 14th being the northwest corner.
24      Q    And when during that time span that you were on
25  the board did -- was there a reorganization?



1        A    It was a result of every ten years that we have
2   to reallocate congressional districts.
3        Q    Do you know approximately what year that
4   happened?
5        A    It would have been based on the '10 census, so
6   probably '11 or '12.
7        Q    Approximately 2011, 2012?
8        A    Yes, ma'am.
9        Q    Thank you.
10            And just to be clear, are the education
11   districts aligned with the Georgia congressional
12   districts?
13       A    I do not understand your question.
14       Q    Okay.  You had mentioned realignment or
15   reorganization of the districts, and I am just trying to
16   confirm, are the districts that you serve as a State
17   Board member aligned with the congressional districts?
18       A    Yes, ma'am.
19       Q    How many districts are there total in Georgia?
20       A    Today, 14.
21       Q    And when you served on the board, how many
22   districts were there?
23       A    13.
24       Q    Is there always one member for each district?
25       A    Yes, ma'am.



1        Q    So that -- again, let me make sure my math is

2    correct.  Would that mean that there were approximately

3    13 or 14 members representing districts on the State

4    Board?

5        A    Yes, ma'am.

6        Q    Were there any other members on the State Board

7    besides the individuals representing districts?

8        A    No, ma'am.

9        Q    Is the State superintendent considered a member

10   of the State Board?

11       A    I don't believe he is.

12       Q    What is the State superintendent's role in

13   connection with the State Board?

14            MR. BELINFANTE:  Object to the form.

15            You can answer.

16            THE WITNESS:  My understanding is that, you

17   know, certainly he is a part of all of our board

18   meetings, you know, and he's the chief administrative

19   officer of the Department of Education.

20       Q    BY MS. HAMILTON:  Also, have you ever had a

21   teacher of the year serve as a member of the State Board?

22       A    Not to my knowledge.

23       Q    Do you get paid to serve on the State Board of

24   Education?

25       A    Yes.



1       Q   How much do board members get paid?

2       A   We started off, I believe, at $105, and I

3   believe we were raised all the way to $110 per day.

4       Q   And are those only days that you are working in

5   your capacity as a board member, or is that for 365 days

6   in the year?

7       A   Only on days that we were serving and that we

8   chose to charge.

9       Q   How did you become a member of the State Board

10   of Education?

11      A   I answered the phone, and Governor Perdue was

12   on the other end of it.

13      Q   And when did he -- and, I guess, what -- I want

14   to make sure I'm having the proper terminology here.

15   Were you appointed by Governor Perdue to serve on the

16   board?

17      A   I was appointed by Governor Perdue and then

18   confirmed by the Georgia Senate.

19      Q   What year were you appointed to the State

20   Board?

21      A   2005.

22      Q   Did the governor indicate why you were

23   appointed to serve on the State Board?

24      A   Yes.

25      Q   What was the reason that he gave?



1      A    He said that everybody on the board had a

2  background in education, but he needed someone who had a

3  background in accounting and finance.

4      Q    And I assume you were that person who had the

5  background in accounting and finance; is that correct?

6      A    In his opinion, and who was I to argue with

7  him.

8      Q    How long are the appointments to the State

9  Board?

10     A    If you serve a full term, seven years.

11     Q    Okay.  Can you serve multiple terms?

12     A    I served two full terms.

13     Q    Is there a limit on the number of terms that

14 board members can serve?

15     A    Other than death, not to my knowledge.

16     Q    When you were appointed to serve on the board,

17 did you have an interest in education issues?

18     A    Please repeat.  I was busy coughing.

19     Q    No worries.

20          When you were appointed to serve on the board,

21 did you have an interest in education issues?

22     A    Yes, as the parent of four children, but I

23 wouldn't say that -- and, you know, and I was the PTA

24 president and things like that at a local school, but

25 beyond that, no.



1      Q   What did you hope to accomplish as a State

2   Board member when you were appointed?

3      A   What I was requested to do was to understand

4   the finances of the State Board of Education in the state

5   of Georgia.

6      Q   Were there any issues in particular that you

7   championed when you served on the State Board?

8      A   Yeah, budget, audits, and our three state

9   schools, I fell in love with them during the course of my

10  term.  Those were our two schools for the deaf and our

11  one school for the blind.

12     Q   Did you have any background in issues affecting

13  students with disabilities when you joined the board, the

14  State Board?

15     A   I am sorry, your question was garbled.

16     Q   Okay.  Did you have any knowledge of issues

17  affecting students with disabilities when you joined the

18  State Board?

19         MR. BELINFANTE:  Object to the form.

20         You can answer.

21         THE WITNESS:  I would say yes.

22     Q   BY MS. HAMILTON:  And what was the basis of

23  that knowledge?

24     A   My youngest child when he was in third grade

25  could not read a word.  It's something his mother and I



1  had worked on with tutors when he was probably four, and

2  finally in third grade we found a program that worked for

3  him, and I'm proud to announce that he has his Ph.D. in

4  analytical chemistry, so we just had to figure out how to

5  unlock his brain.

6          Additionally, I have another son who is Level 1

7  Asperger's.

8      Q   Okay.  I'd like to discuss your professional

9  and educational background more broadly, and then we will

10  return to some questions about your time on the board.

11  Where are you currently employed?

12     A   Nichols, Cauley & Associates.

13     Q   And what is your current job title?

14     A   Partner.

15     Q   What are your general job responsibilities at

16  Nichols, Cauley & Associates?

17     A   I am a general service partner which includes

18  accounting services and tax services, and additionally

19  involved in litigation support and valuations of

20  companies.

21     Q   How long have you been a partner at Nichols,

22  Cauley & Associates?

23     A   Six years.

24     Q   Where were you employed -- well, prior to your

25  time at Nichols, Cauley & Associates, did you work



 1  anywhere else?

 2        A    Yes, ma'am.

 3        Q    Where were you employed before you began

 4  working there?

 5        A    From 1990 until the merger with Nichols Cauley,

 6  with initially Winter & Harris.  They became Winter,

 7  Harris & Scoggins, which became Winter & Scoggins.

 8        Q    What was your job title?

 9        A    Managing partner.  And that goes back to 1990.

10        Q    Okay.  And was that also an accounting firm?

11        A    Yes, ma'am.

12        Q    Prior to your work at that accounting firm as a

13  managing partner, do you hold any other positions?

14        A    Yes, ma'am.  From 1974 to 1990 I was the chief

15  financial officer of Hawthorne Industries.

16        Q    And are there any other relevant job positions

17  that you held prior to that time period?

18        A    From 1970 -- from 1971 to 1974 I worked with

19  Deloitte & Touche, which is also a certified public

20  accounting firm.

21        Q    Where did you obtain your undergraduate degree?

22        A    I got an associate of arts from Palm Beach

23  College, a bachelor's of science in business

24  administration from the University of Florida.

25        Q    What years did you receive those degrees?



1        A    '69, Palm Beach; '71, Florida; and '77 I had a

2    graduate course at the Wharton School of Business of the

3    University of Pennsylvania.  I did not write a thesis, so

4    I did not receive a master's degree.

5        Q    So do you have any professional or graduate

6    degrees?

7        A    Just the ones I have mentioned as degrees.

8        Q    Okay.  And I believe earlier you did list a

9    number of professional licenses or certificates.  Am I

10   correct that you said that you were a certified public

11   accountant?

12       A    Yes, licensed by the State of Florida and

13   Georgia.

14       Q    Okay.  And then I believe you also said that

15   you were a CVA.  Can you remind me what that is, please?

16       A    Certified valuation analyst.

17       Q    Okay.  And where are you licensed?

18       A    By that organization.

19       Q    Okay.  And then I believe you also said that

20   you were a certified -- was it certified fraud examiner?

21       A    Yes, ma'am.

22       Q    Okay.  And where are you licensed?

23       A    By that organization.

24       Q    Do you have any other professional licenses or

25   certificates?



1      A    Yes.  I am also a personal financial planning

2  specialist.

3      Q    And do you have to be licensed by a particular

4  organization or a state for that role?

5      A    That is a designation of the American Institute

6  of CPAs.

7      Q    How did your professional background as a CPA,

8  and more broadly as an accountant, inform your roles on

9  the State Board of Education?

10      A    I understand numbers.

11      Q    All right.  I want to return now to discuss

12  your roles on the State Board, as well as the broader

13  responsibilities of the State Board.  Are you familiar

14  with the State Board of Education Bylaws?

15      A    That they exist, yes.  That I probably read

16  them once or twice, yes.  That I have a deep abiding

17  understanding and recollection, no.

18      Q    And one moment.  I am actually going to share

19  my screen.

20          I would like for the court reporter to mark

21  this document as Plaintiff's Exhibit 603.

22          (Plaintiff's Exhibit 603 was marked for

23  identification.)

24      Q    BY MS. HAMILTON:  Mr. Winter, I am now showing

25  you Plaintiff's Exhibit 603 which are the bylaws for the

1   State Board of Education that are posted on the State DOE

2   website.

3        I want to give you control over this document

4   so that you can scroll through it momentarily, and then

5   once you have scrolled through it, let me know when you

6   are ready.  You don't need to have it memorized.  I just

7   want to -- I'll -- I'll walk you through the parts that

8   are relevant, but I mainly just want to confirm if you

9   recognize the document.

10       A   I am going to assume that I have seen it

11  previously, but do I recall it, no.

12       Q   As a State Board member, did you ever have to

13  reference the Board of Education Bylaws?

14            MR. BELINFANTE:  Object to form.

15            You can answer.

16            THE WITNESS:  I may have.  I don't recall.  I

17  was more familiar with what Georgia's constitution said

18  about the State Board of Education, but again, I'm a

19  numbers person, not a word person.

20       Q   BY MS. HAMILTON:  Are you aware of the purpose

21  of the State Board Bylaws?

22       A   Well, the purpose of bylaws of any organization

23  are to set forth a mechanism to operate it, so that would

24  be the case here.

25       Q   Okay.  What I would like to do is walk through



1   some of the bylaw provisions to confirm whether it

2   reflects your experience of what you were charged to do

3   as a board member.

4          So what I would like to do is begin with

5   Article -- let me start here at the top.  So just to

6   confirm, at the top, do you see here where it says that

7   these are the Bylaws of the State Board of Education of

8   the State of Georgia?

9      A   Yes, ma'am.

10     Q   Okay.  And I am going to scroll down to Article

11  3-2 which lists the duties of the board members.  All

12  right, and I'd like to walk through each of these one by

13  one where it says, "Individual board members shall

14  perform the following duties."  The first one listed here

15  says, "Meet as the SBOE at the State capital in the

16  offices of the Georgia Department of Education or at such

17  place in the capital as may be designated by the governor

18  for that purpose."

19         Was this one of your duties as a State Board

20  member?

21         MR. BELINFANTE:  Object to form.

22         You can answer.

23         THE WITNESS:  I think it was a -- a duty of the

24  board.  I showed up where I was supposed to show up.

25     Q   BY MS. HAMILTON:  Where were the State Board



1  meetings held?

2      A   11 of 12 were held in Atlanta, and one per year

3  was held somewhere in the state.  Other than that, the

4  constitution says that the State Board is to meet four

5  times a year.

6      Q   The second item listed here says individual

7  board members shall "attend meetings" -- I'm looking at

8  letter B, "attend meetings of the State SBOE, enter into

9  discussion, and vote on items presented to the board for

10 decisions."

11         Is this one of the duties that you performed as

12 a State Board member?

13         MR. BELINFANTE:  Object to form.

14         You can answer.

15         THE WITNESS:  Yes, ma'am.

16     Q   BY MS. HAMILTON:  The next item listed here

17 says individual board members shall "recognize that he or

18 she, as an individual board member, has authority to bind

19 the SBOE or act for the SBOE except on -- except on

20 assignment from the SBOE."

21         Do you understand what this provision is

22 referring to?

23     A   No, because I don't believe that a board member

24 individually could bind the State Board.

25     Q   But you do see here where it is listed as a



1  duty in the bylaws; is that correct?

2       A   I see the printed words on the page.

3       Q   But that doesn't reflect your personal

4  experience as a board member; is that correct?

5       A   As I stated previously, I do not believe an

6  individual board member can bind the State Board.

7       Q   The next item here says that individual board

8  members must "adhere to the ethical standards adopted by

9  the SBOE," and it references Appendix I.

10          Are you familiar with the ethical -- with the

11  ethical standards adopted by the SBOE?

12      A   Well, let's go down to Appendix I.  I assume

13  it's attached.

14      Q   It is.  And just for the record, the question

15  again is:  Are you familiar with the ethical standards

16  that were adopted by the State Board listed in Appendix

17  I?

18      A   The answer would be generally yes.

19      Q   And as a board member, did you have to adhere

20  to these ethical standards?

21      A   Yes.

22      Q   I'm going to take control of the screen again

23  and move on to this next duty listed here, letter E,

24  which says -- again, going back to the top -- "Individual

25  board members shall perform the following duties."



1   Letter E says, "Become acquainted with the public

2   educational issues in his or her district and the state

3   as a whole, including conducting an annual public

4   meeting, during the regular school-calendar year, in the

5   congressional district which the board member

6   represents."

7          Are you familiar with this duty as a member of

8   the State Board?

9       A   Again, the document, not per se, but what is

10  contained in E, yes.

11      Q   Okay.  What -- so as a board member, did you

12  become -- did you, quote, become acquainted with the

13  public educational issues in your district?

14      A   I believe I did.

15      Q   How did you go about doing that?

16      A   Well, first of all, I did hold most -- I think

17  I only held 12, not 14, of the annual public meetings.  I

18  talked to my superintendents.  I talked to interested

19  parties that would call me on the phone or asked to meet

20  with me, and then, of course, I was also educated at the

21  State Board meetings.

22      Q   Returning to your comment that you conducted at

23  least 12 annual public meetings, when did those meetings

24  occur?

25      A   Typically in April or May.



1       Q   And who was your target audience when you held
2   those meetings?
3       A   Anyone that chose to show up.
4       Q   How well attended were the meetings?
5       A   They weren't.
6       Q   And when you say they weren't, approximately
7   how many people might be there on average?
8       A   I remember one that had three, and I remember
9   several that had more than a hundred.
10      Q   Who set the agenda for those meetings?
11      A   My job was to listen to the audience at the
12  agenda.
13      Q   So did you basically conduct those meetings as
14  an open forum for people to share?
15      A   Yes, ma'am.
16      Q   Was the topic of GNETS ever raised at any of
17  those public meetings?
18      A   Not that I recall.
19      Q   What type of issues were raised during the
20  meetings?
21      A   Testing was always a favorite.  For a while the
22  concept of -- of how do we rate teachers, educators.
23  Money was always fun.  Those would probably be the top
24  three.
25      Q   Okay.  And when you mentioned that you also



1    would meet with the superintendent, how frequently would

2    you have those meetings?  And, actually, let me clarify.

3    Is this the superintendent of the school districts that

4    were served by your district or the State superintendent?

5        A    Well, I met with both --

6        Q    Okay.

7        A    -- but I was referring to the local

8    superintendents.  I would meet with them at least twice a

9    year.

10       Q    Okay.

11       A    And these were attended probably, you know, 28

12   to 30 times a year.

13       Q    For the local school superintendents, what type

14   of issues did they bring to your attention?

15       A    Their favorite was always, we are not giving

16   them enough money.  I shared with them that that was from

17   the governor and the General Assembly, but they had to

18   vent somewhere, and so I was the person they vented to.

19            And then also the testing was another big one,

20   and they had the same issues that any parent would have.

21       Q    You also mentioned that you met with the State

22   superintendent.  What type of issues did you talk to him

23   about or what type of issues did he raise with you?

24       A    Well, I -- I got the pleasure of meeting with

25   several superintendents.  They all had different ways

 1   of -- of communicating.  Richard Woods was always at a
 2   distance.  The first superintendent was very much
 3   involved in details.
 4        Q   Were these one-on-one -- what type of meetings
 5   were these?
 6        A   They could be one-on-one.  They also were at
 7   our two-day board meetings or during committee meetings.
 8        Q   Okay.  You also mentioned that you became
 9   acquainted with the public educational issues at the
10   State Board meetings.  How -- I guess, what -- what did
11   that look like?  How did you learn about the issues at
12   the State Board meetings?
13        A   Well, the detail of the board was often done at
14   the committee level, so obviously I was in budget or
15   audit, but then each committee came back to what we
16   called the committee of the whole or at our board
17   meetings and would educate the members as the things that
18   were going on within their subcommittee or their
19   committee.
20        Q   All right.  I'd like to look at the next item
21   here, letter F, which says individual board members will
22   "support action of the SBOE, especially in his or her
23   district; promote education at every opportunity,
24   especially at civic group meetings, PTA meetings, and
25   school meetings."



1              Did you perform these duties as a State Board
2    member?
3              MR. BELINFANTE:  Object to the form.
4              You can answer.
5              THE WITNESS:  When invited or requested, yes.
6    Did I run around trying to set up 200 meetings in the
7    course of a year, no.
8         Q    BY MS. HAMILTON:  All right.  Letter G says
9    individual board members will "refer problems brought to
10   his or her attention to the State Superintendent of
11   Schools for action, interpretation, or submission to --
12   to the SBOE."
13             Again, I know you said you are not familiar
14   with the document.  Are you familiar with this as being a
15   duty in general for a State Board member?
16             MR. BELINFANTE:  Object to the form.
17             You can answer.
18             THE WITNESS:  Again, as to the general thing,
19   when I was aware of problems, I brought them to the
20   attention of the superintendent and also the chair of the
21   State Board.
22        Q    BY MS. HAMILTON:  Was there a formal process
23   for bringing those problems to the attention of the
24   superintendent or chair, or could you do it informally?
25        A    Your question was garbled.



1     Q   Okay.  Let me adjust this.

2         All right.  Was there a formal process for

3   referring problems to the superintendent and chair?

4         MR. BELINFANTE:  Object to the form.

5         You can answer.

6         THE WITNESS:  No.

7     Q   BY MS. HAMILTON:  So you could informally

8   approach the superintendent to, quote, refer problems to

9   him or her?

10        (Court reporter clarification.)

11        THE WITNESS:  So I got lost in the question.

12    Q   BY MS. HAMILTON:  Sure, no worries.

13        The question was, I was just trying to confirm,

14  so you could informally approach the superintendent to

15  refer problems to him or her?

16    A   Yes.

17    Q   And similarly, you could informally approach

18  the board chair to refer any problems; is that correct?

19    A   Yes.

20    Q   Once that information was referred to the

21  superintendent, did the superintendent have to pass that

22  information on to the State Board?

23        MR. BELINFANTE:  Object to the form.

24        You can answer.

25        THE WITNESS:  Well, realize that I would



1  mention it to both the chair and the superintendent, so I

2  would think that the board already would know, and -- and

3  if they were areas within my district or in the area of

4  finance, again, I would be working with others.

5        So do I think that things were communicated?

6  The answer was yes, within the area of people's expertise

7  and so on.

8    Q   BY MS. HAMILTON:  All right.  The next item

9  here says individual board members "serve on" -- well,

10 "serve on committees when requested to do so by the chair

11 of the State Board or SBOE."

12       You mentioned earlier that you served on the

13 budget committee, correct?

14   A   Yes, ma'am.

15   Q   And did you serve on the budget committee at

16 the request of the chair?

17   A   Yes.

18   Q   Okay.  Similarly, I know you mentioned earlier

19 that you served on the audit committee.  Was that at the

20 request of the chair?

21   A   Yes.

22   Q   All right.  Moving on to letter I, it says

23 individual board members will "inform himself or herself

24 about educational issues and programs through attendance

25 at local, state, and national educational meetings and



 1    through personal study."

 2         Did you engage in any of these activities to

 3    learn more about your work connected to the board?

 4      A    National education meetings, I did two of those

 5    in 14 years.

 6         In terms of educational issues and programs,

 7    actually, I was the instructor of finance training for

 8    local school board members.  That was done twice a year.

 9    And later on we also changed that around a little bit and

10    included members, board members from charter schools.

11    And again, the rest of the information would have been

12    through the board being educated by others.

13      Q    All right.  And then the last item listed here

14    says the individual board members will, quote -- or I

15    should say, can "suggest proposed policies to the State

16    Superintendent of Schools for study and presentation to

17    the board."

18         As a board member, did you ever suggest

19    proposed policies to the State Superintendent of Schools?

20      A    Probably in passing, things like -- for many

21    years we had training programs for State Board members so

22    they understood the portions of their job, especially in

23    the area of finance and so on when they were coming on

24    board.  But again, you know, when we say "suggest

25    proposed policies," those would be discussions as opposed



```
 1  to term papers.
 2      Q   When you shared that information with the State
 3  superintendent, did he have to take any action on that
 4  information?
 5      A   Have to?  We discussed them, and the majority
 6  of the suggestions I made were put into place, and I
 7  don't recall any suggestions that I made that were not
 8  put in place.
 9      Q   Do you know if the State superintendent could
10  have chosen not to take action on any of your
11  suggestions?
12          MR. BELINFANTE:  Object to the form.
13          You can answer.
14          THE WITNESS:  That's a theoretical question
15  that I really can't respond to because I didn't have that
16  problem with the superintendents that I worked with.
17      Q   BY MS. HAMILTON:  Uh-huh.  Did you have any
18  other duties as a State Board member that we haven't
19  already -- sorry, losing my voice.
20          Did you have any other duties as a State Board
21  member that we haven't already discussed?
22          MR. BELINFANTE:  Object to the form.
23          You can answer.
24          THE WITNESS:  If there is a minor one that
25  neither you have brought up, nor that I have recalled,
```



1  you will need to forgive me, but as to the major ones,

2  no, we have covered those.

3     Q   BY MS. HAMILTON:  At a high level, how does the

4  State DOE bring items to the attention of the board that

5  require a decision being made by the board?

6     A   Well, I think each superintendent's

7  organization of the state -- of the DOE was different.

8  Kathy Cox, things went through her chief of staff, but

9  she was very hands-on.  Richard Woods is through his

10 chief of staff, but Richard was very hands-off.

11        The majority of my time, say 12 of the 14

12 years, department heads had the freedom to, during our

13 committee meetings, meet with board members, meet with

14 those board committees.  The last couple of years, less

15 so.

16    Q   In terms of procedure, did board members have

17 to submit any documentation in order to get an item on

18 the board's agenda for a vote?

19    A   Not that I am aware of.

20    Q   All right.  I just have a few high-level

21 questions about the State Board's role when it comes to

22 funding and budgetary matters.  We will talk in more

23 detail later about some of these things, but, generally

24 speaking, what is the State Board's role when it comes to

25 funding the State Department of Education?



1           MR. BELINFANTE:  Object to the form.
2           You can answer.
3           THE WITNESS:  The funding of the State -- of
4    the Depart -- you are saying -- well, your question is
5    the funding of the Department of Education?
6       Q    BY MS. HAMILTON:  Yes.
7       A    That's done by the General Assembly and the
8    governor.
9       Q    Does the State Board have any role with regard
10   to funding --
11      A    Role?
12      Q    -- for the State Board?
13          MR. BELINFANTE:  Object to the form.
14          You can answer.
15          THE WITNESS:  Role, I would say no.  We all
16   have telephones.
17      Q    BY MS. HAMILTON:  What do you mean when you
18   say, "We all have telephones"?
19      A    You can call individual members of the General
20   Assembly and share your problems with them or your
21   concerns with them, as is the right of every citizen of
22   the state of Georgia.
23      Q    And could board members directly reach out to
24   anyone on the General Assembly?
25      A    Sure.  What -- what prohibition could there be?



1     Q   Did you ever reach out to the General Assembly
2  to raise issues or concerns --
3     A   Yes.
4     Q   -- related to the State DOE?
5     A   The answer is yes because I was chair of
6  budget.  I would work with the education budget people
7  within the House and Senate.
8     Q   Did the State Board have any role in reviewing
9  the proposed budget for the State DOE?
10        MR. BELINFANTE:  Object to the form.
11        You can answer.
12        THE WITNESS:  Okay.  I'm again confused with
13  your question.  Within the Department, yes.  From the --
14  from the General Assembly's budget, again, that's between
15  the General Assembly and the governor.
16     Q   BY MS. HAMILTON:  Right.  And I'm just trying
17  to -- I'm basically trying to parse out what is the
18  difference between the General Assembly's
19  responsibilities and the governor versus the State Board.
20  So if there is no role, that -- that is finance.
21     A   There is a significant difference between the
22  two.  Okay, the State Board of Education's budget
23  committee would have meetings with all department heads
24  and go through their budgets.  Early on we had to deal
25  with the fact that we are having to cut budgets



 1  tremendously.  The interesting thing was during that same

 2  period of time our results were -- of our students

 3  were -- were increasing, but we would meet with each of

 4  the department heads going through their budgets

 5  understanding that, making sure they align to what the

 6  General Assembly had provided and that they were meeting

 7  the needs as we understood them.  And that was done by

 8  the budget committee.  That was part of their role.

 9       Q   Were those steps taken -- just so I understand

10  where this falls in the sequence.  So the General

11  Assembly and governor approved the budget, but am I

12  hearing you correctly, in that you are saying after

13  basically the budget has been approved, the budget

14  committee can then discuss what's been allotted with the

15  department heads?

16       A   That's correct, with -- within each segment,

17  each department within the Department of Education.

18       Q   Okay.  Does the State Board award any funding

19  to the various departments for the State DOE?

20       A   Award, I wouldn't use the word award.

21       Q   Are there any actions beyond what you have

22  already described where the State Board is involved with

23  funding for the State DOE?

24       A   Well, other than getting interim reports that

25  we were utilizing the money the way that the budgets and



1  the State budget had allocated them to be.

2      Q   Okay.  And I guess I'm just trying to -- I'm

3  just trying to think of an example.  So, for example, if

4  the State Board -- sorry, if the General Assembly and

5  governor have allotted like a line item to a specific

6  department in a certain amount, what flexibility, if any,

7  does the State Board have to modify how that money gets

8  directed to that department?

9          MR. BELINFANTE:  Object to the form.

10         You can answer.

11         THE WITNESS:  There are many different

12  allocations of money within the State budget.  Much of

13  it, most of it, goes directly to the LEAs, and the

14  department is a conduit, a pass-through.  Within

15  departments of the DOE, again, that would be more along

16  the lines of the budget items we talked about previously.

17         Now, if somebody, be it an LEA or a program

18  chose to not spend those moneys or deal with those

19  problems the way that they should have, then those could

20  be brought back to the State Board who are working with

21  staff and the right people within the LEAs to correct

22  their problems.

23      Q   BY MS. HAMILTON:  All right.  And I will circle

24  back to this topic later in the deposition with some more

25  specific questions, but I was just trying to get an



 1  understanding at a high level of what the State Board of
 2  Education's role is in connection with funding.
 3          The State Board of Education also has officers;
 4  is that correct?
 5      A   Yes.
 6      Q   During your time serving on the board, what
 7  were the various positions?
 8      A   Well, those that are shown there in 4-1.
 9  Plus --
10      Q   And so -- I'm sorry.  Go ahead.
11      A   Plus then there were chairmen of various
12  committees.
13      Q   Okay.  And just because I want to make sure
14  that those officers are on the record, in 4-1, is it
15  correct that you are saying that the State Board has a
16  chair, vice chair, vice chair for appeals,
17  parliamentarian, and executive officer when you were on
18  the board?
19      A   When I was on the board, yes.
20      Q   And I guess just to circle back, because I know
21  earlier you mentioned that you weren't sure if the State
22  superintendent was a member of the board, does this --
23      A   Okay.
24      Q   -- inform your response?
25      A   My response was, he was there, but he didn't



```
 1   have a vote and still does not.
 2        Q   Okay.  So you would confirm that he is an
 3   officer of the board, but he didn't have a vote; he
 4   wasn't able to vote?
 5        A   That is correct.
 6        Q   Okay.  Thank you.
 7            All right.  I want to scroll down to Article 5
 8   which talks about meetings.  But again, I actually want
 9   to hear more about what your experience with these
10   meetings were rather than walking through the bylaws.
11   What you listed earlier, it sounds like there are several
12   different types of meetings that you can participate in
13   as a State Board member.  What are those meetings?  I
14   should say, what are those formal meetings that the board
15   holds?
16        A   Well, there was a monthly formal meeting.
17   There were committee meetings.  There were executive
18   sessions.  There were called meetings.  So all -- all of
19   those meetings listed there occurred.
20        Q   Okay.  All right.  Let's start then with just
21   your regular monthly meetings.  Those were held once a
22   month; is that correct?
23        A   Yes, sometimes just 11.  It depends on whether
24   a regular meeting needed to be held in concert with our
25   annual planning meeting.
```



1      Q   Is the annual planning meeting the same as the
2  annual board retreat?
3      A   Yes.
4      Q   Okay.
5      A   To me.
6          (Court reporter clarification.)
7      Q   BY MS. HAMILTON:  Are the monthly meetings open
8  to the public?
9      A   Yes.
10     Q   Does the board vote at those meetings?
11     A   Yes.
12     Q   Are minutes prepared after each meeting?
13     A   Yes.
14     Q   Who sets the agenda for the monthly board
15  meetings?
16     A   Well, much of it is standard.  It's the same
17  each month, but the ultimate arbiter would be the chair.
18     Q   And you mentioned that much of the agenda is
19  the same each month.  What are some of the reoccurring
20  agenda items at these monthly meetings?
21     A   Well, reports of the various committees and
22  then items that we need to vote on.
23     Q   During the monthly meetings, did the board ever
24  hold public hearings?
25     A   Yes.



1      Q   And during the monthly meetings, were there

2   regular opportunities for the superintendent to provide a

3   report?

4      A   Yes.

5      Q   Okay.  Relatedly, were there regular

6   opportunities for the board chair to have provided a

7   report?

8      A   Yes.

9      Q   And were those agenda items, do those only

10  happen at the monthly meetings, or do they -- or can they

11  happen at other types of meetings as well?

12          MR. BELINFANTE:  Object to the form.

13          You can answer.

14          THE WITNESS:  I don't understand the question.

15     Q   BY MS. HAMILTON:  Sure.  So for those last

16  items you mentioned the -- like, for example, public

17  hearings, are public hearings only held during monthly

18  meetings?

19     A   I don't recall of one not happening at the

20  monthly meeting.

21     Q   Okay.  Can they be held at other types of

22  meetings?

23     A   Again, I don't recall any not being held at the

24  monthly meeting.

25     Q   You also mentioned committee meetings.  I know



1  that there is a budget committee and an audit committee.

2  What other committees exist on the State Board?

3      A   There were two major ones.  One dealt with

4  education matters and the other one with charter schools.

5      Q   With regard to the committee that dealt with

6  education matters, what was the scope of their focus?

7      A   Education matters.

8      Q   So any -- anything that fell under the bucket

9  of education matters could be raised in that committee?

10     A   Yes, that's my understanding.

11     Q   Okay.

12     A   In 14 years I never attended one of their

13  meetings because at the same time, that's when budget was

14  meeting.

15     Q   Got it.

16         And I guess I want to understand the budget

17  committee a bit better.  What -- from your vantage point,

18  what was the purpose of the budget committee?

19     A   Public education is the largest component of

20  state budget, and so the idea was to provide

21  understanding and, to some extent, oversight of how we

22  were spending our money.  Were we meeting needs?  Were

23  we -- you know, obviously, we -- we also have problems,

24  and are we dealing with those problems appropriately?

25     Q   What do the typical budget committee -- budget



```
 1  committee meeting look like?

 2      A   Well, people would -- we had an agenda of -- of

 3  items to discuss, and we would discuss those, and if you

 4  love numbers, it was a dream, and if you didn't like

 5  numbers, it was a nightmare.

 6      Q   How frequently did the budget committee meet?

 7      A   Every month.  And sometimes during the annual

 8  retreat we did not meet, but for sure the other 11, and

 9  we had special meetings as well.

10      Q   What would be the purpose of the special

11  meetings?

12      A   As I shared with you earlier, once a year we

13  would sit down with all of the department heads within

14  the department going through their budget and -- and so

15  on.  And that would take typically two days prior to the

16  finance committee and then the board approving their

17  budgets.  And then again problems would arise, and we

18  would meet and deal with those.  I know this will be a

19  shock to you, but occasionally people steal.

20      Q   In addition to stealing, were there any other

21  typical problems that you would address during these

22  meetings?

23      A   Well, if -- if it was brought to our attention

24  that people were not dealing with the issues for which

25  they were created, we could work with either departments
```



1   within the department or other committees within the
2   board to see if we can come up with a resolution.
3       Q   During these meetings, could the department
4   heads request supplemental -- supplemental funding?
5           (Court reporter clarification.)
6           MR. BELINFANTE:  Object to form.
7           You can answer.
8           THE WITNESS:  Request, yes.  What flexibility
9   we had would be the -- probably difficult.  Not -- not
10  always, but probably.
11      Q   BY MS. HAMILTON:  Did the budget committee have
12  access -- let me -- actually, let me take a step back.
13          Were there supplemental funds available that
14  the budget committee could access in response to these
15  types of requests?
16      A   Probably no.
17      Q   And when you say "probably no," does that mean
18  that there never was funding?
19      A   The process would be we would have to go back
20  through the General Assembly and the governor.
21      Q   Okay.  And as a State Board, would you make
22  those requests at the General Assembly and governor?
23          MR. BELINFANTE:  Object to the form.
24          You can answer.
25          THE WITNESS:  Are you asking me as an



1  individual or are you asking the board?  I was confused

2  by your question.

3      Q    BY MS. HAMILTON:  Technically either, but

4  primarily the board first.  I'm just trying to make sure

5  I understood your response when you were saying it would

6  have to go through the State Board or governor -- I'm

7  sorry, it would have to go through the General Assembly

8  or governor, and so I was trying to figure out how the

9  request would get to the General Assembly and governor.

10     A    It could be through the board, but more likely

11 it was the use of a telephone, is there any flexibility

12 on the General Assembly's or the governor's side?

13     Q    And when you say "use of the telephone," does

14 that mean an individual board member could reach out to

15 the General Assembly to make a request for supplemental

16 funds?

17     A    Yes.

18     Q    In your experience on the board, did you ever

19 use the phone, so to speak, to make a request of the

20 General Assembly -- I'm trying to use your words --

21 General Assembly or governor to request supplemental

22 funds?

23     A    Yes.

24     Q    What would be an example of -- of a time when

25 you did that?



1       A    We needed additional help in our GNETS program,

2   and so I went to Governor Deal to ask him to see if he

3   couldn't provide to us Clara Keith who worked with the

4   Department of Community Health, because she had expertise

5   in this area, and he agreed.

6       Q    When you approached Governor Deal to make that

7   request, did you have to follow any sort of formal

8   protocol?

9       A    Well, it was a decision of more people than me.

10      Q    Uh-huh.

11      A    And it would have been a consensus within the

12  board and a request of the -- the GNETS folks.  So that

13  would have been involved with the people within the

14  department.

15      Q    Okay.  And I -- I apologize if -- if I'm not

16  fully understanding that.  So before you approached

17  Governor Deal, had you had this discussion with the State

18  Board regarding the need to hire Clara Keith?

19      A    Within the committees, the answer is yes.

20      Q    Okay.  And what was the discussion that you had

21  surrounding the need for bringing on Clara Keith?

22      A    We needed more help, and she had the expertise

23  we needed.

24      Q    Why Clara Keith in particular?

25      A    Because she had the expertise that we needed.



1      Q   Did you -- had you worked with Clara Keith
2   before?
3      A   Yes.
4      Q   In what context did you work with Ms. Keith?
5      A   She used to be a staff member of the Department
6   of Education, and then she retired and went to work with
7   Community Health, and we just needed her continued
8   assistance.  And so lending her to the department was
9   something within the purview of the governor.
10     Q   Okay.  And when you say "lending her," I
11  apologize if I don't understand the process there.  Was
12  the goal for the Department of Education to hire
13  Ms. Keith?
14     A   No.
15     Q   Okay.  Was the goal for any State agency to
16  hire her, or you specifically wanted another department?
17     A   She already was in the Department of Community
18  Health.  We just needed to borrow her.
19     Q   Okay.  And I -- I guess also just to clarify, I
20  don't know if this is familiar to you, but when we
21  deposed Ms. Keith, she had mentioned that she was with
22  the Department of Behavioral Health and Development
23  Disabilities.
24     A   Thank you.  I'm using the wrong term.  That's
25  the word.



1    Q   Okay.  I just wanted to make sure we were

2   talking about the same person.  Thank you.

3        Okay.  So you wanted to borrow her from that

4   agency to assist with some issues related to GNETS; is

5   that correct?

6    A   Yes, ma'am.

7    Q   Okay.  And did -- to the extent that she

8   provided assistance to the Department of Education, did

9   you all have to fund -- provide any funding toward her

10  work in doing so?

11   A   Not that I recall.

12   Q   Okay.  So she was fully paid by the other

13  department?

14   A   They -- they lent her to us, that's correct.

15   Q   Okay.  Was anyone else involved in the decision

16  of bringing Clara Keith on board to assist with the GNETS

17  program?

18   A   I am sure many people were; several members of

19  the board, several members of the department, several

20  members of the governor's staff.

21   Q   Which ones were you direct -- in direct

22  communication with with regard to Ms. Keith's position?

23   A   Several members of the department, several

24  members of the State Board, several members of the

25  governor's staff.



1      Q   Do you remember which members of the
2   department?
3      A   I don't recall.
4      Q   Did you meet with Ms. Keith to discuss her
5   working with the Department of Education to assist with
6   GNETS --
7      A   Yes, ma'am.
8      Q   -- in this capacity?
9      A   Yes, ma'am.
10     Q   Okay.  What did you discuss with her when you
11  met with her?
12     A   We needed her help; would she help?
13     Q   What was her reaction?
14     A   She agreed.
15     Q   Okay.  Did you provide any more specifics to
16  her regarding what exactly her responsibilities would be?
17     A   That would be outside my area of expertise.
18     Q   So when you spoke to her, would you say that
19  your primary role was to bring her on board to assist
20  with GNETS?
21     A   Yes.  Not by myself, but the answer is yes.
22     Q   Okay.  Okay.  And, Mr. Winter, I just want to
23  check in.  How are you doing just in general?  Do you
24  need to take a break, or are you doing okay?
25     A   It's been an hour and a half, so it probably



1  wouldn't hurt for us to take a ten-minute break.

2        MS. HAMILTON:  All right.  Why don't we do that

3  and reconvene at 10:40 a.m.

4        THE VIDEOGRAPHER:  We are off the record at

5  10:31 a.m.

6        (The deposition was at recess from 10:31 a.m.

7  to 10:44 a.m.)

8        THE VIDEOGRAPHER:  We are back on the record at

9  10:44 a.m.

10     Q   BY MS. HAMILTON:  Mr. Winter, I want to circle

11 back to our discussion briefly about Clara Keith, just

12 with a few clarifying questions.  First, what position

13 did you understand Ms. Keith to hold at DBHDD when you

14 reached out to see if you could borrow her to work at

15 DOE?

16     A   I don't recall.

17     Q   How did you come to understand that Ms. Keith

18 was employed by that agency at the time?

19     A   Well, I had known Clara and worked for her when

20 she was an employee of DOE, so how I found out the other

21 piece, I'm -- I'm not real sure.  I'm sure it was not

22 formally but informally.

23     Q   Okay.  Who did you -- who, if anyone, did you

24 coordinate with at DBHDD in order to be able to borrow

25 her to assist with GNETS?



1      A   Never did.

2      Q   Okay.  But you never had to coordinate with

3   anyone at that agency in particular?

4      A   No, I did not.

5      Q   Okay.  Do you have any sense of how she split

6   her time between her work at DBHDD and the Department of

7   Education?

8      A   I'm fairly certain the majority of it was

9   working in GNETS.

10     Q   What particular expertise did Ms. Keith have

11  that prompted the request for her to assist with GNETS?

12     A   I'm real good at money; I'm not real good at

13  educational terms.  She had the faith of those involved,

14  and, you know, when she retired from the Department, we

15  felt that we needed her back to help with this, so that's

16  as generally -- general as I can get.

17     Q   Okay.  And did you have a sense of who she

18  would be working with when she did start assisting with

19  GNETS?

20     A   Nakeba Rollings (sic).

21     Q   And I know -- you said Nakeba.  There was a

22  Nakeba Rahming that ran the --

23     A   Rahming, right.

24     Q   Is that --

25         Okay.  Was there anyone else who you understood



1   that she would be -- that Clara Keith would be working

2   with?

3        A   Well, I'm -- I'm sure she worked with many

4   people out in the field, but the answer is no.  Remember

5   that I am money; I am not education.

6        Q   All right.  I wanted to turn to discussing the

7   various meetings that are held by the State Board, and we

8   were talking about the many meetings, in particular the

9   budget committee meetings.  Was that meeting open to the

10  public?

11       A   Yes, ma'am.

12       Q   As a budget committee, did you vote on any

13  agenda items like during the committee meetings?

14       A   No.

15       Q   Okay.  So is it accurate to say that any agenda

16  items that required a vote from the board had to be

17  addressed in the larger board meetings?

18       A   Yes, ma'am.

19       Q   Were minutes prepared after each meeting?

20           MR. BELINFANTE:  Object to the form.

21           You can answer.

22           THE WITNESS:  Minutes of?

23       Q   BY MS. HAMILTON:  From a procedural standpoint,

24  were written minutes prepared --

25           MR. BELINFANTE:  Form.



1      Q   BY MS. HAMILTON:  -- after each of the budget
2   meetings?
3      A   No, I don't recall.  We had an agenda of what
4   we would discuss, and we just discussed those items, and
5   I don't believe anything more was -- was written.
6      Q   How long did the budget committee meetings
7   typically last?
8      A   Typically, two hours.
9      Q   Earlier you also mentioned that the State Board
10   held committee as a whole meetings.  What are committee
11   as a whole meetings?
12      A   Where the State Board came back together and
13   reported their individual committees to the entire board.
14      Q   All right.  How are those meetings different
15   from the formal monthly meetings that we discussed
16   earlier?
17      A   Well, they were held on a different day in
18   order to help the board prepare for its formal board
19   agenda.
20      Q   Okay.  And is it accurate that all of the
21   board -- all of the board members participated in the
22   committee of the whole meetings?
23      A   No.  It would be all that showed up, so if
24   somebody didn't show up.  But everyone was invited.  No
25   one was excluded.



1        Q    Okay.  Were those meetings open to the public?

2        A    Yes.

3        Q    Was there agenda -- sorry, was there an agenda

4   for those meetings?

5        A    Yes, a basic one, but each of the committees

6   reported to the committee of the whole.

7        Q    Did the board ever vote on matters during the

8   committee of the whole meetings?

9        A    No.

10        Q    And when you say that the committees

11   reported -- reported back at these meetings, what -- what

12   did the, quote, reporting back look like?  Did they give

13   presentations?

14        A    Yes.  There was -- I'll speak to budget.  Okay?

15   We had -- we had our agenda that we had gone through as a

16   budget committee.  We brought that agenda and said, you

17   know, here's what we discussed.  Here are observations

18   that we have made, and these are the recommendations we

19   are probably going to make at the meeting.

20        Q    Were other members of the board allowed to ask

21   questions of the various committees during these

22   meetings?

23        A    Okay.  Again, I'm not sure I understand your

24   question.

25        Q    Sure.  Were -- so, for example, you were



1  talking about what the budget committee would present

2  during these meetings.  Did other board members not on

3  the budget committee ask questions?

4       A    So we are talking about at the committee of the

5  whole?

6       Q    Yes.

7       A    Okay.  That was my confusion.

8            Anyone in the room could ask questions.  That

9  was the whole purpose of it.

10      Q    You also mentioned earlier that there are

11  meetings that are named, quote, called, c-a-l-l-e-d,

12  board meetings.  What are called board meetings?

13      A    Well, they were listed on the document that you

14  had before us earlier, and that's something that needed

15  to be dealt with by the board and couldn't wait for their

16  monthly meeting.

17      Q    Okay.  Could a board meeting be called about

18  any topic?

19      A    I would assume so, but that would be an -- an

20  assumption.  That would be -- you know, it would be -- be

21  called because the chair and -- and the superintendent

22  felt that there was a need for a meeting.

23      Q    So did individual committees request that board

24  meeting be called outside of the normal committee meeting

25  structure -- I'm sorry, outside of the normal meeting



1   structure?

2           MR. BELINFANTE:  Object to the form.

3           You can answer.

4           THE WITNESS:  I would assume that if I felt

5   that there was a need, that I could go to the -- the

6   chair and the superintendent and request one.  I don't

7   recall ever having done that in 14 years.

8       Q   BY MS. HAMILTON:  Are the called board meetings

9   open to the public?

10      A   Yes and no.  Yes as to my items that are open

11  to the public generally, no if it was a matter dealing

12  with personnel.

13      Q   Were there any called meetings where the board

14  members voted on agenda items?

15      A   Yes.

16      Q   Okay.

17      A   But let's define the word agenda items.  When a

18  called board meeting was called, you knew what it was

19  about, so that would be the agenda item.

20      Q   Uh-huh.  Okay.  And were minutes prepared after

21  the called board meeting?

22      A   I am assuming so, but that was not my

23  responsibility.

24      Q   All right.  Are you familiar with the Georgia

25  Foundation for Public Education?



1        A    That it exists and not really anything more.

2        Q    Okay.  Did you ever attend any of their

3   meetings, the Georgia Foundation for Public Education

4   meetings?

5        A    No.

6        Q    Okay.  Earlier you also mentioned that the

7   State Board of Education had planning meetings; is that

8   correct?

9        A    Yes, which you have properly termed the

10  retreat.

11       Q    Okay.  When did those planning meetings or

12  retreats typically occur?

13       A    It depends.  I remember one or two being in

14  April.  I remember the majority of them being in

15  September or October.

16       Q    Okay.  Who participates in those meetings?

17       A    Well, the members of the State Board, the upper

18  members of the cabinet of the Department.

19       Q    Can any members of the public participate in

20  the planning meetings and retreats?

21       A    Yes, and often we did have visitors.

22       Q    Were there ever items that required board

23  members to vote during the -- during these retreats?

24       A    Okay, I am going to split hairs with you.

25  Earlier I already explained that if there was the need

1    for votes, we would have a meeting, so there was a

2    retreat, and then we would have a called meeting, the

3    called meeting having been publicized in advance in

4    accordance with State law.

5         So if you are going to merge the two or are you

6    going to recognize -- I am working very hard to keep them

7    separate -- they just happened at the same location.

8    Q    Okay.  That was actually a really helpful

9    clarification.  Thank you, Mr. Winter.

10        Who sets the agenda for the board retreats?

11   A    I'm sorry, you were garbled.

12   Q    Who sets the agenda for the board retreats?

13   A    The board chair would have the majority of

14   control over the agenda.  They would take input from the

15   members of the board and from the superintendent and his

16   cabinet.

17   Q    Did you -- sorry, did you attend the retreats

18   every year?

19   A    I believe we might -- there might have been one

20   year when we didn't have, but every year that we had

21   it -- had one, I was at it.

22   Q    Okay.  I am going to share a document on my

23   screen, and I would like for the court reporter to mark

24   this document as Plaintiff's Exhibit 604.

25        (Plaintiff's Exhibit 604 was marked for



 1  identification.)

 2      Q   BY MS. HAMILTON:  Mr. Winter, I am now showing

 3  you Plaintiff's Exhibit 604.  This is an October 21st,

 4  2016 press release about the October 2016 State Board

 5  retreat.  This document also has an attachment which has

 6  a copy of the agenda, and I do just want to note for the

 7  record that the Bates number on the first page is

 8  GA00053761.

 9          I'm going to give you control of the document

10  just to give you a brief moment to scroll through to see

11  if you recognize the document, and then you can let me

12  know if you are ready.

13      A   I recall the meeting.  I didn't remember the

14  details of the document, but I recall the meeting.

15      Q   Okay.  And did you attend the meeting?

16      A   Yes, ma'am.

17      Q   All right.  So looking here at page -- let's

18  see.  Looking here at the last page, page 5 of the

19  agenda, I note that there is mention of a presentation

20  here.  I think -- it looks like it was around 10:45.  It

21  says there was a presentation delivered by Nakeba

22  Rahming, the State GNETS director about the GNETS

23  program.  Do you see that here?

24      A   I do.

25      Q   Why would GNETS have been on the agenda?



1      A   We heard from many of the programs that the

2  State was involved in, and -- yeah, as you look at -- at

3  the five pages, you see reports from many of the cabinet

4  members informing the State Board.

5      Q   Was GNETS typically included as a topic during

6  the board retreat?

7      A   Typically, I can't answer that.  I don't

8  recall.

9      Q   Was it ever discussed at any board retreats

10  besides the one that we are looking at from October 2016?

11      A   I -- I don't recall.

12      Q   It says here that Ms. Rahming delivered this

13  presentation.  What did she discuss during the board

14  retreat about GNETS?

15      A   I don't recall.

16      Q   What was the overall purpose of the board

17  retreat?

18      A   To educate board members about what was going

19  on within the department and education in Georgia in a

20  setting that gave us more time to discuss as a group.

21      Q   I'm going to share another document, and I

22  would like for the court reporter to mark this next

23  document as Plaintiff's Exhibit 600 -- 605, or six zero

24  five.

25          (Plaintiff's Exhibit 605 was marked for



1   identification.)

2       Q   BY MS. HAMILTON:   Mr. Winter, I am now showing

3   you Plaintiff's Exhibit 605.   This is a May 22nd, 2018

4   cover e-mail with an attachment that you sent to Matt

5   Jones with the subject line "Orientation -- Forward:

6   Orientation Agenda.docx."   The Bates number of the first

7   page is GA03510889.

8           As before, I'm going to give you control.

9   Actually, you may already have control to scroll through

10  the document to see if you recognize it.

11      A   Okay.

12      Q   Do you recognize this document?

13      A   I recall it.   I had discussed --

14      Q   Okay.

15      A   -- with you earlier -- pardon me.   I had

16  discussed with you earlier that we had new board member

17  training, and I would head that up, and this is the

18  agenda for one of those.   And it's a training --

19      Q   Okay.

20      A   -- specifically for Matthew Krull who was

21  joining the board.

22      Q   How frequently did you hold these new member --

23  did the board hold these new member orientations?

24      A   Whenever a new board member came or any number

25  of them.   Up until my last two years on the board, the



1  superintendent decided that he felt that -- well, I can't

2  judge his -- his decision, but his decision was that the

3  department would no longer support new -- new board

4  member training sessions, and thus, they ceased

5  occurring.

6      Q    Okay.  Why did they make that decision to no

7  longer support the new member orientations?

8      A    You will need to ask the superintendent.

9      Q    Okay.  Were there any budget reasons that may

10 have influenced that decision to stop holding the

11 orientations?

12     A    You will need to ask the superintendent.

13     Q    Okay.  All right.  I want to return to the

14 cover e-mail, and it mentions that attached is the draft

15 agenda.  Did you prepare the attached draft agenda?

16     A    In working with others, the answer would be

17 yes.

18     Q    Okay.  So I want to scroll down to page 2 of

19 this agenda, and it looks like on -- on the agenda, it

20 said Tuesday, July 17th, 2018, at 2:00 p.m. there were a

21 number of presentations, one of them being a presentation

22 by Vickie Cleveland, program manager, about the GNETS

23 program.  Do you see that?

24     A    Yes.

25     Q    Okay.  Why would GNETS have been on the agenda



1  for the new member board orientation?

2      A   The purpose of each item on the agenda was to

3  give board members a basic understanding of the programs

4  that were going on within the state that they are going

5  to be hearing about so that they didn't walk into a room

6  but to hear a presentation over which they knew

7  absolutely nothing.

8      Q   Was GNETS a topic that was typically included

9  as a topic for new members during the orientation?

10         MR. BELINFANTE:  Sorry, I had an objection to

11  form.

12         But you can answer.

13         THE WITNESS:  I'm having difficulty with the

14  word "typically."

15     Q   BY MS. HAMILTON:  Sure.  Was GNETS ever

16  included on any other agendas for the new member board

17  orientations besides this one?

18     A   That's my problem.  I don't remember the

19  agendas of each.  When I was working to develop these

20  agendas, you know, I -- I pick the topics that I felt

21  were most interesting at the time.  And also to some

22  extent, that we had limitations on time and availability

23  of -- of people.

24     Q   Okay.  To the extent that GNETS was the -- on

25  the agenda for this July 2018 orientation, were there any



 1  particular topics that you had wanted Ms. Cleveland to
 2  cover about the GNETS program during that time?
 3       A   Well, in the 15 minutes that she would have
 4  had, she would have been discussing to Mr. Krull, we have
 5  this program.  This is what it is, and this is what it's
 6  for, and there wouldn't be really much time for anything
 7  more than that.
 8       Q   Did any other board members participate in the
 9  training besides the new member or members?
10       A   Yes.
11       Q   I'm sorry, did any new -- did any other board
12  members participate in the orientation besides the new
13  member or members?
14       A   Typically one or two would -- would be there.
15  They all knew it existed.  They all knew that they were
16  invited.  Normally they were the days just before our
17  board meetings, so it was convenient for some to come
18  join us a day early and go through this with us.  It was
19  also a great opportunity to meet this brand-new member.
20       Q   All right.  I am going to stop sharing my
21  screen, and I'm going to switch gears with the questions
22  that I have for you and just ask you some general
23  questions about the GNETS program.
24           When did you first learn about the GNETS
25  program?



1      A    I'm -- I'm assuming before 2016, but I don't

2    know, and I'm picking that up from the other documents

3    that you shared with me.

4      Q    You said you joined the board in 2006; is that

5    correct?

6      A    2005, I thought.

7      Q    Or 2005.  Okay.

8      A    Yeah, spring of 2005.

9      Q    Okay.  When you first joined the State Board,

10   were you aware of the GNETS program?

11     A    When I first joined the State Board, my period

12   of introduction took 15 minutes over a cup of coffee

13   before walking upstairs to having a board meeting, so I

14   would say before, the answer would be no.

15     Q    Okay.  So at least 2016 -- at least around 2016

16   you had learned about the GNETS program, correct?

17     A    Right.

18     Q    Okay.  What is your understanding of the

19   purpose of the GNETS program?

20     A    To provide an interim step for education of --

21   of children with special educational needs.  There were

22   various alternatives that were available, including

23   putting kids in special schools that, you know,

24   unfortunately, because they were a danger to themselves

25   or others or things like that.



1          So, you know, the idea was to have education

2    taking place on the children at the best spot to meet

3    their needs where you could also pull together the

4    staffing and -- and information that you need to help

5    that child.  So for some kids it could have been some

6    pull-out classes at their general school.

7          And then a next step might be or was a GNETS

8    center where kids from several schools were brought

9    together, where instead of having one child in the class

10   or two, you could have a group, and you can also have a

11   group of specialists that would meet with their needs.

12   And we had a lot of successes with this program, was my

13   understanding.

14       Q   Okay.  Which GNETS programs served the students

15   in the district that you represented?

16       A   Okay.  I will fumble the names, but I know that

17   Cherokee had probably one of the best in the state.

18   Whitfield had a good one.  I pick on those two because I

19   visited both of them several occasions.  There was some

20   mountain districts where you had like four districts that

21   came together that -- that did a GNETS together.  It

22   really depended a lot on numbers of students and the

23   ability to find the right local location.  I visited the

24   one in Blue Ridge and Fannin counties as well.  I'm not

25   sure if I visited Walker County.  But again, we had a

1   number of them.

2        Q   Okay.  Do you recall if any of the places that

3   you visited fell within the Northwest GNETS program,

4   Northwest Georgia GNETS program?

5        A   Well, that would to me be the Whitfield/City of

6   Dalton one.

7        Q   Okay.  And similarly, do you recall if any of

8   the programs that were served by your district fell

9   within the NorthStar GNETS program?

10       A   I believe that was Rome, so that would have

11   been Floyd, City of Rome, maybe one or two other

12   districts there.  That's the best I --

13       Q   And that fell within your purview?

14       A   Yes, that would be part of the 14th district.

15       Q   And I knew you mentioned that you had visited a

16   program in Cherokee -- I believe Cherokee County?

17       A   Yeah.

18       Q   Are you aware -- okay.  Are you aware that at

19   some point they stopped using the GNETS program?

20       A   I vaguely recall when they lost their director,

21   they stopped using the GNETS program.

22       Q   Okay.  Also various programs that were served

23   in your district, do you recall if some of them had

24   separate GNETS centers?

25       A   Yes.



1    Q   Okay.  And likewise, did any of the programs in

2  your district have GNETS school-based classrooms?

3    A   My recollection was that some did, even where

4  they were central that they could meet the child's needs

5  because it wasn't needed full-time at the school, and

6  then if children had greater needs, they would go to a

7  center.  That's my recollection.

8    Q   What were your impressions of the GNETS

9  programs that served students in your district?

10    A   Generally very good.  Again, the Cherokee

11  program, when it was in existence, was -- we had people

12  from all over the world coming to there.  They -- they

13  would only take four people from outside of the state of

14  Georgia per year to come work there for a year to learn

15  the educational techniques that they were using there.

16        The feedback from both students and faculty

17  in -- in the one in Whitfield/Dalton was very, very high.

18  The one in Ellijay/Blue Ridge, also was very high.  Those

19  are the ones I recall meeting with parents and educators

20  about the most.

21    Q   Were any issues or concerns ever brought to

22  your attention about the GNETS programs that served

23  students in your district?

24    A   One time a complaint that was brought to my

25  attention on a facility issue in Dalton/Whitfield, and

1  that was brought to their attention, as well, and was

2  remediated.

3      Q    How did that issue get brought to your

4  attention?

5      A    I'm not really sure.  I think a parent, but

6  that's merely a think as opposed to a know.

7      Q    And approximately when was that complaint

8  brought to your attention?

9      A    No, I can't help you there.

10     Q    Would it have been in the last five years?

11     A    Well, I haven't been on the board for the last

12  three, really the last four, so the answer would be no.

13  I would remember if it was in the last five.  It was

14  years ago.

15     Q    Okay.  Would it -- do you remember if it was in

16  the last five years of the time frame that you served on

17  the board?

18     A    That would be more realistic.

19     Q    Okay.  When that complaint was brought to your

20  attention, what steps, if any, did you take with that

21  information?

22     A    I called the two superintendents, and we had

23  lunch.  We met at the school.  We looked at the issue.

24  They agreed with me that the parent was right and we

25  needed to fix it, and they did.



1          Q   When you say "two superintendents," were these
2     the local school superintendents?
3          A   Yes, ma'am.
4          Q   Okay.  At any point did you have to raise this
5     issue with the State Board of Education?
6              MR. BELINFANTE:  Object to the form.
7              THE WITNESS:  Your question is too general for
8     me to answer.
9          Q   BY MS. HAMILTON:  Okay.  I guess to clarify,
10    like it sounds like you were able to meet with the State
11    superintendents to resolve the issues.  Was there
12    anything related to this complaint that you had to bring
13    to the attention of the State Board?
14         A   Okay.  Your -- your question confuses me again.
15    You are asking -- your statement, if I remember
16    correctly, was that I was able to resume it -- or resolve
17    it with the State superintendents.  I -- I didn't meet
18    with --
19         Q   The school superintendents.
20         A   The local superintendents that I met with,
21    okay.  And there was no reason to go any farther than
22    that.  There was a need that got communicated and
23    corrected.
24         Q   Okay.  And I apologize if you didn't hear me
25    correctly.  I was saying my understanding was that you



1   met with the local school superintendents.

2          A   Yes, ma'am.

3          Q   Okay.  And so what I hear you saying is that

4   because you resolved it with the local school

5   superintendents, you did not need to elevate it to the

6   State Board; is that correct?

7          A   In my opinion, that is correct.

8          Q   Okay.  Were any other issues brought to your

9   attention about the GNETS program?

10         A   Yes.

11         Q   What are other examples of the issues that were

12  brought to your attention in your district?

13         A   In my district, the answer is none.

14         Q   Okay.  All right.  So then now we can broaden

15  it.  What other issues were brought to your attention

16  about the GNETS program?

17         A   It was either six or eight of the centers, we

18  had had some complaints in terms of their physical

19  facilities, and the State Board took notice of that.  I

20  believe we had the State fire marshal check each of these

21  locations.  The report back was that they were

22  substandard.  With the backing of the board, the chair,

23  Mike Royal, had meetings with, I believe, all of them,

24  but certainly most of them, and shared with them the news

25  that they needed to do something very, very radical to



 1  improve those facilities.  And once their attention was
 2  gotten, they did that.
 3      Q   How were those complaints brought to the
 4  board's attention?
 5      A   I would assume, but that would be my only
 6  answer.  So I can't -- can't answer how it was.  It
 7  didn't come through me, and I was made aware of it, but
 8  it didn't come to the board from me.
 9      Q   And what was the board's role exactly in
10  responding to these complaints about the physical
11  facilities?
12          MR. BELINFANTE:  Object to the form.
13          You can answer.
14          THE WITNESS:  It was more by way of supporting
15  the staff and then sharing with people the consequences
16  of them not -- not working with the staff and fixing the
17  problems.
18      Q   BY MS. HAMILTON:  Did the State Board make any
19  recommendations pertaining to the closure of any of those
20  GNETS facilities?
21      A   The answer, in my -- I'm going to use my terms;
22  that we wouldn't fund GNETS programs in those facilities.
23  They needed different facilities.
24      Q   Was the State Board of Education involved in
25  issuing any notices of facility closures?



1        A    I can't speak to that.  I know that there

2    was -- you know, a notice of that to me would be formal.

3    All I know is that very strong, detailed conversations

4    took place with those centers, and all of them decided

5    that the better part of valor was to immediately correct

6    their problems.

7        Q    I'm going to share a document with you.

8             All right.  I'd like for the court reporter to

9    mark this next document as Plaintiff's Exhibit 606.

10            (Plaintiff's Exhibit 606 was marked for

11   identification.)

12       Q    BY MS. HAMILTON:  And Mr. Winter, I am now

13   showing you Plaintiff's Exhibit 606.  This is a May 11th,

14   2016 e-mail that you sent to Linda Myers copying Ted Beck

15   and Mike Royal with the subject line, "A summary of the

16   GNETS facilities assessment."  The Bates number of this

17   document is GA00279424.

18            This is the extent of the document, so I'm not

19   going to share my -- give over control of the mouse, but

20   everything on the screen is there.  If you want to take a

21   minute to look at it.  Do you see it?

22            MR. BELINFANTE:  I'm not seeing the document.

23            MS. HAMILTON:  Okay.  Let me try this again.

24   My apologies.

25            MR. BELINFANTE:  Okay.  Thank you.



1      Q   BY MS. HAMILTON:  Okay.  And just so you all

2   can see, that this is the extent of the document on this

3   one page.

4      A   Great.

5      Q   Mr. Winter, do you recognize this document?

6      A   No, but it makes perfect sense.  I mean, I'm --

7   I'm not disclaiming it.

8      Q   Okay.  First of all, I want to make sure I

9   understand who some of these people are.  Linda Myers,

10  who is Linda Myers?

11     A   She was Ted Beck's secretary.

12     Q   Okay.  And then who was Ted Beck?

13     A   Chief financial officer of the department.

14     Q   Okay.  And then Mike Royal, I believe you

15  mentioned that he was the State Board chair for some

16  period of time?

17     A   I believe he was chair in '16 and '17.

18     Q   Okay.  All right.  And in this e-mail, it says

19  here you were asking if Mike could highly summarize the

20  work of your team regarding the GNETS facilities.

21         I'm curious, the Mike that you are referring to

22  here, was this Mike Roland or Roland?

23     A   He's Mike Royal.

24     Q   Okay.  I'm just -- I'm -- I'm sorry.  I was

25  trying to figure out where you say Mike, were you asking



1    Mike --

2         A    Carbon copy.

3         Q    -- to summarize the work of the team here, or

4    were you referring to a different Mike?

5         A    Well, from -- from reading the document, I

6    believe I am referring to Mike Royal.

7         Q    Okay.  So would Mike Royal have had a team

8    working on the GNETS facilities?

9         A    I shared with you earlier that the problems

10   with the facilities were brought to the attention of the

11   board, and Mike Royal as chair had brought together a

12   group of people, some within the department, and I

13   believe the State fire marshal, to look at these very

14   quickly.  I had a report verbally that they had done that

15   work, and this letter was from me to Mike saying, hey,

16   summarize what you discovered.

17        Q    Okay.  How were you planning to use that

18   information?

19        A    I used that to educate myself.

20        Q    And just to make sure I understand, when you

21   say to educate yourself, what were you educating yourself

22   on?

23        A    What was going on at the GNET facilities.

24        Q    And I know we talked a moment ago about the

25   closure of the facilities.  Did you have any involvement



1  or take any action in connection with the facility

2  assessments?

3      A    Assessments, no.  That's outside my area of

4  expertise.

5      Q    Okay.  Did the State Board make any

6  recommendations or take any action with respect to the

7  facility assessments?

8           MR. BELINFANTE:  Object to the form.

9           You can answer.

10          THE WITNESS:  I believe that certainly the

11 issues were dealt with.  As I shared with you earlier,

12 this was brought to the attention of the various GNET

13 facilities management, administrators, especially the six

14 or eight -- and I, again, forget whether it was six or

15 eight -- that we had problems with that they needed to

16 have immediate correction or that action would be taken

17 for them to lose their funding.

18      Q    BY MS. HAMILTON:  I'm going to share another

19 document with you, and I would like for the court

20 reporter to mark this document as Plaintiff's Exhibit

21 607.

22          (Plaintiff's Exhibit 607 was marked for

23 identification.)

24      Q    BY MS. HAMILTON:  Mr. Winter, I am showing you

25 Plaintiff's Exhibit 607.  I am going to give you control



1  of this document.  Just take a moment to get familiar

2  with it.

3       A   I'm familiar with it.

4       Q   Okay.  Great.  And then just for the record,

5  this is a July 2016 e-mail chain between Larry Winter and

6  Clara Keith with the subject line, "RE:  GNETS Article,"

7  and the Bates number on the first page is GA01486139.

8          So, Mr. Winter, just I'm going to scroll back

9  up to the top for a moment.  It looks like the

10  original -- the initial e-mail here is from Clara Keith,

11  and just reading what she says here, it says, "Although

12  some of the specific details are incorrect, I believe the

13  district has the right attitude.  See article below."

14          So is it correct that Ms. Keith sent you an

15  article here via e-mail that's entitled "Coastal Academy

16  building closing, students to move to Risley Annex"?

17       A   Yes.

18       Q   And it appears, based on your response, you

19  read this article; is that correct?

20       A   Yes.

21       Q   What were your views on the closure of these

22  GNETS facilities?  Sorry, what were your views on the

23  closure of these GNETS facilities?

24       A   Okay.  Are we discussing the one GNET facility

25  here?



1    Q   Yes.

2    A   Okay.  I applauded it.  That was one of -- I

3  told you there were six or eight that were -- didn't meet

4  standard.  And, you know, in May this came to our

5  attention, you know, work occurred.  Meetings with the

6  local LEA people that they had a problem that they needed

7  to fix, and they took it seriously.

8        If I remember correctly, the humor out of this

9  one is the Risley Annex was a building they just rehabbed

10  to move all of their administrative people into, and it

11  was brand-new, and so they moved the students into the

12  brand-new facility, and the administrators went -- had to

13  go live in the subpar facilities that they had been

14  putting students in, but they got the message that was

15  not going to happen.

16    Q   And one last question about the e-mail chain

17  here.  You make a comment at the end of your e-mail

18  saying, "I agree with your assessment but am praying the

19  prophecy of the boards attorney is incorrect."

20        What did you mean here where you say you are

21  praying "the prophecy of the boards attorney is

22  incorrect"?

23    A   Okay.  Well, let's go down in the -- the

24  document.  I think that it's talking about their

25  attorney.



1     Q    Uh-huh.

2     A    I think your -- well...

3     Q    Yeah, and if you want, I can give you control

4  or I can scroll down.  I think there is some discussion

5  here in the middle of the page --

6     A    Yeah.

7     Q    -- or top of the page about the board -- the

8  school board's attorney.

9     A    I'm having trouble connecting the pieces

10  myself.  I don't know if Mann was their school board

11  attorney or what.

12     Q    Okay.  So just to make sure I understand, you

13  don't remember exactly what you were referencing --

14     A    No.

15     Q    -- in regard to that statement?

16     A    No, I don't.

17     Q    That's fine.

18         All right.  I am going to stop sharing, and I

19  know that we've discussed Clara Keith and her role quite

20  a bit.  When you had questions or concerns about the

21  GNETS program, were there any other people at the State

22  Department of Education who you would reach out to?

23     A    Nakeba.

24     Q    Okay.  And what was Nakeba's role again?

25     A    To me she was supervising GNETS, and Clara



 1  was -- they were a tag team, the two of them together.

 2        Q   And what mode of communication did you

 3  typically use to reach out to Nakeba?

 4        A   A phone.  I'm a phone person.

 5        Q   Okay.  Was there anyone else at the State DOE

 6  who you would reach out to if you had questions?

 7        A   The answer is yes, 20 or 30 people.  If I had a

 8  question, I'm -- I'm not a shy person.  I just pick up a

 9  phone and call people.

10        Q   Okay.  So when you say if there was a question

11  that you had about a particular issue, you would reach

12  out to whoever you thought had the answer to that

13  question or issue?

14        A   Yes.

15        Q   Did you ever reach out to Debbie Gay?

16            MR. BELINFANTE:  Object to form.

17            You can answer.

18            THE WITNESS:  I mean, I --

19        Q   BY MS. HAMILTON:  When you had questions about

20  the GNETS program?  Sorry, let me restate the question.

21            Did you ever reach out to Debbie Gay when you

22  had questions about the GNETS program?

23        A   I could have.  I don't recall.

24        Q   Okay.  Did you ever reach out to Matt Jones if

25  you had questions about the GNETS program?



1      A    I could have, but my first phone call would
2  have been to Clara until she retired or Nakeba until she
3  was disabled.
4      Q    Okay.  And what do you mean when you say when
5  she was disabled?
6      A    She became disabled and had to leave the employ
7  of the Department.
8      Q    Okay.
9      A    My understanding is she is still disabled.
10     Q    Okay.  And I apologize.  When you say
11 "disabled," I'm not sure what you are referring to.
12     A    She's not able to work.  She has a disability
13 that does not allow her to work.
14     Q    Okay.  Thank you for clarifying that.
15         Do you know when she stopped working for the
16 State Department of Education?
17     A    I don't recall the date.
18     Q    Okay.  And you said that that was Nakeba?
19     A    That was Nakeba, and I don't recall the date on
20 Clara Keith other than it was right after she got
21 married, for which I applauded.
22     Q    Okay.  All right.  I want to ask you about a
23 few documents.  Let's see.  Are you familiar with the
24 2010 GNETS audit?
25     A    I don't recall, so let's bring up the document



 1  so we can refresh our memories.

 2      Q   All right.  It sounds like a plan.  I am

 3  actually pulling that up right now as we speak.

 4          So the document that I am sharing was

 5  previously marked as Plaintiff's Exhibit 284.  At the

 6  outset, let me just note here that we used this

 7  previously during our depositions, not so much for the

 8  content of the cover e-mail, which I just note for the

 9  record was a communication between Debbie Gay and a

10  non-DOE person, and she's just noting, "I have attached

11  several documents."  But the attachments are what I

12  wanted to focus on here, one of which is the 2010

13  performance audit, and that is attachment three.

14          And this was the copy that was produced to us

15  by the State, so I apologize that we don't have a better

16  quality version of this, but let me make it smaller so

17  that you can see, and I will give you control just so

18  that you can skim to confirm if you are familiar with

19  this document.  The document itself, I don't know the

20  exact number of pages, but it's probably about 25, 30

21  pages or so.

22      A   Okay.  I'm -- I'm seeing the document.  I'm

23  reading the document.  Did I see it before?  I don't

24  know.  Is it likely I was given a copy of it?  Yes,

25  because it was from the Department of Audits.  And in my



 1  mind, that was an education matter, and to me that would

 2  be over the folks in the education committee.

 3      Q   Okay.  And I guess just to confirm, the

 4  document says that this audit report was issued in

 5  October of 2010.  You were -- you were on the board

 6  during that time period, correct?

 7      A   I was, yes.  I came on the board in '05.

 8      Q   Okay.  As a board member at the time, would you

 9  have had any role, if any, in addressing the concerns

10  raised in the audit?

11      A   To me --

12      Q   And I heard a moment ago you were saying, on

13  the budget committee your responsibilities were slightly

14  different from the other committees, but I am just

15  curious, in your capacity on the board, did you have any

16  responsibilities with regard to addressing the issues

17  raised in the audit?

18          MR. BELINFANTE:  Object to form.

19          THE WITNESS:  The -- the -- as I have said

20  earlier, to me this was an education matter and would be

21  being dealt with by the education committee at that time.

22      Q   BY MS. HAMILTON:  Okay.  I'm going to scroll

23  down a few pages here to the Table of Contents, and on

24  this first page of the Table of Contents there is a list

25  of findings and recommendations.  It basically is on this



1   one page here.

2          Were you familiar with any of the findings and

3   recommendations that were listed here?

4      A   You asked the question previously slightly

5   differently, did I -- did I receive a copy of this?

6   I'm -- I'm sure I did.  Did I read it?  I'm sure I did.

7   To me these were education issues, and I would be

8   counting on them and would be being educated by them.

9      Q   From your vantage point being a member of the

10  budget committee, would any of these issues here have

11  been relevant to your role directly?

12     A   Based purely on having received this document,

13  no, but obviously by 2016 it was on my radar, wasn't it?

14  Okay, and so from '10 to '16, at least my personal radar

15  was increasing, and I know it was during that period of

16  time that I was visiting some of these locations,

17  specifically visiting the one in Cherokee County.

18     Q   And there is one finding -- I did want to just

19  point out here this one near the bottom says, GA -- "The

20  State DOE needs to place more emphasis on program

21  management through the development of financial and

22  operational requirements for programs to follow."

23         Is that a finding that would have been brought

24  to your attention as a member of the budget committee?

25     A   Again, going back to the document, did I



1   receive a copy?  I'm sure I did.  Given the nature of

2   what's there, was I comfortable in my belief that that

3   was an education matter for them to be dealing with,

4   that's where I am.  Okay, if they felt there were things

5   that involved finance, that they weren't shy people

6   either, so there would have been cross-communication.

7        Q   And based on your recollection, you don't

8   recall them reaching out to the budget committee with

9   questions about --

10       A   Not --

11       Q   -- the findings?

12       A   Not in 2010.

13       Q   Okay.  All right.  And I'm going to show you

14  another document.  It is part of the same -- it's another

15  attachment in this same exhibit, which is Exhibit 284.

16  I'm going to move to attachment number two, which is here

17  on page 23.  And again, this has already been previously

18  marked as part of Exhibit 284.  The document attachment

19  that we're looking at here is titled "Georgia Network for

20  Educational and Therapeutic Support, Program Evaluation,

21  Executive Summary, January 2015."

22           Mr. Winter, I think you may still have control,

23  if you want to take a moment just to scroll through kind

24  of the beginning of this document.  I am mainly

25  interested in whether you recognize it.



1      A    Yes, I recall it.  I recall seeing it.

2      Q    Okay.  Let me scroll back up to the top

3  briefly.  All right, so on the first -- I guess page 2 of

4  the executive summary, it notes here at the top, it says,

5  "In October 2013, the Governor's Office of Planning and

6  Budget initiated a program evaluation on the Georgia

7  Network for Educational and Therapeutic Support Program

8  housed within the state's Department of Education."

9           Is it your understanding that the Governor's

10  Office of Planning and Budget created this program

11  evaluation document?

12      A    That's what it says.

13      Q    How did you become familiar with this document?

14      A    Obviously, I would have received a copy of it.

15  And if we go down into the findings, part of it was the

16  Department of Education needs to establish a dedicated

17  program manager, and that's where we worked together with

18  the governor to come up with Clara and Nakeba working

19  together.

20      Q    Okay.  Okay.  Are there any other findings -- I

21  believe kind of these next two pages, if we can just

22  scroll through, and if you can let me know if there are

23  any other findings that were relevant to your work on the

24  State Board.

25      A    The --



1        Q    The second one here, uh-huh.

2        A    The next one is looking at the facilities,

3   which we have seen, okay, in dealing with that.  And yes,

4   that dealt with funding and funding formula.  Again, that

5   would have, as well, so --

6        Q    And can we pause -- I just want to pause at the

7   third one.  So the first one was about the hiring of

8   basically Nakeba's position, which we have discussed.

9   The second one was about doing the needs assessment for

10  the facilities, which we have discussed.  The third one

11  here that you are referring to says, "The funding formula

12  for the program should be revised to account for

13  differences in programs (for example low wealth

14  districts) and to include resources for therapeutic

15  services provided by the program."

16            So I kind of want to break that down.  What

17  funding formula is being referenced here?

18       A    Well, first of all, I disagree with the

19  foundation in your question.  You made a statement that

20  item one dealt with Nakeba.  The answer was -- my

21  response is no.  The -- the --

22       Q    Okay.

23       A    That's where in addition to add Clara to

24  Nakeba.

25       Q    Okay.  All right.  So let's then go back to



1   that, because I apologize for misunderstanding what you

2   were saying.  So this first bullet point here, which

3   reads, "The Department of Education needs to establish a

4   dedicated state-funded program manager position for GNETS

5   to oversee, monitor and provide technical assistance for

6   the program."

7        A   We could quickly add that one, but we needed

8   more help, hence, going to the governor for Clara.

9        Q   Okay.  So your involvement was bringing Clara

10  Keith on board?

11       A   Was sharing with the governor that we needed

12  more resources, and by working with his team, they

13  agreed.

14       Q   Okay.  Was Clara the person being referenced

15  here as the dedicated state-funded program manager, or

16  was that someone else?

17       A   I think it was a manager.  It ended up being

18  two managers.

19       Q   Okay.  And if I am understanding you correctly,

20  you are saying those two managers were Clara Keith and

21  Nakeba Rahming; is that correct?

22       A   Yes, ma'am.

23       Q   All right.  Thank you for clarifying that.

24       A   And then the third item, yes, the funding was

25  dealt with and looked at.



1      Q    Okay.  What funding formula is being referenced
2  here?
3      A    The funding formula for children -- children
4  generally.  You know, there's -- children fit into
5  different classifications and receive funding based on
6  different classifications.
7      Q    Is that the QBE funding formula?
8      A    That's -- that's part of it.  Then you get down
9  to the very end with children with special needs and that
10  explodes --
11          MR. BELINFANTE:  Excuse me.
12          THE WITNESS:  Bless you.
13          MR. BELINFANTE:  Thank you.
14          THE WITNESS:  That explodes you a little bit.
15  It explodes a little bit.
16      Q    BY MS. HAMILTON:  I'm sorry, I didn't hear your
17  complete statement.
18      A    Okay.
19      Q    Can you please repeat that, Mr. Winter.
20      A    He takes you to a point, and then you get to
21  children with disabilities, and that part of the funding
22  formula explodes a little bit.  It becomes more detailed,
23  and I know we had discussions about that.
24      Q    Okay.  And when it's saying here that the
25  funding formula should be revised to account for



 1  differences in programs, including resources for

 2  therapeutic services provided by the program, what type

 3  of revisions were being considered?

 4       A    Well, I know that we provided more money for

 5  therapeutic as opposed to educational services.

 6       Q    And why was there a focus on providing more

 7  resources for therapeutic services?

 8       A    I assumed because they needed more therapeutic

 9  services.

10       Q    Okay.  All right.  I want to continue just

11  walking through each of these bullet points.  This next

12  one here says, "Local school systems should provide DOE

13  their funding portion of GNETS on an annual basis in

14  order to determine the actual cost of providing these

15  services."

16            Would you have had any role in addressing this

17  particular finding on the budget committee?

18            MR. BELINFANTE:  Object to the form.

19            You can answer.

20            THE WITNESS:  Addressing, no.  Receiving, yes.

21  I would have received it through either Clara or Nakeba.

22       Q    BY MS. HAMILTON:  All right.  Moving on to the

23  next bullet point.  As a member of the budget committee,

24  would you have had any role in addressing --

25       A    Addressing --



1       Q    -- addressing this bullet point?

2       A    Addressing --

3            MR. BELINFANTE:  Object to the form.

4            You can answer.

5            THE WITNESS:  Addressing, no.  Receiving

6    information, yes.

7       Q    BY MS. HAMILTON:  Okay.  And what type of

8    information would you have been receiving?

9       A    I'm going to pick on two as examples.  Cherokee

10   was the gold standard.  It was almost like that we had

11   put Clara down in Albany three days a week to help them

12   improve their program, which she did and they did, but it

13   was a program that was not what it needed to be.  And so

14   that was part that -- that Clara was able to do there, to

15   come to a more common mission and vision and program.  I

16   mean, that would be the poster child for why they needed

17   that help.

18      Q    I'm going to skip down to the bullet point here

19   that says, "The fiscal agent set-up for the GNETS program

20   should be revisited to determine if the current process

21   is the most effective way to administer funds provided to

22   the program."

23           Does this particular finding implicate any of

24   the work of the budget committee?

25           MR. BELINFANTE:  Object to form.



1           You can answer.

2           THE WITNESS:  Realize that when we brought

3      Nakeba and Clara in, we changed many things.  I would

4      believe that in revisiting how we dealt with the various,

5      I'm going to say LEAs, but they could be groups of LEAs.

6      And therefore, if it was a group of LEAs, it would be a

7      administrator, that that would be dealt with.  I know

8      that again we were looking, and certainly '16 -- '15,

9      '16, it was under a much stronger microscope.

10          Q   BY MS. HAMILTON:  All right.  Another finding I

11     want to ask you about is this one here that says, "Local

12     school systems are billing Medicaid for applicable

13     school-based medical services; however, systems do not

14     consistently bill the program each year."

15          Did the budget committee have any involvement

16     with how local school systems handled billing for

17     Medicaid?

18          A   I don't recall ever having done that.

19          Q   Okay.  And are there any other findings that

20     are listed here that were relevant to your work on the

21     State Board --

22          MR. BELINFANTE:  Object to form.

23          Q   BY MS. HAMILTON:  -- that we haven't already

24     discussed?

25          A   You know, we did talk about resources available



1   per geographic locations.  Some of our systems are very

2   small and within the system didn't have the ability to

3   meet the need.  So -- pardon me.  The -- so we had to

4   work with providing them money to transport kids to where

5   they could come together at a more common area where they

6   had enough numbers to effectively educate the children.

7   So I know we had to deal with that.

8       Q    When you served on the board, were concerns

9   ever brought to your attention about rural -- GNETS

10  programs in rural locations having difficulty accessing

11  any resources, specifically?

12          MR. BELINFANTE:  Object to the form.

13          You can answer.

14          THE WITNESS:  Only the fact that we needed to

15  provide additional funding where they had come up with a

16  good mechanism of bringing the kids together, but if you

17  are having to do -- transport a child to where they can

18  get to the services, you -- they needed additional

19  funding for that.

20      Q    BY MS. HAMILTON:  Okay.  Do you recall making

21  any other -- or I should say, do you recall taking any

22  other action with regard to the program evaluation when

23  you served on the State Board besides what we have

24  already discussed?

25          MR. BELINFANTE:  Object to form.



1              You can answer.

2              THE WITNESS:  Not beyond what we have

3    discussed.

4        Q    BY MS. HAMILTON:  All right.  Thank you.  All

5    right.  I'm going to transition to a new topic, but

6    before doing so, I want to check in just to see kind of

7    where we are at.  I know we wanted to take a lunch break

8    at some point.

9              Mr. Winter, is this a good time to take a lunch

10   break, or do you want to continue?

11       A    I think this would be a great time, and we can

12   meet at 12:45.

13       Q    All right.  That works for me.

14             MS. HAMILTON:  And Josh, does that work for

15   you?

16             MR. BELINFANTE:  It does.  Thank you.

17             THE VIDEOGRAPHER:  We are off the record --

18             MS. HAMILTON:  We will reconvene at 12:45.

19             THE VIDEOGRAPHER:  Sorry.  We are off the

20   record at 12:11 p.m.

21             (The deposition was at recess from 12:11 p.m.

22   to 12:48 p.m.)

23             THE VIDEOGRAPHER:  We are back on the record at

24   12:48 p.m.

25       Q    BY MS. HAMILTON:  Mr. Winter, I wanted to



1  circle up and ask you a few follow-up questions from

2  topics raised prior to the break, and then we will pick

3  back up with some new questions.

4         One of the things that we discussed earlier

5  were some of the programs that you visited in your

6  district, and you mentioned that you had visited the

7  Cherokee program.  When you visited the Cherokee program,

8  was it before or after Cherokee had ended its

9  relationship with the GNETS program?

10     A   Before.

11     Q   And you had also mentioned that Cherokee was

12  seen as the gold standard and people would come there to

13  learn techniques.  How did you know about the fact that

14  people were often coming to that program to learn

15  techniques?

16     A   By going and visiting it myself and meeting

17  people from Belgium and France that were there to learn,

18  and finding out what a coveted position it was to come

19  there.

20     Q   Do you know when Cherokee ended its

21  relationship with the GNETS program?

22     A   A specific date, no, I don't.

23     Q   Okay.  Do you know a general time frame when it

24  ended its relationship?

25     A   No.



1    Q   Okay.  Also you had mentioned that you had
2    received feedback from students saying that some of the
3    GNETS programs in your district were rated well.  Where
4    did you get that feedback -- or yeah, where did you get
5    access to that feedback?
6        A   If I said students, please forgive me.  I meant
7    parents.
8        Q   Okay.  All right.  So where did you get access
9    to the parent feedback that had rated those GNETS
10   programs fairly well?
11       A   Unfortunately, I'm rather well-known within my
12   community, so people finding me and knowing me is not a
13   very difficult thing to do.
14       Q   Would you often get feedback then just from
15   parents coming up to you or reaching out to you directly?
16       A   Yes.
17       Q   Did you ever administer surveys to parents to
18   get feedback?
19       A   No.
20       Q   And how long ago did you receive that parental
21   feedback about the -- about their views on the GNETS
22   programs?
23       A   I'm guessing '18, maybe '19.
24       Q   And just to be clear, when you say '18 or '19,
25   are you referring to 2018 and 2019?



1       A    Yes, ma'am.

2       Q    Okay.  Thank you.

3            Before the break we had also discussed the 2010

4   GNETS audit, and you had testified that it was not a

5   document that you remembered in detail or had spent much

6   time reviewing.  One finding that I wanted to circle back

7   to, though, was a finding that said that there wasn't

8   data verifying whether GNETS was cost-effective.  And I

9   am just curious from your role having served on the

10  budget committee, were you ever asked to examine whether

11  GNETS was a cost-effective program?

12           MR. BELINFANTE:  Object to the form.

13           You can answer.

14           THE WITNESS:  I can't recall when I was.

15      Q    BY MS. HAMILTON:  Okay.  And -- and I guess

16  maybe clarifying that a little bit more.  Let me break it

17  up into two questions.  In connection with the 2010 GNETS

18  audit, were you ever asked to verify whether GNETS was a

19  cost-effective program?

20      A    I don't recall being asked.

21      Q    Okay.  And then more generally, have -- when

22  you were on the budget committee, did the budget

23  committee ever examine whether GNETS was a cost-effective

24  program?

25           MR. BELINFANTE:  Object to the form.



1             You can answer.

2             THE WITNESS:  I don't recall us ever doing

3     that.  I think that our discussions were more along the

4     lines of, was it effectively meeting the needs of

5     students.

6         Q    BY MS. HAMILTON:  Okay.  What metrics were you

7     all using to determine whether the GNETS program was

8     effectively meeting the needs of students?

9         A    The almost --

10            MR. BELINFANTE:  Object to form.

11            You can answer.

12            THE WITNESS:  Pardon.  Thank you.

13            The almost monthly reports that I was getting

14    from Nakeba and her team, including Clara.

15        Q    BY MS. HAMILTON:  When you say "monthly

16    reports," what was -- what was the format of these

17    monthly reports?

18        A    I'm a verbal person, so they would have been

19    verbal.

20        Q    Okay.

21        A    Along the lines of, how are we doing, or us

22    passing each other in the hall or meeting with each other

23    if they had an item to come before budget, we would ask

24    those questions or I would ask those questions.

25        Q    Did you have formally scheduled meetings with



1  Nakeba and Clara?

2      A   Not beyond my -- being in the Department for

3  three days each month.

4      Q   And when you say not beyond you being in the

5  Department three days a month, when you were in the

6  Department, did you have more formal meetings with --

7  with them -- with -- sorry, with Nakeba and Clara?

8      A   Formal, no.

9      Q   And then a moment ago, it sounds like you said

10  you did have informal encounters with both of them; is

11  that correct?

12      A   Informal, yes.

13      Q   Okay.  Were there reoccurring questions that

14  you raised with Nakeba and Clara pertaining to the GNETS

15  program?

16      A   Yes, in terms of Albany.  That was one that I

17  would have talked to on numerous occasions with Clara.

18  The issue relative to facilities seemed to clear up

19  within a brief, say, three-, four-month period of time.

20      Q   And I apologize, I didn't hear the first -- you

21  said the issue pertaining to Albany?

22      A   The Albany GNETS program.

23      Q   Okay.  And can you please remind me what the

24  issue was with the Albany GNETS program?  Was this a

25  facility issue?



1        A    No.  This was a general effectiveness of the
2    program issue, as well as facilities.
3        Q    Okay.  And what was the -- and I apologize if
4    you had raised this earlier, but what was the general
5    concern with the program, with the Albany program?
6        A    Leadership, starting at the superintendent
7    there.
8        Q    Okay.  What particular issues pertaining to the
9    Albany program did you bring to the attention of Nakeba
10   and Clara?
11       A    It's the other way around.
12       Q    When you say it's the other way around, what do
13   you mean?
14       A    They brought them to me.
15       Q    Okay.  What were the issues that they brought
16   to your attention about the Albany program?
17       A    The impact of the lack of leadership on the
18   program.
19       Q    And can you please say more -- when you say
20   lack of leadership, what do you mean by "lack of
21   leadership"?
22       A    That that superintendent and the key members of
23   his team seem to be unplugged.
24       Q    I'm sorry, did you say unplugged?
25       A    Yes.



1    Q    Did they have any concerns about the GNETS

2    director for the GNETS program in the Albany area?

3        A    Might have.  I don't recall that.  What I do

4    recall was with the superintendent coming down, and

5    hence, Nakeba -- pardon me -- Clara there two, three days

6    most weeks for some period of time to get everybody's

7    attention and turn things around.

8        Q    What would have been the superintendent's role

9    with regard to the GNETS program -- I guess I should say

10   with regard to leadership impacting the GNETS program for

11   Albany?

12       A    Okay.  Well, leadership functions, everything

13   starts at the top, doesn't it?

14       Q    I'm -- I'm curious to hear that from you.

15       A    That would be my statement.

16       Q    Okay.  And so their concern was that the

17   superintendent wasn't providing leadership, and that

18   impacted the GNETS program?

19       A    Yes.

20       Q    Okay.  What was the general time frame for

21   these concerns that they brought to your attention about

22   the Albany program?

23       A    '15, '16, '17.  It was -- it was a brief but

24   strong period of time that Clara was there.  It was

25   recovered, my memory says, prior to her getting married



1  and resigning, so it was effective, but it was very

2  intense over more than a month or two.

3      Q   Okay.  When they -- when they brought these

4  concerns to your attention, what, if any, steps did you

5  then take as a State Board member?

6      A   Well, I shared with them that they had the

7  right to come to budget and thus the board to effect the

8  funding of Albany, and they could communicate that to

9  him.

10     Q   Okay.  Did Nakeba or Clara follow your

11 recommendation to bring this issue to the board?

12     A   They got his attention.  I wasn't in the room

13 when they talked.

14     Q   Do you know the name of the GNETS program that

15 served the Albany community?

16     A   I don't recall.

17     Q   How are the issues resolved with respect to the

18 Albany -- the program that was in Albany?

19     A   Evidently, they made sufficient changes within

20 the program to improve the quality that Nakeba and Clara

21 were both comfortable, and they were not easily fooled by

22 anybody.

23     Q   Okay.  I'm going to switch gears now and talk

24 to you about the GNETS strategic plan.  And I'm going --

25 are you familiar with the GNETS strategic plan?



1        A   Well, since I'm sure it's a document, it's

2   going to be best if you show it to me, and then I can

3   answer your question.

4        Q   I am just right now just generally curious if

5   you are familiar with a document that has been referred

6   to throughout the -- just in general, the name the GNETS

7   strategic plan?

8        A   Well, what would cause me to have my mind

9   refreshed would be seeing it.  Beyond that right now, my

10  answer is, I -- I don't recall.

11       Q   Okay.  So I wanted to ask you, there is a

12  communication where you are discussing the strategic

13  plan, and so I am trying to get at what you all are

14  talking about here.  I am sharing an e-mail that was

15  previously marked as Plaintiff's Exhibit 77.  This was an

16  e-mail that was sent on May 12th, 2016 from Larry Winter

17  to Matt Jones, Mike -- and Mike Royal and Clara Keith,

18  and then Debbie -- I apologize if I am not saying her

19  name correctly, but Debbie Caputo was copied this e-mail.

20  The subject line is "GNETS," and the Bates number is

21  GA00197127.

22          This is a one-page document, but Mr. Winter, I

23  am just going to give you a chance to read it.  Let me

24  know when you are ready.

25          A   I have read the document.



1    Q   Okay.  Mr. Winter, this is an e-mail that you

2   sent to Matt Jones, Clara Keith, and Mike Royal; is that

3   correct?

4    A   Yes.

5    Q   And I know we've talked about Clara Keith.

6   What was Matt Jones's position?

7    A   Chief of staff to the superintendent.

8    Q   Okay.  And I know we talked about Mike Royal.

9   What was Ms. Debbie Caputo's position?

10    A   She was the secretary of the State Board.

11    Q   Okay.  And then it looks like in the body of

12   the e-mail you were asking Ms. Caputo to forward the

13   e-mail to Debbie Gay and Nakeba Rahming.  What was Debbie

14   Gay's position?

15    A   She was involved in federal programs, I think,

16   or special ed, one or the other.

17    Q   Okay.  All right.  So in the next sentence that

18   follows here, it says, "First of all, thanks to all --

19   thanks to all of you for your work on the GNETS Strategic

20   Plan," and I -- I'm trying to get at what -- what entity

21   GNETS strategic plan?  What were you referencing here,

22   Mr. Winter?

23    A   Evidently the document that I read.

24    Q   Do you remember any details about the GNETS

25   strategic plan?



1        A    Specifically under that label, no, other than,

2    you know, we're -- we're looking in May of '16.

3    Obviously, people are concerned and looking for

4    improvements, so I would assume from the paragraph that

5    that strategic plan was working on how to improve the

6    GNETS program in Georgia.

7        Q    And you also say here in this next paragraph,

8    "By way of preparation for tomorrow's meeting," what

9    meeting would you have been referring to?

10       A    Well, I don't know what day of the week

11   May 12th is, so I -- you know, if this was a Tuesday,

12   then Wednesday would be -- we would be getting committee

13   meetings at the State Board.

14       Q    Okay.  And then it looks like here you then

15   proceed to ask a number of questions about the strategic

16   plan, and I'd like to walk through some of those

17   questions.

18            So this next sentence here, you say you -- you

19   note here that you understand the strategic plan to be

20   more of a "coaching tool rather than an instrument to

21   monitor compliance or effectiveness of program

22   practices," but then you proceed to ask whether there is

23   "a document that outlines the role of the DOE GNETS staff

24   in assuring quality and compliance with Georgia's plan at

25   the GNETS level?"

1          Do you see the language that I just read here,
2    Mr. Winter?
3          A    Yes.
4          Q    Why were you inquiring whether there was a
5    document that outlined the role of the DOE GNETS staff in
6    assuring quality and compliance with Georgia's plan at
7    the GNETS level?
8          A    I would assume it's because I have an inquiring
9    mind, and I'm used to dealing with bureaucracies, and so
10   I like to see things laid out.
11         Q    Did you have any concerns about the State DOE
12   having a mechanism for assuring quality and compliance
13   with Georgia's plans --
14         A    No.  Pardon me?
15         Q    I'm sorry, you can go ahead.
16         A    Not with Clara and Nakeba.
17         Q    And when you say "not with Clara and Nakeba,"
18   you are saying you didn't have any concerns that you were
19   raising with Clara and Nakeba --
20         A    No.
21         Q    -- about that issue?
22         A    They were the staff that was there, and I had
23   no concerns with them, but I was looking down the road.
24         Q    Okay.  So to make sure I understand, you were
25   trying to get a better sense beyond or besides Clara and



 1  Nakeba whether there is a document outlining the role of

 2  DOE GNETS staff --

 3       A   Yes.

 4       Q   -- pertaining to this?

 5           Okay.  What response, if any, did you get to

 6  your question?

 7       A   I don't recall.  I'm not somebody that gives up

 8  easily, so I would have expected that I receive answers

 9  with which I was satisfied.

10       Q   Okay.  Do you remember whether this document

11  existed?

12       A   What document?

13       Q   You were asking whether there was a document

14  that outlined the role of the DOE GNETS staff as noted

15  here.  Did such a document exist?

16       A   I don't know.  I don't recall.

17       Q   So you don't recall if you received a copy of

18  that document?

19       A   I don't recall.

20       Q   All right.  So moving further down -- let me

21  see if I can find the line here.  You ask, "Do we have an

22  outline of what a recommended treatment program at the

23  local level will look like?"

24           Why were you inquiring about whether there was

25  an outline of what a recommended treatment program at the



1  local level looked like?

2       A    Well, again, in the document that we reviewed

3  earlier from the Governor's Office, that was one of the

4  items that was discussed, and I know that one of my LEAs,

5  Rome, for example, did not have a -- a treatment program,

6  and so I was very interested in us making sure that that

7  was available across the state.  So that would have been

8  the question.  And, you know, do I recall the exact

9  answer?  Obviously not.

10      Q    Okay.  And what did you mean when you used the

11 term "recommended treatment program"?

12      A    Well, I'm referring in my mind back to the

13 governor's program, that when we are dealing with more

14 than merely the educational issues but some of the

15 educational and behavioral issues as well.

16      Q    Okay.  And also a little further down here, you

17 have another question where you ask if there is an

18 outcome-based monitoring plan for each location for DOE

19 to monitor the effectiveness of treatment at each GNETS

20 program.

21           Why were you inquiring about whether there was

22 an outcome-based monitoring plan for each GNETS location?

23      A    Because Cherokee had one, and I thought it was

24 a good idea to see them everywhere.

25      Q    And what exactly is an outcome-based monitoring



1  plan?

2      A   Well, from an accountant's perspective, it's

3  where you're measuring how successful are you with what

4  you are doing.

5      Q   And who would benefit from there being an

6  outcome-based monitoring plan for the GNETS program?

7      A   Well, again, as I'm an accountant, if you can't

8  measure it, you don't know what you've done.

9      Q   Would the State Board have had any reason to --

10  let me reframe that.

11      Would the State Board have had any reason to

12  want the GNETS programs to develop outcome-based

13  monitoring plans?

14      A   Per se, no.  I think we were interested -- oh,

15  no.  I won't speak for the board.  I will speak for

16  Larry.  I was interested to make sure that we had a

17  program that was effectively meeting the needs of

18  students.

19      Q   Did you learn whether or not the other program

20  did have outcome-based monitoring plans?

21      A   I learned that some did not, and I don't recall

22  at this point in time which ones did or did not.

23      Q   Okay.  You also ask here in the next question,

24  "Have we discussed the staffing of DOE's GNETS department

25  to deal with treatment?"



1          Why were you inquiring about whether there had

2    been discussions about the staffing of DOE GNETS

3    department to deal with treatment?

4        A   Based on the earlier question of mine of

5    dealing with treatment, if you want -- if you want

6    something to happen, you are gonna at times have to have

7    staffing.

8        Q   And were there particular staff who you felt

9    were necessary to have on staff to deal with treatment at

10   the GNETS programs?

11       A   I was asking questions to learn, not to

12   prescribe.

13       Q   Uh-huh.  Based on any feedback you may have

14   received, did you learn of any particular positions that

15   were -- that were important for the GNETS programs to

16   have available on staff to deal with treatment?

17       A   I don't recall.

18       Q   And then the last part of this paragraph here,

19   you note that, the strategic plan document refers to a

20   State-approved budget, and you asked for an example as to

21   what this budget document would look like.

22          Why were you inquiring about the budget

23   document referenced in the strategic plan?

24       A   Well, because the strategic plan referred to a

25   State-approved budget, and so what's it going to look



1  like?

2      Q   Uh-huh.  Did you understand the reference to

3  State-approved budget to be the -- like money that's

4  allotted to the GNETS program by the General Assembly and

5  Governor's Office or -- or something totally different?

6      A   To me, it would be a State-approved budget of

7  the GNETS approved by the State Department of Ed.  That's

8  my reading of that sentence today.

9      Q   Okay.  Did you receive an example of the budget

10 document that you were requesting at the time?

11     A   I don't recall.

12     Q   So in light of all of the questions that you

13 asked, did you use any of this information at the State

14 Board meeting?  I think you said that was going to be

15 happening -- I guess happening the next day?

16     A   I don't know what I received, you know, that

17 night before the next day.

18     Q   Uh-huh.  How -- I guess because you did ask a

19 number of questions, and I imagine that you have done

20 this in other contexts as well, how do you typically use

21 this information that's provided to you -- if it's

22 provided in advance, how do you use this information

23 during the State Board meeting?

24     A   It's a filter for what you hear.  The more

25 information you have, the better decisions you make.



1      Q   Do you recall whether the State Board provided
2  any feedback on the GNETS strategic plan?
3      A   I -- I don't recall, because normally when you
4  use the word "feedback," you are looking for a written
5  response, was there verbal feedback or things like mine.
6  You know, I can't speak for anybody else, but obviously I
7  was asking questions.
8      Q   Uh-huh.  Did the State Board take any other
9  action with respect to the strategic plan at the time?
10     A   On those days, I don't recall.  I would need to
11  go refresh my -- my memory.
12     Q   And then for you as an individual board member,
13  beyond asking these questions, did you provide any
14  feedback on the GNETS strategic plan?
15     A   Well, I'm hopeful that I got some answers to
16  the questions, but I don't recall.  Again, I'm a verbal
17  person by and large, and I'm not shy.
18     Q   And I guess this is just a question because I
19  don't know that you had any disagreement, but I'm just
20  curious from a process standpoint, if you had disagreed
21  with anything that was in the GNETS strategic plan, as a
22  board member, are there any steps that you can take to --
23  to share -- to share those concerns?
24     A   Certainly.  You can discuss it at our meetings.
25  Our meetings, especially back there in '16, were very



1  open and good discussions took place.  You -- you didn't

2  have any fear of not -- not answering questions or get --

3  getting questions answered.

4      Q   Okay.  And for a document like the strategic

5  plan, does the State DOE have to adopt the

6  recommendations made by the State Board?

7      A   Well, realize, first of all, we are talking

8  about a document that I have not seen because I don't

9  recall it, so I think that -- that question is too much

10  out there for me to respond to it.

11      Q   I'm going to move on to another document here

12  that I would like for the court reporter to mark as

13  Plaintiff's Exhibit 608.

14          (Plaintiff's Exhibit 608 was marked for

15  identification.)

16      Q   BY MS. HAMILTON:  Mr. Winter, I am now showing

17  you Plaintiff's Exhibit 608.  This is a July 23rd, 2016

18  e-mail from Larry Winter to Clara Keith with a subject

19  line, "GNETS student files memo."  The Bates number

20  here -- it's a one-page document.  The Bates number here

21  is GA00197256.

22          I will give you a moment to read that.  It

23  probably won't take you very long.

24      A   Okay.

25      Q   And then let me know when you are ready.



1      A    Ready.

2      Q    Okay.  So basically this e-mail only -- as I

3   said, the subject line says "GNETS student files memo,"

4   and the one sentence here that you wrote to Ms. Keith

5   says, "I just received and read a copy of the memo and

6   was interested in your take."

7           Do you know what a GNETS student files memo,

8   like what -- what document that is?

9      A    No.

10     Q    Do you know what memo you are referring to here

11  in this e-mail?

12     A    No.  Obviously, I was sent a memo.  I read it.

13  Clara had a copy of it, and I asked for her opinion on

14  what was in it.  Beyond that, I don't know.

15     Q    And I know a lot of the topics that you said

16  that you handled focused more on budget.  Do you know

17  just generally why you might have received a copy of a

18  memo pertaining to student files?

19     A    No.

20     Q    Would that surprise you that you had reviewed a

21  memo pertaining to student files looking back at this

22  e-mail?

23     A    Very little in State government surprises me.

24     Q    Okay.  So how would reviewing a memo on student

25  files relate to your -- your particular work on the



1  board?

2      A   I have no idea because I don't know what's in

3  the memo that you and I are discussing.

4      Q   And I guess relatedly, to the extent that you

5  received a memo -- it's not attached to this e-mail, so I

6  don't have the memo myself -- why would you have reached

7  out to Clara Keith to get her take on the memo?

8      A   If it dealt with GNETS, she was my go-to

9  person, she and Nakeba.

10     Q   Okay.  All right.  I am going to share another

11 document.

12         MS. HAMILTON:  All right.  So I'd like for the

13 court reporter to mark this next document as Plaintiff's

14 Exhibit 609.

15         (Plaintiff's Exhibit 609 was marked for

16 identification.)

17     Q   BY MS. HAMILTON:  Mr. Winter, I am now showing

18 you Plaintiff's Exhibit 609.  This is an e-mail chain

19 that also has an attachment from the time period of

20 March to April 2017.  The subject line says, "Forward:

21 Georgia System for Special Needs Students Fails to

22 Provide Equal Education - The Atlantic."  And the Bates

23 number for the first page of this document is GA00198610.

24         I'm going to give you control since this is a

25 few pages here, and let me know when you've had a chance



 1   to -- to scroll through.

 2        A   Okay.

 3        Q   Okay.  So I wanted to start at the bottom of

 4   this e-mail chain with the initial e-mail, and this looks

 5   like an e-mail from Scott Johnson to several individuals

 6   who appear to be on the State Board.

 7            Who is Scott Johnson?

 8        A   He's a member of the State Board.

 9        Q   Okay.  And is it accurate that the individuals

10   listed here on the "to" line, that all of these

11   individuals are also State Board members?

12        A   Correct.

13        Q   Okay.  So in this original e-mail there is an

14   article link.  Are you familiar with the article that's

15   referenced here?

16        A   Not as we sit here today.  Obviously, I

17   received it.  Obviously, I read it.

18        Q   And do you see here where the article link is

19   for theatlantic.com, and it has here, like the title of

20   the article being, "The Separate, Unequal Education of

21   Students With Special Needs 2017"?

22        A   I see that on the page.

23        Q   Okay.  I'd like to show another document.

24            MS. HAMILTON:  All right.  So this next

25   document that I have up, I'd like for the court reporter



1   to mark as Plaintiff's Exhibit 610.

2          (Plaintiff's Exhibit 610 was marked for

3   identification.)

4      Q   BY MS. HAMILTON:  And Mr. Winter, I am showing

5   you Plaintiff's Exhibit 610.  As you can see here, here

6   is an e-mail -- I'm sorry, an article link that is very

7   similar to the article link that we were just looking at

8   a moment ago, and the top of the page -- this is from The

9   Atlantic, and the title is, "The Separate, Unequal

10  Education of Students With Special Needs" from

11  March 2017.

12         Do you recognize this article?  And I can give

13  you control --

14     A   I don't --

15     Q   -- if you want to scroll through.

16     A   -- recognize it, no.

17         Obviously, I read it or I wouldn't have

18  responded to it.

19     Q   Okay.  All right.  So if you read it,

20  Mr. Winter, what was the article about?

21     A   I'm reading it now again.

22     Q   Okay.  Let me know when you are ready.

23         MS. HAMILTON:  And just for the court reporter,

24  I meant to note that the first page of the document is

25  Bates stamped US0003633.  It was a document produced by



 1  the United States in response to the State's request for

 2  production of documents.

 3          THE WITNESS:  Okay.  I've reread the article.

 4      Q   BY MS. HAMILTON:  Okay.  And so I guess I'm

 5  just curious at a high level, what -- what is this

 6  article about?

 7      A   Well, it's obviously a -- a parent's crying out

 8  for their child.

 9      Q   And in reading the article then and now, what

10  is your understanding of like what the article is saying

11  about the GNETS program?

12      A   Well, first of all, it's focused on this one

13  child.  We're not in any way diminishing what the parents

14  are saying, but my questions always then are, okay, what

15  are the other stories that are not in the article?  Hence

16  my memo to -- to Clara to gain more information.

17      Q   Okay.  All right.  And I want to return back to

18  that e-mail that we were discussing a moment ago, which

19  would have been Exhibit 609.  So right before we went to

20  the article, we were discussing that Scott Johnson had

21  sent a link to the article to various board members.

22  This next e-mail -- and I believe this is what you were

23  just referring to, Mr. Winter, is an e-mail from you to

24  Ms. Keith.  And if I am reading this correctly, you say

25  here, "After you read it (you probably have), let's



```
 1   talk."
 2           Am I reading that correctly?
 3       A   Yes.
 4       Q   And were you referring to The Atlantic article
 5   as well?
 6       A   Since it's part of that chain, the answer is
 7   yes.
 8       Q   Okay.  So then Ms. Keith responds to your
 9   e-mail, as we continue to go through the e-mail chain,
10   and she copies Nakeba Rahming and she writes,
11   "Mr. Winter, I think the attached summary provides an
12   update on some of the progress made in GNETS.  Nakeba and
13   I" will try -- "and I have tried to provide some details
14   on the key issues.  Let us know if you have any
15   questions."
16           Do you see this here in the middle of the page?
17       A   I do.
18       Q   Okay.  Great.  So why did you reach out to
19   Ms. Keith about the article?
20       A   Well, when I receive information that I need to
21   know more about, I reach out to people.  We have already
22   discussed that.  She and Nakeba are the two people that I
23   would reach out in terms of GNETS, and so that's why I
24   went to them.
25       Q   And when Ms. Keith says here that she prepared
```



1  an attached summary, did you ask her to prepare a

2  summary?

3      A   No.

4      Q   So let's finish going through this e-mail chain

5  here.  So this last e-mail is from you to, it appears, a

6  number of the board members with Clara Keith and Nakeba

7  copied, and the language here says, "To all.  I felt a

8  response and update to The Atlantic article was

9  appropriate and asked Clara and Nakeba to do so."

10         Do you see that?

11     A   I do.

12     Q   Okay.  So based on what you have here, you did

13  ask Clara and Nakeba to draft a response, an update; is

14  that correct?

15     A   Okay.  The answer is yes.  However, I think

16  we're missing an important sentence that precedes that,

17  okay?  And that is the sentence, "Mr. Winter" -- second

18  sentence, "Nakeba and I tried to provide some details."

19  To me, that indicates that perhaps the writer of the

20  article was not willing initially to accept additional

21  information.  That -- anyway, so that's how I am reading

22  it.

23         So my response, again, reading it today, is, go

24  back to them and -- and give this response.

25     Q   Okay.  And that actually was going to be a



1  question I wanted to ask you.  When you say here you felt

2  a response and update to the article was appropriate, who

3  was the target audience -- or, I guess, what was the

4  target audience that you envisioned needed the response

5  and update?

6      A   The people who wrote The Atlantic article to

7  see if they would do a follow-up with the information

8  from the Department.

9      Q   So if we turn to the attachment, so this was a

10 cover e-mail, and then there is an attachment to the

11 cover e-mail, and there is a one-page document that

12 follows.  Mr. Winter, is this the type of response that

13 you were envisioning could be provided to the individuals

14 who wrote the article?

15     A   Let me read it first.

16     Q   Okay.  And let me know if you are not able to

17 manipulate the page.  Let me know and I can -- there you

18 go.

19     A   Okay.

20     Q   Circling back to the question I asked a moment

21 ago, the -- who was the target audience for this

22 particular response and update?

23     A   Well, in -- in my mind or in Clara's?  I can't

24 speak for her.

25     Q   I guess starting with you.



1    A    Okay.  In my mind --

2    Q    Who did you envision it being?

3    A    In my mind, this is a critique both positive

4  and negative about The Atlantic article, and she brings

5  up some points about things that are being done.  And so

6  that's good information for me, and at the same time

7  there are items that were not in The Atlantic article,

8  and I think that would be a good thing for that reporter

9  to understand as well.

10   Q    Okay.  So it sounds like from what you are

11 saying, there actually could have been dual -- multiple

12 purposes for this particular document?

13   A    That's my take from reading it.

14   Q    Okay.  All right.  Well, let's look at the

15 substance of this document, and it opens by noting that

16 the article raises three key points:  long-term placement

17 of students, the quality of classroom instruction, and

18 providing appropriate therapeutic services.

19        Do you see that?

20   A    Yes.

21   Q    And then it goes on to state that, in addition

22 to addressing the three key points mentioned in the

23 article, the GA DOE project management plan also

24 addresses program administration, monitoring facilities

25 and funding, which all align with the GNETS strategic



1    plan.

2          Do you see that as well?

3    A    I do.

4    Q    Okay.  So just to make sure we are on the same

5    page, we discussed the GNETS strategic plan briefly

6    earlier; is that correct?

7    A    Yes.

8    Q    Okay.  But there's reference here to a GaD --

9    to a GaDOE project management plan.  What is the GaDOE

10   project management plan referenced here?

11   A    I don't recall without seeing it.

12   Q    Okay.  And I don't believe that that was copied

13   to this document.  Do you remember if you received a copy

14   of the project management plan?

15   A    You are very kind in believing that I

16   remembered every one of the 500 documents I received

17   every month for 14 years.  That's why I have to refresh

18   my memory by seeing them again.

19   Q    That's understandable.

20          So you don't remember who would have created

21   the documents?

22   A    No.  I mean, I don't recall.  The people that

23   were in charge of the project were Nakeba and Clara.

24   Q    And here it says that the project management

25   plan was intended to align with the GNETS strategic plan.



1    Do you remember whether that is consistent with anything

2    you remember about the project management plan?

3        A    No.  Again, looking at -- I'm going to need to

4    see the document to be able to recall the document.  I

5    will state that the work of Clara and Nakeba was always

6    very good.  They did not do insufficient job work.

7        Q    All right.  Well, continuing to work down the

8    document that we are looking at, as noted, there were

9    three key points that were discussed here; the first

10   pertained to the long-term placement of students.

11            What was the issue that the State DOE was

12   trying to address?  And again, I'm just going off of

13   what's here on the page.  What was the issue that the

14   State DOE was trying to address pertaining to long-term

15   placement of students in GNETS?

16            MR. BELINFANTE:  Object to form.

17            THE WITNESS:  Okay, you lost me in the

18   question.  Please repeat it.

19        Q    BY MS. HAMILTON:  Sure.  So this document that

20   was provided to you by Clara notes that there are three

21   key points that are being summarized, and it's saying

22   that the information -- let me show you here.  "The

23   information below provides a brief update on the progress

24   of the article's key point."

25            So one of the key points that was flagged was



 1  long-term placement of students, and I'm trying to better

 2  understand, what was the issue that the State DOE was

 3  trying to address pertaining to long-term placement of

 4  students in GNETS?

 5       A   You are saying that DOE or the State Board?

 6       Q   The DOE.

 7       A   Okay.  Well, taking the words at face value,

 8  you know, long-term placement is something that need --

 9  needed to be evidently looked at and that this proposed

10  rule is going to be dealing with that.

11       Q   As a board member, were you aware of any

12  concerns regarding the length of placement of GNETS

13  students beyond the information that's provided here?

14       A   To some extent in updates that we had been

15  receiving beginning in '16 and '17.

16       Q   What were those concerns?

17       A   Again, a student being there too long or that

18  not sufficient progress was being made.  Sometimes it

19  could be because of issues within the child's life and

20  environment, and sometimes it could be ineffectiveness on

21  the part of the people delivering services.

22       Q   Okay.  And I know here it says the State DOE is

23  addressing this issue through the proposed GNETS rule.

24  As a board member, was it your understanding that

25  provisions of the GNETS rule would address the issue of



 1  long-term placement of students?

 2      A   Clara is saying that in the memo.  I don't

 3  recall beyond that.

 4      Q   So based on your independent knowledge as a

 5  board member, did you have any understanding that the

 6  provisions of the GNETS rule would have addressed the

 7  issue of long-term placement?

 8      A   I --

 9          MR. BELINFANTE:  Object to form.

10          THE WITNESS:  I would need to see the proposed

11  rule.  I would be shocked if Clara told me that something

12  was included that -- that was not.

13      Q   BY MS. HAMILTON:  Okay.  And just based on your

14  experience as a board member, did you feel that any of

15  these proposed solutions listed here would be effective

16  in addressing the issue of long-term placement of GNETS

17  students?

18          MR. BELINFANTE:  Object to form.

19          THE WITNESS:  Okay.  Realize again, my area of

20  expertise is accounting, finance and so on.  Everybody

21  worked real hard to help educate me, but it was outside

22  my areas of expertise.  Was I interested because I'm a

23  board member and a human being and one could say I had

24  two special ed kids for at least a period of time, yes.

25  But were these my areas of expertise, no.



1    Q   BY MS. HAMILTON:  That's understandable.  And I

2  guess, Mr. Winter, just to make sure I understand just

3  how the State Board operates, I know you served on the

4  budget committee.  When you all had your formal monthly

5  meetings, did you only vote on budget-related topics?

6    A   No.  That's the purpose of the committee of the

7  whole, is for the other committees to educate us.  But in

8  any legislative process, you have to rely on your

9  colleagues unless, you know, you -- you doubt the

10  information that they are providing to you.

11    Q   So then at the formal meetings, you

12  participated in voting on -- on all of the topics that

13  were presented to the board; is that correct?

14    A   Unless the minutes were called that I chose not

15  to.

16    Q   And how frequently did you choose not to vote

17  on particular items presented to the board?

18    A   Not very often.

19    Q   Okay.  What would be the circumstances under

20  which you would have opted to not vote on a particular

21  board item?

22    A   That I felt that I had a conflict or that I

23  didn't have sufficient information to vote.

24    Q   All right.  I want to move on to the next key

25  point that was noted here in this document pertaining to



 1  quality of classroom instruction.

 2          So again, Ms. Keith presented all of this

 3  information in providing an update about what the -- what

 4  the State DOE was doing to address the concerns that were

 5  raised.  Were you aware of any of these concerns

 6  regarding the quality of instruction in the GNETS

 7  program?

 8      A   From time to time I would hear individual

 9  little pieces, and the two that I had heard from were

10  Albany and Valdosta.

11      Q   And I know when we talked earlier about Albany,

12  you had flagged that there were concerns about the

13  leadership impacting the GNETS program in Albany.  What

14  were the concerns that were raised pertaining to the

15  quality of classroom instruction?

16      A   Just that.

17      Q   And when you say "just that," what are you

18  referring to?

19      A   Quality of classroom instruction being affected

20  by all that preceded it.

21      Q   And I apologize, I -- I don't understand the

22  answer.  You are saying all that preceded?

23      A   If your leadership pyramid isn't working, how

24  do you really expect effectiveness of the people doing

25  the work?



1    Q    And then you also mentioned Valdosta having

2  similar issues, but I -- I don't want to put words in

3  your mouth there.  What were the instructional issues

4  that were brought to your attention?

5    A    That they had instructional issues based on a

6  conversation that again Clara and Nakeba had with them.

7  They changed out their directors and turned the program

8  around very quickly.

9    Q    Okay.

10    A    And remember, eventually, the folks in Albany

11  turned it around, too.

12    Q    Okay.  And similar to the question I asked with

13  the other item above, based on your experience as a board

14  member, are there any particular proposed solutions here

15  that you considered effective in addressing quality as an

16  instruction issue?

17    A    By and large that would be outside my area of

18  expertise.  We had 12 people that understood education

19  very well and one loan accountant.  Ultimately, we got 2

20  accountants and 11 education people.

21    Q    And who was that person?

22    A    For a while it was somebody from a utility and

23  before her somebody from Home Depot.

24    Q    And they were serving as board members?

25    A    Yes.



1    Q    Okay.  And then this last point here, it says

2  appropriate therapeutic services.  And, you know, again,

3  similar to the questions that I asked with regard to the

4  other key points here, had any concerns been brought to

5  your attention regarding the appropriateness of GNETS

6  therapeutic services --

7         MR. BELINFANTE:  Object to form.

8    Q    BY MS. HAMILTON:  -- while you were a board

9  member?

10    A    Well, the one that I shared with you was the

11  fact that Rome did not have any therapeutic services in

12  theirs.

13    Q    If you can remind me, how did that issue get

14  resolved with the GNETS program in Rome?

15    A    I don't recall.  I know a lot of work was being

16  done on PBIS and so on across the state, and but as to

17  Rome's outcome, I don't recall.

18    Q    Okay.  And again, similar to the questions that

19  I asked you for the other key points, based on your

20  experience as a board member, are any of the proposed --

21  let me scroll the page up.  Are any of the proposed

22  solutions listed here -- did you consider any of the

23  proposed solutions here to be effective in addressing the

24  appropriateness of therapeutic services?

25    A    Again, these are outside my area of expertise,



1   so I would have relied on those whose area it was.

2        Q   Okay.  I'm going to stop sharing now.

3            All right.  And I -- I know in that last

4   document there were a few references to a document called

5   a GNETS rule, which we will look at momentarily, but I

6   have a more general question for you, which is, what the

7   State Board's role when the State DOE seeks to revise --

8   sorry.  What is the State Board's role when the State DOE

9   seeks to adopt a new rule?

10       A   It would go to the State.

11           MR. BELINFANTE:  Object to form.

12           THE WITNESS:  It would go to the rules and

13  education committee, and they would vet to the extent

14  they felt appropriate and bring it for a vote based on

15  the rules that affected that particular rule.

16       Q   BY MS. HAMILTON:  Is the process similar to

17  what you just described when the State DOE seeks to

18  revise a rule?

19       A   Yes, ma'am.

20       Q   I'm going to -- all right.  I'm going to share

21  my screen, and I'd like for the court reporter to note

22  that this document was previously marked as Plaintiff's

23  Exhibit 82.  This is 160-4-7-.15, which was the GNETS

24  rule.  And I scrolled to the end here.  It says that it

25  was adopted June 15th, 2017, effective July 5th, 2017,



 1  and the Bates number -- or actually, I take that back.

 2  This was just a copy of the GNETS rule that's been

 3  previously entered.

 4          Mr. Winter, I'm going to give you control, if

 5  you need to take a moment to look at the document, and

 6  then let me know when you are ready.

 7      A   Okay.  Let's start.

 8      Q   All right.  And this is actually just a really

 9  quick clarifying question.  When SEA is referenced here,

10  do you know what SEA stands for?

11      A   State educational agency.

12      Q   Is that the same thing as the State DOE or is

13  that something different?

14      A   To me they would be the same.

15      Q   Okay.  And it's not the State Board; is that

16  correct?

17      A   That is correct.

18      Q   Okay.  Actually, here we go.  Actually, let

19  me -- actually, I apologize.  Let me go back, because I'm

20  looking at this definition here.  And so there's a

21  definition here for State education agency.  Do you see

22  that here?

23      A   I do.

24      Q   Okay.  And then it says, the term used in

25  federal laws and regulations for the State Education



1  Authority, which in Georgia is the Georgia State Board of

2  Education, SBOE.

3          And so based on this definition --

4      A   It would be the State Board based on that

5  definition.

6      Q   Okay.  Thank you.  I -- I missed that earlier.

7          Okay.  You were on the State Board when the

8  State DOE revised the GNETS rule in 2017; is that

9  correct?

10     A   That is correct.

11     Q   And what was the purpose of the revisions that

12 were made to the GNETS rule?

13     A   Well, obviously, I think it reaches back to

14 2015 with the report from the governor, is, we needed to

15 deal with these opportunities for our students and the --

16 one of the results was a new rule.

17     Q   All right.  I'm about to share another document

18 on my screen.  All right.  And I'm going to show you a

19 few documents, Mr. Winter, just to get a better sense of

20 what your role was in the process.

21         This document that I am sharing now, I'd like

22 for the court reporter to mark as Plaintiff's Exhibit

23 611.

24         (Plaintiff's Exhibit 611 was marked for

25 identification.)



1      Q    BY MS. HAMILTON:  And, Mr. Winter, I am now

2   showing you Plaintiff's Exhibit 611.  This is a May 11th,

3   2016 e-mail chain between you and Garry McGiboney with a

4   subject line, "RE: GNETS."  The Bates number of the first

5   page is GA00510340.

6           I will give you a moment to look at the

7   document, and you can let me know when you are ready.

8      A    Okay.  I've read it.

9      Q    Okay.  So starting with the original e-mail

10  here at the bottom, let me see, you appear to be

11  asking -- well, you appear to be saying that you are

12  unable to locate a copy of the proposed rule and wondered

13  if it could be forwarded to you.

14          Why would you have wanted to see the proposed

15  rule?

16     A    Why not?

17     Q    Would it have been -- was it common for you to

18  review copies of the proposed rules before they were

19  presented in the committee -- well, I don't think this

20  one here -- it wasn't clear if it was presented yet.  But

21  would it be -- let me start over.

22          Was it common for you to receive copies of

23  drafts of the proposed rules?

24     A    Yes.  It was common for all board members to

25  get copies.



1      Q    Okay.  And it looks here as though Garry

2   McGiboney responds and is basically saying the rule was

3   still a work in progress.  Who is Garry McGiboney?

4      A    He was an assistant superintendent who was the

5   liaison with the board and the rules committee.

6      Q    It appears here that he's saying, once that

7   document -- essentially once it's ready, he would give

8   you a copy of the draft; is that correct?

9      A    Correct.

10      Q    Okay.  All right.  I am sharing another

11   document.

12           MS. HAMILTON:  I would like for the court

13   reporter to mark this document as Plaintiff's Exhibit

14   612.

15           (Plaintiff's Exhibit 612 was marked for

16   identification.)

17      Q    BY MS. HAMILTON:  And, Mr. Winter, I am now

18   showing you Plaintiff's Exhibit 612.  This is an

19   October 5th, 2016 e-mail chain between you and Clara

20   Keith with the subject line "Draft Rule."  The document

21   has a Bates number on the first page of GA00197817.

22           Again, I will give you a moment to look at it.

23   Let me know when you are ready.

24      A    Okay.

25           MR. BELINFANTE:  Sorry, Andrea, could you



 1  scroll down so I can see the bottom of the document?

 2          MS. HAMILTON:  Sure.

 3      Q   BY MS. HAMILTON:  And, Mr. Winter, I don't know

 4  if you had a chance to look at all of it either, but I

 5  think you -- you have control over it.

 6          MR. BELINFANTE:  All right.  Thank you.

 7          MS. HAMILTON:  Josh, did you see everything you

 8  needed?

 9          MR. BELINFANTE:  I did, yes.  Thank you.

10          MS. HAMILTON:  Okay.  Great.

11      Q   BY MS. HAMILTON:  All right.  So starting with

12  this last e-mail, first of all, Mr. Winter, do you

13  recognize this e-mail chain?

14      A   Sort of.  I don't dispute it.

15      Q   Okay.  So in the original e-mail chain that

16  has -- the original e-mail from Clara to you with the

17  subject of "Draft Rule," Clara writes, "Let me know your

18  thoughts."

19          Is it your understanding looking at this that

20  Ms. Keith was asking for your thoughts on the draft rule?

21      A   To some extent, but to a greater extent my

22  assistance.  Rome --

23      Q   Okay.

24      A   -- did not have therapy, was in my district,

25  and she knew I was concerned about that.



1         Q   I see.

2         A   And so the question is, does it ensure, and

3    she's coming back and saying, it's easier for you as a

4    board member to ask for it than others as well.  And so

5    I --

6         Q   Okay.

7         A   -- said -- my response was, draft it for me,

8    and I will put it up as an amendment to the rule.

9         Q   Okay.  And so that's actually really helpful.

10   You walked through several things I was going to ask you.

11        So just to make sure I understand, in light of

12   what you just said, Ms. Keith in her e-mail response

13   here, it says, "In a roundabout way" -- let me go back

14   here.

15        So there is your question, and then she says,

16   "It would help me if you suggest we add a specific

17   statement about providing therapeutic services," and then

18   she lists certain pages.  "This will require the GNETS to

19   provide therapeutic services and will require the GaDOE

20   to monitor for such."

21        So was it your understanding that Ms. Keith was

22   asking you to draft specific language that could go into

23   the GNETS rule?

24        A   Clara is a very good politician.  She was

25   letting me know if I wanted to ensure it, we needed to



1   change it.  And so I said, please come up with the draft

2   language, and I will be the one who proposes it.

3       Q   I see.  So you are saying you -- Ms. Keith

4   drafted the language, but you were the person who

5   proposed it; is that correct?

6       A   Right.  She says:  Will require a specific

7   statement.  Okay.  And my response is:  I just did ask

8   you to do it.  That's in an inference.

9       Q   Okay.

10       A   It was worded for me.

11       Q   Okay.  And just so that I am clear on what the

12   language was that you wanted added, maybe not the exact

13   wording, but your concern pertained to the therapeutic

14   support staff; is that correct?

15       A   That it required GNETS to provide therapeutic

16   services.  Now, that does not require therapeutic staff.

17   You could have it hired and bring somebody in.  Just the

18   key is that you met those needs of those children.

19       Q   Okay.  And so you wanted -- I'm sorry, go

20   ahead.

21       A   That was it.

22       Q   Okay.  So just to make sure I understand, so

23   you wanted to ensure that the rule expressly stated that

24   therapeutic support staff would be available at the GNETS

25   program; is that correct?



1        A    And for Georgia DOE to monitor for such.

2        Q    Did Ms. Keith ultimately prepare that language

3   to be added to the GNETS rule?

4             MR. BELINFANTE:  Object to form.

5             THE WITNESS:  I am assuming she did, but I am

6   sure in the next document you will show us that will let

7   us both know.

8        Q    BY MS. HAMILTON:  I guess this is a general

9   question.  Do you know if the final rule contained the

10  language that addressed your concern?

11       A    I don't recall.  That's why I would need to see

12  the final rule.

13       Q    Okay.  I can go back to -- so going back to

14  Plaintiff's Exhibit 82, this is the GNETS rule.

15       A    Okay.

16       Q    Mr. Winter, you are welcome to scroll through

17  if this helps refresh your recollection.

18       A    Okay.  We are defining therapeutic supports.

19       Q    And I realize this is a lot of information to

20  try to scroll through in response to this question, so I

21  can also show you another document that may help you with

22  that question.

23       A    To me, I -- what I am seeing here is I see

24  inferences, but I don't see specific statements.

25       Q    Okay.  Let me show you another document.  All



 1 | right.  I would like for the court reporter to mark this
 2 | next document as Plaintiff's Exhibit 613.
 3 |         (Plaintiff's Exhibit 613 was marked for
 4 | identification.)
 5 |     Q   BY MS. HAMILTON:  This is an e-mail chain from
 6 | October 2016 between Larry Winter, Clara Keith, and then
 7 | there are some other related chains below this.  But the
 8 | subject line of what I am focused on is the part that
 9 | says, "Supporting documents for the GNETS Rule 169-4-7.15
10 | Feedback Sessions," and the Bates number on the first
11 | page is GA01486305.
12 |         Mr. Winter, I will give you a second to look at
13 | this.  There is a reference to an attachment, but there
14 | was no attachment to this document so I don't have that
15 | to share with you, but I am just sharing it to the extent
16 | that it helps in any way with refreshing your
17 | recollection.
18 |     A   Okay.  I have read the memos.
19 |     Q   Okay.  And just returning back to my original
20 | question, I am just trying to get a general sense of
21 | whether you understood that the feedback you provided to
22 | Ms. Keith did get incorporated into subsequent versions
23 | of the GNETS rule?
24 |     A   You know, when I view the rule that was
25 | approved, I see an emphasis on the phrase therapeutic



1    services throughout.  And, you know, that was the

2    emphasis that evidently the wordsmiths arrived at.

3    Obviously, this was something that was important to me or

4    I would not have had as many conversations with it, so I

5    am comfortable that at the time, that was increasing

6    therapeutic services, making sure that it was a good

7    partner in the educational services to the children.

8         Q    Okay.  Did you propose any other changes to the

9    GNETS rule besides the language about the therapeutic

10   services?

11        A    I don't recall.

12        Q    Okay.  I'm going to stop sharing my screen now,

13   and, Mr. Winter, I wanted to check in to see, we're going

14   to switch gears to talk about another topic.  Is this a

15   good time for a break?  How are you doing?

16        A    It is.  We've gone another hour and a half, so

17   what if we met again at 2:30?

18             MS. HAMILTON:  That sounds perfect.

19             Does that work for you, Mr. Belinfante?

20             MR. BELINFANTE:  It does.  Thank you.

21             MS. HAMILTON:  All right.

22             THE VIDEOGRAPHER:  We are off the record at

23   2:19 p.m.

24             (The deposition was at recess from 2:19 p.m. to

25   2:30 p.m.)



1          THE VIDEOGRAPHER:  We are back on the record at

2     2:30 p.m.

3          Q    BY MS. HAMILTON:  Mr. Winter, I would like to

4     now transition to asking you some additional questions

5     about funding for the GNETS program, and I'd like to

6     return to looking at Plaintiff's Exhibit 82, which was

7     the GNETS rule.  I'm going to share my screen.  Let me

8     know when you can see it.

9          A    I can see it.

10         Q    Okay.  Great.  All right.  So we began

11    discussing the GNETS rule earlier, but the part that I

12    want to actually focus on now is on page 4, which

13    discusses duties and responsibilities.

14         We discussed earlier that the SEA stands for

15    State Education Agency, correct?

16         A    Yes.

17         Q    And we also discussed that the State Board of

18    Education is the State Education Agency; is that correct?

19         A    That's what we discovered and understand.

20         Q    All right.  So this first item here states

21    that, "The SEA shall receive and disburse funds

22    appropriated by the Georgia General Assembly to support

23    GNETS services."

24         In your role on serving on the board, State

25    Board, what are the funds that are being referenced here



1  that are received and disbursed to support GNETS

2  services?

3      A    To me, that would be the blocks of funds that

4  come out underneath the formula that goes to our schools,

5  and I recall there was an additional block of some money

6  over and above that.

7          MR. BELINFANTE:  I'm sorry to interrupt.  I --

8  I made an objection to form, but I think I had my mic

9  turned off, so I didn't then want to interrupt the

10  witness.  But just for the record and if it ever comes to

11  it, and I doubt it ever will, we can -- we can talk about

12  that later, but I just wanted to get that on the record.

13  You all can hear me now, right?

14          MS. HAMILTON:  Yes, we can hear you.

15      Q    BY MS. HAMILTON:  And I guess, Mr. Winter, just

16  to clarify, I'm just trying to better understand, what

17  funds are being referenced here in this first provision?

18          MR. BELINFANTE:  Yeah, same.  Same.  Object to

19  form.

20          THE WITNESS:  Well, those would be the general

21  education funds that are received based on student

22  populations and so on, and my recollection is there was

23  some additional money for children that had some special

24  needs.

25      Q    BY MS. HAMILTON:  Okay.  And is it your



1  understanding that there are also funds that were

2  specifically appropriated for the GNETS program?

3      A   Well, my recollection is there were federal

4  funds, and then there were those GNETS funds that I just

5  referred to for special needs students.

6      Q   Okay.  And when it says here that the State

7  Board or SEA received and disburses those funds, what --

8  what does it -- I'm trying to think of how best to word

9  this question.  But how does the State Board disburse

10  funds to the GNETS program?

11          MR. BELINFANTE:  Object to form.

12          THE WITNESS:  Well, in reality, the State Board

13  does not have a bank account, so we don't receive money

14  and we don't write checks.  They all come in to the

15  Department.  They are under the purview, and the money

16  spent needs to be approved by the State Board through our

17  budget process, okay, and the money is allocated based on

18  a student, based on the level of need that the students

19  have.

20      Q   BY MS. HAMILTON:  And when you are referring to

21  the state funds or the -- or the funds for the GNETS

22  programs that aren't federal a moment ago, is that the

23  same thing as the grant funds that are referenced here

24  under number 2?

25      A   It could be.  It could be in addition to.



1     Q    Okay.  What is your understanding of what these

2   grant funds are that are being referenced?

3     A    Well, I would want to go back and refresh that

4   part.  I'm looking there, and I'm picturing the thing,

5   and I'm trying to figure out where in the budget they

6   came from, so I would need to review the details to

7   answer your question.

8     Q    Okay.  But just to be clear, there are specific

9   funds that are state funds set aside for the GNETS

10  program; is that correct?

11    A    That's my understanding.

12    Q    Okay.  And then it looks here that there are

13  some additional steps involved for the SEA in

14  administering the grant funds.  The first step here says,

15  "Develop rules and procedures regulating the oper" -- I'm

16  sorry, "regulating the operation of the GNETS grant,

17  including the application process."

18         As a board member, were you familiar with the

19  rules and procedures regarding the operation of the GNETS

20  grant?

21    A    I am sure I was at the time, but I do not

22  recall without getting back to the data once again.

23    Q    When you served on the budget committee, were

24  you involved in any way with the application process for

25  the GNETS grant?



1     A    I would see a summary of it based on the

2  children, their level of need and so on.  I recall on

3  rare occasions there would be questions about, where does

4  this particular student fall?  But beyond that, no.

5     Q    Okay.  And do you ever remember reviewing

6  applications that were coming from individual GNETS

7  programs regarding those grant funding?

8     A    That's -- they would be requesting based on

9  their student population.  That's how they got their

10 budget.

11    Q    All right.  This next step here says, "Notify

12 the fiscal agents regarding each fiscal year's allocation

13 and approve GNETS services budget."

14         What is this particular provision referring to?

15         MR. BELINFANTE:  Object to form.

16         THE WITNESS:  Sometimes the RESA was the fiscal

17 agent because it had a pool of LEAs GNETS in one place.

18 Okay, for example, we talked about Whitfield County had

19 Whitfield County and the City of Dalton, okay, and we

20 talked about others where there were multiple systems.

21 So that's when it's talking about the fiscal agents could

22 be an LEA, could be a RESA.  Okay?  When they turn in,

23 just like when an LEA turns in its budgets, based on

24 student numbers, a RESA is a -- a fiscal agent is for a

25 GNETS program as well.



1    Q   BY MS. HAMILTON:  All right.  So then you would

2    notify the fiscal agents which could include RESAs about

3    the allocation they were receiving for GNETS?

4    A   (Inaudible.)

5    Q   And then -- pardon me.  Continue.

6        Okay.  I just want to make sure.  Is that an

7    accurate summary of that first part?

8    A   Yes, ma'am.

9    Q   And then the second half of it says, "Approve

10   GNETS services budgets."

11       What -- what are the services budgets?

12   A   That would be the --

13       MR. BELINFANTE:  Object to form.

14       THE WITNESS:  (Inaudible.)

15   Q   BY MS. HAMILTON:  I'm sorry, I couldn't hear

16   you.

17       THE REPORTER:  That would be the what?

18       THE WITNESS:  Okay.  Roman numeral little ii is

19   the money going to the GNETS operation, and iii is the

20   money going out.  Well, pardon me.  I've got my numbers

21   mixed up.  Okay, the fiscal year's allocations, the money

22   coming in, and services budget would be the money going

23   out.

24   Q   BY MS. HAMILTON:  And by money going out, are

25   you referring to money that the GNETS program is



1    spending?

2        A    That's correct.

3        Q    Okay.  And then looking at this last small

4    Roman numeral iii, it says, "Monitor GNETS to ensure

5    compliance with Federal and state policies, procedures,

6    rules, and the delivery of appropriate instructional and

7    therapeutic services."

8            How does the State Board of Education monitor

9    GNETS to ensure compliance?

10       A    Through the --

11           MR. BELINFANTE:  Objection to form.

12           THE WITNESS:  Through the State -- through the

13   Georgia DOE's compliance team working on GNETS.

14       Q    BY MS. HAMILTON:  And when you say through the

15   Georgia DOE's compliance team working on GNETS, who is --

16   who makes up that team?

17       A    Well, again, the -- the key people were Clara

18   and Nakeba, and then they had other people in their team

19   working with different GNETS groups across the state.

20       Q    Okay.  And when it -- just to make sure I

21   understand, though, it says here, the SEA or the State

22   Board shall monitor GNETS to ensure compliance with all

23   of these things that follow.  And then I know your answer

24   you said there's a compliance team.

25           How do you ensure that the GNETS program is



1   complying with these policies and procedures that are

2   listed here?

3           MR. BELINFANTE:  Object to form.

4           THE WITNESS:  I'm relying on Clara and Nakeba

5   and their staff.

6      Q   BY MS. HAMILTON:  And by relying on them, are

7   you saying they are reporting back to you regarding the

8   GNETS program's compliance?

9      A   That is correct.  They did report back,

10  typically through Mr. McGiboney, but they could report

11  direct -- back directly as well.

12     Q   And to the extent that this is in the GNETS

13  rule, was there a formal mechanism by which Mr. --

14  Dr. McGiboney or these other individuals were reporting

15  back?

16     A   The only reporting that I was a part of was the

17  budget process, reviewing the money in and the money out.

18     Q   Okay.  I'm going to stop sharing this document,

19  and what I want to do now is actually walk through a

20  State Board meeting agenda, really just from a sample

21  meeting, to get a better sense of the State Board's role

22  when it comes to awarding certain types of GNETS funding.

23  I am going to share my screen.  Give me one moment.

24          All right.  I would like for the court reporter

25  to mark this next document as Plaintiff's Exhibit 614.



1              (Plaintiff's Exhibit 614 was marked for

2     identification.)

3         Q    BY MS. HAMILTON:  Mr. Winter, I am now showing

4     you Plaintiff's Exhibit 614.  This is a copy of the

5     June 13th, 2019 State Board meeting agenda.  This agenda

6     was pulled from the State Board -- sorry, the Georgia

7     Department of Education's public website.  I am going to

8     give you a moment just to scroll through to take a look

9     at the document, and let me know when you are ready.

10        A    Okay.

11        Q    Okay.  Great.  All right.  Are you aware that

12    the State Board of Education posts copies of the board

13    meeting agendas on its website?

14        A    Yes.

15        Q    Okay.  Are those agendas that are posted true

16    and accurate copies of the meetings from the board --

17    sorry, of the agendas from the board meetings?

18        A    We both certainly hope so.

19        Q    Okay.  And are you also aware that for

20    individual agenda items, the board posts copies of the

21    board item and any supporting documentation on its

22    website?

23        A    Well, the first agenda that I always received

24    was in a slightly different form than this, where it

25    broke out, for example, S1 contract, fiscal year '20



1    communities in schools, where it would describe much more

2    about that information.  And instead of being under the

3    term consent agenda, it would be talking about the rules

4    committee or be broken into finance budget and down to

5    charter, and then to other general things.

6            So in the first agendas that I received, they

7    had much more detail.  This agenda was prepared the

8    morning of the meeting after all discussions had been

9    made, ready for voting on the individual items.

10   Q    Okay.  All right.  Okay.  And let me see.  We

11   had recently pulled from the State Board website, but the

12   date of the meeting was June 13th, 2019.

13           Just from looking at the agenda, is it accurate

14   to say that this would reflect a typical agenda for one

15   of the monthly State Board meetings?  I believe you

16   called them like the more formal State Board meetings.

17   A    Well, let's call this a consent agenda.

18   Q    Okay.

19   A    Okay.  Because, again, all of the items that

20   were brought by the committees to the board, there was

21   votes to put them on the consent agenda or have

22   individuals vote.  As each committee reported out, they

23   would say we would like items 1 through 14 to go to the

24   consent agenda.  We want to vote on number 15.  You know,

25   that would be normal for the budget committee to say and



1  the other committees as well.

2       Q   Okay.

3       A   So did that answer your question?

4       Q   I think so.  I'm just trying to make sure I

5  understand.  For the meeting -- like just looking at this

6  agenda and the meeting that this agenda was for, would

7  this be a board meeting that all of the board members

8  would have attended?  In other words, this isn't a

9  committee meeting.  This isn't the committee of the whole

10  meeting.  This is the regular meeting?

11      A   Right.  This is the final step of the monthly

12  meeting.

13      Q   Okay.  Great.  So then what I'd like to do, I'm

14  going to scroll back up here to item 38 under the consent

15  agenda.  And do you see here where item 38 says, "FP -

16  Grant - GNETS State and Federal Allocations"?

17      A   Yes.

18      Q   Okay.  So in a moment we're gonna turn and look

19  at the board item for these particular agenda items, but

20  I just want to confirm that items 38, 39, and 40 all

21  pertain to GNETS in some form; is that correct?

22      A   That's what it appears.

23      Q   Okay.  And just for the record, item 39 says,

24  "FP - Grant - FY20, GNETS Grant for Supplemental

25  Instruction," and then item 40 says, "FP - Grant - FY20



1  State Allocation-Therapeutic Services Reimbursement for

2  GNETS Fiscal Agents."

3         Mr. Winter, what does "FP" stand for in this

4  context?

5     A    Finance.

6     Q    Okay.  What does the "P" stand for?

7     A    I don't remember.  Financial program or

8  something like that, but it was a finance item.

9     Q    Okay.  All right.  So we're gonna turn now to

10  look at item 38, and I'd like for the court reporter to

11  mark this document as Plaintiff's Exhibit 615.

12         (Plaintiff's Exhibit 615 was marked for

13  identification.)

14     Q    BY MS. HAMILTON:  And, Mr. Winter, Plaintiff's

15  Exhibit 615 was one of the documents on the website

16  listed for item 38.  It was listed as being a board item

17  with the title "FP - Grant - GNETS State and Federal

18  Allocations."

19         You have -- you should have control if you want

20  to scroll through the document, and then let me know when

21  you are ready.

22     A    Okay.

23     Q    And I will note just for the record as well

24  that -- like at the bottom of the page, it says June 3rd,

25  2019.  This was attached to the board item for the



 1  June 13th meeting.

 2        Mr. Winter, is it common that you would receive

 3  board items on a different date than the actual meeting

 4  itself?

 5     A   Oh, yes, so that you had time to read and

 6  research.

 7     Q   Okay.  Great.

 8        MR. BELINFANTE:  I'm sorry to interrupt again.

 9  These do not appear to be Bates labeled; is that correct?

10        MS. HAMILTON:  That is correct.  These come --

11        MR. BELINFANTE:  Okay.

12        MS. HAMILTON:  -- from the State DOE's public

13  website.

14        MR. BELINFANTE:  Okay.

15     Q   BY MS. HAMILTON:  And, Mr. Winter, are you

16  familiar with this document template?

17     A   Generally, yes.

18     Q   Okay.  Is this a form that has to be used

19  whenever a board item is presented to the board?

20     A   I have never had that question asked that way.

21  You are saying has to.  I answered easily that is the

22  form I'm used to receiving.  I have no idea about any

23  legal or other requirement.

24     Q   Okay.  All right.  So what exactly is this

25  document?



1      A    It's a summary of a grant.

2      Q    And the grant that we're referring to here

3    pertains to the GNETS state and federal allocations,

4    correct?

5      A    That is correct.

6      Q    What is being recommended in this -- in this

7    grant item?

8      A    That we fund $70,195,000; 62 million of it

9    State, 7, almost 8 million of it federal.

10      Q    Okay.  And would this be the money that we were

11    discussing earlier that has to be approved by the General

12    Assembly and governor first?

13      A    Well, yes and no.  The State portion is coming

14    out of State budget.  The federal portion, of course, is

15    coming from the federal Department of Education.

16      Q    Uh-huh.

17      A    Okay.  You know, funding for students, be it

18    funding for students with disabilities or otherwise, also

19    is subject to, you know, a funding mechanism by a

20    student, you know.  And you can see on this one because

21    of the swings up and down in GNETS, we used the previous

22    three-year average so that there is no shocks to them

23    because they have had a slight change.

24      Q    Okay.  And then to be clear, so then the State

25    Board of Education through the superintendent awards the



1  grant to the GNETS programs?

2          MR. BELINFANTE:  Object to form.

3          THE WITNESS:  Correct.

4          (Court reporter clarification.)

5     Q   BY MS. HAMILTON:  How do you determine how much

6  is allotted to each individual GNETS program?

7     A   Well, there's a lot of paperwork behind that

8  document that you and I are now looking at.  It's where

9  the -- each program, be it a RESA program or a LEA

10 program, comes to us with their budget based on the

11 severity of the children, the number of the children, the

12 current year, three years and so on.  And so all of that

13 then is tabulated, and that's how the -- the budget for

14 each GNETS site is calculated.

15    Q   Okay.  Has the State Board ever not awarded the

16 money in full, the allotments here in full to each of the

17 GNETS programs?

18          MR. BELINFANTE:  Objection to form.

19          THE WITNESS:  Ultimately, no.  However, we have

20 put pauses on certain people for them to realize receipt

21 of the money is not guaranteed; they have

22 responsibilities to perform.  And so there's different

23 levels that you can -- you know, you can give somebody a

24 grant, and they don't get all of the money at once.  They

25 get it over a period of time, but typically monthly by



1  making out requests for the money, just like the State

2  doesn't have all of its money on the first day of its

3  fiscal year.  It collects it monthly from its various

4  funding sources.

5         However, sometimes you can have difficulty in

6  understanding or accepting the information that you are

7  being receiving, and instead of funding in advance, you

8  can fund on a reimbursement basis.  Well, that's really

9  quite a shock to an LEA when we're going to get our money

10  in a month or two or three months after we spend it.

11         Okay, so they -- they tend not to want to do

12  that, or if their program is really out of align, you

13  just tell them, we're not going to fund you, or we are

14  going to stop funding you.

15         So ultimately a meeting of the minds took place

16  wherever there was a disagreement in the past that I was

17  aware of.

18     Q   BY MS. HAMILTON:  Were there ever any instances

19  involving GNETS programs where the State Board put a

20  pause on funding that program?

21     A   Yes.

22         MR. BELINFANTE:  Object to form.

23         THE WITNESS:  The answer was yes.

24     Q   BY MS. HAMILTON:  What would be an example of a

25  time when the State Board put a pause on funding for a



1  particular GNETS program?

2       A    Albany.

3       Q    And how long was the funding for the Albany

4  GNETS program?  How long was that policy?

5       A    Less than 90 days.  It took them that long to

6  use up all of their accumulated reserves and realized

7  that they just needed to just go ahead and get in

8  compliance.

9       Q    Are there any other examples of times when

10  funding for a GNETS program was put on pause?

11      A    Not that I am aware of.  Not that I recall.  We

12  had discussions with others, but we never had to resort

13  to it.

14      Q    Do you remember which other programs you had

15  discussions with regarding the potential of putting their

16  funding on pause?

17           MR. BELINFANTE:  Object to form.

18           THE WITNESS:  Valdosta.

19      Q    BY MS. HAMILTON:  And was that in connection to

20  the quality of instruction issues that we discussed

21  earlier today?

22      A    Yes, ma'am.

23      Q    All right.  I want to scroll down to the

24  section in the board item that says "Performance."  Why

25  is there a section in the board item that discusses



1   performance with respect to awarding the GNETS grant?

2        A   Well, my recollection of the rule is there were

3   performance criteria, and if -- if you want the money,

4   you have to do that.  For example, for an LEA that's

5   got -- running an elementary school, if there are no

6   teachers, no education is taking place, the performance

7   metric is, we are not going to fund that either.

8        Q   Uh-huh.  Okay.  And in terms of formal

9   mechanisms for measuring performance -- and I apologize

10  for the background noise if you are hearing sirens.  So

11  this next line here says, "The Georgia Department of

12  Education will conduct annual monitoring of GNETS for

13  compliance with the GNETS Strategic Plan."

14       So was it your understanding that the GNETS

15  strategic plan was being used as the monitoring tool for

16  the purpose of monitoring performance?

17       A   That's what I read.

18       Q   And then here in this last sentence, it says,

19  "FY19, 24 GNETS were monitored on their success of

20  implementing the components of the GNETS strategic plan."

21       Do you see that as well?

22       A   No.

23       Q   It's in this last sentence.  Let me know if you

24  need me to make it bigger.  I'm sorry, it's in the last

25  sentence of the section that says "Performance, criteria



1   and results."

2       A    Which would make sense because there were 24

3   blocks, so they are saying that they -- they did it for

4   all 24.

5       Q    When you served on the board, did you ever have

6   any concerns regarding inadequate monitoring on the part

7   of the State DOE?

8            MR. BELINFANTE:  Object to form.

9            THE WITNESS:  Not -- not in '16 and '17 with

10  Clara and Nakeba.  As I shared this morning, the

11  superintendent wanted discussions to take place on a much

12  more formal basis in late '19/'20 and so on, so the

13  process -- the free flow of information was not as great.

14      Q    BY MS. HAMILTON:  I'm going to show another

15  document momentarily.  I'd like for the court reporter to

16  mark this as Plaintiff's Exhibit 616.

17           (Plaintiff's Exhibit 616 was marked for

18  identification.)

19      Q    BY MS. HAMILTON:  This is another document from

20  the State Board of -- sorry, the State Department of

21  Education public website with the board items.  This

22  document is titled "Georgia Department of Education Item

23  for State Board of Education Approval - Grant."  It also

24  came from the same board meetings as supporting

25  documentation.  The date of this particular document that



1   was presented for the board's review was on May 30th,

2   2019.

3           Mr. Winter, I will give you a moment to take a

4   look at this, and let me know when you are ready.

5       A   I'm ready.

6       Q   Okay.  So the item name here, it says, "FP -

7   Grant - FY20 GNETS Grant for Supplemental Instruction."

8   What is the difference between the grant for federal and

9   state allotment that we just reviewed compared to this

10  document, which is a grant for supplemental instruction?

11      A   My understanding is the one we just did, that

12  is based on student head counts, just as we fund the LEAs

13  and so on.  This one is additional $151,000 to provide

14  specific support materials evidently that would not be

15  covered by those LEA-type grants.

16      Q   Okay.  Is this money that also had to be

17  approved by the General Assembly and Governor before it

18  could be awarded by the State Board?

19      A   Ultimately, all money had to be approved by the

20  General Assembly.  Some are in larger pieces than others,

21  but the answer would always be, it had to be approved by

22  the General Assembly.

23      Q   How did the State Board evaluate whether to

24  grant requests for supplemental funding such as this?

25      A   On something like this, we were relying on



 1   staff and their reports and the other information we

 2   receive.

 3        Q   And then very quickly I just want to scroll

 4   down here.  It also has a "Performance" section, and I

 5   just want to make sure I understand.  What -- what does

 6   the State Board rely on to monitor the implementation of

 7   fidelity of this particular -- sorry, to monitor fidelity

 8   of implementation of this particular grant initiative?

 9             MR. BELINFANTE:  Object to form.

10             THE WITNESS:  The fact that we send staff to

11   each of the locations to have on-site visits, and -- and

12   just like you, send internal audit teams to go look at

13   their books.

14        Q   BY MS. HAMILTON:  Okay.  And I just want to

15   note here, similar to the other document that we looked

16   at, where it says here, "Describe how the grant will be

17   monitored to ensure satisfactory performance."  In this

18   last sentence, do you see where it says, "The

19   supplemental instruction and diagnostic component is an

20   item to be monitored for implementation fidelity on the

21   strategic plan"?

22             Do you see that here?

23        A   I do.

24        Q   Was it your understanding that the strategic

25   plan was also used as a tool for monitoring whether the



1  State DOE was implementing -- sorry, whether the GNETS

2  were implementing these initiatives with fidelity?

3       A    That would be my assumption from reading it,

4  and I would be relying upon that.

5       Q    All right.  And I want to show you one

6  additional board meeting item from that June 13th

7  meeting.

8            MS. HAMILTON:  I would like for the court

9  reporter to mark this as Plaintiff's Exhibit 617.

10           (Plaintiff's Exhibit 617 was marked for

11  identification.)

12      Q    BY MS. HAMILTON:  This was supporting

13  documentation for grant item -- sorry, for budget item

14  number 40 in that same meeting.  Just noting at the

15  bottom that the board also received this document on

16  May 30th, 2019.  The title says, "Georgia Department of

17  Education Item for State Board of Education Approval -

18  Grant," and the item in particular was "FP - Grant -

19  FY20, State Allocation Therapeutic Services Reimbursement

20  for GNETS Fiscal Agents."

21           Mr. Winter, I will give you a moment to scroll

22  through to take a look.  Let me know when you are ready.

23      A    Okay.

24      Q    And the main reason that I am showing this to

25  you, I'm just trying to understand the various sources of



1  funding that can be awarded to some of the GNETS

2  programs.  This document references the therapeutic

3  services reimbursement for GNETS fiscal agents.  What is

4  the therapeutic services reimbursement?

5      A   As we discussed earlier, especially in small

6  GNETS, they might not have either access to professionals

7  in some of our more rural areas, or might not have a

8  sufficient number of students to fully fund the required

9  needs.  This money was helping to fill in the gap if

10  somebody had to -- they couldn't get a full-time

11  employee, we had to pay people by the hour.  There wasn't

12  enough budget within the number of students they had to

13  meet the needs, this was the State's way of meeting those

14  students' needs.

15      Q   And to make sure I understand what you were

16  saying earlier, I believe you are saying all funding

17  that's approved for the GNETS program has to be approved

18  by the General Assembly and Governor -- Governor's

19  Office.  Is that correct?

20      A   No, that's not what I said.

21      Q   No?  All right.  Can you please clarify.

22      A   I said, all state funding comes from the --

23  from the General Assembly and the Governor.  The federal

24  funding would not.  That's coming from the federal

25  government.



1    Q    Sorry.  I meant to say state funding.  So is it

2  an accurate summary that all state funding has to be

3  approved by the General Assembly and the Governor's

4  Office, including these reimbursement funds?

5    A    All of those funds are in the -- the larger

6  Georgia budget approved by that, that is correct.

7    Q    Okay.  And in this instance, it appears that

8  these funds were only allotted for 11 GNETS programs; is

9  that correct?

10   A    Yes.

11   Q    How does the State Board evaluate whether to

12 grant reimbursement requests to these 11 programs in this

13 instance?

14   A    If you will recall what we said -- what I said

15 earlier, it would be based on the -- it could be based on

16 severity of the child, but more likely was this area, did

17 it have enough students or was it in a rural area where

18 it could not attract staff?

19        So, you know, for example, Metro Atlanta, they

20 wouldn't have trouble with numbers or the ability to get

21 staff, where extremely rural Georgia might have trouble

22 with both.

23   Q    Okay.  And similar to the other board items,

24 there is a performance section here, and it, among other

25 things, asks for a description of how the grant would be



1  monitored to ensure satisfactory performance.

2       What was the State Board relying on in order to

3  monitor the effectiveness of the use of these

4  reimbursement funds?

5       MR. BELINFANTE:  Object to form.

6       THE WITNESS:  The reports of the staff that

7  were monitoring them.

8    Q   BY MS. HAMILTON:  And similar to the other one,

9  I do just want to note here in this initial description,

10  in addition to where it says "GaDOE conducts annual

11  monitoring," this next sentence says, "The behavior and

12  therapeutic supports component is an item to be monitored

13  for implementation fidelity on the strategic plan."

14       Do you see that?

15    A   I do.

16    Q   Okay.  So is it correct that the strategic plan

17  was also a tool that was being used to monitor whether

18  the grant was being used -- sorry, I want to make sure

19  I'm using the correct terminology here -- to make sure

20  that the funding here was being used in the manner that

21  the programs that were being implemented -- sorry,

22  therapeutic services.  Let me start over.  That was a lot

23  that I did not say very clearly.

24       So I just basically want to confirm, was it

25  your understanding that the strategic plan was another



 1  tool that could be used to monitor the implementation of

 2  these therapeutic services that were being provided here?

 3       A    That's my understanding.

 4       Q    All right.  I'm going to share another

 5  document.

 6            MS. HAMILTON:  I'd like for the court reporter

 7  to mark this next document as Plaintiff's Exhibit 618.

 8            (Plaintiff's Exhibit 618 was marked for

 9  identification.)

10       Q    BY MS. HAMILTON:  This is a September 28th,

11  2017 e-mail from -- it's two different e-mails.  There's

12  a forwarded e-mail and then the original e-mail, but the

13  forwarded e-mail was from Ted Beck to Larry Winter.  And

14  the subject line was, "Forward:  Item requested by

15  Mr. Winter in Budget Committee Meeting."  The Bates

16  number on the first page is GA04450268.

17            Mr. Winter, I'll give you a moment to scroll

18  through to read the document, and then let me know when

19  you are ready.

20       A    Okay, I have read it.

21       Q    Okay.  All right.  Do you recognize this e-mail

22  chain, Mr. Winter?

23       A    It would be consistent with correspondence that

24  I had.

25       Q    Okay.  All right.  So looking at this original

1  e-mail that was sent from Nakeba to Ted Beck on

2  September 27th of 2017, Nakeba states that -- sorry,

3  Mr. Winter had a question related to the allocations for

4  the therapeutic services board item.  To be clear, this

5  is not with respect to the meeting that we were just

6  looking at in 2019; this is another -- another board

7  meeting.  But do you see where she makes the statement?

8        A   Yes.

9        Q   Okay.  And then she goes on to describe kind of

10  what the document contains and then says, "His

11  recommendation," presumably referring to you, "was for us

12  to add this information as an attachment to the board

13  item to ensure that the names of the fiscal agents,

14  GNETS, and the reimbursable amounts are transparent."

15        Do you recall requesting Ms. Nakeba to create a

16  document that more clearly stated this information

17  regarding who was being reimbursed?

18        A   Specifically, no, but that would be very much

19  in character for me.  If we're going to spend $900,000 --

20  or pardon me, $670,000, people need to know where.  And

21  as you pointed out, you know, why are ten groups getting

22  it and others not?  And when you can see the size of

23  these districts and so on, you understand, oh, yeah,

24  Crisp County being able to hire somebody on their own

25  full par is going to be hard, and so it made it



1  understandable to people, in my opinion, as to why these

2  people got money when the other 14 RESAs, GNETS fiscal

3  agents did not get the money.

4      Q   Okay.  And just to make sure I understand, I

5  know we were only looking -- like for the June 2019 board

6  meeting, we were only looking at the board item, but you

7  mentioned that there is a lot of other documentation that

8  you review as a board member.  Would this document, for

9  example, regarding the reimbursable therapeutic funds be

10  something that you would have been reviewing as a board

11  member?

12      A   Well, based on the wording, as I was looking

13  for it and it wasn't there, so I was requiring it be

14  produced.

15      Q   Okay.  Do you recall, moving forward sort of

16  after this time frame, that this documentation was

17  subsequently provided?

18      A   I'm sure it was or it wouldn't have gone

19  through.

20      Q   Okay.  I'm going to share another document with

21  you, Mr. Winter.

22          MS. HAMILTON:  All right.  I'd like for the

23  court reporter to mark this document as Plaintiff's

24  Exhibit 619.

25          (Plaintiff's Exhibit 619 was marked for



1   identification.)

2        Q   BY MS. HAMILTON:  And Mr. Winter, Plaintiff's

3   Exhibit 619 is a September 21st, 2016 e-mail from Debbie

4   Gay to yourself, Mr. Winter, with other individuals

5   copied.  The subject line says, "Follow up from budget

6   committee," and the first page of the document is marked

7   with the Bates number GA04450250.

8        I will give you a moment, Mr. Winter, to take a

9   look at the document.  Let me know when you are ready.

10       A   Okay.

11       Q   Do you recognize this e-mail?

12       A   No, but it would be consistent with the types

13  of e-mails that I wrote and received.

14       Q   Okay.  And this is an e-mail that --

15       A   Debbie Gay sent to me.

16       Q   -- you received -- that Debbie Gay sent to you,

17  correct.

18       All right.  So at the beginning of the e-mail,

19  Ms. Gay says, "I am writing -- Mr. Winter, I am writing

20  as a follow-up to your questions in budget committee

21  today."

22       Is that common that you would get written

23  follow-up responses to questions that you would ask

24  during the budget committee meetings?

25       A   When they didn't have the time or the ability



1   to come back and talk to me, yeah.

2        Q   Okay.  And then Ms. Gay goes on to say a little

3   further down in this paragraph, "Following the budget

4   committee, I met with Nakeba to confirm my understanding

5   of the GNETS program involvement in the resources

6   provided through the SAMHSA grant as well as the SPDG.  I

7   wanted to be sure I was providing you with accurate

8   information."

9            What is she referring to when she says "the

10  SAMHSA grant"?

11       A   And acronyms at times get beyond me, so I won't

12  guess.

13           In terms of what is going on, it would be very

14  normal for me to ask questions regarding money that we

15  pay to organizations because it's very easy for them to

16  just be part of the routine as opposed to us challenging,

17  are we getting our money's worth or are we getting what

18  we asked for?  And so, obviously, my questions were in

19  that regard based on her response.

20           And, you know, she and -- and quoting Nakeba,

21  they speak for themselves.  They are coming back to me

22  and telling me, yeah, this is important.  It's -- it's

23  reaching the various groups that are mentioned in the

24  e-mail.  And I, based on that response, would probably

25  have approved that expenditure.



1      Q   Okay.  That's a really helpful overview.  I

2  don't -- we'll see.  Let me ask you a few follow-up

3  questions to see if you remember any of these details.

4  Like this next paragraph here mentions Youth Mental

5  Health First Aid.  What is Youth Mental Health First Aid?

6      A   Yes, that's a very good question.  Do I

7  remember?  No.

8      Q   Okay.  Why were you trying to understand

9  whether GNETS received resources from this particular

10  source?

11      A   Evidently somebody said they were, and I'm a

12  very curious person.  During the course of one budget

13  meeting, I would probably ask 20 or 30 questions that

14  people had to get back to me with information on.

15      Q   Would you have been satisfied with this

16  response that you received from Ms. Gay regarding Youth

17  Mental Health First Aid?

18      A   Yes.

19      Q   Okay.  And it looks like she's mainly

20  confirming that it is being delivered to all the GNETS

21  programs for that time period.

22          All right.  This next one says the State

23  Personnel Development Grant or SPDG.  What was the SPDG

24  grant?

25          A   It was something to improve graduation



1   routes -- rates for students with disabilities.

2        Q   Was it your understanding at the time that that

3   money was available to all students, including GNETS

4   students?

5        A   That would be my response, yes.

6        Q   And it appears here in the last sentence,

7   Ms. Gay says, "As a follow-up, we will work with Nakeba

8   to examine this closely to ensure the resources are used

9   and available in the GNETS Programs."

10           Again, I realize you may not recall a lot of

11  details from this exchange, but were you generally

12  satisfied with the answers that you received from Ms. Gay

13  with regard to the SPDG grant?

14       A   Yeah, I -- I could trust Debbie to give real

15  answers.

16       Q   And I -- I note here in this last paragraph,

17  she says, "I share your concern that the GNETS programs

18  have equitable access to grant funded resources available

19  to students."

20           Do you know what she was referring to when she

21  says, "I share your concerns"?

22           MR. BELINFANTE:  Object to form.

23           THE WITNESS:  Go up to the date on this.

24       Q   BY MS. HAMILTON:  I'm sorry, I didn't hear that

25  last part.



1      A    Okay.  If we look at this, this is the period

2   of time where the whole department, the whole was -- was

3   looking at GNETS.  So everybody was concerned about GNETS

4   at that time.  And so for her to say that, that means

5   that she understood what we, the department and the

6   board, were going through to -- to improve GNETS across

7   the state of Georgia.

8      Q    And she also mentions here in that same

9   sentence, she makes a reference here to equitable access.

10     A    If I can interrupt.

11     Q    I'm sorry, can you hear me?

12     A    I need a five-minute break.

13     Q    Okay.  That's fine.  We will take a break for

14  five minutes.

15     A    Thank you.

16          THE VIDEOGRAPHER:  We are off the record at

17  3:33 p.m.

18          (The deposition was at recess from 3:33 p.m. to

19  3:39 p.m.)

20          THE VIDEOGRAPHER:  We're back on the record at

21  3:39 p.m.

22     Q    BY MS. HAMILTON:  And Mr. Winter, I just have

23  one last question about Exhibit 619.  I'm going to share

24  that document again on my screen.  And first of all, can

25  you confirm if you can see it on your screen?



1        A    I can.

2        Q    Okay.  Great.  So going back to this last

3   sentence where Ms. Gay says, "I share your concern that

4   the GNETS programs have equitable access to grant funded

5   resources available to students," my one last question

6   about this document right now is, were you aware of any

7   instances as a board member where GNETS programs did not

8   have access to grant-funded resources available to

9   non-GNETS students?

10           MR. BELINFANTE:  Objection to form.

11           THE WITNESS:  No.  Although, it was my

12   observation that the source of all wisdom and knowledge

13   often appear in the form of board member's questions, and

14   so for people to share our concerns and to tell me that

15   my questions are good ones, even if that were not true,

16   would be very normal to find in a response memo such as

17   this.

18        Q    BY MS. HAMILTON:  All right.  Mr. Winter, I am

19   about to share a new document with you.

20           MS. HAMILTON:  I would like for the court

21   reporter to mark this as Plaintiff's Exhibit 620.

22           (Plaintiff's Exhibit 620 was marked for

23   identification.)

24        Q    BY MS. HAMILTON:  So Plaintiff's Exhibit -- let

25   me make this a little smaller here.  Plaintiff's Exhibit



1    620 is a May 14th, 2018 e-mail from initially --

2    initially from Garry McGiboney to several individuals who

3    appear to be board members in the "to" line, but then

4    there is a separate e-mail between Larry Winter and Garry

5    McGiboney.  The subject line is "Mental Health Grant,"

6    and the first page has a Bates number of GA00540344.

7              Mr. Winter, I will give you control -- give me

8    one moment -- of this document, and you can scroll

9    through and let me know when you are ready.

10         A    Okay.

11         Q    Do you recognize this e-mail chain, Mr. Winter?

12         A    No, but it would be normal.  That's how Garry

13   writes and how he -- how he informs people.

14         Q    And does this document list you as a recipient

15   of the e-mail from Garry McGiboney on Monday, May 14th,

16   2018?

17         A    Yes, it does.

18         Q    And then does it also show that you wrote him

19   separately, it looks like later that same day, to say

20   thank you?

21         A    Yes.

22         Q    Okay.  In Dr. McGiboney's e-mail here, he

23   states -- let me find the right reference to point to.

24   All right.  So about halfway through in Dr. McGiboney's

25   e-mail, he says, "To continue and expand the YMHFA

 1  training," and I'm going to pause there.  When we say

 2  "YMHFA," do you understand that that is in reference to

 3  Youth Mental Health First Aid?

 4      A   Because the acronym is defined two sentences

 5  previously, yes.

 6      Q   Okay.  So where Dr. McGiboney says, "To

 7  continue and expand the YMHFA training, we learned of a

 8  grant, Mental Health Awareness Training Grant, that could

 9  provide the funding that we need," do you see that

10  language?

11      A   Yes.

12      Q   And then a little further down he says, "We

13  wanted to inform you of our intentions to apply for the

14  grant."

15          Do you see that language as well?

16      A   I do.

17      Q   Does the State DOE always notify the board

18  whenever it seeks to apply for a federal grant?

19      A   The State Board must approve the acceptance of

20  one, so it's normally a wise thing to do it in advance.

21      Q   Are there any steps that the State Board has to

22  take once notified before the -- once notified about a

23  grant such as this -- let me -- let me start over.

24          Are there any steps that the State Board would

25  need to take in response to a notification such as this



1  before the State DOE can apply for an outside grant?

2       A    No.  To my knowledge, they could apply for one,

3  but the State couldn't accept it without the State Board

4  approving it.  You know, normally it would come to us as

5  a board item with the information behind it.  Garry is

6  just telling us in advance I am doing this, and here's

7  why, because he's very good and thorough in the work that

8  he does.

9       Q    Okay.  Do you remember if the State DOE ever

10  received this particular grant?

11       A    No, ma'am, I don't, but if Garry said that he

12  was going to get it, he would get it.

13       Q    As a board member, did you ever facilitate

14  the -- did you ever facilitate efforts to assist the

15  State DOE in obtaining additional funds to cover needs

16  for the GNETS program?

17            MR. BELINFANTE:  Object to form.

18            THE WITNESS:  Not that I recall.

19       Q    BY MS. HAMILTON:  And during your time on the

20  State Board, were there any particular board members who

21  had like a very strong investment in seeing the success

22  of the GNETS program?

23       A    Well, I -- I would say most.  I'm going to look

24  at the -- Lisa Kennemore was very involved.  Barbara

25  Hampton was.  Helen Rice was.  Kevin Boyd was.  Scott



1   always was on the lookout.  Mike Royal, very much so.

2   I -- I skipped over Kenneth because he had a lot of other

3   areas that he was kind enough to keep up on for the

4   board, but through that group right there, Lee Anne

5   Cowart as well.

6          So a large portion of the board was very

7   interested in our special needs students.

8      Q   All right.  I'm going to close out these

9   documents.  Give me one second.

10          And I want to switch gears to discuss a new

11  topic.  I am sharing -- I am sharing a document that I

12  would like for the court reporter to mark as Plaintiff's

13  Exhibit 621.

14          (Plaintiff's Exhibit 621 was marked for

15  identification.)

16      Q   BY MS. HAMILTON:  This is an e-mail chain from

17  September 2015 between you and Matt Jones with the

18  subject line "Re:  GNETS" pro -- sorry, "GNETS position."

19  The first page of this document has a Bates number of

20  GA03463431.

21          This is a short e-mail, but I will give you a

22  moment to read it.  Let me know when you are ready.

23      A   Let's go.

24      Q   All right.  So in the September 18th, 2015

25  e-mail from Matt Jones, at the very bottom he notes that,



1   "We are posting today."  Actually, so not at the very

2   bottom.  Actually, about midway through, he says, "We are

3   posting today," and there is not a lot of information

4   here, but the subject line says "GNETS position."

5          Do you remember what he would have been

6   referring to during this time frame?

7       A    No, ma'am.

8       Q    Is it possible that he would have been

9   referring to Nakeba Rahming's position?

10      A    That would be --

11      Q    Sorry, posting of the position?

12      A    That would be my assumption, but I didn't want

13  to assume.

14      Q    Okay.  As a general matter, do you review all

15  State Department of Ed job postings?

16      A    No.

17      Q    Okay.  And I do note here that he says at the

18  very beginning, "Larry, see attached.  Clara, Debbie, and

19  I have worked together on this."

20          Under what circumstances would you have

21  reviewed of State DOE job postings?

22      A    Okay.  What was occurring in 2015, '16, and

23  '17, okay, we have the -- the report from the Governor's

24  Office.  We are -- we are working on GNETS and so on.

25          So was I interested in GNETS?  Obviously I was.



 1   So there were areas where, you know, if somebody -- if we

 2   were posting a job in internal audit or IT or accounting,

 3   I would be interested in that as well.

 4        Q   I am going to show you another document from

 5   around this time period, and I'd like for the court

 6   reporter to mark this as Plaintiff's Exhibit 622.

 7           (Plaintiff's Exhibit 622 was marked for

 8   identification.)

 9        Q   BY MS. HAMILTON:  This is a December 3rd, 2015

10   e-mail between Larry Winter and Matt Jones with a subject

11   line "Re: GNETS Position," likely related to the chain we

12   just saw a moment ago.  The first page, first and only

13   page of this document, has a Bates number of GA03464539.

14           And I will give you a moment to take a look at

15   this.  Let me know when you are ready.

16        A   I have read it.

17        Q   Okay.  So what is Matt Jones explaining here in

18   his e-mail with regard to the GNETS position at issue?

19           MR. BELINFANTE:  Object to form.

20           THE WITNESS:  Well, I mean, from my reading of

21   the document, he's communicating to me we've made a

22   choice.  We are going to be bringing it to the board.

23        Q   BY MS. HAMILTON:  Why would Matt Jones have

24   been reaching out to you about the interview team's

25   recommendation to the State Board for the GNETS position



1  at issue?

2      A   Because I was interested.

3      Q   And again, do you understand that this position

4  being discussed here was likely Nakeba Rahming's

5  position?

6      A   Again, that's my assumption, but it doesn't say

7  that on its face, but Nakeba's was -- occupied the cube

8  outside of Clara's office, and the rest of it makes sense

9  it's her.

10     Q   Okay.  Does the State Board of Education

11 approve hiring recommendations for State DOE positions?

12     A   Yes.

13     Q   And I note here at the very end of Matt Jones's

14 e-mail, he says, "Also, the GNETS position may -- made a

15 direct report to me."

16         I believe that may have been a typo, but what

17 do you understand Matt Jones to be saying about the GNETS

18 director reporting to him?

19     A   That would be reporting to him.

20     Q   Okay.  Would it have been common for a director

21 at that level to report directly to the chief of staff?

22     A   He had eight or ten people that reported to

23 him.  To add one was not a shock to me, especially as we

24 view, you know, the interest of the Governor's Office

25 and -- and others that have been taking place.



1      Q    And what was the interest of the Governor's

2   Office in the GNETS program at this time?

3      A    You saw --

4           MR. BELINFANTE:  Object to form.

5           THE WITNESS:  You saw the audit from them and

6   their recommendations earlier.

7      Q    BY MS. HAMILTON:  And then in your response you

8   say, "Thank you for your personal involvement in this

9   important project."

10          Would Matt Jones have ordinarily -- sorry.

11  Would Matt Jones's chief of staff have ordinarily been in

12  hiring -- sorry.  You can tell it's getting late in the

13  day, isn't it?

14          Would Matt Jones's chief of staff have

15  ordinarily been involved in hiring of a State DOE

16  director?

17          MR. BELINFANTE:  Object to form.

18          THE WITNESS:  If you knew that the Governor's

19  Office was watching everything that happened, I think you

20  would tend to be more involved, but I think that my

21  response is that was good.

22     Q    BY MS. HAMILTON:  Okay.  And then the last

23  question here for this document, you say here in your

24  response, "If you all have agreed on the person to be

25  GNETS director, I am confident they are the right



 1  person."
 2          Why did you have that assurance that if they
 3  all agreed that you could be confident this was the right
 4  person?
 5      A   Because I am a nice person, and I wrote nice
 6  words.
 7      Q   Did you have any particular confidence in the
 8  skill set of the individuals who were involved in making
 9  the decisions?
10      A   Well, obviously, Nakeba was coming in to take
11  Clara's position which then got morphed where we got to
12  keep two, and Debbie was also involved.  So I know the
13  two of them had a great deal of involvement and
14  experience, and I was thrilled to see the chief of staff
15  becoming more involved in the process as well.
16      Q   Okay.  I want to show you one more document
17  related to this topic.
18          MS. HAMILTON:  I'd like for the court reporter
19  to mark this as Plaintiff's Exhibit 623.
20          (Plaintiff's Exhibit 623 was marked for
21  identification.)
22      Q   BY MS. HAMILTON:  This is an e-mail dated
23  February 16th, 2016 -- an e-mail chain dated
24  February 16th, 2016 between Larry Winter and Matt Jones.
25  One of those e-mails Mike Royal is copied, and the



 1   subject line is "GNETS."  The Bates number for the first
 2   page is GA03465879.
 3        I will give you a moment to read the document.
 4   Let me know when you are ready.
 5        A   I have read it.
 6        Q   Okay.  All right.  So in the original e-mail
 7   from Matt Jones to you, Matt Jones writes, "Larry, we
 8   have a space for the GNETS person right outside of
 9   Clara's office.  However, Clara is at the DOE only twice
10   a week so we also have a space for the GNETS person with
11   the Special Education team.  Just wanted to let you
12   know."
13        Do you see that?
14        A   I did.
15        Q   Okay.  Why would Matt Jones have been reaching
16   out to inform you about the location of the office space
17   for the new GNETS hires?
18        MR. BELINFANTE:  Object to form.
19        THE WITNESS:  Well, if you go back to the
20   document you showed me previously, he had already talked
21   about where he was going to put them.  Now, I have an
22   advantage over you.  I know where those locations, one,
23   were, and it was a terrible office.  So perception in
24   government tends to be very important.  If somebody has a
25   nice office, then they are somebody that's important, and



1  if they are hidden behind the toilets, then there's a

2  problem, okay?

3       It was not gonna be a good office to be

4  bringing in a new director, and if we are really

5  emphasizing, I just thought it was a mistake, and I

6  shared my thoughts, and Matt was very kind and

7  subsequently agreed with me.

8    Q   BY MS. HAMILTON:  Okay.  And I note here in

9  your response to Mr. Jones's e-mail, consistent with what

10  you were just saying, that it sounds like you took a

11  different position of where the location should be.

12       What were you -- what did you mean when you

13  said, "Until all" -- and sorry, let me scroll up.  So in

14  this sentence, it says, "Personally I think it will be/is

15  important that the new GNETS person and Clara's offices

16  not be in the special education area until all of this

17  shakes out."

18       What did you mean when you said "until all of

19  this shakes out"?

20    A   Well, obviously, are we as a state working on

21  GNETS?  The answer is yes, okay.  And are we really

22  emphasizing its importance?  The answer is yes.

23       And to -- in my opinion, and probably some

24  naïvety on my part, to just put them back in special ed

25  might not let people realize that it was special.



1      Q    And then, I guess, relatedly, this next

2    sentence where you say, "I believe this will be important

3    if we have to make a case later on," what were you

4    referring to when you said this later part, "if we have

5    to make a case later on"?

6      A    Well, I'm guessing now looking at it today,

7    that if we had to move Nakeba and so on higher in the

8    structure within the department, that that would help

9    make that case later on, and that ultimately occurred.

10     Q    Okay.  I just stopped sharing my screen.

11          I want to switch gears and ask you some -- some

12   different questions now on a different topic.  What are

13   your views on providing students with school-based mental

14   health services in schools?

15          MR. BELINFANTE:  Object to form.

16          THE WITNESS:  I've never been asked the

17   question before, so I don't have a position.

18     Q    BY MS. HAMILTON:  Okay.  And I know you

19   mentioned earlier that there had been some focus, I

20   believe in response to one of the reports that we talked

21   about earlier like the Governor's report and improving

22   the available therapeutic services.  So I guess going

23   back to my initial question, did you have any views on

24   providing students with therapeutic services in schools?

25          MR. BELINFANTE:  Object to form.

1           THE WITNESS:  Again, if a children -- if a

2    child was not doing well in school because they had other

3    things going on in their life, moving them to GNETS means

4    we need to be working with them on the other things going

5    on in their life, and that made sense to me.

6        Q   BY MS. HAMILTON:  In your work with the State

7    Board, did you ever collaborate with individuals from --

8    let me start over.

9           In your work with the State Board, did you ever

10   interact with officials from other State agencies such as

11   DBHDD or DCH?

12       A   Agencies within the State of Georgia?

13       Q   Yes.

14       A   The answer is yes.  I had a good relationship

15   with the finance people at Regent and also Pre-K, again,

16   their finance people, but it would be more those than

17   anyone else.

18       Q   Okay.  So your interactions with other agencies

19   was primarily through the finance personnel?

20       A   Yeah, the -- the State audit department, things

21   like that, but all financial OMB, so on.

22       Q   Okay.  All right.  I want to show you another

23   document.

24           MS. HAMILTON:  All right.  I'd like for the

25   court reporter to mark this next document as Plaintiff's



 1  Exhibit 624.

 2          (Plaintiff's Exhibit 624 was marked for

 3  identification.)

 4      Q   BY MS. HAMILTON:  And I am showing you,

 5  Mr. Winter, an August 29th, 2017 e-mail chain between you

 6  and -- the initial e-mail is between you and Clara Keith

 7  with the subject "Milo Robot for students with" -- I'm

 8  sorry.  The initial e-mail was between you and Nakeba

 9  Rahming -- okay, was between you and Nakeba Rahming with

10  the subject of "Milo Robot for students With autism," and

11  Clara Keith was copied on that first e-mail in the chain.

12  The first page of the document has a Bates number of

13  GA00792589.

14          Mr. Winter, I will give you a second to look at

15  it, and let me know when you are ready.

16          MR. BELINFANTE:  I don't see a document up.

17          MS. HAMILTON:  Oh, you don't?  Okay.  Give me

18  one second.

19          MR. BELINFANTE:  Thank you.  There we go.

20          MS. HAMILTON:  Okay.  Can you all see it now?

21          MR. BELINFANTE:  Yes, I can.

22      Q   BY MS. HAMILTON:  Mr. Winter, can you see it

23  now?

24      A   I can.

25      Q   And let me give you control.



1       A    Okay.

2       Q    All right.  So, Mr. Winter, we don't have the

3   initial -- so if we look at the original e-mail from

4   Nakeba Rahming, she says, "Hello Mr. Winter.  After

5   reading your e-mail" -- I do want to note that we don't

6   have the e-mail that you may have sent to her that led to

7   this conversation, but I do want to note that Nakeba says

8   here, "After reading your e-mail and viewing the SBOE

9   presentation about the Milo robot for autistic children,

10  I wanted to follow up with GNETS staff to see if any of

11  the GNETS are using Milo."

12           What was the Milo robot?

13      A    I'm not really sure.  The reason I would have

14  done that is because I'm a human being.  My wife is a

15  special ed teacher.  One of my children has level one

16  autism, and I'm sure that caught my attention and I asked

17  questions.

18      Q    And then Ms. Rahming goes on to say that she is

19  aware of Milo, and then she also mentions that HAVEN

20  Academy is using Milo in their program.

21           Were you aware that this robot was being used

22  in a GNETS program?

23      A    No, not until I got that e-mail.

24      Q    Do you know if the robot was ever piloted in

25  any other GNETS program?



```
 1        A   No.

 2        Q   And as we discussed, you would inquire for

 3   various reasons about whether the GNETS programs were

 4   using this robot.

 5            Can the State Board recommend that specific

 6   therapeutic services like the Milo robot be used in the

 7   GNETS program?

 8            MR. BELINFANTE:  Just object to form.

 9            THE WITNESS:  Well, first of all, that was not

10   the purpose of this e-mail, so the balance of your

11   question is total speculation.

12        Q   BY MS. HAMILTON:  Right.  And I'm not asking --

13   I'm stepping away from this e-mail for a moment just

14   trying to better understand as you gather this type of

15   information --

16        A   Our State Board --

17        Q   -- as a State Board --

18        A   Our State Board members are allowed to bring

19   information to staff within the department for

20   evaluation, I believe the answer is yes, but to make a

21   recommendation to them, no.

22        Q   Okay.  And if the State DOE wanted to roll out

23   a larger pilot pertaining to a therapeutic program, would

24   it have to seek funding from the State Board in order to

25   do so?
```



```
 1              MR. BELINFANTE:  Object to form.
 2              THE WITNESS:  It would have to get funding
 3     somewhere.  You know, maybe they get a grant from the
 4     outside, but in the process, would the State Board become
 5     aware of it, the answer is yes.
 6         Q    BY MS. HAMILTON:  Okay.
 7         A    Unless they were using money that they already
 8     had within their various budgets.
 9         Q    All right.  Then my last question about this, I
10     know this e-mail chain was about the Milo robot.  Have
11     you reached out to State DOE personnel to find out about
12     other types of therapeutic services?  Sorry.  When you
13     were on the State Board, did you reach out to any other
14     State personnel to find out about specific therapeutic
15     services?
16         A    Not that I --
17              MR. BELINFANTE:  Object to form.
18              THE WITNESS:  -- recall.  Obviously, this one
19     caught my interest as a parent or as a husband as opposed
20     to anything else.
21         Q    BY MS. HAMILTON:  I'm going to stop sharing the
22     screen, and I'm going to switch gears again and just ask
23     you some general questions about the GNETS programs.
24              As a member of the State Board, did you have
25     any concerns about GNETS students being placed in
```



1  settings where they did not have an opportunity to

2  interact with non-GNETS students?

3           MR. BELINFANTE:  Object to form.  I'm sorry,

4  could you repeat the question again for me?

5           MS. HAMILTON:  Sure.

6     Q   BY MS. HAMILTON:  The question was, just from

7  Mr. Winter's -- based on his opinion as a member of the

8  State Board, did he ever have -- did you have --

9  Mr. Winter, did you ever have any concerns about GNETS

10 students being placed in settings where they did not have

11 opportunities to interact with students who were not in

12 GNETS?

13          MR. BELINFANTE:  Okay.  I will still object to

14 form.  But thank you.

15          THE WITNESS:  I was aware that there were some

16 GNETS students that were in GNETS programs only part

17 time, and they were in their general school part of the

18 time.  I know of some students that -- and, for example,

19 in Whitfield County where they were involved in

20 extracurricular activities.

21          So no, I don't -- I don't think I was ever

22 concerned.  I don't ever think that was really brought to

23 me as a major concern until I read it in that Atlantic

24 article that you showed to me earlier.

25    Q   BY MS. HAMILTON:  Mr. Winter, does the State



1  Board handle appeals of decisions that are rendered by

2  local school boards pertaining to -- pertaining to

3  special education?

4       MR. BELINFANTE:  Object to form.

5       THE WITNESS:  We can.

6    Q    BY MS. HAMILTON:  What is the process by which

7  the State Board would handle any appeals?

8       MR. BELINFANTE:  Object to form.

9       THE WITNESS:  Somebody would file an appeal,

10  normally through Garry McGiboney's office.

11    Q    BY MS. HAMILTON:  And what was his office

12  again?

13    A    He was the person that -- he had a lot of hats,

14  but our rules committee, he would have been the person

15  riding shotgun on that.  He was -- you've seen him on

16  things regarding PBIS and special ed and so on.  So he

17  would have been the person that the appeals flowed

18  through to us.

19    Q    Okay.  And what would the State Board of

20  Education, like what -- what were the expectations for

21  the State Board of Education once you received an appeal?

22       MR. BELINFANTE:  Object to form.

23       THE WITNESS:  Well, we always met and discussed

24  those in executive sessions, and they were very lively

25  discussions.  There were a lot of times when we were not



 1 │ unanimous in our decisions.  The minutes would reflect

 2 │ that.  But we took each one very seriously, because at

 3 │ that point in time we were acting as the Supreme Court.

 4 │     Q   BY MS. HAMILTON:  When you served on the State

 5 │ Board, did you ever receive appeals pertaining to

 6 │ students in the GNETS program?

 7 │         MR. BELINFANTE:  Object to form.

 8 │         THE WITNESS:  I can't recall specifically.

 9 │     Q   BY MS. HAMILTON:  Okay.  And, Mr. Winter, I am

10 │ going to show you another document.  Give me one second,

11 │ and I would like the court reporter to mark this as

12 │ Plaintiff's Exhibit 625.

13 │         (Plaintiff's Exhibit 625 was marked for

14 │ identification.)

15 │     Q   BY MS. HAMILTON:  This is a February 16th, 2016

16 │ e-mail chain between you and Dr. Garry McGiboney with the

17 │ subject "Case # 16-0021."  The Bates number for this

18 │ document is on the first page, GA00506530.

19 │         I want to give you a moment to look at this

20 │ document, and I do want to flag that I am switching gears

21 │ slightly from complaints to the topic of waivers, but I

22 │ will give you a moment to look at this.  Let me make sure

23 │ you have control of the document, and let me know when

24 │ you are ready.

25 │     A   Okay, I read it.



1    Q    Okay.  So beginning with the original e-mail

2    from Dr. McGiboney, he appears to be e-mailing you a case

3    number, and it says for the Elam Alexander GNETS program.

4    Do you see that?

5    A    I do.

6    Q    Okay.  So your response, you say, "What

7    additional information is available to me.  Was a typical

8    waiver summary prepared?"

9         I'm trying to get a better understanding of

10   what -- what -- like what is a waiver?  What -- what was

11   the -- what was the basis for this whole e-mail exchange?

12   A    Well, obviously people wanted a waiver of rules

13   based on something, okay, and so we -- we got the

14   document and the recommendation, but the information to

15   make a decision was not attached, and my response was,

16   where is the typical waiver summary that gives me the

17   facts?

18        And Garry then had -- replied and so that I

19   would know where they stood on it; that they agreed they

20   didn't have any information, and -- and the parent had

21   decided to do something else, so...

22   Q    And the information that you were asking for

23   was for the waiver summary, and you are saying that was

24   not provided?

25   A    That's correct.



1        Q    And then it appears here in Dr. McGiboney's

2   response, he mentions that these are for medical waivers.

3   Just let me see if I -- I'm trying to make sure I have a

4   clear understanding of what service these families would

5   have been seeking permission, like what -- what services

6   they are seeking a medical waiver from.

7              As a member of the State Board, did you all

8   receive medical waivers with any degree of frequency?

9        A    We got some, a few every year.

10        Q    And what -- I guess I'm trying to understand,

11   what exactly is a medical waiver?

12        A    Where we --

13              MR. BELINFANTE:  Object to form.

14              THE WITNESS:  -- waive certain rules based on

15   the medical needs of a child.

16        Q    BY MS. HAMILTON:  I'm sorry, can you repeat

17   that?

18        A    Where we waive some of the rules because of a

19   medical need of a child.  And the reason you are confused

20   is the same reason I'm confused, and in reality, on that

21   one nothing was really answered because the parents

22   pulled the child.

23        Q    I'm going to stop sharing this document.

24              As a State Board member, were any concerns ever

25   brought to your attention regarding the use of physical



1  restraints in GNETS programs?

2      A    Yes.

3           MR. BELINFANTE:  Object to form.

4      Q  BY MS. HAMILTON:  Okay.

5           MR. BELINFANTE:  Marcie --

6      Q  BY MS. HAMILTON:  What was the nature --

7           MR. BELINFANTE:  -- did you -- I'm sorry, we're

8  talking over each other, and I was trying to make sure

9  that last answer --

10          MS. HAMILTON:  Sorry, go ahead, Josh.

11          MR. BELINFANTE:  -- got on.

12          Yeah, but if the court reporter got that

13  answer, I'm good.

14          THE REPORTER:  He said yes.

15          MR. BELINFANTE:  Okay.  Great.

16     Q  BY MS. HAMILTON:  All right.  Mr. Winter, what

17 was the nature of those concerns pertaining to

18 physical -- the use of physical restraints in GNETS

19 programs?

20     A    Before I came on the board, evidently there was

21 a bad case that occurred in Gainesville, and that was

22 used as a teaching point to board members in explanations

23 of things.  So that was the one that was brought to my

24 attention that occurred before I was on the board.

25     Q    And to the extent that it was used as a



 1  teaching point, do you know if there was any specific
 2  action that the State Board took in response to that
 3  incident?
 4          MR. BELINFANTE:  Object to form.
 5          THE WITNESS:  No.  I think the problem was that
 6  the rules that were in place were not followed.
 7      Q   BY MS. HAMILTON:  And when rules that are in
 8  place for issues such as physical restraints aren't
 9  followed, is there any recourse that the State Board of
10  Education has in responding to those issues?
11          MR. BELINFANTE:  Object to form.
12          THE WITNESS:  I would say the answer is yes,
13  and we would be having some significant reach to our
14  level that hadn't been resolved by staff levels beneath
15  it, we would be calling the local superintendent and his
16  school board before the State Board.
17      Q   BY MS. HAMILTON:  Who on the State Board would
18  make those phone calls?
19      A   The phone calls to call them to have them come,
20  that would have been DOE staff, probably.  It could have
21  been any number of people, but DOE staff would have
22  called them to have them come.  We would have prayer
23  meetings like that probably about one a year with a
24  different LEA on all sorts of different items, but
25  sometimes you just have to sit and talk face-to-face.



1    Q   And was the withdrawal of funding ever a

2   consequence stemming from -- stemming from a program

3   improperly using physical restraints?

4    A   No, ma'am, not that I am aware of.  I am not

5   aware of any case on physical restraints other than that

6   history one that was ever brought to me.

7    Q   Similarly, have there ever been any concerns

8   brought to your attention when you served on the State

9   Board regarding the use of seclusion in GNETS programs?

10        MR. BELINFANTE:  Object to form.

11        THE WITNESS:  Not that I recall.

12    Q   BY MS. HAMILTON:  During your time as a State

13   Board member, were there any policy changes that you

14   believed were necessary regarding the use of restraints

15   in the GNETS program?

16    A   Specifically, no.  If anything were, I would

17   have thought that that would have been included in the

18   work done by Nakeba and Clara as they were coming to us

19   with the new rules.

20    Q   During your time as a State Board member, were

21   there any additional resources that you felt the GNETS

22   programs would benefit from having?

23        MR. BELINFANTE:  Object to form.

24        THE WITNESS:  In total, the answer -- my answer

25   is no.  The -- you know, could there have been scattered

1  needs because something wasn't handled correctly?  The

2  answer, of course, would always be yes when you are

3  dealing in numbers.  But we had a few GNETS programs that

4  had to have some counseling, and they got better, be it

5  about how they were dealing with their physical structure

6  or whatever, or we had to go retrain them when Claire

7  lived in Albany for a while.

8           But I -- I believe that good results were being

9  obtained.  You are dealing with a very special group of

10 young people and some of whom I got to talk to at various

11 locations, many of whom were relieved to be in the GNETS

12 area as opposed to feeling pressures in their original

13 schools.

14          You know, is GNETS perfect?  No, I'm sure it's

15 not.  Is any educational program perfect?  I am sure they

16 are not either.

17          MS. HAMILTON:  Thank you, Mr. Winter.  I'd like

18 to take a five-minute break, and we can pick back up at

19 4:35.

20          THE VIDEOGRAPHER:  We are off the record at

21 4:31 p.m.)

22          (The deposition was at recess from 4:31 p.m. to

23 4:38 p.m.)

24          THE VIDEOGRAPHER:  We are back on the record at

25 4:38 p.m.



1              MS. HAMILTON:  All right.  Thank you.

2              Mr. Winter, I do not have any additional

3     questions for you at this time, but I would like to pause

4     in the event that the State has any questions, and if so,

5     I may circle back afterwards.

6

7                          EXAMINATION

8     BY MR. BELINFANTE:

9         Q    Mr. Winter, I just have a couple of questions,

10    actually, just to clear up some things.  You testified

11    today that the meetings of the State Board of Education

12    and the meetings of the budget committee were open to the

13    public.  Do you recall that?

14        A    Yes, ma'am.  I mean, yes, sir.

15        Q    That's all right.

16             And were there times that either the budget

17    committee or the State Board of Education would go into

18    executive session?

19        A    The State Board, yes.

20        Q    Okay.

21        A    They had appeals personnel, legal matters and

22    so on were all done that way.

23        Q    Okay.  And -- and once the State Board is in

24    executive session, that is away from the public; is that

25    correct?



1      A    That is correct.

2      Q    And is it your understanding that that is as

3   set forth in the Georgia Open Meetings Act?

4      A    Yes.

5           MR. BELINFANTE:  Okay.  That's the only

6   questions I had.

7           MS. HAMILTON:  Thank you.

8           And Mr. Winter, I don't have any further

9   questions.  Thank you very much for your time today.

10          THE WITNESS:  Thank you.  You all have a good

11  day.

12          THE VIDEOGRAPHER:  That concludes the

13  deposition of Larry Winter.  We are off the record at

14  4:39 p.m.

15          THE REPORTER:  Mr. Belinfante, you did want a

16  copy of the transcript?

17          MR. BELINFANTE:  Yes, we will do what we

18  normally do.  I think we get certainly an electronic,

19  both condensed and full.

20          (The deposition concluded at 4:39 p.m.)

21

22

23

24

25



1                        CERTIFICATE OF REPORTER

2     STATE OF GEORGIA        )
                             )
3     COUNTY OF DEKALB        )

4

5             I, Marcella Daughtry, a Certified Reporter in
      the State of Georgia and State of California, do hereby
6     certify that the foregoing deposition was taken before me
      in the County of DeKalb, State of Georgia; that an oath
7     or affirmation was duly administered to the witness,
      LARRY E. WINTER; that the questions propounded to the
8     witness and the answers of the witness thereto were taken
      down by me in shorthand and thereafter reduced to
9     typewriting; that the transcript is a full, true and
      accurate record of the proceeding, all done to the best
10    of my skill and ability;

11            The witness herein, LARRY E. WINTER, has
      requested signature.
12
              I FURTHER CERTIFY that I am in no way related
13    to any of the parties nor am I in any way interested in
      the outcome hereof.
14

15            IN WITNESS WHEREOF, I have set my hand in my
      office in the County of DeKalb, State of Georgia, this
16    13th day of December, 2022.

17

18

19                   _Marcella Daughtry_

20                   _____
                     Marcella Daughtry, RPR, RMR
                     GA License No. 6595-1471-3597-5424
21                   California CSR No. 14315

22

23

24

25



800.211.DEPO (3376)
EsquireSolutions.com

1   United States of America v. State of Georgia
    J8828134
2

3              DECLARATION UNDER PENALTY OF PERJURY

4

5              I declare under penalty of perjury that I

6   have read the entire transcript of my deposition taken in

7   the above-captioned matter or the same has been read to

8   me, and the same is true and accurate, save and except

9   for changes and/or corrections, if any, as indicated by

10  me on the DEPOSITION ERRATA SHEET hereof, with the

11  understanding that I offer these changes as if still

12  under oath.

13

14  Signed on the_____day

15  of _____20___.

16

17

18

19  _____

20  LARRY E. WINTER

21

22

23

24

25



```
 1                    DEPOSITION ERRATA SHEET
                            J8828134
 2

 3    Page No.____Line No.____Change to:_____

 4    _____

 5    Page No.____Line No.____Change to:_____

 6    _____

 7    Page No.____Line No.____Change to:_____

 8    _____

 9    Page No.____Line No.____Change to:_____

10    _____

11    Page No.____Line No.____Change to:_____

12    _____

13    Page No.____Line No.____Change to:_____

14    _____

15    Page No.____Line No.____Change to:_____

16    _____

17    Page No.____Line No.____Change to:_____

18    _____

19    Page No.____Line No.____Change to:_____

20    _____

21    Page No.____Line No.____Change to:_____

22    _____

23    Page No.____Line No.____Change to:_____

24    LARRY E. WINTER

25    Signature:_____
```



```
 1                    DEPOSITION ERRATA SHEET

 2                          J8828134

 3    Page No.____Line No.____Change to:_____

 4    _____

 5    Page No.____Line No.____Change to:_____

 6    _____

 7    Page No.____Line No.____Change to:_____

 8    _____

 9    Page No.____Line No.____Change to:_____

10    _____

11    Page No.____Line No.____Change to:_____

12    _____

13    Page No.____Line No.____Change to:_____

14    _____

15    Page No.____Line No.____Change to:_____

16    _____

17    Page No.____Line No.____Change to:_____

18    _____

19    Page No.____Line No.____Change to:_____

20    _____

21    Page No.____Line No.____Change to:_____

22    _____

23    Page No.____Line No.____Change to:_____

24    LARRY E. WINTER

25    Signature:_____
```

