1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                       ATLANTA DIVISION

3

4  UNITED STATES OF AMERICA,
                                    )CIVIL ACTION
5            Plaintiff,             )NO. 1:16-cv-03088-ELR
                                    )
6  vs.                              )
                                    )
7  STATE OF GEORGIA,                )
                                    )
8            Defendants.            )
                                    )
9  - - - - - - - - - - - - - - -    )

10

11              VIDEOTAPE DEPOSITION OF

12                 MICHAEL D. ROWLAND

13

14         Thursday, June 9, 2022, 9:02 a.m., EST

15

16

17

18

19

20         HELD AT:

21         Robbins Alloy Belinfante Littlefield LLC
           500 14th Street, N.W.
22         Atlanta, Georgia  30318

23         -----------------------------------------------

24

25         WANDA L. ROBINSON, CRR, CCR, No. B-1973
           Certified Shorthand Reporter/Notary Public



```
 1                   APPEARANCES OF COUNSEL

 2

 3    Appearing on Behalf of the Plaintiff:

 4

           KELLY GARDNER, ESQUIRE
 5         VICTORIA LILL, ESQUIRE
           LAURA TAYLOE, ESQUIRE
 6         U.S. Department of Justice
           Civil Rights Division
 7         950 Pennsylvania Avenue, N.W.
           Washington, D.C. 20579
 8         T:  202.305.6630   F:
           E-mail:  kelly.gardner@usdoj.gov
 9                  victoria.lill@usdoj.gov
                    laura.tayloe@usdoj.gov
10

11

12    Appearing on Behalf of the Defendant:

13

           JAVIER PICO PRATZ, ESQUIRE
14         DANIELLE HERNANDEZ, ESQUIRE
           MELANIE JOHNSON, ESQUIRE
15         Robbins Alloy Belinfante Littlefield LLC
           500 14th Street, N.W.
16         Atlanta, Georgia  30318
           T:  404.856.3261
17         E-mail:  jprats@robbinsfirm.com
                    dhernandez@robbinsfirm.com
18                  mjohnson@robbinsfirm.com

19

20

21

22

23

24

25
```



```
 1  ALSO PRESENT:

 2  VIA ZOOM:

 3          FRANCES COHEN, ESQUIRE

 4          PATRICK HOLKINS, ESQUIRE

 5          RENEE WOHLENHAUSE, ESQUIRE

 6          ANDREA HAMILTON, ESQUIRE

 7          SANDRA LE VERT, ESQUIRE

 8

 9

10

11

12

13

14  ALSO PRESENT:

15      BRANDON BRANTLEY, Videographer

16

17

18

19

20

21

22

23

24

25
```



```
 1                   INDEX OF EXAMINATIONS

 2

 3  MICHAEL D. ROWLAND

 4  By Ms. Tayloe                               Page 9

 5

 6

 7                    INDEX OF EXHIBITS

 8  PLAINTIFF'S

 9  NO.                DESCRIPTION                PAGE

10  Exhibit 114  Notice of Deposition              28

11  Exhibit 115  1/7/2016 Email Chain From Michael  66
                 Rowland To Doug Suits
12               GA00196767

13  Exhibit 116  1/19/2016 Email From Michael       71
                 Rowland To Clara Keith
14               GA00196789

15  Exhibit 117  Facility Condition Assessment      71
                 Checklist
16               SBE/DOE GNETS Program
                 GA00196790-GA00
17

18  Exhibit 118  5/31/2016 Email From Michael       78
                 Rowland To Ted Beck
19               GA00279624

20  Exhibit 119  7/15/2016 Email Chain From Sarah   80
                 Paul To Nakeba Rahming/Gregory Snapp
21               Electronic Attachment
                 GA00197246-GA00197247
22

23  Exhibit 120  1/20/2017 Email From Michael       91
                 Rowland To Keith and Recipients
24               GA01929308-GA01929309

25
```



```
 1              INDEX OF EXHIBITS (Continued)

 2    PLAINTIFF'S

 3    NO.               DESCRIPTION              PAGE

 4    Exhibit 121  2/24/2017 Email From Michael      105
                   Rowland To Kerri Miller/David Mosely
 5                 GA01486553-GA01486554

 6    Exhibit 122  Facility Conditions Assessments of  109
                   GNETS -GSFIC
 7                 GA01486555-GA01486562

 8    Exhibit 123  3/14/2017 Email From Michael      118
                   Rowland To Recipients
 9                 Electronic Attachment
                   GA01488731-GA01488734
10
      Exhibit 124  11/8/2017 Email From Michael      127
11                 Rowland To Mark Morgan
                   With Attached Email To Morgan
12                 GA00132718-GA00132719

13    Exhibit 125  8/10/2016 Email Chain From Michael  134
                   Rowland To Leonard McCoy
14                 GA04088751-GA04088752

15    Exhibit 126  2/26/2018 Email Chain From Michael  154
                   Rowland To Todd Cason
16                 GA00315849-GA00315850

17    Exhibit 127  5/18/2016 Email Chain From Michael  157
                   Rowland To Nakeba Rahming
18                 Electronic Production
                   GA00041561-GA00041564
19
      Exhibit 128  3/3/2016 Email Chain From Michael   159
20                 Rowland To Emily Jones
                   Electronic Production
21                 GA00196912

22    Exhibit 129  GSFIC Request For Qualifications    160
                   Project No. E-414-FY16-GNET
23                 Electronic Production
                   GA00196913-GA00196
24

25
```



1                    INDEX OF EXHIBITS (Continued)

2    PLAINTIFF'S

3    NO.                    DESCRIPTION                    PAGE

4    Exhibit 130   1/8/2017 Email From Michael          161
                   Rowland To Pat Schofill
5                  Electronic Production
                   GA04089636
6
     Exhibit 131   Facilities List - Excel Spreadsheet 163
7                  GA04089637

8    Exhibit 132   3/1/2017 Email From Michael          167
                   Rowland To Marilyn Dryden
9                  Electronic Production
                   GA04092894-GA04092895
10
     Exhibit 133   8/16/2017 Email Chain From Michael   169
11                 Rowland To Nakeba Rahming
                   GA00791991-GA00791993
12
     Exhibit 134   6/9/2017 Email From Michael          171
13                 Rowland To Stacey Suber-Drake, et al.
                   GA02546048
14
     Exhibit 135   2016 State of Our Schools            175
15                 America's K-12 Facilities
                   GA00985661-GA00985707
16

17

18

19

20

21

22

23

24

25



```
 1              INDEX OF EXHIBITS (Previously Marked)

 2     PLAINTIFF'S

 3     NO.                  DESCRIPTION                    PAGE

 4     Exhibit 86  12/1/2015 Email From Michael             59
                   Rowlan To Ted Beck
 5                 With Attached Documents
                   GA00196569-GA00196587
 6
       Exhibit 87  4/20/2017 Email Chain From Michael      125
 7                 Rowland To Clara Keith
                   With Attached Document
 8                 GA001488847-GA01488858

 9
       Exhibit 88  3/30/2017 Email From Michael            112
10                 Rowland To Recipients
                   With Attached Document
11                 GA00198597-GA00198600

12     Exhibit 89  2/17/2016 Email From Michael             74
                   Rowland To Keith Clara
13                 With Attached Documents
                   GA00196895-GA00196898
14
15     Exhibit 91  7/25/2016 Email Chain From Stacey        87
                   Suber-Drake To Nakeba Rahming
16                 With Attached Document
                   GA01486054-GA01486056
17
18
19
20
21
22
23
24
25
```



800.211.DEPO (3376)
EsquireSolutions.com

1        THE VIDEOGRAPHER:  This will be the video

2    deposition of Michael Rowland, being taken in

3    the matter of United States -- United States of

4    America versus State of Georgia.

5        Today's date is June 9th, 2022.

6        The time on the record is 9:02 a.m.

7        My name is Brandon Brantley.  I'm the

8    videographer.  Wanda Robinson is the court

9    reporter.

10       Counsel, please introduce yourselves for

11   the record, after which the court reporter will

12   swear in the witness.

13       MS. TAYLOE:  My name is Laura Tayloe.  I

14   represent the United States.  I'm here with my

15   colleagues Kim Gardner and Victoria Lill.

16       MR. PICO PRATS:  I'm Javier Pico.  I

17   represent the State of Georgia, and I'm here

18   with my colleagues Melanie Johnson and Danielle

19   Hernandez.

20               - - - - - - -

21           MICHAEL D. ROWLAND,

22   being duly sworn, was examined and testified as

23   follows:

24               - - - - - - -

25



```
 1   EXAMINATION
 2   BY MS. TAYLOE:
 3        Q    Good morning, Mr. Rowland.
 4        A    Good morning.
 5        Q    Thank you for your time.
 6             As you heard, I represent the United
 7   States in the action the United States versus the
 8   State of Georgia.
 9             Am I correct in understanding you're
10   represented by Mr. Pico for purposes of today's
11   deposition?
12        A    That is correct.
13        Q    Have you ever been deposed before?
14        A    Yes.
15        Q    In what context?
16        A    A little over a year ago in another
17   GNETS-related case.
18        Q    Is that the only time?
19        A    Yes.
20        Q    And in that deposition were you a
21   representative of the Department of Education, or
22   was that in your personal capacity?
23        A    Representative of the Department of
24   Education.
25        Q    Right.  So you understand -- just like
```



1  that time, you're under oath.  I'm going to ask

2  questions and your obligation is to answer as

3  truthfully and completely as you can.

4        A    Yes, ma'am.

5        Q    And the court reporter here is recording

6  what we say, recording our conversation for the

7  transcript.  So I would ask that you speak slowly

8  and clearly, answer verbally without head shakes or

9  uh-huhs or uh-uhs.

10            Is that okay?

11       A    Yes.

12       Q    And so that we can avoid talking over each

13 other, I will let you answer my question before I

14 ask my next question and I would ask you to let me

15 finish my question before you begin your answer.

16            Is that okay?

17       A    Yes.

18       Q    If you don't understand my question,

19 please feel free to tell me you don't understand.  I

20 can clarify it or rephrase it.

21       A    Okay.

22       Q    And if there comes a time later that you

23 remember something that you think would more

24 completely answer a question that we've already

25 addressed, just let me know.  We can go back and



1  supplement that record.

2        A    Okay.

3        Q    If you're -- well, if the attorney for the

4  State objects to my questions, you may still answer

5  them, so long as he doesn't instruct you not to

6  answer.  Do you understand?

7        A    Yes, ma'am.

8             MS. TAYLOE:  I want to state for the

9        record the parties have stipulated objections

10       except as to form and privilege have been

11       reserved.

12            MR. PICO PRATS:  Yes.

13 BY MS. TAYLOE:

14       Q    Mr. Rowland, we'll take occasional breaks,

15 but if you need a break outside of one that is

16 scheduled, just let us know.  My only question would

17 be -- request would be that you answer any pending

18 question and can we see about taking a break.

19       A    Okay.

20       Q    Is there any reason you can think of that

21 would prevent you from being able to answer

22 completely and truthfully.

23       A    No.

24       Q    Thank you.  Okay.  That takes care of the

25 background stuff.



1              Could you please tell me your -- tell me

2      about your educational background after high school.

3          A    Okay.  I attended Abraham Baldwin

4      Agriculture College, where I have an associate

5      degree in business administration.  Then Georgia

6      College, where I have a bachelor of -- bachelor of

7      science in -- political science.

8              And I have a Master's degree from Georgia

9      College in social studies and an educational

10     specialist degree from the University of Georgia.

11         Q    What is the specialist degree in?

12         A    I'm sorry.  School administration.

13         Q    Thank you.

14              Okay.  Do you have any other relevant

15     certifications, credentials, licenses for the work

16     that you do?

17         A    I hold a license to teach in the State of

18     Georgia.  I think it expires this year, actually.

19              And a license as a school administrator.

20         Q    And are you currently employed by the

21     Georgia Department of Education?

22         A    No.

23         Q    Okay.  Who is your current employer?

24         A    Well, I'm retired and I work part-time for

25     a firm SSOE.  Stevens and Wilkinson.



1      Q     When did you retire?

2      A     August of 2021.

3      Q     Did you retire from a position in the

4   Department of Education?

5      A     Yes.

6      Q     What was that position?

7      A     I was the assistant director for Facility

8   Services.

9      Q     How long had you worked for the Department

10  of Education prior to your retirement?

11     A     10 years.

12     Q     And how long had you been in the assistant

13  director for Facility Services position?

14     A     About four years.

15     Q     So can we -- I'll do rough.

16           So approximately 2017 to 2021?

17     A     Um, that sounds about right.  I went to

18  work with the department in 2011.

19     Q     Why don't we -- why don't we worked

20  forward then?

21     A     Okay.

22     Q     What position did you have in 2011?

23     A     In 2011 I was hired as an educational

24  facilities consultant in the Facilities Services

25  Division.  That was in August of 20 -- I'm sorry.



 1   August of 2011.

 2            In October of the following year, I was

 3   hired as the director of Facility Services, and I

 4   held that position until a reorganization of the

 5   department, where we combined Facilities and

 6   Transportation.  I think '16 or '17 is about the

 7   right time frame for that.

 8            The reorganization gave me a chance to

 9   take a lesser position in the department and work

10   from home, so I took advantage of that and worked

11   for the balance of my term as the assistant

12   director, just working with facilities.

13       Q    Okay.  So in the combined Facilities and

14   Transportation Department, you were working on the

15   facilities side?

16       A    Yes.

17       Q    Okay.  Thank you.

18            Then let's go back a little bit before

19   that.  You said you had a teaching license.  Did you

20   have education experience before --

21       A    Yes.

22       Q    -- these roles?

23       A    Yes.

24       Q    Can you tell me what those were?

25       A    I taught high school social studies --



1  well, middle school, high school social studies from

2  1982 to 1988.

3            From '88 to '92, I worked as an

4  administrator with alternative education population.

5            In 1996, I became a high school principal

6  in Pulaski County; and I was high school principal

7  in Wayne County for six years; Putnam County for two

8  years, which is where I currently reside.  And the

9  balance of my career I worked in the central office

10  as the operations director for the Putnam County

11  schools.

12     Q    Operations director, is that sort of

13  oversees all the different aspects of the school

14  system?

15     A    Well, it was -- yes.  My responsibilities

16  were Facilities, Transportation, Food Service, and

17  Finance.

18     Q    Facilities, Transportation, Food Service,

19  and Finance.  Okay.

20            And I want to back up for a second.  You

21  mentioned you had an administrative role with an

22  alternative education population.  Can you tell me

23  what that entailed?

24     A    Yes.  In -- let me make sure I get the

25  dates right.



1          Something about retirement, you forget
2    things.  I think that's a trigger.
3          But probably about -- I worked in Houston
4    County at that time, and Houston County had an
5    alternative school program for the six -- eight --
6    6-12 population at that time, and probably around
7    '89, '90 they started a program specific to middle
8    grade students, where a population -- the population
9    was students who had been -- I'm going to use this
10   term for lack of a better one -- adjudicated,
11   disruptive through a due process feature that
12   assigned them to an alternative program.
13         Then there was a population of students
14   that were behind grade level and we created a
15   program to work with those students.
16         Eventually, those two programs were housed
17   in a facility where we had in that facility a -- it
18   would have been a GNETS program now.  Back in those
19   days it was referred to as Psycho Ed.
20         And as, as principal of that facility, I
21   had oversight over the day-to-day operations of the
22   facility and I guess day-to-day oversight over the
23   disruptive population and the off-grade level
24   population, and my building housed -- I'll refer to
25   it as the GNETS program at that time, but I really



1  didn't have direct oversight over those students.

2      Q    So thank you for all that.  I want to make

3  sure I understand that.

4          So you're saying in one facility there was

5  the program for adjudicated, disruptive students,

6  behind grade level program, and the GNETS program

7  was separate from those two?

8      A    Yes.

9      Q    Okay.  Thank you.  We're going to come

10 back to some of those things later.  I was getting

11 background there.

12         So going forward, if I ask you a question

13 and your answer would depend on your position at the

14 time, or just clarify, let me know, because I may

15 have the sequence wrong if I'm assuming you were in

16 one position when I ask a question.  Just let me

17 know.

18     A    Yes.

19     Q    Can you describe your responsibilities in

20 the position you had before your retirement, in your

21 assistant director of Facility Services?

22     A    The Department of Facility Services was

23 responsible for administering the State's capital

24 outlay program for K-12 schools, and my role was --

25 and in that role there were five field consultants



1  that worked with school systems to assist them in

2  the facility, planning aspect of that requirement.

3          And I oversaw the relationship between the

4  -- or I had oversight over the relationship between

5  the field consultants, the school districts, and the

6  rules, guidelines and implementation of that capital

7  outlay program for schools.

8      Q    And you mentioned a facility planning

9  aspect requirement.  What was the requirement?

10     A    In order for schools to participate -- in

11 order for school systems to participate in the

12 State's capital outlay program, the law requires

13 that they engage in a five-year local facility

14 planning process, and that process is defined by

15 State Board rule guideline procedure.

16     Q    So each school district presents the local

17 facility plan every five years or updates it every

18 year?

19         I'm sorry.  How does that work time wise?

20     A    Yes.  So -- there's a little bit of

21 evolution, even in the 10 years that I was with the

22 department.

23         Early on, it was a five-year snapshot, if

24 you want to call it that, of the facility needs in

25 that particular school system.  But even in the 10



 1  years that I was there, we evolved away from that

 2  snapshot approach and more toward an annual update.

 3          And what the law requires is that the

 4  facility plan be updated annually and that every

 5  five years there be a visit from a validation team.

 6          So, so when we're -- for those of us in

 7  the business, we talk about this five-year -- this

 8  five-year exercise as the five -- as kind of the

 9  five-year plan, but it really gets updated every

10  year with, with student count numbers, FTE numbers,

11  and the needs of the district.

12      Q    Do you know if GNETS facilities are

13  included in the local facilities plans?

14      A    It depends.

15      Q    What does it depend on?

16      A    Well, so, so if the local facility plan,

17  the district -- let me answer this way.

18          If a GNETS program were housed in a

19  facility that was included in the district's local

20  facility plan, then the answer is yes.

21          If a GNETS program or center were housed

22  in a facility that was not in the district's local

23  facility plan, then the answer would be no.

24      Q    Okay.  I'm going to jump out of my order

25  here because this is coming up now.



1      A      That's okay.

2      Q      Are you familiar --

3             MS. TAYLOE:  Well, strike that.

4   BY MS. TAYLOE:

5      Q      Facilities that are -- GNETS facilities

6   that are included in LFPs, are they in what many

7   people consider general education school, a

8   classroom in a general education school?

9      A      Yes.

10     Q      And ones that are not included in LFPs

11  might be standalone centers, facilities that only

12  serve GNETS students?

13     A      I wouldn't say that's true in total, but

14  it could be true.

15     Q      What kinds of -- what part of that did I

16  not get right?

17     A      So if, if -- from time to time school

18  districts using the State's rules could phase a

19  facility out of their facility plan; and when they

20  do that, what they're saying is the district, for

21  any number of reasons, no longer has a K-12 use, an

22  instructional use for this facility.  And so we want

23  to -- we're going to phase it out of our plan.

24            It doesn't mean the district doesn't own

25  it anymore, doesn't mean that the district might not



1  find some use for it.  It's just that the district

2  is saying we're not going to use it for a K-12 FTE

3  earning function.

4          And from time to time a GNETS -- a center

5  might have been located in one of these facilities

6  that have been phased out of a local facility plan.

7  But it is also possible that a school system would

8  say we have a facility that is in our plan, that is

9  considered a center, and GNETS population is housed

10  there but other programs are housed there as well.

11  And so in that case a center could still be in the

12  local facility plan.

13     Q    Thank you for clarifying that.

14          If a GNETS facility --

15          MS. TAYLOE:  I'm sorry.

16     Q    If a GNETS program moves into a facility

17  that had been phased out, would that facility remain

18  on the district's LFP?

19     A    No.

20     Q    Because it's not eligible for state funds

21  anymore because it's phased out?

22     A    Correct.

23     Q    Okay.  I wanted to make sure I got that.

24  Thank you.

25          I'm going to go out of my order, too,



 1 because we started talking about things I

 2 anticipated coming up later.

 3            Could you clarify for us, please, what a

 4 K-12 FTE function is?

 5      A    Yes.  The State counts students in

 6 full-time equivalents, and there's really kind of

 7 two components of that.  One, I'm not aware of --

 8 less familiar with, the other I'm more familiar

 9 with.

10            But in -- relative to the state law for

11 funding programs, FTE -- they're weighted FTE.  So

12 various categories of students earn funds based on

13 their identity.  You know, whether they're 9-12,

14 vocational programs, special education programs.

15 All have a different weight that applies to the

16 funding formula.  And that's -- and I know that in

17 general and not specifically.  I have no knowledge

18 of what those weights are.

19            But capital outlay we use non-weighted

20 FTE, which is more like a straight student count.

21 And the law, the law says that the FTE that we --

22 the way we calculate FTE for planning purposes is

23 there's a count in October, there's one in March,

24 and it's -- the formula is two times the fall count,

25 one time the spring count, divided by three.



1          So that average is used in the LFP to
2  project FTE growth or loss over the next five-year
3  period.
4      Q    And then that FTE number that's calculated
5  that way is used to determine the funding that the
6  facility or the district will receive from the
7  State?
8      A    In part.
9      Q    In part they'll receive additional funds
10  or that's part of what goes into the calculation?
11      A    You're asking me for facilities, right?
12  Just on the facilities side?
13      Q    I was going to clarify that because you
14  talk about the weighted number.
15          For the unweighted ones, that's for
16  facilities?
17      A    That's right.
18      Q    An for the weighted ones, it's used for
19  the same thing but it goes more toward programmatic
20  funds?
21      A    The weighted FTE is the QBE formula money
22  that goes to the district.
23      Q    Oh, so the weighted FTE is the QBE.  Could
24  you just state for the record what QBE is?
25      A    Quality basic education.



1      Q    Are GNETS program students counted -- how
2  are they counted for FTE purposes?
3      A    I do not know that specifically.  I just
4  don't know -- I don't know -- I don't know the ratio
5  and the funding formula for, for the various
6  programs.
7           There are, as can you imagine, any number
8  of programs, GNETS being one of them, and each
9  carries a funding.
10          So one is the -- 1.0 is the baseline, and
11 then generally a GNETS program would get funded at
12 1. something, something higher than one against the
13 formula.
14          But I'm not familiar with the specific
15 funding ratios.
16     Q    So how is it then that GNETS students
17 could be placed in a K-12 school that's been phased
18 out if being phased out means it's not eligible for
19 FTE function anymore?
20     A    So it is the practice -- or it was at the
21 time the practice of the Department to say -- the
22 determiner is where are you counting the FTE, and
23 what we would typically see in a situation where the
24 -- where a phased-out facility was being used by a
25 district is that they would be using that facility



1  to deliver the program from multiple school

2  locations in a larger district, and so that FTE was

3  actually being reported back to a home school, not

4  reported from a facility code at the phased-out

5  facility.

6      Q    So if I'm understanding this correctly, so

7  the FTE is attributed to the district that -- like

8  the home school of the student for purposes of FTE

9  accounting, but their services are being provided at

10  the phased-out facility; is that right?

11     A    Correct.

12     Q    Thank you.  That's helpful.

13          Okay.  So that was a little bit -- we went

14  far more into detail than I expected but that was

15  helpful to get that context.

16          Back to when you were the assistant

17  director for Facilities Services, who did you report

18  to?

19     A    Pat Schofill.

20     Q    And who reported to you?

21     A    Hum.  I really had no supervisory role

22  over anyone.

23     Q    Not over the field consultants?

24     A    I had a relationship with the field

25  consultants and I worked with them regularly but I



1  did not -- I did not complete anyone's annual

2  evaluation.

3         Q    Okay.  Understand.  Thank you.

4              And for clarity, I also saw references to

5  field directors.  Is that the same position as the

6  field consultants or is that someone different?

7         A    I'm thinking yes.  I'm thinking that's,

8  that's what our field consultants --

9         Q    There's no other title you're familiar

10 with?

11        A    No, not within the Facility Services unit.

12        Q    Thank you.

13             And then when you were the assistant

14 director for Facility Services, were there other

15 state government agencies or subagencies that you

16 sometimes worked with or communicated with as part

17 of your facilities work?

18        A    Yes.

19        Q    What would they be?

20        A    Well, we communicated with the Governor's

21 Office of Planning and Budget frequently over

22 budgeting.

23             That's the, that's the main outside entity

24 that comes to mind.  I don't have a specific memory

25 of other agencies.  It doesn't mean it didn't



1 | happen.  I'm just not coming up -- obviously, we had
2 | a direct line relationship with the Governor's
3 | Office when it came to budgeting.
4 |      Q    Who was your main contact there?
5 |      A    Oh, my -- I can't recall.  The people at
6 | OPB changed pretty regularly, and I just, I just do
7 | not recall the names.
8 |      Q    That's fine.  And how frequently would you
9 | say you were in communication with people at OPB?
10 |      A    Not infrequently.  You know, it --
11 | typically, they would have a question about -- the
12 | budget submission was usually in the September 1st
13 | time frame.  So obviously from September 1st through
14 | December our office, whether it was me or other
15 | people -- well, they didn't communicate just with
16 | me, but sometimes I was involved in those
17 | communications, and the purpose was to glean
18 | information based on the budget requests that we
19 | submitted from the local -- from the planning
20 | process.
21 |           And then from time to time throughout the
22 | course of, of a year, certainly when the legislature
23 | was in town, there might be inquiries.
24 |           I'm thinking of the legislature.  From
25 | time to time we were asked to communicate with both



1  the house and senate planners, staff.  We met with

2  senators and representatives from time to time at

3  their request for whatever specific questions they

4  might have.

5      Q    So would you describe your role there

6  mostly as providing information that they sought, or

7  were you in an advocacy role?

8      A    I think more provide information.

9      Q    Okay.  Thank you.

10         MS. TAYLOE:  I am going to -- I'm going to

11     hand the court reporter an exhibit that I would

12     like to have marked Exhibit 114.

13         (WHEREUPON, Plaintiff's Exhibit-114 was

14      marked for identification.)

15  BY MS. TAYLOE:

16     Q    Have you seen this document before?

17     A    Yes.

18         MS. TAYLOE:  For the record, this is the

19     notice of deposition of Michael Rowland.

20  BY MS. TAYLOE:

21     Q    Can you confirm you received this

22  deposition notice and your appearance today is

23  pursuant to this notice?

24     A    Yes.

25     Q    And you understand this deposition is



 1  being taken and in connection with the litigation

 2  that we've been -- we referred to earlier?

 3      A    Yes.

 4      Q    And you've been using this term all right,

 5  but just to be clear, when we talk about the GNETS

 6  program, do you understand us to be referring to the

 7  Georgia Network for Educational and Therapeutic

 8  Support program?

 9      A    Yes.

10      Q    Thank you.

11           When did you first learn of this

12  litigation?

13      A    Um, I really think -- and I'm not really

14  clear on what year this was, but probably the first

15  I learned of it was in the 2014, '15, '16 time

16  frame, and the trigger to that was prior to that

17  budget year the Governor's Office put, I'm

18  remembering, $14 million into a budget for GNETS

19  facilities grants.

20           And so that was kind of -- well, not kind

21  of.  That was either at that time or just prior to

22  learning about that through somebody saying, hey,

23  you're going to get some money from the Governor's

24  Office and it's for this, and I started asking, so

25  what's going on?  And then I learned about the

1  lawsuit.

2      Q    So is it fair to say that this kind of

3  grant was not a recurring thing, this is the first

4  time there had been a facilities grant for GNETS?

5      A    Yes.

6      Q    What is your understanding of the nature

7  of the lawsuit?

8      A    I had -- my understanding was that the,

9  the nexus of the lawsuit had to do with the way

10 program services were being provided to GNETS

11 eligible students.

12     Q    What did you understand the issue with the

13 way they were being provided was?

14     A    You know, I really don't have a strong --

15 I don't even have -- I don't even have a superfluous

16 understanding of that, other than, as I mentioned, I

17 have a background as an educator that tells me that,

18 you know, based on IEP, students are eligible for

19 services that are identified.  Specifically what

20 they might be, that knowledge is not -- I don't have

21 that at my finger tips, but whatever, whatever

22 service or supports or program -- programs, for lack

23 of a better way to put it, that GNETS students were

24 eligible for, it's my understanding that the

25 Department of Justice had some concern about --

1  maybe that's understating it, but had some concern

2  about how those were being delivered, or if they

3  were being delivered.

4       Q    So I was going to ask you when you first

5  became aware of the GNETS program but you testified

6  your work with the alternative schools you were in,

7  facility with the predecessor the GNETS program, the

8  psycho educational facilities?  Is that when you

9  first learned about the program?

10      A    I would say, you know, I first taught

11 1982, and in 1982 we had severely disruptive

12 students that, that were -- that were being served

13 by whatever program language was in effect at that

14 time.

15           But I didn't really become involved as an

16 administrator until the early '90s -- '89, '90 time

17 frame.

18      Q    How did you become involved in the early

19 '90s?

20      A    Through the alternative school that I --

21 where I served as the administrator.

22      Q    And that was in the code placed program at

23 the facility?

24      A    Yes.

25      Q    And then when you left that position, did



1  you have any involvement with GNETS again before the

2  grant issue arose?

3       A    Yes.

4       Q    What was that?

5       A    I was a high school principal for 11

6  years, in three different school systems, and from

7  time to time there were students in those schools

8  that were referred for GNETS services.

9       Q    And when you say referred for GNETS

10 services, does that mean they were referred to a

11 different building to receive those services?

12      A    Well, my experience was that we would --

13 or my memory of my experience was that we -- if we

14 had a situation where, you know, these kids were

15 being served on a continuum generally, in the sense

16 that we obviously were trying to find the place to

17 educate them that is least restrictive, but if their

18 behavior was disruptive to the point that it

19 impacted their education in the setting where they

20 were, then an IEP team would be assembled and we

21 would meet with the parents and the IEP team and

22 look at the child's services that were being

23 provided, how it was impacting their program, and

24 then the team would make a decision about placement.

25      Q    Okay.  And so sometimes that team would

1  decide that the services a child needed would be

2  only available at a GNETS facilities program?

3      A    Well, I would say it this way:  The team

4  would decide the child needed GNETS services.  At

5  that point it really became an issue of how, how did

6  the district provide those services.

7           Because in some cases the district

8  provided those services at the home school, either

9  in some kind of pullout program, or some separation

10  from the general population, or some -- didn't have

11  to be that way.  It could be that -- again, based on

12  the continuum of the child's behavior, some kids

13  could manage the regular environment to some degree

14  or, or -- you know, certainly less restrictive than

15  GNETS, but they needed the restrictive nature of the

16  GNETS program for some portion of the day.

17           So it really depended -- again, my memory

18  of my experience is it really depended on the

19  situation.

20           And then in some instances school systems

21  had made management decisions, for lack of a better

22  way to put it, to house a GNETS program at a campus,

23  not, not the home campus.

24      Q    What is your understanding of how the

25  GNETS program is structured?



1      A      Well, I really don't have any knowledge

2   of, of the program side of GNETS, other than what

3   I've explained to you about how it worked when I

4   served as a school administrator.

5           But the last high school principalship I

6   had was in 2007, and, really, from 2007 moving on I

7   just really didn't have any kind of contact with the

8   program, certainly specific to the nature of the way

9   it was run.

10     Q      Understood.

11          So this is also going to seem a little out

12  of order that we've gone through some abbreviations.

13  For the record, I'm getting clear.

14          We haven't talked about if I refer to

15  Department of Education as "DOE" or "GaDOE," you'll

16  understand I'm talking about the Georgia Department

17  of Education?

18     A      Yes.

19     Q      When I refer to an "LEA," I'm talking

20  about a local education agency?

21     A      Yes.

22     Q      And if I refer to a "RESA," I'm talking

23  about a regional education or educational service

24  agency?

25     A      Yes.



```
 1       Q    And if I say "DBHDD," I'm referring to the
 2   Department of Behavioral Health and Developmental
 3   Disabilities?
 4       A    Yes.
 5       Q    I don't know if this will come up, but if
 6   I do say DCH, that's the Department of Community
 7   Health?
 8       A    Yes.
 9       Q    Thank you.
10            And there are some -- I would like for you
11   to tell me what you mean by them or how you
12   understand these abbreviations to work.
13       A    Okay.
14       Q    We've already talked about Local Facility
15   Plan.  So we'll need to say LFP.  That's the Local
16   Facility Plan we've already talked about?
17       A    Correct.
18       Q    What about FSR?
19       A    Facility School Registry.
20       Q    And what's that?
21       A    The Facility School Registry is the
22   mechanism the Department -- the DOE uses to, to
23   database or warehouse information about school
24   sites, facilities, schools and programs.
25       Q    And COPS?
```



1      A      Stands for the capital outlay planning

2    software, and the capital outlay planning software

3    is the mechanism that DOE uses to collect needs

4    assessment data by district to create the statewide

5    needs assessment necessary to determine what capital

6    projects are eligible for state funds.

7      Q      And those would be projects that are

8    listed in the LFPs?

9      A      Yes.

10     Q      Thank you.

11            OPB, that's the Government Office for

12    Planning and Budget?

13     A      Correct.

14     Q      And who are -- how about GSFIC?

15     A      Georgia State Finance Investment

16    Commission, and I had really two -- there were two

17    divisions within GSFIC that I had direct contact

18    with.  One was obviously the finance side, because

19    the planning process that was housed in this COPS

20    software became the basis for entitlement sheets --

21    the basis for entitlement to school districts, which

22    became the basis for a potential application for

23    funding, which became the basis for a budget

24    recommendation to the Governor's Office, which

25    became the basis for a signed budget, which became



1  the basis for the bond sale that would happen

2  subsequent to that to fund those approved projects.

3        Q    I'm trying to kind of ask this in the real

4  world.

5             Is it -- how much of the needs would you

6  say were addressed by the ultimate bond that we're

7  -- needs identified in the plans and requested, how

8  much of that would often be allocated in the final

9  budget?

10            Were those needs fully met or partially?

11       A    Well, I hate to keep saying this, but it

12  depends, and let me see if I can just give you sort

13  of a streamlined idea.

14            With 180 school systems in the state, the

15  purpose of the plan -- the purpose of the plan

16  process -- well, it had multiple purposes, but for

17  purpose of this discussion, the purpose of the plan

18  was to collect needs assessments -- needs assessment

19  data, and those needs would be identified as needs

20  that were eligible for state funds and needs that

21  were not.

22            And the legislature contemplated in the

23  law that districts would collect both sets of

24  information in that Local Facility Plan because from

25  time to time the legislature wanted to understand



1  what is the relationship between state funding and

2  local funding, because none of those projects were

3  ever funded fully.  It was always some portion of

4  the actual cost.

5          And, and that was really by design, not so

6  much in the law.  The law gave the department the

7  authority to make these guidelines and rules, and

8  they did, and decisions were made long before I got,

9  I got involved, that there wasn't enough money to

10 pay for everything, so it would be a portion of what

11 the actual costs were based on formulas that are in

12 State Board rule and get updated from time to time.

13         So, so -- so if you think about it in that

14 context, the need for 180 school systems that was

15 eligible for state funding in a given year might be

16 in the hundreds of billions of dollars, and what got

17 actually funded depended on -- depended on what

18 systems actually applied for in a particular fiscal

19 year, you know, and prior to the upcoming fiscal

20 year.

21         As you can imagine, most school districts

22 wouldn't have enough local money to go with the

23 state funds to get to all of the projects in the

24 plan, so they had to pick and choose and prioritize

25 and do them over time.



1          So, so I don't really know how to quantify

2    a percentage of every year how much of the budget

3    met what percentage of the statewide need, but I

4    think -- I would answer -- or I would say this.  I

5    don't know if it answers your question or not.

6          But in my time at the department I don't

7    remember a time that a local district applied for a

8    project for which they were eligible, we put it into

9    a budget, and it didn't get, it didn't get funded.

10     Q    That's helpful but even if it was funded,

11   they would still -- the local district would have to

12   match some of the funds --

13     A    Yes.

14     Q    -- or provide some of the funds

15   themselves?

16     A    Yes, that's correct.

17     Q    And when you talk about eligible for state

18   funding, what kinds of things are not eligible for

19   state funding?

20     A    Generally site work, which would include

21   repaving parking lots -- and, again, they're kind of

22   two categories of ways to think about it.

23          When you think about a new school, site

24   work is everything from, you know, grading to

25   landscaping, but in an existing facility, a district



1  might have a need to repave a parking lot, for

2  example.  And we would consider that site work and

3  not eligible for state funds.

4          Sometimes -- you know, sometimes a

5  district might put in their plan that they needed to

6  do site work for drainage.  There was some drainage

7  issues and they needed to get a site contractor

8  on-site to do some grading and take care of standing

9  water, whatever, runoff.  Those kinds of -- that's

10 the kind of site work that was not eligible for

11 state funding.

12    Q    And do I understand it correctly that site

13 work means as opposed to facility work?  Like if --

14 sort of the physical property, the land, instead of

15 the building?

16    A    Correct.

17    Q    Okay.  Thank you.

18         Okay.  One last acronym -- not acronym.

19 Abbreviation.  I don't know if you say it by letter

20 or say it, but S-P-L-O-S-T.

21    A    SPLOST.

22    Q    SPLOST.  Okay.

23    A    Yes.

24    Q    Do I understand that to be the Special

25 Purpose Local Options Sales Tax?



1      A    Yes.

2      Q    And E-SPLOST is one for education?

3      A    Correct.

4      Q    And can you tell us a little bit about how

5  that works?

6      A    Sure.  So state law allows for every,

7  every district to place on a ballot a question

8  related to whether the tax -- the voters of that

9  district will impose a one cent sales tax for

10  education, and the constitution of the State of

11  Georgia enumerates what the -- what that tax is

12  eligible to fund.

13          From my perspective, relative to my work

14  at the Department, one of those things it can fund

15  is capital projects.  So, in a nutshell, the

16  E-SPLOST was really the means by which most school

17  systems had money -- had local money to get to the

18  state funds to which they were entitled.

19      Q    So when a district is entitled to state

20  funds but they need local funds to cover the

21  difference, they could raise that money through an

22  E-SPLOST?

23      A    They could.

24      Q    If they got the voters to approve the tax

25  increase?



1      A      That's right.

2      Q      Thank you.  Okay.

3             And then we've kind of touched on some of

4    these but I want to again clarify your terminology

5    here.

6             When we talk about school districts or

7    LEA, we're talking about the county or city

8    overseeing public education in that region; is that

9    correct?

10     A      Yes.

11     Q      And the site, you just clarified, that's

12   the geographical location, the real property itself,

13   the land itself?

14     A      Yes.

15     Q      The facility is on the site, may consist

16   of more than one building?

17     A      Yes.

18     Q      So the term "school" could refer to one

19   building and the site it's on, or a facility with

20   multiple buildings on the site?

21            Would that be encompassed by the word

22   "school"?

23     A      Yeah.  Let me frame it differently.

24     Q      Thank you.

25     A      For purposes of the way we use the term



1  "facility" and "school" and capital outlay," the
2  facility is the, the physical building or collection
3  of buildings, okay.

4          The school represents a, a set of students
5  based on definitions that might be created by the
6  school system.

7          Here's an example.  We may have a -- this
8  would happen most likely in a smaller school system.
9  You may have a facility called ABC Middle High
10 Facility.  It's a collection of buildings on a site,
11 and inside that facility, which might have a single
12 facility code, there might be two schools open, ABC
13 High School and ABC Middle School.  And those two
14 schools have separate codes.  And that coding system
15 is, as I understand it, how the funds flowed back to
16 -- back to the district based on how students are
17 coded in those school settings.

18    Q    So when you gave the example of middle
19 school and a high school in the same facility, would
20 those -- the codes associated with them be referred
21 to as program codes?

22          Is that what the program codes mean or
23 something different than a school code?

24    A    That's something different than a school
25 code.



 1              And, again, I want to -- I want to preface
 2    what I say by telling you that I have a general --
 3    if you talked to me about facility codes, school
 4    code, program code, I certainly understand -- I mean
 5    I certainly have intimate knowledge of what those
 6    codes are intended to do.  And at the -- the school
 7    code identifies a group of students that, that have
 8    a, that have a common structure.
 9              So part of this has to do with -- and I
10    don't -- this is way out of my -- out of my deep
11    understanding, but this really has to do with
12    accountability in a sense that whatever
13    accountability structure is in place now, or the one
14    that started 20 years ago, whenever we first started
15    thinking it might be good to see how kids are doing,
16    or measure it in some way, you had to have a way to
17    identify the kids.  So school code became the way
18    you could say this is how this group of kids is
19    performing relative to other school codes.
20              Well, from time to time school systems,
21    through local board of directors, administrators,
22    that collective -- their collective wisdom, would,
23    would want to create a program that is really a
24    subset of maybe one school or multiple schools
25    trying to, again, engage students in some fashion.



1  You know, whatever it might be.  So that you might

2  bring kids from several school locations into a

3  program, work with them in some special or targeted

4  assistance, maybe that's the way to say it, but at

5  the end of the day each one of those students

6  carried a school code into that program.

7          And so for accountability purposes, when

8  it came time to measure them, they went -- their

9  measurement went back to a school.

10     Q    Okay.  So when you spoke earlier of your

11  experience, there was an alternative school and the

12  off-grade level program and the GNETS program, those

13  are three different programs within a shared

14  facility or a -- a shared facility?

15     A    Yeah.  Well, okay.  I want to try to

16  remember -- remember that was a long time ago now.

17          What I think I remember is that in that

18  situation, which would have been again the late

19  1980s, the kids that were in an alternative

20  environment for, for disruptive behavior, and the

21  kids who were in that environment because they were

22  behind grade level represented the school code.  And

23  that, and that -- that -- those two groups of kids

24  had a school code.  I don't know what it was,

25  couldn't possibly remember that.



MICHAEL D. ROWLAND                                    June 09, 2022
UNITED STATES vs STATE OF GEORGIA                              46

1          But that -- in that way the accountability

2    didn't measure those kids back at a home school,

3    even though they came from one.  It measured them at

4    that location, at that school.

5          The GNETS program at that time was a

6    program, and those kids -- this is my memory -- and

7    those kids would have been -- they would have

8    carried school codes with them that went back to

9    home schools, and not the school code that was

10   associated with the -- and I'm calling the

11   alternative school population.

12      Q    Okay.  So, so some things that might look

13   like programs are in fact schools, and these

14   children will have -- students will have school

15   codes associated with them there, and other things

16   that look like programs are in fact separate service

17   delivery systems, and then the students would have

18   their still school codes associated with them while

19   they're served in that program?

20      A    I think that's right.

21      Q    Okay.  Thank you.

22          I think that's all my questions on that.

23   I just encourage you to correct me if I use a term

24   in a way that makes it not make sense to you, the

25   way I'm trying to ask the question.

1              All right.  Get to the substance.

2              Are you familiar with the GNETS strategic

3    plan?

4         A    I'm not familiar with it, no.  I know it

5    exists, but I haven't looked at it, never -- I

6    didn't have a role to play in creating it.

7         Q    Does the Department of Education have a

8    role to play in it?

9         A    Again, I just -- I don't have any specific

10   knowledge of -- other than the fact that I know that

11   was, as I was transitioning out of my role as a

12   director into a field position and then ultimately

13   retiring, I know that was something that was being

14   worked on, but -- and I had heard reference to it,

15   but I didn't have any direct involvement in, in it.

16        Q    Okay.  Then are you familiar with the

17   Facilities Conditions Assessment Project?

18        A    Yes.

19        Q    Could you describe to me generally what

20   that entailed?

21        A    Okay.  So I was the director when the

22   Governor's Office put the $14 million into the

23   budget for, for GNETS facilities.  And it was --

24   when the budget was passed, my boss, who was the CFO

25   at the time, came down and said, okay, I don't know



1  where this money came from or what we're supposed to

2  do with it but you got to figure it out.

3          Okay.  And, look, it's okay.  I mean

4  that's -- so one of the things -- and this was, this

5  was me.

6          We do -- before we give out money to

7  school systems, we require them to create a needs --

8  to hire an architect and do a needs assessment.

9  Well, I don't care whether they hire them or not.

10 The architect will do it for free but you got to

11 have an architect to do a needs assessment for the

12 things that are going in your plan.

13         We had -- and these numbers might not be

14 exactly right, but they are from my memory.  There

15 were 46 different locations, based on a list I was

16 given from the program staff, that said, here's

17 where all these kids are located.  These are

18 addresses.

19         And some of them are at schools that in a

20 Local Facility Plan, some of them are at -- well,

21 let me -- again, in my world it's easy to use school

22 and facilities interchangeably, but they are really

23 different.  Some of these students were at

24 facilities, in the facility plan.  Some of these

25 students might have been in facilities that were not



1  in a facility plan, and some were in phased-out

2  facilities, and some were in -- so, so, it just

3  occurred to me the first thing we needed was a needs

4  assessment.

5          So I asked for permission to use a portion

6  of that 14 million to engage an architectural firm

7  that would conduct these needs assessments.  And I

8  got that permission.  I went through the selection

9  process, and we hired a firm.

10         And in that summer -- you'd have to tell

11 me the year.  If you tell me the year, I'd say

12 you're right because I don't remember the years.

13 But in the summer of that year the firm that we

14 hired did what we would call a non-destructive site

15 evaluation of each facility, each one of those

16 facilities that was on the list, provided to us by

17 the program staff.

18         They had two or three teams; divided the

19 State up into quandrants.  You know, one team went

20 here, one team went there.  And that function went

21 on all summer.

22         As a kick-off to that, we made a -- we

23 made the decision to -- myself and -- I know I was

24 involved.  Some of the program staff at GNETS was

25 involved in this.  And then representatives from --



1  the team from the architectural firm that we hired,

2  they put together a -- they were going to do --

3  again, if I remember correctly, they were going to

4  do these site visits in about -- in clusters, based

5  on where they were located, just for efficiency.

6         And so we created kind of a test case of

7  three or four sites that we would go look at

8  together.  They would do their work.  We would be

9  there watching it, looking at it, giving feedback,

10 say look at this, don't -- make sure you look at

11 that.  They would say we can't look at this but we

12 can look at that.

13        And that became sort of a baseline from

14 what the teams would do moving forward, to visit the

15 remaining sites, and that function went on during

16 the summer.

17        And in some time in the mid to late July

18 time frame, I think we got a draft report from, from

19 the architect.

20    Q    Thank you very much for that overview.

21        I want to back up to a few things you

22 said.

23        You said you received a list of 46

24 locations from program staff.  Could you tell me who

25 program staff are?



1        A      At that time, the director was Nakeba

2   Rahming.

3        Q      And so she's program staff with what

4   office?

5        A      I don't really know what the office name

6   was at the Department, but --

7        Q      She was in the Department of Education?

8        A      Yeah, she was a Department of Education

9   employee, correct.

10       Q      Okay.  And when you said nondestructive

11  assessment, from what I've seen, I understand that

12  to mean, and correct me if this is wrong, that means

13  they weren't checking for mold or hazardous

14  materials?  Nothing that would have to sort of look

15  behind a wall or something, just what was visible by

16  --

17       A      I think the -- I think looking at what's

18  visible, I mean you can see mold.  So you might, you

19  might see mold.  If you could see it, you could

20  document it.  But if it meant, you know, taking off

21  a wall panel or pulling back part of the roof, then

22  that was not done.  It was pretty much a visual

23  inspection whatever you could see.

24       Q      Okay.  I think we're talking over each

25  other, so I'll try to wait more.



1      A    I'm sorry.

2      Q    I'll ask you to do that.

3           So that's a better way to phrase then.  So

4  it was just what they -- they reported what they

5  would see visually without taking anything apart or

6  looking inside of anything?

7      A    Yes.

8      Q    All right.  And when you said you did a

9  kick-off session yourself and some GNETS staff and

10 architectural firm went to test sites, how were the

11 test sites identified?

12     A    I think just a random.  The, the places we

13 went were in Southeast Georgia, and there was no

14 specific reason for that other than we had to pick

15 somewhere and that's where we picked.

16     Q    Okay.  What was the role -- there was an

17 OPB review as well.  Where did that fall in the

18 sequence?

19     A    That was -- again, I was not involved in

20 that and I only became aware of it when I knew that

21 the Governor had set aside the money for the grant.

22          So it was prior to, prior to the, the

23 money in the budget for the grant and the facility

24 needs assessment.

25     Q    So their review was first, and then your



1  team's review, and then the architectural review?

2       A     Well, their -- as I understand it, OPB

3  review was prior to the Department's review, which

4  was really a -- there wasn't a separate -- well, I

5  think you did say that right.

6            There was a -- again, I remember now that

7  we're talking about it a little bit.  Prior to

8  sending the architects out and us, myself and I

9  think Nakeba was on that team as well, going to

10  Southeast Georgia and doing this test run, we did

11  send our field consultants out to these facilities

12  with a document created by the architect that said,

13  look, just put your eyes on this spot.

14            These guys are not facility condition

15  assessment specialists; they're former educators

16  like I am, but with an awful lot of experience of

17  doing what we do.  And so the first -- kind of the

18  first draft was, take this checklist and just go

19  through the school and give us a very high level,

20  check-it-off-type thing, so that we can then give

21  that information to the architects, and they can use

22  that in informing their decisions about how they,

23  how they move forward with the assessments.

24            So, so there was an OPB function and kind

25  of a department intermediate function, and then



1  this, what I guess would be a more formal exercise

2  by the -- by the architects.

3       Q    Do you recall receiving any assessments or

4  evaluations from OPB that would guide like which

5  ones they thought were in critical condition before

6  you began your review?

7       A    I don't remember that.  I do remember

8  having a meeting with the individual who was -- who

9  had led that effort.  I don't remember her name.

10          It was -- and I'm not even sure I actually

11  saw the physical report, but I do know that she came

12  to my office and sat down and told me what they had

13  done, but I didn't keep any kind of record of, of

14  what she, what she said or identified, and I just

15  don't -- I didn't look at that.  I didn't get that

16  information.

17       Q    Okay.  And what was -- what was the

18  overall objective of completing the facilities

19  conditions assessment?

20          You told us sort of the origin.  What was

21  the objective?

22       A    Well, I think the objective was to create

23  this needs assessment so that -- and very similar to

24  what we do with K-12 capital outlay.  We have a

25  needs assessment, now we're going to offer you an



1   opportunity as a GNETS program to apply for funds to

2   meet some of the needs in this -- assess some or all

3   of the needs in this assessment, and that was what

4   it was for.  I mean that was the basis for it.

5        Q    So were the facilities that were assessed

6   only those that were eligible for grant funding, or

7   were all the GNETS facilities assessed?

8        A    All of them.

9        Q    All of them?

10       A    Everything that was on the -- this is my

11  memory.  Every location that the GNETS staff gave us

12  a physical address for was in that facility

13  conditions assessment.

14       Q    And you gave an estimate before.  Do you

15  remember about how many facilities then were on the

16  final list that were inspected?

17       A    Forty-six.  Or that's my memory.

18       Q    You said before that you learned about

19  this grant and you thought the first thing that

20  needed to happen was a facilities assessment to

21  parallel the work in the other schools, and you

22  asked for permission to use part of that money to do

23  that assessment.

24            Who granted that permission?

25       A    OPB ultimately.



1      Q    OPB.  So that's the Governor's Office?

2      A    Yeah.  The -- I worked for the CFO, and

3  basically get my direction from him.  So when I say

4  OPB, I don't really know that for sure, but I asked

5  him -- it was my assumption he went and asked OPB if

6  it was okay to use the money they appropriated, some

7  portion of it for that purpose, and got permission

8  to do that.

9      Q    Okay.

10      A    So I kind of filled in some gaps there, I

11  think, just assuming that makes sense it would have

12  worked that way.

13      Q    And who else from the Department of

14  Education participated in the site visits with you?

15      A    The only, the only site visit that I

16  participated in was the test site, the test visits

17  to the ones in Southeast Georgia.

18      Q    Okay.

19      A    And I believe that -- I'm reasonably

20  certain the field consultant from that area

21  participated in that, in that visit.

22      Q    Along with you and Nakeba?

23      A    Yes.

24      Q    Do you know if anybody from the Department

25  of Education went on any of the other --



1          MS. TAYLOE:  Well, let me rephrase that.

2      Q    So the field consultants went on the

3  intermediate round of facilities visits.  Do you

4  know if anybody from the Department of Education

5  went with the architecture's round of assessments?

6      A    I don't believe so, no.

7      Q    Do you remember what the results were of

8  the preliminary assessment you said you received in

9  the summer?  What happened when you got the

10  preliminary report?

11     A    There were, there were a number of

12  facilities that the report documented both in

13  narrative form and with supporting pictures that

14  were in very bad condition.

15          And so we shared that information with the

16  State Board of Education.

17     Q    And what did they do with that

18  information?

19     A    The, the -- ultimately, the State Board

20  chair, if I remember this correctly, wrote a letter

21  to those -- I'm going to say programs.  Now, you

22  know, if RESAs were the agencies, then you can say

23  that was RESA, but superintendents are on those

24  boards of control.  So the superintendents really

25  indirectly or directly were the target of the



1  information.

2          And it was my understanding -- or my

3  memory -- and I saw the letter.  Probably -- I just

4  don't remember the specifics of it, other than I

5  think it was aimed at trying to say those districts,

6  you've got some real issues and we're giving you an

7  opportunity to fix them.

8          To the extent that the State Board had

9  whatever authority it had -- which really is outside

10 of my purview.  I don't really know ultimately what

11 authority they had, but I do know the letter went

12 out from the State Board chair that said we've

13 gotten information that says this isn't very good,

14 we need you to do something about it.

15    Q    And was your understanding that the State

16 communicated to the superintendents that the

17 Department of Education would no longer support

18 students being housed in those facilities?

19    A    I don't really know how -- I think, I

20 think -- I think certainly the intent of the letter

21 was to force a conversation on these superintendents

22 that hopefully would help them come to their Own

23 conclusion about the inadequacy of where they housed

24 these kids and make decisions without having to be

25 force into anything.

1          And my memory is that that, that work --

2   that was typical.  That was in general what

3   happened.  Now, that didn't mean I didn't have to go

4   sit down with some of them and walk through what

5   some of their operations were, but -- and we did

6   that at their request.

7          So I think the intent of the letter was

8   certainly to, to heighten the sense of urgency with

9   these superintendents over how they were housing

10  these -- over where they were housing these

11  populations.

12      Q    So it's your recollection that none of the

13  superintendents or school districts felt they were

14  instructed to close facilities?

15          MR. PICO PRATS:  Objection in terms of

16      there's a legal conclusion or any type of

17      knowledge of legal fields, that's outside of

18      his knowledge.

19          MS. TAYLOE:  Okay.  I'll address that

20      through documents then.

21          Let me -- I'm going to start with what was

22      previously marked as Exhibit 86.

23          (WHEREUPON, Plaintiff's Exhibit-86 was

24      marked for identification.)

25



 1  BY MS. TAYLOE:

 2     Q    I'm referring to the exhibit that has been

 3  produced by the State.  It's marked GA00196569, and

 4  it is an email from Mr. Rowland to Ted Beck, dated

 5  December 1st, 2015.

 6          Are you familiar with this document?

 7     A    Yes, ma'am.

 8     Q    Do you see at the beginning of the second

 9  paragraph where you're talking about narrowing the

10  list of facilities to be visited by our consultants?

11     A    Yes.

12     Q    What was the basis for narrowing the list?

13     A    Yeah, I think in reading on down, what I

14  think I'm referring to is the fact that if we had --

15  and we've talked about this earlier.

16          If we had, if we had knowledge that GNETS

17  students were being served in a facility that was

18  already in the Local Facility Plan, then that

19  facility had a way of earning state funds for

20  capital improvements.

21          So we wouldn't look -- those, those --

22  those wouldn't be reviewed.

23          But these other facilities that were not

24  in Local Facility Plans would.

25     Q    So maybe I misunderstood.  When I asked if



1  you were looking at all of the facilities or only

2  those for -- that were eligible for state grants,

3  you said all of them.  Did I misphrase --

4      A    So -- in the sense of that statement, when

5  a school district applies for funding for a facility

6  that's in their local facility grant, plan, that is

7  a state grant for facilities, because if it's

8  funded, those funds are -- so, so in the -- in the

9  true sense of this, the definition of a state grant,

10 if, if -- let's say a GNETS program was housed in a

11 facility that was in the Local Facility Plan and

12 that summer the district applied for a new roof for

13 that school, well, that's a state grant to that, and

14 it was funded.

15     Q    Okay.

16     A    Then that's a state grant.

17     Q    I understand the distinction.  So let me

18 rephrase the question.

19          So was this facilities condition

20 assessment you looked at all GNETS facilities or

21 only those GNETS facilities that would be eligible

22 for the 14 million specific facilities grant --

23     A    Yes.

24     Q    -- that was at issue?

25     A    I think that's correct.  What we were



MICHAEL D. ROWLAND                                June 09, 2022
UNITED STATES vs STATE OF GEORGIA                       62

1  trying to do is target just the facilities that

2  would be eligible for applying for the grant money,

3  because the grant, as I understood it, it was

4  intended to be competitive.

5          We wanted it to be based on this need

6  assessment.  So you at least have to apply for

7  things that have been identified as needs, and if

8  you already have a facility in a Local Facility

9  Plan, there's a mechanism for that already

10 established through department policy.

11         But this other was any facility that fell

12 outside of that.

13    Q    Okay.  So there could be some facilities

14 that might have been disrepair but otherwise

15 needing, needing repairs that might not have been

16 assessed because they were already covered by an

17 LFP?

18    A    That's correct.

19    Q    Okay.  And then other questions on this,

20 this email was copied to Clara Keith and Deborah

21 Gay.

22         Can you tell me who they are?

23    A    Debbie Gay at the time, if I remember

24 correctly, she was -- I don't remember her title but

25 she was over special education programs at the



1  department.

2  　　　　And I think Clara worked in our Policy

3  Division.  Honestly, I really don't know what role

4  she played at DOE, other than -- and I know there

5  was a time when she had retired and might have been

6  actually working for another state agency.  I just

7  don't -- I don't remember her specific connection by

8  state agency to the exercise, other than she was a

9  part of the team.

10  　　Q　　Okay.  So I know some part of her

11  employment she was employed by DBHDD.

12  　　A　　Yeah, and that's what I'm kind of -- so

13  when I first went to the Department, she worked in

14  the Department.  And I just don't know what division

15  she was in, and I knew Clara as a colleague because

16  we would attend meetings, not related to GNETS in

17  any way, but I just didn't -- I don't really know

18  what she did.

19  　　　　Perhaps by the time she was involved in

20  this, she was -- she was working for the other

21  agency.  I just don't know the answer to that.

22  　　Q　　So you asked her to work with Debbie.  In

23  the third paragraph, it talks about you asked her to

24  work with Debbie and her team to develop the

25  application to be used to award facility grants.



1          Was that in your connection with her as a

2    colleague or was that her role --

3       A    Whatever role she was playing.

4       Q    Whatever role.  Thank you.

5          The last part on this document, it talks

6    about the GSFIC is working on the RFQ.  The RFQ is

7    request for qualifications for design professional,

8    and that is the process you talked about before,

9    about getting the architectural team on board to do

10   the assessments?

11      A    Yes.

12      Q    And you already made reference to the

13   checklist.  So I just want to make sure I'm

14   understanding your reference.  Is this the checklist

15   where scores were rated, different categories were

16   rated from one to five?  You know, from poor to like

17   new, or critical to like new?

18      A    I believe so.

19      Q    And we can talk about the other later.

20   Okay.

21          Then next -- may I ask momentarily to see

22   the full version of the document you have because

23   yours has attachments?

24          Thank you.

25          Since this was previously marked as



1  Exhibit 86, I would like to note that the document

2  produced by the State at GA00196572 is attached as

3  an exhibit to this document.  I ask, did you see if

4  that's the correct list you've been talking about?

5          It's not the first attachment.  It's

6  behind the blue sheet of paper.

7      A    Yes.

8      Q    Okay.  Thank you.

9          So that's the document that field

10 consultants used when they went out to the different

11 facilities to do assessments?

12     A    Yes.

13     Q    Is that also a document that the

14 architectural team used when they went out to do

15 assessments?

16     A    I really don't remember -- I would -- my

17 memory is that their -- whatever documents they used

18 to do those assessments had different detail, but I

19 just don't remember.

20         I mean if you showed it to me and said

21 this is what they used, I certainly would agree.  I

22 wouldn't have a way not to agree with that, but I

23 don't think it was this exact document.  It could

24 have been but I don't remember it that well.

25     Q    Okay.  Thank you.



1           MS. TAYLOE:  Then I'm going to --

2    BY MS. TAYLOE:

3        Q    Were there any facilities that did not

4    want to have -- I'm sorry.

5           Were there any superintendents or school

6    districts that did not want to have their facilities

7    assessed?

8        A    I'm not aware of that, no.

9           I'm not saying that -- I really don't -- I

10   don't remember having any trouble getting the

11   assessments done.

12       Q    I know it was a long time ago.

13          MS. TAYLOE:  I'm going to provide the

14       court reporter document GA00196767, and this

15       will be Exhibit No. 115.

16          (WHEREUPON, Plaintiff's Exhibit-115 was

17          marked for identification.)

18   BY MS. TAYLOE:

19       Q    This is an email from Mr. Rowland to Doug

20   Suits, dated January 7th, 2016.

21          Are you familiar with this document?

22       A    Yes.  So I stand corrected.

23          I mean I -- again, if you showed me that

24   first and asked me the question, I'd say, yep, that

25   happened.  But, you know, being able to remember



1  that one specific just, just couldn't do it.

2      Q    I don't mean to trick you.  I was just

3  hoping to avoid having to do so many documents, and

4  what we can do by memory, we can just do it that

5  way.

6      A    You're talking about one instance out of I

7  don't know how many emails that went back and forth.

8  But obviously seeing that I'm reminded of the

9  situation.  But I think you also see that that no

10 was really not an option.

11     Q    So the reason I'm curious about this is,

12 again, trying to figure out the purpose of the

13 facility assessment, since it was really about who

14 was eligible for grants.

15          You see the email you're responding to

16 indicates that the director of the program in Cobb

17 County did not want to make an application for

18 funding and yet they were instructed they had to

19 have the facility visit anyway, and I'm just curious

20 about why that was?

21     A    Even though -- even though I knew the

22 ultimate purpose of the exercise was to create this

23 basis for which GNETS program would apply for funds,

24 whether this was something I determined on my own or

25 felt like I had gotten direction on, it never



 1  occurred to me that not going through the needs

 2  assessment was an option.  You could go through the

 3  needs assessment, and the needs assessment could

 4  determine you've got the Taj Mahal, but you're going

 5  through these --

 6      Q    Is it fair to say you just thought it was

 7  important for the state to know the condition of the

 8  assessments whether or not --

 9      A    Exactly.

10           THE COURT REPORTER:  Say it again.

11      A    My apologies.

12      Q    Is it fair to say you thought it was

13  important for the State to know the condition of the

14  facilities whether or not they were planning on

15  applying for a grant?

16      A    Yes.

17      Q    Thank you.

18           MS. TAYLOE:  Now I'm going to refer to

19      what was previously identified as Plaintiff's

20      Exhibit 46.

21           (WHEREUPON, Plaintiff's Exhibit-46 was

22       marked for identification.)

23           MS. TAYLOE:  I have an extra copy but we

24      can use the same number for it.

25



1  BY MS. TAYLOE:

2       Q    This is a document produced by the State,

3  GA00196789.

4            It is an email from Mr. Rowland to Clara

5  Keith, dated January 19th, 2016.

6            Are you familiar with this document, Mr.

7  Rowland?

8       A    Yes.

9       Q    Do you see in the first paragraph, first

10 sentence says:  "Below are GNETS facilities where my

11 staff have identified immediate concerns thus far,"

12 and it looks like it says, "They will be others, I'm

13 sure."

14           I assume it means "there will be others."

15 Right?

16      A    Yes.

17      Q    Would you tell me on what basis the

18 immediate concerns were identified?

19      A    The checklist, that the, that the

20 consultants used on that initial visit.

21      Q    And this is dated January of 2016.  They

22 had completed the initial visits that early?

23      A    I mean I can't dispute that.  It may have

24 been.  I just don't remember the timing, but

25 apparently -- and I -- typically, what would have --



1  again, I don't remember the timing at all, but this
2  looks like it would have been consistent with that
3  first exercise of sending the consultants out with
4  the checklist and having them report back.  Again,
5  you know, here's the list but here's three of them
6  that we see, that we got, that's a problem.  That's
7  a problem.
8      Q    Do you remember what was specifically
9  concerning about these three programs that were
10  identified as immediate concerns?
11     A    I don't.  Not without documentation.  I
12  just don't.
13     Q    Okay.  And why did you say "there will be
14  others, I'm sure"?
15     A    Just because I didn't have a complete -- I
16  just didn't have a complete list at that point.
17     Q    Do you know what was done with this
18  information about these three facilities?
19     A    No, I don't.
20         MS. TAYLOE:  We've been going for an hour
21     and forty minutes.  Would you like to take a
22     break?
23         THE WITNESS:  Sure.
24         MS. TAYLOE:  Take a break.
25         THE VIDEOGRAPHER:  Off the record at 10:39



MICHAEL D. ROWLAND                                          June 09, 2022
UNITED STATES vs STATE OF GEORGIA                                    71

1     a.m.

2              (A recess was taken.)

3              THE VIDEOGRAPHER:  We're back on the

4        record at 11:10 a.m.

5              MS. TAYLOE:  I have a correction to make.

6        The document I previously identified as having

7        been previously introduced as an exhibit was

8        incorrect.

9              So if we could mark the same document

10       GA00196789 as a new exhibit.  I believe that

11       will be 116.

12             (WHEREUPON, Plaintiff's Exhibit-116 was

13        marked for identification.)

14             MS. TAYLOE:  I apologize for my error.

15             So I just wanted to renumber that for the

16       record.

17   BY MS. TAYLOE:

18       Q     You said, Mr. Rowland, you wouldn't be

19   able to recall from that long ago what the issues

20   were at those facilities without looking at the

21   document.

22             MS. TAYLOE:  So I would like to introduce

23       State-produced GA00196790 to be marked as

24       Exhibit 117.

25             (WHEREUPON, Plaintiff's Exhibit-117 was



 1        marked for identification.)

 2   BY MS. TAYLOE:

 3        Q    Are you familiar with that document, Mr.

 4   Rowland?

 5             (Witness reviews exhibits.)

 6        Q    What is that document?

 7        A    This is the Facility Condition Assessment

 8   Checklist completed by the field consultant for the

 9   Cedarwoods program at 98 Barnes Street, Baxley

10   Georgia, in Appling County, by Leonard McCoy.

11        Q    Thank you.

12             Do you see where this document describes

13   the building -- I'm sorry -- the facility as a 1954

14   building with no major renovation in the past that

15   is evident?

16             That's in the comments on Page 4.

17        A    Yes.

18        Q    Do you see it says it's a 60-year-old

19   building that shows the wear and tear of its age and

20   it was constructed by prisoners?

21             That's in the Comments on Page 5.

22             I'm sorry, that's not the right page.

23             Page 6.

24        A    Yes.

25        Q    Do you see, I believe on Page 10, it talks



1  about some toilets are missing doors and there is no

2  significant separation from the classrooms?

3       A    Yes.

4       Q    And on Page 11, in the Comments, it shows

5  that breakfast is satellited in and eaten in

6  classrooms, and that the students are transported to

7  high school for lunch?

8       A    Yes.

9       Q    Are those the kinds of things you think

10  raise the kind of concerns in the email that you --

11  that was previously admitted as an exhibit?

12       A    I would think so, yes.

13       Q    Previously, Exhibit 116, that was the

14  email?

15       A    Yes.

16       Q    Does that refresh your recollection as to

17  what was done in response to these concerns being

18  raised?

19       A    Well, I think this was certainly -- I mean

20  this -- what I remember, this exercise was the

21  beginning of a process, and certainly, you know,

22  this information created a heightened awareness of

23  that particular facility, which I obviously

24  communicated to Clara, and there were obviously two

25  others that -- based on our preliminary review of



 1  that information.

 2          But, again, I don't know that at the

 3  moment -- I don't have any recollection of at the

 4  moment this was produced and at the moment that I

 5  sent out an email that said, hey, here's one we

 6  obviously have concerns.  I don't really -- without

 7  -- I'm not aware of what, if any, immediate actions

 8  were taken subsequent to the completion of the

 9  process.

10      Q    Okay.  You said immediate.  Are you aware

11  of any longer term actions taken?

12      A    Well, again, that may have eventually

13  occurred at the conclusion of the process, but,

14  really, the documentation is so distant in my --

15  when I look at what you provide, I can put back the

16  chain.  But I just can't remember -- you know, this

17  document obviously produced this email, which makes

18  sense to me, but I mean, what happened next is just

19  not fresh in my memory.

20      Q    Okay.  That's fine.  We'll walk through it

21  with documents together then.  Okay.

22          MS. TAYLOE:  Next, I would like to refer

23      to what is previously introduced as Plaintiff's

24      Exhibit 89, which is GA00196895.

25          (WHEREUPON, Plaintiff's Exhibit-89 was



1          previously marked for identification.)

2    BY MS. TAYLOE:

3        Q    Are you familiar with this document?

4             (Witness reviews exhibit.)

5             MS. TAYLOE:  Counsel, I just want to

6        notify you that his version has the

7        attachments, and your version doesn't.  We can

8        share it electronically.  I just want to know

9        that already has that attached.

10            MR. PICO PRATS:  All right.

11       A    Yes, ma'am.

12       Q    This document is an email from Mr. Rowland

13   to Clara Keith, dated February 17th, 2016.

14            So, for the record, I have to ask this,

15   Mr. Rowland.  You said:  "It's late so I might not

16   have this correct.  If this turns out not to be

17   correct, would you let me know?"

18       A    Yeah.

19       Q    I've been there.  Believe me, I've sent

20   emails and just minutes ago made a mistake.  I know

21   how that happens.

22            Okay.  So it says:  "The first spreadsheet

23   is the list of sites."

24            My younger and more adept colleague is

25   going to screen share for you because I cannot



1   handle that.

2          MS. TAYLOE:  Should with go off the record

3       for a minute.

4          THE VIDEOGRAPHER:  Off the record at 11:23

5       a.m.

6          (Discussion ensued off the record.)

7          THE VIDEOGRAPHER:  Back on the record at

8       11:24 a.m.

9   BY MS. TAYLOE:

10      Q    So you have a paper copy but also Ms. Lill

11  is screen sharing an electronic copy of GA00196896.

12          Can you tell us what that document is?

13          It was attached to the email that we just

14  read.

15      A    It appears to be a list of GNETS programs

16  that -- by location, the corresponding school system

17  name, and analysis as to whether the facility at

18  that location is a facility reporting FTE in the

19  LFP.

20      Q    And is this list a list of the facilities

21  that were visited by the assessment team?

22      A    Again, I, I really don't know that.  I

23  mean if, if you -- if you showed me records of --

24  that corresponded, that this is a facility you said

25  the document showed was visited and there it is,



1  then I certainly agree with that, but I just have no

2  way.

3        I mean these were so many facilities, so

4  many years ago.

5        Or if I said that they were visited in an

6  email.  I certainly don't disagree with that.

7     Q   Let's take a look at the next one then,

8  00196897.

9     A   Okay.

10    Q   In your email, you say:  "The second is

11  the list of those not visited and why."

12    A   Okay.

13    Q   Can you tell me what that document is?

14    A   Yeah.  It's, it's a list of GNETS centers

15  with the city, and the -- no, they weren't visited

16  and the reason for why they weren't visited.

17    Q   Thank you.

18        So does that information along with the

19  email lead you to believe that the first list is the

20  list of sites that were visited?

21    A   Yes.

22    Q   Thank you.

23        (Discussion ensued off the record.)

24        MS. GARDNER:  You have an earlier copy of

25     the document that was marked, right?  Because



1          the hard copy document that was actually marked

2          included the printed attachments.

3               So if you all have your copies that you

4          received when we first marked it, it also has

5          the copies of as attachments.

6               (Discussion ensued off the record.)

7               MS. TAYLOE:   I am going to give the court

8          reporter a document produced from the State

9          labeled GA00279624 and ask that be introduced

10         as Plaintiff's Exhibit 118.

11              (WHEREUPON, Plaintiff's Exhibit-118 was

12         marked for identification.)

13    BY MS. TAYLOE:

14         Q    Are you familiar with this document?

15         A    Yes.

16         Q    This is an email from you to Ted Beck,

17    dated May 31st, 2016.

18              In the second paragraph you indicate that

19    you and Nakeba accompanied two teams from -- that

20    was 2WR, the architectural firm?

21         A    Yes.

22         Q    So were these the pilot visits you talked

23    about before?

24         A    Yes.

25         Q    Where it says:  "The purpose of the trips



1  was to work through expectations and get a baseline

2  of GaDOE's expectations."

3          Can you tell me what those expectations

4  were?

5      A    I don't think we knew until we went on the

6  visit, honestly.  But what I remember about the

7  exercise was that 2WR would go and conduct the visit

8  per some standards that were, that were available

9  for facility condition assessments based on

10 architect's stuff, and that what we were really

11 doing was just witnessing what they were doing to,

12 to understand -- to agree they were on the right

13 track.

14         I don't have any memory of saying don't do

15 this or do that, although that very well could have

16 happened.  It was more of a -- they wanted us, you

17 come watch what we're doing.  If you see anything

18 that you think we shouldn't be doing or should be

19 doing, you know, just give us the feedback.

20         That's my memory.

21     Q    And where you said, "I think we will glean

22 the kind of information that will inform our

23 decisions moving forward," what was that in

24 reference to?

25     A    I have no idea.  I don't know.  I think



1  it's exactly what I -- I don't know what decisions

2  there were to be made moving forward, but if there

3  were decisions to be made moving forward, this

4  facilities condition assessment was necessary to

5  inform those decisions.

6          Now, obviously, we know one of those

7  decisions was to inform future applicants for the

8  grant but short of -- I mean that was the purpose of

9  the exercise, was to create a basis for these

10 centers, or programs, whichever it turned out to be,

11 to be able to make an application.

12     Q    So one of the purposes would have been to

13 be able to notify the facility superintendent or

14 owner of the kinds of deficiencies they might be

15 eligible to request grants to repair?

16     A    Yes.

17     Q    Thank you.  And they might -- they might

18 have been used for something else, but that may or

19 may not have been known at the time?

20     A    Yes.

21          MS. TAYLOE:  I'm going to give the court

22     reporter a document produced by the State

23     GA00197246 and ask it be identified as

24     Plaintiff's Exhibit 119.

25          (WHEREUPON, Plaintiff's Exhibit-119 was



1          marked for identification.)

2    BY MS. TAYLOE:

3          Q    Are you familiar with this document?

4               (Witness reviews exhibit.)

5          A    Yes.

6          Q    Okay.  Who is Sarah Morris?

7          A    Sarah worked, and still does, in the

8    Facilities Department.

9               I don't -- at the time -- she was with us

10   and she left and she came back.  So what I'm

11   stumbling over is I'm not really sure what role she

12   was in at the time, but I do know that -- I think by

13   this point, you know, I was giving this information

14   back to Pat Schofill, who was our director, and

15   Sarah had some role to play on the funding side.

16              She was our grants administrator in the

17   early -- at some point, and she left the department

18   and we hired her back as a grants administrator.  So

19   she may have had -- her role may have been in the

20   process of getting the money out to school districts

21   when -- or the entities that manage the GNETS

22   programs that were doing the work when the time

23   came.

24         Q    Okay.  And she said she's attaching the

25   list, GNETS list, ranked by the GaDOE Facilities



1  team.

2      A    Yes.

3      Q    Is that -- which set of consultants is

4  that?  Or who is the GaDOE Facilities team?

5      A    That's the field consultants that I

6  referenced earlier.

7      Q    Okay.  And the scale she's referencing

8  there is the same one to five scale we talked about

9  before, where one is critical and five is new or

10 like new?

11     A    Correct.

12     Q    Then she talked about a formula for

13 obtaining a ranking.  Can you tell me what that is

14 in reference to?

15     A    Not by memory, no.  I mean I -- so much

16 this -- you know, I want to be clear.  Nothing would

17 make me happier than to tell you everything you're

18 asking me with perfect fidelity.  There was so much

19 -- and so much of this now I'm begin -- I see -- we

20 were doing kind of make up -- just do it as you

21 figure out and try to do the best thing.

22          And so I am confident we used some formula

23 to get to that ranking.  Whether it was an averaging

24 or a formula on a spreadsheet or -- but if you

25 showed it to me, I'd say I remember that.  But



1  without that, I just -- I don't remember what that

2  formula looked like.

3      Q   Okay.  I think I can -- I think I can find

4  one to address that.

5          MS. TAYLOE:  I'm going to ask Ms. Lill to

6      screen share the attached facilities report,

7      which is GA00197248.

8          Do we need to mark that as an exhibit?

9  BY MS. TAYLOE:

10     Q   Mr. Rowland, you have been granted control

11 of that.  So if you want to scroll up and down on

12 that, you can.

13         Have you seen this document before?

14     A   Yes.

15     Q   Can you describe it, please?

16     A   So the heading of the document is "GNETS

17 Facilities Not Active In Local Facility Plans."

18         So I mean this appears to me to be a list

19 of the GNETS programs that we couldn't find evidence

20 were housed in facilities that were in local

21 facility plans.

22         The cells highlighted in red, based on my

23 memory, was those locations that had a facility

24 condition assessment score of .4 or lower -- well,

25 lower than .4.  Because .4 is not in red.



1      Q    And what would be the consequence of

2   having a facility score of lower than .4?

3      A    Well, so I do -- let me say this about the

4   score.  Given the decimal that I'm seeing -- I think

5   this is the score that came out of the facility

6   condition assessments done by 2WR.

7           So, again, my memory is part of what we

8   have asked them to do in this process was to see if

9   they could boil this down to a facility condition

10  assessment ratio where the closer that ratio got to

11  zero, the more deficient, let's say, the building,

12  the facility would be, and the clearer it got to

13  one, the better it was.

14          And so based on this, my memory is this

15  was a spreadsheet we created -- not the list of

16  spaces but the score coming from their condition

17  report.

18          And, again, at this point in the process,

19  I don't think I knew the answer to what does -- what

20  happens to a facility that has a condition

21  assessment lower than .4, other than to say these

22  aren't very good.  And then that, that begets the

23  question, all right, what happens next.

24          I think that's where we were in the

25  process at that point.



1      Q    And you said before you believed that some
2  facilities were encouraged to consider options based
3  on those scores, consider remedial actions based on
4  the scores?
5      A    Yes.
6      Q    Okay.  But is it not your understanding,
7  looking at this document, that these ones marked in
8  red were the ones that were closed by the State?
9      A    Well --
10          MR. PICO PRATS:  And objection for -- I
11      think it's misrepresenting what he said in
12      connection to the State closing.
13  BY MS. TAYLOE:
14      Q    Did you understand these facilities closed
15  after the results were shared with them?
16      A    I'm looking at the list to see, and it --
17  again, I wish I could tell you I remember what every
18  action was, but what I know is we shared this
19  information with the Board, State Board.
20          A letter went out to these facilities from
21  the State Board chairman, and it is my belief, my
22  memory, that in most cases, if not all, that these
23  programs made different arrangements for these kids.
24          There's a, there's a meaning to the word
25  "closed" that I'm not comfortable with, if that



1  helps you understand my -- and I don't mean to be

2  vague.  I just, you know -- the purpose of the

3  exercise to me was to say, you know, guys, look,

4  we've been through this process, nobody's out to

5  hurt anybody.  We're trying to do things, what's

6  best for kids, and this has been -- this is the

7  situation.

8        And it is true that not many

9  superintendents liked to get phone calls from the

10  Department or letters from the State Board chair,

11  but -- so I know they wanted to try to do better,

12  and I think in most, if not all, of these cases they

13  did.

14    Q    So maybe am I using the word "closed" has

15  been confusing because it has different connotations

16  and facilities than I was thinking of it.

17        Would you say after -- would you say these

18  nine facilities relocated their students after --

19  the ones that were marked in red relocated their

20  students after getting those reports?

21    A    Yes, I think that's fair to say.

22        MS. TAYLOE:  I would like to refer to what

23        was previously introduced as Plaintiff's

24        Exhibit No. 91.

25        I'm afraid I don't have a copy for you,



```
 1      because...
 2              (WHEREUPON, Plaintiff's Exhibit-91 was
 3         previously marked for identification.)
 4              MS. TAYLOE:  It's GA01486054.
 5              (Witness reviews exhibit.)
 6   BY MS. TAYLOE:
 7      Q    Have you had a chance to familiarize
 8   yourself with this document?
 9      A    Yes.
10      Q    Okay.  This is an email from Stacey
11   Suber-Drake to Nakeba Rahming and Clara Keith, dated
12   July 25th, 2016.  And it attaches a letter from the
13   Georgia State Board of Education signed by Michael
14   Royal, chairman of the State Board of Education.
15              Is that correct?
16      A    That's correct.
17      Q    Do you see at the end of the first
18   paragraph, where it says:  "Therefore, students
19   receiving services at this facility must immediately
20   be transitioned out of the site before beginning --
21   "before the beginning of the school year."
22      A    Yes.
23      Q    Is that consistent with your understanding
24   of the steps that were taken after the facilities
25   conditions assessment was completed?
```



```
 1        A    Yes.

 2        Q    It says:  "We're directing staff to assist

 3   you and provide guidance throughout this process so

 4   it may provide the best educational opportunities

 5   for all students in a safe and positive

 6   environment."

 7             You see where it says that?

 8        A    Yes.

 9        Q    Were -- which staff was directed to assist

10   and provide guidance to the -- the people these

11   letters were directed to?

12        A    The facility services staff.  Myself and

13   potentially field consultants that served those --

14   that area.

15        Q    And would you say, was that assistance in

16   the form of the GNETS grant or in terms of

17   relocating, or both, or something else?

18        A    At this time, in relation to the letter,

19   it was with relocating.

20             What we required of the GNETS programs was

21   when you find a suitable location, when you find a

22   location that you propose as suitable, you contact

23   me and I go look at it, and I say yes or no.

24        Q    And did you also help them find facilities

25   that had available instructional units that they
```





 1 | could consider using for --
 2 |     A    We did point out to them in their Local
 3 | Facility Plan where they had what we call unearned
 4 | instructional units.
 5 |     Q    So what does unearned instructional units
 6 | mean?
 7 |     A    Well, you earn instructional units based
 8 | on a formula, based on the FTE projected for that
 9 | facilities.  And I'm just giving you example, making
10 | numbers up.
11 |          You may have 750 FTE, and those FTE, based
12 | on DOE's formula, may earn 50 instructional units,
13 | which are classrooms.  We call them IUs.
14 |          When the facility was constructed, it
15 | might have been constructed with 60 IUs.  So there
16 | are 10 IUs that the formula says you have -- you
17 | have fewer students than -- have more classrooms
18 | than you have students, based on this formula, that
19 | need.
20 |          Well, if you're a high school principal,
21 | you don't have any vacant classrooms.  I mean you
22 | found something to do with all these spaces, but
23 | they're not earned in the formula.
24 |          And so they're really at local expense.
25 |     Q    That was very helpful.



1         So they are not entitled to use the space
2    based on the number of students currently enrolled,
3    and so some people might look at those spaces
4    available even if they are using the space for
5    something else because why would you not use a space
6    that you have available in a room, in a school?
7         A    The only -- not exception, but the word I
8    would take exception to, for lack of a better way to
9    say it, is entitled.  They're entitled to every
10   space they have, because they built it, they own it.
11        The formula for funding in DOE's rule says
12   that you earn spaces based on the way you earn
13   teachers in the QBE formula, the theory being that
14   every teacher that you earn should have a space.
15        But just like you have unearned spaces in
16   your facility, most school systems have unearned
17   staff for programs that are beyond what the State
18   will fund.
19        So in that regard an unearned space
20   doesn't mean that there's not a program that's being
21   taught in that space because the district has chosen
22   to fund that program locally.  Teacher --
23   theoretically the space, because there's no state
24   earning based on that space, which is kind of a
25   little complicated, too.



1            But my point is, what we try to do is go

2    back to the school systems and say, look, you have

3    -- we didn't have to say this.  We could say it,

4    point it out but they knew it.  They could look at

5    their plan and know this on their own.

6            You have schools that have unearned

7    spaces.  And so obviously one of your options is to

8    pick the kids up and move them to a better space, or

9    you could just use space you already have.

10            But that's your -- that's where we really

11    get into what you have to do at that point.

12            MS. TAYLOE:  I would like to introduce a

13        document produced by the State as GA01929308

14        and ask it be marked as Plaintiff's Exhibit

15        120.

16            (WHEREUPON, Plaintiff's Exhibit-120 was

17         marked for identification.)

18    BY MS. TAYLOE:

19        Q    Let me know when you've had a chance to

20    familiarize yourself with the document.

21            (Witness reviews exhibit.)

22        A    Yes.

23        Q    This is an email from you to Clara Keith

24    and Nakeba Rahming and Pat Schofill, dated January

25    20th, 2017.



1          Do you see where in the first line it
2   makes reference to the final GNETS report from the
3   drop box location?
4       A    Yes.
5       Q    Is it consistent with your recollection
6   that this would be the time when the architects --
7   the 2WR final report was prepared?
8       A    Yes.
9       Q    And would that be the report that was
10  located in the drop box?
11      A    Yes.
12      Q    Can you describe what, what the -- was the
13  drop box a file sharing system or what was that?
14      A    They provided -- what I remember is that
15  they provided the file in an aggregate format.  In
16  other words, as one report with all of these numbers
17  of facilities, which became many, many pages,
18  hundreds of pages.  And so we used the drop box
19  because the file was too large to share any other
20  way.
21      Q    That makes sense.
22          It says here you're in the process of
23  disaggregating it so you can send each report to
24  each facility as appropriate?
25      A    That's right.



1     Q    I also saw reference to a U-Drive.  Do you

2  know what the U-Drive is?

3     A    Yes.  You asked me what it is?

4     Q    What's the U-Drive, please?

5          You're well coached.

6     A    It's a shared drive at the Department of

7  Education where we housed shared facilities files.

8          MS. TAYLOE:  I just wanted to note to

9          counsel we've seen references to this final

10         report in a drop box in U-Drive, but I have not

11         been able to locate it in the documents that

12         have been produced to us.

13         So perhaps we could be directed to it.  If

14         not, I would ask that it be -- production be

15         supplemented so we can see the final report.

16         It might be we just can't -- we can't find

17         it.

18         I'm about to start on a new section.  I'm

19         happy to keep going but depending on the time

20         we set for lunch, perhaps it's better we stop

21         now.

22         MS. LILL:  It's not here yet.  It should

23         be here in the next 15 to 20 minutes.

24         MS. TAYLOE:  We can just start then and

25         take a break.



1  BY MS. TAYLOE:

2       Q    Are you okay going a few more?

3       A    Absolutely.

4       Q    I want to talk a little bit about the

5  facilities remediation plan next that came after the

6  facilities condition assessment.  Is that correct?

7       A    Yes.

8       Q    Can you tell me -- just give me an

9  overview what the facilities remediation plan was?

10      A    Yeah, I had really forgotten about that.

11           Again, what I remember was that -- and I

12 wish I could tell you that we started this process

13 knowing how it would -- this was, this was really

14 like building an airplane while you fly.

15           And so at some point as a team -- and

16 there was -- I don't want to mislead you I was

17 making these decisions in a vacuum.  I was obviously

18 working with either Pat Schofill, maybe our

19 facilities consultants, Clara, Nakeba, and Stacey

20 and all these people to think about.

21           So we have this report now that says -- it

22 kind of had layers.  Layer one -- the first, most

23 immediate thing was we found these facilities that

24 were -- that needed immediate -- that needed

25 immediate attention, needed to be attended to



 1  immediately.  And that took place.

 2         Then we had a report that said here's a

 3  condition of the facilities that remain, and when we

 4  release the application for funding, you should be

 5  applying for needs that have been identified in the,

 6  in the plan -- or in the facility condition

 7  assessments.

 8         Understand that in the facilities world,

 9  $14 million is not a lot of money.  So intuitively

10  we knew it wasn't enough money to meet all the needs

11  that had been identified in the condition

12  assessments, but we took the position as a

13  department that that didn't absolve the programs

14  from developing plans to remediate those needs.

15         Again, very much in keeping with the K-12

16  focus on you have a Local Facility Plan.  You can't

17  get to everything in it in one year, we know that,

18  but that doesn't mean you shouldn't be -- you

19  shouldn't be planning to meet those needs.

20         So, so -- so part of the requirement was

21  now that we've done this work, you can't just say,

22  well, we want to apply for the money, so we're off

23  the hook.  No.  You have a report and it shows

24  deficiencies -- needs, not deficiencies.  It shows

25  needs.  We want to know how you're going to address



1  those needs.

2       Q    So would it be fair to say that the

3  options available to facilities after receiving the

4  facilities condition assessment report included

5  relocating the students or submitting a plan to make

6  corrections, addressing needs with or without state

7  grant funds?

8       A    Yes.

9       Q    And if the facility operators chose not to

10  continue to serve the students in that facility,

11  were they required to provide you with an exit

12  strategy?

13       A    Yes.

14       Q    And what would that exit strategy entail?

15       A    It would be different for every situation.

16  Again, I think what our -- it's really hard to

17  remember the thinking at the moment, but based on

18  the way I know myself, what I would -- what I think

19  we were looking for is, look, you give us -- one of

20  the things I want to make sure you understand.  This

21  is an awful lot of work, and at some point I thought

22  it was all my work to do.  By me, I mean the

23  Department.

24            So what I wanted to do is give this work

25  back to the people at the ground floor who ought to



1  know how to look after their kids better than

2  anybody else, and the way to do that is to say you

3  give me the strategy -- again, me meaning the

4  Department -- give us the strategy and then we'll

5  react to it.

6          So it wasn't -- and my, my belief is that

7  ranged anywhere from that's an excellent strategy to

8  that's okay but here are some -- here's some

9  feedback like to see you address, and all the way

10 down to that's not going to work, got to have

11 another one.

12         And I just -- I don't remember

13 specifically -- I mean if you showed me a document

14 and said here's one that was submitted, I could look

15 at it and say, yeah, that makes sense.

16         But, but I think we as a Department felt

17 like while we may have started out trying to get a

18 condition assessment so that we could figure out how

19 to competitively award a pot of money, it really

20 evolved into, okay, now you can't not know what you

21 know, how we're going to address it.

22    Q    Okay.  Before -- and I will go through

23 some documents with you to address specific

24 examples, but as part of that overview, after

25 facilities either applied for a grant or proposed



1  their own internal repairs, did your office check up

2  to see whether those repairs were done?

3      A    I did not do that personally.  And I -- my

4  memory is that, you know, all of this took a little

5  time.  Not -- obviously, not just the assessments,

6  but applying for the money, evaluating the

7  applications, making the awards.  There are --

8  there's all kind of bureaucracy that occurs.

9          These were reimbursement grants.  So the

10 district had to spend the money first, send the

11 Department evidence of the work they had done and

12 the money they had spent.  The Department had to

13 evaluate the evidence against the application to

14 make sure that they were parallel, and then the

15 Department would free the money.

16         So now ask me the question again.

17     Q    That was responsive.  I want to follow up

18 on your answer, though.

19         When they produced evidence, was that a

20 bill that showed they had done it, or was it also

21 photographic evidence or a narrative description of

22 what they had done?

23     A    It was -- the evidence would be contracts

24 with the architect to design the change, the

25 changes; contract with the contractor who was



1  performing the work; pay apps from the contractor

2  that showed the schedule of values and the payment

3  for each payout; and then a close-out document at

4  the very -- and so the way DOE manages these grants

5  is we, we reimburse 90 percent of what you are

6  awarded until what we call final close-out.

7          So -- and keep in mind that very much like

8  these -- very much like grants to K-12, K-12 capital

9  outlay, I know there were some applications where

10  the scope of work exceeded the amount of money that

11  they were going to get.  So there was theoretically

12  local money in these projects as well as state funds

13  in kind of a parallel fashion to the way K-12

14  capital outlay works.

15          Although that might not have been true in

16  every case, it was true in some.

17          So all of that documentation had to be

18  provided.  And then at close-out, which was the

19  final attestment that there were no liens against

20  the property and all the bills had been paid and all

21  the contracts had been met, and the fiscal agent for

22  the GNETS program had to attest to that, then they

23  would get the final 10 percent.

24          What I don't think we did in this case and

25  what we didn't do, as routinely in K-12 capital



1  outlay, is go out and do a physical inspection to be
2  sure -- to ensure that what you said you did in your
3  application and what you submitted through all this
4  paperwork, that it all -- we put our eyes on it.
5          I worked for the Department 10 years.
6  Now, that's not -- and that was not routine.  Now,
7  that's not to say Fulton County built a new school,
8  we went through the process, they did all the
9  documentation, and they invited us out three weeks
10 after it opened and we went to look.
11         But you didn't walk through with a notepad
12 checking things off.  I mean that just wasn't --
13 that's not how it worked.
14    Q    And for those who didn't apply for grants
15 but submitted plans that said they were going to
16 make the adjustments or address the needs
17 themselves, was there any follow-up process on
18 those?
19    A    I'm not aware of that.  There may have
20 been because, again, like I said, toward -- this was
21 really toward the end of -- I mean it wasn't.  It
22 was a few years left in my career, but I think I can
23 say this:  I certainly did not go out and inspect a
24 particular facility against what their plan was to
25 see if they met those conditions.



1      Q    You're not aware of the field consultants

2   doing that either?

3      A    I'm not.  I don't want that to be

4   interpreted it didn't happen.  It's just not

5   something that I recall.

6      Q    Okay.  And then what about, were there

7   districts who couldn't front the money and wait for

8   reimbursement?  What happened when that happened?

9      A    I'm not aware of a -- you asked -- let me

10  answer the question you asked first.

11         I'm sure I don't know the answer to the

12  question, were there districts that couldn't front

13  the money.

14         I know there were districts that didn't

15  think they could, didn't feel like they could, but

16  I'm reasonably certain that -- well, I'm almost a

17  hundred percent certain that the Department never

18  sent out money without documentation that the bills

19  had been paid because, again, my memory is these are

20  funded with state tax exempt general obligation

21  bonds that are reimbursable.  So the bond rules

22  required that the districts pay for -- pay first,

23  demonstrate payment, before they were reimbursed.

24     Q    What's the timeline for the exit strategy

25  and remediation plan?



1      A    I'm not sure I understand.

2      Q    It takes a while for bonds to get in place

3   and budgets have already been made.  If they were

4   provided information about needs that needed to be

5   addressed on a short timeline, that would be harder

6   to fine the funds for than a longer timeline?

7      A    Yeah.  Well, the scope on the bonds is

8   five years.  So these are 20-year bonds but, but --

9   and I do know this:  You would have to remind me of

10  the fiscal year in which this took place, but

11  typically the way the bonds worked, and I may have

12  said this earlier, was once we got a signed budget,

13  April or May, GSFIC manages the bond sale, and at

14  that time it usually took place August, July time

15  frame, and there was usually one bond sale a year.

16         Now, the reason I bring that up is my

17  early days with the Department they were doing two

18  bond sales a year.  So when you were managing cash

19  flow, you can say, well, I don't think we're going

20  to be ready -- we know the GNETS programs aren't

21  going to be ready for their money for, let's say, 24

22  months, because of the process we're going through.

23         So instead of asking GSFIC to sell those

24  bonds, we'll delay the sale of those bonds for maybe

25  a six-month period, just a -- just with cash flow.



1          But at that point we were only doing one

2    bond sale a year.  So I know that the 14 million was

3    sold in the bond sale subsequent to the passage of

4    that, of that budget.

5          So typically if the bonds are sold in

6    July, by the time they close on the sale and letters

7    of commitment and a bunch of other bureaucratic

8    stuff takes place, that I really had no role in, you

9    can reasonably expect money to be available in the

10   September, October time frame.

11         So, so -- so the life of -- but the

12   arbitrage rules on the bonds were that you really

13   had to have reimbursed a hundred percent of the

14   proceeds within five years.

15     Q    So I just want to make sure I understand

16   what that means for the facilities themselves.

17         Does that mean facilities who received

18   notice in, say, July of 2016 about needs identified

19   through the facilities conditions assessment, did

20   they have two years or five years?  How long did

21   they have to make the changes that were needed?

22     A    I don't, I don't -- I don't know how to

23   answer that question finitely.

24         I think what was -- what practically

25   happened was, and again this was not something that



MICHAEL D. ROWLAND
UNITED STATES vs STATE OF GEORGIA

1  I had a hand in directly, that I remember, but as

2  these awards were made one of the things the

3  districts had -- or the entity had to provide to the

4  state is tell us when you're going to start your

5  project.

6          And so I know that there were, there were

7  people back-checking to see where are you in that

8  process, and I really don't know who they were.  I

9  know it wasn't me.  At that point I wasn't really

10 involved in that.

11         And keep in mind, again, by the time you

12 go through the application process, make the award,

13 engage an architect -- because these, these projects

14 -- it's not like remodeling your bathroom at home.

15 You know, you hire an architect, individual to have

16 plans drawn.  Those plans have to be submitted to

17 DOE, because we have architects on staff that review

18 them.  Those architects are reviewing those plans to

19 make sure that what that architect has submitted on

20 the school's behalf matches what you said you were

21 going to do in your application.  It can do more but

22 it's got to at least do that.  And that has an

23 approval process.

24         All of that takes place before you can

25 even bid the project.  Then bidding takes two to



1  four weeks -- two to four months.

2          So, so depending on the scope of work in a

3  particular application, it wouldn't have been

4  unreasonable to have been awarded a grant and not

5  really started the project for 24 months.

6      Q    Okay.

7      A    Now -- well, leave it at that.

8      Q    Thank you.  That was helpful.  That was

9  helpful.

10         MS. TAYLOE:  Okay.  I am going to give the

11     court reporter a document produced by the State

12     GA01486553, and ask it be marked as Plaintiff's

13     Exhibit No. 121.

14         (WHEREUPON, Plaintiff's Exhibit-121 was

15      marked for identification.)

16  BY MS. TAYLOE:

17     Q    Let me know when you've had a chance to

18  familiarize yourself with it.

19         (Witness reviews exhibit.)

20     A    Yes, ma'am.

21     Q    This is an email from you to Kerri Miller

22  and David Mosely, dated February 24th, 2017.

23         Is that correct?

24     A    Yes.

25     Q    And can you tell us who Kerri Miller and



 1  David Mosely are?

 2      A    David Mosely was the superintendent of the

 3  Dougherty County schools, and I'm guessing Kerri

 4  Miller was the director the GNETS program.

 5      Q    So is this -- is it fair to say this is --

 6          MS. TAYLOE:  Well, strike.  Let me start

 7      over.

 8  BY MS. TAYLOE:

 9      Q    This document was sent to Dougherty

10  County, and it's a list of the attachments,

11  including Executive Summary, the completed report

12  for their location, Cost Summary and facility

13  condition score, and Letter of Assurance.  Is that

14  correct?

15      A    Yes.

16      Q    Is this typical of the kind of letters

17  that were sent to each of the GNETS facilities

18  programs?

19      A    Yes.

20      Q    Did you read the executive summary when it

21  was produced?

22      A    Yes.

23      Q    We'll come back to that.

24          And then this says a conference call will

25  be held on Wednesday, March 1st.



1          Was this an opportunity to discuss the

2    remediation plan and exit strategy and options for

3    relocation that we were just discussing?

4          A     No.

5          Q     What was that meeting for?

6          A     It was simply to give out information.

7                This, this was the -- well, this was the

8    culminating activity, I referenced previously in an

9    email, breaking these things down into their

10   individual components.  And so what this was -- once

11   we got to that point, we sent an email to every

12   school district -- every entity that had a program,

13   like you said, and it had a -- it had these

14   attachments with it.

15               The purpose of the phone call -- I'm not

16   suggesting there wasn't a question-and-answer

17   period.  There was.  I know there was.  But the

18   purpose of the call wasn't for you to talk to us

19   about your exit strategy.  It was -- or your

20   remediation plan.

21               This was giving you out the information,

22   letting you know that, you know, there will be

23   additional information coming forward in the future,

24   which I think it refers to including the process for

25   actually making the application -- or that may have



1  actually been included in this.

2          But you got -- I think I remember

3  structuring this thing in such a way so that we set

4  aside a period of time -- this is back in the day --

5  this was long before we were doing

6  videoconferencing.  So this was your good

7  old-fashioned conference call, and just trying to

8  manage however many participants there were on the

9  call.  It's, guys, this is for information.  If you

10 got a few technical questions specific to what we've

11 given you, I'll be glad to answer them, but we're

12 not going to get bogged down in a lot of other

13 stuff.

14         So it was really that kind -- that's my

15 memory, it was that kind of call.

16     Q    That makes sense.  I didn't mean to

17 suggest it was a time for them to present their exit

18 strategy, but it was a time for you to outline the

19 process ahead in terms of their options and the kind

20 of process that might follow?

21     A    I think that's right.

22     Q    Okay.

23         MS. TAYLOE:  I'm going to introduce the

24     document produced by the State GA0186 -- I'm

25     sorry.  I did that wrong.

 1          GA01486555.  And ask it be introduced as
 2     Exhibit No -- Plaintiff's Exhibit No. 122.
 3          (WHEREUPON, Plaintiff's Exhibit-122 was
 4       marked for identification.)
 5   BY MS. TAYLOE:
 6     Q    Do you recognize this as the Executive
 7   Summary that you indicated you read when you
 8   received it?
 9     A    Yes.
10     Q    And do you see on -- the second page of
11   the document is marked as Page 12.
12     A    Okay.
13     Q    Where it says Executive Summary.
14          Do you see -- let me see if I can find it.
15          The end of the first paragraph where it
16   says:  "Some structures dating back to the 1920's, a
17   large number of facilities were constructed in the
18   1960's and 1970's, many of these had major
19   renovations and additions in later decades."
20          Do you see that?
21     A    Yes.
22     Q    The next sentence says:  "Most of these
23   facilities were older mainstream schools where the
24   student body had been relocated to newer
25   facilities."



1          Do you see that?

2     A    Yes.

3     Q    Is that your understanding, that that was

4  a common occurrence in the way GNETS programs were

5  located?

6     A    Yes.

7     Q    Do you know why that is?

8     A    No.

9     Q    I just want to back up for a second.  We

10  talked before about how the inspection was a

11  visual-only inspection --

12     A    Right.

13     Q    -- before?

14     A    Right.

15     Q    So would I understand from that that they

16  did not do checks for asbestos?

17     A    Yeah.  I think that's true.  Because we

18  had a lot of discussion about whether to do that,

19  and I think the answer was that we didn't do any

20  specific asbestos testing.

21     Q    Would that also mean there was no checking

22  for lead paint?

23     A    Yes.

24     Q    And how about ventilation system, there

25  would be some that would be visible but some that



1  would be not?

2       A    Yeah.  I mean -- they would -- you might

3  remove an air filter cover, for example, and inspect

4  the air filter to see if it had been changed.

5            There was some ductwork probably that you

6  could get to and see without necessarily having to

7  go behind a wall or into a ceiling, depending on

8  some of them may have been exposed.

9            But other than knowing the --

10 theoretically, they could determine what year the

11 HVAC system had been installed.

12      Q    How about lead in the water?

13      A    No, no -- no.

14      Q    Or radon or any other kind of exposure

15 like that?

16      A    No.

17      Q    Okay.  Are those known to be -- with the

18 exception of ventilation, are the things I listed

19 known to be more common in older buildings?

20      A    Yes.

21           MS. TAYLOE:  I'm going to introduce a

22      document from the State GA00198597, and ask it

23      be marked as Plaintiff's Exhibit No. 123.

24           I'm sorry, that one has been already been

25      marked as Plaintiff's Exhibit 88.  I'm sorry.



1          (WHEREUPON, Plaintiff's Exhibit-88 was

2      previously marked for identification.

3          MS. TAYLOE:  I apologize.

4          (Witness reviews exhibit.)

5    A     Okay.

6    Q     This is an email from you dated March

7  30th, 2017 to a number of email recipients.

8          Can you identify the recipients by

9  category?

10   A     Obviously, it went to -- I think what I'm

11 looking at is GNETS directors and superintendents.

12   Q     And can you -- it says you're asking for a

13 letter of assurance for the facilities grant

14 application process.

15         Can you describe the role of the letter of

16 assurance?

17   A     Again, if you, if you put one in front of

18 me, I can certainly remember what it looked like,

19 but I think the intent was instead of creating this

20 methodology where the State would say here's what

21 you have to do, and we're going to come by and

22 visually inspect it, there was a methodology of

23 creating a list of things that these people, as the

24 fiscal agent and head of the school system, people

25 with authority, would have to attest to that you had



1  done these things.

2          And I do not remember what was on the

3  list.  And if I saw it, I might have a different

4  opinion about what its intent was but that's

5  typically what you use a letter of assurance for.

6  Instead of me saying you did it, I want you to say

7  you did it.

8      Q    Okay.  I think this is a different one,

9  because this is in advance of the --

10     A    Was this the one saying they intended to

11 apply or not apply?

12     Q    Yes.

13     A    Okay.  Well, again, if you show it to me,

14 I might have a different answer.  But I think --

15 there were two things -- so that sets up two

16 thoughts in my mind:  One was we were trying to find

17 out who's going to apply and who's not.  And perhaps

18 that's what this -- that's this letter was about.

19         But I think later on, and as part of the

20 application, there was a letter of assurance, too.

21 Although I might be misremembering that.

22     Q    All right.  I'm going to -- I don't have

23 copies but we can -- it will help you to see the

24 document?

25     A    Yeah.



1      Q    So you have it attached to your.

2      A    Okay.  I got it.

3      Q    00198599.

4           MS. TAYLOE:  If you can pull it up so

5      counsel can see it.

6      A    Yeah.  So I think this is -- this is

7  pretty much what I remembered.

8           I mean the letter of assurance had, had --

9  the first thing it wanted to know was, you know, if

10 you return this, you're telling us you intend to

11 make an application for these funds, and if you

12 intend to make an application to these funds, you

13 attest to these eight things.

14          That you need to either understand, will

15 do, comply.  This is where, you know, you understand

16 that it's a competitive award, so you could, you

17 could not get anything.  You understand you have to

18 comply with all the State and federal laws and State

19 Board rules and guidelines that go along with it.

20          The grant is a reimbursement grant.  So

21 everybody knew that up front.  If you don't think

22 you have the money up front to pull off the project,

23 don't apply.

24          You agree -- one of the issues we ran into

25 is, okay, if we give you this money and you



 1  refurbish this facility, what's the requirement for

 2  how long you're going to stay in it.  So that period

 3  was established, that 10 years.

 4           And these other things that are listed

 5  there.

 6       Q    The 10-year one was the one I wanted to

 7  ask you about.

 8       A    Okay.

 9       Q    Because I understand like fiscally it

10  makes sense you wouldn't want to invest a lot of

11  money and then have the building abandoned the next

12  year.  I understand that's the intent behind it.

13           Were you aware of any concerns by

14  superintendents or programs that they couldn't be

15  sure they would be in there for 10 more years, or

16  that it restricted their flexibility in any way?

17       A    Well, what we tried to do was, was cover

18  that in that sixth point by saying in the event it

19  becomes necessary to move a GNETS program from the

20  facility from which the grant was expended, you just

21  have to get prior approval from the Department.

22           I don't think -- I mean certainly

23  everybody understood that, that -- you know, there's

24  a lot of uncertainty in education when it comes to

25  facilities, particularly as programs evolve.



1           So I think we tried to leave -- I wouldn't
2    really call it an out, but at least leave the
3    applicant with the understanding that, look, if you
4    in good faith take the money, if you in good faith
5    do the work, if you in good faith plan to stay there
6    for 10 years, and three years in something happens
7    that requires -- you think necessitates a move, just
8    get with us and let's work through it.  We'll work
9    through it somehow.
10        Q    Did you have any ideas or discussions
11   about what would account for viability?  Or
12   viability is a different letter.  I'm sorry.
13           Becomes necessary, what would qualify as
14   necessary to move a GNETS program?
15        A    I'm sure we did.  I don't remember what
16   those specific conversations were, but I can tell
17   you in my own mind, from my own experience, but...
18        Q    What would you think those would be?
19        A    Well, I mean most --
20           MR. PICO PRATS:  Objection, as far as it
21        causes him to speculate about it.
22           MS. TAYLOE:  He just said he could say
23        from his own experience.
24           MR. PICO PRATS:  You can answer.
25        A    Well, I mean if GNETS operates the way



1  it's supposed to, you're really supposed to try to

2  transition these kids back into the regular

3  environment.  So if you're a small school system

4  with a small population and you were successful with

5  every kid, theoretically you wouldn't have a need

6  for a program.

7          Now, I mean, that -- all the way -- for

8  that to -- you know, we were in this facility but we

9  have an opportunity to get one that's even better.

10 Or there's a place for these kids now that wasn't

11 available before that gives them, gives them access

12 to things, to programs that they don't have access

13 to there, and the school wants to make that

14 decision.

15         I think the real issue for me in doing

16 this was I don't, I don't -- I don't want to sit

17 around and think about and make up all the things

18 that a school system can be faced with in trying to

19 figure out how to look after their children.  That's

20 what they should do.  But when they do, what I think

21 what we ought to be good at is listening to them and

22 apply common sense as to whether that would be

23 something we could support.

24     Q    So if the Department of Education felt

25 they had a good reason for relocating the students



1  or stopping using a facility that's been renovated,

2  the Department of Education could grant that

3  request?

4       A    I think so, yes.

5       Q    Thank you.

6            MS. TAYLOE:  Now a good time for a lunch

7       break?

8            MR. PICO PRATS:  Sure.

9            MS. TAYLOE:  Thank you.

10           THE VIDEOGRAPHER:  We're off the record at

11      12:38 p.m.

12           (A recess was taken.)

13           THE VIDEOGRAPHER:  We're back on the

14      record at 1:28 p.m.

15           MS. TAYLOE:  All right.  I'd like to pick

16      back up with exhibit -- a document produced by

17      the State, identified as GA01488731, and I

18      would ask it be marked as Plaintiff's Exhibit

19      123.

20           (WHEREUPON, Plaintiff's Exhibit-123 was

21       marked for identification.)

22           (Witness reviews exhibit.)

23      A    Okay.

24      Q    This is an email from you to a number of

25  recipients dated March 14th, 2017.



1          Could you identify by category who the

2    recipients are?

3      A    It looks like the recipients are recent

4    directors and local superintendents.

5      Q    Is that similar to the one we discussed

6    before about the upcoming call?

7      A    Yes.

8      Q    And this references a recent conference

9    call.  Would it be your best recollection that this

10   is follow-up to that same call, March 1st?

11     A    Yes.

12     Q    So would it be correct to say that this

13   email references responses to questions that were

14   raised by the RESA personnel and the superintendents

15   following that call?

16     A    Yes.

17          MS. TAYLOE:  And then I'd like Ms. Lill to

18      pull up to the attachment to that because I

19      don't have it in paper form.

20          It's GA01488733.

21   BY MS. TAYLOE:

22     Q    Ms. Lill will give you control of the

23   document so you can scroll if you want.

24          Could you describe this document for me,

25   please?



1      A    This appears to be the frequently asked

2  question document that was generated from questions

3  we received subsequent to the conference call.

4      Q    This was sent out under the signature of

5  the Georgia School Superintendent, Richard Woods; is

6  that correct?

7           Maybe signature is not the right word.

8  It's on his letterhead?

9      A    Yeah, yeah.

10     Q    But it was issued by his office,

11 presumably?

12     A    I think it was issued by the Facility

13 Service Office on State letterhead.

14     Q    So that's your office?

15     A    Yes -- well, yes.

16     Q    At the time, yeah.  Okay.

17          Did you prepare these responses to

18 frequently asked questions?

19     A    I may have contributed to them, but my

20 recollection is it was a team effort.

21     Q    Who else do you think would have been on

22 that team?

23     A    Pat Schofill, perhaps Sarah Morris.

24     Q    The answer to frequently asked Question

25 No. 3 says, "The number of students served in a



1  GNETS facility will not impact grant applications."

2          Can you explain how that is?

3      A    I mean you may have had a facility that

4  served 50 kids and you may have had a facility that

5  served three kids, and the question appears to be if

6  I have three kids in my facility, can I still apply

7  for the money, and the answer is yes.

8      Q    If someone looked at it more in the sense

9  of does it make sense to invest, you know, $500,000

10  worth of renovation funds in a facility that serves

11  three kids, would that be a factor?

12     A    You know, I don't, I don't -- that may

13  certainly have been discussed but I would think that

14  our intent was to say, look, send us your proposal.

15  Let's don't react to it up front with you can only

16  apply if you have a certain number of kids.  Send us

17  what you're proposing and we'll react to it.

18     Q    Okay.  And Response No. 1, would it be

19  fair to say that's a fair and accurate description

20  of the general procedure anticipated for the grants

21  proposal process?

22     A    Yes.

23     Q    I actually want to correct myself there.

24          If it's for a facility that is not

25  requesting a grant, is that the process for them to



1    follow?

2        A    Yes.

3        Q    And then in Response No. 7, there's a

4    reference to a 50 percent match.

5             We talked earlier about local districts

6    had to contribute some of the money and the state

7    fund contributed some.  Is that what that reference

8    is to?

9        A    Yes.

10       Q    So the states had to provide 50 percent --

11   had to match whatever the -- I'm sorry.

12            The local districts had to match whatever

13   the State contributed towards the project?

14       A    Yes.

15       Q    Then in response to Question No. 9, we

16   talked a little bit briefly about the structure of

17   GNETS, and I can't exactly remember your answer, so

18   I'm going to ask a question that may be duplicative.

19   I'm sorry.

20            Are you aware of some GNETS programs that

21   serve students from multiple school systems?

22       A    Yes.

23       Q    Is that what this Question 9 is

24   addressing?

25       A    Yes.



1    Q    Could you explain what was contemplated

2    that the collaboration would be between districts

3    that are sending students to a joint program?

4    A    If, if -- let's say the grant was for

5    $100,000 and the State is going to give you 50 and

6    you have to come up with 50, and you -- the GNETS

7    program serves five school districts in a facility

8    located in a single district.  Then it would be up

9    to the five districts to determine what -- how that

10   $50,000 local match, that 50 percent local match,

11   would be administered to the five districts.

12   Q    So, for instance, some might decide it

13   would be shared equally and some might do it based

14   on the number of students referred or served by the

15   GNETS program?

16   A    That sounds reasonable.

17   Q    And it was up to them to work that out.

18        Do you -- are you aware of any facilities

19   -- I'm sorry.  I knew I was going to trip up on

20   these words at some point.

21        Are you aware of any programs that chose

22   not to continue to send their students to an out of

23   county program at this point?

24   A    Yes.

25   Q    And why was that?



1       A    I really don't know what -- I can't

2   speculate on what decisions local districts were

3   making and why they were making them, but I do know

4   that some districts decided to serve their kids at

5   home.

6       Q    That's fair.  How did you come to know

7   that that decision had been made?

8       A    Feedback we got from the GNETS programs

9   and the local districts.

10          Now, it could have been an email.  It

11  could have been a phone call.

12      Q    They just reached out and voluntarily told

13  you that was their plan?

14      A    Yeah.

15      Q    Okay.  It may have -- could it have come

16  up in connection with a facility, like if they said

17  we weren't sending them there anymore, so we need to

18  visit this facility instead of a site visit?  Could

19  it have come up like that, too?

20      A    Ask me that question again.

21      Q    If some counties had decided not to send

22  their GNETS eligible student to a program that

23  serves multiple counties but instead we're going to

24  serve them in their own, within their own county,

25  might they have needed to reach out to your office



1  to have an assessment of the facility they intended

2  to move them into instead?

3      A    Yes.

4          MS. TAYLOE:  Now I'm going to refer to

5      another document that was previously marked as

6      Plaintiff's Exhibit 87.

7          (WHEREUPON, Plaintiff's Exhibit-87 was

8       marked for identification.)

9          MS. TAYLOE:  Since I don't have copies of

10     it, Victoria, can I ask you to --

11         MS. LILL:  Just read the number.

12         MS. TAYLOE:  GA01488847.

13         (Witness reviews exhibit.)

14     A    Okay.

15     Q    Okay.  This is an email from you to Clara

16 Keith and Stacey Suber-Drake and Pat Schofill, dated

17 April 20th, 2017.  Is that correct?

18     A    Yes.

19     Q    And it's a -- that date is a culmination

20 of some email threads with various drafts of the

21 facilities grant application form.  Is that correct?

22     A    Yes.

23     Q    Who -- who worked on finalizing this

24 document?

25     A    Based on the email I wrote, I would say



1  that was me, Clara, Stacey, Pat, Sarah, Nakeba.

2      Q    We talked before about Clara had been

3  between -- had been at times both -- not both.

4          At different times had been at the

5  Department of Education and had been at times at

6  DBHDD.  Here she has a DBHDD email address.  Does it

7  make it seem likely she was employed with the

8  department of -- DBHDD?

9      A    Yes.

10     Q    Do you know why that department was

11 involved in this process?

12     A    I really don't.

13     Q    Then the attachment, which I believe is

14 included in your document, but for the record I'll

15 state, in case it's a separate document, is

16 GA01488851.

17         Do you see that?

18     A    Yes.

19     Q    What is that document, please?

20     A    It is the GNETS facilities grant

21 application and instructions.

22     Q    Is that the final version?

23     A    It appears to be, yes.

24     Q    Do you know who else from Georgia

25 Department of Education and GNETS staff participated



1  in the process of reviewing this application?

2       A    I mean I really can't remember.  It was

3  obviously meant to be a team effort.  I was

4  depending on a number of people to review this with

5  input, and based on the email, I know those people.

6  But if there were others, I just don't remember.

7       Q    So are you saying the people who are on

8  this email chain were involved in the process, and

9  there may have been others as well?

10      A    Yes.

11      Q    There may have been?

12      A    May have been.

13      Q    Thank you.

14           MS. TAYLOE:  I'm going to have another

15      document from the state, GA0148 -- I'm sorry,

16      that was the one we just did.

17           It was separate on mine, but it's included

18      in his.  Okay.

19           So this one is GA00132718.  So this will

20      be Plaintiff's Exhibit 124.

21           (WHEREUPON, Plaintiff's Exhibit-124 was

22       marked for identification.)

23           (Witness reviews exhibit.)

24      A    Okay.

25      Q    This is an email from you to Mark Morgan,



 1  sent on November 8, 2017.

 2          Can you tell me who Mark Morgan is,

 3  please?

 4      A   I'm going to assume that it's the

 5  superintendent, but I don't know that for sure.

 6      Q   Can I say superintendent of Berrien

 7  County, based on the email address?

 8      A   Yes.

 9      Q   Do you know what a --

10          MS. TAYLOE:  Strike that.

11  BY MS. TAYLOE:

12      Q   You say in the second paragraph:  "I will

13  be meeting with the State Board of Education later

14  this morning to update them on responses from school

15  systems statewide..."

16          What was the role of the State Board of

17  Education in this process?

18      A   I'm not really sure I know how to answer

19  that.  I can tell you that my role was to report to

20  them regularly on the work that we had been doing,

21  which we did, and, you know, I would think their

22  role in this was consistent with their role as State

23  Board Members in any other matter.

24          So I just don't really know how to answer

25  that question.



1      Q    So would you say you were primarily

2   providing them information, or were they providing

3   you instructions as well, or was it kind of both

4   ways?

5      A    I really feel like in my memory of most of

6   the meetings I had where I presented information, I

7   presented information and then left.  And then if,

8   if I had gotten any direction, it was from my

9   superior later.

10     Q    And that would be Pat Schofill?

11     A    In this case, yes.

12     Q    Could there be someone else in other

13  cases?

14     A    Well, that was the chain of command.  Pat

15  -- first me to Pat, Pat to the CFO.

16          So a directive may have come from the CFO

17  to Pat to me.

18     Q    And the CFO is Ted Beck?

19     A    Yes.

20     Q    Sometimes he would just communicate

21  directly to you?

22     A    Occasionally.

23     Q    And did the State Board of Education

24  mainly ask you for information, or did they ask you

25  for your opinion and advice on things related to the



1  assessment or remediation plan?

2      A    I really believe what I provided the State

3  Board of -- the State Board of Education was

4  information, and then my experience was they

5  received information, they may ask a few questions,

6  and then, again, if anybody asked me for advice or

7  for clarity, it was the chain of command.

8      Q    I'm going to shift gears again a little

9  bit and move on to some funding questions.

10          And we covered some of this SPLOST before

11 and FTE, so we've already got that foundation laid.

12          I know you said you had a general

13 understanding, and I'm not asking for more specifics

14 than you have.  I'm just going to ask this.  If you

15 don't know, you can tell me you don't know.

16          I read some reference to a change in the

17 last several years about the FTE funding formula.

18 Do you know what that was about?

19     A    No.

20     Q    With respect to square footage

21 requirements in light of special education

22 exemptions, does that ring a bell?

23     A    Square footage requirements with respect

24 to special education exemptions?

25          That language doesn't ring a bell.



1    Q    I'll try to find a time then.  I'll just
2  try to find the document.
3         Could you tell me just generally what are
4  the financial challenges in terms of finances of
5  maintaining facilities for GNETS facilities?
6    A    I don't really separate the financial
7  challenges of maintaining facilities by program.
8  School systems all across the State have challenges
9  related to maintaining facilities, and I mean it --
10 it doesn't matter to me who serves in them, what
11 kids are served.
12        So I don't know how to answer that
13 specific to GNETS.
14   Q    Okay.  I'll try to break down then some of
15 the things that -- I'm just trying to break it down.
16   A    Okay.
17   Q    So facilities that are in a Local Facility
18 Plan are entitled to annual distributions; is that
19 correct?
20   A    In a manner of speaking, yes.
21   Q    So I understand they can choose to save
22 them up for bulk distribution later, but they have
23 an entitlement every year?
24   A    Yes.
25   Q    Are GNETS facilities, do they have the



1    same structure in place to get entitlement to funds?

2        A    It depends.

3        Q    Does it depend on whether they're in an

4    LFP or not?

5        A    Yes.

6        Q    If there's a standalone GNETS facility

7    that's not in the LFP, does it have any access to

8    that same kind of funding stream?

9        A    No.

10        Q    And then another funding stream would be

11    the SPLOST funds that general education schools

12    generally have access to, correct?

13        A    Yes.

14        Q    Do standalone GNETS centers have access to

15    SPLOST funds?

16        A    Yes.

17        Q    And to do that, they would have to get

18    agreement by all the contributing school districts

19    to raise taxes to pay for remediation to that

20    facility; is that correct?

21        A    I don't think that's correct.

22        Q    How would they do it?

23        A    Well, SPLOST dollars -- SPLOST dollars are

24    driven by what is listed in the referendum when the

25    taxpayers approve it.  So if the taxpayers approved



1  SPLOST dollars for school systems to use for capital

2  improvements for all -- all facilities in the

3  district, then, then that would be the basis -- you

4  used the term raising taxes.  That's a pretty broad

5  term.

6              It is true SPLOST is a tax.  So the -- but

7  the voter is allowing the district to collect that

8  tax knowing -- or approving they would spend it on

9  capital improvements.  Those capital improvements

10 are not typically specifically outlined in the, in

11 the -- in the ballot question.

12             So if a district chooses to use SPLOST

13 dollars to complete capital improvements at a GNETS

14 facilities, that's legitimate.

15     Q    Okay.  Would you have any -- do you have

16 access to information about SPLOST funds and how

17 they're distributed?

18     A    Be more specific about how they're

19 distributed.

20     Q    If a district did follow a SPLOST

21 procedure and get SPLOST funds, would your

22 department know which facilities they were spent on?

23     A    No.

24     Q    Okay.  Do you have reason to believe they

25 are spent equitably on standalone GNETS facilities?



1      A     I really don't have -- I don't have a

2  basis for drawing that opinion.

3      Q     Okay.  That's fair.

4            And revisiting a little bit because you've

5  clarified some things since I last asked this

6  question, so I want to make sure I didn't

7  misunderstand before.

8            Phased out facilities are not eligible for

9  state facility funds; is that correct?

10     A     Correct.

11           MS. TAYLOE:  I'm going to hand to the

12     court reporter Exhibit GA04088751, and it be

13     asked it be identified as Plaintiff's Exhibit

14     125.

15           (WHEREUPON, Plaintiff's Exhibit-125 was

16      marked for identification.)

17           MS. TAYLOE:

18           (Witness reviews exhibit.)

19     A     Okay.

20     Q     Do you recognize this document?

21     A     I do.

22     Q     This is an email from Mike Rowland to

23  Leonard McCoy, dated August 10th, 2016, and we've

24  kind of gone back and forth about the date, but do

25  you now understand 2016, the summer of 2016, to be



1  the summer the FCAs were being conducted?

2      A    Sure, yeah.

3      Q    This email, Mr. McCoy -- I'm sorry, I'll

4  back up.

5           Is Mr. McCoy one of the field

6  consultants --

7      A    Yes.

8      Q    -- in the department?

9      A    Yes.

10     Q    Mr. McCoy lists some expenses that are

11 overhead associated with running a stand-alone

12 facility, and I think it's fair to say he

13 characterized it as inefficiencies.

14          I want you to look at the last sentence

15 there, where he says -- I want to see if you -- see

16 where he says:  "There is no doubt in this ol' boy's

17 mind that facilities at aside, EBD students could be

18 better served in the schools and a great deal of

19 money is being wasted on administration and M and O

20 in the present setup."

21          EBD, do you understand that to mean

22 emotionally and behaviorally disabled students?

23     A    Yes.

24     Q    And M and O is maintenance and operation?

25     A    Yes.



1      Q    What did you think when you received this
2   email from Mr. McCoy?
3      A    I thought Mr. McCoy had editorialized
4   outside the purview of his job responsibilities.
5      Q    What did you mean when you said "I get
6   it"?
7      A    I get it.
8      Q    All right.  So outside of the -- when you
9   say you get it, what do you get?
10     A    I mean he made an argument that I could
11  understand, but --
12     Q    Do you see there's merit to his argument?
13         MR. PICO PRATS:  Objection.  That calls
14     for lack of personal knowledge, speculation.
15         MS. TAYLOE:  Can we agree to.
16         MR. PICO PRATS:  Those are all form
17     objections.
18         MS. TAYLOE:  Right.  So all you have to
19     say is objection to form.
20         MR. PICO PRATS:  Okay.
21  BY MS. TAYLOE:
22     Q    What was your personal opinion of what he
23  said to you or wrote to you?
24     A    That he had editorialized outside the
25  purview of his job responsibilities.



1      Q    And you had no opinion about the accuracy
2  of what he said?
3      A    I had no way to have an opinion about the
4  accuracy because I didn't know the other side of the
5  story.  Because there is one.
6      Q    Are you talking about in this facility in
7  particular or in GNETS facilities in general?
8      A    Well, in -- he's referring to a specific
9  location.  And I certainly heard his side of the
10 story, but I have no -- I have no way to know what
11 that district's up against or how they're funding
12 anything, and it's just not my job to know that.
13     Q    But you did say you understood his
14 argument?
15     A    I mean I saw where he -- I certainly was
16 able to hear what he was saying.
17     Q    And he said here "facilities aside."  What
18 about not excluding facilities, do you think there's
19 an argument that facility expenditures themselves
20 are -- might be better used in a more consolidated
21 manner?
22     A    With respect to --
23     Q    GNETS standalone facility.
24     A    My opinion is each, each facility is a
25 unique set of data points, and it's impossible for



1  me to have an opinion about efficiency without

2  looking at budget records or ledger entries.  I mean

3  there's just a lot that goes into an analysis over

4  what's efficient and what's not.

5          And I don't know how -- I don't know how

6  to respond to Mr. McCoy's comments.

7      Q    You mentioned earlier that you have an --

8  experts do some of the facilities assessments

9  because the field consultants were former educators

10 like yourself.  Was Mr. McCoy also a former

11 educator?

12     A    Yes.

13     Q    Do you know what his educational -- or

14 professional background as an educator was?

15     A    I do.

16     Q    What was it?

17     A    He was formally the superintendent in

18 Colquitt County.

19     Q    Colquitt?

20     A    Colquitt County.

21     Q    And do you know how long he was

22 superintendent in Colquitt County for?

23     A    I don't.

24     Q    Did he have teaching experience before

25 that?



1      A      Perhaps.  I don't know that.

2      Q      Okay.  How many GNETS facilities would you

3  say you have personally visited in the last, I'd

4  say, 8 to 10 years?

5      A      I have no idea.  I mean a number.

6             Prior to -- prior to this grant, very few.

7  But subsequent to the grant, a number.  I just don't

8  know have -- I can't quantify that specifically.

9      Q      So I thought earlier you said you went on

10  the three test site visits but then didn't go --

11      A      Sure.

12      Q      -- on the rest of them?

13      A      But after that, every time they moved kids

14  to another location, they called me and I went.  So

15  I mean if you're asking me more than five and less

16  than 20, I'm good with that answer.

17      Q      Somewhere in that range?

18      A      Yeah, but I can't -- I mean one of the

19  things that I did a lot of was visit schools in

20  general.

21      Q      So after the three pilot sites that you

22  visited, the ones that you visited were ones that

23  were being -- proposed to be relocated or the ones

24  they were proposing to be relocated to?

25      A      Both.



1      Q    Both?

2      A    Yeah.

3      Q    And was that as part of the exit strategy

4  process, they wanted to get approval for the new

5  facility that they wanted to use?

6      A    Yes.

7      Q    And did they need that approval from your

8  department to be able to move into the new

9  facilities?

10     A    Yes.

11     Q    From the ones you have visited, what is

12 your impression of the general condition of GNETS

13 standalone facilities?

14     A    It depends.  There's one in Athens that's

15 every bit as good as every school you've ever been

16 in, and then there are some in other places that,

17 you know, weren't very good.

18     Q    What were your concerns about the ones

19 that weren't very good?  What kinds of things?

20     A    Well, mainly that, that -- whether this

21 was school -- hard to kind of know what came first,

22 the chicken or the egg, with respect to -- school

23 systems are offering places for programs to locate,

24 centers to locate.  Well, all the schools in their

25 facility plan are being used.  So the only thing



MICHAEL D. ROWLAND                                June 09, 2022
UNITED STATES vs STATE OF GEORGIA                          141

1  available is something that's not being used, and in
2  general school systems that stop using facilities do
3  so for a reason.
4           And those reasons could be multiple but,
5  but it usually results in a lesser commitment to
6  routine upkeep.
7      Q    So GNETS students receiving GNETS service
8  are often, I heard you say, often placed in
9  buildings that were vacated by general education
10 students or were otherwise available because they
11 weren't being used by other classes?
12     A    Yes.
13     Q    Do you think the lesser commitment to
14 routine upkeep is a result of a shortage of finances
15 or some other reason?
16     A    My hunch would be just the -- there's
17 competition for resources.  You know, specific to --
18 again, some school systems took old buildings like
19 and kept them up nicely.  And so whatever students
20 were housed there, whatever programs they housed
21 there, they were, they were to be commended for
22 looking after the taxpayers' asset.
23          But in other situations, I really don't
24 know how to speak to what a school system used in
25 its calculus for why it put money into one facility



1  and not the other.

2      Q    You said there's competition for

3  resources.  Do you think that GNETS standalone

4  facilities are less likely to earn those -- be --

5  have access to those resources?

6      A    I really don't know the answer to that.

7      Q    Why did you mention competition for

8  resources?

9      A    Well, I mean that's true even in schools

10 that are in the Local Facility Plan.  There's just

11 so many dollars and all of this need.

12         So districts have to prioritize projects.

13     Q    Yet you said there was, in these

14 facilities there was a lesser commitment to

15 maintenance?

16     A    Well, I would clarify that by saying in

17 facilities that were phased out of the Local

18 Facility Plan.

19     Q    Because they had been phased out, there

20 was a lesser commitment by the distribution to

21 maintain them?

22     A    In general.  Could be.  It's not always

23 true.

24     Q    Not always, but that would not be

25 uncommon?



1    A    True.

2    Q    That would be even though there are

3 currently GNETS students being served in those

4 facilities?

5    A    Yeah, I guess so.

6    Q    So I asked for a big time frame about how

7 many you had seen in the last 10 years, and that

8 gives me some perspective, but now I'm trying to get

9 a more recent perspective on.  When was last time

10 you visited a GNETS facility?

11    A    2020.

12    Q    Do you remember which one or ones?

13    A    Well, the last site visit that I remember

14 was to look at a facility that -- where the GNETS

15 wanted to locate a program in Washington County.

16    Q    And when was the last one before that?

17         I'm trying to get a sense, were they

18 recent or kind of spread out over the 10 years?

19    A    Yeah.  Again, most of the visits -- I

20 would say -- really, exclusively any GNETS program

21 that I visited in reference to my job at the

22 department occurred in conjunction with this grant.

23    Q    So that would place it sort of 2017 on?

24    A    Yes.

25    Q    I'm going to ask you a few questions now

1   about the knowledge you have about GNETS facilities.

2   This could be either, and you can let me know, if

3   it's from your personal observation or reports from

4   your field consultants.

5           Do you know whether any of the GNETS

6   facilities, the facilities currently housing GNETS

7   students, were those previously used as segregated

8   schools for black children in the '60s, '50s and

9   '60s?

10       A    I do not know that, no.

11       Q    Do you know for those programs that are

12  located on sites that also house general education

13  schools whether the GNETS program is sort of in a

14  locked wing or physically separated barrier between

15  them and the general education students?

16       A    Again, I do not know that.

17       Q    Do you know whether these facilities have

18  seclusion rooms?

19       A    I do not.

20       Q    Would that, to your mind, be something

21  that would be included as part of the spaces that

22  would be looked at when you look at program spaces?

23       A    I really didn't have a role to play in

24  knowing what program spaces would be appropriate for

25  GNETS and when we -- if -- that really wasn't --

1  going into these facilities wasn't with an eye for

2  do the spaces meet program needs, because I didn't

3  really understand the nature of the program needs

4  relative to the technical experience -- I mean

5  technical requirements, delivered instruction to

6  those kids.

7      Q    What were your main take-aways from the

8  facility conditions assessments when they were

9  completed about the conditions at GNETS facilities?

10     A    It was very similar to what we find

11  statewide.  There were some school districts and

12  some entities that were providing quality facilities

13  for those students, and there were some school

14  districts and facilities that were not, and

15  everything in between.

16     Q    Were there any kind of things that were

17  more commonly issues at GNETS facilities?

18     A    I think in general the idea that -- I

19  don't know how -- it's dangerous to quantify because

20  many sounds like a lot, and I don't know what the

21  numbers are.

22          But what I do know is that, that in some

23  cases students were housed in facilities that had

24  been phased out of facility plans for a long time,

25  and where it appeared school districts just hadn't



 1 | put the kind of resources into those facilities that
 2 | they might.
 3 |      Q    And -- let me back up little bit.
 4 |           Did you agree with the recommendation to
 5 | close --
 6 |           MS. TAYLOE:  I'm sorry.
 7 |      Q    Did you agree with the recommendation to
 8 | relocate the students from the nine facilities in
 9 | the summer of 2016?
10 |      A    Yes.
11 |      Q    Did you think there were other facilities
12 | that it might also have been beneficial to relocate
13 | students from?
14 |      A    I don't remember one particularly, for
15 | example, that I felt like we missed, especially
16 | given the fact that we were offering a grant for
17 | facility improvement.
18 |           So there's not one that stands out, I
19 | think is what I'm trying to say, other than the nine
20 | that were identified in that report.
21 |      Q    Do you remember one of your field
22 | consultants saying that they were haunted by the
23 | gross inadequacies -- inadequacies that they saw?
24 |      A    If you say they said it, they said it.
25 |           I don't remember that specifically, but if



MICHAEL D. ROWLAND                                 June 09, 2022
UNITED STATES vs STATE OF GEORGIA                        147

1  you show me a document where they wrote it down, it
2  happened.
3        Q    Do you remember one facility that a field
4  consultant told them he would shut down if he were
5  king?
6        A    Again, I do not remember that specifically
7  but if you say it happened, it happened.  It
8  wouldn't surprise me.
9        Q    So you would have to see documents about
10 those facilities to be able to remember if anything
11 happened -- if they were among the ones that were
12 closed?
13       A    Yes.
14       Q    Were things that were listed in grant
15 applications as part of the grant application
16 process, were those things that were routinely
17 included in local facility plans?
18       A    Yes.
19       Q    Were there any things that were available
20 for funding in the GNETS grant, the GNETS facilities
21 grant, that would not have been covered by LFPs?
22       A    I think so.  I think the answer to that is
23 yes.
24       Q    Do you have a recollection about what
25 kinds of things might have been?



1      A      Things like parking.  You wouldn't -- in

2    regular capital outlay, I think I mentioned this

3    before, repavement of parking lot or creating

4    handicapped access space in parking lots is not an

5    eligible need, but with the GNETS grants I do

6    believe, believe those were needs that were funded,

7    in some cases.

8           Again, without specifically seeing an

9    application or an award, I don't know for sure.

10     Q      So if I recall, that's what you were

11   talking about there were site conditions, some

12   things would not have been reimbursable as a site

13   condition, were eligible under the GNETS grant?

14     A      Yes.

15     Q      Do you know why that was?  That was just

16   how the grant was drawn?

17     A      What I remember the discussion being was

18   that -- don't mind saying it.  I advocated for this.

19           You have a report that says here are some

20   of the -- these are needs, and I understand that in

21   regular capital outlay we wouldn't fund those needs,

22   but this is different.  We sent people out there and

23   said make us a list, and they made us a list, and

24   now we're only -- and we're only going to tell the

25   district, look, we're only giving you half of what



1   it's really going to cost.  So I think as long as

2   it's something that's a need on that list, let's say

3   that's eligible for purposes of this grant.

4            And I'll have to tell you, I don't know if

5   that's where we landed.  I hope that's where we

6   landed.  I hope.  That's my memory.  I know that's,

7   that's what we talked about.  That was the

8   rationale.

9       Q    We already talked a little bit about how

10  frequently GNETS standalone facilities are older

11  than the local -- GNET local schools, and you've

12  said they sometimes suffer from lack of maintenance

13  more than other local schools.

14           Is it fair to say then that those factors

15  mean that GNETS facilities are more likely to not

16  satisfy contemporary codes or standards for

17  educational environments?

18      A    Yes.

19      Q    What kind of codes or standards do you

20  think they might fall within that?

21      A    There have been changes in building codes

22  over the years for a long time.  So electrical

23  codes, plumbing codes, air quality codes are

24  standards more than anything.  I mean these are a

25  few that come to mind.



1      Q    How about technological capacity?

2      A    Again, it depends on what a district might

3  have done to upgrade that facility.  But in the

4  absence of upgrades, sure.

5      Q    What about modern construction materials

6  and practices?

7      A    Um, that is true, but I think it's fair to

8  say that, you know, not all old buildings were

9  poorly constructed.

10     Q    I don't think they would have to be poorly

11 constructed to no longer meet -- I mean I saw -- I'm

12 not a facilities expert by any stretch of the

13 imagination, but I saw things about the types of

14 glass recommended to be used for windows and things

15 like that.

16          MR. PICO PRATS:  Objection for testimony

17     by counsel.

18          MS. TAYLOE:  Okay.  Sorry.

19 BY MS. TAYLOE:

20     Q    Is it possible for buildings not to meet

21 -- facilities not to meet modern construction

22 materials practices even if they were well

23 constructed at the time they were built?

24     A    Yes.

25     Q    We talked before -- we looked at the



1  Cedarwood assessment.  We saw it was 154 old -- I'm

2  sorry -- 1954 building, wear and tear, toilets

3  missing doors, and no food service available.

4          Remember discussing that?

5      A   Yes.

6      Q   Would you say -- would you say it was fair

7  to conclude those conditions had been in existence

8  for some time before the facilities condition

9  assessment was conducted?

10     A   Yes.

11         MS. TAYLOE:  I was going to look for a

12     document, so if we could take a break.

13         THE VIDEOGRAPHER:  Off the record at 2:27

14     p.m.

15         (A recess was taken.)

16         THE VIDEOGRAPHER:  We're back on the

17     record at 2:59 p.m.

18  BY MS. TAYLOE:

19     Q   I wanted to loop back and clarify some

20  time line questions.

21         Is it correct that it was summer of 2016

22  that the students were relocated from those nine

23  facilities that we just discussed?

24     A   That sounds right.

25     Q   And so the grant application then, that



1  process would have started in 2017?

2      A    That sounds right.

3      Q    How long would it have taken for the grant

4  applications to be granted?

5      A    You mean from the time they were submitted

6  to award?

7      Q    Yes.

8      A    Is that what you're asking?

9      Q    Yes.

10     A    I really don't recall.  I'm sure there's a

11  record of when -- there was a deadline for the

12  application and there has to be a record of the

13  first award.

14          So I don't -- I just don't remember those

15  dates.

16          I feel like we sent award letters out.

17     Q    Is it fair to say it would have been some

18  time in the next spring?

19     A    Sure, I think so.  That sounds about

20  right.

21     Q    Then we talked about how there would be

22  some window of time because of all the pieces it

23  takes to get the funding and architects and approval

24  and like that.

25          So I think -- I'm trying to think about



1  the time between the 2017 grant applications and the

2  last visit you said you conducted in 2020.  What was

3  the purpose of the visits between 2018 and 2020?

4      A    I only remembering visiting sites when a

5  district that was either moving a GNETS class or

6  center from where it currently was to another

7  location that I had to visit the new location.

8           In fairness to that, there were some

9  situations where I couldn't go, so I sent a field

10  consultant.  But somebody from the department had to

11  visit the site where the program or center would be

12  located and approve it.

13      Q    And were those facilities --

14           MS. TAYLOE:  Excuse me.

15      Q    Were those programs who were looking to

16  relocate to a new facility, were the ones who had

17  been told in 2016 to relocate their students?

18      A    Not always.  In some cases that was true,

19  but in other cases -- what we tried to communicate

20  to the GNETS program is look, in light of everything

21  we've been through, if you're -- these programs can

22  be somewhat pneumatic, as they're looking for a

23  place to be served.  So it really didn't matter

24  whether you -- whether, whether you had been --

25  whether your site had been the subject of -- if



1  you've got to move or not, if you are -- if the

2  GNETS class or the program or center was located in

3  spot A last year and you're proposing to move it to

4  spot B, you have to get DOE approval for that move.

5      Q    So any time a GNETS program was to change

6  locations, they needed DOE approval?

7      A    Well, that was true when I left.

8      Q    Do you know, has someone else been asked

9  to fill your position?

10     A    I do not know that.

11     Q    So you don't know then if anybody else is

12  continuing with those visits?

13     A    I do not.

14          MS. TAYLOE:  I'd like to mark a document

15      produced by the State, GA00315849, as

16      Plaintiff's Exhibit No. 126.

17          (WHEREUPON, Plaintiff's Exhibit-126 was

18       marked for identification.)

19          (Witness reviews exhibit.)

20     A    Okay.

21     Q    This is an email from you to tcason, sent

22  February 26, 2018.  Is that correct?

23     A    Yes.

24     Q    Who's Dr. Cason?

25     A    I think this was the superintendent of



 1  Valdosta City schools.

 2      Q    And does this email seem to reflect the

 3  kind of approval we were just discussing where the

 4  Department of Education needed to approve a

 5  relocation of a GNETS location from one facility to

 6  another?

 7      A    Yes.

 8      Q    Do you know if this was one of the --

 9          MS. TAYLOE:   Strike.

10  BY MS. TAYLOE:

11      Q    Was this relocation a result of the

12  facilities conditions assessment?

13      A    Well, based on the email that Dr. Cason

14  wrote to Mr. Schofill, it appears that the decision

15  was -- or this, this act was being taken because the

16  Valdosta City schools were contemplating removing

17  themselves from the GNETS network.  And so if I'm

18  reading this correctly, they were looking to find a

19  facility in their district to serve these students.

20          But the first sentence there is "As you

21  know" -- this is Lowndes County.  I'm sorry.

22          Lowndes County school system -- that's not

23  true.  Okay.

24          So this is why it's a little complicated.

25  It is the Valdosta City superintendent who is



1  writing the letter, but Lowndes County is the agent

2  for that particular GNETS.  And Lowndes is talking

3  about pulling out of the GNETS network.  So Valdosta

4  City is saying, okay, we've got to find a spot for

5  our kids, and we're proposing the old Valdosta High,

6  because they had just built a new Valdosta High.

7          And my response is that Mr. McCoy will be

8  doing that visit, not myself.

9      Q    So it's possible that Lowndes County's

10 decision not to serve as a fiscal agent had

11 something to do with the facilities conditions

12 assessment but it may have been an independent

13 decision?

14     A    I don't know now why Lowndes is making

15 that decision.

16     Q    But for whatever reason, they're not

17 serving as fiscal agent anymore.  So Valdosta is

18 looking for a new location for their program?

19     A    Right.

20     Q    And they arranged with you and then

21 through you, Mr. McCoy, to get the site approval

22 from the Department of Education?

23     A    Correct.

24     Q    Have you or anybody from your team visited

25 this site since then?



1       A     I have not.

2       Q     Do you know if anyone from your team has?

3       A     I don't, I don't -- I do not know that.

4       Q     Have you heard any conversations since the

5  facilities condition assessment about the Valdosta

6  GNETS program conditions?

7       A     No, ma'am.

8             MS. TAYLOE:  Do I still mark this as an

9       exhibit even though we don't have a paper copy?

10            MS. GARDNER:  Yes.

11            MS. TAYLOE:  GA00041561 as Plaintiff's

12      Exhibit No. 127.

13            (WHEREUPON, Plaintiff's Exhibit-127 was

14       marked for identification.)

15            (Witness reviews exhibit.)

16      A     Okay.

17      Q     And this is a May 18, 2016 email thread

18  about the pilot schools; is that correct?

19      A     Yes.

20      Q     Do you see that the pilot schools that

21  were visited were identified as Kingsland, Waycross,

22  and Brunswick?

23      A     Yes.

24      Q     And that Kingsland was noted to be

25  average, and Waycross and Brunswick -- Brunswick



1  were noted to be critical?

2      A    I do not see that in this email.

3      Q    Right there.

4      A    Hang on.  I'm sorry.

5           Yes, I do see that.

6      Q    Just since I've been using different

7  terminology in this, are the pilot facilities and

8  the test facilities that we've been talking about,

9  the three, the same?

10     A    Yes.

11     Q    How, how did Waycross and Brunswick come

12 to be identified as critical before the pilot visit?

13     A    From the information provided in the

14 assessments that the field consultants did.

15     Q    So the field consultants went out first,

16 did their assessments, and then this was the test

17 run with the architectural team to show them what

18 kinds of things to look for on the visits?

19     A    Correct.

20     Q    Okay.  What was critical and average?

21 What were they relative to?  To other GNETS

22 facilities or just a general statement of need?

23     A    Yeah.  I don't -- I mean I don't really

24 know.

25           This is a determination that was made by



1  the architectural firm, and the process was, and I

2  think we talked about this before, it was kind of a

3  first phase review by the consultants, who were just

4  using the checklist that we looked at.

5          The checklist was sent with, with the

6  comments, was sent to the architectural firm, who at

7  that point made these, these judgments of critical,

8  average, or whatever they were using.  Obviously,

9  these -- this is the language they used in this

10 email.

11         So that was a determination made by the

12 architect based on the information they had been

13 provided in that first walk-through by the

14 facilities consultants.

15         MS. TAYLOE:  Then I would like to pull up

16    GA00196912.

17         I'd like to have that identified as

18    Exhibit No. -- I'm sorry.  128.  I'm sorry.

19         (WHEREUPON, Plaintiff's Exhibit-128 was

20     marked for identification.)

21 BY MS. TAYLOE:

22    Q    Do you see this that as a March 3rd, 2016

23 email relating to the RFQ?

24    A    Yes.

25    Q    This RFQ is request for qualifications



1  that we discussed earlier?

2       A    Yes.

3       Q    So you sent this to Emily and Clara

4  attaching the RFQ; is that correct?

5       A    That is correct.

6            MS. TAYLOE:  Then I would like to look at

7       the next -- the attachment ending 6913.

8            So that would be GA00196913, and identify

9       that as Exhibit 129, please.

10           We'll mark it as a separate one.

11           (WHEREUPON, Plaintiff's Exhibit-129 was

12        marked for identification.)

13           MS. TAYLOE:  It's marked as an attachment

14      but it's not in one document.

15           (Witness reviews exhibit.)

16      A    Okay.

17      Q    Do you see on -- do you see on Page 2, in

18  Item No. 1, where it says, "The Georgia Department

19  of Education, and local school districts, operate 48

20  GNETS locations throughout the state of Georgia"?

21      A    Yes.

22      Q    And that they "are in need of various

23  repairs and upgrades to meet the needs of students

24  in the GNETS program."

25      A    Yes.



1    Q    Okay.  So that was -- that reflects the

2  entity with which the contractor, the architects

3  entered into the contract?

4         The owner being GSFIC working on behalf of

5  Georgia Department of Education?

6    A    That's correct.

7         MS. TAYLOE:  Now I'd like to ask for

8     document 04089630 to be marked as Exhibit 130.

9          (WHEREUPON, Defendant's Exhibit-130 was

10      marked for identification.)

11         (Witness reviews exhibit.)

12    A    Okay.

13    Q    This is an email from you to Pat Schofill,

14  dated January 8th -- wait a minute.

15         MS. TAYLOE:  I'm sorry, that was the wrong

16     document.

17         We're going to be looking at GA04089636.

18         (Witness reviews exhibit.)

19         MS. TAYLOE:  Can we go off the record for

20     a second.

21         THE VIDEOGRAPHER:  Off the record at 3:24

22     p.m.

23         (Discussion ensued off the record.)

24         THE VIDEOGRAPHER:  Back on the record at

25     3:24 p.m.



1          MS. TAYLOE:  I just want to clarify for

2     the record I stated the wrong exhibit number

3     before, or the wrong Bates number for the

4     exhibit.

5          Plaintiff's Exhibit 130 is properly

6     identified as GA04089636.

7     A     Okay.

8     Q     And you see that's an email from you to

9  Pat Schofill, dated January 8, 2017; is that

10 correct?

11    A     Correct.

12    Q     And does this help refresh your

13 recollection about the facility ratings, the

14 facility condition index score?

15    A     I mean I -- I referred to a draft list

16 with a column I had in the worksheet, and I'm

17 familiar with the facility condition rating

18 component.

19          MS. TAYLOE:  Can we look at the attachment

20     to that, GA04089637.

21          (Witness reviews exhibit.)

22    A     Okay.

23          MS. TAYLOE:  Can we mark this, please, as

24     Plaintiff's Exhibit 131.

25          (WHEREUPON, Plaintiff's Exhibit-131 was



```
 1        marked for identification.)
 2   BY MS. TAYLOE:
 3        Q    Do you see the percentage ratings in the
 4   bottom column marked "Weighted Score"?
 5        A    Yes.
 6        Q    Do you understand that to be what you
 7   described earlier as the percentage closest to zero
 8   was problematic, and closest to one was a good
 9   condition for a facility?
10        A    Yes.
11        Q    So that if these numbers were represented
12   as decimals instead of percentage, for instance, the
13   .4 -- 48 percent would be a .48?
14        A    Yes.
15        Q    Are these the scores you were referencing
16   before when you said the ones below .4 were the ones
17   that were marked in red on that spreadsheet?
18        A    Yes.
19        Q    Do you see on the left-hand column how the
20   percentages are matched up to the categories that we
21   discussed before about getting scored?
22        A    You mean General Physical Condition,
23   Building Systems, Building Envelope?
24        Q    Yes, and how they have percentages next to
25   them?
```



1      A    Yes.

2      Q    Is it correct to say that those

3   percentages in parenthesis next to those categories

4   reflect how heavily or less heavily a score is

5   weighted to get the overall facility condition index

6   score?

7      A    Yes.

8      Q    For instance, if a building is a high

9   physical condition score and a low site amenity

10  score, would have a higher overall score than one

11  with the reverse?

12     A    Say that again.

13     Q    So if a facility has a ten for general

14  physical condition and a one for site amenities,

15  that facility would get an overall higher facilities

16  condition index score than one that had a one for

17  physical condition and a ten for site amenities?

18     A    Yes.

19     Q    Great.  We talked about this before and

20  you said it would be helpful to see a document to

21  remind you of the scale.

22     A    Right, Right.

23     Q    And this was the scale that was used to

24  generate the assessments that resulted in the

25  overall facility index -- facility condition index



 1  scores?

 2      A    Yeah.  I think these numbers came out of

 3  2WR's report, if I remember correctly.

 4      Q    So before we hadn't been entirely clear

 5  about whether 2WR used the same scale or not as your

 6  facility field consultants.

 7           Does this help clarify that?

 8      A    Yeah, yeah.  Okay.

 9           This is what I think.  There were two

10  separate -- like two separate functions.  Function

11  one was a preliminary function -- preliminary visit

12  where we sent the consultants to do this general

13  observation using that checklist that we looked at

14  earlier.  And that was at the request of the

15  architect so that they could get an idea for kind of

16  what they were going into first.  Maybe just to --

17  maybe it was, maybe it was accurate, maybe it

18  wasn't, but at least gave them some baseline to

19  start with in terms of planning and, and -- without

20  having been -- themselves not having visited any of

21  these places.

22           So then they took that information and I

23  think extrapolated the numbers and information into

24  that, the categories we looked at, that I can't --

25  critical, average.  Surely there was one that was



 1  great, but whatever good was.

 2          And then, and then maybe that drove some

 3  decisions about how to organize for the visits.

 4          The visits were held.  The documentation

 5  was collected based on these categories that they

 6  listed in that left column over there, and 2WR's

 7  personnel scored each of those categories

 8  independently of any information -- really, this was

 9  based on their physical assessment of the facility.

10          And so these, these numbers came from 2WR

11  assigning values to those criteria based on their

12  physical visit.

13      Q    Okay.  So the earlier visit by your team

14  may have been used to prioritize sites or something

15  like that, but the evaluations provided in the end

16  by 2WR were their own independent work?

17      A    Yes.

18      Q    Okay.  Do you -- see if the email that we

19  looked at first, the cover email to this, you were

20  asking to discuss with Pat Schofill your

21  recommendation about -- I'll pronounce it -- Ailey?

22      A    Yes.

23      Q    What was your recommendation about Ailey?

24      A    Well, the email just refers to let's

25  discuss the rating for Ailey.  I don't know that it



1  was -- I don't know that the intent of the email was

2  to communicate any kind of recommendation.

3      Q    What was Ailey's score?

4      A    You have to put the spreadsheet back up so

5  I can look at it.

6      Q    I'm sorry.  I forgot they're electronic.

7      A    Or just tell me.  I'll accept whatever you

8  --

9      Q    No, I'm not allowed to testify.  I

10 remember that now.

11     A    That should prove I don't know how this

12 works, so.

13          And the score was 48 percent for Ailey,

14 which is in Montgomery County.

15     Q    Okay.

16          MS. TAYLOE:  Okay.  I'll hold off there.

17          One more.  If we look at GA04092894, and

18      if I could ask that be marked as Plaintiff's

19      Exhibit No. 132.

20          (WHEREUPON, Plaintiff's Exhibit-132 was

21       marked for identification.)

22          (Witness reviews exhibit.)

23     A    Okay.

24     Q    This is an email to you dated March 1st,

25 2017.  Is that correct?



```
 1      A     Correct.

 2      Q     And is that the same date as the phone

 3   conference we talked about earlier?

 4      A     I don't remember.

 5      Q     Okay.  Well, could you please look at

 6   Question No. 4, I believe, that she asked you?

 7      A     Okay.

 8      Q     Could you read that, please?

 9      A     "Will my facility be closed if we don't do

10   anything?  I only have 7 or 8 students and one

11   teacher at one center.  I am not sure of putting 1

12   million dollars into this building is a wise move."

13      Q     And could you read your response to her,

14   please?

15      A     "Thank you for your questions and patience

16   through this process.  I will collect questions

17   through Wednesday of next week, and the other

18   members of the program staff and I will spend

19   Thursday drafting answers.  You can look for a

20   response by Monday, 3/6, at the latest.  Thanks

21   again, and do not hesitate to let me know if you

22   have additional questions."

23      Q     And was this one of the questions that led

24   to the -- that was addressed in the frequently asked

25   questions document that we reviewed earlier?
```



1      A    Perhaps.

2      Q    Was this part of the -- it was part of

3  that process?

4      A    Yes.  Yes.

5      Q    Okay.

6           And who is Marilyn Dryden who wrote this

7  email to you?

8      A    She is the director of River Quest GNETS

9  in Emanuel County.

10          MS. TAYLOE:  I'd like to introduce

11      GA00791991, and ask it be marked as Plaintiff's

12      Exhibit 133.

13          (WHEREUPON, Plaintiff's Exhibit-133 was

14       marked for identification.)

15          (Witness reviews exhibit.)

16     A    Okay.

17     Q    Okay.  And this is an email thread.  I'd

18  like to point you to in the middle of the second

19  page there's an email dated August 15th, 2017.

20          And in the first full paragraph there, it

21  says -- it starts:  "Our records indicate."

22          Do you see that paragraph?

23     A    Yes.

24     Q    Later in that paragraph, it says:  "That

25  being the case, you are reminded of the directive



1  established in the document entitled GNETS

2  Facilities Report Frequently Asked Questions dated

3  March 14, 2017."

4           And then it goes on to say:  "This

5  document directs that if the Local Unit of

6  Administration," and it goes on with the different

7  options available.

8       A    Right.

9       Q    Right?

10      A    Yes.

11      Q    And did you send this?

12      A    Yes.

13      Q    And did you send that to the GNETS program

14  and superintendents list that we talked about, like

15  the superintendents and -- I don't know who the

16  other group was in that category of emails.

17      A    It appears that I sent this document --

18  this to a list of superintendents who had facility

19  oversight or jurisdiction but did not make an

20  application for grant -- make an application for

21  grant funding.

22      Q    And this is the one that reminded them

23  even if they weren't applying for grant funding,

24  they still needed to comply with the directive to

25  either provide exit strategy or report to the



1  Department of Education how they were going to

2  complete the renovations or address the needs?

3      A    Yes.

4      Q    Okay.  Thank you.

5           MS. TAYLOE:  Then I have document

6      GA02546048, and I would ask this be marked as

7      Plaintiff's Exhibit 134.

8           (WHEREUPON, Plaintiff's Exhibit-134 was

9       marked for identification.)

10          (Witness reviews exhibit.)

11     A    Okay.

12     Q    And this is to answer the question before

13 we had about who all was on the Selection Committee,

14 and I would draw your attention to the middle

15 paragraph of this email -- I'm sorry.

16          This email is from you to Stacey

17 Suber-Drake, Nakeba Rahming and Clara Keith, and Pat

18 Schofill.

19     A    Correct.

20     Q    And the second paragraph, it says:  "I

21 have assumed the four of us would comprise the

22 selection committee but we can add or subtract to it

23 as you all see fit."

24     A    Correct.

25     Q    Does that help you remember who was on the



```
 1   Selection Committee?

 2        A    Yes.

 3        Q    And who would that be?

 4        A    Well, at least -- let me say this:  It

 5   makes sense that those people that I indicated in

 6   the email would serve, but I -- unless -- I still

 7   don't -- I know I was part of it, I know Pat was

 8   part of it.  I'm sure Nakeba was part of it.  But

 9   beyond that I just -- if it was somebody else added,

10   for example, you'd have to tell me or show me a

11   document where it said, here we are.

12             I just -- I might have missed somebody, I

13   guess is what I'm trying to say.

14        Q    Okay.  This has you and four addressees,

15   so a total five people on this email, and it says

16   "the four of us would comprise."

17             Is there somebody on this email who was

18   not in the committee?

19        A    It may have just been an oversight on my

20   part.

21        Q    Okay.  So to the best of your

22   recollection, the people on this email comprised the

23   committee and there may have been someone else but

24   you don't have a recollection?

25        A    Or it may have been one, one less of
```



1  these.  I just can't remember specifically who, who
2  -- who ultimately sat down and looked at the
3  applications.
4       Q    Okay.  I'll kind of wrap up from before,
5  so now I'm going to go back to just a few more
6  questions in my main one.
7            Mr. Rowland, do you -- are you familiar
8  with the term "school climate"?
9       A    Yes.
10      Q    What do you understand that to mean?
11      A    Typically it is -- I understand it to mean
12  the culture of the, of the school.
13      Q    And what kinds of factors would be
14  included in culture?
15      A    Relationship between administration and
16  staff, relationship between staff and students,
17  relationship between staff and parents, relationship
18  between staff and families.  The relationship of the
19  teaching staff to families.
20           Just to name a few.
21      Q    Would you consider aspects of the facility
22  condition to be part of the school climate?
23      A    Yes.
24      Q    And what kinds of conditions would you
25  include?



1      A    I would say in the overarching scheme of

2  climate, which I really in the context of my

3  professional background, or the things I mentioned

4  earlier, that poor facility condition would have a

5  negative impact on climate.  Could have a negative

6  impact on climate.

7      Q    And what kinds of conditions would you

8  think could have a negative impact on climate?

9      A    Leaky roofs, poor air quality, unclean

10  conditions, unkept areas.

11      Q    And how do you think that negatively

12  impacts climate?

13      A    Perhaps it makes faculty, staff, students

14  and families feel as if the culture is unimportant.

15      Q    That the culture is unimportant?

16      A    It's hard to -- it's hard to grab a

17  precise word, but, you know, there are a lot of

18  families that live in substandard conditions but

19  have loving households.  Just like there may be some

20  school climates that thrive even though the facility

21  is not optimal.

22           But I think there's -- my intuition is

23  that if the facility is in poor condition, that can

24  contribute to poor climate.

25      Q    And what conditions would it not



1  contribute to poor climate?

2      A    Well, I don't know the answer to that.  I

3  do know that there are faculty, staffs, and families

4  that overcome some negative impacts on school

5  climate to have really positive outcomes.

6          So, you know, not just -- to me that's the

7  overgeneralization that always is true.  I just find

8  it to be a stretch.

9      Q    But it would be a matter of overcoming the

10 poor conditions?

11     A    I agree with that.

12     Q    Okay.

13         MS. TAYLOE:  This one you're going to be

14     familiar with.  I'm about to introduce

15     GA00985661, and ask that it be marked as

16     Plaintiff's Exhibit 135.

17         (WHEREUPON, Plaintiff's Exhibit-135 was

18      marked for identification.)

19     A    Yes, I'm familiar with this document.

20     Q    Can you state for the record what document

21 it is?

22     A    It is the State of Our Schools report,

23 America's K-12 Facilities, produced by the 21st

24 Century School Fund, in cooperation with the

25 National School Council, and the Center for Green



1  Schools.

2      Q    And what was your connection with that

3  council?

4      A    At the time I served -- in 2016, at the

5  time of this report, I served as the president of

6  the National Council on School Facilities.

7      Q    And were you involved in the writing of

8  that report?

9      A    Yes.

10     Q    I imagine it was a team effort, but were

11  there certain sections?  Or would you describe your

12  role as primary author?

13     A    In large part, primary author was the

14  staff of the 21st Century School Fund.

15         The National Council is a -- was at the

16  time.  I'm assuming it still is -- was a group that

17  aspired to be a collection of the various facility

18  heads from the states, and so the staff of the 21st

19  Century School Fund really collected the data that

20  became the basis for the report, and then there was

21  a work meeting between that staff and the members of

22  the National Council to kind of sift through this

23  information, create some wording paradigms, but I

24  would consider the real author of the report to be

25  the staff of the 21st Century Fund.



1    Q    Okay.  Did you approve of its publication
2    under the name of the council you were president of
3    at the time?
4    A    Yes.
5    Q    I'd like to draw your attention to the
6    Executive Summary.
7         Do you see on Page 3 at the top, where it
8    says, "A large and growing body of evidence
9    demonstrates that school facilities have a direct
10   impact on student learning, students and staff
11   health, and school finances"?
12   A    Yes.
13   Q    And immediately after that:  "But too many
14   students attend school facilities that fall short of
15   providing 20th Century learning environments because
16   essential maintenance and capital improvements are
17   underfunded."
18   A    Yes.
19   Q    Do you still agree with that sentence?
20   A    Yes.
21   Q    And do you see a little further down --
22   let's see if I can find a mark for you.
23        MS. TAYLOE:  If I said 20th century, I
24     meant 21st Century.  I'm old.  Sorry.
25        I'm sorry.  I have quotes here but I do



1          not have page numbers for them.  I apologize.

2          Q    So in the paragraph that's headed "K-12

3    School Facilities Matter" in the middle of that

4    paragraph -- let me know when you're caught up.

5               In the middle of the paragraph it says:

6    "Research shows that high-quality facilities help

7    improve student achievement," bracketed, "are

8    integral to ensuring equity in educational offerings

9    and opportunities for students."

10         A    Yes.

11         Q    Do you still believe that's true?

12         A    I do.

13         Q    Then on Page 7, near the top, on the end

14   of the first page there, it says:  "Some students

15   attend school in bright, comfortable, and healthy

16   facilities, while others are assigned to

17   dilapidated, obsolete, and unhealthy facilities that

18   pose substantial obstacles to learning and overall

19   well-being."

20         A    Yes.

21         Q    Do you still believe that's the case?

22         A    I do.

23         Q    How do you think dilapidated, obsolete,

24   and unhealthy facilities pose substantial obstacles

25   to learning and overall well-being for students?



1      A    I think healthy -- there is such a thing

2  as a healthy school.  There's a healthy home.

3           So whether it's in poor air quality, air

4  circulation, aging, floor coverings that capture,

5  you know, particles from the air.

6           I mean there's any number of -- any number

7  of things you could point to that, that, you know,

8  the research indicates and that intuitively makes

9  sense, that, you know, poor facilities can

10  contribute to these things that we've talked about.

11  The condition of -- poor condition of facilities.

12      Q    And so a number of those things were

13  included on the checklist that the assessment team

14  used to evaluate the facilities they visited?

15      A    Yes.

16      Q    Would you expect then that if schools got

17  low marks in a number of those categories, that that

18  would impair student opportunities for learning and

19  well-being?

20      A    Yes.

21           MS. TAYLOE:  I think I'm -- I think I have

22      one possible thing.  I want to find a document

23      to help close the loop on.  Otherwise, I think

24      I'm done.

25           We need to take a quick break to consult



1        and see if we're close to wrapping up.

2             THE VIDEOGRAPHER:  Off the record at 4:02

3        p.m.

4             (A recess was taken.)

5             THE VIDEOGRAPHER:  We're back on the

6        record at 4:04 p.m.

7   BY MS. TAYLOE:

8        Q    I have just two real quick clean-up

9   questions and I'll let you go.

10            First, have you ever said no to a proposal

11  to relocate a facility?  Have you ever denied a

12  request to relocate to a facility?

13       A    Yes.

14       Q    On what grounds?

15       A    That it wasn't a suitable location for the

16  program.

17       Q    And what made it unsuitable?

18       A    Condition.  There have been cases where I

19  said you can locate here but here's a list of things

20  you have to do, and the owner decided it wasn't

21  worth doing what I said you had to do.

22            But there have been -- there have been --

23  I won't be able to point to one specifically, but I

24  feel certain there was a place I visited and said,

25  no, not here.  Keep looking.



1       Q    And I didn't say this in the question, but

2    you only do these inspections, approval process for

3    GNETS facilities?  So it was a GNETS facilities that

4    was denied --

5       A    That's correct.

6       Q    -- relocation?

7       A    That's correct.

8       Q    Okay.  Then the other question was who --

9    we talked before -- you're helping me understand

10   about student codes and program codes and all that.

11   Who makes the decision about how students and

12   programs and things are coded?

13      A    Well, the codes themselves are generated

14   mechanically.  So the -- it's organized this way.

15   Now, let's understand that this starts with

16   identifying a site for a school -- I'm taking you

17   through a new school.

18           A site.  They build a facility.  It gets a

19   code.  This database, DOE plugs all that information

20   to, and they hit a button, the system assigns a code

21   to it.

22           The school code is also generated the same

23   way, when the school opens within the, the Facility

24   School Registry.

25           But the district makes the decision about



1  whether I want to open a school or a program based

2  on the configuration of students.

3      Q    So I'll make sure I understand that.

4          If -- when a new facility or a program is

5  being opened, the district decides whether it's a

6  school or a program?

7      A    So a new facility is a building.  Nobody

8  decides anything about that except the builder.

9          Once you build it, it goes into the

10  database as new high school.  And when we say open

11  that facility, generates a code.

12         So you have -- coding system works this

13  way:  You have -- every school system in the State

14  has a code, three-digit code.  And then every

15  facility within that district has a four-digit code.

16         So you've got system code, facility code.

17         Now, the question becomes inside that

18  facility do you -- are you going to open a school or

19  a program.  And -- schools make that -- school

20  systems make those decisions, within parameters.

21  You wouldn't open a 750 student K-5 population as a

22  program.  If you tried that, the department would

23  say, oh, that's a mistake, we wouldn't allow that.

24         So you -- so that 750 student collection

25  of kids gets opened as a school.  So now we have a



1  system code, a facility code, and a school code.

2          Now, within that school the district may

3  decide we want a certain program for our kids.  It

4  might be college and career academy, it might be a

5  GNETS program, it might be a gifted program.  And so

6  what we're going to do is open that as a program so

7  that it has a program code.  And it's different from

8  school code and different from facility code.

9          But program code, the fact that it's a

10 program code tells the coding system you can't, you

11 can't count this kid here.  Tell me where that kid

12 belongs.  It belongs to a school somewhere.  Because

13 in that facility there may be one open school and

14 four or five open programs, that all report back to

15 that school code.

16     Q    Okay.  I got that now.

17          So a facility that has a GNETS classroom

18 or GNETS wing, for instance, would have a school

19 code for the general education population, and a

20 program code for the students who are being served

21 through GNETS, and those students being served

22 through GNETS would have school codes attached to

23 the sending school?

24     A    Correct.  Correct.

25     Q    So on the flipside then -- because that



1  seems easier when it's a classroom or wing.  If you

2  have a center that serves multiple school systems,

3  there's a facility code for the facility, and a

4  program code for GNETS.  Would that program code be

5  -- what would be the system code for that?  Because

6  it would be the system in which it's located?

7       A    I do not know the answer -- I do not

8  understand fully the funding mechanism behind how

9  centers -- I do know there are program codes, and

10 that does identify the student with a school code

11 and a school system.

12           All of that is really set up for

13 accountability and funding purposes, and that's

14 where my -- that wasn't what I did at the

15 department.

16      Q    Okay.

17      A    So I don't -- because I remember having to

18 work through this myself and being confused of where

19 the money really goes.  Does it go back to the

20 system?  Does it go to GNETS?

21           But there is an accounting structure that

22 is intended for the, for the program to report that

23 student at a school and system so that you keep that

24 chain-of-custody, for lack of a better way to put

25 it, to know where the kid belongs.



1      Q    And so do you happen to know -- I

2  understand this is not something you do -- if the

3  GNETS code varies by program?

4      A    No.  In fact -- here's the -- program

5  codes sometimes overlap.  I mean they were typically

6  a 6,000 number, 6001, two, three, four, five, eight.

7           You might have a program code that is

8  exactly the same but because it links to, to

9  typically a school code and typically a facility

10 code and potentially the system code, the last

11 number is irrelevant -- not irrelevant.  The last

12 number is directed by the first set of numbers.  If

13 that makes any sense.

14     Q    Well, I guess what I'm trying to figure

15 out is, if you looked at a code and you knew this

16 was typically a GNETS code -- GNETS code --

17 typically a GNETS program, say, in Valdosta, we were

18 talking about Valdosta -- I understand the system

19 code and the facility code and everything would be

20 different from typically a GNETS program in Colquitt

21 County?

22     A    Right.

23     Q    But would the GNETS code part be the same

24 or is that also more linked to the -- that's set up

25 by whatever the host system is?



MICHAEL D. ROWLAND                                    June 09, 2022
UNITED STATES vs STATE OF GEORGIA                              186

1      A    Yeah.  It's, it's -- it -- here's what
2  would happen.  When you go into the Facility School
3  Registry and you -- and this is -- I just about have
4  to be looking at it to remember myself how it works,
5  but when -- what you would do is you would go to
6  typically a -- you would find typically a school
7  system by code.  Then you would look at the facility
8  where you wanted to open this GNETS program in that
9  system.  So you have typically a system facility
10 code.

11          I would open that facility, and in that
12 facility there might not be anything.  There might
13 be typically a school, might not be anything.  But
14 if I say in that facility I want to open typically a
15 program, I hit the button that says open program,
16 the program generates typically a program code.  I
17 don't have any control over it.  It assigns it
18 typically a code.

19          It may assign it based on what it knows or
20 it just may randomly assign it.  It may know there's
21 already typically a 6001, so you get 6005.
22     Q    Got it.
23     A    But it may know it doesn't really matter
24 because once you get back to the facility system
25 level, that's the identifier anyway.



1           So once that happened -- and then you

2    would tell the program, computer program, what the

3    open program parameters are, and it's saved, and you

4    -- there was an approval process through DOE.  It

5    sends typically a message to DOE that says, hey, you

6    got a request for typically a program out there.

7    There's a staff person at DOE that would go look at

8    it, make sense of it, it makes sense, they approve.

9    If they have questions, there's a way to, you know,

10   communicate.

11          And that goes on until it's either

12   approved or rejected or fixed or changed, or

13   whatever they needed to do to get it working.

14       Q    Okay.  And then you said you were sure

15   there had been facilities that had been denied.  Do

16   you know of the names of any of them, or you just

17   know there have been some?

18       A    Well, I -- the last one I remember was the

19   one I referenced in Washington County where I went

20   and looked at a facility that when I gave them

21   typically a list of things they had to do to make it

22   appropriate, they passed on it.

23       Q    So they found the list of things they

24   would have -- needs they would have to address to be

25   more trouble than it was worth?



1      A    That's right.  Well, I'm going to assume

2   that's what they decided.

3           MS. TAYLOE:  I'm sorry.  I'm trying to

4       read my colleague's handwriting.

5   BY MS. TAYLOE:

6      Q    You said that was the last one you

7   remember.  Were there others?

8      A    That's the last one I remember.  I don't

9   have another one sticking out in my memory that I

10  remember visiting and saying this won't work, but

11  there may very well have been.

12     Q    And how would that, the one you do

13  remember, how would that denial have been

14  documented?

15     A    I'm assuming we communicated in an email.

16  I looked at -- or it may -- that I'm not sure of.

17  It may have been an email where I said, okay, I went

18  and looked at it.  If you replace the four club --

19  if you replace the floor coverings, replace the HVAC

20  system, fix the broken door, whatever that list was

21  of just things you could look at, that any normal

22  human being would say, that's got to be fixed.  They

23  came back and said, ahh, we'll keep looking.

24     Q    And was that -- I don't know now to

25  pronounce this again.  Oconee --



1   A    Oconee.

2   Q    -- GNETS?  Oconee GNETS?

3   A    Yeah.  Oconee GNETS.  Yeah, I think so.

4   Q    And when was that?  How long ago was that?

5   A    2020.

6        MS. TAYLOE:  I think we're done.

7        MR. PICO PRATS:  I'm good.

8        MS. TAYLOE:  Thank you so much for your

9   time.  We really appreciate your patience

10  explaining all that to me and --

11       THE WITNESS:  Not a problem.

12       MS. TAYLOE:  -- answering all the

13  questions.

14       THE VIDEOGRAPHER:  Off the record -- off

15  the record at 4:17 p.m.

16       (Whereupon, the deposition concluded at

17  4:17 p.m.)

18

19

20

21

22

23

24

25



1                    C E R T I F I C A T E

2

3    STATE OF GEORGIA:

4    FULTON COUNTY:

5

6            I hereby certify that the foregoing

7    transcript of MICHAEL D. ROWLAND was taken down, as

8    stated in the caption, and the questions and answers

9    thereto were reduced by stenographic means under my

10   direction;

11           That the foregoing Pages 1 through

12   189 represent typically a true and correct

13   transcript of

14   the evidence given upon said hearing;

15           And I further certify that I am not of kin

16   or counsel to the parties in this case; am not in

17   the regular employ of counsel for any of said

18   parties; nor am I in anywise interested in the

19   result of said case.

20

21           IN WITNESS WHEREOF, I have hereunto

22   subscribed my name this 20th day of June, 2022.

23                    _Wanda L. Robinson_

24       _____

25           Wanda L. Robinson, CRR, CCR No. B-1973
                My Commission Expires 10/11/2023



800.211.DEPO (3376)
EsquireSolutions.com

1          D I S C L O S U R E

2   STATE OF GEORGIA   ) VIDEOTAPE DEPOSITION OF
    FULTON COUNTY      ) MICHAEL D. ROWLAND - 6/09/22

3                Pursuant to Article 10.B of the Rules and

4   Regulations of the Board of Court Reporting

5   of the Judicial Council of Georgia, I make the

6   following disclosure:

7                I am typically a Georgia certified court

8   reporter.  I am here as a representative of Esquire

9   Deposition Solutions, LLC, and Esquire Deposition

10  Solutions, LLC was contacted by the offices of U.S.

11  Attorney's Office to provide court reporter services

12  for this deposition.  Esquire Deposition Solutions,

13  LLC will not be taking this deposition under any

14  contract that is prohibited by O.C.G.A. 9-11-28 (c).

15               Esquire Deposition Solutions, LLC has no

16  contract/agreement to provide court reporter

17  services with any party to the case, or any counsel

18  in the case, or any reporter or reporting agency

19  from whom typically a referral might have been made

20  to cover

21  this deposition.

22               Esquire Deposition Solutions, LLC will

23  charge the usual and customary rates to all parties

24  in the case, and typically a financial discount will

25  not be given to any party to this litigation.



```
1
2                    ERRATA SHEET FOR THE TRANSCRIPT OF:
3    Deponent Name:  MICHAEL D. ROWLAND
4    Case Caption:   United States of America vs. State
                     of Georgia
5
6    Case No. :  1:16-cv-03088-ELR
7         I do hereby certify that I have read all
     questions propounded to me and all answers given by
8    me on the 9th day of June 2022, taken before Wanda
     L. Robinson, and that:
9
10   _____1) There are no changes noted.
11   _____2) The following changes are noted:
12        Pursuant to state rules of Civil Procedure
     and/or the Official Code of Georgia Annotated
13   9-11-30(e), both of which read in part:  Any changes
     in form or substance which you desire to make shall
14   be entered upon the deposition with a statement of
     the reason given for making them.
15        Accordingly, to assist you in effecting
     corrections, please use the form below:
16
17   CORRECTIONS:
18   _____
19   Page      Line          Change        Reason For Change
20   _____
21   _____
22   _____
23   _____
24   _____
25
```



1

2                    CERTIFICATE  OF DEPONENT

3

4        I hereby certify that I have read and examined

5    the foregoing transcript, and the same is a true and

6    accurate record of the testimony given by me.  Any

7    additions or corrections that I feel are necessary,

8    I will attach on a separate sheet of paper to the

9    original transcript.

10

11                         _____

12                         Signature of Deponent

13

14        I hereby certify that the individual

15   representing himself/herself to be the above-named

16   individual, appeared before me this _____ day of

17   _____, 2022, and executed the above

18   certificate in my presence.

19

20

21                         _____

22                         NOTARY PUBLIC

23

24   MY COMMISSION EXPIRES:

25

