1               THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION

3
   UNITED STATES OF          )
4  AMERICA,                  )
                             )
5               Plaintiff,   )
                             )
6          vs.               ) CASE NO. 1:16-CV-03088-ELR
                             )
7  STATE OF GEORGIA,         )
                             )
8               Defendant.   )

9

10

11

12

13

14

15        VIDEOTAPED DEPOSITION OF MONICA JOHNSON

16                   ATLANTA, GEORGIA

17               THURSDAY, MARCH 2, 2023

18

19

20

21

22

23  REPORTED BY:  TANYA L. VERHOVEN-PAGE,
                  CCR-B-1790
24

25  FILE NO.  J9346742



```
 1                  March 2, 2023

 2                  10:11 a.m.

 3

 4          Videotaped deposition of

 5   MONICA JOHNSON, held at the offices

 6   of Robbins Alloy Belinfante Littlefield,

 7   LLC, 500 14th Street, Atlanta,

 8   Georgia, before Tanya L. Verhoven-Page,

 9   Certified Court Reporter and Notary

10   Public of the State of Georgia.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1              APPEARANCES OF COUNSEL

2

    On behalf of the Plaintiff:
3
            U.S. DEPARTMENT OF JUSTICE
4           CIVIL RIGHTS DIVISION
            950 Pennsylvania Avenue
5           Washington, D.C. 20579
            (858) 847-6700
6           BY:  FRANCES COHEN, ESQ.
                 e-mail: francescohen@usdoj.gov
7           BY:  AILEEN BELL HUGHES, ESQ.
                 e-mail: aileenhughes@usdoj.gov
8           BY:  CRYSTAL ADAMS, ESQ. (Via Zoom)
                 e-mail: crystaladams@usdoj.gov
9

10   ALSO PRESENT:  Sandra LeVert (Via Zoom)

11

12

13   On behalf of the Defendant:

14          ROBBINS ALLOY BELINFANTE LITTLEFIELD, LLC
            500 14th Street, N.W.
15          Atlanta, Georgia 30318
            (404) 856-3255
16          BY:  MELANIE JOHNSON, ESQ.
                 e-mail: mjohnson@robbinsfirm.com
17

18   ALSO PRESENT:  Monica Patel

19

20

21   THE VIDEOGRAPHER:  Page Brantley

22

23                    -    -    -

24

25



MONICA JOHNSON                                    March 02, 2023
UNITED STATES vs STATE OF GEORGIA                            4

```
1                        I N D E X

2

3              WITNESS: MONICA JOHNSON

4

5      Examination                           Page

6   BY MS. COHEN                              8

7

8                      EXHIBITS:

9   Plaintiff's
    (Johnson)
10    Exhibit              Description        Page

11

    Exhibit 942      Georgia Code Title 37
12                   Mental Health 37-1-2      22

13  Exhibit 943      State of Georgia
                     Department of Behavioral
14                   Health and Developmental
                     Disabilities Contract     35

15
    Exhibit 944      Document bearing Bates
16                   numbers US0040522
                     through US0040610         38

17
    Exhibit 945      Document bearing Bates
18                   numbers GA01299795
                     through GA01299861        109

19
    Exhibit 946      CCP Standard - Evidence
20                   Based Treatment, 01-222   136

21  Exhibit 947      Georgia System of
                     Care State Plan 2020      149

22
    Exhibit 948      APEX 3.0 Frequently
23                   Asked Questions           183

24

25
```



MONICA JOHNSON                                     March 02, 2023
UNITED STATES vs STATE OF GEORGIA                              5

```
 1                      EXHIBITS:

 2      Plaintiff's
        (Johnson)
 3        Exhibit            Description            Page

 4
        Exhibit 949      E-mail:  from Monica
 5                       Johnson to Judy
                         Fitzgerald, dated
 6                       6/19/2019                  193

 7      Exhibit 950      Document bearing Bates
                         numbers GA00223643
 8                       through GA00223644        210

 9      Exhibit 951      Document bearing Bates
                         numbers GA01461335
10                       through GA01461338        214

11      Exhibit 952      Document bearing Bates
                         numbers GA01461339
12                       through GA01461342        218

13      Exhibit 953      Document bearing Bates
                         number GA03193311         225
14
        Exhibit 954      Document bearing Bates
15                       numbers GA03193312
                         through GA03193320        225
16
        Exhibit 955      Document bearing Bates
17                       number GA00222442         233

18      Exhibit 956      Document bearing Bates
                         number GA00051015         244
19
        Exhibit 957      Document bearing Bates
20                       numbers GA02600537
                         through GA02600539        259
21
        Exhibit 958      Document bearing Bates
22                       numbers GA00217977
                         through GA00217980        258
23
        Exhibit 959      Document bearing Bates
24                       number GA00172587         263

25
```



MONICA JOHNSON                                    March 02, 2023
UNITED STATES vs STATE OF GEORGIA                            6

```
 1                        EXHIBITS:

 2     Plaintiff's
       (Johnson)
 3       Exhibit           Description           Page

 4
       Exhibit 961        Document bearing Bates
 5                         numbers GA00174295
                           through GA00174298        263
 6
       Exhibit 962        Document bearing Bates
 7                         numbers GA00175100
                           through GA00175102        269
 8
       Exhibit 963        Document bearing Bates
 9                         number GA01458072         272

10     Exhibit 964        Document bearing Bates
                           numbers GA01458073
11                         through GA01458074        273

12

13

14          (Plaintiff's (Johnson) Deposition Exhibit

15     No. 960 was not marked for the record.)

16

17

18

19

20

21

22

23

24

25
```



```
 1   ATLANTA, GEORGIA; THURSDAY, MARCH 2, 2023
 2                  10:11 A.M.
 3
 4          P R O C E E D I N G S
 5
 6          THE VIDEOGRAPHER:  This is the
 7   video deposition of Monica Johnson taken
 8   in the matter of United States of America
 9   versus the State of Georgia.
10          Today's date is March 2nd, 2023.
11   The time on the record is 10:12 a.m.  My
12   name is Page Brantley, and I'm the
13   videographer.  The court reporter is
14   Tanya Page.
15          Counsel, please introduce
16   yourselves, and after which the court
17   reporter will swear in the witness.
18          MS. COHEN:  This is Frances Cohen
19   for the United States.
20          MS. HUGHES:  Aileen Bell Hughes for
21   the United States.
22          MS. JOHNSON:  Melanie Johnson for
23   the State of Georgia, and I'm joined by
24   Monica Patel, the corporate
25   representative for DBHDD.
```



1

2     Thereupon --

3                    MONICA JOHNSON,

4     called as a witness, having been first duly sworn,

5     was examined and testified as follows:

6

7                    EXAMINATION

8  BY MS. COHEN:

9     Q     Good morning.  Thank you for coming in

10 today.

11    A     Good morning.

12    Q     I appreciate it.  I know you're not

13 employed by DBHDD anymore and that this is on your

14 personal time, so thank you for making the time.

15             My name is Fran Cohen.  I represent the

16 United States.

17             MS. COHEN:  And this is the

18        deposition of Monica Johnson in the

19        lawsuit entitled United States versus

20        Georgia, Case Number 1:16-CV-03088.

21             And Ms. Johnson and I -- this

22        Ms. Johnson -- I'm going to have trouble

23        with names today.  Melanie Johnson and I

24        have stipulated that all objections

25        except as to form and all motions to



1          strike are reserved until time of trial,

2          and we will waive notarization and the

3          transcript may be signed under penalty of

4          perjury within 30 days of receipt.

5                  MS. JOHNSON:   Great.

6    BY MS. COHEN:

7          Q      Okay.  Commissioner -- Ms. Johnson, I'm

8    sorry.  You asked me to call you Ms. Johnson and not

9    Commissioner.

10                 Ms. Johnson, could you please state and

11   spell your full name for the record.

12         A      Monica Johnson, M-O-N-I-C-A,

13   J-O-H-N-S-O-N.

14         Q      And what is your home address?

15         A      370 Avian, A-V-I-A-N, Forest Drive,

16   Stockbridge, Georgia 30281.

17         Q      And have you previously been known by the

18   name of Monica Saxby Parker?

19         A      Uh-huh.

20         Q      During what years?

21         A      The last time I was married, so 2000 --

22   2000 through maybe 2000 and -- I don't know.  Let me

23   see.  Seriously.  I'm trying to remember when did I

24   get -- so you could say 2000 until I got remarried.

25   So until March 2016.



MONICA JOHNSON                                      March 02, 2023
UNITED STATES vs STATE OF GEORGIA                            10

1       Q       2016?

2       A       Uh-huh.

3       Q       Are you due for an anniversary?

4       A       Sunday.

5       Q       Congratulations.

6       A       Thank you.

7       Q       How are you currently employed?

8       A       I work for the United States Health and

9    Human Services SAMHSA Division, as the director for

10   988 and Behavioral Health Crisis Coordinating Office.

11      Q       Now, you have a soft voice and I'm hard

12   of hearing.  So I'll ask you to speak up, if you can.

13   And I'll just ask you to repeat it if I don't hear

14   100 percent.  Thank you in advance for your courtesy

15   with that.

16              What are you -- is 988, is that the

17   hotline, the suicide hotline?

18      A       Yeah, it's the suicide, crisis and mental

19   health line, yes.

20      Q       Now, are you represented by counsel here

21   today?

22      A       No, other than the people already here,

23   like --

24              MS. COHEN:  Are you representing

25          her?



1          MS. JOHNSON:  Yes, I'm representing

2     Ms. Johnson today.

3          MS. COHEN:  Are you representing

4     her for all purposes or are there any

5     limitations?

6          MS. JOHNSON:  For all purposes.

7  BY MS. COHEN:

8     Q    Okay.  Have you ever had your deposition

9  taken before?

10    A    No.

11    Q    I think it's better than going to the

12 dentist.  Here are some simple rules we're going to

13 follow today.

14         If you don't understand, tell me and I'll

15 rephrase it.  I apologize in advance if I have to ask

16 you to repeat things.  You can take a break any time

17 you want, except when a question is pending.  I'll

18 ask you to complete your answer before you take a

19 break.

20         Understood?

21    A    Yes.

22    Q    And you must -- you'll hear your counsel

23 note her objections for the record.  To preserve --

24 and she's looking to preserve rights for later on so

25 that she can argue to the judge that it wasn't a



1    proper question.  But unless she directs you not to

2    answer, you must answer every question.  Okay?

3            A    Okay.

4            Q    And the court reporter can't take down

5    uh-huh or nods of the head, so I'll ask you to say

6    yes or no or whatever your going to say in words.

7            A    Okay.

8            Q    And, let's see.  Only one of us can

9    speak.  So I'll try not to jump on your answers and

10   I'll ask you to try and let me finish my questions

11   before you start.

12               Did you meet with counsel to prepare for

13   this deposition?

14           A    Yes.

15           Q    When was that?

16           A    Yesterday.

17           Q    Was that the only time?

18           A    Yes.

19           Q    Did you also speak by telephone to

20   prepare?

21           A    That was how we -- that was how we

22   prepared.

23           Q    Your meeting was over the telephone?

24           A    Right.

25           Q    And how long was that meeting?



```
 1          A     About 40 minutes.

 2          Q     And who was present?

 3          A     Melanie Johnson and Kate, one of the

 4    attorneys from DBHDD.  I can't recall Kate's last

 5    name in this moment.

 6          Q     Someone who works with Ms. Patel?

 7          A     Correct.

 8          Q     And were you shown any documents at that

 9    time?

10          A     It was a telephone call.

11          Q     Had any documents been sent to you in

12    anticipation of the call, by counsel?

13          A     The notice of deposition?

14          Q     Other than that, any other documents?

15          A     No.  For the call?  No.

16          Q     And were any documents sent to you

17    following the call for preparation for today's

18    deposition?

19          A     I got documents with instructions for

20    today.

21          Q     So they didn't have any substance

22    relating to the case?

23          A     No.

24          Q     I think you know a little bit about the

25    case?
```



1    A    Yes.

2    Q    This is a suit by the United States

3  against the State of Georgia alleging that the

4  students in the GNETS programs are wrongfully

5  segregated because of their disabilities.  So it's a

6  suit under Title II, the Americans with Disabilities

7  Act.

8         Previous to this deposition today, you

9  had had some briefings about this case in your former

10  capacity; isn't that right?

11    A    So it depends on how we're describing

12  briefings.  I have not had a conversation about a

13  GNETS case in several years.  So my -- the last

14  communication or meetings that I was in about GNETS

15  was several years ago.

16    Q    All right.  Well, let's take it question

17  by question and I think it will come easier after we

18  get out, you know, when you -- your dates, et cetera.

19         So you're currently employed by SAMHSA.

20  And what are your responsibilities there, in the 988?

21    A    I'm responsible for overseeing the

22  roll-out of the 988 line.

23    Q    My goodness.

24    A    And then the second part of that office

25  is a newer part -- the office is new.  It was just



1  codified by Congress in the summer.  So the second

2  part is building out the behavioral health crisis

3  continuum for the country.

4      Q    Wow.  Congratulations.

5      A    Thank you.

6      Q    Are you able to do that from Georgia?

7      A    Yes.

8      Q    Primarily?

9      A    Yes.

10      Q    And you mentioned that you had gone by

11  the name of Monica Saxby Parker.  Is there -- are you

12  currently licensed by the State of Georgia?

13      A    Yes.

14      Q    And what is your licensing?

15      A    I'm a licensed professional counselor.

16      Q    And is that in the name of Monica Saxby

17  Parker?

18      A    I think so.

19      Q    So what has been your formal education

20  since completing high school?

21      A    I have a Bachelor's degree in psychology

22  and a graduate degree in counseling psychology.

23      Q    What year was your Bachelor's a degree in

24  psychology?

25      A    1999.



1        Q      And what -- what institution confirmed

2    that degree?

3        A      Kennesaw State University.

4        Q      And then, with regard to your degree in

5    psychology counseling, what was the institution that

6    conferred that degree?

7        A      Argosy University, Atlanta campus.

8        Q      And what year did you receive that

9    degree?

10       A      I believe it was 2001.  It could have

11   been 2002.  It was one of those.

12       Q      And is that an MS in professional

13   counseling, slash, psychology?

14       A      No, I'm a -- no.  So it was an MA degree,

15   Master of Arts, Professional Counseling, Psychology.

16       Q      Got it.  And then following your degree

17   from Argosy University, did you also attend

18   Georgetown in a certificate or other kind of program?

19       A      Georgetown had a leadership academy

20   program that I participated in and completed.

21       Q      What years was that?

22       A      I don't recall the exact year.

23       Q      Sometime between 2002 and today?

24       A      Yes.

25       Q      Okay.  And how long have you worked in



1    the behavioral health field?

2         A       Twenty-six years.

3         Q       So since 1997?

4         A       Whatever 26 years is, yeah.  I only know

5    that because I've had to say it so much because of my

6    new job.  So I've had to introduce myself a lot, so

7    I've done the math.

8         Q       So tell me what -- how you've spent those

9    26 years with regard to your job titles and employer.

10        A       So I started out working at a children's

11   psychiatric residential treatment facility as a --

12   what was called -- a social services technician.

13   That was my first job in this field.  I did that

14   part-time while I was still in college.

15               After that, I've worked a variety of

16   community settings.  I've worked in a children's

17   shelter for children in the welfare system.  So if

18   you got taken into custody, you had -- you have to go

19   somewhere initially, and most kids go to a foster

20   home.

21        Q       What years was that?

22        A       Or a shelter.

23        Q       Just very approximate.

24        A       I don't know.  I don't have my resume in

25   front of me.  It's all laid out on my resume.  So I

1    was at Kennesaw State.  So 1998, '99, around that

2    time, was the psychiatric residential facility.

3        Q    Okay.  Where you worked as a social

4    services technician?

5        A    Yeah.  And then the children's shelter

6    was after that.  I was in graduate school.  So

7    sometime around 1999, 2000, 2001, 2002, somewhere in

8    that window.

9        Q    Okay.

10       A    I've worked at a -- at Cobb.  At the time

11   it was called Cobb and Douglas Community Service

12   Board.  I worked there several different times, so I

13   went back and forth there.  Had a baby in between.

14   So I had different roles there.  I interned there.  I

15   was the child and adolescent mental health director

16   for a while.  I was the program development person

17   for a minute.  I was the clinical site director.  So

18   I had a variety of roles there.

19           I did a couple other things.  Ended up in

20   state government.  I came as the child and adolescent

21   mental health director.  I did that for nine months

22   and then I was promoted to the community mental

23   health director role.  And then I was appointed to

24   the behavioral health division director role.  Did

25   that the longest, eight years, and it ended as the

 1  interim commissioner.  And we just talked about what

 2  I do now.

 3      Q    So what -- what date did you resign from

 4  DBHDD?

 5      A    My last day was December 31st, 2022.

 6      Q    And am I correct that you started there

 7  in 2014?

 8      A    Yeah.  In November.  November 16th.

 9      Q    Okay.  And what were your job

10  responsibilities in your first role as child and

11  adolescent mental health director?

12      A    So I oversaw the office, which included a

13  variety of activities.  So you oversee programming,

14  you develop policy, you manage the budget.  It's a

15  variety of functions.  You manage staff, work with

16  providers.

17      Q    And then was it in -- what year were you

18  promoted to -- was that a promotion to become the

19  community mental health director?

20      A    I recall it as, I was in the child and

21  adolescent mental health director role for nine

22  months.  So whatever year or however the math works.

23  I only know it was nine months because I joked about,

24  they only let me stay in that position long enough to

25  have a baby.  So --



1        Q     So what was your next position?  Was it

2   as community mental health director?

3        A     So I became -- I still oversaw the

4   children's mental health office, the director for

5   that.  So I oversaw the director.  I oversaw the

6   director for adult mental health.  And then, at the

7   time, support of housing was a -- an office by itself

8   at that time.  I oversaw that.  And then deaf

9   services was moved to me.  So I think those were the

10  areas I got -- in Federal grants.

11       Q     Deaf as in D-E-A-F?

12       A     Yes.

13       Q     And you also oversaw DBHDD's

14  participation in Federal grants?

15       A     Yes.

16       Q     And --

17       A     The director of that, yeah.

18       Q     How long were you in that role?

19       A     I don't know.  Let's see.  If I was there

20  12 years, eight of it -- two, three, four, five, six,

21  seven, eight.  So that leaves four, so about three

22  years.  Three years and a couple of months, I think.

23       Q     And then when did you become the director

24  of the division of behavioral health?

25       A     I was in it eight years.  So up until



1  November of 2022.  I forget the exact date of the

2  signing in for the interim commissioner role, but I

3  had been in it for eight years.  So from 2022, go

4  back eighth years.

5       Q    And how long were you interim

6  commissioner?

7       A    Whatever the date was in November.  So

8  mid November until I -- pretty much until

9  December 31st.  The new commissioner came two weeks

10  before the end of December, I believe.  So, yeah.

11       Q    And is that new commissioner Mr. Kevin

12  Tanner?

13       A    Yes.

14       Q    And so you were interim commissioner for

15  less than two months?

16       A    Correct.

17       Q    Understood.  As the -- I suspect most of

18  the day today we're going to be talking about your

19  role as director of behavioral health division, which

20  ended at some date in '22, when commissioner Judy

21  Fitzgerald left the department, correct?

22       A    Correct.

23       Q    So let me start with an exhibit, which is

24  the Georgia Code, Title 37, Mental Health, Section

25  37-1-2.



 1              MS. COHEN:  And I'll ask the court

 2        reporter to mark that, please, as Exhibit

 3        942.

 4              (Plaintiff's (Johnson) Deposition

 5        Exhibit No. 942 was marked for the

 6        record.)

 7   BY MS. COHEN:

 8        Q    Are you familiar with this statute?

 9        A    Yes.  Mostly, yes.

10        Q    This is the enabling legislation for the

11   Department of Behavioral Health and Developmental

12   Disabilities in the State of Georgia.

13              MS. JOHNSON:  Object to form.

14   BY MS. COHEN:

15        Q    Sorry.  My questions was, you know this

16   to be the enabling legislation for the Department of

17   Behavioral Health and Developmental Disabilities in

18   the State of Georgia?

19        A    Yes, I understand that to be.

20        Q    And that sets forth the statutory

21   authority and responsibilities of the agency?

22              MS. JOHNSON:  Object to form.

23              THE WITNESS:  Yes, I understand

24        that.

25



1   BY MS. COHEN:

2        Q    And it was your job, both as interim

3   commissioner and as director of the division of

4   behavioral health, to implement this statute?

5             MS. JOHNSON:  Object to form.

6             THE WITNESS:  Yes.

7   BY MS. COHEN:

8        Q    And as director of the division of

9   behavioral health, you performed those duties under

10  Commissioner Judy Fitzgerald, correct?

11       A    I worked under more than one

12  commissioner, but yes.

13       Q    Yeah.  What -- I thought that

14  Ms. Fitzgerald started in 2012.  Am I mistaken?

15       A    I don't know what year she started.  I

16  worked under three commissioners during my tenure.

17       Q    And that was Ms. Fitzgerald?

18       A    Commissioner Shelp, Commissioner Berry,

19  Commissioner Fitzgerald.

20       Q    And then you became interim commissioner,

21  which was the highest officer of the division --

22  excuse me -- of the department?

23       A    Yes.

24       Q    Okay.  Now, this statute says in Section

25  A that:  The General Assembly finds that the State



 1  has a need to continually improve its system for

 2  providing effective, efficient and quality mental

 3  health developmental disability and addictive

 4  services.

 5           Further, the General Assembly finds that

 6  a comprehensive range of quality services and

 7  opportunities is vitally important to the existence

 8  and well-being of individuals with mental health,

 9  developmental disability or addictive disease needs

10  and their families.

11           So that was your responsibility during

12  the time that you were with DBHDD?

13           MS. JOHNSON:  Object to form.

14           THE VIDEOGRAPHER:  That is what we

15      were charged with.

16  BY MS. COHEN:

17      Q     And you were also charged -- and you are

18  also aware that the State acknowledged its obligation

19  and responsibility to develop and deliver -- to

20  develop and implement planning and service delivery

21  systems which focus on a core set of

22  consumer-oriented, community-based values and

23  principles?

24      A     Yes.

25      Q     And one of the first principles in



1    Paragraph Number 1 is that:  Consumers and families

2    should have choices about services and providers and

3    should have substantive input into the planning and

4    delivery of all services.

5         A    Correct.

6         Q    And the system should be appropriately

7    comprehensive, meaning that everyone is included?

8              MS. JOHNSON:  Object to form.

9              THE WITNESS:  Yes.

10   BY MS. COHEN:

11        Q    And adaptive, to allow consumers and

12   their families to access the services they need or

13   desire; is that right?

14             MS. JOHNSON:  Object to form.

15             THE WITNESS:  Correct.

16   BY MS. COHEN:

17        Q    And another value stated in Paragraph 9

18   is that consumers and families should have a single,

19   community-based point of entry into the system?

20             MS. JOHNSON:  Object to form.

21             THE WITNESS:  I understand what you

22        just said.

23   BY MS. COHEN:

24        Q    What is a single, community-based point

25   of entry into the system?



```
1              MS. JOHNSON:  Object to form.
2              THE WITNESS:  It may not be that.
3         So it depends on the choice of the
4         family.  So, it depends.  So if the
5         children's system is a little bifurcated,
6         and so it depends on the family's
7         insurance.  The payors drive a lot of
8         that.  So --
9         Q    Just to clarify.  My question was not how
10   is it implemented.  We'll get to that shortly.  But
11   how do you understand the phrase, single,
12   family-oriented point of entry?
13              MS. JOHNSON:  Object to form.
14              THE WITNESS:  I don't know how to
15         answer that without going into a further
16         explanation.
17   BY MS. COHEN:
18         Q    Go ahead.
19         A    It is -- the system is driven by payors.
20   So families have choices about how they access care.
21   So they have a choice to choose a provider, meaning a
22   doctor, a therapist.  They may have more than one
23   provider.  And so there may not be just one single
24   place.
25              The single point, when you read that, may
```



1  mean the insurance company.  It may mean who the

2  payor is, whoever is helping to coordinate care.  So

3  that's the way I interpret that.

4        Q     Thank you.  And as director of the

5  division of behavioral health, you were responsible

6  for the expenditure of all State and Federal funds

7  for those purposes?

8              MS. JOHNSON:  Object to form.

9              THE WITNESS:  That were

10       appropriated to DBHDD.

11  BY MS. COHEN:

12       Q     And what consumers, what members of the

13  public had access to the mental health services that

14  DBHDD provided for children and adolescence?

15       A     So as of today, it is children who are

16  uninsured or have Medicaid that is Social Security

17  Disability Medicaid.  That is the population DBHDD is

18  responsible as of today.

19       Q     As the payor?

20       A     Correct.

21       Q     And who is the other payor in the system?

22  Is it the department of community health?

23       A     Department of community health, private

24  insurances.

25       Q     Does DBHDD use a manual to set forth the



1    coverage, the types of services that are available

2    under the Medicaid and other public insurance

3    programs?

4         A    Yes.

5         Q    And is that renewed quarterly?

6         A    Yes.

7         Q    And --

8         A    Well, it is reviewed quarterly.  That

9    doesn't mean it was -- that doesn't mean anything

10   changed.  It's reviewed quarterly, or it was.

11        Q    Maybe a better word would be it was

12   reissued quarterly during your time at DBHDD?

13        A    Yes.

14        Q    And what was your responsibility in

15   connection with that manual?

16        A    So my responsibility in the more recent

17   role that I held at the division, the director for

18   behavioral health, is to review changes that were

19   made.  And if changes were made, I reviewed that.

20             There was a whole process, a group that

21   reviewed it as a whole, but I would review changes

22   that were being proposed from individuals that worked

23   under me.

24        Q    And then -- and was it your practice when

25   you were director of the division of behavioral



1  health to submit those changes to the commissioner

2  for approval?

3       A    No.

4       Q    Or did you have final approval?

5       A    No.  It was a -- there was a committee

6  that provided final approval.  Those changes did not

7  go up to the commissioner.

8            So the only -- my role is what I just

9  said.  So if someone in my division proposed a change

10 to the manual, I reviewed that change.  If I approve

11 that change, it moved forward to the approving

12 committee.  And there's a policy somewhere that

13 guides that.

14      Q    Thank you.  Were there any publicly

15 provided behavioral health services provided in

16 Georgia that were not provided by DBHDD during your

17 tenure there?

18      A    I can only speak to what I did at DBHDD.

19 I don't understand the question.  I'm sorry.

20      Q    Let me withdraw it.  It's not a great

21 question.  Let's see.

22           Are there any behavioral health services

23 that are provided with state funds that DBHDD does

24 not have responsibility to implement and coordinate?

25      A    I can only speak to the funds that were



1  appropriated to DBHDD for which I had responsibility

2  for.

3       Q    You're not aware of any others?

4       A    I know the budget that DBHDD was

5  appropriated for.  I cannot speak to what other

6  entities may have received funds for.  That's -- that

7  would be outside of my scope.

8       Q    So when I ask you you're not aware of

9  others, your answer would be no?

10          MS. JOHNSON:  Object to form.

11          THE WITNESS:  In this moment, I do

12      not -- I know what we were appropriated

13      to do.  I don't know what other entities

14      got State funds or funding to do outside

15      of what DBHDD did.

16  BY MS. COHEN:

17       Q    And would your answer, Ms. Johnson, be

18  the same with regard to Federal funds?

19       A    I would have no way of knowing and

20  keeping up with what other entities receive.  What I

21  know, if another entity has a Federal grant and

22  they're implementing a program and we were a partner

23  with, yes, I would know that.  But I would not know

24  other -- other entity's budget process and how much

25  they were allocated.



1      Q     So to your understanding and experience

2   at DBHDD, the services that the public insurance

3   programs and DBHDD covered for the uninsured were

4   itemized in the manuals?

5      A     They were itemized in the manual and they

6   were also in the Medicaid state plan that DCH

7   manages.

8      Q     So did you work with DCH to make sure

9   that the Medicaid State plan was consistent with the

10  coverage manual?

11     A     There was an individual whose position

12  whose main responsibility is essentially a liaison

13  between DBHDD and DCH.  That was a part of that

14  person's responsibility.  But, yes, we worked very

15  closely with DCH to make sure that what we put in

16  provider manuals was consistent with what's in the

17  State plan.  That's a requirement.

18     Q     And who was that individual?

19     A     Wendy Tiegreen White.  Or Wendy White --

20  Wendy Tiegreen.

21     Q     Thank you.  Now, pursuant to the

22  statutory charge there was a separate office for

23  children and adolescent mental health services,

24  correct?

25          MS. JOHNSON:  Object to form.



1              THE WITNESS:  There was an
2         independent office for children and -- I
3         oversaw it, yes, children's mental
4         health.
5    BY MS. COHEN:
6         Q     And that was the Office of Children,
7    Young Adults and Families, OCYF?
8         A     That is our internal working name.  It
9    was children's mental health, was the office, and
10   it's appropriated as children's mental health.  You
11   won't find that language in the appropriation.
12        Q     And what ages does it cover?
13        A     We cover starting at age five.  You can
14   go up to age 21 if you are still in foster care.  So
15   other than that, five to 18.  Eighteen to 21 if
16   you're still in foster care.
17              We do also provide support services
18   for -- or we -- they provide support services for
19   what we consider emerging adults, and that could go
20   up to about 28.  So it's a special population of
21   trans -- emerging young adults.
22        Q     Who covers children with behavioral
23   health needs between the ages of birth to five years
24   old?
25              MS. JOHNSON:  Object to form.



1            THE WITNESS:  A variety -- well,
2       first of all, a variety.  That could
3       be -- I mean, it's kind of a broad
4       question.  Public health can provide
5       services.  Pediatricians can provide
6       services.  So it depends on what the need
7       is.
8  BY MS. COHEN:
9       Q     Did DBHDD have any responsibility for the
10  oversight of that --
11      A     No.
12      Q     -- of such services?
13      A     No.
14      Q     Does the State of Georgia participate in
15  what's known as EPSDT, early prevention, detection
16  and screening.
17      A     I can't speak to that.  I don't know what
18  they're doing right now.  That falls under DCH, not
19  DBHDD.
20      Q     So you didn't have any experience with
21  the EPSDT program?
22      A     It was not implemented while I worked in
23  that role, and it falls under DCH and not DBHDD.
24      Q     Now, while you were director of the
25  division of behavioral health, who was in charge of



1    the office of OCYF?

2         A      So there were three different directors.

3    The most recent is Dante McKay.  Prior to Dante, Matt

4    Yancey, and then Linda Henderson-Smith.

5         Q      Did Mr. McKay start in approximately

6    2015?

7         A      I don't know.  That, I don't remember.

8         Q      Are you familiar with the Apex program?

9         A      Yes.

10        Q      That was administered by your office?

11        A      Yes.

12        Q      And there was an Apex pilot in 2015 to

13   2016.  Do you recall that?

14        A      Yes.

15        Q      And do you recall that Mr. McKay came at

16   the beginning of the pilot?

17        A      The pilot happened before Dante came.

18        Q      Before.

19        A      Matt Yancey initiated the pilot.

20        Q      So did -- did Mr. McKay start in about

21   2016?

22        A      I don't know the date that Dante started.

23             MS. COHEN:  All right.  Let's mark

24        as Exhibit 643 --

25             MS. JOHNSON:  Is it 943?



```
 1              MS. COHEN:  -- 943 -- excuse me --
 2         a copy of a DBHDD, CSB contract with the
 3         Community Service Board of Middle Georgia
 4         for fiscal year 2022.
 5              (Plaintiff's (Johnson) Deposition
 6         Exhibit No. 943 was marked for the
 7         record.)
 8              MS. COHEN:  Why don't we take a
 9         brief break.
10              THE VIDEOGRAPHER:  The time is
11         10:47 a.m., and we are off the record.
12                   (Brief pause.)
13              THE VIDEOGRAPHER:  The time is
14         10:49 a.m., and we are back on the
15         record.  Sorry.  The time is 10:49 a.m.,
16         and we are back on the record.
17   BY MS. COHEN:
18         Q    Thank you.  Commissioner -- Ms. Johnson,
19   let me just ask you.  You said you worked in a
20   residential treatment facility part-time as a social
21   services technician?
22         A    Yes.
23         Q    Which residential treatment facility was
24   that?
25         A    Devereaux.
```



MONICA JOHNSON                                      March 02, 2023
UNITED STATES vs STATE OF GEORGIA                          36

1       Q     And were there kids there who were served

2   in GNETS?

3       A     No.

4       Q     No?

5       A     No.

6       Q     Where did they attend school?  On ground?

7             MS. JOHNSON:  Object to form.

8             THE WITNESS:  Yes.

9   BY MS. COHEN:

10      Q     Were there kids who are in that RTF,

11  residential treatment facility, who left the RTF to

12  attend GNETS placements?

13            MS. JOHNSON:  Object to form.

14            THE WITNESS:  I have no idea.

15            MS. COHEN:  Okay.  I'm going to

16        mark now an exhibit as Exhibit 944 [sic],

17        a copy of the contract between the

18        Community Mental Health Services Board of

19        Middle Georgia and the -- and DBHDD.

20  BY MS. COHEN:

21      Q     Have you seen this previously?

22      A     I don't know.  Let me look at it.

23      Q     Is that 944 or 943?  I'm sorry.  That's

24  943.  I misspoke.

25      A     Well, I signed it, so that's why you



1   asked.  So I've apparently seen it before because I

2   signed it.  So yes is the answer to your question.

3        Q     Did you actually physically sign it or do

4   you have a stamp or something else?

5        A     Sometimes I physically sign, sometimes I

6   use a stamp and sometimes, during COVID, we used

7   electronic signatures.

8        Q     So whether you signed it in-person, used

9   an electronic signature or a stamp, you reviewed the

10  contract before you allowed your signature to be

11  affixed?

12             MS. JOHNSON:  Object to form.

13             THE WITNESS:  Yes.

14  BY MS. COHEN:

15       Q     And this is one of -- that you authorized

16  in May or June of 2021?  You can look at Page 231.

17  And I'm referring to the little red numbers at the

18  top of the upper left-hand corner.

19       A     According to this document, I signed it

20  on February 24th.

21       Q     2021?

22       A     2022 is what it says here, on Page 12 at

23  the back.  Well, so -- let's see.

24       Q     Are you looking at Page 231?

25       A     It's multiple parts to this contract.



 1              MS. JOHNSON:  This looks different
 2         than what we have.  She doesn't have a
 3         red --
 4              MS. COHEN:  Oh, she doesn't have
 5         the --
 6              MS. JOHNSON:  Maybe let's take back
 7         Monica's and give it to her.
 8              MS. PATEL:  Sure.
 9              MS. COHEN:  We're going to mark as
10         944 a copy of the contract with stamps.
11              (Plaintiff's (Johnson) Deposition
12         Exhibit No. 944 was marked for the
13         record.)
14              MS. COHEN:  I apologize.  Thank
15         you, Melanie.
16              MS. JOHNSON:  Uh-huh.
17              THE WITNESS:  Remind me of your
18         question.
19    BY MS. COHEN:
20         Q    Yeah.  Let's start again.
21              I've put in front of you as Exhibit 944 a
22    document which has the stamps MG00181 through 269 in
23    the red numbers in the upper left-hand corner.  And
24    those stamps were affixed by Community Service Board
25    of Middle Georgia.



1              Do you see that?

2         A     Yes.

3         Q     Okay.  Now, I see that you have a

4    signature page on 231, looking at the numbers in the

5    upper left-hand corner?

6         A     Okay.

7         Q     And that -- that signature page is dated

8    June of 2021?

9         A     It is.

10        Q     And then is there another date that's

11   applicable?  Is that the date on which you executed

12   this contract for fiscal year 2022?

13        A     All I can see is what is in front of me.

14   I signed it on 6/1/2021.

15        Q     And do you believe that's the date on

16   which you authorized this contract?

17        A     According to this, yes.

18        Q     Thank you.  And I see you've put to one

19   side pages of one of the annexes to the contract?

20        A     Yes, but for no particular reason, just

21   I'm trying to sort through what I'm looking at.

22        Q     What page do you have in front of you?

23        A     So it's the same, I think.  So MG00202

24   and 233, Apex Deliverables, Annex B.

25        Q     And who was the drafter of that section?



1        A      Whoever the program manager was.  I don't

2   know.

3        Q      The program manager for?

4        A      So within the office there's a director

5   and there are plenty of staff that --

6        Q      Which office are you referring to?

7        A      The children's mental health office,

8   OCYF.  So within that office there are staff, and

9   some of the staff are assigned to certain programs

10  within the office.

11              So whoever was managing Apex at the

12  programmatic level is the individual who drafts the

13  deliverables and puts them in the contract.

14       Q      And did you review this deliverable?

15       A      I review what I sign.

16       Q      So your answer is yes?

17       A      Yes.  I review what I sign.

18       Q      And do you recall whether this was

19  drafted by Mr. McKay or someone who reported to him?

20       A      If the contract comes to me, it is

21  reviewed by -- the programmatic officer initiates

22  that, whoever that staff person is.  Then it goes to

23  Dante.  In this instance, it would have gone to Dante

24  McKay.  He reviews, he signs.  It then comes to me.

25              It also goes to fiscal people, other



 1  budgetary reviews, as well.  But when it comes to me

 2  for signature, it already has those reviews.

 3          Q     Understood.  And each of the contracts

 4  for the Apex program, from 2016 until you left the

 5  department at the end of 2022, contained an Annex B

 6  describing the deliverables for the Apex program,

 7  correct?

 8          A     All of the --

 9                MS. JOHNSON:  Object to form.

10                THE WITNESS:  Oh, I'm sorry.

11                All contracts maintain the

12          deliverables in an annex.  So if the

13          question is, does the Apex contracts have

14          annexes that have the deliverables, they

15          should all have the same level of

16          information.

17  BY MS. COHEN:

18          Q     Now, there were three programs with the

19  Apex name, Apex, Apex 2.0 and Apex 3.0.  What do

20  those separate names refer to?

21          A     It's evolution of the programming.  Some

22  of it was tied to budget.  So we got a certain amount

23  of allocation initially.  That was the first level.

24  And then we got more allocation, made modifications

25  to the program.  Certain -- certain things were just



1  | changed and adjusted and so it became a different

2  | version of the program, an evolution of it.

3  |      Q     Were some of the original Apex contracts

4  | reviewed every year?

5  |      A     All contracts are renewed on an annual

6  | basis at DBHDD.

7  |      Q     What I'm trying to understand is whether

8  | the contracts for the first Apex program, if a CSB,

9  | whether Middle Georgia or another CSB, had a contract

10 | in the form -- in the format that is originally

11 | approved for the deliverables, did that contract

12 | renew every year or did the deliverables changed each

13 | year across all contracts?

14 |           MS. JOHNSON:  Object to form.

15 |           THE WITNESS:  It could be

16 |      either/or.

17 | BY MS. COHEN:

18 |      Q     How so?

19 |      A     Because we can modify deliverables for a

20 | variety of reasons, so it could change.  It could

21 | change because of the budget.  There's a variety of

22 | reasons why deliverables can change.

23 |      Q     And there were 24 providers in the Apex

24 | program?

25 |      A     I don't know how many providers are in



 1  the Apex program.

 2       Q    What's your best estimate?

 3       A    I don't know.

 4       Q    But you -- you reviewed each of those

 5  contracts every year?

 6       A    There are -- so -- I feel like I'm going

 7  to repeat myself.

 8            I signed every contract that comes out of

 9  the behavioral health division.  There are hundreds

10  of contracts that come out of the division.  These

11  are a portion of those contracts.

12       Q    Okay.  So what my question is, is whether

13  this schedule of deliverables was essentially

14  consistent from 2016 to 2022?

15            MS. JOHNSON:  Object to form.

16            THE WITNESS:  They're relatively

17       consistent, as far as I can recall.

18  BY MS. COHEN:

19       Q    Can you recall any critical differences?

20            MS. JOHNSON:  Object to form.

21            THE WITNESS:  I did not manage the

22       day-to-day of Apex, so I don't recall

23       every change to a deliverable that

24       happened with Apex.  Apex evolved over

25       many years and we made modifications.



```
 1   BY MS. COHEN:
 2        Q     Okay.  So my -- my -- do you recall my
 3   question?
 4        A     You can repeat the question.
 5        Q     Do you recall any critical differences
 6   that were implemented to the Deliverables section of
 7   the contract over time?
 8             MS. JOHNSON:  Object to form.
 9             THE WITNESS:  Not that I feel is
10        critical, no.
11        Q     Now, who was the program manager of Apex
12   during the period from 2016 to 2022?
13        A     Under Dante McKay, I don't recall who the
14   staff person was.
15        Q     If I said Layla Fitzgerald?
16        A     Layla, yes, that's correct.  It's Layla.
17   It was her at some point in time, yes.
18        Q     And Layla was the program manager when
19   you left in 2022?
20        A     Yes.
21        Q     And then, initially, there was a one-year
22   Apex pilot from 2015 to 2016, and I think you said
23   that was under the director -- the direction of
24   Mr. Yancey?
25        A     Correct.
```



1          Q      And what did the pilot consist of?

2          A      We had an opportunity to use funds -- we

3     had surplussed funds that year, and so we had an

4     opportunity to do something innovative.  Matt Yancey

5     and I had worked together on a school-based mental

6     health program prior to coming to DBHDD.  So when I

7     worked at Cobb and Douglas Community Service Board,

8     Matt Yancey was the project director for Cobb County

9     School Systems' Safe Schools, Healthy Students grant,

10    which had a major school-based component to it.

11             So he had expertise.  I had expertise

12    from implementing it in an actual school.  So we

13    decided to see if we could implement this at a state

14    level.  And we did, and that is how the pilot

15    started.

16         Q      So let me go back to the time when you

17    were at Cobb Douglas.  What was the impetus for

18    rolling out a school-based mental health program at

19    Cobb Douglas?

20             MS. JOHNSON:  Object to form.

21             THE WITNESS:  So the program was

22         not rolled out by Cobb Douglas.  The

23         Department of Education -- the Federal

24         Department of Education had -- I don't

25         think they have these grants anymore, but



1          they were Safe Schools, Healthy Student

2          grants.  DOE was the primary Federal

3          entity.  It was in partnership with other

4          entities, SAMHSA, but you had to be a

5          school system to receive the grant.

6               A part of the grant had a

7          school-based mental health component to

8          it.  There were other parts to that

9          grant, but that was a large part.  So in

10         Cobb and Douglas, when I was in that

11         role, Marietta city schools received a

12         planning grant for that, and Cobb County

13         received, I believe at the time, probably

14         the largest grant that had been awarded

15         in the country.  If it was not the

16         largest, it was in the top three.  It was

17         a big deal.

18   BY MS. COHEN:

19         Q     Were you involved in winning that grant?

20         A     I helped them write that grant and apply

21   for it.  The grant required that the school system

22   work with a behavior health provider.  So we already

23   were partnered with the school system prior to that,

24   and so we went after the grant together and they were

25   awarded it.



1        Q     What -- who was the person at Cobb

2    Douglas who became interested in pursuing that grant?

3        A     Her name was Paulette, I think her last

4    name was Herbert.  Don't quote me on her last name

5    100 percent.  That feels right.  But her first name

6    was Paulette.  She was the director for the school

7    social workers.

8        Q     And what were -- and she sought to

9    institute school-based mental health services?

10       A     There were many components to that grant.

11   The school-based mental health part of it was the

12   largest part.  Yes, she was interested in that.

13             We had already had a relationship where

14   we worked together to provide support to the schools

15   when they needed it or asked for it.  That's an

16   expectation without Apex, you should be working with

17   schools.  And so that was how it started.

18       Q     You're referring to the Cobb Douglas CSB?

19       A     I'm referring to the grant that Cobb

20   County School Systems got.

21       Q     I meant when you said, we already had a

22   relationship, were you referring to the Cobb Douglas

23   CSB as already having a relationship with the Cobb

24   County School System?

25       A     Correct, as well as Marietta city



 1  schools.

 2        Q     And what was the amount of the grant?

 3        A     I don't recall.

 4        Q     I thought you would have it plastered on

 5  your wall.

 6        A     It's too long ago.

 7        Q     How did the pilot work out?  Well,

 8  actually, let me ask you this.

 9              What was provided as part of the pilot?

10        A     The pilot at DBHDD or the implementation

11  of the grant?

12        Q     Oh, I'm sorry, the implementation.

13              What did -- what were the services

14  provided in connection with the implementation of the

15  grant?

16        A     So school-based mental health services,

17  so for -- whether it was mental health or addiction

18  services.  So there's a best practice model for how

19  to do this.  And so we worked with the school

20  district on identifying which schools would be

21  included.  The -- while the district got the grant,

22  the schools could opt-in or out, and so we had to

23  work with schools to see who wanted to be a part of

24  it and not, and try to convince schools that didn't

25  want in.



1              We identified the group of schools.  We

2    identified staff.  And so we partnered together as a

3    part of -- the way the grant required us to, to

4    identify clinicians, case managers.  The CSB -- I was

5    the CNA director at the time.  So the CSB would hire

6    the clinical staff.  They would be deployed to the

7    schools that they were assigned to.  They did a

8    variety of activities.  Some of it was training

9    teachers.  Some of it was responding to crisis needs

10   in the schools, working with existing school social

11   workers and counselors, providing groups, responding

12   to traumatic events, et cetera.

13        Q     Do you have any training in applied

14   behavior analysis?

15        A     No.

16        Q     Did anyone involved in that grant have

17   training in it?

18        A     I don't recall.

19        Q     Do you know whether applied behavior

20   analysis was used in connection with that grant?

21        A     I don't -- I don't recall --

22        Q     Those services?

23        A     -- identifying that as a particular

24   approach to do -- we weren't required to.  So most of

25   the services -- most of the clinical approaches were



1    CBT, So cognitive behavior therapy.

2          Q      And what -- what types of kids did you

3    serve?

4          A      Kids that were identified that were

5    flagged by teachers or counselors that seemed to have

6    a need for social, emotional support.

7          Q      Were some of these kids disruptive?

8          A      Yes.

9          Q      And engaged in violent behavior?

10         A      That -- that's a possibility.  That's not

11   a requirement.

12         Q      Understood.  And were some of them

13   depressed?

14         A      Yes.

15         Q      Traumatized?

16         A      Could be.

17         Q      Anxious?

18         A      Very common.

19         Q      And what was -- what were the licensing

20   credentials of the clinicians who provided services

21   on behalf of the CSBs in the schools?

22         A      They could be fully licensed as a -- so

23   it was either -- there's only three license types

24   so -- in Georgia, so licensed professional counselor,

25   licensed clinical social worker, licensed marriage



1  family therapist.  And then there's associate level

2  licenses for each of those.

3          So you could be any of those, either the

4  associate level or the fully licensed, or the

5  substance abuse addiction certifications.

6     Q     So with regard to behavioral health, you

7  needed to be associate level or above to provide

8  services in connection with the grant to Cobb County?

9     A     For therapy services.

10    Q     For therapy services.

11    A     You could not have that degree and do

12  case management, which was also a component.

13    Q     So did the CSB supply both case managers

14  and therapists?

15    A     Yes.

16    Q     And the therapists had to be either

17  associate level or above?

18    A     Yes.

19    Q     In their licensing?

20    A     Or certified as an addiction

21  certification.

22    Q     I think -- we're not going to be talking

23  about substance use disorder today.  So I'm going to

24  be primarily asking you about behavioral health

25  therapists for children with serious emotional



MONICA JOHNSON                                      March 02, 2023
UNITED STATES vs STATE OF GEORGIA                            52

1  disturbances.  Understand?

2        A      Yes.  So mental health.

3        Q      Mental health.

4        A      Not behavioral health.  Okay.

5        Q      So how -- how do you distinguish between

6  mental and behavioral health?

7        A      Behavioral health consists of both mental

8  health and addiction.

9        Q      Okay.  Understood.  I wasn't aware of

10  that distinction.

11              So for the mental health services grant,

12  how long -- how long was the grant for?  How many

13  years of service?

14        A      I believe it was approximately five

15  years.

16        Q      Now, you stated that you approved the

17  program within the CSB.  Were you a proponent for the

18  program in the community?

19        A      Yes.

20        Q      You spoke at schools or you spoke to

21  school administrators to convince them to enter the

22  program?

23        A      Alongside with the director for the

24  social -- school social workers, Paulette.

25        Q      And were you there for the entire



1    five-year period of the grant?

2        A    Yes.

3        Q    How did it work out?

4        A    It was great.

5        Q    What were the advantages of it?

6        A    For the schools who took advantage, who

7    chose to be engaged, we saw all types of positive

8    outcomes.  Teachers, number one, reported improved

9    satisfaction.  They felt like the trainings that we

10   provided for them helped them deal with kids in the

11   classroom that were disruptive.  They felt like they

12   had the skills that they had not had before to be

13   able to prevent situations from escalating.  That was

14   a big win.

15            Kids were able to be seen.  You didn't

16   have to worry about transportation.  You didn't have

17   to worry about parents coming into a clinic, per se,

18   or, you know, trying to figure out about babysitters.

19   The environment was there.  That's where families

20   already go, and so it was a good way to capture the

21   audience.  School is a good place try to get to kids.

22   That's where they spend the majority of their time.

23   And so this was a way where schools saw a benefit.

24            We tracked graduation rates and so there

25   was some improvement in graduation rates.  Kids



1  reporting -- you know, if they were reporting

2  having -- let's just say -- increased anxiety, we

3  tracked over the course of that.  Like, did that

4  decrease.  Family satisfaction surveys, et cetera.

5  So it had very positive outcomes.

6       Q     And did you continue to be a proponent of

7  school-based mental health services from the time of

8  the grant to the time that you left DBHDD?

9       A     Yes.

10      Q     And had you been a proponent of

11 school-based mental services prior to the time of the

12 grant?

13      A     Yes.

14      Q     What was -- what was the original impetus

15 for you to become a proponent of school-based mental

16 health services?

17      A     Because I worked in the children system

18 for so long, and children are mostly in school, and

19 so most referrals come from schools.  Like, they

20 spend -- kids spend the most amount of time out of a

21 week at school.  And so it's just a best practice to

22 work with schools to see if you can partner.

23            One of the challenges before the grant --

24 so you are allowed to go into the school as a

25 provider, but the school has to allow that.  They

 1   have to want that.  In many instances, schools did

 2   not want that because they said it disrupted the day,

 3   it disrupted the flow for the children.  So many

 4   schools did not quite enjoy having providers come

 5   into the school.

 6            And so the grant gave a way to provide

 7   some incentive.  They had funding to do some creative

 8   things to get the buy-in.  And so prior to even the

 9   grant, trying to support kids where they were has

10   just always been a way to try to reach the

11   population.

12        Q    So what were the incentives offered to

13   the schools to participate in the program?

14        A    So free training.  And so, like that was

15   a big deal, being able to provide training for their

16   staff on these topics.  And not just for like

17   managing the behavior of kids, but self care and

18   stuff for teachers and administrators.  So your

19   cafeteria workers, your bus -- I mean, so we were

20   very creative in who we were able to target.

21            Some schools that were all-in usually

22   were elementary schools.  We were able to -- we had

23   funds to design play therapy rooms.  And so they

24   would say, we have this space that we haven't been

25   using, and we were able to bring in not just the



1   therapists, but create the atmosphere.

2           I mean, those are some examples.  I -- it

3   was a long time ago, so those are the ones that just

4   stand out, but we had funding to do things that they

5   just weren't able to do before.

6       Q     This was in the years 2005 to 2010?

7       A     Whenever I worked at Cobb Douglas

8   Community Service Board.

9       Q     Approximately?

10      A     Yeah.

11      Q     And you've referred to -- actually, I'm

12  going to ask you a different question.

13          What were the incentives to the CSBs to

14  participate in the program?

15      A     So it -- well, a couple of things.  So

16  when you had therapists that were, like I just said,

17  trying to go -- like if they had a case load and all

18  the kids, obviously, should be in school, they're

19  school-aged kids, it was easier to have it through

20  this program versus trying to schedule to get to

21  the -- to the -- you don't want to take kids out of

22  school and so you have problems scheduling.

23          And so you had higher no-show rates to

24  appointments.  Oftentimes, a lot of the families in

25  the target population, there were other challenges



1  going on with the family, as well.  And so it just

2  was easier, I mean, just easier access.  So for the

3  clinicians, they knew they had an audience that was

4  going to be there.  The kids are going to be in the

5  school.

6        Q      That was the incentive?

7        A      That's an incentive.

8        Q      Were there other incentives, as well, to

9  the CSBs to participate in the program?

10       A      It helped cover some of the costs.  And

11  so while there's already a mechanism to bill, you can

12  bill Medicaid in a school setting for therapy.  So

13  that was already allowable, and thus incentivized for

14  providers to try to go into schools where that --

15  where schools will allow them to.  But there's costs

16  that's not billable that go into the services.

17       Q      What is the non-billable comp that went

18  into the school-based mental health services?

19       A      You don't get paid to put together a play

20  therapy room.  You don't get paid, per se, to do say

21  training for the staff.  You don't get paid to do --

22  to buy the things that go into using the same play

23  therapy example.  And then there's administrative

24  costs.  There's meetings.  There's -- we had to

25  develop processes, how you do referrals, who would



 1  review.
 2          You can't bill for that time.  The only
 3  time you bill for is direct care.  And so the
 4  incentive is it now covers in a more whole way the
 5  services.
 6      Q    So just so I'm sure the record reflects
 7  what you're saying correctly.
 8          Are you saying that the grant to Cobb
 9  County Douglas provided financial incentive to the
10  CSB by paying for non-therapeutic time expended by
11  the professionals involved in serving the schools?
12      A    That is one thing that it did, yes.
13      Q    Was there any other financial
14  compensation to the CSB?
15      A    Not that I can recall.
16      Q    You've mentioned data tracking or you've
17  used the word tracking.  What was being -- what was
18  tracked as part of the grant?
19      A    What I said earlier.  I don't remember
20  obviously every data point.  We had a huge evaluation
21  component to the grant.  So there was an independent
22  evaluator, which was required for the grant.  We
23  collected a lot of different data points.
24          So I don't recall every single data
25  point, but we did have an evaluation component and an



1   outside entity do evaluation.

2        Q     And who was that outside entity?  Was it

3   the Center for Excellence or some other entity?

4        A     No.  The Center for Excellence didn't

5   exist then.  So you're still talking about Cobb or --

6        Q     Yeah, no, we're still talking about Cobb

7   Douglas.  We're going to move on shortly.

8        A     Yeah, the Center for Excellence didn't

9   exist then.  I remember the evaluator's name.  I

10   can't recall where he was affiliated with.  His name

11   was Jan Ligon, but I don't remember his -- the

12   company.

13        Q     And did you -- you received those data

14   reports as the director of children and adolescents

15   at the CSB?

16        A     The reports went to the grantee.  The

17   grantee was Cobb County Schools.  I had access to see

18   the evaluation reports through the relationship we

19   had with them, which was a formal MOU.

20        Q     And what were the metrics?

21        A     I do not recall.

22        Q     Well, I think you've referred --

23        A     I threw out some that I could just kind

24   of remember, but I don't -- it was a long time ago.

25   I don't remember every metric.



1          We looked at satisfaction, consumer

2  satisfaction, teacher rating, surveys, family

3  satisfaction.  We measured consumer change in

4  behavior.  I said that in a broad way on purpose.  We

5  had specific tools in which we use to monitor

6  progression, or not, of behaviors.

7          Q    Was one of those tools office

8  disciplinary referrals?

9          A    No, not for evaluation.  I don't recall

10  that being one.

11          Q    Well, let's move on, then, to your time

12  at DBHDD.

13          So when you joined DBHDD, you were

14  already a proponent of school-based mental health?

15          A    Yes.

16          Q    And did -- throughout your time at DBHDD,

17  did you work to institute school-based mental health?

18          A    Yes.

19          Q    Similar to what had been done in Cobb

20  Douglas?

21          A    Yes.

22          Q    And so how did you -- how did you work

23  towards -- how did you get the pilot program going?

24          MS. JOHNSON:  Object to form.

25          THE WITNESS:  We just did it.  We



1          knew what to do.  We -- that's -- I mean,

2          that was kind of the reason why I brought

3          up the previous stuff.  We already knew

4          what to do.  We already had insight into

5          how to develop the programs and so it was

6          just a matter of introducing the concept

7          to DOE at the state level, because we had

8          been used to dealing with county, and

9          figuring out how could we collaborate.

10              The schools have their own

11         programs, and so how could we work

12         together to use this.  So DBHDD had some

13         funding.  We chose to do this work.  We

14         didn't have to.  We didn't have a mandate

15         to do this.  And so we did the pilot.  It

16         caught on and we are here.

17   BY MS. COHEN:

18         Q    Did the funding come from a State

19   appropriation or from a grant?

20         A    State appropriation.  Like I said, the

21   pilot, we had surplus.

22         Q    I see.  So surplus funding was used?

23         A    We had an opportunity to implement -- we

24   don't usually have opportunities to implement new

25   things.  It is what it is, basically, is how it



1   typically works.

2           But we had had a deficit in children's

3   services when I started.  I ended the deficit.  And

4   so we then had a surplus.  So we chose some projects

5   that we wanted to try to pilot.  That was one of the

6   programs.

7       Q    Did -- who was the principal contact with

8   education from DBHDD at that time?

9       A    So it would have been Matt, but we

10  partnered a lot in the beginning together, because he

11  was new.

12      Q    Matt Yancey?

13      A    Was new to DBHDD.  Not new to State

14  government.  He had been in public health, but then

15  came to DBHDD.

16      Q    So the principal contacts were you and

17  Matt Yancey on the DBHDD side?

18      A    Yes, fair enough.  Primarily.  It would

19  have been Matt, as a director, but I partnered with

20  him because we'd had the history, we knew how to work

21  together already.  He was the project director for

22  the project we just talked about in Cobb.

23      Q    And you were the office of children head?

24      A    Yeah -- no.  When Matt came, I was the

25  director for community mental health.



1         Q      Director for community mental health.

2    Thank you.

3         A      So his office was under me.

4         Q      And on the education side, who were the

5    contacts?

6         A      I hon -- and this is -- I really have no

7    clue.  I don't remember who we -- who was in place

8    then.  They moved different -- it was different

9    people over time, and I can't recall the lady's name.

10   It was a woman.

11              We did some early work with Garry

12   McGiboney.  He was an early partner.  But there was a

13   woman and I just can't remember her name.

14        Q      What was Mr. McGiboney's title at that

15   time?

16        A      I don't -- he was higher up.  I don't

17   remember his exact role in that moment in time.

18        Q      Did he have a role in connection with

19   school climate or mental health?

20        A      He definitely was in that space.

21        Q      And subsequent to Dr. McGiboney, can you

22   remember anyone who was involved in setting up the

23   pilot on the education side?

24        A      I honestly don't remember their names.

25   This is like, literally, maybe ten years ago.  So I



1    just don't recall the initial people's names.

2         Q     Now, for the pilot, was there an

3    independent evaluator?

4         A     No, not at that time.  What we ended up

5    doing was having the Center of Excellence -- which I

6    also stood up -- the Center of Excellence, we engaged

7    them to eventually become the official evaluator of

8    the Apex program so we could track the metrics as it

9    started to grow.

10        Q     How did it come to be that you stood up

11   the Center for Excellence?

12        A     We had a Federal grant, and we got an

13   extension, and we had some money that we reallocated

14   in that grant, was approved to do.  And through a

15   series of other system of care children's work, that

16   center made sense.  Maryland had a similar model.  I

17   had visited other states when I was the child and

18   adolescent director to look at best practices and

19   other places that I was interested in.

20              Maryland had a lot of things at the time

21   that we were interested in trying to mimic.  And that

22   was one of the things, they had a center.  And so we

23   wanted a dedicated Center of Excellence where we can

24   house system of care work, et cetera.  So those were

25   the early vision.



1            I approached the Health Policy Center at

2    Georgia State.  We had conversations.  They liked it.

3    We moved forward.

4        Q    Understood.  You mentioned, by the way,

5    that you had a best practices kit, that you and

6    Mr. Yancey used a best practices kit when you were

7    standing up the initial grant to Cobb Douglas?

8        A    I did not say that we had a kit.  I said

9    that we used best practices.  But I don't remember

10   all that there were.

11           There was other things in that grant,

12   again, that was not just school-based mental health.

13   And so there were some like family training things.

14   There was a best practice model we used for that.  I

15   don't remember the name of that program in this

16   moment.  Because these were Federal grants, they

17   typically give you specific guidance around what type

18   of practices they want you to use.

19       Q    I see.  Was the granting agency the

20   Substance Abuse and Mental Health Services

21   Administration?

22       A    The Department of Education.

23       Q    The Department of Education.

24       A    SAMHSA was a partner.  Department of

25   Education was who the grant was from.



1        Q       Now, how did you reach out to the schools

2   that were included in the original program?  How did

3   you select them?

4        A       We didn't select schools.  We provide --

5   you're talking about at DBHDD?

6        Q       Yes.

7        A       So DBHDD is funded to provide behavioral

8   health services like you talked about in the

9   beginning.  So we give money to provider networks.

10  We don't give money to the schools.

11              So in the DBHDD Apex model, we give

12  funding to the provider and say, provider, go work

13  with the schools in your community or identify the

14  schools, but the money goes to the behavioral health

15  provider.

16       Q       So how did it work in the Apex model

17  after 2000 -- after the initial pilot -- let me ask

18  you first, how is it funded?

19       A       With State appropriations.

20       Q       And was all of the funding for the Apex

21  program via State appropriation?

22       A       As far as I can recall, it's 100 percent

23  State appropriations.

24       Q       And what did the State appropriations

25  cover in the Apex program?



MONICA JOHNSON                                        March 02, 2023
UNITED STATES vs STATE OF GEORGIA                            67

1        A      I mean, it covers what -- what's in these

2    deliverables.  So --

3        Q      You're referring --

4        A      Like what's in the contract here.

5        Q      -- to the contract at Page 202?

6        A      Yeah.  So, I mean, it covers what's in

7    the deliverables here.

8        Q      There's an -- the beginning of the

9    Deliverables statement at Page 202 starts with a

10   description of the challenges and some of the

11   research?

12       A      Uh-huh.

13       Q      Is that common for the Deliverables page

14   of the DBHDD contract or is that unique?

15       A      This is not a requirement of a

16   Deliverables section.  So it's not -- it's not a

17   requirement.

18       Q      Why was it put in here?

19       A      I don't know, other than to set the

20   context of the work.

21       Q      And it says that:  The number of children

22   and youth with mental health challenges is simply

23   staggering.

24              Was that true when the program was

25   started?



1       A     To the best of my knowledge.

2       Q     And is it true today in Georgia?

3       A     Yes.  I mean, this is a national issue,

4    but yes.

5             MS. COHEN:  Let's take a brief

6       break.  Go off the record.

7             THE VIDEOGRAPHER:  The time is

8       11:32 a.m., and we are off the record.

9                   (Brief pause.)

10            THE VIDEOGRAPHER:  The time is

11      11:50 a.m., and we are back on the

12      record.

13   BY MS. COHEN:

14      Q     So looking back at the Deliverables page

15   MG00202, Ms. Johnson, it says that:  Mental health

16   concerns such as attention deficit/hyperactivity

17   disorder, anxiety, depression and family difficulties

18   are often the root causes of poor academic

19   performance, disciplinary matters and school absentee

20   and truancy.

21            Were you in agreement with that statement

22   at the time Apex program was rolled out?

23      A     Yes.

24      Q     And after six years of experience with

25   the Apex program, are you still in agreement?



 1          A      Yes.

 2          Q      And the -- it's -- the Deliverables

 3    section also says on the same page that the same

 4    research shows that:  Mental health interventions are

 5    effective and can significantly improve academic

 6    performances.

 7              Is that -- are you in agreement with that

 8    statement?

 9          A      Yes.

10          Q      All right.  Now, the next section says,

11    quote:  While many schools in Georgia have school

12    psychologists, school social workers, and

13    professional counselors, there has been a national

14    trend to create a more comprehensive approach in

15    meeting the social, emotional and behavioral needs of

16    students.

17              My question is, prior to the Apex

18    program, other than the Cobb Douglas grant, were

19    there any other school-based mental health programs

20    in Georgia?

21              MS. JOHNSON:  Object to form.

22              THE WITNESS:  The only one that I

23         was aware of, and I can't recall if they

24         were in a planning grant -- so that same

25         Safe Schools, Healthy Students grant, you



1          could either get it as a planning grant

2          or you could get it as a full

3          implementation grant.  And I believe that

4          Rockdale or Gwinnett, one of those, had a

5          similar grant, but I'm not 100 percent

6          sure about that, but I think there may

7          have been something there.

8    BY MS. COHEN:

9          Q    Was the grant that you're referring to in

10   cooperation with what has come to be known as

11   Viewpoint CSB?

12         A    Yeah, so Viewpoint -- yeah, so Viewpoint

13   Health would have been the provider, but again, I

14   can't recall if they had a planning grant, and I

15   don't recall if it was Rockdale County or Gwinnett.

16   I lean to Rockdale, but that's the best of my memory.

17         Q    So apart from the two school-based mental

18   health services provided under the Safe Schools

19   grants, you're not aware of any other school-based

20   mental health services?

21         A    So let me be clear that prior -- the

22   grant was one vehicle in where school-based mental

23   health services could be provided.  There was nothing

24   that precluded a school from partnering with a

25   behavioral entity, professional, group of people to



1  establish a model where they allowed clinicians to

2  come in to do different services.

3           That existed in many places and it could

4  look like parts of school-based mental health.  The

5  grant just gave very structured approach to, you must

6  do these elements.  But some of those elements that

7  are done in school-based mental health programs

8  already were -- could be activated and in many ways.

9           And in working at Cobb, we had those

10 relationships with the schools prior to the grant.

11 So I just want to be clear about that.

12      Q    Are you familiar with the GNETS program?

13      A    Yes.  I'm familiar with it more with the

14 terminology of psychoeducational centers.  That's

15 what I used to know it as when I worked in the

16 community.  But I am familiar with the GNETS.

17      Q    Have you been to a GNETS program?

18      A    Yes.

19      Q    Which one?

20      A    In Cobb.

21      Q    Any others?

22      A    No.

23      Q    When you talk about school-based mental

24 health programs, are you excluding GNETS programs?

25      A    I see those as psychoeducational centers.



1   That's how they were described.  So I don't --

2         Q     How is -- had you finished your answer?

3         A     You go ahead.

4         Q     How is a school-based mental health

5   program different from a psychoeducational center?

6               MS. JOHNSON:  Object to form.

7               THE WITNESS:  So I've never worked

8         in a psychoeducational center.  I can

9         tell you my experience of what has been

10        communicated to me by a psychoeducational

11        center, which was those were places

12        for -- or alternative school placements

13        for kids who had significant behavioral

14        challenges that could not be managed in

15        the normal school setting or in their

16        home school setting.  And so they would

17        go to the alternative school and, at the

18        alternative school, they would have

19        access to psychoeducational support.

20              So whatever that all included I

21        cannot speak to, because I never worked

22        in one.

23   BY MS. COHEN:

24        Q     So you're not aware of what kind of

25   services were provided?



1          A       All I know is that when I worked at Cobb,

2    we approached the -- the psycho -- the GNETS program

3    that was closest to -- that was in the Cobb catchment

4    area.  I think that the name of it at the time was

5    Hawthorne.  I'm not sure.  They could have changed

6    names.

7               But we approached them and had a meeting

8    with them when I was the child and adolescent

9    director to see about establishing partnerships, just

10   like we had done with any other school.  So that

11   wasn't an unusual -- we were always talking to

12   schools about how we could partner.  And so we went

13   to that school and we never were able to get traction

14   with them.

15               We had several meetings.  I would say at

16   least three, maybe, meetings.  Three to five probably

17   over time, to try to figure out how we could

18   collaborate.  It seemed like the population of --

19   there would be a lot of kids that probably had

20   Medicaid, so they -- we could bill for the service.

21   It felt like a good collaboration.  But, in the end,

22   they ultimately told us that it felt duplicative,

23   because they are a psychoeducational facility, in

24   that they provide therapeutic supports that sounded

25   similar to what we would offer.  So it never -- so we



 1   never -- it never went anywhere.

 2          It doesn't mean that somebody who left

 3   there and went back to their home school made -- you

 4   know, didn't pop back up in our system and we ended

 5   up connecting with them at some point.  But at far as

 6   trying to establish connectivity, it seemed like

 7   low-hanging fruit to us, but they felt like it was

 8   duplicative, so it never went anywhere.

 9       Q    Now, so when you talk about school-based

10   mental health services, you're excluding

11   psychoeducational centers?

12       A    I am --

13          MS. JOHNSON:  Object to form.

14          THE WITNESS:  Sorry.  I am, mostly

15       because I know what school-based mental

16       health looks like.  I know what the best

17       practice models are.

18          We have worked with like the guru

19       of school-based mental health for

20       technical assistance while we had that

21       grant.  We've gone to several Federal

22       conferences, because you could with the

23       grant.  And so I know what that model

24       should look like.  I don't know what all

25       you got in a psychoeducational center.

```
1          So I did not put them in the same

2          category.

3    BY MS. COHEN:

4          Q     Who did you meet with at Hawthorne?

5          A     We met with administrators.

6          Q     Do you remember the names?

7          A     No.  Sorry.

8          Q     What -- the deliverables contract says

9    there's a national trend toward a more comprehensive

10   approach, going back now to the school-based mental

11   health system.

12         A     Uh-huh.

13         Q     And what was the national trend?

14               MS. JOHNSON:  Object to form.

15   BY MS. COHEN:

16         Q     Or what was typical of the approach that

17   you saw as the national trend to a comprehensive

18   approach to social and emotional and behavioral needs

19   of students?

20               MS. JOHNSON:  Object to form.

21               THE WITNESS:  So are you asking me

22         to describe the model?

23   BY MS. COHEN:

24         Q     Yes.

25         A     So the model, essentially, is taking the
```



1   community continuum of services and pretty much

2   embedding it in the schools.  So some of that

3   includes therapy.  Some of that includes

4   consultation.  Some of that includes training and

5   support and coordination with the other -- so you

6   have school psychologists, you have school

7   counselors, you have school social workers.  Some

8   places have nurses.  So it's about adding, like, to

9   that team and having a comprehensive way to address

10  students' needs.

11              So if a kid is in school and they have

12  a -- a nose bleed or a headache, there's a nurse that

13  typically responds.  So wanting to make sure the same

14  level of response is available for the child that may

15  be having that, but also is having anxiety, also has

16  ADHD.  So it's just really about having a

17  comprehensive way to approach children's emotional

18  wellness.

19              Mostly, for schools, it's to improve

20  graduation rates, is kind of the target for them, but

21  to eliminate issues that may arise when -- it's

22  important to know, for context purposes, that that

23  Safe Schools, Healthy Students grant came after -- it

24  was a part of the Clinton administration and it came

25  as a result of the Columbine shooting.  So it was a

1  way to start to address behavioral health issues,

2  mental health issues, school, climate.  All -- it was

3  a whole bunch of things bundled into the services.

4          And so, yeah, I mean, that's the model

5  essentially.

6      Q    I did not know that it came out of the

7  Columbine shooting.

8      A    It was one of the responses of the

9  government at the time to start to address challenges

10 in schools.

11     Q    So the elements of the approach that

12 you're talking about are -- a partnership with a

13 comprehensive community mental health organization is

14 one element?

15     A    Is one element.

16     Q    And in Georgia those are the CSBs?

17     A    Yes.

18     Q    And another element is to provide

19 services at the schools so that you can increase

20 attendance?

21          MS. JOHNSON:  Object to form.

22          THE WITNESS:  So let me clarify the

23      previous statement I just made.

24          It can be a comprehensive provider,

25      which would be a CSB, but it's not



1       limited to being a CSB.  So other

2       provider types can be a part of a

3       school-based mental health program.

4  BY MS. COHEN:

5       Q     Were there any other participants other

6  than CSBs in the Apex program?

7       A     Yes.

8       Q     Which were those?

9       A     The one that -- the only one I can think

10 of right now goes by the name of Georgia Hope.  They

11 have an official different name.  I can't recall the

12 name, but we -- I know them as Georgia Hope.  They're

13 an Apex provider.

14      Q     So one element is a partnership with

15 comprehensive community mental health provider,

16 either --

17      A     CSBs.

18      Q     -- either a CSB or a Georgia Hope type.

19            Another element is the partnership with

20 the school?

21      A     Correct.

22      Q     And then is another element the

23 clinicians or therapists who provide the mental

24 health services are expected to spend time with the

25 school working on developing resources for the



MONICA JOHNSON                                      March 02, 2023
UNITED STATES vs STATE OF GEORGIA                               79

1    program?

2         A    Yes.

3         Q    And when we talked about it previously

4    you said that one example of services that are not

5    billable under Medicaid that might be provided

6    through Apex would be building out a play room -- a

7    play therapy room?  Excuse me.

8         A    Correct.

9         Q    And was another aspect of participation

10   that would not be billed directly to Medicaid in such

11   a program be partnering with teachers to identify

12   students with behavioral needs?

13        A    Correct.

14        Q    And what types of -- and what types of

15   partnerships with teachers and clinicians were

16   developed under the Apex program?

17        A    It could vary.  I mean, this -- it's a

18   wide -- a wide amount of options there.  It could

19   be -- an example could be you have Monica Johnson in

20   your classroom, I'm 12, and I come as an Apex worker,

21   case manager or therapist, and I come to observe to

22   see how Monica is interacting in that classroom to

23   help identify potential triggers.

24             No kid goes in crisis from zero to 100

25   for real like that.  There is usually something that



1   is happening.  So helping the teacher to identify the

2   triggers, helping to identify maybe it's too much

3   stimulus.  Helping to identify some things that maybe

4   could be different that the teachers doesn't have the

5   expertise to pick up on.  So that's an example of a

6   consultative kind of role.  That's not really a

7   billable activity because it's not a direct treatment

8   service for the child or the family.

9            So that's an example, but it can be a lot

10  of different things.

11       Q    Do you believe that kind of consultative

12  services is helpful in reducing mental health

13  problems in school?

14       A    No.  I think that that type of service is

15  helpful in reducing escalating situations that may

16  happen with a child that may be experiencing some

17  emotional distress.

18       Q    Thank you.  And do you believe that the

19  school-based mental health partnership played a role

20  in alleviating those kinds of behavioral problems

21  resulting from emotional distress?

22       A    Yes.

23       Q    Okay.  And is another component of the

24  Apex program to provide school-based mental health

25  services year round?



1       A    Yes.

2       Q    And that includes summers and vacations?

3       A    Yes.

4       Q    Why is that important?

5       A    Because you can't just cut off a kid or a

6  family that's receiving support and services because

7  school is over, and so it's important to stay

8  connected throughout the summer and breaks.  I mean,

9  that would be that helpful for that child or family.

10           Now, some -- obviously, families may take

11  vacations, may -- you can opt out and say, we're

12  good, or decrease the interactions.  That's a normal

13  thing that could happen.  But to completely disengage

14  would not be necessarily the case.

15           And there's room to be creative and so,

16  in the summers, if you notice that there is lesser

17  participation, you can do therapeutic camps.  Like

18  there are other things that you can do to supplement

19  some of that off or down time, which has been done.

20  I've seen that happen before.

21       Q    So the requirement of the Apex

22  deliverables is that services be provided during

23  summers and vacations?

24       A    Yes, as -- unless somebody tricked me and

25  I don't know about it, that's the answer.



1      Q     That's what you intended?

2      A     Yes.

3      Q     And the community mental health providers

4   would see children even when they're suspended from

5   school?

6      A     Yes.

7      Q     And why is that important?

8      A     It's the same thing as if a child has --

9   is diabetic and they still need to see their regular

10  doctor.  So they need to continue.  It's still a form

11  of Healthcare, and so they still would need, based on

12  their treatment plan, the same interventions.

13     Q     Does it also include wrap-around

14  services, such as family support?

15     A     Yes.

16     Q     What are wrap-around services?

17     A     Well, there's different levels of

18  wrap-around services.  Generally speaking, at the

19  baseline, it's whatever additional ancillary supports

20  are needed in addition to people who just tend to

21  think about therapy services.

22           So there could be peer support services.

23  It could be nontraditional supports.  You may have a

24  church group that you participate in.  So it's not

25  necessarily all clinical type services, but there are



1    therapeutic interventions.  And so it's designed

2    based on your specific needs and the family's -- the

3    family's desires.  So I'll use the church one for

4    example.  If the family is connected to like a pastor

5    and there's -- and they want the pastor involved in

6    part of this support plan, then the pastor may play a

7    role in the wrap plan.

8              It's really just designed to be

9    person-centered based on what we feel like could be

10   wrapped around you to help support you based on the

11   challenges you are presented with and the supports

12   that are available.  And most -- and that should be

13   driven by the parent and the child.

14        Q    Why -- why don't didn't DBHDD believe

15   that those supports were already present with

16   school -- school mental health professionals such as

17   guidance counselors, et cetera?

18              MS. JOHNSON:  Object to form.

19              THE WITNESS:  I don't recall saying

20         that we did not believe that those aren't

21         available.  What I said earlier is that

22         those type of services can be done in --

23         you don't have to have Apex or

24         school-based mental health to do that.

25         There are school social workers that do



1   work.

2       What we have found, from my

3   experience in working with schools, is

4   that school social workers would often

5   say they don't have the capacity.  Like

6   they're dealing with disciplinary issues,

7   truancy issues, that they don't have the

8   time to do therapy.  That's not typically

9   what they are charged with.

10      School counselors will say they are

11  focused on or what they are mandated to

12  do is drive towards graduation.  And so

13  it's about academic support and

14  performance.  So school psychologists

15  will say they are there to do testing.

16  They are not there to do therapy.  So

17  it's -- it's meant to complement what

18  happens.

19      It doesn't mean that a school

20  social worker or a school counselor is

21  not providing therapeutic supports,

22  because they are also doing that, but

23  they will cite capacity issues, in my

24  experience.

25



 1 | BY MS. COHEN:

 2 |     Q     Do school -- so you think it's an issue

 3 | of bandwidth on the part of --

 4 |     A     I think -- so I don't work in the

 5 | department Of Education and have not worked in the

 6 | school.  Based on my interactions with the schools,

 7 | that is what I have seen and that is what has been

 8 | cited to me.  Capacity, bandwidth, different goals.

 9 | School systems have specific goals, they have metrics

10 | they are trying to meet and so they have their

11 | charge.  And so I think all of that plays a role.

12 |     Q     So is it fair to say that the Apex

13 | program was intended to support creation of statewide

14 | infrastructure for school-based mental health?

15 |            MS. JOHNSON:  Object to form.

16 |            THE WITNESS:  It started as a pilot

17 |        and so we did not know if it would even

18 |        go beyond a pilot at the time.  So the

19 |        original thinking behind it was, let's

20 |        get a pilot, let's see if we can

21 |        demonstrate outcomes and see if we can

22 |        get funding actually allocated for this.

23 |            We were using funding, again, that

24 |        was for -- that was just extra funds.  I

25 |        hate to say it that way, but just extra



1          funds that we needed to use.  And we were

2          able to demonstrate that there -- people

3          liked it and schools were starting to buy

4          in, and we eventually were able to get

5          actual appropriations from the

6          legislature.

7     BY MS. COHEN:

8          Q    I can't imagine that it was an easy

9     process.

10         A    Nothing is easy there.

11         Q    I'm referring back to Page 202.  The last

12    paragraph states, quote:  Through partnership with

13    the Department of Behavioral Health and Developmental

14    Disabilities' approved Tier I and Tier II community

15    health providers, DBHDD aims to support the creation

16    of statewide infrastructure for school-based mental

17    health programming.

18              Is that correct?

19         A    Yes.

20         Q    Now, the goals of the program also stated

21    in the Deliverables annex include, first, early

22    detection of children and adolescent mental health

23    needs.

24         A    What page are you looking at?

25         Q    I'm looking at Page 203 now.



1           Do you see the three bullets at the top

2    of page 203?

3        A     Yes, I'm there.

4        Q     Do those describe the goals of the Apex

5    program?

6        A     To the best of my knowledge.  I don't

7    walk around today remembering the goals, so this

8    looks accurate from what I can recall.

9        Q     How is the Apex program intended to

10   provide for early detection of children and

11   adolescent mental health needs?

12       A     If you have clinicians that have the

13   expertise -- hence the requirement for the licensure,

14   et cetera -- working with teachers doing

15   consultation, identifying behaviors earlier versus

16   when the behaviors have been going on for years, the

17   child is now in constantly in crisis, people just

18   only are looking at the acting out.  It's way down

19   the road.  That doesn't happen over night.

20           Hence why the majority of the Apex

21   programs in the schools that jump in are usually

22   elementary school, which is actually the best -- out

23   of all, middle -- elementary, middle and high school,

24   the best time to intervene is obviously elementary.

25   So there usually were -- I don't know the numbers,



1  but in my recollection and in my direct experience

2  doing it in the community, elementary schools were

3  the ones that were the easiest to convince.  And so,

4  I mean, the data is clear that earlier intervention

5  will obviously have a better impact versus later

6  detection.

7      Q    I'm just getting a little advice from my

8  copilot.

9           Did you think that these goals were

10  attainable through the Apex program?

11     A    Yes.

12     Q    Were you concerned that they weren't

13  attainable without the Apex program or a program like

14  Apex?

15     A    I don't understand your question.  Can

16  you say it again?  I'm sorry.

17     Q    Yeah.  Were you concerned that, in the

18  absence of the school-based mental health program

19  such as Apex, the -- these goals might not be

20  attainable, that all students -- that there would be

21  early detection?

22           MS. JOHNSON:  Object to form.

23           THE WITNESS:  No, I didn't have

24      that concern.

25



1    BY MS. COHEN:

2        Q     Maybe my question is not clear.  Let me

3    ask it differently.

4              Do you have any success stories of early

5    detection of mental health problems in the schools

6    through the Apex program?

7        A     I don't recall any success stories off

8    the top of my head, but the data is very clear.  The

9    evidence out there.  I mean, you can Google this, it

10   will come up.  The earlier you intervene, obviously

11   the better the outcomes will be.

12             I -- I can't think of a specific story in

13   this moment, but -- yeah.  That's all I've got.

14       Q     Now, I just want to touch for a minute on

15   the financial structure of the Apex program.

16             Did that come out of the experience that

17   you and Mr. Yancey had in the Cobb Douglas grant?

18       A     Mostly, yes.

19       Q     And the way it worked -- the program was

20   intended to work is that providers were expected to

21   bill Medicaid or public insurance or private

22   insurance to the full extent that they could?

23       A     Yes.

24       Q     And then a certain amount of money was

25   provided to build infrastructure for school-based



1  services?

2      A    Yes.

3      Q    And the certain amount of money was

4  roughly between 200 and $300,000 per provider?

5          MS. JOHNSON:  Object to form.

6          THE WITNESS:  I don't recall the

7      exact dollar amounts of the contracts.

8  BY MS. COHEN:

9      Q    Approximately?

10         MS. JOHNSON:  Object to form.

11         THE WITNESS:  I don't recall.

12 BY MS. COHEN:

13     Q    What is the dollar amount in the contract

14 in front of you?

15     A    My pages are out of order, so you'll have

16 to give me a second.

17     Q    Yeah.  I think if you look at Page 181,

18 you'll see it.  It might be the page with the sticker

19 on it.

20     A    There you go.  This contract is $305,942.

21     Q    And that money was intended to be used

22 for -- to build the infrastructure for non-billable

23 services?

24     A    Yes.  And it sometimes covered when there

25 was -- so, yes, but sometimes we don't know that a



1    child may have a certain insurance.  And so they may

2    look like they don't have coverage to us, because we

3    don't -- they may have Aetna and that's not known.

4    But, yes, it is intended to cover what you just

5    described.

6         Q    So the -- the $305,000 was intended to

7    cover infrastructure, but also it might pay for

8    individuals who receive Medicaid type services but

9    didn't, in fact, have public insurance?

10        A    Yeah, that's an unintended consequence.

11   That's not what we want.  But then at the same time,

12   we also don't want a child that is in a school that

13   is in need of help and somebody's there to provide

14   the help, to not provide it.  But it's a -- it's just

15   an unintended consequence that is a possible thing

16   that could happen.

17        Q    Now, as the director of the division of

18   behavioral health, you put in place the policy

19   relating to evidence-based practices?

20             MS. JOHNSON:  Object to form.

21             THE WITNESS:  Are you referencing a

22        certain policy?

23   BY MS. COHEN:

24        Q    A standard.

25             MS. JOHNSON:  Object to form.



1              THE WITNESS:  So there are --

2        unrelated to Apex, there are performance

3        measures for our provider network.  And

4        at a point in time, one of the metrics --

5        I don't know if it's still there or

6        not -- but one of the metrics was that

7        providers must offer evidence-based

8        practices.

9   BY MS. COHEN:

10       Q     And that was something that you put in

11  place?

12       A     As part of the time that I was there, I

13  developed some performance metrics, and one of them

14  was having evidence-based practices.  This was not

15  specific to Apex, but about any outpatient bundle of

16  services.  Yes, I was responsible for that.

17       Q     What are evidence-based practices?

18       A     They're approaches to treatment that have

19  been tested to prove to be effective.  And so the --

20  if you follow this particular model, you learn it,

21  you give fidelity to it, you implement it.  And if

22  you follow it to the fidelity of the model, then you

23  are expected to get a certain set of outcomes.

24       Q     And why were you a proponent of

25  evidence-based practices?



1        A       Because I'm a clinician and it's what

2     you're supposed to do.  You should use treatment

3     approaches and interventions that have some efficacy

4     so that people get better.

5        Q       So what you're saying is evidence-based

6     practices have been established to have some

7     efficacy?

8        A       Correct.

9        Q       And that efficacy has been replicated

10    across settings?

11       A       Correct.

12       Q       And that is the best practices as far as

13    you're concerned?

14       A       Correct.

15       Q       So I -- I just want to focus for one --

16    very briefly on the payment for children who are

17    uninsured, because I've heard that it's a problem

18    within the system because families may not know that

19    a form of insurance has been terminated or families

20    find themselves without insurance or have to switch

21    providers for reasons beyond their control and a

22    child my lose access to services; is that your

23    understanding?

24       A       The percentage of children in this state

25    that are uninsured is low.  The kids who typically



MONICA JOHNSON                                    March 02, 2023
UNITED STATES vs STATE OF GEORGIA                              94

1  are uninsured are undocumented youth and youth who

2  have dropped.  So they're eligible, but they don't --

3  they're not covered.

4      Q    What does that mean, youths who have been

5  dropped?

6      A    So their -- the premium to renew the

7  insurance may not have been paid by the parent, and

8  so the youth is actually eligible for insurance, they

9  meet the criteria, but they don't have it.  So that

10 is the bulk of kids who end up uninsured.  So they're

11 uninsured for a period of time.

12         So that they only be uninsured, for

13 example, for 90 days and then they go back to either

14 the insurance they had or a different insurance.

15 Mostly this happens because of managed care Medicaid,

16 and most kids in the state, other than private

17 insurers, aren't covered under managed care Medicaid.

18     Q    What percentage are covered?

19     A    I don't know the percentage as of today.

20     Q    What happens in the Apex system to kids

21 who lose their eligibility or are dropped from their

22 eligibility, as you say?

23         MS. JOHNSON:  Object to form.

24         THE WITNESS:  So several -- a

25 couple things could happen.  One, that



1          may not be known right away.  So it

2          depends on how long it took for that to

3          be known.  But the provider would work

4          with the family to reinstate the

5          insurance.

6                The insurance is not just important

7          for their behavioral health.  The

8          insurance is important for their medical,

9          dental, vision.  So they -- and that is a

10         requirement that we have, that providers

11         work with uninsured individuals, adults,

12         kids, to help put -- get them covered.

13               There's a policy in DBHDD somewhere

14         that speaks to this, about uninsured kids

15         and the process to get them and work with

16         them and the expectation.

17   BY MS. COHEN:

18         Q    Was there any aspect of the Apex program

19   that provided -- that eased this problem or

20   facilitated kids remaining covered?

21               MS. JOHNSON:  Object to form.

22               THE WITNESS:  I can't speak to how

23         many people this impacted in the program

24         and -- so I can't really give the

25         concrete, this many people had that issue



1            and Apex helped to do X, Y, Z related to

2            it.

3    BY MS. COHEN:

4         Q     Without referring to the number of kids

5    or specific circumstances, it was the intent of the

6    Apex program to provide continuing services to

7    children, regardless of coverage issues such as being

8    dropped?

9                MS. JOHNSON:  Object to form.

10               THE WITNESS:  Correct, mostly

11           because, though, DBHDD acts as a safety

12           net for individuals that are uninsured.

13   BY MS. COHEN:

14        Q     And the providers were required to

15   provide a core benefit package as part of the

16   standards of DBHDD that you signed?

17        A     Correct.

18        Q     And for children and adolescents, the

19   core package includes behavioral health assessments?

20        A     Yes.

21        Q     Service plan development?

22        A     Uh-huh.

23        Q     What is a behavioral health assessment?

24        A     It's an interview, basically.  It's A

25   clinical interview to assess for what the presenting

1   issues are, gather the family history information,

2   information about the child, that includes school

3   information, living situation, clinical impression.

4        Q     And what is a service plan?

5        A     It's basically a treatment plan.  So here

6   are the identified treatment issues and here is the

7   approach or the interventions that we're going to use

8   or request to use.

9        Q     And did it also cover psychological

10  testing?

11       A     No.  That's a separate independent

12  service.  It's not a required service.  It's

13  actually -- it's not required for core providers to

14  do, but it's -- it's optional.

15       Q     It's a service that may be reimbursed if

16  a provider does it?

17       A     Yeah, if the --

18       Q     But it's not required to be provided as

19  part of the core package --

20       A     No.

21       Q     -- of comprehensive services?

22       A     So there's a nuance there.  So it is a --

23  what you're looking at, I think, is the list of core

24  services that are to be provided.  Psychological

25  testing it a service that we allow core providers to



1  contract out.

2      Q    I see.  Understood.  And does it also

3  include diagnostic assessment?

4      A    Yes.

5      Q    Is that part of the core package or is

6  that a service that's allowed to be contracted out?

7      A    It's a part of the core.

8      Q    And it includes crisis intervention?

9      A    Yes.

10     Q    And individual outpatient services?

11     A    Correct.

12     Q    Case management?

13     A    Yes.

14     Q    And group outpatient services?

15     A    Correct.

16     Q    Family outpatient services?

17     A    Correct.

18     Q    And the CSB provides that under the Apex

19  partnership in the -- in a school-based mental health

20  services?

21     A    They provide whatever is clinically

22  appropriate from that list for the individuals they

23  are treating.

24     Q    Now, are you familiar with the term

25  functional behavioral assessment, FBA?



1        A      I'm not sure how it's being referenced

2   here, so no.

3        Q      There is coverage in the DBHDD manual for

4   functional behavioral assessments in limited

5   contexts.  Are you aware of that?

6        A      I'd have to look at -- no, not off the

7   top of my head.  I'm not sure what that is

8   referencing.

9        Q      Does it refresh your recollection if I

10  tell you that functional behavioral assessments are

11  covered under the manual for individuals in

12  psychiatric residential treatment facilities?

13       A      I don't want to speculate.  It could just

14  be the -- there are certain tools that we -- DBHDD

15  would require for -- to identify level of care of

16  where individuals -- what level of care was the

17  appropriate intervention.

18       Q      What do you mean by level of care?

19       A      So like a psychiatric residential

20  facility is a certain level of care that is on the

21  intensive side.  The core services, any of those

22  services that you just referenced from the paper

23  you're looking at is a lower level of care.  So it's

24  intensity, it's acuity.  And so there are tools that

25  are specifically used to determine the individual's



1  acuity, and then there should be correlation to the

2  service that they are then getting.

3          If that is the context in which that

4  functional assessment term is being used, it could be

5  that, but I'm just not clear in this moment without

6  seeing the context of the provider manual in which

7  it's referenced.

8      Q    And the provider manual also sets forth

9  the licensing and certification requirements for the

10 professionals?

11     A    Correct.

12     Q    And it says whether it's an associate

13 level or a master's level that must -- license must

14 be held by the clinician in order to provide the

15 services?

16     A    Correct.

17     Q    And another aspect of the Apex program is

18 periodic reporting; isn't that right?

19     A    Yes.

20     Q    And was that something that you felt was

21 appropriate to be a component of the Apex system

22 based on your experience at Cobb Douglas?

23     A    Yes.  You have to be able to gather data

24 and information about how the program is going.

25     Q    Why is that important?



1      A     Because we get State appropriations for

2   it and you need to demonstrate that it is having

3   positive outcomes.

4      Q     Does it also provide a helpful measure of

5   reliability for the State agency, the reliability of

6   the program?

7            MS. JOHNSON:  Object to form.

8            THE WITNESS:  It help us provide

9        oversight and know where we may need to

10        make adjustments, where we may need to

11        change funding levels, as examples.

12   BY MS. COHEN:

13      Q     Now, Georgia is a state that has a System

14   of Care statute; isn't that correct?

15      A     Yes.

16      Q     What is a system of Care?

17      A     System of Care is a philosophy that

18   basically, at its core, says that a system -- so

19   rather that's mental health, education, public

20   health, justice system, courts -- like, the system

21   should be working in collaboration to address the

22   needs of youth and families.  It's targeted mostly

23   towards youth with serious emotional disturbances.

24            And at the core of the philosophy is that

25   it is driven by person-centric measures, meaning that



1    the family drives --

2         Q    Let's -- we're getting too big --

3         A    Oh.

4         Q    The reason I'm going to interrupt you is

5    just the gulp is too big.

6         A    Okay.

7         Q    So let me ask you what person-centered

8    is.

9         A    That you, for example, drive --

10        Q    Frances Cohen.

11        A    Yes.

12             -- drive what you want your care to be.

13   So you have a voice, you are -- this is what I feel

14   like would help me.  And so it's not a cookie cutter

15   approach.  It's based on very specific things about

16   what you want to achieve, what your goals are,

17   coupled with therapeutic interventions that seem

18   appropriate based on your presentation.

19        Q    Are you a proponent of a person-centered

20   approach?

21        A    Yes.

22        Q    Why?

23        A    Because nobody knows you better than

24   yourself.  Nobody knows what would help you feel

25   better than you.  And it doesn't matter if you are a



1   kid, you know that too best.  Parents know their kids

2   best, and so their voices should drive the treatment

3   that their kid and their family is going to receive.

4        Q    So we talked about the person-centered

5   concept.  Is there also a family-centered concept?

6   What is that?

7        A    I see it as the same.  I don't see them

8   as different.

9        Q    But I think you described the System of

10  Care as a philosophy.  And just so that the record is

11  clear, a -- the System of Care is something that is

12  required of State -- certain State agencies by

13  Georgia statute?

14            MS. JOHNSON:  Object to form.

15            THE WITNESS:  Yes, but it is a

16       national model.  It was not something

17       just here in Georgia, but, yes.

18  BY MS. COHEN:

19       Q    And, in fact, SAMHSA requires that a

20  state have a System of Care as a condition of its

21  grants?

22       A    No, not really.  We -- DBHDD was the

23  recipient of several SAMHSA System of Care grants

24  over the last few decades.  So with those grants,

25  then yes.



1          Q     You have a System of Care?

2          A     We do.  That's a part of the COE, the

3     Center of Excellence.  That was a big driver of why

4     that was stood up.  That's why the IDT exists.  I

5     don't know it if you've heard of IDT yet.

6          Q     We're talking about a lot of morsels, so

7     let's go back and put them in context.

8          A     Uh-huh.

9          Q     So a Systems of Care is required by

10    Georgia statute?

11               MS. JOHNSON:  Object to form.

12               THE WITNESS:  Yes, still.

13    BY MS. COHEN:

14         Q     And it relates to the provision of mental

15    health services for children with serious emotional

16    disorders?

17         A     Yes.

18         Q     And what -- and an element of the System

19    of Care program that you already described is a

20    child-centered or family-centered approach?

21         A     Correct.

22         Q     And another aspect of it is, the children

23    who have these serious emotional disorders often need

24    the services from more than one agency?

25               MS. JOHNSON:  Object to form.



```
 1                    THE WITNESS:  Not necessarily.
 2    BY MS. COHEN:
 3         Q    Sometimes require the services of more
 4    than one agency?
 5         A    Yes.
 6                    MS. JOHNSON:  Object to form.
 7    BY MS. COHEN:
 8         Q    And can you give me an example of
 9    agencies that might be involved in the provision of
10    services to children with serious emotional
11    disturbances?
12         A    Child welfare, behavioral health
13    provider, schools, juvenile justice.
14         Q    The Department of Education?
15         A    Uh-huh.
16         Q    And is it a component of the System of
17    Care that these agencies collaborate with each other
18    in order to provide the best and most complete
19    services?
20         A    Yes.
21                    MS. JOHNSON:  Object to form.
22    BY MS. COHEN:
23         Q    To children with serious emotional
24    disturbances?
25                    MS. JOHNSON:  Object to form.
```



```
 1                  THE WITNESS:  Yes.

 2   BY MS. COHEN:

 3        Q     And what is the largest grant -- SAMHSA

 4   grant that the Department of Behavioral Health held

 5   when you were there?

 6        A     I don't recall.

 7        Q     With regard to the provision of mental

 8   health services for children?

 9        A     I don't recall.

10        Q     Was it the Community Mental Health Block

11   Grant?

12        A     That is very likely.

13        Q     And that was a grant for which DBHDD

14   wrote an application at the time that you were the

15   director of the behavioral health division?

16        A     Block grants are not discretionary

17   grants.  But yes, while I was there, many times we

18   wrote for the block grant process.

19        Q     When you say a block grant is not a

20   discretionary grant, do you mean that the Federal

21   government has established funding for each state to

22   hold a block grant?

23        A     Yes.

24        Q     Even though it's not discretionary in

25   that sense, the state is required to -- to -- to go
```



MONICA JOHNSON                                    March 02, 2023
UNITED STATES vs STATE OF GEORGIA                        107

1    through the application process?

2         A    Yes.

3         Q    And Georgia went through that process

4    under your direction?

5         A    Yes.

6         Q    And the direction of Commissioner

7    Fitzgerald?

8         A    Yes, and previous commissioners.

9         Q    And previous commissioners.  And one

10   aspect of the Georgia system that is described in the

11   application for a Community Mental Health Block Grant

12   is the Systems of Care, right?

13        A    Yes.

14        Q    And the message -- the -- sorry.

15             The Georgia experience is that the

16   Department Of Behavioral Health and Developmental

17   Disabilities is -- takes the lead in the development

18   of the System of Care?

19             MS. JOHNSON:  Object to form.

20             THE WITNESS:  Yes.

21   BY MS. COHEN:

22        Q    And it is required to prepare a System of

23   Care plan with the collaboration of the Department of

24   Education?

25             MS. JOHNSON:  Object to form.



1          THE WITNESS:  Yes.

2    BY MS. COHEN:

3      Q     And that is the legislature recognition

4    that both the Department of Education and DBHDD are

5    likely to be involved in providing services to

6    children with serious emotional disturbances?

7          MS. JOHNSON:  Object to form.

8          THE WITNESS:  I don't know what the

9       original intent was.

10   BY MS. COHEN:

11     Q     Both of those agencies are, however, in

12   your view, likely to be involved in the provision of

13   services to such children?

14         MS. JOHNSON:  Object to form.

15         THE WITNESS:  Correct.

16   BY MS. COHEN:

17     Q     What is -- is the -- how frequently is it

18   required that a System of Care plan be developed?

19         MS. JOHNSON:  Object to form.

20         THE WITNESS:  I don't remember.

21   BY MS. COHEN:

22     Q     Under your direction as the director of

23   the division of behavioral health services, how

24   frequently was the System of Care plan developed with

25   --



1        A    As best as I can recall, I think three

2   completed versions.

3        Q    One of those was the 2017 version?

4        A    I don't remember the date of the last

5   one, but there was a more recent one that was done in

6   the last few years.

7        Q    Do you recall that one was done in 2017?

8        A    No.  I don't recall what year it was done

9   in.

10       Q    Let me put in front of you what is

11  identified on its face as the Georgia System of Care

12  Plan for 2017, and we'll mark this as 945.

13            (Plaintiff's (Johnson) Deposition

14       Exhibit No. 945 was marked for the

15       record.)

16            MS. JOHNSON:  And there's only the

17       one copy.

18            MS. COHEN:  I think it's also

19       available on the internet.

20  BY MS. COHEN:

21       Q    Are you familiar with this document,

22  Ms. Johnson?

23       A    Mostly.

24       Q    It was created under your supervision?

25       A    I don't remember.  Let me look.



1          Yes, my name is on here.  So, to be

2    clear, not under my supervision, but in collaboration

3    with.  So this was done under the Center of

4    Excellence.  We made this activity be one of the

5    deliverables that the Center of Excellence would do.

6          And so I want to be clear that, while

7    DBHDD contracted with the Center of Excellence, that

8    this collaborative -- so it's on Page 4 of the work

9    group members -- were involved in pulling together

10   this plan.

11       Q    This plan was pulled together on behalf

12   of DBHDD, correct?

13            MS. JOHNSON:  Object to form.

14            THE WITNESS:  The plan was put

15        together on behalf of the Georgia System

16        of Care.  This was a deliverable that

17        DBHDD put into the Center of Excellence

18        contract, to pull the system together to

19        work on the plan.

20   BY MS. COHEN:

21       Q    And what other agencies were involved in

22   the promulgation of the System of Care plan?

23       A    So according to Page 3, the Department of

24   Community Health; DBHDD; DeKalb, which is the

25   Department of Early Care and Learning; Department of



1    Education; Department of Human Services, specifically

2    the Division of Family and Children Services;

3    Department of Juvenile Justice; Department of Public

4    Health; Georgia Vocational --

5          Q      Slow down a little bit.

6          A      I'm sorry.  Georgia Vocational Rehab

7    Agency.

8          Q      And --

9          A      And a list of additional partner

10   organizations.  Do you want me to cite them all?

11         Q      No, no, that's fine.  I think the page

12   you're reading from is the IDT member organizations?

13         A      Correct.

14         Q      What does IDT refer to?

15         A      Interagency directors team.

16         Q      And what is the interagency directors

17   team?

18         A      It's a System of Care collaborative State

19   entity I also developed.

20         Q      You developed that?

21         A      Yes.  It was developed in order to bring

22   together State agencies to focus on system issues

23   related to children's mental health.

24         Q      Like can you give me an example of a

25   system issue?



1          A     So it was really -- okay.  So at the

2    local levels, there's something called LIPT.  What

3    that stands for is local interagency planning teams.

4    Those teams are in the community to provide

5    wrap-around support, essentially, using the System of

6    Care model for kids that are identified in the

7    communities of needing support.

8          Q     So how does a kid get to an LIPT?

9          A     Can I finish so I don't lose the thought?

10         Q     Yeah, sorry.  I didn't mean to interrupt

11   you.

12         A     So an example would be that there is a

13   policy or a funding issue that the LIPT has

14   identified.  They could raise that to this

15   collaborative and, at the State level, we can

16   identify, oh, that's your policy, DBHDD, that doesn't

17   allow this to happen and the community has found that

18   to be a barrier to children getting access to X, Y,

19   Z.  I made that up, but that's an example of things

20   that we would look at.

21               Ultimately, the committee was charged

22   with looking at issues across the system and figuring

23   out ways to improve access for children across the

24   System of Care.

25         Q     You're referring to the interagency



1   directors team?

2         A      Yes.

3         Q      And why did you see a need for that?

4         A      Because we needed a System of Care at a

5   state level that was looking at children's issues in

6   a more proactive way, not just reacting in our

7   individual silos.  I came from a community, so I came

8   from working in community settings where I was used

9   to working with these same entities at local levels.

10  And so you've got to have leadership at the state

11  level to influence what happens in the local levels.

12         So it is an important cornerstone to a

13  good System of Care and so it was necessary.  We

14  learned that through a grant process also, a SAMHSA

15  grant.

16         Q      What grant was that?

17         A      It was a SAMHSA System of Care grant.  It

18  had ended, and one of the recommendations out of that

19  grant -- this is when I first came to DBHDD.  One of

20  the recommendations was to establish, you know, a

21  collaborative at this level.  And so the grant went

22  away and so did the recommendation, and so I brought

23  it back.  Came -- I just came to the department and

24  just reached out to the partners.  It wasn't this

25  long of a list at the time.  But just reached out and

1 | said, hey, do you all want to do this, and they said
2 | yes.
3 |     Q    Everybody said yes?
4 |     A    Everybody said yes.
5 |     Q    What -- and what year was that?
6 |     A    What year did we say I came?
7 |     Q    I had --
8 |     A    So 12 years ago.  It was during my
9 | tenure.
10 |     Q    I have 2009 in my notes.
11 |     A    So it was my tenure -- it was in that
12 | nine months of me being the child and adolescent
13 | mental health director.
14 |     Q    You established the --
15 |     A    The IDT during that time.
16 |     Q    -- IDT.
17 |     And what would have been some of the
18 | accomplishments of the IDT with respect to child and
19 | adolescent mental health services when you were at
20 | DBHDD?
21 |     A    Improved communication, collaboration
22 | across entities.  Getting people to just talk about
23 | their systems and understanding the language.  We
24 | were able to address some very specific things.  The
25 | one thing that came out that I guess I was most proud



1    of, we had partnered with the CDC.  They had data --

2         Q     With the --

3         A     CDC?  Centers for Disease Control.

4               They had data -- they approached us.  And

5    they had data related to children and ADHD.  And so

6    they had data and was like, we don't know what to do

7    with the data, essentially, we'd like to partner with

8    you all.  So we did.

9         Q     So how did you help -- how was the IDT

10   involved in partnering on the ADHD data with the CDC?

11        A     So we worked together, collaboratively,

12   to come up with a work plan and how we can use the

13   data to inform some trainings.  And so we targeted

14   pediatricians and provided training that was informed

15   by the data that we were getting from the CDC.

16               We ended up publishing like a paper that

17   was published later in a -- I'm trying to remember

18   what the name of the --

19        Q     Are you one of the authors of the paper?

20        A     I'm referenced in it.

21               So that was a good outcome and it led

22   to -- we were trying to improve competency in the

23   network around -- one of the most common issues,

24   behavioral health issues children have is ADHD.  And

25   so we were trying to improve competency and improve



1    intervention and disseminate best practices.  So that

2    was a success that would have happened as a result of

3    that.

4                   There were many things that have come out

5    of IDT.  I chaired it for the first three years.  But

6    one of the cool things about it is that it rotate --

7    it's required to rotate chairs so that different

8    agencies have an opportunity to make sure that their

9    priorities are put forward that year.

10        Q      Have there been other chairs from DBHDD

11   other than you?

12        A      Dante McKay has been a chair.

13        Q      Anyone else?

14        A      Not that I can recall.

15        Q      Now looking at the 2017 System of Care,

16   was this the first System of Care plan that you

17   worked on?

18        A      I don't think so.

19        Q      Do you recall one in 2010?

20        A      Well, when I came to the department,

21   there was one that had been done but it wasn't

22   complete.  And I picked it up.  I can't -- I don't

23   remember if it -- I don't remember.  I can't recall

24   what happened with that one.  But there was one that

25   had been started.



1            It was a part of the -- that grant I

2     talked about, the System of Care grant.  I think that

3     was helping to support it.  Because these aren't easy

4     to -- like, you have to have resources to do these

5     type of reports.

6            Q    I'm not surprised.  It's -- how many

7     pages is it?

8            A    Yeah.

9            Q    It's 65 pages with appendices.

10           A    So you have to the resource to do this.

11    And what I recall, to the best of my knowledge, is

12    that it had been started because there were grant

13    resources, but it was not a complete document.  And

14    so part of the work that we wanted to do moving

15    forward was to get a better plan in place, that was

16    more current, also.  And we -- and we did that.

17           Q    And this is the plan?

18           A    Yeah.

19           Q    Exhibit 945?

20           A    Which you can also put down as a -- what

21    came out of kind of IDT stuff.

22           Q    Another product.  And looking at Page 7

23    that is the Executive Summary.  Did you have a hand

24    in writing this?

25           A    I don't recall.



1    Q    It says Children, adolescents -- I'm

2    reading now from the third full paragraph on Page 7.

3    It says:  Children, adolescents and emerging adults

4    ages four to 26 with severe emotional disturbance are

5    the focus of the 2017 Georgia SOC State Plan, as they

6    are a prevalent, vulnerable population that requires

7    an SOC approach to service and support delivery to

8    truly function and thrive.

9         Do you agree with that statement?

10   A    Yes.

11   Q    And I asked you previously whether it

12   required a System of Care -- whether it required

13   collaboration between agencies to serve students with

14   severe emotional disturbances, and I believe you said

15   sometimes.

16   A    Correct.

17   Q    And one of the areas of focus for the

18   System of Care plan was increasing access to mental

19   health services?

20   A    That would be correct.

21   Q    And how is that done?

22   A    What's referenced in the plan?

23   Q    Uh-huh.

24   A    I don't know.  I'd have to look at what's

25   in here.



1      Q      Well, let me help you out.  There are --

2    there's guidance in the plan, right, with regard to

3    access?

4      A      What page are you looking at?

5      Q      I am looking -- well, on Page 2 in the

6    Executive Summary.  I'm sorry Page 8 of the plan.  It

7    says that:  Access to an array of community-based

8    services it supports is a core component of any

9    functional behavioral healthcare system.

10          That's a statement that you agree with?

11      A      Yes.

12      Q      And it -- and going -- skipping a

13    sentence and moving through the paragraph:  A focus

14    on access was chosen to support children and families

15    and their access to and navigation of mental

16    healthcare services in Georgia.  Short-term

17    strategies include service mapping for behavioral

18    health service utilization, increasing behavioral

19    health services in schools, and improving families'

20    ability to navigate the system.  Long-term strategies

21    include recruiting practitioners in shortage areas,

22    strategically increasing the use of telemedicine and

23    telehealth and increasing continuity of care.

24          Now, with regard to these short-term

25    strategies, the phrase mapping is used.  What does

1    that mean?

2          A     So there was an exercise done -- let me

3    make sure that this is the right one.  So it looks

4    like, from reading this one -- because there was also

5    a financial mapping, which looks different from here.

6                This one, it says it here:  Care includes

7    service mapping for behavioral health service

8    utilization.  So it --

9          Q     What is --

10         A     -- looks like that -- from my

11   interpretation of this and what I can recall, this

12   sounds like looking at what services are being

13   utilized across the delivery systems.  So mapping

14   that out.  Like where -- yeah.

15         Q     Mapping is a description of the available

16   services?

17         A     Mapping is described as a system -- a way

18   or an approach.  It's a tool where you can look

19   at what -- what services exist in the community and

20   then try to look at utilization data and figure out

21   who is actually accessing the different services.

22                It helps to inform what services -- what

23   gaps may be, where over or under utilization may be.

24   So it helps to give you a picture of one lens.

25   Access means many things.  So that's one lens to use



1   to try to understand, are people getting to the

2   services and at what level are they getting to it.

3   So the utilization helps inform that.

4        Q     And was another lens offering the

5   services in the school where the children are?

6        A     Yeah.  I mean, here it does say that one

7   of the goals was:  Increasing -- let me just repeat

8   it verbatim -- increasing behavioral health services

9   in schools.

10              So that does increase access to services

11  for the reasons we've talked about earlier today.

12       Q     And the last component of the short-term

13  strategies is improving families' abilities to

14  navigate the current system?

15       A     Yes.

16       Q     And what does that refer to?

17       A     Many families don't know where to start

18  when they are -- when they have a youth that is

19  displaying serious behavioral challenges.  In my

20  experience, the crisis of the -- what is happening to

21  the family in the moment is very overwhelming and

22  most people don't realize how to access behavioral

23  health services, even high functioning adults, until

24  they need it.

25              And so families often would not know



1  where to begin, and so helping to make sure that the

2  pathways to getting services were more known, were

3  clear.  Where could the system provide education,

4  where could there be no wrong door.  So that type of

5  work.

6      Q     So there are a number of references to

7  improving academic performance.  How do mental health

8  supports improve academic performance?

9      A     So I don't work or come from an

10 educational setting, however, what I can say is that,

11 if you are having unaddressed mental health issues,

12 disorders or challenges, how are you also expected to

13 perform well in other settings, rather that is work,

14 rather that is school, rather that is in

15 relationships or in just your community in general.

16         So unaddressed mental health issues do

17 have -- there is a correlation between that and

18 success in education.

19      Q     How important is that correlation?

20         MS. JOHNSON:  Object to form.

21         THE WITNESS:  I don't know how to

22     quantify that in this setting.

23 BY MS. COHEN:

24      Q     But you -- it was something you thought

25 was worth addressing through the System of Care plan



1  by providing increased access?

2       A    It's -- I mean, this is a common -- this

3  is a common concept.  And so the team would identify

4  this as something and, yes, it is an appropriate

5  thing to be in this plan.

6       Q    And you included it?

7       A    You're saying I, like me personally?

8  Yeah.

9       Q    Excuse me.

10      A    The team that worked on this included it,

11 yes.

12      Q    Okay.  Who -- who -- and it was really a

13 team process, as is described in the System of Care

14 plan?  For example, at Page 16 it describes:  Over 15

15 months, the IDT developed the plan through the

16 cooperation of various entities, including the

17 National Training and Technical Assistance Center,

18 which is a technical assistance network, a work group

19 that was comprised of different agencies and meetings

20 of those groups to find out what best practices are.

21           Is that correct?

22      A    Yes, that is correct.

23      Q    And then the plan starts with

24 Recommendations, beginning on Page 19.  Do you have

25 that in front of you?



1        A    Yes.

2        Q    And one of the recommendations was to

3   utilize data to inform a strategic approach to

4   access?

5             MS. JOHNSON:  Object to form.

6             THE WITNESS:  Yes, it's listed

7        here.

8   BY MS. COHEN:

9        Q    And how -- and how did the plan

10  contemplate using data to inform a strategic approach

11  to access?

12       A    I don't know without reading.  I would

13  have to read this.

14       Q    So you -- what is spelled out here is the

15  answer?

16       A    Yes.

17       Q    Okay.  And also, increasing behavioral

18  health services in schools, as we previously talked

19  about?

20       A    Correct.  That's referenced on Page 21,

21  so it's already outlined.

22       Q    Now, looking at the bottom of 21, it

23  says:  There are a variety of program -- of

24  frameworks that guide school-based mental health

25  services.



1              Do you see that?

2       A     I saw that, yes.

3       Q     And one of the frame -- it says:  The

4  most common framework is a three-tiered conceptual

5  model.

6              What is that?

7       A     It's referenced on Page 22.

8       Q     What do you understand the components of

9  the three-tiered --

10      A     What is outlined on Page 22 as universal

11 prevention, 85 percent -- 85 percent to 90 percent of

12 the work is based on that.  It's services and

13 supports that all school staff are able to get access

14 to early intervention, 7 to 10 percent.  That's

15 counselors, social work, mental health providers and

16 then intensive intervention services.

17             But Page 22 describes those tiers.  At

18 the top it reads -- I'll start at the beginning:  As

19 services in Tier 1 are generalized to an entire

20 school, providers of Tier 1 service include all

21 school staff members.  Above Tier 1 lies Tier II,

22 early interventions.  Services in Tier II are geared

23 toward a subset of students in a school who are at

24 risk for developing mental health concerns.

25             Some examples are provided there.  And



1   then it goes on to talk about Tier III, which is:

2   Intensive personalized function-based behavior

3   intervention plans and long-term counseling.

4        Q    And why is it important to have three

5   tiers of service, in your view?

6        A    Because you have all -- everybody's --

7   you need all of these components in order to address

8   and meet the various needs.  It's a continuum.  So

9   not everybody needs -- the smallest percentage are

10  the ones who need the most intervention -- intensive

11  services.  That's always going to be the smallest

12  percentage of the population, regardless if you're

13  talking about kids or adults.

14            So the majority are individuals who are

15  more in the -- I think about in the middle of the

16  bell curve.  So they're more in that generalized

17  population.  And so -- I mean, this is just the math

18  and this is just the way it makes sense to do it.

19       Q    And was the Department of Education a

20  proponent of this three tier --

21            MS. JOHNSON:  Object to form.

22            THE WITNESS:  I don't know.

23  BY MS. COHEN:

24       Q    You don't know?

25       A    I can't speak to -- I don't have any



1  recollection of them being in support or not in

2  support.

3      Q    Because there was a collaborator from the

4  Department of Education as part of this plan, right?

5      A    Correct.

6      Q    Who was it?

7      A    I -- I do not walk around with this in

8  memory, so I have to go back.  It's listed at the

9  beginning.

10      Q    Let me help you a little bit.  Although I

11  think you're going to the right place.

12      A    So according to here, the representatives

13  from DOE was Rebecca Blanton and Nakeba Rahming.

14      Q    Are you familiar with them?

15      A    Rebecca, I am.  I don't remember Nakeba

16  well.

17      Q    Did you discuss with -- do you recall

18  anything Rebecca Blanton said with regard to the

19  three-tier system?

20              MS. JOHNSON:  Object to form.

21              THE WITNESS:  No.

22  BY MS. COHEN:

23      Q    Was it controversial, by which I mean was

24  there more than one point of view within the

25  Department of Education with regard to a tiered



```
 1   system?
 2              MS. JOHNSON:  Object to form.
 3              THE WITNESS:  Not that I'm aware
 4       of.
 5   BY MS. COHEN:
 6       Q     Do you recall any views that were
 7   expressed by the Department of Education on this
 8   subject?
 9       A     About the tiered system?
10       Q     Uh-huh.
11       A     No.
12       Q     Have you -- excuse me.
13              Has anyone from DBHDD, outside of the
14   System of Care plan, met collaboratively with the
15   Department of Education to work on the
16   recommendations that are in the System of Care plan?
17              MS. JOHNSON:  Object to form.
18              THE WITNESS:  Has -- can you
19       repeat -- can you rephrase it or restate
20       it?  I'm sorry.
21   BY MS. COHEN:
22       Q     Yeah.  I'll read it back first, and if
23   you have a problem with it, just let me know.
24              Has anyone from DBHDD, outside of the
25   System of Care plan, met collaboratively with the
```

1  Department of Education to collaborate on

2  recommendations that are in the System of Care plan?

3          MS. JOHNSON:  Object to form.

4          THE WITNESS:  Yes.

5  BY MS. COHEN:

6      Q     Who was involved in the -- that

7  collaboration?

8      A     So by collaboration, I'm -- are you

9  meaning like any commune -- any contact to talk about

10 how to work together?

11     Q     Yeah.

12     A     Okay.  So I've done that before.

13     Q     I know you mentioned it in connection

14 with building a constituency for the Apex program.

15     A     That was one way.

16     Q     What were the other ways?

17     A     We worked with the DOE, Garry McGiboney,

18 and I don't remember -- I cannot remember this other

19 woman's name, but there was another, like, leading

20 woman.  And they had a conference at the Chick-fil-A

21 headquarters.  I don't remember the year.

22     Q     Any goodness.  Were refreshments served?

23     A     Yes.  And it was just like being at

24 Chick-fil-A, but nicer.  That was probably when I was

25 still the child and adolescent mental health



1  director.  But we went to talk about school-based

2  mental health and PBI -- PBIS, so positive behavioral

3  interventional supports, I think -- and how they

4  could complement each other.  So there was a full

5  day, kind of a convening about that.

6             And then numerous -- as a part of the

7  day-to-day job, you coordinate a lot with entities.

8  DOE was just a very common one.  And, more recently,

9  DBHDD has a funded position that is shared between

10  DOE and DBHDD.  So that position sits in Dante's

11  office now.  But there's numerous opportunity and

12  times where that interplay happened outside of this.

13     Q    You thought that collaboration was

14  important?

15     A    Yes.

16     Q    And was -- is it Dr. or Mr. McGiboney,

17  was he a proponent at DOE school-based mental health?

18             MS. JOHNSON:  Objection.  Object to

19         form.

20             THE WITNESS:  I don't know if he

21         specifically was a proponent.  He was an

22         early partner.  I worked with him on a

23         regular -- regular enough basis.  That

24         was kind of my point person for a while.

25         I don't know if he was a proponent of it

1          or not.  I just don't recall.

2    BY MS. COHEN:

3          Q     He was a proponent of PBIS?

4          A     He was, I can say that, yes.

5          Q     What is a multi-tiered system of support?

6          A     Yes, I do believe that to be true and

7    accurate.

8          Q     And you talked about the Chick-fil-A

9    conference.  And with regard to that conference, he

10   spoke about positive behavior interventions and

11   supports?

12         A     Correct.

13         Q     And was there someone from DBHDD who

14   spoke about it?

15         A     I was there.  I don't remember if I had

16   an official speaking role.  I know that I would have

17   talked because I was there and I -- it would have

18   been unusual for me to not talk.  So I know I spoke,

19   but I don't recall if it was an official

20   presentation, if it was more of an open dialogue.  I

21   just don't recall the format in which I communicated

22   there.  It was their meeting, so we were guests.  So

23   I just don't recall.

24         Q     What were the views expressed by DBHDD?

25               MS. JOHNSON:  Object to form.



1              THE WITNESS:  About PBIS?

2    BY MS. COHEN:

3         Q     About the matters at the conference.

4         A     Well, I could speak from -- from my

5    perspective at the time, I understood that PBIS was a

6    priority for them, DOE, and I felt like we had

7    opportunity to try to figure out how to complement

8    each other with school-based services and PBIS.  I

9    feel like my position then, as best as I can recall,

10   was really to really try to demonstrate how those two

11   things could interplay.

12        Q     What were some of the ways?

13        A     They're not the same programming.  I

14   don't remember all of the elements about PBIS in this

15   moment, but I do remember feeling like there was this

16   opportunity where they could complement each other.

17   I didn't feel like you had to choose one over the

18   other.

19              I also felt like, but I can't tell DOE

20   what to do.  And so we were -- I was there from a

21   position of trying to be a good partner, listening

22   and figuring out ways in which we could collaborate,

23   and demonstrate that there probably was room for some

24   of the -- I wish I could remember better the date,

25   because I don't remember the order, if we had already



1    started.

2         Q    I'll give it to you.  We're going to take

3    a break soon for lunch.

4         A    Okay.

5         Q    Let me ask you one other question.

6              You said that, when you went to GNETS,

7    the psychoeducational center, they said that they

8    felt that the Apex services would be duplicative?

9              MS. JOHNSON:  Object to form.

10             THE WITNESS:  It wasn't Apex.

11   BY MS. COHEN:

12        Q    I'm sorry.  The school-based mental

13   health services from CSBs would be duplicative of

14   what they were doing?

15             MS. JOHNSON:  Object to form.

16   BY MS. COHEN:

17        Q    Is that correct?

18        A    Yes.

19        Q    And do you remember who said that?

20        A    No.

21        Q    Did you agree --

22        A    It was an administrator.

23        Q    Did you agree with that point of view,

24   that the services were duplicative?

25             MS. JOHNSON:  Object to form.



1           THE WITNESS:  What I recall is that
2       what they described you would get as a
3       student there sounded like services we
4       would offer.  I cannot speak to if what
5       they described is what was received.
6   BY MS. COHEN:
7       Q    So you don't have enough knowledge to say
8   whether the services were duplicative of the services
9   that you contemplated offering in a partnership?
10          MS. JOHNSON:  Object to form.
11          THE WITNESS:  What they described
12      sounded like I could see why they would
13      think that it was duplicative, that they
14      were doing those services.
15  BY MS. COHEN:
16      Q    Did you think that they were doing those
17  services?
18      A    I had no reason to think they were not.
19      Q    Did you know whether they were providing
20  evidence-based services?
21      A    I do not know.
22      Q    Do you know whether there was any
23  collaboration with CSBs as part of it?
24      A    As part of what?
25      Q    As part of the services that the



1    psychoeducational center was providing?

2        A    No, it was not.  That's why I went.

3        Q    To offer those services?

4        A    Correct.

5        Q    So the -- if the CSBs weren't

6    collaborating, then the children in the

7    psychoeducational center were not receiving services

8    from individuals who worked for the CSB while they

9    were at school?

10            MS. JOHNSON:  Objection.  Object to

11        form.

12            THE WITNESS:  So like I said, we

13        tried to establish something that would

14        look like some parts of school-based

15        mental health.  That didn't work out.

16            MS. COHEN:  All right.  We are

17        going to take a lunch break now.

18            MS. JOHNSON:  The food is here.

19            MS. COHEN:  Good.

20            THE VIDEOGRAPHER:  The time is

21        1:18 p.m., and we are off the record.

22                (Brief pause.)

23            THE VIDEOGRAPHER:  The time is

24        2:04 p.m., and we're back on the record.

25            MS. JOHNSON:  I'm sorry.  Can we go



1        off the record.

2             THE VIDEOGRAPHER:  We are off the

3        record.

4                   (Brief pause.)

5             (Plaintiff's (Johnson) Deposition

6        Exhibit No. 946 was marked for the

7        record.)

8             THE VIDEOGRAPHER:  The time is

9        2:06 p.m., and we are back on the record.

10   BY MS. COHEN:

11        Q    Okay.  Ms. Johnson, the court reporter

12   has put in front of you Exhibit -- is it 946?

13        A    Yes.

14        Q    -- Exhibit 946.  Can you identify this?

15        A    It is a part of a standard -- I mean, a

16   policy -- a set of policies.  It's one standard out

17   of that larger set.  It is titled CCP Standard 22

18   Evidence-Based Treatment.

19        Q    And is this the standard that you

20   referenced earlier that you put in place with regard

21   to evidence-based treatment?

22        A    Yes.  It's one standard out of a set.

23        Q    Is that your signature on the back?

24        A    Yes.

25        Q    And the date of this is June 30th, 2022,



1  but the standard was promulgated long before that,

2  right?

3        A     Correct.  It's reviewed on an annual

4  basis and the -- the date is always updated annually.

5        Q     But you put it together before the Apex

6  program was founded, right?

7        A     This is not just for Apex, correct.

8        Q     Right, I know it's not just for Apex, but

9  it dates from the early years of your work at DBHDD?

10       A     So Apex may have been going parallel to

11 when this -- this, I think, started in 2014, I

12 believe.

13       Q     2014.

14       A     And so it may have been running parallel.

15 I mean, it's a completely different project.  But

16 this was a new initiative of establishing a set of

17 standards, and this is one of several.  But I don't

18 think that -- I think they were parallel activities,

19 if I recall the time line.

20       Q     Yeah.  I was really asking without regard

21 whether the two were related to each other, just what

22 the time line was.

23       A     Right.  So I don't recall which was

24 first.  I think they were parallel in terms of

25 timing.



1          Q      Roughly contemporaneous?

2          A      Yes.

3          Q      Now, I wanted to also ask you about the

4    local interagency planning teams.  And there were --

5    that is an agency -- a unit like the interagency

6    directors team, in that constituents from different

7    agencies come together; isn't that right?

8          A      Correct.

9          Q      And that was something that you said in

10   the June 7 -- I mean, in the 2017 System of Care

11   plan, that that kind of coordination at the local

12   level is important?

13         A      Correct.

14         Q      And at the time of the June '17 -- at the

15   2017 System of Care plan, there were some issues with

16   regard to those local interagency planning teams,

17   right?

18              MS. JOHNSON:  Object to form.

19              THE WITNESS:  What do you mean by

20        issues?

21   BY MS. COHEN:

22         Q      Well, let's look at Page 28.  Do you have

23   that in front of you?

24         A      Yes.

25         Q      It talks about the importance of the



1    LIPTs, right?

2         A    Correct.

3         Q    And it also says that some LIPTs have

4    been more active and efficient than others?

5         A    Correct.

6         Q    And it also talks about something we

7    haven't touched on yet in this deposition, which is

8    regional interagency teams.

9         A    Correct.

10        Q    Those are also called RIATs?

11        A    Yes.

12        Q    And what are regional interagency teams?

13        A    They were designed to be -- so I used to

14   be a chair for LIPT.  So all of the LIPTs have

15   chairs.  It was designed to be a place where the

16   chairs would come together so that -- LIPTs are all

17   across the state.  I don't remember how many there

18   are right now.

19             But it was initially designed so that the

20   LIPT chairs could come together, have a place to --

21   kind of, what are your issues, what are you seeing in

22   your community.  What are y'all doing.  So a learning

23   opportunity, but also an opportunity --

24        Q    Go ahead.  Finish.

25        A    -- an opportunity to identify the



1  original design, an opportunity to identify things

2  that needed to be brought to the state level, so to a

3  DBHDD, a DOE, whatever it may have been.  That was

4  the original design.

5          Q      And is it true that any of the

6  stakeholders in the LIPT can bring an issue to --

7  before the LIPT?

8          A      When you say bring an issue, would it --

9  can you say what you mean about that?

10         Q      Yeah.  I mean if you have a child that

11  seems to have problems that are --

12         A      So LIPTs usually have a -- a way to -- a

13  referral process.  I don't know what it looks like

14  today.  But my former experience, we had a formal

15  process.  And so we had a form, it had questions, a

16  little context about the individual.  We had meetings

17  set that were re -- like reoccurring LIPT meetings.

18  We came together to -- with the family and we would

19  talk about what the -- you know, what was happening.

20                The whole goal was to try to keep the

21  individual out of having to be removed from their

22  home or placed into a psychiatric residential

23  treatment facility and try to find wraps --

24  wrap-around supports for the individual.  So that was

25  the goal.



1      Q      And who are the constituent members of an

2  LIPT?

3      A      It mirrors the IDT.  So welfare,

4  behavioral health providers.  So it didn't just have

5  to be the CSB.  Schools, juvenile justice, where

6  juvenile courts were applicable, because it's not

7  everywhere.  So where that was applicable.  In some

8  cases, there was some of the CMOs, the managed care

9  providers, would come in some instances.  The family

10  was allowed to bring a support.  So if they wanted to

11  bring someone with them, they could do that.

12      Q      Could the family refer an issue to the

13  LIPT?

14      A      It didn't normally happen that way.  I

15  don't think it was prohibited.  It just -- I just

16  don't recall that being the way.  I don't -- yeah, I

17  just don't recall that being a way.

18      Q      And it says -- so what the 2017 System of

19  Care plan recommended was that the LIPTs be invested

20  with authority to coordinate care; isn't that right?

21      A      They needed to be strengthened.  It's an

22  unfunded mandate, and so there was recommendations to

23  help strengthen them so they could be consistently

24  functional and effective.

25      Q      And were the IR -- RIATs, the regional



1  interagency teams, were those -- the constituents

2  also mirrors of the IDT and the LIPT?

3        A     So the RIATs were the chairs --

4        Q     RIATs, thank you.

5        A     Yeah.  The RIATs were the chairs of the

6  LIPTs.  And so you could have different chairs.  So

7  in one area or one county, the chair may be somebody

8  from the school.  In another community, it may be

9  somebody from juvenile -- like DJ, Department of

10  Juvenile Justice.  So the chairs could look like

11  different backgrounds.  And so, yes, in that

12  instance, then, it could have that same kind of mix.

13        Q     So it says here on -- on the top of Page

14  29, that RIATs had been able to identify training

15  needs, share successes and challenges and plan for

16  services throughout the region?

17        A     Yes.

18        Q     And then it -- it goes on to say, I think

19  what you've just been talking about, some RIATs

20  discontinued meeting a few years ago, and some LIPTs

21  are more active and efficient than others.

22              Quote:  One of the reasons for this

23  variability has been the lack of a legislative or

24  formal mandate for the RIATs, as well as a point of

25  accountability identified at the state level or



1  capacity needed to support continued operations of

2  these bodies.

3       A    Yes.

4       Q    And so what was the recommendation of the

5  2017 System of Care plan?

6       A    I'd have to read it, but ultimately it

7  was investing and strengthening them.  So let me see

8  exactly what it says:  The IDT recommends

9  reconstituting the RIATs.

10           It goes through:  Per the Code, Georgia's

11  BHCC was created in 2010.  Describes what the BHCC

12  is, talks about the IDT, and then it talked about how

13  it wanted it to align.  So BHCC being the authority,

14  RIATs -- I'm sorry -- IDT under BHCC, then RIATs, the

15  reinstitution of those, and then LIPTs.  So that was

16  the general recommendation based on the report and

17  from my memory.

18       Q    Now you talked about avoiding residential

19  treatment.  Do you also think it's an important goal

20  to help individuals with SED avoid more restrictive

21  placements?

22           MS. JOHNSON:  Object to form.

23           THE WITNESS:  Well, that's always

24       the goal.  You don't want to remove a

25       child from their home unnecessarily, and



1          so going into a more restrictive

2          environment starts to do that.

3     BY MS. COHEN:

4          Q     Did you consider the psychoeducational

5     facilities to be more restrictive environments or did

6     you lack information about what took place there?

7          A     I've never thought about the question.

8          Q     Okay.  Then let's move on.

9                There is discussion with regard to

10    improving and strengthening the LIPTs and the RIATs

11    about the importance of effective feedback loops.

12         A     Uh-huh.

13         Q     What are you -- what does that refer to?

14         A     Helping families, in the System of Care

15    approach, happens best in the local community.  So

16    the LIPTs are doing the work at a local level.  They

17    know what the resources are.  They -- it's the child,

18    the families' community, so that's where the work

19    happens.

20               But what barriers and challenges that

21    local LIPTs may experience may be out of their

22    control.  So there may be funding issues.  There may

23    be policy issues, other things that are beyond what

24    they can do.  And so the idea was then you would have

25    the RIATs, so that maybe there's information sharing.



1  Sometimes there's misunderstanding about a certain

2  policy, so it's a perceived barrier.  It's not a real

3  barrier.

4            But then if it is a real barrier or it's

5  a funding need or there's a request, there's support

6  that's needed, technical assistance, training, that

7  that can feed into the state System of Care.  So that

8  we can then know what resources should be allocated.

9  So as we're thinking about planning, when we have

10  funding or we have grant opportunities, that we're

11  informed about, we know over in this area this has

12  been a need that's been raised.  Let's try to target

13  over here for X, Y, Z.

14            So that's the feedback loop we were

15  trying to create with this mechanism.

16       Q    Were you able to solve the problems in

17  2017 with the regional and local entities?

18            MS. JOHNSON:  Object to form.

19            THE WITNESS:  I believe that is an

20       ongoing issue that is still being worked

21       on.

22  BY MS. COHEN:

23       Q    Do you think it will require a

24  legislative solution?

25            MS. JOHNSON:  Object to form.



1              THE WITNESS:  I believe it requires

2         appropriate funding and the right

3         mandate.

4    BY MS. COHEN:

5         Q     And the current -- currently, there is no

6    mandate?

7         A     There's no funding.

8         Q     No funding mandate?

9         A     It's an unfunded mandate.

10        Q     Now, let me ask you something else.

11              Did the System of Care -- does the System

12   of Care play a role in avoiding duplicative

13   expenditures and making service delivery more

14   efficient and less costly?

15        A     An effective System of Care would.

16        Q     Excuse me?

17        A     An effective System of Care would do

18   that.

19        Q     How would it do that?

20        A     Because, if -- I mean, just core -- so

21   you understand, going back to the mapping.  So

22   mapping of services, understanding if you do this --

23   training is a good example.  So if DFACS is spending

24   money on trauma-informed care -- this actually is a

25   real example.



1          So DFACS is spending money, DJJ is

2    spending money, DBHDD is spending money, Department

3    of Education is spending money.  So we're all

4    spending dollars around the same topic and perhaps

5    that could have been coordinated.  So there's a

6    resource saving there.  So if you're able to save

7    there, there may be another training need or

8    technical assistance that, if coordinated, can be

9    targeted versus everybody going after the same topic.

10         Q     So I knew you said that the Apex model

11   was based on best practices or at -- yes, it came

12   from Cobb Douglas, which was based on a national

13   model.

14         A     Uh-huh.

15         Q     Are the regional and local agencies, are

16   those also based on national best practices or some

17   best practices model?

18         A     The concept of the LIPTs is -- I told you

19   that the System of Care is a broad philosophy.  It is

20   one way to operationalize the philosophy of System of

21   Care, which is wrapping around with all of the

22   community inputs in the system, to determine what is

23   best to help support the youth and the family.

24         Q     And you think that can be helpful to

25   reducing the effects of serious emotional disorders





1   on academic achievement?

2       A     Yes.

3       Q     And also on behavior in school?

4       A     Yes.

5       Q     So are you familiar with the concept of

6   braiding and blending funding?

7       A     Yes.

8       Q     What is that?

9       A     When different entities -- so in this

10  instance, when different State entities all put

11  together an allocated amount of resources towards an

12  initiative.  And so, right now there is not a

13  braided, blending funding model in the System of Care

14  in Georgia.  Most of the System of Care activities

15  that are stood up are done by DBHDD.

16            So a blended, braided model, there would

17  be like equal contribution to the contract, for

18  example, that goes to the Center of Excellence.  The

19  idea behind creating a Center of Excellence is you

20  have a neutral entity that can convene, that can

21  bring together the different parts of the System of

22  Care.  Everybody would be providing the same level

23  of, like input financially, but that's not what

24  happens now.

25      Q     Was that something that you were working



1    towards?

2        A    Yeah, I mean, it's an ongoing goal, I

3    believe that they are still working towards.  The COE

4    has different contracts with different entities in

5    the System of Care, but there is not a mandate or an

6    equal contribution to stand up the COE, to support

7    the IDT.  All of these System of Care kind of

8    administrative functions is not blended or braided.

9    It's just mostly DBHDD-heavy supported.

10            MS. COHEN:  Okay.  Let's mark as

11        the next exhibit -- and I apologize, but

12        I only have a copy for the witness and a

13        copy for myself.  But this is the Georgia

14        System of Care State Plan 2020, and it's

15        on the internet if you want to follow

16        along during the questioning.  And let's

17        mark this as Exhibit 647 -- 947.  Excuse

18        me.

19            (Plaintiff's (Johnson) Deposition

20        Exhibit No. 947 was marked for the

21        record.)

22            MS. JOHNSON:  That one is a draft

23        version.

24            MS. COHEN:  We'll get into that.

25            MS. JOHNSON:  Well, you said it's



1          on the internet, but this looks like it's
2          a draft.
3                MS. COHEN:  Oh, yeah.  That's what
4          you'll find.
5                MS. JOHNSON:  Okay.
6     BY MS. COHEN:
7          Q     Can you identify Exhibit 947 for the
8     record, please?
9          A     Georgia System of Care State Plan 2020,
10    Exhibit 947.
11         Q     Now, I think your counsel, Melanie, has
12    raised an interesting issue, which is this is stamped
13    Draft.  Is this the final plan?
14         A     I don't recall.
15         Q     Do you know if there was ever a final
16    plan in 2020?
17         A     To my recollection, there is a final
18    plan.  I don't know what year, but there -- to my
19    recollection, there is not -- there is a final plan.
20         Q     And since 2020, have there been any
21    further System of Care plans?
22         A     Not to my knowledge.
23         Q     I want to direct your attention --
24         A     Can I clarify?
25         Q     Sure.



1          A     So I don't know -- I cannot recall if

2    this plan was finalized in this year or at a later

3    time, but my recollection is that there is a more

4    recent System of Care plan that is after 2017.  So

5    with that in mind, I believe, but I'm not 100 percent

6    certain, of dates, and I would need to see it if this

7    moved out of draft form.

8          Q     So let me try and refresh your

9    recollection.

10               Does it refresh your recollection that a

11   System of Care plan was completed with the exception

12   of approval of the Behavioral Health Coordinating

13   Council, which was the --

14         A     That doesn't help.  I don't recall.  That

15   feels familiar, but I don't -- I cannot say with

16   certainty.

17         Q     What is the Behavioral Health

18   Coordinating Council?

19         A     It's a legislative -- I mean, it's a law.

20   It was put in place when the department was stood up,

21   when DBHDD was stood up, that there would be a

22   coordinating entity to coordinate behavioral health

23   issues across agencies.  It doesn't just focus on

24   children, so it's just across behavioral health

25   entities or entities that provide some form of



1  behavioral health service or support.

2      Q    And as part of your work, I think you

3  said you participated in the creation of the

4  interagency directors team?

5      A    The IDT.

6      Q    Yes.

7      A    Yes.

8      Q    And that really was the nucleus or the

9  acting component of the BHCC; is that right?

10      A    No.

11           MS. JOHNSON:  Object to form.

12           THE WITNESS:  No, that's not

13      correct.  The BHCC was put in -- is in

14      law.  And what we did was request of the

15      BHCC to allow the IDT to become a

16      subcommittee of the BHCC.  We did that so

17      that we could anchor it into a -- at a

18      commissioner level or, you know, the

19      highest level of the agencies that were

20      represented at the IDT.

21           So we wanted it to be able to be

22      sustainable and have another level of

23      authority, and so it became a

24      subcommittee of the BHCC.

25

1   BY MS. COHEN:

2        Q     And does the -- does the BHCC have

3   representation from all of the agencies involved in

4   providing supports to children with emotional

5   disturbances?

6        A     To the best of my knowledge, BHCC is

7   represented.  That was the whole idea.  The idea was

8   that, so people leave jobs all the time, and so that

9   if -- if I left, that there was still a mandate from

10  the commissioner from DBHDD that somebody from DBHDD

11  participates on IDT, and the same across each one.

12  So that was the idea.

13       Q     And the IDT then acts as a subcommittee

14  on behalf of the BHCC?

15       A     Correct.

16       Q     That's the relationship?

17       A     Correct.

18       Q     Now, I'm going to direct your attention

19  to Page 5.

20       A     I'm here.

21       Q     And there's a summary starting in the

22  second full paragraph:  During the second plan

23  period, the IDT made significant progress in all the

24  key focus areas, including the developmental

25  awareness and buy-in from stakeholders in the



1  expansion of effective services and supports.

2          Do you see that?

3      A    Yes.

4      Q    And then it goes on to talk about some of

5  the highlights of the IDT's work, described on Page

6  5.  I'm just going to ask you to look this over

7  quickly and see whether there are any other

8  accomplishments that are not included here.  It's on

9  Page 5 continuing onto Page 6.

10     A    Yeah, I wouldn't know.  I wasn't on IDT

11 anymore when -- during this time.  So --

12     Q    You think this is an effective summary?

13     A    What's here should be accurate.

14     Q    Now, looking at Page 22, this is the

15 Summary and Conclusions.  Did you play a role in

16 drafting this?

17     A    I wasn't on the IDT at this time, so no.

18     Q    Did someone you work -- did someone from

19 DBHDD play a role in it?

20     A    We always have a role in it, so the

21 answer would be, yes, we played a role in the

22 drafting of this work.

23     Q    And the last paragraph under the Summary

24 and Conclusions states, quote:  Blending and braiding

25 funding continues to be a roadblock to full



1    implementation of a more comprehensive System of Care

2    inclusive of public and private members.

3            And I take it from what you said a few

4    minutes ago that you believe that it still continues

5    to be a roadblock?

6        A    Yes.

7        Q    And that another roadblock is some of the

8    unfunded mandates?

9            MS. JOHNSON:  Object to form.

10           THE WITNESS:  Correct.

11   BY MS. COHEN:

12       Q    Now, are there some areas of the state

13   that are less well endowed with regard to

14   school-based mental health services than others?

15           MS. JOHNSON:  Object to form.

16           THE WITNESS:  I don't -- I don't

17       know.

18   BY MS. COHEN:

19       Q    Are you aware that in many rural areas

20   it's hard for kids to get access to mental health

21   services?

22           MS. JOHNSON:  Object to form.

23           THE WITNESS:  It is typically

24       harder -- there are different challenges

25       in rural areas.



1    BY MS. COHEN:

2         Q     What are those challenges?

3         A     They vary.  Transportation issues is the

4    first.  Availability of professionals.

5         Q     So under your tenure, what did DBHDD do

6    to improve access to mental health services in rural

7    areas?

8              MS. JOHNSON:  Object to form.

9              THE WITNESS:  For everything?  Like

10         for just -- like --

11    BY MS. COHEN:

12         Q     For children and adolescents.

13         A     We built programs, we built services.

14    All of this -- all of this infrastructure is DBHDD.

15    The System of Care work is carried by DBHDD as the

16    driver.  So we identify resources.  We went after

17    grants.  We've had grants that were focused in rural

18    areas over time.  We helped with workforce capacity,

19    retention work, being very specific about allocating

20    funding to rural areas.

21              I mean, it feels like a laundry list of

22    things.  We built clubhouses across the state.  Those

23    are after-school programs for kids with SED.  We put

24    one in, like, one of the more rural areas of the

25    state, in like Rabun County, which is extremely



1  rural.

2          DBHDD filled the gap for the system in

3  many ways but, yeah, I mean, I just -- off the cusp,

4  those some things that I would identify.

5      Q    Now, when you -- when you were saying you

6  put all of this in place, you were gesturing towards

7  the exhibits in front of you.

8      A    Yes.  I'm sorry.  So the System of Care

9  infrastructure.  Again, new programs, grants.

10     Q    The block grant?

11     A    Block grants, other discretionary grants.

12 We've been the recipient of several grants.  We have

13 a good track record of getting Federal grants.

14          We're -- we were very methodical about

15 balancing between -- making sure we had

16 representation of rural and urban for specialized

17 services and whatnot.  So --

18     Q    So realizing that I think, as you've

19 said, the System of Care infrastructure still isn't

20 perfect, what would you do to move it forward at this

21 point?

22     A    Can I ask to add to the last question?

23     Q    Oh, of course.  Of course.  I didn't mean

24 to cut you off?

25     A    No, you didn't, I just didn't --



1              DBHDD also funds child and adolescent

2      specialists in every region of the state.  And so we

3      have rural child expertise of staff that are employed

4      by DBHDD that are in the regions, and they are there

5      to be resources for community stakeholders, families,

6      whoever needs them, regardless of their payor, to

7      help people get connected.  And so we have a

8      presence, an actual presence, in each of the regions

9      of the state and that's important to the rural

10     question.

11             Now, I'm sorry.  Can you repeat the last

12     question?

13     Q     Well, I'm going to ask you a different

14     one quickly just to finish up what you just started.

15             Was a telehealth medicine initiative also

16     a piece of getting care to rural areas?

17     A     Yeah.  Yes.

18     Q     Are you -- was DBHDD as far along on its

19     telehealth program development as you would have

20     liked when you left?

21     A     Telehealth is wide open because of COVID,

22     so there's still a Federal public health emergency in

23     place.  And so as long as that remains in place,

24     there were allowances given for telehealth that

25     expanded it in ways in which it was not available



 1  before.

 2       Q    So that has -- so in your view, the

 3  telehealth system has expanded access to mental

 4  healthcare?

 5       A    Yes.

 6       Q    Now, realizing that the System of Care

 7  infrastructure is, as you've described, not perfect,

 8  partly because of the unfunded mandate and the

 9  resistance to braiding and blending of funding, what

10  would you recommend to move it forward?

11            MS. JOHNSON:  Object to form.

12            THE WITNESS:  I think taking the

13       recommendations that are in the plans and

14       actually having them implemented, as a

15       starting point, would be where to start.

16       There's a lot of work that went into

17       putting these plans together.

18  BY MS. COHEN:

19       Q    I can see that.

20       A    So it's just operationalizing the

21  recommendations that are right here.  Right here

22  being in these plans that are referenced.

23       Q    And do you see that work as primarily the

24  responsibility of the agencies involved?

25       A    Yes.



MONICA JOHNSON                                    March 02, 2023
UNITED STATES vs STATE OF GEORGIA                            160

1        Q      And the administration of the state?

2        A      Yes.  Making sure that -- we were

3    required in law to have a plan.  So then the plan

4    needs to be allowed to be implemented.  The

5    recommendations should be able to be operationalized.

6    They are recommendations, but there should be, in

7    my -- you're asking me.  So these recommendations

8    should have a formal way of being operationalized,

9    because they're all here in these documents.

10       Q      I want to just ask a couple of clean-up

11   questions about the Apex program.

12              Under the Apex program, the providers are

13   encouraged to increase the number of school

14   partnerships that they participate in?

15       A      Uh-huh.

16       Q      And approval from DBHDD is only required

17   if it will result in additional seed funding?

18       A      Right.

19       Q      And how is the amount of seed funding

20   determined for a CSB participating in Apex?

21       A      I don't know the formula that is used

22   now.  Historically, we had a kind of equal --

23   historically, meaning in the beginning days, when I

24   was more actively involved in this part of the work.

25   There was just kind an equal split across the



1   providers.  Over time it became adjusted depending on

2   volume, depending on the actual draw-down of the

3   funds.  So we right-sized just based on utilization.

4           So I don't know what the current funding

5   approach is, so I can't speak to that at that level

6   of detail.  But it evolved over time.

7       Q    And there are also criteria for selection

8   of schools for partnerships, right?

9       A    As far as I can recall.  I don't remember

10  what the criteria is.

11      Q    Do you remember that it included Title I

12  status of students in the school, attendance data and

13  College and Career Readiness Performance Index?

14      A    If you say it does.  I don't recall

15  specifically and I don't have anything in front of me

16  to reference back to.

17      Q    And one aspect of the Apex program is the

18  collection of data, right?

19      A    That is a component, yes.

20      Q    And schools are required to file --

21  excuse me.

22          CSBs are required to file monthly

23  progress reports?

24      A    As far as I know -- I don't know what the

25  requirement is as of today, but, historically, they



1  provided -- the provider, because it doesn't have to

2  be a CSB -- whoever got the award provided

3  programmatic reports.

4       Q     And what was the function of those

5  reports?

6       A     Do you mean what is the purpose of the

7  report?

8       Q     Yeah.

9       A     Oh.  It's to collect data, so we knew

10  what was happening.  So it's a data collection

11  mechanism.

12       Q     And the data collection mechanism is

13  intended to allow review of the services whether --

14  service utilization?

15       A     So a genere review so we knew -- so we'd

16  have data about the program.

17       Q     So the values and principles guiding

18  DBHDD, in light of the things we've talked about, the

19  enabling legislation, the promulgated standards, the

20  Apex contract and, in particular, the deliverables

21  annex, and the -- the values expressed in the Mental

22  Health -- Community Mental Health Block Grant, really

23  established the services that guide DBHDD in the

24  selection of services for children with serious

25  mental illness?



```
1                    MS. JOHNSON:  Object to form.

2                    THE WITNESS:  Yes, and the Medicaid

3          state plan and whatever other --

4    BY MS. COHEN:

5          Q     And -- yeah.

6          A     Yeah.

7          Q     And DBHDD seeks to provide services that

8    are person-centered, family-centered and

9    child-centered?

10         A     Correct.

11         Q     And DBHDD seeks, although it doesn't

12   always succeed, in establishing a single point of

13   entry for families?

14                   MS. JOHNSON:  Object to form.

15                   THE WITNESS:  We talked about that

16         earlier, and I still don't quite

17         understand what the intent of that

18         language is.

19   BY MS. COHEN:

20         Q     Let me try it a different way.

21         A     Uh-huh.

22         Q     The Apex program reflects DBHDD's values

23   that school-based mental health services should

24   provide ease of access for children and families

25   struggling with serious mental illness?
```



1        A        That is a goal, yes.

2        Q        And one of the goals also is that

3    services have to be evidence-based, right?

4        A        Yes.

5        Q        And also a goal is that it should be

6    provided in the student's home school?

7        A        Correct.

8        Q        With a system -- and it should be

9    provided with a system of multitiered supports?

10       A        Correct.

11       Q        Now, you talked a little bit about your

12   familiarity with GNETS from the time that you were

13   offering to provide services on behalf of the Cobb

14   Douglas CSB.  I'm going to ask you now about the time

15   when you were either director of the behavioral

16   services division or interim commissioner at DBHDD.

17                Did you ever visit a GNETS program during

18   that time?

19       A        No.

20       Q        Why not?

21       A        I didn't have a reason to.

22       Q        GNETS --

23       A        As the, like, behavioral health director

24   or the interim commissioner?

25       Q        Yeah.



1        A      No, I didn't have a reason to do that.

2        Q      Well, GNETS is a provider of behavioral

3   health services?

4        A      I don't -- I did not visit every type of

5   provider.

6        Q      Do you view GNETS as a provider of

7   behavioral health services or do you not have enough

8   knowledge to say?

9        A      We don't have authority or contracts with

10  or, like, oversight of GNETS programs.  So it would

11  not be a part of my normal duty to have to do that.

12  We have a network of providers that we managed at --

13  we being when I was at DBHDD.  So we had a robust

14  provider -- I had my own providers.  So -- that, I

15  mean --

16       Q      Was it your practice to visit those

17  providers?

18       A      Yes.

19       Q      And to supervise their work?

20              MS. JOHNSON:  Object to form.

21              THE WITNESS:  We -- we do not

22          provide direct supervision of the work of

23          providers.  We manage a network of

24          providers through contracts, provider

25          agreements, audits.



```
1    BY MS. COHEN:

2         Q     Manuals?

3         A     Reviews.  Exactly.

4         Q     Got it.  And do you know whether GNETS

5    offers person-centered behavioral health services?

6         A     I do not know.

7         Q     Do you know whether GNETS uses

8    evidence-based practices to provide behavioral health

9    services?

10        A     I don't know.

11        Q     Do you know whether GNETS students

12   receive behavioral health services from CSBs?

13        A     It is possible that you can be a GNETS --

14   in a GNETS school and have a provider in the

15   community that could be a CSB or another type of

16   provider.

17        Q     And what steps does the department take

18   to ensure that there is ease of access for GNETS

19   students to those providers?

20             MS. JOHNSON:  Object to form.

21             THE WITNESS:  So all people are

22        treated -- we want every kid to have the

23        same level of access.  So we don't create

24        special or different lanes.  So we expect

25        that, regardless of what your school
```



1          situation is -- so our approach is what

2          is your need and what is -- how can we

3          treat you and what is the help you need

4          in our system.  And so it does -- what

5          school you go to is not a predetermining

6          factor around getting access to services

7          in the community or outside of the

8          school.

9    BY MS. COHEN:

10         Q    Let me be more specific.

11              MS. COHEN:  And I'm going to take

12         off my jacket, if no one minds, because

13         it is a little warm in here.

14              THE WITNESS:  It is hot.  It's hot.

15              MS. COHEN:  I don't know if you can

16         cool it down in here.

17              MS. JOHNSON:  I'll text our office

18         manager.

19   BY MS. COHEN:

20         Q    The department does not provide

21   transportation for children and families to services,

22   with the exception of school-based mental health

23   services where no transportation is required as

24   provided on site?

25         A    The department contracts with providers.



1  Providers -- for behavioral health.  Providers can

2  provide transportation services.

3       Q    But that -- that would be another hurdle

4  for children and families in terms of getting to

5  services?

6       A    Medicaid has a -- there is a Medicaid

7  transportation option that is managed, actually,

8  through the Department of Human Services.  But there

9  is a transportation system, if you are a Medicaid

10 recipient, for example, that you can access for

11 transportation purposes.  And some providers also

12 offer transportation.  They may have vans, they may

13 have different transportation resources that

14 sometimes are offered.

15      Q    My question was whether the need to be

16 transported away from school to obtain mental health

17 services is another hurdle for children and families?

18           MS. JOHNSON:  Object to form.

19           THE WITNESS:  Okay, I heard it

20      completely different.

21           I -- I don't know the best answer

22      to that.  You don't have to -- it depends

23      on what service we're talking about.  So

24      if you're talking about going to a

25      psychiatrist for -- like that's a medical



1          doctor, for meds, then you are probably

2          going to likely do that in a clinic or if

3          you're going to see a nurse.  So it's

4          just a broad question, so it depends on

5          the service.

6   BY MS. COHEN:

7          Q    But isn't the purpose of Apex to avoid

8   presenting the hurdle of transportation for services

9   that can be provided under Medicaid in the schools?

10         A    So if you're talking specifically about

11  Apex, then yes.

12         Q    And let's leave that there for now.

13              Okay.  So in terms of the coordination

14  between DBHDD and GaDOE -- if I say GaDOE, you know

15  what I'm referring to?

16         A    Uh-huh.

17         Q    Are there various -- I think you talked

18  about different kinds of collaboration.  Are there

19  different levels of coordination?

20              MS. JOHNSON:  Object to form.

21              THE WITNESS:  So I think I

22          referenced earlier that we -- that --

23          that we collaborate, communicate,

24          coordinate in several ways with DOE, and

25          that we have a shared position, kind of



1        as a result of that, to improve or

2        further enhance that relationship.  So

3        they're our primary partner with the

4        department, a key partner.

5   BY MS. COHEN:

6        Q     And at the commissioner level, who is the

7   collaborator between the two agencies?

8             MS. JOHNSON:  Object to form.

9             THE WITNESS:  That would be the

10       Behavioral Health Coordinating Council.

11       That's what that is in place for.  I

12       believe -- you can -- you'll have to

13       double check.  I believe it requires the

14       superintendent or a delegate of the

15       superintendent to be on the BHCC.

16       Q     And it also requires the commissioner of

17  DBHDD?

18       A     Of course.

19       Q     How frequently does the BHCC meet?

20       A     I think it's quarterly.  I'm not 100

21  percent sure.  I don't work there anymore.

22       Q     And who is commissioner for -- I'm glad

23  we're catching you so close in time to when you left

24  the agency because I have a feeling, at deposition a

25  year from now, when you're fully wrapped up in the



1    988 system, it would be very different.

2         A     I agree.

3         Q     But how often does Commissioner

4    Fitzgerald attend BHCC meetings?

5              MS. JOHNSON:  Object to form.

6              THE WITNESS:  To my knowledge, the

7         majority of them.  I don't have a record

8         of her attendance, but -- I don't -- I

9         mean, the majority, if not all of them.

10   BY MS. COHEN:

11        Q     Is her GaDOE peer Superintendent Woods?

12        A     I don't know who the superintendent is at

13   this time or was at that time.  I don't know if they

14   even participated.  They were required, but I don't

15   know if they participated regularly.

16        Q     Do you have some doubt as to they

17   participated regularly?

18             MS. JOHNSON:  Object to form.

19             THE WITNESS:  I think you'd have to

20        look back at the attendance record to

21        see, but I think they're -- I am not

22        sure.  I don't know how often they

23        attended for sure.

24   BY MS. COHEN:

25        Q     And how often did Commissioner Fitzgerald



 1  meet directly with the superintendent of DOE, whether
 2  Mr. Woods or someone else?
 3          MS. JOHNSON:  Object to form.
 4          THE WITNESS:  I don't know.
 5  BY MS. COHEN:
 6      Q    Do you recall any meetings?
 7      A    I wouldn't have -- I wouldn't have that
 8  type of information to know.
 9      Q    Well, you would know -- I mean, you might
10  get a request from the commissioner to help her
11  prepare for such a meeting?
12          MS. JOHNSON:  Object to form.
13          THE WITNESS:  Not necessarily.
14  BY MS. COHEN:
15      Q    Whether necessarily or not, you might
16  from time to time get such a request?
17          MS. JOHNSON:  Object to form.
18          THE WITNESS:  Maybe, sometimes.
19      But I don't have a -- I don't have enough
20      information to say how often she met with
21      the superintendent.
22  BY MS. COHEN:
23      Q    Understood.  Let me try a different way.
24          Do you have a recollection of her ever
25  meeting with Superintendent Woods?



MONICA JOHNSON                                          March 02, 2023
UNITED STATES vs STATE OF GEORGIA                              173

1          A     I don't know if she met with him or not.

2          Q     Yeah, I know, I'm not asking that

3     question now.  Now I'm just asking about your

4     recollection.

5          A     So then, no, I just don't know.

6          Q     You don't know.  You don't have any

7     recollection of it?

8          A     I do not know her meeting schedule with

9     Superintendent Woods.

10         Q     No, I'm asking a different question,

11    which is not whether you know their meeting schedule,

12    but whether you can recall a time when they met.

13         A     I do not.

14               MS. JOHNSON:  Object to form.

15               THE WITNESS:  No.

16    BY MS. COHEN:

17         Q     You do not recall?

18         A     I do not have that information.  I don't

19    recall.  I don't know.

20         Q     How about at the director level, who was

21    your organizational peer at the Department of

22    Education?

23               MS. JOHNSON:  Object to form.

24               THE WITNESS:  I don't remember who.

25         Most of my interactions were -- would



1          have been through the IDT.  That was the

2          whole point of it, to have those regular

3          contacts and communication.  People have

4          changed over the years.  I do not know

5          who.

6                  Every time I've met with someone,

7          the most consistent person for me, during

8          my time, would have been Gary McGiboney.

9          In my more previous roles, I did not just

10         supervise child and adolescent services.

11         So, to be clear, I had a very big book of

12         business.  So there -- just because I

13         wasn't meeting didn't mean that Dante

14         wasn't meeting or whoever the director

15         for children services was not meeting.

16   BY MS. COHEN:

17         Q     Now, there came a point in time when

18   Mr. McGiboney left the agency?

19         A     Correct.

20         Q     And who was your peer contact after that?

21         A     I don't know, because I don't know their

22   org structure.  And so their structure changed over

23   time and people changed over time.  So I didn't have

24   any reason to reach out to them.

25                  Dante -- if I needed something or needed



MONICA JOHNSON                                    March 02, 2023
UNITED STATES vs STATE OF GEORGIA                          175

1  to know something about the Department of Education,

2  I could resolve that by asking Dante to look into X,

3  Y and Z.

4         Q     That would have been your practice after

5  Mr. McGiboney left?

6         A     Yes.  Or, if unless something escalated

7  to a point that I needed to intervene.  I don't

8  recall anything escalating to a point where I needed

9  to intervene over Dante, per se.

10        Q     Did you approach them about the RIATs?

11        A     No.  That was not me.

12        Q     How about the braiding and blending

13 issues?

14        A     These are conversations that were had

15 in -- the conversations that I recall were had in the

16 setting of the IDT, related to that.

17        Q     Did the Department of Education

18 participate actively in the IDT?

19        A     They did.

20        Q     Who was the participant?

21        A     Rebecca Blanton was the participant for a

22 while.  We already referenced another person that was

23 listed in a previous document.  I'm not that familiar

24 with her.  There were others over time, I believe,

25 from DOE.  I just don't remember.  They usually sent



1   more than one person.  And that person sometimes

2   changed, so I don't recall.

3        Q     You don't have any memory?

4        A     What I just said is what I remember.

5        Q     Yeah.  And how about at the OCYF level,

6   who were the -- what were the -- what was the

7   counterpart collaboration?

8        A     That would be a question for Dante.

9        Q     You don't know?

10       A     I wouldn't need to know.

11       Q     I'm not asking whether you need to know.

12  I just want to know what you recall.

13       A     Yeah.  I'm not sure -- Dante communicated

14  with multiple people on the DOE side.  It depends on

15  what he needed to communicate about.  So I just don't

16  know the list of who those people were.

17       Q     Did Dante communicate with respect to

18  Apex?

19            MS. JOHNSON:  Object to form.

20  BY MS. COHEN:

21       Q     With a DOE peer?

22       A     We have a shared position that we've

23  identified earlier was Layla Fitzgerald.  So there

24  was communication that was happening, because Layla

25  was over Apex and would interface with DOE.  And, I'm



MONICA JOHNSON                                    March 02, 2023
UNITED STATES vs STATE OF GEORGIA                            177

1   sorry, let me correct that.

2          I can't recall right now if Layla is the

3   one that's in the shared DOE, DBHDD role.  I combined

4   it and just said, just now, that it was Apex and the

5   combined role and I'm not clear about who is in that

6   combined role.

7      Q    Is it your understanding that the

8   children who are in the GNETS program have severe

9   emotional disorders?

10     A    Yes.

11     Q    Okay.  And who from DBHDD communicated

12  with DOE at Dante's level with regard to the

13  provision of services for those individuals?

14         MS. JOHNSON:  Object to form.

15         THE WITNESS:  I don't know, because

16     I'm not quite sure I'm following the

17     question.

18  BY MS. COHEN:

19     Q    Okay.  What do you find ambiguous about

20  the question?

21     A    Because DBHDD does not provide the

22  construct for GNETS.  So just because an individual

23  is in GNETS and has a severe -- a serious emotional

24  disorder, our path is, if they need access to

25  treatment -- our responsibility is, if they need



 1  access to treatment, do we have the network, do we

 2  have the services, et cetera.

 3          We don't provide the content of the

 4  psychological services for the GNETS program.  So

 5  that's what is stumping me right now.  The way the

 6  question was worded sounded like that.

 7      Q     Did DBHDD -- I understand what you're

 8  saying.

 9          Did DBHDD assess in any way the services

10  that GNETS provided?  GNETS stands for Georgia

11  Network of Educational and Therapeutic Supports?

12      A     Correct.

13      Q     Did DBHDD take any steps to access the

14  behavioral health services that GNETS provided within

15  the GNETS program?

16      A     It's not within our scope, so no.

17      Q     No.  Okay.  Now --

18      A     We wouldn't have the authority to do

19  that.

20      Q     Why not?

21      A     That's under the Department of Education.

22  We cannot -- we're a separate governmental entity.

23  We cannot go in and say we're going to assess your

24  system.  That's -- we don't have any authority to do

25  that.



1        Q     You don't consider the enabling

2    legislation which requires you to monitor the quality

3    of all behavioral health services to require you to

4    do that?

5             MS. JOHNSON:  Object to form.

6             THE WITNESS:  No.

7    BY MS. COHEN:

8        Q     Okay.  So do you recall a time in 2018 or

9    2019 when Superintendent Woods sought to schedule a

10   meeting with you and others at DBHDD to discuss

11   collaboration between GNETS and Apex?

12       A     You're reading something so I'm assuming

13   that that has happened, but I don't recall what date

14   or any of that in this moment.

15       Q     Does it refresh your recollection if I

16   say that either you or Commissioner Fitzgerald asked

17   Mr. McKay to prepare information regarding existing

18   collaborations between GNETS and Apex?

19       A     That could have happened.  It doesn't

20   sound unusual.  We had some meetings with DOE.  I

21   don't know at the request of who.  There were

22   conversations about the GNETS programs early on, so

23   some years ago.  There was a staff person that was

24   eventually kind of sort of working between the two

25   entities around GNETS.



MONICA JOHNSON                                    March 02, 2023
UNITED STATES vs STATE OF GEORGIA                           180

1              And so there were meetings between the

2     two agencies to talk about GNETS, but probably as a

3     result of all of this, but this was some years ago.

4         Q    So do you have any recollection of

5     Mr. McKay being asked to research and prepare

6     information regarding collaboration between GNETS and

7     Apex?

8         A    I don't have direct recollection of that

9     specific thing, no.

10        Q    Do you recall that, after Dante had

11    researched the issue, he found that, except in

12    isolated instances, there were no collaborations

13    between GNETS and Apex?

14        A    Am I surprised or do I remember?  What

15    was the question?

16        Q    Do you remember?

17        A    I don't remember, but I also said earlier

18    my example of my own experience of being in Cobb and

19    working with -- trying to work with a GNETS program

20    and what happened.  So I'm not surprised that's what

21    he found, but I don't remember specifically us having

22    that conversation, but it's very highly possible.

23        Q    Did a meeting with Superintendent Wood to

24    discuss the Apex GNETS collaboration ever take place?

25             MS. JOHNSON:  Object to form.



1              THE WITNESS:  I don't recall ever

2         being in a meeting with Superintendent

3         Wood.

4    BY MS. COHEN:

5         Q     And when Dante made presentations to DOE,

6    you reviewed them; isn't that right?

7              MS. JOHNSON:  Object to form.

8              THE WITNESS:  For the most part.

9         Not always.

10   BY MS. COHEN:

11        Q     Well, do you recall ever reviewing a

12   presentation by Mr. McKay for the benefit of the

13   Department of Education with respect to GNETS?

14        A     I don't recall.

15        Q     Are there any structural impediments to a

16   collaboration between GNETS and Apex?

17              MS. JOHNSON:  Object to form.

18              THE WITNESS:  No.  I mean, all that

19         would have to happen is -- right now I

20         believe, in policy, GNETS is not in the

21         Apex.  Like if you're a GNETS, you don't

22         go to Apex.  But that was not a DBHDD

23         driver.  That was from earlier -- and I'm

24         repeating myself.  That was the earlier

25         position of the Department of Education



1          that there was duplication of services

2          there.

3                 But that doesn't exclude someone

4          there from getting services in the DBHDD

5          network.  Those are two different things.

6          I just wanted to be clear about that.

7    BY MS. COHEN:

8          Q    Understood.  So there was actually, as

9    you've just referenced, a policy by which DBHDD did

10   not provide services to GNETS standalone centers?

11               MS. JOHNSON:  Object to form.

12   BY MS. COHEN:

13         Q    Is that right?

14         A    Yes, from what I can recall, and the

15   reason for that is not because DBHDD excluded GNETS.

16         Q    Well, let's -- let me just mark that so

17   that we have something concrete to talk about.

18               MS. COHEN:  Actually, I need a

19          stapler for this one.  Actually I'll just

20          dog ear the page.

21               MS. JOHNSON:  I can go get one on

22          our next break if you want.

23               MS. COHEN:  Great.  Thank you.  Let

24          me see if I have any extras, but it's on

25          the internet.



1              MS. JOHNSON:  What's the title we

2         can look up?

3              MS. COHEN:  Apex 3.0 Frequently

4         Asked Questions, downloaded from the

5         DBHDD website, and we're going to mark

6         this as Exhibit 948.

7              (Plaintiff's (Johnson) Deposition

8         Exhibit No. 948 was marked for the

9         record.)

10   BY MS. COHEN:

11         Q    Are you familiar with these --

12         A    Relatively.

13         Q    -- Ms. Johnson?

14         A    Relatively.

15         Q    This is -- these questions have gone

16   through some iterations; isn't that right?

17         A    Yes.

18         Q    Prior to this time, there was Apex 2.0

19   Frequently Asked Questions?

20         A    Correct.

21         Q    And before that, there was an Apex

22   Frequently Asked Question?

23         A    I don't remember how many versions of

24   FAQs there was for this service.

25         Q    And the purpose of these FAQs was what?



1              MS. JOHNSON:  Object to form.

2              THE WITNESS:  To communicate.

3    BY MS. COHEN:

4        Q    To communicate to the public what

5    services were available under the Apex program?

6        A    To answer questions most commonly asked

7    about the program.

8        Q    Now, one of the questions is, in which

9    type of schools can Apex services be implemented.  I

10   believe it's on the second page of Exhibit 948.  And

11   I'm sorry I didn't staple it.

12              And it says:  Apex therapists, clinicians

13   and behavioral health support staff are embedded

14   within public schools and public charter schools,

15   pre-kindergarten to 12th grade.  They also help with

16   life skills development and other non-therapeutic

17   activities.  Apex services cannot be provided in

18   private charter schools, GNETS standalone facilities,

19   private schools or home-schooled cyber public

20   schools.

21              Was that a policy of DBHDD from the time

22   that Apex was rolled out, that it would not provide

23   services in GNETS standalone centers?

24              MS. JOHNSON:  Object to form.

25              THE WITNESS:  I don't recall.



1  BY MS. COHEN:

2          Q     But it has been a policy for many years?

3                MS. JOHNSON:  Object to form.

4                THE WITNESS:  Correct.

5  BY MS. COHEN:

6          Q     And what is the reason for that?

7          A     I don't -- I don't recall.  I mean, other

8  than what I've already said several times, of the

9  position from the way I understood, it feels like

10  it's a question for Georgia Department of Education.

11         Q     So who prepared the answer?

12         A     I don't -- I don't recall.

13         Q     But, in your view, it correctly states

14  DBHDD policy?

15                MS. JOHNSON:  Object to form.

16                THE WITNESS:  Correct.

17  BY MS. COHEN:

18         Q     Has DOE ever asked you about this policy?

19                MS. JOHNSON:  Object to form.

20                THE WITNESS:  No.

21  BY MS. COHEN:

22         Q     Have you ever discussed it with anyone?

23         A     No.  I mean, have I discussed this

24  policy, that specific question or --

25         Q     Yes.



1        A       There probably has been internal

2   conversation, like with the CNA director, but I don't

3   have specific recollections of this being a -- an

4   issue of, like, big concern.  Because, like I said, I

5   came from the community and I understood why GNETS,

6   at a local level, said no thank you.  So it didn't

7   feel unusual to me.

8        Q       So, Ms. Johnson, is it your testimony

9   that you just don't know how this got into the FAQs

10  on the website?

11       A       My testimony is that I don't recall what

12  led up to.  So what conversations led up to this.

13       Q       Thank you.  Now, was one of the

14  reasons -- let me see if this can refresh your

15  recollection.

16               Was one of the reasons that Apex did not

17  provide services in GNETS standalone centers because

18  OCYF believed that a GNETS standalone center could

19  not form an effective partnership with Apex?

20       A       I don't -- I don't know.

21       Q       Were any issues ever raised by a GNETS

22  program about not wanting to have a BHT -- behavioral

23  health team embedded in the school?

24       A       I don't know.

25       Q       So during the period that you were the



1   director of the division of behavioral health

2   services and when you were interim commissioner, did

3   you take any -- you or your staff take any steps to

4   foster cooperation between Apex and GNETS?

5              MS. JOHNSON:   Object to form.

6              THE WITNESS:   I do -- I did not,

7         but that does not mean that the staff in

8         the office did not.   I don't have any --

9         I did not have any direct involvement in

10        conversations about that.

11  BY MS. COHEN:

12        Q     And you're not aware of any conversations

13  that your staff had?

14        A     No, not that I can cite specifically.

15        Q     I already asked you whether you thought

16  the services were duplicative, and you said you

17  didn't have a basis because you didn't know what

18  GNETS services are.

19        A     I said mostly that I don't -- I've not

20  worked in a GNETS program, so I only could go by my

21  understanding of what they say they provided at the

22  time when I worked in the community and approached

23  them.

24              They -- again, they're known as -- I know

25  that they are called GNETS, but the older terminology



1  was psychoeducational centers.  And so they were

2  promulgated to be alternative school settings that

3  also provided therapeutic psychological supports.  So

4  it makes sense to me, if the school says -- if the

5  school system says, well, we don't feel like we need

6  it in GNETS, that wouldn't make -- give me pause.

7  Nor has it escalated to -- to be an issue.  So it's

8  never been escalated to where I would need to come in

9  and say, wait, why is this not happening.  I

10 understood why they probably were saying, you know,

11 that they didn't feel like that was necessary.

12      Q    In your judgment, would it be a benefit

13 to the GNETS students with severe emotional

14 disturbance to receive Apex services?

15           MS. JOHNSON:  Object to form.

16           THE WITNESS:  I don't see an issue

17      with changing policy to allow GNETS

18      schools to be included.

19 BY MS. COHEN:

20      Q    What are the eligibility criteria for

21 GNETS?

22      A    I don't work -- I don't know.  I don't

23 work in the school system.  I don't know.

24      Q    Is it a fair summary to say that GNETS

25 services -- [audio disturbance].  Excuse me.



1           I'm going to read now from the GNETS

2    rule.  And it says:  GNETS services aim to support

3    students with social, emotional and/or behavioral

4    challenges.  These students' behaviors may include,

5    but are not limited to, significant, aggressive,

6    self-destructive, atypical and withdrawal behaviors.

7           Is that your understanding of who's in

8    GNETS?

9           MS. JOHNSON:  Object to form.

10          THE WITNESS:  From what I

11      understand about GNETS programs, that

12      sounds like an adequate description of

13      the type of student I would have thought

14      would have been in the program.

15   BY MS. COHEN:

16      Q    Now, the rule also says, the GNETS rule,

17   quote:  GNETS staff will collaborate with

18   professionals from a variety of agencies to enhance

19   students' social, emotional, behavioral and academic

20   development based on their IEPs, closed quote.

21          What agencies did GNETS collaborate with?

22          MS. JOHNSON:  Object to form.

23          THE WITNESS:  I don't know.  I

24      don't oversee -- I've never overseen

25      GNETS programs or worked in one.



1   BY MS. COHEN:

2        Q     So you talked about the Apex services is

3   funded partially through Medicaid or other public

4   insurance mechanisms.

5        A     For billable services.

6        Q     That's the portion, then --

7        A     Uh-huh.

8        Q     -- that's funded.  And that results in a

9   cost savings to the State; isn't that right?

10       A     I don't know that to be true.

11       Q     Well, the Federal government picks up a

12  share of Medicaid; isn't that right?

13       A     Yes, but I don't have any data to say if

14  it's a cost savings or not.  It may or may not be.

15       Q     Do you know what the share is in Georgia

16  that the Federal government picks up?

17       A     No, I don't recall.

18       Q     If I say 65 percent, does that refresh

19  your recollection?

20       A     That sounds -- that sounds accurate.  I'm

21  not 100 percent sure.

22       Q     Now, with respect to the services that

23  are provided in GNETS, is there a failure to realize

24  the cost savings because they're not billing services

25  to Medicaid?



1              MS. JOHNSON:  Object to form.

2              THE WITNESS:  I don't -- I don't

3        know.

4    BY MS. COHEN:

5        Q    You don't know?

6        A    I don't feel like I'm in a position to

7    speak to that.

8        Q    How are GNETS services funded?

9              MS. JOHNSON:  Object to form.

10              THE WITNESS:  I do not know.  I

11        don't work in GNETS and I don't have

12        oversight of their budget.

13    BY MS. COHEN:

14        Q    Have you seen the State budget

15    appropriations committee -- State appropriations

16    committee budget?

17        A    No, when the State appropriations come

18    out, I look for DBHDD budget line items to see what

19    I'll be responsible for.

20        Q    You don't look at the GNETS allocation?

21        A    I have not had a reason to do that.  I'm

22    busy enough with the DBHDD.

23        Q    Have you ever heard that, in some prior

24    years, it's reached as high as $70 million?

25        A    I have not heard that.



MONICA JOHNSON                                    March 02, 2023
UNITED STATES vs STATE OF GEORGIA                         192

1      Q     Have you heard that this year the

2   proposed allocation is $55 million?

3      A     I have not heard that.

4      Q     So you -- you don't have any idea of the

5   magnitude of the GNETS funding?

6      A     I have no idea.  It is not my scope of

7   responsibility, never has been.

8      Q     No.  My question is not whether it's your

9   responsibility but just are you aware.

10     A     No.  I have a lot -- I had a lot of

11  budget responsibility and so I had my own things I

12  had to do.  So, no, I did not also go look at the DOE

13  line or the GNETS line.

14     Q     Do you know that there's a specific

15  legislative allocation for GNETS?

16     A     No.

17     Q     That it's not -- okay.  Now I'm going to

18  ask you about some e-mail.

19           MS. COHEN:  Why don't we take a

20        short break and then we can get into the

21        e-mail.

22           THE VIDEOGRAPHER:  The time is

23        3:20 p.m., and we are off the record.

24              (Brief pause.)

25           THE VIDEOGRAPHER:  The time is



```
 1              3:35 p.m., and we are back on the record.
 2                   (Plaintiff's (Johnson) Deposition
 3              Exhibit No. 949 was marked for the
 4              record.)
 5  BY MS. COHEN:
 6         Q    Okay.  Ms. Johnson, I'm going to put in
 7  front of you Exhibit -- what I've stickered as
 8  Exhibit 949.  I think I have copies for both Melanie
 9  and Monica Patel, as well.  And this document is an
10  e-mail from Monica Johnson to Judy Fitzgerald dated
11  June 19th, 2019, and the production number is
12  GA00142381.  I'll give you the stickered copy.
13              Now, I identified this for the record as
14  one e-mail, but it's really two e-mails, I believe.
15  Is that your understanding?
16         A    I'm reading it now.
17         Q    Take your time and just tell me when
18  you're ready.
19         A    Okay.  Now, what did you ask me?
20         Q    My question was does this appear to you
21  to be two e-mails?
22         A    Yes.
23         Q    What are the two different e-mails?
24         A    One e-mail is from Judy to Dante, and she
25  copied me, I'm assuming, because I responded to her.
```



1    Q    You didn't receive it from Dante?

2    A    I don't know.  I'm looking at what I'm

3  reading here, and so the way it looks like is that I

4  must have been copied.  It could -- it could have --

5  either way, it came to me.  So either he forwarded it

6  to me or she copied.  It feels more likely that she

7  would have copied me, because he reported to me, and

8  that would have been her style, in most cases.  Not

9  100 percent, but most cases she would copy me.

10        But, yeah, I'm -- I understand what's

11  written here.

12    Q    The bottom e-mail is an e-mail dated May

13  28th, 2019 from Judy Fitzgerald to Dante?

14    A    That's what it says on the paperwork.

15    Q    And is that what you believe?

16    A    I'm sorry.  Was there a question?

17    Q    Yeah.

18    A    Oh, I'm sorry.

19    Q    Is that what you believe that the bottom

20  e-mail is an e-mail that Judy Fitzgerald sent to

21  Dante McKay in May 2019?

22    A    Yes.  I thought as I said yes.  Sorry.

23    Q    And the top e-mail is an e-mail that you

24  sent to Judy Fitzgerald in June of 2019?

25    A    According to the paper, yes.



1      Q     Now, your e-mail says -- well, according

2  to the paper, do you also believe that that's

3  accurate?

4      A     I only know it's accurate because it's on

5  the paper.  I obviously have no --

6      Q     You have no reason to question it?

7      A     Right.

8      Q     Now, the top e-mail says:  Okay.  Adding

9  this to my now really long supervision list for our

10  meeting.

11         Did you have supervision meetings with

12  Superintendent Fitzgerald?

13      A     With Commissioner Fitzgerald?

14      Q     Commissioner Fitzgerald, yes.

15      A     Yes.

16      Q     Thank you.  And did you also have

17  supervision meetings with Mr. McKay?

18      A     Yes.

19      Q     So when you say, okay, adding this, are

20  you referring to the concerns expressed by

21  Commissioner Fitzgerald in her e-mail to Dante?

22         MS. JOHNSON:  Object to form.

23         THE WITNESS:  Yes, according to

24      this e-mail that I'm looking at, I'm

25      talking about what she wrote.



1    BY MS. COHEN:

2        Q    And you say:  I'll be keenly interested

3    in the context behind what triggered this e-mail.

4        A    Okay.

5        Q    So you were interested in what had been

6    on Judy's mind when she wrote the e-mail?

7        A    It was obvious that something triggered

8    it, and so I wanted to know what triggered it.

9        Q    And did you ever find out?

10       A    Yes.

11       Q    What was it?

12       A    It was more about relationship

13   challenges.  So it was in interpersonal stuff between

14   the people that are identified here.  So Garry

15   McGiboney and Dante and Tom Rawlings and Dante.  So

16   it was interpersonal.  It was perceptions about what

17   they thought we did or didn't do, et cetera.

18       Q    They thought that Dante had done or not

19   done something?

20           MS. JOHNSON:  Object to form.

21           THE WITNESS:  I'm -- I think it

22       was -- from what I recall, these two

23       individuals had strong opinions about

24       things and it -- this -- looking at it,

25       I'm reminded that I believe that there --



1          they had strong opinions and they voiced

2          them sometimes in ways which could

3          feel -- could make you feel -- could put

4          you back on your heels.

5    BY MS. COHEN:

6          Q     Make you feel defensive?

7          A     Yes, is one way to describe it.  And so

8    Judy was encouraging Dante to help -- be proactive in

9    dealing with those relationships.  These -- this is

10   not an uncommon issue.  So just making sure you're

11   keeping stakeholders in a, you know, cooperative

12   space.

13         Q     Now, did you have a discussion with Dante

14   about it?

15         A     I am positive that we had a discussion

16   about it, I just don't remember when the discussion

17   was.  I do remember coaching him through engagement

18   with both of these individuals.

19         Q     How did it come to Judy's attention?

20               MS. JOHNSON:  Object to form.

21               THE WITNESS:  I don't recall.

22   BY MS. COHEN:

23         Q     Did Mr. McGiboney bring it to her

24   attention?

25               MS. JOHNSON:  Object to form.



1              THE WITNESS:  That is possible.  I
2        don't recall.
3   BY MS. COHEN:
4        Q     What was the thing that Dante had or
5   hadn't done?  Did it relate to Apex?
6        A     It wasn't anything that he had not done.
7        Q     It was something that he did?
8        A     No.  It was, in my opinion, more of
9   interpersonal communication styles and perceptions.
10  Sometimes people are uninformed about what is actual
11  and make assumptions, and so this was kind of rooted
12  in that.  It was not just about Apex, though, but it
13  was just interpersonal stuff.
14       Q     Whatever the interpersonal issue was, it
15  was something that had annoyed both Garry McGiboney
16  and Tom Rawlings?
17            MS. JOHNSON:  Object to form.
18            THE WITNESS:  I cannot speak on
19       behalf of how they felt.
20  BY MS. COHEN:
21       Q     I'm asking you whether that was the
22  report that reached you that had irritated both Tom
23  Rawlings and Garry McGiboney?
24       A     I can't say if they were irritated or
25  not.  It was obviously raised to Commissioner Judy



1  Fitzgerald.  She brought it to my attention or, you

2  know, I was copied or forwarded or whatever.  I know

3  the individuals that we're talking about, also, so I

4  know the personalities.  So.

5      Q    What are the different personalities?

6      A    They have strong personalities.

7      Q    What it says in the e-mail is -- in

8  Commissioner Fitzgerald's e-mail:  It is important

9  that these two gentlemen feel like they have personal

10  knowledge of our Apex plans.

11          So was this an issue of not knowing about

12  certain Apex plans?

13          MS. JOHNSON:  Object to form.

14          THE WITNESS:  All I could say about

15      that is that they have representatives,

16      both of them, that participate on IDT,

17      participate on BACC allegedly.  So them

18      not knowing things did not mean that it

19      was not places that were not

20      communicated.  It was more about people

21      communicating up to them that work in

22      their agencies.

23          So this was a common communication

24      issue, with DOE, with DFACs.  There's

25      multiple people that participate in



1         certain meetings, but those -- the

2         information not being carried up.

3    BY MS. COHEN:

4         Q    Ms. Johnson I think you're giving me your

5    take on what was going on here.

6         A    I guess --

7         Q    But I really just want to find out first

8    what the facts were.  So my question to you was --

9    sorry, this is moving on me.

10             My question was, what it says in the

11   e-mail is -- in Commissioner Fitzgerald's e-mail is:

12   It's important that these two gentlemen feel like

13   they have personal knowledge of our Apex plans.

14             So was it an issue of not knowing about

15   certain Apex plans?

16             MS. JOHNSON:  Object to form.

17             THE WITNESS:  I don't know.

18   BY MS. COHEN:

19        Q    What did you feel should have been

20   communicated to them through the interagency

21   directors team?

22        A    I feel like all the information about

23   Apex was fully visible and I don't know why or how

24   these two people would not know.

25        Q    Did it relate to concerns about areas



1    Apex was serving?

2         A    No.  That's not what came up in my

3    conversation.

4         Q    Did it relate to GNETS, Apex supporting

5    GNETS?

6         A    No.

7         Q    What did it relate to?

8              MS. JOHNSON:  Object to form.

9              THE WITNESS:  I don't remember

10        exactly.  I just know it wasn't those.

11        Like I said, it was more about -- I mean,

12        you just read it, that they were saying

13        they didn't know certain things and

14        wanted visibility.  The information was

15        available.

16   BY MS. COHEN:

17        Q    Without regard to whether the information

18   was available -- which I understand you felt

19   Mr. McKay didn't do anything --

20        A    Correct.

21        Q    -- wrong.

22        A    Correct.

23        Q    But without regard to that, why -- why

24   did these two gentlemen raise that they didn't have

25   personal knowledge of our Apex plans?

```
 1                MS. JOHNSON:  Object to form.
 2                THE WITNESS:  I can only make the
 3         assumption that they weren't getting
 4         information from the people that actually
 5         reported to them and were connected in
 6         the work.
 7   BY MS. COHEN:
 8         Q     What aspect of the plans did they feel
 9   they didn't know about?
10                MS. JOHNSON:  Object to form.
11                THE WITNESS:  I have no idea.
12   BY MS. COHEN:
13         Q     Well, it's a serious matter to elevate it
14   to the commissioner level, isn't it?
15         A     Not from these two individuals.
16         Q     All right.  Did the -- so the concerns --
17   did the concerns relate to funding?
18         A     I don't recall that being an issue.
19                MS. JOHNSON:  Object to form.
20   BY MS. COHEN:
21         Q     Did it relate to perceived feelings that
22   GaDOE -- that DBHDD was not helpful as a partner
23   agency?
24                MS. JOHNSON:  Object to form.
25                THE WITNESS:  I don't know what
```



MONICA JOHNSON                                         March 02, 2023
UNITED STATES vs STATE OF GEORGIA                                203

1         their perception was, about -- I don't

2         know that to be the case.

3   BY MS. COHEN:

4         Q     Well, I'm -- when you spoke to Ms. -- to

5   Commissioner Fitzgerald, she emphasized that it was

6   important to make sure that DOE was informed of the

7   Apex plan?

8              MS. JOHNSON:  Object to form.

9              THE WITNESS:  We already knew that

10        they had been informed of the plans.

11        Just because Garry McGiboney said he

12        didn't know anything, that didn't mean

13        that DOE did not know.

14  BY MS. COHEN:

15        Q     So you felt that this information had

16  been sent to -- had been transmitted in a way that

17  DOE could have access to it?

18        A     Yes.

19        Q     Did anyone say that to Garry McGiboney?

20        A     I -- I don't -- I didn't speak to Garry,

21  so I don't -- I can't say.

22        Q     Garry was an important partner; isn't

23  that right?

24        A     He was an important partner.  His role

25  changed over time.  So, in the beginning, he was more



1   collaborative and more closely connected to the work.

2   Not just Apex, just the work of the children's

3   office, and over time his role changed.  I don't know

4   what all his roles were.

5           He got further and further removed away

6   and wasn't really involved in some of the more -- the

7   things that he used to be involved in.  So he just

8   became further removed.

9       Q    Did he become removed from School Climate

10  issues?

11      A    I'm not sure.  He -- something changed

12  over time.  When I first knew Garry, we worked closer

13  together.  And at that time he was very -- I don't

14  know what his title was, but he was working very --

15  the School Climate was like his thing, and so we

16  worked together a lot.  But then his role changed

17  over time and so did mine, and so we, you know, kind

18  of got further apart in that regard.

19      Q    And what was the -- the importance of the

20  implementation of the First Families Act for DBHDD?

21      A    We were a partner.  We -- that was a --

22  DFACs was the -- child welfare system was the owner

23  of that and we were a partner, a collaborator.

24      Q    Had Dante told Commissioner Fitzgerald

25  that the information that they were seeking had been



1  presented at the IDT?

2          MS. JOHNSON:  Object to form.

3          THE WITNESS:  I don't know what

4      Dante said to the commissioner.  I would

5      have to see if that was an e-mail or

6      something.

7  BY MS. COHEN:

8      Q    Because she says:  Whether or not either

9  of these colleagues are receiving advance updates --

10 I mean -- adequate updates from their IDT

11 representatives or others is not the point at this

12 moment.

13     A    She was -- she was trying to manage the

14 relationships.

15     Q    So she already knew that you and Dante

16 felt that the information had been adequately

17 communicated --

18         MS. JOHNSON:  Object to form.

19 BY MS. COHEN:

20     Q    -- at the time she wrote this e-mail?

21         MS. JOHNSON:  Object to form.

22         THE WITNESS:  Do I still answer?

23         MS. JOHNSON:  Yes.

24         THE WITNESS:  Because I know the

25     individuals here, this is -- this was not



1          like a big shock.  I wanted to know what

2          happened.  I do feel like there was

3          spaces where they should be informed,

4          information was out there.  Mostly in

5          other unrelated dealings with either one

6          of these individuals, particularly Tom

7          Rawlings in this case, the information

8          would be inaccurate.  And when I would

9          research it, I would find that there was

10         either miscommunication other some

11         misunderstanding.  So, I'll say that.

12   BY MS. COHEN:

13       Q    And Judy goes on to say in her e-mail:  I

14   know you will invite their input because I've seen

15   the way you work.

16            She also says that she:  Has full trust

17   in your ability to communicate effectively with both

18   Garry and Tom.

19            Was it Judy's -- Commissioner

20   Fitzgerald's view at the time that Dante was

21   generally responsive to inquiries from fellow

22   agencies?

23            MS. JOHNSON:  Object to form.

24            THE WITNESS:  Yes, and it was my

25         opinion of that, as well.



MONICA JOHNSON                                March 02, 2023
UNITED STATES vs STATE OF GEORGIA                       207

1    BY MS. COHEN:

2         Q     Was Dante wary of responding to certain

3    inquiries from GaDOE relating to GNETS?

4              MS. JOHNSON:  Object to form.

5              THE WITNESS:  Not that I'm aware

6         of.  We've never had that conversation

7         that I can recall.

8    BY MS. COHEN:

9         Q     You mentioned that Layla Fitzgerald has a

10   position as a shared employee.

11        A     I corrected myself.  I don't remember if

12   she's the one in the shared position or someone else.

13   I conflated her being over Apex in the same sentence

14   with the shared position, and I corrected and said

15   I'm not sure if she's the one in the shared position

16   or not.

17        Q     Did you know that Layla Fitzgerald, with

18   regard to the shared position, told the Department of

19   Education that she would not be involved in any way

20   with GNETS?

21             MS. JOHNSON:  Object to form.

22             THE WITNESS:  I have no knowledge

23        of that.

24   BY MS. COHEN:

25        Q     Did Dante tell you that Layla, in her



1  liaison position with the Department of Education,

2  would not be involved in any way with GNETS?

3          MS. JOHNSON:  Object to form.

4          THE WITNESS:  I have not had that

5      conversation with Dante, no.  It would

6      make sense, though, because we already

7      talked about that the policy said GNETS

8      was not a part of the Apex.

9  BY MS. COHEN:

10     Q    So you would have no problem with Layla

11 Fitzgerald telling DOE in the context of a shared

12 liaison position --

13     A    Is she the shared liaison?  Do we know

14 that?  Because I'm not sure.

15     Q    Well, it's not my job or --

16     A    I didn't know if you had something in

17 front of you that knew.

18     Q    I believe that I can represent that Layla

19 was the shared liaison.

20     A    I don't know that Layla is the shared

21 person, but -- okay.  Go back to your question.  I'm

22 sorry.

23     Q    So you would have no problem with -- from

24 DBHDD's point of view, with Ms. Fitzgerald telling

25 DOE that she would not be involved with GNETS?



MONICA JOHNSON                                    March 02, 2023
UNITED STATES vs STATE OF GEORGIA                        209

1              MS. JOHNSON:  Object to form.

2              THE WITNESS:  I would need to know

3         more context of about what was the

4         conversation.  I can't answer that yes or

5         no without context of the full

6         conversation.

7    BY MS. COHEN:

8         Q    Did Dante subsequently follow up with

9    Garry and Tom?

10             MS. JOHNSON:  Object to form.

11             THE WITNESS:  He did.

12   BY MS. COHEN:

13        Q    What was it, the follow up?

14        A    I don't recall if it was an e-mail, if it

15   was a call.  I don't remember what was the method,

16   but we closed the loop.

17        Q    I'm sorry.  I didn't hear the last thing

18   you said.

19        A    We closed the loop on this particular

20   issue.  I'm back at the e-mail.

21        Q    Thank you.  All right.  Let's look at

22   another e-mail.

23             MS. COHEN:  Okay.  We can mark as

24         the next e-mail.  This is an e-mail from

25         Dante McKay to Monica Johnson dated May



```
 1          29th, 2020.  It's actually an e-mail

 2          chain, and it has the production stamp

 3          GA00223643.

 4               (Plaintiff's (Johnson) Deposition

 5          Exhibit No. 950 was marked for the

 6          record.)

 7               MS. COHEN:  Can you two look on and

 8          I'll let Aileen have one?

 9               THE WITNESS:  Okay.

10   BY MS. COHEN:

11       Q    This is an e-mail chain that Dante sent

12   to you on May 29th, 2020?

13       A    Yes, according to the paper in front of

14   me.

15       Q    And we've marked this as Exhibit 949?

16       A    Correct.

17               MS. JOHNSON:  950.

18   BY MS. COHEN:

19       Q    Oh.  950, excuse me.

20       A    Sorry.  I'm tired.

21       Q    I'm putting words in your mouth and it

22   didn't work out.  Okay.

23               Now, the Re line on the e-mail was Apex

24   DOE Data.  Do you see that, the Subject line?

25       A    The Subject line is Grants.gov
```



1    Opportunity?

2         Q     I'm sorry.  Did I give you the wrong

3    e-mail?  May I see your copy of 950 and 949?

4              Okay.  Let's go with 950, then.  Okay.

5    This is an e-mail chain relating to a grant

6    opportunity?

7         A     Uh-huh.

8         Q     And what happened in this e-mail chain,

9    as you understand it?

10        A     Based on the e-mail chain, it looks like

11   the Georgia DOE reached out to the COE.  Wait.  Who

12   reached out to who first?  So it looks like the COE

13   saw a grant opportunity and reached out to --

14   everybody on here is from the school system -- from

15   DOE.  And then DOE, Ashley Harris, looped in Dante

16   and Layla into the conversation.  And so, yeah, I

17   mean, that's what happened.

18        Q     So I guess there are two Ashleys in the

19   e-mail chain, I think.  There's Ashley Harris.  No, I

20   guess only one Ashley Harris.

21             And Ashley Harris is the person at DOE --

22        A     Uh-huh.

23        Q     -- who is responsible for coordinating

24   mental health issues with DBHDD?

25        A     I don't know what her role was.  Her



1  title is here.  I don't know that that was the one

2  thing she did or if she was the point person that

3  was identified.

4       Q    What was her title?

5       A    According to the e-mail, director of

6  whole child supports and strategic partnerships.

7       Q    And what was the nature of the

8  opportunity?

9       A    From this e-mail, there was a grant

10  opportunity for building school-based mental health

11  services.

12       Q    Do you remember receiving this e-mail

13  from Dante?

14       A    No.  I mean, I'm looking at it now, but I

15  don't -- I get thousands of e-mails.  So I don't

16  remember this day reading it.  I'm -- I understand

17  what I'm reading.

18       Q    Do you have any reason to doubt that this

19  is an e-mail chain you received from Dante in May of

20  2020?

21       A    No.

22       Q    Okay.  Now, in -- in the e-mail from an

23  Ann DiGirolamo -- D-I-G-I-R-O-L-A-M-O.  Did I

24  pronounce it right?

25       A    Uh-huh.



1      Q      She is making DOE aware of a grant

2    opportunity for school-based mental health?

3      A      Correct.

4      Q      And saying that COE would love to partner

5    on it?

6      A      Uh-huh.

7      Q      And then in the e-mail above that, which

8    is an e-mail from Ashley Harris to Garry -- to Ann

9    DiGirolamo, Garry McGiboney, Rebecca Blanton, Cheryl

10   Benefield, Lisa McGarrie, Dante McKay and Layla

11   Fitzgerald, she says -- Ashley Harris says:  Good

12   afternoon, everyone.  I hope this e-mail finds

13   everyone well.  I wanted to include both Dante and

14   Layla on this communication as we are working on

15   several projects to establish higher collaboration.

16   I will be shorter, review this opportunity, talk with

17   our leadership and get back to you all as soon as

18   possible.

19           Dante then forwarded this e-mail to you

20   and what he says is:  Progress, dot, dot, dot, I

21   suppose.  COE reached out to DOE and DOE looped us

22   in.

23           That was just an e-mail between you and

24   Dante and didn't involve any of the other

25   individuals?



1        A      Correct.

2        Q      Was it unusual for DOE to send

3    opportunities to DBHDD?

4        A      I don't know.

5        Q      In Mr. McKay's view, was it unusual?

6             MS. JOHNSON:  Object to the form.

7             THE WITNESS:  I can't speak for

8        Dante.  He's -- in this e-mail, he was

9        pointing out that he was happy that DOE

10       looped us in.

11   BY MS. COHEN:

12       Q      He says:  Progress, I suppose.

13            Does that suggest some cynicism on

14   Mr. McKay's part?

15            MS. JOHNSON:  Object to form.

16            THE WITNESS:  If you interpret it

17       that way.  I think he's saying, in my

18       recollection of this at least, DOE is

19       reaching out and including us when we

20       should have been included from the

21       beginning.

22   BY MS. COHEN:

23       Q      And let's mark as the next e-mail Exhibit

24   951.

25            (Plaintiff's (Johnson) Deposition



1           Exhibit No. 951 was marked for the

2       record.)

3   BY MS. COHEN:

4       Q     An e-mail from Mr. McKay to yourself,

5   dated August 15th, 2019.  We'll mark this as 951 and

6   it has the production number GA01461335.

7               Is this an e-mail you received from Dante

8   McKay in August of 2019?

9       A     According to the e-mail, correct.

10      Q     And the Subject of this e-mail is Apex

11  DOE Data Elements of Interest?

12      A     Correct.

13              MS. JOHNSON:  Do you have the first

14      page?

15              MS. COHEN:  You might have to look

16      on with Monica.

17              MS. JOHNSON:  But it is two pages,

18      right?

19  BY MS. COHEN:

20      Q     Up until this time when you received the

21  e-mail --

22      A     Can I have a second?

23      Q     Oh, I'm sorry.  Take your time.

24      A     Okay.  I'm ready.

25      Q     You are.



1        A    Yes.

2        Q    Up until this time, had there been any

3   data sharing between DOE and DBHDD?

4        A    I don't recall.  I think the answer is

5   no.  I don't recall any of that before.

6        Q    What was the nature of the data sharing

7   project that Dante and -- let me ask you this.  Who

8   is Dimple Desai?

9        A    Who is who?

10       Q    Dimple Desai?

11       A    That's not someone that's with us.  I

12  don't know who Dimple is.

13       Q    Did she work for COE?

14       A    I don't know who she is.

15       Q    Well, what --

16       A    Does it have an e-mail address?

17       Q    Research associate.  She has the slug --

18  a signature slug on the bottom e-mail in this chain

19  that identifies her as Dimple Desai, MSW Research

20  Associate II, Center of Excellence for Children's

21  Behavioral Health.

22       A    Am I looking at the same page?

23            MS. PATEL:  Do you also only have

24       one page?

25            THE WITNESS:  Yeah.



1        MS. COHEN:  Do you only have one

2    page?  Melanie, can you give her the

3    extra page.  Yes, there you go.  Which

4    page got stickered?  Is that the second

5    page?  Okay.  Thank you?

6        THE WITNESS:  All right.  So now I

7    need a second.

8        MS. COHEN:  I think we better

9    staple it before anything adverse

10   happens.  Thank you for the staple

11   letter, Melanie.

12       THE WITNESS:  This is the same

13   paper.  Oh, here we go.  Okay, now.

14   Okay.  At least it makes more sense now.

15       I don't know Dimple personally, but

16   according to her tag line she works at --

17   she worked at the COE, the Center of

18   Excellence.

19       MS. COHEN:  May I look at the

20   stamped 951?  I see the problem.  Okay.

21       I'm going to mark as 952 an e-mail

22   from you to Dante on the same subject,

23   the same e-mail chain except for your

24   reply.

25       MS. PATEL:  Should we staple that?



1          Thank you.

2                  MS. COHEN:  Can you pass me the

3          stapler.  I'm going to do some stapling.

4          Thank you.

5                  And was that stickered as 952?

6                  THE WITNESS:  This is 951.

7                  MS. COHEN:  Okay.  Let's sticker

8          the next e-mail as 952.

9                  (Plaintiff's (Johnson) Deposition

10         Exhibit No. 952 was marked for the

11         record.)

12                 THE WITNESS:  Oh, okay.  It's the

13         same e-mail, it's just me saying

14         excellent.  Okay.

15    BY MS. COHEN:

16         Q     I think the one difference between the

17    two e-mails -- I'm going to suggest to you -- is that

18    951 is Dante -- the top e-mail is Dante's e-mail.

19         A     Right.

20         Q     And 952, the top e-mail is your e-mail.

21         A     Yeah, where I just said excellent.  Okay.

22    I got it.  That's the only difference.

23         Q     And I think you testified that, up until

24    the time of this e-mail, there had not been any data

25    sharing with DOE in support of the Apex program?



1          MS. JOHNSON:  Object to form.

2          THE WITNESS:  There had not been

3      any data sharing agreements that I'm

4      aware of -- it's just not usual.  It's

5      not a normal between the two.

6  BY MS. COHEN:

7      Q    Do you have any question in mind?

8          My question is whether, up until that

9  time, there had not been any data sharing with DOE?

10     A    I felt like I answered it no, not that

11  I'm aware of.

12     Q    Now, what -- what data did this relate

13  to?

14     A    I don't know.  I don't recall.

15     Q    You don't have any recollection?

16     A    So, I oversaw a broad book of business --

17     Q    My question is --

18     A    I don't recall -- you asked me did I have

19  a recollection and I said no, and you re-asked it.

20  So I'm just saying no, I don't recall just from this

21  e-mail.

22     Q    You got me.

23          Did this data project ever come to

24  fruition?

25     A    I don't recall.



1        Q     Did D -- do you recall that the --

2   ultimately, DOE provided certain data to the Center

3   for Excellence?

4               MS. JOHNSON:  Object to form.

5               THE WITNESS:  I don't recall.

6   BY MS. COHEN:

7        Q     Did this data relate to data regarding

8   GNETS students?

9               MS. JOHNSON:  Object to form.

10               THE WITNESS:  I do not know.

11   BY MS. COHEN:

12        Q     You don't know?

13        A     I don't know.

14        Q     Now, Dante says in his e-mail to you:

15   Big breakthrough.  We are on track to have a data

16   sharing agreement in place in Apex and pivot away

17   from relying solely on self-reporting.  If we can

18   seal the deal, this will be a big win.

19               What -- what self-reporting does

20   Mr. McKay refer to?

21               MS. JOHNSON:  Object to form.

22               THE WITNESS:  The program reports

23          you asked about earlier today that the

24          providers submit monthly, programmatic

25          reports, data elements that were



1          collected, those are provided by the

2          providers.  So I'm -- that's what I'm

3          assuming he's talking about, we don't

4          have to collect it -- collect certain

5          things from providers anymore.

6    BY MS. COHEN:

7          Q     What was the -- why did he prefer to get

8    it from the Department of Education?

9               MS. JOHNSON:  Object to form.

10              THE WITNESS:  I cannot speak to the

11         specific goal of why this particular

12         project at this -- I just don't remember.

13   BY MS. COHEN:

14         Q     He says this is a big breakthrough?

15         A     That's what he says.

16         Q     In what way was it a big breakthrough?

17              MS. JOHNSON:  Object to form.

18              THE WITNESS:  So as I tried to say

19         earlier and you told me not to go there,

20         was that data sharing agreements aren't

21         easy to implement between entities.  And

22         so whatever the intentions were and

23         whatever they were looking to share --

24         and I don't recall the specifics of this

25         program.  I did not have direct oversight



1            of this particular project -- that would

2            have been a breakthrough, because that's

3            not typically something that exists

4            between any state agency.

5    BY MS. COHEN:

6        Q    Now, looking at this original e-mail from

7    Dimple Desai, she says, Ashley.  This is an e-mail

8    she sent on August 13th.  Do you have it in front

9    you?  It's the bottom e-mail in the 952 chain.

10       A    I do.

11       Q    She says:  Ashley, it was wonderful to

12   see you today.  Per our meeting, please find attached

13   our data elements of interest for the Georgia Apex

14   program.  Looking forward to next steps in the data

15   sharing and renewed partnership with you all at DOE.

16            Does that refresh your recollection that

17   this was about GNETS?

18            MS. JOHNSON:  Object to form.

19            THE WITNESS:  I have no reason to

20       believe that this was about GNETS.

21   BY MS. COHEN:

22       Q    You don't know?

23       A    I don't -- I don't know.  Data sharing is

24   a part of the System of Care elements, and I am

25   relatively positive that in one of these System of



1  Care reports there is language about recommendations

2  for data sharing agreements.  So that is bigger than

3  GNETS.  So that's -- I have no reason to believe this

4  was only about GNETS.

5       Q     You don't know either way?

6             MS. JOHNSON:  Object to form.

7             THE WITNESS:  I do not.

8  BY MS. COHEN:

9       Q     And you can't explain the statement by

10  Ms. Desai that it relates to the Georgia Apex

11  program?

12             MS. JOHNSON:  Object to form.

13             THE WITNESS:  Explain her

14      statement?

15  BY MS. COHEN:

16       Q     Yeah.

17       A     I'm not following the question.

18       Q     You don't understand why she refers to

19  the Georgia Apex program in her e-mail dated

20  August 13th?

21       A     I can only -- I would have to speculate.

22  I didn't author her e-mail, so I would have to

23  speculate that the data sharing agreement was

24  specific to the Apex program.

25       Q     Was the data sharing agreement that Dante



1    McKay was talking about, did it just pertain to Apex

2    data or was it broader -- I mean, to GNETS data or

3    was it broader than that?

4                MS. JOHNSON:  Object to form.

5                THE WITNESS:  I have no reason to

6           know that it's related to GNETS.  That's

7           not in the e-mail communication chain

8           here.

9    BY MS. COHEN:

10       Q     The -- why would the data fields --

11   actually, strike that.

12             I'm going to represent to you that

13   there's another e-mail from Ms. Desai to Ashley

14   Harris.  For the benefit of counsel, it's GA03193311,

15   and it's attachment GA03193312.  And it includes --

16   and it identifies data fields, including the students

17   SPED, experience SPED placement, disciplinary events

18   and daily GNETS segments.

19             Do you know why the Apex program would

20   request this information concerning daily GNETS

21   segments?

22                MS. JOHNSON:  Object to form.

23                THE WITNESS:  I don't know that

24           Apex requested it.  You said Ashley put

25           that together.  Ashley is with DOE.



1  BY MS. COHEN:

2       Q     There's an e-mail --

3       A     So I'm not sure.

4       Q     I'm referring to an e-mail from Dimple

5  Desai --

6       A     Can I see the e-mail?

7       Q     Yeah, you can, but we have to take a

8  break.

9             THE VIDEOGRAPHER:  The time is 4:18

10       p.m., and we are off the record.

11                  (Brief pause.)

12             (Plaintiff's (Johnson) Deposition

13       Exhibits Nos. 953 and 954 were marked for

14       the record.)

15             THE VIDEOGRAPHER:  The time is

16       4:40 -- the time is 4:43 p.m., and we are

17       back on the record.

18  BY MS. COHEN:

19       Q     Okay.  Ms. Johnson, I have put in front

20  of you two exhibits.  The first is an e-mail from

21  Dimple Desai to Ashley Harris, copying Dante McKay,

22  referring to Apex Data Elements of Interest for SY

23  18-19 COE, and it's -- it has the identification

24  number GA03193311.

25             And it says:  Ashley, it was wonderful to



1  see you today.  Per our meeting, please find attached

2  our data elements of interest for the Georgia Apex

3  program.  Looking forward to next steps in the data

4  sharing and renewed partnership with you all at DOE.

5        A     Uh-huh.

6        Q     Then the attachment, 954, has data fields

7  that are highlighted.  They're very pale but I think

8  you can see that they're slightly grayed out.

9              MS. COHEN:  I know that Ms. Melanie

10             Johnson went looking for a color copy and

11             was unable to find it.  So thank you very

12             much for that and for making the copies.

13             MS. JOHNSON:  No problem.

14  BY MS. COHEN:

15       Q     Do you see the data fields that are

16  highlighted here?

17       A     Yes.

18       Q     Okay.  And they include -- and they're in

19  alphabetical order?

20       A     Uh-huh.

21       Q     They include Daily GNETS Segments.  Do

22  you see that?

23       A     I saw it.

24       Q     Excuse me?

25       A     I saw it.



1          Q     On Page 3?

2          A     Uh-huh.

3          Q     Daily GNETS Segments, which is defined

4    as -- Page 3 of Exhibit 954.  Daily GNETS segments is

5    defined as the highest number of segments of GNETS

6    services provided to the student at any time during

7    the school year.

8               Do you see that?

9          A     Yes.

10         Q     And then also another data field

11   requested or grayed out is Days Present?

12         A     Okay.

13         Q     Discipline Event Identifier, which is

14   defined as a number that uniquely identifies the

15   event that caused disciplinary action for the

16   student, discipline process and SPED placement.

17               Why was the Georgia Apex program

18   requesting this information regarding daily GNETS

19   segments in August of 2019?

20         A     I don't know.

21               MS. JOHNSON:  Object to form.

22   BY MS. COHEN:

23         Q     Would your answer be the same with regard

24   to the other data fields?

25         A     Correct, yes, that would be the same.



1      Q     Okay.  Let's go to another e-mail.  We

2  already covered that one, so we can move on to a new

3  topic.

4            I want to ask you about a state employee

5  named Clara Keith.

6      A     Yes.

7      Q     Are you familiar with her?

8      A     Yes.

9      Q     Was she an employee of DBHDD?

10     A     I can't remember her arrangement.  I

11  think that D -- I think DBHDD -- I don't remember the

12  arrangement.  I don't remember who -- I think she was

13  technically employed by DBHDD, but I'm not

14  100 percent sure about that.  But I remember her.  I

15  don't remember how she was paid, by who.

16     Q     How did she come to be hired?

17     A     So I -- I wasn't involved in the

18  on-boarding of her, so it's a little vague.  But it

19  was related to the GNETS stuff, and she was acting

20  kind of like a consultant between -- she had a bunch

21  of department -- like education experience, and

22  was -- it felt like she was like a consultant type

23  role.  But I don't -- I was not involved in the

24  logistics of on-boarding her, so I don't know the

25  specifics of that process.



1          Q     She was formerly, until she became hired

2     by DBHDD, an employee of DOE?

3          A     She used to work at DOE.  I don't

4     remember if she came directly from DOE to DBHDD, but

5     I know that she had -- what I recall, I thought was

6     extensive history in the Department of Education or

7     in the school systems.

8          Q     You don't recall what it was?

9          A     No.  Like, what her role was?  No.  She

10    was an expert, is what I remember.

11         Q     Was she hired at the suggestion of

12    someone at DOE?

13         A     I don't know how her coming about -- I

14    don't know how she came about.  I don't recall how

15    she came about.

16         Q     Did counsel suggest hiring her?

17         A     I don't know that answer.  I don't know

18    that information.

19         Q     Well, prior to hiring Ms. Keith, did

20    anyone at DBHDD have a discussion with counsel about

21    hiring her?

22              MS. JOHNSON:  Object.

23              THE WITNESS:  I did not have a

24         conversation.

25              MS. JOHNSON:  I'm going to object



1          to this line of questioning to the extent

2          that, when you refer to counsel, you're

3          referring to an attorney --

4                 MS. COHEN:  Yes.

5                 MS. JOHNSON:  -- with whom there's

6          attorney-client privilege.

7                 MS. COHEN:  All right.  I'm going

8          to do it question-by-question and if you

9          want to direct her not to answer, that's

10         fine.

11                MS. JOHNSON:  Okay.

12                MS. COHEN:  So are you directing

13         her not to answer?

14                MS. JOHNSON:  Yes.

15    BY MS. COHEN:

16         Q     And what was said in the conversation?

17                MS. JOHNSON:  Same objection and

18         instruct her not to answer.

19    BY MS. COHEN:

20         Q     What was Ms. Keith's title at DBHDD?

21         A     I don't remember.

22         Q     Do you recall that she had a director

23    level title?

24         A     I don't remember what her title was.  I

25    already said I felt like she was a consultant, but I



MONICA JOHNSON                                    March 02, 2023
UNITED STATES vs STATE OF GEORGIA                          231

1    don't know what her title was.

2         Q    Did she ever appear on an org chart?

3         A    I've never seen her on an org chart.

4         Q    Did her duties relate to children and

5    adolescent mental health?

6         A    Yes.

7         Q    Did she work within her duty -- within

8    your division?

9         A    No.

10        Q    What division did she work in?

11        A    I don't recall the structure of -- I

12   don't remember who she -- she didn't work under me,

13   but I don't recall the setup there.  I just don't

14   recall how that was set up.

15        Q    What were her job duties?

16        A    I don't know.  She went -- from what I

17   remember, she was there acting as -- like a -- I keep

18   using the word consultant because that's the closest

19   thing I can think of to describe it.  But it was

20   about the GNETS programs.  I mean, that's all I've

21   got.  I really don't remember her job description or

22   whatever it was.

23        Q    What aspects of the GNETS programs were

24   relevant to DBHDD at that time?

25             MS. JOHNSON:  Object to form.



```
 1                    You can answer.
 2                    THE WITNESS:  Say the question
 3          again.
 4    BY MS. COHEN:
 5          Q     What aspects of the GNETS program were
 6    relevant to DBHDD when Ms. Keith came there?
 7                    MS. JOHNSON:  Object to form.
 8                    You can answer.
 9                    THE WITNESS:  None -- DBHDD still
10          at that time and still now does not have
11          oversights of GNETS programs.  So --
12    BY MS. COHEN:
13          Q     Did she have an office at DBHDD?
14          A     I don't know.  I don't recall where she
15    worked, to be honest.
16          Q     Does it refresh your recollection if I
17    said -- suggest to you that she kept her office at
18    DOE during the time that she was employed by DBHDD?
19          A     That feels like that could be accurate
20    because I do not have any recollection of her having
21    an office at DBHDD.
22          Q     And you don't know who supervised her?
23          A     No, I -- I just -- I don't know.
24          Q     Okay.  Let's look at the e-mails.
25                    MS. COHEN:  I'm sorry.  Can I
```



1           trouble you for one more copy?  Let's go

2           off the record.

3                   THE VIDEOGRAPHER:  The time is

4           4:54 p.m., and we're off the record.

5                       (Brief pause.)

6                   (Plaintiff's (Johnson) Deposition

7           Exhibit No. 955 was marked for the

8           record.)

9                   THE VIDEOGRAPHER:  The time is

10          5:00 p.m., and we are back on the record.

11  BY MS. COHEN:

12          Q     Okay.  Ms. Johnson, I have put in front

13  of you what we have marked as Exhibit 955, which is

14  another e-mail chain.  The top e-mail is from you.

15  I'm sorry.

16              I put in front of you an e-mail from the

17  Nakeba Rahming, I hope.

18          A     Yes.

19          Q     Which was CC'd to Clara Keith?

20          A     Uh-huh, yes.

21          Q     And this e-mail states:  Hello, Monica

22  and Dante.  Thank you so much for finding the time to

23  meet with Clara and I.  I received such awesome

24  details about your work within the community and look

25  forward to exploring avenues on future collaboration



1    for mental health integration with GNETS.

2            Dante, I am working on a mental health

3    service delivery model for students receiving

4    supports in GNETS programs and wondered if we could

5    meet to discuss the possibility of outlining DBHDD

6    resources and mental health services into this model.

7    Some components may already exist, which would be

8    great.  I will send you some dates so that we can

9    schedule a time to meet in advance.

10           So this is an e-mail from Nakeba Rahming

11   to Monica Johnson and Dante McKay, with a CC to Clara

12   Keith?

13       A    Uh-huh.

14       Q    Is this an e-mail that you received in

15   May of 2016?

16       A    According to the e-mail document in front

17   of me, yes.

18       Q    You believe you did?

19       A    Yes.

20       Q    And the e-mail states that a meeting is

21   planned between you and Mr. McKay on the one hand,

22   and Nakeba Rahming and Clara Keith on the other?

23       A    That's what the e-mail says.

24       Q    You don't have any other recollection of

25   it?



1        A      It's seven years ago.  I remember nay kef

2    I can't, I remember Clara, and there were initial

3    meetings.  I don't know how many meetings, but there

4    were meetings.

5              I don't even know -- I can't even recall

6    what came out of these meetings, but we were talking

7    about GNETS.  They would be -- we educated them in a

8    couple of meetings that -- this could have been one

9    that she was referencing because I remember doing --

10   what I would call -- orientation to understanding

11   what's available in the DBHDD system, because they

12   did not have a good understanding of that, how people

13   access services.

14             So that type of orientation, that's what

15   I recall.

16       Q      So is what you're saying, that you met

17   with Nakeba Rahming and Clara Keith once or more than

18   once to discuss the offerings of the DBHDD Apex

19   program?

20       A      No, that's not what I'm saying.  What I'm

21   saying is that my meetings with them were of like --

22   so Nakeba was reporting, I think, to Clara.  This is

23   my recollection of it.  They were working together.

24   Nakeba was more in the weeds, so to speak.  Clara was

25   acting more like a consultant.  I met with both of



MONICA JOHNSON                                    March 02, 2023
UNITED STATES vs STATE OF GEORGIA                             236

1  them and -- at different points in time.  I don't

2  remember how many meetings.

3            And, mostly, my role in those meetings

4  were to educate them about the children's behavioral

5  health system.  It was not limited to Apex.  I do not

6  know what Dante and Nakeba may have been talking

7  about because they had meetings, as well.  We were

8  trying to help support whatever they were asking for.

9  Like mostly it was educational, from what my role was

10  and what I recall.

11       Q    She said she was looking to exploring

12  avenues on future collaboration for mental health

13  integration with GNETS.

14       A    That's what the e-mail says.

15       Q    What avenues were those?

16            MS. JOHNSON:  Object to form.

17            THE WITNESS:  I don't recall.

18  BY MS. COHEN:

19       Q    Was anyone at DBHDD generally aware of

20  the state of mental health integration at GNETS at

21  that time?

22            MS. JOHNSON:  Object to form.

23            THE WITNESS:  I don't recall.

24  BY MS. COHEN:

25       Q    Well, did you understand when you got the



1  e-mail what Nakeba Rahming meant by, quote, an

2  integrated mental health delivery service -- an

3  integrated mental health service delivery model --

4          MS. JOHNSON:  Object to form.

5  BY MS. COHEN:

6      Q    -- for students receiving supports in

7  GNETS, closed quote?

8          MS. JOHNSON:  Object to form.

9          THE WITNESS:  The only thing I can

10         remember close to maybe what you're

11         asking is, at that time, they were

12         looking at exploring -- they were looking

13         at understanding what was available in

14         the community outside of GNETS.  And to

15         the best of my recollection, I believe

16         Nakeba was looking at services that GNETS

17         would provide and looking at the

18         community services that were available.

19             I don't remember anything really

20         beyond that about the depth of her work

21         related to this.  My role was more

22         around -- I acted as a consultant for

23         them, like informing them about how to

24         access the system, how the providers

25         work, how our regions worked.  It was



1          more -- that was our -- most of our

2          exchanges that I can recall.

3     BY MS. COHEN:

4          Q    Were you a peer of Ms. Keith on the org

5     chart -- on an org chart?

6          A    I never saw her on an org chart, so I

7     don't know the answer to that.  I did not see her as

8     a peer, though.

9          Q    Did you see Nakeba as a peer?

10         A    No, she didn't work at DBHDD and she was

11    just over just this one program.

12         Q    I didn't mean peer in that sense.  I mean

13    a counterpart of similar status at DOE?

14         A    As to me?

15         Q    Yeah.

16         A    No.

17         Q    So both of them were below you in status

18    at the counterpart agency?

19              MS. JOHNSON:  Object to form.

20              THE WITNESS:  I don't know what

21         Clara did, so I can't compare her role.

22         This reminds me, looking at the e-mail,

23         that she was over -- she was a program

24         manager over GNETS.  I was a division

25         director over all of behavioral health.



1        So they're not comparable roles.

2   BY MS. COHEN:

3        Q     My understanding is this e-mail says that

4   Nakeba Rahming was the program manager for GNETS at

5   the time.  Is that what you meant to say?

6        A     I thought that's what I said.  If I said

7   something different, I apologize.

8        Q     You don't know what Clara Keith's role

9   was?

10        A     I do not remember what her last role was

11   with DOE.

12        Q     Does this refresh your recollection that

13   she was still at DOE at that time?

14        A     If you tell me she was still there, I

15   will take your word for it.  I don't remember her

16   exact -- I thought she was employed by DBHDD, maybe.

17   I knew she had a role with DOE.  I don't recall the

18   logistics of that infrastructure, just that we would

19   meet with her, give her information, help her

20   understand the DBHDD network.

21        Q     So you don't know -- do you know whether

22   as of August -- excuse me -- whether as of May 2016

23   DOJ was involved in discussions -- the United States

24   Department of Justice was involved in discussions

25   regarding the GNETS program?



MONICA JOHNSON                                        March 02, 2023
UNITED STATES vs STATE OF GEORGIA                                240

1        A      If we were talking to Clara and Nakeba,

2   then their -- I believe that that had already

3   happened.  So that -- that there was awareness.

4        Q      There was an investigation ongoing?

5        A      That's the purpose, as far as I recall,

6   of why they were -- why we were talking with them.

7        Q      They said to you that they wanted -- in

8   light of the DOJ investigation, they wanted to

9   discuss?

10            MS. JOHNSON:  Object to form.

11            THE WITNESS:  I don't know that

12        that was how it was set -- can I --

13            MS. JOHNSON:  You can respond.

14            I wasn't sure if you were done with

15        your question.

16            MS. COHEN:  I wasn't quite.  Thank

17        you, Melanie.

18            MS. JOHNSON:  Please finish.

19   BY MS. COHEN:

20        Q      So what you're saying is that, at the

21   time that Clara Keith and Nakeba Rahming met with

22   you, they said that they wanted to look for more

23   resources for GNETS in light of the claims of DOJ

24   that the program was not legal?

25            MS. JOHNSON:  Object to form.



1                    You can answer.

2                    THE WITNESS:  So I don't remember

3          direct quotes of what was said.  I

4          thought you had just -- you asked me

5          before did -- was there awareness.  My

6          recollection -- my recollection is that

7          that was why they were introduced to us.

8    BY MS. COHEN:

9          Q     Understood.

10         A     Okay.

11         Q     And what introduced them to you?

12         A     Whoever -- was Judy commissioner at this

13   time?  That's a question.  I don't remember.  So

14   whoever the commissioner was at this time.  I can't

15   remember if it was Commissioner Berry or Commissioner

16   Fitzgerald.  I don't remember which one.  So which

17   ever -- whoever was commissioner and -- so if it was

18   Commissioner Berry, then it would have been him and

19   Judy, when she was chief of staff.  But if it was not

20   Commissioner Berry, if he wasn't still there, then it

21   would have been Judy.  But I don't remember for sure.

22         Q     Do you recall in --

23         A     -- who was commissioner.

24         Q     -- what capacity -- what they said about

25   why you should meet with them?



1              MS. JOHNSON:  Object to form.

2              THE WITNESS:  To provide

3        information and to help them understand

4        our system.

5   BY MS. COHEN:

6        Q     You'd never met with them previously?

7        A     No, not until they -- I never met -- I

8   didn't know them until they started working -- when

9   Clara came and then, after Clara, I met Nakeba.

10       Q     I see.  So Clara was already at DBHDD at

11  the time of this e-mail?

12       A     I don't -- I don't know.  I don't -- I

13  would assume yes, because it looks like we already

14  are talking.  And it said, thank you for the time for

15  meeting with Clara and I.  So I -- based on that, she

16  was there.

17       Q     Well, was she at DBHDD at this time or

18  was she still employed by the Department of

19  Education?

20       A     So I think I've said earlier, I don't

21  know the logistics of how she was employed and -- so

22  I don't know those logistics, who was paying -- I

23  think DBHDD was paying her, I think she was a DBHDD

24  employee, how is that -- you just said earlier at DOE

25  is where her office was.



1        Q     Once she came to DBHDD, how often did you

2   meet with her?

3        A     I don't remember.

4        Q     Was it once or more than once?

5        A     I met with her more than once.

6        Q     Was it more than five times?

7        A     I'm not sure.

8        Q     You don't know if it was more than five

9   times?

10       A     I really don't know the answer to that.

11       Q     Did the commissioner meet with her?

12       A     Yes.

13             MS. JOHNSON:  Object to form.

14   BY MS. COHEN:

15       Q     How many times did the commissioner meet

16   with her?

17             MS. JOHNSON:  Object to form.

18             THE WITNESS:  I don't know.

19   BY MS. COHEN:

20       Q     Did Mr. McKay meet with her?

21             MS. JOHNSON:  Object to form.

22             THE WITNESS:  Yes.

23   BY MS. COHEN:

24       Q     And how many times did he meet with her?

25             MS. JOHNSON:  Object to form.



1             THE WITNESS:  I don't know.

2    BY MS. COHEN:

3        Q    And I think you've already testified she

4    did not work in the division of behavioral health?

5        A    No.  She was not -- she was not in my

6    division.

7        Q    And did she leave DBHDD after a time?

8        A    After a time she was gone.

9        Q    Would you say her tenure at DBHDD was a

10   success?

11            MS. JOHNSON:  Object to form.

12            THE WITNESS:  I can't -- I don't

13       know.

14   BY MS. COHEN:

15       Q    You don't know?  What were her principal

16   activities while she was at DBHDD?

17       A    I don't know.

18       Q    I'm going to mark as 5 -- is it 957 --

19   956.  I'll mark as Exhibit 956 an e-mail from Monica

20   Johnson to Vickie Cleveland dated March 6th, 2018,

21   copying Dante McKay.

22            (Plaintiff's (Johnson) Deposition

23       Exhibit No. 956 was marked for the

24       record.)

25            THE WITNESS:  Okay.



1    BY MS. COHEN:

2        Q    I've just marked as Exhibit 956 this

3    e-mail, which has the Bates number GA00051015, dated

4    March 6th, 2018.

5            Does reviewing this e-mail refresh your

6    recollection that Clara Keith had left DBHDD as of

7    March 6th, 2018?

8        A    Yes, based on the e-mail.

9        Q    And --

10       A    Well, let me clarify.  I don't know based

11   on this e-mail that she left on March 6th.  I sent

12   the e-mail on March 6th, but I don't know that that

13   means that's when she left.

14       Q    Did she leave about this time?

15       A    I'm not -- I don't recall.

16       Q    Well, it says in the e-mail:  Hi Vickie.

17   It was --

18           And this is an e-mail from you?

19       A    Uh-huh.

20       Q    Hi Vickie.  It was nice meeting you, as

21   well.  Dante, Vickie is taking over for Clara Keith,

22   who has left the position she was in with DBHDD.

23           So does that refresh your recollection

24   that she had left DBHDD by this time?

25       A    The only thing that I clarify was that



1   just because I sent the e-mail on March 6th does not

2   mean that's when Clara Keith left.  Clara Keith

3   obviously left.  I did know that already.  But I

4   don't know the time difference --

5        Q    I see.

6        A    -- of when Vickie came and Clara left,

7   correct.

8        Q    She left prior to March 6th, 2018?

9        A    Correct.

10        Q    I understand what you're saying.

11             And it says:  I had an opportunity to

12   meet Vickie last week and know that Clara left us in

13   good hands.

14             Did you have a meeting with Vickie?

15        A    According to this e-mail, but I don't

16   even remember Vickie.  I couldn't tell you what

17   she looks -- I remember Clara.  I could describe her.

18   I can't even remember who -- so I must have met with

19   her, obviously, based on this e-mail, but I don't

20   think I met with her beyond whatever this was because

21   I don't even remember her.

22        Q    Was the meeting in-person or was it by

23   telephone?

24        A    I don't know.  I have no idea.

25        Q    Then it goes on to say:  I promised



1    Vickie I would connect her with you.

2                Was this the first time that Dante McKay

3    was informed that Clara Keith had left?

4        A    I don't know.

5        Q    Did Vickie, in taking over from Clara

6    Keith or for Clara Keith, become an employee of

7    DBHDD?

8        A    I have no idea.  In her -- her title --

9    her signature title is different than what Clara did.

10   Her title actually matches more of the previous

11   e-mail, Nakeba.  So they have a similar title.  So

12   I'm not sure what the shuffling was.  I don't

13   remember the -- because it doesn't look like an

14   exact.  I just don't recall and I only can go based

15   on what's here.

16       Q    But Clara Keith and Nakeba -- excuse me.

17                Both Vickie Cleveland and Nakeba Rahming

18   were program manager of GNETS, for a title?

19       A    Based on these two e-mails.

20       Q    Uh-huh.  And then you go on to say in

21   your e-mail:  An immediate ask will be related to CYF

22   partnering to provide training relating to accessing

23   services.  Vickie will provide you with more

24   information.

25       A    Uh-huh.



1      Q     What was said prior to Vickie's taking

2    over at DBHDD about whether she should become an

3    employee of DBHDD or remain at DOE?

4               MS. JOHNSON:  Object to form.

5               THE WITNESS:  I have no knowledge

6          of that.

7    BY MS. COHEN:

8      Q     And when you said that DBHDD has been

9    left in good hands with Vickie Cleveland, did you

10   actually know anything about Vickie Cleveland or were

11   you just being courteous?

12     A     I was being courteous.  It's common for

13   me to be courteous in e-mails.

14     Q     Was DOE, as of the date of this e-mail,

15   still seeking to establish an integrated mental

16   health services model at GNETS with the assistance of

17   DBHDD?

18              MS. JOHNSON:  Object to form.

19              THE WITNESS:  I don't know.  Based

20         on the e-mail, it looks like we were

21         restarting because we were, again, doing

22         what I said earlier, which was

23         essentially providing training related to

24         how do you access services.

25



1    BY MS. COHEN:

2         Q     So when you say restarting, you mean

3    reframing the relationship to focus --

4         A     Because it was a new person --

5         Q     -- on training?

6         A     What I remember is -- and reading this.

7    So reading this and what makes sense and what I can

8    recall, Vickie and Nakeba were no longer involved.  A

9    new person is now involved.  So now we are doing the

10   same thing that we was doing before, which was

11   helping that this DOE staff understand how to access

12   services in the community.

13             And based on this e-mail, I wasn't doing

14   that again.  I just told Dante to do it.

15        Q     Let me mark as the next e-mail, which is

16   957, another e-mail chain from -- the top e-mail is

17   from Monica Johnson on August 21st, 2020 to Dante

18   McKay, copying Monica Patel and Wendy Tiegreen.

19             (Plaintiff's (Johnson) Deposition

20        Exhibit No. 957 was marked for the

21        record.)

22             MS. COHEN:  I think -- can I borrow

23        that stapler back?

24             And this e-mail was produced as

25        GA02600537.



MONICA JOHNSON                                      March 02, 2023
UNITED STATES vs STATE OF GEORGIA                        250

1              THE WITNESS:  Okay.

2    BY MS. COHEN:

3         Q    And in August of 2020 a query was going

4    around DBHDD as to who Clara Keith was?

5         A    Correct.

6              MS. JOHNSON:  Fran, I'm sorry.  I'm

7         going to object.  I think this is a

8         privileged document that may have been

9         inadvertently produced.  So if I could

10        just have -- if we could go off the

11        record for moment so I could speak with

12        my client.

13             MS. COHEN:  Sure.

14             MS. JOHNSON:  Thank you.

15             MS. COHEN:  Do you want us to

16        leave?

17             THE VIDEOGRAPHER:  The time is

18        5:24 p.m., and we are off the record.

19                  (Brief pause.)

20             THE VIDEOGRAPHER:  The time is

21        5:26 p.m., and we are back on the record.

22             MS. JOHNSON:  So this document was

23        inadvertently produced.  It is

24        privileged, and so I'm going to instruct

25        the witness not to answer any further



1          questions on it, and we will follow up

2          with DOJ and recall this document.

3    BY MS. COHEN:

4          Q      Okay.  Let me ask a question.

5                 Does the document refresh your

6    recollection that, in 2020, Dante had no knowledge of

7    who Clara Keith was?

8                 MS. JOHNSON:  I'm going to --

9    BY MS. COHEN:

10         Q      I mean, excuse me, Wendy Tiegreen has no

11   knowledge -- had no knowledge of who Clara Keith was?

12                MS. JOHNSON:  And same objection

13         and I'm going to instruct the witness not

14         to answer.

15   BY MS. COHEN:

16         Q      Does it refresh your recollection that,

17   in August of 2020, Wendy Tiegreen thought that Clara

18   Keith might have been one of the BCBA psych interns

19   that worked under Darlene for IDD?

20                MS. JOHNSON:  Same objection and

21         instruct the witness not to answer.

22   BY MS. COHEN:

23         Q      And Dante says in his e-mail that Clara

24   was a shared employee between DBHDD and DOE.  I

25   interacted with her maybe twice.  She reported to



1   either Jeff or Amy?

2           MS. JOHNSON:  Same objection and

3       instruct the witness not to answer.

4   BY MS. COHEN:

5       Q    Let me ask you this.  Who are Jeff and

6   Amy in DBHDD world?

7       A    Amy does not work there anymore.  She was

8   a former assistant commissioner and general --

9   general counsel.  Jeff --

10      Q    What was her last name?

11      A    Howell.

12      Q    Amy Howell?

13      A    Uh-huh.

14      Q    And who was Jeff?

15      A    Jeff Minor was a former deputy

16  commissioner.

17      Q    Do you know why Clara Keith would report

18  to Amy or Jeff in 20 -- when she worked for DBHDD?

19          MS. JOHNSON:  Object to form.

20          THE WITNESS:  They were -- they

21      were both like assistant level deputy

22      commissioners.  So that doesn't seem odd

23      to me.  I mean -- yeah.

24  BY MS. COHEN:

25      Q    Was she -- did she have legal training?



MONICA JOHNSON                                    March 02, 2023
UNITED STATES vs STATE OF GEORGIA                             253

1      A     I have no idea what kind of training she

2  had.

3      Q     Was she hired to report to Jeff and Amy

4  concerning the GNETS litigation or investigation?

5            MS. JOHNSON:  Object to form.

6            THE WITNESS:  I don't know.  I said

7       earlier I don't know the logistics of

8       that on-boarding and some of those

9       components.

10 BY MS. COHEN:

11     Q     What was Ms. Tiegreen's role in August of

12 2020?

13     A     I -- I don't know her exact title.  She's

14 basically the Medicaid coordinator liaison person.

15     Q     Did you work closely with Ms. Tiegreen?

16     A     Yes.

17     Q     Did Dante work closely with Ms. Tiegreen?

18     A     Yes.

19     Q     So it's likely that if Clara Keith was

20 working on children -- child and adolescent mental

21 health at DBHDD at this time, Ms. Tiegreen would have

22 heard of her?

23            MS. JOHNSON:  Object to form.

24            THE WITNESS:  No.  That's not

25       likely.  That's not an assumption that



1    should be made.

2  BY MS. COHEN:

3    Q    Were you surprised -- does it surprise

4  you that Dante had only two interactions with Clara

5  Keith?

6         MS. JOHNSON:  Object to form.

7         THE WITNESS:  I don't know how many

8    interactions that he had with her.

9  BY MS. COHEN:

10   Q    I'm going to mark as Exhibit 958 -- oh,

11 I'm sorry.  This is already marked as 841.  Let me

12 show it to you.

13        Does this refresh your recollection that,

14 in 2020, Ms. Layla Fitzgerald became a liaison

15 between DOE and DBHDD?

16   A    Okay.  So, yeah, this is the confirmation

17 I've been looking for all day.  I couldn't recall,

18 but I thought it was probably her.

19   Q    And you recall that you reviewed this

20 memorandum at various stages, and the attachments?

21        MS. JOHNSON:  I'm sorry.  What

22    document is this?  Is this an exhibit?

23        MS. COHEN:  841.

24        THE WITNESS:  Yes, is the answer to

25    the question.



1    BY MS. COHEN:

2         Q     So you were looped in on that liaison

3    relationship?

4         A     Yes, which is why I was fairly confident,

5    but not 100 percent, that it was Layla.  I didn't

6    remember if it -- at 100 percent.  But I was very

7    much aware of the lead-in and the work and some of

8    the planning that Dante was leading with DOE around

9    the shared position.

10        Q     And what was the purpose of the shared

11   position?

12              MS. JOHNSON:  Object to form.

13              THE WITNESS:  You'd have to look at

14        the MOU.  So it kind of outlines on the

15        MOU several -- do you want me to read

16        them or --

17   BY MS. COHEN:

18        Q     Maybe you could direct my attention to

19   the paragraph.

20        A     So on page -- so on Page I, it starts

21   with:  The parties understand that -- at the

22   bottom -- it would be beneficial for the behavioral

23   health liaison to belong to Department -- Georgia

24   Department of Education.

25        Q     Hang on for a second because it's very



 1  late in the day, so I'm going to have to step in for

 2  Tanya, if you could read it slowly.

 3       A    So it would be beneficial for the

 4  behavioral health liaison to be loaned to Georgia DOE

 5  for the purpose of.

 6            And then there's several items.  Asset

 7  mapping, behavioral health related resources programs

 8  and initiatives, defining the tiers of support within

 9  G -- Georgia DOE and DBHDD to support students.  I

10  mean, it goes on.  There's several things listed here

11  of what was being agreed upon in the MOU.

12            MS. JOHNSON:  Do you have another

13       copy of this exhibit?

14            MS. COHEN:  I don't, but you can

15       have this one if you'd like.

16            MS. JOHNSON:  I'll glance at it

17       quickly.

18  BY MS. COHEN:

19       Q    And none of this related to GNETS, as far

20  as you know?

21       A    No, this is not specific to GNETS.

22       Q    Did you understand that GNETS was

23  excluded from Ms. Fitzgerald's work?

24            MS. JOHNSON:  Object to form.

25            THE WITNESS:  I never asked the



1          question, so I never knew one way or the

2          other.

3               MS. COHEN:  Do you want it?

4               MS. JOHNSON:  If this is an extra

5          one, I'll keep it.

6     BY MS. COHEN:

7          Q    I want to ask you about Mr. McGiboney's

8     departure.

9          A    Can I ask for a quick pause?  I want to

10    read -- I want to make sure --

11         Q    Sure.

12         A    Okay.  I just wanted to -- you asked me

13    the question about the exclusion of GNETS, and I

14    thought that this MOU was broader.  And it is broader

15    and it doesn't have language about excluding, because

16    this was not just about Apex.  So I just wanted to

17    clarify.

18         Q    I don't want to mislead you.  My

19    understanding was that it was an oral exclusion and

20    it related to a conversation that Layla had with

21    Ashley Harris.

22         A    Okay.

23         Q    And Dante was aware of it.  Did you know

24    that Dante was aware of the exclusion?

25              MS. JOHNSON:  Object to form.



1          THE WITNESS:  He would have to be

2      because earlier today we talked about the

3      FAQs, and in the FAQs it's there, so yes.

4   BY MS. COHEN:

5      Q    Now at a certain point Garry McGiboney

6   left and there was some e-mail discussion of that at

7   DBHDD.  Do you remember that?

8      A    No.

9          (Plaintiff's (Johnson) Deposition

10      Exhibit No. 958 was marked for the

11      record.)

12   BY MS. COHEN:

13      Q    Okay.  I've marked as Exhibit 958 an

14   e-mail chain, the top e-mail is from you dated

15   September 4th, 2020.  The production number is

16   GA0021797.  And this is an e-mail from you to Judy

17   Fitzgerald regarding -- it's a forward of an e-mail

18   relating to Garry McGiboney comments.

19          So what was happening here is that you

20   were forwarding an e-mail that Dante had sent to you?

21      A    Can I have a second to read it?

22      Q    Sure.  Take your time.

23      A    Okay.

24      Q    This is an e-mail chain involving

25   Mr. McGiboney and Talley Wells.  Was Tally Wells



1    someone who was known to you at the time of this

2    e-mail?

3         A    Yes.

4         Q    And how did you know him?

5         A    Through the DOJ settlement agreement.

6         Q    He was involved in monitoring compliance

7    in the DOJ settlement agreement?

8         A    No.  He was a part of -- at least I

9    believe he was a part of the -- what was known as the

10   amici.  So it was a group of advocates and folks that

11   was a part of that group, related to that settlement

12   agreement.  That's how I know Talley.

13        Q    He represented an advocacy group or he

14   was involved within advocacy group, an amici?

15        A    I want to look Aileen so she can just

16   say.  She knows the answer.  I don't know what

17   Talley's official role was.  I don't remember what

18   group he was with, but he was a part of the

19   collective of the -- it was called the amici and he

20   was a person that was very involved in watching the

21   settlement agreement unfold.

22        Q    Okay.  And this was an e-mail originally

23   to -- Mr. Wells' e-mail was from Dante to Garry -- I

24   mean, was to Dante and Garry McGiboney on

25   August 24th, 2020.  And then Mr. McGiboney replies



1   the next day, August 25th, 2020, and he says:  I need

2   to let you know that I was recently blindsided at the

3   Georgia DOE.  They took away mental health School

4   climate/PBIS, school safety, school discipline and

5   policy work away from me, which left me working only

6   with public health.

7            Do you know who -- who Mr. McGiboney felt

8   blindsided him?

9        A    I have no idea.

10       Q    Did you ever hear any rumors about it --

11       A    No.

12       Q    -- through the rumor mill?

13       A    Uh-uh.  Not that I could recall.

14       Q    You don't recall?

15       A    Uh-uh.

16       Q    Did you ever hear that Matt Jones was

17  involved?

18       A    I don't know.  I don't know who that is

19  in this moment.  I don't recall.

20       Q    The chief of staff?

21       A    Yeah, I don't know.  I did not hear that

22  specific level of detail and that doesn't sound

23  familiar to me at all.

24       Q    And you say in your e-mail to Judy

25  Fitzgerald, I'm going to the second sentence:  See



1  below change about Garry McGiboney at DOE.  I

2  understand that he took this really hard and a

3  wellness check was done on him.

4           What -- what is a wellness check?  What

5  did you mean to say by wellness check?

6      A     When there's a concern about someone's

7  health or safety.  And -- I don't recall if this was

8  a formal wellness, but a formal wellness -- anybody

9  can call like adult protection services and send

10  somebody out and say you're concerned.  I don't know

11  what was behind this wellness check.  I don't recall

12  that.

13      Q     A wellness check is done by adult

14  protection services?

15      A     It could be, but I don't know if that's

16  what was done here.

17      Q     Would a wellness check relate to the

18  possibility of self harm?

19      A     It could.

20      Q     Is that what you were referring to in

21  958?

22           MS. JOHNSON:  Object to form.

23           THE WITNESS:  I don't recall.  I

24      mean, reading this, I do remember that I

25      understood him to be very devastated, as



1      he wrote in the e-mail, but I don't

2      remember the details around -- I just

3      don't remember the details around the

4      other components.  Who did a wellness

5      check, did that even happen, was it a

6      rumor, I don't know.

7   BY MS. COHEN:

8      Q    So do you recall ever meeting with Vickie

9   Cleveland?

10     A    I said earlier, I don't even remember

11  her.  I can't even think of what she looked like, but

12  obviously we met because there's an e-mail that says

13  we met.

14     Q    Did you -- subsequent to that e-mail, did

15  you ever participate in any meeting with Vickie

16  Cleveland?

17     A    At the -- I don't recall.

18          MS. COHEN:  Why don't we take a

19     short break and I'll get organized and we

20     are very close to being finished.

21          THE VIDEOGRAPHER:  The time is

22     5:44 p.m.  We are off the record.

23               (Brief pause.)

24          THE VIDEOGRAPHER:  The time is

25     5:54 p.m.  We're back on the record.



1   BY MS. COHEN:

2       Q    Do you remember there was a lot of

3   trouble scheduling and meeting with Vickie Cleveland?

4       A    I don't recall.

5            (Plaintiff's (Johnson) Deposition

6       Exhibit No. 959 was marked for the

7       record.)

8   BY MS. COHEN:

9       Q    I'm going to mark as Exhibit 959 an

10  e-mail produced with the number GA00172587, which

11  appears to be an Outlook Invite from Cedric Bryant.

12           Who is Mr. Bryant?

13      A    He was my executive assistant.

14      Q    And he scheduled the meeting with Clara,

15  Keith, Nakeba Rahming and Dante in March of 2016?

16      A    Per this e-mail -- per this paper in

17  front of me, yes, but it looks like it's an error

18  because we would not have met at 8:00 p.m. at night

19  and ended at 9:00 p.m.

20      Q    Do you know if any meeting occurred with

21  that group?

22      A    Yes, we've -- I've met with each of the

23  people here.  We've had -- we've all been in the same

24  meeting before, but not at 8:00 p.m.

25           (Plaintiff's (Johnson) Deposition



1        Exhibit No. 961 was marked for the

2        record.)

3   BY MS. COHEN:

4        Q    Okay.  Let me put in front of you 961,

5   which is an e-mail from yourself to Mr. McKay, Re

6   Burning Questions, GA00174295.

7             MS. LEVERT:  Do you mean 961?

8             MS. COHEN:  Excuse me?

9             MS. LEVERT:  Do you mean 961?

10            MS. COHEN:  This is Exhibit 961.

11            MS. LEVERT:  I'm sorry, Fran.  Can

12       you repeat the Bates number again?

13            MS. COHEN:  Yeah, Sandra.  It's

14       GA00174295.  And this is an e-mail from

15       Monica Johnson to Mr. McKay sent on

16       October 13th, 2016.

17  BY MS. COHEN:

18       Q    Do you recognize this e-mail,

19  Ms. Johnson?

20       A    No.

21       Q    Do you believe this to be an e-mail that

22  you sent to Dante McKay on October 13th, 2016?

23       A    Well, I'm not sure -- this looks like

24  Dante asked me questions.  MJ is me responding.  So

25  I -- this is an exchange, but it looks like -- it



1  looks like something is missing here.  But this looks

2  like there's questions asking.  It looks like Dante

3  asked questions.  Wherever you see MJ, that's me

4  responding.

5        Q    Okay.  So looking at Question 1:  I meet

6  with Amy tomorrow at 9:00 a.m.  Anything in

7  particular I should know going in?

8             MS. JOHNSON:  I'm just going to

9        interject here.  If Amy is an attorney --

10            THE WITNESS:  She was.

11            MS. JOHNSON:  -- with DBHDD or --

12            THE WITNESS:  She was our general

13        counsel.

14            MS. JOHNSON:  Okay.  I'm sorry.  I

15        just want to review this for just a

16        moment.

17            So we'll just take it question by

18        question.  To the extent anything

19        requires you to -- to the extent a

20        response would require you to reveal

21        privileged information that Amy said to

22        you, or any other attorney, I'll instruct

23        you not to respond, but we can proceed.

24  BY MS. COHEN:

25        Q    Okay.  It says:  MJ.  No, she wants to



1  make sure you have all the context for what is

2  happening with DOJ and DOE to make sure you don't

3  inadvertently step into anything when interacting

4  with DOE or GNETS.  I don't think it will be new

5  information per se, just making sure we are all on

6  the same page.

7           What was the concern about Mr. McKay

8  stepping into something inadvertently when

9  interacting with DOE or GNETS?

10          MS. JOHNSON:  So I'll direct you

11      not to answer if that was privileged

12      legal advice from Amy.

13  BY MS. COHEN:

14      Q    Are you taking the position that it was?

15      A    I am, because the first thing says, I

16  meet with Amy tomorrow.  So this is conversation that

17  feels privileged to me.

18      Q    Your counsel will have to direct you not

19  to answer.

20          MS. JOHNSON:  I'm sorry.  I thought

21      I did instruct you not to answer.

22          MS. COHEN:  It was a conditional

23      instruction.  You said if Amy was.

24          MS. JOHNSON:  Yes.  Yeah, then I

25      wanted to take it question by question,



1        and I thought I objected to this one and

2        instructed you not to respond.

3              THE WITNESS:  Okay.

4              MS. JOHNSON:  In case I didn't,

5        please don't respond to this question on

6        the grounds of attorney-client privilege.

7   BY MS. COHEN:

8        Q    There's a reference to an LA team

9   meeting.  What does that refer to?

10       A    Where are you?

11       Q    I'm now in that same paragraph, in the

12  sentence:  Especially important since we had the LA

13  team meeting with Nakeba and Clara.  I will have to

14  tell you about that, as well.

15             MS. JOHNSON:  If the response would

16       require you to reveal privileged

17       conversations with counsel, then I'll

18       instruct you not to.  Answer and it

19       sounds like you -- well, I'll let you

20       respond.

21             THE WITNESS:  I think it's just a

22       typo.  I don't think there's such a thing

23       as LA team meeting.

24  BY MS. COHEN:

25       Q    Okay.  What do you think was the intended



1  word?

2        A     My best guess is last.

3        Q     Last?

4        A     Last.

5        Q     Last meeting.  When was the -- what was

6  the topic of the last meeting with Nakeba and Clara?

7        A     I don't recall.

8        Q     It says:  I will have to tell you about

9  that, as well.

10             Did you ever tell Mr. McKay about that?

11       A     This is 2016.  I don't recall.

12       Q     And it also says:  Ask Amy for her

13  feedback about that meeting.  It's the same as mine.

14  We debriefed it.

15             Does that refresh your recollection

16  regarding what your reaction to the meeting was?

17             MS. JOHNSON:  And if that pertains

18        to your meeting with Amy and involving

19        legal advice, then I'll instruct you not

20        to answer.

21             THE WITNESS:  Okay.

22  BY MS. COHEN:

23       Q     Do you know that Dante McKay was invited

24  to speak in Milledgeville for GNETS?

25       A     I don't recall.



1              (Plaintiff's (Johnson) Deposition

2          Exhibit No. 962 was marked for the

3          record.)

4    BY MS. COHEN:

5          Q      Let me show you what has been marked as

6    Exhibit 962, which is an e-mail from Nakeba Rahming

7    to Dante McKay, with the production number

8    GA00175100, dated December 2nd, 2016.  Sorry.

9    There's a second page.

10         A      Okay.

11         Q      So let's look at the bottom e-mail, which

12   is an e-mail from Nakeba Rahming to Monica Johnson,

13   copying Clara Keith.  And do you see that Clara Keith

14   had a DBHDD e-mail?

15         A      Yes.

16         Q      And does that refresh your recollection

17   of her role at DBHDD?

18         A      No, I mean, it doesn't change anything.

19   I mean, I see she has the e-mail address.  I still --

20   everything I still said earlier about my

21   understanding of her role and how it was structured

22   is the same.

23         Q      Well, in this e-mail, Nakeba Rahming

24   says:  Hello, Monica.  Thank you for meeting with

25   Clara and I on September 29th, 2016.  The details



1   that you provided regarding DBHDD services were very

2   informative and helpful and I look forward to DBHDD

3   sharing this information with the GNETS directors.

4            I sent Dante an e-mail to confirm his

5   attendance at our GNETS directors meeting and he

6   informed you that you will now be the point person to

7   support us with information regarding GNETS.  Dante

8   was scheduled to join us on October 18th or 19th.

9   Will you let me know which date and time you are

10  available on October 18th or 19th.  The meeting will

11  be in Milledgeville, and we think that the

12  information that you shared will help the GNETS

13  director have a better understanding about the

14  services provided by DBHDD and how students access

15  them.

16           Now, did there come a time in October of

17  2016 when you and Dante agreed that you would be the

18  point person in meeting with DOE regarding -- about

19  information regarding GNETS?

20           Got to go for the verbal answers.

21      A    So, no, I don't know when -- this e-mail

22  is me redirecting Nakeba back to Dante for this

23  presentation ask.  I was the primary point person

24  working with Clara.  And so Nakeba misunderstood and

25  thought -- this was me redirecting her back to, no,



1  you still -- Dante would do that presentation.  That

2  would not be me.

3       Q     You were the primary point person for

4  what --

5       A     For whatever Clara's official role was, I

6  was her point person.  So like I said, I met with

7  her.  If she had questions, she would reach out to

8  me.  If I could not answer them, I would get the

9  answer or connect her with who -- you know, Dante or

10  whoever would be appropriate.  But that's the way it

11  was set up, that I was her point person.

12       Q     She didn't report to you, though?

13       A     No.

14       Q     And she wasn't in your division?

15       A     No.

16       Q     Did Mr. McKay go out to Milledgeville?

17       A     I don't know.  It looks like from the

18  e-mail they were still trying to figure out the

19  schedule.

20       Q     Now, do you recall when Vickie Cleveland

21  came to work at -- I mean, took over from Clara

22  Keith, there were calls scheduled by Ruth Rogers?

23       A     I don't recall that without you showing

24  me something, but --

25       Q     Who is Ruth Rogers?



1          A     She was the executive assistant for the

2    commissioner.

3          Q     And she was involved in scheduling

4    matters that the commissioner attended?

5          A     Yes.

6          Q     Did she schedule matters for other

7    people?

8          A     I don't know.  I don't know all of her --

9    what all her responsibilities were.  She was the

10   executive assistant for the commissioner, and in that

11   role she did scheduling for the commissioner.

12              (Plaintiff's (Johnson) Deposition

13          Exhibit No. 963 was marked for the

14          record.)

15   BY MS. COHEN:

16         Q     Let me show you what's been marked as

17   exhibit 963.  This is GA01458072, an e-mail from

18   Dante McKay to Ruth Rogers, Re Vickie Cleveland/DBHDD

19   Leadership.  And it's dated March 7th, 2019.

20         A     Okay.

21         Q     And this relates to a meeting that had

22   been scheduled for March 7th, 2019 from 11:00 a.m. to

23   12:00 p.m. on the 24th floor in the commissioner's

24   conference room at DBHDD?

25         A     According to the paper.



MONICA JOHNSON                                March 02, 2023
UNITED STATES vs STATE OF GEORGIA                        273

1    Q    And the top e-mail is from Dante McKay to
2  Ruth Rogers, copying you, Re Vickie Cleveland/DBHDD
3  leadership.  And it says:  Hi Ruth.  I called in and
4  held on the line for ten minutes.  No one else ever
5  joined.  Dante.
6         Do you recall that Vickie Cleveland did
7  not show up at several scheduled meetings with the
8  commissioner?
9         MS. JOHNSON:  Object to form.
10         THE WITNESS:  I have no idea.  I
11     don't have any recollection of that.
12         (Plaintiff's (Johnson) Deposition
13     Exhibit No. 964 was marked for the
14     record.)
15  BY MS. COHEN:
16    Q    Let me show you what I've marked as
17  Exhibit 964, which is an e-mail from Ruth Rogers
18  dated -- GA01458073, and this is an e-mail of
19  March 7th, 2019.
20    A    Okay.
21    Q    This is a meeting between -- this is an
22  e-mail between Ruth Rogers and Dante McKay, and
23  copying Dante McKay and you?
24    A    It was to other people.  So Amy Howell is
25  on here, Dante, Jeff.



MONICA JOHNSON                                March 02, 2023
UNITED STATES vs STATE OF GEORGIA                        274

1        Q      Ms. Howell was -- and Jeff Minor were

2    included as CCs?

3        A      Yes.

4        Q      Okay.  If you look down the page to the

5    next e-mail, it's from Dante McKay of the same date,

6    March 7th, to Ruth Rogers, copying you.  And it's

7    that e-mail we looked at a little while ago.

8        A      Right.

9        Q      Hi Ruth, I called in and held on the line

10   for ten minutes.  No one else ever joined.

11       A      Okay.

12       Q      And then, as a result -- following that

13   meeting where Vickie Cleveland did not join,

14   according to Mr. McKay, in the first ten minutes,

15   Ruth Rogers sends out her e-mail thereafter.

16              Do you see the time stamp is 6:02 p.m.?

17       A      Okay.  I see it.

18       Q      And Ruth Rogers said that Ms. Cleveland

19   had previously agreed to join the conference call,

20   confirmed by e-mail?

21       A      That's what it says, yes.

22       Q      And do you recall that, following the

23   failed March 7th meeting, there was a decision by the

24   DBHDD executive team to redelegate the scheduling and

25   monitoring of Vickie Cleveland's meetings to the



1  behavioral health team?

2       A     Yes, now that I see the e-mails, and

3  that's why said Cedric scheduled the meeting, the

4  e-mail that you asked me about a few minutes ago.

5  You asked me who was Cedric Bryant and he was

6  scheduling the meeting with her.  So now that I'm

7  seeing the e-mails, I do remember that the scheduling

8  went from Ruth to Cedric.

9       Q     Who is the executive team?

10      A     That's me.  So Cedric was my executive

11 assistant.  And so all Ruth is saying is, she's not

12 going to schedule these.  Cedric will pick these up.

13 That's what she's saying.

14      Q     So what Ruth was saying is the

15 commissioner is not going to put these meetings on

16 her calendar.  Cedric will schedule on behalf of the

17 division of behavioral health?

18            MS. JOHNSON:  Object to form.

19            THE WITNESS:  Yes, per this e-mail.

20 BY MS. COHEN:

21      Q     And do you know why Ms. Howell -- and

22 Ms. Howell and Jeff Minor had been included in the

23 prior e-mail --

24      A     Uh-huh.

25      Q     -- Invite?



1         A     Yes, according to this e-mail.

2         Q     And you were requesting a change -- or,

3    I'm sorry.  The Office of the Commissioner, Ruth

4    Rogers, is requesting that Amy Howell and Jeff Minor

5    be changed to optional attendees or on an as-needed

6    basis, with the change in the meeting to the division

7    of behavioral health?

8               MS. JOHNSON:  Object to form.

9               THE WITNESS:  That's what the

10          e-mail says, and I do remember that

11          transition.

12   BY MS. COHEN:

13        Q     What was the reason for it?

14        A     Well, most of the topics were just me and

15   Clara communicating or me, Dante and Nakeba.  I mean,

16   we had it.  So if we needed to bring in anyone else,

17   we could, but, I mean, we had it.

18        Q     Why had counsel been included previously?

19        A     Amy Howell was general counsel and

20   assistant commissioner.  So she had other

21   responsibilities other than just general counsel.

22        Q     Why was she included?

23        A     I don't know.  Because the commissioner

24   chose to include her.

25        Q     And why was Mr. Minor included?



1        A        Because the commissioner chose to include

2    him.

3        Q        Mr. Minor was counsel, as well?

4        A        No.  He was deputy commissioner.

5        Q        For what area?

6        A        For the department.  That was his title,

7    Deputy Commissioner.

8        Q        Can you recall any of the meetings that

9    you attended with Vickie Cleveland?

10       A        I cannot.

11       Q        Do you recall at a certain point in time

12   there was a transition from your being included in

13   the meetings to the meetings being assumed by

14   Mr. McKay?

15       A        That's possible.

16       Q        And that the frequency of the meetings

17   was reduced to every other month?

18       A        I don't recall the detail.

19       Q        But you can't recall a single meeting

20   with Ms. Cleveland?

21       A        I've said -- I'm saying the same thing.

22   No, I don't -- I don't remember her.  I just don't

23   remember her.  But obviously I met with her because

24   there's a communication that says, Hi Vickie, it was

25   nice to meet you, et cetera.  But I don't remember



MONICA JOHNSON                                    March 02, 2023
UNITED STATES vs STATE OF GEORGIA                      278

 1    her.

 2                MS. COHEN:  Okay.  Let's take a

 3         brief break and then I'm hoping we can

 4         excuse you subject to any questions that

 5         your lawyer may have.

 6                THE VIDEOGRAPHER:  The time is

 7         6:19 p.m.  We're off the record.

 8                    (Brief pause.)

 9                THE VIDEOGRAPHER:  The time is

10         6:20 p.m., and we are back on the record.

11                MS. COHEN:  Okay.  We have no

12         further questions from the Department of

13         Justice, subject to anything that

14         Ms. Melanie Johnson might ask.

15                MS. JOHNSON:  And I have no

16         questions, either.

17                MS. COHEN:  So this deposition is

18         concluded subject to our reservation on

19         the questions that you directed not to

20         answer.

21                MS. JOHNSON:  Okay.

22                THE VIDEOGRAPHER:  The time is

23         6:21 p.m., and we are off the record.

24

25



1          (Thereupon, the deposition was

2   concluded at approximately 6:21 p.m.)



```
 1                 D I S C L O S U R E

 2        The following representations and disclosures

 3   are made in compliance with Georgia Law, more

 4   specifically:

 5        Article 10(B) of the Rules and Regulations of

 6   the Board of Court Reporting (disclosure forms).

 7        OCGA 9-11-28(c (disqualification of reporter for

 8   financial interest).  OCGA 15-14-37(a) and (b)

 9   (prohibitions against contracts except on a

10   case-by-case basis.)

11        I am a certified court reporter in the State of

12   Georgia.  I am a subcontractor for Esquire Deposition

13   Solutions.  I have been assigned to make a complete

14   and accurate record of these proceedings.

15        I have no relationship of interest in the matter

16   on which I am about to report which would disqualify

17   me from making a verbatim record or maintaining my

18   obligation of impartiality in compliance with the

19   Code of Professional Ethics.

20        I have no direct contract with any party in this

21   action and my compensation is determined solely by

22   the terms of my subcontractor agreement.

23        This 13th day of March, 2023.
```

```
24   _____
                                 Tanya L. Verhoven-Page,
25                               B-1790.
```

```
 1                  C E R T I F I C A T E

 2

 3   STATE OF GEORGIA:

 4   FULTON COUNTY:

 5

 6            I hereby certify that the foregoing

 7       deposition was reported, as stated in the

 8       caption, and the questions and answers

 9       thereto were reduced to written page

10       under my direction, that the preceding

11       pages represent a true and correct

12       transcript of the evidence given by said

13       witness.

14            I further certify that I am not of

15       kin or counsel to the parties in the

16       case, am not in the regular employ of

17       counsel for any of said parties, nor am I

18       in any way financially interested in the

19       result of said case.

20            Dated this 13th day of March, 2023.

21

22       _____

23       Tanya L. Verhoven-Page,
         Certified Court Reporter,
         B-1790.

24

25
```



800.211.DEPO (3376)
EsquireSolutions.com

1                        ESQUIRE ERRATA SHEET

2

3

4    Esquire Job ID:  J9346742

5    Case Caption:  USA  v.  State of Georgia

6

7

8            DECLARATION UNDER PENALTY OF PERJURY

9

10          I declare under penalty of perjury that I

11    have read the entire transcript of my deposition

12    taken in the above-captioned matter or the same has

13    been read to me, and the same is true and accurate,

14    save and except for changes and/or corrections, if

15    any, as indicated by me on the DEPOSITION ERRATA

16    SHEET hereof, with the understanding that I offer

17    these changes as if still under oath.

18          Signed on this_____day of

19    _____ , 2023.

20

21

22

23          _____

24                      MONICA JOHNSON

25



MONICA JOHNSON                                    March 02, 2023
UNITED STATES vs STATE OF GEORGIA                        283

```
 1                DEPOSITION ERRATA SHEET
 2                     CORRECTIONS
 3     Pg.    Ln.    Now Reads      Should Read      Reason
 4     _____ _____ _____ _____ _____
 5     Pg.    Ln.    Now Reads      Should Read      Reason
 6     _____ _____ _____ _____ _____
 7     Pg.    Ln.    Now Reads      Should Read      Reason
 8     _____ _____ _____ _____ _____
 9     Pg.    Ln.    Now Reads      Should Read      Reason
10     _____ _____ _____ _____ _____
11     Pg.    Ln.    Now Reads      Should Read      Reason
12     _____ _____ _____ _____ _____
13     Pg.    Ln.    Now Reads      Should Read      Reason
14     _____ _____ _____ _____ _____
15     Pg.    Ln.    Now Reads      Should Read      Reason
16     _____ _____ _____ _____ _____
17     Pg.    Ln.    Now Reads      Should Read      Reason
18     _____ _____ _____ _____ _____
19     Pg.    Ln.    Now Reads      Should Read      Reason
20     _____ _____ _____ _____ _____
21     Pg.    Ln.    Now Reads      Should Read      Reason
22     _____ _____ _____ _____ _____
23     Pg.    Ln.    Now Reads      Should Read      Reason
24     _____ _____ _____ _____ _____
25
```



1              DEPOSITION ERRATA SHEET

2                    CORRECTIONS

3   Pg.    Ln.   Now Reads        Should Read     Reason

4   _____ _____ _____ _____ _____

5   Pg.    Ln.   Now Reads        Should Read     Reason

6   _____ _____ _____ _____ _____

7   Pg.    Ln.   Now Reads        Should Read     Reason

8   _____ _____ _____ _____ _____

9   Pg.    Ln.   Now Reads        Should Read     Reason

10  _____ _____ _____ _____ _____

11  Pg.    Ln.   Now Reads        Should Read     Reason

12  _____ _____ _____ _____ _____

13  Pg.    Ln.   Now Reads        Should Read     Reason

14  _____ _____ _____ _____ _____

15  Pg.    Ln.   Now Reads        Should Read     Reason

16  _____ _____ _____ _____ _____

17  Pg.    Ln.   Now Reads        Should Read     Reason

18  _____ _____ _____ _____ _____

19

20                    _____
                      Signature of Deponent
21

22  SUBSCRIBED AND SWORN BEFORE ME

23  This the_____ day of_____, 2023.

24  _____

25  (Notary Public)    My Commission Expires:_____

