## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | CIVIL ACTION |
| v. | NO. 1:16-CV-03088-ELR |
| STATE OF GEORGIA, | |
| *Defendant*. | |

## DEFENDANT STATE OF GEORGIA'S REPLY BRIEF
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Introduction ........................................................................................................1

**I.**    Standing ..................................................................................................2

    **A.**    Injury In Fact and the At-Risk Theory ...................................3

    **B.**    Traceability ................................................................................5

**II.**   The Olmstead Claim ..............................................................................7

    **A.**    The State Does Not Administer The Alleged
Discriminatory Services .........................................................7

    **B.**    The Need of Individualized Analysis By Competent Professionals .....8

    **C.**    The Necessity of Considering Individuals' Choice............................13

    **D.**    The Failure to Identify Reasonable Accommodations ......................14

    **E.**    At-Risk Theory ..................................................................17

**III.**  The Equal Opportunity Claim ...................................................17

Conclusion .......................................................................................18

# INTRODUCTION

The DOJ's Response in Opposition to the State's Motion for Summary Judgment (the "Response") largely ignores or does not substantively address controlling precedent and dispositive legal arguments raised in the State's Brief in Support of its Motion for Summary Judgment (the "State's Brief").[1]  In this circuit, the failure to develop an argument in response to a motion for summary judgment constitutes waiver.  Case v. Eslinger, 555 F.3d 1317, 1329 (11th Cir. 2009).  When the Response does address the State's legal arguments and citations to controlling precedent, the Response relies exclusively on distinguishable, persuasive authority from other circuits. The Response also cites to only a few, isolated facts in an ineffective attempt to create a question of material fact about the DOJ's sweeping, systemic allegations. Under these circumstances, the Response has provided this Court with no sound basis to deny the State's Motion for Summary Judgment.

## THE BACKGROUND SECTION OF THE STATE'S BRIEF

Citing specific authority, the State's Brief demonstrates that Georgia statutory and regulatory law (1) affords local school districts significant control over K-12 education; and (2) delegates far less jurisdiction to the DOE.  [Doc. No. 429-1 at 6-10 (citations omitted).] The Response ignores this legal analysis completely, and it

---

[1] This Reply adopts the same abbreviations as the State's Brief. [Doc. No. 429-1.]

does not argue that the DOE exceeds its limited jurisdiction to "administer" GNETS.

In this circuit, precedent treats such silence and even "perfunctory" responses as waiver.  See N.L.R.B. v. McClain of Georgia, Inc., 138 F.3d 1418, 1422 (11th Cir. 1998). Consequently, for purposes of summary judgment, it is undisputed that only local education officials possess the legal authority to make decisions governing each act that the DOJ contends is discriminatory, including where students receive certain special education services, eat, enter buildings, participate in extra-curricular activities, and transportation.[2]

## THE ARGUMENT SECTION OF THE STATE'S BRIEF

The Response sometimes disagrees with the State's contentions, but usually fails to explain why or how.  Such conclusory statements provide no basis to overcome summary judgment.  Dekalb Cnty. v. HSBC N. Am. Holdings Inc., 1:12-CV-03640-ELR, 2015 WL 8699229, at *3 (N.D. Ga. Nov. 16, 2015) (conclusory statements and allegations "have no probative value" at summary judgment).

## I.   Standing

The parties agree that the DOJ must establish constitutional standing.  [Doc. 448-1 at 3.] The disagreement is over whether the DOJ has done so.

---

[2] This omission is not saved by the DOJ's Reply Brief in Further Support of Its Motion for Partial Summary Judgment. [Doc. 442.] That brief fails to respond to the State's analysis of Georgia law or the State's demonstration that the DOJ's evidence is inaccurately described. [Doc. 434 at 14-18; Doc. 442 at 9.]

– 2 –

## A.      Injury In Fact and the At-Risk Theory

The Response identifies only one injury for standing purposes: "injury to [federal] sovereignty arising from violations of [federal] laws." [Doc. 448-1 at 4 (citing Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000); United States v. Raines, 362 U.S. 17, 27 (1960)). But DOJ's Article II authority does not satisfy the required Article III injury in this case. As the Eleventh Circuit explained in United States v. Secretary Florida Agency for Health Care Administration, 21 F.4th 730, 732–34, 737 (11th Cir. 2021) (denying rehearing *en banc*), which the Response does not address, any statutory standing DOJ has arises on a representative basis of aggrieved persons and not as a person. Because DOJ cannot assert an ADA claim in its own right, the required Article III injury must likewise come from the injured party; DOJ's Article II interests are simply irrelevant.

DOJ's reliance on Vermont Agency and Raines is misplaced. As the DOJ concedes, Vermont Agency did not consider the federal government's standing, and the cited reference is distinguishable dicta about enforcing criminal law.  529 U.S. at 768, 771.  The case does show, however, that any offense to sovereignty requires demonstrating an actual violation of the ADA: discrimination against a "qualified individual." 42 U.S.C. 12132.  Absent a violation, there is no offense to sovereignty.[3]

---

[3] The Response's citation to Raines is also unhelpful. That decision addresses the sovereignty of the United States to enforce constitutional law, but even those claims require a showing of an actual and not just hypothetical victim.

The Response also offers an ineffective defense of the alleged at-risk injury to unidentified students who may or may not be unjustifiably separated. See Olmstead v. L.C., 527 U.S. 581, 597 (1999) (plurality opinion) (limiting liability to "unjustified institutionalization"). The Response first suggests that the State must identify "at-risk" students however, even as the DOJ acknowledges, only plaintiffs bear the burden of establishing standing. [Doc. 448-1 at 6 (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)]. The citation to Dr. Putnam's report is also unavailing, as he claims anyone with a disability is "at-risk" of discrimination. [Doc. No. 448-1 at 6.] This approach would remove any requirement of discrimination (e.g., an injury) completely, which is contrary to Olmstead.

Finally, while the DOJ acknowledges it must show a "concrete" and "imminent" injury, it fails to do so. [Doc. 441-15 at n.6 (citing Trichell v. Midland Credit Mgmt., Inc., 964 F.3d 990, 996 (11th Cir. 2020).] Instead, its response is "perfunctory" and constitutes waiver. McClain of Ga., Inc., 138 F.3d at 1422. Whatever substance remains is flawed, as the Fifth Circuit recently recognized: the DOJ's at-risk theory is incompatible with Olmstead.  United States v. Mississippi, 82 F.4th 387, 394 (5th Cir. 2023) (reversing injunction obtained by the DOJ).[4] The

---

[4] By seeking to impose liability based on disability status alone, the DOJ's theory impermissibly removes the anti-discrimination purpose of the ADA altogether.  See Mississippi, 82 F.4th at 393-94.

Eleventh Circuit also held that potential risk (e.g., being at-risk) is not a cognizable injury.  Trichell, 964 F.3d at 996.  The Response's attempt to distinguish Trichell is conclusory or limited to those currently receiving GNETS services.

### B.    Traceability

The DOJ's traceability arguments also fail.  First, by waiving any challenge to the State's descriptions of Georgia law and the State government's limited reach, the DOJ cannot (and the Response does not) explain how an injunction against the State would preclude or even impair LEAs and RESAs from: recommending students for GNETS services; maintaining (or not maintaining) school buildings; deciding where to provide GNETS services; or making decisions about where students eat, enter buildings, or participate in extra-curricular activities.  See [Doc. 429-1 at 19-20.] This omission constitutes waiver. Case, 555 F.3d at 1329. The omission is also dispositive.  See Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1253 (11th Cir. 2020).  Controlling precedent explains that traceability is lacking when the requested judicial action does not impact the complained of conduct. Id. at 1254.

Similarly, the Response fails to effectively respond to the State's demonstration that the DOJ's requested relief of mandating Apex Program and PBIS/MTSS in local schools is incompatible with Jacobson. It says only that the "suggestion is baseless," but does not dispute that the programs are currently

voluntary and changing this status would require this Court to rewrite Georgia statutes and regulations.  Such scant treatment is waiver.  See McClain of Georgia, Inc., 138 F.3d at 1422.  So is the DOJ's speculation about what happens "in practice," or "as a practical matter," as it cites no supporting evidence.  [Doc. No. 448-1 at 9.]

One of the DOJ's only substantive responses claims that GNETS grants are effectively involuntary, and that the State "shapes … decisions" at the local level. The argument is not a legal one, and it is based on four deposition excerpts that the Response cites and does not analyze.  [Doc. No. 448-1 at 8.]  Upon review, it is evident that none of the cited testimony supports the DOJ's contention. Three deponents describe how GNETS grant amounts are determined, but none testify that the State "shapes" local decisions.  [Doc. Nos. 448-14 (Dep. of W. Braddock); 448-29 (Dep. of A. McCollum); 448-39 (Dep. of G. Bell)][5]  The fourth deponent, Dr. Holifield of the North Metro GNETS center, discussed overall funding, but she did

---

[5] The Response mislabels the deposition of Geronald Bell as "Exhibit JJ."  [Doc. No. 448-1 at 9.]  Exhibit JJ is the deposition of Larry Winter.  Mr. Bell's deposition is Ex. II.  The description above represents a description of Mr. Bell's testimony and not Mr. Winter's.  Any attempt to expand one of the three deponents, Geronald Bell, beyond this is improper; he repeatedly indicated he was "not familiar" with the specific question posed by opposing counsel and assumes other information. Doc. No. [409] at 232:8-234:5 (Dep. of G. Bell).  See Fed. R. Civ. Evid. 602, Fed. R. Civ. P. 56(c)(4), Airington v. ITW Food Equip. Grp. LLC, 1:13-CV-00507-ELR, 2015 WL 11233184, at *6 (N.D. Ga. Apr. 21, 2015) ("At the summary judgment stage, the Court requires more than Plaintiff's 'personal speculation' as to what happened).

not testify that GNETS grants are mandatory, that the State shapes her decisions, or that her experience is representative of others. [Doc. No. 448-1, Ex. I.]

The few legal arguments on traceability are equally meritless. For example, the Response asks this Court to speculate about the "likely reaction of third parties" not before it and who did not testify. [Doc. No. 448-1 at 9 (citing Florida, 2023 WL 4546188, at *12).]  The premise for this is the Florida case where, unlike here: (1) the court had some evidence from the third parties on the issue; and (2) unlike the DOE, the Florida agency at issue exercised "detailed and demanding" control.  2023 WL 4546188, at *12-13.  For these reasons, the alleged harm is neither traceable to nor redressable by the State.  The DOJ simply sued the wrong parties.

## II.   The Olmstead Claim

Olmstead recognized that, because isolation may be appropriate for some and not others, deciding what constitutes "appropriate" settings are based on an individual's needs and must be determined by at least some kind of professional. 527 U.S. at 597, 602.  Justice Kennedy's controlling concurrence also made clear that these professional determinations are afforded the "greatest deference." Id. at 610.  The DOJ impermissibly seeks to displace this framework by relying on a generalized approach and claims of systemic discrimination.  The claims fail.

### A.   The State Does Not Administer The Alleged Discriminatory Services.

The DOJ asks this Court to impose liability against the State for what the DOJ

– 7 –

concedes (through waiver) are local officials' decisions. <u>See</u> [429-1 at 17-19 (citations omitted).] As shown, the DOJ's proposed remedy makes this clear: mandating the expansion of the Apex Program and PBIS training does not curtail the challenged local decisions. This ends the inquiry.

## B.     The Need of Individualized Analysis By Competent Professionals.

As the Fifth Circuit properly recognized, "[a]ppropriateness, as <u>Olmstead</u> clearly understood, must be [an] individualized" inquiry. <u>Mississippi</u>, 82 F.4th at 396. This is because only "unjustified" isolation is actionable under the ADA, and for some, separation is justified and appropriate. <u>Olmstead</u>, 527 U.S. at 597. Unjustified isolation occurs when the State's (or at least some) professional has determined that a disabled and isolated individual can be appropriately served in a community setting. <u>Id.</u> at 602. The DOJ's proffered experts agree. (McCart Dep. 143:10–144:1; Putnam Dep. 18:8–21.) Consequently, identifying unjustified isolation requires the ability to distinguish between those properly receiving services in separate settings and those who are not. Summary judgment is warranted, because the DOJ has offered this Court no means to such determinations.

### 1.     The Necessity of Individualized Evidence.

The Response does not challenge the State's (and Fifth Circuit's) reading of <u>Olmstead</u> as requiring individualized analysis. It does not even discuss the opinion. [Doc. 448-1 at 14-15.] <u>Compare</u> [Doc. 429-1 at 19-24] <u>with</u> [Doc. 448-1 at 14-17.]

This failure constitutes waiver, meaning, as a matter of law, the DOJ's generalized theory is erroneous and summary judgment is warranted.  Case, 555 F.3d at 1329.

Instead of addressing Olmstead, the Response relies entirely on one reversed decision from a New York District Court. [Doc. 448-1 at 14 (citing Disability Advocs., Inc. v. Paterson, 653 F. Supp. 2d 184, 258-59 (E.D.N.Y. 2009) (reversed for lack of standing by Disability Advocs., Inc. v. N.Y. Coalit. for Quality Assisted Living, Inc., 675 F.3d 149, 152 (2d Cir. 2012)).  But, as should be obvious, Olmstead controls, not Paterson.  See Generali v. D'Amico, 766 F.2d 485, 489 (11th Cir. 1985).  Further, Paterson is no longer good law because the plaintiff lacked standing to make generalized representations about what is "appropriate."  See N.Y. Coal. for Quality Assisted Living, Inc., 675 F.3d at 157-58.[6]  Paterson is also distinguishable, because the government did not argue for individualized evidence, and the dispute was over the role of expert testimony.  653 F. Supp. 2d at 258.

The DOJ's factual arguments on the need for individualized analysis are equally unavailing.  [Doc. No. 448-1 at 15-17.]  Dr. McCart's testimony does not provide any basis to identify persons subject to alleged unjustified separation: she

---

[6] Further demonstrating the lack of legal support for its position, the DOJ retreats to inappropriate policy arguments.  Any unjustified concerns about correcting "large-scale discrimination" presents an issue for Congress or the Supreme Court should it revisit Olmstead.  [Doc. 448-1 at 14.] "[P]arties should not seek to amend the statute by appeal to the Judicial Branch." 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 270 (2009) (citation omitted).

did not review the "vast majority" of files, challenged no specific IEP Team's determination, and identified no individual student. McCart Dep. 141:10-19, 118:8-120:5. As the DOJ acknowledges, Dr. Putnam did not address the issue at all. [Doc. No. 448-1 at 16 n.17.]

Instead of the individualized approach the DOJ adopted in the <u>Florida</u> litigation, here it cites documents about only ten students.[7] This falls well short of creating a question of material fact about the DOJ's systemic claims. [Doc. 448-1 at 2.] The evidence itself is substantively weak. It contains inadmissible hearsay. Fed. R. Civ. Evid. 802, Fed. R. Civ. P. 56(c)(4). The documents do not show, as the Response claims, that students "succeeded in community" placements. [Doc. 448-1 at 15 n.15.] Indeed, only three documents, Exhibits 10, 21, and 40, suggest that the student was referred out of the GNETS Program. If anything, the evidence shows a working system preventing unjustified isolation. Similarly, the cited documents do not support the DOJ's claim that the "State itself believes that entire populations of students" may be inappropriately referred for GNETS services. [Doc. No. 448-1 at 15 n.15.] Exhibit 28 contains inadmissible hearsay and makes no conclusions. Brooke Cole's deposition reaches no conclusion, and as a local official, she cannot

---

[7] The Response attempts to distinguish the <u>Florida</u> case by pointing out that the decision was issued after trial. [Doc. 448-1 at 5 n.5.] This is irrelevant. Rule 26(e) precludes the DOJ from offering new expert analysis at trial, and Rule 56 requires relevant evidence to be cited now. <u>See Case</u>, 555 F.3d at 1329.

testify about what "the State itself believes." [Id. (citing Exhibit K).]

##### 2.      The Necessity of Professional Judgment

The Eleventh Circuit recently reaffirmed that, under Olmstead, plaintiffs must show "a determination by the State's treatment professionals that [community] placement is appropriate." United States v. Florida, 938 F.3d 1221, 1250 (11th Cir. 2019). The DOJ disagrees, but it fails to address either controlling opinion and instead relies on non-binding decisions. Legally, this is insufficient. Factually, it ignores that the only individualized assessments were completed by IEP Teams, Ga. Comp. R. & Regs. 160-4-7-.15(3)(c).[8]

In addition, this Court's order denying the State's motion to dismiss is not controlling given the different standard of review. [Doc. No. 61 at 16.] The DOJ's reliance on 28 C.F.R. § 35.130(d) fails, because a federal regulation cannot trump the Supreme Court's interpretation of it in Olmstead. 527 U.S. at 592. The DOJ's remaining legal argument, a citation to non-binding authority, neither addresses nor overcomes Olmstead or Florida. [Doc. No. 448-1 at 12-13 (citing Radaszewski ex rel. Radaszewski v. Maram, 383 F.3d 599, 600 (7th Cir. 2004); Z.S. v. Durham Cnty., 1:21CV663, 2022 WL 673649, at *1 (M.D.N.C. Mar. 7, 2022); Paterson, 653 F.

---

[8] Whether this Court cites Justice Kennedy's concurrence and requires a physician's opinion, or whether it relies on the plurality decision and mandates some "professional" determination (e.g., an IEP Team), there is no support for the idea that an absence of competent, individualized assessments is necessary. Olmstead, 527 U.S. at 602, 610.

Supp. 2d at 258-59.] <u>Maram</u> and <u>Z.S.</u> involved individual plaintiffs and deferential standards of review; no one said the <u>Maram</u> plaintiff needed separate services, and a treating professional opined community placement was appropriate in <u>Z.S.</u>  383 F.3d at 613; 2022 WL 673649 at *1 (reviewing a motion to dismiss).  <u>Paterson</u> involved service providers who were monetarily incented **not** to conduct individual reviews and did not.  653 F. Supp. 2d at 259.[9]

The only evidence the Response cites in support of its argument are the DOE's internal review of five IEPs. [Doc. No. 448-1 at 13 n.14.] This limited evidence hardly shows that local districts "often" fail to create exit criteria as DOJ suggests. [Id.]  Moreover, neither of the DOJ's experts assessed these five students' needs. If anything, the documents demonstrate efforts to prevent unjustified isolation.

### 3.    The New "Per Se" Claim.

The Response represents the first time the DOJ argues that the LEAs and RESAs should cease providing GNETS services. [Doc. 448-1 at 16-17.] Neither <u>Olmstead</u> nor the DOJ's proffered experts support this policy, because for some, "no placement outside the institution may ever be appropriate."  527 U.S. at 605; McCart

---

[9] The Fifth Circuit considered the same authority in <u>Mississippi</u>, and it concluded each decision was "distinguishable or unreliable legally."  82 F.4th at 396.  None of the cases involved a demand too "completely rework[ a] state benefit programs," and most were based on judicial deference to the DOJ's regulations that is no longer appropriate. 82 F.4th at 394 (citing <u>Kisor v. Wilkie</u>, 139 S. Ct. 2400, 2414 (2019)), 396. The Response is silent on this analysis too.  [Doc. No. 448-1 at 28-29.]

Dep. 143:10–144:1; Putnam Dep. 18:8–21. This makes the Response's citation to Dr. McCart's report especially weak. [Doc. 448-1 at 17 (citing McCart Rep. at 158).] Dr. McCart's concedes that none of her recommendations would take longer than three years to implement and she did not recommend a review of the IEPs of all students currently receiving GNETS services.  (McCart Dep. 203:7-205:8.)[10]

### C.   The Necessity of Considering Individuals' Choice.

The DOJ agrees with <u>Olmstead</u>: the ADA does not mandate that "community-based treatment be imposed on [those] who do not desire it." <u>Olmstead</u>, 527 U.S. at 602; [Doc. 448-1 at 17]. The Response's attempt to show non-opposition, however, fails in the light of the DOJ's sweeping, systemic claims. Specifically, of the thousands of students that the DOJ contends are subject to discrimination, the Response cites documents about only eight.  [Doc. 448-1 at 8-19 n.20.]  Based on this woefully insufficient sample of hearsay evidence, the Response erroneously demands that this Court make unsupported presumptions about what the "vast majority" of GNETS students would "likely" decide. [Doc. 448-1 at 18 (citing <u>Paterson</u>, 653 F. Supp. 2d at 260-67].[11]  There is no basis or reason to do so.

---

[10] As important, Olmstead makes clear that liability cannot be based on challenges to the quality of services.  527 U.S. at 603 n.14 (plurality opinion).

[11] Equally unavailing is Dr. McCart's inadmissible and unscientific opinion describing an unquantified and unidentified number of "records indicat[ing] the hopelessness." (McCart Rep. at 154.) <u>See</u> State's Motion to Exclude Testimony of Dr. Amy McCart at 20-21.

– 13 –

DOJ next claims that local officials do not provide sufficient "individualized" information about alternatives to GNETS. [Doc. 448-1 at 20 (emphasis added).] While the sudden concern about individualization is curious, the DOJ cites no actual evidence of insufficient communication or that it comes from the State.  The citation to Dr. McCart is unavailing, as she fails to identify any individual student or insufficient communication. (McCart Dep. 56:14-57:20.)  Also, the cited Exhibits 22 and 23 are not only an insufficient sample, they are inadmissible hearsay.

### D.    The Failure To Identify Reasonable Accommodations.

As part of its prima facie case, the Response advocates for two proffered reasonable accommodations: (1) mandatory PBIS and MTSS training; and (2) mandating schools to partner with Apex Program providers.  [Doc. 448-1 at 23.]  It failed, however, to provide this Court with any basis to conclude the policies are "reasonable" in the light of binding precedent.

First, the Eleventh Circuit held that any determination of reasonableness must be based on individual circumstances and not generalized theory. <u>Bircoll</u>, 480 F.3d at 1086.  The court's reasoning is simple and consistent with <u>Olmstead</u>: "terms like reasonable are relative to the particular circumstances of the case … [and] must be decided case-by-case based on numerous factors." <u>Id.</u>  The DOJ's experts agree. McCart Dep. 104:8-11 and 62:18-63:2. Putnam Dep. 19:18-21; 63:1-16; 121:15-8. Thus, just as in <u>Bircoll</u>, summary judgment is warranted because the Response does

not show reasonableness tailored to any individual student's "particular circumstances." Id. This is especially true given the Response's inaccurate treatment of the binding Bircoll decision. It does not, as DOJ contends, address the fundamental alteration defense; the court concluded the plaintiff's requested accommodation was "**per se not reasonable**."[12] Compare [Doc. No. 448-1 at 27 n.27] with 480 F.3d at 1086 (emphasis added).[13] The Response's mention of the State's system of care does not change this conclusion.[14] 480 F.3d at 1086.

Nor does one of the Response's few discussions of the Olmstead decision,

---

[12] The Response claims that the Bircoll decision "in no way alters the burden shifting framework established in Olmstead." [Doc. 448-1 at 27 n.27.] Bircoll does not address the burden shifting of Olmstead. As in Bircoll, the burden never shifts to the fundamental alteration defense, because the DOJ does not satisfy its prima facie burden of demonstrating the reasonableness of his requested accommodation. 480 F.3d at 1086. See Florida, 2023 WL 4546188 at *5.

[13] Districts court in this circuit have uniformly cited Bircoll when considering the plaintiff's burden to show a reasonable accommodation and not the fundamental alteration defense. See Boudreau v. Nocco, 8:21-CV-1158-VMC-AEP, 2022 WL 17812876, at *5 (M.D. Fla. Nov. 2, 2022), report and recommendation adopted, 8:21-CV-1158-VMC-AEP, 2022 WL 17369636 (M.D. Fla. Dec. 2, 2022); Harvard v. Dixon, 4:19-CV-212-AW-MAF, 2022 WL 21694010, at *7 (N.D. Fla. July 25, 2022); Yelapi v. DeSantis, 487 F. Supp. 3d 1278, 1288 (N.D. Fla. 2020); Garner v. City of Ozark, 1:13-CV-90-WKW, 2015 WL 728680, at *8 (M.D. Ala. Feb. 19, 2015); Gaylor v. Georgia Dep't of Nat. Res., 2:11-CV-288-RWS, 2013 WL 4790158, at *5 (N.D. Ga. Sept. 6, 2013); Tucker v. Bradshaw, 11-80058-CIV, 2012 WL 13018592, at *5 (S.D. Fla. Dec. 20, 2012).

[14] The State's system of care also speaks of greater coordination between agencies. [Doc. No. 448-1 at 25 n.26.] It does not support the feasibility of a dramatic expansion of the Apex Program during a dramatic workforce shortage and (at worst) unknown cost, nor does it call for the State legislature to mandate PBIS in every school in Georgia. [Id., Ex. 47.]

– 15 –

where it misreads footnote 16.  527 U.S. at 606 n.16.  The Response claims that the

plurality's identifying of cost and workforce considerations apply to the fundamental

alteration defense, because the footnote references a Rehabilitation Act regulation

on "fundamental hardship."  This is incomplete: the reference to the Rehabilitation

Act was part of the construction of DOJ's "reasonable **modification**" regulation.  Id.

The Response also fails to explain how a request to increase the "amount and

intensity" of behavioral services is not an impermissible demand that the State

expand services. [Doc. 448-1 at 23, 32.].  The Response's citation to inapplicable,

persuasive authority—that neither addresses education nor involves a total absence

of cost analysis—does not excuse its failure to address binding precedent's treatment

of these issues. [Doc. 448-1 at 25-26 (citing Henrietta D. v. Bloomberg, 331 F.3d

261, 280 (2d Cir. 2003); Maram, 383 F.3d at 611-12; United Spinal Ass'n v. Bd. of

Elections in N.Y., 882 F. Supp. 2d 615, 626-27 (S.D.N.Y. 2012); Haddad v. Arnold,

784 F. Supp. 2d 1284, 1284 (M.D. Fla. 2010); Messier v. Southbury Training Sch.,

562 F. Supp. 2d 294, 298 (D. Conn. 2008); Paterson, 653 F. Supp. 2d at 192.]

All that remains is Dr. Putnam's claim that Georgia could fund a massive

Medicaid expansion by simply "reallocating" the limited GNETS grant funds. [Doc.

448-1 at 24.] This unscientific and inadmissible opinion does not create a material

question of fact given Dr. Putnam's concessions that: he "do[esn't] know a lot about

GNETS;" performed no "cost analysis" to support this hypothetical, and based his

conclusion on the experience of one urban school district in Massachusetts that Dr. Putnam acknowledges "may be problematic" if applied to rural schools. (Putnam Dep. 18:19-22; 97:6-10; 39:18-40:6.)  See also McKay Declaration at ¶¶ 6-11. [15]

### E.    At-Risk Theory

The State responds to the DOJ's inappropriate at-risk theory above in the section addressing the lack of an injury-in-fact.  See supra at I.A.

## III.    The Equal Opportunity Claim

The Response clarifies the DOJ's equal opportunity claim, but it does not save it.  The alternative theory is based on 28 C.F.R. § 35.130(b)(3), which prohibits public entities from "utiliz[ing] methods of administration" that either "have the effect" of discriminating against qualified individuals because of their disability or have the purpose or effect of "defeating or substantially impairing" the public entity's program's objectives. The Response does not explain which theory it is choosing, but it is immaterial.  The State neither administers the GNETS Program—directly or through contractual or other arrangements—nor does it control the decisions the DOJ cites as discrimination.  See supra at II.A.; [Doc. No. 434].

Moreover, the Response does not identify a qualified individual subject to discrimination or identify any comparative data from other states that would be

---

[15] Even if this Court strikes McKay's declaration, the DOJ has still failed to provide any competent evidence on cost and, thus, failed to meet its burden.

necessary to show that the administration of GNETS "defeat[s] or substantially impair[s]" its purpose.  28 C.F.R. § 35.130(b)(3)(ii). In fact, Dr. Wiley's report demonstrates that, comparatively, the State provides significant integrated services. Wiley Rep. at 15-16.  It is clear, however, that DOJ's challenge is to the quality of services, despite that <u>Olmstead</u> rejects such an approach. 527 U.S. at 603 n.14. Indeed, the DOJ retained Dr. McCart to address quality issues, and she opined about "ineffective" services. (McCart Rep. at 1, 3, 11, 67, 136, 140, 139, 144-46.)

Finally, the Response does not substantively explain how the educational opportunity claim does not rise under the IDEA.[16]  See <u>Fry v. Napoleon Cmty. Sch.</u>, 580 U.S. 154, 171 (2017).  Indeed, it ignores the two-part test in <u>Fry</u> altogether.  The Response also concedes that the complaint employs IDEA language. [Doc. 429-1 at 35 (citing 20 U.S.C. § 1401(9)(B).]  These "perfunctory" responses do not overcome summary judgment in this circuit.  <u>McClain of Georgia, Inc.</u>, 138 F.3d 1418, 1422.

## CONCLUSION

For the reasons stated above, the State of Georgia respectfully requests that the Court grant its Motion for Summary Judgment.

---

[16] The Response does not dispute that the DOJ lacks authority to bring an ADA IDEA claim. <u>See</u> 20 U.S.C. § 1416 (granting the USDOE exclusive authority to bring IDEA claims).

Respectfully submitted, this 13th day of December, 2023.

*/s/ Josh Belinfante*

| Christopher M. Carr | 112505 |
| *Attorney General* | |
| Bryan Webb | 743580 |
| *Deputy Attorney General* | |
| Russell D. Willard | 760280 |
| *Sr. Assistant Attorney General* | |
| Susan R. Haynes | 901269 |
| *Assistant Attorney General* | |

Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334

| Josh Belinfante | 047399 |
| Melanie Johnson | 466759 |
| Edward A. Bedard | 926148 |
| Danielle Hernandez | 736830 |
| Javier Pico Prats | 664717 |
| Anna Edmondson | 289667 |

Robbins Alloy Belinfante Littlefield, LLC
500 14th St. NW
Atlanta, GA 30318
T: (678) 701-9381
F: (404) 856-3255
E: jbelinfante@robbinsfirm.com
   mjohnson@robbinsfirm.com
   ebedard@robbinsfirm.com
   dhernandez@robbinsfirm.com
   jpicoprats@robbinsfirm.com
   aedmondson@robbinsfirm.com

Alexa R. Ross                614986
AlexaRossLaw, LLC
2657 Danfroth Lane
Decatur, Georgia 30033
E: alexarross@icloud.com

*Special Assistant Attorneys General*

*Attorneys for Defendant*
*State of Georgia*

## LOCAL RULE 7.1(D) CERTIFICATION

I certify that this State of Georgia's Brief in Support of Its Motion for Summary Judgment has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1. Specifically, this document has been prepared using 14-pt Times New Roman font and type.

*/s/ Josh Belinfante*
Josh Belinfante