# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:16-cv-03088- |
| | ) | ELR |
| STATE OF GEORGIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## UNITED STATES' MEMORANDUM IN SUPPORT OF ITS MOTION IN LIMINE TO PARTIALLY EXCLUDE TESTIMONY OF DR. ANDREW WILEY, PH.D.

## I.    INTRODUCTION

After disclosing no affirmative experts in this litigation, Defendant State of Georgia ("State") disclosed one rebuttal expert, Dr. Andrew Wiley, whose testimony purports to reach material issues of law and fact about which he is neither qualified to opine nor adequately informed. The State impermissibly seeks to offer Dr. Wiley to opine on the legal requirements of the Individuals with Disabilities Education Act ("IDEA") and the Americans with Disabilities Act ("ADA"), in contravention of longstanding prohibitions against expert legal opinion testimony. Further, Dr. Wiley's anticipated testimony regarding the Georgia Network for Educational and Therapeutic Support Program ("GNETS" or

"GNETS Program") —including the supports and services received by students placed in the GNETS Program—is based on a review Dr. Wiley himself admits is an inadequate basis upon which to offer an opinion. As he readily acknowledges, Dr. Wiley has limited practical experience in the special education field and conducted only the most cursory review of the GNETS Program as a whole, let alone of any of the twenty-four regional GNETS programs. As a result, the Court should bar the State from admitting as evidence any expert testimony by Dr. Wiley on these topics.

## II.    BACKGROUND

The United States brought this litigation in 2016 to vindicate the rights of thousands of public-school students with behavior-related disabilities in, or at risk of entering, the GNETS Program—an educational program administered by the State of Georgia that unnecessarily segregates students and deprives them of equal educational opportunities in violation of Title II of the ADA. The United States proffered the testimony of two experts—Drs. Amy McCart and Robert Putnam— on whom it intends to rely in support of its case-in-chief. After proffering no affirmative experts, the State disclosed one rebuttal expert, Dr. Andrew Wiley, whose opinions ostensibly respond to parts of Dr. McCart's and Dr. Putnam's expert reports. For the reasons set forth below, this Court should exclude the following testimony: (1) Dr. Wiley's improper legal opinions as set forth in

Section I of his Rebuttal Report, and all other legal opinions Dr. Wiley may be

called to offer; and (2) any testimony Dr. Wiley may offer on the GNETS Program

itself, including any regional GNETS programs or the supports and services

received by students placed in the GNETS Program in the State of Georgia.

Since receiving his Ph.D. in 2008, Dr. Wiley has served as both an assistant

professor and now an associate professor of special education at Kent State

University in Akron, Ohio. Wiley Rebuttal Report ("Wiley Rep.") at 85 (attached

as Exhibit 1). Many of Dr. Wiley's publications center on whether students with

disabilities should be educated alongside non-disabled peers, with Dr. Wiley

describing himself as a "critic of full inclusion." ECF 436, Deposition of Dr.

Andrew Wiley, Ph.D. ("Wiley Dep.") at 275:19-22 (excerpts attached as Exhibit

3). Dr. Wiley's experience is largely academic; he has not evaluated educational

environments or consulted with or advised state or local education agencies on the

provision of services and supports to students with disabilities since well before

earning his doctorate. Wiley Dep. 23:11-24, 33:14-23, 37:25-39:2. Dr. Wiley has

not had practical experience in K-12 schools, reviewed student Individualized

Education Plans ("IEPs") for appropriateness or fidelity of implementation, or

evaluated the adequacy of a student's services and supports since the 1990s—

again, well before he earned his doctorate. Wiley Dep. 33:14-34:24, 39:7-18, 40:4-

11, 327:10-328:19, 329:6-10. Dr. Wiley readily acknowledges his purported

3

expertise centers on *research*, not on practical experience in special education. Wiley Dep. 40:12-42:4. He concedes that his Rebuttal Report is a "synthesis of research" meant to correct what he perceives as "misunderstandings on the literature around placement interventions generally" and, in doing so, "provide a defense for having separate placements generally." Wiley Dep. 183:3-12, 300:5-11. Moreover, Dr. Wiley candidly acknowledges that he does not intend to offer opinions on whether the GNETS Program unnecessarily segregates students with disabilities (Wiley Dep. 186:13-18), or on the sufficiency of mental health and therapeutic services provided to meet the needs of students in the GNETS Program. Wiley Dep. 170:14-21, 176:13-20.

## III.    STANDARD OF REVIEW

To determine whether proffered expert testimony is admissible under Federal Rule of Evidence 702, courts apply a three-part test that considers: (1) whether the expert is qualified to competently testify as to the matters they intend to address (the "qualifications" prong); (2) whether the expert's methodology is sufficiently reliable under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-91, 113 S. Ct. 2786, 2795-96 (1993), (the "reliability" prong); and (3) whether the expert's testimony will assist the factfinder in understanding the evidence or determining a fact in issue (the "helpfulness" prong). *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). The burden of

establishing qualification, reliability, and helpfulness rests with the proponent of the expert opinion. *Id.*

To meet the requirements of the reliability prong, expert testimony must be based on "sufficient facts or data" and be "the product of reliable principles and methods" that have been "reliabl[y] appli[ed] ... to the facts of the case." Fed. R. Evid. 702. "Every step of an expert's analysis must be 'supported by good grounds,' which 'means that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible.'" *Riley v. Tesla, Inc.*, 603 F. Supp. 3d 1259, 1281 (S.D. Fla. 2022), *on reconsideration*, No. 20-CV-60517, 2022 WL 2341165 (S.D. Fla. June 29, 2022) (citing *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1298 (N.D. Fla. 2017)).

In determining reliability, trial courts retain "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999). Courts may reject expert testimony based on sound methodology when "there is simply too great an analytical gap between the data and the opinion proffered." *Easterwood v. Husqvarna Pro. Prod., Inc.*, 576 F. Supp. 3d 950, 958 (M.D. Ala. 2021) (internal quotations omitted) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

To be admissible, expert testimony must also assist the trier of fact; expert

testimony is therefore admissible if it concerns matters that are beyond the understanding of the average lay person. *Frazier*, 387 F.3d at 1262. Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. *Id.* at 1263.

## IV.    ARGUMENT

Dr. Wiley's limited expertise and methodology necessitates an order of this Court limiting his testimony in two key respects. First, Dr. Wiley should be prohibited from opining on questions of law that are more appropriately argued by counsel and adjudicated by this Court. Section I of Dr. Wiley's Rebuttal Report, which sets forth his untrained legal analysis of the relationship between the requirements of the IDEA and Title II of the ADA, presents an improper legal argument under the imprimatur of a purported expert. Second, Dr. Wiley's scant review of any materials related to the GNETS Program, which he admits is less than he would have done had he intended to evaluate the GNETS Program, renders any testimony he might offer on the GNETS Program unreliable and unhelpful to the trier of fact. Therefore, the Court should enter an order *in limine* excluding any testimony Dr. Wiley may offer on any questions of law and the GNETS Program, including any regional GNETS program or the supports and services received by students placed in the GNETS Program.

### a. Dr. Wiley Offers Impermissible, Unhelpful Legal Opinion Testimony Which Should Be Excluded at Trial.

Section I of Dr. Wiley's Rebuttal Report constitutes impermissible legal opinion testimony that should be excluded in its entirety. As he readily acknowledges, Dr. Wiley's claimed expertise is special education research, not the law. *See* Wiley Dep. 237:24-25 ("…my expertise is not specifically the law…"), 239:11-16, 239:23-24. He is not an attorney, has no formal legal training, and testified that he is only familiar with the ADA "at a very introductory level." Wiley Dep. 238:19-239:1. In other words, Dr. Wiley is unqualified to offer any testimony to this Court on the legal implications of the IDEA or the ADA in this case. Despite this, Dr. Wiley's Rebuttal Report contains thirteen pages of opinions related to the construction and application of legal standards relevant to the field of special education. Wiley Rep. at 8-21. Because this proposed expert testimony constitutes legal opinion testimony that invades the exclusive province of the Court, Section I of Dr. Wiley's Rebuttal Report, and all opinion testimony associated with that section of the report, should be excluded at trial.

It is well established that experts cannot offer legal conclusions. *Ma v. Equifax Info. Servs., LLC*, 288 F. Supp. 3d 1360, 1367 (N.D. Ga. 2017) (citing *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005)). As this Court has explained, "all witnesses are prohibited from testifying as to questions of law regarding the interpretation of a statute, the

meaning of terms in a statute, or the legality of conduct." *Id*. (cleaned up). That is

because questions of statutory interpretation are legal questions for the Court to

decide. *United States v. F.E.B. Corp.*, 52 F.4th 916, 932 (11th Cir. 2022). As such,

an expert offers a legal conclusion when he proffers testimony as "to the legal

implications of conduct," and such testimony is improper because "the court must

be the [factfinder's] only source of law." *United States ex rel. Hockaday v. Athens*

*Orthopedic Clinic, P.A.*, 616 F. Supp. 3d 1339, 1365 (M.D. Ga. 2022); *see also*

*Holcombe v. United States*, No. SA-18-CV-555-XR, 2021 WL 4888337, at *3

(W.D. Tex. Mar. 5, 2021) ("Still, even in bench trials, testimony will be excluded

prior to trial if the expert is merely providing legal opinions which invade the

province of the court.") (cleaned up).

Section I of Dr. Wiley's Rebuttal Report provides Dr. Wiley's legal analysis

of the construction and application of the IDEA and ADA, therefore constituting

inadmissible legal opinion testimony. That section provides Dr. Wiley's "analysis

as to how the requirements of the ADA and IDEA should be understood." Wiley

Dep. 239:17-21. Specifically, in the introductory summary of that section, he

explains that his opinion is meant to inform the Court as to how the legal concept

of "unnecessary segregation" under the ADA should be understood. Wiley Rep. at

3, ¶ I. Over the course of thirteen pages of his report, Dr. Wiley provides his

opinions of the meaning of "unnecessary segregation" under the ADA, IDEA legal

standards and their interrelation to the ADA, and the United States' legal theories. Wiley Rep. at 8-21. For example, Dr. Wiley claims that the phrases "participation in" and "benefitting from," as those terms are used in Title II of the ADA, "mean[ ] participation in *instruction* that optimizes *learning*…" in the context of education. Wiley Rep. at 8 (emphasis in original). In addition to being legally incorrect,[1] this language speaks to issues of statutory interpretation. This proposed testimony is nothing other than inadmissible legal opinion testimony.

Even Dr. Wiley's assertions in Section I that do not directly purport to construe statutory language are inadmissible. Dr. Wiley's criticisms of the reports by the United States' experts in that section are premised upon his flawed and inadmissible understanding of the law. For example, Dr. Wiley uses Dr. McCart's report to argue that the United States has taken legally inconsistent positions:

> In light of the DOJ's interpretations of Title II of [the] ADA, questions remain as to how DOJ or its experts believe "segregated" (non-integrated) placement can be provided in a way that both complies with [Free and Appropriate Public Education requirements] and does not discriminate (per their interpretation of ADA requirements) against students with behavior-related disabilities.

---

[1] Title II of the ADA applies to much more than just instruction, even in the context of education. *See*, *e.g.*, *Bahl v. Cnty of Ramsey*, 695 F.3d 778, 787-88 (8th Cir. 2012) ("Courts have broadly construed the 'services, programs, or activities' language in the ADA to encompass 'anything a public entity does.'") (internal citations omitted).

Wiley Rep. at 18. This statement, like much of Dr. Wiley's report, is a flawed legal opinion masquerading as a special education opinion: the only issue this proposed testimony speaks to is the merit of the United States' substantive legal positions in this matter. It does not assist the trier of fact in understanding the evidence before it. *Frazier*, 387 F.3d at 1262 (expert testimony must assist trier of fact). Because Section I of Dr. Wiley's Rebuttal Report "offers nothing more than what lawyers for the parties can argue in closing arguments," it is unhelpful to the Court and should be excluded at trial. *Id.* at 1262-63.

> **b. Dr. Wiley Should Be Precluded from Offering Any Opinions on the GNETS Program Because He Failed to Evaluate that Program, and Any Opinions He Would Offer on the GNETS Program Are Thus Unreliable and Unhelpful.**

Dr. Wiley intended for his Rebuttal Report to be a synthesis of special education research on topics related to this litigation, not an evaluation and analysis of the GNETS Program itself. Wiley Dep. 169:24-170:5, 183:13-18, 186:13-18, 300:5-17, 302:6-303:11, 306:6-21. Nonetheless, the State of Georgia has already cited to Dr. Wiley's report to support contentions related to the State of Georgia and the GNETS Program that are beyond the scope of his expertise. ECF 470 at 18 ("Dr. Wiley's report demonstrates that, comparatively the State [of Georgia] provides significant integrated services.").[2] Because Dr. Wiley did not

---

[2] Of note, the State's citation overstates Dr. Wiley's opinions, which were only that, according to one dataset, the State of Georgia appeared to educate

evaluate the GNETS Program and, in fact, admits he would have implemented a method more akin to that of the United States' experts had he intended to evaluate the GNETS Program, he lacks an adequate basis upon which to opine on the GNETS Program. This lack of an adequate foundation renders any such opinions unreliable and unhelpful. This Court should therefore bar Dr. Wiley from offering these opinions at trial.

In assessing the reliability of an expert, courts ask, among other things, whether the expert's "reasoning or methodology can be applied to the facts in issue." *Kelley v. C.R. Bard, Inc.*, 644 F. Supp. 3d 1316, 1323 (N.D. Ga. 2022), *on reconsideration in part sub nom. Kelley v. C.R Bard, Inc.*, No. 2:20-CV-00045-SCJ, 2023 WL 2370109 (N.D. Ga. Jan. 24, 2023) (*citing Arevalo v. Mentor Worldwide LLC*, No. 21-11768, 2022 WL 16753646, at *3 (11th Cir. Nov. 8, 2022)). To that end, the Court fulfills a gatekeeping role "to ensure that

---

students with emotional and behavioral disorders in general education settings at a higher-than-average rate. The cited reference constitutes a dataset copied and pasted by Dr. Wiley without any explanation of which students are counted as being served in a "separate setting" and without any effort made to validate either the data itself or his application of it; moreover, as Dr. Wiley acknowledged, the table offers little insight into the level of services provided. Wiley Dep. 255:9-15 (did not validate data), 256:10-24 ("assume[d]" GNETS was reported as a separate school), 260:8-25 (table does not show supports and services), 262:4-7 (did not "dive into" how Georgia reports data); *see also Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.").

speculative, unreliable expert testimony does not reach the [trier of fact] under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Skelton v. Action Traders, Ltd.*, 662 F. Supp. 3d 1259, 1263 (N.D. Ga. 2023) (internal citations omitted).

"Under Rule 703, the inadmissible facts or data that form the basis of an expert's opinion must be the kinds of facts or data upon which an expert in his field would 'reasonably' rely. If the data underlying an expert's opinion is 'so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded.'" *Schoen v. State Farm Fire & Cas. Co.*, 638 F. Supp. 3d 1323, 1338 (S.D. Ala. 2022) (internal citation omitted). Similarly, if there is "too great an analytical gap between the facts of the case and the expert's opinion," the expert's testimony is considered unhelpful. *Kelly*, 644 F. Supp. 3d at 1323-24 (cleaned up); *see also Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1294 (11th Cir. 2022) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

Dr. Wiley did not conduct an evaluation of the GNETS Program and, importantly, did not intend to do so. According to Dr. Wiley, the purpose of Sections II through V of his Rebuttal Report was to "correct what [Dr. Wiley] saw

12

to be misunderstandings on the literature around placement interventions generally," and, in doing so, "provide a defense for having separate placements generally." Wiley Dep. 183:3-12. Given his stated purpose, Dr. Wiley did not gather the type of information required to make determinations about the sufficiency or operations of the GNETS Program. In fact, the full extent of Dr. Wiley's review of the GNETS Program consisted of his review of one version of the GNETS Manual; what he loosely recalled from four brief interviews (the State Director for Special Education Services and Supports, two current regional GNETS directors, and one former regional GNETS director) selected with assistance from counsel for the State; and his review of only four depositions, three of which were of the same individuals he interviewed. Wiley Dep. 114:1-6 (describing how interviewees were selected), 146:5-9; Errata to Wiley Report (attached as Exhibit 2).

Consistent with the narrowness of his review, Dr. Wiley explicitly confirmed that he is not offering opinions on whether the GNETS Program as a whole, or any regional GNETS program in particular, unnecessarily segregates students with disabilities. Wiley Dep. 169:24-170:5, 186:13-18. He does not intend to proffer testimony on: the sufficiency of mental health and therapeutic services provided to meet the needs of students in the GNETS Program (Wiley Dep. 170:14-21, 176:13-20); the State of Georgia's implementation of Positive Behavior

13

Interventions and Supports ("PBIS") (Wiley Dep. 174:1-9, 175:4-9) (testifying that Dr. Wiley only looked at and compared state-reported data to other states); general education in Georgia (Wiley Dep. 176:21-177:1, 263:4-9); community services (Wiley Dep. 177:8-12); the appropriateness of educational services in Georgia (Wiley Dep. 179:17-21); or whether students in the GNETS Program could be served in general education settings (Wiley Dep. 181:18-183:1). The end result is that Dr. Wiley's expert opinions in this case only apply to the GNETS Program in the sense that GNETS is a "program that offers separate schools on the continuum of alternative placements." Wiley Dep. 183:13-18. As Dr. Wiley has testified, his rebuttal to key conclusions by the United States' experts applies to GNETS only "insofar as it applies to students with behavior-related disabilities generally, and those are some of the students that are [placed] in [the GNETS Program]." Wiley Dep. 214:6-18. In short, Dr. Wiley's understanding of his own expert testimony is that it does not provide any opinions specific to the State of Georgia or the GNETS Program.

In addition, Dr. Wiley's methodology was insufficient to render any reliable or helpful opinions regarding the GNETS Program. Dr. Wiley testified that, had he intended to opine on the GNETS Program, he would have conducted a different evaluation. Wiley Dep. 302:6-303:11 (would have conducted observations, record reviews, interviews), 306:6-21 ("If my task was to go and evaluate a program, then

I would have used a different set of methods. Some of them would have been similar to, for example, Dr. McCart."). As it stands, Dr. Wiley did not travel to Georgia as part of his evaluation, he conducted no observations of the regional GNETS programs or of general education classrooms in Georgia, he reviewed no student-specific records, and he reviewed no GNETS documents beyond a single version of the GNETS Manual. Ex. 2 (Wiley Errata); Wiley Dep. 100:13-101:7 (errata contains all considered materials); 105:17-106:23 (reviewed GNETS Manual for discrete purpose); 117:2-25 (did not travel or conduct observations). Dr. Wiley did not even look at the records reviewed by the United States' experts to determine the scope of the United States' experts' evaluations, let alone inform his own evaluation. Wiley Dep. 241:15-242:2. Furthermore, Dr. Wiley is unfamiliar with key individuals, including the name of the State-employed GNETS Program Manager. Wiley Dep. 143:4-19. He is also unfamiliar with critical components of a system for delivering mental health and therapeutic services and supports for students in the GNETS Program, including community service boards (Wiley Dep. 163:18-20), the Interconnected Services Framework (Wiley Dep. 164:3-165:1), wraparound interventions (Wiley Dep. 165:17-20), family intervention services (Wiley Dep. 167:14-20), and statewide PBIS strategic plans. Wiley Dep. 166:21-167:2; *but cf.* ECF 428-1 (Putnam Report) at 9-10 (wraparound), 18-20 (ISF), 21 (CSBs), 48-50 (Intensive Family Intervention).

Based on Dr. Wiley's own admissions, he lacks an adequate basis upon which to proffer opinions on the GNETS Program; any such opinion testimony would be both speculative and "too great an analytical gap between the facts of the case and the expert's opinion," to be helpful to the Court. *See Kelley*, 644 F. Supp. 3d at 1323-24 (cleaned up). As Dr. Wiley acknowledges, if he were to gather the "kinds of facts or data upon which an expert in his field would 'reasonably' rely," *Schoen*, 638 F. Supp. 3d at 1338, he would have undertaken an evaluation similar to that of the United States' experts: namely, conducting observations, extensive record reviews, and information gathering from interviews and other sources. Wiley Dep. 302:6-303:11; 306:6-21.

The State's failure to commission such an evaluation[3] undermines the reliability and helpfulness of Dr. Wiley's testimony on the GNETS Program. Were Dr. Wiley permitted to testify about the GNETS Program, such testimony would necessarily be little more than recitation of what he read in one version of the GNETS Manual, what he loosely recalled from only four brief interviews of personnel selected with assistance from counsel for the State, and his review of only four depositions, three of which were of the same individuals he interviewed.

---

[3] Significantly, given Dr. Wiley's lack of practical experience, it is unlikely he would be qualified to complete such an evaluation even had he been asked to do so. *See supra* Section I.

16

Wiley Dep. 114:1-6; 146:5-9; Ex. 2 (Wiley Errata).[4] By contrast, in forming her

opinions on the GNETS Program, one of the United States' experts, Dr. McCart,

conducted 70 site visits to 27 center-based GNETS sites and 36 school-based

GNETS sites, reviewed more than 65 student IEP records, and conducted an

extensive record review.[5] Given the scope of the issues involved in this litigation,

and the size and scope of the statewide GNETS Program, any opinions Dr. Wiley

could offer based on such a limited review would be more likely to mislead and

confuse the issues than "assist the trier of fact." *Frazier*, 387 F.3d at 1262. As a

---

[4] Dr. Wiley's own report underscores this point. In one of the few references in the Rebuttal Report to the GNETS Program, Dr. Wiley stated that three of his four interviewees reported positive parental feedback about the placement of their child into a GNETS program (he did not identify what, if anything, the fourth told him). Wiley Rep. at 37 n.7. When asked about this, Dr. Wiley acknowledged he did not ask if some parents felt differently or if he could speak to any parents himself. Wiley Dep. 342:5-343:1. Despite this concession and his acknowledgment that he does not purport to provide expert testimony "on what parents do or do not feel about the GNETS Program," (Wiley Dep. 343:2-5), Dr. Wiley showed his unreliability as an expert on the subject of the GNETS Program by uncritically repeating as fact in his report what he had been told by three regional GNETS program directors.

[5] That the State erroneously characterizes even this exhaustive review by Dr. McCart as a "wholesale failure to include a defensible methodology," ECF 432-2 at 26, underscores the appropriateness of excluding any testimony on the GNETS Program by Dr. Wiley. It is unclear how the State could reconcile its proffering of Dr. Wiley's expert opinion on so thin a foundation while simultaneously attacking the thorough foundation of Dr. McCart's expert opinion. *See* ECF 432-1, Expert Report of Dr. McCart, App'x. E (considered materials include, among other things, thousands of pages of materials from regional GNETs programs, twelve deposition transcripts, and materials from the state).

result, the Court should exclude any testimony from Dr. Wiley as to the GNETS Program, any regional GNETS programs, or the supports and services received by students placed in the GNETS Program.

## V.    CONCLUSION

Dr. Wiley's expert testimony and Rebuttal Report suffer from a number of flaws the United States will explore at trial. However, for the reasons discussed above, some of Dr. Wiley's opinions warrant exclusion; specifically: (1) Dr. Wiley should be prohibited from proffering any legal opinions at trial given that he lacks any formal legal training and such arguments are properly made by counsel and decided by this Court; and (2) Dr. Wiley should not be permitted to testify as to the GNETS Program, including any regional GNETS program or the supports and services received by students placed in the GNETS Program, given his admitted failure to conduct an evaluation of that Program and the insufficiency of his review. The United States urges this Court to grant its motion to exclude the identified portions of Dr. Wiley's testimony that do not meet the requirements for expert testimony under Federal Rule of Evidence 702.

Dated: February 2, 2024.

Respectfully submitted:

RYAN K. BUCHANAN
*United States Attorney*
Northern District of Georgia

 /s/ *Aileeen Bell Hughes*
AILEEN BELL HUGHES
GA Bar Number: 375505
Assistant United States Attorney
United States Department of Justice
Richard B. Russell Federal Building
75 Ted Turner Dr. SW
Suite 600
Atlanta, GA 30303-3309
(404) 581.6000
aileen.bell.hughes@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General

SHAHEENA A. SIMONS
Chief

KELLY GARDNER WOMACK
Deputy Chief

ANDREA HAMILTON WATSON
Special Litigation Counsel

CRYSTAL ADAMS
CLAIRE CHEVRIER
FRANCES COHEN
MATTHEW GILLESPIE
PATRICK HOLKINS
VICTORIA M. LILL
JESSICA POLANSKY
LAURA C. TAYLOE
MICHELLE L. TUCKER
Trial Attorneys
Educational Opportunities Section


*/s/ Matthew Gillespie*
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 598-6368
Matthew.Gillespie2@usdoj.gov

19

IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF GEORGIA ATLANTA DIVISION

UNITED STATES OF AMERICA,

      PLAINTIFF,

      *v.*

STATE OF GEORGIA,

      DEFENDANT.

Civil Action No.

1:16-cv-03088-ELR

### Certificate of Compliance

I hereby certify, pursuant to Local Rules 5.1 and 7.1D, that the foregoing motion has been prepared using Times New Roman, 14-point font.

February 2, 2024.

*/s/ Matthew Gillespie*
_____
MATTHEW GILLESPIE

IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF GEORGIA ATLANTA DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| PLAINTIFF, | Civil Action No. |
| *v.* | 1:16-CV-03088-ELR |
| STATE OF GEORGIA, | |
| DEFENDANT. | |

## Certificate of Service

I served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

February 2, 2024.

*/s/ Matthew Gillespie*
MATTHEW GILLESPIE