# EXHIBIT 3

1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
2                        ATLANTA DIVISION

3
   UNITED STATES OF AMERICA,              Civil Action No.
4                                         1:16-cv-03088-ELR
              Plaintiff,
5
         vs.
6
   STATE OF GEORGIA,
7
              Defendant.
8  ~~~~~~~~~~~~~~~~~~~~~

9

10            Video Recorded Deposition of:

11                  ANDREW WILEY, Ph.D.

12

13            Monday, October 30, 2023

14                    8:59 a.m.

15

16                    Jones Day
                  901 Lakeside Avenue
17               Cleveland, Ohio 44114

18

19       Reported By:  Sarah R. Drown, RDR, CRR

20

21

22

23

24

25



```
 1              APPEARANCES OF COUNSEL

 2
        On behalf of the Plaintiff:
 3
                MATTHEW K. GILLESPIE, ESQ.
 4              CRYSTAL ADAMS, ESQ.
                CLAIRE CHEVRIER, ESQ. (Via Zoom)
 5              FRANCES COHEN, ESQ. (Via Zoom)
                ANDREA HAMILTON WATSON, ESQ. (Via Zoom)
 6              VICTORIA LILL, ESQ. (Via Zoom)
                JESSICA POLANSKY, ESQ. (Via Zoom)
 7              LAURA TAYLOE, ESQ. (Via Zoom)
                MICHELLE L. TUCKER, ESQ. (Via Zoom)
 8              U.S. DEPARTMENT OF JUSTICE
                950 Pennsylvania Ave., NW
 9              Suite 7273 NWB
                Washington, D.C. 20530-0001
10              202.803.1302
                Matthew.gillespie2@usdoj.gov
11              Crystal.adams@usdoj.gov
                Claire.chevrier@usdoj.gov
12              Frances.cohen2@usdoj.gov
                Andrea.watson2@usdoj.gov
13              Victoria.lill@usdoj.gov
                Jessica.polansky@usdoj.gov
14              Laura.tayloe@usdoj.gov
                Michelle.tucker@usdoj.gov
15

16
        On behalf of the Defendant:
17
                MELANIE JOHNSON, ESQ.
18              ANNA EDMONDSON, ESQ.
                ROBBINS ALLOY BELINFANTE LITTLEFIELD LLC
19              500 14th Street, Northwest
                Atlanta, Georgia 30318
20              678.701.3258
                Mjohnson@robbinsfirm.com
21              Aedmondson@robbinsfirm.com

22
     ALSO PRESENT:
23
        STACEY SUBER-DRAKE, ESQ. (Via Zoom)
24      GEORGIA DEPARTMENT OF EDUCATION

25      BRIAN MCCOLLUM, VIDEOGRAPHER
```



1   I've been, for example, a student in Virginia

2   and a teacher.

3       Q.      Okay.

4       A.      So less so about how that process --

5       Q.      Sure.

6       A.      -- of consulting works than my

7   experience as a teacher.

8               And also when I was in Massachusetts

9   as a postdoctoral research associate.

10      Q.      Understood.

11              So other than teacher credentialing

12  with the state of Ohio through education

13  pathways and the other consulting that we

14  discussed, have you consulted with any other

15  state departments of education?

16      A.      No other state departments of

17  education.

18      Q.      Okay.  And we discussed the

19  professional development you provided.  Have you

20  provided any other consultation services for

21  school districts?

22      A.      I don't think so.  I would not say in

23  a formal sense.  I haven't provided, you know,

24  consultation.  I have interactions with

25  different school districts around our, you know,



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                  33

1   times a year?

2   A.       Yes.

3   Q.       Okay.

4   A.       That's correct.

5   Q.       Thank you --

6   A.       Sure.

7   Q.       -- for bearing with me --

8   A.       Yes.

9   Q.       -- on that.

10          Dr. Wiley, have you ever consulted on

11  the adequacy on an educational environment?

12  A.       I would probably need that clarified.

13  Q.       Sure.

14          Have you ever advised an LEA or any

15  sort of educating entity about whether they were

16  providing adequate supports and services in a

17  particular environment?

18          MS. JOHNSON:  Object to form.

19          You can answer.

20          THE WITNESS:  Okay.

21  A.       I think that what would most closely

22  fit with what you're describing was my work for

23  three years as a behavior specialist.

24          So a lot of what I did as a behavior

25  specialist is I would meet with teachers, I



1  would meet with different support folks, and I

2  did observe in classrooms and would talk about

3  things like, you know, the behavior supports

4  that were, were not in place.  So I did that for

5  several years.

6         That was at a time when functional

7  behavior assessment was a brand new requirement

8  of the law.

9         So I did both consulting around

10  functional behavior assessment, where you're

11  looking at those conditions, right, and saying

12  okay, what's (unintelligible)  behavior, what

13  are the consequences that follow behaviors, so

14  that we can try to develop a hypothesis about

15  why this student's exhibiting a behavior.

16         So I think it's part of that work.  I

17  was absolutely with a school team evaluating the

18  conditions around a student and talking about

19  whether or not there were things that we could

20  change in order to provide better support to the

21  student, if that makes sense.

22  Q.      When was the time period for that

23  work?

24  A.      '90 -- the late '90s.

25  Q.      So --



1    report that said here's where we see strengths,

2    here's where we see weaknesses, and this is our

3    advice in terms of how to improve your program.

4              Does that make sense?

5    Q.        It does.

6    A.        That definitely was consultative while

7    I was at U Mass, Boston.

8    Q.        And what entity was it that you were

9    evaluating?

10   A.        I will have to get -- it was part of

11   that collaborative system.  And so they had

12   various names of collaboratives around the

13   state.  Again, I could find that if you need it,

14   the exact name.

15             It was one of the schools within the

16   collaborative.  You know, this was the model

17   that Massachusetts -- I think they still use,

18   because I did take a peek as I was writing my

19   report, where they have special schools for kids

20   with behavior-related disabilities and it was

21   one of those.

22             It's not jumping into my brain, I'm

23   sorry, but I could find it later if you want.

24   Q.        No.  That's totally fine.

25             So, Dr. Wiley, fair to say in the last



1  15 years or so, though, you haven't conducted

2  sort of a third-party analysis of the adequacy

3  of an educational environment?

4             MS. JOHNSON:  Object --

5  A.     I --

6             MS. JOHNSON:  -- to form.

7             Go ahead.

8  A.     Yeah.  I mean, again, it depends on

9  exactly what you're saying.  But I think when

10  you're saying that direct consultative work to

11  do an in depth evaluation, yeah, that's probably

12  accurate, yes.

13  Q.     Have you provided any sort of

14  consultative services or third-party evaluation

15  of therapeutic or mental health supports and

16  services provide by an LEA?

17             MS. JOHNSON:  Object to form.

18  A.     And if you can specify more -- so now

19  are you talking about -- when you say

20  therapeutic services, you're not talking about

21  things like functional behavior assessment or

22  those kinds of practices, you're talking more

23  about mental health services --

24  Q.     Correct.

25  A.     -- specifically?



1    Q.      Yes.

2    A.      No, I have not.

3    Q.      Okay.  Is there anything that we

4   haven't discussed so far about the consultation

5   work that you have or haven't done?

6    A.      I don't think so.

7    Q.      Okay.  Would it be fair to say, then,

8   Dr. Wiley, that your expertise, for purposes of

9   your report, today is based on your experience

10   as an academic?

11    A.      I think, you know, like I said in my

12   report, my experience is based on my knowledge

13   about the research in the field.

14           It's also based on, you know, my

15   experience in K-12 schools.  And it's also based

16   on my professional reasoning as a special

17   educator who has worked quite a bit with kids

18   with behavior-related disabilities.

19           Am I getting what you're asking?

20    Q.      I think so, yeah.

21    A.      Okay.

22    Q.      No, absolutely.

23    A.      Okay.

24    Q.      And the purposes of these questions is

25   just for me to get an understanding of --



1    A.      Sure.

2    Q.      -- how you approached this.

3    A.      Absolutely.

4    Q.      When you say your experience from K

5    through 12 schools, are you talking back to your

6    experience back before -- back in the '90s, in,

7    like, Fairfax County and the like?  Is that the

8    experience that you're referring to?

9    A.      Yeah.  I mean, when you're talking

10   about my school-based experience, yeah.  That's

11   mostly what I'm talking about.

12   Q.      Okay.  And is it fair to say that your

13   expertise for purposes of your report today

14   relates to the status of academic research

15   regarding the educational placement of students

16   with behavior-related disabilities?

17              MS. JOHNSON:  Object to form.

18   A.      I would say that's true, but when you

19   say "academic research," the research that I'm

20   talking about is research that takes place in

21   schools.  So it's more of an applied research.

22              I think that that even confuses my own

23   students, where they say "What is this

24   research?"

25              They just go into a lab in the



**Exhibit 3**

ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                    41

1  university, but the research that I'm talking

2  about and the conferences that I go to and, you

3  know, the conferences that we host, are all

4  people who are doing research in the schools.

5      Q.      I appreciate that clarification.

6              So fair to say, then, with that

7  caveat, your expertise for purposes of your

8  report today relates to the status of research

9  regarding the educational placement of students

10 with behavior-related disabilities?

11             MS. JOHNSON:  Object to form.

12     A.      That's part of my expertise, --

13     Q.      Okay.

14     A.      -- yes.

15     Q.      What other -- what part am I missing

16 or not appreciating there?

17     A.      Well, -- oh, no.  Sure.  I mean,

18 again, I'm talking about my experience as --

19     Q.      Okay.

20     A.      -- a special educator.

21             My experience directly consulting, all

22 of those things together, but part of it is my

23 understanding of academic research or applied

24 research in the field.

25     Q.      And not to belabor the point, when you



1  say your experience directly consulting, that's

2  the professional development work that we've

3  talked through already, correct?

4     A.     Yes.

5     Q.     Okay.  Dr. Wiley, what's your

6  understanding of what this case is about?

7     A.     My understanding of what this case is

8  about is that the Department of Justice has said

9  that the state of Georgia is unnecessarily

10  segregating students with behavior-related

11  disabilities through their GNETS program.

12     Q.     And what is that understanding based

13  on?

14     A.     My understanding is based on reading

15  the materials.  I'm not going to get the

16  legalese correct, but the letter of findings,

17  the complaint letter.

18           Also the motions that were filed by

19  the DOJ and also state of Georgia.  And also the

20  expert reports by Dr. Putnam and Dr. McCart.

21     Q.     And what is your understanding of what

22  the United States is seeking in this case?

23     A.     I -- I -- I think I've read the

24  recommendations by the experts.  I haven't been

25  completely clear about exactly what the DOJ --



1        mark this one as Exhibit 979?

2                    - - - - -

3            (Deposition Exhibit 979, Errata to

4            Rebuttal Expert Report of Andrew Wiley,

5            Ph.D., was marked for identification

6            purposes.)

7                    - - - - -

8    Q.      All right.  Dr. Wiley, I -- or Sarah

9    has handed you what has now been marked as

10   Exhibit 979.

11           Do you recognize this?

12   A.      Yes.

13   Q.      Is this a copy of an errata to your

14   report identifying your considered materials?

15   A.      Yes.

16   Q.      And is this a comprehensive list of

17   everything you reviewed and considered in

18   forming your opinions in your report?

19           MS. JOHNSON:  Object to form.

20           MR. GILLESPIE:  What's the

21       objection?

22           MS. JOHNSON:  The report speaks for

23       itself and there's other -- the report

24       includes other items than on this list.

25   Q.      You can answer the question, Doctor.



 1    A.      Yes.  I think what's here in the
 2  errata is accurate.
 3    Q.      And the inverse of that question.  Did
 4  you review or consider anything in forming your
 5  opinions for this matter that's not on this
 6  list?
 7    A.      No.
 8    Q.      Who put this list together?
 9    A.      I did.  And I got some help from
10  Melanie with errata.  We had to correct some
11  references and we had to update some of these
12  things.  I'm a first timer, so I think I had
13  forgotten a couple of things that really
14  belonged on this list.
15    Q.      And how did you -- how did you keep
16  track of what you reviewed or considered in
17  putting together your report?
18    A.      Keep track of?
19    Q.      Do you have like a file of your things
20  for -- as part of your review in GNETS?
21    A.      I have a folder, yes, with materials
22  for the case.  And I collected some of the
23  literature that I cited and PDFs.  So yeah.  If
24  that's what you mean, yeah.
25    Q.      Absolutely.



1  I obviously didn't make heavy reference to this

2  specific training in my report, so I'm trying to

3  remember.

4     Q.     Maybe a better question is what's the

5  connection to GNETS?  Was it meant to be a

6  training for teachers of the GNETS program, or

7  what's the connection to GNETS?  Why did you

8  want to see it?

9     A.     So what I learned in my conversations

10  is that these trainings are offered to teachers

11  in general ed, special ed, GNETS, everywhere.

12          If I'm recalling correctly, they

13  receive the same invitations that other

14  schools -- so I think they're invited to attend

15  this training.

16     Q.     Thank you.  I appreciate that.

17          You also reviewed the 2014 GNETS

18  operating manual; is that right?

19     A.     Yes.

20     Q.     And why was that something that you

21  wanted to look at?

22     A.     The specific thing that I was looking

23  at is -- I think there was something in

24  Dr. McCart's report that said that the way

25  that -- and I don't know if she was being



1  general or speaking to Georgia, but she was

2  saying that the way that these students were

3  being referred to GNETS is they were being

4  labeled and placed.

5          So the idea was, you know, we pick the

6  label and then we have a program, which is

7  against the law, you know, procedurally and

8  substantively.

9          So the one thing that I focused on in

10  particular in that was how they described how

11  students were referred to GNETS.  And I wanted

12  to see if their materials -- if it was

13  consistent with the way I understand the correct

14  way that students were referred.

15          It was not label based.  They pointed

16  out that the students they serve tend to have

17  the characteristics of kids with emotional,

18  behavior disorders, but they also serve kids

19  with autism spectrum disorders and OHI, which

20  would probably mostly be ADHD.

21          So I was looking at it to see if what

22  was conveyed in that manual was what Dr. McCart

23  was saying was occurring.

24  Q.      Thank you.  That's helpful.

25          You also reviewed to Georgia DOE PBIS



1    Q.       And so you identified topics, and then

2    you were helped to find people who would speak

3    to those topics?

4    A.       That's right --

5    Q.       Okay.

6    A.       -- basically.

7    Q.       Thank you.

8             And who is Jason Byars?

9    A.       See, that's the one I'm not going to

10   remember; Jason's background.  I think I could

11   tell you about Wina and Brooke and Cassandra --

12   Dr. Holifield.

13   Q.       Do you know if --

14   A.       I would have to look.  I don't have it

15   in my brain.

16   Q.       Do you know if Mr. Byars has ever

17   worked in a GNETS program?

18   A.       I do not know --

19   Q.       Okay.

20   A.       -- but based on my -- I don't know.

21   Q.       And you also spoke -- you also spoke

22   with several individuals as part of your

23   evaluation, correct?

24   A.       I did.

25   Q.       And with whom did you speak?



1    the findings with the materials that I reviewed.

2        Q.        At any point did you travel to the

3    state of Georgia as part of your work in this

4    case?

5        A.        I did not.

6        Q.        So you didn't conduct any observations

7    as part of your evaluation, correct?

8        A.        I did not, no.

9        Q.        So did you consider anything in

10   drafting your report that we have not discussed

11   and that's not listed in the errata?

12       A.        No.  I think -- I think that's

13   accurate and comprehensive.

14       Q.        You didn't review any other documents?

15       A.        No.

16       Q.        You didn't review any other analyses?

17       A.        What do you mean by "analyses"?

18       Q.        Like data analyses, for example.

19       A.        No.  No.

20       Q.        Were you told anything that informed

21   your opinions that may not be reflected

22   separately in a document?  And by that I mean,

23   for example, something you were told over the

24   phone.

25       A.        No.



1   head, but I assume that they must or you

2   wouldn't bring it up.  If I lost track of titles

3   and things, that might have been it.

4      Q.     Do you know who Vickie Cleveland is?

5      A.     I know that name is familiar, but no,

6   I don't know.

7      Q.     Do you know who LaKesha Stevenson is?

8      A.     No.

9      Q.     Sean Owen?

10     A.     Again, I might have seen these names

11  listed --

12     Q.     Sure.

13     A.     -- as, you know, part of the

14  depositions maybe, but no.

15     Q.     But sitting here today, you don't

16  recall who these individuals are.

17            And Matt Jones.  Is that -- do you

18  know who that is?

19     A.     I don't.

20     Q.     Okay.  And you said you spoke with --

21  actually, let me rephrase that.

22            You also said that Dr. Cassandra

23  Holifield, Brooke Cole, and Jeannie Morris were

24  all with the Georgia Department of Education as

25  well?



**Exhibit 3**

ANDREW WILEY, PH.D.                                October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              146

1    Q.      So maybe I'll -- for all four of these

2    individuals, was it either a phone call or a

3    Teams call?

4    A.      Yes.

5    Q.      Okay.  And for Dr. Holifield, how long

6    did you speak with her?

7    A.      I didn't note the exact amount of

8    time, but I think all of those conversations

9    were between an hour and a half and two hours.

10   Q.      Okay.  Did who attended these

11   discussions vary from call to call?

12   A.      I think it was always just the

13   individual, and then Melanie was with me on all

14   of them.  Again, I don't know why I think there

15   might have been one other person from -- but I

16   think it was just the three of us, yeah.

17   Q.      And did you lead the discussion for

18   each of these calls?

19   A.      I did.

20   Q.      Okay.  And was it like this?  Based on

21   some notes that you put together --

22   A.      Yeah.

23   Q.      -- about what you wanted to discuss.

24   A.      That's correct, yes.

25   Q.      Did anyone else take notes during



```
 1   what "those things" are.
 2      A.       Rebutting the claims that I listed
 3   that I rebutted from the expert reports.
 4               So an example would be we now know how
 5   to include the vast majority of kids with
 6   behavior-related disabilities.  That's, in my
 7   opinion, not correct and not consistent with
 8   knowledge in the field.
 9               So that would be an example of, you
10   know, that doesn't require me to specifically
11   look at -- to do the observations and the
12   extensive records reviews that over years I
13   think, in my understanding, Dr. Putnam and
14   Dr. McCart did.
15               Tell me if you need that clarified,
16   because I can say it again.
17      Q.       No.  Thank you.  I appreciate that.
18               Are you familiar with the term
19   "community service board"?
20      A.       Not very familiar.  So I think no.
21      Q.       Did you communicate with any staff of
22   the Department of Behavioral Health and
23   Developmental Disabilities?
24      A.       I did not.
25      Q.       Did you communicate with Heather
```



ANDREW WILEY, PH.D.                           October 30, 2023
UNITED STATES vs STATE OF GEORGIA                        164

1  George about the GNETS program at all?

2      A.      I did not.

3      Q.      Are you familiar with the

4  Interconnected Systems Framework, or ISF?

5      A.      I am generally familiar and I am

6  familiar with a recent randomized control trial.

7  I know that it's something where they're trying

8  to bring essentially wraparound together with

9  PBIS.

10          So I know a little bit about it.

11  Again, I would describe wraparound and the

12  framework as a promising practice, but we

13  haven't solved all the problems and we don't

14  know if that makes it possible to include the

15  vast majority of kids with behavior

16  disabilities.  Behavior related.

17      Q.      And you didn't specifically consider

18  any version of the ISF manual in preparing your

19  rebuttal report, correct?

20      A.      A specific version of the manual.  I

21  did not.

22      Q.      Did you consider any version of the

23  manual in considering your report?

24      A.      The ISF manual?

25      Q.      Yes.



1    A.    No.

2    Q.    Okay.

3    A.    I did have a section where I

4  responded -- and I know that Dr. Putnam in

5  particular spent a lot of time.  He gave some

6  examples of, you know, wraparound research.

7        And I think, again, it's promising,

8  but we're not at a point where we know how to do

9  it.  And we also don't know how well that serves

10  kids with behavior-related disabilities in

11  general ed in particular.

12        I'm hopeful.  You know, I think -- I

13  hope I made that clear.  I hope we're able to

14  develop that and solve all the implementation

15  problems.  But I don't think it's right to say

16  that wraparound is ready for prime time.

17    Q.    Are you aware whether Georgia offers a

18  high fidelity wraparound intervention for

19  children with behavior-related disabilities?

20    A.    I am not aware.

21        And I will say that wraparound is not

22  my heavy sort of area of focus and expertise.  I

23  did read in the reports about some of the

24  community health and some of the things that

25  are -- have been started and are being used to



1  some degree, but I can't really characterize

2  what exactly is in place, how it's accessed, how

3  well it's being implemented.

4          I was a little better able to look at

5  things like PBIS implementation.  So yeah.

6     Q.     Sure.  That's helpful.  Thank you.

7          Do you know whether the state of

8  Georgia's done any research relating to

9  educational outcomes for children receiving high

10 fidelity wraparound intervention?

11    A.     I don't think I'm aware.  I do think

12 that I saw mention of some grants, which I don't

13 know if they're research grants or

14 implementation grants, related to, you know,

15 community mental health.

16    Q.     Are you aware whether Georgia

17 encourages the use of PBIS -- of the PBIS

18 framework in its school?

19    A.     I am aware.  And my opinion is yes,

20 they do encourage it.

21    Q.     Are you aware whether the state of

22 Georgia has a PBIS strategic plan?

23             MS. JOHNSON:  Object to form.

24    A.     I am not aware.  I don't recall seeing

25 it on the website, but ...



```
 1              I think that they do, but I'm not sure

 2     exactly where I saw that.

 3        Q.     Are you aware of whether the state of

 4     Georgia has endorsed a system of care approach

 5     to coordinating its programs and services for

 6     children with behavior-related disabilities?

 7              MS. JOHNSON:  Object to form.

 8        A.     I am not aware.  I think that that was

 9     mentioned, again, in the report.  And without

10     looking at Dr. Putnam's report I think that

11     there is endorsement of a system of care, but

12     that's just -- I may not be remembering

13     correctly.

14        Q.     Are you aware of whether the state of

15     Georgia offers intensive family intervention

16     services for children with behavior-related

17     disabilities?

18              MS. JOHNSON:  Object to form.

19        A.     I am not aware of if or how they

20     provide that.

21        Q.     And do you know whether the state of

22     Georgia has endorsed that service as effective

23     for children who may be at risk for restrictive

24     placement?

25              MS. JOHNSON:  Object to form.
```



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              169

 1 | various kinds to address their needs.
 2 |         I think system of care might relate to
 3 | that, but I'm not sure.
 4 |    Q.      Thank you.
 5 |         So earlier, Doctor, you told me that
 6 | you reviewed the transcripts for Dr. McCart and
 7 | Dr. Putnam in their depositions.
 8 |         Have you reviewed anything else
 9 | related to this matter since completing your
10 | report?
11 |    A.      I have not.  And again I want to
12 | emphasize that I didn't read thoroughly their
13 | depositions, but I looked at some parts of it.
14 |    Q.      And I'm guessing -- is there anything
15 | from your view of either of those that changes
16 | your opinions in your report?
17 |    A.      No.
18 |    Q.      No.
19 |         So, Dr. Wiley, before we dive into the
20 | specifics of your report, I just -- I want to
21 | begin by getting clarification of what opinions
22 | that I understand you're not giving in this
23 | case.
24 |         So, Dr. Wiley, you offer no expert
25 | opinions on whether any students in the GNETS



1   program could or should be appropriately served

2   in a general education environment, correct?

3      A.      On any individual students?

4      Q.      Correct.

5      A.      No.  And I don't think the other

6   experts did either.  If I'm right, but -- yeah.

7      Q.      And I'm just asking here --

8      A.      Yes.

9      Q.      -- to get an understanding --

10     A.      No, that's right.  That's right.  No

11  individual students.

12     Q.      What you are and are not saying.

13     A.      Yes.  Good.

14     Q.      You also offer no expert opinions on

15  the sufficiency of the provided mental health

16  and therapeutic services to meet the needs of

17  the students in the GNETS program, correct?

18     A.      Individual students or students

19  overall?

20     Q.      Either.

21     A.      Either.  No, I'm not.

22     Q.      You're not offering any opinions of

23  Georgia's implementation of PBIS, correct?

24             MS. JOHNSON:  Object to form.

25     A.      Well, I think that I did, you know,



1          So the opinion that you're giving on
2   Georgia's implementation of PBIS is the extent
3   to which schools in the state of Georgia have
4   implemented some tier of PBIS, correct?
5      A.      Right.  That's what the state reports.
6      Q.      And that's based only on the state
7   data on the PBIS website that you looked at,
8   correct?
9      A.      Yes.  Yes, that's correct.
10     Q.      And so your opinion on PBIS is just
11  measuring the state reported data of its own
12  implementation compared to data available to you
13  from other states?
14     A.      Yeah.  And that's a universal thing,
15  though, for states to complete their own tiered
16  fidelity inventories.  So it's not that outside
17  people come in and say okay, we're going to look
18  at you.  The way that it works -- and it's good,
19  it's just not perfect --
20     Q.      Sure.
21     A.      -- for them to fill it out themselves.
22     Q.      I want to make sure -- no, you're
23  great.
24          I just want to make sure that I'm
25  getting this exactly right, that the extent of



1  your opinion on Georgia's implementation of PBIS

2  is just measuring that state reported data --

3  actually, let me withdraw that.

4          Comparing that state reported data

5  from Georgia to other states.  That's -- that's

6  your opinion on Georgia's implementation of

7  PBIS, correct?

8    A.      Yeah.  If my opinion is to

9  characterize their implementation, it's that.

10         And then the other thing that's kind

11  of hard to get throughout my report is it's hard

12  to give an opinion on a level of implementation

13  when implementation is not really clearly

14  defined in the field yet.  That's my opinion.

15         And so you're right.  I mean, I would

16  have to rely on whatever self-report data that

17  they have.  I didn't go into schools and use

18  the -- and, by the way, that's one of them, you

19  know, the fidelity instrument.

20         But relying on what they've said.

21  They're in a very similar place.  And in some

22  ways at that tier one level of implementation

23  above that 24 percent that's reported for all

24  states.

25         And the other part of my opinion is to



1   say implementation is more challenging than I

2   think the experts are saying.  And so it's not

3   like hey, we just don't provide enough training,

4   we don't have the motivation, it's that these

5   frameworks are very complex, difficult to

6   sustain.  I think they're good, you know.

7          One of the things I wrote about in my

8   report is in a lot of ways they've made more

9   progress than other things, but it's still we

10  have to be realistic about where we are in terms

11  of what we know about implementing PBIS.

12  Q.     Understood.  Thank you.

13         Dr. Wiley, you're not offering any

14  expert opinions on the sufficiency of the scope

15  or quality of mental health and therapeutic

16  services available to students in the GNETS

17  program, correct?

18  A.     Certainly not individual students.

19  And then also no about -- about whether or not

20  the scope and quality is sufficient.

21  Q.     And you're not offering any expert

22  opinions on the sufficiency of the scope or

23  quality of services and supports provided in

24  general education settings in Georgia, correct?

25  A.     That is correct.  I'm not providing



1   that opinion, but I am providing an opinion

2   about the claims by the experts that we now know

3   how to do that and schools could do it if they

4   just did it.

5       Q.      Understood.

6       A.      Does that make sense?

7       Q.      Yeah.

8               You're also not offering opinions on

9   the scope or quality of community mental health

10  and therapeutic services in the state of

11  Georgia, correct?

12      A.      That's correct.

13      Q.      And you're not offering any expert

14  opinions on whether any aspect of the education

15  that students in the GNETS program receive is or

16  is not inferior to that of students in general

17  education schools in the state of Georgia,

18  correct?

19      A.      So you're saying I'm not offering an

20  opinion about what's actually happening within

21  GNETS schools?

22      Q.      On whether any aspect of the education

23  that students receive -- students in the GNETS

24  program receive is or is not inferior to that of

25  students in general education settings in the



1   And it's kind of like these are my conclusions,

2   but it's not clear to me how they looked and how

3   they reviewed records.

4           And it's similar to reviewing a

5   manuscript, which I know Dr. Putnam and

6   Dr. McCart and I -- you know, we review research

7   studies.  You look at the method and we say are

8   these conclusions.

9           So that was a little bit of the hat

10  that I had on when I said, you know, have they

11  provided a student that I can look at and also

12  have their methods accurately characterize what

13  is and is not happening in GNETS and what is or

14  is not happening in the general ed schools.  I

15  feel like we don't have that is my opinion.  We

16  don't have that information to look at.

17  Q.      But you didn't conduct any individual

18  or systematic review of educational settings in

19  Georgia for appropriateness of educational

20  services, correct?

21  A.      I didn't.  I don't think anybody else

22  did either.

23  Q.      And you're not offering any expert

24  opinions on the methodology used by either of

25  the United States' experts in this case, are



 1  general ed with these particular settings,

 2  that's the big part of my section where I say

 3  well, hold on.  You know, is this really the

 4  consensus of the field?  How much do we actually

 5  know?  Sorry.

 6     Q.      And -- no.  No.  Dr. Wiley, --

 7     A.      I interrupted you again.  I apologize.

 8     Q.      -- I appreciate what you're saying,

 9  and I promise you we're going to spend most of

10  our time today talking about what opinions you

11  are giving, but --

12     A.      Okay.

13     Q.      -- I just -- you know, before we get

14  into that, I want to have some clarity on the

15  areas where you're not providing an expert

16  opinion.

17     A.      Okay.

18     Q.      And so just here I want to clarify

19  you're not offering any expert opinions on

20  whether any students in the GNETS program could

21  be equally or better served in a more integrated

22  environment, correct?

23     A.      Any individual students.  No, I'm not.

24  Is that okay, for me to clarify it that way?

25     Q.      Yeah.



1    A.        Okay.

2    Q.        But then I'm going to ask any group of

3   students.

4    A.        Kids with behavior-related

5   disabilities I think I am offering an opinion.

6             But I think what you're getting at --

7   I don't mean to be -- I'm sorry.

8    Q.        No.

9    A.        You're saying that I didn't go in and

10   look at the program to say are there kids here

11   that could be in general ed if they just did X,

12   Y, or Z.

13    Q.        Right.

14    A.        That, I think, is accurate.

15             But I think when we're talking about

16   the population of kids and when we've looked at

17   them systematically through research, that's the

18   opinion that I'm offering.

19    Q.        But nothing relating to Georgia

20   specifically or GNETS specifically, --

21    A.        A specific --

22    Q.        -- correct?

23    A.        -- school or a specific student,

24   that's correct.

25    Q.        Or even statewide.



**Exhibit 3**

ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                              183

1      A.      Right.

2      Q.      Yeah.  Thank you.

3              As I understand your report, at least

4      sections II through V, your purpose was to

5      correct what you saw to be misunderstandings on

6      the literature around placements interventions

7      generally, correct?

8      A.      Yes.

9      Q.      And in so doing, you provide a defense

10     for having separate placements generally,

11     correct?

12     A.      Yes.

13     Q.      But, again, you're not offering expert

14     opinions on the GNETS program itself, correct?

15     A.      Well, GNETS program being a program

16     that offers separate schools on the continuum of

17     alternative placements.  Just in that sense,

18     yes.

19     Q.      Okay.  Thank you.

20             When I pause, I'm just trying to see

21     if I can --

22     A.      No.

23     Q.      -- truncate things --

24     A.      No.

25     Q.      -- a bit.



 1  programs or individual GNETS programs, I didn't,

 2  but it's my opinion that I didn't have to to

 3  rebut the claim, right, that there are thousands

 4  of kids who are unnecessarily segregated.

 5          Does that make sense?

 6  Q.      Yes.

 7  A.      Okay.

 8  Q.      And I track you with that.

 9  A.      Okay.

10  Q.      But, Dr. Wiley, I just want to make

11  sure that I have clarity on this.

12  A.      Yes.

13  Q.      You aren't offering expert -- an

14  expert opinion in this case as to whether the

15  GNETS program statewide, or any particular GNETS

16  program, unnecessarily segregates students with

17  disabilities, correct?

18  A.      I am not offering that opinion and I

19  don't think anybody gathered the information

20  that would allow us to make that determination.

21  Q.      Understood.  Thank you.

22  A.      So, yeah.

23  Q.      It's your expert opinion, Dr. Wiley,

24  that some students are best served in separate

25  educational settings, correct?



1    A.        Because the students in the GNETS

2    program were not sort of individually described,

3    then my rebuttal applies to what I think she's

4    saying about the GNETS program being students

5    with behavior-related disabilities.

6           So I think my rebuttal applies to the

7    GNETS program based on what Dr. McCart did or

8    didn't provide.  But it's also more generally to

9    students with behavior-related disabilities.

10   Q.        So your rebuttal applies to -- well,

11   let me keep focus on -- your rebuttal to this

12   quote applies to GNETS, insofar as it applies to

13   students with behavior-related disabilities

14   generally, and those are some of the students

15   that are in GNETS.  Is that an accurate --

16   A.        Correct.

17   Q.        -- paraphrase?

18   A.        Yes.

19   Q.        So in the next quote you wrote -- or

20   you quoted Dr. Putnam, who wrote "Researchers,

21   service providers, and educators have coalesced

22   around a core set of interventions -- including

23   functional behavior assessments and behavioral

24   intervention plans, wraparound services, family

25   and community support, and individual and group



 1   that she's stating something that she doesn't

 2   provide enough support for.

 3      Q.      Thank you.

 4              All right.  Now looking at this next

 5   section here, also on page 3.

 6      A.      Okay.

 7      Q.      You provide summaries of the five

 8   major opinions of your report, correct?

 9      A.      Uh-huh.

10      Q.      And what was your process for

11   identifying these five focus areas of your

12   report?

13      A.      Well, reading the reports and reading

14   the claims that were made -- and a lot of them,

15   again, have been made by sometimes very

16   prominent people in special education -- so

17   a lot of my scholarship is around inclusion in

18   kids with emotional, behavioral disorders.

19              And so when I read what the claims

20   were, I sort of laid out what I thought were the

21   most important ways to rebut what those

22   conclusions were.

23              And so the first one -- even though,

24   you know, my expertise is not specifically the

25   law, you know, I was trying to understand from

1   my training in IDEA what -- how to reconcile

2   that with the requirements of the ADA.  So that

3   was the first section.

4           And I think it's important because

5   unnecessary segregation inevitably relates to,

6   from an IDEA perspective, how are decisions made

7   about the LRE for an individual student.

8           So, as -- I thought about what was

9   being said, what was being included.  That was

10  my first section.

11          Do you want me to walk through all of

12  them, or?

13  Q.      Well, you know what, we were about to

14  do that.

15  A.      Okay.

16  Q.      So let's do it step-by-step.  And you

17  just very helpfully began talking about the

18  first section.  So let's start there.

19          And, Dr. Wiley, you're not a licensed

20  attorney, correct?

21  A.      That's correct.

22  Q.      And you have no formal legal training?

23  A.      That is correct.

24  Q.      And are you familiar outside of this

25  with the Americans with Disabilities Act?



1    A.        At a very introductory level.  In our

2   introduction to exceptionalities course, for

3   example, most of the textbooks have a chapter

4   that's -- has ADA and 504.

5            Because from a historical perspective

6   it's import to understand all of these different

7   laws.  And then of course IDEA gets sort of the

8   heaviest treatment because it's the one that we

9   think about as applying to special education

10  most directly.

11   Q.        But you don't purport to be an

12  expert --

13   A.        No.

14   Q.        -- in the legal application of the

15  ADA, correct?

16   A.        Of the ADA, no.

17   Q.        And in section I of your report, you

18  provide your analysis as to how the requirements

19  of the ADA and IDEA should be understood,

20  correct?

21   A.        Uh-huh.  As I understand them, yeah.

22  And I think my understanding of IDEA is deeper.

23  Again, I don't claim to be a special ed law

24  expert, but all of our preservice teachers have

25  to be trained in the requirements of IDEA; what



ANDREW WILEY, PH.D.                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                 241

1    A.      Page 4?

2    Q.      Yeah.

3    A.      Okay.

4    Q.      At the top of page 4.

5    A.      Got it.

6    Q.      And just the line here you include

7    that says "DOJ's experts did not examine

8    individual students' needs."

9            Do you see that?

10   A.      Yes.

11   Q.      What is this statement based on?

12   A.      The fact that I didn't see examples of

13   individual students who the DOJ was claiming

14   could be served in general ed environments.

15   Q.      Are you aware if either expert for the

16   United States reviewed and considered student

17   specific records?

18   A.      I saw that there was review of

19   records.  I think that was reported as part of

20   the method for both of those experts.

21   Q.      But you didn't take a look at what

22   records were reviewed to see what the scope of

23   the evaluation was, correct?

24   A.      I didn't.  I looked at the conclusions

25   based on those reviews, and I didn't see where



**Exhibit 3**

ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                   242

 1   the experts use those reviews to say here are

 2   example of students that we're talking about.

 3      Q.      This first sentence in paragraph III,

 4   also on page 4, you wrote that "Research does

 5   not show that inclusion (placement in general

 6   education) is categorically more beneficial than

 7   placement in specialized settings (e.g.,

 8   self-contained classrooms, separate school) for

 9   students with behavior-related disabilities."

10              Did I read that correctly?

11      A.      Yes.

12      Q.      Would you agree that research does

13   support placement of students in the least

14   restrictive environment?

15      A.      Which is not always general education.

16              And that's an interesting -- because

17   the least restrictive environment -- you know,

18   the problem is the placement research.  And so,

19   actually, I don't know that research would tell

20   us that the placement -- least restrictive

21   environment.  That's more like a principle of

22   IDEA that has very good reasons for it.

23              I'm answering honestly, because I

24   can't think of the research that would say --

25   the research that would say placement in LRE is

1    Q.      Do you know how this data's collected?

2    A.      The states are required to report it.

3  I don't know the nuts and bolts of it exactly,

4  but all states are required to report how many

5  kids are identified, under what categories, and

6  some other things.  Exit, like graduation, data.

7  There are a number of things that are collected

8  for IDEA every year.

9    Q.      And you didn't take any steps to

10  independently validate any of this data,

11  correct?

12    A.      I did not.  I'm assuming that this

13  federal data would be accurate.  But it

14  certainly could have errors in it that I'm not

15  aware of.

16    Q.      Do you know what constitutes a

17  separate school under this chart?

18    A.      I think that a separate school --

19  uh-oh.  Is that someone --

20    Q.      Yeah, we're good.  You're good.

21    A.      Okay.  You can see these categories.

22  80 percent or more of the school day in regular

23  class, 40 to 79 percent, and then less than 40.

24          And I think a separate school would be

25  entirely separate from general education.  So



1    essentially zero percent in a general ed school.

2      Q.      And is that your assumption from

3    looking at this, or did you see that somewhere?

4      A.      That's my understanding --

5      Q.      Okay.

6      A.      -- yeah.  There may be definitions,

7    but I'm pretty sure -- I've done some research

8    around these IDEA data, and I'm pretty familiar.

9    So I think I'm right, but ...

10     Q.      Is GNETS considered a separate school

11   for purposes of this data, or -- do you know?

12     A.      I would assume that because these are

13   kids with IEP they're being reported with the

14   other state data.  And I know that GNETS is some

15   separate schools, also has some self-contained

16   classrooms.

17          So my guess would be in Georgia the

18   GNETS, for example, that are in the

19   self-contained classrooms could be under less

20   than 40 percent of the day.

21          But, yes, my assumption would be that

22   the GNETS students are in separate schools for a

23   GNETS program would be in that 9.9 percent.

24   That's my assumption.

25     Q.      And when you say GNETS students in a



ANDREW WILEY, PH.D.                          October 30, 2023
UNITED STATES vs STATE OF GEORGIA                        260

1  education setting?

2      A.      Yeah.  So I think that it would be

3  that if they weren't making satisfactory

4  progress in the self-contained classroom.

5      Q.      Thank you.

6              Turning back to table 2.

7      A.      Yes.

8      Q.      From this table, in your review of the

9  material underlying this table, are you able to

10 discern the categories of supports and services

11 provided to students in any of these settings?

12     A.      That is not included in this table.

13 And I'm trying to think if anything -- and, you

14 know, this is one of the things that -- when

15 I've written about instructional inclusion, it's

16 very -- in some ways it's really easy to collect

17 data that says where are the kids.  Right.  Are

18 they in general ed.

19             Understanding what services and

20 supports there I think would be great to know,

21 but it's much more difficult to figure out a way

22 to collect those data and then report them.

23             But it doesn't -- it doesn't -- this

24 table will not tell you what services and

25 supports are provided.



1   different states, but I would assume that that

2   would -- how they would be reported with their

3   IEPs.

4          Did I dive into exactly how Georgia is

5   reporting these required federal data, no, but I

6   think I could assume that that's what they would

7   be reported under.

8   Q.     Dr. Wiley, let's turn to page 19,

9   please.

10         I'm looking at the first full

11  paragraph under the "CAP" title, subheading.

12  You wrote, the last sentence -- last two

13  sentences there, "Students are referred to GNETS

14  through the IEP process, as required by IDEA.

15  If an IEP team determines that a student with a

16  behavior-related disability has not benefited

17  educationally in a less specialized placement,

18  placement in a GNETS program can be considered.

19         Dr. Wiley, what were these

20  statements -- actually, let me rephrase that.

21         Were these statements based off of

22  your review of the things listed in the

23  considered materials?

24  A.     The manual would be one where -- I

25  believe that's where I read the description of



1    the procedures for referral to GNETS.  And it

2    also came up in my conversations with some of

3    the Georgia Department of Ed staff.

4        Q.      And -- but you did not evaluate the

5    supports and services offered by Georgia's

6    general education requirements, correct?

7        A.      For individual students, no, I didn't.

8        Q.      Or collectively.

9        A.      Or collectively.  That's correct.

10       Q.      And you can't speak to what

11   alternative placements are actually available to

12   students with disabilities in the state of

13   Georgia, correct?

14       A.      Do you mean other kinds of special

15   schools besides GNETS?  When you say

16   "alternative," I'm just trying to --

17       Q.      Yeah.  Referring to the -- again to

18   the continuum that you're talking about --

19       A.      Yeah.

20       Q.      -- in this section.

21       A.      Yeah.

22       Q.      You can't speak to what other options

23   there are in the continuum in the state of

24   Georgia, correct?

25       A.      I can't except that, as you saw in the



 1   identified and get the appropriate services to

 2   their individual needs as we can.

 3       Q.      But if I understood you correctly,

 4   what you were saying a few moments ago with

 5   relation to this table 2 is that you can't tell

 6   from this whether students who are in regular

 7   classrooms some or all of the time are being

 8   appropriately served in --

 9       A.      Not in this table.  That's right.

10       Q.      But you also can't tell for students

11   in separates schools; is that correct?

12       A.      I can't tell for either one.

13       Q.      Okay.

14       A.      This is just how many are served in

15   these particular settings.  That's right.

16       Q.      When you use this term in this

17   sentence that we discussed back on 21 --

18       A.      Okay.

19       Q.      When you use the term critics of full

20   inclusion, do you include yourself in that

21   group?

22       A.      Yes.

23           The "full" is the critical qualifier.

24   I am not a critic of inclusion, appropriate

25   responsible inclusion.



1  time to do it at the highest level of, like,

2  peer-reviewed research, but I would expect that

3  there would have been more transparency in the

4  process and more checks on those findings.

5     Q.     Do you think in putting together your

6  report that your methodology was consistent with

7  standards in the field?

8     A.     My -- my -- well, -- so if I used the

9  method if this was to be compared to research,

10 it would be a synthesis of research around a

11 particular problem.

12          And I think that what I did in terms

13 of identifying literature that was relevant to

14 the analysis -- again, maybe not quite to peer

15 reviewed, but I think I had a process whereby I

16 tried to identify research that synthesized

17 everything.  Right.

18          So if I used syntheses in literature

19 reviews, it's not oh, I've cherry-picked a study

20 here or there that I thought oh, yeah, this one

21 really supports my case.

22          I was looking at here are the people

23 who have synthesized research on a particular

24 intervention or and inclusion and I'm basically

25 reporting these are the things that they



1  too much focus on that, but as far as the way I

2  reviewed the literature as part of, not my

3  entire, rebuttal report was -- it was made with

4  effort to be objective about what the research

5  says.

6     Q.      And if you were to opine on the GNETS

7  program specifically, what methodology would you

8  use to conduct a thorough evaluation?

9     A.      And this would be similar to, you

10  know, my experience with program evaluation.

11  And I can give you that example.  Now, this was

12  one program within a Massachusetts collective,

13  but --

14     Q.      You're talking about back when you

15  were --

16     A.      Yes.

17     Q.      -- a graduate student?

18     A.      Right.  And I haven't pulled the name

19  of the school yet.

20           Observations, records reviews,

21  interviews with faculty.  And we had

22  instruments, because this was a research

23  instrument -- institution for systematic reviews

24  of records and observation tools that allowed us

25  to focus on particular things and state upfront



1    here's what we were looking for.

2          So we were trying to give the

3    leadership, and also the faculty there, as

4    accurate of a picture of what we saw going on

5    with our program and make recommendations for

6    how they might improve.

7          So program evaluation includes some of

8    the things.  And I get it, there are decisions

9    that have to be made in limited periods of time,

10   but that's what I would suggest would have added

11   more credibility to some of the conclusions.

12   Q.      And how large was that program in

13   Massachusetts?

14   A.      That was one school.  So I -- you

15   know, I can only ballpark.  30 to 40 students.

16   Q.      And what was your process with -- so

17   you said, again, that your report is about --

18   mostly about being a synthesis of the research,

19   and so what was your process, then, for

20   synthesizing the research?

21   A.      Oh.  Well, I looked at specific claims

22   about, you know, just, for example, you know, we

23   now know that X, Y, and Z are effective and can

24   be implemented in general ed.  Like those kinds

25   of -- and then I said well, what is the actual



1          I'm giving the examples of section IV,

2    I want to say, where I was looking at, you know,

3    what do we know about making general ed

4    appropriate and effective for students with

5    behavior-related disabilities.

6      Q.      But you would agree that the

7    evaluation you conducted would not have been

8    consistent with standards in your field if you

9    were opining specifically on the sufficiency of

10   the GNETS program, correct?

11     A.      What I think I did here was

12   appropriate for a rebuttal report of specific

13   claims.

14          If my task was to go and evaluate a

15   program, then I would have used a different set

16   of methods.  Some of them would have been

17   similar to, for example, Dr. McCart.  And I know

18   Dr. Putnam also visited some.

19          But I would have used a more

20   structured transparent approach.  That's all I'm

21   saying.

22     Q.      Understood.  Thank you.

23          Let's go to page 25, please.

24     A.      Yes.

25              THE WITNESS:  Does it matter that



1   want to say that because I included this as an

2   example in my report that it's the only place

3   where you could look for a summary of, you know,

4   hallmarks of effective programming for kids with

5   EBD.

6           But yes, these are some of the things

7   that I would use to look at and evaluate, again,

8   any setting, whether you're serving a kid in

9   general or at a special setting.  Yeah.

10   Q.      Dr. Wiley, in your work today do

11   you -- are you ever on students' IEP teams?

12   A.      I am not.

13   Q.      Have you ever been on a student's IEP

14   team?

15   A.      Yes, I have.

16   Q.      When was the last time you were on a

17   student's IEP team?

18   A.      It probably would have been when I

19   was -- before I started my doctoral program.

20   When I was working in schools.

21   Q.      Okay.

22   A.      It's pretty unusual for a researcher

23   to be placed on an IEP team.

24   Q.      Do you ...

25           Do you ever review IEPs as part of



1  your work?

2    A.      Well, I have some doctoral students

3  who that's part of their dissertation research.

4  And so we have redacted IEPs that they've looked

5  at and evaluated for quality.

6          The student that I'm thinking about

7  right now has identified -- like I was talking

8  about, records review forms.  There are a number

9  of forms that have been used in research to

10  objectively evaluate IEP components and things

11  like that.

12          And the only other thing I would add

13  is that in some of our classes we use -- now,

14  these are not classes I teach, but our faculty

15  all work together.

16          We have an IEP class where they're

17  actually looking at real life IEPs to try to

18  understand procedural and substantive components

19  of IEPs.

20    Q.      In those settings you're reviewing to

21  IEPs for educational purposes or research

22  purposes, correct?

23    A.      Educating the preservice teachers.

24  That would be the class example.

25          And then for research the student I'm



ANDREW WILEY, PH.D.                                    October 30, 2023
UNITED STATES vs STATE OF GEORGIA                                  329

1  thinking of specifically is interested in kids

2  who are deaf or hard of hearing, and she's

3  designing her dissertation to be an evaluation

4  of IEPs for kids who are deaf or hard of

5  hearing.

6    Q.     And I guess my next question is have

7  you in the last 10, 15 years reviewed a

8  student's IEP for sufficiency or fidelity of

9  implementation or anything along those lines?

10   A.     I have not.

11   Q.     Okay.

12              MR. GILLESPIE:  I forget when we

13       dropped off last time.  Are we about an

14       hour in?

15              MS. ADAMS:  Yeah.

16              MR. GILLESPIE:  Yeah.  Let's take a

17       break.

18              THE WITNESS:  All right.

19              THE VIDEOGRAPHER:  All right.  Off

20       the record, 3:44.

21                   - - - - -

22         (A recess was taken.)

23                   - - - - -

24              THE VIDEOGRAPHER:  On the record,

25       4:00.



**Exhibit 3**

ANDREW WILEY, PH.D.                          October 30, 2023
UNITED STATES vs STATE OF GEORGIA                        342

1   I made note of what I was told bye these

2   different people.

3      Q.      I think we covered this, but it would

4   have been this morning.

5              Did you ask to speak with anyone that

6   you didn't get to speak with?

7      A.      No.

8      Q.      Okay.

9      A.      I had no request denied, if that's

10  what you're describing, --

11     Q.      Yes.

12     A.      -- I'd like to talk to.

13             Yes, that's true.

14     Q.      Did you ask if there were some parents

15  who felt differently than what you describe

16  here?

17     A.      I did not ask that question, and I

18  didn't know that that would be a realistic ask,

19  to be able to speak to parents and also to be

20  able to -- I mean, I'm saying that now, but --

21  you know, when I think about it, but I think it

22  didn't occur to me because I didn't know that

23  that might be something that I would be able to

24  do in my capacity as an expert witness.

25             So instead I talked to some folks that



1   have worked in GNETS.

2      Q.        You're not purporting to be -- to

3   provide expert testimony on what parents do or

4   do not feel about the GNETS program, correct?

5      A.        I am not, but can I say one other

6   thing?  I know I'm doing this and I'm -- you

7   know, it was interesting to me to read the ADA

8   language about whether or not students with

9   behavior-related disabilities would object to

10  being placed in general education.  Right.  I

11  sort of got that right.

12             And I think it's interesting because

13  what that means within a school-aged kid with

14  disabilities in the IEP process -- I'm not

15  saying that there are -- like, the IEP process

16  is not -- is always perfect.  So I'm not using

17  that as a perfect proxy for parents expressing

18  what they wanted.

19             But they are required to be part of

20  the IEP process, including the placement

21  decision, and I just wondered -- I'm not going

22  to say anything that's a conclusion about that

23  except how does that work when you say what is

24  the preference of the student when you have this

25  IEP process where the parent is supposed to have

