# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNITED STATES OF AMERICA,

     *Plaintiff*,

v.

STATE OF GEORGIA,

     *Defendant*.

CIVIL ACTION

NO. 1:16-CV-03088-ELR

## DEFENDANT STATE OF GEORGIA'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO PARTIALLY EXCLUDE THE TESTIMONY OF DR. ANDREW WILEY, PH.D.

Defendant, the State of Georgia, submits this Response in Opposition to Plaintiffs' Motion in Limine to Partially Exclude the Testimony of Dr. Andrew Wiley, Ph.D. (the "Wiley Motion") [Doc. 476.] With this Response, the State shows that the Wiley Motion should be denied. Alternatively, if this Court grants the Wiley Motion based on the Plaintiffs' reasoning, those same arguments warrant granting the State's Motions to Exclude the Testimony of Dr. Robert Putnam [Doc. 428] and Dr. Amy McCart [Doc. 431], as well as the State's motion for summary judgment. [Doc. 395.]

## INTRODUCTION

It is difficult to understand why the Plaintiff ("DOJ" or the "Department") filed the Wiley Motion. As an initial matter, the Wiley Motion is limited in its

scope: it does not seek to exclude Dr. Wiley from providing any testimony. Instead, the DOJ seeks to prevent Dr. Wiley from (1) offering legal opinions; and (2) testifying about GNETS specifically. [Doc. 476-1 at 18.][1] These arguments lack merit. First, Dr. Wiley does not offer legal opinions. Second, the admissibility of Dr. Wiley's rebuttal testimony does not turn on whether he (was asked to or) actually conducted the same kind of formal "evaluation" of locally-provided GNETS services that only Dr. McCart purported to do. [Doc. 476-1 at 10-18.] Unsurprisingly, no authority suggests otherwise. Dr. Wiley effectively rebutted Dr. McCart's and Dr. Putnam's identified presumptions and ideological underpinnings. [Doc. 476-2 at 3-4.] This is a recognized purpose of rebuttal witnesses: to "rebut the opinions of Plaintiff's experts." Six v. Carnival Corp., 07-22567-CIV, 2008 WL 11410000, at *1 (S.D. Fla. Aug. 1, 2008).

Ultimately, both of DOJ's grounds for exclusion—purported legal opinions and a different type of analysis—represent strawmen created by DOJ's misreading of Dr. Wiley's report and his deposition testimony. Consequently, the Wiley Report should not prevent the Court from assessing DOJ's and its experts' false claims that (1) the GNETS Program is the only one of its kind in the United States; (2) the consensus among professional educators is aligned with Dr. McCart's and Dr.

---

[1] "GNETS" refers to the Georgia Network for Educational and Therapeutic Support. In addition, this Response cites to the ECF page number and not the page numbers provided at the bottom of the page of the cited document.

Putnam's inflexible and unsupported philosophy; and (3) the DOJ can, with any degree of intellectual consistency, acknowledge that some students need more isolated settings and seek sweeping and systemic relief based on Dr. McCart's and Dr. Putnam's presumptions about the individualized needs of hypothetical students.

The timing of the filing of the Wiley Motion supports these conclusions. By the time the DOJ got around to filing the Wiley Motion, the parties had concluded briefing on the State's motion for summary judgment, the State's motions to exclude the testimony of Drs. McCart and Putnam, and the DOJ's motion for partial summary judgment. [Docs. 429 (State motion for partial summary judgment), 431 (State motion to exclude Dr. McCart's testimony), 428 (State motion to exclude Dr. Putnam's testimony), 395 (DOJ motion for partial summary judgment).] Strategically, this makes sense. It would understandably be difficult for the DOJ to, on the one hand, defend Dr. McCart's and Dr. Putnam's generalized analysis that speculates about individual needs of hypothetical students neither witness considered and, on the other hand, criticize Dr. Wiley's rebuttal testimony for opining on similarly situated, but still, hypothetical students "with behavior-related disabilities generally." [Doc. 476-1 at 14 (quoting Wiley Dep. 214:6-18).]

Time has not, however, erased these obvious inconsistencies. Rather, the Wiley Motion has, once again, highlighted critical questions before the Court (that the State has repeatedly raised): can ADA liability be based on presumptions about

the unique and individual needs of hypothetical students, or must determinations of "appropriate" necessarily involve consideration of at least an actual student's needs? If the answer is the former, Dr. Wiley's opinions are admissible, and the Court will assign them (and any admissible opinions of Drs. McCart and Putnam) the appropriate weight at summary judgment. If the answer is the latter, as the Fifth Circuit recently held, then none of the proffered expert reports should be deemed admissible and the State's motion for summary judgment should be granted.[2] See United States v. Mississippi, 82 F.4th 387, 396 (5th Cir. 2023) (holding that determining what constitutes appropriate "treatment of those with serious mental illness, as Olmstead clearly understood, must be individualized"). Put simply, the DOJ cannot have it both ways: either expert opinions about unidentified and hypothetical students are sufficient under the ADA or they are not. The State continues to contend that they are not, but either way, that does not represent the totality of Dr. Wiley's rebuttal testimony.

_____

[2] In other recent cases, the DOJ effectively acknowledged the need for actual, individualized analysis. When it sued the State of Florida for alleged ADA violations, the DOJ's expert conducted "individualized review of the medical records of all" children the DOJ claimed were subject to unlawful discrimination. See United States v. Florida, 12-CV-60460, 2023 WL 4546188, at *40 (S.D. Fla. July 14, 2023) (evaluating evidence of an expert's 139 Institutionalized Children").

## ARGUMENT AND CITATION TO AUTHORITIES

Since 1996, Dr. Andrew Wiley has dedicated his life to providing, teaching about, and researching special education services. [Doc. 476-2 at 86-96.] His professional opinions differ from those like Dr. McCart and Dr. Putnam who have adopted and advocated for an ideology of "full inclusion," which is described as the belief that "all or very nearly all students with disabilities [should remain] in general education environments. Full inclusion advocates view placement in general education as a moral imperative and the most important issue in educating students with disabilities." [Doc. 476-2 at 21.] Or, as Dr. McCart herself puts it, "all means all."[3] Dr. Wiley's report specifically identifies and effectively rebuts eight specific statements of Drs. McCart and Putnam, most of which reflect the disputed ideology of the full inclusion camp. [Doc. 476-2 at 3-4.]

As an initial matter, the Wiley Motion does not seek to exclude Dr. Wiley's testimony altogether, nor does it challenge his qualifications to provide expert testimony generally. [Doc. 471-1 at 18 (identifying the limited exclusions the Wiley Motion requests).] That said, the Wiley Motion dedicates significant text to faulting Dr. Wiley's experience as largely an academic. [Doc. 476-1 at 2-4.] Not only is this irrelevant and gratuitous at best, it underscores Dr. Wiley's

---

[3] Amy McCart, Michael McSheehan, Wayne Sailor, Melinda Mitchiner, and Carol Quirk, "SWiFT: Differentiated Technical Assistance" at 39 (available at https://files.eric.ed.gov/fulltext/ED571853.pdf).

qualifications to rebut Drs. McCart and Putnam's presumptions that individualized determinations to provide educational services in separate environments is always or usually unnecessary, and that providing "appropriate services" (whatever that may mean) can always prevent such separation.[4] Dr. Wiley's stated purpose "was to 'correct what [he] saw to be misunderstandings on the literature around placement interventions generally,' and, in doing so, 'provide a defense for having separate placements generally.'" [Doc. 476-1 at 12-13 (quoting Wiley Dep. 183:3-12).]. Dr. Wiley also counters DOJ's experts' assertions that Georgia is somehow unique in its provision of educational and mental health services,[5] and shows that, in actuality, Georgia serves a higher percentage of students with emotional disturbance disabilities in general education settings as compared to other states. [Doc. 476-2 at 17 (citing *U.S. Department of Education 43rd Annual Report to*

---

[4] These are indeed simply presumptions on the part of DOJ experts because, as fully argued in the State's Motions to Exclude the Testimony of Dr. McCart [Doc. 431] and Dr. Putnam [Doc. 428], neither expert conducted the individualized analysis required to show unnecessary segregation. <u>Florida</u>, 12-CV-60460, 2023 WL 4546188, at *40.

[5] For example, Dr. McCart characterizes the GNETS Program as "outdated" [Doc. 432-1 at 3], and "a relic of the institutional systems and structures of the 1970s" [<u>Id</u>. at 157.] Dr. Putnam's report included an entire section on how Georgia should "replicate successes of other states and districts" and then identified exactly one district in one state (Massachusetts) in support of this position. [Doc. 428-1 at 59-62.]

*Congress on the Implementation of the Individuals with Disabilities Education Act,*
*2021* at 156-157).][6]

Also contrary to the DOJ's mischaracterizations, Dr. Wiley's rebuttal
testimony does not turn on any purported opinions of Dr. Wiley regarding the
federal special education law (the IDEA) or anti-discrimination law (the ADA); in
fact, Dr. Wiley's report and testimony made clear that he is not opining on the law.
[Doc. 476-2 at 3-5 (report); Wiley Dep. [Doc. 436] at 238:19-240:21.] Instead, his
"report was really focused on [the opinions of] Dr. Putnam and Dr. McCart," and
the IDEA and ADA provided relevant context to their opinions. (Wiley Dep. [Doc.
436] at 109:4-5.)" The DOJ's second attack on Dr. Wiley's testimony—that his
review of information precludes him from offering admissible testimony "about the
sufficiency or operations of the GNETS Program"—fares no better. [Doc. 476-1 at
13.] As Dr. Wiley's report makes clear, rebutting the eight identified opinions of
Drs. McCart and Putnam [Doc. 476-2 at 3-4], does not require an actual
"evaluation" of GNETS services. [Doc. 476-1 at 16.]

Indeed, when compared to its own proffered experts' methodology, DOJ's
challenges to Dr. Wiley's methodology are strained at best. Like Drs. McCart and
Putnam, Dr. Wiley did not review all or the "vast majority" of IEP Team reports or
other types of files for students who have been referred by IEP Teams for GNETS

---

[6] Available at https://sites.ed.gov/idea/files/43rd-arc-for-idea.pdf.

services (although he did read both Drs. McCart's and Putnam's descriptions of them). (McCart Dep. [Doc. 431-2] at 34:22-35:15, 141:10-19; Putnam Dep. [Doc. 428-2] at 37:23-74:9, 107:10-12, 258:25-259:4; 428-1 at 13 (report).) Also like Dr. McCart and Dr. Putnam, Dr. Wiley does not identify which, if any, students are allegedly "at risk" of being referred for GNETS services by their IEP Team. (McCart Dep. [Doc. 431-2] at 34:22-35:15, 141:10-19; Putnam Dep. [Doc. 428-2] at 37:23-74:9, 107:10-12, 258:25-259:4; 428-1 at 13.) In other words, each of the three proffered witnesses made numerous presumptions about the "vast majority" of hypothetical students they never met, or for whom they reviewed no individual information. Those presumptions included at least what types of services the hypothetical students needed, the amount of services that would be needed to address each hypothetical student's unique needs, the availability of those services to each of the individual hypothetical students, and whether the hypothetical students would more appropriately be served in a general education setting or one that is more separate from general education classrooms. See, e.g., [Doc. 432-1 at 159; 428-1 at 54-63.]

The difference between Dr. Wiley's analysis and Drs. McCart and Putnam's advocacy, however, is that only Dr. Wiley refrains from making sweeping generalizations about the "vast amount" of hypothetical students he never met and whose education files he never reviewed. As Dr. Wiley himself puts it: "It is

irresponsible and unethical to insist that all or nearly all students with behavior-related disabilities be placed in general education before limitations of evidence and implementation have been satisfactorily addressed. Given current realities and uncertainty, we must protect the <u>individualized</u> nature of special education, including <u>individualized</u> placement decisions." [Doc. 472-2 at 60 (emphasis added).] This kind of evidence is relevant and admissible if Drs. McCart and Putnam are permitted to testify.

### 1. Dr. Wiley Does Not Offer Inadmissible Legal Opinions.

No one disputes that Dr. Wiley does not have formal legal training or that he is not an attorney. This is irrelevant, because contrary to the Wiley Motion, Dr. Wiley does not offer testimony on "questions of law" or the "legal implications of the IDEA or the ADA in this case." [Doc. 476-1 at 6, 7.]

He instead addresses eight specific opinions of the DOJ's proffered experts, Drs. McCart and Putnam, and he effectively rebuts their underlying presumptions about the "vast majority" of students who have been referred for GNETS services by local education officials. [Doc. 476-2 at 3-4.] Dr. Wiley's discussions of the IDEA and ADA, which is the subject of the DOJ's challenge, represents (1) responses to the statements about the IDEA from the DOJ's proffered experts; (2) appropriate context for the difficult choices facing local education officials; and (3) information about the state of academic opinion in the light of Drs. McCart's and

Putnam's disputed claims that their "full inclusion" philosophy is the accepted standard. [Doc. 476-2 at 11 n.1., 9-18.]

Any reasonable reading of Dr. Wiley's report makes this clear. [Id.] For example, even the portion of Dr. Wiley's report that the DOJ identifies ignores that Dr. Wiley was critiquing DOJ's *experts'* legal interpretations:

> In light of the DOJ's interpretations of Title II of [the] ADA, *questions remain as to how DOJ **or its experts** believe* "segregated" (non-integrated) placement can be provided in a way that both complies with [Free and Appropriate Public Education requirements] and does not discriminate (per their interpretation of ADA requirements) against students with behavior-related disabilities.

[Doc. 476-1 at 9 (emphasis added).] Dr. Wiley's criticisms of DOJ's experts' understanding of the applicable law and its implications are well within the realm of permissible rebuttal opinion. Indeed, "the purpose of rebuttal evidence is to explain, repel, counteract, or disprove the evidence of the adverse party." United States v. Frazier, 387 F.3d 1244, 1269 (11th Cir. 2004) (cleaned up). Here, Dr. Wiley's testimony counters DOJ's experts' understanding of the ADA and IDEA and the interplay between the two.[7] DOJ's (incorrect) belief that Dr. Wiley's opinions are

---

[7] For example, Dr. Wiley points out the inherent contradiction in Dr. McCart's "statement that '…while the nature of special education is such that it requires attention to each individual student and their learning process —and certain students may need quieter environments, close adult supervision, fewer individuals near them, or other intensive interventions—those are not rationales for a segregated placement decision.'" [Doc. 476-2 at 19.] Similarly, Dr. Wiley notes that DOJ's experts fail to consider the feasibility of implementing their recommendations "alongside the procedural and substantive requirements of IDEA." [Id.]

"premised upon his flawed and inadmissible understanding of the law" may be appropriate for cross examination, but not as a reason for outright exclusion of his testimony. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003) (identification of alleged flaws in expert testimony is the role of cross-examination).

### 2. Dr. Wiley's Testimony Effectively Rebuts The Opinions of Dr. McCart and Dr. Putnam.

The Wiley Motion also seeks to prevent Dr. Wiley from offering testimony "as to the GNETS Program, including any regional GNETS program or the supports and services received by students placed in the GNETS program." [Doc. 476-1 at 18.] This challenge appears to be based on DOJ's misplaced criticisms that Dr. Wiley (1) relied on data from the DOJ's sister agency, the United States Department of Education ("USDOE"); (2) did not conduct an "evaluation" of local education officials' provision of GNETS services; and (3) is supposedly "unfamiliar with critical components" of Georgia's education policies. [Doc. 476-1 at 10-18.] These arguments are legally meritless, and some apply with even greater respect to the testimony of Drs. McCart and Putnam.

As to the data upon which Dr. Wiley relies, the Wiley Motion challenges Dr. Wiley's demonstration that Georgia's locally-administered special education programs are not only consistent with other states' efforts, but also that, comparatively, Georgia school officials teach more students with emotional

disturbance disabilities in general education settings. [Doc. 476-2 at 16-18 (citing

*U.S. Department of Education 43rd Annual Report to Congress on the*

*Implementation of the Individuals with Disabilities Education Act, 2021* at 156-

157).] DOJ alleges Dr. Wiley's conclusions are inadmissible despite that they are

based directly on a USDOE "dataset." [Doc. 476-1 at 10 n.2.] The dataset,

according to DOJ, constitutes hearsay and is so unreliable that apparently Dr.

Wiley should have taken independent steps to validate the data before relying on it

in his report. [Doc. 476-1 at 11 n.2.]

    Experts are permitted to rely on federal government data to reach their

conclusions. See, e.g., Cosper v. Ford Motor Co., No. 2:18-CV-189-RWS, 2022

WL 17908815, at *7 (N.D. Ga. Oct. 17, 2022) (Holding proffered expert testimony

about NASS data is reliable because "the federal government collects NASS data

and the [National Highway Traffic Safety Administration] relies on it to make

motor vehicle safety regulations"). DOJ's authority does not counter this well-

excepted aspect of evidentiary law.[8] [See Doc. 476-1 at 10-12.] It appears, instead,

---

[8] Aside from the USDOE dataset, DOJ does not identify any facts it deems
unreliable such that Dr. Wiley should not have based his opinion on them, let alone
any facts that rise to the level of faulty data in the cases cited. [Doc. 476-1 at 12.]
In Schoen v. State Farm Fire & Cas. Co., 638 F. Supp. 3d 1323, 1338 (S.D. Ala.
2022), for example, the estimate at issue contained admittedly erroneous data that
the court held could not be relied upon as a basis of expert opinion. Similarly, in
Knepfle v. J-Tech Corp., 48 F.4th 1282, 1294 (11th Cir. 2022), the court excluded
as unreliable the testimony of an expert that was based on the "eyeballing" method
to measure helmet liner compression. The State is unable to address *Kelly*, 644 F.

that DOJ questions the veracity of the USDOE's information, which is a subject for cross-examination and not exclusion. In re Disposable Contact Lens Antitrust, 329 F.R.D. 336, 372 (M.D. Fla. 2018) (the sufficiency of the basis for expert opinion is properly explored on cross-examination and argument).

As an additional means of resolving the issue, the State will willingly provide the dataset at issue for the Court's consideration for judicial notice. As the Court is aware, Federal Rule of Evidence 201 empowers federal courts to take judicial notice of matters that are "generally known within the trial court's territorial jurisdiction; or … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. of Evid. 201(b). Other courts have taken judicial notice of federal government data. "The 'public records' of which courts may take judicial notice have been defined by several courts to include facts found on federal government websites." Acella Pharms., LLC v. First DataBank, Inc., No. 1:17-CV-5013-MHC, 2018 WL 7199992, at *6 (N.D. Ga. June 4, 2018), vacated on other grounds, No. 1:17-CV-5013-MHC, 2018 WL 7199807 (N.D. Ga. Oct. 4, 2018) (collecting cases.) If DOJ disagrees with some aspect of the dataset compiled by and sourced from USDOE such that it opposes the Court taking judicial notice of it, the State will have no objection to DOJ submitting such

---

Supp. 3d at 1323-24 (cleaned up) which appears to be a miscite. [Doc. 476-1 at 12.]

argument and explaining why the data is so unreliable or inaccurate that Dr. Wiley should not have used it.

To the extent that the DOJ's challenge is based on Dr. Wiley's interpretation or application of the data (instead of the data itself), such concerns are more aptly addressed by cross-examination rather than as grounds for outright exclusion, as they go to the weight of the testimony not the admissibility of it. *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1345. This ends the inquiry.

The possible dispute about the accuracy of federal government data notwithstanding, the parties agree that Dr. Wiley did not conduct an "evaluation" of the services provided through the GNETS Program. [Doc. 476-1 at 4, 10]. The parties disagree as to whether this matters. To be clear, it does not. Dr. Wiley was not offered as an affirmative expert in this case. The purpose of his testimony is to rebut specific opinions of Drs. McCart and Putnam.

Indeed, DOJ acknowledges that there are only "a few references" to GNETS in his report. [Doc. 476-1 at 17 n.4.] The Wiley Motion does not even cite a single opinion of Dr. Wiley that is purportedly a qualitative analysis of the GNETS Program. Nor does the Wiley Motion cite to a single instance in which the State attempted to use his testimony in support of the GNETS Program.[9] Nevertheless,

---

[9] The purported instance in which the State cited to Dr. Wiley's report to support contentions related to the GNETS Program is demonstrably false, as the included quote states nothing about GNETS and instead provides in full, "Dr. Wiley's report

DOJ seeks to exclude testimony that they admit does not exist and that the State and Dr. Wiley agree he was not engaged to testify about.

Besides missing the point and purpose of Dr. Wiley's testimony completely, the DOJ's criticisms of Dr. Wiley's testimony is odd given the testimony of the Department's proffered experts. Because no one reviewed the files or circumstances of each individual student, no witness offers an individualized analysis. And, the DOJ's criticisms of Dr. Wiley's knowledge about the GNETS Program rings hollow when considering Drs. McCart's and Putnam's fundamental misunderstandings of Georgia education policy (an issue raised in the State's motions to disqualify them).

Notably, DOJ does not attack Dr. Wiley's methodology as to the testimony he *does* provide. Instead, they attack his methodology for opinions he did not provide. His testimony was not on GNETS. It was not on Georgia specifically. Thus any alleged unfamiliarity with subject matter such as the "the Interconnected Services Framework," "wraparound interventions," "family intervention services," and "statewide PBIS strategic plans" (whatever that may mean), does not impact the reliability of his analysis. [Doc. 476-1 at 15.]

---

demonstrates that, comparatively the State [of Georgia] provides significant integrated services." [Doc. 476-1 at 10.]

Despite its acknowledgment that Dr. Wiley's testimony does not purport to evaluate GNETS, DOJ faults Dr. Wiley because it "applies to GNETS only 'insofar as it applies to students with behavior-related disabilities *generally*, and those are some of the students that are [placed] in [the GNETS Program]'…In short, Dr. Wiley's understanding of his own expert testimony is that it does not provide any opinions *specific to* the State of Georgia or the GNETS Program." [Doc. 476-1 at 14] (quoting Wiley Dep. at 214:6-18) (emphasis added).  Essentially, DOJ argues for exclusion of Dr. Wiley's testimony because his opinions are too generalized. He does so in his opinion that separate settings are not always unnecessary and that provision of appropriate services does not always prevent segregation. [Doc. 476-2 at 30-67.]. Put differently, Dr. Wiley's testimony opines on the above-mentioned hypothetical student for whom a separate setting is not inappropriate and for whom the provision of appropriate services does not prevent segregation.

Most surprisingly, the DOJ criticizes Dr. Wiley for not reviewing student files before offering this opinion about a hypothetical subset of students because his testimony is "too great an analytical gap between the facts of the case and the expert's opinion." [Doc. 476-1 at 16.] The great irony of DOJ's argument, however, is that if Dr. Wiley's testimony must be excluded on this basis, then so must Dr. McCart's and Dr. Putnam's. Indeed, this is the same argument that the State submits as the basis to exclude DOJ's experts' testimony. The difference is

that the DOJ bears the burden of an individualized analysis to prove its case; the State does not.[10]

If DOJ's position is that Dr. McCart's generalized analysis is sufficient to opine on a hypothetical student whose file she did not review but for whom she determined GNETS was unnecessary anyway, then Dr. Wiley's analysis on such hypothetical student must be sufficient as well. Put differently, if Dr. McCart can opine on a hypothetical student without the benefit of an individualized, fact-specific inquiry into that student's file, then so can Dr. Wiley. Again, the difference, to the detriment of DOJ, is that the State, as the defendant, need not perform an individualized analysis to prove or disprove any claim.

Lastly, the Wiley Motion claims that Dr. Wiley lacks sufficient information about GNETS to offer an opinion on it. [Doc. 476-1 at 15-16.] This is a particularly odd argument for the DOJ to make. Its own expert, Dr. Putnam, candidly admitted under oath that he "do[esn't] know a lot about GNETS, because that wasn't what

---

[10] DOJ attempts to discredit Dr. Wiley's methodology as a "thin [] foundation" against that of Dr. McCart ("considered materials include, among other things, thousands of pages of materials from regional GNETS programs, twelve deposition transcripts, and materials from the state"). [Doc. 476-1 at 17 n.5.] This predictable attack fails for two reasons. First, Dr. McCart was hired to offer expert testimony on the GNETS Program. Dr. Wiley was not. Second, as shown by the <u>Florida</u> case, Dr. McCart did not conduct the individualized inquiry required to support DOJ's claims. However much DOJ continues to tout her methodology, either against Dr. Wiley's or independently, it still fails on <u>Florida</u> alone.

[he] was asked" to consider.[11] (Putnam Dep. [Doc. 428-2] at 18:19-22, 175:12-18.) Despite this admission, the Wiley Motion actually argues that Dr. Putnam's report (but not his testimony) demonstrates sufficient familiarity with "critical components of a system for delivering mental health and therapeutic services and supports for students in the GNETS Program." [Doc. 476-1 at 15-16 (emphasis added).]

The same is true of Dr. McCart. As pointed out in the State's motion to exclude Dr. McCart's testimony, she too is unaware of material aspects of Georgia education policy but opines on them nevertheless. [Doc. 431 at 10-12.] For example, she has no knowledge of the Georgia appropriations process or budgeting obligations. (Id. at 10.) She was equally uniformed about the ability of the State to control decisions made at the local school level, including recommendations of local IEP Teams. (Id. at 10-11.) She also wrongly believed that GNETS services are provided by the State, but she could not answer whether State or local education officials decide how to spend the voluntary GNETS grant funds. (Id. at 12.) This might not matter except for the fact that Dr. McCart—unlike Dr. Wiley— offered specific opinions and recommendations that the State adopt to address her concerns. (See, e.g., McCart Rep. at 162-67.) Despite this, the Wiley Motion relies

---

[11] Despite this, the Wiley Motion actually cites Dr. Putnam's report in a failed effort to undermine Dr. Wiley's analysis. [Doc. 476-1 at 15 (citing Doc. 428-1 (Putnam Report) at 9-10, 18-20, 21, 48-50).]

on Dr. McCart's report. [Doc. 476-1 at 17-18.] But, instead of addressing the specific rebuttal provided by Dr. Wiley, the Wiley Motion simply restates what Dr. McCart considered when forming her opinions. [Doc. 476-1 at 17-18.] As shown, this misses the point altogether.

The material inconsistencies continue. In response to the State's motions to exclude the testimony of Drs. Putnam and McCart based on this lack of relevant information about Georgia education policy ([Docs. 428 at 16, 431 at 10-12]), the DOJ contended that such arguments "should be advanced through vigorous cross-examination and presentation of contrary evidence." [Docs. 438 at 25, 440 at 15.] Apparently, the Department changed its mind.

Clearer examples of wrongly trying to have it both ways may not be possible. If an unidentified (and unsupported) level of specific knowledge about the GNETS Program is necessary to opine about it, then neither Dr. McCart nor Dr. Putnam cannot offer admissible testimony, particularly as it relates to their policy advocacy guised as reasonable accommodations. [Doc. 476-1 at 16.]

## CONCLUSION

For the reasons described herein, the Motion should be denied.

Respectfully submitted, this 16th day of February, 2024.

|  |  | */s/ Josh Belinfante* | |
|---|---|---|---|
| Christopher M. Carr | 112505 | Josh Belinfante | 047399 |
| *Attorney General* | | Melanie Johnson | 466759 |
| Bryan Webb | 743580 | Edward A. Bedard | 926148 |

*Deputy Attorney General*
Russell D. Willard         760280
*Sr. Assistant Attorney General*
Susan R. Haynes         901269
*Assistant Attorney General*
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334

Javier Pico Prats         664717
Danielle Hernandez         736830
Anna Edmondson         289667
ROBBINS ALLOY BELINFANTE
    LITTLEFIELD, LLC
500 14th St. NW
Atlanta, GA 30318
T: (678) 701-9381
F: (404) 856-3255
E: jbelinfante@robbinsfirm.com
    mjohnson@robbinsfirm.com
    ebedard@robbinsfirm.com
    jpicoprats@robbinsfirm.com
    dhernandez@robbinsfirm.com
    aedmondson@robbinsfirm.com

Alexa R. Ross         614986
AlexaRossLaw, LLC
2657 Danforth Lane
Decatur, Georgia 30033
E: alexarross@icloud.com

*Special Assistant Attorneys General*

*Attorneys for Defendant*
*State of Georgia*

**LOCAL RULE 7.1(D) CERTIFICATION**

I certify that this **DEFENDANT STATE OF GEORGIA'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO PARTIALLY EXCLUDE THE TESTIMONY OF DR. ANDREW WILEY, PH.D.** has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1. Specifically, this document has been prepared using 14-pt Times New Roman font and type.

*/s/ Josh Belinfante*
Josh Belinfante