# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 1:16-cv-03088- |
| v. | ) | ELR |
| | ) | |
| STATE OF GEORGIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>DECLARATION AND EXPERT DISCLOSURE</u>
## <u>OF DR. AMY McCART</u>

I, Amy McCart, declare, in compliance with Fed. R. Civ. P. 26(a)(2)(B), as follows:

1.      I have been retained to present expert testimony in this matter on behalf of the United States.  My report, which is attached, contains a complete statement of all opinions to be expressed in this matter, as well as an explanation of the basis and reasons for those opinions.

2.     My report describes the facts, data, and other information I considered in forming my opinions.

3.     My report includes charts and graphs that may be used as a summary of or support for my opinions.  I have not prepared other exhibits at this time.

4.     My attached *curriculum vitae* states my qualifications and lists all publications I have authored in the past ten years.

5.     I provide my testimony pursuant to a contract with the United States Department of Justice.  My compensation in this litigation is $350 per hour, plus expenses, for my review of documents, participation in site visits, and preparation of reports and statements, and $437.50 per hour, plus expenses, for deposition and testimony.  I have been assisted by two others on staff at the SWIFT Center, Melinda Mitchiner and Hoon Choi, and they are compensated at the rate of $250 per hour, plus expenses.  None of our compensation is dependent on the outcome of this litigation.

6.     Within the last four (4) years, I have not testified as an expert at trial or by deposition.

7.    I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury and under the laws of the United States of America, that the foregoing is true and correct.

Executed this 16th day of June, 2023:

_____
Dr. Amy McCart

**REVIEW OF THE**

**GEORGIA NETWORK FOR EDUCATIONAL AND THERAPEUTIC SUPPORT**

**(GNETS) PROGRAM**

**Expert Report**

**Prepared by Amy McCart, Ph.D.**

**June 16, 2023**

**TABLE OF CONTENTS**

Executive Summary................................................................................................ 1

Section I: Introduction............................................................................................ 2

Section II: Relevant Literature ............................................................................... 3

Section III: Definitions and Indicators.................................................................... 5

Section IV: Methodology....................................................................................... 11

Section V: Understanding the Student Population in the GNETS Program............................ 13

Section VI: Opinions and Findings ........................................................................ 20

Opinion and Finding One: The GNETS Program segregates, separates, and isolates students with behavior-related disabilities in multiple and compounding ways ........... 20

Opinion and Finding Two: The GNETS Program provides unfair and unequal educational opportunities for students with behavior-related disabilities .................... 68

Opinion and Finding Three: The GNETS Program's systemic segregation of students with behavior-related disabilities in the State of Georgia is unnecessary and fails to deliver effective behavioral and therapeutic supports................................... 157

Section VII: Recommendations ........................................................................... 160

Section VIII: Conclusion....................................................................................... 167

Section IX: References.......................................................................................... 168

Appendix A: Data Tables and Graphs

Appendix B: Georgia Department of Education's Map of the GNETS Program

Appendix C: Georgia Department of Education's FY23 GNETS Program Directory

Appendix D: Site Visit Table and Summary

Appendix E: Materials Considered

Appendix F: *Curriculum Vitae* of Dr. Amy McCart

EXECUTIVE SUMMARY

In 2020, the U.S. Department of Justice, Civil Rights Division's Educational Opportunities Section requested that I provide an expert opinion addressing the following issues: (1) the degree and nature of the segregation of students served in the GNETS Program; (2) the quality and range of educational opportunities afforded to students within the GNETS Program as compared to the quality and range of educational opportunities afforded to their general education peers; and (3) the State of Georgia's ability to support students in the GNETS Program in more integrated settings with appropriate services and supports for their needs. Accordingly, I conducted a multi-year, multi-site examination of the GNETS Program using a comprehensive qualitative and quantitative methodology that included observation, record review, and interview analysis. As part of my examination, I conducted 70 site visits to 27 center-based GNETS Program sites and 36 school-based GNETS Program sites across the State, reviewed thousands of relevant records produced by the State as well as the 24 regional GNETS programs, and attended (or reviewed testimony from) the depositions of numerous regional GNETS program directors.

In the Expert Report that follows, I detail my professional opinions and findings, concluding that:

1. The GNETS Program segregates, separates, and isolates students with behavior-related disabilities in multiple and compounding ways.
2. The GNETS Program provides unfair and unequal educational opportunities for students with behavior-related disabilities.
3. The GNETS Program's systemic segregation of students with behavior-related disabilities in the State of Georgia is unnecessary and fails to deliver effective behavioral and therapeutic supports.

I then identify recommended actions for the State of Georgia to: (1) eliminate the statewide systemic segregation of students with behavior-related disabilities in the GNETS Program; and (2) ensure fair and equal access to educational opportunities for students with behavior-related disabilities. These recommended actions focus on using existing tools to develop a more effective system of support that will lead to significantly improved and nondiscriminatory experiences and positive outcomes for students with behavior-related disabilities across the State.

## SECTION I: INTRODUCTION

My name is Dr. Amy McCart, and I have spent the last 39 years of my life working with individuals with disabilities in the capacities of teacher, administrator, consultant, director, and education leadership professional.  I currently hold a professorship at The University of Kansas, one of the consistently highest-ranked departments of Special Education in the United States, and I am a senior researcher within the Life Span Institute at The University of Kansas.  At The University of Kansas, I lead the SWIFT Education Center, a national pre-K-12 research and technical assistance center designed to improve outcomes for students with disabilities, students of color, and students with the most extensive need for support.  The SWIFT Education Center pursues this mission through a team of education technical assistance providers, researchers, and staff that work to build academic, behavioral, social, and emotional support through tiered systems that are effective in improving outcomes for students.  Our team also works to build high-quality, effective instructional leaders across the nation and transform schools into environments that promote inclusion and belonging.

Through my work with the SWIFT Education Center, I have developed partnerships with state education agencies, local education agencies, and schools that have helped to create effective learning environments for students with disabilities and behavioral needs.  I serve as the Principal Investigator for the U.S. Department of Education, Office of Special Education Programs, National Center on Inclusion Toward Rightful Presence.  My work at the National Center on Inclusion Toward Rightful Presence helps to ensure that students with disabilities have access to general education settings and opportunities to learn grade-level content with their peers.  This work includes supporting state education agencies in their efforts toward inclusion of students with disabilities in their neighborhood schools and grade-level classrooms with their general education peers.

Before joining The University of Kansas faculty, I worked to deinstitutionalize individuals with disabilities in the State of Kansas by helping to develop alternative community-based living and learning opportunities for them.  In conducting that work, I spent extended periods of time in state-run institutions with individuals who had significant needs.  These institutional environments were predicated on the notion that it is easier to provide specialized services to people with disabilities if you place them in one location.  This approach resulted in the removal of children and adults from the community for efficiency's sake and started a trend in which people with disabilities were isolated, dehumanized, and wholly segregated from their homes, families, schools, and communities.  My work at the SWIFT Center is, in large part, a response to seeing these institutional environments, as well as the ways in which the trend of isolation and segregation of people with disabilities has shown up in schools struggling to support students with different learning needs.

In 2020, the U.S. Department of Justice, Civil Rights Division's Educational Opportunities Section (DOJ) requested that I provide an expert opinion addressing the following issues: (1) the degree and nature of the segregation of students served in the Georgia Network for Educational and Therapeutic Support (GNETS) Program; (2) the quality and range of educational opportunities afforded to students within the GNETS Program as compared to the quality and range of educational opportunities afforded to their general education peers; and (3) the State of Georgia's ability to support students in the GNETS Program in more integrated settings with appropriate services and supports for their needs.  To develop my opinions, I conducted a multi-year, multi-site examination of the GNETS Program using a comprehensive qualitative and quantitative methodology that included observation, record review, and interview analysis. Based on that examination, I conclude that the GNETS Program unnecessarily segregates students with behavior-related disabilities, provides them unfair and unequal educational opportunities, and causes them harm (in many cases irreparable).  Accordingly, I offer data-informed opinions regarding the GNETS Program statewide.

This Report proceeds in three primary parts.  I begin with an overview of the literature that guides current practice in special education, definitions of key words, and questions used to assess the core issues in this case.  The Report then describes my opinions in detail, citing multiple, confirmed data sources.  Finally, the Report concludes with recommendations for systemic programmatic steps that can be taken to end the unwarranted segregation of and the unfair and unequal education provided to students with behavior-related disabilities in the GNETS Program.

It is important to note from the outset of this Report that my life's work is focused on students with disabilities being served in general education environments, in their neighborhood schools, and close to family and friends.  However, there are times when students with certain learning and behavioral needs benefit from environments that are small, quiet, have low student-to-teacher ratios, have structured and carefully planned time in general education, and have specialized and extensively trained educators.  These conditions are not present in the GNETS Program, which instead serves as a disconnected repository for students with disabilities who have behavioral issues.  The GNETS Program is outdated and uses supports and services that cause emotional concerns, trauma, and increased problem behavior.  These facts, along with the isolation experienced by students within the GNETS Program, are deeply concerning.

## SECTION II: RELEVANT LITERATURE

To understand appropriate and effective educational services for students with disabilities, it is important to understand the research supporting student success.  Shared here is a selection of relevant peer-reviewed literature regarding students with disabilities and the

implications of segregation on their learning and social outcomes.  This literature, along with my background and experience, informs my opinions regarding the GNETS Program.

When students with disabilities are educated outside the general education setting, in separate buildings, wings, rooms, or isolated settings of any kind, they experience a number of adverse outcomes across academic, social-emotional, and behavioral determinants (Ennis & Katsiyannis, 2017).  Conversely when served in inclusive general education classrooms and environments, students with disabilities show growth in academic outcomes (Kurth & Mastergeorge, 2010), positive interactions and communication skills (Fisher & Meyer, 2002), and increased social interactions (Lyons, Cappadocia, & Weiss, 2011).

For those charged with the education of students with disabilities, the inclination to pull students away from general education is often about attaining efficiencies (e.g., resources and budgetary) rather than providing effective or specialized instruction (Argan et. al., 2020).  According to Cosier, Causton-Theoharis, and Theoharis (2013), "hours in general education were significant… suggesting that for each hour [per day] spent in general education, students [with disabilities] scored half a point higher on the reading assessment."  Indeed, "[r]esearch over the past 40 years has continued to demonstrate that inclusive practices are in fact associated with improved outcomes for students with disabilities, and that self-contained (segregated) settings fail to deliver on their promises of effective practices" (Causton-Theoharis et al., 2011).

A study by McCarthy, Wiener, and Soodak (2012) demonstrates that segregation of students with disabilities creates residual implications for educators, administrators, and their students including "(a) categorical thinking underlying placement decisions, [and] (b) biases in the placement of students with behavior disorders and students with autism."  Additionally, the study revealed that segregation of students with disabilities led to "subtle and covert signs of the persisting philosophy of difference and the separate system of special education that promoted and reinforced these beliefs…[and] in the placement options afforded to these students." In other words, when students with disabilities are segregated, educators and administrators can get caught in a way of thinking (either consciously or unconsciously) that perpetuates the continued segregation of students.  Therefore, the implementation of policies, practices, and supports for students with disabilities should point toward inclusion rather than segregation, "with attention to a continuum of support rather than a continuum of placement" (Frattura & Capper, 2007).

A meta-analysis conducted by Young and Filler in 2015 expanded upon the works of Wang and Baker (1985-1986) and Carlber and Kavale (1980) on the effects of placement decisions on the academic and social success of students with disabilities.[1]  Wang and Baker concluded that research from 1975 through spring of 1984 indicated the importance of mainstream or inclusive

---

[1]  A meta-analysis in the field of education is an extensive examination, with clear criteria, of all the relevant research that has come before.

education as a driving factor for student success.  Carlber and Kavale analyzed research studies from the 1930s to the 1970s and concluded that the studies indicated the importance of integrated general education settings.  Overall, these extensive findings "provide evidence spanning over 80 years suggesting separate settings are not as beneficial as are more integrated settings" (Young & Filler, 2015).

The scope of this research on the negative impact of segregation on students with disabilities is significant.  Researchers, scholars, and practitioners agree there are improved outcomes for students with disabilities when they have access to general education core content, effective instruction, and the social aspects of schooling in general education settings. In particular, students with disabilities who learn in inclusive environments experience a powerful positive effect on their academic achievement and social-emotional well-being, as well as improvement in behavior.  While the nature of special education is such that it requires attention to each individual student and their learning process (McKenna, Newton, & Bergman, 2021)—and certain students may need quieter environments, close adult supervision, fewer individuals near them, or other intensive interventions—those are not rationales for a segregated placement decision (Lanterman, Lockwood, Sealander, Winans, & Novelli, 2021).

## SECTION III: DEFINITIONS & INDICATORS

This section identifies various terms used in this Report and their respective definitions. This section also includes a series of tables outlining the indicators of segregation, unfair and unequal educational opportunities, and institutional structures and patterns that I have used to develop opinions in this matter.

The definitions here are informed by my experience in the field of education, typical usage by others in the field, usage by the State of Georgia in connection with the GNETS Program, and content in the Oxford Languages Dictionary (2022).

**Autism Spectrum Disorder** is a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age three.  Other characteristics often associated with Autism Spectrum Disorder are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences.

**Emotional and Behavioral Disorder (EBD)** is an umbrella term used for purposes of special education eligibility that includes behavior disorders, anxiety disorders, mood disorders, and conduct disorders.  EBD involves the exhibition of one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a student's educational performance: (1) an inability to learn that cannot be explained by intellectual, sensory, or health factors; (2) an inability to build or maintain satisfactory interpersonal

relationships with peers and teachers; (3) inappropriate types of behavior or feelings under normal circumstances; (4) a general pervasive mood of unhappiness or depression; and/or (5) a tendency to develop physical symptoms or fears associated with personal problems.

**General education peers** are students with and without disabilities who attend school in a general education setting and have regular and consistent access to classes led by a general education teacher in a public school setting.

**Georgia Network for Educational and Therapeutic Support (GNETS) Program**—as defined by the State of Georgia—"provides comprehensive educational and therapeutic support services to students who exhibit intense social, emotional and/or behavioral challenges with a severity, frequency or duration such that the provision of education and related services in the general education environment has not enabled him or her to benefit educationally based on the IEP."

**GNETS Program site or GNETS Program facility** is a segregated setting intended to provide educational and therapeutic services for students outside of a general education setting. GNETS Program facilities include center-based sites and school-based sites.

**Center or center-based site when used in the context of GNETS or GNETS Program** means a separate facility serving only students in the GNETS Program and not their general education peers.

**School-based site when used in the context of GNETS or GNETS Program** means a separate classroom within or near a general education school, but which serves only students in the GNETS Program.

**Harmful** is causing damage or injury to someone or something, especially to a person's health or environment.  Synonyms include damaging, injurious, destructive, detrimental, hurtful, dangerous, and toxic.

**Integration** is (1) the process of allowing people of all abilities to use a place, institution, or organization (e.g., the integration of schools); (2) the process of combining with other things or people in a single, larger unit or system; and (3) the process of becoming a full member of a group or society and becoming involved completely in its activities.

**Inclusion** is (1) the action or state of including or of being included within a group or structure; and (2) the practice or policy of providing equal access to opportunities and resources for people who might otherwise be excluded or marginalized, such as those who have physical or intellectual disabilities.

**Multi-Tiered System of Support (MTSS or tiered system)** is a framework with a tiered infrastructure that uses data to help match academic and social-emotional behavior assessments and instructional resources to each and every student's needs.  In this tiered, data-informed framework, educators work to ensure that the majority of students respond to core instruction.  Students who need additional supports for enrichment or

remediation are identified by data and provided that support with measured focus and intensity.

**Positive Behavioral Interventions and Supports (PBIS)** is an evidence-based, tiered system for supporting students' behavioral, academic, social, emotional, and mental health. When implemented with fidelity, PBIS improves social-emotional competence, academic success, and school climate. It also improves teacher health and well-being.

**Regional GNETS program** is one of the 24 regional programs that make up the statewide GNETS Program.

**Segregation** is the action or state of setting someone or something apart from other people or things or being set apart. Synonyms include separation, isolation, and exclusion.

**Separate** is forming or being viewed as a unit apart or by itself. Synonyms include unconnected, unrelated, different, discrete, distinct, disparate, detached, and disconnected.

**Student in the GNETS Program** is a student who, based on their disability and evidence of behavioral, social, or emotional needs, is provided educational services within a GNETS Program center-based site or GNETS Program school-based site.

**Unequal** describes situations in which people are treated in different ways or have different advantages in ways that are unfair. Synonyms of unequal include inadequate, unsatisfactory, imbalanced, uneven, and unwarranted.

**Unfair** describes situations that are not right or fair according to a set of principles, rules, or standards. Synonyms of unfair include one-sided, discriminatory, unjust, and inequitable.

**Unsafe** describes situations which are dangerous or in which someone is experiencing danger or the risk of being harmed. Synonyms are hazardous, harmful, threatening, and detrimental.

The tables below were developed specifically for the evaluation of the GNETS Program based upon my experience with special education, segregation, and institutionalization. The tables outline indicators of segregation, unfair and unequal educational opportunities, and institutional structures or patterns. These tables also include well-documented indicators of segregated or institutional environments within the field of special education.

Table 1 identifies questions used to help determine whether or not the GNETS Program is segregated, including the type and degree of segregation. These questions are grouped into five categories: (a) indicators that students in the GNETS Program are physically separate from their general education peers; (b) indicators of the ways in which segregation is occurring across services (e.g., occupational therapy, physical therapy, speech therapy); (c) indicators of different or unequal access to curricular and instructional resources; (d) indicators of social or emotional separation between students in the GNETS Program and general education peers; and (e) indicators of systemic segregation within the GNETS Program (related to the likelihood

that there is ongoing planning for spaces that will continue segregation of students in the GNETS Program).

Table 1. Indicators of Segregation in the GNETS Program

| PHYSICAL SEGEGRATION |
|---|
| 1. If located in a general education school, do students in the GNETS Program arrive and depart through separate entrances and exits? |
| 2. Do students in the GNETS Program access different transportation than their general education peers served outside the GNETS Program (e.g., separate busing)? |
| 3. If located in a general education school, are students in the GNETS Program located in a separated wing, area, or building (as determined by proximity to other students, ease of access to general education peers including the presence or absence of locked doors or other barriers creating separation, and actual access to general education peers)? |
| 4. If located in a general education school, do students in the GNETS Program eat in their classrooms while general education peers eat in the cafeteria? |
| 5. Are students in the GNETS Program served in a building that is separate from a general education school and general education peers? |
| SERVICE PROVISION SEPARATION |
| 6. Do certain groups of students in the GNETS Program access different support services personnel than their peers either with or without IEPs (e.g., speech, physical therapy, occupational therapy, counseling, other mental health supports available within the general education setting)? |
| INSTRUCTIONAL & CURRICULAR SEGREGATION |
| 7. Is administrative or instructional leadership separate for students in the GNETS Program (i.e., is there a separate principal or school administrator for students in the GNETS Program)? |
| 8. Is academic data reviewed for students in the GNETS Program as part of the grade-level or content-specific teams? |
| 9. Are students in the GNETS Program able to regularly access grade-level instruction by educators trained to support literacy, mathematics, science, and other core content subjects, instructional resources, and materials? |
| 10. Are students in the GNETS Program able to access elective courses (e.g., art, physical education, music) within the GNETS Program?  If yes, are they able to do so alongside their general education peers? |
| 11. Are students in the GNETS Program able to regularly access libraries, science labs, and/or computer labs? |

| SOCIAL & EMOTIONAL & BEHAVIORAL SEGREGATION |
|---|
| 12. Do students in the GNETS Program access the same interior or exterior social spaces and areas designated for physical activity (e.g., playgrounds, outdoor eating spaces, hang-out spaces, or transition spaces) as their general education peers? |
| 13. Do students in the GNETS Program participate in extracurricular activities (e.g., clubs, school athletic teams) or social activities (e.g., dances, pep rallies) alongside their general education peers on a regular and consistent basis? |
| 14. Are students in the GNETS Program able to attend their zoned school with their siblings and have parents drop them off because they are in close proximity to the neighborhood in which they live? |
| 15. Are there spaces in which students in the GNETS Program are placed in time out or otherwise isolated based on their behavior? |
| 16. Are students in the GNETS Program suspended, expelled, restrained, confined, or subjected to negative interactions at high rates? |
| PLANNED SEPARATION OF STUDENTS WITH DISABILITIES |
| 17. When establishing new GNETS Program sites, are new buildings built or planned with spaces that are segregated for the GNETS Program? |
| 18. Are new buildings being built that are segregated physically for the purpose of housing students in the GNETS Program? |
| 19. When new students come into a school or district with Emotional and Behavioral Disorder, Autism Spectrum Disorder, or other labels, are they first placed in the GNETS Program prior to allowing them to access general education settings? |
| 20. When students in the GNETS Program are transferred to another district are they placed into another segregated program without first assessing their response and fit within the general education school community? |
| 21. When students in the GNETS Program move from elementary school to secondary school, are they given an opportunity to first access the general education environment? |

Table 2 identifies questions used to help determine whether students in the GNETS Program experience unfair and unequal educational opportunities.  The questions in this table address various elements of educational opportunity, including learning resources, teaching, technology, creative arts, extracurricular activities, building facilities and conditions, and access to therapeutic supports and services.

Table 2. Indicators of Unfair and Unequal Educational Opportunities

| UNFAIR AND UNEQUAL EDUCATIONAL OPPORTUNITIES |
|---|
| 1. Do students in the GNETS Program have access to the kinds of educational opportunities afforded to their general education peers? |
| 2. Do students in the GNETS Program have access to the kinds of learning resources provided to their general education peers? |
| 3. Do students in the GNETS Program have access to the sort of technology provided to their general education peers? |
| 4. Do students in the GNETS Program have access to core grade-level content aligned with Georgia standards like their general education peers? |
| 5. Do students in the GNETS Program have access to instructional methods and assessments similar to those used with their general education peers? |
| 6. Do students in the GNETS Program have access to buildings and facilities that are similar to those enjoyed by their general education peers? |
| 7. Do students in the GNETS Program have reasonable distances/amounts of time to travel to get to school? |
| 8. Do students in the GNETS Program and their general education peers experience similar school climates and cultures? |
| 9. Do students in the GNETS Program have high rates of discipline, tardiness, or absenteeism? |
| 10. Do students in the GNETS Program and their general education peers experience equal exposure to certified educators and professional staff? |
| 11. Do students in the GNETS Program have less time in instruction than their general education peers? |
| 12. Do students in the GNETS Program have access to specials, connections, exploratory courses, or extracurricular or typical end-of-day school activities like their general education peers? |
| 13. Do students in the GNETS Program have access to therapeutic supports and services equal to or greater than those offered to their general education peers? |
| 14. Do students in the GNETS Program have age-appropriate learning resources? |
| 15. Do students in the GNETS Program have access to their general education peers in circumstances permitting the development of friendships and social experiences? |

Table 3 identifies questions used to guide my assessment of whether there are environments or circumstances within the GNETS Program that look and function like state-run institutions for people with disabilities. State-run institutional settings have characteristics such as: use of seclusion and restraint; higher numbers of students exhibiting self-stimulatory behaviors and self-injurious behavior; time-out rooms; dark or damaged flooring, walls, or ceilings; congregated people in certain areas and isolation in others; limited or stark walls; grates on windows; use of bars, gates, and locks; low quality learning materials and resources;

inconsistent lighting; herding of people (and herd-like mentality); the use of punitive practices; isolation rooms; and high rates of injury.  Institutionalized individuals have high rates of behavioral, social, and emotional challenges, and many experience intellectual, physical, and social complications due to exposure to these negative and punitive environments.

Table 3. Indicators of Institutional Structures or Patterns

| INSTITUTIONAL STRUCTURES AND PATTERNS HARMFUL FOR STUDENTS WITH DISABILITIES |
| --- |
| 1. Do students in the GNETS Program experience separation, seclusion, or isolation in any form? |
| 2. Do students in the GNETS Program experience negative or punitive practices such as coercive interactions with staff, paddling, time out, restriction from movement, restrictive workspaces, removal of personal items, lack of stimulation, or lack of attention? |
| 3. Do students in the GNETS Program experience buildings or classrooms that are in physical disrepair, unclean, archaic, or unsafe? |
| 4. Do students in the GNETS Program experience spaces that reflect the extensive use of chains, locks, fences, bolts on doors, alarms, closets as rooms, or use of basements or darker settings? |
| 5. Do students in the GNETS Program experience a lack of instructional resources or resources that are not matched to their age or interests? |
| 6. Do students in the GNETS Program experience a lack of choice regarding food, schedule, movement, or ability to freely use the restroom or provide self-care (e.g., access to water)? |
| 7. Do students in the GNETS Program have higher rates of uncertified teachers, staff who have minimal training, or staff who are lacking appropriate skills or training to provide educational support? |
| 8. Do students in the GNETS Program experience staff who have interaction patterns consistent with institutions? |
| 9. Are students placed in the GNETS Program based on an assertion that that they are an imminent threat to the safety of other students or themselves? |
| 10. Do students in the GNETS Program experience high rates of abuse, neglect, restraint, and isolation? |

## SECTION IV: METHODOLOGY

As discussed at the outset of this Report, DOJ requested that I provide an expert opinion addressing the following issues: (1) the degree and nature of the segregation of students served in the GNETS Program; (2) the quality and range of educational opportunities afforded to students within the GNETS Program as compared to the quality and range of educational opportunities afforded to their general education peers; and (3) the State of Georgia's ability to

support students in the GNETS Program in more integrated settings with appropriate services and supports for their needs.

To develop my opinions, I conducted a multi-year, statewide examination of the GNETS Program using a comprehensive qualitative and quantitative methodology that included observation, record review, and interview analysis.  As part of this process, I conducted 70 site visits to 27 center-based GNETS Program sites and 36 school-based GNETS Program sites.[2] These site visits spanned 20 of the 24 regional GNETS programs and 33 counties in rural, urban, and suburban areas throughout the State.  During these site visits, I generally toured each facility; spent time observing classrooms, students, and staff; conducted informal interviews of regional GNETS program personnel and, where present, school (general education) and district personnel; and documented my observations and impressions through notes and photographs.[3]  I used the questions in the above tables to guide my thinking in preparation for site visits, but allowed my opinions and findings to emerge based on the actual context of each facility and experience.  In addition to conducting site visits, I reviewed thousands of relevant records, including student IEPs, incident reports, handbooks, programmatic reporting, and other documents related to regional GNETS program operations produced by the regional GNETS programs in response to subpoenas issued by DOJ.  I also attended depositions or reviewed the depositions of various State agency personnel and regional GNETS program directors deposed by DOJ.  Finally, I reviewed quantitative analyses related to student placement in the GNETS Program.  These analyses were prepared at my request by a methodologist on my staff and provide a snapshot of the GNETS Program from a quantitative perspective.

---

[2]  Eight site visits consisted of return visits to sites where I was unable to conduct or complete a visit due to testing or other logistical challenges.

[3]  Site visit protocols generally prevented photographs that included students, teachers, and staff.  Accordingly, not every impression or conclusion in this Report could be supported with a photograph.

## SECTION V: UNDERSTANDING THE STUDENT POPULATION IN THE GNETS PROGRAM



Figure A.  Georgia Department of Education's GNETS Program Map (last updated August 2020)

According to the GNETS Rule, the GNETS Program "provides comprehensive educational and therapeutic support services to students who exhibit intense social, emotional and/or behavioral challenges with a severity, frequency or duration such that the provision of education and related services in the general education environment has not enabled him or her to benefit educationally based on the [Individualized Education Program (IEP)]."  Ga. Comp. R. & Regs. § 160-4-7-.15(2)(a).  All students in the GNETS Program are students with disabilities, and it is purportedly behaviors associated with their disabilities that result in the students' referral to the GNETS Program.

In school year 2015-16, State data reveal that 4,492 students were placed in GNETS Program Centers and GNETS school-based sites across the 24 regional GNETS programs[4], with

---

[4]  Pictured above and included in Appendix B is the Georgia Department of Education's GNETS Program Map, showing the statewide nature of the GNETS Program and the geographical locations of the 24 regional GNETS programs.  Included in Appendix C is the FY23 GNETS Program Directory, which offers additional information about each of the regional GNETS programs, including a breakdown of which school districts are served by each regional GNETS program.

regional GNETS programs having placements ranging from 45 to 500 students as indicated in Figure B.  In school year 2021-22, State data revealed that 2,925 students were in the GNETS Program, with regional GNETS programs having placements ranging from 20 to 304 students.  While most regional GNETS programs have had fewer students over this period, the placement numbers at the Futures Program indicate an approximately 33% increase in placements over this period.  During this time, approximately two-thirds of the students in the GNETS Program were served in GNETS Centers; in school year 2015-16 there were 3,096 students in GNETS Centers (68.9%) and 1,355 students in GNETS school-based sites, while in school year 2021-22, there were 1,905 students in GNETS Centers (65.1%) and 1,020 students in school-based sites as indicated in Figure C.[5]

| GNETS Regional Program | SY15-16 | SY16-17 | SY17-18 | SY18-19 | SY19-20 | SY20-21 | SY21-22 |
|---|---|---|---|---|---|---|---|
| Burwell Program | 257 | 223 | 256 | 195 | 166 | 135 | 135 |
| Cedarwood Program | 142 | 116 | 105 | 98 | 78 | 72 | 71 |
| Coastal Academy | 203 | 171 | 94 | 128 | 138 | 127 | 137 |
| Coastal Georgia Comprehensive Academy | 232 | 223 | 208 | 215 | 210 | 153 | 139 |
| DeKalb-Rockdale Program | 192 | 207 | 179 | 182 | 152 | 122 | 113 |
| Elam Alexander Academy | 500 | 468 | 427 | 395 | 373 | 319 | 304 |
| Flint Area Learning Program | 67 | 56 | 56 | 52 | 39 | 32 | 29 |
| Futures Program | 198 | 175 | 186 | 202 | 198 | 227 | 262 |
| GNETS of Oconee | 92 | 88 | 90 | 98 | 104 | 83 | 86 |
| H. A. V. E. N. Academy | 357 | 316 | 252 | 233 | 206 | 156 | 167 |
| Harrell Learning Center | 110 | 102 | 95 | 92 | 86 | 81 | 81 |
| Heartland Academy | 142 | 123 | 112 | 106 | 94 | 96 | 97 |
| Horizon Academy | 158 | 148 | 140 | 151 | 157 | 152 | 154 |
| Mainstay Academy | 225 | 190 | 152 | 151 | 130 | 114 | 111 |
| North Metro Program | 426 | 388 | 346 | 326 | 302 | 318 | 297 |
| Northstar Educational and Therapeutic Services | 101 | 95 | 87 | 98 | 93 | 95 | 91 |
| Northwest Georgia Educational Program | 275 | 256 | 247 | 258 | 251 | 217 | 215 |
| Oak Tree Program | 123 | 107 | 87 | 77 | 77 | 69 | 61 |
| Pathways Educational Program | 117 | 104 | 88 | 39 | 46 | 50 | 47 |
| River Quest Program | 49 | 56 | 53 | 59 | 58 | 42 | 37 |
| Rutland Academy | 152 | 151 | 132 | 113 | 87 | 79 | 77 |
| Sand Hills Program | 103 | 97 | 102 | 81 | 81 | 75 | 72 |
| South Metro Program | 226 | 215 | 247 | 221 | 188 | 127 | 122 |
| Woodall Program | 45 | 38 | 52 | 37 | 30 | 22 | 20 |
|  |  |  |  |  |  |  |  |
| Regional Program TOTAL | 4492 | 4113 | 3793 | 3607 | 3344 | 2963 | 2925 |
| Missing | 0 | 4 | 12 | 0 | 0 | 0 | 0 |
| TOTAL Number of Students | 4492 | 4117 | 3805 | 3607 | 3344 | 2963 | 2925 |

Figure B.  Student Placements by Regional GNETS Program, SY15-16 to SY21-22[6]

---

[5] Data relating to the population of students placed in the GNETS Program, in addition to those discussed in this Section, can be found in Appendix A.  The data in the tables and graphs in this report are derived from data and keys produced by the State (GA00000001-GA00000018; GA05242021-22; GA05242082; GA05242429-31; GA05242789-90).

[6] The row "Missing" in Figure B refers to students for whom a regional GNETS Program was not identified in the data received.



Figure C.  Student Placements by GNETS Program Site Type, SY15-16 to SY21-22

Even though total placement numbers indicate a decline in student population in the GNETS Program, the percentage of new students admitted to the GNETS Program has remained steady; new student admission comprised over 21% of the total GNETS Program student population in school year 2016-17 and remained near 20% for school year 2021-22, as indicated in Figure D.  The GNETS Program is still admitting hundreds of students each year.  For example, in school year 2021-22, 576 new students entered the GNETS Program.



| | SY15-16 | SY16-17 | SY17-18 | SY18-19 | SY19-20 | SY20-21 | SY21-22 |
|---|---|---|---|---|---|---|---|
| Total | 4492 | 4117 | 3805 | 3607 | 3344 | 2963 | 2925 |
| New Students | | 898 | 798 | 852 | 645 | 383 | 576 |
| PK | | 6 | 3 | 0 | 1 | 0 | 2 |
| KK | | 46 | 50 | 35 | 46 | 31 | 50 |
| 01 | | 54 | 56 | 69 | 36 | 27 | 46 |
| 02 | | 82 | 77 | 86 | 62 | 18 | 51 |
| 03 | | 83 | 79 | 69 | 69 | 42 | 51 |
| 04 | | 88 | 95 | 83 | 58 | 31 | 55 |
| 05 | | 71 | 77 | 86 | 75 | 33 | 58 |
| 06 | | 77 | 82 | 100 | 74 | 33 | 58 |
| 07 | | 86 | 60 | 78 | 56 | 45 | 42 |
| 08 | | 73 | 58 | 88 | 45 | 32 | 47 |
| 09 | | 107 | 83 | 77 | 56 | 40 | 53 |
| 10 | | 63 | 40 | 40 | 42 | 31 | 29 |
| 11 | | 37 | 27 | 29 | 12 | 19 | 18 |
| 12 | | 25 | 11 | 12 | 13 | 1 | 16 |
| Total | | 898 | 798 | 852 | 645 | 383 | 576 |

Figure D.  New Student Placements in the GNETS Program by Grade, SY15-16 to SY21-22

Given the length of time students remain in the Program once admitted, there is a disproportionate negative impact on students who enter the Program at a younger age.  For example, more than a third of second graders already in the Program in SY15-16 were still in the Program six years later, as indicated in Figure E, and nearly half of kindergartners new to the program in SY16-17 were still in the Program five years later, as indicated in Figure F.

| | SY15-16 | SY16-17 | SY17-18 | SY18-19 | SY19-20 | SY20-21 | SY21-22 |
|---|---|---|---|---|---|---|---|
| PK | 14 (100.00%) | 8 (57.14%) | 5 (35.71%) | 5 (35.71%) | 4 (28.57%) | 4 (28.57%) | 3 (21.43%) |
| KK | 83 (100.00%) | 67 (80.72%) | 51 (61.45%) | 40 (48.19%) | 33 (39.76%) | 29 (34.94%) | 22 (26.51%) |
| 1 | 159 (100.00%) | 128 (80.50%) | 105 (66.04%) | 84 (52.83%) | 69 (43.40%) | 54 (33.96%) | 48 (30.19%) |
| 2 | 247 (100.00%) | 208 (84.21%) | 181 (73.28%) | 143 (57.89%) | 111 (44.94%) | 100 (40.49%) | 88 (35.63%) |
| 3 | 259 (100.00%) | 218 (84.17%) | 183 (70.66%) | 142 (54.83%) | 107 (41.31%) | 94 (36.29%) | 74 (28.57%) |
| 4 | 333 (100.00%) | 276 (82.88%) | 221 (66.37%) | 165 (49.55%) | 127 (38.14%) | 92 (27.63%) | 77 (23.12%) |
| 5 | 362 (100.00%) | 283 (78.18%) | 237 (65.47%) | 190 (52.49%) | 134 (37.02%) | 100 (27.62%) | 76 (20.99%) |
| 6 | 367 (100.00%) | 289 (78.75%) | 232 (63.22%) | 165 (44.96%) | 115 (31.34%) | 88 (23.98%) | 64 (17.44%) |
| 7 | 416 (100.00%) | 330 (79.33%) | 221 (53.13%) | 168 (40.38%) | 127 (30.53%) | 99 (23.80%) | 34 (8.17%) |
| 8 | 518 (100.00%) | 366 (70.66%) | 269 (51.93%) | 184 (35.52%) | 115 (22.20%) | 46 (8.88%) | 19 (3.67%) |
| 9 | 638 (100.00%) | 420 (65.83%) | 264 (41.38%) | 154 (24.14%) | 61 (9.56%) | 31 (4.86%) | 17 (2.66%) |
| 10 | 453 (100.00%) | 309 (68.21%) | 190 (41.94%) | 69 (15.23%) | 35 (7.73%) | 22 (4.86%) | 3 (0.66%) |
| 11 | 295 (100.00%) | 203 (68.81%) | 69 (23.39%) | 33 (11.19%) | 13 (4.41%) | 5 (1.69%) | 2 (0.68%) |
| 12 | 348 (100.00%) | 114 (32.76%) | 45 (12.93%) | 17 (4.89%) | 4 (1.15%) | 0 (0.00%) | 0 (0.00%) |
| Total | 4492 (100.00%) | 3219 (71.66%) | 2273 (50.60%) | 1559 (34.71%) | 1055 (23.49%) | 764 (17.01%) | 527 (11.73%) |

Figure E.  Percentage of Students in the GNETS Program in SY15-16 Who Remained in the Program in Subsequent Years

| | SY16-17 | SY17-18 | SY18-19 | SY19-20 | SY20-21 | SY21-22 |
|---|---|---|---|---|---|---|
| PK | 6 (100.00%) | 4 (66.67%) | 3 (50.00%) | 1 (16.67%) | 1 (16.67%) | 1 (16.67%) |
| KK | 46 (100.00%) | 39 (84.78%) | 35 (76.09%) | 31 (67.39%) | 26 (56.52%) | 21 (45.65%) |
| 1 | 54 (100.00%) | 41 (75.93%) | 30 (55.56%) | 25 (46.30%) | 21 (38.89%) | 17 (31.48%) |
| 2 | 82 (100.00%) | 69 (84.15%) | 53 (64.63%) | 42 (51.22%) | 31 (37.80%) | 25 (30.49%) |
| 3 | 83 (100.00%) | 66 (79.52%) | 55 (66.27%) | 41 (49.40%) | 33 (39.76%) | 30 (36.14%) |
| 4 | 88 (100.00%) | 68 (77.27%) | 55 (62.50%) | 47 (53.41%) | 43 (48.86%) | 35 (39.77%) |
| 5 | 71 (100.00%) | 60 (84.51%) | 48 (67.61%) | 42 (59.15%) | 34 (47.89%) | 30 (42.25%) |
| 6 | 77 (100.00%) | 55 (71.43%) | 42 (54.55%) | 31 (40.26%) | 27 (35.06%) | 18 (23.38%) |
| 7 | 86 (100.00%) | 62 (72.09%) | 39 (45.35%) | 28 (32.56%) | 21 (24.42%) | 16 (18.60%) |
| 8 | 73 (100.00%) | 50 (68.49%) | 35 (47.95%) | 25 (34.25%) | 20 (27.40%) | 6 (8.22%) |
| 9 | 107 (100.00%) | 68 (63.55%) | 40 (37.38%) | 21 (19.63%) | 6 (5.61%) | 3 (2.80%) |
| 10 | 63 (100.00%) | 36 (57.14%) | 22 (34.92%) | 8 (12.70%) | 4 (6.35%) | 3 (4.76%) |
| 11 | 37 (100.00%) | 21 (56.76%) | 8 (21.62%) | 2 (5.41%) | 1 (2.70%) | 0 (0.00%) |
| 12 | 25 (100.00%) | 6 (24.00%) | 4 (16.00%) | 1 (4.00%) | 1 (4.00%) | 0 (0.00%) |
| Total | 898 (100.00%) | 645 (71.83%) | 469 (52.23%) | 345 (38.42%) | 269 (29.96%) | 205 (22.83%) |

Figure F.  Percentage of Students New to the GNETS Program in SY16-17 Who Remained in the Program in Subsequent Years

**Student Demographics**

*Primary Disability Designation*

The State's data reflects that, from school years 2015-16 to 2021-22, approximately 50% of the students in the GNETS Program had an Emotional and Behavioral Disorder (EBD) designation as their primary disability diagnosis for purposes of special education eligibility, as indicated in Figure G.  Consistent with the definition above, students with EBD as their primary disability designation include those with an emotional or mental health disability, including anxiety, PTSD, and depression.  Many other students in the GNETS Program have Autism Spectrum Disorder or Other Health Impairment (OHI) (e.g., ADHD, ADD, epilepsy, motor impairments impacting behavior) as primary disability designations for purposes of special education eligibility.  Students in the GNETS Program with Autism Spectrum Disorder have accounted for approximately 20% of the total population, and approximately 13% of students in the GNETS Program have had OHI as their primary disability designation.  Lastly, just over 10% of the student population, particularly students in younger grades in the Program, have had a primary designation related to an intellectual disability (including Significant Developmental Delay).  Intellectual disabilities are neurodevelopmental conditions that result in cognitive delays.  It is unclear why the GNETS Program is serving students who have a primary diagnosis related to an intellectual disability.

17

| Primary Disability Designation | SY15-16 | SY16-17 | SY17-18 | SY18-19 | SY19-20 | SY20-21 | SY21-22 |
|---|---|---|---|---|---|---|---|
| Mild Intellectual Disability | 117 | 120 | 103 | 83 | 80 | 65 | 66 |
| Moderate Intellectual Disability | 92 | 94 | 86 | 81 | 76 | 75 | 76 |
| Severe Intellectual Disability | 22 | 19 | 19 | 19 | 12 | 11 | 13 |
| Profound Intellectual Disability | 1 | 2 | 0 | 1 | 0 | 1 | 2 |
| Emotional / Behavioral Disorder | 2642 | 2351 | 2125 | 2016 | 1852 | 1588 | 1474 |
| Specific Learning Disability | 83 | 79 | 65 | 66 | 60 | 51 | 47 |
| Orthopedic Impairment | 0 | 1 | 1 | 1 | 1 | 1 | 0 |
| Hard of Hearing | 2 | 2 | 2 | 1 | 1 | 1 | 1 |
| Deaf | 1 | 1 | 1 | 2 | 0 | 0 | 0 |
| Other Health Impairment | 512 | 505 | 525 | 527 | 484 | 452 | 451 |
| Blind | 0 | 0 | 1 | 0 | 0 | | |
| Speech / Language Impairment | 3 | 3 | 4 | 1 | 1 | 1 | 3 |
| Autism | 768 | 746 | 717 | 667 | 648 | 599 | 644 |
| Traumatic Brain Injury | 10 | 9 | 9 | 7 | 4 | 5 | 6 |
| Significant Developmental Delay | 238 | 185 | 147 | 135 | 125 | 113 | 142 |
| Total | 4491 | 4117 | 3805 | 3607 | 3344 | 2963 | 2925 |
| Not Determined on Initial Entry | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 4492 | 4117 | 3805 | 3607 | 3344 | 2963 | 2925 |

Figure G.  Student Placements in the GNETS Program by Primary Disability Designation, SY15-16 to SY21-22

*Age*

It is also helpful to understand the ages of the students in the GNETS Program.  Per the GNETS Rule, the youngest students currently eligible for services in the GNETS Program are five years old, though earlier versions of the GNETS Rule permitted the referral of students as young as three.  Ga. Comp. R. & Regs. § 160-4-7-.15(2)(a).[7]  In school year 2021-22, there were two pre-K students and 54 kindergartners in the GNETS Program, as indicated in Figure H.  Those young students may attend school at GNETS Program sites with students as old as 21 years of age.  Ga. Comp. R. & Regs. § 160-4-7-.15(2)(a); *see* App. A at A.5.  In school year 2021-22, there were 97 students over the age of 18 in the GNETS Program, including 24 students who were 21 years old.  See App. A at A.6.

---

[7] There were three three-year-olds and ten four-year-olds in the GNETS Program in school year 2015-16.  *See* App. A at A.5.

| Grade Level | SY15-16 | SY16-17 | SY17-18 | SY18-19 | SY19-20 | SY20-21 | SY21-22 |
|---|---|---|---|---|---|---|---|
| PK | 14 | 8 | 3 | 0 | 1 | 0 | 2 |
| KK | 83 | 60 | 61 | 40 | 48 | 34 | 54 |
| 01 | 159 | 119 | 100 | 116 | 73 | 69 | 74 |
| 02 | 247 | 212 | 172 | 170 | 156 | 82 | 108 |
| 03 | 259 | 287 | 258 | 203 | 223 | 173 | 126 |
| 04 | 333 | 308 | 344 | 302 | 229 | 223 | 217 |
| 05 | 362 | 344 | 341 | 365 | 337 | 224 | 265 |
| 06 | 367 | 363 | 365 | 368 | 371 | 327 | 246 |
| 07 | 416 | 377 | 363 | 355 | 361 | 361 | 329 |
| 08 | 518 | 394 | 371 | 389 | 330 | 346 | 382 |
| 09 | 638 | 595 | 456 | 440 | 425 | 378 | 378 |
| 10 | 453 | 409 | 399 | 325 | 307 | 277 | 298 |
| 11 | 295 | 291 | 255 | 249 | 201 | 228 | 195 |
| 12 | 348 | 350 | 317 | 285 | 282 | 241 | 251 |
| Total | 4492 | 4117 | 3805 | 3607 | 3344 | 2963 | 2925 |

Figure H.  Student Placements in the GNETS Program by Grade, SY15-16 to SY21-22

**Student Communication**

As additional context for this Report, it is important to be familiar with the varied and diverse student population in the GNETS Program and how students may communicate through behavior.  All students (both with and without disabilities) exhibit a multitude of different behaviors.  Among the general population, most students (and adults) engage in some form self-stimulation (e.g., thumb sucking, tapping their fingers on a table, twisting their hair, or rubbing a sore spot on their body).  These self-regulatory behaviors are often a form of needed self-soothing, stimulation, or communication.  Students with behavior-related disabilities can have unique or unusual behaviors that result from their disabilities.  For example, they may move in unusual ways, including by spinning, flapping their hands, rocking back and forth, or moving in repetitive patterns with objects.  They may also display aggression or anger at themselves or others, talk out of turn or make uncontrolled noises, run away from other classmates or adults, or hide.  Students with behavior-related disabilities may also use other forms of self-stimulation, as described above.

At times, students with behavior-related disabilities engage in such behaviors to such an extreme degree that it can be viewed as confusing or worrying.  If teachers and staff are not properly trained and do not understand what a student is communicating with their behavior, the lack of understanding can escalate a student's behavior, as teachers and staff may respond to the student based on assumptions that have been made, often based on fear or misunderstanding.  For example, a student may place their head on the desk to minimize stimuli in an attempt to self-regulate.  This may be viewed by others as ignoring or as an act of disrespect.  A disciplinary response to this behavior by teachers and staff would likely escalate the behavior of a student who was already trying to minimize stimuli.  This example demonstrates the importance of educators understanding the nuances of student behavior, particularly when related to a disability.  It is the work of educators—particularly those trained

in supporting students with disabilities—to understand how students communicate with their behavior.

## SECTION VI: OPINIONS AND FINDINGS

**OPINION AND FINDING ONE: The GNETS Program segregates, separates, and isolates students with behavior-related disabilities in multiple and compounding ways.**

The GNETS Program segregates students with behavior-related disabilities from their home schools, general education peers, and school-age siblings.  This segregation manifests in a number of ways, including physical segregation, instructional and curricular segregation, segregation in service provision, and social-emotional segregation.  More often than not, students in the GNETS Program spend their days in segregated buildings, locked wings of buildings, and/or isolated classrooms.  Most students arrive at the GNETS Program sites via separate transportation, walk through separate entrances, and access facilities inferior to those used by students in general education.  When students with behavior-related disabilities are placed in the GNETS Program, they typically face multi-year removal from their general education peers and many remain in segregated GNETS settings for the remainder of their K-12 educational experience.

Unlike traditional special education programs that operate within home schools and districts, the sites within the GNETS Program are organized into regional GNETS programs and are viewed as special entities, not schools.  The State's view of regional GNETS programs as entities and not "schools" is prescient.  Not only do the regional GNETS programs separate and isolate students from their general education peers but, as discussed in more detail below, they deprive students of nearly all of the hallmarks of a traditional "school" experience.

The removal of students with behavior-related disabilities from their home schools to attend the GNETS Program is detrimental.  Due to this removal, students experience a loss of community, a loss of friendships, and diminished self-confidence.  As a result of their placement in the GNETS Program, students with behavior-related disabilities are also likely to face long-term adverse outcomes including poor academic performance, negative social stigma, and behavioral concerns.  Most concerning, students in the GNETS Program are immersed in a culture that perpetuates a persistent philosophy of difference.  GNETS Program sites function like separate entities rather than schools and operate along with other GNETS Program sites in much the same way as institutions do.  There is a sense of desolation that permeates the GNETS Program.  This desolation is reflected in the disrepair of the physical GNETS Program facilities.  The Horizon Academy GNETS Center at Valdosta is but one example of a GNETS Program facility in absolute disrepair.  The condition of this facility and many others creates a culture in which students and their families likely feel unwelcome and inferior.

 

Figure 1.1 Horizon Academy GNETS Center at Valdosta
*Exterior Building Upon Arrival*

**STUDENTS SERVED OUTSIDE THEIR HOME SCHOOLS**

The 24 regional GNETS programs serve students from school districts across the State of Georgia in either center-based or school-based sites.  The number of school districts served by any single regional GNETS program varies; some regional GNETS programs serve students from as many as 16 different school districts.  Accordingly, GNETS Program center-based and school-based sites may be several counties and many miles away from a student's general education home school.  Removing a student from their home school can be, and often is, a very traumatic experience in their young life.  Students find security and a sense of belonging when they are with friends and in familiar environments where they know the building layout and how to navigate their environment.  Students lose that sense of security and belonging when they are removed from their familiar environment and sent instead to a separate, segregated GNETS Program site—some of which require students to travel more than an hour from their home, and sometimes on more than one bus, to get there.  In short, many students are not only *not* at their home school, they are not even close.  Significantly, while moving schools is challenging for most students, it is especially challenging for students who are moved because of behavior-related issues associated with their disability.  Students with behavior-related disabilities do well when they are able to have stability, consistency, and familiar environments close to family and friends.

Long bus rides are particularly problematic for the few students in the GNETS Program permitted to spend a portion of their school day at a general education site.  Because these students must be bused from their GNETS Program center-based sites to the general education sites, they end up spending even longer portions of their day on buses.  This additional bus time

displaces time in instructional settings (whether with the GNETS Program or general education). For students with behavior-related disabilities, long bus rides can be particularly challenging (and especially when, as described below, students are not permitted to bring schools supplies or personal items with them to school). These rides often lead to increased rates of challenging behavior due to boredom, lack of supervision, and troubling interactions with other students. If plans are established for student re-engagement in general education and the plan is for the student not to be served at their home school, it is likely to be unsuccessful since neither the GNETS Program nor the general education site is their home school. This can even intensify the student's sense of disconnection.

**SEGREGATION IN GNETS CENTERS**

The vast majority of students in the GNETS Program are served in GNETS Program center-based sites. All GNETS Program center-based sites exclusively serve students with behavior-related disabilities. Most commonly, they are wholly separate educational facilities; in some cases, GNETS Program Centers are co-located or adjacent to buildings with alternative educational programs and juvenile justice programs. The majority of GNETS Program center-based sites are in old or outdated buildings that were previously used by districts for general education students who have since been moved to newer school facilities.[8]

Students at GNETS Program center-based sites experience physical segregation from their home schools and communities with little to no access to general education peers.[9] Their removal from general education peers and placement into standalone facilities where they routinely interact only with other students with behavior-related disabilities results in increased exposure to and mimicking of problematic behavior and feelings of disconnectedness and isolation.

Further, students in GNETS Program center-based sites have no ability to experience educational settings where they can learn effective social and behavioral skills from their peers. In fact, because they are grouped with other students based on their behavior-related disabilities, students attending GNETS Program center-based sites often ride the bus and attend school in the same building with students who vary significantly in age; indeed, some GNETS Program center-based sites serve students as young as five years of age in the same environment as students who are seniors in high school.

Dramatic student age differences in the same learning environment present significant challenges for educators charged with providing effective grade level content, and also pose significant risk to students, particularly those who are very young. Young students in a number

---

[8] While four of the GNETS center-based sites I visited were in newer buildings and adjacent to general education settings, students at these sites were segregated from general education peers and located in locked wings away from the general education environment.

[9] *See* App. A at A.7.

of GNETS Program center-based sites experience extended periods of time with students who are much older.  The exposure of young children to the language, conversation topics, and behaviors of juniors and seniors in high school raises various concerns, including safety.  Not only are the younger students in such mixed-age settings more likely to be harmed by the older students, much like in institutional environments, but they can also learn behaviors from the older students that may put them at risk in these or other contexts.  For example, students who are five or six years old in the same environment as students who are juniors or seniors in high school can be exposed to risky behavior, including sexual behavior, self-injury, instances of violence, or drug use.

It should be noted that students' placement in GNETS Program center-based sites rather than school-based sites is not necessarily based on their purported needs or abilities.  In some parts of the State, only GNETS center-based sites are available to students referred to the GNETS Program, and in other parts of the State, only GNETS school-based sites are available.  Thus, some students receive a more restrictive placement at a GNETS center-based site and suffer the negative repercussions of the segregated environments at GNETS Centers not based on the degree or severity of the behavior associated with their disability but instead based solely on geography.

The GNETS Program facilities are not typically welcoming environments, further compounding the harmful effects of segregation experienced by students served in the Program.  GNETS center-based facilities are unwelcoming; they commonly have bolted doors, bars, or locked gates, and are dirty and in disrepair.  Below are two representative center-based entrances at GNETS Horizon at Moultrie and Sand Hills GNETS Center at Thomson.



Figure 1.2 GNETS Horizon Academy at Moultrie
*Student Entrance, Locked Front Gate, Old Signage*



Figure 1.3 Sand Hills GNETS Center at Thomson
*Student Entrance, Disrepair*

Other GNETS center-based facilities like the GNETS NorthStar Center at Jasper have buildings with signage from the previous building occupants.  Students enter a building that does not look or feel like a school—and has signage inconsistent with the name of their school or program.




Figure 1.4 NorthStar GNETS Jasper Center
*Mismatched Exterior Signage, Student Entrance*

Further, at Coastal Academy GNETS at Liberty and Horizon Academy GNETS Center at Valdosta, there are old signs and doors that are dirty and dated.



Figure 1.5 Coastal Academy GNETS at Liberty
*Exterior Gated, Locked Student Entrance*



Figure 1.6 Horizon Academy GNETS Center at Valdosta
*Exterior Door Student Use*

While many of the GNETS center-based entrances appear similar to the pictures above, there are also GNETS center-based entrances that appear more like an office building than a school.  For example, below is the GNETS North Metro Buice Center, which serves students K-12 adjacent to Northbrook Middle School.  This building and entrance neither look or feel like the middle school located directly behind this building nor like the high school on the same street.



Figure 1.7 GNETS North Metro Buice Center
*Office Building Appearance Vastly Different from Middle School Appearance*



Figure 1.8 Northbrook Middle School (photos publicly available online)[10]
*Exterior of Middle School and in the Background GNETS North Metro Buice Center*

---

[10] I took all photos included in this Report except where noted.  When publicly available photos are used, they accurately reflect the sites I visited and my personal observations during those visits.

There are a few GNETS center-based sites that are in close proximity or adjacent to general education schools that can be accessed only by passing through locked wings.  One such center is the Oak Tree GNETS Center, connected to Sherwood Acres Elementary School via locked doors.  This is a relatively new building that presents as clean and well-kept.  At this site, as well as at many other center-based sites, the entrance to the general education school, Sherwood Acres Elementary school (below on left), is not the entrance for students in the GNETS Program.  Instead, there is a separate entrance at the far end of the building with signage indicating where students in the GNETS Program should enter.  There are also separate parking and student drop-off areas.  Although the proximity of this GNETS Center to the elementary school might suggest access to general education peers and related activities, this is not the case.  The Oak Tree GNETS Center is a separate, locked, segregated facility utilized only for students with behavior-related disabilities, who, despite very close proximity to peers in general education at Sherwood Acres, have limited or no opportunities to interact with those peers.



Figure 1.9 Sherwood Acres Elementary School and Oak Tree GNETS Center
*Separate Entrances for GNETS and Elementary School Students*

Markers of segregation within Sherwood Acres Elementary School and Oak Tree GNETS Center highlight the actual separation between the adjoining facilities.  The images below depict the differences between the hallways in the two facilities and reflect a 180-degree view from the point where the sites abut.  Students in the GNETS Program can stand in their empty hallway with bare walls and look through a locked door directly toward the hall in Sherwood Acres and see colorful circus-themed decorations and a holiday tree with lights.

 

Figure 1.10 Sherwood Acres Elementary and Oak Tree GNETS Center Hallway
*180-Degree View of General Education Hall and GNETS Program Hall*

The students at the Oak Tree GNETS center-based site also have a segregated playground within the Sherwood Acres playground.  Their small, fenced-in playground sits in the center of the larger, elementary school playground, which already has typical elementary school fencing around it.  The two sets of playground equipment are approximately 30 feet apart.  But the students in the GNETS Program are restricted from accessing the larger playground by the fence that surrounds their designated space.  If these students happen to be on the playground at the same time as Sherwood Acres students, they are only able to watch the Sherwood Acres students play rather than actually play with them.



Figure 1.11 Sherwood Acres Elementary School and Oak Tree GNETS Center (indicator added)
*Fenced, Separated Playground within Already Existing Elementary School Playground*

Elam Alexander GNETS Adolescent Services at Southwest High School has a similar adjacent center-based location.  Southwest High School and Exam Alexander Academy GNETS Adolescent Services operate as two separate entities within a shared building.  Students in the GNETS Program enter and exit around the corner of the right side of the building below, while students at Southwest High School enter at the front of the building.  During a visit to this GNETS Program site, a police car was parked in the grass next to the doors for the GNETS Program.  The decision to place a police car at the entrance to an educational facility for students with disabilities (particularly given the absence of police cars at the main entrance for Southwest High School) felt intimidating.  This unwelcoming atmosphere continued as we walked through the GNETS Program site with blank walls and with students separated from their general education peers, who were just on the other side of two sets of locked double doors.  Students in the GNETS Program at Elam Alexander GNETS Adolescent Services do not use the common areas, lunchroom, or other parts of the high school; accordingly, the students at Elam Alexander GNETS Adolescent Services are segregated from their general education peers.



Figure 1.12 Southwest High School with Elam Alexander Adolescent Services (photos publicly available online; indicators added)
*Separate Entrances for General Education Students (yellow circle) and GNETS Program Students (red arrow) with Separate Signage*



Figure 1.13 Elam Alexander GNETS Adolescent Services Center
*Side Entrance Away from General Education High School Student Entrance*

Based on extended observations across 27 different GNETS center-based sites, it is clear that segregation is the norm and that students suffer harm based upon this this segregation. The majority of the GNETS Centers are stand-alone facilities on separate properties and in different locations than general education schools.

**SEGREGATION IN GNETS SCHOOL-BASED SITES**

While the majority of students in the GNETS Program attend school in center-based sites, some regional GNETS programs also use school-based sites, which are located within, or on the

grounds of, general education schools.  Record review as well as onsite discussions with staff reveal that the GNETS school-based sites students attend are typically not at their home school.  As with GNETS center-based sites, students attending GNETS school-based sites largely do so away from their communities and their neighborhood peers or school-aged siblings.  Further, students at GNETS school-based sites are frequently segregated from their general education peers within that setting, often with limited or no access to the general education environment at the general education school where the site is based.

The majority of GNETS school-based sites I visited are located in segregated wings, hallways, basements, or trailers.  The GNETS school-based classrooms, in many cases, are near alternative education rooms, Career Tech Education (CTE) rooms, or district special education classrooms.  Students in the GNETS Program who attend school-based sites typically enter and exit through separate doors from their general education peers who attend school in the same building.  GNETS school-based entrances are often located a long distance from the front door of the general education school.  Thus, even from the beginning of the day, students who attend GNETS school-based sites are separated from the general education student body and are made to feel different.



Figure 1.14 Flint Area GNETS at Sumter County Middle School
*View Showing Distance from the GNETS Program Entrance to the General Education Entrance*

At the GNETS Coastal Georgia Comprehensive Academy at H.V. Jenkins High School, students in the GNETS Program spend their school day in a locked wing accessed through a separate entrance.  At the time of the site visit, H.V. Jenkins High School's building was only a year old, making it one of the few newer GNETS Program sites.  The high school itself is a beautiful, modern building that includes state-of-the-art resources and spaces like an art studio, coffee cafe, theatre, and STEM education rooms.  However, this new school was designed with

no plan for the students in the GNETS Program to be integrated; instead, the GNETS Program site was built as a small outpost building in the back of the general education building. This new facility was an opportunity for thoughtful inclusion and integration of the students in the GNETS Program, but instead there is ongoing segregation.



Figure 1.15 GNETS Coastal Georgia Comprehensive Academy at HV Jenkins High School (photos publicly available online; indicators added)
*Separate GNETS Program Entrance (Red) and General Education Entrance (Yellow)*

Like the students at GNETS Coastal Georgia Comprehensive Academy at H.V. Jenkins High School, many students attending a GNETS school-based site remain within the confines of the GNETS Program for the entire day. For instance, Merry Acres Middle School has an Oak Tree regional GNETS program school-based site on its grounds. Students who attend the GNETS Program go to a trailer located a significant distance behind the school and spend the entirety of their day there, see Figure 1.17, with the exception of going to the cafeteria to pick up their lunch tray and return to the trailer to eat and visiting a separate trailer that houses the restrooms for students in the GNETS Program. The Oak Tree GNETS program at Merry Acres Middle School has "walking schedules" posted for students. These schedules were developed to allow students time to move around like students typically do in middle school between classes. Although there were walking schedules posted in the Merry Acres GNETS trailer, no students were observed walking outside the trailer. General education middle school students have bell schedules that include student movement from class to class to attend home room, social studies, mathematics, science, English language arts, art, music, and physical education in different rooms, with different teachers, and with different class compositions. Middle school students typically have time for socialization in the halls between class periods, before and after school, and during lunch. The time between courses is critically important for the development of social skills, self-management, and organizational skills for all students, but this time is particularly important for those with behavior-related disabilities. As a result of their segregation from the general education environment, middle and high school students at

GNETS Program school-based sites who spend most of their day in one room, with one teacher and the same classmates, are deprived of these opportunities.



Figure 1.16 Merry Acres Middle School (photo publicly available online)
*General Education Entrance*



Figure 1.17 Oak Tree GNETS Program at Merry Acres Middle School
*GNETS Program Site Behind the Middle School*

In the photo below of the North Metro GNETS school-based site at Hamilton E. Holmes Elementary School, note the distance from the front door of the school (left) to the GNETS

Program site entrance (right).  There are separate bus loops, parking lots, and entrances.  Such systemic segregation is the norm in the GNETS Program.



Figure 1.18 North Metro GNETS at Hamilton E. Holmes Elementary School (indicators added)
*General Education Student Entrance (yellow) and GNETS Program Building and Entrance (red)*

Other GNETS school-based sites use trailers solely for students in the GNETS Program. Trailers, in general, are designed for temporary use.  Not only do they often have poor ventilation, but they are less sturdy than school buildings and more susceptible to moisture, mold, and/or water damage.  During a site visit to the NorthStar GNETS at Fannin County Middle School, there was only one trailer on site, and it was designated for the GNETS Program. The GNETS Program trailer was in disrepair and was not secure like the brick middle school that was ten feet away.  It was also extremely hot in the trailer.  One of the two students in the trailer had become visibly sleepy, which was not surprising given the temperature.



Figure 1.19 NorthStar GNETS at Fannin Middle School
*GNETS Program Trailer Beside General Education Middle School*

 

Figure 1.20 NorthStar GNETS at Fannin Middle School
*Condition of Student Occupied Trailer*

At some GNETS Program sites, students in the GNETS Program may occasionally go into a classroom in the general education school, and sometimes even then only to classrooms with other students with disabilities, particularly for core content classes.  This movement from one segregated setting (i.e., GNETS Program classroom) to another (i.e., a district special education class) are often referred to as "transition classes" or "inclusion classes" and often serve as a trial for possible admittance back into district special education within the school.  Thus, these students are *still* segregated from both general education peers as well as their home schools. Students in GNETS Program school-based sites may occasionally go to lunch in the cafeteria in the general education setting or attend a gym class or other specials classes.  If they do have the opportunity to do so, it is generally only with other students in the GNETS Program and less so with general education peers.

**SEGREGATION WITHIN SEGREGATION**

In light of the facts outlined above, the GNETS Program is a formalized system of segregation for students with behavior-related disabilities.  The kind of segregation described has a compounding negative effect on students.  In other words, when segregation is in place, it breeds further segregation, isolation, minimization, and dehumanization.  This compounding negative impact occurs through: (1) categorical labeling of students used for placement decisions; (2) restrictive student workspaces; (3) restrictions on breaks, water, and movement; (4) segregated cafeterias, gymnasiums, media centers, libraries, art rooms, music rooms, and science labs; and (5) the widespread use of isolation and restraint.

**Use of Categorical Labels That Further Segregate Students**

In order to qualify for special education, a student must have a diagnosis from a licensed psychologist or medical doctor.  This diagnosis provides educators with some sense of the characteristics a student with that diagnosis may present.  For example, a student with Autism Spectrum Disorder may have difficulty with social interactions or early language development; a student with Tourette's Syndrome may have uncontrolled vocalizations; a student with Prader-Willi Syndrome may be more prone to eat very large amounts of food; a student with Bi-Polar Disorder may show more incidences of acute depression, and so on.  These behaviors are more likely to be present as part of behavior-related disabilities, yet there are as many manifestations of disabilities as there are individuals with disabilities.  No two students' educational needs are the same simply because they share the same diagnosis.

The provision of special education has shifted from the outdated medical model of "diagnosis and placement" to a service model of "learning needs and supports."  As discussed further below, students with disabilities have all types and manners of learning styles, regardless of their diagnosed disability.  Students with disabilities, just like their general education counterparts, need the full array of educational supports and services.  To be successful, students with behavior-related disabilities need universal screening, progress monitoring, effectively matched evidence-based learning strategies, positive school climates, and effective teaching.

Students in the GNETS Program are denied these opportunities en masse.  They are segregated through routine categorical placement and teaching based on disability labeling.  Not only are students labeled and placed in the GNETS Program based upon those labels (i.e., behavior disorder), but they are also commonly in classrooms that have labels based on their disability (e.g., "functional class," "Autism class"), their perceived need for intervention (e.g., intensive intervention room), or the statewide assessments they take (e.g., "GAA classroom," "Milestones classroom").

This process of labeling as a pathway to learning is an outdated pedagogical approach.  Students with behavior-related disabilities in the GNETS Program need what all other students need, as noted above.  Support provided to students should be determined by the student's learning needs rather than a label or category.


**Restrictive Student Workspaces**

There are times when students, including students with disabilities, enjoy having little nooks or small spaces, or being under their desks, or behind shelves, for a sense of security or for reducing stimuli.  This is to be distinguished from times when students are blocked, held, or physically limited from moving around.  The former is a choice made by students in the GNETS Program to increase comfort and promote regulation.  The latter is a choice made by staff in the GNETS Program in an effort to control.

The use of partitions, wooden walls, tape on floors, denials of breaks, or the inability to leave the classroom or other designated areas are all circumstances that perpetuate and compound segregation. These practices place students with behavior-related disabilities in circumstances that increase the behaviors that the GNETS Program purports to help.

At times in general education settings, teachers allow students to work at desks that have partitions or move students away from others in the classroom to help minimize distractions and increase focus. This strategy also allows the teacher to provide focused prompting and intensified instruction for the student. However, when students with behavior-related disabilities are concentrated in a single classroom, these strategies are less effective because there are more disruptions connected to the behavior of others in the classroom. In particular, the intensification of interventions through environmental adaptations such as desk movement or teacher proximity is less effective in segregated settings because of the concentration of students with challenging and diverse behaviors.

Teachers and staff in the GNETS Program often resort to using physical barriers, partitions between desks, and other constraints to keep students in place or to minimize student distraction. Figure 1.21, below, shows a curved table generally used for small group instruction. Teachers typically sit in the small area of the table to easily see and work with students sitting on the other side. While at some sites the tables were used in this manner, at other sites within the GNETS Program, including Coastal Academy GNETS Center at Liberty, students were inappropriately placed in the small area of the table and the desk was pushed against the wall to prevent the student from getting out. When tables are used in this manner, students are restricted from moving from the space because the staff is sitting on the other side of table so it cannot be moved.



Figure 1.21 Elam Alexander Burke Center GNETS Campus
*Example of Small Group Table Described Above*

Similarly, the use of partition desks in a GNETS Program classroom is often about restricting students from interacting and student control.  In a number of GNETS Program sites, students are blocked and restricted in spaces through the use of barrier walls, partition walls, and cardboard walls.  Many classrooms within the GNETS Program use tape on the floor to indicate places where students are permitted to stand or not stand.  A number of classrooms within the GNETS Program also contain built-in half walls and makeshift barriers—all techniques used for student containment.

 It is understandable that sometimes teachers and staff want students to sit down and work on a task, but forcibly using a table to hold them in place amounts to a punitive restriction. Similarly, the use of partition walls, tape on the floor, or isolated workspaces serve as reminders of constraints and limitations which can exacerbate student behavior.  The use of some of these desks and tape, in and of themselves, are not restrictive.  It is the scope, magnitude, and intensity in which they are used across the GNETS Program to restrict student movement that cause concern.



Figure 1.22 GNETS Futures Cornelia Center (indicator added)
*Partitioned, Walled-Off Student Area (with student's head visible) and Taped Flooring for Restricting Students*



Figure 1.23 Oak Tree GNETS Program at Merry Acres Middle School (indicator added)
*Partitioned Desk with "Anger Stop Signs" Posted*



Figure 1.24 Rutland GNETS Center
*Isolated, Dirty Workspace in Classroom where Student Also Ate Lunch*

**Restriction of Breaks, Water, and Movement**

Students in the GNETS Program are denied the opportunity to leave the classroom on a regular basis to use the restroom, get a drink of water, take a break, or talk with different GNETS staff. Many GNETS Program sites prohibit students from bringing water bottles to fill for drinking, and students in the Program are routinely denied the opportunity to leave class for a drink of water from a water fountain, if the water fountains are in fact working. For example, at the Cedarwood GNETS Center at Lyons, a posted classroom rule limited water for students. The rule read "[w]ater will be allowed at 9:30 a.m. after P.E. for 10 minutes only." Limiting water is punitive and leads to student dysregulation.



Figure 1.25 Cedarwood GNETS at Lyons (indicators added)
*Denial of Water to Students with the Exception of the 10 minutes after Physical Education*

Below are portions of documents provided as part of regional GNETS program subpoena productions that highlight examples of when students were not able to take a break, were not able to use the restroom, were disciplined after restroom use (including out-of-school suspension), or were denied a request for water.

| Snapshot of October 24, 2018 as described by incident reports from campus police and school personnel: | Snapshot of October 24, 2018 as described by the child: |
|---|---|
| The child had several (nondescript) behavioral issues. | October 23, 2018- the child was told he would *process* on the following day (October 24, 2018). |
| The child was escorted to the counselor due to behavioral issues; he spoke with counselor and returned to class. | On October 24, 2018, the child inquired about his *processing* status and was informed that he could not process because he wore slide shoes to school that day. |
| The child continued to laugh and play with other students. | After hearing the news, the child was disheartened, so he put his head down while in class. |

| | |
|---|---|
| The child threw an eraser at another student and the eraser hit a staff member on the shoulder. | The teacher asked the child not to put his head down. The child asked the teacher to leave him alone. Feeling overwhelmed, the child requested a break but was denied. The child informed the teacher that his IEP allowed him to take a break when he was upset; however, the teacher still denied the break. As a result, the child "took" his break by walking out of the classroom. |
| The child transitioned to the hallway (no details provided), where a different counselor asked him to calm down and to walk with her. | The teacher followed him out of the classroom into the hallway. Other staff members joined and began to follow the child down the hallway. The child asked to be left alone. |
| The child was allowed to express his emotions and call his mother. | When the child realized that staff would continue to follow him, he asked them to call his mother so he could leave school. |
| Upset at the prospect of detention and inability to "process," child punched wall and threw chair.<br>*Process(ing) means a student is no longer subject to a consequence (it is considered a reward).* | The parties transitioned to a guidance counselor's office where a staff member called ▮▮▮▮▮▮, the child's mother. ▮▮▮▮▮ stated that she would pick the child up from school before the situation escalated; however, the staff member said the child should stay and that it was their (Elam Alexander's staff's) job to handle these types of behavioral issues. |
| Staff member called campus police and a counselor called the child's probation officer. Child arrested for probation violation. | Staff informed the child that he would not be picked up from school. The child again requested to leave school. When staff informed him that he had to remain at school, the child punched a bulletin board and walked out of the counselor's office. |
| | While in the hallway, the child asked to be left alone. When the child realized that staff would continue to follow, he threw a chair because he was overwhelmed. |
| | Following the incident, the child was called into the main office, where he was met by campus police and informed that he would be charged with destruction of government property. |
| | Upon the arrival of the child's probation officer, the child was arrested. |

Figure 1.26 Elam Alexander Academy (highlighting added)
*Excerpt from Due Process Complaint; Refusal of Student Break and Parent Pick Up Resulting in Student Arrest*



8/11 11:00 am - ▮▮▮▮▮ was told he couldn't go get water in the middle of instructional time. He became angry, threw his pencil, and cursed loudly several times. He later started slamming his fists on the desk.

Figure 1.27 Flint Area Learning Center GNETS Program
*Refusal of Access to Water*

As educators, we know there are certainly times that students will overuse or make unnecessary requests for breaks and use of the restroom, yet that should not result in large scale restriction amounting to denial of basic bodily functions and needs.  For example, as shown in student records, students should not have to use "reward bucks" to pay to use the restroom as was done at Horizon Academy GNETS Center at Valdosta.  During a site visit to the GNETS North Metro Buice Center, a student who was signaling a need to use the restroom was not permitted to leave the room and urinated on himself.  Students, particularly those with behavior-related disabilities, need opportunities to self-regulate without the stress of not knowing if and when they will get a break, be able to have a drink of water, or be able to use the restroom.  Such restrictions likely exacerbate challenging behaviors rather than minimize them.



Figure 1.28 Haven Academy at Skyview
*Schedule Restricting Restroom Break to Before and After Lunch Only*

Lastly, students in the GNETS Program are denied participation or have to earn participation in planned opportunities for breaks.  For example, a student at North Metro Buice Center was asked to "write notes" in order to have a restroom break.  As a result, the student "got very upset and started interrupting the [c]lass by jumping in [his] seat, pushing the desk, then walking around classroom bothering students."  The student received an out-of-school suspension, which could have been prevented if he had been permitted to use the restroom.  Breaks and rewards in the GNETS Program are often conditional—taken away due to student behavior associated with their disabilities.  Such actions result in student despondence, distrust in the staff, and disbelief in any purported system of reinforcement.

**Segregation in Cafeterias, Gymnasiums, Libraries, Art Rooms, Music Rooms, and Science Labs**
Students in the GNETS Program are often denied the ability to use cafeterias, gymnasiums, libraries, art rooms, music rooms (e.g., for choir and band), and science labs alongside their general education peers, if at all.

For students in GNETS center-based sites, lunches are often bused in from another location. In most cases, lunch is not prepared on site for the students at GNETS center-based sites, so lunches are not served hot.  Students at GNETS center-based sites eat either in their classrooms or in the cafeteria with other students who have behavior-related disabilities.  For example, Figure 1.29 shows a student's desk after lunch at Sand Hills GNETS program at Tubman Educational Center.  Students here do not have a cafeteria, and they eat their lunch at the same desk at which they start and end their day.



Figure 1.29 Sand Hills GNETS Program at Tubman Educational Center
*No Cafeteria, Students Eat at Their Desks*

At Elam Alexander Burke Center GNETS Campus, students ranging in age from five to 18 all eat in the cafeteria at the same time.  This is problematic as this varied age range creates opportunities for much younger students to interact with students who are much older.  As referenced above, older students may use language and reference topics that are not appropriate for younger students, among other concerns.

Students in GNETS school-based sites are in facilities with functioning cafeterias but have limited access to them.  Some of these students are allowed to eat in the cafeteria at tables, but only with other students in the GNETS Program.  More often, staff in the GNETS Program school-based sites bring lunch from the cafeteria for the students to eat in their classrooms, or the students walk to the cafeteria, pick up their lunches, and return to their GNETS Program classrooms to eat.  For example, during a site visit to GNETS of Oconee at Lakeview Academy, students were served lunch at the same desk each student sat at for the entire school day.

The photo below is the Eagle Eatery at Coosa High School in Floyd County.  This is a café for general education students to grab coffee and have snacks, and it is in addition to the lunchroom at this high school, which is much larger and also very appealing.  Although there are students in the GNETS Program at Coosa High School, they do not access the Eagle Eatery or the lunchroom; instead, students eat in their classrooms.



Figure 1.30 Coosa High School Café
*Café Not Used by Students in the GNETS Program*

As discussed in detail below in Opinion and Finding Two, there are a number of GNETS Program sites that lack gymnasiums, playgrounds, libraries, art rooms, music rooms, or STEM education programs or rooms.  Even when a GNETS school-based site is within proximity to these types of facilities, students in the GNETS Program have limited, sporadic, conditional, or, in some instances, no access to those spaces and related resources.  Even in instances where they do have access to these spaces, it is typically not at a time when general education peers are present.  This segregation within segregation continues to distance students in the GNETS Program from their general education peers.

For example, the Woodall GNETS Center at J.D. Davis Elementary is a GNETS school-based site that serves students in K-8th grade and is co-located with an elementary school that has a gymnasium.  Next door to the Woodall GNETS Center is Marshall Alternative School for discipline.  Students in the GNETS Program are not able to use the J.D. Davis Elementary School gymnasium and, instead, must walk through the gated, locked door, across the street, and

through a muddy area to a cluttered, dirty entryway with partially obstructed doors (see below) to access a gym at the alternative education site.



Figure 1.31 Woodall GNETS Center at J.D. Davis Elementary
*Pathway to Alternate Education Site Gym for GNETS Use Instead of Elementary School Gym*

Students located at GNETS center-based sites that are newer and adjacent to general education schools also lack access to those educational resources available to their general education peers.  Southwest High School, where the Elam Alexander GNETS Adolescents Services Center is located, has a gorgeous gym, and at the time of the site visit, it was in use by both students with and without disabilities attending Southwest High School.  The students in the GNETS Program, though co-located, do not use this gym.

The same is true with respect to libraries at DeKalb-Rockdale Shadow Rock GNETS Center.  This GNETS Center is located in the basement of the Shadow Rock Elementary School, no part of which is used by general education students.  The small library for the students in the GNETS Program is located in the basement along with their classrooms.  The GNETS library has few books and was locked at the time of our visit.  During my site visit, when standing in front of the GNETS library in the basement, I could smell popcorn upstairs in the elementary school.  I then asked to see the Shadow Rock Elementary School library that general education students use.  I was led upstairs and saw the hallway next to a full, open-door library and media center.  On that day, outside the library, general education students were able to come and get freshly popped popcorn.  These two libraries were only a few hundred feet away from one another.  It is difficult to understand why a student with behavior-related disabilities would not be able to go to a library that is well-stocked and beautiful, has popcorn popping, has bright lighting, and is connected to hallways that are painted with appealing artwork.  While their general education peers at Shadow Rock Elementary School are enjoying a space of learning and

brightness, students in the GNETS Program downstairs are having a dramatically different experience.



Figure 1.32 DeKalb-Rockdale GNETS Shadow Rock Center
*Library in Basement Used for Students in the GNETS Program*



Figure 1.33 DeKalb-Rockdale GNETS Shadow Rock Center
*General Education Hall Upstairs from Shadow Rock Center in Elementary School*

 

Figure 1.34 Library in Shadow Rock Elementary School
*Separate General Education Library Upstairs from Shadow Rock Center*

Across all the site visits, references to students in the GNETS Program participating in extracurricular activities was minimal.  Most students in the GNETS Program do not have their photos in yearbooks, and they do not get to be involved in school plays or music programs. Students in the GNETS Program do not have the same opportunities to play basketball for their high school, participate in drill team, or be a cheerleader.  Students in the GNETS Program do not have the same opportunities to join book club, swim club, newspaper, performing arts, creative arts, after-school activities, gifted programming, or tutoring programs.  When administrators are asked if students in the GNETS Program are in extracurricular activities, the administrators will often say that they *can* be.  When asked if they *are*, they say no or refer to a *single* student who may be participating or has participated in the past.  The students in the GNETS Program are not involved in these opportunities because they are physically removed from their home school and segregated from it and all the associated activities.

In fact, some regional GNETS programs strictly prohibit students from participating in extracurricular activities.  For example, as exhibited in the form below, the GNETS Flint Area Crisp County Learning Center prohibited a student in the GNETS Program from even attending any school district-sponsored games, events, or dances.  Additionally, the form signed by the student refers to a Georgia High School Association by-law that prohibits "alternative school students or expelled students from participating in or trying out for any school district-sponsored sports and/or extracurricular activities."  This form seems to conflate the GNETS Program with an alternative education program or a form of punishment.  This is concerning and not the advertised purpose of the GNETS Program.



9. ███ I understand that while I am on school property, which includes riding the school bus, I will not use vulgar or profane language to express myself.

10. ███ I understand that trips to the restroom will be limited to four times in one day, unless a medical diagnosis makes more trips necessary. A note or prescription from a doctor's office will be required for exceptions.

11. ███ **I understand that being involved in a fight, arguing with other students and/or adults, or continuous disruptions will result in long-term suspension or permanent expulsion. Being in possession of illegal substances or weapons will result in long-term suspension or permanent expulsion. Students are searched on a daily basis upon entering the school building.**

12. ███ I understand that while I am enrolled in Crisp County Learning Center, I cannot attend any Crisp County games, events or dances unless I have been given written permission by the administration. GHSA by-law 1.56 forbids alternative school students or expelled students from participating or trying out for any school sponsored sports and/or extracurricular activities.

☑ It must be understood that the *minimum stay* in the Alternative School Program for any student who is accepted *is one semester* (August - December or January - May) unless otherwise indicated by a hearing officer or judge. In order for a student to be released back to the home school, the student must: be passing his/her academic classes, be on Level 3 of the behavior chart and present his/her exit presentation before the exit review panel.

☑ The student has been placed in the Crisp County Learning Center until he/she gets the credits needed in order to graduate on time with his/her graduating cohort. The release time will occur at the end of the semester when the credits have been issued.

☑ The student will remain at the Crisp County Learning Center until _____. This is the decision of _____.

Student Signature ███   Parent Signature ███

Figure 1.35 GNETS Flint Area Crisp County Learning Center (highlighting added)
*Form Requiring Student Sign Off Not to Participate in Extracurriculars*

**Segregation in Classrooms**

While there were a few times on site visits where I observed GNETS school-based sites offering opportunities for students in the GNETS Program to have limited engagement with general education peers, such opportunities for integration are the exception. When I did observe these opportunities for engagement, it provided important evidence that the integrated provision of supports and services for students with behavior-related disabilities is possible. For example, I observed a student in the North Metro GNETS at Centennial High School participate in a general education writing class with limited involvement from the para pro (i.e., a teacher aide). This class was large but had effective teaching with high levels of student engagement. It was clear that this general education teacher had relationships with all of her students, clear expectations, interesting grade-level content, and effective strategies for prompting and encouraging student involvement in the task. I observed similar integration at the GNETS Futures site at Cornelia Elementary. During that site visit, a student who is placed in

the GNETS Program was also taught in a general education classroom that had grade-level peers with and without disabilities. There was a co-teacher in the room and all students were engaged and learning. These are examples of inclusion at work. When general educators have effective strategies and support from skilled special educators, students with behavior-related disabilities are able to thrive in the general education settings. Shown below are pictures of the effective classrooms offering inclusionary supports for students with behavior-related disabilities.

The difference between such classrooms with some inclusion and the classrooms serving only students in the GNETS Program was pronounced throughout the sites. Effective classrooms offering inclusionary supports for students with behavior-related disabilities displayed rich educational content on the walls and contained seating arrangements that promote student interaction rather than student isolation. By contrast, classrooms serving only students in the GNETS Program demonstrated a severe lack of visible educational content and promoted practices that served to restrict and isolate.



Figure 1.36 North Metro GNETS at Centennial High School (left) and GNETS Futures at Cornelia Elementary School (right)
*General Education Classrooms in which Students in the GNETS Program Were Included*

Segregation builds upon itself. Segregated schools lead to segregated classrooms, which lead to segregated spaces within classrooms. Segregated spaces within classrooms lead to isolated closets, timeout rooms, and opportunity rooms. None of these are necessary; they are in fact traumatizing and harmful. The corners in the pictures below are two such spaces. Students were asked to stand or stay in these spaces with zero resources or supports. The idea

that you would hang up bright colorful signs (even a personalized label with a student's name) and then allow the student nothing but a cinder block wall is unconscionable.  I watched a student at Sand Hills GNETS Center at Thomson lie in this corner, pictured in Figure 1.37 on the right, rolling on the dirty floor, with no staff interactions.  There were a few times on site visits when I felt physically ill because of the conditions in which I saw students. Here, at Sand Hills GNETS Center at Thomson, was one of those times.



Figure 1.37 Sand Hills GNETS Center at Thomson
*Desperate, Taped, and Dirty Corners for Student Use*

**Isolation Rooms and Restraint**

One of the most concerning aspects of the site visits was the prevalent use of isolation and restraint as punishment for students with behavior-related disabilities in the GNETS Program. Isolation rooms are spaces where students are forced to enter and kept against their will by an adult.[11]  Isolation rooms typically have doors removed, but adults position themselves at the entrance to prevent a student from leaving.  During site visits, a number of the isolation rooms had a chair placed at the entrance for a staff member to sit in to keep the student in the room. In many cases, isolation rooms are old seclusion rooms whose doors have been removed.  In some cases, the isolation rooms still have doors on them.  Isolation can also occur in spaces within a classroom where a student is required to go with no other students nearby and is physically blocked in and required to stay until an adult says otherwise.  These spaces can include bathrooms in classrooms, corners of the room, closets, or other walled-off spaces.

---

[11]  I recognize that during the COVID-19 pandemic, many schools created isolation rooms to separate students experiencing COVID-19 symptoms.  Referenced isolation rooms in this report do not include those spaces.

Although these spaces have been given a variety of names (i.e., opportunity rooms, intensive intervention rooms, quiet spaces, calm down rooms, or student break rooms), they are a form of punishment.  The conditions of these isolation rooms seen on site visits suggested that they had been recently and frequently occupied by students.  These conditions included the smell and appearance of urine and other bodily fluids on the floor and walls, base trim torn off without repair, floors and walls that are drawn on or pulled up, the presence of spackling compound indicating where student bodies have hit the walls hard enough to cause damage, and doors and windows that have been kicked in or out containing padding or boards to cover the open or damaged areas.

Although the isolation rooms in the GNETS Program are ostensibly used for student de-escalation, the conditions of the rooms suggest they do the exact opposite.  These rooms result in dehumanization, not de-escalation.  They limit choice, mimic cell-like environments, and often create interactions between teachers, staff, and students that are coercive, restrictive, and punitive.  Under the guise of student and educator protection, use of these rooms functions more like policing and not educating.  The sheer number of isolation rooms and the use of restraint within the GNETS Program is, quite frankly, alarming.  These rooms are in active use across the GNETS Program for students with behavior-related disabilities.  They are harmful and can lead to student and staff injury.  Isolation rooms are a direct result of segregation and are perpetuated by an ongoing institutional culture.



Figure 1.38 GNETS North Metro Buice Center
*Isolation Room Named Behavior Recovery Room*



Figure 1.39 GNETS North Metro Buice Center
*Inside Behavior Recovery Room Used for Isolation with Damaged Walls from Student Contact*



Figure 1.40 GNETS Futures Cornelia Center (indicators added)
*Inside the Isolation Room Showing Signs of Active Use with Spackling Compound on Walls from Recent Repair, Urine and Other Bodily Fluid Stains at Floorboard*

I have worked for many years with students with extreme behaviors related to their disabilities (e.g., biting, object throwing, eating substances or objects other than food, property destruction, elopement, self-stimulation, and self-injury). In fact, many students without disabilities also experience various forms of these behaviors. These behaviors can and should be effectively supported and de-escalated without the use of isolation or time out. The key

with students who may experience a behavioral crisis is to establish an environment of behavioral prevention, which includes functional behavioral assessment, effective behavior intervention planning, and a crisis intervention plan.  Behavior prevention should include proactive teacher strategies and effective and individualized de-escalation strategies.  As explained above in Section V, behavior is a form of communication, and it is up to educators to understand and effectively support a student exhibiting behaviors.  Note the excerpt from Mindset Safety Management training website,[12] the training system allegedly used by most staff in the GNETS Program to prevent and manage aggressive behavior, regarding why students engage in problem behavior:

> *Why do students in schools and individuals in care become aggressive?*
> *If we truly believe that all behavior is a form of communication, the reasonable answer is because they are trying to meet a need. That need is often rooted in safety. Therefore, the question should not be "Why are they doing that?" Rather, it should be "What do they want?" If we can determine what they are trying to get out of the behavior, we can begin the process of assisting them with alternative behavior that can lead down a path of resolution. Punitive measures often escalate rather than de-escalate the situation. When an individual/student "acts out" the response of staff will determine if the communication following the behavior results in a "confrontation" or a "conversation." The motivation for each is very clear and the results profoundly different. One leads to the destruction of a relationship and the other the development of one.*

Although accurate, through site visits and record review, it is clear that this is not universally understood throughout the GNETS Program.

I understand and recognize the need to protect students engaging in problem behavior and those near them.  At times, there are circumstances in which a student needs time and space to de-escalate, self-regulate, and calm down.  This does not require isolation rooms.  Therapeutic programs should have opportunities for students to take frequent breaks, have staff that understand student behavioral triggers, and foster educator-student relationships that are trusting and rooted in consistency and effective relational support.  Yet, instead of the use of therapeutic or behavioral services, what I saw time and time again throughout the GNETS Program were small, traumatizing, poorly lit rooms that were empty, dirty, and full of indicators of repeated student harm.  These rooms were completely devoid of therapeutic resources, such as sensory or self-calming devices, or any furniture.  The sheer number of these rooms indicate a deeply problematic and punitive approach across the GNETS Program.

---

[12]  The MindSet Safety Management website is available at: https://mindsetinstructortraining.com/mindset-faq/.



Figure 1.41 NorthStar GNETS at East Fannin Elementary School
*Inside the Isolation Room Showing Signs of Active Use, Stains on Walls, Floor Trim Torn Off*



Figure 1.42 Rutland GNETS Center
*Images from Inside the Isolation Room Showing Signs of Active Use, Drains for Bodily Fluids, Cameras*



Figure 1.43 North Metro GNETS Center at Oglethorpe
*Images from Inside the Isolation Room Showing Signs of Active Use, Torn Blinds, Damaged Walls, and Floor Trim Missing*



Figure 1.44 North Metro GNETS Center at Hamilton E. Holmes Elementary School
*Images From Inside the Isolation Room Showing Signs of Active Use*



Figure 1.45 DeKalb-Rockdale GNETS Shadow Rock Center
*Images from Inside the Isolation Room Showing Signs of Active Use*



Figure 1.46 Cedarwood GNETS Center Statesboro
*Former Classroom Now Used for Isolation*

On several site visits, there were disturbing scenarios where students who were struggling behaviorally were physically restrained by GNETS Program staff, forced to enter these spaces, and required to stay in them until they met arbitrary criteria of calm or complied with staff instructions.  It was clear that criteria for exiting the space is determined by the staff at the time they place a student in the isolation room.  For example, I witnessed utilization of restraint with a student at the DeKalb-Rockdale GNETS Shadow Rock Center who was given a chair different from the other students in order to block him against his table.  The student was trying to free his arms, which were held down by staff.  It was not clear why his arms were being held down other than the student wanted to get up and the staff wanted him to be compliant.  This student appeared to be five or six years old and was in a room with only two other students.  In this context and given the lack of problem behaviors at the onset, restraining him in his chair was unnecessary and served no therapeutic purpose.  In fact, this restraint increased his problematic behavior rather than decreased it.  Education is not about mandatory compliance with arbitrary adult requests, particularly when those requests have limited educational or therapeutic value.

There were other instances of restraint during site visits when students were escalated, and they were grabbed by the arms or pushed toward a wall.  There was a significant number of restraints reflected in my record review and also evidence that restraints were underreported.  For example, there was evidence of use of restraints without corresponding incident reports and data.



Figure 1.47 DeKalb-Rockdale GNETS Shadow Rock Center
*Chair Used for Student Restraint*

I have experience, over the course of my career, with the use of limited and specific restraint for student safety. The use of physical restraint in the GNETS Program due to the absence of effective behavior intervention plans is concerning. There is a lack of data of students in the GNETS Program having effective behavior intervention plans based on a functional behavioral assessment and an individualized crisis intervention plan. These plans provide guidance to educators on how to prevent the need for extreme measures like restraint. The widespread use of restraint and the documentation of its use in handbooks along with forms requiring parent signatures again shows a systemic punitive approach. For example, the GNETS of Oconee General Parent Consent 2019-2020 Form, pictured below, states that if a parent does not consent to physical restraint, the police will be called to intervene.



Figure 1.48 GNETS of Oconee (highlighting added)
*Parent Consent Form Stating Refusal of Restraint Results in Police Action*

Isolation rooms and associated restraint used at various GNETS Program sites are indicative of an environment that perpetuates segregation within an already segregated GNETS Program. Whether isolating or segregating students via small, dark spaces, or larger padded rooms, the practices are punitive and used as a form of discipline. When a student is escalating and needs additional supports and resources, it is an opportunity to utilize highly trained specialists rather than empty rooms.

Below are documents from the Sand Hills GNETS Center at Thomson where a student was significantly injured due to physical restraint.

I was called down to see ███████ she stated that ███████ wanted to see me and I came down to see what she needed. ███████ ask could we call her mom, ███████ and I asked the reason why. ███████ said that she was hungry and I told her that we could give her a healthy snack. I proceeded to ask ███████, what they could offer her (███████ and she said fruit, Banana or Apple.

███████ then states that she doesn't want that, they had something else that she wanted, so I asked what, then ███████ said, just call my mom. I replied that "no we will not be calling, lunch will be soon."

I then noticed that ███████ walked out of the school, using the back doors and staff immediately followed her. I watched from a distance to make sure that ███████ is safe.

███████ was seen from feet away hitting other staff members and they were trying to keep her in close proximity, so that she would not be able to run away from them.

The staff was able to steer her (███████ back closer to the back door and ███████ used profanity and continued to be physically aggressive to staff.

The staff was able to steer her back into the building, in the hallway talking to her. I asked her again what kind of snack would she like, she replied I wanted cereal, so I said give her cereal, then ███████ states, No I don't want it.

We were able to convince ███████ to go back into the classroom, when ███████ got into the classroom, she became more Physically aggressive with staff, ==so I said let's take her down into a Horizontal Containment.== Time around 10:30am....

The containment was done exactly how staff is trained. The containment consisted of myself (███████), and ███████. ███████ had the lower half of her body, ███████ upper part of her body. I made sure that her head was cushioned with my hands on the floor and that she wasn't bumping it, also de-escalating her.

I told her once she calms down we will let her up. ███████ ==began yelling stating that her leg is cracked.== I told ███████ that ==I will count down from 5, then we will let her up.== We let her up, the containment lasted no more than 5 minutes.

I called ███████ to let her make the decision of coming to the school to pick ███████ up.

Figure 1.49 Sand Hills GNETS Center at Thomson (highlighting added)
*Witness Document of Student Injury Due to Restraint*

| Accused Employee's Information: | | | |
|---|---|---|---|
| Name: ███████ | | Position: ███████ | |
| Home Phone: ███████ | | Date of Incident: | May 3, 2021 |
| Brief Allegation(s) Description: | | | |
| In Monday May 10, ███████ student in the GNETS program called the Thomson site. She was upset about the report she received from the doctor that morning. She stated that the doctor told her that she was going to need surgery for her ACL and PT. She then stated that ███████ ...ad hurt/broken her leg. The student is not in school at the time. She was placed on Learn From Home on May 5, 2021 based on the medical information received. Due to the nature of the allegations, it was felt that an investigation was needed to determine what took place. | | | |
| Alleged Violation Type: (check all that apply) | | | |
| ☑ ██████ | ☑ BOE | ☑ School/Department | ☐ ... |

Figure 1.50 Sand Hills GNETS Center at Thomson
*Employee Allegation Reporting Checklist Reflecting Same Student Restraint as Figure 1.49*



Location: Regional Open Mri, Llc
Patient Name: ████████
DOB: ████████
ACCESSION NO: ████████
Ordering MD: ████████
Exam Date: 05/07/2021

Exam Performed: MRLKN2  MRI L KNEE WO CONTRAST

History: Left knee pain after injury. Knee popping. Medial pain. Joint feels loose. Kicked in leg during a fight on 5/3/2021.

Technique: Axial T2-weighted images, coronal T1 and T2-weighted images and oblique sagittal T1 and T2-weighted images of the left knee were acquired.

Findings: The ACL is torn. The PCL, MCL and LCL are intact. The medial and lateral menisci are intact. Patellar tendon is intact. There is a moderate joint effusion. There is no evidence of a Baker's cyst. There is a bone bruise involving the posterior aspect of the lateral tibial plateau. There is a bone bruise involving the lateral femoral condyle beneath the condylar patellar sulcus. Articular cartilage is preserved.

Impression: ACL with associated typical bone bruises. Moderate joint effusion.
Signature ████████
05/10/2021 8:56 AM
Electronically Signed - ████████     05/10/21 8:56

Figure 1.51 Sand Hills GNETS Center at Thomson
*Medical Report of Injury Stemming from Same Student Restraint as Figure 1.49*

This use of physical restraint resulted in the tearing of this student's ACL, as indicated in Figures 1.49, 1.50, and 1.51.[13] ACLs are typically torn by extreme force or twisting motion. Figure 1.49 shows that the student began yelling that her leg was cracked yet staff continued to hold her down until they counted to five. It is difficult to understand why staff would continue to hold down, under any condition, a student after she was yelling that her leg was cracked.

Below is another example from Sand Hills GNETS Center at Thomson in Figure 1.52. It provides a fellow student's statement of a restraint that resulted in what could be characterized as physical abuse. The student's statement says: "████████ grabbed ████████ and [spinned] him to the wall and ████████ hit [his] head on the wall and ████████ punched ████████ on his head with

---

[13] ACL or Anterior Cruciate Ligament refers to a key ligament that helps stabilize the knee joint.

his fists and pushed ▮▮▮▮'s head down on the ground."  Although some staff might doubt student statements of this nature, the specificity of this student's account indicates a valid, concerning incident.



Figure 1.52 Sand Hills GNETS Center at Thomson
*Witness Document of Student Describing Injury Due to Restraint*

There are times when students, in any school setting, exhibit dangerous or otherwise concerning behavior.  At those times students may need physical prompting, prevention strategies, or even restraint.  Though, the use of restraint should be the exception, not the norm.  The improper use of restraints is dangerous and can lead to serious harm.  Educators and staff must have sufficient training to prevent any harm resulting from restraint.  Educators and staff should not engage in improper restraint, which is considered abuse.

When working with students who have behavior-related disabilities, educators and staff need to have comprehensive, effective, repeated training and a thorough understanding of student de-escalation strategies, as well as experience in how to calm or diffuse interactions that would otherwise escalate the circumstances.  The science of effective behavioral supports (i.e., proximity, voice, tone, context, setting events, antecedents, triggers, and consequences) is well-established and serves educators in understanding students who have social-emotional and behavioral needs, Autism, or other disabilities.  Use of restraints can be unsafe and deeply harmful to vulnerable student populations.



Figure 1.53 Sand Hills GNETS Center at Thomson
*Isolation Room Showing Signs of Active Use with Window Broken Out and Boarded Over*

    The pervasive use of restraints and isolation throughout the GNETS Program further solidifies my opinion that the Program contains a climate in which segregation, separation, and isolation are the norm.  The mere presence of these spaces and rooms along commonly used corridors and hallways sends a clear message to students in the GNETS Program.  If a student displays precisely the kinds of behaviors that their disability makes difficult for them to control, they will be restrained or isolated to deal with their fears, anxieties, and frustration without effective therapeutic services or supports.  The multitude of compounding ways in which students in the GNETS Program are placed and put away from others is pervasive, punitive, and harmful, creating lifelong trauma.

    Rather than institutionalizing a punitive response to problem behaviors, a truly therapeutic environment would include numerous strategies to help minimize or prevent the behaviors.  In that vein, a number of sites within the GNETS Program have established sensory rooms.  Sensory rooms offer students with disabilities places to go to receive different kinds of stimulation to aid in calming, relaxation, or even meditation.  Sensory rooms, when created thoughtfully and in accordance with well-established principles of self-regulation and self-management, have quiet music, low light, and ways for students to self-calm.

 

Figure 1.54 South Metro GNETS at J.B. Henderson Center and Futures GNETS at Black Mills Elementary School

*Sensory Rooms*

    These sensory rooms are intended to be spaces for students to go into when they need more or less stimuli, or a different kind of environment than can be provided in a classroom. Many of these rooms look welcoming and have newer equipment in them.  However, based upon site visit observation and review of logbooks at some sites, many of these rooms go unused or lightly used.  Some sensory rooms were dirty, damaged, disorganized, or otherwise suffered from lack of maintenance, like other parts of the facilities.



Figure 1.55 North Metro GNETS at Hamilton E. Holmes Elementary School (indicator added)
*Dirty Sensory Room*

In some instances, it appears that sensory rooms were established to serve as an alternative to isolation rooms.  However, sensory rooms are not an alternative to isolation rooms; rather they are part of a larger set of strategies that can be used to help prevent problems from occurring.  Yet because there is not an understanding of how and when to use sensory rooms as part of the therapeutic process, they often are held out as showpieces, but rarely appear to be effectively utilized.

As a better practice, sensory items (e.g., chairs, lighting, whiteboard art, textiles) should be integrated into general education classrooms.  Figure 1.56 indicates how sensory items might be used in an embedded fashion within a general education classroom.



Figure 1.56 Cornelia Elementary School
*Sensory Resources in General Education Classroom (stools, plants, fun lighting)*

Separate sensory rooms can feel like a punishment.  Students who are in segregated settings that have experienced further segregation through seclusion, isolation, or time out have a difficult time when asked to move to another space in the school.  This is an example of how segregation builds upon itself creating fear based on previous traumas in these environments.  Below is an example of one family's report that a student does not want to go to the sensory room (referred to as the "GNETS room" by the parent) for that reason.



Figure 1.57 Northwest GNETS at Woodstation Elementary School
*Mother's Statement of Student Resistance to Segregated Sensory Room*

The use of sensory rooms in the GNETS Program is much like the other resources used in the Program.  They are less effective because they are segregated and prevent students in the

GNETS Program from learning ways to self-calm and self-regulate through exposure to their general education peers.

**Summary of Opinion and Finding One**

After 70 different site visits across the State of Georgia, it is clear that the GNETS Program segregates, separates, and isolates students with behavior-related disabilities in multiple and compounding ways.  Students are served outside their home schools in segregated GNETS Centers or segregated GNETS school-based sites.  Although there are a few individual examples of students in the GNETS Program participating in general education, that is the exception. There is segregation within segregation through the use of categorical labeling, resulting in ineffective instructional or therapeutic support.  There are segregated cafeterias, gymnasiums, libraries, art rooms, music rooms, and science labs.  There are separate playgrounds and lunchrooms.  There are separate systems of transportation and separate drop-off and pick-up locations for students in the GNETS Program.

In the GNETS Program, as within any student population across the country, there are a small number of students that I believe require individualized, quiet learning environments with low levels of interactions with others and a lot of preparation for those interactions.  These few students need a reduction in the number of student-to-student interactions in a day to effectively self-regulate.

There are also a small number of students in the GNETS Program who have very serious, extreme behaviors that require well-trained, highly-specialized teaching and behavior support with carefully planned schedules of interactions with others in order to experience success. There are some students who need to be taught in smaller learning environments away from their peers at certain times and under certain conditions.

The concern is that the GNETS Program is justifying large-scale segregation of students with behavior-related disabilities based on the needs of a small number of students who require intensive supports in limited conditions.  Once placed in the GNETS Program, students often remain segregated for many years and then are required to earn their way back to special education classes offered at their home schools by reducing or eliminating behaviors that are a function of their disability.  They can, therefore, rarely earn their way back because they have to overcome both the challenges involved with their disability and the challenges faced through a program that is neither effective nor therapeutic.

Students in the GNETS Program are entitled to an education in which they are not segregated based on their disability.  They deserve a place in their community and in their home schools.  They deserve to experience schooling as a safe, productive, engaging learning environment regardless of their disability.  And they deserve schools that provide the necessary services and supports to allow them to be successful in that learning environment.  Students deserve schools, not institutions.



Figure 1.58 Elam Alexander Burke Center GNETS Campus
*Hallways Resembling Those Found in Institutions*

**OPINION AND FINDING TWO: The GNETS Program provides unfair and unequal educational opportunities for students with behavior-related disabilities.**

Students with behavior-related disabilities in the GNETS Program do not have access to the same or even similar educational opportunities as students in general education in the State of Georgia. As discussed more fully below, markers of the unfair and unequal educational opportunities that pervade the GNETS Program include the physical conditions of the schools (e.g., building exteriors, interiors, classrooms, restrooms, gymnasiums, playgrounds) where students with behavior-related disabilities are served, the lack of appropriate teaching and learning opportunities (e.g., curricular content, learning resources), the lack of critical therapeutic and behavioral supports, and negative school climate and culture. Students in the GNETS Program begin, spend, and end their days differently than students in general education environments. They are repeatedly exposed to conditions known to increase problematic behavior (e.g., lack of opportunity and engagement, lack of access to learning resources, lack of therapeutic or behavioral support) rather than reduce it.

**UNFAIR, UNEQUAL, AND HARMFUL FACILITIES**

Staff and students in the GNETS Program are subjected to physical environments that are not only segregated, unfair, and unequal, but they are also unsafe and harmful. Exteriors of GNETS Program facilities—including doors, walkways, parking lots, and exterior walls—show signs of age, disrepair, lack of upkeep, and, in some cases, dangerous environmental and

physical conditions.  Interior facilities within some of the GNETS Program sites—including halls, interior walkways, lighting, and flooring—are bleak, dirty, and in disrepair.  The classrooms, gymnasiums, restrooms, libraries, cafeterias, and playgrounds, if any, to which students in the GNETS Program have access are dramatically less appealing than those found in general education settings.  Even newer buildings within the GNETS Program are not welcoming school environments.

Student attendance, student outcomes, and the physical conditions of school buildings where students learn are closely linked.  Students learning in facilities in poor condition score lower academically than students in newer, better functioning buildings.  When buildings are in poor condition, including weak ventilation, peeling paint, broken doors and windows, open trash dumpsters, and other environmental hazards, students and their educators are at risk. Students' exposure to poor air quality, extreme temperatures, poor lighting, and high levels of noise hinders their ability to be present in the environment.  These sorts of barriers do not exist in well-maintained facilities, like many of the general education schools I visited that were attached or adjacent to GNETS Program sites.  Additionally, deteriorating schools negatively impact student and teacher morale, contribute to poor school climate, and are associated with higher levels of teacher turnover.

**Building Exteriors**

The building exteriors of many GNETS Program center-based sites, including parking lots, walkways, entrances, signs, and doorways, are in awful states of physical disrepair.  They are dirty, old, rotting, unclean, and unacceptable by any standard.  Many of the building exteriors have chipped paint, rust, broken or rusted fencing and lights, cracked or damaged walkways, and water damage.  Oftentimes, the buildings used for these GNETS center-based sites are "hand-me down" general education buildings.  That is to say, the buildings were originally used for general education but once the general education school moved into a newer facility, the vacated and less desirable facility was given to the GNETS Program and used for students with behavior-related disabilities.  The GNETS Horizon Center at Valdosta (pictured below) is one such example.  This GNETS Center is located within a building that used to be a general education high school, but the high school vacated the building years ago.  The conditions of that facility were appalling inside and outside.  The exterior of the building was dirty, moldy, and in various states of disrepair.  It also showed extensive water damage.  Bent and rusted lights lined a parking lot littered with cracks where weeds were growing.  Parts of the facility were chained off and appeared to be unusable.  No students other than the 102 students housed in the GNETS Program are located at this huge, run-down, deteriorated property.



Figure 2.1 Horizon Academy GNETS Center at Valdosta
*Sweeping Facilities Concerns*



Figure 2.2 Horizon Academy GNETS Center at Valdosta
*Exterior Door and Outside Dirty Entry and Walkway with Student Desk*

Sand Hills GNETS Center at Thomson is another outdated and unkept facility that was once used for a general education elementary school.  Below, the old elementary school sign remains in the back of the building despite that school having been relocated over five years ago. However, only students in the GNETS Program now access this facility.



Figure 2.3 Sand Hills GNETS Center at Thomson (indicator added)
*Old Elementary School Signage Left in Back of Building*

 

Figure 2.4 Sand Hills GNETS Center at Thomson
*Old Elementary School Signage and Exterior Fencing*

Site after site, there were exterior walls, walkways, parking lots, ventilation systems, roofs, and other exterior components that indicated significant deterioration and raised a number of environmental and physical concerns.

Coastal Academy GNETS Center at Liberty, Cedarwood GNETS Center at Statesboro, Flint Area Crisp County Learning Center, and Sand Hills GNETS Center at Thomson, among others, revealed damaged, aging, and harmful physical conditions, including: rusted beams and ventilation units; uneven or broken concrete at student walkways and entrances; overflowing trash; excessive fencing and locks; and unattended growth on building exteriors.  These GNETS Program sites each have nearly 100 students in attendance.  The degree of disrepair evident from these building exteriors is significant.  It is very disturbing to see buildings in a physical state that could harm students.  It is even more disturbing to know that in some cases, general education peers were moved out of these facilities to new buildings and students in the GNETS Program were moved into these unsafe and ill-maintained center-based sites.  This sends a message to students in the GNETS Program and their families that they are deserving of less than their general education peers.



Figure 2.5 Coastal Academy GNETS Center at Liberty
*Exterior Classroom Doors in Active Use, Damaged Walls, Dirty and Damaged Beams*



Figure 2.6 Coastal Academy GNETS Center at Liberty
*Dirty Exterior Walls, Rusted Ventilation Systems, Overgrowth in Gutters and Roof*



Figure 2.7 Cedarwood GNETS Center at Statesboro
*Student Walkway, Rusted and Dirty Exterior Walls, and Overflowing Trashcan*



Figure 2.8 Cedarwood GNETS Center at Statesboro
*Rusted Exterior Door and Old Parking Area*



Figure 2.9 Flint Area GNETS Crisp County Learning Center
*Worn Exterior Structure and Fencing*



Figure 2.10 Sand Hills GNETS Center at Thomson
*Building Exterior with Untreated and Extensive Mildew, Mold, and Lichen*



Figure 2.11 Sand Hills GNETS Center at Thomson
*Damaged Ashpalt, Exterior Building is Rusted, Unappealing, and Institutional*

For students attending GNETS Program school-based sites, they too are often located in parts of the building or on portions of the school grounds that are not as populated, appealing, clean, or well-lit. In this way, the students in the GNETS Program are segregated from their general education peers and offered subpar facilities and fewer educational opportunities than

those afforded to their general education peers despite being located on the same campus.  For instance, at an Oconee GNETS school-based site at Putnam County Middle School, students in the GNETS Program enter in the back of the school near construction, loading docks, and the parking lot.  Students in general education, however, enter at the front entrance of the school.

    J.D. Davis Elementary school, a general education school, is located on one side of the metal gates in Figure 2.12 below.  Woodall GNETS Center is on the other side of the gates, which were open during this site visit.  The entrance for students in the GNETS Program requires walking past the elementary school, then past the trash cans, and into a locked area on the grounds.



Figure 2.12 Woodall Center GNETS at J.D. Davis Elementary
*Gated GNETS Program Entrance Located Near Trash*

    At NorthStar GNETS at East Fannin Elementary School, there is a separate exterior door and separate classroom for students in the GNETS Program.  The GNETS Program classroom, although near the front of the school, is accessed from outside the building in a wing by itself.  This is another example of creating a circumstance where students with behavior-related disabilities have different ways of accessing school-based sites that set them apart from others.



Figure 2.13 NorthStar GNETS at East Fannin Elementary School
*Exterior GNETS Program Classroom Separate From Other Classrooms*

Frequently on site visits, a nearby newly built general education elementary, middle, or high school was visible from the grounds of the GNETS Program facilities.  In those instances, students in the GNETS Program can see newer facilities and larger playgrounds, tracks, or other school amenities that are not available to them.  For example, from the front door of South Metro GNETS at J.B. Henderson Center, students can see a larger, newer school building across the street with soccer fields and signage advertising schoolwide events.  Again, for students in this GNETS Program, there is a sense of "being on the outside looking in" on a typical school experience.  This adds to the stigma already experienced by students with behavior-related disabilities in the GNETS Program.

**Building Interiors**

Although there are some buildings hosting the GNETS Program that have clean, well-kept, and newer interiors, there are far too many that do not.  Far more common, the interior condition of GNETS Program sites, including the supplies and equipment used therein, are also deficient.  The GNETS Program uses buildings and spaces that have dirty and polluted interiors.  Over and over again on site visits, there was evidence of poor ventilation, mold, rodents, cockroaches, fluctuating temperatures (extreme hot and cold), inadequate lighting, and other serious environmental hazards.  It was also common to see dark hallways with excessive dirt or other damage on the floors, ceilings, and walls.  In the picture below from the Horizon Academy GNETS Center at Valdosta, the table is being used as a blockade to keep students in the GNETS Program from entering other parts of the building that are considered unsafe for use.



Figure 2.14 Horizon Academy GNETS Center at Valdosta
*Dirty Walls and Floors, Area Blockade*

The visit to Sand Hills GNETS Center at Thomson revealed active water leaks and stained ceiling tiles from water damage. Additionally, the walls were stained and dirty. Both rooms in the spaces below were in active use by students.

 

Figure 2.15 Sand Hills GNETS Center at Thomson
*Stained Walls, Leaking Ceiling in Classrooms in Active Use*

Below are pictures of hallways, interior doors, lighting, ceilings, and storage cabinets that are in disrepair.

 

Figure 2.16 GNETS Flint Area Crisp County Learning Center
*GNETS Center-Based Entrance and Cafeteria with Old, Soiled Ceilings*

 

Figure 2.17 GNETS Flint Area Crisp County Learning Center
*GNETS Center-Based Entrance with Exposed Wires and Piping Near Evidence of Water Damage; Door Propped with Tool*



Figure 2.18 Cedarwood GNETS Center at Statesboro
*Office with Leaking Ceiling, Tattered Door, and Chipped Walls*



Figure 2.19 Horizon Academy GNETS Center at Valdosta
*Moldy and Dirty Venting in Classroom in Active Use*



Figure 2.20 Coastal Academy GNETS Center at Camden
*Poor Lighting*

Other examples of concerning building interiors include equipment labeled in permanent marker, which shows a lack of respect for the physical environment.  It also highlights that the equipment is for the GNETS Program only, furthering the distinction between the GNETS Program and general education resources and student populations.



Figure 2.21 GNETS Futures Cornelia Center (indicators added)
*Permanent Marker Writing on Lighting Fixtures in Active Rooms and Clearly Labeled as GNETS Program Property*



Figure 2.22 Northwest GNETS at LeRoy Massey Elementary
*GNETS Program Labeled Equipement Including Funds Used to Purchase*

Storage closets and storage cabinets are also concerning at GNETS Program sites. They are generally dirty and unkept. The below pictures from the Cedarwood and Horizon regional

GNETS programs show old, damaged, and locked storage cabinets as well as shelving units. Many GNETS Program sites also have bulletin boards, student desks, teacher desks, counters, and venting systems that are similarly old, damaged, and institutional in appearance.



Figure 2.23 Cedarwood GNETS Center (left) and South Metro GNETS Ash Street Center (right) *Damaged Cabinetry, Sparse Environments*

**Classrooms**

In addition to the concerns regarding general building interiors (e.g., hallways, lighting, ceilings) of many GNETS Program sites, there were many desperate and sad classrooms. Numerous classrooms in the GNETS Program had troubling environmental and physical conditions. Several classrooms were cluttered and disorganized, and had dirty floors, walls, ceilings, and baseboards.



Figure 2.24 Horizon Academy GNETS Center at Valdosta
*Stained, Dirty Carpet Actively in Use During Visits with Hazardous Electrical Cord Placement*



Figure 2.25 Horizon Academy GNETS Center at Valdosta
*Buckled Ceiling Tiles near Power Lines in Classroom in Active Use*

 

Figure 2.26 Cedarwood GNETS Center at Statesboro
*Single Desk with Student Belongings in Room in Active Use*

 

Figure 2.27 Coastal Academy GNETS Center at Glynn
*Severely Stained Carpet, Few Instructional Resources in Classroom in Active Use*



Figure 2.28 GNETS Flint Area Crisp County Learning Center
*Bleak Classroom with Dirty and Damaged Walls*



Figure 2.29 DeKalb-Rockdale GNETS Shadow Rock Center
*Classroom with Dirty Floors and Damaged Cabinets*

Numerous classrooms had trash on the floor and trash cans with open food containers.  At some sites, the amount of trash was excessive because students do not leave the classrooms for breakfast or lunch, so large amounts of food, trash, and related odors remain in the classrooms for the entirety of the day.  In addition, there were classrooms with broken lights as well as windows.  Many classrooms were excessively hot or cold, even within the same building. Other classrooms had restrooms attached to them that were age-inappropriate for the student population in the classroom and not kept clean.  The following photos show disorganized classrooms with chained, locked cabinets and damaged walls.



Figure 2.30 GNETS Horizon Academy at Moultrie
*Disorganized Classroom, Chained Cabinets*



Figure 2.31 Horizon Academy GNETS Center at Valdosta
*Filthy Floor in Classroom in Active Use*

**Housekeeping:** We have an insect and rodent problem. Please make sure that you do not leave any food or open drinks in your room. Trash should be taken out to the big trash can immediately after breakfast. ████s class will be assigned this responsibility daily. Rooms should be swept at least two times a week. I suggest that if you have snacks in your room they should be in a Rubbermaid container. Ask the students to assist you with keeping your rooms clean. Model neatness and organization for your students by keeping your own desk and tables clean and free of too many papers, books, etc.

Figure 2.32 Cedarwood GNETS Center Statesboro
*Staff Handbook Noting an Insect and Rodent Problem*

There were also many classrooms lacking resources and materials, and some classrooms with even little to nothing in the room. The furnishings were sparse and the walls bare as was the case at the Horizon Academy GNETS Center at Valdosta, the Coastal Academy GNETS Center at Glynn, and the Northwest GNETS school-based site at Main Elementary, all pictured below.



Figure 2.33 Horizon Academy GNETS Center at Valdosta
*Classroom Space with Minimal Learning Resources*



Figure 2.34 Coastal Academy GNETS Center at Glynn
*Stained Carpet, Dirty Wall, Isolated Desk, No Instructional Materials*



Figure 2.35 Northwest GNETS at Main Elementary
*Limited Resources and Sparse Classroom in Active Use*

The contrast between classrooms designated for students in the GNETS Program and classrooms designated for general education students was quite stark, especially when in the same building.  For example, a North Metro GNETS at Centennial High School had a general education classroom with 24 students into which one student in the GNETS Program was successfully included for a particular period of the day.  Below is a photo of that classroom with collaborative workspaces, appealing signage, grade-level content, and very high student engagement.



Figure 2.36 North Metro GNETS at Centennial High School
*General Education Classroom where Student in the GNETS Program Attended Class*

Yet, only four minutes down the same hallway was a GNETS Program classroom that had three students.  In that classroom, one student was laying on the floor on the blue mat captured in the below photo.  Another student was walking around distressed (humming and trying to leave the classroom) waiting to go for the day, and the last student was sitting at a desk.  None of the three students in the classroom for the GNETS Program were engaged in any teaching or learning during the observation.  There was no learning content or resources in the classroom.  There was a broom, vacuum, and laundry basket in the classroom.  This observation at Centennial High School is a microcosm of what is experienced across the GNETS Program. The pictures of the classroom below in contrast to general education classrooms found at Centennial High School and across the State indicate with stark clarity the unfair and unequal educational opportunities experienced by nearly all of the thousands of students with disabilities in the GNETS Program—even when they are only steps away from their general education peers.



Figure 2.37 North Metro GNETS at Centennial High School
*Typical GNETS Program Classroom in the Same High School as Figure 2.36*



Figure 2.38 North Metro GNETS at Centennial High School
*Desperate, Sad, Dirty Classroom in Active Use; No Instructional Resources or Therapeutic Resources in the Same High School as Figure 2.36*

Additionally, there are some interior spaces of grave concern within or in close proximity to classrooms.  The isolation room next to classrooms at North Metro GNETS at Oglethorpe had spackling compound on the walls that needed repair after student bodies had evidently hit the

walls repeatedly. Also in the same isolation room, there was a cabinet in which a student had written profanity on the inside.



Figure 2.39 North Metro GNETS at Oglethorpe (indicators added)
*Student Writing Inside Cabinet in Isolation Room, Patched Holes from Students' Isolation*



Figure 2.40 Cedarwood GNETS Center at Statesboro
*Classroom with a Connected Restroom Evidently Used for Student Isolation*

In Figure 2.40 (above), the extensive markings on the wall along with the holes in the concrete where grout has been picked out, the lack of toilet paper on the roll, and the dirty nature of this room suggest that this restroom has been used as a space to isolate students. There is a door for this room with the lock removed, and from my experience, this is evidence that students have been placed in this space for extended periods of time. General education settings do not have restrooms converted into isolation spaces that are located within classrooms. The unfair nature of a classroom with a small room within it masquerading as a restroom that is in reality being used for student isolation is traumatizing, demeaning, and humilating for students.

**Restrooms**

Many of the restrooms at GNETS Program sites were appalling, characterized by broken toilets, stalls in disrepair, missing latches or doors, missing ceiling tiles, broken or damaged flooring, non-functioning sinks, and water leaks. A number of the restrooms lacked toilet paper, paper towels, functioning hand dryers, or personal hygiene items for students who menstruate. Others had visible traces of urine and feces on the floor and walls. Not only do these restroom conditions lack privacy, but they are unsanitary spaces as well. Restrooms that are not kept clean or are in disrepair are breeding grounds for bacteria, germs, and disease. Below are photos from restrooms at a cross-section of GNETS Program facilities.

 

Figure 2.41 Horizon Academy GNETS Center at Valdosta
*Doors in Disrepair; Urine and Toilet Paper on Seat and Floor*



Figure 2.42 Horizon Academy GNETS Center at Valdosta
*Filthy Entrance to Restroom and Dirty Sink with Missing Faucet Handle*



Figure 2.43 Sand Hills GNETS Center at Thomson
*Filthy Restroom, with Urine and Feces In Stalls, Floors, and Toilets*



Figure 2.44 Horizon Academy GNETS Center at Valdosta
*Broken Urinal, Stained Urinal; Dried Feces*



Figure 2.45 GNETS Flint Area Crisp County Learning Center
*Restroom Still in Use Despite Disrepair and Filthy Conditions*



Figure 2.46 GNETS Flint Area Crisp County Learning Center
*Cluttered, Dirty, Messy Restroom*



Figure 2.47 NorthStar GNETS at East Fannin Elementary School (indicators added)
*Lack of Privacy in Restroom; Cluttered*



Figure 2.48 GNETS Flint Area Crisp County Learning Center
*Restroom in Disrepair and With Filthy Conditions*

**Gymnasiums**

    Students in general education settings have a full array of physical education opportunities in schools that prioritize physical health.  During my site visits, there were many general education settings across the State of Georgia with beautiful, large gyms that allowed general education students to experience the physical and mental benefits associated with physical activity as well as develop skills around teamwork.  The State of Georgia even requires that students in grades K-5 receive 90 contact hours of instruction in health and physical education each year, and schools serving grades 6-12 must make available instruction in health and physical education, including a requirement for graduation.[14]  Students with behavior-related disabilities, like their peers in general education, benefit greatly from physical education.  Indeed, exercise is widely known to guard against depression, anxiety, frustration, and anger.  The ability to move and to seek alternative mechanisms for self-regulation through exercise in formalized physical education is a powerfully effective strategy for students who experience behavioral challenges.

    Unfortunately, for many students in the GNETS Program, access to a gymnasium is non-existent.  Accordingly, they have no way to effectively experience physical education.  For

---

[14] Georgia Department of Education, Health and Physical Education Program: https://www.gadoe.org/Curriculum-Instruction-and-Assessment/Curriculum-Instruction/Documents/New%20Curriculum%20Directors/Health-Physical%20Education%20Summary.pdf#:~:text=Each%20school%20containing%20any%20grade%20K-5%20shall%20provide,unit%20of%20credit%20in%20health%20and%20physical%20education.

example, the physical education equipment at Sand Hills GNETS Center is a basketball hoop across a driveway from the facility.



Figure 2.49 Sand Hills GNETS Center at Thomson
*Single Basketball Hoop for the Playground*

In some cases where an actual gymnasium was missing entirely at a GNETS Program site, students used classrooms, storage rooms, or trailers as makeshift gymnasiums. During a site visit to Sand Hills GNETS Center at Thomson, there was a middle school class of students in the GNETS Program jumping rope in a classroom typically used for storage. The room was too small to serve as a gym, had supplies stacked behind partitions and yet students were trying to jump rope in the classroom space. Similarly, the GNETS Future Center at Cumming does not have a gymnasium, and instead utilizes a bare classroom for this purpose.



Figure 2.50 GNETS Future Center at Cumming
*Outdated, Dirty, and Damaged Classroom Used as a Gymnasium*

The gym at the South Metro GNETS Ash Street Center is in a small trailer behind the school. This trailer was carpeted, had stained walls, smelled bad, and had no actual equipment other than some balls and cones.  The gym class in this trailer did not allow for adequate space for students to move or exercise, and the trailer was too hot for physical activity.  Students outside the trailer were also running around without effective supervision in a parking lot that had moving vehicles.



Figure 2.51 South Metro GNETS Ash Street Center
*Small Trailer Used as Gymnasium*



Figure 2.52 Horizon Academy GNETS Center at Valdosta
*Classroom Used as Gymnasium*

While some GNETS Program sites do have gymnasiums, those gymnasiums are generally inferior to the gymnasiums accessed by students in general education schools. For example, Cedarwood GNETS Center at Lyons had a gymnasium, but it was dirty, damaged, and carpeted. It was also unclear whether or how students used this gymnasium. For instance, some activities and sports, such as basketball, are very challenging to play on carpeted surfaces.

 

Figure 2.53 Cedarwood GNETS Center at Lyons
*State of Gym at Lyons*



Figure 2.54 Haven Academy GNETS Center
*Sparse Gym*

The gym at the Rutland GNETS Center had only a single basketball hoop and did not appear to have an active physical education program.  There were no physical education resources or equipment indicating the presence of recent student activity.  No students went to the gym during the site visit.



Figure 2.55 Rutland GNETS Center
*GNETS Program Gym with One Basketball Hoop*

As described above, the benefits offered through physical education are critical for all students; however, for students who may experience behavioral and therapeutic benefits from such physical activity, like those in the GNETS Program, not having a gym or having an inadequate gym is doubly concerning.  Again, as with many other resources in the GNETS Program, the students who need the most structured, effective support actually receive the least.

**Playgrounds and Outdoor Common Spaces**

As with gymnasiums, a number of sites in the GNETS Program serving elementary-aged students do not have playgrounds.  For example, Sand Hills GNETS Center, NorthStar GNETS Center at Jasper, and Coastal Academy at Camden are among those sites without any playgrounds at all.  At some GNETS Program sites there is minimal or little playground equipment.  At other GNETS Program sites, the equipment has missing or worn-out components, has missing hardware, or is broken, rusted, or not secure.  Playground surfaces were also frequently dirty or otherwise poorly maintained.  Below are examples of some of the playgrounds that were dangerous or unusable.  These include the Cedarwood GNETS Center at

Lyons and Coastal Academy GNETS Center in Liberty, both of which house K-5 students and had rusted, broken slides and swings.



Figure 2.56 Cedarwood GNETS Program at Lyons, Coastal Academy GNETS Center at Liberty
*Playgrounds in Disrepair*



Figure 2.57 Coastal Academy GNETS Center at Liberty
*Playground Equipment in Disrepair*



Figure 2.58 Cedarwood GNETS Center at Lyons
*Playground Equipment in Disrepair*

There are some GNETS Program sites, particularly those located in newer facilities, with acceptable playgrounds.  Yet, even though there are playgrounds on the premises (which is the base level expectation of a school enviorment), students in the GNETS Program do not have fair or equal access to even those playgrounds.  Fair and equal acess involves, first, having what typical school environments have (a playground for elementary school students or common recreational area for middle and high schoolers), but it also involves being able to access that playground or common space in the same manner as students without disabilities.  In many instances, students at school-based GNETS Program sites are not even able to access the playgrounds available to their general education peers in the same facility.  There is really no circumstance in which students with behavior-related disabilities could be considered properly served in a theraputic or behaviorally effective environment without regular, consistent planned access to physical movement outside.

**Exceptions in Facilities**

As a base level expectation, students should have access to clean, well-maintained facilities and classrooms.  I consistently observed such spaces in general education facilities I visited, but in the GNETS Program, these types of facilities and classrooms were the exception rather than the rule.  However, there were a small number of classrooms accessed by students in the GNETS Program that showed positive, functioning settings.  Below is a photo of the art classroom at Cornelia Elementary School, one of the only sites where students in the GNETS Program (here, the Futures regional GNETS program) had access to formalized art instruction, and where students participated in a general education art class with their general education peers.

 

Figure 2.59 GNETS Futures at Cornelia Elementary School
*General Education Art Program where Students in the GNETS Program Participate*

There are some GNETS Program sites with physical environments that are clean and appear well-maintained. Yet, even at many of these sites, the students in the GNETS Program still do not receive fair and equal educational opportunities within these facilities in other respects. Students must also receive fair and equal instruction time, educational resources, qualified staffing and educators, grade-level curriculum, and an effective system of learning support and resources, as discussed below.

The Futures GNETS at Black Mills Elementary School (pictured below) is an example of a well-maintained facility. Students at this GNETS Program site accessed the general education halls, cafeteria, and classrooms. This site still raised a number of concerns regarding segregation and inconsistent and confusing access to general education classrooms, yet students in this GNETS Program site had access to a building that was clean and decorated nicely. Students at this site also had access to peers in general education and ate lunch with them.



Figure 2.60 Futures GNETS at Black Hills Elementary School
*Halls that Students in the GNETS Program Access*

**LACK OF FAIR AND EQUAL ACCESS TO TEACHING AND LEARNING**

   Central to the teaching and learning process is purposeful planning time and effective instructional delivery.  Key steps in the process include an initial screening to understand student knowledge, planned instruction based on that initial screening, delivery of instruction using effective instructional materials and resources, and evaluation of how the information was received by the student (i.e., did they learn it?) and the effectiveness of the way in which instruction was given (i.e., was instruction provided in a way that worked?).  This formalized process of teaching is what results in student learning; yet, this was universally lacking across the GNETS Program.  Core elements in the GNETS Program adversely affecting teaching and learning include: (a) grade-inappropriate resources; (b) a functional rather than standards-based curriculum; (c) missing lesson planning, content mapping, and standards-based teaching; (d) lack of learning resources and content; (e) overreliance on online instruction instead of in-person teaching; and (f) inconsistent schedules and routines.

**Grade-Inappropriate Resources**

   Grade-appropriate resources include classroom resources and materials (e.g., books, multi-media, handouts) that are at student age and grade level.  Pervasive in the GNETS Program is content disconnected from student grade level.  At some GNETS Program sites there were videos playing that are intended for very young children despite older students being in the classroom.  For example, at Sand Hills GNETS Program at Tubman Educational Center, there was preschool video (i.e., Peppa Pig) playing in a classroom for older elementary school students.

When there were books in classrooms (and this was not always the case), books often appeared more random than planned or considered for the classroom population.  Central to reading success is having text matched to learning level.  When a student picks up a book, there needs to be a connection to result in actual reading.  When books or resources are too advanced or too far below the learning level of a student, the student disengages.  This can result in long-term lack of interest in academics (e.g., "I hate reading" or "I am not good at reading").

At other GNETS Program sites, teachers provided instruction as well as conversations at grade levels not matched to students (e.g., looking at Clifford books, which are designed for younger students, when students knew how to read).  Some GNETS Program sites had resources in middle school such as blocks and toys that were intended for much younger students rather than effective, age-appropriate and engaging instructional resources.

Most concerning were the classrooms with high school-aged students that had resources for preschool students.  Below are three classrooms at two different high school sites that had materials for preschool students.  Having preschool resources in high school classrooms for students with disabilities reflects the belief structure of low expectations as the norm.  Students with disabilities, even those who need a significant amount of learning support, need access to resources appropriate to their age and grade.  For example, there are entire series of books written for students who have not yet fully mastered reading that have text that is easier to understand yet still matched to grade level (e.g., books about geography or history rather than books about fuzzy animals or colors of blocks).

  

Figure 2.61 North Metro GNETS at Tri-Cities High School and Centennial High School
*Grade-Inappropriate Content Found in High School Classrooms*



Figure 2.62 HAVEN Academy GNETS at Lassiter High School
*Non-Grade Level Content*

**Functional Curriculum Rather Than Standards-Based Learning**

A few decades ago, a "functional curriculum" was a central aspect of teaching students with disabilities. A functional curriculum is a life skills curriculum intended to teach students how to perform basic life skills, like making beds and doing dishes. This approach is now widely considered outdated and stands in direct contrast to standards-based grade-level learning. Standards-based learning is content linked directly to state standards for learning. For example, a third-grade student in general education might have the following state standard in English language arts: "student will ask and answer questions to demonstrate understanding of a text, referring explicitly to the text as the basis for the answer." The related alternate state standard for students with disabilities in third grade might be "student will answer 'who and what' questions to demonstrate understanding of details in a text." There are specific steps to teaching these standards to mastery which in no way allows for informal, random, ad hoc, or performative teaching.

Consistent and appropriately supported access to standards-based grade-level learning is what fair and equal education looks like for all students, including students with disabilities. Standards-based grade-level learning includes focusing on instruction, progress monitoring, and assessment across a number of subjects, including math, English language arts, science, and social studies. The belief that students are developmentally younger than they are so they should have easier tasks to learn has not only been shown to be false but also ineffective academically. Not only does the presentation of age-inappropriate content reduce student engagement, but it also deprives students of the standards-based instruction, modified and

adapted based on their learning, that they need to reap the benefits that their general education peers are afforded.  Learning standards in education offer teachers a metric for student growth and progress toward larger learning goals.  For example, students must learn how to count items before they can learn addition.  The same is true for students with disabilities.  Though students both with and without disabilities may take any multitude of pathways to learn a skill, the skill that must be learned is the same for both groups of students.

At both the Elam Alexander Academy regional GNETS program and the North Metro regional GNETS program, there was widespread use of a functional curriculum.  Instead of learning to read, write, and do mathematics, students in the GNETS Program were cooking pizza and doing laundry.

 

Figure 2.63 Elam Alexander Burke Center GNETS Campus
*Classroom Resources Used for a Functional Curriculum*



Figure 2.64 North Metro GNETS Center at Oglethorpe
*Classroom with Functional Rather than Instructional Resources*

A functional curriculum was also present at the GNETS Futures Cornelia Center. The stove, washer, and dryer in a classroom indicates a class focused not on academic learning or even social-emotional support, but rather learning to perform household chores. Additionally, during a site visit, the proximity of this stove to the desk of a student with significant behavioral needs raised its own concerns.

 

Figure 2.65 GNETS Futures Cornelia Center (indicators added)
*Classroom with Functional Curriculum*

Teaching students who need intensive academic and behavioral support how to do laundry, make beds, or cook pizzas rather than how to read, self-regulate, or practice social skills is a sign of deeply outdated practices in learning for students with disabilities.  The use of a functional curriculum for students with disabilities (whether emotional, behavioral, physical, or intellectual disabilities) lacks efficacy and is not aligned with the content in general education.  Throughout my many years of work in a variety of educational settings, it has been my experience that parents of students with disabilities consistently express the desire for their child to be able to read and write like other students.  Parents want school to be for learning, for their students to join educational field trips and have opportunities for experiential learning activities.  They do not want school to be about folding laundry and making beds.

Another example of inappropriate functional curriculum was at a high school classroom at GNETS Futures Cornelia Center.  There, the teacher set up a pretend mall so students could practice shopping.  Although this sort of activity might be appropriate in early grade-level classrooms, it is not helpful for teaching high school students who instead need intensive reading and mathematics support.

 

Figure 2.66 GNETS Futures Cornelia Center
*Functional Curriculum*

Students in the GNETS Program, like all students with disabilities, should have access to standards-based learning by certified educators who understand and have experience with

students with behavior-related disabilities.  Students with behavior-related disabilities need specially designed instruction related to core state standards linked to general education curriculum at their grade level.  They should receive appropriate accommodations to access that grade-level content and have opportunities to graduate with a high school diploma like their general education peers.

**Missing Lesson Planning, Content Mapping, and Standards-Based Teaching**

In order for educators, para pros, and staff to teach standards-based grade-level content, they must first have knowledge of those standards.  There must be sufficient education and professional learning to understand the complex depth and breadth of content taught in general education settings.  Standards-based education is an accepted practice for all students since the advent of state assessments and alternate assessments.

Although academic core content standards are posted in many classrooms in the GNETS Program, site visit observations consistently revealed that teaching is neither aligned to academic standards, nor to grade-level content.  Additionally, there was no indication that alternate state standards were available or utilized for those needing it.  During some site visits to the GNETS Program, teachers or staff would access unrelated YouTube videos or simply be searching for a video to show while the students (and the visitors) waited.  Typically, they did not connect the videos to instruction or standards.  Further, during site visits, teachers and staff did not refer to lesson plans or look at prepared notes for teaching.  The educators did not reference the standard or the alternate standard they were aiming to accomplish nor they indicate an understanding of formalized steps to achieve understanding of the concepts detailed in the standards.

In order to have effective instruction comparable to that provided to general education students, educators in the GNETS Program must first understand the importance of standards-based instruction.  Traditional educator training involves helping teachers to understand the scope of the content to be taught, to plan lessons in a sequence matched to that content, and then to map out the content for the quarter in which it is taught.  Schools that are clear with their instructional process—including lesson planning, scope and sequencing, and content mapping aligned with state standards—and have certified general and special educators working together are able to meet the full array of student needs, including the needs of those with significant behavior-related disabilities.  During my site visits to the GNETS Program, the instruction I observed revealed a lack of lesson planning associated with general education content, and there was no content mapping that indicated achievement of educational standards or alternative educational standards.

In addition, my observations during site visits and record review showed little indication of grade level teaming with general educators on content or other evidence of standards-based alignment to student IEP goals or objectives.  In many cases, the learning environments I saw

lacked appropriate academic stimulation, effective or current resources, and tools for learning, including the sort of technology commonly used in general education classrooms.

There was a lot of performative teaching, which appeared to have been made up for visitors rather than being part of any planned instructional sequence. Performative teaching is when there is more of a performance than actual teaching. The purpose of this type of teaching leans toward impressing observers rather than providing teaching content. This sort of teaching often is experienced by students as out of context and can happen when visitors arrive in classrooms. Students are quick to point out when staff do this. For example, on site visits, there were statements from teachers or staff reminding students that they had just learned a concept and responses from students making clear the concept had not been introduced. Teachers and staff would also randomly give out tickets or "bucks" to students during site visits, presumably in an attempt to demonstrate a positive and supportive environment, but students' confused or surprised reactions when they were receiving these tickets and "bucks" indicated that the students did not typically receive them. In addition, teachers or staff made little or no reference to lesson plans, source materials, or standards. They would arbitrarily mention the schedule, and they would be embarrassed about being unable to complete work on the board. Teachers or staff would seemingly act with extra excitement that the students appeared unaccustomed to, they would attempt to share success stories with me about their students rather than teaching the class, and there would be dramatic over-prompting, which at times instigated student problem behavior.

During many site visits, teachers and staff would introduce lessons when we walked in the room and stop lessons when we left the room. For example, at the NorthStar GNETS at Fannin County Middle School, a teacher started a lesson after I walked in to observe. I left the classroom to continue the site visit, and when I returned not too much later for the express purpose of checking in on that lesson, the students were no longer on the lesson. Students were instead tossing a ball in the other part of the trailer. This is also an example of the excessive amounts of break times built in that were unnecessary given the general lack of instructional content.

**Lack of Learning Content and Resources**

Students in the GNETS Program also experience deficiencies in learning content and curricular resources. Learning content is the source material an educator uses to build lessons and typically involves the following elements: determining important aspects of a theme to be taught, instructional hooks, discussion questions, experiential learning ideas, contextualized content based on students, instructional guides, books excerpts, docuseries, teacher experiences, and targeted web searches with validated learning content. These elements determine what an educator uses to share knowledge in order to teach. Although lessons may involve in-the-moment adjustments, established learning content is critical and must be clearly

articulated in concert with curricular resources.  Curricular resources are the teaching materials (e.g., books, online content, handouts, experiential resources) students use to support their learning in a given content area (e.g., English language arts, mathematics, science, writing, arts) within the classroom. Curricular resources include academic reference material that is posted on the wall or bulletin boards or general academic reference materials for students to rely on when engaged in learning (e.g., handouts).  Curricular resources should be matched to learning content to produce effective instruction.  There were a number of classrooms in the GNETS Program that had learning content on the walls, but the content was not matched to the grade levels of the students in the classrooms, and in fact, was often for much younger students.  Even during site visits around the time of standardized state assessments when curricular resources were covered up, observations still revealed that posted content often was mismatched for student grade, age, and interest.

In a few classrooms in the GNETS Program, instead of hanging learning content or using a bulletin board, staff wrote on the wall in marker.  In all my time of working in schools, I have never seen educators write in permanent marker on a wall for a learning activity.  There was no such writing on the walls in the general education classrooms within the general education schools that have GNETS Program school-based classrooms on site.  This disregard for the physical appearance of the school is indicative of a poor school climate (discussed below) and a lack of respect for students and the educational environment.  For example, in Figure 2.67, there is a picture of a Word Wall from Horizon Academy's GNETS Center at Valdosta.  Besides the unappealing and uninviting appearance of this Word Wall, most important here, however, is the lack of understanding of what a word wall is, how a word wall is used, and how a word wall can be accessed by students to advance their learning.  Word Walls typically act as a detailed resource for students to experience vocabulary and offer multiple ways to access content.  While the second Word Wall pictured, in Figure 2.68, at Northwest GNETS at Main Elementary, is on a bulletin board, it appears to lack purposeful attention to vocabulary.  During a site visit to Elam Alexander GNETS at Miller Middle School there was an empty Word Wall, as shown In Figure 2.69.



Figure 2.67 Horizon Academy GNETS Center at Valdosta
*Word Wall Written Directly on Wall*



Figure 2.68 Northwest GNETS at Main Elementary
*Word Wall in GNETS Program Classroom*



Figure 2.69 Elam Alexander GNETS at Miller Middle School
*Empty Word Wall*

When used effectively, word walls often look more like the bulletin board pictured below in Figure 2.70.  The distinction between a word wall and a bulletin board is a word wall offers the specific purpose of detailed extension of knowledge around acquisition and understanding of the English language whereas bulletin boards may have varied content.



Figure 2.70 Cedarwood GNETS Center at Lyons
*Bulletin Board with Learning Resources*

**Online Instruction Instead of In-Person Instruction**

Online instruction has emerged as an important resource to aid student learning.  When used effectively along with in-person instruction, students can benefit from online resources.  Indeed, there are a number of computer-based learning platforms that can greatly enhance outcomes for students, including those with disabilities.  The challenge in the GNETS Program is the over-reliance on online content as the primary mode of purported teaching and avenue for learning for students with disabilities.  At multiple regional GNETS programs, online instruction was used because there were no certified personnel to provide instruction.  Online instruction does not allow for appropriate differentiation of instruction or the use of in-person teaching matched to student learning needs.  Further, it does not provide adaptations and modifications based on the students' disability-related learning needs.

General education settings largely use online learning as a supplemental resource; such settings typically do not rely on online learning for primary or core-content delivery.  This is yet another difference between the students in the GNETS Program and students in general education.  When looking at schedules for some students in the GNETS Program, the name of the online learning platform was listed as the teacher of record.  For instance, rather than having an assigned educator to offer instruction in math, the teacher of record was solely the computer.



Figure 2.71 Flint Area GNETS at Sumter County Middle School (indicator added)
*Classroom with Only Computer Log-In for Learning Reference*

In addition to the over-reliance on online instruction, a great number of GNETS Program sites have outdated and old technology, with some in disrepair or nonfunctional altogether. Computers in the GNETS Program are often slow to turn on and slow to access online learning platforms. These delays will cause a number of students, along with their educators, to become agitated and frustrated even before learning is able to begin. There were many occasions during site visits when students experienced these periods of waiting for technology connection. Additionally, if a GNETS Program site did have more current technology like a Chromebook, it was routinely locked up by educators who expressed concerns that students with behavior-related disabilities could damage the devices.

The removal of learning material such as a Chromebook due to purported concerns about behavior related to a student's disability is troubling and based on inappropriate generalizations. During a site visit at Rutland GNETS Center, a student told another student

that Chromebooks had been locked up and that students needed two weeks of good behavior to get them back.

The reliance on computer-based instruction partnered with the subsequent removal of that technology based on a behavior related to disability and/or the lack of ability to get online due to slow or dated technology further restricts learning and engagement for students in the GNETS Program, which only compounds diminished academic growth.

**Schedules**

Schedules in schooling are critical.  They offer routine, predictability, and structure.  Schools cannot operate without effective master scheduling systems.  Master schedules offer the way in which students access needed support.  Schedules and routines are also critical for school functioning, teacher satisfaction, and reduction of student problem behavior.  Additionally, schedules provide assurance that students are accessing necessary content to advance their learning.  Site after site, regional GNETS programs provided examples of schedules with reduced time in instruction, little or no time in general education settings, limited exposure to classrooms outside of the GNETS Program classroom, and limited or no exposure to general education peers.

Consistently across the GNETS Program, the schedules (if they existed at all) did not indicate with accuracy where students were, their specific courses and what educational activities they were engaging in.  Schedules posted on walls or given on site visits were not followed or accurate.  At many sites across the GNETS Program, students were moving around in a random manner without a connection to a schedule, routine, or any discernible purpose.  There were many times on site visits when we would walk down many different hallways searching for a student that was purportedly accessing some general education opportunity only to find the student was not where they were scheduled to be.  For example, students were often found outside or roaming hallways when they were supposed to be in classrooms.  Another example occurred at Futures GNETS at Black Mills Elementary School.  The search for a single student in the GNETS Program who was supposed to be accessing a class in the general education environment took over 30 minutes in this relatively small school.  The student was ultimately found in the GNETS wing and joined the general education classroom late, after instruction had already started.  This type of confusion about student whereabouts happened time and time again during site visits.  Not knowing where students are is unexpected and highly unusual in education environments.

Additionally, the schedules as written do not offer clear opportunities for tiered support academically or behaviorally and often do not allow students to move from classroom to classroom for core content classes like their general education peers.  For example, the below schedules for two students at the Futures GNETS at Dawson County Junior High indicate both students remain in their GNETS Program classroom with the GNETS Program teacher as the

teacher of record for the whole school day, with the exception of one class period for one of the students.

| Student Name | ▮▮▮ | | | |
|---|---|---|---|---|
| Grade | 8th | | | |
| Period | Time | Subject | Teacher name | Room # |
| Check-In | 7:35-7:40 | Homeroom/GNETS | ▮▮▮ | B19 |
| 1st | 7:40-8:24 | Math/GNETS | ▮▮▮ | B19 |
| 2nd | 8:27-9:10 | ELA/GNETS | ▮▮▮ | B19 |
| 3rd | 9:16-10:46 | Weight Training | ▮▮▮ | D05 |
| Lunch | 10:52-12:02 | Lunch | | B19 |
| 4th | 12:05-12:52 | Social Skills | ▮▮▮ | B19 |
| 5th | 12:58-1:43 | Science/GNETS | ▮▮▮ | B19 |
| 6th | 1:45-2:25 | Social Studies/GNETS | ▮▮▮ | B19 |
| Check-Out | 2:25-2:30 | Homeroom/GNETS | ▮▮▮ | B19 |

| 2 | | | | |
|---|---|---|---|---|
| Student Name | ▮▮▮ | | | |
| Grade | 8th | | | |
| Period | Time | Subject | Teacher name | Room # |
| Check-In | 7:35-7:40 | Homeroom/GNETS | ▮▮▮ | B19 |
| 1st | 7:40-8:24 | Math/GNETS | ▮▮▮ | B19 |
| 2nd | 8:27-9:10 | ELA/GNETS | ▮▮▮ | B19 |
| 3rd | 9:16-10:46 | Health/GNETS | ▮▮▮ | B19 |
| Lunch | 10:52-12:02 | Lunch | ▮▮▮ | B19 |
| 4th | 12:05-12:52 | Social Skills | ▮▮▮ | B19 |
| 5th | 12:58-1:43 | Science/GNETS | ▮▮▮ | B19 |
| 6th | 1:45-2:25 | Social Studies/GNETS | ▮▮▮ | B19 |
| Check-Out | 2:25-2:30 | Homeroom/GNETS | ▮▮▮ | B19 |

Figure 2.72 Futures GNETS at Dawson County Jr. High
*Schedule Indicating GNETS Program Teacher for Nearly All Courses*

The below student schedule from Oconee GNETS at Baldwin County High School, which is a school-based site located in a general education high school, shows that all courses for this student are with one teacher for the GNETS Program and in the GNETS Program classroom. All of these student's courses, including culinary arts, are online. Many times, as in the example below, schedules indicate specials, connections or exploratory classes (i.e., P.E.); yet, those often occur in the same classroom designated for the GNETS Program, not in a designated space or with a certified teacher.



Figure 2.73 Oconee GNETS at Baldwin County High School (highlighting in original) *Schedule Reflecting Student in the GNETS Program—in One Classroom with One Teacher— Enrolled in Online Culinary Arts (Despite State-of-the-Art Culinary Program Available at High School, Discussed More Below)*

   Many schedules also reflect significantly reduced instructional time.  The below schedule at Figure 2.74 from the Cedarwood GNETS Center at Statesboro indicates instruction begins at 8:30 a.m. and ends at 11:55 a.m. which, without breaks, allows for approximately 180 instructional minutes (excepting the time it takes to log onto and access content on computers).  Students in general education settings without disabilities receive nearly double that.  Additionally, of that 180 minutes of instruction, 65 minutes is dedicated to online instruction (i.e., iReady).  From 11:55 a.m. to dismissal at 2 p.m., the schedule indicates that students receive zero instruction.  The likely rationale for less time in instruction is that students with behavior-related disabilities cannot handle more, when in fact, they can and should be allowed a full school day.

7:30-8:30: Arrival/Breakfast/Bellringer

8:30-8:50: ELA

8:50-9:30: iReady (reading)

*Brain Break* 5 minutes

9:35-10:00: Science/Social Studies

10:00am-10:30: P.E.

10:30-10:45: Snack/Social Skills

10:50-11:30: Math

11:30-11:55: iReady(Math)

*Brain Break* until 12:30

12:30- 1:15: Lunch

1:15-2:00: Recess

2:00pm: Dismissal

Figure 2.74 Cedarwood GNETS Center at Statesboro
*Reduced Instructional Minutes*

Schedules in the GNETS Program are also not consistently followed due to students arriving late, being released early, or only staying for half the school day.  Further, during site visits, there were extremely high rates of absenteeism.  25% to 50% of students (or more) were not in attendance.  This is not typical as average absentee rates for schools with high-risk students are generally 14% to 20%.

Not having consistent schedules or adherence to those schedules is very difficult for students who have social, emotional, or behavioral needs and leads to increased likelihood of behavior concerns.  Schedules and routines are truly critical for the success of students with behavior-related disabilities and can help to prevent a number of problems.

**LITTLE OR NO ACCESS TO SPECIALS, CONNECTIONS, OR EXPLORATORY CLASSES**

In addition to the inequities discussed above, students in the GNETS Program experience a lack of specials (art, music, P.E.), and electives (drama, health, first aid, government, civics, economics, vocational arts, nutrition, computer skills, home economics, career development, public speaking, and driver's education).  They have less access to instructional and creative spaces like libraries, vocational or technical education classrooms, science labs, music or art rooms, and gymnasiums or exterior spaces used for physical education.

As discussed in Opinion and Finding One and in the facilities discussion appearing earlier in this Opinion and Finding, students in the GNETS Program often lack access to playgrounds and gymnasiums or have access only to playgrounds or gymnasiums in disrepair.  Students in the

GNETS Program experience a similar lack of availability of specials, connections, and exploratory classes (e.g., art, music, physical education, performing arts, science, technology, and career classes).  For example, Baldwin High School is a beautiful new high school that houses an Oconee regional GNETS program school-based site.  For the general education students, this high school offers a number of classes for career and technical education, including culinary and cosmetology programs with professional-level resources.  As pictured below in Figure 2.75, there is a functioning beauty salon and nail salon for students in the general education program to learn how to provide these services and try career paths before graduation.  However, students in the GNETS Program housed at this school are only permitted to take a related course online despite the necessary instructional resources being physically available down the hall.



Figure 2.75 Oconee GNETS at Baldwin High School
*Beauty Salon for General Education Students; Students in the GNETS Program Learn Cosmetology Online*

    The same is true for the culinary program offered at Baldwin High School.  Students in general education are able to use the culinary kitchen, but students in the GNETS Program must take culinary courses online, despite the fact that these course offerings—and the necessary instructional equipment—are in the same facility.  If students in the GNETS Program at this site want to access an exploratory course in these subjects, they cannot do so in the same way as their general education peers.

    Exploratory courses are often where students with behavior-related disabilities find a sense of purpose, interest, and joy.  To be denied the opportunity to experience singing in a choir,

playing an instrument, or using a kiln to make pottery is not only unfair and unequal—it is also upsetting.  Not only are students being denied the opportunity to learn experientially how to do hands-on vocational and technical activities in well-designed classrooms that are available to students in general education, they are also being denied opportunities to find joy through creative and exploratory experiences that can lead to promising future life opportunities.

Similarly, elementary school-aged children in the GNETS Program do not generally have access to music and arts classes like their peers in general education.  Typically, students in elementary school have the opportunity to sample instruments and select one to play for band.  Students in general education settings have the opportunity to sing in a choir and perform for their families.  These options are by and large not made available to students in the GNETS Program, who do not have the chance to perform in band concerts or choir concerts, nor to display their creative art pieces in an art show for their families to come and see.

The norm in the GNETS Program is that students do not have the same opportunities as their general education peers.  If students in the GNETS Program have access to specials, connections, or exploratory courses, these opportunities are largely only with their peers in the GNETS Program, and/or these opportunities are accessed through online coursework.

**BUS RIDES**

Bus rides are part of the educational ecosystem and impact the teaching and learning process of schooling.  Specifically, bus rides impact instruction time, school climate and safety, and student well-being.  It was clear that there is a disproportionately negative impact on students in the GNETS Program across the State in part due to busing.  Busing across the GNETS Program is concerning and confusing at best.

The significant majority of students in the GNETS Program are not going to their home schools or attending schools in their neighborhoods.  Students in the GNETS Program may not even be attending GNETS Program sites closest to their homes and often travel great distances, sometimes even across school districts.  Therefore, bus rides become a larger part of the school day for students in the GNETS Program compared to their general education peers.  Some sites within the GNETS Program even utilize a hub or "bus barn" approach, where students in the GNETS Program ride a bus to one central location, and then the students are redistributed to a different bus before going to school in the morning or going home in the afternoon.  This approach not only lengthens the time students are in transition, but this movement to different buses can also lead to difficulties for students who have social, emotional, or behavioral needs.

Longer bus rides are especially challenging for students with behavior-related disabilities.  First, congregating students with behavior-related disabilities creates a greater likelihood of concerning behaviors and limits opportunities to learn from general education peers.  In addition, bus rides often lack support for students with behavior-related disabilities to effectively de-escalate and self-regulate.  Students placed in the GNETS Program typically have

restrictions on bringing personal items to school.  This leads to long bus rides without access to a phone, books, music, or other personal items that students use to regulate themselves.  Buses also often lack adequate adult supervision other than the bus driver.

Students in the GNETS Program who have longer bus rides also get less time at home before and after school for rest, play, participation in extracurricular activities, or connection with friends and family.  When a student in the GNETS Program has a behavioral or health concern at school, parents are often long distances from their children.  As a result, the children who need the most support are farthest from their families.  If a parent of a student in a general education setting has a concern with busing, there are other transportation options that can be used (e.g., carpools, relative or friend pick up), given the proximity of students to their home schools.  This is generally not the case for students in the GNETS Program.

Lengthy bus rides and complicated busing schedules for students in the GNETS Program contribute to fewer instructional hours for students across the GNETS Program.  General education settings at elementary, middle, and high school levels across the country are generally strict about arrival and departure times due to the importance of instructional minutes for student learning and academic success.  This is reflected in state requirements relating to daily and yearly instructional time.  However, students in the GNETS Program have markedly different arrival and departure times at both GNETS center-based sites and GNETS school-based sites, resulting in reduced instructional time.  In fact, students in the GNETS Program even have remarkably varied arrival and departure times from their peers in attendance at the very same GNETS Program site, which disrupts the flow of schooling.  For example, the GNETS Flint Area Crisp County Learning Center site serves students from four different school districts that span a wide geographic area, and students have staggered start times based on their home school district.  Other GNETS Program sites, like HAVEN Academy GNETS at Skyview, utilize a "rolling departure," which means students leave within a window of time from 2:30 to 4:00 p.m.  Given these differing arrival and departure times, students often arrive and depart mid-lesson and miss content.  During a site visit to the NorthStar GNETS at Fannin County High School, I observed a classroom with varied departure times in which teachers stopped lessons once students started to depart despite significant time left in the classroom for other students.  This is another example of loss of instructional time for students in the GNETS Program.

Students at GNETS Program school-based sites experience additional inequities related to busing.  During bus drop off and pick up, many students in the GNETS Program use different doors than those used by their general education peers to enter and exit the school.  For example, the majority of students at Putnam County Middle School are dropped off at the main entrance of the school, students receiving special education services not through the GNETS Program are dropped off at a second entrance not far from the main entrance, and students in the GNETS Program are dropped off at the farthest location in the back of the school.  In

addition, some GNETS Program school-based sites do not follow the same schedule as those students in the general education setting in the same building. This disparity in arrival and departure times makes it very difficult for students at GNETS Program school-based sites to experience the typical rhythm of the school day or after-school extracurricular activities. For example, during a site visit to the GNETS North Metro Buice Center, departure was set for 1:45 p.m.; however, general education students at the adjacent Northbrook Middle School left at 4:00 p.m. In addition, while arrival and departure times are indicated on websites and posted in schools, my observations indicated these times are consistently not adhered to. In addition to the loss of potential general education instructional time, even if students in the GNETS Program were permitted to access afterschool activities at Northbrook Middle School, they would not be able to do so as their day ends much earlier.

Because of long bus rides and related differing instruction time, students in the GNETS Program also miss out on important time in the hallways and on buses with grade-level general education peers. Students in the GNETS Program may arrive after the start of the school day and leave before the end of the day, enter and exit through different doors, and ride on buses only with other students who have behavior-related disabilities. They also miss out on social opportunities critical to age-appropriate development: the little moments where students develop a crush; laugh with friends; make plans; dream; play games; or exchange texts. These kinds of important moments are difficult for a student to fully and meaningfully experience if they are on multi-age buses used only by students with behavior-related disabilities in their same segregated educational setting.

Of note, Elam Alexander GNETS at Miller Middle School stood out as an exception to repeated patterns of inequitable busing schedules. Students at this GNETS Program site departed at 4:30 p.m.—the same time as their general education peers. This is evidence that the GNETS Program and general education schools can work to align resources and supports, which offers promise for replication.

**POOR SCHOOL CLIMATE AND CULTURE**

School climate is critical to the success of students, particularly those with behavior-related disabilities. School climate is the collective experiences, values, and patterns of behavior that are present in a school environment. It is an amalgamation of all that is within the walls of an educational facility, including: how the buildings, classrooms, walls, and halls look and feel; how educators, staff, and students interact; and how educators, staff, and students feel about being present at school. There is strong evidence in the literature indicating a correlation between poor school climate and problem behavior. A lack of positive school climate and culture is also a driving force in poor school attendance. When students do not feel good about their school climate and culture, they stay home from school. Students will avoid school if it is not a positive or reinforcing environment, and students will stay home from school in order to avoid

stress and negative interactions with difficult teachers or other students.  On the other hand, improved student behavior, teacher retention, attendance rates, and student outcomes are all linked to positive school climate and culture.

Poor school climate and culture is one of the biggest challenges facing the GNETS Program. This is especially alarming for a system which purports to support students with behavior-related disabilities in a therapeutic environment given that positive school climate is an integral part of any effective support system.  School climate is also informed by the surrounding community's perceptions and beliefs about a school or educational program.  Positive school climate cannot be achieved against such a backdrop of exclusion and inequity.  Outlined below are some of the factors that result in a poor school climate and culture in the GNETS Program.

**Police and Security Presence**

One of the factors impacting school climate is the presence of police and security.  At a number of GNETS Program site visits, the police were on site.  Many times police were even parked at the entrance of the site, making their presence visible for students to see each morning when entering the GNETS Program.  This police presence sends a message to students that their disabilities are dangerous or that their placement is punitive.  The use of police in school environments is a concern particularly for students with behavior-related disabilities because police officers typically have little or no training on how to support students with disabilities, particularly those with behavior-related disabilities.  The routine presence of police officers in a school environment can be an indication of a lack of appropriate training for educators on how to effectively redirect and de-escalate students and support students' self-regulation.  Increased police presence in a program touted as providing therapeutic services and supports to students with disabilities is concerning and confusing.

A review of regional GNETS program handbooks showed that it is a common practice that police will be called if a problem behavior emerges or if staff are not allowed to use restraint on a student.  That is, parents must consent to the use of restraint on their child if the child is to be served in the GNETS Program, or else the police will be called for behaviors that often relate to the student's disability.  This practice not only surprised me but caused concern.  Use of restraint and other extreme measures as a mandatory procedural intervention for students in the GNETS Program further indicate the lack of behavioral and therapeutic supports available.

**Troubling Signage**

Signage in schools provides a window into the environment that students experience.  Signs can reflect the values and priorities of a school and serve as reminders to students, educators, and staff about expectations.  Many signs in GNETS Program sites demonstrate an awareness of an important practice; for example, there are frequently signs hanging in hallways and

classrooms to indicate school-wide expectations relating to PBIS (discussed in more detail below).  Yet, there is limited indication of the actual related practices being in place.

   In some cases, signage can be used as a prompt or reminder for students or educators to use a previously learned practice.  For example, a teacher might pause a line of students in the hallway and point at the sign as a reminder that when walking in the hallway, it needs to be a quiet environment.  This is done in a positive way as a kind reminder of expected behavior.  Within the GNETS Program, there were limited indications of signage used as a positive reminder to prompt student behavior.

   Most concerning, though, was signage that was negative, sarcastic, or punitive.  This includes signs that are negatively stated, signs that indicate that students are not bright, and signs that asserted that behavior is a choice.  For example, Figure 2.76 is a sign from the North Metro GNETS Center at Oglethorpe.  This sign is above a single-partition desk and students' names have been put on it.  The sign is negative, disrespectful, and punitive.



Figure 2.76 North Metro GNETS Center at Oglethorpe
*Signage That Is Disrespectful of Students*



Figure 2.77 Coastal Georgia GNETS Comprehensive Academy (indicator added)
*Directions in an Intensive Intervention Room*

Other signage was also problematic.  For example, Figure 2.77 shows a student desk with partitions that faces a wall, so that students who sit there are required to recount the behavior that resulted in them being placed there.  This strategy of recounting a challenging behavior is rarely, if ever, effective in supporting student de-escalation.  It points to a belief structure that students exhibiting a challenging behavior need to be held accountable for their behavior rather than an understanding that the behavior is a function of their disability and typically used as a form of communication.  This misunderstanding of separating choice from behavior linked to a student's disability permeated the GNETS Program.  Figure 2.78 shows a sign in front of a classroom at the Pathways GNETS Center that further exemplifies and reinforces this flawed concept.



Figure 2.78 Pathways GNETS Center
*Posted Sign in Hallway*

**Access to Personal Items**

   School climate and culture are also reflected in the ways in which students are able to access personal items or resources that are important to them.  This can be especially important for students with behavior-related disabilities, who need to have regular, planned, and consistent access to items that help them manage, self-regulate, and calm.  Access to personal items can also help lessen safety concerns for students with behavior-related disabilities in segregated programs, as access to their personal devices may allow for calls to family, particularly for de-escalation purposes.  What is important or useful to support the behavior of an individual student is unique to that student.  For example, one student with a disability may want and need some time on the computer, to listen to music, or to walk around to help self-regulate, while another student may need string or yarn for tactile stimulation.  Another student might need regular access to snacks for blood sugar regulation.  The GNETS Program's consistent practice (reflected in student and parent handbooks) is to uniformly remove access to such personal items.  Those items are placed in bins or locked cabinets and students are not able to access them until the end of the day.

   For example, in the student handbook for Coastal Academy GNETS Center at Liberty, students are expressly prohibited from bringing any items with them to school, which includes school supplies.  If personal items are found on a student at this site, such items will not be returned.  If a student brings a cell phone to school it will be confiscated for 5 days and it will not be returned to the student; rather, a parent will have to come to the school and pick it up.  These are unduly harsh, punitive, and unreasonable policies.  Not only are many students on the buses for long periods of time where a phone, book, or other school supplies are useful, but there are also a number of missing school supplies at GNETS Program sites, which students are prohibited from bringing themselves.

## Bringing Items To School

**Students are not allowed to bring any items with them to school. This includes school supplies, hats, toys, electronics, combs brushes, etc.** We provide all students with the materials they need in the classroom. If your child brings items to school they will be taken and the family service worker/case managers will return them to you when he/she makes a home visit.

## ELECTRONIC DEVICES / CELL PHONES

Students attending Coastal Academy GNETS Program are not permitted to bring electronic communication and listening devices (IPODs, MP3s, gaming devices, etc) to school, **this includes cell phones**. If items are found in student's possession during school hours, the device will be confiscated and kept for a period of 5 days. These items will not be returned to the student. The parent / guardian will be required to come to school to meet with a school administrator and pick up the device.

### BRINGING ITEMS TO SCHOOL

**Students are not allowed to bring any items with them to school.**

This includes school supplies, hats, toys, combs, brushes, cell phones or other electronic devices, etc. We provide all students with the materials they need in the classroom. If your child brings items to school they will be confiscated and returned at the discretion of the school in accordance with school policy.

*EXCEPTION:* Students attending class(es) at their home school are allowed to bring a book bag, but it must be placed in the designated area in the office upon arrival and may be picked up when buses arrive.

Figure 2.79 Coastal Academy GNETS Center at Liberty, Cedarwood GNETS Center at Statesboro (highlighting in the original)
*Pages from Two Different Student Handbooks: Denial of Personal Items*

Additionally, for students who are menstruating or students who have colds or allergies, there were not personal hygiene items readily available, nor were there tissues or other items used for personal hygiene. Oddly, water is also limited within the GNETS Program. Water fountains are broken or not in use at many GNETS Program sites. In addition, many students are not able to carry water bottles or have regular access to water during the day. Denial of water, which is a basic human need, is deeply concerning. Going through the school day, with long bus rides, a lack of engaging content, *and* not being able to have personal hygiene items (e.g., pads, tampons, tissues) or water is inhumane.

**GNETS Program "Specialness" Mentality**

On the site visits, it was not uncommon to hear educators and staff in the GNETS Program making statements like "our students" and "our program," while school district personnel referred to students in the GNETS Program as "those students," or "GNETS students." Further, it was common to see teachers and staff in the GNETS Program referred to as the "GNETS teacher." The qualifying phrasing is revealing regarding the degree to which the GNETS Program is considered outside the general education operations of the school districts and school district facilities. In contrast, teachers in general education settings (including those that teach special education) are simply referred to as "teachers." Labeling students and educators as "GNETS" reinforces a culture that declares that the GNETS Program is special because "our students" have special needs. This is detrimental to students with disabilities who need to view

themselves as capable, skilled, and worthy of attending general education schools with their peers—not as different or other.

Nearly all the GNETS Program sites have separate signage indicating the GNETS Program is distinct from any nearby school districts or general education schools.  There are buildings, walls, wings, halls, equipment, and desks that are labeled in capital letters: GNETS.  There are spaces allocated outside of general education that indicate which classrooms are for the GNETS Program and which are for general education.  When educators or staff assume a mentality of these are our "special" students, and we are their "special" educators, it creates a need-based relationship.  Such relationships perpetuate patterns that are focused on specialness or otherness that is then rationalized as important for a student's education.  It establishes a construct in which students in the GNETS Program falsely begin to believe that due to their behavior-related disability, they require special teachers and special places, and therefore cannot be part of general education.

While both educators and students need to feel a sense of purpose and belonging, a successful school environment is focused on creating a sense of community for *students*, which adults work to cultivate.  This is lacking in the GNETS Program.  Although there are a number of GNETS Program sites where it is clear adults care about the students, there appears to be a greater focus on building adult-to-adult relationships rather than adult-to-student relationships.

**Use of Corporal Punishment**

As referenced above, at some GNETS Program sites, guardians are required to approve of corporal punishment of their child in order for the child to continue to receive educational services in the GNETS Program.  Corporal punishment, or paddling, typically involves the adult hitting various parts of the child's body with a hand, large wood board, paddle, yardstick, or the like to cause both pain and fear in an effort to dissuade the child from engaging in a behavior.

Although the use of corporal punishment in certain circumstances is still legal in the State of Georgia, the GNETS Program's decision to allow corporal punishment to be used on students with behavior-related disabilities is shocking.  The GNETS Program holds itself out as providing behavioral and therapeutic services to students with behavior-related disabilities; however, data indicates that corporal punishment does the exact opposite.  Corporal punishment is known to increase aggression and anti-social behavior as well as promote fear and low self-esteem.  Corporal punishment is also known to negatively impact cognitive functioning and to increase mental health concerns.

## Behavior Detail Report

Name: ▮▮▮▮▮▮▮▮▮    Grade:

| | | | |
|---|---|---|---|
| **Event:** Other - Student Incivility | | **Role:** Offender | **Demerits/Points:** 0 |
| **Injury:** No Injury | | **Injury Description:** | |
| **Medical Service Provided:** No | | | |
| **Participant Details:** | | | |
| **Resolution 1:** | Corporal Punishment | | |
| **Assign Date:** | 10/31/2018 | | |
| **Start Date:** | 10/31/2018 | **Start Time:** | 10:30 AM |
| **End Date:** | 10/31/2018 | **End Time:** | 10:45 AM |
| **Behavior Admin Staff Name:** ▮▮▮▮▮ | | | |

**Resolution Details:** ▮▮▮▮▮ spoke with ▮▮▮▮ s grandmother, and she gave permission for ▮▮▮ to be paddled. ▮▮▮ witnessed.

Figure 2.80 Northwest GNETS Center
*Incident Report Parent Accepting Request from Center to Paddle Student for Incivility*

| | |
|---|---|
| **Date:** 01/21/2009    **Time:** 12:00 AM | |
| **Submitted By:** , | |
| **Alignment:** Discipline | **Damages:** |
| **Location:** | **Location Description:** |
| **Context:** School hours | **Context Description:** |

**Incident Details:** Today, ▮▮▮▮ s father demanded that he not be paddled (NO corporal punishment). His father was informed that ▮▮▮▮ would be given OSS instead and that he would have to pick him up immediately.

| | | |
|---|---|---|
| **Event:** DO NOT PADDLE | **Role:** Offender | **Demerits/Points:** 0 |
| **Injury:** | **Injury Description:** | |
| **Medical Service Provided:** No | | |

Figure 2.81 Northwest GNETS Center
*Parent Opted Out of Corporal Punishment and Student Given Out-of-School Suspension as Result*



Figure 2.82 NorthStar GNETS Program
*Student was Given a Spanking then Kept in Office for Remainder of Day as Punishment for Behavior Related to Disability*

The frequency of use of corporal punishment in the GNETS Program is unclear.  What is clear is that any form of corporal punishment used in the GNETS Program demonstrates a lack of understanding of effective behavioral and therapeutic practices for students with behavior-related disabilities.  Among many negative impacts, it also contributes to poor school climate.

**LACK OF BEHAVIORAL OR THERAPEUTIC SUPPORT**

Through the observations, evaluation, and review process that I have undertaken over the last three years, it has become clear that despite its name, the GNETS Program does not provide sufficient educational or therapeutic services consistent with the evidence (past or current) in the field of education for students with behavior-related disabilities.  This statement is not made lightly.  Administrators, teachers, and staff in the GNETS Program, like all educators, do not enter and dedicate careers to education to intentionally cause harm or create environments where students do not feel welcome.  Yet because of the institutional nature of segregated programs like the GNETS Program, that is precisely the kind of environment that is in operation across the State.

In the GNETS Program, there is a lack of therapeutic staff implementing effective strategies; a lack of social, emotional, and behavioral support; a lack of PBIS implementation; a lack of, or ineffective, sensory resources or rooms; ineffective interaction patterns; a lack of understanding that behavior is a form of communication; a lack of additional effective and behavioral therapeutic supports; a lack of understanding of intensive interventions; and use of ad hoc interventions that are not evidenced-based.  There is also a lack of other basic therapeutic supports and a lack of understanding the importance of individualized

interventions for effective behavioral prevention and response. These realities contribute to a feeling of hopelessness in the GNETS Program that is hard to witness and even harder for students and their families to experience.

**Lack of Certified Behavioral and Therapeutic Staff and Resources**

The GNETS Program operates with insufficient and inconsistent access to, and support from, highly-trained specialists including psychologists, licensed clinical social workers, therapists, counselors, and behavior specialists. This is despite the GNETS Program's assertion that it supports students with the most significant emotional and behavioral needs, which requires consistent and repeated access to such specialists. At some GNETS Program sites there were very large staff-to-student ratios, yet often most of those staff are para pros, who have the least professional learning.

Across the entirety of the GNETS Program, records showed that there were only 125 clinical support personnel for the 2021-22 school year supporting over 3,000 students with behavior-related disabilities in the Program. That is a ratio of approximately one clinical support person per 24 students. In a program that offers effective intensive behavioral and therapeutic support, the number of clinical support personnel should be significantly higher. For the 2021-22 school year, the GNETS Program had less than a total of 16 clinically-trained therapists, psychiatrists, and psychologists, statewide. This amounts to one trained clinical professional for every 187 students. Not only is this unreasonable, but it also makes it impossible to provide effective supports to students in the GNETS Program. There are a number supports and services offered as a part of general education that are commonplace, and students in the GNETS Program are not even able to access those. For example, general education environments offer guidance counselors, clinically trained school social workers, school counselors and counseling groups, mental health programs and resources, and student groups that connect for well-being.

During site visits to some GNETS Program sites, there were counselors or therapists that would come to meet with students, yet that was uncommon. Evaluation of the GNETS Program, especially through site visits, indicates that the lack of involvement of clinically-trained personnel is resulting in a failure to deliver even the most basic of behavioral and therapeutic services to students. The low levels of staffing of psychologists, therapists, counselors, and music and art therapists leads to deficiencies in, and even an absence of, much of the needed services for students within the Program.

Evidence of a comprehensive supportive tiered system that includes academic, behavioral, and social-emotional learning would be found in posted schedules, clear routines, and student movement in and out of support as needed. This formalized support, which would be provided by highly-trained educators and expected in a program that claims to support students with behavioral needs, was not evident in the GNETS Program. There were teachers who offered

praise and reinforcement to students (e.g., "proud of you buddy" or "you get [some] points for raising your hand"), but there were so many more that had a negative tenor (e.g., "mind your own business" or "get busy"), and still others who used sarcasm, which is punitive language disguised as humor (e.g., "about time you got that one right").

Like with academic content, teachers and support personnel need to have professional learning opportunities to gain a deep understanding of the ways in which concerning behavior can be minimized and to learn which therapeutic resources and supports most effectively engage with the student population they are teaching.  For example, the use of timely, clear, and consistent data for monitoring of behavioral and therapeutic progress at the individual student level and at each school or Program site, is one such necessary resource.  The GNETS Program produces a lot of data, yet, in many circumstances, the Program lacked consistent tracking of individual behavioral interventions, there was missing data, and there was a failure to consistently track punitive or restrictive actions.

In addition to clinically-trained personnel and proper data use and analysis, effective systems of behavioral and therapeutic support include a planned comprehensive set of resources established for use within a tiered system.  This set of resources should amount to a full array of evidenced-based content and resources solely for the purpose of providing effective social-emotional learning, response to trauma, positive behavioral support, mental health, and well-being.  Although within the GNETS Program there was signage and brief and sporadic mentions of these sorts of resources, it was clear teachers and staff had not been given sufficient training to implement these practices at all, much less with fidelity.  For example, at a number of GNETS Program sites, particularly during classroom observation, there were very low expectations of student output and extreme over-prompting by educators.  Rather than having effective levels of instruction with high-interest materials and content, the teachers and staff chose to reduce expectations in order to reduce instances of problem behavior.

Additionally, in some classes there were unreasonably high numbers of para pros with fewer students.  In some classes there was one or two students with two or more para pros continually prompting the student(s).  This inconsistent attempt at addressing student behavior relies on the personal experiences of para pros rather than clinically trained professionals in the GNETS Program.  Low levels of instruction, reduced time on task, and classroom wide breaks appeared to be used as strategies to minimize behavior rather than the provision of intensive, effective instruction and support.

One representative example was at Elam Alexander Burke Center Campus.  There was a PBIS reinforcement room, but it was not accessed during the time of either of the two site visits to this site, nor did it have the appearance of current or active use.  The room was not stocked with reinforcers, it did not have a schedule for use, there was not discussion of its use with students, and it remained empty for the duration of both site visits.  Also at this site, there was

a student in the corner of a classroom disengaged, who, when prompted, scribbled on a paper and then went back to hiding.  In this situation, it would have appropriate to visit the PBIS reinforcement room, or to see a counselor, therapist, BCBA, teacher, administrator, social worker, or para pro work directly with this student to help them process their emotions and engage in the task at hand.  Additionally, at GNETS Coastal Georgia Comprehensive Academy Center at Cynthia Street, spaces that were designated for therapy were previously used for seclusion.  These rooms showed signs of active use, including spackling compound on the walls. The notion that students in the GNETS Program would receive "therapy" in such a room, devoid of any warmth or comfort, is deeply concerning.



Figure 2.83 GNETS Coastal Georgia Comprehensive Academy Center at Savannah (indicators added)
*Former Seclusion Rooms Designated for Use as Therapy Rooms*

There were so many students across the Program that were left unattended, without attempts to engage, process emotions, or work through what might be impacting the students. Students with behavior-related disabilities can have externalizing behaviors (i.e., behaviors that are easy to see, like stomping around the room, speaking very loudly, or jumping).  There are also students with behavior-related disabilities that have internalizing behaviors (i.e., behaviors that are not easy to see, like withdrawal, silence, internal physical manifestations of unrest – stomach aches, headaches linked to anxiety, etc.).  There was the inclination on the part of teachers and staff to not interact with students who had internalizing behaviors.  On a number of occasions, if a student was asleep or hiding or in the back of the room under a blanket, they would be left unprompted and without engagement (clinical or otherwise) or other supports to process.  During site visits, when students exhibited externalizing behaviors, teachers and staff attempted to respond to that behavior, often in extreme or ineffective ways resulting in escalation of those behaviors.

The lack of clinical therapeutic staff, lack of well-trained teachers and staff, the failure to use data in a manner to improve Program quality, ineffective behavioral planning for students, and the failure to use an effective array of evidenced-based behavioral and therapeutic resources only further exacerbate the problem, found all across the GNETS Program, of students not being able to exit the GNETS Program and return to their home schools. Students in the GNETS Program in many cases are there for years, many for the duration of their schooling. On site visits, when regional GNETS program administrators were asked about how students exit the GNETS Program, the typical response was that students needed to earn their way out. In other words, students have to be good (e.g., have no behaviors, meet varying and arbitrary expectations) in order to go back to their home school. This sets up a situation in which students are placed in a Program that is failing to provide effective support, and then must meet criteria to exit that requires a change in behavior that stems from their disabilities. For example, at Northwest GNETS at Main Elementary, administration indicated that students needed to earn their way out of the GNETS Program into district-run special education classrooms. Administrators at various regional GNETS programs would report that the IEP team was responsible for deciding when students could return to their home school, yet it was stated time and again that students had to earn their way back.

Furthermore, it was routinely stated on site visits that certain students in the GNETS Program were at home—receiving home-based services or virtual services—or were on reduced schedules. Students are also expelled or denied any educational services or are provided reduced instructional hours due to behaviors associated with their disability. This denies the students with behavior-related disabilities access to general education, special education, and related services through the GNETS Program. Central to the success of students with behavior-related disabilities is exposure to behavioral and therapeutic support—if the students are not reporting to school because they have been suspended or are on home bound instruction, then those students are getting even less than those who are in attendance in the GNETS Program.

Students with disabilities should receive regular and intensive behavior supports from analysts and other highly trained and specialized personnel, have detailed schedules and routines, and have effective and readily available preventative behavioral supports and resources. The alarming lack of these supports in a program designed to deliver them is confounding.

**Lack of Social, Emotional, and Behavioral Support**

Effective behavioral or therapeutic programs must provide a comprehensive menu or portfolio of supports and services. The National Center on Positive Behavioral Interventions and Support offers a framework detailing how to both support and respond to students' social, emotional, and behavioral needs with evidence-based practices.



Figure 2.84 Supporting and Responding to Student's Social, Emotional, and Behavioral (SEB) Needs: Evidence-Based Practices for Educators (Version 2). Center on PBIS, University of Oregon. www.pbis.org. (2022).

These critical or key elements help establish a system of effective support.  The steps to support and respond to student social, emotional, and behavioral needs include: (a) positive teaching and learning environments; (b) active promotion of social, emotional, and behavioral growth; (c) fidelity, monitoring, and data use; and (d) student outcome monitoring and support through tiered systems.  These are the base-level fundamental elements of a school environment designed to effectively support students with behavior-related disabilities.

The GNETS Program was intended to provide students with behavior-related disabilities an educational experience that was specifically designed to support their behavior through strategies and therapeutic services.  Yet, for students with behavior-related disabilities to be successful, they need (as suggested above) proactive and positive behavioral strategies, social-emotional learning, restorative practices, trauma-informed care, measured mental health support, multi-tiered systems of support inclusive of positive behavioral interventions, and support to include functional behavioral assessments, behavior intervention plans, and individualized crisis intervention plans.  Although there are references on walls in GNETS Program sites and within certain GNETS Program written materials to the strategies and supports listed above, I observed very little if any evidence within the GNETS Program of fidelity of implementation or consistent use of therapeutic supports or services to benefit students.

**Lack of Positive Behavioral Interventions and Support (PBIS) Implementation**

The GNETS Program did not show evidence of fidelity of implementation or consistent implementation of positive behavioral interventions and supports (PBIS). PBIS helps schools to create positive learning environments through school-wide expectations, check in – check out systems, social-emotional learning groups, and individualized interventions rather than punitive learning environments. It relies heavily on consistent and accurate implementation for success.

PBIS in the GNETS Program consisted largely of excessive and inappropriate use of reward "bucks," and it seemed focused more on making a show of PBIS rather than actual student reinforcement. Classroom observations repeatedly revealed that there was little teaching of school-wide expectations (i.e., Tier One, or universal support), a lack of appropriate use of PBIS systems of reinforcement, and a lack of secondary level PBIS (i.e., Tier Two). There was also a lack of evidence regarding any effective use of intensive individualized (i.e., Tier Three) positive behavioral intervention and support. This is in direct contrast to reports from administrators referencing successful implementation and widespread use of PBIS at regional GNETS program sites. In fact, it became clear that, by and large, many GNETS Program staff did not know how or were not given the tools to implement PBIS with fidelity. A foundational core practice for success of students with behavior-related disabilities was limited or non-existent within the GNETS Program.

**Lack of or Ineffective Sensory Resources and Rooms**

There were other lacking or missing practices that would be beneficial for students who have behavioral needs. Specifically, many GNETS Program sites lacked or had deficient sensory experiences, resources, tools, or rooms to serve as a space to calm. Sensory rooms are designed to offer students a place to self-regulate and calm with a variety of tactile, auditory, and sensory experiences. However, the sensory rooms observed were not used as such. For example, at the Oak Tree GNETS Center at Sherwood Acres Elementary School, the sensory room was an empty room (i.e., completely empty except a single chair with discipline forms on a clipboard on it). A classroom in the South Metro GNETS at J.B. Henderson Center had a "Calm Corner" (pictured at Figure 2.85) that is intended to serve as a therapeutic space to help students in the GNETS Program de-stress, breathe, and regroup. Instead, there is an entrance doormat, dirty floors, walls with old tape, carpet squares strewn about, and complex signage lacking therapeutic benefit. At North Metro GNETS at Hamilton E. Holmes Elementary School there was a room intended for use as a sensory room (pictured at Figure 2.86), but it also lacked the necessary resources. Similarly, at Sand Hill GNETS Center at Thomson, there was a corner of the classroom designated for cooling down (pictured at Figure 2.90), but it lacked any resources whatsoever.



Figure 2.85 South Metro GNETS at J.B. Henderson Center
*A Calm Down Corner Lacking Therapeutic Resources*



Figure 2.86 North Metro GNETS at Hamilton E. Holmes Elementary School
*Lack of Therapeutic, Behavioral, Social Resources, Old Glue on the Wall*

As mentioned in Opinion and Finding One, there were a number of sensory rooms across the State.  While some were physically appealing, they were not used or not consistently used.  For example, at North Metro GNETS at Haynes Bridge Middle School, for the entire Spring 2022 semester, the sensory room was used by only four students over four days despite the fact that the GNETS Program is intended to serve students that could benefit from regular use of such resources.



Figure 2.87 North Metro GNETS at Haynes Bridge Middle School
*Sensory Room Sign In*

**Ineffective Interaction Patterns**

There are strategies applied within the GNETS Program that increase problematic behavior rather than decrease it, such as coercive interactions that lead to an escalating sequence of problem behavior.  For example, there are supportive or inflammatory ways to respond to a student who says: "I need a break."  An educator's appropriate response may be: "Yes, you've been working hard; if you feel like you can, finish that sentence and then yes, go ahead and take a break."  An educator's coercive or inflammatory response may be: "You already had your break.  You need to learn that you cannot take breaks all the time."  Although the latter statement may be true, how such messages are conveyed to students must be carefully considered, particularly for those with behavior-related disabilities.  These inflammatory kinds of interactions are pervasive in the GNETS Program and lead to higher rates of problem behavior.  These interactions do not lend themselves to a therapeutic or supportive environment.  There is a common misperception that 'getting tough,' 'keeping it real,' or 'life is not fair' approaches will help educators teach students with behavior-related disabilities to

understand life's realities. However, the use of such harsh approaches is detrimental to the learning, growth, and well-being of students—particularly for students with behavior-related disabilities. Further, this approach is in direct opposition to what is expected in a therapeutic environment. When strategies intended to be therapeutic or to support behavior are ineffective or harmful—based on partial implementation, inconsistency, lack of training, or use without evidence of efficacy—research and evidence show that they increase concerning behavior. When behavior concerns increase, there is a greater likelihood of the use of restraint or removal of the student from the classroom, which could result in learning loss and physical harm.

**Lack of Understanding that Behavior Is Communication**

As referenced in Section V above, for students with behavior-related disabilities, there are multiple ways in which they express themselves. Some expressions may seem unusual, like rocking, staring off, rubbing surfaces, humming, crying, tapping, facial expressions, head-banging, pointing, moaning, walking, and jumping. While it may be difficult for others to understand what students are communicating with their behaviors, this is the work of educators, particularly those trained to support students with behavior-related disabilities. Understanding communication as a function of behavior is in large part about relationships. Although there are many teachers and staff in the GNETS Program with long-term relationships with students, there are a significant number of students who are not being "heard."

This is why functional behavioral assessments, discussed more below, are key to understanding the communication of students exhibiting these unique or complex behaviors and are typically one of the first strategies implemented in an effective system of support for students with behavior-related disabilities. During a functional behavioral assessment, the function or reason why a behavior is occurring is identified, as well as what supports might be needed based on that function. Behavior analysts can be very helpful in a classroom setting to know what students are attempting to communicate by their behavior. Although there were a few occasions where behavioral analysts were on site during my visits, there was no evidence of that information being shared with teachers and staff in meaningful ways.

**Lack of Effective Student Communication Systems**

Students, including those with behavior-related disabilities, may require augmentative or alternative communication to effectively communicate in the way that many students do using their speech. Alternative and augmentative communication are all the ways in which students communicate in addition to talking, and can also include facial expressions, gestures, sign language, graphic symbols, tactile symbols like a 3-D printed item, photographs, devices, or electronic applications. Importantly, within education, particularly special education,

formalized communication is essential for student success and, in most cases, is a critical first step in understanding student needs.

Students who take an alternative assessment due to intellectual disabilities, students with Autism, and students with significant behaviors that struggle to speak or are unable to use traditional spoken word can all benefit immensely from alternative and augmentative communication. Given the importance of understanding student behavior as communication, augmentative or alternative aids can offer significant pathways for student expression, learning and output.



Figure 2.88 Oconee GNETS at ███████████████
*Ineffective Attempt at Facilitating Communication*

Of concern across the GNETS Program is the lack of formalized strategies to facilitate communication including augmentative and alternative communication aids or devices. For example, at Oconee GNETS at ███████████, a student with Autism in a GNETS Program classroom did not use words to speak. The only way this student could express his needs was through movement or pointing. This is a student who would benefit greatly from a supplemented system of communication. Instead, this student had six pictures and post-its reflecting yes and no taped to the wall beside him, as pictured above in Figure 2.88. Although this was clearly an attempt to facilitate communication, this demonstrates a significant gap in teacher and staff understanding of the importance of utilizing communication and related formalized systems of support to learn and prevent problematic behavior. This student would not be able to communicate regarding his needs unless he was directly in front of the taped

items on the wall in this specific room.  Furthermore, this student does not have access to age-appropriate photos or images.

**Lack of Understanding of Intensive Intervention**

Within an effective tiered system of support, all students should receive core instruction in academics, as well as support for social, emotional, behavioral, and mental health and well-being.  When core instruction is not sufficient or if students need more, additional instruction is provided.  When core instruction and additional instruction is provided and is not sufficient to meet students' needs, then formalized, scheduled, and planned intensified interventions, either subsequently and/or concurrently, must be provided.  This level of support is about intensifying effective strategies and interventions available within the core instruction and secondary instruction.  When primary and secondary instruction are insufficient to meet a student need, the application and implementation of an intensified set of social, emotional, behavioral, and curricular resources are utilized, again reinforcing the notion that intensified supports are about more effective evidenced-based practices being applied in better ways rather than punishment or removal of a student to a separate place.  Intensive intervention is the application of support within the classroom or learning space to effectively support a student.  It is preventative and not reactive.  It is also planned.  Students with behavior-related disabilities often have recurring patterns of behavior that allow for educators to know what might occur and allow them to establish effective supports and strategies to prevent concerning behavior.

Unfortunately, the GNETS Program is a reactive program in the fashion of some forms of alternative education or juvenile justice programs.  In the GNETS Program, student behavior is often punished and there are restrictive measures in place; accordingly, the GNETS Program typically uses fear to deter student behavior.  Educational settings should be different for all students, including for those students in the GNETS Program.  Educators can and should provide intensive intervention strategies in a proactive, preventative way.  This is largely misunderstood within the GNETS Program.

When utilized properly and in line with evidence-based practices, intensive interventions are teaching and learning strategies that are part of a tiered system of education that allows for those who have the most needs to get the necessary support for academic, social, and behavioral student growth.  Intensive intervention is not a place or a consequence that occurs as punishment for unwanted behavior in schools.  However, in the GNETS Program, the concept of Intensive Intervention or "I.I." often refers to a particular place where students must go as a form of punishment.  Across the GNETS Program, there are many isolation rooms or spaces labeled "Intensive Intervention" where students are sent for de-escalation or as a punishment for violations of school rules.  For example, the sign shown in Figure 2.89 hanging at Elam Alexander GNETS Center at Southwest High School identifies intensive intervention as punishment for students that engage in behaviors considered to be in violation of the code of

conduct.  At the Rutland GNETS Center, there were numerous Intensive Intervention rooms, labeled as such, on multiple floors of the building.  These were empty, dirty rooms that contained small isolation rooms with the doors removed.  On the site visit, we observed staff taking two students unwillingly into separate isolation rooms.  The students were forced to remain inside the rooms until determined compliant.



Figure 2.89 Elam Alexander GNETS Adolescent Services at Southwest High School
*Posted Note About Violations Resulting in "Intensive Intervention"*

Beyond the lack of understanding of intensive interventions is the pervasive and persistent idea that intensive intervention is something you do *after* a behavior occurs.  However, intensive intervention is first about how to prevent and effectively support and understand behavior through behavioral strategies and effective academic, social, emotional, and mental health supports in a tiered system.

In addition to intensive interventions applied preventatively within a tiered system, it is important to understand the role of functional behavioral assessments, behavior intervention plans, and embedded individualized crisis intervention planning.  When implemented properly, a school might offer a full menu of behavioral and therapeutic supports for all students.  Those students who have additional needs would receive that formalized support and then students who need even more would receive further intensified supports.  Lastly, any program

supporting students with significant behavior-related disabilities must have a program- wide crisis intervention program.  The GNETS Program uses a statewide crisis prevention program (Mindset Safety Management).  Mindset Safety Management provides crisis intervention strategies to support students who have behavior concerns that can escalate into a harm or danger.  The concern within the GNETS Program is that Mindset is used as *the* intervention. This is instead of all the interventions that are key to student behavioral success (e.g., core preventative strategies, additional preventative strategies, intensified prevention strategies, *and* functional behavior assessment, behavior intervention plans *and* individualized crisis intervention plans).  The GNETS Program uses Mindset as a blanket intervention for all students instead of the full array of preventative support.

Though I reviewed many GNETS Program files containing student IEPs and behavior intervention plans, they did not include individualized crisis intervention planning.  And although at some GNETS Program site classrooms there were IEPs or behavior intervention plans hanging on the walls (which is unusual as they contain private information about students), there were only a few times I could see that staff had been trained on a specific protocol for student behavior response.  There were strategies that may have been partially implemented, or an effort made, but at the wrong time or with the wrong student. Consistently, there were concerns about how teachers and staff were responding to student problem behavior.  To be clear, I am not concerned with the behaviors themselves, as what I observed was consistent with students who have behavior-related disabilities.  Rather, I am concerned that there was a lack of understanding of the myriad tools, resources, and support available to help students.

For example, at the North Metro GNETS school-based site at ███████████████, there was a ██████████ student in the GNETS Program classroom who had repetitive self-injurious behavior of head banging.  Head banging is exactly as it sounds: a student will hit their head on hard surfaces repeatedly for stimulation or out of frustration.  This is a common behavior for children who have sensory needs or chronic inner ear issues.  There are countless articles published in the field of behavioral sciences on how to support students with repetitive or self- injurious behaviors.  Those articles include the use of functional behavioral assessment, behavior intervention plans, intensive individualized crisis intervention plans, and effective use of positive behavioral support.  This particular student was in a chair placed up against the wall of this classroom, and the staff had glued a mat to the wall so that the student could hit her head on a mat instead of concrete.  Rather than implement proper intensive interventions to prevent, re-direct, or otherwise engage this student, they allowed her to hit her head over and over again.  This is an example of an ill-conceived strategy regarding behavior in a program established ostensibly for intensive behavioral and therapeutic support.  This student on two different occasions, lasting approximately ten minutes each, hit her head over 70 times with no staff intervention.  There were no adults taking steps to prevent this child from repeatedly

hitting her head on the wall.  I returned to this classroom on several occasions to check on the student and at no time did this student move from the chair or stop banging her head.  One staff person left the room and brought back lunch for the student; the student did not have the opportunity leave the room or her chair.  She was interested in other things in the classroom as evidenced by her eye gaze and facial expression, yet there was no attempt to do anything other than let her continually injure herself.

In addition to a lack of understanding of intensive interventions, there is a universal absence of trauma-informed practices, restorative practices, or effective behavioral practices, despite teacher and staff reporting otherwise.  When asked about these practices, administrators, teachers, and staff struggled to identify or describe the practice, how it might be implemented or when it should be used.  Restorative practices offer students and educators the opportunity to positively address past concerns or conflicts in ways that are healing and affirming.  Trauma-informed practices create learning environments that are safe, trusting, and minimize triggering events and repeated occurrences of past traumatic events.  Additionally, there are formalized evidence-based social skills and instructional support (e.g., mentors, peer support groups, check in check out, mindfulness, among others) that could be implemented.

Administrators, teachers, and staff in the GNETS Program do not have a sufficient understanding of these practices.  This is related to the lack of professional learning for staff in the GNETS Program.  At times, there were attempts to implement some of these practices yet not effectively.  For example, in one high school class at Sand Hills regional GNETS program, the teacher announced she was going to do a lesson on restorative practices.  The GNETS Program teacher was trying to get a student to facilitate this activity.  The student did not know what the teacher was talking about, nor did he want to do what she was asking.  As the lead teacher began the lesson, she looked around the room and could not find any resources to support an impromptu lesson on a restorative circle.  When left with little besides a sign on the wall, she then started the activity by calling on a student and reminding him of his negative behavior the previous Wednesday.  The student stated he did not want to discuss this incident.  This teacher was calling a process a restorative practice that was in fact not restorative; instead, it directly led to a triggering event from the earlier incident with that student.  It was clear that the teacher was on a path to instigate a problem situation for this student and that the teacher was not familiar with effectively implementing anything restorative.  The teacher was talking loudly about the student's behavioral issues in front of strangers and having other students chime in.  This was not only concerning, but also an indication of the lack of training and understanding of therapeutic and restorative work.

**Use of Ad Hoc Interventions That Are Not Evidence-Based**

At a number of GNETS Program sites, administrators would describe practices that were developed in-house for students.  Specifically, at the Coastal Academy GNETS Center at

Camden, the administrator had set up stations used for students to self-regulate.  The explanation of the ways in which this room could be used was disjointed, unusual, and, at times, incomprehensible.  Although these attempts to develop ad hoc interventions are well-intentioned, there are already a number of well-established evidenced-based interventions rooted in years of behavioral science.  Students would be better served if GNETS Program staff focused on effective system-wide implementation of strategies known to improve behaviors rather than made-up or ad hoc interventions.

GNETS Program teachers and staff have not been given the tools, resources, or training needed to understand and implement effective interventions for students with significant needs, the very population intended to be served in the GNETS Program.  This fundamental lack of training, tools, and resources is precisely what leads to incidents like the one discussed above regarding staff failure to intervene with self-injurious student behavior.

In sum, the lack of certified behavioral and therapeutic staff and resources, lack of PBIS implementation, lack and ineffective use of sensory resources and rooms, ineffective interaction patterns between staff and students, and the lack of understanding that behavior is a form of communication are all extremely concerning conditions indicated within the GNETS Program.  Additionally, the misuse of intensive intervention and the use of ad hoc interventions that are not evidence-based leads to the use of harmfully restrictive punitive educational experiences for students in the GNETS Program.  As mentioned in Opinion and Finding One, the lack of understanding of how to provide, and the subsequent failure to provide, effective behavioral and therapeutic supports results in use of isolation of students.  This directly compounds the experiences of segregation for students.  Isolation rooms, like the one pictured below, are used repeatedly as a mechanism to change behavior and are ineffective, punitive, and harmful.

 

Figure 2.90 Sand Hills GNETS Center at Thomson
*Ineffective Therapeutic Space Lacking in Resources*

At Horizon Academy GNETS at Moultrie, there was a photocopied handout in an isolation space (pictured at Figure 2.92) conveying staff views that students have chosen to engage in problem behaviors related to their disabilities and that their isolation is a natural consequence of their choices. The note indicates that students must be responsible for their behavior and the choices they make. That premise alone is concerning given that students with behavior-related disabilities need support to understand their behavior rather than to be told that their choices are bad and that they "lose points" for those choices. Further the note goes on to say that students will "face consequences they do not like," if bad choices are made.

I have worked for many years with students who have behavior-related disabilities who are so very frustrated and disappointed when a behavioral incident occurs. They will often cry and are extremely upset in connection with a behavioral occurrence. These students do not want to have behavioral issues and do not understand why such behaviors occur. The notion in the GNETS Program that somehow students are choosing to behave in these ways is careless and misguided.



Figure 2.91 Horizon Academy GNETS Center at Moultrie
*Inside the Isolation Room Where Student Behavior Statement Was Found*



Figure 2.92 Horizon Academy GNETS Center at Moultrie
*Student Behavior Statement*

**HOPELESSNESS**

Hopelessness is a pervasive element of an institutional culture, and I saw indications of hopelessness time and time again within the GNETS Program.  There is a sense of hopelessness on the part of students (as indicated on site visits) and on the part of parents (as indicated in documentation).  Students without hope are sad, despondent, desperate, and/or in despair. Countless records indicated the hopelessness felt on the part of parents when their child was referred for placement in the GNETS Program.  Even in documents, there was a palpable feeling of sadness from parents expressing a feeling of hopelessness when they were denied a community placement for their child.

Hopelessness can come in the shape of coursework that is too easy or hard.  The feeling of hopelessness can begin with a lack of incentives like pizza parties for reading books, field days, recess, or music class.  Hopelessness can start with a student's inability to make decisions during their school day.  Even the opportunity for a student to choose where they sit for lunch and with whom make a difference for students both with and without disabilities.

Hopelessness in the GNETS Program showed up in all these ways. It showed up in the inability of students to express their sadness or frustration without reprimand, and showed up when they were told to smile or be happy when there was nothing in the environment that would support happiness.



Figure 2.93 GNETS Future Center at Cumming
*Empty and Sad Therapeutic Room*

One of the most devastating days of the 70 site visits was when I observed a student who was in 5th grade at ███████████████████████ who was confined to a wheelchair with ████████████████. This student was biting the back of his hand, hitting his head on the back of his chair, and slapping his ears. While the negotiated site visit protocol prohibited me from engaging with this student, he cried during the entirety of the visit and begged me to take him out of his classroom, where a preschool video was playing on repeat. The student had no ability to leave given his confinement to a wheelchair, the environment was maddening, and it was clear that he was in pain. Yet none of the adults present helped him. He felt helpless and hopeless, as did I.

There was hopelessness in the words of a high school student at Coastal Academy GNETS at Camden who said he had been in this same facility (with the same teacher) for over ten years.

There was hopelessness in the eyes of the student that sat in her segregated classroom repeatedly banging her head on the wall while being taught nothing for the duration of my site visit.

There was hopelessness in the face of the student who did not use words to speak but laid on the dirty floor in a corner at the Sand Hills regional GNETS program site, looking intently at me, with nothing to do but lay there.

I felt hopelessness as I took the following picture of students in a filthy classroom.



Figure 2.94 Coastal Academy GNETS Center at Glynn
*Stained Carpet, Chained cabinet, Filthy Classroom in Active Use*

I saw hopelessness when I watched five boys walking toward the exit at Coastal Academy GNETS Center at Liberty behind a gated, locked, and barred entrance.  I was reminded of the school-to-prison pipeline.  I could not help but worry if their future would be like so many other students in segregated environments.

As an expert on this case, and an expert on equity for students with disabilities, I feel compelled to point out, although not at issue in the case, the number of times on site visits when I directly observed the conditions that lead to the creation of a school-to-prison pipeline. The GNETS Program, as it currently operates and with the current student population (i.e., students with behavior-related disabilities, a large percentage of whom are Black boys), is perpetuating a broken system in which students with behavior-related disabilities who are also Black are, in multiple ways, marginalized, harmed, and discarded.

Hopelessness was also evident in a number of teachers and staff in the GNETS Program.  In some cases, they appeared to believe that students with problem or challenging behaviors will never improve and that the students cannot learn because of their behavior-related disabilities.  This is further evidenced by the long length of stay of many students in the GNETS Program.  It is clear that the State of Georgia contributes to this hopelessness by maintaining the GNETS Program in its current form and failing to provide opportunities for these students to succeed in their home schools.

**Summary of Opinion and Finding Two**

The GNETS Program uses outdated practices and is a relic of the institutional systems and structures of the 1970s.  Thousands of students in the GNETS Program do not have the academic resources, behavioral support, social learning, and emotional strategies afforded to their peers in the general education setting.  There is unfair and unequal access to and use of both facilities and learning content and structures.  There is poor school climate and culture, as well as inadequate therapeutic supports and services.  There are disproportionately fewer opportunities to access qualified educators and support personnel who have sufficient professional learning.  There are inadequate school supplies, resources, and technology.  There are many students moved around in different ways ostensibly to promote access to general education but this actually results in a loss of all access to education.  Students in the GNETS Program are socially ostracized through labeling and distribution patterns across the State of Georgia.  There is a dramatic lack of student engagement, loss of instructional minutes, and performative application of break times in learning.  These losses are rationalized as necessary based on the students' behavior-related disabilities.  There is an unfair and unequal establishment of a purported system of support that is in fact a repository for students with behavior-related disabilities.  There are insidious and universal harms affecting students in the GNETS Program based on the unfair and unequal educational opportunities afforded to them.  While I shared specific examples above, there are many more examples that illustrate unfair and unequal educational opportunities for students with behavior-related disabilities in the GNETS Program.

**OPINION AND FINDING THREE: The GNETS Program's systemic segregation of students with behavior-related disabilities in the State of Georgia is unnecessary and fails to deliver effective behavioral and therapeutic supports.**

As discussed in prior sections of this Report, the GNETS Program segregates, separates, and isolates students with behavior-related disabilities.  It also treats students unfairly by offering inadequate and inequitable educational opportunities.  These realities are concerning on their own.  They are even more concerning when one considers that the placement of most students

in the GNETS Program is unnecessary.  Further, while the justification given for the GNETS Program is to provide therapeutic services and supports, my review of the Program indicates that it does not actually provide those services and supports. The GNETS Program, as it operates today, is unnecessary, inappropriate, and harmful; because it operates on such a large scale across the state, thousands of students with disabilities in the GNETS Program suffer in myriad ways.  The State has failed to ensure the provision of sufficient academic, social, emotional, behavioral, or therapeutic supports to students in the GNETS Program, resulting in a systemic failure to Georgia's students.

Education of students with behavior-related disabilities should focus on *what* educational resources students need, rather than *where* to put students.  The State of Georgia supports a model focused on *where to place* students that is unnecessarily segregated and offers inappropriate resources, rather than clearly understanding and implementing services aimed at *what* students need.  This large-scale approach of placing students outside of general education settings leads to long-term, harmful outcomes for students with behavior-related disabilities.

For decades, educational research has established the harms of segregating children with disabilities and the benefits of de-segregated learning environments with equal and fair educational resources for students with disabilities.  Nonetheless, students in the GNETS Program are unjustly and inappropriately segregated, provided an inappropriate education, and forced to face numerous harmful consequences.  Further, as discussed in Opinions and Findings One and Two, students in the GNETS Program have access to fewer qualified educators, have fewer curricular and instructional resources, suffer from poor climate and culture, and are in failing facilities.

Students in the GNETS Program deserve more.  Students exhibiting behaviors related to their disability deserve more.  The GNETS Program, as presently structured, is an inappropriate and unjust program for students with behavior-related disabilities, as evidenced by: (a) unnecessary and inappropriate systemic segregation; and (b) widespread failure to actually provide those behavioral and therapeutic supports the GNETS Program uses to justify the segregation of students.

**Unnecessary and Inappropriate Systemic Segregation**

The GNETS Program uses student behavior as a rationale for large-scale segregation that ultimately deprives students placed in the Program of equal educational opportunities.  The Program has adopted and perpetuates the idea that segregating large numbers of students with emotional and behavioral disabilities permits the students to receive intensive social, emotional, and behavioral therapeutic services and supports in a specialized environment.  By investing millions of dollars and untold resources in segregated settings, the State of Georgia implicitly encourages schools and their IEP teams to remove students with behavior-related disabilities from the general education environment—in other words, *if you build it, they will*

*come.* But these referrals and the segregation that they promote are unnecessary. The vast majority of students in the GNETS Program can and should be served in integrated settings with appropriate services and supports, where they are more likely to experience social, emotional, behavioral, and academic success.

Over the course of 70 GNETS Program site visits and my three-year long review of the GNETS Program, I spent countless hours carefully observing nearly 1,000 students within the Program. In particular, I spent significant time in classrooms observing student behavior and engagement with educators and peers. I also carefully observed student behavior during times of transition between classes or on breaks. The overwhelming majority of students I observed exhibited typical behaviors associated with their behavior-related disabilities. This population of students can and should be effectively supported in the general education environment. My observations and time spent in various GNETS Program facilities support this view. In one especially memorable classroom, located in a school-based GNETS Program site, I decided to remain seated in the room for as long as the students could stay engaged without redirection: I sat there for nearly a full hour while the students worked diligently and without incident. Students capable of staying on task for such an extended period of time without redirection can undoubtedly be served in less restrictive settings. Further, although there were only rare occasions where I observed students in a school-based GNETS Program location be allowed to participate in general education classes and have meaningful interactions with their general education peers at lunch or during periods of transition, these observations indicate that the students in the GNETS Program are capable of being in general education settings and can benefit from meaningful interaction with their general education peers.

With any student population across the country, there are a small number of students who have very serious, extreme behaviors that require well-trained, highly specialized teaching and behavior support—including carefully planned schedules of interactions with others—in order for them to experience success. The same is true in the GNETS Program. There are a small number of the nearly 1000 students I observed who have very serious and extreme behaviors that require highly specialized teaching and behavioral support. While these students may need to be taught in smaller, quieter learning environments away from their peers at certain times during the school day and under certain conditions to effectively self-regulate, the vast majority of the students I observed in GNETS do not. The needs of this small number of students requiring intensive supports should not justify the statewide segregation of thousands of students with behavior-related disabilities.

It is worth noting that while the rationale for the existence of the GNETS Program is to support students with behavior-related disabilities (e.g., Emotional Behavioral Disorder or Autism Spectrum Disorder), the GNETS Program also serves students with primary diagnoses that indicate intellectual disabilities, or those with complex learning needs. The Program, which

is failing to adequately serve its intended population, is now serving students with more intensive learning needs that it was not even designed to serve.  This is confounding.

The rationale often used to justify removing students with behavior-related disabilities from the general education setting is the severity of these students' behavior.  Yet, if students in the GNETS Program have aggressive or dangerous behaviors that are so severe that they cannot be served alongside their general education peers but only in the GNETS Program's segregated settings, it is unclear why these students can be served alongside a vulnerable population of students like those with significant cognitive disabilities.  In my opinion, if students with behavior-related disabilities can be in the same classrooms, halls, and spaces as students with cognitive disabilities, they can also be around their peers in general education settings.  The fact that they are not suggests that student placement in the GNETS Program is more about removing students who are the most challenging—either behaviorally or intellectually—and separating them from students without disabilities.

**The GNETS Program Does Not Actually Provide The Effective Behavioral and Therapeutic Support Used to Justify Its Segregated Settings**

The GNETS Program attempts to justify large-scale segregation of students with behavior-related disabilities by claiming to provide concentrated, intensive therapeutic services and supports in particular locations with more efficiency.  However, on the whole, the GNETS Program does not in fact provide the kinds of therapeutic services and supports it claims to deliver.  Nor does it provide the types of services and supports needed by the students it segregates.  Indeed, the GNETS Program is marked by a fundamental absence of basic resources, including a lack of: certified behavioral and therapeutic staff and resources to support students; social, emotional, and behavioral support; proper PBIS implementation; effective sensory resources and spaces; effective interaction patterns with staff; proper understanding of behavior as a form of communication; understanding and proper implementation of intensive interventions; and use of evidence-based behavior support.  Opinion and Finding Two discusses in great detail the specifics of these inadequacies.

## SECTION VII: RECOMMENDATIONS

After completion of an extensive evaluation of the GNETS Program, including site visits across the State as well as document and deposition transcript review, the following is recommended for the State of Georgia to provide students in the GNETS Program with equal educational opportunities and appropriate services and supports within an integrated general education environment.  These recommendations are based on my extensive experience in statewide educational reforms focused on equity-based inclusive education using a multi-tiered system of support (MTSS).  This experience includes years of work with school districts and

states to support inclusive practices for student with disabilities, particularly those students with the most significant needs and behavior-related disabilities. The recommendations are rooted in established evidence of efficacy and specifically matched to the needs of students served within the GNETS Program. The hope is that these recommendations support the State of Georgia in reforming its system, like other states have done, to center effective practices that are systemic and evidence-based. The recommendations are not about throwing out all aspects of Georgia's system or starting over with a blank slate; rather, the recommendations focus on using existing tools to develop a more effective system of support. Within the GNETS Program, there are already administrators, teachers, para pros, and other related service personnel who have dedicated their lives to supporting students with behavior-related disabilities. My hope is that educators within the GNETS Program will embrace the recommendations and see themselves as part of a movement toward better support for themselves professionally and better outcomes for students with behavior-related disabilities.

These recommendations rely on the work of three national centers funded by the U.S. Department of Education, Office of Special Education Programs: (1) The National Implementation Research Network (NIRN) and the State Implementation and Scaling-Up of Evidence-Based Practices (SISEP) at the University of North Carolina at Chapel Hill; (2) The Center on Positive Behavioral Interventions and Supports at the University of Oregon; and (3) The National Center for Inclusion Toward Rightful Presence at SWIFT Education Center at The University of Kansas. These three centers individually and collectively have worked with most states, as well as thousands of schools and districts, on the issues of state reform in support of students with disabilities. There are also four documents central to the statewide recommendations for reform that I propose. They include: (1) The Active Implementation Formula Reflection Guide associated with the statewide framework for implementation; (2) Four Key Actions for State Education Agency Teams to Support Implementation of Multi-Tiered Systems of Support; (3) Supporting and Responding to Student's Social, Emotional, and Behavioral Needs: Evidence-Based Practices for Educators (Version 2); and the (4) Resource Guide for Inclusion Toward Rightful Presence for Students with Disabilities. This work is not new. It confirms that there are better ways than what is currently offered in the GNETS Program, with strong evidence of efficacy, to support students with behavior-related disabilities.

NIRN offers a formula (figure shown below) for effective large-scale implementation of education reform for states, districts, and schools. This formula suggests that when states, districts, and schools identify *effective practices* (e.g., MTSS, PBIS, social-emotional learning, mental health supports, and restorative practices) and *effectively implement* those practices in an *enabling context* (e.g., inclusive general education home school), socially significant outcomes occur (i.e., all students, with and without disabilities, have better outcomes).



Described in detail below, these recommendations offer guidance to the Georgia Department of Education (GaDOE) in identifying effective practices and implementing those practices with success within enabling contexts to achieve socially significant outcomes for students with behavior-related disabilities.  This guidance includes statewide mapping of what currently works within the State and the use of current national evidence-based practices for large scale implementation.  Such effective practices include, but are not limited to, standards-based learning, MTSS, PBIS, social-emotional learning, restorative practices, and readily available mental health supports.  Next, the State of Georgia will need to effectively implement these practices.  GaDOE should specifically turn its attention to statewide implementation of MTSS, a service-based approach, rather than promoting the GNETS Program which is placement based.  Effective implementation of any practice—including MTSS—involves employing a full array of professional learning resources, ensuring educators are trained and certified (including administrators, teachers, and staff), and maintaining systems for ensuring fidelity of implementation through monitoring.  Central to the success of this work is the implementation of effective practices *within enabling contexts*.  Enabling contexts exist in environments where students are not segregated and have fair and equal access to educational opportunities.  This approach will result in significant improvements (including social, academic, behavioral, psychological) in outcomes for the thousands of students currently served in the GNETS Program.

Based on my broad examination of the GNETS Program, and consistent with an approach that focuses on service delivery rather than placement, I recommend that the State of Georgia:

(1) **Eliminate the statewide systemic segregation of students with behavior-related disabilities in the GNETS Program**.

(2) **Provide fair and equal access to educational opportunities for students with behavior-related disabilities.**

To carry out these recommendations, the following actions are needed to ensure students with behavior-related disabilities across the State of Georgia are provided the services and supports they need in integrated educational environments.  These recommended actions provide for a universally applied, effective statewide system that will benefit all students, and particularly those with disabilities.  The recommendations track those outlined in the below graphic:

**Recommended Action: Develop State capacity to provide guidance for implementation of MTSS through direction, policy, and technical assistance for districts and schools throughout the State**.

To do this, GaDOE should develop a consistent set of statewide resources, tools, materials, professional learning, and funding aimed toward effective implementation of MTSS. GaDOE can coordinate and align policies with MTSS practices to alleviate the burden, removing barriers for district and school implementation. GaDOE should invest in local capacity through regional and district structures in support of MTSS implementation. GaDOE can shift its role to technical support for districts within the State and provide guidance allowing districts to make decisions regarding their students that promote effective MTSS within inclusive educational settings with effective evidence-based support. This support would include the comprehensive provision of technical assistance to designated MTSS or instructional coaches, administrators, and educators throughout the State. GaDOE should also establish a system of local self-evaluation of school reform in favor of MTSS for the purpose of improving outcomes for students.

GaDOE should disseminate inclusive policy structures and practices for the purpose of building strong relationships furthering equity-based inclusive education. These policy structures and practices should include supporting district leadership team growth around MTSS structures, systems, and practices for the benefit of students with behavior-related disabilities. This would include a comprehensive suite of professional learning resources

provided by the State for each school district to adapt and build on in order to support their educators in using effective practices and maintaining fidelity in implementation of those practices to support their student population.

**Recommended Action: Develop State capacity to serve as technical support for district implementation of social, emotional, behavioral, and mental health practices within MTSS.**

GaDOE should develop its capacity to provide guidance and technical support for supporting and responding to students' social, emotional, behavioral, and mental health needs through a tiered system of support using evidence-based practices for all students with attention to those currently in the GNETS Program or those at risk for placement in the GNETS Program. GaDOE can provide guidance about how to establish positive classroom environments, and how to promote effective, wide-spread social, emotional, behavioral, and mental health support to its students. GaDOE should provide guidance on how local districts can monitor fidelity and use data to guide implementation. GaDOE can ensure the effective implementation of a tiered system of support to include therapeutic and mental health services and ensure that supports are provided to its students within contexts that are enabling (e.g., with general education peers, in home schools, district-supported, without segregation). This would include adapting the existing statewide system of support framework to focus on the provision of services and supports to students, rather than focusing on placement-based services (i.e., center-based and school-based GNETS Program sites).

**Recommended Action: Develop State capacity to serve as technical support for district-focused learning aligned with high expectations and standards-based learning for students with behavior-related disabilities.**

GaDOE should provide technical assistance for district implementation of a process that creates high learning expectations for students with behavior-related disabilities. Part of the challenge within the GNETS Program is the belief that students with behavior-related disabilities cannot learn grade-level content. With State support, districts and schools can implement standards-based learning with associated teaching strategies, resources, and content aligned to the Georgia Standards of Excellence or the Georgia Alternate Assessment. This standards-based instruction combined with improvements in core instruction using high-interest materials and the principles of universal design for learning will increase student interest in learning along with positive school climate, and will create long term success for students with behavior-related disabilities. GaDOE can also serve as a source of technical support, providing professional learning and resources on how to employ effective and current universal screening and analyze progress monitoring data for students. These efforts will move the State toward a system of academic support that is focused on what students need, with clear data on academic need, and would allow the State to move away from a categorical

system of service delivery. This would allow for student progress monitoring through the home school and school district. This structure would also promote collaborative peer-based instruction (i.e., learning from one another) for both students with and without disabilities.

**Recommended Action: Develop State capacity to serve as technical support for district scaling of evidence-based implementation actions to support equity-based MTSS with embedded social, emotional, behavioral, and mental health.**

GaDOE should accomplish this recommended action by teaching, supporting, and modeling the use of evidence-based practices intended to establish school-wide efficacy. These actions include: (a) MTSS design; (b) State, district, and school teaming and coaching structures; (c) effective and clear data use; (d) establishment of priorities within MTSS; and (e) resource mapping and matching for students, with particular attention to those with behavior-related disabilities.

**Recommended Action: Develop State capacity to serve as technical support for district implementation of evidence-based practices to support equity-based MTSS with embedded social, emotional, behavioral, and mental health.**

Central to effective statewide reform is large scale investment in building State, school district, and school leadership and **leadership teaming** structures. It is important to provide strong and engaged site leadership focused on equity-based inclusive education for students with behavior-related disabilities. This should include establishing a Statewide Equity-Based MTSS Team that uses tools to measure its growth, progress, and capacity toward providing technical resources and support to districts to develop their ability to implement MTSS in schools. Districts could then support the development of school administrative leadership teams that understand instruction to address the full array of student needs, including those needs of students with behavior-related disabilities. Leadership teams at the school level would incorporate administrators, teachers, and staff from the GNETS Program as resources to provide effective communication, shared involvement, and support for students with behavior-related disabilities. These teams would use individual, school, district-wide, and statewide data to support students with behavior-related disabilities.

Equally important is the establishment of **strong and positive school cultures** where adults see themselves as responsible for all students within their home school. Strong and positive school cultures create welcoming environments that are not separate or unequal and that provide safety and security for students, particularly those with behavior-related disabilities. This would require educators and staff to foster and advance a strong belief in the ability of students with behavior-related disabilities to effectively learn. In addition, educators within the State should facilitate regular and consistent access to extracurricular activities within the home school environment for students with behavior-related disabilities. The State can offer

policy, guidance, and technical support on the full menu of education resources that should be afforded to all students in general education settings (including core content curriculum, art, career and technology courses, physical education, and other specials or connections classes).

GaDOE should create a **strong educator support system** focused on creating student success. This system should include coaching, professional learning, and the use of tiered resources of support for educators to understand the full array of student need, particularly for those with behavior-related disabilities. A key high-leverage variable for success for students with behavior-related disabilities across the State is comprehensive professional learning of effective practices for all adults in the educational environment, including administrators, teachers, para pros, and other staff. In order to meet the needs of students with behavior-related disabilities, the State should establish collaborative planning structures with general educators and district special educators, regular professional learning, access to resources aligned with effective standards-based learning, and social, emotional, behavioral, and mental health resources within MTSS.

GaDOE can actively support, through technical guidance, the investment of family and community organizations within the State system of support, with focused attention on students with behavior-related disabilities. **Family and caregiver engagement** is critical for student success and to aid in eliminating statewide segregation. Opportunities for student success will increase when educators help families to understand the array of supports and services to which their students are entitled in the general education environment, rather than presenting the GNETS Program as a segregated placement where a student can receive services in connection with their behavior-related disabilities. In fact, families should be actively invited and have support, involvement, and engagement in: (a) the restructuring of the overall system of education in Georgia for students with behavior-related disabilities in favor of MTSS, and (b) their students' learning progression and development and implementation of their IEP. Families of students with behavior-related disabilities should also be provided professional learning opportunities to give them the necessary tools to advocate for their student and effectively support their learning while reducing problem behaviors.

GaDOE should also engage **community partners** who understand the needs of students with behavior-related disabilities and can provide resources and supports to help ensure their success in school. GaDOE can provide a statewide resource map of community partners across the state who offer resources for social, emotional, behavioral and mental health supports. These resources could be available to enhance the fully actualized menu of support that each district and school would implement within their school environment. The benefit of this structure of support is that schools are then able to establish their own equity-based MTSS structure, supported by community partners and matched to their unique student population with guidance and support from district and state technical assistance resources.

If GaDOE moves toward the role of technical support and out of the role of promoting a system that is segregated, unfair, unequal, and unnecessary, then students with behavior-related disabilities can be afforded the same opportunities as their general education peers in integrated settings.  The State of Georgia can achieve this integrated service by ensuring broad implementation of effective practices that are evidence-based.  This will help to expand the kinds of services and supports necessary for students with behavior-related disabilities to succeed in general education settings.  My professional experience has revealed, time and time again, that when educators and staff are given the tools to support students with behavior-related disabilities in more integrated environments, they do so and are better able to effectively serve their students, contributing positively to the students' educational experience and outcomes.

## SECTION VIII: CONCLUSION

Education is about learning, growing, and experiencing new things in a place where you feel safe and welcome.  But this is not the experience of students with disabilities in the State of Georgia who attend segregated environments within the GNETS Program.  The GNETS Program, with some exceptions, consists of a series of sad, disturbing facilities used unnecessarily and inappropriately as repositories for students with behavior-related disabilities.  The GNETS Program is based upon the idea that segregating mass amounts of students with behavior-related disabilities is necessary in order to offer them intensive social, emotional, and behavioral therapeutic services and supports.  Year after year, the State has encouraged and perpetuated this idea by dedicating over 60 million dollars to the GNETS Program (most of which are State funds), despite its gross lack of educational opportunities, adequate resources, and appropriate supports.  This is confounding given the daily harm students in the GNETS Program experience.  It is my fervent belief and expert opinion that these students do not need to be segregated to be effectively served.  The vast majority of them can and should be served in integrated settings with appropriate services and supports, where they are more likely to experience social, emotional, behavioral, and academic success.

As a professional in the field of education for many years with many hours spent in the southern region of our United States (including in Georgia), I believe in the educators in the State of Georgia.  I believe that these educators can and will refine practices to support students with behavior-related disabilities who have been marginalized for far too long.  I believe in the promise of what Georgia's education system can provide for those who need it most.

## SECTION IX: REFERENCES

*6 key takeaways from The State of School Transportation 2022 Report*. (n.d.). Hop Skip Drive.
https://www.hopskipdrive.com/blog/6-key-takeaways-from-the-state-of-school-transportation-2022-report

Agran, M., Jackson, L., Kurth, J. A., Ryndak, D., Burnette, K., Jameson, M., Zagina, A., Fitzpatrick, H., & Wehmeyer, M. (2020). Why aren't students with severe disabilities being placed in general education classrooms: Examining the relations among classroom placement, learner outcomes, and other factors. *Research and Practice for Persons with Severe Disabilities*, *45*(1), 4-13. https://doi.org/10.1177/1540796919878134

Ain, G. I. (2018). What is the appropriate curriculum for students with disabilities? Standards-based curriculum versus functional curriculum for students with disabilities. Ball State University. https://files.eric.ed.gov/fulltext/ED593728.pdf

Albright, M. (2023). *Interactive: Georgia GNETS students mostly black, male*. The Atlanta Journal-Constitution. https://www.ajc.com/state-regional-govt-politics/georgia-gnets-programs/

Annamma, S. A. & Handy, T. (2019). DisCrit solidarity as curriculum studies and transformative praxis. *Curriculum Inquiry*, *49*(4), 442-463.
https://doi.org/10.1080/03626784.2019.1665456

Artiles, A. & Kozleski, E., (2007). Beyond convictions: Interrogating culture, history, and power in inclusive education. *Language Arts, 84*(4), 357-364.
https://kuscholarworks.ku.edu/bitstream/handle/1808/10881/KozleskiBeyondConvictionsMedium.pdf?seq

Aviv, R. (2018, October 1). *Georgia's separate and unequal special-education system. A statewide network of schools for disabled students has trapped black children in neglect and isolation.* The New Yorker. Georgia's Separate and Unequal Special-Education System. https://www.newyorker.com/magazine/2018/10/01/georgias-separate-and-unequal-special-education-system

Butler, A. (2018, December 11). *Hidden but prevalent racism in Georgia's special education programs. Project Censored*. Validated Independent News.
https://www.projectcensored.org/hidden-but-prevalent-racism-in-georgias-special-education-programs/

Calabrese Barton, A., & Tan, E. (2020). Beyond equity as inclusion: A framework of "Rightful Presence" for guiding justice-oriented studies in teaching and learning. *Educational Researcher, 49*(6), 433–440. https://doi.org/10.3102/0013189X20927363

Center on PBIS. (2022). Supporting and Responding to Student's Social, Emotional, and Behavioral Needs: Evidence-Based Practices for Educators (Version 2). Center on PBIS, University of Oregon. www.pbis.org

Choi, J. H., McCart, A. B., & Sailor, W. (2020). Achievement of Students with IEPs and Associated Relationships with an Inclusive MTSS Framework. *Journal of Special Education.* https://doi.org/10.1177/0022466919897408

Choi, J. H., McCart, A. B., & Sailor, W. (2020). Reshaping educational systems to realize the promise of inclusive education. In *FIRE: Forum for International Research in Education*, *6*(1), 8-23.https://doi.org/10.32865/fire202061179

Codrington, J., & Fairchild, H. H. (2012). *Special education and the miseducation of African American children: A call to action*. Washington, DC: Association of Black Psychologists. https://www.abpsi.org/pdf/specialedpositionpaper021312.pdf

Cooc, N. (2017). Examining racial disparities in teacher perceptions of student disabilities. *Teachers College Record*, *119*, 1-32. https://journals.sagepub.com/doi/abs/10.1177/016146811711900703?journalCode=tcza

Cook, B. G., & Schirmer, B. R. (2003). What is special about special education? Overview and analysis. *The Journal of Special Education*, *37*(3), 200-205. https://journals.sagepub.com/doi/abs/10.1177/00224669030370031001

Cordes, S. A., Christopher, R., and Schwartz, A. (2021). *Do long bus rides drive down academic outcomes?* (EdWorkingPaper: 21-504). Annenberg Institute at Brown University. https://doi.org/10.26300/5v2d-5p08

Cornett, J., & Knackstedt, K. M. (2020). Original sin(s): lessons from the US model of special education and an opportunity for leaders. *Journal of Educational Administration,58(5),* 507-520. https://www.emerald.com/insight/content/doi/10.1108/JEA-10-2019-0175/full/html

Cortiella, C. (2008). *Understanding the standards-based individualized education program (IEP).* National Center for Learning Disabilities. (Advocacy Brief from National Center for Learning Disabilities). https://www.advocacyinstitute.org/resources/UnderstandingStandards-basedIEPs

Cosier, M., Causton-Theoharis, J., & Theoharis, G. (2013). Does access matter? Time in general education and achievement for students with disabilities. *Remedial and Special Education*, *34*(6), 323-332. https://journals.sagepub.com/doi/abs/10.1177/0741932513485448

Dalton, M. (2019). Forgotten children: Rethinking the individuals with disabilities education act behavior provisions. *American University Journal of Gender, Social Policy, and the Law, 27*(2), Article 3. https://digitalcommons.wcl.american.edu/jgspl/vol27/iss2/3

DeMatthews, D. (2014). Deconstructing systems of segregation: Leadership challenges in an urban school. *Journal of Cases in Educational Leadership, 17(1) 17-31.* https://doi.org/10.1177/1555458913518537

Dent, N. (2019, February 15). Georgia's segregated special education system: How alternative schools became a means to combat integration. Yorktown Sentry. https://yorktownsentry.com/6640/opinion/georgias-segregated-special-education-system/

Dynamic Learning Maps. (2021). *Mini-map for ELA.EE.RL.3.1.* https://dynamiclearningmaps.org/sites/default/files/documents/ELA_EEs/ELA.EE.RL.3.1_Instructions.pdf

Ennis, R. P., & Katsiyannis, A. (2018). Avoiding unwarranted segregation of students with behavioral needs: Lessons learned. *Intervention in School and Clinic*, *53*(4), 212-215. https://doi.org/10.1177/1053451217712954

Ennis, R. P., Blanton, K., & Katsiyannis, A. (2017). Child find activities under the individuals with disabilities education act: Recent case law. *Teaching Exceptional Children*, *49*(5), 301-308. https://journals.sagepub.com/doi/abs/10.1177/0040059916685063?journalCode=tcxa

Fain, K. C. (2017). Segregation of Georgia Schoolchildren with Disabilities: A Violation of International Law. *Ga. J. Int'l & Comp. L.*, *46*, 715. https://digitalcommons.law.uga.edu/cgi/viewcontent.cgi?article=2431&context=gjicl

Ferri, B. A., & Connor, D. J. (2005a). In the shadow of *Brown*: Special education and over-representation of students of color. *Remedial and Special Education*, *26(2)*, 93–100. https://doi.org/10.1177/07419325050260020401

Fisher, M., & Meyer, L. H. (2002). Development and social competence after two years for students enrolled in inclusive and self-contained educational programs. *Research and Practice for Persons with Severe Disabilities*, *27*(3), 165-174. https://journals.sagepub.com/doi/abs/10.2511/rpsd.27.3.165

Garwood, J. D., & Ampuja, A. A. (2019). Inclusion of students with learning, emotional, and behavioral disabilities through strength-based approaches. *Intervention in School and Clinic*, *55*(1), 46-51. https://doi.org/10.1177%2F1053451218767918\

Gee, K. (2020). Why Indeed?. *Research and Practice for Persons with Severe Disabilities*, *45*(1), 18-22. https://doi.org/10.1177/1540796919900951

Georgia Network for Educational and Therapeutic Support (GNETS), Georgia Compilation of
Rules & Regulations, Rule 160-4-7-.15. (2010). https://casetext.com/regulation/georgia-
administrative-code/department-160-rules-of-georgia-department-of-
education/chapter-160-4/subject-160-4-7-special-education/rule-160-4-7-15-georgia-
network-for-educational-and-therapeutic-support-gnets

Gilmour, A. F., Fuchs, D., & Wehby, J. H. (2019). Are students with disabilities accessing the
curriculum? A meta-analysis of the reading achievement gap between students with and
without disabilities. *Exceptional Children*, *85*(3), 329-346.
https://journals.sagepub.com/doi/abs/10.1177/0014402918795830

Goodman, S., Ward, C., & McIntosh, K. (2019). *Four key actions for State Education Agency
teams to support implementation of Multi-Tiered Systems of Support*. National
Implementation Research Network, University of North Carolina at Chapel Hill.

Graham, B. C., Keys, C. B., McMahon, S. D., & Brubacher, M. R. (2014). Transportation
challenges for urban students with disabilities: Parent perspectives. *Journal of
prevention & intervention in the community*, *42*(1), 45-57.
https://doi.org/10.1080/10852352.2014.855058

Gross, A. (2015, July 30). *Georgia is illegally segregating students with behavioral problems.
There's a better way*. Mother Jones.
https://www.motherjones.com/politics/2015/07/behavior-segregation-georgia-doj/

Harrison, J. R., Soares, D. A.  & Joyce, J. (2019) Inclusion of students with emotional and
behavioural disorders in general education settings: a scoping review of research in the
US. *International Journal of Inclusive Education, 23(12)*, 1209-1231.
https://doi.org/10.1080/13603116.2018.1444107

Jackson, L. B. (2014). What legitimizes segregation? The context of special education discourse:
A response to Ryndak et al. *Research and Practice for Persons with Severe Disabilities,
39*(2), 156-160. https://doi.org/10.1177/1540796914545960

Judd, A. (2009, July 27). *Death highlights lack of regulation at Georgia 'psychoeducational'
schools.* The Atlanta-Constitution. https://www.ajc.com/news/local/death-highlights-
lack-regulation-georgia-psychoeducationalschools/

Judd, A. (2016, April 28). *Georgia psychoeducational students segregated by disability, race.
Part one of a three-part series: Schools send disproportionate number of black children
to programs already under fire for warehousing student with behavioral disorders*. The
Atlanta Journal-Constitution. http://specials.myajc.com/psychoeducation/

Judd, A. (2016, May 5). *Part two of a three-part series: Educators wanted to subject Libby Bean
to behavioral experimentation in Georgia's unique system of psychoeducational schools.*

*A courtroom showdown would determine Libby's fate*. The Atlanta Journal-Constitution. http://specials.myajc.com/psychoeducation/#

Judd, A. (2016, May 8). Physical restraint common in psychoeducational schools. Part three of a three-part series: With a tiny sliver of students, special behavioral programs record five times more restraints that all other Georgia schools combined. The Atlanta Journal-Constitution. http://specials.myajc.com/psychoedrestraint/

Kamali, B., Mason, S. & Pohl, E. (2013). An analysis of special needs student busing. *Journal of Public Transportation, 16*(1). https://creativecommons.org/licenses/by-nc/4

Kern, L., Evans, S. W., Lewis, T. J., State, T. M., Weist, M. D., & Wills, H. P. (2015). CARS comprehensive intervention for secondary students with emotional and behavioral problems: Conceptualization and development. *Journal of Emotional and Behavioral Disorders*, *23*(4), 195-205. https://doi.org/10.1177/1063426615578173

Kleinert, H., Towles-Reeves, E., Quenemoen, R., Thurlow, M., Fluegge, L., Weseman, L., & Kerbel, A. (2015). Where students with the most significant cognitive disabilities are taught: Implications for general curriculum access. *Exceptional Children*, *81*(3), 312-328. https://doi.org/10.1177/0014402914563697

Knoester, M., & Au, W. (2015). Standardized testing and school segregation: like tinder for fire? *Race Ethnicity, and Education,* 20:1, 1-14, https://doi.org/10.1080/13613324.2015.1121474

Kohli, R., Pizarro, M., & Nevárez, A. (2017). The "new racism" of K–12 schools: Centering critical research on racism. *Review of Research on Education*, *41*, 182–202. https://journals.sagepub.com/doi/pdf/10.3102/0091732X16686949

Kozleski, E., Artiles, A., & Waitoller, F. (2014). Equity in inclusive education: A cultural historical comparative perspective. In L. Florian (Ed.), The Sage handbook of special education (2nd ed., Vol. 1, pp. 231250). Los Angeles, CA: Sage.

Kurth, J. A., Lyon, K. J., & Shogren, K. A. (2015). Supporting students with severe disabilities in inclusive schools: A descriptive account from schools implementing inclusive practices. *Research and Practice for Persons with Severe Disabilities*, *40*(4), 261-274. https://doi.org/10.1177/1540796915594160

Kurth, J. A., Lyon, K., & Shogren, K. A. (2015). Supports provided to students with severe disabilities in inclusive schools: Lessons learned from schools implementing inclusive practices. https://doi.org/10.1177/1540796915594160

Kurth, J. A., Morningstar, M. E., Hicks, T. A., & Templin, J. (2018). Exploring the relationship between school transformation and inclusion: A Bayesian multilevel longitudinal analysis. *Inclusion*, *6*(1), 19-32.https://doi.org/10.1352/2326-6988-6.1.19

Lanterman, C., Lockwood, A. B., Sealander, K., Winans, S., & Novelli, M. (2021) Expanding the gaze and moving the needle: Inclusion for students with EBD, Preventing School Failure: Alternative Education for Children and Youth, 65:3, 185-193. https://doi.org/10.1080/1045988X.2020.1852526

Lory, C., Mason, R. A., Davis, J. L., Wang, D., Kim, S. Y., Gregori, E., & David, M. (2020). A meta-analysis of challenging behavior interventions for students with developmental disabilities in inclusive school settings. *Journal of autism and developmental disorders*, *50*(4), 1221-1237. https://link.springer.com/article/10.1007/s10803-019-04329-x

MacDonald, A., McGill, P., & Murphy, G. (2018). An evaluation of staff training in positive behavioural support. *Journal of Applied Research in Intellectual Disabilities*, *31*(6), 1046-1061. https://doi.org/10.1111/jar.12460

McCart, A. B., & Miller, D. (2019). *Leading equity based MTSS for all students.* Thousand Oaks, CA: Corwin Press. (ISBN 9781544372853).

McCarthy, M. R., Wiener, R., & Soodak, L. C. (2012). Vestiges of segregation in the implementation of inclusion policies in public high schools. *Educational Policy*, *26*(2), 309-338. https://doi.org/10.1177/0895904810386596

McKenna, J. W., Garwood, J., & Parenti, M. (2021). Inclusive instruction for students with emotional/behavioral disorders: Service in the absence of intervention research. *Intervention in School and Clinic*, *56*(5), 316-321.https://doi.org/10.1177%2F1053451220963084

McKenna, J. W., Newton, X, & Bergman, E. R. (2021). Inclusive instruction for students receiving special education services for emotional disturbance: A survey development study. *Assessment for Effective Intervention, 46(3),* 207-216. https://doi.org/10.1177/1534508419895085

McKenna, J. W., Solis, M., Brigham, F., & Adamson, R. (2019). The responsible inclusion of students receiving special education services for emotional disturbance: Unraveling the practice to research gap. *Behavior modification*, *43*(4), 587-611. https://doi.org/10.1177/0145445518762398

Meindl, J. N., Delgado, D., & Casey, L. B. (2020). Increasing engagement in students with autism in inclusion classrooms. *Children and Youth Services Review*, *111*, 104854. https://www.sciencedirect.com/science/article/pii/S0190740919312538?casa_token=ll0Kzg6A2xEAAAAA:aXKiAtS_IAxai7pO6M6PO4u8fkF-kLRYDyIPlBysLVmdIHFs8sF5hHHaVLJ06k9wofjXLj9LSQ

Mitchell, B. S., Kern, L., & Conroy, M. (2019). Supporting students with emotional or behavioral disorders: State of the field. *Behavioral Disorders, 44(2),* 70-84. https://doi.org/10.1177/0198742918816518

Morgan, P. L., Woods, A. D., Wang, Y., Hillemeier, M. M., Farkas, G., & Mitchell, C. (2020). Are Schools in the US South Using Special Education to Segregate Students by Race?. *Exceptional Children*, *86*(3), 255-275. https://doi.org/10.1177%2F0014402919868486

National Implementation Research Network (2008). Active Implementation Formula, Active Implementation Hub. https://nirn.fpg.unc.edu/module-2/implementation-drivers. Charlotte, NC: Author.

National Association of State Mental Health Program Directors Research Institute, Inc. (NRI). (2015, July). *Tracking the history of state psychiatric hospital closures from 1997 to 2015*. NRI Analytics Improving Behavioral Health. https://www.nri-inc.org/media/1111/2015-tracking-the-history-of-state-psychiatric-hospital-closures-lutterman.pdf

Nighswander, M., & Blair, P. (2022). From institutions to inclusion: How children with disabilities gained educational rights in the U.S. *The Journal of School Nursing,* 1-11. https://doi.org/10.1177/10598405221105054

Oh-Young, C. & Filler, J. (2015). A meta-analysis of the effects of placement on academic and social skill outcome measures of students with disabilities. *Research in Developmental Disabilities, 47,* 80-92. https://doi.org/10.1016/j.ridd.2015.08.014

Oliver, K. (2015, July 18). State behavioral program serving Gainesville, hall student under federal scrutiny. The Gainesville Times. https://www.gainesvilletimes.com/news/state-behavioral-program-serving-gainesville-hallstudents-under-federal-scrutiny/

Ordway, D. (2023, March 1). *Corporal punishment in schools: Research and reporting tips to guide your coverage.* The Journalist's Resource, Informing the news. https://journalistsresource.org/education/corporal-punishment-schools-discipline-research/

Orozco, R., & Jaime Diaz, J. (2016). "Suited to Their Needs": White Innocence as a Vestige of Segregation. *Multicultural Perspectives*, *18*(3), 127-133. https://doi.org/10.1080/15210960.2016.1185610

Pratt, T. (2017, March 21). The separate, unequal education of students with special needs. Hechinger Report. https://hechingerreport.org/georgia-program-children-disabilities-separate-unequaleducation/

Sadler, N. (2022, September 12). Forsyth co paraprofessional arrested for striking a student with her purse. AccessWDUN. https://accesswdun.com/article/2022/9/1130901/forsyth-co-paraprofessional-arrested-forstriking-a-student-with-her-purse

Savransky, B. (2023, April 13). Collapsing roofs, broken toilets, flooded classrooms; Inside the worst-funded schools in the nation. *Idaho Statesman.* https://www.propublica.org/article/idaho-deteriorating-schools-repair-bonds

Scott, N., Lakin, C., & Larson, S. (2008). The 40th anniversary of deinstitutionalization in the united states: Decreasing state institutional populations, 1967- 2007. *Intellectual and Developmental Disabilities, 46*(5), 402-405. https://doi.org/10.1352/2008.46:402-405

Scott, T. M., & Burt, J. L. (2018). The continuing evolution of a science for students with behavioral disorders: Who, what, when, where, and how. *Rural Special Education Quarterly*, *37*(3), 132-139. https://doi.org/10.1177%2F8756870518764381

Skiba, R. J., Artiles, A. J., Kozleski, E. B., Losen, D. J., & Harry, E. G. (2016). Risks and consequences of oversimplifying educational inequities: A response to Morgan et al.(2015). *Educational Researcher*, *45*(3), 221-225. https://doi.org/10.3102/0013189X16644606

SWIFT Education Center. (2020). Schoolwide Integrated Framework for Transformation Fidelity Integrity Assessment, Version 2.1. Lawrence, KS: Author.

Technical Assistance ALLIANCE for Parent Centers. (2023). *Transportation and children with Disabilities.* (Pacer Center-ALLIANCE ACTion Sheet: ALL-55). Partners Resource Network. https://prntexas.org/transportation-and-children-with-disabilities/

Thompson, K. (2013). Is separate always unequal? A philosophical examination of ideas of equality in key cases regarding racial and linguistic minorities in education. *American Educational Research Journal.* 50(6), 1249-1278. https://doi.org/10.3102/0002831213502519

United States Department of Education, Office of Special Education and Rehabilitative Services, Office of Special Education Programs. (2018). 40th annual report to Congress on the implementation of the Individuals with Disabilities Education Act. https://www2.ed.gov/about/reports/annual/osep/2018/parts-b-c/40th-arc-for-idea.pdf

Wehmeyer, M., Shogren, K., Kurth, J., Morningstar, M., Kosleski, E., Argan, M., Jackson, L., Jameson, J., McDonnell, J., & Ryndak, D (2016). Including students with extensive and pervasive needs. *Advances in Special Education.* 31, 129-155. ISSN: 0270-4013/doi:10.1108/S0270-401320160000031009

Wiey, A. L., Brigham, F. J., Kauffman, J. M., & Bogan, J. E. (2013). Disproportionate poverty, conservatism, and the disproportionate identification of minority students with emotional and behavioral disorders. *Education and Treatment of Children*, *36(4)*, 29–50. https://muse.jhu.edu/pub/20/article/524142/pdf

Williams, J., Pazey, B., Fall, A., Yates, J., & Roberts, G. (2015). Avoiding the threat: An exploratory study into a theoretical understanding of the de facto segregation of students with disabilities. *NAASP Bulletin*, 99(3) 233-253. https://doi.org/10.1177/0192636515601491

Zigmond, N. (2003). Where should students with disabilities receive special education services? Is one place better than another?. *The Journal of special education*, *37*(3), 193-199. https://doi.org/10.1177/00224669030370030901

Zimmer, A. & Gonen, Y. (2019, October 17). *Special needs students are plagued by an increasing number of school bus delays*. Chalkbeat New York. https://ny.chalkbeat.org/2019/10/17/21109079/special-needs-students-are-plagued-by-an-increasing-number-of-school-bus-delays

Appendix A

Data Tables and Graphs

A.1: GNETS placements by region, SY15-16 to SY21-22



A.2: GNETS placements by site type, SY15-16 to SY21-22

| Site Type | SY15-16 | SY16-17 | SY17-18 | SY18-19 | SY19-20 | SY20-21 | SY21-22 |
|---|---|---|---|---|---|---|---|
| GNETS Center Based | 3096 | 2714 | 2340 | 2331 | 2124 | 1924 | 1905 |
| GNETS School Based | 1355 | 1391 | 1458 | 1274 | 1219 | 1036 | 1020 |
| Total | 4451 | 4105 | 3798 | 3605 | 3343 | 2960 | 2925 |
| Not Determined on Initial Entry | 41 | 12 | 7 | 2 | 1 | 3 | 0 |
| TOTAL | 4492 | 4117 | 3805 | 3607 | 3344 | 2963 | 2925 |

A.3: Proportion of GNETS placements by site type, SY15-16 to SY21-22



A.4: GNETS placements by primary disability designation, SY21-22

| Primary Disability Designation | Frequency | Percent |
|---|---|---|
| Mild Intellectual Disability | 66 | 2.3 |
| Moderate Intellectual Disability | 76 | 2.6 |
| Severe Intellectual Disability | 13 | 0.4 |
| Profound Intellectual Disability | 2 | 0.1 |
| Emotional / Behavioral Disorder | 1474 | 50.4 |
| Specific Learning Disability | 47 | 1.6 |
| Hard of Hearing | 1 | 0.0 |
| Other Health Impairment | 451 | 15.4 |
| Speech / Language Impairment | 3 | 0.1 |
| Autism | 644 | 22.0 |
| Traumatic Brain Injury | 6 | 0.2 |
| Significant Developmental Delay | 142 | 4.9 |
| Total | 2925 | 100.0 |

A.5: GNETS placements by age in SY1516, and how many remained in the Program in following years

| SY13-16 Age | # of Students | SY16-17 Age | Students Remained | SY17-18 Age | Students Remained | SY18-19 Age | Students Remained | SY19-20 Age | Students Remained | SY20-21 Age | Students Remained | SY21-22 Age | Students Remained |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 3 | 4 | 2 | 5 | 2 | 6 | 2 | 7 | 2 | 8 | 2 | 9 | 2 |
| 4 | 10 | 5 | 5 | 6 | 2 | 7 | 2 | 8 | 1 | 9 | 1 | 10 | 17 |
| 5 | 66 | 6 | 55 | 7 | 41 | 8 | 33 | 9 | 28 | 10 | 24 | 11 | 44 |
| 6 | 137 | 7 | 108 | 8 | 88 | 9 | 71 | 10 | 60 | 11 | 49 | 12 | 64 |
| 7 | 203 | 8 | 169 | 9 | 147 | 10 | 112 | 11 | 82 | 12 | 72 | 13 | 81 |
| 8 | 252 | 9 | 213 | 10 | 180 | 11 | 140 | 12 | 110 | 13 | 98 | 14 | 76 |
| 9 | 304 | 10 | 250 | 11 | 199 | 12 | 150 | 13 | 117 | 14 | 93 | 15 | 69 |
| 10 | 313 | 11 | 250 | 12 | 202 | 13 | 115 | 14 | 115 | 15 | 84 | 16 | 66 |
| 11 | 353 | 12 | 282 | 13 | 238 | 14 | 181 | 15 | 127 | 16 | 95 | 17 | 48 |
| 12 | 364 | 13 | 284 | 14 | 209 | 15 | 159 | 16 | 122 | 17 | 95 | 18 | 27 |
| 13 | 469 | 14 | 353 | 15 | 263 | 16 | 189 | 17 | 126 | 18 | 69 | 19 | 17 |
| 14 | 462 | 15 | 329 | 16 | 211 | 17 | 144 | 18 | 73 | 19 | 31 | 20 | 16 |
| 15 | 477 | 16 | 330 | 17 | 227 | 18 | 107 | 19 | 43 | 20 | 29 | 21 | 0 |
| 16 | 380 | 17 | 255 | 18 | 124 | 19 | 53 | 20 | 33 | 21 | 0 | 22 | 0 |
| 17 | 304 | 18 | 158 | 19 | 65 | 20 | 28 | 21 | 16 | 22 | 0 | 23 | 0 |
| 18 | 201 | 19 | 102 | 20 | 54 | 21 | 29 | 22 | 0 | 23 | 0 | 24 | 0 |
| 19 | 100 | 20 | 40 | 21 | 20 | 22 | 0 | 23 | 0 | 24 | 0 | 25 | 0 |
| 20 | 56 | 21 | 34 | 22 | 1 | 23 | 0 | 24 | 0 | 25 | 0 | 26 | 0 |
| 21 | 38 | 22 | 0 | 23 | 0 | 24 | 0 | 25 | 0 | 26 | 0 | 27 | 0 |
| Total | 4492 | | 3219 | | 2273 | | 1559 | | 1055 | | 764 | | 527 |

A.6: Age-grade alignment of students in the GNETS Program, SY21-22

| AGE | PK | KK | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5 | 1 | 41 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6 | 0 | 13 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7 | 0 | 0 | 24 | 78 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | 0 | 0 | 0 | 29 | 83 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9 | 0 | 0 | 0 | 0 | 1 | 42 | 146 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10 | 0 | 0 | 0 | 0 | 0 | 64 | 173 | 5 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11 | 0 | 0 | 0 | 0 | 0 | 7 | 87 | 143 | 0 | 0 | 0 | 0 | 0 | 0 |
| 12 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 91 | 190 | 2 | 0 | 0 | 0 | 0 |
| 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 116 | 210 | 3 | 0 | 0 | 0 |
| 14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 149 | 172 | 3 | 0 | 0 |
| 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 19 | 142 | 125 | 1 | 0 |
| 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 42 | 110 | 73 | 5 |
| 17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 44 | 81 | 70 |
| 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 10 | 33 | 79 |
| 19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 6 | 7 | 45 |
| 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28 |
| 21 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24 |

A.7:  Average daily segments by site type, SY15-16 to SY21-22



A.8: Primary Disability Designations of students in the GNETS Program

## Primary Disability Designations of students in the GNETS Program by grade, SY16-17

| Primary Disability Designation | PK | KK | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mild Intellectual Disability | 0 | 0 | 0 | 6 | 4 | 7 | 10 | 7 | 8 | 9 | 24 | 17 | 13 | 15 | 120 |
| Moderate Intellectual Disability | 0 | 0 | 2 | 2 | 2 | 6 | 14 | 11 | 5 | 2 | 12 | 8 | 10 | 20 | 94 |
| Severe Intellectual Disability | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 2 | 2 | 0 | 0 | 5 | 0 | 7 | 19 |
| Profound Intellectual Disability | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Emotional / Behavioral Disorder | 1 | 11 | 32 | 83 | 141 | 167 | 201 | 237 | 233 | 243 | 395 | 269 | 188 | 150 | 2351 |
| Specific Learning Disability | 0 | 0 | 1 | 0 | 7 | 5 | 5 | 9 | 11 | 11 | 13 | 9 | 3 | 5 | 79 |
| Orthopedic Impairment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Hard of Hearing | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 |
| Deaf | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Other Health Impairment | 2 | 6 | 8 | 30 | 42 | 59 | 51 | 44 | 53 | 52 | 70 | 33 | 26 | 29 | 505 |
| Blind | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Speech / Language Impairment | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Autism | 3 | 11 | 20 | 35 | 53 | 57 | 60 | 52 | 62 | 77 | 80 | 68 | 48 | 120 | 746 |
| Traumatic Brain Injury | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 1 | 0 | 2 | 3 | 9 |
| Significant Developmental Delay | 2 | 31 | 55 | 56 | 35 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 185 |
| Total | 8 | 60 | 119 | 212 | 287 | 308 | 344 | 363 | 377 | 394 | 595 | 409 | 291 | 350 | 4117 |

## Primary Disability Designations of students newly placed in the GNETS Program by grade, SY16-17

| Primary Disability Designation | PK | KK | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mild Intellectual Disability | 0 | 0 | 0 | 2 | 2 | 2 | 2 | 1 | 2 | 3 | 4 | 1 | 2 | 2 | 23 |
| Moderate Intellectual Disability | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 2 | 7 |
| Severe Intellectual Disability | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| Profound Intellectual Disability | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Emotional / Behavioral Disorder | 1 | 9 | 18 | 40 | 47 | 50 | 43 | 43 | 47 | 43 | 68 | 38 | 24 | 12 | 483 |
| Specific Learning Disability | 0 | 0 | 1 | 0 | 3 | 1 | 1 | 5 | 6 | 5 | 2 | 2 | 0 | 2 | 28 |
| Orthopedic Impairment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Hard of Hearing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Deaf | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Health Impairment | 2 | 3 | 3 | 17 | 12 | 21 | 12 | 14 | 20 | 12 | 16 | 11 | 4 | 2 | 149 |
| Blind | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Speech / Language Impairment | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Autism | 2 | 9 | 10 | 11 | 16 | 11 | 12 | 11 | 9 | 10 | 16 | 10 | 6 | 4 | 137 |
| Traumatic Brain Injury | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 | 3 | |
| Significant Developmental Delay | 1 | 25 | 20 | 12 | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 63 |
| Total | 6 | 46 | 54 | 82 | 83 | 88 | 71 | 77 | 86 | 73 | 107 | 63 | 37 | 25 | 898 |

## Primary Disability Designations of students in the GNETS Program by grade, SY21-22

| Primary Disability Designation | PK | KK | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Primary Disability Designation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mild Intellectual Disability | 0 | 0 | 1 | 1 | 1 | 8 | 4 | 1 | 6 | 11 | 9 | 7 | 8 | 9 | 66 |
| Moderate Intellectual Disability | 0 | 0 | 1 | 2 | 3 | 2 | 8 | 6 | 9 | 12 | 4 | 14 | 6 | 9 | 76 |
| Severe Intellectual Disability | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 13 |
| Profound Intellectual Disability | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| Emotional / Behavioral Disorder | 0 | 3 | 12 | 27 | 47 | 102 | 140 | 136 | 203 | 230 | 205 | 170 | 105 | 94 | 1474 |
| Specific Learning Disability | 0 | 0 | 0 | 0 | 3 | 0 | 7 | 3 | 5 | 5 | 6 | 9 | 5 | 4 | 47 |
| Orthopedic Impairment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hard of Hearing | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Deaf | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Health Impairment | 0 | 1 | 10 | 22 | 23 | 40 | 47 | 50 | 47 | 59 | 61 | 40 | 21 | 30 | 451 |
| Blind | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Speech / Language Impairment | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Autism | 0 | 7 | 16 | 14 | 28 | 52 | 62 | 47 | 58 | 59 | 87 | 60 | 51 | 103 | 644 |
| Traumatic Brain Injury | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 2 | 1 | 0 | 0 | 6 |
| Significant Developmental Delay | 2 | 43 | 34 | 37 | 22 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 142 |
| Total | 2 | 54 | 74 | 108 | 126 | 217 | 265 | 246 | 329 | 382 | 378 | 298 | 195 | 251 | 2925 |

## Primary Disability Designations of students newly placed in the GNETS Program by grade, SY21-22

| Primary Disability Designation | PK | KK | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Primary Disability Designation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mild Intellectual Disability | 0 | 0 | 1 | 1 | 1 | 5 | 0 | 1 | 0 | 3 | 2 | 1 | 2 | 0 | 17 |
| Moderate Intellectual Disability | 0 | 0 | 0 | 1 | 0 | 0 | 3 | 2 | 2 | 2 | 0 | 2 | 0 | 1 | 13 |
| Severe Intellectual Disability | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Profound Intellectual Disability | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Emotional / Behavioral Disorder | 0 | 3 | 9 | 16 | 19 | 25 | 29 | 22 | 23 | 24 | 24 | 10 | 7 | 3 | 214 |
| Specific Learning Disability | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 2 | 2 | 0 | 11 |
| Orthopedic Impairment | 0 | 1 | 7 | 7 | 9 | 7 | 8 | 21 | 8 | 9 | 9 | 4 | 4 | 2 | 96 |
| Hard of Hearing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Deaf | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Health Impairment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Blind | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Speech / Language Impairment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Autism | 0 | 7 | 11 | 7 | 16 | 15 | 17 | 11 | 8 | 7 | 15 | 10 | 5 | 9 | 138 |
| Traumatic Brain Injury | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | |
| Significant Developmental Delay | 2 | 39 | 18 | 17 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 81 |
| Total | 2 | 50 | 46 | 51 | 51 | 55 | 58 | 58 | 42 | 47 | 53 | 29 | 18 | 16 | 576 |

Appendix B

Georgia Department of Education's Map of the GNETS Program

# Georgia Network for Educational and Therapeutic Support (GNETS) Map



**Legend:**

- Burwell
- Cedarwood
- CGCA
- Coastal Academy
- Dekalb-Rockdale
- Elam Alexander
- Flint Area
- Futures
- H.A.V.E.N.
- Harrell
- Heartland
- Horizon
- Mainstay
- North Metro
- NorthStar
- Northwest
- Oak Tree
- Oconee
- Pathways
- Riverquest
- Rutland
- Sand Hill
- South Metro
- Woodall

updated August 2020

Appendix C

# Georgia Department of Education's FY23 GNETS Program Directory

# GNETS Directory FY *23*

| NAME AND OFFICE LOCATION | Fiscal Agent and Districts Served |
|---|---|
| **BURWELL**<br>106 Westside School Road,<br>Newnan, Georgia 30263<br> (770) 254-2877/FAX (770) 251-4027<br>David Blevins, Director<br>david.blevins@cowetaschools.net | West Georgia RESA<br><br>Carroll, Coweta, Harris, Heard, Meriwether, and Troup Counties;  Carrollton City |
| **CEDARWOOD**<br>400 Donnie Simmons Way<br>Statesboro, GA 30458<br>(912) 212-8740 FAX (912) 526-7166<br>Whitney Braddock, Director<br>wbraddock@cedarwoodgnets.org | First District RESA<br><br>Appling, Bulloch, Candler, Evans, Jeff Davis, Jenkins, Tattnall, Toombs Counties; Vidalia City |
| **COASTAL ACADEMY** 1100B<br> C.A. Devillars Road Darien,<br> Georgia  31305<br>(914)437-8917<br> Lisa Futch/Jody Carter, Directors<br>lfutch@coastalacademygnets.com/jcarter@coastalacademygnets.com | First District RESA<br><br>Bryan, Glynn, Liberty, Long McIntosh and Wayne Counties |
| **COASTAL GEORGIA COMPREHENSIVE ACADEMY**<br>2001 Cynthia Street<br>Savannah, Georgia  31415<br>(912) 395-5440/FAX (912) 201-5453<br>David Ackerman, Director<br>david.ackerman@sccpss.com | Chatham County School District<br><br><br>Savannah-Chatham |
| **DEKALB-ROCKDALE**<br>5931 Shadow Rock Dr.<br>Lithonia, Georgia  30058<br>(678) 676-8111/FAX (678) 676-8110<br>Melinda Maddox ,Substitute Director<br>Melinda_Maddox@dekalbschoolsga.org | DeKalb County School District<br><br>DeKalb and Rockdale Counties; Decatur City |
| **ELAM ALEXANDER ACADEMY**<br>2051 Second Street<br>Macon, Georgia  31201<br>(478) 779-3930/FAX (478) 779-4821<br>Brooke Cole, Director<br>Brooke.cole@bcsdk12.net | Bibb County School District<br><br>Bibb, Crawford, Houston, Jasper, Jones, Monroe, Peach and Twiggs Counties |
| **FLINT AREA LEARNING**<br>607 E 8th Street<br>Cordele, Georgia  31015<br>(229) 276-3425<br>Sherri Nance, Director<br>snance@crispschools.org | Crisp County School District<br><br>Crisp, Dooly, Macon, Marion, Schley, Sumter, Taylor and Webster Counties |
| **FUTURES**<br>P.O.Box 1789<br>Cleveland, Georgia<br>706-865-2141<br>Stacey Benson, Director<br>sbenson@pioneerresa.org | Pioneer RESA<br><br>Banks, Dawson, Franklin, Forsyth, Habersham, Hall, Hart, Lumpkin, Rabun, Stephens, Towns, Union, and White Counties; Gainesville City |

# GNETS Directory FY *23*

| NAME AND OFFICE LOCATION | Fiscal Agent and Districts Served |
|---|---|
| **HARRELL LEARNING CENTER**<br>1215 Bailey Street  Suite C<br>Waycross, Georgia  31501<br>(912) 285-6191<br> Haley Livingston, Director<br>hlivingston@okhlc.org | Okefenokee RESA<br><br>Atkinson, Bacon, Brantley, Camden, Charlton, Clinch, Coffee, Pierce, and Ware Counties |
| **H.A.V.E.N. ACADEMY**<br>5805 Dunn Rd.<br>Mableton, Georgia   30126<br>(770) 819-2584  EXT. 022<br>FAX (770) 819-2592<br>Robin Baumgarten, Director<br>robin.baumgarten@cobbk12.org | Cobb County School District<br><br>Cobb and Douglas Counties; Marietta City |
| **HEARTLAND ACADEMY**<br>800 Martin Luther King Drive<br>Ailey, Ga. 30410<br>(912) 583-4657/FAX (912) 583-4120<br>Joanna Mock, Director<br>joannam@hgresa.org | Heart of Georgia RESA<br><br>Bleckley, Dodge, Laurens, Montgomery, Pulaski, Telfair, Treutlen, Wheeler, and Wilcox Counties; Dublin City |
| **HORIZON    ACADEMY**<br>3103  Barack  Obama  Blvd<br>Valdosta, Georgia 31601<br>229-333-8500 ext 4052 or 4011,/Fax 229-333-0392<br>Samuel Clemons, Director<br>samuel.clemons@gocats.org | Coastal Plains RESA<br><br>Ben Hill, Berrien, Brooks, Colquitt, Cook,Echols, Irwin, Lanier, Lowndes, Tift , Turner Counties: Valdosta City |
| **MAINSTAY ACADEMY**<br>200 A. Z. Kelsey Avenue<br>Griffin, Georgia  30223<br>(770) 467-6600/FAX (770) 467-6604<br>Craig Whedon, Director<br>craig.whedon@gscs.org | Griffin-Spalding School District<br><br>Butts, Fayette, Lamar, Newton, Pike, Spalding and Upson Counties |
| **NORTH METRO**<br>601 Beckwith Street SW<br>Atlanta, Georgia  30314<br>(404) 802-6070/FAX 404-802-6098<br>Cassandra Holifield, Director<br>Cassandra.holifield@mresa.org | Metro RESA<br><br>Fulton County, Atlanta Public Schools, Gwinnett County and Buford City |
| **NORTHSTAR EDUCATIONAL AND THERAPEUTIC SERVICES**<br>159 Stegall Dr.<br>Jasper, Georgia 30143<br>(706) 253-1790/FAX (706) 253-1795<br>Jacqie Neal, Director<br>Jacqie.Neal@dalton.k12.ga.us | North GA RESA<br><br>Fannin, Gilmer, Murray, Pickens, and Whitfield Counties; Dalton City |
| **NORTHWEST GEORGIA EDUCATIONAL**<br>P.O. Box 2130<br>Fort Oglethorpe Georgia  30742<br>(706) 295-6189 Ext. 142/FAX (706) 291-0109<br>Greg McElwee, Director<br>gmcelwee@nwgnets.org | Northwest GA RESA<br><br>Bartow, Catoosa, Chattooga, Dade, Floyd, Gordon, Haralson, Paulding, Polk, and Walker Counties; Bremen, Calhoun, Cartersville, Chickamauga, Rome and Trion Cities |

# GNETS Directory FY *23*

| NAME AND OFFICE LOCATION | Fiscal Agent and Districts Served |
|---|---|
| **OAK TREE**<br>2204 Sharon Drive<br>Albany, GA  31707<br> (229) 431-1323/FAX (229) 483-6350<br>Kerrie Miller, Director<br>Kerri.miller@docoschools.org | Dougherty County School District<br><br>Baker, Calhoun, Dougherty, Early, Lee, Miller, Terrell, Seminole and Worth Counties |
| **GNETS of OCONEE**<br>155 Hwy 49 West<br>Milledgeville, Georgia  31059-1830<br>(478) 414-2023/FAX (478) 414-2025<br>Pat Wolf, Director<br>Pat.wolf@gnetsofoconee.org | Oconee RESA<br><br>Baldwin, Hancock, Johnson, Putnam, Washington, and Wilkinson Counties |
| **PATHWAYS EDUCATIONAL**<br>208 N. Pinetree Blvd.<br>Thomasville, Georgia  31792<br>(229) 225-3910/FAX (229) 225-5283<br>Susan Weakland, Director<br>sweakland@tcjackets.net | Thomas County School District<br><br>Grady, Mitchell County, Thomas County, Pelham City, Thomasville City |
| **RIVER QUEST**<br>190 Tiger Trail<br>Swainsboro, Georgia  30401<br>(478) 419-1035/ FAX (478) 419-1015<br>Karen Ross, Director<br>kross@riverquestedu.org | Central Savannah River RESA<br><br>Burke, Emanuel, Glascock, Jefferson, and Screven Counties |
| **RUTLAND ACADEMY**<br>1250 Oglethorpe Avenue<br>Athens, Georgia  30606<br>(706) 549-3030 Ext. 427/FAX (706) 613-7142<br>Celest Ngeve- Director<br>celest.ngeve@rutlandacademy.org | Northeast GA RESA<br><br>Barrow, Clarke, Elbert, Greene, Jackson, Madison, Morgan, Oconee, Oglethorpe, and Walton Counties, Commerce, Jefferson, and Social Circle Cities |
| **SAND HILLS**<br>1740 Walton Way 30904<br>(706) 796-7791/FAX (706) 736-8195<br>Talithia Newsome, Director<br>newsota@boe.richmond.k12.ga.us | Richmond County School District<br>Glascock, Lincoln, McDuffie, Richmond, Taliaferro, Warren and Wilkes Counties |
| **SOUTH METRO**<br>5277 Ash Street<br>Forest Park, Georgia  30297<br>(770) 472-2860/FAX (770) 472-2858<br>Derrick Gilchrist, Director<br>Derrick.gilchrist@clayton.k12.ga.us | Clayton County School District<br><br>Clayton County and Henry County |
| **WOODALL**<br>1822 Shephard Drive<br>Columbus, Georgia  31906<br>(706) 748-3166/FAX (706) 748-3171<br>LaChrista Thornton, Director<br>Thornton.Lachrista.S@muscogee.k12.ga.us | Muscogee County School District<br><br>Chattahoochee, Clay, Muscogee, Quitman, Randolph, Stewart and Talbot Counties |

Appendix D

Site Visit Table and Summary

**GNETS Program SITE VISIT TABLE AND SUMMARY**

| | Date | GNETS Program Site Name and Address | CB/SB |
|---|---|---|---|
| | **SITE VISIT ONE** | | |
| 1 | Monday, November 15, 2021, AM<br><br>Dougherty Co | Oak Tree GNETS Center at Sherwood Acres Elementary School<br>2204 Sharon Dr<br>Albany, GA 31707 | 1. CB |
| 2 | Monday, November 15, 2021, AM<br><br>Dougherty Co | Oak Tree GNETS Program at Merry Acres Middle School<br>1601 Florence Dr<br>Albany, GA 31707 | 1. SB |
| 3 | Monday, November 15, 2021, PM<br><br>Dougherty Co | Oak Tree GNETS Program at Westover High School<br>2600 Partridge Ln<br>Albany, GA 31707 | 2. SB |
| 4 | Tuesday, November 16, 2021, AM<br><br>Muscogee Co | Woodall GNETS Center at JD Davis Elementary<br>1822 Shepherd Dr<br>Columbus, GA 31906 | 2. CB |
| 5 | Tuesday, November 16, 2021, PM<br><br>Muscogee Co | Woodall GNETS at G.W. Carver High School<br>3100 8th St<br>Columbus, GA 31906 | 3. SB |
| 6 | Wednesday, November 17, 2021, AM<br>Return visit:<br>Wednesday, October 26, 2022<br><br>Bibb Co | Elam Alexander GNETS Academy at Burke Center Campus<br>2051 Second St<br>Macon, GA 31201 | 3. CB |
| 7 | Wednesday, November 17, 2021, AM<br>Return visit:<br>Wednesday, October 26, 2022<br><br>Bibb Co | Elam Alexander GNETS at LH Williams Elementary School<br>325 Pursley St<br>Macon, GA 31201 | 4. SB |
| 8 | Thursday, November 18, 2021<br>Return Visit:<br>Wednesday, October 26, 2022<br><br>Bibb Co | Elam Alexander GNETS Adolescent Services at Southwest High School<br>1775 Williamson Rd<br>Macon, GA 31206<br>*Building says Academy* | 4. CB |
| 9 | Thursday, November 18, 2021<br><br>Bibb Co | Elam Alexander GNETS at Miller Middle School<br>751 Hendley St<br>Macon, GA 31204 | 5. SB |

GNETS Program SITE VISIT TABLE AND SUMMARY

| 10 | Thursday, November 18, 2021<br><br>Crawford Co | Elam Alexander GNETS at Crawford County High School<br>400 East Agency St<br>Roberta, GA 31078 | 6. SB |
|----|----|----|----|
| 11 | Thursday, November 18, 2021<br><br>Crawford Co | Elam Alexander GNETS at Crawford County Middle School<br>401 Lowe Rd<br>Roberta, GA 31078 | 7. SB |
|  | **SITE VISIT TWO** |  |  |
| 12 | Wednesday, December 8, 2021<br>Return Visit: May 12, 2022<br>Clayton Co | South Metro GNETS Center at JB Henderson<br>354 N Ola Rd<br>McDonough, GA 30252 | 5. CB |
| 13 | Thursday, December 9, 2021, AM<br><br>Clayton Co | South Metro GNETS Ash Street Center<br>5277 Ash Street<br>Forest Park, GA 30297 | 6. CB |
| 14 | Thursday, December 9, 2021, PM<br><br>Clayton Co | South Metro GNETS at Edmonds Elementary<br> 4495 Simpson Rd<br> Forest Park, GA 30297 | 8. SB |
| 15 | Thursday, December 9, 2021, PM<br><br>Clayton Co | South Metro GNETS at Forest Park High School<br>5452 Phillips Dr<br>Forest Park, GA 30297 | 9. SB |
|  | **SITE VISIT THREE** |  |  |
| 16 | Tuesday, March 1, 2022, AM<br><br>Chatham Co | GNETS Coastal Georgia Comprehensive Academy at HV Jenkins High School<br>1800 East Derenne Ave<br>Savannah, GA 31406 | 10. SB |
| 17 | Tuesday, March 1, 2022, PM<br><br>Chatham Co | GNETS Coastal Georgia Comprehensive Academy at Savannah<br>2001 Cynthia St<br>Savannah, GA 31415 | 7. CB |
| 18 | Wednesday, March 2, 2022, PM<br><br>Clarke Co | Rutland GNETS Center<br>1250 Oglethorpe Ave<br>Athens, GA 30606 | 8. CB |
| 19 | Thursday, March 3, 2022, AM<br><br>DeKalb Co. | Dekalb-Rockdale GNETS Center at Eagle Woods Academy<br>5931 Shadow Rock Dr<br>Lithonia, GA 30058 | 9. CB |
| 20 | Thursday, March 3, 2022, AM<br><br>DeKalb Co | Dekalb-Rockdale GNETS Shadow Rock Center at Shadow Rock Elementary<br>1040 Kingway Dr<br>Lithonia, GA 30058 | 10. CB |

GNETS Program SITE VISIT TABLE AND SUMMARY

| 21 | Thursday, March 3, 2022, PM<br><br>DeKalb Co | Dekalb-Rockdale GNETS at McLendon Elementary School<br>3169 Hollywood Dr<br>Decatur, GA 30033 | 11. SB |
|---|---|---|---|
| 22 | Thursday, March 3, 2022, PM<br><br>DeKalb Co | Dekalb-Rockdale GNETS at Southwest DeKalb High School<br>2863 Kelley Chapel Rd<br>Decatur, GA 30034 | 12. SB |
| | **SITE VISIT FOUR** | | |
| 23 | Monday, April 25, 2022, AM<br><br>Baldwin Co | Oconee GNETS at Baldwin High School<br>155 Hwy 49 W<br>Milledgeville, GA 31061 | 13. SB |
| 24 | Monday, April 25, 2022, AM<br><br>Baldwin Co | Oconee GNETS at Oak Hill Middle School<br>356 Blandy Road<br>Milledgeville, GA 31061 | 14. SB |
| 25 | Monday, April 25, 2022, AM<br><br>Baldwin Co | Oconee GNETS at Lakeview Academy<br>220 N ABC N<br>Milledgeville, GA 31061 | 15. SB |
| 26 | Monday, April 25, 2022, PM<br>Putnam Co | Oconee GNETS at Putnam County Middle School<br>140 Sparta Hwy<br>Eatonton, GA 31024 | 16. SB |
| 27 | Tuesday, April 26, 2022, AM<br>Return Visit:<br>October 7, 2022<br>Habersham Co | Futures GNETS Cornelia Center<br>595 Elrod Street<br>Cornelia, GA 30531 | 11. CB |
| 28 | Tuesday, April 26, 2022, AM<br><br>Habersham Co | Futures GNETS at Cornelia Elementary<br>375 Old Cleveland Rd<br>Cornelia, GA 30531 | 17. SB |
| 29 | Tuesday, April 26, 2022, PM<br><br>Dawson Co | Futures GNETS at Dawson County Jr High<br>109 Allen Street,<br>Dawsonville, GA 30534 | 18. SB |
| 30 | Wednesday, April 27, 2022, AM<br><br>Dawson Co | Futures GNETS at Dawson County High School<br>1665 Perimeter Road<br>Dawsonville, GA 30534 | 19. SB |
| 31 | Wednesday, April 27, 2022, AM<br><br>Dawson Co | Futures GNETS at Black Mills Elementary School<br>1860 Dawson Forest Road East<br>Dawsonville, GA 30534 | 20. SB |
| 32 | Wednesday, April 27, 2022, PM<br><br>Forsyth Co | Futures GNETS Center at Cumming<br>136 Elm Street<br>Cumming, GA 30040 | 12. CB |

**GNETS Program SITE VISIT TABLE AND SUMMARY**

| 33 | Thursday, April 28, 2022, AM<br><br>Cobb Co | HAVEN Academy GNETS at Lassiter High School<br>2601 Shallowford Road<br>Marietta, GA 30066 | 21. SB |
|----|---------------------------------------------|--------------------------------------------------------------------------------------------|--------|
| 34 | Thursday, April 28, 2022<br><br>Cobb Co | HAVEN Academy GNETS at Sprayberry High School<br>2525 Sandy Plains Rd<br>Marietta, GA 30066 | 22. SB |
| 35 | Thursday, April 28, 2022, PM<br>Cobb Co | HAVEN Academy GNETS at Skyview<br>5805 Dunn Road<br>Mableton, GA 30126 | 13. CB |
| | **SITE VISIT FIVE** | | |
| 36 | Monday, May 2, 2022, AM<br>Bulloch Co | Cedarwood GNETS Center at Statesboro<br>400 Donnie Simmons Way<br>Statesboro, GA 30458 | 14. CB |
| 37 | Monday, May 2, 2022, PM<br>Toombs Co | Cedarwood GNETS Center at Lyons<br>214 East Toombs Ave<br>Lyons, GA 30436 | 15. CB |
| 38 | Tuesday, May 3, 2022, AM<br>Liberty Co | Coastal Academy GNETS Center at Liberty<br>100 Deen St<br>Hinesville, GA 31313 | 16. CB |
| 39 | Tuesday, May 3, 2022, PM<br>Glynn Co | Coastal Academy GNETS Center at Glynn<br>2900 Albany St<br>Brunswick, GA 31520 | 17. CB |
| 40 | Wednesday, May 4, 2022, PM<br>Camden Co | Coastal Academy GNETS Center at Camden<br>311 South East St<br>Kingsland, GA 31548 | 18. CB |
| 41 | Thursday, May 5, 2022, AM<br><br>Thomas Co | Pathways GNETS Center<br>208 Pinetree Blvd<br>Thomasville, GA 31792 | 19. CB |
| 42 | Thursday May 5, 2022 PM<br><br>Lowndes Co | Horizon Academy GNETS Center at Valdosta<br>3101 North Barack Obama Blvd<br>Valdosta, GA 31601 | 20. CB |
| 43 | Friday, May 6, 2022, PM<br><br>Crisp Co | GNETS Flint Area Crisp County Learning Center<br>500 East 14th Ave<br>Cordele, GA 31015 | 21. CB |
| | **SITE VISIT SIX** | | |
| 44 | Monday May 9, 2022<br><br>Floyd Co | Northwest GNETS at Coosa High School<br>4454 Alabama Hwy<br>Rome, GA 30165 | 23. SB |

GNETS Program SITE VISIT TABLE AND SUMMARY

| 45 | Monday, May 9, 2022<br><br>Floyd Co | Northwest GNETS at Main Elementary<br>3 Watters St<br>Rome, GA 30161 | 24. SB |
|----|----|----|----|
| 46 | Monday, May 9, 2022<br><br>Chattooga Co | Northwest GNETS at Chattooga High School<br>989 GA-114<br>Summerville, GA 30747 | 25. SB |
| 47 | Monday May 9, 2022, PM<br><br>Chattooga Co | Northwest GNETS at LeRoy Massey Elementary<br>403 Dot Johnson Dr<br>Summerville, GA 30747 | 26. SB |
| 48 | Monday, May 9, 2022, PM<br>Floyd Co | Northwest GNETS at Coosa Middle School<br>212 Eagle Dr<br>Rome, GA 30165 | 27. SB |
| 49 | Tuesday, May 10, 2022, AM<br><br>Fulton Co | North Metro GNETS at Haynes Bridge Middle School 10665 Haynes Bridge Road<br>Alpharetta, GA 30022 | 28. SB |
| 50 | Tuesday, May 10, 2022, AM<br><br>Gwinnett Co | North Metro GNETS Buice Center<br>1225 Northbrook Pkwy<br>Suwannee, GA 30024 | 22. CB |
| 51 | Tuesday, May 10, 2022, PM<br><br>Fulton Co | North Metro GNETS at Centennial High School<br>9310 Scott Rd<br>Roswell, GA 30076 | 29. SB |
| 52 | Wednesday, May 11, 2022, AM<br><br>Fulton Co | North Metro GNETS at Tri-Cities High School<br>2575 Harris St<br>East Point, GA 30344 | 30. SB |
| 53 | Wednesday, May 11, 2022, PM<br><br>Fulton Co | North Metro GNETS at Hamilton E. Holmes Elementary School<br>2301 Connally Dr<br>East Point, GA 30344 | 31. SB |
| 54 | Thursday, May 12, 2022, AM<br>**First Visit**: December 8, 2021<br>Henry Co | South Metro GNETS at J.B. Henderson Center<br>354 Ola Rd<br>McDonough, GA 30523 | CB<br>(Repeat) |
| 55 | Friday, May 13, 2022, AM<br><br>McDuffie Co | Sand Hills GNETS Center at Thomson<br>511 Main St<br>Thomson, GA 30824 | 23. CB |
| 56 | Friday, May 13, 2022, PM<br><br>Richmond Co | Sand Hill GNETS at Tubman Educational Center<br>1740 Walton Way<br>Augusta, GA 30906 | 24. CB |

**GNETS Program SITE VISIT TABLE AND SUMMARY**

|  | **SITE VISIT SEVEN** | | |
|---|---|---|---|
| 57 | Wednesday, October 5, 2022, AM<br><br>Fulton Co | North Metro GNETS Center at Oglethorpe<br>601 Beckwith Street SW<br>Atlanta, GA 3031 | 25. CB |
| 58 | Wednesday, October 5, 2022, PM<br><br>Gwinnett Co | North Metro GNETS Buice at Northbrook Middle School<br>1221 Northbrook Parkway<br>Suwannee, GA 30024 | 32. SB |
| 59 | Friday, October 7, 2022, AM<br>Habersham<br>**First Visit:** Tuesday, April 26, 2022 | GNETS Futures Cornelia Center<br>595 Elrod Street<br>Cornelia, GA 30531 | CB<br>(Repeat) |
|  | **SITE VISIT EIGHT** | | |
| 60 | Wednesday, October 26, 2022, AM<br>**First Visit:**<br>Thursday, November 18, 2021<br><br>Bibb Co<br>(Site 1) | Elam Alexander GNETS<br>Adolescent Services at Southwest High School<br>1775 Williamson Rd<br>Macon, GA 31206<br><br>Building says Academy | CB<br>(Repeat) |
| 61 | Wednesday, October 26, 2022<br>Bibb Co | Elam Alexander GNETS at Southwest High School<br>1775 Williamson Rd<br>Macon, GA 31206 | SB<br>(Repeat) |
| 62 | Wednesday, October 26, 2022<br>Bibb Co<br><br>**First Visit:**<br>Wednesday, November 17, 2021 AM<br><br>Repeat for Photos | Elam Alexander GNETS at<br>Burke Center Campus<br>2051 Second St<br>Macon, GA 31201 | CB<br>(Repeat) |
| 63 | Wednesday, October 26, 2022<br>Bibb Co<br><br>**First Visit:**<br>Wednesday, November 17, 2021 AM<br><br>Repeat Visit for Photos | Elam Alexander GNETS at<br>LH Williams Elementary School<br>325 Pursley St<br>Macon, GA 31201 | SB<br>(Repeat) |
| 64 | Wednesday, October 26, 2022<br><br>Bibb Co<br><br>**First Visit:**<br>Thursday, November 18, 2021<br><br>Repeat Visit for Photos | Elam Alexander GNETS at Miller Middle School<br>751 Hendley St<br>Macon, GA 31204 | SB<br>(Repeat) |

**GNETS Program SITE VISIT TABLE AND SUMMARY**

| | | | |
|---|---|---|---|
| 65 | Friday, October 28, 2022, AM<br>Sumter Co<br>**Note:**<br>Rescheduled visit from<br>Friday 5.6.22 PM | Flint Area GNETS at Sumter County Middle School<br>200 Industrial Blvd<br>Americus, GA 31719 | 33. SB |
| 66 | Friday, October 28, 2022, AM<br><br>Colquitt Co | Horizon GNETS Academy at Moultrie<br>2510 West Boulevard<br>Moultrie, GA 31768 | 26. CB |
| | **SITE VISIT NINE** | | |
| 67 | Thursday, March 2, 2023<br><br>Fannin Co | NorthStar GNETS at Fannin County Middle School 4560 Old Hwy 76<br>Blue Ridge, GA 30513 | 34. SB |
| 68 | Thursday, March 2, 2023, AM<br><br>Fannin Co | NorthStar GNETS at East Fannin Elementary School<br>1 Elementary Circle<br>Morganton, GA 30560 | 35. SB |
| 69 | Thursday, March 2, 2023<br><br>Fannin Co | NorthStar GNETS at Fannin County High School<br>360 Rebel Cir<br>Blue Ridge, GA 30513 | 36. SB |
| 70 | Friday, March 3, 2023, AM<br><br>Pickens Co | NorthStar GNETS Center at Jasper<br>159 Stegall Dr.<br>Jasper, GA 30143 | 27. CB |
| | | Site visit to NorthStar GNETS Center at Dalton canceled due to weather. | |

**KEY:**
Gray -Repeat visits
Yellow boxed-Centers that are adjacent to schools and newer construction-still segregated
Blue boxed-Center-Based
White boxed-School-Based
27 centers/36 school-based/33 counties/7 Repeat visits

# Appendix E

# Materials Considered by Amy McCart in the Preparation of her Expert Report

*United States v. Georgia*
1:16-cv-03088-ELR
In the United States District Court
for the Northern District of Georgia
Atlanta Division

**REPORT OF Dr. Amy McCart**
***Considered Materials***

1. Plaintiff's Complaint (ECF Doc. 001)

2. Defendant's Motion to Dismiss (ECF Doc. 047)

3. Plaintiff's Opposition to Motion to Dismiss (ECF Doc. 050)

4. Order Denying State's Motion to Dismiss (ECF Doc. 061)

5. Deposition transcripts of the following GNETS Directors:

   - Talithia Newsome
   - Celeste Ngeve
   - Whitney Braddock
   - David Ackerman
   - Derrick Gilchrist
   - Patricia Wolf
   - Brooke Cole
   - Lisa Futch
   - Cassandra Holifield
   - Samuel Clemons
   - Jacqueline Neal
   - Haley Livingston

6. Deposition transcripts of the following State employees:

   - Lakesha Stevenson
   - Vickie Cleveland
   - Matt Jones
   - Wina Low
   - Shaun Owen
   - Zelphine Smith-Dixon

**Publicly available documents**

The GNETS Rule, directory, map, and other resources, available at
https://www.gadoe.org/Curriculum-Instruction-and-Assessment/Special-Education-Services/Pages/Georgia-Network-for-Special-Education-and-Supports.aspx

Georgia Department of Education, Health and Physical Education Program:
https://www.gadoe.org/Curriculum-Instruction-and-Assessment/Curriculum-and-Instruction/Documents/New%20Curriculum%20Directors/Health-Physical%20Education%20Summary.pdf#:~:text=Each%20school%20containing%20any%20grade%20K-5%20shall%20provide,unit%20of%20credit%20in%20health%20and%20physical%20education

The MindSet Safety Management website, available at
https://mindsetinstructortraining.com/mindset-faq/

Nonviolent Crisis Intervention, CPI (2010), Georgia Department of Education Rule 160-5-1-.35 Seclusion and Restraint for all Students; Correlation to *Nonviolent Crisis Intervention* Training (2010), available at:
https://www.crisisprevention.com/CPI/media/Media/Resources/alignments/10-CPI-LEG-017_Georgia_DOE_Alignment.pdf

Links for photos:

- Northbrook, available at photosphere:
  https://www.google.com/maps/uv?pb=!1s0x88f5bd7cba0db193%3A0xe86f7bd49503c187!3m1!7e115!4s%2Fmaps%2Fplace%2Fnorthbrook%2Bmiddle%2Bschool%2Bgeorgia%2F%4034.0053202%2C-84.067533%2C3a%2C75y%2C319.19h%2C90t%2Fdata%3D*213m4*211e1*213m2*211s7GUHFHkGCjRIsmTWSzLsHw*212e0*214m2*213m1*211s0x88f5bd7cba0db193%3A0xe86f7bd49503c187%3Fsa%3DX!5snorthbrook%20middle%20school%20georgia%20-%20Google%20Search!15sCgIgAQ&imagekey=!1e2!2s7GUHFHkGCjRIsmTWSzLsHw&hl=en&sa=X&ved=2ahUKEwjM2_7zjMT_AhXsFjQIHf1TCm4Qpx96ABzhzEAw
- Northbrook, available at:
  https://www.google.com/search?client=safari&rls=en&q=northbrook+middle+school+georgia&ie=UTF-8&oe=UTF-8#lpg=cid:CgIgAQ%3D%3D,ik:CAoSLEFGMVFpcE9ZcmhMdHJkTkNraTdrc0x0WHNBYWhva3JjjLWxRV21WbHJjQ1Vn
- Merry Acres Middle School, available at: https://www.facilitron.com/mams31707
- Elam Alexander at Southwest, available at:
  https://www.google.com/local/place/fid/0x88f3fc0ada2166cf:0xf11be9c1960e4be7/photosphere?iu=https://streetviewpixels-pa.googleapis.com/v1/thumbnail?panoid%3D3yNhG7BEa-Of_gqX2Y5Ypg%26cb_client%3Dlu.gallery.gps%26w%3D160%26h%3D106%26yaw%3D349.45963%26pitch%3D0%26thumbfov%3D100&ik=CAISFjN5TmhHN0JFYS1PZl9ncVgyWTVZcGc%3D
- HV Jenkins, available at: https://www.sccpss.com/esplost/Hero%20%20Jenkins/005.jpg

## References from Report

*6 key takeaways from The State of School Transportation 2022 Report*. (n.d.). Hop Skip Drive.
https://www.hopskipdrive.com/blog/6-key-takeaways-from-the-state-of-school-transportation-2022-report

Agran, M., Jackson, L., Kurth, J. A., Ryndak, D., Burnette, K., Jameson, M., Zagina, A., Fitzpatrick, H., & Wehmeyer, M. (2020). Why aren't students with severe disabilities being placed in general education classrooms: Examining the relations among classroom placement, learner outcomes, and other factors. *Research and Practice for Persons with Severe Disabilities*, *45*(1), 4-13. https://doi.org/10.1177/1540796919878134

Ain, G. I. (2018). What is the appropriate curriculum for students with disabilities? Standards-based curriculum versus functional curriculum for students with disabilities. Ball State University. https://files.eric.ed.gov/fulltext/ED593728.pdf

Albright, M. (2023). *Interactive: Georgia GNETS students mostly black, male*. The Atlanta Journal-Constitution. https://www.ajc.com/state-regional-govt-politics/georgia-gnets-programs/

Annamma, S. A. & Handy, T. (2019). DisCrit solidarity as curriculum studies and transformative praxis. *Curriculum Inquiry*, *49*(4), 442-463. https://doi.org/10.1080/03626784.2019.1665456

Artiles, A. & Kozleski, E., (2007). Beyond convictions: Interrogating culture, history, and power in inclusive education. *Language Arts, 84*(4), 357-364. *https://kuscholarworks.ku.edu/bitstream/handle/1808/10881/KozleskiBeyondConvictionsMedium.pdf?seq*

Aviv, R. (2018, October 1). *Georgia's separate and unequal special-education system. A statewide network of schools for disabled students has trapped black children in neglect and isolation.* The New Yorker. Georgia's Separate and Unequal Special-Education System. https://www.newyorker.com/magazine/2018/10/01/georgias-separate-and-unequal-special-education-system

Butler, A. (2018, December 11). *Hidden but prevalent racism in Georgia's special education programs. Project Censored.* Validated Independent News. https://www.projectcensored.org/hidden-but-prevalent-racism-in-georgias-special-education-programs/

Calabrese Barton, A., & Tan, E. (2020). Beyond equity as inclusion: A framework of "Rightful Presence" for guiding justice-oriented studies in teaching and learning. *Educational Researcher, 49*(6), 433–440. https://doi.org/10.3102/0013189X20927363

Center on PBIS. (2022). Supporting and Responding to Student's Social, Emotional, and Behavioral Needs: Evidence-Based Practices for Educators (Version 2). Center on PBIS, University of Oregon. www.pbis.org

Choi, J. H., McCart, A. B., & Sailor, W. (2020). Achievement of Students with IEPs and Associated Relationships with an Inclusive MTSS Framework. *Journal of Special Education.* https://doi.org/10.1177/0022466919897408

Choi, J. H., McCart, A. B., & Sailor, W. (2020). Reshaping educational systems to realize the promise of inclusive education. In *FIRE: Forum for International Research in Education*, *6*(1), 8-23.https://doi.org/10.32865/fire202061179

Codrington, J., & Fairchild, H. H. (2012). *Special education and the miseducation of African American children: A call to action*. Washington, DC: Association of Black Psychologists. https://www.abpsi.org/pdf/specialedpositionpaper021312.pdf

Cooc, N. (2017). Examining racial disparities in teacher perceptions of student disabilities. *Teachers College Record*, *119*, 1-32. https://journals.sagepub.com/doi/abs/10.1177/016146811711900703?journalCode=tcza

Cook, B. G., & Schirmer, B. R. (2003). What is special about special education? Overview and analysis. *The Journal of Special Education*, *37*(3), 200-205. https://journals.sagepub.com/doi/abs/10.1177/00224669030370031001

Cordes, S. A., Christopher, R., and Schwartz, A. (2021). *Do long bus rides drive down academic outcomes?*. (EdWorkingPaper: 21-504). Annenberg Institute at Brown University. https://doi.org/10.26300/5v2d-5p08

Cornett, J., & Knackstedt, K. M. (2020). Original sin(s): lessons from the US model of special education and an opportunity for leaders. *Journal of Educational Administration,58(5),* 507-520. https://www.emerald.com/insight/content/doi/10.1108/JEA-10-2019-0175/full/html

Cortiella, C. (2008). *Understanding the standards-based individualized education program (IEP).* National Center for Learning Disabilities. (Advocacy Brief from National Center for Learning Disabilities). https://www.advocacyinstitute.org/resources/UnderstandingStandards-basedIEPs

Cosier, M., Causton-Theoharis, J., & Theoharis, G. (2013). Does access matter? Time in general education and achievement for students with disabilities. *Remedial and Special Education*, *34*(6), 323-332. https://journals.sagepub.com/doi/abs/10.1177/0741932513485448

Dalton, M. (2019). Forgotten children: Rethinking the individuals with disabilities education act behavior provisions. *American University Journal of Gender, Social Policy, and the Law, 27*(2), Article 3. https://digitalcommons.wcl.american.edu/jgspl/vol27/iss2/3

DeMatthews, D. (2014). Deconstructing systems of segregation: Leadership challenges in an urban school. *Journal of Cases in Educational Leadership, 17(1) 17-31. https://doi.org/*10.1177/1555458913518537

Dent, N. (2019, February 15). Georgia's segregated special education system: How alternative schools became a means to combat integration. Yorktown Sentry. https://yorktownsentry.com/6640/opinion/georgias-segregated-special-education-system/

Dynamic Learning Maps. (2021). *Mini-map for ELA.EE.RL.3.1.* https://dynamiclearningmaps.org/sites/default/files/documents/ELA_EEs/ELA.EE.RL.3.1_Instructions.pdf

Ennis, R. P., & Katsiyannis, A. (2018). Avoiding unwarranted segregation of students with behavioral needs: Lessons learned. *Intervention in School and Clinic*, *53*(4), 212-215. https://doi.org/10.1177/1053451217712954

Ennis, R. P., Blanton, K., & Katsiyannis, A. (2017). Child find activities under the individuals with disabilities education act: Recent case law. *Teaching Exceptional Children*, *49*(5), 301-308. https://journals.sagepub.com/doi/abs/10.1177/0040059916685063?journalCode=tcxa

Fain, K. C. (2017). Segregation of Georgia Schoolchildren with Disabilities: A Violation of International Law. *Ga. J. Int'l & Comp. L.*, *46*, 715. https://digitalcommons.law.uga.edu/cgi/viewcontent.cgi?article=2431&context=gjicl

Ferri, B. A., & Connor, D. J. (2005a). In the shadow of *Brown*: Special education and over-representation of students of color. *Remedial and Special Education*, *26(2)*, 93–100. https://doi.org/10.1177/07419325050260020401

Fisher, M., & Meyer, L. H. (2002). Development and social competence after two years for students enrolled in inclusive and self-contained educational programs. *Research and Practice for Persons with Severe Disabilities*, *27*(3), 165-174. https://journals.sagepub.com/doi/abs/10.2511/rpsd.27.3.165

Fixsen, D., Blase, K., Horner, R., Sims, B. & Sugai, G. (2013). *Scaling-up Brief, No. 1.* State Implementation & Scaling-up of Evidence-based Practices, University of North Carolina at Chapel Hill. https://nirn.fpg.unc.edu/projects/state-implementation-and-scaling-evidence-based-practices-sisep-center

Garwood, J. D., & Ampuja, A. A. (2019). Inclusion of students with learning, emotional, and behavioral disabilities through strength-based approaches. *Intervention in School and Clinic*, *55*(1), 46-51. https://doi.org/10.1177%2F1053451218767918\

Gee, K. (2020). Why Indeed?. *Research and Practice for Persons with Severe Disabilities*, *45*(1), 18-22. https://doi.org/10.1177/1540796919900951

Georgia Network for Educational and Therapeutic Support (GNETS), Georgia Compilation of Rules & Regulations, Rule 160-4-7-.15. (2010). https://casetext.com/regulation/georgia-administrative-code/department-160-rules-of-georgia-department-of-education/chapter-160-4/subject-160-4-7-special-education/rule-160-4-7-15-georgia-network-for-educational-and-therapeutic-support-gnets

Gilmour, A. F., Fuchs, D., & Wehby, J. H. (2019). Are students with disabilities accessing the curriculum? A meta-analysis of the reading achievement gap between students with and without disabilities. *Exceptional Children*, *85*(3), 329-346. https://journals.sagepub.com/doi/abs/10.1177/0014402918795830

Goodman, S., Ward, C., & McIntosh, K. (2019). *Four key actions for State Education Agency teams to support implementation of Multi-Tiered Systems of Support*. National Implementation Research Network, University of North Carolina at Chapel Hill.

Graham, B. C., Keys, C. B., McMahon, S. D., & Brubacher, M. R. (2014). Transportation challenges for urban students with disabilities: Parent perspectives. *Journal of prevention & intervention in the community*, *42*(1), 45-57. https://doi.org/10.1080/10852352.2014.855058

Gross, A. (2015, July 30). *Georgia is illegally segregating students with behavioral problems. There's a better way*. Mother Jones. https://www.motherjones.com/politics/2015/07/behavior-segregation-georgia-doj/

Harrison, J. R., Soares, D. A. & Joyce, J. (2019) Inclusion of students with emotional and behavioural disorders in general education settings: a scoping review of research in the US. *International Journal of Inclusive Education, 23(12)*, 1209-1231. https://doi.org/10.1080/13603116.2018.1444107

Jackson, L. B. (2014). What legitimizes segregation? The context of special education discourse: A response to Ryndak et al. *Research and Practice for Persons with Severe Disabilities, 39*(2), 156-160. https://doi.org/10.1177/1540796914545960

Judd, A. (2009, July 27). *Death highlights lack of regulation at Georgia 'psychoeducational' schools.* The Atlanta-Constitution. https://www.ajc.com/news/local/death-highlights-lack-regulation-georgia-psychoeducationalschools/

Judd, A. (2016, April 28). *Georgia psychoeducational students segregated by disability, race. Part one of a three-part series: Schools send disproportionate number of black children to programs already under fire for warehousing student with behavioral disorders*. The Atlanta Journal-Constitution. http://specials.myajc.com/psychoeducation/

Judd, A. (2016, May 5). *Part two of a three-part series: Educators wanted to subject Libby Bean to behavioral experimentation in Georgia's unique system of psychoeducational schools. A courtroom showdown would determine Libby's fate*. The Atlanta Journal-Constitution. http://specials.myajc.com/psychoeducation/#

Judd, A. (2016, May 8). Physical restraint common in psychoeducational schools. Part three of a three-part series: With a tiny sliver of students, special behavioral programs record five times more restraints that all other Georgia schools combined. The Atlanta Journal-Constitution. http://specials.myajc.com/psychoedrestraint/

Kamali, B., Mason, S. & Pohl, E. (2013). An analysis of special needs student busing. *Journal of Public Transportation, 16*(1). https://creativecommons.org/licenses/by-nc/4

Kern, L., Evans, S. W., Lewis, T. J., State, T. M., Weist, M. D., & Wills, H. P. (2015). CARS comprehensive intervention for secondary students with emotional and behavioral problems: Conceptualization and development. *Journal of Emotional and Behavioral Disorders*, *23*(4), 195-205. https://doi.org/10.1177/1063426615578173

Kleinert, H., Towles-Reeves, E., Quenemoen, R., Thurlow, M., Fluegge, L., Weseman, L., & Kerbel, A. (2015). Where students with the most significant cognitive disabilities are taught: Implications for general curriculum access. *Exceptional Children*, *81*(3), 312-328. https://doi.org/10.1177/0014402914563697

Knoester, M., & Au, W. (2015). Standardized testing and school segregation: like tinder for fire? *Race Ethnicity, and Education,* 20:1, 1-14, https://doi.org/10.1080/13613324.2015.1121474

Kohli, R., Pizarro, M., & Nevárez, A. (2017). The "new racism" of K–12 schools: Centering critical research on racism. *Review of Research on Education*, *41*, 182–202. https://journals.sagepub.com/doi/pdf/10.3102/0091732X16686949

Kozleski, E., Artiles, A., & Waitoller, F. (2014). Equity in inclusive education: A cultural historical comparative perspective. In L. Florian (Ed.), The Sage handbook of special education (2nd ed., Vol. 1, pp. 231250). Los Angeles, CA: Sage.

Kurth, J. A., Lyon, K. J., & Shogren, K. A. (2015). Supporting students with severe disabilities in inclusive schools: A descriptive account from schools implementing inclusive practices. *Research and Practice for Persons with Severe Disabilities*, *40*(4), 261-274. https://doi.org/10.1177/1540796915594160

Kurth, J. A., Lyon, K., & Shogren, K. A. (2015). Supports provided to students with severe disabilities in inclusive schools: Lessons learned from schools implementing inclusive practices. https://doi.org/10.1177/1540796915594160

Kurth, J. A., Morningstar, M. E., Hicks, T. A., & Templin, J. (2018). Exploring the relationship between school transformation and inclusion: A Bayesian multilevel longitudinal analysis. *Inclusion*, *6*(1), 19-32.https://doi.org/10.1352/2326-6988-6.1.19

Lanterman, C., Lockwood, A. B., Sealander, K., Winans, S., & Novelli, M. (2021) Expanding the gaze and moving the needle: Inclusion for students with EBD, Preventing School Failure: Alternative Education for Children and Youth, 65:3, 185-193.  https://doi.org/10.1080/1045988X.2020.1852526

Lory, C., Mason, R. A., Davis, J. L., Wang, D., Kim, S. Y., Gregori, E., & David, M. (2020). A meta-analysis of challenging behavior interventions for students with developmental disabilities in inclusive school settings. *Journal of autism and developmental disorders*, *50*(4), 1221-1237. https://link.springer.com/article/10.1007/s10803-019-04329-x

MacDonald, A., McGill, P., & Murphy, G. (2018). An evaluation of staff training in positive behavioural support. *Journal of Applied Research in Intellectual Disabilities*, *31*(6), 1046-1061. https://doi.org/10.1111/jar.12460

McCart, A. B., & Miller, D. (2019). *Leading equity based MTSS for all students.*  Thousand Oaks, CA: Corwin Press. (ISBN 9781544372853).

McCarthy, M. R., Wiener, R., & Soodak, L. C. (2012). Vestiges of segregation in the implementation of inclusion policies in public high schools. *Educational Policy*, *26*(2), 309-338. https://doi.org/10.1177/0895904810386596

McKenna, J. W., Garwood, J., & Parenti, M. (2021). Inclusive instruction for students with emotional/behavioral disorders: Service in the absence of intervention research. *Intervention in School and Clinic*, *56*(5), 316-321.https://doi.org/10.1177%2F1053451220963084

McKenna, J. W., Newton, X, & Bergman, E. R. (2021). Inclusive instruction for students receiving special education services for emotional disturbance: A survey development study. *Assessment for Effective Intervention, 46(3),* 207-216. https://doi.org/10.1177/1534508419895085

McKenna, J. W., Solis, M., Brigham, F., & Adamson, R. (2019). The responsible inclusion of students receiving special education services for emotional disturbance: Unraveling the practice to research gap. *Behavior modification*, *43*(4), 587-611. https://doi.org/10.1177/0145445518762398

Meindl, J. N., Delgado, D., & Casey, L. B. (2020). Increasing engagement in students with autism in inclusion classrooms. *Children and Youth Services Review*, *111*, 104854. https://www.sciencedirect.com/science/article/pii/S0190740919312538?casa_token=lI0Kzg6A2xEAAAAA:aXKiAtS_IAxai7pO6M6PO4u8fkF-kLRYDyIPlBysLVmdIHFs8sF5hHHaVLJ06k9wofjXLj9LSQ

Mitchell, B. S., Kern, L., & Conroy, M. (2019). Supporting students with emotional or behavioral disorders: State of the field. *Behavioral Disorders, 44(2),* 70-84. https://doi.org/10.1177/0198742918816518

Morgan, P. L., Woods, A. D., Wang, Y., Hillemeier, M. M., Farkas, G., & Mitchell, C. (2020). Are Schools in the US South Using Special Education to Segregate Students by Race?. *Exceptional Children*, *86*(3), 255-275. https://doi.org/10.1177%2F0014402919868486

National Implementation Research Network (2008). Active Implementation Formula, Active Implementation Hub. https://nirn.fpg.unc.edu/module-2/implementation-drivers. Charlotte, NC: Author.

National Association of State Mental Health Program Directors Research Institute, Inc. (NRI). (2015, July). *Tracking the history of state psychiatric hospital closures from 1997 to 2015*. NRI Analytics Improving Behavioral Health. https://www.nri-inc.org/media/1111/2015-tracking-the-history-of-state-psychiatric-hospital-closures-lutterman.pdf

Nighswander, M., & Blair, P. (2022). From institutions to inclusion: How children with disabilities gained educational rights in the U.S. *The Journal of School Nursing,* 1-11. https://doi.org/10.1177/10598405221105054

Oh-Young, C. & Filler, J. (2015). A meta-analysis of the effects of placement on academic and social skill outcome measures of students with disabilities. *Research in Developmental Disabilities, 47,* 80-92. https://doi.org/10.1016/j.ridd.2015.08.014

Oliver, K. (2015, July 18). State behavioral program serving Gainesville, hall student under federal scrutiny. The Gainesville Times. https://www.gainesvilletimes.com/news/state-behavioral-program-serving-gainesville-hallstudents-under-federal-scrutiny/

Ordway, D. (2023, March 1). *Corporal punishment in schools: Research and reporting tips to guide your coverage.* The Journalist's Resource, Informing the news. https://journalistsresource.org/education/corporal-punishment-schools-discipline-research/

Orozco, R., & Jaime Diaz, J. (2016). "Suited to Their Needs": White Innocence as a Vestige of Segregation. *Multicultural Perspectives*, *18*(3), 127-133. https://doi.org/10.1080/15210960.2016.1185610

Pratt, T. (2017, March 21). The separate, unequal education of students with special needs. Hechinger Report. https://hechingerreport.org/georgia-program-children-disabilities-separate-unequaleducation/

Sadler, N. (2022, September 12). Forsyth co paraprofessional arrested for striking a student with her purse. AccessWDUN. https://accesswdun.com/article/2022/9/1130901/forsyth-co-paraprofessional-arrested-forstriking-a-student-with-her-purse

Savransky, B. (2023, April 13). Collapsing roofs, broken toilets, flooded classrooms; Inside the worst-funded schools in the nation. *Idaho Statesman.* https://www.propublica.org/article/idaho-deteriorating-schools-repair-bonds

Scott, N., Lakin, C., & Larson, S. (2008). The 40th anniversary of deinstitutionalization in the united states: Decreasing state institutional populations, 1967- 2007. *Intellectual and Developmental Disabilities, 46*(5), 402-405. https://doi.org/10.1352/2008.46:402-405

Scott, T. M., & Burt, J. L. (2018). The continuing evolution of a science for students with behavioral disorders: Who, what, when, where, and how. *Rural Special Education Quarterly*, *37*(3), 132-139. https://doi.org/10.1177%2F8756870518764381

Skiba, R. J., Artiles, A. J., Kozleski, E. B., Losen, D. J., & Harry, E. G. (2016). Risks and consequences of oversimplifying educational inequities: A response to Morgan et al.(2015). *Educational Researcher*, *45*(3), 221-225. https://doi.org/10.3102/0013189X16644606

SWIFT Education Center. (2020). Schoolwide Integrated Framework for Transformation Fidelity Integrity Assessment, Version 2.1. Lawrence, KS: Author.

Technical Assistance ALLIANCE for Parent Centers. (2023). *Transportation and children with Disabilities.* (Pacer Center-ALLIANCE ACTion Sheet: ALL-55). Partners Resource Network. https://prntexas.org/transportation-and-children-with-disabilities/

Thompson, K. (2013). Is separate always unequal? A philosophical examination of ideas of equality in key cases regarding racial and linguistic minorities in education. *American Educational Research Journal.* 50(6), 1249-1278. https://doi.org/10.3102/0002831213502519

United States Department of Education, Office of Special Education and Rehabilitative Services, Office of Special Education Programs. (2018). 40th annual report to Congress on the implementation of the Individuals with Disabilities Education Act. https://www2.ed.gov/about/reports/annual/osep/2018/parts-b-c/40th-arc-for-idea.pdf

Wehmeyer, M., Shogren, K., Kurth, J., Morningstar, M., Kosleski, E., Argan, M., Jackson, L., Jameson, J., McDonnell, J., & Ryndak, D (2016). Including students with extensive and pervasive needs. *Advances in Special Education.* 31, 129-155. ISSN: 0270-4013/doi:10.1108/S0270-401320160000031009

Wiey, A. L., Brigham, F. J., Kauffman, J. M., & Bogan, J. E. (2013). Disproportionate poverty, conservatism, and the disproportionate identification of minority students with emotional and behavioral disorders. *Education and Treatment of Children*, *36(4)*, 29–50. https://muse.jhu.edu/pub/20/article/524142/pdf

Williams, J., Pazey, B., Fall, A., Yates, J., & Roberts, G. (2015). Avoiding the threat: An exploratory study into a theoretical understanding of the de facto segregation of students with disabilities. *NAASP Bulletin*, 99(3) 233-253. https://doi.org/10.1177/0192636515601491

Zigmond, N. (2003). Where should students with disabilities receive special education services? Is one place better than another?. *The Journal of special education*, *37*(3), 193-199. https://doi.org/10.1177/00224669030370030901

Zimmer, A. & Gonen, Y. (2019, October 17). *Special needs students are plagued by an increasing number of school bus delays*. Chalkbeat New York. https://ny.chalkbeat.org/2019/10/17/21109079/special-needs-students-are-plagued-by-an-increasing-number-of-school-bus-delays

Documents produced by the State of Georgia, regional GNETS programs, or the United States

| Production::Begin Bates | Production::End Bates | Doc FileName |
|---|---|---|
| GA00003635 | GA00003639 | BHPAC Office of Children Young Adults and Families 3.12.19.pdf |
| GA00003749 | GA00003749 | 00000000F88D3B3374F1C246BD7F35362307754E04FB7000.MSG |
| GA00003877 | GA00003883 | Meeting February 28 2019 MINUTES.pdf |
| GA00003891 | GA00003892 | Resilient Georgia_2PG Flyer.pdf |
| GA00004463 | GA00004464 | 00000000F88D3B3374F1C246BD7F35362307754E64714400.MSG |
| GA00004651 | GA00004652 | DBHDD OCYF_Array.pdf |
| GA00013175 | GA00013175 | GNETS Services Flow Chart.docx |
| GA00013176 | GA00013179 | GNETS Student Information Pkt.docx |
| GA00013180 | GA00013181 | Guidance for GNETS Placements.docx |
| GA00013646 | GA00013712 | FY18 Winter LEA Collaborative ppt Final 12-6-2017-.pdf |
| GA00018870 | GA00018871 | 000000006C8AEE8608460C42A25E63E540F1D2AAC4A92200.MSG |
| GA00018922 | GA00018931 | Memo re Teacher Qualifications (10-3-16).docx |
| GA00018932 | GA00018932 | 000000006C8AEE8608460C42A25E63E540F1D2AAA4A62200.MSG |
| GA00018934 | GA00018939 | Georgia.docx |
| GA00018978 | GA00018981 | 000000006C8AEE8608460C42A25E63E540F1D2AA44C12200.MSG |
| GA00018995 | GA00018995 | 000000006C8AEE8608460C42A25E63E540F1D2AA447F2200.MSG |
| GA00018997 | GA00019030 | 1314_SSI_D2820_151920151113.pdf |
| GA00019032 | GA00019033 | 000000006C8AEE8608460C42A25E63E540F1D2AAC45F2200.MSG |
| GA00019090 | GA00019094 | Draft LEA SNS Comment Guide.docx |
| GA00019102 | GA00019104 | 000000006C8AEE8608460C42A25E63E540F1D2AA24572200.MSG |
| GA00019105 | GA00019106 | 000000006C8AEE8608460C42A25E63E540F1D2AA64A32200.MSG |
| GA00019121 | GA00019122 | 1pager.docx |
| GA00019130 | GA00019132 | GA ESSA Meeting notes.docx |
| GA00019133 | GA00019135 | 000000006C8AEE8608460C42A25E63E540F1D2AAE4762200.MSG |
| GA00019143 | GA00019143 | FY17 FALL PBIS newsletter_FINAL.pub |
| GA00019144 | GA00019144 | Object 0 |
| GA00019145 | GA00019146 | 000000006C8AEE8608460C42A25E63E540F1D2AAA47F2200.MSG |
| GA00019216 | GA00019217 | 000000006C8AEE8608460C42A25E63E540F1D2AAA4732200.MSG |
| GA00019273 | GA00019274 | 000000006C8AEE8608460C42A25E63E540F1D2AA04412200.MSG |
| GA00019306 | GA00019307 | 000000006C8AEE8608460C42A25E63E540F1D2AAA4BC2200.MSG |
| GA00019344 | GA00019346 | IDT Meeting Notes 9.28.16.docx |

Documents produced by the State of Georgia, regional GNETS programs, or the United States

| GA00019434 | GA00019439 | StateDirectorSurveyFinalYear5Paper.pdf |
| GA00019440 | GA00019441 | 000000006C8AEE8608460C42A25E63E540F1D2AAA45E2100.MSG |
| GA00019443 | GA00019447 | IDT Operating Guidelines_2016_DRAFT.docx |
| GA00019529 | GA00019530 | 000000006C8AEE8608460C42A25E63E540F1D2AA44012100.MSG |
| GA00019641 | GA00019642 | 000000006C8AEE8608460C42A25E63E540F1D2AA84AA2100.MSG |
| GA00019759 | GA00019760 | 000000006C8AEE8608460C42A25E63E540F1D2AAC42F2100.MSG |
| GA00019762 | GA00019778 | GaDOE GVRA Partnership - November 2016 - Integration into Collab Comm .pdf |
| GA00019795 | GA00019795 | SEEDS Webinar Flyer.pdf |
| GA00019839 | GA00019839 | 000000006C8AEE8608460C42A25E63E540F1D2AA242B2200.MSG |
| GA00019840 | GA00019840 | PBIS Booklet 11-2016.pub |
| GA00019841 | GA00019841 | Object 0 |
| GA00019842 | GA00019842 | Object 1 |
| GA00019849 | GA00019849 | 000000006C8AEE8608460C42A25E63E540F1D2AAA4BD2100.MSG |
| GA00019865 | GA00019867 | Scanned from a Xerox Multifunction Printer.pdf |
| GA00019871 | GA00019871 | Object 1 |
| GA00019890 | GA00019894 | IDT MOU_SIGNED.pdf |
| GA00019895 | GA00019899 | IDT Operating Guidelines_2016_final.pdf |
| GA00019954 | GA00019957 | PBIS Legislator Booklet_Fall 2016 FINAL.pdf |
| GA00020264 | GA00020268 | IDT Operating Guidelines_2016_December.docx |
| GA00020429 | GA00020431 | SBOE Item Template-Grant Amendment - GNETS.docm |
| GA00020716 | GA00020717 | 000000006C8AEE8608460C42A25E63E540F1D2AA04BB2200.MSG |
| GA00037319 | GA00037319 | NASDSE MTB GA & OH.ppt |
| GA00037326 | GA00037327 | 000000006C8AEE8608460C42A25E63E540F1D2AA041B2400.MSG |
| GA00037328 | GA00037333 | 000000006C8AEE8608460C42A25E63E540F1D2AAE40B2400.MSG |
| GA00037346 | GA00037346 | NASDSE MTB GA OH 8-24-16.ppt |
| GA00037519 | GA00037519 | Powerpoint SPDG FY16Kimdata.ppt |
| GA00037551 | GA00037551 | 21 Tuition Multi-Handicapped FY18.xlsx |
| GA00037575 | GA00037593 | GNETS Student Progress 2015-16pdf.docx |
| GA00037755 | GA00037756 | 000000006C8AEE8608460C42A25E63E540F1D2AA042C2400.MSG |
| GA00037757 | GA00037759 | School Data Profile FY16.docx |
| GA00041155 | GA00041155 | 0000000034064EC826FF9E47A4BBDFFD5C7CD139446D2500.MSG |

Documents produced by the State of Georgia, regional GNETS programs, or the United States

| | | |
|---|---|---|
| GA00049644 | GA00049663 | 08192020114159-0001.pdf |
| GA00049831 | GA00049835 | GaDOE response to GNETS audit.pdf |
| GA00063754 | GA00063773 | FY17 Grant _Woodall.pdf |
| GA00065483 | GA00065483 | 0000000034064EC826FF9E47A4BBDFFD5C7CD13924282300.MSG |
| GA00065484 | GA00065484 | Response 092716.pdf |
| GA00129988 | GA00129988 | 000000005ED9A159448FBA49B278862BEB85B1FC64A62600.MSG |
| GA00200495 | GA00200495 | 180130 ELAM ALEXANDER ACAD ELA.xlsx |
| GNET000381 | GNET000382 | Student IEP file |
| GNET036633 | GNET036644 | Milo 200910.pdf |
| GNET040287 | GNET040317 | Student IEP file |
| US0132556 | US0134822 | Documents produced by CGCA to the United States pursuant to subpoena |
| US0134823 | US0142642 | Documents produced by Burwell to the United States pursuant to subpoena |
| US0142643 | US0144882 | Documents produced by Cedarwood to the United States pursuant to subpoena |
| US0144883 | US0144947 | Documents produced by CGCA to the United States pursuant to subpoena |
| US0144948 | US0149192 | Documents produced by Coastal Academy to the United States pursuant to subpoena |
| US0149193 | US0150024 | Documents produced by Dekalb-Rockdale to the United States pursuant to subpoena |
| US0150025 | US0150053 | Documents produced by CGCA to the United States pursuant to subpoena |
| US0150054 | US0153605 | Documents produced by Elam Alexander to the United States pursuant to subpoena |
| US0153606 | US0153616 | Documents produced by CGCA to the United States pursuant to subpoena |
| US0153617 | US0164967 | Documents produced by Flint Area Learning to the United States pursuant to subpoena |
| US0164968 | US0191112 | Documents produced by Futures to the United States pursuant to subpoena |
| US0191113 | US0191118 | Documents produced by CGCA to the United States pursuant to subpoena |

Documents produced by the State of Georgia, regional GNETS programs, or the United States

| | | |
|---|---|---|
| US0191119 | US0193870 | Documents produced by Harrell to the United States pursuant to subpoena |
| US0193871 | US0197672 | Documents produced by H.A.V.E.N. to the United States pursuant to subpoena |
| US0197673 | US0197881 | Documents produced by Heartland Academy to the United States pursuant to subpoena |
| US0197882 | US0199813 | Documents produced by Horizon to the United States pursuant to subpoena |
| US0199814 | US0200248 | Documents produced by CGCA to the United States pursuant to subpoena |
| US0200249 | US0203234 | Documents produced by Mainstay to the United States pursuant to subpoena |
| US0203235 | US0203243 | Documents produced by CGCA to the United States pursuant to subpoena |
| US0203244 | US0210280 | Documents produced by Northstar to the United States pursuant to subpoena |
| US0210281 | US0215996 | Documents produced by NorthMetro to the United States pursuant to subpoena |
| US0215997 | US0239595 | Documents produced by Northwest Georgia Educational Program to the United States pursuant to subpoena |
| US0239596 | US0282588 | Documents produced by GNETS of Oconee to the United States pursuant to subpoena |
| US0282589 | US0286804 | Documents produced by Oak Tree GNETS to the United States pursuant to subpoena |
| US0286805 | US0289409 | Documents produced by Pathways GNETS to the United States pursuant to subpoena |
| US0289410 | US0289457 | Documents produced by Elam Alexander to the United States pursuant to subpoena |
| US0289458 | US0289586 | Documents produced by CGCA to the United States pursuant to subpoena |
| US0289587 | US0289595 | Documents produced by Elam Alexander to the United States pursuant to subpoena |
| US0289596 | US0289605 | Documents produced by CGCA to the United States pursuant to subpoena |

Documents produced by the State of Georgia, regional GNETS programs, or the United States

| | | |
|---|---|---|
| US0289606 | US0295133 | Documents produced by River Quest GNETS to the United States pursuant to subpoena |
| US0295134 | US0298068 | Documents produced by Rutland GNETS to the United States pursuant to subpoena |
| US0298069 | US0300882 | Documents produced by Sand Hills GNETS to the United States pursuant to subpoena |
| US0300883 | US0300890 | Documents produced by CGCA to the United States pursuant to subpoena |
| US0300891 | US0301574 | Documents produced by South Metro GNETS to the United States pursuant to subpoena |
| US0301575 | US0301668 | Documents produced by CGCA to the United States pursuant to subpoena |
| US0301669 | US0301712 | Documents produced by CGCA to the United States pursuant to subpoena |
| US0301713 | US0303488 | Documents produced by Woodall GNETS Program to the United States pursuant to subpoena |
| US0303489 | US0303494 | Documents produced by CGCA to the United States pursuant to subpoena |
| US0303495 | US0303523 | Documents produced by Burwell GNETS Program to the United States pursuant to subpoena |
| GA00904409 | GA00904410 | 0000000092D40B104256A74FAEA09257602F7A4D64CF2500.MSG |
| GA00904411 | GA00904411 | GNETS Assessment Data Summary - 2016-2019.xlsx |
| GA00904412 | GA00904412 | Copy of FY21 DOE_Performance Measures OPB Feedback Review and Questions.xlsx |
| GA01486555 | GA01486562 | 2.Executive summary.pdf |
| US0306845 | US0306974 | ▪ Student Records (Horizon) |
| GA05242582 | GA05242592 | GNETS Legislative Report (HB 911).pdf |
| GA03677596 | GA03677596 | 000000003CC4EC2975585B49825F11909BF946BC04AB2100.MSG |
| GA03677597 | GA03677597 | GNETS Maps - Clinical Support Positions 9-14-21.pdf |
| GA03677598 | GA03677598 | GNETS Maps - LEA and Grant Funded Positions 9-14-21.pdf |
| GA03677599 | GA03677600 | Analysis and Possible Next Steps.docx |

Documents produced by the State of Georgia, regional GNETS programs, or the United States

| | | |
|---|---|---|
| GA03677601 | GA03677601 | GNETS Clinical Supports LEA Grant Funded.xlsx |
| GA00000001 | GA00000018 | State produced data and keys on GNETS student population |
| GA05242021 | GA05242021 | GNETS-data-file-code-tables.xlsx |
| GA05242022 | GA05242022 | gnets-institution-list.xlsx |
| GA05242082 | GA05242082 | sr-sc-2021_system_code_list.xlsx |
| GA05242429 | GA05242429 | sr-sc-2022_school_code_list.xlsx |
| GA05242430 | GA05242430 | sr-sc-2021_school_code_list.xlsx |
| GA05242431 | GA05242431 | sr-sc-2022_system_code_list.xlsx |
| GA05242789 | GA05242789 | p13_sr2021_gnets-student-detail.xlsx |
| GA05242790 | GA05242790 | p13_sr2022_gnets-student-detail.xlsx |
| | | |

Appendix F

*Curriculum Vitae* of Dr. Amy McCart

# AMY MCCART, PH.D.

Research Professor & Co-Director of SWIFT Education Center at The University of Kansas

Owner of Allen Education, LLC.

email: amy.allened@gmail.com | phone: 816.305.6213 | LinkedIn/Amy McCart | she/her

Dr. McCart is a Research Professor with Life Span Institute and Adjunct Faculty with the Department of Special Education at the University of Kansas.  Dr. McCart co-directs SWIFT Education Center (Schoolwide Integrated Framework for Transformation), a national pre-k-12 research and technical assistance center designed to improve outcomes for students, with an emphasis on students of color and those with the most extensive need for support. She is the principal investigator for many SWIFT Education Center research projects focused on enhancing student outcomes at the intersection of equity, inclusion, and MTSS.  Dr. McCart helps to grow high-quality, effective instructional leaders. Her partnership networks with state and local education agencies and schools have promoted effective integrated-MTSS implementation from coast-to-coast.  Dr. McCart is a best-selling author of the book *Leading Equity-Based MTSS* for all students, and has a new book titled *Build Equity, Join Justice: A Paradigm for School Belonging* scheduled for publication in April 2023. Dr. McCart continues to contribute to special education literature through peer-reviewed journals and other publications related to equity and issues of social justice to improve the lives of children.

••••••

# EDUCATION

| | |
|---|---|
| 2003 | Doctorate of Philosophy, School of Education<br>Department of Special Education<br>Emphasis: Positive Behavior Support and School-wide Transformation<br>University of Kansas |
| 1996 | Master of Education, School of Education<br>Department of Special Education<br>Emphasis: Students with Significant Academic and Behavioral Needs<br>University of Kansas |
| 1988 | Bachelor of Science, School of College of Liberal Arts and Sciences<br>Department of Applied Behavioral Sciences<br>Human Development and Family Life<br>Emphasis: Early Childhood Education, Students with Behavioral Needs<br>University of Kansas |

••••••
# EXPERIENCE

| | The University of Kansas, Lawrence, KS | |
|---|---|---|
| | 2020 | Research Professor with the Life Span Institute |
| | Present | Department of Special Education |
| | 2014 | Co-Director and Principal Investigator |
| | Present | SWIFT Education Center, Life Span Institute |
| | 2012 | Director of Technical Assistance and Principal Investigator |
| | 2014 | SWIFT Education Center, Life Span Institute |
| | 2010 | Special Graduate Faculty |
| | 2014 | Department of Special Education |
| | 2006 | Courtesy Professor |
| | 2012 | Department of Applied Behavioral Sciences |
| | 2010 | Special Graduate Faculty |
| | 2014 | Department of Special Education |
| | 2002 | Courtesy Professor |
| | 2009 | Department of Special Education |
| | 1994 | Teacher, New York Elementary School |
| | 1995 | Special Education Practicum |
| | Allen Education, LLC., Kansas City, Missouri | |
| | 2020 | Consultant |
| | 2021 | New Orleans K-12 Inclusive Education Charter School, New Orleans, LA |
| | 2018 | Expert Consultant |
| | 2020 | New York Lawyers for the Public Interest, Paul, Weiss, Rifkind, Wharton Garrison, LLP |
| | | New York, NY |
| | 2018 | Consultant on MTSS and Leadership |
| | Present | Various states, school districts, and organizational entities |
| | PBIS Research & Consultation, LLC., Lawrence, Kansas | |
| | 2003 | Co-Owner |
| | 2010 | Kansas Woman Owned Business |
| | 1988 | Behavioral Crisis Consultant |
| | 2011 | Functional Behavioral Assessments, |
| | | Behavior Intervention Plans, Crisis Intervention Plans |
| | 2000 | Behavioral Expert Consultant, |
| | 2013 | Partners in Behavioral Milestones, Kansas City, MO |
| | 1990 | Behavior Consultant for Individuals in Crisis |
| | 2008 | Local, Regional, and National Individual Behavioral Support |

| Community Living Opportunities, Lawrence, KS | | |
|---|---|---|
| | 1988 1998 | Site Director, Director of Vocational Services Community Living Opportunities |
| | 1990 1996 | Director of Vocational Services for Community Placement Deinstitutionalization to Community Placement Community Living Opportunities |
| | 1991 1996 | Instructor, Behavioral De-escalation Training and Crisis Prevention, The Mandt System Community Living Opportunities |
| **Previous Employment** | | |
| | 2006 2010 | Senior Technical Assistance Provider SAMSCHOOLS, LLC, Lawrence, KS. |
| | 1985 1990 | Homeless Shelter Children's Services Educator The Salvation Army, Lawrence, KS |
| | 1991 1992 | Child Care Director LaPetite Academy, Boulder, CO |
| | 1986 1988 | Lead Teacher, Behavior Teacher Behavior Resource Room, Educare, Flextime Preschools University of Kansas, Lawrence, KS |

••••••

# SERVICE

| 2003 Present | Member | Friends of the Life Span Institute Schiefelbusch Institute for Life Span Studies, University of Kansas, Lawrence, KS |
|---|---|---|
| 2018 Present | Member | American Educational Research Association National Headquarters, Washington, D.C. |
| 2014 Present | Member | National Association of ESEA State Program Administrators Fort Bragg, CA |
| 2012 Present | Associate | Council of Chief State School Officers and National State Directors of Special Education Washington, D.C. |
| 2021 2022 | Advisory Member | Strategic Planning National Center for Learning Disabilities Washington, D.C. |
| 2012 2023 | Advisor | State Departments of Education – Oklahoma (2009-2001), New Hampshire (2012-2017), Oregon (2012-2023), Louisiana (2006-2008), California (2016-2020), Colorado (2019-2020), Kansas (2004-2006), Maryland (2012-2017), Mississippi (2012-2017), Vermont (2012-2017), Washington, D.C. (2010-2011) |
| 2016 Present | Chair | Advisory Group for Supporting Effective Educator Development (SEED) Equity Leadership in High Need Schools University of Kansas, Lawrence, KS |

| 2017 Present | Member | Rural Network Research Committee, Rural Network of California Butte County Office of Education, Butte County, CA |
|---|---|---|
| 2017 | Advisor | National Ghana Education Service for Students with Special Needs CHIP-International, Ghana, Africa |
| 2004 2016 | KU Lead | National Center on Positive Behavioral Intervention and Support, United States Office of Special Education Programs, Eugene, OR |
| 2014 | Associate | Associate - Cerebral Palsy Foundation Parent Organization New York, NY |
| 2013 | Associate | National Down Syndrome Congress Roswell, GA |
| 2012 2016 | Member | TASH Association for Individuals with Disabilities Washington, D.C. |
| 2018 2020 | Advisory Member | Panel for Charter Schools for Students with Disabilities, Bill & Melinda Gates Foundation San Francisco, CA |
| 2001 2003 | Member | Council for Exceptional Children Division of Early Childhood Arlington, VA |
| 2013 2016 | Lead | My Brother's Keeper Task Force SWIFT Education Center, University of Kansas, Lawrence, KS |
| 2013 2016 | Co-Lead | University of Kansas Better Together Task Force SWIFT Education Center, University of Kansas, Lawrence, KS |
| 2018 2021 | Design Team Member | Safe, Healthy, Responsive Schools Design Team, California State Department of Education, Orange County Office of Education, University of California Los Angeles Center for School Transformation, Orange County, CA |
| 2015 2016 | Board Member | Social Impact Technology and Engineering, 501(C)3 Kansas City, MO |
| 2011 2020 | Member | Search Committee, Department of Special Education University of Kansas, Lawrence, KS |
| 2017 2018 | Member | K-Cart: Development of Autism Research and Training Center, Life Span Institute, University of Kansas, Lawrence, KS |
| 2008 2012 | Chair | Graduate Doctoral Grant Award Committee Life Span Institute, University of Kansas, Lawrence, KS |
| 2004 2023 | Chair | Doctoral Committee Member for Doctoral Candidates Seeking Degrees in Special Education and Clinical and Child Psychology, University of Kansas, Lawrence, KS |
| 2004 | Speaker | Legislative Testimony - Senate Ways and Means Committee Kansas Senate on State and National De-institutionalization of individuals with Disabilities, Topeka, KS |
| 2003 | Speaker | Testimony - Legislative Educational Planning Committee Joint Committee of the Kansas Legislature on the need for implementation of Positive Behavior Support in Kansas schools, Topeka, KS |

| 2005 | Family Advocate | Supporting family opposing long-term suspension-expulsion of a child with ADHD Overland Park, KS |
| 1991 1992 | Volunteer | Buddy Group for College Students with Disabilities Beach Center on Disability, University of Kansas, Lawrence, KS |
| 2005 2006 | Advocate | Developmental Disabilities Council, advocating for individuals in the State of Kansas with Developmental Disabilities, Topeka, KS |
| 1999 2000 | Committee Member | Community Living Opportunities Policy and Advisory Committee Member on Quality Services, Lawrence, KS |
| 2004 2006 | Group Member | Kansas Statewide Positive Behavior Support Committee Topeka, KS |
| 2012 2016 | Associate | PEAK Parent Center Colorado Springs, CO |

●●●●●●

# PUBLICATIONS

McCart, A., Kelly, W., & Sailor, W. (2023). Build Equity, Join Justice: A paradigm for school belonging. Norton Professional Books, W.W. Norton, New York.

Choi, J. H., McCart, A. B., Miller, D. H., & Sailor, W. (2022). Issues in statewide scale up of a multi-tiered system of support. Journal of School Leadership, 32(5), 514-536.

Choi, J. H., & McCart, A. (2021). High leverage practices to improve inclusive educational environments for students with IEPs. Research Brief.  SWIFT Education Center.

Choi, J. H., McCart, A. B., Kelly, W., Sailor, W. (2020). Impact of equity-based multi-tiered system of support on black and non-black students of color. Submitted abstract to Educational Researcher.

McCart, A., & Choi, J. H. (2020). State-wide social and emotional learning embedded within equity-based MTSS: impact on student academic outcomes. research brief.  SWIFT Education Center.

Choi, J. H., McCart, A. B., & Sailor, W. (2020). Achievement of students with IEPs and associated relationships with an inclusive MTSS framework. Journal of Special Education.

Choi, J. H., McCart, A. B., & Sailor, W. (2020). Reshaping educational systems to realize the promise of inclusive education. FIRE: Forum for International Research in Education 6(1), 8-23.

McCart, A. & Choi, J. H. (2020). State-wide social and emotional learning embedded within equity-based MTSS: Impact on student academic outcomes. Research Brief.

McCart, A. B., & Miller, D. (2019). Leading equity based MTSS for all students. Thousand Oaks, CA: Corwin Press. (ISBN 9781544372853).

Choi, J. H., McCart, A. B., Hicks, T. A., & Sailor, W. (2018). An analysis of mediating effects of school leadership on MTSS implementation. Journal of Special Education, 53(1), 15-27.

Hicks, T.A., McCart, A.B. Choi, J.H. & Sailor, W. (2018). Exploring the relationship between MTSS and inclusion: Fixed effects modeling with Bayesian analysis. American Educational Research Association. New York, NY.

Sailor, W., McCart, A. B. Choi, J. H. (2018). Re-conceptualizing inclusive education through multi-tiered system of support. Inclusion, 6, 2-18.

McCart, A., Kelly, W. & Woods, K. (2018).  Considerations for Biden transition team United States Department of Education: The First 100 Days and Beyond. University of Kansas, SWIFT Education Center.

Choi, J. H., Meisenheimer, J. M., McCart, A. B., & Sailor, W. (2017). Improving learning for all students through equity-based inclusive reform practices: Effectiveness of a fully integrated schoolwide model on student reading and math achievement. Remedial and Special Education, 38(1), 28-41.

McCart, A., McSheehan, M., Sailor, W., Mitchiner, M., & Quirk, C. (2016). SWIFT differentiated technical assistance. (White paper). Lawrence, KS: SWIFT Education Center.

Algozzine, B., Morsbach Sweeney, H., Choi, J. H., Horner, R., Sailor, W., McCart, A. B., Satter, A., Lane, K. L. (2016). Development and preliminary technical adequacy of the Schoolwide Integrated Framework for Transformation Fidelity of Implementation Tool. Journal of Psychoeducational Assessment, 35, 302-322.

Shogren, K., McCart, A., Lyon, K., & Sailor, W. (2015). All means all: Building knowledge for inclusive schoolwide transformation. Research & Practice for Persons with Severe Disabilities, 40, 173-191.

McCart, A., McSheehan, M., & Sailor, W. (2015). Differentiated technical assistance for sustainable transformation. Technical Assistance Brief #2. Lawrence, KS: SWIFT Education Center.

McCart, A. B. & Sailor, W. (2015). Who is my brother's keeper? All of us. Issue Brief #5. Lawrence, KS: SWIFT Education Center.

McCart, A., Sailor, W., Bezdek, J., & Satter, A. (2014). A framework for inclusive educational delivery systems. Inclusion, 2(4), 252-264.

Sailor, W. & McCart, A. (2014). Stars in alignment. Research and Practice for Persons with Severe Disabilities, 39(1), 55-64.

Algozzine, B., Morsbach Sweeney, H., Choi, H., Horner, R., Sailor, S., McCart, A., Satter, A., & Lane, K. (2014). SWIFT Fidelity of Implementation Tool (SWIFT FIT): Development and preliminary technical adequacy. Lawrence, KS: SWIFT Education Center.

Sailor, W., McCart, A., McSheehan, M., Mitchiner, M. & Quirk, C. (2014). SWIFT technical assistance process Technical Assistance Brief #1. Lawrence, KS: SWIFT Education Center.

Mitchiner, M., McCart, A., Kozleski, E., Sweeney, H., & Sailor, W. (2014). What are emerging trends and future directions in effective, inclusive elementary schools for students with extensive support needs. In J. McLeskey, N. Waldron, F. Spooner, & B. Algozzine (Eds.), Handbook of effective inclusive schools: research and practice (pp. 477-491).  New York: Routledge.

Haines, S.J., McCart, A., & Turnbull, A.P. (2013). Family engagement within early childhood response to intervention.  In V. Buysse and E. Peisner-Feinberg (Eds.) Handbook on Response to Intervention (RTI) in early childhood (pp. 313-324). New York: Brook.

McCart, A., Lee, J., Frey, A., Wolf, N. & Choi, J. H. (2010).  Comprehensive response to intervention in early childhood: Multi-tiered supports promoting family engagement. Early Childhood Services: An Interdisciplinary Journal of Effectiveness ,4(2), 87-104.

McCart, A., Wolf, N., Sweeney, H. & Choi, H. (2009). The application of a family-based multi-tiered system of support. NHSA Dialog: A Research-to-Practice Journal for the Early Intervention Field, 12(2), 122-132.

Sugai, G., Horner, R.H. Algozzine, R., Barrett, S., Lewis, T., Anderson, C., Bradley, R., Choi, J. H., Dunlap, G., Eber, L., George, H., Kincaid, D., McCart, A., Nelson, M., Newcomer, L., Putnam, R., Riffel, L., Rovins,

M., Sailor, W., & Simonsen, B. (2010). School-wide positive behavior support: Implementation blueprint and self-assessment. Eugene, OR: University of Oregon.

McCart, A., Wolf, N., Sweeney, H. M., Markey, U., & Markey, D. J. (2009). Families facing extraordinary challenges in urban communities: Systems level application of positive behavior support.  In M. C. Roberts (Series, Ed.), & W. Sailor, G. Dunlap, G. Sugai, & R. Horner. Handbook of positive behavior support. (pp. 257-277). New York: Springer.

Putnam, B., McCart, A., Griggs, P. & Choi, J. H. (2009). Implementation of school-wide positive behavior support in urban settings.  In M. C. Roberts (Series, Ed.), & W. Sailor, G. Dunlap, G. Sugai, & R. Horner. Handbook of positive behavior support (pp. 443-463). New York: Springer.

Hall, T. P., Turnbull, A. P., McCart, A., Griggs, P., Choi, J-H., Markey, U., Markey, D.J. & Sailor, W. (2007). The effects of positive behavior support parent-training programs on parent-child relationships in culturally and linguistically diverse families. Multiple Voices, 10(1 & 2), 191-210.

Wang, M., McCart, A., & Turnbull, A.P. (2007). Implementing positive behavior support with Chinese American families:  Enhancing cultural competence. Journal of Positive Behavior Interventions, 9(1), 38-51.

Dunlap, G., Strain, P.S., Fox, L., Carta, J.J., Conroy, M., Smith, B., Kern, L., Hemmeter, M. L., Timm, M. L., McCart, A., Sailor, W., Markey, U., Markey, D.J., Lardieri, S., & Sowell, C. (2006). Prevention and intervention with young children's challenging behavior:  A summary and perspective regarding current knowledge. Behavioral Disorders, 32, 29-45.

Sailor, W., Zuna, N., Choi, J., Thomas, J., McCart, A., & Roger, B. (2006). Anchoring school-wide positive behavior support in structural school reform. Research and Practice for Persons with Severe Disabilities, 31(1), 18-30.

Warren, J.S., Edmonson, H.M., Griggs, P., Lassen, S.R., McCart, A., Turnbull, A.P., & Sailor, W. (2004). Urban applications of school-wide positive behavior support: Critical issues and lessons learned. In L.M. Bambara, G. Dunlap, & I.S. Schwartz (Eds.), Positive behavior support: Critical articles on improving practice for individuals with severe disabilities (pp. 376-387). Pro-Ed and TASH.

McCart, A. (2003). Effectiveness of School-wide Positive Behavior Support in two urban schools. (Doctoral Dissertation, University of Kansas).

Turnbull, A., Edmonson, H., Griggs, P., Wickham, D., Sailor, W., Beech, S., Freeman, R., Guess, D., Hale, N., Lassen, S., McCart, A., Riffel, L., Smerchek, D., Turnbull, H.R., Warren, J., & Wilcox, B. (2002). A blueprint for School-wide Positive Behavior Support:  Full implementation of three components. Exceptional Children, 68(3), 377-402.

Freeman, R. L., Baker, D., Horner, R. H., Smith, C., Britten, J., & McCart, A. (2002). Using functional assessment and systems-level assessment to build effective behavioral support plans. In K. C. Lakin & N. Weisler (Eds.), Crisis Prevention and Response in the Community (pp. 199-224). Washington D.C.: American Association on Mental Retardation.

Sailor, W., Freeman, R., Britten, J., McCart, A., Smith, C., Scott, T., & Nelson, M. (2000). Using information technology to prepare personnel to implement functional behavioral assessment and positive behavioral support. Exceptionality, 8(3), 217-230.

Freeman, R. L., Britten, J., McCart, A., Smith, C., & Sailor, W. (2000). Setting Events (Module 4) Intervention strategies: Part I. Lawrence, KS: Kansas University Affiliated Program, Center for Research on Learning. Available: Onlineacademy.org.

Smith, C., McCart, A., Britten, J., Freeman, R. L., & Sailor, W. (2000). Person-centered planning (Module 7). Creating positive lifestyles. Lawrence, KS: Kansas University Affiliated Program, Center for Research on Learning. Available: Onlineacademy.org.

Freeman, R. L., Britten, J., McCart, A., Smith, C., & Sailor, W. (2000). School-wide discipline (Module 6) Redesigning Environments. Lawrence, KS: Kansas University Affiliated Program, Center for Research on Learning. Available: Onlineacademy.org.

Freeman, R. L., McCart, A., Britten, J., Smith, C., & Sailor, W. (2000). Designing PBS plans (Module 3).  Development and implementation of PBS plans. Lawrence, KS: Kansas University Affiliated Program, Center for Research on Learning.  Available: Onlineacademy.org.

Freeman, R. L., McCart, A., Britten, J., Smith, C., & Sailor, W. (1999). Crisis prevention (Module 5) Intervention strategies: Part II.  Lawrence, KS: Kansas University Affiliated Program, Center for Research on Learning.  Available: Onlineacademy.org.

Freeman, R. L., Britten, J., McCart, A., Smith, C., Heitzman-Powell, L., Baker, D., & Sailor, W. (1999). (Module 1) Foundations of positive behavioral support. Lawrence, KS: University of Kansas UAP, Center for Research on Learning. Available: Onlineacademy.org.

Freeman, R. L., Britten, J., McCart, A., Smith, C., Poston, D., Anderson, D., Edmonson, H., Sailor, W., Baker, D., Guess, D., & Reichle, J.  (1999). (Module 2) Functional Assessment [Online].  Lawrence, KS: University of Kansas UAP, Center for Research on Learning. Available: Onlineacademy.org.

Freeman, R. L., Britten, J., McCart, A., Smith, C., & Sailor, W. (1999). (Module 1-7) Foundations of positive behavioral support [Online]. Lawrence, KS: University of Kansas Continuing Education, Center for Research on Learning. www.continuinged.ku.edu, University of Kansas Continuing Education Modules.

●●●●●

# REVIEWS & EDITORSHIPS

| 2007 | Topics in Early Childhood Special Education |
| 2010 | Consulting Editor |
| 2008 | Corwin Press Publishing |
| 2010 | Inclusive Classroom-Based Testing and Assessment Practices |
|  | Book Review |
| 2006 | Remedial and Special Education |
| 2007 | Guest Review |

• • • • •

# EDUCATOR RESOURCES

McCart, A. & Hill, C. (Hosts). (2020). What is your sphere of influence? with Dr. Cokethea Hill. [Audio podcast]. SWIFT Education Center.  https://soundcloud.com/user-562198250/what-is-your-sphere-of-influence-with-dr-cokethea-hill

McCart, A. & Hill, C. (Hosts). (2020). Statement to action with Dr. Cokethea Hill. [Audio podcast]. SWIFT Education Center.  https://soundcloud.com/user-562198250/from-statement-to-action

McCart, A. & Carpenter, D. (Hosts). (2020). This moment in history with Dr. Dennis Carpenter. [Audio podcast]. SWIFT Education Center.  https://soundcloud.com/user-562198250/this-moment-in-history-with-dr-dennis-carpenter

McCart, A., Sailor, W., Choi, H., Quirk, Q., Woods, K. & Mitchiner, M. (2019). Schoolwide integrated framework final performance report. Submitted: U.S. Department of Education, Office of Special Education Programs. Lawrence, KS: SWIFT Education Center.

Pollitt, D., McCart, A., Satter, A., Meisenheimer, J., Morsbach Sweeney, H., Horner, R., Algozzine, B., Lane, K., Roger, B., Choi, J. H., & Sailor, W. (2018). Schoolwide integrated framework for transformation fidelity of implementation tool. v. 2.0 Lawrence, KS: SWIFT Education Center.

McCart, A., Satter, A., Meisenheimer, J., Choi, J. H. & Sailor, W. S.  (Ed.). (2018). SWIFT fidelity integrity assessment v. 2.0. Lawrence, KS: SWIFT Education Center.

McCart, A., Satter, A., Woods, K., Miller, D. & Lord, L. (2017).  Schoolwide integrated framework for transformation field guide.  Lawrence, KS: SWIFT Education Center.

McCart, A., Miller, D. & McSheehan, M. (2016). SWIFT technical assistance playbook [online tools].  swiftschools.org/playbook. Lawrence, KS: SWIFT Education Center.

McCart, A. B. (2016). Inclusive School Reform: Report on UNICEF U.S. Delegation to Republic of South Africa, Department of Basic Education.  Letter to Dr. Selete Avoke, U.S. Department of Education, Office of Special Education Programs, Washington, D.C.

McCart, A. (February 20, 2014). All means ALL: The SWIFT Education Center and inclusive education.  In The Classroom at www.swiftschools.org/swifttalk/article/19/all-means-all-the-swift-center-and-inclusive-education. Lawrence, KS: SWIFT Education Center.

Choi, J. H., Satter, A., Pollitt, D. McCart, A. (2014). SWIFT fidelity integrity assessment tracking tool. Lawrence, KS: SWIFT Education Center.

Lyon, K., Blue-Banning, M., McCart, A., (2014). Lessons from the field.  Lawrence, KS: SWIFT Education Center.

McCart, A., Satter, A., Meisenheimer, J., Choi, J. H. & Sailor, W. S.  (Ed.). (2013). SWIFT Fidelity Integrity Assessment v. 1.3. Lawrence, KS: SWIFT Education Center.

McCart, A., Miller, D., McSheehan, M., & Mitchiner, M. (2013).  Exploration/ Foundation Self-Assessment.  Lawrence, KS: SWIFT Education Center.

McCart, A., & Miller, D. (2012).  Multi-tiered system of support starter kit.  Lawrence, KS: SWIFT Education Center.

Piper, N., McCart, A., & Miller, D. (2012).  Master scheduling tool.  Lawrence, KS: SWIFT Education Center.

Cornett, J., Palmer, A. & McCart, A. (2011) Oklahoma State Department of Education Statewide Manual for Positive Behavioral Intervention and Support.  Training manual for state coordinators of PBIS. Oklahoma City, OK.

Royer, C., McCart, A., & Edwards, J. (2011). Professional Development Curriculum for Individuals with Crisis Behavior in the Community.  Comprehensive Behavioral Intervention Services, LLC. Overland Park, KS.

McCart, A. & Wolf, N. (Spring/Summer 2011).  School-wide positive behavioral support: Promoting social-emotional well-being of all.  IMPACTS: Feature Issue on Supporting the Social Well-Being of Children and Youth with Disabilities, 24(1).

Tucker, M., Little, A., Freeman, R., McCart, A., Griggs, P., & Reese, M. (February, 2010).  Family support evaluation tool.  University of Kansas, Lawrence, Kansas. Adapted from: School-wide Evaluation Tool version 2.0. Sugai, Lewis-Palmer, Todd & Horner (November, 2001).  Educational and Community Supports.  University of Oregon, Eugene, OR.

Choi, J. H., McCart, A., & Sailor, W. (2010).  SAM: Schoolwide applications model brief.  SAMSCHOOLS, LLC, Lawrence, KS.

McCart, A. & Bannerman-Juracek, D. (2008). Positive Behavior Support: Developing effective strategies to address challenging behavior. Positive Behavioral Support Module for Job Coaches. National Center for Disability Education and Training. University of Oklahoma, Norman, OK.

Dunlap, G., Lewis, T., & McCart, A. (April, 2006).  Program-wide positive behavior support for young children.  National Technical Assistance Center on Positive Behavioral Intervention and Support.  Newsletter.  Spring Issue.

Bezdek, J., McCart, A., Choi, H., & Griggs, P. (Fall, 2006). PBS Connections Newsletter, 1(1).  Available at: http://beachcenter.org. University of Kansas, Beach Center on Disability, Lawrence, KS.

Thomas, J., McCart, A., Tieghi, C., Griggs, P., Freeman, R., Kimbrough, P., & Viswanadha, L. (Spring, 2006).  Kansas Institute for Positive Behavior Support Family

Newsletter, 1(2). http://newsletter.kipbs.org. University of Kansas, Beach Center on Disability, Lawrence, KS.

Thomas, J., Kimbrough, P., Tieghi, M., Freeman, R., McCart, A., & Viswanadha, L. (Winter, 2006). Kansas Institute for Positive Behavior Support Family Newsletter,1(1). http://newsletter.kipbs.org. University of Kansas, Beach Center on Disability, Lawrence, KS.

McCart, A., Griggs, P., Sailor, W., & Bezdek, J.  (2006).  Effective instructional practices in early childhood settings.  Center for Evidence-Based Practice: Young Children with Challenging Behavior, www.challengingbehavior.org, Tampa, FL.

Bezdek, J., McCart, A., & Griggs, P., (2006).  What is school-wide positive behavior support? National Down Syndrome Congress.  Down Syndrome Newsletter. Washington, D.C.

McCart, A., & Bannerman-Juracek, D. (2006).  Practical strategies for supporting families in the use of positive behavior support.  Newsletter. Journal of Positive Behavioral Interventions and Supports.

McCart, A. (2005). Impact on Kansas. School-Wide Positive Behavior Support. Wildcat Way In. (Ed.), The Schiefelbusch Institute for Life Span Studies at the University of Kansas Annual Report 2004-2005. Lawrence, KS: University of Kansas.

McCart, A., & Sailor, W., (2003).  Using empowerment evaluation to establish and sustain schoolwide positive behavior support. TASH Connections 29(1/2), 25-27.

McCart, A., Griggs, P. & Choi, J. H. (2003).  Positive behavior support in Kansas: Team based approach for a safe learning environment and school improvement.  Newsletter University of Kansas and Kansas City Kansas Public Schools.

Lassen, S. R., Steele, M. M., McCart, A., Wolf, N. Wickham, D., Griggs, P., Beegle, G., & Sailor, W, Shannon, L. Englebrick, L. & Harsh, R. (2003).  Data-based decision making in schools: development of the PBS data analyzer. Development Report Kansas City Kansas Public Schools and Software Outfitters.

McCart, A., & Turnbull, A. (2002).  The issues: behavioral concerns within inclusive classrooms. PBS TeacherSource, From The Start.  www.pbs.org/teachersource/prek2/.

McCart, A., & Turnbull, A. (2002).  The issues: Behavioral concerns. PBS TeacherSource, From The Start.  www.pbs.org/teachersource/prek2/.

McCart, A., & Bannerman Juracek, D. (2002). Behavior Summary: Functional assessment tool.  University of Kansas, Lawrence, KS.

McCart, A., & Bannerman Juracek, D. (2003) BAIS: Behavior analysis and intervention summary.  Simplified functional assessment tool. University of Kansas, Lawrence, KS.

McCart, A., & Turnbull, R. H., Bieker, R., & Biles, D. (2001).  The legal implications of student suicide for families and their schools.  Unpublished manuscript.  University of Kansas, Lawrence, KS.

The Schiefelbusch Institute for Life Span Studies at the University of Kansas Annual Report 2004-2005. Impact on Kansas.  School-Wide Positive Behavior Support.  Wildcat Way.  Featured Article.

McCart, A. B. (1997). The Death of David Dahlke: Winfield State Hospital and Training Center (Doctoral dissertation, University of Kansas).

●●●●●

# ADVANCED MEDIA MATERIALS

McCart, A., Kelly, W., Woods, K. & Perry, N. (2023).  SWIFT Education Center website: swiftschools.org. University of Kansas, Lawrence, KS.

Irvin, M. & McCart, A. (2015). Social Impact and Technology logo design and website design. Kansas City, MO.

McCart A. (2016). Rosewood Services for Individuals with Disabilities website design. Great Bend, KS.

McCart, A., Harsh, R. & Sailor, W. (2005).  The data wall: An educational software decision making tool for school-wide instructional planning [Computer program]. Lawrence, KS: University of Kansas.

McCart, A., Choi, J.H., & Mitchiner (2014).  The national center on positive behavioral interventions and supports.  Website Redesign and Launch [Website]. Lawrence, KS: University of Kansas and University of Oregon.

McCart, A. (Executive Producer), & Schuh, M., Satter, A., Woods, K., McSheehan, M. & Habib, D. (Producers) & Habib, D. (Director). (2017).  Multi-tiered system of support: Universal, Additional, Intensified [3-part short films]. Lawrence, KS:  University of Kansas SWIFT Education Center and University of New Hampshire.

McCart, A. (Executive Producer), & Schuh, M., Satter, A., Woods, K., McSheehan, M. & Habib, D. (Producers) & Habib, D. (Director). (2016). Together [short film]. Lawrence, KS:  University of Kansas SWIFT Education Center and University of New Hampshire.

McCart, A. (Executive Producer), & Schuh, M., Satter, A., Woods, K., McSheehan, M. & Habib, D. (Producers) & Habib, D. (Director). (2016).  Whatever it takes [short film].  Lawrence, KS:  University of Kansas SWIFT Education Center and University of New Hampshire.

McCart, A. (Executive Producer), & Schuh, M., Satter, A., Woods, K., McSheehan, M. & Habib, D. (Producers) & Habib, D. (Director). (2016).  SWIFT in 60 [10 video series].  Lawrence, KS:  University of Kansas SWIFT Education Center and University of New Hampshire.

McCart, A. (Executive Producer), & Schuh, M., Satter, A., Woods, K., McSheehan, M. & Habib, D. (Producers) & Habib, D. (Director). (2016).  All means all. A SWIFT overview [video].  Lawrence, KS:  University of Kansas SWIFT Education Center and University of New Hampshire.

McCart, A. (Executive Producer), & Schuh, M., Satter, A., Woods, K., McSheehan, M. & Habib, D. (Producers) & Habib, D. (Director). (2014).  Domains and features at Henderson school [video].  Lawrence, KS:  University of Kansas SWIFT Education Center and University of New Hampshire.

McCart, A., Woods, K., Satter, A., Miller, D. (2013). SWIFT schools [website]. swiftschools.org.  Lawrence, KS: University of Kansas SWIFT Education Center.

Sailor, W. & McCart, A. (2013). SWIFT (Schoolwide Integrated Framework for Transformation) [video]. Retrieved from http://www.youtube.com/watch/?v=ZR4rO0cxDs4.

Choi, J. H, McCart, A., & Riffel, L. (2010). National Technical Assistance Center on Positive Behavioral Support and Intervention Website Re-Design and Development. www.pbis.org. Lawrence, KS: University of Kansas and University of Oregon.

McCart, A. & Bannerman-Juracek, D. (2008). Positive Behavior Support: Developing effective strategies to address challenging behavior. National Center for Disability Education and Training, Positive Behavioral Support Module for Job Coaches. [Online module]. Tulsa, OK: University of Oklahoma.

Harsh, R., Englebrick, L., McCart, A., & Griggs, P. (2004). Web-Based Integrated Data System: Positive Behavioral Support Data Analyzer. Lawrence, KS: University of Kansas and Software Outfitters.

Sailor, W., McCart, A., & Keetle, S. (2004) Creating a unified system of integrating general and special education for the benefit of all students [DVD].  Available from http://www.forumoneducation.org. Leonard Burrello, Executive Director in collaboration with Elephant Rock Productions, Inc.

••••••

# COURSES TAUGHT

SPED 767 Creating Positive Lifestyles Through Positive Behavioral Support, 2005-2011

SPED 766 Redesigning Environmental Systems, 2005-2011

SPED 765 Intervention Strategies Part Two, 2005-2011

SPED 764 Intervention Strategies Part One, 2009

SPED 763 Development and Implementation of PBS Plans, 2009

SPED 762 Functional Assessment Methods for Positive Behavioral Support, 2005- 2011

SPED 761 Foundations of Positive Behavioral Support, 2005- 2011

SPED 997 Advanced Topics in Behavior, 2009

SPED 997 Advanced Topics in Special Education, 2009

••••••

# GRADUATE ADVISING

Hill, C. N. (2018). Culturally Relevant Pedagogy, Student Connectedness to School and Reading Achievement: A Study of the Children's Defense Fund Kansas City Freedom Schools Initiative (Doctoral dissertation, University of Kansas). Committee: Rury, John L., McCart, Amy, Ng, Jennifer, Rice, Suzanne, Saatcioglu, Argun, & Sailor, Wayne.

Mitchiner, M. (2014). Post Hoc Study Of A State Selection Process To Predict State Readiness To Participate In Schoolwide Inclusive School Reform. (Doctoral dissertation, University of Kansas). Committee: Sailor, Wayne, McCart, Amy, Kozleski, Elizabeth, Skrtic, Tom, & Ng, Jennifer.

Satter, A. (2013). Teacher-student relationships: Exploring the perceptions of students who exhibit challenging behaviors. (Doctoral dissertation, University of Kansas). Committee: Sailor, Wayne, Adams, Deb, Skrtic, Tom, Turnbull, Ann, McCart, Amy, & Wolf, Nikki.

Haynes, H. (2012). Multi-tiered Systems of Supports: An Investigative Study of Their Impact on Third Grade Reading Test Scores in an Urban District.  (Doctoral dissertation, University of Kansas). Committee: Sailor, Wayne, Frey, Bruce, McCart, Amy, Skrtic, Thomas M., & Walther-Thomas, Chriss.

Bezdek, J. M. (2011). An examination of the validity of Office Disciplinary Referrals (ODR) as a behavioral screener: A descriptive study (Doctoral dissertation, University of Kansas). Sailor, Wayne S., Frey, Bruce F., McCart, A., & Skrtic, Thomas M.

•••••
# SELECTED PRESENTATIONS

McCart, A. (2023, March). National Center on Inclusion toward Rightful Presence. Presented at the National State Directors OSEP Technical Assistance Call.  Washington, D.C.

McCart, A. (2023, February). Build equity. Join justice: A paradigm for school belonging. Presented at the National ESEA Conference. Indianapolis, IN.

McCart, A. (2021, January). Equity and Inclusion: Creating a sense of belonging through tiered systems of support. Colorado League of Charter Schools. Denver, CO.

Miller, D., McCart, A., & Mitchiner, M.  (2022, May). Understanding MTSS Implementation. Clackamas Education Service District. Clackamas, OR.

Miller, D., McCart, A., & Mitchiner, M.  (2022, April). Resource Mapping For MTSS. Clackamas Education Service District. Clackamas, OR.

Miller, D., McCart, A., & Mitchiner, M. (2022, February). Tiered Instruction Matrix for MTSS. Clackamas Education Service District. Clackamas, OR.

Miller, D., McCart, A., & Mitchiner, M. (2022, January). Creating Effective Teaming Statures for MTSS. Clackamas Education Service District. Clackamas, OR.

McCart, A. & Mitchiner, M. (2021, September). Understanding MTSS Implementation. Presented at Gates TA Charter Management Organization Convening.

Miller D. & McCart A. (2021, February). Innovation Keynote: MTSS Means More: Equity & Justice in Education. MTSS Innovations Conference.

McCart, A. & Mitchiner, M. (2021, May). Session 3: What resources do we already have for this work? Lake Washington, WA.

McCart, A. & Mitchiner, M. (2021, April). Session 2: Creating efficiencies with teaming in MTSS. Lake Washington, WA.

McCart, A. & Mitchiner, M. (2021, March). Session 1: What is MTSS and what does IT look like here? Lake Washington, WA

McCart, A. (2021, March). Keynote – All Means All. Presented at 18th Annual Early Years Conference. San Diego, CA.

McCart, A. (2021, January). Topic-based webinar: Equity and Inclusion: Creating a sense of belonging through tiered systems of support. Presented to CA Rural Researchers.

McCart, A. & Sailor, W. (2021, January). Equity-based MTSS in education. Presented to University of Kansas Doctoral Diversity and Policy Specialization. Lawrence, KS.

McCart, A. & Kelly, W. (2021, January). Build Equity, Join Justice: A graphic series podcast. The SWIFT Education Center, University of Kansas, Lawrence, KS.

McCart, A. & Sailor, W. (2021, January). Equity-based MTSS in education. Presented to University of Kansas Doctoral Diversity and Policy Specialization, Lawrence, KS.

McCart, A. (2020, December). Strategies for building inclusive learning environments. Presented to the Equity Convening Open to all:  Equitable Access for Students with Special Needs in CO Charter Schools.

McCart, A. & Miller, D. (2020, December). Leading MTSS for equity and inclusion. [Webinars]. Corwin Press.

McCart, A. & Miller, D. (2020, November). Facilitation: Leading systems change in schools, session 2. Presented to District Leadership Team. New Oxford, PA.

McCart, A. & Miller, D. (2020, November). Facilitating Transformation: Leadership for equity-based MTSS, session 1. Presented to District Leadership Team. New Oxford, PA.

McCart, A. (2020, November). CMO convening brainstorm. TA Convening Panelist. Presented to Charter Management Organization. Bill and Melinda Gates Foundation.

Sailor, W. & McCart, A. (2020, November). Supporting All Students with Equity-Based MTSS. Guest Lecturer. Presented to SPED 972. University of Kansas. Lawrence, KS.

McCart, A. (2020, June). Preparing for school year 2020 implementation of MTSS amid COVID. Presented to Legacy Alternative HS. Evergreen School District, School Leadership Team. Vancouver, WA.

McCart, A. (2020, June). Adaptive Leadership – In Schools Through Tiered Systems. Presented to the Global Implementation Society.

McCart, A., Choi, J. & Sailor, W. (2020, April). Collaboration for Equity and Inclusion Through Multi-Tiered System of Supports (MTSS) Implementation: Longitudinal Evaluation of Student Outcomes [Paper Session]. AERA Annual Meeting. San Francisco, CA. http://tinyurl.com/sdts33e (Conference Canceled).

McCart, A., Hickman, K., Hill, C. (2020, February). Who should, who can, and who will succeed in our schools?: A conversation about equity. Presented at the 2020 National ESEA Conference. Atlanta, GA.

McCart, A. (2020, February). PBIS, school climate, & culture within a MTSS framework. Presented at the Illuminate Education Users Conference. West. Anaheim, CA.

McCart, A. (2020, January). Bill and Melinda Gates Foundation Panel of Advisors Convening in College Park, GA.

Mitchiner, M., Hart, M., McCart, A., & Sailor, W. (2020, January). Multi-tiered System of Support & teacher performance expectations. California Teacher Residency Lab Convening. Bill and Melinda Gates Foundation. Burlingame, CA.

McCart, A. (2019, November). PBIS, school climate, & culture within a MTSS framework. Invited Keynote presented at Midwest Illuminate Education Users Conference. Grand Rapids, MI.

McCart, A. (2019, November). MTSS district exploration: equity and inclusion. Presented to Evergreen Public Schools. Vancouver, WA.

Mitchiner, M., McCart, A, Carpenter, D. (2019, November). SWIFT framework & research. Presented to the Oregon Department of Education. Salem, OR.

McCart, A. & Mitchiner, M.  (2019, November). FIA administration and debrief. Presented at Lakeview Elementary School, Lake Washington School District. Kirkland, WA.

Mitchiner, M. & McCart, A. (2019, November). FIA administration and debrief. Presented at Rush Elementary School, Lake Washington School District. Redmond, WA.

McCart, A. (2019, October). School climate and culture within a MTSS Framework. Presented at the Innovations Conference. Salt Lake City, UT.

McCart, A. (2019, October). PBIS, school climate and culture within the California MTSS Framework. Presented at the PBIS Conference. Sacramento, CA.

McCart, A. (2019, October). Understanding and using school climate and culture data [webinar]. Illuminate Education. Orange County, CA.

McCart, A. & Mitchiner, M. (2019, October). SWIFT ACCESS. Presented to Alternative Community and Correctional Education Schools and Services Leadership Team. Orange County, CA.

McCart, A. & Mitchiner, M. (2019, October). Introduction to SWIFT Fidelity Integrity Assessment. Presented at Lakeview Elementary School, Lake Washington School District. Kirkland, WA.

Mitchiner, M. & McCart, A. (2019, October). Introduction to SWIFT Fidelity Integrity Assessment. Presented at Rush Elementary School, Lake Washington School District. Redmond, WA.

McCart, A. (2019, November). Effective supports in action. Presented at Morris Jeff Community School. New Orleans, LA.

McCart, A. & Mitchiner, M. (2019, September). Viewing the preparation of California's teachers through an MTSS lens. Presented at Residency Lab Convening. Hollywood, CA.

McCart, A. (2019, August). Equity in schools:  Building a system of support. Presented in Vancouver, WA.

McCart, A. (2019, August). We are about equity in schools: Building our system of support, part one. Lake Washington School District. Kirkland, WA.

McCart, A. (2019, August).  We are about equity in schools: Building our system of support, part 2. Lake Washington School District. Kirkland, WA.

McCart, A. & Hill, C. (2019, August). KCPS Discussion. Presented at Kansas City Public Schools. Kansas City, MO.

Sindelar P., McCart A., & Mitchiner, M. (2019, July). IHE Professional Learning Institute. Presented at the CA MTSS Professional Learning Institute. Long Beach, CA.

McCart, A. (2019, June). Equity leadership: Principal leadership launch. Presented at the SWIFT Equity Leadership Summit, Keynote Speaker. Kansas City, MO. University of Kansas SWIFT Education Center, Lawrence, KS.

McCart, A., McIntosh, K. Sudduth. E. & Wiedemann, T. (2019, May). Panel Conversations Implementation for Equity: Voices from ALL perspectives. Presented at the CCSSO MTSS Convening. Grand Rapids, MI

McCart, A., Miller, D. & Myers, C. (2019, May). Rural research in the context of California: Next Steps. Presented at the California Rural Network. McClellan Park, CA. University of Kansas SWIFT Education Center, Lawrence, KS.

McCart, A. & Miltenberger, L. (2019, May). Overview of SWIFT Equity Leadership: Overview for Teton County Schools. Presented to Teton County District Team. Jackson Hole, WY. University of Kansas SWIFT Education Center, Lawrence, KS.

McCart, A. & Jablonski, A. (2019, May). Overview of SWIFT Equity Leadership Overview for SWIFT Equity Leadership Overview for Guilford County Schools.  Presented to Guilford County Schools District Team. Greensboro, NC. University of Kansas SWIFT Education Center, Lawrence, KS.

McCart, A. & Jablonski, A. (2019, May). Overview of SWIFT Equity Leadership Overview for SWIFT Equity Leadership Cumberland County Schools. Presented to Cumberland County Schools District Team. Fayetteville, NC. University of Kansas SWIFT Education Center, Lawrence, KS.

McCart, A. & Hill, C. (2019, May). KCPS Discussion- SWIFT- Who We Are. Presented at Kansas City Public Schools. Kansas City, MO.

McCart, A. (2019, March). SWIFT ACCESS. Presented to Alternative Community and Correctional Education Schools and Services Leadership Team. Orange County, CA.

McCart, A. (2019, January). Illuminate Advisory Board MTSS overview. Presented at Illuminate Education User Conference. San Diego Convention Center. San Diego, CA.

McCart, A. (2019, January). Know your truth: Using data to make decision. Presented at Illuminate Education User Conference. San Diego Convention Center. San Diego, CA.

McCart, A. (2019, January). MTSS Starter Kit: Basic tools for any school. Presented at Soledad Unified School District Professional Development. Soledad, CA.

McCart, A. (2019, January). Keynote Address: Making MTSS Work for Every Student Every Day. Presented at Soledad Unified School District Professional Development. Soledad, CA.

McCart, A. (2018, December). SWIFT ACCESS MTSS for District Leadership Team. Presented to Alternative Community and Correctional Education Schools and Services Leadership Team. Orange County, CA.

McCart, A. (2018, December). SWIFT ACCESS Principal Leadership in MTSS. Presented to Alternative Community and Correctional Education Schools and Services Leadership Team. Orange County, CA.

McCart, A. (2018, December). Equity leadership in high need schools: Building high quality effective instructional leaders to improve student outcomes. Presented at University of California. San Diego, CA.

McCart, A. (2013, August). Learning Session Effective Implementation of College and Career Ready Standards For All Students. Guided Discussion. Presented to U.S. Secretary of Education-Arnie Duncan, U.S. Department of Education. Washington, D.C.

McCart, A. (2018, November). All Means All: Equity and inclusion. Presented at the 5th Annual Cape Coast Autism Training Workshop on Inclusion: Strategies & Skills for the Special Needs Child. University of Cape Coast Ghana, School of Medical Sciences. Ghana, Africa.

McCart, A. (2018, November). Equity based MTSS. Presented at the 5th Annual Cape Coast Autism Training Workshop on Inclusion: Strategies & Skills for the Special Needs Child. University of Cape Coast Ghana, School of Medical Sciences. Ghana, Africa.

McCart, A. (2018, November). Inclusion starter kit. Presented at the 5th Annual Cape Coast Autism Training Workshop on Inclusion: Strategies & Skills for the Special Needs Child. University of Cape Coast Ghana, School of Medical Sciences. Ghana, Africa.

McCart, A. (2018, November). Differentiated instruction. Presented at the 5th Annual Cape Coast Autism Training Workshop on Inclusion: Strategies & Skills for the Special Needs Child. University of Cape Coast Ghana, School of Medical Sciences. Ghana, Africa.

McCart, A. (2018, November). Understanding behavior. Presented at the 5th Annual Cape Coast Autism Training Workshop on Inclusion: Strategies & Skills for the Special Needs Child. University of Cape Coast Ghana, School of Medical Sciences. Ghana, Africa.

McCart, A. (2018, November). Including Samuel. Presented at the 5th Annual Cape Coast Autism Training Workshop on Inclusion: Strategies & Skills for the Special Needs Child. University of Cape Coast Ghana, School of Medical Sciences. Ghana, Africa.

McCart, A. (2018, October). California MTSS Region 7 Community of Practice. California Multi-Tiered System of Support presentation. Fresno, CA.

McCart, A. (2018, October). School Climate and Interaction Patterns. Presented at Sunburst Academy. Los Alamitos, CA.

McCart, A. (2018, October). Equity Leadership Series: Instructional Leadership and Reciprocal Communication. Presented at Sunburst Academy. Los Alamitos, CA.

McCart, A. (2018, September). SWIFT ACCESS site teams: MTSS in action. CA at Outdoor Education Center. Orange County, CA.

McCart, A. (2018, September). Equity Leadership Series: Reciprocal Communication and Leadership Teaming in Equity-based MTSS. Presented in Santa Ana, CA.

McCart, A. & Mitchiner, M. (2018, August). SWIFT ACCESS: Fall Kickoff new teaming structure MTSS in action. Presented to Alternative Community and Correctional Education Schools and Services. Santa Ana, CA.

McCart, A. & Mitchiner, M. (2018, August). SWIFT ACCESS: The Data Snapshot Process for MTSS. Presented to Alternative Community and Correctional Education Schools and Services Leadership Team. Orange County, CA.

McCart, A. (2018, August). Foundations of MTSS, CA Cohort 3. Presented at Inyo County Department of Education. Bishop, CA.

Olmstead, C., Marriott, R., Miller, D., McCart, A., & McSheehan, M. (2018, July). Online Module Trifecta. Presented at the 2018 National MTSS Professional Learning Institute. Sacramento, CA.

McCart, A. (2018, July). Implementing MTSS in Alternative Settings. Presented at the 2018 National MTSS Professional Learning Institute. Sacramento, CA.

McCart, A., & Devoll, R. (2018, July). Leadership Development in MTSS/ Shifting Reacting to Creating. Presented at the 2018 National MTSS Professional Learning Institute. Sacramento, CA.

McCart, A. & Martin, R. (2018, May). MTSS in Alternative Settings. Presented at the 49th Annual JCCASAS Conference. Orange County, CA.

Mijares, A., McCart, A., Montes, E. & Olmstead, C. (2018, February). Transforming school culture through MTSS. Presented at College Board Regional Forum. Las Vegas, NV.

McCart, A., Mitchiner, M., Moutry, A., Mayfield-Harris, B., & Miltenberger, L. (2018, January). SWIFT ACCESS: Introduction to MTSS. Orange County, CA.

McCart, A. (2017, various). Using a multi-tiered system of support to improve student outcomes. Presented at multiple California County Offices of Education. CA.

McCart, A. & Olmstead, C. (2017, March). California Department of Education Division Day Meeting. Presented at Orange County Office of Education. Costa Mesa, CA.

McCart, A. (2017, November). Scaling Up Statewide MTSS. Presented at Orange County Office of Education. Costa Mesa, CA.

McCart, A. & Mitchiner, A. (2017, November). SWIFT ACCESS: MTSS: Designing, Teaming, & Expanding. Presented to ACCESS Executive Leadership Team. Orange County, CA.

McCart, A. (2017, October). CAMTSS Evaluation retreat. Presented at Orange County Office of Education. Costa Mesa, CA.

McCart, A., Mitchiner, M., & Miltenberger, L. (2017, September). SWIFT ACCESS: Multi-tiered System of Support in Alternative Education. Presented to Alternative Community and Correctional Education Schools and Services Leadership Team. Orange County, CA.

Olmstead, C., Hukkanen, S., & McCart, A. (2017, July). Scaling up a multi-tiered system of support. Presented at 2017 National MTSS Professional Learning Institute. Costa Mesa, CA.

McCart, A. & Olmstead, C. (2017, June). Leadership in Transition:  Focusing On All California SUMS Initiative. Presented at Merced County Office of Education. Merced, CA.

McCart, A. (2017, February). Making it personal: extended session on MTSS/SUMS. Presented at 2017 Curriculum and Instruction Steering Committee (CISC) Leadership Symposium of the California County Superintendents Educational Services Association. Anaheim, CA.

Mijares, A., Montes, E., Hukkanen, S., & McCart, A. (2017, February). All means all: Equity and access for all students through an MTSS framework. Presented at College Board Forum 2017. New York, NY.

McCart, A. (2016, November). California SUMS Initiative Regional County Office Team Training. Presented at Orange County Department of Education. Costa Mesa, CA.

McCart, A. (2016, September). MTSS Implementation for School-wide Success: Advancing your MTSS. Presented at Orange County Department of Education. Costa Mesa, CA.

McCart, A. (2016, July). SWIFT and MTSS. Opening remarks. Presented to SWIFT 2016 National Professional Learning Institute. Arlington, VA.

McCart, A. (2016, June). California SUMS initiative: Engineering your MTSS. Presented at Orange County Department of Education, SUMS Initiative. Costa Mesa, CA.

McCart, A. (2016, June). California SUMS initiative: Structuring your MTSS. Presented at Butte County Department of Education. Oroville City, CA.

McCart, A. (2016, June). California SUMS initiative: Foundations of MTSS. Presented at Orange County Department of Education, SUMS Initiative. Costa Mesa, CA.

McCart, A. (2016, May). An introduction to SWIFT. Presented at Orange County Department of Education, SUMS Initiative. Costa Mesa, CA.

McCart, A. (2016, May). MTSS the driver for equity-based inclusion. Presented at National Leadership Consortium. Kansas City, MO.

McCart, A. (2016, May). State of SWIFT. Presented at National Leadership Consortium. Kansas City, MO.

McCart, A. (2016, March). California SUMS Initiative Regional County Office Team Training SWIFT- Training 2, Foundations of CA MTSS. Presented California Department of Education. Sacramento, CA.

McCart, A. (2016, February). California SUMS Initiative Regional County Office Team Training. Presented at Orange County Department of Education, SUMS Initiative. Costa Mesa, CA.

McCart, A & Moutry, A. (2016, January). SWIFT – Baltimore City Public School Literacy Learning Initiative. Presented at Baltimore, MD.

McCart, A. (2016, January). SWIFT- Evaluation Team Data Camp. Presented at Lawrence, KS.

McCart, A. (2016, February). SWIFT differentiated technical assistance for sustainable equity-based inclusive education. Presented at Department of Basic Education, Republic of South Africa [Invited Presentation, U.S. UNICEF Delegation].

McCart, Mayfield, & Williams. (2015, September). Mississippi State Department of Education and SWIFT. Presented at Mississippi State Department of Education. Jackson, MS.

Sailor, W., & McCart, A. (2015, August). SWIFT. Presented at Office of Special Education and Rehabilitative Services. Washington, D.C.

McCart & McSheehan, M. (2015, May). SWIFT Differentiated technical assistance process. Presented at SWIFT National Leadership Consortium. Kansas City, MO.

McCart, A. (2015, April). SWIFT Differentiated Technical Assistance: Lockard Elementary School Climate Survey. Presented at TA&D Program Area Meeting. Washington D.C.

McCart, A., & Quirk, C. (2015, April). Transforming school practices to teach all students. Presented Council for Exceptional Children. San Diego, CA.

McCart, A. (2015, March). SWIFT. Teaching through transformation. Presented to CEEDAR Center. Loyola Marymount University, Los Angeles, CA.

McCart, A. & McSheehan, M. (2015, February). SWIFT Intensive Technical Assistance Process. Presented at PBIS-SWIFT TA Meeting. Denver, CO.

McCart, A., McSheehan, M., Sailor, W., Mitchiner, M., & Quirk, C. (2014, December). SWIFT Intensive Technical Assistance. Presented at OSEP 3+2 Response Meeting. Washington, D.C.

Sailor, W., McCart, A., Quirk, C., & Dunford, P. (2014, July). From Silos to SWIFT. Presented at OSEP Project Director Conference. Washington, D.C.

McCart, A. (2014, February). Do you really mean all? PBIS as a driver of inclusive school reform supporting students with extensive needs [Keynote]. Presented at 12th Annual Northwest PBIS Conference. Portland, OR.

McCart, A. (2014, February). All means all: What we are learning at the SWIFT Education Center. Presented at PEAK Parent Center Conference on Inclusive Education. Denver, CO.

McCart, A. (2014, January). SWIFT Implementation in Mississippi. Mississippi State Department of Education. Jackson, MS.

McCart, A. (2013, December). Launching SWIFT in Vermont. Vermont State Department of Education. Montpelier, VT.

McCart, A. (2013, November). SWIFT Domains and Features, National Leadership Consortium. SWIFT Education Center. Intercontinental Hotel. Kansas City, MO.

McCart, A. (2013, November). Launching SWIFT in Oregon. Oregon State Department of Education. Salem, OR.

McCart, A. (2013, October). Launching SWIFT in Maryland. Maryland State Department of Education. Baltimore, MD.

McCart, A. (2013, October). The SWIFT Education Center. Presented at 2013 PBIS Leadership Forum PBIS: Equity in Education – Making Education Work for All. Chicago, IL.

McCart, A. (2013, October). Creating Partnerships Through Knowledge Sharing. Stoughton, WI.

Sailor, W., McCart, A., & McSheehan, M. (2013, July). Strengths Based Strategies for Districts and Schools to Meet the Needs of All Students. Presented at OSEP Project Director's Meeting. Washington, D.C.

McCart, A. (2013, July). Cross Center Collaboration: Working Together for Change. Presented at TACC. Washington, D.C.

McCart, A. (2013, July). All Means All. Presented at SWIFT Professional Learning Institute. Washington, D.C.

McCart, A. (2013, June). Building Sustainability Through SWIFT: School-wide Integrated Framework for Transformation. Chicago, IL.

McCart, A. (2013, May). Oregon State Department of Education SWIFT State Partnerships: Working Together To Transform Schools. Oregon State Department of Education. Salem, OR.

McCart, A. (2013, May). The Who, What and Why of SWIFT? National Leadership Consortium. Intercontinental. Kansas City, MO.

McCart, A. (2013, April). Idaho State Department of Education SWIFT State Partnerships: Working Together To Transform Schools. Presented at Idaho State Department of Education.

McCart, A. (2013, April). The Who, What and Why of SWIFT? Advisory Group, Presented at Kansas City, MO.

McCart, A. (2013, March). Vermont State Department of Education SWIFT State Partnerships: Working Together To Transform Schools. Presented at Vermont State Department of Education.

McCart, A. (2013, March). Massachusetts State Department of Education SWIFT State Partnerships: Working Together To Transform Schools. Presented at Massachusetts State Department of Education.

McCart, A. (2013, March). Michigan State Department of Education SWIFT State Partnerships: Working Together To Transform Schools. Presented at Michigan State Department of Education.

McCart, A. (2013, March). The SWIFT Education Center: School-wide Integrated Framework for Transformation. Presented at 2013 Leveraging Resource Conference, TACC. Washington, D.C.

McCart, A. (2013, February). Creating Partnerships Through Knowledge Sharing. SWIFT Education Center. Presented at Camdenton, MO.

Sailor, W. & McCart, A. (2012). Multi-tiered systems of supports and students with significant disabilities supported by intensity of supports within inclusive settings. Presented at 2012 TASH Conference. Long Beach, CA.

McCart, A. (2011, August). RtI: Instructional Strategies for Diverse Learners. Presented at SAMSCHOOLS, Winter Institute. Washington, D.C.

McCart, A. (2011, August). Intensive Behavioral Intervention and Support (PBIS at Tier 3). Presented at SAMSCHOOLS, Winter Institute. Washington, D.C.

McCart, A. (2010, Spring). Individual Positive Behavioral Intervention and Support: Functional Behavioral Assessment. Presented at Georgia Department of Education. Savannah, GA.

McCart, A. (2010, September). Implementing Positive Behavior Support Across the Tiers. Presented at Oklahoma State Department of Education. Tulsa and Oklahoma City, OK.

McCart, A., & Wolf, N. (2010, Winter). Effective Inclusion in Private School Settings. Presented at Stanley British Primary School. Denver, CO.

McCart, A., & Bannerman Juracek. (2010, November). Implementing Positive Behavior Support for Job Coaches/Employment Specialist. Presented at University of Oklahoma. Oklahoma City, OK.

McCart, A., & Bannerman Juracek. (2010, April). Intensive Teaching Skills for Effective Job Coaching. Presented at University of Oklahoma. Tulsa, OK.

McCart, A. (2010, February). Statewide PBIS Coaches Training, Oklahoma State Department of Education. Presented workshop titled Active Supervision Skills. Oklahoma City, OK.

McCart, A. (2010, March). Statewide PBIS Coaches Training, Oklahoma State Department of Education. Presented workshop titled Staff Reinforcement and Positive Behavioral Support and State Assessments. Oklahoma City, OK.

McCart, A. (2010, March). Statewide PBIS Coaches Training, Oklahoma State Department of Education. Presented at School-wide Motivation Systems. Oklahoma City, OK.

McCart, A. (2010, May). Statewide PBIS Coaches Training, Oklahoma State Department of Education. Pre-Teaching at Tier 2. Oklahoma City, OK.

McCart, A. (2010, January). Statewide PBIS Coaches Training, Oklahoma State Department of Education. Presented at Identifying Patterns of Problem Behavior and Re-Teaching Behavior Expectations. Oklahoma City, OK.

McCart, A. (2010, January). SSBD: How to Use Universal Screening to Monitor Student Behavioral Outcomes.  Presented at SAMSCHOOLS Winter Institute. Washington, D.C.

McCart, A. & Choi, J. H. (2009, March). Improving PBS Implementation in Urban Schools Using a Structural School Reform Process. Presented at Association of Positive Behavioral Support. St. Louis, MO.

McCart, A. & Wolf, N (2009, February). Universal Positive Behavior Support. Oklahoma City and Tulsa, OK.

McCart, A., Riffel, L., & Wolf, N. (2009, July). Statewide PBIS Coaches Training, Presented at the Oklahoma State Department of Education, Professional Development Training Sequence. Oklahoma City, OK.

McCart, A. (2009, September). Statewide PBIS Coaches Training. Presented at the Oklahoma State Department of Education, What is a Coach? Oklahoma City, OK.

McCart, A. (2009, October). Statewide PBIS Coaches Training, Presented at the Oklahoma State Department of Education, Classroom Support for Reductions in ODRs? Universal Screening. Oklahoma City, OK.

McCart, A. (2009, November). Statewide PBIS Coaches Training, Presented at the Oklahoma State Department of Education. Parent, Family and Community Engagement. Oklahoma City, OK.

McCart, A. (2009, December). Statewide PBIS Coaches Training, Presented at the Oklahoma State Department of Education. Positive Behavioral Support Lesson Planning. Oklahoma City, OK.

McCart, A. (2008, June). Positive Behavioral Support Strategies in Early Childhood Settings.  Presented at Early Childhood Governor's Institutes. KeyStone College, PA.

McCart, A. (2008, July). Positive Behavioral Support Strategies in Early Childhood Settings. Presented at Early Childhood Governor's Institutes.  Juniata College, PA.

Sailor, W., McCart, A., & Choi, H. (2008, December). Response to Intervention for All Students. Presented at TASH, Nashville, TN.

McCart, A., & Wolf, N., (2008, August). Co-Teaching in the Washington D.C. Public Schools. Presented at Washington, D.C.

McCart, A., Wolf, N., & Roger, B., (2008, March). Getting Started with PBS, RtI and Inclusionary Practices. Presented at Washington D.C. Summer Training Institute. Washington D.C. Public School District.

Wolf, N. & McCart, A. (2008, October). Use of Tiered PBS Support with Families Accessing Early Head Start Services. Presented at Fifth International Conference on Positive Behavior Support, Rosemont, IL.

McCart, A. & Juracek, D.B. (2007, August). Preventing and Reducing Challenging Behavior.  Presented at Workshop for early childhood providers through the Positive Intervention and Support Flint Hills Special Education and Cooperative. Emporia, KS.

Wolf, N. & McCart, A., (2007, Fall). Parent training & Support. Presented at Project Eagle, Early Head Start, University of Kansas Medical Center. Kansas City, KS.

Juracek, D.B., & McCart, A. (2007, May). Increasing Family Self-Sufficiency to Assess the Functions of Child Problem Behavior and Develop the Fix. Presented at Association for Behavior Analysis International 33rd Annual Convention. San Diego, CA.

McCart, A., & Juracek, D.B., (2007, May). Use of Evidenced-based Teaching Procedures in the Teaching of Job Skills. Workshop sponsored by Oklahoma Developmental Disability Services for job coaches working with adults with developmental disabilities. Oklahoma City, OK.

McCart, A., & Juracek, D.B. (2007, March). Increasing Family Self-Sufficiency in the Development and Implementation of PBS to Address Challenging Behavior. Presented at Fourth International Conference on Positive Behavior Support. Boston MA.

Sailor, W., & McCart, A. (2007, March). RTI and School Reform: A Context for Schoolwide Positive Behavior Support. Presented at the Association of Positive Behavior Support. Boston, MA.

McCart, A., & Juracek, D.B. (2007, January). Positive Behavior Support: Providing Effective Behavior Supports in Community Job Settings. Workshop Sponsored by Oklahoma Developmental Disability Services for job coaches working with adults with developmental disabilities. Oklahoma City, OK.

McCart, A. (2006, November). PBS in Early Childhood. Presented at the National Head Start Association.  Detroit, MI.

McCart, A., Griggs, P., Wolf, N., & Choi, J. (2006, September). School-wide evaluation training. Haysville Kansas School District. Haysville, KS.

Sailor, W., & McCart, A. (2006, October). A Response to Intervention Logic Model. Presented at PBS Implementers Forum. Chicago, IL.

McCart, A., Griggs, P., & Wolf, N. (2006, October). Implementing Effective Self-Management Systems in Urban Contexts. Presented at PBS Implementers. Forum, Rosemont, IL.

McCart, A. & Bannerman-Juracek, D. (2006, August). Strategies to Support Children with Challenging Behavior. Presented at Cherokee Indian Nation, 6th Annual Early Childhood Conference. Northeastern State University. Tahlequah, OK.

McCart, A. (2006, April). Individual PBS Part I and II. Spring PBS Forum. Overland Park, KS.

McCart, A. Wolf, N. Griggs, P. Harsh, R., & Englebrick L., (2006, March). The PBS Data Analyzer: Going Beyond Analysis to Impact Individual Students. Presented at The Third International Conference on Positive Behavior Support. Reno, NV.

McCart, A. (2006, March). Easy Functional Assessment. Presented at National Training Institute. Clearwater, FL.

McCart, A. (2006, March). Early Childhood PBS Panel. Presented at International Conference on Positive Behavior Support. Reno, NV.

McCart, A., & Bannerman Juracek, D. (2006, March). Practical Strategies for Supporting Families. Presented at International Conference on Positive Behavior Support. Reno, NV.

Freeman, R., Kimbrough, P., & McCart, A. (2006, March). KIPBS. Presented at International Conference on Positive Behavior Support. Reno, NV.

McCart, A. (2006, March). Family systems change. Presented at International Conference on Positive Behavior Support. Reno, NV.

Harsh, R., McCart, A. & Wolf, N. (2006, March). PBS Data Analyzer. Presented at APBS Conference. Reno, NV.

McCart, A., & Griggs, P. (2006, March). Positive Behavior Support Vision Planning. Presented at Kansas City Kansas Public School. Kansas City, KS.

McCart, A., & Freeman, R. (2006, February). Child Welfare Vision Planning. Topeka, KS.

McCart, A. (2006, February). Understanding Behavior. Jacksonville, FL.

McCart, A. (2005, December). Going Beyond Data Analysis to Impact Individual Students. Presented at Kansas State Department Technology Seminar. Topeka, KS.

McCart, A. (2005, December). Understanding Problem Behavior. Presented at National Head Start Association. Washington, D.C.

Sailor, W., McCart A., Malloy, J., & Sprague, J. (2005, October).  Developing Structures for Family/Community/Student Involvement.  Presented at Positive Behavioral Interventions and Support National Leadership Forum. Rosemount, IL.

McCart, A. (2005, October). Supporting Families and Communities: SAM. Presented at PBS Implementers Forum. Chicago, IL.

McCart, A. (2005, October). No Child Left Behind and Schoolwide PBS. Presented at Implementers Forum. Chicago, IL.

McCart, A. (2005, September). Kicked out at three! supporting early childhood providers to prevent and deal with challenging behaviors. The Nations Network of Childcare Resource and Referral. NACCRRA's 2005 Regional Institute: Focus on Practice: Developing a Continuum of Growth in CCR&R. Kansas City, MO.

McCart, A., Griggs, P., & Wolf, N. (2005, September). Family Wellness Workshop on Behavior Support: Effectively Supporting Children with Challenging Behavior through Research-Based PBS Strategies. Kansas Institute on Positive Behavior Support. Overland Park, KS.

Bannerman Juracek, D., & McCart, A. (2005, September). Understanding the Needs of Diverse Parents: Adapting Your In-home Support for Parents with Special Needs (Part Two). Child and Family Services Project EAGLE Community Programs. Kansas City, KS.

McCart, A., & Bannerman Juracek, D. (2005, August). Understanding the Needs of Diverse Parents: Adapting Your In-home Support for Parents with Special Needs (Part One). Child and Family Services Project EAGLE Community Programs. Kansas City, KS.

McCart, A. & Bannerman Juracek, D. (2005, Summer). Family-centered interventions and supports for young children with problem behavior. Keynote presentation for the Inclusion Institute Conference at Bloomsburg University. 4th Annual Inclusion Institute. Lewisburg, PA.

McCart, A., Griggs. P., Sailor, W. & Hall, T. (2005, August). Longitudinal Impact of PBS Training for Parents and Teachers on Child Outcomes in Urban Settings: Center for Evidence-Based Practice. Portland, MA.

McCart, A. (2005, August). Brief Overview of School-wide Applications Model (SAM). Presented at National Technical Assistance Center for Positive Behavior Support. Denver, CO.

Freeman, R., & McCart, A. (2005, July). Family Systems Change Initiative: Family Systems as Compared with School-wide Behavior Systems. National Advisory Board Meeting. Kansas Institute on Positive Behavior Support. Kansas City, KS.

McCart, A., Griggs, P., Wolf, N. & Thomas, J. (2005, June). Family Wellness Workshop on Behavior Support: Effectively Supporting Children with Challenging Behavior through Research-Based PBS Strategies. Kansas Institute on Positive Behavior Support. Overland Park, KS.

McCart, A. (2005, June). Person-Centered Planning for Children. Kansas Institute on Positive Behavior Support. Parsons, KS.

McCart, A., & Harsh, R. (2005, June). The PBS Data Analyzer: Longitudinal Data Use for the State of Kansas. Kansas State Department of Education. Topeka, KS.

Choi, J. H., & McCart, A. (2005, March). Effectiveness of the continuum of all levels of SWPBS in Classroom Settings. Presented at 5th Annual International Conference on Positive Behavior Support. Tampa, FL.

Utley, C., McCart, A., & Wolf, N. (2005, March). Implementing Positive Behavior Support (PBS) in Urban Multicultural Schools: Research and Reality. Preconvention Workshop, Council for Exceptional Children Convention and Expo. Baltimore, MD.

Harsh, R., McCart, A., & Wolf, N., (2005, March). The PBS Data Analyzer: A Comprehensive Web-Based Data Analyzer System for Examining Student Behavioral and Academic Outcomes. Presented at The Second International Conference on Positive Behavior Support. Tampa, FL.

McCart, A., & Juracek, D.B. (2005, March). Practical Strategies for Supporting Families through Comprehensive PBS. Presented at Second International Conference on Positive Behavior Support. Tampa, FL.

McCart, A., & Bannerman, D. (2005, March). Practical Strategies for Supporting Families through Comprehensive PBS. Presented at Second International Conference on Positive Behavior Support. Tampa, FL.

McCart, A., & Englebrick, L. (2005, March). That Might Work in the Suburbs but . . . PBS in the Urban School. Presented at Second International Conference on Positive Behavior Support. Tampa, FL.

McCart, A., Sailor, W., Roger, B., Keetle, S. (2005, March). Anchoring School-wide PBS in Comprehensive School Reform:  The School-wide Applications Model (SAM). Presented at Second International Conference on Positive Behavior Support. Tampa, FL.

McCart, A. (2005, January). Introduction to School-wide Positive Behavior Support. Haysville, KS.

McCart, A., Griggs P., & Thomas J. (2004, September). PBS: Schools and families working together to understand behavior. Presented at Grant Elementary School, Kansas City KS USD 500. Kansas City, KS.

McCart A., & Griggs P. (2004, September). PBS and Student Improvement Teams: Integrating school-wide, group, and individual support through PBS and SIT. Annual PBS Fall Forum. Overland Park, KS.

McCart A., & Griggs, P. (2004, August). PBS: Making differences locally and nationally. Management Team, Kansas City KS USD 500. Kansas City, KS.

McCart, A, Englebrick, L., Rios, J., Cottrell, B., Riley, N., Wolf, N., Lassen, S., Choi, H., Griggs, P. (2004, April). Positive Behavior Support:  Kansas City Kansas School District Making Positive Differences: Locally and Nationally. KDSE Conference. Kansas City, KS.

McCart, A., Wolf, N., Englebrick, L., Lassen, S., Choi, J. H., Griggs, P. (2004, April). School-wide PBS in Kansas City, KS. Presented at Kansas State Department of Education (KSDE) Annual Conference. Overland Park, KS.

McCart, A. (2004, March). Legislative testimony on Senate Bill 531: Proposing a committee to consider hospital closure in Kansas for persons with developmental disabilities. Presented at Kansas State Senate. Topeka KS.

McCart, A. (2004). Legislative testimony on a PBS incentive bill for the state of Kansas. Presented at Kansas House Committee. Topeka KS.

McCart, A., Wolf, N., & Griggs, P. (2004). Presentation to USD 500 Principal's Forum. Kansas City, Kansas Public Schools. Kansas City, KS.

McCart, A., & Bannerman Juracek, D. (2004, February). Providing Positive Behavioral Support for Students with Challenging Behavior. Inclusive Network of Kansas: Field Based Technical Assistance and Professional Development. Wichita, KS.

McCart, Griggs, & Wolfe (2004, February-March). PBS Data Analyzer: Data-based planning for effective behavior supports. Kansas City, KS USD 500 Principals. Kansas City, KS.

McCart, A., Sailor, W., Griggs, P., Wickham, D., Wolf, N., (2003).  School-Wide Approaches to PBS through the use of Empowerment Evaluation.  Presented at The First International Conference on Positive Behavior Support. Orlando FL.

McCart, A., Englebrick, L., & Griggs, P. (2003, November). PBS Data Analyzer. Kansas State Department of Education (KSDE). Topeka, KS.

McCart A., & Griggs P. (2003, November) PBS: Working together as a family to understand problem behavior. Lowell Preschool, Kansas City KS USD 500. Kansas City, KS.

Juracek, D.B., & McCart, A. (2003, October). An Overview of Positive Behavior Support. Invited workshop. Salina, KS.

Juracek, D.B., & McCart, A. (2003, October). Taking the "Challenge" Out of Challenging Behaviors. Invited keynote presentation. Salina, KS.

Juracek, D.B., McCart, A., Sweeney, H.M., Price, J., Sheldon, J.B., Sherman, J.A., & Strouse, M.C. (2003, May).  Enhancing quality of life and reducing challenging behavior with functional assessment and corresponding life arrangement.  J.B. Sheldon (Chair). Durable Dance Partners:  Enhancing Quality of Life for People with Developmental Disabilities. Symposium presented at the 29th annual convention of the Association for Behavior Analysis. San Francisco, CA.

McCart, A. (2003, March). Implementing Positive Behavior Support in your School. Presented at Spring Forum on Positive Behavior Support. Lawrence, KS.

McCart, A., Sailor, W., Griggs, P., Wickham, D. & Wolf, N. (2003, March). Whole-school approaches to PBS through the use of empowerment evaluation. Presented at the first International Conference of the Association of Positive Behavior Support. Orlando, FL.

McCart, A., & Bannerman Juracek, D. (March, 2003). Helping Stakeholders "Take the PBS Wheel": Evaluating a PBS protocol across settings. Poster presented at the First International Conference on Positive Behavior Support. Orlando, FL.

Englebrick, L., Wickham, D., & McCart, A. (2003, January). Positive Behavior Support in Urban School Settings. Presented at Federal Office of Special Education Project Directors Meeting. Washington, D.C.

McCart, A., & Wickham D. (2002, December). Positive Behavior Support in Schools. Presented at TASH Annual Conference. Boston, MA.

McCart, A., & Bannerman Juracek, D. (2002, December). Addressing the Needs of Children with Autism, Day One. Oklahoma City, OK.

Juracek, D.B., & McCart, A. (2002, October). Positive Behavioral Support: Addressing the Needs of Children with Autism.  Invited Workshop by the Lee Mitchener Tolbert Center for Developmental Disabilities at the University of Oklahoma Health Sciences Center. Oklahoma City, OK.

McCart, A., Wolf, N., & Ozbun, S. (2002, August). Understanding Positive Behavior Support. Summer Training Series. Kansas City, KS.

McCart, A., Wolf, N., & Ozbun, S. (2002, August). School-wide Expectations. Summer Training Series. Kansas City, KS.

McCart, A., Wolf, N., Ozbun, S. (2002, August). Individual Positive Behavior Support. Summer Training Series. Kansas City, KS.

McCart A., & Griggs P. (2002, August). Starting the school year right! Positive behavior support. Arrowhead Middle School and White Church Elementary School, USD 500. Kansas City, KS.

McCart, A., & Cottrell, B. (2002, May). Implementation of School-wide Positive Behavior Supports and Access to the General Education Initiatives in Kansas City Kansas. Presented at KSDE/KSDC Annual Conference: Connecting the Links to Student Learning Success. Wichita, KS.

McCart, A., & Bannerman Juracek, D. (2002, May). Positive Behavior Support: How to Develop and Implement Positive Behavior Support Plans. Rosewood Services. Great Bend, KS.

McCart, A. (2002, April). Behavior Support 101. Region VII CRP-RCEP Issues Forum. Kansas City, MO.

McCart, A. (2002, April). Positive Behavior Support 102. Region VII CRP-RCEP Issues Forum. Kansas City MO.

McCart, A., Wickham, D., & Cottrell, B. (2002, April). Positive Behavior Support: School Experiences with Positive Behavior Support and Access to General Education Initiatives. Presented at Midwest Symposium.  Kansas City, MO.

McCart, A. & Bannerman Juracek, D. (2002). Positive Behavioral Support: Addressing the needs of children with autism. Presented at New Mexico physical OUHSC Continuing Education Unit, Oklahoma City, OK.

McCart, A., Wickham, D., & Cottrell, B. (2002, February). School Experiences with Positive Behavior Supports and Access to General Education Initiatives. Presented at Midwest Symposium for Leadership in Behavior Disorders, Inc. Kansas City, MO.

McCart, A., & Wickham, D. (2002, January). Kansas City Kansas: Positively Supporting All Students. Presented at Kansas City Kansas Board of Education. Kansas City, Kansas.

McCart, A., Park, J., & Turnbull, A. P. (2001, December). Positive behavioral support for young children with special needs. Presented at 17th Annual DEC International Early Childhood Conference on Children with Special Needs. Boson, MA.

Wickham, D., Griggs, P., & McCart A. (2001, August). Creating a school community through PBS. White Church Elementary School, USD 500. Kansas City, KS.

McCart, A., & Bannerman Juracek, D. (2001). Positive behavior support plan template: A tool for individuals with challenging behavior. Rosewood Services, Inc. Great Bend, KS.

Park, J., & McCart, A. (2001, March). Positive Behavioral Support for young children with special needs. Presented at Annual Kansas Division for Early Childhood Conference. Overland Park, KS.

Freeman, R., Britten, J., Smith, C., & McCart, A. (1999). Online Academy Positive Behavioral Support Research Summit. University of Kansas. Lawrence, KS.

Sailor, W., Freeman, R., Britten, J., & McCart, A. (1999, May). Positive Behavioral Support. Poster presentation for the Online Academy Conference. Lawrence, KS.

•••••

# FUNDED GRANT AWARDS

OAK Foundation Learning Differences Grant Program: Suite of SWIFT Developed Equity Tools (Award # OFIL-22-045). Principal Investigator- McCart, A. $450,000 (May 2022 - April 2026).

California SUMS Initiative: Scaling Up Multi-Tiered System of Support (CA SUMS) (Grant #10000780). Co-principal Investigator- McCart, A. Orange County Department of Education. $1,200,000 (May 2022 - March 2026).

Resources Aligned and Integrated for Student Equity (RAISE): Protocol for Grade-level Teams to Intensify Instruction for Students With or At-risk for Disabilities (R324X220051). Co-principal Investigator- McCart, A. $2,998,288 (September 2022 - August 2026).

Oregon Multi-Tiered Systems of Support (MTSS) (Sponsor #15543). Co-Principal Investigator- McCart, A. Oregon Department of Education. $1,183,518 (December 2022 - September 2023).

Supporting Effective School Leaders through Professional Learning and Resources for Equity Leadership & Educator Well-Being (S423A220034). Principal Investigator- McCart, A. United States Department of Education. $10,112,318 (October 2022 - September 2025).

Rightful Presence Center: National Technical Assistance Center for Inclusive Practices and Policies (OSEP-H326Y220003). Principal Investigator- McCart, A. Office of Special Education Programs, United States Department of Education, Washington, D.C. $10,000,000 (September 2022 - August 2027).

New York City Public Schools District Planning for Equity-Based MTSS. Principal Investigator- McCart, A. New York City Department of Education. $24,000 (March 2022-June 2022).

Exploring Implementation of Equity-based MTSS. Principal Investigator- McCart, A. GreenDot Public Schools, CA. $48,000 (October 2022 - June 2024).

Principal and Charter School Site Leadership TA. Principal Investigator- McCart A. Bill and Melinda Gates Foundation. $1,199,999 (November 2019-June 2022).

Gates Evaluation. Principal Investigator- McCart, A. Bill and Melinda Gates Foundation. $479,216 (March 2022-August 2023).

Equity-based MTSS Implementation. Principal Investigator- McCart, A. Aspire Public Schools, Oakland, CA. $71,000 (August 2022 - June 2023).

Installation of Equity-based MTSS. Principal Investigator- McCart, A. Sonoma County Office of Education, Santa Rosa, CA. $36,368 (January 2023 - June 2023).

Installation of Equity-based MTSS. Principal Investigator- McCart, A. Teton County School District, Jackson, WY. $19,703 (September 2022 - June 2023).

Installation of Equity-based MTSS. Principal Investigator- McCart, A. Idaho Coeur d' Alene School District. $846,000 (July 2021 - June 2023).

Oklahoma AWARE South. Principal Investigator- McCart, A. Oklahoma State Department of Education. $477,377 (January 2022 - September 2026).

Implementation of MTSS. Principal Investigator- McCart, A. Santa Barbara Unified School District. $1,066,500 (July 2021 - June 2024).

SWIFT Fidelity of Implementation Tool Assessment Consultation. Principal Investigator- McCart, A. Portland Public Schools, Portland, OR. $25,500 (September 2021 - June 2022).

SWIFT Fidelity of Implementation Assessment Assessor Training and Central Leadership Team Meetings. Principal Investigator- McCart, A. Portland Public Schools, Portland, OR. $48,999 (August 2022 - June 2023).

Marshall Street Initiatives. Principal Investigator- McCart, A. Summit Public Schools. $100,000 (September 2021 - June 2022).

Installation of Equity Based MTSS. Principal Investigator- McCart, A. Greenfield Union School District, Bakersfield, CA. $884,354 (May 2021 - June 2024).

Idaho Safe Schools (HC204400). Principal Investigator- McCart, A. State of Idaho Department of Health and Welfare $470,000 (December 2020 - October 2022).

Idaho Advancing Wellness and Resiliency in Education (ID-AWARE) (23-7905). Principal Investigator- McCart, A. Idaho State Department of Education $764,404 (January 2021 - September 2025).

Cumberland County School District Learning Module. Principal Investigator- McCart, A. Cumberland County School District, NC. $27,000 (February - October 2021).

Leadership in Research and Teacher Preparation for Systemwide Inclusive Education (H325D190042). Project Advisor. $1,249,879 (November 2019 - October 2024).

Washington School District MTSS, Oklahoma. Principal Investigator- McCart, A. Washington School District, OK. $36,000 (January - September 2021).

Oklahoma AWARE East. Principal Investigator- McCart, A. Oklahoma State Department of Education. $338,000 (September 2020 - September 2025).

Oklahoma SWITCH. Principal Investigator – McCart, A. Oklahoma State Department of Education. $210,000 (August 2020 - June 2022).

District of Columbia Statewide Inclusive Professional Learning Framework and Institute Proposal (ED-GRANTS-072920-001). Principal Investigator – McCart, A. Office of the State Superintendent of Education. $300,000 (October 2020 - September 2021).

Charter Management Organization.  Principal Investigator- McCart, A. Bill and Melinda Gates Foundation $1,199,998 (November 2019 - June 30, 2022). Invited Sole Source Contract.

Inclusionary Practices Statewide Professional Development & Support. Principal Investigator- McCart. A. State of Washington Office of Superintendent. $1,337,786 (March 2020 - June 2021).

Idaho Safe Schools. Principal Investigator- McCart, A. State of Idaho Department of Health and Welfare. $470,000 (November 2020 - October 2022).

Idaho AWARE. Principal Investigator- McCart, A. State of Idaho Departments of Education and Health and Welfare.

$770,000 (August 2020 - August 2025).

Leadership in Research and Teacher Preparation for Systemwide Inclusive Education (H325D190042). Project Advisor. $2,499,879 (October 2019 - October 2024).

Washington School District MTSS, Oklahoma. Principal Investigator- McCart, A. Washington School District. $36,000 (January - September 2021).

Oklahoma AWARE East. Co-Principal Investigator- McCart, A. & Miller, D. Oklahoma State Department of Education. $338,000 (October 1, 2020 - September 30, 2025).

Oklahoma SWITCH. Principal Investigator- McCart, A. Oklahoma State Department of Education. $87,000 (August 2020 - June 2021).

Washington Inclusionary Practices. Principal Investigator- McCart, A. State of Washington Office of Superintendent. $983,997 (July 2020 - June 2021). External Refereed Competitive Process.

California Residency Lab. Principal Investigator- McCart, A. Bill and Melinda Gates Foundation. $173,250 (September 2019 - August 2020). Invited Sole Source Contract.

Introduction to MTSS in Legacy Alternative High School. Principal Investigator-McCart, A. Evergreen School District. $11,000 (June 2019). Invited Sole Source Contract.

Introduction to MTSS in Orchards Elementary School. Principal Investigator-McCart, A. Evergreen School District. $21,000 (June 2019 - August 2019). Invited Sole Source Contract.

Supporting Effective Educator Development:  Equity leadership in high need schools.  Principal Investigator-McCart, A. & Sailor, W. $17,179,657 (October 2018 - September 2023). United States Department of Elementary and Secondary Education.  Office of Innovation and Improvement. University of Kansas SWIFT Education Center-Prime. External Refereed Competitive Process.

The National Technical Assistance Center on Positive Behavioral Interventions and Support. Principal Investigator-Choi, J. H. & McCart, A. Office of Special Education Programs, United States Department of Education, Washington, D.C.  $50,000 (October 2018 - September 2019). University of Oregon-Prime-University of Kansas-Sub. External Refereed Competitive Process.

Implementation of Mental Health Supports in MTSS: Project AWARE (West). Principal Investigators-McCart, A. & Miller, D. United States Department of Health and Human Services. Substance Abuse and Mental Health Services Administration (SAMSA). $435,275.53 (April 2019 - September 2023). Oklahoma State Department of Education-Prime; University of Kansas SWIFT Education Center-Sub External Refereed Competitive Process.

Introduction MTSS in the State: Incorporating MTSS into Local School Systems. Principal Investigator-McCart, A. the Arizona Department of Education. $4,500 (May 2019). Invited Sole Source Contract.

Foundations of MTSS. Principal Investigator-McCart, A. Inyo County School District. $9,000 (January 2019). Invited Sole Source Contract.

District Leadership Introduction to MTSS: Exploration of Evidence Based Framework. Principal Investigator-McCart, A. Bellevue School District. $30,000 (March 2017 - June 2017). Invited Sole Source Contract.

Installation and Coaching of MTSS: District and School Based Support. Principal Investigator-McCart, A. Bellevue School District. $225,000 (September 2017 - August 2018). Invited Sole Source Contract.

Across Cohort Installation and Coaching of MTSS: District and School Based Support. Principal Investigator-McCart, A. Bellevue School District. $264,000 (July 2018 - June 2019). Invited Sole Source Contract.

Building District Capacity Across Cohorts for Installation and Coaching of MTSS: District and School Based Support. Principal Investigator-McCart, A. Bellevue School District. $160,000 (July 2019 - June 2020). Invited Sole Source Contract.

Installing Evidence Based Practices: Holistic Diagnostic Review Support at Elementary School Level. Principal Investigator-McCart, A. Aspen School District. $42,000 (January 2019 - June 2020). Colorado State Department of Education.

Installing Evidence Based Practices: Holistic Diagnostic Review Support at Middle School Level. Principal Investigator-McCart, A. Aspen School District. $51,000 (January 2019 - June 2020). Colorado State Department of Education.

Installing Evidence Based Practices: Holistic Diagnostic Review Support at Elementary Schools. Principal Investigator-McCart, A. Colorado Springs. $72,000 (July 2019 - Dec 2019). Colorado State Department of Education.

Installing Evidence Based Practices: Holistic Diagnostic Review Support at Elementary Schools. Principal Investigator-McCart, A. Colorado Springs. $82,000 (January 2019 - June 2019). Colorado State Department of Education.

Crosswalk of A Fidelity Assessment Process with the Four Domains:  Colorado State Leadership Team. Principal Investigator-McCart, A. Denver, Colorado. $8,000 (January 2019 - June 2019). Colorado State Department of Education.

Introduction to MTSS for District Planning:  How to Scale Up Lake Washington School District. Principal Investigator-McCart, A. Lake Washington, Washington. $31,500 (September 2018 - June 2019). Invited Sole Source Contract.

Installation MTSS for District Planning: Building Capacity. Lake Washington School District. Principal Investigator-McCart, A.  Lake Washington, Washington. $88,500 (July 2019 - June 2020). Invited Sole Source Contract.

Introduction to MTSS. Monterey County Office of Education. Principal Investigator-McCart, A.  Monterey California. $4,500 (March 2019). Invited Sole Source Contract.

MTSS in Early Childhood Settings: Mississippi. North Mississippi Education Consortium. Principal Investigator-McCart, A. Jackson, Mississippi. $100,000 (March 2017 - November 2018). Kellogg Foundation. University of Mississippi-Prime, University of Kansas SWIFT Education Center-sub. External Refereed Competitive Process.

Exploration of SWIFT Implementation. Northbrook School District 28. Principal Investigator-McCart, A. Northbrook, Illinois. $27,000 (April 2019 - December 2019). Invited Sole Source Contract.

Implementation of a State-wide Model of Support: Oregon. Oregon State Department of Education. Principal Investigator-Mitchner, M. & McCart, A. Salem, OR. $225,000 (October 2017 - September 2019). United States Department of Education Special Education Personnel Preparation Grants. State Department of Oregon-Prime, University of Kansas SWIFT Education Center-sub.

Implementation of a State-wide Model of Support: Oregon- Evaluation. Oregon State Department of Education. Principal Investigator-Mitchner, M. & McCart, A. Salem, OR. $28,500 (October 2017 - September 2019). United States Department of Education Special Education Personnel Preparation Grants. State Department of Oregon-

Prime, University of Kansas SWIFT Education Center-sub.

Implementation of a State-wide Model of Support: Oregon- Building Capacity and Scale Up. Oregon State Department of Education.  Principal Investigator-Mitchiner, M. & McCart, A. Salem, OR. $301,500 (October 2019 - September 2021). United States Department of Education Special Education Personnel Preparation Grants. State Department of Oregon-Prime, University of Kansas SWIFT Education Center-sub.

Vermont Inclusive Practices. Implementation of MTSS in School Sites. Vermont Department of Education.  Principal Investigator- McCart, A. Salem, OR. $99,000 (December 2017 - November 2018). University of Kansas SWIFT Education Center. Invited Sole Source Contract.

Developing, Aligning, and Improving Systems of Academic and Behavioral Supports: Scaling Up Multi-Tiered System of Supports statewide application. Principal Investigator-McCart, A. California Department of Education. $2,000,000 (2016 - 2018). Orange County Department of Education-Prime; University of Kansas-Sub. External Refereed Competitive Process.

Developing, Aligning, and Improving Systems of Academic and Behavioral Supports: Scaling Up Multi-Tiered System of Supports statewide application: Year 3. Principal Investigator-McCart, A. California Department of Education. $410,794 (July 2018 - December 2018). Orange County Department of Education-Prime; University of Kansas-Sub. External Refereed Competitive Process.

Developing, Aligning, and Improving Systems of Academic and Behavioral Supports: Scaling Up Multi-Tiered System of Supports statewide application: Year 3 Part 2. Principal Investigator-McCart, A. California Department of Education. $660,794 (2019). Orange County Department of Education-Prime; University of Kansas-Sub. External Refereed Competitive Process.

Implementation of Multi-Tiered System of Support in Alternative Education: Alternative, Community, and Correctional Education Schools and Services (ACCESS). Orange County Department of Education. Principal Investigator - McCart, A. $126,000 (June 2018 - July 2019). University of Kansas SWIFT Education Center. Invited Sole Source Contract.

Principal Equity Leadership Series in Alternative Education: Alternative, Community, and Correctional Education Schools and Services (ACCESS). Orange County Department of Education. Principal Investigator - McCart, A. $72,000 (June 2018 - July 2019). University of Kansas SWIFT Education Center. Invited Sole Source Contract.

The National Technical Assistance Center on the Schoolwide Integrated Framework for Transformation. SWIFT. Co-Principal Investigators- Sailor W., & McCart, A. Office of Special Education Programs, United States Department of Education, Washington, D.C. $24,500,000 (2012-2017). University of Kansas. External Refereed Competitive Process.

The National Technical Assistance Center on Positive Behavioral Interventions and Support. Principal Investigator-Sailor W., Freeman, R. & McCart, A. Office of Special Education Programs, United States Department of Education, Washington, D.C. $675,000 (2003-2008). University of Oregon-Prime-University of Kansas-Sub. External Refereed Competitive Process.

The National Technical Assistance Center on Positive Behavioral Interventions and Support. Principal Investigator-McCart, A. Office of Special Education Programs, United States Department of Education, Washington, D.C. $675,000 (2013-2018). University of Oregon-Prime-University of Kansas-Sub. External Refereed Competitive Process.

Personnel Development to Improve Services and Results for Children with Disabilities Preparation of Leadership

Personnel (84.325D). Co-Principal Investigators-Sailor, W., & McCart, A. Office of Special Education Programs, United States Department of Education, Washington, D.C. $787,332 (2009-2014). University of Kansas. External Refereed Competitive Process.

Multi-Tiered Systems of Support: Implementing Effective Evidence-Based Practices in Community Agencies Meeting the Needs of Families with Co-Occurring Behavioral and Mental Health Disorders. Co-Principal Investigator-McCart, A., & Wolf, N. Healthcare Foundation of Greater Kansas City, Kansas City, MO. $168,924 (2009-2012). The University of Kansas Beach Center-Prime-Wyandot Center for Community Behavioral Healthcare-Sub. External Refereed Competitive Process.

Intensive Positive Behavioral Support: Implementing A Response to Intervention Model for Families with Behavioral and Mental Health Needs. Principal Investigator-McCart A. Healthcare Foundation of Greater Kansas City, Kansas City, MO. $331,942 (2008-2011). The University of Kansas Beach Center-Prime-Wyandot Center for Community Behavioral Healthcare-Sub. External Refereed Competitive Process.

The National Technical Assistance Center on Positive Behavioral Interventions and Support. Principal Investigator McCart, A. Office of Special Education Programs, United States Department of Education, Washington, D.C. $550,000 (2008-2013). University of Oregon-Prime-University of Kansas-Sub. External Refereed Competitive Process.

Kansas-Illinois Tertiary Center on Positive Behavior Supports and Interventions. Co-Principal Investigators-Sailor, W., & McCart, A. Office of Special Education Programs, United States Department of Education, Washington, D.C. $1,388,116 (2007-2011). University of Kansas-Prime-Illinois State Board of Education-Sub. External Refereed Competitive Process.

The National Technical Assistance Center Evidence-Based Practice for Children with Challenging Behaviors: Early Childhood. Principal Investigator- Carta, J., Horn, E., Sailor, W. & McCart, A. Office of Special Education Programs, United States Department of Education, Washington, D.C. $748,000 (2002-2006). University of South Florida-Prime University of Kansas-sub- Juniper Gardens-Department of Special Education and Beach Center on Disability. Refereed Competitive Process.

Intensive Positive Behavioral Support: Implementing A Response to Intervention Model for Families with Behavioral and Mental Health Needs. Principal Investigator-McCart A. Healthcare Foundation of Greater Kansas City, Kansas City, MO. $84,997 (2005-2007). The University of Kansas Beach Center-Prime-Wyandot Center for Community Behavioral Healthcare-Sub. External Refereed Competitive Process.

The eServe Initiative: An Empirically Supported Web-Based Educational Decision-Making Product Providing Academic and Behavior Data Analysis and Proactive Intervention Selection Suggestions for School Personnel. Principal Investigator- McCart, A. & Harsh, R. Small Business Innovation Research Program. Phase I. United States Department of Education, Washington, D.C. $99,518 (2007-2008). Software Outfitters, Inc.-Prime-University of Kansas -Sub. External Refereed Competitive Process.

Using Technology to Facilitate District and Building Level Reading/Literacy and Behavioral Outcomes for Students Across Kansas. Principal Investigator-McCart, A. & Miller, D. Northeast Kansas Education Service Center. Northeast, KS. $20,000 (2006-2007). University of Kansas. Invited Sole Source Contract.

Kansas Institute for Positive Behavior Support. Co-Principal Investigators-Freeman R., & McCart, A. Kansas Department of Social and Rehabilitation Services. Topeka, KS. $501,862 (2005-2006). University of Kansas. Invited Sole Source Contract

Comprehensive School Reform: The Positive Behavior Support Math Proficiency Model-Douglass Elementary

School.  Principal Investigator-McCart, A. Kansas State Department of Education. Topeka, KS. $270,000 (2004-2007). University of Kansas-Prime-Kansas City Kansas Public Schools-Sub. External Refereed Competitive Process.

Comprehensive School Reform: The Positive Behavior Support Math Proficiency Model-F.L. Schlagle High School Principal Investigator-McCart, A. Kansas State Department of Education, Topeka, KS. $90,000 (2004-2005). University of Kansas-Prime-Kansas City Kansas Public Schools-Sub. External Refereed Competitive Process.

A Whole School Model to Enhance Learning through Partnership. Co-Principal Investigators- Beegle, G., McCart, A., Turnbull, A., & Sailor, W. Office of Special Education and Directed Model Demonstration. United States Department of Education, Washington D.C. $659,902 (2003-2008). University of Kansas-Prime-Kansas City Kansas Public Schools-Sub. External Refereed Competitive Process.

Providing Positive Behavioral Support at Grant Elementary School. Principal Investigator- McCart, A. Kansas City Kansas School District USD 500, Kansas City KS. $26,000 (2005-2006). University of Kansas. Invited Sole Source Contract.

Whole School Approaches to Positive Behavior Supports and Access to the General Curriculum: A Model Demonstration Project. Co-Principal Investigators-Wickham, D., McCart, A., Wehmeyer, M., & Sailor, W. Special Education Research and Innovation to Improve Services and Results for Children with Disabilities.  United States Department of Education, Washington, D.C. $374,238 (2000-2004). University of Kansas-Prime-Kansas City Kansas Public Schools-Sub. External Refereed Competitive Process.

Build Equity. Join Justice.

swiftschools.org

"Celebrate teaching that enables transgressions –a movement against and beyond boundaries.  It is that movement which makes education the practice of freedom."  bell hooks