1

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                     ATLANTA DIVISION

 3

   UNITED STATES OF AMERICA,
 4
             PLAINTIFF,
 5
        -VS-                    DOCKET NO. 1:16-CV-03088-ELR
 6
   STATE OF GEORGIA,
 7
             DEFENDANT.
 8

 9            TRANSCRIPT OF MOTIONS PROCEEDINGS
            BEFORE THE HONORABLE ELEANOR L. ROSS
10               UNITED STATES DISTRICT JUDGE
                      APRIL 18, 2024
11
   APPEARANCES:
12
   ON BEHALF OF THE PLAINTIFF:
13
        KELLY GARDNER WOMACK, ATTORNEY AT LAW
14      JESSICA POLANSKY, ATTORNEY AT LAW
        ANDREA HAMILTON WATSON, ATTORNEY AT LAW
15      AILEEN BELL HUGHES, ATTORNEY AT LAW
        FRANCES SUSAN COHEN, ATTORNEY AT LAW
16      ANDREA E. HAMILTON, ATTORNEY AT LAW
        MATTHEW KENNETH GILLESPIE, ESQ.
17      CRYSTAL ADAMS, ATTORNEY AT LAW

18  ON BEHALF OF THE DEFENDANT:

19      JOSHUA BARRETT BELINFANTE, ESQ.
        EDWARD BEDARD, ESQ.
20      ANNA NICOLE EDMONDSON, ATTORNEY AT LAW
        DANIELLE MARIA HERNANDEZ, ATTORNEY AT LAW
21      MELANIE LEIGH JOHNSON, ATTORNEY AT LAW
        JAVIER PICO-PRATS, ESQ.
22

23

24  ELIZABETH G. COHN, RMR, CRR
    OFFICIAL COURT REPORTER
25  UNITED STATES DISTRICT COURT
    ATLANTA, GEORGIA
```

2

1              (ATLANTA, FULTON COUNTY, GEORGIA; APRIL 18, 2024, AT

2    10:01 A.M. IN OPEN COURT.)

3              THE COURT:  THANK YOU, SIR.

4              THANK YOU.  GOOD MORNING.  BE SEATED.

5              I TRUST WE ARE ALL AWAKE NOW, HUH?

6              ALL RIGHT.  I NOW CALL THE CASE OF UNITED STATES OF

7    AMERICA AS PLAINTIFF VERSUS STATE OF GEORGIA AS DEFENDANT.

8    THIS IS CIVIL ACTION 16-CV-3088.  AND WE ARE HERE FOR SEVERAL

9    MOTIONS, ORAL ARGUMENTS SPECIFICALLY ON PLAINTIFF UNITED

10   STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT; DEFENDANT STATE OF

11   GEORGIA'S MOTION FOR SUMMARY JUDGMENT; DEFENDANT'S MOTIONS TO

12   EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT WITNESSES, DR. AMY

13   MCCART, AND ALSO DR. ROBERT PUTNAM; PLAINTIFF'S MOTION TO

14   EXCLUDE THE DECLARATION OF DANTE MCKAY; AND MOTION TO PARTIALLY

15   EXCLUDE THE TESTIMONY OF DEFENDANT'S EXPERT WITNESS, DR.

16   ANDREW WILEY.

17             I AM GOING TO HAVE THE ATTORNEYS WHO WILL BE

18   PRESENTING TO ANNOUNCE YOURSELF FOR THE RECORD.

19             DID WE JUST DO AWAY WITH THE ZOOM ATTEMPTS?

20             THE COURTROOM DEPUTY:  THEY ARE HERE.  THEY CAN HEAR

21   US.

22             THE COURT:  OKAY.  WILL ANYONE WHO IS PRESENT BY ZOOM

23   NEED TO ANNOUNCE THEMSELVES?  NO?

24             THE COURTROOM DEPUTY:  THEY CAN, BECAUSE A FEW HAVE

25   --

1          THE COURT:  OKAY.  I AM BEING TOLD NO.

2          ALL RIGHT.  SO ON BEHALF OF THE PLAINTIFFS, IF YOU

3    WOULD GO AHEAD AND ANNOUNCE YOUR APPEARANCE FOR THE RECORD.

4          MS. WOMACK:  GOOD MORNING, YOUR HONOR.  KELLY GARDNER

5    WOMACK FOR THE UNITED STATES.

6          THE COURT:  GOOD MORNING.

7          MS. POLANSKY:  GOOD MORNING, YOUR HONOR.  JESSICA

8    POLANSKY FOR THE UNITED STATES.

9          THE COURT:  GOOD MORNING TO YOU.

10          MS. WATSON:  GOOD MORNING, YOUR HONOR.  ANDREA

11    HAMILTON WATSON FOR THE UNITED STATES.

12          THE COURT:  YES, MA'AM.  GOOD MORNING.

13          MS. COHEN:  GOOD MORNING, YOUR HONOR.  FRAN COHEN FOR

14    THE UNITED STATES.

15          THE COURT:  GOOD MORNING TO YOU.

16          MS. HUGHES:  GOOD MORNING.  AILEEN BELL HUGHES FOR

17    THE UNITED STATES.

18          THE COURT:  GOOD MORNING.

19          AND, LET'S SEE, JUST WHO ELSE IS AT COUNSEL TABLE,

20    WHETHER OR NOT AN ATTORNEY.

21          MR. DENAULT:  MICHAEL DENAULT.

22          THE COURT:  ALL RIGHT.  YOU GET TO ANNOUNCE YOURSELF,

23    TOO.  AND WHAT CAPACITY ARE YOU APPEARING, SIR?

24          MR. DENAULT:  I'M JUST HERE AS THE TECH MAN.

25          THE COURT:  NOT JUST.  YOU ARE IMPORTANT.  SO THANK

4

1  YOU FOR BEING HERE.  THANK YOU SO MUCH.

2          AND WE'LL RESUME WITH THE ANNOUNCEMENTS.

3          MR. GILLESPIE:  GOOD MORNING, YOUR HONOR.  MATTHEW

4  GILLESPIE FOR THE UNITED STATES.

5          THE COURT:  GOOD MORNING.

6          MS. ADAMS:  GOOD MORNING, YOUR HONOR.  CRYSTAL ADAMS

7  FOR THE UNITED STATES.

8          THE COURT:  GOOD MORNING.

9          YOU OTHER TWO LADIES ON THE FRONT ROW NEED NOT

10  ANNOUNCE?  NO?  OKAY.

11          ALL RIGHT.  ANYONE ELSE OVER THERE?

12          ALL RIGHT.  GOOD MORNING TO ALL OF YOU.

13          AND ON BEHALF OF DEFENDANT.

14          MR. BELINFANTE:  GOOD MORNING, YOUR HONOR.  JOSH

15  BELINFANTE WITH THE ROBBINS FIRM APPEARING AS A SPECIAL

16  ASSISTANT ATTORNEY GENERAL ON BEHALF OF THE STATE OF GEORGIA.

17          THE COURT:  GOOD MORNING TO YOU.

18          MS. JOHNSON:  GOOD MORNING, YOUR HONOR.  MELANIE

19  JOHNSON, ALSO WITH THE ROBBINS FIRM, APPEARING ON BEHALF OF THE

20  STATE OF GEORGIA.

21          THE COURT:  GOOD MORNING, MA'AM.

22          MS. JOHNSON:  GOOD MORNING.

23          MR. BEDARD:  GOOD MORNING, YOUR HONOR.  ED BEDARD

24  ALSO WITH THE ROBBINS FIRM ON BEHALF OF THE STATE OF GEORGIA.

25          THE COURT:  YES, SIR.  GOOD MORNING.

1          MR. PICO-PRATS:  GOOD MORNING, YOUR HONOR.  JAVIER

2    PICO-PRATS ON BEHALF OF THE ROBBINS FIRM ON BEHALF OF THE STATE

3    OF GEORGIA.

4          THE COURT:  GOOD MORNING, SIR.

5          MS. EDMONDSON:  GOOD MORNING.  ANNA NICOLE EDMONDSON

6    ON BEHALF OF THE STATE AND THE ROBBINS FIRM.

7          THE COURT:  GOOD MORNING, MA'AM.

8          MS. HERNANDEZ:  GOOD MORNING.  DANIELLE MARIA

9    HERNANDEZ, ALSO WITH THE ROBBINS FIRM, ON BEHALF OF THE STATE

10   OF GEORGIA.

11         THE COURT:  GOOD MORNING TO YOU.  THANK YOU.

12         ANYBODY ELSE ON BEHALF OF DEFENDANT?

13         ALL RIGHT.  WELL, THANK YOU SO MUCH.

14         WELL, I DO APPRECIATE THAT YOU ALL HAVE PROVIDED US

15   WITH A PROPOSED SCHEDULE FOR THE HEARING, WHICH I SEE NO ISSUES

16   WITH.

17         I WILL TELL YOU, JUST BY A QUICK SHOW OF HANDS, IS

18   ANYONE HERE TODAY THAT WAS HERE YESTERDAY FOR THE REVIEW OF THE

19   COURTROOM TECHNOLOGY?  OKAY.

20         SO YESTERDAY OUR MICROPHONES WERE ON, AS THEY OFTEN

21   ARE WHEN WE ARE LISTENING TO THINGS IN CHAMBERS.  AND I HEARD

22   SOMEONE, AND I DON'T KNOW WHO, SAY, THIS IS GOING TO TAKE ALL

23   DAY ON THURSDAY.

24         AND I LOOKED BACK AT MY SCHEDULE, AND I SAID, HUH,

25   I'M CALCULATING ABOUT FOUR HOURS.  AND I THINK I EVEN

1   PREVIOUSLY OFFERED FRIDAY, IN CASE THIS GOES OVER, SO WHERE THE

2   ALL DAY IS COMING FROM I'M NOT SURE. I'M NOT SURE IF THERE HAS

3   BEEN A CHANGE I'M NOT AWARE OF.  BUT THAT'S WHAT I OVERHEARD

4   SOMEONE SAY YESTERDAY.  SO WE'LL SEE HOW THIS UNFOLDS.

5           I ASSUME UNLESS I AM TOLD OTHERWISE THAT THE PROPOSED

6   SCHEDULE THAT YOU ALL HAVE PRESENTED ALSO INDICATES THE ORDER

7   IN WHICH YOU ALL WANT TO PRESENT, WHICH IS THE ORDER IN WHICH I

8   CALLED THE -- THE MOTIONS.  SO I'M GOING TO JUST LOOK AROUND

9   AND SCAN THE ATTORNEYS TO SEE IF ANYONE STANDS TO TELL ME THAT

10  THAT IS NOT RIGHT.

11          I DON'T SEE THAT, SO I'M ASSUMING THAT THAT IS

12  CORRECT.  SO WE'RE GOING TO START WITH DEFENDANT'S MOTION FOR

13  SUMMARY JUDGMENT.  AND I WILL JUST ASK AT THIS TIME IF THERE IS

14  ANYTHING WE NEED TO TAKE UP BEFORE GOING RIGHT INTO THAT

15  ARGUMENT.

16          ON BEHALF OF PLAINTIFF?

17          MS. WOMACK:  YES, YOUR HONOR, JUST A COUPLE OF

18  THINGS.  ONE, WE DID WANT TO NOTE FOR THE COURT, THE PROPOSED

19  SCHEDULE THAT THE JOINT PARTIES SUBMITTED IS ACCURATE.  FOR THE

20  FIRST MOTION THAT YOUR HONOR CALLS, THE UNITED STATES HAS 30

21  MINUTES.  THERE WILL BE TWO ATTORNEYS SPLITTING THAT ARGUMENT

22  EQUALLY 15 MINUTES APIECE.  SO I JUST WANTED TO MAKE SURE YOUR

23  HONOR WAS AWARE OF THAT.

24          AND THEN TWO OTHER QUICK HOUSEKEEPING MATTERS.  JUST

25  FOR THE COURT'S AWARENESS, YESTERDAY, THE UNITED STATES FILED A

1    REDACTED VERSION OF THE EXPERT REPORT OF DR. AMY MCCART.  THAT

2    REPORT HAD PREVIOUSLY BEEN FILED UNDER SEAL IN THE RECORD.  AND

3    SO JUST TO ENSURE THAT, YOU KNOW, THERE WAS A VERSION THAT'S

4    REDACTED AND APPROPRIATE FOR POTENTIAL USE AS A DEMONSTRATIVE

5    OR OTHERWISE IN A PUBLIC PROCEEDING, WE DID FILE THAT

6    YESTERDAY.

7            WE HAVE HARD COURTESY COPIES SHOULD YOUR HONOR WANT

8    THAT, BUT OBVIOUSLY THAT'S UP TO YOUR HONOR.

9            AND THEN THE ONLY OTHER THING I'LL NOTE IS THAT THE

10   UNITED STATES DOES ANTICIPATE USING A NUMBER OF DEMONSTRATIVES

11   TODAY.  AGAIN, THEY WILL BE SHOWN ELECTRONICALLY.  BUT SHOULD

12   YOUR HONOR WANT ANY HARD COPIES OF THOSE, WE DO HAVE THOSE

13   AVAILABLE FOR YOU.

14           THE COURT:  OKAY.  THANK YOU SO MUCH.

15           ANYTHING ELSE TO TAKE UP BEFORE WE PROCEED WITH OUR

16   FIRST ARGUMENT?

17           MR. BELINFANTE:  NO, YOUR HONOR.  I'LL JUST LET YOU

18   KNOW THAT IN THE FIRST MOTION, THE DEFENDANT'S MOTION FOR

19   SUMMARY JUDGMENT, MR. BEDARD WILL BE ARGUING PART OF IT.  SO

20   WE'LL HAVE A SWITCH AS WELL.

21           THE COURT:  OKAY.

22           MR. BELINFANTE:  BUT, OTHERWISE, WE DO HAVE A

23   POWERPOINT.  IT'S PRETTY LIMITED.

24           I DO HAVE HARD COPIES.  AND WE CAN ALSO E-MAIL THE

25   COURT A COPY AND OPPOSING COUNSEL AS WELL.

8

1          THE COURT:  ALL RIGHT.  AND SO, MS. BECK, LET ME

2   KNOW, BECAUSE I SEE THAT THE DOCUMENT CAMERA IS PUSHED BACK, IF

3   WE WERE DOING ELECTRONIC EXHIBITS, HOW WERE WE PLANNING TO DO

4   THEM?  HAVE YOU ALL TALKED ABOUT THIS?

5          MR. BELINFANTE:  IF THE COURT WILL ALLOW, I'LL PLUG

6   THIS IN, MAKE SURE.

7          THE COURT:  SO THAT IT SHOULD COME UP ON MY SCREEN

8   OVER HERE, MS. BECK?

9          THE COURTROOM DEPUTY:  YES.

10          MR. BELINFANTE:  THAT'S MY UNDERSTANDING.

11          AND THIS IS WHY I DON'T DO TECHNOLOGY.

12          THE COURT:  YEAH.  LET'S GET SOME OF THIS OUT OF THE

13   WAY BEFORE THE CLOCKS ROLL, BECAUSE I DON'T, EITHER.

14          THE COURTROOM DEPUTY:  WE PRACTICED EARLIER, SO WE

15   DID IT.

16          MR. BELINFANTE:  I STILL REFER TO COMPUTERS AS

17   MACHINES, SO THIS IS NOT UNUSUAL.

18          THE COURT:  AND I THINK THIS IS WHY OUR I.T. PEOPLE

19   UNDERSTAND, YOU ARE NOT JUST I.T.  YOU ARE VERY INSTRUMENTAL IN

20   OUR PROCEEDINGS.  SO WE APPRECIATE YOUR PRESENCE.

21          MR. BELINFANTE:  OKAY.

22          THE COURT:  ALL RIGHT.  AND SO WE CAN GO AHEAD AND

23   GET STARTED.

24          ALL RIGHT.  YOU MAY PROCEED.

25          MR. BELINFANTE:  I'M GOING TO HAVE MY PHONE UP HERE

1   WITH ME.  I'M NOT CHECKING E-MAILS OR LOOKING AT CALLS.  I'M

2   USING IT AS A STOPWATCH.

3          THE COURT:  WHATEVER YOU FEEL COMFORTABLE DOING.  WE

4   WILL START OUR CLOCKS GOING, TOO.  BUT I KNOW THEY MAY BE AT AN

5   AWKWARD ANGLE.

6          MR. BELINFANTE:  YOUR HONOR, ONCE AGAIN, JOSH

7   BELINFANTE ON BEHALF OF THE STATE OF GEORGIA.

8          I WOULD LIKE TO INTRODUCE TWO ADDITIONAL PEOPLE.

9   STACEY SUBER-DRAKE IS THE GENERAL COUNSEL FOR THE DEPARTMENT OF

10  EDUCATION.  AND KRISTEN SETTLEMIRE IS HERE WITH THE ATTORNEY

11  GENERAL'S OFFICE AS WELL.

12         YOUR HONOR, NO DOUBT THIS IS AN IMPORTANT CASE.  THE

13  ISSUES ARE SIGNIFICANT.  AND THE QUESTIONS RAISED FOCUSING ON

14  POLICY ARE PARTICULARLY DIFFICULT.

15         IMPORTANTLY, THOUGH, THEY ARE ALSO NEW.  AS THE

16  UNITED STATES INFORMED EVERYONE IN A PRESS RELEASE WHEN THE

17  SUIT WAS FILED, THIS LAWSUIT IS THE FIRST CHALLENGE TO A

18  STATE-RUN SCHOOL SYSTEM FOR SEGREGATING STUDENTS WITH

19  DISABILITIES.  IN FACT, AS THE COURT HAS PROBABLY NOTICED FROM

20  THE CITATIONS IN THE BRIEFS, THIS IS THE FIRST TIME THAT

21  OLMSTEAD APPEARS TO BE EXTENDED TO THE EDUCATION ENVIRONMENT.

22  IT ALSO APPEARS TO BE ONE OF THE FIRST TIMES THAT AN OLMSTEAD

23  CASE IS BEING USED IN A MENTAL HEALTH CAPACITY WITHOUT

24  IDENTIFYING OR TREATING THE INDIVIDUALS THEMSELVES.

25         WHAT WE SAW RECENTLY IN THE UNITED STATES VERSUS

1  FLORIDA CASE, IN THE TRIAL COURT'S OPINION, THERE ARE 167

2  IDENTIFIED CHILDREN PLAINTIFFS.  EACH OF THEM WERE ASSESSED AND

3  REVIEWED BY THE UNITED STATES' EXPERTS.  HERE THERE ARE ROUGHLY

4  2900 STUDENTS STILL IN GNETS.  ONE EXPERT REVIEWED SEVEN FILES.

5  ANOTHER REVIEWED ABOUT THREE PERCENT OF THOSE FILES.  AND THE

6  UNITED STATES IS ASKING THIS COURT AGAIN FOR THE FIRST TIME TO

7  MAKE NEW LAW AND SAY THAT THAT IS SUFFICIENT.  IT IS NOT UNDER

8  BINDING PRECEDENT.

9        THEY'VE BROUGHT TWO CLAIMS UNDER THE ADA.  ONE

10  ALLEGES UNJUSTIFIED ISOLATION UNDER THE DEPARTMENT OF

11  JUSTICE'S, WHAT THEY CALL, INTEGRATION MANDATE.  AND THE OTHER

12  IS AN EQUAL EDUCATION OPPORTUNITIES CLAIM.  BUT WHEN

13  CONSIDERING THESE CLAIMS, IT IS IMPORTANT, PARTICULARLY GIVEN

14  THAT THEY ARE ASKING THE COURT TO MAKE NEW LAW, TO LOOK AT WHAT

15  THE SUPREME COURT HAS SAID IN THE CONTEXT OF EDUCATION AND

16  MENTAL HEALTH.

17        IN 1973, THE COURT SAID, EDUCATION, PERHAPS MORE THAN

18  WELFARE ASSISTANCE, PRESENTS A MYRIAD OF INTRACTABLE ECONOMIC,

19  SOCIAL, AND EVEN PHILOSOPHICAL PROBLEMS.  JUSTICE KENNEDY'S

20  CONTROLLING CONCURRENCE IN THE OLMSTEAD DECISION ADDRESSED

21  MENTAL HEALTH.  AND NO ONE IS DISPUTING THAT HIS OPINION IS THE

22  CONTROLLING ONE.  THERE HE SAYS, THE INQUIRY -- AND HE'S

23  TALKING ABOUT WHAT WOULD BE AN APPROPRIATE SERVICE -- WOULD NOT

24  BE SIMPLE.  COMPARISONS OF DIFFERENT MEDICAL CONDITIONS AND THE

25  CORRESPONDING TREATMENT REGIMENS MIGHT BE DIFFICULT, AS WOULD

1    BE THE ASSESSMENTS OF DEGREE OF INTEGRATION IN VARIOUS SETTINGS

2    IN WHICH MEDICAL TREATMENT IS OFFERED.

3         THE COURT HAS ALSO INDICATED THAT IT LACKS, OR THE

4    JUDICIARY LACKS, THE TYPE OF ABILITY TO -- TO ACHIEVE THE

5    REMEDIES THAT THE PLAINTIFFS ARE SEEKING HERE, THE UNITED

6    STATES IS SEEKING HERE, SPECIFICALLY, ORDERING APPROPRIATE

7    SERVICES FOR AN UNDEFINED NUMBER OF INDIVIDUALS WITH AN

8    UNCATEGORIZED CONDITION.

9         IN RODRIGUEZ, DEALING WITH EDUCATION, THE COURT SAID,

10   THIS INVOLVES A PERSISTENT AND DIFFICULT QUESTIONS OF EDUCATION

11   POLICY, ANOTHER AREA IN WHICH THIS COURT'S LACK OF SPECIALIZED

12   KNOWLEDGE AND EXPERIENCE COUNSELS AGAINST PREMATURE

13   INTERFERENCE WITH INFORMED JUDGMENTS MADE AT THE STATE AND

14   LOCAL LEVELS.  AND THIS CASE INVOLVES INFORMED JUDGMENTS.

15        EVERY STUDENT WHO HAS BEEN REFERRED TO THE GNETS

16   SERVICES BY LOCAL OFFICIALS HAS BEEN DONE SO BY WHAT'S REFERRED

17   TO AS THEIR IEP TEAM, WHICH INCLUDES EXPERTS AND PROFESSIONALS

18   IN SPECIAL EDUCATION AND GENERALIZED EDUCATION.  JUSTICE

19   KENNEDY'S CONCURRENCE RAISES ANOTHER ISSUE, GRAVE

20   CONSTITUTIONAL CONCERNS.  AND THIS IS A CASE, THE OLMSTEAD CASE

21   INVOLVING THE ADA AND THE REGULATIONS AT ISSUE HERE.  GRAVE

22   CONSTITUTIONAL CONCERNS ARE RAISED WHEN A FEDERAL COURT IS

23   GIVEN THE AUTHORITY TO REVIEW THE STATE 'S CHOICES IN BASIC

24   MATTERS, SUCH AS ESTABLISHING OR DECLINING TO ESTABLISH NEW

25   PROGRAMS.

1          WITH THIS BACKGROUND IN MIND, THE STATE OF GEORGIA

2    ASKS THE COURT TO GRANT SUMMARY JUDGMENT FOR TWO REASONS:

3          FIRST, THE DEPARTMENT LACKS CONSTITUTIONAL STANDING.

4    MR. BEDARD WILL BE SPEAKING TO THE INJURY AND FACT REQUIREMENT.

5    I WILL BE RESERVING THE ISSUES OF TRACEABILITY AND

6    REDRESSABILITY FOR THE UNITED STATES' PARTIAL MOTION FOR

7    SUMMARY JUDGMENT, AS THEY ARE INTERTWINED WITH THE QUESTION OF

8    ADMINISTRATION.

9          SECOND, THE DEPARTMENT HAS NOT DEMONSTRATED A

10   MATERIAL QUESTION OF FACT FOR THE ELEMENTS UNDER OLMSTEAD.

11   ONE, THE STATE DOES NOT ADMINISTER THE GNETS PROGRAM.  AND THAT

12   IS THE WORDS IN THE REGULATION.  AND I WILL BE RESERVING THAT

13   ARGUMENT FOR THE PARTIAL MOTION FOR SUMMARY JUDGMENT.

14          AND, TWO, THE UNITED STATES HAS NOT IDENTIFIED A

15   SINGLE STUDENT FOR WHOM THERE HAS BEEN A DETERMINED THE

16   ELEMENTS OF OLMSTEAD HAVE BEEN MADE.  AND THERE HAS BEEN A

17   RECENT DEVELOPMENT IN THIS IN THE ELEVENTH CIRCUIT.  OTHER THAN

18   THE OLMSTEAD CASE ITSELF, WHICH CAME FROM THE STATE OF GEORGIA,

19   THE ELEVENTH CIRCUIT HAS NOT REALLY FOCUSED ON OR HAD AN

20   OPPORTUNITY TO LOOK AT OLMSTEAD ISSUES UNTIL RECENTLY.  THE

21   CASE THAT WE WERE BEFORE THIS COURT ON THE MOTION TO DISMISS

22   THAT IT ULTIMATELY DECIDED AND SAID THAT THE UNITED STATES HAD

23   STATUTORY STANDING AND COULD BRING A CLAIM UNDER THE STATUTE OF

24   THE ADA.

25          WHAT THE ELEVENTH CIRCUIT SAID IN THE 2019 DECISION

1    IS THAT THE -- A DETERMINATION BY STATE'S TREATMENT

2    PROFESSIONALS THAT A PLACEMENT IS APPROPRIATE.  THAT IS NOW

3    BINDING PRECEDENT, WHICH IT WAS NOT AT THE TIME OF THE MOTION

4    FOR SUMMARY JUDGMENT.  NOR HAS THE UNITED STATES SHOWN THAT

5    INDIVIDUALS -- ANY INDIVIDUAL THAT IS AT ISSUE PREFERS THE

6    GENERAL EDUCATION ENVIRONMENT, NOR HAS IT ARTICULATED ANYTHING

7    REGARDING A REASONABLE ACCOMMODATION, BECAUSE IT IS MERELY JUST

8    DONE THAT.  I'M SORRY.  IT HAS ARTICULATED IT, BUT THERE IS NO

9    EVIDENCE SHOWING ANY LEVEL OF REASONABLENESS IN THIS CASE.

10            THE FACTS FOR THE PURPOSES OF THE MOTION FOR SUMMARY

11   JUDGMENT ARE NOT PARTICULARLY MANY OR COMPLEX.  ONE, AS WE'VE

12   ARGUED TO THE COURT BEFORE, THE SUPREME COURT OF GEORGIA HAS

13   SAID IN THE COX DECISION FROM 2011 THAT, AS A MATTER OF STATE

14   CONSTITUTIONAL LAW, THE CONSTITUTION EMBODIES THE FUNDAMENTAL

15   PRINCIPLE OF EXCLUSIVE CONTROL FOR THE LOCAL SYSTEMS AND K-12

16   PUBLIC EDUCATION.  THE CONSTITUTION SAYS IN ARTICLE EIGHT,

17   SECTION FIVE, PARAGRAPH TWO, THAT ANY EDUCATION DECISIONS ARE

18   UNDER THE LOCAL BOARD OF EDUCATION.  AND IN THE NEXT PARAGRAPH,

19   WITH A SCHOOL SUPERINTENDENT.

20            THE STATE STATUTES FOLLOW THAT.  AND THIS IS

21   CRITICAL, PARTICULARLY FOR THE ADMINISTRATION SIDE, THAT LOCAL

22   SCHOOL SYSTEMS -- AND THIS IS CODE SECTION 20-2-152(B) -- LOCAL

23   SCHOOL SYSTEMS SHALL PROVIDE SPECIAL EDUCATION PROGRAMS.

24            SO WHAT DOES THE DEPARTMENT OF EDUCATION DO?  IT CAN

25   PROMULGATE RULES AND REGULATIONS GOVERNING STATE AID.  IT CAN

14

1    PROVIDE VOLUNTARY AID TO LOCAL SCHOOL DISTRICTS.  BUT,

2    IMPORTANTLY, THE GNETS RULE, WHICH IS THE ONE AT 160-4-7-.15,

3    LEAVES THE QUESTIONS THAT THE UNITED STATES SAYS ARE SO

4    DISCRIMINATORY SOLELY TO LOCAL SCHOOL OFFICIALS AND, IN

5    PARTICULAR, TREATMENT OFFICIALS IN THE IEP TEAM.  AS INDICATED

6    -- AND THIS IS PARAGRAPH 5(B)(8) OF THE GNETS RULE -- NO

7    STUDENT CAN BE REFERRED TO THE GNETS PROGRAM UNLESS THEIR IEP

8    TEAM SAYS THEY CAN.  AND THERE ARE NO STATE OFFICIALS ON THE

9    IEP TEAM.

10          WHAT DOES THE DEPARTMENT OF COMMUNITY HEALTH DO?  IT

11   ADMINISTERS THE MEDICAID PROGRAM, OR IT OVERSEES THE MEDICAID

12   PROGRAM.  IT REIMBURSES PROVIDERS.

13          AND WHAT DOES THE DEPARTMENT OF BEHAVIORAL HEALTH AND

14   DEVELOPMENTAL DISABILITIES DO IN THIS CONTEXT?  IT OVERSEES THE

15   APEX PROGRAM, WHICH IS PROVIDED IN GENERAL EDUCATION SCHOOLS TO

16   PROVIDE THE SAME SERVICES THAT ARE TO BE PROVIDED IN THE GNETS

17   PROGRAM.  IT IS A VOLUNTARY PROGRAM AS WELL.

18          WITH THOSE FACTS IN MIND, I WILL TURN IT TO MR.

19   BEDARD, WHO WILL NOW FOCUS ON THE INJURY IN FACT FOR

20   CONSTITUTIONAL STANDING.

21          THE COURT:  THANK YOU.

22          MR. BELINFANTE:  THANK YOU.

23          MR. BEDARD:  GOOD MORNING, YOUR HONOR.

24          THE COURT:  GOOD MORNING.

25          MR. BEDARD:  AS MR. BELINFANTE SAID, I'M HERE TO TALK

1    ABOUT STANDING.  AND JUST AS A QUICK REMINDER FOR ALL OF US,

2    BECAUSE THE LANGUAGE CAN BE A LITTLE CONFUSING SOMETIMES,

3    THERE'S TWO DIFFERENT TYPES OF STANDING.  THERE'S

4    CONSTITUTIONAL STANDING, STATUTORY STANDING.  CONSTITUTIONAL

5    STANDING, OF COURSE, IS JURISDICTIONAL.  IT ASKS WHETHER THE

6    COURT IS AUTHORIZED TO HEAR THE CASE.  STATUTORY STANDING IS

7    NOT JURISDICTIONAL AND INSTEAD ASKS WHETHER THE PLAINTIFF IS

8    ONE WHO IS AUTHORIZED TO BRING THAT CLAIM.

9         IN THE UNITED STATES VERSUS FLORIDA CASE MR.

10   BELINFANTE MENTIONED, THE ELEVENTH CIRCUIT HELD THAT DOJ HAS

11   STATUTORY STANDING UNDER THE ADA, BUT IT DIDN'T ADDRESS THE

12   UNITED STATES' CONSTITUTIONAL STANDING TO BE ABLE TO BRING THIS

13   CASE.  IT WASN'T AT ISSUE THERE.  IT WAS MERELY PRESUMED.  AND

14   THAT'S REALLY WHAT I WANT TO ADDRESS HERE.

15        THE COURT'S, YOU KNOW, WELL FAMILIAR WITH THE ARTICLE

16   III REQUIREMENTS FOR STANDING.  I WON'T BELABOR THEM.  IT NEEDS

17   TO DEMONSTRATE INJURY -- THE PLAINTIFF NEEDS TO DEMONSTRATE

18   INJURY IN FACT TRACEABLE TO THE DEFENDANT AND REDRESSABLE BY

19   JUDICIAL RELIEF.

20        AS MR. BELINFANTE MENTIONED, TRACEABILITY AND

21   REDRESSABILITY WOULD BE ADDRESSED IN MORE DEPTH WITH RELATION

22   TO UNITED STATES' PARTIAL MOTION.  THE QUESTION FOR THE INJURY

23   IN FACT BEFORE THE COURT, THOUGH, IS WHOSE INJURY NEEDS TO BE

24   DEMONSTRATED.  AND THAT QUESTION REALLY COMES DOWN TO, IN WHAT

25   CAPACITY IS THE UNITED STATES SUING.  WHOSE INJURY IS IT

1    BRINGING THIS CASE ON BEHALF OF.  SOMETIMES THE FEDERAL

2    GOVERNMENT CAN SUE TO REMEDY ITS OWN INJURY.  IN THE CRIMINAL

3    CONTEXT, FOR EXAMPLE, IT'S SUING ON BEHALF OF ITS INTEREST AS

4    THE SOVEREIGN TO JUSTIFY, YOU KNOW, TO VINDICATE THE RIGHTS OF

5    THE PUBLIC.  BUT IN OTHER CASES IT SUES IN A REPRESENTATIVE

6    CONTEXT.  IT SUES TO BRING SOMEBODY ELSE'S CLAIM.

7         THE MOST PREVALENT EXAMPLE OF THIS IS WHEN STATES

8    BRING A CASE PARENS PATRIAE ON BEHALF OF THEIR CITIZENS.

9         AND IN THOSE CASES, IT'S NOT ENOUGH TO DEMONSTRATE

10   THAT THE GOVERNMENTAL ENTITY HAS ITS OWN INTERESTS.  THAT IS

11   CERTAINLY NECESSARY.  BUT IT MUST ALSO DEMONSTRATE THAT THE

12   PEOPLE ON WHOSE BEHALF IT IS SUING HAVE THEIR OWN ARTICLE III

13   INJURY.  THIS IS NO DIFFERENT THAN A QUI TAM CASE, FOR EXAMPLE,

14   WHERE THE QUI TAM REALTOR NEEDS TO NOT ONLY DEMONSTRATE THEIR

15   OWN INTEREST BUT ALSO THE INTEREST OF THE UNITED STATES ON

16   WHOSE BEHALF THEY ARE BRINGING THE CASE, OTHER THIRD-PARTY

17   STANDING CASES, AND THE PARENS PATRIAE CASES THAT I MENTIONED

18   BEFORE.

19        AND, YOU KNOW, DETERMINING IN WHAT CAPACITY THE

20   UNITED STATES IS BRINGING THIS LAWSUIT IS REALLY DETERMINED BY

21   FOCUSING ON THE UNDERLYING CLAIM ITSELF.  AND HERE I THINK IT'S

22   IMPORTANT TO LOOK AT TITLE II.  WHAT DOES TITLE II AUTHORIZE AS

23   FAR AS A REMEDY IS CONCERNED.  AND HOW DID THE ELEVENTH CIRCUIT

24   INTERPRET THAT IN THE UNITED STATES VERSUS FLORIDA CASE.

25        HERE TITLE II PROVIDES REMEDIES FOR, QUOTE, PERSONS

1    WHO HAVE SUFFERED DISCRIMINATION.  THAT'S AT 42 U.S.C. 12133,

2    WHERE IT SAYS, THE REMEDIES AVAILABLE UNDER THE REHABILITATION

3    ACT SHALL BE THE REMEDIES THAT THIS SUBCHAPTER PROVIDES TO ANY

4    PERSON ALLEGING DISCRIMINATION ON THE BASIS OF DISABILITY.

5         BASED ON THAT LANGUAGE, FLORIDA CHALLENGED DOJ

6    STANDING TO SUE UNDER TITLE II IN THE FLORIDA CASE ARGUING THE

7    DOJ IS ADMITTEDLY NOT A PERSON ALLEGING DISCRIMINATION.  THE

8    ELEVENTH CIRCUIT ULTIMATELY HELD THAT DOJ HAD STATUTORY

9    STANDING TO BRING THE ENFORCEMENT ACTION, BUT NOT BECAUSE IT

10   WAS A PERSON ALLEGING DISCRIMINATION.  INSTEAD, THEY SAID THAT

11   A DOJ ENFORCEMENT ACTION WAS A REMEDY WHICH WAS AVAILABLE TO

12   PERSONS ALLEGING DISCRIMINATION.

13        AS JUDGE JILL PRYOR, WHO WAS A MEMBER OF THAT PANEL

14   THAT ISSUED THAT PANEL OPINION, LATER SAID IN AN OPINION

15   DENYING REHEARING EN BANC, THE DOJ BRINGS THESE CLAIMS TO

16   VINDICATE THE MEDICALLY-FRAGILE CHILDREN'S RIGHTS.  THEY SUE ON

17   BEHALF OF THE AGGRIEVED PERSON.  IN FACT, HE SAID VERY CLEARLY,

18   THE ATTORNEY GENERAL DID NOT BRING THIS LAWSUIT ON HIS OWN

19   BEHALF BUT, RATHER, ON BEHALF OF THE MEDICALLY-FRAGILE

20   CHILDREN.  SO THE ALLEGED INJURY HERE IS NOT ULTIMATELY THE

21   INJURY TO THE UNITED STATES SUING IN SOME ARICLE II ENFORCEMENT

22   CAPACITY BUT IS, INSTEAD, IT'S SUING AS A THIRD PARTY BRINGING

23   SOMEONE ELSE'S CLAIM ON THEIR BEHALF.

24        SO THE UNITED STATES MUST DEMONSTRATE AN UNDERLYING

25   ARTICLE III INJURY TO THE STUDENTS AT ISSUE HERE.  AND, OF

1    COURSE, THEY HAVEN'T DONE SO.  THEY HAVEN'T IDENTIFIED A SINGLE

2    STUDENT WHOM THE UNITED STATES SAYS WOULD OTHERWISE BE SERVED

3    IN A GENERAL EDUCATION SETTING HAD THEY RECEIVED A PARTICULAR

4    SERVICE, NOR HAVE THEY IDENTIFIED A SINGLE STUDENT WHO WOULD

5    HAVE RECEIVED A PARTICULAR STUDENT HAD THEY NOT BEEN IN GNETS.

6    THIS STANDS IN STARK CONTRAST TO THE WORK THE DOJ DID IN THE

7    FLORIDA CASE WHERE, AS MR. BELINFANTE MENTIONED, THEY REVIEWED

8    150, APPROXIMATELY, INDIVIDUAL STUDENT'S FILES.  THEIR EXPERTS

9    MADE INDIVIDUALIZED DETERMINATIONS ABOUT EACH ONE OF THOSE

10   STUDENTS.  UNITED STATES HASN'T DONE THAT WITH ANY ACTUAL

11   STUDENT HERE.  SO, INSTEAD, THEY ALSO ALLEGE AN AT-RISK THEORY.

12   AND THEY SAY THAT THERE ARE STUDENTS WHO ARE AT RISK OF

13   ENTERING GNETS.

14          THE PROBLEM WITH THAT THEORY, THOUGH, IS THAT THE

15   UNITED STATES NEEDS TO FIRST DEMONSTRATE THAT ENTERING GNETS

16   ITSELF IS A VIOLATION OF TITLE II.  AND THEY HAVEN'T DONE THAT.

17   THEY HAVEN'T EVEN ATTEMPTED TO DO THAT.  THEIR EXPERTS DON'T

18   SAY THAT.  THEY DON'T GO SO FAR AS TO SAY THAT GNETS OR EVEN A

19   SEPARATED EDUCATIONAL SETTING FOR STUDENTS WITH BEHAVIORAL

20   DISORDERS IS PER SE DISCRIMINATORY, NOR CAN THEY.  JUSTICE

21   GINSBURG'S PLURALITY OPNINION IN OLMSTEAD EMPHASIZES, AND I

22   QUOTE, WE EMPHASIZE THAT NOTHING IN THE ADA OR ITS IMPLEMENTING

23   REGULATIONS CONDONES TERMINATION OF INSTITUTIONAL SETTINGS FOR

24   PERSONS UNABLE TO HANDLE OR BENEFIT FROM COMMUNITY SETTINGS.

25          SO THE SIMPLE RISK OF ENTERING GNETS CANNOT ITSELF BE

1    AN AT RISK -- THE TYPE OF CERTAINLY IMPENDING AT-RISK INJURY

2    THAT SATISFIES ARTICLE III.

3         SO WITH THAT, I WILL TURN IT BACK OVER TO MR.

4    BELINFANTE TO TALK ABOUT THE MERITS OF THE UNITED STATES'

5    CLAIMS RESERVING, AGAIN, THE TRACEABILITY AND REDRESSABILITY

6    ISSUES FOR UNITED STATES' PARTIAL MOTION.

7         MR. BELINFANTE:  YOUR HONOR, I'LL START WITH THE

8    MERITS OF THE UNJUSTIFIED ISOLATION CLAIM.  IT IS BASED ON THE

9    OLMSTEAD DECISION, AS WE INDICATED, AND THE ELEVENTH CIRCUIT IN

10   2019 REAFFIRMED THESE THREE ELEMENTS AS PART OF AN OLMSTEAD

11   CLAIM, AND THEY ARE TO BE TAKEN TOGETHER.

12        AT SUMMARY JUDGMENT, THE UNITED STATES BEARS THE

13   BURDEN OF SHOWING MATERIAL QUESTION OF FACT AS TO EACH OF THEM.

14   AND THERE'S AN ABSENCE OF EVIDENCE AS TO JUST ABOUT ALL OF

15   THEM.

16        THE FIRST PROBLEM IS THAT THE UNITED STATES DOES NOT

17   CONDUCT AN INDIVIDUALIZED ANALYSIS, AS THEY DID IN THE FLORIDA

18   CASE.  AS A MATTER OF STATUTORY LAW, THAT IS IN ERROR.

19        LOOKING AT THE AMERICANS WITH DISABILITIES ACT, IT

20   FOCUSES ON QUALIFIED INDIVIDUALS, NOT A GROUP.  IT'S ALSO TRUE

21   AS A MATTER OF PRECEDENT THAT THERE HAS TO BE AN INDIVIDUALIZED

22   ASSESSMENT.  THE OLMSTEAD DECISION SAYS AT 581 -- AND THIS IS

23   THE PLURALITY DECISION -- THAT THE STATE MAY RELY ON REASONABLE

24   ASSESSMENTS OF ITS OWN PROFESSIONALS IN DETERMINING WHETHER AN

25   INDIVIDUAL MEETS THE ESSENTIAL ELIGIBILITY REQUIREMENTS.  AND

1  IT REJECTED IN THE KENNEDY CONCURRENCE THE APPROACH TAKEN BY

2  THE UNITED STATES IN THIS CASE.

3       THERE THE CONTROLLING OPINION OF JUSTICE KENNEDY

4  SAYS, THE ISSUE OF WHETHER RESPONDENTS HAVE DISCRIMINATED UNDER

5  THE ADA BY INSTITUTIONALIZED TREATMENT CANNOT BE DECIDED IN THE

6  ABSTRACT.  YET, THAT IS EXACTLY WHAT THE UNITED STATES IS

7  ASKING THIS COURT TO DO AND ASKING THIS COURT TO BE THE FIRST

8  TO DO SO IN THE EDUCATIONAL CONTEXT.

9       IT IS ALSO TRUE THAT THE -- AGAIN, THE ELEVENTH

10  CIRCUIT HAS NOW ADOPTED THE LANGUAGE OF OLMSTEAD, WHICH IT HAD

11  NOT PREVIOUSLY.  WE WILL ALSO POINT THE COURT TO THE RECENT

12  DECISION OF THE FIFTH CIRCUIT IN UNITED STATES VERSUS

13  MISSISSIPPI.  IT'S THE MOST RECENT APPELLATE COURT TO LOOK AT

14  THIS ISSUE.  AND IT SAYS -- AND IT REVERSED A JURY -- OR,

15  EXCUSE ME, AN INJUNCTION IN FAVOR OF THE UNITED STATES ON THIS

16  GROUND.

17       LIKE HERE, THE FEDERAL GOVERNMENT, QUOTE, CHARGED

18  THAT DUE TO SYSTEMATIC DEFICIENCIES IN THE STATE'S OPERATION OF

19  MENTAL HEALTH PROGRAMS, THERE WAS DISCRIMINATION.  BUT JUDGE

20  JONES SAID NO.  APPROPRIATE TREATMENT FOR THOSE WITH SERIOUS

21  MENTAL ILLNESS AS OLMSTEAD CLEARLY UNDERSTOOD MUST BE

22  INDIVIDUALIZED.  AND, IMPORTANTLY, WITH THE MISSISSIPPI CASE,

23  IS IT ANALYZES, DISTINGUISHES, AND SHOWS WHY EVERY CASE THE

24  UNITED STATES RELIES ON ON THIS POINT IS NO LONGER GOOD LAW

25  AFTER KISOR, BECAUSE EACH OF THOSE CASES AFFORDED THE

1   DEPARTMENT OF JUSTICE A GREATER DEAL OF DEFERENCE THAN IS NOW

2   THE LAW IN THE UNITED STATES.

3        THE DEPARTMENT DOES NOT RESPOND AT ALL TO THE STATE'S

4   CHARACTERIZATION AND DESCRIPTION OF OLMSTEAD.  IT SIMPLY

5   DOUBLES DOWN ON A REVERSED NEW YORK DISTRICT COURT DECISION IN

6   DAI.  YOUR HONOR, THAT CONSTITUTES WAIVER.  UNDER THE CASE

7   VERSUS ESLINGER DECISION FROM THE ELEVENTH CIRCUIT IN 2009, THE

8   COURT SAID, A PARTY CANNOT READILY COMPLAIN ABOUT THE ENTRY OF

9   A SUMMARY JUDGMENT ORDER THAT DID NOT CONSIDER AN ARGUMENT THEY

10  CHOSE NOT TO DEVELOP.  IT CITES THE JOHNSON VERSUS GEORGIA

11  BOARD OF REGENTS DECISION FROM THE ELEVENTH CIRCUIT IN 2001.

12       THERE IT SAID, ONCE THE ARGUMENT WAS RAISED, IT,

13  QUOTE, BECAME INCUMBENT UPON THE INTERVENORS TO RESPOND BY, AT

14  THE VERY LEAST, RAISING IN THEIR OPPOSITION PAPERS ANY AND ALL

15  ARGUMENTS OR DEFENSES THEY FELT PRECLUDED JUDGMENT.

16       HERE, THE UNITED STATES HAS EFFECTIVELY CONCEDED THAT

17  OLMSTEAD ITSELF AND THE UNITED STATES VERSUS FLORIDA DECISION

18  REQUIRE INDIVIDUALIZED ASSESSMENTS.  AND THE UNITED STATES HAS

19  NOT DONE THAT.  AND THEY HAVE NOT PUT FORWARD EVIDENCE ON IT.

20  WE WILL RELY ON -- TO THE EXTENT THEY CITE FACTS, WHICH IS

21  ABOUT ONE STATEMENT IN A DEPOSITION WHICH WAS HEARSAY, AND A

22  REVIEW OF DR. MCCART OF THREE PERCENT OF STUDENT FILES TO OUR

23  BRIEF.

24       THE SECOND ISSUE THAT THEY HAVE NOT SHOWN ON SUMMARY

25  JUDGMENT IS THAT A DETERMINATION OF APPROPRIATE PLACEMENTS

1   REQUIRE EVALUATIONS BY THE STATE'S TREATMENT PROFESSIONALS OR

2   AT LEAST SOME TREATMENT PROFESSIONALS.  THIS IS A MATTER OF LAW

3   UNDER OLMSTEAD AND NOW IN THE ELEVENTH CIRCUIT.  AS A MATTER OF

4   FACT, IT IS UNDISPUTED THAT THERE IS NO IEP TEAM WHERE DR.

5   MCCART OR DR. PUTNAM SAID THAT DECISION WAS WRONG.

6           AND, IMPORTANTLY -- AND THIS GETS INTO THE I.D.E.A.

7   ISSUE -- ONCE THE IEP TEAM MAKES A RECOMMENDATION, UNDER THE

8   I.D.E.A., THE STATE CANNOT OVERRIDE THAT.  SO THE DEPARTMENT OF

9   JUSTICE IS PUTTING THE STATE IN AN UNTENABLE POSITION.  THEY

10  WANT THE STATE OF GEORGIA TO OVERRIDE AN IEP TEAM TO SOLVE AN

11  ADA PROBLEM THAT IS MOOT.

12          IF THE STATE DOES THAT, THE UNITED STATES DEPARTMENT

13  OF EDUCATION, WHICH ENFORCES THE I.D.E.A., COULD BRING A CLAIM

14  AND SAY, YOU ARE VIOLATING THE I.D.E.A.  THIS IS WHY THE CASE

15  HAS NOT PROCEEDED.  AND THIS IS WHY IT IS A NEW ARGUMENT AND A

16  WRONGFUL EXPANSION OF THE AMERICANS WITH DISABILITIES ACT.

17          THE REQUIREMENT OF INDIVIDUAL ASSESSMENTS BY A

18  TREATING PROFESSIONAL COULD NOT BE CLEARER.  JUSTICE KENNEDY'S

19  CONCURRENCE SAYS, IT IS OF CENTRAL IMPORTANCE THAT COURTS APPLY

20  TODAY A DECISION OF THE GREAT DEFERENCE TO THE MEDICAL

21  DECISIONS OF A RESPONSIBLE TREATING PHYSICIAN.

22          AND THIS MAKES SENSE.  AS JUSTICE GINSBURG WROTE IN

23  THE PLURALITY DECISION OF OLMSTEAD, SOME INDIVIDUALS, LIKE THE

24  TWO PLAINTIFFS IN THAT CASE, MAY NEED INSTITUTIONAL CARE FROM

25  TIME TO TIME.  FOR OTHER INDIVIDUALS, NO PLACEMENT OUTSIDE AN

1    INSTITUTION MAY EVER BE APPROPRIATE.

2         SO WE HAVE A SPECTRUM.  THE COURT SAID, A SEPARATE

3    FACILITY IS NOT PER SE DISCRIMINATORY.  THAT'S WHY IT HAS TO BE

4    UNJUSTIFIED ISOLATION.  AND WHAT MAKES IT UNJUSTIFIED IS IF THE

5    STATE'S TREATMENT PROFESSIONALS SAY THIS PERSON WOULD DO BETTER

6    OR COULD BE APPROPRIATELY SERVED IN A LESS RESTRICTIVE

7    ENVIRONMENT.  DR. MCCART AND DR. PUTNAM AGREE.  THE ONLY PERSON

8    SAYING SOMETHING DIFFERENT IS THE UNITED STATES DEPARTMENT OF

9    JUSTICE.

10         NOW, THIS COURT REJECTED THIS ARGUMENT AT THE

11    MOTION-TO-DISMISS STAGE.  AND IT DID IT FOR TWO REASONS.

12         ONE, IT CITED THE DAI CASE FROM THE DISTRICT COURT OF

13    DISTRICT OF COLUMBIA IN 2012.  IN THAT CASE, WHAT THE JUDGE

14    FOCUSED ON WAS A CONCERN THAT IF STATE'S TREATMENT

15    PROFESSIONALS WERE REQUIRED, A STATE COULD SIMPLY NOT OBSERVE

16    SOMEONE AND SAY, WELL, THE FIRST ELEMENT IS NOT MET.

17         THAT DOESN'T APPLY IN EDUCATION, BECAUSE THE I.D.E.A.

18    MANDATES THAT AN IEP TEAM OF TREATMENT PROFESSIONALS EVALUATE

19    EACH STUDENT, AND EACH STUDENT CANNOT BE REFERRED TO GNETS

20    UNLESS THAT IS THE RECOMMENDATION OF THEIR IEP TEAM.  BUT,

21    ALSO, SINCE THE COURT -- AND THE COURT ALSO RECOGNIZED THAT

22    UNDER A 12(B)(6) STANDARD, IT HAD TO ACCEPT THE ALLEGATIONS IN

23    THE COMPLAINT AS TRUE.  IT NO LONGER HAS TO DO THAT AND, UNDER

24    RULE 56, CANNOT.

25         BUT MOST IMPORTANTLY IS THAT THE ELEVENTH CIRCUIT HAS

1    NOW ADDRESSED THE ISSUE.  WHEN THE ELEVENTH CIRCUIT SAID THAT

2    THE UNITED STATES CAN BRING A TITLE II CLAIM, IT DESCRIBED AN

3    ELEMENT OF OLMSTEAD AS A DETERMINATION BY THE STATE'S TREATMENT

4    PROFESSIONALS THAT SUCH PLACEMENT IS APPROPRIATE.  AND IT USED

5    THAT IN THE LAST PARAGRAPH IN STRIKING THE BALANCE OF

6    FEDERALISM AND THE AMERICANS WITH DISABILITIES ACT.  IT IS PART

7    OF THE DECISION.

8         HERE AGAIN, ON THE ISSUE OF TREATMENT PROFESSIONALS,

9    THE UNITED STATES FAILS TO ADDRESS OLMSTEAD.  THAT IS WAIVER

10   UNDER JOHNSON AND CASE.  INSTEAD, IT MAKES THE REMARKABLE

11   ARGUMENT THAT TITLE II'S INTEGRATION MANDATE, I.E., A DOJ

12   REGULATION, DOES NOT REFER TO TREATMENT PROFESSIONALS.  THAT'S

13   AT DOCKET 446, PAGE 11.  YOUR HONOR, THE OLMSTEAD CASE

14   INTERPRETED AND APPLIED THE DEPARTMENT'S REGULATION AND SAID,

15   ABSENT SUCH QUALIFICATION OF APPROPRIATE SERVICES BY A

16   TREATMENT PROFESSIONAL, IT WOULD BE INAPPROPRIATE TO REMOVE A

17   PATIENT FROM A MORE RESTRICTIVE SETTING.  THAT'S PAGE 602.

18        THE FACTUAL ARGUMENTS, TO THE EXTENT THAT THEY ARE

19   THERE, THERE ARE FIVE IEP'S CITED, NOTHING SYSTEMATIC.  AND

20   THEIR CLAIM THAT AN IEP TEAM IS NOT A TREATING PHYSICIAN IS A

21   RED HERRING.  IT IS A TREATMENT PROFESSIONAL.  AND THE REASON

22   THAT TREATING PHYSICIANS WAS USED IN OLMSTEAD IS BECAUSE THOSE

23   WERE THE PEOPLE REVIEWING THE PATIENT.  AND JUSTICE KENNEDY

24   MAKES CLEAR, THOSE DECISIONS ARE ENTITLED TO THE GREATEST

25   DEFERENCE.

1          THE NEXT ELEMENT, THE LACK OF OPPOSITION, YOU HAVE TO

2    SHOW THAT SOMEONE WANTS COMMUNITY TREATMENT.  THE UNITED STATES

3    -- AND THAT'S A CLEAR ELEMENT OF OLMSTEAD.  THE UNITED STATES

4    SAYS, WELL, WE DON'T HAVE TO DO THAT.  BUT THAT'S NOT HOW

5    SUMMARY JUDGMENT WORKS.  IT'S AN ELEMENT OF THE CLAIM.  AND

6    THEY'VE NOT SHOWN IT, AND PRECEDENT SAYS OTHERWISE, BOTH

7    OLMSTEAD AND THE UNITED STATES VERSUS FLORIDA DECISION FROM THE

8    ELEVENTH CIRCUIT.

9          FACTUALLY, THEY CITE TO ONLY EIGHT INDIVIDUALS IN

10   THEIR BRIEF, 448-1 AT PAGES 18 AND 19, NOTE 20, AND ASK THE

11   COURT TO PRESUME THAT INDIVIDUALS WOULD LIKELY CHOOSE MORE

12   INTEGRATED SETTING.  THAT'S NOT WHAT RULE 56 ALLOWS.

13         ON THE ELEMENT OF REASONABLE ACCOMMODATION, THE

14   ELEVENTH CIRCUIT HERE IS CLEAR AS WELL.  IN THE BIRCOLL

15   DECISION, IT SAYS, WHAT IS REASONABLE MUST BE DECIDED ON A

16   CASE-BY-CASE BASIS BASED ON NUMEROUS FACTORS.  AND IT IS PART

17   OF THE PLAINTIFF'S PRIMA FACIE BURDEN IN AN ADA CASE, WHICH THE

18   UNITED STATES AGREES.

19         NOW, IMPORTANTLY, WHAT THEIR REMEDIES ARE IS TO

20   EXPAND AN APEX PROGRAM AND TO EXPAND OR MANDATE A -- DR.

21   MCCART'S PREFERRED POLICY OF MTSS, OR IT'S A TYPE OF TRAINING

22   IN SCHOOLS TO DEAL WITH CHILDREN WITH BEHAVIOR ISSUES.

23   OLMSTEAD SAYS, THOUGH, YOU CAN'T MANDATE THE EXPANSION OF

24   SERVICES THAT ARE NOT THERE.  AND TO THE EXTENT THAT DR. MCCART

25   -- AND WE WILL GET INTO THIS ON THE DAUBERT -- MAKES AN

1    ARGUMENT THAT THE PROGRAM SHOULD BE EXPANDED, SHE ACKNOWLEDGES

2    SHE DOESN'T KNOW WHAT THE STATE IS CURRENTLY DOING.  SO TO THE

3    EXTENT THEY ARE RELYING ON DR. MCCART'S OPINION, IT IS

4    SPECULATIVE, AT BEST, INADMISSIBLE, AND SHOULD NOT BE

5    CONSIDERED AT SUMMARY JUDGMENT.

6         NEXT THEY TALK ABOUT AT-RISK INDIVIDUALS.  THIS IS

7    WHERE THE UNITED STATES VERSUS MISSISSIPPI CASE IS SO

8    IMPORTANT.  THEY SAY IT'S NOT JUST THE PEOPLE IN GNETS, IT'S

9    THE PEOPLE THAT COULD GO TO GNETS.

10        THE PROBLEM THERE, YOUR HONOR, IS THAT THE ADA SAYS

11   YOU HAVE TO UNDERGO DISCRIMINATION.  AND WHAT THE UNITED STATES

12   IS SEEKING TO DO IS REMOVE THE REQUIREMENT OF DISCRIMINATION

13   FROM THE ADA AND SAY THAT ANYONE WHO HAS A DISABILITY IS NOW

14   ABLE TO CLAIM A VIOLATION OF THE ADA WITHOUT ANY STATE ACTION.

15   THAT CAN WORK IN CASES WHERE, FOR EXAMPLE, A BUILDING DOESN'T

16   HAVE A RAMP FOR A WHEELCHAIR.  THAT'S CLEAR AND PREDICTABLE.

17   BUT AS JUSTICE KENNEDY POINTS OUT, IN DEALING WITH MENTAL

18   HEALTH, IT IS SO INDIVIDUALIZED THAT THOSE TYPE OF PRESUMPTIONS

19   CANNOT BE MADE.

20        ON THE UNEQUAL OPPORTUNITY CLAIM, HERE THE

21   ADMINISTRATION PART IS HERE.  ALL OF THE DECISIONS THE UNITED

22   STATES IS CONCERNED ABOUT ARE DECIDED AT THE LOCAL LEVEL,

23   NUMBER ONE.  AND, NUMBER TWO, IF THE COURT LOOKS AT WHAT IS AN

24   I.D.E.A. CLAIM, WHICH THE UNITED STATES DEPARTMENT OF JUSTICE

25   LACKS THE ABILITY TO ENFORCE, IT IS EXACTLY WHAT THEIR

1    COMPLAINT SAYS.

2            ON THE LEFT, YOU SEE WHAT IS A FAPE, A FREE

3    APPROPRIATE PUBLIC EDUCATION.  AND ON THE RIGHT, YOU SEE

4    PARAGRAPH 47 IN THE COMPLAINT.  IT'S THE SAME.  THE SUPREME

5    COURT HAS SAID IN THE FRY DECISION THAT IF THE COMPLAINT COULD

6    BE BROUGHT IN A PUBLIC FACILITY THAT WAS NOT A SCHOOL, AND IF

7    AN ADULT COULD BRING THE CLAIM, IT'S PROBABLY NOT AN I.D.E.A.

8    CLAIM.  HERE, THE DEPARTMENT'S EQUAL-EDUCATION-OPPORTUNITY

9    CLAIM CAN ONLY BE BROUGHT IN A SCHOOL AND ONLY FOR YOUTH.  IT

10   IS VERY DIFFERENT THAN THE CLAIM BROUGHT IN FRY THAT WAS DEEMED

11   DISTINCT.

12           AND SO WITH THAT, YOUR HONOR, I'LL RESERVE MY

13   REMAINING TWO MINUTES FOR REBUTTAL.

14           THE COURT:  ALL RIGHT.  THANK YOU, SIR.

15           MR. BELINFANTE:  THANK YOU.

16           OH, SORRY.

17           MS. WOMACK:  MAY IT PLEASE THE COURT.

18           THE COURT:  YES, MA'AM.

19           MS. WOMACK:  KELLY GARDNER WOMACK FOR THE UNITED

20   STATES.

21           NEARLY EIGHT YEARS AGO, THE UNITED STATES BROUGHT

22   SUIT AGAINST THE STATE OF GEORGIA TO ADDRESS SYSTEMIC

23   VIOLATIONS OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT.

24   THE UNITED STATES ALLEGES THAT THOSE SYSTEMIC VIOLATIONS ARISE

25   FROM THE STATE OF GEORGIA'S ADMINISTRATION OF THE GEORGIA

1    NETWORK FOR EDUCATIONAL AND THERAPEUTIC SUPPORT PROGRAM, ALSO

2    KNOWN AS THE GNETS PROGRAM.

3          THROUGH THE GNETS PROGRAM, THE STATE OF GEORGIA

4    UNNECESSARILY SEGREGATES STUDENTS WITH BEHAVIOR-RELATED

5    DISABILITIES, SEPARATING THOSE STUDENTS FROM THEIR GENERAL

6    EDUCATION PEERS AND RELEGATING THEM TO INFERIOR EDUCATIONAL

7    OPPORTUNITIES.

8          SINCE COMMENCEMENT OF THIS LAWSUIT, THOUSANDS OF

9    CHILDREN HAVE BEEN PLACED IN THE GNETS PROGRAM.  TWO-THIRDS OF

10   THOSE CHILDREN ARE REMOVED FROM THEIR GENERAL EDUCATION

11   ENVIRONMENTS ALTOGETHER AND SENT TO SEPARATE FACILITIES SERVING

12   ONLY STUDENTS WITH DISABILITIES.  THOSE SEPARATE FACILITIES ARE

13   OFTEN AGING, DILAPIDATED SCHOOL BUILDINGS, MANY OF WHICH ARE

14   HAND-ME-DOWNS, GIVEN TO THE GNETS PROGRAM ONLY AFTER LOCAL

15   SCHOOL DISTRICTS DETERMINE THAT THOSE BUILDINGS' USEFUL LIFE

16   HAS COME TO AN END.

17         GNETS SCHOOL BUILDINGS CHARACTERISTICALLY LACK ALL OF

18   THE HALLMARKS THAT YOU AND I WOULD ASSOCIATE WITH A SCHOOL.

19   THERE ARE OFTEN NO GYMNASIUMS, NO LIBRARIES, NO SCIENCE LABS,

20   NO MUSIC ROOMS, NOT EVEN PLAYGROUNDS.  THE WALLS ARE NOT

21   BRIGHTLY DECORATED WITH STUDENT ARTWORK OR OTHER ENRICHING

22   EDUCATIONAL MATERIALS, BUT INSTEAD ARE BARREN AND INSTITUTIONAL

23   IN APPEARANCE.

24         IN THE THERAPEUTICS SERVICES AND SUPPORTS THAT THE

25   STATE OF GEORGIA ASSERTS THE GNETS PROGRAM IS DESIGNED TO

1  PROVIDE ARE LOOKING, IN FACT, IN RECENT YEARS, THE STATE OF

2  GEORGIA HAS PROVIDED A MERE 16 CLINICALLY-TRAINED

3  PSYCHOLOGISTS, PSYCHIATRISTS, AND THERAPISTS TO SERVE THE MORE

4  THAN 3,000 STUDENTS IN THE GNETS PROGRAM, AMOUNTING TO ONE

5  CLINICIAN FOR EVERY 187 STUDENTS.

6       THE EDUCATIONAL OPPORTUNITIES THAT STUDENTS IN THE

7  GNETS PROGRAM ARE AFFORDED PARALLEL THESE DEFICIENCIES.

8  STUDENTS IN THE GNETS PROGRAM ARE DENIED THE OPPORTUNITY TO

9  INTERACT WITH AND TO LEARN FROM THEIR GENERAL EDUCATION PEERS.

10  THEY ARE OFTEN CONFINED TO A SINGLE CLASSROOM FOR THE ENTIRE

11  DAY WHERE THEY RECEIVE MINIMAL LIVE INSTRUCTION AND ARE

12  DEPRIVED OF ACCESS TO SPECIALS LIKE ART AND MUSIC.

13       UNLIKE THEIR GENERAL EDUCATION PEERS, STUDENTS IN THE

14  GNETS PROGRAM HAVE NO SPORTS OR CHEERLEADING TEAMS TO JOIN, NO

15  AFTER-SCHOOL CLUBS THAT SERVE AS CHANNELS FOR THEIR

16  SELF-DISCOVERY AND GROWTH, NO SCHOOL DANCES TO DRESS UP FOR, NO

17  YEARBOOKS FOR FRIENDS TO SIGN.  CIRCUMSTANCES ARE GENERALLY NO

18  BETTER FOR THE MINORITY OF STUDENTS IN THE GNETS PROGRAM WHO

19  ATTEND GNETS CLASSROOMS LOCATED IN GENERAL EDUCATION SCHOOLS.

20       WHILE THOSE STUDENTS MAY HAVE ACCESS TO

21  BETTER-QUALITY FACILITIES, PORTIONS OF THOSE FACILITIES OFTEN

22  REMAIN OUT OF REACH OR OFF LIMITS TO STUDENTS IN THE GNETS

23  PROGRAM.  STUDENTS IN THE GNETS PROGRAM HAVE CLASSROOMS THAT

24  ARE OFF THE BEATEN PATH, OFTEN LOCATED AT THE END OF HALLWAY

25  CORRIDORS, NEAR EXITS, IN BASEMENTS, AND IN TRAILERS BEHIND

1  SCHOOLS.

2          NOT ONLY THAT, FOR MANY STUDENTS IN THE GNETS PROGRAM

3  WHO ATTEND GNETS CLASSROOMS AND GENERAL EDUCATION SCHOOLS,

4  THOSE STUDENTS ARE FORCED TO ENTER AND EXIT THEIR SCHOOL

5  BUILDINGS THROUGH DOORS DIFFERENT FROM THE ONES USED BY THEIR

6  GENERAL EDUCATION PEERS.  AND, YET, THE STATE OF GEORGIA HAS

7  JUST COMMITTED ANOTHER $53 MILLION TO SUSTAIN THE GNETS PROGRAM

8  FOR THE COMING FISCAL YEAR.

9          AGAINST THIS BACKDROP, THE STATE SEEKS YET AGAIN TO

10  DELAY AND POTENTIALLY FORECLOSE ALTOGETHER A TRIAL THAT

11  PROMISES LONG-AWAITED RELIEF FOR THE THOUSANDS OF PUBLIC-SCHOOL

12  CHILDREN WHOSE EXPERIENCES I'VE JUST DESCRIBED.

13          IN PARTICULAR, THE STATE REVISED AND REPACKAGES

14  PROCEDURAL ARGUMENT THAT THIS COURT HAS ALREADY CONSIDERED AND

15  PROPERLY REJECTED AT EARLIER STAGES OF THIS LITIGATION.

16          THE STATE ALSO ASSERTS THAT THE UNITED STATES CANNOT

17  MAKE OUT A PRIMA FACIE OLMSTEAD CLAIM.  I WILL BEGIN BY

18  ADDRESSING THIS COURT'S WELL-REASONED DECISIONS REJECTING THE

19  STATE'S ASSERTED PROCEDURAL BARS AND WHY THOSE DECISIONS WERE

20  CORRECTLY DECIDED.  I'LL ALSO DISCUSS WHY THE STATE'S ARGUMENTS

21  HAVE NO MORE MERIT TODAY THAN THEY DID IN MAY 2020 OR JANUARY

22  2021 WHEN THIS COURT REJECTED THE STATE'S MOTION TO DISMISS AND

23  ITS MOTION FOR JUDGMENT ON THE PLEADINGS.

24          MY COLLEAGUE, JESSICA POLANSKY, WILL THEN ADDRESS THE

25  STATE'S ARGUMENTS REGARDING OUR OLMSTEAD CLAIM AND WHY THOSE

1    ARGUMENTS LACK MERIT.

2            WHILE THE FULL WEIGHT OF THE EVIDENCE THE UNITED

3    STATES DEVELOPED IN DISCOVERY WILL BE REVEALED AT TRIAL, WE ARE

4    CONFIDENT THAT YOUR HONOR WILL CONCLUDE THAT THE EVIDENCE

5    OUTLINED IN OUR BRIEFS AND DISCUSSED HERE TODAY IS MORE THAN

6    SUFFICIENT TO RAISE A GENUINE ISSUE OF MATERIAL FACT ENTITLING

7    THE UNITED STATES TO PRESENT ITS EVIDENCE AT TRIAL.  GIVEN THE

8    THOUSANDS OF STUDENTS IN THE GNETS PROGRAM WHO CONTINUE TO BE

9    HARMED EACH DAY, THE UNITED STATES IS EAGER TO PROCEED TO THAT

10   TRIAL EXPEDITIOUSLY.

11           REVISITING AN ARGUMENT THAT THIS COURT HAS ALREADY

12   ADDRESSED AND PROPERLY DISPOSED OF, THE STATE FIRST ASSERTS

13   THAT THE UNITED STATES HAS FAILED TO ESTABLISH ARTICLE III

14   STANDING.  BECAUSE THE UNITED STATES CAN SHOW ALL THREE

15   ELEMENTS OF ARTICLE III STANDING -- INJURY IN FACT,

16   TRACEABILITY, AND REDRESSABILITY -- THIS COURT SHOULD REJECT

17   THE STATE'S ARGUMENTS.

18           THE SUPREME COURT'S DECISION IN VERMONT AGENCY OF

19   NATURAL RESOURCES MAKES CLEAR THAT THE UNITED STATES SUFFERS AN

20   INJURY TO ITS SOVEREIGNTY WHENEVER ITS LAWS ARE VIOLATED.

21   BECAUSE THE UNITED STATES HAS ALLEGED AND AMASSED EXTENSIVE

22   EVIDENCE SHOWING THE STATE OF GEORGIA IS VIOLATING THE ADA,

23   THAT INJURY ALONE IS SUFFICIENT TO SATISFY ARTICLE III

24   STANDARDS.  THE UNITED STATES NEED NOT SHOW THAT AFFECTED

25   STUDENTS HAVE ALSO SUFFERED AN INJURY IN FACT.

1          DESPITE THE STATE'S EFFORTS TO DISTORT THE MEANING OF

2   VERMONT AGENCY, A CLEAR READING OF THAT CASE SHOWS THAT THE

3   SUPREME COURT SQUARELY CONSIDERED WHETHER AN INJURY TO THE

4   UNITED STATES SOVEREIGNTY MEETS THE REQUIREMENTS OF ARTICLE III

5   FOR PURPOSES OF A CIVIL ACTION.  IT CONCLUDED THAT IT DOES.

6          AND NOTHING ABOUT THE FLORIDA DECISION THE STATE

7   REFERENCES CHANGES THAT, ESPECIALLY GIVEN THAT THAT CASE

8   ADDRESSES STATUTORY STANDING, NOT CONSTITUTIONAL STANDING.

9          IN ANY EVENT, EVEN SETTING ASIDE THE INJURY TO ITS

10  SOVEREIGNTY, THE UNITED STATES ALSO SATISFIES THE REQUIREMENTS

11  OF ARTICLE III STANDING BASED ON THE VOLUMINOUS EVIDENCE IT HAS

12  DEVELOPED OF THE REAL, CONCRETE, AND IMMINENT HARMS THAT

13  CHILDREN IN GEORGIA EXPERIENCE AS A RESULT OF THE STATE'S

14  UNLAWFUL RELIANCE ON THE GNETS PROGRAM.  THERE CAN BE NO

15  QUESTION THAT THE UNNECESSARY SEGREGATION, ISOLATION, AND

16  DENIAL OF OPPORTUNITY THAT CHILDREN IN THE GNETS PROGRAM SUFFER

17  CONSTITUTE COGNIZABLE INJURIES UNDER TITLE II AND OLMSTEAD.

18         THE STATE'S INSISTENCE THAT THE UNITED STATES PRESENT

19  MORE DETAILED INDIVIDUALIZED EVIDENCE OF THOSE INJURIES

20  CONFUSES ITS BROADER ARGUMENT ABOUT A PLAINTIFF'S PRIMA FACIE

21  BURDEN IN AN OLMSTEAD CASE, WHICH MY COLLEAGUE WILL ADDRESS

22  SHORTLY, WITH THE STANDARD FOR ESTABLISHING ARTICLE III

23  STANDING.

24         THE STATE FARES NO BETTER IN EXTENDING ITS ARGUMENTS

25  ABOUT ARTICLE III STANDING TO THE HARMS THAT STUDENTS AT

1   SERIOUS RISK OF PLACEMENT IN THE GNETS PROGRAM EXPERIENCE.  THE

2   UNDISPUTED EXPERT EVIDENCE IN THIS CASE SHOWS THAT STUDENTS

3   ROUTINELY ENTER THE GNETS PROGRAM WITHOUT RECEIVING THE KINDS

4   OF THERAPEUTIC SERVICES AND SUPPORTS THAT WOULD HELP THEM

5   REMAIN IN MORE INTEGRATED LEARNING ENVIRONMENTS.  THAT LACK OF

6   SERVICES AND REPORTS PUTS MANY MORE STUDENTS AT RISK, AT

7   SERIOUS RISK, OF BEING SEGREGATED IN THE GNETS PROGRAM.

8           THEIR INJURIES ARE NO LESS REAL OR CONCRETE BECAUSE

9   THEY ARE NOT YET IN THE GNETS PROGRAM.  INDEED, IF INDIVIDUALS

10  WITH DISABILITIES WERE FORCED TO SUFFER THE SIGNIFICANT HARM OF

11  SEGREGATION BEFORE THEY COULD SEEK RELIEF, OLMSTEAD'S

12  PROHIBITION ON UNNECESSARY SEGREGATION WOULD BE HOLLOW.

13          THE SECOND AND THIRD ELEMENTS OF ARTICLE III

14  STANDING, WHICH CONCERN TRACEABILITY AND REDRESSABILITY, ARE,

15  AS OPPOSING COUNSEL NOTED, INEXTRICABLY LINKED TO THE STATE OF

16  GEORGIA'S CONTROL AND ADMINISTRATION OF THE GNETS PROGRAM,

17  WHICH WE WILL ADDRESS LATER THIS MORNING IN THE CONTEXT OF THE

18  UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT.  FOR NOW IT

19  SUFFICES TO SAY THAT THIS COURT HAS ALREADY REJECTED THE

20  STATE'S ARGUMENT THAT THE HARM AT ISSUE IN THIS CASE IS

21  INDEPENDENTLY CAUSED BY AND CAN ONLY BE REMEDIED BY THIRD

22  PARTIES.  BECAUSE THE RECORD DEVELOPED IN DISCOVERY FULLY

23  SUPPORTS THE ALLEGATIONS CONTAINED IN THE UNITED STATES'

24  COMPLAINT, THE STATE HAS GIVEN THIS COURT NO GOOD REASON TO

25  RULE OTHERWISE NOW THAT DISCOVERY HAS CLOSED.

1        THE SECOND ARGUMENT THE STATE ADVANCES IN ITS EFFORTS

2    TO PREVENT THIS CASE FROM PROCEEDING TO TRIAL IS THAT THE

3    UNITED STATES FAILS TO POINT TO ANY EVIDENCE DEMONSTRATING

4    DISCRIMINATORY INTENT WHICH THE STATE ASSERTS IS A REQUIRED

5    PART OF THE UNITED STATES' UNEQUAL EDUCATIONAL OPPORTUNITIES

6    CLAIM.  THE STATE'S ASSERTION IS SQUARELY AT ODDS WITH THE

7    IMPLEMENTING REGULATIONS FOR TITLE II AND FINDS NO SUPPORT IN

8    RELEVANT CASE LAW.

9        A PROPER READING OF THE RELEVANT CASE LAW MAKES CLEAR

10   THAT THE INTENT REQUIREMENT THE STATE CITES IS AN ADDITIONAL

11   HURDLE BEYOND PROVING THE ELEMENTS OF A PRIMA FACIE TITLE II

12   CLAIM THAT APPLIES ONLY WHEN A PARTY SEEKS MONETARY DAMAGES.

13   THE ELEVENTH CIRCUIT MADE THIS DISTINCTION CLEAR IN SILVERMAN

14   VERSUS MIAMI DADE TRANSIT NOTING, QUOTE, IN AN ORDINARY COURSE,

15   PROOF OF A TITLE II OR SECTION 504 VIOLATION ENTITLES A

16   PLAINTIFF ONLY TO INJUNCTIVE RELIEF.  TO GET DAMAGES, AS

17   SILVERMAN SEEKS HERE, A PLAINTIFF MUST CLEAR AN ADDITIONAL

18   HURDLE.  HE MUST PROVE THAT THE ENTITY THAT HE HAS SUED ENGAGED

19   IN INTENTIONAL DISCRIMINATION, WHICH REQUIRES A SHOWING OF

20   DELIBERATE INDIFFERENCE, END QUOTE.

21       BECAUSE THE UNITED STATES DOES NOT SEEK MONETARY

22   DAMAGES IN THIS CASE, IT NEED NOT CLEAR THE ADDITIONAL HURDLE

23   OF SHOWING INTENTIONAL DISCRIMINATION DESCRIBED BY THE ELEVENTH

24   CIRCUIT.  THE TEXT OF THE TITLE II REGULATIONS AND THE

25   LEGISLATIVE HISTORY OF THE ADA ITSELF CONFIRM THAT THE ADA

1    PRESCRIBES MORE THAN JUST INTENTIONAL DISCRIMINATION.

2          28 C.F.R. SECTION 35.130(B)(3) EXPRESSLY PROHIBITS

3    PUBLIC ENTITIES FROM UTILIZING METHODS OF ADMINISTRATION THAT

4    HAVE THE EFFECT OF SUBJECTING QUALIFIED INDIVIDUALS TO

5    DISCRIMINATION.  THE STATE FINDS NO PRECEDENT SUPPORTING THE

6    VIEW THAT SUCH DISCRIMINATORY EFFECTS ARE NOT ACTIONABLE UNDER

7    THE ADA.  AND SUCH PRECEDENT WOULD BE SURPRISING, GIVEN THE

8    OBSERVATION BY NUMEROUS COURTS THAT THE ADA IS ALSO AN ATTEMPT

9    TO REMEDY THE EFFECTS OF, QUOTE, BENIGN NEGLECT RESULTING FROM

10   INVISIBILITY OF THE DISABLED.

11         FINALLY, THE STATE PRESSES THIS COURT TO DEPART FROM

12   ITS PRIOR DECISIONS AND HOLD THAT THE UNITED STATES' CLAIMS IN

13   THIS CASE CANNOT PROCEED BECAUSE THEY ARISE UNDER THE

14   INDIVIDUALS WITH DISABILITIES EDUCATION ACT, OR THE I.D.E.A.

15   WHATEVER THE REASON FOR THE STATE'S ARGUMENTS REGARDING THE

16   I.D.E.A., THE GUIDING QUESTION FOR THIS COURT IS THE SAME.  AND

17   THAT IS THE QUESTION IDENTIFIED IN FRY VERSUS NAPOLEON, WHETHER

18   THE GRAVAMEN OF THE UNITED STATES' CLAIM IS A DENIAL OF A FREE

19   AND APPROPRIATE PUBLIC EDUCATION, OR FAPE.  AS THE UNITED

20   STATES MAKES CLEAR IN ITS BRIEFING AND AS THIS COURT PREVIOUSLY

21   DETERMINED AT THE MOTION-TO-DISMISS STAGE, THE ANSWER TO THIS

22   QUESTION IS NO.

23         THE UNITED STATES' CLAIM CHALLENGES THE STATE'S

24   SYSTEMIC DISCRIMINATION OF A CATEGORY OF STUDENTS:  HERE,

25   STUDENTS WITH BEHAVIOR-RELATED DISABILITIES.  THAT SYSTEMIC

1    DISCRIMINATION STIGMATIZES THOSE STUDENTS.  IT SEGREGATES THEM

2    WITHOUT JUSTIFICATION.  IT DENIES THEM EQUAL ACCESS TO PUBLIC

3    INSTITUTIONS.  AND IT DEPRIVES THEM OF THE ADVANTAGES THAT COME

4    FROM INTEGRATED LEARNING ENVIRONMENTS IN WAYS THAT ARE DISTINCT

5    FROM THE BREACH OF THE REQUIREMENTS OF THE I.D.E.A.

6            TO THE EXTENT THE STATE CITES A SINGLE STATEMENT FROM

7    THE UNITED STATES' 27-PAGE COMPLAINT CONCERNING THE GNETS

8    PROGRAM'S WIDESPREAD ABSENCE OF GRADE-LEVEL INSTRUCTION AS

9    EVIDENCE THAT THE UNITED STATES' UNEQUAL EDUCATIONAL

10   OPPORTUNITY CLAIM ARISES UNDER THE I.D.E.A., THE STATE'S

11   SELECTIVE READING SHOULD BE REJECTED.

12           THE UNITED STATES' COMPLAINT ALLEGES A LITANY OF WAYS

13   THAT THE STATE'S GNETS PROGRAM DISCRIMINATES AGAINST STUDENTS

14   PLACED IN THE PROGRAM, INCLUDING, AMONG OTHER THINGS, GNETS'

15   USE OF INFERIOR FACILITIES, ITS LACK OF INSTRUCTION FROM

16   CERTIFIED TEACHERS, AND ITS LACK OF CO-CURRICULAR

17   OPPORTUNITIES.  THESE ALLEGATIONS, WHICH THE FACTUAL RECORD

18   DEVELOPED THROUGH DISCOVERY NOW FULLY SUPPORTS, MAKE OUT A

19   VIOLATION OF TITLE II'S REQUIREMENT OF NONDISCRIMINATORY ACCESS

20   TO PUBLIC INSTITUTIONS DISTINCT FROM ANY VIOLATION OF FAPE.

21           I NOTE, YOUR HONOR, THAT A FEW MOMENTS AGO, THE STATE

22   ALSO REFERENCED A NUMBER OF HYPOTHETICAL QUESTIONS THAT ARE

23   IDENTIFIED IN FRY AS A METHOD FOR HELPING A COURT IDENTIFY WHEN

24   A CLAIM MIGHT ARISE UNDER THE I.D.E.A.  AND I'LL JUST NOTE THAT

25   THERE'S NOTHING MAGICAL ABOUT THOSE HYPOTHETICAL QUESTIONS.

1    THEY ARE QUESTIONS THAT THE COURT IDENTIFIED.  BUT IN OTHER

2    CASES, COURTS HAVE NOTED THAT SOMETIMES THOSE QUESTIONS ARE NOT

3    A PERFECT FIT.  AND I'LL NOTE THAT, EVEN WITHIN THE ELEVENTH

4    CIRCUIT, THAT THAT HAS BEEN THE CASE.  IN THE J.S. VERSUS

5    HOUSTON COUNTY BOARD OF EDUCATION CASE, 877 F.3D 979, THE COURT

6    IS ASKING THE SAME QUESTION.  AND THAT IS A CASE THAT DOES

7    ARISE IN THE EDUCATION CONTEXT.  AND THE COURT THERE FOUND THAT

8    THOSE HYPOTHETICAL QUESTIONS MIGHT NOT BE A PARTICULARLY GOOD

9    FIT.

10          SO WE WOULD NOTE FOR YOUR HONOR THAT THOSE QUESTIONS

11   ARE NOT MAGICAL IN SOME WAY AND THAT IF THEY DON'T APPLY, A

12   CASE NECESSARILY ARISES UNDER FAPE, AND WOULD DIRECT YOUR HONOR

13   TO -- TO THAT ELEVENTH CIRCUIT CASE LAW.

14          I'LL NOW TURN IT OVER TO MY COLLEAGUE TO ADDRESS THE

15   STATE'S SUBSTANTIVE OLMSTEAD CLAIM.

16          THE COURT:  THANK YOU, MA'AM.

17          MS. POLANSKY:  MAY IT PLEASE THE COURT, JESSICA

18   POLANSKY FOR THE UNITED STATES.  I WILL BE ADDRESSING WHY THE

19   UNITED STATES' OLMSTEAD CLAIM SURVIVES GEORGIA'S MOTION FOR

20   SUMMARY JUDGMENT.  TO DEFEAT THE STATE'S MOTION, WE SIMPLY MUST

21   DEMONSTRATE THAT THERE IS A GENUINE ISSUE OF MATERIAL FACT AS

22   TO EACH ELEMENT OF OUR PRIMA FACIE CASE.

23          THE UNITED STATES HAS EASILY SURPASSED THAT BAR.

24   SPECIFICALLY WE HAVE PUT FORWARD AND EVIDENCE DEMONSTRATING

25   THAT CHILDREN IN GNETS CAN APPROPRIATELY BE SERVED IN MORE

1    INTEGRATED SETTINGS, THAT THEIR PARENTS AND GUARDIANS DO NOT

2    OPPOSE PLACEMENT IN MORE INTEGRATED SETTINGS, AND THAT THE

3    STATE CAN REASONABLY MODIFY ITS SYSTEM TO ACCOMPLISH THIS.

4            I WOULD LIKE TO LOG THROUGH EACH ELEMENT OF OUR PRIMA

5    FACIE CASE IN MORE DETAIL.  FIRST, THE UNITED STATES HAS PUT

6    FORWARD SUBSTANTIAL EVIDENCE THAT THE VAST MAJORITY OF CHILDREN

7    CURRENTLY IN GNETS COULD BE APPROPRIATELY SERVED IN MORE

8    INTEGRATED SETTINGS, SUCH AS THEIR COMMUNITY SCHOOLS.  THE

9    UNITED STATES' EXPERT, DR. AMY MCCART, PROVIDED EVIDENCE ABOUT

10   APPROPRIATENESS.  YOU WILL HEAR MORE ABOUT HER REVIEW LATER, AS

11   WELL AS HER EXPERTISE IN THE FIELD OF SPECIAL EDUCATION AND HER

12   DECADES OF EXPERIENCE ADVISING STATES AND SCHOOL DISTRICTS ON

13   HOW TO SUPPORT INTEGRATED BEHAVIORAL SERVICES TO CHILDREN WITH

14   DISABILITIES.

15           DR. MCCART'S REVIEW IS EXTENSIVE.  OVER THE COURSE OF

16   THREE YEARS, SHE VISITED 70 GNETS SITES WHERE SHE OBSERVED

17   NEARLY 1,000 STUDENTS AND HUNDREDS OF CLASSROOMS.  DR. MCCART

18   ALSO REVIEWED THE RECORDS OF APPROXIMATELY 500 STUDENTS IN

19   GNETS, AND SHE ATTENDED OR REVIEWED THE TESTIMONY FROM

20   DEPOSITIONS OF NUMEROUS REGIONAL GNETS PROGRAM DIRECTORS.

21           BASED ON HER COMPREHENSIVE REVIEW, DR. MCCART FOUND

22   THAT JUST A HANDFUL OF STUDENTS WOULD BE -- CURRENTLY IN GNETS

23   ARE APPROPRIATE FOR SEGREGATED SETTINGS.  FOR THE LARGE

24   REMAINDER, DR. MCCART FOUND THAT THOSE STUDENTS COULD MORE

25   APPROPRIATELY BE SERVED IN A MORE INTEGRATED EDUCATIONAL

1    SETTING.

2         BEYOND DR. MCCART'S REVIEW, THERE IS SIGNIFICANT

3    EVIDENCE THAT SUPPORTS THIS FINDING, INCLUDING STUDENT RECORDS,

4    PARENT STATEMENTS, AND RECORDS FROM IEP MEETINGS.  IN ONE

5    EXAMPLE, A STUDENT PSYCHIATRIST WROTE TO A GNETS DIRECTOR

6    NOTING THAT THE STUDENT, QUOTE, NEEDS TO BE MAINSTREAMED,

7    UNQUOTE.

8         IN ANOTHER EXAMPLE, A PARENT FILED A FORMAL COMPLAINT

9    WITH THE STATE'S DEPARTMENT OF EDUCATION TO CHALLENGE HER SON'S

10   PLACEMENT IN GNETS.  THE COMPLAINT RECOUNTED THAT HER SON WAS

11   LOSING A SIGNIFICANT AMOUNT OF INSTRUCTIONAL TIME AT THE GNETS

12   SITE, AS THE SITE THAT HE WAS PLACED AT WAS ONLY OPEN FOUR DAYS

13   A WEEK, THAT HER SON HAD BEEN PHYSICALLY RESTRAINED BY STAFF IN

14   THE GNETS PROGRAM, AND THAT HE WAS NOT ABLE TO PARTICIPATE IN

15   FIELD TRIPS OR GO TO THE LIBRARY OR TO LUNCH WITH NONDISABLED

16   PEERS.

17        AFTER FILING LITIGATION, THE PARENT FINALLY SUCCEEDED

18   IN GETTING HER SON OUT OF GNETS.  THE UNITED STATES IS PREPARED

19   TO SHOW AT TRIAL THAT HER SON IS NOW IN GENERAL EDUCATION

20   CLASSES FOR SCIENCE, SOCIAL STUDIES, AND SPECIALS, AND THAT HE

21   PARTICIPATES IN SCHOOL ACTIVITIES WITH HIS PEERS, SUCH AS

22   ATHLETICS AND THE 4-H CLUB.  THESE ARE TWO EXAMPLES.  BUT

23   THERE, OF COURSE, ARE OTHERS.

24        IN ADDITION, GNETS IS SERVING CHILDREN WHO ARE NOT

25   APPROPRIATE FOR THE PROGRAM AND WHO DO NOT RECEIVE THE SERVICES

1    THAT THEY NEED THERE.  FIRST, ALTHOUGH GNETS IS NOT INTENDED TO

2    SERVE CHILDREN WITH INTELLECTUAL DISABILITIES, MORE THAN TEN

3    PERCENT OF THE STUDENTS IN GNETS HAVE AN INTELLECTUAL

4    DISABILITY OR A RELATED CONDITION.  GEORGIA'S DIRECTOR OF

5    SPECIAL EDUCATION TESTIFIED THAT GNETS IS CATEGORICALLY

6    INAPPROPRIATE TO MEET THE NEEDS OF THESE STUDENTS, AS DID A

7    GNETS REGIONAL PROGRAM DIRECTOR.

8            SECOND, GNETS PROGRAMS OFTEN DO NOT PROVIDE THE

9    THERAPEUTIC SERVICES.  GEORGIA REQUIRED GNETS PROGRAMS TO

10   REVIEW THE FILES OF EVERY STUDENT IN THEIR PROGRAM TO ASSESS

11   THE SERVICES THAT STUDENTS WERE RECEIVING.  HOWEVER, MANY OF

12   THESE REVIEWS, WHICH WERE CONDUCTED BY THE GNETS REGIONAL

13   DIRECTORS THEMSELVES OF THEIR OWN PROGRAMS, DETERMINED THAT

14   STUDENTS WERE NOT RECEIVING ANY THERAPEUTIC SERVICES IN GNETS,

15   EVEN THOUGH THAT IS THE VERY PURPOSE OF THE PROGRAM.

16           DR. MCCART'S REVIEW CORROBORATED THIS, FINDING THAT

17   THERE IS A GROSS LACK OF THE MENTAL HEALTH AND THERAPEUTIC

18   EDUCATIONAL SERVICES AT GNETS THAT IT PURPORTS TO PROVIDE.

19   ACCORDINGLY, IT IS DIFFICULT TO SEE HOW GNETS COULD BE AN

20   APPROPRIATE PLACEMENT FOR ANY STUDENT.

21           THE STATE MAKES TWO ARGUMENTS AGAINST THE UNITED

22   STATES' FINDINGS, BOTH OF WHICH SHOULD BE REJECTED.

23           FIRST, THE STATE ARGUES THAT, QUOTE, A RESPONSIBLE

24   TREATING PHYSICIAN MUST MAKE THE DETERMINATION WHETHER STUDENTS

25   CAN APPROPRIATELY RECEIVE SERVICES IN COMMUNITY SCHOOLS.  THIS

1    IS A REHASH OF AN ARGUMENT THAT THE STATE PREVIOUSLY MADE ABOUT

2    STATE TREATING PROFESSIONALS AND THAT THIS COURT PREVIOUSLY

3    REJECTED.  PERPLEXINGLY, THE STATE CONTENDS THAT THIS COURT'S

4    PRIOR ORDER ABOUT WHETHER A RECOMMENDATION FROM A TREATING

5    PHYSICIAN IS REQUIRED, QUOTE, IS NOT CONTROLLING, GIVEN THE

6    DIFFERENT STANDARD OF REVIEW, UNQUOTE.

7         BUT THE STATE PROVIDES NO SUPPORT FOR ITS NOVEL

8    PROPOSITION THAT A LEGAL FINDING AT THE MOTION-TO-DISMISS STAGE

9    WOULD NOT APPLY LATER IN THE CASE.  THIS COURT HAS ALREADY

10   CORRECTLY FOUND THAT A STATE TREATING PROFESSIONAL'S OPINION IS

11   NOT REQUIRED, AND THE WEIGHT OF AUTHORITY MAKES CLEAR THAT A

12   TREATING PROFESSIONAL, WHETHER EMPLOYED BY THE STATE OR NOT, IS

13   NOT REQUIRED TO MAKE THE APPROPRIATENESS DETERMINATION.

14        AND IT IS NONSENSICAL IN THIS CONTEXT TO REQUIRE A

15   PHYSICIAN'S DETERMINATION WHEN STUDENTS' EDUCATIONAL PLACEMENTS

16   ARE DETERMINED BY IEP TEAMS BUT NOT BY PHYSICIANS.

17        YOUR HONOR, OPPOSING COUNSEL REFERENCED THE ELEVENTH

18   CIRCUIT'S EARLIER DECISION IN FLORIDA.  THAT REFERENCE IS

19   UNAVAILING.  THAT OPINION DID NOT ADDRESS WHETHER A

20   DETERMINATION BY A TREATING PHYSICIAN WAS REQUIRED.  THAT

21   ELEVENTH CIRCUIT EXAMINED WHETHER THE UNITED STATES HAD THE

22   AUTHORITY TO BRING A TITLE II CLAIM BUT DID NOT INQUIRE WHETHER

23   A TREATING PROFESSIONAL'S OPINION WAS REQUIRED AND SIMPLY CITED

24   LANGUAGE FROM OLMSTEAD.

25        GOING TO THE STATE'S SECOND ARGUMENT, THE STATE

42

1  ARGUES THAT THE UNITED STATES HAS NOT PROVIDED SUFFICIENTLY

2  INDIVIDUALIZED EVIDENCE ABOUT EACH STUDENT'S NEEDS TO SET OUT

3  OUR PRIMA FACIE CASE.  THAT IS NOT THE CASE.

4          OTHER COURTS CONSIDERING OLMSTEAD HAVE RELIED ON A

5  VARIETY OF SOURCES OF EVIDENCE TO DEMONSTRATE APPROPRIATENESS.

6  COURTS HAVE DETERMINED THAT PLAINTIFFS ESTABLISH

7  APPROPRIATENESS BASED ON EVIDENCE THAT THEY HAD PREVIOUSLY

8  RECEIVED SERVICES IN INTEGRATED SETTING OR THAT OTHER

9  INDIVIDUALS WITH SIMILAR DISABILITIES WERE CURRENTLY RECEIVING

10  SERVICES IN INTEGRATED SETTINGS.  FOR EXAMPLE, IN D-A-I VERSUS

11  PATTERSON, THE COURT CREDITED EVIDENCE SIMILAR TO THE EVIDENCE

12  THE UNITED STATES HAS PUT FORWARD, SUCH AS AN EXPERT REVIEW

13  VERY SIMILAR TO DR. MCCART'S, WHICH UTILIZED A MIX OF RECORD

14  REVIEWS, IN-PERSON OBSERVATIONS, AND VISITS.  THE COURT ALSO

15  CREDITED A STATE OFFICIAL, EVEN THOUGH SHE DID NOT DO A HOUSING

16  ASSESSMENT FOR SPECIFIC RESIDENTS OR REVIEW THEIR TREATMENT

17  RECORDS, AND ALSO CREDITED A WORK GROUP THAT DETERMINED THAT A

18  SIGNIFICANT NUMBER OF RESIDENTS COULD MOVE TO MORE INTEGRATED

19  SETTINGS, EVEN THOUGH THAT WORK GROUP DID NOT LOOK AT CLINICAL

20  DATA ABOUT THOSE INDIVIDUALS.  RATHER, THE WORK GROUP'S

21  PROPOSAL WAS BASED ON ITS FINDINGS, QUOTE, THAT THESE RESIDENTS

22  HAD SIMILAR CHARACTERISTICS TO INDIVIDUALS LIVING MORE

23  INDEPENDENTLY, UNQUOTE.

24          THESE ARE ALL ACCEPTABLE METHODS OF DEMONSTRATING

25  APPROPRIATENESS AND COMPORT WITH THE UNITED STATES' EVIDENCE.

1    AND, ADDITIONALLY, THE UNITED STATES HAS PRESENTED OTHER

2    EVIDENCE SHOWING THAT INDIVIDUAL STUDENTS COULD APPROPRIATELY

3    BE SERVED IN MORE INTEGRATED SETTINGS.  AND THIS EVIDENCE

4    INCLUDES DOCUMENTATION FROM TREATING PHYSICIANS, IEP'S, AND

5    EVIDENCE THAT STUDENTS SUCCEEDED IN COMMUNITY EDUCATIONAL

6    PLACEMENTS ONCE PARENTS SUCCESSFULLY DEMANDED THE STUDENTS

7    LEAVE THE GNETS PROGRAM.

8         YOUR HONOR, THIS CASE IS NO DIFFERENT THAN OTHER

9    OLMSTEAD CASES THAT HAVE FOUND THAT THE CASE WAS SUSCEPTIBLE TO

10   SYSTEMIC PROOF.  FOR EXAMPLE, IN KENNETH R. VERSUS HASSAN, THE

11   COURT FOUND THAT THE PLAINTIFFS MET -- IN CONSIDERING CLASS

12   CERTIFICATION, THE COURT FOUND THAT THE PLAINTIFFS MET THE

13   COMMONALITY REQUIREMENT, NOTING THAT THERE WAS SUBSTANTIAL

14   EVIDENCE THAT THE STATE'S POLICIES AND PRACTICES CREATED A

15   SYSTEMIC DEFICIENCY IN THE AVAILABILITY OF COMMUNITY-BASED

16   MENTAL HEALTH SERVICES -- AND I WOULD POINT OUT THAT THIS IS

17   ALSO A MENTAL HEALTH OLMSTEAD CASE -- AND THAT THE DEFICIENCY

18   IS THE SOURCE OF HARM ALLEGED BY ALL CLASS MEMBERS.

19        SIMILARLY, THE COURT SPECIFICALLY LOOKED --

20   CONSIDERED AN AT-RISK CLAIM IN THAT SAME ORDER AND NOTED THAT,

21   IN FACT, THE CASE LAW DEMONSTRATED THAT NO INDIVIDUALIZED

22   INQUIRIES NEED TO BE MADE TO DETERMINE WHETHER A SYSTEMIC

23   CONDITION PLACES CLASS MEMBERS AT SERIOUS RISK OF UNNECESSARY

24   INSTITUTIONALIZATION AND, INSTEAD, THE INQUIRY CAN PROPERLY

25   TURN ON SYSTEMWIDE PROOF.

1          THIS IS SIMILAR HERE.  THE THIRD CIRCUIT HAS FOUND

2    THE SAME IN FREDERICK L., WHERE IT NOTED THAT ONE-THIRD OF THE

3    PLAINTIFFS WERE QUALIFIED FOR COMMUNITY-BASED SERVICES, AND A

4    LARGER PORTION HAD EXPRESSED INTEREST IN BEING PLACED IN

5    COMMUNITY CARE.  BUT THERE WAS NOT AN ASSERTION THAT THERE

6    NEEDED TO BE A 100-PERCENT SHOWING.  AND THIS ACCORDS AS WELL

7    WITH HERE.

8          THE UNITED STATES HAS DEMONSTRATED A GENUINE ISSUE OF

9    MATERIAL FACT ON THE APPROPRIATENESS PRONG AND ITS CLAIM SHOULD

10   BE ALLOWED TO PROCEED.

11         NEXT, THE UNITED STATES HAS DEMONSTRATED THAT PARENTS

12   AND GUARDIANS ARE NOT OPPOSED TO THEIR CHILDREN LEAVING GNETS

13   AND MOVING TO MORE INTEGRATED EDUCATIONAL SETTINGS.  THE RECORD

14   EVIDENCE IS MORE THAN ADEQUATE TO DEMONSTRATE A GENUINE ISSUE

15   OF MATERIAL FACT EXISTS AS TO THIS ELEMENT OF OUR PRIMA FACIE

16   CASE AS WELL.  GEORGIA SUGGESTS THAT THE UNITED STATES IS

17   REQUIRED TO SHOW THAT STUDENTS' FAMILIES PREFER AN INTEGRATED

18   SETTING.  BUT THIS IS NOT THE STANDARD.  THE DEFAULT

19   ESTABLISHED BY THE AMERICANS WITH DISABILITIES ACT AND OLMSTEAD

20   IS THAT INDIVIDUALS SHOULD BE IN A MORE INTEGRATED SETTING

21   UNLESS THEY OPT AGAINST IT.

22         EVEN IF AN EXPRESS PREFERENCE WERE THE STANDARD, THE

23   UNITED STATES HAS PUT FORWARD EVIDENCE TO SHOW THAT NUMEROUS

24   PARENTS HAVE EXPLICITLY OBJECTED TO THEIR CHILDREN'S PLACEMENT

25   IN GNETS AND SEEK MORE INTEGRATED EDUCATIONAL PLACEMENT.  WE

1  HAVE EXAMPLES IN THE RECORD DOCUMENTING THIS.

2          MOREOVER, THE UNITED STATES HAS PUT FORWARD EVIDENCE

3  THAT PARENTS HAVE BEEN TOLD THAT THE ONLY OPTION FOR THEIR

4  CHILD IS A GNETS PROGRAM AND DENIED ANY ALTERNATIVES.  THE

5  STATE CANNOT REASONABLY CLAIM THAT PARENTS OPPOSE COMMUNITY

6  PLACEMENT WHEN THEY WERE NEVER PROVIDED INFORMATION OR

7  REALISTIC COMMUNITY ALTERNATIVES TO MAKE AN INFORMED CHOICE IN

8  THE FIRST PLACE.  OTHER COURTS HAVE FOUND THE SAME.

9          FINALLY, GEORGIA ASSERTS THAT THE UNITED STATES'

10 EVIDENCE IS TOO LIMITED.  BUT THIS IS INCORRECT.  THE UNITED

11 STATES DID NOT MOVE FOR SUMMARY JUDGMENT.  THE STATE DID.  THE

12 UNITED STATES HAS NOT PUT FORWARD ALL OF THE EVIDENCE THAT WE

13 INTEND TO MARSHAL FOR TRIAL.  WE SIMPLY PROVIDED A FEW

14 ILLUSTRATIVE EXAMPLES OF FAMILIES DEMONSTRATING THAT THEY DO

15 NOT OPPOSE, AND IN SOME INSTANCES, AFFIRMATIVELY REQUEST THAT

16 THEIR CHILD BE MOVED FROM GNETS TO A MORE INTEGRATED

17 EDUCATIONAL SETTING.

18          THE STATE, BY CONTRAST, HAS PUT FORWARD NO EVIDENCE

19 DEMONSTRATING THAT THERE ARE FAMILIES THAT, IN FACT, DO OPPOSE

20 COMMUNITY PLACEMENT.  THE UNITED STATES' SHOWING IS SUFFICIENT

21 TO DEFEAT THE STATE'S MOTION FOR SUMMARY JUDGMENT ON THIS

22 ELEMENT.

23          THE FINAL PRONG OF AN OLMSTEAD CLAIM IS WHETHER

24 COMMUNITY-BASED SERVICES CAN BE REASONABLY ACCOMMODATED, TAKING

25 INTO ACCOUNT THE RESOURCES AVAILABLE TO THE STATE AND THE NEEDS

1    OF OTHER PERSONS WITH DISABILITIES.  THE UNITED STATES HAS PUT

2    FORWARD EXTENSIVE EVIDENCE ABOUT THE MODIFICATIONS IT SEEKS AND

3    ESTABLISHING THAT THOSE PROPOSED MODIFICATIONS ARE REASONABLE.

4          THE STATE CONTESTS THE REASONABLENESS OF THESE FOUR

5    MODIFICATIONS.  HOWEVER, THE STATE ITSELF HAS ADOPTED OR

6    ENDORSED THE BULK OF THESE MEASURES ALREADY.  FIRST, GEORGIA

7    ALREADY PROVIDES THE CORE INTEGRATED THERAPEUTIC SERVICES AND

8    SUPPORTS THAT OUR EXPERT, DR. PUTNAM, RECOMMENDS TO EXPAND TO

9    PREVENT UNNECESSARY SEGREGATION IN GNETS.

10          DESPITE MR. BELINFANTE'S SUGGESTION, THE UNITED

11   STATES IS NOT ASKING FOR THE CREATION OF NEW SERVICES.  RATHER,

12   WE ARE REQUESTING THAT THE STATE PROVIDE EXISTING SERVICES IN

13   SUFFICIENT AMOUNTS SO THAT ALL STUDENTS WHO NEED THEM CAN GET

14   THEM BEFORE THEY GET SENT TO A SEGREGATED SETTING LIKE GNETS.

15          SECOND, WE PROPOSE THAT GEORGIA ABIDE BY ITS OWN

16   STANDARDS WHICH IT HAS PUT IN ITS CONTRACTS AND REQUIRES OF ITS

17   PROVIDERS.

18          THIRD, WE ARE ASKING FOR TRAINING FOR SCHOOL

19   PERSONNEL TO HELP THEM SUPPORT STUDENTS WITH BEHAVIORAL NEEDS

20   IN COMMUNITY SETTINGS.

21          AND, FINALLY, WE ARE ASKING THE STATE TO IMPLEMENT

22   THE ACTIONS IT HAS ALREADY COMMITTED TO TAKE IN A SYSTEM OF

23   CARE PLAN THAT IT HAS FAILED THUS FAR TO EXECUTE.  THESE ARE

24   OBJECTIVELY REASONABLE, AND IN LARGE PART, ARE THINGS THAT THE

25   STATE ALREADY PURPORTS TO BE DOING.

1          THE UNITED STATES' BURDEN IS NOT HIGH.  ONCE THE

2     PLAINTIFF ASSERTING AN OLMSTEAD CLAIM PUTS FORWARD, QUOTE, THE

3     EXISTENCE OF A PLAUSIBLE ACCOMMODATION, THE COST OF WHICH

4     FACIALLY DO NOT CLEARLY EXCEED ITS BENEFITS, SHE HAS MADE OUT A

5     PRIMA FACIE SHOWING, AND THE RISK OF NONPERSUASION FALLS ON THE

6     DEFENDANT.

7          THE UNITED STATES HAS SUGGESTED SEVERAL VIABLE

8     APPROACHES THAT GEORGIA COULD ADOPT.  THIS IS SUFFICIENT TO

9     ESTABLISH A GENUINE ISSUE OF MATERIAL FACT ON THIS POINT.

10         GEORGIA ALSO ARGUES THAT THE UNITED STATES HAS NOT

11    PUT FORWARD EVIDENCE ABOUT THE COST OR WORKFORCE IMPLICATIONS

12    OF ITS PROPOSED MODIFICATIONS.  GEORGIA IS ENTITLED TO PUT

13    FORWARD EVIDENCE THAT THE MODIFICATIONS WE PROPOSE WOULD

14    CONSTITUTE A FUNDAMENTAL ALTERATION, BUT THAT IS NOT A PART OF

15    THE PLAINTIFF'S PRIMA FACIE CASE.  NUMEROUS COURTS HAVE

16    AFFIRMED THIS PRINCIPLE.

17         YOUR HONOR, THIS ISSUE WILL ALSO COME UP IN THE

18    MOTION TO EXCLUDE THE AFFIDAVIT OF MR. MCKAY.  WE WOULD ARGUE

19    THAT THAT AFFIDAVIT WAS IMPROPER.  AND THE COURT WILL HEAR

20    SEPARATE ARGUMENT ABOUT THAT.  HOWEVER, THE ASSUMPTIONS IN THE

21    AFFIDAVIT ARE INCORRECT THAT CERTAIN SERVICES THE APEX PROGRAM

22    WOULD NEED TO BE EXPANDED TO ALL SCHOOLS, BUT THAT WAS NOT WHAT

23    WE PROPOSED.

24         ACCORDINGLY, THE PREMISE FOR THAT ESTIMATE IS FAULTY.

25    AND, IN FACT, OUR EXPERT FOUND THAT GEORGIA CAN TAP INTO

1    SUBSTANTIAL FEDERAL RESOURCES AVAILABLE THROUGH MEDICAID, WHICH

2    PROVIDES AN ADDITIONAL ALMOST TWO DOLLARS IN FEDERAL FUNDS FOR

3    EVERY ONE DOLLAR THAT THE STATE PROVIDES, AND THAT IT COULD

4    REDIRECT SUBSTANTIAL STATE FUNDS ALLOCATED FOR SEGREGATED

5    PLACEMENTS, SUCH AS THE $53 MILLION THAT THE STATE RECENTLY

6    COMMITTED TO GNETS.

7           THE AMERICANS WITH DISABILITIES ACT ESTABLISHES A

8    CAREFUL BALANCE TO AVOID DISCRIMINATION WHILE ALSO PROVIDING

9    STATES WITH THE FLEXIBILITY TO DETERMINE HOW TO MODIFY THEIR

10   SYSTEM TO CURE THE LEGAL VIOLATION.  THE UNITED STATES HAS

11   CAREFULLY RESPECTED THAT BALANCE HERE.  THE UNITED STATES IS

12   NOT DICTATING PARTICULAR MODIFICATIONS.  RATHER, WE HAVE PUT

13   FORWARD PROPOSED MODIFICATIONS THAT ARE REASONABLE, THAT

14   COMPORT WITH THE STATE'S OWN STANDARDS, AND THAT WOULD CURE THE

15   STATE'S LEGAL VIOLATION.  THIS IS SUFFICIENT TO MEET OUR

16   BURDEN.

17          ACCORDINGLY, THE COURT SHOULD REJECT THE STATE'S

18   MOTION FOR SUMMARY JUDGMENT.

19          THANK YOU, YOUR HONOR.

20          THE COURT:  ALL RIGHT.  REBUTTAL.

21          MR. BELINFANTE:  YOUR HONOR, TWO THINGS ARE MOST

22   IMPORTANT WHEN CONSIDERING THE UNITED STATES' ARGUMENT.  THEY

23   ARE MAKING A SYSTEMATIC CLAIM AND SEEKING SYSTEMATIC REMEDIES.

24   AND THEY ARE RELYING ON INCIDENTS THAT HAPPENED ONCE OR TWICE

25   IN A CASE WHERE OVER 782,000 DOCUMENTS HAVE BEEN PRODUCED.

1    THAT IS NOT THEIR MEETING THEIR BURDEN ON SUMMARY JUDGMENT TO

2    SHOW SYSTEMIC VIOLATIONS.

3          WHEN IT COMES TO LOOKING AT THE OLMSTEAD CLAIM, THEY

4    AGAIN RELY ON DR. MCCART'S CLAIM ABOUT THE VAST MAJORITY.  YET

5    THEY HAVE STILL NOT ANSWERED ANY ANALYSIS AS TO WHY OLMSTEAD

6    ITSELF FOCUSES ON AN INDIVIDUALIZED CLAIM.  THERE IS NO ANSWER.

7    AND THE ELEVENTH CIRCUIT MADE THAT CLEAR.

8          AND IT WASN'T JUST DICTA, BECAUSE IN THE FINAL

9    PARAGRAPH, THE JUDGE WROTE, THE SAME CONSIDERATIONS OF OLMSTEAD

10   APPLY TO THE MERITS OF THIS CASE.  AND THAT WAS IN DIRECT

11   RESPONSE TO FLORIDA'S ARGUMENT ON FEDERALISM.  AND JUSTICE

12   KENNEDY POINTS TO THE NEED TO LOOK AT TREATMENT PROFESSIONALS

13   AND INDIVIDUAL CARE TO RESOLVE FEDERALISM INTENTION.

14         AS IT RELATES TO PATTERSON THAT THEY RELY ON, ON OUR

15   BRIEF, WE POINT OUT HOW THAT CASE HAS BEEN REVERSED, NEVER BEEN

16   CITED BY AN APPELLATE COURT AND, IN THE DISTRICT COURT, IN

17   UNITED STATES/MISSISSIPPI, RELIED ON THE SAME ARGUMENT IN

18   PATTERN THE UNITED STATES ADVANCED HERE, AND THE FIFTH CIRCUIT

19   REVERSED THEM.  THE AT-RISK ANALYSIS STILL DOES NOT CONSIDER

20   THE ARGUMENTS IN MISSISSIPPI AND THE IMPORTANT INTERVENING CASE

21   OF KISOR.

22         ON THE NEED TO SHOW NON-OBJECTION, THE UNITED STATES

23   AGAIN MISSES THAT THAT IS AN ELEMENT OF THEIR CASE.  AND TO

24   SHOW SYSTEMIC VIOLATIONS, THEY NEED TO SHOW MORE THAN TWO OR

25   THREE PARENTS, ONE OF WHOM USED THE I.D.E.A. TO GET OUT OF

1    GNETS BECAUSE THAT WAS NOT APPROPRIATE.

2            FINALLY, ON REASONABLE ACCOMMODATION, THE COURT DID

3    NOT HEAR ANY ANALYSIS ON BIRCOLL.  AND THE ONLY PLEADING

4    EVIDENCE WE'VE SEEN OF IT IS A FOOTNOTE SAYING, BIRCOLL DOESN'T

5    REALLY MEAN THAT A CASE BY CASE IS NOT THERE.  BUT THAT'S WHAT

6    THE PRECEDENT SAYS.

7            I'LL CLOSE AGAIN WITH THE WORDS OF JUSTICE KENNEDY:

8    QUESTIONS ABOUT INSTITUTIONALIZED TREATMENT CANNOT BE DECIDED

9    IN THE ABSTRACT.  AND THAT'S EXACTLY WHAT THE UNITED STATES

10   SEEKS.  AND THAT'S EXACTLY WHY SUMMARY JUDGMENT SHOULD BE

11   GRANTED.

12           THE COURT:  THANK YOU.

13           MR. BELINFANTE:  THANK YOU.

14           THE COURT:  ALL RIGHT.  GIVE ME ONE QUICK BREAK TO

15   CONFER WITH MS. BECK ABOUT SOMETHING.

16           (WHEREUPON, THERE WAS A PAUSE IN THE PROCEEDINGS.)

17           THE COURT:  ALL RIGHT.  ARE WE READY TO PROCEED ON

18   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT?

19           MS. WATSON:  YES, YOUR HONOR.

20           THE COURT:  ALL RIGHT.  YOU MAY PROCEED.

21           MS. WATSON:  I'D LIKE TO RESERVE FOUR MINUTES FOR

22   REBUTTAL.

23           THE COURT:  YOU'LL HAVE TO WATCH FOR THAT YOURSELF.

24   BUT AS LONG AS YOU UNDERSTAND THAT, THAT'S FINE.

25           MS. WATSON:  YES, YOUR HONOR.

1              THE COURT:  OKAY.  OR SOMEONE FROM YOUR TEAM.

2              MS. WATSON:  OKAY.

3              MAY IT PLEASE THE COURT.

4              THE COURT:  YES, MA'AM.

5              MS. WATSON:  ANDREA HAMILTON WATSON FOR THE UNITED

6    STATES.

7              THE UNITED STATES MOVES FOR PARTIAL SUMMARY JUDGMENT

8    ON ONE DISCRETE ISSUE, WHETHER THE STATE OF GEORGIA ADMINISTERS

9    THE GNETS PROGRAM AS A MATTER OF LAW AND IS, THEREFORE, SUBJECT

10   TO THE INTEGRATION MANDATE OF TITLE II OF THE AMERICANS WITH

11   DISABILITIES ACT.

12             TO BE CLEAR, THIS IS NOT THE COURT'S FIRST TIME

13   CONSIDERING THIS ISSUE.  AT THE PLEADING STAGE, THIS COURT

14   CONCLUDED, NOT ONCE, BUT TWICE, THAT THE UNITED STATES

15   ADEQUATELY ALLEGED THAT THE STATE ADMINISTERS THE GNETS

16   PROGRAM.

17             HAVING REACHED THE CLOSE OF DISCOVERY, THE QUESTION

18   NOW IS WHETHER THE UNDISPUTED FACTUAL RECORD SUPPORTS THE

19   ALLEGATIONS THAT THIS COURT PREVIOUSLY FOUND SUFFICIENT TO

20   DEMONSTRATE THAT TRUE ADMINISTRATION OF THE GNETS PROGRAM RESTS

21   WITH THE STATE.  WE SUBMIT THAT IT DOES.

22             ALTHOUGH THE COURT HAS RECEIVED NUMEROUS PAGES OF

23   BRIEFING AND SUPPORTING EVIDENCE FROM THE PARTIES, WE BELIEVE

24   THAT INFORMATION CAN BE DISTILLED DOWN TO A FEW CORE TAKEAWAYS.

25             I WILL BEGIN BY WALKING THE COURT THROUGH KEY

1    UNDISPUTED FACTS THAT CONFIRM WHY THIS COURT CAN AND SHOULD

2    RULE THAT THE STATE ADMINISTERS THE GNETS PROGRAM AS A MATTER

3    OF LAW.  THEN I WILL ADDRESS THE STATE'S ARGUMENTS OPPOSING OUR

4    MOTION, INCLUDING THE STATE'S OBJECTIONS TO THE LEGAL STANDARD

5    THAT THIS COURT APPROPRIATELY APPLIED AT THE PLEADINGS STAGE

6    REGARDING STATE ADMINISTRATION.

7            TURNING TO OUR CORE ARGUMENT, THE UNITED STATES ASKS

8    THIS COURT TO DISPOSITIVELY RULE THAT THE STATE OF GEORGIA

9    ADMINISTERS THE GNETS PROGRAM AND IS SUBJECT TO TITLE II'S

10   INTEGRATION MANDATE.

11           TITLE II'S IMPLEMENTED REGULATION, 28 C.F.R. SECTION

12   35.130(D), REQUIRES PUBLIC ENTITIES TO, QUOTE, ADMINISTER

13   SERVICES, PROGRAMS, AND ACTIVITIES IN THE MOST INTEGRATED

14   SETTING APPROPRIATE TO THE NEEDS OF QUALIFIED INDIVIDUALS WITH

15   DISABILITIES, END QUOTE.  THIS COURT PREVIOUSLY OUTLINED AND

16   APPLIED THE STANDARD FOR ESTABLISHING THE STATE'S

17   ADMINISTRATION OF THE GNETS PROGRAM AT THE PLEADINGS STAGE, IN

18   BOTH ITS RULING ON THE STATE'S MOTION TO DISMISS AND THE

19   STATE'S MOTION FOR JUDGMENT ON THE PLEADINGS.  THIS COURT

20   CONCLUDED THAT THE UNITED STATES HAD ARTICULATED SPECIFIC FACTS

21   THAT EXPLAIN THE WAYS IN WHICH THE GEORGIA DEPARTMENT OF

22   EDUCATION CONTROLS AND ADMINISTERS THE GNETS PROGRAM WITHIN THE

23   MEANING OF TITLE II.

24           THIS COURT ALSO CONCLUDED THAT, AMONG OTHER THINGS,

25   THE UNITED STATES HAD ALLEGED FOUR KEY ACTIONS UNDERTAKEN BY

53

1    THE STATE THAT WERE SUFFICIENT TO DEFEAT THE STATE'S MOTIONS.

2         FIRST, THAT THE STATE PROMULGATES REGULATIONS TO

3    CARRY OUT THE GNETS PROGRAM.

4         SECOND, THAT THE STATE ESTABLISHES CRITERIA FOR THE

5    IMPLEMENTATION OF THE PROGRAM.

6         THIRD, THAT THE STATE OVERSEES THE OPERATIONS AND

7    IMPLEMENTATION OF THE PROGRAM THROUGHOUT THE STATE.

8         AND, FINALLY, THAT THE STATE DISBURSES FEDERAL AND

9    STATE FUNDING TO SUPPORT THE GNETS PROGRAM.

10        USING THESE FOUR CATEGORIES FOR ILLUSTRATIVE PURPOSES

11   TODAY, I'D LIKE TO WALK THE COURT THROUGH EACH ONE FRAMED AS A

12   QUESTION TO DEMONSTRATE THAT NOW THAT DISCOVERY HAS ENDED, THE

13   UNDISPUTED FACTS CONFIRM THE STATE'S ADMINISTRATION OF THE

14   GNETS PROGRAM.

15        SO TURNING TO THAT FIRST QUESTION, DO THE UNDISPUTED

16   FACTS SHOW THAT THE STATE PROMULGATES REGULATIONS TO CARRY OUT

17   THE GNETS PROGRAM.  THE ANSWER TO THAT QUESTION IS YES.

18        IT IS UNDISPUTED THAT THE STATE OF GEORGIA CRAFTED

19   AND ISSUED THE GNETS RULE, SECTION 160-4-7-.15 OF THE GEORGIA

20   COMPILED RULES AND REGULATIONS.  A COPY OF THE GNETS RULE HAS

21   BEEN PULLED UP ON THE SCREEN FOR THE COURT'S CONVENIENCE.  AND

22   WE ALSO HAVE PAPER COPIES IF YOUR HONOR WOULD LIKE THAT.  THIS

23   IS EXHIBIT SEVEN FROM THE UNITED STATES' MOTION FOR PARTIAL

24   SUMMARY JUDGMENT.

25        THE GNETS RULE IS A STATE REGULATION THAT HAS BEEN IN

54

1  EFFECT FOR SEVERAL YEARS.  AND IT WAS MOST RECENTLY REVISED IN

2  2017.  THE RULE IS BINDING ON EACH OF THE 24 REGIONAL GNETS

3  PROGRAMS.  AND IT SETS FORTH REQUIREMENTS PERTAINING TO NEARLY

4  EVERY AREA OF THE GNETS PROGRAM OPERATIONS.

5          I'M GOING TO BRIEFLY HIGHLIGHT A FEW PROVISIONS FROM

6  THE GNETS RULE TO SHOW JUST HOW INVOLVED THE STATE IS IN

7  CRAFTING REGULATIONS THAT SHAPE THE OPERATIONS OF THE GNETS

8  PROGRAM.

9          AMONG OTHER THINGS, THE STATE, THROUGH THE GNETS

10  RULE, ESTABLISHES THE PURPOSE OF THE GNETS PROGRAM.  AND WE'RE

11  GOING TO TRANSITION TO SECTION TWO OF THE GNETS RULE HERE,

12  WHICH THE COURT CAN SEE.  IN FACT, THE SECTION HERE IS TITLED,

13  GNETS PURPOSE AND SERVICES.

14          AS WE CONTINUE TO WALK THROUGH SECTION TWO OF THE

15  GNETS RULE, THE COURT CAN ALSO SEE THAT THE STATE, THROUGH THE

16  GNETS RULE, SETS ELIGIBILITY REQUIREMENTS.  SPECIFICALLY THE

17  STATE SETS AGE REQUIREMENTS.  AND AS THE COURT CAN SEE HERE,

18  THE PROGRAM IS FOR STUDENTS WITH DISABILITIES, AGES 5 THROUGH

19  21.

20          THE STATE ALSO SETS REQUIREMENTS REGARDING THE

21  NECESSARY DISABILITY DIAGNOSES AND OTHER ELIGIBILITY

22  REQUIREMENTS FOR STUDENTS TO PARTICIPATE IN THE PROGRAM,

23  HIGHLIGHTED HERE AT THE END OF SECTION TWO -- PROVISION 2(A).

24          MOVING ON TO SECTION 2(C) OF THE GNETS RULE, THE

25  STATE, THROUGH THE GNETS RULE, SETS EXPECTATIONS REGARDING

55

1   SERVICE DELIVERY.  FOR EXAMPLE, IN THE RULE NOTED HERE, AMONG

2   OTHER THINGS, THE STATE REQUIRES THAT GNETS SERVICES SHOULD BE,

3   QUOTE, IMPLEMENTED WITH GREATER INTENSITY AND FREQUENCY THAN

4   WHAT IS TYPICALLY DELIVERED IN A GENERAL EDUCATION SCHOOL

5   ENVIRONMENT, END QUOTE.

6           AND, FINALLY, MOVING ON TO SECTION FIVE -- AND,

7   AGAIN, THESE ARE JUST A FEW EXAMPLES -- THE STATE, THROUGH THE

8   GNETS RULE, DEFINES THE DUTIES AND RESPONSIBILITIES OF SEVERAL

9   ENTITIES IN RELATION TO GNETS.  THOSE ENTITIES INCLUDE ITSELF,

10  PHYSICAL EDUCATION AGENCIES OR SCHOOL DISTRICTS, THE REGIONAL

11  GNETS PROGRAMS, AND FISCAL AGENTS.

12          SECTION 5(A) HERE FOCUSES SPECIFICALLY ON SOME OF THE

13  STATE'S FUNDING AND MONITORING-RELATED RESPONSIBILITIES.

14          NOTABLY, THE STATE IS REQUIRED IN 5(A)(1) TO RECEIVE

15  AND DISBURSE FUNDS TO SUPPORT THE GNETS SERVICES.  IN 5(A)(2),

16  THE STATE IS REQUIRED TO ADMINISTER GRANT FUNDS.  THIS INCLUDES

17  DEVELOPING RULES AND PROCEDURES RELATED TO THE FUNDING PROCESS

18  IN THE GNETS PROGRAM.

19          THEN MOVING ON, NOTIFYING -- SO DEVELOPING RULES AND

20  PROCEDURES, NOTIFYING FISCAL AGENTS ABOUT THE FUNDING THAT'S

21  BEEN ALLOTTED TO THE VARIOUS PROGRAMS.  APPROVING PROGRAM

22  BUDGETS FOR THE VARIOUS REGIONAL GNETS PROGRAMS.

23          AND THEN, HONESTLY, I WANT TO PAUSE FOR A BRIEF

24  MOMENT, YOUR HONOR, TO NOTE WITH RESPECT TO FUNDING, FIRST WITH

25  REGARD TO PROGRAM BUDGETS, THAT IN THE STATE'S BRIEFING, THEY

56

1    INSIST THAT THE STATE IS NOT INVOLVED WITH DETERMINING HOW

2    PROGRAMS SPEND THEIR FUNDING.  BUT AS THE COURT CAN SEE HERE,

3    THE STATE IS DIRECTLY INVOLVED IN APPROVING WHAT MAKES IT INTO

4    EACH REGIONAL PROGRAM'S BUDGET.  SO THE STATE DOES HAVE A ROLE

5    IN THAT CAPACITY.

6         I'D ALSO LIKE TO NOTE, YOUR HONOR, THAT GIVEN THE

7    STATE'S ROLE OF FUNDING, I DO WANT TO HIGHLIGHT THAT THE

8    STATE'S FUNDING FORMULA FOR GNETS ONLY ALLOTS FUNDING FOR

9    STUDENTS RECEIVING SERVICES IN SEGREGATED SETTINGS.  THEREFORE,

10   NOTWITHSTANDING THE RANGE OF ENVIRONMENTS THAT YOU WILL HEAR

11   THE STATE LISTING THAT STUDENTS CAN BE PLACED IN THROUGH GNETS,

12   THE MANNER IN WHICH THE STATE ADMINISTERS FUNDING DEPRIVES THE

13   PROGRAMS OF THE RESOURCES NEEDED TO ACTUALLY OFFER THOSE

14   SERVICES IN FULLY INTEGRATED ENVIRONMENTS.

15        AND THEN FINALLY HERE I'D LIKE TO NOTE THAT THE GNETS

16   RULE GIVES THE STATE MONITORING RESPONSIBILITIES IN CONNECTION

17   WITH ITS ADMINISTRATION OF FUNDING REQUIRING THE STATE TO,

18   QUOTE, MONITOR GNETS TO ENSURE COMPLIANCE WITH FEDERAL AND

19   STATE POLICIES, PROCEDURES, RULES, AND THE DELIVERY OF

20   APPROPRIATE INSTRUCTIONAL AND THERAPEUTIC SERVICES.

21        SO FOR ALL OF THESE REASONS, YOUR HONOR, THE

22   UNDISPUTED FACTS SHOW THAT THE STATE'S REGULATORY POWER,

23   PARTICULARLY ITS AUTHORITY TO CRAFT AND ISSUE THE GNETS RULE,

24   IS EVIDENCE OF ITS ADMINISTRATION OF THE GNETS PROGRAM.

25        MOVING ON TO THE SECOND QUESTION, DO THE UNDISPUTED

1    FACTS SHOW THAT THE STATE ESTABLISHES CRITERIA FOR STANDARDS

2    REGARDING THE IMPLEMENTATION OF THE GNETS PROGRAM.  AGAIN, THE

3    ANSWER IS YES.

4          WITH REGARD TO CRITERIA SPECIFICALLY, IN THIS COURT'S

5    ORDER DENYING THE STATE'S RENEWED MOTION TO DISMISS, THE COURT

6    OBSERVED THAT STATE LAW REQUIRES THE STATE TO ADOPT BOTH

7    CLASSIFICATION CRITERIA FOR EACH AREA OF SPECIAL EDUCATION TO

8    BE SERVED ON A STATEWIDE BASIS, AS WELL AS CRITERIA USED TO

9    DETERMINE ELIGIBILITY OF STUDENTS FOR STATE-FUNDED SPECIAL

10   EDUCATION PROGRAMS.

11         FURTHER, AS WE DISCUSSED JUST A FEW MINUTES AGO, THE

12   STATE, THROUGH THE GNETS RULE, SETS ELIGIBILITY CRITERIA FOR

13   PARTICIPATION IN THE PROGRAM.

14         THE REGIONAL GNETS PROGRAMS ALSO ENSURE THAT THEY

15   THEMSELVES ARE ABIDING BY THESE ELIGIBILITY CRITERIA BY

16   UTILIZING A SET OF FORMS KNOWN AS A CONSIDERATION OF SERVICES

17   FORMS.  THESE FORMS, WHICH INCLUDE CHECKLISTS, FLOWCHARTS,

18   AMONG OTHER THINGS, ARE SIGNED OFF ON BY THE STATE.  AND THEY

19   ARE ALIGNED TO THE STATE GNETS RULE.  THESE DOCUMENTS GUIDE

20   REGIONAL GNETS PROGRAMS THROUGH A SERIES OF STEPS IN ENSURING

21   THAT THEY ARE ONLY CONSIDERING PLACING STUDENTS IN THE PROGRAM

22   WHO MEET THE STATE'S ELIGIBILITY CRITERIA.

23         FURTHER, THE GNETS STRATEGIC PLAN, SELF-ASSESSMENT

24   AND REVIEW PROCESS, IS ANOTHER VEHICLE THAT THE STATE HAS

25   ESTABLISHED AND IMPLEMENTED REGARDING OPERATING STANDARDS AND

58

1   CRITERIA FOR THE GNETS PROGRAM.  THE STRATEGIC PLAN PROCESS IS

2   A MANDATORY FRAMEWORK THAT HAS BEEN CREATED AND UTILIZED BY THE

3   STATE FOR MANY YEARS THAT GOVERNS NEARLY EVERY ASPECT OF GNETS

4   PROGRAM OPERATIONS.  ALTHOUGH THE PARTICULARS OF THE STRATEGIC

5   PLAN PROCESS HAVE EVOLVED OVER TIME, THE GENERAL FRAMEWORK

6   REMAINS THE SAME.

7           THE STRATEGIC PLAN -- EXCUSE ME, THE STRATEGIC PLAN

8   AND ITS EMBEDDED SELF-ASSESSMENT CONTAIN FOCUS AREAS SUCH AS

9   INSTRUCTIONAL AND ACADEMIC SUPPORT OR PROGRAM FUNDING AND

10  FISCAL MANAGEMENT.  THAT PRESCRIBES SPECIFIC STANDARDS AND

11  ACTION ITEMS THAT THE REGIONAL GNETS PROGRAMS SHOULD IMPLEMENT.

12          THE REGIONAL PROGRAMS ARE REQUIRED TO USE THESE

13  STANDARDS TO ASSESS THEIR OWN COMPLIANCE WITH THE GNETS RULE.

14  AND THEY DO SO BY COMPLETING THE SELF-ASSESSMENT TWICE A YEAR.

15          AND AS WE'LL DISCUSS WHEN WE GET TO THE NEXT

16  QUESTION, THE STATE ALSO USES THESE STANDARDS TO ASSESS THE

17  REGIONAL GNETS PROGRAM'S COMPLIANCE WITH THE RULE.

18          ALL OF THESE FACTS TAKEN TOGETHER DEMONSTRATE THAT

19  THE STATE DEVELOPS AND DIRECTS THE OPERATING STANDARDS TO WHICH

20  THE REGIONAL GNETS PROGRAMS ARE THEN HELD ACCOUNTABLE.

21          MOVING ON TO THE THIRD QUESTION, DO THE UNDISPUTED

22  FACTS SHOW THAT THE STATE OVERSEES OPERATIONS AND

23  IMPLEMENTATION OF THE GNETS PROGRAM.  AGAIN, THE ANSWER IS YES.

24          THE GNETS RULE AUTHORIZES THE STATE TO ENGAGE IN

25  MONITORING OF THE GNETS PROGRAM AS WE SAW MOMENTS AGO.  AND IN

59

1    PRACTICE, THAT TAKES A NUMBER OF DIFFERENT FORMS.

2              AS I JUST NOTED, THE STATE USES THE STRATEGIC PLAN

3    PROCESS TO NOT ONLY SET THE OPERATING STANDARDS FOR THE GNETS

4    PROGRAM, IT ALSO ASSESSES THE REGIONAL PROGRAM'S COMPLIANCE

5    WITH THOSE STANDARDS.  THE STATE SPEARHEADS THAT REVIEW

6    PROCESS, WHICH HAS HISTORICALLY INVOLVED STEPS SUCH AS SITE

7    VISITS, FACILITY TOURS, MEETINGS WITH GNETS STAFF TO ASK

8    QUESTIONS, REVIEW EVIDENCE, THEIR COMPLIANCE, AND TO SHARE

9    FINAL RATINGS AND FEEDBACK.

10             THE STATE ALSO IMPOSES BROAD DATA REPORTING

11   OBLIGATIONS ON THE REGIONAL PROGRAMS.  AND IT HAS REQUIRED

12   REGIONAL GNETS PROGRAMS TO CONDUCT IEP FILE REVIEWS FOR

13   STUDENTS IN GNETS.  THE TOPICS THAT THE PROGRAMS HAVE BEEN

14   REQUIRED TO REPORT DATA ON ARE VARIED, AND THEY ALL PERTAIN TO

15   OPERATIONS, INCLUDING STUDENT PLACEMENT, STAFFING, AVAILABLE

16   SERVICES AND SUPPORTS, AND CONSTRUCTION, AMONG OTHER THINGS.

17   THAT INFORMATION IS NOT JUST COLLECTED BY THE STATE, IT IS THEN

18   USED TO INFORM DECISIONS RELATED TO BUDGET ALLOTMENTS, PROGRAM

19   NEEDS, AND PROGRAM ALIGNMENT WITH THE GNETS RULE.

20             FINALLY, THE STATE IS INVOLVED IN MANY OF THE

21   DAY-TO-DAY AFFAIRS OF THE REGIONAL GNETS PROGRAM AND THE

22   PROGRAM AT LARGE.  FOR EXAMPLE, THE STATE EMPLOYS A FULL-TIME

23   GNETS PROGRAM MANAGER AND PROGRAM SPECIALISTS WHO PROVIDE

24   OVERSIGHT.  THESE INDIVIDUALS FACILITATE PERIODIC STATEWIDE

25   GNETS DIRECTOR MEETINGS, AND THEY PROVIDE RESOURCES TO THE

1    GNETS DIRECTORS.

2          THEY ALSO ARE IN PERIODIC COMMUNICATION WITH THE

3    REGIONAL GNETS DIRECTORS.  IN THE UNITED STATES' BRIEFS, WE

4    PROVIDED THE COURT WITH JUST A SAMPLING OF APPROXIMATELY 30

5    DIFFERENT COMMUNICATIONS.  I SAY ABOUT 30 DIFFERENT

6    COMMUNICATIONS AND EXPERTS OF DEPOSITION TESTIMONY FROM GNETS

7    DIRECTORS TO ILLUSTRATE WAYS THAT THEY HAVE REACHED OUT TO

8    STATE GNETS PERSONNEL FOR DIRECTION AND GUIDANCE ON TOPICS

9    RANGING FROM STUDENT ELIGIBILITY TO SERVICE DELIVERY.

10          ALTHOUGH THE STATE ATTEMPTED TO DOWNPLAY THE

11    SIGNIFICANCE OF THESE COMMUNICATIONS AND, IN FACT, IN THEIR

12    BRIEFING ONLY ACKNOWLEDGED FOUR OF THEM, THE STATE ULTIMATELY

13    MISSED THE LARGER POINT.  REGARDLESS OF HOW THESE

14    COMMUNICATIONS WERE RESOLVED, THERE IS A CLEAR PATTERN OF GNETS

15    DIRECTORS TURNING TO STATE GNETS PERSONNEL FOR DIRECTION ON

16    MATTERS RELATED TO GNETS PROGRAM OPERATIONS.

17          THIS INFORMATION, TAKEN TOGETHER WITH ALL OF THE

18    OTHER UNDISPUTED FACTS REGARDING THE STATE'S OVERSIGHT ROLE,

19    FURTHER SUPPORT THE CONCLUSION THAT THE STATE ADMINISTERS THE

20    GNETS PROGRAM.

21          FOURTH, AND FINALLY, DO THE UNDISPUTED FACTS SHOW

22    THAT THE STATE PROVIDES FUNDING TO THE GNETS PROGRAM.  THE

23    ANSWER TO THAT QUESTION IS YES.

24          THE FUNDING THAT THE STATE ALLOTS FOR THE GNETS

25    PROGRAM IS NO SMALL SUM.  SINCE 2015, THE STATE HAS ALLOTTED

1    MORE THAN $60 MILLION EACH YEAR TO THE GNETS PROGRAM, THE VAST

2    MAJORITY OF THAT FUNDING BEING ACTUAL STATE FUNDS.  THAT SUM

3    ALSO INCLUDES SEVERAL MILLIONS OF DOLLARS OF DISCRETIONARY

4    FEDERAL FUNDS EACH YEAR THAT THE STATE CHOOSES TO DESIGNATE FOR

5    THE GNETS PROGRAM.

6         THE STATE ALSO PROVIDES FUNDING SEPARATE FROM THE

7    GNETS GRANT, WHICH IS CAPTURED BY THE FUNDING I JUST MENTIONED,

8    FOR OTHER GNETS SERVICES, INCLUDING FUNDING FOR THERAPEUTIC

9    SERVICES AND STAFF AND FUNDING FOR OTHER SUPPORTS AND SERVICES,

10   LIKE BEHAVIORAL AND ACADEMIC ASSESSMENTS.

11        THE UNDISPUTED FACTS FURTHER REVEAL THAT THE STATE'S

12   ROLE IS NOT LIMITED TO DISBURSING GNETS FUNDING.  AMONG OTHER

13   THINGS, THE STATE ESTABLISHES AND MANAGES THE PROCESS FOR

14   ALLOTTING AND DISBURSING FUNDS TO THE REGIONAL PROGRAMS AND TO

15   THE GNETS PROGRAM AT LARGE.  AMONG OTHER THINGS, THE STATE

16   CREATES THE GNETS FUNDING FORMULA.  THE STATE IS CREATING AND

17   REVIEWING THE GRANT APPLICATIONS THAT ARE BEING USED TO MAKE

18   DECISIONS ABOUT WHO'S RECEIVING WHAT FUNDING.  THE STATE

19   REQUIRES THE PROGRAMS TO SIGN ASSURANCES.  AND THESE ASSURANCES

20   CONTAIN CONDITIONS ABOUT HOW THE INDIVIDUAL PROGRAMS MUST

21   OPERATE IN EXCHANGE FOR RECEIVING FUNDING.

22        THE -- THE STATE ALSO APPROVES THE REGIONAL PROGRAM'S

23   BUDGETS, AS WE DISCUSSED EARLIER.  AND, FURTHER, THROUGH THE

24   FUNDING PROCESS, THE STATE EFFECTIVELY INCENTIVIZES CERTAIN

25   PLACEMENT DECISIONS BASED ON HOW FUNDING IS OFTEN ALLOTTED.

1           FOR EXAMPLE, AS I MENTIONED EARLIER, THE FUNDING

2    FORMULA ADOPTED BY THE STATE FOR GNETS ONLY CONSIDERS AS A

3    FACTOR WHETHER STUDENTS ARE BEING SERVED IN SEGREGATED GNETS

4    SETTINGS.  CERTAIN SERVICES THAT ARE PROVIDED IN GENERAL

5    EDUCATION SETTINGS, SUCH AS CONSULTATIVE SERVICES, ARE NOT

6    INCLUDED AS PART OF -- ARE NOT INCLUDED IN THE FUNDING FORMULA.

7    THUS, IF EVEN IN THEORY, PROGRAMS CAN CHOOSE FROM A CONTINUUM

8    OF SERVICE LOCATIONS LISTED IN THE GNETS RULE, IN PRACTICE THE

9    FUNDING MECHANISM FOR GNETS DOESN'T SUPPORT THAT OUTCOME.

10          BY FAILING TO ADMINISTER ADEQUATE FUNDING FOR GNETS

11   SERVICES IN THE GENERAL EDUCATION ENVIRONMENT, PROGRAMS ARE

12   BEING DEPRIVED OF THE ABILITY TO REDIRECT THEIR RESOURCES IN

13   STAFFING TO BEING ABLE TO SERVE THESE STUDENTS IN INTEGRATED

14   SETTINGS.

15          THESE AND OTHER UNDISPUTED FACTS THAT ARE FULLY SET

16   FORTH IN THE UNITED STATES' BRIEFS AND ACCOMPANYING EXHIBITS

17   ARE SUFFICIENT TO ESTABLISH THAT THE STATE ADMINISTERS THE

18   GNETS PROGRAM AS A MATTER OF LAW.

19          I ALSO WANT TO JUST TAKE A FEW MINUTES TO ADDRESS

20   SOME OF THE STATE'S OBJECTIONS TO THE UNITED STATES' MOTION.

21   THESE ARGUMENTS LACK MERIT.

22          FIRST, THE STATE CLAIMS THAT THE PROPER INQUIRY FOR

23   DETERMINING WHETHER TITLE II'S INTEGRATION MANDATE APPLIES IS

24   NOT WHETHER A PUBLIC ENTITY ADMINISTERS THE SERVICES AND

25   PROGRAMS AND ACTIVITIES AT ISSUE HERE BUT, RATHER, THAT THESE

63

1    SERVICES, PROGRAMS, AND ACTIVITIES ARE, QUOTE, PROVIDED BY, END

2    QUOTE, THE PUBLIC ENTITY.

3         AS A PRELIMINARY MATTER, YOUR HONOR, THE STATE'S

4    POSITION IS A RADICAL REVERSAL FROM THE POSITION THAT IT ASKS

5    THIS COURT TO TAKE AT THE PLEADINGS STAGE.  IN ITS MOTION TO

6    DISMISS, INITIALLY, THE STATE CONCEDED THAT THE LANGUAGE SET

7    FORTH IN 28 C.F.R. SECTION 35.130, WHICH USES A TERM

8    ADMINISTER, WAS THE APPROPRIATE STANDARD.  IT ALSO ARGUED THAT

9    THE TERM ADMINISTER SHOULD BE CONSTRUED IN ACCORDANCE WITH ITS

10   PLAIN MEANING.  AND IT USED THE DEFINITION OF, QUOTE, MANAGE

11   AND BE RESPONSIBLE FOR THE RUNNING OF, END QUOTE, IN QUOTE,

12   PRACTICAL MANAGEMENT AND DIRECTION, END QUOTE.

13        FOR AN ISSUE THAT WAS SO CENTRAL TO THE STATE'S

14   ARGUMENTS AT THE PLEADINGS STAGE, ONE CAN'T HELP BUT QUESTION

15   WHY THE STATE WOULD NOW CHANGE ITS POSITION.  WE BELIEVE IT IS

16   BECAUSE THE STATE IS NOW CONFRONTED WITH THE FACTUAL RECORD AT

17   THE CLOSE OF DISCOVERY THAT SUPPORTS THE UNITED STATES AND EVEN

18   THE COURT'S PRIOR CONCLUSIONS THAT THE STATE ADMINISTERS GNETS.

19        SETTING THAT ASIDE, WE TAKE THE POSITION THAT THE

20   STANDARD THE STATE NOW OFFERS IS INCORRECT UNDER ANY

21   INTERPRETATION.  FIRST, THE STATE OFFERS NO AUTHORITY FOR THIS

22   NEW INTERPRETATION OF THE ADA AND ITS IMPLEMENTING REGULATION.

23   INSTEAD, THE STATE RELIES ON GENERAL CASE LAW THAT MERELY

24   ESTABLISHES THE GENERAL PRINCIPLE THAT REGULATIONS, IN ORDER TO

25   BE VALID, MUST BE CONSISTENT WITH THE STATUTE UNDER WHICH THEY

1    ARE PROMULGATED, TO WHICH WE DO NOT -- WE DON'T DISAGREE.

2            THE STATE FURTHER ARGUES THAT, TO THE EXTENT THE ADA

3    OR TITLE II REGULATION DOESN'T DEFINE THE TERM ADMINISTER, THE

4    COURT MUST APPLY THE GENERAL RULES OF STATUTORY CONSTRUCTION

5    AND LOOK AT THE PLAIN MEANING OF THE TERM.  THE STATE'S CHOSEN

6    REFERENCE POINT FOR THE PLAIN MEANING OF ADMINISTER NOW COMES

7    FROM THE MERRIAM-WEBSTER DICTIONARY, MOVING AWAY FROM THE

8    SOURCES IT HAD PREVIOUSLY RELIED ON.

9            THE MERRIAM-WEBSTER DICTIONARY FIRST DEFINES

10   ADMINISTER TO MEAN MANAGE OR SUPERVISE THE EXECUTION, USE, OR

11   CONDUCT OF, WHICH IS VERY CONSISTENT WITH THE DEFINITION THAT

12   THE UNITED STATES AND THE COURT HAD PREVIOUSLY USED IN PRIOR

13   INTERPRETATIONS.  HOWEVER, THE STATE CHOOSES TO NOW IGNORE THIS

14   FIRST DEFINITION AND IT INSTEAD RELIES ON A SECONDARY

15   DEFINITION THAT IT HAS FOUND OF, TO PROVIDE OR APPLY.  AND THEN

16   IT ARGUES THAT ADA LIABILITY ONLY ATTACHES TO THE ENTITY THAT'S

17   DIRECTLY ENGAGED IN DISCRIMINATORY CONDUCT.

18           THE STATE MISUNDERSTANDS THE TRUE REACH OF THE ADA IN

19   MAKING THIS ARGUMENT, YOUR HONOR.  THE TITLE II REGULATION

20   EXPRESSLY REACHES CONDUCT THAT'S RELATED TO SERVICES, PROGRAMS,

21   AND ACTIVITIES, EVEN THAT HAVE BEEN OUTSOURCED BY THE STATE TO

22   THIRD PARTIES.  AND THE REGULATIONS EVEN SAY AS MUCH USING

23   LANGUAGE SUCH AS, THROUGH CONTRACTUAL OR OTHER MEANS.

24           FURTHER, IN OUR BRIEF, WE CITE TO NUMEROUS COURTS

25   THAT HAVE FOUND THAT THE STATE CAN BE HELD LIABLE UNDER TITLE

1   II EVEN WHEN IT HAS CONTRACTED OUT THE PROVISION OF THE

2   CHALLENGED SERVICES THAT ARE AT ISSUE.  THEREFORE, EVEN IF THE

3   COURT WAS TO APPLY THE STANDARD, WHICH WE BELIEVE IS NOT THE

4   APPROPRIATE STANDARD, WE BELIEVE THIS COURT COULD STILL

5   CONCLUDE THAT THE STATE PROVIDES GNETS SERVICES BOTH DIRECTLY

6   AND INDIRECTLY.

7          FINALLY, YOUR HONOR, I WOULD LIKE TO NOTE THAT IN --

8   NOTWITHSTANDING THE STATE'S ARGUMENTS, IN A NUMBER OF THEIR

9   BRIEFS, INCLUDING IN THEIR BRIEF ON THIS MOTION, NOTING THAT

10  THE UNITED STATES HAD WAIVED ARGUMENTS, WE WOULD LIKE TO JUST

11  AFFIRMATIVELY NOTE THAT WE'VE ADDRESSED ALL OF THE STATE'S

12  ARGUMENTS IN SOME FORM.  WE HAVE ADDRESSED THE ARGUMENTS IN OUR

13  BRIEFS, ON OUR MOTION FOR PARTIAL SUMMARY JUDGMENT.  WE'VE

14  ADDRESSED THEM IN THE STATE'S SUMMARY JUDGMENT MOTION.  AND, IN

15  FACT, BECAUSE SO MANY OF THE STATE'S ARGUMENTS THAT THEY

16  RECYCLED FROM PAST MOTIONS, WE WOULD ALSO NOTE, YOUR HONOR,

17  THAT THE UNITED STATES HAS ADDRESSED MANY OF THESE ARGUMENTS

18  REPEATEDLY IN BRIEFING ON THE STATE'S PRIOR MOTION TO DISMISS

19  AND MOTION FOR JUDGMENT ON THE PLEADING.

20         ONE POINT, HOWEVER, THAT WE WILL REITERATE IN THE

21  TIME THAT REMAINS ADDRESSES AN ISSUE THAT THE STATE

22  MISCHARACTERIZES REPEATEDLY IN ITS BRIEFING AND THAT WAS ALSO

23  ALLUDED TO EARLIER THIS MORNING.  THE STATE CLAIMS THAT IT IS

24  NOT THE ENTITY THAT DISCRIMINATES AGAINST GNETS STUDENTS

25  BECAUSE THE STATE IS NOT THE ONE MAKING DECISIONS THAT ARE

1    BEING CHALLENGED, SUCH AS DETERMINING WHERE SERVICES ARE

2    PROVIDED AND WHERE STUDENTS RECEIVE SERVICES.  INSTEAD, THE

3    STATE CLAIMS THAT THESE ARE DECISIONS MADE AT THE LOCAL LEVEL

4    BY LEA'S AND IEP TEAMS.

5           WITH REGARD TO OUR ARGUMENT ON STATE ADMINISTRATION,

6    WE DISAGREE WITH THE STATE'S CONCLUSIONS HERE.  THE STATE

7    ADMINISTERS A STATEWIDE SERVICE DELIVERY SYSTEM THAT, AMONG

8    OTHER THINGS, CREATES REGULATIONS AND STANDARDS THAT ESTABLISH

9    THE PARAMETERS FOR WHERE THESE GNETS SERVICES ARE PROVIDED AND

10   WHERE STUDENTS ARE RECEIVING THE SERVICES.  THEREFORE, THE

11   LEA'S AND IEP TEAMS ARE NOT OPERATING IN A VACUUM.

12          FURTHER, AS WE EXPLAINED EARLIER, THE MANNER THROUGH

13   WHICH THE STATE FUNDS THE GNETS PROGRAM DEPRIVES ENTITIES LIKE

14   THE LEA'S AND THE IEP TEAMS FROM TRULY BEING ABLE TO MAKE

15   INDEPENDENT DECISIONS RELATED TO WHERE THESE SERVICES ARE

16   PROVIDED.

17          FINALLY, EVEN THIS COURT CONCLUDED IN ITS DECISION ON

18   THE STATE'S MOTION FOR JUDGMENT ON THE PLEADINGS THAT, BASED ON

19   THE FACTS ALLEGED, THE STATE, QUOTE, BEARS SOME RESPONSIBILITY

20   FOR OPERATING AND ADMINISTERING THE GNETS PROGRAM IN

21   DISCRIMINATORY MANNER.

22          FURTHER, THE COURT NOTED THAT ANY DECISION, QUOTE,

23   ADDRESSING THESE ACTS WOULD BE REDRESSABLE BY A JUDGMENT

24   AGAINST THE STATE, END QUOTE.  THESE ALLEGATIONS ARE NOW

25   SUPPORTED BY THE FACTUAL RECORD NOW THAT WE'RE AT THE CLOSE OF

1    DISCOVERY, AND THIS COURT'S PRIOR CONCLUSIONS WOULD STILL

2    APPLY.

3              ACCORDINGLY, THE STATE, AS THE ULTIMATE ADMINISTRATOR

4    OF THE GNETS PROGRAM, IS RESPONSIBLE FOR THE DISCRIMINATION

5    THAT RESULTS FROM THESE ACTIONS THAT ARE TAKEN.

6              FOR ALL OF THESE REASONS, WE BELIEVE THE COURT SHOULD

7    GRANT THE UNITED STATES' MOTION.

8              AND I'LL RESERVE THE REST OF MY TIME FOR AFTER THE

9    STATE'S ARGUMENT.

10             THE COURT:  ALL RIGHT.  THANK YOU.

11             MR. BELINFANTE:  YOUR HONOR, MAY I JUST HAVE A COUPLE

12   OF MINUTES TO GET THE --

13             THE COURT:  CERTAINLY.

14             MR. BELINFANTE:  OKAY.  THANK YOU.

15             (WHEREUPON, THERE WAS A PAUSE IN THE PROCEEDINGS.)

16             MR. BELINFANTE:  ALL RIGHT.  MAY IT PLEASE THE COURT.

17             THE COURT:  YES.

18             MR. BELINFANTE:  IN THIS MATTER, THE STATE HAS MOVED

19   FOR SUMMARY JUDGMENT ON THE QUESTION OF ADMINISTER AND THE

20   UNITED STATES HAS MOVED FOR PARTIAL SUMMARY JUDGMENT ON THE

21   QUESTION.  WHILE I'LL BE ADDRESSING THE UNITED STATES' MOTION

22   HERE, THE ARGUMENTS SHOW WHY THE COURT SHOULD GRANT THE STATE'S

23   MOTION FOR PARTIAL SUMMARY JUDGMENT FOR TWO KEY REASONS.

24             ONE, LEGALLY THE STATE CANNOT ADMINISTER THE GNETS

25   PROGRAM.  AND, IN FACT, THE UNITED STATES STILL DOES NOT

1    ADDRESS CODE SECTION 20-2-152, WHICH ESTABLISHES THAT AS A

2    MATTER OF STATE LAW.

3          TWO, FACTUALLY IT DOES NOT.  WHEN THE COURT REVIEWS

4    THE BRIEFS, IN LOOKING AT OUR RESPONSE ON THE MOTION FOR

5    PARTIAL SUMMARY JUDGMENT AND THE REPLY BRIEF BY THE UNITED

6    STATES, THE RESPONSE GOES THROUGH AND ADDRESSES EVERY SINGLE

7    CITATION THAT IS THERE AND SHOWS WHY THAT CITATION DOES NOT

8    OVERCOME SUMMARY JUDGMENT, MUCH LESS GRANT SUMMARY JUDGMENT.

9          AND IN THE REPLY BRIEF, THE UNITED STATES MERELY

10   REITERATES WHAT IT SAID IN THE ORIGINAL.  IT DOES NOT GRAPPLE

11   WITH ANY OF THE DISTINCTIONS OR FACTS SET FORTH IN THE

12   MEMORANDUM THAT WE PUT IN OPPOSITION.  THAT MATTERS.

13         LOOKING AT THE CASE THAT -- THE LAST THING THE UNITED

14   STATES ARTICULATED IS THAT THIS IS ABOUT THE SYSTEM OF CARE.

15   BUT THAT'S NOT WHAT THE BRIEFING SAYS.  THE BRIEFING MAKES

16   CLEAR THAT THE UNITED STATES' ISSUE IS WITH THE GNETS PROGRAM.

17   ON PAGE TWO OF THEIR BRIEF IN SUPPORT OF THE PARTIAL MOTION FOR

18   SUMMARY JUDGMENT, AT DOCKET 395-1, THEY SAY, NOT ONLY DOES THE

19   GNETS PROGRAM SEGREGATE CERTAIN STUDENTS WITH DISABILITIES, BUT

20   IT DEPRIVES THEM OF EQUAL EDUCATIONAL OPPORTUNITIES.

21         IT'S NOT ABOUT MEDICAID.  IT'S NOT ABOUT THE APEX

22   PROGRAM OVERSEEN BY DBHDD.  IT IS ABOUT THE GNETS PROGRAM.  AND

23   SO THE DISPOSITIVE QUESTION IS WHETHER THE STATE OF GEORGIA

24   ADMINISTERS OR, AS IT SHOULD BE UNDER THE STATUTE OF THE ADA,

25   PROVIDES THE SERVICES IN GNETS.  AND THE ANSWER IS NO.

1          AS WE PUT IN OUR BRIEF AND HAVE REITERATED SEVERAL

2     TIMES, LOOKING AT THE DISTINCTIONS BETWEEN THE LOCAL AND STATE

3     GOVERNMENTS -- AND THE CITATIONS TO EACH OF THESE ARE IN OUR

4     BRIEFS -- THESE ARE ALL THE THINGS THAT THE LOCAL EDUCATION

5     AGENCIES AND RESA'S DO.  THEY DECIDE WHETHER TO APPLY FOR THE

6     GNETS GRANT.  THEY DON'T HAVE TO.

7          THEY ALLOCATE SUPPORTS AND RESOURCES FOR SERVICE

8     DELIVERY.  THAT'S A STATUTE.

9          THEY COLLABORATE WITH COMMUNITY SERVICE PROVIDERS.

10    THEY MAINTAIN SCHOOL BUILDINGS.

11         YOU HEARD EARLIER THAT THE UNITED STATES DESCRIBED

12    THE CONDITION OF SCHOOL BUILDINGS WITHIN THE STATE OF GEORGIA.

13    THAT IS A LOCAL EDUCATION AGENCY ISSUE.  AND IF THE CONCERN

14    THAT THE UNITED STATES HAD IS WITH HOW THE LOCAL EDUCATION

15    AGENCIES ARE MAINTAINING THEIR BUILDINGS OR HOW THE POSTERS

16    APPEAR ON THE WALL, THEN THEY COULD BRING A CLAIM AGAINST A

17    LOCAL EDUCATION AGENCY.  THERE'S NO REASON WHY THEY COULD NOT

18    DO THAT HERE.

19         THE LOCAL STATE AGENCIES HIRE AND FIRE SCHOOL

20    EMPLOYEES.  SO TO THE EXTENT THAT DR. MCCART IS CONCERNED ABOUT

21    THE QUALITY OF EDUCATION PROVIDED IN GEORGIA, WHICH IS BOTH

22    RELEVANT TO AN ADA CLAIM, THERE'S NOTHING THAT THE STATE CAN DO

23    IN THAT CONTEXT.

24         THE LOCAL EDUCATION AGENCIES PROVIDE TRAINING TO

25    EDUCATORS, INCLUDING THOSE IN GNETS.  THE LOCAL EDUCATION

70

1    AGENCIES DECIDE WHERE TO PROVIDE GNETS SERVICES.  AND THAT'S

2    CRITICAL.  THE GNETS RULE -- AND THE ONE PART YOU DIDN'T HEAR

3    ABOUT, AND WE'LL GET TO IT -- IS 4(C), WHICH MAKES VERY CLEAR

4    THAT IT IS A LOCAL DECISION AND THAT LOCALS ARE AUTHORIZED BY

5    THE GNETS RULE TO PROVIDE ITS SERVICES IN THE MOST INTEGRATIVE

6    SETTING ALL THE WAY TO THE MOST SEPARATE SETTING THAT THE GNETS

7    PROGRAM ALLOWS.

8         AND AT THIS POINT, IT'S IMPORTANT TO TAKE A STEP

9    BACK, BECAUSE GNETS IS PART OF THE CONTINUUM OF SERVICES.  AND

10   THERE IS A STEP PAST IT WHERE STUDENTS RECEIVE RESIDENTIAL CARE

11   AT A MUCH MORE ISOLATED ENVIRONMENT.  AND GNETS HELPS PREVENT

12   THEM FROM GOING THERE.  THE LOCALS DETERMINE THROUGH THEIR IEP

13   TEAMS ON AN INDIVIDUALIZED BASIS WHAT SERVICES ARE APPROPRIATE.

14   THE STATE IS NOT A PART OF THAT, NOR DOES THE STATE GET

15   INVOLVED IN PROVIDING TRANSPORTATION, AND NOR DOES THE STATE

16   SERVE ON IEP TEAMS.

17        THE DEPARTMENT NEVER ADDRESSES THESE ISSUES, NEVER

18   SAYS WHY THEY DON'T MATTER.  IT SIMPLY RELIES ON A SERIES OF

19   ABOUT TWO TO THREE E-MAILS PER SIDE.  AND THEIR BURDEN AT

20   SUMMARY JUDGMENT WAS NOT TO PROVIDE THE COURT WITH A SAMPLE,

21   BUT TO DEMONSTRATE THAT THERE IS A QUESTION OF MATERIAL FACT

22   AND, AT THE VERY LEAST, TO COUNTER WHAT THE STATE HAS PUT FORTH

23   IN ITS BRIEFING AND LOOKING AT THAT NOW.

24        AND AS WE DO TURN TO WHAT THE FACTS WERE AT

25   DISCOVERY, IT'S IMPORTANT TO REMEMBER HOW MASSIVE AND

1    SIGNIFICANT DISCOVERY WAS IN THIS CASE.  THERE WERE TOURS OF

2    FACILITIES, AS THE COURT HEARD.  FIFTY DEPOSITIONS.  PRODUCTION

3    OF OVER 728,200 DOCUMENTS THAT WERE 5.5 MILLION PAGES.

4         SO WHEN YOU THINK ABOUT THAT SCOPE, AND THEN THE

5    UNITED STATES TELLS YOU, WE HAVE TWO E-MAILS FROM TWO PARENTS,

6    AND THEY ARE BRINGING A CLAIM FOR SYSTEMIC RELIEF?  THAT IS NOT

7    MEETING THEIR BURDEN AT SUMMARY JUDGMENT FOR A SYSTEMIC CLAIM.

8    IF THEY WANTED TO BRING AN INDIVIDUAL CLAIM, PERHAPS.  BUT THE

9    REASON THEY DIDN'T DO THAT IS BECAUSE THAT IS CLEARLY AN

10   I.D.E.A. CLAIM.  AND THE DEPARTMENT OF JUSTICE LACKS THE

11   AUTHORITY TO BRING AN I.D.E.A. CLAIM.

12        THE FIRST THING THAT THE UNITED STATES SAYS IN THEIR

13   BRIEF AT PAGE THREE IS THAT THE GNETS PROGRAM IS DEVELOPED AND

14   FUNDED BY THE STATE OF GEORGIA.  THERE'S NO CITATION TO THAT IN

15   THE RECORD.  AND WHAT THE CODE SECTION 20-2-270.1, WHICH IS THE

16   ONLY CODE -- OR STATUTE IN GEORGIA THAT EVEN MENTIONS THE GNETS

17   PROGRAM, AND EVEN THEN NOT BY NAME, DOES NOT ESTABLISH THE

18   STATE OF GEORGIA DEVELOPED IT AT ALL, NOR IS IT CLEAR WHAT THAT

19   EVEN MEANS.

20        FURTHER, IN TERMS OF FUNDED BY THE STATE OF GEORGIA,

21   IT IS A TRI-PART FUNDING.  LOCALS FUND PART.  THE STATE FUNDS

22   PART, IF THE LOCALS CHOOSE TO APPLY FOR A GRANT.  AND THE

23   UNITED STATES DEPARTMENT OF EDUCATION FUNDS ABOUT 17 PERCENT OF

24   THE GNETS GRANT BUDGET.  THAT'S IN DOCKET 434, PAGE EIGHT.  SO

25   FUNDING IS NOT UNIQUE TO THE STATE OF GEORGIA, NOR HAVE THEY

1    SHOWN THAT IT IS AT THE LEVEL THAT WOULD DESCRIBE

2    ADMINISTRATION, WHICH BEGS EVEN FURTHER THE QUESTION OF, IF THE

3    ISSUE IS THAT THE GNETS PROGRAM IS BEING ADMINISTERED IN A

4    DISCRIMINATORY MANNER AND LOCAL EDUCATION AGENCIES ARE NOT EVEN

5    REQUIRED TO USE THE GNETS FUND, THAT MAKES ADMINISTRATION EVEN

6    FURTHER REMOVED.  THIS IS NOT A CASE WHERE THE STATE IS SAYING

7    THAT THIS IS THE ONLY WAY TO PROVIDE SPECIAL EDUCATION IN THE

8    STATE OF GEORGIA.  IT IS A CHOICE BY THE LOCAL EDUCATION

9    AGENCIES.

10         AT PAGE FOUR OF THEIR BRIEF, THE UNITED STATES SAYS

11   THAT THE GNETS' 24 REGIONAL PROGRAMS ARE EACH ANSWERABLE TO THE

12   STATE.  WHAT'S THE AUTHORITY FOR THAT?  THEY CITE FOUR REQUESTS

13   FOR ADMISSIONS, DOCKET 395, AT 33.  HERE'S WHAT THOSE REQUESTS

14   SAID:  ADMIT THAT THE FIRST GNETS PROGRAM LOCATION WAS A SINGLE

15   EDUCATIONAL SYSTEM IN ATHENS, GEORGIA.

16         NUMBER FOUR:  ADMIT THAT IN 1976, THE STATE

17   REORGANIZED THE PSYCHO-ED CENTERS OPERATING THROUGHOUT THE

18   STATE INTO 24 REGIONS.  IT CREATED REGIONS.  IT DID NOT MAKE

19   ANY OF THE DETERMINATIONS.  AND THE STATE SPECIFICALLY OBJECTED

20   TO ANY IMPLICATION THAT THAT MEANS THE STATE IS ADMINISTERING.

21         WHAT NEXT?

22         NUMBER FIVE:  ADMIT THAT IN 2007, THE STATE RENAMED

23   THE PSYCHO-ED CENTERS TO GNETS.  THERE'S NO INDICATION OF WHAT

24   RENAMING DOES IN TERMS OF ADMINISTER.  AND THE UNITED STATES

25   HAS CERTAINLY NOT INDICATED ANYTHING ITSELF.

1          NUMBER SIX:  ADMIT THAT THE GNETS PROGRAM CURRENTLY

2    INCLUDES THE FOLLOWING 24 REGIONAL PERMIT.  YOUR HONOR, THAT

3    HAPPENS THROUGHOUT THE UNITED STATES' MOTION FOR PARTIAL

4    SUMMARY JUDGMENT, TO CLAIM THAT THE STATE IS -- THAT THE GNETS

5    SYSTEMS ARE ANSWERABLE TO THE STATE BASED ON THOSE REQUESTS FOR

6    ADMISSIONS IS SIMPLY MISCHARACTERIZING THE EVIDENCE.

7          PAGE FOUR, THE UNITED STATES SAYS THAT THE STATE

8    LEGISLATIVELY MANDATED A SYSTEM OF CARE.  THE PROBLEM IS, THAT

9    GOT THE LAW WRONG.  AND THAT IS A LEGAL ISSUE AND NOT A FACTUAL

10   ONE.  THE CODE SECTION THEY CITE, 49-5-220(A)(6), IT'S IN THEIR

11   BRIEF AT PAGE FIVE, NOTE TEN, IT'S A DECLARATORY STATEMENT OF

12   THE GENERAL ASSEMBLY ABOUT ITS INTENTION, LITERALLY, QUOTE, THE

13   GENERAL ASSEMBLY DECLARES ITS INTENTION AND DESIRE TO, AND THEN

14   IT LISTS SEVERAL THINGS.  THAT IS NOT AN OPERATIONAL STATUTE

15   THAT SAYS THAT MANDATES ANYTHING AS A MATTER OF LAW.  AND THE

16   UNITED STATES DOESN'T RESPOND TO THAT.

17         THEY THEN CITE TO FORMER DBHDD COMMISSIONER JUDY

18   FITZGERALD'S TESTIMONY FOR THE IDEA THAT DBHDD OVERSEES ALL

19   MENTAL HEALTH SERVICES IN GEORGIA.  THAT'S NOT WHAT SHE SAID.

20   SHE SAID THEY OVERSEE IT FOR THOSE PERSONS FOR WHOM THEY HAVE

21   JURISDICTION AND MADE VERY CLEAR IT WAS NOT EVERYONE.

22         THAT EVIDENCE DOES NOT ESTABLISH THAT THE STATE OF

23   GEORGIA LEGISLATIVELY MANDATED A SYSTEM OF CARE.  NOT EVEN

24   CLOSE.

25         THE NEXT STATEMENT ON PAGE SIX IS THAT THE STATE

74

1  REGULATES THE GNETS PROGRAM OPERATIONS PRIMARILY THROUGH THE

2  GNETS RULE.  THAT, TOO, IS NOT A QUESTION OF FACT BUT A

3  QUESTION OF LAW.  THE MEANING OF A REGULATION IS A LEGAL

4  QUESTION.  THAT'S THE ELEVENTH CIRCUIT IN MCFARLAND FROM 2004.

5  AND ARGUMENTS ABOUT LEGAL CONCLUSIONS DO NOT OVERCOME SUMMARY

6  JUDGMENT.  THE ELEVENTH CIRCUIT AGAIN IN TAYLOR VERSUS POLHILL

7  IN 2020.

8         BUT THE ANALYSIS THAT THE UNITED STATES OFFERS ON THE

9  GNETS RULE ITSELF IS NOT CONSISTENT WITH THE TEXT OF THE

10  REGULATION ITSELF.  AND THIS IS THE PIECE THAT THEY CONTINUE TO

11  IGNORE.  4(C).  GNETS CONTINUUM OF SERVICES MAY BE DELIVERED AS

12  FOLLOWS:  MOST INTEGRATED TO FACILITIES PROVIDED IN A GNETS

13  FACILITY FOR THE FULL DAY.

14         THOSE ARE THE DECISIONS MADE AT THE LOCAL LEVEL.  AND

15  THAT IS WHAT THE UNITED STATES SAYS IS DISCRIMINATORY.  UNLESS

16  THE UNITED STATES' ARGUMENT IS THAT THIS CONTINUUM ITSELF IS

17  DISCRIMINATORY, WHICH THEY HAVE NOT ARTICULATED, THEY CAN'T

18  MAKE THAT ARGUMENT.

19         THE OLMSTEAD DECISION SAID, SOMETIMES

20  INSTITUTIONALIZATION IS REQUIRED, AND THE ADA VIOLATION OCCURS

21  ONLY IF THERE IS UNJUSTIFIED INSTITUTIONALIZATION.  AND DR.

22  MCCART AND DR. PUTNAM AGREE.  SO IT'S ULTIMATELY THE LOCALS AND

23  THE RESA'S WHICH WE SAW IN THE PRIOR SLIDE -- CHART THAT

24  DECIDE, ONE, WHETHER TO SEEK GNETS GRANTS; TWO, FOR WHOM GNETS

25  SERVICES ARE APPROPRIATE; THREE, WHERE GNETS SERVICES WILL BE

1    PROVIDED; AND, FOUR, WHO WILL PROVIDE THE SERVICES.

2          THE UNITED STATES WOULD LIKE THE COURT TO SAY, WELL,

3    JUST BECAUSE THE STATE HAS A REGULATION WITHOUT, YOU KNOW,

4    ANSWERING THE TEXT OF THE REGULATION AND BECAUSE IT DOES SOME

5    FUNDING, THAT'S ENOUGH.  THAT'S A STRICT LIABILITY STANDARD.

6    IT IS NOT APPLICABLE IN THE ADA.  AND I'LL GET TO THAT IN A

7    MOMENT, BECAUSE THE UNITED STATES DID NOT RESPOND TO THAT

8    ARGUMENT, EITHER.

9          THEY NEXT SAY ON PAGE SIX OF THEIR BRIEF -- AND YOU

10   HEARD IT AGAIN A MOMENT AGO -- THAT THE GNETS RULE BINDS THE

11   GNETS PROGRAM.  AGAIN, THAT'S A LEGAL CONCLUSION.  AND WHEN YOU

12   LOOK AT THE GEORGIA STATUTE SAYING THAT THE LOCALS PROVIDE

13   SPECIAL EDUCATION, THERE'S NOT A BINDING ASPECT TO IT.  IT IS

14   ONLY TO THE EXTENT THAT THEY ACTUALLY SEEK AND OBTAIN A GNETS

15   GRANT.  BUT THE UNITED STATES CAN'T RELY ON THE RULE TO SHOW

16   ADMINISTRATION IF THEY ARE NOT SHOWING WHAT SPECIFICALLY THE

17   STATE IS DOING TO ADMINISTER THROUGH THE RULE.

18         THE STATE -- AND WHEN THE COURT LOOKS AT THE GNETS

19   RULE, IT IS BASED ON AND WHOLLY CONSISTENT WITH AND IN FACT

20   CITES TO THE I.D.E.A.  IT IS AN I.D.E.A.-BASED REGULATION.  AND

21   THIS IS WHERE, ONCE AGAIN, THE UNITED STATES IS TRYING TO PUT

22   THE STATE IN A COMPLETELY UNTENABLE POSITION.

23         IF IT COMPLIES WITH THE RULE, IT COMPLIES WITH THE

24   I.D.E.A.  YET, IF IT COMPLIES WITH THE RULE BASED ON DECISIONS

25   MADE AT A LOCAL LEVEL, THE STATE IS SOMEHOW VIOLATING THE ADA.

1    THAT DEMONSTRATES A MISREADING OF THE ADA.

2          AND WHAT IS THE UNITED STATES' FACTUAL SUPPORT FOR

3    THE IDEA THAT THE GNETS RULE BINDS PROGRAMS?  AGAIN, THEIR

4    BRIEF AT PAGE SIX.  IT'S BASED ON A REQUEST FOR ADMISSION THAT

5    STATED THAT THE -- THAT SAYS JUST THIS:  ADMIT THAT THE STATE

6    HAS PERIODICALLY REVISED THE GNETS RULE, MOST RECENTLY IN 2017.

7    THAT'S IT.

8          NEXT, THEY SAY, WELL, THE GNETS RULE REQUIRES LOCAL

9    SCHOOLS AND THE DOE TO COLLABORATE.  COLLABORATION IS NOT

10   ADMINISTRATION.  THE UNITED STATES' DEFINITION, THEY ARE

11   FOCUSING ON MANAGEMENT.  A MANAGER IS SOMEONE DIFFERENT THAN AN

12   EQUAL.  AND THE SUPREME COURT OF GEORGIA HAS SAID THAT THE

13   PROVISION OF EDUCATION SERVICES IN GEORGIA IS EXCLUSIVELY IN

14   THE HANDS OF LOCALS.

15         THE UNITED STATES THEN SAYS THAT THE GNETS RULE

16   REQUIRES SCHOOLS TO SUBMIT STUDENT DATA.  TRUE.  AND WE POINTED

17   OUT IN OUR REPLY BRIEF -- AND THE UNITED STATES DOES NOT

18   RESPOND AT ALL -- THE REASON IS THE I.D.E.A., SPECIFICALLY 20

19   U.S.C. SECTION 1418.

20         COMPLYING WITH THE I.D.E.A. DOES NOT MEAN THAT THE

21   STATE OF GEORGIA IS ADMINISTERING FOR THE PURPOSES OF THE ADA.

22   U.S. BRIEF THEN, STARTING ON PAGE EIGHT, SAYS THAT STATE

23   EMPLOYEES TOOK DIRECTION -- OR, EXCUSE ME, DIRECTED ACTIVITIES

24   OF GNETS PROGRAM PERSONNEL.  THEY CITE FIRST THE PROGRAM

25   MANAGEMENT PLAN.  WE POINT OUT THAT THAT INVOLVED THE

1    DEPOSITION TESTIMONY OF CLARA KEITH, WHERE SHE DISCUSSES AN

2    ASPIRATION, NOT ANYTHING BINDING, THINGS THAT THEY WOULD LIKE

3    TO SEE HAPPEN.  THAT'S NOT DIRECTING LOCALS HOW TO ACT.  AND

4    THE UNITED STATES DOESN'T RESPOND TO THAT.

5            WE'D ALSO POINT OUT THAT THE OTHER DOCUMENTS ARE

6    EQUALLY ASPIRATIONAL, AGAIN, NOTHING BINDING, NOTHING

7    MANDATING.  THEY CITE THEIR STRATEGIC PLAN ON THEIR BRIEF AT

8    PAGES 9 TO 13.  THEY DON'T ANSWER, AS WE POINT OUT, THAT THE

9    MAJORITY OF OFFICIALS WHO DECIDE THE STRATEGIC PLAN AND,

10   INDEED, DRAFTED THE DOCUMENTS YOU HEARD ABOUT A MOMENT AGO, ARE

11   LOCAL OFFICIALS.  ELEVEN OF 17, IN FACT.

12           THE DOCUMENTS CITED BY DOJ ALSO DO NOT IDENTIFY ANY

13   ROLE FOR THE DEPARTMENT OF EDUCATION, THE STATE DEPARTMENT OF

14   COMMUNITY HEALTH, OR THE DEPARTMENT OF BEHAVIORAL HEALTH AND

15   DEVELOPMENTAL DISABILITIES.  AS A MATTER OF SUMMARY JUDGMENT,

16   THEY ARE NOT CREATING A QUESTION OF MATERIAL FACT AS TO WHAT

17   THESE AGENCIES ARE DOING WITH REGARDS TO THE VERY EVIDENCE THEY

18   ARE CITING.

19           AND THEY ARE NOT SAYING THE STRATEGIC PLAN ITSELF IS

20   BINDING.  AND THERE'S NO DOCUMENTS THAT THEY CITE FOR THE

21   ARGUMENT, AS THEY SAY IN THE SAME SECTION, THAT GNETS PROGRAMS

22   MUST TAKE STEPS BASED ON THE STRATEGIC PLAN IN ORDER TO SOLICIT

23   STATE FUNDS.  IT'S JUST NOT THERE.

24           AND, REMEMBER, IF THE LOCALS COMPROMISE THE MAJORITY

25   OF THOSE DECIDING THE STATE PLAN, IT IS NOT THE STATE THAT IS

1    ADMINISTERING OR CREATING THE STATE PLAN.  IT IS THE LOCALS WHO

2    ARE CHOOSING WHAT TO DO.  AND THAT'S THE 11 OUT OF 17.

3            THEY TALK ABOUT PERSONNEL VISITS IN THEIR BRIEF AT 12

4    AND 13 AND SAY, WELL, ONCE THE STRATEGIC PLAN IS IN PLACE, THE

5    STATE SENDS PEOPLE OUT TO LOOK AT THE SCHOOLS AND SEE WHAT'S

6    HAPPENING.  THAT, TOO, IS REQUIRED BY THE I.D.E.A.  AND THE

7    DOCUMENTS CITED ACKNOWLEDGE THAT THE DOE'S ROLE IS NONBINDING

8    AND ADVISORY.  THEY DON'T HAVE A DOCUMENT, DESPITE THE

9    728-SOME-ODD-THOUSAND, WHERE A LOCAL OFFICIAL SAYS, I WANT TO

10   DO X; THE STATE SAYS, NO, YOU MUST DO Y.  THAT'S NOT THERE.

11           IT IS CERTAINLY NOT THERE TO SHOW A SYSTEMIC CLAIM.

12   AND I'LL GET TO THE E-MAILS THEY CITE.  I THINK THERE'S LIKE

13   FOUR THAT THEY CLAIM DOES THAT.

14           AND THE UNITED STATES ALSO ON THIS POINT SAYS, WELL,

15   WE DIDN'T SHOW ALL OUR EVIDENCE, WE DON'T HAVE TO.  AT RULE 56,

16   AT SUMMARY JUDGMENT, AS THE COURT KNOWS WELL, IF THERE IS AN

17   ABSENCE OF EVIDENCE, IT IS THE PART OF THE NONMOVING PARTY TO

18   SHOW, HERE'S THE EVIDENCE THAT ADDRESSES THAT.  IT'S NOT ENOUGH

19   TO SAY, WELL, WE'VE GOT IT, WE'LL SAVE IT FOR TRIAL.  THAT'S

20   NOT HOW IT WORKS.  AND PARTICULARLY IF YOU'RE MOVING FOR

21   SUMMARY JUDGMENT, AS THE UNITED STATES IS.

22           AND PAGES 13 TO 15, THEY SAY, WELL, THERE ARE OTHER

23   DOCUMENTS THAT SHOW THAT THE STATE IS DIRECTING.  THEY CITE A

24   SERVICES FORM OR CONSIDERATION OF SERVICES FORM WHICH, ON ITS

25   FACE, IS NOT BINDING ON THE LOCAL GOVERNMENTS.  THEY CITE AN

79

1    E-MAIL WHERE THE DEPARTMENT OF EDUCATION IS SEEKING INPUT FROM

2    A LOCAL OFFICIAL.  SOMEONE WHO IS ADMINISTERING OR MANAGING IN

3    THE TRADITIONAL SENSE DOESN'T GO DOWN AND ASK FOR, HOW SHOULD

4    WE DO THIS.  THE REGIONAL GNETS EMPLOYEES -- OR THE OTHER ONES

5    SHOW GNETS EMPLOYEES SEEKING TO PARTICIPATE IN PLANNING

6    SESSION.

7              AND, YOUR HONOR, THESE ARE ALL ARGUMENTS MADE IN OUR

8    REPLY BRIEF IN OPPOSITION, TO WHICH THERE IS NO RESPONSE.

9              IN THEIR BRIEF AT PAGE 14, NOTE 42, THEY SAY -- THEY

10   CITE THE OPERATIONS MANUAL.  THE OPERATIONS MANUAL ON ITS FACE

11   SAYS IT IS TO PROVIDE GUIDANCE.  GUIDANCE IS NOT

12   ADMINISTRATION.  GUIDANCE IS NOT PROVISION OF SERVICES.  PAGE

13   14 NOTE 43, THEY CITE DATA DIRECTIVES.  THOSE WERE E-MAILS WITH

14   SOME STATE OFFICIALS WHO ARE SEEKING DATA.

15             WE WILL CONCEDE THE STATE SEEKS DATA.  WE WILL ALSO

16   CONCEDE THAT THAT IS REQUIRED BY THE I.D.E.A., 20 U.S.C. 1418.

17   IT'S ALSO NOT CLEAR HOW JUST TRYING TO COLLECT DATA

18   DEMONSTRATES AN ADMINISTRATION.  THAT WOULD BE WHAT YOU DO WITH

19   THE DATA, PERHAPS.  BUT THE UNITED STATES DOESN'T MAKE THAT

20   ARGUMENT.

21             THEY TALKED ABOUT A REVIEW OF IEP FILES IN THEIR

22   BRIEF AT PAGE 14 TO 15.  BUT THAT RELIES ON TESTIMONY OF GNETS

23   PROGRAM DIRECTORS.  AND IN THAT TESTIMONY, IT IS CLEAR THAT THE

24   STATE DID NOT EXPLAIN TO THE REGIONAL DIRECTORS WHY THEY WERE

25   REVIEWING OR WHY IT WAS REVIEWING THE IEP FILES.

1          AND SO WHAT THE REGIONAL DIRECTORS THEN TESTIFY ABOUT

2     IS SPECULATIVE AND THEREFORE INADMISSIBLE IN TERMS OF WHAT IS

3     THE STATE DOING WITH IT.  AND THEY DIDN'T SAY IN THEIR

4     TESTIMONY THAT THERE WAS A CONSEQUENCE TO IT OR ANYTHING OF

5     THAT NATURE.  IT JUST SAYS THAT THE STATE DID SEEK TO REVIEW

6     IEP FILES.  AGAIN, THAT'S ALSO A REQUIREMENT OF THE I.D.E.A.

7          THE DOJ MAKES NO RESPONSE TO THE EVIDENTIARY

8     ARGUMENT, EITHER.  THEY SAY THEN, WELL, THERE'S DAY-TO-DAY

9     DIRECTION, PAGES 15 TO 16.  THAT RELIES ON THE FOUR E-MAILS.

10          NOW, WE POINT THIS OUT.  AND THERE IS AGAIN NO

11     RESPONSE.  TWO ARE FROM ONE PERSON ASKING CLARIFICATION ABOUT

12     WHEN THE GNETS RULE COMES INTO EFFECT.  THAT'S NOT SHOWING AN

13     ADMINISTRATION.  THAT'S A QUESTION ABOUT THE STATE

14     ADMINISTRATIVE PROCEDURE ACT.  ONE PERSON ASKING TWO QUESTIONS

15     IS HARDLY EVIDENCE OF ANYTHING SYSTEMIC, EITHER.

16          THE OTHER ONE IS FROM A GNETS OFFICIAL NOTIFYING THE

17     STATE OF A LOCAL DECISION.  I THINK IT WAS MOVING A CHILD FROM

18     ONE SCHOOL TO ANOTHER.  THE OFFICIAL WAS NOT ASKING FOR

19     PERMISSION.  IT WAS TELLING THE STATE THAT HAD ALREADY

20     HAPPENED.

21          AND, FINALLY, OF THE 728,000 DOCUMENTS, THERE IS ONE

22     E-MAIL WHERE A DIRECTOR SEEKS ADVICE THAT THE UNITED STATES

23     CITES, SEEKING IT.  AND THERE'S NO INDICATION THAT THE STATE --

24     OR THE LOCAL OFFICIAL HAD TO AGREE WITH WHAT THE STATE SAID.

25     AND, CERTAINLY, ONE E-MAIL FROM A DIRECTOR SEEKING ADVICE IS

1   NOT EVIDENCE OF ADMINISTRATION, PARTICULARLY IN THE SCOPE OF

2   THIS CASE.

3           SO THEN THEY LOOK TO FUNDING.  THIS WAS PAGES 16 TO

4   21.  THEY TALK ABOUT THE FUNDING FORMULA.  BUT THE DOJ PROVIDES

5   NO EVIDENCE, NO TESTIMONY OF HOW THE FORMULA PREVENTS A LOCAL

6   EDUCATION AGENCY FROM USING ANY OF THE OPTIONS THAT ARE HERE.

7   AND IT'S ONE GNETS DIRECTOR WHO TALKS ABOUT THAT, MAYBE TWO.  I

8   CAN'T RECALL IF IT WAS ONE OR TWO.  IT'S NOT A STATE OFFICIAL.

9   AND IT'S NOT SPECIFICALLY FLOWING THROUGH HOW IT DOES.

10          AND, MOST IMPORTANTLY, AND THIS WE'LL GET TO, THE

11  FUNDING FORMULA UTILIZED BY THE STATE OF GEORGIA IS INCREDIBLY

12  SIMILAR TO THAT OF THE UNITED STATES DEPARTMENT OF EDUCATION IN

13  THE GRANTS THAT ULTIMATELY FLOW DOWN TO THE GNETS GRANT

14  PROGRAM.

15          AND SO IF THE COURT ACCEPTS THE ARGUMENT THAT THE

16  UNITED STATES DEPARTMENT OF JUSTICE IS ADVANCING TODAY, IT IS

17  ALSO BY IMPLICATION STATING THAT THE UNITED STATES DEPARTMENT

18  OF EDUCATION ADMINISTERS ITS FUNDS IN A DISCRIMINATORY MANNER.

19  THE UNITED STATES THEN CITES STATE FUNDING CONTRACTS FROM 2019,

20  BRIEF PAGES 17 TO 18, FOOTNOTES 52, THERE'S NO INDICATION -- I

21  THINK IT TALKS ABOUT $1.3 MILLION WORTH OF GRANTS OR OF

22  CONTRACTS THAT WERE DONE DIRECTLY, OUT OF A $75.1 MILLION GNETS

23  GRANT BUDGET IN 2019.  IT'S 1.7 PERCENT.

24          IT DOESN'T SHOW THAT THE STATE IS ADMINISTERING A

25  GNETS PROGRAM.  IT SHOWS THAT THE STATE, AT MOST, WOULD BE

1   ADMINISTERING THAT INDIVIDUAL CONTRACT.  BUT EVEN THEN THE

2   UNITED STATES DOES NOT ARGUE THAT THAT CONTRACT DISCRIMINATES.

3   SO, IN OTHER WORDS, IT'S NOT SHOWING ANY TYPE OF ADMINISTRATION

4   THAT COULD BE ACTIONABLE, BECAUSE IT'S NOT JUST ADMINISTERED IN

5   A VACUUM.  IT HAS TO BE THE ADMINISTRATION OF SERVICES THAT ARE

6   IN A DISCRIMINATORY MANNER.

7          THEY THEN SHOW IN THEIR BRIEF AT PAGE 20, NOTE 61,

8   THAT THE GNETS PROGRAM SEEK FUNDS AFTER COSTS ARE INCURRED.  IF

9   THE PROGRAMS ARE SEEKING FUNDS AFTERWARDS, THEN THEY ARE

10  CLEARLY NOT TAKING DIRECTION FROM THE STATE ON WHETHER THEY CAN

11  DO IT OR NOT.  AND, AGAIN, NO RESPONSE TO THIS.

12         THE GRANT APPLICATION PROCESS THEY CITE NEXT IN THEIR

13  BRIEF AT 18 AND 19, BUT THERE IS NO EVIDENCE THAT THE

14  APPLICATION PROCESS ITSELF ADMINISTERS THE PROGRAM.  IT IS

15  ADMINISTERING A GRANT THAT THE LOCAL AGENCIES CAN USE TO

16  PROVIDE SERVICES IN ANY OF THESE CRITERIA.  THE STATE IS NOT

17  ADMINISTERING HOW THE SERVICE IS BEING PROVIDED.

18         AND SO THAT BEGS THE NEXT QUESTION.  WHAT DOES THE

19  WORD ADMINISTER MEAN IN THE REGULATION.  NOW, TELLINGLY, THE

20  DEPARTMENT OF JUSTICE BEGINS WITH THE TERM ADMINISTRATION,

21  BECAUSE THAT'S WHAT'S IN THEIR REGULATION.  WHAT THEY DON'T

22  TALK ABOUT IS WHAT THE ADA SAYS.

23         NOW, IF WE LOOK AT THE STATUTE, THE ACTIONABLE

24  STATUTE, THE TOP ONE, IS THAT YOU CAN'T DISCRIMINATE AGAINST

25  SOMEONE OR DENY THEM THE BENEFITS OF SERVICES OF A PUBLIC

1    ENTITY.  WELL, WHO IS THAT PERSON FOR WHOM YOU CAN'T

2    DISCRIMINATE AGAINST?  IT'S A QUALIFIED INDIVIDUAL WITH A

3    DISABILITY.

4            AND WHEN WE LOOK TO WHAT THAT DEFINITION IS, IT'S

5    SOMEONE WHO MEETS THE ESSENTIAL ELEMENTS OR REQUIREMENTS FOR

6    THE RECEIPT OF SERVICES, PROVIDED BY A PUBLIC ENTITY.

7    PROVIDED.  THERE'S NO DEFINITION IN THE STATUTE OF PROVIDED,

8    AND THE DEPARTMENT OF JUSTICE HAS NOT PROMULGATED A REGULATION

9    DEFINING WHAT IS PROVIDED, SO, YES, CONSISTENT WITH OUR MOTION

10   TO DISMISS, WE SAY THE PLAIN MEANING CONTROLS.  BUT UNLIKE THE

11   MOTION TO DISMISS, WE ARE COMPARING THE STATUTE NOW TO THE

12   REGULATION.

13           AND THERE IS ABSOLUTELY A WAY TO INTERPRET A STATUTE

14   AS SIMILAR TO THE REGULATION.  MERRIAM-WEBSTER HAS, YES, TWO

15   DEFINITIONS FOR THE WORD ADMINISTER.  ONE SAYS PROVIDE.  ONE

16   SAYS MANAGE.

17           PROVIDE IS THE EXACT WORD IN THE STATUTE AND IS

18   CONSISTENT WITH THE STATUTE, WHICH MAKES SENSE, BECAUSE PROVIDE

19   MEANS TO ACTUALLY DO.  AND ADMINISTER MEANS TO OVERSEE.  AND IF

20   THE DEPARTMENT'S POSITION IS MERELY HAVING THE ABILITY TO

21   OVERSEE ESTABLISHES LIABILITY, THAT EXPANDS ADA LIABILITY WELL

22   BEYOND WHAT THE STATUTE ITSELF SAYS WHERE IT HAS TO BE

23   PROVIDED.

24           THE UNITED STATES AGREES THAT A REGULATION CANNOT

25   PROVIDE MORE LIABILITY THAN A STATUTE.  SUPREME COURT SAID THAT

1    IN THE DECKER DECISION.  AND, INDEED, THE OLMSTEAD CASE WHERE

2    THE UNITED STATES' OWN REGULATION AT ISSUE NOW WAS INTERPRETED,

3    JUSTICE KENNEDY SAID, WE MUST BE CAUTIOUS WHEN WE SEEK TO INFER

4    SPECIFIC RULES LIMITING STATE'S CHOICES WHEN CONGRESS HAS ONLY

5    USED GENERAL LANGUAGE IN A CONTROLLING STATUTE, MEANING,

6    BINDING PRECEDENT SAYS, TAKE THE NARROW APPROACH.  AND UNDER

7    THAT INTERPRETATION, THE STATE DOES NOT PROVIDE SPECIAL

8    EDUCATION PROGRAMS.  AGAIN, THAT'S CODE SECTION 20-2-152.

9         THE STATUTES LINK UP.  THE STATE STATUTE USES THE

10   SAME LANGUAGE AS THE FEDERAL ADA.  THAT SHOULD END THE INQUIRY.

11        AND WHY DOES THE -- THE UNITED STATES SAYS, WELL,

12   THERE'S NO AUTHORITY TO SUPPORT WHAT THE STATE IS NOW ARGUING.

13   THAT'S BECAUSE, AS THE UNITED STATES ACKNOWLEDGES, IN 2016,

14   QUOTE, THE LAWSUIT IS THE FIRST CHALLENGE TO A STATE-RUN SYSTEM

15   FOR SEGREGATING STUDENTS WITH DISABILITIES.  THEY THEN RELY ON

16   POLICY ARGUMENTS THAT, IF WE ACTUALLY APPLY THE WORDS OF THE

17   ADA, THAT THAT WOULD PREVENT CONGRESSIONAL INTENT AND CAUSE ALL

18   THESE TERRIBLE ISSUES.  THE SUPREME COURT SAID IN 2018, POLICY

19   ARGUMENTS ARE PROPERLY ADDRESSED TO CONGRESS AND NOT THE COURT.

20   AND CONGRESS USED THE WORD PROVIDE, WHICH ADMINISTER CAN BE

21   CONSISTENT WITH.

22        LOOKING AT THE COURT'S FOUR-FACTOR TEST FROM THE

23   MOTION TO DISMISS -- AND, AGAIN, HERE'S ANOTHER -- THE UNITED

24   STATES SAYS, WELL, THE STATE HAS NO AUTHORITY FOR THE IDEA THAT

25   A DECISION AT THE MOTION TO DISMISS DOESN'T APPLY LATER.  THE

85

1    COURT'S OWN ORDER EXPLAINS THAT THE ALLEGATIONS ARE ACCEPTED AS

2    TRUE.

3           WE JUST WALKED THROUGH THE FACTS SHOWING WHAT THE

4    UNITED STATES ALLEGES IS NOT WHAT THE EVIDENCE THEY CITE SHOWS,

5    NUMBER ONE.  AND, NUMBER TWO, WE'VE HAD -- THERE'S NOW A NEW

6    ARGUMENT BEFORE THE COURT IT DIDN'T HAVE BEFORE.  SO LOOKING AT

7    ESTABLISHING THE CRITERIA, THAT WAS THE FIRST; YES, THE STATE

8    DOES PROVIDE THE CRITERIA.  BUT IF YOU LOOK AT GNETS RULE

9    PARAGRAPH 3(A), IT SAYS THE CRITERIA ARE SET FORTH IN STATE

10   BOARD RULE 160-4-7-.06.  AND THAT REGULATION CITES PRECISELY TO

11   FEDERAL I.D.E.A. ALLEGATIONS.

12          AND THE FACT THAT THE CRITERIA IS ESTABLISHED CANNOT

13   BE A BASIS FOR STRICT LIABILITY.  JUDGE BROWN RECOGNIZED THAT

14   IN THE PARALLEL GAO VERSUS GEORGIA DECISION.  AS JUDGE BROWN

15   SAID, THE LEVEL OF CONTROL THE PUBLIC ENTITY HAS INFORMS

16   WHETHER THE PLAINTIFF HAS SHOWN A CAUSAL CONNECTION WHEN

17   LOOKING AT THIS EXACT QUESTION.  IT'S NOT JUST THAT YOU

18   OVERSEE.  THERE HAS TO BE A CAUSAL CONNECTION FROM THAT

19   OVERSEEING OR PROVIDING TO THE DISCRIMINATION.

20          THE COURT LOOKED AT FUNDING, WE'VE TALKED ABOUT THAT.

21   AND THE COURT SAID IN THE MOTION-TO-DISMISS ORDER AT PAGES 13

22   TO 14, FUNDING ALONE IS NOT ENOUGH.

23          NEXT, THE COURT LOOKED AT PROMULGATING REGULATIONS TO

24   CARRY OUT THE PROGRAM.  THE REGULATIONS GIVE IT -- YES, THERE

25   IS A REGULATION.  BUT THE REGULATION GIVES THE LOCAL

1  GOVERNMENTS, AS WE'VE SEEN, A TREMENDOUS AMOUNT OF FLEXIBILITY.

2  OVERSEEING THE OPERATIONS AND IMPLEMENTING THE PROGRAM, THAT'S

3  AT THE ORDER AT PAGE NINE.

4       AGAIN, THE STATE CAN OVERSEE, BUT IT CAN'T IMPLEMENT

5  ANYTHING.  IT CAN'T HIRE OR FIRE THE INDIVIDUALS.  AND WE WENT

6  THROUGH THAT CHART EARLIER ON WHAT THE STATE CAN DO AND WHAT

7  THE LOCALS CAN DO.  AND THIS IS A KEY POINT, AGAIN, THAT THE

8  UNITED STATES DOES NOT RESPOND TO.

9       IN JACOBSON, THE ELEVENTH CIRCUIT SAID, IF A STATE

10  ENTITY HAS TO GO TO COURT TO ENFORCE SOMETHING, AS OPPOSED TO

11  DOING IT ITSELF, THAT'S NOT CONTROL.  AND IF THERE'S NO

12  CONTROL, THERE'S NO TRACEABILITY AND THERE'S NO REDRESSABILITY.

13  THE EVIDENCE THEY CITE FOR THIS WAS LARRY WINTER, A FORMER

14  BOARD MEMBER WHO DOESN'T SAY THAT THEY WENT TO COURT OR NOT, HE

15  SAID THEY WITHHELD THE FUNDING.  BUT IT DOESN'T INDICATE THAT

16  THE PROCESS WAS THERE.  AND THE UNITED STATES NEVER CHALLENGES

17  THE STATE'S INTERPRETATION OR REALLY NEVER ADDRESSES AS TO WHY

18  STATE LAW REQUIRES THAT JUDICIAL INVOLVEMENT.

19       THANK YOU, YOUR HONOR.

20       THE COURT:  THANK YOU.

21       MS. WATSON:  YOUR HONOR, IN THE TIME THAT REMAINS,

22  I'D LIKE TO ADDRESS A NUMBER OF THE ARGUMENTS THAT WERE RAISED

23  BY THE STATE.  BUT I ALSO WOULD JUST LIKE TO REFRAME WHAT THE

24  ISSUE IS FOR THE COURT YET AGAIN.

25       THE STATE WOULD HAVE THE COURT BELIEVE THAT THE COURT

1    ISSUE BEFORE THE COURT RIGHT NOW PERTAINS TO LOCAL CONTROL AND

2    THE ROLE OF THE LEA'S AND IEP TEAMS, AMONG OTHERS, IN

3    CONNECTION WITH THE GNETS PROGRAM.  BUT, YOUR HONOR, THE ISSUE

4    THAT THE UNITED STATES HAS BROUGHT BEFORE THE COURT IS ABOUT

5    THE STATE'S ADMINISTRATION OF THE PROGRAM, BECAUSE IT IS THE

6    STATE, NOT THE LEA'S AND IEP TEAMS, THAT'S PROMULGATING

7    REGULATIONS THAT THEN SHAPE THE ACTIONS THAT THE LEA'S AND IEP

8    TEAMS CAN TAKE.

9            IT IS THE STATE, NOT THE LEA'S AND IEP TEAMS, THAT IS

10    ESTABLISHING THE STANDARDS AND CRITERIA THAT INFLUENCE WHAT

11    DECISIONS THE LOCAL ENTITIES CAN MAKE.

12            IT IS THE STATE THAT'S PROVIDING THE VAST MAJORITY OF

13    FUNDING FOR THE GNETS PROGRAM.  BUT THEN THE LEA'S AND IEP --

14    THAT THE LEA'S AND OTHER LOCAL ENTITIES ARE USING.

15            AND IT'S THE STATE THAT'S PROVIDING OVERSIGHT AT A

16    STATEWIDE LEVEL THAT, AGAIN, IS SHAPING MANY OF THE ACTIONS

17    THAT THE LEA'S AND IEP TEAMS ARE TAKING.

18            SO WITH THAT IN MIND, I WOULD LIKE TO RESPOND TO A

19    FEW SPECIFIC ISSUES THAT THE STATE HAS RAISED.  SO ONE OF THE

20    ISSUES THAT WAS RAISED BY THE STATE IS WHETHER THE GNETS RULE

21    IS BINDING ON THE LEA'S AND OTHER ENTITIES.  AND, YOUR HONOR,

22    WE SUBMIT THAT THAT ONE IS A VERY SIMPLE ARGUMENT.  IT IS A

23    STATE REGULATION.  IT'S SETTING FORTH THE RULES AND THE

24    REQUIREMENTS FOR THE OPERATION OF THE GNETS PROGRAM.

25            THE STATE ALSO RAISES A NUMBER OF ISSUES RELATED TO

88

1  THE STRATEGIC PLAN, ONE OF WHICH WAS THE STRATEGIC PLAN.  I

2  THINK THEY ARGUE THAT THE STRATEGIC PLAN WAS CREATED BY LOCAL

3  OFFICIALS.

4        AND I SHOULD NOTE, ALSO, YOUR HONOR, THAT MANY OF

5  THESE ISSUES WHICH THE STATE IS SUGGESTING WE DID NOT ADDRESS

6  WERE ADDRESSED AFFIRMATIVELY IN OUR STATEMENT OF MATERIAL FACTS

7  AND THE FACTS THAT WE SET FORTH IN CONNECTION WITH OUR MOTION

8  THAT WAS FILED.  SO, FOR EXAMPLE, WITH REGARD TO THE STRATEGIC

9  PLAN, THE STATE CONTENDS IT WAS CREATED BY LOCAL OFFICIALS, BUT

10  WE MAKE CLEAR AT THE OUTSET THAT THE STRATEGIC PLAN WAS

11  SPEARHEADED BY THE STATE.  AND IT WAS SPEARHEADED BY THE

12  STATE'S GNETS PROGRAM MANAGER.

13        AT THE END OF THE DAY, THE STATE IS THE ENTITY THAT

14  IS UTILIZING THIS DOCUMENT FOR MONITORING AND COMPLIANCE

15  PURPOSES.  SO WHILE THE STATE IS ATTEMPTING TO DISTRACT THE

16  COURT AND FOCUSING ON FACTS THAT ARE NOT MATERIAL TO THE KEY

17  ISSUE THAT WE ARE RAISING, WE'RE TRYING TO REDIRECT THE COURT

18  BACK TO THE FACT THAT THIS IS A DOCUMENT THAT THE STATE IS

19  USING FOR MONITORING PURPOSES.

20        WE ALSO DON'T, YOUR HONOR, WITH REGARD TO FUNDING,

21  AGAIN, TO MAKE VERY CLEAR, WE ARE NOT SUGGESTING THAT FUNDING

22  ALONE IS SUFFICIENT TO DETERMINE ADA LIABILITY.  BUT WE HAVE

23  GIVEN NUMEROUS EXAMPLES OF HOW THE STATE IS USING FUNDING AND

24  MAKING A LOT OF DECISIONS RELATED TO ADMINISTRATION.

25        IN PARTICULAR, EVEN THOUGH, YOU KNOW, THE STATE HAS

89

1    POINTED OUT THAT THE LEA AND LOCAL ENTITIES' PARTICIPATION IN

2    GNETS IS VOLUNTARY AND THAT THEY ARE INVOLVED IN HIRING AND

3    FIRING THEIR OWN STAFF, AMONG OTHER THINGS, WE NOTE THAT, ONCE

4    THESE ENTITIES CHOOSE TO PARTICIPATE IN THE GNETS PROGRAM, THEY

5    ARE THEN SUBJECT TO THE STATE'S WIDESPREAD AUTHORITY AND THE

6    PARAMETERS THAT ARE THEN SET FORTH BY THE STATE THROUGH THE

7    REGULATIONS, VARIOUS OTHER RULES AND STANDARDS, ASSURANCES THAT

8    REQUIRE THEIR COMPLIANCE, AMONG OTHER THINGS.

9           WE ALSO NOTE, YOUR HONOR, THE STATE TAKES ISSUE WITH

10   SOME OF THE E-MAILS THAT WERE BROUGHT TO THE COURT'S ATTENTION

11   IN THE UNITED STATES' FILING.  BUT, AGAIN, WE JUST POINT OUT TO

12   THE COURT THAT THESE E-MAILS DEMONSTRATE NUMEROUS INSTANCES,

13   MORE THAN JUST THE FOUR THAT THE STATE ACKNOWLEDGE, NUMEROUS

14   INSTANCES OF GNETS DIRECTORS LOOKING TO THE STATE FOR

15   DIRECTION, AND MANAGEMENT, EFFECTIVELY, WITH REGARD TO HOW TO

16   OPERATE THEIR GNETS PROGRAMS.

17          YOUR HONOR, THE STATE CONTENDS THAT THE U.S.

18   DEPARTMENT OF EDUCATION FUNDING FORMULA IS SIMILAR TO HOW

19   FUNDING OPERATES FOR GNETS, AND THEY MAKE SIMILAR ARGUMENTS IN

20   THEIR BRIEFING.  AND WE JUST CONTEND THAT THAT IS NOT -- THAT

21   THAT'S NOT A VALID ARGUMENT.  IT'S APPLES-AND-ORANGES

22   COMPARISON.

23          SO I REALIZE, YOUR HONOR, I'M OUT OF TIME.

24          THE COURT:  IT'S OKAY.  GO AHEAD.

25          MS. WATSON:  BUT I THANK YOU SO MUCH, YOUR HONOR, FOR

1  HEARING ALL OF THESE ARGUMENTS.  AND, REALLY, AT THE END OF THE

2  DAY, WE JUST REDIRECT THE COURT AGAIN TO THE FACT THAT THE

3  STATE, NOT MISSTATING ALL THESE OTHER ENTITIES WHO MAY PLAY

4  VARIOUS ROLES IN THE PROCESS, IT IS THE STATE THAT IS THE TRUE

5  ADMINISTRATOR THAT ULTIMATELY SHAPES THESE OTHER DECISIONS THAT

6  THESE OTHER ENTITIES CAN MAKE.

7              THANK YOU, YOUR HONOR.

8              THE COURT:  THANK YOU.

9              ALL RIGHT.  I'M SORRY THAT I'M TALKING WHILE YOU'RE

10  STILL THERE, COUNSELOR, BUT I SHOULD HAVE SAID AT THE

11  BEGINNING, THANK YOU FOR YOUR PROPOSED HEARING SCHEDULE, BUT

12  I'M NOT GOING TO CUT ANYBODY OFF MID-SENTENCE.  SO THAT'S MY

13  FAULT FOR NOT MENTIONING THAT.  BUT THOSE ARE GUIDELINES FOR

14  US.  BUT CERTAINLY THE COURT WANTS TO HEAR AND IS MAKING NOTES

15  OF ALL OF THE THINGS THAT -- THAT WE NEED TO DISCUSS HERE.

16              AND SO IF YOU ARE RIGHT ON THE -- THE EDGE OF YOUR

17  DEADLINE, YOUR TIME DEADLINE, AND YOU'RE GOING TO START

18  RUSHING, I'D RATHER YOU JUST TAKE YOUR TIME AND FINISH YOUR

19  POINT.  IT'S MORE HELPFUL TO THE COURT THAT WAY.

20              WE ARE RIGHT AT 12:17.  I'M SORRY THAT I COULD NOT

21  START THIS HEARING EARLIER.  IF SO, WE PROBABLY COULD HAVE

22  PUSHED THROUGH AND FINISHED BEFORE LUNCH.  BUT HERE WE ARE AT

23  THE LUNCH HOUR.  AND SO I'M GOING TO DISMISS YOU FOR AN HOUR TO

24  RETURN AT 1:15 FOR LUNCH, AND THEN WE WILL PROCEED WITH THE

25  MOTIONS TO EXCLUDE AND THE MOTION TO LIMINE.

1        IS THERE ANYTHING BEFORE WE DEPART, ON BEHALF OF

2   PLAINTIFF?

3            MS. WOMACK:  NO, YOUR HONOR.

4            THE COURT:  ON BEHALF OF DEFENDANT.

5            MR. BELINFANTE:  NO, YOUR HONOR.  THANK YOU.

6            THE COURT:  ALL RIGHT.  THEN I WILL SEE YOU ALL ALL

7   BACK AT 1:15.  THANK YOU SO MUCH.

8            THE COURTROOM SECURITY OFFICER:  ALL RISE.  COURT

9   STANDS IN RECESS UNTIL 1315 HOURS.  THANK YOU.

10            (WHEREUPON, THE LUNCH RECESS WAS HAD FROM 12:18 P.M.

11   UNTIL 1:19 P.M.)

12            THE COURT:  THANK YOU, SIR.

13            THANK YOU.  GOOD AFTERNOON.  PLEASE BE SEATED.

14            ALL RIGHT.  THE FIRST MOTION TO EXCLUDE IS

15   DEFENDANT'S REGARDING DR. AMY MCCART.

16            MR. BELINFANTE:  WELL, GOOD NEWS/BAD NEWS, YOUR

17   HONOR.  THE GOOD NEWS IS, IT'S MY LAST ONE.

18            THE COURT:  OKAY.

19            MR. BELINFANTE:  THAT MEANS IT'S A HALF AN HOUR.

20            THE COURT:  BAD NEWS COULD HAVE BEEN A LOT WORSE.

21   THAT'S ALL RIGHT.

22            MR. BELINFANTE:  MAY IT PLEASE THE COURT.

23            THE COURT:  YES, SIR.

24            MR. BELINFANTE:  YOUR HONOR, ON BEHALF OF THE STATE

25   OF GEORGIA, WE ARE MOVING TO EXCLUDE ALL OR PORTIONS OF DR. AMY

1    MCCART'S REPORT AND TESTIMONY AS INCONSISTENT WITH RULE 702 OF

2    THE FEDERAL RULES OF EVIDENCE.  IT IS OFFERED TO PROVIDE THE

3    LINK BETWEEN THE DEPARTMENT'S ALLEGATION THAT THE STATE

4    UNJUSTIFIABLY ISOLATES STUDENTS, AND ALSO THAT THERE IS

5    INEQUITABLE EDUCATIONAL OPPORTUNITIES FOR STUDENTS FOR WHOM

6    LOCAL OFFICIALS HAVE RECOMMENDED GNETS SERVICES.

7          DR. MCCART'S TESTIMONY IS OFFERED BOTH AS A CRITICISM

8    OF IEP TEAMS' RECOMMENDATIONS, AS JUSTICE KENNEDY WOULD SAY,

9    THOUGH, IN THE ABSTRACT, AND ALSO TO THE DAY-TO-DAY OPERATIONS

10   OF GNETS PROGRAMS.  AND THE UNITED STATES IS ATTEMPTING TO USE

11   HER TESTIMONY THAT LITERALLY RANGES FROM CLASSROOM POSTERS AND

12   WRITING ON WALLS AS A MATTER OF DISCRIMINATION UNDER THE ADA

13   AND FEDERAL LAW.

14         IT SHOULD BE EXCLUDED FOR THREE REASONS.  HER

15   CONCLUSIONS ARE IRRELEVANT BECAUSE THEY APPLY THE WRONG LEGAL

16   STANDARD.  THEY ARE UNHELPFUL TO THE TRIER OF FACT BECAUSE SHE

17   MAKES ARGUMENTS ABOUT THE STATE'S EFFORTS IN TRAINING THAT SHE

18   HAS NOT REVIEWED AND HAS NOT CONSIDERED.  AND HER METHODOLOGY,

19   TO THE EXTENT THAT IT IS EVEN ARTICULABLE, IS CERTAINLY NOT

20   RELIABLE.  MORE SPECIFICALLY -- WELL, WE'LL GET TO THAT.

21         DR. MCCART HAS OPINED IN HER REPORT ON THREE THINGS,

22   WHICH TRACK THE LANGUAGE OF THE UNITED STATES' ALLEGATION.

23         NUMBER ONE, THE GNETS PROGRAM, QUOTE, SEGREGATES --

24   SEPARATES AND ISOLATES STUDENTS WITH BEHAVIOR-RELATED

25   DISABILITIES IN MULTIPLE AND COMPOUNDING WAYS.

1          NUMBER TWO, THE GNETS PROGRAM PROVIDES UNFAIR AND

2    UNEQUAL EDUCATIONAL OPPORTUNITIES FOR STUDENTS WITH

3    BEHAVIOR-RELATED DISABILITIES.

4          AND, NUMBER THREE, THE GNETS PROGRAM'S SYSTEMATIC

5    SEGREGATION OF STUDENTS WITH BEHAVIOR-RELATED DISABILITIES IN

6    THE STATE OF GEORGIA IS UNNECESSARY AND FAILS TO DELIVER

7    EFFECTIVE BEHAVIORAL AND THERAPEUTIC SUPPORTS.

8          I KNOW THE COURT HAS DECIDED MANY OF THESE MOTIONS

9    BEFORE, SO I'M NOT GOING TO BELABOR THE STANDARDS.  JUST

10   BRIEFLY, THOUGH, IT IS THE UNITED STATES THAT BEARS THE BURDEN

11   HERE OF ESTABLISHING THE ADMISSIBILITY OF THEIR OWN EXPERT

12   WITNESS.  AND WHILE IT IS TRUE -- THAT'S THE FRAZIER CASE --

13   AND WHILE IT IS TRUE THAT IN THIS CIRCUIT THE STANDARDS OF RULE

14   702 ARE RELAXED AT A BENCH TRIAL, THEY ARE STILL APPLIED.  AND

15   A CASE REPRESENTING THAT WAS DECIDED BY THE ELEVENTH CIRCUIT IN

16   2012.  IT'S SOVEREIGN MILITARY HOSPITAL ORDER OF ST. JOHN OF

17   JERUSALEM OF RHODES AND OF MALTA VERSUS FLORIDA.

18         IN THAT CASE, THERE ARE TWO OPINIONS, ONE AT 694 F.3D

19   1200, AND THEN ON RECONSIDERATION AT 702 F.3D 1279.  AND IN

20   THAT CASE, JUDGE PRYOR, WILLIAM PRYOR, POINTS OUT IN THE FIRST

21   DECISION THAT IT WAS ERROR TO NOT MAKE A DECISION AT A BENCH

22   TRIAL ON THE QUESTION OF ADMISSIBILITY OF EXPERT TESTIMONY.

23   THE TRIAL JUDGE ADOPTED PRETTY MUCH THE STANDARD THAT IT'S

24   RELAXED AND THEREFORE DID NOT MAKE FINDINGS.

25         IT WAS LATER DETERMINED, AND QUOTING FROM THE CASE ON

1    PAGE 1296, AT BOTTOM, THE DISTRICT COURT ERRED WHEN IT ALLOWED

2    THE WITNESS TO TESTIFY.  THAT MUCH IS TRUE.  THAT A COURT DID

3    NOT DEEM THAT REVERSIBLE ERROR BECAUSE THEY FOUND IT TO BE

4    HARMLESS, BUT IT DOES INDICATE THAT, EVEN IN BENCH TRIALS, THE

5    RULE IS GOING TO APPLY AND DOES APPLY.

6         FINALLY, IF THE COURT CONSIDERS DR. MCCART'S

7    TESTIMONY IN LIMITED OR OTHERWISE INADMISSIBLE, THAT WOULD

8    APPLY AT SUMMARY JUDGMENT AS WELL.  AND ON THAT, THERE'S NO

9    ARGUMENT.

10        THE FIRST ISSUE IS THAT DR. MCCART'S TESTIMONY IS

11   IRRELEVANT TO THE ACTUAL CASES OR QUESTIONS BEFORE THE COURT ON

12   SUMMARY JUDGMENT STARTING WITH HER CLAIM OF UNNECESSARY

13   SEGREGATION.  UNDER RULE 702 AND DAUBERT, IT IS PLAIN THAT ONLY

14   RELEVANT EVIDENCE IS ADMISSIBLE.  AND WHAT THE UNITED STATES

15   COURT OF APPEALS FOR THE ELEVENTH CIRCUIT SAID IN 2014 DECISION

16   OF DOLGENCORP THAT WE CITE IN OUR BRIEF IS THAT THE -- IN THAT

17   CASE, THEY EXCLUDED OR AFFIRMED THE EXCLUSION OF AN EXPERT'S

18   REPORT BECAUSE THE EXPERT'S, QUOTE, REPORTS ARE ANALYZING THE

19   WRONG PROBLEM AND THEREFORE DO NOT ASSIST THE TRIER OF FACT TO

20   DETERMINE A FACT AT ISSUE IN THE CASE.

21        JUDGE GODBEY WOOD CITED THAT DECISION IN A 2015

22   DECISION OF UNITED STATES VERSUS AEGIS THERAPIES.  IT WAS A

23   FALSE CLAIMS ACT CASE OR -- AND THERE THE JUDGE WROTE THAT THE

24   PLAINTIFF'S EXPERT'S ANALYSIS AND CONCLUSIONS REST UPON

25   REPEATED AND ERRONEOUS EVALUATIONS OF DEFENDANT'S BILLING

1    PRACTICES.  BY EVALUATING INSTANCES OF CARE UNDER THE

2    SIGNIFICANT IMPROVEMENT STANDARD, THE EXPERTS ANALYZE, QUOTE,

3    THE WRONG PROBLEM.  AND IT WAS THEREFORE EXCLUDED.

4         THE UNITED STATES' RESPONSE BRIEF IN SUPPORT OF DR.

5    MCCART'S TESTIMONY DOES NOT CITE TO OR QUARREL WITH EITHER OF

6    THOSE CONCLUSIONS.  SO WE HAVE AGREEMENT THAT IF DR. MCCART HAS

7    APPLIED THE WRONG TEST, THEN HER TESTIMONY SHOULD BE EXCLUDED.

8    AND THE FIRST AREA IS ON UNJUSTIFIED SEGREGATION, AS SHE CALLS

9    IT.

10        OLMSTEAD SAYS AND IS CLEAR THAT ONLY UNJUSTIFIED

11   ISOLATION IS ACTIONABLE UNDER THE ADA.  THAT'S IN BOTH THE

12   PLURALITY DECISION AND IN JUSTICE KENNEDY'S CONTROLLING

13   CONCURRENCE.  IN FACT, AS JUSTICE GINSBURG POINTED OUT FOR THE

14   PLAINTIFFS IN THAT CASE -- AND I KNOW WE'VE ALREADY TALKED

15   ABOUT THIS -- THE COURT ACKNOWLEDGED THAT THOSE INDIVIDUAL

16   PLAINTIFFS MAY NEED TO RETURN FOR SOME TIME TO AN ISOLATED

17   SETTING, AND THEN THERE ARE SOME WHO MAY NEVER LEAVE AN

18   ISOLATED SETTING.  AND THAT WOULD BE APPROPRIATE.

19        IT'S THE SPECTRUM THAT REQUIRES THAT INDIVIDUALIZED

20   ANALYSIS THAT WE TALKED ABOUT.  SOME FOLKS DON'T MEET ISOLATED

21   SETTINGS AT ALL.  SOME FOLKS ALWAYS NEED IT.  AND IN BETWEEN IS

22   WHAT REQUIRES THE INDIVIDUALIZED ANALYSIS.  WE'VE ALREADY

23   TALKED ABOUT HOW THE ELEVENTH CIRCUIT REAFFIRMED THAT DECISION

24   THAT IT IS UNJUSTIFIED ISOLATION ONLY.

25        DR. MCCART, HOWEVER, APPLIES A DIFFERENT STANDARD

1   THAN UNJUSTIFIED ISOLATION.  AND, REMEMBER, THE ELEMENTS OF

2   OLMSTEAD SAY IT IS ONLY UNJUSTIFIED IF THE STATE'S TREATING

3   PROFESSIONALS HAVE DETERMINED THAT COMMUNITY PLACEMENT IS

4   APPROPRIATE; NUMBER TWO, THE INDIVIDUAL DOES NOT OBJECT TO

5   COMMUNITY PLACEMENT; AND, THIRD, THE PLACEMENT CAN BE

6   ACCOMMODATED CONSIDERING THE STATE'S RESOURCES AND NEEDS OF

7   THEIR INDIVIDUALS.

8          DR. MCCART IN HER DEPOSITION -- IT'S PAGE 65, 17 TO

9   22 -- ANSWERS THE QUESTION THIS WAY:  WHAT CONSTITUTES

10  UNNECESSARY SEGREGATION?

11         ANSWER, WHEN A CHILD IS MOVED AWAY FROM HIS OR HER

12  SCHOOL-AGED PEERS OR SIBLINGS, SET APART FROM OR TREATED

13  DIFFERENTLY THAN STUDENTS WITHOUT DISABILITIES.

14         THAT IS A PER SE ANALYSIS.  AT ANY TIME A CHILD IS

15  MOVED AWAY FROM HIS OR HER SCHOOL-AGED PEERS OR SIBLINGS THAT

16  THAT IS UNJUSTIFIED SEGREGATION.

17         THAT MAY BE A FINE POLICY DEBATE.  THAT MAY BE

18  CERTAINLY ONE THAT CLEARS ON IN THE ACADEMIC REALM.  BUT IN

19  TERMS OF THE QUESTION BEFORE THE COURT, IS AN ISOLATED SETTING

20  APPROPRIATE, AND IS IT -- YOU KNOW, PUTTING ASIDE THE WHOLE

21  TREATING PROFESSIONAL ISSUE -- IS IT APPROPRIATE.  THE LAW IS

22  FOR THE PURPOSES OF THE ADA THAT IT CAN -- IT IS NOT A PER SE

23  VIOLATION, WHICH IS WHAT DR. MCCART ARTICULATES.  SO HER

24  TESTIMONY ON UNJUST ISOLATION APPLIES THE WRONG TEST AND UNDER

25  AEGIS AND DOLGENCORP WOULD BE INADMISSIBLE.

1    SHE ALSO CONDUCTS A GENERALIZED INQUIRY, WHEREAS

2    WE'VE SPENT TIME DISCUSSING PREVIOUSLY THE ADA REQUIRES AN

3    INDIVIDUALIZED INQUIRY.  HER OPINION IN HER DEPOSITION, 178,

4    PAGES 8 TO 12, SHE SAYS:  MY OPINION IS THAT THE STATE

5    DEPARTMENT OF EDUCATION IN GEORGIA UNNECESSARILY SEGREGATES

6    STUDENTS EN MASSE.

7    AND HOW DID SHE COME TO THAT CONCLUSION?  SHE DID IT

8    BY REVIEWING ABOUT THREE PERCENT OF THE IEP FILES AND TOURS, ET

9    CETERA.  BUT SHE ACKNOWLEDGES SHE DID NOT REVIEW THE VAST

10   MAJORITY OF STUDENTS.  AND, THUS, SHE DID NOT CONDUCT THE TYPE

11   OF INDIVIDUALIZED DETERMINATION THAT THE ADA REQUIRES.

12   AS JUSTICE KENNEDY WROTE IN HIS CONCURRING OPINION,

13   COMPARISONS OF DIFFERENT MEDICAL CONDITIONS AND THE

14   CORRESPONDING TREATMENT REGIMES MIGHT BE DIFFICULT AND WOULD BE

15   ASSESSMENTS OF A DEGREE OF INTEGRATION OF VARIOUS SETTINGS

16   WHICH THE MEDICAL TREATMENT IS OFFERED.

17   THAT CAN'T HAPPEN, AS KENNEDY WROTE, IN THE ABSTRACT.

18   YET, THAT'S WHAT DR. MCCART HAS DONE.

19   NOW I'LL GET TO THE ARGUMENT THAT HER EXPERIENCE

20   ALLOWS HER TO DO THAT IN THE METHODOLOGY PIECE.  BUT FOR THE

21   PURPOSES OF THIS ANALYSIS, IT IS THAT SHE APPLIED THE WRONG

22   TEST.

23   IN RESPONSE, THE DOJ MAKES SEVERAL ARGUMENTS.  THE

24   FIRST, THOUGH, IS THAT WE AGREE ON THE ELEMENTS OF UNJUSTIFIED

25   ISOLATION.  BUT THE DOJ DOES NOT ATTEMPT TO DEFEND DR. MCCART

1  OR CLAIM THAT SHE HAS PROVIDED THE CORRECT DEFINITION.  IN

2  THEIR BRIEF AT PAGE 440, PAGES 21 AND 22, THE DOJ WRITES:  NOR

3  IS IT RELEVANT WHETHER DR. MCCART USED THE UNJUSTIFIED LANGUAGE

4  FROM OLMSTEAD IN HER REPORT, AS THE STATE OBJECTS.  WHETHER OR

5  NOT AN EXPERT USES A CATCH PHRASE IS IRRELEVANT TO THE

6  ADMISSIBILITY OF HER OPINIONS AS LONG AS THE OPINIONS OFFERED

7  ARE HELPFUL TO THE COURT IN MAKING THOSE LEGAL DETERMINATIONS.

8        IT'S NOT HELPFUL IF HER DEFINITION OF UNJUST

9  ISOLATION OR UNJUST SEGREGATION, AS SHE CALLS IT, IS PER SE.

10  AND THE LAW GOES THE OTHER WAY.  THEY CITE THE BRAGG DECISION

11  FROM THE MIDDLE DISTRICT OF ALABAMA IN 2016 IN SUPPORT OF THEIR

12  ARGUMENT THAT BRAGG IS EASILY DISTINGUISHABLE.  BRAGG INVOLVED

13  A CASE WHERE A PHYSICIAN EVALUATED AND SAID THERE WAS A RISK OF

14  HARM FOR PRISONERS AND DID NOT USE THE LEGAL PHRASE SERIOUS

15  RISK OF HARM.  AND IT WAS TRULY AT THAT POINT A SEMANTIC ISSUE:

16  WAS IT A RISK OF HARM OR SERIOUS RISK OF HARM.

17        HERE WE'RE NOT ATTACKING THE USE OR LACK OF USE OF

18  DR. MCCART USING THE RIGHT PHRASE.  WHAT WE ARE ARGUING IS THAT

19  HER OPINION OF WHAT CONSTITUTES UNJUSTIFIED SEGREGATION, BY

20  DEFINITION, IS NOT THE DEFINITION THAT THE SUPREME COURT IN THE

21  ELEVENTH CIRCUIT USE WHEN LOOKING AT OLMSTEAD CLAIMS.  IT'S NOT

22  A WORD ISSUE.  IT'S A MEANING ISSUE.

23        ON HER GENERALIZED INQUIRY WHERE WE MAKE THAT

24  ARGUMENT, THE DEPARTMENT OF JUSTICE RESPONDS AND SAYS, WELL,

25  THE STATE'S EXPERT, DR. WILEY, SAID HE WOULD DO WHAT DR. MCCART

1    DID; THEREFORE, IT MUST BE OKAY.

2            AS YOU WILL HEAR IN THE RESPONSE TO DR. WILEY, THE

3    STATE AGREES THAT IF THE COURT AGREES WITH THE STATE AND SAYS

4    THAT HYPOTHETICAL STUDENTS ARE NOT RELEVANT OR ARE NOT

5    CONSIDERED IN AN ADA ANALYSIS, THAT IT HAS TO BE

6    INDIVIDUALIZED, THEN, YES, DR. WILEY'S TESTIMONY IS NOT GOING

7    TO BE HELPFUL.

8            BUT AT THAT POINT, DR. PUTNAM AND DR. MCCART'S

9    TESTIMONY WOULD BE EXCLUDED, AND THE UNITED STATES WOULD NOT

10   HAVE SUFFICIENT EVIDENCE TO OVERCOME SUMMARY JUDGMENT.

11           BUT HERE'S THE OTHER ISSUE WITH THE MIS-RELIANCE THAT

12   THE UNITED STATES HAS ON DR. WILEY'S TESTIMONY.  HE WAS ASKED A

13   QUESTION ABOUT A CATEGORICAL INFERENCE.  IT CITES HIS

14   DEPOSITION TESTIMONY AT PAGE 76, 3 TO 24.  THE QUESTION ASKED

15   WAS:  ARE THERE SOME THINGS YOU WOULD AGREE -- OR, EXCUSE ME,

16   ARE THERE SOME THINGS YOU AGREE THAT WOULD MAKE A SEPARATE

17   SETTING CATEGORICALLY INAPPROPRIATE, EVEN IF IT IS OTHERWISE

18   SPECIALIZED.

19           WHEN THE QUESTION IS FRAMED OF IN TERMS OF A

20   CATEGORY, AGAIN, THAT MAY BE RELEVANT FOR ACADEMIC ISSUES.  IT

21   MAY BE RELEVANT FOR POLICY ISSUES.  BUT IT'S NOT THE PIECE THAT

22   THE ADA FOCUSES ON OR FUNCTIONS ON.  AS KENNEDY SAID, IT CANNOT

23   BE DECIDED IN THE ABSTRACT.

24           THE NEXT OPINION OF DR. MCCART THAT SHOULD BE DEEMED

25   INADMISSIBLE -- AND IF THE COURT AGREES WITH US ON THIS, THEN

1  HER ENTIRE FIRST CONCLUSION AND THIRD CONCLUSION ON UNNECESSARY

2  SEGREGATION WOULD GO AWAY.  THE NEXT ONE, THOUGH, IS ABOUT THE

3  QUALITY AND QUANTITY OF SERVICES.  THIS SPEAKS TO BOTH

4  REASONABLE ACCOMMODATION AND UNNECESSARY SEGREGATION.

5          THE LEGAL TEST UNDER THE ADA IS NOT BASED ON WHETHER

6  THE QUALITY OF SERVICES ARE SUFFICIENT.  WRITING FOR BOTH

7  PLURALITY, JUDGE GINSBURG WROTE:  THE ADA DOES NOT, QUOTE,

8  IMPOSE ON STATES A STANDARD OF CARE FOR WHATEVER MEDICAL

9  SERVICES THEY RENDERED, NOR DOES THE ADA REQUIRE STATES TO

10  PROVIDE A CERTAIN LEVEL OF BENEFITS TO INDIVIDUALS WITH

11  DISABILITIES.

12          JUSTICE KENNEDY'S CONCURRENCE SAYS THE SAME THING

13  ABOUT QUANTITY OF SERVICES AT PAGES 612 TO 613.  IT FOLLOWS

14  THAT A STATE MAY NOT BE FORCED TO CREATE COMMUNITY TREATMENT

15  PROGRAMS WHERE NONE EXIST.

16          DR. MCCART, THOUGH, OPINES ON QUALITY, AND IT IS

17  CLEAR THAT HER CONCLUSIONS ARE BASED ON HER CONSIDERATIONS OF

18  QUALITY.  IN HER DEPOSITION AT PAGE 172, LINE 19 TO 173-3, WE

19  HAVE THIS EXCHANGE:  QUOTE, QUESTION, IS THE STATE DEPARTMENT

20  OF EDUCATION PROVIDING INSUFFICIENT QUALITY IN TERMS OF THE

21  SUPPORT SERVICES THAT ARE PROVIDED TO STUDENTS WITH EMOTIONAL

22  OR BEHAVIORAL DISABILITIES.

23          ANSWER:  INASMUCH AS IT'S UTILIZING, AS IT RELATES TO

24  THE GNETS PROGRAM, YES.

25          SO WHEN SHE CRITICIZES THE GNETS PROGRAM FOR AN

1    INSUFFICIENT QUALITY OF SERVICES, THAT'S IRRELEVANT TO THE

2    QUESTION OF WHETHER THERE'S BEEN AN ADA VIOLATION.  THERE MAY

3    BE OTHER STATUTES THAT ADDRESS THAT.  BUT IT IS NOT INDICATIVE

4    OF AN ADA VIOLATION UNDER TITLE II.  AND THE SUPREME COURT HAS

5    MADE THAT CLEAR.

6            SHE ALSO DIS-APPLIES TO HER EDUCATIONAL OPPORTUNITIES

7    ANALYSIS AS WELL.  IN HER DEPOSITION AT PAGE 235, LINE NINE,

8    SHE SAYS:  SO THERE ARE MANY REASONS, INCLUDING CONCERNS WITH

9    THE QUALITY OF THE PROGRAM AND THE OUTCOMES EXPERIENCED BY

10   STUDENTS IN THE PROGRAM.  SHE CONTINUED OR SAID EARLIER AT PAGE

11   175 THAT THE STATE DOE, QUOTE, FAILED TO PROVIDE EFFECTIVE

12   SUPPORTS, PROFESSIONAL LEARNING, TECHNICAL ASSISTANCE,

13   GUIDANCE, AND VISION FOR STUDENTS IN THE GNETS PROGRAM.

14           THIS IS A QUALITATIVE ANALYSIS THAT THE SUPREME COURT

15   HAS SAID DOES NOT INDICATE ANYTHING FOR AN ADA CLAIM.

16           NOW, DR. MCCART'S OPINIONS ON QUANTITY ARE A LITTLE

17   BIT MIXED.  IT COULD BE THAT WE DON'T HAVE AN ISSUE.  I ASKED

18   HER AT PAGE 172:  IS IT YOUR OPINION, AS REFLECTED IN YOUR

19   REPORT, THAT THE STATE OF GEORGIA DEPARTMENT OF EDUCATION

20   PROVIDES AN INSUFFICIENT NUMBER OF SUPPORT SERVICES AND

21   INSUFFICIENT QUANTITY OF SUPPORT SERVICES TO STUDENTS WITH

22   EMOTIONAL BEHAVIORAL DISABILITIES.

23           ANSWER:  THAT'S NOT REFLECTED IN MY REPORT.

24           SO IF THE UNITED STATES IS NOT SEEKING TO USE HER TO

25   SAY THAT THE STATE SHOULD EXPAND SERVICES, THAT IT OFFERS AN

1   INSUFFICIENT NUMBER OF SERVICES, THEN WE MAY NOT HAVE AN ISSUE.

2   THE PROBLEM IS, IT'S UNCLEAR WHAT BOTH HER TESTIMONY AND THE

3   POTENTIAL USE OF IT IS.

4        HER REPORT SAYS AT PAGE 151 THAT GNETS PROGRAM

5   TEACHERS AND STAFF HAVE NOT BEEN GIVEN THE TOOLS, RESOURCES, OR

6   TRAINING NEEDED TO UNDERSTAND AND IMPLEMENT EFFECTIVE

7   INTERVENTIONS AS DR. MCCART DEFINES THEM.  AND SO THERE IS A

8   FUNDAMENTAL LACK OF TRAINING, TOOLS, AND RESOURCES.

9        WELL, IF THAT LACK IS RESOLVED BY PROVIDING MORE,

10  THAT'S THE QUANTITY-OF-SERVICES ARGUMENT THAT IS NOT RELEVANT

11  TO AN ADA CLAIM.  THE REPORT SAYS THERE ARE ALSO, QUOTE,

12  INSUFFICIENT RESOURCES, INCLUDING A LACK OF CERTIFIED

13  BEHAVIORAL AND THERAPEUTIC STAFF AND RESOURCES TO SUPPORT

14  STUDENTS, REPORT AT PAGE 160.

15       SO, AGAIN, IF THE UNITED STATES IS SEEKING TO USE

16  THAT TESTIMONY TO SAY THAT THE STATE NEEDS TO PROVIDE MORE

17  BEHAVIORAL AND THERAPEUTIC STAFF, MORE RESOURCES, MORE

18  TRAINING, THAT'S NOT RELEVANT TO AN ADA CLAIM, AND HER

19  TESTIMONY SHOULD NOT BE THERE.

20       IN RESPONSE, THE UNITED STATES ACKNOWLEDGES THAT IT'S

21  USING DR. MCCART'S OPINION TO ESTABLISH LIABILITY BASED ON HER

22  TESTIMONY ON QUALITY AND QUANTITY.  BUT, AGAIN, IT'S UNCLEAR IF

23  THAT'S ACTUALLY WHAT DR. MCCART'S DOING.

24       IN THEIR BRIEF AT DOCKET 440, PAGE TEN, THEY SAY,

25  WHETHER THE STATE IS PROVIDING THE QUALITY AND SCOPE OF

103

1    SERVICES NEEDED TO APPROPRIATELY SERVE STUDENTS WITH

2    BEHAVIORAL-RELATED DISABILITIES AND PREVENT UNNECESSARY

3    SEGREGATION AND DENIAL OF EQUAL EDUCATIONAL OPPORTUNITIES IS

4    CLEARLY RELEVANT.

5            THAT'S NOT THE CASE.  AND OLMSTEAD MAKES THAT CLEAR.

6            THEY ALSO TALK ABOUT A, QUOTE, GROSS LACK OF MENTAL

7    HEALTH AND THERAPEUTIC EDUCATIONAL SERVICES AND SUPPORTS.  BUT,

8    ONCE AGAIN, THE UNITED STATES' BRIEF DOES NOT CHALLENGE THE

9    STATE'S INTERPRETATION OF OLMSTEAD.  IN FACT, THE SECTION ON

10   THE BRIEF CITES TO NO CASE LAW OR REGULATION OR STATUTE AT ALL.

11           NEXT WOULD BE DR. MCCART'S TESTIMONY ON REASONABLE

12   ACCOMMODATIONS.  HERE, TOO, SHE APPLIES THE WRONG STANDARD.

13   UNDER THE ADA -- AND THIS IS -- THIS IS TO HER POINT THAT THE

14   UNITED STATES ARGUES, BOTH IN ITS MERITS BRIEF ON SUMMARY

15   JUDGMENT, THAT THE ACCOMMODATIONS IT SEEKS ARE REASONABLE, AND

16   CITES TO DR. MCCART'S REPORT AND ALSO DR. MCCART'S STATEMENT

17   THAT WHAT SHE PROFFERS IS REASONABLE.

18           NOW, WE'VE ALREADY HAD THE DEBATE ABOUT WHETHER

19   REASONABLE ACCOMMODATION IS A PRIMA FACIE ELEMENT.  IT IS.  AND

20   I DON'T THINK THERE'S DISAGREEMENT ABOUT THAT.  WE STILL

21   DISAGREE ABOUT THE -- WHETHER BIRCOLL FROM THE ELEVENTH CIRCUIT

22   IS BINDING WHEN IT SAYS THAT WHAT IS REASONABLE MUST BE DECIDED

23   ON A CASE-BY-CASE BASIS.

24           WE HAVE ALSO ARGUED, CITING OLMSTEAD, IN NOTE 16 OF

25   THE PLURALITY OPINION, THAT CONSIDERATIONS OF REASONABLENESS

1    REQUIRE, PARTICULARLY IN CASES LIKE THIS WHEN YOU'RE LOOKING AT

2    SOCIAL SERVICES, CONSIDERATIONS OF COST AND WORKFORCE.   DR.

3    MCCART'S REPORT MAKES FIVE RECOMMENDATIONS FOR THE DEPARTMENT

4    OF EDUCATION.

5            AND, JUST FOR CONTEXT, SHE SAYS SHE DID NOT LOOK AT

6    OR STUDY THE DEPARTMENT OF COMMUNITY HEALTH OR THE DEPARTMENT

7    OF BEHAVIORAL HEALTH AND DEVELOPMENTAL DISABILITIES.   SO WHEN I

8    KEEP SAYING DOE, THAT'S BECAUSE THAT'S WHAT HER REPORT FOCUSED

9    ON.   AND SHE TESTIFIED THAT HER RECOMMENDATIONS ARE REASONABLE

10   ACCOMMODATIONS.   IT'S IN THE DEPOSITION AT PAGE 81.

11           SHE ALSO CONCEDED, THOUGH, THAT HER RECOMMENDATIONS

12   ARE, QUOTE, NOT EASY AND WOULD LOOK DIFFERENT IN STATES WHERE

13   SHE HAS EXPERIENCE.   HERE SHE DID NOT OFFER THE INDIVIDUALIZED

14   APPROACH THAT THE ELEVENTH CIRCUIT DEMANDED AND, THEREFORE,

15   ONCE AGAIN, SHE APPLIED THE WRONG TEST.   NOR DID SHE CONSIDER

16   QUESTIONS OF COSTS AND WORKFORCE, DESPITE THAT SHE TESTIFIED,

17   COST IS RELEVANT IN A GENERAL SENSE, ON PAGE 43, AND THAT SHE

18   DID NOT CONSIDER COST, PAGE 162.

19           SHE ALSO TESTIFIED THAT WORKFORCE AVAILABILITY IS,

20   QUOTE, ALWAYS A FACTOR, BUT DID NOT PERFORM ANY WORKFORCE

21   ANALYSIS.   SHE'S NOT EVEN APPLYING HER OWN TEST.

22           THE UNITED STATES RESPONDS ON THE INDIVIDUALIZED

23   APPROACH BY, ONCE AGAIN, NOT ADDRESSING OLMSTEAD.   THEY ADDRESS

24   THE BIRCOLL CASE ONCE -- AND I THINK THIS IS THE ONLY TIME IN

25   THE BRIEFING THAT IT DOES -- PAGE 440, PAGE 13, NOTE FIVE.   AND

1    IT SAYS:  WHILE REASONABLENESS IS INDEED DETERMINED ON A CASE

2    BY CASE, NOTHING IN BIRCOLL OR ANY DECISION CITED BY THE STATE

3    SUGGESTS THAT REASONABLENESS CAN ONLY BE DETERMINED ON AN

4    INDIVIDUAL RATHER THAN SYSTEMIC LEVEL.

5            YOUR HONOR, THAT'S JUST HARD TO SQUARE WITH THE

6    SENTENCE, WHAT IS REASONABLE MUST BE DETERMINED ON A CASE BY

7    CASE BASED ON NUMEROUS FACTORS.  AND IF YOU LOOK AT THE CASES

8    -- AND WE CITE THEM IN OUR BRIEF -- THAT HAVE CITED BIRCOLL IN

9    THE ELEVENTH CIRCUIT, THEY DO SO FOR THIS PURPOSE, BECAUSE

10   UNDER THE ADA, WHAT CONSTITUTES REASONABLE FOR ONE PERSON MAY

11   NOT BE REASONABLE FOR ANOTHER.

12           NOW, IF WE'RE TALKING AGAIN ABOUT RAMPS AND ENTRYWAY

13   THINGS, THAT YOU CAN MAKE MORE OF AN ARGUMENT.  BUT AS THE

14   OLMSTEAD DECISION AND THE MISSISSIPPI DECISION MAKE EXPLICITLY

15   CLEAR, WHEN DEALING WITH EDUCATION OR MENTAL HEALTH ISSUES, THE

16   TREATMENT PLAN IS GOING TO VARY.  THE MEDICATION IS GOING TO

17   VARY.  THE SERVICE THAT IS APPROPRIATE IS GOING TO VARY.  EVEN

18   DR. MCCART AND DR. PUTNAM AGREE.

19           NOW, DR. MCCART ALSO SAYS HER RECOMMENDATIONS ARE

20   REASONABLE, BUT THIS IS HOW SHE DESCRIBES THEM.  IT WOULD BE A

21   FUNDAMENTAL REDESIGN -- DEPOSITION, PAGE 93 -- REQUIRING

22   REORGANIZED SYSTEMS, STRUCTURES, AND RESOURCES.

23           DEPOSITION 276, EXTENSIVE PROFESSIONAL LEARNING AND

24   INTENSIVE TECHNICAL ASSISTANCE.

25           DEPOSITION 266, WHEN ASKED HOW HER EXPERIENCE WITH

1    OTHER STATES HAS ALLOWED HER TO MAKE THE CONCLUSION THAT THIS

2    IS REASONABLE -- AND I REALIZE THIS IS BLEEDING INTO THE

3    METHODOLOGY PIECE -- SHE COULD NOT IDENTIFY A STATE THAT HAS

4    ACHIEVED WHAT SHE'S RECOMMENDED, SO SHE CAN'T SAY MY EXPERIENCE

5    SAYS THAT THIS IS REASONABLE AND THEN NOT BE ABLE TO SAY THE

6    BASIS OF THAT EXPERIENCE.  AND WE'LL GET INTO THAT IN A MOMENT.

7            AND SHE ACKNOWLEDGES SHE DOES NOT KNOW IF HER

8    RECOMMENDATION COULD BE IMPLEMENTED IN GEORGIA, PAGE 468, LINE

9    20; 269, LINE THREE.

10           THE UNITED STATES THEN SAYS THAT WHAT WE'RE REALLY

11   TALKING ABOUT HERE IS THE UNDUE BURDEN DEFENSE AND NOT THE

12   REASONABLE ACCOMMODATION DEFENSE.

13           THEY ALSO SAY AT ONE POINT THAT WE DIDN'T PLEAD THAT.

14   BUT THE ONLY COURT THAT HAS ACTUALLY LOOKED AT WHETHER YOU HAVE

15   TO PLEAD AN UNDUE BURDEN DEFENSE IN YOUR ANSWER HAS SAID, OF

16   COURSE NOT, AND THE REASON IS BECAUSE YOU DON'T KNOW WHAT THE

17   REMEDY OF THE -- THE REQUIREMENT OR THE REASONABLE

18   ACCOMMODATION THAT IS BEING PROFFERED IS, AND IT WOULD BE

19   INAPPROPRIATE TO PLEAD IT WITHOUT KNOWING THAT.

20           AND WE, IN FACT, FILED IN OUR MOTION TO DISMISS THAT

21   THE REQUEST FOR RELIEF WAS INVALID BECAUSE IT WAS JUST AN

22   OBEY-THE-LAW INJUNCTION REQUEST.  BUT THE PROBLEM WITH THE

23   UNITED STATES' ARGUMENT IS THAT, AS WE CITED BEFORE, THE WILLIS

24   CASE FROM THE ELEVENTH CIRCUIT IN 1997.  THEY SAY THERE THAT

25   THE EVIDENCE PROBATIVE OF AN ISSUE OF WHETHER AN ACCOMMODATION

1    FOR AN EMPLOYEE IS REASONABLE WILL OFTEN BE SIMILAR OR

2    IDENTICAL TO THE EVIDENCE OF THE PROBATIVE OF THE ISSUE OF

3    WHETHER THE RESULTING HARDSHIP FOR THE EMPLOYER IS UNDUE.

4         THAT DOES NOT CHANGE THE FACT THAT ESTABLISHING THAT

5    A REASONABLE ACCOMMODATION EXISTS IS PART OF AN ADA PLAINTIFF'S

6    CASE, WHEREAS UNDUE HARDSHIP IS AN AFFIRMATIVE DEFENSE.  IT

7    DOESN'T MATTER IF IT LOOKS AT THE SAME FACTORS.  IT IS THE

8    BURDEN ON THEM.

9         NEXT, YOUR HONOR, HER DECISIONS -- HER OPINIONS ARE

10   NOT HELPFUL.  AND I'LL BE VERY BRIEF ON THIS.  IT'S SIMPLY A

11   QUESTION THAT SHE RECOMMENDS THAT THE DEPARTMENT OF EDUCATION

12   IMPLEMENT AND PROVIDE TRAINING ON HER MODEL OF WHAT SHE CALLS

13   EQUITY-BASED MTSS.  BUT SHE ACKNOWLEDGES -- AND WE CITE IN OUR

14   BRIEF -- THAT SHE DOESN'T KNOW WHAT THE STATE IS DOING IN

15   REGARDS TO THIS.

16        NOW, THE DEPARTMENT OF JUSTICE SAYS, BUT HER REVIEW

17   IS VERY EXTENSIVE, FROM PAGE 40 -- OR, EXCUSE ME, DOCKET 440,

18   NOTE 16.  BUT THAT DOESN'T OVERCOME THE STATEMENT IN HER

19   DEPOSITION THAT SHE DOESN'T KNOW WHAT THE STATUS IS OF WHAT

20   SHE'S RECOMMENDING.

21        NEXT, YOUR HONOR, DR. MCCART'S METHODOLOGY CANNOT

22   SATISFY THE REQUIREMENTS OF RULE 702.  NOW, THIS IS NOT, WE

23   WILL CONCEDE, A TRADITIONAL DAUBERT CASE.  IT'S NOT AN

24   ENGINEER.  IT'S NOT A MOLD EXPERT OR SOMETHING OF THAT NATURE.

25   BUT, CLEARLY, NONE OF THE DAUBERT FACTS APPLY.  AND WE'VE PUT

1    THAT IN OUR BRIEF.

2          SHE -- SHE HAS NOT INDICATED HER REVIEW HAS BEEN

3    TESTED.  SHE HAS NOT SHOWN THAT THE CRITERIA THAT SHE MADE --

4    SHE KIND OF CREATED A CHART WITH A BUNCH OF DIFFERENT FACTORS

5    LOOKING AT WHETHER THAT CONSTITUTES INSTITUTIONALIZATION, HAS

6    NOT BEEN SUBJECT TO PEER REVIEW.  THERE'S BEEN NO IDENTIFIED

7    RATES OF ERROR.  AND, SIMILARLY, IT'S NOT GAINING AT ALL,

8    ACCEPTING CONCLUSORY SENTENCES OR STATEMENTS AT BEST.  BUT

9    WE'LL ACKNOWLEDGE THAT THIS IS NOT THE SCIENTIFIC THAT DAUBERT

10   APPLIES TO.  IT'S MORE A FRAZIER CASE, BECAUSE WHAT DR. MCCART

11   IS REALLY RELYING ON IS HER EXPERIENCE.  BUT THE ELEVENTH

12   CIRCUIT MADE VERY CLEAR HERE, TOO, THAT AN EXPERT MAY BE

13   QUALIFIED -- WE ARE NOT SAYING DR. MCCART IS NOT QUALIFIED --

14   BY EXPERIENCE, BUT THAT DOES NOT MEAN THAT EXPERIENCE STANDING

15   ALONE IS SUFFICIENT FOUNDATION RENDERING RELIABLE ANY

16   CONCEIVABLE OPINION.  THE BURDEN IS, THE WITNESS MUST EXPLAIN,

17   QUOTE, HOW THAT EXPERIENCE LEADS TO THE CONCLUSION REACHED, WHY

18   THAT EXPERIENCE IS A SUFFICIENT BASIS FOR THE OPINION, AND HOW

19   THE EXPERIENCE IS RELIABLY APPLIED TO THE FACTS.

20          THIS COURT IN THE SCHEINFELD DECISION FROM 2020 DEALT

21   WITH AN EXPERT THAT SAID:  I APPLIED THE SCIENTIFIC METHOD.

22   AND IT WAS A MOLD EXPERT.  AND THIS COURT PROPERLY DEEMED THAT

23   ARTICULATION INSUFFICIENT.  AND THE EXPERT WAS NOT ALLOWED TO

24   RELY SIMPLY ON HIS EXPERIENCE BECAUSE IT WOULD, AS THIS COURT

25   SAID IN THE AMERICAN PEGASUS CASE FROM 2016, RULE 702 REQUIRES

1   MORE THAN SIMPLY TAKING THE EXPERT'S WORD FOR IT.  YET, THAT'S

2   EXACTLY WHAT DR. MCCART ASKS THE COURT TO DO -- OR THE

3   DEPARTMENT DOES.

4            DR. MCCART'S ANALYSIS IN DETERMINING HER METHODOLOGY

5   IS DIFFICULT.  IT'S A 167-PAGE REPORT.  THERE ARE TWO PAGES

6   WHERE SHE CITES OUTSIDE AUTHORITY.  AND WHEN I ASKED HER ABOUT

7   THOSE AUTHORITY IN HER DEPOSITION, SHE COULDN'T RECALL THE

8   SPECIFICS OF THEM AND SPOKE TO THEM IN GENERAL TERMS, AT BEST.

9   IT IS TRULY A MASSIVE REPORT WITH A LOT OF CONCLUSIONS THAT

10  CITES TO NOTHING TO SUPPORT THEM.  SO IT MAKES IT DIFFICULT.

11           THE ARTICULATION MAKES IT DIFFICULT AS WELL.  HER

12  REPORT AT PAGE 84 DESCRIBES SAD CLASSROOMS AND WHETHER SAD

13  CLASSROOMS MAKE FOR INEQUITABLE EDUCATIONAL OPPORTUNITIES.

14  THERE'S NO ARTICULATED METHODOLOGY TO DETERMINE THAT.

15           SIMILARLY, SHE SAID SHE COULD FEEL SADNESS FROM

16  PARENTS.  AGAIN, THIS -- I'M NOT CRITICIZING THAT, HER

17  SINCERITY OR ANYTHING OF THAT NATURE -- BUT WHEN IT COMES TO

18  APPLYING RULE 702 AND IF SHE'S GOING TO USE THAT EXPERIENCE IN

19  FEELING SADNESS FROM PARENTS AS A BASIS TO ESTABLISH LIABILITY

20  UNDER THE ADA, THAT'S WHY IT DOESN'T SATISFY RULE 702.  IF SHE

21  WANTED TO TESTIFY AS A LAY WITNESS ABOUT HER OWN OPINIONS FROM

22  DOING THIS, THAT MAY BE A SEPARATE ISSUE.  CERTAINLY NOT SAYING

23  IT WOULD BE APPROPRIATE.  BUT IT'S NOT APPROPRIATE EXPERT

24  TESTIMONY.

25           SHE HAD CONCERNS ABOUT POSTERS, WRITINGS ON THE WALL,

1  AND SEPARATE ENTRANCES.  BUT THERE'S NO METHODOLOGY USED TO

2  DETERMINE WHAT THAT IS.  THERE IS NO EXPLANATION OF HOW THE

3  REVIEW OF 65 TO 100 IEP'S AND EVEN WHAT METHODOLOGY SHE USED.

4  SHE DID NOT SAY:  HERE'S THE FACTORS I LOOKED FOR AND HERE IS

5  WHAT I DECIDED.  IT WAS, I'M DR. MCCART AND I'M AN EXPERT,

6  BECAUSE I KNOW EXACTLY THIS FIELD.  AND NO QUESTION SHE DOES.

7  BUT TO TESTIFY, SHE HAS TO EXPLAIN HER METHODOLOGY.

8            THIS COURT SAID IN SCHEINFELD THAT CONCLUSORY

9  STATEMENTS ABOUT OPINIONS ARE INSUFFICIENT.  AND IF IT

10  REAPPLIES THE SCHEINFELD DECISION, DR. MCCART SHOULD NOT BE

11  ABLE TO TESTIFY.

12            SHE HAS NO EXPLANATION OF HOW, WHY HER EXPERIENCE IN

13  OTHER STATES LED TO HER CONCLUSIONS HERE, PARTICULARLY WHEN SHE

14  COULDN'T ARTICULATE WHAT OTHER STATES HAVE DONE WHAT GEORGIA --

15  SHE'S TELLING GEORGIA, A, IT MUST DO AND, B, WOULD BE

16  REASONABLE.

17            SHE HAS NO POPULATION COMPARISONS WITH OTHER STATES,

18  NO IDEAS IF OTHER STATES HAVE SUGGESTED IT, YET, ACKNOWLEDGES

19  THAT GEORGIA IS DIFFERENT.  THE COUNTER-ANALYSIS FROM THE

20  DEPARTMENT, AGAIN, FOCUSES ON DR. WILEY, BUT THE SAME ARGUMENTS

21  APPLY THERE.  IF YOU ASK A CATEGORICAL QUESTION, YOU'LL GET A

22  CATEGORICAL ANSWER.

23            AND WITH THAT, I'LL RESERVE MY REMAINING TIME FOR

24  REBUTTAL.

25            THE COURT:  ALL RIGHT.  THANK YOU.

1           MR. BELINFANTE:  THANK YOU.

2           THE COURT:  I AGREE WITH A STATEMENT THAT YOU MADE,

3    THAT THIS IS -- IT'S DIFFERENT TRYING TO APPLY DAUBERT IN THIS

4    CONTEXT, VERY DIFFERENT THAN WHAT I'M ACCUSTOMED TO.

5           MR. BELINFANTE:  RIGHT.

6           THE COURT:  STANDING ARGUMENTS, IT'S HARD FOR ME

7    TO -- AND THIS MAY APPLY TO YOU ALL, TOO -- BUT IT'S HARD FOR

8    ME TO IMAGINE IS AN EXPERT WITH WHOM YOU WOULD AGREE IN THIS

9    CONTEXT UNLESS THEY HAVE THE EXACT OPINIONS OF YOU.  BUT I'M

10   GOING TO HEAR YOU ALL OUT.  SO GO AHEAD.

11          MR. GILLESPIE:  MAY IT PLEASE THE COURT --

12          THE COURT:  YES, SIR.

13          MR. GILLESPIE:  -- COUNSEL, MATTHEW GILLESPIE FOR THE

14   UNITED STATES.

15          DR. MCCART HAS DEDICATED HER ALMOST 40-YEAR CAREER

16   WORKING TO MEET THE BEHAVIORAL AND EDUCATIONAL NEEDS OF

17   STUDENTS WITH DISABILITIES.  DR. MCCART HAS WORKED AS A

18   TEACHER, A BEHAVIORAL CRISIS CONSULTANT, A PROFESSOR OF SPECIAL

19   EDUCATION AND APPLIED BEHAVIOR ANALYSIS, A SPECIAL EDUCATION

20   RESEARCH PROFESSOR WITH THE PRESTIGIOUS LIFE SPAN INSTITUTE, A

21   CONSULTANT FOR STATE AND LOCAL EDUCATION AGENCIES ON

22   MULTI-TIERED SYSTEMS OF SUPPORTS, OR MTSS, AND CODIRECTOR AND

23   PRINCIPAL INVESTIGATOR FOR THE SWIFT EDUCATION CENTER OF THE

24   UNIVERSITY OF KANSAS.

25          DR. MCCART'S EXPERIENCES INCLUDE WORKING TO

112

1   DEINSTITUTIONALIZE INDIVIDUALS WITH DISABILITIES BY DEVELOPING

2   ALTERNATIVE COMMUNITY-BASED LIVING AND LEARNING OPPORTUNITIES.

3   SHE HAS SPENT SIGNIFICANT AMOUNTS OF HER TIME AND HER CAREER

4   WORKING IN AND AROUND INSTITUTIONS, IN FACILITATING THE

5   TRANSITION OF INDIVIDUALS WITH DISABILITIES TO MORE INCLUSIVE

6   ENVIRONMENTS.  IN OTHER WORDS, DR. MCCART KNOWS WHEN

7   SEGREGATION IS AND IS NOT NECESSARY AND HOW TO MEET STUDENTS'

8   NEEDS WITHOUT NEEDLESSLY SEPARATING THEM FROM THEIR FRIENDS,

9   THEIR FAMILY, AND THEIR COMMUNITY.

10          OVER HER CAREER, DR. MCCART HAS WORKED BOTH DIRECTLY

11   AND INDIRECTLY WITH MANY THOUSANDS OF CHILDREN.  AND THE IMPACT

12   OF HER WORK HAS AFFECTED AND CONTINUES TO AFFECT MANY THOUSANDS

13   MORE.

14          DR. MCCART IS ALSO A CELEBRATED ACADEMIC.  AND HER

15   WRITINGS INCLUDE DOZENS OF ARTICLES, CHAPTERS, AND BOOKS

16   OUTLINED IN HER CV FROM 1999 TO PRESENT.

17          DR. MCCART BROUGHT THE FULL BREADTH OF HER KNOWLEDGE

18   AND EXPERIENCE TO BEAR IN HER METICULOUS AND EXACTING WORK IN

19   THIS CASE.  OVER THE COURSE OF NEARLY A YEAR AND A HALF, DR.

20   MCCART SPENT APPROXIMATELY SEVEN WEEKS CONDUCTING 70 SITE

21   VISITS TO GNETS PROGRAM SITES, INCLUDING TO 23 OF THE STATE'S

22   34 STAND-ALONE CENTER-BASED GNETS PROGRAM SITES, AND THREE

23   DOZEN SCHOOL DAYS GNETS PROGRAM SITES.

24          IN ADVANCE OF THESE SITE VISITS, DR. MCCART WOULD

25   OFTEN REVIEW INFORMATION ABOUT BOTH THE SITE ITSELF AND THE

1    STUDENTS ASSIGNED THERE.

2         DR. MCCART WOULD ALSO OFTEN ASK ABOUT PARTICULAR

3    CLASSROOMS OR STUDENTS ON THE TOUR AS PERMITTED, OR WOULD EVEN

4    CROSS-REFERENCE SPECIFIC STUDENT FILES AFTER OBSERVING THOSE

5    STUDENTS OVER THE COURSE OF HER DAY.

6         AS PART OF THESE VISITS, DR. MCCART VISITED AND

7    OBSERVED HUNDREDS OF STUDENT CLASSROOMS.  SHE SPENT BETWEEN TEN

8    AND 90 MINUTES IN EACH ONE, DURING WHICH DR. MCCART CAREFULLY

9    OBSERVED NEARLY 1,000 STUDENTS ASSIGNED TO THE GNETS PROGRAM.

10        USING HER VAST EXPERIENCE WORKING IN SPECIAL

11   EDUCATION WITH STUDENTS WITH BEHAVIOR-RELATED DISABILITIES, DR.

12   MCCART WAS ABLE TO DRAW CONCLUSIONS FROM THESE OBSERVATIONS

13   ABOUT STUDENT NEEDS, THE DEGREE AND NATURE OF SUPPORTS AND

14   SERVICES PROVIDED, AND HOW WHAT SHE OBSERVED SHOWED HER THAT

15   STUDENTS IN THE GNETS PROGRAM ON A WHOLE HAD THE SAME

16   EMOTIONAL, BEHAVIORAL, AND EDUCATIONAL NEEDS AS THE STUDENTS

17   DR. MCCART HAS WORKED WITH AND FOR THROUGHOUT HER CAREER.

18        DR. MCCART'S ANALYSIS WAS FURTHER INFORMED BY HER

19   REVIEW OF HUNDREDS OF STUDENT FILES, INCLUDING INDIVIDUALIZED

20   EDUCATION PLANS, FUNCTIONAL BEHAVIORAL ASSESSMENTS, AND

21   BEHAVIOR INTERVENTION PLANS.

22        SHE ALSO ATTENDED OR REVIEWED DEPOSITION TESTIMONY

23   FOR A DOZEN WITNESSES, INCLUDING VARIOUS STATE AGENCY PERSONNEL

24   AND REGIONAL GNETS PROGRAM DIRECTORS.

25        USING HER VAST EXPERIENCE, HER ACADEMIC BACKGROUND,

1    AND OBSERVATIONS AS HER BASIS, DR. MCCART SET FORTH HER

2    FINDINGS AND OPINIONS IN A 167-PAGE REPORT, EXCLUSIVE OF

3    APPENDICES.  AND THIS REPORT INCLUDES BACKGROUND INFORMATION,

4    DETAILS OF HER METHODOLOGY, KEY ANALYSES, CLUSTER OF EXAMPLES,

5    PHOTOGRAPHS, OBSERVATIONS, AND DOCUMENTARY SUPPORT, AND

6    CULMINATES IN A SERIES OF RECOMMENDATIONS GEARED TOWARD HAVING

7    THE STATE LEVERAGE AND EXPAND EXISTING RESOURCES TO REMEDY AND

8    PREVENT UNNECESSARY SEGREGATION AND UNEQUAL EDUCATIONAL

9    OPPORTUNITIES FOR STUDENTS WITH DISABILITIES.  IN OTHER WORDS,

10   IT IS ANYTHING BUT ABSTRACT.

11         THIS REPORT AND DR. MCCART'S TESTIMONY WILL PROVIDE

12   THE COURT WITH CRITICAL CONTEXT BASED ON THE KNOWLEDGE AND

13   OBSERVATIONS OF AN IMMINENTLY QUALIFIED SPECIAL EDUCATION

14   PROFESSIONAL ON HOW STUDENTS ASSIGNED TO THE GNETS PROGRAM

15   COULD BE APPROPRIATELY SERVED IN INTEGRATED ENVIRONMENTS AND

16   REASONABLE MODIFICATIONS THE STATE COULD MAKE TO MEET THAT END.

17         DESPITE THIS, THE STATE HAS FILED AN EXPANSIVE MOTION

18   ASKING THIS COURT TO EXCLUDE DR. MCCART'S TESTIMONY IN ITS

19   ENTIRETY, ARGUING IT IS IRRELEVANT, UNHELPFUL, AND CRITICALLY

20   DEFICIENT.

21         AS I'LL DISCUSS, THESE ARGUMENTS FAIL TO FIND SUPPORT

22   IN FACT OR IN LAW, AND ALL OF THE ARGUMENTS, AT THEIR BEST, GO

23   TO WEIGHT RATHER THAN ADMISSIBILITY.  AS A RESULT, FOR THE

24   REASONS SET FORTH IN OUR BRIEF AND I'LL DISCUSS HERE SHORTLY,

25   THE STATE'S MOTION SHOULD BE DENIED IN ITS ENTIRETY.

1          THE STATE'S FIRST ARGUMENT IS THAT DR. MCCART'S

2     OPINIONS ON THE QUALITY AND SCOPE OF BEHAVIORAL HEALTH SERVICES

3     PROVIDED IN THE GNETS PROGRAM ARE IRRELEVANT TO THE ISSUES

4     BEFORE THE COURT FOR TWO REASONS:  ONE, BECAUSE THEY AMOUNT TO

5     AN IMPROPER IMPOSITION OF A STANDARD OF CARE; AND, TWO, BECAUSE

6     THEY REQUIRE THE CREATION OF NEW PROGRAMS.  NEITHER ARGUMENT IS

7     AVAILING.

8          ON THE ONSET, I WANT TO NOTE THAT, WHILE WE AGREE

9     THAT OLMSTEAD DOESN'T ALLOW FOR US TO REQUIRE A QUALITY OF

10    SERVICES OR STANDARD OF CARE, OLMSTEAD DOES ALLOW FOR EXPANSION

11    OF ACCESS TO SERVICES.  MANY COURTS HAVE REQUIRED THE EXPANSION

12    OF SERVICES AS A REMEDY IN OLMSTEAD CASES.

13         NOW, WHILE CERTAINLY TRUE THAT DR. MCCART'S REPORT

14    DOES INCLUDE EXTENSIVE ANALYSES OF THE GNETS PROGRAM'S FAILURE

15    TO PROVIDE ADEQUATE BEHAVIORAL HEALTH SERVICES TO ITS STUDENTS,

16    NONE OF THIS EXPERT TESTIMONY AMOUNTS TO REQUIRING A STANDARD

17    OF CARE.  INSTEAD, DR. MCCART REPEATEDLY HIGHLIGHTS NUMEROUS

18    DEFICIENCIES WHERE THE UNITED STATES CONTENDS THE STATE IS

19    FAILING TO ADHERE TO ITS NONDISCRIMINATION OBLIGATIONS FOR

20    SERVICES THE STATE DOES ALREADY PROVIDE, WHICH THE COURT IN

21    OLMSTEAD RECOGNIZED IS THE CRUX OF AN OLMSTEAD CLAIM.

22         WHILE THE STATE FAILS WHERE -- WHAT THE STATE FAILS

23    TO APPRECIATE IS THAT DR. MCCART'S FINDINGS ARE NOT ABOUT

24    IMPOSING A STANDARD OF CARE, BUT IT'S INSTEAD ABOUT THE QUALITY

25    OF EDUCATIONAL OPPORTUNITIES.  AS JUST ONE EXAMPLE AND AS

1    REFERENCED EARLIER TODAY, ON PAGE 137 OF HER REPORT, DR. MCCART
2    WROTE THAT, FOR THE '21-'22 SCHOOL YEAR, THE GNETS PROGRAM HAD
3    FEWER THAN 16 CLINICALLY-TRAINED THERAPISTS, PSYCHIATRISTS, OR
4    PSYCHOLOGISTS STATEWIDE SERVING THE STUDENT POPULATION OF OVER
5    3,000 STUDENTS SPREAD ACROSS 157 GNETS SITE LOCATIONS.  AS SHE
6    WROTE, QUOTE, NOT ONLY IS THIS UNREASONABLE, IT ALSO MAKES IT
7    IMPOSSIBLE TO PROVIDE EFFECTIVE SUPPORTS TO STUDENTS IN THE
8    GNETS PROGRAM.

9         NOT ONLY DO ANALYSES SUCH AS THESE NOT IMPOSE A
10   STANDARD OF CARE, MANY OF THEM ARE ALSO ENTIRELY CONSISTENT
11   WITH THE STATE'S OWN LANGUAGE IN THE GNETS RULE.  FOR EXAMPLE,
12   RELEVANT TO THAT EXAMPLE IN PARTICULAR, THE GNETS RULE PROVIDES
13   THAT, QUOTE, GNETS WILL BE STAFFED TO MEET THE NEEDS OF A
14   UNIQUE POPULATION OF STUDENTS REQUIRING INTENSIVE
15   INDIVIDUALIZED SUPPORTS, INCLUDING PROVIDING APPROPRIATE
16   THERAPEUTIC SERVICES IDENTIFIED IN THE IEP.

17        CONTRARY TO STATE'S ARGUMENTS, THIS TYPE OF ANALYSIS
18   IS CLEARLY RELEVANT, AS IT ILLUSTRATES HOW THE STATE'S FAILURE
19   TO PROVIDE ADEQUATE SUPPORTS AND SERVICES DEPRIVES STUDENTS
20   WITH DISABILITIES IN THE GNETS PROGRAM OF EQUAL EDUCATIONAL
21   OPPORTUNITIES AND RESULTS IN UNNECESSARY PLACEMENT OF STUDENTS
22   IN SEGREGATED GNETS SETTINGS.

23        THE STATE ALSO ALLEGES THAT DR. MCCART'S FINDINGS AND
24   ANALYSIS IMPERMISSIBLY REQUIRED THE CREATION OF NEW PROGRAMS BY
25   THE STATE IN CONTRAVENTION OF OLMSTEAD.  WHEN GIVEN A CLOSER

1  LOOK, HOWEVER, NOT ONLY IS THIS ARGUMENT LACKING MERIT, BUT THE

2  LOGICAL EXTENSION OF THE STATE'S POSITION IS TROUBLING.

3        ON PAGE 15 OF ITS ORIGINAL BRIEF, THE STATE

4  SPECIFICALLY CALLS OUT LANGUAGE IN DR. MCCART'S REPORT THAT

5  GNETS STAFF, QUOTE, LACKED AN UNDERSTANDING OF AND MUST BE

6  TRAINED IN INTENSIVE INTERVENTIONS, TRAUMA-INFORMED PRACTICES,

7  RESTORATIVE PRACTICES, OR EFFECTIVE BEHAVIORAL PRACTICES.

8        IN THAT SAME PARAGRAPH, THE STATE CALLS OUT LANGUAGE

9  FROM DR. MCCART ABOUT THE LACK OF TOOLS, RESOURCES, OR TRAINING

10 FOR GNETS STAFF TO SUPPORT STUDENTS IN THE GNETS PROGRAM.

11 THUS, THE STATE'S POSITION APPEARS TO BE THAT THE GNETS PROGRAM

12 IS SO DEFICIENT IN ITS PROVISION OF SUPPORTS AND SERVICES THAT

13 ANY CURE WOULD NOT CONSTITUTE AN EXPANSION OF CURRENTLY

14 EXISTING PRACTICES BUT WOULD BE SO SUBSTANTIVE AS TO

15 NECESSITATE THE CREATION OF NEW PROGRAMS.

16        AND WHILE THE IMPLICATIONS OF THIS POSITION ARE

17 TROUBLING, THE LEGAL ARGUMENT LACKS SUPPORT.  THE FACT IS,

18 UNITED STATES IS PERMISSIBLY SEEKING TO REQUIRE THE STATE TO

19 EXPAND ACCESS TO ALREADY-EXISTING SERVICES AND SUPPORTS.  AND

20 DR. MCCART SAYS AS MUCH IN HER REPORT.  HER RECOMMENDATIONS, AS

21 SHE SAYS ON PAGE 161, ARE, QUOTE, NOT ABOUT THROWING OUT ALL

22 ASPECTS OF GEORGIA'S SYSTEM OR STARTING OVER WITH A BLANK

23 SLATE; RATHER, THE RECOMMENDATIONS FOCUS ON USING EXISTING

24 TOOLS TO DEVELOP A MORE EFFECTIVE SYSTEM OF SUPPORT.

25        INDEED, LOOKING TO THE VERY DISCUSSIONS HIGHLIGHTED

1    BY THE STATE IN ITS BRIEF ILLUSTRATE THIS POINT.  AS I MENTION,

2    THE STATE SPECIFICALLY CITES DR. MCCART'S LANGUAGE THAT GNETS

3    STAFF, QUOTE, LACK OF UNDERSTANDING OF INTENSIVE INTERVENTIONS

4    ON PAGE 15.  BUT WHEN VIEWED IN CONTEXT ON PAGES 147 TO 150 OF

5    HER REPORT, THE INCONSISTENCY OF THE STATE'S POSITION BECOMES

6    CLEAR.  ON PAGES 147 TO 149, DR. MCCART DISCUSSES A VARIETY OF

7    SUPPORTS GNETS PURPORTS TO PROVIDE, INCLUDING INTENSIVE

8    INTERVENTION.

9            SHE OBSERVES THAT, RATHER THAN BEING USED AS A

10   PREVENTATIVE PRACTICE TO SUPPORT STUDENTS IN THE CLASSROOM,

11   INTENSIVE INTERVENTIONS IN THE GNETS PROGRAM INSTEAD REFER TO

12   REACTIVE OR EVEN PUNITIVE MEASURES, INCLUDING USE OF ISOLATION

13   ROOMS.

14           DR. MCCART ALSO IDENTIFIES A PARTICULAR SITUATION SHE

15   OBSERVED FIRSTHAND WHERE STAFF WERE FAILING TO IMPLEMENT

16   APPROPRIATE INTENSIVE INTERVENTIONS FOR A STUDENT WHO WAS

17   CLEARLY IN NEED OF SUPPORT.  SHE HIGHLIGHTED THIS EXAMPLE IN

18   PART TO SHOW OFF -- TO SHOW HOW STAFF FAILED TO USE THE VERY

19   INTENSIVE INTERVENTIONS THEY CLAIMED TO PROVIDE WHEN THAT

20   STUDENT NEEDED IT MOST.

21           DR. MCCART NOTES OTHER EXAMPLES OF RESOURCES THE

22   GNETS PROGRAM CLAIMS TO UTILIZE, SUCH AS INDIVIDUALIZED

23   EDUCATION PLANS AND BEHAVIOR INTERVENTION PLANS, BUT ALSO NOTES

24   WHETHER OR NOT THEY ARE BEING USED AS THEY SHOULD, SUCH AS WHEN

25   THEY FAILED TO INCLUDE INDIVIDUALIZED CRISIS INTERVENTION

1  PLANNING OR STAFF WERE NOT KNOWLEDGEABLE ABOUT THEIR CONTENTS

2  OR WHERE THEY WERE IMPLEMENTED INCONSISTENTLY.

3       IT WOULD NOT TAKE A NEW PROGRAM FOR THE STATE TO

4  REMEDY THESE DEFICIENCIES AND, INDEED, ACCORDING TO THE GNETS

5  RULE, THE STATE PURPORTS TO BE PROVIDING, QUOTE, COMPREHENSIVE

6  EDUCATIONAL AND THERAPEUTIC SUPPORT SERVICES TO STUDENTS NOW.

7       THE REALITY, HOWEVER, IS THAT THE STATE OFTEN ONLY

8  NOT ONLY IMPLEMENTS SUPPORTS LIKE INTENSIVE INTERVENTIONS, AND

9  IT IS THAT SITUATION DR. MCCART'S REPORT ADDRESSES.

10      THE STATE ALSO ASSERTS THAT BY FAILING TO USE THE

11  LANGUAGE UNJUSTIFIED ISOLATION, DR. MCCART'S 167-PAGE ANALYSIS

12  IS RENDERED NULL AND VOID.  HOWEVER, UNLIKE THE STATE'S EXPERT

13  REBUTTAL WITNESS, DR. MCCART'S REPORT WAS NOT INTENDED TO TOUCH

14  ON LEGAL QUESTIONS.  AS A RESULT, IT WOULD NEITHER BE HELPFUL

15  NOR APPROPRIATE FOR DR. MCCART TO PURPORT TO SET FORTH WHAT

16  UNNECESSARY SEGREGATION SHOULD MEAN TO THE COURT.

17      INSTEAD, HER ANALYSIS CONSISTS OF THE OPINIONS OF A

18  HIGHLY-CREDENTIALED SPECIAL EDUCATION PROFESSIONAL WITH

19  EXTENSIVE EXPERIENCE IN THE SPACE AND AS TO WHETHER THE

20  SEGREGATION OF STUDENTS IN THE GNETS PROGRAM IS NECESSARY.

21  IT'S UP TO THE COURT, IN ITS ROLE AS THE ULTIMATE

22  DECISION-MAKER, TO APPLY THE APPROPRIATE LEGAL STANDARDS TO

23  THAT ANALYSIS.

24      A CORRECT READING OF THE CASE LAW -- AND THIS,

25  SUPPLIED BY THE STATE, UNDERSCORED THIS POINT AS ONE EXAMPLE --

1    THE ELEVENTH CIRCUIT IN WINN-DIXIE STORES DID NOT EXCLUDE AN

2    EXPERT BECAUSE THEY DIDN'T USE CATCH PHRASES FROM CASE LAW AS

3    THE STATE SEEKS TO DO HERE.  INSTEAD, THE COURT CONCLUDED THAT,

4    BY FAILING TO ACCOUNT FOR CERTAIN EXCEPTIONS IN AN ACTION OVER

5    RESTRICTIVE COVENANTS FOR THE SALE OF GROCERY ITEMS, THE EXPERT

6    IN THAT CASE CONDUCTED AN ANALYSIS THAT WAS MISMATCHED BETWEEN

7    ISSUES BEING LITIGATED AND SHOULD THUS BE EXCLUDED.

8          AND THE OTHER EXAMPLES THE STATE POINTS TO ALL USE

9    SIMILAR LOGIC, BUT THERE IS NO MISMATCH HERE.  DR. MCCART'S

10   ANALYSIS OF WHETHER STUDENTS ARE BEING UNNECESSARILY SEGREGATED

11   FROM THE STANDPOINT OF A SPECIAL EDUCATION PROFESSIONAL HEWS

12   CLOSELY TO LEGAL QUESTIONS BEFORE THIS COURT.

13         BURIED IN THE FACTS SECTION OF THE STATE'S INITIAL

14   BRIEF, HOWEVER, THE STATE DID AT SEVERAL POINTS ATTEMPT TO

15   MISCONSTRUE DR. MCCART'S DEPOSITION TESTIMONY, ARGUING THAT DR.

16   MCCART IMPERMISSIBLY EQUATED ALL SEGREGATION WITH PER SE

17   UNNECESSARY SEGREGATION FOR PURPOSES OF HER ANALYSIS.

18         THIS -- THIS CLAIM IS EASILY RESOLVED BY TWO FACTS.

19   NUMBER ONE, DR. MCCART DEFINES SEGREGATION ON PAGE SEVEN OF HER

20   REPORT BUT SEPARATELY AND DISTINCTLY USES THE TERM UNNECESSARY

21   SEGREGATION AT VARIOUS POINTS THROUGHOUT HER REPORT.

22         TWO, IN THAT SAME DEPOSITION, DR. MCCART REPEATEDLY

23   CLARIFIED THAT NOT ALL SEGREGATION IS UNNECESSARY SEGREGATION.

24   AND THE STATE'S QUESTIONING CLEARLY REFLECTS THAT THEY DO NOT

25   UNDERSTAND DR. MCCART'S TESTIMONY TO BE THAT ALL SEGREGATION IS

1    UNNECESSARY.

2          I'LL HIGHLIGHT A FEW EXAMPLES OF THAT.  ON PAGE 19 OF

3    HER DEPOSITION, DR. MCCART WAS ASKED IF SHE BELIEVED THERE IS,

4    QUOTE, AN APPROPRIATE ROLE FOR A PROGRAM LIKE GNETS EVER, TO

5    WHICH SHE RESPONDED, QUOTE, NO, NOT FOR GNETS SPECIFICALLY.  IF

6    YOU'RE ASKING WHETHER OR NOT IT'S APPROPRIATE TO EVER SEGREGATE

7    STUDENTS, YES.

8          ON PAGE 68 OF HER DEPOSITION, DR. MCCART STATED SHE

9    WOULD NOT CONSIDER AN IEP TEAM RECOMMENDING A SEGREGATED

10   SETTING BASED ON INDIVIDUAL NEEDS TO BE UNNECESSARY

11   SEGREGATION.

12         ON PAGE 80, DR. MCCART IS SAYING THAT SHE WOULD NOT

13   CONSIDER FREESTANDING FACILITIES FOR STUDENTS WITH AUTISM

14   SPECTRUM DISORDER OR TRAUMATIC BRAIN INJURY TO BE UNNECESSARY

15   SEGREGATION IN EVERY CASE.

16         AND ON PAGE 143, DR. MCCART STATED THAT ONE

17   INDICATION OF WHETHER SEGREGATION IS NECESSARY OR NOT IS THE

18   STUDENT'S IEP.  ANOTHER WOULD BE WHAT SUPPORTS AND SERVICES ARE

19   PROVIDED.  AND, FRANKLY, THOUGH THE STATE KNOWS THAT DR. MCCART

20   DID NOT AND DOES NOT EQUATE ALL SEGREGATION WITH UNNECESSARY

21   SEGREGATION.  ON PAGE SEVEN OF THE STATE'S REPLY BRIEF, THE

22   STATE ADMITS AS MUCH WRITING, DR. MCCART, QUOTE, ACKNOWLEDGES

23   SOME STUDENTS NEED TO LEARN IN SEPARATE ENVIRONMENTS.  THE

24   STATE MAKES A SIMILAR ACKNOWLEDGMENT ON PAGE SIX OF ITS

25   ORIGINAL BRIEF.

1          THE STATE'S ARGUMENT HERE STRAINS CREDULITY AND

2    SHOULD BE REJECTED.  REGARDLESS, THE FACTUAL BASES OF DR.

3    MCCART'S OPINIONS ARE SPELLED OUT IN PAINSTAKING DETAIL IN HER

4    REPORT, AND, THUS THE COURT CAN USUALLY MAKE ITS OWN

5    DETERMINATIONS AS TO THE APPLICABILITY AND WEIGHT SUCH

6    TESTIMONY SHOULD BE AFFORDED.

7          THE STATE ALSO REPEATEDLY ASSERTS THAT DR. MCCART DID

8    NOT ENGAGE IN THE TYPE OF INDIVIDUALIZED ANALYSIS REQUIRED FOR

9    THE UNITED STATES TO PROVE ITS CLAIM UNDER OLMSTEAD.  THIS

10   ARGUMENT IS RAISED REPEATEDLY IN THE STATE'S MOTIONS.  IT HAS

11   BEEN ADDRESSED EARLIER THIS MORNING.

12         WHILE SUCH INDIVIDUALIZED ANALYSIS IS NOT REQUIRED,

13   THE FACT OF THE MATTER IS THAT DR. MCCART'S ANALYSIS DOES TOUCH

14   ON INDIVIDUAL STUDENTS.  AGAIN, DR. MCCART PERSONALLY OBSERVED

15   ALMOST A THOUSAND STUDENTS IN THEIR CLASSROOMS IN THE GNETS

16   PROGRAM, SPENDING BETWEEN TEN AND 90 MINUTES IN THOSE

17   CLASSROOMS, WHERE SHE OBSERVED THINGS LIKE STUDENTS' LEVEL OF

18   ENGAGEMENT, PROBLEM BEHAVIORS, COMMUNICATION STYLES,

19   INTERACTIONS WITH TEACHERS AND RESPONSES TO THOSE INTERACTIONS.

20         DR. MCCART ALSO REVIEWED HUNDREDS OF STUDENT FILES.

21   AND HER REPORT IS REPLETE WITH STUDENT-SPECIFIC EXAMPLES WHEN

22   APPROPRIATE.

23         AND I WANT TO NOTE FOR THE COURT, TOO, THAT THE 65 TO

24   100 IEP ESTIMATE THAT'S REFERENCED IN THE BRIEFING WAS AN

25   EXPLICITLY CONSERVATIVE ESTIMATE, GIVEN ONLY WHEN PRESSED TO

1    GIVE A SPECIFIC FIGURE IN THE DEPOSITION.  DR. MCCART

2    REPEATEDLY TOLD THE STATE SHE REVIEWED ALL DOCUMENTS IDENTIFIED

3    IN HER CONSIDERED MATERIALS, AND CROSS-REFERENCE TO THESE

4    MATERIALS WOULD SHOW THAT SHE REVIEWED OVER 500 INDIVIDUAL

5    STUDENT'S FILES.

6         THE STATE'S CHARACTERIZATION OF DR. MCCART'S ANALYSIS

7    AS GENERALIZED IS JUST NOT BORNE OUT BY REALITY.  SIMILARLY,

8    THE STATE'S CITATION TO BIRCOLL IS MISPLACED.  IT DOES NOT SAY

9    THAT THE UNITED STATES CANNOT ADDRESS SYSTEMIC VIOLATIONS OF

10   TITLE II AS IT SEEKS TO DO HERE.

11        WHILE IT DOES SAY THAT REASONABLENESS IS DETERMINED

12   ON A CASE-BY-CASE BASIS, THIS IS BOTH UNCONTESTED AND

13   UNCONTROVERSIAL.  REASONABLENESS SHOULD BE DETERMINED UNDER THE

14   FACTS OF EACH CASE, INCLUDING THIS ONE.  BUT THAT DOES NOT

15   MEAN, HOWEVER, AND IT WAS NOT BEFORE THE COURT IN THAT CASE,

16   THAT EVERY INDIVIDUAL VICTIM OF SYSTEMIC TITLE II VIOLATIONS

17   MUST BE EVALUATED FOR INDIVIDUALIZED REMEDIES TO PROVE A CLAIM.

18   AND THE STATE CITES NO APPLICABLE AUTHORITY TO SUGGEST

19   OTHERWISE.

20        NEXT, THE STATE CLAIMS THAT, IN ADDITION TO BEING

21   EXPERT IN SPECIAL EDUCATION, DR. MCCART WAS OBLIGATED TO ALSO

22   SERVE AS AN EXPERT IN BUDGETING AND WORKFORCE FOR HER REPORT TO

23   BE RELEVANT.  AGAIN, MUCH OF THIS WAS DISCUSSED EARLIER THIS

24   MORNING.  BUT WHILE DR. MCCART CAN SPEAK TO BOTH OF THESE

25   ISSUES, GIVEN HER EXTENSIVE EXPERIENCE IN THE FIELD, THE

1    STATE'S ARGUMENT IS UNREASONABLE.

2              OLMSTEAD DOES NOT, AND AS THE STATE ASSERTS, REQUIRE

3    TITLE II PLAINTIFFS TO AFFIRMATIVELY ADDRESS COSTS OR WORKFORCE

4    FOR ITS REMEDIES TO BE DEEMED REASONABLE MODIFICATIONS.  AS THE

5    SECOND CIRCUIT HELD IN HENRIETTA D., IN SHOWING REASONABLE

6    MODIFICATIONS, THE BURDEN ON THE PLAINTIFF IS NOT A HEAVY ONE.

7    THIS IS CONSISTENT WITH THE TENTH AND THIRD CIRCUITS' RULINGS

8    IN FISHER AND FREDERICK L. THAT ACKNOWLEDGE THAT COST IS NOT

9    DISPOSITIVE, AND SIMILARLY COURTS HAVE RULED THAT REASONABLE

10   MODIFICATIONS MAY INCLUDE THE EXPANSION OF SERVICES AND

11   RESOURCE ALLOCATION.  INSTEAD, THE BURDEN IS ON THE STATE, TO

12   THE EXTENT IT WANTS TO PLEAD AND PROVE A DEFENSE OF FUNDAMENTAL

13   ALTERATION.

14             NEXT, THE STATE CLAIMS THAT DR. MCCART'S REPORT

15   SHOULD BE EXCLUDED UNDER FRAZIER DUE TO HER ALLEGED FAILURE TO

16   EXPLAIN IN HER REPORT HOW HER EXPERIENCE RELATES TO HER

17   FINDINGS IN THIS CASE.  AND WHILE DR. MCCART CERTAINLY HAS VAST

18   EXPERIENCE WORKING WITH DOZENS OF STATES ACROSS THE COUNTRY,

19   YET IS A CELEBRATED ACADEMIC IN THE FIELD OF SPECIAL EDUCATION,

20   THE STATE'S ARGUMENT LACKS MERIT.

21             THE STATE'S CITATION TO FRAZIER AND HAMMAD IS

22   INAPPOSITE.  THOSE CASES STAND FOR THE PROPOSITION THAT, WHEN

23   AN EXPERT IS RELYING, QUOTE, SOLELY OR PRIMARILY ON EXPERIENCE,

24   THEN THEY MUST, QUOTE, EXPLAIN HOW THAT EXPERIENCE LEADS TO THE

25   CONCLUSIONS REACHED.  AND THAT'S -- THOSE CASES CITE IN THE

125

1  COMMITTEE NOTE TO RULE 702.  WHILE DR. MCCART'S EXTENSIVE

2  EXPERIENCE CERTAINLY ASSISTED HER IN THE PROCESS OF GATHERING

3  AND ANALYZING VAST AMOUNTS OF INFORMATION THAT'S CONTAINED IN

4  HER REPORT, SHE IS NEITHER SOLELY NOR PRIMARILY RELYING ON HER

5  EXPERIENCE TO FORM HER OPINIONS.  HER EDUCATION AND CREDENTIALS

6  AS AN ACADEMIC IN THE FIELD OF SPECIAL EDUCATION AS WELL AS HER

7  COMPREHENSIVE REVIEW IN THIS CASE ALL FORM A COEQUAL BASIS WITH

8  HER EXPERIENCE FOR HER OPINIONS.

9        DR. MCCART, EXPLAINING TO HER METICULOUS METHODOLOGY

10  SUFFICIENTLY IN HER REPORT, BUT SHE'LL ALSO HAVE THE

11  OPPORTUNITY TO EXPLAIN AT TRIAL WAYS IN WHICH HER EXPERIENCE

12  WORKING WITH EDUCATION AUTHORITIES ACROSS THE COUNTRY HELPED TO

13  INFORM HER ANALYSIS IN THIS CASE.

14        THE STATE ALSO ARGUED THAT, BY FAILING TO IDENTIFY A

15  STATE THAT HAS FULLY IMPLEMENTED MULTI-TIERED SYSTEMS OF

16  SUPPORTS, OR MTSS, DR. MCCART'S TESTIMONY IS SOMEHOW

17  INVALIDATED AND AT THE ONSET, I WANT TO ACKNOWLEDGE, TOO, MTSS,

18  WHICH INCLUDES PBIS, POSITIVE BEHAVIOR INTERVENTION AND

19  SUPPORTS, WHICH IS THE BEHAVIORAL COMPONENT OF MTSS, BUT MTSS

20  IS NOT A PROGRAM.  IT IS A FRAMEWORK FOR PROVIDING SUPPORTS AND

21  SERVICES FOR STUDENTS, WITH THE LOWEST LEVEL OF SUPPORTS AND

22  SERVICES BEING TIER ONE, WHICH IS AVAILABLE FOR ALL STUDENTS,

23  AND THE HIGHEST LEVEL BEING TIER THREE.

24        NOTABLY, THE STATE HAS ENDORSED MTSS AND CONTINUES TO

25  ENCOURAGE DISTRICTS TO ADOPT IT.  OF COURSE, THAT

126

1    IMPLEMENTATION OF RECOMMENDATIONS IN GEORGIA AND, INDEED, ANY

2    STATE WILL DIFFER FROM OTHER STATES DOES NOTHING TO CHANGE THE

3    ANALYSIS THAT WILL ULTIMATELY BE BEFORE THE COURT.  ALL STATES,

4    JUST LIKE ALL CASES, ARE DIFFERENT.

5         BUT DR. MCCART'S EXTENSIVE EXPERIENCE WORKING WITH A

6    WIDE VARIETY OF STATES TO SERVE STUDENTS WITH DISABILITIES

7    MAKES HER UNIQUELY POSITIONED TO SPEAK TO THE REASONABLE

8    MODIFICATIONS THAT GEORGIA CAN MAKE.  IN ADDITION, DR. MCCART'S

9    RECOMMENDATIONS, INCLUDING THOSE RELATED TO IMPLEMENTATION OF

10   MTSS, ARE WELL ROOTED IN HER THOROUGH EVALUATION OF THE GNETS

11   PROGRAM.

12        WHILLE THE EVALUATION OF STATEWIDE MTSS

13   IMPLEMENTATION WAS BEYOND THE SCOPE OF HER REVIEW, THIS IS

14   NOTHING TO DETRACT FROM HER FINDINGS OR RECOMMENDATIONS BASED

15   ON THE STATE'S DEFICIENT PRACTICES LEADING TO UNNECESSARY

16   SEGREGATION AND UNEQUAL EDUCATIONAL OPPORTUNITIES FOR STUDENTS

17   IN THE GNETS PROGRAM.  IF ANYTHING, AGAIN, THE STATE'S

18   ARGUMENTS GO TO WEIGHT RATHER THAN ADMISSIBILITY.

19        THE STATE ALSO ASSERTS THAT DR. MCCART'S TESTIMONY IS

20   UNHELPFUL BECAUSE OF HER LACK OF KNOWLEDGE OF FUNDING, HIRING,

21   AND SIMILAR TOPICS.  AND THIS ARGUMENT, TOO, IS UNAVAILING.

22   DR. MCCART'S TESTIMONY IS HELPFUL BECAUSE, ONE, IT IS BASED ON

23   THOROUGH REVIEW THAT, AGAIN, CONSISTED OF 70 SITE VISITS,

24   PERSONAL OBSERVATIONS OF NEARLY 1,000 STUDENTS, REVIEW OF

25   HUNDREDS OF STUDENT FILES, REVIEW OR ATTENDANCE AT A DOZEN

127

1    DEPOSITIONS, AND REVIEW OF NUMEROUS OTHER DOCUMENTS IDENTIFIED

2    IN HER CONSIDERED MATERIALS.

3          TWO, IT'S ON A SPECIALIZED SUBJECT, NAMELY, SPECIAL

4    EDUCATION FOR STUDENTS WITH BEHAVIOR-RELATED DISABILITIES,

5    WHICH INCLUDES NOT ONLY EDUCATION, BUT BEHAVIOR ANALYSIS AND

6    MANAGEMENT.

7          AND, THREE, HER EDUCATION AND -- OR EXPERIENCE AND

8    CREDENTIALS WILL HELP THE COURT CONTEXTUALIZE VAST AMOUNTS OF

9    INFORMATION ABOUT THE GNETS PROGRAM.  ULTIMATELY, THE ISSUES

10   THE STATE POINTS TO ARE OUTSIDE THE SCOPE OF DR. MCCART'S

11   REVIEW.

12         FOR EXAMPLE, THE STATE OF -- THE ISSUE OF STATE

13   ADMINISTRATION HAS BEEN BRIEFED MULTIPLE TIMES BEFORE THIS

14   COURT AND ARGUED AGAIN TODAY.  NONETHELESS, TO THE EXTENT THE

15   STATE WANTS TO ARGUE THAT DR. MCCART'S PURPORTED FAILURE TO

16   EVALUATE THE GNETS FUNDING STRUCTURE UNDERMINES HER OPINIONS

17   ABOUT UNNECESSARY SEGREGATION OR UNEQUAL EDUCATIONAL

18   OPPORTUNITIES, THEY ARE FREE TO DO SO.  SUCH ARGUMENTS GO TO

19   WEIGHT, ONCE AGAIN, RATHER THAN ADMISSIBILITY.

20         FINALLY, THE STATE'S ATTACKS ON DR. MCCART'S

21   METHODOLOGY IGNORE THE STANDARDS APPLICABLE TO SOCIAL SCIENCE

22   EXPERTS LIKE DR. MCCART.  AS SET FORTH IN OUR BRIEF, THE

23   STANDARDS FOR EXPERTS UNDER DAUBERT ARE FLEXIBLE, PARTICULARLY

24   IN A BENCH TRIAL AND PARTICULARLY WHERE, AS HERE, THE STATE

25   SEEKS TO EXCLUDE TESTIMONY AT THE SUMMARY JUDGMENT STAGE.

128

1    SOCIAL SCIENCES IN PARTICULAR ARE ONLY REQUIRED TO HAVE

2    FOLLOWED THE STANDARDS APPLICABLE TO THEIR FIELD TO BE

3    RELIABLE.  AND THE TYPE OF REVIEW THAT DR. MCCART CONDUCTED

4    CAN'T BE CONDUCTED IN A CONTROLLED ENVIRONMENT.  SO AS SET

5    FORTH IN SIMMONS, THE COURT SHOULD INSTEAD LOOK TO HER

6    EXPERIENCE, EDUCATION, TRAINING, AND OBSERVATIONS.

7            AND AS THIS DISTRICT HAS RECOGNIZED, FOR SOCIAL

8    SCIENCES, THIS TYPE OF OBSERVATION AND ANALYSIS IS BOTH

9    GENERALLY ACCEPTED AND SOUND UNDER DAUBERT.  AND THAT'S THE

10   FAIR FIGHT ACTION CASE.

11           IN THIS CASE, DR. MCCART'S TESTIMONY IS BASED ON HER

12   EXPERIENCE, TRAINING, EDUCATION, AND OBSERVATIONS AFTER

13   SIGNIFICANT TIME SPENT IN GNETS SETTINGS.  THAT IS SUFFICIENT.

14           THE STATE'S ATTEMPTS TO ARGUE AGAINST ESTABLISHED

15   CASE LAW, INCLUDING IN THIS DISTRICT, SHOULD BE REJECTED.

16           IN SUM, THOUGH THE STATE ATTEMPTS TO ALLOW THE NUMBER

17   OF VARYING ATTACKS AGAINST DR. MCCART'S TESTIMONY, HER EXPERT

18   OPINIONS ARE WELL FOUNDED BY BOTH HER COMPREHENSIVE REVIEW AND

19   THE STANDARDS FOR ADMISSION OF SUCH TESTIMONY UNDER LAW.  FOR

20   THAT REASON, THE UNITED STATES ASKS THIS COURT TO DENY THE

21   STATE'S MOTION IN ITS ENTIRETY.

22           THANK YOU.

23           THE COURT:  THANK YOU.

24           ACTUALLY, BEFORE YOU START, MR. BELINFANTE --

25           MR. BELINFANTE:  YES, YOUR HONOR.

1              THE COURT:  LET ME ASK YOU ONE THING, MR. GILLESPIE.

2    I JUST WANT, SINCE WE HAVE HEARD A LOT ABOUT THE BUDGET, THE

3    COST FOR CHANGES AND ADEQUATE STAFFING AND ALL, AND NOW THAT WE

4    -- IT'S UNDERSTOOD THAT DR. MCCART WOULD NOT BE OFFERING THAT

5    TESTIMONY, AND YOUR POSITION IS SHE DOESN'T NEED TO, DOES

6    PLAINTIFF HAVE SOMEONE ELSE WHO WILL DISCUSS THAT TYPE OF

7    EVIDENCE?  OR DOES PLAINTIFF TAKE SOME OTHER POSITION REGARDING

8    WHETHER YOU ALL EVEN NEED TO GO THAT FAR?

9              MR. GILLESPIE:  YOUR HONOR, SO I'LL SAY ON THE ONSET,

10   IT'S OUR POSITION THAT WE DON'T NEED TO TOUCH ON COST OR

11   WORKFORCE AS A PART OF OUR AFFIRMATIVE CASE.

12             THE COURT:  OKAY.

13             MR. GILLESPIE:  WE NEED TO SHOW OUR REASONABLE

14   MODIFICATIONS.  AND BOTH OF OUR EXPERTS ARE GOING TO BE ABLE TO

15   DISCUSS THAT.

16             BUT AS THE CASES THAT WE CITE TO INDICATE, COST ISN'T

17   DISPOSITIVE.  AND THAT'S SOMETHING THAT IF THE STATE WANTED TO

18   RAISE, IT SHOULD BE THROUGH THE FUNDAMENTAL ALTERATION DEFENSE.

19             THE COURT:  ALL RIGHT.  THANK YOU.

20             MR. GILLESPIE:  THANK YOU, YOUR HONOR.

21             MR. BELINFANTE:  ALL RIGHT.  I'LL START WHERE YOU

22   JUST LEFT OFF.

23             IF DR. MCCART IS GOING TO TESTIFY THAT HER

24   RECOMMENDATIONS ARE REASONABLE, SHE NEEDS TO DETERMINE WHAT

25   REASONABLE IS.  AND SHE SAYS COST AND WORKFORCE MATTER.

1          AND SO WHAT WE'VE HEARD FROM THE DEPARTMENT JUST NOW,

2    WE DISAGREE WITH A LOT OF THE FACTS THAT WERE SAID, AND I'M NOT

3    GOING TO GET INTO THAT.  BUT A LOT OF WHAT WE ALSO HEARD WAS

4    NEW AND NOT IN THE BRIEFS.

5          BUT HERE'S THE KEY.  WHEN THE UNITED STATES TRIES TO

6    ARGUE ITSELF AROUND, SHE APPLIED THE WRONG TEST, IT ONLY

7    HIGHLIGHTS THE PROBLEM WITH DR. MCCART'S COMPLETELY ABSENT

8    METHODOLOGY.  IN OTHER WORDS, IF YOU LOOK AT WHAT WAS SAID, IT

9    IS, WELL, DR. MCCART'S HIGHLY QUALIFIED.

10          AGAIN, FRAZIER SPEAKS TO THIS.  IF ADMISSIBILITY

11    COULD BE MERELY ESTABLISHED BY THE IPSE DIXIT OF AN ADMITTEDLY

12    QUALIFIED EXPERT, THE RELIABILITY PRONG WOULD BE, FOR ALL

13    PRACTICAL PURPOSES, SUBSUMED.

14          AND THE COURT ASKED, HOW DO YOU MEASURE WHETHER

15    SOMEONE IS RELIABLE IN THIS CONTEXT.  THAT'S WHERE THE AEGIS

16    AND THE DOLGENCORP CASES COME IN AND THEY SAY, IS THIS PERSON

17    APPLYING THE CORRECT TEST.

18          THE PROBLEM WITH DR. MCCART IS, THE MORE THEY TRY TO

19    ARTICULATE THAT SHE'S APPLYING THE RIGHT TEST, IT ONLY BEGS THE

20    QUESTION ON THE METHODOLOGY.  SAYS THAT SHE DIDN'T CONSIDER IEP

21    TEAMS' RECOMMENDATIONS UNNECESSARY.

22          BUT HOW DID SHE EVALUATE THE IEP TEAMS.  DR. MCCART

23    DOESN'T SAY.  HER REPORT DOESN'T SAY.  THERE'S JUST NO

24    EXPLANATION OF IT.

25          ON THE INDIVIDUALIZED ANALYSIS, THEY SAY, WELL, SHE

1    PERSONALLY OBSERVED ALL THESE PEOPLE AND SHE WALKED INTO THE

2    CLASSROOMS.  WHAT METHODOLOGY DID SHE APPLY?  IN THE DEPOSITION

3    WE ASKED THIS SPECIFICALLY.  I SAID, CAN YOU DETERMINE SOMEONE

4    WITHIN TEN MINUTES OF WHAT WOULD BE APPROPRIATE FOR THAT CHILD?

5             ABSOLUTELY.

6             WHAT'S THE METHODOLOGY APPLIED THERE?

7             OH, IT'S IN THE LITERATURE.  IT'S THE CLASSIC, TRUST

8    ME, I'M AN EXPERT, WHICH THIS COURT HAS REJECTED.

9             THEY DIDN'T SAY DR. MCCART'S EXPERIENCE IS NOT THE

10   SOLE BASIS.  BUT I DON'T KNOW THAT THE UNITED STATES WANTS TO

11   ARGUE THAT, BECAUSE THEN THEY GET MORE INTO THE DAUBERT

12   CATEGORIES, WHICH THEY HAVE NOT -- PLAINLY NOT SATISFIED.

13            AND WHEN THEY LOOK TO THE REASONABLE ACCOMMODATIONS

14   AND THE RELEVANCE OF DR. MCCART'S TESTIMONY ON THAT, IT WAS

15   NICE TO HEAR ABOUT THE SECOND CIRCUIT, THE TENTH CIRCUIT AND

16   THE FOURTH, BUT YOU HAVE STILL NOT HEARD ABOUT BIRCOLL IN THE

17   ELEVENTH CIRCUIT, OR THE OTHER CASE IN THE ELEVENTH CIRCUIT,

18   THAT IT IS PART OF THEIR PRIMA FACIE CASE.  AND IF THEY ARE NOT

19   GOING TO PUT UP DR. MCCART OR DR. PUTNAM, THE ONLY WITNESSES

20   THAT THEY'VE OFFERED TO OFFER ANY KIND OF REASONABLE

21   ACCOMMODATION, AND THEY CAN'T TESTIFY TO THE REASONABLENESS OF

22   IT, THEN, YOUR HONOR, THE CASE SHOULD BE DISMISSED ON THAT

23   PRONG ALONE.

24            THAT'S ALL I'VE GOT, YOUR HONOR.

25            THE COURT:  OKAY.

132

1              MR. BELINFANTE:  THANK YOU.

2              I DIDN'T KNOW IF YOU WERE THINKING OF A QUESTION.

3              THE COURT:  NO, I WAS NOT.

4              MR. BELINFANTE:  ALL RIGHT.  THANK YOU, YOUR HONOR.

5              THE COURT:  GOT ONE OF THOSE PENSIVE FACES, I GUESS.

6              ALL RIGHT.  WHERE ARE WE NEXT?

7              MS. HERNANDEZ:  YOUR HONOR, WE'RE GOING TO BE ARGUING

8      -- WELL, I WILL BE ARGUING DEFENDANT'S MOTION TO EXCLUDE

9      PLAINTIFF'S EXPERT ROBERT PUTNAM.

10             THE COURT:  GOT IT.  ALL RIGHT.  THANK YOU.

11             AND REMIND ME OF YOUR NAME, COUNSELOR, I'M SORRY.

12             MS. HERNANDEZ:  DANIELLE HERNANDEZ.

13             THE COURT:  GOT IT.  ALL RIGHT.  THANK YOU.

14             MS. HERNANDEZ:  IS THERE ANY WAY WE CAN GET THIS

15     SWITCHED ON?

16             THANK YOU SO MUCH.

17             GOOD AFTERNOON, YOUR HONOR.  MAY IT PLEASE THE COURT.

18             THE COURT:  YES, MA'AM.

19             MS. HERNANDEZ:  DANIELLE HERNANDEZ ON BEHALF OF THE

20     STATE OF GEORGIA.

21             YOUR HONOR, I WILL BE DISCUSSING WHY DR. PUTNAM'S

22     EXPERT REPORT AND RELATED TESTIMONY SHOULD BE EXCLUDED.

23             DR. PUTNAM ADMITS, AS YOU CAN SEE ON MY FIRST LEG,

24     THAT I DON'T KNOW A LOT ABOUT GNETS BECAUSE THAT'S NOT WHAT I

25     WAS ASKED TO CONSIDER.

1          YOUR HONOR, THIS QUOTE IS IMPORTANT BECAUSE IT SHEDS

2    LIGHT ON WHY DR. PUTNAM'S REPORT IS UNRELIABLE AND IRRELEVANT

3    TO THE CASE AT HAND.  I WILL DIVE INTO THAT MORE SHORTLY.

4          AS MY COLLEAGUE MR. BELINFANTE DISCUSSED, THERE IS A

5    THREE-PART INQUIRY TO DETERMINE THE ADMISSIBILITY OF A

6    PROFFERED EXPERT.  RELEVANT TO THE STATE'S MOTION TO EXCLUDE

7    DR. PUTNAM ARE THE RELIABILITY AND RELEVANCE PRONGS.

8          DR. PUTNAM'S TESTIMONY IS TOO UNRELIABLE.  DR.

9    PUTNAM'S REPORT AND TESTIMONY IS TOO UNRELIABLE TO BE

10   CONSIDERED IN THIS CASE FOR THREE REASONS.  THE FIRST REASON,

11   DR. PUTNAM EMPLOYED LITTLE TO NO METHODOLOGY IN REACHING HIS

12   CONCLUSIONS.

13         SECOND, YOUR HONOR, THE DEFINITIONS THAT DR. PUTNAM

14   RELIES ON TO REACH HIS CONCLUSIONS AND RECOMMENDATIONS ARE ONES

15   THAT ARE NOT GENERALLY ACCEPTED IN THE SCIENTIFIC COMMUNITY.

16   THEY ARE DEFINITIONS THAT PUTNAM HIMSELF CREATED.

17         AND, THIRD, YOUR HONOR, DR. PUTNAM ACKNOWLEDGES NOT

18   KNOWING ABOUT CRITICAL ASPECTS OF GEORGIA STATE GOVERNMENT AND

19   GEORGIA'S EDUCATIONAL SYSTEM, DESPITE MAKING NUMEROUS AND

20   SIGNIFICANT POLICY RECOMMENDATIONS CONCERNING THESE FUNDAMENTAL

21   MISUNDERSTANDINGS.

22         SO, FIRST, YOUR HONOR, DR. PUTNAM'S METHODOLOGY IS

23   UNRELIABLE.  YOUR HONOR, AS YOU CAN SEE UP HERE ON THE

24   POWERPOINT, THIS IS A SCREENSHOT OF PAGE FOUR OF DR. PUTNAM'S

25   REPORT AND METHODOLOGY SECTION.  SO WHILE DR. PUTNAM LABELS

134

1    THIS SECTION METHODOLOGY, NOWHERE IN THIS SECTION OR IN THE

2    REST OF HIS REPORT DOES HE LAY OUT THE METHODOLOGY HE EMPLOYS.

3    HE SIMPLY SAYS AND LISTS OUT BROADLY WHAT INFORMATION HE

4    CONSIDERED AND HE EXPLAINS THAT HE RELIED ON, QUOTE, HIS

5    EXPERTISE IN THE FIELD TO REACH HIS CONCLUSIONS AND

6    RECOMMENDATIONS.

7              DR. PUTNAM STATES HE REVIEWED DOCUMENTS, HE OBSERVED

8    DEPOSITIONS, HE CONDUCTED SITE VISITS, HE CONSIDERED SCHOLARLY

9    RESEARCH, AND, QUOTE, HE USED HIS DECADES OF EXPERIENCE.

10             LIKE IN SCHEINFELD, YOUR HONOR, WHERE THE EXPERT ONLY

11   STATED THAT HE UTILIZED THE SCIENTIFIC METHOD TO REACH HIS

12   CONCLUSION, DR. PUTNAM MERELY LISTING OUT WHAT HE CONSIDERED

13   AND REVIEWED AND STATING THAT HE USED HIS YEARS OF EXPERIENCE

14   IN THE FIELD, THAT DOES NOT DEMONSTRATE THAT HE EMPLOYED A

15   SPECIFIC METHODOLOGY, NOR DOES IT INFORM THE STATE OR THE COURT

16   ON HOW HIS EXPERIENCE LED HIM TO REACH HIS CONCLUSIONS IN THIS

17   CASE.  LIKE THE EXPERT IN SCHEINFELD, DR. PUTNAM'S REPORT IS,

18   QUOTE, VOID OF FACT EXPLANATION.

19             YOUR HONOR, DR. PUTNAM FAILED TO CONSIDER MANY THINGS

20   WHEN HE WAS WRITING HIS REPORT AND CONDUCTING HIS ANALYSIS.

21   FIRST, HE DID NOT REVIEW ANY STUDENT FDA'S.  HE ONLY REVIEWED

22   SEVEN OUT OF APPROXIMATELY 3,000 GNETS STUDENT FILES.  HE

23   LIMITED HIS ANALYSIS TO ONLY STUDENTS WHO WERE MEDICAID

24   BENEFICIARIES.  AND HE DOES NOT STATE HOW HIS EXPERIENCE IN THE

25   FIELD HAS LED HIM TO REACH HIS CONCLUSIONS, WHY HIS EXPERIENCE

135

1   IN THE FIELD IS A SUFFICIENT BASIS FOR HIS CONCLUSIONS AND

2   RECOMMENDATIONS, OR HOW HE RELIABLY APPLIED HIS EXPERIENCE TO

3   THE FACTS IN THIS CASE.

4         YOUR HONOR, THE SECOND REASON WHY DR. PUTNAM'S

5   METHODOLOGY IS TOO UNRELIABLE TO BE CONSIDERED IS BECAUSE HE

6   RELIES ON HIS OWN DEFINITIONS TO COME TO HIS CONCLUSIONS.  HE

7   DOES NOT RELY ON ONES THAT ARE GENERALLY ACCEPTED IN THE

8   COMMUNITY.  AS YOU CAN SEE FROM MY POWERPOINT, YOUR HONOR, DR.

9   PUTNAM MAKES HIS OWN DEFINITIONS OF APPROPRIATE SERVICES AND

10  SERVED EFFECTIVELY.  THESE DEFINITIONS ARE CONTRARY TO THE ONES

11  OUTLINED BY THE ADA AND OLMSTEAD.

12        SPECIFICALLY, DR. PUTNAM'S MAIN ASSERTION IN THIS

13  CASE IS THAT, QUOTE, THE VAST MAJORITY OF STUDENTS WITH

14  BEHAVIOR-RELATED DISABILITIES, INCLUDING THOSE STUDENTS AT

15  SERIOUS RISK OF RESTRICTIVE EDUCATIONAL PLACEMENT, CAN BE

16  SERVED EFFECTIVELY IN GENERAL EDUCATION SCHOOLS WITHIN THEIR

17  COMMUNITIES IF PROVIDED WITH THE APPROPRIATE SERVICES.

18        WHY ARE THESE -- THESE TERMS APPROPRIATE SERVICES AND

19  SERVED EFFECTIVELY IMPORTANT.  WELL, YOUR HONOR, AS MY

20  COLLEAGUE PREVIOUSLY STATED, IT IS WELL ESTABLISHED THAT WHAT

21  CONSTITUTES APPROPRIATE SERVICES IN AN ADA CLAIM REQUIRES AN

22  INDIVIDUALIZED INQUIRY BASED ON THE INDIVIDUAL UNIQUE NEEDS OF

23  EACH STUDENT.  THIS DOES NOT PERMIT A GENERALIZED APPROACH LIKE

24  THE ONE USED BY DR. PUTNAM.  AGAIN, DR. PUTNAM ONLY REVIEWED

25  SEVEN STUDENT FILES OUT OF 3,000 STUDENT FILES TO COME TO HIS

1    CONCLUSIONS IN THIS CASE.

2          THIRD, YOUR HONOR, DR. PUTNAM'S TESTIMONY AND REPORT

3    ARE TOO UNRELIABLE BECAUSE HE ACKNOWLEDGES NOT KNOWING ABOUT

4    CRITICAL ASPECTS OF GEORGIA STATE GOVERNMENT AND EDUCATION

5    SYSTEM, BUT HE STILL MAKES NUMEROUS AND SIGNIFICANT POLICY

6    RECOMMENDATIONS BASED ON THESE MISUNDERSTANDINGS.

7          A FEW EXAMPLES OF WHAT DR. PUTNAM MISUNDERSTANDS ARE

8    HERE ON THE SCREEN.  FIRST, YOUR HONOR, HE MISUNDERSTANDS HOW

9    THE GNETS PROGRAM IS FUNDED OR WHETHER STATE AGENCIES CAN

10   MANDATE THAT GEORGIA SCHOOL DISTRICT ADOPT A PBIS PROGRAM.

11         YOUR HONOR, NOW I'M GOING TO DISCUSS WHAT -- THE

12   SECOND PRONG, THE RELEVANCY PRONG.  DR. PUTNAM'S TESTIMONY IS

13   NOT RELEVANT TO THIS CASE FOR THREE REASONS.

14         FIRST, YOUR HONOR, THE STANDARD-OF-CARE TESTIMONY BY

15   DR. PUTNAM IS NOT APPLICABLE TO AN ADA CLAIM.

16         SECOND, ANALYSIS ON APPROPRIATENESS BY DR. PUTNAM OF

17   THE SERVICES THESE STUDENTS ARE RECEIVING IS NOT RELEVANT

18   BECAUSE HE DID NOT CONDUCT AN INDIVIDUALIZED ANALYSIS FOR WHAT

19   IS INHERENTLY INDIVIDUALIZED DETERMINATION.

20         AND, THIRD, YOUR HONOR, DR. PUTNAM'S TESTIMONY DOES

21   NOT ACCOUNT FOR THE PRESENT REALITIES IN GEORGIA.

22         THE COURT:  ALL RIGHT.  SO LET ME JUST STOP YOU

23   THERE.  FOR APPROPRIATENESS OF SERVICES, BECAUSE YOU'VE ALREADY

24   DISCUSSED THAT IN THESE DEFINITIONS HE SUPPOSEDLY MADE UP, I'M

25   TRYING TO UNDERSTAND YOUR POINT THERE.

137

1              ARE YOU SAYING HE MADE THAT POINT -- HE MADE THAT

2       DEFINITION UP, OR HE JUST DID NOT CARRY IT OUT OR APPLY IT

3       CORRECTLY BECAUSE HE DID NOT DO IT ON AN INDIVIDUALIZED BASIS,

4       AS OPPOSED TO DOING IT ON A GENERAL BASIS?  I MISSED SOMETHING

5       WITH MAKING UP DEFINITIONS THERE, BECAUSE FROM WHAT YOU

6       DESCRIBED, IT SEEMED TO COMPORT WITH THE REQUIRED DEFINITION.

7              MS. HERNANDEZ:  SO, YOUR HONOR, WHAT I'M TRYING TO

8       SAY HERE IS THAT THE -- WHAT DR. PUTNAM DEEMS AN APPROPRIATE

9       SERVICE IS IRRELEVANT, BECAUSE THE ADA DOES NOT REQUIRE A STATE

10      TO PROVIDE A CERTAIN LEVEL OR A CERTAIN AMOUNT OF A SERVICE.

11             THE COURT:  AND I UNDERSTAND NOW YOU'RE TALKING ABOUT

12      RELEVANCY.

13             MS. HERNANDEZ:  YES, MA'AM.

14             THE COURT:  BUT ON THE PREVIOUS SCREEN, YOU WERE

15      SAYING HE JUST KIND OF -- IT SOUNDED LIKE YOU WERE SAYING HE

16      JUST PULLED THIS DEFINITION OUT OF THE AIR, NOT SO MUCH

17      RELEVANCY, BUT THAT IT'S AN INCORRECT TERM OR BEING USED

18      INCORRECTLY.  AND I THINK I MISSED SOMETHING THERE.

19             MS. HERNANDEZ:  YES, YOUR HONOR.  I WAS SAYING THAT

20      THE FACT THAT HE DID A GENERALIZED ANALYSIS, FOR EXAMPLE,

21      DEALING WITH THAT SEVEN OUT OF 3,000 STUDENTS, BECAUSE WHAT IS

22      DETERMINED -- WHAT AN APPROPRIATE SERVICE IS DEFINED BY THE

23      INDIVIDUAL NEEDS OF THE STUDENT, SO BECAUSE HE CONDUCTED THIS

24      VERY GENERALIZED APPROACH, HIS METHODOLOGY IS FLAWED IN THAT

25      SENSE AND SHOULD NOT BE ADMISSIBLE.

1          THE COURT:  OKAY.  OKAY.

2          MS. HERNANDEZ:  NOW, YOUR HONOR, I'M GOING TO TALK

3  ABOUT THE STANDARD OF CARE AND WHY DR. PUTNAM'S DEFINITION OF

4  THE STANDARD OF CARE HERE IS NOT ADMISSIBLE AND NOT RELEVANT.

5          AS YOU CAN SEE HERE, DR. PUTNAM DEFINES THE STANDARD

6  OF CARE AS BEING COMPRISED OF THESE FIVE KEY SERVICES AND THESE

7  TWO SERVICE DELIVERY METHODS.  HOWEVER, WHAT DR. PUTNAM

8  DESCRIBES AS THE STANDARD OF CARE IS IRRELEVANT BECAUSE, AS

9  PREVIOUSLY STATED, TITLE II OF THE ADA DOES NOT IMPOSE ON

10  STATES THE STANDARD OF CARE FOR WHATEVER MEDICAL SERVICES THEY

11  RENDER.

12          IT ALSO MAKES CLEAR THAT IT DOES NOT REQUIRE STATES

13  TO PROVIDE A CERTAIN LEVEL OF BENEFITS TO STUDENTS WITH

14  DISABILITIES.

15          SECOND, YOUR HONOR, DR. PUTNAM'S TESTIMONY ON WHAT

16  APPROPRIATE SERVICE IS IS IRRELEVANT.  I JUST WANT TO LAY THAT

17  WITH YOUR HONOR AND SO I'LL GO AHEAD SINCE I'M RUNNING OUT OF

18  TIME.

19          THE COURT:  YOU'RE OKAY.

20          MS. HERNANDEZ:  LASTLY, YOUR HONOR, DR. PUTNAM'S

21  TESTIMONY IS NOT RELEVANT BECAUSE IT DOES NOT ACCOUNT FOR THE

22  PRESENT REALITIES IN GEORGIA AND, THEREFORE, IT CAN'T SHOW THAT

23  HIS RECOMMENDATIONS ARE REASONABLE.

24          SPECIFICALLY, DR. PUTNAM DID NOT CONDUCT A WORK OR

25  COST STUDY ANALYSIS TO DETERMINE WHETHER HIS PROPOSED

139

1  RECOMMENDATIONS ARE IN FACT REASONABLE.  DR. PUTNAM'S FAILURE

2  TO CONSIDER COST AND WORKFORCE ANALYSIS PREVENTS THE STATE AND

3  THIS COURT FROM DETERMINING WHETHER DR. PUTNAM'S

4  RECOMMENDATIONS --

5          THE COURT:  SLOW DOWN.  I'M NOT GOING TO STEAL FROM

6  YOU THE TIME IT TOOK ME TO ASK THOSE QUESTIONS.  SLOW DOWN.

7  YOU'LL BE FINE.  OKAY?  OR MADAM COURT REPORTER WILL BE MAD AT

8  BOTH OF US.  SLOW DOWN.

9          MS. HERNANDEZ:  THANK YOU, YOUR HONOR.

10          WHETHER DR. PUTNAM'S RECOMMENDATIONS ARE IN FACT

11  REASONABLE PER OLMSTEAD AND THEREFORE RELEVANT.

12          FOR THESE REASONS, YOUR HONOR, WE ASK THAT DR.

13  PUTNAM'S REPORT AND TESTIMONY BE EXCLUDED.

14          THE COURT:  THANK YOU.

15          MS. HERNANDEZ:  I RESERVE THE REMAINDER OF MY TIME

16  FOR REBUTTAL.

17          THE COURT:  WE'LL MARK IT UP TO AT LEAST 60 SECONDS.

18  NO, YOU'LL BE FINE.  YOU'LL BE FINE.

19          YES, MA'AM.

20          MS. COHEN:  THANK YOU, YOUR HONOR.

21          THE COURT:  THANK YOU.

22          MS. COHEN:  FRAN COHEN FOR THE UNITED STATES.

23          THE COURT:  YES, MA'AM.

24          MS. COHEN:  WELL, WE'VE HEARD A LOT ABOUT WHAT THE

25  STATE THINKS DR. PUTNAM DID OR DIDN'T DO.  I'M GOING TO REVIEW

140

1    WHAT HE ACTUALLY DID DO.

2           THE COURT:  OKAY.

3           MS. COHEN:  HE WILL TESTIFY THAT GEORGIA FAILS TO

4    PROVIDE INTEGRATED SERVICES IN SUFFICIENT QUANTITY OR INTENSITY

5    TO SUPPORT STUDENTS WITH BEHAVIOR-RELATED DISABILITIES IN

6    GENERAL EDUCATION SETTINGS.

7           HE WILL ALSO TESTIFY THAT THE -- THIS FAILURE RESULTS

8    IN STUDENTS UNNECESSARILY BEING PLACED IN GNETS.

9           AND, THREE, HE WILL TESTIFY THAT GEORGIA CAN

10   REASONABLY MODIFY ITS SERVICE DELIVERY SYSTEM TO PROVIDE

11   APPROPRIATE SUPPORTS AND SERVICES IN GENERAL EDUCATION SCHOOLS.

12          WE -- IT MAY BE A RELIEF TO YOUR HONOR THAT THERE IS

13   NO DISAGREEMENT THAT THE RELEVANT STANDARD IN THIS CASE WE

14   AGREE THAT GENERALLY EXPERT ADMISSIBILITY TURNS ON EXPERTS'

15   QUALIFICATIONS, THE RELIABILITY OF METHODOLOGY, AND THE

16   RELEVANCY OF THE OPINIONS.  AND THERE'S NO DISPUTE ABOUT DR.

17   PUTNAM'S QUALIFICATIONS.

18          SO THE ONLY ISSUES BEFORE YOUR HONOR TODAY ARE THE

19   RELIABILITY OF HIS METHODOLOGY AND HIS RELEVANCE.  AND I'M

20   GOING TO SPEAK FIRST TO THE RELIABILITY OF DR. PUTNAM'S

21   METHODOLOGY.

22          I THINK YOU JUST HEARD THAT THE STATE CLAIMS THAT DR.

23   PUTNAM EMPLOYED, QUOTE, LITTLE OR NO METHODOLOGY, CLOSED QUOTE.

24   IN FACT, HIS REPORT IS IN THE RECORD AT 420 E.C.F. 428-1 FOR

25   THIS COURT TO REVIEW.  AND WITH THE COURT 'S PERMISSION, I'LL

141

1   PUT ON THE MONITOR JUST THE TABLE OF CONTENTS FOR THAT REPORT.

2        OKAY.  THIS IS ACTUALLY JUST A PORTION OF THE -- CAN

3   YOU SHOW THE FULL PAGE?  THANK YOU.

4        THIS IS THE TABLE OF CONTENTS FOR THIS REPORT.  AND

5   AS YOU SEE, IT GOES THROUGH HIS QUALIFICATIONS.

6        AND THEN IF YOU CAN BLOW UP THE OTHER SECTIONS,

7   PLEASE.

8        IT HAS HIS METHODOLOGY AS SECTION DESCRIBING HIS

9   METHODOLOGY AND OTHER SECTIONS, WHICH I AM GOING TO NOW

10  DESCRIBE TO YOU.  HE CONSIDERED FOUR QUESTIONS.

11       FIRST, ARE THERE SUFFICIENT SERVICES AND SUPPORTS

12  THAT CAN HELP KIDS WITH BEHAVIORAL DISABILITIES LEARN IN

13  INTEGRATED SETTINGS.  AND HE REVIEWED THAT AS A CLINICAL

14  PSYCHOLOGIST WHO HAS WORKED WITH THESE KIDS AND WITH STATE

15  SYSTEMS AND LOCAL SYSTEMS FOR OVER 50 YEARS.  HE IS VERY

16  FAMILIAR WITH THIS ISSUE.

17       AND HIS METHODOLOGY HERE WAS TO REVIEW THE

18  PEER-REVIEWED LITERATURE AND OTHER ACADEMIC TEXTS THROUGH THE

19  LENS OF HIS OWN EXPERIENCE.  THIS IS A WELL-RECOGNIZED

20  METHODOLOGY IN THE CASE LAW.  AND HE CONCLUDED THAT THERE IS A

21  BROAD SCIENTIFIC CONSENSUS THAT STUDENTS WITH BEHAVIOR-RELATED

22  DISABILITIES WHO RECEIVED TIMELY APPROPRIATE SERVICES CAN AVOID

23  RESTRICTIVE PLACEMENTS.  MANY OF THESE JUDGMENTS HAVE BEEN

24  ACCEPTED, NOT ONLY BY THE PEER-REVIEWED LITERATURE IN THE

25  ACADEMIC COMMUNITY, BUT ALSO BY THE STATE, BY THE LEADING

142

1    AGENCY ON THIS TOPIC, THE DEPARTMENT OF BEHAVIORAL HEALTH AND

2    DEVELOPMENTAL DISABILITIES.  AND THE EVIDENCE AT TRIAL WILL

3    SHOW THEIR WRITINGS TO THE SAME EFFECT.

4        THE SERVICES THAT HE RECOMMENDS INCLUDES SYSTEMS OF

5    SUPPORTS SUCH AS POSITIVE BEHAVIORAL INTERVENTIONS AND

6    SUPPORTS, WHICH IS A MONITORING AND DETECTION AND WHOLE SCHOOL

7    CLIMATE SUPPORT SYSTEM; AS WELL AS EVIDENCE-BASED SERVICES,

8    WHICH ARE TYPICALLY THOSE PROVIDED THROUGH MEDICAID; THAT IS,

9    RIGOROUS ASSESSMENTS CALLED FUNCTIONAL BEHAVIORAL ASSESSMENTS

10   IN THIS FIELD; INDIVIDUAL GROUP AND FAMILY THERAPY AND CARE

11   COORDINATION SERVICES.  SO THAT'S WHAT HE LOOKED AT FOR PART

12   THREE, STANDARDS OF CARE FOR SERVING STUDENTS WITH

13   BEHAVIOR-RELATED DISABILITIES.

14       AS QUESTION TWO THAT WE ASKED HIM TO ANSWER, DOES

15   GEORGIA CURRENTLY PROVIDE BEHAVIORAL HEALTH SERVICES IN

16   SUFFICIENT QUANTITY OR INTENSITY TO SUPPORT KIDS IN GENERAL

17   EDUCATION SETTINGS.  TO ANSWER, HIS METHODOLOGY, WHICH IS

18   SPELLED OUT SPECIFICALLY IN THE SUBSTANTIVE SECTION -- IN EACH

19   OF THE SUBSTANTIVE SECTIONS I'M DESCRIBING, HE -- HE REVIEWED

20   GEORGIA'S STATUTES, REGULATIONS, THE MEDICAID COVERAGE MANUAL,

21   THE MEDICAID PLAN ITSELF.

22       HE REVIEWED DEPOSITIONS OF GEORGIA OFFICIALS AND

23   PROVIDERS.  AND HE VISITED 27 GNETS SCHOOLS, ONE GNETS

24   CLASSROOM, ONE GNETS CENTER, AND 25 GENERAL EDUCATION SCHOOLS

25   TO SEE WHAT WAS PROVIDED.

1          HE ALSO REVIEWED STATEWIDE DATA RECORDING ALL

2     MEDICAID-REIMBURSED BEHAVIORAL HEALTH SERVICES FOR EVERY CHILD

3     IN GEORGIA BETWEEN 2016 AND 2021.  THIS IS NOT A MATTER OF

4     REVIEWING SEVEN RECORDS.  HE CONCLUDED THAT THE DATA SHOWED

5     THAT RELATIVELY FEW CHILDREN IN GEORGIA RECEIVED THE KIND OF

6     SERVICES THAT COULD IMPROVE THEIR FUNCTIONING AND PREVENT

7     TRANSFERS TO RESTRICTED SETTINGS.  AND THAT IS COVERED, YOUR

8     HONOR, IN PART FIVE AND PART SIX OF HIS REPORT.

9          NEXT, HE LOOKED AT GNETS SPECIFICALLY.  AND THE

10    QUESTION THAT HE ANSWERED HERE WAS, DO GEORGIA KIDS GET

11    ADEQUATE SERVICES BEFORE THE STATE ENROLLS THEM IN GNETS.  AND

12    IN ORDER TO ANSWER THAT, HIS METHODOLOGY WAS TO LOOK AT THE

13    MEDICAID CLAIMS DATA, WHICH SHOWS ALL THE SERVICES THE KIDS

14    RECEIVE, TO LOOK AT THESE RECORDS AND SERVICES FOR KIDS

15    ENROLLED IN GNETS USING MEDICAID DATA FOR OVER 5,000 STUDENTS.

16         AND I SHOULD MENTION HERE THAT 80 PERCENT OF GNETS

17    STUDENTS ARE ENROLLED IN EITHER MEDICAID OR PEACH CARE.  AND

18    USING THIS METHODOLOGY, HE FOUND THAT LARGE NUMBERS OF KIDS HAD

19    NOT RECEIVED ANY OF THE CRITICAL SERVICES IN THE SIX MONTHS

20    PRIOR TO THEIR ADMISSION TO GNETS OR EVEN IN THE ONE YEAR PRIOR

21    TO THEIR ADMISSION TO GNETS.  AND 25 PERCENT OF THESE STUDENTS

22    WHO WERE ENROLLED IN GNETS HAD NOT RECEIVED ANY BEHAVIORAL

23    HEALTH SERVICES AT ALL PRIOR TO THEIR TRANSFER TO GNETS.

24         THE NEXT QUESTION HE ANSWERED -- AND THIS IS IN PART

25    EIGHT -- WHAT ARE THE REASONABLE STEPS THAT GEORGIA COULD TAKE

144

1    TO PREVENT UNNECESSARY GNETS PLACEMENT.  AND HE FOUND THAT

2    GEORGIA COULD REASONABLY MODIFY THEIR SYSTEM.

3            AND I'M JUST GOING TO TOUCH ON THE BRIEF, AND THE

4    REPORT TOUCH ON MANY MORE SERVICES, BUT I'M JUST GOING TO SPEAK

5    TO A FEW.  THE NEEDED SERVICES ARE ALREADY INCLUDED IN

6    GEORGIA'S MEDICAID PLAN.  THOSE ARE THE SERVICES THAT ARE

7    RECOMMENDED BY THE PEER-REVIEWED AND OTHER ACADEMIC LITERATURE.

8    GEORGIA INCLUDES THEM IN THEIR MEDICAID PLAN.  WHAT HE FOUND IS

9    THAT THE KIDS ARE NOT RECEIVING THEM BEFORE THEY ARE PLACED IN

10   A SEGREGATED SETTING.

11           HE ALSO FOUND THAT GEORGIA COULD EXPAND THE NEW APEX

12   PROGRAM, WHICH IS THE BEHAVIORAL HEALTH, SCHOOL-BASED MENTAL

13   HEALTH PROGRAM, AND EXPAND ITS EXISTING SCHOOL-BASED BEHAVIORAL

14   HEALTH SERVICES.

15           HE SAID THAT GEORGIA SHOULD ENHANCE SYSTEMS LIKE

16   POSITIVE BEHAVIOR AND INTERVENTIONS AND SUPPORTS TO EARLY

17   IDENTIFY AND DEAL WITH THE CHILDREN WHO NEED -- NEED ADDITIONAL

18   SUPPORT.

19           AND HE ALSO CONCLUDED THAT GEORGIA COULD ENSURE

20   DELIVERY OF THE KEY SERVICES THROUGH MEDICAID BECAUSE THEY ARE

21   INCLUDED IN THE MEDICAID PLAN.  AND HE NOTED THAT THE COST OF

22   MEDICAID SERVICES ARE BORNE IN LARGE PART BY THE FEDERAL

23   GOVERNMENT.  GEORGIA'S FEDERAL MATCH IS 65 PERCENT.  SO ALMOST

24   TWO OF EVERY THREE DOLLARS IT COSTS WOULD BE BORNE BY THE

25   FEDERAL GOVERNMENT.

1          SO REVIEWING THIS REPORT SHOWS THERE IS SIMPLY NO

2    MERIT TO THE STATE'S CLAIM THAT DR. PUTNAM DOES NOT USE OR

3    DESCRIBE A RELIABLE METHODOLOGY FOR ANY OF THE SECTIONS OF THIS

4    REPORT.  HIS METHODOLOGY IS, IN THE WORDS OF THE 702 ADVISORY

5    COMMITTEE QUOTED BY THE ELEVENTH CIRCUIT IN THE UNITED STATES

6    VERSUS FRAZIER, 387 F.3D 1244 AT 1262, QUOTE, PROPERLY

7    GROUNDED, WELL REASONED, AND NOT SPECULATIVE, END QUOTE.

8          NEXT I'LL SPEAK TO THE ISSUE OF RELEVANCY, WHETHER

9    THE INFORMATION IN DR. PUTNAM'S REPORT WOULD BE OF ASSISTANCE

10   TO THIS COURT AS TRIER OF FACT.  A SIGNIFICANT ISSUE IN THIS

11   CASE IS WHETHER KIDS ARE UNJUSTIFIABLY SEGREGATED IN GNETS

12   WITHOUT HAVING BEEN PROVIDED APPROPRIATE SERVICES AND SUPPORTS

13   IN INTEGRATED SETTINGS.  DR. PUTNAM'S REPORT WILL UNDOUBTEDLY

14   BE HELPFUL TO THE COURT ON THAT ISSUE.

15         WHY DOES THE STATE SAY IT'S NOT RELEVANT?  THEY SAY

16   HE DIDN'T CONSIDER CERTAIN ELEMENTS THE STATE CONSIDERS ARE

17   LEGALLY REQUIRED, SUCH AS INDIVIDUALIZED SERVICES OR A COST

18   ANALYSIS OR A WORKFORCE ANALYSIS.  THEY SAY THAT THE STATE

19   CLAIMS THAT DR. PUTNAM WAS MISINFORMED REGARDING CERTAIN

20   ASPECTS, SUCH AS THE NATURE OF STATE FUNDING OR THE -- HOW THE

21   STATE COULD COMPEL THE ADOPTION OF PBIS.

22         WE DISAGREE WITH THE CRITICISMS OF DR. PUTNAM AND

23   THAT HIS ASSUMPTIONS ARE INACCURATE.  BUT, NEVERTHELESS, THERE

24   IS SUBSTANTIAL CASE LAW IN THE ELEVENTH CIRCUIT AND THE SEVENTH

25   CIRCUIT AND ELSEWHERE, AND IT HOLDS THAT EXPERT OPINION SHOULD

1    NOT BE EXCLUDED ON GROUNDS OF ADMISSIBILITY BECAUSE IT DIDN'T

2    COVER CERTAIN PURPORTED NECESSARY ELEMENTS OR FACTS.

3           AND AS THE ELEVENTH CIRCUIT SAID IN ROSENFELD VERSUS

4    OCEANIA, 654 F.3D 1190, 1193, FAILURE TO INCLUDE VARIABLES WILL

5    AFFECT THE PROBATIVENESS OF THE ANALYSIS BUT NOT ITS

6    ADMISSIBILITY.  AND INADEQUACIES GO TO WEIGHT, NOT

7    ADMISSIBILITY.

8           AND TO TAKE LANGUAGE FROM AN ELEVENTH CIRCUIT

9    DISTRICT COURT CASE IN THE SOUTHERN DISTRICT OF ALABAMA,

10   KIRKSEY VERSUS SCHINDLER ELEVATOR RECENTLY QUOTED BY JUDGE

11   JONES IN FAIR FIGHT VERSUS RAFFENSPERGER, A DAUBERT MOTION IS

12   NOT A FACT OR MEANS OF ACHIEVING A SECOND BITE AT THE

13   SUMMARY-JUDGMENT APPLE.

14          AS -- AS MR. BELINFANTE ACKNOWLEDGED, THE STANDARD IS

15   FLEXIBLE IN A BENCH TRIAL WHERE THERE'S LESS NEED OF A

16   GATEKEEPER TO KEEP THE GATE WHEN THE GATEKEEPER IS KEEPING THE

17   GATE ONLY FOR HERSELF.  AND THAT'S A PARAPHRASE, THE UNITED

18   STATES VERSUS BROWN, YOUR HONOR, FOURTH -- 415 F.3D 1257, 1268

19   TO 1269.

20          THIS COURT HAS AMPLE ABILITY TO EVALUATE THE EXPERT

21   TESTIMONY WITHOUT CONFUSION.  ACCORDINGLY, THIS COURT SHOULD

22   DENY THE STATE'S MOTION IN LIMINE TO EXCLUDE DR. PUTNAM'S

23   TESTIMONY.

24          THANK YOU, YOUR HONOR.

25          THE COURT:  THANK YOU.

147

1          FEEL LIKE I AM GOING TO GO GET A T-SHIRT THAT SAYS

2     GATEKEEPER.

3          MS. COHEN:  WE CAN ALL DO IT, YOUR HONOR.

4          MS. HERNANDEZ:  YOUR HONOR, I'M GOING TO ADDRESS A

5     FEW OF THE POINTS BROUGHT UP BY THE DOJ.

6          FIRST, YOUR HONOR, THIS -- THE DOJ'S CASE IS ALL

7     ABOUT ADEQUATE, QUALITY -- THE ADEQUATE QUANTITY AND QUALITY OF

8     SERVICES, AS IS DR. PUTNAM'S REPORT.

9          YOUR HONOR, THIS IS IMPORTANT TO NOTE, BECAUSE THAT'S

10    WHAT THEY DEFINE AS THE PROPER STANDARD OF CARE.  THAT IS

11    INCORRECT.  AS PREVIOUSLY STATED, TITLE II OF THE ADA DOES NOT

12    REQUIRE STATES TO PROVIDE A CERTAIN QUALITY OR QUANTITY OF

13    SERVICES.  IT DOES NOT IMPOSE ON THE STATE A STANDARD OF CARE.

14         SECOND, YOUR HONOR, THE DOJ BRINGS UP THAT DR.

15    PUTNAM'S TESTIFIES -- OR HIS TESTIMONY OR CONCLUSION IS THAT

16    THE GEORGIA'S PRACTICES RESULTS IN STUDENTS BEING UNNECESSARILY

17    SEGREGATED.

18         YOUR HONOR, DR. PUTNAM WAS NOT ABLE TO IDENTIFY A

19    SINGLE STUDENT WHO WAS -- WHO WAS -- WHOSE IEP TEAM DIRECTED

20    THEM TO NOT BE IN GNETS, THAT THAT SERVICE IS INAPPROPRIATE.

21         SECOND, YOUR HONOR, GEORGIA -- THE DOJ SAYS THAT

22    GEORGIA CAN REASONABLY MODIFY ITS SUPPORTS AND SERVICES TO

23    PROVIDE THE APPROPRIATE SERVICES.  THEY SAY THAT THAT IS ONE OF

24    THE THINGS THAT DR. PUTNAM IS GOING TO TESTIFY OR STATED IN HIS

25    REPORT.

148

1          THAT'S INTERESTING, BECAUSE HE SAYS THAT HIS -- THAT

2    GEORGIA SERVICES ARE REASONABLE AND THAT HIS RECOMMENDATIONS

3    ARE REASONABLE.  YET, HE DID NO COST STUDY OR WORKFORCE STUDY

4    TO DETERMINE WHETHER THEY ACTUALLY ARE REASONABLE, WHETHER THEY

5    ACTUALLY CAN BE IMPLEMENTED IN THIS STATE.

6          AND, YOUR HONOR, THAT IS ALL I HAVE.

7          THE COURT:  ALL RIGHT.

8          MS. HERNANDEZ:  THANK YOU.

9          THE COURT:  THANK YOU.

10         OKAY.  ALL RIGHT.  SO THAT TAKES US WHERE NOW TO --

11   WE ONLY HAVE ONE MORE.  OKAY.  ARE WE TALKING ABOUT DANTE MCKAY

12   NOW?

13         MS. ADAMS:  YES, YOUR HONOR.

14         THE COURT:  ALL RIGHT.

15         MS. ADAMS:  MAY IT PLEASE THE COURT, CRYSTAL ADAMS

16   FOR THE UNITED STATES.

17         I WILL BE RELYING ON A DEMONSTRATIVE THAT WILL BE

18   DISPLAYED ON THE SCREEN MOMENTARILY.

19         AS IS SHOWN ON THE TIMELINE BEFORE YOU, ON NOVEMBER

20   7TH, 2023, NEARLY FOUR MONTHS BEFORE THE DEADLINE TO DISCLOSE

21   REBUTTAL EXPERTS AND AFTER DISCOVERY HAD CLOSED, THE STATE

22   INTRODUCED THE DECLARATION OF MR. DANTE MCKAY.  THE THREE-PAGE

23   DECLARATION CONTAINS OPINIONS ABOUT THE ESTIMATED COSTS OF

24   EXPANDING THE STATE'S SCHOOL-BASED MENTAL HEALTH PROGRAM, APEX,

25   TO EVERY PUBLIC SCHOOL IN THE STATE.  BUT THE DECLARATION DOES

1    NOT EXPLAIN THE MULTI-FACETED ANALYSIS THAT INFORMS THE COST

2    ESTIMATE AND SUPPORTS MR. MCKAY'S OPINIONS.

3         HE DOES NOT DESCRIBE WHO CONDUCTED THE ESTIMATE, WHEN

4    THE ESTIMATE WAS CONDUCTED, OR WHY CERTAIN ASSUMPTIONS WERE

5    USED.  NEVERTHELESS, THE STATE PROFFERS THIS THREADBARE

6    DECLARATION AS ITS SOLE EVIDENCE THAT STATEWIDE APEX EXPANSION

7    WOULD FUNDAMENTALLY ALTER THE STATE'S PROGRAMS.

8         THE DECLARATION WAS PREPARED AFTER THE STATE RECEIVED

9    THE REPORT OF OUR EXPERT, DR. ROBERT PUTNAM, WHO RECOMMENDED

10   THAT GEORGIA REASONABLY MODIFY ITS PROGRAMS IN MULTIPLE WAYS,

11   INCLUDING BY MAXIMIZING AVAILABLE MEDICAID FUNDING TO PROVIDE

12   MORE APEX SERVICES.

13        TO BE CLEAR, DR. PUTNAM DID NOT RECOMMEND EXPANDING

14   APEX STATEWIDE.  SO THE COST ESTIMATE IS NOT AN ACCURATE

15   ASSESSMENT OF THE REASONABLENESS OF DR. PUTNAM'S PROPOSED

16   MODIFICATION.

17        THE UNITED STATES WAS JUSTIFIABLY SURPRISED WHEN

18   GEORGIA INTRODUCED THE DECLARATION.  THE STATE DID NOT PLEAD A

19   FUNDAMENTAL ALTERATION DEFENSE.  THE FIRST TIME THE STATE

20   RAISED FUNDAMENTAL ALTERATION WAS IN ITS MOTION FOR SUMMARY

21   JUDGMENT.  WE REQUESTED DOCUMENTS DESCRIBING THE ANALYSIS ABOUT

22   COSTS OF EXPANDING APEX.  BUT AFTER A GOOD-FAITH SEARCH, WE DID

23   NOT FIND THE COST ESTIMATE OR ITS BASIS, EVEN THOUGH WE

24   REQUESTED THOSE DOCUMENTS DURING DISCOVERY.

25        WHEN WE DEPOSED MR. MCKAY, WE ASKED HIM IF DBHDD HAD

1    CONDUCTED ANY ANALYSIS OF THE COST OF EXPANDING APEX.  HE

2    ANSWERED NO.  AFTER REVIEWING THE DECLARATION, WE ASKED GEORGIA

3    TO CONFIRM THE DATE OF THE COST ESTIMATE AND WHETHER THEY

4    PRODUCED THE COST ESTIMATE OR ANY SUPPORTING DOCUMENTS.  THEIR

5    ENTIRE RESPONSE WAS, QUOTE, MR. MCKAY'S AFFIDAVIT SPEAKS FOR

6    ITSELF.  TO THE EXTENT YOU DISAGREE, GIVEN THE TIMETABLE WE'RE

7    OPERATING UNDER, THE ISSUE IS NOW ONE FOR SUMMARY JUDGMENT, END

8    QUOTE.

9         ALLOWING THE STATE TO PROFFER THE DECLARATION IN THE

10   11TH HOUR WOULD UNFAIRLY PREJUDICE THE UNITED STATES.  WE

11   RELIED ON THE STATE'S CONDUCT WHEN IT DID NOT PLEAD A

12   FUNDAMENTAL ALTERATION DEFENSE, WHEN IT DID NOT PRODUCE

13   COST-ESTIMATE EVIDENCE SUPPORTING THE DECLARATION, WHEN MR.

14   MCKAY TESTIFIED IN HIS DEPOSITION THAT DBHDD HAD NOT ANALYZED

15   THE COST OF EXPANDING APEX, AND WHEN THE STATE FAILED TO

16   DISCLOSE MR. MCKAY AS AN EXPERT.

17        HAD WE RECEIVED THE COST-ESTIMATE EVIDENCE DURING

18   DISCOVERY, THE EVIDENCE COULD HAVE INFORMED OUR DECISIONS

19   DURING DISCOVERY AND WHEN WE WROTE OUR DISPOSITIVE BRIEFS.

20        THE COURT SHOULD EXCLUDE THE DECLARATION FOR THE

21   FOLLOWING REASONS:

22        FIRST, MR. MCKAY LACKS PERSONAL KNOWLEDGE OF THE

23   BASIS FOR HIS OPINIONS AND APPARENTLY RELIES ON INADMISSIBLE

24   HEARSAY.

25        SECOND, THE STATE FAILED TO DISCLOSE MR. MCKAY AS AN

1    EXPERT.

2             AND, THIRD, THE STATE'S FAILURE TO COMPLY WITH THE

3    FEDERAL RULES AND THIS COURT'S ORDERS WAS NOT SUBSTANTIALLY

4    JUSTIFIED OR HARMLESS.

5             THE FIRST BASIS FOR EXCLUSION IS, THE DECLARATION

6    VIOLATES FEDERAL RULE OF CIVIL PROCEDURE 56.  RULE 56 REQUIRES

7    A DECLARATION IN SUPPORT OF A MOTION FOR SUMMARY JUDGMENT TO BE

8    MADE ON THE WITNESS' PERSONAL KNOWLEDGE AND ADMISSIBLE FACTS.

9             THERE IS NO EVIDENCE THAT MR. MCKAY HAS SUCH PERSONAL

10   KNOWLEDGE.  NEITHER THE STATE NOR MR. MCKAY ASSERT THAT HE

11   PERSONALLY CONDUCTED THE COST ESTIMATE OR WAS DIRECTLY INVOLVED

12   IN THE PREPARATION OF THE ESTIMATE.

13            MR. MCKAY APPEARS TO RELY ON INADMISSIBLE HEARSAY.

14   THE DECLARATION DOES NOT PROVIDE ANY UNDERLYING INFORMATION IN

15   SUPPORT OF MR. MCKAY'S OPINIONS.  THUS, IT APPEARS HE RELIES ON

16   OUT-OF-COURT STATEMENTS THAT WERE PROVIDED TO HIM.  THE STATE

17   RELIES ON THIS BASELESS DECLARATION TO SUPPORT AND PROVE THEIR

18   ALLEGED TRUTH OF THE MATTER, WHICH IS THAT ONE OF OUR PROPOSED

19   MODIFICATIONS, EXPANDING APEX, WOULD FUNDAMENTALLY ALTER THE

20   STATE'S PROGRAMS.

21            THE SECOND REASON THE COURT SHOULD EXCLUDE THE

22   DECLARATION IS BECAUSE IT CONTAINS UNDISCLOSED EXPERT

23   TESTIMONY.  THE STATE IS TRYING TO PROFFER MR. MCKAY AS A

24   REBUTTAL EXPERT IN LAY-WITNESS CLOTHING.  THE STATE ADMITS IT

25   TURNED TO MR. MCKAY IN RESPONSE TO DR. PUTNAM'S TESTIMONY

1   RECOMMENDING THAT THE STATE REASONABLY MODIFY ITS PROGRAMS,

2   INCLUDING BY EXPANDING APEX.  THE STATE IS ATTEMPTING TO AVOID

3   ITS DISCOVERY OBLIGATIONS BY PROFFERING THIS DECLARATION AS LAY

4   TESTIMONY.

5           THIS IS THE EXACT BEHAVIOR THAT THE RULE 701 ADVISORY

6   COMMITTEE SOUGHT TO GUARD AGAINST WHEN IT MADE CLEAR THAT

7   TESTIMONY BASED ON SPECIALIZED KNOWLEDGE UNDER RULE 702 IS NOT

8   LAY TESTIMONY.  THE DECLARATION CONTAINS EXPERT OPINION BECAUSE

9   IT IS BASED ON A MULTI-FACETED COST ESTIMATE ANALYSIS REQUIRING

10  AN UNDERSTANDING OF EXISTING APEX PROGRAM PROVIDERS, THE NUMBER

11  OF SCHOOLS AND STUDENTS THEY SERVE, THEIR MEDICAID BILLING

12  PRACTICES, AND THE MEDICAID REIMBURSEMENT PROCESS, AMONG MANY

13  OTHER FACTORS.  THIS MULTI-FACETED COST ESTIMATE IS THE WORK OF

14  AN EXPERT AND SHOULD HAVE BEEN DISCLOSED ACCORDINGLY.

15          FINALLY, THE COURT SHOULD EXCLUDE THE DECLARATION

16  BECAUSE THE STATE'S FAILURE TO FULFILL ITS DISCOVERY

17  OBLIGATIONS WAS NOT SUBSTANTIALLY JUSTIFIED OR HARMLESS.

18  FEDERAL RULE OF CIVIL PROCEDURE 37 REQUIRES A PARTY WHO

19  VIOLATES RULE SIX -- EXCUSE ME, 26(A) OR (E) TO DEMONSTRATE

20  THAT ITS CONDUCT WAS SUBSTANTIALLY JUSTIFIED OR HARMLESS.  THE

21  STATE HAS NOT MET ITS BURDEN HERE.

22          THE STATE'S CONDUCT WAS NOT HARMLESS.  WE RELIED ON

23  THE STATE'S DECISION NOT TO PLEAD A FUNDAMENTAL ALTERATION

24  AFFIRMATIVE DEFENSE.  AND DURING THREE YEARS OF DISCOVERY, WE

25  RELIED ON THE STATE'S DISCOVERY DISCLOSURES, INCLUDING MR.

1    MCKAY'S DEPOSITION TESTIMONY, THAT DBHDD HAD NOT ANALYZED THE

2    COST OF EXPANDING APEX AND THE STATE'S DECISION NOT TO DISCLOSE

3    MR. MCKAY AS AN EXPERT.

4            HAD THE STATE COMPLIED WITH OUR DISCOVERY -- EXCUSE

5    ME, WITH ITS DISCOVERY OBLIGATIONS, OUR EXPERTS COULD HAVE

6    REBUTTED THE COST ESTIMATE EVIDENCE, AND WE COULD HAVE

7    CONSIDERED THAT EVIDENCE AS WE WROTE OUR DISPOSITIVE BRIEF.

8            COURTS HAVE FOUND SEVERE PREJUDICE WHEN A PARTY

9    DISCLOSED NEW EVIDENCE AFTER THE DISCOVERY PERIOD CLOSED AND

10   THE OPPOSING PARTY HAD RELIED ON THAT DISCLOSING PARTY'S

11   DISCOVERY DISCLOSURES WHEN THE OPPOSING PARTY SERVED DISCOVERY

12   REQUESTS, TOOK DEPOSITIONS, RETAINED EXPERTS, AND WROTE

13   DISPOSITIVE MOTIONS.  COURTS HAVE REJECTED THIS KIND OF

14   GAMESMANSHIP, AND THIS COURT SHOULD DO THE SAME.

15           IN ADDITION, THE STATE'S CONDUCT WAS NOT

16   SUBSTANTIALLY JUSTIFIED.  THE STATE WOULD HAVE THIS COURT

17   BELIEVE THAT GEORGIA JUST HAPPENED TO RECEIVE THE DECLARATION

18   THE DAY BEFORE IT FILED ITS MOTION FOR SUMMARY JUDGMENT.  BUT

19   THE STATE HAD AMPLE NOTICE OF OUR PROPOSED REASONABLE

20   MODIFICATIONS.  IT COULD HAVE DISCLOSED MR. MCKAY AS AN EXPERT

21   DURING DISCOVERY.

22           AS THE TIMELINE BEFORE YOU SHOWS, ON MARCH 10TH,

23   2023, FIVE MONTHS BEFORE EXPERT DISCOVERY CLOSED, WE EXPRESSLY

24   NOTIFIED THE STATE OF OUR PROPOSED APEX EXPANSION, AND WE

25   REMINDED THE STATE OF OUR PROPOSED APEX EXPANSION WHEN WE

1    DISCLOSED DR. PUTNAM'S EXPERT REPORT ON JUNE 16TH, 2023, SIX

2    WEEKS BEFORE THE DEADLINE TO DISCLOSE REBUTTAL EXPERTS.

3         THE STATE HAD EVERY OPPORTUNITY TO TIMELY IDENTIFY AN

4    EXPERT TO SUPPORT ITS FUNDAMENTAL ALTERATION ARGUMENTS.  FOR

5    THESE REASONS, THE UNITED STATES RESPECTFULLY REQUESTS THE

6    COURT GRANT ITS MOTION TO EXCLUDE.

7         I'LL RESERVE THE REMAINDER OF MY TIME FOR REBUTTAL.

8         THE COURT:  THANK YOU.

9         MR. PICO-PRATS:  GOOD AFTERNOON, YOUR HONOR.

10        THE COURT:  GOOD AFTERNOON.

11        MR. PICO-PRATS:  YOUR HONOR, YOU'VE HEARD TODAY WHY

12   THE DEPARTMENT OF JUSTICE THINKS THAT MR. MCKAY'S DECLARATION

13   SHOULD BE EXCLUDED.  LET ME EXPLAIN TO YOU WHY THE DEPARTMENT

14   OF JUSTICE IS SO CONCERNED AT THIS POINT ABOUT EXCLUDING MR.

15   MCKAY'S DECLARATION.

16        THE COURT:  AND ANNOUNCE YOUR NAME ONE MORE TIME.

17        MR. PICO-PRATS:  MY NAME IS JAVIER PICO.

18        THE COURT:  ALL RIGHT.

19        MR. PICO-PRATS:  HERE'S A TIMELINE TO BETTER GUIDE US

20   THROUGH THIS.  AS YOU'RE WELL AWARE, THIS CASE HAS BEEN ONGOING

21   SINCE AUGUST 23, 2016.  AFTER A STAY, THE CASE WAS PUT ON AN

22   EIGHT-MONTH DISCOVERY TRACK BEGINNING ON JUNE 25TH, 2020.  AND

23   AFTER VARIOUS EXTENSIONS, FACT DISCOVERY OFFICIALLY CLOSED ON

24   MARCH 10, 2023.

25        DURING THOSE TWO YEARS AND EIGHT MONTHS, DANTE MCKAY

1    SAT FOR TWO DEPOSITIONS.  THE DEPARTMENT OF JUSTICE SERVED

2    THREE SETS OF INTERROGATORIES TO THE STATE.  AND DESPITE ALL OF

3    THAT, THE DEPARTMENT OF JUSTICE DIDN'T ASK ONE SINGLE TIME HOW

4    MUCH IT WOULD COST TO EXPAND THE APEX PROGRAM.  IT WAITED UNTIL

5    FILING DR. PUTNAM'S EXPERT REPORT ON JUNE 16, 2023, TO LET US

6    KNOW THAT.  THEY HAVE NOW CLAIMED THAT THEY TOLD US ON MARCH

7    10TH, BUT WE WERE NOT AWARE OF THAT.

8         AND AS MR. BELINFANTE DISCUSSED BEFORE, COST AND

9    WORKFORCE CONCERNS ARE NECESSARY ELEMENTS OF A REASONABLE

10   ACCOMMODATION, AS DISCUSSED IN THE OLMSTEAD CASE.  THE DOJ'S

11   FAILURE TO DO THAT DOES NOT MEAN THAT MR. MCKAY'S DECLARATION

12   SHOULD BE EXCLUDED.  IN FACT, THE ONLY CASE DISCUSSING A

13   FUNDAMENTAL ALTERATION DEFENSE IS THE BROOKLYN CENTER FOR

14   INDEPENDENCE OF DISABLED V. BLOOMBERG.  AND THAT'S OUT OF THE

15   SOUTHERN DISTRICT OF NEW YORK.  AND IN THAT CASE ITSELF, IT

16   STATED THAT DEFENDANTS COULD NOT REASONABLY BE EXPECTED TO HAVE

17   PLEADED DEFENSE TO A CLAIM NOT PRESENTED.

18        AND, REGARDLESS, YOUR HONOR, DESPITE WHAT THE DOJ MAY

19   THINK, IF THIS COURT RULES TO STRIKE THE DECLARATION OF DR.

20   MCKAY, IT IS NOT DISPOSITIVE OF THE STATE'S MOTION FOR SUMMARY

21   JUDGMENT, AND IT SHOULD STILL BE GRANTED.

22        NOW, DISCUSSING THE DEPARTMENT OF JUSTICE'S ARGUMENTS

23   IN ORDER, FIRST, THE DECLARATION IS ADMISSIBLE AT SUMMARY

24   JUDGMENT BECAUSE IT MEETS THE REQUIREMENTS OF FEDERAL RULES OF

25   CIVIL PROCEDURE 56(C)(4).  THERE'S THREE ELEMENTS TO THAT, THE

1    FIRST BEING PERSONAL KNOWLEDGE.  MR. MCKAY HAS PERSONAL

2    KNOWLEDGE ON THIS, AS HE STATED IN PARAGRAPH TWO OF HIS

3    DECLARATION, THAT HE HAS ACQUIRED FIRSTHAND KNOWLEDGE OF THE

4    BUSINESS OPERATIONS FOR THE DBHDD.  IN FACT, HE'S BEEN WORKING

5    AT DBHDD SINCE FEBRUARY 16, 2016.

6              IN THE DOJ'S MOTION, THEY EVEN SAY AS MUCH.  THEY SAY

7    THAT MR. MCKAY, AND I QUOTE, DEMONSTRATED HIS DETAILED

8    UNDERSTANDING OF THE APEX PROGRAM, SUCH AS THE FUNDING SOURCES

9    FOR MULTIPLE EXPANSIONS OF THE PROGRAM.  THEY GO ON TO SAY,

10   AND, AGAIN, I QUOTE, HE IS ONE OF THE STATE EMPLOYEES MOST

11   KNOWLEDGEABLE ABOUT APEX.

12             IT'S CLEAR THAT HE HAS PERSONAL KNOWLEDGE ON THE

13   MATTER, YOUR HONOR.

14             SECOND, THE DECLARATION MUST SET OUT FACTS THAT WOULD

15   BE ADMISSIBLE IN EVIDENCE.  IT'S ADMISSIBLE BECAUSE MR. MCKAY

16   HAS FIRSTHAND KNOWLEDGE OF THE BUSINESS OPERATIONS WITHIN

17   DBHDD, AND ANY ARGUMENT THAT THIS HAS COME THROUGH HEARSAY IS

18   PURE SPECULATION FROM THE PLAINTIFFS, YOUR HONOR.  THEY HAVE

19   PROVIDED NO EVIDENCE THAT THIS IS HEARSAY.  AND, AS SUCH, THAT

20   SHOULD BE IGNORED.

21             BUT THEY DID NOT NEED TO BE -- THIS DID NOT NEED TO

22   BE DISCLOSED DURING DISCOVERY, YOUR HONOR.  THIS DOCUMENT WAS

23   CREATED IN NOVEMBER OF 2023, PARTLY DUE TO DR. PUTNAM'S EXPERT

24   REPORT.  ANY ARGUMENT THAT THIS HAD TO BE DISCLOSED DUE TO AN

25   RFP OR EITHER REQUEST FOR ADMISSION OR INTERROGATORY IS NOT

1    TRUE, BECAUSE IT WAS NOT IN EXISTENCE AT THE TIME.  WE DID NOT

2    HAVE TO CREATE THIS DOCUMENT.

3          FURTHERMORE, THEY HAD THE OPPORTUNITY TO ASK FOR THIS

4    THROUGHOUT THE THREE SETS OF INTERROGATORIES THEY SENT US OR

5    THROUGHOUT THE TWO DEPOSITIONS THAT MR. MCKAY SAT FOR, AND THEY

6    FAILED TO DO EITHER.

7          AND, FINALLY, THE DECLARATION MUST SHOW THAT THE

8    DECLARANT IS COMPETENT TO TESTIFY ON THE MATTER.  DOJ DOES NOT

9    ARGUE THIS IN EITHER OF THEIR BRIEFS.  THEY DO NOT ARGUE THAT

10   MR. MCKAY IS NOT COMPETENT.  AND MR. MCKAY IS COMPETENT, AS HE

11   STATED IN PARAGRAPH ONE OF THE DECLARATION, TO MEET THE LEGAL

12   REQUIREMENTS.

13         SECOND, THE DECLARATION DOES NOT CONTAIN AN EXPERT

14   OPINION.  EXPERT -- LAY FACT WITNESS OPINIONS ARE GOVERNED BY

15   THE FEDERAL RULES OF CIVIL PROCEDURE 701.  THERE IT STATES

16   THAT, IN ORDER FOR A WITNESS TO OFFER A LAY OPINION, A, MUST

17   RATIONALLY BASE ON THE WITNESS' PERCEPTION.

18         B, BE HELPFUL TO CLEARLY UNDERSTANDING THE WITNESS'

19   TESTIMONY OR DETERMINING AN ISSUE IN FACT.

20         AND, C, NOT BASED ON SCIENTIFIC, TECHNICAL, OR OTHER

21   SPECIALIZED KNOWLEDGE WITHIN THE SCOPE OF RULE 702.

22         THE ADVISORY COMMITTEE SHEDS A LITTLE MORE INSIGHT ON

23   THIS BY STATING THAT SUCH OPINION TESTIMONY IS ADMITTED, NOT

24   BECAUSE OF EXPERIENCE, TRAINING, OR SPECIALIZED KNOWLEDGE

25   WITHIN THE REALM OF AN EXPERT, BUT BECAUSE OF THE

158

1    PARTICULARIZED KNOWLEDGE THAT THE WITNESS HAS BY VIRTUE OF HIS

2    OR HER OWN POSITION IN THE BUSINESS.

3         IN TAMPA BAY SHIP BUILDING CODE, THE ELEVENTH CIRCUIT

4    STATED THAT LAY TESTIMONY IS ALLOWED IF GARNERED BY VIRTUE OF

5    THE LAY WITNESS' POSITION IN THE BUSINESS.

6         NOW, THE DOJ ATTEMPTS TO DISTINGUISH THE TAMPA BAY

7    CASE BY STATING THAT, THERE, THE WITNESS IN QUESTION WAS

8    DIRECTLY INVOLVED IN SHIP-LOADING REPAIRS PROCESS AND WAS

9    RESPONSIBLE FOR APPROVING INITIAL QUOTATION OF REPAIRS.

10   HOWEVER, AS I'LL EXPLAIN SHORTLY, MR. MCKAY WAS JUST AS

11   INVOLVED IN THE DEPARTMENT OF BEHAVIORAL HEALTH AND

12   DEVELOPMENTAL DISABILITIES.

13        MR. MCKAY IS A DIRECTOR OF THE OFFICE OF CHILDREN,

14   YOUNG ADULTS, AND FAMILIES IN THE BEHAVIORAL HEALTH DIVISION OF

15   DBHDD.  AND HE'S HELD THAT POSITION SINCE FEBRUARY 16, 2016.

16   AND MR. MCKAY HAS STATED IN HIS DEPOSITION THAT APEX IS A

17   PROGRAM THAT HIS DIVISION FUNDS, EVALUATES, AND MONITORS.  AND

18   THAT CAN BE FOUND IN HIS DEPOSITION TESTIMONY IN DOCUMENT 451-1

19   AT 14.

20        HE WENT ON TO SAY THAT, AS THE OFFICE DIRECTOR, HE

21   APPROVES THE APEX PROGRAM.  HE RECEIVES REPORTS ON THE

22   PERFORMANCE TO THE PROGRAM AND HAS A ROLE IN THE PROCUREMENT

23   THAT LED TO THE PROVIDERS SELECTED FOR THE PROGRAM, SAME

24   DOCUMENT AT PAGE 16.

25        NOW, TO BRIEFLY DISCUSS THE CALCULATION THAT'S IN

159

1    QUESTION THAT HE PROVIDED IN HIS DECLARATION --

2              THE COURT:  I'M SORRY, COUNSELOR.  I JUST WANT TO

3    MAKE SURE I'M WITH YOU.  YOU ARE ABOUT TO EXPLAIN CALCULATIONS

4    FROM THIS WITNESS THAT YOU ARE DESCRIBING AS A LAY WITNESS AND

5    SAYING THIS IS NOT EXPERT TESTIMONY?

6              MR. PICO-PRATS:  CORRECT.

7              THE COURT:  OKAY.  ALL RIGHT.  I JUST WANT TO MAKE

8    SURE I HEARD YOU CORRECTLY.

9              GO AHEAD.

10             MR. PICO-PRATS:  YES, MA'AM.

11             AND I'LL EXPLAIN, BECAUSE THERE IS CASE LAW THAT

12   TALKS ABOUT -- FROM THE ELEVENTH CIRCUIT AND THIS COURT -- THAT

13   SPEAKS ABOUT WHY CALCULATIONS CAN BE PROVIDED BY FACT

14   WITNESSES.

15             FIRST, IF YOU ARE LOOKING AT THIS COURT, IN THE

16   KIPPERMAN V. ONEX CORP. CASE, IT STATES, THEY QUOTE, A BUSINESS

17   OWNER IS NOT PERMITTED TO GIVE LAY TESTIMONY ON MATTERS THAT GO

18   BEYOND STRAIGHTFORWARD COMMON SENSE CALCULATIONS.

19             THE ELEVENTH CIRCUIT FOUND IN THE UNITED STATES V.

20   HAMAKER CASE THAT AN EXPERIENCED FINANCIAL ANALYST DID NOT NEED

21   TO BE CERTIFIED AS AN EXPERT WITNESS BECAUSE THE WITNESS, AND I

22   QUOTE, SIMPLY ADDED AND SUBTRACTED NUMBERS AND THEN COMPARED

23   THOSE NUMBERS IN A STRAIGHTFORWARD FASHION.  THAT CAN BE FOUND

24   AT 455 F.3D 1316.

25             AND THIS COURT AGAIN FOUND THAT A TESTIMONY PROFFERED

160

1    BY COMPANY'S ACCOUNTANT DID NOT CONSTITUTE EXPERT EVIDENCE

2    BECAUSE THE WITNESS, AND I QUOTE, PRESENTED SIMPLE

3    GRADE-SCHOOL-LEVEL ARITHMETIC BASED ON THE DATA CONTAINED IN

4    THE ACTUARIAL REPORTS.

5            THE COURT:  AND YOUR POSITION IS, THAT IS ALL THAT

6    THIS WITNESS DID?

7            MR. PICO-PRATS:  CORRECT.

8            THE COURT:  IS --

9            MR. PICO-PRATS:  AND I'LL SHOW THAT SOON.  BUT, YES,

10   IT'S CORRECT.

11           THE COURT:  OKAY.  OKAY.  I'M GOING TO HANG WITH YOU.

12   OKAY.

13           MR. PICO-PRATS:  AND THE LAST THING I'LL QUOTE FROM

14   THE SAME CASE IS THAT THE EXPERT ENGAGED IN NOTHING MORE THAN

15   CLEAR ADDITION AND DIVISION EXERCISES.  AND THAT'S FROM THE

16   GEORGIA SELF-INSURERS FUND V. PMA MANAGEMENT CORP. FOUND AT 143

17   F.SUPP.3D 1317 FROM THIS VERY COURT.

18           NOW, HERE, LOOKING AT THE CALCULATION WHICH I HAVE ON

19   THE BOARD, IT'S ONLY ONE DIVISION FOLLOWED BY ONE

20   MULTIPLICATION.  MR. MCKAY TOOK THE ESTIMATED NUMBER OF

21   STUDENTS.  HE DIVIDED THE NUMBER BY 50, BECAUSE IT'S 50

22   STUDENTS PER ONE THERAPIST, AND THEN HE MULTIPLIED THAT NUMBER

23   BY THE OUTER SALARY OF THE THERAPIST TO ARRIVE AT THE NUMBER

24   THAT WE HAVE.

25           AND, YOUR HONOR, AS STATED BEFORE, THIS IS COMMON

161

1    SENSE CALCULATION, STRAIGHTFORWARD:  ONE DIVISION, ONE

2    MULTIPLICATION.  A GRADE-SCHOOL STUDENT COULD DO THIS.  AND THE

3    ACTUAL VALUES THEMSELVES ARE OBTAINED, AS STATED BY THE TAMPA

4    BAY CASE, FROM HIS ACTUAL EXPERIENCE AT DBHDD.

5            IN TERMS OF THE WORKFORCE SHORTAGES, IT'S NO SECRET

6    PARTICULAR TO THE DOJ THAT GEORGIA HAS SUFFERED FROM

7    WELL-DOCUMENTED AND ONGOING WORKFORCE SHORTAGES FOR MENTAL

8    HEALTH PROFESSIONALS IN THIS STATE.  AND THEY KNOW THAT BECAUSE

9    WE'VE PROVIDED NUMEROUS DOCUMENTS THROUGHOUT DISCOVERY.  AND

10   THOSE ARE ALL LISTED IN OUR RESPONSE BRIEF TO THEIR MOTION.

11           AND, FURTHERMORE, MR. MCKAY TESTIFIED ABOUT THIS

12   EXTENSIVELY THROUGHOUT HIS TWO DEPOSITIONS.  AND THOSE

13   CITATIONS ARE ALSO LISTED IN OUR RESPONSE BRIEF.

14           AND THEN FINALLY, YOUR HONOR, THE STATE HAS COMPLIED

15   WITH RULE 26 OBLIGATIONS DURING DISCOVERY.  THE STATE WAS NOT

16   REQUIRED TO PERFORM ANY ANALYSIS IN RESPONSE TO THE DEPARTMENT

17   OF JUSTICE.  AND IT WAS ONLY REQUIRED TO PRODUCE EXISTING

18   DOCUMENTS THE STATE HAD PREVIOUSLY.

19           THIS DECLARATION CAME INTO EXISTENCE ON NOVEMBER 6,

20   2023.  AND ANY -- ANY TYPE OF ARGUMENT OTHERWISE IS PURE

21   SPECULATION.

22           THIS WAS FILED THE FOLLOWING DAY ON NOVEMBER 7, 2023.

23   AND, THUS, IT WAS TIMELY DISCLOSED.  THE DOJ'S ARGUMENT THAT

24   THE FEDERAL RULES OF CIVIL PROCEDURE 26(E) REQUIRED DISCLOSURE

25   IS NOT TRUE BECAUSE THE FEDERAL RULE DOES NOT STATE THAT.  THAT

162

1  ONLY APPLIES TO INTERROGATORIES, REQUESTS FOR PRODUCTION OF

2  DOCUMENTS, AND REQUESTS FOR ADMISSIONS.

3           SINCE THIS WAS NOT IN EXISTENCE, THIS DOES NOT NEED

4  TO BE DISCLOSED DURING THOSE.  AND THE ONLY ONE THAT APPLIES TO

5  SUPPLEMENTING EXPERT TESTIMONY IS RULE 26(A)(2)(B).  AND,

6  AGAIN, MR. MCKAY WAS NOT DISCLOSED AS AN EXPERT, PURPOSEFULLY

7  SO.

8           AND, FINALLY, THE DEPARTMENT OF JUSTICE CAN'T SHOW

9  PREJUDICE.  THEY CITE IN THEIR REPLY BRIEF TO FTC V. NATIONAL

10 UROLOGICAL GROUP TO STATE THAT THIS IS A TRIAL BY AMBUSH.  AND,

11 YOUR HONOR, THERE, THAT CASE WAS TALKING ABOUT A WITNESS WHICH

12 WAS NOT ABLE TO BE DEPOSED.

13          THEY CAN'T SHOW PREJUDICE HERE BECAUSE MR. MCKAY WAS

14 DEPOSED TWICE AT TWO EXTENSIVE DEPOSITIONS.  AND THE DEPARTMENT

15 OF JUSTICE HAS HAD INFORMATION ABOUT THE APEX PROGRAM ALL

16 THROUGHOUT DISCOVERY FOR THE TWO YEARS -- TWO MONTHS -- TWO

17 YEARS AND EIGHT MONTHS.  THE DEPARTMENT OF JUSTICE CHOSE NOT TO

18 IDENTIFY A REASONABLE ACCOMMODATION AS A REMEDY UNTIL THEIR

19 EXPERT REPORT.  AND THEY FAILED TO CONDUCT AN ANALYSIS.  AND

20 THROUGH BINDING PRECEDENT THROUGH THE OLMSTEAD CASE, THAT WAS A

21 KEY ELEMENT OF A REASONABLE ACCOMMODATION.

22          AND, YOUR HONOR, FOR THESE REASONS, THE DEPARTMENT'S

23 MOTION TO INCLUDE THE DECLARATION OF MR. MCKAY SHOULD BE

24 DENIED.

25          THE COURT:  OKAY.  THANK YOU.

1          MS. ADAMS:  YOUR HONOR, THIS MOTION IS A SIMPLE

2     MATTER OF FAIRNESS.  WE ARE ASKING THE COURT TO EXCLUDE THE

3     DECLARATION SO WE CAN AVOID BEING PREJUDICED BY THE STATE'S

4     VIOLATION OF ITS OWN DISCOVERY OBLIGATIONS.

5          AS I SAID EARLIER, WE ASKED THE STATE TO PRODUCE

6     DOCUMENTS DESCRIBING THE COST OF APEX EXPANSION.  AND YOU CAN

7     SEE THAT CLEARLY INDICATED ON THE TIMELINE BEFORE YOU ON

8     DECEMBER 22ND.  THAT'S WHEN WE SENT THAT REQUEST TO THE STATE.

9          THE STATE ALSO REFERENCED THAT MR. MCKAY'S FIRSTHAND

10    KNOWLEDGE OF DBHDD'S OPERATIONS IS SUFFICIENT TO SATISFY THE

11    PERSONAL KNOWLEDGE OR PARTICULARIZED KNOWLEDGE REQUIREMENT.

12    THAT IS NOT THE CASE.  IT'S VERY IMPORTANT THAT WE FOCUS ON THE

13    TEXT OF THE DECLARATION ITSELF.  THE DECLARATION IS DEFICIENT

14    ON ITS FACE.  IT IS A THREE-PAGE BASELESS DECLARATION.  THE

15    ONLY DISCUSSION OF MR. MCKAY'S KNOWLEDGE IS THE ONE SENTENCE

16    TALKING ABOUT HIS PERSONAL FIRSTHAND KNOWLEDGE OF DBHDD'S

17    OPERATIONS.

18          THAT KIND OF KNOWLEDGE IS NOT SUFFICIENT, AND COURTS

19    HAVE AGREED WITH OUR ASSESSMENT.  IN THE GALLAGHER CASE OUT OF

20    THE NORTHERN DISTRICT OF GEORGIA, THERE WAS A CORPORATE

21    REPRESENTATIVE PROFFERED AS A LAY WITNESS.  HE HAD 15 YEARS OF

22    EXPERIENCE IN THE COMPANY.  BUT THE COURT FOUND THAT HE DID NOT

23    HAVE SUFFICIENT PERSONAL KNOWLEDGE OR PARTICULARIZED KNOWLEDGE

24    BECAUSE HE WAS NOT FAMILIAR WITH THE BASIS OF THE OPINIONS HE

25    WAS MAKING.  HE DID NOT HAVE ANY UNDERSTANDING OF THE

1    UNDERLYING INFORMATION.  THE COURT FOUND HE RELIED ON HEARSAY

2    INFORMATION.  AND HE WAS TALKING ABOUT THINGS THAT WERE NOT A

3    PART OF HIS ORDINARY COURSE OF EMPLOYMENT.

4            THE SAME THING IS TRUE HERE.  THERE IS NO EVIDENCE

5    ASSERTED IN THE DECLARATION OR IN THE STATE'S BRIEFS THAT MR.

6    MCKAY WAS PERSONALLY INVOLVED IN PREPARING THE DECLARATION --

7    EXCUSE ME, THE COST ESTIMATE.  AND THE STATE HAS NOT PROVIDED

8    ANY EVIDENCE OF THE CALCULATIONS PERFORMED.  THE SLIDE THAT

9    THEY SHOWED TITLED APEX EXPANSION CALCULATION SLIDE IS NOWHERE

10   TO BE FOUND IN THE DECLARATION.  IT'S NOT MENTIONED IN THEIR

11   BRIEF.  THIS IS BRAND NEW INFORMATION THAT WE'RE JUST HEARING

12   ABOUT TODAY.

13           THIS IS AN EXAMPLE OF, UNFORTUNATELY, THE TYPE OF

14   IMPROPER GAMESMANSHIP THAT OTHER COURTS HAVE SAID IS NOT

15   ACCEPTABLE AND UNDULY PREJUDICES THE OTHER PARTY.

16           IN ADDITION, THE STATE REFERENCES THE TAMPA BAY CASE,

17   AN ELEVENTH CIRCUIT CASE.  THAT IS CLEARLY DISTINGUISHABLE

18   HERE.  IN THAT CASE, THERE WERE THREE OFFICERS WHO WERE

19   EMPLOYED BY A SHIPBUILDING COMPANY.  THEY WERE INTIMATELY

20   INVOLVED IN SHIPBUILDING REPAIRS AND ASSESSING THE

21   REASONABLENESS OF THE BILLING FOR THOSE REPAIRS.

22           THAT IS NOT THE CASE HERE.  THERE IS NO EVIDENCE THAT

23   MR. MCKAY ROUTINELY ENGAGES IN COST ESTIMATE ANALYSIS FOR

24   STATEWIDE EXPANSION OF A PROGRAM LIKE APEX.  NOTHING IN THE

25   DECLARATION OR ANY OF THE STATE'S ARGUMENTS ASSERT THAT HE HAS

1    THAT KIND OF PERSONAL KNOWLEDGE.

2          IN ADDITION, AS I THINK YOUR HONOR'S QUESTIONS WERE

3    ALLUDING TO, THIS TESTIMONY REALLY IS MORE EXPERT TESTIMONY

4    THAN LAY OPINION BECAUSE IT IS BASED ON COMPLICATED

5    CALCULATIONS.  THIS IS NOT SIMPLE MATH.  THIS IS INVOLVING A

6    MULTI-FACETED ANALYSIS THAT INCLUDES A CONSIDERATION OF

7    MEDICAID COVERAGE.

8          THE WHOLE REASON DR. PUTNAM DISCUSSED EXPANDING APEX

9    WAS BECAUSE HE BELIEVES THAT THE STATE CAN LEVERAGE AVAILABLE

10   MEDICAID FUNDING TO EXPAND THE PROGRAM.  IN ORDER TO TALK ABOUT

11   A COST ANALYSIS REGARDING MEDICAID FUNDING, YOU NEED TO KNOW

12   CURRENT MEDICAID BILLING PRACTICES FOR YOUR PROVIDERS.  YOU

13   ALSO NEED TO KNOW IF YOU'RE GOING TO ADD ADDITIONAL MEDICAID

14   PROVIDERS TO YOUR SYSTEM AND WHAT KINDS OF SERVICES THEY ARE

15   GOING TO PROVIDE, HOW MANY MORE SCHOOLS, HOW MANY MORE

16   STUDENTS.  ALL OF THESE ARE COMPLICATED FACTORS.

17         AND IN THE WHITE CASE FROM THE SIXTH CIRCUIT, THAT

18   COURT FOUND THAT THE LOWER COURT ERRED IN ALLOWING MEDICAID --

19   EXCUSE ME, MEDICARE AUDITORS FROM TESTIFYING AS LAY WITNESSES

20   ABOUT MEDICARE COVERAGE, MEDICARE REIMBURSEMENT PRACTICES, NEW

21   PROVIDERS.  SO THAT CASE IS VERY HELPFUL TO THE COURT HERE IN

22   SHOWING THAT THIS IS COMPLICATED EXPERT ANALYSIS THAT SHOULD

23   NOT BE ALLOWED AS LAY TESTIMONY.

24         THE FINAL THING I'LL SAY, YOUR HONOR, IS, I'M NOT

25   SURE WHY THE STATE IS SAYING THAT IT DID NOT HAVE NOTICE OF OUR

166

1    REASONABLE MODIFICATIONS.  AS I DISCUSSED BEFORE, ON MARCH

2    10TH, 2023, THAT WAS FIVE MONTHS BEFORE EXPERT DISCOVERY

3    CLOSED.  AS YOU SEE ON OUR TIMELINE, WE EXPRESSLY NOTIFIED THE

4    STATE OF OUR PROPOSED REASONABLE MODIFICATION.

5             WE SAID, QUOTE, THE STATE CAN ALSO APPROPRIATELY

6    ADDRESS THE NEEDS OF STUDENTS CURRENTLY SEGREGATED IN THE GNETS

7    PROGRAM THROUGH REASONABLE MODIFICATIONS TO THE STATE SYSTEM

8    FOR DELIVERING COMMUNITY-BASED SERVICES, INCLUDING -- AND THEN

9    WE GO ON TO SAY -- BY EXPANDING APEX -- EXCUSE ME, BY EXPANDING

10   ACCESS TO SCHOOL-BASED INTERVENTIONS AND SUPPORTS SUCH AS THOSE

11   OFFERED THROUGH APEX.  THAT'S AN EXCERPT FROM OUR RESPONSE ON

12   MARCH 10TH.

13            SO THEY HAD SUFFICIENT KNOWLEDGE THAT THIS WAS WHAT

14   WE WERE PROPOSING, AND THEY COULD HAVE IDENTIFIED MR. MCKAY OR

15   AT LEAST DISCLOSED WHATEVER EVIDENCE CALCULATIONS, WHATEVER

16   THEY WANTED TO RELY ON IN ORDER TO INTRODUCE THIS DECLARATION.

17            SO WITH THAT, I WILL RESPECTFULLY REQUEST THAT THE

18   COURT GRANT OUR MOTION.  THANK YOU.

19            THE COURT:  THANK YOU.

20            ALL RIGHT.  AND THEN, FINALLY, I THINK WE HAVE DR.

21   ANDREW WILEY.

22            MR. GILLESPIE:  MAY IT PLEASE THE COURT --

23            THE COURT:  YES, SIR.

24            MR. GILLESPIE:  -- COUNSEL, MATTHEW GILLESPIE FOR THE

25   UNITED STATES.

1          AT ISSUE BEFORE THE COURT TODAY IS A LIMITED, NARROW

2   MOTION BY THE UNITED STATES TO PREVENT THE STATE FROM ELICITING

3   WHAT THE STATE'S REBUTTAL EXPERT FROM PROVIDING UNHELPFUL AND

4   INADMISSIBLE TESTIMONY.  WE DO NOT SEEK OVERBROAD EXCLUSION OF

5   DR. WILEY'S TESTIMONY OR REPORT IN ITS ENTIRETY.  INSTEAD, THE

6   MOTION CENTERS ON TWO CATEGORIES OF TESTIMONY DR. WILEY OFFERS

7   AND WILL LIKELY BE CALLED TO OFFER THAT WOULD WASTE THE COURT'S

8   TIME AND CONFUSE THE ISSUES, IF PERMITTED, TO BE OFFERED AT

9   TRIAL.

10          AS BRIEFING MAKES CLEAR, THERE'S ACTUALLY VERY LITTLE

11  ABOUT THE FACTUAL BASES WITH THE MOTION WITH WHICH THE STATE

12  DISAGREES.  AS A RESULT, I'LL BRIEFLY DISCUSS BOTH WILEY

13  OPINIONS DR. WILEY OFFERS IN SECTION ONE OF HIS REBUTTAL REPORT

14  ARE INADMISSIBLE LEGAL OPINION TESTIMONY AND WHY THE STATE'S

15  BRIEF MAKES CLEAR THAT AN ORDER FROM THIS COURT PREVENTING DR.

16  WILEY FROM TESTIFYING ABOUT THE GNETS PROGRAM IS APPROPRIATE.

17          FIRST, AS THE COURT IS AWARE, THE UNITED STATES MOVED

18  TO EXCLUDE SECTION ONE OF DR. WILEY'S REBUTTAL REPORT, AS WELL

19  AS THE NEW TESTIMONY DR. WILEY OFFERED RELATED TO THAT SECTION.

20  THE PARTIES AGREE, OR AT LEAST THE STATE DOESN'T CONTEST, THE

21  WELL-ESTABLISHED LEGAL PRINCIPLE THAT LEGAL OPINION TESTIMONY

22  IS INADMISSIBLE WHEN OFFERED BY EITHER LAY OR EXPERT WITNESSES.

23          INSTEAD, TO SAY THE OPINIONS THAT THE UNITED STATES

24  SEEKS TO EXCLUDE FROM SECTION ONE OF DR. WILEY'S REPORT ARE NOT

25  LEGAL OPINION TESTIMONY, OR IF THEY ARE, THEY ARE NONETHELESS

1    PERMISSIBLE.  AND THIS FLATLY CONTRADICTS BOTH DR. WILEY'S OWN

2    ADMISSIONS AND THE PLAIN LANGUAGE FROM THE REPORT.

3         FIRST, TO BEST UNDERSTAND WHAT SECTION ONE WAS

4    INTENDED TO BE, IT'S BEST TO LOOK TO DR. WILEY'S OWN

5    UNDERSTANDING OF HIS REPORT.  TIME AND TIME AGAIN, WHEN DR.

6    WILEY DESCRIBES HIS ANALYSIS IN SECTION ONE OF HIS REPORT, HE

7    CONFIRMED HE INTENDED THE SECTION TO BE SUBSTANTIVELY HIS LEGAL

8    ANALYSIS.

9         SECTION ONE OF DR. WILEY'S REPORT IS, AS HE AFFIRMED

10   IN HIS DEPOSITION, QUOTE, AN ANALYSIS AS TO HOW THE

11   REQUIREMENTS OF THE ADA AND I.D.E.A. SHOULD BE UNDERSTOOD.

12   THAT ANALYSIS OFFERS NOTHING THAT COUNSEL FOR THE STATE COULD

13   NOT ARGUE IN LEGAL BRIEFING AND APPLICABLE CASE LAW MAKES CLEAR

14   IS THE KIND OF TESTIMONY THAT IS PROPERLY EXCLUDED.

15        INDEED, IN SUMMARIZING SECTION ONE OF HIS REPORT, ON

16   PAGE THREE OF THE REPORT, DR. WILEY OFFERS HIS FRAMEWORK FOR

17   HOW ONE, PRESUMABLY THE COURT, SHOULD DETERMINE WHAT THE PHRASE

18   UNNECESSARILY SEGREGATED MEANS, QUOTE, UNDER THE ADA.  IN THAT

19   SAME SUMMARY, DR. WILEY SUGGESTS THAT, UNDER HIS ANALYSIS, THE

20   UNITED STATES' ASSERTIONS OF UNNECESSARY SEGREGATION OF

21   STUDENTS ARE UNSUBSTANTIATED BECAUSE ITS EXPERTS, QUOTE, DO NOT

22   CONSIDER I.D.E.A.'S PROCESSES AND THEIR EFFECT ON DECISIONS

23   RELATED TO A CHILD'S PLACEMENT.

24        IN OTHER WORDS, ACCORDING TO DR. WILEY, IN SECTION

25   ONE OF HIS REPORT, HE OPINES ON THE LEGAL RAMIFICATIONS OF

169

1    UNITED STATES' EXPERTS NOT WEIGHING THE I.D.E.A. IN THE WAY

2    THAT HE THINKS THEY SHOULD.  WHEN READ IN THIS CONTEXT THAT DR.

3    WILEY PROVIDED, SECTION ONE IS INDISPUTABLY LEGAL OPINION

4    TESTIMONY.  I'LL HIGHLIGHT A FEW EXAMPLES.  ON PAGE EIGHT AND

5    NINE, DR. WILEY OFFERS HIS STATUTORY INTERPRETATION OF THE

6    ADA-RELATED TERMS PARTICIPATION IN, BENEFITING FROM, AND

7    EXCLUSION AS APPLIED TO EDUCATION.

8            THEN, AS NOTED IN BRIEFING, NOT ONLY IS THAT LEGAL

9    OPINION TESTIMONY, BUT DR. WILEY'S NARROW CONSTRUCTION OF TITLE

10   II IS WRONG IN LIGHT OF ESTABLISHED CASE LAW.  THE REST OF

11   SECTION ONE CONSISTS OF DR. WILEY'S INTERPRETATION OF THE

12   REQUIREMENTS OF THE I.D.E.A., HIS CRITICISMS OF THE UNITED

13   STATES' LEGAL POSITION AS HE UNDERSTANDS IT, HIS OPINION ON THE

14   LEGAL IMPLICATIONS OF THE GNETS PROGRAM UNDER THE I.D.E.A., AND

15   HIS CRITICISMS OF WHAT HE TERMS THE FULL INCLUSION MOVEMENT.

16           EACH PORTION OF THIS SECTION CONVEYS OR RELIES ON DR.

17   WILEY'S LEGAL OPINIONS AND COULD JUST AS EASILY AND MORE

18   APPROPRIATELY BE FOUND IN THE LEGAL ARGUMENTS SECTION OF THE

19   BRIEF BY THE STATE.  THE STATE'S POST-HOC JUSTIFICATIONS FOR

20   SECTION ONE ARE BOTH CONTRADICTED BY DR. WILEY AND ARE

21   SIMILARLY UNSUPPORTABLE.

22           SO, FOR EXAMPLE, SECTION ONE OF DR. WILEY'S REPORT IS

23   NOT IN RESPONSE TO LEGAL ARGUMENTS MADE BY UNITED STATES'

24   EXPERTS.  THE STATE CITES NOTHING IN ITS BRIEF TO SUPPORT THAT

25   ASSERTION.  AND THAT'S BECAUSE THERE IS NOTHING THERE.

1        DR. PUTNAM MAKES ONE LONE REFERENCE TO THE I.D.E.A.

2   IN HIS REPORT.  IT'S IN A FOOTNOTE ON PAGE 33.  DR. MCCART

3   DOESN'T DIRECTLY REFERENCE THE I.D.E.A. AT ALL, BUT SHOWING ITS

4   INDIRECT REFERENCE SUCH AS WHERE SHE DISCUSSES THE IEP PROCESS.

5        NOW, ONCE AGAIN, THE MOST COMPELLING EVIDENCE OF HIS

6   INTENT IS WHAT DR. WILEY WRITES.  DR. WILEY STATED IN HIS

7   REPORT WAS WRITTEN IN RESPONSE TO EIGHT STATEMENTS MADE BY THE

8   UNITED STATES' EXPERTS.  THOSE EIGHT STATEMENTS ARE IDENTIFIED

9   ON PAGES ONE AND TWO OF HIS REPORT.  AND NONE OF THESE

10  STATEMENTS DISCUSS EITHER THE I.D.E.A. OR THE ADA.

11       ULTIMATELY, THE STATE'S ARGUMENTS IN DEFENSE OF

12  SECTION ONE OF DR. WILEY'S BRIEF DO NOT PASS MUSTER.  INSTEAD,

13  THE COURT SHOULD LOOK TO THE PLAIN TEXT IN THAT SECTION OF THE

14  REPORT IN DR. WILEY'S OWN WORDS TO CONCLUDE THAT SECTION ONE OF

15  THE REBUTTAL REPORT IS INADMISSIBLE LEGAL OPINION TESTIMONY.

16       SHIFTING NOW TO THE SECOND HALF OF UNITED STATES'

17  MOTION, THE BASIS FOR THE UNITED STATES SEEKING A RULING

18  PREVENTING DR. WILEY FROM OPINING ON THE GNETS PROGRAM IS

19  SUBSTANTIVELY UNCONTESTED.  AS THE STATE WROTE IN ITS BRIEF,

20  QUOTE, DR. WILEY DID NOT CONDUCT AN EVALUATION OF THE SERVICES

21  PROVIDED THROUGH THE GNETS PROGRAM.

22       BRIEF AT 14, QUOTE, DOJ SEEKS TO EXCLUDE TESTIMONY

23  THAT THE STATE AND DR. WILEY AGREE HE WAS NOT ENGAGED TO

24  TESTIFY ABOUT.

25       BRIEF AT 15, QUOTE -- AND THIS IS REFERRING TO DR.

1    WILEY -- HIS TESTIMONY WAS NOT ON GNETS.  IT WAS NOT ON GEORGIA

2    SPECIFICALLY.

3          BRIEF AT 15, QUOTE, DR. MCCART WAS HIRED TO OFFER

4    EXPERT TESTIMONY ON THE GNETS PROGRAM.  DR. WILEY WAS NOT.

5          BRIEF AT 17, NOTE TEN.  NOT ONLY HAS THE STATE

6    CONCEDED THAT DR. WILEY DID NOT PERFORM THE TYPE OF ANALYSIS

7    NEEDED TO PROVIDE EXPERT TESTIMONY ON THE GNETS PROGRAM, BUT

8    THE STATE EVEN ACKNOWLEDGES THAT THE SCOPE OF DR. WILEY'S WORK

9    DIFFERED IN KIND FROM THAT OF THE UNITED STATES' EXPERTS.

10          WHEN STRIPPED AWAY FROM EXTRANEOUS ARGUMENT, THERE'S

11    NO DISPUTE BETWEEN THE PARTIES AS TO THE SECOND CATEGORY OF

12    TESTIMONY UNITED STATES SEEKS TO EXCLUDE.  BOTH PARTIES AGREE

13    DR. WILEY DID NOT EVALUATE AND WAS NOT RETAINED TO REVIEW THE

14    GNETS PROGRAM.  AND, AS A RESULT, HE SHOULD BE BARRED FROM

15    OFFERING ANY SUCH TESTIMONY AT TRIAL.

16          FOR THESE REASONS, WE ASK THE COURT GRANT THE UNITED

17    STATES' MOTION.

18          I RESERVE THE BALANCE OF MY TIME.

19          THE COURT:  THANK YOU.

20          MR. GILLESPIE:  THANK YOU.

21          MS. JOHNSON:  GOOD AFTERNOON, JUDGE.

22          THE COURT:  GOOD AFTERNOON.

23          MS. JOHNSON:  MELANIE JOHNSON ON BEHALF OF THE STATE

24    OF GEORGIA.

25          IT IS HARD TO UNDERSTAND WHY DOJ BROUGHT THE WILEY

172

1    MOTION.  THE STATE SAID THIS IN ITS OPPOSITION BRIEF.  AND

2    AFTER A COMPLETE BRIEFING ON THE TOPIC AND ORAL ARGUMENT TODAY,

3    THAT STILL REMAINS TRUE.  AND THIS IS BECAUSE DOJ'S POSITION

4    WITH RESPECT TO DR. WILEY IS CONFOUNDING.

5            ON THE ONE HAND, THE MOTION INDICATES THAT DOJ HAS A

6    FUNDAMENTAL MISUNDERSTANDING OF WHAT DR. WILEY'S ROLE IS IN

7    THIS CASE.  WHILE ON THE OTHER HAND, THEY DO READILY ADMIT

8    THAT, LIKE DR. PUTNAM, HE WAS NOT PROFFERED TO PROVIDE

9    TESTIMONY ON GNETS.  THIS CONCESSION BEGS THE QUESTION, WHAT

10   WAS THE POINT OF THIS MOTION.

11           BUT BEFORE DIGGING INTO DOJ'S MOTION AND WHAT IT

12   CHALLENGES, IT'S JUST AS IMPORTANT TO EMPHASIZE WHAT IS NOT

13   CHALLENGED HERE, AND THAT IS DR. WILEY'S ACTUAL OPINIONS IN

14   THIS CASE.  AND THERE ARE FIVE OF THEM.

15           FIRST, THAT THE I.D.E.A. SHOULD BE CONSIDERED

16   ALONGSIDE THAT OF THE ADA, AND DOJ'S EXPERTS' FAILURE TO DO SO

17   UNDERMINES THEIR OPINIONS IN THIS CASE.

18           SECOND, THAT THE VAST MAJORITY OF STUDENTS, OR THE

19   IDEA THAT THE VAST MAJORITY OF STUDENTS WITH BEHAVIOR-RELATED

20   DISABILITIES CAN BE TAUGHT IN GEN ED IS A GENERALIZATION AND

21   UNDERESTIMATES THE DIVERSITY AND COMPLEXITY OF THE EDUCATIONAL

22   DIFFICULTIES EXPERIENCED BY THESE STUDENTS.

23           THIRD, RESEARCH DOES NOT SHOW THAT PLACEMENT IN GEN

24   ED IS CATEGORICALLY BETTER THAN PLACEMENT IN SPECIALIZED

25   SETTINGS.

1          FOURTH, LIMITATIONS OF EDUCATIONAL SERVICES AND

2   SUPPORTS THAT ARE INTENDED TO MAKE GEN ED APPROPRIATE AND

3   EFFECTIVE FOR STUDENTS WITH BEHAVIOR-RELATED DISABILITIES CASTS

4   DOUBT ON WHETHER THOSE STUDENTS CAN SUCCEED IN GEN ED.

5          AND, LASTLY, SEPARATE PLACEMENTS CAN BE MORE

6   APPROPRIATE AND EFFECTIVE THAN GENERAL EDUCATION.  INSTEAD,

7   SPECIFICALLY, DOJ SEEKS TO EXCLUDE TWO CATEGORIES:  FIRST,

8   SECTION ONE OF DR. WILEY'S REPORT BECAUSE IT IS PURPORTEDLY

9   LEGAL OPINION.  AND, SECOND, TESTIMONY THAT IS NOT IN THE

10  REPORT AND DOES NOT EXIST.

11         I WILL FIRST DISCUSS THE FIRST CATEGORY, WHICH -- THE

12  FIRST CATEGORY THAT THEY ARGUE IT SHOULD BE EXCLUDED BECAUSE

13  IT'S LEGAL OPINION.  IN SECTION ONE, DR. WILEY PROVIDES CONTEXT

14  OR A ROADMAP, IF YOU WILL, FOR THE REST OF HIS REPORT.  HE

15  TALKS ABOUT THE ADA AND HE TALKS ABOUT THE I.D.E.A.  AND HE

16  TALKS ABOUT COMMONLY-USED TERMS SUCH AS LRE, LEAST RESTRICTIVE

17  ENVIRONMENT, AND THE CAP, OR THE CONTINUUM OF ALTERNATIVE

18  PLACEMENTS, IN ORDER TO INTRODUCE THESE TERMS AND GIVE A

19  PRACTITIONER'S PERSPECTIVE ON THE INTERRELATEDNESS OF THESE

20  LAWS AND LEGAL PRINCIPLES IN THE REAL WORLD.

21         SECTION ONE IS SIMPLY NOT LEGAL OPINION.  AND DOJ

22  HASN'T IDENTIFIED ANY AUTHORITY THAT SAYS AN EXPERT CAN'T TALK

23  ABOUT THE LAW, NOR COULD THEY.  THEIR OWN EXPERTS TALK ABOUT

24  LAW.  IT'S THAT YOU CAN'T PROVIDE A LEGAL OPINION OR INTERPRET

25  A STATUTE OR OFFER AN OPINION ON ULTIMATE ISSUE OF LAW, SUCH

174

1   AS, HAS THE ADA BEEN VIOLATED.  DR. WILEY DOES NONE OF THESE

2   THINGS.

3            AGAIN, WE'RE TALKING ABOUT THE ADA IN THE EDUCATION

4   SETTING.  AND SO DR. WILEY'S PROVIDING A PRACTITIONER'S

5   PERSPECTIVE FROM THAT EDUCATION-SETTING STANDPOINT.  AND THIS

6   TYPE OF OVERVIEW SIMPLY DOES NOT ENCROACH ON THE COURT'S DOMAIN

7   AS THE SOURCE OF THE LAW.

8            ONE THING THAT DOJ DOES REPEATEDLY IS BRING UP ONE

9   LINE FROM DR. WILEY'S DEPOSITION ABOUT HIS SORT OF FRAMING OF

10  WHAT HE SAID IN HIS REPORT.  AND HE SAID THAT A COUPLE OF TIMES

11  IN HIS REPORT AND THEY BROUGHT IT UP.  THEY SAID IT A COUPLE OF

12  TIMES IN THEIR MOTION.  AND THEY BROUGHT IT UP TODAY.

13           AND I THINK IT'S IMPORTANT TO REMEMBER THAT THERE'S

14  BEEN NO AUTHORITY OFFERED THAT WHAT AN EXPERT SAYS IN THEIR

15  DEPOSITION CONTROLS OVER HOW THEIR REPORT SHOULD BE CONSIDERED

16  AND WHETHER IT'S LEGAL OPINION OR NOT.  AND, ALSO, IT WAS DR.

17  MCCART THAT OPINED ON THE MEANING OF UNNECESSARY SEGREGATION

18  AND WHETHER THAT WAS HAPPENING IN THIS CASE.  AND DR. WILEY

19  SIMPLY RESPONDED TO THAT.

20           SO IF -- IF DR. MCCART CAN OPINE ON UNNECESSARY

21  SEGREGATION, THEN DR. WILEY CAN, AS WELL, AS A REBUTTAL EXPERT.

22           BUT EVEN IF THE COURT WERE TO FIND THAT SOME OF

23  SECTION ONE CONTAINS LEGAL OPINION -- AND IT DOESN'T -- BUT

24  THIS IS NOT GROUNDS TO STRIKE ALL OF SECTION ONE IN ITS

25  ENTIRETY.  AND THAT IS BECAUSE THE VAST MAJORITY OF SECTION ONE

1    IS UNAMBIGUOUSLY OBJECTIVELY NOT LEGAL OPINION.

2         FOR EXAMPLE, LET'S TALK ABOUT TABLE TWO IN SECTION

3    ONE, WHICH I SUSPECT, READING BETWEEN THE LINES, MAY BE PART OF

4    THE REASON THAT DOJ REALLY WANTS ALL OF SECTION ONE STRICKEN.

5    TABLE TWO CONTAINS GOVERNMENT DATA SOURCED FROM DOJ'S SISTER

6    AGENCY, THE UNITED STATES DEPARTMENT OF EDUCATION.  THE DATA

7    SHOWS THAT GEORGIA IS ACTUALLY ABOVE THE NATIONAL AVERAGE IN

8    ITS EDUCATION OF STUDENTS WITH EBD.

9         THE NATIONAL PERCENTAGE OF STUDENTS WITH EBD TAUGHT

10   80 PERCENT OR MORE OF THE TIME IN A GENERAL EDUCATION SETTING

11   IS 50.2 PERCENT NATIONWIDE.  IN GEORGIA, IT'S HIGHER, AT 52

12   PERCENT.  AND THE NATIONAL PERCENTAGE OF STUDENTS WITH EBD

13   TAUGHT IN A SEPARATE SCHOOL NATIONWIDE IS 12.3 PERCENT.  IN

14   GEORGIA IT'S LOWER AT JUST 9.9 PERCENT.

15        DATA IS NOT AN OPINION, AND IT'S CERTAINLY NOT A

16   LEGAL OPINION.  THIS DATA IS BAD FOR DOJ.  AND THEY

17   UNDERSTANDABLY WANT IT STRICKEN FROM DR. WILEY'S REPORT.  BUT

18   THEY CAN'T BLATANTLY MISCHARACTERIZE DATA AS IMPROPER LEGAL

19   OPINION IN ORDER TO ACHIEVE THEIR DESIRED OUTCOME.

20        I'LL MOVE ON NOW TO THE SECOND CATEGORY, WHICH IS

21   TESTIMONY ON GNETS.  AND AS I NOTED PREVIOUSLY, DOJ'S POSITION

22   WITH RESPECT TO THE SECOND CATEGORY OF THINGS THEY WANT

23   EXCLUDED IS PARTICULARLY CONFUSING, GIVEN THAT THEY READILY

24   ADMIT DR. WILEY WAS NOT OFFERED TO PROVIDE TESTIMONY ON GNETS

25   AND THAT HE HAS NOT DONE SO IN THIS CASE.

1          MAYBE IF DOJ COULD IDENTIFY A SPECIFIC PART OF THE

2     REPORT THAT THEY WANT EXCLUDED ON THESE GROUNDS, THE REQUEST

3     COULD BE BETTER UNDERSTOOD, BUT THEY HAVEN'T IDENTIFIED ANY

4     SUCH PORTION OF THEIR REPORT.  AND THEIR REQUEST IS CONFUSING,

5     PARTICULARLY WHEN KEEPING IN MIND THAT AN EXPERT CAN'T OFFER

6     NEW OPINION TESTIMONY AT TRIAL THAT WAS NOT PREVIOUSLY

7     DISCLOSED IN THEIR EXPERT REPORT.  AND THAT'S FEDERAL RULE OF

8     CIVIL PROCEDURE 26(A)(2)(B).

9          SO DR. WILEY HASN'T OFFERED AN OPINION ON GNETS IN

10    HIS REPORT.  THE STATE HASN'T DISCLOSED DR. WILEY AS AN EXPERT

11    THAT WILL OFFER SUCH AN OPINION.  AND FEDERAL RULE 26 PROHIBITS

12    DR. WILEY FROM OFFERING NEW OPINION TESTIMONY AT TRIAL NOT IN

13    HIS REPORT.

14         WHEN TAKING ALL OF THIS INTO CONSIDERATION, THE

15    MOTION IS UNNECESSARY AND IT'S MERITLESS.  IT'S ESSENTIALLY

16    ASKING THE COURT TO AFFIRMATIVELY AND UNNECESSARILY STATE IN AN

17    ORDER WHAT IS ALREADY CLEAR:  DR. WILEY IS NOT PROVIDING AND

18    WILL NOT PROVIDE TESTIMONY ON GNETS AT TRIAL.

19         MOVING ON TO SOME OF DOJ'S OTHER ARGUMENTS, MUCH OF

20    DOJ'S ARGUMENTS IN ITS MOTION AND TODAY CONSISTS OF WHAT DR.

21    WILEY DID NOT DO.  BUT NONE OF THIS MATTERS, BECAUSE THESE

22    ITEMS OR TASKS WERE NOT NECESSARY FOR DR. WILEY TO RENDER THE

23    OPINION THAT HE DID PROVIDE IN THIS CASE.

24         FOR EXAMPLE, IN OUR MOTION, DOJ NOTES THAT DR. WILEY

25    DID NOT REVIEW STUDENT IEP'S FOR APPROPRIATENESS AND FIDELITY

1    OF IMPLEMENTATION.  THIS DOESN'T MATTER, BECAUSE DR. WILEY, AS

2    A REBUTTAL WITNESS AND FOR THE PURPOSES FOR WHICH HE WAS

3    ACTUALLY ENGAGED, DID NOT NEED TO REVIEW IEP'S TO PROVIDE THE

4    OPINION THAT HE DID PROVIDE.  HE ISN'T AN AFFIRMATIVE EXPERT

5    OFFERING OPINION ON THE APPROPRIATENESS OF STUDENTS IN GNETS'

6    IEP'S.  AND NOTABLY, THOUGH DOJ LISTS THINGS THAT DR. WILEY DID

7    NOT DO, THEY DO NOT ARGUE THAT HIS FAILURE TO DO THESE THINGS

8    IS FATAL TO HIS REPORT.

9            AND IT'S WORTH NOTING THAT DOJ'S OWN EXPERTS DID NOT

10   DO THIS, EITHER.  YOU WILL HEAR DOJ TOUT THAT DR. MCCART

11   REVIEWED SOMEWHERE AROUND 65 IEP'S.  BUT WHEN YOU CONSIDER

12   THERE ARE APPROXIMATELY 3,000 STUDENTS IN GNETS, THAT'S JUST

13   TWO PERCENT.  AND DR. PUTNAM LOOKED AT SEVEN.  AND THESE ARE

14   THE AFFIRMATIVE EXPERTS WHO ARE PROVIDING TESTIMONY ON GNETS.

15           LASTLY, REGARDING THE STATE'S ARGUMENTS ON THE

16   HYPOTHETICAL STUDENT, THE STATE'S POINT IS THIS:  NO ONE IN

17   THIS CASE, NOT DR. WILEY, NOT DR. MCCART, NOT DR. PUTNAM, HAS

18   LOOKED AT EACH OF THE 3,000 INDIVIDUAL STUDENTS IN THE GNETS

19   PROGRAM, IDENTIFIED THEM, AND MADE A DETERMINATION ABOUT WHAT

20   THEIR NEEDS ARE.  SO WE ARE TALKING IN GENERALITIES, OR, IN

21   OTHER WORDS, THEORETICALLY, BECAUSE WE ARE TALKING ABOUT

22   STUDENTS WHO ARE UNIDENTIFIED AND WHOSE NEEDS ARE NOT ACTUALLY

23   KNOWN.

24           SO THIS CASE HAS ALWAYS BEEN ABOUT HYPOTHETICAL

25   STUDENTS.  AND IF THE DOJ WANTS OR AGREES THAT A MORE

178

1    INDIVIDUALIZED ANALYSIS IS REQUIRED, THEN DR. WILEY IS OUT.

2    BUT SO ARE DR. PUTNAM AND DR. MCCART.

3         IT IS DOJ WHO HAS OFFERED AFFIRMATIVE EXPERTS SEEKING

4    TO PROVIDE EXPERT OPINION ON INDIVIDUAL NEEDS USING WHAT ARE

5    REALLY GENERALITIES.  AND YOU'VE ALREADY HEARD TODAY WHY THIS

6    IS A PROBLEMATIC APPROACH.

7         IN CONCLUSION, YOUR HONOR, WE ASK YOU TO DENY DOJ'S

8    MOTION.  DR. WILEY IS NOT ARGUING A LEGAL OPINION.  AND EVEN IF

9    HE WERE IS NOT GROUNDS TO EXCLUDE ALL OF SECTION ONE OF HIS

10   REPORT.

11        SECOND, DR. WILEY IS NOT AN AFFIRMATIVE EXPERT

12   OFFERING OPINION TESTIMONY ON GNETS IN THIS CASE.  THAT IS NOT

13   GROUNDS TO GRANT A MOTION TO PROHIBIT TESTIMONY THAT IS NOT IN

14   THE REPORT AND DOES NOT EXIST.

15        THANK YOU.

16        THE COURT:  THANK YOU.

17        MR. GILLESPIE:  YOUR HONOR, I'M JUST GOING TO TAKE A

18   COUPLE MINUTES TO RESPOND TO A COUPLE OF DISCRETE POINTS RAISED

19   BY THE STATE.

20        EARLY ON, THE STATE CHARACTERIZED SECTION ONE OF DR.

21   WILEY'S REPORT AS SETTING FORTH HOW THE I.D.E.A. SHOULD BE

22   CONSIDERED ALONG WITH THE ADA.  AND THAT IS PRECISELY THE ISSUE

23   HERE, IS THAT DR. WILEY IN SECTION ONE DOES PURPORT TO SET

24   FORTH HOW THE I.D.E.A. AND THE ADA SHOULD INTERRELATE WITH ONE

25   ANOTHER.  BUT THAT IS A LEGAL QUESTION.  IT'S A LEGAL QUESTION

1    THAT THE STATE HAS RAISED IN BRIEFING THAT WE HAVE TALKED ABOUT

2    HERE TODAY AND IS NOT SOMETHING THAT'S APPROPRIATE FOR A

3    SPECIAL EDUCATION EXPERT TO OPINE ON AT TRIAL.

4            THE STATE ALSO TRIED TO DRAW A COMPARISON BETWEEN DR.

5    MCCART'S OPINIONS ON THE UNNECESSARY SEGREGATION AND EQUATING

6    THOSE WITH SECTION ONE OF DR. WILEY'S REPORT.  I THINK THERE'S

7    A REALLY IMPORTANT DISTINCTION HERE TO DRAW.

8            DR. MCCART, AS I REFERENCED EARLIER TODAY, GAVE HER

9    OPINIONS ON UNNECESSARY SEGREGATION AFTER A VERY

10   FACTUALLY-INTENSIVE REVIEW OF THE GNETS PROGRAM.  DR. WILEY'S

11   OPINIONS ON UNNECESSARY SEGREGATION, ON THE OTHER HAND, ARE

12   COMPLETELY DIVORCED FROM ANY FACTS RELATED TO THE GNETS

13   PROGRAM.  AND THAT'S PART OF THE ISSUE.  HIS OPINIONS ARE

14   ABOUT, ON HOW THE COURT SHOULD CONSTRUE CERTAIN LAWS TO RELATE

15   WITH ONE ANOTHER AND HOW IT SHOULD BE INTERPRETED IN THE

16   CONTEXT OF EDUCATION.

17           THE STATE ALSO RAISED QUESTION ABOUT WHY THE UNITED

18   STATES MOVED TO EXCLUDE DR. WILEY'S TESTIMONY AS IT RELATES TO

19   THE GNETS PROGRAM.  AND THERE ARE A COUPLE OF POINTS THAT I

20   WANT TO RAISE.

21           NOW, DESPITE THE FACT THAT DR. WILEY DID NOT EVALUATE

22   THE GNETS PROGRAM, HIS REPORT DOES MAKE PERIODIC CONCLUSORY

23   STATEMENTS ABOUT IT.  FOR EXAMPLE, ON PAGE TEN, HE DISCUSSES

24   THAT, IN HIS VIEW, PLACEMENT OF GNETS IS BASED ON THE NEEDS OF

25   THE INDIVIDUAL STUDENTS.

1        ON PAGE 12, HE SAYS THAT, PRIOR TO PLACEMENT IN

2   GNETS, IEP TEAMS CONSIDER AND DOCUMENT SERVICES AND SUPPORTS

3   WERE PROVIDED IN LESS RESTRICTIVE ENVIRONMENTS.

4        ON PAGE 37, HE PARAPHRASES INDIVIDUALS THAT HE SPOKE

5   WITH IN SAYING THAT PARENTS ARE RELIEVED TO KNOW WHEN THEIR

6   STUDENTS ARE PLACED IN GNETS.  GNETS STAFF ARE TRAINED AND

7   FOCUSED ON SUPPORTING STUDENTS WITH BEHAVIOR-RELATED

8   DISABILITIES.  THIS HE SAYS HE LEARNED AFTER SPEAKING WITH

9   SEVERAL GNETS PROGRAM DIRECTORS.

10        THESE TYPES OF OPINIONS ARE UNRELIABLE AND UNHELPFUL,

11   AS IS THE STATE'S OVEREXTENSION OF TABLE TWO, TRYING TO APPLY

12   DR. WILEY'S INCLUSION OF THAT TABLE TO THE GNETS PROGRAM IN THE

13   STATE OF GEORGIA.

14        IN THE END, YOUR HONOR, WE THINK THAT IT'S

15   STRAIGHTFORWARD, THAT SECTION ONE IS AS DR. WILEY CLAIMS IT TO

16   BE, HIS ANALYSIS AS TO HOW THE REQUIREMENTS OF THE ADA AND

17   I.D.E.A. SHOULD BE UNDERSTOOD, AND THAT THE SECOND GROUNDS FOR

18   UNITED STATES' MOTION ARE UNCONTESTED AND, THEREFORE, THE

19   MOTION SHOULD BE GRANTED.

20        THANK YOU.

21        THE COURT:  ALL RIGHT.  AND BEFORE YOU STEP AWAY,

22   BECAUSE I HAVE NOT LOOKED AT THE --

23        MR. GILLESPIE:  YES, YOUR HONOR.

24        THE COURT:  WELL, LET ME ASK YOU:  IS IT CLEARLY

25   MARKED WHAT PORTIONS OF HIS OPINION YOU SEEK TO EXCLUDE?  IS IT

1   SECTION ONE IN ITS ENTIRETY, OR ARE THERE CERTAIN PARTS?  I

2   MISSED THAT, BECAUSE I THINK THE COUNTERARGUMENT WAS THAT, YOU

3   KNOW, ALL OF IT SHOULD BE IN.  BUT EVEN IF NOT, ONLY A PORTION

4   SHOULD COME OUT UNDER YOUR ARGUMENT.

5          WHEN I GO LOOK AT IT, WILL IT BE CLEAR TO ME WHICH

6   PORTIONS YOU ARE SEEKING TO ELIMINATE OUT, SINCE YOU CAN SEE

7   THAT IT DOESN'T APPLY TO THE ENTIRE?

8          MR. GILLESPIE:  YES, YOUR HONOR.  WE'RE SEEKING TO

9   EXCLUDE THE ENTIRETY OF JUST SECTION ONE OF HIS REPORT.  THERE

10  ARE FIVE.  FOR THE FIRST PART OF OUR -- OUR MOTION WE'RE JUST

11  FOCUSED ON SECTION ONE.  AND IT'S ARGUED THAT, EVEN THOUGH

12  THERE ARE PARTS OF IT THAT ARE MORE OR LESS DIRECTLY LEGAL

13  OPINION, THE PURPOSE OF THAT SECTION AS SET FORTH BY DR. WILEY

14  MAKES CLEAR THAT IT'S ALL INTERCONNECTED.  IT IS HIM TRYING TO

15  SET FORTH A FRAMEWORK FOR HOW THE COURT SHOULD UNDERSTAND THE

16  I.D.E.A. AND ADA.

17         THE COURT:  SO SECTION ONE IN ITS ENTIRETY.

18         MR. GILLESPIE:  YES, YOUR HONOR.

19         THE COURT:  OKAY.  ALL RIGHT.  THANK YOU SO MUCH.

20         MR. GILLESPIE:  THANK YOU, YOUR HONOR.

21         THE COURT:  ALL RIGHT.

22         YES.

23         MS. COHEN:  YOUR HONOR, I DID MENTION IN MY ARGUMENT

24  TWO CASES THAT WE HAVE NOT FURNISHED THE COURT WITH.  WOULD YOU

25  LIKE ME TO HAND THEM UP?  I ALSO HAVE COPIES FOR OPPOSING

1   COUNSEL.

2          THE COURT:  THAT'S FINE.  I DON'T THINK I'VE GOTTEN

3   HARD COPIES ON ANY OTHER CASES, BUT IF YOU HAVE THEM PREPARED,

4   THAT'S FINE.

5          THANK YOU.

6          OKAY.  IS THERE ANYTHING ELSE, AS SHE DOES THAT, FROM

7   ANYONE ELSE?

8          ALL RIGHT.  I WILL TAKE THIS UNDER ADVISEMENT.  THANK

9   YOU.

10         I WILL TELL YOU ALL THAT NORMALLY -- AND I THINK

11  THOSE OF YOU WHO HAVE HAD CASES BEFORE ME WOULD PROBABLY KNOW

12  THIS ALREADY -- NORMALLY IN PREPARATION FOR A HEARING, I KIND

13  OF LOOK AT EVERYTHING BEFORE THE HEARING.  THIS CASE, TO BE

14  QUITE HONEST -- AND I'M TELLING ON MYSELF -- IS SO MASSIVE, I

15  THOUGHT I'D DO IT DIFFERENTLY.  AND SO I DID NOT LOOK AT ALL OF

16  THE DEPOSITIONS AND EVERYTHING AS CLOSELY AS I NORMALLY WOULD

17  BEFOREHAND.  I KIND OF JUST REVIEWED IT IN SUMMARY FORM.

18         I WILL TELL YOU THAT, BASED ON WHAT I'VE HEARD TODAY

19  -- AND THESE ARE JUST INCLINATIONS JUST TO GIVE YOU SOME

20  GUIDANCE; THESE ARE NOT PRONOUNCEMENTS OF ANY RULINGS -- THE

21  ONLY -- WITH RESPECT TO THE FOUR WITNESSES WE TALKED ABOUT, THE

22  ONLY ONE I'M CONCERNED ABOUT, BASED ON JUST WHAT I'VE HEARD

23  HERE -- AND EVEN THAT I'LL LOOK AT MORE CLOSELY -- IS DANTE

24  MCKAY FOR VARIOUS REASONS.  THE OTHER ONES I DIDN'T HEAR A LOT

25  THAT WOULD CONCERN ME.  BUT I'M STILL GOING TO GO LOOK AT

183

1    EVERYTHING IN ITS ENTIRETY AND CONSIDER THE ARGUMENTS THAT WERE

2    MADE.

3              AND THE MOTION FOR SUMMARY JUDGMENT AND MOTION FOR

4    PARTIAL SUMMARY JUDGMENT REMAIN UNDER ADVISEMENT AS WELL.

5              IS THERE ANYTHING ELSE AT THIS TIME BEFORE WE DEPART,

6    ON BEHALF OF THE PLAINTIFF?

7              MS. WOMACK:  NO, YOUR HONOR.

8              THE COURT:  ON BEHALF OF THE DEFENDANT.

9              MR. BELINFANTE:  NO, YOUR HONOR.

10             THE COURT:  ALL RIGHT.  THE FINAL THING I WANT TO SAY

11   -- GOOD AFTERNOON, SIR -- IS, I KNOW THERE WAS SOME CONFUSION

12   GOING ON OVER THERE.  AND I ASKED MY CRD TO SEE WHAT IT WAS.

13   APPARENTLY DIFFERENT JUDGES HAVE DIFFERENT RULES ABOUT PHONES

14   BEING USED IN THE COURTROOM.  I DON'T HAVE THAT.  AND SO I'VE

15   NOT DIRECTED ANYONE TO SAY ANYTHING TO ANYONE.  I WANT THAT

16   KNOWN, AS LONG AS PHONES ARE NOT BEING USED TO RECORD OR TAKE

17   PICTURES, THINGS AGAINST OUR RULES, I DON'T HAVE AN ISSUE WITH

18   THAT.

19             SO MY APOLOGIES IF ANYONE WAS -- I WON'T SAY -- I

20   DON'T WANT TO SAY ANYTHING AGAINST OUR CSO'S, BECAUSE I

21   APPRECIATE ALL OF THE WORK THAT YOU ALL DO IN ENFORCING ALL OF

22   THE RULES.  BUT, AGAIN, DIFFERENT JUDGES HAVE DIFFERENT RULES,

23   AND I'VE NEVER COMMUNICATED ANY RULE THAT I MIGHT HAVE

24   REGARDING PHONE USAGE IN THE COURTROOM, UNDERSTANDING THAT

25   THOSE BASIC RULES OF RECORDING AND TAKING PICTURES IS NOT

184

1    PERMISSIBLE IN THE ENTIRE COURTHOUSE.

2              ALL RIGHT.  IF THERE IS NOTHING ELSE AT THIS TIME, WE

3    ARE ADJOURNED.  THANK YOU.

4              THE COURTROOM SECURITY OFFICER:  ALL RISE.  COURT

5    STANDS IN RECESS.

6                    (PROCEEDINGS CONCLUDED AT 3:39 P.M.)

7                         -   -   -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

185

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF GEORGIA

3    CERTIFICATE OF REPORTER

4

5

6              I DO HEREBY CERTIFY THAT THE FOREGOING PAGES ARE A

7    TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS TAKEN DOWN BY

8    ME IN THE CASE AFORESAID.

9              THIS, THE 10TH DAY OF MAY, 2024.

10

11

12

13                              /S/ ELIZABETH G. COHN

                                _____
14                              ELIZABETH G. COHN, RMR, CRR
                                OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25